# Exhibit F

| Subject | **Paige Complaint** *Paige v. Google, et al.*, No. 1:20-cv-03158, ECF No. 1 | **Developer Complaint** *Pure Sweat Basketball Inc., et al. v. Google LLC, et al.*, No. 3:20-cv-05792, ECF No. 56 | **DOJ Complaint** *United States v. Google LLC, et al.*, No. 1:20-cv-03010, ECF No. 1 |
|---|---|---|---|
| Development of Search and AdWords | Google was launched in 1998 as a general online search engine that served users web results in response to online queries. Google's key innovation was its PageRank algorithm, which ranked the relevance of a webpage by assessing how many other webpages linked to it. PageRank enabled Google to improve the quality of its search results even as the web rapidly grew in contrast with the technology used by rival search engines. While Google had entered a crowded field, it had become the world's largest search engine by 2000. Google launched AdWords, an online advertising service that let businesses purchase keyword advertising to appear on Google's search results page—an offering that would evolve to became the heart of Google's business model—later that year.<br><br>Compl. at ¶ 12. | The market for licensable smart mobile OSs is characterized by high barriers to entry and expansion. First, development of a smart mobile OS requires an enormous investment of time and money in research and development. Google claims, for example, that it subsidized the development of Android through advertising revenue derived from Google Search and Chrome.<br><br>Compl. at ¶ 50. | Search advertising first appeared on Google in 2000. During that same year Google launched AdWords, its buying platform for search ads. Two years ago, Google rebranded AdWords as Google Ads.<br><br>Compl. at ¶ 26. |
| Android Being Open-Source Was a Key to It's Popularity | In order to establish dominance, Google released the Android mobile operating system. Google released the Android code for free as "open source," which means that anyone could access the code and modify it. Modifying the operating system constitutes a "fork."<br><br>Compl. at ¶ 19. | Google owns and controls the Android OS. Ostensibly, the code for the operating system itself is open-source. According to Google, anyone can download, use, and modify the Android OS source code, as long as Google allows it. Google calls this aspect of its OS the Android Open Source Project (AOSP). As Google puts it: Android is an open source operating system for mobile devices and a | The answer started with Android, a mobile operating system that Google purchased in 2005. In 2007, Google released the Android code for free under an open-source license. Being "open source" means that anyone can access the source code and use it to make their own, modified operating system—a "fork." This was key to Android's adoption. |

| | | |
|---|---|---|
| | The open source aspect of the Android OS was key to its wide adoption by OEMs (such as LG, Motorola, Samsung, etc.) and phone carriers (such as AT&T, T-Mobile/Spring, Verizon, etc.). Google's supposed lack of control over an open source OS led skeptical OEMs and phone carriers to use Android instead of other choices then available. The open source model suggested that the distributors, and not Google, would ultimately retain control over their devices and the app ecosystem on those devices.<br><br>Compl. at ¶ 20. | corresponding open source project led by Google. This site and the Android Open Source Project (AOSP) repository offer the information and source code needed to create custom variants of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.<br><br>Compl. at ¶ 69.<br><br>But the open-source code only enables a device's most basic functions. As Google explains: "The Android Open-Source Project (AOSP) is the core software stack behind the Android OS and consists of the operating system, middleware, and open-source apps like a phone dialer, email, and messaging. Mobile operators, device makers, and developers can use this to build devices and apps."<br><br>Compl. at ¶ 62.<br><br>What makes a mobile device marketable and attractive to modern consumers is its apps. Google has developed several popular apps, including YouTube, Google Maps, Gmail as well as the Google Play client, among others. These are proprietary apps, and they are decidedly not open-source. Smartphone and tablet manufacturers must sign agreements to pre-install these apps on their Android OS devices, | Compl. at ¶ 60.<br><br>First, Google's apparent lack of control over an open-source operating system attracted skeptical manufacturers and carriers of mobile phones to use Android instead of the other choices then available. As the Android team leader observed to Google's board of directors, "Google was historically seen as a threat" to these distributors. But an open-source model suggested that they—and not Google—would ultimately retain control over their devices and the app ecosystem on those devices.<br><br>Compl. at ¶ 61. |

2

| | | | |
|---|---|---|---|
| | | and for devices sold into the U.S., they come bundled together as a suite— manufacturers who want to pre-install any one of them must pre-install all of them.71 Google refers to this program as Google Mobile Services. As Google touts it: The best of Google, right on your devices Google Mobile Services brings Google's most popular apps and APIs to your Android devices. Google's most popular apps, all in one place Google Mobile Services (GMS) is a collection of Google applications and APIs that help support functionality across devices. These apps work together seamlessly to ensure your device provides a great user experience right out of the box.<br><br>Compl. at ¶ 72. | |
| Network Effects Lead to High Barriers to Entry | However, once the distributors agreed to use Android OS, app developers looking for wide distribution of their apps were then incentivized by Google to develop apps compatible with Android OS. As more apps became available on Android OS, the operating system became more attractive to consumers which in turn led to even more developers designing for Android.<br><br>Compl. at ¶ 21.<br><br>To achieve desired network effects and make the Android system ubiquitous, Google then "shared" its search advertising and app store revenues with distributers to further induce distributors to give up control | The European Commission also has concluded that there are high barriers to entering the market for Android OS app distribution. The same factors it cited as high barriers to entry in "the worldwide market (excluding China) for licensable smart operating system," where Google's Android OS was estimated in 2018 to have "a market share of more than 95%," apply as well with respect to entry into the U.S. market for Android OS app distribution:<br><br>There are high barriers to entry in part due to network effects: the more users use a smart mobile operating system, the more developers write | Second, once enough major distributors agreed to use Android, the operating system attracted developers looking for wide distribution of their apps. As more app developers focused their efforts on designing Android apps, Android became more attractive to consumers, which in turn led even more developers to design for Android. The result was a must-have ecosystem of Android apps.<br><br>Compl. at ¶ 62.<br><br>Third, to help the Android ecosystem achieve critical mass and to advance the network effects, Google "shared" its search advertising |

3

|   |   |   |   |
|---|---|---|---|
|   | over the OS and what apps come preinstalled on mobile devices.<br><br>Compl. at ¶ 22. | apps for that system – which in turn attracts more users. Furthermore, significant resources are required to develop a successful licensable smart mobile operating system.<br><br>Compl. at ¶ 108. | and app store revenues with distributors as further inducement to give up control. As one senior executive explained about Android Market, an earlier name for Google's app store, "Android Market is a bitter pill for carriers, and a generous revenue share is the sugar that makes it go down smoother." In other words, beginning over ten years ago, Google used revenue sharing to attract partners to Android; as discussed below, Google uses revenue sharing to keep them locked in today.<br><br>Compl. at ¶ 63. |
| Google's Anti-Forking Agreements | Google solidified market dominance of Android OS through a series of contracts with distributors designed to minimize competition. Google requires OEMs such as LG, Motorola, and Samsung to enter "anti-forking agreements." These agreements specifically forbid OEMs from developing or distributing versions of Android that do not comply with onerous Google-controlled technical standards. The signatories may not distribute devices with Android forks, or us their powerful brands to market forks on behalf of third parties. As a result of Google's anticompetitive practices, Android OS represents over 95 percent of licensable mobile operating systems for smartphones and tablets in the United States.<br><br>Compl. at ¶ 23. | Over time, Google has moved more and more apps into its proprietary, non-opensource universe of apps, as well as services that make third-party apps work effectively, in ways that users have come to expect (e.g., by calling up map services, now through the proprietary Google Maps). As one analyst describes Google's machinations:<br><br>Over time, Google began migrating applications – like Search, Music, and the Calendar – out of AOSP and into GMS. Any OEM wanting to use AOSP to build its own Android fork would now have to build their own versions of these apps, on top of email, maps, and so on. (Ars Technica has a good rundown of the application migration here.) On top of | Google's anti-forking agreements specifically forbid manufacturers from developing or distributing versions of Android that do not comply with Google-controlledtechnical standards, as defined in its Android Compatibility Definition Document (CDD).<br><br>Compl. at ¶ 68.<br><br>Google's anti-forking agreements, however, have inhibited operating system innovation through forking, ensuring that manufacturers and distributors are beholden to Google's version of Android. Distributors know that any violation of an anti-forking agreement could mean excommunication from Google's Android ecosystem, loss of access to Google's |

| | | | |
|---|---|---|---|
| | | that, the device would lack the Google services APIs that lots of third-party apps need. And Google didn't stop there. Google Mobile Services mutated into Google Play Services in September 2012.<br><br>A fork in the road: Why Google Play Services is key to understanding the 'forking' question<br><br>Back in May 2013 at the Google I/O Keynote there was no mention of an Android upgrade. Instead, Google announced a bunch of new features to be rolled out to Android devices via Google Play Services. Google had started to move away from Android-as-platform to Play Services-as-platform. As Ron Amadeo writes: 'Play Services has system-level powers, but it's updatable. It's part of the Google apps package, so it's not open source. OEMs are not allowed to modify it, making it completely under Google's control… If you ever question the power of Google Play Services, try disabling it. Nearly every Google App on your device will break.' It is 'a single place that brings in all of Google's APIs on Android 2.2 and above.' Things like Play | must-have GPS and Google Play, and millions or even billions of dollars in lost revenue sharing.<br>Thus, distributors avoid anything that Google might deem "fragmentation"—a term that Google "purposely leave[s] . . . very vague" and interprets broadly.<br><br>Compl. at ¶ 128. |

5

| | | Game services, Google Cloud Messaging and fused location services are all handled by Play Services, and not the OS.<br><br>Compl. at ¶ 65. | |
|---|---|---|---|
| Control of Android OS Allowed Google Play to Become the Dominant App Store | With control over the dominant Android OS, Google exercised its monopoly power to establish the Google Play Store as the dominant "store" by which other applications can be downloaded for use by consumers on the Android ecosystem.<br><br>Compl. at ¶ 24. | Google's Android OS10 is one of the two dominant mobile device operating systems. Google Play is the 1,000-pound gorilla of app providers to the many hundreds of millions of Android OS device consumers. While Google does not publish its share among app stores for the Android mobile operating system, in the European Economic Area, it is at "more than 90%."<br><br>Compl. at ¶ 5. | By 2010, the Android team leader noted that "Android is poised for world domination—the success story of the decade." He was right; the strategy worked. The "Google Play" app store has a massive library of apps, making it essential for Android distributors to have on their devices. As for the operating system itself, it quickly became the dominant licensable mobile operating system in the United States. In the four years between 2009 and 2012, Android's share of licensable mobile operating systems on smartphones in the United States more than tripled, reaching about 80 percent. Today, Android represents over 95 percent of licensable mobile operating systems for smartphones and tablets in the United States and accounts for over 70 percent of all mobile device usage worldwide. The only other mobile operating system with significant market share in the United States is Apple's iOS, which is not licensable.<br><br>Compl. at ¶ 64. |
| Pre-Installation and a Lack of | Google required that mobile device OEMs pre-install the Google Play Store on all mobile devices, knowing that users rarely | Manufacturers of smart mobile devices ("device manufacturers") pre-install smart mobile OSs on devices before selling them to | Google uses preinstallation agreements—MADAs—to ensure that its entire suite |

6

| Software Competition | change defaults. Google also refuses to allow any rival app store to be downloaded from the Google Play Store. Indeed, third-party app stores could only be accessed by "sideloading," a complicated multi-step process where users are warned that sideloading is unsafe. Thus, while Google theoretically permits sideloading third-party app stores, few users pursue this option because Google implements significant frictions designed to steer consumers away from sideloading.<br><br>Compl. at ¶ 25.<br><br>Google also limits basic app functions that are available to apps downloaded on the Google Play Store, including making it more difficult for users to update apps (versus automatic updates in the mobile device's background).<br><br>Compl. at ¶ 26.<br><br>Because the Google Play Store is the primary way users install applications on Android devices, the Play Store effectively functions as a gatekeeper for software distribution on all mobile devices with Android OS.<br><br>Compl. at ¶ 27. | retailers and end users. Most device manufacturers do not develop their own OSs but instead license Google's Android OS. The most widely-used mobile non-Android OS outside of China is Apple's iOS. But because Apple does not license its operating system to device manufacturers, instead manufacturing its own smart phones and tablets, Apple's iOS is not an option for device manufacturers.<br><br>Compl. at ¶ 44.<br><br>Non-licensable smart mobile OSs such as Apple's iOS do not belong to the same product market as licensable smart mobile OSs. From the demand side, device manufacturers cannot obtain a license to pre-install Apple's iOS because Apple does not license iOS to competing device manufacturers. As even Google has conceded, device manufacturers cannot switch to non-licensable OSs such as iOS.<br><br>Compl. at ¶ 45. | of search-related products is given premium placement on Android GMS devices. Consumers naturally and regularly turn to these prominently placed search access points to conduct searches. Preinstallation agreements also reinforce Google's anti-forking requirements, either by including an anti-forking clause of their own or, more commonly, requiring device manufacturers to be signatories to an anti-forking agreement.<br><br>Compl. at ¶ 133.<br><br>Another key part of GMS is the set of APIs that allow developers to access certain important features. The APIs available within GMS are part of "Google Play Services" (GPS). GPS allows apps, including third-party apps, to perform functions that are not possible using the open-source version of Android. For example, using the open-source Android system, third-party apps cannot provide basic "push notifications," enable in-app purchases through Google Play, or use data from Google Maps; to have these functionalities, third-party apps must use GPS.<br><br>Compl. at ¶ 74.<br><br>The integration of key functions with GPS makes it more difficult for third-party |

| | | | |
|---|---|---|---|
| | | | Android developers to port their apps to Android forks because the apps are designed to interact with Google's proprietary APIs. And as the functionality gap between open-source Android apps and Google's proprietary apps grows, developers are more dependent on GPS.<br><br>Compl. at ¶ 75. |
| MADA Agreements Allow Google to Expand its Monopoly | Google maintains a monopoly in the Android Mobile App Market and is able to charge supracompetitive prices for mobile app and in-app purchases. Google uses anticompetitive covenants in Google's Mobile Application Distribution Agreement ("MADA"), requiring OEMs to license the entire suite of Google applications and services in order to also license the Android OS. Google also requires OEMS to pre-install the Google Play Store on its home page. If OEM refuse these restrictive terms and conditions, they lose access to the Android OS.<br><br>Compl. at ¶ 30.<br><br>As a result of the MADA terms and conditions, Google has successfully prevented competition from its rivals in the Android Mobile App Market. Google's MADA agreements also allow Google to charge supracompetitive prices for mobile app and in-app purchases, harming Plaintiff and Class | Previously leaked copies of Google's contracts with device manufacturers, called MADAs, provide details of Google's abusive market manipulation. Upon information and belief, the same or similar contracts, or those with the same intent or restrictions, remain in use today.<br><br>Compl. at ¶ 93.<br><br>If a smartphone or tablet manufacturer such as Acer, Samsung, or HTC wishes, for example, to pre-load Google's popular and exclusive YouTube app on a given Android OS phone or tablet, then Google requires that the manufacturer agree via its MADA to pre-load Google Play on the device as well. This results in a tremendous advantage for Google in that yet more devices will carry its store client to the exclusion of competing apps and store clients.<br><br>Compl. at ¶ 94.<br><br>Additionally, such a manufacturer must agree via this contract that it will pass a socalled | Manufacturers agree to anti-forking agreements in part because they are a precondition to receiving a license to distribute devices with must-have proprietary Google apps and APIs (the set of technical specifications that enable software applications to communicate with each other, operating systems, and hardware). This license is provided only through preinstallation agreements—called Mobile Application Distribution Agreements, or MADAs. Leading Android device manufacturers, such as LG, Motorola, and Samsung, are MADA licensees.<br><br>Compl. at ¶ 72.<br><br>Signing a preinstallation agreement is the only way for an Android device manufacturer to preinstall any Google app, including Google Play. It is also the only way an Android device manufacturer can gain access to GPS and the APIs many developers need for their apps to work properly, |

| | | |
|---|---|---|
| Members by limiting consumer choice.<br><br>Compl. at ¶ 31. | Android Compatibility Test as to that device, which Google administers and controls in its sole discretion. This ties to Google's restraint on the production of devices using Android forks as their operating systems, which in turn restricts avenues for distribution of competing app-store clients, as discussed herein.<br><br>Compl. at ¶ 95.<br><br>Plaintiffs do not yet have sufficient information to identify all other manufacturers beyond Acer, Samsung and HTC that have, or have had, MADAs with Google containing these specific (or functionally equivalent) terms. But the Joint Submission of Corrected Exhibit List submitted in a matter called Oracle v. Google lists MADAs between Google and a who's who of Android OS device manufacturers, including LG and Sony. Unfortunately, these MADAs are not available for public inspection because they were not entered into evidence in the case. It appears likely, however, that Google has insisted on similar arrangements with some or all of these other manufacturers, in violation of federal and state law, and to the detriment of competition and consumers.<br><br>Compl. at ¶ 96.<br><br>Furthermore, Google also currently provides a long list of brands whose devices are | at least without expensive and time-consuming reprogramming. But any manufacturer installing Google Play or GPS must preinstall a full suite of apps identified by Google, including the search access points most frequently used by consumers: Chrome, Google search app, Google search widget, and Google Assistant. Google's search engine is the default on all these search access points. Indeed, Google uses the MADAs to control the appearance of Android devices, requiring the manufacturer to place the Google search widget on the home screen, and to preinstall Chrome, the Google search app, and other apps in a way that makes them undeletable by the user.<br><br>Compl. at ¶ 76.<br><br>Moreover, before 2017, most MADAs also required manufacturers to set Google as the default general search engine for all key search access points on any device with preinstalled Google apps—these requirements are now found in the revenue sharing agreements discussed below.<br><br>Compl. at ¶ 77. |

|  |  | equipped with the GMS suite (including, of course, Google Play). As alleged herein, Google requires entry into a MADA or MADA-like contract to license GMS.<br><br>Compl. at ¶ 97.<br><br>Because of Google's secrecy, Plaintiffs are unaware as to whether MADAs as such, or updated versions, continue to be the specific operative documents between Google and manufacturers. But plainly Google continues to bundle its apps, including Google Play, into a suite (the GMS suite) for U.S. distribution, and plainly they can only be licensed by contract.<br><br>Compl. at ¶ 98.<br><br>Google is violating antitrust and unfair competition law because of the importance of its Google Play client. Google uses its MADAs or similar contracts to restrain and quash competition in the Android OS app distribution market. There is no lawful reason to compel manufacturers wishing to pre-load the YouTube or Google Maps app onto a device, to pre-load Google Play as well. These restraints give Google a de facto monopoly because most users will not know how to, or will not, sideload an alternative app store onto a phone (if they even know that is a possibility). Google's practice is a pure power play designed to maintain and extend its monopoly in the Android |  |

|  |  | OS app distribution market. Its aim, of course, is to impose its super-high 30% transaction fee on developers who have no choice but to pay it.<br><br>Compl. at ¶ 99. |  |