# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

United States of America, *et al.*,

       *Plaintiffs*,

v.

Google LLC,

       *Defendant*.

Case No. 1:20-cv-03010-APM

## PLAINTIFFS' SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT GOOGLE LLC

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs United States of America, and the States of Arkansas, California, Florida, Georgia, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, South Carolina, Texas, and Wisconsin request that Defendant Google LLC produce the documents requested below, in accordance with Local Rule 26.2(d) of the U.S. District Court of Columbia, no later than 30 days after service of this request or at any other time or place counsel for the parties may agree or the Court may direct in the Case Management Order or otherwise. Documents shall be produced at the office of the U.S. Department of Justice, Antitrust Division, Technology and Digital Platforms Section, 450 Fifth Street NW, 7100, Washington, DC 20530, or at any other place counsel for the parties may agree.

## **DEFINITIONS**

1.      The terms defined below and used in each of the topics should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure. These definitions are provided solely for the purpose of these Requests for Production.

2.      The terms "Google," "you," "your," and "the company" mean Google LLC, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

3.      The term "addressing" means, in whole or in part, analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that contain reports, studies, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that address the subject. However, documents that merely mention or refer to a subject without further elaboration should not be treated as documents that address that subject.

4.      The term "agreement" means any understanding, formal or informal, written or unwritten.

5.      The term "alternative assistant" means any service other than Google Assistant that delivers assistant services in a manner that is substantially similar to Google Assistant, including but not limited to Siri, Alexa, Cortana, and Bixby.

2

6.      The term "alternative search application" means any application other than the Google Search Application that delivers services substantially similar to the Google Search Application.

7.      The term "alternative search engine" means any service other than Google Search that delivers general search services in a manner that is substantially similar to Google Search, including but not limited to Bing, Yahoo, and DuckDuckGo.

8.      The term "alternative web browser" means any web browser other than Google Chrome.

9.      The term "Android device" means any device running any version of Android OS.

10.     The term "Android Open Source Project" or "AOSP" means the licensable open source Android operating system.

11.     The term "application programming interface" or "API" means any routines, protocols, commands, rules, or specifications that a software program follows to access and make use of the services and resources provided by any software or hardware that implements that API.

12.     The terms "and" and "or" have both conjunctive and disjunctive meanings.

13.     The term "any" means each and every.

14.     The term "communication" means every disclosure, receipt, transfer, or exchange of information, inquiry, or opinion however made.

15.     The term "concurrency" means the simultaneous presence of multiple voice assistants on a voice-activated device, including the ability to use multiple wake words to access a user's preferred voice assistant at any time.

3

16.    The term "customer" or "consumer" means an end user, as opposed to a distribution partner.

17.    The term "device" means any electronic equipment (e.g., laptop, desktop computer, mobile phone, tablet, home service device, smart television, smartwatch, soundbar, home appliance) that uses a software OS and is primarily used to communicate or convey information.

18.    The terms "digital ad" or "digital advertising" include all types of ads filled by way of the internet—as opposed to out-of-home, broadcast television, or print—including video ads, display (desktop and mobile) ads, social ads, search ads, in-app ads, native/rich text ads, and any other ad categorized as a type of digital advertising by the company in its ordinary course of business. The terms "digital ad" and "digital advertising" shall be construed broadly and shall include at a minimum the various types of advertising described in the complaint in this matter.

19.    The term "documents" is defined to be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure and includes electronically stored information ("ESI") of any kind in the possession, custody, or control of the company.

20.    The term "documents sufficient to show" means documents sufficient to provide Plaintiffs with a true and correct disclosure of the factual matter requested.

21.    The term "discussing" means, in whole or in part, analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that contain reports, studies, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that discuss the subject. However, documents that merely mention or refer

4

to a subject without further elaboration should not be treated as documents that discuss that subject.

22.     The term "general search service" means a service that allows consumers to find responsive information on the internet by entering keyword queries. Consumers may use general search services to perform several types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase). Examples of general search services include Google, Bing, Yahoo, and DuckDuckGo.

23.     The term "Google Android" means the operating system approved explicitly or tacitly by Google as "Android compatible" by passing Google's Compatibility Test Suite.

24.     The term "Google Assistant" means the assistant service offered by Google that may be accessed or invoked from a device via specified access points (e.g., hardware activation via the long-press home button, handsfree activation through wake words or hotwords).

25.     The term "Google Search" means the search and advertising services offered by Google at Google.com, which may be accessed from points including the Google Search Application, the Google Assistant, the Chrome web browser, third party browsers, or launchers.

26.     The term "Google Search Application" means the following or similar services or features: (a) access to Google Search via the Google Search widget, the Google Search service icon, the Google Search app, the minus one screen, or Google Now and/or its successors; (b) handling of voice searches, Now on Tap requests, and search intents; or (c) access to the Google Assistant.

27.     The term "including" means including, but not limited to.

5

28.     The term "internet of things" or "IoT" means devices other than computers, phones, or tablets that may connect to the internet or to other devices, including smart speakers, smart TVs, wearable devices, and automotive devices.

29.     The term "lawsuit" or "complaint" means the lawsuit filed by the United States of America, and the States of Arkansas, California, Florida, Georgia, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, South Carolina, Texas, and Wisconsin against Google and pending in the United States District Court for the District of Columbia, 1:20-cv-03010-APM.

30.     The term "local ad" or "local advertising" shall mean a local ad on Google as defined by the Company or by Google, and similar ads on Bing, Yahoo, and DuckDuckGo.

31.     The term "miniCPC" means a click space (also known as a "CPC Space") cost.

32.     The term "mobile operating system" means system software for a mobile wireless device (e.g., Android, iOS) that manages device hardware and supports application software.

33.     The term "mobile device" means a device (e.g., phone, tablet, smartwatch) suitable for use with any telecommunications service using radio transmission between mobile or fixed stations that allows customers to maintain telephone calls or data sessions wirelessly when traveling.

34.     The term "OS" means operating system.

35.     The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

36.     The term "personnel files" includes any and all documents relating to the individual's employment relationship with, and job performance for, the company, including employment contracts, performance evaluations or reviews (including self-evaluations or

reviews), bonus recommendations, promotion recommendations, compensation history, and information provided to the individual about compensation or company policies or procedures.

37.     The term "plans" includes preliminary proposals, recommendations, or considerations, whether finalized or adopted.

38.     The term "relating to" means, in whole or in part, constituting, containing, reporting on, considering, recommending, setting forth, concerning, discussing, describing, analyzing, identifying, referring or alluding to, or stating.

39.     The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances, and excise taxes. "Sales" includes sales of the relevant product whether manufactured by the company itself or purchased from sources outside the company and resold by the company.

40.     The term "search access point" means any application, software, or service that is capable of using or invoking an internet search engine. Examples of search access points include web browsers (mobile and desktop), applications, widgets, and voice assistants.

41.     The terms "search ad" or "search advertising" mean all types of ads generated in response to online search queries, including general search text ads (offered by general search engines such as Google and Bing) and other, specialized search ads (offered by general search engines and specialized search providers such as Amazon, Expedia, or Yelp). These definitions shall be at least as broad as the description of "search ads" in paragraphs 97 and 98 of the complaint.

42.     The terms "sensitive Personally Identifiable Information" or "sensitive PII" mean information or data that would identify an individual, including a person's Social Security Number; or a person's name, address, or phone number in combination with one or more of their

(a) date of birth; (b) driver's license number or other state identification number, or a foreign country equivalent; (c) passport number; (d) financial account number; or (e) credit or debit card number.

43.    The terms "Sensitive Health Information" or "SHI" mean information or data about an individual's health, including medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. SHI relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

44.    The terms "specialized search ad" or "specialized search advertising" shall mean search ads other than general search text ads, including but not limited to shopping ads and product listing ads ("PLAs"). These definitions shall be at least as broad as the description of "specialized search ads" in paragraphs 31, 97-98, and 101-105 of the complaint.

45.    The term "specialized search engines" or "specialized search services" are services that offer users a narrower, focused set of answers to a narrower set of queries (e.g., travel, shopping) than general web search applications, or enable search of content not easily accessible on the web (e.g., content on devices or personal content). As compared to general search engines or services, specialized search engines or services respond to narrower searches in their areas of specialization, such as retail, travel, local, or non-web content.

46.    The terms "text ad" or "text advertising" or "search text ad" or "search text advertising" or "general search text ad" or "general search text advertising" mean a general search text ad. General search text ads are sold by general search engines, typically placed just above or below the organic search results on a search engine results page (SERP), and resemble

8

the organic results that appear on a general search engine's SERP, with a subtle notation that

they are "ads" or "sponsored." These definitions shall be at least as broad as the descriptions of

"general search text ad" in paragraphs 101-105 of the complaint.

47.     The term "third parties" means any person other than you.

48.     The term "vertical search" means a search on a specific commercial topic or a

specific commercial segment of overall search, including travel, local services, and shopping.

49.     The term "web browser" means any software that allows the user of a desktop or

laptop computer, mobile device, tablet, or similar technology to access or interact with

information on the World Wide Web.

50.     The singular includes the plural and vice versa.

51.     The definitions provided herein shall apply to the terms defined regardless of

capitalization.

## <u>INSTRUCTIONS</u>

1.     All documents already produced by Google in response to Civil Investigative

Demands Nos. 30092, 30178, 30120, 30121, 30357, and 30358, and not clawed back, need not

be reproduced in response to these document requests.

2.     These requests seek all responsive documents within your possession, custody, or

control, whether or not prepared by you or a third party.

3.     In addition to the specific instructions set forth below, these document requests

incorporate the instructions set forth in Rules 26 and 34 of the Federal Rules of Civil Procedure,

the Local Rules of the U.S. District Court for the District of Columbia, and the Stipulation and

Order Regarding Discovery Procedure ("ESI Order") (ECF # 86) or the operative version of that

order in place at the time production is made. Subject to a valid claim of privilege, the entire document must be produced if any part of that document is responsive.

4. Unless otherwise specified, these requests are for all documents in your possession, custody, or control that were created, altered, or received at any time from January 1, 2010, to the present. Unless otherwise stated, these requests are for all otherwise responsive documents relating to the United States or any part thereof, regardless of where those documents are kept.

5. Produce a legible copy of each document requested together with all non-identical copies and drafts of that document. Subject to the ESI Order, all metadata of electronic documents must also be produced. You must retain all of the original documents for inspection or copying throughout the pendency of this case, any appeal(s), and any related proceedings.

6. These requests are continuing in nature, and you must supplement your responses pursuant to Rule 26(e) of the Federal Rules of Civil Procedure. Plaintiffs specifically reserve the right to seek supplementary responses and the additional supplementary production of documents before trial.

7. Where a claim of privilege or other protection from discovery is asserted in objecting to any request or sub-part thereof, and any document is withheld (in whole or in part) on the basis of such assertion, you shall provide a log ("Privilege Log") in accordance with the Case Management Order (ECF #85) and ESI Order (ECF #86), or the operative versions of those orders in place at the time you provide a log.

8. Do not produce any sensitive PII or SHI before discussing the information with Department representatives. If any document or data responsive to a particular request contains sensitive PII or SHI that is not responsive to that request, redact the unresponsive sensitive PII or

10

SHI before producing the document or data. Provide an index that lists such redacted documents by document control number. If the index is available in electronic form, provide the index in that form.

9.      If documents, data, or other information responsive to a particular request no longer exist for reasons other than your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost, list the request to which it was responsive, and list persons with knowledge of such documents, data, or other information.

## **REQUESTS FOR PRODUCTION**

1.      Produce all documents discussing (a) the lawsuit, or (b) the investigation into the allegations in the lawsuit, including:

> a.   Internal communications; and
>
> b.   Communications between the company (including its outside counsel) and any non-party (including the non-party's counsel) identified in Plaintiffs' initial disclosures or likely to have discoverable information regarding Google's defenses. For the avoidance of doubt, such communications include draft and executed declarations and affidavits.

2.      From January 1, 2002, to the present, produce all documents addressing or discussing:

> a.   Google's market share of the general search market, including those documents addressing or discussing third party estimates or analysis of Google's market share of that market; and

      b.   Google's market share of the search advertising or digital advertising markets, including those documents addressing or discussing third party estimates or analysis of Google's market share of those markets.

3.      From January 1, 2002, to the present, produce all minutes, recordings, summaries, or reports of meetings, whether formal or informal, of your company's (and each of its divisions' or subsidiaries') board of directors (including committees or subgroups), addressing or discussing:

      a.   Search distribution;

      b.   Competition, competitors, strategy, or market analyses in search advertising; or

      c.   Competition, competitors, strategy, or market analyses in digital advertising.

4.      From January 1, 2002, to the present, produce all documents addressing or discussing barriers to entry or expansion in general search services, general search text advertising, or search advertising, including documents addressing or discussing:

      a.   The possible entry of Apple, or any other third party, into general search services (including the development or potential development of search engines), general search text advertising, or search advertising;

      b.   Efforts by Apple, or any other third party, to crawl the web or otherwise index websites; and

      c.   The possible entry of specialized search services into general search services, general search text advertising, or search advertising.

5.      From January 1, 2005, to the present, produce all documents addressing or discussing:

    a.   The quality of Google's general search engine (including changes to quality over time);

    b.   The quality of other alternative search engines, including Bing and DuckDuckGo (including changes to quality over time);

    c.   Comparisons between Google's search engine and alternative search engines, including for factors such as ease of use, speed, relevance of results, the protection, safety, and security of consumers' identities and information, and consumers' control over tracking and advertising (e.g., providing "ad blocking");

    d.   The relative brand strength or weakness of general search engines or services;

    e.   Competition among search engines; and

    f.   Any investments, actions, or changes Google made to its search engine in response to alternative search engines.

6.    From January 1, 2000, to the present, produce all documents addressing or discussing Google's general search engine functionality as compared to search engines on social media sites (such as Facebook), retail marketplaces (such as Amazon), and specialized search engines, and addressing or discussing changes made to Google's general search engine based on any findings of such comparative analysis.

7.    From January 1, 2005, to the present, produce all documents addressing or discussing:

    a.   User preferences regarding privacy protections and advertisements with regard to general search services;

      b.   Google's requests for, or receipt of, consumer or third party data as part of Google's provision of general search services;

      c.   The use of technology to limit or block ads provided by Google's search engine, and Google's efforts to avoid or defeat these efforts, including agreements with companies that develop and sell ad-blocking technology; and

      d.   Google's competitive response to the privacy innovations of alternative search engines.

8.     From January 1, 2005, to the present, produce all documents addressing or discussing the impact of data or scale on the quality of search or search advertising products or services, including the use of data to improve search or search advertising products or services.

9.     From January 1, 2005, to the present, produce all documents addressing or discussing exclusive agreements with web hosting companies or publishers to crawl their websites, or otherwise gain access to information displayed on their websites.

10.     From January 1, 2005, to the present, produce documents sufficient to show the relative number or share of general search queries performed through each type of search access point.

11.     From January 1, 2007, to the present, produce all documents or data relating to:

      a.   Whether mobile users can delete preloaded search access points, change preloaded default settings on search access points, or add new search access points;

      b.   How often mobile users change:

         i.   The preset default search engine on preloaded browsers;

        ii.   The preset default search engine on preloaded search widgets;

iii.   The preset default search engine on preloaded voice assistants; and

c.   Desktop or mobile user propensity to use, avoid using, change, or delete

preloaded or default search access points or search engines.

12.   From January 1, 2005, to the present, produce all documents addressing or

discussing:

a.   Google's strategy related to the development of the Chrome browser;

b.   The effect of the *United States v. Microsoft* consent decree on the success of

Chrome;

c.   The quality of Chrome browser and any comparisons to alternative web

browsers, including for factors such as ease of use, speed, relevance of results,

the protection, safety, and security of consumers' identities and information,

and consumers' control over tracking and advertising (e.g., providing "ad

blocking");

d.   Any studies, surveys, or analyses conducted on browser usage and switching

between browsers (including any underlying data); and

e.   The effect of the European Union's 2010 Microsoft browser choice screen

remedy on Chrome usage or adoption in the European Union.

13.   From January 1, 2008, to the present, produce all documents addressing or

discussing the setting of Chrome's default search feature, including the number or percentage of

devices with Google, Bing, Yahoo, DuckDuckGo, or any other general search service set as the

default in Chrome at particular points in time.

15

14.    From January 1, 2008, to the present, produce all documents or data addressing or discussing the frequency with which Chrome browser users (1) enter search queries into the monobar (or "address bar"), and (2) navigate to a search engine before entering a search query.

15.    From January 1, 2008, to the present, produce documents sufficient to show the number of Google toolbar installations by year.

16.    From January 1, 2007, to the present, produce all documents addressing or discussing the impact, value, or desirability of application preinstallation, application placement, or preset defaults on devices.

17.    From January 1, 2007, to the present, produce all documents addressing or discussing how Google's payments to third parties have affected, or are intended to affect, device prices.

18.    From January 1, 2007, to the present, produce all documents addressing or discussing the efficacy of different channels for advertising, promoting, or distributing search engines, including documents comparing or contrasting different channels.

19.    From January 1, 2002, to the present, produce all communications between Google and Apple relating to Google's search partnerships with Apple, including partnerships in general search and map-based searches.

20.    From January 1, 2004, to the present, produce all documents addressing or discussing:

    a.   Any agreements and payments between Google and any third party, including Apple, regarding the provision of map-based searches; and

    b.   The functionality or usage of general search services as compared to map-based search services (such as Google Maps, Waze, Apple Maps, and Bing

16

Maps), local search services (such as Yelp), or any other specialized search service.

21.     From January 1, 2007, to the present, produce all documents addressing or discussing:

      a.  Competition between Google's Android OS and Apple's iOS operating systems;

      b.  Consumer switching behavior between Android and iOS on mobile devices;

      c.  Competition between Apple Maps and Google Maps/Waze; and

      d.  Consumer switching behavior between Apple Maps and Google Maps/Waze.

22.     Produce all documents addressing or discussing John Giannandrea's departure from Google.

23.     From January 1, 2004, to December 31, 2007, produce all documents addressing or discussing Google's purchase of Android and Google's plans to license Android.

24.     From January 1, 2007, to the present, produce all communications between Google and the Open Handset Alliance (including individual members) addressing or discussing:

      a.  The commitment to develop Android as an open platform;

      b.  The availability of the Android Software Development Kit;

      c.  The APIs available through the Android Open Source Project (including nay changes to the APIs available); and

      d.  The ability or inability of Open Handset Alliance members adopting Android to innovate and/or differentiate their products from one another.

25.     From January 1, 2007, to the present, produce all documents addressing or discussing the following agreements or licenses:

17

      a.   Android Compatibility Commitments (ACC)

      b.   Anti-Fragmentation Agreements (AFA)

      c.   Google Assistant Distribution Agreements (GADA)

      d.   Google Automotive Services (GAS)

      e.   Google Mobile Services (GMS)

      f.   Google Play Services (GPS)

      g.   Mobile Application Distribution Agreements (MADA)

      h.   Mobile Incentive Agreements (MIA)

      i.   Revenue Share Agreements (RSA)

For clarity, this includes:

      i.   The agreements themselves, exchanged drafts of the agreements, discussions of drafts, or improvements of the agreements;

      ii.   Communications with third parties about the agreements; and

      iii.   Documents addressing or discussing the agreements' purpose, effect, negotiation, implementation, operation, function, enforcement, requirements, restrictions, changes over time, revenue, cost, and value.

26.     From January 1, 2007, to the present, for the agreements and licenses listed (a – i) in RFP 25, produce all documents addressing or discussing the company's review of such potential agreements and licenses for all regions (including outside the United States of America). By way of example and not limitation, such documents may be similar in form or substance to GOOG-DOJ-06456790.

27.     From January 1, 2007, to the present, produce each of Google's search revenue sharing agreements worldwide.

28.     From January 1, 2007, to the present, produce:

    a.   All documents sent to or from search-rev-team@google.com;

    b.    All documents addressing or discussing incremental revenue from search distribution deals; and

    c.   All documents addressing or discussing Google's rationale for entering into RSAs, including those agreements' expected effects on search market share.

29.     From January 1, 2007, to the present, produce all documents addressing or discussing:

    a.   The requirement that manufacturers sign any Anti-Fragmentation Agreements or Mobile Application Distribution Agreements as a prerequisite to accessing Google Mobile Services or Google Play Services;

    b.   Any requirement that, for devices running Google Android, third parties conform to specific user interface designs (e.g., conforming to the Material Design guidelines);

    c.   Any requirement that, for devices running Google Android, third parties conform to specific hardware designs (including display requirements such as screen size, physical screen resolution, or logical screen resolution);

    d.   Any requirement that, for devices running Google Android, third parties manufacture or ship devices running a particular OS version of Google Android (and related requirements including security patch provisions, bug fixes, and OS updatability);

19

e.   Any requirement that, for devices running Google Android, third parties
     participate or comply with certain initiatives, including Project Mainline or
     Project Treble;

f.   Any requirement that, for devices running Google Android, third parties
     conform to certain functionality requirements (e.g., camera characteristics,
     cellular and other forms connectivity, battery charging, biometric sensors,
     secure enclave processor speeds, device memory, or device storage capacity);

g.   The application of Google's Anti-Fragmentation Agreements, Android
     Compatibility Commitments, or similar agreements to non-mobile devices,
     including smart speakers, smart TVs, wearable devices, and automotive
     devices; and

h.   How Google's agreements with device manufacturers affect Google's
     counterparties' ability to distribute devices that run on operating systems other
     than Google Android.

30.   From January 1, 2007, to the present, produce all documents addressing or
discussing:

a.   The effect of Google's compatibility tests, including the Compatibility Test
     Suite, Vendor Test Suite, and Google Mobile Services Test Suite on
     manufacturers' ability to distribute devices running Google Android or forked
     versions of Android;

b.   Changes to Google's compatibility tests, including the Compatibility Test
     Suite, Vendor Test Suite, and Google Mobile Services Test Suite;

20

    c.  Google's decision to approve or deny the distribution of any devices that failed to meet the standards set out in the Android Compatibility Definition Document, the Compatibility Test Suite, Vendor Test Suite, or Google Mobile Services Test Suite;

    d.  The effect of the Google's Anti-Fragmentation Agreements and Android Compatibility Commitments on the development of forked versions of Android; and

    e.  How a forked version of Android would affect (i) the sale of mobile devices with Android, or (ii) the sale of non-mobile devices with Android.

31.    From January 1, 2007, to the present, produce all documents relating to how forked versions of Android would or could affect Google's search and search advertising businesses.

32.    From January 1, 2007, to the present, produce all documents addressing or discussing:

    a.  The value, importance, desirability, or effect of preinstalling Google Play on Android devices, including any effect failing to install Google Play would have on the commercial value or viability of devices;

    b.  Manufacturer, carrier, developer, or consumer demand for, or use of, the Google Play Store or any alternative app store;

    c.  What specific APIs are offered through Google Mobile Services or Google Play Services, and how those have changed over time;

    d.   Why the APIs offered through Google Mobile Services or Google Play Services in Android were not offered through the Android Open Source Project; and

    e.   The importance of access to Google Mobile Services and Google Play Services' APIs to manufacturers, carriers, developers, and consumers.

33.    From January 1, 2007, to the present, produce all documents addressing or discussing:

    a.   Any agreement preventing a third party from preinstalling an application, or from distributing a device containing an application; and

    b.   Any agreement preventing a third party from using any Google products or services on all or a defined subset of devices the third party manufactures or sells.

34.    Produce all documents addressing or discussing:

    a.   Any considerations of or plans to develop or acquire specialized search services; and

    b.   The effect of Google's agreements with third parties on the success or failure of competing specialized search services.

35.    Produce all documents:

    a.   Comparing the relative qualities or desirability of Google Assistant and alternative assistants; and

    b.   Addressing or discussing required "hotwords" or dedicated hardware buttons used to activate Google Assistant or alternative assistants.

36.     Produce all documents addressing or discussing the distribution of Google Assistant or Google search services on IoT devices, including smart speakers, smart TVs, wearables, and automotive devices. For clarity, this includes:

    a.   Google's product plans for IoT devices;

    b.   Google's rationale for distributing IoT devices, or for partnering to distribute Google products such as Google Assistant on third parties' IoT devices;

    c.   Google's decision to manufacture its own IoT devices, including devices that distribute Google Assistant;

    d.   Google's strategy for controlling search access points on IoT devices;

    e.   The advantages of preinstallation of Google Assistant on IoT devices; and

    f.   Voice assistant concurrency and Google's lack of participation in the Voice Interoperability Initiative.

37.     Produce documents sufficient to show:

    a.   The number of Google employees that work on search;

    b.   The number of Google employees that work on search ads;

    c.   The number of Google employees working on search text ads;

    d.   The number of Google employees working on both search and search ads; and

    e.   Whether Google has a dedicated engineering team devoted to search ads, and the extent to which Google's search engineers and search ads engineers overlap.

38.     Produce documents showing the Google employees responsible for search advertising sales to the third parties listed on the Plaintiffs' Rule 26 Initial Disclosure List dated November 20, 2020.

39.     Produce all documents addressing or discussing the similarities or differences between forms of advertising, including search advertising, general search text advertising, display advertising, social-media advertising, and any other forms of digital or non-digital advertising.

40.     Produce documents showing the search keywords and queries that generated the highest search advertising revenue (top 100) by month and the revenue generated.

41.     Produce all documents addressing or discussing Google's search advertising monetization metrics including:

   a.  Revenue;

   b.  RPM;

   c.  Query volume;

   d.  Clicks;

   e.  Top CPC;

   f.  Top Ad CTR;

   g.  Top Coverage; and

   h.  Top Depth.

42.     For Google's search advertising business, produce:

   a.  Documents sufficient to show the top 250 most expensive keywords by year; and

   b.  Documents sufficient to show the top 250 advertisers (by dollars spent) by year.

43.     Produce all documents addressing or discussing IS 4 (referenced in the CID deposition of Ben Gomes at pages 140-142), PQ (referenced in the CID deposition of Ben

Gomes at page 141), IS 4 dashboards (referenced in the CID deposition of Ben Gomes at page 143), IS 1-3, or other metrics comparing Google to Bing or other general search engines.

44.     Produce all documents describing Google's methodology in selecting which advertiser wins each search ad slot, including:

   a.   All components of Google's search advertising auction and algorithms;

   b.   The nature and effect of any changes or modifications thereto (including all reports describing the measures of any such inputs such as beta, or the quality cost of an ad used in the LTV auction scoring formula over time).  By way of example and not limitation, some exemplar measurements can be found in GOOG-DOJ-10776576;

   c.   Respond simulation tools, including AR-SIM; and

   d.   Advertiser experiment framework, including advertiser experiments.

45.     Produce all documents addressing or discussing search advertising headroom and price indices, including:

   a.   How Google calculates search advertising headroom and price indices;

   b.   The role of customer data (including ROI or ROAS information) in calculating or capturing search advertising headroom and price indices;

   c.   Any studies or analyses related to search advertising headroom and price indices; and

   d.   Any documents discussing the impact of Google's search advertising auction or algorithms on search advertising headroom and price indices (including the impact of changes such as Holy Load, Holy Grail, and any change to the number or size of the search ads).

25

46.    Produce all documents comparing, contrasting, or analyzing search advertising pricing or competition in vertical search.

47.    Produce all documents addressing or discussing complaints from advertisers relating to Google's pricing or quality of advertising.

48.    Produce all documents provided to advertisers showing or explaining the advantages of using Google advertising platforms over Amazon or Facebook's platforms.

49.    Produce all documents addressing or discussing Google introduction and use of product listing ads (PLAs) including:

      a.    Why Google introduced PLAs;

      b.    Whether Google worried about PLAs cannibalizing text ads; and

      c.    Any studies, analysis, or experiments relating to PLAs (including any comparisons to text ads).

50.    Produce all documents relating to Google's behavioral economics group's analysis or discussion of defaults, keyword auctions, or application positioning.

51.    Produce all documents created by Google's smartASS group addressing or discussing potential or executed launches.

52.    Produce all documents, including all projections, forecasts, reports, studies, or analyses, relating to the impacts of the (1) 2015 Russian FAS Decision, and (2) 2017 European Union Android Decision, on Google's search and search advertising business. Documents responsive to this request should include documents sufficient to show Google's strategic responses, both actual and contemplated, to the aforementioned regulatory actions.

53.     Produce all communications with third parties regarding any form of cooperation in responding to antitrust investigations or litigation, including communications with Facebook regarding 'Jedi Blue.'

54.     Produce all documents addressing or discussing:

    a.   Changes, updates, or revisions to Google's blog pages on the topic of search quality or search distribution;

    b.   Changes, updates, or revisions to pages on ads.google.com discussing 'search campaigns,' 'shopping campaigns,' or 'display campaigns,' including but not limited to https://ads.google.com/home/resources/advanced/; and

    c.   Changes, updates, or revisions to Google's blog, website, or other promotional material in order to support Google's defenses or arguments against antitrust scrutiny.

55.     Produce all documents addressing or discussing Google's funding of any think tank, foundation, organization, academic institution, or individual, including any funding of specific projects, academic papers, or articles.

56.     Produce all documents relating to the following documents: GOOG-DOJ-04830531, GOOG-DOJ-04029024, and GOOG-DOJ-00987646.

57.     Produce all recordings (audio or visual) containing or discussing employee training or education on search or search advertising.

58.     Produce all documents addressing or discussing Google's guidance to its employees to avoid using certain words, terms, or phrases in internal and external communications and documents.

59.     Produce all documents addressing, discussing, or supporting the assertions made by Kent Walker in the October 20, 2020 Google blog post titled "A deeply flawed lawsuit that would do nothing to help consumers," including the assertion that this lawsuit "would artificially prop up lower-quality search alternatives, raise phones prices, and make it harder for people to get the search services they want to use."

60.     Produce the following documents in connection with Google's Answer and Affirmative Defenses to the Complaint ("Answer") (ECF #87):

    a.  All documents supporting Google's assertion in its Answer that Figure 6 does not present a fair and complete description of Search Engine Market Share, including any documents Google has that would show different market shares;

    b.  All documents supporting Google's assertion in its Answer that Figure 7 does not present a fair and complete description of Mobile Search Engine U.S. Market Share, including any documents Google has that would show different market shares;

    c.  All documents supporting Google's assertion in its Answer that Figure 8 does not present a fair and complete description of Computer Search Engine Market Share, including any documents Google has that would show different market shares;

    d.  All documents supporting Google's assertion in its Answer that search advertising is not a relevant antitrust market;

    e.  All documents supporting Google's assertion in its Answer that search text advertising is not a relevant antitrust market; and

    f.  All documents supporting Google's Affirmative Defenses.

28

61. Produce all documents or data relating to:

    a.  Any purported procompetitive justification for Google's distribution and licensing agreements; and

    b.  Any purported benefit to consumers or innovation derived from Google's distribution and licensing agreements.

62. Produce all documents relating to the removal and subsequent restoration of Blixt to Google's Play Store.

63. Produce all personnel files for each person selected as a custodian under these Requests for Production.

64. From January 1, 2019, to the present, on an annual basis, produce data comprising the number of web pages indexed by each internet search engine owned by Alphabet.

65. From September 1, 2019, to the present, on a quarterly basis, produce data, separately for each revenue center, comprising the following amounts:

    a.  Total revenue;

    b.  Traffic acquisition costs;

    c.  Other cost of sales that are directly attributable to the corresponding revenues as tracked in Google's internal systems; and

    d.  The remaining cost of sales that are externally reported, including allocations of portions of costs treated as operating expenses internally.

66. From January 2010, to the present, on a monthly basis, produce data, broken out for the United States, the European Union (excluding the United Kingdom), the United Kingdom, and Russia, and separately by device type (e.g., desktop, tablet, mobile phone), and

each client ID associated with a Revenue Share Agreement ("RSA") or paid distribution agreements with Google, comprising the following:

    a.   RSA partner or firm;

    b.   Search access point, if relevant;

    c.   Ad revenue, billed ad revenue, or gross advertising revenue;

    d.   Net ad revenue;

    e.   Shared net ad revenue or Google payments to any third party;

    f.   Number of queries, if relevant;

    g.   Number of valid queries (as defined in the RSA), if relevant;

    h.   Number of queries that were performed from the search access point that were not part of an RSA, if relevant; and

    i.   Number of devices that fall under the agreement.

67.    From January 2015, to the present, on a daily basis, produce data on search ad auctions, broken out for the United States and worldwide, and separately by device type (e.g., desktop, tablet, or mobile phone), type of search ad auction (e.g., auctions for text, product, or local ads), and vertical category of bidded keywords that are held for the search engine's first results page, comprising the following amounts:

    a.   Average auction reserve price in USD;

    b.   Average number of ad slots per auction;

    c.   Average auction reserve quality score, if different from the average reserve price;

    d.   Average number of bidders per auction;

    e.   Total number of unique bidders for the month;

30

    f.   Average total search advertising spend per bidder in the month;

    g.   Average winning bid for the highest positioned ad in USD;

    h.   Average winning bid for the second highest positioned ad in USD;

    i.   Average winning bid for the third highest positioned ad in USD;

    j.   Average clearing price, or cost-per-click if clicked, for the highest positioned ad in USD;

    k.   Average clearing price, or cost-per-click if clicked, for the second highest positioned ad in USD;

    l.   Average clearing price, or cost-per-click if clicked, for the third highest positioned ad in USD;

    m.   Average cost-per-click paid in USD; and

    n.   Percent of auctions where the lowest positioned ad shown had a clearing price that was equal to the reserve price.

68.    From November 1, 2019, to the present, on a daily basis, produce data, broken out for the United States and worldwide, and separately for all search ads on Google and each type of search ad (e.g., text ad, product listing ad, and local ad), comprising the following amounts:

    a.   Number of search ads;

    b.   Number of search ad clicks;

    c.   Average cost-per-click paid;

    d.   Total advertising spend;

    e.   Number of search ads that were displayed on the results page without additional clicks by the user (if different from the total number of impressions);

31

f.   For search advertisers that only advertised on Google through SA360:

    i.   Number of search ads;

    ii.   Number of search ad clicks;

    iii.   Average cost-per-click paid;

    iv.   Number of search ads that were displayed on the results page without additional clicks by the user (if different from the total number of search ads);

g.   For search advertisers that only advertised on Bing through SA360:

    i.   Number of search ads;

    ii.   Number of search ad clicks;

    iii.   Average cost-per-click paid;

    iv.   Number of search ads that were displayed on the results page without additional clicks by the user (if different from the total number of search ads);

h.   For search advertisers that advertised on both Google and Bing through SA360:

    i.   Number of search ads on Google;

    ii.   Number of search ad clicks on Google;

    iii.   Average cost-per-click paid on Google;

    iv.   Number of search ads on Google that were displayed on the results page without additional clicks by the user (if different from the total number of search ads);

    v.   Number of search ads on Bing;

32

> vi. Number of search ad clicks on Bing;
>
> vii. Average cost-per-click paid on Bing; and
>
> viii. Number of search ads on Bing that were displayed on the results page without additional clicks by the user (if different from the total number of search ads).

69. From January 1, 2010, to the present (United States), and from January 1, 2016, to the present (Russia), produce all launch reports (and any associated back-up data) that cover the following topics:

> a. Analyses for changes prior to a launch (this should also include reports for changes that never launched);
>
> b. Analyses looking at the impact of launches on the company's revenue (i.e., ex-post or retrospective analyses);
>
> c. Impact of scale, including studies done varying the months of historical training data used to predict click-through rates and search results;
>
> d. Changes to the reserve price (and/or the minCPC or the minimum quality score) including changing the reserve price and/or minCPC in the Fall 2018 from $0.01 to $0.03;
>
> e. Changes to the number of ad slots on the search engine results page;
>
> f. Analyses of Mantel-Haenszel CPC; and
>
> g. The launch of RankBrain and products leading up to it.

70. From January 1, 2010, to the present, produce the QueryNav database with all available fields and geographies. This should include the 1% sample of data prior to 2017.

71.     From January 1, 2010, to the present, on a monthly basis, produce data, separately by publisher category, and separately for Display & Video 360 and Google Ads. Data should be comprised of the total number of impressions, or views, and the total revenues for digital advertising, broken down by:

      a.  Type of user device, including but not limited to desktop, mobile web, mobile application, and any other category maintained in the ordinary course of Google's business;

      b.  Type of transaction, including programmatic guaranteed, private marketplace, open auction, and any other category maintained in the ordinary course of Google's business;

      c.  Type of digital advertising, including but not limited to display, video, native, social, and any other category maintained in the ordinary course of Google's business; and

      d.  Each SSP, ad exchange, or ad network transacting the impression.

72.     From January 1, 2020, to the present, on a daily basis, produce data on traffic referrals from general search engines for each Google owned and operated vertical search, broken out for the United States and worldwide, and separately by device type (e.g., desktop, tablet, and mobile phone), and each general search engine that referred the traffic (e.g., Google, Bing, Yahoo, and Yandex), comprising the following amounts:

      a.  Total page visits referred by organic clicks; and

      b.  Total page visits referred by ad clicks;

73.     From January 1, 2010, to present, produce data on user traffic for each Google owned and operated vertical search, broken out for the United States and worldwide, and

34

separately by device type (e.g., desktop, tablet, and mobile phone), operating system, browser, and source of traffic (including direct navigation, paid referral from each search engine, organic referrals from each search engine, and access through mobile applications), compromising the following amounts:

       a.  Number of users;

       b.  Number of queries;

       c.  Number of page visits;

       d.  Organic click-through-rate;

       e.  Ad click-through-rate;

       f.  Number of ad clicks;

       g.  Number of ad impressions;

       h.  Average number of ads shown;

       i.  Search ad revenue;

       j.  Search ad spend, separately for each platform if applicable;

       k.  Search text ad spend, separately for each platform if applicable;

       l.  Digital ad spend, if applicable;

       m.  Total advertising spend, if applicable;

       n.  Display ad revenue;

       o.  Display ad spend, if applicable; and

       p.  Purchase revenue, or revenue received from conversions.

74.    From September 1, 2012, to the present, on a monthly basis, produce data on Google Maps' and Waze's U.S. user traffic separately by device type (e.g., desktop, tablet, and

mobile phone), operating system, and method of access (e.g., Google Maps app, Waze app, or search on Google.com), comprising the following amounts:

    a.   Number of users;

    b.   Number of queries:

        i.    For a specific numeric address (e.g., 1600 Amphitheater Parkway, 1600 Pennsylvania Avenue NW); and

        ii.    Not for a specific numeric address (e.g., gas station);

    c.   Separately for queries for a specific numeric address, and not, the number of queries:

        i.    Resulting in the user requesting map-based directions to a site in the query results;

        ii.    Resulting in the user calling a phone number shown in the query results;

        iii.    Resulting in the user visiting a website shown in the query results;

        iv.    Resulting in the user taking any other action available in Google Maps or Waze (e.g., ordering food or making a reservation). Identify each such action and provide the total number of queries for each action; and

        v.    Ad revenue.

75.    From January 1, 2020, to the present, on a daily basis, produce data on navigational queries and referrals, broken out for the United States and worldwide, and separately by specialized vertical (e.g., Amazon, Expedia, Yelp, and any Google vertical search),

device type (e.g., desktop, tablets, and mobile phones), search category (e.g., auto, finance, and shopping), and ad type (e.g., text, product listing, and local), comprising the following amounts:

   a.   The number of navigational queries that received organic clicks referring the user to the specialized vertical;

   b.   The number of navigational queries that received search ad clicks referring the user to the specialized vertical, and the total dollar amount associated with such clicks;

   c.   The number of non-navigational queries that received organic clicks referring the user to the specialized vertical; and

   d.   The number of non-navigational queries that received search ad clicks referring the user to the specialized vertical, and the total dollar amount associated with such clicks.

76.   From January 1, 2010, to the present, on a daily basis, produce data on each search advertising customer in the United States, separately by device type (e.g., desktop, tablet, and mobile phone), comprising the following amounts:

   a.   The name of the customer;

   b.   The category or industry of the customer;

   c.   The total search advertising spend;

   d.   The total search advertising spend on text ads;

   e.   The total search advertising spend on product ads;

   f.   The total search advertising spend on local ads;

   g.   The total number of impressions;

   h.   The total number of text ad impressions;

37

    i.   The total number of product ad impressions;

    j.   The total number of local impressions;

    k.   The total number of clicks;

    l.   The total number of text ad clicks;

    m.  The total number of product ad clicks;

    n.   The total number of navigational queries; and

    o.   The total number of local ad clicks.

77.    From January 1, 2010, to the present, on a monthly basis, broken out for the United States, the European Union (excluding the United Kingdom), the United Kingdom, and Russia, produce telemetry data, or similar data, separately by operating system and device type (e.g., desktop, tablet, and mobile phone), showing:

    a.   How frequently users change the default search engine in Chrome;

    b.   How frequently users change the default browser on Android devices;

    c.   How frequently users change the default voice assistant on Android devices;

    d.   How frequently users activate alternative assistants (including but not limited to Alexa or Bixby) on Android devices; and

    e.   The number of devices, separately stated by device type, with Google, Bing, Yahoo, DuckDuckGo, or any other search service set as the default search in Chrome.

Dated: January 11, 2021

By:    */s/ Kenneth M. Dintzer*
Kenneth M. Dintzer
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*

By:    */s/ Leslie Rutledge*
Leslie Rutledge, Attorney General
Johnathan R. Carter, Assistant Attorney General
Office of the Attorney General, State of Arkansas
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Johnathan.Carter@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

By:    */s/ Adam Miller*
Xavier Becerra, Attorney General
Kathleen E. Foote, Senior Assistant Attorney
General
Paula Blizzard, Supervising Deputy Attorney
General
Adam Miller, Deputy Attorney General
Brian Wang, Deputy Attorney General
Ryan McCauley, Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Adam.miller@doj.ca.gov

*Counsel for Plaintiff State of California*

By:    */s/ R. Scott Palmer*
Ashley Moody, Attorney General
R. Scott Palmer, Interim Co-Director, Antitrust
Division
Nicholas D. Niemiec, Assistant Attorney General

Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:___*/s/ Christopher Carr*_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Dale Margolin Cecka, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
dcecka@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By:___*/s/ Scott L. Barnhart*_____
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Erica Sullivan, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By:___*/s/ Justin D. Clark*_____
Justin D. Clark, Deputy Director of Consumer
Protection
Daniel Cameron, Attorney General
J. Christian Lewis, Executive Director of
Consumer Protection
Philip R. Heleringer, Assistant Attorney General
Jonathan E. Farmer, Assistant Attorney General
Office of the Attorney General, Commonwealth of
Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601

40

Justind.Clark@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By:      /s/ Jeff Landry
Jeff Landry, Attorney General
Stacie L. Deblieux, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
Deblieuxs@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By:      /s/ Wisam Naoum
Dana Nessel, Attorney General
Wisam Naoum, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
NaoumW1@Michigan.gov

*Counsel for Plaintiff State of Michigan*

By:      /s/ Hart Martin
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

By:      /s/ Kimberley G. Biagioli
Kimberley G. Biagioli
Assistant Attorney General
Missouri Attorney General's Office
615 E. 13th Street, Suite 401
Kansas City, MO 64106
Kimberley.Biagioli@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

41

By: ___*/s/ Timothy C. Fox*_____
Timothy C. Fox, Attorney General
Mark Mattioli, Chief, Office of Consumer
Protection
Office of the Attorney General, State of Montana
P.O. Box 200151
555 Fuller Avenue, 2nd Floor
Helena, MT 59620-0151
mmattioli@mt.gov

*Counsel for Plaintiff State of Montana*

By: ___*/s/ Rebecca M. Hartner*_____
Rebecca M. Hartner, Assistant Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Office of the Attorney General, State of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211-1549
Rhartner@scag.gov

*Counsel for Plaintiff State of South Carolina*

By: ___*/s/ Bret Fulkerson*_____
Bret Fulkerson
Office of the Attorney General, Antitrust Division
300 West 15th Street
Austin, Texas 78701
Bret.Fulkerson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: ___*/s/ Gwendolyn J. Lindsay Cooley*____
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley
Wisconsin Department of Justice
17 W. Main St.
Madison, WI 5370
Gwendolyn.cooley@wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

42

## **CERTIFICATE OF SERVICE**

I certify that on January 11, 2021, I served the foregoing on the below individuals via e-mail.

For Defendant Google LLC:

John Schmidtlein
WILLIAMS & CONNELLY LLP
725 12th Street NW
Washington, DC 20005
Telephone: (202) 434-5901
jschmidtlein@wc.com

Franklin M. Rubinstein
WILSON SONSINI
GOODRICH & ROSATI P.C.
1700 K St, NW
Washington, DC 20006
Telephone: (202) 973-8833
frubinstein@wsgr.com

Mark S. Popofsky
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 508-4624
Mark.Popofsky@ropesgray.com

Dated: January 11, 2021

By:___ */s/ Kenneth M. Dintzer*_____

Kenneth M. Dintzer
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*

43