# EXHIBIT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| Google LLC | ) |
| *Defendant* | ) |

Civil Action No.    1:20-cv-03010 (APM)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Apple Inc., One Apple Park Way, Cupertino, CA 95014

*(Name of person to whom this subpoena is directed)*

✓ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

        See attached schedule.

| Place: United States Attorney's Office<br>450 Golden Gate Avenue, 11th Floor<br>San Francisco, CA 94102 | Date and Time:<br><br>03/02/2021 9:00 am |
|---|---|

✓ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      02/01/2021

|  CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Kenneth M. Dintzer |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

United States of America _____ , who issues or requests this subpoena, are:
 Kenneth M. Dintzer, U.S. Department of Justice, Antitrust Division, 450 Fifth St. NW, Suite 7100, Washington, D.C. 20530,
 Kenneth.Dintzer@usdoj.gov, 202-227-1967

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:20-cv-03010 (APM)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## PLAINTIFFS' SUBPOENA TO APPLE

### DEFINITIONS

1.       The terms defined below and used in each of these Requests for Production ("Requests") should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure. These definitions are provided solely for the purpose of these Requests.

2.       The terms "Apple," "Company," or "you" and their variants mean Apple Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.[1] The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between you and any other person.

3.        The term "addressing" means, in whole or in part, analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that contain reports, studies, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that address the subject. However, documents that merely mention or refer to a subject without further elaboration should not be treated as documents that address that subject.

---

[1] This includes: Apple Canada Inc.; Canada Apple Computer Trading (Shanghai) Co., Ltd.; Apple Distribution International Limited; Apple Europe Limited; Apple France; Apple GmbH; Apple Japan, Inc.; Apple Operations Limited; Apple Operations Europe Limited; Apple Operations International Limited; Apple Pty Limited; Apple Sales International Limited; Apple Value Services, LLC; and Braeburn Capital, Inc.

4.     The term "agreement" means any understanding, whether formal or informal, written or unwritten, express or implied.

5.     The terms "and" and "or" have both conjunctive and disjunctive meanings.

6.     The term "any" means each and every.

7.     The term "communication" means every disclosure, receipt, transfer, exchange of information, inquiry, or opinion however made.

8.     The term "collaborative work environment" means a platform used to create, edit, review, approve, store, organize, share, and access documents and information by and among authorized users, potentially in diverse locations and with different devices. Even when based on a common technology platform, collaborative work environments are often configured as separate and closed environments, each one of which is open to a select group of users with layered access control rules (e.g., reader vs. author vs. editor). Collaborative work environments include Microsoft SharePoint sites, eRooms, document management systems (e.g., iManage), intranets, web content management systems ("CMS") (e.g., Drupal), wikis, and blogs.

9.     The term "customer" or "consumer" means an end user, as opposed to a distribution partner.

10.    The term "data dictionary" means documentation of the organization and structure of the databases or data sets that is sufficient to allow their reasonable use by the Department, including, for each table of information: (a) the name of the table; (b) a general description of the information contained; (c) the size in both number of records and megabytes; (d) a list of fields; (e) the format, including variable type and length, of each field; (f) a definition for each field as it is used by Apple, including the meanings of all codes that can appear as field values; (g) the fields that are primary keys for the purpose of identifying a unique observation; (h) the fields that

are foreign keys for the purpose of joining tables; and (i) an indication of which fields are populated.

11.     The terms "Department," "DOJ," or "Division" mean the U.S. Department of Justice, including any sections or divisions, including the Antitrust Division.

12.     The term "device" means any electronic equipment (e.g., laptop, desktop computer, mobile phone, tablet, home service device, smart television, smartwatch, soundbar, home appliance) that uses a software OS and is primarily used to communicate, store, transfer, or convey information.

13.     The term "digital ad" or "digital advertising" means all types of ads filled by way of the internet—as opposed to out-of-home, broadcast television, or print—including video ads, display (desktop and mobile) ads, social ads, search ads, in-app ads, native/rich text ads, and any other ad categorized as a type of digital advertising by Apple in its ordinary course of business.

14.     The term "discussing" means, in whole or in part, analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that contain reports, studies, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that discuss the subject. However, documents that merely mention or refer to a subject without further elaboration should not be treated as documents that discuss that subject.

15.     The term "documents" is defined to be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure and includes electronically stored information ("ESI") of any kind in the possession, custody, or control of the Company.

16.     The term "ESI Order" refers to the Stipulation and Order Regarding Discovery Procedures entered by the court on January 21, 2021 (Dkt. No. 99).

17.     The terms "general search service" or "general search engine" mean a service that allows consumers to find responsive information on the internet by entering keyword queries. Consumers may use general search services to perform several types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase). Examples of general search services include Google, Bing, Yahoo, and DuckDuckGo.

18.     The term "Google Assistant" means the assistant service offered by Google that may be accessed or invoked from a device via specified access points (e.g., hardware activation via the long-press home button, handsfree activation through wake words or hotwords).

19.     The term "Google Android" means devices approved explicitly or tacitly by Google as "Android compatible" by passing Google's Compatibility Test Suite.

20.     The term "Google" means Google LLC, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between Google and any other person.

21.     The term "include" and any derivations thereof mean to include, but not be limited to.

22.     The term "internet of things" or "IoT" means devices other than computers, phones, or tablets that may connect to the internet or to other devices, including smart speakers, smart TVs, wearable devices, and automotive devices.

23.     The term "local ad" or "local advertising" means a local ad on Google as defined by the Company or by Google, and similar ads on Bing, Yahoo, and DuckDuckGo.

24.     The term "messaging application" refers to any electronic method used by Apple and its employees to communicate with each other or entities outside Apple for business purposes. "Messaging application" includes platforms for email, chats, instant messages, text messages, and other methods of group and individual communication (e.g., Microsoft Teams, Slack). "Messaging application" may overlap with "collaborative work environment."

25.     The term "MNO" means Mobile Network Operator.

26.     The term "mobile operating system" means system software for a mobile wireless device (e.g., Android, iOS) that manages device hardware and supports application software.

27.     The term "mobile device" includes mobile phones and tablets.

28.     The term "ODM" means original design manufacturer.

29.     The term "OEM" means original equipment manufacturer.

30.     The term "OS" means operating system.

31.     The term "person" includes you and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

32.     The term "plans" includes preliminary proposals, recommendations, or considerations, whether finalized or adopted.

33.     The term "relating to" means, in whole or in part, constituting, containing, reporting on, considering, recommending, setting forth, concerning, discussing, describing, analyzing, identifying, referring or alluding to, or stating.

34.      The term "Relevant Product or Service" means, and submit information separately for each product or service offered by Apple within one or more of the following

5

categories, including all versions since 2004 of any:

    a. Operating system(s), including macOS, iOS, iPadOS, Watch OS, and tvOS;

    b. Web browser and any web browser engine, including Safari and WebKit;

    c. Internet search engine, whether or not released to the public or licensed from another person, including general and specialized search services (e.g., Google, Bing, Yelp, Expedia, etc.);

    d. Voice-activated application or service, including applications or services offered by Apple (e.g., Siri) or third-party applications or assistants offered on any Relevant Product or Service (e.g., Google Assistant);

    e. Internet-, mobile-, WiFi-, or entertainment-capable device, including iPhones, iPads, Macs, Apple Watch, HomeKit-compatible products (e.g., HomePod), or Apple TV (or TV+) sold by Apple;

    f. Video or music streaming services;

    g. Digital advertising;

    h. Software applications;

    i. News services provided by Apple to its users, for example, Apple News;

    j. Device-based search features of an OS, including Spotlight;

    k. Map-based search services, including those offered by Apple (e.g., Apple Maps) or third-party applications and assistants offered on any Relevant Produce or Service (e.g., Google Maps, Waze).

    35. The term "RSA" means Revenue Sharing Agreement.

36.     The term "sales" means net sales, i.e., total sales after deducting discounts, returns, allowances, and excise taxes. "Sales" includes sales of the Relevant Product or Service whether manufactured by Apple itself or purchased from a third party and resold by Apple.

37.     The term "search access point" means any application, software, or service that is capable of using or invoking an internet search engine. Examples of search access points include web browsers (mobile and desktop), applications, widgets, and voice assistants.

38.     The term "search ad" or "search advertising" means all types of ads generated in response to online search queries, including general search text ads (offered by general search engines or general search services, such as Google and Bing) and other, specialized search ads (offered by general search engines or general search services, and specialized search providers such as Amazon, Expedia, or Yelp).

39.     The term "senior management" means any Company officer or employee above the level of vice president or general manager, including senior vice presidents, Apple Fellows, and Board Members.

40.     The term "sensitive Personally Identifiable Information" or "sensitive PII" means information or data that would identify an individual, including a person's Social Security Number; or a person's name, address, or phone number in combination with one or more of their (a) date of birth; (b) driver's license number or other state identification number, or a foreign country equivalent; (c) passport number; (d) financial account number; or (e) credit or debit card number.

41.     The term "Sensitive Health Information" or "SHI" means information or data about any individual's health, including medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. SHI relates to:

the past, present, or future physical or mental health or condition of any individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

42.     The term "specialized search ad" or "specialized search advertising" means search ads other than general search text ads, including but not limited to shopping ads and product listing ads ("PLAs").

43.     The term "specialized search engines" or "specialized search services" are services that offer users a narrower, focused set of answers to a narrower set of queries (e.g., travel, shopping) than general web search applications, or that enable search of content not easily accessible on the web (e.g., content on devices or personal content). As compared to general search engines or services, specialized search engines or services respond to narrower searches in their areas of specialization, such as retail, travel, local, or non-web content.

44.     The term "Siri Suggestions" means any predictive feature of Apple's voice assistant used to organize, sort, anticipate or otherwise suggest options for what users might want to do next, such as call into a meeting or confirm an appointment, based on that user's routines and how a user utilizes the user's apps or other Apple device features.

45.     The term "Smart Stack" means the iOS 14 feature that prearranges widgets on a user's home screen based on the apps most used by that consumer—with the right widget showing up automatically at the right time of day.

46.     The term "sufficient to show" means information sufficient to provide the Department with a true and correct disclosure of the factual matter requested.

47.     The term "text ad" or "text advertising" or "search text ad" or "search text advertising" or "general search text ad" or "general search text advertising" means a general

search text ad. General search text ads are sold by general search engines, typically placed just above or below the organic search results on a search engine results page ("SERP"), and resemble the organic results that appear on a general search engine's SERP, with a subtle notation that they are "ads" or "sponsored."

48.      The term "third party" or "third parties" means any person other than you.

49.      The term "web browser" means any software that allows the user of a desktop or laptop computer, mobile device, tablet, or similar technology to access or interact with information on the World Wide Web.

50.      The term "telemetry" includes the collection, analysis, measurement, or transmission of user data to or from Apple devices.

51.      The term "widget" means quick links of information on the Home Screen of an Apple device from various apps, including a weather app, calendar, news, time, etc.

**INSTRUCTIONS**

1.      Direct any questions Apple has relating to the scope or meaning of anything in this subpoena or suggestions for possible modifications thereto to Christine Sommer, U.S. Department of Justice, Antitrust Division, 450 5th Street N.W., Suite 7100 Washington, D.C. 20530, (202) 316-2096 (m) (christine.sommer@usdoj.gov). The response to this subpoena must be addressed to the attention of Kenneth Dintzer and delivered between 8:30 a.m. and 5:00 p.m. local time on any business day to 450 Fifth Street, NW, Suite 7100, Washington, DC 20530. If Apple wishes to submit its response by U.S. mail, please email Christine Sommer (christine.sommer@usdoj.gov).

2.      All documents already produced by Apple in response to Civil Investigative Demand No. 30474, and not clawed back, need not be reproduced in response to these Requests.

9

3.      These Requests seek all responsive documents within your possession, custody, or control, whether or not prepared by you or a third party.

4.      In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in Rules 26 and 34 of the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Columbia, and the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (ECF # 99) or the operative version of that order in place at the time production is made. Subject to a valid claim of privilege, the entire document must be produced if any part of that document is responsive.

5.      Unless otherwise specified, these Requests are for all documents in your possession, custody, or control that were created, altered, or received at any time from **January 1, 2010**, to the present. Unless otherwise stated, these Requests are for all otherwise responsive documents relating to the United States or any part thereof, regardless of where those documents are kept.

6.      Produce a legible copy of each document requested together with all non-identical copies and drafts of that document. Subject to the ESI Order, all metadata of electronic documents must also be produced. You must retain all of the original documents for inspection or copying throughout the pendency of this case, any appeal(s), and any related proceedings.

7.      These Requests are continuing in nature, and you must supplement your responses pursuant to Rule 26(e) of the Federal Rules of Civil Procedure. Plaintiffs specifically reserve the right to seek supplementary responses and the additional supplementary production of documents before trial.

8.      Where a claim of privilege or other protection from discovery is asserted in objecting to any Request or sub-part thereof, and any document is withheld (in whole or in part)

on the basis of such assertion, you shall provide a log ("Privilege Log") in accordance with the Case Management Order (ECF #85) and ESI Order (ECF #99), or the operative versions of those orders in place at the time you provide a log.

9.      Do not produce any sensitive PII or SHI before discussing the information with Department representatives. If any document or data responsive to a particular Request contains sensitive PII or SHI that is not responsive to that Request, redact the unresponsive sensitive PII or SHI before producing the document or data. Provide an index that lists such redacted documents by document control number. If the index is available in electronic form, provide the index in that form.

10.     If documents, data, or other information responsive to a particular Request no longer exist for reasons other than your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost, list the Request to which it was responsive, and list persons with knowledge of such documents, data, or other information.

11.     The singular includes the plural and vice versa.

12.     The definitions provided herein shall apply to the terms defined regardless of capitalization.

## PRODUCTION REQUESTS

1.    Board of Directors.  From **January 1, 2002**, produce:

    a.    Documents sufficient to identify all Board Members, including their current contact information, contact information during their service on Apple's Board of Directors (including but not limited to their email addresses), dates they served on the Board, and any other employment or Board positions held during the Member's term with Apple.

    b.    All minutes, recordings, summaries, strategic plans or analyses, or reports of meetings, whether formal or informal, of the Board of Directors of your company, the members of the Board, and each committee or subgroup and each of its divisions or subsidiaries, addressing or discussing:

        i.    Google, Google's products or services, any payments by Google to Apple, or competition involving Google, including competition with Apple or other third-parties;

        ii.    Digital advertising; or

        iii.    any Relevant Product or Service.

2.    Agreements.  From **January 1, 2002**, produce:

    a.    All final agreements or exchanged drafts addressing or discussing:

        i.    General or specialized search services or search engines;

        ii.    Siri or voice assistants;

        iii.    Digital advertising;

        iv.    Use of Apple or Google user data;

        v.    Maps-based search services or navigational assistance services;

      vi.        Search or other preinstalled or preset default applications on Apple devices;

      vii.       Web browsers;

     viii.      Sales of Apple mobile devices to MNOs; or

      ix.       Sales of Apple mobile devices by or through MNOs.

b.      For any agreement or draft agreement pursuant to subpart (a) above, documents addressing or discussing the negotiation, implementation, and enforcement of those agreements or analyzing those agreements;

c.      Monthly statements, by device type, provided by Google to Apple related to Google's revenue share payments to Apple made under any Information Services Agreement with Google;

d.      Documents related to provisions contained in Apple's Information Services Agreement with Google requiring Apple and Google to cooperate in the defense of the Information Services Agreement to resolve regulatory concerns, including analyses, communications, and presentations; and

e.      Documents related to provisions contained in Apple's Information Services Agreement with Google requiring Chief Executive Officers from each party to meet to review and discuss the performance of the Information Services Agreement, referred to as the "Annual CEO Check-In," including analyses, communications, and presentations.

3.      Payments. From **January 1, 2004**, produce documents sufficient to show the following:

a.   By month, any payments made from Google to Apple, broken out by geographic region (US, EU, ME, Asia, Russia, etc.) and by device type (smart phone, desktop, tablet, home device, etc.);

b.   By month, any payments made by any Google competitor to Apple, under any agreement for a Relevant Product or Service, broken out by geographic region (US, EU, ME, Asia, Russia, etc.) and by device type (smart phone, desktop, tablet, home device, etc.);

c.   By month, any payments made by Apple to any MNO, under any agreement for a Relevant Product or Service, broken out by geographic region (US, EU, ME, Asia, Russia, etc.) and by device type (smart phone, desktop, tablet, home device, etc.);

d.   For all (a), (b), and (c), the factor that generated the monthly payment to or from Apple (e.g., number of queries, number of device sales, etc.); and

e.   Any effects of the following types of payments (including the effects of any increase, decrease, or change in scope of those payments) on the quality, cost, features, time of introduction, prices and terms of device protection plans, or price of any Relevant Product or Service or MNO service:

    i.   Payments received by Apple pursuant to any executed third-party agreement identified in response to Request No. 2; and

    ii.   Payments made by Apple pursuant to any sales agreement with any MNO.

4.   Employees.

a.   From **January 1, 2004**, produce documents sufficient to identify the individuals at Apple responsible for:

    i.   Negotiating, analyzing, approving, or supporting negotiations for Apple's revenue sharing agreements or any other agreement within the scope of Request 2(a);

    ii.   Performing, reviewing, approving, or requesting analyses relating to any Relevant Product or Service.

b.   From **January 1, 2010**, produce all documents related to Apple's efforts to hire any employees of Google, Bing (Microsoft), Yahoo!, or DuckDuckGo with expertise or experience in Internet search services or search advertising, including:

    i.   John Giannandrea; and

    ii.   Ben Gomes.

5.   Meetings.

a.   From **January 1, 2006**, produce:

    i.   Documents related to any meetings at which both (1) Tim Cook, and (2) Sundar Pichai, Larry Page, Sergey Brin, and/or Eric Schmidt were present, including but not limited to notes, minutes, agendas, presentations, business proposals, memoranda, communications, or other recordings. This includes video or telephonic meetings; and

    ii.   Documents related to any meetings at which both (1) Steve Jobs and (2) Sundar Pichai, Larry Page, Sergey Brin, and/or Eric

Schmidt were present, including but not limited to notes, minutes, agendas, presentations, business proposals, memoranda, communications, or other recordings. This includes video or telephonic meetings.

b.    From **December 1, 2019**, produce:

    i.    All documents (including notes, minutes, agendas, presentations, business proposals, memoranda, communications, attendee lists, summaries, emails, follow-up communications, and recordings) addressing or discussing the meeting referenced in Peter Stern's December 20, 2019, email to harrison@google.com; and

    ii.    All documents addressing or discussing coordination (whether explicit or implicit) between Apple and Google to act as "one company."

6.    Search development by Apple. From **January 1, 2010**, produce all documents discussing or addressing any of Apple's efforts to develop, acquire, or partner with a general search service, specialized search service, or other search access point(s) or capabilities.

7.    Bing. From **January 1, 2016**, produce all documents from the files of senior management discussing or addressing Apple's decision to replace Bing in favor of Google on Siri and Spotlight.

8.    Competition. From **January 1, 2006**, produce:

a.    Documents sufficient to show Google and its competitors' annual market shares in the market(s) for any Relevant Product or Service; and

b.    All documents from senior management that address or discuss:

i.      The quality of Google's general search service or any other general search service; or

ii.     Google's general search service compared with any other general search services in terms of quality, protection of user privacy, ability to monetize, or any other metric; or

iii.    Google's digital advertising functionality and pricing.

9.     Monetization of Search. From **January 1, 2010**, produce:

a.     Documents discussing or addressing monetization of internet searches or Map searches on Apple devices;

b.     For each Relevant Product or Service, documents sufficient to show:

i.      Total revenue received by Apple;

ii.     Number of devices served by the provider of that product or service;

iii.    Number of Apple user searches served by the provider of that product or service;

iv.    Number of Apple user searches monetized by the provider of that product or service;

v.     Revenue received by Apple for user searches monetized by the provider of that product or service; and

vi.    Payments made by Apple to MNOs for, or related to, user searches on Apple devices of that product or service.

17

     c.      Any communications (including attachments) between Apple and any third party regarding the monetization of internet searches or Map searches originating from Apple devices.

10.     Voice Assistants. From **January 1, 2010**, produce:

     a.      Documents sufficient to show:

          i.      The source(s) of results returned by user inquiries made using Apple's voice assistant system (e.g., Siri results sourced by Google or Yelp); and

          ii.      Apple's use and licensing of user data generated by Siri.

     b.      For all sources identified in subsection (a)(i), documents related to the reasons why Apple selected these source(s), whether Google or agreements with Google restrict the source(s) Apple can select, what alternative source(s) Apple considered, and any related payment(s) made to or by Apple.

     c.      Documents addressing or discussing the state of competition, entry, expansion, or retrenchment plans in the market for voice assistants.

     d.      All documents addressing voice assistant concurrency, including:

          i.      Legal, technological, or practical limits imposed by a third party or Google;

          ii.      The state of competition, entry, expansion, or retrenchment plans; and

          iii.      Benefits to consumers and innovation.

11.     Dissemination of User Information. From **January 1, 2009**, produce:

a.    Documents sufficient to show all of Apple's privacy policies, including consumer-facing policies and those in agreements with third parties (e.g., search providers, vendors, or app developers);

b.    Documents sufficient to show:

    i.    Apple's Intelligent Tracking Prevention protocol and the Identifier for Advertiser protocol;

    ii.    The method by which Apple Workbench integrates, or integrated, with Google Ad Manager, including any policies regarding features, product strategy, and pricing;

    iii.    The development of, adoption of, promotion of, and the business strategy for advertising on the Apple News Platform;

    iv.    The company's use of data generated by users of any Relevant Product or Service and the Apple App Store, including Apple's plans to license or otherwise share or make available that data, and any policies associated with such use, licensing, sharing, or making available; and

c.    Documents discussing or addressing Google's privacy and data tracking policies.

12.    **Browsers.** From **January 1, 2016**, produce all documents from the files of senior management addressing or discussing Apple's strategies, policies, and objectives for its web browser (Safari), including but not limited to:

a.    Documents addressing or discussing search or other preinstalled or preset default application settings;

    b.       Documents addressing or discussing the state of competition, entry, expansion, or retrenchment plans;

    c.       Documents addressing or discussing users' ability to change the preset browser default (currently Safari) to a third-party browser;

    d.       Documents addressing or discussing:

        i.       iOS 14 (from **January 1, 2019**);

        ii.       Competing web browsers;

        iii.       Google Chrome.

    e.       Migration of user traffic away from Safari to third-party browsers (e.g., Chrome, Firefox) or other internet access points on iPhones (e.g., Siri); and

    f.       RSA payments to Apple.

13.    Litigation involving Google. From **January 1, 2010,** produce all documents from the files of senior management relating to any allegation that Google or any of its employees has behaved in a manner allegedly violating antitrust laws, including customer and competitor complaints; threatened, pending, or completed lawsuits; and federal or state investigations.

14.    Responses to Investigations. From **January 1, 2008,** produce all information, documents, or data submitted to any domestic or foreign government entity related to any investigation into alleged anticompetitive practices by Google.

15.    Market Studies. From **January 1, 2010,** produce all information, documents, or data submitted to any domestic or foreign government entity related to any market study on mobile OSs, web browsers, internet search, digital advertising, mobile devices, or applications for mobile devices.

16.     Competition-related communications. From **January 1, 2008,** produce all documents relating to Apple's (including its outside counsels') communications with Google or any third-party (including Google's or the third-party's outside counsel) regarding any actual or potential antitrust litigation, antitrust oversight, or antitrust investigations, including but not limited to the Department of Justice's investigation into Google and this litigation.

17.     Purchase of Digital Advertising.  Produce all documents addressing or discussing Apple's business strategy or rationale for selecting companies from which to purchase digital advertising, including those:

    a.     Comparing, contrasting, or showing the advantages and disadvantages of particular entities, platforms, or other sources of inventory; or

    b.     Addressing or discussing allocation of advertising spend across different entities, platforms, or other sources of inventory.

18.     Digital Advertising. Produce all documents discussing the advantages or disadvantages of or otherwise comparing or contrasting different formats, types, or channels of digital advertising (e.g., search, text, specialized search, PLAs, shopping, display, and local ads), including but not limited to:

    a.     The process by which Apple sets any budgets or targets for digital advertising spend;

    b.     The marketing functions of different advertising channels (e.g., brand awareness; customer engagement or interest; and customer action, conversion, or purchase), and the substitutability of advertising channels for these functions;

c.   The strengths and weaknesses of different advertising channels, including but not limited to audience reach, scale, attribution, measurement, value, and cost;

d.   Apple's strategies or reasons for using different formats, types, or channels of digital advertising;

e.   Apple's strategies, reasons, or factors used to allocate advertising spend between different formats, types, or channels of digital advertising;

f.   The substitutability or complementarity of different formats, types, or channels of digital advertising; and

g.   The price or cost for, or return on investment ("ROI") or return on advertising spend ("ROAS") from, digital advertising, including changes over time.

19.   Bidding strategies. From **January 1, 2010**, produce documents sufficient to show the process by which Apple chooses its bids for search advertisements and the strategies it utilizes, including documents sufficient to identify any and show the process and rationale of any autobidding strategies or products used or created by Apple.

20.   Effects of changes by Google to advertising practices or products. Produce all documents discussing or analyzing any actual or potential effects on Apple related to changes made by Google to its search advertising products or services, such as Google changing: the number or size of ads on Google's SERP; the addition or removal of proprietary services on Google's SERP; the change in pricing, incentives, auctions, bundles or discounts for search advertising; changes in how Google allocates search advertising; or changes to the search advertising features Google offers, including the addition of autobidding.

21.     Provision of Apple information and data. Produce documents sufficient to show the type of data Apple provided to or received from Google regarding ROAS or ROI on any form of digital advertising.

22.     User behavior.  From **January 1, 2007**, produce:

   a.   All behavioral or economic analyses, studies, reports, decisional packages, or business strategy assessments, discussing or addressing the impact, value, or desirability of application preinstallation, application placement, or preset defaults on devices;

   b.   All documents discussing or addressing whether users can or should be able to delete preloaded search access points, change preloaded default settings on search access points, or add new search access points; and

   c.   All documents discussing or addressing how often users change:

      i.    The preset default search engine on preloaded mobile browsers;

      ii.   The preset default search engine on preloaded mobile search widgets; or

      iii.  The preset default search engine on preloaded voice assistants.

23.     Communications.   Produce the following documents:

   a.   All communications from the files of senior management at Apple addressing or discussing the below products and timeframes:

      i.    Internet search engines, from **January 1, 2002**;

      ii.   Any search access points, from **January 1, 2010**;

      iii.  Competition between or development of voice assistants, from **January 1, 2010**;

    iv.        Revenue shares related to internet search engines, from **January 1, 2004**;

    v.        Competition in any product market between Google and Apple, as well as Google and any other company, from **January 1, 2004**;

    vi.        iOS 14, from **January 1, 2019**; or

    vii.        Map-related searches or default settings related to maps from **January 1, 2010**.

b.    All communications between senior management of Apple and senior management of the following companies:

    i.        Google;

    ii.        Microsoft, including but not limited to Satya Nadella;

    iii.        DuckDuckGo, including but not limited to Gabriel Weinberg;

    iv.        Yandex;

    v.        Naver;

    vi.        Any smartphone OEM or ODM, including but not limited to: Samsung; RIM; HTC; Motorola; LG; HP; Nokia; Kyocera; or Sony Ericsson; or

    vii.        Any MNO, including but not limited to: AT&T; Verizon; T-Mobile; Sprint; Deutsche Telekom; Vodafone; Telefónica; or Orange.

c.    All communications (including but not limited to notes, documents, messages, and recordings) between Tim Cook and John Giannandrea; and

d.    All communications between Steve Jobs and any senior officer or director of Google, from **January 1, 2002**.

24.     Maps and map-based assistance.  From **January 1, 2007**, produce from the files of senior management:

a.      Any discussions, agreements, or payments between Apple and any third-party discussing or analyzing the provision of map-based or navigational searches originating from Apple devices;

b.      Any discussions, agreements, or payments between Apple and any third-party regarding Apple supporting maps-based or navigational searches on a third-party app or website;

c.      All documents discussing or addressing Apple's efforts to develop or acquire map-based search services, or to solicit assistance to provide these services, including documents regarding the creation, launch, and continued development of Apple Maps;

d.      All documents discussing or addressing efforts by Apple to introduce or include advertising in its map-based or navigational search service results;

e.      All documents describing or analyzing changes in the feature set, product quality, or usage of Apple Maps over time;

f.      All documents comparing the feature set, product quality, or usage of Apple Maps with (i) Google Maps, (ii) Waze, or (iii) any other relevant apps and services, such as Google Search, Bing, and Yelp; and

g.      Documents sufficient to show the volume of user complaints about Apple Maps by month.

25.     Telemetry or Diagnostic Data.  For each month from **January 1, 2010**, produce Apple device telemetry or diagnostic data (including reports or analyses of telemetry data) for

Apple's customers separately for the United States, the United Kingdom, the European Union, and the Russian Federation broken out by device type (e.g., mobile phones, tablets, desktops, laptops), comprising the following:

      a.     How frequently users change the default search engine in Safari, and to which non-default search engine;

      b.     How frequently users ask Siri for internet searches;

      c.     How frequently users change the default browser on Apple devices, and to which non-default browser;

      d.     How frequently users change the default voice assistant on Apple devices;

      e.     How frequently users activate third-party voice assistants (including but not limited to Google Assistant) on Apple devices; and

      f.     The number of devices with Google, Bing, Yahoo, DuckDuckGo, or any other search service set as the default search in Safari.

26.     Safari Suggestions.  For each month from **January 1, 2010**, produce data related to Safari Suggestions for Apple broken out by device type (e.g., mobile phones, tablets, desktops, laptops), comprising the following:

      a.     Number of searches in the Safari search bar that resulted in a click on a Safari Suggestions website;

      b.     Categories of search terms that resulted in a click on Safari Suggestions; and

      c.     Categories of the websites that received a click from Safari Suggestions.

27.     Spotlight searches.  For each month from **January 1, 2010**, produce data or other information sufficient to show for Spotlight searches done on Apple devices:

a.       Number of searches on Spotlight;

b.       The circumstances under which the search will be performed by Spotlight or a general search engine;

c.       Apple's categorization (e.g., app searches, weather, maps) of searches done on Spotlight; and

d.       What users clicked on in response to a Spotlight search.

28.      App usage on iPhones. For each month from **January 1, 2010**, produce data related to app usage on iPhones separately for the United States, the United Kingdom, and the European Union, comprising the following:

a.       Ranking of app downloads both by category (i.e., weather, shopping, search, messaging, etc.) and by developer (including Apple and/or third-parties);

b.       Revenues received by Apple related to app activity, broken down by downloads, in-app purchases, or in-app ad activity; and

c.       Complaints from consumers ranked by volume of complaints attributable to either the developer or category.

29.      Studies or reports. For each year from **January 1, 2010**, produce all studies or reports (with the backup data) Apple conducted or received from a third-party (e.g., McKinsey Consulting, Keystone Strategy, Irrational Labs, any MNO, etc.) related to:

a.       Analysis of the importance of preinstalled default settings pertaining to search engines (e.g., the impact of changing the default search engine on Safari or any other search access point on Apple devices);

b.       Promotion of different search access points on Apple devices;

      c.       Reports, estimates, or other statements of market shares for search engines on Apple devices;

      d.       Development of competing search products (e.g., search function that searches across mobile apps, Safari Suggestions, and Spotlight searches);

      e.       Whether Spotlight is, or is not, used in place of general search and, if so, (i) in what circumstances, and (ii) by which users;

      f.       Pricing, quality, or costs of Apple devices, including any analysis of how pricing, quality, or costs are affected by revenue received from Google (or any other search engine or third-party);

      g.       Pricing or costs of mobile network services, including any analysis of how pricing or costs are affected by revenue received from Google (or any other search engine or third-party);

      h.       Comparison of search engines based on search privacy or other quality characteristics, including user experience or performance benchmarking; or

      i.       Competition between mobile operating systems, including studies comparing iOS's and Android's relative strengths (or weaknesses).

30.    Financial Reports. From **January 1, 2010,** produce annual (or, if not available on an annual basis, quarterly) ordinary-course financial reports for Apple related to sales revenue, revenue share payments, and variable costs per device, broken out by device category (e.g., phone, tablet, watch, desktop, home speaker, etc.).

31.     Devices.  For each month from **January 1, 2010**, for each of Apple's mobile device models in the United States, separately by sales channel (e.g., through Apple versus an MNO, directly to consumers) and MNO, produce data comprising the following:

      a.     The number of active devices;

      b.     Sales information indicating;

          i.     Device sales volume;

          ii.     Gross revenue;

          iii.     Net revenue;

          iv.     Discount and/or promotional value;

          v.     Each cost of sales (e.g., manufacturing costs, shipping costs) tracked by Apple in the regular course of business; and

          vi.     Gross margins;

      c.     For each search engine, the number of searches conducted through each search access point;

      d.     For each search engine, the number of searches that result in an RSA payment to Apple conducted through each search access point;

      e.     For each search engine, Revenue Services Agreement (RSA) revenues received by Apple conducted through each search access point; and

      f.     For each search engine and each search access point, payments made by Apple to MNOs for, or related to, searches on Apple devices.

32.     Map-based Searches.  For each month from **September 1, 2012**, produce data for Apple Maps' user traffic broken out by (i) device type (e.g., desktop, mobile phone, tablet) and (ii) method of access (e.g., Apple Maps app, search on DuckDuckGo), comprising the following:

29

    a.      Number of users;

    b.      Number of page visits;

    c.      Number of queries, separately by:

        i.      For a specific numeric address (e.g., 1600 Pennsylvania Avenue NW); and/or

        ii.      By category of query term, where available (e.g., gas station, pizza, restaurant, pharmacy, etc.);

    d.      For each of the categories in subsection (c) of this request, the number of queries:

        i.      Resulting in the user requesting navigational directions to a site in the query results;

        ii.      Resulting in the user calling a phone number shown in the query results;

        iii.      Resulting in the user visiting a website shown in the query results;

        iv.      Resulting in the user taking any other action available in Apple Maps (e.g., ordering food, making a reservation). Identify each such action and provide the total number of queries for each action; and

    e.      Ad revenue

33.    Navigation-based advertising to users. For each month from **September 1, 2012**, produce data for Apple Maps advertisement and user traffic broken out by device type (e.g., desktops, mobile phones, tablets) and the category of searches (e.g., specific addresses, food, restaurants, gas, hospitals), comprising the following:

a.    Number of searches;

b.    Number of searches that showed at least one ad;

c.    Organic click-through-rate;

d.    Number of ad clicks;

e.    Number of ad impressions;

f.    Search ad revenue;

g.    Search ad spend, separately for each platform where an Apple Map advertisement was shown;

h.    Digital ad spend;

i.    Total ad spend;

j.    Display ad revenue;

k.    Display ad spend; and

l.    Purchase revenue, or revenue received from conversions.