## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>              Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |

| | |
|---|---|
| State of Colorado, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>              Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

## DEFENDANT'S MOTION TO COMPEL PRODUCTION OF
## DOCUMENTS OF YELP, INC. CUSTODIAN LUTHER LOWE

Google moves to compel the production of documents from a proposed custodian in
response to Google's April 13, 2021 subpoena to Yelp, Inc. ("Yelp").  Despite weeks of
negotiation, Yelp refuses to produce custodial documents from Luther Lowe, Yelp's Senior Vice
President, Public Policy, who during Plaintiffs' investigation and for years prior to that, led
Yelp's global outreach regarding its antitrust claims about Google.  On Yelp's behalf, Mr. Lowe
has been pushing for a case against Google for many years, and has knowledge of the evolution
of, and sources for, Yelp's factual allegations.  There is no comparable individual among Yelp's
proposed custodians.  Google asks the Court to compel Yelp to produce responsive documents

for Mr. Lowe by October 29, 2021, and to produce a privilege log for documents withheld from production.  Yelp lacks any basis to oppose these requests.  Yelp's allegations against Google, conceived and advanced by Mr. Lowe, are a central part of the Government's case.  Now that the very governmental action Yelp advocated for in its communications is underway, Yelp cannot deny Google the documents it needs to defend itself.

## BACKGROUND

Yelp is an online platform that allows consumers to search for and connect with local businesses.  On April 13, 2021, Google issued a Rule 45 subpoena to Yelp.  During Plaintiffs' investigations, Yelp presented its allegations about Google, which were ultimately pleaded in the Complaints.[1]  Yelp nonetheless asserted broad objections to the subpoena.

In August 2021, Google moved for the Court's assistance due to Yelp's lack of response to its subpoena [Dkt. Nos. 190, 195], and this Court ordered updates on Yelp's progress.  After this prodding, Google and Yelp reached an agreement on search terms for five custodians, and are in the process of reaching agreement on similar terms for an additional five custodians.

Despite its agreement as to other custodians, Yelp refuses to run the same search terms for Luther Lowe, who has led Yelp's competition claims and has knowledge of any alleged harm caused by Google.  After initially agreeing to include Mr. Lowe as a custodian, Yelp advised in late August that it had changed its position.  Yelp thereafter rejected Google's offer to negotiate limitations to reduce burden (*e.g.*, filtering out attorney names).  To assist Yelp in identifying targeted, responsive information, Google next provided samples from Plaintiffs' productions, including Yelp presentations to Plaintiffs and Mr. Lowe's congressional testimony [*see* Joint

---

[1]  Indeed, as Google explained in its August 27, 2021 briefing [Dkt. Nos. 190, 195], Yelp's response to Google's subpoena contrasts starkly with the cooperation and responsiveness it has offered to DOJ and the Colorado Plaintiffs.  *See* Appendices A, B.

Status Reports, Dkt. Nos. 210, 215, 222].  Yelp was unmoved, citing the burden of reviewing

material and asserting that Mr. Lowe had no personal knowledge of the information in his

statements.  And despite its purported burden, Yelp offered other custodians.  None of these

points resonate: Mr. Lowe's documents are indisputably relevant and should be produced.

## ARGUMENT

**I.   Mr. Lowe's Relevant, Non-Privileged Documents Should be Produced**

Mr. Lowe is a non-lawyer who has testified before the U.S. Senate and Ohio Senate, has

made numerous appearances on television and podcasts, and has given other commentary

seeking antitrust enforcement against Google on the very allegations ultimately brought by the

Plaintiffs.[2] ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.[3]

The specific Subpoena requests to which Yelp objects are plainly relevant to this case,

including Requests 12 and 13 (emphasis added below).[4]

- Request 12: All communications with, and documents or data provided to, third parties (including, but not limited to, government entities, market participants, trade associations, consultants, researchers, academia, and interest groups) ***related to Google's search results, including any antitrust, competition, or consumer protection investigation or litigation involving Google***.

- Request 13: All documents related to actual, potential, or contemplated participation in industry organizations or coalitions ***related to search or search advertisements***.

For several reasons, Yelp's strategy of offering other custodians[5] in lieu of Mr. Lowe is

---

[2] *See* Appendices A, B.
[3] *See* Appendix B.
[4] Yelp has agreed to search terms and data productions that relate to a focused set of subpoena requests proposed by Google.  *See* Appendix C.
[5] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

not acceptable, as it will deprive Google of the information needed to effectively depose or cross-examine Yelp witnesses in this matter.  ***First***, the majority of public and other statements regarding Yelp's allegations about Google as they relate to this case are from Mr. Lowe.  Yelp's substitute custodians do not sufficiently address such statements, including Mr. Lowe's March 2020 testimony to the Senate Judiciary Committee that closely aligns with the Colorado Plaintiffs' Complaint, at ¶¶ 183-89:

> *When Google sees a user's query has local intent, Google's local search service is placed higher on the page, and in a more attractive format, than any organic links to other local search verticals that might appear. The effect is to steer a massive amount of traffic away from local search providers, starving them of the user interaction they require to keep their content fresh and relevant.*[6]

Documents that Yelp already produced in this case reveal that none of the alternative proposed custodians focuses on competition issues, as Mr. Lowe does.  For example, ███████████ is a data scientist, whose role appears to be largely technical, based on documents produced to date.[7]  ████████ is ███████████████████████, whose documents produced thus far focus on details of advertising campaigns and budgets, and internal metrics.[8]  The remaining five individuals are similarly not substitutes for Mr. Lowe.[9]  ***Second***, none of the substitute individuals are ███████████████████████████████████████ ████████████.  *See* Appendix B (examples of ████████████).  Indeed, two are

---

[6]  Testimony of Luther Lowe before the U.S. Senate Committee on the Judiciary (March 10, 2020), at 5, *https://www.judiciary.senate.gov/imo/media/doc/Lowe%20Testimony.pdf*.

[7] ████████████████████████████████████████████████████████
████████████████████████████████████████

[8] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[9] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████

business school professors, who are not even current employees of Yelp.  Yelp has not provided

any search hit count reports that demonstrate the documents Yelp intends to produce from other

custodians will contain Mr. Lowe's records.[10]  ***Third***, it is simply not accurate if Yelp asserts that

Mr. Lowe lacks sufficient knowledge for his documents to be relevant.  His public and other

commentary about antitrust cases, including about this litigation, reflect specific and historical

knowledge of Yelp's allegations as they relate to Google.[11]

## II.    Yelp Has Declined Reasonable Proposals by Google to Reduce Burden

Yelp has refused to engage Google's repeated efforts to resolve any legitimate burden

objection.  Google submits that the following process will enable Yelp to produce documents

with minimal burden:

- Yelp should run the agreed-upon search terms over Mr. Lowe's documents with appropriate revisions to capture documents responsive to Requests 12 and 13, and Google is willing to revise search terms based on hit reports that show categories likely to contain significant privileged material.

- Likewise, for the remaining requests at issue,[12] Google and Yelp can negotiate and agree upon document categories likely to be privileged (*e.g.*, communications with attorneys in the "To" and "From" fields absent other non-attorney recipients), subject to Yelp's production of a privilege log with entries describing withheld documents.

- Google will mark documents with third party names presumptively Highly Confidential, subject to de-designation under the Protective Order as appropriate.

Yelp's burden argument is without merit; it can designate filters, such as attorney and/or firm

names (*e.g.*, @kanterlawgroup.com or @hueston.com) to avoid producing privileged material, as

is typical in any e-discovery process.  Nor has Yelp provided search hit counts that demonstrate

---

[10]  Google notes that Yelp's counsel has also advised it will oppose any deposition or other testimony of Mr. Lowe, an objection which Google believes also lacks any basis.

[11]  *See* Alex Kantrowitz, *Yelp's Luther Lowe on the 'Seismic' Antitrust Case Against Google*, MEDIUM, Oct. 20, 2020, https://onezero.medium.com/yelps-luther-lowe-on-the-seismic-antitrust-case-against-google-d835a3578c99 (commenting on this litigation, including historical observations about Google, Yelp, and his own views on competition law and policy); *see also* Appendix B at ████████████████████████████
████████████████████████████████████████████████████████████████

[12]  *See* Appendix C.

significant overlap with other custodians, or any other unique issue with this particular custodian.

### III.    There is No First Amendment Protection for Factual Allegations About Google

The First Amendment does not bar the discovery into facts Google seeks.  Yelp's views about Google are widely known and published.  There can be no allegation, much less any risk of reprisal, if the identities of any third parties revealed by Yelp's communications are designated Highly Confidential.[13]  Weighed against the clear relevance of the information Google seeks, as Yelp cannot "show that there is some probability that disclosure will lead to reprisal or harassment," it cannot shield itself from discovery requests with generalized First Amendment claims.  *See Greyhound Lines, Inc.*, 1992 U.S. Dist. LEXIS 10095, at *6 (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981), *vacated on other grounds*, 458 U.S. 1118 (1982) (ordering production despite First Amendment claims about association contribution lists)); *see also Educ. Fin. Council v. Oberg*, No. 10-mc-0079 (JDB), 2010 U.S. Dist. LEXIS 102221, at *15 (D.D.C. Mar. 8, 2010) ("largely vague protests do not comply with Rule 45's requirement" when a party asserts a First Amendment challenge to a subpoena).

---

[13]  *See Hispanic Leadership Fund, Inc. v. Walsh*, No. 1:12-CV-1337 (MAD/TWD), 2014 U.S. Dist. LEXIS 192506, at *12-13 (N.D.N.Y. June 9, 2014) (granting defendant's motion to compel because plaintiff "failed to show articulable objective evidence that the requested disclosure will expose [it] and its contributors to economic reprisal, loss of employment, threat of physical coercion, harassment or reprisal from government or private entities, and other manifestations of public hostility").  Courts, including in this District, have recognized that protective orders may minimize any concern of an associational "chilling effect."  *See Klayman v. Judicial Watch*, Civil Action No. 06-670 (CKK) (AK), 2008 U.S. Dist. LEXIS 142879, at *11-12 (D.D.C. Jan. 8, 2008) (declining to quash subpoena to third party and noting that the potential chilling effect of production was minimized by presence of protective order); *Filanowski v. Wal-Mart Stores, Inc.*, Civil No. 99-147-B, 1999 U.S. Dist. LEXIS 24150, at *5-6 (D. Me. Oct. 29, 1999) ("Having failed to make some showing how Defendant's possession of the list impairs ATLA's associational activities, especially in light of the recently issued confidentiality order, the Court is satisfied that the privilege does not apply in this case.").  Courts in this District have also recognized that there can be no "chilling effect" where the allegedly "chilled" group's views are already publicly known.  *Greyhound Lines, Inc. v. Int'l Amalgamated Transit Union*, Misc. Action No. 90-134, 1992 U.S. Dist. LEXIS 10095, at *6-7 (D.D.C. July 9, 1992) ("[C]hilling effect would not extend to information regarding contributions made by ATU International or local ATU affiliates, since these organizations are already known to be associated with the strike.")

Yelp relies on a post-trial discovery ruling in *Apple Inc. v. Match Group Inc.*, which neither aligns with precedent in this District nor is it on point on the facts. *See* Case No. 4:21-mc-80184-YGR, Dkt. No 36 at 4 (N.D. Cal. Aug. 19, 2021) (Appendix D). Any concerns Yelp may have about disclosure of third-party information to Google can be resolved by designating documents containing names of third parties as presumptively Highly Confidential. *Id.* at 13-14 (discussing concerns that disclosure to Apple would "chill" participation in the Coalition). The Protective Order in *Apple v. Match* would have permitted certain Apple employees to view the documents sought regardless of their designation. *Id.* at 13 n.7. Although Google of course disagrees with Yelp's assertions, its agreement to presumptively designate documents containing names of third parties as Highly Confidential under the Protective Order should alleviate any concerns.

Moreover, unlike Google's tailored requests (*see* Appendix C), in that case, the post-trial discovery requests sought "absolutely every document in Match's possession," including documents about its "formation, documents of incorporation, bylaws, purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees." *See id*. at 4. The court struggled to understand why documents about "which politicians the Coalition ha[d] been lobbying" or about the Coalition's formation and bylaws related in any way to the antitrust claims in the class action. *Id.* at 5. By contrast, Google's requests are limited to topics for which Yelp has already agreed to produce information. Yelp has no basis to oppose production.

## CONCLUSION

For these reasons, Google respectfully requests that the Court compel Yelp to produce responsive non-privileged documents from Mr. Lowe by October 29, 2021, and provide a privilege log regarding any responsive documents withheld on privilege or other grounds.

Dated: October 1, 2021

Respectfully submitted,

By:

WILSON SONSINI GOODRICH & ROSATI P.C.
Wendy Huang Waszmer (D.C. Bar No. 478725)
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1301 Avenue of the Americas
New York, New York 10019
Tel:  212-497-7702
wwaszmer@wsgr.com

1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com


WILLIAMS & CONNOLLY LLP
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
725 12th Street, NW
Washington, DC 20005
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com


ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
Matthew McGinnis (*pro hac vice*)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

*Counsel for Defendant Google LLC*

8

# APPENDIX A

## APPENDIX A

### Proposed Yelp Custodian Currently Disputed

**Luther Lowe**:  Mr. Lowe[1] is Senior Vice President of Public Policy at Yelp and has been a Yelp employee for over thirteen years.  In this role, he manages and directs the company's global outreach to policy makers about Yelp, including interfacing with competition agencies.

Yelp initially agreed to include Mr. Lowe as a custodian, but advised on August 27, 2021 that it no longer agreed to include him.

 Mr. Lowe has also testified before the U.S. Senate and Ohio Senate regarding Google, including the specific allegations pleaded in this case.  *See* Appendix B (Ohio Senate testimony).  Mr. Lowe has also given interviews and participated in podcasts specifically discussing the allegations in this litigation, as well as the preceding investigations.[3]

Google expects that Mr. Lowe's documents will address gaps left by the current set of Yelp custodians.  Mr. Lowe's documents will cover the basis for his statements about Google and alleged harm to Yelp that is at issue in this case.  Relevant documents include third-party communications with government entities and other third parties, and internal communications related to and supporting Yelp's public statements about the allegations in this case.

---

[1] https://www.linkedin.com/in/lutherlowe/.

[2] As Google explained in its August 27, 2021 briefing [Docket Nos. 190, 195], Yelp's response to Google's subpoena contrasts starkly with the cooperation and responsiveness it has offered to DOJ and the Colorado Plaintiffs.

[3] *See, e.g.,* Alex Kantrowitz, *Yelp's Luther Lowe on the 'Seismic' Antitrust Case Against Google*, MEDIUM, Oct. 20, 2020, https://onezero.medium.com/yelps-luther-lowe-on-the-seismic-antitrust-case-against-google-d835a3578c99 (commenting on this litigation, including historical observations about Google, Yelp, and his own views on competition law and policy); Luther Lowe on CNBC Squawk Alley, https://www.youtube.com/watch?v=qMQhzqHtQRE (October 20, 2020).

# APPENDIX B

# APPENDIX C

## APPENDIX C

**Google's April 13, 2021 Subpoena to Yelp, Inc. - Document and Data Requests**

Yelp has agreed to search terms and data productions relating to the following set of subpoena requests proposed by Google:

| Request No. | Document Requests |
|---|---|
| 4 | DOJ Request 10 seeks documents about the substitutability or complementarity of the Company's search advertising or other paid listings or result formats with other forms of digital and non-digital advertising. To the extent not already called for by DOJ Request 10, produce all documents comparing, contrasting, discussing, analyzing, or addressing the actual or potential substitutability or complementarity of the Company's search advertising services or other paid listings or result formats with an advertiser's efforts to obtain free traffic, including by improving its organic search ranking or otherwise improving its profile or listing on Your website or any other search service. |
| 5 | DOJ Request 14 seeks documents sufficient to show whom the Company sees as competitors for search advertisements and specialized search services. To the extent not already called for by DOJ Request 14, produce documents sufficient to show whom the Company sees as its competitors for digital and non-digital advertising. |
| 8 | The Second DOJ Request 16 seeks documents discussing the advantages and disadvantages of types or formats of digital advertising. In addition to digital advertising, produce all documents on the topics covered by the Second DOJ Request 16 regarding the advantages and disadvantages, or otherwise comparing different formats, types, or channels of non-digital advertising. In addition, to the extent not already called for by the Second DOJ Request 16, for both digital and non-digital advertising, produce documents concerning:<br>a. how and how often the Company revises or considers revising its advertising budget, including shifting advertising budget or spend from one format, type, or channel to a different format, type, or channel;<br>b. how different advertising formats, types, or channels were or may be affected by innovations and changes in targeting and attribution technologies;<br>c. how different advertising formats, types, or channels were or may be affected by past, upcoming, anticipated, or potential changes in digital platforms' policies and government regulations concerning cookies and data privacy;<br>d. other key performance indicators ("KPIs"), if any, that the Company uses to evaluate the effectiveness of each advertising format, type, or channel, including changes over time; or<br>e. the value of an additional click or impression and whether the value of an |

|   | |
|---|---|
|   | additional click or impression is decreasing, constant, or increasing (e.g., would the Company be willing to spend more, the same, or less for the first click/impression of the ad than the 100th?) including changes over time. |
| 9 | DOJ Request 17 seeks documents about the Company's strategy or rationale regarding digital advertising. In addition to digital advertising, produce all documents on the topics covered by DOJ Request 17 as to non-digital advertising. In addition, to the extent not already called for by DOJ Request 17, for both digital and non-digital advertising, produce documents:<br>a. discussing changes in targeting or attribution technologies used by different platforms, entities, or other sources of inventory; or<br>b. discussing data privacy. |
| 10 | Colorado Request 8 seeks documents concerning communications with Google related to the topics of the Colorado Lawsuit. Produce communications on the same topics identified in Colorado Request 8 with any search service, including Microsoft, DuckDuckGo, and Facebook. |
| 11 | All documents concerning the actual or potential business, strategic, or other impact, if any, of any actual or potential antitrust investigation of Google, whether or not resulting in any government action, including advantages or disadvantages to the Company of any such action. |
| 12 | All communications with, and documents or data provided to, third parties (including, but not limited to, government entities, market participants, trade associations, consultants, researchers, academia, and interest groups) related to Google's search results, including any antitrust, competition, or consumer protection investigation or litigation involving Google. |
| 13 | All documents related to actual, potential, or contemplated participation in industry organizations or coalitions related to search or search advertisements. |
| 14 | All documents related to the paper by Michael Luca et al. titled "Does Google Content Degrade Google Search? Experimental Evidence" (dated September 2015) or the paper by Hyunjin Kim et al. titled "Product Quality and Entering Through Tying: Experimental Evidence" (dated 2019), including, but not limited to, communications with and payment to the authors, documents concerning the underlying studies and experiments, and any documents or data You supplied in connection with the papers or the underlying studies and experiments. |
| 15 | All documents concerning any study, analysis, or presentation related to Google's search results or search advertising offerings. |
| 17 | All documents concerning actual or potential competition the Company faces related to its search service, including (i) documents sufficient to show who the Company views as its actual or potential competitors; and (ii) documents, studies, analyses, or |

| | |
|---|---|
| | data relating to how often users navigate from/to the Company's properties to/from another search service to run the same or similar queries. |
| 18 | All documents discussing the Company's strategy regarding actual, potential, or anticipated development or entry into specialized search services, including documents sufficient to show each specialized search service the Company has developed and/or has considered developing. |
| 19 | All documents discussing how user query volume on the Company's properties affects the quality of or demand for the Company's search service. |
| 21 | All documents discussing the market share of Your search service over time, based on queries, users, search starts, purchases or bookings, or any other metric tracked or analyzed by the Company. |
| 22 | All documents related to the Company's strategies or plans for attracting or retaining users and user traffic and queries to its properties, including all supporting data (including, but not limited to, ongoing monitoring), analyses, studies, experiments, surveys, or reports. Examples of responsive material include, but are not limited to, documents concerning: a. the Company's strategy to compete for user traffic and queries with search engines, including decisions to not pursue certain strategies; b. users' choices of where to initiate user queries, users' path in seeking information, and the extent to which users multi-home or otherwise switch between or among the Company's properties, and the properties of the Company's competitors; c. the quality and performance (including changes over time) of the Company's search service on any dimension, by category of search (if available), including, but not limited to, search result quality, user preference, user experience, or monetization potential; d. how the quality and performance of the Company's search results compare with that of other search engines and social media, including documents that assess relative quality and performance for specific categories of search queries; e. how search results on Your search service are ranked, changes to that process over time, and the reasons for those changes; f. user feedback or complaints regarding the quality of Your search service, including related to user experience or ease of access, negative or fraudulent experiences with third parties found or booked through Your search service, or comprehensiveness of results; g. practices or policies concerning the types of results (e.g., results from other search services) that are included or excluded in Your search service results, including any related user or quality studies and all underlying data; h. any acquisitions, investments, actions, or changes the Company made to its service(s) in response to competition with other search engines or social media sites; i. the Company's strategies for and costs of obtaining user traffic and diversifying sources of user traffic (e.g., search engine optimization ("SEO") and search engine |

3

|   | marketing ("SEM")), downloaded and preinstalled applications, display ads, video ads, TV ads, social media, non-digital ads, etc.), including data showing any distribution payments by channel (e.g., Safari web browser, Apple Maps, Siri, Spotlight, Mozilla web browser, preinstalled applications, etc.);<br>j. the Company's strategies to improve its brand recognition or otherwise increase the likelihood that users will navigate directly to Your properties;<br>k. the implications of users shifting from desktop to mobile and how app usage on mobile has affected or could affect searches on Company websites and those of its competitors, including Google;<br>l. the Company's strategies for obtaining mobile user traffic, including the level of user engagement on the Company's mobile applications and websites; or<br>m. the effect of preinstallation or default of the Company's app or website on users' propensity to use the Company's services, other search engines, or social media sites for their shopping searches. |
|---|---|
| 23 | All documents concerning actual, potential, considered, explored, or anticipated agreements between the Company and search engines, device OEMs, wireless carriers, web browser developers, voice assistant developers, or any other party to distribute, promote, integrate with, or use content from Your search service. For each such agreement provide:<br>a. all documents concerning actual, potential, or anticipated benefits or gains, or disadvantages or losses arising from the agreements, including but not limited to analyses of incremental revenues, profits, or query volume attributed to such agreements;<br>b. all documents concerning modification or termination of such agreements; and<br>c. data sufficient to show on a monthly basis from January 1, 2010, any distribution or revenue-sharing payments paid or received in connection with the agreement, by agreement, device type, device OEM, OS, and channel (e.g., web browser, app, voice assistant, map service, search feature, etc.). |
| 25 | All documents discussing the display, placement, prominence, or visibility of Your website or search service in ads, paid listings, or organic listings on other search engines, social-media sites, or app stores, including documents concerning the benefits of appearing in one area of a search engine results page versus another. |
| 26 | All documents concerning actual, potential, or contemplated requests that a search engine modify the way in which it shows results for, or other content related to, Your website or search service. |
| 27 | All documents concerning (i) any actual or potential effects, if any, on the Company, or on the businesses appearing in the Company's search results, of changes made by any search engine on the selection, ranking, or display of content on its results page; and (ii) the Company's response, if any, to such changes. |
| 28 | All documents describing user quality improvements in the Company's search services, and how the Company measures and evaluates such improvements. |

| | |
|---|---|
| | Responsive information may include documents about design innovations, improvements in result quality, changes to search result types or formats, changes to query options, changes in data or information used to generate results, changes the availability of presentation of product categories, improvements in shopping experience or time to conversion, or any other changes or developments, including documents relating to the metrics by which the Company measures or evaluates such improvements, and documents that refer to user quality improvements by Your competitors. |
| 32 | All documents concerning any actual, potential, or contemplated strategies or plans for earning revenue in connection with Your search service, including, but not limited to, relative amount of revenue by source (e.g., advertising, referral fees, licensing fees, quality certification fees, commissions, etc.) and any actual or contemplated changes in fees charged to users, businesses, or advertisers. |
| 33 | Documents and data sufficient to show the following information regarding any advertising source of revenue referenced in documents provided in response to Request 32:<br>a. the total U.S. advertising revenue for all advertising products and solutions by year and year to date;<br>b. the total U.S. advertising revenue by year and year to date, broken down by product or solution; and<br>c. the Company's terms and/or eligibility requirements for advertisers to use each product and solution or any other limitation on any class or category of advertisers to advertise on particular locations on the Company's properties. |
| 34 | Documents and data sufficient to show the following information regarding any non-advertising source of revenue referenced in documents provided in response to Request 32:<br>a. total revenue by year and year to date;<br>b. the total U.S. revenue by year and year to date, broken down by product or solution; and<br>c. the Company's terms and/or eligibility requirements for businesses to receive referrals, bookings, or other benefits associated with the revenues listed in part (a). |
| 35 | Documents sufficient to show the actual or potential competition You face for advertisers who place advertisements on the Company's properties, including, but not limited to, documents discussing:<br>a. advertisers' allocation of their budget between You and others;<br>b. the reasons advertisers choose You or Your competitors; and<br>c. improvements made in response to advertiser feedback and/or competition. |
| 37 | Documents sufficient to describe all tools, functionality, or features offered by the Company that have the purpose or effect of assisting advertisers to (i) target advertising towards customers or groups of customers or (ii) measure the outcome of advertising (e.g., click-through rates, conversions, etc.), including any data used |

| | |
|---|---|
| | to support these tools, functionality, or features and any changes in these tools, functionality, or features over the past ten years. |
| 39 | All documents regarding Your eligibility to appear on search engines and in types of search engine results (including ads, paid listings, organic listings, and any other formats), including documents relating to any policy or decision of a search engine not to include You in particular types of search engine results. |
| 40 | All documents concerning whether any entity, platform, or other source that sells digital advertising prevents You from displaying Your branding information on ads You buy. |
| 42 | All documents concerning any actual, potential, or contemplated strategies or plans concerning the development, distribution, or promotion of (i) mobile applications or services allowing users to access Your search service, or (ii) websites optimized for mobile devices ("mobile websites") allowing users to access Your search service, including, but not limited to: <br> a. projections or estimates of total and incremental traffic or usage You would realize through such mobile applications, services, or websites; <br> b. analyses of user demand or market opportunity, including market share analyses; <br> c. documents concerning identification or evaluation of competing applications, services, or websites; <br> d. documents concerning costs of development; <br> e. documents concerning plans for monetization; <br> f. documents concerning plans regarding obtaining user data through a mobile application, service, or website, including documents concerning the type and amount of user data You obtain from Your mobile applications and the purposes for which this data is used; <br> g. documents concerning consideration or prioritization of mobile OS on which to develop; <br> h. documents concerning Your ability to develop, distribute, and promote Your mobile applications and services on Android as compared with other mobile OS; <br> i. documents concerning preinstallation or placement of Your applications or services or setting Your applications or services as a default on any device; or <br> j. documents concerning user difficulty with using Your services on mobile devices through Your websites that were not optimized for mobile devices, and Your response to such difficulties. |
| 43 | All documents concerning the actual or potential effects, if any, Google's agreements with third parties have on Your ability to distribute or promote your applications and services on mobile devices, desktops, or any other device. |
| 45 | All documents regarding the use of prompts, suggestions, or instructions to users to download or install Your search service, including on the Company's own products and services or on third-party products and services; include any agreements with third parties to prompt, suggest, or instruct users to download or install Your search |

| | service and any analyses of the impact of such prompts, suggestions, or instructions to download or install Your search service on user behavior. |
|---|---|
| 49 | All documents discussing the process by which the Company sets its SEO budget and allocates its SEO budget to optimize performance on different search providers. |
| 50 | All documents discussing the effectiveness of or returns from the Company's SEO strategies, including changes over time. |
| 51 | All documents discussing the substitutability or complementarity of SEO and SEM, and whether this view varies by search engine or changes over time. |
| 56 | All documents concerning any justifications for underperformance or reasons You have been unable to meet revenue, user traffic or usage, or any other targets or guidance You have provided to Your investors. |
| 57 | All documents concerning comparisons between Your performance and the performance of other local search services (e.g., TripAdvisor, OpenTable, Grubhub, ANGI Home Services, etc.) on revenue, user growth, traffic growth, review growth, sales productivity, monetization, or any other metric. |
| 58 | All documents concerning deficiencies or gaps in the features or functionality of Your products or services as compared with those of Your competitors and/or other local search services (e.g., TripAdvisor, Open Table, Grubhub, ANGI Home Services, etc.). |
| 61 | All documents regarding the advantages and disadvantages for users and advertisers of the introduction and development of local, product, travel, and other category-specific search results by search engines such as Microsoft, Google, Yahoo!, DuckDuckGo, or earlier search engines, such as AltaVista or Excite! |
| 63 | All documents related to Your decision to "[wind] down [Your] international sales and marketing operations and reallocate[] the associated resources primarily to [Your] U.S. and Canadian markets," as described in Your 2016 Form 10-K filed with the Securities Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1345016/000120677417000642/yelp3063 379-10k.htm. |
| 65 | All documents regarding (i) the information and conclusions in the presentation by SQN Investors, "A Fresh New Perspective," dated January 16, 2019, on the Company's strategy, execution, management, optimization, alignment with stockholders, and corporate governance, (ii) SQN Investors' recommendations in the same presentation, and (iii) communications between You and SQN Investors and any participants named in the presentation as "SQN" regarding the information, conclusions, and recommendations in the presentation and Your response. |

| 67 | All documents supporting the statement that Yelp has a "strong partner ecosystem" in Your Q3 2019 Earnings Conference Call Presentation, available at https://s24.q4cdn.com/521204325/files/doc_financials/quarterly/2019/q3/Yelp-Investor-Presentation_November-2019.pdf, including all documents related to agreements with each of the partners listed in the presentations (e.g., Yext, GoDaddy, Apple, Sprint, TDn2K, Vagaro, etc.) and with any other partners for any of the categories (e.g., "advertising," "ad starts & claims," "fusion," "mobile distribution," "knowledge," "platform," etc.) that were not listed in the presentations. |
| 69 | All documents concerning Your policies, procedures, actions, or reactions to businesses that decline to advertise, promote, list, or market their product or service with the Company, including complaints from businesses about repeated contacts or communications from the Company, complaints from businesses regarding ranking or demoting of their businesses in results, Your removal of positive reviews or refusal to remove negative reviews from business listing pages on Your site, or other responses from the Company as well as Your consideration of or reaction to such complaints, both for specific businesses and in aggregate. |
| **Request No.** | **Data Requests** |
| 3 | DOJ Request 7 seeks information about the Company's user traffic data. Produce the data requested by DOJ Request 7 with the following additional break outs: (i) by additional sources of traffic, including device search features (e.g., Apple Spotlight), map services (e.g., Apple Maps), and social media (e.g., Facebook); and (ii) for web traffic, stated separately by web browser. In addition, for the same time period and broken out in the same way, produce data sufficient to show: a. organic listing clicks; b. paid listing clicks; c. paid listing click-through-rate; d. number of queries with no ads displayed; e. average number of ads appearing above the search results, overall and by ad type (e.g., search ad, display ad); and f. costs associated with obtaining the user traffic, including, but not limited to (extending DOJ Request 7(k)): i. non-digital advertising spend; ii. mobile app advertising spend; iii. display advertising spend; and iv. search engine optimization spend. |

| 7 | The First Request 16 of the DOJ Subpoena seeks data about the Company's purchase of ads, broken down by month. For each category of ad identified in the First DOJ Request 16, please also produce the following:<br>a. targeting criteria used;<br>b. conversions; and<br>c. return on ad spend ("ROAS"). |
| --- | --- |
| 38 | Documents or data sufficient to show the top advertisers on the Company's properties in the following categories:<br>a. the top 250 advertisers by revenue with U.S. advertising spend on the Company's properties in any year from 2010 onwards, including (i) the name and address of the advertiser; and (ii) each such advertiser's total annual U.S. advertising spend on the Company's properties from 2010 to 2020, broken out by type of ad format; and<br>b. the top 250 third-party professional service providers offering their services through the Company's sites or pages, including (i) name and address of the advertiser; and (ii) each third party's total annual payments to the Company in connection with selling their services broken out by type (e.g., pay per click advertising, pay per impression advertising, pay-per-lead fees, etc.). |
| 46 | From January 1, 2010, separately for each brand or domain You own or control, data sufficient to show, on a monthly basis, (i) the number of prompts, suggestions, or instructions to users to download or install Your search service on Your products and services or on third-party products and services; and (ii) the number of downloads or installations of Your search service resulting from such prompts, suggestions, or instructions. |
| 47 | From January 1, 2010, separately for each brand or domain You own or control, data on the Company's search service sufficient to show, on a monthly basis, the number of devices with the Company's search service applications(s), and provide the data broken down by each app:<br>a. by device type, device OEM, device model, and OS; and<br>b. distinguishing whether the app was preinstalled or downloaded by the user. |
| 68 | Separately for each brand or domain You own or control, data sufficient to show on a monthly basis, separately by category of business (e.g., Restaurants, Plumbers, Hotels, etc.) and by zip code:<br>a. number of reviews;<br>b. number of photos of businesses available;<br>c. the absolute number and proportion of local businesses that have claimed their location on Yelp;<br>d. the number of new businesses that claimed their location on Yelp; and<br>e. the absolute number and proportion of local businesses that purchase advertisements or other products or services from You. |
| 72 | Separately for each brand or domain You own or control, all data relating to search queries conducted on the Company's digital properties by users in the United |

| | States on or between February 3, 2020, and February 9, 2020 (or other dates agreed to by the parties), including:<br><br>a. search event ID (or encrypted event ID as agreed upon among the parties);<br>b. date of search;<br>c. time of search in Pacific Time;<br>d. categorization of search, using any categories or sub-categories tracked in the ordinary course of business;<br>e. metropolitan statistical areas from which the search was conducted;<br>f. search query string (or encrypted search query string as agreed upon among the parties);<br>g. device type (e.g., computer, tablet, or mobile phone);<br>h. web browser;<br>i. operating system;<br>j. search access point (e.g., the Company's app, Chrome, the Google Search App, etc.);<br>k. identity of redirecting site (e.g., Google, Bing, travel-related website, etc.);<br>l. number of search ads displayed;<br>m. number of clicks on sponsored search ads;<br>n. organic listing clicks;<br>o. paid listing clicks;<br>p. number of bidders in each auction;<br>q. total revenue from all sponsored search ads displayed;<br>r. total number of conversions;<br>s. keywords (or encrypted keywords as agreed upon among the parties) bid on by the advertiser that generated the highest sponsored ad, if applicable;<br>t. keywords (or encrypted keywords as agreed upon among the parties) bid on by the advertiser that generated the second highest sponsored ad, if applicable;<br>u. keywords (or encrypted keywords as agreed upon among the parties) bid on by the advertiser that generated the third highest sponsored ad, if applicable;<br>v. cost-per-click for highest positioned sponsored ad;<br>w. cost-per-click for second highest positioned sponsored ad;<br>x. cost-per-click for third highest positioned sponsored ad;<br>y. bid for the highest positioned ad;<br>z. bid for the second highest positioned ad;<br>aa. bid for the third highest positioned ad;<br>bb. reserve price;<br>cc. binary indicator (e.g., 0 or 1) for if highest position sponsored ad was clicked;<br>dd. binary indicator (e.g., 0 or 1) for if second highest position sponsored ad was clicked;<br>ee. binary indicator (e.g., 0 or 1) for if third highest position sponsored ad was clicked;<br>ff. binary indicator (e.g., 0 or 1) for if a product or service of an advertiser whose sponsored ad was shown also showed up as an organic search result; |
|---|---|

| | gg. binary indicator (e.g., 0 or 1) for if a product or service of an advertiser whose sponsored ad was shown also showed up as an organic search result and the organic link was clicked; and |
| | hh. total value of the bids for all sponsored search ads. |

# APPENDIX D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

APPLE INC,

        Movant,

    v.

MATCH GROUP, INC.,

        Respondent.

Case No.  21-mc-80184-YGR   (TSH)

**DISCOVERY ORDER**

Re: Dkt. No. 1

In this miscellaneous action transferred from the Northern District of Texas, Apple moves to compel documents from Match Group that are responsive to Apple's requests for production ("RFPs") 29, 30 and 32.  The RFPs were part of a subpoena Apple served on non-party Match in three underlying actions pending in this district:  *Epic Games, Inc. v. Apple Inc.*, 20-cv-5640; *Cameron, et al. v. Apple Inc.*, 19-cv-3074; and *In re Apple iPhone Antitrust Litigation*, 11-cv-6714.  Match, as you probably know, operates various online dating services, such as Tinder, OkCupid, PlentyofFish, and Match,[1] and these services have related apps that run on smartphone devices, such as the iPhone and Android phones and tablets.  Apps are the primary way customers use the services Match provides.

The three underlying lawsuits are all antitrust cases against Apple, alleging that Apple monopolizes the iOS app distribution market and uses that monopoly power to charge supracompetitive commissions to app developers for paid apps and on in-app purchases.  To obtain information about relevant subjects such as market definition, Apple and the plaintiffs in the underlying lawsuits have subpoenaed many non-party app developers and other companies that

---

[1] The Court is simplifying.  Match Group, Inc. is a holding company, and its subsidiaries operate the various dating services.  The Court refers to MGI and its subsidiaries together as "Match," as Match did in its briefing.

Apple contends are part of the relevant market(s). The antitrust trial in the *Epic Games* case is over, so there is no point in forcing Match to produce documents on the basis that they are relevant to the antitrust issues in that lawsuit, because it's too late to use them as evidence.[2] The deadline for Apple to oppose class certification in the two class actions was August 10, 2021, but since a certified class can be decertified later, the Court will assume that documents relating to class certification could still be relevant to the class actions. And, of course, merits discovery is still open in the class actions.

So, let's turn to the dispute.

## A.    The RFPs

The RFPs in dispute seek the following:

> REQUEST FOR PRODUCTION NO. 29:[3]
>
> DOCUMENTS, INCLUDING COMMUNICATIONS CONCERNING the COALITION INCLUDING its formation, documents of incorporation, bylaws, purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees.
>
> REQUEST FOR PRODUCTION NO. 30:
>
> DOCUMENTS CONCERNING COMMUNICATIONS with any actual or proposed founder or member of the COALITION, INCLUDING Basecamp, Blix Inc., Blockchain.com, Deezer, Epic Games Inc., European Publishers Council, News Media Europe, Prepear Inc., ProtonMail, SkyDemon, and Tile, CONCERNING the COALITION, DEFENDANT, any APP MARKETPLACE, YOUR APP(s), and/or any allegations or suspicion of any anti-competitive conduct or behavior.
>
> REQUEST FOR PRODUCTION NO. 32:
>
> ALL COMMUNICATIONS between YOU and any APP DEVELOPER, INCLUDING EPIC, or any member of the COALITION, CONCERNING:
>
>> a. the DEFENDANT'S iOS App Store, INCLUDING any guidelines, policies, and procedures for the DEFENDANT'S

---

[2] Other issues remain untried in the *Epic* case, such as Apple's breach of contract counterclaim. During oral argument, Apple agreed that its subpoena to Match is not directed to these other issues in the *Epic* case and that Apple's relevance arguments relate to the developer and consumer class actions.

[3] As written, RFP 29 is ungrammatical. The Court interprets the RFP as if there were commas after the words "communications" and "Coalition."

United States District Court
Northern District of California

iOS App Store;

b. policies, practices, and/or procedures for handling and processing payments for the sale of IN-APP PRODUCTS;

c. the following ongoing litigation, INCLUDING declarations, anticipated oral testimony, or documentary evidence relating to the same:

> i. *In re Apple iPhone Antitrust Litigation.*, Case No. 4:11-cv-06714-YGR (N.D. Cal.);
> ii. *Lawrence v. Apple Inc.*, Case No. 4:19-cv-02852-YGR (N.D. Cal.);
> iii. *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.);
> iv. *Sermons v. Apple Inc.*, Case No. 4:19-cv-03796-YGR (N.D. Cal.); and
> v. *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.).

The dispute between Apple and Match is pretty straightforward.  Apple says the RFPs seek relevant documents and do not infringe on the First Amendment privilege.  Match disagrees.

**B.      Whether the RFPs Seek Relevant and Proportional Discovery**

Apple's theory of relevance concerns the Coalition for App Fairness (the "Coalition"). Apple has put forth evidence that the Coalition was something created by Epic Games as part of its Project Liberty, an aggressive and sustained legal and media campaign aimed at Apple's control over iOS app distribution and the App Store's high commissions.  Internal documents show that Epic did not regard itself as a sympathetic figure because it is a large company, so it decided to build a coalition in the form of a 501(c)(4) entity and have other app developers join it. Apple has provided an unsigned statement of work (admitted in evidence in the *Epic* trial) showing that Epic retained The Messina Group to set up the Coalition, whose purpose is to "define the opposition aggressively – who they are, what they do and their motives while proactively positioning the campaign focus.  The Coalition will pitch local and national press, influence conversations on social media, and engage in other earned media efforts."  The Coalition has a website (https://appfairness.org) that describes its mission, and on it we learn that Match was one of the founding members, along with Epic Games and 12 other companies.

For its part, Match describes the Coalition more broadly, stating that "the Coalition's activities include (1) political advocacy and lobbying, including engaging Congress, state

3

legislators, and foreign officials on relevant areas of concern (*i.e.*, antitrust legislation and enforcement regarding anti-competitive practices in the mobile app ecosystem); (2) educating the public; (3) public relations; (4) recruiting other app developers and coalition building in support of political advocacy and lobbying; and (5) researching, strategizing, and exchanging information and opinions."  Mark Buse Decl. ¶ 7 (Match APPX003, ECF No. 21).

The Court thinks it understands why the Coalition is relevant to the *Epic* case, or at least why Apple thinks so.  Epic had a major press strategy that accompanied its lawsuit.  The "Coalition for App Fairness" sounds like a groundswell of popular opposition to Apple's policies, but at least in Apple's telling, the organization was actually Epic's idea, and it was created for the purpose of presenting a more appealing public face for the cause Epic was championing, and was apparently bankrolled by Epic and perhaps others.

But as noted, the *Epic* antitrust trial is over.  Therefore, the Court must figure out how, if at all, discovery concerning the Coalition is relevant and proportional to the two class actions.  RFP 29 seeks documents (including communications) concerning the Coalition, including its formation, documents of incorporation, bylaws, purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees.  As written, RFP 29 seeks absolutely every document in Match's possession, custody or control concerning the Coalition.  The specific examples of types of documents listed in the RFP (such as documents of incorporation, bylaws and so on), after all, follow the word "including," so just serve as examples.  Once you take out the two "including" clauses (because they don't actually narrow the RFP), RFP 29 seeks "documents . . . concerning the Coalition."  Definition 11 in the subpoena states that "'document' and 'documents' . . . shall include, without limitation, *any and all* drafts; communications" and about two dozen other types of documents.  (emphasis added).  Definition 8 in the subpoena states that "'concerning' a given subject shall mean:  directly or indirectly comprising, concerning, constituting, containing, discussing, embodying, evidencing, exhibiting, identifying, mentioning, negating, pertaining to, recording, regarding, reflecting, relating to, showing, or supporting a given subject matter."  So, putting these definitions together we see that RFP 29 seeks any and all documents mentioning, pertaining to, discussing, regarding, or relating to the Coalition,

4

United States District Court
Northern District of California

1    underscoring the breadth of this request.

2         Match says "[t]here can be little doubt why Apple wants these documents:  to peek behind

3    the curtain of a political opponent."  Opp'n at 1, ECF No. 19.  Match decries "Apple's stated

4    justifications" as "transparent pretext," and says the true purpose of this motion to compel is to

5    "force a non-party to turn over to a public policy opponent its internal communications."  *Id*.

6    (simplified).  The Court cannot read minds to know Apple's true intentions, but it also doesn't

7    need to.  Rule 26 limits discovery to what is relevant and proportional to the needs of the

8    underlying cases, and much of what Apple is requesting does not meet that standard.  The

9    Coalition's lobbying activities, for example, are not relevant to class certification or the merits.

10   Apple does not need to know which politicians the Coalition has been lobbying, how many

11   meetings they have had, which foreign officials in which countries the Coalition has been talking

12   to, and what public education efforts the Coalition has undertaken in order to effectively oppose

13   class certification or defend the cases on the merits.  Neither are draft public statements by the

14   Coalition, emails among Coalition members about what the Coalition's website should say, or

15   brainstorming emails about public relations strategies relevant to the legal and factual issues

16   presented in the class actions.  The next section of this order will discuss the First Amendment

17   concerns that arise from this attempt by Apple to take discovery into the inner workings of its

18   public policy opponent.  But for now, it is sufficient to note the sweeping overbreadth of this RFP,

19   which is not at all limited to discovery that is relevant and proportional to the needs of the class

20   actions.

21        Even if we scrap the broad request for "documents . . . concerning the Coalition" and just

22   limit RFP 29 to the second including clause ("its formation, documents of incorporation, bylaws,

23   purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees"),

24   the Court still cannot understand how all of this is relevant and proportional to the needs of the

25   class actions.  How will the Coalition's documents of incorporation and bylaws shed light on

26   whether the developer and consumer proposed classes should be certified or whether their antitrust

27   claims against Apple have merit?  For any organization, meeting minutes tend to be sparse, but

28   here those minutes would presumably record the activities of the Coalition, and Apple has not

5

United States District Court
Northern District of California

1  explained why the details of its media and political campaign would be evidence that is relevant to

2  class certification or the merits of Plaintiffs' claims or Apple's defenses.

3      As the Coalition has an entire website explaining its purpose and objectives, why should

4  Match be compelled to produce documents about those subjects?  Also, in the class actions, why

5  do we care what the Coalition's purpose and objectives are?  In the *Epic* trial, the fact that Epic

6  came up with the idea for the Coalition shed light on its Project Liberty, but the class actions are

7  about thousands of developers and millions of consumers.  That some portion of the proposed

8  developer class banded together to form the Coalition doesn't seem to shed light on anything.

9      Neither does the Court see the relevance of the Coalition's membership, founders or

10  sponsorship.  It might be true that certain types of app developers have joined or sponsored the

11  Coalition and that they are not representative of app developers overall.  We can infer that app

12  developers that have joined or sponsored the Coalition support its mission, but Apple has not

13  provided a reason to think that the failure to join or sponsor the Coalition means anything at all.

14  Even for extraordinarily well known organizations, which the Coalition is not, you can't infer

15  anything from someone's failure to join or sponsor, say, the NAACP or the National Organization

16  for Women.  Apple does not explain what relevant facts would be revealed, or what inferences

17  could be drawn, from evidence about the Coalition's members or sponsors.

18      Likewise, the Coalition's fees and activities do not seem relevant to the class actions.  Why

19  does it matter how much an app developer has to pay to join the Coalition?  How will that show

20  that common questions do or do not predominate among the proposed developer class, or that

21  Apple has or has not exercised monopoly power?  The details of the Coalition's activities will

22  presumably show a media and political campaign against Apple's policies, but those public

23  relations materials are not themselves evidence of anything.  This proposed discovery is not

24  proportional to the needs of the class actions.

25      RFP 30 seeks (with some simplification) Match's communications with actual or proposed

26  Coalition members concerning the Coalition, Apple, any app marketplace, Match's apps, and anti-

27  competitive conduct.  This RFP suffers from the same problem as RFP 29 in that it seeks every

28  communication between Match and other Coalition members (and proposed Coalition members)

6

about the Coalition or about Apple, no matter what the subject of the communication is.  This sweeps in all discussions of the Coalition's media and political campaign against Apple, including discussions of lobbying activities, recruitment efforts, public education efforts, and so on, that are unlikely to be relevant to class certification or the merits of the class actions.  As with RFP 29, this RFP walks right into Match's accusation that Apple is trying to use discovery to learn what its enemies have been up to, and it does not seem in any way targeted to what is relevant and proportional to the needs of the underlying cases.

Apple says it wants to find evidence of "the harm or benefits the developers perceive from the App Store and the policies at issue," "the importance to them of Apple's security and privacy features for app development and customer acquisition," "the varying monetization strategies that developers are able to deploy," and "individualized differences between developers."  Mot. at 5. Yet there is a strange misalignment between what Apple says it wants to take discovery about and what its RFP actually asked for.  This RFP did not ask for documents concerning the harm or benefits developers perceive from the App Store, or concerning the importance to developers of privacy and security, or concerning app monetization strategies, and so on, and then leave it to Match to go find those in its internal documents or external communications.  Instead, Apple asked for all communications between Match and other members or proposed members of the Coalition concerning the Coalition or Apple, whether or not those communications have anything to do with these subjects.  Thus, relevant documents would be responsive only by accident because the RFP is not drafted in terms of relevant subjects.

To be sure, the document dump[4] envisioned by RFP 30 would probably include some relevant documents.  However, the Court's responsibility under Rule 26 is to limit discovery to what is proportional to the needs of the class actions, and under Rule 45 it is to avoid undue burden.  The wholesale production of communications with other actual or proposed Coalition

---

[4] Match's Mark Buse stated in his declaration that Match's IT department ran preliminary searches to determine the burden on Match if it were forced to produce responsive documents.  Buse's inbox alone contains more than 1,600 emails with the Coalition members specifically named in Apple's subpoena, and that is not even counting any emails with more than 50 other non-Coalition-member app developers, which Match would also have to review for responsiveness if the Court enforced RFP 32.  Buse Decl. ¶¶ 20, 21 (Match APPX007, ECF No. 21).

United States District Court
Northern District of California

members about the Coalition or about Apple is not proportional to the needs of the cases and would be an undue burden, even aside from the significant First Amendment concerns presented by this motion.

RFP 32 seeks (with some simplification) communications between Match and any app developer or member of the Coalition concerning (a) the App Store, (b) policies concerning the sale of in-app products, and (c) five lawsuits pending against Apple in this district.  Subjects (a) and (b), especially subject (a), are substantially overbroad because they sweep in every communication about the Coalition's media and political campaign against Apple, which is all about the App Store.  *See* https://appfairness.org/our-vision/ (the Coalition's "vision for the future" consists of ten "App Store Principles").  Emails describing lobbying efforts to get Congress or the states to regulate the App Store, summaries of discussions with foreign officials to try to get their countries to take regulatory action toward the App Store, drafts of public relations statements about the App Store, efforts to recruit more developers to create public pressure on Apple to change its App Store policies – these are all sought by this RFP and are highly unlikely to be relevant.  And remember:  Because Match is a founding member of the Coalition, it is more likely than most developers or more recent Coalition members to have these kinds of political and media-oriented communications that are untethered to the legal or factual issues that are relevant to class certification or the merits.  Subjects (a) and (b) are therefore not proportional to the needs of the cases.

For subject (c), Apple is clear that it wants communications with Match's *counsel* (Mot. at 1) because "Apple is entitled to know the degree to which Match and the Coalition are coordinating with the class plaintiffs," *id*. at 3, and because Apple wants to learn "whether there was some grander level of coordination between litigants suing Apple," *id*. at 7.  Assuming for the sake of argument that coordination between Match or the Coalition, on the one hand, and the class Plaintiffs, on the other, is a relevant subject, that information can be obtained from the Plaintiffs in the underlying actions.  Federal Rule of Civil Procedure 26(b)(2)(C)(i) provides that the Court must limit the extent of discovery otherwise permitted by the rules if the discovery "can be obtained from some other source that is more convenient, less burdensome, or less expensive . . ."

United States District Court
Northern District of California

1    In general, party discovery is more convenient and less burdensome and expensive than

2    subpoenaing a non-party for the same information.[5]

3         RFP 32, of course, is written very broadly and requests communications between Match

4    and "any" developer on the listed subjects, not just the class Plaintiffs.  However, Apple's

5    argument in its motion to compel about discovery from Match's counsel focuses on coordination

6    with "litigants suing Apple," and on pages 3 and 7 of its motion, Apple seems to use the word

7    "coordinate" to mean *helping with a lawsuit*.  Accordingly, Apple's desire through subsection (c)

8    of RFP 32 to learn about efforts to coordinate with those who are suing it does not justify

9    producing communications between Match and app developers that are not suing Apple.

10        For all three RFPs, Apple's back up relevance argument is that responsive documents

11   could be relevant to bias, if Match is called as a witness to testify at trial.  That argument does not

12   in any way address the Court's concerns, discussed above, about the overbreadth and

13   disproportionality of the RFPs.  Nonetheless, let's think about that bias argument.  Normally, bias

14   is something that an individual has or does not have, and Apple's RFPs do not ask for documents

15   from anybody in particular at Match.  Apple's theory of bias seems to be that Match's

16   participation in the Coalition (which responsive documents would presumably show) will be

17   evidence that any witness who is employed by Match is likely to be biased against Apple.  Bias in

18   favor of the perspective held by one's employer can be real, but in this case it does not justify any

19   discovery.  The home page of the Coalition's website lists Match as a founding member and

20   contains a full-throated attack on Apple's policies at issue.  It is perfectly clear where Match

21   stands as a company.  And since Apple makes no argument in its motion to compel that there are

22   particular individuals at Match who it wants to prove are biased, it needs nothing further to

23   substantiate its argument that Match as a company is biased against Apple.  Regardless, even if

24   some additional documents might be helpful to further flesh out the degree of Match's bias, for the

---

[5] One of the listed lawsuits is the *Epic* case.  Of course, Apple cannot get additional discovery from Epic about any coordination with Match or the Coalition because fact discovery is closed in that case.  Regardless, whatever the relevance of litigation coordination may be, the antitrust trial in the *Epic* case is over, and Apple agreed at oral argument that this subpoena is not seeking discovery for the remaining issues at play in the *Epic* case.  *See* n.2, above.

United States District Court
Northern District of California

1  reasons explained above, these RFPs are overbroad and disproportional to that goal.

2          For all of these reasons, the Court concludes that RFPs 29, 30 and 32 do not seek relevant

3  and proportional discovery or are otherwise improper.

4          The next question is what the Court should do about that.  Specifically, should the Court

5  rewrite Apple's RFPs to make them narrower?  The Court thinks the answer is no.  First, the party

6  seeking discovery should write its RFPs because it knows what it wants.  Here, the Court's major

7  concern with Apple's RFPs is that they seek broad discovery into a media and political campaign

8  that is largely irrelevant to the class actions.  But if those documents are what Apple cared most

9  about getting, then narrowing Apple's RFPs would burden both Apple and Match with narrowed

10  RFPs for things Apple doesn't want or doesn't want very much.  Second, the parties briefed this

11  dispute as all-or-nothing.  It is best for the Court to rule on the dispute as it has been presented,

12  rather than try on its own to come up with a compromise that neither side suggested.[6]

13          Accordingly, Apple's motion to compel is denied.

**C.     Whether the RFPs Are Barred by the First Amendment Privilege**

15          Because Apple can appeal this order, the Court should also address Match's argument that

16  Apple's RFPs are barred by the First Amendment privilege.  But first the Court must determine

17  whether Match waived the privilege by failing to timely assert it.

18          **1.     Whether Match Waived the First Amendment Privilege**

19          Objections to a subpoena are due before the earlier of the time for compliance or 14 days

20  after the subpoena is served.  Fed. R. Civ. P. 45(d)(2)(B).  Here, both of those days were

21  December 23, 2020, and Match's December 23 objections stated that "Respondent objects to the

22  Subpoena to the extent that it seeks information that may be protected by the attorney-client

23  privilege, the work-product doctrine, the joint defense privilege, common interest privilege or any

24  other privilege."  Apple asserts, and Match does not deny, that the first time Match specifically

25  asserted the First Amendment privilege was in June 2021.  The Court agrees with Apple that this

26  _____

27  [6] *See* Opp. at 12 (arguing that because Apple did not demonstrate the relevance of the requested
documents "there has been no reason for Match to discuss potential compromises to reduce its
28  burden"); Reply at 7, ECF No. 24 (criticizing Match for taking that approach, but also confirming
that the parties have not discussed potential compromises).

privilege was not timely asserted under Rule 45.  The catch-all reference to "or any other privilege" in Match's December objections was not an assertion of the First Amendment privilege but reads like a reservation of rights to assert other privileges that Match might think of in the future.  However, Match did not have that right to reserve, as all objections were due by December 23.

Nonetheless, despite the First Amendment objection being untimely, there is case law finding "that where a constitutional privilege is involved a trial court possesses the discretion not to find waiver."  *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998).  "This is particularly true . . . when the alleged waiver is accomplished by inaction rather than action."  *Id.*  The Court declines to find a waiver of the First Amendment privilege here.  The six month gap between the December 2020 objections and the first specific invocation of the First Amendment privilege in June 2021 is not as bad as it looks because for about half of that time (*i.e.*, between the close of fact discovery in the *Epic* case and the end of the *Epic* trial) Apple largely dropped communications about this subpoena.  *See* Brandon Kressin Decl. ¶ 8 (Match APPX010, ECF No. 21).  Apple basically parked this subpoena for several months, and its current motion to compel relies heavily on trial exhibits and trial testimony from the *Epic* trial in May of this year.  There is nothing necessarily wrong with Apple letting this subpoena sit for a while and then moving to compel with materials it gathered in the meantime against an opponent who could very well have thought it had nothing further to do.  However, that approach partially explains why it took Match some time to assert this specific privilege.

Also, it bears remembering that Apple's subpoena contained 33 RFPs.  So far as the record before the Court discloses, it appears that Apple's May 27, 2021 meet and confer letter was the first time Apple specifically focused on the Coalition-related RFPs (*see* Match APPX029-030, ECF No. 21), and was the first communication since February to alert Match that Apple did not consider the subpoena resolved.  This did prompt the First Amendment objection.  *See* Jay Srinivasan Decl. ¶ 4 (Apple APPX002, ECF No. 3).  Thus, although Match should have asserted the First Amendment privilege last December, it did promptly assert it once the specific discovery dispute that implicated this privilege crystallized.  In the context presented here, that was good

11

enough to avoid a waiver of a constitutional privilege.  There was certainly no prejudice to Apple, which does not claim it took or failed to take any actions in reliance on Match's not asserting a First Amendment privilege.

### 2.    The First Amendment Privilege

Turning to the merits, a claim of First Amendment privilege is subject to a two-part test. First, the party asserting the qualified privilege must make a *prima facie* showing of arguable First Amendment infringement.  This *prima facie* showing requires the party to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights.  *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).  Second, if the litigant can make the necessary *prima facie* showing, the evidentiary burden then shifts to the requesting party to demonstrate that the information sought through the discovery is rationally related to a compelling government interest and is the least restrictive means of obtaining the desired information.  *See id*. at 1161.  "More specifically, the second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it."  *Id*.  The question is therefore whether the party seeking the discovery has demonstrated an interest in obtaining the disclosures it seeks that is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association. *See id*.  The Ninth Circuit has made clear that the First Amendment privilege is weaker when the speech at issue is of a commercial nature, as opposed to political, religious or literary speech.  *See generally In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011).

Here, as applied to communications between Coalition members and other documents internal to the Coalition (such as meeting minutes), the associational rights of Match, the other Coalition members and the Coalition itself are both commercial and political in nature.  The commercial aspect hardly needs explanation.  Apple generates vast sums from the commissions it charges paid app developers and from commissions on in-app purchases.  The developers who are members of the Coalition have a financial stake in challenging those commissions, as well as the

App Store's exclusive role in distributing iOS apps.  At the same time, the Coalition is engaged in a media and political campaign against Apple's policies, which are the subject of scrutiny by Congress, regulators, and foreign countries, *see, e.g.,* 19-3074 ECF No. 305 at 5-6 (discussing testimony by Apple's CEO Tim Cook to the House Judiciary Committee concerning Apple's commissions on paid apps), and which are part of a larger political debate about the power wielded by Big Tech and the role that antitrust law should play in limiting that power.  The Coalition's speech, and the associational rights that give rise to that speech, are therefore political too, and they do not cease to be political merely because the Coalition's cause aligns with its members' financial interests, as is often the case in politics.

Match has established a *prima facie* case that Apple's RFPs, insofar as they relate to the Coalition, infringe its First Amendment rights.  The Coalition is a public advocacy organization. It is not a trade association, as Apple contends, that merely pursues issues of interest to the members of an industry.  It was formed to advocate for a specific cause, and members join to support that cause.  So far as the Court is able to discern, issue-related public advocacy is essentially all that the Coalition does.  Turning over the Coalition's internal communications *to Apple* – its public policy opponent – would chill any further participation in the organization.  *See Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018) (reversing discovery order and noting that "[e]ven more disturbing, this discovery order forces TCCB to turn over *to a public policy opponent* its internal communications") (emphasis original).  Who in their right mind would want to participate in a public advocacy organization, knowing that all their internal communications about strategy, lobbying, planning, and so on, would be turned over to their principal opponent?  Once people realize that the Coalition's documents and internal communications have been turned over to Apple, no one will want to join or remain in the Coalition.[7]

Match has submitted evidence that it joined the Coalition with the expectation that

---

[7] The Court therefore finds unpersuasive Apple's argument that Match can designate its documents as confidential under the terms of the protective order in this case.  The First Amendment problem is not so much that public disclosure would chill participation in the Coalition, but that disclosure to Apple would do so.

communications among Coalition members would remain confidential and that compelled disclosure would chill its participation.  Mark Buse Decl. ¶¶ 13-15 (Match APPX005, ECF No. 21).  Further, the fact that the Coalition's membership agreement requires all members to maintain the confidentiality of the Coalition's communications, *id.* ¶ 13, is a strong indicator that other Coalition members relied on a similar expectation of confidentiality.  In addition, despite Apple's insistence that it does not engage in retaliatory actions, the heavy dependence that app developers have on access to Apple's App Store would give rise to a legitimate fear of retaliation in the event these communications were disclosed to Apple.  *Id.* ¶¶ 16-17 (Match APPX006).[8]  Not every app developer is Epic Games, willing to spend a fortune on a public brawl with Apple.  In assessing the potential chilling effect that would result from a compelled disclosure, the Court must be mindful of the realistic effect the disclosure would have.  *See Perry*, 591 F.3d at 1162-63 ("Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private.  Compelling disclosure of internal campaign communications can chill the exercise of these rights.").  Realistically, it is difficult to see the Coalition surviving as an effective public advocacy organization if its internal communications are turned over to Apple.

Turning to the second prong of the legal test, the Court must now balance the First Amendment injury against "a sufficient need for the information."  *Id.* at 1165.  But here, the Court finds that there is nothing on the other side of the scale.  As explained in the previous section of this order, even aside from the First Amendment privilege, the Court would deny Apple's motion to compel because the information sought is not relevant and proportional to the needs of the underlying cases.  *A fortiori* Apple's motion to compel does not satisfy a heightened

---

[8] Spotify's Chief Legal Officer Horacio Gutierrez testified before the Senate Judiciary Committee that he had "spoken with dozens of developers who have looked on with frustration as Apple has engaged in exclusionary and predatory conduct without any accountability.  Many of them are afraid to speak publicly, fearing retribution from Apple that could end their businesses."  Testimony of Horacio Gutierrez, U.S. Senate Judiciary Committee, Subcommittee on Competition Policy, Antitrust, and Consumer Rights, Apr. 21, 2021, at 5.  *See also* Ben Thompson, *Rethinking the App Store*, Stratechery (Aug. 25, 2020), https://stratechery.com/2020/rethinking-the-app-store/ ("[N]one of the [twenty-one] developers were willing to go on the record for fear of angering Apple.").

standard under the First Amendment.

**D.      Conclusion**

Apple's motion to compel is denied.

**IT IS SO ORDERED.**

Dated: August 19, 2021

THOMAS S. HIXSON
United States Magistrate Judge