# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

## NON-PARTY SAMSUNG AMERICA ELECTRONICS, INC.'S
## POSITION STATEMENT CONCERNING DISCOVERY DISPUTE WITH PLAINTIFFS

## PRELIMINARY STATEMENT

At great burden and expense, non-party Samsung Electronics America, Inc. ("SEA") has agreed to Plaintiffs' onerous demand for the collection and review of millions of documents pursuant to an expedited schedule typically reserved for emergency proceedings. Specifically, SEA has agreed to substantially complete its review and production of nearly 3 million documents collected for the nine agreed-upon custodians by December 8, 2021. Moreover, even though Plaintiffs did not identify their final set of custodians until recently, SEA has agreed to begin its rolling production by next week as part of its concerted effort to reach a compromise.

To accomplish this herculean task, SEA proposed applying Plaintiffs' preferred search terms to eliminate irrelevant material and thereafter employing well-established technology-assisted review ("TAR")—which the U.S. Department of Justice ("DOJ") regularly approves in other matters—to the approximately 1.5 million documents captured by these broad search terms. As SEA has explained, this process—which will cost SEA approximately $500,000 in vendor and contract attorney costs alone—presents the only realistic option for meeting Plaintiffs' timing demands while managing non-party SEA's cost and burden.

Inexplicably, Plaintiffs rejected SEA's proposal and demanded that SEA agree to a wholly unreasonable schedule that completely disregards the significant cost and burden that would be imposed on SEA. In their final ultimatum, Plaintiffs commanded that SEA complete its production by November 14, 2021. Plaintiffs then added to the impossibility of this task by mandating that SEA conduct a document-by-document manual review of the nearly 1.5 million documents captured by their search terms for responsiveness, privilege, and confidentiality. Alternatively, Plaintiffs told SEA that it could employ TAR but only if SEA applied TAR to all 3 million documents collected *without using the agreed-upon search terms*.

Plaintiffs' position clearly violates their Rule 45 duty to avoid imposing undue cost and burden on non-party SEA. For instance, Plaintiffs' proposed manual review would force SEA to spend approximately $1.4 million more to complete its production when compared to SEA's proposal. Plaintiffs' TAR proposal would force SEA to spend about $350,000 more in vendor and contract attorney fees alone due to Plaintiffs' insistence that SEA undertake the wasteful exercise of analyzing the 1.5 million documents excluded as non-responsive by the search terms.

As detailed below, Plaintiffs' assertion that SEA created the supposed timing urgency is belied by the subpoena negotiations. Likewise, Plaintiffs' objection to SEA's proposal to use TAR and search terms finds no support in the case law because courts have repeatedly held that such review processes fully comport with the federal rules while minimizing cost and burden.

Accordingly, the Court should deny Plaintiffs' requests. If the Court rules in Plaintiffs' favor, it should require them to pay for the additional expenses that SEA will incur. As the D.C. Circuit has held, cost-shifting is "mandatory" under Rule 45 where, as here, a third party's compliance with a subpoena subjects it to "significant expense."

## **RELEVANT BACKGROUND**

A.    **Plaintiffs Spent Six Months Seeking Improper Discovery Of SEA's Korean Parent Company, Which Is Not A Recipient Of Either Subpoena**

In January and February 2021, Plaintiffs issued overly broad subpoenas, which together include over 100 separate requests that purport to impose on SEA the obligation of producing ***all*** documents and data for ***all*** Samsung entities worldwide for nearly ***15 years***. After multiple meet and confers, Plaintiffs finally identified a set of priority requests. In doing so, Plaintiffs chose to focus their discovery efforts on SEA's Korean parent company, Samsung Electronics Co., Ltd. ("SEC"), by proposing seven current and former non-U.S. SEC employees as custodians.

SEA immediately objected to Plaintiffs' SEC-related discovery requests because (i) SEC is not a recipient of the subpoenas, (ii) SEA lacks possession, custody and control over its

2

foreign parent company's files, and (iii) discovery of a non-U.S. company for documents located outside the U.S. should be pursued under the Hague Convention. Nonetheless, in the spirit of compromise, SEA agreed to inquire with SEC about its willingness to make available voluntarily the files of the identified non-U.S. SEC employees.

Ultimately, SEC agreed to search the files of the two most relevant employees identified by Plaintiffs, provided that Plaintiffs withdraw their requests for the remaining five employees. Importantly, Plaintiffs were expressly warned that only a small amount of material may be available for these employees due to SEC's two-week document retention practice. Fully informed of this possibility, Plaintiffs agreed to limit their custodian request to these two SEC employees and did not request any SEA custodians. Ex. A.

**B.    Plaintiffs' Negotiation Tactics Caused Further Delay And Expense**

In mid-June 2021, SEA told Plaintiffs that SEC located a small amount of responsive material for the two agreed-upon SEC employees due to SEC's limited document retention practices. Despite having knowingly assumed this risk, Plaintiffs responded by issuing a series of unreasonable demands, especially given the fact that SEA is not a party to this litigation.

For instance, in a July 6, 2021 letter, Plaintiffs demanded that SEA commence producing documents for 10 custodians—who had never been discussed previously and included several non-SEA employees—within ***three weeks***. Notably, Plaintiffs' July 6 letter marked ***the first time*** that Plaintiffs requested any specific SEA custodians.

Two days later, SEA informed Plaintiffs that it was willing to agree promptly to a reasonable number of appropriate SEA custodians but could not agree to Plaintiffs' request for non-SEA custodians because SEA lacks control over the files of other Samsung entities. Plaintiffs initially agreed to focus their custodian requests on SEA employees but subsequently renewed their demand for non-SEA custodians, thereby prolonging the negotiations.

Within approximately two weeks of Plaintiffs first identifying potential SEA custodians, SEA agreed to three of the five requested SEA employees. In addition, SEA proposed two alternative SEA employees as custodians in exchange for Plaintiffs agreeing to withdraw their request for the two other SEA custodians. Moreover, SEA informed Plaintiffs that it had agreed to Google's request to designate the head of SEA's mobile business as a custodian. As a further sign of good faith, SEA provided Plaintiffs with draft search terms that could be used to produce responsive material promptly upon the completion of custodian negotiations.

In a July 30, 2021 letter, Plaintiffs indicated that SEA's willingness to produce material for six SEA employees was "not sufficient" and claimed that SEA had a legal duty to produce material for non-SEA employees because "[r]egardless of the specific legal entities these people work for . . . our subpoena calls for documents from [SEA's] 'parent[s], subsidiary[ies and], affiliates.'" Plaintiffs also added another dispute by renewing their SEC discovery requests.

After SEA objected to Plaintiffs' requests for non-SEA discovery, Plaintiffs sent SEA another letter on August 13, 2021 that further expanded the parties' dispute by threatening to renew their previously-dropped request for additional SEC custodians. Plaintiffs also threatened to issue subpoenas to other Samsung entities, which Plaintiffs have now done.

In contrast, SEA made multiple good faith proposals to reach a global resolution. For instance, SEA agreed to exceed its discovery obligations by committing to produce emails for non-SEA employees where these individuals were the senders or recipients of emails found in the email boxes of SEA employees. SEA also provided Plaintiffs with email volume estimates for each potential custodian and promptly accepted nearly all of Plaintiffs' search string edits.

On September 13, 2021, SEA agreed to nine custodians after Plaintiffs finally settled on the list they wanted. Throughout the subpoena negotiations, SEA continued to respond to

Plaintiffs' "go get" requests on a rolling basis. To date, SEA has produced more than 30,000

pages of documents in response to Plaintiffs' subpoenas and prelitigation information requests,

as well as voluminous amounts of data covering over a 10-year period.[1]

**C.      Plaintiffs Repeatedly Refused To Compromise On Their Unrealistic Demand
         That SEA Review And Produce Millions Of Documents Within Five Weeks**

Within a week of reaching agreement with Plaintiffs on custodians, SEA produced search

term hit reports for the first seven custodians while it continued to process the extremely large

volume of material for the final two custodians selected by Plaintiffs. These hit reports showed

that Plaintiffs' preferred search strings captured approximately 1.13 million (including families)

deduplicated documents for these first seven custodians alone. Ex. B at 1.

Given that the hit rates showed that SEA would have to review approximately 1.5 million

of the nearly 3 million documents collected, SEA immediately explained to Plaintiffs that

applying TAR to this large review set presented the only realistic option for meeting Plaintiffs'

desire for an expedited production while managing non-party SEA's already substantial costs

and burden. Plaintiffs indicated a preference for a manual review using the agreed-upon search

terms but said they would consider in "good faith" any TAR proposal. Ex. C at 5.

Soon thereafter, SEA followed up to confirm Plaintiffs' openness to employing TAR

because SEA needed to confirm the process that could be employed to meet Plaintiffs' timing

demands. Plaintiffs reiterated that they would consider in "good faith" SEA's TAR proposal but

preferred a manual review of all documents that hit on the search terms. However, the very next

day, Plaintiffs sent an email proclaiming to be "deeply frustrate[ed]" by SEA's inquiry about the

---

[1] On October 8, 2021, SEA completed its custodian negotiations with Google, which requested
two additional SEA custodians. The data for these two custodians—which SEA is still collecting
and processing—is not included in the volume counts or cost estimates provided for SEA's
dispute with Plaintiffs.

possibility of using TAR. Ex. C at 3. Plaintiffs then commanded SEA to agree within *48 hours* to complete its review for responsiveness, privilege, and confidentiality of the 1.5 million documents captured by the search terms within five weeks (*i.e.,* November 7, 2021).

SEA immediately objected to Plaintiffs' sudden and unrealistic demand (Ex. C at 1) and, after meeting and conferring with Plaintiffs, promptly proposed an aggressive schedule that reflected the significant time, resources, and processes needed to properly complete such a large document production project. Ex. D at 6. Under this proposal, SEA would apply TAR to the nearly 1.5 million documents captured by the negotiated search terms and then substantially complete its production on a rolling basis within 10 weeks (*i.e.,* December 15, 2021).

Within less than 24 hours, Plaintiffs rejected SEA's proposal, describing it as "unworkable," and demanded that SEA agree within *24 hours* to substantially complete its production within five weeks (*i.e.,* November 14, 2021). In doing so, Plaintiffs said SEA could conduct a manual review of the approximately 1.5 million documents captured by the search strings but rejected "many of the revised search strings" that SEA proposed to try to meet such a schedule and lower SEA's burden. Ex. D at 5. Alternatively, Plaintiffs said SEA could use TAR but would have to "run the TAR process across all [3 million] document[s] collected," including the 1.5 million presumptively irrelevant documents that were not captured by the search strings.

In a final attempt to reach a compromise (Ex. D at 1), SEA further shortened the already-aggressive production schedule under its earlier TAR proposal as follows: (i) October 22, 2021: initial production (Plaintiffs' requested date); (ii) November 5, 2021: 25% of SEA production; (iii) November 19, 2021: 50% of SEA production; (iv) December 1, 2021: 75% of SEA production; and (v) December 8, 2021: substantial completion of production. The next morning, Plaintiffs rejected SEA's proposed compromise even though there was only a difference of

roughly three weeks between Plaintiffs' substantial completion date (which fell on a Sunday) and

SEA's substantial completion date. Ex. D at 1.

## ARGUMENT

### A.    Plaintiffs' Proposed Schedule And Review Methodology Is Unreasonable

SEA's proposal to use TAR after search terms to complete substantial production of

responsive material from the large review set of nearly 1.5 million documents by December 8

will require SEA to incur approximately $500,000 in vendor and contract attorney costs alone.

Even though Rule 45 imposes on them an affirmative duty to "avoid imposing undue burden or

expense on [third-parties]," Plaintiffs have insisted that SEA agree to review processes and

timing that would subject SEA to huge additional costs.

By insisting on a five-week (now four-week) production schedule, Plaintiffs have said

that SEA can conduct a document-by-document manual review of the nearly 1.5 million

documents captured by their preferred search strings. Such a position ignores the resources,

processes, and time needed to properly complete a manual review of such a large volume of

documents for responsiveness, privilege, and confidentiality. Indeed, to even try to accomplish

this impossible task, SEA would have to immediately hire hundreds of contract attorneys and

require them to complete their work within a couple of weeks. SEA would also have to spend

approximately $1.4 million more to complete its review when compared to SEA's proposal.

Plaintiffs' desire to have SEA substantially complete its production three weeks earlier

than proposed by SEA is not a valid basis for subjecting SEA—a non-party that has significant

discovery obligations in many other matters—to this huge additional burden, especially given

that (i) SEA's proposal would allow Plaintiffs to begin receiving documents that TAR ranks as

the most highly relevant earlier in SEA's rolling production, and (ii) any supposed timing issues

are the product of Plaintiffs' own decisions. Importantly, Plaintiffs made SEA's ability to

conduct a manual review under their accelerated timeframe all the more impossible by rejecting "many of the revised search strings" that SEA proposed to further reduce its burden.[2] Ex. D at 5.

Alternatively, Plaintiffs have said that SEA can employ TAR to complete its production within five weeks (now four-weeks) but must apply TAR across all of the nearly 3 million documents collected for the nine agreed-upon custodians. Such a position is also unreasonable because it would force SEA to incur approximately $350,000 in additional vendor and contract attorney costs alone for the purpose of analyzing the 1.5 million documents excluded as non-responsive by Plaintiffs' own search terms. Not even an actual party to a litigation should be subjected to such a wasteful and unjustifiable exercise.

**B.     Plaintiffs' Positions Violate Their Rule 45 Obligations**

Plaintiffs have attempted to justify their unreasonable demands by referencing the time that has elapsed since they issued their subpoenas. However, as detailed above, any purported delay was caused by Plaintiffs' own conduct, in particular, Plaintiffs' conscious decision to use six months seeking improper discovery of SEC, and thereafter unnecessarily prolonging the SEA custodian negotiations by demanding the inclusion of non-SEA employees and renewing their SEC-related requests. Moreover, Plaintiffs' focus on promptly receiving SEA's relevant material is better served by SEA's proposal, which will allow Plaintiffs to begin receiving documents that TAR ranks as the most highly relevant early in SEA's rolling production while permitting SEA

---

[2] Given Plaintiffs' focus on an expedited production schedule, SEA believes that renegotiating the search terms would be an unproductive use of each party's time and resources because, as shown by Plaintiffs' position, there is a low likelihood that a prompt agreement could be reached. In addition, SEA would then have to secure Google's agreement to any modifications negotiated with Plaintiffs. SEA proposed search term modifications solely because Plaintiffs insisted that it do so.

to avoid wasting significant time and resources on a large volume of documents that are presumptively irrelevant because they were not captured by Plaintiffs' broad search terms.

Plaintiffs have attempted to justify their rejection of SEA's TAR proposal by arguing that DOJ has not previously agreed to the use of TAR after the application of search strings. However, SEA identified a recent example where DOJ agreed to the use of TAR after the application of search terms. In any event, Plaintiffs' position is undermined by the case law holding that applying TAR and search terms is fully consistent with "the exhortation of Rule 26 that discovery be tailored by the court[s] to be as efficient and cost-effective as possible." *Bridgestone Am., Inc. v. IBM Corp.*, 2014 WL 4923014, at *1-2 (M.D. Tenn. July 22, 2014).[3]

Plaintiffs further have attempted to justify their positions by citing this Court's resolution of Plaintiffs' discovery dispute with Apple. Plaintiffs' reliance on this decision is wholly misplaced. In requesting that Apple be required to complete its document production within six weeks, Plaintiffs argued that "Apple sort of engineered th[e] [timing] urgency" by: (i) "refus[ing] to do anything" for "a month" until it received "Google's subpoena;" (ii) declining to "talk about [search strings] until [the parties] resolved custodians;" (iii) rejecting requests to test agreed-upon search strings "[u]ntil . . . all [search strings were] agreed to;" and (iv) refusing to provide Plaintiffs with any "deconstructed hit reports." Ex. E at 16, 18-19. None of these asserted facts are present here.

More importantly, Plaintiffs repeatedly emphasized that Apple would not truly be required to review 1.5 million documents because this figure was calculated prior to the running

---

[3] *See also Livingston v. City of Chicago*, 2020 WL 5253848, at *1-3 (N.D. Ill. Sept. 3, 2020) (applying TAR after search terms is "reasonable" and consistent with Rule 26's proportionality requirements); *In re Biomet M2a Magnum Hip Implant Prods. Liability Litig.*, 2013 WL 1729682, at *1-3 (N.D. Ind. Apr. 18, 2013) (applying TAR after search terms "complies fully" with the federal rules).

of search strings. *See, e.g.*, *id.* at 7. Here, the nearly 1.5 million documents that SEA would have to review under Plaintiffs' preferred process (*i.e.,* a document-by-document manual review) are *post*-deduplication and *post*-search string application. In addition, Apple had already completed its review of a substantial portion of the 1.5 million documents in question. *Id.* at 23-24. This is not true here because Plaintiffs did not identify their final custodian list until a few weeks ago.[4]

**C.    Plaintiffs Should Be Required To Pay For The Large, Unjustifiable Additional Costs That SEA Would Incur Under Their Proposals**

Plaintiffs' requested timing and methodology should be rejected. If the Court rules in Plaintiffs' favor, it should order Plaintiffs to pay for the additional costs that SEA would be forced to incur. The D.C. Circuit has long-held that Rule 45 mandates such cost-shifting where a third-party incurs "significant expense" when complying with a subpoena.[5] There can be no doubt that this standard would easily be met by the approximately $350,000 to $1.4 million in additional costs that Plaintiffs' proposals would unnecessarily impose on SEA.

## CONCLUSION

For the foregoing reasons, SEA requests that the Court enter an Order permitting SEA to apply search strings and TAR to substantially complete its document production by December 8, 2021.

---

[4] Plaintiffs' willingness to seek a Rule 502(d) order does not save their unreasonable timing and methodology demands because courts presented with similar disputes have held that a party has the legal "right to perform a review to produce only those documents that are responsive and relevant." *Livingston*, 2020 WL 5253848, at *3. This is especially true here because the collected documents are competitively sensitive and reflect highly confidential information of a non-party.

[5] *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (holding that shifting of "significant expense" is "mandatory" under Rule 45 and "hav[ing] no trouble concluding" that "nearly $200,000" in subpoena compliance expenses is "significant"); *Rhea v. Apache Corp.*, 883 F. App'x 186, 190 (10th Cir. 2020); *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013); *R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 F. App'x 880, 883 (3rd Cir. 2002).

Dated: October 14, 2021

**CROWELL & MORING LLP**

By:  /s/ Juan A. Arteaga
       Juan A. Arteaga (*pro hac vice*)
       590 Madison Avenue
       New York, New York 10022
       (212) 223-4000
       jarteaga@crowell.com

       Jeane A. Thomas (D.C. Bar #432600)
       Alexis V. DeBernardis (D.C. Bar #994713)
       1001 Pennsylvania Avenue, NW
       Washington, D.C. 2004
       (202) 624-2500
       jthomas@crowell.com
       adebernardis@crowell.com

       *Attorneys for Non-Party*
       *Samsung Electronics America, Inc.*

**CERTIFICATE OF SERVICE**

Pursuant to LCvR 5.3, I hereby certify that on October 14, 2021, I caused to be filed a copy of the foregoing Position Statement Concerning Discovery Dispute with Plaintiffs to the Court's CM/ECF system, and service was effected electronically pursuant to LCvR 5.4(d) to all counsel of record.

/s/ Juan A. Arteaga
Juan A. Arteaga
(*admitted pro hac vice*)