# EXHIBIT B



U.S. Department of Justice

Antitrust Division

*Liberty Square Building*
*450 5th Street, N.W.*
*Washington, DC 20530*

February 10, 2022

**BY EMAIL DELIVERY**

John E. Schmidtlein
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
JSchmidtlein@wc.com

      Re:   *United States, et al. v. Google LLC*, No. 1:20-cv-03010-APM

Dear Mr. Schmidtlein:

I write regarding the remedy needed to resolve Google's failure to satisfy its Rule 30(b)(6) obligation in connection with Topic 3 of Plaintiffs' November 30(b)(6) notice. Contrary to the Court's instruction that Google provide a "[t]horough and comprehensive response that identifies the factors that Google takes into account, how it considers those factors, and any other information that [Plaintiffs] think addresses the topic," Jan. 7, 2022 Hr'g Tr. at 47:9-13, Google's high-level general response (1) fails to provide any information on the RSA partner agreements identified by Plaintiffs, and (2) inexplicably ignores several questions Plaintiffs provided Google on January 18.

To cure Google's deficient response, Plaintiffs request that Google provide supplemental written responses to Topic 3 no later than February 18. Plaintiffs expect Google's response to resolve the following open questions. Because Google wholly ignored some questions Plaintiffs posed on January 18, some of these questions are simple restatements from the January 18 letter. The remaining questions are follow-up questions necessitated by Google's vague and inadequate written response.

1. Google stated in its response that when evaluating whether to enter into any particular revenue share agreement, Google business personnel ████████████████████████ ████████████████████████████████████████████████████ among other factors. Please describe the manner in which Google business personnel typically ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████?

2. Plaintiffs requested in question 2(c) of their January 18 letter that Google enumerate each major benefit (including any non-financial benefits) Google believes it receives from entering into revenue share agreement along with a description of how, if at all, Google calculates the value of this benefit. In response, Google listed some general benefits of these agreements, but did not describe whether Google calculates the value of these benefits and, if so, how.

    a. For the following counterparties, please list each major benefit Google receives under its current revenue share agreement and explain how, if at all, Google calculates the value of the benefit: Apple, Samsung, Mozilla, AT&T, Verizon, and T-Mobile–Sprint.
    b. Prior to entering into past revenue share deals with the entities listed in 2(a), did Google undertake any efforts to estimate the financial benefits of the deal as a whole to Google? If such estimates were not done for all deals, but only certain deals, for which deals were benefit estimates used, why was the benefit estimated only for these deals, and what methods did Google use to calculate the deal's benefits?

3. In providing guidance to its employees, what is the standard ceiling for revenue share payments (i.e., payments that do not require further authority or approval)?
    a. How has this ceiling and approval process changed over the past 10 years, and what contracts, worldwide, exceed this ceiling?

4. Does Google calculate the maximum revenue-share percentage it is willing to pay a prospective Search RSA partner at any time in negotiation? If so, how is the maximum revenue-share percentage calculated?

5. In the context of a Search RSA, what do the following terms mean, how are they calculated, and how are they used: TAC and net revenue?

6. From 2010, to the present, for each of Google's revenue share agreements and amendments (if applicable) with Apple, Samsung, Mozilla, AT&T, Verizon and T-Mobile, Sprint:
    a. Was a clawback rate (or range of clawback rates) used at any point in the negotiation for the purposes of estimating the incremental revenue the deal would create? If so, provide Google's best estimate and describe how this clawback rate was selected.
    b. Was the actual or estimated bid of a competitor used at any point in the negotiations when Google determined how much it was willing to pay for the distribution agreement? If so, describe (1) the nature of the bid, or (2) if estimated—the key inputs used by Google to estimate the level of the competitors' bid.

7. From 2010, to the present, please describe, how, if at all, the existence of the MADA affects the amount Google is willing to pay for search distribution agreements with Android OEMs and US Carriers.

    a. In each of Google's negotiations with AT&T, Verizon, T-Mobile, Sprint, and Samsung, did Google assume some proportion of search revenue would be protected by its MADA with Android OEMs regardless of whether a distribution deal was signed? If so, what proportion or range of proportions was used? If not, please explain how, if at all, the existence of the MADA impacts Google's valuation of revenue-share agreements with US mobile carriers and Samsung.

    b. Please describe how, if at all, the lack of a MADA on iOS devices affects the amount Google is willing to pay for search distribution deals with Apple.

8. In Google's description of winback or clawback rate, it states ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ What revenue share deals ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

                    Sincerely,

                    */s/ Kenneth Dintzer*

cc:
Franklin M. Rubinstein, Esq. (frubinstein@wsgr.com)
Mark S. Popofsky, Esq. (Mark.Popofsky@ropesgray.com)
Colette T. Connor, Esq. (cconnor@wc.com)