**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br><br>                             Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>                             Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████████████<br><br>███████████████████ |

### GOOGLE LLC'S OPPOSITION TO DOJ PLAINTIFFS' MOTION
### TO SANCTION GOOGLE AND COMPEL DISCLOSURE
### OF DOCUMENTS UNJUSTIFIABLY CLAIMED BY GOOGLE
### AS ATTORNEY-CLIENT PRIVILEGED

Accusing an adversary of engaging in a systematic, bad-faith scheme to falsify and hide documents is a serious matter. A charge of that magnitude should be accompanied by unassailable proof. The DOJ Plaintiffs ("Plaintiffs") have provided none.[1] Their allegations of sanctionable misconduct are baseless. They misread three slides from internal presentations out of the more than 4.5 million documents produced by Google to argue that Google engaged in a nefarious scheme to falsify and hide documents. When read in context, the slides provide legitimate guidance to Google employees about how to communicate with in-house counsel to request legal advice on subjects with obvious legal implications.

To be sure, Google employees copy in-house counsel on emails and label those emails "privileged and confidential." That is understandable: many aspects of Google's operations have significant legal implications (such as contractual and privacy-related issues) and are subject to

---

[1] The present motion was filed by Plaintiffs in *United States v. Google LLC*, but not the Plaintiffs in *Colorado v. Google LLC*. Accordingly, references to "Plaintiffs" herein refer only to Plaintiffs in *United States v. Google LLC*.

government oversight and regulation; Google in-house counsel work hand-in-hand with lay employees every day to navigate complex legal and commercial issues; and distinguishing between privileged legal advice and nonprivileged business advice is "especially difficult." *Am. Nat'l Bank & Tr. Co. v. Equitable Life Ass. Soc'y*, 406 F.3d 867, 879 (7th Cir. 2005).

Copying in-house counsel on emails or marking emails "privileged" did not spoliate emails or otherwise exempt them from scrutiny during discovery.  Google collected responsive documents, reviewed them for privilege, served privilege logs, and has been working in good faith to re-review documents challenged by Plaintiffs—including documents that are the subject of this motion and that Plaintiffs first challenged just weeks ago.  In fact, Google already produced the vast majority of emails that seemingly meet Plaintiffs' "silent-attorney" rubric—more than 100,000 in total—including those that Plaintiffs attach as exhibits to their motion.  Plaintiffs come nowhere close to proving the bad-faith misconduct that is required to strip a party of its privilege protections as a sanction under the Court's inherent authority.  The Court should deny the motion for sanctions.

Plaintiffs' alternative motion to compel seeks the same relief as their sanctions motion: blanket removal of privilege protection over large swathes of unidentified emails.  They ask the Court categorically to compel production of what they call "silent-attorney" emails on the theory that if an attorney did not respond to an email in the same email chain, the email cannot be privileged or work product.  Of course, this is wrong and there are many reasons why an attorney might not respond to a privileged or work-product email, which is why privilege must be assessed on a case-by-case basis.  Plaintiffs cite no case adopting their "silent-attorney" rule, and the case law does not require an attorney response to render a client's request for legal advice privileged. Adopting Plaintiffs' rule would unjustly require production of large quantities of privileged and

work-product documents, and would "limit the valuable efforts of corporate counsel to ensure their client's compliance with the law." *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981).  The Court should deny Plaintiffs' motion to compel.

**BACKGROUND**

**A.      Plaintiffs' "Communicate-with-Care" Allegations Are Baseless.**

Plaintiffs' motion rests on their allegation that Google "systematically trained its employees" to hide documents from discovery by "camoflag[ing] ordinary-course business documents to look like privileged discussions." Mot. 3.  Plaintiffs call this supposed instruction "Communicate with Care." Mot. 4.  Plaintiffs' allegation lacks any basis in fact and cannot support an award of sanctions.

*1.      What "communicate with care" actually means.*

Google has, in trainings from time to time, reminded employees to "communicate with care," but for entirely legitimate reasons.   "[C]ommunicate with care" conveys a set of recommendations that encourage employees to think carefully about what they reduce to writing in order to protect commercially sensitive and/or legitimately privileged communications.  Plaintiffs' attempt to transform "communicate with care" into a scheme to thwart government investigations or discovery finds no support in the evidence.  To the contrary, as discussed below, the ideas advanced in Google's "communicate with care" guidance have been endorsed by legal commentators.

Google's documents show that "communicate with care" means to follow best practices for handling confidential, proprietary, and/or privileged information in email correspondence and other internal communications.  For example, as part of a quarterly presentation to one business group, Google instructed employees on how to share sensitive, non-public information within their working groups.  One slide in the presentation recommended, in relevant part, that employees

3

pause before pressing 'send' and consider whether they would be comfortable if *The New York Times* published the contents of their emails.[2]  Importantly, the presentation educated employees about the limitations of attorney-client privilege; it specifically told employees that marking documents as privileged "does not make it so."  And it reminded employees of the importance of sensible email etiquette (e.g., avoiding exaggerations and legal conclusions) regardless of whether emails and other communications reflect or seek legal guidance.

**Figure 1[3]**



Contrary to Plaintiffs' assertions, such instructions to "communicate with care" do not teach employees to shield their emails from discovery by abusing attorney-client privilege.  As set forth in the examples below, Google employees receive industry-standard guidance regarding the scope of attorney-client privilege.  Employees are trained, for example, that communications are

---

[2] Google Ex. 4 (GOOG-DOJ-16974608), at -616; *see also, e.g.*, Google Ex. 5 (GOOG-DOJ-07746117), at -230 ("A good rule of thumb is don't type anything . . . that you wouldn't want to see quoted on the front page of The Verge.").

[3] Google Ex. 4 at -616.

privileged only to the extent they reflect confidential information between a lawyer and a client

for the purpose of receiving or providing legal advice:

**Figure 2[4]**



Google also provides its employees with tips for protecting *legitimately* privileged

communications from disclosure, while cautioning that "just adding a lawyer to an email/document

doesn't guarantee that it will be protected by the privilege":

---

[4] Google Ex. 6 (GOOG-DOJ-21004668), at -672.

Figure 3[5]



That same guidance told employees that "magic words" do not "make a document privileged," but added that "it's helpful to identify documents that *might* contain privileged material" (emphasis added). Google advised employees to "[l]imit the distribution of privileged emails/documents to a need-to-know audience," and told them to "assume that everything you write, send or share may be subject to public scrutiny."

Plaintiffs cite no evidence that Google intentionally encouraged its employees to make pretextual requests for legal advice in order to prevent disclosure of information during discovery. To the contrary, one Google presentation explained that, with respect to privilege, "you can't fake it":

---

[5] Google Ex. 7 (GOOG-DOJ-31153588), at -592 (emphasis added).

Figure 4[6]



In depositions, employees confirmed that "communicate with care" means to "be thoughtful about communication."  Google Ex. 9 (Richardson), at 262; *see also* Google Ex. 10 (Juda), at 150-51 ("In my mind, it's intended to reflect the act of communicating in the various ways that one can communicate, oral, verbal, et cetera, that match the intentions of the – the person communicating and – yeah, ideally, with like a tone and spirit that is also, you know, appropriate for the intention of the person.").  No witness identified "communicate with care" as a strategy for falsifying and hiding documents.

Google's "communicate with care" guidance follows best practices approved by credible stakeholders in the legal industry.  For example, a recent article by contributors to the American Bar Association embraces much of the guidance that Google employees received.  *See* Doug

---

[6] Google Ex. 6 at -674 (emphasis added); *see also, e.g.*, Google Ex. 8 (GOOG-DOJ-27161395), at -401 ("So if a lawyer is not included in a document / email or a lawyer is included but you are not asking for legal advice, then privilege does not apply even if you mark the document / email.");  *id.* ("Note that use of 'ACP' on a document is NOT definitive as the legal discovery team reviews all to ensure actual legal advice is being requested / provided.").

Gallagher & Manasi Raveendran, *Attorney-Client Privilege for In-House Counsel*, 10 No. 2 Landslide, Nov.-Dec. 2017.  Recognizing that "attorney-client privilege for in-house counsel is complex and can be hard to navigate," the article encourages in-house counsel to train employees to: "avoid[] making conclusory statements of fact or drawing legal conclusions; "[a]void circulating privileged communications too broadly";  and "[a]sk . . . how the communication would be read or interpreted by unintended recipients, such as an opposing party, a court, or the media." *Id.*; *see also, e.g.*, Jackie Unger, *Maintaining the Privilege:  A Refresher on Important Aspects of the Attorney-Client Privilege,* Business Law Today (ABA Oct. 2013) (recommending, among other steps, "[c]learly labeling written communications seeking or rendering legal advice").

Similar tips appear in a treatise published by the American Bar Association that is widely consulted by attorneys around the country, which advises:  "When documents are conveyed to an attorney for the purpose of soliciting legal advice, an attorney would be well advised to recommend to the client that the fact be so stated on the face of the document," and "Care should be taken that distributions of e-mails be made only to persons within a 'need to know' group."  1 Edna S. Epstein, *Attorney-Client Privilege & the Work-Product Doctrine* §§ 1.III.E4.B, 1.III.E4.A (6th ed. 2017).

## 2.  *Plaintiffs' mischaracterization of "communicate with care."*

Plaintiffs present none of the just-discussed evidence to the Court.  Instead, ignoring all this evidence, Plaintiffs incorrectly infer a "systematic[]" "communicate with care" practice from *one* slide of *one* presentation using that phrase (Plaintiffs' Exhibit 1).  *See* Mot. 3-4; Pls.' Ex. 1. And they ignore the context of that single slide.  Plaintiffs' Exhibit 1 is a 2015 orientation presentation for new Google employees in its Apps division.  The at-issue slide appears at page 35 of 40 of the presentation.  Critically, it appears in a section of the presentation related to "Privacy and User Trust" that was developed by Google's Security, Trust, and Privacy team.  Pls.' Ex. 1

(GOOG-DOJ-06890329), at -359, -363; Frey Decl. (Google Ex. 2) ¶¶ 4-7.  Protection of user data is an area of Google's business that involves significant and frequently evolving government regulation, and Google's in-house counsel work closely with the Security, Trust, and Privacy team to resolve privacy-related questions within Google.  Frey Decl. ¶ 5.  The slide immediately before slide 35 tells new employees what to do *if* they "see a problem" *related to privacy*:  they should

██████████████████████████████████████████████████ Pls.' Ex. 1 at -362.  Slide 35

then provides legitimate guidance to employees on how to protect their communications to in-house counsel requesting privacy-related legal advice:  (1) direct the email to the lawyer, (2) mark the email "Attorney-Client Privileged," and (3) ask the lawyer a question.  *Id.* at -363.  By encouraging Google employees to "communicate with care," the Security, Trust, and Privacy team responsible for these slides simply meant that Google employees entrusted with highly sensitive information subject to evolving legal and regulatory requirements should be thoughtful about what is put in writing and request advice from Google's internal experts on privacy and in-house counsel where appropriate.  Frey Decl. ¶¶ 8-11.

Nothing about this slide suggests that employees should ask a lawyer a question to hide documents, and Plaintiffs present no evidence that any Google employee understood it that way.  Plaintiffs have not even asked any Google employee about this slide in any deposition, likely because the subject matter of the slide has little relevance to this case.

Plaintiffs also cite a slide appearing in two versions of a presentation entitled "Android Mobile Search & Assistant Revenue Share Agreement Training."  Pls.' Mot. 4-7; Pls.' Exs. 3, 5.[7]  Again, Plaintiffs ignore the context of this slide.  Both presentations reflect guidance provided to a limited group of Android team members after Google modified certain contractual terms of its

---

[7] Plaintiffs' Exhibit 30 is a later-in-time version of this presentation.

template Revenue Share Agreements (RSAs) and Mobile App Distribution Agreements (MADAs).  Veer Decl. (Google Ex. 3) ¶¶ 7-8, 13-14.  Google's in-house counsel participated in the development of and drafted the modified terms for Google's RSA and MADA contracts.  Veer Decl. ¶ 6.  The employees attending these presentations were responsible for negotiating the modified terms with Google's commercial partners, and the presentations were intended to educate the employees about the modified terms.  Veer Decl. ¶¶ 7-8, 13.  As the 2019 presentation (Exhibit 5) makes clear, following those negotiations, Google's in-house "Legal" team would need to "finalize" the revised agreements.  Pls.' Ex. 5 at -142; *see* Veer Decl. ¶ 6.

The slide appropriately reminds employees to direct questions about the revised RSA and MADA contractual terms to the responsible in-house counsel and to keep counsel informed during the negotiations.  Pls.' Ex. 3 at -666 ("any written communication regarding Rev Share and MADA should include Legal" (emphasis omitted)); Pls.' Ex. 5 at -046 (same); *see* Veer Decl. ¶¶ 10-12, 15.  Since in-house counsel would have to approve the final negotiated agreements, it made sense to involve them in relevant internal communications about the agreements.  *See BankDirect Cap. Fin. v. Cap. Premium Fin.*, 326 F.R.D. 176, 181 (N.D. Ill. 2018) ("Invariably, the contracts underlying complex and intricate commercial transactions have commercial and legal aspects to them – and the two, as we have noted, are often difficult, if not impossible, to separate.").  The slide also provided the same legitimate advice for how to direct requests for legal advice to in-house counsel: "request guidance" and "mark content as 'Confidential – Attorney Client Privileged.'"  Pls.' Ex. 3 at -666; Pls.' Ex. 5 at -046.  The slide does not instruct employees to make pretextual requests for legal advice to hide documents from discovery.

In depositions, Google employees who attended one or more of these presentations confirmed their understanding that it was important to communicate with in-house counsel about

the RSA and MADA contracts because of those contracts' legal nature.  *See* Google Ex. 11 (Rosenberg), at 216-17 ("[I]t's often the case that a discussion or clarification regarding a particular term might be one that is best answered by an attorney.  So as a matter of practice, including an attorney in the communications could be helpful in helping the individual seeking an answer get the answer."); Google Ex. 12 (Kolotorous), at 239 ("[A]nything regarding rev share contracts or MADA contracts, in those instances, yes, I would make sure that an attorney was on the note given it was a discussion orbiting around contracts in particular.").  Another attendee disclaimed copying counsel on all emails "regarding revenue share or MADA."  Google Ex. 13 (Schindler), at 305 ("Is it your general practice to include Legal -- Legal on any written communication regarding revenue share and MADA?  A.  No.  My general -- my general practice is to include Legal and ask for attorney-client privilege if I need counsel and advice from Legal.").  No employee testified that they understood this slide to instruct employees to make pretextual requests for legal advice.

From these slides, Plaintiffs inappropriately allege that Google created a "three-step formula" to hide documents:  (1) marking emails "privileged and confidential," (2) directing emails to lawyers, and (3) asking the lawyer a question.  Mot. 7-8.  Responsive documents fitting those criteria, however, were not categorically withheld or otherwise shielded from production.  Google collected the documents and independently reviewed them for privilege.  "Privileged and confidential" markings appropriately flagged the documents as ones that Google should review in its privilege review but did not control the privilege determination.  As discussed in more detail below, Google produced many of these documents to Plaintiffs.

Plaintiffs' motion proves the point:  Plaintiffs attach to their motion numerous examples of emails supposedly reflecting these three steps that Google has *produced* in this case.  Of the

produced emails that Plaintiffs attach to their motion, 19 were marked by employees with some version of "privileged and confidential."  *See* Pls.' Exs. 6-7, 9-16, 18, 20-23, 27-29, 33.  Thirteen emails contain "please advise" or similar language.  *See* Pls.' Exs. 6-7, 9-16, 22, 27-28.  Plaintiffs have these emails because Google produced them, some in its initial production and some as a result of its re-review, discussed in more detail below.

None of the emails that Plaintiffs attach to their motion evidences a bad-faith scheme to hide documents.  Most involve Google's contractual negotiations with business partners, a subject on which employees would appropriately need and desire legal advice from in-house counsel for the reasons already explained above.  *See* Pls.' Exs. 6-7, 9-11, 13-17, 22-23, 25, 26, 27, 28-29, 31-33.  Others likewise involve issues with obvious legal implications.  *See, e.g.*, Pls.' Ex. 12 (company's handling of ████████████████████████████); Pls.' Ex. 20 (the implications of ██████████████████████████████).  Some reflect common misperceptions of attorney-client privilege.  For example, some employees appear to use the word "privileged" to mean "confidential."  *See, e.g.*, Pls.' Exs. 23, 24.  Others mistakenly think that copying attorneys on a document automatically renders the document privileged.  *See, e.g.*, Pls.' Exs. 17-20.  These are common misperceptions among laypeople, as the Court recognized at the January 2022 status conference.  1/7/22 Hr'g Tr. at 16 (it is not "unusual in corporate America for any communication with in-house counsel to simply be reflexively labeled as attorney-client privilege communication").  The emails do not suggest, let alone prove, that employees falsified their email correspondence in order to hide them from investigators or litigants.

**B.   Google's Document Production and Privilege Review Further Demonstrate That Plaintiffs Have Not Been Denied Access to Evidence.**

Even if individual employees mislabeled some documents as privileged, those labels did not operate to hide the documents from Plaintiffs.  Google's document collection and production

efforts have resulted in production of more than 100,000 emails that are the subject of Plaintiffs' motion.  Indeed, as discussed in more detail below, Google produced the vast majority of these emails in its initial productions, before any challenges by Plaintiffs or re-review.

Plaintiffs requested a sprawling set of documents in their investigation and litigation covering large swathes of Google's operations.  Google's resulting document collection, review, and production undertakings have been immense.  Google collected and produced documents, including emails, from more than 120 custodians.  Tennis Decl. (Google Ex. 1) ¶ 4.  The produced documents span at least 15 years.  Tennis Decl. ¶ 4.  To date, Google has produced more than 4.5 million documents to Plaintiffs.  Tennis Decl. ¶ 4.

Plaintiffs' allegations and document requests focus on aspects of Google's operations that involve significant oversight by Google's in-house counsel, including Google's contractual relationships with third parties.  Google collected and produced documents created during time periods where Google has been subject to significant regulatory scrutiny, including documents created during DOJ's investigation that led to this litigation and during the litigation itself.  Tennis Decl. ¶ 7.  Google's in-house legal department employs a large number of attorneys, and attorneys are embedded in Google's product teams and communicate daily with Google non-attorneys.  This is hardly surprising:  "The 'vast and complicated array of regulatory legislation' requires corporations to 'constantly go to lawyers to find out how to obey the law . . . .'" *FTC v. Boehringer Ingelheim Pharms.*, 892 F.3d 1264, 1269 (D.C. Cir. 2018) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981)).  Google's document collection in this case swept in a tremendous number of communications with attorneys who have worked for Google over the more than decade-long period covered by Plaintiffs' documents requests.  Unsurprisingly, a document

production of this magnitude triggered a large and complex privilege review—a review that resulted in a privilege log with more than 1000 in-house attorneys listed.  Tennis Decl. ¶ 9.

Distinguishing between in-house counsel's legal advice and business advice is an "especially difficult" "area of privilege law," and reasonable lawyers can have "good-faith difference(s) of opinion" over privilege calls.  *Am. Nat'l Bank & Tr. Co. v. Equitable Life Ass. Soc'y*, 406 F.3d 867, 878-79 (7th Cir. 2005); *see also Boehringer Ingelheim*, 892 F.3d at 1267 ("The application of the attorney-client privilege can become more complicated when a communication has multiple purposes—in particular, a legal purpose and a business purpose.").  Google's privilege review required it to conduct this analysis across hundreds of thousands of documents.

Google devoted substantial resources to this endeavor.  A large team of trained attorneys—often exceeding more than one hundred attorneys at a given time—reviewed documents for privilege during the investigation and litigation stages.  Tennis Decl. ¶ 5.  Google trained reviewers not to base privilege determinations on the mere presence of attorneys or on "privileged and confidential" markings.  Tennis Decl. ¶ 6.   To date, outside counsel and contract attorneys under outside counsel's supervision have devoted more than 21,000 hours to privilege-related work in this case.  Tennis Decl. ¶ 11.

Google produced privilege logs on a rolling basis, first during the investigation and then later in litigation.  Google produced its first investigation-stage log in September 2020.  Tennis Decl. ¶ 8.  Google produced its first litigation-stage log in April 2021. Tennis Decl. ¶ 8.  Plaintiffs first raised questions about Google's privilege designations in June 2021.  As relevant here, on June 4, 2021, Plaintiffs asked Google to re-review an identified set of 81,122 logged communications in which an attorney appeared only in the CC line.  Pls.' Ex. 35 at 9-11.  Plaintiffs

reiterated that request with respect to additional volumes of Google's log in July 2021.  Google Ex. 14 (July 29, 2021 letter).

After meet-and-confer discussions, Google agreed in early August 2021 to re-review the subset of those emails in which the attorney remained on the CC line throughout the email chain. Google Ex. 15 (Aug. 4, 2021 letter).  Google offered to prioritize the review for document custodians noticed for deposition if necessary.  *Id.*  At that time, Plaintiffs did not raise any objection to logged emails with attorneys on the "to" line to which the attorney did not respond.

Google completed the first wave of its re-review and produced documents resulting from the re-review in September 2021.  Tennis Decl. ¶ 13.  On November 15, 2021, Plaintiffs asked Google to re-review an identified set of 23,861 additional logged communications, from more recently produced volumes of Google's log, in which an attorney appeared only in the CC line. Pls.' Ex. 36 at 6-8.  Again, Plaintiffs did not raise any objections to emails in which an attorney appears on the "to" line to which the attorney did not respond.  One week later, Google again agreed to re-review the subset of these communications where the attorney remained in the CC line throughout the email chain.  Google Ex. 16 (Nov. 22, 2021 letter).  Google completed that re-review and produced the resulting documents by mid-January 2022.  Tennis Decl. ¶ 18.

On January 25, 2022—nearly half a year after Google first agreed to re-review the subset of emails where an attorney remains on the CC line throughout an email chain—Plaintiffs demanded that Google re-review *all* previously identified emails with an attorney on the CC line, whether or not the attorney responded to the email.  Pls.' Ex. 37 at 1-2.  One month later, on February 28, Plaintiffs changed their demand.  In a letter, Plaintiffs insisted that Google produce on a blanket basis (1) all emails copied to attorneys to which the attorney did not respond, (2) all emails with an attorney in the "to" line among multiple non-attorney recipients to which the

attorney did not respond, and (3) emails where an attorney is included but later removed from the chain without responding. Google Ex. 17 (Feb. 28, 2022 letter).  Plaintiffs demanded production of these categories of documents, unredacted, *irrespective of whether the documents are privileged*.  Notably, Google had already reviewed many thousands of emails in categories (1) and (3) as part of its re-review process and determined them to be privileged.  Plaintiffs had never before disputed category (2), involving attorneys in the "to" line.  Plaintiffs did not identify the specific at-issue documents by Bates number (providing only a categorical description).  Plaintiffs filed their sanctions motion and motion to compel a mere 8 days later.

Google estimates that Plaintiffs' motion may implicate approximately 140,000 documents—which include documents previously reviewed and produced in full, as well as documents withheld in full or redacted as privileged.  Tennis Decl. ¶ 22.  As the chart following this paragraph shows, by March 1, 2022, *Google had already produced in full more than 111,000 of these documents*, with another nearly 10,000 documents produced in redacted form.  Tennis Decl. ¶ 22.  Notably, Google produced the vast majority of these documents as part of its regular periodic productions, before any privilege challenges from Plaintiffs.  Tennis Decl. ¶ 22.  As of March 1, 2022, Google was withholding in full only 18,000 or so such emails—less than 13 percent of the total.[8]  Tennis Decl. ¶ 22.

---

[8] Plaintiffs claim in a footnote that "Google has fully withheld over 80,000 documents where an attorney is merely carbon-copied on an email between non-attorneys." Mot. 17 n.35. They do not explain how they calculated this figure, but this figure apparently includes emails where the attorney responds and thus do not qualify as a "silent-attorney" emails under Plaintiffs' definition.

**Figure 5**



*See* Tennis Decl. ¶ 22.  Notably, Plaintiffs concede in their motion that Google has produced more than 9,000 emails involving phrases such as "please advise" and just 5 attorney names.  Mot. 11 n.23.

Following Plaintiffs' February 28 letter, and before the filing of Plaintiffs' motion, Google promptly began re-reviewing documents on its log that it believes fall into the categories identified in the letter.  Tennis Decl. ¶ 19.  (Plaintiffs have not identified the set of at-issue documents, and Plaintiffs' definition of this category of documents shifts across their motion.  *See infra* p. 27.)  Google has already re-reviewed approximately two-thirds of those documents and anticipates producing documents resulting from that re-review by March 25, 2022.  Tennis Decl. ¶ 20.  Google estimates that it will complete the re-review by April 1, 2022.  Tennis Decl. ¶ 20.  Throughout the re-review process, Google prioritized reassessing privilege determinations involving documents from custodians noticed for upcoming depositions, and it produced documents resulting from the re-review on a rolling basis to Plaintiffs so that they were available in advance of a custodian's

deposition.  Tennis Decl. ¶ 15.  Google has continued that practice during the current re-review.  Tennis Decl. ¶ 21.

## ARGUMENT

**I.      The Court Should Deny Plaintiffs' Baseless Request for Sanctions.**

      **A.      An Award of Sanctions Under a Court's Inherent Authority Requires Bad-Faith Misconduct.**

Although Plaintiffs request sanctions, they do not invoke the ordinary sanctions remedy of Rule 37(b), nor could they:  Rule 37(b) sanctions require a "production order," *Shepherd v. ABC*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) (citation omitted), and Plaintiffs never moved for such an order.  Short-circuiting the ordinary discovery process—which ensures that sanctions are imposed only *after* a court has intervened on a discovery issue—Plaintiffs urge the Court to impose sanctions under its inherent authority.

When "a party's misconduct has tainted the evidentiary resolution of [an] issue," a court may use its inherent authority to impose sanctions related to that issue, *id.* at 1478, if "the Rules are [not] up to the task," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).  Courts must, however, exercise "restraint in the use of inherent powers '[b]ecause of their very potency.'"  *Shepherd*, 62 F.3d at 1475 (quoting *Chambers*, 501 U.S. at 44); *see also Roadway Express v. Piper*, 447 U.S. 752, 764 (1980) (requiring "restraint and discretion").  Accordingly, courts exercising the "powerful . . . weapon" of inherent authority must "consider less onerous alternatives." *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998).  As Plaintiffs concede, "'the sanction must never be any more severe than it need be to correct the harm done and to cure the prejudice created to the other party, unless the opposing party's behavior has been so flagrant or egregious that deterring similar conduct in the future in itself warrants the sanction sought.'"  Mot. 26 (quoting *Zenian v. District of Columbia*, 283 F. Supp. 2d 36, 38 (D.D.C. 2003)).  Even in cases of

18

deterrent sanctions, "a discovery sanction imposed for its deterrent effect must be calibrated to the gravity of the misconduct." *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (applying Rule 37).

Before invoking its inherent power to sanction a party, a court must make "a finding of bad faith." *United States v. Wallace*, 964 F.2d 1214, 1219 (D.C. Cir. 1992); *accord Chambers*, 501 U.S. at 47, 50; *Roadway Express*, 447 U.S. at 767.   A court thus cannot impose sanctions to penalize "an aggressive litigation posture" or to "discourage" "good faith assertions of colorable claims or defenses." *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178, 181 (D.C. Cir. 1980).

The cases that Plaintiffs cite imposing inherent-authority sanctions reflect this stringent standard.  Each involves bad-faith spoliation of documents and/or other litigation misconduct.  For example, in *Johnson v. BAE Sys.*, 106 F. Supp. 3d 179 (D.D.C. 2015), the plaintiff "destroyed" files on her computer shortly after learning that the defendant would request a forensic examination of the laptop, and "repeatedly obfuscated the truth" through the proceedings, including by "alter[ing] medical records." *Id.* at 187, 191.  And in *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350 (N.D. Ill. 2016), the court found that the plaintiff deleted relevant emails with the defendant's competitors in bad faith and that the evidence, including her instruction to a subordinate to delete emails to "permanent trash," negated any conclusion that the deletion occurred in the ordinary course of business.  *Id.* at 354-55; *see also, e.g., Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 350-52 (9th Cir. 1995) (defendant "repeatedly lied" to the court about whether relevant documents had survived a fire, reflecting "abiding contempt and continuing disregard for th[e] court's orders").

As Plaintiffs recognize (Mot. 27), this same standard governs the "serious sanction" of "waiver of a privilege." *United States v. Philip Morris, Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003).

The D.C. Circuit has cautioned that the sanction of a privilege waiver is "most suitable for cases of unjustified delay, inexcusable conduct, and bad faith." *Id.* (internal quotation marks omitted) (reversing production order).  Other circuits likewise require "bad faith, willfulness, or fault." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 386 (3d Cir. 2007) (reversing production order made without such a finding) (citing *Am. Nat'l Bank & Tr. Co. v. Equitable Life Assurance Soc'y*, 406 F.3d 867, 877-80 (7th Cir. 2005)).[9]

Plaintiffs cite only *one* case in which a court issued a sanction barring a party from asserting the privilege across a large category of documents:  *DL v. District of Columbia*, 274 F.R.D. 320 (D.D.C. 2011).  In *DL*, the defendant disclosed on the first day of a bench trial that it had commenced a rolling production of thousands of documents and intended to continue producing the documents on a rolling basis through and after the trial.  *Id.* at 321-22.  That untimely production violated a court order from three years earlier compelling production of documents. *Id.* at 326.  The court characterized the defendant's belated production as "[a] discovery violation of . . . exotic magnitude [that was] literally unheard of in this Court," *id.* at 322, and recounted the defendant's "repeated, flagrant, and unrepentant failures to comply with Court orders" throughout the case, *id.* at 326.  Because "litigating privileges and objections post-trial would . . . unreasonably delay any possible effort by plaintiffs to reopen the trial record," the court ordered the defendant to produce all documents within one week after the trial and held, applying Rule 37, that the defendant had waived its right to assert privilege objections.  *Id.* at 322.

---

[9] In a footnote, Plaintiffs argue that "a party may have a 'culpable state of mind' to support sanctions relating to spoliation 'even if the party did not act in bad faith or purposefully destroy records.'" Mot. 27 n.47 (quoting *Paavola v. Hope Vill.*, 2021 WL 4033101, at *12 (D.D.C. Sept. 4, 2021)).  The cited case inappositely involves the sanction of an adverse-inference instruction in cases of spoliation of documents.  Plaintiffs neither allege spoliation nor request an adverse-inference instruction.

Plaintiffs cite no case where a court removed privilege protection to sanction a party whose employees might have mistakenly mislabeled emails as privileged.  Even where a party's counsel in litigation makes erroneous judgment calls regarding how to apply the privilege—which Plaintiffs do not claim here—courts have rejected blanket removal of privilege protection as a sanction.  In *American National Bank & Trust Co.*, 406 F.3d 867, the defendant's document production required it to "tackl[e] privilege issues involving in-house counsels, their notes, their e-mails, and fine line distinctions between legal and nonlegal (i.e., business) advice." *Id.* at 870. Over time, the defendant reconsidered certain privilege calls and removed some documents from the log. *Id.* at 870-71.  The plaintiff argued that "the log as a whole was unacceptably tainted by erroneous assertions of privilege" and moved for blanket disclosure of all documents on the log. *Id.* at 871.  After reviewing a sample of the at-issue documents, the magistrate judge found that five of twenty documents were not privileged, concluded that he could not "rely on the integrity of the log," and granted the blanket motion to compel as a sanction. *Id.* at 873.

The Seventh Circuit reversed.  While acknowledging that "[t]he process for winnowing down the number of privileged documents was tedious and protracted," the Seventh Circuit held that the withdrawal of all privilege protection was unfair and improper. *Id.* at 879.  In particular, the court explained that the defendant's privilege calls involved "an area of privilege law that is generally recognized to be especially difficult, namely, distinguishing in-house counsels' legal advice from their business advice." *Id.* at 879 (citation omitted).  The defendant's "good-faith difference of opinion" about its privilege calls was "not sanctionable conduct," especially where the defendant "exhibited good faith throughout the privilege log proceedings" by cooperating with the plaintiff to resolve disputes and removing documents from its log. *Id.* at 879.

Other courts also have refused to withdraw privilege on a blanket basis.  *In Trading Technologies International, Inc. v. eSpeed, Inc.*, 2007 WL 844558 (N.D. Ill. Mar. 14, 2007), for example, the district court denied in relevant part a motion to compel production of all documents on the defendant's privilege log notwithstanding the existence of documents on the log that were merely copied to in-house counsel.  *Id.* at *1.  Recognizing that "the lines [between legal and business advice] may be difficult to draw," the court held that it could not find that the defendant had engaged in bad faith and thus could not grant the "broad request."  *Id.*; *see also GIF Licensing, LLC v. Agere Sys., Inc.*, 2010 WL 11707209, at *5 (D. Del. Oct. 6, 2010) (erroneous but good-faith invocation of common-interest privilege, made "in the fulfillment of counsel's obligations to its clients," not litigation misconduct), *report and recommendation adopted*, 2012 WL 6085368 (D. Del. Dec. 3, 2012); *Banks v. Off. of the Senate Sergeant-at-Arms*, 233 F.R.D. 1, 8 (D.D.C. 2005) (sanction of waiver of privilege for all documents on a privilege log "would be disproportionate" to the defendant's inadvertent offense).

## B.    Plaintiffs Do Not Identify Sanctionable Conduct.

Plaintiffs have not demonstrated that Google engaged in sanctionable, bad-faith misconduct.

For starters, Plaintiffs do not allege that Google destroyed or otherwise spoliated documents.  *Cf. Cohn*, 318 F.R.D. at 354-55.  They do not allege that Google misrepresented the existence of any documents in litigation to hide them from Plaintiffs.  *Cf. Anheuser-Busch*, 69 F.3d at 350-52.  And, notwithstanding Plaintiffs' unsupported accusations about a strategy of "hiding" documents, the at-issue documents are not and were never hidden.  Google collected the documents and, as set forth above, has produced the vast majority–more than 111,000—in full (and another 10,000 with redactions).  *See supra* p. 16.  Google logged the remaining documents on privilege logs produced to Plaintiffs.

22

There is no viable claim that Google otherwise engaged in litigation-related misconduct. The presentations cited by Plaintiffs appropriately instruct employees to direct inquiries about privacy-related problems (Exhibit 1) and contractual terms (Exhibits 3 and 5) to in-house counsel. As already discussed, Google had a legitimate interest in ensuring that these inquiries were routed to in-house counsel. By instructing employees to caption those emails "privileged and confidential," Google appropriately ensured they would be captured for a privilege review in future litigation, which is exactly what happened in this litigation. And, consistent with privilege best practices, the presentations appropriately instructed its employees to include an "explicit request" for legal advice in their emails to in-house counsel. *E.g.*, 1 Epstein, *supra*, § 1.III.E4.B.

Nor do the emails attached by Plaintiffs suggest, let alone evidence, bad-faith misconduct. Even for experienced lawyers, determining the application of attorney-client privilege to employees' communications with in-house counsel is "difficult," *Am. Nat'l Bank & Tr. Co.*, 406 F.3d at 879, and "complicated," *Boehringer Ingelheim*, 892 F.3d at 1267. That determination is all the more difficult for lay employees communicating with in-house counsel in real time— especially in a company like Google whose products and services implicate a wide range of complex laws. It is unsurprising that Google employees copied lawyers on emails with potential legal implications, asked for "privileged" email threads with lawyers, and erred on the side of marking emails with in-house counsel "privileged and confidential." There is no evidence that the Google employees sending these emails had the bad-faith intent to use privilege claims to hide nonprivileged emails. To the contrary, other evidence ignored by Plaintiffs shows that Google correctly told employees that they could not "fake" privilege and that they should "assume that everything you write, send or share may be subject to public scrutiny." *See supra* pp.6-7.

What is more, Plaintiffs have not demonstrated, and cannot demonstrate, that Google employees' email practices "tainted the evidentiary resolution" of any privilege issues in this case. *Shepherd*, 62 F.3d at 1478.  The relevant documents were collected and reviewed for privilege, and Google has re-reviewed and continues to re-review documents challenged by Plaintiffs— thousands of which Plaintiffs challenged for the first time just one week before filing this motion. Plaintiffs have previously acknowledged that outside counsel have undertaken these efforts in good faith.  *See* 1/7/22 Hr'g Tr. at 7 ("[T]o counsel's credit, they have been willing to go back and look at some of these and make productions on some, and so we've made progress and that's why it hadn't come to the Court.").  Google has produced in full nearly 100,000 documents that fit Plaintiffs' "silent-attorney" criteria before any re-review—defeating Plaintiffs' claim that it is impossible for Google to conduct a legitimate privilege review after the fact.  Put another way, had Google's privilege review failed in the way that Plaintiffs claim, they would not have had fodder for their errant motion.

Plaintiffs' complaints about the duration of Google's privilege review (*see* Mot. 16-18, 27) do not justify the punitive sanction they request.  The scope, complexity, and duration of Google's privilege review are a function of the scope of Plaintiffs' sprawling document requests.  As set forth above, Google has produced more than 4.5 million documents, from more than 120 custodians, across the investigation and litigation stages of this case.  Plaintiffs requested documents on subjects that were the subject of appropriate and extensive discussion between Google employees and in-house lawyers.  And Google has been working in good faith to respond to Plaintiffs' privilege challenges since Plaintiffs first raised some of them in June 2021.  Plaintiffs might find the resulting privilege review and re-review process "tedious and protracted," *Am. Nat'l Bank & Tr.*, 406 F.3d at 878, but tedium is not the standard for sanctions.  Absent "bad faith,

24

willfulness, or fault" on Google's part, Plaintiffs cannot simply terminate the privilege-review process by asking the Court to impose the "severe sanction" of stripping Google of its privilege protections.  *Id.* at 879.

Plaintiffs similarly complain that Google's ongoing privilege re-review has resulted in the production of deprivileged documents after the depositions of relevant Google custodians.  *See* Mot. 27.  Plaintiffs, however, have not identified any deprivileged documents that prejudiced their ability to take an effective deposition.  And they waited to raise some of the documents at issue here and file the present motion after many depositions occurred.  Google is working in good faith to re-review documents for which Plaintiffs have challenged Google's privilege assertions, and it has been prioritizing that review by custodians who have been noticed for depositions.  *See supra* pp. 17-18.  Whether Plaintiffs can credibly establish prejudice from the timing of any future production of documents resulting from Google's re-review, and whether they can establish that they timely raised the relevant privilege issue with Google and the Court, are speculative inquiries at present.

### C.    Plaintiffs' Proposed Sanction Is Disproportionate to the Alleged Conduct.

Finally, Plaintiffs' proposed sanction is anything but "narrowly tailored and proportional." Mot. 26.  Plaintiffs concede that "[i]t is possible that the proposed sanction could result in the production of documents where individuals genuinely sought legal advice."  *Id.*  Google would put it differently: the proposed sanction *will* result in the production of documents where individuals genuinely sought legal advice or created work product.  Many of the at-issue documents are ones that Google already re-reviewed to confirm that privilege and work-product protection claims were made appropriately, and Google is working diligently to re-review the rest. Plaintiffs' unsubstantiated misconduct allegations cannot justify this "severe sanction."  *Am. Nat'l Bank & Tr.*, 406 F.3d at 879.

Plaintiffs' sanctions motion transparently attempts to circumvent the normal discovery process set out in the Federal Rules, even though "the Rules are up to the task." *Chambers*, 501 U.S. at 50.  If Plaintiffs dispute Google's privilege assertions, Plaintiffs' remedy is to meet and confer and, if the parties cannot reach agreement, to file a proper motion to compel identifying the at-issue documents.  Google continues to re-review the at-issue emails in good faith and remains willing to meet and confer with Plaintiffs.  Although Google believes that its re-review efforts will obviate the need for motions practice (as has been the case to date in this litigation), should motions practice become necessary, Google will respond to a properly filed motion to compel at the conclusion of the meet-and-confer process.  If Plaintiffs file a proper motion to compel, the Court finds that certain of the at-issue documents are not privileged or work product, the Court enters a production order, and Google fails to comply with the production order, Plaintiffs may *then* file for sanctions under Rule 37.  The present motion is many steps premature.   The Court should deny Plaintiffs' request for sanctions.

## II.    The Court Should Deny Plaintiffs' Baseless Motion To Compel.

Plaintiffs alternatively move to compel production of emails from Google's log "adopting the Communicate-with-Care instructions" or "created under the Communicate-with-Care rubric." Mot. 28.  For all the reasons set forth above, Plaintiffs have not proved the existence of any such bad-faith strategy.  The Court should deny Plaintiffs' motion to compel for that reason alone. Plaintiffs also have not proposed any reliable mechanism for identifying such emails, nor have they tied the at-issue emails to the specific presentations they claim reflect this supposed strategy (whether by date, author, or recipient).  For that reason as well, the Court should deny Plaintiffs' motion to compel.

Because Plaintiffs have no way to identify the at-issue emails, they create an artificial proxy for these emails that they call "silent-attorney emails."  Mot. 31.  Plaintiffs' definition of a "silent-

attorney email" is ambiguous and shifting, and they do not identify these emails by reference to Google's privilege log or otherwise quantify them.  For example, some definitions require multiple employees; some do not.  One requires a "chain"; others do not.  *See, e.g.*, Mot. 1, 3, 18, 26, 28, 31, 32, 33, 34.

No matter the definition, the premise underlying Plaintiffs' "silent-attorney" argument—that an email to an attorney is not privileged or work product unless the attorney responds in the same email chain—is baseless.  That bright-line proposition finds no support in the law.  For starters, privilege must be determined on a "case-by-case basis."  *Upjohn Co. v. United States*, 449 U.S. 383, 396-97 (1981) (internal quotation marks omitted).  For another, Plaintiffs' proposed rule makes no sense. "The privilege covers *both* (i) those communications in which an attorney gives legal advice; *and* (ii) those communications in which the client informs the attorney of facts that the attorney needs to understand the problem and provide legal advice."  *Boehringer Ingelheim*, 892 F.3d at 1267 (emphases added); *see also Upjohn Co.*, 449 U.S. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.").  And the work-product doctrine, as codified in Rule 26(b)(3)(A), protects documents prepared in anticipation of litigation by a party's representative, irrespective of whether the documents are prepared by or for an attorney.  *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 76-77 (D.D.C. 2003).  Plaintiffs cite no case for their contrary rule.

Additionally, the mere fact that a document may have more than one purpose does not strip it of privilege or work-product protection.  In cases where a communication has "multiple purposes"—for example, a business and legal purpose—courts ask "whether obtaining or providing legal advice was *one of* the significant purposes of the attorney-client communication."

*Boehringer Ingelheim*, 892 F.3d at 1267 (citation omitted).  If yes, the document is privileged.  A similar standard governs the work-product doctrine:  "a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation."  *United States v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010).

There are many legitimate reasons why an attorney may not respond to a privileged or work-product email.  To provide several:

1. The attorney may respond to an employee's email in some other manner—for example, by phone, in person, or in a meeting, or in a separate email thread.

2. The employee may be responding to a separate request from the attorney for information necessary to provide legal advice to others in the organization, in which case the attorney may not respond to the at-issue email.

3. The employee's email may not require an immediate response.  The employee may be "inform[ing] the attorney of facts that the attorney needs to understand the problem and provide legal advice" upon *further* investigation and analysis.  *Boehringer Ingelheim* , 892 F.3d at 1267; *see also, e.g.*, *Banks v. Off. of the Senate Sergeant-at-Arms*, 228 F.R.D. 24, 32 (D.D.C. 2005) ("Client communications intended to keep the attorney generally apprised of continuing business developments, with an implied request for legal advice thereon . . . may also be protected." (citation omitted)).

4. The employee may be conveying the attorney's legal advice or a request for legal advice to other employees with a need to know, and copying the attorney for awareness.  *See, e.g.*, *FTC v. GlaxoSmithKline*, 294 F.3d 141, 147 (D.C. Cir. 2002) (protecting as privileged dissemination of attorney advice "to specifically named employees and contractors, most of whom were attorneys or managers and all of whom needed to provide input to the legal department and/or receive the legal advice and strategies formulated by counsel"); *EEOC v. George Washington Univ.*, 502 F. Supp. 3d 62, 79 (D.D.C. 2020) ("[C]ommunications among non-attorneys can be entitled to protection if they concern matters in which the parties intend to seek legal advice or reflect legal advice provided by an attorney." (citation omitted)).

5. The employee and his colleagues may have collected the information in the email "in anticipation of litigation" as Google's "agent[s]" and may be communicating the email to the attorney for her use (or for outside counsel's use) in preparation for litigation, giving rise to work-product protection.  Fed. R. Civ. P. 26(b)(3)(A).

Plaintiffs themselves concede that their categorical request for production may "result in the production of documents where individuals genuinely sought legal advice." Mot. 26. Their justification for that result—apart from their baseless request for sanctions—is that the supposedly malicious "Communicate-with-Care strategy . . . throw[s] into doubt all of Google's privilege claims over attorney communications" and makes it impossible for Google to "distinguish between genuine requests for legal advice and those adopted under the Communicate-with-Care formula." Mot. 31. That is akin to the argument the Seventh Circuit rejected as a basis to strip a party of its privilege protections. *See Am. Nat'l Bank & Tr. Co.*, 406 F.3d at 871, 879. Both premises of Plaintiffs' assertion are flawed. First, Plaintiffs misunderstand what "communicate with care" means, for all the reasons already stated. Second, the email practices of Google employees have not made it impossible for outside counsel to conduct a privilege review. As already explained, Google has produced more than 100,000 "silent-attorney" emails, the large majority of which were produced in Google's initial productions without any re-review.

Plaintiffs' argument is no way to litigate a motion to compel production of documents withheld under a claim of privilege. Plaintiffs cite no case where a court ordered production of any email, let alone thousands of unidentified emails, on the ground that if the attorney didn't respond to the email in the same chain, it must not be privileged. Nor do they cite any case where a court took such extreme action while a party was still conducting a good-faith re-review of the disputed privilege assertions. Google is conducting its re-review with all reasonable speed and in good faith. Plaintiffs challenged some of what it calls "silent-attorney" emails for the very first time on February 28, just a week before filing this motion. Google's re-review has resulted in decisions to withdraw Google's privilege assertions for some, but not all, of the documents that Google has identified as "silent-attorney" emails. Upon completion of Google's re-review and the

subsequent meet-and-confer process, if Plaintiffs continue to dispute certain of Google's privilege claims, they should file a motion to compel identifying the at-issue documents. The parties can then litigate the privilege issues by reference to specific documents, as typically occurs—rather than by reference to Plaintiffs' meritless, categorical "silent-attorney" rule. *See Waugh v. Pathmark Stores*, 191 F.R.D. 427, 430 (D.N.J. 2000) ("No bright-line rule governs the applicability of the attorney-client privilege and, as a result, the applicability of the privilege should be determined on a case-by-case basis.").

## III.    The Court Should Deny Plaintiffs' Request for a Revised Privilege Log.

Plaintiffs claim that the alleged "Communicate with Care" program renders Google's privilege log "useless" and request that the log "be replaced." Mot. 34. Google does not know what that means, and Plaintiffs provide no explanation in their motion, much less in the conferral that preceded the motion. Plaintiffs do not claim that the log fails to comply with Rule 26(b)(5); the log identifies the parties to each communication, identifies attorneys, and describes the basis for Google's privilege assertions. Plaintiffs in fact have used the log to dispute Google's privilege assertions, and the parties have used the log as the basis for their meet-and-confer efforts. The Court should reject Plaintiffs' unexplained request for a "replacement" log.

Plaintiffs also request "a single, comprehensive privilege log that combines all remaining privilege claims Google is continuing to assert in this litigation." Mot. 34. This is Plaintiffs' first request for such a "comprehensive" log. As Google has conducted its re-review, it has produced to Plaintiffs updated versions of its privilege log volumes. Tennis Decl. ¶ 14. If Plaintiffs are now requesting that Google merge those updated volumes into one "comprehensive log," Google will do so at the completion of its current re-review. Meeting and conferring would have obviated the need to make this request as part of Plaintiffs' motion.

Plaintiffs also request "an index" linking deprivileged documents to their original privilege log identifier. As a courtesy, Google identifies de-privileged documents in the production metadata when it produces them. Tennis Decl. ¶ 14. Plaintiffs do not explain why such an index identifying documents over which Google is no longer asserting privilege is necessary to assess Google's continued privilege assertions. Google's obligation under Rule 26(b)(5) is to identify the documents over which it is asserting privilege. No rule requires a party to identify the documents over which it is not asserting privilege.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: March 24, 2022

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _/s/ John E. Schmidtlein_
John E. Schmidtlein
Benjamin M. Greenblum
725 12th Street, NW
Washington, DC 20005
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Franklin M. Rubinstein
1700 K St, NW
Washington, DC 20006
Tel: 202-973-8833
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

*Counsel for Defendant Google LLC*

31