## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

                              Plaintiffs,

v.

GOOGLE LLC,

                              Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

███████████████

## PLAINTIFFS' REPLY IN SUPPORT OF
## PLAINTIFFS' MOTION TO SANCTION GOOGLE AND COMPEL DISCLOSURE OF
## DOCUMENTS UNJUSTIFIABLY CLAIMED
## BY GOOGLE AS ATTORNEY-CLIENT PRIVILEGED

Google has deliberately created and encouraged a widespread practice among its employees of adding pretextual requests for legal advice to business documents to shield those documents from discovery. This is the sanctionable conduct at the heart of Plaintiffs' motion, which Google fails to acknowledge and cannot justify. The scope and impact of Google's misconduct are significant and sprawling. Just *within the past week,* only after Plaintiffs filed their sanctions motion, Google produced more than 8,000 documents wrongly withheld under claims of privilege.

Unable to refute the evidence of its misconduct, Google seeks a veneer of legitimacy to its Communicate-with-Care program by pointing to other training documents and post-hoc testimony. These materials, however, conflict with Google's own contemporaneous documents. Google also suggests that subsequent, good-faith efforts by outside counsel during discovery somehow excuse years of the company's misconduct. But rather than curing the harm, outside

1

counsel's belated deprivileging of tens of thousands of erroneously withheld documents merely confirms the existence, persistence, and extent of Google's privilege abuse. This subversion of the attorney-client privilege and judicial process cannot be tolerated. What is worse, Google has been here before. Google has been put on notice about its spurious privilege designations in at least two other legal proceedings. But that has not deterred Google from persisting in its misconduct. Sanctions—in the form of compelled production of all withheld or redacted silent-attorney emails—is the appropriate relief to both remediate the harm suffered by Plaintiffs and to deter similar misconduct in the future. Indeed, Google's enduring refusal to take responsibility for its conduct demonstrates the need for sanctions.

Plaintiffs' motion to compel production of the withheld silent-attorney emails is also independently warranted because, after multiple opportunities, Google has failed to meet its burden to establish with reasonable certainty that these communications have a genuine and significant purpose of seeking legal advice.

## ARGUMENT

### I.    Unable To Justify Its Conduct, Google's Opposition Seeks To Obscure It

Google fails to forthrightly address extensive evidence of its misconduct. The company cannot defend its practice of hiding emails behind sham requests for legal advice. As a result, Google turns to misdirection and strawmen. The company argues that—with context—Plaintiffs' evidence is benign. Context, however, is no friend to Google.

### A.    Plaintiffs' Motion For Sanctions Is Not Concerned With Overly Cautious Employees Or The Conduct Of Outside Counsel

The Court should reject Google's efforts to recast Plaintiffs' motion as a request for sanctions on "a party whose employees may have mistakenly mislabeled emails as privileged, " Opp. at 21, or for sanctions on overworked outside counsel. Google's conduct was no mistake,

but deliberate corporate action.

1.      **Plaintiffs' Sanctions Motion Is Not Based On The Conduct Of A Few Mistaken Employees**

In its Opposition, Google argues that Plaintiffs' sanctions motion is aimed at isolated examples of laypeople's "common misperceptions of attorney-client privilege." Opp. at 12–18, 21–25. The sheer volume of the conduct disproves Google's position. As shown in Figure 5 of Google's Opposition, there are *over 140,000* silent-attorney emails at issue—emails in which Google employees added artificial indicia of privilege and copied in-house counsel, who never bothered to respond. Opp. at 17. These are not isolated innocent "mistakes" but a systemic practice within Google that reaches to the top. According to its own chart, Google erroneously withheld and redacted approximately 30,000 silent-attorney emails and reproduced those only after Plaintiffs' efforts to challenge. Opp. at 17 (Figure 5). Then, after Plaintiffs moved for sanctions, Google deprivileged over 9,000 additional erroneously withheld documents.[1] This shows that Google's Communicate-with-Care program worked: documents that should have been produced in the normal course of discovery were withheld because of false indicia of privilege. Google's practice is simply too pervasive for its backhanded dismissals to be believed.

Google focuses on the copying of in-house counsel and attorney-client-privilege labels but fails to acknowledge the crux of the sanctionable conduct—the pretextual requests for legal advice. Asking employees to fabricate requests for legal advice separates Google's conduct from companies acting in an "abundance of caution" or lay misunderstandings about when to affix a privilege label. Indeed, this was a sophisticated, savvy way of shielding documents from discovery.

---

[1] Declaration of Meagan K. Bellshaw (Bellshaw Decl.) at ¶ 7.

     **2.**      **Plaintiffs' Sanctions Motion Is Not Based On The Shortcomings Of Google's Outside Counsel**

Google cannot misdirect the focus of Plaintiffs' motion to the conduct of outside counsel; the misconduct is solely Google's. Google's Opposition focuses much of its attention on the efforts of outside counsel to work with Plaintiffs to deprivilege erroneously withheld or redacted documents. Opp. at 12–18. But this misses the point. Plaintiffs are not accusing outside counsel of misconduct. All the misconduct took place within the walls of Google.

Google points out that, for attorneys performing privilege review, it can be difficult to determine whether advice is legal or business in nature. Opp. at 1–2. In the silent-attorney emails, however, *no* advice is given by in-house counsel. Moreover, Google's misconduct over many years made it *more* difficult for outside counsel to properly identify legitimate privilege claims. No good-faith efforts by outside counsel can cure Google's efforts to camouflage business documents. To rule otherwise would protect Google from its malign efforts, simply because the company's outside counsel did not knowingly participate in the charade.

**B.**      **Google Cites Other Attorney-Client-Privilege Training Materials That, If Anything, Only Highlight The Need For Relief**

Google attempts to distract from its sanctionable conduct by citing other training materials and practices it says are "entirely legitimate." Opp. at 3. These documents, however, are largely irrelevant, inconsistent with Google's actual practice, and, if anything, show that Google knew that its efforts to hide business documents from discovery were wrong.

Google proffers five examples of privilege guidance given to employees between 2014 and 2020. *See* Def. Exs. 4–8. Although these documents admittedly include uncontroversial statements about the attorney-client privilege, these benign training slides are irrelevant and do not reflect the actual behavior of Google's employees. First, the existence of training slides

neither disproves nor cures the misconduct described in Plaintiffs' motion. Plaintiffs have (1) identified specific guidance that is improper and, more importantly, (2) shown that employees actually obeyed that improper guidance. Citing different training materials offered to different employees at a different time is a red herring, not a valid defense.

If anything, the documents Google cites show it knows the proper boundaries of the attorney-client privilege. *See, e.g.*, Def. Exs. 4, at -616; 6, at -672;.7, at -592; 8, at -401. This, of course, makes the company's conduct much worse. Further, Google's training slides confirm that the conduct Plaintiffs describe in their brief (camouflaging documents to appear privileged) is, without question, improper. For example, a training presentation cited by Google says: "You can't fake it - Must tie to legal advice." Def. Ex. 6, at -674. The slides cited in Plaintiffs motion taught employees they could "fake it" if they made documents *look like* they were tied to "legal advice." Further, Google's own exhibits demonstrate that the company well understood that the impact of instructing employees to add spurious requests for legal advice to business emails would be to shield those documents from discovery. Def. Ex. 8, at -401 ("We care about ACP because if a situation were to arise where we had a regulatory investigation or a litigation, we do not produce ACP documents to the opposing side."); *see also* Def. Ex.6, at -671.

Google attempts further misdirection by pointing to non-sanctionable aspects of its Communicate-with-Care policy. These cannot redeem a program that, to hide documents from discovery, instructs employees to affix requests for attorney advice to all emails. Nor are those other aspects of Communicate with Care entirely innocuous. The training slides cited by Google repeatedly emphasize the broad scope of discovery and the risks of written communications. This training heavily signals—and often outright suggests—that employees avoid written discussion of unfavorable facts. Rather than advising employees to clean up the underlying cause of the

unfavorable facts, the Communicate-with-Care policy advocates hiding the facts from discovery by avoiding using certain words[2] or "going old school" with a call or a meeting. Def. Ex.7, at -592; Def. Ex.8, at -401.

Google is also incorrect that Communicate with Care did not include—and was not interpreted by employees to include—the misconduct at the heart of Plaintiffs' motion. Opp. at 3, 8. As Figure 1 illustrates, a warning to "#communicateWithCare" about a press article led another employee to add a sham "privileged - seeks advice of counsel" to the responding email:[3]

**Figure 1**



Note the responding Google employee knew exactly what was expected when the

---

[2] For example, Google's Communicate With Care trainings taught Google employees to avoid using the term "market share." Def. Ex.7, at -591; *see also* Bellshaw Decl. Ex. 38, at -297 ("[A]bsolutely, I'm aware of not using the word 'market' . . . -- the one big thing I remember from all that Legal training.") (Hereafter the exhibits attached to the Bellshaw Declaration will be referred to as Pls. Exs); Pls. Ex. 39, at -374 ("I just went through Communicating with Care training, and there are a lot of words I've written in emails without thinking much about it (like 'leverage' and 'market share').").

[3] Pls. Ex. 40, at -891. This document was originally withheld by Google and was produced only *after* Plaintiffs moved for sanctions.

Communicate-with-Care hashtag appeared; this is Google's culture. The Court should conclude that curated examples of benign training materials are unsurprising and uninformative. By contrast, the misconduct documented in Plaintiffs' motion is endemic.

**C.    Google Mischaracterizes The Training Slides Cited By Plaintiffs**

The training slides cited in Plaintiffs' motion direct Google employees to hide emails behind a wall of sham requests for legal advice. Google's contrary reading of these slides conflicts with their plain text. Plaintiffs' reading of these slides, moreover, is supported by the facts.

Google claims the first Communicate-with-Care slide cited in Plaintiffs' brief simply meant that Google employees "should be thoughtful about what is put in writing and request advice from Google's internal experts on privacy and in-house counsel *where appropriate*." Opp. at 9 (emphasis added). The slide does not say this. The slide tells employees to add a lawyer in the "To" field, mark "Attorney/Client Privileged," and "ask the lawyer a question."[4] There is no "where appropriate" limitation that Google's Opposition imagines.

Indeed, Google ignores the speaker notes that state, "If you're dealing with a sensitive issue, it's important to communicate with care over email. *You can follow these steps to ensure your email communication is privileged in these circumstances*."[5] Sensitive information is *not* synonymous with privileged information. This slide offers a recipe for creating the illusion of privilege and hiding documents from discovery. Google's Opposition offers context that conflicts with the 2015 training slides' actual contents. In such circumstances, the Court should trust its eyes rather than Google's arguments.

---

[4] Pls. Ex. 1, at -363.

[5] *Id.*

Google also mischaracterizes the three subsequent training slides cited by Plaintiffs, relating to the revenue sharing agreements (RSAs) and mobile application distribution agreements (MADAs) at the heart of Plaintiffs' case.[6] Google suggests that, because in-house counsel would approve the final agreements, "it made sense to involve them in relevant internal communications about the agreements." Opp. at 10. But these training slides did not merely suggest employees loop counsel in for context. Nor, as Google claims, did these slides merely provide guidance "for how to direct requests for legal advice to in-house counsel." Opp. at 10. Instead, in each of the three presentations, "request guidance" from an attorney is an imperative on "**any written communication** regarding Rev Share and MADA": requesting legal guidance is not optional nor limited to cases when employees actually have a legal question.[7]

**Figure 2**



The slides speak for themselves. But if there is any doubt, the best evidence of the slides'

---

[6] Memo. at 4–7, 19–20 (citing Pls. Exs. 3, 5, 30).

[7] Pls. Ex. 3, at -666; Pls. Ex. 5, at -046; Pls. Ex. 30 at -605, -617, -681, -702.

meaning and effectiveness is how Google employees executed those instructions.

## II.     The Evidence Of What Google Employees Did In Practice Overwhelms The Explanations In Google's Opposition

Plaintiffs provided numerous examples that the inclusion of artificial requests for legal advice—to which attorneys never responded—is widespread within Google.[8] The most plausible explanation is that employees sought to create the appearance of privilege to shield the documents from discovery and that this was a practice in which the employees were instructed and encouraged to engage.

### A.     Google's Conduct Must Be Viewed As A Whole

Google seeks to minimize its conduct by arguing that any one email, on its own, cannot support Plaintiffs' motion for sanctions. Google's conduct, however, must be weighed in its entirety.

Google claims that, "[n]one of the emails that Plaintiffs attach to their motion evidences a bad-faith scheme to hide documents." Opp. at 12. But Google overlooks that many silent-attorney emails (1) begin with a "privilege" marker and request for an attorney's unspecified advice, which is followed by (2) a second salutation addressing only non-attorneys and a substantive message that poses a question, if at all, only to non-attorneys.[9] Employees' frequent use of generic phrases, such as "please advise," coupled with the failure of the copied attorney to even bother responding further support that these requests for legal advice were not legitimate.[10]

---

[8] *See* Pls. Ex. 3, 5, 6, 7, 9–33.

[9] *E.g.,* Memo. at 8–11 (citing Pls. Exs. 6, 7, 9, 10, 12, 13, 16).

[10] *E.g.*, Memo at 10–11 (citing Ps. Ex. 13, 7, 14, 15, 16) and n. 23 (explaining that over 9,000 documents from Google's production includes generic requests for legal advice). Even Google's CEO Sundar Pichai uses these generic frames on routine business emails. *See* Pls. Ex. 41, at -895 (in response to a forwarded New York Times article, Mr. Pichai writes: "Privileged Kent – legal advice please Thanks for handling this well to all of you - Sundar").

The examples—and there are countless more in Google's production[11]—must be read in the context of Google's larger, institutionalized efforts to hide documents. Over seven years, Google repeatedly instructed its employees to include fake requests for legal advice, as evidenced by the training slides in Plaintiffs' motion. Google executives routinely instructed others to create "privileged" versions of emails or slide decks,[12] and one even confessed to adding counsel because he was about to "use some trigger words."[13] Tens of thousands of emails with fake requests for advice flooded the inboxes of in-house counsel. Plaintiffs have yet to find one example of in-house counsel correcting employees when they added generic "please advise" requests to business communications. Every step in this process is the result of Google's bad-faith conduct: it proves that without sanctions, this conduct will absolutely continue.

Plaintiffs' exhibits were not isolated incidents, but evidence of Google's longstanding and deliberate strategy of using the attorney-client privilege to shield business documents from discovery. Additional examples put the key issue—the pretextual requests for legal advice—in even clearer focus. In 2014, a Google finance director drafted an email about a deal with ██████ in advance of an executive review meeting. Figure 3 shows comments exchanged between the director and a Google vice president about the draft email.[14]

---

[11] Google's production of deprivileged documents after Plaintiffs' motion for sanctions revealed even more examples of Google employees adding sham requests for legal advice to business documents. *See* Pls. Exs. 42–51, 54, 55. All of these are documents that were erroneously withheld and would have remained hidden but for Plaintiffs' motion.

[12] *E.g.*, Pls. Exs. 17, 19, 24–27.

[13] Pls. Ex. 22, at -065.

[14] Pls. Ex. 56, at -107 (metadata indicates the message is dated Apr. 20, 2015).

**Figure 3**



The Google vice president asked the finance director to add an attorney-client privilege label,
include a lawyer, and ask the lawyer a question. The finance director complied and admitted that
legal guidance was unnecessary ("I am pretty sure I know the answer") but "allow[ed] for the
'Attorney Client Privileged' language." It appears that Google initially fully withheld a final
version of the email as privileged because of the question posed to the lawyer. After Plaintiffs
moved for sanctions, Google deprivileged this document but continues to redact the pretextual
question.[15] This document is unequivocal: Google's conduct is not the result of a mistake, but of
a deliberate and widespread strategy, evincing bad faith.

In a 2014 document discussing ▉▉▉▉▉▉, an advertising-auction design proposal,
one Google employee instructed colleagues to mark "all ▉▉▉ documents" as privileged and, of
course, to add a lawyer and ask for a legal opinion.[16]

**Figure 4**

> **Commented [1]:** For all ▉▉▉ documents, until all
> design details are finalized, please mark the document:
>
> CONFIDENTIAL AND LEGALLY PRIVILEGED
> ATTORNEY CLIENT COMMUNICATION
>
> Also, include one or more attorney's on any document
> and in any discussion and be sure to ask for their legal
> opinion.

---

[15] Pls. Ex. 57, at -319.
[16] Pls. Ex. 58, at -231 (referenced language is in the first comment in the margin of the
document).

The comment betrays Google's intent: train its employees to (1) apply an attorney-client privilege stamp, (2) include an attorney on *all* sensitive business documents, and (3) "be sure to ask for their legal opinion." The addition of a boilerplate request for legal advice is the linchpin —Google bakes the privilege log entry into the document. Of note, this particular example includes a forward-looking instruction—it applies to documents that have not yet been created.

Not only was Google's scheme deliberate, but it appears to have been crafted in response to an earlier, failed attempt to shield business documents under a veil of privilege. During a 2011 suit brought by Oracle against Google, a dispute arose as to whether an internal Google email was protected by the attorney-client privilege. *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5024457, at *2 (N.D. Cal. Oct. 20, 2011). A non-attorney sent an email "To" Google's vice president of Android and an in-house counsel. *Id.* at *1. The email had "Attorney Work Product" and "Google Confidential" stamps at the top, followed by a salutation addressed only to the vice president. *Id.* Importantly, the attorney was not included in the salutation nor otherwise mentioned in the email. "The salutation of the . . . email addressed only a non-attorney. The attorney, at most, was a mere 'To.'" *Id.* at *4. As with the silent-attorney emails here, there was "no evidence" the attorney "actually read or responded to the email, much less used it in constructing legal advice." *Id.* The magistrate judge, the district court judge, and a panel of judges at the Federal Circuit Court of Appeals saw through Google's obfuscation—all agreed that the email had not been prepared for the provision of legal advice. *In re Google Inc.*, 462 F. App'x 975, 978 (Fed. Cir. 2012); *Oracle Am.*, 2011 WL 5024457, at *4; *Oracle Am., Inc. v. Google, Inc.*, No. C-10-03561-WHA (DMR), 2011 WL 3794892, at *4 (N.D. Cal. Aug. 26, 2011). Most notably, the magistrate judge and the district court relied in part on the salutation, which did not address an attorney, and "the email text," which "'never mention[ed] legal

advice.'" *Oracle Am.*, 2011 WL 5024457, at *4; *Oracle Am.*, 2011 WL 3794892, at *4.

On notice of its problematic privilege practices, Google refined its strategy, as evidenced by (1) its subsequent instructions to specifically "request guidance" or "ask a question" of an attorney and (2) the widespread execution of that guidance. Thus, after the *Oracle* opinions, Google doubled down on its efforts to hide business communications from discovery.

**B.    Google Cites Sworn Testimony That Is Either Irrelevant Or Inconsistent With The Evidence Plaintiffs Cite**

Google's Opposition uses various deposition and declaration testimony to argue that the company's Communicate-with-Care instructions were solely for legitimate reasons. *See* Opp. at 9–11. But Google's proffer of self-serving testimony cannot overcome the substantial, contemporaneous evidence demonstrating Google's true intent.

For example, Google cites the testimony of a company vice president, Jamie Rosenberg, about general efforts to seek assistance from counsel. Opp. at 11. But that testimony conflicts with Mr. Rosenberg's actual practice of adding unnecessary "requests" for legal advice to hide ordinary business documents from discovery, as evidenced in his email to Google CEO Sundar Pichai regarding an RSA proposal to Samsung:[17]

**Figure 5**



---

[17] Pls. Ex. 59, at -787; *see also* Pls. Ex. 11, at -243, & Pls. Ex. 22, at -065.

Google's RSAs are at the heart of the company's strategy to unlawfully maintain its monopolies. In Figure 5, a document withheld by Google and deprivileged only *after* Plaintiffs moved for sanctions, Mr. Rosenberg emailed Mr. Pichai to "quickly summarize" the Samsung RSA proposal. The email did not seek *any* advice, from anyone, which, of course, was why Matthew Bye, the copied attorney, did not respond. Google withheld this document despite eight months of challenge by the Plaintiffs. Whatever Google hoped to prove by quoting Mr. Rosenberg's deposition, contemporaneous words show us exactly what he meant.

Google's reliance on its Chief Business Officer's testimony is similarly meaningless, given Mr. Schindler's actual practice of directing employees to put business discussions in "privileged emails." Memo. at 15–16, 20–21. As makeweight, Google also cites its own 30(b)(6) witness for support, although he admitted that he did not educate himself on the Communicate-with-Care program before his deposition.[18]

In evaluating Google's conduct, the Court should rely on the statements in Google's documents and reject the self-serving employee testimony proffered by Google.

## III.   Google Misstates When Courts May Use Their Inherent Authority To Sanction

Google's Opposition misstates sanction law, seeking to impose a higher "bad faith" standard than required for Plaintiffs' motion. To be clear, the evidence shows that Google acted in bad faith when it instructed its employees to add sham requests for attorney advice to sensitive business emails. But a finding of bad faith is not required for the Court to issue the measured sanctions that Plaintiffs seek. The Court may, under its inherent authority, sanction Google even

---

[18] Pls. Ex. 60 at 153:8–13.

if the Court finds that Google acted with gross negligence rather than bad faith.[19]

Google's reliance on case law applying the "bad faith" standard is inapposite. Those cases considered sanctions that would have imposed attorneys' fees or deprived a party of its day in court by default judgement, neither of which is sought here. Opp. at 18–20 (citing cases). Google cites *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998), for the proposition that courts exercising their inherent authority to sanction must "consider less onerous alternatives." Opp. at 18. But *Webb* explains that, "[b]ecause disposition of cases on the merits is generally favored… *a default judgment* must be a 'sanction of last resort,' to be used only when less onerous methods (for example, adverse evidentiary determinations *or other* '*issue-related sanctions*') will be ineffective or obviously futile." *Webb*, 146 F.3d at 971 (emphasis added).

Less onerous issue-related sanctions are exactly what Plaintiffs have proposed. The sanction requested—that Google be compelled to produce all silent-attorney emails—is narrowly tailored (1) to remedy, to the extent possible, the harm caused in this litigation, and (2) to deter similar conduct by Google and other companies in the future. In this way, the sanctions Plaintiffs seek are proportional to the misconduct alleged. *See Shepherd*, 62 F.3d at 1479 ("We agree with the First Circuit that the district court must properly 'calibrate the scales' to ensure that the gravity of an inherent power sanction corresponds to the misconduct."). As Plaintiffs request an issue-related sanction directed at remedying Google's misconduct, a heightened standard of proof and intent is not required. The D.C. Circuit Court of Appeals has explained that "[b]ecause

---

[19] Google suggests that Plaintiffs seek to "short circuit" the "ordinary" sanctions available under Federal Rule of Civil Procedure Rule 37(b), by failing to first secure "production order." Opp. at 18. But, "[w]hen rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. Am. Broad. Co.*, 62 F.3d, 1469, 1474 (D.C. Cir. 1995) This is precisely the case here.

issue-related sanctions are fundamentally remedial rather than punitive and do not preclude a trial on the merits, we conclude that they do not require a heightened standard of proof." *Id.* at 1478.[20]

Further, bad faith also is not required because Google's conduct has "tainted the evidentiary resolution of the issue," akin to spoliation. "[A] district court may impose issue-related sanctions [like an adverse evidentiary determination] whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Beck v. Test Masters Educ. Servs.*, 289 F.R.D. 374, 378 (D.D.C. 2013) (quoting *Shepherd*, 62 F.3d at 1478) (second alteration in *Beck*). When assessing the intent required for issue-related sanctions in the context of spoliation, courts have held that negligence is sufficient. *See Mannina v. District of Columbia*, 437 F. Supp. 3d 1, 12 (D.D.C. 2020) (holding bad faith is not required for sanctionable spoliation and "mere negligence may suffice"); *Chen v. District of Columbia.*, 839 F. Supp. 2d 7, 13 (D.D.C. 2011) ("the spoliation of evidence need not be 'purposeful,' as Red Roof implies; negligent spoliation may suffice").

Google attempts to avoid the import of these cases by claiming Plaintiffs have not alleged spoliation, Opp. at 20 n.9, and ignoring Plaintiffs' argument that Google's misconduct is "commensurate with other sanctionable conduct, including elements of both spoliation and misrepresentation." Memo. at 23. Although Google did not destroy documents, shielding non-privileged business communications through pretextual requests for legal advice has the same purpose and effect—keeping evidence out of the hands of regulators, plaintiffs, and the courts.

---

[20] Google also argues that a showing of bad faith is required because Plaintiffs are not seeking an adverse-inference instruction. Opp. at 20 n.9. Although Plaintiffs explicitly reserved the right to seek adverse inferences, Memo. at 27, the sanction that Plaintiffs presently seek is actually *less* drastic than an adverse inference. At this stage, Plaintiffs are simply asking for production of the silent-attorney emails implicated by Google's misconduct.

Google's intentional privilege abuse was undertaken in bad faith. At a minimum, Google was grossly negligent in allowing the establishment of this pretextual practice, in allowing it to become widespread, and in allowing it to continue unabated for years. Google has not provided a single example of anyone on these emails—including in-house counsel, whose inboxes would have been flooded with these fake requests for legal advice—correcting this misconduct.

## IV.   Outside Counsel Cannot Cure The Harm Caused By Google's Misconduct

Contrary to Google's arguments, efforts of outside counsel have not—and cannot—cure the harm caused by their client's misconduct. Google's misconduct took place before outside counsel reviewed a single document.

The subsequent efforts by Google's outside counsel to reduce the impact from the misconduct may be relevant to the ultimate remedy afforded Plaintiffs, but should not affect the underlying decision of whether Google should be sanctioned. As for the impact of Google's conduct on Plaintiffs' trial preparation and the waste of Plaintiffs' time, the impact has been enormous: missed opportunities in preparation and deposition, enormous effort in ferreting out Google's long-term scheme (including nine months scrutinizing privilege claims, drafting challenges, negotiating with outside counsel, and reviewing deprivileged documents), as well as the time necessary for this briefing because Google has not taken responsibility for its conduct. The recent efforts of Google's counsel to review the silent-attorney emails has not ameliorated the impact of Google's efforts to hide relevant documents.

Google relies on the fact that, during this litigation, it has produced and deprivileged over 110,000 of the problematic silent-attorney emails. Opp. at 17. That number, however, merely shows the breadth of Google's Communicate-with-Care program. The fact that Google's outside counsel confessed error and eventually deprivileged over tens of thousands of previously withheld documents further shows the effectiveness of Google's misconduct.

As for the emails that outside counsel eventually deprivileged, the delay in production has created waste and harm. As explained, Google belatedly produced many of documents challenged by Plaintiffs in its June 2021 and November 2021 letters only after the depositions of Google witnesses.[21] Google cannot credibly argue that Plaintiffs have failed to identify any deprivileged documents that affected their ability to take depositions. Opp. at 25. Indeed, Google produced over 9,000 deprivileged documents, including for previously deposed witnesses, only *after* Plaintiffs filed their motion for sanctions.[22] For example, within the last week, Google produced 1,900 deprivileged custodial documents from a single executive, three months after his deposition on December 16, 2021.[23] Google's misconduct denied Plaintiffs the use the thousands of improperly withheld documents in forming their deposition strategy, selecting deposition topics, and asking specific questions.

Further, Google concedes that there are tens of thousands of silent-attorney emails still redacted or withheld. Opp. at 17 (Fig. 5). And, importantly, it is the quality, not quantity of documents that matters. Plaintiffs are harmed if *any* sensitive business documents are hidden by Google's artificial privilege claims—especially if those documents contain critical evidence for the case. Given what Plaintiffs have seen in deprivileged documents, Google applied artificial indicia of privilege to the business discussions that Google did not want plaintiffs to see.

Google's production of improperly withheld documents, moreover, has occurred in a

---

[21] Memo. at 17 n.33 (citing examples).

[22] Bellshaw Decl. ¶ 7.

[23] Bellshaw Decl. ¶ 9. Over the past six weeks, Google also has deprivileged thousands of documents for other already-deposed custodians, including more than 1,300 Jamie Rosenberg custodial files (deposed on December 13-14, 2021), over 900 Joan Braddi custodial files (deposed on January 25, 2021), over 600 Paul Gennai custodial files (deposed on September 2, 2021), over 500 Hiroshi Lockheimer custodial files (deposed on February 16-17, 2022), over 400 Yuki Richardson custodial files (deposed on December 15, 2021), and over 300 Philipp Schindler custodial files (deposed on February 9-10, 2022).

manner that has made it impossible for Plaintiffs to check Google's work. Despite repeated requests over the last six months, Google has failed to identify (1) which silent-attorney emails have been reviewed and (2) which silent-attorney emails have been deprivileged and (3) which emails Google continues to withhold.[24]

Finally, Google attempts to avoid responsibility by claiming that Plaintiffs should have raised some of their privilege challenges earlier. The vast majority of these silent-attorney emails, however, were challenged in June 2021.[25] Google's counsel simply refused to review many of these until after Plaintiffs filed their motion. The numbers tell the tale: 9,000 documents produced within two weeks of seeing Plaintiffs' Motion; these should have been produced months ago. It also makes no sense to blame Plaintiffs for not unraveling Google's hidden scheme earlier. When Plaintiffs first raised its privilege challenges, Plaintiffs had yet to uncover the full scope of Google's Communicate-with-Care strategy, including the specific directions to put attorneys on the "To" line. The extent of Google's misconduct was revealed through additional investigation and review of the belatedly deprivileged documents.

All of Google's arguments related to the subsequent production of withheld documents, however, ignore that the sanctions motion is about Google's misconduct, not any actions by outside counsel. Plaintiffs do not dispute that Google's outside counsel has expended significant efforts to respond to privilege challenges in this litigation. But this does not absolve Google of its bad-faith misconduct. The fact that 100 attorneys from top law firms spent 2100 hours reviewing these documents, Opp. at 14, and still got it wrong on *tens of thousands of documents* demonstrates that obscuring privilege claims was Google's objective. Outside counsel's efforts

---

[24] Google's failure to provide an index that links a newly deprivileged document to its prior privilege log entry also makes it impossible for Plaintiffs to tell which erroneously privilege log entries have been resolved and which have not.

[25] Pls. Ex. 35.

cannot shield Google from the consequences of its actions or make Plaintiffs whole.

The Court should therefore sanction Google and order the production of all the silent-attorney emails.

**V.     Sanctions Are Necessary To End Google's Privilege Abuses And Deter Other Companies From Engaging In Similar Misconduct**

As demonstrated by its Opposition, Google is unrepentant in its privilege abuse. Without sanctions, Google's subversion of the attorney-client privilege will continue unabated and spread to any company that can afford armies of in-house counsel. Plaintiffs have expended enormous time and effort to challenge Google's erroneous privilege claims. Other litigants may not have same the ability or opportunity to uncover Google's strategy of cloaking sensitive business emails with sham privilege claims.

Deterrent sanctions are necessary because, despite rebuke by multiple judges, Google has spent many years cloaking business communications in privilege by "merely including an attorney in a communication" and applying "[b]oilerplate designations." *See, e.g.*, *Oracle*, 2011 WL 3794892, at *4. As recently as six months ago, a special master appointed by an administrative law judge for the National Labor Relations Board condemned Google's efforts at giving non-privileged material "the facial appearance of privileged communications." In that matter, the special master reviewed *in camera* 149 disputed privilege claims and rejected Google's position on more than 100 of them. Among the rejected privilege claims was an email that merely copied three attorneys and "d[id] not include a bona fide request for, or the provision of, legal advice." Special Master's Second Interim Report And Order, *Google, LLC and Alphabet Inc., a single employer*, No. 20-CA-252802, N.L.R.B., at 5 (N.L.R.B. Dec. 16, 2021).[26] In a separate order, the special master denounced as "disingenuous" Google's direction to a

---

[26] Order available at https://www.nlrb.gov/case/20-CA-253105 (last visited Apr. 2, 2022).

third-party consultant to "funnel[] the materials through outside legal counsel . . . so that outside legal can then forward it onto [Google] under privilege." Special Master's First Interim Report And Order, *Google, LLC and Alphabet Inc., a single employer*, No. 20-CA-252802, at 5 (Nov. 26, 2021).[27] Google's history of manipulating privilege claims must inform the remedy here.

Undeterred, Google continues to engage in privilege gamesmanship and even claims in its Opposition that such behavior comports with industry best practices. The sources Google cites in support, however, condemn Google's practices. For example, Google's cited article by Doug Gallagher and Mansasi Raveendran, Opp. at 7–8, includes "The Careless Test," which warns companies to "[a]void overuse of the 'privileged' legend, especially in documents that do not contain communications that would be protected by privilege," and "[s]uch practices will result in diluting the privilege and courts scrutinizing privilege logs to determine the scope and accuracy of the corporation's assertions of privilege." Doug Gallagher & Manasi Raveendran, Attorney-Client Privilege for In-House Counsel, 10 Landslide 38 (2017)). Jackie Unger's American Bar Association article, relied on by Google, Opp. at 8, also explains that "[c]ommunications will only be privileged if the party sought*, and the attorney rendered*, legal advice." Jackie Unger, *Maintaining the Privilege: A Refresher on Important Aspects of the Attorney-Client Privilege*, Business Law Today (Am. Bar. Ass'n 2013) (emphasis added).

Google's claim that its privilege abuses are common in its industry emphasizes the need for sanctions in this case: the bar must understand that adding sham requests for attorney advice to shield documents from discovery is not permissible. As Plaintiffs have noted previously, many large companies are watching this case. Deterring future misconduct is a *bona fide* reason to exercise the Court's inherent authority. *Shepherd*, 62 F.3d at 1478 (recognizing courts may use

---

[27] *Id.*

their inherent authority to sanction to deter misconduct). The Court should do so here.

**VI.     Google Has Not Met Its Burden To Establish With Reasonable Certainty That Any Of The Withheld Silent-Attorney Emails Are Privileged And Therefore Their Production Should Be Compelled**

Wholly separate from the issue of sanctions or intent, Plaintiffs' requested remedy is independently warranted because Google has failed to establish privilege over the withheld or redacted silent-attorney emails. Accordingly, Plaintiffs' Motion to Compel production of the silent-attorney emails should be granted.

**A.      Google Bears The Burden To Establish Privilege**

Google argues that Plaintiffs request a bright-line rule that silent-attorney emails can never be privileged. Opp. at 27. Plaintiffs make no such argument. Rather, with respect to these specific emails and this specific case, given Google's conduct, the company has failed to meet its burden to establish privilege.

Applying well-settled case law to the facts here, Google cannot rely on the mere presence of an attorney on an email to claim privilege. Memo. at 30 (collecting cases). Google's misconduct, moreover, renders Google's privilege log unreliable by making it impossible to discern whether documents claiming to "seek advice of counsel" are based on legitimate or pretextual requests for legal advice. *See* Memo. 32 and Pls. Ex. 34. As a result, the next best proxy for determining which communications among non-attorneys are actually privileged is to look at whether the copied attorney ever responded. Where an attorney did not even bother to respond on discussions between non-attorneys, Google has not demonstrated that seeking legal advice was either genuine or a "significant purpose" of the communication. *See* Memo. at 28.

Google's argument, however, would require Plaintiffs to prove that all of the silent-attorney emails are affirmatively not privileged to obtain a motion to compel. That would stand privilege law on its head. Google, as the privilege claimant, has the burden of presenting

sufficient facts to establish that each of the silent-attorney emails are privileged. *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 280 (D.C. Cir. 1997). Google has failed to do so.

Instead, Google's Opposition posits a series of hypothetical situations in which a silent-attorney email "may" be privileged. Opp. at 28. But *hypotheticals* are not facts. Google has not provided, or attempted to provide, *any* evidence that any of Google's withheld or redacted silent-attorney emails fall within those hypotheticals. For example, Google claims that an attorney *may* have responded to the employee's email "by phone, in person, or in a meeting, or in a separate email thread." Opp. at 28. Not only is it unlikely that the attorney picked up the phone for each of the tens of thousands of redacted or withheld silent-attorney communications, Google has not shown that actually happened for any, much less all, the requested documents.

The Court, moreover, should reject Google's efforts to draft the work product doctrine to protect their withheld documents. Opp. at 27. The work-product protection does not shield from discovery documents that were "prepared in the regular course of compiler's business, rather than specifically for litigation, even if it is apparent that a party may soon resort to litigation." *Fann v. Giant Food, Inc*., 115 F.R.D. 593, 596 (D.D.C. 1987). Here, the silent-attorney emails were all created in the normal course of Google's business—certainly Google has not offered proof of otherwise—not because of the prospect of litigation. Memo. at 33. Thus, the fact that Google might ultimately be sued for the RSA and MADA discussions to which employees affixed artificial requests for legal advice does not render them prepared "in anticipation of litigation." Because Google has failed to establish that silent-attorney emails may be withheld as attorney-client privileged or work product, they must be produced.

### B. Google Can And Has Identified The Silent-Attorney Emails At Issue

In the absence of valid argument, Google attempts to avoid disclosure by arguing that the

requested documents are "unidentifiable," Opp. at 2, 16–17, despite the fact that Google identifies those documents in the chart and numbers provided in Google's Opposition. Google also has been able to identify and review documents within this category over the past eight months of privilege challenges without any objection. Because Google has fully withheld many of these documents, only Google knows which email chains an attorney has and has not responded to and is therefore the party in the best position to identify the individual documents.

Finally, Google also complains about the volume of silent-attorney emails and the burden of actually demonstrating privilege for each. This burden, of course, is a consequence of Google's own conduct. Google intentionally created the situation where every request for attorney assistance is suspect. Google cannot now categorically claim that all of these documents are privileged without sufficient proof. Because Google has not met its burden to show that these documents are privileged—nor provided sufficient facts or any alternative method to do—these documents must be produced.

## CONCLUSION

The context here is clear: Google has engaged in a strategy designed to hide documents from discovery using pretextual requests for legal advice and other false indicia of privilege. This misconduct demands more than a *mea culpa*, although the Opposition does not even offer that. Plaintiffs therefore respectfully request that the Court *sanction* Google and order it to produce in unredacted form all silent-attorney emails. In the alternative, Plaintiffs respectfully request that the Court nevertheless *compel* Google to produce in unredacted form all silent-attorney emails.

Dated: April 1, 2022                        Respectfully submitted,

                                            By:_____/s/ Kenneth M. Dintzer_____
                                            Kenneth M. Dintzer
                                            Karl E. Herrmann
                                            U.S. Department of Justice, Antitrust Division
                                            Technology & Digital Platforms Section
                                            450 Fifth Street NW, Suite 7100
                                            Washington, DC 20530
                                            Telephone: (202) 227-1967
                                            Kenneth.Dintzer2@usdoj.gov

                                            *Counsel for Plaintiff United States of America*

                                            By:_____/s/ Johnathan R. Carter_____
                                            Leslie Rutledge, Attorney General
                                            Johnathan R. Carter, Assistant Attorney General
                                            Office of the Attorney General, State of Arkansas
                                            323 Center Street, Suite 200
                                            Little Rock, Arkansas 72201
                                            Johnathan.Carter@arkansasag.gov

                                            *Counsel for Plaintiff State of Arkansas*

                                            By:_____/s/ Adam Miller_____
                                            Rob Bonta, Attorney General
                                            Ryan J. McCauley, Deputy Attorney General
                                            Adam Miller, Deputy Attorney General
                                            Paula Blizzard, Supervising Deputy Attorney
                                            General
                                            Kathleen Foote, Senior Assistant Attorney General
                                            Office of the Attorney General,
                                            California Department of Justice
                                            455 Golden Gate Avenue, Suite 11000
                                            San Francisco, California 94102
                                            Adam.Miller@doj.ca.gov

                                            *Counsel for Plaintiff State of California*

By:____*/s/ Lee Istrail*_____
Ashley Moody, Attorney General
R. Scott Palmer, Interim Co-Director, Antitrust
Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*


By:____*/s/ Daniel Walsh*_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


By:____*/s/ Scott L. Barnhart*_____
Theodore Edward Rokita, Attorney General Scott
L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Erica Sullivan, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By: ___ /s/ *Philip R. Heleringer* _____
Daniel Cameron, Attorney General
J. Christian Lewis, Executive Director of
Consumer Protection
Philip R. Heleringer, Deputy Executive Director of
Consumer Protection
Jonathan E. Farmer, Assistant Attorney General
Office of the Attorney General, Commonwealth of
Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: ___ /s/ *Christopher J. Alderman* _____
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: ___ /s/ *Scott Mertens* _____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: ___ /s/ *Stephen M. Hoeplinger* _____
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov
*Counsel for Plaintiff State of Missouri*

By: _____/s/ Hart Martin_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

By: _____/s/ Rebekah J. French_____
Austin Knudsen, Attorney General
Rebekah J. French, Assistant Attorney General,
Office of Consumer Protection
Office of the Attorney General, State of Montana
P.O. Box 200151
555 Fuller Avenue, 2nd Floor
Helena, Montana 59620-0151
Rebekah.french@mt.gov

*Counsel for Plaintiff State of Montana*

By: _____/s/ Rebecca M. Hartner_____
Rebecca M. Hartner, Assistant Attorney General
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
RHartner@scag.gov

*Counsel for Plaintiff State of South Carolina*

By:___*/s/ Bret Fulkerson*_____
Bret Fulkerson, Deputy Chief, Antitrust Division
Kelsey Paine, Assistant Attorney General
Office of the Attorney General, Antitrust Division
300 West 15th Street
Austin, Texas 78701
Bret.Fulkerson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:___*/s/ Gwendolyn J. Lindsay Cooley*___
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*