## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>                              Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>                              Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████ |

| | |
|---|---|
| State of Colorado, *et al.*,<br><br>                              Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>                              Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████ |

## JOINT STATUS REPORT

Pursuant to the Court's Minute Entry of May 24, 2022 and Order of May 25, 2022, ECF No. 357, the parties in *United States v. Google LLC* and *State of Colorado v. Google LLC* submit the following Joint Status Report summarizing the state of discovery and identifying any issues between the parties, and the parties' respective positions, that will be raised at the status hearing scheduled for June 17, 2022.

I.      **Case No. 1:20-cv-03010**

A.      **Google's Discovery of Plaintiffs**

A summary of Google's First Set of Requests for Production and prior document

productions made by Plaintiffs are set forth in the parties' earlier Joint Status Reports, including

their reports dated February 23 (ECF No. 111), March 28 (ECF No. 124), April 23 (ECF No.

131), May 24 (ECF No. 135), June 24 (ECF No. 149), July 27 (ECF No. 165), August 27 (ECF

No. 191), September 24 (ECF No. 223), October 26 (ECF No. 248), November 23 (ECF No.

256), January 4 (ECF No. 271), February 8 (ECF No. 285), March 4 (ECF No. 315), April 4

(ECF No. 333), and May 10 (ECF No. 351).

Plaintiffs served supplemental responses to Google's First Set of Interrogatories on May

18 and June 10 as well as supplemental responses to Google's Second Set of Interrogatories on

June 10 and June 14.

Plaintiffs served five expert reports on Google on June 6, and served related and

underlying support for those reports on June 13.

B.      **Plaintiffs' Discovery of Google**

A summary of Plaintiffs' First through Thirteenth Sets of Requests for Production and the

document productions previously made by Google are set forth in the parties' earlier Joint Status

Reports, including their reports dated February 23 (ECF No. 111), March 28 (ECF No. 124),

April 23 (ECF No. 131), May 24 (ECF No. 135), June 24 (ECF No. 149), July 27 (ECF No.

165), August 27 (ECF No. 191), September 24 (ECF No. 223), October 26 (ECF No. 248),

November 23 (ECF No. 256), January 4 (ECF No. 271), February 8 (ECF No. 285), March 4

(ECF No. 315), April 4 (ECF No. 333), and May 10 (ECF No. 351).

Google produced additional documents on May 11, 12 and 27, and on June 3 and 6.

Google produced additional data on May 25 and June 10.

Google served supplemental responses to Plaintiffs' Second Set of Interrogatories on May 18.

Google served supplemental responses to Plaintiffs' First Set of Requests for Admission on May 25.

Google served supplemental responses to Plaintiffs' data 30(b)(6) notice on May 27.

Google served supplemental responses to Plaintiffs' Fourth Set of Interrogatories on May 31.

Google served eight expert reports on Plaintiffs on June 6, and served related and underlying support for all but one of those reports on June 13.

### C.    Identification of Unresolved Requests and Disputes

Pursuant to the Court's May 25, 2022 Order, ECF No. 357 at 2, the parties have identified the following unresolved disputes.

The parties respectfully seek the Court's guidance on a dispute regarding Request No. 1 of U.S. Plaintiffs' Thirteenth Requests for Production. U.S. Plaintiffs' position statement on this issue is set forth below in Section III.A, Plaintiff States' position statement is set forth below in Section III.B, and Google's position statement is set forth in Section III.C.

The parties respectfully seek the Court's guidance on a dispute regarding the timing of any requests by Plaintiffs to reopen depositions in light of Google's production of deprivileged documents. U.S. Plaintiffs' position statement on this issue is set forth below in Section IV.A, Plaintiff States' position statement is set forth in Section IV.B, and Google's position statement is set forth in Section IV.C.

The parties respectfully seek the Court's guidance on a dispute regarding Plaintiffs' responses to Interrogatory Nos. 8 and 10 of Google's Second Set of Interrogatories. Google's

position statement on this issue is set forth in Section V.A., U.S. Plaintiffs' position statement is

set forth in Section V.B., and Plaintiff States' position statement is set forth in Section V.C.

The parties have, pursuant to this Court's direction at the February and May status

conferences, conferred regarding presentations to be delivered to the Court before summary

judgment briefs are filed. The parties jointly propose certain aspects of the presentations in

Section VI.A. The parties respectfully seek the Court's guidance regarding the remaining,

disputed aspects. U.S. Plaintiffs' and Plaintiff States' position statement is set forth in Section

VI.B, and Google's position statement is set forth in Section VI.C.

### D.    The Parties' Discovery of Third-Parties

A summary of the third-party discovery requests previously issued by the parties is set

forth in the parties' earlier Joint Status Reports, including their reports dated February 23 (ECF

No. 111), March 28 (ECF No. 124), April 23 (ECF No. 131), May 24 (ECF No. 135), June 24

(ECF No. 149), July 27 (ECF No. 165), August 27 (ECF No. 191), September 24 (ECF No. 223),

October 26 (ECF No. 248), November 23 (ECF No. 256), January 4 (ECF No. 271), February 8

(ECF No. 285), March 4 (ECF No. 315), April 4 (ECF No. 333), and May 10 (ECF No. 351).

## II.    Case No. 1:20-cv-03715

### A.    Google's Discovery of Plaintiff States

A summary of Google's First Set of Requests for Production and the document

productions made by Plaintiffs to date are set forth in the parties' earlier Joint Status Reports,

including their reports dated March 28 (ECF No. 124), April 23 (ECF No. 131), May 24 (ECF

No. 135), June 24 (ECF No. 149), July 27 (ECF No. 165), August 27 (ECF No. 191), September

24 (ECF No. 223), October 26 (ECF No. 248), November 23 (ECF No. 256), January 4 (ECF

No. 271), February 8 (ECF No. 285), March 4 (ECF No. 315), April 4 (ECF No. 333), and

May 10 (ECF No. 351).

Plaintiff States served Supplemental Responses and Objections to Google's Second Set of Interrogatories on June 9.

Plaintiffs served two expert reports on Google on June 6, 2022, and served related and underlying support for those reports on June 13, 2022.

**B.     Plaintiff States' Discovery of Google**

A summary of Plaintiff States' First through Seventh Sets of Requests for Production and the document productions previously made by Google are set forth in the parties' earlier Joint Status Reports, including their reports dated March 28 (ECF No. 124), April 23 (ECF No. 131), May 24 (ECF No. 135), June 24 (ECF No. 149), July 27 (ECF No. 165), August 27 (ECF No. 191), September 24 (ECF No. 223), October 26 (ECF No. 248), November 23 (ECF No. 256), January 4 (ECF No. 271), February 8 (ECF No. 285), March 4 (ECF No. 315), April 4 (ECF No. 333), and May 10 (ECF No. 351). Google has continued to produce to Plaintiff States the documents and data produced to the U.S. Plaintiffs and its co-plaintiffs in Case No. 1:20-cv-03010 in addition to producing documents and data in response to Plaintiff States' First through Seventh Sets of Requests for Production.

Google served Supplemental Responses and Objections to Plaintiffs' Third Set of Interrogatories on May 20 and June 1.

Google served Supplemental Responses and Objections to Plaintiffs' Second Set of Requests for Admission on June 1.

Google served eight expert reports on Plaintiffs on June 6, 2022, and served related and underlying support for all but one of those reports on June 13, 2022.

**C.     The Parties' Discovery of Third-Parties**

A summary of the third-party discovery requests previously issued by the parties is set forth in the parties' earlier Joint Status Reports, including their reports dated February 23 (ECF

No. 111), March 28 (ECF No. 124), April 23 (ECF No. 131), May 24 (ECF No. 135), June 24
(ECF No. 149), July 27 (ECF No. 165), August 27 (ECF No. 191), September 24 (ECF No. 223),
October 26 (ECF No. 248), November 23 (ECF No. 256), January 4 (ECF No. 271), February 8
(ECF No. 285), March 4 (ECF No. 315), April 4 (ECF No. 333), and May 10 (ECF No. 351).

### III.    The Parties' Dispute Regarding Request No. 1 of U.S. Plaintiffs' Thirteenth Requests for Production

#### A.    U.S. Plaintiffs' Position Statement

The Court should order Google to produce documents linked to those already provided in
discovery, as required by Plaintiffs' document requests.

Google employees routinely use hyperlinks to share company documents internally.
Because of this practice, many significant documents in this case contain hyperlinks to other
Google documents. In some cases, Google employees include hyperlinks in emails to transmit
documents much like including an attachment would. In other cases, employees include
hyperlinks in non-email documents (such as memoranda, presentations, or spreadsheets) as a
means of providing additional detail or context on the subject of the document. For both of these
categories, the linked documents are often necessary for the proper interpretation of the parent
documents. Despite Plaintiffs' request, Google has not produced many of these linked-to
documents and largely refuses to do so, even in cases where the linked-to documents appear
directly relevant to the litigation.

Plaintiffs have attempted to negotiate a compromise on this issue, but Google has not
offered a meaningful solution. For the reasons discussed below, the Court should order Google to
(1) produce the linked-to documents contained within the set of materials that Google and its
vendors have already collected for purposes of this case, and (2) produce up to 1,000 additional
linked-to documents that Plaintiffs may identify on a case-by-case basis no later than December

31, 2022. Google's production of these linked documents would ensure that Plaintiffs, and ultimately the Court, have relevant information needed to interpret the already-produced documents.

### 1.      Background

In the ordinary course of business, Google employees use cloud-based applications such as Google Docs, Google Sheets, and Google Slides. These applications allow employees to share a hyperlink to the "live" version of a document saved in a central location on the company's servers. Sharing a document in this manner, rather than attaching or appending a local copy of the document (as is often done with documents created in other applications, such as Microsoft Word, Excel, or PowerPoint), allows Google's employees to collaborate on the document in real time. For this reason, Google employees routinely share documents by sending hyperlinks rather than by other means.[1]

Due to this practice, hyperlinks appear within both emails and non-email documents throughout Google's productions in this case. For some hyperlinks, Google has produced the linked-to document and associated metadata connecting the linked document to the parent document. But for others, Google either (1) has not produced the linked-to document, or (2) has produced the linked-to document but without metadata sufficient to connect it to the parent document. In these instances, without appropriate metadata, Plaintiffs have no indication of whether the linked-to document is missing, withheld for privilege, or located elsewhere in the production set.

---

[1] *See* Deposition of John Yoo (Google), March 30, 2022, 87:24–88:7 ("Q. Is including a hyperlink the way that you normally send a document to others within Google? A. Yes. Q. Why do you do that as opposed to using an attachment? A. Because our work is done on Google Sheets or Google Docs or Google Slides. And so I link to that -- to that document rather than downloading and attaching.").

For example, in one produced email, Google's Chief Financial Officer shared a weekly financial update on the company's performance (including the services at issue in this case) with the Chief Executive Officer.[2]  The email contains a high-level summary of the update and includes the statement "Here is the weekly Alphabet financial update." The word "Here" has a hyperlink. This hyperlink appears to link to a separate Google document containing the full financial update, but when Google produced the email, the company either (1) did not produce the hyperlinked document containing the full financials, or (2) did not provide metadata connecting the hyperlinked document to the email. Thus, Plaintiffs had no way to know whether Google had produced the financial document hyperlinked within the CFO's email, and if so, how to identify it in the production set.

Similarly, a produced document from the company's 2021 annual planning process contains a high-level summary of Google's business plans for several product areas, including search and search advertising.[3]  The document then includes hyperlinks to more detailed business plans and financial information. But, again, Google either (1) did not produce the hyperlinked documents containing that information, or (2) did not provide metadata connecting those documents to this one. This left Plaintiffs unable to access the more detailed information contained in these linked-to documents.

Recognizing this issue, during fact discovery Google agreed to a protocol to identify and produce documents linked within responsive emails.[4]  But even after Google applied this

---

[2] GOOG-DOJ-30670501.

[3] GOOG-DOJ-29791419.

[4] *See* Letter from Franklin Rubinstein to Jeremy Goldstein, January 15, 2021, at 1–2 ("1. For all emails produced by Google, Google will conduct an automated search to identify all links within emails that are linked to shared G Suite documents (Google Docs, Google Sheets, and Google Slides). 2. For each link identified, Google will conduct an automated search for the document corresponding with the link. The

protocol, many of the hyperlinks within both emails and non-email documents Google produced

did not have corresponding linked-to documents in the production set. Accordingly, as Plaintiffs

came across these materials (such as the documents described above) Plaintiffs identified them

for Google and requested the linked-to documents on a case-by-case basis. Although Google

generally responded to these requests, it adopted a narrow interpretation of its obligation to do so

and often provided untimely or incomplete information.[5]

Given Google's posture and the pervasiveness of this issue, Plaintiffs issued their

Thirteenth Request for Production of Documents, Request No. 1 (the "RFP") on April 5, 2022.

The RFP calls for Google to produce all linked-to documents that are in Google's custody,

control, or possession, as well as metadata sufficient to identify the connection between each

linked-to document and the parent document containing the hyperlink (or, where a hyperlinked

---

search will be over the collection sets of documents for the custodians that received the email(s) containing the link. 3. Google will process and produce the documents corresponding with the email links as though they were separate documents. 4. For each email containing a link to a document located through the process above [both the parent document and linked-to document would be produced with sufficient metadata to tie the documents together]."). This letter did not resolve Google's obligations as to documents linked within non-emails, see id. at 2 ("For links contained in documents that are not email, such as presentations (and not subject to the process described above), Google agrees to meet and confer regarding any requests by Plaintiffs for Google to produce documents or metadata that correlate with such links."), nor did it provide an end date for Google's obligations.

[5] For example, as to the business planning document discussed above (GOOG-DOJ-29791419), Plaintiffs asked Google on February 3 to prioritize producing or identifying the missing linked-to documents by February 8 "in light of upcoming depositions." Google did not do so. Plaintiffs contacted Google again regarding this issue on February 14 but did not receive a response. Google identified the linked-to documents only after Plaintiffs then raised the prospect of rescheduling the relevant deposition, which was scheduled to take place just three days later. As to the CFO's email discussed above (GOOG-DOJ-30670501), Plaintiffs asked Google on March 23 to identify the missing linked-to document by March 30. Google did not do so. Plaintiffs have followed up with Google regarding this request on April 12, May 26, and June 8. To Plaintiffs' knowledge, Google still has not produced or identified the linked-to document. Google now states that it will resolve outstanding requests for individual linked-to documents, including this one, by the date of the status conference on June 17.

document has been withheld for privilege, metadata sufficient to identify the corresponding entry on the privilege log).[6]

Based on Google's representations, Plaintiffs believe that the parties have reached an agreement as to the metadata component of the RFP. The parties have reached an impasse, however, as to which additional linked-to documents Google will produce.

**2.      The Court Should Order Google to Provide Meaningful Access to Linked-to Documents**

There is no question that the linked-to documents are relevant. As discussed above, these documents often either resemble email attachments or are used to provide additional detail on, or context for, the responsive documents within which they are linked. Despite the obvious importance of these linked documents, Google proposes to limit Plaintiffs to 200 linked documents that Plaintiffs must request by June 20, 2022. This proposal is inadequate. It would leave Plaintiffs without access to thousands of linked-to documents that Google and its counsel *have already collected* and would deprive Plaintiffs of the ability to obtain additional linked-to documents moving forward, including through the remainder of expert discovery and summary judgment. The Court should order Google to provide more meaningful access to these materials.

---

[6] *See* Plaintiffs' Thirteenth Request for Production of Documents, Request No. 1 ("For each document that Google produced or will produce in response to U.S. CID No. 30120, a request for production issued in this action, or a request for production issued in State of Colorado, et al., v. Google LLC, 20-cv-3715 (D.D.C.), and that contains at least one hyperlink to a document currently or previously within Google's custody, control, or possession, produce: (a) the linked-to document(s) within Google's custody, control, or possession and the metadata required to establish the relationship between the parent and linked-to document(s), namely, the LinkedAttachmentIDs for the parent document and the LinkedParentIDs for the linked-to document(s); (b) for any linked-to document(s) within Google's custody, control, or possession that Google is withholding for privilege, both a placeholder TIFF image for the linked-to document indicating that the linked-to document(s) has been withheld for privilege and the metadata requested in subsection (a) for the parent document and the placeholder TIFF image; and (c) for any linked-to document(s) that was but is no longer within Google's custody, control, or possession, LinkedAttachmentIDs for the parent document populated with information (e.g., 'Linked Document Missing') indicating that the linked-to document(s) is missing.").

First, the Court should order Google to produce the linked-to documents that Google and its vendors have already collected. Google has stated that this group of documents "could be in the tens of thousands."[7] As it stands, Google has the benefit of using these linked-to documents to interpret produced documents containing the hyperlinks, but Plaintiffs do not. Google could, for example, include in a summary judgment brief a document that is linked within one of Plaintiffs' exhibits and argue that the linked-to document contextualizes the exhibit in ways previously unknown to Plaintiffs. The Court should reject this unfair outcome, particularly in light of the minimal burden of producing these already-collected documents.

Second, the Court should order Google to produce up to 1,000 additional linked-to documents that Plaintiffs may identify on a case-by-case basis no later than December 31, 2022. This component of Plaintiffs' proposal is important because, even if Google produces the documents it has already collected, this would leave Plaintiffs without access to a wide range of documents that have *not* been collected (e.g., documents that are linked in responsive emails but were not swept up by Google's original document collection). Given the breadth of materials produced in this case, there is little doubt that certain of these materials will become more important as the case moves forward. Ensuring Plaintiffs' access to important linked-to documents ensures a level playing field as we complete expert discovery and move to briefing and trial.

---

[7] Letter from Franklin Rubinstein to Alex Cohen, May 2, 2022, at 2. Google states that it has provided Plaintiffs with all collected documents that are linked within emails but not those linked within non-email documents. *See* Letter from Karl Herrmann to Franklin Rubinstein, May 26, 2022, at 1–2. Even as to emails, Google has not produced many of the linked-to documents because they were not collected in the first place. Given Google's claim as to its practices thus far, it is not clear why certain documents that are very likely to have been collected, such as the financial document linked within the CFO's email discussed above (GOOG-DOJ-30670501), have not yet been produced (with metadata sufficient to identify them).

Plaintiffs' proposed approach is consistent with how other courts have addressed this issue in the past. In *IQVIA, Inc. v. Veeva Systems, Inc.*, Veeva had produced "over 2,200 documents that purport to link to or otherwise reference documents from the Google Drive, without actually attaching the documents from the Google Drive." *IQVIA, INC. v. Veeva Systems, Inc.*, No. 2:17-CV-00177-CCC-MF, 2019 WL 3069203, *1 (D.N.J. July 9, 2019). The special master ordered Veeva to produce the linked-to documents in a manner that connected them to the documents containing the hyperlinks, noting that "IQVIA has no way to link the documents, only Veeva is capable of [doing so.]" *Id.* at *5. *See also Kelly v. Provident Life & Accident Ins. Co.*, No. 04-CV-0807-WQH, 2009 WL 10664172, at *5 (S.D. Cal. May 29, 2009) ("The Court agrees that any documents at the end of the hyperlinks must be produced."); *In re Telxon Corp. Sec. Litig.*, No. 5:98-CV-2876, 2004 WL 3192729 (N.D. Ohio July 16, 2004) (holding that PwC should have produced materials linked within its work papers).

In support of its position, Google relies on *Nichols v. Noom, Inc.*, No. 20-CV-2677, 2021 WL 948646 (S.D.N.Y. Mar. 11, 2021). In that case, Nichols requested that Noom conduct a broad and duplicative "*new collection*" of the same documents that Noom had already collected, which the court found to be "redundant." *Id.* at 4 (emphasis added). Here, by contrast, the significant majority of the documents that Plaintiffs are requesting have already been collected, and Plaintiffs are not proposing that any documents that have already been collected be recollected. Moreover, while the court in *Noom* did not grant the full relief that Nichols requested, it held that "if there were certain documents discovered in the production containing hyperlinks for which the corresponding hyperlinked document could not be located or identified, Plaintiffs could raise the issue with Noom and Noom would be required to provide the document or Bates number." *Id.* at *2. The court explained that this process "will allow Plaintiffs to

evaluate Noom's production and, if Plaintiffs determine there is a need for an additional targeted pull or production or clarifying information about a hyperlinked document's identity or Bates number, Plaintiffs can request it." *Id.* at *4. Google's proposal would curtail Plaintiffs' ability to make such requests going forward.

For the foregoing reasons, the Court should order Google to (1) produce the linked-to documents contained within the set of materials that Google and its counsel have already collected for purposes of this litigation, and (2) produce up to 1,000 additional linked-to documents that Plaintiffs may identify on a case-by-case basis no later than December 31, 2022.

**B.      Plaintiff States' Position Statement**

Plaintiff States incorporate by reference U.S. Plaintiffs' Position Statement in Section III.A. above.

**C.      Google's Position Statement**

Plaintiffs' latest demand that Google manually identify, review, and produce many thousands of additional documents without any showing of relevance is neither justified nor warranted given the burden it would place on Google, particularly at this point in the litigation.

In early 2021, the parties agreed that Google would identify, collect, and produce certain documents hyperlinked within responsive emails, where those "linked documents" did not fall within the agreed-upon search terms and thus would not have been otherwise subject to review for responsiveness and production.  With respect to documents hyperlinked in non-email forms of ESI, such as spreadsheets, presentations, or word processing documents, the parties agreed that those documents would not be presumptively collected or produced, but that the parties

would meet and confer regarding any request for production of such documents.[8]  It is this latter category of documents, *i.e.*, documents hyperlinked within non-email ESI, that is in dispute.

During fact discovery, Plaintiffs periodically requested specific linked documents associated with non-email ESI, and Google located, reviewed, and produced those documents.  Plaintiffs never asked for anything more until the DOJ Plaintiffs served their Thirteenth Request for Production on ***April 5, 2022***—requesting that Google produce <u>all</u> documents associated with <u>any</u> link in <u>any</u> document produced during Plaintiffs' investigation or this litigation.  And Plaintiffs never made the specific demand now before the Court until June 1, 2022—almost four weeks *after* fact discovery closed and the parties had reached impasse on an earlier proposal made by Plaintiffs.

Plaintiffs' most recent correspondence on this issue calls for "the production of all linked-to documents contained within the set of documents Google has already collected."  June 1, 2022 Ltr. from K. Herrmann at 1.  Google has identified approximately 170,000 links within the non-email ESI produced where none of these links are to other produced documents.  Google is currently searching to see how many of these documents were previously collected for the litigation.  In all likelihood, tens of thousands of these links are to documents in the collection set that would need to be reviewed prior to production—an overly burdensome undertaking at any point, and one that is patently unreasonable at this stage of the litigation.  And that is not all.  Plaintiffs additionally have demanded "the production of up to 1,000 linked-to documents that Plaintiffs may identify on a case-by-case basis no later than November 10, 2022."  *Id.*  In other words, Plaintiffs propose that for more than six months after the close of fact discovery,

---

[8] "Linked documents" that were identified using the agreed-upon ESI search parameters were produced pursuant to the parties' negotiated search parameters; this dispute involves those linked documents that did not hit on the search parameters.

they will have the right to ask Google to locate a thousand additional documents linked in any

produced document, regardless of relevance and even if the requested documents were not

previously collected (*e.g.*, because they were not in the possession of any of the agreed-upon

document custodians).  Although Google tracked down and produced linked documents in that

manner on a number of isolated occasions at Plaintiffs' request over the last year, fact discovery

is now over, and Plaintiffs should not be permitted to extend it any further.

Despite the unreasonable scope and timing of Plaintiffs' request, Google proposed a

reasonable compromise by offering to locate and produce approximately 200 additional

documents of Plaintiffs' choosing that are linked in documents produced since February 4, 2022,

provided that Plaintiffs request them in the near future.[9]  This proposal balances the need for fact

discovery to end against Plaintiffs' claim that they should have more time to identify additional

documents beyond those that were collected and produced using the agreed-upon search terms

and other parameters.

### 1.    The Parties' Prior Agreement Regarding Linked Documents and Requests Made Pursuant to That Agreement

Plaintiffs have long known how Google's cloud-based document system works and that

documents authored by Google employees sometimes contain links to other Google documents

within the body of the document.[10]  In the fall of 2019, during the DOJ's pre-Complaint

investigation, Google and the DOJ agreed that certain linked documents within emails would be

produced as part of Google's standard document production protocol.  Shortly after discovery in

---

[9] Google originally proposed a deadline of June 20, 2022, but it will agree to extend that deadline by 21 days given that Plaintiffs waited more than a month to bring this dispute before the Court after the parties reached impasse.

[10] These links are references only, and unlike attachments or embeddings which are stored as part of the underlying document, links are not and pose significant technical challenges for collection and mapping.

this case began, in January 2021, Google agreed to continue that practice during the litigation, and further agreed to meet and confer regarding production of specifically identified documents hyperlinked within non-email ESI, such as spreadsheets and presentations.  See Jan. 15, 2021 Ltr. from F. Rubinstein.[11]

Beginning in October 2021, Plaintiffs periodically identified specific produced documents that contained hyperlinks and asked Google to search for and produce the linked documents if they were not otherwise captured by the agreed-upon search protocols.  Although collection of these linked documents often requires a burdensome manual process, Google nevertheless agreed to search for and produce all of the linked documents requested by Plaintiffs in this manner during the fact discovery period.[12]

## 2. DOJ Plaintiffs' Thirteenth RFP No. 1 Violates the Parties' Prior Agreement by Requesting All Linked Documents

On April 5, 2022, the DOJ Plaintiffs served their Thirteenth Set of Requests for Production, which included, among other things, the following request:

> For each document that Google produced or will produce in response to U.S. CID No. 30120, a request for production issued in this action, or a request for production issued in *State of Colorado, et al. v. Google LLC*, 20-cv-3715 (D.D.C.), and that contains at least one hyperlink to a document currently or previously within Google's custody, control, or possession, produce:
>
> a. the linked-to document(s) within Google's custody, control, or possession and the metadata required to establish the relationship between the parent and linked-to document(s)....

---

[11] At that point, the DOJ and a number of the Plaintiff States had spent more than a year reviewing documents produced by Google in connection with the pre-Complaint investigation and were well aware of the prevalence and nature of hyperlinks in those documents.

[12] Over the course of fact discovery, Plaintiffs requested linked documents referenced within 365 produced documents, which required investigation of over 1,995 individual links.

In other words, Plaintiffs sought to go far beyond previous agreements between Google and Plaintiffs for the production of linked documents from *emails*, itself a substantial undertaking, to *all produced documents*, including spreadsheets, memos, meeting notes, and other non-email ESI.  Google immediately met and conferred with Plaintiffs, and during the meet-and-confer process, Google agreed to a number of Plaintiffs' specific requests.  First, Google agreed to generate and produce additional metadata reflecting, among other things, whether a link in a particular produced document was linked to another produced document.  Second, Google agreed that if it cites a document in a subsequent court filing (e.g., a summary judgment motion) that includes a hyperlink to a document that was not previously produced, then Plaintiffs may request the linked document.  Third, Google proposed that "if Plaintiffs identify on or before June 20, 2022 a limited number of links (*i.e.*, on the order of approximately 200) in documents produced on or after February 4, 2022, then Google will manually search for those linked documents, as it has done in response to Plaintiffs' requests during the fact discovery period."  May 6, 2022 Email from F. Rubinstein.

On May 6, 2022, Plaintiffs accepted that framework but proposed expanding the numerical cap and date range.  Specifically, Plaintiffs proposed that "[n]o later than November 10, 2022, Plaintiffs may identify on a case-by-case basis up to 1,000 linked documents that Google has not produced, and Google will manually search for and produce those linked documents, as it has done in response to Plaintiffs' requests during the fact discovery period."  May 6, 2022 Email from D. Aguilar.  Google informed Plaintiffs that it would not accept Plaintiffs' 1,000 linked documents proposal.  May 9, 2022 Email from F. Rubinstein.  Although Plaintiffs had indicated that they would submit that proposal to the Court as a disputed issue in the May 10, 2022 Joint Status Report, they later informed Google on May

10 that they "did not have enough time to brief the relevant issues in [that] JSR."  May 10, 2022

Email from D. Aguilar.  A few weeks later, on June 1, 2022, Plaintiffs made a new proposal and

unexpectedly expanded the scope of their demand.  In addition to reiterating their proposal that

Plaintiffs be permitted to identify up to 1,000 additional linked documents by November 10,

2022, Plaintiffs insisted upon "the production of all linked-to documents contained within the set

of documents Google has already collected."  June 1, 2022 Ltr. from K. Herrmann at 1.

### 3. Plaintiffs' Request for Thousands of Additional Linked Documents Is Unreasonable and Unduly Burdensome

Plaintiffs have made no showing that they are entitled to production of a document

merely because it is linked in a document that has been produced, and they surely have not

established that the burden of this eleventh-hour request is justified or proportional to any

supposed need.  Such documents are not inherently relevant or responsive, and they are more

appropriately addressed on an individualized basis, as they were throughout fact discovery.  *See,*

*e.g.*, *Nichols v. Noom Inc.*, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) (observing that

"[w]hen a person creates a document or email with a hyperlink, the hyperlinked

document/information may or may not be necessary to the communication," and denying a

request for a broad set of linked documents because "if Plaintiffs determine there is a need for an

additional targeted pull or production or clarifying information about a hyperlinked document's

identity or Bates number, Plaintiffs can request it").

Requiring Google to produce documents solely because they are linked within other

documents, on top of the extensive searches of ESI that have already taken place, is unreasonable

and unduly burdensome.  *See, e.g.*, *Nichols*, 2021 WL 948646, at *5 (refusing to order the

defendant to collect documents linked within produced documents because collecting ESI

"through both a direct collection and a collection through hyperlinks" would "dramatically

increase redundancies in the collection, increase costs, and delay discovery").  Plaintiffs' request

is even more objectionable in this case because the parties negotiated the parameters that Google

used to respond to hundreds of individual requests for production with the understanding that

Plaintiffs were not seeking production of all documents that are merely hyperlinked in a

responsive document.  If Plaintiffs had taken this position at the outset of discovery, Google

would have opposed it.  And if Plaintiffs had prevailed, Google would have incorporated the

additional burden of reviewing every hyperlinked document into its hit reports and other

assessments of Plaintiffs' search term and custodian proposals and adjusted its responses

accordingly.

The burden of the first portion of Plaintiffs' June 1, 2022 proposal is not mitigated by the

fact that it is "limited" to "the production of all linked-to documents contained within the set of

documents Google has *already collected*."  June 1, 2022 Ltr. from K. Herrmann at 1 (emphasis

added).  Even though the documents in question have already been collected (likely tens of

thousands of the 170,000 links Google has identified), they would still need to be reviewed by

attorneys for privilege before they could be produced, which of course would involve a

considerable amount of attorney time and corresponding expense.  Plaintiffs are asking that

Google undertake that review even though fact discovery has closed, Google has produced

approximately 4 million documents during the investigation and litigation, and none of the

documents in question was either retrieved by the agreed-upon search parameters or specifically

requested by Plaintiffs at any point during fact discovery.  That is a remarkable request, and it

should be denied in full.

Although Plaintiffs' May 6, 2022 request—for "production of up to 1,000 linked-to

documents that Plaintiffs may identify on a case-by-case basis no later than November 10,

2022"—is narrower than their subsequent request for all links in all documents, it is still unjustified. Google has been producing documents in response to Plaintiffs' CIDs and RFPs for more than two years, and the opportunity for Plaintiffs to request additional documents in this manner should have ended when fact discovery closed.

Although fact discovery has closed, Google has acknowledged that Plaintiffs may need a bit more time to review recently produced documents and identify any unproduced linked documents that they contend should be produced. Google has therefore agreed to produce 200 additional linked documents referenced in documents produced during or after the final 90 days of fact discovery (*i.e.*, since February 4, 2022), so long as Plaintiffs request those documents in a relatively prompt manner (*i.e.*, on or before July 11, 2022). This gives Plaintiffs sufficient time to identify additional linked documents that are potentially of interest, without unnecessarily burdening Google with the time-consuming process of investigating, locating, and producing an unreasonable volume of documents long after the end of fact discovery. Google submits that nothing more is necessary or reasonable, and it respectfully asks the Court to deny Plaintiffs' request.

IV. **The Parties' Dispute Regarding the Timing of Any Requests by Plaintiffs to Reopen Depositions in Light of Google's Production of Deprivileged Documents**

A. **U.S. Plaintiffs' Position Statement**

The Court should issue an order granting Plaintiffs 45 days following Google's production of its final privilege log for Plaintiffs seek to reopen depositions, or to seek to take depositions in the first instance, due to Google's late productions of deprivileged documents. This 45-day period would allow Plaintiffs to properly review Google's recent, extensive productions of deprivileged documents in addition to Google's planned future productions. The 45-day period would further permit Plaintiffs to review Google's final privilege log and, if

necessary, to challenge its contents. This 45-day period is made necessary solely because of Google's many errors in withholding non-privileged documents.

At this juncture, Plaintiffs face three roadblocks in evaluating which depositions need to be reopened or taken in the first instance: (1) the sheer number of deprivileged documents produced by Google to date, (2) the uncertainty of the contents of Google's further productions and privilege logs, and (3) Google's piecemeal production of deprivileged documents. Without a comprehensive set of deprivileged documents or sufficient time to review them, Plaintiffs cannot meaningfully determine which documents may necessitate further deposition testimony, from whom, or for how long. Google's frequent productions of documents, each containing the files of multiple custodians, makes finalizing review of documents on a custodian-by-custodian basis impossible.

### 1. Google's Deprivileging Productions Have Been Erratic And Voluminous

Google has recently deprivileged thousands of documents improperly withheld on claims of privilege; Plaintiffs received these documents after the documents' custodians were deposed.

From March 1, 2022, when the U.S. Plaintiffs informed Google that Plaintiffs would be filing a motion to compel regarding privilege issues, Google has made a number of productions of formerly privileged documents. These productions have been erratic—on no discernable schedule—and have come without notice or description. They fall within the following groups:

- 1,635 deprivileged documents produced in four separate productions between March 1 and March 8, the date that U.S. Plaintiffs filed their motion for sanctions and motion to compel.[13]

---

[13] PROD157 (1,168 deprivileged documents, produced on March 3); PROD158 (84 deprivileged documents, produced on March 6); PROD160 (197 deprivileged documents, produced on March 6); and PROD162 (186 deprivileged documents, produced on March 7). *See* ECF No. 326.

- 17,346 deprivileged documents produced in nine separate productions between the March 8 motion and the Court's April 8 status conference.[14]

- 659 deprivileged documents produced in seven separate productions between the April 8 status conference and the close of fact discovery on May 6.[15]

- 17,653 deprivileged documents produced in four separate productions since the close of fact discovery.[16]

Google has indicated that it will complete production of its deprivileged documents on June 17, 2022.

For each of these productions, Google has provided documents from a variety of custodians. A chart shows the deprivileged documents produced for just ten custodians.[17] Nine of these custodians were deposed by Plaintiffs, with all of these depositions completed before large swaths of the deprivileged documents arrived.

---

[14] PROD163 (304 deprivileged documents, produced on March 10); PROD167 (540 deprivileged documents, produced on March 19); PROD170 (1 deprivileged document, produced on March 21); PROD171 (8,412 deprivileged documents, produced on March 27); PROD172 (9 deprivileged documents, produced on March 26); PROD173 (12 deprivileged documents, produced on March 28); PROD 175 (7,356 deprivileged documents, produced April 2); PROD176 (684 deprivileged documents, produced April 2); and PROD177 (28 deprivileged documents, produced April 6).

[15] PROD180 (6 deprivileged documents, produced April 11); PROD182 (2 deprivileged documents, produced April 11); PROD185 (2 deprivileged documents, produced April 13); 30 deprivileged documents produced on April 19, in conjunction with Google's filing on random sampling (no production number); PROD189 (1 deprivileged document, produced April 19); PROD192 (32 deprivileged documents, produce April 28); and PROD194 (586 deprivileged documents, produced April 30).

[16] PROD198 (8,232 deprivileged documents, produced May 7); PROD201 (3,471 deprivileged documents, produced May 12); PROD205 (4,182 deprivileged documents, produced June 3); and PROD206 (1,768 deprivileged documents, produced June 6).

[17] Google produced deprivileged documents from 238 custodians, some with only one or two documents and others with hundreds or thousands of documents.

| | Mar. 1 – Mar. 8[18] | Mar. 9 – Apr. 8[19] | Apr. 9 - May 6[20] | May 7 - June 6[21] | June 17 | Total |
|---|---|---|---|---|---|---|
| Total Deprivileged Productions | 1,635 | 17,346 | 659 | 17,653 | TBD | **37,223** |
| | | | | | | |
| Kolotouros | 89 | 3,361 | 25 | 1,725 | TBD | 5,200 |
| Rosenberg | 59 | 1,892 | 1 | 830 | TBD | 2,782 |
| Braddi | 98 | 1,112 | 454 | 496 | TBD | 2,160 |
| Harrison | 1,191 | 151 | 50 | 492 | TBD | 1,884 |
| Gennai | 40 | 1,082 | 17 | 605 | TBD | 1,744 |
| Kartasheva | 28 | 825 | 3 | 733 | TBD | 1,589 |
| Li^ | 28 | 905 | 0 | 578 | TBD | 1,511 |
| Dischler | 43 | 689 | 71 | 481 | TBD | 1,284 |
| Levine | 15 | 683 | 0 | 420 | TBD | 1,118 |
| Lockheimer | 30 | 631 | 6 | 409 | TBD | 1,076 |

This chart demonstrates three important points:

First, Google improperly withheld documents from a large number of significant witnesses, only producing them after the depositions had been completed.

Second, the ongoing flow of deprivileged documents has prevented the Plaintiffs from completing review of any of these custodians.

Third, that Plaintiffs have had only about a month, during preparation of expert reports, to load and review the four productions of over 17,000 deprivileged documents produced after the close of discovery, while simultaneously reviewing the other 60,000-plus documents that

---

[18] PROD157; PROD158; PROD160; and PROD162.

[19] PROD163; PROD167; PROD170; PROD171; PROD172; PROD173; PROD175; PROD176; and PROD177.

[20] PROD180; PROD182; PROD185; PROD189; PROD192; and PROD194.

[21] PROD198; PROD201; PROD205; and PROD206.

Google produced during the final two months of discovery.[22] Google's final, June 17 production may include thousands more deprivileged documents, across multiple custodians.

Finally, under the CMO, Google's final privilege log will be produced at the end of June. This log will provide Plaintiffs a chance to—once again—check Google's homework to see if there are significant errors in Google's privilege claims. Only after that review is completed will the Plaintiffs have the complete set of documents that should have properly been produced in discovery.

**2.      Google Created This Situation And Should Not Be Heard To Complain**

The Court should provide Plaintiffs with 45 days—after receiving Google's final privilege log—to seek to reopen depositions or schedule new depositions based on the recently deprivileged documents. This time will ensure that Plaintiffs have sufficient time to review Google's deprivileging efforts and examine Google's final privilege log, without the effort undermining Plaintiffs' endeavors in expert discovery. The Court should reject Google's attempts to place unreasonable limits on Plaintiffs' ability to reopen depositions or take new depositions, because Google created the present situation by (1) over privileging documents, (2) refusing to perform a re-review when asked by Plaintiffs, and (3) performing such a poor re-review that yet another round of review revealed a 12-percent error rate. Google's actions systematically deprived Plaintiffs of documents that could have been used when deposing Google's current and former employees.

---

[22] These more than 60,000 documents include approximately 18,000 deprivileged documents. Google also produced significant amounts of data during this time, and the parties took approximately 50 depositions in addition to continuing exchanges of written discovery.

Because Google is still producing deprivileged documents, U.S. Plaintiffs have not yet had the opportunity to complete the review and determine which documents might have—if not withheld—been used at depositions. Thus, we have not identified a final set of depositions that we need to consider. As discussed at the May 12 status conference, "[o]nce we have a full set [of deprivileged documents], then we'll determine if we need to re-open depositions. Right now it's looking like, at least some . . . might need to be re-opened for the documents that have been de-privileged, but we haven't made any decisions and we really can't until this process is done."[23]

Plaintiffs, of course, have already been harmed by Google's over privileging. Indeed, without these deprivileged documents, Plaintiffs were denied the opportunity to fully weigh whether additional depositions were necessary: in total, Plaintiffs took 78 of the 80 depositions available during fact discovery. Google's timely production of its deprivileged documents may have resulted in Plaintiffs using the remaining two fact depositions permitted by the Court.[24] Certainly some of the deprivileged documents would have been used in the depositions that did take place.

By depriving Plaintiffs of a reasonable chance to review these just-deprivileged documents and reopening or taking new depositions as necessary, Google now seeks to benefit from its many privilege failures. The Court should reject Google's efforts.

---

[23] Transcript of May 12, 2022 Status Conference, ECF No. 353 at 6:16-22. *See also* Memorandum in Support of Motion to Sanction Google and Compel, ECF No. 326-1 at 27 (reserving the right to seek adverse inferences or to reopen depositions, as necessary).

[24] Christopher Li, for example, marked with a caret in the chart, was one of the individuals considered by U.S. Plaintiffs for deposition. Google produced 578 of Mr. Li's custodial files after the close of discovery, and he was a sender or a recipient of nearly another 100 non-custodial emails. If Plaintiffs had the full complement of Google's productions, Mr. Li may very well have been selected for deposition.

Accordingly, the Court should order that the Plaintiffs may seek to reopen depositions, or take depositions in the first instance—based on documents deprivileged after March 1, 2022—within 45 days of Google's filing its final privilege log.

### B.    Plaintiff States' Position Statement

Plaintiff States are unable to determine whether it is appropriate reopen specific depositions until Google has produced all deprivileged documents and Plaintiff States have the opportunity to review those documents. Google's production of deprivileged documents in ongoing. Indeed, since the close of fact discovery, Google produced an additional 17,653 deprivileged documents. Google has indicated that such productions will continue until the production deadline of June 17. As such, Plaintiffs States ask the Court to afford them the opportunity to review these late arriving deprivileged documents before making the determination that it is appropriate to reopen depositions.

### C.    Google's Position Statement

For months Plaintiffs have intimated that they may seek to reopen unspecified depositions of Google witnesses purportedly based on the timing of certain document productions.  *See, e.g.*, May 12, 2022 Hr'g Tr. 6:16-22; ECF No. 330 at 18; ECF No. 317-1 at 27.  Throughout that period, however, Plaintiffs have neither identified any particular deposition that they contend should be reopened nor pointed to any particular documents that purportedly would justify doing so.  Instead, Plaintiffs have sought to impose a framework whereby they remain silent while Google completes production of all documents requested by Plaintiffs, at which point Plaintiffs will take some time to consider whether they intend to seek leave to reopen any depositions.  *See, e.g.*, ECF No. 356 at 2-3; May 12, 2022 Hr'g Tr. 37:22-39:18. Most recently, Plaintiffs stated that they "intend to request that the Court allow Plaintiffs 45 days, starting from Google's production of a final privilege log, to reopen depositions based

26

upon documents erroneously withheld for privilege." June 9, 2022 Ltr. from E. Murdock-Park at 2. That proposal is unreasonable in at least two respects.

*First*, there is no reason for Plaintiffs to wait any longer to identify any depositions that they presently contend should be reopened. If Plaintiffs intend to argue that a document produced months ago entitles them to reopen a deposition, then the request may already be untimely given Plaintiffs' failure or refusal to raise the issue during fact discovery. *See, e.g.*, *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 576 F. Supp. 2d 128, 133 (D.D.C. 2008) (explaining that the standard for modifying a scheduling order "primarily considers the diligence of the party seeking the amendment," and if the moving "party was not diligent, the inquiry should end"). Although Google will evaluate in good faith any request it receives from Plaintiffs, it is difficult to envision how a document produced well before the close of fact discovery could serve as the basis for a request to reopen a deposition that is made for the first time more than a month *after* the fact discovery deadline. If Plaintiffs contend that a document produced more recently should allow for reopening a deposition, there is no justification for further delay, and they should proceed on the timeline established by the Court's order of May 25, 2022. *See* ECF No. 357 at 2-3 (establishing a deadline of June 24, 2022 to file any further motions to compel, with an exception for "disputes relating solely to documents, data, privilege log entries, or supplemental responses to written discovery requests produced for the first time on or after June 2, 2022, that could not reasonably have been identified prior to the movant's receipt of the documents, data, privilege log entries, or supplemental responses").

*Second*, Plaintiffs should not be permitted 45 days after receipt "of a final privilege log" to attempt to reopen depositions based on documents first produced on or after June 2, 2022. As Google previously explained, Plaintiffs have had the "final privilege log" for the vast majority of

documents that are subject to a claim of privilege for at least several months, if not longer.  *See,*
*e.g.*, May 12, 2022 Hr'g Tr. 15:24-18:7; ECF No. 351 at 25.  Google is in the process of
completing its productions in response to Plaintiffs' most recent requests and the Court's Order
of May 12, 2022, and next week Google will produce an updated version of its privilege log that
includes entries that have been added or revised within the last several weeks.  If Plaintiffs intend
to seek any form of relief (including reopening a deposition) based on documents produced since
June 2, 2022, then Google respectfully submits that they should identify the request for Google
no later than July 12, 2022 and present any such unresolved dispute to the Court by July 22,
2022.  That allows Plaintiffs even more time to consider documents produced in June then they
previously indicated they would need in order to identify any depositions that purportedly should
be reopened.  *See* May 27, 2022 Ltr. from M. Rosengart at 1 (proposing that if "Google agree[s]
to produce all re-reviewed silent-attorney emails that are deprivileged in whole or in part no later
than June 3," then "Plaintiffs will agree to identify any depositions to be reopened no later than
June 10").

Plaintiffs have referenced the number of documents produced in recent weeks in support
of their request for additional time to consider whether to seek to reopen any depositions, *see*
June 9, 2022 Ltr. from E. Murdock-Park at 2, but that is not an accurate measure of the task at
hand.  Almost all of Plaintiffs' challenges to privilege log entries have encompassed entire
categories of documents, without regard to the custodian of the document, the time period, or the
subject matter reflected in the log description.  As a consequence, a significant number of the
documents that have been produced following further review involve topics that were a subject
of Plaintiffs' pre-Complaint investigation but that are irrelevant to this case.  Even among the
fraction of arguably relevant documents, many involve employees who were never noticed for

deposition, and many others contain content that was already produced months ago in identical or substantially similar form.  While Plaintiffs have repeatedly referenced the number of de-privileged documents, they have yet to identify a single one that they contend warrants reopening a deposition.  If they are aware of any such documents, then there is no apparent justification for their failure to identify them in a timely manner.

**V.    The Parties' Dispute Regarding Plaintiffs' Responses to Interrogatory Nos. 8 and 10 of Google's Second Set of Interrogatories**

    **A.    Google's Position Statement**

At the March status conference, Google sought to remedy Plaintiffs' unwillingness to identify "the specific agreements that they claim are in play in the lawsuit" and why those agreements purportedly are unlawful.  Mar. 9, 2022 Hr'g Tr. 45:10-47:3.  At that time, the Court stated that "Google has a right to find out and understand what the Department and the plaintiffs' theories are about their conduct that is unlawful," including "[w]hat is it about the agreements that makes them anti-competitive?"  *Id.* 55:12-23.

Google's subsequent efforts to obtain the answer to that fundamental question have been met with further resistance.  Following the March status conference, Plaintiffs supplemented their responses to Google's First Interrogatory No. 1, which asked them to identify the agreements they "allege to have harmed competition, what specific provision of each of the agreements harmed competition, and how it has done so."  *See id.* at 55:24-56:7.  Plaintiffs' supplemental response to Google's First Interrogatory No. 1 listed approximately 500 agreements and amendments thereto entered over the last 20 years—an absurd position that is not consistent with Plaintiffs' Complaint or other discovery responses.  *See* DOJ Pls.' Fifth Supp. Resp. & Obj. to Google's First Interrog. No. 1.  And Plaintiffs' list of the provision(s) of each agreement that purportedly harmed competition is similarly broad and non-specific, as it

includes, by way of example, vague references to "[p]rovisions requiring Apple to set Google as the default search service on preinstalled search access points in exchange for revenue share," and "[p]rovisions requiring partners to set Google as the default on search access points and/or requiring partners to give Google apps prominent placement." *Id.* Such agreements have been commonplace in the industry for many years and have been entered into by other competing search engines with browsers and other developers of smartphones, and Plaintiffs' vague descriptions of provisions that are standard industry practice do little to explain what makes these agreements anti-competitive.

In view of those responses and the history of search engine promotional agreements, Google posed additional interrogatories to determine whether Plaintiffs' position in this case is that all such agreements are anticompetitive, regardless of the parties to the agreement, or whether they are somehow harmful to competition because Google entered into them.

### 1.      Google's Second Set of Interrogatories No. 8

Google's Second Interrogatory No. 8 provides:

> For each agreement You identified in response to Interrogatory No. 1 in Google's First Set of Interrogatories, state whether You contend any other search provider (e.g., Microsoft) could have lawfully entered into a substantially similar agreement, or if it is Your contention that the agreement would have harmed competition regardless of the search provider.

Put another way, are the agreements in question purportedly anti-competitive because it is Google, rather than some other company, that is party to them? Or do Plaintiffs contend that competition is harmed when any search service enters an agreement that, by way of example, sets "the default search service on preinstalled search access points in exchange for revenue share"?

Plaintiffs initially refused to answer this interrogatory, stating that they "have not made and make no contentions about hypothetical agreements hypothetically entered into by parties

other than Google and not at issue in this case."[25]  On June 14, DOJ Plaintiffs supplemented their responses and objections to state:

> Subject to and without waiving the foregoing objections, U.S. Plaintiffs additionally respond that certain exclusionary practices that can permissibly be engaged in by a non-monopolist are forbidden to one with monopoly power or one with a dangerous probability of acquiring monopoly power.  The agreements identified in this Interrogatory constitute such a practice.  Google is the only general search engine with monopoly power in the United States, and under U.S. Plaintiffs' theories in this case, other non-monopolist search engines would not violate Section 2 of the Sherman Act by entering into substantially similar contracts.  U.S. Plaintiffs make no contentions about any law or rule other than Section 2 of the Sherman Act.

DOJ Plaintiffs' response, however, evades the question posed:  whether other search providers could have <u>lawfully</u> entered into a substantially similar agreement.  By cabining their response to Section 2, thereby avoiding the question of whether it is their contention that default agreements substantially similar to those at issue here are otherwise unlawful (*i.e.*, under Section 1 of the Sherman Act).  Plaintiffs should be required to answer the question as posed: do Plaintiffs contend any other search provider could have lawfully entered into a substantially similar agreement, or is it Plaintiffs' contention that the agreement would have harmed competition regardless of the search provider?

Plaintiffs' objection to providing a further response to the interrogatory on the grounds that it is asking about a "hypothetical agreement" should be dismissed.  The interrogatory is posed not at a hypothetical agreement, but rather an agreement that is "substantially similar" to the contracts that Plaintiffs contend are unlawful.  Plaintiffs are aware of and presumably have considered all of the terms of the agreements which they "allege to have harmed competition," and Second Interrogatory No. 8 seeks to have Plaintiffs explain whether the conduct at issue

---

[25] The quoted response was served by the DOJ Plaintiffs, and the Plaintiff States separately "incorporate[d] by reference" the DOJ Plaintiffs' objections and responses to Second Interrogatory Nos. 8 and 10.

harms competition only because Google is a party to an agreement or whether the conduct in general harms competition regardless of the contracting parties.

Plaintiffs allege that "[c]omputers and mobile devices generally have apps preinstalled that include search access points, such as browsers, search apps and widgets, and voice assistants," and that "[e]ach of these search access points can and almost always does have a preset default general search engine."  DOJ Pls.' Am. Compl. ¶ 41.  And Plaintiffs contend that contractual "[p]rovisions requiring manufacturers to set Google as the default on search access points" are among the "categories of contractual provisions that have harmed competition."  DOJ Pls.' Fifth Supp. Resp. & Obj. to Google's First Interrog. No. 1.  It is therefore entirely reasonable to expect Plaintiffs to reveal whether they contend that competition would be harmed by another search provider entering a substantially similar agreement or whether the harm to competition alleged in this case is attributable solely to the fact that Google is the search engine in question.

### 2.    Google's Second Set of Interrogatories No. 10

Google's Second Interrogatory No. 10 provides:

> State whether You contend that, from 2005 to the present, any search provider could lawfully contract with Apple, Mozilla, or other browser provider to be the pre-set search default on the browser.  If You contend that some, but not all, search providers could lawfully do so, or that a search provider could lawfully do so for some, but not all, of the time period, identify those limitations to Your response.

As with Second Interrogatory No. 8, Plaintiffs initially responded that they "have not made and make no contentions about hypothetical agreements hypothetically entered into by parties other than Google and not at issue in this case."  On June 14, U.S. Plaintiffs served a supplemental

response identical to the response to Second Interrogatory No. 8 quoted above, again cabining their response to Section 2.[26]

Notwithstanding Plaintiffs' response, the Interrogatory is not "hypothetical," as browser providers have in fact contracted with other search providers "to be the pre-set search default on the browser" during the period encompassed by the request.[27]  Plaintiffs have taken extensive discovery regarding consummated and proposed agreements of this kind, and there is no legitimate basis for them to withhold their position regarding the lawfulness of the very agreements that they have placed at issue in the case.  Plaintiffs allege, for example, that "[i]n a competitive market, rivals could compete to be the preset default general search engine on a browser."  DOJ Pls.' Am. Compl. ¶ 159.  In response to Google First Interrogatory No. 1, however, Plaintiffs assert only generically that "Defendant's Revenue Share Agreements, Sponsorship Agreements, and other search distribution agreements with browser companies, including Mozilla, Opera, and UCWeb, and all exhibits thereto" have "individually or collectively harmed competition."  DOJ Pls.' Fifth Supp. Resp. & Obj. to Google's First

---

[26] U.S. Plaintiffs' supplemental response is word-for-word the same response as No. 8: "Subject to and without waiving the foregoing objections, U.S. Plaintiffs additionally respond that certain exclusionary practices that can permissibly be engaged in by a non-monopolist are forbidden to one with monopoly power or one with a dangerous probability of acquiring monopoly power.  The agreements identified in this Interrogatory constitute such a practice.  Google is the only general search engine with monopoly power in the United States, and under U.S. Plaintiffs' theories in this case, other non-monopolist search engines would not violate Section 2 of the Sherman Act by entering into substantially similar contracts. U.S. Plaintiffs make no contentions about any law or rule other than Section 2 of the Sherman Act."

[27] *See, e.g.*, https://blog.mozilla.org/en/mozilla/promoting-choice-and-innovation-on-the-web/ ("Google has been the Firefox global search default since 2004. Our agreement came up for renewal this year, and we took this as an opportunity to review our competitive strategy and explore our options…. Under a new five-year strategic partnership announced today, Yahoo Search will become the default search experience for Firefox in the U.S."); https://www.fastcompany.com/3001129/bing-now-default-search-engine-amazons-kindle-fire-apple-next ("Amazon confirmed to Fast Company that Bing would come as the default search engine on all new Kindle Fires, the flagship product Amazon is positioning against Apple's iPad and other Android tablets…. In addition to the millions of new Bing-equipped Kindle Fires Amazon is likely to sell this holiday season, a number of Android-based smartphones have already replaced Google with Bing, thanks to a partnership between Microsoft and Verizon.")

Interrog. No. 1. With fact discovery closed, Plaintiffs should no longer be permitted to delay disclosing why these agreements are purportedly unlawful. Is it the fact that Google, rather than another search service, is presently the "preset default general search engine" on the browsers in question? Or do Plaintiffs contend that for some or all of the period referenced in Interrogatory No. 10, contracting "to be the pre-set search default on the browser" is itself harmful to competition in violation of the Sherman Act, irrespective of which search service is the default?

Plaintiffs offer no burden objection to responding to these appropriate contention interrogatories, which should be answered in full now that fact discovery has closed.

### B.     U.S. Plaintiffs' Position Statement

The Court should deny Google's request for further supplementation regarding its Second Set of Interrogatories to Plaintiffs, Interrogatories Nos. 8 and 10. Plaintiffs' responses stand complete to the two Interrogatories which request:

> **Interrogatory No. 8:** For each agreement You identified in response to Interrogatory No. 1 in Google's First Set of Interrogatories, state whether You contend any other search provider (e.g., Microsoft) could have lawfully entered into a substantially similar agreement, or if it is Your contention that the agreement would have harmed competition regardless of the search provider.

> **Interrogatory No. 10:** State whether You Contend that, from 2005 to the present, any search provider could lawfully contract with Apple, Mozilla, or other browser provider to be the pre-set search default on the browser. If You contend that some, but not all, search providers could lawfully do so, or that a search provider could lawfully do so for some, but not all, of the time period, identify those limitations to Your response.

U.S. Plaintiffs originally objected to both Interrogatories as (1) vague, ambiguous, impermissibly hypothetical, and unduly burdensome and (2) inconsistent with the Sherman Act. U.S. Plaintiffs then answered Google's interrogatories, responding that U.S. Plaintiffs make no contentions about hypothetical agreements not involving Google and not at issue in this case. U.S. Plaintiffs' Objections and Responses to Defendant Google LLC's Second Set of

Interrogatories to Plaintiffs (May 6, 2022) at 12-15. This answer thus satisfied these Interrogatories.

Following receipt of U.S. Plaintiffs' May 6 responses and objections, the parties met and conferred on May 20. The next business day—May 23—U.S. Plaintiffs sought clarification on Interrogatory No. 10, asking if Google was "seeking only a 'yes' or 'no' answer to Interrogatory No. 10" or it if was "seeking [a] narrative or further response to the posed hypothetical." Google never responded, and instead—to Plaintiffs' surprise—informed Plaintiffs on June 10 of Google's intent to challenge both responses.

Despite Google's unilateral disengagement from the meet-and-confer process, U.S. Plaintiffs then sought to resolve this issue by amending both responses to add the following language:

> Subject to and without waiving the foregoing objections, U.S. Plaintiffs additionally respond that certain exclusionary practices that can permissibly be engaged in by a non-monopolist are forbidden to one with monopoly power or one with a dangerous probability of acquiring monopoly power. The agreements identified in this Interrogatory constitute such a practice. Google is the only general search engine with monopoly power in the United States, and, under U.S. Plaintiffs' theories in this case, other non-monopolist search engines would not violate Section 2 of the Sherman Act by entering into substantially similar contracts. U.S. Plaintiffs make no contentions about any law or rule other than Section 2 of the Sherman Act.

US. Plaintiffs' Second Supplemental Responses to Google's Second Set of Interrogatories (June 14, 2022).

U.S. Plaintiffs have thus answered queries beyond what is posed by Google's Interrogatories, directly stating for both Interrogatories that "**under U.S. Plaintiffs' theories in this case, other non-monopolist search engines would not violate Section 2 of the Sherman Act by entering into substantially similar contracts.**" Google is not entitled to anything further.

To the extent Google demands that U.S. Plaintiffs respond to hypothetical questions beyond what was asked in Interrogatories Nos. 8 and 10, Plaintiffs note that Google has sought this before, recasting such a demand from its Interrogatory No. 5 from Google's First Set of Interrogatories. That Interrogatory called for a hypothetical identification of "any circumstances from 2005 to the present under which Google could lawfully contract to be the default search engine for a third-party browser, or to be the default or exclusive search engine preloaded for any search access point on an iOS or Android device." Defendant Google LLC's First Set of Interrogatories to Plaintiffs at ¶ 5. In denying Google's demand that Plaintiffs answer inappropriate hypothetical interrogatories, the Court noted:

> I guess I'm sympathetic to what the Department has said in response, which is that, how are we supposed to answer a question about what might be legal in a hypothetical world when it is just that, a hypothetical world, but much like Google's negotiations involving its partners, involve a number of variables and factors and ultimately asking them to make some predictions about what the world would look like in this alternative scenario.

Transcript of March 9, 2022 Status Conference, ECF No. 323 at 44:21-45:4.

Indeed, Courts regularly reject so-called "factual scenario" interrogatories calling for parties to express their legal positions on hypotheticals. *See, e.g., Martin v. Evans*, 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018) (citing *Kendrick v. Sullivan*, 125 F.R.D. 1, 3 (D.D.C. 1989)). To be sure, a party may ask for contentions relating to the application of law to a fact, but Google's interrogatories do not do that. Instead, they do the opposite, asking U.S. Plaintiffs to assume factual circumstances not present in this case (or at least not identified in the Interrogatory) and render an advisory agreement on those circumstances.[28] Old wine in new bottles is still vinegar. Interrogatories No. 8 and 10 indeed

---

[28] "Requests made in interrogatories which give hypothetical factual situations present issues requiring pure legal conclusions not rooted in the facts of the case are impermissible under Rule 33 of FRCP."

warrant no different treatment from Interrogatory No. 5 from Google's First Set of Interrogatories.

Moreover, answering Google's additional, hypothetical requests would be incredibly burdensome. In response to earlier discovery, U.S. Plaintiffs individually identified by Bates number nearly 600 contracts contributing to Google's anticompetitive scheme. Google does not challenge the sufficiency of that response.[29] Google's Interrogatory No. 8, however, demands— for *each* such agreement—that U.S. Plaintiffs contend whether "any other" search provider (real or imagined) could have entered into a "substantially similar" agreement, or if "each agreement" would have harmed competition regardless of the search provider. A 600-part Interrogatory is overly burdensome and Google's attempt to evade the numeric limitations set forth in this matter's Amended Scheduling and Case Management Order is improper. *See* Am. Scheduling and Case Management Order, ECF No. 108-1 at ¶ 11.

U.S. Plaintiffs' responses already provide Google more than what was asked. Both Interrogatories present a yes or no question: whether U.S. Plaintiffs made certain contentions. U.S. Plaintiffs responded that they did not. U.S. Plaintiffs have now supplemented to inform Google of the role its monopoly power plays in the agreements' illegality, and that, under U.S. Plaintiffs' theories in this case, non-monopolist search providers would not violate Section 2 of the Sherman Act by executing substantially similar contracts. U.S. Plaintiffs are at a loss as to what other information they could provide, other than repeating the same answer 600 times, and

---

*Priddy v. Health Care Serv. Corp.*, No. 14-cv-3360, 2016 U.S. Dist. LEXIS 147126, at *9 (C.D. Ill. Oct. 25, 2016) (citing *Kendrick*, 125 F.R.D. at 2-3).

[29] U.S. Plaintiffs did so in response to Google's Interrogatory No. 1 in its First Set of Interrogatories, which requested U.S. Plaintiffs "[i]dentify by bates number each of the agreements You allege to have harmed competition, what specific provision of each of the agreements harmed competition, and how it has done so."

Google has provided no indication of what else it might want. This Court should again deny Google's request that U.S. Plaintiffs opine on hypotheticals.

### C.      Plaintiff States' Position Statement

Google's Second Set of Interrogatories were directed at Plaintiff States and U.S. Plaintiffs. Interrogatory Nos. 8 and 10 seek information related to issues that overlap Plaintiffs' allegations. As such, Plaintiff States coordinated with U.S. Plaintiffs on responding to Interrogatory Nos. 8 and 10 and incorporated by reference their responses to these interrogatories. As such, we agree with and incorporate by reference U.S. Plaintiffs' position statement in Section V.B above.

## VI.   The Parties' Joint Proposal and Disputes Regarding the Presentations Requested by the Court

### A.      The Parties' Joint Statement

During the February and May status conferences, the Court asked the Parties to provide a joint proposal regarding presentations to be delivered to the Court before summary judgment briefs are filed. Since then the Parties have reached agreement on some aspects of the presentations to the Court. The Parties jointly propose an in-person, six-hour session that allots three hours to each side. The Parties will endeavor to work together on a joint submission of a glossary of terms, acronyms, and abbreviations to present to the Court. The Parties also agree that the slide decks and joint submission should be simultaneously exchanged and submitted to the Court 48 hours in advance of the presentation. Further, the Parties agree that the proceedings before the Court will be transcribed, but the information, statements, slides, exhibits, and other materials presented during these presentations will have no binding evidentiary effect in the litigation. To this end, the Parties also agree that if a Party refrains from objecting to a statement

contained in another Party's oral presentation, slide deck, or other demonstrative, it should not be deemed a waiver of the Party's right to object to such statements later in the litigation.

The Parties have not reached agreement regarding (1) the scope of the presentations, (2) when the presentations should take place, (3) whether Plaintiffs will be able to address the Court after Google's presentation, and (4) whether the courtroom should be opened or closed for the presentations. The individual position statements regarding these disputed aspects of the presentations follow below.

**B.**      **U.S. Plaintiffs' and Plaintiffs States' Position Statement**

Following the Court's instructions, Plaintiffs have put forth a proposal to educate the Court on the terminology, facts, and specific issues in these actions before summary judgment briefs are filed. Plaintiffs' proposal differs from Google's in four key ways: Plaintiffs' proposal (1) allows for the presentations to include, where appropriate, the relevant legal and economic context; (2) schedules the presentations after the close of expert discovery, (3) permits Plaintiffs to collectively reserve up to 30 minutes to respond to Google's presentation, and (4) calls for the presentations to be made in open court. Plaintiffs' proposal should be adopted by the Court because it maximizes efficiency, fairness, and trust in the judicial process.

First, the Court should not limit the facts that the parties may discuss during their presentations. Both parties agree that these presentations should not be legal argument. However, Google goes a step further and takes the position that the presentations should be devoid of any legal discussion, precluding the parties from presenting the legal and economic context of certain issues. Recognizing the need for context given the large range of issues in the case, Plaintiffs propose that the presentations focus on the terminology, facts, and specific issues in these actions as well as issues and underlying facts that are likely to figure prominently at summary judgment and/or trial. In practice, Google's approach would also introduce unnecessary complications to

these presentations. For example, Google's approach would invite objections to the scope of the parties' presentations as the parties seek to police the unnecessary lines that Google seeks to draw. A more efficient approach is to allow the parties to use their best judgment about what to present to the Court while agreeing that they should endeavor to avoid making legal arguments.

Second, the Court should schedule the presentations after the close of expert discovery (Nov. 10, 2022) to provide a proper opportunity to prepare. Google proposes that the presentations be made either in September or October, which would locate the presentations just as the parties are preparing and taking expert depositions. Given the scope of expert discovery, scheduling the presentations in September and October would be extremely burdensome. The parties have together identified 15 experts so far; under the Amended Scheduling and Case Management Order, the parties have a 45-day window (encompassing 32 business days) to complete the 10-hour depositions of each of these experts. Scheduling the presentation during this window would divert resources from expert discovery and risk the parties giving rushed and less comprehensive presentations.

Third, the Court should allow Plaintiffs to reserve up to 30 minutes (collectively) to address any factual discrepancies in Google's presentation. Google objects to Plaintiffs providing a reply arguing that such responses are only necessary in adversarial proceedings such as when motions are heard. This misses the point. The Plaintiffs should have the opportunity to address any omissions, bias and/or discrepancies in Google's presentation. Google will, no doubt, address the Plaintiffs' presentation during its allotted three hours. For the sake of fairness, the Court should allow Plaintiffs to do the same.

Fourth, the Court should hold that these presentations will be made in open court. There "is a strong presumption in favor of public access to judicial proceedings." *EEOC v. National*

*Children's Center, Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (internal quotations and citations omitted).[30] "That presumption may be outweighed in certain cases by competing interests." *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665-66 (2017). However, the burden is on the party seeking to overcome the presumption of openness to show that the interest in limiting public access outweighs the presumption. *See In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001) ("[T]he party seeking the closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." (internal quotations omitted)); *see also New York v. Microsoft*, No. CIV A 08-1233, 2002 WL 649385, at *2 (D.D.C. Mar. 28, 2002) (ordering courtroom closed for proceeding after finding that disclosure of confidential information would result in "clearly defined and very serious injury" to a non-party). In this District, courts apply a balancing approach to determine whether the interest in secrecy outweighs the presumption of openness. *See e.g., U.S v Hubbard*, 650 F.2d 293, 317-22 (D.C. Cir. 1980). "A seal may be maintained only if the district court, after considering the relevant facts and circumstances of the particular case, and after weighing the interests advanced by the parties in light of the public interest and the duty of the courts, concludes that justice so requires." *MetLife*, 865 F.3d at 665-66 (internal quotation marks and citations omitted); *see also Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.");

---

[30] "Although much of the available case law on the subject of openness arises in the criminal context, the presumption of openness applies in the civil context as well." *McConnell v. FEC*, 251 F. Supp. 2d 919, 925 (D.D.C. 2003) (internal quotation and citations omitted).

*In re Cendant Corp.*, 260 F.3d at 194 (an order to seal judicial proceedings and records must articulate "compelling countervailing interests" to be properly issued and valid).

Here, Google has not and cannot make the necessary showing to close the courtroom for the presentations. To date, Google has only advanced vague arguments about potentially sensitive material that may come up during the presentations. Plaintiffs believe that the presentations will be sufficiently high-level as to not disclose any confidential business information or trade secrets; if necessary, such information can be shared with the Court in a manner that does not disclose it to the public.[31] Moreover, this is an important law enforcement proceeding that has garnered significant public interest and should be open to the public.

If Google makes the requisite showing that the disclosure of its presentation will require the company to disclose confidential information or trade secrets and this Court finds that Google's privacy interest outweigh the public's right to access this judicial proceeding, then Plaintiffs respectfully submit that the Court should narrowly exclude that information from public access. *See McConnell v. FEC*, 251 F. Supp. 2d 919, 925 (D.D.C. 2003) ("*Hubbard . . .* recognized that 'where both the public interest in access and the private interest in non-disclosure are strong, partial or redacted disclosure [may] satisfy both interests.'").

However, based on the record presented by Google to date, Plaintiffs respectfully request that the Court deny Google's request that these presentations be conducted in a closed court.

### C.    Google's Position Statement

Following the last status conference, the parties exchanged proposals regarding the tutorial presentation requested by the Court in recent months.  *See* May 12, 2022 Hr'g Tr. 54:2-

---

[31] For example, all presentation materials do not have to be shown on the screen viewable by the public, and a key can be shared with the Court that correlates the identity of a customer to general labels used in the presentation that allows the Court to follow along with all the relevant information available without disclosing confidential information.

25; Feb. 11, 2022 Hr'g Tr. 57:1-58:10.  Although the parties reached agreement on several

aspects of the presentation, four points of disagreement remain that Plaintiffs indicated they

would submit to the Court as part of this Joint Status Report.  Accordingly, Google has set forth

below its position on these four points.

### 1.      The Scope of the Presentation

Google understood that the Court wanted a presentation focused on pertinent factual

background—as opposed to legal contentions or theories of liability.  Plaintiffs have not

identified for Google any particular topics that they may address through their presentation, but

in correspondence Plaintiffs have indicated that they may discuss "the key issues" as well as the

"underlying facts" that they believe "are likely to figure prominently at summary judgment

and/or trial," June 3, 2022 Ltr. from K Dintzer at 1, and they have argued that "the significance

of the facts is informed by the legal and economic issues in these matters," June 13, 2022 Ltr.

from K. Dintzer at 2.  While the particular facts that the parties deem pertinent will of course be

informed by their views of the claims and defenses, Google proposes that the parties focus on

industry background facts, how the services involved in the case work, and similar factual

subjects that will provide the Court with helpful background and context for summary

judgment.  In other words, the presentations would more closely resemble what in other contexts

has been labeled a "tech tutorial" or "science day."  To offer a specific example, the Court

mentioned at the last status conference that it would appreciate additional information regarding

"how the particular search engines operate" and who the parties "think the competitors

are."  May 12, 2022 Hr'g Tr. 54:12-15.  Google did not interpret that as a request to prepare a

presentation summarizing or expressly rebutting Plaintiffs' assertions regarding the applicable

legal principles or the antitrust markets alleged in their Complaints; and Google would propose

addressing the topics referenced by the Court from a factual perspective rather than delivering a preview of legal arguments that may be presented at a summary judgment hearing or trial.

### 2.    The Timing of the Presentation

Plaintiffs have proposed scheduling the presentation between November 14 and November 30, 2022 because "the case would benefit from these presentations occurring after the close of expert discovery." June 13, 2022 Ltr. from K. Dintzer at 1. Contrary to Plaintiffs' suggestion, there is no need to link the presentation to the close of expert discovery if it is viewed as an opportunity to educate the Court on the pertinent factual background. And as a practical matter, there are not many business days to choose from during the second half of November given the Thanksgiving holiday. Although Google will of course be available at the Court's convenience, it believes that a date in September or early October would be well positioned between the deadline for serving rebuttal expert reports (August 5, 2022) and the first day on which parties may file dispositive motions without leave of Court (November 10, 2022).

### 3.    The Allocation of Time Among the Parties

The parties have agreed that, subject to the Court's availability, Plaintiffs will be permitted to present for up to three hours, and then Google will be permitted to present for up to three hours. The parties disagree, however, about whether Plaintiffs should be allowed to reserve a portion of their three hours to respond to Google's presentation. Consistent with its position regarding the proper scope of the presentation, Google's view is that there is no basis for Plaintiffs to reserve time for rebuttal in a setting that is more akin to a tutorial than a motions hearing.

### 4.    Addressing Confidentiality Concerns

Finally, the parties disagree about how to address concerns relating to the disclosure of commercially sensitive information that may warrant sealing. In Google's view, the parties and

the Court would benefit from a candid exchange that does not require the participants to choose their words carefully or avoid divulging too many details for fear of describing information that should not be disclosed publicly.  The best way to accomplish that objective is through a proceeding that is not open to the public, so that both parties and non-parties will have a reasonable opportunity to identify any redactions that they contend are warranted before the transcripts, demonstratives, and any recordings or other materials are placed on the public docket.

Concerns about the disclosure of non-public information are particularly complicated because of the significant discovery undertaken of Google as well as numerous third parties – who can be expected to oppose public disclosure of confidential commercial or technical information.  So that the parties may tailor their presentations in the manner that they believe is most informative for the Court, rather than having to withhold or sanitize certain information due to confidentiality concerns, Google submits that the presentations should not in the first instance be open to the public so that a redacted transcript can be prepared after the presentation and made available to the public.

Dated: June 15, 2022                   Respectfully submitted,

                                       WILLIAMS & CONNOLLY LLP

                                       By:  /s/ John E. Schmidtlein
                                       John E. Schmidtlein (D.C. Bar No. 441261)
                                       Benjamin M. Greenblum (D.C. Bar No. 979786)
                                       Colette T. Connor (D.C. Bar No. 991533)
                                       680 Maine Avenue, SW
                                       Washington, DC 20024
                                       Tel: 202-434-5000
                                       jschmidtlein@wc.com
                                       bgreenblum@wc.com
                                       cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

*Counsel for Defendant Google LLC*


By:_____*/s/ Kenneth M. Dintzer*_____
Kenneth M. Dintzer
Karl E. Herrmann
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*

By:    */s/ Bret Fulkerson*
Bret Fulkerson, Deputy Chief, Antitrust Division
Kelsey Paine, Assistant Attorney General
Office of the Attorney General, Antitrust Division
300 West 15th Street
Austin, Texas 78701
Bret.Fulkerson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:    */s/ Adam Miller*
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Adam Miller, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Kathleen Foote, Senior Assistant Attorney General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Adam.Miller@doj.ca.gov

*Counsel for Plaintiff State of California*

Leslie Rutledge, Attorney General
Johnathan R. Carter, Assistant Attorney General
Office of the Attorney General, State of Arkansas
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Johnathan.Carter@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

Ashley Moody, Attorney General
R. Scott Palmer, Interim Co-Director, Antitrust
Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Erica Sullivan, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov

*Counsel for Plaintiff State of Indiana*


Daniel Cameron, Attorney General
J. Christian Lewis, Executive Director of
Consumer Protection
Philip R. Heleringer, Deputy Executive Director of
Consumer Protection
Jonathan E. Farmer, Assistant Attorney General
Office of the Attorney General, Commonwealth of
Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Austin Knudsen, Attorney General
Rebekah J. French, Assistant Attorney General,
Office of Consumer Protection
Office of the Attorney General, State of Montana
P.O. Box 200151
555 Fuller Avenue, 2nd Floor
Helena, Montana 59620-0151
Rebekah.french@mt.gov

*Counsel for Plaintiff State of Montana*

Rebecca M. Hartner, Assistant Attorney General
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
RHartner@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

By:    */s/ Jonathan B. Sallet*
Jonathan B. Sallet, Special Assistant Attorney
General (D.C. Bar No. 336198)
Steven Kaufmann, Deputy Attorney General (D.C.
Bar No. 1022365 inactive)
Diane R. Hazel, First Assistant Attorney General
(D.C. Bar No. 1011531 inactive)
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Tel: 720-508-6000
Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Diane.Hazel@coag.gov

*Counsel for Plaintiff State of Colorado*

Joseph Conrad
Office of the Attorney General of Nebraska
Consumer Protection Division
2115 State Capitol Building
Lincoln, NE 68509
402-471-3840
joseph.conrad@nebraska.gov

*Counsel for Plaintiff Nebraska*

Brunn W. (Beau) Roysden III, Solicitor General
Michael S. Catlett, Deputy Solicitor General
Dana R. Vogel, Unit Chief Counsel
Christopher M. Sloot, Assistant Attorney General
Arizona Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Tel: (602) 542-3725
Dana.Vogel@azag.gov

*Counsel for Plaintiff State of Arizona*

51

Max Merrick Miller
Attorney General's Office for the State of Iowa
1305 East Walnut Street, 2nd Floor
Des Moines, IA 50319
(515) 281-5926
Max.Miller@ag.Iowa.gov

*Counsel for Plaintiff Iowa*


Elinor R. Hoffmann
John D. Castiglione
Morgan J. Feder
Office of the Attorney General of New York
28 Liberty Street, 21st Floor
New York, NY 10005
212-416-8513
elinor.hoffmann@ag.ny.gov
john.castiglione@ag.ny.gov
morgan.feder@ag.ny.gov

*Counsel for Plaintiff New York*


Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
919-716-6000
Jmarx@Ncdoj.Gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff North Carolina*


J. David McDowell
Jeanette Pascale
Christopher Dunbar
Office of The Attorney General & Reporter P.O.
Box 20207
Nashville, TN 37202
615-741-3519
david.mcdowell@ag.tn.gov
jenna.pascale@ag.tn.gov
chris.dunbar@ag.tn.gov

*Counsel for Plaintiff Tennessee*

Tara Pincock
Attorney General's Office Utah
160 E 300 S, Ste 5th Floor
PO Box 140874
Salt Lake City, UT 84114
801-366-0305
tpincock@agutah.gov

*Counsel for Plaintiff Utah*

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
jeff.pickett@alaska.gov

*Counsel for Plaintiff Alaska*

Nicole Demers
State of Connecticut Office of the Attorney
General
165 Capitol Avenue, Ste 5000
Hartford, CT 06106
860-808-5202
nicole.demers@ct.gov

*Counsel for Plaintiff Connecticut*

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
302-577-8924
michael.undorf@delaware.gov

*Counsel for Plaintiff Delaware*

Catherine A. Jackson (D.C. Bar No. 1005415)
Elizabeth Gentry Arthur
David Brunfeld
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
202-724-6514
catherine.jackson@dc.gov
elizabeth.arthur@dc.gov
david.brunfeld@dc.gov

*Counsel for Plaintiff District of Columbia*

Leevin Taitano Camacho, Attorney General
Fred Nishihira, Chief, Consumer Protection
Division
Benjamin Bernard Paholke, Assistant Attorney
General
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Tel: (671)-475-3324
bpaholke@oagguam.org

*Counsel for Plaintiff Guam*

Rodney I. Kimura
Office of the Attorney General of Hawaii
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
808-586-1180
rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff Hawaii*

Brett DeLange
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Fl.
PO Box 83720
Boise, ID 83720-0010
208-334-4114
brett.delange@ag.idaho.gov

*Counsel for Plaintiff Idaho*

Blake Harrop
Joseph Chervin
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
312-793-3891
bharrop@atg.state.il.us
jchervin@atg.state.il.us

*Counsel for Plaintiff State of Illinois*

Lynette R. Bakker
Office of the Attorney General of Kansas
Consumer Protection & Antitrust
120 S.W. 10th Avenue, Ste 2nd Floor
Topeka, KS 66612-1597
785-368-8451
lynette.bakker@ag.ks.gov

*Counsel for Plaintiff Kansas*

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006
207-626-8838
christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

Schonette J. Walker
Assistant Attorney General
Deputy Chief, Antitrust Division
Office of the Attorney General
swalker@oag.state.md.us

Gary Honick
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6480
ghonick@oag.state.md.us

*Counsel for Plaintiff Maryland*

Matthew B. Frank, Assistant Attorney General
Antitrust Division
William T. Matlack, Assistant Attorney General
Chief, Antitrust Division
Michael B. MacKenzie, Assistant Attorney
General
Deputy Chief, Antitrust Division
Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108
Tel: (617) 727-2200
Matthew.Frank@mass.gov
William.Matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff Massachusetts*

Justin Moor, Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2130
(651) 757-1060
justin.moor@ag.state.mn.us

*Counsel for Plaintiff Minnesota*

Marie W.L. Martin
Michelle Christine Newman
Lucas J. Tucker
Nevada Office of the Attorney General
Bureau of Consumer Protection
100 N. Carson Street
Carson City, NV 89701
775-624-1244
mwmartin@ag.nv.gov
mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff Nevada*

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
603-271-1217
brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff New Hampshire*

Robert Holup
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
239-822-6123
robert.holup@law.njoag.gov

*Counsel for Plaintiff New Jersey*

Mark F. Swanson
Cholla Khoury
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Tel: 505.490.4885
mswanson@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff New Mexico*

Parrell D. Grossman
Director
Elin S. Alm
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of the Attorney General
1050 E. Interstate Ave., Suite 200
Bismarck, ND 58503
701-328-5570
pgrossman@nd.gov
ealm@nd.gov

*Counsel for Plaintiff North Dakota*

Beth Ann Finnerty
Mark Kittel
Jennifer Pratt
Office of The Attorney General of Ohio, Antitrust
Section
30 E Broad Street, 26th Floor
Columbus, OH 43215
614-466-4328
beth.finnerty@ohioattorneygeneral.gov
mark.kittel@ohioattorneygeneral.gov
jennifer.pratt@ohioattorneygeneral.gov

*Counsel for Plaintiff Ohio*

Caleb J. Smith Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel: (405) 522-1014
Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff Oklahoma*

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
503-934-4400
cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff Oregon*

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Pennsylvania*

Johan M. Rosa Rodríguez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
PO Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201
jorosa@justicia.pr.gov

*Counsel for Plaintiff Puerto Rico*

David Marzilli
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
dmarzilli@riag.ri.gov

*Counsel for Plaintiff Rhode Island*

Yvette K. Lafrentz
Office of The Attorney General of South Dakota
1302 E. Hwy 14, Suite1
Pierre, SD 57501
605-773-3215
yvette.lafrentz@state.sd.us

*Counsel for Plaintiff South Dakota*

Ryan G. Kriger
Office of The Attorney General of Vermont
109 State St.
Montpelier, VT 05609
802-828-3170
ryan.kriger@vermont.gov

*Counsel for Plaintiff Vermont*

Sarah Oxenham Allen
Tyler Timothy Henry
Office of the Attorney General of Virginia
Antitrust Unit/Consumer Protection Section
202 N. 9th Street
Richmond, VA 23219
804-786-6557
soallen@oag.state.va.us
thenry@oag.state.va.us

*Counsel for Plaintiff Virginia*

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-5419
amy.hanson@atg.wa.gov

*Counsel for Plaintiff Washington*

Douglas Lee Davis
Tanya L. Godfrey
Office of Attorney General, State of West Virginia
P.O. Box 1789
812 Quarrier Street, 1st Floor
Charleston, WV 25326
304-558-8986
doug.davis@wvago.gov
tanya.l.godfrey@wvago.gov

*Counsel for Plaintiff West Virginia*

Benjamin Mark Burningham
Amy Pauli
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
(307) 777-6397
ben.burningham@wyo.gov
amy.pauli@wyo.gov

*Counsel for Plaintiff Wyoming*