IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>        Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION
TO COMPEL PRODUCTION OF DOCUMENTS AND DATA CITED IN
EXPERT REPORTS OF EDWARD A. FOX AND MARK A. ISRAEL**

  The positions advanced in Defendant Google LLC's Opposition to DOJ Plaintiffs' Motion to Compel Production of Documents and Data Cited in Expert Report of Edward A. Fox and Mark A. Israel ("Opposition Brief") are not supported by the law, the Federal Rules, or the Case Management Order. Plaintiffs must be allowed access to data and testimony necessary to test the calculations and conclusions of Google's experts. Indeed, Google's Opposition Brief tries to justify the selective disclosure of information relating to two topics *Google* has put at issue. Google is wrong on both counts.

  First, Google provided hand selected privileged information for Dr. Fox to rely upon while simultaneously trying to shield under a claim of privilege nearly all other related information regarding the alleged privileged subject matter. Second, Google's refusal to produce the data underlying the expert report of Dr. Israel flouts the plain language of the Amended Case Management Order ("CMO"). (ECF No. 108-1).

1

I.  **THE COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF REGARDING THE EUROPEAN DATA EXPERIMENT INCLUDED IN THE EXPERT REPORT OF DR. FOX**

Last year, Google performed an experiment "conducted at the request of European lawyers" to test the importance of scale to search. Expert Report of Edward A. Fox, June 3, 2022 ("Fox Report)" at 45. The origins of the experiment as support for attorney advocacy are telling. First, even under the case law cited by Google, it is clear that the produced documents meet all of the requisite elements of a privileged communication. Google chose not to claim privilege over the document to avoid making an admission of waiver. Second, Google's actions prior to Plaintiffs raising the issue of waiver indicate that Google sought to claim privilege over these materials. In doing so, Google misstates its prior actions that strongly indicate that Google had every intention of withholding these materials as privileged. Google cannot now be permitted to backtrack by selectively disclosing privileged information after having intentionally put this lawyer-led experiment at issue.

A.  **Background**

On June 6 Google served the expert report of Professor Edward A. Fox, the crux of which is an experiment design and conducted for the purposes of this litigation. To attempt to buttress the results, Google elected to provide Dr. Fox with materials for three other experiments. Two of those experiments appear to have been conducted in the ordinary course and are what Google calls "launch" experiments. Fox Report at 42-45. The ordinary-course experiments do not support Dr. Fox's conclusions and only highlight Google's reliance on troves of user data.[1] The

---

[1] For example, Google's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To be sure, ▮▮▮▮▮▮ still supplies Google with a staggering volume of data. By way of comparison, it would take Google's largest rival ▮▮▮▮▮▮ ▮▮▮▮▮ to accumulate as much user-side data as Google accumulates in ▮▮▮▮▮.

2

third Google experiment—an experiment conducted for Google's European lawyers—however, is consistent with the one used in this litigation.[2] This is perhaps unsurprising given that both experiments were performed at the request of counsel for advocacy purposes.

When first confronted by Dr. Fox's use of materials that were not produced to Plaintiffs, Google averred, as it does now, that Dr. Fox had not "relied" on these materials. This tactic reveals Google's first attempt to conceal its expert's reliance on privileged materials and circumvent any waiver of privilege. But the plain text of the Fox Report is clear: he relies upon the European experiment by citing it and drawing conclusions from it. Upon threat of this motion, Google belatedly supplied Plaintiffs with two documents relating to the European experiment. Now, having conceded Dr. Fox's reliance on these materials, Google next asserted that these materials were not, in fact, privileged, and therefore, no waiver attached.

B.     Argument

Google argues that it can maintain privilege over information relating to its European lawyer-directed experiment because it only shared non-privileged information with Dr. Fox, citing *Trs. Of Elec. Workers Loc. No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*, 266 F.R.D. 1, 11 (D.D.C. 2010) ("[I]t is perfectly legitimate for a party to disclose a non-privileged communication but to decline to disclose a privileged communication, even though the privileged communication would prove that the party is lying through his teeth."). But Google is mistaken as a matter of fact and law. It cannot selectively disclose information relating to its European data reduction experiment, "conducted at the request of European lawyers," by providing its expert with a summary of its results while simultaneously using privilege to deny

---

[2] Although I was not involved in the 10% and 1% DREs, their results shown above are generally consistent with the results of my DRE study." Fox Report at 46.

Plaintiffs access to information about the experiment's purpose and design.

First, the documents relied upon and disclosed to Dr. Fox were clearly meant to facilitate the provision of legal advice. Dr. Fox's report admits as much in his description of the experiment as "for the purposes of European policy advocacy." Google now claims—for the first time—the disclosed documents "were created with the understanding that they may be disclosed to the European Commission or certain other authorities."[3] Opposition Brief at 7. There is serious reason to cast doubt on this assertion. First, the document's title bears an internal project codename ▇▇▇▇▇▇▇ suggesting an internal audience was intended. Second, Google does not contend that the document was ever disclosed to the European Commission or any other authority (a decision likely made by Google lawyers) before it was provided to Dr. Fox.

Next, the disclosed document clearly meets the requirements of privilege as articulated by Google; Google has chosen not to assert privilege. Dr. Fox reported, and Google does not appear to dispute, that the European data reduction experiment was conducted at the direction of counsel. *See* Fox Report at 45; Opposition Brief at 9. As a case cited by Google in its Opposition states, documents that "do not reflect express requests for or provision of legal advice" including "factual work product, are nevertheless subject to the attorney-client privilege" *FTC v. Boehringer Ingelheim Pharm., Inc.*, 180 F. Supp. 3d 1, 32 (D.D.C. 2016). Further, Google does not contest that the experiments were conducted under anything other than "the auspices of [the] in-house legal department, acting in its legal capacity." *FTC v. Boehringer Ingelheim Pharm., Inc.*, 180 F. Supp. 3d 1, 32 (D.D.C. 2016). Moreover, the primary purpose of the European

---

[3] Had they been submitted to the European Commission or certain other regulatory bodies, they would have been subject to disclosure because Plaintiffs issued an RFP that cover all such submissions. Plaintiffs' Third Request for Production of Documents to Defendant Google LLC, Request No. 1 (June 21, 2021).

experiment was to facilitate legal advice regarding EU regulation.

Perhaps unsurprising in the context of a privileged undertaking,[4] Google withheld as privileged all other documents about the European experiment. But it cannot explain its basis for asserting privilege over the documents it continues to withhold while simultaneously failing to assert privilege over the few documents it selected for its expert. Google does not attempt to resolve this apparent inconsistency in its privilege claims. This inconsistency has led courts to adopt the sword-shield principle that "prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones." *In re Pabst Licensing GMBH & Co., KG Litig.*, 250 F.R.D. 55, 58 (D.D.C. 2008) (quotation omitted). There is reason to suspect that the documents Google now attempts to shield are regarded by Google as "less favorable" as they could cast a negative light on the design of experiments and Dr. Fox's willingness to bless an experiment directed by Google lawyers to yield certain results.[5]

Finally, Google's explanations for why it withheld the two European experiment documents only belatedly produced do not make sense. Google withheld the documents throughout fact discovery because it believed them privileged and only recategorized them when

---

[4] Compare the broad and comprehensive privilege claims Google has asserted in other ▊▊▊▊▊ ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ including whether Google even ran experiments or what those experiments showed, were privileged. Deposition of Paul Gennai, Sept. 2, 2021 at 145:11-146:3 ("Q. So in ▊▊▊▊▊▊▊▊▊▊▊▊ what user experiments did Google run ▊▊▊▊▊ ▊▊▊▊▊? MR. SCHMIDTLEIN: Paul, I want you to draw a very distinct distinction here between work that was done pre decision and post decision, okay? Pre decision a privileged. Post decision, in terms of implementing the order, to the extent that's the question, that you can answer.").

[5] The information Plaintiffs have been able to review indicates that Google's lawyers had a hand in the design of these experiments. Google's privilege log entry for one of the shielded documents reads that the provision of legal advice was regarding the "reduction of the amount of user search data used for main ranking systems in connection with an EC regulatory investigation." In its Opposition Brief, Google instead cryptically notes that legal advice provided by lawyers relates to "deliberation regarding the design of a technical analysis[.]"

5

it realized its privilege claim had become inconvenient and inconsistent with its latest set of arguments.

There is no dispute that these documents address issues core to this litigation and should have been produced long ago, if they were not privileged. Plaintiffs specifically requested documents regarding this topic:

> From January 1, 2005, to the present, produce **all documents addressing or discussing the impact of data or scale on the quality of search** or search advertising products or services, including the use of data to improve search or search advertising products or services.

Plaintiffs' Second Request for Production of Documents to Defendant Google LLC, Request No. 8 (Jan. 11, 2021) (emphasis added). Google argues that the documents "were not retrieved pursuant to the agreed-upon search parameters" and thus were not produced in fact discovery. But that cannot be so. Setting aside whether the documents would have been identified through search strings, Google agreed to produce documents that were responsive to Plaintiffs' requests and were located pursuant to other search efforts. It is implausible that Google *first* became aware of these documents after the close of fact discovery on May 6, but in time for Dr. Fox to use the documents in his June 6 expert report. Google also should have known about these documents for the 30(b)(6) Deposition noticed on February 22, 2022: Plaintiffs explicitly sought testimony from Google as to whether it had "ever studied the relationship of queries and related data on a search engine's quality and/or ability to monetize, including how they vary based on a search engine's query volume." Notice of Deposition of Google 30(b)(6), Feb. 22, 2022 at 23. Dismayingly, in the 30(b)(6) deposition, Google's corporate representative Pandu Nayak told Plaintiffs there have been no data reduction experiments at Google ▮▮▮▮▮▮,[6] despite

---

[6] Deposition of Google (Pandurang Nayak), Apr. 7, 2022 at 91:8-14 ("Q. And aside from ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, have there been any other experiments

the two European experiment documents explicitly showing the opposite. Fox Report at 45-46.

Google's failure to disclose these materials during discovery prevent Plaintiffs from pursuing additional discovery on these materials, including the ability to question Google witnesses. Plaintiffs request that they be allowed to question witnesses regarding these documents during the already open depositions, which is reasonable and serves the interest of fairness.

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' requested relief regarding the European data reduction experiment.

## II. THE COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF REGARDING THE RAW PANELS DATA USED IN THE EXPERT REPORT OF DR. ISRAEL

Google's Opposition reveals certain points of agreement. The parties agree that the CMO governs expert disclosures, including the present motion. Opposition Brief at 6, 13-14. The parties agree that Dr. Israel's June 6 report used an aggregated and curated dataset that Google generated from raw Google Panels data. *See id.* at 12-13.[7] Plaintiffs accept Google's representation that Dr. Israel himself has not seen the raw Google Panels data. *Id.* at 13. The parties appear to agree that, had Dr. Israel reviewed the data directly from Google's Panels to aggregate the data for use in his report, then Google would be obligated to produce this data under the CMO. *See id.* at 11 (noting Google's production of all data Dr. Israel "accessed"). Finally, the parties agree that pre-existing privacy safeguards are appropriate for query text in the raw Google Panels data. *See id.* at 12 n.4.

Remaining is Google's refusal to produce the raw Google Panels data underlying the

---

that have been run on changes to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬? A. We have not been doing much there, I have to admit….").

[7] Google produced this aggregated and curated dataset on June 13.

calculations in Dr. Israel's report, solely because Google curated and aggregated that data and Dr. Israel did not. Google's position contradicts the clear terms of the CMO, which command the production of "all data" underlying the calculations in an expert's report, with no exception for a party's manipulation of data before its use by an expert. CMO at 18, ¶ 24.[8] If anything, the CMO emphasizes the breadth of that "all data" requirement by indicating that the data provided should enable Plaintiffs "to recreate the [experts'] calculations *from the initial ('raw') data files*." CMO at 18, ¶ 24 (emphasis added). These clear terms resolve the dispute.[9]

Google attempts to rid itself of its obligation by arguing that the CMO only requires disclosure of materials shared with Dr. Israel and the "starting point of the analysis performed by Dr. Israel" was the curated and aggregated dataset, not the raw Google Panels data maintained in the ordinary course. As demonstrated below, how data is compiled, filtered, and manipulated is instrumental to understanding and recreating the calculations of an expert report. *See infra* at 10-11. For instance, two different approaches to curating and aggregating data from the same raw data set can lead to wildly different conclusions.

Here, Google admits it filtered Dr. Israel's dataset from the raw Google Panels data by "relevan[ce]." *Id.* at 13. But Plaintiffs have no insight into how—and who—determined relevance and no ability to scrutinize that determination or the criteria used.[10] Denied the raw

---

[8] Paragraph 24 reads in part: "[T]he following materials will be disclosed . . . (e) for all calculations appearing in the report, all data and programs underlying the calculations, including all programs and codes necessary to recreate the calculations from the initial ("raw") data files, and including the intermediate working-data files that are generated from the raw data files and used in performing the calculations appearing in the report."

[9] Google must also produce a dictionary explaining the specialized terms in that raw data.

[10] Google recognized that the process of aggregating and curating the raw Google Panels data required discretion, but Google failed to identify who exercised that discretion or the metrics used. *See id.* at 13 (explaining that the altered data came about when Google "compiled" raw data deemed "relevant" by an unspecified person), at 13 (explaining that an unspecified person determined that "there was no need for Dr. Israel or his team to review the [raw] data"), at 18

Google Panels data, Plaintiffs cannot determine if Google curated the data objectively and fairly and are therefore deprived of an avenue for critiquing Dr. Israel's analysis.[11] Dr. Israel and Google are under no obligation to curate or aggregate data in an objectively fair, or representative manner. Plaintiffs therefore cannot accept "trust us" as an answer, and the parties negotiated the CMO to give the parties the ability to test the other side in precisely this situation, consistent with the aims of the Federal Rules.

Google next argues that Plaintiffs have not complied with the CMO either. *Id.* at 17. As an initial matter, Google's accusation is not relevant to Plaintiffs' present motion; Google may move to compel production of data if it genuinely believes it to be warranted. But it has not. Google's sole example of Plaintiffs' purported non-compliance is that "some third parties have produced" aggregated data and that Plaintiffs have not disparaged that data.[12] *Id.* at 17. Yet, the situation is different. First, Google has had ample opportunity to request any raw third-party data it needed from third parties because Google received copies of every subpoena Plaintiffs issued, all data made available to Plaintiffs by third parties, and Plaintiffs' correspondence with the subpoena recipients. Second, all raw data available to Plaintiffs is also available to Google. Plaintiffs' motion seeks symmetric access to information (as contemplated by the CMO); Google

---

(explaining that the altered dataset contained only the information deemed "pertinent" by an unspecified person). Similarly, Google emphasized how Dr. Israel never "access[ed]" the raw data, *id.* at 2, but despite Plaintiffs' requests, Google will not clarify whether Dr. Israel spoke to Google employees about the contents of the raw data.

[11] Plaintiffs have sought from Google a data dictionary for the raw Google Panels data, which would have provided Plaintiffs with more insight into the raw data's contents. Google has refused this request.

[12] Google's example fails to explain whether Google or Plaintiffs subpoenaed the data, which third parties produced the data, how or even whether Plaintiffs (or Plaintiffs' experts) have used the data, when Plaintiffs should have raised concerns about the data, and whether Google requested the raw data from Plaintiffs.

already has that with respect to third-party data.

Google also emphasizes how it "produced the computer code that had been used to extract the panels data provided to Dr. Israel and his team." *Id.* at 15. Yet, the code is meaningless without the data it was designed to run on. It is an absurd result to suggest that the CMO requires Google to produce code that is useless without the underlying data.

And Google claims that this dispute is mooted by Google's August 15 production of Google-selected Panels data and an accompanying data dictionary for the newly selected dataset. It is not. Google's August 15 production is another curation of the raw, Google Panels data, so it suffers from the same problems as the dataset used by Dr. Israel.

In fact, Google's August 15 production provides an example of the importance of obtaining the full underlying data. The curated and aggregated dataset provided to Dr. Israel has two parts. One part is supposed to include only data about user searches entered on general search engines and verticals, which an undisclosed person identified within the raw data based on an undisclosed method.[13] With only the aggregated and curated dataset, Plaintiffs could not even begin to test the reasonableness of that classification method. But when Google produced partial raw data on August 15, apparent misclassifications began to surface. The partial raw data included a partial URL where each "search" supposedly occurred. Some of those "searches" seem to have occurred on websites where a search is impossible (e.g., a Bank of America account login page at "secure.bankofamerica.com/login/sign. . ."). Of course, additional, unproduced variables within the raw data (and the remainder of the URL data) may help Plaintiffs further evaluate the reasonableness of this classification beyond the limited information

---

[13] *See* Expert Report of Dr. Mark A. Israel, June 4, 2022, ¶ 141 (explaining that the analysis was done "by looking at all search queries" on general search engines and verticals).

10

available through only a partial URL string. Further, absent production of the full raw Google Panels data, Plaintiffs cannot test the reasonableness of Google's curated August 15 production. For instance, without the raw data, Plaintiffs cannot check for searches mistakenly omitted from Dr. Israel's aggregated data (so-called false negatives). Plaintiffs also cannot scrutinize other critical classifications underlying Dr. Israel's analysis, such as the "vertical" to which each search belongs. The aggregated and curated dataset provided to Dr. Israel ostensibly focuses on searches within only five verticals. Without the raw data, Plaintiffs cannot check whether searches were properly classified within these five verticals or whether any additional verticals were reasonably omitted. Plaintiffs therefore are entitled to the raw Google Panels data underlying Dr. Israel's calculations.

## CONCLUSION

For the foregoing reasons, the Court should grant the relief sought in Plaintiff's Motion to Compel Production of Documents and Data Cited in Expert Reports of Edward A. Fox and Mark A. Israel.

Dated: August 19, 2022  Respectfully submitted,

By: */s/ Kenneth M. Dintzer*
Kenneth M. Dintzer
Karl E. Herrmann
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*

By: */s/ Kelsey Paine*
Kelsey Paine, Assistant Attorney General
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, Antitrust Division
300 West 15th Street
Austin, Texas 78701
Kelsey.Paine@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: */s/ Matthew Michaloski*
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Leslie Rutledge, Attorney General
Johnathan R. Carter, Assistant Attorney General
Office of the Attorney General, State of Arkansas
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Johnathan.Carter@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney General
Kathleen Foote, Senior Assistant Attorney General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

13

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Erica Sullivan, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Daniel Cameron, Attorney General
J. Christian Lewis, Executive Director of Consumer Protection
Philip R. Heleringer, Deputy Executive Director of Consumer Protection
Jonathan E. Farmer, Assistant Attorney General
Office of the Attorney General, Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

14

Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Austin Knudsen, Attorney General
Rebekah J. French, Assistant Attorney General, Office of Consumer Protection
Office of the Attorney General, State of Montana
P.O. Box 200151
555 Fuller Avenue, 2nd Floor
Helena, Montana 59620-0151
Rebekah.french@mt.gov

*Counsel for Plaintiff State of Montana*

Rebecca M. Hartner, Assistant Attorney General
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy Attorney General
Mary Frances Jowers, Assistant Deputy Attorney General
Office of the Attorney General, State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
RHartner@scag.gov

*Counsel for Plaintiff State of South Carolina*

15

Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*