# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>                                   Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>                                   Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████████ |

**DEFENDANT GOOGLE LLC'S MOTION TO PARTIALLY EXCLUDE THE
OPINION OF PLAINTIFFS' EXPERT CHRISTINE M. HAMMER**

Pursuant to Federal Rule of Evidence 702, Defendant Google LLC ("Google") respectfully moves to partially exclude the opinions of DOJ Plaintiffs' proffered expert Christine Hammer as set forth below, and any reliance thereon.

### INTRODUCTION

The testimony and opinions of one of Plaintiffs' proposed experts, Christine Hammer, should be excluded in part because certain of her opinions do not meet the reliability or relevancy requirements of Rule 702.  Ms. Hammer is a Certified Public Accountant whom the Department of Justice has retained to evaluate the profitability of the search and search advertising businesses of Google.  *See* Ex. 1, June 6, 2022 Expert Report of Christine Hammer ¶ 9.  By this motion, Google is not moving to exclude Ms. Hammer's opinion identifying the internally-reported profit margins ███████████████████████████████  Rather, Google is moving to exclude Ms. Hammer's opinion that those profit margins are "high relative to those of other businesses included in industry benchmark groups."  *Id.* at ¶ 13.  This "benchmarking" opinion should be excluded because Ms. Hammer concedes that the comparators she selected are not comparable to Google's search and search advertising businesses, and that she did not select them with the economically relevant antitrust market in mind.  *Id.* at ¶ 92; Ex. 3, Excerpts of the Deposition of Christine Hammer (Oct. 10–11, 2022) at 221:14–17; 228:18–229:13.  Comparisons between the profitability of Google Search and a miscellany of online businesses are meaningless, and do not assist the trier of fact to determine any fact at issue in this case.

### BACKGROUND

In this lawsuit, Plaintiffs allege that "Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services, search advertising, and general search text advertising."  Am. Compl. ¶ 1.  They further allege that "[t]he United States is

a relevant geographic market for general search services" as well as for "the search advertising and the general search text advertising markets."  *Id.* at ¶¶ 91, 107.[1]  Their economic expert, Professor Michael D. Whinston, defines the relevant market for general search services as including "web searches performed on the main pages of general search engines,[2] as well as searches done in general search engines' applications on mobile phones and tablets."  Ex. 4, Excerpts of June 6, 2022 Expert Report of Michael D. Whinston ¶ 127.  Professor Whinston further defines the relevant search advertising market as "all ads served on the SERPs of both general search engines and specialized search engines that are generated in response to search queries (including on those search engines' mobile apps)," excluding "all non-digital ad products; display (also called 'banner') advertising shown across the web and in mobile apps; and most ads on social media sites."  *Id.* at ¶ 303.  Professor Whinston also defines a "narrower market wholly contained within the US search ads relevant market: general search text ads"—i.e. "ads that appear on the SERP of a general search engine and look very much like organic links."  *Id.* at ¶ 388.

Plaintiffs' accounting expert, Ms. Hammer, reviewed internal accounting records produced by Google, as well as publicly-reported financial information, to reach a conclusion identifying the profitability of Google's search and search advertising businesses.  *See* Ex. 1 ¶¶ 10, 12–13; Ex. 3 at 39:12–40:3.  Ms. Hammer identified what she contends are the accounting profit margins of Google's search and search advertising businesses ███████████████████████

████████████████████████████████████████████████

___

[1] "General search services available in other countries are not reasonable substitutes for general search services offered in the United States."  Am. Compl. ¶ 91.

[2] The "general search engines" identified in Plaintiffs' Amended Complaint are Google, Bing, DuckDuckGo, and Yahoo!.  Am. Compl. ¶ 23.  Professor Whinston further identifies "smaller search engines" including AOL, Ask, Baidu, Ecosia, Infospace, and Yandex, although he notes that Yandex and Baidu are "seldom used within the US."  Ex. 4 ¶¶ 51–52.

██████████████████████     *See* Ex. 1 ¶¶ 49, 80–81.  Ms. Hammer then compared the profit margins

she identified to three "industry benchmark groups."  *See* Ex. 1 at Part VII.B.  Ms. Hammer again

compared an accounting measure ████████—return on invested capital ("ROIC")—to the

three "industry benchmark groups" in her Reply Report.  Ex. 2, September 26, 2022 Expert Reply

Report of Christine Hammer ¶¶ 83, 97–103.

Ms. Hammer admits that she has never conducted this type of comparison in an antitrust

case, Ex. 3 at 213:8–14, and does not link her benchmark analysis to either an alleged antitrust

market or whether Google has market or monopoly power, *id.* at 63:24–64:24, 72:18–73:17.

Professor Whinston, however, relies on Ms. Hammer's opinion that Google's profit margins are

high relative to the industry benchmark groups as "[d]irect evidence of Google's monopoly power

in the relevant markets."  Ex. 4 at p. 208 & ¶¶ 544, 546–55.[3]

But the "industry groups" Ms. Hammer selected in her June 6, 2022 Expert Report were

not groups limited to general search engines or even specialized search engines—instead, they

comprise a hodgepodge of online businesses that bear no relation to the alleged relevant markets

in this matter.  These "industry groups" were:

---

[3] Google is separately moving to exclude certain of Professor Whinston's opinions, including any opinions that he has offered that rely upon Ms. Hammer's benchmark analysis.

(1) RDG Internet Composite Index, Ex. 1 ¶ 93, a stock market index[4] comprising 92 companies.[5]

(2) S&P Capital IQ Interactive Media and Services, a market intelligence grouping including over 200[6] publicly-traded U.S. "[c]ompanies engaging in content and information creation or distribution through proprietary platforms, where revenues are derived primarily through pay-per-click advertisements, including search engines, social media and networking platforms, online classifieds, and online review companies." *See* Ex. 1 ¶ 93 and Schedule D.2.

(3) Standard Industry Classification ("SIC") Code 7370, a US-government system for classifying industry areas "by the type of activity in which they are primarily engaged." *Id.* at ¶ 93. SIC Code 7370 contains 367 companies[7] and corresponds to Computer Programming, Data Processing, and Other Computer Related Services. *Id.* at ¶ 100.

*See also* Ex. 3 at 220:21–221:7.

Hammer personally selected these groupings by "look[ing] for indices or classifications that Alphabet itself was a part of." *Id.* at 290:15–20, 321:5–8. She did not rely on the Amended Complaint, she did not receive guidance from another Department of Justice expert, nor did she rely on any other expert's opinions when selecting these industry groupings. *Id.* at 63:6–20, 64:25–65:3, 221:14–17; 290:15–20. She testified that she did not select these industry groupings with the economically relevant antitrust market in mind, did not alter the groupings to reflect that

---

[4] "Market indexes are hypothetical portfolios of investment holdings that investors use as an indicator of market movement." Julie Young, *Market Index: Definition, How Indexing Works, Types, and Examples*, INVESTOPEDIA (last updated Apr. 28, 2022), https://www.investopedia.com/terms/m/marketindex.asp. Index managers determine "which companies or other investments to include," and these companies are weighted to determine the impact that their individual performances will have on the index's overall performance. Kat Tretina, *What is a Market Index?*, FORBES (last updated Oct. 5, 2022), https://www.forbes.com/advisor/investing/stock-market-index/.

[5] *RDG Internet Composite*, https://researchdatagroup.com/composite-internet/ (identifying the 92 included companies).

[6] *See* Ex. 5 for list of these companies as of November 22, 2022.

[7] *See* Ex. 6 for complete list of these companies.

market, and has no opinion on whether her benchmark groups are equivalent to that market. *Id.* at 221:14–222:3. She testified that the purpose of using the benchmark groups "was to look at profitability within an industry." *Id.* at 221:8–13. When asked to specify which industry, she vaguely described it as the "internet industry." *Id.* at 318:14–320:14.

Notably, Ms. Hammer confirmed that she did not assess the products or services these companies sell to determine whether they are similar to Google's search and search advertising businesses, nor did she assess or exclude any dissimilar business lines from her comparators. *Id.* at 212:10–24, 221:18–20, 257:8–21; 269:22–270:4. Ms. Hammer admits that these companies may have different product strategies and processes as compared to Google's search and search advertising businesses. *See, e.g.*, *id.* at 253:3–8, 271:7–12, 273:5–9; Ex. 1 ¶ 92. When asked "when you looked for industry groupings, did you look for an industry grouping of search engines?"—she responded "[w]ell, I did, but there is not one." Ex. 3 at 308:24–309:2.

After applying two filters to somewhat narrow her groups,[8] Ms. Hammer's benchmarks groups include 174 companies, many of which bear little resemblance to Google's search and search advertising businesses. *See* Ex. 1 at Schedules D.1–D.3. These companies are listed on Schedules D.1, D.2, and D.3 to Ms. Hammer's report. *See id.* These companies include:

- o 1-800-FLOWERS is a "provider of gifts" that serves its "customers' celebratory needs" through products such as fresh-cut flowers, cookies, fruit bouquets,

---

[8] Ms. Hammer narrowed her comparator industry groupings somewhat, by excluding companies with revenues below $1 billion in 2021. Ex. 1 at Schedules D.1–D.3. In two of the three groups, she also excluded companies that are not publicly traded or are not "domeciled [*sic*] in the United States." *Id.* at Schedules D.2–D.3. But she did not exclude companies even if their operations were primarily in jurisdictions other than the United States. Ex. 3 at 322:21–323:13.

"Moose Munch," "wine, and gift-quality fruit."[9]  It generates revenue through sales of these goods.[10]

o  Booz Allen Hamilton is a consulting firm that "provid[es] long-term solutions" to clients such as "the U.S. government's cabinet-level departments" for "challenges[] such as protecting soldiers in combat and supporting their families."[11]  It generates "[s]ubstantially all of [its] revenue . . . from services provided under contracts and task orders with the U.S. government."[12]

o  Cimpress is a printing company that fulfills "large volumes of individually small-sized customized orders" for "marketing materials, business cards, signage, promotional products, logo apparel, packaging, books and magazines, wall decor," and more.[13]  It generates revenue "primarily from the sale and shipment of customized products."[14]

o  Dropbox is a platform that lets "individuals, teams, and organizations . . . create and organize their content, access it from anywhere, share it with internal and external collaborators, and review feedback and history."[15]  It "generate[s] over 90% of [its] revenue" from registered "users who purchase a subscription through [the Dropbox] app or website."[16]

o  Roblox is a company that operates an online gaming and "social interaction" platform that hosts "millions of 3D digital worlds that are entirely user-

---

[9] 1-800-FLOWERS.COM, Inc., Annual Report (Form 10-K) at 1, 4 (Sept. 16, 2022), https://www.sec.gov/Archives/edgar/data/1084869/000143774922022580/flws20220626_10k.htm.

[10] *Id.* at 4.

[11] Booz Allen Hamilton Holding Corp., Annual Report (Form 10-K) at 3 (May 20, 2022), https://www.sec.gov/Archives/edgar/data/1443646/000144364622000058/bah-20220331.htm.

[12] *Id.* at 52.

[13] Cimpress plc, Annual Report (Form 10-K) at 1 (Aug. 5, 2022), https://www.sec.gov/Archives/edgar/data/1262976/000126297622000031/cmpr-20220630.htm.

[14] *Id.* at 28.

[15] Dropbox, Inc., Annual Report (Form 10-K) at 6–7 (Feb. 18, 2022), https://www.sec.gov/Archives/edgar/data/1467623/000146762322000015/dbx-20211231.htm.

[16] *Id.* at 6.

generated, built by . . . millions of active developers."[17]   It "generate[s] substantially all of [its] revenue through the sale of virtual items on the Roblox Platform," where "[u]sers can purchase and spend Robux to obtain virtual items to enhance their social experience on the [platform]."[18]

o   Stitch Fix is a U.S.- and U.K.-based apparel retailer that offers "personalized retail experiences . . . power[ed] through a combination of data science and human judgment."[19]   It generates revenue when clients order "a personalized shipment of items informed by [Stitch Fix's] algorithms and sent by a Stitch Fix stylist" or "purchas[e] directly from [its] website or mobile app based on a personalized assortment of outfit and item recommendations."[20]

o   Vroom is a holding company that uses "[d]ata science and experimentation" to operate an "end-to-end ecommerce platform" for selling used cars.[21]   It generates revenue by selling "used vehicles and value-added products . . . directly to consumers," "through wholesale channels," and "at Houston-based Texas Direct Auto."[22]

Ms. Hammer admits that she is unfamiliar with the companies within her benchmark groups.  For example, she testified:

Q.   And this—your index—the RDG index also includes a company by the name of Cimpress? . . .
A.   I see that.
Q.   Are you familiar with that business?
A.   I am not.
Q.   Do you know what business Cimpress is in?
A.   I just said I'm not familiar with that business.

---

[17] ROBLOX Corp., Annual Report (Form 10-K) at 6 (Feb. 25, 2022), https://www.sec.gov/Archives/edgar/data/1315098/000131509822000058/rblx-20211231.htm.

[18] *Id.* at 81.

[19] Stitch Fix, Inc., Annual Report (Form 10-K) at 5 (Sept. 21, 2022), https://www.sec.gov/Archives/edgar/data/1576942/000157694222000077/sfix-20220730.htm.

[20] *Id.* at 4.

[21] Vroom, Inc., Annual Report (Form 10-K) at 6 (Feb. 28, 2022), https://www.sec.gov/Archives/edgar/data/1580864/000095017022002352/vrm-20211231.htm.

[22] *Id.* at 67.

> Q.      And so is it fair to say that [your] index includes some companies that are in [the RDG] index but for which you do not know what products or services they sell?
>
> A.      I know that they're in this Internet Composite Index.
>
> Q.      All right. And—but there's some where you—you don't know what specific products or services they sell.
>
> A.      That's correct. They're part of the index; therefore, they're included.

Ex. 3 at 256:12–257:7; *see also, e.g.*, *id.* at 252:20–253:15 (Etsy), 255:23–256:11 (1-800-Flowers), 266:17–19 (Ziff Davis), 270:8–10 (NortonLifeLock). As a result, nearly all of the other companies in the industry groups have nothing to do with general or specialized search engines or advertising.

In addition to applying the same benchmarking methodology to ROIC, Ex. 2 ¶¶ 83, 97–103, Ms. Hammer's Reply Report contained additional analysis based on her benchmark groups. In response to criticisms of her methodology raised by Google expert Dr. Mark Israel, Ms. Hammer analyzed the profitability of 14 companies that Alphabet, Inc. had identified as competitors in its 2021 Form 10-K filed with the SEC,[23] to the extent that those companies had already been included within her original set of 174 benchmark comparators. Ex. 2 ¶¶ 43–47. This subset consisted of: Alibaba, Amazon, Baidu, Booking Holdings, Criteo, eBay, Meta, Microsoft, Netflix, Salesforce, Snap, Twitter, Zoom, and Yandex. Ms. Hammer admitted that she did not have reason to believe the competitors identified in the Alphabet, Inc. 10-K were limited to those who compete with Google's search and search advertising business, and that it "may well include companies that do not compete directly with the Search and Search Ads businesses." Ex. 3 at 295:16–296:8. Ms. Hammer did not exclude companies that "operat[ed] primarily in jurisdictions other than the United States," *id.* at 323:10–13, and here too, Ms. Hammer did not isolate business lines for the comparator firms and instead used the comparators' "consolidated results," *id.* at 322:14–323:8.

---

[23] *See* Alphabet, Inc., Annual Report (Form 10-K) at 7 (Feb. 1, 2022), https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm.

**ARGUMENT**

Ms. Hammer's benchmarking opinion should be excluded because the profitability of a wide variety of "internet industry" companies is not relevant to whether Google possesses market power in the alleged relevant markets of general search services and general search advertising. Her benchmarking opinion methodology is also unreliable, as it compares apples and oranges, which does not withstand scrutiny under both applicable law and reputable accounting literature.

## I.     LEGAL STANDARD

In deciding a motion to exclude expert testimony, the Court acts as a "gatekeeper" to ensure that the requirements of Rule 702 are met. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597–98 (1993). Plaintiffs bear the burden of establishing Ms. Hammer's qualifications and the admissibility of each of her opinions. *Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009). Under Rule 702, an expert must have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a).   Moreover, the testimony must be "the product of reliable principles and methods" that "the expert has reliably applied . . . to the facts of the case." Fed. R. Evid. 702(c)–(d); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (explaining that the requirements of Rule 702 apply to all forms of expert testimony, including that based on experience).

When assessing relevance, courts determine whether the proffered testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (internal quotations and citations omitted). The party offering the testimony "must show not only that its experts' methodologies are reliable for some purposes, [but] also . . . that those methodologies are reliable ways 'to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant.'" *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 250 (S.D.N.Y 2010).

Expert testimony needs "a reliable foundation," *Daubert*, 509 U.S. at 597, and must be "'properly grounded, well-reasoned and not speculative before it can be admitted,'" *Estate of Gaither v. District of Columbia*, 831 F. Supp. 2d 56, 62 (D.D.C. 2011) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).  For example, using a methodology that "result[s] in an 'apples and oranges comparison' . . . mandate[s] exclusion of [an expert's] testimony" as unreliable.  *Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318, 327 (N.D.N.Y. 2000) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

## II.   MS. HAMMER'S BENCHMARKING OPINION IS IRRELEVANT.

Ms. Hammer's benchmark comparisons are not probative of market or monopoly power in the relevant antitrust market.  The first element of monopolization is "'the possession of monopoly power *in the relevant market.*'"  *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (emphasis added) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  Because her comparisons are untethered to any reliable assessment of whether Google has monopoly power in the alleged relevant market, they should be excluded pursuant to *Daubert*.  509 U.S. at 591.

"At its core, an antitrust market is 'the area of effective competition.'"  *Am. President Lines, LLC v. Matson, Inc.*, 2022 WL 4598538, at *5 (D.D.C. Sept. 30, 2022) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)).  Products and services "compete with each other in the relevant legal sense" when consumers can use them "for the same purpose" and are therefore "willing to substitute one for the other."  *Federal Trade Comm'n. v. Facebook, Inc.*, 560 F. Supp. 3d 1, 13–14 (D.D.C. 2021).  Thus, "the relevant market must include all products 'reasonably interchangeable by consumers for the same purposes.'"  *Microsoft Corp.*, 253 F.3d at 52 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

Ms. Hammer admits that she did not select industry groupings with the economically relevant antitrust market in mind.  Ex. 3 at 64:25–65:3, 221:14–17.  Instead, using a methodology that she admits she has never used in an antitrust case, *id.* at 213:8–14, Ms. Hammer "made a decision" that the RDG Internet Composite Index, Cap IQ Interactive Media and Services, and SIC Code 7370 "were three industry groups that Alphabet was a part of, and therefore [she] would use them for purposes of benchmarking," *id.* at 276:20–23.  But none of the three is limited to a grouping of search engines, *id.* at 308:24–309:2, and Plaintiffs do not contend that the constituent companies all compete with Google's search or search advertising businesses.  To the contrary, Ms. Hammer's groupings contain a large number of companies that offer entirely different products or services, such as Moose Munch, customized business cards, consulting services, and online gaming platforms, and rely upon entirely different business models.  *See supra* pp. 6–8. These widespread dissimilarities pollute Ms. Hammer's benchmark comparisons, leaving them utterly disconnected from the relevant legal issue.  Most of the constituent companies do not, even arguably, compete with Google's search and search advertising businesses.  *See Am. President Lines*, 2022 WL 4598538, at *5.  A consumer or advertiser could hardly use 1-800-FLOWERS' Moose Munch, Booz Allen Hamilton's consulting services, or Roblox's online gaming platform to search for information or advertise products.  *See Facebook, Inc.*, 560 F. Supp. 3d at 13–14.

Even Ms. Hammer's smallest group—the collection of 10 companies remaining in S&P Capital IQ Interactive Media and Services grouping, after Ms. Hammer applied her narrowing filters—contains companies offering disparate products and services.  *See* Ex. 1 at Schedule D.2. For example, it includes Meta Platforms, Inc.—but does not isolate the profitability of Meta's advertising business, versus its other products and investments, including its development of artificial intelligence technologies.  *See* Ex. 3 at 260:5–262:8.  In contrast, Ms. Hammer sought to

isolate Google's search and search advertising businesses from Alphabet's other business segments.  Ex. 1 ¶¶ 69–73.

A company's relative profitability is not probative of its market or monopoly power in an alleged antitrust market unless the comparator companies are connected to that market.  *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1239, 1253–54 (11th Cir. 2002).  In *Bailey*, the Eleventh Circuit criticized an economic expert's effort to use an accounting measure as evidence of market power, *id.* at 1252–53, and further criticized the expert's failure to compare that measure "against an appropriate benchmark," where the expert used the Fortune 500 as its comparator, *id.* at 1253–54.  When it came to assessing the profitability of Allgas, "a distributor and seller of liquid propane gasoline," *id.* at 1239, the "better comparator" would be "the liquid propane gas industry," *id.* at 1253 n.22.  The Eleventh Circuit derided as "meaningless" comparisons between Allgas and "companies [that] are in no way similar to Allgas or its industry."  *Id.*  Like the expert in *Bailey*, Ms. Hammer used broad, preexisting groupings as comparators.  And like the Fortune 500, Ms. Hammer's selected benchmarks (the RDG Internet Composite, S&P Capital IQ Interactive Media and Services, and SIC Code 7370) contain a wide range of companies that are unlike Google's search and search advertising businesses.  Because Ms. Hammer's benchmark comparisons are similarly meaningless, they merit exclusion.

## III.   MS. HAMMER'S BENCHMARKING OPINION IS UNRELIABLE.

In addition to being irrelevant, Ms. Hammer's benchmarking opinion is unreliable because it is methodologically unsound to select a comparator that is inherently unlike the subject of the comparison.  *See Cayuga Indian Nation*, 83 F. Supp. 2d at 327 (explaining that apples-and-oranges comparisons "mandat[e] exclusion").  This concept is recognized by reputable accounting literature upon which Ms. Hammer relies for other portions of her report.  When an expert

misapplies the methodology she purports to use, it renders her testimony inadmissible.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d. Cir. 1994).

In her report, Ms. Hammer did not cite an accounting treatise, textbook, handbook, or other authority describing the benchmarking analysis she used, and could not identify such an authority at her deposition.  Ex. 3 at 409:11–410:7.  The only identified authority for Ms. Hammer's benchmarking methodology—identified by Professor Whinston—is an accounting textbook that Ms. Hammer relies upon elsewhere in her report.  *See* Ex. 4 ¶ 544 & n.660 (citing Charles T. Horngren, Srikant M. Datar, and Madhav V. Rajan, *Cost Accounting: A Managerial Emphasis*, 15th ed. (Pearson: Upper Saddle River, New Jersey, 2015) [hereinafter *Horngren's Cost Accounting*] at 267–68; 891–92).  Ms. Hammer testified that *Horngren's Cost Accounting* is a reputable source for information relating to managerial accounting.  Ex. 3 at 42:25–43:16.

*Horngren's Cost Accounting* explains that benchmarking "is the continuous process of comparing your firm's performance levels against the best levels of performance **in competing companies or in companies having similar processes**."  Ex. 7, *Horngren's Cost Accounting* (excerpts) at 267 (emphasis added).  The textbook presents an example of benchmarking United Airlines against "six competing U.S. airlines."  *Id.* at 267–68.  The text goes on to explain:

> It can be difficult for firms to find appropriate benchmarks such as [the six benchmark companies] in [the illustrative chart].  Many companies purchase benchmark data from consulting firms.  **Another problem is ensuring the benchmark numbers are comparable.  In other words, there needs to be an "apples to apples" comparison.**  Differences can exist across companies in their strategies, inventory costing methods, depreciation methods, and so on.

*Id.* at 267 (emphasis added).

Ms. Hammer concedes that a company's business strategy "always has an impact on profit."  Ex. 3 at 402:5–19, 403:6–10.  When asked, "[D]o you agree that a company's business model, including what type of product they sell, would be likely to have an impact on a comparison

14

of profit margins from one company to another?" she testified, "Yes, I agree with that."  *Id.* at
402:15–19.  Ms. Hammer acknowledges that business and product differences can impact profit
in connection with her first opinion, ███████████████████████████████████████████
████████████████████, Ex. 1 ¶ 73—reasoning that some of Google's other product areas have
"'different economic risk profiles,'" *id.*  at ¶ 70 (stating that Google Play's revenues are
"fundamentally different" from advertising revenues).    When asked whether a comparison
between the profitability ███████████████████████████████████████████████████████████
would be "apples to apples," she testified that "certainly ███████████████████████████████
███ might be different, and ████████████████████████ certainly would be different."  Ex.
3 at 127:13–129:11.  And yet—when it came to her benchmarking opinion—Ms. Hammer did
nothing to ensure that the comparators in her benchmark groups were "apples to apples" with
Google's search and search advertising businesses.  Instead, she ignored fundamental business and
product differences.

      During her deposition, Ms. Hammer sought to distance herself from the methodology
described in *Horngren's Cost Accounting*, *see id.* at 395:20–399:13—notwithstanding the fact that
Professor Whinston relied upon this section of *Horngren's Cost Accounting* to justify his reliance
on Ms. Hammer's benchmarking opinion.  *See* Ex. 4 ¶ 544 & n.660.  She testified that "[i]t's a
very, very different situation than what Professor Horngren is discussing here, which is a
managerial process within a company where you are taking key performance indicators and
tracking them against competitors that are – 'directly analogous,' I think, is the right term."  Ex. 3
at 398:3–8.  Ms. Hammer testified that she was unable to conduct a direct comparison between the
profitability of Google's search and search advertising businesses and another company in the

15

relevant market because "I think that there are no comparative firms. . . . there is no comparison ███████████████ that I could identify. . . . they don't exist." *Id.* at 397:23–399:13.

Having failed to identify any appropriate comparators, Ms. Hammer misapplies the accounting guidance upon which she relies and makes fundamentally unsound apples-and-oranges comparisons. *See In re Paoli*, 35 F.3d 7 at 745; *Cayuga Indian Nation*, 83 F. Supp. 2d at 327. Her benchmarking opinion merits exclusion on this basis.

## IV.   THE ADDITIONAL BENCHMARKING ANALYSIS IN MS. HAMMER'S REPLY REPORT IS SIMILARLY FLAWED.

Ms. Hammer's additional benchmarking analysis, contained in her September 26, 2022 Reply Report—in which she turned her focus to a subset of her original benchmarking comparators—suffers from the same methodological flaws as her original benchmarking opinion. *See* Ex. 2 ¶¶ 47–48.[24]   Many of the companies in the subset—although identified in Alphabet, Inc.'s 10-K as competitors with some aspect of Alphabet's business—are not search engines or engaged in search advertising.   And Ms. Hammer did not isolate the financial results of business segments potentially comparable with Google's search and search advertising business from dissimilar business segments within these firms' company-wide consolidated financial results. Ex. 3 at 322:14–323:8.

This subset of her original comparators includes companies such as Netflix, Salesforce, and Zoom, which do not offer general search, search advertising, or search text advertising services.   Ms. Hammer admits that Alphabet identified Netflix as a company "providing digital video services," which "relate[s] most likely to YouTube"—a product area that Ms. Hammer

---

[24] Ms. Hammer benchmarking analysis of return on invested capital ("ROIC") in her Reply Report—in which she again relies upon data from the three "industry benchmark groups" in the same manner as in her Expert Report—suffers from the same flaws set forth above. *See* Ex. 2 ¶¶ 83, 97–103.

excluded when she sought to isolate the profitability of Google's search and search advertising business.  Ex. 3 at 298:12–299:1; Ex. 1 ¶ 43, 48–49, 64.  Similarly, when asked about "[p]roviders of workspace connectivity and productivity products," such as Zoom, Ms. Hammer testified that such companies would relate to Google's "browsers and the operating systems and Assistant"— not Google's search or search advertising business.  Ex. 3 at 299:3–22.  And when asked about "providers of enterprise cloud services" such as Salesforce, Ms. Hammer admits that such companies relate to Google Cloud, *id.* at 297:22–298:11, another business area she excluded from her profitability analysis, *see* Ex. 1 ¶ 43, 48–49, 64.  These companies bear no relation to Plaintiffs' alleged antitrust markets.  *See* Am. Compl. ¶¶ 1, 23; Ex. 4 ¶ 11.

Ms. Hammer's subset also includes companies such as Yandex and Baidu, which offer search engines but "operate primarily in non-U.S. jurisdictions."  Ex. 3 at 324:16–19; *see also* Ex. 4 ¶ 52 (noting that "Yandex in Russia" and "Baidu in China" are "seldom used within the US").  Whereas Ms. Hammer reviewed available Google financial data in order to assess whether Google's worldwide margins are an appropriate proxy for U.S. margins, *see* Ex. 1 ¶ 79, Ms. Hammer did not assess whether Yandex or Baidu's "worldwide profitability data was a reasonable proxy for their United States-specific data," Ex. 3 at 243:14–23.  She has no opinion on whether those companies' worldwide profitability data is a reasonable proxy for U.S.-specific data.  *Id.*

And for *all* of the companies in this subset, Hammer ignored the fact that many of these companies—like Microsoft, Meta, and Amazon—have diverse business segments and product areas, which are reported together in those companies' consolidated financial reports.  Ex. 3 at 322:14–323:8.  For example, Ms. Hammer admits that Microsoft's diverse products include the Bing search engine, Windows Operating System, and "a variety of workspace software products like Word and Excel and Outlook."  *Id.* at 311:9–22.  Ms. Hammer similarly admits that Amazon

17

"has many activities, and some may relate to [cloud computing services], but they also have retailing and—they have multiple activities." *Id.* at 321:24–322:12.  Despite excluding Alphabet Inc.'s other business segments in her effort to isolate ██████████████████████████ ████, when it came to her comparators, Ms. Hammer used "consolidated companywide results [that] included a diversity of product areas," without "making an effort to limit [her] analysis to product areas that are closest in business model ███████████ *Id.* at 315:5–17.  She did not do so because, as she testified, "[t]he information to do that is not available in the discovery record in this case, nor is it available publicly that I could ascertain," *id.* at 315:12–17—a reason that does not excuse her fundamentally flawed comparisons.

## CONCLUSION

For the foregoing reasons, Google's Motion to Partially Exclude the Opinion of Plaintiffs' Expert Christine M. Hammer should be granted, and her benchmarking opinion should be excluded.

Dated: December 12, 2022            Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

19