**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

███████████████████████████████

**TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND ...................................................................................4

    A.    Plaintiffs' Claims ...................................................................................4

        1.    Plaintiffs' Claims Regarding Browser Default Agreements.......................5

        2.    Plaintiffs' Claims Regarding Android Agreements....................................5

        3.    Plaintiffs' Other Miscellaneous Assertions ................................................7

    B.    Google's Browser Default Agreements ...........................................................7

        1.    An Overview of the Apple Agreements Challenged by Plaintiffs...............8

            a.    Apple's Design for the Safari Browser............................................8

            b.    The 2005 Agreement Between Google and Apple ..........................8

            c.    Apple's Evaluation of Other Search Engines and Decisions to Set Google as the Default in Safari............................................10

            d.    Apple's Promotion of Google's Rivals in Safari and Elsewhere ......................................................................................12

        2.    An Overview of the Mozilla Agreements Challenged by Plaintiffs..........14

            a.    Mozilla's Design for the Firefox Browser and 2004 Agreement with Google................................................................14

            b.    Mozilla's Decision to Set Yahoo as the Default in Firefox ..........15

            c.    Mozilla's 2017 Agreement with Google and Ongoing Evaluation of Search Partnerships ................................................16

            d.    Mozilla's Promotion of Google's Rivals ......................................17

        3.    Google's Other Browser Default Agreements...........................................18

    C.    Google's Android Agreements .......................................................................19

        1.    Android Compatibility Commitment (ACC) / Anti-Fragmentation Agreement (AFA) ...................................................................................19

        2.    Mobile Application Distribution Agreement (MADA) .............................20

        3.    Revenue Sharing Agreements (RSAs)......................................................22

II.    LEGAL STANDARD...............................................................................................23

    A.    Monopolization under Section 2 of the Sherman Act....................................23

    B.    Summary Judgment under Federal Rule of Civil Procedure 56 ...........................25

III.    ARGUMENT ...........................................................................................................25

    A.    The Browser Agreements Do Not Constitute Anticompetitive Conduct.............26

        1.    Google's Agreements with Browser Developers Are Not "Exclusive" or "*De Facto* Exclusive".....................................................28

2.    Plaintiffs Offer No Evidence That Apple's and Mozilla's Design Decisions Can or Should Be Altered by This Court ..................................31

3.    Google's Agreements with Apple, Mozilla, and Other Browser Companies Are the Result of Lawful Customer-Instigated "Competition for the Contract" ..................................................................35

B.    Google's Agreements with Android Device Manufacturers and Wireless Carriers Do Not Violate Section 2 of the Sherman Act ........................................39

1.    The Agreements Relating to Android Devices Do Not "Foreclose a Substantial Share" of Any Alleged Market ..............................................41

C.    There Is No Evidence of an Anticompetitive Effect from Android Compatibility Commitments or Anti-Fragmentation Agreements ......................43

D.    The Other Conduct Alleged by Plaintiffs Does Not Violate Section 2 of the Sherman Act ..............................................................................................47

1.    There Is No Evidence of an Anticompetitive Effect from Agreements Relating to Google Assistant or Internet-of-Things Devices ...........................................................................................................47

2.    Google's Evolution of a Limited Number of Early Open-Source Applications Is Not Exclusionary ..............................................................48

IV.    CONCLUSION ..............................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991 (9th Cir. 2010)...... 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 25

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)............................................................................. 36

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983)............................. 30, 38

*Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814 (M.D.N.C. 2000) .................................. 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 25

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)................................................................... 28

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) ........................................................................ 45

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ........ 26, 37, 38

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .................... 25

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ................. 27, 35

*Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999)........ 42

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc) ................................................ 34

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) ................... 25, 36

*Retractable Techs., Inc.  v. Becton Dickinson & Co.*, 842 F.3d 888 (5th Cir. 2016) .................. 24

*Simon & Simon, P.C. v. Align Tech., Inc.*, 533 F. Supp. 3d 904 (N.D. Cal. 2021)....................... 28

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........................................................... 24

*Stearns Airport Equip. Co. v.  FMC Corp.*, 170 F.3d 518 (5th Cir. 1999)............................. 34, 37

*Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011)........................ 3, 40, 41

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)............................................................ 23, 30

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ...... *passim*

*United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122 (D.C. Cir. 1981)................. 49

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).............. 50

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)............................................. 28, 30

### OTHER AUTHORITIES

15 U.S.C. § 2.................................................................................................................................. 23

Fed. R. Civ. P. 56........................................................................................................................... 25

The DOJ Plaintiffs' case centers on two categories of contracts that they seek to condemn under Section 2 of the Sherman Act.  The first concerns decisions by web browser developers— particularly Apple and Mozilla—to set Google as the default search engine in their browsers. Although these contracts have been amended or renewed on numerous occasions, the framework has remained largely unchanged since the 2000s—when the vast majority of Internet users searched the web on Microsoft Windows computers pre-loaded with Microsoft's search engine, and Apple had yet to introduce the iPhone.  The second consists of agreements, also first introduced many years ago, between Google and companies that manufacture and/or sell Android mobile devices that provide consumers with innovative and competitive alternatives to Apple devices.

Plaintiffs must clear several legal hurdles to establish that these agreements violate Section 2, including proving that Google possesses monopoly power in a properly defined market.  *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam).  The Court need not decide that issue to enter summary judgment, however, because the challenged contracts do not comprise "exclusionary conduct" and did not cause "the requisite anticompetitive effect." *Id.* at 58-59.  Rather, the agreements that Plaintiffs attack are important components of the extraordinary competition that has unleashed innovation and provided users more choices than ever to search the Internet.  And unlike in *Microsoft*, where the Court invalidated conduct that forced Microsoft's inferior Internet Explorer browser upon third parties, Google Search is today— and has been throughout the relevant time period—the highest quality search engine in the U.S., preferred by every third party subject to the challenged agreements.

The Browser Agreements.  For nearly two decades, companies that develop web browsers have designed and implemented an integrated search box that routes user queries to a default search engine.  A number of these companies, including Apple and Mozilla, have selected Google as the

default search engine in their browsers as reflected in revenue sharing agreements with Google. Plaintiffs contend that these browser agreements are "exclusionary" because they purportedly confer "*de facto* exclusivity" on Google, but that assertion cannot be reconciled with antitrust law or the factual record.

Apple and Mozilla can—and do—promote other search engines.

*See* Section III.A.1. That fact suffices to defeat Plaintiffs' "*de facto* exclusive" contention. But other undisputed facts reinforce the absence of a Section 2 violation. Apple and Mozilla (and virtually every other browser developer) have *chosen* to design their browsers with a single default search engine upon first use which can be changed by the user. A browser provider's selection of a single default search engine cannot "exclude" its rivals in any legally cognizable sense. *See* Section III.A.2. Finally, even if these browser agreements could be characterized as "*de facto* exclusive," summary judgment would still be warranted where undisputed facts show that they result from the kind of "competition on the merits" that antitrust law promotes. *Microsoft*, 253 F.3d at 62, 65. Whenever Apple and Mozilla have entered a new or amended agreement to set Google as the default, they have done so based on their independent conclusions that doing so provides the best experience for their customers after evaluating other rival search engines. *See* Section III.A.3. In short, Google's browser default agreements are the product of "legitimate competition," not "illicit exclusion." *Microsoft*, 253 F.3d at 58.

Notwithstanding Google's success competing on the terms and conditions established by browser developers like Apple and Mozilla, Plaintiffs apparently believe that the Court should require Google to abstain from competing for the single pre-set default that Apple, Mozilla, and others have designed—even though those companies and their customers prefer Google—in the

2

speculative hope that doing so will boost future competition from rivals with inferior products. Requiring Google *not* to compete vigorously—or requiring browser developers to alter their product designs and provide a worse experience for their customers—would turn competition law on its head.

The Android Agreements.  Plaintiffs' challenges to Google's Android agreements also present no triable issue under Section 2.  Plaintiffs contend that Google has entered agreements with certain device manufacturers and mobile phone carriers to make Google the "exclusive" preinstalled search engine on many Android smartphones and other devices.  This characterization fails to consider all the ways in which rivals can compete for promotion on Android devices, as well as the ways in which consumers can access other search engines on those same devices.  But the Court need not address that issue because the undisputed facts demonstrate that the Android agreements do not have "the requisite anticompetitive effect."  *Microsoft*, 253 F.3d at 58–59.

In evaluating purported "exclusive dealing arrangements" under Section 2, courts have concluded that "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy."  *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011) (quotation marks omitted).  In this case, an analysis performed by Plaintiffs' own expert places the degree of alleged foreclosure from the Android agreements at approximately *1 percent*—an insubstantial figure by any measure.  *See* Section III.B.

In addition to challenging the Android agreements under an "exclusive dealing" framework, Plaintiffs contend that Google's agreements to maintain baseline compatibility on Android mobile devices (which were implemented to attract developers to Android and enable Android to compete against other mobile devices, including Apple's iPhone) block "pathways"

for other search engines or give Google discretion to block search rivals.  No evidence supports these speculative contentions.  *See* Section III.C.  Plaintiffs have seemingly abandoned or failed to support other theories concerning promotion of Google's virtual assistant and decisions about which Android features to develop on an open-source basis, and no DOJ expert witness offers any opinion that they impacted search engine competition at all.  *See* Section III.D.

## I.   FACTUAL BACKGROUND

### A.   Plaintiffs' Claims

Plaintiffs assert that "Google has unlawfully maintained its monopolies by implementing and enforcing a series of exclusionary agreements with distributors over at least the last decade." DOJ Pls.' Am. Compl. ¶ 112.[1]   The challenged agreements fall into one of two categories.  The first consists of agreements with web browsers, particularly Apple's Safari and Mozilla's Firefox, in which those third parties have selected Google to be the default search engine and Google agrees to pay them a share of the search advertising revenue generated from searches on their browsers. The second consists of agreements with manufacturers of Android mobile devices (*e.g.*, Samsung) and agreements with phone carriers that sell those devices (*e.g.*, Verizon) regarding, among other things, the pre-loading or exclusive promotion of Google Search on those devices.  DOJ Plaintiffs do not allege that Google engaged in any unlawful conduct in connection with any search advertising market; they instead claim that the anticompetitive conduct that maintains a monopoly in the general search services market also adversely impacts search advertising.

---

[1] The plaintiffs in *State of Colorado, et al. v. Google LLC*, No. 1:20-cv-03715-APM (the "Colorado Plaintiffs") incorporate by reference most of the complaint and many of the discovery responses of the plaintiffs in *United States, et al. v. Google LLC*, No. 1:20-cv-03715-APM (the "DOJ Plaintiffs").  *See* Colo. Pls.' Compl. ¶ 58.  The term "Plaintiffs" in this brief refers to both the DOJ Plaintiffs and the Colorado Plaintiffs, and all of the arguments apply to both cases.

### 1. Plaintiffs' Claims Regarding Browser Default Agreements

Plaintiffs contend that Google has harmed competition by entering revenue share agreements with web browser developers that provide that Google will be the pre-set default general search engine on their browsers. According to Plaintiffs, even if "users can change the default" search engine in a browser, "they rarely do," which "leaves the preset default general search engine with *de facto* exclusivity." DOJ Pls.' Am. Compl. ¶ 3. The browser agreements allegedly "harm competition," according to Plaintiffs, "by foreclosing rivals from these efficient means of distribution." Ex. 81 (DOJ Pls.' 6th Supp. Resps. to Google's 1st Interrogs.) at 15; Ex. 82 (Colo. Pls.' 4th Supp. Resps. to Google's 1st Interrogs.) at 5. The browser agreements are addressed in further detail in Sections I.B and III.A.

### 2. Plaintiffs' Claims Regarding Android Agreements

Plaintiffs also contend that Google has harmed competition through three sets of agreements with companies that manufacture and/or sell Android devices. Android is a mobile operating system, licensed open source, in which Google has invested billions of dollars since its release in the fall of 2008. SMF ¶¶ 194-96, 389.[2] Android is the second most widely used mobile phone operating system in the U.S., behind Apple's iOS. SMF ¶ 198.

The first Android agreement challenged by Plaintiffs is the Android Compatibility Commitment (ACC), which succeeded the Anti-Fragmentation Agreement (AFA). Google has entered ACCs or AFAs with original equipment manufacturers (OEMs), such as Samsung ▮ ▮ since the Android operating system was first launched in order to establish baseline quality, compatibility, and security standards for Android devices. SMF ¶¶ 261-64. A device

---

[2] All citations to "SMF" refer to Google's concurrently filed Statement of Material Facts as to Which There Is No Genuine Issue in Support of Its Motion for Summary Judgment.

████████████████████████████████

maker that seeks to license Google's proprietary apps commits that all Android devices it markets will meet these standards, absent an exemption.  SMF ¶¶ 265, 276.  Plaintiffs contend these agreements "harm competition by inhibiting the growth of alternative Android-based operating systems, which could serve as pathways for distribution of rival [search] providers" or by giving Google discretion to block devices pre-loaded with search rivals.  Ex. 81 at 14; Ex. 82 at 5.

The second Android agreement at issue is the Mobile Application Distribution Agreement (MADA).  This non-exclusive agreement, entered into by numerous OEMs over the course of many years, provides a zero-royalty license to a suite of popular Google applications, services, and application programming interfaces (APIs)—including the Google Play Store, Google Maps, the Chrome browser, and the Google Search App—for OEMs to pre-load on their devices.  SMF ¶ 212-14.  Plaintiffs allege, among other things, that the MADA "harms competition by reducing the likelihood that users install alternative search services."  Ex. 81 at 14; Ex. 82 at 5.

Third, Plaintiffs challenge a set of agreements known generally as Revenue Share Agreements (RSAs) that also have been offered by Google for many years.  These agreements allow certain OEMs, such as Samsung, as well as certain wireless carriers, including ████████ T-Mobile, an opportunity to earn revenue if they choose to exclusively promote Google Search on Android devices and provide other valuable commitments, such as agreeing to regular security and operating system updates that enhance device security and functionality.  SMF ¶ 222.[3]  According to Plaintiffs, RSAs include provisions that "harm competition by foreclosing rivals from these efficient means of distribution" and "by restricting the ability of rivals to compete for these

---

[3] Although these agreements are generally referred to as RSAs by Google and its partners, the titles of the agreements have varied somewhat over time and among the different Android OEMs and carriers.  For example, in some cases, the agreements are referred to as Mobile Incentive Agreements or MIAs.

efficient means of distribution." Ex. 81 at 14-15; Ex. 82 at 5. The Android agreements are addressed in further detail in Sections I.C, III.B, and III.C.

### 3. Plaintiffs' Other Miscellaneous Assertions

Plaintiffs have also indicated that they intend to premise liability on two other forms of conduct. First, Plaintiffs appear to challenge contracts promoting Google Search on Internet-of-Things (IoT) devices, such as smart speakers and TVs. They originally made allegations that these agreements purportedly "harm competition by foreclosing [search engine] rivals from these efficient means of distribution." Ex. 81 at 15; Ex. 82 at 5. Second, Plaintiffs—in a contention made nowhere in their Complaints—purport to challenge a "practice of making important features and functionality" available only as part of proprietary Google applications that run on Android compatible devices, and "of removing important features and functionality from [the] open-source Android" operating system. Ex. 81 at 16-17; Ex. 82 at 6. In other words, Plaintiffs appear to argue that Google has a duty to develop certain proprietary Google applications only on an open-source basis. These contentions are addressed in further detail in Section III.D.

### B. Google's Browser Default Agreements

Although Google's agreements with browser developers are individually negotiated and differ in some respects, they have three important commonalities. First, the agreements have never prevented companies such as Apple and Mozilla from promoting other search engines in their browsers, and those companies have in fact agreed to promote Bing, DuckDuckGo, and other search services ███████████████████████████████████████████

████████ *E.g.*, SMF ¶¶ 61-96, 157-75. Second, Apple and Mozilla, not Google, designed their browsers to each include an integrated search box with a default search engine upon first use, and they continue to believe that design enables the best user experience. *E.g.*, SMF ¶¶ 3-7, 100-04. Third, Apple and Mozilla decided to set Google as the default search engine in their browsers

██████████████████████████████

because they believe it provides the highest quality experience for their customers.  *E.*g., SMF ¶¶ 8-12, 107-08, 154-56.

### 1.  An Overview of the Apple Agreements Challenged by Plaintiffs

#### a.  Apple's Design for the Safari Browser

Apple unveiled the first version of its Safari web browser approximately 20 years ago, in January 2003, for its Mac computers.  SMF ¶ 1.  Apple's design for Safari included a dedicated "search box" built in to the browser's interface.  SMF ¶ 3.  A query entered in the box would be routed directly to a search engine, without the need for the user to navigate to a search engine's website or download a toolbar extension to the browser.  *Id.*  Apple believed the feature would make Safari more appealing to Apple's customers.  SMF ¶ 4.

As it developed Safari, Apple decided on a design that would route queries entered in the search box to a single provider.  SMF ¶¶ 5-6.  It determined that Google Search provided the highest-quality results, and obtained a license from Google to allow Safari users "to send web queries from a search box in [Safari] to www.google.com, and to receive results pages from Google."  SMF ¶¶ 9, 13.  When Apple debuted the browser in January 2003, it boasted in its press release that "Safari's innovative features include Google search capabilities integrated directly into the toolbar."  Ex. 1 at 1.  An Apple executive explained that the idea "was to make it very easy for customers," so Apple "picked the best search engine," and "when a customer uses it, it just works."  Ex. 2 (Cue (Apple) Tr.) at 124:16-22; *see* SMF ¶¶ 3-7.

#### b.  The 2005 Agreement Between Google and Apple

In 2005, ███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████  SMF ¶¶ 14-15.  The agreement

defined the term ███████████████████████████████████████████████

██████████████████████████████████

████████████████████████████  SMF ¶ 16.  Although the terminology has changed somewhat as the parties renegotiated the agreement over the years, Google's contracts with Apple have expressly recognized that a Safari user may select a different search engine for use in Safari's integrated search box.  *E.g.*, SMF ¶¶ 16, 45.  Neither the 2005 contract nor any subsequent agreement has specified the steps that a user must take in order to set a different default search engine.  SMF ¶¶ 76-77.  The agreements leave it to Apple to design the menus and interfaces that enable each user to change the default search engine that receives queries entered in the integrated search box.[4]  *Id.*  They also permit Apple to promote search rivals.  *See* Section I.B.1.d.

Under the 2005 agreement, ████████████████████████████████



████████████████████████████  SMF ¶ 14.  In other words,

---

[4] While it has long been possible to easily change the default in Safari, that is not the case with every web browser.  For example, Microsoft distributes a version of its Edge browser in which the only integrated search engine is Microsoft's Bing.  SMF ¶ 88.  Similarly, DuckDuckGo is the only search engine integrated with DuckDuckGo's Privacy Browser.  SMF ¶¶ 87, 89.  By contrast, Google's Chrome browser and Apple's Safari browser make switching default search engines easy by providing pre-populated drop-down menus with multiple alternative search providers to choose from.  *E.g.*, SMF ¶¶ 61-63, 233-34.

████████████████████████████

When Google and Apple entered their first revenue share agreement in 2005, the Safari browser accounted for an estimated 1.3% of worldwide browser usage, and so only a miniscule fraction of search queries were entered through Safari.  SMF ¶ 18.  Microsoft's Internet Explorer—preinstalled on Microsoft Windows computers—was far and away the most widely used browser at the time, with an estimated worldwide share on desktop computers in excess of 80%.  SMF ¶ 19. It would be another two years until Apple introduced the first iPhone (in 2007), and longer still until it sold the first iPad (in 2010).  SMF ¶¶ 20, 31.

While Apple has decided to make Safari the only preinstalled web browser on its devices—including Mac computers, iPhones, and iPads—that is not required by any agreement between Apple and Google.  SMF ¶¶ 2, 91.  Since 2012, Google has marketed its Chrome browser to Apple mobile device users through the Apple App Store, alongside other browsers such as Microsoft's Edge (in which Bing is the default search engine) and DuckDuckGo's Privacy Browser (in which DuckDuckGo is the default); Mac computer users also may download other browsers, including Chrome, directly.  SMF ¶¶ 86-87, 90.

> ### c.   Apple's Evaluation of Other Search Engines and Decisions to Set Google as the Default in Safari

Apple determines which search engine to set as the default in Safari based on its assessment of which option will provide the best results and therefore contribute to the best user experience on new Apple devices.  SMF ¶ 8.  Google and Apple have amended or extended their agreement ████████████████████, and at each juncture Apple has concluded that Google Search offers the best default search experience for Apple's customers in the United States.  SMF ¶¶ 9-11.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

Apple regularly evaluates alternatives to Google Search.  SMF ¶ 10.  ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████  Following negotiations with Google ██████, Apple signed

a new agreement that maintained Google as the default search engine in Safari.  SMF ¶ 44.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

### d.    Apple's Promotion of Google's Rivals in Safari and Elsewhere

Apple has agreed to set Google as the default search service that responds to queries entered in Safari unless the user selects a different search engine, but Google and Apple have never entered an agreement that restricts Apple from promoting other search engines in Safari, elsewhere on Apple devices, and through its App Store.  *E.g.*, SMF ¶¶ 61-62, 79-81, 92-93.

<u>Promoting other search engines in the Safari browser</u>.  Apple has always been allowed to promote other search engines in Safari ████████████████████████████████████████ ████████████████████████  SMF ¶¶ 64-75.  At present, Apple integrates four other search engines into Safari in the U.S.: Yahoo, Bing, DuckDuckGo, and Ecosia.  SMF ¶ 63.  ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

████████████████████████████████████

████████████████████████████   In addition, Apple pre-

sets other search engines, including Bing and Yahoo, as default "Favorites" or bookmarks in

Safari.  SMF ¶¶ 79-80.  When a new Apple user opens Safari for the first time, the browser interface

includes clickable icons for these rival search services, as shown in the image on the right from an

iPhone.  SMF ¶ 40.




Promoting other search engines elsewhere on Apple devices.   Apple has always been

allowed to promote rival search engines elsewhere on its devices or digital properties, and it has

done so for more than a decade.  *E.g.*, SMF ¶¶ 81-82, 85-87.  For example, other search engines

can and do distribute their search apps, search widgets, and browsers through the Apple App Store

(and through other channels for download onto Mac computers), and they can and do pay Apple

to advertise in the App Store.  *Id.*  No contract prevents Apple from working with rival search

engines to make their apps more visible or easily accessible to Apple's customers.  *E.g.*, SMF

¶¶ 83-84, 91-92.  Google's agreements with Apple have never specified which apps may be

preinstalled on Apple devices, how users can locate new search apps or browsers that might be of interest to them, or which options are available to users for accessing and interacting with search apps or browsers that are either preinstalled or downloaded by the user. *Id.*

> ### 2.   An Overview of the Mozilla Agreements Challenged by Plaintiffs
>
> #### a.   Mozilla's Design for the Firefox Browser and 2004 Agreement with Google

Mozilla, "a non-profit organization dedicated to preserving choice and promoting innovation on the Internet," released the first version of its Firefox web browser in 2004.  Ex. 30 at 1; *see* SMF ¶¶ 97-98.  Mozilla designed Firefox to include a built-in search box that automatically routed user queries to a Mozilla-selected default search engine and to also integrate other search services into the browser for users who wish to change the default.  SMF ¶¶ 99-102. Mozilla's CEO explained that "[t]he quality of the search experience, whether it works for your users, whether people like it is … one of the handful of things that are the most critical about a browser," and "[y]ou want the browser to work when it starts, and so … [t]he default in the search box, the awesome bar in Firefox, is what happens if the user makes no choice."  Ex. 31 (Baker (Mozilla) Tr.) at 34:1-13, 47:3-11.  At the same time, "it's always been a key princip[le] of [Mozilla's] search philosophy that users always have choice," and so they "try to make it easy for people to pick a different search engine if they want it."  *Id.* at 12-23.

Mozilla considered setting Yahoo as the default search engine in Firefox in 2004 but concluded that Google offered the best choice for its users.  SMF ¶¶ 107-08.  The parties signed a contract in which ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████  SMF ¶¶ 109-10.  Mozilla boasted in its press

███████████████████████████

release that Firefox provided "Faster, Easier, More Accessible Search" because it "tightly integrates support for leading search services into the toolbar, including Google search, Yahoo!, eBay, Amazon, Dictionary.com, Creative Commons, and more." Ex. 30 at 1.

When Firefox debuted in 2004, Microsoft's Internet Explorer likely accounted for more than 90% of worldwide web browser usage on computers. SMF ¶ 112. Firefox became an increasingly popular alternative, however, and by 2009 it attracted an estimated 20% of browser users in the U.S., many of whom chose to download it for use on Microsoft Windows computers. SMF ¶ 119. Mozilla concluded that Google should remain Firefox's default search engine throughout that period, and ████████████████████████████ amendments or extensions to their original revenue-sharing agreement. SMF ¶¶ 113-18, 121-24.

### b.   Mozilla's Decision to Set Yahoo as the Default in Firefox

In 2014, Mozilla decided that Yahoo should replace Google as the default search engine in Firefox in the U.S. and certain other countries. SMF ¶ 126. ██████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████

    ██████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████

████████████████████████████████████████████

██████████████████████████████████

    **c.**    **Mozilla's 2017 Agreement with Google and Ongoing Evaluation of Search Partnerships**

Mozilla decided in 2017 to set Google as the default search engine in Firefox in the U.S. in place of Yahoo.  SMF ¶ 142.  The 2017 agreement was similar to the earlier contracts between Mozilla and Google, including that it provided for the "pre-setting of Google Search Services as the default search service" in the Firefox browser, but it did "not limit or preclude End User customization or modification."  SMF ¶ 145.  In 2020, Mozilla decided to extend the agreement with Google ██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

### d.      Mozilla's Promotion of Google's Rivals

All of Google's agreements with Mozilla have contemplated that users may change the default search engine, and Mozilla has promoted multiple search engines in Firefox since releasing the first version in 2004.  SMF ¶¶ 157-59.  These agreements leave to Mozilla to specify the steps that a user takes to change the default search engine in Firefox and how to integrate other search services.  SMF ¶¶ 164-65.  Exercising this freedom, Mozilla has introduced new ways of enabling users to switch search engines, including adding multiple user interfaces with search engine options, and allowing users to change the default search engine using keyboard shortcuts in addition to accessing other search engines through the settings menu.  *E.g.*, SMF ¶¶ 167-70.

Mozilla, like Apple, has entered contracts with rival search engines ███████████████



Mozilla has continued to introduce new features that promote rival search engines.  SMF ¶¶ 167-70.  For example, when a Firefox user begins to type a query in the built-in search box, the browser will display a "this time, search with" prompt inviting the user to send the query to a different search service, such as DuckDuckGo or Bing, as shown in the image below from a desktop computer.  SMF ¶¶ 167-68.  Through this Firefox Suggest feature, Mozilla facilitates one-click access to rival search engines at the moment a user is entering a query that would otherwise be submitted to Google.  *Id.*



Mozilla has also added sponsored "shortcuts" or "tiles" to Firefox tabs, examples of which appear in the image below.  SMF ¶¶ 170-71.



Mozilla uses these displays to present Firefox users with multiple search options, whether Google (as the default service upon first use), Bing (as an alternative search service triggered by Firefox Suggest), Amazon (as a sponsored shortcut and an alternative search service), or more.  *Id.*

### 3.    Google's Other Browser Default Agreements

Plaintiffs have also made passing reference to agreements with browser developers Opera and UCWeb.  Ex. 83 (DOJ Pls.' 5th Supp. Resps. to Google's 1st Interrogs.) at 13, 67-68, 79; Ex. 82 at 5.  Their browsers are widely used in some overseas markets, but the available data indicates that neither Opera nor UCWeb has garnered more than about 1% of browser usage in the U.S. since 2009.  SMF ¶¶ 181, 187.  Google's agreements with Opera and UCWeb provide revenue-share payments in exchange for being the default search engine upon first use, without preventing

the promotion of rival search services or users' ability easily to change the default.  SMF ¶¶ 176-78, 182-84.  There is no evidence that either company would have refused to set a rival search engine as the default in place of Google if they had determined it would provide superior user experience and were able to reach agreement with the rival.  SMF ¶¶ 179, 185.[5]

## C.    Google's Android Agreements

Plaintiffs also challenge three types of agreements relating to Android, an open-source mobile operating system that Google released in 2008: (1) the ACC, earlier versions of which were known as the AFA; (2) the MADA; and (3) RSAs.  These agreements underpin an innovative Android business model that had no assurance of success, but has greatly benefited consumers.  SMF ¶¶ 197-202.  Android vigorously competes with Apple's iOS through differentiated devices offered by dozens of OEMs, offering consumers a range of lower-priced, innovative, and more customizable alternatives to the iPhone.  SMF ¶¶ 199-201.  Android devices accounted for an estimated ▮▮▮▮ of search queries in the U.S. in 2021.  SMF ¶ 203.

### 1.    Android Compatibility Commitment (ACC) / Anti-Fragmentation Agreement (AFA)

Google released the open-source Android mobile device operating system in October 2008 against the backdrop of a market full of customizable mobile operating system platforms that suffered from incompatibilities, including the market-leading Symbian and other platforms such as JavaMe and Mobile Linux.  SMF ¶¶ 194, 256-57.  To reach users of different implementations

---

[5] Plaintiffs have also intimated that they may challenge Google's distribution agreements with Adobe and Avast.  Ex. 83 at 7, 46-47, 51-52; Ex. 82 at 5.  These companies offer software that users may download to enhance their online experience, such as multimedia players and anti-virus products.  SMF ¶¶ 188-93.  Google and other search engines entered agreements with companies such as Adobe and Avast to promote their search services to consumers who downloaded their software products, and Google' agreements with them have never required a device manufacturer or browser developer to set Google as a default search engine upon first use.  *Id.*

of the same operating system, developers were forced to write different versions of their apps, significantly increasing development costs. SMF ¶¶ 258-59. As Google's Larry Page wrote to investors: "developing apps for mobile devices was incredibly painful. We had a closet full of over 100 phones, and we were building our software pretty much one device at a time." SMF ¶ 260.

To overcome these challenges and attract developers to Android, Google sought commitments from device manufacturers that license Google's proprietary Android applications that their Android devices would meet baseline compatibility, security, and quality requirements. SMF ¶¶ 207, 209, 261-65, 272. Google first sought compatibility commitments before Android launched. SMF ¶ 263. Commitments to these baseline requirements—embodied first in the AFA and today the ACC—seek to ensure that Android applications operate as designed on any compatible Android device. SMF ¶¶ 267, 269, 271-72. Although OEMs that seek to license Google's proprietary services agree to ACCs or equivalent terms, ACCs and AFAs are not a condition of licensing the open-source Android operating system, which Google continues to invest in developing and updating through the Android Open Source Project (AOSP). SMF ¶¶ 208, 264-65, 298, 389, 393.

Neither the ACC nor the AFA requires an OEM to pre-load Google Search; nor do they restrict an OEM's ability to preinstall a rival search application or a web browser with a search engine other than Google set as the default. SMF ¶¶ 210-11, 277-80.

### 2. Mobile Application Distribution Agreement (MADA)

Since launching Android in 2008, Google has offered OEMs that sell Android devices in the U.S. a royalty-free license to a suite of Google apps and APIs through an agreement known as the MADA. SMF ¶¶ 212-14. The current version of the MADA provides a license to a suite of Google applications that includes the Play Store, Google Maps, YouTube, the Chrome browser, and the Google Search app. SMF ¶ 213. By providing a suite of applications and APIs on a zero-

royalty basis to OEMs, Google has been able to offer low-cost, feature-rich Android devices that include all the apps and functionality users expect from a smartphone.  *See* SMF ¶¶ 200, 213, 218.

In return for a royalty-free license to these Google apps and APIs, Google asks OEMs to agree to minimal placement requirements that promote these services to consumers upon first use. *Id.* ¶ 217.  Specifically, Google requires OEMs that choose to pre-load these apps to place the Play Store, the Google Search widget, and a folder containing icons for the remaining Google apps on the device's default home screen.  *Id.*  As shown in the image below, these placement requirements affect only a small fraction of the default home screen, and each OEM may pre-load any other apps of its choosing on that screen and elsewhere on the device.  SMF ¶ 218.



The MADA is a non-exclusive agreement that permits OEMs to pre-load other general search engine apps and other browsers with a different search engine set as the default.  SMF ¶ 219.  The MADA does not specify the default search service or default browser for any device. SMF ¶¶ 220-21.[6]

---

[6] OEMs may decide on a device-by-device basis whether to pre-load the MADA suite of apps or, instead, pre-load no Google apps.  SMF ¶ 216.

### 3.      Revenue Sharing Agreements (RSAs)

In addition to providing a royalty-free license to popular Google apps and proprietary APIs through the MADA, Google offers OEMs and wireless carriers the opportunity to earn revenue by promoting Google Search on their Android devices.  SMF ¶ 222.  These agreements, generally known as revenue-sharing agreements or RSAs, have been offered to certain OEMs and carriers for many years, and have been renegotiated and extended on numerous occasions.  *E.g.*, *id.*[7]

Each RSA differs in some respects, and the current agreements generally allow the OEM or carrier to share search revenue with Google in exchange for elevated promotion of Google Search.  *E.g.*, *id.*  As a general matter, the highest revenue-sharing tier provides that the OEM or carrier responsible for the configuration of an Android device will receive a share of the revenue that Google generates from queries entered through certain search access points on a device if (i) Google is the default search engine for those access points upon first use, and (ii) no alternative search service is preinstalled on the device upon first use.  *E.g.*, *id.*  For OEMs and carriers who want to promote other search engines more prominently, the RSAs currently in effect offer device-by-device options that allow the pre-loading of alternative search services, such as the Bing search app, on any individual device without losing revenue share payments for other devices that comply with the RSA requirements.  SMF ¶¶ 226-28.

Although RSAs establish certain aspects of the default configuration of a device upon first use, they do not restrict—and in fact they affirmatively preserve—the consumer's ability to

---

[7] Google enters RSAs with wireless carriers because in the U.S. they are often responsible for determining the configuration of an Android device upon first use.  For example, a Samsung smartphone sold by AT&T may have different apps pre-loaded than the same model sold by Verizon.  Whether the OEM or the carrier determines the configuration of a given device depends upon the outcome of negotiations between each OEM and carrier.  SMF ¶¶ 223-24.

download other search apps, widgets, or browsers from the Play Store or elsewhere.  SMF ¶ 225.
A user may, for example, download the Bing search widget from the Play Store (or other pre-loaded or downloaded Android app stores) and set it as the default search engine on the device's home screen, and the user may download the Microsoft Edge browser and set it as the default browser instead of Google Chrome.  *Id.*[8]

## II.   LEGAL STANDARD

### A.   Monopolization under Section 2 of the Sherman Act

Plaintiffs claim that through the conduct summarized above, Google has unlawfully maintained a monopoly in each of the alleged markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  *See* DOJ Pls.' Am. Compl. ¶¶ 173-93.  "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  The second element—known as "exclusionary conduct"—is an essential part of any Section 2 claim, as "having a monopoly does not by itself violate § 2."  *Microsoft*, 253 F.3d at 58.

With respect to the second element, Plaintiffs must demonstrate that the conduct complained of "is exclusionary, rather than merely a form of vigorous competition."  *Id.* at 58.  Even a monopolist remains free to compete and to maintain its monopoly through "competition on the merits."  *Id.* at 50.  Put another way, the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition

---

[8] A user may also change the default search engine in Google's Chrome browser by selecting their preferred option from a list that includes Bing, Yahoo, DuckDuckGo, and Ecosia.  SMF ¶ 234.

itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). "[T]o be condemned as exclusionary" under Section 2, the conduct at issue therefore "must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58.

Additionally, Plaintiffs, "on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *Id.* at 58-59 (citations omitted). More specifically, Plaintiffs must show that the purportedly exclusionary conduct in fact "has a substantial effect in protecting" the defendant's "market power." *Id.* at 62. Where, as here, Plaintiffs purport to challenge a course of conduct, courts individually evaluate whether different types of conduct are exclusionary. *See, e.g.*, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 888, 892 (5th Cir. 2016) (analyzing each "type" of conduct "separately" "in light of settled antitrust principles"); *accord Microsoft*, 253 F.3d at 78 (declining to aggregate the impact of exonerated conduct with other conduct after separately analyzing each category of conduct).

Plaintiffs must make the showings described above—*i.e.*, that Google has engaged in conduct other than "competition on the merits" with a resulting "anticompetitive effect"—in order to state a "*prima facie* case under § 2" of exclusionary conduct. *Microsoft*, 253 F.3d at 59. Only then does the focus shift to Google's "'procompetitive justification' for its conduct" and an assessment of whether "the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.*; *see also id.* at 62.[9]

---

[9] Although there are significant procompetitive benefits to all of the challenged agreements that outweigh any alleged anticompetitive harm, those issues are not addressed here because the Court need not reach them in order to enter summary judgment on all counts given Plaintiffs' failure to make out a *prima facie* case under Section 2.

████████████████████████

### B.      Summary Judgment under Federal Rule of Civil Procedure 56

A federal "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Conversely, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249 (internal citations omitted).

 "[S]ummary judgment is not disfavored in the antitrust context," *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010); indeed "[s]ummary judgment is of particular importance in the area of antitrust law, because it helps to avoid wasteful trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces," *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (brackets and quotation marks omitted).  In this case, as in any other, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## III.    ARGUMENT

The undisputed facts confirm that Google has not engaged in "exclusionary conduct," and therefore the Court should enter judgment as a matter of law on each count.  To begin with, the agreements between Google and browser developers, such as Apple and Mozilla, are not "exclusionary" at all, nor have Plaintiffs demonstrated that they resulted in any anticompetitive effects in any relevant market; they instead reflect a "form of vigorous competition" that the

antitrust laws encourage rather than condemn.  *See* Section III.A.  The Android agreements, too, reflect competition at work, and the Court should enter summary judgment because undisputed facts show that Google's Android MADAs and RSAs do not have an "anticompetitive effect" in any alleged market.  *See* Section III.B.  That is also true of the ACCs and AFAs that OEMs have signed in order to foster Android device compatibility.  *See* Section III.C.  Plaintiffs likewise have not demonstrated any legally relevant "anticompetitive effect" attributable to Google Assistant promotion agreements or Google's decisions regarding which Android apps to develop on an open-source or proprietary basis.  *See* Section III.D.

### A.    The Browser Agreements Do Not Constitute Anticompetitive Conduct

Plaintiffs contend that Google's agreements with browser developers, such as Apple and Mozilla, are a form of "exclusionary conduct" under Section 2 of the Sherman Act because they "mak[e] Google the *de facto* exclusive general search engine" in those browsers.  DOJ Pls.' Am. Compl. ¶ 119; *see* Ex. 81 at 15 (asserting the browser agreements "harm competition by foreclosing rivals from these efficient means of distribution"); Ex. 82 at 5.  Before addressing each of the reasons why Plaintiffs' theory fails as a matter of law, it bears mention that "exclusive dealing contracts are 'frequently upheld when challenged on antitrust grounds," and "[c]ourts repeatedly explain that exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist."  *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F. 4th 959, 983 (10th Cir. 2022); *see also Microsoft*, 253 F.3d at 69-70.

Here, as a threshold matter, the undisputed facts demonstrate that Google's agreements with browser developers such as Apple and Mozilla are ***not*** "exclusive" or "*de facto* exclusive" under any established meaning of those concepts.  As discussed further below in Section III.A.1, Google's agreements with Apple and Mozilla have never prevented them from promoting rival

search engines to consumers in the same browsers that are the subject of their agreements with Google. *E.g.*, SMF ¶¶ 61-62, 93-96, 157-58, 172-75. Moreover, it is undisputed that Apple and Mozilla have long done exactly that. *E.g.*, SMF ¶¶ 64-75, 79-80, 159-163, 167-70.

Google's browser agreements are not exclusive contracts for a second reason. As discussed in Section III.A.2, the undisputed facts confirm that Apple and Mozilla—like many browser providers, including search rivals Microsoft and DuckDuckGo—have decided to design their browsers with a single search engine set as the default upon first use. *E.g.*, SMF ¶¶ 5-6, 100-01. There is no evidence that Google coerced Apple, Mozilla, or any other browser developer to forgo an alternative design ███████████████████████████████ ███—a point that even Plaintiffs' experts readily acknowledged. *E.g.*, SMF ¶¶ 7, 12, 104, 156. Here, Google supplied a superior product in response to a customer's product design demands— that does not amount to "exclusive dealing" that resulted in any anticompetitive effects in a relevant market for purposes of antitrust law.

Finally, even assuming, contrary to the evidence in the record, that a browser default could somehow be characterized as "*de facto* exclusive," the undisputed facts show that Google's agreements with Apple and Mozilla are the product of customer-driven "competition on the merits," which antitrust law protects rather than condemns. *Microsoft*, 253 F.3d at 59. The opportunity to compete for the Safari and Firefox default reflects a recurring "competition for the contract," in which Apple and Mozilla evaluate rival search engines and select as the default the option that they conclude is the best input for their service and their browser customers. *See* Section III.A.3. This kind of "competition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004).

1.   **Google's Agreements with Browser Developers Are Not "Exclusive" or "*De Facto* Exclusive"**

Plaintiffs' challenge to Google's agreements with independent browser developers is predicated on their assertion that those agreements make Google the "*de facto* exclusive general search engine."  DOJ Pls.' Am. Compl. ¶ 119.  It is axiomatic that "[a] threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012).  Generally speaking, "[e]xclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Plaintiffs' claims fail at the threshold because the contracts indisputably do ***not*** prevent Apple, Mozilla, or other browser developers from integrating and promoting any other search engine, or users from otherwise accessing search rivals via these browsers .  *See* Sections I.B.1.d and I.B.2.d *supra*.

Some courts have held that "the lack of complete exclusivity in each contract does not preclude [a] *de facto* exclusive dealing claim."  *ZF Meritor*, 696 F.3d at 284.  That doctrine is inapposite here, however, because agreements "are not exclusive dealing arrangements, de facto or actual, *unless they prevent the buyer from purchasing a given good from any other vendor.*"  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003–04 (9th Cir. 2020) (emphasis added) (brackets, quotation marks, and ellipses omitted); *see Simon & Simon, P.C. v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 916 (N.D. Cal. 2021) (observing that a *de facto* exclusive dealing claim proceeds from the premise that "even without an explicit agreement of exclusivity, a monopolist can violate section 2 by entering arrangements that have the '*practical effect*' of *preventing buyers from doing business with the monopolist's competitors*" (emphasis added)).  The facts confirm that Apple and Mozilla not only are permitted to promote other search engines under the terms of their agreements

28

███████████████████████████████

with Google, but ***actually do*** promote rival search engines in Safari and Firefox ██████████

█████████████████████████████         *See* Sections I.B.1.d and I.B.2.d *supra*.

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████

        The contrast with cases that found "exclusive" or "*de facto* exclusive dealing" to violate Section 2 reinforces the conclusion that the Court should enter judgment as a matter of law with respect to the browser agreements.  In *Microsoft*, for example, the court condemned Microsoft's distribution of its Internet Explorer (IE) browser through an agreement with America Online (AOL), which at the time "accounted for a substantial portion of all existing Internet access

███████████████████████████████

subscriptions." 253 F.3d at 68 (quotation marks omitted). The challenged agreement provided

that AOL must "not promote any non-Microsoft browser, nor provide software using any non-

Microsoft browser except at the customer's request, *and even then* AOL will not supply more than

15% of its subscribers with a browser other than IE." *Id*. (emphasis added).

Google's agreements with browser developers, by contrast, allow them to promote rival

search engines *and* do not restrict their ability to serve every end user who chooses a different

search engine. SMF ¶¶ 40, 93-96, 167, 172-75. And as the DOJ's economic expert readily

acknowledges, consumers who prefer a search engine that is not the default do in fact seek out and

use their preferred search engine. *E.g.*, SMF ¶¶ 139-40, 252. Thus, for example, when Mozilla

set Yahoo as the default in Firefox in 2014, a significant percentage of Firefox users navigated

back to Google, including by changing the default in Firefox or switching to Google's Chrome

Browser. SMF ¶¶ 138-40. ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

Moreover, unlike in certain other cases involving claims of "*de facto* exclusivity," Apple

and Mozilla have **no** obligation to ensure that any particular volume of search traffic flows to

Google, ████████████████████████████████████████████

████████████████████████████████████ SMF ¶¶ 93-96, 172-75;

*compare Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (exonerating

agreement that did not limit buyer's purchases from rivals) *with ZF Meritor*, 696 F.3d at 282-83,

286 (finding "*de facto* partial exclusive dealing" where monopolist effectively imposed

"mandatory purchase requirements of at least 80%, and up to 97.5%" on every manufacturer in the

market). If a growing number of Safari users switched to Bing, Google would have no right to

█████████████████████████████████████

terminate its agreement with Apple.  SMF ¶¶ 54, 94. ████████████████████████████

████████████████████████████████████████████████████████

██████████████   SMF ¶ 66.  And if Apple believed a change in search quality or consumer sentiment was meaningful, then it could evaluate whether to pursue an agreement to set Bing as the default in Safari at the next available opportunity.  *E.g.*, SMF ¶¶ 41, 52, 54.

The **non-exclusive** nature of the relationship between Google and the browser developers—and consequently between Google and search users—is apparent from both the face of their negotiated agreements and an undisputed course of conduct.  Indeed, executives from Apple and Mozilla testified that they do not consider their agreements with Google to be exclusive and described the ways in which they have partnered with rival search engines to integrate their services and make it easy for users to switch.  *E.g.*, Ex. 31 at 47:12-23; Ex. 2 at 124:16-22.  There is no precedent for Plaintiffs' contention that the challenged agreements ought to be condemned as "*de facto* exclusive," and the Court should enter summary judgment in Google's favor with respect to these agreements.

### 2. Plaintiffs Offer No Evidence That Apple's and Mozilla's Design Decisions Can or Should Be Altered by This Court

This Court should reject Plaintiffs' "exclusive dealing" characterization, and grant summary judgment insofar as Plaintiffs' Section 2 claims challenge the browser agreements, for a second reason: Plaintiffs effectively challenge Apple's and Mozilla's decisions to **design** their browsers to default to a single search engine.  They offer no evidence, however, as to what competition in their undefined but-for world would look like (this Court surely cannot enjoin independent parties not before it from optimizing the design of their products), much less that any but-for world would result in procompetitive benefits for either browser developers or consumers.

*E.g.*, SMF ¶¶ 237-41.  In sum, Plaintiffs have not demonstrated any harm to competition resulting from the designs implemented by independent browser developers.

Plaintiffs characterize the browser agreements as *de facto* exclusives, apparently because browser developers have unilaterally chosen not to design their browsers with multiple default search engines or an out-of-the-box choice screen mechanism for users to select their default search service—designs that their experts offer no details about and that no real-world browser has implemented.  *Id.*  But this is a mischaracterization: undisputed facts show that a single pre-set default search service was not imposed by Google through the challenged **agreements**, but rather is a consequence of Apple, Mozilla, and other companies having **chosen to design** their browsers with a single search engine set as the default upon first use.  *E.g.*, SMF ¶¶ 5-6, 100-01.  In the face of this evidence, Plaintiffs' experts offer no opinion that consumers would prefer a different product design or that any material percentage of consumers want a preinstalled default search engine other than Google (or have otherwise been frustrated in reaching a preferred search engine while using Safari or Firefox).  *E.g.*, SMF ¶¶ 237-38, 252.

It is undisputed that Apple and Mozilla each concluded that their browsers would be more appealing to their end users by presenting a single integrated search box with a single pre-set default search engine.  SMF ¶¶ 3-6, 99-101.  Apple made that decision because it "just wanted [the user] to get the results they were looking for," and "the best way to do that was to pick the best search engine that was out there so that they would get the results."  Ex. 3 at 119:14-120:8.  Over the years, Apple has continued to set a default search engine in Safari's integrated search box because it believes the design makes the product more appealing to users.  *E.g.*, SMF ¶¶ 6-7.

Mozilla likewise has determined that queries entered in Firefox's integrated search box should be routed to a single default search engine.  SMF ¶¶ 100-01, 104.  According to Mozilla's

CEO, the company "found the search experience in the browser to be fundamental to the browser," and "[y]ou want the browser to work when it starts, and so … [t]he default in the search box … is what happens if the user makes no choice."  Ex. 31 at 47:3-23.  There is no evidence that Mozilla preferred a browser design without a default upon first use or that Google directed the design of Firefox.  SMF ¶ 99-101, 104.

Notably, Apple and Mozilla are not the only companies to design their browsers to include a single (but user-changeable) default search engine.  For more than a decade, Bing has been the default search engine in Microsoft's Internet Explorer and Edge browsers.  *E.g.*, SMF ¶ 86.  And when smaller companies such as DuckDuckGo and Brave have released web browsers, they too have decided to set a default search engine for queries submitted through their browsers' integrated search box (in each instance, pre-setting their own search engine as the default).  *E.g.*, SMF ¶ 87.

Against these undisputed facts, there is ***zero*** evidence that Google's agreements dictate these non-parties' product design.  No evidence suggests that Google coerced Apple, Mozilla, or any other browser developer into adopting a design that includes a single default search engine. *E.g.*, SMF ¶¶ 3-6, 99-101.  Nor is there any evidence that Apple, Mozilla, or other browser developers                                                         *E.g.*, SMF ¶¶ 7, 104.  Indeed, Plaintiffs and their experts have not identified a single U.S. browser provider that has chosen to implement a different design regarding default search engines. *E.g.*, SMF ¶ 239.

There is no basis for condemning non-parties' decisions to design their browsers in a way that they believe best enables their products to compete in the market.  For example, in *Stearns*

████████████████████████████

*Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999), the plaintiff complained that the defendant monopolist had succeeded in persuading the customer to include product specifications in its contract that only the defendant could meet. *Id.* at 523-24. The court, however, rejected the plaintiff's Section 2 claim, noting that "the decision to … adopt a particular specification was always ultimately in the hands of the consumer." *Id.* at 524.

Here, Plaintiffs have no evidence that a different browser design would benefit browser developers—their proffered economic experts undertook no such analysis. SMF ¶¶ 238, 240. And Plaintiffs have offered no evidence that browser providers would be better off implementing a different product design or being forced to offer their preferred design only to lesser rival search engines that they do not prefer. SMF ¶¶ 237-38. Given that "courts are properly very skeptical about claims that competition has been harmed by a *dominant firm's* product design changes," *Microsoft,* 253 F.3d at 65 (emphasis added), this Court should be even more reluctant to condemn or otherwise interfere with third-party design choices undertaken in the best interest of their customers and in the browser providers' own interests of making their products as competitive as possible.

Put differently, Google's contracts with Apple, Mozilla, and other browser developers that specify Google as the single pre-set default are not the result of Google preventing those browser providers from configuring their product in a different way. Rather, they reflect the configuration that the browser suppliers contracted with Google to fulfill. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007) (en banc) ("If the buyers in a market demand one thing, the antitrust laws do not prohibit [an alleged monopolist] from offering that same thing on slightly different terms."). Under these circumstances, Plaintiffs have failed to meet their burden of demonstrating that

Google's default browser agreements have harmed competition or resulted in anticompetitive effects in any alleged relevant market.

> **3.    Google's Agreements with Apple, Mozilla, and Other Browser Companies Are the Result of Lawful Customer-Instigated "Competition for the Contract"**

Finally, even assuming, contrary to the evidence, that Google's browser agreements could be characterized as "exclusive" or "*de facto* exclusive," summary judgment would still be warranted because the agreements are the product of lawful "competition for the contract"—"a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp.*, 354 F.3d at 663.

Apple and Mozilla have regularly reevaluated their choice of default search engine and sought to negotiate a favorable deal with whichever company they conclude best advances their objective of providing a high-quality product to their own customers. *E.g.*, SMF ¶¶ 41-42, 54, 125-26, 154-56. As Mozilla's CEO put it, "[t]he quality of the search experience, whether it works for your users, whether people like it is … one of the handful of things that are the most critical about a browser." Ex. 31 at 34:1-13. Rival search engines therefore can and do compete with Google to be the default search engine in Safari, Firefox, and other third-party browsers by offering the promise of quality search results and competitive financial terms, as well as other consideration that browser developers value. *E.g.*, SMF ¶¶ 41, 52, 125-27. When Google wins this competition, it has done so on the merits as established and judged by its customers, not through anticompetitive or exclusionary conduct. *E.g.*, SMF ¶¶ 42-43, 53, 142, 156.

The long-standing decision of independent browser developers such as Apple and Mozilla to implement a pre-set default search engine enhances, rather than undermines, the competition to reach the ultimate consumers of search services. That would be the case even if the agreements in question were properly characterized as "exclusive" because "[i]t is well established that

██████████████████████████████████████████

competition among businesses to serve as an exclusive supplier should actually be *encouraged*." *Race Tires*, 614 F.3d at 83.  In this context, browser developers recognize that a default search engine plays an important role in the competitiveness of their browser products, ████████ ████████████████████████████████████████████████████████████  *E.g.*, SMF ¶¶ 103, 106.[10]  And insofar as Plaintiffs argue that being a browser's default search engine is especially valuable because some consumers stick with the default option out of convenience or habit, there is even more incentive for rivals to compete for and win any incremental advantage purportedly inherent in being the default.  *See Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (explaining exclusive agreements "may actually encourage, rather than discourage, competition, because the incumbent and other, competing [firms] have a strong incentive continually to improve the [quality] and prices they offer in order to secure the exclusive positions").

Google has prevailed in the ongoing competition to be the default search engine in most third-party browsers in the U.S. since the mid-2000s because companies such as Mozilla and Apple have repeatedly determined it is the best option for creating a compelling search experience for their customers.  *E.g.*, SMF ¶¶ 8-11, 154-56. ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[10] From the browser developer's perspective, an increased revenue share payment is economically equivalent to a price discount.  *E.g.*, Ex. 9 (Murphy (Google's Expert) Opening Rep.) ¶ 24.

███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███  That is the essence of competition on the merits, and not a process or outcome that may be condemned.

Mozilla's decision to set Google as the default search engine in Firefox likewise is the product of a recurring "competition for the contract."  Beginning in 2004, when it was an upstart non-profit with limited funding and name recognition, Mozilla decided that Google should be the default upon first use in Firefox because it offered the best search experience.  SMF ¶ 108. ████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

Accordingly, here, as in other cases, a challenge to the **outcome** of a competition created by customers fails as a matter of law, regardless of the label ("*de facto* exclusive" or otherwise) attached to that outcome.  *See, e.g.*, *Stearns Airport Equip.*, 170 F.3d at 524; *EpiPen*, 44 F.4th at 989, 994-95 (granting summary judgment because, *inter alia*, Mylan's exclusive agreements were "a normal competitive tool" to "stimulate price competition").  This conclusion reflects that when

"customers are instigating exclusivity"—assuming the term "exclusivity" even applies here—that can "ease[] any anticompetitive concern arising from a monopolist's use of exclusive dealing contracts." *EpiPen*, 44 F.4th at 995.

Any "concern" that may potentially arise under other circumstances involving allegations of "exclusive dealing" is wholly absent here, as there is no evidence of coercive conduct, and Google has won based on considerations of quality and price. *E.g.*, SMF ¶¶ 11-12, 153-56. Apple is "not a small firm that [Google] could likely bully into accepting a contract that might foreclose new competition." *Barry Wright*, 724 F.2d at 237–38 (upholding monopolist's partial requirements contracts because, among other things, if the agreements "significantly interfered with new entry, or inhibited the development of a new source of supply, it is difficult to understand why [the counterparty] would have sought the agreements"). Mozilla, meanwhile, was willing and able to switch Firefox's default search engine in the U.S. to Yahoo in 2014 notwithstanding its decade-long relationship with Google, and when it switched back in 2017 it was still "able to reach an agreement with Google[] that made sense for [Mozilla]." Ex. 31 at 80:15-24. As in *EpiPen*, rival search engines need only "offer a better product or a better deal to reverse, and possibly wield," whatever alleged "exclusivity" Plaintiffs attribute to being the default in Safari, Firefox, and other third-party browsers. *EpiPen*, 44 F.4th at 989 (quotation marks omitted).

For all of these reasons, Google's contracts with Apple, Mozilla, and other browser developers are "merely a form of vigorous competition" that the antitrust laws encourage rather than condemn. *Microsoft*, 253 F.3d at 58. The Court should enter summary judgment to the extent Plaintiffs' claims pertain to these agreements.

### B.   Google's Agreements with Android Device Manufacturers and Wireless Carriers Do Not Violate Section 2 of the Sherman Act

Plaintiffs contend that Google's Android agreements provide "search exclusivity for Google," Am. Compl. ¶ 82, and thereby allegedly "harm competition by foreclosing rivals from these efficient means of distribution," Ex. 81 at 14-15; Ex. 82 at 5.  In other words, Plaintiffs' contentions regarding the Android agreements rely in large part on the same doctrine of "exclusive" (or "*de facto* exclusive") dealing that underpins their assertion that the browser agreements are unlawful.[11]

But Plaintiffs' characterization of the Android agreements is wrong.  It is undisputed that no company is required to promote Google Search on an "exclusive" basis (or on any basis, for that matter) in order to manufacture or sell an Android smartphone.  SMF ¶¶ 208, 210, 215.  The AFA and ACC, which require OEM signatories to meet baseline compatibility requirements, do not obligate the installation of *any* Google proprietary software.  SMF ¶¶ 210-11.  For OEMs that wish to install Google apps and APIs on their Android devices (it is a device-by-device choice), Google offers the MADA—a zero-royalty non-exclusive license to a suite of proprietary apps and services, such as the Play Store, YouTube, the Chrome Browser, and the Google Search App.  SMF ¶¶ 212-13, 216.   Again, however, there is no "search exclusivity," as MADA licensees can preinstall other browsers and search apps and set them as the default upon first use.  SMF ¶¶ 218-21.  Any purported "exclusivity" arguably arises only if an OEM or wireless carrier chooses to earn revenue from Google on its Android device by signing an RSA.  The RSAs generally allow OEMs and carriers to decide whether to participate in the highest revenue-sharing tier by

---

[11] Plaintiffs present alternative theories regarding the compatibility commitments found in the ACC and AFA, the promotion of Google Assistant on Android devices, and Google's decision to develop certain apps on a proprietary basis.  Those theories are addressed in Sections III.C, III.D.1, and III.D.2, respectively.

configuring the device with Google Search as the default search engine upon first use and no alternative search service preinstalled upon first use.  SMF ¶¶ 222, 226-28.  Users can and do download search rivals from the Play Store (including by downloading competing browsers, such as Microsoft's Edge), and change search defaults in the preinstalled browser(s) (including Google's Chrome).  SMF ¶¶ 225, 232.  Google knows this well, having successfully won consumers' business on Microsoft Windows PCs, even though it has historically had little or no pre-load distribution or default status while Microsoft search engines and browsers have been pre-loaded exclusively on almost all such devices.  SMF ¶¶ 205-06.

The Court, however, need not determine whether any Android agreement is "exclusive" (or "*de facto* exclusive") to enter summary judgment because Plaintiffs' claims would fail as a matter of law **even if** they could make that high showing.  "[A]n exclusive contract does not violate" the antitrust laws "unless its probable effect is to foreclose competition in a *substantial share* of the line of commerce affected."  *Microsoft*, 234 F.3d at 69 (emphasis added) (quotation marks omitted).  Plaintiffs have not established that any degree of competition was actually foreclosed by an Android RSA, and their own expert's speculative analysis shows that the theoretical foreclosure allegedly attributable to these agreements is **insubstantial** by any measure.  As the *Microsoft* court held, even if the market foreclosure share in a Section 2 case need not meet the "40% or 50% share usually required in order to establish a § 1 violation," there must be as a showing of "substantial" foreclosure.  234 F.3d at 70.  Put differently, "while high numbers do not guarantee success … low numbers make dismissal easy."  *Sterling*, 656 F.3d at 124 (quotation marks omitted).

In this case, the best estimate of the potential foreclosure level offered by Plaintiffs' economist is no more than about **1 percent of U.S. search queries**, and he cannot conjure any

███████████████████████████████

hypothetical scenario where the alleged level even approaches 20 percent.  SMF ¶¶ 247-48, 251.

These "low numbers make dismissal easy."  *Sterling*, 656 F.3d at 124 (quotation marks omitted).

### 1. The Agreements Relating to Android Devices Do Not "Foreclose a Substantial Share" of Any Alleged Market

The DOJ's primary economic expert, Professor Michael Whinston, recognizes that in order to assess the economic impact of any exclusive dealing arrangement, one ideally examines the impact of those agreements relative to a but-for world in which the alleged unlawful agreements do not exist.  SMF ¶ 235.  But neither Plaintiffs nor their experts have identified any concrete but-for world, much less one that demonstrates that Google's Android agreements have resulted in foreclosure of a "substantial share" of search queries in the United States.  *E.g.*, SMF ¶¶ 236, 242.

As an initial matter, Plaintiffs have never even articulated what the but-for world—one without the challenged conduct—would look like in this case: it is not specified in the Complaints or in any interrogatory responses.  SMF ¶ 236.  And Professor Whinston has offered no opinion about what a but-for world without Google's Android MADA or RSA agreements would look like. SMF ¶ 242.  Professor Whinston initially offered estimated share shifts for two "possibilities": (1) that all Android OEMs and carriers would switch to pre-loading rival search engines exclusively on Android devices, and alternatively (2) that all Android OEMs and carriers would adopt a choice screen (a form of "parity") to allow users to select a default search engine during the start-up of a device.  SMF ¶¶ 245-47, 251.  But he subsequently clarified that he is not offering the opinion that *all* Android partners would have switched to pre-loading rivals exclusively on Android devices in a but-for world, or even that *any* individual OEM or carrier would have done so.  SMF ¶¶ 253-55.

███████████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████████████████

████████████████████████████████████████

██████████████████████████████████

As for Professor Whinston's choice-screen opinion, he again cannot say how many, if any, Android OEMs or carriers would have adopted a choice screen (nor has he even evaluated the financial impact on the Android partner of doing so). SMF ¶¶ 249-50. Nonetheless, he has opined that if all Android OEMs and carriers were to choose to display a choice screen prompting their customers in the U.S. to select a default search engine from a list of options, more than 9 out of every 10 Android users would choose Google. SMF ¶ 245. Put another way, in a world in which every Android agreement that Plaintiffs characterize as "exclusive" or "*de facto* exclusive" ceased to exist, and consumers were required to affirmatively select their default search engine when setting up an Android device, Google would be selected more than 90% of the time. *Id.*

The estimated "shift" from Google to other search engines in this mandatory choice screen world would **total approximately 1%** of all search queries in the U.S. in recent years. SMF ¶¶ 247-48.[12] This is not "substantial" by any measure. *Microsoft*, 253 F.3d at 70. No court has held that a foreclosure level on the order of *1%* could serve as a basis for liability under Section 2, and "judicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less." *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1143 (D. Minn. 1999) (quotation marks omitted); *see Sterling*, 656 F.2d at 123-24 (affirming summary judgment in defendant's favor, including on Section 2 claims, and observing that "'foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent'").

---

[12] Android devices accounted for ███ of Google search queries in the U.S. in 2020. SMF ¶ 243. Professor Whinston agrees that even this low figure "is not an economically sensible measure of foreclosure" allegedly attributable to any agreements because, among other things, "Google would have served some of this search traffic even without the contracts." Ex. 77 (Whinston (DOJ Pls.' Expert) Rebuttal Rep.) ¶ 77.

Even Professor Whinston's alternative method of estimating foreclosure allegedly attributable to the challenged Android agreements, which he concedes is based on the unsupported notion that all Android RSA partners would switch to pre-load search engine rivals exclusively, does not show substantial foreclosure.  SMF ¶¶ 253-55.  For one thing, this scenario posits that Google cannot seek terms rivals can.  But there is no evidence that tying Google's hands would benefit partners or users, or lead to the selection of rivals.[13]  In any event, Professor Whinston hypothesizes that approximately 11.6-13.5% of all U.S. queries, in this scenario, could move to rivals.  SMF ¶ 251.  A theoretical foreclosure rate on the order of 11-13% is still well below the lower bound that courts have deemed "substantial" in exclusive dealing cases.  *See, e.g.*, *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (granting summary judgment for defendant where plaintiff "present[ed] best-case foreclosure rates of 21.5% in [one market] and 18.5% in [another market]" because "[t]hese percentages fall far short of any value presumed to be substantial and lie on the margin of what is considered to be significant").

### C. There Is No Evidence of an Anticompetitive Effect from Android Compatibility Commitments or Anti-Fragmentation Agreements

Plaintiffs advance a different set of arguments specific to the ACC and AFA, which establish baseline quality, compatibility, and security standards for Android devices.  Google has sought commitments by OEMs to Android compatibility standards since ***before*** Android launched and continuing through today to encourage application developers to make Android apps.  SMF ¶¶ 261-67.

---

[13] At deposition, Professor Whinston conceded that he had no opinion that any particular Android OEM or carrier had ever determined that a rival's search engine was superior to Google's or that any such partner would have pre-loaded a rival search engine exclusively if Google could not compete for exclusive pre-load and promotion on Android devices.  SMF ¶¶ 253-55.

Although one of Plaintiffs' experts acknowledges that "preventing fragmentation can be an important factor" in "encouraging application developers to write applications for Android," SMF ¶ 268, Plaintiffs' first theory nevertheless asserts that ACCs and AFAs "harm competition by inhibiting the growth of alternative [incompatible] Android-based operating systems, which could serve as pathways for rival providers," Ex. 81 at 14; Ex. 82 at 5.  Plaintiffs also claim that AFAs and ACCs give Google the ability to "threaten the profitability" of Android OEMs that promote search rivals, supposedly because Google might wrongly deem devices pre-loaded with search rivals as noncompliant with compatibility standards.  *See e.g.*, Ex. 77 at ¶ 346 & Ex. 20 (Whinston (DOJ Pls.' Expert) Reply Rep.) at ¶ 384.

*First*, Plaintiffs' theory regarding the development of non-compatible Android devices fails because there is no triable evidence that ACCs or AFAs "ha[ve] a substantial effect in protecting" Google's purported "market power" in search.  *Microsoft*, 253 F.3d at 62, 71.  Plaintiffs cannot withstand summary judgment merely because ACCs and AFAs bar signatories from marketing Android devices that fail to comply with an AFA or ACC (so-called incompatible Android "forks").   Plaintiffs must present evidence that limitations on OEMs' marketing of incompatible Android devices has a substantial anticompetitive effect in a search or search advertising market.  *See, e.g.*, *Microsoft*, 253 F.3d at 71.  They have none.  The agreements commit signatories to minimum APIs, hardware, and security requirements for Android devices they market.  SMF ¶¶ 269-75.  What they do ***not*** do is require any OEM to preinstall, promote, or set as the default Google Search, the Chrome browser, or any other Google software or service.  SMF ¶¶ 210-11, 277-80.

*Second*, there is no evidence that ACCs or AFAs have impeded search rivals because they somehow would have more likely succeeded on non-compatible Android devices.  Undisputed

evidence shows that promotion on **compatible** Android devices offers Google's search rivals advantages over promotion on incompatible devices because compatible Android devices attract more application developers, in turn attracting users. SMF ¶¶ 281, 283. Professor Whinston offers no opinion that the existence of the ACC or AFA has "shifted" any search queries from rivals to Google. SMF ¶ 282. That omission is sufficient to end Plaintiffs' claim of an anticompetitive effect in search on the grounds that incompatible forks "***could*** serve as pathways for rival providers." Ex. 81 at 14 (emphasis added). "Accepting such conclusory allegations as true … would defeat the central purpose of the summary judgment device." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

The reference by one of DOJ Plaintiffs' experts to the unsuccessful 2014 Amazon Fire Phone, an incompatible Android fork that preinstalled Bing, fails to show that Google's conduct "has the requisite anticompetitive effect" in search. *Microsoft*, 253 F.3d. at 58-59. Putting aside that factors other than the lack of partnerships with AFA signatories sufficed to doom the Fire Phone, *see* SMF ¶¶ 288-90, it is undisputed that Amazon could have promoted Bing had it made Fire Phone Android-compatible, and thus eligible for such partnerships with OEMs who were AFA signatories, SMF ¶¶ 209, 287. Regardless, the Plaintiffs' expert who advanced the Fire Phone argument confirmed that he is "not offering any opinion on competition amongst search services." Ex. 109 (Davies (DOJ Pls.' Expert) Tr.) at 83:17-84:5.

Plaintiffs' second theory—that the AFA and ACC let Google "threaten the profitability" of Android OEMs that promote search rivals—is the sole theory that Professor Whinston actually endorses. Ex. 4 (Whinston Tr. 242:8-10, 245:9-19). But there is no actual evidence that ACCs or AFAs give Google the "ability to threaten the profitability" of Android OEMs who promote search rivals, much less that Google has done so or that there has been an anticompetitive effect in search.

*First*, the agreements indisputably do not give Google pre-launch oversight, and there is no evidence that Google ever rejected (let alone based on the ACC or AFA) an Android device because it had a search rival.  Android OEMs *self-certify* ACC and AFA compliance through a publicly available test suite, and the agreements contain no requirement to submit any attestation of compliance to Google.  SMF ¶¶ 292-95.  If an Android OEM wants to feature a Google search rival, the ACC and AFA give Google no opportunity to block the device because there is no such requirement for compatibility.  Not surprisingly, Professor Whinston points to no example of Google even threatening to do so.  Ex. 4 at 250:8-15, 246:17-247:4, 252:2-8.

*Second*, conflating distinct agreements, Professor Whinston points to certification requirements in the ***MADA***.  *Id.* at 251:1-7, 252:20-253:5; *see also* SMF ¶¶ 296-306.  But even as to those requirements, which are ***not*** imposed by the ACC or AFA, Professor Whinston concedes that he knows of no evidence that "Google threatened" to block a device because it installed a search rival.  Ex. 4 at 250:8-15, 245:20-246:11.  In fact, there is clear evidence to the contrary: Microsoft markets the Surface Duo, an Android MADA device that features the Edge Browser with Bing as the preinstalled search default.  SMF ¶¶ 299-300.[14]

While pro-competitive justifications support the ACC and AFA, the Court need not evaluate them because no triable evidence shows that they have a substantial effect in protecting Google's alleged search or search advertising monopolies.



### D.      The Other Conduct Alleged by Plaintiffs Does Not Violate Section 2 of the Sherman Act

#### 1.      There Is No Evidence of an Anticompetitive Effect from Agreements Relating to Google Assistant or Internet-of-Things Devices

Plaintiffs have also indicated that they may challenge Google's promotion of its Google Assistant product on Android smartphones and IoT devices such as smart speakers, connected cars, and TVs.  Google's Assistant, like Apple's Siri or Amazon's Alexa, is a virtual assistant that can respond to voice commands to play a song, set an alarm, place a call, or perform various other tasks.  SMF ¶¶ 310-14.  Google promotes its Assistant on IoT devices—some Android, and some running on other operating systems.  SMF ¶¶ 325-50.  Google's MADAs have recently included the Google Assistant and made it the out-of-the-box default assistant; and Google's Android RSAs with OEMs and carriers provide for forms of increased promotion for Google Assistant.  SMF ¶¶ 341-50.  None of Plaintiffs' experts opine on Google's IoT Agreements.  Nor have Plaintiffs' experts opined that Google's Assistant agreements foreclose any share of search queries in the putative general search services market.  No triable evidence supports Plaintiffs' claim that terms relating to Google's Assistant harmed competition by "foreclos[ing search rivals] from … distribution through voice assistant providers" on "emerging search access points."  DOJ Pls.' Am. Compl. ¶¶ 165, 169.

As Professor Whinston acknowledges (SMF ¶ 322), consumers overwhelmingly use virtual assistants to complete actions (such as setting a timer or turning on lights).  SMF ¶¶ 314-18.  Informational requests account for a tiny slice of virtual assistant usage, and informational requests that return web search results only a microscopic sliver.  SMF ¶¶ 318-21.  Data confirms that queries submitted to virtual assistants are a mere ▮▮▮ of Google Search requests, with IoT devices (such as smart speakers and TVs) accounting for only ▮▮▮ of Google Search queries.  SMF ¶ 318.  Recognizing these realities, Professor Whinston concedes that virtual assistants are

*not* part of the alleged "market for general search services" because they "are significantly differentiated from general search engines, fulfilling different and varied consumer needs." SMF ¶ 323. Professor Whinston also recognizes that Google Assistant is not "[t]he future of Google search." SMF ¶ 324.

Thus, even if Plaintiffs could show that Google's assistant practices detrimentally impact robust assistant competition (which they cannot, SMF ¶¶ 325-340), summary judgment is warranted because Google's Assistant agreements lack any substantial anticompetitive effect in search. *Microsoft*, 253 F.3d at 71.

### 2.   Google's Evolution of a Limited Number of Early Open-Source Applications Is Not Exclusionary

Finally, while the theory does not appear in Plaintiffs' Complaints, they now contend that Google's "removing important features and functionality from open-source Android" violates Section 2. Ex. 81 at 16-17; Ex. 82 at 6. In particular, Plaintiffs object to Google's decision to change its investment in, and at times remove from later Android releases, certain early open-source applications.[15] Plaintiffs also contend that Google's development and licensing of proprietary apps, such as Google Maps, has "increase[d] the gap in functionality" between the open-source Android operating system and Google's proprietary apps and APIs that are licensed through the MADA. Ex. 79 (DOJ Pls.' 2d Supp. Resps. to Google's 2d Interrogs.) at 24; Ex. 80 (Colo. Pls.' 2d Supp. Resps. to Google's 2d Interrogs.) at 8-9.

As to the evolution of AOSP applications: Google has invested ***billions*** in open-source AOSP Android, continues to introduce new open-source apps, and had legitimate reasons for no

---

[15] The AOSP apps Plaintiffs identify include "VoiceD[ia]ler, Phone, MMS, IM, FN Radio, Email, and Calculator" (Ex. 79 at 23), as well as calendar, contacts, camera, music, search, browser, and photos. *See* Ex. 40 (Whinston (DOJ Pls.' Expert) Opening Rep.) ¶ 726; Ex.101 (Davies (DOJ Pls.' Expert) Opening Rep.) ¶ 40.

longer investing in certain obsolete AOSP apps.  SMF ¶¶ 364-93.  Plaintiffs' theory fails because there is no evidence that Google's evolution of the AOSP applications harmed competition in **search**.  *See Microsoft*, 253 F.3d at 59.  Indeed, Plaintiffs' experts offer no opinion that Google's "developing and licensing of the Android operating system" harms search competition.  Ex. 4 at 250:16-21; Ex. 109 at 288:2-6, 84:1-5.

First, each rival search provider offers its own search app, and has no need for the obsolete AOSP search app.  SMF ¶¶ 360, 374-79.  And with respect to browsers, Google introduced the open-source Chromium browser project in 2008, well before moving on from the antiquated AOSP browser.  SMF ¶¶ 361, 382-86.  Several search rivals are the default search engine for browsers based on open-source Chromium.  SMF ¶ 362.  Second, there is no evidence that Google's evolution of AOSP apps somehow raises barriers to entry.  Each retired AOSP app remains available if an OEM wants to use it as a reference; and there are numerous more sophisticated alternatives available today to the early open-source apps—including a basic MP3 player, calculator, and email client, none of which could connect with proprietary services absent modifications.  SMF ¶¶ 353, 355, 359, 363, 388.  Plaintiffs also mistakenly claim that Google deprecated services that **never** were part of AOSP.  SMF ¶¶ 394-98.  As with the failed claim regarding the ACC and AFA, the contention that Google's evolution of certain AOSP apps somehow harmed search competition by raising entry barriers is unsupported speculation.

The second half of Plaintiffs' theory—that Google violated some supposed duty to develop and license an unspecified set of features open-source and not through proprietary licenses— founders on settled legal principles.  An intellectual property holder has the right "to license others, or to refuse to license, and to charge such royalty as the [IP] permits."  *United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1127 (D.C. Cir. 1981).

Shackling Google with a novel and amorphous obligation that would essentially require it to open source its proprietary application threatens the very harm of "undermin[ing] incentives for investment and innovation" that the rule against compelled IP licensing guards against.[16] Companies develop all manner of Android software on a proprietary basis, from web browsers (*e.g.*, Microsoft Edge) to messaging services (*e.g.*, Facebook Messenger) to virtual assistants (*e.g.*, Amazon Alexa). This is because proprietary development can offer greater functionality and security, among other advantages. SMF ¶¶ 355-57, 363. Plaintiffs do not explain, much less prove, how any specific Google proprietary service could be licensed as open source without distorting quality or undermining the related investment incentives. "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) (quotation marks omitted).

## IV.    CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in Google's favor on all counts of the DOJ Plaintiffs' Amended Complaint. And for all of the same reasons, the Court should enter summary judgment in Google's favor on all counts of the Colorado Plaintiffs' Complaint to the extent that it incorporates by reference the DOJ Plaintiffs' allegations.

Dated: December 12, 2022                     Respectfully submitted,

                                             WILLIAMS & CONNOLLY LLP

                                             By: /s/ John E. Schmidtlein
                                             John E. Schmidtlein (D.C. Bar No. 441261)
                                             Benjamin M. Greenblum (D.C. Bar No. 979786)
                                             Colette T. Connor (D.C. Bar No. 991533)
                                             680 Maine Avenue, SW

---

[16] Antitrust Guidelines for Licensing Intellectual Property, U.S. DEP'T OF JUSTICE AND FEDERAL TRADE COMMISSION § 2.1 (Jan. 12, 2017), *available at* https://www.justice.gov/atr/IPguidelines/download.

Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*