## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

State of Colorado, *et al.*,

                                  Plaintiffs,

v.

Google LLC,

                                  Defendant.

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

███████████████

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ................................................................. 4

    A.    Undisputed Facts Relevant to Plaintiffs' SVP Claims ...................... 4

        1.    Google's Introduction and Design of Specialized Results .......... 4

        2.    Specialized Vertical Providers ................................................. 7

        3.    The Challenged Units ............................................................. 7

        4.    Google's Testing of Search Results ........................................ 10

        5.    Google's Data Agreements .................................................... 11

    B.    Undisputed Facts Relevant to Plaintiffs' SA360 Claim ................. 12

        1.    Advertisers' Options for Buying Online Advertising ............... 12

        2.    Google's SA360 SEM Tool ................................................... 13

    C.    The Claims and Conduct at Issue in the Plaintiffs' Case ............... 14

        1.    The Alleged Markets ............................................................. 14

        2.    The Alleged Conduct and Effects .......................................... 15

            a.    Plaintiffs' Challenge Regarding Google's Specialized Units ....... 15

                i.    Plaintiffs' Challenge to Google's SERP Design ............... 16

                ii.    Plaintiffs' Challenge to Google's Use of SVP Data ......... 17

            b.    Plaintiffs' Challenge Regarding Google's SA360 SEM Tool ...... 18

II.    LEGAL STANDARDS ................................................................... 18

    A.    Sherman Act § 2: Elements of a Monopoly Maintenance Claim ...................... 18

    B.    Sherman Act § 2: Claims Based on Product Design Changes ......................... 20

    C.    Summary Judgment Under Federal Rule of Civil Procedure 56 ......................... 22

III.    ARGUMENT ............................................................................... 23

    A.    Plaintiffs' SVP Claims Fail. ......................................................... 23

        1.    The Challenged Designs Are Indisputably Improvements to Google's SERP. ......................................................................... 23

        2.    Plaintiffs Have Failed to Raise a Triable Issue Regarding Google's Legitimate SERP Design. ....................................................... 26

            a.    Whether Google Could Have Designed Its Results Differently Is Irrelevant to Whether Google's Design Is An Improvement. ....... 26

            b.    Plaintiffs' "Click Through" Analysis Is Irrelevant to Whether Google's Design Is An Improvement. ......................................... 29

        3.    Google's Voluntary Data Agreements Are Lawful Business Contracts. . 29

4.    The SVP Claims Fail For the Independent Reason that Plaintiffs Cannot Show the Challenged Conduct Had an Anticompetitive Effect in the Proffered Relevant Markets. ................................................. 31

B.    Plaintiffs' SA360 Claim Fails ................................................ 34

1.    Plaintiffs Cannot Meet Their Burden to Show SA360's Feature Design and Development Had an Anticompetitive Effect in the Proffered Relevant Markets. ................................................ 36

a.    Google's Implementation of and Feature Development for SA360 Has Not Foreclosed a Substantial Share of the Proffered Relevant Markets. ................................................ 36

b.    No Other Anticompetitive Harm: Plaintiffs Have Presented No Evidence That the Timing of Google's Feature Design and Development for SA360 Harmed Competition in Search Advertising. ................................................ 39

i.    There Is No Evidence of Harm to Microsoft as A Search or Search Advertising Competitor ........................ 40

ii.    There Is No Evidence of Harm to Other SEM Tool Providers ................................................ 40

iii.    There Is No Evidence of Harm to Advertisers.................. 41

2.    There is No Anticompetitive or Exclusionary Conduct: ██████████ ██████████████████████████ ............. 42

IV.    CONCLUSION................................................ 45

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ................................45

*Allied Orthopedic v. Tyco Health Care Group*, 592 F.3d 991 (9th Cir. 2010) .................. *passim*

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns.*, 108
    F.3d 1147 (9th Cir. 1997) .................................................................................................45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................22

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) ....................19

*Cal. Comput. Prods., Inc. v. IBM*, 613 F.2d 727 (9th Cir. 1979) ..........................................20, 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................23

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *appeal pending*
    No. 21-16506 (9th Cir. Sept. 13, 2021) & No. 21-16695 (9th Cir. Oct. 14, 2021) ...............42

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ...........................................................32, 44

*HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007) ...............................................29

*ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423 (N.D. Cal. 1978) ..............................27

*In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137 (N.D. Cal. 2011) ...............22, 29

*Kartell v. Blue Shield of Mass.*, 749 F.2d 922 (1st Cir. 1984) ....................................................31

*Liveuniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852 (C.D. Cal. June 4, 2007) ....................27

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ...................23

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) ...........................31

*N.Y. v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021), *appeal pending*, No. 21-7078
    (D.C. Cir. July 29, 2021) .....................................................................................................45

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ...................................... *passim*

*Pacific Bell Tel. Co. v. linkLine Communcs., Inc.*, 555 U.S. 438 (2009) ........................30, 31, 35

*Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005 (Fed. Cir. 2020) .............22

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) .......................22

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ...........................................................19, 32

*S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869 (11th Cir. 1998) ...........34

*Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989) ...........27

*Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006) .................................................................35

*Simon & Simon, PC v. Align Tech., Inc.*, 2020 WL 1975139 (D. Del. 2020) ............................27

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ...................................................35

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ........................................19

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ..................................................19

*United States v. Microsoft*, 147 F.3d 935 (D.C. Cir. 1998)........................................27

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001).................................... *passim*

*Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004).............35

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ...........................................................................................22

Phillip E. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58
   Antitrust L.J. 841 (1989)................................................................................35

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2022) .......................... *passim*

The Colorado Plaintiffs ("Plaintiffs") allege that Google has maintained a monopoly in violation of Section 2 of the Sherman Act through three purportedly anticompetitive acts: (1) designing certain units appearing on its search engine results page in a way that allegedly discriminates against companies that Plaintiffs call "Specialized Vertical Providers" ("SVPs"), as well as entering into certain data contracts with these SVPs that improve search results; (2) designing and operating Google's search advertising tool, Search Ads 360 ("SA360"), in a way that provides incomplete interoperability with certain Microsoft advertising platform functionality; and (3) entering distribution agreements involving Google Search that Plaintiffs claim are exclusionary.  Colo. Pls.' Compl. (ECF No. 1-2) ¶¶ 214, 221, 228.[1]  None of this conduct, individually or together, violates United States antitrust law, and summary judgment should be entered for Google.

Plaintiffs' attack on Google's product design decisions and innovations over many years is both legally and factually unfounded.  There is no legal basis for Plaintiffs' demand that this Court second-guess Google's innovations that have improved the quality of Google's search results and thereby enhanced competition.  Moreover, Plaintiffs' convoluted theory of harm to competition in alleged general search engine related markets is not supported by the factual record and only highlights the impossibility of a court administering a test to balance product improvements against hypothetical harms that allegedly would have been avoided with a different product design.  Plaintiffs never substantiated their speculation that supposed harm to SVPs, whom Plaintiffs place outside the alleged relevant markets, harms competition among general search engines by supposedly impacting partnerships between SVPs and other general search engines.

---

[1] All citations to the Colorado Plaintiffs' Complaint are to the docket in Case No. 20-cv-3715-APM, which is now consolidated with *United States, et al.*, *v. Google LLC*, No. 20-cv-3010-APM.

Plaintiffs similarly failed to prove any harm to competition from Google's implementation of various Microsoft Ads features in SA360. Last, for the reasons set forth in the memorandum in support of Google's motion for summary judgment in the DOJ Plaintiffs' case, Plaintiffs here have failed to make a *prima facie* case with regards to their challenges to Google's search agreements.

Google seeks summary judgment on each of Plaintiffs' claims as follows:

Plaintiffs' SVP Claims: Google's SERP design and data contracts. One of Google's key quality innovations over the past two decades has been introducing specialized results (*i.e.*, those beyond the ten blue weblinks and text advertisements) that appear on Google's search engine results page ("SERP") in response to user queries on certain topics. These include specialized or "vertical" units, familiar to anyone who has used Google to search for, *e.g.*, flights to New York, hotels in Washington, or local businesses "near me." These units provide users with information relevant to their query, beyond the weblinks and ads on the rest of the SERP. For example, if a user searches for Mexican restaurants "near me," Google might display its local unit listing nearby Mexican restaurants with ratings, price information, and a map, with options to click to view more restaurants in the "immersive" and to click on a specific restaurant to view its "detail page."

Plaintiffs do not challenge the creation of these units or how Google displays SVP information in the "immersive" and "detail" pages that users reach as they interact with the unit (or how SVP information is displayed everywhere else on the SERP). Instead, Plaintiffs' claim is focused solely on Google's display of SVP information at the level of the specialized units that first appear on the SERP. Specifically, Plaintiffs contend that when Google displays its hotels unit, flights unit, local unit, or local services ads unit in response to a user's query, Google should be required to display the names of SVPs with links to their websites within that unit. But antitrust

law provides no basis to micromanage Google's design of its SERP where undisputed evidence shows the designs improved the quality of the results for Google's users.

Plaintiffs also challenge Google's use of data licensed from SVPs to improve the quality of its results (*e.g.*, hotel availability). They contend that the agreements between Google and the SVPs provide the SVPs inadequate compensation and/or attribution for the data. That claim also fails as a matter of law, as it amounts to simply challenging how much Google compensates SVPs for information they provide for Google to use.

Both of Plaintiffs' SVP claims fail for another, independent reason. Plaintiffs ***do not*** contend that the SVPs and Google inhabit the same relevant market. But to have a claim, the alleged harm to SVPs must result in harm to a party that the Plaintiffs ***do*** contend competes in the markets they allege: general search engines and search advertising. After virtually unlimited discovery, that leap rests entirely on Plaintiffs' speculation as opposed to record evidence.

Google's SA360 Search Advertising Tool. Plaintiffs also challenge narrow aspects of Google's SA360 advertising tool, which helps advertisers manage search advertising campaigns across multiple search engines. Plaintiffs contend that Google acted anticompetitively by not immediately building SA360's support for five specific features related to advertising on Microsoft's Bing search engine that Microsoft requested. Plaintiffs would have preferred Google to prioritize four of the Microsoft-related features *sooner* than it did. ████████████████ ████████████████████████████████████████████ ████████████████████████████

Plaintiffs' SA360 claim fails for two independent reasons. *First*, there is no evidence that Google's decisions in developing and implementing specific features in SA360 harmed

competition in any relevant market.  *Second*, it is undisputed that Google's SA360 product team has built, ███████, the disputed Microsoft Ads features.

<u>Search Distribution Agreements.</u>  Plaintiffs advance the same claims regarding Google's search distribution agreements as the DOJ Plaintiffs.  As explained in Google's parallel motion for summary judgment regarding those agreements, summary judgment should be granted as to Plaintiffs' claims as they pertain to Google's search distribution agreements.

For these reasons, the Court should grant Google summary judgment on the entirety of Plaintiffs' case.

## I.      FACTUAL BACKGROUND

### A.      Undisputed Facts Relevant to Plaintiffs' SVP Claims

#### 1.      Google's Introduction and Design of Specialized Results

When Google launched its search engine in 1998, its search engine results page consisted of plain text web results ranked according to relevancy and quality ("web results," also called "blue links").  SMF ¶¶ 1, 3.[2]  Google launched its first ads product several years later, allowing advertisers to buy keyword-targeted text ads that would appear on the SERP when relevant to the user query.  SMF ¶ 4.  In the two-plus decades since then, Google has launched many thousands of changes to its SERP aimed at improving the quality of its search results and advertising features.  *See, e.g.*, SMF ¶¶ 33-38.

Among these changes, in the early 2000s, Google began introducing specialized results for certain categories of searches.  SMF ¶ 5.  In the industry, including at Google, categories of searches related to a specific topic (*e.g.*, travel, restaurants, news, shopping, etc.) are sometimes

---

[2] All citations to "SMF" refer to Google's concurrently filed Statement of Material Facts as to Which There Is No Genuine Issue in Support of Its Motion for Summary Judgment.

referred to as "verticals."  SMF ¶ 6.  The first specialized result that Google developed was news. SMF ¶ 12.  This innovation was motivated by the difficulty Google users experienced in finding breaking news during the 9/11 terrorist attacks, during which Google's search results mainly displayed links to webpages with general information about the World Trade Center.  *Id.*  To address this, Google created specialized results that offered a better way to present news to its users by, among other things, emphasizing fresh results or a sudden change in information about a topic that might reflect a significant news event.  SMF ¶ 13.

Over the past twenty years, Google has developed and introduced dozens of specialized units in categories as varied as shopping (2002), local (2004), sports scores (2006), weather (2006), hotels (2011), flights (2011), local services (2015), and events (2017).  SMF ¶¶ 10, 16, 28, 59, 108, 135, 171, 202.  Whether a unit triggers at all, and where it is displayed on the SERP, is algorithmically determined based on many signals, including relevance to the user query and the quality of the information in the unit.  SMF ¶¶ 9, 15.  When triggered, the unit will present users with structured or "packaged" information about a specific topic (*e.g.*, a carousel of relevant products, a map identifying relevant places, a graph of flight prices) that may be drawn from many different sources, such as user and merchant generated content and licensed data feeds.  SMF ¶¶ 16, 30.  A portion of the SERP that Google returned for an exemplar query for "hotels in Washington, DC" is reproduced below.  SMF ¶ 8.



The hotels unit appears in the middle of the screenshot, with text ads appearing above it (here, from SVPs Expedia and Priceline.com), and "organic" (non-paid) web results below (here, starting with a result from the SVP Hotels.com). Google has designed a number of units in various vertical categories of search to include associated "immersive" pages. SMF ¶ 20. Google displays the associated immersive pages when the user clicks on certain aspects of a unit (*e.g.*, the "View 284 hotels" link in the screenshot above); the immersive pages provide users more information about that particular topic. SMF ¶¶ 20-21. When the user selects a particular product or service—

either from the unit or the immersive—Google typically displays what it calls a "detail page" with more information about that product or service.  SMF ¶ 22.  The detail page often includes the names and links to third parties providing the relevant product or service for purchase, such as the supplier (*e.g.*, Marriott) or an SVP.  SMF ¶¶ 96, 128, 184.[3]

### 2.    Specialized Vertical Providers

Google competes with so-called "Specialized Vertical Providers" or "SVPs" in a number of categories of commercial search queries.  SVPs are online businesses that offer search and other services focused on a particular "vertical" area like travel or shopping.  As defined by Plaintiffs, SVPs "focus on a specific, narrow range of queries, often confined to a single vertical commercial segment."  Colo. Pls.' Compl. (ECF No. 1-2) ¶ 68.  Examples of SVPs identified by Plaintiffs in the challenged verticals include: in the travel vertical, Booking.com, Expedia, and TripAdvisor; in the local services vertical, Angi, HomeAdvisor, Thumbtack, and Rover; and in the local vertical, OpenTable and Yelp.  Ex. 115 (Colo. Pls.' 4th Supp. Resps. To Google's 1st Interrogs.), at 19-20.

### 3.    The Challenged Units

Plaintiffs' claims are directed to the information that Google chooses to display in the specialized units that may appear in response to user queries in four categories: hotels, flights, local, and local services ads.  Ex. 115 (Colo. Pls.' 4th Supp. Resps. To Google's 1st Interrogs.), at 27-28.[4]  A brief summary of each is provided below.

---

[3] Exemplar immersive pages and detail pages are reproduced in Google's Statement of Material Facts for reference.  SMF ¶¶ 93, 96, 98, 123, 127, 161.

[4] Plaintiffs' interrogatory responses also identified Google's movies and events units.  Google's Statement of Material Facts outlines the relevant facts regarding those units, SMF ¶¶ 186-211, but given that Plaintiffs' expert economist does not offer any opinion about those units, Ex. 114 (Baker Tr.) 41:2-42:16, Google does not separately address them here.

***Hotels.***  Google launched the first iteration of its hotels unit in 2011.  SMF ¶ 59.  Previously, a user searching for hotels on Google would be presented with only text ads, limited hotel information in the local unit, and web results providing links to specific hotels or SVPs—where users would then need to further search for hotel availability and pricing.  SMF ¶ 60.  After Google introduced the hotels unit, when a user enters hotel-related queries, Google may serve a SERP containing a "hotels unit" among other SERP elements (such as text ads and additional web results).  SMF ¶ 55.  The current iteration of the hotels unit allows users to see a map of the relevant area with a list of hotels and information about those hotels, including images, reviews, availability, and pricing.  SMF ¶¶ 56, 58; *see also supra*, p.6 (screenshot of SERP).  The unit also links to an "immersive page" that shows more available hotels and provides options for users to search and filter for hotels.  SMF ¶¶ 58, 92-93.  When a user selects a particular hotel property (*e.g.*, the Capitol Hilton in the image above), either from the unit or the immersive, the user is taken to a hotel "detail page" with more information, including both paid and unpaid booking links from a variety of sources that may include SVPs.  SMF ¶¶ 95-97.  If a user searches directly for a specific hotel property (*e.g.*, "Hyatt Regency McCormack Place"), the SERP may display a hotel "knowledge panel" for that property instead of the hotels unit.  SMF ¶ 98.  Both paid and unpaid booking links for SVPs can appear in the knowledge panel.  *Id*.

***Flights.***  Google launched its flights unit in 2011.  SMF ¶ 108.  Previously, a user searching for flights on Google would be presented with only text ads, basic flight schedule information in the flights "onebox," and web results providing links to individual airline websites or SVPs—where users would then need to further search for flight availability and pricing.  SMF ¶¶ 103-05.  After Google designed its flights unit, when a user enters certain queries relating to air travel, such as "flights from Chicago to San Francisco," Google may serve a SERP containing a flights unit.

SMF ¶¶ 99-100.  The design varies depending on the query, but an exemplar design lists airlines, flight durations, and prices matching the user-entered criteria, as well as a graph of flight prices that helps users find the lowest-cost dates to fly a particular route.  SMF ¶¶ 100, 102.  There is also a link to Google's flights immersive, which provides users with search options.  SMF ¶¶ 102, 123-26.  After a user refines their flight search, they can select their flights and view a detail page where Google displays the complete flight itinerary.  SMF ¶ 127.  This detail page displays unpaid booking links to airlines, as well as to SVPs (when such links are permitted by the airline).  SMF ¶¶ 127-29.

*Local.*  Google launched its local unit in 2004.  SMF ¶ 135.  Previously, Google would surface only text ads and web results in response to a query associated with a local entity; meaning that if a Google user was interested in finding a restaurant in New York City, the user would only see ads or links to other websites with information about restaurants in New York City or individual links to the hundreds of New York restaurants.  SMF ¶ 136.  After Google designed its specialized local results, when a user enters certain queries relating to local entities, Google may serve a SERP containing a "local unit" (also referred to as the "local universal unit").  SMF ¶ 130.  The unit provides a list of relevant local entities on a map of the user's location (or the user-specified location), along with information about those entities that Google deems most pertinent to users' information needs, such as images, ratings, address, and descriptions or key attributes.  SMF ¶¶ 131, 133.  The unit may also provide advertisements for such entities.  SMF ¶ 134.  Google's design allows users to navigate to an immersive or detail page from the local unit where the user may search, find information about more local entities, or navigate to websites for the local entity or SVPs if applicable.  SMF ¶¶ 133, 161.  If a user searches directly for a specific local

entity (*e.g.*, "Rasika West End"), the SERP may display a panel for that place instead of the local unit.  SMF ¶ 162.

***Local Services Ads.***  Google launched a pilot of its Local Services Advertisement ("LSA") unit in 2015 and has since expanded to other cities and regions, as well as new service categories. SMF ¶¶ 171-76.  When a user enters certain queries relating to local services, such as "electricians near me," Google typically surfaces a carousel of LSAs at the top of the SERP.  SMF ¶ 163.  LSAs may include, for example, the service provider's name, a summary of reviews (*i.e.*, star ratings) that a provider has received from users, and, if applicable, a Google Guaranteed badge, the provider's SVP affiliation, and other information.  SMF ¶ 166.  A user may view additional details about a service provider by clicking on the ad listing.  *Id*.  Unlike the other specialized units challenged by Plaintiffs, Google's LSAs are solely an ads product.  Google directly connects its users to particular service professionals (*e.g.*, plumbers or electricians) through LSAs by, for example, a click-to-call button or online scheduling tool, and in return is paid on a per lead basis. SMF ¶ 184.  Google offers SVPs the ability to buy LSAs on behalf of professionals that also advertise on the SVP's site.  SMF ¶ 183.  These ads provide the SVP's name and information about the professional.  SMF ¶ 183.

### 4.    Google's Testing of Search Results

Before launching changes to its SERP, including with respect to the challenged units, Google analyzes whether the potential new design will, based on Google's metrics, improve the search experience for Google's users.  *See, e.g.*, SMF ¶¶ 36-51; *see also infra* p. 24.  Google evaluates potential launches using both qualitative and quantitative inputs, including feedback from external Search Quality Raters, live user tests, and traffic analyses.  SMF ¶¶ 36, 39.

For example, Google will often send "side-by-side" comparisons of the existing results and the results from the proposed launch to Search Quality Raters, who are trained to evaluate search

results based on Google's search quality guidelines.  SMF ¶¶ 40-41.  Raters will assign scores in the context of all the results on the page, with particular stress given to how helpful each result set is as a whole.  SMF ¶¶ 42-44.  Another way in which Google evaluates whether to implement a new or updated specialized unit or other change to its search results is live traffic tests, whereby Google sends search results that include a proposed change to a fraction of its existing users and evaluates user interactions with the results.  SMF ¶ 45.  The side-by-side and live traffic tests provide a variety of metrics about the proposed launch, including how users interact with the entire results page as well as individual parts of the page.  SMF ¶¶ 46-47.  Following testing, Google's Launch Committee reviews the results of Google's quality tests in light of Google engineers' experience in analyzing search quality and decides whether to launch the change based on whether it is expected to improve Google users' search experience.  SMF ¶¶ 48-50.

After the launch of a specialized unit, Google continues to conduct tests and surveys to understand how helpful its users find the experience, and to evaluate potential improvements. SMF ¶¶ 52-54, 80-88, 113-16, 154-55, 177.  One such test is called an "ablation study," in which Google turns off or removes a specialized unit (or aspect thereof) from its search results in order to measure the difference in quality between a SERP with and without that result (or aspect thereof).  SMF ¶ 53.

### 5.    Google's Data Agreements

For some specialized units, Google enters into agreements with third parties to receive structured data (again, data in a standardized format that allows for easier importation and use) via a data feed for use in its specialized results and in connection with serving advertisements.  SMF ¶¶ 212-14; *see also id.* ¶¶ 84 (hotels), 118 (flights), 157 (local).  Google obtains the data in an effort to ensure that it has up-to-date information and because the data may otherwise not be available on the open web (or, if available, may not be reliable).  SMF ¶¶ 85, 119, 158, 182, 213-

14.  For example, for the hotels unit and associated immersive and detail pages, Google contracts with hotels and with SVPs such as online travel agencies for price information, availability, and lodging features.  SMF ¶ 216.  Those data allow Google to display the hotel's or SVP's offerings to users in search results and advertisements.  SMF ¶¶ 214, 216, 221.  For instance, when travel SVPs provide pricing and availability data to Google for hotel rooms, Google uses those data to determine whether the SVPs' offerings are relevant to a user inquiry (*e.g.*, whether that provider has available rooms at properties responsive to the user's query); if the user selects a hotel that the SVP offers, Google identifies and links to that SVP on the hotel detail page so that the user can navigate to the SVP site to complete a transaction.  SMF ¶¶ 96-97, 213-14, 216.

**B.     Undisputed Facts Relevant to Plaintiffs' SA360 Claim**

**1.     Advertisers' Options for Buying Online Advertising**

Advertisers have numerous choices when it comes to buying online ads.  For example, advertisers can buy online advertising:

- Directly from online content publishers, for example, The New York Times.  SMF ¶ 243(a).

- Directly from online platforms like Google, Amazon, Facebook, and Microsoft. SMF ¶ 243(b).  Advertisers may purchase advertisements from these "native tools" or "user interfaces" without using a search engine management tool ("SEM tool"). *Id.*  Microsoft Ad's native tool, for instance, allows advertisers to bid on ads that would show up on its Bing search engine using all of the functionality that Plaintiffs claim SA360 should have adopted sooner.  SMF ¶¶ 245-248, 251.[5]

- Using SEM tools.  SEM tools allow advertisers to manage ad campaigns across multiple channels (*e.g.*, more than one search engine or social media platform). SMF ¶ 243(c).  SA360, Marin, Skai (formerly "Kenshoo"), and Adobe are examples of SEM tools.  *Id.*

---

[5] Microsoft Advertising (or "Microsoft Ads" or "Bing Ads") is a pay-per-click advertising platform used to display ads based on the keywords used in a user's search query.  SMF ¶ 245.  Advertisers can use Microsoft Ads to place ads on the search results page of Bing, AOL, and Yahoo owned and operated sites, as well as Bing, AOL, and Yahoo syndicated search partner sites.  *Id.*

Advertisers of course are not limited to a single option for purchasing online advertising, and may buy advertising through a mix of these options, a practice known in the industry as "multi-homing."  SMF ¶¶ 244, 249.

### 2. Google's SA360 SEM Tool

SA360, like other SEM tools, serves as an interface between advertisers and platforms on which advertising can be purchased.  SMF ¶¶ 243(c), 252.  SA360 allows agencies and marketers to manage their search marketing campaigns across multiple search engines, including Google Ads, Microsoft Ads, Yahoo! Japan, and Baidu.  SMF ¶ 252.  Rival SEM tools include Skai, Marin, and Adobe.  SMF ¶¶ 243(c), 253.  These rival SEM tools all allow advertisers to buy ads on search engines, social media, and other sites, and, unlike SA360, integrate not just with search engines like Google and Bing, but also with sites like Amazon, Facebook, Twitter, and Pinterest.  SMF ¶¶ 252-54.  All SEM tools vary with respect to the advertising features that they support for search engines and other channels (*e.g.*, social media), and the extent of that support.  SMF ¶¶ 250, 252-54.

Advertisers are free to use any of those SEM tools.  SMF ¶¶ 243(c), 244, 249-51, 253-54.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██ Because there are several options for buying online advertising, SEM tools must compete for customers.  Any advertiser that is dissatisfied with an SEM tool's performance or features can multi-home, switch to another SEM tool (as major advertisers like ████████████ have done),

---

[6] This figure does not include search ad revenue generated by U.S.-based platforms other than Google Ads or Microsoft Ads—platforms with which SA360 does not integrate.  *Id.*

or advertise directly with the publisher or platform using native tools.  SMF ¶¶ 243-44, 249, 251, 257-58.

Each search provider offers different advertising features, not all of which are supported by SA360 or other SEM tools.  SMF ¶¶ 250, 252-54.  Notably, no SEM tool provider achieved "full feature parity" between Google Ads and Microsoft Ads, meaning an identical set of features for Google Ads and Microsoft Ads.  SMF ¶¶ 271, 275, 279-80, 283-85. ███████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████ An advertiser that prioritizes Microsoft Ads automated bidding has the option of using Skai's SEM tool or using Microsoft Ads' native tool to purchase search ads.  SMF ¶¶ 245-48, 251, 282.  Developing and maintaining a SEM tool that can integrate with advertising features of different search engines and other advertising channels is complicated.  This process necessarily involves some assessment of the technical feasibility of adding the new features and advertiser demand for the features.  SMF ¶ 293. ██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████ SMF ¶¶ 294-96. ████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

### C.      The Claims and Conduct at Issue in the Plaintiffs' Case

#### 1.      The Alleged Markets

Plaintiffs allege that Google has unlawfully maintained a monopoly in three markets, which they label "(a) general search services; (b) general search text advertising, and (c) general search

advertising." Colo. Pls.' Compl. (ECF No. 1-2) ¶ 59.[7]  According to Plaintiffs, "[f]or consumers, general search engines are distinct from specialized vertical providers." *Id.* ¶ 67.  As Plaintiffs define the relevant markets, SVPs do not compete in the relevant markets because they are not general search engines. *Id.* ¶ 173.  Although Google disagrees that Plaintiffs' alleged markets are cognizable markets under applicable law or that it is a monopolist in any properly defined market, that disagreement is not the subject of the present motion and resolving it is not necessary to dispense with Plaintiffs' claims.  The remainder of this submission therefore focuses on the alleged conduct that Plaintiffs contend is anticompetitive.

### 2.      The Alleged Conduct and Effects

### a.      Plaintiffs' Challenge Regarding Google's Specialized Units

Plaintiffs claim that "Google has acted to leverage and protect its monopoly power through its operation of" specialized results that Google displays for certain queries in certain verticals. Colo. Pls.' Compl. (ECF No. 1-2) ¶ 198.  Plaintiffs challenge two aspects of Google's conduct.

First, Plaintiffs assert that Google's design of specialized units in certain verticals disadvantages SVPs by limiting their visibility on Google's SERP. *Id.* ¶¶ 177-192.  Second, Plaintiffs challenge Google's acquisition of certain data that Google uses to display results to users: they claim that Google's contracts with SVPs unfairly require the SVPs to provide Google data

---

[7] The Colorado Complaint incorporates paragraphs 1-172 of the Department of Justice's complaint in *United States of America et al. v. Google*, 1:20-cv-03010.  Colo. Pls.' Compl. (ECF No. 1-2) ¶ 58.  That includes the incorporation by reference of the "search advertising market defined in the DOJ Complaint," Colo. Pls.' Compl. (ECF No. 1-2) ¶ 56, n.3, but Colorado Plaintiffs also define an additional search advertising market that is narrower than that defined by the DOJ Plaintiffs (as it does not include any search advertising by SVPs), which they label as "general search advertising."  Both the DOJ Plaintiffs and Colorado Plaintiffs allege a "general search text advertising" market.

without adequately compensating the SVPs or, in some cases, without adequately crediting the SVPs as the source of the data. *Id.* ¶¶ 193-197.

These claims relate exclusively to Google's treatment of SVPs, firms that are expressly excluded from Plaintiffs' alleged "general search services" market and related advertising markets. Colo. Pls.' Compl. (ECF No. 1-2) ¶ 173.  Plaintiffs thus pursue a highly speculative and indirect theory of harm.  They contend that Google's conduct *vis-à-vis the SVPs* has anticompetitive effects in the alleged *general search services markets*: if Google's design of the challenged units afforded SVPs more visibility and if Google relaxed its data requirements, the argument goes, then the SVPs would be more successful; and if SVPs were more successful, then they would be better prospective partners for Google's general search engine rivals; and if SVPs were better prospective partners, then they would enter into more or different (unidentified) partnerships with those general search engines than they already do; and if more of those imagined partnerships existed, then *general search engines* would potentially increase competition in the general search services market. *Id.* ¶ 206; Ex. 113 (Baker (Colo. Pls.' Expert) Reply Rep.) ¶¶ 9, 14.

### i.      Plaintiffs' Challenge to Google's SERP Design

Plaintiffs do not challenge Google's introduction of specialized units on its SERP or its "subsequent use of these SERP features *per se*."  Ex. 112 (Baker Reb. Rep.) ¶ 34; *see also id.* at ¶ 99, n.237 ("the States do not challenge Google's use of SERP universals.").[8]  Nor do Plaintiffs claim that Google excludes SVPs from appearing elsewhere on the SERP—from either the (free) web results, or from purchasing text ads.  Rather, Plaintiffs contend that Google must redesign its

---

[8] Indeed, Plaintiffs do not dispute that Google's introduction of specialized units provided users with useful results that were not previously available on Google's SERP.  And Plaintiffs' economic expert offers no opinion on whether Google improperly triggers specialized units or whether Google should have introduced the units in the first place. Ex. 114 (Baker Tr.) 45:1-46:23.

specialized units to afford SVPs more visibility within the units as the units are first displayed on the SERP (including better attribution and weblinks to the SVPs' sites), before the user navigates to the associated immersive and/or detail pages.  Ex. 111 (Baker Opening Rep.) ¶ 279; *see also* Ex. 115 (Colo. Pls.' 4th Supp. Resps. To Google's 1st Interrogs.), at 19-20 (alleging that certain of Google's vertical search units are designed "in a manner that limits the ability of" SVPs "to appear and participate").  Although Google's specialized results link to SVPs in their immersive and/or detail pages, these promotional opportunities supposedly are not sufficient.

### ii.        Plaintiffs' Challenge to Google's Use of SVP Data

Google enters into content-licensing agreements with SVPs to obtain information it may use to respond to user queries.  SMF ¶¶ 212-22.  Plaintiffs' claims focus on Google's agreements with online travel agencies and travel metasearch companies for structured data, such as pricing and availability information.  Google uses the information to return relevant search results to users, including results that link and direct traffic to the SVPs; this data changes rapidly and is not reliably crawlable on the open web.  SMF ¶¶ 85 (hotels), 119 (flights); *see also id.* ¶¶ 216-219.  Plaintiffs also challenge Google's contracts with local service SVPs in connection with Google's Local Services Ads program.

Plaintiffs object to certain terms of those agreements, specifically Google's "advertising terms and conditions that require specialized vertical providers to provide data to Google in order to participate in certain Google features or advertising."  Ex. 115 (Colo. Pls.' 4th Supp. Resps. To Google's 1st Interrogs.), at 4.  According to Plaintiffs, those terms and conditions permit Google to use SVP data "without compensation . . . [or] without attribution or with limited attribution to the" SVPs, and "without providing any information or limited information to specialized vertical providers about users who click on or otherwise interact with the features or advertising and/or without restrictions or with minimal restrictions on Google's use of the data."  *Id*.  In short,

Plaintiffs claim that Google "uses valuable data that it forces" SVPs "to share with Google to populate information in certain features and immersives and for its own competitive advantage." *Id*. at 19-20.

### b.    Plaintiffs' Challenge Regarding Google's SA360 SEM Tool

Plaintiffs' claim concerning SA360 is narrowly cast and relates only to advertising features offered by Microsoft Ads.  Specifically, the allegations concern SA360's implementation of support for five specific Microsoft Ads features: 1) call extensions, 2) automated bidding, ███████ ██████████████████████████████████████████████████████ Colo. Pls.' Compl (ECF 1-2) ¶¶ 152, 160; Ex. 9 (Amaldoss (Colo. Pls.' Expert) Opening Rep.), Table 2 at 130-31.   Of those, SA360's new platform has already implemented support for four of these features, ██████████ ███████████████████████████████████. SMF ¶¶ 272, 291, 308-12.

Plaintiffs allege that Google, by delaying and/or not providing full support for these features, "harms competition by refusing interoperability to comparable advertising features offered by Microsoft's Bing general search engine," Colo. Pls.' Compl. (ECF No. 1-2) ¶ 50, because allegedly as a result, "advertisers buy more of [Google's] general search advertising, and less of any rivals,' [sic] than they would in a more competitive marketplace," *id.* ¶ 149.  As the case has developed, perhaps for the obvious reason that four of the challenged features are now supported, ████████████████████████████████████████████████████████ ██████████████████████████████. *Id.* ¶¶ 152-58.

## II.    LEGAL STANDARDS

### A.    Sherman Act § 2: Elements of a Monopoly Maintenance Claim

"A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *United States v.*

*Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).  The burden of proof rests on the plaintiff, who must demonstrate that the defendant "maintained" monopoly power "through anticompetitive means"— so-called "exclusionary conduct."  *Id*. at 51, 58; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013).  To show exclusionary conduct, the plaintiff must initially show both that the defendant's conduct is the *type* that courts condemn as exclusionary, and that the challenged conduct *in fact* had "the requisite anticompetitive effect," *i.e.*, that competition was harmed.  *Microsoft*, 253 F.3d at 58-59.

As to the first element, conduct that is "competitive, even severely so," *id*. at 58, does not violate the Sherman Act.  For example, "a monopolist does not violate the Sherman Act simply by developing an attractive product," or by otherwise engaging in "competition on the merits." *Id.* at 68, 65.  "Action that injures rivals *may* ultimately injure consumers, but it is also perfectly consistent with competition, and to deter aggressive conduct is to deter competition." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986); *see also Microsoft*, 253 F.3d at 58 ("'The successful competitor, having been urged to compete, must not be turned upon when he wins.'" (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945)).

As to the second element, the plaintiff must prove "the anticompetitive *effect* of the monopolist's conduct."  *Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (emphasis added).  That anticompetitive effect must reflect "harm [to] competition, not just a competitor," and it must be "substantial." *Microsoft*, 253 F.3d at 59, 62.  Specifically, to be "anticompetitive," the defendant's conduct must "ha[ve] a *substantial effect* in protecting [its] market power, *and* do[]" so through a means other than competition on the merits."  *Id.* at 62 (emphasis added).

Failure to make either showing leaves the plaintiff unable to establish a *prima facie* case. *Id*. at 60, 72. Only if the plaintiff meets its *prima facie* burden does the analysis proceed to consider justifications or a determination of "whether the monopolist's conduct on balance harms competition." *Id.* at 59.

**B.     Sherman Act § 2: Claims Based on Product Design Changes**

"As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Id.* at 65. Indeed, if a product design change improves a product, the conduct reflects "competition on the merits," and cannot (absent some associated conduct that is not claimed here) form the basis for an antitrust violation. *Id.* at 65-75; *Allied Orthopedic v. Tyco Health Care Group*, 592 F.3d 991, 1000 (9th Cir. 2010) (explaining product improvement does not violate section 2 absent associated anticompetitive conduct). "[A] monopolist does not violate the Sherman Act simply by developing an attractive product." *Microsoft*, 253 F.3d at 68. As leading antitrust commentators explain: "[P]roduct superiority is one of the objectives of competition and cannot be wrongful, even for a monopolist. As a result, the courts have held categorically that a genuine product improvement cannot be an antitrust violation." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 781a (5th ed. 2022); *see also Cal. Comput. Prods., Inc. v. IBM*, 613 F.2d 727, 744 (9th Cir. 1979) (Even monopolists have "the right to redesign" products "to make them more attractive to buyers—whether by reason of lower manufacturing cost and price or improved performance.").

In *Microsoft*, for example, the D.C. Circuit applied these principles to bless Microsoft's development and promotion of its own Java Virtual Machine ("JVM")–which translated code into instructions to the operating system, and competed with Sun Microsystem's JVM (previously the only option on Windows). *Microsoft*, 253 F.3d at 74-75. Recognizing Microsoft's design changes enabled Java applications to run faster on Windows than did Sun's version of the product—that is,

it reflected a Windows product improvement—the court concluded that Microsoft's development of its own JVM comprised competition on the merits. *Id.* Because the challenged conduct made the product "more attractive to consumers," and did not "reduc[e] the usage share of rivals" through "something *other* than competition on the merits," *id.* at 65 (emphasis added), the court reversed the district court's "imposition of liability for Microsoft's development and promotion of its JVM," *id.* at 75.

The court so held even though Microsoft's JVM was intentionally designed to break compatibility with Sun's competing product (a Java application designed to work with Microsoft's JVM would not work with Sun's JVM). *Id.* at 74-75. Even though the incompatibility in *Microsoft* caused many Java developers not to distribute applications compatible with Sun's standards, the D.C. Circuit did not consider whether Microsoft could have achieved the same speed gains while maintaining compatibility. Instead, the court ended its analysis upon concluding that the product redesign was a genuine improvement. *Microsoft*, 253 F.3d at 75.

Thus, in assessing a design change that amounts to a product improvement, there is "no room" to balance "the benefits or worth of [the] product improvement against" any supposed "anticompetitive effects." *Allied Orthopedic*, 592 F.3d at 1000. "[W]eigh[ing] the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable." *Id.* "There are no criteria that courts can use to calculate the 'right' amount of innovation, which would maximize social gains and minimize competitive injury." *Id.* For courts to second-guess product improvements by asking whether some alternative design might achieve equal or comparable gains while being more favorable to rivals is both unadministrable as well as harmful to innovation. *See id.*

Applying this framework, a "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Id.* at 999-1000; *see also Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1018 (Fed. Cir. 2020) (rejecting plaintiff's balancing test which would have weighed procompetitive benefit of a product against loss of competition in relevant markets); *In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137, 1144 (N.D. Cal. 2011) (because a product redesign "was a genuine improvement," the court could "not balance the benefits or worth of" the product redesign "against its anticompetitive effects"). Thus, if the evidence shows a genuine product improvement, the challenger must show that some *other* conduct—conduct separate from "the product improvement at issue"—is exclusionary. *Allied Orthopedic*, 592 F.3d at 1002; *see also id.* at 998-999 ("[A] design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct.").

## C.    Summary Judgment Under Federal Rule of Civil Procedure 56

A federal "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine' . . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conversely, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249 (internal citations omitted).

"[S]ummary judgment is not disfavored in the antitrust context," *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010); indeed "[s]ummary judgment is of particular importance in the area of antitrust law, because it helps to avoid wasteful trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces," *Major*

*League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (brackets and quotation marks omitted).  In this case, as in any other, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## III.   ARGUMENT

### A.   Plaintiffs' SVP Claims Fail

Plaintiffs cannot meet either element of their *prima facie* burden: the challenged conduct is a genuine product improvement and so not of the type that is cognizable under the Sherman Act, and nor can they raise a triable issue with respect to the requisite anticompetitive effects.

### 1.   The Challenged Designs Are Indisputably Improvements to Google's SERP

The undisputed facts show that Google's introduction of the challenged units improved its SERP by providing new benefits to users.  Indeed, Plaintiffs do not suggest otherwise, and the lack of any dispute on this score dooms Plaintiffs' claim as a matter of law.

The reason is simple:  Courts embrace "new benefit[s] to consumers" such as "improv[ed] performance," *Allied Orthopedic*, 592 F.3d at 998-1001, as "competition on the merits," *Microsoft*, 253 F.3d at 65.  And it is undisputed that Google's design of these challenged units allows users to access relevant information, in a user-friendly format not previously available on Google.  SMF ¶¶ 58-60 (hotels), 102-03 (flights), 133-36 (local), 166-69 (local services ads).  Those units display a useful summary of information that enhances the user experience, and users can obtain further information from Google's immersive and detail pages that are linked from the units.  *See, e.g.*,

SMF ¶¶ 58, 102, 133, 166.  As Plaintiffs' experts readily admit, these units are "useful to consumers."[9]  That admission is fatal to their claim.

Nor can there be any genuine dispute that Google believed that its product design changes would improve its service to users—and with good reason.  Google extensively researched whether and how specialized units improve its SERP.  SMF ¶¶ 36-54, 67-83 (hotels), 109-16 (flights), 144-49 (local), 171-76 (local services ads).  Before introducing or altering its SERP design, Google first evaluates, through external human Search Quality Raters, live user tests, traffic analyses, or a combination thereof, whether the potential change would improve the user experience.  SMF ¶¶ 36-51; 67-71, 74, 78 (hotels); 109-11, 114-15 (flights); 147-149 (local), 171-76 (local services ads).  Over time, Google's vertical teams have confirmed improvements in the efficiency of search for Google's users and that these specialized units have improved the user experience on Google Search.  SMF ¶¶ 52-54; 80-83 (hotels); 110, 116 (flights); 154-56 (local), 176-77 (local services ads).

The present case is therefore on all fours with case law holding that a product redesign that improves a product cannot, by itself, harm competition.  *Microsoft*, 253 F.3d at 75.  This is the case even where those redesigns make a monopolist's product less compatible with a competitor's product.  *Id.* at 74-75.  In the Ninth Circuit's decision in *Allied Orthopedic*, for example, the court

---

[9] Professor Amaldoss admits that the flight unit "can be helpful" to users, Ex. 40 (Amaldoss (Colo. Pls.' Expert) Tr.) 209:1-15, and "attracts travelers who are actively looking for specific flight options and connects them with airlines that meet the consumer's needs," Ex. 9 (Amaldoss Opening Rep.) ¶ 142.  Likewise, the hotels unit "is useful to consumers," Ex. 40 (Amaldoss Tr.) 171:1-3.  Professor Amaldoss also agreed that "there's advantages to small businesses" from being able to appear in Google's LSAs, *id.* at 150:6-12, and that the local unit can be beneficial in meeting users' information needs, *id.* at 239:5-9.  Professor Baker acknowledges that Google's vertical search units "provide users with what amounts to an abbreviated selection guide on its SERP that incorporates a map or information about prices and features of various products." Ex. 112 (Baker Reb. Rep.) ¶ 99.

affirmed a grant of summary judgment on a Section 2 monopolization claim challenging defendant Tyco's redesign of its OxiMax sensor.  There, Tyco not only "initially believed that clinicians would value the new feature set," but "the documents [also] show[ed] that Tyco continued to believe that the flexibility of the new OxiMax platform would appeal to consumers at the point that it introduced OxiMax."  *Allied Orthopedic*, 592 F.3d at 1001.  So too here.  It is undisputed that Google implemented its product redesigns with the expectation that they would improve Google's search service for users.  Indeed, unlike *Allied Orthopedic*, where the evidence showed that post-launch some of Tyco's expectations regarding market acceptance had not been met, *id.*, here Google's ordinary course metrics showed that its product changes did in fact improve the user experience.  SMF ¶¶ 67-83 (hotels); 109-16 (flights); 144-56 (local), 172-77 (local services ads).

Plaintiffs have not contended that Google's methodology for evaluating its product designs was pretextual, or that it used some anomalous testing approach for the challenged designs that it does not employ in testing other contemplated changes to its SERP.  Nor could they: the undisputed record shows that Google used its same processes and methods for assessing whether to implement these product changes as it uses in the ordinary course of testing other contemplated design changes.  SMF ¶¶ 36-54; 68-70, 78 (hotels); 109-11 (flights); 147-49 (local); 171-76 (local services ads).

There is also no reason to second-guess Google's belief that its product design decisions make ample good sense.  Within the verticals at issue, if the user chooses to click into the unit on the SERP, Google displays SVPs at a logical point in a user's search journey: the point at which the user is ready to make a purchase.  Thus, for example, if a user clicks on a particular hotel within Google's hotels unit, the user is directed to the hotel's detail page.  SMF ¶ 95.  Once within that

particular hotel's detail page, Google surfaces links to book the hotel from SVPs and other websites.  SMF ¶¶ 77, 89, 96.

There is, in short, no basis to dispute that Google's design of its specialized results not only was expected to, but does, improve the overall quality of Google Search for its users.  As discussed immediately below, Plaintiffs' effort to create a triable issue boils down to a claim that this is not enough—that Google is obliged to design its search service in a way that best promotes SVPs. That theory is foreclosed by both uniform case law and sound antitrust policy.

### 2. Plaintiffs Have Failed to Raise a Triable Issue Regarding Google's Legitimate SERP Design

Notwithstanding the overwhelming, undisputed evidence that Google's designs comprise "competition on the merits," *Microsoft*, 253 F.3d at 62, Plaintiffs raise two arguments in their effort to create a triable issue.  First, they contend that Google should have adopted a different (and unidentified) design that would have provided SVPs more visibility—implying that Google has a duty to design its SERP to accommodate the interests of SVPs.  Second, through their economic expert Jonathan Baker, they question the usefulness of the challenged units on the basis of his click-through-rate analysis.  *See* Ex. 112 (Baker Rebuttal Rep.) ¶¶ 23-26.  Antitrust law does not allow the courts to micromanage Google's design of its SERP.

### a. Whether Google Could Have Designed Its Results Differently Is Irrelevant to Whether Google's Design Is An Improvement

Implicit in Plaintiffs' claim is the notion that Google had an obligation to select a different design that better promoted SVPs.  According to them, Google limits "the ability of specialized vertical providers to display their own brand name prominently or at all," does not "allow[] links to specialized vertical providers' own websites," and "show[s] links to specialized vertical provider's websites in less prominent places."  Ex. 115 (Colo. Pls.' 4th Supp. Resps. To Google's 1st Interrogs.), at 22; *see also* Ex. 111 (Baker Opening Rep.) ¶ 52 (Google's policies "interfere

with the ability of" SVPs "in certain segments . . . to use cost-effective means of obtaining visibility on Google's SERP that are available to other businesses.").

But these contentions fail to show that the design Google chose is anything other than a product improvement.  The Sherman Act imposes no duty on Google to provide SVPs free visibility or to offer specialized ad units where SVPs are displayed more prominently.  "Antitrust law does not compel your competitor to praise your product or sponsor your work."  *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989).  Firms have no duty "to send" rivals "business on favorable terms," *Simon & Simon, PC v. Align Tech., Inc.*, 2020 WL 1975139, at *7 (D. Del. 2020), or to "constrict[] [their] product development so as to facilitate sales of rival products," *Cal. Comput. Prods.*, 613 F.2d at 744.  *See also Liveuniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852, at *14-15 (C.D. Cal. June 4, 2007) (finding no anticompetitive conduct where MySpace deleted links to another website from its own site but did not otherwise restrict users' ability to access that site or create links on platforms other than MySpace).

Plaintiffs' efforts to second-guess Google's design decisions do not suffice to raise a triable issue.  "[C]ourts are poorly equipped to evaluate" the "significance, usefulness, or competitive or other effects of innovation."  Areeda & Hovenkamp, *supra*, ¶ 775c.  Plaintiffs' contention that there may have been a better design that Google could have adopted would leave the Court "enmeshed in a technical inquiry into the justifiability of product innovations," *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 439 (N.D. Cal. 1978) (internal quotation marks omitted), which would in turn risk "dampening . . . technological innovation" in a manner "at cross-purposes with antitrust law," *United States v. Microsoft*, 147 F.3d 935, 948 (D.C. Cir. 1998).  And given the nature of innovation, particularly in "technologically dynamic markets," "[b]y the time a court can assess liability, firms, products, and the marketplace are likely to have changed dramatically."

*Microsoft*, 253 F.3d at 49. Google continually experiments and innovates to improve its SERP. *See supra* pp. 4-5. There is no way to predict the future innovations that could be stifled by intervention in Google's design of its search results, and thus no way to adequately account for lost future innovation if all product designs can be questioned after the fact by lawyers and economists substituting their product design preferences for those of the innovator. That is precisely why "a genuine product improvement cannot be an antitrust violation." Areeda & Hovenkamp, *supra*, ¶ 781a. The uncertainty firms such as Google would face under a test that "balanced" gains of innovation against impacts on rivals would deter the very innovation the antitrust laws seek to encourage. The rule sheltering a genuine product improvement avoids putting courts "in the position of the innovator before" the "innovation [was] undertaken with all the attendant uncertainties." *Id.* ¶ 776a.

The D.C. Circuit's analysis of Microsoft's incompatible JVM improvement is instructive: The court did not assess whether Microsoft could have achieved the same or comparable speeds in some way that would have preserved compatibility with its rival's JVM. *Microsoft*, 253 F.3d at 74-75. Yet Plaintiffs urge the Court to do just that. Doing so here could very well require the Court to sacrifice the interests of Google's *users* in favor of SVPs. If the unidentified redesign would diminish the value of specialized units to Google users by "only" some quantum, while resulting in better promotion of SVPs, how would the Court go about weighing those trade-offs? Recognizing the impossibility of such balancing, courts have held that the "proper focus of section 2" is "on protecting the process of competition, with the interests of consumers, not competitors in mind." *Novell*, 731 F.3d at 1072. "Forcing monopolists to hold an umbrella over inefficient competitors might make rivals happy but it usually leaves consumers paying more for less." *Id.* (internal quotation marks omitted).

**b.      Plaintiffs' "Click Through" Analysis Is Irrelevant to Whether Google's Design Is An Improvement**

Plaintiffs attempt to create a triable issue regarding the benefits of Google's specialized units with a click-through-rate analysis by their economic expert Professor Jonathan Baker. According to Professor Baker, ███████████████████████████████████████ ████████████████████ Ex. 112 (Baker Reb. Rep.) ¶¶ 23-26.  Google disputes the methodology of this analysis, but accepting his calculations for purposes of this motion, they do not save Plaintiffs' claim.  The extent to which users click on the challenged units as compared to elsewhere on the SERP is irrelevant to the question of whether Google's design is an improvement on the prior SERP design.  As the uniform authorities confirm, there is no lawful basis for substituting Plaintiffs' judgment for Google's as to the usefulness of improvements to its search results—let alone when Google applies its judgment to thousands of potential product changes annually.

* * * *

Plaintiffs' contention that Google's product designs are exclusionary joins the list of failed attacks on product improvements, and Google is entitled to summary judgment on this claim.  *See, e.g.*, *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) (affirming grant of summary judgment challenging product redesign); *Microsoft*, 253 F.3d at 75 (reversing district court's imposition of liability based on product improvement); *Allied Orthopedics*, 592 F.2d at 999-1003 (affirming grant of summary judgment where product "was a genuine improvement"); *Apple*, 796 F. Supp. 2d at 1146 (granting summary judgment where product redesign was "genuine improvement" and plaintiffs presented no evidence of associated anticompetitive conduct).

**3.      Google's Voluntary Data Agreements Are Lawful Business Contracts**

Plaintiffs' assertions that Google's specialized units in certain verticals do not adequately identify SVPs as the source of structured data and that SVPs do not otherwise receive "fair"

29

compensation for their structured data have no basis in fact; and even if they did, would not run afoul of the Sherman Act. *See Pacific Bell Tel. Co. v. linkLine Communcs., Inc.*, 555 U.S. 438, 447-48, 454 (2009) (recognizing that even a monopolist can charge a high price even if that denies rivals a purportedly "fair price" or "living profit" (internal quotation marks omitted)).

Plaintiffs do not dispute that SVPs voluntarily provide structured data to Google under contract, and that Google uses the data to inform whether SVPs should appear in response to a relevant user query. Nor do they dispute that SVPs can appear in web results and text ads without providing any structured data to Google. In other words, it is undisputed that SVPs are not required to provide Google with any data at all to appear on Google's SERP and that Google uses data that SVPs voluntarily provide to surface additional results for users that could ultimately direct business their way. SMF ¶¶ 216-20. Plaintiffs' claim that the SVPs nonetheless receive too little compensation and traffic in return for their data, *see* Ex. 115 (Colo. Pls.' 4th Supp. Resps. To Google's 1st Interrogs.), at 4, has no mooring in antitrust law.

SVPs voluntarily enter into agreements to provide data to Google (and other general search engines) so that Google (and other general search engines) can display relevant information to users in search results and advertisements. SMF ¶¶ 212-13, 222, 233-38. For example, for its hotels results, Google contracts with SVPs to receive structured data related to price, availability, and lodging features. SMF ¶ 216.[10] Those data are different in kind from what Google obtains from crawling the web. SMF ¶¶ 85, 214.

---

[10] Google uses the hotel-related data that SVPs provide to display paid and unpaid links to book hotels on the SVP's site. SMF ¶¶ 96-97, 216. Similarly, Google uses data from SVPs who participate in the LSAs partnership program to display advertisements from which users can obtain the local service being marketed by the SVP. SMF ¶ 219. Google uses data from food-delivery SVPs to display links so that users can order food delivery using the SVP's service. SMF ¶ 217. Google also uses flights-related data to display unpaid links to book flights on SVPs' sites, to the extent permitted by airlines. SMF ¶ 218.

The Sherman Act imposes no obligation on Google to give valuable benefits to SVPs for free or on terms that would be unacceptable to Google.  Indeed, "a company—even a monopolist company—that expends time and money to create a valuable product does not violate the antitrust laws when it declines to provide that product to its competitors for free."  *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1298 (11th Cir. 2004); *see also Novell*, 731 F.3d at 1073 ("Forcing firms to help one another would . . . risk reducing the incentive . . . to innovate, invest, and expand[,]" "results inconsistent with the goals of antitrust.").

Plaintiffs nonetheless argue that SVPs who enter into data-sharing agreements with Google should receive monetary compensation, attribution, or in some cases, more prominent attribution, in ***addition*** to the traffic to their websites that is facilitated by their provision of such data.  But regardless of whether providing such compensation would boost their prospects, the antitrust laws do not require Google to surrender value to SVPs, even if one assumes incorrectly that Google has monopoly power.   "Simply possessing monopoly power and charging monopoly prices does not violate § 2."  *Pacific Bell*, 555 U.S. at 447-48; *see also Kartell v. Blue Shield of Mass.*, 749 F.2d 922, 929 (1st Cir. 1984) ("[T]he choice of what to seek to buy and what to offer to pay is the buyer's.  And, even if the buyer has monopoly power, an antitrust court . . . will not interfere with a buyer's (nonpredatory) determination of price.").   "It is not antitrust's purpose to regulate ordinary business contracts."  Areeda & Hovenkamp, *supra*, ¶ 782m.  Accordingly, Google is entitled to summary judgment on Plaintiffs' claims based on Google's use of data provided to it by SVPs.

### 4. The SVP Claims Fail For the Independent Reason that Plaintiffs Cannot Show the Challenged Conduct Had an Anticompetitive Effect In the Proffered Relevant Markets

Plaintiffs have painted themselves into a corner by proposing markets fundamentally disconnected from the harms they allege.  To prevail, Plaintiffs must show harm to competition in

the relevant market.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 991-92 (9th Cir. 2020) ("[A]ctual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law."); *see also Microsoft*, 253 F.3d at 50-51 (explaining Section 2 requires showing unlawful maintenance of monopoly power in the monopolized "market"); *Rambus*, 522 F.3d at 466-467 (holding FTC failed to establish defendant "unlawfully monopolized the relevant markets" because there was no showing of anticompetitive "effect").  But Plaintiffs allege that Google's actions harm SVPs, entities that are outside the proffered general search services and derivative search advertising markets.  There is no basis to conclude that the alleged harm to SVPs harms competition in the alleged markets.  This missing link is independently fatal to Plaintiffs' SVP claims.

Plaintiffs construct an elaborate chain of unsupported inferences to try and show a connection between their alleged harm and alleged markets.  As discussed above, they posit that Google harmed SVPs by designing its SERP in ways that limit SVPs' visibility and by acquiring SVP data on favorable terms.  Plaintiffs' theory as to how that alleged harm causes an anticompetitive effect in their alleged markets has shifted over time.  As of the close of expert discovery, it stands essentially as follows:  (1) Google's SERP design and data practices have discouraged SVPs from making investments in their own growth; (2) the SVPs are thus unable to offer as high a level of content and trustworthiness to their users; (3) which makes the SVPs less capable of partnering with other existing or new general search engines, or less attractive to partner with them, in connection with the general search engines' offerings that compete with Google; and (4) this alleged decline in the number and quality of partnerships between SVPs and general search engines in turn harms competition in the alleged relevant markets.  *See* Ex. 112 (Baker (Colo. Pls.' Expert) Reb. Rep.) ¶¶ 9, 14.  As discussed in Sections III.A.1-3, above, the first step in the

Plaintiffs' chain fails.  But even taking the alleged harms to the SVPs as a given for purposes of this argument, and drawing all justifiable inferences in favor of Plaintiffs, there is insufficient evidence that competition in the alleged general search services and derivative advertising markets suffered any injury flowing from the challenged conduct.  Plaintiffs have not adduced evidence to show the links in this chain of inferences.

To start, Plaintiffs have not identified any SVP that has failed to invest in its own growth to such an extent that its purported value as a partner to rival general search engines has decreased and resulted in less competition in the market for general search.  More fundamentally, Plaintiffs have not produced evidence that any general search engine has forgone, or would forgo, partnering with SVPs as a result of the challenged conduct.  Nor have they produced evidence that any existing partnerships between SVPs and general search engines would be more effective but for the challenged conduct.  And there is no evidence whatsoever that, but for more or more effective partnerships between SVPs and other general search engines, competition in the relevant markets is being harmed.  All Plaintiffs and their experts offer is speculation.

On the other side of the ledger, the evidence is undisputed that there are already many existing partnerships between SVPs and other general search engines.  SMF ¶¶ 233-38.  It is plain from this record that rival general search engines have in fact continued existing partnerships and entered into new partnerships with SVPs notwithstanding Google's current data agreements and SERP design.  SMF ¶¶ 233-38.  A Microsoft witness testified that Bing has ███████████ ███████████ including TripAdvisor, ████████████████████████.  SMF ¶ 237. NextDoor, a relatively new entrant in local services search, partnered with Bing to provide local content *before* any other search engine.  SMF ¶ 236.  And Yelp has had multiple partnerships with other general search engines—as of November 2015, Yelp had active partnerships with Yahoo,

Bing, and DuckDuckGo, and today, Yelp continues to partner with Yahoo and Neeva.  SMF ¶ 234.

Plaintiffs fail to explain how or why, given that such partnerships already exist, more or different

partnerships would materially impact competition in the general search services market.

At best, Plaintiffs' claim of an anticompetitive effect in the alleged relevant markets is pure

speculation; at worst, it is contradicted by the undisputed facts.  But "[s]peculation about

anticompetitive effects is not enough" to avoid summary judgment.  *S. Card & Novelty, Inc. v.*

*Lawson Mardon Label, Inc.*, 138 F.3d 869, 877-78 (11th Cir. 1998) (internal quotation marks

omitted) (affirming summary judgment on plaintiff's Sherman Act claims where "evidence was

insufficient for a reasonable jury to find that [defendant's] practices generated an anticompetitive

effect in the relevant market").  And the fact that Plaintiffs cannot show anticompetitive effects in

their own alleged relevant markets is yet another independent reason why Google is entitled to

summary judgment.

## B.        Plaintiffs' SA360 Claim Fails

Plaintiffs also argue that the Sherman Act bars Google from operating SA360 in a manner

that "limit[s] the tool's interoperability with a competitor."  Colo. Pls.' Compl. (ECF No. 1-2) ¶¶

214, 221, 228.  But that is a tall order under U.S. law.  Citing "the uncertain virtue of forced sharing

and the difficulty of identifying and remedying anticompetitive conduct by a single firm," the

Supreme Court is "very cautious in recognizing [any] exceptions" to businesses' fundamental

freedom to refuse to deal with others.  *Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko*

*LLP*, 540 U.S. 398, 408 (2004).  "Institutional concerns . . . counsel against recognition of [such]

claims," as "[c]ourts are ill suited 'to act as central planners, identifying the proper price, quantity,

and other terms of dealing.'"  *Pac. Bell Tel. Co.*, 555 U.S. at 452 (quoting *Trinko*, 540 U.S. at 408);

*accord Novell*, 731 F.3d at 1076 (a bright-line rule favoring firm independence avoids "the risk of

inducing collusion and inviting judicial central planning").

34

Even if a defendant has a monopoly, "[f]orcing a firm to share its monopoly is inconsistent with antitrust['s] basic goals," as "consumers are no better off when a monopoly is shared; ordinarily price and output are the same as they were," and "the right to share a monopoly discourages firms from developing their own alternative inputs."  Areeda & Hovenkamp, *supra*, ¶ 771b (2022).  Thus, the general rule is that "businesses are free to choose" whether to deal with other businesses.  *Pacific Bell*, 555 U.S. at 448; *accord Schor v. Abbott Labs*., 457 F.3d 608, 610 (7th Cir. 2006) ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete.  Cooperation is a *problem* in antitrust, not one of its obligations." (citing *Trinko*)); Phillip E. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 852 (1989) ("Compulsory access, if it exists at all, is and should be very exceptional.").  Even apart from these substantial authorities, Google is entitled to summary judgment for two independent reasons.

*First*, the Plaintiffs cannot show any anticompetitive harm resulting from SA360's feature development decisions.  There is no evidence that Google's conduct foreclosed "a substantial share" of the relevant market, *Microsoft*, 253 F.3d at 69 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)), their only theory of competitive harm.  It is undisputed that:

- Advertisers have always had access to the features at issue via Microsoft Ads' native tool.  SMF ¶¶ 243(b), 246-47, 251.

- Advertisers can and do switch between ad buying platforms.  Advertisers cited in Plaintiffs' expert reports have done exactly that.  SMF ¶¶ 244, 249, 251, 257-58; Ex. 9 (Amaldoss Opening Rep.) ¶ 287; Ex. 111 (Baker Opening Rep.) ¶ 310 n.446.

- There is no evidence that Google's alleged delay in developing particular Microsoft Ads features on SA360 caused advertisers to buy less search advertising on Microsoft Ads, or more generally beyond Microsoft Ads.  SMF ¶¶ 243(b), 246-47, 251, 259-62.

35

Nor have Plaintiffs pointed to any other evidence of harm to competition; they offer only speculation that Google's conduct harmed Microsoft's search ad revenue, which, even if proven, would be insufficient to show harm to competition. *Microsoft,* 253 F.3d at 58. In addition:

- Plaintiffs have not identified *any* advertiser who has declined to buy Microsoft Ads or any other online advertising because of feature availability (or unavailability) on SA360.

- ███████████████████████████ Plaintiffs' experts identify no evidence or analysis that (1) advertisers paid higher prices for online search ads as a result of Google's purported delay in building any particular Microsoft Ads feature on SA360; or (2) advertisers incurred lower return on their search ad spend as a result of Google's purported delay in building any particular Microsoft Ads feature on SA360.[11]

- There is no evidence that Google's operation of SA360 harmed rival SEM tool providers, or limited their incentive to innovate; for example, Skai launched an automated bidding feature for Microsoft Ads in the first quarter of 2020. SMF ¶ 282.
  ██████████████████████████████████████

    *Second*, Google has launched, ██████████████████████████████

Microsoft Ads features cited by Plaintiffs—further confirming that Google has not engaged in any exclusionary conduct.

          **1. Plaintiffs Cannot Meet Their Burden to Show SA360's Feature Design and Development Had an Anticompetitive Effect in the Proffered Relevant Markets**

              **a. Google's Implementation of and Feature Development for SA360 Has Not Foreclosed a Substantial Share of the Proffered Relevant Markets**

The record contains no support for Plaintiffs' only theory of anticompetitive harm—that SA360's feature design and development process has foreclosed advertisers from running

---

[11] *See* Ex. 111 (Baker Opening Rep.) ¶¶ 301-314, 338, Tables 4, 26, and 27; Ex. 112 (Baker Reb. Rep.) ¶¶ 106-137, Tables 6 and 7; Ex. 113 (Baker Reply Rep.) ¶¶ 168-174; Ex. 114 (Baker Tr.) 239:17-243:12; Ex. 9 (Amaldoss Opening Rep.) ¶¶ 280-291; Ex. 110 (Amaldoss Reply Rep.) ¶¶ 115-128.

campaigns on Microsoft Bing's search advertising platform.  Colo. Pls.' Compl. (ECF No. 1-2) ¶¶ 161-62.  To demonstrate that "the monopolist's conduct indeed has the requisite anticompetitive effect," Plaintiffs "must demonstrate that the monopolist's conduct harmed competition, not just a competitor."  *Microsoft*, 253 F.3d at 58-59.  Beyond Google's efforts to support the relevant features, Google's design and feature development decisions for SA360 have never substantially foreclosed competition in the proffered search or derivative advertising markets—again, Plaintiffs' only theory of anticompetitive harm.

To the contrary, (i) advertisers do not need SA360 to access Microsoft Ads (with all its features and functionalities), or other search or online ad platforms, SMF ¶¶ 246-47, 251; (ii) there is no evidence that advertisers' online search ad spend on Microsoft Ads would have increased had SA360 developed specific features for Microsoft Ads sooner; and ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████  Accordingly, there is no basis to conclude that the challenged conduct has harmed competition in any proffered relevant market.  Indeed, Plaintiffs have identified *no* advertiser who was prevented or even dissuaded from buying search ads on Microsoft Ads because of SA360's feature (un)availability.  *See* Ex. 114 (Baker Tr.) 242:1-13.  Nor can they show that any purported feature delay, individually or collectively, caused advertisers to buy less search advertising on Microsoft Ads, which is their theory of anticompetitive harm.  In fact, Plaintiffs have not even *attempted* to estimate the market foreclosure caused by Google's feature development decisions, much less quantify it.

And for good reason.  Advertisers have never been foreclosed from purchasing ads on Microsoft Ads or any other platform.  They have a broad array of choices to manage digital

advertising campaigns, including search ads campaigns.  SMF ¶¶ 243-44.  There is literally no record evidence that any lack of specific features for Microsoft Ads on SA360 affects advertisers' ability or propensity to buy search ads.

Moreover, each relevant Microsoft Ads feature is available either (i) directly via Microsoft Ads' native tool, (ii) via the new version of SA360, or (iii) via another SEM tool.  SMF ¶¶ 245-48.  Advertisers seeking Microsoft Ads' automated bidding, responsive search ads, or any other Microsoft Ads feature have always been able to access them through one or more of these channels.  SMF ¶¶ 245-48, 282, 291, 310-12.  In Plaintiffs' own words: "independent SEM tools offer superior support for Bing features compared to SA360[.]"  Colo. Pls.' Compl. (ECF No. 1-2) ¶ 163.  And should advertisers become dissatisfied with one SEM tool's features, they can—and do—switch to rival tools to access features that meet their ad objectives.  SMF ¶¶ 243-44, 249, 251, 257-58.  SA360 does nothing to prevent that.  *See* SMF ¶¶ 244, 251, 257.

Nor is there any evidence that advertising spend in the alleged markets would have increased on Microsoft Ads had SA360 developed features for Microsoft Ads ***sooner***.  Plaintiffs' expert reports say nothing about how any SA360 feature (or lack thereof) affected advertisers' ability to buy search or other online advertising, including Microsoft Ads.  The only evidence offered is by Plaintiffs' expert Jonathan Baker, who calculates various revenue estimates including the "revenue opportunity from attracting spending away from Google."  Ex. 111 (Baker Opening Rep.) ¶ 118, Tables 4, 26, 27.  None of those revenue estimates are tied to the build of (or lack of) specific Microsoft Ads or Google Ads features on SA360.  *Id.*[12] ███████████

———————————

██ ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Regardless of SA360's features, advertisers can reach Microsoft Ads and other advertising platforms directly or via other tools.  SMF ¶ 243-54.

Because advertisers have always been able to access the relevant features and buy advertising on other SEM tools and other platforms, including Microsoft Ads, Plaintiffs cannot show substantial anticompetitive effects in any alleged relevant market.  Nor have Plaintiffs identified any advertisers who were foreclosed from buying search advertising, including from Microsoft Ads, as a result of SA360's feature development decisions.  This alone warrants summary judgment for Google on the SA360 allegations.

        **b.**    **No Other Anticompetitive Harm: Plaintiffs Have Presented No Evidence That the Timing of Google's Feature Design and Development for SA360 Harmed Competition in Search Advertising**

Nor can Plaintiffs make any other showing that Google's operation of SA360 harmed competition in the alleged markets.  Plaintiffs offer only an unsubstantiated claim of "spend shift" from Bing to Google on SA360, but the antitrust laws were not designed to remedy speculative harms, or to protect particular competitors, as opposed to competition itself.  And in any event, the undisputed record shows no evidence of harm to Microsoft, other SEM tool providers, or advertisers, and Plaintiffs have no other theory under which the allegations—even if proven, which

--------------------------------

███████████████████████████████████████████████████████

████████████████████████████████████

they are not—resulted in harm to competition in search advertising.  That too warrants summary judgment.

### i.   There Is No Evidence of Harm to Microsoft as A Search or Search Advertising Competitor

Plaintiffs alleged in their Complaint that Microsoft was harmed by a "shift in advertiser spending caused by Google's conduct."  Colo. Pls.' Compl. (ECF No. 1-2) ¶ 159.  But Plaintiffs have not proven any harm to Microsoft, much less non-transient harm, to support that allegation. ███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████  That does not cut it.  Even if harm to Microsoft qualified as harm to *competition*—and again, it does not—Plaintiffs have produced no evidence that Google's auction-time bidding feature, or any other SA360 feature, caused advertiser spend to shift to Microsoft's detriment.

### ii.   There Is No Evidence of Harm to Other SEM Tool Providers

Beyond Microsoft, Plaintiffs allege that "independent SEM tools … are constrained in their ability to [support Bing features] by Google's treatment of them, including its demand

requirements that limit its capacity to support Bing and its artificial lowering of demand for Bing advertisements."  Colo. Pls.' Compl. (ECF No. 1-2) ¶ 163.  Yet Plaintiffs identify no support for this vague allegation.  Insofar as it refers to the dictates of Google's "required minimum functionality" criteria—specifications for API connectivity—███████████████████████ ███████████████████████.  SMF ¶¶ 263-66.

### iii.   There Is No Evidence of Harm to Advertisers

Plaintiffs' advertiser harm theory shifted as discovery failed to substantiate their claims.  Their Complaint alleged that "[t]o induce advertisers to adopt SA360, Google repeatedly assured them that it would remain forever neutral," Colo. Pls.' Compl. (ECF No. 1-2) ¶ 150, but that it did not, instead "refus[ing] interoperability to comparable [Google Ads] features offered by Microsoft's Bing," *id.* ¶ 50.  But Plaintiffs have presented no evidence that advertisers were "deceived" or "misled" by Google's description of SA360's features.  And when it turned out that SA360 maintains a public page listing the features it offers for Microsoft Ads—a page showing that Google never included every feature available directly on Bing's native tool—Plaintiffs evidently abandoned that theory.  SMF ¶ 267.  There is no question advertisers have a range of options, can assess what features are most important to them, and switch to Microsoft's native tool or other platforms if they desire.  *See* Section III.B.1, *supra*.

Plaintiffs now say, "Google has reduced the efficiency of its customers advertising spend" by "limiting SA360 support for key features of underlying native tools other than Google Ads." Ex. 9 (Amaldoss Opening Rep.) ¶ 285.  Here too, however, Plaintiffs have no evidence that Google's operation of SA360 caused advertisers to pay higher prices or incur lower return on their ad spend.  Even assuming, *arguendo*, that Google's auction-time bidding feature caused spend to shift from Bing to Google because advertisers received a better return on investment with Google, advertisers were not harmed unless, "in a 'but-for' world" where Google had built the features

earlier, (i) the return on investment would have been better (not just equal) on Bing than on Google; (ii) as a result, advertisers would have shifted their advertising dollars from Google to Bing; and (iii) the resulting inefficient spend was material. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 998 (N.D. Cal. 2021), *appeal pending* No. 21-16506 (9th Cir. Sept. 13, 2021) & No. 21-16695 (9th Cir. Oct. 14, 2021). But one searches the record in vain for evidence establishing the conditions in the "but-for" world. Plaintiffs never even attempt to estimate the magnitude of harm allegedly suffered by any advertiser. Ex. 114 (Baker Tr.) 239:17-243:12 (testifying that he could not recall any advertiser who declined to multihome based on SA360's supposed limited support for rival search firms); Ex. 40 (Amaldoss Tr.) 251:20-252:9, 284:5-11, 285:11-22 (testifying that "another expert" offered opinions on advertiser harm and conceding that he "did not conduct an experiment" on how lack of Microsoft Ads features allegedly "reduced the return on ad spend").

### 2.    There is No Anticompetitive or Exclusionary Conduct: Google Built and ████████ Microsoft Advertising Features for Search Ads 360

Finally, and quite apart from their failure to prove anticompetitive harm, Plaintiffs cannot prove anticompetitive conduct for a straightforward reason: Google did not refuse to build the Microsoft Advertising features at issue. On the contrary, SA360 has launched, ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████   SMF ¶¶ 308-12. And Plaintiffs cannot show that the timing of Google's development of the features was unreasonable—████████████████████████

███████████████████████████████████████████████████

████████████ , and various other undisputed hurdles.

To begin with, Google never refused to develop the requested features. SMF ¶ 277. Google built, ███████████████████████████████████████████████████

███████████████████  The five features identified in the Complaint are a subset of features that are and were the subject of ongoing discussions between Google and Microsoft.  SMF ¶¶ 272, 276-77.   For instance, Microsoft requested in 2019 that Google develop 27 features, and Google offered to develop eight of them within 18 months.  SMF ¶¶ 269, 276.   Microsoft said this was too slow.  SMF ¶ 276.  But despite Microsoft's objections, Google built more than 10 additional Microsoft Ads features into its new SA360 platform, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████  It is undisputed that in late 2019, at the time Microsoft demanded "full feature parity," *i.e.*, all of the same features SA360 supported for Google Ads, Microsoft did not have a list of its or SA360's customers that wanted the five features at issue in this case.  SMF ¶ 298.[13]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

"[T]he process of firms investing in their own infrastructure and intellectual property and competing rather than colluding normally promotes competition and consumer gains[.]"  *Novell*, 731 F.3d at 1078.  Nonetheless, Google invested in building other search engine ads features into

───────────────────

█ ████████████████████████████████████████████████████
████████████████████████████████████████

the new SA360 infrastructure, including over 10 additional Microsoft Ads features.  SMF ¶¶ 278,
291, 310-12.

What's more, building complex features like automated bidding for Google Ads and
Microsoft Ads takes substantial time and resources.  ████████████████████████████████
████████████████████████████████████████████████████████  Google's
timing in building these resource-intensive features was "reasonable and consistent with current
industry practice."  *Qualcomm*, 969 F.3d at 996.  Other SEM tool vendors provide ample
corroboration.  For example:

- ██████████████████████████████████████████████████
- ██████████████████████████████████████████████████
- ██████████████████████████████████████████████████
- ██████████████████████████████████████████████████

██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

At most, therefore, all Plaintiffs could show is a "transitory delay," and that does not violate Section 2. *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (quoting Phillip E. Areeda & Donald F. Turner, *Antitrust Law* ¶ 737b (1978)); *see N.Y. v. Facebook, Inc.*, 549 F. Supp. 3d 6, 30 (D.D.C. 2021) (dismissing claim for injunctive relief where harm was "not ongoing or 'contemporary'"), *appeal pending*, No. 21-7078 (D.C. Cir. July 29, 2021).  "[A]necdotal speculation and supposition are not a substitute for evidence," and even "evidence," if "decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1175 (9th Cir. 2016).  The record presents no evidence that Google's feature decisions for SA360, including the timing of its response to Microsoft's feature requests, were anticompetitive: ████████████████████████████████████████████ ████████████████████████████████ and whatever delay Plaintiffs claim occurred has not translated into harm to competition in any alleged relevant market.

## IV.    CONCLUSION

For the foregoing reasons, and for those stated in the accompanying brief addressing the DOJ Plaintiffs' and Colorado Plaintiffs' claims with respect to Google's distribution agreements, Google is entitled to summary judgment on all of Plaintiffs' claims.

Dated: December 12, 2022                         Respectfully submitted,

                                                 WILLIAMS & CONNOLLY LLP

                                                 By:   /s/ John E. Schmidtlein
                                                 John E. Schmidtlein (D.C. Bar No. 441261)
                                                 Benjamin M. Greenblum (D.C. Bar No. 979786)
                                                 Colette T. Connor (D.C. Bar No. 991533)
                                                 680 Maine Avenue, SW
                                                 Washington, DC 20024
                                                 Tel: 202-434-5000
                                                 jschmidtlein@wc.com
                                                 bgreenblum@wc.com
                                                 cconnor@wc.com

                                                 WILSON SONSINI GOODRICH & ROSATI
                                                 P.C.
                                                 Susan A. Creighton (D.C. Bar No. 978486)
                                                 Franklin M. Rubinstein (D.C. Bar No. 476674)
                                                 Wendy Huang Waszmer (D.C. Bar No.  1631078)
                                                 1700 K Street, NW
                                                 Washington, DC 20006
                                                 Tel: 202-973-8800
                                                 screighton@wsgr.com
                                                 frubinstein@wsgr.com
                                                 wwaszmer@wsgr.com

                                                 ROPES & GRAY LLP
                                                 Mark S. Popofsky (D.C. Bar No. 454213)
                                                 2099 Pennsylvania Avenue, NW
                                                 Washington, DC 20006
                                                 Tel: 202-508-4624
                                                 Mark.Popofsky@ropesgray.com

                                                 *Counsel for Defendant Google LLC*