**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

**PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF**
**RANDOLPH E. BUCKLIN AND MEMORANDUM IN SUPPORT**

December 12, 2022

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ....................................................................................................................... 2

FACTUAL BACKGROUND ....................................................................................................... 3

STANDARD ............................................................................................................................... 6

ARGUMENT .............................................................................................................................. 7

   I.   **Prof. Bucklin's Opinions About The History of Advertising And The History Of Spend Shift Between Advertising Channels Are Not Tied To The Facts Of The Case** 7

      A.   Prof. Bucklin's History Lesson Is Not Related To The Case ........................................ 8

      B.   Prof. Bucklin's Conclusions About "New" Advertising Channels Rely On His Flawed Historical Analysis ................................................................................................. 13

CONCLUSION .......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*\*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)....... 3, 6, 7, 8, 9, 13, 14, 16

*\*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)............................................................ 8, 12, 16

*\*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................ 6, 13

*Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705 (2d Cir. 1989) ........................................ 15

*Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir. 1994) ............................................................ 13

*Kennedy v. Collagen Corp.,* 161 F.3d 1226 (9th Cir. 1998)........................................................... 8

*Masters v. Hesston Corp.*, 291 F.3d 985 (7th Cir. 2002).............................................................. 6

*Meister v. Med. Eng'g Corp.*, 267 F.3d 1123 (D.C. Cir. 2001)................................................... 6, 7

*Sykes v. Napolitano*, 634 F. Supp. 2d 1 (D.D.C. 2009) ................................................................ 7

**Rules**

*\*Federal Rule of Evidence 702.......................................................................................... 3, 7, 8, 12

**Treatises**

Wright & Miller, Federal Practice & Procedure (2d ed. Apr. 2022 update)................................ 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ██████████████████ |
| Defendant. | |

### PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF RANDOLPH E. BUCKLIN AND MEMORANDUM IN SUPPORT

Plaintiffs respectfully move to exclude the testimony of Prof. Randolph E. Bucklin, whom defendant, Google LLC, intends to have testify regarding, among other things, the history of advertising, shares of U.S. advertising spend, and shares of U.S. digital advertising revenues. Prof. Bucklin's opinions are not tied to the facts of this case and will not assist the Court in resolving any relevant factual dispute. Prof. Bucklin's proposed testimony is excludable for three reasons: (1) Prof. Bucklin did not review or rely upon any of the documents or deposition testimony gathered in this action in reaching these opinions; (2) Prof. Bucklin reaches conclusions about how advertisers shift spending among advertising channels without any analysis of what advertisers actually do; and (3) Prof. Bucklin reaches conclusions based on his share calculations without any consideration that advertising spend and digital advertising revenues continuously grew during the periods he examined. As a result, Prof. Bucklin's opinions are not tied to the facts of this case and will not assist the Court in resolving any relevant factual dispute.

Accordingly, the Court should exclude the following portions of Prof. Bucklin's reports and any testimony related to these portions:

(a)     paragraph 10 (Summary of Opinions), paragraphs 15 through 30 (Section IV), paragraph 69 (concluding paragraph), and Exhibits 1–4 in the Expert Report of Randolph E. Bucklin, June 3, 2022; and

(b)     footnote 132 in the Rebuttal Expert Report of Randolph E. Bucklin, Aug. 4, 2022, which references Section IV of his June 3, 2022 report.

## INTRODUCTION

In support of its argument that Plaintiffs' search advertising markets are not distinct product markets, Google has retained Prof. Randolph E. Bucklin to opine as to how advertisers view various advertising channels.[1] Among his opinions, Prof. Bucklin describes (1) how advertisers *shift* spend in response to the emergence of new advertising channels and (2) the continued creation of new advertising channels. Ex. A, Bucklin Initial Report, ¶ 15. These opinions should be excluded because they are not sufficiently tied to the facts of this case.

Prof. Bucklin starts his initial expert report by detailing the history of advertising in the United States, from town criers in colonial times up to the present. He also calculates the shares of U.S. advertising spend for various advertising channels since 1935 and shares of U.S. digital advertising revenues earned—by company—since 2008. As part of this discussion, Prof. Bucklin opines that as new advertising channels have arisen, "advertisers have shifted expenditure both from older to newer channels and amongst existing channels." Ex. A, Bucklin Initial Report,

---

[1]   Prof. Bucklin uses the term *channel* "to signify a means of transmission (newspaper, magazine, radio, television, email, website, mobile app, etc.)." Ex. A (exhibit excerpts the cited portions of the report), Expert Report of Randolph E. Bucklin, ¶ 15, n.12, June 3, 2022 (herein "Bucklin Initial Report").

¶ 15. He also concludes that "new advertising channels continue to arise, providing even more alternatives for advertisers." Ex. A, Bucklin Initial Report, ¶ 15.

These opinions are not tied to this case. Indeed, aside from Plaintiffs' Complaints,[2] Professor Bucklin's initial report did not cite or rely upon any materials produced in or relating to this litigation. This was no accident. Before filing his initial report, Prof. Bucklin failed to review *any* documents related to this case, including any materials produced by or about advertisers whose conduct he claims to describe. Thus, these opinions from Prof. Bucklin cannot satisfy Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Prof. Bucklin's testimony relating to historical shifts in advertising and the historical rise of new channels will not assist the Court in understanding the evidence in this case or determining a fact in issue. Certainly, this recitation of history is not necessary for the Court to understand the likely evidence at trial. In addition, these opinions are based on insufficient facts and data and are not the product of reliable principles and methods.

The Court should therefore exclude any expert testimony about these historical opinions.[3]

## FACTUAL BACKGROUND

Plaintiffs allege two relevant antitrust markets within the broader category of digital advertising in the United States—search advertising and general search text advertising. Amended Compl. (ECF. #94), ¶¶ 97, 101. In challenging these markets, Google seeks to establish that advertisers routinely move funds between different advertising channels. To this

---

[2]   Complaint, Oct. 20, 2020, ECF #1 (Amended Jan. 15, 2021, ECF No. 94); Complaint, Dec. 17, 2020, ECF No. 3, *State of Colorado et al. v. Google LLC*, No. 1:20-cv-03715-APM (D.D.C.) (the parallel action consolidated with this action for discovery).

[3]   These opinions are contained in paragraphs 10, 15–30, and 69 of Prof. Bucklin's initial report and referenced in footnote 132 of his rebuttal report.

end, Google engaged Prof. Bucklin to provide expert testimony on the history of advertising, the

marketing (or consumer-purchase) funnel, and the use of digital advertising to reach consumers.

In his initial report, among his other opinions, Prof. Bucklin opines on the history of

advertising, beginning in the 1800s with town criers. He then marches through 200 years of

advertising changes, including discussions of the different advertising channels such as print,

radio, television, and digital advertising. *See* Ex. A, Bucklin Initial Report*, ¶¶ 15–30, Exs. 1–4.[4]

Prof. Bucklin also opines on the "shares" of U.S. advertising spend, by advertising channel, from

1935 to 2020 (Exhibit 1), and the "shares" of U.S. digital advertising revenue, by company, from

2008 to 2020 (Exhibit 4). Ex. A, Bucklin Initial Report*, ¶¶ 15–30*, Exs. 1, 4.[5]

From these initial opinions, Prof. Bucklin offers a broad, inchoate theory of how

advertising markets evolve over time. In his report, he stated:

> Advertisers have long sought to reach relevant consumers with targeted ads that
> deliver the right information to drive maximum returns. The on-going evolution
> of advertising channels and innovations in media technologies have continuously
> given advertisers new ways to achieve their goals. As the channels available to
> advertisers have evolved, ***advertisers have shifted expenditure both from older to
> newer channels and amongst existing channels.*** This pattern—new channels
> creating new opportunities for advertisers to reach relevant consumers, and
> advertisers, in turn, shifting expenditure to take advantage of them—has occurred
> again and again. This evolution has implications for the channel options
> advertisers have to achieve their objectives. Today, new advertising channels
> continue to arise, providing even more alternatives for advertisers.

---

[4]  Exhibits 1 and 4 are specifically discussed in this memorandum, but Prof. Bucklin uses
Exhibits 1–4 to illustrate his history discussion. None of the four exhibits appear outside of
paragraphs 10, 15–30 (Section IV), or 69 of Prof. Bucklin's initial report. Thus, all four
Exhibits should be excluded with the rest of Section IV for the reasons discussed in this
memorandum.

[5]  Prof. Bucklin uses the term *share* to refer to the proportion of U.S. advertising spend that
occurs in each of the different advertising channels and of U.S. digital advertising revenues
earned by different companies that he calculated. *See e.g.*, Ex. A, Bucklin Initial Report,
¶¶ 21, 30 & Exs. 1, 4. To avoid confusion, this memorandum also uses *share* when referring
to Prof. Bucklin's calculated "shares," but Plaintiffs do not concede that these "shares"
represent market shares of any relevant antitrust market.

Bucklin Initial Report, ¶ 15 (citation omitted & emphasis added); *see also* Bucklin Initial Report, ¶ 10 (nearly identical passage).[6] This opinion references no specific party, third party, or advertiser. He offers no support for his spend-shift theory sourced from any journal or respected literature.

In reaching these opinions, Prof. Bucklin cited and relied upon only the Complaints, although Prof. Bucklin testified that he had "complete access" to the case record in this action.[7] In drafting his initial report and reaching the opinions in that report, Prof. Bucklin did not review *any* documents or information produced in discovery in this action.[8] He did not review any of the over 4 million documents that Google produced, the over 7 million documents that third parties produced, or the more than 100 depositions of third parties and of current and former Google employees.

Prof. Bucklin, moreover, did not seek to cure these infirmities in either of his subsequent reports. Prof. Bucklin's rebuttal report only contains one reference to Section IV of his initial report. In a footnote he doubles down on his vague, unsupported opinion that increased spend in new advertising channels necessarily comes from existing advertising channels:

> As I discussed in my Initial report, new digital advertising channels continue to arise over time and the share of digital advertising revenue of new entrants, for example Facebook and Amazon, steadily increased. *See* Initial Report, ¶ 30. This implies that individual advertisers ***are reallocating*** marketing resources to these channels, which has also been observed in advertising practice.

---

[6]   In addition, Prof. Bucklin repeats these opinions in the concluding paragraph of his initial report. *See* Ex. A, Bucklin Initial Report, ¶ 69.

[7]   Ex. C (exhibit excerpts the cited portions of the deposition), Bucklin Dep., 81:20–82:14, Oct. 26–27, 2022 ("I was given complete access to the case record . . . .").

[8]   Ex. C, Bucklin Dep., 95:24–96:9 (acknowledging that he did not review any documents from the case record until he started working on his rebuttal report), 96:10–13 ("Q. So the only case materials you reviewed related to your first report are the two complaints? A. That is my recollection, yes.").

Ex. B,[9] Rebuttal Expert Report of Randolph E. Bucklin, ¶ 38, n.132, Aug. 4, 2022 (citations omitted) (emphasis added). Again, he offers no citations to support the link he makes between increased spend in new channels and where that money is coming from. Indeed, his only citation is back to his own original, unsupported assertions. He does not mention Section IV at all in his reply report.

## STANDARD

To be admissible, expert opinions must satisfy Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Pursuant to FRE 702, imposes upon the Court a special "gatekeeping' obligation" to prevent the introduction of expert testimony that is irrelevant or unreliable. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, the Supreme Court's decisions in *Daubert*, 509 U.S. 579 (1993), and *Kumho Tire*, require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under Federal Rule of Evidence 702 is both relevant and reliable." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002); *see also Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126–27 (D.C. Cir. 2001). Additionally, the expert testimony proffered must meet FRE 702's "fit" requirement; that is, it

---

[9]   Exhibit B excerpts the cited portions of the report.

must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)).[10]

Finally, Google, as the party proposing to introduce expert opinion testimony, "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *See* Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing *Bourjaily v. United States*, 483 U.S. 171 (1987); *see also Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009) (citing *Meister*, 267 F.3d at 1127 n.9).[11]

## ARGUMENT

**I.    Prof. Bucklin's Opinions About The History of Advertising And The History Of Spend Shift Between Advertising Channels Are Not Tied To The Facts Of The Case**

The Court should exclude Prof. Bucklin's opinion regarding historical spending shifts between advertising channels and his supporting opinions on the history of advertising as these opinions will not assist the Court in understanding the evidence or determining a fact in issue in this case. In addition to lacking key support, these opinions are not tied to the facts of this case, are not the result of properly applying any analysis to the facts. Indeed, these opinions do not adequately account for obvious, and likely more reasonable, alternative explanations for the

---

[10]  FRE 702 is slated to be amended on December 1, 2023. *See* Comm. on Rules of Prac. of Proc., Agenda Book 892–95 (June 7, 2022), *available at* https://www.uscourts.gov/sites/default/files/2022-06_standing_committee_agenda_book_final.pdf. Specifically, the "Committee unanimously approved a proposal . . . that would amend Rule 702(d) to require the court to find that 'the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.'" *Id.* at 6. The prospective amendments do not affect the analysis here.

[11]  The Committee has also unanimously approved a proposal that "would explicitly add the preponderance of the evidence standard to Rule 702(b)-(d)." *Id.* at 7–8. The Committee's comment note that "incorporating the preponderance standard into the text of Rule 702 was made necessary by the decisions that have failed to apply it to the reliability requirements of Rule 702." *Id.* at 8.

alleged shift in historical spending. The Court should also exclude Prof. Bucklin's follow-on opinions about the ongoing creation of new advertising channels because they rely on his unreliable and irrelevant historical observations and similarly are not tied to the facts of this case. Finally, Prof. Bucklin's opinions about shifting digital advertising revenues suffer the same flaws as his opinions based on historical observations—they are not tied to the facts, do not result from the proper application of any analysis, and do not adequately account for obvious alternative explanations for the shift in digital advertising revenues.

### A.     Prof. Bucklin's History Lesson Is Not Related To The Case

Because Prof. Bucklin's historical opinions provide no insight into how advertisers are actually responding in the relevant markets in this case, they should not be presented at trial.

Under FRE 702, expert testimony must "fit"—i.e., be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591. Specifically, the principles or methods underlying the testimony must be both (1) relevant to the facts of the case, *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228 (9th Cir. 1998); and (2) properly applied to the facts of the case, *see General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

 In support of the opinion that, historically, "advertisers have *shifted* expenditure both from older to newer channels and amongst existing channels" (emphasis added), Prof. Bucklin describes the development of advertising over two centuries. Moving from town criers to present day, Prof. Bucklin's analysis focuses on print advertising (e.g., newspapers, magazines, directories, and billboards), radio advertising, television advertising, and digital advertising (e.g., display advertising and search advertising). Ex. A, Bucklin Initial Report, ¶¶ 15–30 (citing a trio of books). As he introduces each new form of advertising, Prof. Bucklin explains how new advertising channels provided more value to advertisers than older advertising channels.

For example, Prof. Bucklin explains that advertisers "shifted" their advertising spend from print advertising to radio advertising because, with radio, advertisers could (a) reach consumers at home whenever the radio was on, (b) reach a national audience more easily than print, (c) interact with consumers more often, and (d) target different consumer segments. *See* Ex. A, Bucklin Initial Report, ¶ 21. This history will not "aid the [Court] in resolving a factual dispute." *Daubert*, 509 U.S. at 591. As a general matter, new technologies have at times offered advertisers new ways to reach and target consumers to market their products and optimize their spend across multiple advertising channels. Expert testimony is not necessary on such a point and observations such as these do not meaningfully help the Court resolve the disputed issues here.

Based on this history, Prof. Bucklin opines in his initial report that in these historical settings, advertisers shifted spending from one advertising channel to another. He wrote, "As the channels available to advertisers have evolved, advertisers have shifted expenditure from older to newer channels and amongst existing channels. This pattern—new channels create new opportunities for advertisers to reach relevant consumers, and advertisers, in turn, shift expenditure to take advantage of them—has occurred again and again." Ex. A, Bucklin Initial Report, ¶ 10. Of course, even if these patterns had happened in the past, there is no basis to conclude they are happening here. Certainly, Prof. Bucklin does not provide one.

Moreover, Prof. Bucklin assumes, without analysis or testing, that advertisers *shifted* spend—rather than simply increasing their spend across all channels as new forms of advertising took hold. Google argues that the Plaintiffs' advertising markets are too narrow because of the alleged movement by advertisers of spend between advertising channels, implying that the channels are in the same relevant antitrust market. Prof. Bucklin, however, did not examine this

issue. When directly asked if *shifting* expenditures, as described in his initial report, meant

advertisers took money from one advertising channel and moved it to another, Prof. Bucklin

disclaimed that part of his opinion. He testified:

> Q. Okay. And then, in the bullet point in that paragraph [¶ 10 of Prof. Bucklin's initial report], you say: "As the channels available to advertisers have evolved, advertisers have shifted expenditure from older to newer channels and amongst existing channels." What does it mean when you say they "have shifted expenditure"?
>
> A. Well, from the exhibits, that the allocated share of spending has changed.
>
> Q. Okay. ***Does it mean that they have actually taken money from one and moved it to the other?***
>
> A. In the case of their—I would have—***I haven't analyzed the data in that way.*** I simply presented it as—***I simply presented it as shares to show the growth in the alternatives.*** . . .

Ex. C, Bucklin Dep., 209:13–210:21 (emphasis added).

This testimony places Prof. Bucklin's historical analysis in a *Daubert* bind. If Prof.

Bucklin seeks to simply testify about the historical rise of advertising channels, then that opinion

is certainly unrelated to the facts of this case. Indeed, Prof. Bucklin offers this bit of advertising

history without citing a single document in the case.

If, however, Prof. Bucklin hopes to testify at trial that advertisers have historically shifted

spend between advertising channels (as suggested by the use of the word "shifting" in his report)

and that this historical practice *is what is happening here today*, that opinion is unsupported,

given that he admittedly did not perform the necessary analysis. He cannot say—as he

acknowledges—that a single dollar of advertising spend was *shifted* from one channel to another.

Also, again, he cited no documents from the case to support a "shifting" thesis. Further, his

analysis suffers from a complete failure to show a link between the noted rise in advertising

spend on new technologies and the asserted fact that this spend comes at the cost of older forms

of advertising.

Over the lengthy periods presented by Prof. Bucklin in Exhibit 1 of his initial report, advertising spend is ever increasing.[12] New types of advertising emerge and are used alongside older methods. Thus, an advertising channel's share of advertising spend provides little insight into actual *shifts* in advertising spending. Prof. Bucklin confirmed this at his deposition, testifying that under his definition of "shift," shares of advertising spend would "shift" even if the new advertising channels solely attracted *new* spending from advertisers and did not draw it away from other advertising channels:

> Q.  [I]f you look at paragraph 24 of your [initial] report, you say that: "Advertisers shifted expenditure towards television advertising because television demonstrated several new and desirable attributes." If I'm an advertiser, and I have a better form of advertising, I may also choose to increase my spend, maintain my spend in my current channels, but bring new money to these other channels.
>
> Would that show a change in the market shares if that's what I did, all else being equal?
>
> A.  Again, without looking at the specific data, it would be hard to say, but in theory, yes, it could.
>
> Q.  I mean, I'm not sure it's hard to say. If there's $100 spent in the market—
>
> A.  Okay.
>
> Q.  —I have $25 that I'm spending, and I spend 20 of it on radio, 5 of it on print, and then television comes along and I say, Oh, I'm going to spend 10 more dollars, so I'm now going to spend 35. 20 on radio, 5 on print, 10 on television. And everything else is the same. So now $110 is being spent in the market.
>
> As basic math, the market shares would change. Correct?
>
> A.  In your scenario, yes.

---

[12]  The underlying data for Exhibit 1 of Prof. Bucklin's initial report shows that advertising spend generally increased from 1935 to 2020 (with decreases matching downturns in the economy). *See* Ex. D (exhibit excerpts the cited portions of the spreadsheet), Backup to Exhibit 1 of Bucklin Initial Report (produced June 13, 2022), "Aggregated Data" tab, column Q (herein "Exhibit 1 Backup") (showing, for example, total advertising spend dropping between 2007 (cell 77Q ($192,681,000,000)) and 2009 (cell 79Q ($145,651,000,000), contemporaneously with the financial crisis).

Ex. C, Bucklin Dep., 214:25–216:6. Thus, Prof. Bucklin acknowledges that the changes in share of advertising spend that he tracks could arise merely from a growing pie, rather than shifting advertising spend in a static pie.

To illustrate, consider Prof. Bucklin's description of changes in "share" for radio advertising. Based on his data, Prof. Bucklin correctly states that radio advertising's share of advertising spend was "reduced" from 17% in 1948 to 9% in 1968, *see* Ex. A, Bucklin Initial Report, ¶ 25, but the actual spending on radio increased from $562 million in 1948 to $1.2 billion in 1968.[13] Rather than shift spend away from radio, advertisers dramatically increased their radio spend, even as new advertising channels emerged. Thus, although the relative size of the advertising channels may be changing over time, a ready explanation is that the pie is just getting bigger. Therefore, Prof. Bucklin's opinion that "advertisers have *shifted* expenditure both from older to newer channels and amongst existing channels" is wholly unsupported, does not "help the trier of fact to understand the evidence or to determine a fact in issue," and is not based on "sufficient facts or data" as required by FRE 702(a)–(b). *See* Ex. A, Bucklin Initial Report, ¶ 15; Fed. R. Evid. 702.

In addition, because Prof. Bucklin's conclusion about shifting advertising dollars based on share of advertising spend rests on "simply too great an analytical gap between the data and the opinion proffered," the conclusion unreliable. *See Joiner*, 522 U.S. at 146.

---

[13]  *See* Ex. D, Exhibit 1 Backup, "Aggregated Data" tab, cells N18, N38. Although 1948 dollars cannot be compared one-for-one to 1968 dollars, the inflation calculator on the Federal Reserve Bank of Minneapolis's website calculates that $562 million 1948 dollars are equivalent to about $813 million 1968 dollars, which still shows significant growth. *See* Inflation Calculator, Federal Reserve Bank of Minneapolis, available at https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator (last visited 12/9/2022).

As discussed above, a change or shift in the share of advertising spend for a specific advertising channel can occur for multiple reasons, but when the pie is constantly growing, the conclusion that advertisers are taking money from one advertising channel and shifting it to another is not a reasonable first inference. Prof. Bucklin would need more evidence (an econometric analysis, for example) to eliminate the more likely inference that historically more money is being spent on advertising. Prof. Bucklin's conclusion fails to adequately account for obvious alternative explanations for the shift in share and should therefore be excluded. *See Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition); *see also Kumho Tire*, 526 U.S. at 149–51.

Accordingly, the Court should exclude Prof. Bucklin's proffered expert testimony because it does not "fit" the facts in this action and fails to be "sufficiently tied to the facts of the case." *See Daubert*, 509 U.S. at 591 (citing *Downing*, 753 F.2d at 1242).

**B.      Prof. Bucklin's Conclusions About "New" Advertising Channels Rely On His Flawed Historical Analysis**

The Court should exclude Prof. Bucklin's other opinions that rely on his flawed "share-shifting" analysis. Specifically, Prof. Bucklin opines that "new advertising channels continue to arise, providing even more alternatives for advertisers." Ex. A, Bucklin Initial Report, ¶ 15. In Google's view, this supports the idea that these new advertising channels provide meaningful competition to search ads and general search text ads. This new-channels opinion, however, explicitly relies on Prof. Bucklin's analysis regarding historical shifts in advertising spend. He writes:

> The on-going evolution of advertising channels and innovations in media technologies have given advertisers new ways to achieve their goals. As the channels available to advertisers have evolved, advertisers have shifted expenditure from older to newer channels and amongst existing channels. ***This***

> ***pattern—new channels create new opportunities for advertisers to reach
> relevant consumers, and advertisers, in turn, shift expenditure to take
> advantage of them—has occurred again and again.*** New alternatives for
> consumers and advertisers continue to arise today.

Ex. A, Bucklin Initial Report, ¶ 10 (citation omitted & emphasis added); *see also* Ex. A, Bucklin

Initial Report, ¶¶ 15, 30. Again, there are no citations to case documents or scholarly writings.

Moreover, given the lack of historical support regarding spend shifting, as detailed in the

previous section, Prof. Bucklin's hypothesis about future spend shifting is even more remote and

fanciful. Indeed, Prof. Bucklin's opinions that the historical pattern of spend shifting will

continue with new, emerging advertising channels today are an attempt to extend his flawed,

unsupported opinions. These forward-looking opinions also fail *Daubert*'s requirement that an

expert opinion "fit" the facts in this action and have a sufficient connection to those facts. *See*

*Daubert*, 509 U.S. at 591. Accordingly, Prof. Bucklin's opinions on advertisers being likely to

shift their advertising to new, emerging advertising channels should be excluded. Certainly, Prof.

Bucklin has no alternative basis for these new-channel opinions because, as explained in the

prior section, he simply adopted a definition of "shift" that does not require evidence of actual

shifting. *See* Ex. C, Bucklin Dep., 209:13–210:21, 214:25–216:6.

In addition, at the end of Section IV of his initial report, Prof. Bucklin extends his

opinions to specific, emerging advertising channels, saying that "new alternatives such as video-

focused social media platforms (*e.g.*, TikTok), connected television (*e.g.*, Roku), and influencer

marketing via social media have continued to emerge." Ex. A, Bucklin Initial Report, ¶ 30.

However, Prof. Bucklin only cites an eMarketer report and *Los Angeles Times* article to support

extending his new-channel opinion to these specific platforms. By doing nothing more than cite

these two sources, Prof. Bucklin provides no expert analysis that would help the Court. Indeed,

the facts presented in the two cited articles are well within a lay person's understanding and

could be presented through a fact witness. *See* Wright & Miller, 29 Federal Practice &

Procedure, § 6265.1 (2d ed. Apr. 2022 update) ("[E]xpert testimony does not 'help' if that

testimony addresses a subject within common understanding or experience."); *see also Andrews*

*v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) ("For an expert's testimony to

be admissible under [FRE 702], it must be directed to matters within the witness' scientific,

technical, or specialized knowledge and not to lay matters which [the factfinder] is capable of

understanding and deciding without the expert's help.").

 Therefore, the Court should exclude Prof. Bucklin's proffered expert testimony that

emerging advertising channels will repeat history, as these opinions fail to address actual

advertiser conduct reflected in the millions of documents produced in this action and the

numerous depositions taken in fact discovery.

### C. Prof. Bucklin's Opinions On Shares Of U.S. Digital Advertising Revenues Attempt To Extrapolate Too Much From The Supporting Facts

 Prof. Bucklin also calculated historical shares of U.S. digital advertising revenues,

presented in Exhibit 4 of his initial report, (1) to "illustrate[] how U.S. digital advertising revenue

by company has shifted from 2008 to 2020" and (2) to support his conclusion that display ads on

Facebook and search ads on Amazon have supplanted search ads and general search text ads on

Google and Yahoo! *See* Ex. A, Bucklin Initial Report, ¶ 30. These conclusions, however, suffer

from the same flaws as Prof. Bucklin's extrapolations from the shares of U.S. advertising spend

in Exhibit 1.

Based on Prof. Bucklin's calculations, total digital advertising revenues *increased* each year from 2010 to 2020,[14] and the specific digital advertising revenues for Google, Facebook, Amazon, and Microsoft *increased* every year for each company from 2008 to 2020.[15] Like overall U.S. advertising spend, between 2008 to 2020, the U.S. digital advertising pie grew more than six-fold. For the same reasons as discussed above regarding shares of advertising spend, Prof. Bucklin's shares of digital advertising revenues cannot support, without more, a conclusion that advertisers are "shifting" spend between these digital advertising companies, nor can the numbers support any inference about how advertisers view the different digital advertising channels. Because he did no actual analysis of shifting spend, the only other support relied upon by Prof. Bucklin is a Reuters news article,[16] which fails to provide support for the inferences that Prof. Bucklin makes and does not require expert testimony to assist the Court's understanding.

Accordingly, the Court should exclude Prof. Bucklin's opinions on shifting shares of U.S. digital advertising revenues and the opinions relying upon them. The opinions are too great a leap from the supporting facts, *see Joiner*, 522 U.S. at 146, and do not fit the facts of this action, *see Daubert*, 509 U.S. at 591.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court exclude the following portions of Prof. Bucklin's report and any testimony related to these portions: (a) paragraph 10

---

[14]   *See* Ex. E (exhibit excerpts the cited portions of the spreadsheet), Backup to Exhibit 4 of Bucklin Initial Report (produced June 13, 2022) (herein "Exhibit 4 Backup"), "Raw Data" tab, column M (showing total revenue increasing from $23.6 million in 2008 to $152.7 million in 2022).

[15]   *See* Ex. E, Exhibit 4 Backup, "Raw Data" tab, columns B, C, D, E. Yahoo!'s revenues dropped from 2008 to 2009 and then remained fairly steady through 2020. Ex. E, Exhibit 4 Backup, "Raw Data" tab, column G.

[16]   *See* Ex. A, Bucklin Initial Report, ¶ 30, n.44.

(Summary of Opinions), paragraphs 15 through 30 (Section IV), paragraph 69 (concluding

paragraph), and Exhibits 1–4 in the Expert Report of Randolph E. Bucklin, June 3, 2022, and

(b) footnote 132 in the Rebuttal Expert Report of Randolph E. Bucklin, Aug. 4, 2022, which

references Section IV of his initial report.

Dated: December 12, 2022                    Respectfully submitted,

By: _____ */s/ Kenneth M. Dintzer* _____
Kenneth M. Dintzer
Matthew C. Hammond
Karl. E. Herrmann (DC Bar #1022464)
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*

By: _____ */s/ Kelsey Paine* _____
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Kelsey Paine, Assistant Attorney General
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Kelsey.Paine@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: ___*/s/ Matthew Michaloski*___
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By: ___*/s/ David A.F. McCoy*___
David A.F. McCoy, Ark. Bar No.2006100
Senior Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
David.McCoy@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*


By: ___*/s/ Brian Wang*___
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Kathleen Foote, Senior Assistant Attorney General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By:_____/s/ Lee Istrail_____
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:_____/s/ Daniel Walsh_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: ____/s/ Philip R. Heleringer_____
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director of
the Office of Consumer Protection
Office of the Attorney General, Commonwealth of
Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: _____ */s/ Christopher J. Alderman* _____
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: _____ */s/ Scott Mertens* _____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: _____ */s/ Stephen M. Hoeplinger* _____
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

By: _____ */s/ Hart Martin* _____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

By: _/s/ Derek Oestreicher_
Derek Oestreicher
Chief Deputy Attorney General
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: 406-442-1894
derek.oestreicher@mt.gov

*Counsel for Plaintiff State of Montana*


By: _/s/ Mary Frances Jowers_
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: _/s/ Gwendolyn J. Lindsay Cooley_
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

21