**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ████████████ |
| Defendant. | |

**PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF**
**RONALD T. WILCOX AND MEMORANDUM IN SUPPORT**

December 12, 2022

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ iii

**INTRODUCTION** ............................................................................................................... 2

**FACTUAL BACKGROUND** ............................................................................................. 4

**STANDARD** ........................................................................................................................ 8

**ARGUMENT** ....................................................................................................................... 9

   I.   **Prof. Wilcox's Testimony And Opinion Should Be Excluded Because They Are Unreliable Amount To Nothing More Than *Ipse Dixit*** ................................. 9

      A.   Prof. Wilcox's Coding Of Survey Results Into Three Buckets Is Unreliable ............... 10

      B.   Prof. Wilcox Draws Unsupported Conclusions From The Survey Results .................. 13

**CONCLUSION** ................................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)......................... 3, 8, 10, 14

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ................................................................. 15

*In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717 (3d Cir. 1994)..................................................... 14

*Jackson v. Colgate-Palmolive Co.*, No. 15-01066, 2019 U.S. Dist. LEXIS 131298
   (D.D.C. Aug. 6, 2019) .............................................................................................................. 10

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005) ............................. 10

Cross Com. Media, Inc. v. Collective, Inc.*, No. 13-2754, 2014 WL 11343849
   (S.D.N.Y. Aug. 21, 2014)......................................................................................................... 15

Grimes v. Hoffmann-LaRoche*, 907 F. Supp. 33 (D.N.H. 1995)................................................ 19

Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273 (S.D. Ga. 2018)............................... 11

In re Dicamba Herbicides Litig.*, No. MDL No. 2820, 2019 U.S. Dist. LEXIS 206589
   (E.D. Mo. Nov. 27, 2019)......................................................................................................... 13

In re Ondova Ltd.*, No. 09-34784, 2012 WL 5879147 (Bankr. N.D. Tex. Nov. 21, 2012) .......... 13

Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................ 8, 15

Masters v. Hesston Corp.*, 291 F.3d 985 (7th Cir. 2002).............................................................. 8

Meister v. Med. Eng''g Corp.*, 267 F.3d 1123 (D.C. Cir. 2001) .................................................... 8

Revlon Consumer Prod. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268
   (S.D.N.Y. 1994)........................................................................................................................ 16

Sykes v. Napolitano*, 634 F. Supp. 2d 1 (D.D.C. 2009) ............................................................... 9

United States v. Bynum*, 3 F.3d 769 (4th Cir. 1993) ................................................................... 13

United States v. Hebshie*, 754 F. Supp. 2d 89 (D. Mass. 2010).................................................. 11

United States v. Mitchell*, 365 F.3d 215 (3d Cir. 2004) .............................................................. 11

**Rules**

*Federal Rule of Evidence 702........................................................................................................ 8

**Treatises**

Shari Seidman Diamond, "Reference Guide on Survey Research," in REFERENCE MANUAL ON
    SCIENTIFIC EVIDENCE, 359–423 (3rd Edition 2011)................................................................... 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA<br>[redacted] |
| STATE OF COLORADO, *et al.*,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA<br>[redacted] |

**PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF RONALD T. WILCOX AND MEMORANDUM IN SUPPORT**

Plaintiffs respectfully submit this motion and supporting memorandum to exclude the expert testimony of Ronald T. Wilcox, whom defendant, Google LLC, intends to have testify based on a survey he conducted. Prof. Wilcox's survey purports to predict what would happen to application developers in a world without Google's Android Compatibility Agreements. Prof. Wilcox's proposed testimony is excludable for two reasons (1) in analyzing a survey commissioned for this litigation, he relies on a methodology that cannot be reproduced or tested by Plaintiffs for accuracy and (2) Prof. Wilcox fails to establish how he could reliably extrapolate between the survey results and his opinions making those opinions nothing more than

*ipse dixit*. Accordingly, the Court should exclude Prof. Wilcox's report in its entirety and any related testimony. Pursuant to Local Civil Rule 7(m), Plaintiffs conferred with Google's counsel prior to filing this motion. Google's counsel declined to withdraw Prof. Wilcox's expert testimony.

## INTRODUCTION

Google's Android Anti-Fragmentation Agreements and Android Compatibility Agreements commit device manufacturers to comply with Google's Android compatibility requirements. Specifically, device manufacturers that sign these agreements cannot sell devices with variations (or "forks") of Android that Google decrees unacceptable.

Google claims that these agreements protect Android application developers by ensuring they do not have to adapt their code for different versions of Android. To support this position, Google retained Prof. Wilcox to survey application developers about the predicted impact of an increase in Android mobile devices that do not comply with Google's compatibility requirements. Accordingly, Prof. Wilcox asked a small number of individuals to predict how their businesses would be affected in a hypothetical future where a substantial number of Android mobile devices were not compliant with Google's Android compatibility requirements.

In his report, Prof. Wilcox's opinions are limited to reporting and classifying survey responses; he offers no opinions as to the views of Android application developers generally and acknowledges that the results of his survey cannot be extrapolated beyond the survey's specific participants.

> Q.  What did you mean in paragraph 27, the fourth line from the bottom, when you say that the ultimate goal of your survey was not to make statistical inferences about the entire population of Android app developers?
>
> A.  This is not a quantitative survey, I'm not providing formal test of statistical inferences, and I'm not implementing formal mechanisms by which results of

>    this, albeit very interesting population, could be extrapolated to a much
>    broader population. It is meant to be descriptive.

Ex. A,[1] Wilcox Dep., 288:1–13, Oct. 18-19, 2022.

Ultimately, he opines that 58% of survey participants (98 of the 168 respondents who provided written, free-form responses) anticipated adverse effects on their businesses in response to his hypothetical, forked-Android scenario.

Notwithstanding the flaws in Prof. Wilcox's survey design, this motion focuses on the "analysis" conducted by Prof Wilcox, namely how he evaluated survey responses and generated his resulting opinions. These opinions, which are based entirely on his flawed classification of survey responses into buckets, do not constitute a scientific methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Accordingly, the opinions should be excluded. Further, Prof. Wilcox's classification of the survey responses based on his understanding of unrecorded and undocumented interviews with eighteen participants is unreproducible and as such is not testable, running afoul of *Daubert*. Finally, Prof. Wilcox puts forth nothing more than unsupported opinions about the survey responses. These opinions improperly extrapolate—*ipse dixit*—beyond the responses, in violation of *Daubert's* requirement that results be "scientifically" linked to any conclusion drawn from the considered data. Because Plaintiffs are not able to reproduce and test Prof. Wilcox's "methodology" and because he offers no evidence at all that the results of the survey "can be linked through scientifically reliable means to" his opinions, the Court should exclude Prof. Wilcox's opinions in their entirety.

---

[1]   Exhibit A excerpts the cited portions of the deposition.

## FACTUAL BACKGROUND

Google owns the Android operating system, a mobile operating system that it provides without a licensing fee to any mobile phone vendor ("OEM") interested in using it. Because Android is offered on an open-source basis, OEMs can modify the source code at will to create tailored and differentiated user experiences on their devices. But this open-source offer is largely illusory. Before OEMs can access critically important Google applications through Google's Mobile Application Development Agreements ("MADAs") and qualify for search revenue share payments through Google's Revenue Share Agreements ("RSAs"), OEMs must sign either an Anti-Fragmentation Agreement or Android Compatibility Commitment (collectively, an "ACC").

These agreements broadly prohibit manufacturers—including their corporate parents and subsidiaries—from distributing *any* device (mobile phone or otherwise) that runs a version of Android that does not comply with Google's Android Compatibility Document ("CDD"), a set of technical standards disseminated and updated by Google. Google calls these non-compliant Android versions "forks."

Plaintiffs allege that by forbidding OEMs from distributing forked versions of Android, Google's MADAs and RSAs stifle innovation and deprive consumers of novel user experiences.[2] Google counters that, absent the ACCs, OEMs would distribute devices running forked versions of Android and third-party application (or app) developers would either have to (1) change

---

[2]   Amended Complaint (ECF #94); Complaint, *State of Colorado et al. v. Google LLC*, No. 1:20-cv-03715-APM (D.D.C.) (the parallel action consolidated with this action for discovery), ¶¶ 126-132. Additionally, Plaintiffs allege signatories are prohibited from using their own brands to market Android forks on behalf of third parties. These agreements are not just limited to smartphones, but apply to tablets, smart TVs, smart watches, and automotive devices.

application code so that their applications would work across devices running multiple Android versions or (2) prioritize one version of Android over another.

Google retained Prof. Wilcox to survey Android application developers regarding how a substantial increase in forked versions of Android would affect the application developers' businesses.[3] As a first step in the survey-design process, Prof. Wilcox hired a firm to conduct eighteen pre-survey interviews [4] with Prof. Wilcox watching by video conference.[5] The content of these interviews is unknown to Plaintiffs—there is no recording of the interviews and, although requested, Google did not produce any transcripts, notes, or other documentation related to these interviews. Indeed, Prof. Wilcox failed to provide even basic information (such as the industry focus) about the interviewed participants.[6] Prof. Wilcox relied on these undisclosed interviews to design his survey and interpret the results.

For the survey itself, a firm recruited participants by email or through its dashboard.[7] Those who volunteered faced screening questions to identify individuals who Prof. Wilcox believed were in a position to "to answer the hypothetical in a meaningful way."[8] To select

---

[3]   Ex. B, Expert Report of Ronald T. Wilcox, Ph. D., June 2, 2022 (herein "Wilcox Report"), ¶ 10.

[4]   Ex. B, Wilcox Report, App. D-1, 1-2.

[5]   Ex. A, Wilcox Dep., 28:2–22.

[6]   *See* Ex. B, Wilcox Report, App. D-2; *see also* Ex. B, Wilcox Report, App. D-1, 1; Ex. A, Wilcox Dep., 237:14–239:10. Prof. Wilcox's report contains a "script" that moderators used during these pre-survey interviews, but this "script" was merely a guide and moderators had discretion to skip questions, skip topics, ask different questions, or modify questions at their discretion. No survey participants were asked all questions or topics in the guide, and Prof. Wilcox had no record of which interviewees were asked which questions or even which topics were covered in the interviews.

[7]   Ex. A, Wilcox Dep., 307:3–17. The communications from the market research firm to participants were not produced to Plaintiffs.

[8]   Ex. A, Wilcox Dep., 19:19–22.

which volunteers would actually receive the survey, Prof. Wilcox relied on information gleaned during the 18 unrecorded interviews.[9] Of the 1,892 respondents who entered the survey, 354 respondents "qualified" and completed the survey.[10]

The survey itself asked the participants to consider, among other things, a hypothetical scenario where "The apps your company develops for Android devices do <u>not</u> work properly on substantially <u>more</u> Android devices used in the U.S. because <u>more</u> devices do <u>not</u> meet the Android baseline requirements."[11] In responding to the hypothetical, Prof. Wilcox asked respondents to assume:

- that they would necessarily need to change code for applications to work on non-compliant devices;
- that such changes would need to be done at a device-by-device level; and
- that these changes would need to be done for a "substantial" number of devices.

The survey then asked participants to "describe how, if at all, this hypothetical scenario would affect your company."[12] Of the 354 complete survey responses, 186 respondents selected "Don't know/Not sure."[13] The remaining 168 participants provided written, free-form responses.[14]

---

[9]   Ex. A, Wilcox Dep., 77:13–78:1; 209:4–211:15. For example, to qualify, individuals needed to be eighteen years or older, work more than 30 hours per week for a company with an application development team in a role that involved developing applications for Android, and have some responsibility for front-end application development. Ex. B, Wilcox Report, App. E, 1–9 (Introduction and Screening) Screener Questions S1–S140); Ex. B, Wilcox Report, ¶¶ 29–30.

[10]   Ex. B, Wilcox Report, ¶¶ 47, 51.

[11]   Ex. B, Wilcox Report, App. E, 13, H02.

[12]   Ex. B, Wilcox Report, App. E, 14, H10.

[13]   Ex. B, Wilcox Report, ¶ 50, n.70.

[14]   Ex. B, Wilcox Report, ¶ 50.

To interpret and classify these written responses, Prof. Wilcox relied on information he learned during the unrecorded and undocumented pre-survey interviews. Prof. Wilcox classified (or "coded," in Prof. Wilcox's parlance) survey responses into categories:

> (1) participants who anticipated adverse impacts to their business from the hypothetical scenario;
> (2) those who anticipated no impact, mixed impacts, or possibility of positive impacts; and
> (3) written responses that were too ambiguous or difficult to interpret.[15]

To determine which of these three buckets the written survey responses belonged in, Prof. Wilcox again relied on the undisclosed, pre-survey interviews.[16] Based on these interviews, Prof. Wilcox made certain assumptions about the survey participants and how they think. He testified: "It is true that I use knowledge from the in-depth interviews in my interpretation of some the responses." Ex. A, Wilcox Dep., 486:9–16. For example, based on the pre-survey interviews, Prof. Wilcox assumed that the surveyed application developers "all like to use the Android [software development tools] because it makes their life easy." Ex. A, Wilcox Dep., 419:1–420:7. Similarly, based on the undisclosed interviews, Prof. Wilcox assumed that changing code is a "major pain point for [application developers]." Ex. A, Wilcox Dep., 422:3–424:9.

After this sorting-hat process, Prof. Wilcox offers the opinion that, in response to his hypothetical future scenario, the majority (96) of those respondents that provided a written response anticipated adverse impacts on their businesses. Because Prof. Wilcox's interpretation of the survey results—the conclusions he offers in his report—are entirely subjective and

---

[15] *See* Ex. B, Wilcox Report, ¶ 50; *see also* Ex. A, Wilcox Dep., 360:12–363:3 (describing the "methodology" of his coding); Ex. A, Wilcox Dep., 486:17–487:1 (clarifying that he only coded a response as "possibly positive," if it was "facially positive").

[16] *See* Ex. B, Wilcox Report, ¶ 50. Wilcox concedes that categorizing *and interpreting* responses was difficult giving the technical nature of the question and the varied; in which respondents used language to communicate their answers.

premised largely on undocumented and unrecorded, pre-survey interviews, the Court should exclude the opinions.

**STANDARD**

To be admissible, expert opinions must satisfy Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702 imposes upon the Court a special "gatekeeping obligation" to prevent the introduction of expert testimony that is irrelevant or unreliable. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, the Supreme Court's decisions in *Daubert*, 509 U.S. 579, and *Kumho Tire*, 526 U.S. 137, require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony "offered under FRE 702 is both relevant and reliable." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002); *see Meister v. Med. Eng''g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001). Additionally, the expert testimony proffered must meet FRE 702's "fit" requirement; that is, it must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).[17]

---

[17] FRE 702 is slated to be amended on December 1, 2023. *See* Comm. on Rules of Prac. of Proc., Agenda Book 892–95 (June 7, 2022), *available at* https://www.uscourts.gov/sites/default/files/2022-06_standing_committee_agenda_book_final.pdf. Specifically, the "Committee unanimously approved a proposal . . . that would amend Rule 702(d) to require the court to find that 'the expert's opinion reflects a reliable application of the principles and

Finally, Google, as the party proposing to introduce expert opinion testimony, "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *See* Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing *Bourjaily v. United States*, 483 U.S. 171 (1987));[18] *see also Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009) (citing *Meister*, 267 F.3d at 1127 n.9).

## ARGUMENT

I.     **Prof. Wilcox's Testimony And Opinion Should Be Excluded Because They Are Unreliable Amount To Nothing More Than *Ipse Dixit***

The Court should exclude Prof. Wilcox's opinions because they are nothing more than *ipse dixit*, as they rely on an analysis which is not testable and, ultimately, is entirely subjective.

Prof. Wilcox opines that, in response to his hypothetical scenario, the majority of respondents offering a written, free-form response anticipated adverse impacts on their businesses.[19] His opinions are excludable for two reasons. First, Prof. Wilcox's coding and classification of survey responses, which are central to his opinions, lack reliability because the coding and classification are based on parameters that cannot be reproduced, verified, or tested. The law makes clear that such testimony is inadmissible. Second, the Court should exclude Prof. Wilcox's opinions because they are subjective, unsupported, and accepting them would amount to accepting *ipse dixit*.

---

methods to the facts of the case.'" *Id.* at 6. The prospective amendments do not affect the analysis here.

[18]  The Committee has also unanimously approved a proposal that "would explicitly add the preponderance of the evidence standard to Rule 702(b)-(d)." *Id.* at 7–8. The Committee's comment note that "incorporating the preponderance standard into the text of Rule 702 was made necessary by the decisions that have failed to apply it to the reliability requirements of Rule 702." *Id.* at 8.

[19]  Ex. B, Wilcox Report, ¶ 15.

### A.       Prof. Wilcox's Coding Of Survey Results Into Three Buckets Is Unreliable

The Court should exclude Prof. Wilcox's survey analysis because Prof. Wilcox relied on undisclosed interviews when sorting the written survey results into three buckets.

*Daubert* requires that expert opinions employ a "scientific methodology," which involves "generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593 (citations omitted). For this reason, when a party proffers an analysis at trial, *Daubert* requires that "[s]omeone else using the same data and methods must be able to replicate the [expert's] result." *Zenith Elecs. Corp. v. WH-TV Broad. Corp*., 395 F.3d 416, 419 (7th Cir. 2005). And because the party proffering an expert bears the burden of demonstrating reliability, that party must preserve and produce the necessary materials for the opposing party to replicate and test the expert's conclusions. *Jackson v. Colgate-Palmolive Co*., No. 15-01066, 2019 U.S. Dist. LEXIS 131298, at *19 (D.D.C. Aug. 6, 2019) (Expert's "testing results are not reproducible and must therefore be excluded as unreliable.").[20]

A party unable to replicate or test an opposing expert's work suffers real prejudice. The testability requirement "assures the opponent of proffered evidence the possibility of meaningful cross-examination (should he or someone else undertake the testing)." *United States v. Mitchell*, 365 F.3d 215, 238 (3d Cir. 2004). Put differently, an expert presenting an analysis that cannot be replicated deprives the factfinder of the opportunity to fully assess the testimony, including any potential weaknesses in the expert's methodology or in how she implemented that methodology.

---

[20]  *Jackson* relied on *Hanson v. Colgate-Palmolive Co*., 353 F. Supp. 3d 1273, 1284 (S.D. Ga. 2018) and *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the *sine qua non* of 'science.'").

To reach his conclusions regarding the potential impact of forked versions of Android on application developers, Prof. Wilcox relied upon a series of undocumented, pre-survey interviews. Before performing the survey, Prof. Wilcox observed moderators interview eighteen application developers.[21] The purpose of such pre-survey interviews generally is "to refine questions for future surveys of a particular group."[22] Prof. Wilcox, however, took his reliance on these pre-survey interviews further. With no expertise in application development, Prof. Wilcox relied on these interviews to make assumptions about application developers and how they think. These assumptions included that developers would need to make separate changes to the application code for a substantial number of devices in order for their applications to work properly in the hypothetical world.[23] Without access to these pre-survey interviews, Plaintiffs have no way to test whether and to what degree these assumptions are justified.

Then, after receipt of 168 written, free form survey responses, Prof Wilcox again returned to the pre-survey derived assumptions. Specifically, he applied these assumptions when he coded written, free-form survey responses into three buckets: (1) responses anticipating adverse impacts, (2) responses anticipating no impact, mixed impacts, or possibility of positive impacts, and (3) ambiguous or difficult to interpret responses.[24] Once again, because no transcripts or notes were provided from these pre-survey interviews, Plaintiffs cannot test the connection between the pre-survey interviews, the assumptions generated, and the application of those

---

[21] Ex. B, Wilcox Report, ¶ 20; Ex. B, Wilcox Report, Apps. D-1, D-2; Ex. A, Wilcox Dep., 27:10–30:13 (describing how Prof. Wilcox provided questions to the moderators and observed the questioning, but did not himself ask questions).

[22] Ex. B, Wilcox Report, ¶ 21 (quoting C. Boyce & P. Neale "Conducting In-Depth Interviews: A Guide for Designing and Conducting In-Depth Interviews for Evaluation Input," *Pathfinder International Tool Series*, 3 (2006)).

[23] Ex. A, Wilcox Dep., 22:1–12; 23:16–24:11; 26:11–27:7.

[24] Ex. B, Wilcox Report, ¶ 50.

assumptions to sorting the survey responses upon which Prof. Wilcox relies to render his opinion here.

It is also undisputed that Prof. Wilcox has no personal expertise in application development. Nevertheless, based on these eighteen interviews, Prof. Wilcox "never seriously" considered having independent coders review and analyze the subsequent 168 written responses. Instead, Prof. Wilcox claimed he was an appropriate interpreter of these responses because he is "the person who went through all the in-depth interviews."[25] However, when asked about the contents of the undisclosed interviews, Prof. Wilcox does not remember any specifics. For example, he could not say how many interviewees made certain points or what participants said.[26] For example, he testified "I can't tell you how many would use the word[s] 'major pain point' or if any used the word[s] 'major pain point.'" Ex. A, Wilcox Dep., 424:1–20.

The Court should exclude Prof. Wilcox's opinion given its reliance on the undisclosed interviews. *See United States v. Bynum*, 3 F.3d 769, 773 (4th Cir. 1993) ("An opinion that defies testing, however defensible or deeply held, is not scientific."). Certainly, Google's strategic litigation decisions with respect to these pre-survey interviews (i.e., not to record them) means the company cannot meet its burden under *Daubert* of demonstrating that Prof. Wilcox's coding was reliable. *See In re Ondova Ltd.*, No. 09-34784, 2012 WL 5879147, at *10 (Bankr. N.D. Tex. Nov. 21, 2012) ("After a Daubert-objection was lodged by the Receiver's counsel, the court did

---

[25] Ex. A, Wilcox Dep., 366:2–19.

[26] *See, e.g.*, Ex. A, Wilcox Dep., 443:19–444:7 (testifying that he "will absolutely testify there's some topics that came up again and again," but that "I don't have a number for you"); Ex. A, Wilcox Dep., 487:19–489:11 (after testifying that some interviewees had oversight responsibilities over back-end developers (supervisors) and being asked whether he specifically discussed those responsibilities with those supervisors, stating, "I would not have probed the supervisors in any depth on their relationship with their back-end engineers.  I just knew they were part of their team"); Ex. A, Wilcox Dep., 489:7–11 (Prof. Wilcox testifying that he did remember how many respondents in survey had supervisory responsibility).

not let [the expert] testify as to his opinion on the value of the Domain Names, because he could

not share the methodology he used—it is proprietary information of Sedo, LLC."); *In re*

*Dicamba Herbicides Litig.*, No. MDL No. 2820, 2019 U.S. Dist. LEXIS 206589, at *27 (E.D.

Mo. Nov. 27, 2019) (excluding expert whose "results cannot be replicated using the R software

[expert] used").

Therefore, because Plaintiffs are not able to reproduce and test Prof. Wilcox's coding

based on the undocumented interviews, the Court should exclude the results of the coding and

Prof. Wilcox's opinions based on this coding.

### B.      Prof. Wilcox Draws Unsupported Conclusions From The Survey Results

The Court should exclude Prof. Wilcox's testimony in its entirety because his opinions

cannot reliably be extrapolated from the results of the Wilcox Survey, thus failing *Daubert's*

"fit" requirement. Under FRE 702, expert testimony must "fit"—i.e., be "sufficiently tied to the

facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509

U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

The *Daubert* court explained that "Rule 702's 'helpfulness' standard requires a valid

scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509

U.S. at 591–92. "For example, in order for animal studies to be admissible to prove causation in

humans, there must be good grounds to extrapolate from animals to humans, just as the

methodology of the studies must constitute good grounds to reach conclusions about the animals

themselves." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 743 (3d Cir. 1994). "Thus, the

requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the

way through the step that connects the work of the expert to the particular case." *Id.*

Prof. Wilcox's opinions are unreliable because they are unsupported conclusory opinions;

in short, the Court is asked to accept Prof. Wilcox opinions merely on his say-so. The Court

should reject this invitation. Indeed, courts can and should reject any opinion not logically connected to or that otherwise exceeds the scope of the data relied upon. *See e.g.*, *Kumho Tire*, 526 U.S. at 157 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (citations omitted). The Court should not admit opinions as evidence if there is "too great an analytical gap" between the expert's conclusions and the underlying data on which he relies. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). When a court has no means by which to verify the claim, it "is left only with [the expert's] *ipse dixit*." *Cross Com. Media, Inc. v. Collective, Inc.*, No. 13-2754, 2014 WL 11343849, at *10 (S.D.N.Y. Aug. 21, 2014) (rejecting expert's opinion as unreliable where expert identified a group of consumer survey respondents as "the correct group, but provide[d] no rationale as to why," instead, leaving the court "only with his *ipse dixit*"), *rev'd in part on other grounds*, *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155 (2d Cir. 2016).

Here, there can be no doubt that Prof. Wilcox's interpretations of the survey responses are just that—*ipse dixit* of Prof. Wilcox, with his own assertions far exceeding the limited data available to him and certainly in excess of the even more limited set of support preserved and produced to Plaintiffs. An authoritative manual, relied on by Prof. Wilcox, explains that coding responses "to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately. Two trained coders should independently score the same responses to check for the level of consistency in classifying responses."[27] Here, Prof. Wilcox failed to apply any guidelines whatsoever when

---

[27] Shari Seidman Diamond, "Reference Guide on Survey Research," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 359, 413 (3rd Edition 2011) (cited in Ex. B, Wilcox Report, ¶ 16, n.13).

coding responses and employed no methodology to ensure that he coded responses consistently.[28] As he acknowledged, he did not "prepare guidelines or standards for coding written, free form responses," ostensibly because he was coding the responses himself.[29] Indeed, he concedes that his coding decisions were subjective, saying, for instance, that there were no "hard-and-fast rules"[30] for determining what qualified as an adverse impact. When he was unsure how to code a response, he "would just have a conversation with someone or more than one person at Cornerstone," the consulting firm that assisted him in preparing the survey.[31] Again, there is no record or support to identify any such ambiguous cases or the methodology used to resolve the ambiguity. Prof. Wilcox failed to use any instructions, decision standards, or independent coders and without the recorded interviews, neither Plaintiffs nor the Court can verify that Prof. Wilcox accurately or consistently coded the responses.

This foundational error is compounded by the fact that Prof. Wilcox—inexplicably— excluded the majority of qualified respondents (186 of 354)[32] because they responded "don't

---

[28]  *See, e.g.*, Ex. A, Wilcox Dep., 363:16–365:9. Other than conversations with employees at Cornerstone of which he cannot recall any specific responses or numbers, Wilcox did nothing to verify his interpretations and coding. Ex. A, Wilcox Dep., 366:2–368:1; *see also Revlon Consumer Prod. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (finding survey unreliable due to, among other reasons, inconsistent and confusing coding).

[29]  Ex. A, Wilcox Dep., 363:16–364:3 ("I guess I didn't think it was important to prepare guidelines for myself.").

[30]  Ex. A, Wilcox Dep., 391:3–392:6; *see also* Ex. A, Wilcox Dep.*,* 393:17–394:2 ("I have no hard-and-fast rule that suggests any word 'keep' means it's negative, but 'keep' in conjunction with the rest of the phrase, yes, I believe that is a negative.").

[31]  Ex. A, Wilcox Dep., 364:4–15.

[32]  Ex. B, Wilcox Report, ¶ 50 & n.70; Ex. A, Wilcox Dep., 387:13–19. *See also* Ex. B, Wilcox Report, ¶ 47 (1,892 respondents entered the survey and 354 of those respondents qualified and completed the survey);

know" or "not sure" when asked about the possible impact of the hypothetical increase in forked versions of Android.[33] This exclusion allowed Prof. Wilcox to throw out the majority of respondents and thereby redefine the denominator to conclude that the "majority" of respondents (in actuality, 98 of 354) anticipate adverse impacts. He concedes, as he must, that inclusion of the 186 written responses that selected "Don't know/Not sure" would decrease the percent of respondents who anticipated adverse effects to approximately 25 percent.[34]

Further, Prof. Wilcox expressly resolved doubts in favor of Google. That is, Prof. Wilcox coded certain survey responses using his "judgement," in other words, responses that were facially unclear, he coded as "anticipating adverse impacts" based on his belief that the person was anticipating some kind of negative outcome.[35] Prof. Wilcox's report has no support for this approach. Conversely, he applied a different metric when coding "possibly positive" responses. For these, he only coded a response as such if the response was facially positive.[36] Thus, Prof. Wilcox, perhaps unsurprisingly, created a weighted system that tips the scale in favor of Google, but is unjustifiable as a basis for expert testimony.

---

[33] Prof. Wilcox excluded these respondents from his analysis even though he confirmed that "Don't know/Not sure" was a valid response to these questions." Ex. A, Wilcox Dep., 141:9–21 (testifying that "Don't Know / Not Sure" is a valid response to survey question M10); Ex. A, Wilcox Dep.,151:22–152:10 (testifying that "Don't Know / Not Sure" is a valid response to survey question M30); Ex. A, Wilcox Dep. 196:6–10 (testifying that "Don't Know / Not Sure" is a valid response to the main hypothetical and survey question H10).

[34] Ex. A, Wilcox Dep., 388:5–15; *see also* Ex. B, Wilcox Report, ¶ 51. Had Wilcox used the proper denominator of 354, which represents the total number of respondents that completed the survey, he should have concluded, notwithstanding his faulty coding practices, that 28% (98/354), not 58%, of respondents anticipated adverse impacts.

[35] *See* Ex. A, Wilcox Dep., 365:13–366:4.

[36] Ex. A, Wilcox Dep., 486:9–487:12.

The subjective nature of Prof. Wilcox's analysis can be shown with an example. When considering how their business would be affected by an Android fork, one respondent wrote: "We would have to rework our app code." Prof. Wilcox concluded this response qualified as "anticipating adverse impacts" because it included the word, "rework."[37] Of course, in the English language, "rework" is simply a synonym for "change."[38] Nevertheless, Prof. Wilcox interpreted the word "rework" as something "broader" than the word "change" and as having "negative implications."[39] Thus, the neutral statement about reworking code (that the respondent had been asked to assume as part of the hypothetical) was placed in the "anticipating adverse impacts" bucket simply because Prof. Wilcox felt that was where it belonged. This is far afield of the scientific rigor required under FRE 702.

Prof. Wilcox similarly classified the survey response "[u]ser satisfaction with the application is very high which has a big impact on us" as suggesting an adverse impact in response to the hypothetical, though Prof. Wilcox acknowledges this statement "is a bit cryptic."[40]

Because Google cannot, as it must, demonstrate that Prof. Wilcox's survey "can be linked through scientifically reliable means" to his opinions about how application developers would

---

[37] Ex. A, Wilcox Dep., 400:19–401:4.

[38] *See, e.g.,* "Change," Merriam-Webster, *available at* https://www.merriam-webster.com/thesaurus/change (last visited Dec. 7, 2022).

[39] Ex. A, Wilcox Dep., 401:5–402:7.

[40] Ex. A, Wilcox Dep., 454:12–457:4; *see also* Ex, A, Wilcox Dep., 403:5-405:14 (If a participant stated that he would have to make changes to the application code, Wilcox assumed the participant was describing a time issue, and Wilcox would classify the response as an adverse impact. If the participant decided he would not make changes to the application code, Wilcox assumed the participant was describing a negative development decision, and he would classify it as an adverse impact as well. As a result, no matter the choice the participant made, if he mentioned code, Wilcox would have categorized it as an adverse effect.).

view Android forks, those opinions must be excluded under *Daubert*. *See Grimes v. Hoffmann-LaRoche*, 907 F. Supp. 33, 35 (D.N.H. 1995) (citing *In re Paoli*, 35 F.3d at 743–44) ("Thus, the results of a scientifically reliable experiment or study will fail *Daubert's* fit requirement and be excluded unless the results can be linked through scientifically reliable means to the expert opinion it purports to support.")).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court exclude the expert report and testimony of Prof. Wilcox.

Dated: December 12, 2022                              Respectfully submitted,

By: ____ */s/ Kenneth M. Dintzer* _____
Kenneth M. Dintzer
Sara T. Gray
Jeremy M. P. Goldstein
Karl. E. Herrmann (DC Bar #1022464)
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*

By: ____ */s/ Kelsey Paine* _____
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Kelsey Paine, Assistant Attorney General
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Kelsey.Paine@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:_____/s/ Matthew Michaloski_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By:_____/s/ David A.F. McCoy_____
David A.F. McCoy, Ark. Bar No.2006100
Senior Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
David.McCoy@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

By:_____/s/ Brian Wang_____
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Kathleen Foote, Senior Assistant Attorney General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By:_____*/s/ Lee Istrail*_____
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:_____*/s/ Daniel Walsh*_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: ____/s/ *Philip R. Heleringer*_____
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director of
the Office of Consumer Protection
Office of the Attorney General, Commonwealth of
Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By:_____/s/ Christopher J. Alderman_____
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By:_____/s/ Scott Mertens_____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By:_____/s/ Stephen M. Hoeplinger_____
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

By:_____/s/ Hart Martin_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

By:____/s/ Derek Oestreicher____
Derek Oestreicher
Chief Deputy Attorney General
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: 406-442-1894
derek.oestreicher@mt.gov

*Counsel for Plaintiff State of Montana*

By:____/s/ Mary Frances Jowers_____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By:_____/s/ Gwendolyn J. Lindsay Cooley_____
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

By: */s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Jon.Sallet@coag.gov
Steven M. Kaufmann, DC Bar No. 1022365
*(inactive)*
Steve.Kaufmann@coag.gov
Matt Schock, DC Bar No. 1531265
Matt.Schock@coag.gov
Carla Baumel
Carla.Baumel@coag.gov
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Tel: 720-508-6000

*Counsel for Plaintiff Colorado*


Joseph M. Conrad, Assistant Attorney General
Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
Joseph.Conrad@nebraska.gov
Colin.snider@nebraska.gov
Matt.Mckinley@nebraska.gov

*Counsel for Plaintiff Nebraska*

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER
LLOP
1133 Avenue of the Americas, Suite 2200
New York, NY 10036-6710
212-335-2793
wfcavanaugh@pbwt.com

*Counsel for Plaintiff Colorado and Nebraska*

Michael S. Catlett, Deputy Solicitor General
Arizona Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Tel: (602) 542-7751
michael.catlett@azag.gov

*Counsel for Plaintiff Arizona*

Bryce Pashler, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Tel: (515) 725-5391
bryce.pashler@ag.iowa.gov

*Counsel for Plaintiff Iowa*

Elinor R. Hoffmann
Morgan J. Feder
Michael Schwartz
Office of the Attorney General of New York
28 Liberty Street, 21st Floor
New York, NY 10005
212-416-8513
elinor.hoffmann@ag.ny.gov
morgan.feder@ag.ny.gov
michael.schwartz@ag.ny.gov

*Counsel for Plaintiff New York*

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
919-716-6000
kchoksi@ncdoj.gov
jabram@ncdoj.gov
Jmarx@Ncdoj.Gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff North Carolina*

J. David McDowell
Chris Dunbar
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 741-8722
David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov

*Counsel for Plaintiff Tennessee*

Scott R. Ryther
Tara Pincock
Assistant Attorney General, Antitrust Section
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
385-881-3742
sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff Utah*

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
jeff.pickett@alaska.gov

*Counsel for Plaintiff Alaska*

Nicole Demers
State of Connecticut Office of the Attorney
General
165 Capitol Avenue, Ste 5000
Hartford, CT 06106
860-808-5202
nicole.demers@ct.gov

*Counsel for Plaintiff Connecticut*

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
302-577-8924
michael.undorf@delaware.gov

*Counsel for Plaintiff Delaware*

Elizabeth Gentry Arthur
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
202-724-6514
elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

Leevin Taitano Camacho, Attorney General
Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Tel: (671)-475-3324

*Counsel for Plaintiff Guam*

Rodney I. Kimura
Office of the Attorney General of Hawaii
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
808-586-1180
rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff Hawaii*

Brett Talmage DeLange
John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Fl.
PO Box 83720
Boise, ID 83720-0010
208-334-4114
Brett.delange@ag.idaho.gov
john.olson@ag.idaho.gov

*Counsel for Plaintiff Idaho*

Elizabeth Maxeiner
Brian Yost
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
773-590-7935
elizabeth.maxeiner@ilag.gov
brian.yost@ilag.gov

*Counsel for Plaintiff Illinois*

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Tel: (785) 296-3751
lynette.bakker@ag.ks.gov

*Attorneys for Plaintiff Kansas*

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006
207-626-8838
christina.moylan@maine.gov

*Counsel for Plaintiff Maine*

Schonette J. Walker
Assistant Attorney General
Chief, Antitrust Division
Office of the Attorney General
swalker@oag.state.md.us
Gary Honick
Assistant Attorney General
Deputy Chief, Antirust Division
Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6480
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

William T. Matlack, Assistant Attorney General
Chief, Antitrust Division
Michael B. MacKenzie, Assistant Attorney
General
Deputy Chief, Antitrust Division
Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108
Tel: (617) 727-2200
William.Matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff Massachusetts*

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
651-757-1257
zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff Minnesota*

Michelle Christine Newman
Lucas J. Tucker
Nevada Office of the Attorney General
Bureau of Consumer Protection
100 N. Carson Street
Carson City, NV 89701
775-684-1164
mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff Nevada*

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
603-271-1217
brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff New Hampshire*

Isabella R. Pitt, Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
973-648-7819
Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff New Jersey*

Judith E. Paquin, Assistant Attorney General
Cholla Khoury
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Tel: 505.490.4885
jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff New Mexico*

Parrell D. Grossman
Director
Elin S. Alm
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
701-328-5570
pgrossman@nd.gov
ealm@nd.gov

*Counsel for Plaintiff North Dakota*

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of The Attorney General of Ohio, Antitrust
Section
30 E Broad Street, 26th Floor
Columbus, OH 43215
614-466-4328
jennifer.pratt@ohioattorneygeneral.gov
beth.finnerty@ohioattorneygeneral.gov
mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff Ohio*

Caleb J. Smith Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel: (405) 522-1014
Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff Oklahoma*

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301
503-934-4400
cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff Oregon*

30

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Pennsylvania*

Guarionex Díaz Martínez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
PO Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201
gdiaz@justicia.pr.gov

*Counsel for Plaintiff Puerto Rico*

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
SProvazza@riag.ri.gov

*Counsel for Plaintiff Rhode Island*

Yvette K. Lafrentz
Office of The Attorney General of South Dakota
1302 E. Hwy 14, Suite1
Pierre, SD 57501
605-773-3215
yvette.lafrentz@state.sd.us

*Counsel for Plaintiff South Dakota*

31

Ryan G. Kriger
Office of The Attorney General of Vermont
109 State St.
Montpelier, VT 05609
802-828-3170
ryan.kriger@vermont.gov

*Counsel for Plaintiff Vermont*

Tyler Timothy Henry
Office of the Attorney General of Virginia
Antitrust Unit/Consumer Protection Section
202 N. 9th Street
Richmond, VA 23219
804-786-6557
thenry@oag.state.va.us

*Counsel for Plaintiff Virginia*
Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-5419
amy.hanson@atg.wa.gov

*Counsel for Plaintiff Washington*

Douglas Lee Davis
Office of Attorney General, State of West Virginia
P.O. Box 1789
812 Quarrier Street, 1st Floor
Charleston, WV 25326
304-558-8986
doug.davis@wvago.gov

*Counsel for Plaintiff West Virginia*

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
(307) 777-6397
benjamin.peterson2@wyo.gov

*Counsel for Plaintiff Wyoming*