## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>          Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>          Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

## PLAINTIFF STATES' MEMORANDUM IN OPPOSITION TO
## DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT

██████████

## SUBMITTED WITH CORRECTIONS FEBRUARY 9, 2023

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

I.   STATEMENT OF FACTS ......................................................................................... 7

  A.   Industry Background ............................................................................................ 7

  B.   Google's Search Distribution Agreements ....................................................... 10

  C.   Google's SEM Tool SA360 ............................................................................... 11

    1.   Google's conflicted position in the U.S. advertising market ......................... 12

    2.   SA360 feature disparity: auction-time bidding ............................................. 13

    3.   SA360 feature disparity in other current and future features ....................... 15

  D.   Google's Conduct Impacting SVPs ................................................................... 16

    1.   SVPs rely on Google for customers even as Google limits their visibility to those customers ................................................................................................... 17

    2.   Google requires SVPs to provide valuable data for Google's own use ......... 19

II.   APPLICABLE LAW ............................................................................................... 20

  A.   Summary Judgment Cannot be Granted in the Face of Material Factual Disputes ........... 20

  B.   This Circuit's Precedent Precludes Summary Judgment .................................. 21

III.   ARGUMENT ........................................................................................................... 24

  A.   The Components of Google's Ongoing Conduct Facilitate and Reinforce Each Other .... 24

    1.   Monopoly maintenance analysis considers all conduct that creates or amplifies competitive harm ............................................................................................. 24

    2.   Google does not challenge the States' allegation that monopoly-maintaining actions reinforce one another ........................................................................... 25

  B.   Google's Arguments that it is Entitled to Judgment as a Matter of Law Fail ................. 28

    1.   Google's business practice of restricting SVP visibility in strategically important verticals is subject to antitrust scrutiny ......................................................... 28

    2.   Given Google's ongoing dealings with advertisers and SVPs, there is no "duty to deal"

to be adjudicated ................................................................................................................ 30

C.   The Record Overflows With Issues of Material Fact .......................................................... 31

1.   The competitive harm flowing from Google's distribution agreements cannot be properly assessed or dispensed with on summary judgment ................................................. 32

2.   Evidence that SA360 feature disparity caused anticompetitive harm cannot be severed or disregarded ......................................................................................................... 33

3.   Google's SVP conduct impedes threats to its monopolies and presents disputed factual issues that preclude summary judgment. ............................................................... 37

D.   Google's Purported Requirements for Use of a "But-For" World to Support the Existence of Harm Fail as a Matter of Law and of Fact .......................................................... 48

IV.   CONCLUSION ............................................................................................................. 50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.I.B. Express, Inc. v. FedEx Corp.*,
358 F. Supp. 2d 239 (S.D.N.Y. 2004) ..................................................................31

*Allen v. Johnson*,
795 F.3d 34 (D.C. Cir. 2015) ............................................................................21

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
592 F.3d 991 (9th Cir. 2010) .......................................................................29, 30

*American Professional Testing Serv. v. Harcourt Brace Jovanovich Legal &*
*Professional Publs.*, 108 F.3d 1147 (9th Cir. 1997) ...............................................37

*In re Apple iPod iTunes Antitrust Litigation*,
796 F. Supp. 2d 1137 (N.D. Cal. 2011) ................................................................30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................20

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .......................................................................................24

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) .......................................................................25, 47

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992) .................................................................................2, 21, 22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
383 F. Supp. 187 (S.D.N.Y. 2019) .....................................................................47

*King Drug Co. of Florence v. Cephalon, Inc.*,
88 F. Supp. 3d 402 (E.D. Pa. 2015) ....................................................................21

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ..............................................................................25

*Mayorga v. Merdon*,
928 F.3d 84 (D.C. Cir. 2019) ............................................................................20

*McGaughey v. Dist. of Columbia*,
740 F. Supp. 2d 23 (D.D.C. 2010) .................................................................21, 36

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ............................................................................36

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) .......................................................................37

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).................................................................................25

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009).......................................................................................30, 31

*Phillips v. Cohen*,
    400 F.3d 388 (6th Cir. 2005) ........................................................................21, 36

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    60 F. Supp. 2d 502 (M.D.N.C. 1999) .................................................................36

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000)............................................................................................20

*Standard Oil Co. of Cal. v. United States*,
    337 U.S. 293 (1949)............................................................................................36

*Standard Oil Co. of N.J. v. United States*,
    221 U.S. 1 (1911)................................................................................................50

*In re Suboxone*,
    No. 13-MD-2445, 2022 WL 3588024 (E.D. Pa. Aug. 22, 2022) .........................21

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ............................................................................36

*United States v. Am. Tobacco Co.*,
    221 U.S. 106 (1911)............................................................................................24

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ...................................................... *passim*

*United States v. Microsoft Corp.*,
    887 F. Supp. 2d 30 (D.D.C. 2000) .....................................................................47

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*,
    540 U.S. 398 (2004)............................................................................................30

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
    331 F. Supp. 2d 513 (E.D. Tex. 2004) ...............................................................31

**Statutes**

Sherman Act Section 1 (15 U.S.C. § 1) ........................................................................36

Sherman Act Section 2 (15 U.S.C. § 2) .............................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 56..................................................................................................14, 20

Menace of the Hour, Anti-Monopoly Cartoon (1899), available at
    https://www.gettyimages.com/detail/news-photo/the-menace-of-the-hour-anti-
    monopoly-cartoon-george-luks-news-photo/629446167........................................50

## <u>INTRODUCTION</u>

For two decades, Google has controlled an overwhelming and increasing share of the market for "general search services" in the United States.  Whether measured by user search queries or page views, Google's current market share approaches 90%.  Moreover, Google's control of the vast majority of user queries affords it an equally commanding share of the over $80 billion that U.S. advertisers spend each year to reach those general search users. Spurred by the desire to protect that revenue stream, Google has maintained its dominant position by means of a web of agreements and other exclusionary conduct, as described in the DOJ and States[1] Complaints, the cumulative effect of which is to choke off the air supply from the competitive process.

By neutralizing threats from all sides with mutually-facilitating and reinforcing conduct, Google limits the ability of rivals to mount a realistic challenge to its monopoly power and weakens the firms with which those rivals might partner to infuse the market with choice and greater innovation. Google's conduct maintains and strengthens barriers to entry and expansion in these markets by making it harder for consumers to use a rival general search firm ("GSF")[2] and by creating a critical scale gap between itself and its rivals.  As the DOJ and States' Joint Opposition ("Joint Opposition") demonstrates, Google's distribution agreements comprise the foundation of that collective conduct.

And yet, Google now asks this Court to declare, without trial, that its actions constitute

---

[1] "States" as used in this brief are the undersigned thirty-eight jurisdictions that are Plaintiffs in *Colorado et al. v. Google LLC*, No. 20-cv-03715-APM.

[2] General search firms are companies that provide general search services. Some of them are also general search engines ("GSEs") which crawl the Internet and gather and index the information found there.  Google and Bing are both GSEs and GSFs.  DuckDuckGo and Yahoo!, which syndicate Bing search results and do not themselves crawl the Internet, are solely GSFs.

nothing more than lawful—even laudable—competition on the merits.  While the evidence adduced in discovery paints a starkly different picture, Google claims victory by ignoring or misapplying controlling precedent in this Circuit, by declaring as uncontested facts ones that are very much in dispute, and by substituting a straw man for the version of the States' Complaint that was actually filed.

Importantly, Google's Motions do not challenge (1) the existence of the three product markets on which the States rely ("Relevant Markets") (States' Compl. ¶¶ 59-89), (2) the durable monopoly power held therein (States' Compl. ¶¶ 90-102; DOJ Am. Compl. ¶¶ 92-96), (3) the actual conduct that the Plaintiffs allege (States' Compl. ¶¶ 103-211; DOJ Am. Compl. ¶¶ 111-65), and (4) in the case of the States' Complaint, even the assertion that competitive harm arises from the interlocking and cumulative impact of that continuing conduct (States' Compl. ¶¶ 103, 207).

Instead, Google wages a campaign of misdirection—dividing the States' unitary Complaint into three.  Silent on evidence of misconduct that it apparently wishes not to defend, it vigorously defends the merits of conduct that is not challenged.  It ignores the proof that the States will offer at trial to show that competition has been and is being harmed through the combined effects of anticompetitive distribution contracts, the operation of SA360—by which Google inserts itself between its advertising rivals and critically important advertisers—and the conduct it directs at selected specialized vertical providers ("SVPs"), all in order to degrade threats to its advertising revenues and limit competition in Relevant Markets.

Google's continuing conduct must be understood within the "actual market realities" that shape its incentives and abilities to preserve and strengthen its monopoly power. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 465–66 (1992); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 60, 71 (D.C. Cir. 2001) (en banc) (monopoly conduct kept rivals

from achieving scale required for actual success in that market).  The incentive is money.  Google Search is an advertising machine—built on its ability to attract users looking for online destinations and monetize their attention and data through the sale of advertising that appears alongside Google web results (the traditional "blue links") and other features of the search engine results page ("SERP") that appear in response to a Google search query.  If users no longer came to Google Search to research and discover online destinations, then its general search product, as a Google document says, would face "acute risk of irrelevance."  SMF ¶ 21.[3]  The financial impact on Google would be severe.  Google search ads do not just drive Google's profits; they actually subsidize Google businesses that are losing money.  SMF ¶¶ 16-20.

The challenged conduct strengthens barriers to entry and expansion by rivals at multiple levels and diminishes the likelihood that users will switch general search services, thus preserving and enlarging the scale gap between Google and its general search rivals.  Google has purchased the exclusive default position at search access points by paying massive sums of money to Apple, mobile carriers, and others in exchange for preferential advantages in attracting and maintaining user attention.  The powerful tendency of search users to stick with a Google default makes its payments highly effective at boosting user switching costs.[4]  In short, the explanation for the almost ▓▓▓▓▓▓ that Google has paid since 2014 for this preferential treatment is that the default position advantages Google in attracting and maintaining user attention and, as such, the payments

---

[3] Citations to "SMF" refer to the States' concurrently-filed Statement of Material Facts. Citations to "Ex." refer to the exhibits submitted with the States' SMF.  The States also filed an index with descriptions of all the exhibits.  Citations to "Google SMF" refer to Google's Statement of Material Facts regarding the allegations in the States' Complaint.

[4] Switching costs can impede competitive choice without acting as a complete abolition of choice.  Rather, their effect is to place sand in the gears of competition, with predictable results. Ex. 3 (Baker) ¶¶ 19, 114 (identifying switching costs in connection with the ability of users to change general search firms and the ability of advertisers using SA360 to change to different search engine marketing ("SEM") tools).

create obstacles for rivals daring to challenge Google.  Greater volumes of user queries—scale—attract increased advertising revenue as advertisers seek the attention of the users entering those queries.  Scale is essential to the business of search and search advertising.

The harm that flows from Google's purchases of exclusive default positions is magnified by its conduct in the operation of SA360 and treatment of SVPs.  The three categories work together to reinforce and facilitate competitive harm as a single coherent set of actions.  But Google's Motion repeatedly, and wrongly, isolates each category as a separate "claim" that must be analyzed on a standalone basis.[5]  Consider the ripple effects of the distribution agreements.  By pushing rivals to the edges of the marketplace, these agreements effectively eliminate the ability of advertisers and SVPs to substitute Google rivals for Google as a way to attract users.  Liberated from competitive pressure, Google has a free hand to engage in additional harmful conduct.

That conduct includes its operation of SA360, a tool that big advertisers use to buy general search advertising from multiple companies.  Here, the harm to competition includes conduct aimed directly at Google's rivals, specifically at Microsoft Ads.  Google has the incentive—it makes more money when SA360 sells a Google ad rather than a Microsoft ad—and ability—because it owns and operates SA360—to delay support for Microsoft's competitive ad features, increasing the scale gap between Google and its rivals and harming the very advertisers that are Google's customers.  Because advertisers have no practical alternatives, Google can limit their ability to buy up-to-date advertising products from its rivals without fear that they will take their advertising dollars elsewhere.

Additional harm comes from Google's treatment of SVPs in certain commercial sectors,

---

[5] While the States plead three distinct claims based on three different markets, the collective conduct applies to each of those three claims.  States' Compl. ¶¶ 212-32 (including the full range of conduct in each claim of monopoly maintenance).

like travel and local searches. Unlike Google, SVPs in those sectors are sellers of goods and services that users may purchase (hotel rooms, for example). SVPs have a dual relationship with Google: as recipients of traffic from Google (including through ads) for which there is no viable substitute, and as suppliers of valuable, proprietary content (such as the prices, capacity and features of various hotels). Google's distribution agreements and the operation of SA360 create barriers to entry and expansion that give it monopoly leverage over SVPs that would not exist in a competitive world. That allows Google to target SVPs by limiting their visibility to users, thus raising the cost of customer acquisition, and by exploiting the SVPs' reliance upon access to Google's monopoly share of consumer traffic. Google can then require the SVPs to surrender valuable proprietary data that Google wants but cannot collect from the open web.

In the case of SVPs, the exclusionary conduct is, as in *Microsoft*, directed at companies against which Google does not compete. In *Microsoft*, the success of out-of-market software products could have enhanced the ability of rivals to improve their ability to challenge the monopolist. 253 F.3d at 53-55. Here, evidence establishes that SVPs could work with Google's rivals to better serve consumers in a competitive world. As a victim of Google's exclusionary conduct, ███████████████████████████████████████████████████████████████████████████████████████ Ex. 3 (Baker) ¶ 179; SMF ¶ 189.[6] Moreover, Microsoft recognizes the benefits of working with SVPs ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ SMF ¶ 190. As a result, ███████████████████████ ███████████████████████████████████████████████ SMF

_____

[6] Professor Jonathan Baker, the States' economic expert, submitted an Opening Report (Ex. 1), a Rebuttal Report (Ex. 2), a Reply Report (Ex. 3), and Supplemental Materials (Ex. 4).

¶ 190.  But consumers would benefit from stronger partnerships in a competitive world; as a senior SVP executive testified: ███████████████████████████████████████

███████████████████████████ SMF ¶ 199.  And competition would push Google itself to work harder, including with SVPs.  Ex. 3 (Baker) ¶¶ 182-86; SMF ¶¶ 191-93 (Yahoo! Japan); *infra* sec. III.D.

In today's marketplace, each of Google's bad acts begets more bad acts.  For example, the distribution agreements reduce the demand for rivals' advertising, which Google boldly uses as an excuse to justify its SA360 conduct, further harming advertisers and rivals.  Similarly, the distribution agreements and SA360 conduct effectively eliminate SVPs' ability to acquire significant numbers of new customers through other GSFs.  That leaves them without a competitive alternative when Google further raises their costs, limits their visibility, and demands the valuable proprietary data that fuels their businesses.  By actively fortifying barriers to entry and expansion, Google consigns its rivals to the distant edges of the markets and gains greater ability to attack any innovation it believes might be a future threat.  Indeed, that is how Google has already limited the ability of (1) ██████████████ to work with SVPs to give users the ability to search across apps on mobile devices and (2) mobile carriers to give consumers easier access to new products.  SMF ¶¶ 63-71.

Google asks the Court to ignore these interlocking and continuing effects on GSFs.  But, just as viewing any single dot of color in a pointillist painting has no meaning and reveals nothing about the artwork as a whole, so does a compartmentalized analysis of each individual act by Google fail to reveal the competitive impact of Google's expansive actions to maintain and enhance its monopoly.  Each dot of paint contributes toward creating a unified picture; likewise, each part of Google's conduct contributes to protecting its monopolies.  A complete understanding

requires judging them as a whole.

The Joint Opposition explains in detail why the Court should deny Google's motion for summary judgment on search distribution issues. As demonstrated herein, there is ample evidence to support the States' monopoly maintenance allegations, numerous genuine disputes of material fact, and clear errors of law in Google's Motion, all of which preclude summary judgment and warrant sending this case to trial.

## I.     STATEMENT OF FACTS

### A.     Industry Background

Google Search is a general search engine, a website that responds to user queries in order, in Google's words, to "make[] it easy to discover a broad range of information from a wide variety of sources." SMF ¶¶ 1-2. The "buyers" of general search services are users who provide their attention and data to advertisers. SMF ¶ 3. The four leading U.S. general search firms today, based on user queries, are Google, Bing, Yahoo!, and DuckDuckGo. SMF ¶ 4. Others include AOL, Brave, Ecosia and Neeva. SMF ¶ 4. Google has dominated the U.S. general search services market for over a decade: its share, measured by either search queries or page views, is nearly 90% and has been more than 80% since 2012. SMF ¶ 5. Bing, Google's closest competitor, has not exceeded an 11% market share since 2012. SMF ¶ 5.

The information available on a SERP is largely collected by crawling and indexing websites throughout the Internet, or by syndicating this data from a GSE that crawls and indexes. SMF ¶ 6. General search firms supplement this information with "structured data" acquired from third parties that is not available on the open Internet (*e.g.,* data indicating a hotel's availability and prices on different dates, or a plumber's service area and business hours). SMF ¶ 7. SVPs are important providers of such structured data. SMF ¶ 173.

The major GSFs derive nearly all of their search-related revenue from advertising. SMF ¶

8.  Most ads that appear on the SERP of the four leading U.S. general search companies are served by Google or Bing.  SMF ¶ 9.  Yahoo! and DuckDuckGo (the third and fourth largest GSFs) use Bing to serve their ads and share the resulting revenue with Bing.  SMF ¶ 9.  Google also has a longstanding monopoly in search advertising markets, which Google does not contest for purposes of this Motion.  Google's market share of advertising revenue in general search services is over 91% and has been over 80% every year since at least 2012.  SMF ¶ 10.  Bing, Google's closest competitor, has held less than 10% share every year.  SMF ¶ 10.

Google itself depends heavily on its search advertising revenue.  In 2019, Google Search advertising generated about ███████████████████████ total revenue in the U.S.  SMF ¶ 16.  The vast majority of Google's ad revenue is from text ads, accounting for ███ of all U.S. general search advertising spending on Google.  SMF ¶ 17.  As a DOJ expert has demonstrated, in 2020, Google's operating profits from general search advertising ███████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████  SMF ¶ 20.

Figure 1 below shows different elements that can appear on Google's SERP, in this example, for the query "plumbers chicago."  SMF ¶¶ 22-23.  The top of the SERP displays paid ads specific to local services, a type of vertically-focused general search ad.  Compared to text ads, Google's vertically-focused general search ads look less like web results and may include photos and information such as prices, customer ratings, and business hours.  SMF ¶ 23.  In this example are local services ads for three plumbers.  Beneath those, the SERP shows a paid text ad that takes a user to the advertiser's website when clicked. SMF ¶ 23.  Next is an example of Google's "universal" feature (also referred to as a "unit"), which includes information specific to the local

query obtained from various sources, including third parties.  SMF ¶ 23.  Finally, near the bottom

of the figure and lower on the SERP is an unpaid link (here for Yelp.com) commonly referred to

as a "web result," "blue link," or an "algorithmic result."  SMF ¶ 23.

A user can navigate from the universal to Google's immersive and business listing pages

on the same subject.  SMF ¶ 29 (also referred to as a "detail page" or, depending on the vertical, a

"property placement" page).  In the Hotels vertical, for example, the immersive page displays ads

alongside a map of the properties.  SMF ¶ 30.  The business listing or details page offers additional

information and booking links specific to a single hotel.  SMF ¶ 31.

## Figure 1



Today, Google's search engine typically receives more than ▮▮▮▮ search queries per

week in the U.S. and 89% of all search queries on GSFs in the U.S.  SMF ¶ 11.  The vast number

of search queries that Google receives provides it with scale, which helps it to provide information faster and more accurately and to improve its algorithms to better respond to future queries.  SMF ¶ 12.  More users running more queries also makes Google more appealing to advertisers because it increases the likelihood that some of those users will be interested in the advertiser's product or service.  SMF ¶ 13.  Indeed, many advertisers do not find it cost-effective to advertise on smaller GSFs due to the fixed costs of creating and managing an ad campaign.  SMF ¶ 14.  Microsoft, Google's closest but distant competitor in search advertising, ███████████████████████ ████████████████████████████████████████  SMF ¶ 15.

### B.    Google's Search Distribution Agreements

Google's conduct concerning its search distribution agreements is described briefly here to help show that Google's anticompetitive conduct—its exclusionary distribution agreements as well as the other forms of conduct described herein—is mutually-facilitating and mutually-reinforcing.

Since 2014, Google has paid almost ██████████, including about ██████ion in 2021 alone, to smartphone manufacturers, mobile carriers, browsers, and other Android partners to ensure that Google Search is the pre-installed default.  SMF ¶ 47.  Google paid the largest sums to Apple— over ██████████ since 2014, including nearly ██████████ in 2021—to provide the default general search service on Apple devices.  SMF ¶ 48.  Google's payments to Apple also ████████████ ██████████████████████████████████████████████████████  SMF ¶¶ 56-58; Ex. 3 (Baker) ¶ 111.  ████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████  Apple has worked with SVPs to provide SVP-branded travel and local content for Apple Maps.  SMF ¶ 59.  ████████████████████████████████████████████ ████████████████████████████████  SMF ¶ 57.  To avoid that outcome, ██████████

██████████████████████████████████████████████████

████████████████ SMF ¶ 58.

Taken together, Google's agreements control the majority of general search queries, which are performed on pre-installed Google defaults.  Adding queries made through Google's Chrome browser and its Search App, which also use Google as the default and thus impose switching costs on users that wish to choose a rival GSF, brings the percentage of all mobile and desktop general search queries controlled by a Google default to a striking ███ as of 2021.  SMF ¶¶ 62.

## C.     Google's SEM Tool SA360

The totality of Google's conduct, reinforcing and facilitating competitive harm, also includes operation of the Google-owned tool SA360.  It is the leading SEM tool—one of the two primary methods, along with native advertising tools—to bid in ad auctions and place search ads. SMF ¶ 75.  While native advertising tools such as Google Ads or Microsoft Ads allow advertisers to place ads with one specific GSF, SEM tools allow advertisers to plan and manage search advertising campaigns across multiple GSFs.  SMF ¶ 76.  In 2020, about one-third of the revenues from the sale of general search advertisements flowed through an SEM tool.  SMF ¶ 79. Competitors to Google's SEM tool, SA360, include Marin, Skai, and Adobe.  SMF ¶ 77.  SA360 is by far the most used SEM tool: in 2020, it accounted for ███ of general search ad revenue from SEM tools, up from ███ in 2016.  SMF ¶ 80.  When an advertiser places ads through an SEM tool, including SA360, the tool earns a commission on the dollars it manages (and, of course, the GSF earns the ad dollars).  SMF ¶ 78.

SEM tools are competitively important because they save advertisers time and effort by allowing them to use a single product to manage and compare ad campaigns across multiple native tools, evaluate the relative performance of ad campaigns across multiple platforms, and plan their ad placement and bidding strategies.  SMF ¶ 81.  As Google has explained, ████████████████

11

████████████████████████████████████████████████████████████████

█████████████████████████████████ SMF ¶ 82.  SEM tools are also competitively important for rival GSFs because they provide an efficient means to attract advertisers that would not otherwise invest in using the rival GSF's native tool to place ads.  SMF ¶ 83.

Advertisers rarely switch between SEM tools because it requires significant investments of time, effort, and expense.  SMF ¶ 84.  For example, █████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ SMF ¶ 85.  █████████████████████████████████ ███████████████████████████████████████████████████████ SMF ¶ 86. ████████████████████████████████████████████████████████████████

█████████ SMF ¶ 87.

In addition, it is costly for an advertiser to use a rival SEM tool as an alternative to, or even in addition to, SA360.  Google integrates all Google Ads features into SA360, but not necessarily into competing SEM tools.  SMF ¶ 88.  The use of SA360 is thus essential to maximizing the use of Google Ads features, and it is nearly impossible for online marketers (including large SA360 users like █████████████████████████████ to avoid advertising on Google due to Google's dominance in general search.  SMF ¶ 89.  Moreover, using multiple SEM tools concurrently is inefficient, requiring advertisers to train staff to operate both tools and often to pay multiple licensing fees.  SMF ¶ 90.  The use of multiple SEM tools also contravenes the tools' very purpose, which as Google explains is to "allow[] buyers to manage and track digital campaigns across a *single platform*."  SMF ¶ 91 (emphasis added).

### 1. Google's conflicted position in the U.S. advertising market

SA360 was previously called DoubleClick, which Google acquired in 2008.  SMF ¶ 92. Through its ownership of SA360, Google has conflicting interests, *i.e.,* Google operates the biggest

SEM tool through which large advertisers can reach Google's general search advertising competitors. SMF ¶ 93. No other SEM tool provider has this conflict. SMF ¶ 93. After acquiring SA360, "Google represented that it would operate the [SA360] tool in a neutral manner," without favoring its own GSF over that of competitors. SMF ¶¶ 94-95. The reason for that representation,

██████████████████████████████████████████████████████████████

████████████████████████████████████████ SMF ¶ 94.

Yet, by Google's own admission, it ████████████████████████████████████

████████████████████████████████████████ while denying or delaying integration of these key features on competing search platforms, including Microsoft Ads. SMF ¶ 96. Google's explicit business goal is that SA360 ████████████████████████████████████

████ but not on Microsoft Ads. SMF ¶ 97. The incentive for this conduct is obvious: Google makes more money if advertisers use SA360 to purchase ads on Google than on competing GSFs because it gains revenue from both the underlying ads placed on Google and the fee charged by SA360 for the purchase of any ad. SMF ¶ 78. Google has expressly sought to leverage its position as both SEM tool provider and ad seller ████████████████████ in the general search industry. SMF ¶ 99. Major advertisers have expressed concern that SA360 operates in a manner that is "Google centric" and is no longer an "unbiased platform," resulting in less efficient ad spending. SMF ¶ 100. But, because of Google's search monopolies, they have no practical alternative.

### 2. SA360 feature disparity: auction-time bidding

As Google admits, SA360 has since 2019 supported a key feature called auction-time bidding on Google Ads, but not on Microsoft Ads. SMF ¶ 101. Auction-time bidding empowers bidding strategies to be changed in real time, as market conditions change. SMF ¶ 102. Bids are automatically set at the time of *each individual* ad auction, rather than only a few times a day. SMF ¶ 103. This greatly improves productivity of ad spending: by Google's own calculation,

auction-time bidding results in a 15-30% increase in conversions and ██████████

████████████████████████████████████████████████████ SMF ¶ 104.

Unsurprisingly, numerous advertisers such as ██████████████████ determined that

the lack of SA360 support for auction-time bidding on Microsoft Ads resulted in less effective

Bing ad campaigns.  SMF ¶ 105. ████████████████████████████████

████████████████████████████████████████████████████

██████  SMF ¶ 106.

Google integrated auction-time bidding support for Google Ads into SA360 in September

2019.  SMF ¶ 107.  It has not done so for Microsoft Ads, despite the fact that auction-time bidding

functionality has been available on Microsoft's native platform since at least 2016.  SMF ¶ 108.

Google concedes that ██████████████████████████████████████

████████████████████████████████████████  SMF ¶ 109.  For years, Google

has ██████████████████████████████████████████████████

SMF ¶ 110.  Nonetheless, Google admits that it has still not released auction-time bidding support

for Microsoft Ads.  SMF ¶ 111.[7]  In contrast, Google admits that ████████████████

████████████████████████████████████████████████████

██████████████████████  SMF ¶ 112.

Google's continued delay in integrating auction-time bidding support for Microsoft Ads is

an intentional choice and not due to any external impediment.  A Google SA360 Senior Product

---

[7] The Court should disregard the declaration from Google employee Eduardo Indacochea to the
extent it purports to declare facts or events that occurred after June 17, 2022.  *See* Indacochea
(Google) Decl. ¶¶ 7-8 (Google SMF Ex. 80).  This declaration ██████████████
████████████████████████████████ and was signed on Dec. 9,
2022.  The discovery cut-off entered by the Court, ECF No. 357, prohibits Parties from relying
upon affidavits or declarations submitted pursuant to Fed. R. Civ. P. 56(c) based upon events
having occurred after June 17, 2022.

Manager testified that it has been ███████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████.

### 3.    SA360 feature disparity in other current and future features

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████ In early 2022, Google announced a new version of SA360 with

Microsoft Ads integration for some of these features, but support for dynamic search ads is still

incomplete.  SMF ¶ 118.  The primary purpose of the new SA360 is to ensure that any new feature

will be immediately integrated for Google Ads, but not necessarily for competing ad platforms—

thereby exacerbating the disparity between Google and its competitors for any future feature.  SMF

¶ 120.

Google's preference for its own ad platform causes ad campaigns on Bing to be less useful

than they could have been and less effective than campaigns on Google.  SMF ¶ 121.  The

inevitable result is that SA360 steers ad spend towards Google and away from Microsoft, or as one

Google economic expert put it, "dollars to Google would not go to Bing."  SMF ¶ 122.  This

conduct "den[ies advertisers] the ability to access all of the features that Bing could give them to

help them optimize their campaigns, to help them get greater return on their advertising

investment."  SMF ¶ 123.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

### D.    Google's Conduct Impacting SVPs

SVPs focus on one or a limited number of commercial segments.  SMF ¶ 127.  For example, Amazon, eBay, and Etsy sell products to shoppers; Expedia and Booking sell airline tickets and hotel reservations; and Angi's List, Thumbtack, and OpenTable enable consumers to book local service providers, like plumbers, or make a restaurant reservation.  SMF ¶ 128.  SVPs differ from GSFs because of their much narrower commercial focus and because many of them afford users the convenience of completing transactions on their websites, such as purchasing a pair of shoes (Amazon) or reserving a hotel room (Booking).  *See* Ex. 1 (Baker) ¶¶ 120-21; SMF ¶ 129.

SVPs deal with Google in two ways.  First, SVPs depend on Google as a source of customers, especially new customers, through unpaid results (like the blue links) and advertising. SMF ¶¶ 134-38.  Second, SVPs are important suppliers to Google of structured data—proprietary information that SVPs create that is not available to be crawled on the web.  SMF ¶ 173.  As a result of the search distribution and SA360 conduct, SVPs have no realistic ability to find another GSF to replace Google as a source of traffic.  SMF ¶¶ 134-37. That allows Google to limit the visibility of SVPs in selected verticals, which increases their customer acquisition costs and pads Google's monopoly revenues.  SMF ¶¶ 143, 164, 166.  At the same time, Google wields its monopoly power to obtain valuable data on non-competitive terms, limiting the SVPs' ability to make better arrangements with Google rivals.  SMF ¶¶ 175, 178, 180-8.  This works in tandem with the other forms of conduct to reinforce Google's monopoly power.  *See infra* sec. III.A.2.

Google's keen awareness that informed consumers may become increasingly empowered to discover and revisit online destinations, like a trusted SVP, without the need to first conduct research on a SERP gives Google a powerful incentive to degrade the ability of SVPs to succeed. Although Google has monopolized general search, it fears the loss of relevance, lower user traffic,

16

and the resulting collapse of advertising revenues.   SMF ¶¶ 21, 194-97.   Limiting both SVP

visibility and the SVPs' ability to use their data, which would strengthen their brands, makes SVPs

less valuable partners to Google's rivals.   SMF ¶¶ 186-90.   Google actively prevents consumers

from gaining knowledge that would allow them to dispense with Google Search if they were to

discover that navigating directly to online destinations would be in their best interest. SMF ¶ 133,

143-48, 194-98.

### 1.  SVPs rely on Google for customers even as Google limits their visibility to those customers

General search is a significant source of user traffic for SVPs, accounting for as much as

88% of website traffic for significant SVPs.  Ex. 1 (Baker) ¶ 270 & Figure 20.   Appearing on a

SERP allows SVPs to gain user attention.  For example, a user may learn of a place to buy a needed

product through general search, then journey to an SVP's site to conduct further research and/or

make a purchase.  Ex. 3 (Baker) ¶ 76.

Because Google dominates the general search market, SVPs are deprived of any effective

choice among GSFs and are, therefore, heavily reliant on Google to obtain user traffic.   Ex. 1

(Baker) ¶¶ 220-21 & Figures 20-23; SMF ¶ 134-37; *see also* Ex. 11 (Elzinga Tr.) 337:22-38:3

("Google has lots of users[,] and advertisers [like SVPs] look upon users as potential customers.

So the fact that there's many people using the Google Search engine itself makes it attractive.").

███████████████████████████████████████████████████   SMF ¶ 137.   █████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

SMF ¶ 137.

New customer acquisition is particularly important to SVPs in terms of both revenue and

customer loyalty.  SMF ¶ 134-38.  For example, █████████████████████████████████████

██████████████████████████████████████ SMF ¶ 138.  Customers who develop loyalty to a specific SVP generally do so through their experience using that SVP's services.  SMF ¶ 139.  An SVP's ability to grow depends in no small part on its ability to attract new customers.  SMF ¶ 139.

Given the importance of general search to customer acquisition, SVPs are among Google's largest advertisers.  SMF ¶ 140.  Google knows this.  One internal Google document says that

████████████████████████████████████████████

████████████████████████████████████████████

██████ SMF ¶ 141.

Google concedes that it imposes visibility restrictions on SVPs in certain strategically important commercial arenas such as hotels, flights, and local services.  SMF ¶¶ 142-43.  Those restrictions on the SERP include the following:

- Universals/Units:

  - SVPs cannot appear in results in the free listings in Google's hotel universal, flights universal, or in the local universal triggered by searches for nearby businesses (restricted universals or units).  SMF ¶¶ 144-46; *Cf.* SMF ¶¶ 151-52 (movies, events).

- Vertically-Focused Ads:

  - SVPs cannot purchase ads in their own name and cannot appear prominently in the tile of local services ads on Google's SERP.  Additionally, when a user clicks on an ad paid for by the SVP featuring the name of a supplier, the consumer is directed to another Google site, not the SVP's site.  SMF ¶¶ 147-49.

  - Google also often prohibits SVPs from buying local search ads displaying their brand name in Google's local universal.  SMF ¶ 147.

By inserting the restricted universals in a prominent place on the SERP, typically above the fold, Google demotes the blue links, in which SVPs often appear, making it less likely users will click on them.  SMF ¶¶ 33-34, 130, 163-64.  Google's own data confirms that when its

universals appear on the SERP, users are 19% less likely to click on the blue links that follow. SMF ¶ 37.  The demotion of blue links magnifies the impact of Google's visibility restrictions on SVPs that are excluded from its universals.  SMF ¶¶ 163-64, 166.

Even a seemingly small change in visibility on Google's SERP can make a substantial difference in the traffic SVPs receive.  SMF ¶ 165.  Consequently, Google's visibility-limitation practices, in combination with its demotion of the unpaid blue links, have raised customer acquisition costs for the affected SVPs, often by inducing them to purchase more advertising in an effort to restore their visibility.  SMF ¶¶ 162-66; SMF ¶ 167 ████████████████████████ ████████████████████████ SMF ¶ 168 ████████████████████ ████████████████████████████████████ see also SMF ¶ 169.

### 2.    Google requires SVPs to provide valuable data for Google's own use

Many SVPs make substantial investments in collecting, organizing, and updating the data they present in searchable form on their sites.  SMF ¶ 173.  For example, a hotel database may include, for each hotel, room availability by date, room type and location, and ratings and reviews. Those data are "very valuable" and cannot be crawled by Google.  SMF ¶ 173.  Google admits that it requires certain SVPs to give it access to their valuable structured data in order to appear in some of its vertically-focused ads (*e.g.*, Hotel Ads).  SMF ¶ 175; *supra* sec. I.A.  Beyond using the data to populate SVP advertisements, Google displays the data for its own business purposes in the restricted universals and immersive pages.  Google also uses business profile data from local services SVPs to train its local services ranking models and conversion data from travel SVPs in its auction algorithms.  SMF ¶¶ 180-81.

Google uses SVP data within SERP features where SVPs are not permitted to appear, such as in the restricted universals on its SERP, and also uses data without attribution to SVPs in immersives that link to the SERP.  SMF ¶ 180.  Google has employed these data-sharing

agreements since at least 2010 (SMF ¶ 177) and remains unmoved in the face of SVP pleas to be compensated fairly.   SMF ¶ 184 

SMF ¶ 184

SMF ¶ 185

## II.   <u>APPLICABLE LAW</u>

### A.   Summary Judgment Cannot be Granted in the Face of Material Factual Disputes

Summary judgment can be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law."  *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019).  A dispute is "genuine" if a reasonable trier of fact could find for the nonmoving party.  *Id*.  The court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor.  *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are reserved for the trier of fact at trial.  *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

When a plaintiff presents evidence that calls a defendant's procompetitive justifications into question, or raises a genuine factual dispute as to the existence of competitive harm, summary judgment should not be granted.  *See, e.g., Eastman Kodak*, 504 U.S. at 484-85; *In re Suboxone*,

13-MD-2445, 2022 WL 3588024 at *17 (E.D. Pa. Aug. 22, 2022); *King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 419 (E.D. Pa. 2015). Furthermore, when evaluating a motion for summary judgment, the court should draw all justifiable inferences in favor of the non-moving party. *Eastman Kodak*, 504 U.S. at 456. An inference is justifiable if "a reasonable jury could return a verdict for the nonmoving party." *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986.)). "As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case." *McGaughey v. Dist. of Columbia*, 740 F. Supp. 2d 23, 31-32 (D.D.C. 2010). Further, summary judgment should not be granted in cases involving competing expert opinions as it is "up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (internal citation omitted).

### B.   This Circuit's Precedent Precludes Summary Judgment

The leading case, and the precedent in this Circuit that demonstrates the errors of Google's legal theories, is *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001) (en banc). There, the D.C. Circuit held that Microsoft had unlawfully maintained its monopoly in a PC operating system market. *Id.* at 46. At issue was the threat posed to Microsoft by two middleware products, Netscape Navigator, a new browser, and Java, a software platform. *Id.* at 53. Neither were current or potential rivals to Microsoft, *id*. at 53-54, but "[b]ecause applications written for multiple operating systems could run on any operating system on which the middleware product was present with little, if any, porting, the operating system market would become competitive and make it easier for rival operating systems to have access to the apps needed to challenge Microsoft." *Id.* at 55.

The Court analyzed five forms of conduct that together constituted the offense of monopoly

maintenance under Section 2 of the Sherman Act,[8] including the use of exclusive contracts to limit middleware distribution (*id.* at 71) and product design that harmed competition (*id.* at 67).   In assessing liability, the Court examined the interaction among different contracts and categories of conduct.   *Id*. at 64 ("all the OEM license restrictions"); *id.* at 75 ("Microsoft's exclusive deals with the leading [Internet Service Vendors] took place against a backdrop of foreclosure."); *id.* at 76 ("the cumulative effect of the deals is anticompetitive").   As the Court explained, the forms of "illicit exclusion" are "myriad," (*id.* at 58), and examination of conduct must be informed by the market realities.   *Id.* at 58; *see also Eastman Kodak*, 504 U.S. at 466-67.

At trial, a court will examine evidence of anticompetitive conduct, then any "procompetitive justification," *i.e.*, "a nonpretextual claim that its conduct is indeed a form of competition on the merits," then, if both exist, whether "the anticompetitive harm of the conduct outweighs the procompetitive benefit."   *Id*. at 59.   This is, as the *Microsoft* Court illustrated in its careful review of the multiple forms of conduct (*id*. at 59-79), a fact-intensive inquiry that considers whether "the monopolist's conduct on balance harms competition." *Id.* at 59.

The touchstone is that conduct "harm[s] the competitive process and thereby harm[s] consumers."   *Id.* at 58.   Importantly, however, the *Microsoft* Court did not require a showing of effects, such as higher prices or any specific impact on Microsoft customers, to conclude that the competitive process had been harmed.   Rather, the Court rested on showings that, for example, Microsoft's conduct had prevented pre-installation of browsers (*id.* at 61), prevented OEMs from promoting rival browsers (*id.* at 62), reduced the usage share of browsers "through something other

---

[8] The five categories of conduct were: (1) Licenses issues to Original Equipment Manufacturers, (2) Integration of Internet Explorer and Windows, (3) Agreements with Internet Access Providers, (4) Dealings with Internet Content Providers, Independent Software Vendors, and Apple Computer, and (5) Java.  253 F.3d at 59-78.

than competition on the merits" (*id.* at 65), and kept browsers from gaining widespread distribution (*id.* at 75).  In other words, the D.C. Circuit looked to the impact on other companies and drew reasonable inferences as to whether such conduct would harm competition by insulating the monopoly from the competitive process, thereby entrenching monopoly power.

To that end, the *Microsoft* Court concluded that complete exclusion is not required, that issues of product design are subject to the same process of weighing and balancing process applied to conduct generally, and that, of course, harm to out-of-market products, like Netscape and Java, can cause harm in the market in which the monopoly is being maintained.

The *Microsoft* Court coupled its emphasis on "competitive process" with a standard for causation at the liability stage that eschewed an unnecessarily strict connection between conduct and harm.  The Court was specific why it adopted that approach: "To some degree, the defendant is made to suffer the uncertain consequences of its own undesirable conduct." (internal quotation omitted).  Indeed, "[t]o require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action."  *Id.*  Thus, the test at trial is whether anticompetitive conduct "reasonably appears capable of making a significant contribution to maintaining monopoly power."  *Id.* (cleaned up).

As we demonstrate below, the *Microsoft* decision by itself supplies the complete answer to Google's claims that its conduct should not be considered in its totality (*infra* sec. III.A.1); that product innovation cannot be balanced against anticompetitive conduct, (*infra* sec. III.B.1.i);  and that Plaintiffs must show with exactitude the outcomes caused by the conduct (*infra* sec. V), while providing the applicable legal framework in circumstances in which Google wrongly seeks to apply the so-called "duty to deal" doctrine (*infra* sec. III.B.2).

## III.    ARGUMENT

### A.    The Components of Google's Ongoing Conduct Facilitate and Reinforce Each Other

The States allege three major types of interrelated, concurrent, and ongoing conduct: exclusive distribution agreements, the shunting of ad dollars away from rivals through delayed or denied SA360 functionality, and SVP suppression and exploitation in targeted commercial segments—which together maintain Google's monopolies in the Relevant Markets.  Google wants to rewrite the States' Complaint to assert three independent claims, thus sidestepping and leaving unchallenged the States' assertion that the totality of conduct harms competition.

#### 1.    Monopoly maintenance analysis considers all conduct that creates or amplifies competitive harm

Supreme Court precedent directs courts to analyze monopolization evidence as a factual whole, "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  The plaintiff in *Continental Ore* alleged that the defendants' monopoly scheme included five different strategies.  *Id.* at 693.  The Court of Appeals had treated the allegations as "five completely separate and unrelated lawsuits" and rejected each seriatim.  *Id.* at 698.  The Supreme Court reversed, holding that segregating the allegations is improper.  *Id.* at 699.  As the DOJ has explained, the Supreme Court in a series of cases focused on whether the evidence as a whole established the proscribed result, not whether particular acts did so in isolation.  *See* Joint Opposition at 2-3, 17-18, 20 n. 10 & 42; *see also United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (expressly "not considering" the legality of certain conduct "isolatedly viewed").

Similarly, the *Microsoft* decision held that elements of five categories of conduct made up the single offense of monopoly maintenance.  *Supra* fn. 8; *see also Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (monopolist had engaged in "a systematic effort

to exclude competition . . . by numerous avenues."); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653–58 (2d Cir. 2015) (assessing introduction of a new product and withdrawal of a product together as a unitary violation of Section 2); *LePage's Inc. v. 3M*, 324 F.3d 141, 157, 162 (3d Cir. 2003) (bundled rebates "magnified" the exclusionary effects of 3M's exclusive contracts, which in turn "reinforced" the bundled rebates' foreclosure effect; the effect of each "cannot be separated").[9]

### 2.    Google does not challenge the States' allegation that monopoly-maintaining actions reinforce one another

Google does not dispute that both its SA360 conduct and its SVP conduct reinforce the distribution agreements or that the distribution agreements enable this other conduct. *See* Google MSJ at 15–18. Nor did Google's experts study the interlocking effects of its conduct.

Google maintains its search monopoly through a series of actions that work together to suppress competition. Google's distribution agreements enable its SA360 conduct and its SVP conduct by cutting its rivals off from potential users. The SA360 conduct and the SVP conduct further raise barriers to entry and expansion that make it easy for Google to perpetuate its distribution agreements by weakening Google's rivals.

Google uses distribution agreements to inflate its market share by locking up a captive set of consumers, which impedes its rivals' ability to attract advertisers. *See* SMF ¶¶ 47, 49, 55, 58, 61; Joint Opposition at 1, 7-9, 19-20. This sets up a feedback loop because getting some

---

[9] The *Microsoft* Court declined to consider whether a separate offense was committed through a "course of conduct" separate and "apart from Microsoft's specific acts." *Microsoft*, 253 F.3d at 78. The Court concluded that it need not "pass upon" that contention "[b]ecause the District Court identifies no other specific acts as a basis for 'course of conduct' liability." *Id.* Here, of course, the totality of conduct includes the three categories discussed herein; just as when the *Microsoft* Court considered five categories of conduct within its analysis of monopoly maintenance. *Id.* at 59–78. So, there is no need to consider a separate "course of conduct".

distribution agreements in place makes it easier for Google to obtain other distribution agreements. Ex. 1 (Baker) ¶ 319.  These mutually-reinforcing distribution agreements give Google massive advantages in both scale and knowledge about consumer behavior.  *See* SMF ¶¶ 11-15; Joint Opposition at 7-8, 19-20; Ex. 1 (Baker) ¶¶ 316-18.  Those advantages constitute barriers to entry and expansion.  Joint Opposition at 1-2, 7-8, 19-20; Ex. 1 (Baker) ¶¶ 316–20.  At the same time, Google makes itself effectively indispensable to users and advertisers alike, and that brings in additional profits that it uses to fund additional harmful conduct.  Ex. 3 (Baker) ¶ 177.  Having buffered itself against meaningful competition, Google frees itself to engage in additional conduct to even further strengthen and sustain its monopoly power.

The distribution agreements also facilitate Google's anticompetitive operation of SA360— a cross-platform tool that empowers Google to act as a major gateway between its advertising rivals and large advertisers—to increase the cost for advertisers to do business with Google's rivals and further bolster the scale advantage that Google has over its rivals.  With no meaningful alternatives remaining, advertisers have no choice but to continue to hand over their advertising dollars to Google, even as Google limits their ability to buy up-to-date advertising products from rival GSFs.  SMF ¶¶ 88-89, 99-100; *infra* sec. I.C.  By delaying or refusing to support Microsoft Ads features that advertisers want, Google uses SA360 to limit advertisers' spending on alternative, non-Google ads.  Ex. 1 (Baker) ¶¶ 334–35.  This both harms competition and rewards Google with more revenue.  *Id.*  The distribution agreements also make Google's rivals' ads less attractive, which skews competition even when advertisers go to the time and expense to use a different SEM tool or to buy ads directly.  SMF ¶¶ 14, 83; Google SMF ¶ 284.

The combined impact of the distribution agreements and Google using SA360 to disadvantage its rivals leaves SVPs dependent on Google for customers, especially new customers.

SVPs depend on GSFs as a critical channel for generating consumer traffic; they also provide valuable content (like information on hotel rates and capacity) that GSFs cannot obtain by crawling the web. SMF ¶ 173. That dual role creates obvious incentives for SVPs and GSFs to work together to make SVPs and their valuable content visible. But Google's monopoly makes SVPs depend almost entirely on Google, enabling it to exploit that dependency both by limiting SVPs' visibility—which makes it harder for them to gain customers—and by wringing valuable, proprietary data out of them, which Google uses for its own purposes. *See* SMF ¶¶ 134-38, 143-49, 150, 175, 177-78; *infra* sec. III.C.3.b. The combined impact of this conduct impedes SVPs' ability to work with Google's rivals for their mutual benefit.

Thus, taken together, Google's SA360 and SVP tactics weaken its rivals, amplifying Google's ability to secure distribution agreements, and creating the monopoly feedback loop illustrated in Figure 2.

**Figure 2: Google's monopoly feedback loop**

The agreements cut Google's rivals off from potential users,
enabling Google's SA360 and SVP conduct



SA360 Conduct        Distribution Agreements        SVP Conduct

Google's SA360 and SVP conduct weaken Google's rivals,
amplifying Google's ability to negotiate exclusive distribution agreements

When Google's conduct involving SA360 and SVPs protects its monopoly, the effects of that conduct feeds back and magnifies the impact of the distribution agreements, magnifying their impacts, by weakening Google's rivals as an alternative in the eyes of ██████ and other search distributors. Ex. 3 (Baker) ¶¶ 180-81. Moreover, it reduces the benefit that Google's rivals could

achieve from obtaining distribution agreements themselves. *Id.* All this adds to Google's monopoly war chest, which it then uses to entice search distributors into prolonging their distribution agreements, likely at a lower rate than it would have to pay in a competitive environment. *See* Ex. 3 (Baker) ¶ 181. And the perpetual motion of the feedback loop continues.

One cannot fully understand harm to competition without examining the continuing interrelationship among harmful acts. As noted above, Google's SVP conduct weakens SVPs, making them less attractive as partners to Google rivals. In the other direction, Google's distribution agreements deprive its rivals of users, making *them* less attractive to SVPs. Google has thus degraded both sides of the bargaining table. This is why Google argues so strenuously that each contract, each piece of conduct, should be examined in isolation: to hide in plain sight the growing mountain of competitive harm.

## B. Google's Arguments that it is Entitled to Judgment as a Matter of Law Fail

Google asserts immunity from normal antitrust scrutiny for ordinary-course commercial conduct. That fails because, as just discussed, it is legally improper to evaluate the effect of any particular form of conduct in isolation and apart from the totality of conduct. *See supra* sec. III.A.1. But even as separate claims, Google's conduct would be subject to the *Microsoft* framework set forth above.

### 1. Google's business practice of restricting SVP visibility in strategically important verticals is subject to antitrust scrutiny

Google argues that some "challenged conduct is a genuine product improvement and so not of the type that is cognizable under the Sherman Act[.]" Google MSJ at 23; *id.* at 1 (claiming "impossibility of a court administering a test to balance product improvements against hypothetical harm"). That is not the law.

*Microsoft* establishes that claimed product improvements are to be assessed, like other

alleged conduct, by looking at evidence of harm.  253 F.3d at 65 ("Judicial deference to product innovation, however, does not mean that a monopolist's product design decisions are per se lawful"); *see also id*. at 75 (considering whether the evidence shows "an anticompetitive effect that outweighs any procompetitive justification for the design.").  Google emphasizes that the *Microsoft* decision did not find the introduction of the Java Virtual Machine to be unlawful. Google MSJ at 20-21.  But that is because the Court found wanting any evidence of anticompetitive effect (253 F.3d at 75), which is wholly consistent with the framework that *Microsoft* applied to product design that it found *did* harm competition.  *See id*. at 65 (decision to exclude Internet Explorer from the "Add/Remove Programs" utility in Windows 98—a "product design change[]"—had the anticompetitive "effect of significantly reducing usage of rivals' products and hence protecting [Microsoft's] own operating system monopoly").  Thus, *Microsoft* did not refuse to consider anticompetitive effects in connection with purported product design; rather the Court looked carefully at all of the evidence before deciding whether the conduct was unlawful.  *See also id*. at 59 (a court "consider[s] whether the monopolist's conduct on balance harms competition").[10]

For three reasons, Google errs in its reliance on *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 1000–03 (9th Cir. 2010), (Google MSJ at 21), in which the plaintiff challenged the introduction of a new product—an improved pulse oximeter.  First, *Microsoft*, not the Ninth Circuit decision in *Allied*, controls.  Second, *Allied* involved an antitrust challenge to the introduction of a new product, which Google acknowledges is not at issue here.

---

[10] Google argues that Professor Baker's analysis of the extent to which users click on the restricted units is barred as a matter of law.  Google MSJ at 29.  But *Microsoft* expressly examined whether evidence supported the existence of procompetitive claims and instructed courts to balance the weight of such claims against harm to competition.  *Microsoft,* 253 F.3d at 59.  Professor Baker's analysis appropriately speaks directly to this inquiry, Ex. 3 (Baker) ¶¶ 23-26, and should be considered at trial, especially in light of Google's admitted uncertainty as to its accuracy.  Ex. 11 (Elzinga Tr.) 50:10-16, 145:7-16.

Google MSJ at 16 ("Plaintiffs do not challenge Google's introduction of specialized units on its SERP").   Third, the Ninth Circuit recognized in *Allied* that had there been associated anticompetitive conduct—not just the product improvement—the outcome could have differed. *Allied*, 592 F.3d at 1000; *see also id.* at 998 ("changes in product design are not immune from antitrust scrutiny").   Here, the States allege anticompetitive conduct distinct from the introduction of the Google universals.   *Supra* sec. I.D.1. (SVPs can appear in some verticals and not others); *supra* sec. I.D.2. (Google acquisition of proprietary data); *see In re Apple iPod iTunes Antitrust Litig.,* 796 F. Supp. 2d 1137, 1146–47 (N.D. Cal. 2011) (under *Allied*, trial was needed to determine whether challenged putative high-tech product improvement violated Section 2).

### 2. Given Google's ongoing dealings with advertisers and SVPs, there is no "duty to deal" to be adjudicated

Again, by inappropriately claiming that the States have brought separate SA360 and SVP claims (Google MSJ at 29-31, 34-35), Google argues that assertions regarding the SVP data contracts and the purported "SA360 Claim" run afoul of the Supreme Court's "duty to deal" doctrine as described in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004), and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009).   But even if there were separate claims, this caselaw would be inapplicable.

The *Trinko-linkLine* doctrine focuses on a situation where the monopolist-defendant does not wish to work at all with a company allegedly harmed by its conduct.   In *Trinko,* "the complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." 540 U.S. at 409.   Similarly, in *linkLine,* the Court noted that a telecommunications company's course of dealing with the plaintiffs "arises only from FCC regulations."  555 U.S. at 450.

However, there is no refusal to deal where, as here, there is voluntary, ongoing dealing.

30

The States allege that (1) to boost its revenues and improve the content of its search results page, Google voluntarily maintains commercial relationships with SVPs, including selling them billions of dollars of search-related advertising each year and securing exclusionary contracts with them as content providers, and (2) Google has voluntarily furthered its own financial interests through the acquisition and ongoing operation of SA360.  *See A.I.B. Express, Inc. v. FedEx Corp.,* 358 F. Supp. 2d 239, 251 n.86 (S.D.N.Y. 2004) (distinguishing allegation of "a five-year-long course of dealing" from *Trinko*); *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.,* 331 F. Supp. 2d 513, 525 (E.D. Tex. 2004) ("[A]s a matter of logic, if an antitrust plaintiff's contention of voluntary . . . network sharing is substantiated, a viable cause of action may proceed in harmony with Trinko.").

Moreover, as explained above, neither *Trinko* nor *Linkline* confronted a collection of voluntary behavior that works together to harm competition.  Google's attempt to pick apart the Complaint and choose the portions that it wishes to attack is improper.  *Compare* Google MSJ at 31 ("It is not antitrust's purpose to regulate ordinary business contracts") (internal quotation omitted) *with Microsoft*, 253 F.3d at 76 ("the First Wave Agreements requiring use of Microsoft's JVM as the default are exclusionary, in violation of the Sherman Act.").  The SA360 and SVP conduct cannot be viewed in isolation apart from the totality of the conduct.  *Supra* sec. III.A.1.

### C.     The Record Overflows With Issues of Material Fact

Google does not deny the existence of the three categories of conduct the States allege or that, as to the contested issue of competitive harm, each category of conduct contributes to the totality of harm.  *See Microsoft*, 253 F.3d at 59–78 (including five categories of harm in its analysis of a scheme of monopoly maintenance).  Indeed, hundreds of material disputed facts must be resolved at trial.

1.    **The competitive harm flowing from Google's distribution agreements cannot be properly assessed or dispensed with on summary judgment**

Google secures agreements that guarantee its placement as the exclusive preinstalled default search service at numerous search access points.  SMF ¶¶ 39-46.  The Joint Opposition describes at length the way these agreements raise costs for, and restrict Google's rivals' access to, the necessary scale of a crucial input: search queries.  They form the foundation for the walls Google has built around its monopoly, and link directly to Google's anticompetitive practices around SA360 and the SVPs.

Google's deal with Apple stands out.



SMF ¶ 56.

SMF ¶ 57.

SMF ¶ 58.

Beyond Apple, Google secured exclusive defaults with Android-based device manufacturers and mobile carriers (Android and Apple are essentially the only mobile operating systems in the United States).  SMF ¶ 47.  For ▉▉ of the search queries which were made in 2021 using Google Search, for example, Google benefits from default status, either because Google paid through an agreement for preinstallation of Google as the default at search access points on which the queries were made or because the queries were made through Chrome or its Google Search App.  SMF ¶ 62.  The practical effect of Google's agreements is to raise rivals' costs in acquiring user scale by increasing switching costs for users.

2.      **Evidence that SA360 feature disparity caused anticompetitive harm cannot be severed or disregarded**

Google also seeks summary judgment on what it characterizes as "Plaintiffs' SA360 Claim." Google MSJ at 34–45. Again, this is not a standalone claim. *Supra* sec. III.A. Regardless, Google's arguments here fail because (1) the record contains ample evidence of Google's SA360 conduct contributing to the totality of competitive harm; (2) the parties dispute material fact issues that must be resolved at trial; and (3) Google's foreclosure and transitory-delay arguments misstate both the States' legal theories and applicable law.

a.   **Google's SA360 conduct causes ongoing anticompetitive harm**

SA360 has a longstanding feature disparity between Google Ads and Microsoft Ads, despite Google's initial promise to "operate [SA360] in a neutral manner." SMF ¶ 94. That statement is important not because there is a deception claim (Google MSJ at 41), which there has never been, but because it provides valuable insight into the motives and likely effect of Google's subsequent and inconsistent conduct. *See Microsoft*, 253 F.3d at 59 (evidence of intent can help a court "understand the likely effect of the monopolist's conduct"). Google concedes that this feature disparity remains, even though the most critical feature, auction-time bidding, has been supported by Microsoft's native tool since at least 2016. SMF ¶ 108. Moreover, Google admitted that ███████████████████████████████████████████████████████████

██████ SMF ¶ 114. Another SEM tool confirmed this when it released this same feature almost three years ago.[11] SMF ¶ 112. This feature disparity follows naturally from Google's conflict of interest in offering a product that ostensibly helps advertisers optimize their ad purchases across

---

[11] Google's criticism that ████████████████████████████████████████████████████████

███████████████████████████ SMF ¶ 116.

multiple platforms, while profiting the most when ads are placed on Google's own platform. SMF ¶ 78. Google recognizes that by ███████████████████████████████████ but not for rival advertising platforms—it makes ad campaigns more efficient on Google than on Bing (and other actual or potential competitors). SMF ¶¶ 97-100, 121. Thus, Google steers ad spend towards Google and away from its competitors. SMF ¶¶ 105, 122-25.

While advertisers recognize that SA360 is "Google centric" and not an "unbiased platform," they continue using SA360 because (i) Google's undisputed general search monopoly makes Google Search a "must have" for digital advertisers; (ii) Google has ensured that SA360 is the SEM tool with the most features for advertising on Google; and (iii) all other advertising alternatives—such as using native advertising tools, switching SEM tools, or using multiple SEM tools—are costly and burdensome for advertisers that place ads on multiple online channels. SMF ¶¶ 81-91. Google's claim that advertisers can simply switch SEM tools or avoid SEM tools altogether ignores these market realities.

Google ███████████████████████ and entrench its search monopolies, discouraging potential entry, and harming its general search competitors and advertisers. SMF ¶¶ 99, 125-26. ████████████████████████████████████████████████████████████ ███████████████████████████ SMF ¶ 124. When advertisers cannot access Microsoft Ads features that would make their ad campaigns more efficient and productive, they spend less on Microsoft Ads, which widens the scale gap. SMF ¶¶ 122-23. Further, this harm is ongoing and enduring: SA360 still does not support auction-time bidding for Microsoft Ads, has still not completed support for dynamic search ads, and in its new version ensures that it will support future features from ███████ for Google Ads, but not for rival platforms. SMF ¶¶ 101, 117-20.

### b. Numerous disputed material facts exist

At a minimum, many factual disputes remain on issues that Google itself acknowledges

are material to the States' case, including the following:

1.     Google claims there is no evidence that Google's auction-time bidding feature, or any other SA360 feature, caused advertiser spending to shift away from Microsoft.  Google MSJ at 40.  ████████████████████████████████████████████████ ████████████████████ MF ¶ 124. [2]  Google's own documents show that auction-time bidding causes a 15–30% increase in conversions and ██████████ SMF ¶ 104.  It follows logically that this disparity causes advertisers to shift their SA360 ad spend away from Microsoft Ads.  SMF ¶ 121-23.

2.     Google states there is "no evidence that Google's alleged delay in developing particular Microsoft Ads features on SA360 caused advertisers to buy less search advertising on Microsoft Ads[.]"  Google MSJ at 35.  Yet, as explained in point 1, evidence that Google's conduct made it less efficient to buy ads on Microsoft Ads supports the reasonable conclusion that advertisers spent less money on Microsoft Ads.  SMF ¶¶ 121-23.

3.     Google claims that advertisers are free to change their SEM tool if they are dissatisfied with SA360.  Google MSJ at 38.  In fact, evidence shows that changing an SEM tool is costly and burdensome, as is managing ad campaigns with multiple SEM tools or with native tools alone.  SMF ¶¶ 81-91.

4.     Google says there is no evidence that "the timing of Google's development of the features was unreasonable[.]"  Google MSJ at 42.  However, Google witnesses ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████                    SMF ¶¶ 96, 101, 115, 119.

Google also ignores the opinions of the States' expert economist, Professor Baker.  Based on his review of the record, he concluded that "Google's SA360 restrictions limit the ability of Bing or any other actual or potential search advertising rival to compete more effectively in general search advertising markets," harms advertisers, and in conjunction with Google's other conduct "collectively excluded . . . all of Google's actual or potential rivals" in the general search user and advertising markets.  Ex. 1 (Baker) ¶¶ 315, 334.  Those expert opinions, supported by record

---

[12] Google criticizes this evidence because ██████████████████████████████████████ ████████████████████ Google MSJ at 40.  ████████████████████████████████ ████████████████████████████████████████████████████ Moreover, the proper weight to be given to this or any other evidence is a question of fact to be decided at trial, not at summary judgment.

evidence, create a dispute of fact on core issues that should be decided at trial, not by summary judgment. *See Phillips*, 400 F.3d at 399; *McGaughey*, 740 F. Supp. 2d at 31-32.

### c.  Google's foreclosure and transitory delay arguments lack merit

In addition to disregarding scores of factual disputes, Google posits two baseless legal arguments regarding SA360.  First, Google seeks dismissal on the basis that the States have not shown substantial foreclosure due to the SA360 conduct alone.  Google MSJ at 35.  Even if that had been presented as a standalone claim, the argument fails because, as the Joint Opposition explains at length, Google conflates exclusive dealing and exclusionary conduct.  Joint Opposition at 40–41.  The "substantial foreclosure" test applies only to exclusive dealing contracts.  *See McWane, Inc. v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015) (citing *Microsoft*, 253 F.3d at 69) ("The difference between the traditional rule of reason and the rule of reason for exclusive dealing is that in the exclusive dealing context, courts are bound by *Tampa Electric*'s requirement to consider substantial foreclosure."); *see also Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 311– 14 (1949).  Because Google's SA360 conduct is not premised on exclusive dealing contracts, the States need only show that Google's conduct harmed competition.  *Microsoft*, 253 F.3d at 58.  As described above, ample evidence supports the conclusion that the SA360 feature disparity caused substantial harm to competition.[13]  *Supra* sec. III.C.2.a, b.

---

[13] Even if the "substantial foreclosure" test applied, it does not have the quantitative rigidity that Google suggests.  *Microsoft*, 253 F.3d at 70 (Section 2 does not require the strict quantitative approach to foreclosure used under Section 1). Rather, courts routinely recognize Section 2 violations based on combined evidence of harm and despite minimal or unquantified foreclosure. *See McWane*, 783 F.3d at 837 (affirming substantial foreclosure holding despite FTC not "quantify[ing] a percentage" of foreclosure); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302 (9th Cir. 1982) (same based on "aggregate pattern of conduct"); *Microsoft*, 253 F.3d at 71 (affirming exclusive dealing liability despite lack of foreclosure of distribution channels); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 60 F. Supp. 2d 502, 507- 08, 512 (M.D.N.C. 1999) (enjoining exclusionary contract despite minimal foreclosure).  The evidence here shows that Google's combined conduct, including the SA360 conduct, caused

Second, Google argues there can be no anticompetitive harm because its delay in developing SA360 features was merely "transitory."  Google MSJ at 45.  But these delays and their anticompetitive effects have persisted for years, and Google has taken steps to ensure that feature disparity will continue into the future.  SMF ¶ 120.  Likewise, Google's distribution agreements have persisted for years, allowing Google to impose greater restrictions and delays with less risk of advertisers shifting to alternatives.  *Supra* secs. I.B & I.C; Ex. 1 (Baker) ¶ 338.

The cases that Google relies on are readily distinguishable.  *See* Google MSJ at 45. *American Professional Testing v. Harcourt Brace Jovanovich* analyzes when an ordinary business tort (disparagement) can give rise to a Sherman Act violation and holds there cannot be liability if the anticompetitive effect is temporary.  108 F.3d 1147, 1151 (9th Cir. 1997).  The States' legal theory—ongoing anticompetitive conduct that maintains years of monopoly power—is indisputably a cognizable Section 2 claim.  In *New York v. Facebook*, the Court found that the challenged conduct had ceased and was not "likely to . . . recur."  549 F. Supp. 3d 6, 30 (D.D.C. 2021).  The conduct here is ongoing and likely to continue.  *Supra* sec. III.C.2.a.  Google's incentive and ability to develop SA360 feature support for Google, but not for its rivals, will continue at least as long as the distribution agreements remain in place.

### 3.    Google's SVP conduct impedes threats to its monopolies and presents disputed factual issues that preclude summary judgment.

Once again, Google erroneously frames the States' Complaint as asserting discrete SVP claims, then argues that the evidence supporting these claims cannot show anticompetitive effect in the Relevant Markets.  But even if the States had presented a separate SVP claim, it would easily survive summary judgment.  The record contains numerous important factual disputes surrounding

---

substantial and enduring harm to competition.  SMF ¶¶ 121-26.

the anticompetitive impact of Google's treatment of SVPs on the ability of Google rivals to be stronger competitors.

The starting point is to understand why Google fears the success of SVPs, which explains Google's incentives without regard to whether its conduct results in harm only in the Relevant Markets. The presence of SVPs could lead consumers to conclude that they no longer need Google as an intermediary, even though SVPs do not compete with Google. Google recognizes that Google Search assists people who are engaged in research and discovery of online destinations, including SVPs. SMF ¶ 133. The threat to Google is that its own users will not need Google to help them find where to go, at least not as often.

Google fully recognizes the import of a shift in consumer behavior. Thus, for example, facing "a significant amount of user demand for food" in 2019, Google saw itself threatened by the rapid growth of food-delivery brands. SMF ¶ 194. Looking back at the growth of SVPs in the Shopping vertical, Google recognized that: "we're at acute risk of irrelevance." SMF ¶ 21.

Google understands the threat and "described itself as having an incentive to protect commercial queries against disintermediation by SVPs." Ex. 2 (Baker) ¶ 70 (footnotes omitted). Google is incentivized to limit SVP brand recognition in order to keep users searching for answers on its SERP. SMF ¶¶ 194-97. But if SVPs could gain more prominence, users might decide that they no longer need to detour through the Google SERP (much as a new resident to a neighborhood might soon decide that she no longer needs a map to find local supermarkets). "Google recognizes that SVP visibility on its SERP tends to enhance the SVP's usage, reputation, and recognition— to the detriment of user traffic and ad revenues from Google sites." Ex. 2 (Baker) ¶ 73. The stronger and better-known SVPs become, the more loyalty they can build among customers and the more likely users are to eschew Google Search to navigate directly to them, threatening

Google's monopoly revenues.  *Id.* ¶¶ 70-75.  In contrast, raising the costs of SVP customer acquisition by making it harder for new customers to find SVPs and for SVPs to build customer loyalty further reduces the SVPs' leverage in bargaining with Google over data contracts.  *See* Ex. 1 (Baker) ¶¶ 292-300, 324.

### a. Google's admitted visibility restrictions harm SVPs and lack justification

Google has adopted business practices that prohibit or severely limit SVPs' ability to appear in SERP features within strategically important verticals such as flights, hotels, and local search.  SMF ¶¶ 142-49.  Some of these business practices bar an SVP from appearing in a SERP feature; for example, Google prohibits SVPs from appearing among the nonpaid results in a hotel, flight, or local search universal.  SMF ¶¶ 144-46.  Other practices severely limit SVPs' ability to acquire customers through a SERP feature, such as Google's requirement that the name of the SVP buying a local services ad appear below the names of both a service provider and Google (*see* Figure 1) and, unlike text ads, take a user to another Google site instead of to the SVP's site. Google also applies restrictions to SVPs in Google pages reached from the SERP, such as immersives that a user can reach by clicking on a hotel, flight, or local universal.  SMF ¶ 150.[14] Google concedes that it engages in these business practices and only challenges whether they can harm competition standing alone.  That is not the States' case (*see supra* sec. III.A.), but in any event, factual disputes abound.

Google claims that these business practices provide competitive benefits, but offers only self-serving assertions devoid of evidence.  *See* States' Response to Google SMF ¶¶ 89, 122, 159,

---

[14] Google asserts that the States only attack the content of the universals.  That is another attempt to dictate what Plaintiffs may prove, and is simply wrong.  *See supra* sec. III.B.1.

180.  Most tellingly, for all of its emphasis on a multi-faceted process of testing, experimentation, and analysis of changes to the SERP (Google MSJ at 10–11), Google fails to provide *any* evidence of having applied that ordinary-course approach to the challenged conduct.  Google has not identified *any* instance in which its panoply of human raters, live experiments, Launch Committee review, launch diagnosis, or consumer follow-up has examined the simple question of whether users feel advantaged by its prohibition on SVPs appearing in prominent positions on the SERP.  That omission is particularly glaring for a company that boasts that it conducts thousands of tests annually in order to determine which SERP changes improve the search experience.  Google MSJ, Ex. 21.  Indeed, in his deposition, Google's own expert did not identify even a single experiment, study, or test upon which he relied that assessed the difference in user satisfaction between the presence or absence of an SVP in any SERP feature.  *See* SMF ¶ 153.  With no evidentiary proffer to support claimed competitive benefits, Google's attack fails under the *Microsoft* analytical framework.  253 F.3d at 58–59.

The lack of such evidence is not surprising because the challenged business practices contrast against the well-established, ordinary-course evidence that users like to see SVPs as part of a mix of results.  Google's traditional blue links and its text ads both regularly feature SVPs, including in the same vertical segments in which Google restricts their visibility (*e.g.,* hotels, flights, and local search).  SMF ¶¶ 130-31.  The Google algorithm that generates its blue links, which Google claims it designed to serve users the most relevant and highest quality search results, often ranks SVPs highly.  SMF ¶¶ 130, 132.  The algorithm that selects text advertising, which takes into account a prediction of ad value to the search user, also ranks SVPs highly.  SMF ¶¶ 131-32.

Google's disparate treatment of SVPs across different commercial segments similarly

undercuts Google's claim that users benefit from its visibility limits.  In the Vacation Rentals and Shopping verticals, SVPs can appear prominently on the SERP.  Shopping SVPs can buy vertically-focused ads on Google's SERP and show up in SERP features like the free product listings.[15]  *See* SMF ¶¶ 154-56.  Google attempts to distinguish vacation rentals by arguing that they are so unlike hotels as to preclude monetization, but Google told an industry participant in 2019 that it was planning to monetize them.  *See* SMF ¶ 157.

Moreover, the evidence on which Google relies (*see* Google MSJ at 23) deals with practices the States do not challenge, such as the existence of universals, the inclusion of prices and non-SVPs in them, and the way Google selects the order in which SERP features should appear.  *See* SMF ¶ 153.

That SVPs may appear more prominently on the SERPs of Google's rivals reinforces the point.  For example, both Bing and DuckDuckGo give TripAdvisor visibility by putting its name and mark near tiles showing hotel properties for which TripAdvisor provides data.  SMF ¶¶ 159-60.  And Neeva credits Yelp as the source of information for restaurant results on its SERP.  SMF ¶ 161.  Nothing prevents Google from rescinding its unjustified, challenged business practices, or at the very least allowing its ordinary course of testing, experimentation, and analysis to determine the extent to which consumers would benefit from increased SVP visibility on its own SERP.

These business practices have a real impact on users seeking meaningful information on the SERP.  SVPs can appear in other parts of the SERP, such as text ads and blue links, but the harm from Google's restrictions persists.  Shifting traffic into text ads merely balloons Google's monopoly profits.  And Google's own data confirms that when its universals appear on the SERP,

---

[15] Google also launched free hotel booking links, but those links only appear on the SERP when the query triggers a knowledge panel, which it does infrequently.  SMF ¶ 158.

users are 19% less likely to click on the blue links that appear below universals.  SMF ¶ 37.[16]

Moreover, Google's boast that the universals contain more information than the text ads and blue links (*see* Google SMF ¶ 11) merely emphasizes that excluding SVPs from certain universals limits users' supply of important information.  For example, Google recognizes that travel SVPs facilitate price competition, such as by offering discounts.  SMF ¶ 171.  Without the ability to display their prices on the SERP in their own names in the restricted universals, trusted SVPs have more limited ability to compete by offering pricing on the SERP.  SMF ¶ 172.

Google's business practices thus present factual disputes over the impact of conduct directly relevant to SVPs' ability to grow stronger, and in turn, to work with Google rivals.

### b. Google abuses its monopoly power to acquire valuable proprietary data that it cannot obtain by crawling the web

Collecting data from the open web is the foundation for general search services.  But—as the paywalls of major newspapers demonstrate—a great deal of valuable data is not public.  Coveting information that it could not crawl, Google initially tried to simply appropriate such data.  SMF ¶ 174.  When that failed, Google used its monopoly power over access to customers as a lever.  For example, Google freely admits that, as a term of the purchase of its vertically-focused Hotel Ads, it "requires" SVPs to turn over their valuable proprietary data, lock, stock, and barrel.  SMF ¶ 175.  At the same time, ███████████████████████████████████████ ███████████████████████████████████████████████████████████  SMF ¶ 179.

Google's vertically-focused ads are important to SVPs because, even though the number of users

---

[16] Google notes that SVPs have visibility on its immersive and detail pages.  Google MSJ at 25-26.  But those pages are not on the SERP, the page shown to all users (Ex. 11 (Elzinga Tr.) 334-35), and Google limits SVP visibility even in such pages.  *See* SMF ¶¶ 150, 170.  In any event, Google's notion that some of its conduct alleviates the impact of other conduct is surely a matter for trial.

who click on universals is relatively small (SMF ¶ 36), the users who do navigate through the unit can be of great commercial interest.  SMF ¶ 176.

Consider the live data that an SVP has about all of its hotels, their current rates, and capacity.  The States do not contest that Google could use such data from a particular SVP to populate an ad featuring that same SVP.  *See* Google SMF ¶ 214.  But Google also uses data provided by SVPs broadly for its own advantage to populate the restricted universals on its SERP and in ads in which Google curtails SVPs' ability to attract customers.  *See* Ex. 214 (Elzinga Rebuttal Rep.) at Ex. 5 (indicating that Google uses SVP data but restricts SVP visibility on its SERP in Google's hotels, flights, and local search units and in its local services ads; as well as in its hotels and flights immersives).  Moreover, Google benefits from SVP business-profile and conversion-tracking data by incorporating it into its auction algorithms and by using it to train its ranking modules.  SMF ¶ 181.  Google's many uses of SVP data contradict Google's suggestion that it uses the SVP data only "to inform whether SVPs should appear in response to a relevant user query" (Google MSJ at 30), creating yet another material factual dispute.

Google claims that its licensing agreements prove "that SVPs voluntarily provide" all of their structured data to Google.  Google MSJ at 30.  The SVPs say otherwise.  They have documented their complaints to Google (*see* SMF ¶ 184 ███████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████ and have registered official objections. ████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████

SMF ¶ 185.  Google's claim that SVPs can appear in blue links and text ads without providing any structured data to Google (Google MSJ at 30) is immaterial and incomplete.  Vertically-focused search advertising provides real value to SVPs, especially where limited visibility on the SERP has already obstructed their ability to reach customers.  SMF ¶¶ 164, 176.

Google's data requirements disincentivize SVPs from investing in the creation of valuable structured data.  SMF ¶ 187.  And by requiring SVPs to provide Google all data provided to any other GSF, these mandates appear to prevent SVPs from granting exclusive access to some data to Google's rivals.  SMF ¶ 183.  Google's conduct makes SVPs less attractive, and less valuable, as partners for GSFs.  SMF ¶ 188.

Google mandates that SVPs—*e.g.*, ███████████████████—provide it with data equivalent to what they provide to any of Google's competitors, robbing SVPs of control over their valuable assets and potentially foreclosing a differentiated data deal with a GSF rival.  SMF ¶¶ 183, 187-88.  Indeed, as Professor Baker has explained:

> Absent such a provision, for example, an SVP specializing in hotels might reach an agreement with a search firm rival to Google by which the SVP makes available its lower-priced, lower-quality hotel room inventory through the rival only (while continuing to provide access to its higher-priced, higher-quality inventory through all general search firms, including Google).  The rival could promote itself as a source for discount hotel rooms, and thereby attract more price-sensitive search users.  Competition of this form could potentially be discouraged by the type of contractual provision found in Google's contract with ████.

Ex. 3 (Baker) ¶ 167.  Thus, Google's data restrictions disincentivize SVPs from investing in their data further, as they cannot realize a meaningful return on these investments.  Ex. 1 (Baker) ¶ 278; Ex. 3 (Baker) ¶ 163.  In a more competitive world, improvements could come, for example, through helping consumers make the best choice for themselves.  SMF ¶ 199.

### c. By harming SVPs, Google limits its risks that it will lose revenues and discourages the supply of innovation to users in the Relevant Markets

Google impedes SVPs from threatening it and its monopoly revenues in two ways.  First, SVPs could enter stronger content partnerships and other arrangements with rival GSFs, but Google hamstrings them.  Google's conduct limits SVPs' investment incentives.  Ex. 2 (Baker) ¶ 61; Ex. 3 (Baker) ¶¶ 14, 23, 41, 160, 178.  Limiting SVPs' visibility necessarily harms their brand recognition.  SMF ¶¶ 172, 186, 190.  And Google's data requirements disincentivize SVPs from using their data to strike better deals with Google rivals by, for example, providing some of their data to only select GSFs.  *See* Ex. 1 (Baker) ¶ 324–25.  Each of these harms makes SVPs less attractive, and less valuable, as partners for GSFs and for other nascent threats to Google's monopolies.  SMF ¶ 188.

Consider how differently Google behaves when forced to operate in a competitive market.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████  Just as partnerships with SVPs facilitate Google's competition with Japanese rivals, so too would the unhampered growth of partnerships between SVPs and GSFs in the U.S. facilitate competition in the Relevant Markets.

Second, stronger relationships with SVPs could aid the growth of innovative challengers to Google's monopoly.  ███████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████  SMF ¶ 63.  SVPs have valuable data in their apps, and

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ SMF ¶¶ 67-68.

      ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██ ████████████████████████████████████████

█████████████████████████████ SMF ¶ 73.

But for Google's anticompetitive conduct, ████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████ *Id.*; SMF ¶¶ 64-6█

Accordingly, ████████████████████████████████████████

██████████ Even without resolving evidentiary ambiguities in the States' favor, it is readily apparent that the harm to SVPs harms the competitive process in multiple respects. *Accord Microsoft*, 253 F.3d at 65 (Microsoft's conduct is anticompetitive because it "reduce[d] rivals' usage share and protect[ed] Microsoft's monopoly").

      Google argues that partnerships between SVPs and its rivals exist today, so there is no harm.  Google MSJ at 33 34.  Google wrongly truncates the analysis by focusing solely on the existence of *some* partnerships, while turning a blind eye to the prospect of stronger and potentially more diverse partnerships in a competitive world.  As explained by ██████████████████████

████████ when asked what would happen if there were more economically viable alternatives to replace Google's traffic:



Ex. 187 (_____ Tr.) 246:5-17.  SMF ¶¶ 15, 190 (Microsoft); SMF ¶¶ 191-93 (Yahoo! Japan); *see also* Ex. 3 (Baker) ¶¶ 182-86.

"[T]he law has never required complete market exclusion as a prerequisite to suit.  Indeed, some successful § 2 plaintiffs have both grown their market shares and earned high profits even through the period that the exclusionary practices were occurring."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 187, 235-36 (S.D.N.Y. 2019) (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 651b5, at 108-09); *see* Ex. 3 (Baker) ¶ 6.  For example, in *Microsoft*, although NetScape's installed base was growing at all times, Microsoft's conduct violated Section 2 because it prevented any competitor from "fulfilling their potential to open the market for Intel-compatible PC operating systems to competition on the merits."  *United States v. Microsoft Corp.*, 887 F. Supp. 2d 30, 39 (D.D.C. 2000), *aff'd in the relevant part by* 253 F.3d at 51, 117–18; *see also Conwood*, 290 F.3d at 784 (affirming monopoly maintenance where plaintiff's market share was increasing and market was expanding).  Similarly here, the issue is not whether Google's conduct has foreclosed *any* partnership but rather whether, but for Google's conduct, more or stronger partnerships would be likely.  The record contains ample evidence that they would.  At the very least, Google's SVP conduct, its purported procompetitive justifications for it, and the manner by which this conduct affects the Relevant Markets present disputed issues of fact that preclude summary judgment.

**D.      Google's Purported Requirements for Use of a "But-For" World to Support the Existence of Harm Fail as a Matter of Law and of Fact**

Google fictitiously separates SA360 and SVP allegations into separate claims (Google MSJ at 33, 41–42), and then insists that the States have failed to sufficiently detail separate worlds as they would appear *but for* Google's actions: one for each category of conduct.  Of course, there are no separate "claims," by category of conduct in the States' case.  *See supra* sec. III.A.

In any event, the States need not detail any but-for world with the extravagant level of specificity Google demands.  For example, one of its economists insists that the States must actually identify "*which specific SVPs* are best positioned to facilitate competition" in that but-for world.  Ex. 30 (Elzinga Rep.) ¶ 28 (emphasis in original).  Yet, the very same Google economist conceded in his deposition: "I think it's difficult to define precisely what we mean by the but-for world here because the allegations cover an array of conduct, not all of which I'm examining[.]" Ex. 11 (Elzinga Tr.) at 381.  That is precisely the point.  The States present an array of conduct, not a separate SVP claim, thus any but-for world must account for all of the alleged conduct, as Professor Baker—but no Google expert—has done.  *See, e.g.*, Ex. 3 (Baker) ¶¶ 35–45; *supra* sec. III.A.

The D.C. Circuit in *Microsoft* rejected Google's approach to defining a but-for world.  The Court explained that "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct." 253 F.3d at 79.  Instead, the Court asked whether anticompetitive conduct "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power." *Id*.

The States' case illustrates why such a standard is appropriate.  For purposes of this Motion, and in fact, Google has a strong, durable monopoly.  The existence of that monopoly itself has reduced visibility into the but-for world because businesses operating in Google's shadow are

unlikely to spend their time and resources creating strategies for a world that has never existed. *See* Google Motion at 32 (asserting that States must produce "evidence" that existing partnerships between SVPs and rivals would be "more effective" in the but-for world).  And that is why "[t]o some degree, 'the defendant is made to suffer the uncertain consequences of its own undesirable conduct.'" *Microsoft*, 253 F.3d at 79 (citing 3 Areeda & Hovenkamp, Antitrust Law ¶ 651c, at 78).

The distribution agreements cause significantly fewer people to use rival GSFs and cause rivals to face a correspondingly significant scale gap.  That predictably diminishes demand for the rivals' advertising, giving Google a free hand to use SA360 to suppress competition while boosting its own revenues.  Google's anticompetitive conduct has the effect of barring advertisers from accessing through SA360 exactly the kind of Microsoft Ads features that Google itself believes are important, thus putting (another) lid on advertising competition.  SMF ¶ 106; *supra* sec. I.C.

In addition, Google's distribution agreements and SA360 limitations weaken SVPs—some of Google's largest advertising customers—enabling Google to increase SVPs' customer acquisition costs, limit their visibility, rob them of control over their proprietary data, and erode rivals' ability to strengthen themselves through SVP integrations.  Similarly, Google's SVP conduct limits SVPs' ability to work with Google rivals, while directly protecting and boosting Google's monopoly revenues.  ██████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████ What is good for the Google is good for the rivalrous gander.

In a competitive world, one would expect Google's rivals to attract more users and more advertisers, thus limiting Google's ability to bias the operation of SA360 and its ability to curb

SVPs from forming stronger partnerships with Google's rivals.  Ex. 3 (Baker) ¶¶ 182–86.  The interplay of anticompetitive distribution agreements, the operation of SA360, and the conduct directed at SVPs "reasonably appear capable of making a significant contribution to . . . maintaining monopoly power."  *Id.*; *supra* sec. III.A.2.

More than a century ago, journalistic cartoons depicted monopolies using separate tentacles to harm competition in different ways while controlled by the single mind of a single octopus.[17]  In 1911, the Supreme Court recognized combined competitive harm arising from a monopoly's "resistless methods," which included multiple products, places, and forms of conduct.  *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 76-77 (1911).  Much has changed in the economy in the last hundred years but not this simple precept: a company that has harmed competition in multiple ways must face responsibility for the full and cumulative effects of all of its anticompetitive conduct, without regard to which tentacle it employs.

## IV.   **CONCLUSION**

As demonstrated herein and in the Joint Opposition, Google has failed to establish that it is entitled to judgment as a matter of law, and that no genuine issues of material fact are in dispute.  Google's Motion for Summary Judgment should be denied and this case should proceed to trial on the merits.

---

[17]*See* The Menace of the Hour, Anti-Monopoly Cartoon (1899), available at https://www.gettyimages.com/detail/news-photo/the-menace-of-the-hour-anti-monopoly-cartoon-george-luks-news-photo/629446167.

Dated: January 26, 2023                              Respectfully submitted,


                                                     FOR PLAINTIFF STATE OF COLORADO:

                                                     PHILIP WEISER
                                                     Attorney General

                                                     Jonathan B. Sallet
                                                     Special Assistant Attorney General

                                                     /s/ Jonathan B. Sallet
                                                     Jonathan B. Sallet, DC Bar No. 336198
                                                     Jon.Sallet@coag.gov
                                                     Steven M. Kaufmann, DC Bar No. 1022365
                                                     *(inactive)*
                                                     Steve.Kaufmann@coag.gov
                                                     Carla Baumel
                                                     Carla.Baumel@coag.gov
                                                     Elizabeth W. Hereford
                                                     Elizabeth.Hereford@coag.gov
                                                     Conor J. May
                                                     Conor.May@coag.gov
                                                     Colorado Office of the Attorney General
                                                     1300 Broadway, 7th Floor
                                                     Denver, CO 80203
                                                     Tel: 720-508-6000

                                                     William F. Cavanaugh, Jr.
                                                     PATTERSON BELKNAP WEBB & TYLER
                                                     LLP
                                                     1133 Avenue of the Americas
                                                     Suite 2200
                                                     New York, NY 10036-6710
                                                     212-335-2793
                                                     Email: wfcavanaugh@pbwt.com

                                                     *Counsel for Plaintiff Colorado*


                                                     FOR PLAINTIFF STATE OF NEBRASKA:

                                                     MIKE HILGERS
                                                     Attorney General

                                                     Joseph M. Conrad, Assistant Attorney General

51

Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant
Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
Joseph.Conrad@nebraska.gov
Colin.snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
212-335-2793
Email: wfcavanaugh@pbwt.com

*Counsel for Plaintiff Nebraska*


FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General

Robert A. Bernheim, Unit Chief Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-315
Tucson, Arizona 85701
Tel: (520) 628-6507
Robert.bernheim@azag.gov

*Counsel for Plaintiff Arizona*


FOR PLAINTIFF STATE OF IOWA:

BRENNA BIRD
Attorney General

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa

1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Tel: (515) 725-1018
Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff Iowa*


FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General

Elinor R. Hoffmann
Morgan J. Feder
Michael Schwartz
Office of the Attorney General of New York
28 Liberty Street, 21st Floor
New York, NY 10005
212-416-8513
Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff New York*


FOR PLAINTIFF STATE OF NORTH
CAROLINA:

JOSH STEIN
Attorney General

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
919-716-6000
kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

53

*Counsel for Plaintiff North Carolina*


FOR PLAINTIFF STATE OF TENNESSEE:

JONATHAN SKRMETTI
Attorney General

J. David McDowell
Chris Dunbar
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville.TN 37202
(615) 741-8722
David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov

*Counsel for Plaintiff Tennessee*


FOR PLAINTIFF STATE OF UTAH:

SEAN D. REYES
Attorney General

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
385-881-3742
sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff Utah*


FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
Attorney General

Jeff Pickett
State of Alaska, Department of Law

Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Jeff.pickett@alaska.gov

*Counsel for Plaintiff Alaska*


FOR PLAINTIFF STATE OF
CONNECTICUT:
WILLIAM TONG
Attorney General

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
860-808-5202
Nicole.demers@ct.gov

*Counsel for Plaintiff Connecticut*


FOR PLAINTIFF STATE OF DELAWARE:

KATHY JENNINGS
Attorney General

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
302-577-8924
Michael.undorf@delaware.gov

*Counsel for Plaintiff Delaware*


FOR PLAINTIFF DISTRICT OF COLUMBIA:

BRIAN SCHWALB
Attorney General

Elizabeth Gentry Arthur

55

Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
202-724-6514
Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*


FOR PLAINTIFF TERRITORY OF GUAM:

DOUGLAS MOYLAN
Attorney General

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Tel: (671) 475-3324

*Counsel for Plaintiff Guam*


FOR PLAINTIFF STATE OF HAWAI'I:

ANNE E. LOPEZ
Attorney General

Rodney I. Kimura
Department of the Attorney General, State of
Hawai'i
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
808-586-1180
Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff Hawai'i*


FOR PLAINTIFF STATE OF IDAHO:

RAÚL LABRADOR
Attorney General

56

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
208-334-4114
Brett.delange@ag.idaho.gov
John.olson@ag.idaho.gov

*Counsel for Plaintiff Idaho*


FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General

Elizabeth Maxeiner
Brian Yost
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
773-590-7935
Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov

*Counsel for Plaintiff Illinois*


FOR PLAINTIFF STATE OF KANSAS:

KRIS W. KOBACH
Attorney General

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue., 2nd Floor
Topeka, KS 66612
Tel: (785) 296-3751
Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff Kansas*

FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
Attorney General

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
207-626-8800
Christina.moylan@maine.gov

*Counsel for Plaintiff Maine*


FOR PLAINTIFF STATE OF MARYLAND:

ANTHONY G. BROWN
Attorney General

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6480
swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff Maryland*


FOR PLAINTIFF COMMONWEALTH
MASSACHUSETTS:

ANDREA CAMPBELL
Attorney General

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Fl.
Boston, MA 02108
Tel: (617) 727-2200
William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff Massachusetts*


FOR PLAINTIFF STATE MINNESOTA:

KEITH ELLISON
Attorney General

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-757-1257
Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff Minnesota*


FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General

Michelle Christine Newman
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
775-684-1164
mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff Nevada*


FOR PLAINTIFF STATE OF NEW
HAMPSHIRE:

JOHN FORMELLA
Attorney General

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street

Concord, NH 03301
603-271-1217
Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff New Hampshire*


FOR PLAINTIFF STATE OF NEW JERSEY:

MATT PLATKIN
Attorney General

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
973-648-7819
Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff New Jersey*


FOR PLAINTIFF STATE OF NEW MEXICO:

RAUL TORREZ
Attorney General

Judith E. Paquin
Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Tel: 505-490-4885
jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff New Mexico*


FOR PLAINTIFF STATE NORTH DAKOTA:

DREW WRIGLEY
Attorney General

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
701-328-5570
ealm@nd.gov

*Counsel for Plaintiff North Dakota*

FOR PLAINTIFF STATE OHIO:

DAVE YOST
Attorney General

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
614-466-4328
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff Ohio*

FOR THE PLAINTIFF STATE OKLAHOMA:

GENTNER DRUMMOND
Attorney General

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel: (405) 522-1014
Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff Oklahoma*

FOR PLAINTIFF STATE OREGON:

ELLEN ROSENBLUM
Attorney General

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
503-934-4400
Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff Oregon*


FOR PLAINTIFF COMMONWEALTH
PENNSYLVANIA:

MICHELLE HENRY
Attorney General

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Pennsylvania*


FOR PLAINTIFF TERRITORY PUERTO
RICO:

DOMINGO HERNANDEZ
Attorney General

Guarionex Diaz Martinez
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Tel: (787) 721-2900, ext. 1201
gdiaz@justicia.pr.gov

*Counsel for Plaintiff Puerto Rico*


FOR PLAINTIFF STATE RHODE ISLAND:

PETER NERONHA
Attorney General

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
SProvazza@riag.ri.gov

*Counsel for Plaintiff Rhode Island*


FOR PLAINTIFF STATE SOUTH DAKOTA:

MARTY J. JACKLEY
Attorney General

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
605-773-3215
Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff South Dakota*


FOR PLAINTIFF STATE VERMONT:

CHARITY R. CLARK
Attorney General

Christopher J. Curtis
Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
802-828-3170
Ryan.kriger@vermont.gov

63

*Counsel for Plaintiff Vermont*


FOR PLAINTIFF COMMONWEALTH VIRGINIA:

JASON S. MIYARES
Attorney General

Tyler T. Henry
thenry@oag.state.va.us
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Tel: (804) 692-0485

*Counsel for Plaintiff Virginia*


FOR PLAINTIFF STATE WASHINGTON:

BOB FERGUSON
Attorney General

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-5419
Amy.hanson@atg.wa.gov

*Counsel for Plaintiff Washington*


FOR PLAINTIFF STATE WEST VIRGINIA:

PATRICK MORRISEY
Attorney General

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard, East
Building 6, Suite 402
P.O. Box 1789

64

Charleston, WV 25305
304-558-8986
Douglas.l.davis@wvago.gov

*Counsel for Plaintiff West Virginia*


FOR PLAINTIFF STATE WYOMING:

BRIDGET HILL
Attorney General

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
(307) 777-6397
Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff Wyoming*