# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF RONALD T. WILCOX**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

LEGAL STANDARD ............................................................................................. 8

ARGUMENT ......................................................................................................... 8

    I.       PROFESSOR WILCOX'S CONCLUSIONS ARE ADMISSIBLE ..................... 9

          A.      Plaintiffs' Quarrels with Survey Conclusions Go to Weight Rather Than Admissibility ................................................................................ 9

          B.      Plaintiffs' Replicability Argument Fails ................................... 11

          C.      Plaintiffs' *Ipse Dixit* Argument Fails ........................................ 14

CONCLUSION ...................................................................................................... 20

i

# **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Campbell v. AMTRAK*, 311 F. Supp. 3d 281 (D.D.C. 2018) ...........................................................8

*Cardenas v. Toyota Motor Corp.*, No. 18-cv-22798, 2022 WL 3370886 (S.D. Fla. Aug. 16, 2022) ...............................................................................................................................17

*Cardenas v. Toyota Motor Corp.*, No. 18-cv-22798, 2022 WL 3370874 (S.D. Fla. Aug. 16, 2022) ...............................................................................................................................10

*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252 (9th Cir. 2001) ...........................2, 9, 19

*Coal. for Equity and Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540 (D. Md. 2017) ...........................................................................................15

*In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014)..............................................11, 12

*Counts v. Gen. Motors, LLC*, No. 1:16-cv-12541, 2022 WL 2078023 (E.D. Mich. June 9, 2022) ...............................................................................................................................15

*Cross Com. Media, Inc. v. Collective, Inc.*, No. 13-cv-2754, 2014 WL 11343849 (S.D.N.Y. Aug. 21, 2014) ...............................................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ............................................. *passim*

*Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267 (E.D.N.Y. 2012)..................................18

*In re Dicamba Herbicides Litig.*, No. MDL 2820, 2019 WL 6340260 (E.D. Mo. Nov. 27, 2019) ...............................................................................................................................13

*Dzielak v. Whirlpool Corp.*, No. 2:12-cv-0089, 2017 WL 1034197 (D.N.J. Mar. 17, 2017)........13

*Forschner Grp., Inc. v. Arrow Trading Co.*, 904 F. Supp. 1409 (S.D.N.Y. 1995)..................19, 20

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................................18, 19

*Grimes v. Hoffmann LaRoche, Inc.*, 907 F. Supp. 33 (D.N.H. 1995)...........................................18

*Herman Miller, Inc. v. Belnick LLC*, No. 1:18-cv-05012, 2021 WL 2582547 (N.D. Ga. Jan. 11, 2021) ........................................................................................................................18

*Jaffrey v. PorterCare Adventist Health Sys.*, No. 15-cv-02297, 2017 WL 5624572 (D. Colo. Nov. 22, 2017) .................................................................................................................9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................................................8

*LG Elecs. USA, Inc. v. Whirlpool Corp.*, No. 08-cv-242, 2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) ............................................................................................................... *passim*

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485 (S.D.N.Y. 2015) .........19

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871 (D.C. Cir. 2010) .....................8

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-cv-80371, 2015 WL 11251759 (S.D. Fla. July 6, 2015)...........................................................................12, 13

*Ohio Org. Collaborative v. Husted*, No. 2:15-cv-1802, 2016 WL 8201848 (S.D. Ohio May 24, 2016) ................................................................................................................13

*In re Ondova Ltd.*, No. 09-34784, 2012 WL 5879147 (Bankr. N.D. Tex. Nov. 21, 2012) ..........13

*Oracle v. Google Inc.*, No. 10-cv-03561, 2016 WL 1743116 (N.D. Cal. May 2, 2016) ...............10

*Paige Int'l, Inc. v. XL Specialty Ins. Co.*, No. 14-cv-1244, 2016 WL 3024008 (D.D.C. May 25, 2016) ..................................................................................................................8

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) .....................................................18

*Patteson v. Maloney*, 968 F. Supp. 2d 169 (D.D.C. 2013) .............................................................8

*Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730 (N.D. Ill. 2005) ...................................15, 17, 20

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 16-cv-3059, 2019 WL 5328730 (S.D. Cal. Oct. 21, 2019) .............................................................................................................10, 19

*Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268 (S.D.N.Y. 1994) ..........................................................................................................10

*Schechner v. Whirlpool*, No. 2:16-cv-12409, 2018 WL 6843305 (E.D. Mich. Oct. 30, 2018), *adopted by* 2019 WL 978934 (E.D. Mich. Feb. 28, 2019) .....................................................10

*Schering Corp. v. Pfizer, Inc.*, No. 98-cv-7000, 2000 WL 718449 (S.D.N.Y. June 5, 2000) .16, 20

*Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-cv-227, 2021 WL 1691136 (E.D. Tex. Apr. 29, 2021) 10

*SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202 (D.C. Cir. 2014) ................................................8

*Smilovits v. First Solar, Inc.*, 2019 WL 6875492 (D. Ariz. Dec. 17, 2019) .................................12

*Smith v. Allegheny Techs., Inc.*, No. 2:19-cv-147, 2022 WL 10755425 (W.D. Pa. Aug. 1, 2022) .........................................................................................................................11

*Trading Techs. Int'l, Inc. v. IBG LLC*, No. 10-cv-715, 2021 WL 5033464 (N.D. Ill. July 23, 2021) .........................................................................................................................13

*United States v. Harris*, 502 F. Supp. 3d 28 (D.D.C. 2020) .........................................................16

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ...............3

*United States v. Morgan*, 45 F.4th 192 (D.C. Cir. 2022) ..............................................................11

*United States v. Philip Morris USA Inc.*, No. 99-cv-2496, 2022 WL 1101730 (D.D.C. Apr. 13, 2022) .........................................................................................................................8

*United States v. Torres*, No. 20-cr-608, 2021 WL 1947503 (S.D.N.Y. May 13, 2021) ...............18

*Walker v. Life Ins. Co. of the Sw.*, No. 10-cv-09198, 2018 WL 11362384 (C.D. Cal. Dec. 14, 2018) .........................................................................................................................18

*Wendt v. Host Int'l, Inc.*, 125 F.3d 806 (9th Cir. 1997) .................................................................9

## STATUTES AND RULES

Ad. Comm. Notes to Fed. R. Evid. 702, 2000 Amend. ............................................................2, 11

## OTHER AUTHORITIES

Isabella McLafferty, *Focus Group Interviews as a Data Collection Strategy*, 48 J. of Advanced Nursing 187 (2004)....................................................................................................5

Shari S. Diamond, *Reference Guide on Survey Research* 359 (3d ed. 2011) ...........................6, 17

Susan Spiggle, *Analysis and Interpretation of Qualitative Data in Consumer Research*, J. of Consumer Research 491 (1994).......................................................................................14, 16

Plaintiffs do not challenge the reliability of Professor Wilcox's survey of Android application developers, but rather quarrel with conclusions he drew from the survey responses. Because Plaintiffs' ill-founded objections go to weight and not admissibility, and because Plaintiffs do not attack the reliability of either the survey or the survey responses, the Court should deny Plaintiffs' Motion.

## INTRODUCTION

Professor Ronald Wilcox has extensive experience in marketing, surveys, and qualitative analysis. He designed and carried out a survey of Android application developers ("developers") to elicit—in their own words—how, if at all, their businesses could be impacted by a hypothetical scenario involving an increase in the number of Android devices that do not meet baseline compatibility requirements consistent with Google's Android Compatibility Commitment ("ACC") and Anti-Fragmentation Agreement ("AFA"). Professor Wilcox obtained 168 open-ended responses to that hypothetical. Applying his expertise, including in some cases what he learned in pre-survey in-depth interviews, he categorized the responses: anticipated adverse, potentially positive, etc. He intends to present the survey, the survey results, and conclusions based on his categorization of the survey responses at trial if the Court reaches Google's defenses on issues pertinent to his survey.

Plaintiffs do not challenge Professor Wilcox's survey methodology and have made no attempt to replicate any aspect of his analysis. Plaintiffs conducted no interviews of developers, despite the detailed interview outline and 25-paragraph interview write-up that Professor Wilcox furnished. Plaintiffs conducted no developer survey of their own. And Plaintiffs declined to offer an expert to opine that the 168 open-ended survey responses should have been categorized (or "coded") differently. Instead, Plaintiffs seek to bar Professor Wilcox's opinions altogether under Federal Rule of Evidence 702 based solely on the contentions that his use of unrecorded pre-survey

in-depth interviews to code certain responses renders his opinions unreliable and that his coding of the survey responses is *ipse dixit*.  This Court should deny the Motion.

**First**, Plaintiffs' *Daubert* argument fails for the straightforward reason that they challenge neither the reliability of the survey itself nor the relevance of the 168 open-ended written responses, but rather only the conclusions Professor Wilcox draws.  It is settled law that quarrels with conclusions from a survey "go to the weight of the survey rather than its admissibility."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).  That principle is sufficient to deny the Motion.

**Second**, Plaintiffs' claim that Professor Wilcox's coding cannot be "replicate[d]" because no transcripts exist of his in-depth interviews (Pls.' Mot. to Exclude Expert Test. of Ronald T. Wilcox & Mem. in Supp. 10–13 ("Mot.")) is groundless.  Even when *Daubert*'s testability factor applies, the question is not replicability, but rather "whether the expert's theory can be challenged in some objective sense."  Ad. Comm. Notes to Fed. R. Evid. 702, 2000 Amend.  Plaintiffs, who have all of the raw survey responses, plainly could seek to "challenge[]" Professor Wilcox's coding choices as well as how the interviews informed them at trial, as the detailed questions posed to Professor Wilcox at his deposition illustrate.  *Id.*  In any event, Plaintiffs' argument for exclusion based on purported lack of replicability fails when, as here, they have not attempted to replicate the survey, Professor Wilcox's coding, or the in-depth interviews.

**Third**, Plaintiffs' *ipse dixit* argument fails because Professor Wilcox engaged in a reasonable and consistent approach to coding the survey responses, a process he described in detail in his report and deposition.  Particularly when Plaintiffs declined the opportunity to engage in their own coding of the 168 open-ended responses, Plaintiffs' quarrels with Professor Wilcox's approach go only to weight, not admissibility, of his opinions.

# BACKGROUND

Plaintiffs seek to invalidate, *inter alia*, Google's agreements with OEMs to maintain minimum compatibility standards for Android devices they market: Google's AFAs and ACCs ("compatibility commitments").  *See* Am. Compl., ECF No. 94, ¶¶ 66–71.  Google has moved for summary judgment, *inter alia*, because Plaintiffs failed to prove any anticompetitive effects in the search markets Plaintiffs define arising from the compatibility commitments.[1]  *See* Def.'s Mot. Summ. J., ECF No. 422, at 43–46.  Notably, Plaintiffs' experts offered no opinions supporting Plaintiffs' contention that a proliferation of Android devices that fail to comply with Google's compatibility standards would benefit search competition.  *Id.* at 45.  If—and only if—the Court denies Google's summary judgment motion **and** Plaintiffs make out a prima facie case of monopoly maintenance at trial based on the AFAs/ACCs will the Court need to pass on the compatibility commitments' procompetitive justifications.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc) (per curiam).

Google's lead expert for those defenses will be Professor Kevin Murphy, against whom Plaintiffs have not filed a *Daubert* motion.  Professor Murphy will opine that Google's compatibility commitments enhance search competition, among other ways, by reducing developers' costs of writing applications to Android.  *See* Ex. 4, Excerpts of June 6, 2022 Expert Report of Kevin M. Murphy ¶¶ 368–86.  Responses from the developer survey conducted by Professor Wilcox comprise just one of many items that Professor Murphy invokes that independently support his opinion.  *Id.* ¶¶ 378–86.

Professor Wilcox is the NewMarket Corporation Professor of Business Administration at the Darden School of Business at the University of Virginia, where he has taught since 2001 and

---

[1] Indeed, Plaintiffs notably omit any impact on search competition in describing their objection to the compatibility commitments.  Mot. 4.

served as an associate dean since 2012. Ex. 1, June 2, 2022 Expert Report of Ronald T. Wilcox ¶ 1, App. A.[2]  His academic work involves, *inter alia*, survey design and analysis, consumer behavior, marketing, and analysis of qualitative interviews in business settings. *Id.* ¶ 4.; Ex. 2, Excerpts of the Deposition of Ronald T. Wilcox (Oct. 18–19, 2022) at 31:21–34:1; 35:10–38:5. Professor Wilcox has conducted numerous case studies that have involved interviews with businesses. Ex. 2 at 470:7–471:2; Ex. 1 ¶ 3.  He earned a Ph.D. in Business Administration and has a background in computer programming. Ex. 2 at 433:5–12; Ex. 1 ¶ 1, App. A.

Professor Wilcox has published several books, including *Marketing Analytics: Essential Tools for Data Driven Decisions* and *Cutting Edge Marketing Analytics: Real Word Cases and Data Sets for Hands-on Learning*, as well as numerous peer-reviewed articles in publications such as the *Journal of Marketing Research*, the *Journal of Business*, and *Marketing Science*. Ex. 1 ¶ 2, App. A.  He has designed or implemented "hundreds" of surveys (Ex. 2 at 53:16–54:2) and has been retained in litigation to design and implement surveys approximately a dozen times and to address survey methodologies some 20 times, *id.* at 44:5–46:6.  Nearly all of the surveys he designed included qualitative elements. *Id.* at 47:14–21.

Professor Wilcox designed the developer survey in this case in accordance with standard practices.  *See* Ex. 1 ¶ 16.  Importantly, Plaintiffs mount no challenge to the design or administration of the survey itself.  As part of his survey design process, Professor Wilcox oversaw 18 in-depth developer interviews. *Id.* ¶¶ 20–21.  As literature Professor Wilcox cited in his report explains, interviews are "'often used to refine questions for future surveys.'"[3]  The pre-survey in-

---

[2] Professor Wilcox's curriculum vitae is appended as Appendix A to his report, Exhibit 1 to this Opposition.

[3] *Id.* ¶ 21 (quoting C. Boyce & P. Neale, *Conducting In-Depth Interviews: A Guide for Designing and Conducting In-Depth Interviews for Evaluation Input* 3 (2006)).  Plaintiffs complain that the

depth interviews helped Professor Wilcox "learn the language that the app developers use" so that he could "write a survey that was clear to them." Ex. 2 at 214:12–215:21. With Professor Wilcox observing, a moderator conducted each interview using a discussion guide Professor Wilcox developed. Ex. 1, App. D-1 (explaining interview process); App. D-2 (discussion guide). Professor Wilcox memorialized points from the interviews in a 25-paragraph summary appended to his report. *Id.* App. D-1.

Informed by his experience, record evidence, and the interviews, Professor Wilcox developed a survey instrument that included a hypothetical. It asked participants to assume: (i) a non-trivial increase in incompatible Android devices; (ii) *if* a developer wanted their app to work on those incompatible devices, the developer would have to make changes to the app code; and (iii) it **may** be necessary to modify the app to run on different incompatible Android devices. *Id.* App. E at 13.[4] Professor Wilcox pretested his survey, and a firm experienced in conducting surveys fielded it. Professor Wilcox obtained 168 open-ended written responses to the question of "how, if at all, this hypothetical scenario would affect the [developer's] company," out of the 354 developers who completed the survey. *Id.* App. E at 14; ¶ 50.

Plaintiffs make no *Daubert* challenge to Professor Wilcox's qualifications or to the reliability of the survey methodology that yielded the 168 written responses. As Professor Wilcox's report explains, "[t]he survey was qualitative in nature" with the goal of soliciting

---

moderator at times departed from the discussion guide (Mot. 5 n.6), but that is common practice. *See* Isabella McLafferty, *Focus Group Interviews As a Data Collection Strategy*, 48 J. of Advanced Nursing 187, 189 (2004).

[4] Plaintiffs incorrectly state that the hypothetical assumed "device-by-device level" code changes. Mot. 6. Instead, the hypothetical explicitly assumed only that each "device model **may** require separate changes to the app code for the app to function properly on those devices." Ex. 1 ¶ 40 (emphasis added). Deposition testimony and declarations from Google witnesses, as well as evidence from Amazon, informed the hypothetical. *See id.* n.60; Ex. 2 at 23:16–24:11.

developers' "assessments, in their own words, on if and how their business could be impacted in th[e] hypothetical." *Id.* ¶ 14.  A qualitative survey is appropriate "to probe the why question or . . . how kinds of questions."  Ex. 2 at 48:2–22.  Professor Wilcox's survey posed open-ended questions, which "gauge what comes first to a respondent's mind."  Shari S. Diamond, *Reference Guide on Survey Research* 359, 394 (3d ed. 2011) (hereinafter "Diamond").  "The survey respondents' open-ended answers" accordingly "provide valuable insights into the ways Android App Developers think their business could be impacted in the hypothetical." Ex. 1 ¶ 14.  All 168 open-ended responses appear in Appendices J–M of Professor Wilcox's report, and Plaintiffs have had them since the opening expert report round.[5]

Plaintiffs challenge solely "how [Professor Wilcox] ***evaluated*** survey responses."  Mot. 3 (emphasis added). "[T]o describe the [survey] data in as simplest terms possible" (Ex. 2 at 382:7–15), Professor Wilcox, applying his expertise, coded (or bucketed) the 168 open-ended responses into three broad categories: (i) anticipated adverse impacts; (ii) anticipated possibly positive, mixed, or no impact; and (iii) non-responsive/ambiguous.  The categories reflect "patterns that" Professor Wilcox "saw in the responses."  *Id.* at 360:22–363:3.  For "most" of the 168 responses, the appropriate bucket was "obvious" (*id.* at 362:10), as a few sample responses coded as "anticipated adverse impacts" illustrate:

- "It would decimate our business as we rely on the code working on multiple android devices and we have []to make major changes to our code" (131).  Ex. 1, App. J at 7.

- "The hypothetical scenario would be a disaster for us.  We want Android to work properly in devices used in the U.S." (921).  *Id.*

- "As a result, some applications will not run or load, affecting the user experience and leading to decrease in satisfaction, which will also increase the time to build the application and spend more money on testing" (1822).  *Id.* at 5.

---

[5] For the Court's convenience, Exhibit 3 hereto lists all of the responses without categorization.

To interpret some responses, Professor Wilcox, applying his marketing and survey expertise, employed what he learned during the pre-survey interviews.  Ex. 2 at 486:7–16.  When asked at his deposition how the pre-survey interviews aided the interpretation of certain responses, in each instance, Professor Wilcox supplied the information he recalled.  *See, e.g.*, *id.* at 422:22– 424:20, 427:20–432:4.[6]  He also discussed a "minority" of responses with individuals at Cornerstone Research—a supporting economic consulting firm—"to get an outside view of the bucketing."  *Id.* at 362:6–364:19.  He proceeded conservatively in categorizing responses.  Ex. 1 ¶ 52 n.88.  "[I]f it wasn't an obvious negative," he "wouldn't put it in the negatives."  Ex. 2 at 362:17–20.  By contrast, if it appeared at all positive—that is, "facially" positive (*id.* at 361:18– 19)—Professor Wilcox coded the response "possibly positive."  Ex. 1 ¶ 15.

Based on his coding, Professor Wilcox concluded that the "anticipated adverse impacts" accounted for 58% (a "majority") of the 168 written open-ended responses.  *Id.* ¶¶ 15, 51.  The ratio of the adverse responses to those coded as "possibly positive" was 98/17, or nearly 5.8:1.  Ex. 2 at 476:22–477:8.

Plaintiffs have made no counter-categorization of the survey responses.  Nor did they proffer an expert to critique the reliability or integrity of Professor Wilcox's survey instrument, the survey responses he collected, or his opinions based on them.  Plaintiffs, moreover, made no attempt to replicate Professor Wilcox's pre-survey interviews (for example, by using the discussion guide developed by Professor Wilcox and available to Plaintiffs) or the survey itself.

---

[6] For example: Respondent 1132 stated that the hypothetical was a "perfect example and we run into this scenario all the time and need to customize our code."  Professor Wilcox explained that the in-depth interviews comported with his categorization of this response as adverse, because the interviews revealed that "changing the app code for all these different devices is a major pain point" for developers.  Ex. 2 at 420:8–424:9.  The report appendix describing "trends" that "emerged" from the in-depth interviews confirms the same.  Ex. 1, App. D-1 ¶¶ 18–19.

## LEGAL STANDARD

Rule 702 permits expert testimony that is "reliable and relevant." *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 894 (D.C. Cir. 2010) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *accord SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1214 (D.C. Cir. 2014) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

"Relevancy"—or "fit"—means that testimony "will aid" the factfinder in resolving issues in the case. *Daubert*, 509 U.S. at 591.  As for reliability, courts "must focus solely on principles and methodology, not on the conclusions that they generate." *Campbell v. AMTRAK*, 311 F. Supp. 3d 281, 297 (D.D.C. 2018).  Although courts often list factors, they "do ***not*** constitute a definitive checklist or test . . . and the gatekeeping inquiry must be tied to the particular facts." *Kumho*, 526 U.S. at 141, 150 (emphasis added) (internal quotation omitted).  The "test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Patteson v. Maloney*, 968 F. Supp. 2d 169, 173 (D.D.C. 2013) (internal quotations omitted).  "[T]here are many different kinds of experts, and many different kinds of expertise." *Paige Int'l, Inc. v. XL Specialty Ins. Co.*, No. 14-cv-1244, 2016 WL 3024008, at *4 (D.D.C. May 25, 2016) (quoting *Kumho*, 526 U.S. at 150).  "[E]xperience alone—or experience in conjunction with other knowledge, skill, training or education" may "provide a sufficient foundation for expert testimony." *United States v. Philip Morris USA Inc.*, No. 99-cv-2496, 2022 WL 1101730, at *6 (D.D.C. Apr. 13, 2022) (internal quotations omitted).

## ARGUMENT

This Court should deny Plaintiffs' bid to exclude Professor Wilcox's opinions and report. Plaintiffs challenge not the reliability of the survey or the responses themselves, but rather ***only conclusions*** Professor Wilcox draws.  Quarrels with conclusions go to weight, not admissibility. The specific attacks Plaintiffs make on those conclusions—that he declined to record pre-survey

interviews and supposedly engaged in *ipse dixit* coding of survey responses—are both meritless and provide no basis for exclusion under Rule 702.  Last, exclusion of Professor Wilcox's evaluation of the survey's output would not warrant excluding Professor Murphy's reliance upon the survey responses, which Professor Murphy cites to illustrate the types of harms that abrogating AFAs and ACCs would inflict.

## I.   PROFESSOR WILCOX'S CONCLUSIONS ARE ADMISSIBLE

Plaintiffs' attack on Professor Wilcox's conclusions based on his "classification of survey responses" (Mot. 3) does not warrant exclusion of his opinions or report under Rule 702.

### A.   Plaintiffs' Quarrels with Survey Conclusions Go to Weight Rather Than Admissibility

As an initial matter, Plaintiffs' attack fails because it pertains solely to the ***conclusions*** Professor Wilcox draws from the survey responses rather than how he ***conducted*** the survey.  "[S]urveys are to be admitted as long as they are conducted according to accepted principles and are relevant."  *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).  By contrast, "follow-on issues," including "critique of conclusions . . . go to the weight of the survey rather than its admissibility."  *Clicks*, 251 F.3d 1252, 1263 (9th Cir. 2001); *see also e.g.*, *Jaffrey v. PorterCare Adventist Health Sys.*, No. 15-cv-02297, 2017 WL 5624572, at *7 (D. Colo. Nov. 22, 2017) ("While Defendant can certainly challenge the rigor of, or conclusion drawn, from Dr. Bauer's informal survey, those criticisms are more properly directed at the weight, rather than the admissibility, of that opinion.").

Here, as explained, Plaintiffs make no argument for exclusion based on how Professor Wilcox conducted the developer survey.  And Plaintiffs make no argument that the survey responses themselves are irrelevant to Google's defenses; they plainly are relevant, as Professor Murphy's report shows.  *See* Ex. 4 ¶¶ 384–86.  Plaintiffs challenge only how Professor Wilcox

"evaluated survey responses" based on his "classification of survey responses into buckets."  Mot. 3.  However dressed up, this is a classic quarrel with "interpretation of the data collected" by a survey that "go[es] to weight, not admissibility."  *Cardenas v. Toyota Motor Corp.*, No. 18-cv-22798, 2022 WL 3370874, at *2 (S.D. Fla. Aug. 16, 2022); *see also e.g.*, *Oracle v. Google Inc.*, No. 10-cv-03561, 2016 WL 1743116, at *8–9 (N.D. Cal. May 2, 2016) (holding that quarrels with "conclusions" drawn from a developer survey went "to the weight of the survey rather than its admissibility").

 *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 16-cv-3059, 2019 WL 5328730 (S.D. Cal. Oct. 21, 2019), is instructive.  There, as here, defendants challenged a survey expert's coding of responses, arguing (as here) that percentages based on the expert's classifications were unreliable.  *Id.* at *5–6.  The court rejected this challenge under the principle that "a 'critique of the [survey's] conclusion' goes to the weight of the survey, not its admissibility."  *Id.* at *6 (quoting *Clicks*, 251 F.3d at 1263).  So too here, this Court should reject Plaintiffs' argument for exclusion based on Professor Wilcox's "classification of survey responses into buckets."  Mot. 3.  Asserted flaws with coding and associated conclusions "bear solely on the weight afforded to the survey, not its admissibility."  *Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-cv-227, 2021 WL 1691136, at *2–3 (E.D. Tex. Apr. 29, 2021); *accord LG Elecs. USA, Inc. v. Whirlpool Corp.*, No. 08-cv-242, 2010 WL 3397358, at *5, 17 (N.D. Ill. Aug. 24, 2010) (same); *Schechner v. Whirlpool*, No. 2:16-cv-12409, 2018 WL 6843305, at *10–11 (E.D. Mich. Oct. 30, 2018) (same), *adopted by* 2019 WL 978934 (E.D. Mich. Feb. 28, 2019).[7]

---

[7] The cases Plaintiffs cite involve defective survey methodologies.  *See, e.g.*, *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1275–76 (S.D.N.Y. 1994) (improper controls); *Cross Com. Media, Inc. v. Collective, Inc.*, No. 13-cv-2754, 2014 WL 11343849, at *8–10 (S.D.N.Y. Aug. 21, 2014) (expert did not undertake a survey but instead

B.       **Plaintiffs' Replicability Argument Fails**

Even assuming that Professor Wilcox's conclusions present an admissibility issue, Plaintiffs' argument for excluding them because no transcripts exist of the pre-survey in-depth interviews that helped Professor Wilcox code a subset of the 168 survey responses, which Plaintiffs say presents a "replica[bility]" and thus reliability defect (Mot. 10), is infirm.

*First*, Plaintiffs overstate the in-depth interviews' role in Professor Wilcox's coding of survey responses, a step he took to "describe the data" from his qualitative survey "in as simplest terms possible" and to present the responses in a "simple, normal way."  Ex. 2 at 382:11–14. Professor Wilcox's coding categories emerged from the survey responses themselves, not the in-depth interviews conducted as part of the survey design process.  *Id.* at 361:7–9.  Only a "definit[e] minority" of responses presented non-obvious coding calls.  *Id.* at 362:6–364:19.  The in-depth interviews provided Professor Wilcox insight into the language of developers, helping him interpret some of those responses.  *Id.* at 215:9–21, 486:9–16.

*Second*, **testability,** not replicability, is the pertinent *Daubert* factor.  *Daubert*, 509 U.S. at 593–94.  When this factor applies,[8] the question is "whether the expert's theory can be challenged in some objective sense."  Ad. Comm. Notes to Fed. R. Evid. 702, 2000 Amend.; *accord In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 554 (C.D. Cal. 2014).  This standard reflects that "[n]ot all expert testimony" is "the result of calculations or formulae."  *Smith v. Allegheny Techs., Inc.*, No. 2:19-cv-147, 2022 WL 10755425, at *2 (W.D. Pa. Aug. 1, 2022) (rejecting replicability

---

commented on a "marketing document").  Here, in contrast, an allusion to unspecified "flaws in Prof. Wilcox's survey design" (Mot. 3) makes no Rule 702 challenge.

[8] As noted, the *Daubert* factors "do not constitute a definitive checklist or test" and "may or may not be pertinent in assessing reliability in specific circumstances."  *United States v. Morgan*, 45 F.4th 192, 200 (D.C. Cir. 2022) (internal quotations omitted).

requirement); *Smilovits v. First Solar, Inc.*, 2019 WL 6875492, at *4 (D. Ariz. Dec. 17, 2019) (same).

Here, assuming the "testability" factor applies to Professor Wilcox's use of the pre-survey in-depth interviews to help code some survey results, his approach is plainly "capable of being challenged in some objective sense."   *In re ConAgra*, 302 F.R.D. at 554 (internal quotations omitted).   Plaintiffs can probe at trial—just as they did during Professor Wilcox's deposition— how the in-depth interviews, if at all, informed his interpretation and coding of a particular survey response.  *See, e.g.*, Ex. 2 at 412:10–424:20.  Indeed, at his deposition, Professor Wilcox identified the themes from those interviews that support his conclusions, many of which find expression in Professor Wilcox's summary of the in-depth interviews, a source Plaintiffs ignore.  *Id.* at 422:22– 424:20; Ex. 1, App. D-1 at 4–6.  Plaintiffs can draw out at trial any gaps in Professor Wilcox's recollection that, they claim, warrant giving his conclusions less weight.  There is no requirement that "in order to be deemed reliable, an expert must possess copious notes and/or a flawless memory."  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-cv-80371, 2015 WL 11251759, at *14 (S.D. Fla. July 6, 2015) (internal quotations omitted).

The claim that Plaintiffs cannot "test the connection between the pre-survey interviews" and Professor Wilcox's categorization because "no transcripts or notes were provided from the[] interviews" (Mot. 11) is thus incorrect.  Plaintiffs may prefer that Professor Wilcox created such materials[9]; but their absence—particularly in light of Professor Wilcox's detailed summary of the

---

[9] Plaintiffs' suggestion that Google made a "strategic litigation decision[] . . . not to record them" (Mot. 12) is baseless.  Google represented to Plaintiffs that "[t]here are no transcripts or other notes or documentation relating to the in-depth interviews" beyond Appendix D to Professor Wilcox's report because "Professor Wilcox" made that decision "to protect the privacy of interview participants."  Ex. 5, Email from Rubinstein (Wilson Sonsini) to Aguilar (DOJ) (July 8, 2022).

in-depth interviews (Ex. 1, App. D-1)—does not prevent Plaintiffs from conducting "[v]igorous cross-examination" to "attack[]" Professor Wilcox's use of the interviews. *Daubert*, 509 U.S. at 596. The lack of such interview notes is thus no bar to admissibility of his opinions. *See, e.g.*, *Nat'l Union*, 2015 WL 11251759, at *14 (admitting testimony despite absence of notes); *Ohio Org. Collaborative v. Husted*, No. 2:15-cv-1802, 2016 WL 8201848, at *7 (S.D. Ohio May 24, 2016) (finding expert's methodology reliable when expert relied on undocumented conversations); *Trading Techs. Int'l, Inc. v. IBG LLC*, No. 10-cv-715, 2021 WL 5033464, at *1 (N.D. Ill. July 23, 2021) (admitting testimony that relied in part on conversations for which no notes existed).[10]

*Third*, Plaintiffs' failed attempt to transmute the testability factor into a non-existent hard requirement of replicability cannot be taken seriously when they have not "shown any inclination to reproduce" any aspect of Professor Wilcox's analysis. *Dzielak v. Whirlpool Corp.*, No. 2:12-cv-0089, 2017 WL 1034197, at *7 (D.N.J. Mar. 17, 2017) (rejecting *Daubert* challenge). Professor Wilcox supplied not only the 168 open-ended survey responses, but also the lengthy and detailed discussion guide (Ex. 1, App. D-2), as well as his summary of the interviews (Ex. 1, App. D-1). Having made no attempt to harness these materials to replicate the qualitative pre-survey interviews—let alone the survey, the survey responses, or the coding of them—"[t]he mere possibility" that "they believe their efforts to do so, if undertaken, would have been thwarted, does not detract from the testability or validity of [Professor Wilcox's] conclusions." *Dzielak*, 2017 WL 1034197, at *7.

---

[10] Cases Plaintiffs cite, involving refusal to disclose an expert's methodology or underlying data, are inapposite. *See In re Ondova Ltd.*, No. 09-34784, 2012 WL 5879147, at *10 (Bankr. N.D. Tex. Nov. 21, 2012) (refusal to share methodology); *In re Dicamba Herbicides Litig.*, No. MDL 2820, 2019 WL 6340260, at *5 (E.D. Mo. Nov. 27, 2019) (excluding scientific testimony when software codes were not provided and replication demonstrated unreliability). Here, Plaintiffs have the survey instrument, responses, and coding methodology. *See infra* Part I.C.

### C.  Plaintiffs' *Ipse Dixit* Argument Fails

Plaintiffs further contend that Professor Wilcox's conclusions based on his categorization of the 168 open-ended responses are "unreliable because they are unsupported conclusory opinions."  Mot. 13.  This argument reruns the objection to coding in a new "fit" wrapper, asserting that Professor Wilcox "employed no methodology to ensure that he coded responses consistently."  Mot. 14–15.[11]  This groundless claim likewise provides no basis for exclusion.

Professor Wilcox proceeded reasonably and systematically in his coding.  Professor Wilcox engaged in qualitative analysis, well-recognized in the literature, in which the researcher "notes general similarities in the specific empirical instances in the data and labels them as representing the same category."  Susan Spiggle, *Analysis and Interpretation of Qualitative Data in Consumer Research*, J. of Consumer Research 491, 493 (1994).  Professor Wilcox described his application of this process in his report and at his deposition.  *See* Ex. 1 ¶¶ 50–53; Ex. 2 at 360:12–363:3.  He "reviewed all of the responses."  Ex. 1 ¶ 50.  He let the categories fall out of the survey responses.  Ex. 2 at 14:20–15:8, 361:4–9.  He coded responses into those categories himself (*id.* at 362:6–16) because the information was "technical in nature" and required familiarity with the language developers use because they were asked to "use their own words."  Ex. 1 ¶ 50.  The pre-survey interviews with developers, as explained, helped him understand that language.  Ex. 2 at 215:9–21.

Professor Wilcox testified that the proper categorization for the majority of responses was "obvious," Ex. 2 at 362:6–13, as a cursory glance at Appendix J will confirm for the Court.  Responses such as "The hypothetical scenario would be a disaster for us" (921) and "the user

---

[11] While Plaintiffs position this as an issue with "fit," the substance of the attack is that "coding decisions were subjective."  Mot. 13, 15.  Plaintiffs do not argue the absence of "fit," or the irrelevance of the survey responses, if the Court rejects their *ipse dixit* contention.

experience would suffer because of the constant change and evolution of said scenarios" (115) could not reasonably be categorized any way other than "adverse."  For those that merited further interpretation, in addition to discussions with Cornerstone Research, Professor Wilcox applied what he learned from the record, the pre-survey interviews, his experience in marketing, surveys, and qualitative research, and "common themes" observed in the responses.  Ex. 1 ¶ 50; Ex. 2 at 32:14–34:13, 445:19–446:4, 486:9–16.

Such a "general methodology—gathering relevant information and applying one's training, experience, and knowledge to the process of analyzing information is a matter of common sense" and "reasonable," not *ipse dixit*.  *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743–44 (N.D. Ill. 2005) (rejecting *ipse dixit* objection); *see also Counts v. Gen. Motors, LLC*, No. 1:16-cv-12541, 2022 WL 2078023, at *12 (E.D. Mich. June 9, 2022) (rejecting *ipse dixit* objection when expert applied marketing expertise to qualitative content analysis).  "[A]nalysis of a body of information" is "itself a generally accepted approach."  *Coal. for Equity and Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 554 (D. Md. 2017).  "[T]he process of analyzing assembled data while using experience to interpret the data is not illicit."  *Phillips*, 364 F. Supp. 2d at 742.

Plaintiffs' claim that Professor Wilcox's lack of coding guidelines renders his categorization *ipse dixit* (Mot. 14–15) is a red herring.  For one thing, Plaintiffs point to no systemic inconsistencies in his coding; on the contrary, at his deposition, Plaintiffs elicited that he consistently classified numerous responses involving altering app code.  Ex. 2 at 391:3–404:17.[12]

---

[12] Plaintiffs' contention that Professor Wilcox's coding as "adverse" the response "We would have to rework our app code" supports their *ipse dixit* argument (Mot. 17) is infirm.  Plaintiffs base this contention on the flawed premise that the hypothetical assumed respondents **would** change the app code.  *Id.*  But that is incorrect; the hypothetical left open whether the surveyed developers would take this step.  Ex. 2 at 404:13–16.  Set in this context, Professor Wilcox had a reasoned basis to

For another, coding such open-ended responses is not mechanical, but rather applies specialized training—here, his marketing research and survey expertise.  *Id.* at 31:12–20.  *See United States v. Harris*, 502 F. Supp. 3d 28, 41–42 (D.D.C. 2020) ("[A]ll technical fields which require the testimony of expert witnesses engender some degree of subjectivity requiring the expert to employ his or her individual judgment, which is based on specialized training, education, and relevant work experience.").  Interpretation of qualitative data, such as open-ended survey responses, is not "a set of procedures."  Spiggle at 497.  Professor Wilcox did not need to write guidelines for himself.

*LG Electronics* shows why Plaintiffs' argument fails.  There, a survey and marketing expert performed a "content analysis" of sample consumer feedback videos and (as here) "divided the videos into three categories," those with "positive," "negative," and "mixed" comments.  *LG Elecs.*, 2010 WL 3397358, at *16.  The expert (as here) calculated percentages of the sample that, based on this coding, fit each category.  *Id.*  The court admitted the opinion over a *Daubert* objection, relegating quarrels with the coding to the survey's weight.  *Id.* at *16–17.  This Court should similarly reject Plaintiffs' bid to exclude either Professor Wilcox's coding or opinions based on that coding here.  This is particularly appropriate because Plaintiffs have "had access to the underlying responses," so "that, if responses were improperly coded," they have "not been prevented from recoding them."  *Schering Corp. v. Pfizer, Inc.*, No. 98-cv-7000, 2000 WL 718449, at *5 (S.D.N.Y. June 5, 2000).

---

view the phrase "would have to rework our app code" as adverse—because it implied devoting resources.  Rework implies "something I really have to get into," as Professor Wilcox explained (*id.* at 401:19–402:5); and Plaintiffs make no *Daubert* challenge to Professor Wilcox's deeming the anticipated expenditure of additional resources as adverse.

Plaintiffs' related claim, that Professor Wilcox applied a "weighted system" skewed toward Google (Mot. 16), not only defeats Plaintiffs' *ipse dixit* argument by recognizing that Professor Wilcox coded systematically, but also gets it exactly backward.  Professor Wilcox proceeded conservatively. Ex. 1 ¶ 52 & n.88; Ex. 2 at 362:17–363:3.  That he coded "potentially positive" anything facially positive, and "anticipated adverse" only if "obvious[ly]" adverse (Ex. 2 at 362:17–363:3, 475:4–16), confirms this.  Critiques of these coding decisions go to weight, not admissibility.  *See supra* Part I.A (citing cases).  If the concern is that Professor Wilcox used an "unorthodox" set of "definitions," that merely "provide[s] fodder for cross examination." *Cardenas v. Toyota Motor Corp.*, No. 18-cv-22798, 2022 WL 3370886, *3 (S.D. Fla. Aug. 16, 2022) (rejecting *ipse dixit* challenge to Professor Wilcox).

Professor Wilcox also provided a "common sense," *Phillips*, 364 F. Supp. 2d at 743–44, reason for not using independent coders, a measure suggested by the Diamond excerpt Plaintiffs cite.[13]  Regardless, as one court held in rejecting the same gripe, a claim of "improper coding" because an expert "failed to adhere to the guidelines" in Diamond cannot justify exclusion.  *See LG Elecs.*, 2010 WL 3397358, at *17 (rejecting *Daubert* challenge).  Plaintiffs also conveniently ignore that Professor Wilcox followed Diamond's next passage:  "In all cases, the verbatim responses should be available so that they can be recoded using alternative criteria" (Diamond at 413)—a suggestion Plaintiffs declined.

Plaintiffs' insinuation that the Court should exclude Professor Wilcox's coding because he lacks "expertise in application development" (Mot. 11) falls flat.  Experts may "testify concerning

---

[13] Mot. 14 (citing Diamond at 413).  Other coders, Professor Wilcox explained, would have needed "a frame of reference for how [developers] talk which helps [understand] how they write."  Ex. 2 at 366:10–19.

related applications" of their expertise in new fields. *Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 277 (E.D.N.Y. 2012). There is "no[] authority" that "requires a survey expert to also be an expert in [the] market of the specific products" at issue. *Herman Miller, Inc. v. Belnick LLC*, No. 1:18-cv-05012, 2021 WL 2582547, at *3 (N.D. Ga. Jan. 11, 2021). Like other experts, Professor Wilcox applied his survey and marketing expertise to a particular field. *See, e.g.*, *id.*; *LG Elecs.*, 2010 WL 3397358, at *16 (survey expert with marketing research expertise validly opined on content analysis despite not being a "technical expert" in the area). Not surprisingly, courts have rejected this argument for excluding Professor Wilcox. *See Walker v. Life Ins. Co. of the Sw.*, No. 10-cv-09198, 2018 WL 11362384, at *2 (C.D. Cal. Dec. 14, 2018) (Professor Wilcox "has the requisite experience to conduct surveys and render his opinions based thereon. That he may not have experience in insurance products goes to the weight of his opinion.").

Plaintiffs' cases do not support exclusion when, as here, the expert proceeded reasonably in coding open-ended responses to a qualitative survey. Their pre-*Kumho* cases all involve "hard" scientific issues of causation, not conclusions drawn from a qualitative survey in the social sciences. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743–46 (3d Cir. 1994) (pre-*Kumho* case involving "scientific" issue of causation of ailments from PCB exposure); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (same; causal link between chemical exposure and cancer); *Grimes v. Hoffmann LaRoche, Inc.*, 907 F. Supp. 33, 35 (D.N.H. 1995) (same; causal link between prescription drug and cataracts). Put simply, Plaintiffs' cases are inapposite because "social science . . . cannot have the exactness of hard science methodologies." *United States v. Torres*, No. 20-cr-608, 2021 WL 1947503, at *6 n.8 (S.D.N.Y. May 13, 2021) (internal quotations omitted). "[T]hat an analysis may be qualitative does not mean that it is unreliable for the purposes

of *Daubert*."  *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015).[14]

Plaintiffs' further contention—that, using Professor Wilcox's coding, the percentage of adverse responses is 28%, rather than 58%, because the "don't know/not sure" responses should be included in the denominator (Mot. 15–16)—is a classic quarrel with conclusions that "go[es] to weight of the survey rather than its admissibility."  *Clicks*, 251 F.3d at 1263; *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 741 (S.D.N.Y. 2011) (admitting survey over objection that expert improperly coded ambiguous responses).  In any event, Professor Wilcox both defended excluding the "don't know/not sure" responses from the denominator and testified that, regardless of the denominator, the ratio of responses he coded "anticipated adverse" to "possibly positive" would remain 98 to 17.  Ex. 2 at 380:14–22; 477:7–8.

Last, Plaintiffs' infirm "fit" argument respecting Professor Wilcox's conclusions does not support excluding all reliance upon or use of the survey itself—part of the relief Plaintiffs seek—because this Court can conduct its own analysis of the survey responses.  *See, e.g.*, *Forschner Grp., Inc. v. Arrow Trading Co.*, 904 F. Supp. 1409, 1426–27 (S.D.N.Y. 1995) (finding likelihood of confusion "[e]ven without the benefit of an expert" after "rely[ing] on the results of the survey, both directly" and as analyzed by expert).  As explained, Professor Wilcox conducted a "qualitative" survey (Ex. 2 at 73:17–22), the reliability of which Plaintiffs declined to challenge, to "solicit" developers' "assessments, in their own words, on if and how their business could be impacted" in the hypothetical.  Ex. 1 ¶ 14.  The survey's 168 open-ended responses provide "their

---

[14] *LG Elecs.*, 2010 WL 3397358, at *16, *Quidel*, 2019 WL 5328730, at *5–6, and numerous other cases cited above illustrate why drawing conclusions from a qualitative survey, where survey methodology and the relevance of the survey responses themselves are unchallenged, is different than the scientific question of causation, where "conclusions and methodology" involving "extrapolat[ion]" from data may not be "entirely distinct."  *Joiner*, 522 U.S. at 146.

voice" on "how their world might change" under the hypothetical.  Ex. 2 at 202:4–6; Ex. 1 ¶ 35.
The responses plainly are relevant to Google's defense of its compatibility commitments.  This
Court can draw its own conclusions from them, in addition to (or in lieu of) following the guidance
provided by Professor Wilcox's roadmap.  *See Forschner*, 904 F. Supp. at 1426–27.[15]  This is a
corollary of the key point that, because Plaintiffs have "access to the underlying responses," if
"responses were improperly coded," Plaintiffs have "not been prevented from recoding them."
*Schering*, 2000 WL 718449, at *5.

In sum, the Court should reject Plaintiffs' "fit" argument because Professor Wilcox's
coding method was "reasonable."  *Phillips*, 364 F. Supp. 2d at 743–44.  Plaintiffs may quibble
with Professor Wilcox's coding.  But Plaintiffs can make those points, and raise other purported
objections to the survey or conclusions drawn therefrom, during cross-examination at trial.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court deny Plaintiffs'
Motion to Exclude the Expert Testimony of Ronald T. Wilcox.

Dated: January 26, 2023                    Respectfully submitted,

                                           WILLIAMS & CONNOLLY LLP

                                           By: _/s/ John E. Schmidtlein_____
                                           John E. Schmidtlein (D.C. Bar No. 441261)
                                           Kenneth C. Smurzynski (D.C. Bar No. 442131)
                                           Benjamin M. Greenblum (D.C. Bar No. 979786)
                                           Colette T. Connor (D.C. Bar No. 991533)
                                           680 Maine Avenue, SW
                                           Washington, DC 20024
                                           Tel: 202-434-5000

---

[15] So too can Professor Murphy, who cites some of the open-ended responses to illustrate, *inter alia*, "actions" that developers "could take that would lead to reduced supply of apps and/or lower quality apps for the Android Platform" (Ex. 4 ¶ 384), an analysis not dependent on Professor Wilcox's coding.

jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

21