**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ██████████████ |
| Defendant. | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN
EXPERT TESTIMONY OF PROFESSOR RANDOLPH E. BUCKLIN**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

LEGAL STANDARD........................................................................................................ 9

ARGUMENT .................................................................................................................... 10

    A.    The History Of New Advertising Channels Emerging And Of Advertisers Adopting Them Is A Proper Subject For Expert Testimony. ............................... 10

    B.    Increasing Overall Ad Industry Spending Does Not Make History Irrelevant Nor Does It Render Professor Bucklin's Opinions Inadmissible.........12

        1.    The "growing pie" criticism goes to the weight of Professor Bucklin's testimony, not its admissibility..................................................12

        2.    Relative share shifts are relevant, even with a growing pie.....................13

        3.    DOJ Plaintiffs' data critique is incorrect. .................................................15

    C.    Professor Bucklin Can Rely On Industry Scholarship And Data To Form Opinions About Industry Evolution........................................................................16

    D.    DOJ Plaintiffs' Other Cavils Fail........................................................................17

CONCLUSION..................................................................................................................18

## **TABLE OF AUTHORITIES**

### CASES

*Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) ...................................................9, 12, 14

*Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...............................................9, 12, 17

*Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987)...........................10

*Heller v. D.C.*, 952 F. Supp. 2d 133 (D.D.C. 2013) ...................................................................9

*Midamerica C2L Inc. v. Siemens Energy, Inc.*, No. 617-CV-171 -ORL-40-LRH,
     2019 WL 7423523 (M.D. Fla. June 7, 2019).....................................................................10

*Miller v. Holtzmann*, 563 F. Supp. 2d 54 (D.D.C. 2008), *aff'd in part, vacated in
     part, remanded sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr.,
     Inc.*, 608 F.3d 871 (D.C. Cir. 2010)...........................................................................16, 17

*Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183 (D.D.C. 2015) (Jackson,
     J.), *aff'd*, 836 F.3d 57 (D.C. Cir. 2016)..............................................................................14

*Smith v. Strom Eng'g Corp.*, No. CV 2:19-147, 2022 WL 2668556 (W.D. Pa. Apr.
     20, 2022), *report and recommendation adopted sub nom. Smith v.
     Allegheny Techs., Inc.*, No. 2:19-CV-147, 2022 WL 10755425 (W.D. Pa.
     Aug. 1, 2022) ...........................................................................................................10

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945)...........................................10

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) .......................................10

### RULES

Fed. R. Evid. 702 .......................................................................................................9, 16, 17

Fed. R. Evid. 702(b).........................................................................................................16

Fed. R. Evid. 705 ...........................................................................................................17

### MISCELLANEOUS

Catarina Sismeiro & Randolph E. Bucklin, *Modeling Purchase Behavior at an E-
     Commerce Web Site: A Task Completion Approach*, 41 J. Mktg. Rsch., no.
     3, 2004..........................................................................................................................8

Koettsier, John, "1 In 3 Marketers Shifting Ad Spend From Facebook and Google
     to Amazon, Study Says," Forbes, February 6, 2019......................................................8

Oliver Rutz & Randolph E. Bucklin, *Does Banner Advertising Affect Browsing
     for Brands? Clickstream Choice Model Says Yes, For Some*, Quantitative
     Mktg. & Econ, 2012........................................................................................................9

Paul R. Hoban & Randolph E. Bucklin, *Effects of Internet Display Advertising in the Purchase Funnel: Model-Based Insights from a Randomized Field Experiment,*" 52 J. Mktg. Rsch., no. 3, 2015 ........................................................................9

Randolph E. Bucklin, et al., *A Model of Web Site Browsing Behavior Estimated on Clickstream Data*, 40 J. Mktg. Rsch., no. 3, 2003 ........................................................8

Randolph E. Bucklin, et al., *Games of Survival in the US Newspaper Industry* Applied Econ., no. 5, 1989 ....................................................................................8

Randolph E. Bucklin, et al., *Metrics for the New Internet Marketing Communications Mix*, Rev. Mktg. Rsch., 2009 ................................................................8

# INTRODUCTION

DOJ Plaintiffs seek to exclude a small portion of Professor Randolph Bucklin's opinions that describe how advertisers historically have adopted new forms of advertising and changed their spending across those advertising channels.  The bulk of their objections are directed to Professor Bucklin's opinion that advertisers have historically reallocated their spending to new channels and among existing channels, in contradiction to Plaintiffs' contention that search engine advertising does not compete with any other forms of digital or non-digital advertising.  Scholarship and industry data show that as new advertising channels such as radio, television, and digital/internet have emerged, advertisers have shifted spending to take advantage of them — reducing relative spend on older channels and increasing relative spend on newer ones.  In digital advertising in particular, advertising providers like Facebook, and later Amazon and others, have captured an increasing share of digital advertising revenue year over year even though these providers are not considered general search engines.

This historical pattern and the popularity of new advertising alternatives undermine the narrow search engine-related advertising markets alleged by DOJ Plaintiffs and their experts as well as their suggestion that Google is an entrenched monopolist that faces no meaningful competition in sales of search advertising.  DOJ Plaintiffs' market definition is premised in part on the theory that advertisers allocate distinct forms of advertising to distinct stages of a "marketing funnel" (for example "awareness," "consideration," or "conversion"), and do not substitute among them.  The fact that advertisers reduce spending on some advertising channels and increase it on others and that relative spending levels change refutes this "funnel silo" theory, as advertisers attempt to maximize their return on advertising spend by varying their spend among channels.  The overall increasing shares of advertising spend captured by new rival digital

advertising platforms presented by Professor Bucklin show that Google faces meaningful and strengthening competition from Amazon, Facebook, and others, contradicting DOJ Plaintiffs' assertions that those companies are not competitive constraints and that advertisers lack alternatives to reach consumers.

DOJ Plaintiffs' motion asks this Court to exclude all of this undisputed history from the Court's consideration of relevant market and market power issues at trial.  The motion is deficient for numerous reasons.

**Increasing overall advertising spend is not a reason to exclude Professor Bucklin's opinions.**  DOJ Plaintiffs take issue with Professor Bucklin's opinion that advertisers have "shifted" spend from older to newer channels and among channels, arguing that overall increased advertising spend somehow undermines the notion of shifts in spending among channels.  This criticism is incorrect because "new" (or "increased") spending cannot explain all of the share shifts that occurred; in some instances, part of the spend on newer channels must necessarily have come from the older channels.  But most importantly, the criticism misses the point of Professor Bucklin's analysis.  Professor Bucklin does not claim that his analysis of historical, aggregate revenue numbers conclusively shows that any particular individual advertiser moved dollars from one channel to another.  However, the changes in the relative proportion of spend that each channel or provider makes up tend to show that advertisers as a whole are reallocating their resources between and among different channels (including search ads)—and this is unquestionably relevant to substitution based on competition.  The fact that advertisers as a whole change their allocation among advertising channels and the fact that new channels capture an increasing share of ads revenue show substitution whether or not the overall pie is growing.

**The historical advertising trends and data are sufficiently tied to this case.** DOJ Plaintiffs also argue that this advertising spend history does not "fit" the case because Professor Bucklin relied on publicly available scholarship and industry data, rather than documents produced during discovery. It is perfectly legitimate for experts to analyze industry data sources in forming their opinions, and there is no requirement that an expert review only the discovery record before doing so.

Accordingly, the Court should deny DOJ Plaintiffs' motion to exclude portions of Professor Bucklin's testimony.

## BACKGROUND

DOJ Plaintiffs do not allege that Google has engaged in any exclusionary conduct with respect to search advertising. Instead, they contend the challenged conduct that allegedly impacts distribution of Google Search has spillover effects in *advertising markets* and, thus, that alleged monopolization of a search market results in monopolization of search advertising market(s). DOJ Plaintiffs' search advertising market definition arguments depend on the contention that companies overwhelmingly use search advertising for "conversion" purposes and use other types of advertising at different stages of a supposed marketing funnel and, therefore, that search advertising (or general search text advertising) must be a relevant market by itself. DOJ Plaintiffs also allege that Google has monopoly power in these search-advertising markets and, therefore, that popular and rapidly growing advertising platforms like Amazon and TikTok (who primarily sell advertisements that DOJ Plaintiffs would not call "search ads") do not constrain Google's ability to set ad prices.

Professor Bucklin is one of the experts who offers opinions relevant to advertising-side market definition and market power. He is a Professor of Marketing at the UCLA Anderson

3

School of Management, where he holds the Peter W. Mullin Chair in Management.  *See* Ex. 1, Bucklin Initial Report, Appendix A.  He has been on the UCLA faculty for over 30 years.  *Id.*  He holds a bachelor's degree in Economics from Harvard University, a master's degree in Statistics from Stanford University, and a Ph.D. in Business (Marketing emphasis) from Stanford University.  Professor Bucklin has a broad range of experience in working with marketing information and studying the factors that may affect a product's sales.  He has published 37 peer-reviewed research articles and authored five chapters for books, all in the field of marketing.  *Id.* He has also taught many relevant courses, including courses that cover resource allocation methods (mathematical models in marketing and advanced marketing research) and internet customer analytics.  *Id.*

Professor Bucklin offers six primary opinions in this matter:

- Advertising has continually evolved to provide advertisers more alternatives to reach the consumers that they want to reach.  *See* Ex. 1, Bucklin Initial Report ¶ 10. This is the opinion that DOJ Plaintiffs seek to exclude, as discussed further below.

- The "purchase funnel[s]" in the DOJ and States' complaints do not accurately capture the consumer buying experience or its relationship to advertising.  *See id.* ¶ 11.

- DOJ Plaintiffs' and Colorado Plaintiffs' experts do not offer a cohesive view of the stages in the purchase funnel, nor do they agree on the stages at which different types of advertisements are most effective.  *See* Ex. 2, Bucklin Rebuttal Report ¶ 5. Additionally, they offer inconsistent views on the stages where search ads are most effective.  *Id.*  These inconsistencies help to illustrate why the "funnel" constructs

they propose are not useful frameworks for evaluating the degree of substitution between different types of advertisements.  *Id.*

- Evidence from the case record, including evidence cited by Plaintiffs' experts, shows that advertisers characterize consumer purchase behavior as a journey, offer varying descriptions of the mental states and behaviors corresponding to "upper" and "lower" stages of the traditional purchase funnel construct, and describe both search and display advertising as being effective at influencing consumer purchase behavior across the consumer journey.  *See id.* ¶ 7.

- Evidence in the case record, including evidence cited by Plaintiffs' experts, shows that advertisers routinely measure the effectiveness of their advertising with metrics such as ROI (return on investment) and ROAS (return on ad spend).  *See id.* ¶ 8. There is also evidence that it is widespread practice among small and large advertisers to use such metrics in allocating their marketing budgets across different advertising channels to get the best possible results from their marketing spending. *Id.*

- Consumer search queries are not always related to a direct interest in making a purchase and can trigger ads throughout the consumer's journey to purchase.  *See id.* ¶ 9.  Other forms of advertising, in addition to search advertising, work across the consumer journey and can be used to influence consumer purchase behavior. *Id.*  Advertisers therefore use various forms of advertising, such as display ads (including social media ads), to respond to consumers' specific purchase intent and substitute between various types of advertising based on relative measures of ad performance.  *Id.*

The industry history that DOJ Plaintiffs seek to exclude comprises a small part of Professor Bucklin's opinions.  The expert opinions that DOJ Plaintiffs seek to exclude are summarized in Paragraph 10 of Professor Bucklin's opening report:

> Advertisers have long sought to reach relevant consumers with targeted ads that deliver the right information to maximize returns. The on-going evolution of advertising channels and innovations in media technologies have given advertisers new ways to achieve their goals. As the channels available to advertisers have evolved, advertisers have shifted expenditure from older to newer channels and amongst existing channels. This pattern—new channels create new opportunities for advertisers to reach relevant consumers, and advertisers, in turn, shift expenditure to take advantage of them—has occurred again and again. New alternatives for consumers and advertisers continue to arise today. (See Section IV.)

Ex. 1, Bucklin Initial Report ¶ 10; *see also* ECF No. 453 (Pls.' Mot. To Exclude The Expert Test. Of Randolph E. Bucklin & Mem. In Supp. ('Pls.' Mem.')) 2 (moving to exclude Paragraph 10 of Professor Bucklin's opening report as well as Section IV itself (paragraphs 15 through 30) and paragraph 69 (concluding paragraph)).

DOJ Plaintiffs also seek to exclude two exhibits from Professor Bucklin's opening report showing changes in the overall shares of spending on different advertising channels and various leading digital advertising platforms over time:[1]

---

[1] DOJ Plaintiffs also seek to exclude Exhibits 2 and 3 but do not discuss them in their Motion.  *See* Pls.' Mem.







Finally, DOJ Plaintiffs seek to exclude the following footnote from Professor Bucklin's rebuttal

report:

> As I discussed in my Initial report, new digital advertising channels continue to
> arise over time and the share of digital advertising revenue of new entrants, for
> example Facebook and Amazon, steadily increased. *See* Ex. 1, Bucklin Initial

Report ¶ 30. This implies that individual advertisers are reallocating marketing resources to these channels, which has also been observed in advertising practice. *See e.g.*, Patel, Sahil, "Advertisers Love TikTok. Now They're Looking to Double Their Spending on It," The Information, January 21, 2022, https://www.theinformation.com/articles/advertisers-love-tiktok-now-theyre-looking-to-double-their-spending-on-it; Koettsier, John, "1 in 3 Marketers Shifting Ad Spend From Facebook and Google to Amazon, Study Says," Forbes, February 6, 2019, https://www.forbes.com/sites/johnkoetsier/2019/02/06/1-of-3-marketers-shifting-ad-spend-fromfacebook-and-google-to-amazon-study-says/.

Ex. 2, Bucklin Rebuttal Report ¶ 38 n.132; *see also* Pls.' Mem. 2.

Professor Bucklin's opinions on advertising history are based on publicly available information and data, respected monographs, and his own research and expertise.  Indeed, Plaintiffs' experts relied on similar sources.[2]  Professor Bucklin has published several papers relevant to his opinions on the history of advertising and advertiser behavior in these channels. Professor Bucklin's work has, *inter alia*, covered the economics of newspaper advertising (relevant to Ex. 1, Bucklin Initial Report ¶¶ 16-18, 25),[3] the role of websites as an advertising vehicle in the early years of e-commerce (relevant to *id*. ¶ 28),[4, 5] an overview of emerging digital advertising channels (relevant to *id*. ¶¶ 27-29),[6] display ads on websites purchased directly by

---

[2] *See e.g.,* Ex. 3, Appendix H of Initial Report of Kinshuk Jerath, June 6, 2022 (relying on eMarketer data); *see also id*., Initial Report of Kinshuk Jerath ¶¶ 76-82 (relying on, *inter alia*, publications in Forbes, GRIN and Hootsuite); Ex. 4, Initial Report of Michael Whinston, June 6, 2022, ¶¶ 459-471 (relying on eMarketer data); Ex. 5, Rebuttal Report of Michael Whinston, August 5, 2022, ¶ 277 (same).

[3] Randolph E. Bucklin, et al., *Games of Survival in the US Newspaper Industry*, 21 Applied Econ., no. 5, 1989, at 631-649.

[4] Randolph E. Bucklin, et al., *A Model of Web Site Browsing Behavior Estimated on Clickstream Data*, 40 J. Mktg. Rsch., no. 3, 2003, at 249-267.

[5] Catarina Sismeiro & Randolph E. Bucklin, *Modeling Purchase Behavior at an E-Commerce Web Site: A Task Completion Approach*, 41 J. Mktg. Rsch., no. 3, 2004, at 306-323.

[6] Randolph E. Bucklin, et al., *Metrics for the New Internet Marketing Communications Mix*, 5 Rev. Mktg. Rsch., 2009, at 173-192 (Malhotra, Naresh ed.).

advertisers (relevant to *id*. ¶ 28),[7] and cookie-based targeting in display advertising (relevant to *id.* ¶ 29).[8]

Exhibits 1 and 4 to Professor Bucklin's opening report were developed from eMarketer data. Plaintiffs' experts also rely on similar eMarketer data. *See, e.g., supra* note 3.

## LEGAL STANDARD

Rule 702, governing admissibility of expert opinion testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

If a witness is qualified under Rule 702, the remaining analysis centers on "evidentiary reliability and relevancy." *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). The relevance (*i.e.*, "fit") query requires the expertise proffered be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted). "While the way in which reliability is evaluated may vary from case to case, in all cases, the trial judge . . . must find that the proffered testimony is properly grounded, well-reasoned and not speculative before it can be admitted." *Heller v. D.C.*, 952 F. Supp. 2d 133, 140 (D.D.C. 2013) (quotations, citations, and alterations omitted).

---

[7] Oliver Rutz & Randolph E. Bucklin, *Does Banner Advertising Affect Browsing for Brands? Clickstream Choice Model Says Yes, For Some*, 10 Quantitative Mktg. & Econ, 2012, at 231-257.

[8] Paul R. Hoban & Randolph E. Bucklin, *Effects of Internet Display Advertising in the Purchase Funnel: Model-Based Insights from a Randomized Field Experiment*," 52 J. Mktg. Rsch., no. 3, 2015, at 375-393.

**ARGUMENT**

**A.     The History Of New Advertising Channels Emerging And Of Advertisers Adopting Them Is A Proper Subject For Expert Testimony.**

Professor Bucklin opines that the history of the advertising industry shows a pattern of new advertising methods emerging and advertisers adopting those channels and spending an increasing portion of advertising dollars on those new channels.  For example, as radio advertising emerged, that format took share from newspaper advertising; later, TV emerged and became the most popular channel.  These shifts are due, in part, to the new attributes and targeting capabilities that each new format offered.  He also opines that this same pattern is being borne out today, with the emergence and rapid adoption of new digital advertising platforms beyond traditional search engine advertising.

The advertising industry's history is a proper subject for expert testimony and will help the Court understand the context for and dynamics behind the parties' arguments regarding advertising market definition and market power.  The history of advertising is "not widely known" but is very much "relevant to the central issues in this case."  *Smith v. Strom Eng'g Corp.*, No. CV 2:19-147, 2022 WL 2668556, at *5 (W.D. Pa. Apr. 20, 2022) (denying motion to exclude expert testimony on the background and history of the strike-staffing industry), *report and recommendation adopted sub nom. Smith v. Allegheny Techs., Inc.*, No. 2:19-CV-147, 2022 WL 10755425 (W.D. Pa. Aug. 1, 2022); *see also Midamerica C2L Inc. v. Siemens Energy, Inc.*, No. 617-CV-171 -ORL-40-LRH, 2019 WL 7423523, at *4 (M.D. Fla. June 7, 2019) (denying motion to exclude expert testimony regarding history of the gasification industry).  To say, as DOJ Plaintiffs do, that the history of advertising is irrelevant *in a case where they claim that advertising markets have been harmed*, is absurd on its face.  *See, e.g., Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) ("the strength of the competition, the probable development of the industry, the

barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand" are all potentially relevant to an analysis of alleged monopolization); *see also, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 598-605 (1957) (Section 2 opinion tracing history of automotive finishes industry); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 421-24 (2d Cir. 1945) (Section 2 opinion tracing history of aluminum industry).

Notably, DOJ Plaintiffs also seek to use industry history where they believe it suits them. For example, DOJ's Complaint includes an entire section titled "industry background," (Compl. ¶¶ 19-87, ECF No. 1) and DOJ's expert economist Professor Michael Whinston devotes four pages of his opening report to "trends in digital advertising." Ex. 4, Initial Report of Michael Whinston ¶¶ 296-300.

The history of digital advertising is relevant because one aspect of this case is whether other forms of digital advertising compete with search advertising for advertiser spend, either in the aggregate or for particular advertisers seeking to advertise particular products. The fact that advertising channels change in importance over time illustrates the dynamic nature of the market — and should be considered by the Court in evaluating the presence and durability of any alleged market power and the ability of new firms to emerge and capture share.

The emergence and adoption of new advertising channels, and particularly channels that provide new ways to reach interested consumers, bear directly on one of Plaintiffs' arguments regarding the relevant market. Plaintiffs argue that advertisers do not meaningfully substitute between search advertising and other forms of advertising because each advertising format has a distinct place in a "marketing funnel" and is used for distinct purposes. In other words, Plaintiffs contend that advertising channels are each used only for distinct phases of an idealized consumer buying process. Professor Bucklin's analysis of the advertising industry's history is one of the

many things that refutes that contention.  In the past, new channels emerged, providing new ways to reach potential consumers.  Advertisers took advantage of these new channels and their new capabilities to reach those consumers most likely to be interested in their products and began to spend relatively more on new channels than old ones.  This directly undermines Plaintiffs' contention that advertisers rigidly assign channels to "funnel stages" and never/rarely substitute between them.

 **B.** **Increasing Overall Ad Industry Spending Does Not Make History Irrelevant Nor Does It Render Professor Bucklin's Opinions Inadmissible.**

 DOJ Plaintiffs' main substantive argument is that the history of advertisers shifting and reallocating their advertising expenditures from older to newer and emerging channels is either immaterial or unsupported by the data.  DOJ Plaintiffs dispute that a drop in channel A's share and an increase in channel B's share reflects a "shift" of advertising dollars from A to B because the shift could be explained by an increase in overall spending for both channels A and B ("growing [the] pie").  Pls.' Mem. 12.

 **1.** **The "growing pie" criticism goes to the weight of Professor Bucklin's testimony, not its admissibility.**

 DOJ Plaintiffs do not dispute the accuracy of the underlying materials and data on which Professor Bucklin relied, nor do they dispute that the relevant changes in shares occurred. Professor Bucklin's approach in assessing changes over time is valid, and this should end the *Daubert* inquiry.  *See Ambrosini*, 101 F.3d at 140 ("*Daubert* instructs that the admissibility inquiry focuses not on conclusions, but on approaches.").  Nonetheless, DOJ Plaintiffs' motion disputes the conclusion to be drawn from these changes in overall shares.  Professor Bucklin opined that this history shows advertisers reallocating their ad spending among channels, whereas DOJ Plaintiffs argue that Professor Bucklin failed to consider that overall ad spend was increasing.  Pls.' Mem. 13.  Even if valid, DOJ Plaintiffs' observation would be an avenue for cross-examination,

not a basis for exclusion.[9]  The crux of DOJ Plaintiffs' argument appears to be that Professor Bucklin's opinion does not include an analysis of advertising demand cross-elasticities. *Id.* ("Prof. Bucklin would need more evidence (an econometric analysis, for example) to eliminate the more likely inference that historically more money is being spent on advertising."). But Professor Bucklin is not an expert economist offering an affirmative opinion that a particular relevant market exists.  Professor Bucklin is an expert in marketing.  Shifts in overall advertising spend shares are relevant to his analysis, which primarily concerns the purposes for which advertisers use different advertising channels.

The fact that overall ad spend grew does not disprove the share shifts that Professor Bucklin observed.  Moreover, contrary to DOJ Plaintiffs' suggestion, Professor Bucklin *did* consider that advertising spending increased in the aggregate over the relevant time periods.   Professor Bucklin's backup materials show the same facts DOJ Plaintiffs claim he ignored.

### 2.    Relative share shifts are relevant, even with a growing pie.

To the extent that DOJ Plaintiffs argue that Professor Bucklin has no basis to conclude that shifts in share mean that advertisers reallocated their marketing resources, that criticism is incorrect.   Their attempt to discount the import of Professor Bucklin's conclusion is also misplaced.  A change in the shares of two advertising channels means that advertisers on the whole have reallocated their total resources and changed their priorities — this is true whether total spending went up, down, or stayed the same.  The point is that the importance of each channel has

---

[9] The case law relied upon by DOJ Plaintiffs concerns medical experts offering causation opinions. *See* Pls. Mem. 13.  In cases where an expert is opining as to the sole cause of an illness, a complete failure to consider obvious alternative explanations may render the expert's opinion unreliable. That is not remotely analogous to Professor Bucklin's opinions here.

changed relative to the other, and this shows that advertisers do not spend in fixed proportions to some "marketing funnel" and that new channels have become attractive options for advertisers.

These share changes are clearly relevant to this case. For one thing, the relative proportion of spend on different channels and changes over time can inform the likelihood of substitution across channels. "[T]he advertiser, looking across the landscape, is allocating its spending, in other words, it's – an advertiser will think in terms of its total budget and its allocation. And its allocation has shifted, which is represented by the share." Ex. 6, Bucklin Dep. 216:15-216:21, ECF No. 420-3. If advertisers spent over 65% of their dollars on newspapers in 1935 but just 2% in 2020, spend has plainly shifted to other channels. The argument that this does not account for overall ad spend growth and that the gross newspaper dollars might even be higher in 2020 (ignoring inflation) misses the point entirely. As Exhibit 1 to the Bucklin Initial Report demonstrates, there are now more channels for advertising; and advertisers are shifting spend from older channels to newer channels. *See* Ex. 7, Backup to Exhibit 1 of Bucklin Initial Report (produced June 13, 2022), ECF No. 420-4 ("Ex. 7, Exhibit 1 Backup"). If DOJ Plaintiffs contend that this is not a "shift," they can do so during cross-examination. Moreover, the fact that the overall pie is generally increasing demonstrates yet another weakness of DOJ Plaintiffs' case. Antitrust law favors increased output. It does not condemn it.

DOJ Plaintiffs also argue that aggregate share shifts do not conclusively prove that any individual advertiser took dollars from one channel and spent them on another. That observation is true, but beside the point. "[A] court may not exclude an expert's otherwise reliable and relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's *entire* case." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 198 (D.D.C. 2015) (Jackson, J.), *aff'd*, 836 F.3d 57 (D.C. Cir. 2016). Nor do DOJ Plaintiffs need to be convinced that Professor

14

Bucklin's opinion is persuasive for it to be admissible.  *See Ambrosini*, 101 F.3d at 135 ("[E]vidence does not warrant exclusion simply because it fails to establish the causal link to a specified degree of probability.").  DOJ Plaintiffs insinuate that Professor Bucklin should have performed some quantitative analysis of substitution.  However, Professor Bucklin is not an antitrust economist and is not offering an affirmative relevant market opinion.  He is an expert in marketing, testifying regarding advertisers' historical behaviors, all of which are relevant to questions of substitution and the alternatives that advertisers actually use in practice.

### 3.     DOJ Plaintiffs' data critique is incorrect.

Finally, DOJ Plaintiffs are simply wrong on the data.  Contrary to DOJ Plaintiffs' unsupported suggestion, the increases in various channels' and platforms' shares *cannot* all be explained by an influx of "new" spending.  *See* Pls. Mem. 13.  For example, in 2020, digital advertising spending increased relative to the previous year by $20.3 billion — much more than advertising spending increased overall ($0.4 billion).  *See* Ex. 7, Exhibit 1 Backup.  This means that in 2020 (and other years as well), some of the share shift to digital advertising cannot be explained by an increase in overall spend.  Moreover, in many of the years reflected in Professor Bucklin's analysis, total ad spending is increasing, but spending on a particular channel or platform is decreasing.  In other years, total ad spending is decreasing, but spending on a particular channel or platform is increasing.  In these years, changes in the size of the overall "pie" cannot explain changes in the shares of these channels or platforms.  *See* Pls. Mem. 12.  For example, while ad spend on all channels decreased from $192.7 billion in 2007 to $176.5 billion in 2008 (as a result of the financial crisis), *see* Ex. 7, Exhibit 1 Backup, at 12; *see also* Pls.' Mem. 11 n.12 (noting decrease in ad spending from 2007-2009), ad spend on *digital* advertising nonetheless increased from $21.2 billion in 2007 to $23.6 billion in 2008. *See* Ex. 7, Exhibit 1 Backup, at 12.  Certainly, in that year, increased spend on digital advertising cannot be explained by an increase in overall

spend; instead, it must have come "at the cost of older forms of advertising." *Contra* Pls.' Mem. 10. Notably, DOJ Plaintiffs do not support their "growing [the] pie" criticism (Pls.' Mem. 12) with any technical or expert analysis, and none is present in their experts' reports. That is because it is not actually borne out by the data.

### C. Professor Bucklin Can Rely On Industry Scholarship And Data To Form Opinions About Industry Evolution.

DOJ Plaintiffs argue that Professor Bucklin's opinion does not "fit" this case because he relied on publicly available scholarship and data, rather than confidential business records and data discovered during the course of this litigation. Pls.' Mem. 13. They argue that, because Professor Bucklin's opening report's passages about the history of the advertising industry were not based on the discovery record of this case, any context surrounding the advertising industry is "not tied to the facts of this case" and will not "assist the Court in resolving any relevant factual disputes." Pls.' Mem. 1. This is no reason to exclude testimony regarding the background and history of the relevant industry.

Professor Bucklin's opinion is based on "sufficient facts or data." Fed. R. Evid. 702(b). DOJ Plaintiffs do not contend that the academic work, industry data, and extensive experience that Professor Bucklin relies on are somehow insufficient or unreliable. Nor have DOJ Plaintiffs cited a single rule or case that requires an expert to review and rely only upon the discovery record before explaining the *history* of an industry, with which the expert is intimately familiar and where publicly available statistical information is available. In fact, the Advisory Committee's Notes to Rule 702 specifically contemplate that an expert "might instruct the factfinder" on general principles "without ever knowing about or trying to tie their testimony into the facts of the case." Fed. R. Evid. 702 advisory comm. note to 2000 amendment.

DOJ Plaintiffs make the same error here as the defendants in *Miller v. Holtzmann*, 563 F. Supp. 2d 54, 90 (D.D.C. 2008), *aff'd in part, vacated in part, remanded sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010). In that case, the defendants argued that an expert economist's testimony was inadmissible because he did not review or know the facts of the case. *Id.* at 89-90. The court rejected that argument, ruling that "so long as [the expert's] testimony satisfied Rule 702's other requirements, it was properly admitted regardless of whether he reviewed facts particular to this case." *Id.* at 90. The same is true of Professor Bucklin's opinions regarding industry history. Here, however, Professor Bucklin also extensively reviewed the case record, as his second and third reports demonstrate.

### D.   DOJ Plaintiffs' Other Cavils Fail.

DOJ Plaintiffs attempt to buttress their relevance attack by claiming that "even if these patterns had happened in the past, there is no basis to conclude they are happening here." Pls.' Mem. 9-10. This criticism belongs in cross-examination or closing argument, not a *Daubert* motion. Professor Bucklin *does* provide reason to think that advertising history is informative. After providing a necessary historical background, Professor Bucklin analyzed the record in this case and demonstrated that historical trends of shifting spend among different ad channels continue today. *See, e.g.,* Ex. 2, Bucklin Rebuttal Report ¶¶ 34-38; *see also* Ex. 8, Bucklin Reply Report ¶¶ 16, 17, 19, nn.25, 26, 32.

Finally, DOJ Plaintiffs seek to exclude the uncontroversial statement that "new alternatives such as video focused social media platforms (e.g., TikTok), connected television (e.g., Roku), and influencer marketing via social media have continued to emerge." Pls.' Mem. 14. DOJ Plaintiffs argue that this particular statement "provides no expert analysis that would help the Court," and suggest that a lay witness could say the same thing. *Id.* While it is true that the dramatic rise of TikTok, Roku and influencer marketing are facts, Professor Bucklin may provide

the factual basis and relevance of these facts to his opinions.  Fed. R. Evid. 705.  No one contends this statement is unreliable or that the facts are inadmissible.  The import of these facts, *i.e.*, that advertisers increasingly adopt these new alternative channels, is the proper subject of expert opinion and should not be excluded.

## CONCLUSION

For the above reasons, Google respectfully requests that this Court deny DOJ Plaintiffs' Motion to exclude certain limited aspects of Professor Bucklin's proffered expert opinions.

Dated: January 26, 2023                          Respectfully submitted,

                                                 WILLIAMS & CONNOLLY LLP

                                                 By:  */s/ John E. Schmidtlein*
                                                 John E. Schmidtlein (D.C. Bar No. 441261)
                                                 Kenneth C. Smurzynski (D.C. Bar No. 442131)
                                                 Benjamin M. Greenblum (D.C. Bar No. 979786)
                                                 Colette T. Connor (D.C. Bar No. 991533)
                                                 680 Maine Avenue, SW
                                                 Washington, DC 20024
                                                 Tel: 202-434-5000
                                                 jschmidtlein@wc.com
                                                 bgreenblum@wc.com
                                                 cconnor@wc.com

                                                 WILSON SONSINI GOODRICH & ROSATI P.C.
                                                 Susan A. Creighton (D.C. Bar No. 978486)
                                                 Franklin M. Rubinstein (D.C. Bar No. 476674)
                                                 Wendy Huang Waszmer (D.C. Bar No. 1631078)
                                                 1700 K Street, NW
                                                 Washington, DC 20006
                                                 Tel: 202-973-8800
                                                 screighton@wsgr.com
                                                 frubinstein@wsgr.com
                                                 wwaszmer@wsgr.com

                                                 Justina Sessions (admitted *pro hac vice*)
                                                 One Market Plaza
                                                 Spear Tower, Suite 3300

San Francisco, CA 94105
Tel: 415-947-2000
jsessions@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

19