## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF EDWARD A. FOX**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION..................................................................................................................... 1

BACKGROUND...................................................................................................................... 3

ARGUMENT.......................................................................................................................... 13

I.     Professor Fox is Eminently Qualified to Conduct an Experiment Testing the Impact of the
       Scale of User Interaction Data on Search Quality.................................................................14

II.    Professor Fox's Finding that the Volume of User Interaction Data has a Limited Effect on
       the Quality of Commercial Search Engines is Relevant to the Issues in the Case.................16

III.   Professor Fox's Opinions Are Reliable...............................................................................19

   A.    Professor Fox Directed the Experiment........................................................................ 22

      1.    Professor Fox Led the Design of the Experiment........................................................22

      2.    Professor Fox Oversaw the Implementation of the Experiment...................................25

      3.    Professor Fox Incorporated Multiple Internal Cross-Checks to Confirm the
            Experiment's Reliability............................................................................................ 29

      4.    Professor Fox Validated the Rigorousness of the Experiment.................................... 32

   B.    That the Experiment Tested the Performance of Google's Proprietary Systems is No
         Impediment to Admissibility........................................................................................ 33

CONCLUSION.......................................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) ............................................................17

*City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036 (9th Cir. 2014) ........................................34

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) ....................................................................27

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).................................................. passim

*Dueker v. CSRT Expedited Inc.*, 2020 WL 7222095 (C.D. Cal. Dec. 7, 2020) ............................36

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002)..............................27

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................................13, 17

*Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273 (S.D. Ga. 2018)...................................36

*Holcombe v. United States,* 516 F. Supp. 3d 660 (W.D. Tex. 2021)..............................................17

*In re Celexa & Lexapro Prods. Liab. Litig.,* 927 F. Supp. 2d 758 (E.D. Mo. 2013)....................18

*In re Dicamba Herbicides Litig.*, 2019 WL 6340260 (E.D. Mo. Nov. 27, 2019) ........................37

*In re EpiPen Mktg., Sales Practices & Antitrust Litig*, 44 F.4th 959 (10th Cir. 2022) ................18

*In re Ondova Ltd.*, 2012 WL 5879147 (Bankr. N.D. Tex. Nov. 21, 2012) ...................................39

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) ............................................18

*In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2022 WL 17480906 (S.D. Fla. Dec. 6, 2022)........27

*Jackson v. Colgate-Palmolive Co.*, 2019 WL 3603547 (D.D.C. Aug. 6, 2019)...........................36

*Korsing v. United States*, 2017 WL 7794276 (S.D. Fla. Aug. 16, 2017) ....................................36

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...........................................................13, 14

*Lorraine v. Markel American Insurance Co.*, 241 F.R.D. 534 (D. Md. 2007).............................39

*McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30 (D.D.C. 2004) .....................28

*Meyer v. Bayerische Motoren Werke AG*, 2022 WL 3566748 (W.D. Wash. Aug. 18, 2022) .............................................................................................................................28

*Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464 (S.D.N.Y. 2004)................................18

*State v. Pickett*, 246 A.3d 279 (N.J. Super. App. Div. 2021) .......................................................39

*Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856 (N.D. Cal. May 22, 2008) ................................................................................................................27, 28

*TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722 (10th Cir. 1993).....................................27

*Trubridge, L.L.C. v. Tyrone Hospital*, 2020 WL 3105424 (S.D. Ala. Apr. 24, 2020) .................36

*United States ex rel. Schmuckley v. Rite Aid Corp.*, 2020 WL 3970201 (E.D. Cal. July 14, 2020) ...............................................................................................................34, 38

*United States v. Bynum*, 3 F.3d 769 (4th Cir. 1993) .....................................................37

*United States v. Chiaradio*, 684 F.3d 265 (1st Cir. 2012) ............................................38

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ...............................................27

*United States v. Gissantaner*, 990 F.3d 457 (6th Cir. 2021)...........................34, 35, 38

*United States v. Hebshie*, 754 F. Supp. 2d 89 (D. Mass. 2010).....................................36

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ....................................................27

*United States v. Mitchell*, 365 F.3d 215 (3d Cir. 2004) .........................................34, 36

*United States v. Morgan*, 292 F. Supp. 3d 475 (D.D.C. 2018), *aff'd*, 45 F.4th 192 (D.C. Cir. 2022) .................................................................................................................37

*United States v. Morgan,* 45 F.4th 192 (D.C. Cir. 2022)...................................... passim

*United States v. Nelson*, 533 F. Supp. 3d 779 (N.D. Cal. 2021).....................................38

*United States v. Springstead*, 520 F. App'x 168 (4th Cir. 2013)....................................38

*Washington v. Boudreau*, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022).........................28

*Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005)......................35

## OTHER AUTHORITIES

Fed. R. Evid. 702 ................................................................................................ passim

Fed. R. Evid. 703 ...................................................................................22, 27, 28

# INTRODUCTION

Plaintiffs contend that "scale," by which they mean some unspecified minimum amount of data from users' interactions with a search engine, is necessary for a general search engine rival to provide a "quality search experience" and "compete effectively" with Google. *See* No. 1:20-cv-03010, ECF No. 94 (DOJ Pls.' Am. Compl.) ¶¶ 8, 95; No. 1:20-cv-03715, ECF No. 1-2 (CO Pls.' Compl.) ¶ 91. Plaintiffs' assertion—as DOJ's rebuttal computer-science expert Professor Douglas Oard concedes—is a testable one. Indeed, Professor Oard opines that without testing, he cannot determine the validity of Plaintiffs' allegation that Google's rivals would benefit from additional scale such that competition would be enhanced. Ex. 5, Excerpts of the Deposition of Douglas Oard (Oct. 24–25, 2022) at 60:7–64:10.

Such an experiment is exactly what Google's counsel asked Professor Edward Fox to design (even though Google does not have the burden of proof on any issue related to search engine scale). In particular, Professor Fox designed and oversaw the implementation of a "data reduction experiment" (or "DRE") that compared the quality of the search results produced on Google's search engine between (1) a version trained using the volume of data that Google uses in the ordinary course of business and (2) versions trained using reduced data volumes, including one approximating the volume of data Microsoft has available. The experiment confirms that there are diminishing search quality returns from user interaction data—a phenomenon well-known in the industry and one that has become even more pronounced in recent years with continued advancements in machine learning technology. The experiment further demonstrates that the vast majority of the significant search result quality gap between Google and Microsoft is unrelated to their respective volumes of user interaction data. Faced with these devastating results, Plaintiffs have moved to exclude all evidence of this experiment and Professor Fox's testimony related

1

thereto.  In their desperation to do so, Plaintiffs misstate the factual record, rely on inapposite cases, and fail to bring relevant D.C. Circuit precedent to the Court's attention.

It is undisputed that Professor Fox possesses the requisite qualifications to have designed the data reduction experiment.  Plaintiffs instead attack Professor Fox's opinions as being irrelevant and unreliable.  His opinions are neither.

The attack on the experiment's relevancy is particularly odd given DOJ's expert's own suggestion that an experiment would be useful here and the opinions he himself offers which are based on the results of Professor Fox's experiment.  And in all events, the experiment addresses what is unquestionably an issue raised by Plaintiffs' Complaints:  Is it Google's greater scale that accounts for its superior quality, or other factors (like, say, its extraordinary innovation and investment)?  The experiment's results also address the extent to which a modern commercial search engine at Microsoft's scale would benefit from additional user interaction data by comparing models trained on Microsoft's level of data to those with (1) twice the mobile volume and (2) the same volume as Google.  The results, which show minimal benefit from additional user interaction data, are unquestionably relevant.

Plaintiffs' principal reliability attack is premised upon the mistaken assertion that Professor Fox was uninvolved with the experiment.  To read Plaintiffs' brief, one would think that Professor Fox sat back, received the results from Google engineers, and issued a cursory blessing.  Not so.  In fact, in advance of the experiment being run, Professor Fox spent over 200 hours on the design of the experiment, and hundreds of hours more supervising its implementation and reporting its results.

Plaintiffs also argue that the experiment is inherently unreliable because it involved Google's proprietary systems, and thus cannot be replicated by Plaintiffs.  The cases Plaintiffs cite

do not in fact stand for that proposition. Even more devastatingly for Plaintiffs, a number of courts, including the D.C. Circuit, *United States v. Morgan,* 45 F.4th 192 (D.C. Cir. 2022), have blessed expert testimony that relies on proprietary software that cannot be accessed by an adversary.

The Court should reject Plaintiffs' effort to exclude Professor Fox's opinions.

## BACKGROUND

Professor Edward Fox is a world-renowned computer scientist with over half a century of experience in academia and industry. Since September 1983, he has been a professor at Virginia Polytechnic Institute & State University, better known as Virginia Tech, where he holds appointments in the Department of Computer Science and the Department of Electrical and Computer Engineering. Professor Fox specializes in the field of information retrieval. Information retrieval concerns processes and techniques for obtaining information in response to an "information need." Ex. 1, June 3, 2022 Expert Report of Edward A. Fox at 8. Information retrieval has many applications, but in the context of the internet, it is the academic discipline underlying online search. In that respect, it is foundational to what a search engine does, forming "[t]he science surrounding search engines." *See Information Retrieval and the Web*, GOOGLE RESEARCH, https://research.google/research-areas/information-retrieval-and-the-web/ (last visited Jan. 24, 2023).

Professor Fox's expertise lies at the intersection of computer science and information retrieval; as relevant here, he has particular experience in machine learning, deep learning, and natural language processing. *See* Ex. 1 at 3. He is a Fellow of the Association for Computing Machinery ("ACM"), the world's leading learned society dedicated to advancing the science of computing. *See id.*; *About the ACM Organization*, ASSN. FOR COMPUTING MACH., https://www.acm.org/about-acm/about-the-acm-organization (last visited Jan. 24, 2023). He has served as the chairman of its prestigious Special Interest Group on Information Retrieval

3

("SIGIR"), which, for the past sixty years, has promoted the research and development of search and other information-access technologies. *See* Ex. 1 at 3; *About*, SIGIR, https://sigir.org/general-information/about/ (last visited Jan. 24, 2023). His work has impacted not just academic study but industry too. He has collaborated with industry groups (including Microsoft), has received numerous grants (including from IBM, Microsoft, and the federal government), and has instructed a generation of computer scientists employed by industry-leading technology companies. *See generally* Ex. 1, App. B.

Through counsel, Google retained Professor Fox to "test the extent to which Google's search quality is affected by the volume of user interaction data available to train its ranking algorithms." *Id.* at 5. To that end, Professor Fox designed what is known as a "data reduction experiment." The experiment is described at greater length below, but can be summarized as follows: Google's search engine uses many different algorithms to generate search results. Some, but not all, of those algorithms are "trained" with data accumulated from past user search sessions.[1] A data reduction experiment "retrains" those algorithms with smaller volumes of data. The search results generated by the original version and the retrained version can then be evaluated by human raters to determine how (if at all) search quality has changed. A data reduction experiment uses the same basic tools as standard industry testing: search engine companies commonly conduct tests where human raters evaluate search results that have been generated by systems that have been altered in some fashion, to test potential improvements and other changes to the systems. *See, e.g., Improving Search with Rigorous Testing,* GOOGLE SEARCH, https://www.google.com/search/howsearchworks/how-search-works/rigorous-testing/ (last

---

[1] User interaction data is, at times, referred to as "click-and-query" data, although it involves more than recorded queries and resulting clicks.

visited Jan. 24, 2023); ████████████████████████████████████████████

████████████   At times, such experiments will remove (or "ablate") search components in their

entirety in an effort to determine their impact on search quality.  *See, e.g.*, Ex. 2, Oct. 10, 2022

Reply Expert Report of Edward Fox ¶ 94; *see also, e.g.*, *Improving Search with Rigorous Testing*,

*supra*.

Professor Fox spent over 200 hours across several months planning the experiment.  Ex. 3,

Excerpts of the Deposition of Edward Fox (Nov. 14–15, 2022) at 65:2–15.  The experiment design

was sophisticated.  It involved comparing the quality of Google's search results across three

different volumes of user interaction data.  The first is a "Low Mobile" random sample that

corresponds to the amount of data available to Microsoft.  Ex. 1 at 49.  The second is a "High

Mobile" random sample that corresponds to a hypothetical where Microsoft's mobile query

volume in the United States is doubled.  *Id.* at 50.  The third is a "frozen" version of Google's

search engine trained with 100% of the data ordinarily used.  *See id.*  The reason Professor Fox

chose a "frozen" 100% sample is to avoid comparing the Low Mobile and High Mobile samples'

search results (which are static) with results drawn from the live version of Google's search engine

(which reflects constant updates).  As he explains, that approach "allow[s] for an apples-to-apples

comparison to the reduced size samples."  *Id.*

Professor Fox ensured the experiment retrained "the most important ranking components

that would be changed by retraining, *i.e.*, the ones with the largest effect on the search results that

are ranked and displayed."  *Id.*, App. A at 5.  In general terms, machine learning involves training

a piece of software to make useful predictions from data.  The software that makes the predictions

is often called a "model."[2]  Machine learning models can be trained on a variety of data.  For example, a model that predicts rainfall could be trained on historical weather data.  Google uses a number of different machine learning models to predict which search results would be most relevant to a user's query, and to rank the results accordingly.  Some—although not all—of the machine learning models are trained on data about users' interaction with Google's search engine results.  As Professor Fox explains, it is with respect to ranking models that one would expect user interaction data to prove most useful.  *See* Ex. 2 ¶ 4(4).  Even there, however, ████████████ ████████████████████████████████████████████████████████.  *See, e.g.*, Ex. 1 at 46; Ex. 2 ¶ 20 n.56.  The six ranking components that were retrained in the experiment are identified and described in Table 1 of Appendix A to Professor Fox's report.  Ex. 1, App. A. at 5–6.

As a check on the selection of the most important ranking components, Professor Fox directed an analysis of the extent to which Google's ranking of search results is dependent on the six components that were retrained.  *Id.*, App. A at 7.  Table 2 of his Appendix identifies the ████ ████ most impactful signals in the ranking of search results—defined as those that have an impact greater than or equal to ██████—and, for each signal, calculates its impact on ranking and identifies (1) whether it uses user interaction data and (2) whether it uses one of the six retrained components.  *Id.*, App. A at 8–10.  The calculations in Table 2 thus allow for a computation of the impact of those signals with an impact of at least ██████ that *do* use user interaction data for ranking but that were *not* retrained.  The result was less than ████; stated in the reverse, the retrained components combined with components that do *not* use user interaction data (and thus could not affect quality

---

[2]    *See, e.g.*, *What is Machine Learning?*, Google Developers, https://developers.google.com/machine-learning/intro-to-ml/what-is-ml (last visited Jan. 24, 2023).

based on the volume of user interaction data) account for over ██ of the impact of the signals that affect ranking at Google.  Ex. 1 at 6 & App. A at 8–10.  As Professor Fox explains in his report, "Given that any additional component was likely, on its own, to have a negligible effect on ranking, and given that retraining additional components was likely to take a considerable amount of time and to require a significant amount of computationally expensive resources, I concluded that retraining additional components was not necessary."  *Id.* at 8.

Professor Fox next selected which "querysets" would be used to generate search results that in turn would then be graded.  Professor Fox understood that Google maintains "querysets" for experimentation in the ordinary course.  *Id.* at 51–52.  These querysets are predefined collections of queries used to evaluate Google's ranking, which Google uses when vetting significant and high-stakes business decisions.  Professor Fox thus found them to be an appropriate tool for evaluating search quality.  *See id.* at 52–53.  Professor Fox directed the use of the three ███ querysets within Google that are ██████████████████████.  One queryset—██████████████████████████████████ *See id.* at 52 & App. A at 15.  ██████████████ ██████████████ *Id.*, App. A at 15.  ████████████████████ ████████████████████████████████████ *See id.* at 59–60 & App. A at 15.  The second—called the ████ ████████████████████████████████████ *See id.* at 52 & App. A at 15.  ████████ ████████████████████████████████. *Id.*  The third— called the ██████████████████████████ ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████

With the querysets identified, Professor Fox had to select a methodology to grade the results for each query in the three querysets. For that, he chose human raters who graded the results, blind to how they had been generated. As his report recounts, Google has long used human raters to vet potential changes to Google Search and to measure Google's performance relative to its competitors. Google maintains publicly available guidelines for human raters to follow, so their assessments will be systematic and of high quality. *See id.* at 36, 53. To aggregate the individual ratings into a usable measure, Professor Fox needed a quality metric. To be thorough, he chose four. Two of those metrics—███████████████—came from ██████████████████████ ████████████████ *See id.* at 35. The other two—discounted cumulative gain ("DCG") and normalized discounted cumulative gain ("NDCG")—are metrics that Microsoft used. *Id.* at 39.

To operationalize his experiment, Professor Fox worked with engineers from Google. That included consulting with Google search engineers to inform the design of the data reduction experiment. In particular, Professor Fox conferred with Google personnel to ensure that the experiment "would be as robust as possible and encompass as many machine learning models as possible." *Id.* at 49. Additionally, Professor Fox relied on Google engineers to execute the mechanical tasks associated with running the data reduction experiment. For example, acting at Professor Fox's direction, and following standard procedures, Google engineers initiated the process whereby the Low Mobile, High Mobile, and 100% samples were used to retrain the selected machine learning models. *See id.* at 48–49.

Across the various querysets and metrics, the results were consistent. Each showed that—at most—only minor diminutions in quality resulted from retraining Google's models with substantially lower amounts of user interaction data. *Id.*, App. A at Tables 7–19. To provide additional context for his results, *i.e.*, to show how the diminution in quality compared to Google's overall quality relative to its competitors, Professor Fox also included a comparison of search quality metrics for Google's live search results with Bing's. That comparison drew from Google's ordinary course process of carefully instructed human raters retained to assess Google's search quality relative to Bing's. *Id.*, App. A at 11–13 and Figures 1–2. The comparison from Winter and Spring 2022 is consistent with Google's finding on prior occasions, and reflects that Google's results are consistently of higher quality than Bing's. *See id.*

Notably, the Google-Bing quality gap far exceeds the quality drop that resulted from retraining Google's ranking components with less user interaction data. Across repeated measurements, human rater results show that Google's search quality exceeded Bing's by ███████

███████████. *See, e.g.*, *id.*, App. A at 12. As the chart below illustrates, that is far larger than the measured quality diminution associated with the Low Mobile and High Mobile samples:

9



*Id.*, App. A at 21.   The above chart thus shows that the quality drops associated with the Low

Mobile and High Mobile samples were far less than ███████████, whereas Google's quality

exceeded Bing's by ████████████.   Indeed, as the below chart shows, irrespective of

the choice of queryset ████████████████████ or sample (*i.e.*, "100%,"

"High Mobile," or "Low Mobile"), the results showed that Google—even in a data-reduced

setting—bested Bing by a wide margin:



*Id.* at 55.[3] When the analysis was limited to longtail queries, Google in data-reduced form continued to beat Bing by ██████████████ :



---

[3] The graphic depicted above uses ████████████████████. The results were similar when using NDCG.  Ex. 1 at 51.

*Id.*, App. A at 30.[4]  To provide statistical rigor to his results, Professor Fox repeatedly provided 95% confidence intervals and *p*-values alongside his measured results.  *See id.*, App. A, at 14.

The results were, in Professor Fox's words, "very definitive."  Ex. 3 at 99:3–4.  From them, he concluded that "[t]here are diminishing search quality returns for an increase in log data scale." Ex. 1 at 7.  He further concluded that the data reduction experiment "suggests that Microsoft is already at a scale where the benefit to search quality of additional click-and-query volume would be small for a search provider with Google's technology."  *Id.*  Consistent with those observations, he also concluded that "the vast majority of the quality 'gap' between Google and Microsoft's search results must be explained by factors other than the amount of available click-and-query data."  *Id.*  Professor Fox further concluded that "[t]his experiment demonstrates that even without changing its methods to compensate for having less data, Google would maintain a considerable search quality lead over Microsoft even with greatly reduced click-and-query data."  *Id.* at 7–8. Or, put differently, he concluded that if a search engine with technology equal to or exceeding that of Google increased its user interaction data volume to Google's level, its quality level would not meaningfully increase.  *E.g.*, *id.* at 61.

After receiving Professor Fox's opening report, DOJ retained its own computer-science expert, Professor Douglas W. Oard of the University of Maryland.  Although Professor Oard critiqued Professor Fox's methodology in certain respects, he stopped short of embracing Plaintiffs' scale theories.  When asked at his deposition whether Bing's, Neeva's, or Yahoo's search quality would substantially improve with a doubling of its user-side data, Professor Oard consistently responded that he could not know without running an experiment.  *See, e.g.*, Ex. 5 at

---

[4] The difference between Google's Production score (leftmost column in red) and Google's "100% Sample" score (leftmost column in orange) was expected by Professor Fox and, as explained later, was the reason that he used a "frozen" sample to measure diminution in search quality.

63:6–12 ("Q.  If Microsoft had twice as much user-side data today as it, in fact, does, would Microsoft's search quality improve by a substantial amount as you used the term 'substantial'? . . . A.  I don't know, but that's a question on which you could structure an experiment."); *id.* at 63:14–20 ("[Q.]  If Neeva had twice as much user-side data today as it, in fact, does, would Neeva's search quality improve by a substantial amount as you've used that term 'substantial'? . . .  A. I don't know, but you could run an experiment to find out."); *id.* at 63:21–64:5 ("Q.  If Yahoo had twice as much user-side data today as it, in fact, does, would Yahoo's search quality improve by a substantial amount as you've used that term 'substantial'? . . .  A.  I'm sorry.  I don't know enough about Yahoo to answer the question.").

Professor Oard offered various criticisms of Professor Fox's experiment.  *See, e.g.*, Ex. 4, August 19, 2022 Expert Report of Douglas Oard ¶ 45 (opining that "[t]here is no one comprehensive way to measure the quality of search, as 'quality' is dependent on subjective human experience").  Notwithstanding those criticisms, Professor Oard also relied on Professor Fox's experiment for several opinions of his own.  *See, e.g.*, *id.* ¶¶ 98–106, 148.

## ARGUMENT

The requirements for the admission of expert opinion testimony are well established.  In general terms, Rule 702, *Daubert* and its progeny require the Court to consider three broad questions: (1) whether the expert is qualified in the relevant field; (2) whether the expert's opinion is relevant to the issues in the case; and (3) whether the expert's opinion is reliable.  *See* Fed. R. Evid. 702; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

Professor Fox's opinions satisfy all three criteria.

***First***, Professor Fox is eminently qualified to render opinions in the information retrieval field.  This is undisputed.

13

**Second**, Professor Fox's empirical work tests a question affirmatively raised by Plaintiffs in this case:  the role of user interaction data on search quality for commercial search engines. Plaintiffs' suggestion that his opinions are irrelevant both ignores what he actually opines and suggests an overly cramped test for when an expert's opinion may be helpful to the finder of fact.

**Third**, Professor Fox's work satisfies the reliability requirement.  As a legal matter, *Daubert* and its progeny teach that this inquiry is a flexible one.  There is no "definitive checklist or test" for determining reliability.  *Kumho Tire*, 526 U.S. at 150.  Rather, the trial court's inquiry must consider the nature of the expertise offered and the facts of the particular case.  *Id.*; *see also United States v. Morgan*, 45 F.4th 192, 200 (D.C. Cir. 2022).  Plaintiffs not only misstate the law throughout their brief; they mischaracterize the record.  In an attempt to suggest Professor Fox was uninvolved in the work, they claim, for example, that "Google engineers designed and carried out the experiment and he simply accepted the results."  ECF No. 443 (Pls.' Mot. To Exclude The Expert Test. Of Edward A. Fox & Mem. In Supp. ("Pls.' Mem.")) 4.  Among other things, that contention ignores the over 200 hours Professor Fox put into designing the experiment alone, as well as the hundreds of additional hours he spent supervising the experiment once it was underway.

In similar fashion, Plaintiffs argue that the case law holds that if a proprietary system is involved in an experiment, then the resulting work is unreliable and inadmissible.  That argument misstates the law, and ignores the many courts that have permitted expert testimony grounded in the outputs of proprietary software.

## I.   Professor Fox is Eminently Qualified to Conduct an Experiment Testing the Impact of the Scale of User Interaction Data on Search Quality.

Plaintiffs do not dispute that Professor Fox is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Professor Fox holds a Ph.D. in computer

science from Cornell University, where his advisor was Professor Gerard Salton, often called the "father of information retrieval." Ex. 1 at 2.  He has nearly forty years' experience as a computer-science professor at Virginia Tech.  *Id.* at 1.  Professor Fox specializes in information retrieval, the computer-science subdiscipline most relevant to search engines, and has done so since before Google was formed.  He is a member and former chairman of SIGIR, *id.* at 3, which is a body in the Association for Computing Machinery responsible for promoting the research and development of search and other information-access technologies.  Professor Fox was an inaugural inductee into the ACM SIGIR Academy, which honors and recognizes individuals who have made significant, cumulative contributions to the development of the field of information retrieval.  *Id.*

In his forty-plus years in the field, Professor Fox has run "hundreds and hundreds of experiments and studies."  Ex. 3 at 57:11–12.  He has "built a number of search engines" himself and run experiments on them.  *Id.* at 57:20–58:1.  Those include studies to determine the "scalability" of search engines.  *Id.* at 57:13–17.  He has authored "hundreds o[r] thousands of publications that relate to these kinds of matters."  *Id.* at 64:7–65:1.  For example, he has published on methods of "reduc[ing]" a dataset to "a smaller but representative subset" that can be used for searching.  *See* Nicholas O. Andrews & Edward A. Fox, *Clustering for Data Reduction: A Divide and Conquer Approach*, VIRGINIA TECH (Oct. 16, 2007), https://eprints.cs.vt.edu/archive/00000999/01/redux.pdf (last visited Jan. 24, 2023).  And he has spent years studying Google's systems.  Indeed, over two decades ago, he served on a National Science Foundation panel on digital libraries that reviewed Google's then-nascent search technology.  Ex. 3 at 58:21–59:10.

In short, Professor Fox possesses the requisite expert qualifications.

II.     **Professor Fox's Finding that the Volume of User Interaction Data has a Limited Effect on the Quality of Commercial Search Engines is Relevant to the Issues in the Case.**

One of Plaintiffs' key contentions in the case is that some unidentified level of "scale" (of user interaction data), greater than that available to any of Google's rivals, is necessary for a rival general search engine to deliver a "quality search experience" and "compete effectively" with Google. *See* ECF No. 94 (DOJ Pls.' Am. Compl.) ¶¶ 8, 95; CO Pls.' Compl. ¶ 91.  That contention is testable, as DOJ's own rebuttal computer-science expert concedes.   Ex. 5 at 60:7–64:10. Plaintiffs not only never attempted to test this assertion before they filed suit, but also made no attempt (nor did their experts make any attempt) to do so post-Complaint.  Indeed, DOJ did not even *retain* a computer-science expert in this case until July 2022, Ex. 5 at 8:20–22, just weeks before the rebuttal deadline—and well after Professor Fox's June 3, 2022 report was served.[5]  The Colorado Plaintiffs never retained one.[6]

Professor Fox's experiment measured the impact of a reduction in available data on the search quality of a search engine with Google's innovation and investment.  In particular, it showed that, at a volume of user interaction data equivalent to that of Microsoft, the quality decrease was slight, and that decrease was a small fraction of the quality difference between Google and Microsoft.  *See* Ex. 1 at 6–7.  Professor Fox also considered whether a modern

---

[5] This timing suggests that DOJ Plaintiffs' request this past summer for additional time to respond to Professor Fox's report may have been more about the need to get their expert up to speed than any alleged deficiency in the production of back-up materials.  *Cf.* ECF No. 368 (Pls.' Mot. to Extend the Deadline to Respond to the Report of Edward A. Fox).

[6] The Colorado Plaintiffs attempt to rebut Professor Fox solely through opinions offered by their proffered expert economist, Professor Jonathan Baker.  *See* ECF No. 419-3 (September 26, 2022 Expert Reply Report of Jonathan B. Baker) at 62–66.  Google has filed a *Daubert* motion to exclude those opinions, as Professor Baker is utterly unqualified to offer expert opinions related to search-engine scale and how it impacts search-result quality.  ECF No. 419 (Def. Google LLC's Mot. to Partially Exclude the Opinion of Pls.' Expert Jonathan Baker).

commercial search engine with Google's technology and Microsoft's scale would benefit from doubling its mobile query volume, and found that the difference was slight.  *See id.*

Those empirical findings led Professor Fox to two principal opinions.  One is as direct as can be: "that the vast majority of the quality 'gap' between Google and Microsoft's search results must be explained by factors other than the amount of available click-and-query data."  *Id.* at 7.  Stated in the obverse, if a company as innovative as Google made the investments that Google has made, it could, at Microsoft's scale, have a search engine of similar quality to Google.  The second principal opinion reflects an extrapolation that Professor Fox explains using his unquestioned expertise in the subject area:  If Google's search engine does not meaningfully benefit from an increase in user interaction data from Microsoft's current level to Google's, it is reasonable to conclude that another, equivalently efficient modern commercial search engine would not meaningfully benefit either.  *See id.*

Both of Professor Fox's opinions satisfy the relevance, or "fit," requirement under *Daubert*. 509 U.S. at 591.  Plaintiffs' brief completely ignores the first opinion (that the quality gap between Google and Bing is explained by factors other than scale), and never even mentions the Google/Bing gap that serves as the benchmark for the comparison.  As to the second (no meaningful benefit from increased user interaction data for an efficient competitor at Microsoft's scale), Plaintiffs present an overly cramped concept of relevance.  Pls.' Mem. 25–28.  To begin with, *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), teaches that "[t]rained experts commonly extrapolate from existing data."  Thus, courts routinely permit experts to extrapolate from data when offering opinions.  *See, e.g.*, *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996); *Holcombe v. United States,* 516 F. Supp. 3d 660, 675–77 (W.D. Tex. 2021); *In re*

*Celexa & Lexapro Prods. Liab. Litig.,* 927 F. Supp. 2d 758, 762–63 (E.D. Mo. 2013); *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 479–81 (S.D.N.Y. 2004).[7]

Plaintiffs contend that Professor Fox's analysis should be discarded altogether because the tests were performed on Google's systems and not the systems of a rival. They try to make much of Professor Fox's observation that "[n]o two search engine companies are the same, in part because they employ different people with different strategic visions, different talents, and different priorities." Pls.' Mem. 26 (quoting Ex. 2 ¶ 104). Plaintiffs miss the import of the observation. That sentence merely acknowledged that greater data scale is not a *guarantee* of success because other limitations (for example, engineering resources) might inhibit search quality. *See, e.g.*, Ex. 2 ¶ 104. But that hardly makes empirical findings from one search engine irrelevant to another. To the contrary, Professor Fox explains that his experiment "empirically test[ed] Plaintiffs' hypothesis that rivals could not compete on search quality without a volume of user interaction data above what is currently available to Microsoft." *Id.* ¶ 14. Professor Fox's experiment demonstrates that a competitor that has Microsoft's scale and—like Google but unlike Microsoft—has tried hard to compete in Search *can* effectively compete; and it also shows that such a competitor would not gain search quality from doubling its mobile query volume. Professor Fox's experiment, in other words, speaks directly to one of the essential issues in the case. *See In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 985 (10th Cir. 2022) ("with the adoption of the consumer welfare standard, antitrust became indifferent to the preservation of inefficient competitors").

---

[7] Plaintiffs' citation to *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994), is not to the contrary. In fact, there, the Third Circuit reversed the district court's holding that animal studies were irrelevant to claims regarding damage caused by polychlorinated biphenyls. *Id.* at 779–81.

Finally, despite Plaintiffs' argument that the results of Professor Fox's experiment are irrelevant to the issues in the case, DOJ's own computer-science expert does not hesitate to offer his own conclusions from the experiment. *See, e.g.*, Ex. 4 ¶¶ 98–106, 148; Ex. 5 at 253:12–254:18. While many of Professor Oard's conclusions based on the experiment's results are flawed for reasons that will come out at trial, that he sees fit to offer them speaks to the relevance of the experiment itself.

In sum, Professor Fox's empirical work will be helpful to the Court in assessing the actual role of user interaction data on both search quality and the ability of Google's rivals to effectively compete.

## III.    Professor Fox's Opinions Are Reliable.

Professor Fox's opinions are also reliable under Rule 702. He designed and supervised the implementation of a rigorous, empirical experiment. Plaintiffs' arguments to the contrary do not withstand scrutiny. They, for the most part, read Professor Fox's reports and deposition out of the record, and then conclude there is "no evidence" for a proposition. On the rare occasions when Plaintiffs do address Professor Fox's reports and deposition, they do so in a selective and misleading manner. Not only do Plaintiffs' arguments find no support in the factual record, but they also find no support in the law.

Before turning to Plaintiffs' arguments, we briefly summarize Rule 702's reliability requirements and their application to Professor Fox's experiment:

*First*, there can be no question that Professor Fox's analysis is "based on sufficient facts or data." Fed. R. Evid. 702(b). The experiment (1) tested the performance of the search engine under three conditions (100%, High Mobile, and Low Mobile); (2) retrained ranking components that comprise the overwhelming majority of the impact of user interaction data on ranking; and (3)

generated search results for well over ██████████ queries, each of which was scored using multiple quality metrics.

*Second*, Professor Fox's "testimony is the product of reliable principles and methods." Fed. R. Evid. 702(c). Professor Fox's data reduction experiment applies methodologies familiar to the information-retrieval community generally, and which are employed by Google in the ordinary course. *See* Ex. 1 at 41–42; Ex. 2 ¶ 94; *see also, e.g.*, *Improving Search with Rigorous Testing*, *supra*. As readily acknowledged by DOJ's computer science expert Professor Douglas Oard, experiments that change the amount (or type) of data used in a component of the retrieval system and test the results are well-known in the field. *See* Ex. 5 at 251:20– 52:7. Google is no exception, and conducts such experiments in the ordinary course, as the examples identified by Professor Fox in his reports demonstrate. *See, e.g.*, Ex. 1 at 42–44. Like the overall methodology—testing the effect of a difference in input data by measuring the output— each aspect within the experiment also draws from well-established methodologies. The experiment (1) used the same querysets that Google routinely uses;[8] (2) tested the quality of the results generated in response to those queries using the method of evaluation that Google uses in the ordinary course (human raters), which is also widely used in the industry;[9] and (3) applied the quality metrics that Google uses in the ordinary course as well as those that Microsoft uses in the

---

[8] *See* Ex. 1 at 51–53 & App. A at 14–15.

[9] *See, e.g.*, *Improving Search with Rigorous Testing*, *supra* ("We work with external Search Quality Raters to measure the quality of Search results on an ongoing basis."); Ex. 8, Excerpts of the Deposition of Pandu Nayak (Apr. 7, 2022) at 49:4–19; Ex. 5 at 48:11–15 ("There are several ways you could measure [search quality]. For example, you could ask the user their opinion. You could also show the user two results side by side. These are both often done in academic experiments."); ████████████████████████████████████████ ██████ (noting Microsoft employs human judges to evaluate Bing's search quality); Ex. 2 ¶ 50.

ordinary course.[10]  In those (and other) respects, Professor Fox's experiment adheres to industry-leading techniques.  By building into his experiment design principles and methods consistently and successfully used in the industry generally and at Google specifically, Professor Fox has ensured that his analysis is "the product of reliable principles and methods." Fed. R. Evid. 702(c); *see Morgan*, 45 F.4th at 202; *see also* Ex. 1 at 49 ("In designing and conducting this experiment, I aimed to use the systems and methods that Google would normally use in evaluating the impact of changes to Google Search on search quality.").

*Third*, Prof. Fox has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d).  Professor Fox's experiment incorporates analyses designed to uncover execution errors.  For example, his study built in meaningful analytic redundancy.  It did so by using, among other things, multiple querysets and multiple quality metrics.  As noted above, the results remained robust irrespective of the choice of queryset, sample, and quality metric.  *See supra* p. 11 & n.3.

Beyond that, Professor Fox incorporated other quality-control steps into his analysis.  For example, he directed a series of "ablation" studies.  *See* Ex. 1, App. A at Tables 11, 16.  Those studies turned off, one by one, each retrained ranking component.  They then measured the resulting quality drop using four separate quality metrics ██████████████████████ separately for the Low Mobile and High Mobile samples.  *Id.*  Reassuringly, each such ablation study showed, at most, a modest quality decrease for each ranking component.  *Id.*  That ruled out the possibility of, for example, one component showing an anomalous and meaningful quality improvement that offset and thereby masked an otherwise observable quality degradation in the

---

[10] Ex. 1 at 54; *see also id.* at 39.

others.  In these respects too, Professor Fox scrutinized his own experiment for potential problems and found further grounds for confidence.

None of Plaintiffs' arguments gives any reason for pause under Rule 702 (or Rule 703),[11] let alone exclusion.

## A.    Professor Fox Directed the Experiment.

The gravamen of Plaintiffs' reliability argument is their claim that Google engineers "designed and carried out the experiment and [Professor Fox] simply accepted the results and interpretation, ignoring contradictory results."  Pls.' Mem. 4.  But Professor Fox's reports and deposition testimony bely this contention, and Plaintiffs' brief is littered with gross mischaracterizations and outright misstatements of the record.

### 1.    Professor Fox Led the Design of the Experiment.

Plaintiffs first contend that "there is no evidence that Prof. Fox designed the experiment."  *Id.* at 7.  This is simply false: Professor Fox testified that he "led the design of the effort," Ex. 3 at 57:6–12, and that he "spent about 200 hours on this matter before the experiment was run," *id.* at 64:13–14.  It is only by disregarding Professor Fox's sworn testimony—which Plaintiffs remarkably characterize as a "bald assertion"—that Plaintiffs make this charge.  *See* Pls.' Mem. 12 ("Other than his bald assertion, there is no evidence that Prof. Fox designed the 2022 DRE.").

The first source to which Plaintiffs point for their claim that Professor Fox did not design the experiment is their contention that "there is no evidence that Google engineers conducted the 2022 DRE pursuant to any formal specifications, let alone specifications from Prof. Fox."  *Id.* at

---

[11] Plaintiffs' brief mentions Rule 703 in passing.  Plaintiffs do not appear to move under it, as that Rule is not mentioned in either the brief's "Standard" section or the proposed order.  In all events, for the reasons discussed here, Professor Fox's work complies with Rule 703.

12; *see also id.* at 7 ("Google has produced no evidence that Prof. Fox developed specifications as to how the 2022 Data Reduction Experiment was to be performed.").  By this, Plaintiffs appear to mean that, *apart from Professor Fox's signed reports and his sworn testimony*, there is no *separate* document that dates from *before* the experiment was run that outlines the specifications for the experiment.  But there is a simple reason that is the case:  an expert's drafts and interim work papers are exempted from production under the Case Management Order.  In his testimony, Professor Fox made clear that the specifications for the experiment are those laid out in Appendix A to his opening report.  *See, e.g.*, Ex. 3 at 180:13–21 ("[Q]. [W]hen you designed the 2022 DRE was there a design document where you laid out all the specifications? . . . A. Appendix A is the document.").  Contrary to Plaintiffs' assertion, Pls.' Mem. 12, Professor Fox did *not* refuse to answer any question regarding "whether he developed specifications for the experiment before it was executed"; the actual question that prompted a privilege objection asked about *documents* created before the 2022 experiment was performed.  *See id.* at 182:12–83:17.  Such draft analysis is indisputably protected from disclosure under the Case Management Order.  ECF No. 108-1, § 23.

The second source Plaintiffs identify for their charge that Professor Fox did not—contrary to his sworn statements—design the data reduction experiment is their contention that "in his report, design choices of consequence were justified by representations from Google engineers which Prof. Fox could not explain during his deposition."  Pls.' Mem. 6–7.  Once again, Plaintiffs' characterization finds no support in the record.  The lone design choice to which Plaintiffs point is the decision to compare the High Mobile and Low Mobile samples to a "frozen" version of Google Search rather than the "live" version of Google Search.  That choice is expressly explained in Professor Fox's reports, and he reiterated the explanation in his deposition.  In testimony left

uncited by Plaintiffs, Professor Fox repeatedly testified that he discussed the choice with Google's engineers and considered the approach to be "obvious" because it allowed for an apples-to-apples comparison, *see, e.g.*, Ex. 3 at 123:9–10, 124:2–3, 125:3–4; his report specifically explains that "[u]sing the 100% sample as the baseline of comparison is commonly used at Google and therefore part of the experimental design," citing an interview with a Google engineer, Ex. 1 at 50; *see also id.*, App. A at 33–34.

Referencing the fact that human rater quality scores are lower for the "frozen" version than they are for the "live" version of Google Search, Plaintiffs claim that Professor Fox failed to "apply[] his scientific knowledge to the effect of this design choice." Pls.' Mem. 13. But that difference is exactly what Professor Fox explained that he expected to see, and indeed why he directed that Google use a frozen version—to get an apples-to-apples comparison to the High Mobile and Low Mobile samples, which by necessity reflect a moment in time. Professor Fox explained in his deposition that he did in fact explore the result, and the Google engineers confirmed this difference between the live and frozen versions was consistent with what they observe in the ordinary course, and that their explanation made sense to him. *See* Ex. 3 at 355:11–19. Contrary to Plaintiffs' claim, this is not an instance of Professor Fox "ignor[ing] contradictory evidence," but rather an example of (1) the results appearing perfectly consistent and as he expected, *and* (2) Google engineers confirming that they are also consistent with Google's ordinary-course experiments.[12]

Beyond these two examples, Plaintiffs' argument regarding the experiment's design is riddled with other misstatements. At no point did Professor Fox testify, as Plaintiffs claim, that

---

[12] It must be noted that neither Plaintiffs nor Professor Oard raise a merits-based challenge to this design choice.

"Google's engineers exerted great discretion as to how to implement the 2022 DRE."  Pls.' Mem. 12.  The lone purported support Plaintiffs offer is the choice between frozen and live versions just addressed—a design decision made by Professor Fox.

The final contention that Plaintiffs make in connection with their design argument is once again, at a minimum, misleading.  They claim that Professor Fox does not "identify any materials he could have relied on to design or 'direct' the experiment—*i.e.*, any materials that detail the mechanics of Google's search system, retraining components, or human rater experiments."  *Id.* at 13.  Plaintiffs again ignore Professor Fox's reports and supporting materials.  In reality, Professor Fox's list of materials relied upon includes the depositions of Google's search engineers deposed in the case (in addition to third party engineers), as well as Google-produced documents regarding Google's ranking algorithms and search-quality metrics.  Beyond his materials relied on lists (and beyond his fifty years' experience in the discipline of information retrieval), Professor Fox testified that he reviewed hundreds of Google documents to learn about Google's systems when designing the experiment.  *See, e.g.*, Ex. 3 at 110:21–111:8, 153:7–15.

## 2.    Professor Fox Oversaw the Implementation of the Experiment.

Plaintiffs' contention that Professor Fox "failed to supervise the 2022 Data Reduction Experiment," Pls.' Mem. 14; *see also id.* at 14–15, fares no better.  Once again, their contention—which is repeated throughout their brief[13]—is contradicted by both Professor Fox's signed reports and his sworn testimony.  Professor Fox testified unequivocally that he directed the experiment.  *See, e.g.*, Ex. 3 at 44:11–12, 57:6–12; *see also* Ex. 1 at 41 (referring to "the experiment

---

[13]  *See, e.g.*, Pls.' Mem. 1 (Prof. Fox's "testimony is . . . based on a[n] . . . experiment that Prof. Fox did not supervise, conduct, or properly validate"); *id.* at 8 (Prof. Fox "did not conduct or supervise the experiment that serves as the 'singular focus' for his proffered trial testimony"); *id.* at 10 (Prof. Fox's testimony is "based solely on an experiment which Prof. Fox did not supervise, conduct, or properly validate").

that I directed").  It is absolutely not the case that the experiment was merely "provided to Prof. Fox for use in his expert report," Pls.' Mem. 15, and Plaintiffs' baseless assertion is once again premised on ignoring Professor Fox's testimony and reports.  Professor Fox testified that he has spent roughly 600 hours on the matter, which confirms the tremendous attention and work that he personally devoted to designing the experiment, supervising its execution, and analyzing the results.  Ex. 3 at 300:11–16.[14]

Plaintiffs go so far as to claim that "Prof. Fox was disinterested regarding the work done on the 2022 DRE."  Pls.' Mem. 14 (citing Ex. 3 at 44:9–46:6).  Once again, Plaintiffs' rhetoric is many steps removed from the actual record evidence.  What Plaintiffs cite to is Professor Fox's inability to recite—from memory at his deposition, many months after the experiment was designed and executed—which Google engineer handled exactly which aspect of the technological execution of the experiment.  But nothing about Professor Fox's reports, the number of hours he devoted to the matter, or his deposition testimony indicates "disinterest" on his part.  Plaintiffs' claim that Professor Fox "did not know when [the experiment] was conducted" falls into the same memory test category.  His report in fact identifies numerous dates on which steps in the analysis were performed.  *See, e.g.*, Ex. 1  at 50 & App. A at 7, 11, 13, 29, 33–34.

Finally, Plaintiffs claim that "there is no evidence that Prof. Fox is familiar enough with Google's system that . . . he would have had the ability to meaningfully supervise the 2022 DRE."  Pls.' Mem. 14.  That is again false.  In making their statement, Plaintiffs disregard Fox's unchallenged expertise in the field, his reports, including his materials relied on lists, and his sworn deposition testimony.  When asked whether he "ha[d] the specific expertise and knowledge to

---

[14] In contrast, Professor Oard issued his report a few weeks after having been engaged.  Ex. 5 at 8:22.

design this specific DRE without Google's assistance," Professor Fox responded that he did, and in fact that he believed himself to be "one of the most qualified people in the world to do this experiment and to design it."  Ex. 3 at 64:7–65:1; *see also id.* at 62:13–63:1.

To the extent that Plaintiffs' argument is that Professor Fox could not properly "supervise" the experiment without direct, tactile access to all of Google's systems, Plaintiffs provide no support for that contention either in the factual record[15] or in the case law.  Plaintiffs' principal cited case, *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856 (N.D. Cal. May 22, 2008) (*see* Pls.' Mem. 18), expressly *approved* of experts "work[ing] directly with client representatives to run tests and to develop facts and reasonably rely on the results in expressing an opinion at trial."  *Id.* at *2.[16]  In *Therasense*, it was the fact that the expert "did not participate in, observe, or supervise" the experiments on which he intended to opine that caused the court concern; the court took pains to clarify that it was *not* condemning employee-implemented

---

[15] Professor Fox testified that he has "spent more than 40 years designing" "hundreds" of "similar kinds of studies with . . . very senior doctoral students, master's partners, [and] collaborators in other universities," Ex. 3 at 62:16–20, and that he "had indirect access by way of the engineers following [his] direction on doing things and reporting back and answering questions."  *See, e.g., id.* at 119:4–7.

[16] Plaintiffs' other cases are inapposite as they involve circumstances where the expert was a mere mouthpiece for others.  *See United States v. Mejia*, 545 F.3d 179, 197–98 (2d Cir. 2008) (excluding portions of expert testimony that merely repeated information the expert had read or heard from others); *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (excluding expert testimony that merely repeated statements made by non-testifying witnesses or co-defendants); *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (rejecting the proposition that a scientist may testify as the "mouthpiece of a scientist in a different specialty"); *TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 731–32 (10th Cir. 1993) (finding that Rule 703 did not permit an expert to declare another person an expert and then adopt that person's opinions without familiarity as to that person's methodology or reasoning); *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2022 WL 17480906, at *41 (S.D. Fla. Dec. 6, 2022) (expert testimony inadmissible where others "develop[ed], conduct[ed], and document[ed] the ranitidine testing and then . . . interpret[ed] the results of that testing"); *see also Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir. 1999) (affirming exclusion of testimony that offered only a "'bottom line' conclusion").

experiments, noting, for example, that an expert might "choose[] not to conduct a copper-zinc test himself" and, instead, "might supervise qualified professionals employed by the client to do so." 2008 WL 2323856, at *2.  In short, the facts here are nothing like what the court criticized in *Therasense*, and instead are on all fours with the exact scenario the court blessed.[17]  Courts in this circuit and elsewhere have likewise made clear that Rule 703 permits reliance on assistants to carry out the analysis or experiment upon which the expert relies.  *See, e.g.*, *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36–37 (D.D.C. 2004) ("[P]ursuant to Fed. R. Evid. 703, an expert may rely on any facts or data 'of a type reasonably relied upon by experts in the particular field,' including facts, data, and opinions that are otherwise inadmissible.  This includes relying on one's assistants to carry out analyses that the expert designed." (internal citations and quotation marks omitted)); *Washington v. Boudreau*, 2022 WL 4599708, at *9–10 (N.D. Ill. Sept. 30, 2022) (permitting expert to rely on data from a spreadsheet compiled by a project coordinator employed by Plaintiffs' lawyer); *Meyer v. Bayerische Motoren Werke AG*, 2022 WL 3566748, at *4 n.3 (W.D. Wash. Aug. 18, 2022) (noting that the plaintiffs had not established that "reliance on evidence gathered, under [the expert's] direction, by assistants or coworkers is inconsistent with the practices of other experts within his field").

---

[17] In fact, *Therasense* suggests that it would countenance "client-conducted test[s]" that the "expert does not supervise" provided that the expert later "scrutinize[s]" the test, its protocol, and its participants.  2008 WL 2323856, at *2.  A leading patent-law treatise includes *Therasense* in a chapter entitled "Expert does not always have to observe first hand."  *See* 7 Robert A. Matthews, Jr., Annotated Patent Digest § 44:47; *see also id.* ("In formulating an opinion that an expert will give in the case, an expert is not required to have observed first hand tests, processes, or other visible occurrences relating to the subject matter at issue.").

### 3.     Professor Fox Incorporated Multiple Internal Cross-Checks to Confirm the Experiment's Reliability.

Plaintiffs next argue that Professor Fox "failed to validate the DRE." Pls.' Mem. 15; *see also id.* at 15–17.  Plaintiffs never explain what they mean by "validation," but the idea seems to be a claim that Professor Fox did not take sufficient steps to ensure the trustworthiness of his results.  Plaintiffs are mistaken.  Again, Professor Fox's experiment incorporated internal cross-checks to confirm the experiment's reliability.  Those included:

- Quantifying the impact of the search "signals" that use user interaction data yet were not retrained.  That analysis led to the conclusion that the retrained components, together with components that do not use user interaction data, collectively account for over ▮▮ of the impact on final ranking. Ex. 1, App. A, at 8–10.

- Using both a Low Mobile and a High Mobile sample.  The results found that "[t]he decreases in quality, relative to the 100% sample, that result from using either the high mobile or low mobile sample, are very similar." *Id.*, App. A, at 19.

- Using multiple querysets—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—thereby ensuring that the results are not attributable to the peculiarities of a single chosen set.[18]  Professor Fox found that results for all three querysets showed search quality considerably higher than Microsoft's search quality. *See id.* at 55.

- Using a ▮▮▮ queryset ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 35.

---

[18]  Plaintiffs understate the number of queries in the three querysets by ▮▮▮▮▮▮▮ queries.  *Compare* Pls.' Mem. 7 n.19 (claiming that the 2022 DRE used "▮▮ query sets with ▮▮▮ queries, and ▮▮ query set with ▮▮▮ queries"), *with* Ex. 1, App. A, at 14–15 (indicating that the DRE used ▮▮ querysets with ▮▮▮ queries and ▮▮ queryset with ▮▮▮ queries).

- Separately analyzing the results for longtail queries, to specifically address Plaintiffs' contention that user interaction data is more useful for those types of queries.  *Id.* at 60–61.

- Using multiple quality metrics ████████████████████████████ to ensure that the selection of metric did not skew the findings.  *See id.* at 51.  The results are similar irrespective of the quality metric observed.  *Id.*, App. A, Tables 7–8, 12–13.

- Using quality metrics that ███████████████████████████████████ ███████████████████████ thereby ensuring that the results did not flow from some sort of home-court advantage.  The results show no such home-court advantage.  *Id.* at 51.

- Conducting separate ablation analyses on each of the six retrained ranking components. Those analyses showed that the results for each component individually were consistent with the experiment's overall findings. Ex. 3 at 116:6–12.

Again, Plaintiffs point to no anomalous results undermining Professor Fox's opinions.

The supposed "failure to validate" instances that Plaintiffs identify highlight the superficiality of their argument.  Plaintiffs fault Professor Fox for not sampling to see if the search quality scores were "calculated properly."  Pls.' Mem. 15.  But neither the Google engineers nor Professor Fox scored the search results; human raters did so on a blind basis, and the aggregate quality metrics derived from those individual ratings were calculated using code made available to Plaintiffs.  That is the essence of scientific inquiry, and again there is nothing across either the many checks and controls, or the backup data produced, that Plaintiffs actually claim gives reason to question the scores.  Plaintiffs also contend that Professor Fox did not "validate" how the ranking components were retrained, by which they mean that he did not personally observe the amount of training data used to retrain the components to confirm that it was the level he

directed. *Id.* at 16. Here, Plaintiffs apparently speculate that Google personnel may have, in bad faith, intentionally manipulated the data to skew Professor Fox's results. Similarly, Plaintiffs suggest later in their brief that, because Professor Fox did not review line-by-line the many thousands of queries that compromise the querysets, he cannot be sure that Google engineers did not "cherry-pick" the queries. *Id.* at 17–18. Not a shred of evidence supports these accusations, and they certainly are no basis for a *Daubert* challenge.

Plaintiffs assert that the (supposed) lack of validation matters because, in their telling, "[t]here is no evidence that Google conducts similar experiments in the ordinary course." *Id.* at 16. This ignores the ordinary-course experiments run by Google and identified by Professor Fox. The results of those ordinary-course experiments were consistent with the findings of Professor Fox's data reduction experiment, further underscoring the reliability of the results of his findings. *See, e.g.*, Ex. 2 ¶ 100 (noting that Google's past data reduction experiments "provide further support for the finding that search quality ranking, in multiple settings, responds to increases in user interaction data according to the law of diminishing returns"). It also ignores the many thousands of human rater tests and experiments Google performs each year—which use raters to assess the quality of Google's search results using the same metrics as Professor Fox's experiment—for the purposes of comparing its results to its competitors as well as assessing whether and how to implement proposed changes. *See Improving Search with Rigorous Testing*, *supra*.

Plaintiffs conclude by arguing that Professor Fox's data reduction experiment was essentially a "faith-based exercise not countenanced by *Daubert*." Pls.' Mem. 18. Far from it. Professor Fox designed a rigorous computer-science experiment painstakingly detailed in a highly technical, one-hundred-page expert report. Plaintiffs, by contrast, postulated a relationship

between user interaction data and search quality in their complaints and thenceforth presumed it true.  If anyone proceeds blindly on faith, it is Plaintiffs.

### 4.       Professor Fox Validated the Rigorousness of the Experiment.

Plaintiffs again misconstrue Professor Fox's testimony when they assert that he "explicitly testified that the 2022 DRE lacks the rigor (both in performance and documentation) that he applies to his professional work."  Pls.' Mem. 23; *see also id.* at 23–25.  Professor Fox squarely testified that the study was thorough in its design and definitive in its results.  *See, e.g.*, Ex. 3 at 130:12–15 ("I think the experiment was designed to test the hypotheses that are relevant in this case and was definitive in the results.  I don't think there was anything necessary else to be done.").

Plaintiffs selectively quote Professor Fox as having said that if he were "publishing an article in *Nature* about this study, then [he] probably would have done more things, but that wasn't the context of the study."  Pls.' Mem. 23 (quoting Ex. 3 at 98:13–16).  In his deposition, DOJ's counsel asked Professor Fox to "[e]xplain that answer."  Ex. 3 at 98:17.  *Professor Fox then continued*:

> So there are highly prestigious journals that people read like *Nature* and *Science*.  This study from my perspective is one that could appear in one of these very best journals and would be really exciting to the public to read and understand.  Because of the nature of the case and the situation I don't think we're in a situation to do that, but I'm very proud of the study and very definitive results and it has significant impact.  So if I were to do something like that, then reviewers would probably ask for more things just like Professor Oard asked some questions which I responded to.

*Id.* at 98:18–99:8.  In other words, Professor Fox did *not* say that his study lacked rigor.  Much the opposite, he believed his data reduction experiment was of such quality that it could appear in one of the "very best journals" and could survive a famously demanding peer review process.  *Id.*

Plaintiffs next assert that Professor Fox "failed to apply the same rigor to his report's citations as that which he applies in his professional academic work" because, they say, he "left

out 100 additional citations of explanation he would have normally have included." Pls.' Mem. 24. But, again, that misconstrues the exchange. In response to questioning regarding why a particular sentence in the report did not have a footnote citation, Professor Fox explained that the points therein were (1) industry common knowledge and (2) supported by numerous Google documents cited elsewhere, and that while he could have added additional citations, to do so would have meant that the report would have had another 100 footnotes. He did not go that route for readability's sake, and even noted that he is routinely "chastised" during the publication process for an excessive number of citations. Ex. 3 at 356:15–357:5, 359:20–360:13. Nothing in Rule 702 requires experts to cite their sources on a sentence-by-sentence basis. Professor Fox's opening and reply reports, which collectively totaled nearly two hundred pages, are hardly thinly sourced. They cite dozens of documents, and *contain nearly 500 footnotes*.

### B. That the Experiment Tested the Performance of Google's Proprietary Systems is No Impediment to Admissibility.

To conduct his experiment, Professor Fox tested Google's own systems, both because his opinions addressed the effect of scale on Google's quality advantage and because his experiment on the effects of scale more generally required the use of a modern, commercial search engine— which, unsurprisingly, are proprietary systems. The need to use a proprietary system does not render the experiment unreliable.

Plaintiffs equate "testability" with "replicability," and from there argue that an experiment that cannot be replicated by the opposing side cannot be relied upon by an expert witness. They are wrong on both points: Professor Fox's experiment is testable as that concept is defined under the Rules of Evidence and *Daubert* and its progeny, and the fact that the experiment was run on a proprietary system and thus cannot be re-run by the opposing side does not weigh against its admissibility.

As the Advisory Committee Notes to Rule 702 explain, the question of whether "the expert's technique or theory can be or has been tested," means: "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Fed. R. Evid. 702, Advisory Committee Notes to the 2000 Amendments; *see, e.g.*, *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing advisory committee notes regarding "testability" and describing the sorts of opinions that would not be testable as those like "a clairvoyant's statement that he receives messages from dead relatives" because "there is no way for the departed to deny this"); *City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1046 (9th Cir. 2014) (citing advisory committee notes regarding "testability" and holding "[t]he question is whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability'").

Nothing in Rule 702 requires an opposing party to have the ability to recreate, from scratch, every bit of analysis underlying an opposing expert's report. Thus, in *City of Pomona,* the Ninth Circuit reversed a trial court that had excluded an expert because, *inter alia,* the expert did not retain a "dual" sample for the other side to retest. *See* 750 F.3d at 1046. The appellate court explained that the failure "[wa]s a question for the jury, not the court, to determine what weight to afford [the expert's] testimony." *Id.* at 1047; *see also United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021) ("Disputes about the adequacy of the theory's testing or about the accuracy of a theory's results, generally speaking, provide grist for adversarial examination, not grounds for exclusion." (brackets and internal quotation marks omitted)); *United States ex rel. Schmuckley v. Rite Aid Corp.*, 2020 WL 3970201, at *14 (E.D. Cal. July 14, 2020) (holding that "any inability to replicate the data," where the data came from a proprietary software system, "does not render the

methodology used to produce that data unreliable" and can be considered by the fact-finder, "but does not require its exclusion").

Professor Fox's experiment is testable in accordance with the Rule.  There is nothing subjective or unscientific about any step in the analysis.  As discussed in detail *supra,* he explains how the three versions of the search engine were created, including identifying which ranking components he selected for retraining, the reasons for their selection, and a calculation of their impact on ranking.  Plaintiffs have every ability to challenge those decisions, and indeed their expert has done so.  Professor Fox also explains the objective metric by which querysets were selected to test the resulting search quality, and Google has provided to Plaintiffs the queries in the three querysets.  Again, Plaintiffs may challenge those decisions and further may examine the querysets themselves.  And far from offering a subjective opinion as to differences in the quality of the outputs of the three versions of the search engine, those outputs were submitted to independent raters, who assessed the quality, blind to the experiment, based on Google's standard, public guidelines.  Professor Fox then reported and analyzed those results, calculating confidence intervals and *p*-values.  The analytical redundancy that Professor Fox built into the experiment gives even more objective metrics by which it can be challenged—by, for example, comparing the results of the multiple querysets and multiple samples.  *Cf. Gissantaner*, 990 F.3d at 467 (finding that principles were reliably applied for purposes of Rule 702 where the relevant technology underwent "internal validation").

In trying to fashion a non-existent "replicability" requirement, Plaintiffs' brief selectively quotes from the cases in a manner that obscures their actual holdings.  Consider first *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005) (Pls.' Mem. 19), which leads off Plaintiffs' discussion of the law.  That case involved an expert whose opinion was

based on "expert intuition" and who "preferred intuition to the empirical toolkit of the social sciences." 395 F.3d at 419. It thus presented the classic *Daubert* problem of the expert who "supplies nothing but a bottom line." *Id.* at 419–20 (quoting *Mid-States Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989)). In *United States v. Mitchell*, 365 F.3d 215 (3d Cir. 2004) (Pls.' Mem. 20), the court *affirmed* the admission of the government's fingerprint expert. In so doing the Third Circuit made clear that *Daubert*'s "[t]estability" factor does not require there to be "directed, specific actual testing" of the expert's technique. 365 F.3d at 235, 238. Equally inapposite is *Jackson v. Colgate-Palmolive Co.*, 2019 WL 3603547 (D.D.C. Aug. 6, 2019) (Pls.' Mem. 20), which involved an expert whose analysis suffered from unprincipled departures from a published methodology employed in the field. 2019 WL 3603547, at *6–7.[19]

Other cases cited by Plaintiffs likewise bear no resemblance to Professor Fox's experiment. *Korsing v. United States*, 2017 WL 7794276 (S.D. Fla. Aug. 16, 2017) (Pls.' Mem. 22 n.50), involved an expert who did not disclose, and failed to explain, the mathematical formula he used to generate his results. 2017 WL 7794276, at *8–9. In *Trubridge, L.L.C. v. Tyrone Hospital*, 2020 WL 3105424 (S.D. Ala. Apr. 24, 2020) (Pls.' Mem. 21–22 n.50), the expert testified that he "applied rules" from his "experience," but did not know whether the rules were industry standards, did "not have those rules available," and could not "recall exactly" what the rules were. 2020 WL 3105424, at *7. In *Dueker v. CSRT Expedited Inc.*, 2020 WL 7222095 (C.D. Cal. Dec. 7, 2020) (Pls.' Mem. 21), the court found that an expert's code contained "syntax errors, [was] missing code, and include[d] improper sequencing of code," and led to "data

---

[19] Plaintiffs' brief notes that *Jackson* relied on *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1284–85 (S.D. Ga. 2018) (involving the same expert and the same problem) and *United States v. Hebshie*, 754 F. Supp. 2d 89, 124–27 (D. Mass. 2010) (which also involved an expert's departure from published methodology used in the field).

anomalies" such as "attribut[ing] more than 24 hours of unpaid wages to some drivers for single workdays."  2020 WL 7222095, at *3–4 (internal quotation marks omitted).  And *In re Dicamba Herbicides Litig.*, 2019 WL 6340260 (E.D. Mo. Nov. 27, 2019) (Pls.' Mem. 23), is a case in which the court found the expert's model unreliable because the opposing party's expert's attempt to recreate it generated negative yield values, which were "biologically impossible" and therefore "show[ed] that the model was unreliable."  2019 WL 6340260, at *5.  Finally, in *United States v. Bynum*, 3 F.3d 769 (Pls.' Mem. 21) (4th Cir. 1993), the court in fact *permitted* testimony rooted in a purportedly novel chromatograph analysis of cocaine.  3 F.3d at 773.

At bottom, Plaintiffs' legal argument rests on the contention that an expert may not rely on a proprietary system.  But that is not the law: none of Plaintiffs' cases supports that sweeping proposition, and numerous courts have rejected precisely the argument that an opposing party's lack of access to the proprietary systems is grounds for exclusion.

The D.C. Circuit—in a 2022 case ignored by Plaintiffs—rejected the proposition that the use of a proprietary, nonpublic algorithm required exclusion of expert testimony.  In *United States v. Morgan*, the United States sought to proffer testimony from an FBI agent who relied on the output of a technology known as Enterprise Sensor Processing and Analytics ("ESPA").  45 F.4th at 198–99.  Because "ESPA's algorithm [wa]s proprietary," the FBI agent could not independently evaluate its accuracy, and nor could the defendant access and examine the underlying software.  *See United States v. Morgan*, 292 F. Supp. 3d 475, 481 n.3 (D.D.C. 2018), *aff'd*, 45 F.4th 192 (D.C. Cir. 2022); *Morgan*, 45 F.4th at 198.  Despite that fact, the district court admitted the FBI agent's testimony based on ESPA.  *Morgan*, 292 F. Supp. 3d at 486.  On appeal, the defendant argued that ESPA was unreliable because ESPA was a "black box" based on an "unknowable and untestable" algorithm that "no one [was] able to explain."  Brief for Appellant at 26–27, 41, *United*

*States v. Morgan*, 45 F.4th 192 (D.C. Cir. Oct. 28, 2020) (No. 18-3045).  The D.C. Circuit rejected that argument, reasoning that the agent's "inability to explain a proprietary algorithm did not pose a categorical bar to a finding of reliability."  45 F.4th at 203.

Numerous other courts have likewise held admissible expert testimony that is rooted in proprietary software and so cannot be replicated by the opposing side.  For example, the Sixth Circuit held that the district court erred in excluding testimony based on proprietary "probabilistic [DNA] genotyping" software, noting that the technology could be tested, including by the lab that used it.  *See Gissantaner*, 990 F.3d at 462, 464, 467.  Or, to take another example, the First Circuit found that it was "well within the district court's discretion" to permit an FBI agent to offer testimony rooted in proprietary FBI technology deployed in child-pornography investigations notwithstanding that neither the defendant nor anyone outside the government has access to the technology.  *See United States v. Chiaradio*, 684 F.3d 265, 271, 276–78 (1st Cir. 2012).  Likewise the Eastern District of California permitted expert testimony rooted in a statistical sampling generated by a state agency's "rules-based software program," noting that the inability to replicate goes to weight, not admissibility.  *See United States ex rel. Schmuckley,* 2020 WL 3970201, at *2, *13–14.  Examples go on.[20]  The conclusion is unmistakable.  Rule 702 concerns reliability; the use of proprietary technology does not render an expert's opinion unreliable.  And, indeed, it is not just the case law that rejects the Plaintiffs' narrow notion:  scientific publications are, including

---

[20] *See, e.g.*, *United States v. Springstead*, 520 F. App'x 168, 169 (4th Cir. 2013) (rejecting the argument that expert's inability to explain the design and functioning of "Forensic Tool Kit" software rendered opinions inadmissible); *United States v. Nelson*, 533 F. Supp. 3d 779, 783 (N.D. Cal. 2021) (rejecting the contention that an FBI agent was "not qualified to offer expert opinion in reliance on the Government's proprietary mapping software for purposes of Federal Rule of Evidence 702 and *Daubert*").

ones authored by Microsoft employees, replete with many studies that "have been published with a proprietary system and proprietary datasets."  Ex. 3 at 117:20–118:1; *see, e.g.*, Ex. 2 ¶ 96.

The cases Plaintiffs describe as involving proprietary software or computer simulations do not support their argument.  *Lorraine v. Markel American Insurance Co.*, 241 F.R.D. 534 (D. Md. 2007) (Pls.' Mem. 20), had to do with methods to authenticate computer animation and computer simulations under Federal Rule of Evidence 902 (their "reliability" for the purposes of authentication), not the inquiry under Rule 702.  241 F.R.D. at 560.  The cited quotation in *In re Ondova Ltd.*, 2012 WL 5879147 (Bankr. N.D. Tex. Nov. 21, 2012) (Pls.' Mem. 23), is to an earlier unpublished decision in that case, 2012 WL 5879147 at *10; there is no meaningful context given.  Finally, *State v. Pickett*, 246 A.3d 279 (N.J. Super. App. Div. 2021) (Pls.' Mem. 20), involved a state court, applying *Frye*, not Fed. R. Evid. 702 and *Daubert*, in a criminal case, where the issue was whether the software used by the State's expert to conduct a particular test "has gained general acceptance within the computer science community."  *Id.* at 283.  Moreover, the question before that court was not admissibility of the expert testimony, but instead whether the defendant had made a showing for additional discovery.  *Id.*

Plaintiffs' efforts to use Paragraph 24 of the Case Management Order ("CMO"), ECF No. 108-1, to buttress their arguments, Pls.' Mem. 21–23, fare no better.  Those contentions fail for any one of three reasons.  First, the CMO does not purport to modify—or, for that matter, even address—the *Daubert* standard.  Instead, it identifies certain "Materials to Be Disclosed" during expert discovery.  *See* ECF No. 108-1, § 24.

Second, Plaintiffs have waived any such argument.  As the Court will recall, DOJ Plaintiffs moved twice on this topic last summer.  Originally, they sought an extension of time to file a rebuttal report, ECF No. 368, which the Court partially granted.  *See* Minute Order (July 14,

39

2022). Later, they sought certain additional materials related to the Fox Report, ECF No. 376, which was resolved by a Joint Stipulation and Order. *See* ECF No. 388. If Plaintiffs believed that Google had not met its CMO obligations, for reasons beyond those that they moved on and fully litigated, the time to say so was then.

Third, Google has in fact complied with its Paragraph 24 obligations. Google has produced, for example, files containing a considerable volume of data, including the queries used in the experiment, aggregate query-rating pairs ██████████████, search result ratings ██████████, and proprietary code from Google's systems. The code included, for instance, ████████████████████████████████████████████

████████████████████████████████████████████

██████ Remarkably, of the more than ██████ back-up files produced by Google, just three appear on the list of files that Professor Oard relied upon. *See* Ex. 6, August 19, 2022 Expert Report of Douglas Oard, Ph.D., Materials Relied Upon. Given Professor Oard's sparing use of Professor Fox's backup data, Google's counsel asked Professor Oard whether he "had access to all of the material that was produced by Google to the Government subsequent to Professor Fox's report with respect to the experiments described in Professor Fox's report." Ex. 5 at 312:22–313:8. Counsel for DOJ instructed him not to answer that question. *Id.* Thus, whether he was never given the materials, or found them to in fact support the rigor of Professor Fox's results, is unknown. Either way, it strongly suggests Plaintiffs' complaint about the absence of material is a cynical one that simply seeks to manufacture a requirement that cannot be met in order to avoid having to respond to unfavorable evidence. The CMO cannot sanction that gambit. *Cf. Morgan*, 45 F.4th at 203 (rejecting an understanding of *Daubert* under which "expert witnesses . . . could almost never testify on matters related to proprietary technology").

40

## CONCLUSION

Professor Fox's opinions satisfy the requirements of the Federal Rules of Evidence for expert opinions.  He is eminently qualified, his opinions address issues in the case, and are the result of reliable methods.  Plaintiffs' motion should be denied.

Dated: January 26, 2023                    Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Kenneth C. Smurzynski (D.C. Bar No. 442131)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
ksmurzynski@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI
P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower

41

800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*