# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | █████████████ |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANT GOOGLE LLC'S MOTION TO PARTIALLY EXCLUDE
## THE OPINION OF PLAINTIFFS' EXPERT MICHAEL WHINSTON

January 25, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.      Prof. Whinston Is A Well-Credentialed, Award-Winning, And Prolific Economist
With Deep Experience On Economies Of Scale ...................................................... 3

II.     Prof. Whinston's Economic Opinions In This Case ................................................ 4

    A.     Prof. Whinston Opines About The Importance Of Scale ................................. 5

    B.     Latency And Privacy Are Important Axes Of Competition In Search ............... 8

STANDARD ..................................................................................................................... 9

ARGUMENT .................................................................................................................... 9

I.     Professor Whinston's Opinions Regarding Scale Are Admissible .......................... 10

    A.     Prof. Whinston's Opinions Regarding Scale Are Firmly Rooted In His Economic
Expertise ....................................................................................................... 10

        1.    Prof. Whinston's Proffered Scale Testimony Satisfies The Federal Rules Of
Evidence .................................................................................................. 10

        2.    Precedent Forecloses Google's Argument That Prof. Whinston Lacks Technical
Expertise ................................................................................................. 14

        3.    Google's Argument Goes To Weight Rather Than Admissibility ...................... 17

        4.    Google's Argument Ignores The Role Of Industrial Economist And Is Belied By
Google's Own Practice ............................................................................. 17

    B.     Prof. Whinston Did Not Engage In Improper Evidence Narration .................... 19

        1.    Prof. Whinston Properly Relied On The Factual Record In Conjunction With His
Economic Opinions And Empirical Analysis ................................................ 20

        2.    Google Has Not Identified Which Of Prof. Whinston's Factual Citations Are
Allegedly Improper And Unrelated To His Economic Opinions ...................... 24

        3.    Any Improper Evidence Narration Should Be Addressed Through Evidentiary
Rulings At Trial ...................................................................................... 25

        4.    Google Cannot Complain About Evidence Narration Because Its Experts Follow
The Same Practice ................................................................................... 25

    C.     Prof. Whinston Employed Reliable Methods For His Regression Analysis
Showing The Importance Of Scale ................................................................. 27

II.     Prof. Whinston's Opinions On How Competition Affects Google's Incentives
Regarding Privacy And Latency Are Admissible ................................................... 29

III.    Prof. Whinston's Opinions On Google's Profitability Are Admissible .................... 31

CONCLUSION ................................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*American Society for Testing & Materials v. Public.Resource.Org., Inc.*,
2016 WL 7839128 (D.D.C. Sept. 21, 2016) ................................................................. 14, 28

*Arias v. DynCorp*,
928 F. Supp. 2d 10 (D.D.C. 2013) ....................................................................................... 15

*Barber v. Corizon Health, Inc.*,
2019 WL 8112500 (W.D. Pa. May 6, 2019) ........................................................................ 26

*Bresler v. Wilmington Trust Co.*,
855 F.3d 178 (4th Cir. 2017) ............................................................................................... 27

*Campbell v. National Railroad Passenger Corp.*,
311 F. Supp. 3d 281 (D.D.C. 2018) ..................................................................................... 20

*City of Mankato, Minnesota v. Kimberly-Clark Corp.*,
2019 WL 4897191 (D. Minn. May 28, 2019) ...................................................................... 23

*Crowley v. Perdue*,
318 F. Supp. 3d 277 (D.D.C. 2018) ..................................................................................... 26

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .............................................................................................................. 9

*Deutsch v. Novartis Pharmaceutical Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ................................................................................. 17

*Evans v. Washington Metropolitan Area Transit Authority*,
674 F. Supp. 2d 175 (D.D.C. 2009) ....................................................................................... 9

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................................................... 22

*Groobert v. President & Directors of Georgetown College*,
219 F. Supp. 2d 1 (D.D.C. 2002) ......................................................................................... 17

*Highland Capital Management, L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................................. 25

*Hoffman v. Kansas City Life Insurance Co.*,
2019 WL 2297348 (D.S.C. May 30, 2019) ............................................................. 11, 14, 17

*In re 3M Combat Arms Earplug Product Liability Litigation*,
2021 WL 765019 (N.D. Fla. Feb. 28, 2021) .................................................................. 20, 22

*In re Dealer Managment Systems Antitrust Litigation*,
581 F. Supp. 3d 1029 (N.D. Ill. 2022) ................................................................................. 22

*In re Disposable Contact Lens Antitrust*,
329 F.R.D. 336 (M.D. Fla. 2018) .................................................................................... 23, 27

*In Re Industrial Silicon Antitrust Litigation,
    1998 WL 1031507 (W.D. Pa. Oct. 13, 1998) ....................................................... 28

In Re Linerboard Antitrust Litigation,
    497 F. Supp. 2d 666 (E.D. Pa. 2007) ................................................................. 29

In re Rail Freight Fuel Surcharge Antitrust Litigation,
    292 F. Supp. 3d 14 (D.D.C. 2017) aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust
    Litig. - MDL No. 1869, 934 F.3d 619 (D.C. Cir. 2019) ........................................ 20

In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation,
    2021 WL 662292 (E.D. Pa. Feb. 19, 2021) ......................................................... 10

Khairkhwa v. Obama,
    793 F. Supp. 2d 1 (D.D.C. 2011), aff'd 703 F.3d 547 (D.C. Cir. 2012) .................................. 9

N.O. v. Alembik,
    160 F. Supp. 3d 902 (E.D. Va. 2016) ................................................................. 17

Ohio State Troopers Association , Inc. v. Point Blank Enterprises, Inc.,
    2020 WL 1666763 (S.D. Fla. Apr. 3, 2020) ......................................................... 20

Pipitone v. Biomatrix, Inc.,
    288 F.3d 239 (5th Cir. 2002) ........................................................................... 27

*Premier Comp Solutions LLC v. UPMC,
    2019 WL 480480 (W.D. Pa. Feb. 7, 2019) ......................................................... 14

Reach Music Publishing, Inc. v. Warner Chappell Music, Inc.,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ........................................................... 21, 25

Regal Cinemas, Inc. v. W&M Properties,
    90 F. App'x 824 (6th. Cir. 2004) ...................................................................... 14

RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.,
    609 F. App'x 731 (4th Cir. 2015) ...................................................................... 15

*Rothe Development, Inc. v. Department of Defense,
    107 F. Supp. 3d 183 (D.D.C. 2015), aff'd 836 F.3d 57 (D.C. Cir. 2016) ...................... 12, 23

Scentsational Technologies, LLC v. Pepsi, Inc.,
    2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ....................................................... 24

Scott v. Chipotle Mexican Grill, Inc.,
    315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................................ 21

SEC v. Tourre,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................... 15, 24

Sitts v. Dairy Farmers of America, Inc.,
    2020 WL 3467993 (D. Vt. June 24, 2020) ...................................................... 25, 27

SourceOne Dental, Inc. v. Patterson Cos.,
    2018 WL 2172667 (E.D.N.Y. May 10, 2018) ....................................................... 27

Southeast Missouri Hospital v. C.R. Bard, Inc.,
    2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) ...................................................... 18

*TFWS, Inc. v. Schaefer,
   183 F. Supp. 2d 789 (D. Md. 2002) .................................................................. 14, 30

U.S. Information. Systems, Inc. v. Int'l Brotherhood of Electrical Workers Local, Union No. 3,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) ....................................................................... 25

United States ex rel. Westrick v. Second Chance Body Armor, Inc.,
   289 F. Supp. 3d 145 (D.D.C. 2018) .................................................................. 13, 15

United States v. Anthem, Inc.,
   236 F. Supp. 3d 171 (D.D.C. 2017) ......................................................................... 17

United States v. Gatto,
   986 F.3d 104 (2d Cir. 2017) ..................................................................................... 11

United States v. H & R Block, Inc.,
   831 F. Supp. 2d 27 (D.D.C. 2011) ............................................................................. 9

United States v. Mitchell,
   365 F.3d 215 (3d Cir. 2004) ..................................................................................... 11

Universal Surveillance Corp. v. Checkpoint Systems, Inc.,
   2015 WL 6082122 (N.D. Ohio Sept. 30, 2015) ....................................................... 17

Washington v. Kellwood Co.,
   105 F. Supp. 3d 293 (S.D.N.Y. 2015) ...................................................................... 14

**Rules**

Federal Rule of Evidence 703 ............................................................................... 22, 24

*Federal Rule of Evidence 702 ........................................................................... passim

The Court should deny Defendant Google's motion to partially exclude the opinion of Plaintiffs' expert Professor Michael D. Whinston. *See* ECF No. 418 ("Def. Br.").

## INTRODUCTION

Google acknowledges that Prof. Whinston has expertise in microeconomics and industrial organization—fields focused on the workings of markets, and in particular how firms *compete* within those markets. *See* Def. Br. at 11 ("Professor Whinston's credentials as an economist may qualify him to serve as an expert on certain economic matters"). Prof. Whinston's opinions regarding (1) scale, (2) latency, and (3) privacy are about just that: how search engines compete—a quintessential topic for an expert economist in an antitrust case. Prof. Whinston's opinions on all three fronts fall well within his admitted and undisputed expertise as an economist. Applying well-established economic methods and supported by both case-specific data analysis and ample factual evidence, Prof. Whinston's opinions are reliable, relevant, and "fit" the case. The motion should be denied.

Fundamentally, Google confuses Prof. Whinston's role as an *economic* expert (which Google does not challenge) with that of a *subject-matter* or *technical* expert in a particular industry (which Prof. Whinston does not purport to be). It is telling that Google cites no relevant case law for its novel proposition that a qualified antitrust economist must possess subject-matter expertise to apply economic theory to the industry at hand. Prof. Whinston properly applies his undisputed expertise in economics to evaluate the competitive implications of Google's vast scale and its muted incentives to compete on key quality factors. Those opinions will assist the Court in understanding the market for general search services and in making factual determinations regarding Google's monopolies and exclusionary conduct.

*First*, Google attempts to exclude Prof. Whinston's opinions on the competitive advantages resulting from Google's scale—i.e., the data it obtains when users perform searches

on Google. As an initial matter, Google suggests that Prof. Winston should be barred from opining on the competitive benefits accruing from scale based on the incorrect assumption that such an opinion must be grounded in technical or engineering expertise. Such a narrow view is contrary to the applicable legal standards and the nature of the field of industrial organization. As an economist with decades of experience, Prof. Whinston is amply qualified to offer opinions about the market implications of scale; his testimony will assist the Court in evaluating whether Google is unlawfully maintaining monopolies.

Google's argument that economic opinions on scale boil down to improper evidence narration is wrong, root and branch: Prof. Whinston did not merely read documents on scale—he applied his economic expertise and performed independent empirical analyses. Indeed, Google's assertion that Prof. Whinston's opinions merely narrate the documents and testimony of market participants ignores the very empirical work—e.g., Prof. Whinston's regression analysis showing the importance of scale—that Google challenges elsewhere in its Motion. The record is clear that, under Federal Rule of Evidence 702, Prof. Whinston appropriately grounded his opinions in the case facts, by citing and synthesizing the evidence that supports his economic opinions.

Google's additional basis for challenging Prof. Winston's opinions on scale focus on the inputs and construction of his regression analysis. But Prof. Winston employed a reliable and accepted methodology. The fact that Google would have used different numbers is irrelevant to admissibility and not a proper basis for a motion to exclude.

*Second*, Google's attempt to exclude Prof. Whinston's opinions on Google's incentives to compete on product quality (e.g., latency and privacy) fail for similar reasons. Once again, Google misunderstands the nature of Prof. Whinston's testimony: he is offering an *economic opinion* about Google's incentives to compete, not a technical opinion about the engineering

mechanisms through which a search engine can implement enhanced data privacy or reduce

latency. Testimony about how competitive conditions in the market affect Google's incentives is

a perfectly ordinary topic for an industrial economist such as Prof. Whinston. That he supported

his opinions with substantial record evidence is hardly grounds for exclusion; it is precisely what

experts in an antitrust case should do.

## BACKGROUND

I.    **Prof. Whinston Is A Well-Credentialed, Award-Winning, And Prolific Economist
      With Deep Experience On Economies Of Scale**

Prof. Whinston teaches Economics at MIT, as the Sloan Fellows Professor of

Management. Before joining MIT's faculty, Prof. Whinston earned his PhD in economics at MIT

and taught economics at Northwestern and Harvard. Def. Ex. 1, Expert Report of Michael D.

Whinston, PhD, June 6, 2022 [Corrected Nov. 4, 2022] (ECF No. 418-1) ("Whinston Initial

Report"), A-1. Prof. Whinston has won numerous prizes and awards in economics, including the

2016 Frisch Medal and several National Science Foundation research grants. *See id.* at A-9. Prof.

Whinston has co-written economics textbooks used at colleges and graduate schools across the

country. *See id.* at A-3. Courts have accepted expert testimony from Prof. Whinston in antitrust

cases spanning a variety of industries, including as a court-appointed expert. *Id.* at A-2–A-3. His

opinions have never been excluded under *Daubert* and Rule 702.

As part of his economic work, Prof. Whinston is a noted and widely published expert in

economies of scale. Economies of scale refer to advantages gained by a firm through increased

levels of production. Prof. Whinston has written about scale—and how scale affects

competition—in various contexts, including, *inter alia*, with respect to vertical integration, how

scale advantages can be used to exclude rivals and to exercise market power, and how scale

economies impact merger policy.[1] *See also* Pls. Ex. A, Excerpts from the Deposition of Michael D. Whinston, Nov. 9–10, 2022 ("Whinston Dep."), 119:17–120:16 ("[S]ome of my most significant papers are about scale economies and their implications.").

Indeed, textbooks co-authored by Prof. Whinston are used to teach economies of scale to graduate and undergraduate students across the United States.[2] Prof. Whinston's undergraduate textbook—which was published in 2014—specifically discusses how Google benefits from scale.[3]

## II.    Prof. Whinston's Economic Opinions In This Case

Prof. Whinston submitted three reports (initial, rebuttal, and reply). Prof. Whinston's opinions include unchallenged analysis regarding market definition, Google's monopoly power, Google's distribution agreements, the power of search defaults, foreclosure effects, and search

---

[1]   Patrick Bolton and Michael D. Whinston, "Incomplete contracts, vertical integration, and supply assurance." *Review of Economic Studies* 60, No. 1 (1993): 121–48, *available at* https://business.columbia.edu/sites/default/files-efs/pubfiles/2020/incomplete% 20contracts.pdf (visited Jan. 23, 2023); Ilya R. Segal and Michael D. Whinston. "Naked Exclusion: Comment." *American Economic Review* 90, No. 1 (2000): 296–309, *available at* https://web.stanford.edu/~isegal/comment.pdf (visited Jan. 23, 2023); Michael D. Whinston. "Tying, Foreclosure, and Exclusion." *American Economic Review* 80, No. 4 (1990): 837–59; Ben Mermelstein, Volker Nocke, Mark A. Satterthwaite, and Michael D. Whinston. "Internal versus External Growth in Industries with Scale Economies: A Computational Model of Optimal Merger Policy." *Journal of Political Economy* 128, No. 1 (2020): 301–41, *available at* https://www.journals.uchicago.edu/doi/epdf/10.1086/704069 (visited Jan. 23, 2023).

[2]   Andreu Mas-Colell, Michael D. Whinston, and Jerry R. Green, *Microeconomic Theory* (1995); B. Douglas Bernheim and Michael D. Whinston, *Microeconomics* (2nd ed., 2014) (covering scale economies in Sections 7.4, 7.5, and 8.7).

[3]   *Microeconomics*, *supra* note 2, at 593 ("For Google, having the most search traffic allows it to learn about what people want to see when they enter particular search terms, which helps it generate better search results than its rivals.").

advertising.[4] As part of his economic analysis, Prof. Whinston also offers economic opinions relating to scale, privacy, and latency.

### A.   Prof. Whinston Opines About The Importance Of Scale

Every day, Google processes billions of user queries. Google uses these queries and other fine-grained information about user behavior (such as the user's location, the links they clicked on, and their "swipes" and "hovers" on the Google search page) to better understand user intent and train its algorithms.[5] The sheer quantity of that data—Google's *scale*—powers Google's search systems and is the self-identified "source of Google's magic."[6]

Past and present search executives have recognized the importance of scale. As Google former CEO Eric Schmidt put it: "Scale is the key." *See* Def. Ex. 1, Whinston Initial Report, ¶ 982. Apple executive John Giannandrea explained that, for a search engine, ███████████ ███████████████████████ with respect to uncommonly seen █████████ Pls.

---

[4] *See generally* Def. Ex. 1, Whinston Initial Report, ¶¶ 99–300 (general search market definition), ¶¶ 301–428 (search advertising market definition); ¶¶ 429–679 (monopoly power), ¶¶ 695–843 (distribution agreements); ¶¶ 846–876 (power of defaults); ¶¶ 877–965 (foreclosure effects).

[5] *See e.g.*, Pls. Ex. B, Google, How Search Works, Ranking Results, https://www.google.com/search/howsearchworks/how-search-works/ranking-results/ (visited Jan. 17, 2023) ("[Google] *use[s] aggregated and anonymized interaction data to assess whether search results are relevant to queries.* [Google] transform[s] that data into signals that help our machine-learned systems better estimate relevance." (emphasis added)).

[6] Pls. Ex. C, GOOG-DOJ-30591861, at -872 ("The source of Google's magic is this two-way dialogue with users. With every query, we give a little knowledge, and get a little back . . . These bits add up. After going around this cycle a few hundred billion times, we start lookin' pretty smart!"); *see also id.* at -870 ("[M]ost of the knowledge that powers Google, that makes it magical, ORIGINATES in the minds of Google users." (emphasis in original)); *see also* Pls. Ex. D, GOOG-DOJ-17680293, at -297 ("I'd like to start with something really basic: how people interact with Google. The magic of Google ranking doesn't start with fancy algorithms or deep learning. It starts here. This is the wellspring of our magic.").

Ex. E, Excerpts from the Deposition of John Giannandrea, Apr. 22, 2022, 138:16–21[7]. And

Neeva CEO (and former Google SVP) Sridhar Ramaswamy explained that "[t]he quality of a

search engine is an exceptionally complicated process" that "involves the scale of the training

data available." He noted "Let's put it this way: Better quality depends on scale." Pls. Ex. F,

Excerpts from the Deposition of Sridhar Ramaswamy, Mar. 23–24, 2022 ("Ramaswamy Dep."),

119:21–120:7.[8]

Both the United States and Google have offered technical experts on scale, who will

educate the Court and opine on the engineering mechanisms through which search engines use

scale to improve search quality.[9] Prof. Whinston, however, is not offered as a technical expert.

*See* Pls. Ex. A, Whinston Dep. 432:15–433:4 ("So I'm not a technical expert on search, of

course. I'm not an engineer."). Rather, drawing on his expertise in the field of economics, Prof.

Whinston will testify about how scale affects *competition* in the general search services market

and related advertising markets.

Prof. Whinston's initial report emphasizes the economic scope of his opinion. For

example, Prof. Whinston opined as to "how a general search engine's *competitivenes*s is affected

---

[7] *See also* Def. Ex. 1, Whinston Initial Report, ¶ 988 ███████████████████████████████
█████████████████████ (emphasis added)) (citing APLGOOGDOJ-00576506, at -507).

[8] Google misleadingly quotes Mr. Ramaswamy for the proposition that Neeva (an ad-free
general search engine that makes money from subscriptions) would only need scale
amounting to ███ percent of the users" in its markets. *See* Def. Br. at 3. But in that exchange,
Mr. Ramaswamy was talking about the number of subscribers Neeva would need to ███
███—*not* the query scale Neeva would need to effectively challenge Google's monopoly.
*See* Pls. Ex. F, Ramaswamy Dep. 223:5–234:23 (Mr. Ramaswamy testifying that Neeva
would need ███████—translating to a ███ percent market share—to be ███████
████████); Pls. Ex. G, Excerpts from the Deposition of Ophir Frieder, Nov. 3–4, 2022
("Frieder Dep."), 201:24–202:11, (Google's scale expert agreeing Mr. Ramaswamy was
making a point about cash flow).

[9] The United States has moved to exclude the testimony of one of Google's scale experts, Prof.
Edward Fox. *See* ECF No. 443.

by its scale, as measured by the number of queries that it receives." Whinston Initial Report, ¶ 966 (emphasis added). During his deposition, Prof. Whinston testified: "I'm an expert in . . . the economics of competition. And so what I'm doing is looking at the evidence before me of the effects of scale and analyzing what implications that has for—for competition." Pls. Ex. A, Whinston Dep., 432:15–433:4. In support of his opinion on the competitive importance of scale, Prof. Whinston offered a multi-part analysis featuring extensive independent empirical work.

*First*, Prof. Whinston opined that Google has a significant scale advantage relative to rival general search engines. For example, in the United States in 2020, Google received ▮ times as many queries as its nearest rival (Bing) and ▮ times as many queries as all rival general search engines combined. Def. Ex. 1, Whinston Initial Report ¶ 968. Prof. Whinston's data analysis shows that Google has a scale advantage both with respect to unique search phrases, *id.*, ¶¶ 969–970, Figs. 176–177, and the frequency with which Google sees search phrases, *id.*, ¶ 972, Fig. 178.

*Second*, Prof. Whinston opines on how search engine quality hinges on scale. *See* Def. Ex. 1, Whinston Initial Report, ¶¶ 975–1069 (§ VII.B.2). To reach these opinions, Prof. Whinston performed his own empirical work—analyzing Google's ordinary-course business data—to show that: (1) scale is particularly important for delivering high-quality results for "tail" queries, *id.*, ¶¶ 1048–1064; and (2) Google's scale advantage relative to Microsoft Bing "contributes to Google's higher quality search experience for consumers," *id.*, ¶¶ 1065–1068.

Further, again relying on both case materials, Def. Ex. 1, Whinston Initial Report, ¶¶ 1074–1099, and his own empirical work, *id.*, ¶¶ 1100–1118, Prof. Whinston opined that Google's greater scale allows its search engine to offer better-targeted search advertisements. Finally, Prof. Whinston analyzed a real-world example—the joint search agreement between

Microsoft and Yahoo, *see id*, ¶ 1138—to measure the importance of scale, *id.*, ¶¶ 1137–1156. To begin, Prof. Whinston evaluated documents discussing the scale benefits of the Microsoft-Yahoo deal. Then he performed data analysis showing how increased scale helped Microsoft improve its organic search results and advertising profits. *See id.*, ¶¶ 1150–1155, Figs. 201, 204; Def. Ex. 3, Reply Expert Report of Michael D. Whinston, PhD, Sept. 26, 2022 [Corrected Nov. 4, 2022] (ECF No. 418-3) ("Whinston Reply Report"), ¶¶ 563–579, Fig. 36.

### B.      Latency And Privacy Are Important Axes Of Competition In Search

Prof. Whinston will testify at trial that Google's anticompetitive search distribution agreements have harmed competition. Among other things, Prof. Whinston is expected to testify that Google's conduct has (1) harmed rival search quality, Def. Ex. 1, Whinston Initial Report, ¶¶ 1175–1177, and (2) lowered the incentives for anyone—including Google—to improve and innovate product quality features such as latency and privacy, *id.*, ¶¶ 1178, 1198. He has explained "consistent with the lack of competitive threats and muted incentives it now faces, Google's efforts to improve its quality in key areas such as latency and privacy have lagged." *Id.*, ¶ 1198.

Latency—a measure of how fast a webpage page loads—is a "critical aspect of delivering a quality search experience to consumers." Def. Ex. 1, Whinston Initial Report, ¶ 1209 n.1473 (Google documents: "Fast, accurate results mean happy users" and "[P]eople are very sensitive to speed."). Prof. Whinston analyzed the case evidence to conclude that, consistent with Google's muted incentives to compete, Google's latency performance has lagged. For example, by 2017, ███████████████████████████ Google has made only modest improvements since then. *Id.*, ¶¶ 1212, 1216–1221. Through his economic analysis, Prof. Whinston tied Google's muted incentives to reduce this latency lag to Google's monopoly position in search.

Similarly, data privacy is a substantial axis of competition between general search engines. Def. Ex. 1, Whinston Initial Report, ¶ 1223. Prof. Whinston opined that "because of the absence of search competition, Google has not improved its Search privacy policies as significantly or quickly as it would have in a more competitive market." *Id.*, ¶ 1224. Prof. Whinston then evaluated case evidence supporting Google's muted incentives to compete on privacy. For example, Google executives have evaluated potential changes to Google's data-tracking policies in light of the competitive pressure (or lack thereof) that Google faces from privacy-focused search engines such as DuckDuckGo. *Id.*, ¶¶ 1232–1235.

## STANDARD

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702, "a trial court may only admit expert testimony that is both relevant and reliable." *United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 30 (D.D.C. 2011). In evaluating threshold admissibility, "the court assumes only a 'limited gate-keep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief or unsupported speculation.'" *Id.* (quoting *Ambrosini v. Labarraque,* 101 F.3d 129, 135–36 (D.C. Cir. 1996)). "In general, Rule 702 has been interpreted to favor admissibility." *Khairkhwa v. Obama,* 793 F. Supp. 2d 1, 10 (D.D.C. 2011) (citing *Daubert,* 509 U.S. at 587), *aff'd* 703 F.3d 547 (D.C. Cir. 2012); *see also Evans v. Wash. Metro. Area Transit Auth.*, 674 F. Supp. 2d 175, 178 (D.D.C. 2009) ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.") (citing Fed. R. Evid. 702 Advisory Committee Note (2000)).

## ARGUMENT

Google's arguments to exclude certain portions of Prof. Whinston's testimony are misplaced and should be rejected. *First*, Prof. Whinston is qualified to testify about the competitive implications of scale; he properly cited documents and testimony to support and

explain the factual basis for his economic opinions; and his regression analysis employed a reliable methodology commonly used by industrial economists. *Second*, on latency and privacy, Prof. Whinston is likewise qualified to analyze Google's economic incentives to compete on product-quality features.

## I.      Professor Whinston's Opinions Regarding Scale Are Admissible

The Court should conclude that Prof. Whinston's opinions on scale arise fully from his undisputed economic expertise, employ reliable principles from the analytical toolkit of industrial economics, and appropriately tie that economic theory to the facts of the case. In short, Prof. Whinston is qualified to offer opinions on how scale affects competition between Google and its rivals, and his opinions are reliable and relevant. Google's disagreements with Prof. Whinston's testimony on scale should be raised at trial and through cross-examination.

### A.      Prof. Whinston's Opinions Regarding Scale Are Firmly Rooted In His Economic Expertise

Prof. Whinston is well-qualified to provide the Court, as the factfinder, with helpful insights on how economies of scale affect competition among general search engines.

#### 1.      Prof. Whinston's Proffered Scale Testimony Satisfies The Federal Rules Of Evidence

Under Rule 702, an expert must possess "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In considering expert testimony under Rule 702, courts have "eschewed imposing overly rigorous requirements of expertise" and instead have "been satisfied with more generalized qualifications." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2021 WL 662292, at *3 (E.D. Pa. Feb. 19, 2021) (citation omitted). An "expert's qualifications should be assessed liberally," with the focus on "whether the qualifications that an expert does have provide a foundation for the witness to testify

meaningfully on a given matter." *Id.* (quotations and citation omitted); *accord Hoffman v. Kansas City Life Ins. Co.*, 2019 WL 2297348, at *4 (D.S.C. May 30, 2019) ("Courts have generally found experts to lack the requisite qualifications *only when the proposed expert clearly has no relevant qualifications*." (emphasis added)).

Here, Google mischaracterizes Prof. Whinston's relevant expertise in analyzing the competitive benefits companies derive from superior scale. Google complains that Prof. Whinston lacks a degree in computer science, has never worked for a search engine, and hasn't analyzed "*search engine* scale" (emphasis added) in his prior work. Def. Br. at 10. But Google's myopic focus on search-industry specialization overlooks Prof. Whinston's relevant credentials as an economist. Prof. Whinston's opinion does not and need not rest on subject-matter expertise or experience working in the search business. Rather, he is an industrial economist evaluating how scale affects competitiveness, here, in the search engine industry. Def. Ex. 1, Whinston Initial Report, ¶ 966 ("Scale is critical for the *competitiveness of general search engines*." (emphasis added)).

In addressing that question, Prof. Whinston brings to bear "scientific" or "other specialized knowledge"—e.g., his undisputed expertise in the field of economics and economies of scale in particular—that will help the Court (1) understand the market realities and competitive dynamics in the relevant markets and (2) determine whether Google is unlawfully maintaining monopolies in these markets. Fed. R. Evid. 702(a); *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) (Rule 702 boils down to "the twin concerns of 'reliability' . . . and 'helpfulness.'"); *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2017) ("Generally, an expert may be permitted to testify if he is qualified, reliable, and helpful.").

Prof. Whinston is especially qualified because, along with his general expertise in industrial economics, he has specific expertise in how economies of scale impact the competitive dynamics of a given industry. The parties' technical scale experts—Profs. Fox and Frieder for Google and Prof. Oard for Plaintiffs—are not so qualified: They can speak to the computer science behind scale, but *not* as to how scale affects competition.[10]

Google does not dispute that Prof. Whinston is an expert in economies of scale. Def. Br. at 13 (noting Prof. Whinston "may understand how scale economies work in general"). Instead, Google posits that being an economist "does not make one expert in anything that touches commerce." Def. Br. at 12. True, but that is a straw man: Prof. Whinston is not claiming to be an all-purpose expert on commerce. Rather, Prof. Whinston is particularly well-qualified because he has published and taught on the specific topic of how economies of scale affect competition—precisely what he is testifying about here.

To the extent Google plans to argue that scale economies do not apply in the market for general search engines because it is "highly technical"—an argument Google hints at, but does not develop (*see* Def. Br. at 13)—that goes to the weight of Prof. Whinston's testimony and is a matter for cross-examination. *See Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 197 (D.D.C. 2015) ("The presumption under the Rules is that expert testimony is admissible once a

---

[10]   *See* Pls. Ex. G, Frieder Dep., 46:7–10 ("Q. And for purposes of this litigation, you're not offering any expertise in economics, right? A. Not at all."); *id.*, 75:7–12 ("Q: Are you an expert on the economic aspects of competition? A. No. Q. And you're not offering an opinion on the economic aspects of competition? A. I wouldn't be able to."); *see also* Pls. Ex. H, Excerpts from Expert Report of Edward A. Fox, June 3, 3022, App. B, at 2 (Prof. Fox has a Ph.D. in Computer Science, but no degrees in Economics); Pls. Ex. I, Excerpts from Deposition of Douglas Oard, Oct. 24, 2022, 237:19–238:16 (United States' scale expert testifying: "I'm not sure I can be helpful to you on this. I don't have expertise in competition.").

proponent makes the requisite threshold showing; further disputes go to weight, not admissibility." (citation omitted)), *aff'd* 836 F.3d 57 (D.C. Cir. 2016).

Google relies on *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 289 F. Supp. 3d 145 (D.D.C. 2018) (Def. Br. 12–13), but that case only highlights Google's mistaken logic. *Second Chance Body Armor* involved an expert in the tire industry who claimed—with scant explanation—that his tire-business expertise transferred to body-armor ballistics. *Id.* at 176. In excluding the proffered testimony, the district court explained "it is hardly adequate to say that '[t]ires, like bullet resistant vests, are safety-critical products'" and noted that the expert cited no "industry standards or relevant articles" in his reports. *Id.*

In contrast with the erstwhile subject-matter expert in *Second Chance Body Armor*, Prof. Whinston is not hanging his hat on industry-specific expertise. Rather, he is a credentialed economist qualified to evaluate competition and economies of scale in any industry, just like Google's economists have opined in antitrust cases arising in many far-flung industries. For example, Google's Prof. Murphy regularly testifies for the antitrust defense bar. Looking just at reported cases on WestLaw, he has served as an economic expert in cases involving the news media, propane gas, coffee machines, milk producers, grocery stores, airlines, credit cards, computer chips, and Big-Tech companies such as Microsoft and Apple. Nothing in his resume suggests Prof. Murphy has specialized expertise in any of those areas; rather, he—like Prof. Whinston—is a generalist economist who can apply his expertise to a range of industries.

Thus, the Court should conclude that Prof. Whinston's scale testimony fully satisfies *Daubert* and the Federal Rules.

### 2.    Precedent Forecloses Google's Argument That Prof. Whinston Lacks Technical Expertise

Numerous cases contradict Google's argument (Def. Br. 9–10) that Prof. Whinston's lack of technical expertise precludes his testimony on scale.

Courts commonly accept expert testimony from antitrust economists even when they are not technical or subject-matter experts in the underlying industry. For example, one district court explained that the proffered witness "qualifies as an expert economist in this case. Although he has no experience in the alcoholic beverage industry, his testimony as to general economic principles, as applied to the alcoholic beverage industry, is well within his asserted realm of expertise and is helpful." *TFWS, Inc. v. Schaefer*, 183 F. Supp. 2d 789, 793 (D. Md. 2002), *vacated on other grounds*, 325 F.3d 234 (4th Cir. 2003); *see also Premier Comp Solutions LLC v. UPMC*, 2019 WL 480480, at *5 (W.D. Pa. Feb. 7, 2019) (finding economist's lack of specialized expertise "is of no moment" because his "academic qualifications and experience as an antitrust economist certainly gives him the ability to analyze" the relevant market).

More broadly, courts accept testimony from experts where they offer helpful general expertise, regardless of whether they have additional specialized or technical expertise in the underlying industry. For example, this Court explained that "specialized personal knowledge is not required for an expert" in economics "to be qualified to opine on the economic impact of copyright infringement." *Am. Soc'y for Testing & Materials v. Pub. Resource Org., Inc.*, 2016 WL 7839128, at *1 (D.D.C. Sept. 21, 2016).[11]

---

[11] *See also Hoffman*, 2019 WL 2297348, at *5 (declining to exclude general expert in insurance based on "lack of nuanced expertise in insurance claims processes" underlying the particular dispute); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308 (S.D.N.Y. 2015) (finding expert in business valuation need not have specific expertise in the apparel industry to testify about the valuation of an apparel-related enterprise); *Regal Cinemas, Inc. v. W&M Props.*, 90 F. App'x 824, 833 (6th. Cir. 2004) (finding certified public accountant was qualified to testify

Prof. Whinston's testimony here falls comfortably within these principles. His lack of technical or engineering knowledge is beside the point: Prof. Whinston offers his economic expertise to help the Court understand the *competitive implications* of economies of scale in this market. At bottom, Google argues that Prof. Whinston cannot provide helpful testimony on scale because he is not a technical expert in search. But Google cites no analogous case law for this novel proposition.

Instead, Google cites three cases, all far afield from antitrust economists. *Arias v. DynCorp*, 928 F. Supp. 2d 10 (D.D.C. 2013), involved a medical doctor who had no expert basis to testify about whether a herbicide contained excessive concentrations of glyphosate and surfactant. *Id.* at 17. *SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), involved a self-styled expert in "financial economics" seeking to testify about synthetic credit derivatives in a securities case. *Id.* at 677. And *Second Chance Body Armor* is inapposite, for the reasons described above.

Certainly, Google's own experts would flunk the proposed technical-expertise test. *See* Pls. Ex. N, Excerpts from Deposition of Kevin Murphy, Nov. 21–22, 2022, 230:21–231:22 (Google's economic expert, Kevin Murphy: "I'm an economist; I'm not a search technical expert."). For example, Google's expert Catherine Tucker offers opinions on how user data affects the accuracy of Google's search results[12]—even though she is not a computer scientist

---

on lost profits of a movie theater, despite lack of experience in the movie theater industry); *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 738–39 (4th Cir. 2015) (finding an expert with an MBA in Economics could testify as to damages resulting from dispute over maritime contract without maritime experience).

[12] *E.g.,* Expert Report of Catherine Tucker, Ph.D. (June 6, 2022) (ECF No. 397-1), ¶¶ 51–58 (opining about how collecting less user data leads to a "tradeoff" of less accurate search results); Rebuttal Expert Report of Catherine Tucker, Ph.D. (Aug. 5, 2022) (ECF No. 397-2), ¶ 9 ("Search engines that do not collect location data, IP address, and past search activity do

nor an engineer, claims no technical expertise, and has never seen Google's algorithms. Pls. Ex. O, Excerpts from the Deposition of Catherine Tucker, Dec. 8–9, 2022, 16:16–20 ("No, I wouldn't call myself a technical expert. I'm an economist."); *id.*, 19:2–5 ("Q: Have you, yourself, ever seen under the hood of Google's—the Google Search algorithms? A: No. I've never inspected the code of any Google Search algorithm.").

Google points to testimony from Prof. Whinston's deposition, where Google's counsel asked Prof. Whinston whether it would be possible for rivals to match Google's search quality without gaining additional scale. *See* Def. Br. at 11. But Prof. Whinston is not an engineer, so unsurprisingly he has no opinion on whether it is technically possible for a firm—with unlimited resources—to engineer a search engine on par with Google without first having access to search queries at scale. That thought experiment, however, is not at issue in this case, nor the point of Prof. Whinston's testimony.

Rather, as an economist, Prof. Whinston rightly focused on the commercial and competitive realities that actually exist in the marketplace. *See* Def. Br. at 11 (acknowledging Prof. Whinston's testimony that, even in the hypothetical, scale would affect the required investment; he further questioned whether it is "economically sensible for you to invest if you can't gain traffic"); Def. Ex. 1, Whinston Initial Report, ¶ 1192 ("Rivals such as Microsoft also recognize that investment decisions must be justified by their expected return."). Accordingly, the Court should reject Google's challenge to Prof. Whinston based on his lack of technical expertise.

---

not offer the same degree of functionality."); *see generally id.* (opining throughout about how user data affects search accuracy).

### 3.   Google's Argument Goes To Weight Rather Than Admissibility

In any case, Google's critiques of Prof. Whinston's expertise at most go to weight, not

admissibility. If Google wishes to argue that Prof. Whinston's lack of technical or engineering

expertise undermines his opinions about the competitive import of scale, they are free to do so at

trial. As one court explained: "If the expert has educational and experiential qualifications in a

general field closely related to the subject matter in question, the court will not exclude the

testimony solely on the ground that the witness lacks expertise in the specialized areas that are

directly pertinent." *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y.

2011); *accord N.O. v. Alembik*, 160 F. Supp. 3d 902, 908 (E.D. Va. 2016) (It is "well-settled that

gaps in an experts knowledge generally go to the weight of the witness's testimony, not its

admissibility."); *Hoffman*, 2019 WL 2297348, at *5 (similar).

### 4.   Google's Argument Ignores The Role Of Industrial Economist And Is Belied By Google's Own Practice

Google's argument that Prof. Whinston would need technical engineering expertise to

testify about how scale affects competition proves too much because it misunderstands the role

of industrial economists in antitrust cases and is contradicted by Google's own practice of

relying on generalist economists for insights on search engine scale.

Scale effects are a well-accepted topic within the expertise of industrial economists.

*Groobert v. Pres. & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (*Daubert*

factor whether the "technique or theory has been generally accepted in

the scientific community."). Generalist economists frequently opine on issues of scale in antitrust

cases. *See, e.g.*, *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 234, n. 32 (D.D.C. 2017)

(antitrust economists opining on economies of scale); *Universal Surveillance Corp. v.

Checkpoint Sys., Inc.*, 2015 WL 6082122, at *11, 16 (N.D. Ohio Sept. 30, 2015) (similar);

*Se. Missouri Hosp. v. C.R. Bard, Inc.*, 2008 WL 4372741, at *6 (E.D. Mo. Sept. 22, 2008) (similar).

Even within the specific domain of search engines, economists have studied scale effects using the standard toolkit of industrial economics. For example, Prof. Whinston's initial report cited two industrial economists' (Maximilian Schäferand Geza Sapi) paper on scale effects with respect to general search engines. Def. Ex. 1, Whinston Report, ¶ 1009 n.1274. This article found, among other things, that "[s]earch result quality increases when more users search a keyword."[13] Economist Preston McAfee (then at Microsoft, now at Google) similarly has written that there is "substantial improvement on rare queries as more data flows in," such that the evidence "strongly suggest[s] that major search engines still operate in a region where more data matters." *Id.*; *see also* Pls. Ex. J, GOOG-DOJ-25102166, at -180; Def. Ex. 1, Whinston Report, ¶ 1009 n.1274 (citing GOOG-DOJ-25102166).

If there was any doubt as to whether economists have a proper role in discussing search engine scale, they should be put to rest by Google's own longtime Chief Economist Hal Varian. Prof. Varian admits that he, too, is not a technical expert in how search engines work. Pls. Ex K, Excerpts from the Deposition of Hal Varian, Mar. 1–2, 2022, 25:20–26:5 (Q: "So do you consider yourself an expert in engineering or computer programming? A: I don't consider myself an expert in those areas."); *id.*, 107:17–108:1 ("I'm not an expert on the organic search side of

---

[13]  Maximilian Schäferand Geza Sapi, "Learning from Data and Network Effects: The Example of Internet Search," DIW Berlin Discussion Paper No. 1894, Sept. 2020, *available at* https://ssrn.com/abstract=3688819.

things."). Nevertheless, Prof. Varian frequently opines on economies of scale in the search

business, including through presentations and as Google's public-facing expert on the issue.[14]

Thus, Google itself relies on the expertise of a non-technical economist concerning scale,

refuting the theory in its Motion that only technical experts can offer valuable insights on the

issue.

      For all these reasons, the Court should reject Google's argument that Prof. Whinston is

unqualified to offer helpful opinions on the competitive implications of economies of scale.

      **B.**     **Prof. Whinston Did Not Engage In Improper Evidence Narration**

      The Court should reject Google's argument that Prof. Whinston's opinions on scale

should be excluded because they consist "mostly" of "improper narration of evidence in the

case." Def. Br. at 13.

      In particular, Google argues that Prof. Whinston functions as a "vehicle for a factual

narrative" and offers little more than a "gloss" on case evidence. *Id.* at 13–14. That argument

fails for four reasons. *First*, Google's characterization is wrong—Prof. Whinston does not

merely narrate case evidence on scale. Rather, Prof. Whinston properly examined the facts of

this case—which is *required* under Rule 702—through the lens of economic theory and

substantial empirical analysis. *Second*, Google fails to identify which of Prof. Whinston's factual

citations constitute improper evidence narration unrelated to his economic opinions. *Third*,

Google's motion is premature because the Court can address any improper evidence narration by

---

[14]  Pls. Ex. L, GOOG-DOJ-01162745 (presentation by Prof. Varian entitled, "Economies of scale
in search engines?"); *see also* Def. Ex. 1, Whinston Initial Report, ¶¶ 978–981 (discussing
Prof. Varian's views on scale, including his view that there are "substantial" scale effects
propelling general search engines); Pls. Ex. M, Steven Levy, *Secret of Googlenomics: Data-
Fueled Recipe Brews Profitability*, Wired, May 22, 2009, *available at*
www.wired.com/2009/05/nep-googlenomics/ (visited Jan. 17, 2023) (profiling Prof. Varian in
an article about Google's "secret sauce" of data).

experts at trial. *Fourth*, Google has no basis to complain about evidence narration because its experts mirror Prof. Whinston's approach.

### 1.   Prof. Whinston Properly Relied On The Factual Record In Conjunction With His Economic Opinions And Empirical Analysis

Federal Rule of Evidence 702(d) contains a relevancy or "fit" component, requiring that the expert apply his expertise "to the facts of the case." "With respect to relevance, the Court must determine whether the proffered testimony is sufficiently tied to the facts of the case and whether it will aid the factfinder in resolving a factual dispute." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 42 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019).

Testifying experts are thus expected to cite and rely upon case materials to provide the factual basis for their opinions and to connect their expertise to the facts. *E.g.*, *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *40 (N.D. Fla. Feb. 28, 2021) (finding an expert may "explain[ ] the basis of admissible opinions through commentary on documents and exhibits in evidence"); *Ohio State Troopers Ass'n , Inc. v. Point Blank Enters., Inc.*, 2020 WL 1666763, at *15–16 (S.D. Fla. Apr. 3, 2020) (finding an expert may narrate facts "which may be necessary to provide the facts supporting his opinions"). Indeed, reliance on the facts is mandated by Rule 702, which requires that expert testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b), and "fit" with the case, *e.g., Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 297 (D.D.C. 2018). Thus, the only way Prof. Whinston can proffer analysis regarding the importance of scale is by citing facts and data from the case file.

### a.   Prof. Whinston's Use Of The Factual Record Is Proper

Prof. Whinston's use of the record evidence was entirely consistent with these principles. Prof. Whinston's opinions on scale are *not* based on mere evidence narration, as Google wrongly

contends. Def. Br. at 13 ("mostly" narration), 14 ("vast majority" narration). Google doesn't dispute that Prof. Whinston reached economic conclusions with respect to scale—indeed, Google recites those conclusions in its Motion. Def. Br. at 6–8 (discussing Prof. Whinston's opinions).

Throughout the scale sections in his reports, Prof. Whinston performed substantial empirical work, including data analysis to show Google's scale advantage, Def. Ex. 1, Whinston Initial Report, ¶¶ 969–972, Figs. 176–178; how scale underpins Google's search quality and lucrative advertising business, *id.*, ¶¶ 1048–1068; and how the scale benefits from the Microsoft-Yahoo deal helped improve Bing's organic search results and ad monetization, *id*, ¶¶ 1150–1155, Figs. 201, 204.[15] In short, Prof. Whinston blended economic expertise, data analysis, and factual support to form and explain his economic opinion on the competitive implications of scale—precisely what an economic expert in an antitrust case should do.

Indeed, the only portion of Prof. Whinston's opinion on scale that did *not* feature his own empirical work concerned how Google's scale allows it to conduct more experiments, with larger sample sizes, to better refine its algorithms. Def. Ex. 1, Whinston Initial Report, ¶¶ 1119–1136. But that is far from improper; that section provided an additional factual basis for Prof. Whinston's economic opinion that scale is an important driver of competitive success. *See Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013) (finding expert is entitled to present facts "as the predicate for his opinion testimony"); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (finding expert "of course" may "lay a foundation that necessarily requires restating facts in evidence"); *3M Combat Arms*, 2021

---

[15] *See also* Pls. Ex. A, Whinston Dep., 80:2–14 ("I conducted quite a bit of analysis of different components that affect competition in the market."); *id.*, 157:5–158:16 (describing his empirical work and market dynamics showing the importance of scale).

WL 765019, at *41 (finding expert entitled to provide "commentary on evidence that explains the factual bases of their opinions").

Moreover, Prof. Whinston can assist the Court at trial by synthesizing the voluminous record in this case and highlighting the evidence most relevant for evaluating competition. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 34 (D.D.C. 2015) (FTC's economist, Prof. Mark Israel (Google's expert here), properly served as a "*de facto* summary witness, synthesizing the mass of testimonial and documentary evidence gathered by the FTC" in an antitrust bench trial.); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1052–53 (N.D. Ill. 2022) (rejecting evidence-narration *Daubert* challenge because, "[a]s courts have found sufficient in other antitrust cases," the economist properly "synthesizes the economic and non-economic evidence," including through "evaluations of the record" from discovery).

Thus, Prof. Whinston's citations to case documents and deposition testimony were not evidence narration but rather properly synthesized record evidence to provide the framework and foundation for his economic opinions and empirical work.

For example, Prof. Whinston cited record evidence he used to design (and confirm the results of) data analysis on the importance of scale in answering long-tail queries, which relied on the metric of "very short clicks." Def. Ex. 1, Whinston Initial Report, ¶ 1054. These are instances where users follow a Google link and then "very short[ly]" return to the main results page because, presumably, the link was not helpful. Prof. Whinston cited and discussed Google documents showing that very short clicks tend to reflect a "low quality experience for consumers," whereas long clicks may indicate higher user satisfaction. *Id.* With that factual foundation, Prof. Whinston conducted data analysis to demonstrate that users are more dissatisfied with Google's results for tail queries (queries that Google rarely sees) than with head

queries (queries that Google sees frequently). *Id.*, ¶¶ 1060–1064. In other words, Google performs better on queries it sees at scale. In this example, Prof. Whinston did not improperly narrate evidence—he used case evidence as the foundation for his empirical work, which in turn informed his economic opinion on the competitive importance of scale.

### b. Prof. Whinston Is Not A Fact Witness

To the extent Google argues, without legal support, that Prof. Whinston should be excluded from discussing the evidence because he is not a percipient fact witness, *see* Def. Br. at 9 (Prof. Whinston not an "actual industry participant"), 14 (Prof. Whinston lacks "personal experience that would allow him to recite these facts himself"), that fundamentally misunderstands the role of expert testimony. Fed. R. Evid. 703 (noting an "expert may base an opinion on facts or data in the case that the expert has been made aware of").

Retained experts always testify about facts to which they are not percipient witnesses. *E.g., City of Mankato, Minn. v. Kimberly-Clark Corp.*, 2019 WL 4897191, at *8 (D. Minn. May 28, 2019). Further, Google's claim that Prof. Whinston misinterpreted the factual evidence (Def. Br. at 15) is at most fodder for cross-examination. *Rothe*, 107 F. Supp. 3d at 202; *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 373 (M.D. Fla. 2018) (If defendants believe an expert "misconstrued, misrepresented or overstated facts," they "can bring this to the attention of the trier of fact through cross-examination.").

Of course, Google is free to take issue with Prof. Whinston's economic opinion—and the repeated statements of its own C-suite executives—and argue that scale is *not* competitively significant in the search engine market. *See supra* Background § II.A (quoting Google CEO and others); Def. Ex. 1, Whinston Initial Report, ¶ 979 (quoting former Google COO, and later Yahoo CEO, Marissa Mayer: "You do get better as you have more users—that's why we have

the best spell check, the best personalized search, the best refinements, etc."). But those are issues for trial, not for consideration under *Daubert*.

Because Prof. Whinston properly relies on and incorporates facts from the case in his analysis, the Court should reject Google's narration argument as unfounded.

> ### 2. Google Has Not Identified Which Of Prof. Whinston's Factual Citations Are Allegedly Improper And Unrelated To His Economic Opinions

Google's evidence-narration argument also fails because Google has made no effort to identify which of Prof. Whinston's thousands of citations constitute improper evidence narration untethered to an economic opinion.

Google broadly argues that Prof. Whinston has improperly narrated case evidence. Def. Br. at 13–15. But Google fails to identify even a single instance of this phenomenon. The law demands more to exclude blanket swaths of expert testimony, as requested here. *See generally Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *8–18 (S.D.N.Y. Apr. 18, 2018) (evaluating evidence-narration *Daubert* challenge on document-by-document basis).

Certainly, Google does not identify any specific factual statements from Prof. Whinston's reports that are unrelated to his economic opinions. This situation is thus at odds with Google's cited evidence-narration cases. For example, Google cites *Tourre* for the proposition that "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology." 950 F. Supp. 2d at 675; *see id.* ("*Mere* narration" fails *Daubert*. (emphasis added)). *Tourre* (and cases like it) distinguish between opinion and unadorned factual narration—only condemning the latter practice of providing facts *without* opinion.

This case does not fall into that latter camp. Prof. Whinston is *not* being "presented" at trial "solely for the purpose of constructing a factual narrative based upon record evidence,"

*Highland Capital Mgt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); rather, he

is offering economic opinions and analysis, as Google's brief acknowledges, Def. Br. at 6–8

(reciting Prof. Whinston's economic opinions), 15–16 (regression analysis); *see also U.S. Info.*

*Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, 313 F. Supp. 2d 213, 237 (S.D.N.Y.

2004) (rejecting motion to exclude based on alleged evidence narration, where the expert recited

deposition testimony as background for and in conjunction with offering economic conclusions).

Thus, Google's evidence-narration challenge fails because it is facially incomplete.

### 3.   Any Improper Evidence Narration Should Be Addressed Through Evidentiary Rulings At Trial

In any case, Google's Motion should be denied as premature. Objections about experts

narrating or interpreting evidence can be addressed, if necessary, at trial. The proper remedy is

not exclusion under Rule 702.

To the extent the materials relied on by Prof. Whinston are otherwise admissible, or fall

under Rule 703, they will come into evidence at trial with the proper foundation and Prof.

Whinston can rely upon them. *E.g., Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 3467993, at \*9

(D. Vt. June 24, 2020) (denying evidence narration *Daubert* motion because "Plaintiffs represent

that, at trial, they will establish the factual foundation for Professor Elhauge's analyses, and he

may rely upon that evidence consistent with Fed. R. Evid. 703"). If an expert exceeds the proper

scope of establishing factual foundation, Google may object contemporaneously. *See Reach*

*Music*, 988 F. Supp. 2d at 404 (rejecting *Daubert* challenge and reserving for trial a party's

objection to an expert's "lengthy factual narrative").

### 4.   Google Cannot Complain About Evidence Narration Because Its Experts Follow The Same Practice

Finally, if Prof. Whinston has engaged in improper evidence narration (he has not),

Google has no basis to complain because Google's experts have done the same thing. *See Barber*

*v. Corizon Health, Inc.*, 2019 WL 8112500, at *1 (W.D. Pa. May 6, 2019) (rejecting *Daubert* challenge where the party's own experts had testified "on [the] same basis" because "what's good for the goose is good for the gander" (citation omitted)).

To cite one example, Google's Prof. Israel spills significant ink discussing Google's investments based purely on reading documents and deposition testimony. *See, e.g.*, Pls. Ex. P, Excerpts from the Expert Report of Mark Israel, June 4, 2022, ¶¶ 30–42. Prof. Israel describes documents which discuss Google's search experiments, *id.*, ¶ 30, research and development expenditures, *id.*, ¶ 31, and product improvements, *id.*, ¶¶ 32–33, among other topics. Like Prof. Whinston, Prof. Israel is not a technical or subject-matter expert, nor does he have personal knowledge of any of the evidence he recites. *See id.*, ¶¶ 2–7. At trial, the United States may object to the exposition of Google's experts to the extent not related to their opinions, but that would be an evidentiary objection in the context of a trial; it is not the proper basis for exclusion at the summary-judgment stage under Rule 702. *See Crowley v. Perdue*, 318 F. Supp. 3d 277, 291–92 (D.D.C. 2018) (noting courts should tread "cautiously" when asked to exclude expert testimony at the summary-judgment stage).

To the extent Google is concerned that Prof. Whinston has selected the "wrong" facts to rely upon for his testimony, that too is not the proper subject of a *Daubert* motion. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). The 2000 Advisory Committee notes to Rule 702 are instructive in this regard: "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 Advisory Committee Note (2000); *see also Pipitone v. Biomatrix, Inc.*,

288 F.3d 239, 249–50 (5th Cir. 2002) (factfinder is entitled to hear expert testimony and consider whether predicate facts were accurate).

For all these reasons, the Court should reject Google's evidence narration argument.

### C.     Prof. Whinston Employed Reliable Methods For His Regression Analysis Showing The Importance Of Scale

The Court should reject Google's quibbles with Prof. Whinston's regression analysis because such arguments are not properly the basis for exclusion under Rule 702.

Prof. Whinston designed and conducted a regression analysis to illustrate the importance of scale in search. Def. Ex. 1, Whinston Initial Report, ¶¶ 1060–1064; Def. Ex. 3, Whinston Reply Report, ¶¶ 534–536. ███████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ Prof. Whinston's regression analysis shows that, controlling for potentially confounding factors, the difference in Google's search quality performance between these types of queries is consistent with the expected benefits of scale. *Id.*

Google argues that this regression analysis is unreliable because it does not control for sufficient variables. *See* Def. Br. at 15–18. But such an argument is paradigmatically the province of cross-examination. *Sitts*, 2020 WL 3467993, at *10 ("This type of challenge goes to the weight of [the expert's] opinion rather than its admissibility as it pertains only to whether [the expert's] regression analysis is sufficiently detailed and illustrative to yield persuasive conclusions.").[16]

_____

[16]  *See also Bresler v. Wilmington Tr. Co*., 855 F.3d 178, 195 (4th Cir. 2017) (similar); *SourceOne Dental, Inc. v. Patterson Cos.*, 2018 WL 2172667, at *6 (E.D.N.Y. May 10, 2018) (similar); *Disposable Contact Lens*, 329 F.R.D. at 387–88 (similar).

As an initial matter, Google does not dispute that Prof. Whinston employed generally accepted and reliable methods, conceding that "regression analyses are within the general toolkit of economic experts." Def. Br. at 16. Instead, Google is attempting to use a Rule 702 motion to challenge the *substance* of Prof. Whinston's regression analysis. That it cannot do.

*In Re: Industrial Silicon Antitrust Litigation*, 1998 WL 1031507 (W.D. Pa. Oct. 13, 1998), is on point. There, as here, the defendant brought a *Daubert* challenge against an admittedly qualified economist, *id.* at *1–2, who used the generally accepted and reliable regression analysis model, *id.* at *3. Like Google, the defendant argued the expert's regression analysis was unreliable because she failed to consider certain variables. *Id.* The court rejected the *Daubert* motion, holding "a party cannot successfully challenge the admissibility of a regression analysis by simply pointing to a laundry list of possible independent variables that were not included in the study." *Id.* (citing *Palmer v. Schultz*, 815 F.2d 84, 101 (D.C. Cir. 1987)). "Rather," the court explained, "the party must introduce evidence to support its contention that the failure to include those variables would change the outcome of the analysis." *Id.*

Google has put forth no such evidence here. Nowhere in its motion does Google argue, much less prove, that the inclusion of any alleged missing variable(s) would change the outcome of Prof. Whinston's analysis. On the contrary, Google's Prof. Murphy—while critiquing the exclusion of some variables—did *not* conduct his own regression analysis to show that inclusion of additional variables would change the outcome of Prof. Whinston's analysis. *See* Pls. Ex. Q, Excerpts from Rebuttal Report of Professor Kevin M. Murphy, Aug. 5, 2022 [Corrected Nov. 15, 2022], ¶ 238.

In short, Google argues "that different analyses would have resulted in an expert report more favorable to [its] position." *Am. Socy. for Testing & Materials*, 2016 WL 7839128, at *2.

But under Rule 702, a court should "not strike an expert report simply because the expert did not rely on the particular assumptions or data [the opposing party] thought was necessary. Those issues are more properly addressed through 'vigorous cross-examination [and] presentation of contrary evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596) (alternation in original).

Indeed, Prof. Whinston squarely addresses Prof. Murphy's critiques. In his rebuttal report, Prof. Murphy suggests that the complexity of the different types of queries, rather than scale, may affect the quality of Google's results. Pls. Ex. Q, Murphy Rebuttal Report, ¶ 238. In his reply report, Prof. Whinston specifically controlled for query complexity (such as average words in a query) between the "head," "torso," and "tail," categories, and confirmed similar results as shown in his opening report. Def. Ex. 3, Whinston Reply Report, ¶¶ 534–536; *see In Re: Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 679 (E.D. Pa. 2007) (rejecting *Daubert* challenge where expert addressed critiques to regression variables).

Prof. Whinston's regression analysis is reliable, relevant, and admissible.

## II.   Prof. Whinston's Opinions On How Competition Affects Google's Incentives Regarding Privacy And Latency Are Admissible

The Court should also reject Google's cursory, one-page argument to exclude Prof. Whinston's opinions with respect to two quality dimensions of general search engines: latency and data privacy. Def. Br. at 18–19. According to Google, Prof. Whinston lacks the specialized expertise to comment on these topics and engages in improper evidence narration. These arguments should be rejected for the same reasons the Court should reject similar arguments regarding scale. *See supra* Argument §§ I.A (specialized expertise argument), I.B (evidence narration argument).

*First*, Google's argument that Prof. Whinston lacks the specialized expertise to offer opinions on privacy and latency again misunderstands the nature of his testimony. He is offering

an *economic opinion* about how competition affects Google's incentives to compete on product quality, not a technical opinion about the engineering mechanisms through which Google can reduce latency or improve data privacy protections. *See supra* Argument § I.A; Def. Ex. 1, Whinston Initial Report, ¶¶ 1179, 1183–1184, 1194–1196 (applying economic theory to product quality analysis). Thus, Prof. Whinston's lack of technical expertise in these areas is irrelevant to admissibility and is, at most, an argument Google can pursue on cross-examination.

Quality is fundamental to industrial organization, as the flip side of price. Economists regularly testify about aspects of product quality, including in monopolized markets; they do not need industry-specific expertise to do so. *TFWS, Inc.,* 183 F. Supp. 2d at 793. And product–quality factors are particularly salient in markets where the product is offered for free, such as in general search. In those markets, competition and consumer decisions necessarily revolve around quality considerations.

*Second*, Prof. Whinston properly relies on evidence from Google and other sources to support his economic opinion that Google's market dominance reduces its incentives to compete on product–quality. For example, Prof. Whinston cited documents and deposition testimony showing that (1) Google offers consumers less privacy protection than rivals such as DuckDuckGo, Def. Ex. 1, Whinston Initial Report, ¶¶ 1225–1227, and (2) Google weighs the query volume it is losing to DuckDuckGo when considering improvements to its privacy policies, *id.* ¶¶ 1233–1235. Economists can and must look to the evidence to provide a factual foundation for their expert opinions and to tie those opinions to the case facts. Under Google's Catch-22 logic, if Prof. Whinston had not tied the economic theory of Google's investment incentives to the facts, his testimony could have been excluded on that basis.

Finally, Google claims in passing (Def. Br. at 18) that Prof. Whinston uses "cherry-picked documents and testimony" showing that the company has lagged behind on privacy and latency improvements, but that argument—like so many of Google's challenges—goes to weight rather than admissibility. *E.g., Overwell Harvest Ltd. v. Widerhorn*, 2022 WL 17369676, at *3 (N.D. Ill. Dec. 2, 2022).

## III.   Prof. Whinston's Opinions On Google's Profitability Are Admissible

Finally, the Court should reject Google's argument to exclude Prof. Whinston's testimony regarding Google Search's exceptionally high profitability, as that challenge is unfounded. Def. Br. at 19.

According to Google, Prof. Whinston "heavily relies" on the analysis of the United States' accounting expert—Christine Hammer—for his analysis of Google's profitability. Def. Br. at 19. Google has filed a *Daubert* motion against Ms. Hammer (ECF No. 416) and argues that, if that motion is successful, Prof. Whinston's "opinions regarding Google Search's profitability must be excluded as well." Def. Br. at 19. This argument fails for three reasons.

*First*, Google's *Daubert* motion against Ms. Hammer should fail, for the reasons stated in our separate opposition filed today. Accordingly, Prof. Whinston's reliance on Ms. Hammer is appropriate.

*Second*, Google has challenged only the portion of Ms. Hammer's opinion that compares the profitability of Google's search business to the profitability of other businesses in industry benchmark groups. Even if that portion of Ms. Hammer's opinion were excluded, there would be no basis to exclude any of Prof. Whinston's opinions that rely on unchallenged portions of Ms. Hammer's opinion. For example, Prof. Whinston offers the opinion that "Google's search engine earns high profits, both *absolutely* and compared to other relevant benchmark firms." Def. Ex. 1, Whinston Initial Report, ¶ 529 (emphasis added). Specifically, Prof. Whinston performed

31

an independent analysis that showed Google's search profits are high in absolute terms. *See Id.*, ¶ 540, Fig. 86. Thus, Google's Motion to exclude Ms. Hammer's benchmarking analysis—which is comparative in nature—has no bearing on the admissibility of Prof. Whinston's conclusion that Google search profits are high in absolute terms

Moreover, Prof. Whinston relies on Ms. Hammer's analysis of Google Search's profitability within the context of the profitability of other products within Google. *See* Def. Ex. 1, Whinston Initial Report, ¶ 545. This, too, is a portion of Ms. Hammer's opinion that Google does not seek to exclude. Hence, any ruling on Google's challenge of Ms. Hammer's benchmarking analysis should not disturb Prof. Whinston's opinion on Google Search's profitability relative to other Google products.

*Third*, Prof. Whinston performed his own analysis comparing Google's profit margins to those of other firms. *See* Def. Ex. 2, Rebuttal Expert Report of Michael D. Whinston, Ph.D. (Aug. 6, 2022) [Corrected Nov. 4, 2022] (ECF No. 418-2), ¶¶ 265–266, Figs. 24–25. Google does not challenge Prof. Whinston's margin analysis. Prof. Whinston therefore has an independent, unchallenged basis to testify that Google's profit margins are high compared to relevant benchmark firms, separate and apart from Ms. Hammer's analysis.

There is, therefore, no basis for limiting Prof. Whinston's testimony regarding Google's profits.

## CONCLUSION

For all the reasons stated above, Google's partial *Daubert* motion to exclude portions of the testimony of Prof. Michael D. Whinston should be denied.

Dated: January 25, 2023                Respectfully submitted,


By:   */s/ Kenneth M. Dintzer*
Kenneth M. Dintzer
Joshua Hafenbrack (DC Bar #1017128)
Lara E.V. Trager
Diana A. Aguilar Aldape
Karl E. Herrmann (D.C. Bar # 1022464)
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov
Joshua.Hafenbrack@usdoj.gov
Lara.Trager@usdoj.gov
Diana.Aguilar@usdoj.gov

*Counsel for Plaintiff United States of America*


By:   */s/ Margaret Sharp*
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Margaret.Sharp@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: ___*/s/ Matthew Michaloski*___
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By: ___*/s/ Keaton Barnes*___
Keaton Barnes
Arkansas Bar No. 2022161
Assistant Attorney General
Office of Tim Griffin, Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Keaton.Barnes@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*


By: ___*/s/ Brian Wang*___
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By: ___/s/ Lee Istrail___
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*


By: ___/s/ Daniel Walsh___
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


By: ___/s/ Philip R. Heleringer___
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General, Commonwealth
of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By:    /s/ Christopher J. Alderman
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By:    /s/ Scott Mertens
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*


By:    /s/ Stephen M. Hoeplinger
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

By: ___/s/ Hart Martin_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By: ___/s/ Anna Schneider___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*


By: ___/s/ Mary Frances Jowers_____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By: ___*/s/ Gwendolyn J. Lindsay Cooley*___
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*