**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| | HON. AMIT P. MEHTA |
| v. | |
| GOOGLE LLC, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT GOOGLE LLC'S MOTION TO PARTIALLY EXCLUDE
THE OPINION OF PLAINTIFFS' EXPERT CHRISTINE M. HAMMER**

January 25, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 2

I.      Christine Hammer Is A Deeply Experienced Accountant Who Has Consistently Been Accepted As An Expert By Courts ................................................ 2

II.     Ms. Hammer's Accounting Opinions In This Case ....................................... 3

    A.      Google's Search Businesses Are Highly Profitable ............................... 3

        1.    Selecting The Benchmarks ...................................................... 6

        2.    Comparing The Benchmarks ................................................... 7

        3.    Prof. Whinston's Reliance On Ms. Hammer's Conclusions ...................... 7

        4.    Dr. Israel's Critique And Ms. Hammer's Response ............................. 8

STANDARD .................................................................................................... 10

ARGUMENT ................................................................................................... 11

I.      Ms. Hammer's Benchmarking Opinion Is Relevant And Will Assist The Court In Determining Google's Monopoly Power .............................................. 11

    A.      Ms. Hammer Did Not Need To Consider The Relevant Antitrust Market For Her Benchmarking Analysis To Meet FRE 702's Standards .............................. 12

    B.      Ms. Hammer's Benchmark Analysis Is Directly Relevant To The Monopoly Analysis ............................................................................ 13

    C.      Benchmark Analysis Is A Proper Method For Understanding ▮▮▮▮ Profitability ............................................................................ 15

    D.      Ms. Hammer Selected Appropriate Indexes ..................................... 18

        1.    Ms. Hammer Properly Selected Three Relevant Benchmarks ...................... 19

        2.    There Is Not An Apples-To-Oranges Problem .................................. 22

II.     Ms. Hammer's Benchmarking Opinion Is Based On Reliable Methodology ........... 24

    A.      There Is Wide Support In Accounting Literature For Ms. Hammer's Benchmark Methodology As A Form Of Ratio Analysis ................................ 25

    B.      Google's Citation To *Horngren's Cost Accounting* Is Misdirected .................. 28

CONCLUSION ................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*American Tobacco Co. v. United States*,
    328 U.S. 781 (1946) ................................................................................................ 14

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ........................................................................ 16, 17

*Capri Sun GmbH v. American Beverage Corp.*,
    595 F. Supp. 3d 83 (S.D.N.Y. 2022) ...................................................................... 29

*Cayuga Indian Nation of New York v. Pataki*,
    83. F. Supp. 2d 318 (N.D.N.Y 2000) ........................................................ 22, 23, 24

*Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ................................................................................. 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ....................................................................... 10, 11, 13

*DocMagic, Inc. v. Ellie Mae, Inc.*,
    745 F. Supp. 2d 1119 (N.D. Cal. 2010) ................................................................. 14

*Graham v. Playtex Products, Inc.*,
    993 F. Supp. 127 (N.D.N.Y. 1998) ........................................................................ 24

*Hermes Consolidated, LLC v. EPA*,
    787 F.3d 568 (D.C. Cir. 2015) ............................................................................... 17

*In re Paoli Railroad Yard PCB Litigation*,
    35 F.3d 717 (3d Cir. 1994) ..................................................................................... 11

*In re Payment Card Interchange Fee*,
    No. 05-MD-1720 (MKB), 2022 U.S. Dist. LEXIS 195227 (E.D.N.Y Oct. 7, 2022) . 17, 18, 24

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litigation - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019) ................................................... 28

*Keys v. Washington Metropolitan Area Transit Authority*,
    577 F. Supp. 2d 283 (D.D.C. 2008) ...................................................................... 10

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................... 11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................................. 14

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ......................................................................................... 13, 14

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ......................................................................................... 13, 14

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ........................................................................... 12, 14

*United States v. Morgan*,
  45 F.4th 192 (D.C. Cir. 2022) ................................................................................. 18

*United States v. Williams*,
  827 F.3d 1134 (D.C. Cir. 2016) ............................................................................... 10

*Zerega Avenue Realty Corp. v. Hornbeck Offshore Transportation, LLC*,
  571 F.3d 206 (2d Cir. 2009) .................................................................................... 18

**Rules**

Federal Rule of Evidence 401 ................................................................................. 10, 13

*Federal Rule of Evidence 702 .............................................................................. 10, 12

Plaintiffs oppose Defendant Google LLC's Motion to Partially Exclude the Opinion of Plaintiffs' Expert Christine M. Hammer (ECF No. 416) ("Def. Br.") and respectfully submit this memorandum of points and authorities in support of their opposition. Based on the law and the factual record, Google's motion should be denied.

## INTRODUCTION

A company's high profitability is direct evidence of market power.[1] Accordingly, Plaintiffs retained Ms. Hammer to "evaluate the profitability of the search and search advertising businesses of Google, LLC."[2]

Christine Hammer is a Certified Public Accountant who has provided her accounting expertise in approximately 100 litigated cases over the past 40 years; she is an uncontested, globally recognized expert in financial and managerial accounting. Relying on her command of these disciplines, Ms. Hammer examined Google's ordinary course documents and applied widely accepted accounting principles, concluding that Google's search and search ads businesses █████████ are highly profitable. Ms. Hammer determined that, consistently, in each of the years 2014 through 2021, ████████████████████████████ ████████████. Annually, those margins contributed to ███████████ profits.

Ms. Hammer also provided context for these profit margins. To do so, she selected three industry groupings to which Google's parent, Alphabet, was assigned by independent parties. She then used a cross-sectional benchmark analysis to compare ████████ margins with the

---

[1] *See* Pls. Ex. A, Excerpts from the Expert Report of Michael D. Whinston, PhD, June 6, 2022 [Corrected Nov. 4, 2022] ("Whinston Initial Report"), ¶ 526; *see also id*., ¶¶ 421, 525–555 (§ IV.C.1).

[2] Def. Ex. 1, Expert Report of Christine Hammer, June 6, 2022 [Corrected Dec. 5, 2022] (ECF No. 416-1) ("Hammer Initial Report"), ¶ 9; Pls. Ex. B, Excerpts from the Deposition of Christine Hammer, Oct. 10–11, 2022 ("Hammer Dep."), 35:11–13.

margins of 145 companies contained in those industry benchmark groups. This analysis revealed that, during this eight-year period, ███████ margins were consistently "close to or beyond the top of the range of operating profit margins" for the comparator companies. Def. Ex. 1, Hammer Initial Report, ¶ 102. ████████████████████████████████████████████████████

████████████████████████

Google argues that the Court should not consider Ms. Hammer's conclusion that ███████ margins are "high relative to those of other businesses" because the benchmarks are not tied to the alleged relevant antitrust markets. The Court should reject this challenge for two reasons. First, all three benchmarks selected by Ms. Hammer are reasonable, with Google's parent company, Alphabet Inc., a constituent of each. Comparing ███████ margins to those of other companies provides the Court with helpful context to assess ███████ high profitability and evidences Google's sustained market power. Excluding this relevant evidence, evaluated using sound accounting principles, is unwarranted, and Google's motion should be denied.

Second, Google's monopoly has permeated the general search market and affected its rivals; as a result, adopting a benchmark of rivals in the relevant antitrust market would provide little insight. Google should not be permitted to use its monopoly as a shield against a benchmark analysis that will aid the Court. In any event, Google's experts could have attempted to develop and present alternative benchmarks to make Google's points, but they chose not to. Ultimately, Google's challenges are the proper provenance of a cross examination, not a *Daubert* motion.

## FACTUAL BACKGROUND

### I.   Christine Hammer Is A Deeply Experienced Accountant Who Has Consistently Been Accepted As An Expert By Courts

Google does not object to Ms. Hammer's qualifications as an expert in financial and managerial accounting.

Ms. Hammer specializes in applying accounting principles and theory to issues arising in business litigation, from calculating profit estimates to evaluating merger efficiencies. She received her MBA from the Stanford Graduate School of Business in 1975 and became a Certified Public Accountant in 1978. In 2012, she was one of the first professionals to obtain global recognition as a Chartered Global Management Accountant, which "distinguishes professionals who have advanced proficiency in finance, operations, strategy[,] and management."[3] Throughout her more than 40-year career, Ms. Hammer has consulted on over 100 matters for litigation purposes—and many more otherwise—analyzing companies in dozens of industries. She has appeared as an expert witness in cases ranging from antitrust to intellectual property; none of her opinions have ever been excluded from evidence. Def. Ex. 1, Hammer Initial Report, ¶¶ 1–8 & Appx. A; Pls. Ex. B, Hammer Dep., 11:25–19:16.

## II.   Ms. Hammer's Accounting Opinions In This Case

Ms. Hammer offers opinions regarding the profitability of Google's search and search advertising business in the United States and also provides context for that profitability analysis.

### A.   Google's Search Businesses Are Highly Profitable

Google's businesses cover many different product areas. Ms. Hammer focused on two of Google's product areas: Search and Search Ads. █████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ Def. Ex. 1, Hammer Initial Report, ¶ 49; *see also id.*, ¶¶ 42–52 (company structure). Ms. Hammer reviewed and verified ████████ profitability data from multiple sources, including

---

3   *See, e.g.*, CGMA Overview, https://www.cgma.org/aboutcgma.html (visited Jan. 21, 2023) (explaining that the designation recognizes "a unique group of management accountants who have reached the highest benchmark of quality and competence").

"Google's internal managerial accounting reports prepared in the ordinary course of business" and raw financial data provided in this litigation. *Id.*, ¶ 75; *see also id.*, ¶¶ 52–53; Pls. Ex. B, Hammer Dep., 39:15–41:17. Google does not assert that Ms. Hammer failed to review or consider any relevant documents or data in her analysis.



she used Google's worldwide profitability data ███████ as a proxy for U.S.-specific data. Def. Ex. 1, Hammer Initial Report, ¶¶ 77–79 & Fig. 14; Pls. Ex. B, Hammer Dep., at 205:6–206:9. Although noting that Ms. Hammer elected to use Google's worldwide data as a proxy, *see* Def. Br. at 17, Google does not contest that usage nor assert that ███████ margins in the United States differ materially from ███████ margins worldwide.

After scrutinizing the data and documents, Ms. Hammer determined that Google's search and search ads businesses are highly profitable. To reach this conclusion, she used a ratio analysis, "the most common form of financial analysis," which "provides relative measures of the firm's conditions and performance." Pls. Ex. F, Jae K. Shim et al., *Barron's Dictionary of Accounting Terms,* (6th ed. 2014) ("*Barron's*"), at 203. Ms. Hammer's ratio analysis initially focused on two common metrics ███████████████████: gross margin and operating margin.[4]

---

[4]   In her Reply Report, Ms. Hammer also evaluated a third metric—the return on invested capital ("ROIC") ███████. Ms. Hammer found that ███████ ROIC "provides further evidence for the conclusion [she] reached in [her] opening report—that these businesses are highly profitable and have been so for a number of years." Def. Ex. 2, Expert Reply Report of Christine Hammer, Sept. 26, 2022 [Corrected Dec. 5, 2022] (ECF No. 416-2), ¶ 8 ("Hammer Reply Report"); *see also id.* at ¶¶ 83–104 (ROIC analysis, describing the ROIC as the "ratio of the after-tax profit generated by the business itself").

Gross Margins: Gross margins consider only costs tied directly to producing the units sold, such as the raw materials and labor used to produce them. Gross margins are useful for calculating the amount of revenue still available to a business after the costs of production are incurred. *See* Def. Ex. 1, Hammer Initial Report, ¶ 32 & n.16 (describing gross margin as the ratio of gross profit to revenues); Def. Ex. 2, Hammer Reply Report, ¶¶ 17–23. From 2014 through 2021—███████████████████████████████, Def. Ex. 1, Hammer Initial Report, ¶ 80 & n.91—███████████████████████████████ ██████████████████████████ *Id.*, ¶ 81 & Fig. 15.

Operating Margins: Operating margins consider directly attributable costs and also account for costs that only tie indirectly to the units sold, such as sales and marketing, R&D, and infrastructure costs. Operating margins measure a business's overall, long-run profitability. Def. Ex. 1, Hammer Initial Report, ¶ 32 & n.18 (describing operating margin as "another important profitability ratio," of operating income to revenues"); Def. Ex. 2, Hammer Reply Report, ¶¶ 17–23. From 2014 through 2021, ███████████████████████████████ █████████████████████████████ Def. Ex. 1, Hammer Initial Report, ¶ 81 & Fig. 15.

### B.      Benchmarks Provide Important Context

After determining Google's profit margins, Ms. Hammer put those numbers in context. Specifically, she assessed ██████ profitability relative to that of other companies included in "three independently constructed industry benchmark groups." Def. Ex. 1, Hammer Initial Report, ¶ 92; *see also* Pls. Ex. F, *Barron's,* at 204 ("*Industry comparison.* The ratios of a firm are compared with those of similar firms or with industry averages or norms to determine how the company is faring relative to its competitors."); *see also* Pls. Ex. E, James R. Hitchner, *Financial*

*Valuation: Applications and Models,* (4th ed. 2017) ("*Financial Valuation*"), at 1196 (describing the relevance of benchmark financial ratios).

### 1.        Selecting The Benchmarks

Using her reasoned judgment and experience as an accounting expert, Ms. Hammer selected three benchmark groups, constructed by third parties: (1) the RDG Internet Composite Index[5] ("RDG Index"), to which Alphabet compares itself in its Form 10-K; (2) the S&P Capital IQ Primary Industry Classification, Interactive Media & Services Index ("IMS Index"); and (3) Standard Industry Classification system (SIC) Code 7370—Computer Programming, Data Processing, And Other Computer Related Services Index ("SIC Code 7370 Index").[6] Def. Ex. 1, Hammer Initial Report, ¶ 93; Pls. Ex. B, Hammer Dep., 220:21–221:7. Ms. Hammer explained that "[t]his analysis is not to suggest that the individual companies [in the benchmarks] are comparable to Google's search and search ads businesses, but to provide directional context of the profitability of ███ relative to the margins of other businesses." Def. Ex. 1, Hammer Initial Report, ¶ 92; *see also* Pls. Ex. B, Hammer Dep., 246:4–24.

Each of these groups included Alphabet, which Ms. Hammer filtered out before performing her analysis. Def. Ex. 1, Hammer Initial Report, ¶ 94 n.112; Pls. Ex. B, Hammer Dep., 210:24–211:4. She then set a threshold requirement for all index constituents of $1 billion in 2021 revenues, to avoid comparing ███ to less mature companies. Def. Ex. 1, Hammer Initial Report, ¶ 94; Pls. Ex. B, Hammer Dep., 232:1–18, 234:3–18. For both the IMS Index and the SIC Code 7370 Index, Ms. Hammer also filtered out companies that were not publicly traded,

---

5   *See* James Chen, "What Is an Index? Examples, How It's Used, and How to Invest," Investopedia, Aug. 4, 2022, https://www.investopedia.com/terms/i/index.asp.

6   SIC Codes group companies "by the type of activity in which they are primarily engaged." *See* Def. Ex. 1, Hammer Initial Report, ¶ 93 & n.110; *see also id*. at ¶ 100.

nor domiciled in the United States. Def. Ex. 1, Hammer Initial Report, Schedules D.2 & D.3.
And to ensure comparability, for each year of her analysis, Ms. Hammer added a portion of
Alphabet's publicly reported unallocated corporate costs to her calculated ██████ operating
margins—reducing the ██████ reflected profits—because the "benchmark constituent operating
margins may well include these types of expenses." *Id.* ¶ 95 & Fig. 19; Pls. Ex. B, Hammer
Dep., 211:15–212:2.

### 2. Comparing The Benchmarks

Ms. Hammer concluded that, from 2014 to 2021, "██████ adjusted operating profit
margins have consistently been close to or beyond the top of the range of operating profit
margins for constituents in each of the three industry benchmark groups." Def. Ex. 1, Hammer
Initial Report, ¶ 102. ████████████████████████████

████████████████████████████████████████████

████████████████████ ████████████████████████

████████████████████ *Id.*, Schedules D1–D3.

### 3. Prof. Whinston's Reliance On Ms. Hammer's Conclusions

Prof. Michael D. Whinston, Plaintiffs' economic expert, relied on Ms. Hammer's
profitability analysis in his Initial Report as evidence "in support of the conclusion that [Google]
possesses and profitably exercises monopoly power in its search engine business." Pls. Ex. A,
Whinston Initial Report, ¶ 555. Prof. Whinston explained that, although accounting profits do not
perfectly measure economic profits, "*all* measures of Google's search engine profit point in the
same direction: Google's search engine earns high profits, both absolutely and compared to other

---

7  ████████████████████████████████████████████
████████████████████████████████████

relevant benchmark firms. Moreover, Google's search engine has earned these levels of profit for a very long time." *Id.*, ¶ 529 (italics in original); *see also id.*, ¶¶ 530–555.

Prof. Whinston concluded that ███████ "remarkably stable" profit margins over an eight-year period indicate that ███████ "profits were high and not competed away either by entry by new rivals or by expansion of existing rivals." *Id.*, ¶ 539. And "[t]he inability of competitive pressure to compete down these profits is consistent with the barriers to entry and expansion," as set forth in his report. *Id.*, ¶ 539.

### 4.    Dr. Israel's Critique And Ms. Hammer's Response

Of Google's experts, only Dr. Mark A. Israel, who is not an accountant, attempted to respond to Ms. Hammer's profitability analysis. Dr. Israel did not contest Ms. Hammer's margin calculations, nor did he propose an alternative index or industry classification group to compare ███████ margins. Instead, he limited his challenge to two areas.

First, Dr. Israel challenged Ms. Hammer's comparison of companies "dissimilar to Google Search" included in the three benchmarks, along with her comparison of "profits for a particular component of Google ███████ to profit margins of entire companies." Pls. Ex. C, Excerpt from the Expert Rebuttal Report of Mark A. Israel, Aug. 6, 2022 ("Israel Rebuttal Report"), ¶¶ 108–109.

Addressing Dr. Israel's criticism of her benchmarking choices, Ms. Hammer turned to Google's Form 10-K. She compared ███████ profitability to the fourteen companies that were both (1) already contained within one of the benchmark groups and (2) characterized by Alphabet itself as its competitors: Microsoft, Facebook, eBay, Zoom, Booking Holdings, Netflix, Alibaba, Baidu, Amazon, Criteo, Twitter, Salesforce, Snap, and Yandex. Def. Ex. 2, Hammer Reply Report, ¶ 47 & Fig. 3. Ms. Hammer observed that, even when limiting her comparisons to

this narrower group of companies, her "conclusion that ▮▮▮▮ operating margins are high relative to relevant industry benchmarks would remain the same." Def. Ex. 2, Hammer Reply Report, ¶ 48.

Addressing Dr. Israel's criticism that she improperly compared ▮▮▮▮ (as a component of Alphabet) to entire companies, Ms. Hammer reiterated that because she burdened ▮▮▮▮ with an appropriate portion of Alphabet's "corporate costs, unallocated," she had rendered ▮▮▮▮ comparable as a standalone entity, thereby allowing her to compare it to other companies. Def. Ex. 2, Hammer Reply Report, ¶¶ 34–42; *see also* Def. Ex. 1, Hammer Initial Report, ¶ 95.

Second, Dr. Israel criticized Ms. Hammer's use of operating margins in her analysis. As part of his critique, he compared ▮▮▮▮ gross margin to those of six companies which he chose. Pls. Ex. C, Israel Rebuttal Report, ¶¶ 106 & n.189, 110–111. Dr. Israel criticized operating margins based in part on a claim that they "do not allow one to calculate a rate of return." *Id*., ¶ 106 n.189. To address this criticism, Ms. Hammer compared the same three industry benchmark groups from in her Initial Report to ▮▮▮▮ Net Return on Invested Capital (Net ROIC), another profitability metric. *See* Def. Ex. 2, Hammer Reply Report, ¶¶ 84–85, 97–104. She similarly concluded that "▮▮▮▮ has consistently earned returns on its investments . . . exceeding those of the significant majority of companies in relevant industry benchmark groups." *Id*., ¶ 103; *see also id*. at ¶ 8 ("This [ROIC] calculation provides another perspective on the profitability of these businesses and provides further evidence for the conclusion I reached in my opening report—that these businesses are highly profitable and have been so for a number of years.").

In his Reply Report, Prof. Whinston relied on this Net ROIC benchmarking analysis as further "evidence of Google's substantial market power in the relevant general search services, the relevant advertising markets, or both." Pls. Ex. D, Excerpts from the Reply Expert Report of Michael D. Whinston, PhD, Sept. 26, 2022 [Corrected Nov. 4, 2022] ("Whinston Reply Report"), ¶ 262. As with her margin calculations, Google also does not contest Ms. Hammer's ROIC calculations.

<strong>STANDARD</strong>

Federal Rule of Evidence 702 governs the admissibility of expert testimony, requiring that expert testimony "both rest[] on a reliable foundation and is relevant to the task at hand," and entailing "a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and [] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 597 (1993); *see also United States v. Williams*, 827 F.3d 1134, 1156 (D.C. Cir. 2016) ("These [FRE 702] factors reflect that the Supreme Court has placed 'gatekeeping' responsibilities on the trial courts 'at the outset' and thereafter during trial to ensure that expert testimony is sufficiently reliable to help, as opposed to confuse and hinder, the jury.").

To meet FRE 702(a)'s relevancy prong, evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue"; conversely, "[e]xpert testimony is irrelevant if it has no bearing on any issue in the case or if it relates to matters of common sense that a [trier of fact] can decide for itself." *Keys v. Wash. Metro. Area Transit Auth.*, 577 F. Supp. 2d 283, 285 (D.D.C. 2008) (cleaned up); *see also* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."); *Daubert*, 509 U.S. at

587. For evidence to be "not only relevant, but reliable," trial courts consider whether the expert

has "a reliable basis in the knowledge and experience of [the relevant] discipline" such that

testimony is supported by "good grounds, based on what is known," *Daubert*, 509 U.S. at 589–

90, 592 (internal quotation marks omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 149 (1999), although "the grounds for the expert's opinion merely have to be good, they do

not have to be perfect,'" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

## ARGUMENT

### I.    Ms. Hammer's Benchmarking Opinion Is Relevant And Will Assist The Court In Determining Google's Monopoly Power

Ms. Hammer's benchmark analysis provides useful context for her calculations of

███████ margins and supports Plaintiffs' arguments that Google possesses and profitably

exercises its monopoly power to the detriment of its competitors. Her benchmark analysis will

aid the Court in this case. Accordingly, the Court should deny Google's *Daubert* motion.

Google is not disputing any of Ms. Hammer's calculations as to the ███████ profit

margins. Hence, it is not disputing that, for at least eight years, ████████████████

██████████████████████████████████████. Instead,

Google hopes to avoid comparisons of ███████ profitability with benchmark groups that

provide context for these profits. The Court should reject Google's contention that Ms.

Hammer's benchmark analysis is not relevant for four reasons: (1) Ms. Hammer properly did not

consider the relevant antitrust market when conducting her analysis; (2) contextualizing

███████ margins with other companies' margins aids the Court in its consideration of Google's

monopoly power; (3) benchmarks are a well-recognized method for analyzing profitability; and

(4) the indexes that Ms. Hammer used are appropriate, and Google offers no alternatives.

A.      **Ms. Hammer Did Not Need To Consider The Relevant Antitrust Market For Her Benchmarking Analysis To Meet FRE 702's Standards**

Google incorrectly asserts that Ms. Hammer's benchmark analysis is irrelevant because she did not consider the relevant antitrust markets when conducting her analysis. *See* Def. Br. at 11–13. Ms. Hammer is not conducting a market definition analysis and never purported to do so; this is no basis on which to exclude her opinion.

Instead, Ms. Hammer bases her benchmarking analysis on accounting principles. In the ordinary course, accountants do not attempt to define antitrust markets or limit their profitability analyses to firms that would be included in such a market. *See, e.g.*, Pls. Ex. J, Shannon P. Pratt, *The Market Approach to Valuing Businesses* (2001), at 82–113 (describing comparative financial analysis). Rather, when an accountant benchmarks a company's profit margins, she does so objectively, based on an industry standard or in comparison to other companies classified as in the same industry. She does not, as Google suggests she should, determine what companies to compare by first judging whether the companies have "reasonably interchangeable" products. *See, e.g.*, Def. Br. at 11 ("Thus, 'the relevant market must include all products 'reasonably interchangeable by consumers for the same purposes.'" (quoting *United States v. Microsoft*, 253 F.3d 34, 52 (D.C. Cir. 2001))). There is, quite simply, no basis for Google to demand its profits only be compared to those of its search rivals.

Even more farcical is Google's criticism that Ms. Hammer "us[ed] a methodology that she admits she has never used in an antitrust case." Def. Br. at 12. Ms. Hammer's approach employs the same type of analysis that she has repeatedly used in the past. Pls. Ex. B, Hammer Dep., 213:21–220:16. Accountants do not change their analytical techniques based on the type of claim at issue. Instead, the proper inquiry is whether Ms. Hammer's proposed testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," FRE 702(a), not,

as Google suggests, whether she has performed such analyses in other antitrust cases. Notably absent from FRE 702 and the cases cited by Google is the requirement that an expert have used a particular expertise in a certain type of litigation. Of course, such a requirement would disqualify all first-time experts.

Regardless, Ms. Hammer testified that she has acted as an expert consultant in 11 other antitrust matters. Pls. Ex. B, Hammer Dep., 28:10–22. Thus, she has experience testifying in antitrust cases, and in using the type of benchmarking analysis she has used here. Ms. Hammer is unquestionably qualified as an accounting expert, and the Court should not exclude her sound analysis and conclusions based on Google's disagreements regarding the proper composition of benchmark indexes.

### B.    Ms. Hammer's Benchmark Analysis Is Directly Relevant To The Monopoly Analysis

Evidence showing that ███████ profitability is persistently high relative to other companies operating within the same industry classification speaks directly to Plaintiffs' allegations that Google both possesses and exercises monopoly power. Ms. Hammer's proffered testimony is, therefore, relevant. Fed. R. Evid. 401; *Daubert*, 509 U.S. at 587.

Two elements are necessary to prove the offense of monopolization under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level. Where evidence indicates that a firm has in fact

profitably done so, the existence of monopoly power is clear." *Microsoft*, 253 F.3d at 51 (citing

2A Phillip E. Areeda et al., *Antitrust Law* ¶ 501, at 85 (1995) (other citations omitted)).

Thus, one way to establish a defendant's monopoly power directly is to show large,

persistent profit margins.[8] *See, e.g.*, *American Tobacco Co. v. United States*, 328 U.S. 781, 805–

06 (1946) (holding that defendant's "tremendous profits" were evidence of monopoly power).

Ms. Hammer's analysis has established that ████████████████████████████████████

████████████████████████████████████ *See* Def. Ex. 1, Hammer Initial Report,

¶ 81 & Fig. 15. Moreover, her comparison of those margins with benchmarks gives context to

the scale of ███████ profits. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████ This information is relevant to the first prong of the monopoly analysis and

should be considered. *Grinnell*, 384 U.S. at 570–71; *E.I. du Pont*, 351 U.S. at 391. If Google

wants to challenge Ms. Hammer's approach, it may certainly do so at trial—although it is telling

that Google chose not to present a "better" benchmark during expert discovery.

Without Ms. Hammer's benchmark analysis, there would be no objective basis to

determine whether the profit margins she calculates are large or small relative to other

---

[8] A plaintiff can also show market power indirectly, "by showing that the defendant has a dominant share of the market, that there are significant barriers to entry into that market, and that existing competitors cannot increase their production in the short run." *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1136 (N.D. Cal. 2010) (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)); *see also Microsoft*, 253 F.3d at 51 ("[M]onopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." (internal citation omitted)).

[9] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

companies. In such circumstances, Google would be free to argue that its profit margins are not significant. The benchmark analysis forestalls this type of argument. Because the benchmark analysis is relevant to material issues in the case, the Court should reject Google's motion.

**C.     Benchmark Analysis Is A Proper Method For Understanding ███ Profitability**

The Court should reject Google's attack on Ms. Hammer's benchmarks as not probative of Google's market power. Def. Br. at 11–13.

### 1.     Ms. Hammer's Benchmark Analysis

Benchmark analyses, such as the type conducted by Ms. Hammer, objectively compare one company to other companies in an industry.[10] As Ms. Hammer explained, the analysis provides "an objective framework, a yardstick to measure profitability against." Pls. Ex. 2, Hammer Dep., 216:6–19. The best way to conduct this review is to (1) find similar industry groups of which the company in question is a part, and then (2) apply sufficient "parameters that would allow someone to take a very objective look over a wide panel of companies in the same industry." Pls. Ex. B, Hammer Dep., 216:6–217:3, 218:3–9, 220:4–16; *see also* Def. Ex. 1, Hammer Initial Report, ¶ 92; Def. Ex. 2, Hammer Reply Report, ¶ 45.

Google suggests subjective, company-to-company comparisons are superior. *See* Def. Br. at 15. Ms. Hammer, however, explained that she did not pursue such a subjective comparison; instead, she sought to examine, directionally, how ███ margins compared to other companies classified alongside Alphabet in independently created benchmark groups. Def. Ex. 1, Hammer Initial Report, ¶ 92; Pls. Ex. B, Hammer Dep., 218:22–220:16; Def. Ex. 2, Hammer Reply Report, ¶¶ 44–45.

---

[10]  *See* James Chen, "Benchmark: What It Is, Types, and How to Use Them in Investing," Investopedia, Sept. 30, 2022, https://www.investopedia.com/terms/b/benchmark.asp.

### 2.    *Bailey* **Is Inapposite**

To support its attack on the benchmark analysis, Google relies on *Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002). Def. Br. at 13. The court in *Bailey* rejected an expert's comparison of defendant's "estimated rate of return on assets (ROA) for [] two years with the average rate of return for Fortune 500 companies." *Bailey*, 284 F.3d at 1251. Apart from the fact that *Bailey* is non-binding on this Court, it is also readily distinguishable from the present facts.

First, the challenged expert in *Bailey* used a benchmark untethered to the company under comparison. Although the defendant was a "distributor and seller of liquid propane gas operating in Alabama," the *Bailey* expert indiscriminately compared the defendant's ROA to the ROAs of all other companies in the Fortune 500—a revenue-based ranking of companies incorporated and operating in the United States across multiple industries.[11] *Id.* at 1239. Thus, the court rejected the analysis because the expert had not used the "ROA of similar firms in the same or similar industries." *Id*. at 1253.

Here, Ms. Hammer expressly rejected using a general index such as the Fortune 500. *See* Pls. Ex. B, Hammer Dep., 249:23–250:20 (explaining that she chose not to use the S&P 500 or the NASDAQ Composite because the constituents of those indexes "aren't in the same industry"). Instead, she selected third-party indexes categorized "using industry and size as primary factors," all of which include Alphabet. Def. Ex. 2, Hammer Reply Report, ¶ 45. The *Bailey* expert, moreover, agreed that a better comparator would have been the "ROA for the liquid propane gas industry," 284 F.3d at 1253 n.22; conversely, Ms. Hammer testified that no

---

[11] *See* Fortune, "Methodology for Fortune 500," https://fortune.com/franchise-list-page/fortune-500-methodology-2022/ (visited Jan. 21, 2023).

"industry grouping of search engines" exists—a conclusion that Google has not rebutted. Pls. Ex. B, Hammer Dep., 308:24–309:2.

Second, for comparison, the expert in *Bailey* improperly cherry-picked inputs for his analysis, using only two years of data, of the four available. *Bailey*, 284 F.3d at 1253–54 & n.23. Ms. Hammer, on the other hand, analyses all eight years of available ▉▉▉▉ data. Google does not challenge the sufficiency of the period covered.

Finally, in *Bailey* the court found flaws with the expert's ROA comparison as the sole means of determining supracompetitive profits. *Id.* at 1252–53. Unlike the expert in *Bailey*, Ms. Hammer's benchmark analysis simply provides context for ▉▉▉▉ margins, showing their extremely high nature as compared to 145 other companies. Prof. Whinston, then, relies on this analysis as but one piece of evidence supporting his conclusions regarding Google's market power. Accordingly, Google's reliance on *Bailey* is inapposite.

Recently, defendants in *In re Payment Card Interchange Fee*, No. 05-MD-1720 (MKB), 2022 U.S. Dist. LEXIS 195227 (E.D.N.Y Oct. 7, 2022), unsuccessfully raised arguments similar to those raised by Google, likewise relying on *Bailey*. Particularly, the defendants attempted to exclude an expert's "comparison between 'the weighted average EBITDA margin for Visa and Mastercard' and 'the weighted average EBITDA margin of their peers'" because the comparison included companies that do not compete with the defendants in the relevant markets.[12] *In re Payment Card*, 2022 U.S. Dist. LEXIS 195227, at **236–37. The district court rejected each of defendant's challenges because "all of the [benchmark] companies Professor Harris selected 'are in the payments space.'" *Id*. at **241–42 (internal citation omitted).

---

[12] "EBITDA" stands for "earnings before interest, taxes, depreciation, and amortization." *See Hermes Consol., LLC v. EPA*, 787 F.3d 568, 578 (D.C. Cir. 2015).

Moreover, the court explained, "[w]hile the comparison may not be perfect, Professor Harris is not comparing 'apples and oranges,' and therefore arguments that his assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Id.* (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)) (other citations omitted).

As with the expert in *In re Payment Card*, Ms. Hammer selected benchmarks for comparison that include companies operating in the industry of which Google is a part— technology companies that do business on the Internet. *See, e.g.*, Def. Ex. 1, Hammer Initial Report, ¶ 98 n.120 (explaining that the IMS Index includes "[c]ompanies engaging in content and information creation or distribution through propriety platforms, where revenues are derived primarily through pay-per-click advertisements. Includes search engines[.]"); Def. Ex. 2, Hammer Reply Report, ¶ 43. And by burdening ███████ margins, Ms. Hammer's methodology ensured that ██████ could be compared with the externally reported Generally Accepted Accounting Principles ("GAAP") financials for the constituents of the benchmark groups that she selected. Def. Ex. 2, Hammer Reply Report, ¶¶ 38–41.

The benchmark analysis conducted by Ms. Hammer thus contextualizes ███████ margins and provides relevant and useful information to the Court. To the extent that the Court finds fault with any of Ms. Hammer's assumptions or conclusions, such concerns go to weight, not admissibility. *See, e.g.*, *United States v. Morgan*, 45 F.4th 192, 201 (D.C. Cir. 2022).

### D.  Ms. Hammer Selected Appropriate Indexes

The Court should further conclude that all three indexes selected by Ms. Hammer—RDG, IMS, and SIC Code 7370—are appropriate industry comparators for ██████ profit margins.

Google argues that Ms. Hammer's benchmarks are composed of a "hodgepodge" or "miscellany" of companies. Def. Br. at 2, 4. But using her extensive experience as an expert accountant, Ms. Hammer appropriately selected these three benchmarks because they were filled with reasonable industry comparators as determined by unbiased third parties. Her comparison of these companies to ███████ margins provides the Court with useful information to consider Google's monopoly power.

### 1.    Ms. Hammer Properly Selected Three Relevant Benchmarks

Each of the benchmark groups chosen by Ms. Hammer, of which Alphabet is a part, is relevant and suitable, with independent arbiters finding them to be reflective of the industry in which ███████ operates:

- **The RDG Index**: Alphabet uses the RDG index in its Form 10-Ks for comparing Alphabet's stock return. The index, curated by RDG and including only publicly traded companies, contains "stocks representing the internet industry, including internet software and service companies and e-commerce companies."[13] Constituent companies include Facebook, Amazon, Expedia, and Angi. Def. Ex. 1, Hammer Initial Report, ¶¶ 93, 96–97, Schedule D.1; *see* Def. Ex. 2, Hammer Reply Report, ¶ 99; *see also* Pls. Ex. C, Israel Rebuttal Report, ¶ 110 (listing six self-selected comparators for ███████).[14]

- **The IMS Index**: This industry classification index collects "[c]ompanies engaging in content and information creation or distribution through proprietary platforms, where revenues are derived primarily through pay-per-click advertisements. Includes search engines, . . . ." The IMS Index includes Meta (Facebook) and Angi. Def. Ex. 1, Hammer Initial Report, ¶¶ 93, 98–99, Schedule D.2; *see* Def. Ex. 2, Hammer Reply Report, ¶ 100.

- **The SIC Code 7370 Index**: This industry classification index gathers companies operating in "Computer Programing, Data Processing, And Other Computer Related Services," and includes Microsoft, Meta, and Angi. Def. Ex. 1, Hammer

---

[13] *See, e.g.*, Booking Holdings, Inc. 2021 Form 10-K (Feb. 23, 2022), at 36, *available at* https://www.sec.gov/Archives/edgar/data/1075531/000107553122000008/bkng-20211231.htm.

[14] DuckDuckGo is not publicly traded, and is the only one of Dr. Israel's purported comparators that was not included in one of the benchmarks used by Ms. Hammer. *Compare* Def. Ex. 1, Hammer Initial Report, Schedules D.1–D.3 *with* Pls. Ex. C, Israel Rebuttal Report, ¶ 110.

Initial Report, ¶¶ 100–101, Schedule D.3; *see* Def. Ex. 2, Hammer Reply Report, ¶ 101.

Moreover, Ms. Hammer did more than simply compare ███████ to the indexes. Rather, once she selected the indexes, she excluded firms that were small, privately held, or foreign-domiciled; this narrowed the indexes' constituents to a closer approximation of ████████ massive scale and ensured reasonable financial comparability. Pls. Ex. B, Hammer Dep., 234:3–18; *see* Def. Ex. 1, Hammer Initial Report, ¶¶ 94–95, Schedules D.1–D.3. She also, of course, excluded Google from the indexes. Finally, Ms. Hammer burdened ███████ margins with a proportional share of Alphabet's unallocated costs, effecting a tighter comparison of ██████ to the benchmark group constituents. Def. Ex. 1, Hammer Initial Report, ¶ 95. Using these parameters, Ms. Hammer compared ███████ to 145 companies, █████████████████████ ████████████████████████████████████████████████████████████ █████████████████[15]

Google notes that Ms. Hammer "did not exclude companies even if their operations were primarily in jurisdictions other than the United States." Def. Mot. at 6 n.8 (citing Def. Ex. 3, Hammer Dep., 322:21–323:13). Determining whether a company operates "primarily" in the United States requires the type of subjective analysis that Ms. Hammer chose not to undertake, based on data that she did not have. Instead, Ms. Hammer intentionally conducted an objective analysis, using as many comparison points as possible from her three selected benchmark groups, and based on their consolidated results, the most granular publicly reported data for most

---

[15] Although Google asserts that there are 174 companies contained within the three indexes, *see* Def. Br. at 6, 9, Ms. Hammer explained that there are 145 companies between the indexes once duplicates are eliminated and her filters are applied. Def. Ex. 2, Hammer Reply Report, ¶ 47 & n.44.

companies. *See, e.g.*, Pls. Ex. B, Hammer Dep., 260:17–23, 261:20–24; *see* Def. Br. at 9 (noting use of "consolidated results").

Google, of course, offers no alternative benchmarks nor suggests alternative filters that Ms. Hammer should have applied to the benchmarks that she selected. Instead, the company contends—without legal support—that the only appropriate comparisons to ███████ are company-to-company comparisons of other general search engines identified in Plaintiffs' complaint, such as Bing and DuckDuckGo. *See, e.g.,* Def. Br. at 4, 16. The Court should reject Google's approach for two reasons.

First, Ms. Hammer's benchmark analysis was intended to provide objective context to ███████ margins beyond that small group of general search engines. Def. Ex. 1, Hammer Initial Report, ¶ 92; Def. Ex. 2, Hammer Reply Report, ¶¶ 43–45, 97. Alphabet's own public filings note that it is in the "technology industry" or just "the industry"; it compares itself to the RDG Index in those filings as well.[16] Thus, Ms. Hammer selected three benchmark groups, considered by accountants to be an appropriate number, each of which Alphabet is a part and each of which defines itself differently. In that way, Ms. Hammer found 145 comparators to ███████, far more than the handful that Google contends it should be compared against.

Second, the participants of the relevant antitrust market would not, alone, create a suitable benchmark for comparison here, as they all operate in a market extensively and adversely affected by Google's monopoly power. *See* Def. Br. at 5, 12 (arguing Ms. Hammer did not select benchmarks with the relevant antitrust market in mind). And Ms. Hammer's reports include information on rival search engines in any event. *See* Def. Ex. 1, Hammer Initial Report,

---

[16] *See* Alphabet, Inc. 2021 10-K (Feb. 1, 2022), at 9, 15, 16, *available, at* https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm.

Schedule D.3 (listing Microsoft); Def. Ex. 2, Hammer Reply Report, ¶¶ 58–75 (addressing Bing, DuckDuckGo). Google's attempt to exclude the ███ margin benchmark analysis is especially pernicious because there *can* be no direct comparisons to it: Google's monopolistic behavior has ensured as much. There are no other United States-based search engines with revenues anywhere near Google's. But Google's uniquely profitable business should not render it beyond comparison. Indeed, if Google is correct and there are no comparable companies, a position with which we disagree, it is because Google's own actions caused there to be insufficient comparators.[17]

Thus, Ms. Hammer's selection of benchmarks was the proper exercise of her experience and expertise, and Google's challenge should fail.

### 2. There Is Not An Apples-To-Oranges Problem

The Court should reject Google's argument that the benchmarks are too far removed from ███ main business to be of value. Def. Br. at 10. This is not factually true and, in any event, goes to weight rather than admissibility.

Google argues that "it is methodologically unsound to select a comparator that is inherently unlike the subject of the comparison." Def. Br. at 13. In support, Google cites *Cayuga Indian Nation of New York v. Pataki*, 83. F. Supp. 2d 318 (N.D.N.Y 2000), for the proposition that "apples-and-oranges comparisons 'mandat[e] exclusion.'" Def. Br. at 13. In *Cayuga*, a fair

---

[17] Notably, Dr. Israel, despite his criticisms that Ms. Hammer did not select the appropriate benchmarks, has also taken the contrary position that every company offering a search box or providing information on the Internet competes with Google in search. So even according to one of Google's theories—which Plaintiffs reject—every company in the benchmarks competes with Google. *See, e.g.*, Pls. Ex. K, Deposition of Mark. A. Israel, Ph.D. (Nov. 3–4, 2022), 82:16–84:9 (testifying that companies that sell toasters online compete with Google on search to some degree); *id.* at 525:6–527:9 (testifying that customers searching for a car on the General Motors website "would be a little bit of competition for Google").

market valuation case, three experts attempted to value ancestral land that was dispossessed for centuries. Because no "directly applicable methodology for [this] unique factual situation" existed, the experts created new valuation methodologies. 83 F. Supp. 2d at 320; *see also id.* at 323. One expert used a multi-stepped "sales comparison approach" to reach a fair market value for the land. *Id.* at 323–24.

Unlike the uncontested calculations of Ms. Hammer's reports, in *Cayuga*, the excluded expert's opinion was rife with computational errors, filled with inaccurate data, and lacked a complete analysis of each comparable sale. 83 F. Supp. 2d at 323–27. In part, the expert subjectively "selected by 'feel' the four sales which he used" for each year's analysis, rendering the sales comparisons "apples and oranges" instead of the "apples-to-apples" comparisons necessary for market valuation purposes. *Id.* at 324. Because he used unreliable data that resulted in faulty calculations and methodology, the expert presented evidence lacking in probative value and the court excluded his opinion. *Id.* at 327.

*Cayuga*, quite far afield from the relevant facts here, cannot support the exclusion that Google seeks. Ms. Hammer's benchmark analysis was never intended as a direct, company-to-company comparison. Def. Ex. 1, Hammer Initial Report, ¶ 92; Def. Ex. 2, Hammer Reply Report, ¶ 44. Rather, comparisons of a company's profit margins against industry averages (or other summary statistics) are a standard, and objective, means used by external stakeholders to determine a company's relative profitability. Def. Ex. 1, Hammer Initial Report, ¶ 35; *see also id.*, ¶ 94 & n.112 (explaining summary statistics utilized for comparison).

Nor did the Northern District of New York make a blanket proclamation that all comparison analyses must be rejected unless they are "apples to apples," as Google contends. *See* Def. Br. at 11. Rather, the court noted that "[s]tanding alone, any one of the deficiencies

outlined . . . would not cause the court to question the reliability of either [the expert's] data, or his method of applying the same to the present case." *Cayuga*, 83 F. Supp. 2d at 327. Indeed, as to the other two experts who attempted different valuation methods, the court explained that "even if perhaps there are some flaws in the methodologies proffered . . . that alone does not render inadmissible their opinions," because "the grounds for the experts' opinions do not have to be perfect; they 'merely have to be good[.]'" *Id*. at 328 (quoting *Graham v. Playtex Prods., Inc.*, 993 F. Supp. 127, 133 (N.D.N.Y. 1998)); *see also In re Payment Card*, 2022 U.S. Dist. LEXIS 195227, at **241–42 (holding that an expert's selection of companies for a profitability comparison was not an "apples and oranges" comparison requiring exclusion).

Finally, although Google does not explicitly attack Ms. Hammer's ROIC analysis, Google makes veiled reference to it. *See* Def. Mot. at 9, 16 n.24. To the extent that Google seeks to exclude her ROIC analysis, the Court should reject this request for the same reasons that it should reject Google's request to exclude Ms. Hammer's benchmarking analysis.

To the extent that Google disagrees with Ms. Hammer's sound methodology, despite its support in both accounting and legal literature, the company may cross-examine her; exclusion of her opinions is unwarranted.

## II.   Ms. Hammer's Benchmarking Opinion Is Based On Reliable Methodology

Ms. Hammer's methodology is widely used by accounting professionals and described in leading accounting and financial analysis textbooks, including ones to which she cites in her reports. Accordingly, the Court should reject Google's contentions that (1) accounting literature demonstrates that Ms. Hammer misapplied benchmarking methodology, and (2) she did not cite to any authority describing her precise type of benchmarking analysis, Def. Br. at 14 (citing Pls. Ex. B, Hammer Dep, 409:11–410:7).

### A.   There Is Wide Support In Accounting Literature For Ms. Hammer's Benchmark Methodology As A Form Of Ratio Analysis

Google's attack on whether the accounting literature supports Ms. Hammer's approach boils down to minor objections to her footnoting practices, and should be rejected.

When asked for a specific citation that endorses her benchmarking methodology, Ms. Hammer testified that the methodology she uses is "so common" and "so obvious" that providing a textbook citation is nearly meaningless. Pls. Ex. B, Hammer Dep., 409:11–410:7 (testifying that she performs these types of benchmarks "time and time again"). Google's objections to the reliability of Ms. Hammer's analysis ignores that numerous textbooks—including ones cited by Ms. Hammer—endorse the precise benchmarking method that she used.

In her Initial Report, Ms. Hammer cited *Financial Valuation: Applications and Models,* (4th ed. 2017), a textbook co-authored by "30 highly visible and well-respected valuation professionals."[18] Pls. Ex. E, *Financial Valuation*, at xvii; *see* Def. Ex. 1, Hammer Initial Report, ¶ 35 n.19. *Financial Valuation* explains that ratio analysis (the type of margin analysis performed by Ms. Hammer) may be "the most commonly used tool in financial analysis. Financial ratios allow the analyst to assess and analyze the strengths and weaknesses of a given company with regard to such measures as . . . profitability . . . by comparison to other companies in its industry or to an industry standard." Pls. Ex. E, *Financial Valuation*, at 97.

One type of ratio analysis is a "[c]ross-sectional analysis[, which] compares a specified company's ratios to other companies or to industry standards/norms." Pls. Ex. E, *Financial Valuation*, at 97; *see also id.* at 87, 88, 101 (referring to benchmark data and analysis, and noting

---

[18]  Twenty-one of the textbook's co-authors are Certified Public Accountants, as is Ms. Hammer; four are Chartered Global Management Accountants, as is Ms. Hammer. *See* Pls. Ex. E, *Financial Valuation*, at xviii.

that "[t]o use benchmark industry ratios appropriately, analysts must be familiar with their scope and limitations as well as with the differences among them regarding data presentation and computation methods."). Although "most useful" when companies have comparable business types, sizes, and accounting methods (among others), "[w]hen some of these items are unknown," general comparisons are used based on an analyst's professional judgment. *Id.* at 98; *see also id.* at 109.

Ms. Hammer also cited *Barron's Dictionary of Accounting Terms*, which describes the "Industry Comparison" as a common type of financial statement analysis, and describes these comparisons: "The ratios of a firm are compared with those of similar firms or with industry averages or norms to determine how the company is faring relative to its competitors." Pls. Ex. F, *Barron's*, at 203–04 (italics removed); *see* Def. Ex. 1, Hammer Initial Report, ¶ 23 nn.6–7, ¶ 25; Def. Ex. 2, Hammer Reply Report, ¶ 83 n.108; *see also* Pls. Ex. F, *Barron's*, at 254 (defining "industry ratios" as the "mean or median financial ratios for a particular industry" and advising that "[t]he computed ratios for a company being analyzed should be compared to the industry average to form a basis for comparison").

Ms. Hammer's benchmarking methodology is similarly set forth in numerous other well-regarded textbooks; excerpts of some are attached to this brief. *See* Pls. Ex. G, Stephan H. Penman, *Financial Statement Analysis & Security Valuation* (2001), at 282 (explaining that, "[t]o make judgments about a firm's performance the analyst needs benchmarks," which are established by referring to firms in the same industry through a cross-sectional analysis); Pls. Ex. H, Clyde P. Stickney et al., *Financial Accounting: An Introduction to Concepts, Methods, and Uses* (13th ed. 2010), at 163 (explaining that, in a cross-section benchmark analysis, a "broad industry" is used with the objective "to hold constant the effects of business models by

identifying a peer group, using industry classification as a primary factor.")[19]; Pls. Ex. J, Shannon P. Pratt, *The Market Approach to Valuing Businesses* (2001), at 96 (ratifying use of SIC codes for industry comparisons and explaining that "[o]nce the subject company's industry is defined by a specific SIC" code, a comparison analysis can be performed using publicly available data, including from companies' Form 10-K filings).

In addition to these endorsements from accounting academics and practitioners, legal literature supports the type of benchmark analysis used by Ms. Hammer. For example, one law review article discusses the need to compare companies' financial information using a "cross section analysis," explaining that

> The importance of such comparisons is stressed repeatedly throughout the literature of financial statements analysis. Clyde Stickney and Roman Weil, for example, in their famous intermediate level book on financial accounting, describe the importance of comparisons as follows:
>
> Readers cannot easily answer questions about a firm's profitability and risk from the raw information in financial statements . . . . Ratios aid financial statement analysis because they conveniently summarize data . . . [but] ratios, by themselves out of context, provide little information. For example, does a rate of return on common shareholders' equity of 8.6 percent indicate satisfactory performance? After calculating the ratios the analyst must compare them with some standard . . . [such as] the corresponding ratio for a similar firm in the industry . . . [or] the average ratio for other firms in the same industry.[20]

---

[19]  The book's 14th edition explains the same in a slightly different manner, describing a "cross-section analysis" as a common approach "to evaluating whether a firm has done well or poorly during a given accounting period," by comparing a firm with other firms' performance over the same time period by comparing financial ratios. Pls. Ex. I, Roman L. Weil et al. *Financial Accounting: An Introduction to Concepts, Methods, and Uses* (14th ed. 2014), at 239. "Firms selected for comparison in a cross-section analysis share common business elements with the firm being analyzed," such as "industry membership" and "size." *Id.* at 242.

[20]  Sharon Hannes, "Comparisons Among Firms: (When) Do They Justify Mandatory Disclosure?," 29 Iowa J. Corp. L. 699, 702 (2004) (quoting Clyde P. Stickney & Roman L. Weil, *Financial Accounting*, at 249 (10th ed. 2003) (ellipses in original), and citing Gerald L. White et al., *The Analysis and Use of Financial Statements*, at 111 (3rd ed. 2003), and Jerry L. Weygandt et al., *Principles of Financial Accounting* (6th ed. 2002)).

Each of these citations underscores the points that Ms. Hammer made at her deposition: (1) the use of a benchmarking analysis to compare companies in an industry is common and well-accepted in the accounting community, and (2) the literature supports the analyst's selection of industry benchmarks using her reasoned judgment. The Court should reject Google's challenge to the reliability of a method used by accountants around the world. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 69 (D.D.C. 2017) ("Rule 702 'is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise'" (citing FRE 702 advisory committee's note to 2000 amendment)), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019).

### B.   Google's Citation To *Horngren's Cost Accounting* Is Misdirected

Google contends that Ms. Hammer distanced "herself from the [benchmarking] methodology described in *Horngren's Cost Accounting*," notwithstanding Prof. Whinston's reliance on it. Def. Br. at 15 (citing Charles T. Horngren et al., "*Cost Accounting, A Managerial Emphasis*" (15th ed. 2015)); *see* Pls. Ex. A, Whinston Initial Report, ¶ 544 n.660. This is false. Ms. Hammer agrees that *Horngren* is a reliable and authoritative source; she simply disagreed that the benchmarking example in *Horngren* was intended for the same purpose as her analysis.

When questioned about the 16th edition of Prof. Horngren's textbook, Ms. Hammer testified that the book discussed benchmarking analysis in the context of "working with companies, within a company, to set up key performance indicators, and then use those benchmarks to track your process." Pls. Ex. B, Hammer Dep., 395:20–396:10. This type of analysis is used to develop *internal* performance standards for company management. As Ms. Hammer explained, *Horngren* presented a "very, very different situation," than her benchmark

analysis. Rather, Ms. Hammer conducted a cross-sectional analysis for *external* financial

accounting comparison purposes—to give context to ███████ high profit margins. *Id.*, at

395:2–399:2 (testifying regarding *Horngren*'s 16th ed.).

Thus, although both types of benchmarking analyses are valid, Ms. Hammer

appropriately performed the latter here, given the purpose of her analysis. *See, e.g.*, *Capri Sun*

*GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83, 133 (S.D.N.Y. 2022) ("ABC's contention that

other, more sophisticated methods could have been used, although a fair ground for cross-

examination and critique at trial, is not the decisive test on a motion to preclude under Daubert or

Rule 702."). Certainly, Ms. Hammer's insight into Prof. Horngren's work is valuable given that

she "consulted with Prof. Horngren . . . for 20 years." Pls. Ex. B, Hammer Dep., 396:24–397:1.

Accordingly, Ms. Hammer has not distanced herself from *Horngren,* and there is no basis to

exclude her benchmark analysis.

## CONCLUSION

For these reasons, the Court should deny Google's motion to exclude the benchmarking

analysis of Plaintiffs' expert, Christine Hammer.

Dated: January 25, 2023                    Respectfully submitted,


By:___/s/ Kenneth M. Dintzer_____
Kenneth M. Dintzer
Erin Murdock-Park (DC Bar # 1019993)
Karl E. Herrmann (D.C. Bar # 1022464)
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov
Joshua.Hafenbrack@usdoj.gov
Lara.Trager@usdoj.gov
Diana.Aguilar@usdoj.gov


*Counsel for Plaintiff United States of America*


By:___/s/ Margaret Sharp___
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Margaret.Sharp@oag.texas.gov


*Counsel for Plaintiff State of Texas*

By:     /s/ Matthew Michaloski
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By:     /s/ Keaton Barnes
Keaton Barnes
Arkansas Bar No. 2022161
Assistant Attorney General
Office of Tim Griffin, Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Keaton.Barnes@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

By:     /s/ Brian Wang
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By:    */s/ Lee Istrail*
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:    */s/ Daniel Walsh*
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By:    /s/ *Philip R. Heleringer*
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General, Commonwealth
of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: _____ /s/ Christopher J. Alderman_____
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By: _____ /s/ Scott Mertens_____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*


By: _____ /s/ Stephen M. Hoeplinger_____
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

By: ___/s/ Hart Martin_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By: ___/s/ Anna Schneider___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*


By: ___/s/ Mary Frances Jowers_____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By:   /s/ Gwendolyn J. Lindsay Cooley
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*