**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT GOOGLE LLC'S MOTION TO EXCLUDE
THE OPINION OF PLAINTIFFS' EXPERT MICHAEL A. M. DAVIES**

January 25, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................ 3

I.      Mr. Davies' Background And Qualifications ............................................ 3

II.     Mr. Davies' Opinions .......................................................................... 4

        A.      Initial Report ......................................................................... 5

        B.      Reply Report .......................................................................... 6

        C.      Deposition ............................................................................. 7

STANDARD ................................................................................................. 8

ARGUMENT ................................................................................................ 9

I.      Mr. Davies' Testimony Is Reliable Because He Is Well Qualified To Opine On The
        Smartphone Industry ............................................................................ 9

        A.      Mr. Davies' Formal Training And Education Qualify Him As An Expert ........... 9

        B.      Mr. Davies' Extensive Industry Experience Qualifies Him As An Expert ......... 12

        C.      Mr. Davies' Opinions Are Admissible Regardless Of His "Practical Experience"
                With Google's Distribution Agreements ............................................... 18

        D.      Mr. Davies' Opinions Are Based On Legitimate Principles And Methods ......... 20

II.     Mr. Davies' Opinions About Why Smartphone Vendors And Carriers Tend To
        Enter Into Google's Distribution Agreements Is Valid and Reliable Expert
        Testimony ......................................................................................... 24

III.    Mr. Davies' Opinions Are Relevant And Will Assist The Court In Understanding
        The Facts .......................................................................................... 27

CONCLUSION ............................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Ambrosini v. Labarraque*,
   101 F.3d 129 (D.C. Cir. 1996) ...................................................................... 8, 27, 28

*Barber v. Corizon Health, Inc.*,
   No. 2:15-cv-01427, 2019 WL 8112500 (W.D. Pa. May 6, 2019) ......................... 22

*\*Bazarian International Financial Associates., LLC v. Desarrollos Aerohotelco, C.A.*,
   315 F. Supp. 3d 101 (D.D.C. 2018) ............................................................... *passim*

*\*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)..................................................................... 3, 23, 26, 28

*DL v. District of Columbia*,
   730 F. Supp. 2d 78 (D.D.C. 2010) ....................................................................... 14

*\*Groobert v. President & Directors of Georgetown College*,
   219 F. Supp. 2d 1 (D.D.C. 2002) .............................................................. 8, 10, 14

*Hangarter v. Provident Life & Accident Insurance Co.*,
   373 F.3d 998 (9th Cir. 2004) ............................................................................... 20

*In re Mirena IUD Products Liability Litigation*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016).................................................................. 26

*\*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
   No. 05-MD-1720 (MKB), 2022 WL 15044626 (E.D.N.Y. Oct. 26, 2022) ........... 24

*Jennings v. Thompson*,
   792 F. Supp. 2d 1 (D.D.C. 2011) ........................................................................ 15

*Khairkhwa v. Obama*,
   793 F. Supp. 2d 1 (D.D.C. 2011), *aff'd* 703 F.3d 547 (D.C. Cir. 2012)................. 9

*\*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................... 8, 15

*Metavante Corp. v. Emigrant Savings Bank*,
   619 F.3d 748 (7th Cir. 2010) ........................................................................ 21, 25

*On Track Innovation Ltd. v. T-Mobile USA, Inc.*,
   106 F. Supp. 3d 369 (S.D.N.Y. 2015)................................................................. 27

*Robinson v. District of Columbia*,
   75 F. Supp. 3d 190 (D.D.C. 2014) ......................................................................... 9

*Robinson v. GEICO General Insurance Co.*,
   447 F.3d 1096 (8th Cir. 2006) ............................................................................. 18

*Rothe Development, Inc. v. Department of Defense*,
   107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd* 836 F.3d 57 (D.C. Cir. 2016) .............. 28

*Sitts v. Dairy Farmers of America, Inc.*,
   No. 2:16-CV-287, 2020 WL 3467993 (D. Vt. June 24, 2020) ........................ 24, 26

*United States ex rel. Morsell v. Nortonlifelock, Inc.*,
    567 F. Supp. 3d 248 (D.D.C. 2021) ............................................................... 18

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*,
    289 F. Supp. 3d 145 (D.D.C. 2018) ............................................................... 20

*United States v. Baskin*,
    886 F.2d 383 (D.C. Cir. 1989) ....................................................................... 18

*United States v. Benkahla*,
    530 F.3d 300 (4th Cir. 2008) ......................................................................... 28

*\*United States v. Dunn*,
    846 F.2d 761 (D.C. Cir. 1988) ................................................................. 24, 26

*United States v. Gomez-Norena*,
    908 F.2d 497 (9th Cir. 1990) ......................................................................... 24

*\*United States v. Vesey*,
    338 F.3d 913 (8th Cir. 2003) ......................................................................... 21

*\*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398, 411 (2004) ........................................................................... 3, 27

**Rules**

Federal Rule of Civil Procedure 26 ................................................... 12, 14, 15

*\*Federal Rule of Evidence 702* ................................................................ *passim*

Plaintiffs respectfully submit this memorandum in opposition to Defendant Google LLC's Motion to Exclude the Opinion of Plaintiffs' Expert Michael A. M. Davies (ECF No. 417) ("Def. Br."). For the reasons laid out below, Defendant's motion should be denied.

## INTRODUCTION

Plaintiffs' technical and industry expert, Michael Davies, has spent nearly 30 years studying mobile and digital ecosystems and the evolution of the smartphone industry. Dozens of leading smartphone vendors and wireless carriers—including Samsung, Motorola, Nokia, Apple, Verizon, and AT&T—have sought out his expertise to, among other things, (1) help develop business strategy, (2) launch mobile products and services, and (3) provide expert advice on intellectual property and commercial relationships.

Drawing on that expertise, Mr. Davies has opined that for the past decade, Google's proprietary version of the Android mobile operating system ("OS") has been the only compelling option for mobile phone vendors[1] seeking to license a mobile OS for smartphones sold in the United States. For that and other reasons, smartphone vendors and wireless carriers are strongly incentivized to enter into exclusionary search distribution agreements with Google ("Google's Distribution Agreements").[2] Plaintiffs allege that Google uses those agreements to illegally maintain its monopoly in general search services and related advertising markets. The

---

[1]   In his expert reports, Mr. Davies uses the term "mobile phone vendor" to describe businesses that develop, distribute, and market mobile phones generally and the term "smartphone vendor" to describe businesses that develop, distribute, and market smartphones specifically. *See* Def. Ex. 1, Expert Report of Michael A. M. Davies, June 6, 2022 (ECF No. 417-1) ("Davies Initial Report"), ¶ 16 n.4. In their pleadings, Plaintiffs refer more generally to mobile phone manufacturers or "OEMs," which would include mobile phone and smartphone vendors. Plaintiffs have adopted Mr. Davies' terminology for the purposes of this memorandum.

[2]   Google refers to these agreements as "the Android Agreements." *See*, *e.g.*, Def. Br. at 3.

commercial realities that compel smartphone vendors and wireless carriers to enter into Google's Distribution Agreements and the harms that result are central issues in this case.

Despite Mr. Davies' strong qualifications and the relevancy of his opinions, Google seeks to exclude Mr. Davies' testimony in its entirety, relying on perfunctory and misguided *Daubert* arguments. *First*, Google argues that Mr. Davies lacks the expertise to offer opinion testimony in this case. But Google ignores Mr. Davies' engineering and business degrees, technical and business training, and teaching experience. Google further neglects the extensive industry experience listed in his resume and described in his deposition. Google claims Mr. Davies cannot rely on his industry experience because certain details of his work are covered by non-disclosure agreements. But, in forming his opinions, Mr. Davies did not rely upon proprietary or other information covered by those non-disclosure agreements, and an expert's inability to disclose *every* detail of *every* prior engagement is not disqualifying under Federal Rule of Evidence 702. Regardless, Mr. Davies identified more than enough other industry experience to support his qualification as an expert.

Google further attacks Mr. Davies' expertise by arguing that he lacked "practical experience" with Google's Distribution Agreements before this lawsuit. But "practical experience" is not necessary when Mr. Davies is not being offered as a fact witness or an expert in Google's Distribution Agreements themselves; he is an expert in the smartphone industry and will testify as such. Nor is it improper for Mr. Davies to rely on experience in arriving at his opinions when case law states that industry and technical experts are permitted to do so.

*Second*, Google argues that some of Mr. Davies' opinions are improper because they purportedly involve speculation about the intent and motivation of third parties. Yet, that argument mischaracterizes the nature of Mr. Davies' expected testimony. His opinions speak to

the commercial reality and industry incentives faced by smartphone vendors and wireless carriers, and how they are affected by signing Google's Distribution Agreements. Mr. Davies does not opine on the motive or intent of any specific party to those agreements.

*Finally*, Google argues that Mr. Davies' opinions are irrelevant because he is not opining on the effect of Google's Distribution Agreements on competition between search providers. That, of course, is wrong. Mr. Davies' opinions are relevant because "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). Moreover, the standard for judging the relevancy of expert testimony requires only that it "will assist the trier of fact to understand or determine a fact in issue," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993), and Mr. Davies' testimony clearly passes that hurdle.

Google's motion fails to identify a single reason grounded in applicable law to exclude Mr. Davies' opinions. The motion therefore should be denied.

## FACTUAL BACKGROUND

### I.   Mr. Davies' Background And Qualifications

Mr. Davies is the founder and chairman of Endeavour Partners, LLP, a boutique business consulting and expert advisory firm, and a senior lecturer at the Massachusetts Institute of Technology's ("MIT's") School of Engineering and Sloan School of Management. Def. Ex. 1, Davies Initial Report, at ¶¶ 1–2, Attach. A, at 2. He received a B.A. and an M.A. in Engineering and Electrical Sciences from the University of Cambridge; an M.E. in Cybernetics, Robotics, and Microelectronics from the University of Durham; and an M.B.A. from the London Business School. *See id.*, ¶ 3, Attach. A, at 2.

Since 1992, a central focus of Mr. Davies' career has been the development, design, and marketing of mobile phones and their components and complements, including mobile OSs and

mobile applications. *See* Def. Ex. 1, Davies Initial Report, ¶¶ 4–6, Attach. A, at 1. Mr. Davies

has worked with leading smartphone vendors such as Mitsubishi Electric, Nokia, Sony Ericsson,

HTC, Motorola, Samsung, and Apple, and wireless carriers including Verizon, AT&T, BellSouth

New Zealand, and Virgin Mobile, on issues related to smartphone product development, business

strategy (including marketing), intellectual property, and public policy. *See, e.g., id.*, ¶¶ 4–6,

Attach. A, at 1–6; Def. Ex. 3, Deposition of Michael A. M. Davies, Oct. 26–27, 2022 (ECF No.

417-3) ("Davies Dep."), 66:11–72:14, 76:7–77:2. For example, Mr. Davies has been engaged by:

- Nokia, HTC, Motorola, Samsung, and Mitsubishi Electric on the design of smartphones running the Symbian, Microsoft's Windows Mobile, and Android mobile OSs;

- Nokia on software engineering and other practices related to the development of the Symbian mobile OS (specifically, Nokia's S60 implementation) and Nokia's Maemo operating system; and

- Motorola, Verizon Wireless, Vodafone, and others to evaluate potential mobile OS platforms, including Google's proprietary Android, the Android Open Source Project ("AOSP"), and Windows Mobile.

*See id.* at 76:3–76:15; 78:20–80:7; *see also* Def. Ex. 1, Davies Initial Report, Attach. A, at 1–6.

Mr. Davies is, thus, more than qualified to discuss the technical and financial incentives

facing smartphone vendors and wireless carriers and how Google's Distribution Agreements

affect them.

## II.    Mr. Davies' Opinions

Mr. Davies wrote two expert reports in this matter (an initial report and a reply report)

and was deposed by Google for nearly 10 hours. His testimony addresses the commercial

realities of the smartphone industry: specifically, the technical and financial incentives that

compel smartphone vendors and wireless carriers to sign Google's Distribution Agreements. He

explains how those agreements limit the ways Google's partners can develop unique

smartphones, alternative smartphone OSs, and new application ecosystems.

A.      **Initial Report**

The Davies Initial Report sets forth Mr. Davies' core opinion: since the early 2010s, the Android mobile OS with Google's proprietary applications and application programming interfaces ("APIs") included ("Google's proprietary Android") has been the only viable, licensable smartphone OS available to manufacturers that distribute smartphones to U.S. consumers. Def. Ex. 1, Davies Initial Report, ¶¶ 14–31. No other licensable mobile OS provides the core components of a successful smartphone, including a rich application ecosystem. *Id.*

Mr. Davies explains why building a mobile OS atop AOSP—the open-source portion of the Android mobile OS—is no longer a viable alternative to smartphone vendors' adopting Google's proprietary Android. Def. Ex. 1, Davies Initial Report, ¶¶ 32–52. Although AOSP is "made freely available under the Apache open-source license," today it "lacks important core apps, and the critical APIs that those core apps provide"; as a result, "AOSP on its own does not now include all the elements required for a complete and compelling modern smartphone." *Id.,* ¶ 40. What Mr. Davies terms "Google's proprietary Android, on the other hand, is a complete and compelling modern smartphone OS because it includes AOSP *and* the apps that are part of Google Mobile Services ('GMS') . . . and related APIs that help support functionality that other third-party apps depend on." *Id.,* ¶ 41.

Building on his core opinion, Mr. Davies notes that because there are no licensable alternatives to the Android mobile OS, smartphone vendors have limited choices; they must either invest substantial resources to build their own smartphone OS (from scratch or with AOSP as a starting point) or license Google's proprietary Android. Because of the costs and risks inherent in building a smartphone OS, there are strong financial and technical incentives favoring adoption of Google's proprietary Android. Def. Ex. 1, Davies Initial Report, ¶¶ 53–60.

Next, Mr. Davies opines that because Android smartphone vendors preinstall and provide prominent placement to Google services, wireless carriers "have a strong incentive to contract with Google to receive revenue share payments for those services, even at the cost of ceding control over the out-of-the-box experience (OOBE)." Def. Ex. 1, Davies Initial Report, ¶ 81.

Finally, he describes two adverse effects of Google's Distribution Agreements—specifically, Mobile Application Distribution Agreements ("MADAs"), Revenue Share Agreements ("RSAs"), Anti-Fragmentation Agreements ("AFAs"), and Android Compatibility Commitments ("ACCs")—on smartphone vendors and wireless carriers and ultimately consumers: (1) constraints on the ability of smartphone vendors to differentiate their products;[3] and (2) the effective preclusion of viable Android-based alternatives to Google's proprietary Android. Def. Ex. 1, Davies Initial Report, ¶¶ 88–114.

## B.   Reply Report

In his rebuttal expert report, Google's economic expert, Prof. Kevin M. Murphy, challenged several aspects of Mr. Davies' opinions. *See* Pls. Ex. A, Excerpts from Rebuttal Report of Professor Kevin M. Murphy, Aug. 5, 2022 [Corrected Nov. 15, 2022] ("Murphy Rebuttal Report"), ¶¶ 311–326. Specifically, Prof. Murphy argues that AFAs and ACCs, and related terms in the MADAs that require their adoption, are necessary to avoid fragmentation of the Android mobile OS. *Id.* In his reply report, Mr. Davies responds to Prof. Murphy. Mr. Davies notes that Prof. Murphy fails to acknowledge the interdependencies between Google's

---

[3]   As Mr. Davies explains, "Google's contracts with smartphone vendors make it more difficult for them to differentiate their offerings from one another and to innovate, as these contracts impose constraints on, amongst other things, actions that Google may deem to be 'fragmentation'; which apps they preload on smartphones and where they are placed; and which services (in particular, search services) are invoked by users by default. The result is an OOBE largely designed by and for Google." Def. Ex. 1, Davies Initial Report, ¶ 90.

Distribution Agreements—for instance, that MADAs expressly require signatories to sign AFAs and ACCs. *See* Def. Ex. 2, Reply Expert Report of Michael A. M. Davies, Sept. 26, 2022 (ECF No. 417-2) ("Davies Reply Report"), ¶¶ 6–8. He then opines that Prof. Murphy's failure makes his analysis of the agreements misleading. *See id.*

Also, Mr. Davies explains that Prof. Murphy's analysis of AFAs and ACCs is flawed because Prof. Murphy overstates the risks fragmentation poses to the success of mobile OSs and misstates or misconstrues Mr. Davies' analysis of the issue. *See* Def. Ex. 2, Davies Reply Report, ¶¶ 9–33. Further, Mr. Davies explains that Prof. Murphy's conclusion that Google's MADAs represent "competition on the merits" ignores how market factors—specifically, the lack of alternative licensable mobile OSs—limit smartphone vendors' negotiating leverage and strongly incentivize their adoption of Google's Distribution Agreements. *Id.,* ¶¶ 34–41.

### C.     Deposition

On October 26 and 27, 2022, Google deposed Mr. Davies, who testified at length about his education, training, and industry experience. Among other things, Mr. Davies listed smartphone vendors and carriers that had retained him over the years and described the work he had done for them generally, although in some cases did not identify the specific firm that had retained him for a particular project. *See, e.g.,* Def. Ex. 3, Davies Dep., 66:11–73:12, 76:3–80:7, 236:14–19. Google repeatedly pushed Mr. Davies to identify those firms or describe in greater detail the particular projects he completed for specific firms. *See, e.g.*, *id.* at 22:10–22, 30:13–19, 236:14–19. Mr. Davies answered most of Google's questions. *See, e.g.*, *id.* at 33:14–34:2 (describing consulting work for AT&T); *id.* at 37:15–38:13 (describing consulting work for HTC). Over the course of ten hours, though, he declined to answer approximately 15 questions, some being repeat questions, explaining that he could not reveal the party that had retained him

or describe in greater detail commercially sensitive projects that he completed for specific parties without violating the terms of a non-disclosure agreement ("NDA").

Mr. Davies repeatedly explained that his opinions in this case do not rely upon any proprietary or other confidential information he learned in the course of engagements covered by an NDA. *See, e.g.*, Def. Ex. 3, Davies Dep., 65:14–17, 81:11–14.

## STANDARD

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, requires trial judges to "'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). Under *Daubert* and its progeny, the trial court "must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 592).

"[T]he standard under Federal Rule of Evidence 702 is a liberal and 'flexible' one," *Groobert v. Pres. & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (citing *Kumho Tire*, 526 U.S. at 149), and the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable," *Kumho Tire*, 526 U.S. at 152. Notably, "personal experience can be a reliable and valid basis for expert testimony," *Groobert*, 219 F. Supp. 2d at 7 (citing *Kumho Tire*, 526 U.S. at 149), and "experience alone can constitute a basis of reliable principles and methods," *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 110 (D.D.C. 2018) (citing to Fed. R. Evid. 702 (c) (internal quotations omitted)) ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.").

## ARGUMENT

**I.      Mr. Davies' Testimony Is Reliable Because He Is Well Qualified To Opine On The Smartphone Industry**

Mr. Davies' education, teaching experience, and decades-long career working with smartphone vendors and wireless carriers provide more than sufficient qualifications to testify about (1) the availability of licensable mobile OSs, (2) the factors that incentivize smartphone vendors and wireless carriers to enter into Google's Distribution Agreements, and (3) the effects of those agreements on smartphone vendors and wireless carriers. *See, e.g.*, Def. Ex. 3, Davies Dep., 25:20–26:6; *see also* Def. Ex. 1, Davies Initial Report, ¶¶ 3–6, 11, Attach. A, at 2–6. The Court should thus reject Google's argument that Mr. Davies "lacks the requisite foundational personal knowledge or experience to offer opinion testimony in this action," Def. Br. at 9, as it is unmoored from the facts and law.

### A.      Mr. Davies' Formal Training And Education Qualify Him As An Expert

Google argues that Mr. Davies is not qualified as an expert because he "cannot point to any formal training or education as the basis for his expertise" in this case. Def. Br. at 9. The Court should reject Google's attack because Mr. Davies' education, training, and teaching experience make him highly qualified to offer his expert opinions.

As a threshold matter, there is no requirement under FRE 702 that an expert possess a formal education, and "an expert may be qualified on the basis of his or her practical experience." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011) (citing *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269–70 (9th Cir. 1994)), *aff'd*, 703 F.3d 547 (D.C. Cir. 2012); *see also Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 197 (D.D.C. 2014) ("[I]n the absence of such formal education, an expert may still be qualified on the basis of his or her practical experience or training." (citing *Newton Int'l Enters.*, 42 F.3d at 1269-70)). For that

reason, courts routinely find technical and industry experts like Mr. Davies qualified to offer opinions on the basis of their industry experience alone. *See, e.g.*, *Bazarian*, 315 F. Supp. 3d at 111–12 (finding expert without college degree or industry licenses qualified based on "his extensive experience in the industry"); *Groobert*, 219 F. Supp. 2d at 8–11 (finding expert with 12 years of work in the field, a record of speaking engagements, and continuous study of industry trends qualified to opine on stock photographer incomes).

Regardless, Mr. Davies' educational and formal training do, in fact, qualify him to opine on (1) the technical and financial incentives that smartphone vendors and wireless carriers encounter and (2) the effects the Google's Distribution Agreements have on the industry's ability to differentiate and innovate. As Google acknowledges, Mr. Davies has advanced degrees in engineering and related disciplines from leading English universities—the University of Cambridge and the University of Durham—and his studies inform his opinions on, among other things, the structure of Android and the difficulties associated with developing mobile OSs. *See* Def. Ex. 1, Davies Initial Report, Attach. A, at 2; Def. Ex. 3, Davies Dep., 25:17–26:20.

Mr. Davies' M.B.A. and post-graduate studies at the London Business School and Harvard Business School included a specialized focus on technology strategy, system dynamics, decision-making under uncertainty, and how the structure of organizations fuels innovation. *See* Def. Ex. 1, Davies Initial Report, Attach. A, at 2; Def. Ex. 3, Davies Dep., 394:14–395:15. Those studies directly relate to his opinions about how smartphone vendors and wireless carriers respond to market incentives and the constraints within Google's Distribution Agreements.[4]

---

[4]   Google faults Mr. Davies for "not point[ing] to anything in his educational background that would qualify him to serve as an expert in the case," Def. Br. at 9, but the burden of identifying deficiencies in his expertise for the purpose of Google's motion rests squarely on its shoulders. In Mr. Davies' nearly 10-hour deposition, Google did not ask Mr. Davies to

Google's challenge to Mr. Davies' qualifications is at odds with the company's own practice given that the company retained Prof. Murphy—an economist without any engineering training at all—to proffer opinions about technical issues such as the risks that fragmentation (the creation of incompatible mobile OS variants based on common source code) poses to the success of mobile OSs. *See* Pls. Ex. A, Murphy Rebuttal Report, ¶¶ 9–33, App. A.

Google is similarly mistaken in arguing that Mr. Davies' teaching experience does not qualify him as an expert. At MIT and the London Business School, Mr. Davies has taught engineering and leadership courses related to integrated design, product development, business strategy, and corporate decision-making. *See* Def. Ex. 1, Davies Initial Report, Attach. A, at 1, 7–8. What Mr. Davies teaches in those courses directly applies to the topics he addressed in his report: how smartphone vendors and wireless carriers—"large, complex high-tech and system businesses" that are the focus of his seminars—assess challenges, make decisions, and bring to market differentiated and innovative products. *See id.*, Attach. A, at 7; *see, e.g.*, Def. Ex. 3, Davies Dep., 308:11–309:11 (explaining how teaching an article by Patrick Viguerie on "decision-making under uncertainty" informed his opinion that contractual ambiguities in Google's AFA impose constraints on smartphone vendors). Google ignores these experiences, which establish Mr. Davies' expertise in the technology sector and are plainly sufficient for him to proffer his opinions here.

---

explain his specialization within engineering or address, at all, his post-graduate studies. Google briefly asked Mr. Davies his title at MIT, the subject of a single class he taught this past summer, and his interactions with smartphone vendors and carriers in his role at MIT, but did not ask about other classes he has taught, the subjects he addressed in them, or the materials he reviewed in preparation for his lectures. *See* Def. Ex. 3, Davies Dep., 43:1–44:17. Google cannot blame Mr. Davies now for its failure to ask more about his credentials, which were disclosed in his curriculum vitae ("CV") in Attachment A of each of his reports.

Google also attacks Mr. Davies for not interacting with smartphone vendors and wireless carriers *in his specific capacity* as an MIT lecturer beyond "case studies, student employment opportunities, and university events." *See* Def. Br. at 9. But Google does not—indeed cannot—explain why personally interacting with these companies is necessary for someone studying industry trends, particularly in light of Mr. Davies' extensive interaction with smartphone vendors and wireless carriers through his consulting engagements.

Mr. Davies' education and teaching experience fully qualify him to testify to the opinions in his report.

### B.    Mr. Davies' Extensive Industry Experience Qualifies Him As An Expert

Google argues that Mr. Davies cannot rely on industry experience to establish his expertise because he purportedly "could not identify any such experiences during his deposition" not protected by an NDA. Def. Br. at 10. The Court should reject those arguments. Mr. Davies' more than thirty years of experience in the mobile phone industry fully and independently qualify him as an expert in this case. He described those experiences in his report and at his deposition. Moreover, Mr. Davies did not rely on proprietary information covered by an NDA to form his opinions, and Google's argument conflates the standard of Federal Rule Evidence 702 with the disclosure requirements of Federal Rule of Civil Procedure 26.

### 1.    Mr. Davies Has Extensive Experience In The Smartphone Industry

Mr. Davies disclosed a lifetime of industry experience in his CV and during his deposition. He has been retained by many of the leading smartphone vendors and wireless carriers in the United States and abroad that are signatories to Google's Distribution Agreements. *See, e.g.*, Def. Ex. 1, Davies Initial Report, Attach. A, at 1–6 (identifying Verizon Wireless, AT&T, Sprint, T-Mobile, Vodafone, BT, HTC, Samsung, Apple, Nokia, LG, Sony Ericsson, and Motorola as clients at Endeavour Partners); Def. Ex. 3, Davies Dep., 32:17–39:17 (describing

work performed for Verizon Wireless, AT&T, HTC, Motorola, and others). On its face, this

work clearly qualifies Mr. Davies to opine on (1) the commercial realities that influence

smartphone vendors' and wireless carriers' decisions related to mobile OS platforms, and (2) the

ways Google's Distribution Agreements affect the development of novel features and services.

In describing his experience, Mr. Davies testified that:

- While at BellSouth New Zealand, he evaluated the commercial prospects of the IBM Simon Personal Communicator, an early touchscreen personal digital assistant often characterized as the first smartphone, and he worked with Nokia on the development of the Nokia Communicator, the "first digital smartphone," Def. Ex. 3, Davies Dep., 29:5–14;

- While at Mercator Partners and Endeavour Partners, he was retained by smartphone vendors HTC, Sony Ericsson, Motorola, and Samsung and wireless carriers AT&T, Verizon, and Virgin Mobile on the development of smartphones and their components, including work with Mitsubishi Electric on the development of the first Windows Mobile OS smartphone, Def. Ex. 3, Davies Dep., 29:18–20; Def. Ex. 1, Davies Initial Report, Attach. A, at 1–6;

- While at Endeavor Partners, he was retained by Verizon Wireless to help develop business models, monetization strategies, and new services, and by AT&T on media services, network standards, and messaging services, Def. Ex. 3, Davies Dep., 32:22–33:6, 33:14–34:3; Def. Ex. 1, Davies Initial Report, Attach. A, at 1–6;

- While at Endeavour Partners, he was retained by HTC to advise on competing more effectively in the smartphone industry in light of HTC's declining market share in the United States and elsewhere; by Motorola on developing partnerships related to modular hardware compliments to its flagship smartphones; and by a smartphone vendor to conduct a competitive analysis of ███████ Phone, Def. Ex. 3, Davies Dep., 37:20–39:14, 236:5–237:12; Def. Ex. 1, Davies Initial Report, Attach. A, at 1–6; and

- He worked with signatories to Google's Distribution Agreements that were trying to determine how Google might respond to changes in their business models given their commitments under those agreements, Def. Ex. 3, Davies Dep., 306:8–308:5; Davies Initial Report, Attach. A, at 1–6.

These experiences provide a strong basis for Mr. Davies' testimony in this case and

easily satisfy FRE 702. *See, e.g.*, *Bazarian*, 315 F. Supp. 3d at 110–12 (finding expert qualified

to opine on financing agreement based on associations with real estate development, finance,

13

consulting, and marketing firms); *Groobert*, 219 F. Supp. 2d at 7–8 (finding owner of production company who lectured on subject of stock photography, studied industry trends, and spoke regularly to other photographers qualified to opine on party's photography-related expenses).

*DL v. District of Columbia*, 730 F. Supp. 2d 78 (D.D.C. 2010), which Google cites in its brief, is plainly distinguishable. There, a proffered expert testified summarily that he had "more than 35 years of experience with computers, computer programming and databases," *id.* at 80, providing no other information. Here, Mr. Davies provided extensive information during his nearly ten-hour deposition.

### 2.    Mr. Davies' NDAs Are Not Relevant To His Testimony

Google's focus on NDAs signed by Mr. Davies in connection with his work for smartphone vendors and carriers is a red herring and should be disregarded by the Court.

#### a.    The NDAs Are Not Relevant

That Mr. Davies declined to disclose information covered by NDAs is irrelevant to the admissibility of his proffered testimony. Mr. Davies did not rely upon any proprietary or confidential information learned in the course of those engagements when formulating his opinions, and he said so every time he was asked during his deposition. *See, e.g.*, Def. Ex. 3, Davies Dep., 64:10–65:17, 81:4–14 (declining to provide details about conversations he had with Verizon employees about the company's relationship with Google and their views on AOSP, but confirming that he was not relying on those conversations to render opinions in this case).

Google's suggestion that Mr. Davies "cannot rely on [his] experience as a basis for any purported expertise here" without disclosing confidential information conflates the requirements of FRE 702 with experts' disclosure obligations under FRCP 26. *See* Def. Br. at 11. FRCP 26, as modified by the Case Management Order in this case, required Mr. Davies to disclose data and

other materials he *relied upon* in forming his opinions. Mr. Davies satisfied his Rule 26

obligations, and Google has never argued otherwise. No rule, however, mandates disclosure of

every detail of every experience that contributes to Mr. Davies' expertise. Instead, Mr. Davies

need only disclose—as he has here—sufficient experience for the Court to determine that his

"testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"

*Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592 (alteration in original)).

Tellingly, Google cites *Jennings v. Thompson* in support of its argument, Def. Br. at 11, a case

involving an expert's failure to disclose prior testimony under FRCP 26—not establish his

expertise under FRE 702. *See* 792 F. Supp. 2d 1, 4–7 (D.D.C. 2011).

### b.   Information Withheld Under An NDA Is Not Relevant

Google has not shown that information Mr. Davies declined to provide is important to

understanding the bases of his expertise. Mr. Davies described the work he has done for device

vendors, component vendors, and wireless carriers in his deposition, often only declining to

name the specific firm that retained him for a project. *See, e.g.*, Def. Ex. 3, Davies Dep., 19:6–

19:19 (declining to name component vendors that retained him within the past five years, but

summarizing the work he did for those firms); *id.* at 20:6–21:13 (declining to provide a list of

infrastructure vendors that retained him within the past five years, but summarizing the work he

did for them). For instance, when asked if he had performed an analysis of ███████████

Phone, Mr. Davies testified that in 2014, "[o]ne of our clients who is a mobile device vendor

asked us to do an analysis of the ███████ Phone." *Id.* at 236:5–236:13. Though he declined

to name the client, citing an NDA, he otherwise answered questions about the engagement:

> Q.  What client asked you to do an analysis of the ███████ Phone?
> A.  I can't identify the client.
> Q.  And the reason you are unable to identify the client is because of an NDA?
> A.  Yes.

Q. In what year did this client ask you to do an analysis of the ███████ Phone?
  . . .
A. 2014.
Q. For what reason did your client ask you to do an analysis of the ███████ Phone in 2014?
A. They were concerned with two issues. One, the extent to which it might represent a competitive threat, and, two, whether or not there were any specific features or functionality in the [███ Phone] that might inform their produce pipeline and product portfolio.
  . . .
Q. Was this a U.S. smartphone vendor?
A. This client was a smartphone vendor who sold smartphones in the United States.

See *id.* at 236:14–237:19. Mr. Davies' description of the project and the firm that retained him, even without disclosing the name of that firm, is sufficient to establish his expertise.

Similarly, Mr. Davies declined to describe business strategy work he performed for Samsung related to smartphones. *See* Def. Ex. 3, Davies Dep., 36:3–8. But he did detail the work he did for smartphone vendors generally, *see, e.g., id.* at 66:18–68:11, and specific projects he completed for other smartphone vendors like HTC and Motorola, *see, e.g., id.* at 37:15–39:4. Details about his business strategy work for Samsung are not necessary for understanding the bases of Mr. Davies' expertise or the opinions themselves. Certainly, the information provided establishes his expertise.

At several points, Google cites deposition excerpts in support of its argument; those excerpts show Mr. Davies responding generally to a broad question or declining to provide the specific name of a client that retained him for a specific purpose. *See, e.g.,* Def. Ex. 3, Davies Dep., 18:20–19:5 (declining to provide a list of the device vendors that had retained Endeavour Partners in the last five years); *id.* at 19:6–9 (declining to provide a list of component vendors that had retained Endeavor Partners in the past five years, but volunteering to "speak generally to the area of work"); *id.* at 21:21–22:13 (declining to provide the names of clients that had retained Endeavour Partners on engagements involving mobile ecosystems over the past five years); *id.* at

25:17–26:6 (responding to the broad question, "what is the basis of your expertise in smart phones?"); *id.* at 30:3–31:6 (declining to name the specific "smartphone vendors in the United States for whom [Mr. Davies had] performed work on future business models in the last five years); *id.* at 30:13–17 (declining to name the smartphone vendors that had retained Endeavour Partners on engagements involving future business models). None of these citations show the witness withholding information necessary to establish his expertise.

### c.   Google's Proposed Rule Is Unworkable

If every expert in the technology or telecommunication industry had to disclose every detail of his or her prior engagements, few if any would be permitted to testify at trial. Technology and telecommunication firms—including Google itself—routinely require employees and contractors to sign NDAs.[5] A rule precluding industry experts from testifying if they have signed an NDA would take off the field anyone who has ever had access to confidential company information. There is no basis to adopt such a restriction.

Exclusion of an expert's testimony is also not the proper remedy for the expert providing incomplete answers during a deposition. Experts routinely testify at trial, even where their testimony is informed by experiences covered by an NDA. Indeed, one of Google's own experts also declined to answer a question in this case on account of work he performed being covered by an NDA. *See* Pls. Ex. B, Excerpts from the Deposition of Randolph E. Bucklin, Oct. 26–27, 2022, 47:16–21 (refusing to provide the name of a company that retained him due to confidentiality agreement).

---

[5]   *See* Nitasha Tiku, Reed Albergotti, & Gerrit De Vynck, "California Judge Rules Google's Confidentiality Agreements Break Labor Law," *The Washington Post*, Jan. 14, 2022, *available at* https://www.washingtonpost.com/technology/2022/01/14/google-nda-illegal-california/ (visited Jan. 22, 2023).

Of course, if Google found Mr. Davies' responses to deposition questions deficient, it could have moved to compel Mr. Davies to respond to those questions. Google did not do so. Google's belated complaints about the sufficiency of Mr. Davies' testimony are relevant—if at all—to the weight the Court gives that testimony, not its admissibility. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citing Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)).

Mr. Davies' consulting experiences in the smartphone industry qualify him to proffer opinions about the business and marketing considerations described in his reports.

### C.    Mr. Davies' Opinions Are Admissible Regardless Of His "Practical Experience" With Google's Distribution Agreements

Google argues that Mr. Davies is not qualified because he lacks "relevant practical experience with the Android Agreements." Def. Br. at 11. But this argument confuses the role of fact and expert witnesses and should be rejected.

Unlike fact witnesses, expert witnesses do not need to demonstrate personal knowledge of the facts at issue. *See United States v. Baskin*, 886 F.2d 383, 387 (D.C. Cir. 1989) ("Whether or not one qualifies as an expert depends not on knowledge of facts of a particular case but on one's past experience with regard to the subject matter on which one will opine."). Experts may review materials produced in litigation, assume facts within those materials are correct, and reach conclusions based upon those materials. *See, e.g.*, *United States ex rel. Morsell v. Nortonlifelock, Inc.*, 567 F. Supp. 3d 248, 262 (D.D.C. 2021) ("It is generally acceptable for counsel to provide factual assumptions to an expert—without asking the expert to opine on whether those assumptions are correct—and for counsel to then attempt to prove the correctness of those assumptions with other evidence."). Here, as in any other case, Mr. Davies "reviewed sections of Google's distribution contracts with leading smartphone vendors that [distribute]

devices in the United States" and applied his educational, technical, and industry expertise to opine on their likely effects. *See* Def. Ex. 1, Davies Initial Report, at 28 n.103, ¶¶ 81–114.

Nor is it disqualifying—or even surprising—that before his retention Mr. Davies had not personally reviewed Google's Distribution Agreements or spoken at length to any counterparties about their contents, given that Google's Distribution Agreements ███████████████████

███████. *See* Def. Br. at 11–12; *see, e.g.*, Pls. Ex. C, ██████████████████████

████████████████████████████████████████████

██████████████████████████████. Mr. Davies' core opinions—that for the past ten years Android has been the only compelling, licensable mobile OS, and, for that and other reasons, smartphone vendors are strongly incentivized to enter into Google's Distribution Agreements—do not require him to have previously reviewed or discussed the Google's Distribution Agreements. Certainly, Mr. Davies did not need prior familiarity with specific contract terms to know that smartphone vendors need a license from Google to distribute phones with Google's proprietary applications and APIs. Also, Mr. Davies' testimony indicates that although he has not discussed specific agreements with his clients, he has spoken to them about their relationships with Google. *See, e.g.*, Def. Ex. 3, Davies Dep., 63:1–64:1, 306:8–308:5.

Moreover, Plaintiffs have proffered Mr. Davies as an expert in the smartphone industry—specifically, the design, development, and marketing of smartphones—not as an expert in Google's Distribution Agreements. Mr. Davies' testimony is not excludable merely because Google "may prefer a different characterization of his specialization." *See Bazarian*, 315 F. Supp. 3d at 112 (internal quotation marks omitted) (dismissing attempts to fault expert for inadequate experience in investment banking when expert did not "hold himself out as an investment banker" and finding him qualified to opine on real estate financing agreement).

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 289 F. Supp. 3d 145 (D.D.C. 2018), which Google cites in its motion, is inapposite. The proffered expert in *Second Chance Body Armor* sought to opine on quality-control procedures based on his review of litigation materials without any established expertise in that topic. *See id. at* 157–58. As described above, Mr. Davies has extensive expertise in the development and marketing of mobile and smartphone OSs. His discussion of the likely effects of Google's Distribution Agreements is firmly rooted in this expertise.

### D.   Mr. Davies' Opinions Are Based On Legitimate Principles And Methods

Google argues that Mr. Davies' testimony is not "the product of reliable principles and methods" applied "reliably to the facts of the case." Def. Br. at 12 (quoting *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 296-97 (D.D.C. 2018)). That is incorrect. Mr. Davies' industry experience, detailed above, informed and supported his opinions here. As a technical and industry expert and not a scientific expert, Mr. Davies' experience satisfies FRE 702.

#### 1.   Experience Alone Is Sufficient

Under FRE 702, "'experience' alone can constitute the basis of 'reliable principles and methods.'" *Bazarian*, 315 F. Supp. 3d at 110 (quoting FRE 702(c)); *see also Hangarter v. Provide***Error! Bookmark not defined.***nt Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (finding non-scientific or non-technical testimony need not be "contingent upon a particular methodology or technical framework," so long as an expert's testimony is reliable "based on his knowledge and experience"). Technical and industry experts' testimony is reliable as long as they "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 (advisory committee notes on 2000 amendments).

In *United States v. Vesey*, for example, the Eight Circuit held that a trial court had abused its discretion by excluding the expert testimony of a law enforcement informant seeking to testify about how illegal drug operations are normally conducted. 338 F.3d 913, 916 (8th Cir. 2003). The court held that the informant had sufficiently established the reliability of his methods and principles by testifying that he had "extensive knowledge of the sale, use, and distribution of narcotics" as a result of his experience as a drug trafficker and informant; "used his knowledge to formulate general rules of drug trafficking behavior and to explain the logic and reasoning behind that behavior from the point of view of drug dealers"; and "then applied both the rules and the reasoning behind them to the behavior of the actors in this case." *Id.* at 917–18; *see also Bazarian*, 315 F. Supp. 3d at 112 (describing *Vesey* as instructive in evaluating the reliability of experience-based experts' testimony); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 n.8 (7th Cir. 2010) (citing to *Vesey* in discussing the reliability of experience-based experts' testimony).

Mr. Davies similarly used his education, training, and industry experience to reach his opinions. In Section III of his Initial Report, Mr. Davies recounts, based on his firsthand experience, the evolution of the smartphone industry in the 1990s and 2000s; he then uses this history to explain why the industry coalesced around a single, licensable mobile OS. Def. Ex. 1, Davies Initial Report, ¶¶ 14–31. Next, he describes—again using his extensive experience working on behalf of smartphone vendors and wireless carriers—the commercial realities that inform smartphone vendors' and wireless carriers' decision-making related to smartphone OSs. *Id.*, ¶¶ 53–60. Further, he explains why these vendors and carriers are strongly incentivized to enter into Google's Distribution Agreements. *Id.*, ¶¶ 61–87.

### 2.   Mr. Davies' Conclusions Are Tied To His Experience

To support excluding or limiting Mr. Davies testimony, Google offers two examples to suggest Mr. Davies' conclusions are "unmoored from any particular principle or methodology." *See* Def. Br. at 13–14. Neither is compelling. Google first asserts that Mr. Davies merely cites portions of Google's written discovery submissions in support of his declaration "that Google 'removed' or 'deprecated' certain 'core apps' from AOSP," the open-source portion of Google's proprietary Android. *See* Def. Br. at 13. But, the fact that Google removed or deprecated applications and functionality from AOSP is merely a predicate fact to Mr. Davies' conclusion that AOSP is no longer a viable substitute for Google's proprietary Android.

There is, of course, nothing improper about Mr. Davies establishing a predicate fact with a citation to a document in which Google explicitly concedes that fact. Google is well aware of this, as its economic expert—who has significantly less experience in the smartphone industry than Mr. Davies—opines about why Symbian (a former leading mobile OS) failed. Pls. Ex. D, Excerpts from the Expert Report of Professor Kevin M. Murphy, June 6, 2022 [Corrected Nov. 15, 2022], ¶¶ 315–329. Prof. Murphy relies on documents about the smartphone industry for the predicate facts needed to reach these conclusions. *Id.* Thus, Google asks the Court to adopt a rule which Google's own experts did not follow. *See Barber v. Corizon Health, Inc.*, No. 2:15-cv-01427, 2019 WL 8112500, at *1 (W.D. Pa. May 6, 2019) (rejecting *Daubert* challenge where a party's expert relied upon "the same factual predicate" she faulted the defense experts for relying upon and noting in a parenthetical, "what's good for the goose is good for the gander").

In fact, Mr. Davies supports his conclusion by citing multiple sources, including the deposition testimony of one of Android's founders, a submission by ▮▮▮▮ to the European Commission, and reporting in a technology publication. *See* Def. Ex. 1, Davies Initial Report,

¶ 40 n.54 (citing Rich Miner's deposition testimony); *id.*, ¶ 50 n.75 (citing ████ Response to the European Commission's Request for Information dated July 18, 2014); *id.*, ¶ 51 n.84 (citing reporting in *Ars Technica*). Moreover, Mr. Davies explained in his deposition that his conclusions about AOSP are supported by industry experiences, including engagements in which he was asked to evaluate the viability of building a mobile OS atop AOSP. *See* Def. Ex. 3, Davies Dep., 78:20–80:17.

Second, Google faults Mr. Davies for using the terminology "sustainable differentiation" without identifying "established or commonly accepted industry or academic usage of methodology associated with this ambiguous term." Def. Br. at 13. This ignores Mr. Davies' explanation in his report about (1) why differentiation is important for smartphone vendors and (2) what he means by the term "sustainable differentiation." *See, e.g.*, Def. Ex. 1, Davies Initial Report, ¶¶ 88–89 (explaining importance of differentiation). In addition, Mr. Davies cited to smartphone vendor and wireless carrier deponents similarly discussing their efforts to differentiate their products. *See id.*, ¶¶ 83 n.155, 88 n.163 (citing deposition testimony of Verizon and Motorola executives).

To the extent Google disagrees with Mr. Davies' assessment that some product differentiation is more "sustainable," *Daubert* is not the proper vehicle for this challenge. The company may attack the testimony during cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Thus, given Mr. Davies' deep experience in the smartphone industry, the Court should reject Google's challenges and conclude that his testimony is reliable.

II.    **Mr. Davies' Opinions About Why Smartphone Vendors And Carriers Tend To Enter Into Google's Distribution Agreements Is Valid and Reliable Expert Testimony**

Google seeks to exclude Conclusions 2 through 5 of Mr. Davies' Initial Report and all the opinions in his Reply Report because they purportedly (1) speculate about the motivation of third parties and (2) substitute Mr. Davies' opinions for fact testimony. Def. Br. at 14, 16–18. But, Mr. Davies' proposed analysis about industry incentives and their likely effect is firmly within the proper scope of expert testimony. Google's request for exclusion of these opinions should therefore be denied.

A.    **Industry Experts May Opine Regarding Industry Incentives**

Technical and industry experts are permitted to opine on incentive structures within their specific industries. *See Sitts v. Dairy Farmers of Am., Inc.*, No. 2:16-CV-287, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020) (noting experts in antitrust cases "frequently testify concerning economic incentives, the market behaviors they are likely to induce, and the market events or conditions that may contribute to monopsony [or monopoly] power"). For example, in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720 (MKB), 2022 WL 15044626, at *17 (E.D.N.Y. Oct. 26, 2022), the court permitted a technical expert to opine that actions by the defendants and others would drive late adopters to become compliant with a new technology standard.[6] The court explained that although the

---

[6] Experts may testify to facts that would be consistent with a party having a given motivation or intent, so long as they do not offer an ultimate opinion on what that party actually thought. *See, e.g.*, *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988) (expert testimony on *modus operandi* permissible so long as he is silent as to "the last step in the inferential process—a conclusion as to the defendant's actual mental state"); *see also United States v. Gomez-Norena*, 908 F.2d 497, 502 (9th Cir. 1990) (special agent's testimony that possession of large amounts of cocaine is consistent with an intent to distribute it was proper expert testimony).

industry expert "may not ascribe a particular motivation to [specific parties] or call their credibility into question, he may explain why a particular action would be inconsistent with normal market incentives." *Id.*; *see also Metavante Corp.*, 619 F.3d at 761 (permitting industry expert to opine that "in the financial sector, as he has seen and experienced it, businesses consider technological innovation satisfactory if it enables them to meet their business financial objective").

That is precisely what Mr. Davies does in his expert reports. Mr. Davies does not opine on specific smartphone vendors' or wireless carriers' intent or motivation when entering Google's Distribution Agreements. As he would readily concede, he was not in the room when these contracts were negotiated and does not foreclose actor-specific factors—for instance, the relationship between negotiators and priorities beyond a company's smartphone businesses—playing a role. Instead, Mr. Davies' anticipated trial testimony concerns the industry incentives that affect smartphone vendors' and wireless carriers' decision-making, like the absence of a compelling alternative to licensing Google's proprietary Android. *See, e.g.*, Def. Ex. 1, Davies Initial Report, ¶¶ 28–31 (describing failure of smartphone OS providers to respond to new dominant design for smartphones and industries coalescing around Google's proprietary Android and Apple's iOS).[7]

Google also argues Mr. Davies is seeking to substitute personal views for those of fact witnesses—specifically employees of smartphone vendors and wireless carriers. Def. Br. at 16–

---

[7] *See also* Def. Ex. 1, Davies Initial Report, ¶¶ 54–60 (describing "important factors" smartphone vendors consider in choosing to adopt a mobile OS and summarizing the advantages to adopting Google's proprietary Android over building a mobile OS from scratch); *id.,* ¶¶ 81–85, 87 (describing facts that result in "wireless carriers hav[ing] a strong incentive to contract with Google").

17. But Mr. Davies does not offer opinions on why any individual agreement was signed; to the extent a fact witness testified about such motivation, that testimony would stand on its own.[8] *See Sitts*, 2020 WL 3467993, at *7; *see also Dunn*, 846 F.2d at 762. Even if such fact testimony was heard at trial, conflicts with fact witness testimony is not a proper basis for excluding experts' opinions. *See, e.g.*, *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 426 (S.D.N.Y. 2016) (refusing to exclude testimony of expert who was contradicted by statements from company's employees); *see also Daubert*, 509 U.S. at 596 (finding once testimony is deemed admissible, adverse parties may still challenge it through "vigorous cross-examination [and] *presentation of contrary evidence*" (emphasis added)).

Relatedly, Google claims that Mr. Davies' opinions based solely on his review of the documentary record in this case and therefore speculative, but as described above, Mr. Davies' extensive experience working with smartphone vendors and wireless carriers over the past 30 years provides the foundation of his expertise and testimony in this case. *See* Argument Sections I.A. and B., *supra*.

### B.    *On Track Innovation Ltd. v. T-Mobile USA, Inc.*

Google criticizes Mr. Davies by saying a court ruled that he "violated settled principles by seeking to substitute his 'expert' testimony for that of fact witnesses" in *On Track Innovation Ltd. v. T-Mobile USA, Inc*. Def. Br. at 19. But in that case, the court merely restricted Mr. Davies

---

[8]    Google is also mistaken to the extent it believes Mr. Davies' opinions conflict with the deposition testimony of Eric Christensen (Motorola), Timothy Baxter (Samsung USA), Justin Denison (Samsung USA), Jeffrey Giard (T-Mobile), Brian Higgins (Verizon), and Jeffrey Ezell (AT&T). Mr. Davies cites to testimony from each of those deponents in his reports. *See, e.g.*, Def. Ex. 1, Davies Initial Report, ¶ 9 n.13 (citing deposition testimony of Mr. Christensen), *id.*, ¶ 40 n.154 (citing testimony of Messrs. Baxter, Ezell, and Higgins), ¶ 45 n.177 (citing deposition testimony of Denison), *id.*, ¶ 41 n.157 (citing deposition testimony of Mr. Giard).

from repeating information he learned from T-Mobile in preparing his testimony, saying that

testimony was not helpful to the court because those witnesses could be called to testify

themselves. *On Track Innovation Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 413

(S.D.N.Y. 2015). The court held that the "flaw [was] not fatal to the entirely of Mr. Davies'

testimony," because "it is clear that Mr. Davies' conclusions are drawn . . . primarily from his

own business experience and familiarity" with the market, and he was allowed to testify. *Id.*

Moreover, the court concluded:

> Mr. Davies' testimony is properly-grounded, well-reasoned, and not speculative. He has
> extensive academic and business experience in the relevant field. Drawing upon this
> wealth of experience, he has opined on a range of relevant subjects that are likely to assist
> a jury in assessing any damages from T–Mobile's assessment.

*Id.* at 412. In this case, Mr. Davies testified that his opinions are not based on interviews, but

rather based squarely within his "business experience and familiarity" with the smartphone

industry. *See id.* at 413; *see, e.g.*, Def. Ex. 3, Davies Dep., 60:16–61:8.

### III. Mr. Davies' Opinions Are Relevant And Will Assist The Court In Understanding The Facts

Finally, Google argues that Mr. Davies is neither offering opinions on competition

amongst search services nor supporting the testimony of another expert and, therefore, his

testimony should be excluded as irrelevant. Def. Br. at 19. The Court should reject Google's

argument because Mr. Davies' proffered opinions on commercial realities in the smartphone

industry are clearly relevant, as "[a]ntitrust analysis must always be attuned to the particular

structure and circumstances of the industry at issue." *Trinko*, LLP, 540 U.S.  at 411.

Google fundamentally misunderstands FRE 702 to the extent it suggests experts may

only opine on the ultimate issue in a case. *See Ambrosini*, 101 F.3d at 135. Expert testimony is

relevant and admissible even though it "alone may be insufficient for the [plaintiff] to survive

summary judgment." *Id.*; s*ee also Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 198

(D.D.C. 2015) ("It is well established that a court may not exclude an expert's otherwise reliable and relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's entire case."), *aff'd* 836 F.3d 57 (D.C. Cir. 2016). Indeed, expert testimony is relevant so long as it "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592 (1993); *see also United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008) (affirming admissibility of expert testimony where "evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations").

Mr. Davies' anticipated testimony easily clears that hurdle. Understanding why commercial realities within the smartphone industry force smartphone vendors and wireless carriers to enter into Google's Distribution Agreements, and what effects those agreements have on the broader industry, are central issues in this case. Mr. Davies' opinions on those matters will help the Court determine whether smartphone vendors and wireless carriers are coerced into Google's Distribution Agreements, given commercial realities, or their decision to enter into those agreements reflects mere competition on the merits. *See, e.g.*, Def. Br. at 2.

Moreover, documents and testimony in this case are likely to raise difficult commercial and technical issues. Mr. Davies' testimony will aid the Court in making sense of that evidence, explaining, for instance, why AOSP today is not a compelling alternative to Google's proprietary Android and how terms in Google's agreements adversely affect smartphone vendors' product development cycles. *See Ambrosini*, 101 F.3d at 135.

## CONCLUSION

For all the forgoing reasons, the Court should deny Google's motion to exclude the opinion of Michael A. M. Davies.

Dated: January 25, 2023

Respectfully submitted,


By: _____/s/ Kenneth M. Dintzer_____
Kenneth M. Dintzer
Jeremy M. P. Goldstein
Sara T. Gray
Karl E. Herrmann (D.C. Bar # 1022464)
U.S. Department of Justice, Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff United States of America*


By: _____/s/ Margaret Sharp_____
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Margaret.Sharp@oag.texas.gov

*Counsel for Plaintiff State of Texas*


By: _____/s/ Matthew Michaloski_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By: ___ /s/ Keaton Barnes ___
Keaton Barnes
Arkansas Bar No. 2022161
Assistant Attorney General
Office of Tim Griffin, Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Keaton.Barnes@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*


By: ___ /s/ Brian Wang ___
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*


By: ___ /s/ Lee Istrail ___
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: ___/s/ Daniel Walsh_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


By: ___/s/ Philip R. Heleringer_____
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General, Commonwealth
of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


By: ___/s/ Christopher J. Alderman___
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By:    */s/ Scott Mertens*
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*


By:    */s/ Stephen M. Hoeplinger*
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*


By:    */s/ Hart Martin*
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

By: ___/s/ Anna Schneider___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*


By: ___/s/ Mary Frances Jowers___
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: ___/s/ Gwendolyn J. Lindsay Cooley___
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*