**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ARKANSAS, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF INDIANA, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MICHIGAN, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF SOUTH CAROLINA, STATE OF TEXAS, AND STATE OF WISCONSIN | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| | HON. AMIT P. MEHTA |
| v. | ██████████ |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, STATE OF NEBRASKA, STATE OF ARIZONA, STATE OF IOWA, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF UTAH, STATE OF ALASKA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, TERRITORY OF GUAM, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF KANSAS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF PUERTO RICO, STATE OF RHODE ISLAND, STATE OF SOUTH DAKOTA, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, | Case No. 1:20-cv-03715-APM |
| | HON. AMIT P. MEHTA |
| | ██████████ |

STATE OF WEST VIRGINIA, AND STATE
OF WYOMING

                         Plaintiffs,

v.

GOOGLE LLC,

                         Defendant.

███████████

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT GOOGLE'S
MOTION FOR SUMMARY JUDGMENT**

January 26, 2023

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 5

I.     Google's Dominance In General Search And Related Advertising Markets ............... 5

  A.  The Relevant Markets .................................................................................................. 5

  B.  Google's Dominance Creates Significant Scale Advantages ........................................ 6

II.    Defaults And Preinstallation Are The Most Powerful Means Of Distributing General
      Search Engines ............................................................................................................ 8

III.   Google's Distribution Agreements Lock Up The Most Important Distribution
      Channels For General Search Engines ...................................................................... 10

  A.  The Apple Distribution Agreement ............................................................................ 10

  B.  Android Distribution Agreements .............................................................................. 11

  C.  Third-Party Browser Distribution Agreements .......................................................... 14

LEGAL STANDARDS .......................................................................................................... 15

I.     Summary Judgment .................................................................................................... 15

II.    Monopolization ........................................................................................................... 15

  A.  Burden-Shifting Framework ...................................................................................... 15

  B.  Application Of The Burden-Shifting Framework ....................................................... 16

  C.  Anticompetitive Effects Are Analyzed Contextually, Not Through The Formalistic
      Granularity Proposed By Google ............................................................................... 17

ARGUMENT .......................................................................................................................... 18

I.     Google Has Engaged In Anticompetitive Conduct In Violation Of Section 2 ............ 18

  A.  Google's Distribution Agreement With Apple Is Anticompetitive .............................. 21

     1.  Google's Exclusionary Agreement With Apple Locks Up A Critical Distribution
         Channel And Harms Competition ........................................................................ 21

     2.  Google's Claim That The ISA Was "Customer-Instigated" Does Not Provide A
         Basis For Summary Judgment .............................................................................. 24

3.   Google's Claim That There Has Been "Competition For The Contract" Does Not Provide A Basis for Summary Judgment ....................................... 27

B.   Google's Distribution Agreements With Android OEMs And Wireless Carriers Are Anticompetitive ....................................................................... 30

1.   Google's Agreements With Android OEMs And Wireless Carriers Lock Up Search Distribution On Android Devices ............................................ 31

2.   Google's Claim That Users Can Download Rival Apps Or Change Their Default Search Engine Is A Material, Factual Dispute ......................... 33

3.   Google's Claim That Android Partners Agreed To The MADAs And RSAs Does Not Provide A Basis For Summary Judgment ...................... 35

C.   Google's Distribution Agreements With Third-Party Browsers Are Anticompetitive ....................................................................................... 36

1.   Google's Distribution Agreements With Third-Party Browsers Are Anticompetitive Under *Microsoft* ............................................................ 37

2.   Google's Claims Provide No Bases For This Court To Excuse These Agreements ................................................................................................ 38

II.   Even Under Its Own Erroneous Legal Standard, Google's Conduct Violates Section 2 ................................................................................................. 40

A.   Google's Motion Asks The Court To Apply The Wrong Legal Standard ................ 40

B.   Factual Disputes Remain Even Under Google's Incorrect Legal Standard ............. 43

1.   Google's Distribution Agreements Are Exclusive Contracts ..................... 43

2.   Google's Agreements Substantially Foreclose Competition ...................... 47

CONCLUSION .................................................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*American President Lines, LLC v. Matson, Inc.*,
  No. 21-cv-02040 CRC, 2022 WL 4598538 (D.D.C. Sept. 30, 2022) .............................. 43, 48

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................................ 15

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) .............................................................................................. 26

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ............................................................................................................ 30

*FTC v. Surescripts, LLC*,
  424 F. Supp. 3d 92 (D.D.C. 2020) ................................................................................ 43, 49

*In re EpiPen Marketing, Sales Practices, & Antitrust Litigation*,
  44 F. 4th 959 (10th Cir. 2022) ........................................................................... 25, 26, 29, 30

*\*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) (en banc) ....................................................................... 20, 41, 49

*Masimo Corp. v. Tyco Health Care Group, L.P.*,
  CV 02-4770 MRP, 2004 WL 5907538 (C.D. Cal. June 10, 2004) ...................................... 44

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ............................................................................................ 17

*Menasha Corp. v. News America Marketing In-Store, Inc.*,
  354 F.3d 661 (7th Cir. 2004) ......................................................................................... 26, 29

*NicSand, Inc. v. 3M Co.*,
  507 F.3d 442 (6th Cir. 2007) .............................................................................................. 30

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ................................................................................................. 29

*Southeast. Missouri Hospital v. C.R. Bard, Inc.*,
  642 F.3d 608 (8th Cir. 2011) .............................................................................................. 43

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. (1993) ............................................................................................................. 31, 36

*Stearns Airport Equipment Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) .............................................................................................. 26

*Tampa Eletric. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ............................................................................................................ 49

*Thompson v. District of Columbia*,
  967 F.3d 804 (D.C. Cir. 2020) ........................................................................................... 15

*United States v. American Tobacco Co.*,
  221 U.S. 106 (1911)..................................................................................................... 20

*\*United States v. Dentsply International, Inc.*,
  399 F.3d 181 (3d Cir. 2005)....................................................................................... 41

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)..................................................................................................... 15

*\*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)........................................................................... passim

*United States v. Microsoft Corp.*,
  No. CIV. A. 98-1232-TPJ, 1998 WL 614485 (D.D.C. Sept. 14, 1998)........................... 15, 18

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..................................................................................................... 42

*\*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)................................................................................... 41, 43

**Statutes**

Section 2 of the Sherman Act, 15 U.S.C. § 2....................................................... passim

**Rules**

Federal Rule of Civil Procedure 56 ......................................................................... 15

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, (4th ed. 2015)................... 24, 47, 48, 49

iv

## ABBREVIATIONS

| | |
|---|---|
| **Colorado Plaintiffs** | Plaintiffs in *State of Colorado v. Google, LLC*, No. 1:20-cv-03715-APM (D.D.C.): the States of Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Vermont, Washington, Virginia, and Wyoming; the Commonwealths of Massachusetts, Pennsylvania, Puerto Rico, and Virginia; the District of Columbia; and the Territory of Guam |
| **Colorado Pls. Br.** | Plaintiff States' Memorandum In Opposition To Google's Motion For Summary Judgment in *State of Colorado v. Google, LLC*, No. 1:20-cv-03715-APM (D.D.C.) |
| **COMF** | Plaintiffs' Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment |
| **Def. Br.** | Defendant's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment (ECF No. 422) |
| **Defendant** *or* **Google** | Defendant Google LLC |
| **Plaintiffs** | U.S. Plaintiffs and Colorado Plaintiff States |
| **SOGI** | Plaintiffs' Statement of Genuine Issues in Response to Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue In Support of Its Motion For Summary Judgment |
| **U.S. Plaintiffs** | Plaintiffs in *United States v. Google. LLC*, No. 1:20-cv-03010-APM (D.D.C.): United States of America; the States of Arkansas, California, Florida, Georgia, Indiana, Louisiana, Michigan, Mississippi, Missouri, Montana, South Carolina, Texas, and Wisconsin; and the Commonwealth of Kentucky |

This court should deny Defendant Google LLC's Motion for Summary Judgment, ECF No. 421.[1] Google's motion asks the Court to resolve disputes of material fact by ignoring documents and deposition testimony demonstrating that Google has engaged in exclusionary conduct that harms competition and the competitive process.

## INTRODUCTION

Google is the gatekeeper of the internet. It has a durable monopoly in general search services, where it enjoys a nearly 90% market share in the United States. COMF ¶¶ 406–407. Google also possesses durable monopolies over important channels by which advertisers reach consumers—search ads and general search text ads—with market shares of 74% and 88%, respectively, in the United States. COMF ¶¶ 418–419. Google has maintained and reinforced these monopolies, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), through a variety of anticompetitive tactics that deprive consumers and advertisers of the benefits of competition.

Google cements its monopolies through exclusionary distribution agreements that steer billions of search queries to Google each day. COMF ¶ 483. Although these agreements would be anticompetitive in almost any industry, they are particularly pernicious in general search, where having more users fuels a feedback loop that affects a search engine's quality and competitiveness. COMF ¶¶ 426–427. Thus, by denying potential rivals access to search queries, Google's distribution agreements perpetuate the scale gap between Google and would-be competitors, which serves to further entrench its power. COMF ¶¶ 423, 436–437. Therefore,

---

[1] This Opposition to Google's motions for summary judgment addresses issues common to both the *United States, et al. v. Google, LLC*, No. 1:20-cv-03010-APM and the *State of Colorado, et al. v. Google LLC*, No. 1:20-cv-03715-APM cases. The Colorado Plaintiff States address issues raised only in their case in a separate filing.

Google's exclusionary conduct strengthens barriers to entry and expansion in general search, raises switching costs, and reinforces Google's monopolies. COMF ¶¶ 484–485.

The Colorado Plaintiff States (Colorado Plaintiffs) additionally allege that the distribution agreements lead to even more competitive harm in today's marketplace because they deprive Google's users and advertisers of any meaningful competitive alternative. Colorado Pls. Br. at 4–7. With a free hand and contrary to what it has promised in the past, Google delays the availability of its rivals' advertising improvements on its SA360 tool, undermining its advertising competitors. *Id.* at 13–17, 36–37. This boosts Google revenues while increasing the harm to rivals and its own advertising customers. *Id.* at 49–50. Google's monopoly conduct also weakens Specialized Vertical Providers (SVPs), many of which are themselves important Google advertisers harmed by the distribution agreements and the operation of SA360. *Id.* at 16–20, 37–47. Google abuses its monopoly power to acquire valuable proprietary data from SVPs in important commercial sectors, reducing their ability to work with Google rivals, while also reducing SVP visibility to Google users. *Id.* at 42–44. Harming SVPs harms competition in Google's markets because more successful SVPs could work with and strengthen Google's rivals in challenging Google's dominance. *Id.* at 28–30, 37–39.The Colorado Plaintiffs allege this additional conduct taken as a whole further raises barriers to expansion and entry, boosts the scale gap, harms competition, and threatens innovation by maintaining Google's monopolies. *Id.* at 1, 3, 6, 26, 45–47. Although the United States has not challenged this additional conduct, it agrees that the effect of Google's anticompetitive conduct is cumulative and mutually reinforcing, which exacerbates the network and scale effects that protect Google's monopoly and deepens barriers to entry and expansion. Accordingly, it is appropriate for the Court to evaluate

the conduct challenged by the United States both independently and alongside the additional conduct challenged by the Colorado Plaintiffs.

Google's motion ignores much of Plaintiffs' case. Google does not dispute the existence of relevant antitrust markets in general search, search ads, and general search text ads. Nor does it challenge Plaintiffs' ability to prove that Google has had monopoly power in these markets for years. Finally, Google does not—and cannot—contest that it enters into distribution agreements and pays billions of dollars annually for its search engine to be placed as preset default. Rather, Google asks the Court to resolve critical factual disputes about the effects of these agreements and hold *as a matter of law* that Google's exclusionary conduct *cannot* violate Section 2. Because Google is wrong on the facts and the law, the Court should reject this request.

On the facts, Google's own documents demonstrate that its distribution agreements substantially restrict rival search engines' ability to compete. For example, U.S. Plaintiffs' economic expert Professor Michael D. Whinston, Ph.D., demonstrates with documents and testimony that Google's conduct forecloses rivals from 50% of the general search market. COMF ¶¶ 471, 473. Even under Google's erroneous legal standard, that is a clear showing of anticompetitive effect. Google responds by disputing Plaintiffs' view of the record evidence, arguing its Android distribution agreements only block rivals from 1% of U.S. search queries. *See* Def. Br. at 40–43. Google's math here is wrong and, of course, any dispute about the size of this foreclosure is a factual issue that precludes summary judgment. More importantly, Google's argument also fundamentally misconstrues Plaintiffs' case, which is focused on both the individual and aggregate impacts of Google's exclusionary conduct in markets characterized by powerful scale and network effects. Google also misconstrues the factual record in its favor by claiming ██████████████████████████████████████████████ Def. Br.

at 8, but Apple's corporate representative testified that asking for a payment had ███████

██████████████████████████████████ COMF ¶ 539.

On the law, Google ignores *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001). In that case, the D.C. Circuit held that a monopolist cannot entrench its monopoly with exclusionary distribution agreements, including default and preinstallation agreements. Contrary to *Microsoft*, Google urges the Court to assess its distribution agreements by applying an overly-narrow and formalistic exclusive dealing framework that is inappropriate under Section 2. Google then contends the agreements fail this test because, in its view, they are not exclusive. *Microsoft* rejected this kind of rigid formalism and instead sensibly instructed courts to examine the cumulative effect of a defendant's conduct in light of market realities. Google's failure to adhere to *Microsoft* is a sufficient basis to deny Google's motion.

*Microsoft* resolves Google's other arguments as well. For example, *Microsoft* analyzed the anticompetitive effect of each of Microsoft's agreements in light of the others. By contrast, Google argues that the Court should analyze whether each of its anticompetitive acts, in isolation, violate Section 2. Likewise, Google's asserted method of measuring foreclosure based on hypothetical relevant markets (i.e., the but-for world), which is the 1% foreclosure number Google repeatedly cites, is contrary to *Microsoft*.

Finally, Google argues that its distribution agreements cannot be exclusionary because (1) Google's counterparties "instigated" the process that led to the agreements; and (2) Google faced "competition for the contract" when it entered into certain agreements. Def. Br. at 35–38. Both arguments fail on the law and provide no basis for summary judgment. Under Google's proposed legal standard, broad swaths of anticompetitive conduct would be immunized from review so long as a monopolist could find partners willing to share in the monopoly profits or

identify a disadvantaged rival willing to bid for the contracts. This is quintessentially form over function. Accepting Google's approach would make the antitrust laws bow to admitted monopolists.

Accordingly, the Court should apply *Microsoft* and conclude that Google has not met the standard for summary judgment.

## FACTUAL BACKGROUND

### I.    Google's Dominance In General Search And Related Advertising Markets

Google possesses monopolies in general search, search advertising, and general search text advertising.[2] COMF ¶¶ 401–402, 407, 413–416, 418–419. The data Google obtains from these monopolies gives it a competitive advantage over rivals in improving its search products.

### A.    The Relevant Markets

General search engines are "one-stop shops" consumers use to search the internet. COMF ¶ 400. The two leading general search engines in the United States today are Google and Bing.[3] *Id.* ¶¶ 404–405. Smaller players include Yahoo!, DuckDuckGo, Brave, Ecosia, and Neeva. *Id.* ¶ 405. Google has dominated the general search services market for over a decade, with an average annual market share exceeding 80% since at least 2010. *Id.* ¶ 406. In 2020, Google's share of the market was nearly 90%, with 94% share on mobile devices. *Id.* ¶ 407. Bing, Google's closest competitor, has a 6% market share, and it has not exceeded a 10% share since

---

[2]    As explained by the Colorado Plaintiffs and not disputed by Google for purposes of summary judgment, Google also possesses a monopoly in the market for general search advertising. Colorado Pls. Br. at 2.

[3]    The Colorado Plaintiffs use the term general search engine (GSE) to describe firms that "crawl the Internet and gather and index the information found there," like Google and Bing, as well as the term general search firms (GSF), which includes firms that "syndicate [] search results and do not themselves crawl the Internet." Colorado Pls. Br. at 1 n.2. The U.S. Plaintiffs use general search engine to refer to both.

2015. *Id.* ¶ 408. On mobile devices, Bing's share is even smaller, at roughly 1% in 2021, and it has not exceeded a 2% share since 2016. *Id.* ¶ 409.

Most general search engines do not charge consumers a fee. *Id.* ¶ 410. Instead, a consumer provides Google data and attention in exchange for search results. *Id.* ¶ 411. Then, Google monetizes the consumer's data and attention by selling advertisements. *Id.* ¶ 412. In addition to the general search market, the U.S. Plaintiffs have identified two relevant advertising markets: search ads and general search text ads. The search ads market consists of advertising that is displayed on a search engine results page (SERP), i.e., the results displayed in response to a consumer's search query. *Id.* ¶¶ 403, 413. General search text ads is a narrower market wholly contained within the search ads market. *Id.* ¶ 414. General search text ads appear on the SERP of a general search engine and look much like organic search links. *Id.* ¶ 417.

Google has a share of 74% in the U.S. search ads market and has had a share of over 70% since 2015. *Id.* ¶ 418. In the general search text ads market, Google's market share is 88% and has been greater than 80% since at least 2016.[4] *Id.* ¶ 419. Bing, Google's closest competitor, has held less than 9% share since 2016. *Id.* ¶ 420. In 2021, Google earned approximately ███ in revenue from the sale of search ads, resulting in roughly ███ in operating profits. *Id.* ¶¶ 421–422.

### B.    Google's Dominance Creates Significant Scale Advantages

Google's general search engine receives more than ███ search queries per week in the United States, which exceeds its rivals by many multiples, especially on mobile. COMF ¶¶ 424–425, 428–429, 432. This scale fuels a powerful feedback loop. *Id.* ¶¶ 423, 426–427. The

---

[4]    As relevant to the Colorado Plaintiffs' claims, Google also possesses greater than 80% market share in the general search advertising market. Colorado Pls. Br. at 8.

more data a search engine receives, the better the user experience it can deliver. *Id.* ¶¶ 426–427, 430–431. And the better the user experience, the more a search engine can compete by attracting users, who provide even more data and attention, which, in turn, allows search engines to generate more advertising revenue from each search query. *Id.* ¶¶ 437–439. Earning more from each search query allows a search engine to pay more for distribution deals on browsers, computers, and mobile devices, which, in turn, serves to capture even more search queries for the feedback loop. *Id.* ¶ 439.2.

Google documents demonstrate how Google relies on scale to improve the ranking of its search results, a critical dimension of search quality: "One can regard each [results page] as a massive multiple-choice test. Each day, we get to ask humanity a billion questions of the form, 'Which of these 10 documents is most relevant to your query?'" *Id.* ¶ 426. "With every query, [Google gives] some knowledge, and get[s] a little back. Then we give some more, and get a little more back. These bits add up. After a few hundred billion rounds, [Google] start[s] lookin' pretty smart! This isn't the only way [Google] learn[s], but the most effective." *Id.*

The importance of scale to general search engines creates powerful barriers to entry and expansion for rival search engines. A consequence of Google's anticompetitive agreements is that they nurture and reinforce Google's dominance by denying its rivals access to data like search queries and clicks. Without such data, rival search engines cannot overcome or narrow Google's scale advantage—the scale gap—and efficiently match Google's search quality. *Id.* ¶¶ 428–434, 436–437. This, in turn, makes it harder for rivals to attract users. *Id.* ¶ 437. With fewer users, rivals struggle to attract advertising revenue. *Id.* ¶¶ 438–439. With less revenue, rivals are predictably less able to invest in quality improvements that benefit consumers and advertisers and less able to fund distribution agreements. *Id.* ¶¶ 439.1, 440. This, in turn, makes it

even harder to attract users, exacerbating the feedback loop that benefits Google and harms its rivals' ability to compete. *Id.* ¶¶ 427, 439.1–439.2.

Thus, by denying rivals scale, Google can fortify its scale advantages and the barriers to entry and expansion that protect its core monopolies in search and search advertising.

## II.      Defaults And Preinstallation Are The Most Powerful Means Of Distributing General Search Engines

Like any product, if users cannot readily access a general search engine, they will not use it. The most common way users access general search engines is through preinstalled search access points. COMF ¶ 441. A search access point is a place on a computer or mobile device (collectively, devices)[5] where a consumer can enter a search query, such as a browser's address bar or a search app on a device's home screen. *Id.* ¶ 442. On U.S. devices, search access points come with a preset or preinstalled default search engine, i.e., the search engine that a search access point automatically sends queries to when a consumer first uses their device. *Id.* ¶ 447.

In the United States, device distributors (e.g., Apple, original equipment manufacturers (OEMs) such as Samsung, or wireless carriers) decide what apps—and therefore what search access points—to preinstall. *Id.* ¶ 446. For example, when a user purchases an Apple iPhone, it comes with Apple's Safari browser preinstalled, which has Google set as the default search engine for queries users enter in the address bar. *Id.* ¶ 448.

Being the default search engine on a preinstalled and prominently placed app is *by far* the most efficient and effective way for a general search engine to reach users. *Id.* ¶¶ 445, 454. As the evidence at trial will show, although most devices allow users to change some defaults, many users stick with a device's search defaults. *Id.* ¶¶ 449, 453. Google's economic expert Professor

---

[5]   Computer includes both desktop computers and laptop computers. Mobile devices include both smartphones and tablets.

Kevin M. Murphy, Ph.D., concedes that "default status generally will lead to some increase in usage." *Id.* ¶ 449. But the parties disagree about the amount and impact of default settings. Moreover, habit guides how users search the internet, and users often do not make (or even know they can make) an explicit choice about which search engine to use. *Id.* ¶¶ 450–451. Even where search users might want to switch defaults, the effort and knowledge required to make that change biases them towards sticking with the default option. *Id.* ¶ 452. Defaults are particularly powerful on mobile devices. *Id.* ¶ 455; *see also id.* ¶ 463.

In practice (if not in this case), Google recognizes the extraordinary power of defaults to drive search traffic, paying billions of dollars for default status in the United States. *Id.* ¶¶ 456, 469, 515, 612, 618, 650. This simultaneously widens Google's scale gap and denies rivals opportunities to gain scale, which disproportionately harms smaller rivals trying to achieve a critical mass of users and advertisers. *Id.* ¶¶ 425, 437.1. As one Google document explains: "It's all about access to the default [Operating System] search access points and where we are starting on a device." *Id.* ¶ 445; *see also id.* ¶ 453.

While negotiating its deal with Apple in 2016, Google estimated that if Apple chose a rival as Safari's default search engine, ██████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ *Id.* ¶¶ 526–528. Executives from Microsoft, DuckDuckGo, and Neeva have all explained that users are unlikely to switch away from a device's preset default search engine, underscoring the value of default distribution. *Id.* ¶ 461. The enormous impact defaults have in driving search traffic is also revealed in the rare instances in which a rival search engine obtains a default position. For instance, Bing's share of

queries is much higher on devices (such as Windows PCs and Amazon Fire tablets) where it is the default. *Id.* ¶ 462.

In the United States, Google's search rivals have no viable alternatives to default distribution. Google's documents acknowledge this, stating that paying for the default position is the "highest cost but highest value way to acquire users," and "organic downloads, paid marketing, and app promotion/integration" do not match the likelihood of success that being the preset default search engine has in getting consumers to use Google's search engine. *Id.* ¶ 465; *see also id.* ¶ 464.

### III. Google's Distribution Agreements Lock Up The Most Important Distribution Channels For General Search Engines

For more than a decade, Google has entered into distribution agreements that make it the preset default search for preinstalled search access points on Apple and Android devices. These are the most important search distribution channels in the United States, especially given the role of mobile searches in improving search quality. Google has also entered into distribution agreements with third-party browser companies, such as Mozilla, to be the preset default for those browsers' search access points.

#### A. The Apple Distribution Agreement

Many U.S. consumers use Apple devices to access general search services. Apple is a leading provider of devices in the United States. Roughly 60% of all mobile phones in the United States are iPhones, and roughly 27% of all computers in the United States are Macs. COMF ¶¶ 495–496. In 2020, ▮▮▮▮▮▮▮ of all Google search queries in the United States were performed on Apple devices. *Id.* ¶ 494.

Google distributes its general search engine to Apple's users through the Information Services Agreement (ISA). SOGI ¶¶ 13, 55. Under the ISA, Apple sets Google as the default

search engine for queries performed through Safari. COMF ¶ 501. In exchange for Google being set as the default for ███████████████████████████████████████████ ███████████ in Safari (or any successor web browser on any Apple device), Apple receives a portion of the search ad revenue ███████████████████ *Id.* ¶¶ 501–503, 512. Since 2005, Google has made payments to Apple to guarantee that Google will be the exclusive default search engine on Apple devices. *Id.* ¶ 511; SOGI ¶ 14. In 2021 alone, under the ISA, Google paid Apple approximately ███████ on searches in the United States. COMF ¶¶ 514, 517. These payments were ██████████ of Apple's total operating income in the United States that year. *Id.* ¶ 516. ████████████████████ was directly attributable to Apple making Google the preset search default for the Safari address bar.[6] *Id.* ¶ 515; *see also* ¶ 517.

Google prizes its default search engine status for Safari in part because Apple has never preinstalled third-party apps on its devices, let alone third-party search apps or browsers. *Id.* ¶¶ 497–499. Indeed, Apple's corporate representative explained that the company "would never" preinstall third-party apps on iPhones. *Id.* ¶ 498. Accordingly, Safari's preset search default remains the most critical channel for general search distribution on Apple devices. *Id.* ¶ 500.

The ISA also includes a term ███████████████████████████████████ ███████████████████████████████████ *Id.* ¶ 510.

## B. Android Distribution Agreements

Android is the second-largest mobile operating system in the United States. COMF

---

[6]  Under the ISA, Google pays Apple a share of the search ad revenue Google earns ██████ █████████████████████████████████████████ ███████████████████████ COMF ¶¶ 512–513; SOGI ¶ 39. In his deposition, Google's economic expert acknowledged that Google's payments to Apple ██████ ██████████████ COMF ¶ 518.

¶ 580; SOGI ¶ 198. In 2020, approximately ████ of all Google search queries in the United

States were performed on Android devices. COMF ¶ 565. In 2008, Google released the Android

operating system code for free, creating the Android Open Source Project (AOSP). COMF

¶¶ 570, 571; SOGI ¶ 194. Any original equipment manufacturer (OEM) can use AOSP for its

mobile devices, but AOSP has significant limitations. COMF ¶ 572. Over time, Google has

removed or deprecated many AOSP apps (e.g., calendar, camera, email) and placed newly

developed features exclusively within its proprietary apps and services—collectively, Google

Mobile Services (GMS). COMF ¶ 573; SOGI ¶¶ 364–365, 368.

Of particular importance to OEMs and carriers is Google's app store, the Play Store.

In the United States, for an Android device to be successful, it must have the Play Store

preinstalled. SOGI ¶ 211; COMF ¶ 577. Another critical piece of GMS is a set of application

programming interfaces (APIs), known as Google Play Services (GPS). COMF ¶¶ 574–575;

SOGI ¶ 210. GPS helps support app functionality, e.g., enabling location manager functions, and

hundreds of thousands of third-party Android apps use it. COMF ¶¶ 574–575.

To license the Play Store, GPS, or any other part of GMS, OEMs must sign a Mobile

Application Distribution Agreement (MADA). SOGI ¶¶ 211–213. For more than a decade,

Google has used the MADA, along with Revenue Share Agreements (RSAs), to distribute its

general search service on U.S. Android devices. COMF ¶ 568.

Mobile Application Distribution Agreements: The MADA is a license from Google that

permits OEMs to preinstall GMS on Android devices. SOGI ¶ 212. Under the MADA, if an

OEM preinstalls any Google app on a device, the OEM commits to (1) putting Google's search

widget (a search bar or box) on the device's home screen and (2) preinstalling 11 Google apps.

COMF ¶ 584; SOGI ¶¶ 212–213, 217. These mandatory preinstalled apps include the Google

Search App (GSA) and Google's Chrome browser, on which Google is the preset default search engine. SOGI ¶¶ 213; COMF ¶ 584. The MADAs prohibit OEMs from encouraging, teaching, or helping end users to change the device's preinstalled default settings.[7] COMF ¶ 585.

The vast majority of Android devices in the United States have GMS preinstalled. COMF ¶ 583.Samsung and Motorola are the leading manufacturers of Android devices sold in the United States, and both companies have MADAs. COMF ¶¶596–599. LG, which used to be a leading Android OEM, also had a MADA. *Id.* ¶ 600. In 2020, LG announced its exit from the smartphone business. *Id.*

Revenue Share Agreements: Google also enters into revenue share agreements with carriers and with OEMs that have signed MADAs. *Id.* ¶¶ 602–603, 606–607. These agreements induce carriers and OEMs to agree to additional requirements and restrictions that benefit Google in exchange for the opportunity to earn ███████████████████████ COMF ¶¶ 443–444, 602, 612; SOGI ¶ 222. These distribution agreements have explicit exclusivity requirements: Google must be the preset default search engine on all search access points on Android devices. COMF ¶¶ 602, 605; SOGI ¶ 226.

In the United States, the vast majority of Android devices are sold from OEMs to mobile carriers, who then resell the devices to consumers. COMF ¶¶ 566–567. Google's RSAs with carriers cover these devices. *Id.* ¶ 606. Google's RSAs with OEMs also ensure that the smaller

---

[7] Under the MADA, an OEM may preinstall GMS only on Android devices that comply with a set of Google-defined technical requirements known as the Compatibility Definition Document (CDD). SOGI ¶¶ 209, 296. If the OEM preinstalls GMS on devices, the MADA requires the OEM to send sample devices to Google for approval. SOGI ¶ 297. On top of the MADA's own compatibility requirements, the MADA also generally requires OEMs to have signed either an Antifragmentation Agreement (AFA) or an Android Compatibility Commitment (ACC), which separately prevent OEMs from distributing Android devices (with limited exceptions) that do not comply with Google's CDD, regardless of whether the OEM preinstalls GMS or not. SOGI ¶¶ 297–298.

portion of Android devices that OEMs sell directly to U.S. consumers are also covered. *Id.* ¶ 607.

Under both types of RSAs (with carriers directly or with OEMs), Google makes monthly payments to the counterparty in exchange for search exclusivity on Android devices. *Id.* ¶¶ 602, 608–610; SOGI ¶ 226. In 2020, for searches in the United States, Google paid ███████████ ████████████████████ COMF ¶¶ 612–613.

### C.    Third-Party Browser Distribution Agreements

Since the early 2000s, Google has also entered into revenue share agreements with third-party browser companies, including Mozilla, Opera, and UCWeb. COMF ¶¶ 633, 635. These agreements guarantee that, when the browser is installed by users, Google will be the preset default search engine in all search access points, namely the address bar. *Id.* ¶ 646; SOGI ¶¶ 157, 176, 182. In 2020, Google paid third-party browser companies approximately █████████ for this default status. COMF ¶ 650.

Third-party browsers generally do not come preinstalled on devices (which come with a different preinstalled browser out of the box). *Id.* ¶ 644. Users must separately decide to install third-party browsers. *Id.* ¶ 645. Predictably, third-party browsers represent a relatively small distribution channel for search engines—they collectively account for roughly 5% of U.S. browser usage. *Id.* ¶ 634. The vast majority of this usage occurs on computers rather than mobile devices. *Id.* ¶ 643.

Google's current agreement with Mozilla (the most popular third-party browser) requires the company to preset Google as the default search engine for all search access points on the browser; in exchange, Mozilla receives a share of Google's search ad revenue. *Id.* ¶¶ 635, 646; SOGI ¶¶ 143, 149, 157. ████████████████████████████████████ ████████████████████████████████████ COMF ¶ 648; SOGI ¶ 157. ██████████████████████████████

███████████████████████████ COMF ¶ 649.

## LEGAL STANDARDS

### I.   Summary Judgment

To prevail on summary judgment, Google must "show[] that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any doubts, inferences, or issues of credibility must be resolved against the moving party. *See Thompson v. District of Columbia*, 967 F.3d 804, 812-13 (D.C. Cir. 2020). A "genuine" dispute of material fact exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### II.   Monopolization

Unlawful monopoly maintenance requires "the possession of monopoly power" and "the willful . . . maintenance of that power" through "exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Google does not dispute it has monopoly power in the relevant markets for the purpose of its summary judgment motion. Thus, the issue before this Court is whether "there are disputed facts regarding whether [Google] has 'willfully' maintained its alleged monopoly" by engaging in exclusionary conduct. *United States v. Microsoft Corp.*, No. CIV. A. 98-1232-TPJ, 1998 WL 614485, at *22 (D.D.C. Sept. 14, 1998).

#### A.   Burden-Shifting Framework

The D.C. Circuit has adopted a fact-specific, burden-shifting framework for determining whether conduct is exclusionary. *Microsoft*, 253 F.3d at 58–59. At step one, the plaintiff must show that the challenged conduct has an "anticompetitive effect"—that it "harm[s] the competitive process and thereby harm[s] consumers." *Id.* at 58. If step one is satisfied, the

burden shifts to the monopolist to show a sufficient "procompetitive justification" for its

conduct. *Id.* at 59. The burden then returns to the plaintiff "to rebut that claim" or "demonstrate

that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.*

### B.       Application Of The Burden-Shifting Framework

*Microsoft* is instructive. There, the D.C. Circuit affirmed a district court's findings that

Microsoft possessed a monopoly in Intel-compatible PC operating systems, which was

reinforced by barriers to entry that made it difficult for rival operating systems to compete. *Id.* at

52. Middleware products, such as web browsers, allowed developers to make applications for

Microsoft's operating system and rival operating systems at the same time. This created a threat

to Microsoft's monopoly. If a middleware product gained a critical mass of users, it could attract

developers to write applications that worked on different operating systems, eroding the

applications' barriers to entry that protected Microsoft's operating system monopoly. *Id.* at 53,

55–56, 60. To nullify this threat, Microsoft stifled the growth of middleware products by, among

other things, using exclusionary agreements to control the two leading distribution channels for

browsers: OEMs and internet access providers (IAPs). *Id.* at 60.

For example, the district court found that Microsoft "prevented many OEMs from

distributing browsers other than IE [Microsoft's own browser]." *Id.* at 60. As the D.C. Circuit

explained, this conduct was anticompetitive because it eliminated "one of the two primary

channels for distribution of browsers" and thus "protect[ed] Microsoft's monopoly from the

competition that middleware [like browsers] might otherwise present." *Id.* at 61. The court

reached similar conclusions for other contractual provisions with similar effect. *See, e.g.*, *id.* at

62 (holding that provisions preventing OEMs from promoting rival browsers in computers'

initial boot sequence and through "various alterations to the desktop" were anticompetitive). The

court condemned these agreements even though they were not exclusive contracts and did not

explicitly prevent OEMs from preinstalling or promoting rival browsers. What controlled—as in any monopolization case—was the *effect* these agreements had on the competitive process and ultimately in reinforcing Microsoft's monopoly. *See, e.g.*, *id.* at 64 ("[T]he OEM license restrictions at issue represent uses of Microsoft's market power to protect its monopoly[.]").

In addition, Microsoft required IAPs to offer Microsoft's own browser "as the default browser or as the only browser." *Id.* at 71. Similar to the OEM agreements, the D.C. Circuit held that the IAP agreements were anticompetitive because they foreclosed "a substantial percentage of the available opportunities for browser distribution," which "help[ed] keep usage of Navigator [a browser rival] below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly." *Id.* at 71. In doing so, the court emphasized that when the defendant is a proven monopolist, exclusive contracts can violate Section 2 of the Sherman Act "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a [violation of Section 1 of the Sherman Act]." *Id.* at 70; *see also McWane, Inc. v. FTC*, 783 F.3d 814, 834 (11th Cir. 2015) (focusing on the "practical effect" of agreements at issue rather than "formalistic distinctions").

### C.       Anticompetitive Effects Are Analyzed Contextually, Not Through The Formalistic Granularity Proposed By Google

In assessing the anticompetitive effect of Microsoft's conduct, the D.C. Circuit did not analyze each of Microsoft's acts in isolation; instead, it examined them in light of each other. For example, in analyzing Microsoft's agreements with independent software vendors (ISVs), the court recognized these agreements covered "a relatively small channel for browser distribution." *Microsoft*, 253 F.3d at 72. And yet, they were still anticompetitive because "Microsoft had largely foreclosed the two primary channels [the OEM and IAP channels] to its rivals," meaning the anticompetitive effect of the ISV agreements took on "greater significance."

17

*Id.*

The D.C. Circuit analyzed Microsoft's acts in light of market realities, including the role that scale played in reinforcing its operating systems monopoly. These market realities amplified the effect that Microsoft's conduct had on distorting the competitive process. *See, e.g.*, *id.* at 60 (recognizing that browsers benefit from scale and thus they "must have a critical mass of users" in order to succeed); *id.* at 71 (Microsoft's conduct preserved its operating system monopoly by keeping rival browsers "below the critical level necessary" to "pose a real threat").

## ARGUMENT

## I.   Google Has Engaged In Anticompetitive Conduct In Violation Of Section 2

Google argues that it is entitled to summary judgment solely because its conduct is not anticompetitive, i.e., the first step of *Microsoft*'s burden-shifting framework, and therefore cannot violate Section 2.[8] Def. Br. at 1. But whether Google's conduct is anticompetitive involves "fact-bound questions that generally cannot be resolved on summary judgment." *Microsoft*, 1998 WL 614485 at *22, 23 ("These are quintessential fact questions and genuinely disputed.").

Here, case documents and deposition testimony create clear issues of material fact as to this important issue. Indeed, as explained below, the record evidence shows that Google's distribution agreements with Apple, Android OEMs, wireless carriers, and third-party web browsers ensure Google is the only preset default for key search access points. That walls off Google's rivals from almost 50% of U.S. search traffic and roughly 70% of U.S. mobile search

---

[8]   Any argument about alleged procompetitive benefits is thus not relevant and, in any event, no basis for summary judgment. *See Microsoft*, 1998 WL 614485 at *22 ("balancing of potentially legitimate business justifications against what plaintiffs contend are exclusionary effects are fact-bound questions that generally cannot be resolved on summary judgment").

traffic (an ever-growing category of searches).[9] COMF ¶¶ 471, 473. Google's ownership of Chrome—a dominant web browser, *id.* ¶ 581—amplifies the anticompetitive effect of these distribution agreements because Google can ensure that search access points in Chrome include Google search as the preset default. *See id.* ¶ 582. That walls off an additional ███ of U.S. search traffic and ███ of U.S. mobile search traffic. *Id.* ¶¶ 472, 474.

The 50% of all U.S. searches covered by the challenged terms of Google's contracts are well protected by the power of defaults. A portion of Google's searches are conducted by users who are not affected by the default; they would search with Google no matter how their devices were configured. But U.S. Plaintiffs' economic expert Prof. Whinston demonstrates that those users are rare: 33% of *all* U.S. searches are covered by the challenged terms of Google's contracts and conducted by users who follow the default, whatever it is. *Id.* ¶ 468. Thus, Google has bought, not earned, at least 33% of all U.S. searches.

As these numbers demonstrate, Google's distribution agreements are at least as exclusionary as the agreements found anticompetitive in *Microsoft*. *See, e.g.*, 253 F.3d at 61 (contract term anticompetitive because it "prevent[ed] many OEMs from pre-installing a rival browser"); *id.* at 70 ("closing to rivals a substantial percentage of the available opportunities for browser distribution"); *id.* at 71 ("the 'majority' of all [Internet Access Providers] subscribers are offered [Internet Explorer] either as the default browser or as the only browser"); *id.* at 72 ("Microsoft's deals . . . 'increase the likelihood that . . . millions of consumers . . . will use Internet Explorer rather than Navigator.'"). To the extent Google disputes these numbers or their significance, it only underscores why summary judgment is inappropriate.

---

[9]   Google's distribution agreements likewise cover a significant portion of U.S. search ad revenue and general search text ad revenue, at roughly 36% and 45% respectively. COMF ¶¶ 490, 492.

These numbers do not tell the full story, however, because of the feedback and scale effects in the relevant markets here. Denying rivals access to search traffic also denies them the data that might help overcome Google's significant scale advantages. COMF ¶¶ 426, 436–437. Although Google has benefited for the last decade from a feedback loop that drives its product quality and advertising revenue, *see* Argument, Section I.B, Google's rivals have experienced just the opposite. *Id.* ¶¶ 427, 436–437, 440. Without search volume, rival search engines cannot match Google's search quality. *Id.* ¶ 437. This, in turn, makes it harder for rivals to attract users, which means less data and advertising revenue. *Id.* ¶¶ 439. This feedback loop is "a characteristic of the [relevant] market, not of [Google's] popularity, or, as asserted by [Google], the company's efficiency." *Microsoft*, 253 F.3d at 56; *see also* Def. Br. at 1. Google's distribution agreements exacerbate and reinforce these effects, raise user switching costs, and fortify the barriers to entry and expansion that protect Google's search monopolies. *Id.* ¶¶ 427, 452, 484. Microsoft's distribution agreements had a similar effect, "keeping rival browsers from gaining the critical mass of users necessary to attract developer attention away from Windows," and so were rightly condemned under Section 2 of the Sherman Act. *Microsoft*, 253 F.3d at 60.

Although Google's conduct would be anticompetitive regardless of whether it owned Chrome or benefited from scale advantages these market realities provide essential context for assessing the "cumulative effect" of each type of distribution agreement at issue and raise genuine disputes of material fact that preclude summary judgment here.[10] *See id.* at 76.

---

[10] In its summary judgment motion, Google suggests that "Plaintiffs purport to challenge a course of conduct." Def. Br. at 24. As in *Microsoft*, however, Google's agreements are anticompetitive when the effects of each type of agreement are viewed in light of each other and cumulatively. 253 F.3d at 76. They are mutually reinforcing, not discrete acts that should be "isolatedly viewed." *United States v. Am. Tobacco Co.*, 221 U.S. 106, 83 (1911); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) ("The relevant inquiry is the

A.      **Google's Distribution Agreement With Apple Is Anticompetitive**

Google's distribution agreement with Apple substantially restricts rival search engines' ability to compete. Google attempts to sidestep a clear dispute in this category of facts by instead arguing it is entitled to summary judgment because (1) Apple "instigated" the process that led to the contract, and (2) Google "won" the agreement over other search engines. *See* Def. Br. at 35–38. These arguments do not excuse Google's conduct and cannot support summary judgment.

1.      **Google's Exclusionary Agreement With Apple Locks Up A Critical Distribution Channel And Harms Competition**

Google locks up a substantial share of the queries performed on Apple devices by paying to be the sole preset default search engine on Safari.



Distribution on Apple devices is critical for a general search engine. In 2020, ▮▮▮▮ ▮▮▮ of all Google search queries in the United States were performed on Apple devices. COMF ¶ 494. Because Apple does not preinstall third-party apps on its devices, the only preinstalled app with a search access point of significance is Apple's own Safari browser. *Id.* ¶¶ 497–498. Thus, Google pays Apple ▮▮▮▮▮▮▮ under the ISA each year to secure the critically important default status on Safari. In 2021, for the United States, Google paid Apple approximately ▮▮ ▮▮ under the ISA—▮▮▮▮▮▮▮▮▮▮ was directly attributable to Apple making Google the preset default search engine on the Safari address bar. *Id.* ¶¶ 514–515.

The ISA's value reflects the breadth of its coverage: in 2020, default Google queries through the Safari address bar accounted for roughly ▮▮ of all search queries performed in the United States *Id.* ¶ 475. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Google

_____

anticompetitive effect of [the defendant]'s exclusionary practices considered together," i.e., "taken as a whole rather than considering each aspect in isolation.").

captures a substantial share of these queries simply by paying Apple to be the preset default search engine in Safari.

### i.     Google's Clawback Analysis

During negotiations with Apple, Google's search finance team modeled the Safari default's value. COMF ¶ 522. For this analysis, the team calculated the revenue Google would lose if another general search provider captured the search default on the Safari browser. They predicted that Google would recover (or "claw back") ████████████ of the revenue that it had previously earned from queries conducted through the Safari address bar. *Id.* ¶ 523. That is, if Safari shipped with another preset default search engine, ████████████ of the present revenue would find its way back to Google—despite Google's purported quality advantage. Over five years, this would have represented a loss to Google of ████████████ in net revenue. *Id.* ¶ 523.[11] This analysis underscores the importance and value of default status.

### ii.     Apple's Clawback Analysis

Apple's documents also recognize the value of the Safari search default.



COMF ¶ 526; SOGI ¶ 52.

COMF ¶ 527.

*Id.* ¶ 528. Despite having the financial and technological resources to create or buy a search engine, however, Apple continued to accept Google's enormous payments rather than enter the search business itself. SOGI ¶ 55. That not

---

[11] This analysis was conducted during ████ negotiations that led Google to share ██ of its revenue with Apple to secure Safari's search default. COMF ¶ 524. In a deposition, Google's corporate representative testified that Google is not currently aware of a better estimate. *Id.* ¶ 525.

only blocked rivals from a key distribution channel, it deterred a potential entrant—Apple—from entering the market and challenging Google directly. Apple's lead negotiator in recent ISA discussions with Google testified that, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ COMF ¶¶ 537–538.

### iii.  Expert Analysis Of Clawback Evidence

Based on ordinary-course evidence, *see* COMF ¶¶ 460–461, 522–529, Prof. Whinston has calculated the potential change in market shares that would have resulted in 2020 if Google had lost the Safari default to another general search engine. He estimates that, if this had occurred, Google would have lost ████ or more of the U.S. Safari default queries conducted on Apple's mobile devices and more than ████ of the U.S. Safari default queries conducted on Mac computers. *Id.* ¶ 532. This translates to a shift of more than ████ of all U.S. search traffic in the United States. *Id.* Google has effectively purchased this share of the general search market and made it unavailable to its rivals.

Google's economic expert Prof. Murphy contests these figures. *Id.* ¶ 533. In his deposition, he dismissed Google's ordinary-course documents regarding the impact of defaults as "somebody's estimate" that may be "seat-of-the-pants ideas" or "a way of justifying what they felt they needed to do." *Id.* ¶ 534. He further testified that, even if Google had "relied on" these numbers in negotiating its distribution agreements, this would not change his opinion about the impact of defaults if he believed Google's ordinary-course numbers were "mistaken." *Id.*

The ISA locks up market share for Google on Apple devices, which in turn restricts Google's rivals' ability to compete and preserves Google's monopoly. *See Microsoft*, 253 F.3d at 62, 71–72. Factual disputes regarding the magnitude of this effect survive summary judgment.

2.     **Google's Claim That The ISA Was "Customer-Instigated" Does Not Provide A Basis For Summary Judgment**

Despite the ISA's impact on competition, Google argues that the agreement is not anticompetitive because Apple "instigated" the process that led to the decades-long agreement. *See* Def. Br. at 31–35, 37–38. The Court should reject this argument for several reasons.

*First*, an agreement between a dominant supplier and a distributor can have an anticompetitive effect even if both parties find the agreement to be in their self-interest. COMF ¶ 547. A dominant supplier (Google) will enter into such an agreement because it stands to benefit from reducing the threat posed by competing suppliers. *Id.* ¶ 549. A distributor (Apple) will be guided by its own financial incentives when determining whether to agree to such a contract. *Id.* ¶ 550. Thus, the mere fact that a distributor agrees to (or even "instigates") a contract with a supplier says nothing about the contract's competitive impact. For this reason, "it matters little whether one views exclusive dealing as 'imposed' by the dominant firm or 'agreed upon' by the dominant firm and its dealers." 18A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, Areeda & Hovenkamp ¶ 1800c5 (4th ed. 2015).

Google counters that Apple "acts as a collective bargaining agent for consumers," such that Apple would not agree to a contract if it had the potential to cause consumer harm. COMF ¶ 536. This is wrong, as a matter of economics and facts and, at a minimum, asks the Court to make an inappropriate factual determination. *Id.* ¶ 548. A distributor may profit from an agreement even if, as here, the contract reduces competition to the detriment of consumers.[12]

---

[12] One reason why a distributor's incentives differ from those of consumers is that a dominant supplier may be willing to pay more for a distribution contract like the ISA than a competing firm would or could. COMF ¶¶ 549, 551. As Prof. Whinston explains, "there is a basic asymmetry between the outcome if [a dominant firm] wins or if rivals win." *Id.* ¶ 552. If the dominant firm wins, its market power is strengthened, and it may gain or protect monopoly profits. *Id.* ¶ 553. If, instead, a rival wins and gains strength as a competitor, the most it can

And Google cannot argue that Apple's incentives reflect undisputed facts, because Google cites no evidence that Apple has based its decisions regarding the ISA on how the agreement would affect consumers as a whole. To the contrary, when Google has considered how "Apple thinks about this" to inform its negotiation strategy, Google analyzed only the financial implications to Apple. *Id.* ¶ 535. Because the preservation of competition is what economists refer to as a "public good," it cannot be entrusted to private firms to protect.[13]

*Second*, Google's reliance on *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F. 4th 959 (10th Cir. 2022) ("*EpiPen*"), and similar cases is misplaced. Google cites *EpiPen* for the proposition that "when customers are instigating exclusivity . . . that can ease[] any anticompetitive concern arising from a monopolist's use of exclusive dealing contracts." Def. Br. at 37–38 (internal citation and quotation marks omitted). But in *EpiPen*, the court's basis for this statement was that "the party instigating exclusive dealing [was] the *end user*." *Id.* at 995

---

hope for is competitive profits. *Id.* ¶ 554. "As a result, even if the dominant firm and the rival are equally efficient, profits are greater when the dominant firm wins than when a rival wins." *Id.* ¶ 555. Thus, a dominant firm (Google) has the ability to offer a distributor (Apple) higher payments than can competing firms. As a profit-maximizing company, Apple has an incentive to accept this higher payment even though it may not be the optimal outcome for consumers.

[13] The fact that the preservation of competition is a public good presents an independent reason why Apple may find it profitable to reach an agreement that is not in the interests of consumers. A "public good" is "a commodity or service that is made available to all members of a society." COMF ¶ 556. In this case, the "commodity" made available to consumers is the benefit of a more competitive marketplace, which consumers experience in the form of lower prices and increased quality. *Id.* ¶¶ 557–558. Apple's decision to enter into an exclusionary deal affects the competitive process as a whole, meaning the interests of all consumers are at stake. *Id.* ¶ 559. But even if Apple were viewed as a "collective bargaining agent" for its own customers, Apple would not factor in the interests of all consumers. *Id.* ¶¶ 559–561. Indeed, this is true of any party that deals with Google (or any other economic actor for that matter)— each negotiates according to its own incentives. No party fully factors in the harm that consumers as a whole stand to incur as a result of a reduction in general search competition, which makes each party individually more willing to sign an exclusionary deal with Google than would otherwise be the case. *Id.* ¶ 562. In this respect, consumers suffer from what economists refer to as a "collective action problem." *Id.*

(emphasis added). The court explicitly limited its holding, explaining that it "ha[d] no occasion to decide whether this logic applies equally to customer-instigated exclusive dealing by non-end users (like distributors)." *Id.* at 995 & n.15. Whatever the merits of the *EpiPen* court's reasoning as to deals "instigated" by end users, Google wrongly asks the Court to extend this reasoning to deals "instigated" by distributors. The Court should reject this request.[14]

*Third*, Google's characterization of the ISA as no more than a "product design" decision by Apple, Def. Br. at 31–35, appears to be another way of claiming the contract was "instigated" by Apple.[15] But this characterization—even if accurate—would not meaningfully change the analysis. Plaintiffs do not allege that Apple's (or anyone else's) product design decisions have violated the law. Instead, Plaintiffs' claims target terms in the ISA—terms by which Google pays Apple to set Google as the sole default search engine in Safari for ███████ It is those contractual terms that are the subject this lawsuit. The question of whether the ISA is anticompetitive focuses on its effects, not whether Apple "instigated" it through its "product design" or otherwise. *See Microsoft*, 253 F.3d at 58–59.

---

[14] Other cases Google cites are likewise distinguishable on the facts. *See, e.g., Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir. 1999) (defendant's sales tactics were not anticompetitive because the purchase decision remained "in the hands of the consumer"); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 227–30 (1st Cir. 1983) (affirming judgment for defendant where a "major [] user" of the product had sought to extend a purchase agreement for a fixed quantity of goods); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("the consumers of couponing services" favored exclusive deals and "Menasha [did] not contend that they are trapped in a collective-action bind, each fearing the worst if it holds out while others sign").

[15] If Google instead means to suggest that the ISA should be permitted because courts are "skeptical about claims that competition has been harmed by a dominant firm's product design changes," *see* Def. Br. at 34, this argument is baseless. Google's product design is not at issue, and it offers no legal authority for the suggestion that "product design" protections should be expanded to immunize acts by a monopolist that relate to design decisions by third parties.

*Fourth*, even if the Court were to view the question of whether the ISA was "customer-instigated" as material (which it should not), genuine factual disputes exist. For example,

- Google claims that ███████████████████████████████████ ████████ Def. Br. at 8, but Apple's corporate representative testified that asking for a payment had ███████████████ until ███████████████ ███████████ SOGI ¶ 15; COMF ¶ 539.

- Google asserts that Apple has "unilaterally chosen" not to design Safari with "an out-of-the-box choice screen mechanism for users to select their default search service," Def. Br. at 32, but ██████████████████████████████████████████████ 

- On several other occasions, ███████████████████████████████████ ███████████████████ undermining any claim that these restrictions have been "instigated" by Apple. COMF ¶¶ 542–545; SOGI ¶¶ 21, 36, 44, 45.

In sum, the Court should decline to grant summary judgment based on Google's assertion that the ISA was "customer instigated."

### 3. Google's Claim That There Has Been "Competition For The Contract" Does Not Provide A Basis for Summary Judgment

The Court should further reject Google's contention that summary judgment is appropriate as to the ISA because there was "competition for the contract." Def. Br. at 35–38. The existence of multiple bidders does not transform an anticompetitive agreement into a permissible one, and the cases Google cites do not support this novel and dangerous proposition. For multiple reasons, the Court should reject Google's claims. *E.g.*, *id.* at 38.

*First*, under Google's approach, the existence of any "competition for the contract" would establish that the contract represents permissible "competition on the merits" regardless of the contract's terms and effects. This would mean a monopolist could enter into *any* contract—

no matter its effects on competition—so long as one rival existed and made some feeble attempt to secure the business, or the buyer had another option.[16] This approach would effectively end Section 2 challenges to exclusionary agreements until the dominant firm had managed to wipe out all vestiges of present or future competition. Nothing in the antitrust caselaw supports such a conclusion.

*Second*, the existence of a rival bidder (like the question of who "instigated" a contract) says nothing about the actual terms of a final contract or its effects on competition. What matters here is whether the terms of Google's contracts harm competition, not whether Google beat out a rival in imposing those terms. *Microsoft*, 253 F.3d at 58. Moreover, as discussed above, competitors are at a distinct disadvantage relative to a monopolist in the bidding process, which means that a monopolist's offer will often be the winning bid. COMF ¶¶ 551, 555. Indeed, Google's own economic expert, Prof. Murphy, has recognized that "competition by a dominant supplier for exclusivity sometimes may result in harm to consumers." *Id.* ¶ 563. He conceded in his deposition that the presence of multiple bidders for a contract is not sufficient to demonstrate that conduct should be found permissible "competition on the merits." *Id.* ¶ 564. If Google's expert cannot support the company's economic theory, the Court should reject it as well.

*Third*, Google fails to cite a single case supporting the proposition that a showing of "competition for the contract" is sufficient to warrant summary judgment against a claim that the contract is exclusionary. Instead, Google relies on inapposite caselaw. For example, Google cites

---

[16] At times, Google suggests that the ISA should be viewed as permissible specifically because the company "won" it on the basis of its product quality. Def. Br. at 8, 35–38. This raises nothing but a factual dispute. For example, in one negotiation, Apple's lead negotiator communicated to Google's CEO that Apple ███████████████████████████████████████████ ███████████████████████████████ COMF ¶ 546.

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004), but the *Menasha* court simply cited "competition for the contract" in explaining that (1) the contracts at issue were not "unlawful *per se*" under Section 1, and (2) a "detailed analysis under the Rule of Reason" was, therefore, appropriate. *Id.* at 663. Upon conducting this more detailed analysis, the *Menasha* court granted summary judgment because the plaintiffs had not sufficiently proven monopoly power, *not* on the basis of any "competition for the contract." *Id.* at 663–66.

Google also cites *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010), where the Third Circuit held that "sanctioning bodies and other sports-related organizations" may adopt "exclusive equipment requirements" and solicit bids for that equipment. *Id.* at 81. In reaching this decision, the Third Circuit acknowledged that "courts have generally accorded sports organizations a certain degree of deference" and described the unique justifications that apply to sports-related organizations (such as the interest in creating a level playing field among athletes). *Id.* at 80–82. The court was "careful not to establish an overly broad rule detached from the specific facts now before [it], especially in light of the highly fact-specific nature of the antitrust standards themselves." *Id.* at 80. And even in the fact-specific context of a sports-related organization, the defendant was "*not* entitled to summary judgment merely because there is an absence of coercion or interference" in the bidding process. *Id.* at 78 (emphasis in original). Google's reliance on an out-of-circuit, sports-related case that expressly limits its reach underscores the weakness of this argument.

*Fourth*, any "competition for the contract" that currently exists for search distribution agreements is tempered by the effects of Google's conduct over the last decade. Citing *EpiPen*, Google argues that "rival search engines need only offer a better product or a better deal to reverse, and possibly wield," the effects of the Safari default. Def. Br. at 38 (internal quotation

marks omitted). But the general search engines attempting to compete with Google have been locked out of critical distribution channels for years, depriving them of both revenue and scale, which has deepened the moat that insulates Google from competitive threats.[17] COMF ¶¶ 511, 521, 568, 633. In 2021, Google's payment to Apple in the United States under the ISA ███████ ████████████████████████████████████████████████████ COMF ¶¶ 514, 519. Google denies the realities of this marketplace when it argues that a rival (let alone a smaller entrant) "need only" commit ██████████████████ to win a deal, while simultaneously attempting to compensate for quality disadvantages arising from a persistent lack of scale. *Cf. Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").

Accordingly, the Court should reject Google's "competition for the contract" theory.

**B.   Google's Distribution Agreements With Android OEMs And Wireless Carriers Are Anticompetitive**

Google's distribution agreements with Android OEMs and wireless carriers—namely, MADAs and RSAs—allow Google to secure the preset default search position on Android mobile devices: (1) the MADA ensures that, on almost all Android devices sold in the United States, Google's search widget will be placed on the home screen and the Google Search App

---

[17] For example, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ COMF ¶ 520; *see also id.* ¶¶ 530–531. Thus, this case is easily distinguishable from *EpiPen* and other cases cited by Google in which a rival filed suit after failing to compete aggressively. *See EpiPen*, 44 F. 4th at 971 (explaining "the clear answer to [plaintiff's] problem was offering better prices" but plaintiff had declined to do so); *see also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007) (explaining plaintiff could have competed effectively but was unwilling to incur a "modest reduction in profit margins").

(GSA), as well as Google's Chrome browser, will be preinstalled, COMF ¶ 584; SOGI ¶¶ 213,

217, and (2) the RSA ensures that Google's rivals will not have default status on Android

devices. COMF ¶¶ 602, 604; SOGI ¶ 226. Together, these Android agreements cover roughly

███ of all U.S. search traffic. COMF ¶ 476. In light of Google's ISA with Apple, the Android

agreements have a substantial effect in blocking rivals' access. *Microsoft*, 253 F.3d at 72.

Together the Apple and Android agreements cover roughly ███ of all U.S. search traffic. COMF

¶¶ 475–476.

By restricting the ability of rival search engines to compete effectively against Google,

the Android agreements "destroy competition itself." *Microsoft*, 253 F.3d at 58 (quoting

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)). This further reinforces Google's

monopoly power and the scale effects that raise barriers to entry and expansion, insulating

Google from rivals that might "pose a real threat to [Google's] monopoly." *Id.* at 71. That

Google disputes the facts offered by Plaintiffs to establish these effects only goes to show why

summary judgment is inappropriate.

> **1.     Google's Agreements With Android OEMs And Wireless Carriers Lock Up Search Distribution On Android Devices**

Google's distribution agreements ensure that rivals cannot be set as the default search

engine on Android devices. Android is the only significant licensable mobile operating system in

the United States. COMF ¶ 576; SOGI ¶ 199. Other than Apple devices, Android phones and

tablets make up nearly the entire mobile device marketplace. COMF ¶ 580; SOGI ¶ 198. In 2020,

approximately ███ of all Google search queries in the United States were performed on

Android devices. COMF ¶ 565. Accordingly, distribution on Android devices is critical for a

general search engine.

Although some basic aspects of the Android operating system are open source (i.e.,

publicly available and free), the operating system lacks specific software necessary for marketing

a mobile device to consumers. First, the operating system lacks an open-source app store. COMF

¶ 578. The dominant licensable Android app store in the United States is Google's Play Store,

which OEMs and carriers deem necessary for producing a sellable mobile device. *Id.* ¶ 577.

Second, the operating system lacks Google Play Services (GPS) on which many third-party

Android apps rely. *Id.* ¶ 579. To access GPS and the Play Store, OEMs must sign the MADA.

SOGI ¶ 211. As a result, virtually all Android phones sold in the United States are built under a

MADA, which requires the OEM to place the Google search widget on the home screen and

preinstall the GSA and Chrome. COMF ¶¶ 583–584; SOGI ¶¶ 213, 217.

The MADA further ensures that OEMs will not take steps to teach or aid consumers in

changing the defaults, or implement apps that provide customization and personalization over an

Android device's display screens (launchers), which would deviate from the MADA

requirements. SOGI ¶ 219. As a result, nearly every Android phone sold in the United States

defaults to Google when consumers access general search services through the most used search

access points. COMF ¶¶ 478, 583; SOGI ¶¶ 213–221.

Using a belt-and-suspenders strategy, Google then provides payments to OEMs and

wireless carriers, under the RSA, to ensure rivals are not preinstalled on Android devices and

Google is the preset default search engine for *all* search access points. COMF ¶¶ 466–467, 569,

604–605, 616; SOGI ¶¶ 222, 224, 227. Except for a small number of Android devices—

primarily tablets made by Amazon, and even fewer Android phones made by Microsoft and

others—the overwhelming majority of Android devices sold in the United States are subject to

the default rules established in Google's RSA. COMF ¶ 611.

In 2020 alone, Google paid ███████████████████████████████ under their

U.S. RSAs. COMF ¶¶ 612–613. Google demands these agreements to ensure control of search defaults on Android devices because—to quote Google's employees—of the "power of the defaults." *Id.* ¶¶ 453, 614.

> ### 2.     Google's Claim That Users Can Download Rival Apps Or Change Their Default Search Engine Is A Material, Factual Dispute

Google disputes Plaintiffs' evidence that Android search defaults are an important distribution channel for search engines by arguing that users can download alternative search apps or change the search default on browsers. Def. Br. at 40. But the impact of search defaults is a factual question. *Cf. Microsoft*, 253 F.3d at 73 (citing the district court's factual finding that "[p]re-installation of a browser" was an "important method[] of browser distribution"). The Court should reject Google's invitation to resolve this factual dispute on summary judgment.

*First*, Google's expert, Prof. Murphy acknowledged that defaults drive some usage. Specifically, he testified, "I think, in general, what we've seen, and from the empirical evidence, as well as the underlying economics, would be that default status generally will lead to some increase in usage." COMF ¶¶ 449, 617. Indeed, Prof. Murphy concedes that if rivals were set as all the search defaults on Android devices, they would receive an additional ▮▮▮▮▮▮ of the queries on those devices. *Id.* ¶ 619.

*Second*, Google's own documents confirm that preset defaults drive usage on Android devices. For example, when contemplating what might happen if it lost the worldwide Android search defaults ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ COMF ¶ 620. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Prof. Whinston estimated that, if Google were to lose the preset search defaults on U.S. Android devices, Google would lose between 11.6% and 13.5% of all U.S. search traffic. COMF ¶ 621; SOGI ¶ 251. This share of the market is thus effectively awarded to Google and made unavailable to its general search

rivals due to the Android agreements.

*Third*, if defaults were not a uniquely valuable means of distributing general search, Google—a public company that owes a fiduciary duty to its shareholders—would not pay ▮▮▮▮▮▮ to secure these preset defaults. COMF ¶ 622. The fact that the RSA and MADA do not completely shut out Google's rivals from ever receiving any queries on Android devices does not undermine Plaintiffs' claims. *See, e.g.*, *Microsoft*, 253 F.3d at 70–71, 73–74. To the extent Google contests these well-supported facts, including why it pays significant sums for these defaults, summary judgment is inappropriate.

In urging the Court to decide, as a matter of law, that defaults are not a key distribution channel, Google points to its own success on Windows PCs—which generally have Bing as the only preinstalled search default. Def. Br. at 40. Google's references to its success on Windows PCs, Def. Br. at 40, prove little, because: (1) defaults on Windows devices—while still meaningful[18]—are mitigated by Windows devices' large screen sizes, making defaults easier to change, COMF ¶ 623; (2) Internet Explorer's infamously poor performance likely contributed to greater switching to alternative browsers on Windows than on other platforms, *id.* ¶ 625; and (3) Google's distribution agreements with nearly every alternative browser used on Windows and its ownership of Chrome allowed it to uniquely benefit from Internet Explorer's shortcomings, *id.* ¶ 626; SOGI ¶ 205. In any event, the differences in the factual recitations with respect to Windows PCs is yet another material factual dispute that precludes summary judgment.

---

[18]  For example, on Windows PCs, where Bing is the leading default, Bing's market share is more than seven times higher than on Mac PCs, where Google is the default. COMF ¶ 624.

### 3. Google's Claim That Android Partners Agreed To The MADAs And RSAs Does Not Provide A Basis For Summary Judgment

Google argues that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ Def. Br. at 41–42. Notwithstanding its legal

deficiencies, Google's assertion provides yet another example of a factual dispute.

As an initial matter, some Android counterparties ██████████████████████

███████████████████████████ For example:

- ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ████████████████████████████████████ one Verizon executive
  described as ██████████ COMF ¶ 628. In his deposition, that same Verizon executive
  described Google as ████████████ in its demands for search exclusivity. *Id.* ¶ 629.

- In a 2019 email exchange, Google's Finance Manager for Android Mobile
  Ecosystems, John Yoo was asked to consider a hypothetical in which ██████████
  ███████████████████████████████████████████████████████████
  ████████████████████████ *Id.* ¶ 630.

- In a 2020 document, T-Mobile stated: "Even though the relationship [with Google]
  has been a good source of cash for [T-Mobile], we have absolutely no control over
  the customer experience [on the device] or the monetization. Google is the one that
  controls both." *Id.* ¶ 631.

Also, Google's contractual requirement that its Android partners not help users change

the preset search defaults reflects Google's own concern that its partners may not be happy with

the monopolist's control of the defaults. *Id.* ¶¶ 585, 604.

More importantly, even if the Android partners are willing, satisfied parties to Google's

distribution agreements, the agreements can be anticompetitive for the same reasons that Apple's

agreement to the ISA does not save that agreement from antitrust scrutiny. *See*, Argument,

Section I.A.2. In short, (1) a monopolist supplier can win distributors' support by sharing

monopoly profits earned at the expense of end consumers, and (2) because competition is a public good, each individual buyer can find that a deal advances its own self-interests even when the deals collectively hurts buyers.

Ultimately, summary judgment is inappropriate because Google ignores or otherwise disputes record evidence that demonstrates Google's Android distribution agreements "destroy competition itself" and thus reinforce Google's monopolies. *Microsoft*, 253 F.3d at 58 (quoting *Spectrum Sports*, 506 U.S. at 458).

### C. Google's Distribution Agreements With Third-Party Browsers Are Anticompetitive

Google's distribution agreements with third-party browsers Mozilla, Opera, and UCWeb substantially restrict Google's rivals in light of Google's agreements with its Apple and Android partners, thereby harming the "competitive process" in the relevant markets. *Microsoft*, 253 F.3d at 58. Google denies that these agreements have an anticompetitive effect. Google's own documents refute this claim; this is yet another material, factual dispute.

Third-party browsers, such as Mozilla, Opera, and UCWeb, are developed and distributed by companies independent from large U.S. OEMs or major software companies. Typically not preinstalled on desktop or mobile devices, these browsers are available through download. COMF ¶¶ 644–645. Google's agreements with these browser companies ensure that Google holds the preset default search position when consumers choose to download a third-party browser, which they do predominantly on computers rather than on mobile devices. *Id.* ¶¶ 643, 646; SOGI ¶¶ 157, 176, 182. Although third-party browsers account for roughly 5% of U.S. browser usage, these third-party browsers represent the largest remaining distribution channel after those controlled by Google, Apple, and Microsoft. COMF ¶ 642.

The preset default search position is the most effective means for a search engine to reach

consumers via third-party browsers. Mozilla has explained that browsers' "search boxes are among the most valuable pieces of internet real estate [because to] begin to use the internet, many people open a browser and conduct a search." *Id.* ¶ 647. The substantial sums paid to third-party browsers support this assertion. Roughly ▮▮▮ of Mozilla's annual revenue comes from its RSA with Google, i.e., in exchange for setting Google as the default search on Mozilla's Firefox. *Id.* ¶ 651; *see also id.* ¶ 652.

Google's own documents confirm the importance of the preset default on third-party browsers. In 2014, Mozilla switched the Firefox default from Google to Yahoo. SOGI ¶ 126. According to Google's own calculations, the next year, Google lost approximately ▮▮▮ of its search traffic from Firefox, which cost Google approximately ▮▮▮▮▮▮ in search ad revenue. COMF ¶ 658. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 657; *see also id.* ¶ 470. This dynamic extends beyond Mozilla—Google estimates that losing its position as the default search engine on the Opera browser would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 656.

Prof. Whinston has estimated that if Google lost the default position on Mozilla, Opera, and UCWeb, it would lose between ▮▮▮▮▮▮ of default search queries through these browsers on computers, and between ▮▮▮▮▮▮ of default search queries through these browsers on mobile devices. COMF ¶¶ 654–655.

### 1. Google's Distribution Agreements With Third-Party Browsers Are Anticompetitive Under *Microsoft*

The issues surrounding Google's distribution deals with third-party browsers resemble those surrounding Microsoft's deals with independent software vendors (ISVs) in *Microsoft*.

There, the ISVs represented "a relatively small channel for browser distribution." *Microsoft*, 253 F.3d at 72. But because "Microsoft had largely foreclosed the two primary channels to its rivals," the court concluded that this smaller channel had "take[n] on greater significance." *Id.* The court held that, "[i]n that light," these deals "had a substantial effect in *further* foreclosing rival browsers from the market." *Id.* (emphasis added).

The same analysis applies here. Although Google's contracts with third-party browsers account for a relatively small percentage of U.S. search traffic (roughly ███ *see* COMF ¶ 477), Google's distribution agreements with Apple and Android partners—which cover roughly ███ of U.S. search traffic—have significantly restricted competing search engines' ability to reach consumers through those major channels. With these three categories combined, almost ███ of U.S. search traffic is covered by the challenged terms of the distribution agreements. Google's ownership of Chrome compounds these effects. All of this has increased the importance of third-party browsers as another avenue (albeit a narrow one) through which competing search engines could reach consumers. But Google's agreements with third-party browsers, under which Google pays these browsers approximately ██████████ in exchange for their defaults, significantly restrict this alternative channel. COMF ¶ 650.

Contrary to Google's factual and legal assertions, these browser agreements have a substantial effect in further harming competition and reinforcing Google's monopolies. *Microsoft*, 253 F.3d at 72.

### 2. Google's Claims Provide No Bases For This Court To Excuse These Agreements

For the same reasons as described in Argument, Section I.A above, the Court should reject Google's theories that its agreements with third-party browsers are permissible because they are "customer-instigated" and the result of "competition for the contract." Def. Br. at 31–38.

Google's history with Mozilla highlights another factual dispute between the parties. Plaintiffs intend to present evidence that Mozilla's history with Google shows the lack of competition for the search defaults. In 2014, Mozilla adopted Yahoo as the default search engine on Firefox ███████████████████████████████████████ ██████████ COMF ¶ 653. ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████ SOGI ¶¶ 167–168. At the time, Mozilla declared that █████████████████████████████████ and hoped to use this event as an ███████████████████████████ COMF ¶ 660; SOGI ¶ 126. But by 2016, Mozilla's bet had not paid off. Yahoo no longer represented a viable option for Mozilla, and Mozilla returned to Google, cementing the browser's dependence on Google's revenue share payments that continue to this day. COMF ¶¶ 651–652, 661.

Mozilla's failed attempt to use the default selection process to promote competition in search—the very mechanism Google cites to exonerate its conduct—illustrates the nature of competition as a "public good." COMF ¶¶ 556–558. Each distributor has the incentive to pursue the most profitable deal for itself, even if such a deal is with a known monopolist. *Id.* ¶ 561. On its own, Mozilla's deal with Yahoo was not enough to facilitate a more competitive general search market. Thus, even though increased search competition would be in Mozilla's long-term interest, the company ultimately returned to Google after Mozilla's efforts failed to promote more competition. *Id.* ¶ 562.

*     *     *     *

Google has failed to demonstrate that, under *Microsoft*, it is entitled to summary judgment as a matter of law because, at a minimum, Google cannot show there are no genuine

disputes as to material facts regarding the anticompetitive effects of its distribution agreements. Indeed, the record shows that, as a result of Google's conduct, consumers are left with less choice, less innovation, and lower-quality search offerings than what they would see in a more competitive market. COMF ¶¶ 485–487. For instance, Google has cited the absence of competition as a reason to forgo offering improved privacy protections. *Id.* ¶ 488. On the advertising side, the absence of competition allows Google to raise the prices and reduce the quality of its search ads products. *Id.* ¶ 489. The Court should deny Google's motion.

## II.   Even Under Its Own Erroneous Legal Standard, Google's Conduct Violates Section 2

Application of *Microsoft* and related case law support Plaintiffs; the existence of material, factual disputes to be resolved at trial precludes summary judgment, much less in favor of Google. Given these circumstances, the Court may deny Google's motion without applying its incorrect and overly rigid exclusive dealing framework. But even if the Court indulges Google's incorrect framing of the legal standard, it should conclude that Google's agreements are exclusive contracts that unlawfully maintain Google's monopolies in general search, search ads, and general search text ads.

### A.   Google's Motion Asks The Court To Apply The Wrong Legal Standard

Google's motion almost entirely ignores *Microsoft*. Instead, Google moves for summary judgment on the theory that Plaintiffs must establish a Section 2 violation "under an 'exclusive dealing' framework." Def. Br. at 3; *see also id.* at 26 ("Google's agreements with . . . Apple . . . are ***not*** 'exclusive' or '*de facto* exclusive'"), *id.* at 39 ("Plaintiffs' contentions regarding the Android agreements rely in large part on the . . . doctrine of 'exclusive' (or '*de facto* exclusive') dealing"), *id.* at 28 ("challenge to Google's agreements with independent browser developers is predicated on [Plaintiffs'] assertion that those agreements make Google the '*de facto* exclusive

general search engine'"). Google's narrow focus on exclusive dealing and the label that the Court should give its contracts—rather than their effect on competition—ignores disputed facts.

In *Microsoft,* the D.C. Circuit analyzed the anticompetitive effects of both non-exclusive and exclusive contracts. In addressing the exclusive contracts under Section 2, *Microsoft* acknowledged that exclusive dealing requires showing the challenged agreements create "a significant degree of foreclosure[.]" *Microsoft*, 253 F.3d at 69. But the D.C. Circuit also recognized that a monopolist's use of exclusive contracts raises heightened concerns.[19] *Id.* at 70. Thus, although the court acknowledged that the degree of foreclosure is relevant, it declined to adopt a rigid test for assessing whether a monopolist's use of exclusive contracts is anticompetitive. *Id.* at 70 (exclusive contracts may violate Section 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation"); *see also United States v. Dentsply Intern., Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."). In analyzing Microsoft's exclusive contracts with ISVs, the D.C. Circuit recognized that these agreements foreclosed "a relatively small channel for browser distribution[]" on their own but still "had a substantial effect" because Microsoft had already foreclosed the other key distribution channels available to rival browsers. *Id.* at 72; *see* Section I.C.1.

By ignoring *Microsoft's* holding that Microsoft's non-exclusive agreements with OEMs were anticompetitive and that Microsoft's exclusive contracts with ISVs were anticompetitive

---

[19]   The Third Circuit similarly recognized that, "[e]xclusive dealing arrangements are of special concern when imposed by a monopolist." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012); *LePage's*, 324 F.3d at 151–52 ("[A] monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior.").

even though they individually foreclosed "a relatively small channel for browser distribution," *id.* at 61–62, 72, Google invites the Court to adopt the wrong legal standard. The Court should reject that invitation. As noted above, *Microsoft* dictates that the Court should focus on the anticompetitive effect of Google's conduct overall, not the rigid, formalistic framework Google proposes.

On the last page of its brief, Google also suggests that Plaintiffs' claims fail under a "refusal to deal" framework. Def. Br. at 50 (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) ("*Trinko*").[20] Again, Google's reliance on labels and formalism ignores the case-by-case assessments that drive the proper analysis under Section 2. *See Trinko*, 540 U.S. at 411 (analysis depends on "the particular structure and circumstances of the industry at issue"). In any event, *Trinko* did not involve a monopolist's decision to voluntarily deal with its rivals. *See* 540 U.S. at 409 (because Verizon never "voluntarily engaged in a course of dealing with its rivals" the court declined to force it to do so). Here, Google has voluntarily entered into the challenged distribution agreements, along with the conduct challenged by the Colorado Plaintiffs. *Trinko*'s framework for analyzing duty to deal claims is therefore inapposite. The question for the Court, as in *Microsoft*, is whether Google's conduct has anticompetitive effects. *See* 253 F.3d at 61 (analyzing whether the Microsoft license agreements were anticompetitive). As explained above, there are numerous genuine disputes of material fact as to that question.

---

[20]   Although, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal,' . . . [u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408 (internal citations omitted).

**B.      Factual Disputes Remain Even Under Google's Incorrect Legal Standard**

Even if the Court applies Google's exclusive dealing framework, genuine disputes of material fact remain on the two issues Google raises: (1) whether Google's distribution agreements are exclusive; and (2) whether they substantially foreclose rivals. These questions are not apt for resolution by a motion for summary judgment.

**1.      Google's Distribution Agreements Are Exclusive Contracts**

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor*, 696 F.3d at 270. Express exclusivity, however, is not required for an agreement to count as exclusive because courts "look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.'" *Id.* at 270; *Microsoft*, 253 F.3d at 75 (noting a contract need not be "literally exclusive" to run afoul of Section 2); *ZF Meritor*, 696 F.3d at 270 ("Therefore, just as total foreclosure is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer." (internal citation and quotation marks omitted)); *Am. Pres. Lines, LLC v. Matson, Inc.*, No. 21-cv-02040 CRC, 2022 WL 4598538, at *10 (D.D.C. Sept. 30, 2022) ("[The defendant] does not cite—and the Court has not independently identified—any federal precedent requiring 100% exclusivity. Accordingly, the Court finds that the absence of a total exclusivity requirement does not shield [the defendant's] loyalty program from potential liability."). Thus, a contract may be considered "exclusive" whether it is either actually exclusive or "de facto" exclusive. *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 101 (D.D.C. 2020) (holding that the plaintiff alleged a valid claim for "de facto exclusive dealing" (emphasis in original)); *see also S.E. Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 612 (8th Cir. 2011) (defendant's discounts exclusive even when no one was required to purchase from the defendant or refrain from purchasing from a rival).

43

Applying these principles, both the district court and the D.C. Circuit in *Microsoft* determined that agreements establishing Microsoft as a "default" provider were exclusive contracts. *See Microsoft*, 253 F.3d at 75 ("The District Court found that, although not literally exclusive, the deals were exclusive in practice because they required developers to make Microsoft's [Java virtual machine] the default in the software they developed."); *id.* at 76 (agreeing with the district court that "the default clause" made these agreements "exclusive as a practical matter[]"); *id.* at 71 (holding that Microsoft's separate agreements with IAPs, which established Internet Explorer "as the default browser or as the only browser," constituted unlawful exclusive dealing).

Google's argument that its distribution agreements are not exclusive—even though they establish Google as the *only* preset default search engine across a variety of search access points—raises factual disputes about whether these agreements are actually or de facto exclusive. *Masimo Corp. v. Tyco Health Care Group, L.P.*, CV 02-4770 MRP, 2004 WL 5907538, at *12 (C.D. Cal. June 10, 2004) (denying summary judgment because "it is possible that given the material facts, a jury could find that [the defendant's] contracts create *de facto* exclusivity and thus violate the Sherman Act"). Given these factual disputes, even under Google's incorrect legal standard, the Court should deny summary judgment.

### i.    The Apple Distribution Agreement Is Exclusive

Google's distribution agreement with Apple (the ISA) is also exclusive because it requires Apple to make Google the preset default search engine on the only preinstalled search access point on its devices—the address bar in Safari— ███████████ COMF ¶¶ 501, 504–506. Under the ISA, ████████████████████████████████████████████ ████████████████████████████████ *Id.* ¶¶ 507–508. Thus, a user in Safari can send a query to a rival search engine only by navigating to the rival's website (through a bookmark or

otherwise) or by switching away from the preset default in Safari's settings. *Id.* ¶ 509. Rivals cannot distribute their own browser or other search access point through preinstallation on Apple devices because that option simply is not—and will never be—for sale. *Id.* ¶ 498. All of this is, of course, why Google pays Apple billions of dollars each year under the ISA. *Id.* ¶¶ 514–515.

Google insists that its distribution agreement with Apple is not an exclusive contract because marginal forms of distribution remain available to rivals, e.g., rivals can convince users to change their preset default or download an app. But an agreement need not close off *all* channels of distribution to be considered exclusive. *Microsoft*, 253 F.3d at 64  ("[A]lthough Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones."); *id.* at 68 (treating Microsoft's deal with AOL as "exclusive" even though it permitted AOL to make Netscape available to its customers on a limited basis); *id.* at 70–71 (accepting that "Microsoft ha[d] not 'completely excluded Netscape' from reaching any potential user by some means of distribution"). Regardless, the extent to which Google's ISA with Apple closes off distribution is a factual question. *Id.* at 73 (analyzing record).

Accordingly, there is a genuine factual dispute about whether Google's ISA with Apple is exclusive because Google has secured an exclusive default on the only preinstalled search access point on all Apple devices.

ii.     **The Android Distribution Agreements Are Exclusive**

Like the Apple ISA, there is a genuine factual dispute about whether the Android distribution agreements (MADA and RSAs) are exclusive. Even Google does not seriously contend otherwise. Def. Br. at 39–40. Nor could it, as Google's CEO has acknowledged these terms are exclusive. COMF ¶ 632. The MADAs and RSAs are exclusive because, working together as "belt and suspenders," they guarantee Google is the only preset default search engine on any Android preinstalled search access point. *Id.* ¶ 569. And, again like the Apple ISA, the

fact that rivals can still encourage users to change their preset default or download an app does not mean Google's Android distribution agreements are not exclusive.

The MADAs are the first contract securing Google's exclusivity on Android devices. The Google search widget, which must be placed on the home screen, occupies three-to-five slots, and the default search engine on the widget cannot be changed from Google. *Id.* ¶¶ 584, 587–589; SOGI ¶ 217. The search widget is the single most important search access point on an Android device. COMF ¶¶ 478–480, 586. Technically, the MADA permits OEMs to preinstall a rival's search widget alongside Google's but, practically speaking, the market reality is that preinstalling a second widget is not possible. COMF ¶¶ 590–592; SOGI ¶ 219; *cf. Microsoft*, 253 F.3d at 61 (explaining that although Microsoft's anticompetitive agreements permitted OEMs to preinstall a second, rival browser, OEMs could not do so "practically"). Google's own expert, Prof. Murphy, even concedes "the fact that OEMs may be unlikely to place multiple search widgets on a device." COMF ¶ 592.

The MADA also requires Android OEMs to preinstall Chrome, which defaults to Google and which is the second most important search access point on Android devices. COMF ¶¶ 481–482, 593–594. Although still disfavored, secondary browsers on Android devices, which are permitted by the MADA, are not unprecedented—Samsung Android devices, for example, come with both Chrome and S-Browser, Samsung's proprietary browser. *Id.* ¶¶ 595, 601. However, any opportunity this creates is smothered by Google's RSAs.

Android RSAs seal off the little opportunity that the MADA leaves open. In particular, the RSA ensures that all preinstalled search access points will have Google as the preset default and no rival search will be preinstalled. SOGI ¶ 226; COMF ¶¶ 602, 604–605. The RSA's provisions guarantee that no rival search access point (e.g., a rival search widget or a rival

default on a secondary browser) will appear on an Android device. *Id.*

When viewed collectively, the MADAs and Android RSAs ensure all roads on Android lead to Google. That is exclusivity.

### iii. The Mozilla And Other Third-Party Browsers Distribution Agreements Are Exclusive

Similarly, there are material factual disputes as to whether Google's distribution agreements with third-party browsers Mozilla, Opera, and UCWeb—which require these browsers to make Google the preset default search engine and cover nearly all search access points on nearly all versions of third-party browsers in the United States—are exclusive. COMF ¶ 646; SOGI ¶¶ 143, 176, 182.

### 2. Google's Agreements Substantially Foreclose Competition

For exclusive dealing claims, in addition to exclusivity, plaintiffs must show substantial foreclosure—though, as *Microsoft* makes clear, what is substantial will vary and depends on the context and market realities. 253 F.3d at 69–72. Substantial "[f]oreclosure is measured by looking at the percentage of the market that is 'tied up' by the exclusive-dealing contract, and thus by considering how much of the market is available to rival sellers." 7D-2 Areeda & Hovenkamp ¶ 768b4 n.39.  Accordingly, the foreclosure created by exclusive contracts is equal to the percentage of the market those contracts cover. *Id.* ¶ 1820a ("[A] plaintiff makes a prima facie case . . . by showing market structure, power, and *coverage* of the exclusive-dealing arrangement sufficient to create an inference of reduced output and higher prices in the affected market." (emphasis added)).

Here, Prof. Whinston's analyses show that the challenged terms of Google's distribution agreements cover almost 50% of all U.S. general search traffic ████████████████████
████████████████████████████████████████████████████ 45% of U.S.

general search text ads, and 36% of U.S. search ads. COMF ¶¶ 471, 475–477, 490, 492. These coverage numbers—especially when viewed in light of the ███ of searches controlled by the Google default on Chrome for Windows and Apple devices, *id.* ¶¶ 472, 491, 493—easily qualify as "significant foreclosure" under *Microsoft*, 253 F.3d at 70 (foreclosure of less than 40 or 50% may give rise to a Section 2 violation); *see also Am. Pres. Lines*, 2022 WL 4598538, at *10 ("[F]oreclosure of 35% is not defective as a matter of law."); 7D-2 Areeda & Hovenkamp ¶ 768b4 n.39 (emphasizing that the ultimate purpose of assessing foreclosure is to assess "how much of the market is available to rival sellers").

In spite of this record evidence, Google urges the Court to conclude that its agreements foreclose just 1% of the relevant markets. Def. Br. at 40–41. As an initial matter, Google's argument evidences a significant factual dispute, making summary judgment improper. In any event, Google's foreclosure estimate is neither calculated correctly nor relevant here.

Google arrives at 1% foreclosure by calculating the most modest estimate of how much rivals' market-wide share would grow if Google's Android defaults were replaced with choice screens. Def. Br. at 42. In other words, Google's foreclosure estimate is an estimate of effects in a but-for world, i.e., a world where the anticompetitive effects of Google's distribution agreements are not present and instead users select their default search engine using a choice screen, rather than the real world where Google's distribution agreements block rivals from key distribution channels. *Id.* ("if all Android OEMs and carriers were to choose to display a choice screen . . . [t]he estimated 'shift' from Google to other search engines in this mandatory choice screen world would *total approximately 1%* of all search queries").

Although users' switching behavior in response to a choice screen may be interesting, it has no bearing on the foreclosure analysis here (even on Android devices). Foreclosure is

properly calculated by measuring the volume of distribution closed off to rivals, not the volume

of sales they would have won if that distribution were available. Consider this example:

> Suppose that all Levi's brand stores, selling 1,000 pairs of jeans annually, are
> covered by exclusive-dealing contracts, but in addition jeans are sold through
> department stores. Levi's has no exclusive-dealing relationship with them; these
> stores sell an additional 2,000 pair of jeans annually. In that case, the percentage
> of the market foreclosed by exclusive dealing must be reckoned at one-third, or
> 33%.

18D Areeda & Hovenkamp ¶ 1821d4. In the example, the market foreclosed is the market

covered by Levi's exclusive deals, i.e., all sales at the Levi's-exclusive stores. That coverage is

calculated without reference to the but-for world, a world where the exclusive dealing contracts

do not exist. Indeed, in this example, any reasonable estimate of the exclusive contracts' effects

in a but-for world with choice would yield a number much smaller than 33%. That is, if the

exclusive deals vanished and rivals could have their jeans sold alongside Levi's, rivals would not

capture *all* 33% of the foreclosed sales. Levi's would continue to sell jeans, even when rivals

appeared on the rack alongside it. Even so, the proper legal measure of foreclosure is 33%.

This approach is consistent with *Microsoft*, which explained that foreclosure is measured

by the share of the market rivals might otherwise compete for, not the sales rivals otherwise

would have won. *See Microsoft*, 253 F.3d at 69 (foreclosure concerns exclusive contracts'

limitations on "'the *opportunities* for other traders to enter into or remain in that market'"

(emphasis added) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)).

Thus, in *FTC v. Surescripts, LLC,* the court used coverage—not lost sales—as its measure of

foreclosure based on its reading of *Microsoft*, which *Surescripts* described as holding that

"[e]xclusivity provisions *covering* about 40–50% of the relevant market have been found to

foreclose competition illegally." 424 F. Supp. 3d at 102 (emphasis added) (citing *Microsoft*, 253

F.3d at 70). *LePage's Inc. v. 3M* expressed the same understanding of *Microsoft* when it

endorsed a focus on the foreclosure "'of the available *opportunities* for browser distribution.'" 324 F.3d at 159  (emphasis added) (quoting *Microsoft*, 253 F.3d at 70–71).

The only authority Google's brief cites for its argument that foreclosure is measured against a but-for world is its own economist, Prof. Murphy. *See* Def. Br. at Def. Br. at 40–42; SOGI ¶¶ 247–248. Prof. Murphy cited no authority for this foreclosure methodology, and when given the chance in his deposition to repair that failure, he again had nothing to offer. COMF ¶¶ 564.2, 564.3. In a footnote of its brief, Google quotes Prof. Whinston as having stated that coverage "is not an *economically* sensible measure of foreclosure." Def. Br. at 42 n.12. This reference is misleading. Google has misattributed Prof. Murphy's statements to Prof. Whinston. In the cited paragraph, Prof. Whinston quotes Prof. Murphy and agrees with the quotation only "[t]o the extent that" Prof. Murphy is arguing that absent Google's contracts, rivals would not have won "*all* of the search traffic that the contracts cover." COMF ¶ 564.1. As discussed in the Levi's example above, rivals will never have won "all" foreclosed sales. Thus, Prof. Whinston's analysis comports with using coverage to measure foreclosure. Whatever foreclosure may mean to Prof. Murphy, *Microsoft* is the binding precedent that controls this analysis.

Factual disputes remain as to whether Google's distribution agreements are exclusive, and whether they foreclose a significant percentage of distribution.[21] As a result, Google's motion for summary judgment fails even under its own incorrect legal standard.

## CONCLUSION

For the reasons demonstrated above, the Court should deny Google's motion for summary judgment.

---

[21] The statements in U.S. Plaintiffs' complaint relating to voice assistants and internet-of-things were made in anticipation of a rebuttal argument that Defendant Google has not made, and are, therefore, not relevant to Google's motion for summary judgment.

Dated: January 26, 2023                     Respectfully submitted,


                                            By:___ */s/ Kenneth M. Dintzer*_____
                                            Kenneth M. Dintzer
                                            Adam Severt
                                            Matthew C. Hammond
                                            Elizabeth S. Jensen
                                            Diana A. Aguilar Aldape
                                            Sarah M. Bartels (D.C. Bar No. 1029505)
                                            Richard C. Gower
                                            Thomas Greene
                                            Karl E. Herrmann (D.C. Bar No. 1022464)
                                            Matthew Jones (D.C. Bar No. 1006602)
                                            Claire M. Maddox (D.C. Bar No. 498356)
                                            Michael G. McLellan (D.C. Bar No. 489217)
                                            Veronica N. Onyema (D.C. Bar No. 979040)
                                            Lara E.V. Trager
                                            Catharine S. Wright (D.C. Bar No. 1019454)

                                            U.S. Department of Justice, Antitrust Division
                                            Technology & Digital Platforms Section
                                            450 Fifth Street NW, Suite 7100
                                            Washington, DC 20530
                                            Telephone: (202) 227-1967
                                            Kenneth.Dintzer2@usdoj.gov

                                            *Counsel for Plaintiff United States of America*


                                            By:___ */s/ Margaret Sharp*___
                                            Ken Paxton, Attorney General
                                            James Lloyd, Chief, Antitrust Division
                                            Margaret Sharp, Assistant Attorney General
                                            Office of the Attorney General, State of Texas
                                            300 West 15th Street
                                            Austin, Texas 78701
                                            Margaret.Sharp@oag.texas.gov

                                            *Counsel for Plaintiff State of Texas*