# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

State of Colorado, et.al.,
Plaintiffs.

    **v/**

**Google, LLC,**
**Defendant.**

**Case no. 1:20-cv-03715-APM**
**Hon. Amit P. Mehta**

### BRIEF OF PROPOSED *AMICUS CURIAE*
### THE AMERICAN ANTITRUST INSTITUTE IN SUPPORT OF PLAINTIFF STATES
### OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT

KATHLEEN BRADISH
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, DC  20036
(202) 304-0195
*Counsel for Amicus Curiae*

February 17, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT ................................................................................................................... 3

I.      GOOGLE'S ACTIONS SHOULD BE ANALYZED AS A WHOLE BECAUSE
        THE STATES ALLEGE MUTUALLY REINFORCING CONDUCT ........................... 3

        A.   In General, Antitrust Allegations Need to be Analyzed as a Whole,
             Especially Where Plaintiffs Allege Section 2 Monopolization ............................ 4

        B.   Google Misconstrues Microsoft in Order to Improperly Segment
             State's Claims ........................................................................................ 7

        C.   The States' Allegations Should Not be Compartmentalized Because They
             Describe Mutually Reinforcing Conduct ............................................... 8

        D.   This Court Should Consider the Cumulative Effect of Google's Conduct
             When Assessing Market Foreclosure ..................................................... 9

II.     GOOGLE IMPROPERLY INVOKES A PATCHWORK OF INAPPLICABLE
        DOCTRINES ON EXCEPTIONS TO ANTITRUST SCRUTINY ............................... 11

        A.  Google Cannot Use Product Design as a Shield Against Antitrust Scrutiny .......... 12

        B.  Google Cannot Use "No Duty to Deal" to Obtain Immunity ................................. 18

CONCLUSION ................................................................................................................ 21

CERTIFICATE OF SERVICE ........................................................................................ 23

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Teva Pharms. USA, Inc.*,
    432 F. Supp. 2d 408 (D. Del. 2006) ................................................................. 9, 13, 15

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ..................................................................................Passim

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
    917 F.2d 1413 (6th Cir. 1990) ........................................................................................ 5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ................................................................................................. 4, 10

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ......................................................................................... 17

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*,
    49 F. Supp. 2d 750 (D.N.J. 1999) ..................................................................... 8, 10, 11

*Bonjorno v. Kaiser Aluminum & Chem. Corp.*,
    752 F.2d 802 (3d Cir. 1984) ........................................................................................... 8

*Cal. Comp. Prods., Inc. v. IBM*,
    613 F.2d 727 (9th Cir. 1979) .................................................................................. 14, 16

*Caldera, Inc. v. Microsoft Corp.*,
    72 F. Supp. 2d 1295 (D. Utah 1999) ............................................................................ 12

*City of Anaheim v. S. Ca. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) ............................................................................... 4, 5, 6

*City of Groton v. Connecticut Light & Power Co.*,
    662 F. 2d 921 (2d Cir. 1981) .................................................................................. 6, 11

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ............................................................................................. 3, 4, 11

*GAF Corp. v. Eastman Kodak Co.*,
    519 F. Supp.1203, 1228 (S.D.N.Y. 1981) .................................................................... 17

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ..................................................................................... 6, 7

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ....................................................................... 18

*In re Suboxone Antitrust Litig.*,
    967 F.3d 264 (3d Cir. 2020) ..................................................................................... 8

*LePage's, Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ....................................................................... 4, 5, 9, 10

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ................................................................................... 5

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ................................................................................ 5, 17

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009) ................................................................................................ 18

*Power Analytics Corp. v. Operation Tech., Inc.*,
    820 F. App'x 1005 (Fed. Cir. 2020) ................................................................. 14, 16

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 888 (5th Cir. 2016) ..................................................................................... 7

*Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*,
    368 F.2d 679 (8th Cir. 1966) ..................................................................................... 5

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..........................................................................Passim

*Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..................................................................................... 14, 20, 21

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ........................................................................................ 5

**Other Authorities**

Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*,
    115 Nw. U. L. Rev. 1581 (2021) ............................................................................... 6

Dennis Carlton & Ken Heyer, *Appropriate Antitrust Policy Toward Single-Firm Conduct*,
    Economic Analysis Group, Antitrust Div., U.S. Dep't of Just.
    (Discussion Paper No. 08-2, March 2008) ............................................................. 19

John Newman, *Antitrust in Digital Markets*,
   72 Vand. L. Rev. 1497 (2019) ................................................................. 15

Jonathan Jacobson, et al., *Predatory Innovation: An Analysis of* Allied Orthopedic v. Tyco
   *in the Context of Section 2 Jurisprudence*,
   23 Loyola Consumer L. Rev. 1, 8 (2010) ............................................... 15

Katherine Strandburg, *Free Fall: The Online Market's Consumer Preference Disconnect*,
   U. Chicago L. Forum (2013) ................................................................. 16

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2022) ................................ Passim

## INTEREST OF AMICUS CURIAE

AAI is an independent, nonprofit organization devoted to promoting competition that protects consumers, businesses, and society.  It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy.  AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. *See* http://www.antitrustinstitute.org.[1]

Amicus' interest in this matter is that the organization is a public interest advocate seeking to improve the administration of the antitrust laws and to ensure that antitrust enforcement best serves the interests of competition and consumers.  The Court's decision in this matter affects the Amicus because those goals cannot be achieved if the enforcement under Section 2 of the Sherman Act is weakened so that monopolists can cut loopholes in the caselaw by creatively repackaging their conduct or if doctrines designed to limit the scope of antitrust in specific, narrow circumstances are expanded to immunize a broad range of harmful and anticompetitive conduct.  To avoid such a result, courts must apply the Supreme Court's mandate to assess the whole scope of the monopolist's exclusionary conduct, rather than assessing each component separately and "wiping the slate clean" after each.  Courts must also not blindly and broadly apply doctrines about the limitations of antitrust to "immunize" a wide array of monopolistic conduct.  Such doctrines must be applied narrowly and only in cases consistent with the policy concerns that first prompted them if they are not to undermine valid Section 2 enforcement.  The Court's decision here has the potential to have a lasting effect on both counts.

---

[1] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The States, along with the United States Department of Justice, allege that Google has constructed a web of restrictive contracts and conduct that blocks the path of any challenger to Google's monopolies in general search and search advertising.  Google does not contest its market position, but instead claims that there can be no violation because each of its restrictions, viewed in isolation, does not meet the criteria for Sherman Act Section 2 liability.  Defendant's analysis mischaracterizes the precedent in two ways, both of which present a danger to effective Section 2 enforcement.

First, Google's divide and conquer approach ignores the Supreme Court's directive to consider the whole of the alleged antitrust violation and not "wipe the slate clean" after analyzing each component.  As discussed in detail below, precedent requires that the anticompetitive effect of each individual restriction be assessed in light of the overall anticompetitive scheme.  Any other rule would, as a practical matter, carve a giant loophole in Sherman Act enforcement.  A sufficiently clever monopolist could legalize monopolistic conduct by imposing a variety of interrelated and mutually reinforcing restrictions instead of a one-size-fits-all approach or by hiring a sufficiently clever lawyer to chop up the anticompetitive scheme. In short, a mandate to consider each alleged restriction for its role in an anticompetitive scheme is not, as Google would have it, a requirement that the court consider each claim in the isolation of its own silo.

Second, after slicing up Plaintiffs' allegations into artificially isolated restrictions, Google attempts to force them into categories it then claims are immunized by precedent, including product design, refusal to deal, and price-squeeze.  A closer look, however, shows that (1) the claimed "immunizations" do not sweep nearly as broadly as Google suggests, and (2)

Google's alleged actions should not be confined to these categories at all.  For example, Google isolates the States' allegations regarding restrictions on the display of Specialized Vertical Providers (SVPs) on the Google search results page to suggest that the States claim only a predatory product design that is not cognizable under Section 2.  But that suggestion ignores caselaw on product design that does allow antitrust scrutiny, and the States' allegation that the design is just one component of a broader scheme that strips nascent competitors of a potential path to entry.  Here and elsewhere, Defendant mischaracterizes the alleged restriction, a means of preventing new entry, as an end in itself.  Defendant cannot avoid trial on the facts by invoking a patchwork of inapplicable caselaw on narrow exceptions to antitrust scrutiny.

## ARGUMENT

## I.   GOOGLE'S ACTIONS SHOULD BE ANALYZED AS A WHOLE BECAUSE THE STATES ALLEGE MUTUALLY REINFORCING CONDUCT

A central flaw in Google's motion for summary judgement is that it recasts the States' allegations into three isolated "purportedly anticompetitive acts" and asks the court to disregard their combined effect.  Google Mot. Summ. J., Case 1:20-cv-03010-APM, Doc. No. 452, at 1 [Google State MSJ].  This is contrary to precedent, particularly where, as here, a defendant's anticompetitive acts are interrelated and mutually reinforcing.  *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam).

In *Continental Ore*, a unanimous Supreme Court admonished the Ninth Circuit Court of Appeals for treating the plaintiff's Sherman Act Sections 1 and 2 antitrust claims "as if they were five completely separate and unrelated lawsuits."  *Cont'l Ore Co.*, 370 U.S. at 698-99.  After vacating and remanding the judgment, the Supreme Court held that an antitrust matter is "not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a

whole." *Id.*; *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 599 (1985) (approving that "the Court of Appeals considered the record 'as a whole' and concluded that it was not necessary for Highlands to prove that each allegedly anticompetitive act was itself sufficient to demonstrate an abuse of monopoly power"); *City of Anaheim v. S. Ca. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). As such, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping this slate clean after each." *Cont'l Ore*, 370 U.S. at 698-99.

Plaintiffs are entitled to present their complete case so that the factfinder can fulfill its "duty […] to look at the whole picture and not merely at the individual figures in it." *Id.*; *LePage's, Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together.").

## A.  In General, Antitrust Allegations Need to be Analyzed as a Whole, Especially Where Plaintiffs Allege Section 2 Monopolization

It is not contradictory for plaintiffs to claim that that each individual act is an antitrust violation *and* that a group of acts, taken together, have an anticompetitive impact. *Lepage's*, 324 F.3d at 154-59 (examining alleged exclusionary conduct individually and as a whole). When plaintiffs so plead, courts should examine those claims as a whole, especially where the conduct at issue is alleged to be interrelated and mutually reinforcing. *See* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 310c7 (5th ed. 2022) ("[E]ach [act] viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim."); *LePage's*, 324 F.3d at 162 ("The effect of 3M's conduct in strengthening its monopoly position by destroying competition by LePage's in second-tier tape is most apparent when 3M's

various activities are considered as a whole. . . . 3M's bundling of its products via its rebate programs *reinforced* the exclusionary effect of those programs.") (emphasis added). This makes practical sense because a monopolist bent on preserving its dominant position is "likely to engage in repeated and varied exclusionary practices." *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 310 c7. Therefore "[t]he fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact." *Id.*

Courts routinely assess the cumulative anticompetitive effect of a Section 2 defendant's conduct. *See, e.g.*, *LePage's*, 324 F.3d at 162 ("The relevant inquiry is the anticompetitive effect of [the defendant's] exclusionary practices considered together."); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010) (holding courts must take anticompetitive conduct "as a whole" when evaluating whether required injury to competition was met under Section 2); *City of Anaheim*, 955 F.2d at 1376 ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653-54 (2d Cir. 2015) (examining plaintiffs' claims and proof as a whole and for synergistic effects); *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 691 (8th Cir. 1966) ("[A]n act in itself may be legal, but it still may become involved in an antitrust violation when it is 'part and parcel of unlawful conduct or agreement with others or conceived in a purpose to unreasonably restrain trade, control the market, or monopolize . . . We must consider the evidence as a whole."); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (finding Section 2 liability because "damages ar[o]se from a series of unlawful acts intertwined with one another."); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443–44 (6th Cir. 1990) ("The

[factfinder] is entitled to look at the whole picture with respect to allegations and evidence of Sherman Act Section 2 violations.") (internal citation omitted).

Ignoring the aggregate and synergistic effects of monopolistic acts would carve a vast loophole in Section 2.  Without analyzing each of a monopolists' actions in the context of the whole, a factfinder cannot see their conduct's full anticompetitive impact.  Adopting this myopic approach would thus create a dangerous blind spot that allows a monopolist to evade liability. *See City of Groton v. Connecticut Light & Power Co.*, 662 F. 2d 921, 929 (2d Cir. 1981) (holding the proper inquiry is whether, qualitatively, there is a synergistic effect."); *see also City of Anaheim,* 955 F.2d at 1376 ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1646-47 (2021) (comparing the outcomes of concurrent antitrust litigation to conclude that those opinions which "compartmentalized" individual allegations allowed sophisticated defendants to "evade antitrust liability").

Google's divide and conquer approach to the States' allegations is particularly inappropriate at the summary judgment stage.  As Judge Posner famously wrote, the "trap to be avoided in evaluating evidence of an antitrust [violation] for purposes of ruling on the defendants' motion for summary judgment is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to [a violation], the evidence as a whole cannot defeat summary judgment."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002).  Instead, a defendant's motion for summary judgment cannot succeed if a reasonable jury could find that "when the evidence was considered *as a whole*, it was more likely that the defendants had" engaged in the alleged anticompetitive conduct than that they had not.

*Id.* at 655-56 (emphasis added).  The essential question at the summary judgment is not whether each "single piece" of evidence "is sufficient in itself to prove [the violation]. . . . The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment."  *Id.*

**B.  Google Misconstrues *Microsoft* in Order to Improperly Segment State's Claims**

Google depicts the D.C. Circuit's *Microsoft* decision as limiting the court's assessment of an alleged Section 2 violation to "separately analyzing each category of conduct."  Google Mot. Summ. J., Case 1:20-cv-03010-APM, Doc. No. 451, at 24 [Google DOJ MSJ].[2]  This is not correct.  The *Microsoft* court, in fact, begins its analysis by noting the need to consider the mutually reinforcing effects of anticompetitive acts, even if those acts took place in separate markets.  *Microsoft*, 253 F.3d at 60.  Throughout its analysis, the court considers synergistic anticompetitive effects.  The court assesses Microsoft's decision to deny interoperability, for example, against the "backdrop of foreclosure" created by its other anticompetitive acts, including "Microsoft's exclusive deals with the leading ISVs."  *Id.* at 75.  Ultimately, the court concludes that Microsoft's anticompetitive conduct in the browser market reinforced its monopolization of the operating systems market.  *Id.* at 60 ("Microsoft's efforts to gain market share in one market (browsers) served to meet the threat to Microsoft's monopoly in another market (operating systems) by keeping rival browsers from gaining the critical mass of users

---

[2] Google cites *Retractable Techs., Inc. v. Becton Dickinson & Co.*, as another example of a court analyzing each "category of conduct" separately.  842 F.3d 888, 891-92 (5th Cir. 2016).  Google ignores, however, that the court in *Retractable Techs.* chose to analyze each category of conduct separately only after the jury had already rejected the "critical" factual predicates that would have tied together plaintiffs' claims.  *Id.* ("Critical to our analysis is that the jury verdict significantly narrowed the factual predicate for potential antitrust liability by rejecting RTI's case for exclusionary contracting practices by BD.").  Even more importantly, the court in *Retractable Techs.* did not prematurely rule on questions of market foreclosure at the summary judgment stage, as Google's Motion urges.  Rather, the *Retractable Techs.* court appropriately allowed the very questions at issue here, including those about market foreclosure and mutually reinforcing conduct, to be considered at trial by the ultimate factfinder, the jury.  *See id.* (ruling that Defendant had only during trial "successfully rebutted the testimony of over a dozen [customers] that BD's practices did not foreclose their ability to choose among competing products.").

necessary to attract developer attention away from Windows as the platform for software development.").

Google is wrong that *Microsoft* stands for the proposition that courts must "individually evaluate whether different types of conduct are exclusionary," especially when a plaintiff alleges that those types of conduct interrelate.  *See* Google DOJ MSJ at 24.  Rather, under both *Continental Ore* and *Microsoft*, courts must look at "all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly."  *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir. 1984); *see also Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750, 760 (D.N.J. 1999) ("[D]efendants contend, at various points in their brief, that one particular allegation or another did not cause Biovail injury and, therefore, must be dismissed. . . . The allegations, however, under *Continental Ore*, should not be so 'tightly compartmentaliz[ed].'").

### C.  The States' Allegations Should Not be Compartmentalized Because They Describe Mutually Reinforcing Conduct

Each of the States' allegations is so related to the others that it should not be examined separately.  The States' theory is that Google's actions constitute a "campaign" to "entrench[] and solidif[y] its monopoly positions against competition in the markets at issue."  Complaint at ¶¶ 103, 207 (describing how Google's actions "individually *and cumulatively* harm competition" in those markets) (emphasis added); *Compare In re Suboxone Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) ("Purchasers theory of the case, however, is not simply that Reckitt's pricing of brand tablets individually caused harm. Rather, they allege that the totality of Reckitt's actions . . . suppressed generic competition and thus violated the antitrust laws.") (internal citations omitted).  As part of that campaign, each alleged anticompetitive act operated in conjunction with the others to foreclose competition in the interrelated markets of general search

engine services, general search text advertising, and general search advertising.  *See, e.g.*, Tr. of

Tutorial Presentation Proceedings at 127:12-21, Case 1:20-cv-03010-APM, Doc. No. 393 (Sept.

8, 2022) [Tutorial Tr.] (describing how Google's different types of exclusionary conduct

weakens partnerships between general search and SVPs from "both directions").

The acts that the States allege together contribute to a cumulative end, "building an

impenetrable moat" around Google's market dominance.  Complaint ¶¶ 9, 39. The allegations

regarding Google's exclusionary search distribution agreements, its actions to weaken SVPs and

its discriminatory practices regarding SA360 are, for example, part of a "connected narrative."

Tutorial Tr. at 110:15-111:3.  Given the interdependent nature of Google's conduct and its

common object of "entrench[ing] and solidif[ying] its monopoly positions against competition,"

this court should analyze the State's allegations as a whole.  Complaint ¶ 103; *see also*

*Microsoft*, 253 F.3d at 66-67 (finding Microsoft's goal in comingling code was to "mak[e] it

impossible to acquire one without the other"); *LePage's*, 324 F.3d at 162 (analyzing allegations

as a whole because "the anticompetitive effect of 3M's exclusive dealing arrangements, whether

explicit or inferred, cannot be separated from the effect of its bundled rebates.  3M's bundling of

its products via its rebate programs reinforced the exclusionary effect of those programs.");

*Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 428 (D. Del. 2006) ("When

determining antitrust liability based on a collection of factual allegations, the courts must look to

the monopolist's conduct taken as a whole rather than considering each aspect in isolation.")

(internal citations omitted).

    **D.  This Court Should Consider the Cumulative Effect of Google's Conduct When Assessing Market Foreclosure**

In Section 2 monopolization cases, a central question is whether defendant's actions

effectively foreclosed a substantial amount of the market.  To answer that question, a court

should consider the cumulative foreclosure from the alleged anticompetitive acts.  Areeda &
Hovenkamp, *Antitrust Law* ¶ 310 c7 ("[A]ggregating a monopolist's disparate acts in order to
determine liability makes perfect sense because "one can imagine a case in which a half dozen
independently unlawful acts each had an impact insufficient to warrant antitrust relief, but the
impact of the aggregation was substantial."); *Aspen Skiing Co.* at 599 (explaining that because
the "Court of Appeals considered the record 'as a whole' ... it was not necessary for Highlands to
prove that each allegedly anticompetitive act was itself sufficient to demonstrate an abuse of
monopoly power").

Google's divide and conquer approach to market foreclosure is impermissible because it gets
the order of operations wrong.  A court should "first examine whether an antitrust violation has
been alleged; then, if a violation has been alleged, the court will examine whether—as a result of
all of the violations alleged—[defendant] has suffered 'injury of the type the antitrust laws were
intended to prevent and that flows from that which makes defendants' acts unlawful." *Biovail*,
49 F. Supp. 2d at 760; *Lepage's*, 324 F.3d at 158-59 ("LePage's produced evidence that the
foreclosure caused by exclusive dealing practices was magnified by 3M's discount practices.").

The *Microsoft* court took such an aggregate approach.  For example, it assessed the
cumulative impact of Microsoft's alleged anticompetitive acts in foreclosing channels of browser
distribution.  *Microsoft Corp.*, 253 F.3d at 72 ("Although the ISVs are a relatively small channel
for browser distribution, they take on greater significance because, as discussed above, Microsoft
had largely foreclosed the two primary channels to its rivals.").  It was only in "light" of the
foreclosure resulting from other allegations that "Microsoft's exclusive deals with the ISVs had a
substantial effect in further foreclosing rival browsers from the market." *Id.*

The States here allege a web of actions that foreclosed competition in the markets that Google dominates.  *See, e.g,* Tutorial Tr. at 97:11-19 and *forward* (describing how States' three types of alleged harm that are not just "additive" but work together to foreclose competition).  At the summary judgment stage, the proper question is whether a reasonable jury could find that Google's actions "as a whole" substantially foreclosed the marketplace.  *See City of Groton*, 662 F.2d at 929; *Biovail*, 49 F. Supp. 2d at 760 ("[T]he court will first examine whether an antitrust violation has been alleged; then, if a violation has been alleged, the court will examine whether—as a result of all of the violations alleged—Biovail has suffered injury of the type the antitrust laws were intended to prevent...").  To do otherwise would be irrational and permit monopolists to inflict a thousand anticompetitive cuts, many perhaps causing only small amount of foreclosure, but that collectively disable competition in the relevant markets.  *See Cont'l Ore*, 370 U.S. at 698-99; Areeda & Hovenkamp, *Antitrust Law* ¶ 310 c7 (concluding for this reason that "[t]he fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact.").  A legal conclusion that a particular anticompetitive act caused insufficient market foreclosure is meaningless if the sum of such acts resulted in sufficient market foreclosure for a Section 2 violation.  Therefore, a matter of both logic and sound antitrust law, the foreclosing effects of Google's anticompetitive conduct should be considered as a whole.

## II.   GOOGLE IMPROPERLY INVOKES A PATCHWORK OF INAPPLICABLE DOCTRINES ON EXCEPTIONS TO ANTITRUST SCRUTINY

After artificially carving up the States' allegations, Google invokes various doctrines about supposed exceptions to antitrust scrutiny, including judicial concerns about claims based on product design, price squeeze, and refusal to deal.  *See, e.g.*, Google State MSJ at 20-7, 30-5. Google then asserts a kind of "immunity" or antitrust safe harbor for each isolated kind of

conduct.  In so doing, it distorts the law and ignores context that renders the doctrines inapplicable.

**A.  Google Cannot Use Product Design as a Shield Against Antitrust Scrutiny**

Google repeatedly invokes judicial deference to product design to fend off antitrust scrutiny, most emphatically when it contests whether allegations regarding SVP advertising and SA360 features are appropriately part of the States' Section 2 claims.  *See, e.g.*, Google State MSJ at 20, 23-5.  Google tries to paint product design as a kind of sacred space where antitrust has no role.  This characterization expands beyond recognition any judicial deference that courts give to innovation claims.  It is contrary to the binding precedent of this Court and the policies that shaped it.

It is wrong for Google to assert that any admission by the States that a product is "useful" is "fatal to [a Section 2] claim."  *See* Def. State MSJ at 24.  No court has adopted a rule of per se legality for product design choice.  To the contrary, the binding precedent in this court is clear that a product design, even if it includes an improvement, is *not* immune from antitrust scrutiny. *See Microsoft Corp.*, 253 F.3d at 65 ("Judicial deference to product innovation . . . does not mean that a monopolist's product design decisions are per se lawful."). The *Microsoft* court conducted a careful analysis of several of the company's design choices, deciding antitrust liability not on a blind blanket deference to product design, but only on the basis of the particular facts of each example.

Nor are Plaintiffs required, as Google suggests, to show that a product design's sole purpose is an anticompetitive one.  This Circuit, among others, has rejected such a categorical approach, instead choosing to apply the standard burden-shifting analysis under Section 2.  In product design claims, as with most other Section 2 claims, plaintiff's initial showing of

anticompetitive effect puts the burden on the defendant to show procompetitive justification. Only then does the burden shift back to plaintiffs to rebut and show that anticompetitive effect outweighs its procompetitive justification. *Microsoft*, 253 F.3d at 65; *see also Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1312–13 (D. Utah 1999) ("Particularly offensive to the Court is the [defendant's] assertion that . . . [its] conduct violates §2 of the Sherman Act only if the design changes had no purpose and effect other than the preclusion of competition. This is simply not true. . . . The standard actually . . . contemplates the effect the design choice has on competition. It does not impose the much heavier burden on a plaintiff of demonstrating that a design choice is entirely devoid of technological merit.") (internal quotations omitted); *Abbott Lab'ys v. Teva Pharma*, 432 F. Supp. 2d at 422 ("Contrary to defendant's assertion, plaintiffs are not required to prove that the new formulations were absolutely no better than the prior version or that the only purpose of innovation was to eliminate the complementary product of a rival. . . . [I]f plaintiffs show anti-competitive harm from the formulation changes, that harm will be weighed against any benefits presented by defendants.").

Google tries to dispense with valid Section 2 claims by mischaracterizing the D.C. Circuit precedent on product design. Google rests much of its product design argument on the basis that *Microsoft* shares the same legal framework and rationale as a Ninth Circuit case, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010). *See* Google State MSJ at 20- 2. But this is a highly inaccurate portrayal of the D.C. Circuit's standard. The D.C. Circuit in *Microsoft* did exactly what Google claims is forbidden by *Allied Orthopedic*; it unambiguously balanced the "benefits or worth" of Microsoft's design choice against the "anticompetitive effect." *See* Google State MSJ at 21; *Microsoft*, 253 F.3d at 65-7. To take the case of Microsoft's non-interoperable JVM, discussed at length by Google as an

example of the *Microsoft* court's supposed "immunization" of product design, the *Microsoft* court in fact concluded only that the facts on the record did not support Plaintiffs claim of anticompetitive effect. *Compare* Google State MSJ at 20-1 *with Microsoft,* 253 F.3d at 65. Had Plaintiffs had an adequate factual basis to show such an effect, as the D.C. Circuit earlier found with respect to the design choices underlying Microsoft's browser integration, the opinion made clear that the standard balancing test would have applied. *Microsoft*, 253 F.3d at 65-7 (noting that the "incompatible product must have an anticompetitive effect that *outweighs* any procompetitive justification for the design") (emphasis added). Contrary to Defendant's argument, the D.C. Circuit has no special standard for Section 2 claims involving product design, and there is no basis to award summary judgment by importing one from a different circuit.

Policy considerations also counsel against unthinking deference to Google's design choices. First, the primary concerns prompting judicial deference to product design are not present in this case. As the Supreme Court has recognized, "antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). The cases Google cites in favor of a high degree of deference to product design involve industries quite different than Google's. Google's search results page is neither a medical device nor a complex piece of computer hardware nor the power grid of a nuclear power plant.[3] In cases involving products like those, the challenged product design changes involved significant sunk costs, including extensive research and/or regulatory approvals, costly investment in manufacturing facilities, etc. In such instances, courts might worry about chilling those kinds of potentially irretrievable investments should they get the competitive calculus wrong and condemn net-

---

[3] *See Allied Orthopedic*, 592 F.3d 991 (analyzing medical device); *Cal. Comp. Prods., Inc. v. IBM*, 613 F.2d 727 (9th Cir. 1979) (analyzing computer CPUs and disk products); *Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005 (Fed. Cir. 2020) (analyzing power grids).

beneficial innovations.  But in digital markets, "predatory innovation" is different.  As academics have noted, digital markets differ from brick and mortar markets because "(t)he associated risks and costs [of anticompetitive product design] are lower, and the potential profits higher, as compared with traditional brick-and-mortar contexts.  As a prescriptive matter, this militates in favor of a less deferential standard than the antitrust enterprise has historically employed."  John Newman, *Antitrust in Digital Markets*, 72 Vand. L. Rev. 1497, 1534 (2019).

Leading antitrust authorities agree that digital markets, like the three in which Google has a monopoly, hold the greatest potential of harm from exclusionary product design.  Professor Hovenkamp, cited out of context in the Google State MSJ, in fact writes that in markets with significant network externalities, like those here, there is an increase in "both the incentive and the opportunities for anticompetitive product redesigns."  Areeda & Hovenkamp, *Antitrust Law* at ¶ 776c; *see also* Jonathan Jacobson, et al., *Predatory Innovation: An Analysis of* Allied Orthopedic v. Tyco *in the Context of Section 2 Jurisprudence*, 23 Loyola Consumer L. Rev. 1, 8 (2010) ("There are two scenarios where an exclusionary redesign may be especially harmful: (a) in the context of network markets . . . and (b) pharmaceutical markets. . . .").

The potential for harm—and, accordingly, the need for antitrust scrutiny—are even greater where, as here, there is a market defect that prevents free consumer choice.  The usual judicial reluctance to evaluate product design is founded on the idea that buyers can freely choose one product over another.  *Abbott Lab'ys*, 432 F. Supp. 2d at 421 (noting that judicial deference is based on "the success of those products is an open market, and the related conclusion that the harm to competitors was a matter of consumer choice").  But search is no open market.  Substantial network effects and the barriers to entry erected by Google deprive consumers of a meaningful choice.  *See, e.g.*, Complaint at ¶¶ 90-102 (describing barriers to

entry).  Further, consumers do not make a straightforward trade-off between the price and quality

of one product versus another.  The market for search involves far more than just dollars and

cents; consumers give Google their attention and both consumers and the SVPs give Google their

data.  *See, e.g.*, Complaint at ¶¶ 5, 6 (describing "attention economy").  The defaults that Google

invests billions of dollars are "sticky," and the fact that people don't change them "doesn't tell us

anything about their preference."  Tutorial Tr. at 52:15- 54:11.  As a result, there is a significant

disconnect between price and product—that is, the consumer price/quality choice that disciplines

most traditional markets does not exist.  *See* Katherine Strandburg, *Free Fall: The Online*

*Market's Consumer Preference Disconnect*,  U. Chicago L. Forum, 95, 96-7 (2013) (discussing

how consumer choice does not discipline digital markets because 1) they are zero-price, 2)

customers "cannot reasonably estimate the marginal disutility that particular instances of data

collection impose on them," and 3) "online data collection and aggregation associated with the

behavioral advertising business model pose collective action problems").  As a result, the cases

on which Google relies for their proposed standard for judicial deference—involving markets

disciplined by free consumer choice—do not fit the facts here.  *See, e.g.*, *Allied Orthopedic*, 592

F.3d at 1002 (noting that court's decision was based on "rational inference[s]" from some

customers' non-compelled decision to adopt the new design); *Cal. Comput. Prods.*, 613 F.2d at

744 (noting evidence that price and performance of redesigned processor unit offered an

advantage from the "buyer's point of view"); *Power Analytics Corp.*, 820 F. App'x at 1018

(noting court would not second guess what a buyer finds preferable or inferior "in the free

market" and  distinguishing this deference from a scenario in which a monopolist "forces a

[customer] to adopt its product" or  places "unreasonable impediments and conditions intended

to preclude and/or deter" customers' substitution of its products).  More fitting are cases where

courts have recognized that scrutiny of product design is necessary because "market forces cannot operate . . . that is, in cases in which a single firm controls the entire market or in which a monopolist engages in coercive conduct to affect consumer choice." *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp.1203, 1228 (S.D.N.Y. 1981).

Finally, this is far from being just a "product design" case.  None of the precedent cited by Google to argue for deference goes to the question of discrimination and interrelated anticompetitive conduct at the heart of the States' allegations.  *See, e.g.*, Complaint at ¶ 188 ("Google discriminates . . . by virtue of its differing treatment of specialized vertical providers operating in different verticals.").  Each of the so-called "product design" cases Google cites limits what deference it gives to the design standing alone, not to a defendant's design implementation or the restrictions placed on its use.  In the case of the incompatible JVM in *Microsoft* discussed above, for example, the D.C. Circuit affirmed that even if the incompatible design itself was not an antitrust violation, the ways in which Microsoft used that incompatible JVM were.  In this way, the court found contracts that required developers to promote Microsoft's JVM exclusively and deceptive assurances of the neutrality of its tools to be violations—all conduct that would not have had an anticompetitive effect if not for Microsoft's initial incompatible design choice.  *See Microsoft*, 253 F.3d at 65.

In fact, regardless of how a particular jurisdiction has articulated the relevant test, none have refused to scrutinize product design changes when they involve associated anticompetitive conduct.  *See Allied Orthopedics,* 592 F.3d at 999 (clarifying that the introduction of a new and improved product design would constitute a violation of Section 2 where "some associated conduct . . . supplies the violation.")*; Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 n.30 (2d Cir. 1979); *New York ex rel. Schneiderman*, 787 F.3d at 654 ("Under Berkey Photo,

when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019) (denying motion to dismiss product design allegations because "the amended complaints are filled with allegations of 'associated conduct'—including, for example, allegations of exclusive dealing, tying agreements, and product disparagement—the overall effect of which is to coerce customers to purchase K-Cups over Competitor Cups, rather than to compete on the merits.").

The States' allegations are not limited to the design of a search results page.  Instead, they describe a wide web of "associated conduct" deriving from that design that effectively excludes potential competition.  The conduct includes, for example, differential, discriminatory treatment of SVPs in areas where Google has its own offerings and contracts that require SVPs to provide Google with more data than necessary to implement OneBox.  Complaint at ¶ 188 (discriminatory treatment), ¶¶ 193-7 (requirements for SVPs to provide data); *see also* Tutorial Tr. at 128:1-129:10 (describing differing treatment of SVPs).  When—as precedent demands— the States' allegations are taken as a whole, summary judgment should not be granted, regardless of any judicial deference that may be given to the design of the product itself.

**B.  Google Cannot Use "No Duty to Deal" to Obtain Immunity**

Google also aims to avoid antitrust scrutiny by isolating the States' allegations about SVP data contracts from other conduct that weakens SVPs as potential competitors.  For instance, it wrongly recharacterizes those allegations as a "price squeeze" claim so it can invoke *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009).  In reality, *linkLine* has no role here.  That case involved a company operating as both a wholesaler and a retailer.

Plaintiffs there claimed the monopolist used high pricing in the wholesale market and low pricing in the retail market to deny its retail competitors a reasonable profit margin.  In rejecting their antitrust claims, the Supreme Court expressed concerns about dictating the price a company would charge when it had no duty to deal with its competitors in the first place.  Google does not make clear why *linkLine* might apply here.  Perhaps Google's position is that its contractual requirement that SVPs provide structured data is the "price" for linking to the SVPs website.  However, requiring a potential competitor to give up a significant competitive advantage is not, by any stretch of the imagination, the same as merely charging a high price.  Rather, that requirement is better viewed as exclusionary conduct designed to make SVPs less likely to compete with or partner with Google's competitors.  Entire bodies of Section 2 caselaw are based on the distinction between contractual restrictions and high prices, including exclusive dealing and tying.  The *Microsoft* case itself stood for the proposition that a monopolist cannot use its power over customers and distributors to require contractual conditions that stymie its competitors.

The same error applies to Google's attempt to recast the States' SVP claims as a variant of an essential facility case in which Google has "no duty to provide its services free of charge to competitors."  Google State MSJ at 31, 34.  The States' contention is not that Google should be required to provide access to SVPs free of charge; it is that, as a monopolist, Google conditions its services on conduct that diminishes current or potential competition.  A monopolist's refusing to deal with competitors is fundamentally different from the monopolist conditioning a deal on anticompetitive terms.  Ignoring this difference would give a monopolist carte blanche to place any contractual restrictions it sees fit as its "price" to its customers, regardless of the anticompetitive effects.

19

Rather than a variant of a refusal to deal, contractual restrictions are a pillar of Section 2 liability.  Where a dominant firm's willingness to deal is contingent on the other firm accepting terms rather than exiting, the "proper focus" is on "the anticompetitive conduct that a willingness to deal may be inducing others to engage in."  Dennis Carlton & Ken Heyer, *Appropriate Antitrust Policy Toward Single-Firm Conduct*, Economic Analysis Group, Antitrust Div., U.S. Dep't of Just. (Discussion Paper No. 08-2, March 2008).  The monopolist's anticompetitive terms of dealing matter because they can inhibit the monopolist's rivals.

For similar reasons, Google cannot hide behind the Supreme Court's decision in *Trinko*, 540 U.S. 398 (2004).  *Trinko* does not immunize Google from Section 2 liability for using its SA360 platform to discriminate against its search advertising competitors.  The States' claim is not that Google is required to design a platform that provides advertiser access to other search engines.  Rather, their claim is that once Google creates a product that links advertisers to competitors' search engines, it cannot wait until it becomes the largest such platform and then degrade its service to its competitor to shift share to itself.  At a minimum, the States' allegations establish a prior profitable course of dealing that excludes Google's conduct from the *Trinko* analysis.  *Id.* at 409 (distinguishing *Aspen Skiing* as exception and noting importance of prior course of conduct in refusal to deal analysis).  The most accurate way to characterize Google's conduct is not as refusing to deal, but as conditioning its profitable dealing with search competitors on discriminatory, anticompetitive terms.

Furthermore, refusal to deal and essential facility cases should not protect Google because States' allegations do not implicate any of the policy concerns that led courts to curtail antitrust liability.  Specifically, the Supreme Court in *Trinko* spelled out three main concerns with compelling a monopolist to deal with its competitors.  None of them apply here.

First, *Trinko* was concerned that forced sharing could "lessen[] the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407-08. Here, there is no such chilling effect. Google has already invested in both OneBox and SA360 knowing about and relying on the participation of current or potential competitors. *Trinko* and the cases that follow it sought to protect procompetitive incentives to invest; they did not seek to protect the incentives that might arise from dealing with competitors on anticompetitive terms.

Second, *Trinko* worried that enforcing a duty to deal could "force[] courts to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Id.* at 408. However, in the case of both the OneBox and SA360, the States do not ask a court to police proper price, quantity, or terms. Instead, States ask that this Court stop Google from discriminating against its competitors and potential competitors in anticompetitive ways. No central planner is needed; Google simply needs to cease its discriminatory practices.

Finally, *Trinko* thought that forced sharing could "facilitate the supreme evil of antitrust: collusion." *Id.* Here, where Google is already voluntarily working with its competitors and potential competitors through SA360, the probability of collusion would not increase if Google were forced to drop the anticompetitive conditions on those relationships.

In short, by trying to reframe the States' allegations as a variant of a duty to deal claim, Google mischaracterizes and co-opts a patchwork of cases on the limits of antitrust that are not applicable as a matter of law or policy. Such a move should not shield Google from facing an assessment of its antitrust liability based on the evidence.

## CONCLUSION

Taken as a whole, Google's bid for summary judgment is an attempt to dismember the States' case and jam each part into a box of the wrong size. Precedent and the policy

considerations behind it direct this Court to look behind Google's façade and allow the States'

full case to proceed to trial.

Respectfully submitted,

/s/ Kathleen Bradish
KATHLEEN BRADISH
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW Suite 1000
Washington, DC 20036
(202) 304-0195
kbradish@antitrustinstitute.org

DATED: February 17, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2023, I electronically filed a true and correct copy of the foregoing BRIEF OF AMICUS CURIAE THE AMERICAN ANTITRUST INSTITUTE with the Clerk via the CM/ECF system which will send notification of such filing and service upon all counsel of record.

By: /s/ Kathleen Bradish

KATHLEEN BRADISH
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue NW, Suite 1000
Washington, DC 20036
(202) 304-0195
kbradish@antitrustinstitute.org
*Counsel to Amicus Curiae*