# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

| | |
|---|---|
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

**BRIEF OF BEHAVIORAL ECONOMISTS GEORGE LOEWENSTEIN,
KLAUS M. SCHMIDT, AND PAUL HEIDHUES
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS[1]**

---

[1] This *amicus* brief was prepared with the assistance of Eleanor Runde, Kartikeya Kandula, and Mohamad Batal, law students participating in the Tech Accountability & Competition Project, a clinical offering at the Yale Law School. Nothing in this *amicus* brief represents or purports to represent the institutional views of Yale University or Yale Law School, if any.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................... 1

STATEMENT OF THE CASE ........................................................................................... 2

SUMMARY OF ARGUMENT ........................................................................................ 3

INTRODUCTION ............................................................................................................. 5

    I.   Behavioral economics reveals competition as it actually presents itself. ............................ 5

    II.  Behavioral economics can inform the analysis of anticompetitive and exclusionary effects alleged in this case .................................................................................................. 8

ARGUMENT ..................................................................................................................... 9

    I.   Defaults are predictably sticky ........................................................................................ 9

        A.  Stickiness is a proven feature of defaults across a range of contexts. ............................ 9

        B.  Defaults are sticky because consumers perceive defaults as advantageous on a number of (conscious or subconscious) dimensions. ..................................................... 10

        C.  These perceptions hold direct economic implications for non-default competitors. ..... 13

    II.  Defaults in the market for general search services are likely to be especially sticky. ......... 14

    III. Default stickiness operates independently of exclusivity. ................................................... 16

    IV. Considering default stickiness is consistent with doctrine and necessary for an accurate understanding of anticompetitive and exclusionary dynamics in the relevant market. ........ 17

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Blumenthal v. FERC*, 552 F.3d 875 (D.C. Cir. 2009) ...................................................... 7

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ............................ 6

Eur. Comm'n Case No. COMP/C-3/39.530 - Microsoft (Tying) (2009) ........................ 14

Eur. Comm'n Case No. COMP/M. 7217 - Facebook/WhatsApp (2014) (C 7239) 24-25 ........... 14

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) .................................... 7

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ................................................... 7

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ...................... 6

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953) ................................. 17

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ....................... 7

*United States v. Griffith*, 334 U.S. 100 (1948) ............................................................ 17

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................... 6

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ......................... 7

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................. 7, 8

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ............................................ 6

## Statutes

15 U.S.C. § 2 ................................................................................................................... 2

## Other Authorities

Alessandro Bonatti *et al*., *More Competitive Search Through Regulation*, Yale Tobin Center
   for Economic Policy, Policy Discussion Paper No. 2 (May 20, 2021) ...................... 11

Amos Tversky & Daniel Kahneman, *Loss Aversion in Riskless Choice:
   A Reference-Dependent Model*, 106 Q.J. Econ. 1039 (1991) .................................... 12

Andreas Hermann *et al*., *The Effect of Default Options on Choice—Evidence from Online
   Product Configurators*, 18 J. Retailing & Consumer Servs. 483 (2011) .................. 10

Brian X. Chen, *The Default Tech Settings You Should Turn Off Right Away*,
   N.Y. Times (July 27, 2022) ................................................................................. 4

Brigitte C. Madrian & Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k)
   Participation and Savings Behavior*, 116 Q.J. Econ. 1149 (2001) ............................... 9

Cass R. Sunstein & Richard H. Thaler, *Libertarian Paternalism*,
   93 Am. Econ. Rev. 175 (2003) ............................................................................ 11

Cass R. Sunstein, *Endogenous Preferences, Environmental Law*,
   22 J. Legal Stud. 217 (1993) ............................................................................... 12

Cédric Argenton & Jens Prüfer, *Search Engine Competition with Network Externalities*,
   8 J. Competition L. & Econ. 73 (2012) .................................................................. 15

Christina L. Brown & Aradhna Krishna, *The Skeptical Shopper: A Metacognitive Account
   for the Effects of Default Options on Choice*, 31 J. Consumer Rsch. 529 (2004) ................... 11

Colin F. Camerer, *Prospect Theory in the Wild: Evidence from the Field*, *in Advances in
   Behavioral Economics* 155 (Colin F. Camerer, George Loewenstein, Matthew Rabin, eds.,
   ed. 2011) ......................................................................................................... 13

Colin F. Camerer & George Loewenstein, *Behavioral Economics: Past, Present, Future*, *in
   Advances in Behavioral Economics* 3 (Colin F. Camerer *et al*., eds., 2004) ....................... 5

Daniel Kahneman *et al*., *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo
   Bias*, 5 J. Econ. Perspectives 193 (1991) ................................................................. 9

Daniel Kahneman *et al*., *Experimental Tests of the Endowment Effect and the Coase Theorem*,
   98 J. Pol. Econ. 1325 (1990) ............................................................................... 12

Daniel Pichert & Konstantinos Katsikopoulos, *Green Defaults: Information
   Presentation and Pro-Environmental Behavior*, 28 J. Env. Psych. 63 (2008) .......... 9, 11, 12, 16

David S. Evans, *The Antitrust Economics of Free*, John M. Olin Program in Law and
   Economics Working Paper No. 555 (2011) .............................................................. 15

Eric J. Johnson & Daniel G. Goldstein, *Defaults and Donation Decisions*,
   78 Transplantation 1713 (2004) .......................................................................... 12

Eric J. Johnson & Daniel Goldstein, *Do Defaults Save Lives?*, 302 Sci. 1338 (2003) ............ 9, 17

Eric J. Johnson *et al*., *Framing, Probability Distortions, and Insurance Decisions*,
   7 J. Risk & Uncertainty 35 (1993) ......................................................................... 9

Eric J. Johnson *et al*., *Defaults, Framing and Privacy: Why Opting-In is Better than
   Opting-Out*, 13 Marketing Letters 5 (2002) ............................................................ 9, 16

iv

Fabian Herwig & Klaus M. Schmidt, *Loss Aversion and Inefficient Renegotiation*,
82 Rev. Econ. Stud. 297 (2015) ................................................................. 13

Fiona Scott Morton *et al.*, *Do We Need A New Sherman Act?*,
2022 Colum. Bus. L. Rev. 42 ................................................................. 6, 7

George Loewenstein & Daniel Adler, *A Bias in the Prediction of Tastes*,
105 Econ. J. 929 (1995) ................................................................. 12

James J. Choi *et al.*, *For Better or For Worse: Default Effects and 401(k) Savings Behavior*,
*in* Perspectives on the Economics of Aging (David A. Wise, ed., 2004) ................ 10

Jessica Wisdom *et al.*, *Promoting Healthy Choices: Information Versus Convenience*,
2 Am. Econ. J.: Applied Econ. 164 (2010) ................................................... 10

Johan Egebark and Mathias Ekström, *Can Indifference Make the World Greener?*,
76 J. Env't. Econ. & Mgmt. 1 (2016) ......................................................... 10

John M. Newman, *Antitrust in Zero-Price Markets: Applications*,
94 Wash U. L. Rev. 49 (2016) ............................................................... 15

John M. Newman, *Antitrust in Zero-Price Markets: Foundations*,
164 U. Penn. L. Rev. 149 (2015) ............................................................ 15

John M. Newman, *The Myth of Free*, 86 Geo. Wash. L. Rev. 513 (2018) .................... 15

John. K. Horowitz & Kenneth E. McConnell, *A Review of WTA / WTP Studies*,
44 J. Env. Econ. & Mgmt. 426 (2002) ....................................................... 15

Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously:
The Problem of Market Manipulation*, 74 N.Y.U. L. Rev. 630 (1999) ...................... 9

Kristen Purcell *et al.*, *Search Engine Use 2012*,
Pew Internet & American Life Project (2012) ............................................... 13

Leaf Van Boven *et al.*, *Egocentric Empathy Gaps Between Owners and Buyers:
Misperceptions of the Endowment Effect*, 79 J. Personality & Soc. Psych. 66 (2000)...... 12

Maurice E. Stucke, *Behavioral Antitrust and Monopolization*,
8 J. Competition L. & Econ. 545 (2012)..................................................... 16

Maurice E. Stucke & Ariel Ezrachi, *When Competition Fails to Optimize Quality: A Look at
Search Engines*, 18 Yale J. L. & Tech. 70 (2016) ........................................... 16

Michael A. Jones *et al.*, *Why Customers Stay: Measuring the Underlying Dimensions of
Services Switching Costs and Managing Their Differential Strategic Outcomes*,
55 J. Bus. Rsch. 441 (2002) ............................................................... 13

Özlem Bedre-Defolie & Rainer Nitsche, *When Do Markets Tip? An Overview and Some Insights for Policy*, 11 J. Eur. Competition L. & Practice 610 (2020)......................................15

Paul Heidhues *et al.*, *Economic Research on Loyalty Price Discrimination*, E.CA Economics (2020) ........................................................................................14

Paul Klemperer, *Markets with Consumer Switching Costs*, 102 Q. J. Econ. 375 (1987) ............13

Richard A. Posner, *The Problematics of Moral and Legal Theory* (1999) .....................................5

Russell Korobkin, *The Endowment Effect and Legal Analysis*, 97 Nw. U. L. Rev. 1227 (2003) ..................................................................................12

Russell Korobkin, *The Status Quo Bias and Contract Default Rules*, 83 Cornell L. Rev. 608 (1997) ..................................................................................12

Stefano Della Vigna, *Psychology and Economics: Evidence from the Field*, NBER Working Paper Series (2007) ..................................................................10

Steffen Altmann *et al.*, *Defaults and Donations: Evidence from a Field Experiment*, 101 Rev. Econ. & Stat. 808 (2019)..............................................................10

Steffen Altmann *et al.*, *Communicating Through Defaults*, 104 Rev. Econ. & Stat. (forthcoming 2023) ..................................................................................11

Thomas A. Burnham *et al.*, *Consumer Switching Costs: A Typology, Antecedents and Consequences*, 31 J. Acad. Marketing Sci. 109 (2003) .............................................14

Tonya M. Buchanan *et al.*, *I'll Have What She's Having: (Social) Perceptions of Default Options and Implications for Marketing and Decision Making*, 47 Int'l J. Consumer Stud. 509 (2023).........................................................11

UK Competition and Markets Authority, *Online Platforms and Digital Advertising Market Study* (2020) ..................................................................................15

William Samuelson & Richard Zeckhauser, *Status Quo Bias in Decision Making*, 1 J. Risk & Uncertainty 7 (1988)..................................................................9

Young Eun Huh *et al.*, *Social Defaults: Observed Choices Become Choice Defaults*, 41 J. Consumer Rsch. 746 (2014)..............................................................10

Zhilin Yang & Robin T. Peterson, *Customer Perceived Value, Satisfaction, and Loyalty*, 21 Psych. & Marketing 799 (2004)..........................................................14

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici Curiae* are Professor George Loewenstein, Professor Klaus M. Schmidt, and Professor Paul Heidhues. Together, *Amici* are leading economists with substantial experience in and knowledge of behavioral economics.

**Professor Loewenstein** is the Herbert A. Simon University Professor of Economics and Psychology at Carnegie Mellon University. His academic work focuses on applications of psychology to economics; he has published over 300 articles and six books on these and related subjects, many of which have been cited thousands of times. Professor Loewenstein is also the past president of the Society for Judgment and Decision Making and a fellow of the American Academy of Arts and Sciences.

**Professor Schmidt** is a Full Professor of Economics at the University of Munich. His academic work focuses on behavioral and experimental economics, industrial organization, and competition policy. He was a member of the European Advisory Group on Competition Policy of the European Commission's Directorate-General for Competition and he is president elect of the German Economic Association ("Verein für Socialpolitik"). He has held Visiting Professorships at Harvard, Yale, University of California Berkeley, Stanford, and MIT.

**Professor Heidhues** is a Professor of Behavioral and Competition Economics at the Düsseldorf Institute for Competition Economics of the Henrich-Heine University. His academic work focuses on industrial organization and behavioral economics. He serves on the European Advisory Group on Competition Policy of the European Commission's Directorate-General for

Competition and was a Member of the Academic Panel for the United Kingdom Competition & Markets Authority.

For decades, *Amici* have engaged in scholarship that, among other things, studies the realities, causes, and effects of consumer behavior. Among the interests critical to us are the accurate description of behavioral economic causes and effects. With this brief, we seek to advance the correct application of these phenomena to the enforcement of the law. Behavioral economics supplies important concepts for the accurate assessment of economic decision-making in the real world, including as it relates to anticompetitive and exclusionary effects. Ensuring that legal decision-makers recognize and appropriately apply behavioral economics is one of our core academic missions. In furtherance of that interest, *Amici* submit the following brief describing certain principles of behavioral economics implicated in this case—specifically, the effects of defaults on consumer behavior and, where consumer choice is affected by defaults, the resulting effects on how competition actually presents itself in the markets.

## STATEMENT OF THE CASE

The United States and several States ("Plaintiffs") have brought claims that now have been coordinated in this action against Google, LLC ("Defendant") for unlawfully maintaining monopolies in the markets for general search services, search advertising, and general search text advertising in the United States through anticompetitive and exclusionary practices, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Plaintiffs allege that Google possesses a monopoly in the market for general search services in the United States. They allege that Google has contracted with computer and mobile device manufacturers, web browser developers, and cell phone carriers for default status for its

general search services. According to the Complaint, Google is now the preinstalled, preselected search engine on all significant search access points (such as browsers, search bars on the home screen, and voice assistants) on Apple and Android mobile devices (99% of the U.S. mobile device market), and is the default search engine for Apple Safari and Google Chrome web browsers (90% of browser usage). Plaintiffs allege that Google pays more than $8 billion a year to Apple to maintain these arrangements on Apple devices; as to Android devices, Plaintiffs allege that Google (which owns Android) conditions use of the licensable Android operating system on the preinstallation of its search engine at all major access points. Plaintiffs further allege that Google's default status has anticompetitive and exclusionary effects in the relevant markets in that the defaults raise the cost of entry and of customer acquisition for non-default competitors. Complaint at 7.

Defendant has filed a motion for summary judgment under Federal Rules of Civil Procedure Rule 56, asserting that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Def.'s Mot.

## SUMMARY OF ARGUMENT

Decades of theoretical and empirical research in the field of behavioral economics credibly demonstrate the effects of defaults on consumer behavior. A well-developed literature shows that defaults significantly reduce the likelihood that a consumer will explore alternatives, engage in quality-adjusted price comparison, or switch away from the default. In other words, defaults are "sticky."

This body of literature also makes clear that, to overcome a default's stickiness, non-default competitors must invest capital, above and beyond what would otherwise be required, to

reach potential customers. Either they must outbid the incumbent for default status, or they must invest in workarounds (if they exist), the cost of which is increased by the default's stickiness. The consequence is an increase in the costs of entry and customer acquisition for non-default competitors; this is also part of the value of the default to the default merchant.[2]

Defendant's motion incorrectly assigns relevance to the concept of "de facto exclusivity," suggesting that Google's defaults cannot be anticompetitive and exclusionary unless they generate de facto exclusivity.[3] But this Court needn't concern itself with whether these defaults generate "de facto exclusivity"—that is, the literal absence of alternatives—because the government has alleged a theory that does not depend on the literal absence of alternatives. The government's theory relies on the fact, well understood for decades, that defaults are "sticky" in that they deter consumers from switching to alternative products or services, significantly increasing the likelihood that consumers subject to a default will simply "stick" with what they've got.

Nor could the law require the government to prove that these defaults result in "de facto exclusivity" as a *prerequisite* to finding that their stickiness generates anticompetitive and

---

[2] We note that defaults are not impermissibly anticompetitive or exclusionary in all circumstances. As alleged here, however, where a market actor with significant market power obtains and maintains default status, the anticompetitive and exclusionary consequences of defaults' stickiness are potentially large. *See* United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist.").

[3] It is our experience that the word "default" in the context of digital technology generally refers to the initial settings of features or functions included in particular devices when purchased new. *See*, *e.g.*, Brian X. Chen, *The Default Tech Settings You Should Turn Off Right Away*, N.Y. Times (July 27, 2022). Technologists and those who have studied digital markets understand that default settings can be changed. In this context, the concept of a default setting that could *not* be changed would be unusual indeed. The presence and availability of alternatives—which is the nearly universal state of affairs when it comes to digital default settings—therefore does not by itself justify entering judgment in favor of the alleged monopolist.

exclusionary effects. Simple logic tells us why: de facto exclusivity refers to situations in which users lack the choice to switch. Stickiness, on the hand, describes the tendency to remain with the default option *rather than switching to an available alternative*. Defaults can generate stickiness, as economists use that word in connection with defaults, only when the consumer has options *in addition* to the default. Google simply has it backwards.

*Amici* therefore urge the Court to consider how the presence of defaults in the search market likely gives rise to anticompetitive and exclusionary effects, the details of which are examined below. *Amici* in particular suggest that the Court reject any assertion that defaults' stickiness depends on whether consumers are subject to an exclusivity clause. *Amici* stress that ignoring or discounting the effects of defaults as a matter of law could impede enforcement of the antitrust laws, including Section 2 of the Sherman Act.

## INTRODUCTION

### I.   Behavioral economics reveals competition as it actually presents itself.

Antitrust relies so heavily on economics that some have called it "a branch of applied economics." Richard A. Posner, *The Problematics of Moral and Legal Theory* 229 (1999). "*Behavioral* economics increases the explanatory power of economics by providing it with more realistic psychological foundations." Colin F. Camerer & George Loewenstein, *Behavioral Economics: Past, Present, Future*, *in Advances in Behavioral Economics* 3, 3 (Colin F. Camerer *et al*., eds., 2004) (emphasis added). Antitrust analyses that fail to incorporate the insights of behavioral economics should not be presumed accurate and cannot be deemed complete.

Though the origins of behavioral economics as a distinctive discipline are located in the 1950s, the consideration of human psychology as predictive of economic decision-making can be

5

traced at least as far back as the eighteenth century. This field has produced a number of Nobel laureates, including George Akerlof, Daniel Kahneman, Robert Shiller, and Richard H. Thaler. *See* Fiona Scott Morton *et al.*, *Do We Need A New Sherman Act?*, 2022 Colum. Bus. L. Rev. 42, 55.

Antitrust law necessarily concerns itself with consumer behavior insofar as it aims to preserve and restore competition among firms vying for consumers and their dollars. To understand the dynamics of competition, it therefore is important to understand how consumers behave in response to the companies' efforts to win them over. For this reason, Supreme Court opinions in antitrust cases regularly reference consumer behavior in assessing the dynamics of competition. *See, e.g.*, *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 897 (2007) ("[A] retailer cartel is unlikely when only a single manufacturer in a competitive market uses resale price maintenance. Interbrand competition would divert consumers to lower priced substitutes . . ."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463, 469 (1992) (given likely consumer purchasing patterns, "[e]nough doubt is cast on Kodak's claim of a unified market that it should be resolved by the trier of fact. . . . The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'"); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 559-60 (1966) (Harlan, J., concurring) ("The record demonstrates a recognition in the industry that a successful sales program relies to a large extent on consumer recognition and preference for particular brands, and that this preference must be built up through intensive advertising and other promotional techniques . . . ."); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("[S]ubstitute products must also be considered, as customers may turn to them if there is a slight

increase in the price of the main product"); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("[I]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that [of] commodities reasonably interchangeable by consumers.").

When called upon to assess the dynamics of competition, many courts have relied on economic assumptions relating to consumer behavior.[4] These assumptions have helped courts explain how particular markets seemed to operate under a particular set of conditions and how they could be expected to operate if the conditions were changed. In some cases, particular assumptions regarding consumer behavior are incomplete or misplaced. There are countless documented instances where consumers appear to make decisions contrary to what traditional economic models would predict. This is not because consumers are "irrational," but because "consumers are limited in their ability to optimize in complex environments." Scott Morton et al., *supra*, at 55-56. In such instances, behavioral economics can help fill the gaps, add detail, and refine models of the realities of consumer behavior and the effects on competition in the market as it actually presents itself.

---

[4] Courts in this district and circuit also reference consumer behavior in assessing the dynamics of competition. *See, e.g.*, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 30-31 (D.D.C. 2015) (considering consumer behavior in defining the relevant market); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 75 (D.D.C. 2011) (considering the effect of reputation and brand on consumer purchasing); *Blumenthal v. FERC*, 552 F.3d 875, 884 (D.C. Cir. 2009) ("[H]igher prices are likely to affect consumers' behavior. . . ."); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) (discussing consumer perceptions of interchangeability to define the relevant market); *United States v. Microsoft Corp.*, 253 F.3d 34, 55, 60, 65 (D.C. Cir. 2001) (discussing what "most consumers prefer," what consumers "feel compelled to select," and practices that "deter[] consumers from using" alternatives).

**II.  Behavioral economics can inform the analysis of anticompetitive and exclusionary effects alleged in this case.**

Behavioral economics looks to actual consumer behavior, identifies patterns in that behavior, and theorizes explanations for those patterns. Knowledge of these patterns and the contexts in which they arise helps predict consumer behavior in specific circumstances. Behavioral economics thereby serves as a tool that can sharpen and refine analyses in which courts already engage.

Courts have long employed principles of behavioral economics in assessing the dynamics of competition, albeit without giving any particular label to their mode of analysis. The most prominent example of this is *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), in which the D.C. Circuit found that Microsoft had leveraged its dominant Windows operating system into arrangements that ensured default status for its own browser on consumer devices. The court acknowledged that rival browsers were not wholly foreclosed from consumers as alternative means of distribution existed, specifically pointing to the possibility of rivals mailing installation disks to consumers or making their browser available for download over the Internet. *Id.* at 70. Nevertheless, the court found that this did not preclude Microsoft from Section 2 liability because "[a]lthough Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones." *Id.* at 64.

The *Microsoft* court was hardly pushing the boundaries of behavioral economics when it observed the powerful effects of a default position. It was merely following decades of theoretical and empirical research that credibly demonstrates the effects of switching costs imposed by defaults on consumer behavior.

## ARGUMENT

**I.    Defaults are predictably sticky.**

      **A.  Stickiness is a proven feature of defaults across a range of contexts.**

Decades of research demonstrate that defaults increase the "stickiness" of the relationship between the consumer and the default merchant. That is, once a default is set, "people do not switch to another alternative." Daniel Pichert & Konstantinos Katsikopoulos, *Green Defaults: Information Presentation and Pro-Environmental Behavior*, 28 J. Env. Psych. 63, 69 (2008). Consumers exhibit "status quo bias," that is, "a large and statistically significant preference" in favor of the default. Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: The Problem of Market Manipulation*, 74 N.Y.U. L. Rev. 630, 673 (1999); William Samuelson & Richard Zeckhauser, *Status Quo Bias in Decision Making*, 1 J. Risk & Uncertainty 7 (1988); Daniel Kahneman et al., *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Perspectives 193 (1991).

The stickiness of defaults has been demonstrated by numerous studies in a wide array of contexts. *See, e.g.*, Eric J. Johnson et al., *Probability Distortions, and Insurance Decisions*, 7 J. Risk & Uncertainty 35 (1993) (showing that a default option triggered loss aversion with respect to non-default alternatives in insurance decisions); Brigitte C. Madrian & Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 1149 (2001) (finding 401(k) to be significantly higher upon automatic enrollment); Eric J. Johnson et al., *Defaults, Framing and Privacy: Why Opting-In is Better than Opting-Out*, 13 Marketing Letters 5 (2002) (finding that about twice as many people agreed to be contacted in the future for research purposes if the question was posed in an opt-out format rather than opt-in); Eric J. Johnson & Daniel Goldstein, *Do Defaults Save Lives?*, 302 Science 1338 (2003) (demonstrating

that setting a policy of default organ donation registration with an opt-out clause results in 99% organ donation registration, while an opt-in policy requiring one-click active registration results in 12% organ donation registration); James J. Choi et al., *For Better or For Worse: Default Effects and 401(k) Savings Behavior*, *in* Perspectives on the Economics of Aging (David A. Wise, ed., 2004) (finding that "automatic enrollment [in 401(k) retirement plans] has a dramatic impact on participation rates"); Stefano Della Vigna, *Psychology and Economics: Evidence from the Field*, NBER Working Paper Series, at *8-10 (2007) (collecting studies); Jessica Wisdom et al., *Promoting Healthy Choices: Information Versus Convenience*, 2 Am. Econ. J.: Applied Econ. 164 (2010) (discussing the effect of defaults on choices related to sandwiches); Andreas Hermann et al., *The Effect of Default Options on Choice—Evidence from Online Product Configurators*, 18 J. Retailing & Consumer Servs. 483 (2011) (showing that default features act as reference points for other features); Young Eun Huh *et al.*, *Social Defaults: Observed Choices Become Choice Defaults*, 41 J. Consumer Rsch. 746, 757 (2014) (demonstrating that "social defaults automatically engender choice mimicry" in the context of snack selection, and that these effects can be "sufficiently strong to lead consumers to choose options that they would otherwise reject."); Johan Egebark & Mathias Ekström, *Can Indifference Make the World Greener?*, 76 J. Env't. Econ. & Mgmt. 1 (2016) (finding that default "double-sided print" option reduced paper consumption); Steffen Altmann et al., *Defaults and Donations: Evidence from a Field Experiment*, 101 Rev. Econ. & Stat. 808 (2019) (demonstrating a strong default effect on individuals' charitable donation decisions).

**B.  Defaults are sticky because consumers perceive defaults as advantageous on a number of (conscious or subconscious) dimensions.**

Behavioral economics research has developed, through rigorous experimentation, several explanations for why defaults are sticky. First, as a practical matter, remaining with the default requires no attention, time, or cognitive energy. In contrast, switching away from the default takes time and energy, and it "comes with heavy cognitive loads." Alessandro Bonatti et al., *More Competitive Search Through Regulation*, Yale Tobin Center for Economic Policy, Policy Discussion Paper No. 2 at *10 n.27 (May 20, 2021); *see also* Pichert & Katsikopoulos, *supra*, at 69 (discussing effect of "expected inconvenience . . . associated with switching"); Cass R. Sunstein & Richard H. Thaler, *Libertarian Paternalism*, 93 Am. Econ. Rev. 175, 177 (2003) ("a change from any status quo entails time and effort, and many people seem to prefer to avoid both of these").

Second, consumers may interpret defaults as the "most popular response," "socially preferred option," or recommended choice. Tonya M. Buchanan et al., *I'll Have What She's Having: (Social) Perceptions of Default Options and Implications for Marketing and Decision Making*, 47 Int'l J. Consumer Stud. 509, 518 (2023) (collecting studies); *see also* Pichert & Katsikopoulos, *supra*, at 69 (suggesting that consumers may be more likely to choose the default because they interpret it as "an implicit recommendation" or "standard established by an authority"); Christina L. Brown & Aradhna Krishna, *The Skeptical Shopper: A Metacognitive Account for the Effects of Default Options on Choice*, 31 J. Consumer Rsch. 529, 529 (2004) ("[W]hen our preferences are uncertain, we look to defaults to tell us something about the relative value of the alternatives . . . a consumer might conclude that the default option is the one the marketer prefers to sell."); Steffen Altmann et al., *Communicating Through Defaults*, 104 Rev. Econ. & Stat. (forthcoming 2023) (showing that consumers perceive defaults as "advice"

11

and are more likely to follow defaults than to accept (equally informative) "advice" from elsewhere).

Third, status quo bias creates an "endowment effect": consumers assign higher value to an item that they already own than to an identical item that they do not own. *See, e.g.*, Russell Korobkin, *The Endowment Effect and Legal Analysis*, 97 Nw. U. L. Rev. 1227 (2003); Russell Korobkin, *The Status Quo Bias and Contract Default Rules*, 83 Cornell L. Rev. 608 (1997); Cass R. Sunstein, *Endogenous Preferences, Environmental Law*, 22 J. Legal Stud. 217, 230 (1993); Daniel Kahneman et al., *Experimental Tests of the Endowment Effect and the Coase Theorem*, 98 J. Pol. Econ. 1325, 1330 (1990). Consumers are not aware of the endowment effect on their own behavior. George Loewenstein & Daniel Adler, *A Bias in the Prediction of Tastes*, 105 Econ. J. 929 (1995).

In part because of this lack of awareness, the endowment effect has real and significant consequences on consumers' economic choices. Leaf Van Boven et al., *Egocentric Empathy Gaps Between Owners and Buyers: Misperceptions of the Endowment Effect*, 79 J. Personality & Soc. Psych. 66 (2000).

Fourth, the effect known as "loss aversion" causes individuals to prefer to avoid losses more than they prefer to acquire equivalent gains. Amos Tversky & Daniel Kahneman, *Loss Aversion in Riskless Choice: A Reference-Dependent Model*, 106 Q.J. Econ. 1039 (1991). This can cause consumers to implicitly adopt the default option and then consider all other options as potential losses. Eric J. Johnson & Daniel G. Goldstein, *Defaults and Donation Decisions*, 78 Transplantation 1713, 1714 (2004) ("loss aversion suggests an increased weighting of what is foregone, making the default seem more attractive"); Pichert & Katsikopoulos, *supra*, at 69 (discussing consumers' "distrust" of alternative options). Loss aversion creates "friction" that

contributes to the stickiness of the default. Fabian Herwig & Klaus M. Schmidt, *Loss Aversion and Inefficient Renegotiation*, 82 Rev. Econ. Stud. 297 (2015).

All of these behavioral effects and biases translate directly into consumer perceptions of the default good or service as easier to obtain, less costly, socially preferred, more trustworthy, and more valuable than non-default goods.[5] These phenomena make defaults "sticky."

### C. These perceptions hold direct economic implications for non-default competitors.

"Making one option the status quo or default or endowing a person with a good (even hypothetically) seems to establish a reference point people move away from only reluctantly, or if they are paid a large sum." Colin F. Camerer, *Prospect Theory in the Wild: Evidence from the Field*, *in* Advances in Behavioral Economics 155 (Colin F. Camerer, George Loewenstein, Matthew Rabin, eds., ed. 2011). In other words, the existence of a default imposes quantifiable costs on non-default competitors.

New entrants and small market participants always must deploy capital to gain new customers.[6] However, holding general switching costs constant, the existence of a default

---

[5] Some consumers may be entirely unaware that Google Search has been selected for them as the default search engine and have given no conscious effort to understanding why all of their searches are conducted by Google Search. In the privacy context, nearly two-thirds of consumers are unaware of affirmative steps they can take to protect their privacy. *See* Kristen Purcell, Joanna Brenner & Lee Rainie, *Search Engine Use 2012*, at *3, Pew Internet & American Life Project (2012). This explains yet another way defaults could increase the cost for rivals to reach potential customers: consumers may be unaware that a choice has been made for them at all, and they would need to be informed of that fact and its significance.

[6] The vast literature on general switching costs is beyond the scope of this brief. For the Court's convenience, we note a few prominent authorities on the subject. Paul Klemperer, *Markets with Consumer Switching Costs*, 102 Q. J. Econ. 375 (1987); Michael A. Jones, David L. Mothersbaugh & Sharon E. Beatty, *Why Customers Stay: Measuring the Underlying Dimensions of Services Switching Costs and Managing Their Differential Strategic Outcomes*, 55 J. Bus. Rsch. 441 (2002); Thomas A. Burnham, Judy K. Frels & Vijay Majahan, *Consumer Switching*

reliably increases the capital necessary to succeed in switching customers away from the default. In other words, non-default competitors must deploy additional capital, above and beyond what would be required in the absence of any default, to persuade consumers to select their non-default product. That constitutes a direct increase in the costs of entry and customer acquisition. This is an economic advantage gained by the default merchant simply by virtue of its default status.

Defaults' stickiness gives default merchants additional market power, which operates independently of the quality of the default product relative to non-default products. This puts the non-default merchants at a disadvantage, which must be overcome with additional expenditure—if it can be overcome at all.

## II. Defaults in the market for general search services are likely to be especially sticky.

There is no reason to believe that the defaults at issue in this case operate differently from what is described in the literature. Status quo bias, a precursor to default stickiness, has already been acknowledged in two European Commission cases regarding anticompetitive and exclusionary effects in the context of applications on desktops, laptops, and mobile devices. *See* Eur. Comm'n Case No. COMP/C-3/39.530 - Microsoft (Tying) (2009); Eur. Comm'n Case No. COMP/M. 7217 - Facebook/WhatsApp (2014) (C 7239) 24-25, at ¶ 134. The United Kingdom's Competition and Markets Authority recently found that "defaults play a very important role in

---

*Costs: A Typology, Antecedents and Consequences*, 31 J. Acad. Marketing Sci. 109 (2003); Zhilin Yang & Robin T. Peterson, *Customer Perceived Value, Satisfaction, and Loyalty*, 21 Psych. & Marketing 799 (2004); Paul Heidhues, Johannes Johnen & Michael Rauber, *Economic Research on Loyalty Price Discrimination*, E.CA Economics (2020).

influencing consumers' use of search engines." UK Competition and Markets Authority, *Online Platforms and Digital Advertising Market Study* ¶ 32 (2020).

If anything, there is reason to think that defaults' stickiness would be especially strong in the context of general search services. In zero-cash-price markets,[7] such as the market for general search services,[8] the anti-competitive effects of defaults' stickiness may be heightened. A zero-cash price limits the workarounds available to competitors, who cannot compete on cash price. *See* John M. Newman, *Antitrust in Zero-Price Markets: Applications*, 94 Wash U. L. Rev. 49, 77-79 (2016); Özlem Bedre-Defolie & Rainer Nitsche, *When Do Markets Tip? An Overview and Some Insights for Policy*, 11 J. Eur. Competition L. & Practice 610 (2020) (explaining that free essential services are more likely to tip, because the lack of ability to undercut on price hinders market entry). This further increases the capital outlay required for non-default merchants to attract new consumers—suggesting that the anti-competitive effects of defaults may be particularly severe in zero-cash-price markets, including the market for general search services.

Additionally, the endowment effect has been shown to be greater for non-ordinary market goods for which the price is uncertain. *See* John. K. Horowitz & Kenneth E. McConnell, *A Review of WTA / WTP Studies*, 44 J. Env. Econ. & Mgmt. 426 (2002). Assuming that a zero-cash

---

[7] *Amici* note that zero-cash-price markets are still markets for the purposes of antitrust. John M. Newman, *Antitrust in Zero-Price Markets: Foundations*, 164 U. Penn. L. Rev. 149 (2015); *see also* David S. Evans, *The Antitrust Economics of Free*, John M. Olin Program in Law and Economics Working Paper No. 555, at *14 (2011) ("a 'free price' simply means that the competitive market or the profit-maximizing firm sets a price of zero. Zero is just another number.").

[8] General search services are typically offered for a zero-cash price, and users typically perceive the services to be free. *See* Cédric Argenton & Jens Prüfer, Search Engine Competition with Network Externalities, 8 J. Competition L. & Econ. 73 (2012). That said, users often compensate search service providers with users' own data, in a type of barter. *See* John M. Newman, *The Myth of Free*, 86 Geo. Wash. L. Rev. 513, 553-54 (2018) ("Instead of paying with fiat currency, consumers pay with their attention or personal information. And where consumers pay, no matter the medium of exchange, Free is not free.")

price will make customers more uncertain of the overall effective price, the endowment effect may be especially strong in zero-cash-price markets like the market for general search services. Default stickiness is certainly real, ubiquitous, and potentially significant in the context of free general search services. Some scholars assert that "[t]he battle over search may soon become the battle over the default option, as inertia may trump quality differences among the search engines." Maurice E. Stucke & Ariel Ezrachi, *When Competition Fails to Optimize Quality: A Look at Search Engines*, 18 Yale J. L. & Tech. 70, 106 (2016); *see also* Maurice E. Stucke, *Behavioral Antitrust and Monopolization*, 8 J. Competition L. & Econ. 545 (2012). In the words of a prominent set of scholars: "[C]hoosing a default can, in a probabilistic sense, determine what outcome is chosen." Johnson et al., *Defaults, Framing and Privacy*, at 13.

## III.    Default stickiness operates independently of exclusivity.

The presence of alternatives does not undermine or counteract the stickiness of a default. For this reason, Defendant's argument misstates the importance of "exclusivity" in the assessment of anticompetitive and exclusionary effects. Behavioral economics studies and theories of defaults' stickiness *assume* the availability of alternatives. Stickiness describes consumers' tendency to stick with one good *rather than* switching to a different good. "*[A]lthough they are free to do so at any time*, most people simply do not change the default." Pichert & Katsikopoulos, *supra*, at 69 (emphasis added).

Defendant's reliance on the availability of "one-click access," Def.'s Mot. at 17, is misplaced, too; one-click access also does not undermine or counteract the stickiness of the default. Default systems in which switching to the alternative requires a single click have been shown to elicit similarly differentiated responses as more elaborate default systems do. *See supra*

Johnson & Goldstein, *Do Defaults Save Lives?*. Defendant's own actions contradict its logic: If competition being "one click away" really counteracted default stickiness, no rational company would spend billions of dollars purchasing the default; the company would spend nothing and wait for the consumer to select its product.

Exclusivity, de jure or de facto, can be anticompetitive and exclusionary. But exclusivity does not undermine or counteract default stickiness. Even if exclusivity does not obtain, default stickiness is still in operation. Even where non-default options are accessible and available, default stickiness is reliably shown to influence consumer behavior in a way that makes it more difficult and expensive for non-default rivals to persuade potential customers to select one of those non-default options.

IV.   **Considering default stickiness is consistent with doctrine and necessary for an accurate understanding of anticompetitive and exclusionary dynamics in the relevant market.**

Ignoring defaults' stickiness runs the risk of giving monopolists a free pass to use defaults for anticompetitive and exclusionary purposes. In this context, courts are not confined to formalistic analysis. Antitrust cases frequently require courts to assess the actual and probable effects of conduct on market competition. Inquiries under both the Clayton Act and the Sherman Act focus not only on the precise formalities of the conduct at issue but also on that conduct's "practical effects." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 608 (1953); *United States v. Griffith*, 334 U.S. 100, 107 (1948) (stating that Section 2 of the Sherman Act "is aimed, inter alia, at the acquisition or retention of effective market control").

Behavioral economics, an established specialty within the broader social science of economics, comprises a system of principles that explain actual consumer behavior and predict when it will differ from the classic "rational" model of consumer behavior often assumed in the (law and) economics literature. In markets where consumers have been assigned one of several goods or services by default, the effects of a default are well-established and uncontroversial. Defaults create stickiness between the consumer and the default merchant. Default stickiness means that default merchants enjoy an advantage over all non-default merchants, which operates independently of the relative quality of their products. This directly raises the cost of entry and consumer acquisition cost for all non-default merchants.

Non-default rivals can only overcome default stickiness by investing substantially more capital than otherwise would be required. The additional expenditure may prove prohibitive for rivals and entrants who can neither afford to outbid the incumbent for the default positions or pay for expensive workarounds, if workarounds exist. Rivals and entrants may be dissuaded from investing capital to purchase default status or from attempting less efficient workarounds. In the context at issue in this case, where search services are perceived to be free, the economic effects of defaults' stickiness may be amplified.

Default stickiness can exist regardless of de facto exclusivity. Due to its status as the overwhelming default search engine, Google's argument regarding the alleged lack of "exclusivity" in Google's contractual arrangements does not necessarily indicate that the ensuing arrangements are neither anticompetitive nor exclusionary.

Considering default stickiness in this case is not only permissible but necessary. Google allegedly wields monopoly power in the general search services market. It allegedly has used its monopoly profits to set an astronomical price for default status—more than $8 billion each year

18

for Apple devices alone. Complaint at 118. This reported annual payment can be seen as a minimum estimate of the value to the company of maintaining their product as the default. Taking these allegations as true, non-default rivals can only overcome default stickiness by investing substantially more capital than otherwise would be required, in order to reach potential consumers, educate them on the existence of alternatives, and persuade them to switch away from the default. Rivals and entrants may be dissuaded from investing capital to purchase default status or from attempting less efficient workarounds (if workarounds exist). For the reasons we have articulated, default stickiness directly raises the costs of distribution for non-default merchants and increase the expenditures needed to persuade potential customers to select a non-default option.

Behavioral economics' teachings on default stickiness are therefore integral to understanding the potential anticompetitive and exclusionary dynamics in the market for general search services. In light of these observations, *Amici* urge the Court to consider the anti-competitive effects of defaults in this case.

## CONCLUSION

As it relates to Google's motion for summary judgment, *Amici* offer an inference based on foundational principles of behavioral economics and decades of theoretical and empirical study of defaults: that Google's defaults are highly likely to generate anticompetitive and exclusionary effects in the market for general search services. As economists, we are confident in the reasonableness of this inference. Accordingly, and for the reasons explained in this brief, *Amici* respectfully request that this Court deny Google's motion for summary judgment.

DATED: February 17, 2023

Respectfully submitted,

TECH ACCOUNTABILITY &
COMPETITION PROJECT, a division of the
Media Freedom & Information Access (MFIA)
Clinic at the Yale Law School

David A. Schulz (DC Bar No. 459197)
MFIA Clinic, Yale Law School
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 436-5827
david.schulz@yale.edu

David Dinielli (*pro hac vice* application
forthcoming)
MFIA Clinic, Yale Law School
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(323) 547-6325
david.dinielli@yale.edu

*and*

/s/ Joseph J. Wardenski
Joseph J. Wardenski (DC Bar No. 995549)
WARDENSKI P.C.
195 Plymouth Street, Suite 519
Brooklyn, NY 11201
(347) 913-3311
joe@wardenskilaw.com

*Attorneys for Amici Curiae*