Exhibit 1

FILED UNDER SEAL

**Volume 1**

**Pages 1 - 144**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ) | |
| ANTITRUST LITIGATION ) | NO. 21-md-02981-JD |
| ——————————————————————————— ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| Epic Games, Inc. vs. Google LLC, et al., ) | |
| Case No. 3:20-cv-05671-JD ) | |
| ) | |
| In Re Google Play Consumer Antitrust ) | |
| Litigation, Case No. 3:20-cv-05761-JD ) | |
| ) | |
| State of Utah, et al. v. Google LLC, ) | |
| et al., Case No. 3:21-cv-05227-JD ) | |
| ) | |
| Match Group, LLC, et al. vs. Google LLC, ) | |
| et al., Case No. 3:22-cv-02746-JD ) | |
| ——————————————————————————— ) | |

San Francisco, California
Thursday, January 12, 2023

**TRANSCRIPT OF PROCEEDINGS**

**IN RE EVIDENTIARY HEARING ON CHAT PRESERVATION**

**APPEARANCES**:

For Plaintiff Epic Games in C 20-05671 JD:
                    CRAVATH SWAINE AND MOORE LLP
                    825 Eighth Avenue
                    New York, New York 10019
             BY:  **LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**
                  **GARY A. BORNSTEIN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1    APPEARANCES:  (CONTINUED)

 2    For Plaintiff Epic Games in C 20-05671 JD:
                          FAEGRE DRINKER BIDDLE & REATH LLP
 3                        Four Embarcadero Center
                          27th Floor
 4                        San Francisco, California 94111
                 BY:  PAUL J. RIEHLE, ATTORNEY AT LAW
 5

 6    For the Consumer Class Plaintiffs in C 20-05671-JD:
                          KAPLAN FOX AND KILSHEIMER LLP
 7                        850 Third Avenue
                          14th Floor
 8                        New York, New York 10022
                 BY:  HAE SUNG NAM, ATTORNEY AT LAW
 9                      AARON L. SCHWARTZ, ATTORNEY AT LAW

10                        BARTLIT BECK LLP
                          1801 Wewatta Street
11                        Suite 1200
                          Denver, Colorado 80202
12               BY:  KARMA M. GIULIANELLI, ATTORNEY AT LAW
                      GLEN E. SUMMERS, ATTORNEY AT LAW
13
                          BARTLIT BECK LLP
14                        54 West Hubbard Street
                          Suite 300
15                        Chicago, Illinois 60654
                 BY:  JOHN D. BYARS, ATTORNEY AT LAW
16

17    For Plaintiff Brian McNamara/In Re Google Play Consumer
      Antitrust Litigation, C 20-07361 JD:
18                        COTCHETT, PITRE & MCCARTHY LLP
                          San Francisco Airport Office Center
19                        840 Malcolm Road
                          Burlingame, California 94010
20               BY:  NANCI E. NISHIMURA, ATTORNEY AT LAW

21
      For Plaintiffs in Carroll/In Re Google Play Consumer Antitrust
22    Litigation, C 20-07379 JD:
                          PRITZKER LEVINE LLP
23                        1900 Powell Street - Suite 450
                          Emeryville, California 94608
24               BY:  ELIZABETH C. PRITZKER, ATTORNEY AT LAW

25            (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

USDOJ-GOOGEX-000178

```
1   APPEARANCES:  (CONTINUED)

2   For State of Utah and the Plaintiff States in C 21-05227-JD:
                        OFFICE OF THE UTAH ATTORNEY GENERAL
3                       160 East 300 South
                        Fifth Floor
4                       Salt Lake City, Utah 84114
                   BY:  LAUREN M. WEINSTEIN
5                        BRENDAN P. GLACKIN
                         ASSISTANT ATTORNEYS GENERAL
6

7   For Match Group LLC in C 22-02746-JD:
                        HUESTON HENNIGAN LLP
8                       620 Newport Center Drive, Suite 1300
                        Newport Beach, California 92660
9                   BY:  DOUGLAS J. DIXON, ATTORNEY AT LAW

10

11  For Defendants:
                        MORGAN LEWIS & BOCKIUS LLP
12                      One Market Street, 28th Floor
                        Spear Street Tower
13                      San Francisco, California 94105-1596
                   BY:  BRIAN C. ROCCA, ATTORNEY AT LAW
14                       MICHELLE PARK CHIU, ATTORNEY AT LAW

15                      MUNGER TOLLES & OLSON LLP
                        350 South Grand Avenue
16                      Fiftieth Floor
                        Los Angeles, California 90071
17                  BY:  GLENN D. POMERANTZ, ATTORNEY AT LAW

18                      MUNGER, TOLLES & OLSON LLP
                        601 Massachusetts Avenue NW
19                      Washington, D.C. 20004
                   BY:  JONATHAN KRAVIS, ATTORNEY AT LAW
20

21  Also Present:       Phillip Nickels
                        Senior Trial Technology Strategist
22                      Munger Tolles & Olson

23

24

25
```

USDOJ-GOOGEX-000179

4

```
 1                          I N D E X

 2

 3     Thursday, January 12, 2023 - Volume 1

 4
       DEFENDANTS' WITNESSES                        PAGE   VOL.
 5
       LOPEZ, GENARO
 6       (SWORN)                                      13    1
       Direct Examination by Mr. Rocca               14    1
 7     Cross-Examination by Ms. Moskowitz            51    1
       Redirect Examination by Mr. Rocca             75    1
 8

 9     ROSENBERG, JAMIE
         (SWORN)                                      77    1
10     Direct Examination by Mr. Kravis              78    1
       Cross-Examination by Ms. Moskowitz            88    1
11     Redirect Examination by Mr. Kravis           104    1

12

13     ROPE, ANDREW
         (SWORN)                                     108    1
14     Direct Examination by Ms. Chiu               108    1
       Cross-Examination by Ms. Weinstein           117    1
15

16                       E X H I B I T S

17     PLAINTIFFS' EXHIBITS                  IDEN   EVID   VOL.

18       PX-9                                         68    1

19       PX-11                                        67    1

20       PX-16                                        96    1

21       PX-25                                        98    1

22       PX-31                                        70    1

23       PX-37                                        92    1

24       PX-68                                        65    1

25
```

| 1 | **I N D E X** | | | |
| 2 | **E X H I B I T S** | | | |
| 3 | **PLAINTIFFS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
| 4 | PX-103 | | 71 | 1 |
| 5 | PX-106 | | 67 | 1 |
| 6 | PX-120 | | 101 | 1 |
| 7 | | | | |
| 8 | **E X H I B I T S** | | | |
| 9 | | | | |
| 10 | **DEFENDANTS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
| | DXCH-1 | | 28 | 1 |
| 11 | DXCH-2 | | 51 | 1 |
| 12 | DXCH-8 | | 82 | 1 |
| 13 | PX-67 | | 84 | 1 |
| 14 | DXCH-104 | | 21 | 1 |
| 15 | DXCH-105 | | 23 | 1 |
| 16 | DXCH-106 | | 24 | 1 |
| 17 | DXCH-107 | | 29 | 1 |
| 18 | DXCH-108 | | 31 | 1 |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

USDOJ-GOOGEX-000181

6

PROCEEDINGS

| | |
|---|---|
| 1 | **Thursday - January 12, 2023**                                    **1:05 p.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc. vs. |
| 5 | Google LLC; Civil 20-5761, In Re Google Play Consumer Antitrust |
| 6 | Litigation; Civil 21-5227, State of Utah vs. Google; |
| 7 | Multidistrict Litigation 21-2981, In Re Google Play Antitrust |
| 8 | Litigation; and Civil 22-2746, Match Group LLC vs. Google. |
| 9 | Counsel, please state your appearances for the record. |
| 10 | **MR. BORNSTEIN:**  Your Honor, Gary Bornstein. |
| 11 | **THE CLERK:**  I need -- I'm going to need -- |
| 12 | **THE COURT:**  Oh.  Microphone, please. |
| 13 | **THE CLERK:**  Counsel, please use the microphone. |
| 14 | **MR. BORNSTEIN:**  Good afternoon, Your Honor.  Gary |
| 15 | Bornstein for Epic Games. |
| 16 | **MS. MOSKOWITZ:**  Good afternoon, Your Honor.  Lauren |
| 17 | Moskowitz, also for Epic. |
| 18 | **MS. WEINSTEIN:**  Good afternoon, Your Honor.  Lauren |
| 19 | Weinstein, the State of Utah Attorney General's Office, on |
| 20 | behalf of the State of Utah and the plaintiff states. |
| 21 | **MR. GLACKIN:**  Good afternoon, Your Honor.  Brendan Glackin |
| 22 | for the states. |
| 23 | **MS. GIULIANELLI:**  Good afternoon.  Karma Giulianelli for |
| 24 | the consumers. |
| 25 | **THE CLERK:**  Counsel in the back, come forward and use the |

**PROCEEDINGS**

1  microphone.

2      **MR. BYARS:**  Good afternoon, Your Honor.  John Byars from

3  Bartlit Beck for consumer plaintiffs.

4      **MR. SUMMERS:**  Also Glen Summers of Bartlit Beck for the

5  consumer plaintiffs.

6      **MR. DIXON:**  Good afternoon, Your Honor.  Doug Dixon of

7  Hueston Hennigan for Match Group LLC.

8      **MS. NAM:**  Good afternoon, Your Honor.  Hae Sung Nam for

9  the consumer plaintiffs.

10      **MR. POMERANTZ:**  Good afternoon, Your Honor.  Glen

11  Pomerantz of Munger, Tolles & Olson on behalf of defendants.

12  And with me is my colleague Jonathan Kravis of our firm.  Also,

13  Mr. Phil Nickels is sitting up front there.  He's going to be

14  running the technology on our side.

15      And we apologize.  He's sitting there because the cord on

16  our side, the cable doesn't work.

17      **THE COURT:**  Oh, it's fine.

18      **MR. POMERANTZ:**  Thank you.

19      **MR. ROCCA:**  Your Honor, it's Brian Rocca and my partner

20  Michelle Park Chiu from Morgan Lewis representing Google

21  defendants.

22      **THE COURT:**  Okay.  Is that it?

23      Now, if you are fully immunized -- or vaccinated, I should

24  say.  If you're fully vaccinated and you're comfortable, you

25  can take off your masks.  Leave it up to you, but you're

PROCEEDINGS

1  perfectly free to do that.

2      Okay.  Who are we going to start with?

3      **MR. POMERANTZ:**  Your Honor, I know that you had said in a

4  recent order that you wanted to discuss scheduling.

5      We had jointly submitted a stipulation for a July 31 --

6      **THE COURT:**  Oh, no.

7      **MR. POMERANTZ:**  -- trial date.

8      **THE COURT:**  We'll do that later.

9      **MR. POMERANTZ:**  Okay.

10     **THE COURT:**  I just want to get --

11     **MR. POMERANTZ:**  You want to start with --

12     **THE COURT:**  I want to get going with the witnesses,

13 please.  Yeah, that'd be great.

14     **MR. POMERANTZ:**  That's fine, Your Honor.

15     So I thought what I -- if Your Honor would allow me, I

16 just want to give you a brief roadmap for the witnesses that

17 we're calling today so you know what the lineup is and who they

18 are and what they'll be discussing.

19     **THE COURT:**  Let me find that.  Okay.  I have your list.

20 All right.

21     **MR. POMERANTZ:**  All right.  So we will start with

22 Mr. Genaro Lopez.  He is the information governance lead at

23 Google.

24     He's going to directly address two of the three issues

25 that you identified in your order.  First, he'll address the

PROCEEDINGS

1  use and operation of Google's chat system.  He's going to

2  explain what Google does to retain chats.  He's going to

3  explain how that differs from ways that it retains e-mails and

4  other kinds of electronic documents, and he'll explain why

5  those differences exist.

6      He'll also explain why Google's retention and preservation

7  of e-mails and of chats is reasonable, why they do something

8  different for each kind, and that it's consistent with the way

9  that Google's employees use these various types of

10  communication.

11      And then he'll also address the second topic in your

12  order, which is the guidelines for chat content.

13      We'll then call Mr. Jamie Rosenberg.  Mr. Rosenberg is

14  currently a part-time consultant for Google, but he was a

15  senior executive for a number of years at Google, and he

16  stepped down from that position in September of last year.

17      The plaintiffs asked to have Mr. Rosenberg here today, and

18  we agreed with them to make him available.  We will question

19  him briefly, and we'll ask him about his own use of chats, and

20  we'll describe what -- he will describe what a typical chat is

21  in the way that he uses chats.

22      The next witness is Mr. Tian Lim.  That's T-i-a-n L-i-m.

23  Mr. Lim was the one who we asked to have --

24      **THE COURT:**  Oh.  So no Lawrence Koh?

25      **MR. POMERANTZ:**  Correct.  The plaintiffs asked for Tian

PROCEEDINGS

1          Briefly, our three arguments are as follows:  first,

2     that Google's preservation of chats and, frankly, other

3     documents was both reasonable and proportional, as the rules

4     require.  And given the way that chats are used --

5          **THE COURT:**  You know, Mr. Pomerantz, I do want to hear

6     what you have to say.  I need an evidentiary foundation first.

7          **MR. POMERANTZ:**  That's why I said I would be brief.

8          **THE COURT:**  Why don't we --

9          **MR. POMERANTZ:**  I will stop.  I will stop.

10         **THE COURT:**  I know you think everything's great; they

11    think everything's terrible.  I get it.

12                         (Laughter.)

13         **THE COURT:**  But let me do the witnesses, and then --

14         **MR. POMERANTZ:**  That's totally fine.

15         **THE COURT:**  -- I'll be a much more informed consumer of

16    your argument at that point.  Okay?

17         **MR. POMERANTZ:**  I totally get that.

18         Mr. Rocca is going to handle Mr. Lopez, who's our first

19    witness.

20         **THE COURT:**  Okay.  Let's bring him in.

21         **MR. ROCCA:**  Brian Rocca for Google.

22         Your Honor, Google calls Genaro Lopez.

23     (Witness enters the courtroom and steps forward to be sworn.)

24         **THE CLERK:**  Please come forward and take the witness

25    stand.

PROCEEDINGS

```
 1        Stand and raise your right hand.

 2                        GENARO LOPEZ,

 3    called as a witness for the Defendants, having been duly sworn,

 4    testified as follows:

 5        THE WITNESS:  I do.

 6        THE CLERK:  Please be seated.

 7        Move the microphone in front of you.

 8        THE WITNESS:  All right.

 9        THE CLERK:  Please state your full name for the Court and

10    spell your last name.

11        THE WITNESS:  Genaro Lopez, L-o-p-e-z.

12        THE CLERK:  And what's your first name?

13        THE WITNESS:  Genaro, G, as in "George," e-n-a-r-o.

14        THE CLERK:  Thank you.

15        MR. ROCCA:  Your Honor, with your permission, I have a

16    smaller binder that's a subset of the exhibits.  It might be

17    more efficient if I hand the exhibits to Mr. Lopez.  It'll be

18    easier for him.  And I have a copy for the Court as well.

19        THE COURT:  Good.  Yes, please.

20        Do you have two copies for me?

21        MR. ROCCA:  I'll get one more copy.

22        MS. MOSKOWITZ:  Can I have one too, please?

23        MR. ROCCA:  It's the same exhibit binder you have with the

24    exhibits.

25        MS. MOSKOWITZ:  Yeah, but do you have one for me, or no?
```

LOPEZ - DIRECT / ROCCA

| | |
|---|---|
| 1 | Thank you. |
| 2 | **DIRECT EXAMINATION** |
| 3 | BY MR. ROCCA: |
| 4 | **Q.**   Mr. Lopez, can you please, again, introduce yourself for |
| 5 | the Court? |
| 6 | **A.**   Yes.  I'm Genaro Lopez. |
| 7 | **Q.**   Where are you currently employed? |
| 8 | **A.**   I work for Google. |
| 9 | **Q.**   Where are you based? |
| 10 | **A.**   I'm based in the Bay Area.  My office is here in |
| 11 | San Francisco, and I live in Berkeley, California. |
| 12 | **Q.**   How long have you been employed at Google? |
| 13 | **A.**   A little over three years. |
| 14 | **Q.**   What is your current job title? |
| 15 | **A.**   I am the information governance lead. |
| 16 | **Q.**   As information governance lead, what are your job |
| 17 | responsibilities? |
| 18 | **A.**   Yeah.  I manage a team that's responsible for ensuring |
| 19 | that Google's corporate data is appropriately retained, |
| 20 | communicated to employees, secured, and disposed of after its |
| 21 | useful life. |
| 22 | **Q.**   Why does Google need someone like you, information |
| 23 | governance lead, to help manage information as you just |
| 24 | described? |
| 25 | **A.**   Yeah.  Well, Google is a very complex and diverse place. |

**LOPEZ - DIRECT / ROCCA**

1  So I spend a lot of my time helping to coordinate our

2  activities across functions, internal teams, to make sure that,

3  to the fullest extent possible, we're making holistic decisions

4  about our management of corporate data.

5  **Q.**  Do you have any prior experience in information

6  management?

7  **A.**  Yes.

8  **Q.**  Please briefly describe that to the Court.

9  **A.**  Yeah.  So prior to Google, I spent almost a decade at

10 Nike, where I was the director of information governance.

11 **Q.**  Briefly describe your educational background.

12 **A.**  I have a bachelor's in biology from UC Berkeley and a J.D.

13 from Lewis & Clark Law School.

14 **Q.**  Are you a practicing lawyer?

15 **A.**  No.

16 **Q.**  Do you have any professional certifications related to

17 information management?

18 **A.**  Yes.  I have an Information Governance Professional

19 certificate from ARMA International.

20 **Q.**  Mr. Lopez, as information governance lead, do you play a

21 role in setting the retention periods for categories of

22 documents at Google?

23 **A.**  Yes.

24 **Q.**  What is your general approach for setting those retention

25 periods?

LOPEZ - DIRECT / ROCCA

1   **Q.**   Does this screenshot accurately reflect what a typical

2   group chat would look like at Google?

3   **A.**   Yes, it does.

4   **Q.**   Again, if you could describe the elements of what's on the

5   screen for the Court.

6   **A.**   Sure.  So obviously, there are more people involved in

7   this chat.  So at the top, you see the names, as much as screen

8   real estate will allow.  There are nine members here.  So you

9   see who's involved in the chat.  You see, again, the retention

10  and the history state indicators on the screen.  You see the

11  conversation stream, who's -- the different messages.  And

12  then, again, on the left-hand side, you see a running list of

13  all the other conversations that this particular employee is

14  involved in.

15  **Q.**   Mr. Lopez, are group chats always related to business

16  issues?

17  **A.**   No.

18  **Q.**   Can you please give the Court an example of what you mean?

19  **A.**   Yeah.  So like we talked about before, there is no

20  limitation on the topic of a group chat.  And so internally, we

21  have even really sensitive things, like folks who are in

22  recovery and they have a community and an ongoing group chat

23  where they share their own personal stories, really sensitive

24  information.  And those all are happening on -- via group chat.

25       **MR. ROCCA:**  Your Honor, Google requests that Exhibit 105

LOPEZ - DIRECT / ROCCA

```
1   be admitted into evidence.
2        THE COURT:  All right.  It's admitted.
3        (Defense Exhibit DXCH-105 received in evidence.)
4   BY MR. ROCCA:
5   Q.   Mr. Lopez, the third category you mentioned were something
6   called rooms and spaces.  Do you recall that?
7   A.   Yes.
8   Q.   Please describe those for the Court.
9   A.   Yeah.  Those are more topic- or project-based type of
10  conversations that are specifically oriented around a
11  particular item or subject matter.
12  Q.   Please turn to Exhibit DXCH-106.  That's the next tab in
13  your binder.
14       Are you there?
15  A.   Yes.
16  Q.   What is that exhibit?
17  A.   Yep.  This is a screenshot of a threaded room.
18  Q.   Does this accurately depict what a threaded room looks
19  like?
20  A.   Yes, it does.
21  Q.   Can you describe for the Court what's in this
22  threaded room example?
23  A.   Sure.  So, yeah, as a difference from the group chats that
24  we were just looking at, this has a name.  So "Design Systems"
25  is the topic of this room or this -- yeah, this room.  There
```

LOPEZ - DIRECT / ROCCA

1   are 22 members in this room.  And as before, you'll see the

2   individual messages and the names of the folks who are involved

3   in that room conversation.

4        **MR. ROCCA:**  Your Honor, Google requests that

5   Exhibit DXCH-106 be admitted into evidence.

6        **THE COURT:**  It is admitted.

7        (Defense Exhibit DXCH-106 received in evidence.)

8   **BY MR. ROCCA:**

9   **Q.**   Mr. Lopez, are Google employees provided any guidelines on

10  how chats are retained in the normal course of business?

11  **A.**   Yes.

12  **Q.**   What are those guidelines?

13  **A.**   We have a Google Chat retention policy that's made

14  available to employees.

15  **Q.**   If you'll turn to the first tab in that binder, which is

16  DXCH-1.  Please let me know when you're there.

17  **A.**   Okay.  Yep.

18  **Q.**   What is this document?

19  **A.**   This is the Google Chat retention policy I just mentioned.

20  **Q.**   Is this a true and correct copy of the Chat retention

21  policy?

22  **A.**   Yes.

23  **Q.**   And is this policy maintained in the normal course of

24  business at Google?

25  **A.**   Yes.

LOPEZ - DIRECT / ROCCA

1   **Q.**   Would you please read the first sentence of the first

2   paragraph of this Chat retention policy.

3   **A.**   Sure.  So (as read):

4        "Our Google Chat retention policy aims to reduce

5        redundant, obsolete, and trivial information in

6        corporate chats."

7   **Q.**   My question is:  Why is that an aim of the Google Chat

8   retention policy, to reduce redundant, obsolete, and trivial

9   information?

10   **A.**   Yeah.  Very simply, it's because Google, like any large

11   organization, is experiencing an explosion of information

12   that's created by every single employee every single day in

13   their everyday roles.  So it's really critical for us to do

14   everything we can to minimize the amount of obsolete or trivial

15   information and try to ensure that we're only keeping those

16   items that are absolutely necessary to do our jobs.

17   **Q.**   Now, are there privacy issues that you have in mind when

18   you try to achieve this aim?

19   **A.**   Yes.

20   **Q.**   Can you please describe that for the Court?

21   **A.**   Sure.  You know, one of the things that I monitor in my

22   role are developments in things like Europe's GDPR regulation.

23   California has CCPA.  All of those are focused on ensuring that

24   we have a legitimate business reason to continue to retain data

25   on our systems.

LOPEZ - DIRECT / ROCCA

1  substantive type of communication, to a one-on-one chat, which

2  even with history on is judged to be less substantive, probably

3  more quick one-on-one, you know, conversation back and forth.

4  And so as a result, we've adjusted the retention period for

5  those one-on-one conversations.

6      **MR. ROCCA:**  Your Honor, Google requests that DXCH-1 be

7  admitted into evidence.

8      **THE COURT:**  It's admitted.

9      (Defense Exhibit DXCH-1 received in evidence.)

10 **BY MR. ROCCA:**

11 **Q.**  Mr. Lopez, what steps does an employee need to take in

12 order to turn history on for a chat?

13 **A.**  Yeah.  Very straightforward.  So in the product, there's a

14 little three-button menu.  You click on that.  The next section

15 you get to has a button that says "Turn history on."

16 **Q.**  If you refer to Exhibit DXCH-107 in your binder,

17 Mr. Lopez.

18 **A.**  Yep.

19 **Q.**  Can you please tell the Court what that is?

20 **A.**  Sure.  So the left-hand screenshot is just showing where

21 you're starting from.  So you're in a one-on-one chat; the

22 history is off.

23      Then you would click on those three dots up on the upper

24 right.  That would open a menu.  That's the center screenshot.

25 There you see a prominent option which says "Turn on history."

LOPEZ - DIRECT / ROCCA

1        If you click on that "Turn on history" button, now when

2    you return to the chat, you'll see that history is now on.

3    **Q.**   Does this exhibit with these steps accurately reflect the

4    steps for turning history on?

5    **A.**   Yes.

6    **Q.**   Is there any other terminology that Googlers use when

7    referencing history on?

8    **A.**   Yeah.  So we internally use the terms "history on" or

9    "on the record."  They're synonymous.  And actually, if you

10   look at the support pages for Google Vault, they use the terms

11   side by side in the same sentence to indicate they are

12   synonymous.

13   **Q.**   If an employee turns history on for a particular

14   conversation, how long does that setting remain in place for

15   the conversation?

16   **A.**   Yeah.  That setting will remain the same until manually

17   changed by that user.

18       **MR. ROCCA:**   Your Honor, Google requests that DXCH-107 be

19   admitted into evidence.

20       **THE COURT:**   It is admitted.

21       (Defense Exhibit DXCH-107 received in evidence.)

22   **BY MR. ROCCA:**

23   **Q.**   Mr. Lopez, besides turning history on, are there any other

24   tools available within the Google Chat product to help

25   employees retain a message?

LOPEZ - DIRECT / ROCCA

1    A.    Yes.

2    Q.    Please describe that.

3    A.    Yeah.  Within the product, there's a feature called

4    "Forward to inbox" that allows a user to select an individual

5    message and up to four preceding messages and send those to

6    their e-mail inboxes for longer-term archiving.

7    Q.    If you flip to Exhibit 108 in your binder, can you please

8    tell the Court what this exhibit is?

9    A.    Yep.  This is a screenshot showing the steps to forward

10   messages to your inbox.

11   Q.    Can you briefly describe what the Court is seeing in this

12   exhibit?

13   A.    Yeah.  So as before, in this case, you're wanting to

14   forward an individual message.  So the three dots will hover

15   over an individual message.  That will take you to a menu.

16   Within that menu, there's an option named "Forward to inbox."

17   Click on that and the action will happen.

18   Q.    And what inbox does this refer to?

19   A.    Yeah.  This is sending to your personal Gmail inbox, where

20   it will then be subject to the 18-month default retention

21   period.

22   Q.    Does Exhibit 108 accurately reflect the steps necessary to

23   use the "Forward to inbox" function?

24   A.    Yes.

25        MR. ROCCA:  Your Honor, at this point, Google requests

LOPEZ - DIRECT / ROCCA

1  refer back to that information because it's, you know, relevant

2  to some other project that they're working on.

3  **BY MR. ROCCA:**

4  **Q.**   Now, Mr. Lopez, so far we've been talking about Google's

5  retention policies in the absence of a legal hold.

6       I'd like to now ask you about retention and preservation

7  policies that come into play when a legal hold is in place.

8       Do you have any role in implementing legal holds for

9  specific matters?

10  **A.**   No.

11  **Q.**   Do you have a general understanding of how Google

12  approaches this from a standard practice perspective?

13  **A.**   Yes.

14  **Q.**   Is there any general guidance available to Google

15  employees related to the preservation of chats that may be

16  subject to a legal hold?

17  **A.**   Yes.

18  **Q.**   Where is that guidance maintained?

19  **A.**   That's maintained in a FAQs page that accompanies our

20  Chat retention policy.

21  **Q.**   Please turn to Exhibit 2, DXCH-2 in the binder.

22       Are you with me?

23  **A.**   Yep.

24  **Q.**   What is this document?

25  **A.**   This is the page of the FAQs that I just described.

LOPEZ - DIRECT / ROCCA

1   **Q.**   Is this a true and correct copy of the Chat retention

2   FAQs?

3   **A.**   Yes.

4   **Q.**   Is this a document that's maintained in the normal course

5   of business at Google?

6   **A.**   Yes.

7   **Q.**   Midway down, Mr. Lopez, there is a question that says,

8   quote (as read):

9          "Under what circumstances should history

10      settings be turned on in Chat?"

11      Do you see that?

12   **A.**   Yep.

13   **Q.**   What is the response?

14   **A.**   Yeah.  We outline two specific scenarios where history

15   should be on.

16      One of them is, if you are on legal hold and there's a

17   topic that comes up in your conversation that's related to that

18   hold, you are expected to turn history on at that point if it's

19   not already on.

20      And then also, if the subject matter of your conversation

21   is of substantive business value, you are expected to also turn

22   history on at that point for longer-term archiving.

23   **Q.**   And, again, is this FAQ document available internally at

24   Google to all employees who are looking for information on chat

25   retention?

LOPEZ - DIRECT / ROCCA

1    **A.**    Yes.  It's a live page.  It's available 24/7.

2    **Q.**    Now let's turn to this particular case.

3         Do you have an understanding of how Google's standard

4    approach for chats was implemented specifically for the

5    employees on legal hold for this case?

6    **A.**    Yes.

7       **MR. ROCCA:**  Your Honor, before moving on to the next

8    series of questions, we would like the Court's guidance on an

9    attorney-client privilege issue.

10        We're prepared to provide testimony from Mr. Lopez on the

11   specific Chat preservation instructions that were included in

12   the litigation hold notice for employees for this specific

13   case.  We think that that testimony may be helpful for

14   the Court because the Court asks about guidelines for chat

15   content as part of this hearing.

16      **THE COURT:**  Just talk to me.  You don't have to -- so

17   what's the issue?  You have a litigation hold that a lawyer

18   wrote, and you're worried about sharing it.  Is that the issue?

19      **MR. ROCCA:**  The issue is, Your Honor, the legal hold

20   notice itself is privileged.  We want to provide testimony to

21   you, if it would be helpful to the Court, about the specific

22   preservation practices for chats.

23      **THE COURT:**  Is it in here?

24      **MR. ROCCA:**  It is not -- the legal hold is not in there,

25   Your Honor.  It's a privileged document.

LOPEZ - DIRECT / ROCCA

```
1   hear from you.  I don't want to hear from you when I have ten
2   minutes to prepare, figuratively speaking.  That's the issue.
3       MS. MOSKOWITZ:  Understood.
4       THE COURT:  All right.  Look, why don't you ask your
5   questions without showing him the hold.  You should be able to
6   ask him questions about the hold without showing him the hold.
7       MR. ROCCA:  And just --
8       MS. MOSKOWITZ:  And, Your Honor, we will take the position
9   that that just -- you'll decide it, but that that is a waiver
10  of all of the instructions that they provided.
11      THE COURT:  Not a waiver.  You can ask the questions.
12  What happened?  What did the company do?  What were people
13  told?  That's fine.  Okay?  But you don't have to show him the
14  thing you're worried about.
15      MR. ROCCA:  Your Honor, counsel just said they're going to
16  take the position that it's a waiver of all privilege.  She
17  admitted exactly the issue.
18      THE COURT:  Can I share something with you?  It's my
19  position that counts.
20      MR. ROCCA:  And so --
21      THE COURT:  And I'm taking the position that you can ask
22  the questions and you're not going to face a waiver because I
23  will decide the waiver issue.  Okay?
24      MR. ROCCA:  Thank you, Your Honor.
25      THE COURT:  I've given you the biggest blanket I can give
```

LOPEZ - DIRECT / ROCCA

1    you to wrap yourself in.  So just go ahead and do it.

2    All right?

3         MR. ROCCA:  Very well, Your Honor.

4    Q.   Mr. Lopez, in this litigation specifically, the

5    Google Play cases, what specific actions did Google instruct

6    custodians to take with respect to Google Chats?

7         MS. MOSKOWITZ:  Your Honor, I will object again, just on

8    foundation, for him being able to talk about the specific steps

9    that anyone took.

10        THE COURT:  Let's see what he says and we'll go from

11   there.

12        Go ahead.

13        THE WITNESS:  Yeah.  So in the legal hold notice, there

14   are two specific instructions related to chats.

15        One is that folks on legal hold are asked not to use the

16   product to discuss any topics that are related to their legal

17   hold.  And also, if they do find themselves in a conversation

18   that strays into a topic related to the legal hold, they're

19   asked to turn history on at that point to make sure that those

20   messages are properly preserved.

21   BY MR. ROCCA:

22   Q.   Mr. Lopez, does Google have the technical ability to set

23   "History on" as the default for all employees on legal hold?

24   A.   Yes.

25   Q.   Why don't you do that?

LOPEZ - DIRECT / ROCCA

**A.**   Yeah.   So our decision not taking that route is based on a variety of different factors.   The most, you know, kind of relevant to my work is that would lead to a massive over-retention of corporate data.

And then, very specifically, because of the way the product works, it wouldn't actually change any of the history settings for existing conversations.   So that would have very little effect to the active conversations of the custodians involved.

**Q.**   So let's focus on that piece of --

**THE COURT:**  If I may, just pardon me.

So Google never did a blanket preservation order for chats relevant to this case; is that right?

**THE WITNESS:**  I believe on-the-record chats are preserved.

**THE COURT:**  Which chats?

**THE WITNESS:**  The chat messages that were exchanged when the history was on, on the product.

**THE COURT:**  But the question that you were just asked, if I understood it -- and you can help me if I didn't -- is:  Does Google have the ability, figuratively speaking, to flip a switch and preserve all chats?  You said "yes."  You didn't choose to do that, but the answer is "yes."

My question is:  Did Google, in fact, flip that switch and preserve all chats with respect to this litigation?

**THE WITNESS:**  Well, just to clarify, the switch that we're

**LOPEZ - DIRECT / ROCCA**

1   talking about is to set the default.  So it's kind of a

2   starting point of a conversation.  So it doesn't change the

3   ability to toggle history on or off.

4       And like we were just talking about, if you have an

5   existing conversation and we were to flip that switch, it

6   wouldn't change the history setting of any existing

7   conversation.  Only new conversations that were started after

8   that switch was flipped would start with history on, which

9   would be the effect of making the change that we were just

10  talking about.

11      **THE COURT:**  I understand that.  You save only after the

12  switch is on.  I get that.  Is that what you're saying?

13      **THE WITNESS:**  Yeah.

14      **THE COURT:**  I get that.

15      But did Google at any point turn the switch on for

16  everybody's chat related to this case?

17      **THE WITNESS:**  No.

18  **BY MR. ROCCA:**

19  **Q.**   Mr. Lopez, let's go back to Exhibit --

20      **THE COURT:**  I'm sorry.  Why not?  You were saying, why did

21  Google choose not to preserve all the chats?

22      **THE WITNESS:**  Yeah.  Because to -- you know, in our

23  estimation, the kind of substantive business value of chats is

24  sufficiently low that we were confident that custodians would

25  take the instruction seriously.  They would follow -- they

LOPEZ - DIRECT / ROCCA

1  would make sure that any relevant conversations were being

2  preserved because history was turned on in those cases and that

3  all the other conversations they were involved in were able to

4  continue in the history-off state that they were previously.

5      THE COURT:  Okay.  So, basically, you left it up to each

6  individual Google employee to decide about the history?

7      THE WITNESS:  Yes.

8      THE COURT:  Okay.  And did anybody ever audit that?  Did

9  anybody in your department ever audit the chats to make sure

10  that nothing relevant to the litigation was getting missed?

11      THE WITNESS:  That's the thing.  We don't actually monitor

12  the substance of employee conversations.  So we wouldn't -- we

13  wouldn't be able to know that.

14      THE COURT:  All right.  So there was never any check to

15  make sure relevant evidence wasn't being missed?

16      THE WITNESS:  No.  We wouldn't have the ability to do

17  that.

18      THE COURT:  Okay.  And just one other -- if I may, just

19  one other question.

20      You mentioned earlier that the chat space was kind of a

21  place where people felt maybe more comfortable about airing,

22  I think you said, substance abuse issues, personal concerns and

23  the like.  Is that right?

24      THE WITNESS:  That was a group chat versus a -- a space

25  was more where, like, substantive project conversations were

LOPEZ - DIRECT / ROCCA

1   happening.  So a group chat was what we were talking about.

2       THE COURT:  Okay.  But in your experience, is Google Chat

3   a place where people feel a little more -- sort of letting

4   their hair down, so to speak, more likely to give personal

5   opinions, that kind of a thing?

6       THE WITNESS:  It's definitely more informal, yeah.

7       THE COURT:  Things that they may not necessarily want to

8   put in an e-mail?

9       THE WITNESS:  Anything under the sun that they want to

10  communicate, for sure.

11      THE COURT:  Okay.  But is it seen as something -- as a

12  place where you might say something you didn't necessarily --

13  that you thought might be too sensitive or something that you

14  didn't want to put in an e-mail?

15      THE WITNESS:  That hasn't been my experience.  I think

16  it's more down to the expediency and the speed of the

17  communication which is why you go to Chat versus using e-mail

18  for your other communications.

19      THE COURT:  Okay.  Please.

20  BY MR. ROCCA:

21  Q.  Mr. Lopez, if Google were to take a big group of

22  custodians and turn the default history on, how would that

23  impact the group chat conversations that the Court was just

24  referring to that are of the more personal nature, in your

25  experience?

LOPEZ - DIRECT / ROCCA

1    A.    Yeah.   So the challenge with doing that is that you then

2    may surprise participants in group chats that were previously

3    comfortable having a conversation in a history-off state

4    because they knew those sensitive items were not going to be

5    available for longer than 24 hours.   You are then changing and

6    maybe surprising folks.   And, you know, with the kind of longer

7    time frame that those messages might be available, folks might

8    be less willing to share, you know, kind of those really

9    sensitive, important pieces of information.

10   Q.    What impact would it have on the chat behavior of

11   participants in those groups in your experience at Google?

12   A.    Yeah.   I think it would just make it a less intimate space

13   to have a conversation.   I think it would just change the

14   nature and folks would just be less willing to share, which,

15   you know, as we're all kind of working from home more, is even

16   more important in just building communities and relationships

17   internally.

18   Q.    Finally, Mr. Lopez, have you heard of the concept of an

19   organizational unit?

20   A.    Yes.

21   Q.    For purposes of the chat product, what is an

22   organizational unit?

23   A.    Yeah.   So as far as I understand -- and this is the

24   non-engineer speaking -- an organizational unit is basically

25   just a way for a system admin to group users for the purpose of

LOPEZ - CROSS / MOSKOWITZ

| | |
|---|---|
| 1 | **MR. ROCCA:**  Your Honor, I don't know if I moved |
| 2 | Exhibit DXCH -- those were the FAQs -- into evidence. |
| 3 | **THE COURT:**  What do we have, Ms. Clark? |
| 4 | **MR. ROCCA:**  Number 2.  Sorry.  Tab 2. |
| 5 | **THE CLERK:**  You did not. |
| 6 | **MR. ROCCA:**  Your Honor, may I move Exhibit 2 into |
| 7 | evidence? |
| 8 | **THE COURT:**  Exhibit 2?  Yes, it's admitted. |
| 9 | (Defense Exhibit DXCH-2 received in evidence.) |
| 10 | **MR. ROCCA:**  Thank you, Your Honor. |
| 11 | **MS. MOSKOWITZ:**  Thank you, Your Honor. |
| 12 | <u>**CROSS-EXAMINATION**</u> |
| 13 | BY MS. MOSKOWITZ: |
| 14 | **Q.**  Good afternoon, Mr. Lopez.  My name is Lauren Moskowitz. |
| 15 | I represent Epic Games, and I'll be questioning you on behalf |
| 16 | of all the plaintiffs here today. |
| 17 | A couple of things off the top.  You say that the primary |
| 18 | way that Google employees communicate is to use Gmail.  Do you |
| 19 | remember saying that? |
| 20 | **A.**  Yes. |
| 21 | **Q.**  Did you do any quantitative analysis to understand how |
| 22 | many chats are sent within Google on a daily basis? |
| 23 | **A.**  No. |
| 24 | **Q.**  So you can't tell us how many chats versus how many |
| 25 | e-mails are sent on a given day? |

**LOPEZ - CROSS / MOSKOWITZ**

1    **A.**    No.

2    **Q.**    And you talked about history on and history off a little

3    bit.  Do you remember that?

4    **A.**    Yes.

5    **Q.**    And you said history on is called "on the record"; right?

6    **A.**    That's right.

7    **Q.**    And history off is called "off the record" at Google;

8    right?

9    **A.**    They're used synonymously, yep.

10    **Q.**    And in terms of the normal course document retention, you

11    said that the history-on chats are preserved for either 30 days

12    or 18 months, depending on how many participants?

13    **A.**    That's right.

14    **Q.**    And history-off chats are preserved for only 24 hours;

15    correct?

16    **A.**    That's right.

17    **Q.**    And we confirmed with you earlier, it sounds like that

18    when history on is turned on, it applies only to messages sent

19    after that setting change; right?

20    **A.**    That's correct.

21    **Q.**    So even if a history on is later in the chat, the prior

22    discussions will be deleted after 24 hours; right?

23    **A.**    Unless you've used the "Forward to inbox" feature that we

24    discussed.

25    **Q.**    Unless you have.  So if you haven't, just based on the

LOPEZ - CROSS / MOSKOWITZ

1  history settings, those chats before the setting change go away

2  and are deleted forever after 24 hours?

3  **A.**   That's right.

4  **Q.**   And there's no way to recover those deleted chats after

5  that 24 hours expires; correct?

6  **A.**   Correct.

7  **Q.**   And you talked a little bit about the e-mail retention of

8  18 months.  Do you recall that?

9  **A.**   Yes.

10  **Q.**   And you said that employees could opt out and make

11  individual e-mails indefinitely saved; right?

12  **A.**   That's right.

13  **Q.**   Do you make that option available for chats?

14  **A.**   No.

15  **Q.**   And the default policy for threaded rooms is history on,

16  but the default is history off for all other chats; right?

17  **A.**   There are multiple different kinds of rooms.  So if we're

18  talking about threaded rooms, they're always on.  But there are

19  also flat rooms where you have the option to toggle history,

20  like for the other chat types.

21  **Q.**   So for all other chat types other than threaded rooms,

22  history is off by default?

23  **A.**   That's right.

24  **Q.**   The Court asked you -- well, withdrawn.

25       You talked about setting retention periods based on the

LOPEZ - CROSS / MOSKOWITZ

1   business value to Google.  Do you recall that?

2   **A.**   Yes.

3   **Q.**   But in terms of when a litigation hold scenario is in

4   place, the business value to Google is not the same as what is

5   relevant for preservation for litigation purposes.  Would you

6   agree with that?

7   **A.**   There is a different obligation that attaches for sure.

8   **Q.**   The business value to Google really doesn't have anything

9   to do with what those obligations are; right?

10  **A.**   It's not part of the -- the analysis at that point; you're

11  right.

12  **Q.**   And when a litigation hold is in place, Google preserves

13  all e-mails from relevant custodians automatically; right?

14  **A.**   That's right.

15  **Q.**   Custodians don't have to do anything to make sure that

16  their e-mails are preserved; correct?

17  **A.**   That's right.

18  **Q.**   And custodians cannot override that automated preservation

19  of their e-mails; correct?

20  **A.**   That's right.

21  **Q.**   You don't require employees to manually select individual

22  e-mails to be marked as that "Indefinite"; right?

23  **A.**   That's right.

24  **Q.**   And so Google does not leave it up to their employees to

25  decide which e-mails are preserved; correct?

LOPEZ - CROSS / MOSKOWITZ

1   please.  This is a February 8th, 2016, chat between two Google

2   employees.

3        Which I will also move into evidence, Your Honor.

4        **THE COURT:**  It's admitted.

5        **THE CLERK:**  I'm sorry.  What was the number?

6        **MS. MOSKOWITZ:**  PX-11.

7        (Plaintiffs' Exhibit PX-11 received in evidence.)

8   **BY MS. MOSKOWITZ:**

9   **Q.**   Are you there?

10  **A.**   Yes.

11  **Q.**   This is also a substantive business discussion between two

12  Google employees; correct?

13  **A.**   It looks like it, yep.

14  **Q.**   If you could turn to PX-106, please.  This is a March 3rd,

15  2021, chat between Karan Gambhir and Mike, Michael Marchak.  Do

16  you see that?

17              (Official Reporter clarifies.)

18  **BY MS. MOSKOWITZ:**

19  **Q.**   -- 2021 chat between K-a-r-a-n, Gambhir, G-a-m-b-h-i-r,

20  and Michael Marchak, M-a-r-c-h-a-k.

21       Do you see that?

22  **A.**   Yes.

23       **MS. MOSKOWITZ:**  Your Honor, I move PX-106 into evidence.

24       **THE COURT:**  Admitted.

25       (Plaintiffs' Exhibit PX-106 received in evidence.)

LOPEZ - CROSS / MOSKOWITZ

1    BY MS. MOSKOWITZ:

2    **Q.**   And these two individuals are members of the Google Play

3    team; right?

4    **A.**   I don't actually know their role at the company.

5    **Q.**   This is a substantive business discussion between these

6    two employees; correct?

7    **A.**   It appears to be, yep.

8    **Q.**   Google employees know that the default is for their chats

9    to be off the record; right?

10   **A.**   Yes.

11   **Q.**   And they know that off-the-record chats are not retained;

12   right?

13   **A.**   I assume so.

14   **Q.**   So they know that if they do want to talk about something

15   sensitive, whatever that might mean, without leaving behind a

16   record, they can do that over Google Chat; right?

17   **A.**   I don't have an idea of their mental state when they use

18   the product; so no ability to answer that.

19       **MS. MOSKOWITZ:**   All right.  Why don't you take a look at

20   PX-9.  This is GOOG-PLAY-007653956.  This is a March 2021

21   document regarding "Play Apps BD Updates."

22       Let me know when you have that.

23       And, Your Honor, I will move this into evidence.

24       **THE COURT:**   Okay.  It's admitted.

25           (Plaintiffs' Exhibit PX-9 received in evidence.)

1   BY MS. MOSKOWITZ:

2   Q.   And really, it's a long document.  I'm really going to

3   focus just on the first page.  There's a heading (as read):

4            "Read me before inputting to this document."

5        Do you see that?

6   A.   Yep.

7   Q.   And this is some points for communications between what

8   are called BDMs -- that's business development managers; right?

9   A.   I actually don't know what that stands for.  We have a lot

10  of acronyms internally.

11  Q.   I've noted.

12       The fourth instruction here states, quote (as read):

13           "Comment freely but please be aware that this

14       doc is not privileged."

15       End quote.  And it says, continues, quote (as read):

16           "For anything sensitive, please move to

17       Chat/video call."

18       Do you see that?

19  A.   Yep.

20  Q.   Let's please look at PX-31, GOOG-PLAY4-003752440.  This is

21  a document for a September 13th, 2018, event entitled

22  "Roundtable Breakfast with Don Harrison."  Do you see that?

23  A.   Yes.

24       MS. MOSKOWITZ:  Your Honor, I move this into evidence as

25  well.

ROSENBERG - CROSS / MOSKOWITZ

1 **Q.**   And, Mr. Rosenberg, when you were in that last full-time

2 role, did you ever intentionally delete any chats related to

3 this litigation?

4 **A.**   No, I did not.

5        **MR. KRAVIS:**   Thank you, Mr. Rosenberg.

6        I have no further questions.

7        **THE COURT:**   Okay.   You want to pass the witness to what

8 should be a brief exam, I would imagine.

9        **MS. MOSKOWITZ:**   Thank you, Your Honor.   May I proceed?

10       **THE COURT:**   Yes.

11       **MS. MOSKOWITZ:**   Thank you.

12                       <u>CROSS-EXAMINATION</u>

13 BY MS. MOSKOWITZ:

14 **Q.**   Good afternoon, Mr. Rosenberg.

15 **A.**   Good afternoon.

16 **Q.**   My name is Lauren Moskowitz.   I represent Epic Games, and

17 I'll be questioning you on behalf of the plaintiffs.

18       You just ended your direct by talking about what your role

19 was at the time this litigation was commenced.   Do you remember

20 that?

21 **A.**   I do.

22 **Q.**   And I think you -- you said your team wasn't responsible

23 for Google Play, but you acknowledge that you were consulted

24 and communicated about Google Play throughout the rest of your

25 tenure at Google; correct?

ROSENBERG - CROSS / MOSKOWITZ

1  **A.**   That happened from time to time.

2  **Q.**   Right.  You received plenty of e-mails about Google Play

3  issues throughout the rest of 2020 and 2021 and 2022; correct?

4  **A.**   I might have been on e-mails as part of larger groups that

5  were included on those e-mails.

6  **Q.**   You were involved; right?  It's not a "might."  You know

7  you got those e-mails; right?  Do I have to show them to you?

8  **A.**   No.  If you're asking whether I received e-mails about

9  Google Play during that period, yes, I did.

10  **Q.**   And you also participated in chats about issues relating

11  to this lawsuit throughout that time; right?

12  **A.**   I don't know.

13  **Q.**   Do you remember your counsel just showed you one?

14  **A.**   A chat relating to the lawsuit?

15  **Q.**   About the MADA and the contract from December of 2020,

16  PX-92?

17  **A.**   There was a -- yes, I remember seeing a chat about MADA.

18  **Q.**   Right.  Do you understand whether MADAs are at issue in

19  this case or not?

20  **A.**   I'm not familiar with the specific details of the case.

21  **Q.**   You can't tell me sort of what topics are and are not

22  relevant to this case; right?

23  **A.**   Not in detail, no.

24  **Q.**   All right.  So moving ahead here, you testified that you

25  used Google Chat, I think you said probably a few times a day

ROSENBERG - CROSS / MOSKOWITZ

1   for various purposes.  Right?

2   **A.**   Yes.

3   **Q.**   So you were at Google for 11 years, I think.  If we do the

4   math, we're talking about thousands and thousands of chats;

5   right?

6   **A.**   Potentially.

7   **Q.**   Do you have any reason to believe it's not thousands and

8   thousands of chats?

9   **A.**   No, not necessarily.

10  **Q.**   You testified to your counsel about various ways that you

11  used Chat and saw some examples of those.  Do you remember

12  that?

13  **A.**   I do.

14  **Q.**   I just want to make sure I understand your testimony.  I

15  want to make sure I heard it.

16      Did you -- is it your testimony that you did not use Chat

17  for substantive business discussions at all?

18  **A.**   That was not my testimony.

19  **Q.**   So you did, in fact, use Chat -- in addition to those

20  other reasons, you also used Chat to conduct substantive

21  business discussions; correct?

22  **A.**   Not that I recall, but it's possible.

23  **Q.**   Do you think it didn't happen?

24  **A.**   It's possible.

25  **Q.**   All right.  Let's look.  Let's look at a couple.

ROSENBERG - CROSS / MOSKOWITZ

1    Let's hand up those books.  Sorry we didn't do that.
2    Let's hand those up, please.
3    While that's being handed up, you recall sitting for a
4    deposition in this case?
5    **A.**    I do.
6    **Q.**    All right.  And do you remember testifying about
7    Project Banyan in that deposition?
8    **A.**    I do.
9    **Q.**    And Project Banyan is a code name for a potential deal
10   where Google proposed paying $200 million to Samsung in
11   exchange for, among other things, Samsung agreeing to use
12   Google Play instead of the Samsung store to distribute apps?
13   **A.**    I would characterize it a bit differently, but
14   Project Banyan was related to a potential collaboration with
15   Samsung on app stores.
16   **Q.**    And it was on the order of hundreds of millions of
17   dollars?
18   **A.**    There were economics involved, yes.
19   **Q.**    On the order of $200 million?
20   **A.**    That, I -- that sounds familiar as part of our proposal.
21   **Q.**    And Mr. Kolotouros, Jim Kolotouros, K-o-l-o-t-o-u-r-o-s,
22   managed Google's relationship with Samsung; is that right?
23   **A.**    He managed -- yes.  He was a member of our business
24   development team, and the Samsung account was one of the
25   accounts he was responsible for.

ROSENBERG - CROSS / MOSKOWITZ

1  **Q.**   And you and Mr. Kolotouros discussed this $200 million

2  deal over Google Chat; right?

3  **A.**   I don't recall.

4  **Q.**   All right.  Let's look at PX-37 in your binder, please,

5  GOOG-PLAY-001974461, a June 8th, 2019, e-mail between

6  Mr. Kolotouros and yourself.

7       Please let me know when you're there.

8  **A.**   Yes, I see it.

9  **Q.**   And it may look familiar.  It was marked during your

10 deposition as Exhibit 786.  Do you see that?

11 **A.**   Yes.

12      **MS. MOSKOWITZ:**  Your Honor, I move PX-37 into evidence.

13      **THE COURT:**  It's admitted.

14         (Plaintiffs' Exhibit PX-37 received in evidence.)

15 **BY MS. MOSKOWITZ:**

16 **Q.**   According to your e-mail that you sent at 10:28 a.m. -- do

17 you see where I am?

18 **A.**   Yes.

19 **Q.**   At 10:28 a.m., you said in this e-mail to Mr. Kolotouros,

20 quote (as read):

21          "You mentioned in our IM chat yesterday that

22      Samsung broached the topic of asking for rev share on

23      the Play Store."

24      Do you see that?

25 **A.**   I do.

ROSENBERG - CROSS / MOSKOWITZ

1    **Q.**   So you're referencing in an e-mail the fact that you had a

2    Google Chat conversation with Mr. Kolotouros about negotiations

3    with Samsung; correct?

4    **A.**   Yes.

5    **Q.**   And those chats no longer exist; right?

6    **A.**   I assume they don't.

7    **Q.**   And they no longer exist because when you had those

8    conversations, your chat history was turned off and so was

9    Mr. Kolotouros's; correct?

10   **A.**   I can't speak for his, but mine was turned off.

11   **Q.**   You also understood that he kept his off too?

12   **A.**   I -- I didn't -- didn't know that.

13   **Q.**   Okay.  All right.  Well, we have his testimony.

14        So the only reason we ever knew that these chats even

15   existed is the mention of them in an instant message -- I'm

16   sorry -- of an instant message in this e-mail; right?

17   **A.**   I assume so.

18   **Q.**   Okay.  Can I get your agreement that the IM chat

19   referenced in this e-mail was not the only conversation you had

20   with Mr. Kolotouros about the status of negotiations with

21   Samsung and other OEMs?

22   **A.**   Not the only conversation --

23   **Q.**   This wasn't the only chat you ever had with him; right?

24   **A.**   I don't -- I don't know if it was.

25   **Q.**   Do you think it was even possible that that was the single

ROSENBERG - CROSS / MOSKOWITZ

1   chat you ever had with Mr. Kolotouros over your entire time
2   working with him at Google?
3       **MR. KRAVIS:**  Objection.  Vague.  And misstates the prior
4   testimony.
5       **THE COURT:**  Overruled.
6       **THE WITNESS:**  I'm sorry.  Can you repeat the question?
7   BY MS. MOSKOWITZ:
8   **Q.**   Sure.  I'm trying to understand if it's your testimony
9   that you think it's even in the realm of possibility that the
10  one chat referenced in this e-mail that we don't have was the
11  only time you ever communicated over Chat with Mr. Kolotouros.
12  **A.**   No, it wasn't the only time I communicated over Chat with
13  him.
14  **Q.**   And you had substantive business communications with him
15  over Chat; right?
16  **A.**   Not typically, no.
17  **Q.**   But you did it; right?  You did have some; right?
18  **A.**   Are you -- if I could just ask a question.  Are you
19  clarifying -- are you categorizing this as a substantive
20  business conversation?
21  **Q.**   Well, let's see what your definition is because I think
22  that might be part of the problem.
23  **A.**   Right.
24  **Q.**   Do you think having a chat about negotiation status with a
25  $200 million deal with Samsung is a substantive business

ROSENBERG - CROSS / MOSKOWITZ

1  communication?

2  **A.**   It would be, but what I want to point out to you is that

3  the rest of the discussion on that topic was happening in

4  e-mail.

5  **Q.**   Yeah, I get that --

6  **A.**   And so what we --

7  **Q.**   -- there's something in the e-mail.

8  **A.**   What we did here is actually bring the conversation into

9  the -- into the e-mail.

10  **Q.**   We will never know if that's right; right?  We don't have

11  the chat.  You can't tell me that's what happened, can you?

12  **A.**   I -- I don't know, but I know that the discussion was

13  happening in the e-mail and we added this topic to that

14  discussion.

15  **Q.**   Yeah, I got the e-mail.  We're very happy to have the

16  e-mails.  I'm talking about the chat.  You cannot tell me what

17  was and was not in that chat; right?

18  **A.**   I don't recall what was in the chat.

19  **Q.**   And you had other substantive business communications with

20  Mr. Kolotouros over Chat; right?

21  **A.**   It's possible that I did.

22  **Q.**   It's likely you did; right?

23  **A.**   I -- I don't know.

24  **Q.**   All right.  How about other people?  You had substantive

25  business communications over Chat with other Google employees

ROSENBERG - CROSS / MOSKOWITZ

1   over the time you worked at Google; correct?

2   **A.**   It wouldn't be typical, but it's possible.

3   **Q.**   It's not only possible.  I just want to understand your

4   testimony.  Do you or do you not concede that you did have

5   substantive business communications over Chat with colleagues

6   at Google over your time there?

7   **A.**   I don't recall the chat conversations I had.

8         **MS. MOSKOWITZ:**   All right.  PX-16, please, March, 17th,

9   2017, chat between you and Ashish, A-s-h-i-s-h, Pimplapure,

10  P-i-m-p-l-a-p-u-r-e.  Let me know when you have it.

11        And I will move this PX-16 into evidence, please,

12  Your Honor.

13        **THE COURT:**   It is admitted.

14          (Plaintiffs' Exhibit PX-16 received in evidence.)

15  **BY MS. MOSKOWITZ:**

16  **Q.**   Do you have it?

17  **A.**   I do have it.

18  **Q.**   This is a conversation over Chat between you and

19  Mr. Pimplapure, who was one of the individuals responsible for

20  the Google relationship with Samsung; right?

21  **A.**   Yes.

22  **Q.**   This is an eight-page-long chat conversation; right?

23  **A.**   I see that.

24  **Q.**   Yeah.  And it lasted over six hours; right?

25  **A.**   I could double-check, but I believe you on that.

ROSENBERG - CROSS / MOSKOWITZ

1   **Q.**   All right.  And without having to spend time reading this
2   out loud, can you agree that this is a substantive business
3   communication that you had over Chat at Google?
4   **A.**   So there are a couple of things going on here.  One is, we
5   are coordinating on getting to a final contract signature, and
6   so we're trying to -- I think we were going back and forth on,
7   you know, where are we on that.  So more in the sort of
8   logistics realm.
9   **Q.**   Okay.  So you put this in the logistical bucket?
10  **A.**   Part of it.  And then another part of it was preparing for
11  a meeting that was going to happen and going back and forth in
12  terms of what we needed in advance of the meeting.  I mean,
13  there's certainly topic -- you know, topics here that are
14  implicated, but it's in reference to this contract or it's in
15  reference to the meeting that's about to happen.
16  **Q.**   Just a clean question.  Does this chat contain substantive
17  business discussions at Google or not?
18  **A.**   So this chat includes discussions about business topics,
19  but the reason I struggle with the question is they're very
20  incomplete.  Like, this is not where the entire discussion is
21  happening.  It's not where the full issue is being -- is being
22  framed up.
23  **Q.**   That may be true, but it contains part of the discussion
24  on a substantive business topic; agree?
25  **A.**   I would characterize this more as coordination.

USDOJ-GOOGEX-000223

ROSENBERG - CROSS / MOSKOWITZ

1      **MS. MOSKOWITZ:**  Okay.  PX-25, please, July 20, 2018, chat

2  between you and Mr. Borchers, B-o-r-c-h-e-r [sic].  Let me know

3  when you have it.

4      I will move PX-25 into evidence, please.

5      **THE COURT:**  Admitted.

6          (Plaintiffs' Exhibit PX-25 received in evidence.)

7  BY MS. MOSKOWITZ:

8  **Q.**  You there?

9  **A.**  I have it.

10 **Q.**  All right.  This is a chat describing business counsel at

11 Google approving a proposal to offer Epic 100 to 200 million

12 dollars to try to persuade it to launch Fortnite on

13 Google Play.  Do you see that?

14 **A.**  I don't see those numbers mentioned here, but I see the

15 reference to business counsel.

16 **Q.**  And there was a discussion in Chat about the strategy of

17 how to make that offer and how to make it more attractive than

18 whatever Samsung might be offering; right?

19 **A.**  Yeah, based on the cont- -- I don't remember this chat

20 specifically; but based on the context, I think we were nearing

21 a meeting with Epic.  Bob, who was running marketing for us at

22 the time, was reaching out to me, asking if I had everything I

23 needed for the meeting.

24 **Q.**  Okay.  So was this a substantive business communication,

25 in your view?

ROSENBERG - CROSS / MOSKOWITZ

1   **A.**    Again, I would put this more in that sort of

2   coordination/meeting readiness category.

3   **Q.**    Okay.  All right.  That's good to know.

4        All right.  So let's talk about the holds.  You've been

5   placed under many litigation holds over your time at Google;

6   right?

7   **A.**    I believe so, yes.

8   **Q.**    During the last five or six years at Google, do you recall

9   a time where you were not under at least one litigation hold?

10  **A.**    I don't.

11  **Q.**    And is it fair to say that in the aggregate, the holds

12  cover pretty much every aspect of your job?

13  **A.**    I assumed they did.

14  **Q.**    Let's see.  So I think you talked about not really

15  communicating after the litigation hold.  Is that your -- is

16  that your testimony, that you didn't really communicate over

17  Chat after getting a hold?

18  **A.**    I don't recall --

19  **Q.**    Okay.

20  **A.**    -- testifying exactly that way.

21  **Q.**    All right.  So you did use chats after getting the

22  litigation holding?

23  **A.**    Yes.  I use Chat every day.

24  **Q.**    You recall receiving live training on written

25  communications several times throughout your career at Google;

ROSENBERG - CROSS / MOSKOWITZ

1   right?

2   **A.**   I definitely recall training -- receiving training once or

3   twice.

4   **Q.**   And those were live discussion sessions with a group of

5   people; right?

6   **A.**   Yes, typically.

7   **Q.**   And many people at Google received that same training you

8   got; right?

9   **A.**   I think others did, yes.

10  **Q.**   And those training sessions were presented by lawyers?

11  **A.**   The ones that I was in, yes.

12  **Q.**   And those trainings included presentation slides?

13  **A.**   Yes.

14  **MS. MOSKOWITZ:**   Please take a look at PX-120.  This is a

15  June 14th, 2021, slide deck.

16  I would move PX-120 into evidence, please, Your Honor.

17  **THE COURT:**  What is this?

18  **MS. MOSKOWITZ:**  What is it?

19  **THE COURT:**  Yes.

20  **MS. MOSKOWITZ:**  Oh, we are going to talk about it.  It is

21  a presentation that Google trains its employees on how to,

22  quote, communicate with care.

23  **MR. KRAVIS:**  I object on relevance grounds.  This is

24  irrelevant.  It has nothing to do with the issues before

25  the Court at the hearing.  This is a separate issue that was

1   litigated by the state plaintiffs in another case.  They did

2   not prevail there.  It is not relevant here.

3       **MS. MOSKOWITZ:**  A very different issue.  And I'm happy to

4   lay the foundation by pointing everyone's attention to the

5   relevant pages.

6       **THE COURT:**  Okay.  It's admitted.  Go ahead.

7       **MS. MOSKOWITZ:**  Thank you.

8           (Plaintiffs' Exhibit PX-120 received in evidence.)

9   **BY MS. MOSKOWITZ:**

10  **Q.**   So the first page is -- it shows that it's an interactive

11  set of slides, right, that you click through?

12  **A.**   I assume so, yes.

13  **Q.**   And if you turn to the second page --

14      **THE COURT:**  Well, have you ever seen this document

15  before --

16      **THE WITNESS:**  I don't recall this --

17      **THE COURT:**  -- Mr. Rosenberg?

18      **THE WITNESS:**  I don't recall this specifically.  This is

19  not -- this is the not training that I remember.

20      **THE COURT:**  He has to be familiar with it before you start

21  asking questions.

22  **BY MS. MOSKOWITZ:**

23  **Q.**   Okay.  You received "Communicate with Care" training;

24  correct?

25  **A.**   I did receive training, but I don't -- I don't recognize

ROSENBERG - CROSS / MOSKOWITZ

1    this particular training.

2        MS. MOSKOWITZ:  All right.  Your Honor, I think the

3    contents, even if not this specific document, may have been

4    provided in the training.  Can I ask whether he has received

5    training along the lines of some of the contents of

6    these pages?

7        THE COURT:  If you want to use it as a door opener, sure,

8    but don't ask him to testify about a document he hasn't seen

9    before.

10   BY MS. MOSKOWITZ:

11   Q.   Okay.  Did you receive training from Google that reminded

12   employees that Google is in the public eye and often in the

13   courthouse and has to produce documents in connection with

14   those proceedings?

15   A.   I don't know if that was the specific content of the

16   training I received.

17   Q.   Did you have that understanding as a Google employee?

18   A.   Which -- understanding of what?  Sorry?

19   Q.   That Google was going to have to produce lots of records

20   in lots of litigation and government proceedings based on

21   Google being in the public eye.

22   A.   I mean, I had that understanding generally.  I don't know

23   if that understanding came from one of these trainings.

24   Q.   Okay.  So do you recall ever being presented with

25   hypothetical scenarios of how to approach communicating about

ROSENBERG - CROSS / MOSKOWITZ

1   certain issues in those trainings?

2   **A.**   I don't recall.

3   **Q.**   Do you ever recall getting trained on moving conversations

4   over to Chat in connection with those trainings?

5   **A.**   I don't recall.

6   **Q.**   Okay.  Well, we'll reserve that for closing.  I'll move

7   on.

8        During your time at Google, you kept your chat history off

9   the entire time; correct?

10  **A.**   Correct.  I didn't change the default.

11  **Q.**   And when you were deposed on February 10th of 2022, your

12  chat history was still turned off; correct?

13  **A.**   Correct.

14  **Q.**   You have done nothing to preserve chats for purposes of

15  this litigation; correct?

16  **A.**   I have not done anything to preserve chats for this

17  litigation.

18      **MS. MOSKOWITZ:**  I pass the witness, Your Honor.

19      **THE COURT:**  Did you get one of those litigation hold

20  notices for this case?

21      **THE WITNESS:**  I did.

22      **THE COURT:**  Okay.

23      Okay.  Is that it?

24      **MR. KRAVIS:**  Your Honor, may I just very briefly inquire

25  about these exhibits?

ROSENBERG - REDIRECT / KRAVIS

```
 1          THE COURT:  Very briefly, please.

 2          MR. KRAVIS:  Thank you.

 3                    REDIRECT EXAMINATION

 4   BY MR. KRAVIS:

 5   Q.   Mr. Rosenberg, very briefly.  I think I heard you testify

 6   on direct examination that the last full-time position you held

 7   at Google was from March of 2020 until September of 2022.  Did

 8   I have that right?

 9   A.   May of 2020 --

10   Q.   May of 2020.

11   A.   -- to September of 2022.

12   Q.   Thank you.  Yes.

13        And I think, as we had discussed, you were in that

14   position when this litigation was filed in August of 2020.  Do

15   I have that right?

16   A.   Yes.

17   Q.   Can I ask you to just take a look at Plaintiffs'

18   Exhibit 37, one of the exhibits you were shown.  What's the

19   date on that exhibit?

20   A.   The date is June 8th, 2019.

21   Q.   Before the lawsuit was filed?

22   A.   Yes.

23   Q.   Plaintiffs' Exhibit 16, can you take a look at that.  The

24   date of that one is March 17th, 2017?

25   A.   Correct.
```

PROCEEDINGS

```
1        THE COURT:  Okay.  Here's what I would like to do.  I
2    actually think I need to hear a little bit more.
3        I'm going to put this in the minute order, but I would
4    like to have answers to the following questions.
5        Number one, how many --
6        I'm sorry.  You can step down.  Be careful on the way
7    down.
8                     (Witness excused.)
9        THE COURT:  Number one, how many of the Google individuals
10   who received a litigation hold elected to preserve their chats?
11   So we've heard testimony there are about 360 people who got the
12   hold notice.  How many of those people actually preserved their
13   chats?
14       If it's possible -- meaning not too much work.  If it's
15   some work, that's okay, but not too much work -- when did those
16   individuals elect to start preserving their chats, by date?
17       I'd also like to know that for those people who did elect
18   to preserve their chats, did they stop at any point?  And if
19   so, when?
20       I'd like to know has there been any case -- any case -- in
21   which Google has been a party in the last five years where the
22   company has systematically preserved chats or prevented
23   deletions of chats or suspended -- turned history on -- however
24   you want to put it -- I want to know if there's been any case
25   in the United States in the last five years where Google has
```

PROCEEDINGS

1    preserved the chats systematically and not just left it up to

2    individual users to make their own call.  So that's what -- I

3    need more on that.

4        If you can present that in a written form, that's fine.

5    If you want to bring somebody in for further testimony, that's

6    fine.

7        I do want to have a more expanded opportunity for closing.

8    Let me just give you some initial thoughts.  All right?  These

9    are all tentative thoughts.  It's a little more than what I

10   typically say of "speaking among friends," but it's by no means

11   a finding and I could very well change my thinking on it,

12   depending on how we go.

13       But I'll tell you where I am right now.  And that is,

14   I think there's little doubt on the evidence that we've heard

15   so far that Chat, Google's Chat function could, in fact, have

16   contained evidence relevant, as "relevance" is defined in the

17   Federal Rules of Evidence, to this case.

18       I think the evidence also shows that Google did not

19   systematically preserve those chats but, instead, left the

20   preservation of chats to the discretion of each individual who

21   received a hold notice.

22       It also is clear to me from the evidence that Google never

23   monitored the chats to see if relevant evidence was possibly

24   being lost.

25       I'm concerned about all this for a variety of reasons, but

PROCEEDINGS

1   one of them is, at our very first case management conference in

2   October of 2020, Docket Number 45, Google represented to me

3   that it had taken all appropriate steps to preserve all

4   evidence relevant to the issues reasonably evident in this

5   action.  I'm finding that representation to the Court to be

6   hard to square with what appears to have been failure to

7   preserve the chats.  So I'd like to hear more about whether

8   that representation was, in fact, accurate or not.

9        I also want to hear about when the chat issue first came

10  up.  Now, this is the first I'm hearing about it.  I don't know

11  when it came up between the parties.  But I have to say, a good

12  argument can be made that if Google didn't intend to preserve

13  the chats, they should have told me about that in October of

14  2020.  We could have had a much better discussion about why and

15  what you're going to do and burden and everything else.  I

16  don't recall that happening.  Now, maybe it did, and you can

17  help me figure that out, but I don't recall that happening.

18       At the very least, you should have shared that with your

19  colleagues across the aisle and had a discussion with them

20  because they're a stakeholder in the collection of that

21  evidence.  I don't believe that happened either.  So I want to

22  hear more about that.

23       Now, I also want to hear, assuming I stick with those

24  tentative impressions, what the remedy is going to be.  Now,

25  I'll just tell you, think of it as a U-curve, U-shaped curve.

PROCEEDINGS

1  The 10 percent side that says, "You win by default, plaintiffs"

2  is just not going to happen.  All right?  That's not going to

3  happen.  So don't even propose that to me.  The next 10 percent

4  of just inviting the jury to conclude that Google's guilty

5  because they didn't produce chats is not going to happen.  I'm

6  not going to do that.

7       On the other hand, I'm not going to let -- assuming I

8  stick with these tentative conclusions, I'm not going to let

9  Google get away with this is.  There is going to be a

10  substantial trial-related penalty.  Now, what that is, I don't

11  know.  I'm thinking purely off the top of my head.  Here are

12  some options that I have considered.

13       Well, you know what?  I'm not going to do that.

14       I want you to tell me, in the first instance, what you

15  think an appropriate remedy is.  Now, you have to put some

16  specificity on it.  Just saying, "Oh, you know, the general

17  principles of FRCP 37(e)(2)," that's not going to help me.  You

18  need to tell me exactly what you would like to have done in

19  this case.

20       As I said, this is a sizable, important, complicated

21  antitrust case.  I'm not going to give an invitation to the

22  jury to decide it all on the basis of missing chats.  It's just

23  not fair.  I think that could be a due process violation.

24       The reason I say that is, this is going to be a challenge

25  for the jury.  I have a hundred percent confidence in juries.

USDOJ-GOOGEX-000234

# PX-16

USDOJ-GOOGEX-000235

Message
___

**From:**     Jamie Rosenberg (jamierosenberg@google.com) [jamierosenberg@google.com]
**Sent:**     3/17/2017 12:36:52 AM
**To:**       Ashish Pimplapure [pimplapure@google.com]

___

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 17:36:52`

i&#39;m going to try to reach Peter now... any update from ES on getting final devices with final software?

- **Ashish Pimplapure,** `2017-03-16 17:39:30`

I spoke with Jay. He is looking into giving us access to final hardware ID. (We may need to visit Samsung office as they won&#39;t release it outside). For build software, they are saying that current build software is final. However, the apps will update closer to launch as the apps are not finalized (including Bixby)

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 17:43:08`

That sounds a bit evasive.  How are they planning to get the &quot;updated&quot; apps on the device?  I can&#39;t see how they&#39;d deliver Bixby over the air if they don&#39;t have voice input wired up now and it&#39;s a key part of the device proposition.

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 17:43:23`

Also, can we get sample builds for all the configurations contemplated in our waiver so we can validate placement?

- **Ashish Pimplapure,** `2017-03-16 17:44:00`

For placement, yes. That is an approval condition.

- **Ashish Pimplapure,** `2017-03-16 17:44:17`

(on a per sku basis)

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 17:44:39`

Right... but they need to deliver us devices for our &quot;TA&quot;, where it&#39;s actually feasible for them to address issues if we find them

- **Ashish Pimplapure,** `2017-03-16 17:47:26`

for the build approval, our TAMs will just reflash an existing device (lunchbox version of GS8) with the build to review and approve it.

- **Ashish Pimplapure,** `2017-03-16 17:47:54`

so for h/w, we have lunchbox only

- **Ashish Pimplapure,** `2017-03-16 17:48:21`

but for s/w, we get all build variations...

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 17:48:37`

that&#39;s an OK approach for things like placement

- **Ashish Pimplapure,** `2017-03-16 17:54:59`

So CTS / GTS: automated tests, placement, other contractual requirements: manual review of build on flagship lunchbox. But no final form hardware disclosure from Samsung as it is not covered under any requirement, and they guard it till unpacked.

- **Ashish Pimplapure,** `2017-03-16 18:18:19`

Hi Jamie, I just sent you and others a note re: final h/w &amp; s/w, including ES&#39; response.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-007216709

USDOJ-GOOGEX-000236

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 18:19:40`

what do you think we should do about the long press issue?

- **Ashish Pimplapure**, `2017-03-16 18:20:12`

two things:

- **Ashish Pimplapure**, `2017-03-16 18:20:28`

1. checking if there is a bug ... the issue that Hiroshi identified

- **Ashish Pimplapure**, `2017-03-16 18:21:27`

2. since both long and short press map to the assistant, require that they should have the same time delay. (500ms).

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 18:30:30`

Can you please send an email to Jay + Peter with exactly what we want, so there is no confusion? Btw, on my call with Peter he said he considers is done with MADA. I said let&#39;s start the signing process...and he agreed...so pls follow up on that.

- **Ashish Pimplapure**, `2017-03-16 18:31:11`

Thanks. That is great news. Will do.

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 18:35:02`

Btw, I don&#39;t know if that means they fully reviewed the last draft you sent over, but let&#39;s be presumptive and start the signing process anyway.

- **Ashish Pimplapure**, `2017-03-16 18:35:54`

understood. We typically do one final review with redlines of final draft against original (in this case 2014 MADA), which we get started

- **Ashish Pimplapure**, `2017-03-16 18:36:12`

(just want to make sure that nothing was slipped inadvertently )

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 19:52:46`

yt?

- **Ashish Pimplapure**, `2017-03-16 19:57:55`

Hello

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 19:59:30`

hi.  hiroshi and I are talking to Injong and Peter at 10 p.m. about the home button issue.  can I call you to make sure I have background on anything else that&#39;s open?

- **Ashish Pimplapure**, `2017-03-16 20:00:23`

Happy to chat. We shared the draft earlier today, but have not seen their response yet.

- **Ashish Pimplapure**, `2017-03-16 20:00:59`

for non business issues, we need their email confirmation on things like supporting Hotword and Duo reset by MR, etc.

- **Ashish Pimplapure**, `2017-03-16 20:01:07`

let me prepare a list and send it to you

- **Ashish Pimplapure**, `2017-03-16 20:01:18`

and then we can chat on phone.

- **Ashish Pimplapure**, `2017-03-16 20:03:27`

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

actually

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 20:03:32`

It&#39;s less about MADA and what we need for device approval.  They are going to push us on the call to articulate where the finish line is.

- **Ashish Pimplapure,** `2017-03-16 20:03:32`

let me update the S8 blocker doc

- **Ashish Pimplapure,** `2017-03-16 20:03:37`

got it

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 20:03:59`

And is there a distinction between CTS approval and device approval?

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 20:04:29`

Finally, what asks do we have of them for dogfood devices and additional build configurations?  i.e., do we need to see all app placement configurations before we can approve... and have we communicated that to them?

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 20:04:53`

And have we confirmed that no carriers are getting final HW devices for their TA, or are they treating us differently?

- **Ashish Pimplapure,** `2017-03-16 20:05:12`

they are treating us differently

- **Ashish Pimplapure,** `2017-03-16 20:05:20`

they are only providing what is contractually required

- **Ashish Pimplapure,** `2017-03-16 20:05:35`

so they send us lunchbox devices + all builds

- **Ashish Pimplapure,** `2017-03-16 20:05:48`

(this is for flagships)

- **Ashish Pimplapure,** `2017-03-16 20:06:24`

will update the doc now

- **Jamie Rosenberg (jamierosenberg@google.com),** `2017-03-16 20:12:50`

are you suggesting that we hold up approval until all blockers are resolved?  CTS approval?  Full device approval?  And has this been communicated to them?

- **Ashish Pimplapure,** `2017-03-16 20:13:04`

CTS is clean

- **Ashish Pimplapure,** `2017-03-16 20:13:23`

GTS has one issue (flexible apps in user partition) which goes away after MADA is confirmed

- **Ashish Pimplapure,** `2017-03-16 20:13:36`

so it is really about the open issues in the doc that I am listing

- **Ashish Pimplapure,** `2017-03-16 20:13:42`

we have communicated these to them

- **Ashish Pimplapure,** `2017-03-16 20:13:53`

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

&lt;a
href="https://docs.google.com/document/d/1tspCxiHeUXn0sSxXwEtsWNhvOqS0XAcBc4IEvrdQr_4/edit">htt
ps://docs.google.com/document/d/1tspCxiHeUXn0sSxXwEtsWNhvOqS0XAcBc4IEvrdQr_4/edit&lt;/a>

- **Ashish Pimplapure**, 2017-03-16 20:14:17

Our TAM (Andrew Baek) communicates these right after each build review

- **Ashish Pimplapure**, 2017-03-16 20:14:32

so their tech team has known these for a while

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 20:15:34

Has their business team known about them?

- **Ashish Pimplapure**, 2017-03-16 20:15:42

Jay has

- **Ashish Pimplapure**, 2017-03-16 20:16:08

although it appears that they just bundle everything as &quot;CTS approval&quot;

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 20:17:44

the doc does&#39;t seem up to date.  All issues you list seem closed... though a few need verification.  So
where is the finish line for them?

- **Ashish Pimplapure**, 2017-03-16 20:22:34

it is the items in bulleted list: a few verifications + resolution of long touch / press.

- **Ashish Pimplapure**, 2017-03-16 20:22:45

and I am re-checking with TAM team on any other open items.

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 20:29:45

Ok

- **Ashish Pimplapure**, 2017-03-16 20:38:39

btw, Samsung just pinged me and asked about the list. would be helpful to share it in advance with them so both
parties are on the same page.

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 20:43:44

yes, please do.

- **Ashish Pimplapure**, 2017-03-16 20:44:20

thanks

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 20:49:25

also, pls try to get a better answer on hotword... I don&#39;t understand why it&#39;s taking that long,
particularly since all the code seems to be done

- **Ashish Pimplapure**, 2017-03-16 20:50:16

they are dragging their feet. Really disappointed that in spite of all our efforts with both SoCs (Qualcomm
&amp; SLSI), Samsung is taking so long

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 20:55:06

so we should ask Samsung to commit to first MR for this, right?  Also, have they committed to Daydream for
first MR?

- **Ashish Pimplapure**, 2017-03-16 20:56:03

Hotword: they did commit to first MR at MWC.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

- **Ashish Pimplapure**, `2017-03-16 20:56:19`

so we should just hold them to that date

- **Ashish Pimplapure**, `2017-03-16 20:56:27`

Same for Daydream

- **Ashish Pimplapure**, `2017-03-16 20:56:39`

there is really no excuse for them to slip either of these

- **Ashish Pimplapure**, `2017-03-16 20:57:14`

(we have not brought up Daydream in our MADA review process)

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 21:02:05`

Reading through the doc, it seems that we should be able to verify most things with the build we have (and should do that ASAP, no later than tomorrow).  Pls split the doc into 1) things we can (and should) verify with the build we have.  2) Asks of Samsung for additional verification (seems like Gmail, plus additional configurations of app placement [i.e., open market, non-US carrier, etc.];  and 3) Commitments for first MR.  I should only be talking about #2 and #3 on the call.

- **Ashish Pimplapure**, `2017-03-16 21:02:30`

ok

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 21:16:08`

when you have that ready, pls send in that format to Samsung as well, so we can all be working off the same list.  And lmk when it&#39;s ready so I can send to Hiroshi.

- **Ashish Pimplapure**, `2017-03-16 21:16:40`

ok

- **Ashish Pimplapure**, `2017-03-16 21:24:05`

resolved all comments

- **Ashish Pimplapure**, `2017-03-16 21:24:16`

no other inputs from APEs

- **Ashish Pimplapure**, `2017-03-16 21:24:22`

so it is ready for your review

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 21:27:55`

i added one more question

- **Ashish Pimplapure**, `2017-03-16 21:28:39`

we approve builds on a SKU basis

- **Ashish Pimplapure**, `2017-03-16 21:28:54`

GS8 launch is staggered over a few months

- **Ashish Pimplapure**, `2017-03-16 21:28:59`

so we won&#39;t get all builds in one go

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 21:29:05`

ok

- **Ashish Pimplapure**, `2017-03-16 21:29:19`

we are getting the big ones: VZ, AT&amp;T, etc.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

- **Ashish Pimplapure**, 2017-03-16 21:29:42

other builds (smaller countries) may come later

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 21:33:01

ok.  you can resolve the comment and then pls send to Samsung

- **Ashish Pimplapure**, 2017-03-16 21:33:25

Done. Sent to Jay.

- **Ashish Pimplapure**, 2017-03-16 21:34:56

got the message that they are reviewing it now

- **Ashish Pimplapure**, 2017-03-16 21:39:51

just one minor tweak, this is for us to verify.... Gmail will be in the folder for carrier version. (I also clarified with Samsung)

- **Ashish Pimplapure**, 2017-03-16 21:41:38

Also, please let me know if I should join the call. Happy to listen in.

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 21:42:19

who is attending from their side?

- **Ashish Pimplapure**, 2017-03-16 21:42:40

checking...

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 21:43:05

I told them Hiroshi and I were joining and am expecting Injong and Peter

- **Ashish Pimplapure**, 2017-03-16 21:43:15

ok

- **Ashish Pimplapure**, 2017-03-16 21:49:31

they responded with four: Injong / Peter / Jay / Seung. If a small group is preferred, I can ask them to have just Injong &amp; Peter.

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 21:51:42

if they are bringing four then you should join.  i will add you to the invite

- **Ashish Pimplapure**, 2017-03-16 21:51:59

sounds good. thanks

- **Ashish Pimplapure**, 2017-03-16 22:01:09

btw, feedback from Samsung:

- **Ashish Pimplapure**, 2017-03-16 22:01:48

On 500ms: they want to find out the right value.

- **Ashish Pimplapure**, 2017-03-16 22:02:12

Hotwords: they say that both teams agreed to finish dev / QA by 6/15 and then do next MR

- **Ashish Pimplapure**, 2017-03-16 22:02:24

Email: they want to fix it via an app update

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 22:02:24

which teams?

- **Ashish Pimplapure**, `2017-03-16 22:02:49`

samsung / soc / google. QA is from samsung, and that is the long pole

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 22:03:28`

i don&#39;t feel very well informed on the hotword issue.  is the development work done or not?

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 22:03:50`

and on 500ms, have we shared any data or research from our side on the right value?

- **Ashish Pimplapure**, `2017-03-16 22:05:37`

500ms:

- **Ashish Pimplapure**, `2017-03-16 22:05:38`

we have not shared any data

- **Ashish Pimplapure**, `2017-03-16 22:05:59`

Assistant team&#39;s first priority was that they both have the same value (touch / press)

- **Ashish Pimplapure**, `2017-03-16 22:06:04`

and preference is 500ms

- **Ashish Pimplapure**, `2017-03-16 22:06:18`

but worst case time would be scott&#39;s decision

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 22:06:18`

would be good to know (maybe from Glen/ Pixel team) what research we did on the right value for Pixel

- **Ashish Pimplapure**, `2017-03-16 22:07:41`

Pixel is 500 ms

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 22:07:47`

we&#39;ve had long press on home on Android much longer than Assistant has existed

- **Ashish Pimplapure**, `2017-03-16 22:12:24`

We will send them a report

- **Ashish Pimplapure**, `2017-03-16 22:24:31`

Either they truly don&#39;t know what their team has implemented, or they don&#39;t want to share future plans.

- **Jamie Rosenberg (jamierosenberg@google.com)**, `2017-03-16 22:44:27`

ji soo is in mtv?

- **Ashish Pimplapure**, `2017-03-16 22:44:52`

We met him yesterday.

- **Ashish Pimplapure**, `2017-03-16 22:47:36`

Licensed content

- **Ashish Pimplapure**, `2017-03-16 22:48:41`

Injong is asking for content that our team is not syndicating.

- **Ashish Pimplapure**, `2017-03-16 23:04:27`

Hotword is really a resourcing issue

- **Ashish Pimplapure**, `2017-03-16 23:05:08`

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-007216715

USDOJ-GOOGEX-000242

They just need to dedicate resources and commit.

- **Ashish Pimplapure**, 2017-03-16 23:18:50

I am drafting up a response to Hiroshi&#39;s question: &quot;what percent of domains can we not provide?&quot;

- **Ashish Pimplapure**, 2017-03-16 23:19:21

short answer: it is complicated. For example,

- **Ashish Pimplapure**, 2017-03-16 23:19:26

we cannot provide answer to :

- **Ashish Pimplapure**, 2017-03-16 23:19:32

[michael jackson thriller]

- **Ashish Pimplapure**, 2017-03-16 23:19:33

but

- **Ashish Pimplapure**, 2017-03-16 23:19:37

we can answer

- **Ashish Pimplapure**, 2017-03-16 23:19:42

[composer of thriller]

- **Ashish Pimplapure**, 2017-03-16 23:19:57

or

- **Ashish Pimplapure**, 2017-03-16 23:20:18

Images: we cannot provide an image if it comes from Google+

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 23:21:14

 I understand there are limitations.  At the same time, there is probably more we can do on domains if we push the Assistant team to put some effort in.  We need to get their P0 domain list ASAP and sit down with the Assistant team to find out what&#39;s possible with a hard push.

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 23:22:11

Also, to the point the Assistant team made about being able to provide some incremental TTS support by 3/31, can you float that by Ji Soo and see if the additional support we can provide there would make a difference?

- **Ashish Pimplapure**, 2017-03-16 23:23:46

I will check with Ji Soo, but he tends to defer to Injong. So we should also bring this up with Injong again (maybe a call on Monday)

- **Jamie Rosenberg (jamierosenberg@google.com)**, 2017-03-16 23:24:46

we should have a call when we have a full update on domains as well... so we just need to know how soon we&#39;d be ready for that

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

# PX-25

USDOJ-GOOGEX-000244

Message
_____

**From**:      Bob Borchers [bborchers@google.com]
**Sent**:      7/20/2018 12:04:15 AM
**To**:        Jamie Rosenberg [jamiero@google.com]

- **Bob Borchers**, 2018-07-19 17:04:15

Have everything you need for epic?

- **Jamie Rosenberg**, 2018-07-19 17:08:06

yes, I think so... we got BC approval today for the $$.  I just scanned through Albert&#39;s slides.... I don&#39;t know if tomorrow will be a &quot;slides&quot; type discussion... but there are a couple that are very cool visuals, so I&#39;ll have them at the ready

- **Jamie Rosenberg**, 2018-07-19 17:08:46

Also, I want to make sure pick the things that would look good compared to whatever Samsung offered them

- **Jamie Rosenberg**, 2018-07-19 17:09:02

The OOH mockup is awesome, but I&#39;m a bit worried that Samsung might have courted them with lots of ATL associated with Note 9

- **Jamie Rosenberg**, 2018-07-19 17:09:10

The gift card thing is something Samsung can&#39;t do

- **Bob Borchers**, 2018-07-19 17:09:48

The wild card for me are the cause related pieces. Might appeal to his current mindset even if they don&#39;t drive dowlads

- **Bob Borchers**, 2018-07-19 17:09:57

Downloads that is

- **Jamie Rosenberg**, 2018-07-19 17:10:40

yes... and part of our financial offer is to co-fund philanthropic and developer-focused initiatives together

- **Jamie Rosenberg**, 2018-07-19 17:12:57

I think that stuff will resonate conceptually... but they have some philanthropic/ community initiatives of their own, so we&#39;ll have to get a feel for how much would be about introducing fortnite to our initiatives or Google making contributions to their stuff.

CONFIDENTIAL                                             GOOG-PLAY-000087767

# PX-37

USDOJ-GOOGEX-000246

Message
_____

| | |
|---|---|
| **From**: | Jim Kolotouros [jimk@google.com] |
| **Sent**: | 6/8/2019 5:29:51 PM |
| **To**: | Jamie Rosenberg [jamiero@google.com] |
| **CC**: | Donald Harrison [harrison@google.com]; Sameer Samat [ssamat@google.com]; Christopher Li [lichristopher@google.com]; Kate Lee [katelee@google.com]; jinyoungbaik [jinyoungbaik@google.com] |
| **Subject**: | Re: Notes from Samsung / Play / IAP conversation |

\*\* attorney client privileged \*\*

They would align on IAP as well...

On Sat, Jun 8, 2019 at 10:28 AM Jamie Rosenberg <jamiero@google.com> wrote:
 Privileged

 Thanks, Jim.

 You mentioned in our IM chat yesterday that Samsung broached the topic of asking for rev share on the Play Store.  Did they offer what they would give in return for that?


On Sat, Jun 8, 2019 at 10:22 AM Jim Kolotouros <jimk@google.com> wrote:
 \*\* attorney client privileged \*\*

 Don/Sameer/Jamie:

 Last night Chris, Jinyoung and I had a call with Samsung (Jay Kim & Seung) to discuss our Play Store proposal.  The notes are here.

 Long story short: They are committed to developing a financial relationship with developers to enhance the fundamental economics of their mobile hardware business.  They think that gaming in particular is a vertical that would yield good economics.

 I think our trip next week will be productive, if for no other reason than we can have honest discussions about how to align moving forward while also achieving Hiroshi's goal of bringing them closer to us.

 Some very important points:

 - Chris has pre-flighted with Samsung that we want the MADA renewal to be free of friction.  He noted that we're looking to do an "as is" extension with a short amendment to cover a limited number of items (e.g., pre-load policy, GMS expiration on old letter versions, hardware affordance).  Chris will publish more detailed notes of their initial reactions before we jump on a plane.

 - In fact, we DO have a short-term AFA in place that was executed concurrent to the Becker deals.  So the risk that I had thought was there is in fact not present.  So we have that going for us.  We will still push hard on getting the ACC in place and digging deep on the non-supported form factor exceptions they'd like.

 - We have not brought up search revenue share (RSA) at all.  I think it will and should come up in our meetings on Tuesday as part of a broader plan for alignment.  And I'd like us to align on the potential message of "alot of the things that we valued and included in revenue share 2 years ago are things that we do not believe are as important within the context of a revenue share deal... we don't think you made any changes to

letter/search update cadence/frequency at all, so why include it in RSA (since it doesn't alter behavior)?  Daydream?  search exclusivity (especially in Europe where so much revenue flows and in a choice screen world?), etc.,")

Happy to discuss before jumping on a plane on Sunday night.

thanks.

CONFIDENTIAL

GOOG-PLAY-001974462

USDOJ-GOOGEX-000248

# PX-103

USDOJ-GOOGEX-000249

Message

| | |
|---|---|
| **From:** | kamdar@google.com [kamdar@google.com] |
| **Sent:** | 2/9/2021 10:02:41 PM |
| **To:** | kamdar@google.com; ssamat@google.com |
| **Subject:** | AAAATEh6aUk-CgfnQTbfM_Y |

- **kamdar@google.com** 2021-02-09T16:02:41.521-06:00

https://stratechery.com/2021/an-interview-with-eric-seufert-about-apple-facebook-and-mobile-advertising/

   o         https://stratechery.com/2021/an-interview-with-eric-seufert-about-apple-facebook-and-mobile-advertising/

- **kamdar@google.com** 2021-02-09T16:03:16.820-06:00

i hadn't thought about things in this way

- **kamdar@google.com** 2021-02-09T16:03:18.845-06:00

The thing that is always kind of weird to me about this is I think people underestimate and frankly I think Apple underestimates the degree to which Apple's growth in services revenue and the growth in the App Store is because of Facebook and that Facebook and Apple have had this very symbiotic relationship where Facebook has done all of Apple's dirty work, and Apple has harvested 30% on the backend just by virtue of owning the App Store. The question I have is, is it possible that Apple is shooting themselves in the foot here where their services revenue actually takes a meaningful hit because they've destroyed the engine driving it and they didn't even realize it because they actually didn't understand Facebook's role in this?

ES: I don't think so. I think Apple very much recognizes the role that it plays in the app ecosystem, which is the distribution engine for apps, and I think that's what Apple doesn't like. I think Apple sees that the App Store has basically become irrelevant as a point of content discovery. It's basically this kind of frictional, annoying moment between clicking an ad and installing an app. Almost all discovery happens via ads or word of mouth and I think what Apple is doing in this, in recognizing the power that Facebook has in terms of influencing which apps become big, which apps are popular, how people are using their iPhones essentially.

In recognizing that, Apple is trying to regain control of that because if Apple cripples advertising, which it basically is doing, mobile advertising — this is all happening within the context of all this stuff that's happening on the browser, which we don't need to go down that rabbit hole, but Apple has been the instigator of all of that too. If Apple cripples mobile advertising, then the App Store becomes the primary discovery point for apps again, and Apple decides how people use our iPhones, Apple decides which apps are the most popular, and by the way, that's a position that Apple used to occupy. 2012, 2013, Apple was king maker, if you got featured, your company valuation might increase by a hundred million dollars. It was really important to make that pilgrimage to Apple, go to Cupertino and beg for featuring, like "Please feature us, please give us the headline featuring because that would make such a big difference for our company".

Then in that way, Apple got to influence what kind of apps got made and how you made them, so my sense here is that Apple wants to regain control. Now, I think there's a broader three to five year arc that's also happening, which is that maybe Apple recognizes that these one-to-one hardware dependent content platforms are becoming anachronistic, everything's moving to the cloud. I don't care about the App Store, I've got a device that connects to the internet, I can connect to any content platform, the App Store is just a middleman. Why do I need that? And if Apple maybe feels that way, then this would be the way to try to lengthen the useful life of this paradigm of hardware-based content platform.

- **ssamat@google.com** 2021-02-09T16:03:47.189-06:00

pls keep in mind this chat history is not off.

# PX-120

USDOJ-GOOGEX-000251



ALTERNATE LAUNCH OPTIONS

Click here for the screenreader version

Language other than English?
Click here for the translatable version

CONFIDENTIAL

GOOG-PLAY-005029848

**USDOJ-GOOGEX-000252**

ALTERNATE LAUNCH OPTIONS ▶



Click to Start

CONFIDENTIAL

GOOG-PLAY-005029849

**USDOJ-GOOGEX-000253**

# At Google,

## We are constantly in the public eye

...and the courthouse. We often have to produce employee
communications as evidence, which means your communications
can become public at any time. Our communications can hurt or
embarrass us as a company, or as individuals. We need to be
cautious in our communications to avoid unnecessary harm.

This is not about "hiding stuff" or not pointing out something that
may need fixing. Speaking up is a core company value. This is about
being thoughtful in your communication in order to reduce the risk
of unintended harm to Google and/or you.

Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029850

USDOJ-GOOGEX-000254



You'll earn a checkmark each time you successfully
complete a required activity. Here's an example...do this.

Drag the circle to its home.



CONFIDENTIAL

GOOG-PLAY-005029851

USDOJ-GOOGEX-000255



Activity Complete

Yup, that's it!

Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029852

USDOJ-GOOGEX-000256



CONFIDENTIAL

GOOG-PLAY-005029853



CONFIDENTIAL

GOOG-PLAY-005029854

USDOJ-GOOGEX-000258



## RULE
## 03
# Avoid Communicating When Angry or Tired.

Angry or tired? Step away from the keyboard! When you feel alert, calm, and happy, you'll be more likely to fully consider the importance of your communication and less likely to say something you don't mean and/or may regret.

Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029855

USDOJ-GOOGEX-000259



It's 11:00pm. You and Echo have been working all night on the Rockabye unit for our newest product, the gStroller, while your team lead took the night off to attend a basketball game. Rockabye has just crashed for the 14th time. Echo has decided to write this email to the team lead before calling it a night and wants you to take a look at it before sending it.

What do you think you should tell Echo to do?

| Send the email.

| Don't send the email now. Send it in the morning.

| Talk to the team lead in the morning.

| Don't send the email.
  Chat "off the record" via Hangouts instead.

To: Joss (google.com)  ×

This Thing Will Never Work

Joss,

We've done everything we can to get this Rockabye unit to work. 114 failures in one night is my limit.

I know we want to launch on Friday, but with the unit such a mess, there's no way we're going to be ready.

Could have really used your help tonight. Hope you enjoyed the game.

- Echo

CONFIDENTIAL

**USDOJ-GOOGEX-000260**

| INTRO | 01 | 02 | 03 | ⩔ | 04 | ⩔ | 05 | 06 | 07 | ⩔ | 08 | 09 | 10 | ⩔ | ✓ |

## 03 Activity

It's 11:00pm. You and Echo have been working all night on the Rockabye unit for our newest product, the gStroller, while your team lead took the night off to attend a basketball game. Rockabye has just crashed for the 14th time. Echo has decided to write this email to the team lead before calling it a night and wants you to take a look at it before sending it.

**What do you think you should tell Echo to do?**

▌ Send the email.

▌ Don't send the email now. Send it in the morning.

▌ Talk to the team lead in the morning.

▌ Don't send the email.
Chat "off the record" via Hangouts instead.

Nope. While it's critical that Echo tell the team lead about any problems Rockabye might have, doing so at 11 pm, when one is tired and angry, isn't the best idea.

The email has a significant typo (there were 14 failures that night, not 114), and it contains hyperbole (the characterization of the unit as "a mess") and exaggeration (the unit will "never work", "there's no way they'll be ready to launch").

It sounds like Echo is angry at the team lead for taking the night off. Rather than send this now, Echo might want to get some rest and reassess in the morning when Echo is fresh and calm. Then the email will be more likely to be about the facts and less about how tired and angry Echo is.

[Hide]

...ork. 114 failures in

...mess, there's no way

...the game.

CONFIDENTIAL

GOOG-PLAY-005029857

USDOJ-GOOGEX-000261



CONFIDENTIAL

GOOG-PLAY-005029858



CONFIDENTIAL

GOOG-PLAY-005029859



CONFIDENTIAL

GOOG-PLAY-005029860

**USDOJ-GOOGEX-000264**



RULE
**04**

# Stick to the Facts.

I'm sure you've heard this *a million times* and think folks working at *a company that employs only the smartest people in the world* would *never, ever* get this wrong, but exaggeration, sarcasm, and hyperbole increase the risk that someone could accidentally, or intentionally, misconstrue the meaning of your communication.



*Killer* exercise to *guarantee perfection...*

CONFIDENTIAL

GOOG-PLAY-005029861

**USDOJ-GOOGEX-000265**



CONFIDENTIAL

GOOG-PLAY-005029862

**USDOJ-GOOGEX-000266**



CONFIDENTIAL

GOOG-PLAY-005029863

**USDOJ-GOOGEX-000267**



CONFIDENTIAL

GOOG-PLAY-005029864

**USDOJ-GOOGEX-000268**



CONFIDENTIAL

GOOG-PLAY-005029865

**USDOJ-GOOGEX-000269**



GOOG-PLAY-005029866



CONFIDENTIAL

GOOG-PLAY-005029867

**USDOJ-GOOGEX-000271**



CONFIDENTIAL

GOOG-PLAY-005029868

USDOJ-GOOGEX-000272



CONFIDENTIAL

GOOG-PLAY-005029869

USDOJ-GOOGEX-000273



CONFIDENTIAL

GOOG-PLAY-005029870



CONFIDENTIAL

GOOG-PLAY-005029871



CONFIDENTIAL

GOOG-PLAY-005029872



CONFIDENTIAL

GOOG-PLAY-005029873

**USDOJ-GOOGEX-000277**



# Quick Self-Test

Without looking back, how many rules do you remember?

Can you remember 2 of them?

Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029874





RULE
**05**
# Keep it Confidential

There are no friends and family exceptions for this. Confidential includes your spouse, partner, children, grandma, and former college roomie who is developing the greatest Android app ever. Don't share any Google confidential information with anyone outside the company. This includes, but is not limited to, stuff about the status of products, deals, litigation, investigations, or other legal matters.

Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029875

**USDOJ-GOOGEX-000279**



CONFIDENTIAL

GOOG-PLAY-005029876

**USDOJ-GOOGEX-000280**





RULE
**07** "Privileged and Confidential"...What?

While phrases like "confidential," "sensitive," and "private" may alert Googlers to the sensitivity of your communication, they won't protect it from being disclosed in the course of a legal or investigative matter, as would be the case if it were protected by the attorney-client privilege. Attorney-client privilege is a legal concept that protects a confidential communication between a Googler and a Google lawyer that is about the Googler asking for or getting legal advice from the Google lawyer. Privilege can apply not only to emails, but to any record of a communication between a lawyer and client. This can include Google docs, presentations, calendar invites, video- or audio-taped meetings, etc. Communications intended to be privileged should be labeled as such.

Learn more about the
attorney-client privilege

CONFIDENTIAL

GOOG-PLAY-005029877

USDOJ-GOOGEX-000281

| INTRO | 01 | 02 | 03 | ⏬ | 04 | ⏬ | 05 | 06 | 07 | ⏬ | 08 | 09 | 10 | ⏬ | ✔ |

## 07
# Activity

After receiving an email from nervous team member Wash, quick-acting Echo wanted to immediately reach out to a Lawyercat for guidance on how to react to the information Wash provided. Help Echo craft an attorney-client privileged email to accomplish this.

Drag the proper recipient(s) to address the email:

| | |
|---|---|
| Darla, gStroller Product Counsel | dlawyercat |
| Ulric, Admin for the gStroller team | ulric |
| Irena, gStroller team lead | iteamlead |
| Group alias for miscellaneous engineering-related discussions | eng-misc |

To:

Cc:

Bcc:

*drag + drop*

CONFIDENTIAL

GOOG-PLAY-005029878

USDOJ-GOOGEX-000282

INTRO 01 02 03 ⬇ 04 ⬇ 05 06 07 ⬇ 08 09 10 ⬇ ✔

## 07
## Activity

Help Echo craft an email that's attorney-client privileged.

Drag the best subject line to the email:

🖐 ATTORNEY-CLIENT PRIVILEGED: Please help

🖐 Please help!

🖐 Confidential, please help.

To:  dlawyercat   ulric   iteamlead   eng-misc

Cc:

Bcc:

Subject:

*drag + drop*

◀ Back

CONFIDENTIAL

GOOG-PLAY-005029879

USDOJ-GOOGEX-000283



CONFIDENTIAL

GOOG-PLAY-005029880

INTRO 01 02 03 ⩔ 04 ⩔ 05 06 07 ⩔ 08 09 10 ⩔ ✔

## 07
## Activity

**Here's what happened:**

Darla Lawyercat called Echo upon receiving this email that was addressed to multiple recipients.

Let's look closer at what did not work well in this email.

| To: | dlawyercat | ulric | iteamlead | eng-misc |
|-----|------------|-------|-----------|----------|

Cc:

Bcc:

Subject:   Please help!

I think my team member, Wash, is losing it. He's driving me nuts. He's fixated on what he thinks are "product issues," and I wish he'd just stop already, you know? Hey, you wanna have lunch?

Take a Closer Look

CONFIDENTIAL

GOOG-PLAY-005029881

**USDOJ-GOOGEX-000285**



Incorrect. You must include an attorney in the address. Copying others who have no relationship to the legal matter can void the privilege. It would also be okay to include others who "need to know" about the legal issue, such as the iteamlead, in order to do their job or help the lawyer give effective legal advice.

Incorrect. If the intention is to create an attorney-client privileged email, it should be labeled that way. However, it's important to remember that the label alone will not make it privileged. The email must still meet the requirements of being addressed to an attorney, and it must be for the purposes of getting legal advice.

Incorrect. In addition to addressing it to an attorney and labeling it as such, for the email to be attorney-client privileged, it must be for the purposes of getting legal advice.

INTRO 01 02 03 ⌄ 04 ⌄ 05 06 07 ⌄ 08 09 10 ⌄ ✓

To: dlawyercat   ulric   iteamlead   eng-misc

Cc:

Bcc:

Subject: Please help!

I think my team member, Wash, is losing it. He's driving me nuts. He's fixated on what he thinks are "product issues," and I wish he'd just stop already, you know? Hey, you wanna have lunch?

You must assemble the email correctly to get credit for this activity. Please try again.

◀◀ Try Again

CONFIDENTIAL

GOOG-PLAY-005029882

USDOJ-GOOGEX-000286

INTRO | 01 | 02 | 03 | ⯆ | 04 | ⯆ | 05 | 06 | 07 | ⯆ | 08 | 09 | 10 | ⯆ | ✔

## 07 Activity

**Here's what happened:**

Darla Lawyercat called Echo upon receiving her email. Though the email was correctly addressed to an attorney, there was more Echo could do to make it clear that the email was intended to be covered by attorney-client privilege.

Let's look closer at what did not work well in this email.

To: [ dlawyercat ]

Cc:

Bcc:

Subject:   Confidential, please help.

My team member, Wash, has concerns that gStroller has product safety issues. I'm not sure about the proper steps to take and need your advice on what to do here. May we meet to talk about this?

Take a Closer Look

CONFIDENTIAL

GOOG-PLAY-005029883

**USDOJ-GOOGEX-000287**

| INTRO | 01 | 02 | 03 | ⌄ | 04 | ⌄ | 05 | 06 | 07 | ⌄ | 08 | 09 | 10 | ⌄ | ✔ |

Correct. The attorney-client privilege protects communications with a lawyer. So writing to dlawyercat is great. It is also okay to include others who "need to know" about the legal issue in order to do their job or help the lawyer give effective legal advice. So including the iteamlead also would have been okay.

Incorrect. If the intention is to create an attorney-client privileged email, it should be labeled that way. However, it's important to remember that the label alone will not make it privileged. The email must still meet the requirements of being addressed to an attorney, and it must be for the purposes of getting legal advice.

Correct. Echo has asked for legal advice.

To: dlawyercat

Cc:

Bcc:

Subject: Confidential, please help.

My team member, Wash, has concerns that gStroller has product safety issues. I'm not sure about the proper steps to take and need your advice on what to do here. May we meet to talk about this?

You must assemble the email correctly to get credit for this activity. Please try again.      ◂◂ Try Again

CONFIDENTIAL

GOOG-PLAY-005029884



CONFIDENTIAL

GOOG-PLAY-005029885

**USDOJ-GOOGEX-000289**

| INTRO | 01 | 02 | 03 | ⮛ | 04 | ⮛ | 05 | 06 | 07 | ⮛ | 08 | 09 | 10 | ⮛ | ✔ |

## 07 Activity

**Here's what happened:**

Darla Lawyercat called Echo and expressed appreciation for the email. Happy to help her with her concerns, Darla set up a meeting to discuss the issue in person, which is much safer than continuing a conversation like this over email.

Smart! You were able to help Echo put together an email that was protected by the attorney-client privilege. Let's look closer at what made this email grrrrrrreat!

| | |
|---|---|
| To: | dlawyercat |
| Cc: | |
| Bcc: | |
| Subject: | ATTORNEY-CLIENT PRIVILEGED: Please help |

My team member, Wash, has concerns that gStroller has product safety issues. I'm not sure about the proper steps to take and need your advice on what to do here. May we meet to talk about this?

Take a Closer Look

CONFIDENTIAL

GOOG-PLAY-005029886

**USDOJ-GOOGEX-000290**

| INTRO | 01 | 02 | 03 | ⌄ | 04 | ⌄ | 05 | 06 | 07 | ⌄ | 08 | 09 | 10 | ⌄ | ✔ |

Correct. The attorney-client privilege protects communications with a lawyer. So writing to dlawyercat is great. But keep in mind that, in many countries, such as Mexico, Sweden, a number of countries in the European Union (and others), the privilege doesn't apply to in-house lawyers, only outside counsel. In other countries (such as China), the privilege may may not even be recognized at all.

It is also okay to include others who "need to know" about the legal issue in order to do their job or help the lawyer give effective legal advice. So including the iteamlead is also okay.

Correct. You intended to create an attorney-client privileged email and labeled it that way. However it's important to remember that the label alone will not make it privileged.

Correct. Echo has asked for legal advice. In addition, the email is being sent to an attorney, and the "attorney-client privilege" label is there.

To:     dlawyercat

Cc:

Bcc:

Subject:   ATTORNEY-CLIENT PRIVILEGED: Please help

My team member, Wash, has concerns that gStroller has product safety issues. I'm not sure about the proper steps to take and need your advice on what to do here. May we meet to talk about this?

Send the Email

CONFIDENTIAL

GOOG-PLAY-005029887

USDOJ-GOOGEX-000291





## Activity Complete

*Remember...*

*This activity relates to how the attorney-client privilege works in the US. As mentioned, this may vary by country. For instance, China doesn't generally recognize attorney-client privilege, and a number of countries in the EU don't always recognize attorney-client privilege for communications with in-house lawyers. Consult a Google lawyer about how to exercise and maintain the privilege in your country.*

Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029888

**USDOJ-GOOGEX-000292**



CONFIDENTIAL

GOOG-PLAY-005029889

USDOJ-GOOGEX-000293



CONFIDENTIAL

GOOG-PLAY-005029890

**USDOJ-GOOGEX-000294**





## RULE 10 Think...Then Speak.

Your communications can have unintended consequences for you and the company. Think carefully before you speak publicly about anything related to Google. Understand that unless you're specifically authorized to speak on behalf of the company, you aren't. Even if it isn't your intent to speak on behalf of the company, your status as a Googler makes it likely that your communications will be attributed to Google anyway. Be careful out there.

**how to get approval**

### Shhhh...

In addition to company policy, there are US regulations, like Regulation Fair Disclosure, or Reg FD, that govern the disclosure of material non-public information to those outside the company. In particular, improperly sharing facts and figures with friends and family that could be used to make investment decisions relating to Google could result in fines and other penalties for you and Google unless the information is made available to the general public at the same time.

**risky situations**

### Avoid Legalese and Uninformed Fault Finding

Are you a lawyer? Are you responsible for drawing legal conclusions on Google's behalf? Do you have all the facts? Unless you answered "yes" to all three questions, avoid communications that conclude, or appear to conclude, that Google or Googlers are acting "illegally" or "negligently," have "violated a law," should or would be "liable" for anything, or otherwise convey legal meaning. Your conclusions could be incorrect and could hurt us.

**risky words**

What should I say instead?

CONFIDENTIAL

GOOG-PLAY-005029891

**USDOJ-GOOGEX-000295**





# RULE 10 Think...Then Speak.

Your communications can have unintended consequences for you and the company. Think carefully before you speak publicly about anything related to Google. Understand that unless you're specifically authorized to speak on behalf of the company, you speak...

## How to Get Approval

If you wish to speak at any event, consult the Speaker Center, and then seek approval from both investor-relations@google.com and press@google.com at least two weeks in advance of the proposed engagement. For tech talks and academic presentations, please see the Pub Approve Process.

### Shhh...

In addition to compa..., Regulation Fair Disclo... of material non-publi... company. In particula... with friends and family that could be used to make investment decisions relating to Google could result in fines and other penalties for you and Google unless the information is made available to the general public at the same time.

**risky situations**

### ...ault Finding

...rawing legal ... all the facts? Unless ...void communications ...oogle or Googlers are ...ting illegally or negligently, have violated a law," should or would be "liable" for anything, or otherwise convey legal meaning. Your conclusions could be incorrect and could hurt us.

**risky words**

What should I say instead?

CONFIDENTIAL

GOOG-PLAY-005029892

USDOJ-GOOGEX-000296



What should I say instead?

CONFIDENTIAL

GOOG-PLAY-005029893

USDOJ-GOOGEX-000297



## 10 Activity

During product testing, Wash became aware of safety concerns with the gStroller product and was worried that it was being pushed to market before it was ready. This is the email that Wash wrote when he became concerned about safety issues for the gStroller project.

Select the best replacement option below for the highlighted paragraph in the email:

| If we launch the product as is, someone's definitely going to sue us, and I don't want to be blamed.

| As long as we notify our manager and document our concerns in writing as proof, if Google becomes liable for anything later on, you and I should be in the clear. Don't you think?

| I'm going to set up a meeting so the two of us can talk this through.

**To:** Echo (google.com) ✕

need your advice

Echo,

I just looked at the gStroller dogfooding data, specifically in relation to the rockabye technology. You've seen some of the user feedback, haven't you?

You know and I know that there are **serious flaws in the technology. If we release this thing like this, Google's going to get sued left and right, the product liability damages will be off the chart, and you and I may even be held personally negligent.** [why?]

- Wash

CONFIDENTIAL

GOOG-PLAY-005029894

USDOJ-GOOGEX-000298





CONFIDENTIAL

GOOG-PLAY-005029896



CONFIDENTIAL

GOOG-PLAY-005029897



CONFIDENTIAL

GOOG-PLAY-005029898



Click to Continue

CONFIDENTIAL

GOOG-PLAY-005029899

**USDOJ-GOOGEX-000303**



# Certify

Click below to affirm that you have fully reviewed, understand and are responsible for applying the advice and guidelines provided in this training to your interactions, responsibilities, and work at and for Google.

Without this certification, this training will be marked incomplete.



CONFIDENTIAL

GOOG-PLAY-005029900

**USDOJ-GOOGEX-000304**

# DXCH-2

USDOJ-GOOGEX-000305

# Google Chat Retention FAQs

age las  modified:  Oc ober 1, 2021

## Frequently Asked Questions

**W   docs and   nks shared  n Chat spaces d sappear after the retent on per od (  ke messages) or w   they rema n?**



Up oaded and  nked docs ava  ab e  n the F  es tab are assoc ated w th the messages that or g na  y ntroduced them to the Chat space, so they w   d sappear from the space at the same t me as the r assoc ated messages.

For docs  nked  n (rather than up oaded  nto) the Chat space, they w   st   be ava  ab e  n the r or g na  ocat on after the retent on per od exp res—just not w th n the Chat U  / F  es tab. Docs up oaded d rect y  nto the Chat space w   not be ava  ab e e sewhere.

**Examp e:** f someone  nks a Goog e Doc  n your space and shares that doc w th you, then you' ma nta n access to that doc  n Dr ve even when the assoc ated Chat message d sappears.

---

**What  f  am subject to a  ega  ho d?**

P ease see the gu dance  n the "Lega  Ho ds" sect on on the Goog e Chat Retent on Po  cy page.

---

**What  f  have a bus ness need to reta n messages for  onger than the app  cab e retent on per od?**

Cons der stor ng cr t ca  bus ness  nformat on  n a d fferent med um or  ocat on when  onger retent on per ods are requ red. Check w th your manager  f you are not sure what qua  f es as bus ness  nformat on and the durat on for wh ch you shou d reta n such data.

---

**Under what c rcumstances shou d h story sett ngs be turned on  n Chat?**

The H story ON sett ng shou d on y be used  n the fo  ow ng c rcumstances:

- When you need to reference the contents of a message at a  ater date for bus ness-cr t ca reasons.
- When you are d scuss ng a top c  dent f ed  n any  ega  ho d not ce you've rece ved.

Turn ng h story "on" or "off" app  es on y to messages sent after that change. For examp e,  f you send or rece ve messages wh  e h story  s "off" and then you turn  t "on," the pre-ex st ng messages w   on y be reta ned for 24 hours.

Cons der stor ng cr t ca  bus ness  nformat on  n a d fferent med um or  ocat on when  onger retent on per ods are requ red. Check w th your manager  f you are not sure what qua  f es as bus ness  nformat on and the durat on for wh ch you shou d reta n such data.

---

**Does the retent on po  cy app y to my persona  account?**

No. The Chat retent on po  cy  s spec f c to Goog e corporate data (your @goog e.com or other A phabet account) and doesn t app y to any users outs de of A phabet,  nc ud ng your persona @gma  .com account.  n other words, you w   need to keep th s retent on po  cy  n m nd as you

**CONFIDENTIAL**

**USDOJ-GOOGEX-000306**

Google Chat Retention information Workspace Admin Help

manage your corporate ema s, but you don't have to change any behav or for your persona account.

---

Where can  find more  nformat on about Chat Retent on?

P ease v s t the Goog e Chat Retent on Po  cy    page.

---

Can   change my h story defau ts?

Yes, but be m ndfu  about the r sks of over-reta n ng chat conversat ons (see go/ nfogov    ).  f you st  w sh to change your persona  defau t sett ng so that conversat ons you start have H story On by defau t, you can do so by jo n ng the group g/chat-h story-defau t-on. (Members of our extended workforce can jo n the group by ema  ng chat-h story-defau t-on+subscr be@goog e.com; see go/add-me for more deta  s.) Once you have jo ned, any 1:1 or group chat that you create w   start w th H story On. P ease note that conversat ons started by non-group-members w   st   start w th H story Off (un ess  n a threaded space, where h story  s a ways forced On).

Google Chat Retention Policy

**CONFIDENTIAL**

**USDOJ-GOOGEX-000307**