**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ▆▆▆▆▆▆▆▆▆▆ |
| Defendant. | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE**
**THE EXPERT TESTIMONY OF RANDOLPH E. BUCKLIN**

February 27, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

ARGUMENT ............................................................................................................................. 2

I.      Prof. Bucklin's Historical Opinions Are Not Relevant To This Case ............................. 2

    A.      Prof. Bucklin's Opinions Regarding Shifting Ad-Spend Shares Relies On
        Unsupported Inferences And Does Not Satisfy Relevancy Standards ........................ 2

        1.      Prof. Bucklin's Opinions Do Not Account For The Constant Increase In Ad
            Spend And Digital Ad Revenues .............................................................. 3

        2.      Prof. Bucklin's Inference That Shifts In Ad Spend Prove Product Substitutability
            Is Not Supported By The Caselaw ........................................................... 8

    B.      Google Fails To Demonstrate The Relevance Of Prof. Bucklin's Opinions ............. 10

II.     Prof. Bucklin Fails To Link His Historical Opinions To The Facts Of This Case .......... 11

    A.      Caselaw Does Not Support Prof. Bucklin's Approach ............................................ 12

    B.      Google Cannot Bolster Prof. Bucklin's Historical Opinions With Information He Did
        Not Rely On In Forming Those Opinions ................................................................ 14

        1.      The Caselaw Cited By Google Is Inapposite ........................................ 14

        2.      Google Cannot Bolster Prof. Bucklin With Materials He Did Not Cite .............. 16

    C. Prof. Whinston's Discussion Of Recent Digital Advertising History Highlights The Flaws
        In Prof. Bucklin's Historical Opinions ................................................................. 18

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*,
    849 F.2d 1336 (11th Cir. 1987) ............................................................................... 9

*Community Publishers v. Donrey Corp.*,
    892 F. Supp. 1146 (W.D. Ark. 1995) ...................................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................................... 10, 17, 20

*\*FTC v. Whole Foods Market, Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) .............................................................................. 9

*\*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997) .............................................................................. 3, 10, 17, 20

*Kennedy v. Collagen Corp.*,
    161 F.3d 1226 (9th Cir. 1998) ........................................................................ 10, 20

*Midamerica C2L Inc. v. Siemens Energy, Inc.*,
    No. 617-CV-171-ORL-40-LRH, 2019 WL 7423523 (M.D. Fla. June 7, 2019) .................... 15

*Miller v. Holzmann*,
    563 F. Supp. 2d 54 (D.D.C. 2008) .................................................................. 12, 13

*Smith v. Strom Engineering Corp.*,
    No. CV 2:19-147, 2022 WL 2668556 (W.D. Pa. Apr. 20, 2022) ................................... 14, 15

*Sykes v. Napolitano*,
    634 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................ 4

*Times-Picayune Publishing Co. v. United States*,
    345 U.S. 594 (1953) ................................................................................................ 9

*\*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) .......................................................................... 8

**Rules**

Federal Rule of Evidence 702 ........................................................................... 2, 3, 4, 13

Google seeks to offer opinions from Prof. Randolph E. Bucklin regarding historical "shifts" in shares of advertising spend and the historical rise of new advertising channels. This testimony should be excluded for two reasons: (1) Prof. Bucklin reaches his opinions through unsupported inferences based on historical shifts in shares of ad spend and shares of digital ad revenue[1] during periods of continual increases in ad spend; and (2) Prof. Bucklin fails to tie his opinions to the facts of this case.

Google's response does not address the substantive flaw in Prof. Bucklin's analysis—namely, that he cannot opine on whether advertisers actually *shifted* ad spend between advertising channels (as he concludes), as opposed to the alternate and more reasonable explanation that advertisers were simply directing fresh ad spend into new channels. Google also does not link his historical opinions to the facts of this case as required under the law. In fact, Google and Prof. Bucklin concede that he did not review any of the documents and testimony available in this case. His historical opinions thus provide no useful insight into how advertisers today are actually responding in the relevant U.S. advertising markets that we allege—search ads and general search text ads.

Instead, Google defends Prof. Bucklin's report on three bases: (1) shifts in shares of ad spend are relevant to showing substitutability across ad channels regardless of overall ad spend growth, (2) Prof. Bucklin's opinions supposedly refute the existence of search ads and general search text ads relevant markets, and, regardless (3) any infirmities in his opinions go to weight rather than admissibility. Google further contends that Prof. Bucklin's subsequent review of case documents and deposition testimony saves his historical analysis.

---

[1]  Prof. Bucklin's opinions on shifts in shares of ad spend and shift in shares of digital ad revenue suffer from the same flaws. References to shares of ad spend generally also refer to shares of digital ad spend.

None of these arguments addresses the fundamental problems with Prof. Bucklin's opinions. Accordingly, Plaintiffs respectfully request that the Court exclude any testimony from Prof. Bucklin on his historical opinions.

**ARGUMENT**

## I.     Prof. Bucklin's Historical Opinions Are Not Relevant To This Case

Plaintiffs allege that Google has violated Section 2 of the Sherman Act in maintaining its monopoly in the relevant antitrust markets of U.S. search ads and U.S. general search text ads. In response, Google has retained Prof. Bucklin to opine that different advertising channels—from newspapers, radio, and television to different forms of digital advertising—are viewed by advertisers as substitutes for each other based on what he calls "shifting" shares of ad spend over the course of 85 years. Based on this, Prof. Bucklin calls the different advertising channels substitutes, and Google will argue that these advertising channels belong in the same antitrust market as search ads and general search text ads. *See*, *e.g.*, Def. Br. at 2, 11–12.

As explained in our Motion, Prof. Bucklin's analysis does not satisfy the relevancy standard for two reasons. *See* Pls.' Mot. to Exclude the Expert Testimony of Randolph E. Bucklin And Memo. In Support ("Pls. Br."), ECF No. 420, at 8–13. First, he ignores the continuous growth in overall ad spend, which undermines his conclusion that advertisers are shifting their ad spend between advertising channels. Second, he improperly infers that shifts in ad spend show that multiple advertising channels are substitutes for each other, which Google claims undermine the existence of Plaintiffs' relevant advertising markets.

### A.     Prof. Bucklin's Opinions Regarding Shifting Ad-Spend Shares Rely On Unsupported Inferences And Do Not Satisfy Relevancy Standards

Plaintiffs' Motion argues that, due to the enormous growth in advertising spend during the 85 years covered in Prof. Bucklin's analysis of shares of ad spend, it is impossible to say

whether advertisers were *shifting* ad spend between channels (as he concludes), as opposed to the more likely explanation that advertisers were directing fresh ad spending into new channels. Pls. Br. at 8–13. This flaw in Prof. Bucklin's approach presents "simply too great an analytical gap between the data and the opinion proffered" to be reliable. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *see also* Fed. R. Evid. 702 (b)–(c) (requiring expert testimony to be "based on sufficient facts or data" and "the product of reliable principles and methods").

Google responds by arguing that (1) the growing pie of ad spend and digital advertising revenues goes to the weight of Prof. Bucklin's testimony rather than its admissibility and (2) despite the continuous growth of ad spend and digital advertising revenues, relative share shifts indicate that advertisers view them as substitutes. Def.'s Opp'n to Plaintiffs' Mot. to Exclude Certain Expert Testimony of Professor Randolph E. Bucklin ("Def. Br."), ECF No. 474, at 12–15. These arguments are inconsistent with Prof. Bucklin's report and testimony and do not meaningfully address Plaintiffs' objections.

1.    **Prof. Bucklin's Opinions Do Not Account For The Constant Increase In Ad Spend And Digital Ad Revenues**

a)    **Prof. Bucklin's "Growing Pie" Error Is Foundational And Merits Exclusion**

Google first asserts that the "'growing pie' criticism goes to the weight of Professor Bucklin's testimony, not its admissibility," because we do not challenge the accuracy of the underlying data or his calculations. Def. Br. at 12 (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)). This argument, however, misses the point. Prof. Bucklin's approach is inherently flawed regardless of the accuracy of the underlying data and calculations.

Next, Google argues that "[t]he fact that overall ad spend grew does not disprove the

3

share shifts that Professor Bucklin observed." Def. Br. at 13. But that observation is not sufficient to meet Google's burden of establishing that Prof. Bucklin's analysis satisfies *Daubert* in the first instance. It is legally insufficient for Google simply to say that its expert's analysis might potentially be accurate. *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." (citing *Bourjaily v. United States*, 483 U.S. 171 (1987))); *see also Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009) (citing *Meister v. Med. Engr. Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001)). As explained in our Motion, Prof. Bucklin's inference that advertisers view the different ad channels as substitutes based on the shifting shares of ad spend lacks the necessary support because he failed to account for the continuous growth of ad spend. *See* Pls. Br. at 9–13. This error is foundational and makes his opinions as a whole unreliable under *Daubert*.

Google also claims that Prof. Bucklin actually considered overall growth in ad spend when analyzing shifting shares of ad spend. Def. Br. at 13 (stating without citation: "[P]rofessor Bucklin did consider that advertising spending increased in the aggregate over the relevant time periods. Professor Bucklin's backup materials show the same facts DOJ Plaintiffs claim he ignored."). This claim falls short of addressing our challenges as shown in Prof. Bucklin's report and deposition testimony.

First, Google did not, and cannot, point to any place in Prof. Bucklin's report where he mentions, much less takes into account, the overall growth in ad spend across time or that he factored such growth into his spend-shift analysis. Second, in deposition, when asked about how a general increase in ad spend could have affected his calculated relative spend in different ad channels, Prof. Bucklin testified:

> **Q.** Separate from [just "eyeballing" the chart in your report depicting ad-spend shares], in this matter, do you have an opinion on whether digital advertising has increased in a greater amount than the decrease in spending on other advertising channels?
>
> **A.** As I sit here, without reviewing the data, *I don't have an opinion on that one way or the other*. The point was simply to show the alternatives for advertisers increasing over time and that there was reallocation of spending across channels.

Pls. Ex. F, Excerpts from the Deposition of Randolph E. Bucklin, Oct. 26–27, 2022 ("Bucklin Dep."), 220:8–18 (emphasis added).

Even if Prof. Bucklin "considered" the overall growth in ad spend as claimed by Google, his response makes it clear that he did not account for this growth in reaching his opinions.[2] For example, the backup materials *containing the ad-spend numbers*—i.e., the ones referenced by Google in its response—had already been introduced as an exhibit in his deposition when he provided this response. But he did not point to these numbers—or anything else—when asked whether digital advertising has increased in a greater amount than the decrease in spending on other advertising channels. *See* Pls. Ex. G, Exhibit 7 to Bucklin Dep.; Pls. Ex. F, Bucklin Dep., 206:24–207:10 (introducing Exhibit 7). The fact that he looked at, or "considered," ad-spend numbers is irrelevant. Prof. Bucklin's historical analysis never accounted for what these numbers show, i.e., the growth of advertising spend. His methodology is therefore flawed and his related opinions should be excluded.

Google also attempts to reframe our challenge, contending that "[t]he crux . . . appears to be that Professor Bucklin's opinion does not include an analysis of advertising demand cross-elasticities." Def. Br. at 13. Google then purports to resolve this "argument" by pointing out that

---

[2]  Prof. Bucklin did use the data that showed ad spend and digital ad revenue continuously grew over the period for which he calculated shares. But other than using the data in his calculations, Prof. Bucklin seemingly ignored overall ad-spend growth.

Prof. Bucklin is not an economist "offering an affirmative opinion that a particular relevant market exists." *Id.*[3] Again, Google misses the mark. In our Motion, we merely offered "an econometric analysis" as an example of evidence that might allow Prof. Bucklin to make the kinds of inferences he relies on in his historical opinions. Pls. Br. at 13. That example is not the crux of out argument; the fact that Prof. Bucklin makes unsupported inferences without accounting for equally plausible and indeed more reasonable explanations is. Such an infirmity is foundational and casts doubt, under *Daubert*, on the opinions offered as a whole.

> **b)** **Google's Data Analysis Regarding The "Growing Pie" Error Is Incomplete And Mistaken**

In defense of Prof. Bucklin's failure to account for the overall increase in ad spend, Google cites two examples—ad spend growth from 2007 to 2008 and 2019 to 2020[4]—to argue that "the increases in various channels' and platforms' shares *cannot* all be explained by an influx of 'new' spending." Def. Br. at 15 (emphasis in original) (citing Pls. Br. at 13). This argument fails for two reasons.

*First*, Google's argument is the first time the company or Prof. Bucklin has pointed to any period that covers less than a decade.[5] Thus, in trying to defend Prof. Bucklin's historical

---

[3] This contention is in tension with how Google repeatedly argues that Prof. Bucklin's opinions refute our relevant markets. *See, e.g.*, Def. Br. at 2.

[4] Between 2007–2008, the country was in the midst of a major financial crisis (as we acknowledged, *see* Pls. Br. at 11 n.12), and in 2019–2020, the country was in the midst of the COVID-19 pandemic.

[5] *See* Def. Br. at 14 (newspaper share of ad spend decreases from 65% to 2% from 1935–2020 (85 years)); Def. Ex. 1, Expert Report of Randolph E. Bucklin, June 3, 2022 ("Bucklin Initial Rep."), ECF No. 474-1, at ¶ 20 (radio share of ad spend increased from 10% to 21% from 1935–1945 (10 years)); *id.* ¶ 24 (TV share of ad spend increased from 4% to 35% from 1950–2000 (50 years)); *id.* ¶ 25 (from 1948–1968 (20 years), radio share of ad spend decreased from 76% to 58% and newspaper share of ad spend decreased from 17% to 9%); *id.* ¶ 27 (from 2000–2020 (20 years), TV share of ad spend decreased from 35% to 25%, magazine and

opinions, Google rewrites it to suggest that an opinion Prof. Bucklin never offered is relevant to this case. It is certainly true that the period covered by or otherwise the focus of a historical opinion like Prof. Bucklin's is a critical piece of his methodology and framework. And the mid-flight change of the covered time period is, therefore, material. Because Prof. Bucklin never adopted a year-by-year analysis, we were never able to question him on it in his deposition. Google cannot belatedly recast Prof. Bucklin's conclusions to save his "growing pie" error. Accordingly, this belated change to Prof. Bucklin's opinions should be rejected.

*Second*, we have never asserted that in each and every year, total advertising growth could account for spending in new advertising channels (i.e., an attack on Prof. Bucklin's conclusions). Rather, we have pointed out that Prof. Bucklin concedes that he did not account for the growing pie over the periods *he* analyzed (i.e., an attack on Prof. Bucklin's methodology). Pls. Br. at 8–13. Thus, in the many years when advertisers increased their spend, he made no attempt to measure which dollars were "shifted" between advertising channels and which dollars were new spend.[6] The fact that a few of those 85 years may have involved some amount of ad-spend shifting does not cure the fact that Prof. Bucklin failed to account for the growing-pie error during the time periods he analyzed.

Google's arguments thus illustrate that Prof. Bucklin reached his opinions based on observations of simple "shifts" in his calculated shares of ad spend by ad channel. He did not

---

newspaper share decreased from 38% to 4%, and digital advertising share increased from 5% to 63%).

[6] To illustrate this flaw in Prof. Bucklin's approach, our initial brief gave an example: Prof. Bucklin discusses in his initial report that from 1948 to 1968, the share of radio ad spend *decreased* by roughly 50%, but the backup data shows that during that same period, the actual dollar amount of ad spend on radio *increased* by nearly 50%. Pls. Br. at 12. Thus, although the relative size of the advertising channels may be changing over time, a ready explanation is that the pie is just getting bigger and the new spend is disproportionately going elsewhere.

conduct any further analysis of how that simple "shift" interacted with other factors. This is not the proper province of expert testimony and should, pursuant to *Daubert*, be excluded.

### 2. Prof. Bucklin's Inference That Shifts In Ad Spend Prove Product Substitutability Is Not Supported By The Caselaw

Our Motion argues that even if Prof. Bucklin's analysis properly showed a shift between advertising channels—which is very much in dispute—Prof. Bucklin improperly infers that this means the different ad channels were substitutes. Pls. Br. at 13. This is wrong. For example, even if an advertiser did move spend from paper handbills to radio, this would not support the conclusion that the two channels were viewed as substitutes by advertisers and possibly in the same relevant antitrust market.

In response, Google asserts that "the relative proportion of spend on different channels and changes over time can inform the likelihood of substitution across channels," and further that "advertisers' historical behaviors . . . are relevant to questions of substitution and the alternatives that advertisers actually use in practice." Def. Br. at 14–15. These arguments are contrary to relevant legal precedent.

Courts have routinely recognized problems with inferences such as those in Prof. Bucklin's report. First, customers shift between potential products for many reasons unrelated to substitutability for competitive reasons. For example, in 2011, this court recognized that taxpayers switching tax preparation methods due to changes in the complexity of their taxes does not support any inference about reasonable substitutability, or competition, between the methods. *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 59–61 (D.D.C. 2011); *see also* Pls. Ex. H, Excerpts from the Rebuttal Expert Report of Michael D. Whinston, PhD, Aug. 5, 2022, ¶¶ 163–164; Pls. Br. at 8–13. And as D.C. Circuit Judge Tatel has explained, the fact that consumers shift from one product

to another over time provides little insight into the contours of the relevant antitrust market (i.e., whether the products are reasonable substitutes):

> [W]hen the automobile was first invented, competing auto manufacturers obviously took customers primarily from companies selling horses and buggies, not from other auto manufacturers, *but that hardly shows that cars and horse-drawn carriages should be treated as the same product market*. That Whole Foods and Wild Oats have attracted many customers away from conventional grocery stores by offering extensive selections of natural and organic products thus tells us nothing about whether Whole Foods and Wild Oats should be treated as operating in the same market as conventional grocery stores. Indeed, courts have often found that sufficiently innovative retailers can constitute a distinct product market even when they take customers from existing retailers.

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J., concurring) (emphasis added).

In fact, courts have recognized that advertising channels *can* be in separate product markets—the opposite of what Prof. Bucklin implies. As the Supreme Court noted, "The advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in other mass media." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 613 n.31 (1953) ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range."); *see also Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1342 (11th Cir. 1987) (finding that "advertising in telephone directories is unique"); *Cmty. Publishers v. Donrey Corp.*, 892 F. Supp. 1146, 1156 (W.D. Ark. 1995) (distinguishing advertising in local daily newspapers from advertising in national newspapers, radio, television, advertising circulars, and direct mail), *aff'd sub nom. Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998).

Prof. Bucklin's inference and opinions are thus fundamentally flawed. Like Judge Tatel recognized in *Whole Foods*, search advertising may have attracted advertiser dollars away from "conventional" or other digital advertising channels—but that "tells us nothing about whether

[search ads or text ads] should be treated as operating in the same market as [any other type of ad channel]." *Whole Foods*, 528 F.3d at 1048 (Tatel, J., concurring). Thus, Prof. Bucklin's opinions do not support an inference about what advertisers are actually doing today and what ad products advertisers currently view as reasonable substitutes. *See Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 591; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

**B.**     **Google Fails To Demonstrate The Relevance Of Prof. Bucklin's Opinions**

As explained above and in our Motion, Prof. Bucklin's lengthy historical analysis is not relevant to any question at issue in this case. Pls. Br. at 8–11. Google argues that Prof. Bucklin's lengthy historical opinions are relevant because they "bear directly on one of Plaintiffs' arguments regarding the relevant market." Def. Br. at 11. According to Google, we contend that "advertising channels are each used only for distinct phases of an idealized consumer buying process" and that "advertisers rigidly assign channels to 'funnel stages.'" *Id.* at 11–12. Using that strawman, Google asserts that Professor Bucklin's historical analysis "refutes" and "directly undermines" our contentions. *Id.* at 11.

But Google's response is, in fact, non-responsive to the defects Plaintiffs identified. We have never contended that "advertising channels are each used *only* for distinct phases" or that "advertisers *rigidly* assign channels to 'funnel stages.'" *See* Def Br. at 11–12 (emphasis added). No witness has proffered such testimony, and in fact, our advertising expert, Prof. Kinshuk Jerath, has said the opposite. At deposition, Prof. Jerath testified, "[S]earch advertising can be used upper-funnel, but my opinion is about *most suited and effective*, [and] say[s] that search advertising is most suited and effective for middle and lower-funnel goals." Pls. Ex. I, Excerpts

from the Deposition of Kinshuk Jerath, Nov. 7–8, 2022, 273:20–274:03 (emphasis added). His

reports repeatedly make this same point.[7]

Thus, even if Prof. Bucklin's analysis were to show that advertisers might consider

different advertising channels as alternatives—something Prof. Bucklin fails to establish—the

relevancy of his historical analysis hinges on Google's mischaracterization of Plaintiffs'

allegations, i.e., that advertisers use a rigid, siloed conception of the marketing funnel as they

make decisions about their ad spend. When considered in the context of Plaintiffs' actual

positions, Google cannot demonstrate, as it must, how Prof. Bucklin's opinions tend to make a

relevant fact in dispute more or less probable.

## II.      Prof. Bucklin Fails To Link His Historical Opinions To The Facts Of This Case

The Court should also reject Prof. Bucklin's historical opinions because they are not tied

to the facts of this case and thus fail the *Daubert* "fit" requirement. Plaintiffs' Motion argued

that, when opining how advertisers have historically shifted their spending, Prof. Bucklin

ignored the voluminous documents and deposition testimony gathered in this case, which reflect

the present state of the industry. *See* Pls. Br. at 5–6 & n.8. We noted that, at no point, does

---

[7]   *See, e.g.*, Pls. Ex. J, Excerpts from the Expert Report of Kinshuk Jerath, June 6, 2022, ¶ 40
("Broadly speaking, each advertising or marketing channel serves certain purposes better than
others, and therefore different advertising or marketing channels are better suited than others to
achieve different funnel goals, though a particular advertising or marketing channel may be
used to meet goals at multiple funnel stages." (footnote omitted)); Pls. Ex. K, Excerpts from
Rebuttal Report of Kinshuk Jerath, Aug. 5, 2022, ¶ 13–14 ("Prof. Bucklin asserts, for example,
that 'many forms of advertising, including search and display advertising, work 'up and down'
the purchase funnel. . . . In my [Initial] Report, I similarly note that a particular advertising or
marketing channel may be used to meet goals at multiple stages of the funnel. I disagree with
Prof. Bucklin, however, to the extent he intimates that because search advertising and other
forms of advertising can be used at different stages of the funnel, this means they are *similarly
suited and effective* alternatives for achieving goals at different stages of the funnel. There is
broad agreement in the advertising industry that certain channels contain characteristics
rendering them more suitable and more effective than others for achieving certain funnel
goals." (emphasis in original) (internal footnotes omitted)).

Prof. Bucklin tie his lengthy discussion of advertising history to what advertisers are actually doing today.

In response, Google does not dispute that Prof. Bucklin's historical opinions do not account for the documents and testimony here. Instead, Google argues (a) that Prof. Bucklin's after-the-fact review of some case documents saves his historical analysis and (b) that, regardless of its connection to the case, Prof. Bucklin should be permitted to provide a historical analysis of advertising because our economic expert, Prof. Michael Whinston, also performed a historical review. Def. Br. at 11, 16–17. These arguments should not save Prof. Bucklin's analysis.

### A.      Caselaw Does Not Support Prof. Bucklin's Approach

Under FRE 702, a historical exposition unconnected to and disengaged from the facts of a particular dispute is not the proper subject for expert testimony.

Google argues that FRE 702 "contemplate[s] that an expert 'might instruct the factfinder' on general principles 'without ever knowing about or trying to tie their testimony into the facts of the case,'" Def. Br. at 16 (citing Fed. R. Evid. 702, advisory committee's note to 2000 amendment), and relies on a case from the District Court of the District of Columbia for the same principle, *id.* at 17 (citing *Miller v. Holzmann*, 563 F. Supp. 2d 54, 90 (D.D.C. 2008), *aff'd in part, vacated in part, remanded sub nom. United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010)). These arguments are misplaced.

*First*, Google fails to explain how Prof. Bucklin's historical opinions constitute a discussion of "general principles" under FRE 702. Indeed, immediately following the language that Google quotes, the comments provide: "For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case." Fed. R. Evid. 702, advisory committee's note to 2000 amendment. There is no parallel

between Prof. Bucklin's discussion of 200+ years of advertising history and the type of complex examples provided in the comments, nor has Google suggested any.

*Second*, even when an expert's testimony concerns "general principles," the rules and caselaw still require that the testimony "fit" the facts of the case. *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment (noting that FRE 702 requires "generalized testimony" to "'fit' the facts of the case"); *Miller*, 563 F. Supp. 2d at 90–91 (same). That makes sense for a variety of reasons, including judicial economy and fairness. Referring to "general principles" is not a free pass for an expert to expound on any subject they wish; that testimony must interact with and account for the facts and circumstances actually in dispute. Prof. Bucklin's historical opinions fail to satisfy the requirement that the opinions fit the facts of this case.

*Third*, *Miller* illustrates how Prof. Bucklin's historical opinions fail to fit the facts of this case. In *Miller*, the plaintiffs alleged that the defendants colluded to win contracts and overcharge for the projects at issue. 563 F. Supp. 2d at 73. The plaintiffs asked their expert "to explain how auctions and bidding work, how collusion in auctions work[s], and the incentives that are created for seeking cost-reducing technologies." *Id.* at 89 (internal quotation marks omitted). In ruling on post-trial motions, the court found the testimony permissible, concluding that the expert's testimony "educated the jury about theoretical characteristics of collusive behavior in an auction setting and assisted them in determining whether events in this case bore the hallmarks of such collusion." *Id.* at 94. The court noted that although "[the expert's] model may not have mimicked the facts [t]herein in every minute detail, it was sufficiently tied to the facts of the case." *Id.* at 94–95 (internal quotation marks omitted).

By contrast, Prof. Bucklin's historical opinions do not offer any kind of model, set of recognized parameters, or established theories that the Court could use in evaluating the evidence

in this case and assessing what advertisers are actually doing today. Prof. Bucklin's opinions likewise do not explain complex concepts like thermodynamics, nor are they customized to aid in understanding the claims and defenses in this case. Thus, *Miller* underscores the distinction between Prof. Bucklin's historical opinions and permissible "general principles" testimony.

### B.     Google Cannot Bolster Prof. Bucklin's Historical Opinions With Information He Did Not Rely On In Forming Those Opinions

The Court should reject Google's efforts to bolster Prof. Bucklin's historical opinions after the fact with materials he neither cited nor relied on in presenting those opinions.

### 1.     The Caselaw Cited By Google Is Inapposite

Our Motion explained that Prof. Bucklin did not review or rely on any documents or depositions from this case, as caselaw requires. Pls. Br. at 8–12 (citing *Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 591; *Kennedy*, 161 F.3d at 1228). Tellingly, in its response, Google fails to cite a single case where the court qualified an expert who completely ignored the factual record in reaching his or her opinions. Moreover, the two cases Google cites in support of industry history being a proper subject for expert testimony, Def. Br. at 10, are readily distinguishable. Indeed, these cases highlight the differences between the testimony Prof. Bucklin offers and what other courts have permitted.

In *Smith v. Strom Engineering Corp.*, a central issue was whether the defendant-company, which provided "strike staffing" during lockouts, was required to compensate the plaintiff-strike staffers for their time being transported by the defendant to the jobsite and across picket lines. 2022 WL 2668556, at *1 (W.D. Pa. Apr. 20, 2022), *rep. & rec. adopted sub nom. Smith v. Allegheny Techs., Inc.*, 2022 WL 10755425 (W.D. Pa. Aug. 1, 2022). Contrary to Google's assertion, the challenged expert in that case did not simply offer testimony regarding "the background and history of the strike-staffing industry." Def. Br. at 10. Instead—in contrast

to Prof. Bucklin here—the expert addressed both "the essential elements of the business of strike staffing agencies, and the purpose and manner by which such agencies, including [defendant's], regulate and control traveling to and crossing picket lines by replacement workers, including how this may apply to the facts in this case."[8] *Id*. at *6 (emphasis added).

Google's reliance on *Midamerica C2L Inc. v. Siemens Energy, Inc.*, is similarly misplaced. 2019 WL 7423523 (M.D. Fla. June 7, 2019). *Midamerica* involved claims of design defects in gasification equipment, and the defense expert's report included a section—among others discussing the underlying facts of that case—on the "History of Gasification Technology and Its Implementation," which the plaintiff sought to exclude. *Id*. at *1–3. Recognizing that "[t]he parties agree[d] that the gasification industry is complex," with "[e]ach system [being] uniquely designed for specific applications," the court found that the expert's testimony on industry history would "assist the trier of fact to understand the how gasification plants, and the related technology, is designed, constructed, commissioned, and operated." *Id*. at *4. Yet, even with that direct connection between the expert's industry testimony and the claims at issue—a connection not present here—the court noted that it would "limit the scope of [the expert's] historical overview to a reasonable length." *Id*.

Here, despite our claims focusing on the digital era and alleging relevant markets in search advertising and text advertising, Prof. Bucklin seeks to expound on 200 years of advertising history going back to colonial times and town criers without accounting for and

---

[8]  Indeed, further distinguishing *Smith* from this case is the fact that, in her report, the *Smith* expert "reviewed and relied on . . . specific information related to the facts of [the] case in reaching her conclusions" and "specifically discuss[ed] the facts of [the] matter, citing deposition testimony given in [the] case, and aligning [the defendant's] practices to those of the strike staffing industry." 2022 WL 2668556, at *3, *5. Prof. Bucklin did neither of those things here.

considering the facts and circumstances present in this case. Google therefore seeks to admit siloed inferences about trends in advertising spend from decades ago, long before search engines even existed. Nothing in *Smith* or *Midamerica* supports Google's arguments to permit such testimony.

### 2. Google Cannot Bolster Prof. Bucklin With Materials He Did Not Cite

On the wrong side of the caselaw, Google attempts to bolster Prof. Bucklin's opinions by belatedly citing information that purportedly supports it. *See* Def. Br. at 8–9, 17. Google's effort necessarily fails, however, as the company cannot remedy Prof. Bucklin's failure after the fact with information that he did not actually rely on in forming his historical opinions.

Google first seeks to link six articles co-authored by Prof. Bucklin to the report's discussion of Prof. Bucklin's historical opinions. Def. Br. at 8–9 & nn.3–8. In doing so, Google conflates Prof. Bucklin's qualifications—which we have not challenged—with the materials he relied upon. Prof. Bucklin did not cite any of these articles as support for his historical opinions, and only cited three of them in his expert reports at all.[9] Moreover, Prof. Bucklin did not identify any of these articles at deposition when directly asked what he relied upon to support his historical opinions. *See, e.g.,* Pls. Ex. F, Bucklin Dep., 155:11–15 ("Q. So everything that's in

---

[9] These three articles were cited in other parts of Prof. Bucklin's initial report and in his rebuttal and reply reports. *See* Def. Ex. 1, Bucklin Initial Rep., ¶¶ 34 & nn.53–54, 36 & nn.58–59 (discussing the history of the purchase funnel and the consumer journey); *id.* at ¶ 60 & n.112 (discussing the purchase funnel and display ads); Def. Ex. 2, Rebuttal Expert Report of Randolph E. Bucklin, Aug. 4, 2022 ("Bucklin Rebuttal Rep."), ECF No. 474-2, at ¶ 40 & n.138 (referencing his discussion at ¶ 60 of his initial report); Def. Ex. 8, Reply Expert Report of Randolph E. Bucklin, Sept. 24, 2022, ("Bucklin Reply Rep."), ECF No. 474-8, at ¶ 39 & n.89 (responding to comments about his article in our expert's report).

your reports includes everything that you relied upon beyond your experience for your opinions in this matter? A. Yes.").[10]

Google then argues that "Professor Bucklin also extensively reviewed the case record, as his *second* and *third* reports demonstrate." Def. Br. at 17 (emphasis added) (before citing his rebuttal and reply reports). Google implicitly concedes—as Prof. Bucklin did in his deposition— that in forming his historical opinions, Prof. Bucklin did not rely upon—or even review—any documents or testimony in this case. Pls. Ex. F, Bucklin Dep., 95:9–96:13. Indeed, even Google's citations to Prof. Bucklin's "second and third reports," *see* Def. Br. at 17, do not tie a discussion of the factual record in any way to Prof. Bucklin's historical opinions.[11]

*Daubert* requires that expert testimony be "sufficiently tied to the facts of the case." 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)). Google cites no support, nor are we aware of any, for the proposition that reviewing materials after the fact can cure an expert's failure to rely upon them in forming opinions in the first instance. Certainly, nothing in his historical opinions is tied—by reference or citation—to these documents. Of course, just reviewing the documents—had Prof. Bucklin actually done this when writing his historical opinions—would not save that testimony from challenge. Because Prof. Bucklin did not connect his historical analysis with the facts of this case, his general, historical summary

---

[10] One of the articles came up in Prof. Bucklin's deposition in relation to consulting work he has done, but not his opinions. Pls. Ex. F, Bucklin Dep., 47:8–48:5 (pointing to Paul R. Hoban & Randolph E. Bucklin, "Effects of Internet display Advertising in the Purchase Funnel: Model-Based Insights from a Randomized Field Experiment," 52 *J. of Marketing Research*, 2015, no. 3, at 375–93, to describe the work, and avoid identifying the company he worked for, due to a confidentiality agreement).

[11] *See* Def. Ex. 2, Bucklin Rebuttal Rep., ¶¶ 34–38 (discussing advertiser documents from 2018–2021 and how advertisers use return on ad spend with no reference to past industry history); Def. Ex. 8, Bucklin Reply Rep., ¶¶ 16–17 & nn.25–26, 19 & n.32 (discussing an April 2021 AT&T document and a Crate & Barrel document with information covering May 2019 to February 2021 without reference to the past industry history).

cannot be relevant. *See Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 591.

C.    **Prof. Whinston's Discussion Of Recent Digital Advertising History Highlights The Flaws In Prof. Bucklin's Historical Opinions**

Comparing Prof. Bucklin's historical opinions to the report of our economics expert, Prof. Whinston, Google argues that we "seek to use industry history where they believe it suits them." Def. Br. at 11 (citing Pls. Ex. L, Excerpts from the Expert Report of Michael D. Whinston [Corrected Oct. 28, 2022] ("Whinston Initial Rep."), ¶¶ 296–300 (§ III.D.1.d.)).[12] Yet unlike Prof. Bucklin's 16-paragraph, 200-year historical discussion, Prof. Whinston's 5-paragraph discussion of digital advertising trends is focused and directly tied to the factual record in this case, underscoring the significant shortcomings in Prof. Bucklin's historical opinions in several ways.

*First*, Prof. Whinston analyzed data *produced in this case* to support his discussion of digital advertising trends and presented two figures reflecting his analysis. For example, in Figure 41, Prof. Whinston charted advertising spend by ad type from 2011–2025, using Google's internal "Industry Metrics" reports that consistently "break[] out search as a separate advertising channel." Pls. Ex. L, Whinston Initial Rep., ¶¶ 297–298 & Fig. 41. In Figure 42, Prof. Whinston reviewed Google's internal "Industry Metrics" reports and additional data from Google, Amazon, Facebook, and Microsoft and then depicted the percentage of 2019 U.S. online advertising revenues earned by

---

[12] Oddly, Google also points to the entire *Industry Background* section of the Complaint as an example of us using the history of advertising to our benefit. Def. Br. at 11 (citing Compl. (ECF No. 1), ¶¶ 19–87). The allegations in the Complaint, however, do not rise to the level of evidence, unlike expert testimony. Also, after an opening paragraph about "computer scientists and entrepreneurs explor[ing] different ways to search and index the growing number of internet sites" starting in the early 1990s, *see* Compl., ¶ 19, the *Industry Background* section is focused on describing the current state of the search and search advertising industry and its recent history, never straying from this century, *see id.* ¶¶ 20–87. (To avoid confusion, we refer to the original Complaint (ECF No. 1) cited by Google and note that the cited paragraphs are identical in Plaintiffs' Amended Complaint (ECF No. 94).)

Google Search, YouTube, Bing, Facebook, Instagram, Amazon, and others. *See id.* ¶ 299 &
Fig. 42.

    *Second*, unlike Prof. Bucklin's narrative of over 200 years of advertising history,
Prof. Whinston remained focused on this century, only looking back to 2011. *See id.* ¶¶ 296–300 &
nn.351–356. In his discussion, Prof. Whinston cites multiple Google documents and depositions of
three Google executives and an ad-agency executive—all in the case record to which Prof. Bucklin
had access. *See id.* This illustrates the concept of "fit," namely that Prof. Whinston's discussion is
relevant to this case.

    *Third*, Prof. Whinston expressly used his digital advertising trends discussion to "inform
[his] analysis of relevant advertising markets in subsequent sections" of his report, *id.* ¶ 296, and
indeed he follows this discussion with over 40 pages of extensive analysis of the evidence for our
alleged search ads and text ads markets, Pls. Ex. L, Whinston Initial Rep., § III.D.2–.3. This
contrasts the significant and unsupported analytical leap Prof. Bucklin made to infer that ad-spend
shifts over time draw different ad channels into the same market. Thus, Prof. Whinston's review
provides a helpful contract to Prof. Bucklin's historical opus, in both breadth and the manner in
which it relates to the facts in this case.

    Finally, Google notes the general proposition that industry history is a proper subject of
expert testimony and can be helpful to the Court. *See* Def. Br. at 10. But we have not argued
that industry history is irrelevant or that an expert cannot consider historical facts when forming
his opinions. Instead, the critical defect is Prof. Bucklin's failure to consider the facts of this
case. Thus, although an expert's use of history to place the case facts in context may satisfy
*Daubert*, a seminar-like presentation without connection to the case cannot. *See Joiner*, 522 U.S.

at 146; *Daubert*, 509 U.S. at 591; *Kennedy*, 161 F.3d at 1228. Because Prof. Bucklin's historical analysis is not tied to this case, the Court should exclude it from evidence.[13]

## CONCLUSION

Google's arguments fail for the reasons stated above. Accordingly, the Court should exclude the following parts of Prof. Bucklin's reports and any testimony related to these parts: (a) paragraph 10 (Summary of Opinions), paragraphs 15 through 30 (Section IV), paragraph 69 (concluding paragraph), and Exhibits 1–4 in the Expert Report of Randolph E. Bucklin, June 3, 2022 (Def. Ex. 1); and (b) footnote 132 in the Rebuttal Expert Report of Randolph E. Bucklin, Aug. 4, 2022 (Def. Ex. 2), which references Section IV of his June 3, 2022 report.

---

[13] Plaintiffs note that although their Motion seeks to exclude only Prof. Bucklin's historical opinions, Google included in its opposition a gratuitous list of Prof. Bucklin's other opinions being offered in this case. Def. Br. at 4–5. Because Plaintiffs did not challenge those opinions in our Motion and intend to challenge the merits of those opinions at trial, this reply is limited only to responding to arguments relevant to this Motion.

Dated: February 27, 2023                    Respectfully submitted,


                                            By:___ /s/ Kenneth M. Dintzer_____
                                            Kenneth M. Dintzer
                                            Matthew C. Hammond
                                            Thomas Greene
                                            Claire Maddox (D.C. Bar #498356)
                                            Michael G. McLellan (D.C. Bar #489217)
                                            Karl. E. Herrmann (DC Bar #1022464)
                                            U.S. Department of Justice, Antitrust Division
                                            Technology & Digital Platforms Section
                                            450 Fifth Street NW, Suite 7100
                                            Washington, DC 20530
                                            Telephone: (202) 227-1967
                                            Kenneth.Dintzer2@usdoj.gov

                                            *Counsel for Plaintiff United States of America*


                                            By:___ /s/ Margaret Sharp___
                                            Ken Paxton, Attorney General
                                            James Lloyd, Chief, Antitrust Division
                                            Margaret Sharp, Assistant Attorney General
                                            Office of the Attorney General, State of Texas
                                            300 West 15th Street
                                            Austin, Texas 78701
                                            Margaret.Sharp@oag.texas.gov

                                            *Counsel for Plaintiff State of Texas*

By: _____/s/ Matthew Michaloski_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By: _____/s/ Keaton Barnes_____
Keaton Barnes
Arkansas Bar No. 2022161
Assistant Attorney General
Office of Tim Griffin, Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Keaton.Barnes@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*


By: _____/s/ Brian Wang_____
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By:    */s/ Lee Istrail*
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*


By:    */s/ Daniel Walsh*
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


By:    /s/ *Philip R. Heleringer*
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General, Commonwealth
of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: ___ */s/ Christopher J. Alderman* ___
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By: ___ */s/ Scott Mertens* ___
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*


By: ___ */s/ Stephen M. Hoeplinger* ___
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

By: ___/s/ Hart Martin_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By: */s/ Anna Schneider*
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*


By: ___/s/ Mary Frances Jowers_____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By:   */s/ Gwendolyn J. Lindsay Cooley*
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*