# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF RONALD T. WILCOX**

February 27, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT ...................................................................................................................... 2

I.  **Google Fails To Address Challenges To Prof. Wilcox's Flawed Coding Methodology** ................................................................................................ 2

    A.  Prof. Wilcox's Coding Methodology Conflicts With Generally Accepted Coding Standards ................................................................................. 3

        1.  The Only Coding Resource That Google Cites Rejects Prof. Wilcox's Methodology ..................................................................... 3

        2.  Google Does Not Justify Prof. Wilcox's Deviating From Generally Accepted Coding Standards .................................................. 6

    B.  Prof. Wilcox's Coding Methodology Is Legally Inadequate ........................ 9

II.  **Google's Focus On Testability Does Not Save Prof. Wilcox's Coding Methodology** 13

    A.  Replicability Is A Component Of Testability ............................................ 14

    B.  Even Under Google's Flawed Standard, Prof. Wilcox's Analysis Is Not Testable.... 16

III.  **Google Has Failed To Meet Its Burden To Demonstrate That Prof. Wilcox's Coding Methodology Is Reliable And Replicable** ................................................ 19

IV.  **Prof. Wilcox's Coding Methodology Was Neither Reasonable Nor Consistent** ........ 21

CONCLUSION ................................................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. National Railroad Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ................................................................ 21

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) .................................................. 20

*Bell v. Okuwobi*,
    2006 WL 692457 (M.D. Ga. Mar. 14, 2006) ....................................... 10

*Brokerage Concepts v. United States Healthcare*,
    140 F.3d 494 (3d Cir. 1998) ................................................................ 23

*Brown v. Illinois Central Railroad Co.*,
    705 F.3d 531 (5th Cir. 2013) ............................................................... 19

*Bullock v. Daimler Trucks North America, LLC*,
    2010 WL 4115372 (D. Colo. Sept. 30, 2010) ....................................... 9

*Byrd v. Union Pacific Railroad Co.*,
    453 F. Supp. 3d 1260 (D. Neb. 2020) .................................................. 14

*Cardenas v. Toyota Motor Corp.*,
    2022 WL 3370874 (S.D. Fla. Aug. 16, 2022) ...................................... 13

*Castagna v. Newmar Corp.*,
    2020 WL 525936 (N.D. Ind. Feb. 3, 2020) ........................................... 9

*City of Pomona v. SQM North America Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ....................................................... 14, 15

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ............................................................. 12

*Coalition for Equity & Excellence in Maryland Higher Education v. Maryland Higher Education Community*,
    295 F. Supp. 3d 540 (D. Md. 2017) .................................................... 12

*Counts v. Gen. Motors, LLC*,
    2022 WL 2078023 (E.D. Mich. June 9, 2022) ................................ 7, 12

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004) ..................................................... 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................ 1, 3, 6, 9, 11, 15, 18

*Dzielak v. Whirlpool Corp.*,
    2017 WL 1034197 (D.N.J. Mar. 17, 2017) .......................................... 20

*Evanston Insurance Co. v. Xytex Tissue Services, LLC*,
    378 F. Supp. 3d 1267 (S.D. Ga. 2019) ................................................ 10

*Gucci America, Inc. v. Guess?, Inc.*,
831 F. Supp. 2d 723 (S.D.N.Y. 2011) ......................................................... 13

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ......................................................... 14, 15

*In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018)......................................................... 9

*In re TMI Litigation*,
193 F.3d 613 (3d Cir. 1999)......................................................... 16

*Jaffrey v. PorterCare Adventist Health System*,
2017 WL 5624572 (D. Colo. Nov. 22, 2017) ......................................... 13

*LG Electronics U.S.A., Inc. v. Whirlpool Corp.*,
2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) ......................................... 8

*Luxco, Inc. v. Jim Beam Brands Co.*,
2016 WL 4611385 (N.D. Ill. Sept. 6, 2016) ......................................... 9

*Mahoney v. JJ Weiser & Co., Inc.*,
2007 WL 3143710 (S.D.N.Y. Oct. 25, 2007)..................................... 10, 11

*Manpower Inc. v. Insurance Company of Pennsylvania*,
2011 WL 1356945 (E.D. Wis. Apr. 11, 2011)......................................... 9

*Metavante Corp. v. Emigrant Savings Bank*,
619 F.3d 748 (7th Cir. 2010) ......................................................... 9

*Mobile Medical International Corp. v. Advanced Mobile Hospital Systems, Inc.*,
2015 WL 778553 (D. Vt. Feb. 24, 2015) ......................................... 10

*Oracle America, Inc. v. Google Inc.*,
2016 WL 1743116 (N.D. Cal. May 2, 2016) ......................................... 3

*Paine ex rel. Eilman v. Johnson*,
2010 WL 749851 (N.D. Ill. Feb. 25, 2010) ......................................... 9

*Phillips v. Raymond Corp.*,
364 F. Supp. 2d 730 (N.D. Ill. 2005) ......................................... 9, 10

*Pittsburgh Press Club v. United States*,
579 F.2d 751 (3d Cir. 1978)......................................................... 23

*Pulse Medical Instruments, Inc. v. Drug Impairment Detection Services, LLC*,
858 F. Supp. 2d 505 (D. Md. 2012) ......................................... 18

*Quidel Corp. v. Siemens Medical Solutions USA, Inc.*,
2019 WL 5328730 (S.D. Cal. Oct. 21, 2019) ......................................... 13

*Schechner v. Whirlpool Corp.*,
2018 WL 6843305 (E.D. Mich. Oct. 30, 2018) ......................................... 13

*Schering Corp. v. Pfizer, Inc.*,
2000 WL 718449 (S.D.N.Y. June 5, 2000) ......................................... 8, 18

*Scrum Alliance, Inc. v. Scrum, Inc.*,
    2021 WL 1691136 (E.D. Tex. Apr. 29, 2021) ...................................................... 13

*Smilovits v. First Solar, Inc.*,
    2019 WL 6875492 (D. Ariz. Dec. 17, 2019) .................................................. 14, 15

*Smith v. Allegheny Technologies, Inc.*,
    2022 WL 10755425 (W.D. Pa. Aug. 1, 2022) ................................................ 14, 15

*Smith v. Target Corp.*,
    2012 WL 5876599 (N.D.N.Y. Nov. 20, 2012) ...................................................... 10

*Soldo v. Sandoz Pharmaceuticals Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003) .................................................................... 21

*United States v. Cloud*,
    576 F. Supp. 3d 827 (E.D. Wash. 2021) ................................................................ 14

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ............................................................................. 19

*United States v. Harris*,
    502 F. Supp. 3d 28 (D.D.C. 2020) ......................................................................... 12

*Wells v. Antero Resources Corp.*,
    497 F. Supp. 3d 96 (N.D. W. Va. 2020) .................................................................. 9

*Wendt v. Host International, Inc.*,
    125 F.3d 806 (9th Cir. 1997) ................................................................................... 3

*Wilden v. Laury Transportation, LLC*,
    901 F.3d 644 (6th Cir. 2018) ................................................................................... 3

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,
    395 F.3d 416 (7th Cir. 2005) .......................................................................... 11, 14

**Rules**

Federal Rule of Evidence 702 ............................................................... 9, 15, 16, 18

**Other Authorities**

Howard Lune & Bruce L. Berg, QUALITATIVE RESEARCH METHODS FOR THE SOCIAL SCIENCES
    (9th ed. 2017) .......................................................................................................... 5

Kimberly A. Neuendorf, *The Content Analysis Guidebook* (2002) .......................... 5, 6

Klaus Krippendorff, *Content Analysis: An Introduction to Its Methodology* (4th ed. 2018)
    ...................................................................................................................... 6, 7, 18

Mailman School of Public Health, Columbia University, "Population Health Methods: Content
    Analysis," https://www.publichealth.columbia.edu/research/population-health-
    methods/content-analysis ..................................................................................... 5, 7

Mariette Bengtsson, "How to plan and perform a qualitative study using content analysis," NURSINGPLUS OPEN (Feb. 24, 2016) ................................................................................. 5, 7

Shari Seidman Diamond, "Reference Guide on Survey Research," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 359 (3d ed. 2011) .............................................................................. 5

Susan Spiggle, "Analysis and Interpretation of Qualitative Data in Consumer Research," 21(3) J. OF CONSUMER RESEARCH 491 (Dec. 1994)........................................................................ 4, 5, 7

Susan Spiggle, "Measuring Social Value: A Content Analysis of Sunday Comics and Underground Comix," 13 J. OF CONSUMER RESEARCH 100 (June 1986) ................................. 6

Professor Ronald T. Wilcox categorized (or "coded") survey responses based on his undocumented, subjective intuition. Such a "methodology" renders his opinion inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Prof. Wilcox's methodology is immune to testing and replication, and the results he generated cannot be "scientifically" linked to any conclusion drawn from the data. Such infirmities fundamentally render Prof. Wilcox's methodology unreliable and, therefore, unable to satisfy *Daubert*.

Google's response fails to address the relevant facts and law applicable here. First, Google characterizes our motion as challenging either (1) flaws in the individual codes Prof. Wilcox assigned to specific survey responses or (2) conclusions Prof. Wilcox drew from those codes. With this characterization, Google argues that any such disagreement goes to weight, rather than admissibility. But, Google misstates the basis of our objections. The fundamental flaw is Prof. Wilcox's undocumented coding methodology itself. That methodology reveals that Prof. Wilcox's opinion is based on his intuition, which is insufficient under both the law and generally accepted coding standards. Prof. Wilcox's coding methodology cannot be dissected and vetted through cross-examination given its lack of documentation, replicability, and testability, creating the type of black box methodology that *Daubert* is aimed to exclude.

Google's additional arguments also fail. Google argues that testability—not replicability—is the applicable standard and argues that Prof. Wilcox's analysis is testable. As an initial matter, testability *includes* replicability. But more significantly, Google's argument is unavailing here because Prof. Wilcox's methodology is untestable by any measure. Google also faults us for not trying to replicate Prof. Wilcox's methodology. Google's attempt to shift the burden on replicability is unsupported by the relevant legal standards and ignores the fact that Prof. Wilcox's methodology cannot be replicated given its nature and the lack of documentation.

Indeed, the best we can do is attempt to replicate Prof. Wilcox's results (as opposed to methodology). We have tried, but Prof. Wilcox's results are incapable of replication because the codes he gave the various survey responses are unreasonable and inconsistent.

As argued in detail below, the Court should exclude Prof. Wilcox's testimony.

## ARGUMENT

### I.      Google Fails To Address Challenges To Prof. Wilcox's Flawed Coding Methodology

We moved to exclude Prof. Wilcox's analysis because he coded survey results using an undocumented, intuition-based methodology, which conflicts with both generally accepted coding standards and the law. *See* Pls.' Mot. to Exclude the Expert Testimony of Ronald T. Wilcox and Memo. in Support (ECF. No. 424) ("Pls. Br."), at 10–18. Rather than create and follow written coding guidelines, Prof. Wilcox "just read [each survey response] and made a determination based on that." Pls. Ex. K, Excerpts from the Deposition of Ronald T. Wilcox, Oct. 18–19, 2022 ("Wilcox Dep."), 391:3–11; *accord id.* at 405:15–406:4 ("I have to read the totality of the answer and interpret it and put it in what I believe is the correct bucket."). Indeed, Prof. Wilcox explained his criteria-free methodology in the context of reading responses that he deemed as deserving the "no impact" code: "[T]he only criteria that I used is I read the comment, and if my interpretation of the comment was that this comment indicated that the person thought there would be no impact, then I put it in that bucket." *Id.* at 369:2–18.

Google does not dispute that expert opinions based on flawed and undisclosed methodologies are inadmissible. *See* Def.'s Memo. of Points and Authorities in Opposition to Pls.' Mot. to Exclude the Expert Testimony of Ronald T. Wilcox ("Def. Br."), at 10 n.7 (recognizing precedent that excluded experts based on "defective survey methodologies"), 13 n.10 (recognizing precedent that excluded experts based on a "refusal to disclose an expert's

methodology").[1] Instead, Google frames our motion as "pertain[ing] solely to the **conclusions** Professor Wilcox draws from the survey responses." Def. Br. at 9 (emphasis in original). This is false. Because Prof. Wilcox's coding methodology itself is fundamentally flawed, any conclusions emanating from that flawed methodology should be excluded under *Daubert*.

## A.    Prof. Wilcox's Coding Methodology Conflicts With Generally Accepted Coding Standards

As described in our initial brief, Prof. Wilcox's coding methodology violates generally accepted coding standards, which require a written, principled coding methodology. *Wilden v. Laury Transp., LLC*, 901 F.3d 644, 654–55 (6th Cir. 2018) (affirming the exclusion of testimony based in part on its lack of general acceptance in the field).

Google responds by (1) citing one coding resource supporting Prof. Wilcox's methodology and (2) offering three reasons why the Court should accept Prof. Wilcox's approach. The Court should reject each of these arguments.

### 1.    The Only Coding Resource That Google Cites Rejects Prof. Wilcox's Methodology

It is undisputed that Prof. Wilcox engaged in "content analysis" or "qualitative analysis." Def. Br. at 14–16, 18. In particular, Prof. Wilcox read free-form survey responses and assigned, or "coded," each to one of three categories, such as "anticipated adverse impacts." *Id.* at 14–16, 18. The parties also agree that content analysis, such as coding, is an accepted practice. *See id.* at 14 ("[Q]ualitiative analysis [is] well-recognized in the literature."). But like any good science, content analysis has standards. As explained in our motion, Prof. Wilcox has failed to satisfy

---

[1]    Several of the cases Google cites support the same proposition. *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (explaining that a survey may be excluded when the expert failed to follow "accepted principles"); *Oracle Am., Inc. v. Google Inc.*, 2016 WL 1743116, at *9 (N.D. Cal. May 2, 2016) (explaining that critiques of an expert's "survey methodology [and] results" go to admissibility).

those standards because—rather than create and follow written coding guidelines—Prof. Wilcox coded responses based on the intuition he had when he read them. Pls. Br. at 14–15.

For coding resources supporting Prof. Wilcox's approach, Google quotes a single 1994 article ("the Spiggle article") purportedly saying that coding "is not 'a set of procedures.'" Def. Br. at 16 (quoting Pls. Ex. C, Susan Spiggle, "Analysis and Interpretation of Qualitative Data in Consumer Research," 21(3) J. OF CONSUMER RESEARCH 491, 497 (Dec. 1994) ("Spiggle")). This article, however, is no lifeline for Prof. Wilcox. Rather, the article explicitly rejects Prof. Wilcox's methodology.

The Spiggle article describes two forms of work one can perform on qualitative information: "analysis" and "interpretation." Pls. Ex. C, Spiggle, at 491. "Analysis," as the term is defined in the article, is the form of work preferred by "investigators [who] put a high premium on reproducible, logical, methodical, and systematic inference." *Id.* at 497. "Interpretation," by contrast, is a form of work that derives from the field of literary rhetoric. *Id.* The tools of "interpretation" include metaphor, irony, and "other tropes." *Id.* "[I]nterpretation results from an emergent, holistic, extralogical insight." *Id.* It is "playful, creative, intuitive, subjective, particularistic, transformative, imaginative, and representative." *Id.* at 500.

As these definitions suggest, coding is a form of "analysis," not "interpretation." *Compare id.* at 493 (discussing "the process of coding" under the section explaining what constitutes "Analysis"), *with id.* at 497–500 (discussing "Interpretation" without any mention of coding). Nonetheless, Google's support for Prof. Wilcox's approach comes from the *Interpretation* section of the Spiggle article, which says that "interpretation [is not] a set of procedures." *See* Def. Br. at 16 (quoting Pls. Ex. C, Spiggle, at 497). That statement is simply

not directed at coding. Thus, Google's single citation offers no support for Prof. Wilcox's

undocumented, intuition-based coding methodology.

Indeed, the article directly rejects Prof. Wilcox's coding methodology. As the article

explains, "analysis," such as coding, requires "keep[ing] records of the analysis in process" to

"*preserve* the construction of inference." Pls. Ex. C, Spiggle, at 496–97 (emphasis in original).

Keeping records of analysis, such as "summaries of how one proceeded," is important because

records "permit[] the reconstruction of inferential processes, allowing [others] to judge how

logical, extensive, and methodical the inferences were." *Id.* at 497.

The Spiggle article's instructions are not controversial: coding authorities universally

explain that coders should follow written guidelines, not gut reactions.[2] And indeed, in a separate

---

[2]   *E.g.*, Pls. Ex. D, Shari Seidman Diamond, "Reference Guide on Survey Research," in
REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 359, 413 (3d ed. 2011) ("Diamond")
(explaining that coding responses "to open-ended questions requires a detailed set of
instructions so that decision standards are clear"); Pls. Ex. E, Mailman School of Public
Health, Columbia University, "Population Health Methods: Content Analysis," https://www.
publichealth.columbia.edu/research/population-health-methods/content-analysis (last visited
Feb. 24, 2023), at 3 ("Mailman School of Public Health")  ("Develop rules for coding your
texts. . . . [D]eveloping rules for translation of text into codes . . . will keep the coding process
organized and consistent. . . . Validity of the coding process is ensured when the researcher is
consistent and coherent in their codes, meaning that they follow their translation rules. In
content analysis, obeying [] the translation rules is equivalent to validity."); Pls. Ex. F,
Excerpts from Kimberly A. Neuendorf, THE CONTENT ANALYSIS GUIDEBOOK, at 132 (2002)
("Neuendorf") ("All measures for human content analysis coding need to be fully explicated
in a document called a *codebook*. . . . The construction of an original codebook is a rather
involved process, with repeated revisions right up until the moment when coding begins. Even
the most mundane details need to be spelled out. All instructions should be written out
carefully and fully." (emphasis in original)); Pls. Ex. G, Mariette Bengtsson, "How to plan
and perform a qualitative study using content analysis," NURSINGPLUS OPEN, at 12 (Feb. 24,
2016) ("Bengtsson") ("The researcher should use a coding list, including explanations of the
codes, to minimize a cognitive change during the process of analysis in order to secure
reliability."); Pls. Ex. H, Excerpts from Howard Lune & Bruce L. Berg, QUALITATIVE
RESEARCH METHODS FOR THE SOCIAL SCIENCES, at 197 (9th ed. 2017) ("[Y]ou need to
establish objective criteria by which the code categories are applied to the content. The idea
here is to offer some explicit definition or coding rules for each category . . . ."); Pls. Ex. I,
Excerpts from Klaus Krippendorff, CONTENT ANALYSIS: AN INTRODUCTION TO ITS

article where Spiggle herself described a coding process that she oversaw, she explained that coders used a written "coding scheme" that was "discussed and modified until coders reached a 90 percent level of agreement in their independent coding assignments." Pls. Ex. J, Susan Spiggle, "Measuring Social Value: A Content Analysis of Sunday Comics and Underground Comix," 13 J. OF CONSUMER RESEARCH 100, 106 (June 1986).

In contrast to accepted coding practices recognized by Spiggle and others, Prof. Wilcox coded based on his intuition, not written coding guidelines. Pls. Ex. K, Wilcox Dep., 391:3–11, 405:15–406:4, 369:2–18. This intuition-driven process contravenes generally accepted coding standards and does not satisfy *Daubert*.[3]

## 2. Google Does Not Justify Prof. Wilcox's Deviating From Generally Accepted Coding Standards

With no support from a coding authority, Google offers three bases why the Court should nevertheless accept Prof. Wilcox's survey analysis. Def. Br. at 15–17. The Court should reject each as meritless.

*First*, Google explains that Prof. Wilcox coded the survey responses on his own and argues that he "did not need to write guidelines for himself." *Id.* at 16; *accord id.* at 17 n.13. Google, however, fails to cite a single authority to support the idea that when a researcher is the

---

METHODOLOGY, at 129 (4th ed. 2018) ("Krippendorff") (recognizing that, to "minimize idiosyncratic judgments" inherent in coding, "researchers attempt to formulate [coding] instructions that contain explicit and detailed rules that coders can apply reliably, just as mechanical devices would"); *id.* at 155 ("The most common source of coding errors is evident when the [coding] instructions are not well spelled out . . . .").

[3] For some responses, Prof. Wilcox formed his intuition through undocumented discussions with his consultants about their intuitions. Pls. Ex. K, Wilcox Dep., 364:4–15. Layering intuition on intuition multiplies the methodological problem. And indeed, coding authorities confirm that doing so is forbidden. *E.g.*, Pls. Ex. I, Krippendorff, at 133–34 ("Coders need to learn to work independently of each other with the [coding] instructions as their sole guide."); Pls. Ex. F, Neuendorf, at 133 ("Final coding is to be done by each coder individually; at this stage, it is not a consensus-building process.").

coder, he need not show his work with written guidelines. Moreover, rather than excuse his flawed coding methodology, Prof. Wilcox's failure to employ an independent coder is another flaw in his analysis. As one authoritative text explains, "self-applied [coding] instructions are notoriously unreliable." Pls. Ex. I, Krippendorff, at 134. Another author emphasizes, "To increase the validity, at least two investigators should perform the analysis separately and then discuss their results and obtain consensus." Pls. Ex. G, Bengtsson, at 11. Indeed, the caselaw supports the use of multiple coders. *Counts v. Gen. Motors, LLC*, 2022 WL 2078023, at \*14 (E.D. Mich. June 9, 2022) ("[T]he coding technique that [the expert] implemented for his content analysis, using three third-party coders that independently reviewed and coded the ads, minimized the possibility of subjectivity creeping into the analysis.").

Further, even when one coder is used, written guidelines are needed for both consistency and external review. Pls. Ex. C, Spiggle, at 497 (explaining that written guidelines are needed for others "to judge how logical, extensive, and methodical the inferences were"); Pls. Ex. E, Mailman School of Public Health, at 3 ("Validity of the coding process is ensured when *the researcher* is consistent and coherent in their codes, meaning that they follow their translation rules." (emphasis added)); Pls. Ex. I, Krippendorff, at 86 ("For a research design to be replicable, not merely understandable, the researcher's descriptive account of the analysis must be complete enough to serve as a set of *instructions* to coders, fellow researchers, and critics . . . ." (emphasis in original)); Pls. Ex. G, Bengtsson, at 12 ("*The researcher* should use a coding list, including explanations of the codes, to minimize a cognitive change during the process of analysis in order to secure reliability." (emphasis added)). Thus, Google's argument that a researcher can code alone without any documented guidelines belies generally accepted coding standards.

*Second*, Google attempts to ameliorate any infirmities with Prof. Wilcox's methodology by focusing on the fact that he disclosed the underlying survey responses, as some coding resources recommend. Def. Br. at 17 (quoting Pls. Ex. D, Diamond, at 413). But Google's response is a non-sequitur. The practices of creating written guidelines and disclosing survey responses are separate, not alternative, practices. *See supra* note 2 (collecting coding authorities that prescribe written coding guidelines unconditionally, not as an alternative to disclosing the coded text). Put differently, Prof. Wilcox's compliance with one generally accepted practice does not remedy his failure to comply with the other. Prof. Wilcox's analysis could have been worse, but that is not the test for admissibility.[4]

*Third*, Google argues that *LG Electronics U.S.A., Inc. v. Whirlpool Corp.* held that a failure to adhere to generally accepted guidelines goes only to weight and can never justify exclusion. Def. Br. at 17 (quoting 2010 WL 3397358, at *17 (N.D. Ill. Aug. 24, 2010)). To the contrary, *LG Electronics* held only that select "instances of improper coding of participant feedback" go to weight (as opposed to admissibility). 2010 WL 3397358, at *17. Our motion rests on a systemic flaw in Prof. Wilcox's methodology (or lack thereof), not one-off instances where he gave a response the wrong code.[5]

---

[4]   Similarly, Google argues that we can re-code the survey responses ourselves. *E.g.*, Def. Br. at 16 (quoting *Schering Corp. v. Pfizer, Inc.*, 2000 WL 718449, at *5 (S.D.N.Y. June 5, 2000)). That argument is addressed in Section II.B below.

[5]   Although not necessary to our motion, in Section IV below, we have identified additional evidence of Prof. Wilcox's flawed methodology: instances of unreasonable and inconsistent codes that Prof. Wilcox assigned to survey responses. These instances are consequences (or symptoms) of Prof. Wilcox's flawed methodology and evidence that even his results (not just his methodology) cannot be replicated.

Because Prof. Wilcox's undocumented, intuition-based coding methodology contravenes the generally accepted practice of creating written coding guidelines, the Court should exclude the analysis under Federal Rule of Evidence 702 and *Daubert*.

### B.      Prof. Wilcox's Coding Methodology Is Legally Inadequate

As we noted in our initial brief, an expert may not rely upon an undisclosed or intuition-based methodology, as Prof. Wilcox has done here. *E.g.*, *Luxco, Inc. v. Jim Beam Brands Co.*, 2016 WL 4611385, at *5 (N.D. Ill. Sept. 6, 2016) ("[I]t is well-established that expert testimony cannot 'be based on subjective belief or speculation.'" (quoting *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010))); *Paine ex rel. Eilman v. Johnson*, 2010 WL 749851, at *4 (N.D. Ill. Feb. 25, 2010) ("Expert opinions reached merely by virtue of the expert's general expertise or intuition are not admissible."); *Bullock v. Daimler Trucks N. Am., LLC*, 2010 WL 4115372, at *4 (D. Colo. Sept. 30, 2010) ("[E]ven where the methodology is an inexact one, the expert must 'show his work.'").[6]

In response, Google cites *Phillips v. Raymond Corp.* as endorsing an expert "gathering relevant information and applying one's training, experience, and knowledge." Def. Br. at 15 (quoting 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005)). But *Phillips* is inapposite. First, *Phillips* did not involve content analysis (such as coding). Even if the profession in *Phillips* generally accepts

---

[6]     *Accord Castagna v. Newmar Corp.*, 2020 WL 525936, at *3 (N.D. Ind. Feb. 3, 2020) (holding that even when an expert employs a methodology that "is an art, not a science," the expert cannot "invoke gut intuition as the basis for an opinion"); *Manpower Inc. v. Ins. Co. of Penn.*, 2011 WL 1356945, at *2 (E.D. Wis. Apr. 11, 2011) (excluding an expert because "the method that [the expert] employed seem[ed] to rely on little more than [the expert's] own intuition, which is insufficient"); *Wells v. Antero Resources Corp.*, 497 F. Supp. 3d 96, 101 (N.D. W. Va. 2020) (excluding an expert in part because "[t]here are simply no standards cited in his report to ensure that [his] calculation is replicable"); *In re Mirena Ius Levonorgestrel-Related Products Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 257 (S.D.N.Y. 2018) (excluding an expert in part because her methodology included "no standards controlling its operation"), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

undocumented uses of intuition, Prof. Wilcox's field—content analysis—does not. *See supra*

note 2. Second, the expert in *Phillips* was an industry expert proffered based on her experience to

testify about her field. 364 F. Supp. 2d at 742. By contrast, Prof. Wilcox has no expertise in

Android app development, the focus of his survey. Thus, he had no experience-based expertise to

rely upon in interpreting the writings of Android app developers. Pls. Br. at 12; *see also* Def. Br.

at 14 (explaining that the responses that Prof. Wilcox coded are "'technical in nature'" and

"require[] familiarity with the language developers use" to interpret).[7]

　　This distinction is critical for deciding which precedent to follow. When an expert's

opinion rests on experience, "the *Daubert* factors 'have little applicability . . . [since] there really

is no methodology or technique supporting it.'" *Mobile Med. Intern. Corp. v. Adv. Mobile Hosp.

Sys., Inc.*, 2015 WL 778553, at *5 (D. Vt. Feb. 24, 2015) (quoting *Smith v. Target Corp.*, 2012

WL 5876599, at *10 (N.D.N.Y. Nov. 20, 2012) (alteration in original)).[8] Thus, in cases such as

those cited by Google, "the emphasis is placed not on the methodology of the expert testimony,

but on the professional and personal experience of the witness." *Crowley v. Chait*, 322 F. Supp.

2d 530, 539 (D.N.J. 2004). Accordingly, Google's focus on cases specific to industry experts is

---

[7]　Even the little bit of information Prof. Wilcox has learned about Android app development comes in large part from the undocumented pre-survey interviews he conducted. Def. Br. at 11 ("The in-depth [pre-survey] interviews provided Professor Wilcox insight into the language of developers."), 14 ("The pre-survey interviews with developers, as explained, helped him understand [the responses'] language.").

[8]　*Accord Mahoney v. JJ Weiser & Co., Inc.*, 2007 WL 3143710, at *4 (S.D.N.Y. Oct. 25, 2007) (explaining an opinion that "is the product of an experiment or analysis" must satisfy different standards from an opinion "based on professional experience [because] there really is no methodology or technique supporting" an opinion based on experience); *Bell v. Okuwobi*, 2006 WL 692457, at *1 (M.D. Ga. Mar. 14, 2006) ("There is no methodology involved in [the expert's] analysis as it is an opinion formed after years of experience so the [methodology concerns in *Daubert* are] inapplicable."); *Evanston Ins. Co. v. Xytex Tissue Services, LLC*, 378 F. Supp. 3d 1267, 1279 (S.D. Ga. 2019) ("[E]xperience-based experts need not satisfy the factors set forth in *Daubert*.").

misplaced. The Court should instead follow cases examining experts whose opinions are "the product of an experiment or analysis." *Mahoney*, 2007 WL 3143710, at *4.

One case applicable to Prof. Wilcox is *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, where a social-science expert projected how a business "would have grown rapidly, and its profits ballooned," but-for an alleged breach of contract. 395 F.3d 416, 418–19 (7th Cir. 2005). When "[a]sked repeatedly during his deposition what methods he *had* used to generate [the] projections, [the expert] repeatedly answered 'my expertise' or some variant ('my industry expertise[,]' '[my] awareness,' and 'my curriculum vitae')." *Id.* at 418 (emphasis in original). The Seventh Circuit found those answers disqualifying because the expert "either had no method or could not describe one. He was relying on intuition, which won't do," even "among social scientists." *Id.* at 418–19.

Like the social scientist in *Zenith Electronics*, Prof. Wilcox relied on an undisclosed or intuition-based methodology. When asked repeatedly in his deposition to explain his methodology, Prof. Wilcox could say only that he had read each response and given the code his intuition deemed most appropriate. He testified:

- "I have to read the totality of the answer and interpret it and put it in what I believe is the correct bucket." Pls. Ex. K, Wilcox Dep., 405:15–406:4.
- "I just read the whole [response] and made a determination based on that." *Id.* at 391:3–11.
- "[T]he only criteria that I used is I read the comment, and if my interpretation of the comment was that this comment indicated that the person thought there would be no impact, then I put it in that bucket." *Id.* at 369:2–18.

This approach fails under *Zenith Electronics* and *Daubert*.

Google cites, in addition to *Phillips*, three more cases to support Prof. Wilcox's intuition-based methodology. Def. Br. at 15–16. But those cases are even less relevant than *Phillips*. *Counts v. General Motors, LLC* involved a "marketing expert with over 30 years of experience"

who "opine[d] on the contents of advertising" and who hired "three third-party coders [to] independently review[] and code[] the ads." 2022 WL 2078023, at *14 (E.D. Mich. June 9, 2022). *Coalition for Equity & Excellence in Maryland Higher Education v. Maryland Higher Education Community* involved "experiential experts" (i.e., industry experts) who used a methodology generally accepted in their field. 295 F. Supp. 3d 540, 554 (D. Md. 2017). And *United States v. Harris* involved a "*partially* subjective methodology," which the court found was not "an immediate bar to admissibility" but which the court nonetheless factored against the expert. 502 F. Supp. 3d 28, 42 (D.D.C. 2020) (emphasis added).

Next, Google argues that a survey expert need not have expertise in the field surveyed. Def. Br. at 17–18. Our motion does not depend on anything to the contrary. Instead, as relevant here, we argue only (1) that Prof. Wilcox cannot violate generally accepted coding practices and legal precedent rejecting undocumented, intuition-based methodologies and (2) that precedent specific to industry experts cannot save Prof. Wilcox's flawed methodology.

Finally, Google claims support from a string of case citations purportedly showing that our motion rests on a challenge to Prof. Wilcox's conclusions, not his methodology. One of those cases, *Clicks Billiards, Inc. v. Sixshooters, Inc.*, has no relevance whatsoever. 251 F.3d 1252 (9th Cir. 2001). In *Clicks*, the Ninth Circuit held that the district court erred when it "admit[ed] [a] survey into evidence and then [began] to analyze what it considered to be [the survey's] deficiencies" because "[o]nce the survey is admitted," all criticisms of the survey go to weight. *Id.* at 1263. This analysis provides no insight into whether Prof. Wilcox's survey results are admissible. Google's remaining cases are relevant only because of how they contrast to this scenario. Google's cases show arguments that were rejected as challenging an expert's conclusions, but none of those cases considers an argument analogous to ours. *E.g.*, *Cardenas v.*

*Toyota Motor Corp.*, 2022 WL 3370874, at *2 (S.D. Fla. Aug. 16, 2022) (explaining that an argument relying on "a better or more plausible interpretation of the data" goes to weight, not admissibility); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2019 WL 5328730, at *5–6 (S.D. Cal. Oct. 21, 2019) (rejecting a motion to exclude where the expert had "disclose[d] how he coded the respondents' answers" and where the motion was based on an argument that 17 responses received the wrong code).[9]

In sum, Prof. Wilcox's undocumented, intuition-based methodology conflicts not only with generally accepted practices but also with applicable legal precedent. Thus, the Court should reject Google's argument that our motion is a "dressed up" attack on Prof. Wilcox's conclusions and exclude Prof. Wilcox's testimony. Def. Br. at 10.[10]

## II.   Google's Focus On Testability Does Not Save Prof. Wilcox's Coding Methodology

Our motion explains that Prof. Wilcox's report could be excluded for the independent reason that it is not replicable. In response, Google counters that "***testability***, not replicability, is

---

[9]   *Jaffrey v. PorterCare Adventist Health System*, 2017 WL 5624572, at *7 (D. Colo. Nov. 22, 2017) (admitting testimony from an expert who had "disclosed his methodology" and whose "methodology [was] reasonably reliable"); *Scrum All., Inc. v. Scrum, Inc.*, 2021 WL 1691136, at *2 (E.D. Tex. Apr. 29, 2021) (rejecting an argument that an expert "incorrectly interpret[ed]" various survey responses when applying codes); *LG Elecs.*, 2010 WL 3397358, at *17 (rejecting an argument that an expert had engaged in select "instances of improper coding of participant feedback" based on mischaracterizations of that feedback); *Schechner v. Whirlpool Corp.*, 2018 WL 6843305, at *10 (E.D. Mich. Oct. 30, 2018) (rejecting an argument that an expert assigned codes that were overlapping and overinclusive); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 741 (S.D.N.Y. 2011) (rejecting an argument that the expert had "over-reported" his survey results by giving certain responses the wrong code).

[10]   Google attempts to frame our argument as demanding that Prof. Wilcox have a "flawless memory" or "copious notes." Def. Br. at 12–13. We have not challenged Prof. Wilcox's memory of the methodology he employed. Indeed, Prof. Wilcox quite clearly recalled that to implement his methodology, he "just read [each response] and made a determination based on that." Pls. Ex. K, Wilcox Dep., 391:3–11. Also, we have not insisted that Prof. Wilcox produce personal notes. We have challenged Google's failure to record or transcribe the pre-survey interviews, but even a video recording of those interviews would not rectify Prof. Wilcox's uses of an undocumented, intuition-based methodology.

13

the pertinent *Daubert* factor" and says that we have all the raw survey response needed "to 'challenge[]' Professor Wilcox's coding choices." Def. Br. at 2. Google's proposed standard misses the mark and, in any event, supports the exclusion of Prof. Wilcox's testimony.

### A.    Replicability Is A Component Of Testability

Google argues that testability, not replicability, is the relevant standard. *Id.* at 11–13.[11] This approach is contrary to relevant legal standards.

Courts have recognized that testability comprises two parts: falsifiability and replicability. *United States v. Cloud*, 576 F. Supp. 3d 827, 839 (E.D. Wash. 2021). Thus, the Ninth Circuit explained, "Under *Daubert*'s testability factor, the primary requirement is that 'someone else using the same data and methods be able to replicate the results.'" *City of Pomona v. SQM N.A. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) (cleaned up); *accord Byrd v. Union P. R.R. Co.*, 453 F. Supp. 3d 1260, 1271–72 (D. Neb. 2020). The Seventh Circuit reached a similar conclusion, noting that a method is "testable" if "[s]omeone else using the same data and methods [can] replicate the result." *Zenith Elecs.*, 395 F.3d at 419. Thus, Google's argument that the Court should review for "***testability***, not replicability," Def. Br. at 11, is nonsensical; replicability is a component of testability.

Google cites three cases in support of its proffered distinction between replicability and testability. *Id.* at 11–12 (citing *Smith v. Allegheny Techs., Inc.*, 2022 WL 10755425, at *2 (W.D. Pa. Aug. 1, 2022); *Smilovits v. First Solar, Inc.*, 2019 WL 6875492, at *4 (D. Ariz. Dec. 17, 2019); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 554 (C.D. Cal. 2014)). In fact, none of these cases draws the distinction between testability and replicability that Google urges on the Court.

---

[11]  Google says that testability is not always required, but Google does not claim that testability is inapplicable here. *See, e.g.*, Def. Br. at 12 ("assuming the 'testability' factor applies").

Two of the cases could not have endorsed Google's argument because they were issued by district courts in Arizona and California after binding Ninth Circuit precedent holding the opposite. *City of Pomona*, 750 F.3d at 1047 ("Under *Daubert*'s testability factor, the primary requirement is that 'someone else using the same data and methods be able to replicate the results.'" (cleaned up)).

Further, all three cases address challenges to industry (or experience-based) experts; Prof. Wilcox is not that type of expert. *Smith*, 2022 WL 10755425, at *1 (permitting an expert to testify about "the field of labor relations and history"); *Smilovits*, 2019 WL 6875492, at *3 (permitting a securities analyst "to opine about the role of securities analysts and . . . on [their] ability to assess the true value of [a] stock"); *In re ConAgra*, 302 F.R.D. at 554 (permitting a genetic engineer to testify about genetic engineering and genetically engineered crops). Experts who testify based on their industry experience may justifiably employ little-to-no methodology to reach their conclusions. *See supra* note 8 and accompanying text. Thus, precedent about testability and replicability in those circumstances has little relevance to Prof. Wilcox, who has no expertise in Android app development and must instead rely on his methodology. Pls. Br. at 12.

Google also emphasizes how the 2000 Advisory Committee Notes to Federal Rule of Evidence 702 say that the Court should consider "whether the expert's theory can be challenged in some objective sense." Def. Br. at 2, 11. Google's argument rests on the idea that the proponent of an expert can select the limited methods by which the challenging party might examine the expert's work. That argument conflicts with *Daubert*'s premise. But more directly, Google's argument ignores how the sentence it quotes creates a dichotomy between an unchallengeable theory and "a subjective, conclusory approach." *See* Fed. R. Evid. 702, Ad.

Comm. Notes to 2000 Amend. Prof. Wilcox's approach is the subjective, conclusory type. Similarly, the same sentence directs the Court to assess an expert's work for "the existence and maintenance of standards." *Id.* Prof. Wilcox's undocumented, intuition-based methodology lacks those standards.

In sum, replicability is required as part of testability, and Google's out-of-context cases do not hold otherwise. Because Prof. Wilcox's approach cannot be replicated, the survey should be rejected.

### B. Even Under Google's Flawed Standard, Prof. Wilcox's Analysis Is Not Testable

Even if the Court adopted Google's testability standard, which it should not, Prof. Wilcox's analysis is inadmissible because his undocumented, intuition-based methodology is not testable.

As the Third Circuit explained, "it is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology." *In re TMI Litig.*, 193 F.3d 613, 703 n.144 (3d Cir. 1999). Here, Prof. Wilcox applied a subjective methodology, rendering himself the only person capable of testing it.

Prof. Wilcox explained at his deposition—when pressed for rules or principles that one could use to test his coding—that he had nothing to offer because only he could give the code that a particular response deserved. Pls. Ex. K, Wilcox Dep., 369:2–18 ("[T]he only criteria that I used is I read the comment[] and [gave a code reflecting] my interpretation."), 405:15–406:4 ("I have to read the totality of the answer and interpret it and put it in what I believe is the correct bucket."). He testified, "I just read the whole [response] and made a [coding] determination

based on that." *Id.* at 391:3–11. Similarly, Prof. Wilcox explained that no independent person

could have coded alongside (or in review of) him because no one else has had his experiences:

> Q.  Did you consider having independent coders review and categorize the written
>     responses?
> A.  Never seriously.
> Q.  Why not?
> A.  I could never have found independent coders with the amount of knowledge
>     that would have been necessary to do this kind of coding.
> Q.  Why not?
> A.  I've had independent coders on projects before, but this particular situation
>     you have to have – I'm the person who went through all the in-depth
>     interviews. The coders never would have been through those in-depth
>     interviews. So they wouldn't have a frame of reference for how these people
>     talk which helps with how they write, understanding how they write. So I was
>     in a better position than an independent coder to code this information.

*Id.* at 366:2–19.[12] This admission is remarkable given that Prof. Wilcox has no expertise

in Android app development, Pls. Br. at 12, meaning the knowledge he claims was

necessary was not that of an expert but that of someone who participated in his "in-depth

interviews." Of course, because Prof. Wilcox did not keep written records of those

interviews, Pls. Br. at 5 & n.6, he has made it impossible for anyone to test his coding

decisions.[13]

---

[12]  *See also* Def. Br. at 14 ("[Prof. Wilcox] coded responses into . . . categories himself because
the information was 'technical in nature' and required familiarity with the language
developers use because they were asked to 'use their own words.' The pre-survey interviews
with developers, as explained, helped him understand that language." (citations omitted));
Def. Br. at 17 n.13 (explaining that no one could help Prof. Wilcox code the survey responses
because no one else has Prof. Wilcox's "'frame of reference'" for understanding "'how
[developers] talk'" (quoting Pls. Ex. K, Wilcox Dep., 366:10–19) (alteration in original));

[13]  Despite Prof. Wilcox's statements that he "could never have found independent coders with
the amount of knowledge that would have been necessary to do this kind of coding," Pls.
Ex. K, Wilcox Dep., 366:2–19, Google notes that Prof. Kevin Murphy, who has no expertise
in Android app development and who did not attend the pre-survey interviews, intends to rely
on these same responses, Def. Br. at 20 n.15.

Put differently, Prof. Wilcox "could never have found" another person to help him code the survey responses, Pls. Ex. K, Wilcox Dep., 366:2–19, because Prof. Wilcox coded based on his own intuition, not written guidelines. For the same reasons, we could never have tested Prof. Wilcox's coding methodology: he did not (and could not) create the documentation we needed to do so. *See* Pls. Ex. I, Krippendorff, at 131 ("Any researcher who claims to be the only one who is capable of reading a text correctly in fact denies the possibility of replicating the research elsewhere."), 134 ("Content analysts should be able to find other coders who are able to understand and reliably apply the recording instructions before claiming that the data they generate do account for the phenomena under considerations.").

Finally, Google quotes *Schering Corp. v. Pfizer, Inc.* to emphasize that we "have 'had access to the underlying responses,' so 'that, if responses were improperly coded,' [we] have 'not been prevented from recoding them.'" Def. Br. at 16 (quoting 2000 WL 718449, at *5 (S.D.N.Y. June 5, 2000)). If Google was right, nearly any degree of junk science would be admissible as long as the inputs to the junk science were disclosed. This is plainly contrary to Federal Rule of Evidence 702 and *Daubert*, but is also inconsistent with Google's cited authority.

The movant in *Schering* argued that an expert and others implementing a survey were biased. 2000 WL 718449, at *5. "Alleged bias is ordinarily a question of credibility, not admissibility." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 515 (D. Md. 2012). In denying the motion, the court in *Schering* simply followed the ordinary rule for bias. Here, we challenge Prof. Wilcox's methodology, not his bias, so *Schering* and the general rule for bias are inapplicable.

In sum, we have neither Prof. Wilcox's intuition nor a record of the interviews he relied upon in forming that intuition. Thus, the Court should exclude Prof. Wilcox from testifying because his undocumented, intuition-based methodology it not testable or replicable.

## III.    Google Has Failed To Meet Its Burden To Demonstrate That Prof. Wilcox's Coding Methodology Is Reliable And Replicable

Google has the burden to demonstrate that Prof. Wilcox's methodology is reliable and replicable. Google cannot shift its legal burden to require us to replicate Prof. Wilcox's methodology; the law does not require it, and the facts do not permit it.

Google argues that we cannot rely on the replicability requirement because, we "have not attempted to replicate the survey, Professor Wilcox's coding, or the in-depth interviews." Def. Br. at 2. No legal support exists for this assertion, and Google cites none. Further, Google misstates our argument. We argue that we cannot replicate and test Prof. Wilcox's coding methodology—not that we cannot re-administer Prof. Wilcox's survey.

The proponent of expert testimony always bears the burden to show, among other things, that an expert's methodology is sufficiently reliable. As the Fifth Circuit explained in *Brown v. Illinois Central Railroad Co.*, the party offering expert testimony has the burden of furnishing "some objective, independent validation of [his] methodology." 705 F.3d 531, 536–37 (5th Cir. 2013) (internal citation omitted); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Google's argument attempts to shift the burden to us to disprove Prof. Wilcox's methodology reliability. This burden cannot be shifted; the proponent of an expert has access to information that the opposing party simply does not, and it must be that party's burden of coming forward with this evidence. *Frazier*, 387 F.3d at 1260.

Google cannot demonstrate that Prof. Wilcox's analysis is reliable because (1) Prof. Wilcox did not record his in-depth interviews that serve as the basis of his coding, (2) Prof.

Wilcox did not take notes of his interviews, and (3) Prof. Wilcox did not create any written criteria before coding survey results. Google cannot make those tactical decisions and then shift the burden to the us to divine information that does not exist. Even if the law required us to replicate Prof. Wilcox's coding methodology—which it does not—Google's failure to show Prof. Wilcox's work prevents us from doing so.

Google quotes *Dzielak v. Whirlpool Corp.* as supporting its view that, before a movant can exclude a methodology as not replicable, the movant must attempt to replicate it. Def. Br. at 13 (quoting 2017 WL 1034197, at \*7 (D.N.J. Mar. 17, 2017)). Not so. In *Dzielak*, the expert's methodology was, in fact, replicable: the methodology was described in an academic article and embodied in publicly available software (the source code for which was also available to the movant). 2017 WL 1034197, at \*6. The movant asked for exclusion nonetheless because it had not, in fact, corroborated the expert's results. *Id*. at \*7.

As the *Dzielak* court explained, the relevant inquiry is whether an expert's methodology is replicable, not whether the opposing party has *actually corroborated* the expert's results. *Id.* The court further noted that, even if admissibility turned on corroboration, the movant could not rely on that argument when it was able but unwilling to attempt to corroborate the expert's results. *Id. Dzielak* is thus distinguishable for two reasons. First and most importantly, Prof. Wilcox's methodology is undocumented and not replicable, meaning we are unable—*not unwilling*—to replicate it. *See Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 923 (S.D. Cal. 2019) (excluding testimony that was not replicable without requiring any attempt to replicate). Second, as explained in our motion and in Section IV below, we have attempted and failed to corroborate Prof. Wilcox's results (as opposed to methodology); those attempts show that Prof. Wilcox's results are neither reasonable nor consistent. Pls. Br. at 15–18.

**IV.     Prof. Wilcox's Coding Methodology Was Neither Reasonable Nor Consistent**

In our motion, we demonstrated that Prof. Wilcox failed to employ a reasonable and consistent methodology to scientifically link his conclusions to the data. Therefore, his opinion amounts to *ipse dixit* and must be excluded. *See, e.g.*, *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (affirming exclusion of proffered expert who "fail[ed] to apply his stated methodology reliably to the facts of the case" (internal quotation marks omitted)); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 561 (W.D. Pa. 2003) (excluding experts "[b]ecause consistency is a hallmark of reliability").

In response, Google argues that our "*ipse dixit* argument fails because Prof. Wilcox engaged in a reasonable and consistent approach to coding the survey responses." Def. Br. at 2. That is wrong.

In his survey, Prof. Wilcox gave the respondents a fact pattern and asked how they would be impacted by the hypothetical scenario. Prof. Wilcox claims he was able to categorize the survey responses broadly using three categories or codes: (1) those related to anticipated adverse impacts, (2) those related to anticipated no impact or mixed impacts, or possibly positive impacts, and (3) those that were ambiguous, difficult to interpret, appeared nonresponsive, or indicated that the respondent did not review the hypothetical scenario carefully. Prof. Wilcox's actual coding, however, shows that the methodology is both unreasonable and inconsistent.

*First*, Prof. Wilcox redefined words to fit his preferred category. For example, one respondent stated "[w]e need to innovate the schedule to meet customer satisfaction." Pls. Ex. B (ECF. No. 424-2), Expert Report of Ronald T. Wilcox, Ph.D., June 2, 2022, App. J, at 6 ("Wilcox Report"). Prof. Wilcox decided without support from a dictionary, guidelines, or some other process summary that the respondent's use of the word "innovate" was "inartful"; despite admitting that "innovate" has positive connotations, Prof. Wilcox determined "innovate" had an

adverse meaning here and coded it as such (which supported his conclusion). Pls. Ex. K, Wilcox Dep., 451:14–452:13; Pls. Ex. B, Wilcox Report, App. J, at 6.

*Second*, Prof. Wilcox interpreted vague or neutral statements as supporting Google's position. For instance, in response to Prof. Wilcox's survey question, one respondent answered, "Application functionality decisions and development time are somewhat influenced." Pls. Ex. B, Wilcox Report, App. J, at 2, 5. In deposition, Prof. Wilcox acknowledged that (1) the response was "a short phrase for sure with not a lot of -- not a lot of detail" and (2) the participant did not explain how their company's decision would be influenced by the hypothetical. Pls. Ex. K, Wilcox Dep., 448:15–450:7. Nevertheless, Prof. Wilcox determined that the respondent meant that "it's going to cost more resources or they're going to have to not service some devices," *id.*, and coded the response as adverse, Pls. Ex. B, Wilcox Report, App. J, at 2, 5. This coding decision could not have been part of a reasonable, consistent approach.

*Third*, Prof. Wilcox defined common terms inconsistently. For instance, if a respondent stated that he had to change app code to maintain their company's application, Prof. Wilcox coded that response as anticipating an adverse impact. Pls. Ex. K, Wilcox Dep., 399:4–400:9. But, if the respondent said that he had to change the app code to improve their company's application, he coded that differently. *Id.* Prof. Wilcox's method to code "change app code" in one instance as anticipating an adverse outcome and, in another instance, as positive or something else is both unreasonable and inconsistent.

In sum, Prof. Wilcox's flawed methodology yielded results that were neither reasonable nor consistent. Thus, even his results cannot be replicated, and his opinion is *ipse dixit*. The Court should reject the analysis altogether.[14]

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court exclude the expert report and testimony of Prof. Wilcox.

---

[14] Google concludes by suggesting that the Court may admit Prof. Wilcox's survey results into evidence on their own, even without Prof. Wilcox, and "draw its own conclusions from them." Def. Br. at 19–20. Google's argument for admitting into evidence the survey responses on their own is best resolved upon a separate motion. If that time comes, the Court should exclude the survey results as inadmissible hearsay. *See Brokerage Concepts v. United States Healthcare*, 140 F.3d 494, 516 n.14 (3d Cir. 1998) ("Survey results offered as proof of the matter asserted are hearsay, and thus the results of a survey . . . cannot be admitted into evidence unless the survey falls into a recognized class exception to the hearsay rule or into the residual exception."); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 757 (3d Cir. 1978).

Dated: February 27, 2023                    Respectfully submitted,


                                            By: ___/s/ Kenneth M. Dintzer_____
                                            Kenneth M. Dintzer
                                            Sara T. Gray
                                            R. Cameron Gower
                                            Karl. E. Herrmann (DC Bar #1022464)
                                            U.S. Department of Justice, Antitrust Division
                                            Technology & Digital Platforms Section
                                            450 Fifth Street NW, Suite 7100
                                            Washington, DC 20530
                                            Telephone: (202) 227-1967
                                            Kenneth.Dintzer2@usdoj.gov

                                            *Counsel for Plaintiff United States of America*


                                            By: ___/s/ Margaret Sharp___
                                            Ken Paxton, Attorney General
                                            James Lloyd, Chief, Antitrust Division
                                            Margaret Sharp, Assistant Attorney General
                                            Office of the Attorney General, State of Texas
                                            300 West 15th Street
                                            Austin, Texas 78701
                                            Margaret.Sharp@oag.texas.gov

                                            *Counsel for Plaintiff State of Texas*


                                            By: ___/s/ Matthew Michaloski_____
                                            Theodore Edward Rokita, Attorney General
                                            Scott L. Barnhart, Chief Counsel and Director,
                                            Consumer Protection Division
                                            Matthew Michaloski, Deputy Attorney General
                                            Christi Foust, Deputy Attorney General
                                            Office of the Attorney General, State of Indiana
                                            Indiana Government Center South, Fifth Floor
                                            302 West Washington Street
                                            Indianapolis, Indiana 46204
                                            Matthew.Michaloski@atg.in.gov

                                            *Counsel for Plaintiff State of Indiana*

By: ___/s/ Keaton Barnes___
Keaton Barnes
Arkansas Bar No. 2022161
Assistant Attorney General
Office of Tim Griffin, Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Keaton.Barnes@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*


By: ___/s/ Brian Wang___
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*


By: ___/s/ Lee Istrail___
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: ____/s/ Daniel Walsh_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


By: ____/s/ Philip R. Heleringer_____
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General, Commonwealth
of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


By: ____/s/ Christopher J. Alderman___
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: ___/s/ Scott Mertens___
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: ___/s/ Stephen M. Hoeplinger___
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

By: ___/s/ Hart Martin___
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

By: ___/s/ Anna Schneider___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*


By: ___/s/ Mary Frances Jowers___
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: ___/s/ Gwendolyn J. Lindsay Cooley___
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP WEISER
Attorney General

Jonathan B. Sallet
Special Assistant Attorney General

/s/ Jonathan B. Sallet
Jonathan B. Sallet, DC Bar No. 336198
Jon.Sallet@coag.gov
Steven M. Kaufmann,  DC Bar No. 1022365
*(inactive)*
Steve.Kaufmann@coag.gov
Carla Baumel
Carla.Baumel@coag.gov
Elizabeth W. Hereford
Elizabeth.Hereford@coag.gov
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Tel: 720-508-6000

William F. Cavanaugh , Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
212-335-2793
Email: wfcavanaugh@pbwt.com

*Counsel for Plaintiff Colorado*

FOR PLAINTIFF STATE OF NEBRASKA:

MIKE HILGERS
Attorney General

Joseph M. Conrad, Assistant Attorney General
Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant
Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
Joseph.Conrad@nebraska.gov
Colin.snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh , Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
212-335-2793
Email: wfcavanaugh@pbwt.com

*Counsel for Plaintiff Nebraska*


FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General

Robert A. Bernheim, Unit Chief Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-315
Tucson, Arizona 85701
Tel: (520) 628-6507
Robert.bernheim@azag.gov

*Counsel for Plaintiff Arizona*

FOR PLAINTIFF STATE OF IOWA:

BRENNA BIRD
Attorney General

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Tel: (515) 725-1018
Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff Iowa*


FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General

Elinor R. Hoffmann
Morgan J. Feder
Michael Schwartz
Office of the Attorney General of New York
28 Liberty Street, 21st Floor
New York, NY 10005
212-416-8513
Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff New York*

FOR PLAINTIFF STATE OF NORTH
CAROLINA:

JOSH STEIN
Attorney General

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
919-716-6000
kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff North Carolina*

FOR PLAINTIFF STATE OF TENNESSEE:

JONATHAN SKRMETTI
Attorney General

J. David McDowell
Chris Dunbar
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville.TN 37202
(615) 741-8722
David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov

*Counsel for Plaintiff Tennessee*

FOR PLAINTIFF STATE OF UTAH:

SEAN D. REYES
Attorney General

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
385-881-3742
sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff Utah*


FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
Attorney General

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Jeff.pickett@alaska.gov

*Counsel for Plaintiff Alaska*

FOR PLAINTIFF STATE OF CONNECTICUT:
WILLIAM TONG
Attorney General

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
860-808-5202
Nicole.demers@ct.gov

*Counsel for Plaintiff Connecticut*


FOR PLAINTIFF STATE OF DELAWARE:

KATHY JENNINGS
Attorney General

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
302-577-8924
Michael.undorf@delaware.gov

*Counsel for Plaintiff Delaware*


FOR PLAINTIFF DISTRICT OF COLUMBIA:

BRIAN SCHWALB
Attorney General

Elizabeth Gentry Arthur
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
202-724-6514
Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

FOR PLAINTIFF TERRITORY OF GUAM:

DOUGLAS MOYLAN
Attorney General

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Tel: (671) 475-3324

*Counsel for Plaintiff Guam*


FOR PLAINTIFF STATE OF HAWAIʻI:

ANNE E. LOPEZ
Attorney General

Rodney I. Kimura
Department of the Attorney General, State of
Hawaiʻi
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
808-586-1180
Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff Hawaiʻi*

FOR PLAINTIFF STATE OF IDAHO:

RAÚL LABRADOR
Attorney General

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
208-334-4114
Brett.delange@ag.idaho.gov
John.olson@ag.idaho.gov

*Counsel for Plaintiff Idaho*


FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General

Elizabeth Maxeiner
Brian Yost
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
773-590-7935
Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov

*Counsel for Plaintiff Illinois*

FOR PLAINTIFF STATE OF KANSAS:

KRIS W. KOBACH
Attorney General

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue., 2nd Floor
Topeka, KS 66612
Tel: (785) 296-3751
Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff Kansas*


FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
Attorney General

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
207-626-8800
Christina.moylan@maine.gov

*Counsel for Plaintiff Maine*

FOR PLAINTIFF STATE OF MARYLAND:

ANTHONY G. BROWN
Attorney General

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6480
swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff Maryland*


FOR PLAINTIFF COMMONWEALTH
MASSACHUSETTS:

ANDREA CAMPBELL
Attorney General

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Fl.
Boston, MA 02108
Tel: (617) 727-2200
William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff Massachusetts*

FOR PLAINTIFF STATE MINNESOTA:

KEITH ELLISON
Attorney General

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-757-1257
Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff Minnesota*


FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General

Michelle Christine Newman
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
775-684-1164
mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff Nevada*

FOR PLAINTIFF STATE OF NEW
HAMPSHIRE:

JOHN FORMELLA
Attorney General

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
603-271-1217
Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff New Hampshire*


FOR PLAINTIFF STATE OF NEW JERSEY:

MATT PLATKIN
Attorney General

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
973-648-7819
Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAUL TORREZ
Attorney General

Judith E. Paquin
Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Tel: 505-490-4885
jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff New Mexico*


FOR PLAINTIFF STATE NORTH DAKOTA:

DREW WRIGLEY
Attorney General

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
701-328-5570
ealm@nd.gov

*Counsel for Plaintiff North Dakota*

FOR PLAINTIFF STATE OHIO:

DAVE YOST
Attorney General

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
614-466-4328
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff Ohio*


FOR THE PLAINTIFF STATE OKLAHOMA:

GENTNER DRUMMOND
Attorney General

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel: (405) 522-1014
Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff Oklahoma*

FOR PLAINTIFF STATE OREGON:

ELLEN ROSENBLUM
Attorney General

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
503-934-4400
Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff Oregon*


FOR PLAINTIFF COMMONWEALTH
PENNSYLVANIA:

MICHELLE HENRY
Attorney General

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Pennsylvania*

FOR PLAINTIFF TERRITORY PUERTO
RICO:

DOMINGO HERNANDEZ
Attorney General

Guarionex Diaz Martinez
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Tel: (787) 721-2900, ext. 1201
gdiaz@justicia.pr.gov

*Counsel for Plaintiff Puerto Rico*

FOR PLAINTIFF STATE RHODE ISLAND:

PETER NERONHA
Attorney General

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
SProvazza@riag.ri.gov

*Counsel for Plaintiff Rhode Island*

FOR PLAINTIFF STATE SOUTH DAKOTA:

MARTY J. JACKLEY
Attorney General

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
605-773-3215
Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff South Dakota*


FOR PLAINTIFF STATE VERMONT:

CHARITY R. CLARK
Attorney General

Christopher J. Curtis
Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
802-828-3170
Ryan.kriger@vermont.gov

*Counsel for Plaintiff Vermont*

FOR PLAINTIFF COMMONWEALTH
VIRGINIA:

JASON S. MIYARES
Attorney General

Tyler T. Henry
thenry@oag.state.va.us
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Tel: (804) 692-0485

*Counsel for Plaintiff Virginia*


FOR PLAINTIFF STATE WASHINGTON:

BOB FERGUSON
Attorney General

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-5419
Amy.hanson@atg.wa.gov

*Counsel for Plaintiff Washington*

FOR PLAINTIFF STATE WEST VIRGINIA:

PATRICK MORRISEY
Attorney General

Douglas Lee Davis
Office of the Attorney General, State of West
Virginia
1900 Kanawha Boulevard, East
Building 6, Suite 402
P.O. Box 1789
Charleston, WV 25305
304-558-8986
Douglas.l.davis@wvago.gov

*Counsel for Plaintiff West Virginia*


FOR PLAINTIFF STATE WYOMING:

BRIDGET HILL
Attorney General

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
(307) 777-6397
Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff Wyoming*