# Exhibit N

*United States, et al. v. Google LLC*, No. 20-cv-3010-APM
*State of Colorado, et al. v. Google LLC*, No. 20-cv-3715-APM

# Introduction to Industrial Organization

SECOND EDITION

## Luís M. B. Cabral

The MIT Press

Cambridge, Massachusetts · London, England

© 2017 Massachusetts Institute of Technology

All rights reserved. No part of this book may be reproduced in any form by any electronic or mechanical means (including photocopying, recording, or information storage and retrieval) without permission in writing from the publisher.

This book was set in Melior by diacriTech, Chennai. Printed and bound in the United States of America.

Library of Congress Cataloging-in-Publication Data

Names: Cabral, Luis M. B., author.
Title: Introduction to industrial organization / Luis M.B. Cabral.
Description: Second edition. | Cambridge, MA : MIT Press, [2017] | Includes
    bibliographical references and index.
Identifiers: LCCN 2016045858 | ISBN 9780262035941 (hardcover : alk. paper)
Subjects: LCSH: Industrial organization (Economic theory)
Classification: LCC HD2326 .C33 2017 | DDC 338.6–dc21 LC record available at https://lccn.loc.gov/2016045858

10  9  8  7  6  5  4

The Herfindahl index provides a better measure of market concentration, as I will show later. However, it is more difficult to compute: it requires knowledge of the market share of all firms in the industry, whereas $C_4$, for example, only requires knowledge of the market shares of the four largest firms.[a]

We are also interested in measuring market power. Up to now, I did so by computing the price cost margin: either $p - MC$ or $(p - MC)/p$ or $(p - MC)/MC$. This is fine if all firms have the same costs. If costs vary from firm to firm, then so do margins (even if market price is the same for all firms, which is the case when the product is homogeneous). What is then market power in the industry as a whole? The natural generalization of the margin is the **Lerner index**, defined as the weighted average of each firm's margin, with weights given by the firm's market share:

$$L \equiv \sum_{i=1}^{n} s_i \frac{p - MC_i}{p} \qquad (10.1)$$

where $s_i$ is firm $i$'s market share.[3,b] Obviously, if all firms have the same marginal cost, then the Lerner index is simply the (common) margin set by all firms, as considered before.

## 10.1 ENTRY COSTS AND MARKET STRUCTURE

My first goal is to determine the relation between technology, market size, and industry concentration. I begin by considering a simple model in which all firms are of the same size. For this reason, determining concentration is equivalent to determining the number of firms. C4, for example, is given by $4/n$; that is, if all firms are of the same size, then the market share of the four largest firms is equal to the ratio of four to the number of firms. Changes in C4 can therefore be measured by changes in $n$.

Suppose that a generic firm, firm $i$, has a cost function given by $C = F + cq_i$ and that the demand curve is given by $Q = (a - P)S$. In this equation, $S$ stands for market size. I am therefore allowing two different markets (e.g., the market for a given product in two different countries) to be identical once differences in size are taken into account.

It can be shown (cf Exercise 10.9) that, for a Cournot equilibrium, each firm's profit is given by:

$$\Pi(n) = S\left(\frac{a-c}{n+1}\right)^2 - F \qquad (10.2)$$

A **free-entry equilibrium** is characterized by a set of active firms such that (i) no active firm wishes to leave the market and (ii) no inactive firm wished to enter the market. Specifically, the equilibrium number of firms, $\hat{n}$, has to be such that $\Pi(\hat{n}) \geq 0$ (no active firm wishes to exit) and $\Pi(\hat{n}+1) \leq 0$ (no inactive firm wishes to enter).[c] Equating the right-hand side of (10.2) to zero, and solving for $n$, we get:

$$n = (a-c)\sqrt{\frac{S}{F}} - 1 \qquad (10.3)$$

[a.] However, even if we lack information on the market shares for some of the firms, we can still find a lower and an upper bound for the value of $H$. See Exercise 10.14.

[b.] I first introduced the Lerner index in Section 3.2. Then I considered the case of one seller only; in this case the Lerner index corresponds to the seller's margin. Equation (10.1) considers the general $n$-firm case, of which (3.4) is the particular case when $n = 1$.

[c.] Notice that, if $\Pi(n') = 0$, then both $\hat{n} = n' - 1$ and $\hat{n} = n'$ form an equilibrium. Since $\Pi(n') = 0$ is only true "by coincidence" (that is, non-generically) I will henceforth assume that there exists a unique solution to the system $\Pi(\hat{n}+1) \leq 0 \leq \Pi(\hat{n})$.

Hence, the equilibrium value of $n$ is given by:

$$\hat{n} = \left[(a - c)\sqrt{\frac{S}{F}} - 1\right] \qquad (10.4)$$

where $[x]$ (expression $x$ in square brackets) denotes the highest integer lower than $x$ (the characteristic function). That is, if (10.3) gives $n = 32.4$, for example, then $\hat{n} = [32.4] = 32$.

■ **MARKET SIZE AND CONCENTRATION.** Equation (10.4) states that the number of firms is an increasing function of market size (here measured directly by $S$ and indirectly by $a$) and an inverse function of both fixed and variable costs ($F$ and $c$). None of this is very surprising. Note, however, that the relation between $S$ and $\hat{n}$ is not proportional. In fact, *for high values of $\hat{n}$, the relation between $S$ and $\hat{n}$ is approximately quadratic*: in order to double the number of firms, market size must increase four-fold; conversely, if market size doubles, the number of firms increases by only 40% (specifically, by $\sqrt{2} - 1$).

What explains this non-proportional relationship? If market price were constant (with respect to the number of firms), then the relation between size and number of firms would be proportional: double market size and you double the number of firms. However, as the number of firms increases, the market becomes more competitive, that is, the margin $p - c$ decreases. As a result, variable profit per unit of market size also decreases, which in turn limits the number of firms the market can sustain.

> Due to increased price competition, the equilibrium number of active firms varies less than proportionally with respect to market size.

■ **MINIMUM EFFICIENT SCALE AND CONCENTRATION.** As mentioned earlier, one of the determinants of market structure is the firm's cost structure. In particular, the fact that most firms have a U-shaped average cost curve is an important determinant of market structure. A firm in the left-hand side of the U, that is, a firm with decreasing average cost, is said to operate under **increasing returns to scale**. (The model considered in this section, where costs are given by $F + cq$, is an extreme case in which average cost is always decreasing.)

In order to measure the relation between increasing returns to scale and market structure, we first need to measure the degree of increasing returns to scale. There are several ways of doing this. One is to use the concept of **minimum efficient scale**, the minimum scale at which a firm's average cost is, say, within 10% of the minimum.[d] In the model considered in this section, total cost is $C = F + cq$. Average cost is therefore $AC = F/q + c$. The minimum of average cost is $c$. Let the minimum efficient scale (MES) be the minimum scale such that average cost is equal to $c'$. Equating $AC = c'$ and solving for $q$, we get:

$$\text{MES} = \frac{F}{(c' - c)}$$

d. Strictly speaking, MES is defined as the lowest output level such that average cost is minimized; the definition I consider here is slightly more general. For the special case when $C = F + cq$ (constant marginal cost), MES = $\infty$ according to the strict definition.

It is natural to interpret changes in MES as changes in the value of $F$: an increase in $F$ by a factor $\lambda$ implies an increase in MES by the same factor $\lambda$. In this sense, Equation 10.4 shows how market structure changes when MES changes (that is, when $F$ changes). If MES increases by a factor of 2, then the number of firms decreases by a factor of approximately $\sqrt{2}$. The intuition for this is exactly the inverse of an increase in market size by a factor of 2. In fact, if both market size and the MES increase by the same amount, then the equilibrium number of firms remains constant. For this reason, when comparing the structure of different industries, it is common to consider as an explanatory variable market size divided by MES, or MES divided by market size.

■ **SCALE ECONOMIES AND CONCENTRATION.** An alternative way of measuring increasing returns to scale is the coefficient of scale economies, defined as the ratio of average cost over marginal cost: $\rho \equiv AC/MC$. If this ratio is greater than one, that is, if average cost is greater than marginal cost, then we say that there are **economies of scale**; if the ratio is less than one, then we say there are **diseconomies of scale**. It can be shown that average cost is greater than marginal cost if and only if average cost is decreasing. Therefore, economies of scale or increasing returns to scale are the same thing.[e]

How does market structure depend on the degree of scale economies? As with minimum efficient scale, we would expect an industry to be more concentrated if the degree of scale economies is greater (or the MES higher). For the cost function considered above, $C = F + cq$, we have:

$$\rho \equiv \frac{AC}{MC} = \frac{\frac{F}{q} + c}{c} = 1 + \frac{F}{cq} \tag{10.5}$$

If we think of two industries that differ in the value of $F$, then the industry with the greatest degree of scale economies is more concentrated. In fact, from (10.5), the industry with greater $F$ has greater degree of scale economies; and, from (10.4), the industry with greater $F$ has a smaller number of firms in the free-entry equilibrium.

> Concentration is generally greater the greater the minimum efficient scale (or the greater the degree of scale economies).

Both the minimum efficient scale and economies of scale are instances of **barriers to entry**. A generalization of the above point is therefore that concentration is greater the higher the barriers to entry are. (I should add, however, that the precise definition of a barrier to entry is a highly controversial issue. Not all authors would agree that economies of scale constitute a barrier to entry.)

■ **HISTORY MATTERS.** The model presented at the beginning of this section makes a number of implicit assumptions regarding the entry process. It assumes that (a) all firms have access to the same unique available technology (corresponding to the cost function $C = F + cq$); (b) firms have perfect information regarding the market (in particular, they all know the demand function); and (c) the entry process itself is well coordinated;

e. See Exercise 10.11. See also the definition of economies of scale in Chapter 3.

in particular, we assume that firms make their entry decisions sequentially, knowing what previous decisions earlier entrants have made.

Based on the above assumptions, we can predict exactly the equilibrium number of firms for a given a set of parameter values that characterize the industry (that is, the values of $a, c, F$, and other possible parameters in a more complex model). Moreover, the equilibrium predicted is symmetric; that is, all firms are of the same size.

Alas, the evidence of most real-world industries fails to match these predictions. One can find examples of industries that seem to share the same set of parameters but exhibit very different market structures. Consider for example the prepared soups industry in the US and in the UK. Although the two markets differ in size, they are very similar in terms of their state of development, the composition of demand across categories (canned versus dried), and so on. Campbell was the first entrant in the United States, having established operations in 1869. In the UK, Heinz established an initial lead in the 1930s. Although Campbell made an attempt at entering the UK market and Heinz the US market, the current picture is still that Campbell dominates the US market (63% share), while Heinz has a very small share (it mostly sells through retailers' own labels); and Heinz dominates the UK market (41% share), while Campbell has a fairly small share (9%).[4]

One should also add that most industries include firms of different sizes. For example, the US car market includes three domestic firms of different sizes and a variety of importers of different size too. And the European mineral water industry is dominated by three firms of different sizes.[f]

To close the gap between the predictions of the theoretical model and empirical observation, we must go beyond the assumptions listed above. First we must consider that often not all firms have access to the same technology. For some period of time, Dupont maintained a cost advantage over its rival producers of titanium dioxide. This was due to the fact that Dupont held exclusive patent rights over a lower-cost production process. Even after those patents expired, Dupont maintained much of that advantage due to the fact that it had moved down the **learning curve**; in other words, it transformed a **first-mover advantage** into a **sustainable competitive advantage**.

Even when all firms have access to the same technology, if there are several available technologies, then there may be several possible free-entry equilibria. For example, in the steel industry there are (roughly speaking) two different production processes, one with a high MES (regular mills) and one with a low MES (mini-mills). In terms of the notation of the model introduced earlier, regular mills have a high $F$ and a low $c$, whereas mini-mills have a low $F$ and a high $c$. Unless one of the technologies clearly dominates the other one (lower $F$ and lower $c$), one can find (under Cournot competition) different combinations of $n_1$ regular mills and $n_2$ mini-mills that would constitute a free-entry equilibrium.[g] Currently, operating profit per ton is approximately the same for mini-mills and major mills, although the latter are about four times bigger than the former. This suggests that none of the technologies dominates the other one, so that the above assumption is satisfied.

Imperfect information about market conditions may also influence market structure in ways not considered in the model above. For example, several oil companies

---

f. Some refer to this market structure as a **triopoly**.

g. This possibility is illustrated in Exercise 10.13.

8. Arrow, Kenneth J (1962), "Economic Welfare and the Allocation of Resources for Invention," in National Bureau of Economic Research, *The Rate and Direction of Inventive Activity*, Princeton: Princeton University Press.

9. *The Wall Street Journal*, November 3, 1999.

10. Griliches, Zvi (1957), "Hybrid Corn: An Exploration of the Economics of Technological Change," *Econometrica* **25**, 501–522. See also Ryan, B., and N. C. Gross (1943), "The Diffusion of Hybrid Seed Corn in Two Iowa Communities," *Rural Sociology* **8**, 15–24

11. For a more complete analysis of the theory of innovation diffusion, see Rogers, E.M. (1962), *The Diffusion of Innovations*, New York: Free Press.

12. Adam B. Jaffe, Manuel Trajtenberg and Rebecca Henderson (1993), "Geographic Localization of Knowledge Spillovers as Evidenced by Patent Citations," *The Quarterly Journal of Economics* **108** (3), 577–598.

13. I thank Joshua Gans for suggesting this example.

14. Gans, Joshua S., and Scott Stern (2003), "The Product Market and the Market for 'Ideas': Commercialization Strategies for Technology Entrepreneurs," *Research Policy* **32** (2), 333–350.

15. Moser, Petra (2005), "How Do Patent Laws Influence Innovation? Evidence from Nineteenth-Century World's Fairs," *American Economic Review* **95** (4), 1214–1236.

16. Arora, Ashish, Andrea Fosfuri, and Alfonso Gambardella (2001), "Markets for Technology and their Implications for Corporate Strategy," *Industrial and Corporate Change* **10** (2), 419-451.

17. Gans, Joshua S., David H. Hsu, and Scott Stern (2002), "When Does Start-Up Innovation Spur the Gale of Creative Destruction?," *RAND Journal of Economics* **33** (4), 571–586.

18. Adapted from Barese, Paul, Adam Brandenbuerger and Vijay Krishna (1992), "The Race to Develop Human Insulin," Harvard Business School Case No. 9-191-121. See also Hall, Stephen S (1987), *Invisible Frontiers: The Race to Synthesize a Human Gene*, New York: Atlantic Monthly Press.

19. Adapted from Bresnahan, Timothy (1985), "Post-Entry Competition in the Plain Paper Copier Market," *American Economic Review* **75**, 15–19.

20. Adapted from Nalebuff, Barry, and Adam Brandemburger (1996), *Co-opetition*, London: Harper Collins Publishers.

21. This subsection is adapted from Henderson, Rebecca (1993), "Underinvestment and Incompetence as Responses to Radical Innovation: Evidence from the Photolithographic Alignment Equipment Industry," *Rand Journal of Economics* **24**, 248–270.

22. Bessen, James, and Michael Meurer, *Patent Failure: How Judges, Bureaucrats, and Lawyers Put Innovators at Risk*, Princeton: Princeton University Press (2008).

23. Shapiro, Carl, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting," in Jaffe, Lerner and Stern (Eds.), *Innovation Policy and the Economy*, Vol. 1 (2001).

24. Adapted from Tucker, Catherine (2015), "Patent Trolls and Technology Diffusion: The Case of Medical Imaging," Working Paper.

25. Lampe, Ryan, and Petra Moser (2010), "Do Patent Pools Encourage Innovation? Evidence from the Nineteenth-Century Sewing Machine Industry," *The Journal of Economic History* **70** (04), 898–920.

26. Lampe, Ryan, and Petra Moser (2013), "Patent Pools and Innovation in Substitute Technologies: Evidence From the 19th-century Sewing Machine Industry," *RAND Journal of Economics* **44** (4), 757–778.

27. Bloom, Nicholas, Mark Schankerman, and John Van Reenen (2013), "Identifying Technology Spillovers and Product Market Rivalry," *Econometrica* **81** (4), 1347–1393.

28. The following is partly based in Gilbert, Richard, and Carl Shapiro (1990), "Optimal Patent Length and Breath," *Rand Journal of Economics* **21**, 106–112.

CHAPTER **16**

# NETWORKS

For a consumer in the twenty-first, it may be difficult to picture life without telephones (wireless or otherwise). But imagine you live in the 1880s and ask yourself the question: how much would having a telephone be worth? The answer should probably be "not very much," as the number of other telephone owners was then rather small. To take a more recent example, consider electronic mail. Thirty years ago, outside of the military and academic worlds, the benefits of having an email address were not that large, as the number of people with whom one could exchange messages was then rather small. Nowadays, it seems as no one can live without it.

Both of these are examples of **network externalities**: the situation whereby the benefit a consumer derives from owning a product increases when the number of other consumers increases. This is true for both telephones and email. In fact, these two means of communication have one additional aspect in common: both are examples of *direct* network externalities, those that arise when the different buyers form a network of users who communicate with each other.

Direct network externalities are by no means the only relevant instance when consumers care about the number of other consumers. The benefit from buying a Windows-based computer, for example, is greater the greater the number of other buyers of the same operating system: even if a computer user does not directly communicate with others, the fact that there are many of them implies that a great variety of software will be written for the popular operating system. We then say that Windows users benefit from *indirect* network externalities resulting from there being other Windows users.[a]

In this chapter, I look at a number of issues related to competition with network externalities (also referred to as network effects). In Section 16.1, I show that an important implication of network externalities is the possibility of multiple equilibria ("everybody uses Windows because everybody uses Windows," but the opposite would also be

---

a. Network externalities can also be created by firm pricing. For example, if a cell phone company charges more for calls made to or from outside their network, then a consumer is better off when he or she belongs to a large network, since most of his or her calls will then be made within the network, at a lower price. This type of network externalities is known as *tariff-mediated network externalities*.

possible: "nobody uses Windows because nobody uses Windows"). Next I consider various implications of equilibrium multiplicity for the process of adoption of innovations with network effects; this will leads us to concepts such as critical mass, excess inertia, excess momentum, and path dependence. Finally, Sections 16.3 and 16.4 are devoted to firm strategy and public policy, respectively, in the presence of network externalities.

■ **ESTIMATING NETWORK EFFECTS.** Before continuing with the economic analysis of the nature and implications of network effects, it is worth addressing the question of their actual importance in reality. Throughout this book, I have emphasized the difficulty of statistical identification from economics data. The world is full of correlations; some of these correspond to causal effects, most do not. The quest for network effects is no exception; in fact, in some sense estimating direct or indirect network effects is a particularly difficult task.

Suppose that we have time series data on, for example, the number of fax machine users. Suppose moreover that potential adopters estimate network size by finding out the latest published figures (e.g., number of fax machine users in the previous period). We could then estimate an equation of the form $q_t = f(q_{t-1}, p_t, z_t)$, where $p_t$ denotes price and $z_t$ other variables. To the extent that $q_t$ is positively associated to $q_{t-1}$, we might be tempted to conclude network effects are present. The problem with this approach is that there may be unobserved variables (e.g., income) that push $q_t$ and $q_{t-1}$ in the same direction, thus creating a correlation that does not correspond to causality. As much as we try to include these variables in $z_t$, we can never be sure we are not leaving out unobserved sources of correlation (which does not correspond to causality).

Alternatively, we might look for cross-section data. For example, based on data from 110,000 US households in 1997, it is estimated that households are more likely to buy their first home computer in areas where a high fraction of households already own computers. Again, one limitation of this approach is that we may be measuring a correlation, not a causality relation.

A preferred approach is to study what researchers refer to as a "natural experiment." Consider the case the automated clearinghouse (ACH) system used for interbank payments. This system is more efficient that alternative systems, but it requires both payer and payee to acquire the necessary technology. For large US banks, the decision to adopt ACH is taken nationwide; that is, once the technology is adopted, all branches start using it. At the level of small, isolated geographical markets, it seems reasonable to consider the number of nationwide banks using ACH to be an exogenous variable; we can thus look for a causal relation with greater assurance. Specifically, if network effects are important, then we expect small local banks to be more likely to adopt ACH if their neighboring branches do so. The data suggests this is indeed the case: for instance, if a small local bank has an adoption probability of 50%, then an increase of 10 percentage points in the fraction of neighboring banks using ACH raises the small bank's adoption probability by 4.4 percentage points.