# Exhibit A

Excerpts from the Deposition of Ronald Wilcox, 1, 19, 22–24, 26–30, 77–78, 141, 151–152, 196, 209–211, 237–239, 288, 307, 360–368, 387–388, 391–394, 400–405, 419–420, 422–424, 443–444, 454–457, 486–489. Oct. 18–19, 2022.

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3    ---------------------------------- )

4    UNITED STATES OF AMERICA, et al.,   )

5                    Plaintiffs,        )Case No.

6          vs.                          )1:20-cv-03010

7    GOOGLE, LLC,                       )APM

8                    Defendant.         )

9    ---------------------------------- )

10   STATE OF COLORADO, et al.,          )

11                   Plaintiffs,        )Case No.

12         vs.                          )1:20-cv-03715

13   GOOGLE, LLC,                       )APM

14                   Defendant.         )

15   ---------------------------------- )

16

17         DEPOSITION OF RONALD WILCOX, Ph.D.

18                    VOLUME I

19                 WASHINGTON, D.C.

20                 OCTOBER 18, 2022

21

22   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

1       Q.   And for the purpose of your survey, what

2   are app developers or who are app developers?

3       A.   Individuals who develop applications for

4   mobile devices.

5       Q.   So your opinions here today are limited to

6   application developers for mobile devices?

7       A.   They're further limited because recall

8   that I said that they needed to be in a position to

9   comment on the hypothetical, and so I did put

10   further restrictions on that.

11       Q.   Understood.  I'm just focusing on the type

12   of application developer that you surveyed.  Are

13   your opinions limited to application developers for

14   mobile devices?

15           MR. POPOFSKY:  Objection to form.

16       A.   My participants in my survey were almost

17   entirely I believe application developers for

18   mobile devices.  It's possible that someone

19   developed an app for a non-mobile device in that

20   pool, but in the main these are app developers for

21   mobile devices and particular phones.

22       Q.   Which particular phones did the

22

1      Q.  What assumptions did you make in designing

2   your survey?

3          MR. POPOFSKY:  Object to form.

4      A.  I think the only substantive assumption I

5   made was that individuals, developers that is,

6   would have to change app code in certain

7   circumstances in order to have their app work

8   properly on non-compliant devices and that some of

9   those code changes would vary from device to

10  device.  However, that assumption is based on the

11  deposition evidence presented by Google employees

12  in this particular case.

13     Q.  Are those the depositions that you cite in

14  your report?

15     A.  Yes.

16     Q.  Did you rely on any deposition evidence

17  other than the depositions that are cited in your

18  report?

19     A.  No.

20     Q.  Did you rely on anything other than the

21  deposition evidence cited in your report as a basis

22  for your assumption that developers will have to

USA v
Google

Ronald Wilcox

23

1    change their application code in order to make the

2    devices work properly?

3            MR. POPOFSKY:  I object to the witness

4    having that question propounded to him without his

5    report in front of him to be able to see what

6    evidence he cited, Counsel, and objection to form.

7            You may answer.

8        A.  Okay.  I also used knowledge of my

9    in-depth interviews as well as deposition

10   testimony.

11       Q.  Any other basis for the assumption?

12       A.  I may have cited something in my report

13   that is not coming to recollection right now, but

14   those are the main bases of my -- of that

15   particular assumption.

16       Q.  And what was the basis for your assumption

17   that developers may have to make -- the changes

18   that developers may have to make to their app codes

19   could vary by device in that hypothetical future

20   scenario in your survey?

21           MR. POPOFSKY:  Objection, asked and

22   answered.

1          You may answer again.

2      A.  It's the exact same basis that I just

3  mentioned to you.

4      Q.  Same basis.  That would be the deposition

5  testimony that you cite in your report and the

6  results of your in-depth interviews?

7      A.  That's correct.  And possibly that

8  statement that I mentioned before.  I just don't

9  remember exactly where the information shows up,

10  but the deposition testimony for sure and my

11  interviews for sure.

12      Q.  How would it affect your opinion in this

13  case if application developers did not have to

14  change the application code in order to make their

15  applications work properly on non-compliant Android

16  devices in your hypothetical scenario?

17          MR. POPOFSKY:  Objection to form.

18          You may answer.

19      A.  Well, I mean, it would impact it because

20  the hypothetical as stated wouldn't exist if all

21  the code was the same.  I hasten to mention that I

22  don't believe that that's what would happen in the

USA v
Google

Ronald Wilcox

26

```
1        Q.  Did you make any assumptions about the

2   magnitude of devices that developers would need to

3   make changes to their application code?

4        MR. POPOFSKY:  Objection, vague.

5        A.  I certainly did not assume any particular

6   number of devices that needed changes in the app

7   code in order for the app to work properly.

8        Q.  Understood that you didn't assume a

9   certain number.

10       A.  Right.

11       Q.  Did you assume a certain magnitude, you

12  know, a certain change in the number of devices

13  that app developers would need to make changes to

14  their application code in order for the devices --

15  in order for the applications to work properly in

16  your hypothetical?

17       MR. POPOFSKY:  Objection, vague, Counsel.

18       A.  I believe I used the word substantial in

19  my hypothetical.  That would be the closest thing

20  to an answer I can give on that.

21       Q.  What was your basis -- what was the basis

22  for your assumption that developers would have to
```

1    make changes to a substantial number -- changes to

2    the application code for a substantial number of

3    devices under your hypothetical scenario?

4         A.   The exact same basis that we've been

5    talking about, the deposition testimony.

6         Q.   And the --

7         A.   And the in-depth interviews.

8              MR. POPOFSKY:   Objection, misstates prior

9    testimony as well.

10        Q.   When you're referring to the in-depth

11   interviews, is that the reference to the

12   18 pre-survey interviews that you conducted and

13   describe in your report?

14        A.   Yes.  There are two groups of 18 and one

15   is the in-depth interviews and the other is the

16   pretest, both of which occur prior to the survey.

17        Q.   And when you have been referring to your

18   in-depth interviews as a basis for the assumptions

19   that we've been discussing, have you been referring

20   to both the pretest and the in-depth interviews or

21   were you referring to the in-depth interviews?

22        A.   In our discussion so far I would have been

1   referring to the in-depth interviews only.

2       Q.  Did you personally conduct those in-depth

3   interviews?

4       A.  I had a moderator from Escalant, but I

5   was -- I was present during them.

6       Q.  Were you present in the room during the

7   in-depth interviews or did you observe them

8   remotely?

9       A.  There was no room in the sense that it was

10  all conducted remotely.

11      Q.  Were they conducted over Zoom or some

12  other video platform?

13      A.  Yes.

14      Q.  And you were a participant in the -- on

15  the Zoom platform?

16      A.  Correct.

17      Q.  Did you ask questions during the in-depth

18  interviews, or was that the moderator?

19      A.  During the interview itself the moderator

20  asked questions and I did not.  However, the

21  questions that the moderator asked were based on a

22  script that I provided to the moderator.

1      Q.  You said during the interview itself the

2  moderator asked questions and you did not.  At any

3  point during the -- you know, whether part of the

4  formal interview or not, did you ask questions of

5  the interviewee?

6      A.  No, I did not ask questions of the

7  interviewee.  These are trained moderators and this

8  is generally the way this is handled.

9      Q.  Were those Zoom interviews recorded?

10     A.  Not by me.

11     Q.  Do you know if Escalant recorded the Zoom

12  interviews?

13     A.  No, I do not.

14     Q.  You said that the moderators were trained.

15  Did you train the moderators for the in-depth

16  interviews?

17     A.  No, I did not train the moderators.

18     Q.  Did you provide any guidance to Escalant

19  in training the moderators?

20     A.  Only in the sense that I produced a script

21  for the interview and that's a form of training.

22     Q.  Other than the script that you provided to

USA v
Google

Ronald Wilcox

30

1  Escalant, which I believe you included as part of

2  your report, did you provide any other written

3  guidance to Escalant in conducting the pre-survey

4  in-depth interviews?

5      A.  I had -- along the way I had conversations

6  with Escalant while this was going on and I did

7  talk to them about things related to the interview

8  along the way.

9      Q.  Did you speak with -- who at Escalant were

10 you working with on these in-depth interviews?

11     A.  I do not remember the names, although it

12 would have not been an individual, it would have

13 been a team of individuals at Escalant.

14         MR. POPOFSKY:  Before you go any further,

15 Counsel, I'd remind you of our stipulation in this

16 case that any communications or work product that

17 are not relied on by the expert in forming his

18 opinions, including communications between the

19 expert and any person assisting the expert, are not

20 discoverable.  So I'd like to keep that line in

21 mind as you move forward.  Apologies for the

22 interruption.

USA v
Google

Ronald Wilcox

1    inference.

2        Q.  So is your report and the results from the

3    qualitative survey that you're offering in this

4    case, is that limited to the individuals who

5    provided responses to your survey?

6            MR. POPOFSKY:  Objection to form.

7        A.  I certainly don't draw any formal

8    statistical inferences to a broader population.

9    However, I think the group that I did interview is

10   an interesting group and reflective of a group of

11   individuals who are in a position to answer the

12   hypothetical.

13       Q.  And what is your basis for saying that the

14   group that you interviewed is reflective of a group

15   of individuals who are in a position to answer the

16   hypothetical?

17       A.  Because I conducted in-depth interviews at

18   the beginning I was able to determine

19   characteristics of the particular app developers

20   that would make them more likely able to respond in

21   a meaningful way to the issues presented by the

22   hypothetical, and I built that knowledge into the

78

1    screening for the sample of the main survey.

2        Q.  When designing a survey when is it

3    appropriate to use hypotheticals?

4        A.  That's I believe too broad of a question

5    for me to answer in any kind of systematic way.

6        Q.  Why is that?

7        A.  Because surveys are used to measure all

8    kinds of phenomena, and I think whether or not you

9    decide to use a hypothetical depends on the

10   particulars of the situation that you're trying to

11   survey.

12       Q.  Are there circumstances in which you think

13   it would be inappropriate or not appropriate to use

14   a hypothetical in a survey?

15       A.  There may be situations where I think a

16   hypothetical is inappropriate, but it would depend

17   on the particulars of the situation that I'm

18   facing.

19       Q.  Can you think of any example sitting here

20   today where a hypothetical would be inappropriate

21   in a survey design?

22           MR. POPOFSKY:  Objection to form.

1     A.  No.

2     Q.  Did you consider asking M10 after you

3  asked the final hypothetical for a subset of

4  respondents in your survey?

5     A.  No.

6     Q.  And no survey respondent was shown M10

7  after H10, correct?

8     A.  That is correct.

9     Q.  Looking at M10, respondents were given the

10  option of selecting "Don't know" to question M10,

11  correct?

12     A.  That's correct.

13     Q.  And would you consider "Don't know/not

14  sure" to be a valid response to question M10?

15     A.  Sure.  It's not -- I would not consider it

16  an invalid response.

17     Q.  It's not a disqualifying response to

18  answer "Don't know" and "Not sure" in response to

19  question M10?

20     A.  Correct.  We're past the screening

21  questions at this point.  So...

22     Q.  Turning next to question M20, which is on

1    M30 used to inform your conclusions in this case?

2         A.   It wasn't.

3         Q.   And what would your survey have lost if

4    you didn't include M30?

5         A.   Again, it goes back to my prior testimony,

6    but when you are going to ask somebody a question

7    as broad as contemplating a hypothetical of the

8    sort that I've included in my survey, it's best

9    practice to get them thinking about issues related

10   to that hypothetical prior to considering the

11   hypothetical.  So therefore my belief is that if I

12   would just ask the hypothetical without the warm-up

13   questions that my responses to the hypothetical

14   open-ended question would have been less

15   informative.

16        Q.   And with M20 and M30 you wanted

17   respondents to be thinking about how their company

18   is affected when developing apps for Android by

19   either multiple different Android versions or many

20   different Android device models?

21        A.   That's true.

22        Q.   Again in M30 you gave respondents the

152

1    option of selecting don't know or not sure; is that

2    right?

3         A.  Yes.

4         Q.  Did you consider don't know/not sure to be

5    a valid response to question M30?

6         A.  Yes.

7         Q.  And, again, answering don't know/not sure

8    is not a disqualifying response in response to

9    M30?

10        A.  That is correct.

11            MS. BELLSHAW:  We can go off the record.

12            THE VIDEOGRAPHER:  Going off the record.

13   The time is 12:20 p.m.

14                    (Whereupon, at 12:20 p.m., the

15                     deposition was recessed, to

16                     reconvene at 1:00 p.m.,this

17                     same day.)

18

19

20

21

22

```
 1   they want, if anything, or they can say I don't

 2   know and I'm not sure.

 3        Q.  And, again, in question H10 you offered I

 4   don't know/not sure as an option for respondents?

 5        A.  Yes.

 6        Q.  And as with the other questions we

 7   discussed earlier, do you consider I don't know/not

 8   sure to be a valid selection by respondents in

 9   response to H10?

10        A.  Yes.

11        Q.  Why did you ask respondents how their

12   business would be affected by the hypothetical

13   scenario rather than could be affected?

14        MR. POPOFSKY:  Objection to form,

15   misstates the document.

16        A.  "Would affect your company."  I just think

17   I'm making this concrete in writing and in plain

18   English.

19        Q.  You think including the word "would" is

20   more concrete and in plain English than "could"?

21        MR. POPOFSKY:  Objection to form.

22        A.  Well, we are already in the world of a
```

209

1      A.   Yeah.   In the main they just didn't know

2   much about it.

3      Q.   Okay.

4           Earlier today you described your target

5   population as "Application developers who are in a

6   position to answer the hypothetical in a meaningful

7   way."

8      A.   Yes.

9      Q.   Is that an accurate description of your

10   target population?

11     A.   Yes.   I think I might put in the word in

12   the best position to answer the hypothetical in a

13   meaningful way, but yes, broadly speaking, that's

14   what I mean.

15     Q.   And what does it mean to be in a position

16   to answer the hypothetical in a meaningful way?

17     A.   To be in a position where you know or

18   believe you know how things would change for your

19   business.   Some application developers have better

20   insight to that based on their job description,

21   years of experience, et cetera, which I screen for,

22   and others less so.   So I wanted to make sure they

1   were not just app developers, but they had a --

2   they had sight line into some of the decisions

3   their company might make.

4       Q.  And are the criteria that you used to

5   determine whether an app developer was in the best

6   position to answer your hypothetical in a

7   meaningful way contained in your expert report?

8       A.  It is.

9       Q.  Okay.

10          Do you describe the target population of

11  your survey in your report?

12      A.  Yes.

13      Q.  Can you please point me to the paragraph

14  or paragraphs in your report where you describe the

15  target population of your survey?

16      A.  Well, there is a section in my report

17  where I talk about just what we were talking about,

18  which is why I screen certain people out to get to

19  the target population, but I don't know what

20  paragraph that is in.  I don't know what paragraph

21  it's in.  I do know that in my report I talk about

22  why I did the certain screens that I did to get to

211

1    the -- to get to the sample that I ultimately

2    chose.

3         Q.  Are you thinking of paragraph 22?

4         A.  I can look at that.  Yes, and 23 goes into

5    that as well.

6         Q.  How did you determine that Android

7    application developers who are in the best position

8    to answer the hypothetical in a meaningful way was

9    the appropriate target population of your survey --

10   for your survey?

11        A.  Well, those are the responses that I

12   believe were the most interesting to collect as

13   opposed to individuals who would not be able to

14   envision how their world might change in the

15   hypothetical described.

16        Q.  So did you design your survey instrument

17   and then determine your target population?

18        A.  No.  It was a little more organic than

19   that.  Some of that would have happened

20   simultaneously as I was doing the in-depth

21   interviews.

22        Q.  Did you have a target population for your

237

1          Q.  It is.  You're welcome to look at it, I'm

2    not going to ask -- actually, yes, let's take a

3    look at it.

4          MR. POPOFSKY:  It's Appendix D2, correct?

5          MS. BELLSHAW:  It's Appendix D2.

6          MR. POPOFSKY:  Correct, Counsel.

7          A.  Okay.  Yes.  So this particular in-depth

8    interview discussion guide was drafted by me.  I

9    did get input from Cornerstone Research on things

10   related to this, but it was the subject of multiple

11   conversations I would have had with them about what

12   we needed to probe and I would write some of it,

13   they revised some of it.  That was the process.

14         Q.  How was the discussion guide in

15   Appendix D2 used during the pre-survey interviews?

16         A.  So this is what we give to the moderator

17   and ask them to probe these particular issues

18   during the interview.  I would say that there's a

19   little bit of a difference between reading this

20   verbatim and reality of the interview process in

21   that this is a long discussion guide and we were

22   restricting ourselves to about an hour per

1    interview.

2           So it is the case that for some interviews

3    parts of this discussion guide were emphasized and

4    then in other interviews other parts of the

5    discussion guide were emphasized.  It is also true

6    that the moderator if they hear something

7    interesting in the answer to one of these questions

8    can follow up on it in realtime.

9       Q.  So the questions reflected in Appendix D2

10   are not necessarily the ones that were asked of

11   respondents?

12      A.  They're a very good, I'm going to

13   conservatively say, approximation.  In many cases

14   they are the exact questions that were answered

15   respondent, but a good moderator does have the

16   flexibility to follow up with questions in realtime

17   as part of their job.

18      Q.  And as part of that flexibility the

19   moderator was able to adapt, skip, or modify

20   questions as they went along the interview?

21      A.  That would have been within their ability.

22      Q.  And not every participant was asked about

239

1    all of the different topics; is that right?

2         A.  That's correct.

3         Q.  Do you have a record of which questions

4    were actually asked of which participants in the

5    interviews?

6         A.  No.

7         Q.  And then only the last 10 out of 18

8    participants were asked the final hypothetical; is

9    that correct?

10        A.  That's correct.

11        Q.  Turning back to the target population of

12   your survey.  You excluded from your target

13   population respondents who had less than three

14   years of experience, correct?

15        A.  Three years or less.

16        Q.  Three years or less.  I see.  So

17   respondents had to have four years or more of

18   experience to continue on through this survey?

19        A.  The way it reads is they have to have

20   greater than three years of experience.  So...

21        Q.  Greater than three.  Okay.

22            Why did you limit your survey respondents

1      Q.  What did you mean in paragraph 27, the

2   fourth line from the bottom, when you say that the

3   ultimate goal of your survey was not to make

4   statistical inferences about the entire population

5   of Android app developers?

6      A.  Well, how would I say that other than it

7   is written?  This is not a quantitative survey, I'm

8   not providing formal test of statistical

9   inferences, and I'm not implementing formal

10   mechanisms by which results of this, albeit very

11   interesting population, could be extrapolated to a

12   much broader population.  It is meant to be

13   descriptive.

14      Q.  You write that "The survey provides

15   valuable insights because the respondents in the

16   survey are members of the population of interest"?

17      A.  Yes.

18      Q.  But your target population for your survey

19   is much narrower than the entire population of

20   Android app developers, right?

21          MR. POPOFSKY:  Objection to form,

22   misstates document.

307

1   implementing your survey?

2        A.  Ultimately the decision was mine.

3        Q.  Can you please describe the process you

4   followed for implementing your survey or how the

5   survey was implemented?

6        A.   Implement is a broad question.  So I'll

7   answer it the best that I can.  After the survey

8   design was complete and Escalant had programmed in

9   the survey according to our instructions, then

10  individuals at the aforementioned panel were

11  invited to be a part of the survey.  My

12  understanding is that is a combination of e-mails

13  in certain cases, but also a dashboard that they

14  have that indicates upon log-in tasks or surveys

15  that the individual who's a part of that panel may

16  be able to complete and that they can then select

17  those and take them on their own time.

18       Q.  What did you mean by Escalant programmed

19  the survey or programmed the questionnaire?

20       A.  The document that's contained here is

21  generally called a programming document.  The

22  document that indicates, for example, about

360

1   expert witness?

2        MR. POPOFSKY:  Objection to form.  Are you

3   asking him only for witness in court proceedings or

4   all consulting gigs as well?

5        MS. BELLSHAW:  Thank you.

6        How much time -- all consulting gigs.

7        A.   Okay.  I don't think there's actually much

8   of a differentiation between those two because my

9   consulting gigs are with Cornerstone and as a

10  testifying expert witness.  I believe I worked on

11  three matters this year with Cornerstone.

12       Q.   I'd like to talk -- ask you a few

13  questions about the coding methodology you used.

14  If you could turn to page -- I'm sorry -- paragraph

15  50 of your report.

16       A.   Sure.

17       Q.   And that begins on page 23.

18       A.   Yes.

19       Q.   So 168 respondents provided written

20  responses to question H10; is that correct?

21       A.   That is correct.

22       Q.   Can you please walk me through the process

1    you used to code the written responses to H10.

2        A.   Sure.  It is spelled out right here, but I

3    can walk you through it.

4            So got all the written responses from H10,

5    did an initial pass on them, kind of reading

6    through them to look for patterns in the responses.

7    Based on the patterns that I saw in the responses I

8    created some I would call them buckets into which I

9    would categorize individual comments.  So some

10   buckets are around, you know, negative consequences

11   about app development, others are about negative

12   consequences for things like time or money spent in

13   the app development process.  There are those

14   buckets.

15           Then there was a bucket that people had a

16   mixed view, they said some things that were kind of

17   positive and some things that were kind of

18   negative.  There were some that just facially

19   looked positive to me, so I created a positive

20   bucket based on that.  And then I created a couple

21   other buckets.  One is it looks like they were

22   trying to make a point, but I don't know what the

1    point was.  So it's ambiguous to me.  And then a

2    final bucket which was I don't know what this means

3    at all.  I don't know if they were not paying

4    attention to the question or what, but this doesn't

5    look responsive to me.

6              So those categorizations -- those buckets

7    were mine, those are things that I came up with,

8    and then I would take each of the individual

9    responses and I think a fair characterization is

10   most of them were obvious in the buckets, I could

11   put them in the buckets very quickly, and I think

12   there were some that were -- that were more

13   difficult.  So I would take a crack at it myself,

14   but particularly for those I would have

15   conversations with Cornerstone staff just to get an

16   outside view of the bucketing.

17             And overall my mode of operation with it

18   was to be conservative in the sense that if it

19   wasn't an obvious negative, you know, I wouldn't

20   put it in the negatives.  If it was facially

21   positive, I'd put it in the positives.  And if I

22   had no idea what it meant, then I was going to put

363

1     it in one of those latter buckets and just be

2     upfront about that, I don't know what this comment

3     means.  That's the way I went through it

4          Q.  How many individuals at Cornerstone staff

5     did you discuss the coding of these ones that you

6     felt were not immediately obvious?

7          A.  It happened at different times.  So it

8     wasn't like one grand meeting with everyone there,

9     but in various pairs and combinations it would have

10    been Allen Potter, Gila Bronshtein, and Vildan

11    Altuglu.

12          THE REPORTER:  What's the last name?

13          THE WITNESS:  Altuglu, A-L-T-U-G-L-U.

14          THE REPORTER:  And the first name?

15          THE WITNESS:  Vildan, V-I-L-D-A-N.

16          Q.  Did you prepare guidelines or standards

17    for coding the written responses?

18          A.  No.

19          Q.  Why not?

20          A.  Well, I was doing it.  So it would have

21    been writing guidelines for myself.

22          Q.  You didn't think it was important to

1    prepare guidelines even for yourself?

2        A.  No, I guess I didn't think it was

3    important to prepare guidelines for myself.

4        Q.  Without written guidelines what steps did

5    you take to ensure that the written responses were

6    coded consistently?

7        A.  Well, I kind of walked you through my

8    process.  That's my process.  That's the -- if I

9    had a question about a particular one, was unsure

10   maybe where -- what bucket to put it in, which was

11   not most of them but there were some, then I would

12   just have a conversation with someone or more than

13   one person at Cornerstone and say what do you think

14   about this one or this is what I'm thinking, what

15   are you thinking.  Just -- that was the process.

16       Q.  What percentage of the responses that you

17   reviewed did you discuss with Cornerstone?

18       A.  I don't know, but it would definitely be

19   the minority of them.

20       Q.  Do you recall any specific responses that

21   you discussed with Cornerstone?

22       A.  No.  I might remember if I was looking at

1   the response or, you know, it might come back to

2   memory, but I'm not going to be able to pull that

3   to memory right now.

4       Q.  Do you recall what bucket those responses

5   tended to fall into?

6       A.  No.  I mean, some were should this be

7   ambiguous, should this be positive, but no, I don't

8   think there was any systematic -- we talked about

9   one particular bucket, for example.

10      Q.  You don't define adverse impact in your

11  report, correct?

12      A.  I don't think I define that, no.

13      Q.  What criteria did you apply to determine

14  that a response should be coded as an anticipated

15  adverse event -- or adverse impact?  Excuse me.

16      A.  Well, reflecting on what I previously

17  testified, I would read the comment and it does

18  require my judgment, no doubt about it.  I had to

19  look at the comment and say what is this -- what is

20  this person writing here and do I believe that what

21  this person is writing anticipates some kind of

22  negative outcome from the hypothetical.  It's just

366

1    as simple as that, that's the way I defined it.

2        Q.  Did you consider having independent coders

3    review and categorize the written responses?

4        A.  Never seriously.

5        Q.  Why not?

6        A.  I could never have found independent

7    coders with the amount of knowledge that would have

8    been necessary to do this kind of coding.

9        Q.  Why not?

10       A.  I've had independent coders on projects

11   before, but this particular situation you have to

12   have -- I'm the person who went through all the

13   in-depth interviews.  The coders never would have

14   been through those in-depth interviews.  So they

15   wouldn't have a frame of reference for how these

16   people talk which helps with how they write,

17   understanding how they write.  So I was in a better

18   position than an independent coder to code this

19   information.

20       Q.  Could you have had a second individual

21   attend the in-depth interviews with you so that

22   they could help with the coding?

367

1       A.  Well, staff at Cornerstone Research did,

2   in fact, attend the in-depth interviews, every

3   single one of them.

4       Q.  So was staff at Cornerstone Research

5   positioned to have helped conduct -- or help do the

6   coding of the written responses?

7           MR. POPOFSKY:  Objection to form.

8       A.  Well, that's why when I had a question

9   about a particular comment I talked to staff at

10  Cornerstone Research because they had been through

11  that process of the in-depth interviews.  So I was

12  interested in their thoughts.

13      Q.  No one at Cornerstone Research conducted

14  an independent review, an independent coding of the

15  written responses, correct?

16      A.  Yes.  There was no -- if you're asking did

17  two people separately independently code, no.  I

18  would describe it as more of a collaborative

19  effort.

20      Q.  Did the staff at Cornerstone Research

21  review the written responses and propose coding

22  without knowing what your proposed coding was?

```
 1        A.  No.

 2        Q.  When you were coding whether a response

 3    anticipates an adverse impact, did you consider the

 4    magnitude of the additional work the response

 5    anticipated?

 6            MR. POPOFSKY:  Objection to form and

 7    foundation.

 8        A.  I didn't have a bucket that particularly

 9    differentiated between like a little effort to fix

10    this problem or a lot of effort to fix this

11    problem.  I categorized it by the type of issue

12    they anticipated.

13        Q.  When coding whether a response anticipated

14    an adverse impact, did you consider whether the

15    additional work identified in the written response

16    could have also positively impacted the developer's

17    business?

18            MR. POPOFSKY:  Objection to form.

19        A.  And I thought about things like that

20    depending on the response.  So what you're seeing

21    is a good faith effort on my behalf and sometimes

22    in collaboration with Cornerstone to put it in the
```

1    in Appendix K.

2         Q.  Did you create subcategories or subbuckets

3    of any of the positive impacts that were

4    identified?

5         MR. POPOFSKY:  Objection to form.

6         A.  So I only have one bucket for positive

7    impacts, and anything that was positive was put

8    into this bucket.

9         Q.  Okay.

10         So a total of 354 respondents completed

11   the survey and were qualified, correct?

12        A.  Yes.

13        Q.  So in addition to the 168 who provided

14   written responses that we've been discussing, 186

15   selected don't know or not sure?

16        A.  Let me --

17        Q.  It's in footnote 70.

18        A.  Okay.  We're talking numbers.  I want to

19   make sure that I have this correct.  Yes.

20        Q.  Why did you combine don't know and not

21   sure into a single option?

22        A.  That's just generally the way it's done.

388

1    I mean, that's pretty much on all my surveys which

2    I ask open-ended questions I give them the option

3    of I don't know or I'm not sure.  It's always one

4    option.

5        Q.  If all 354 respondents who completed the

6    survey are included in the denominator, that drops

7    the percentage of respondents who anticipated

8    adverse impacts from your hypothetical scenario to

9    approximately 25 percent, right?

10       A.  I haven't done that math, but I have no

11   reason to disagree with you.

12       Q.  Would you agree that the equation for that

13   math would be the 98 responses, the numerator, and

14   the 354 responses is -- or 354 is the denominator?

15       A.  That sounds right.

16       Q.  53 percent of respondents selected don't

17   know or not sure in response to the final

18   hypothetical, right?

19       A.  Yes.

20       Q.  Does this level -- high level of don't

21   know/not sure selections indicate that the

22   hypothetical was difficult for respondents to

391

1    response to question H10; is that right?

2        A.  Correct.

3        Q.  Did you assume that any need to change a

4    respondent's app code is anticipating an adverse

5    event?

6            MR. POPOFSKY:  Objection to form.

7        A.  I think it depends on the context in which

8    it was written.  So I didn't have any hard-and-fast

9    rules about if this word X is used it gets

10   categorized in one bucket.  I just read the whole

11   thing and made a determination based on that.

12       Q.  The hypothetical scenario that you

13   presented to respondents included that they would

14   need to make changes to the app code in order for

15   their company's app to work properly on

16   substantially more devices, right?

17       A.  That is correct.

18       Q.  So given that changes to the app code was

19   part of the hypothetical scenario, do you think

20   that it would be appropriate to code responses that

21   predict changes to the app code as an anticipated

22   adverse event?

1          MR. POPOFSKY:  Objection to form.

2      A.  I think it would be inappropriate to

3   enforce any kind of hard-and-fast rule like the

4   kind you're talking about right now because I think

5   you have to read what somebody's written in its

6   totality and make a judgment about it.

7      Q.  If you would look on the first page of

8   Exhibit J, No. 1079, the response.  ID No. 1079 on

9   the first page of Exhibit J.

10     A.  Did I get these --

11     Q.  Sorry.  Appendix J.

12         MR. POPOFSKY:  Page 1 of Appendix J,

13  correct, Counsel?

14         MS. BELLSHAW:  Yes.

15     A.  Oh, 1079.  My bad.  It's sitting right in

16  front of me.  I have it.

17     Q.  1079's response to the final hypothetical

18  was "Keep changing your code to meet market needs"?

19     A.  Yes.

20     Q.  And you coded this adverse, correct?

21     A.  I did.

22     Q.  Why did you -- what was your basis for

393

1    coding this as adverse?

2        A.  When I read "Keep changing your code to

3    meet market needs," particularly the word "keep"

4    indicates to me that this person is going to be

5    having to repeatedly change code over time is the

6    way I read that, and I think it's a reasonable

7    thing to think, given all my conversations with app

8    developers, that that is a negative comment.

9        Q.  Changing the app code is baked into your

10   hypothetical, correct?

11       A.  The need to change some code is built into

12   my hypothetical, but notice the word "keep" in

13   front of that.  So I believe this is an individual

14   who believes that this is a dynamic phenomena and

15   they will have to repeatedly do this.  I believe

16   that's what the word "keep" means.

17       Q.  So the basis for coding this adverse is

18   because the Respondent included the word "keep"?

19           MR. POPOFSKY:  Object to form.

20       A.  Not just because they included the word

21   "keep."  I have no hard-and-fast rule that suggests

22   any word "keep" means it's negative, but "keep" in

Ronald Wilcox, Ph.D.

                                                          394

1    conjunction with the rest of the phrase, yes, I

2    believe that is a negative.

3         Q.  If you could look on page 2, No. 1331, you

4    also coded this response as adverse?

5         A.  Uh-huh.

6              THE REPORTER:  Yes?

7              THE WITNESS:  Yes.

8         Q.  This response identifies, among other

9    things, that "We would have to spend time making

10   the necessary alterations to improve app

11   performance"; do you see that?

12        A.  I do.

13        Q.  Why did -- what was your basis for coding

14   this as adverse?

15        A.  When I read "We would have to spend time

16   making necessary alterations to improve app

17   performance," I read this as someone who wants to

18   spend -- or needs to spend more time in order to

19   improve app performance.  I know I'm just quoting

20   the response, but then further they add "To

21   determine priority of Android or other OS we would

22   start with the system that has the larger user

400

1          A.   In the way that it is stated here, yes.

2     I'm taking these one at a time, we will definitely

3     continue to maintain the Android application.  Not

4     improve the Android application for the

5     non-compliant (indecipherable), nothing like that.

6     Just maintain the Android application and we will

7     change the application code individually for the

8     different device models.  I believe that's

9     negative.

10         Q.   Would you look at No. 1238 on page 4.

11         MR. POPOFSKY:  And, Counsel, when you get

12    to an appropriate point, I would love a break.

13         MS. BELLSHAW:  Okay.  I'm going to finish

14    this line of questioning.

15         MR. POPOFSKY:  Yeah.

16         A.   12 --

17         Q.   1238.

18         A.   Correct.

19         Q.   The response to 1238 is "We would have to

20    rework our app code," correct?

21         A.   That is correct.

22         Q.   And what was your base -- what was your

1   basis for categorizing this as anticipating adverse

2   impacts?

3       A.  The word "rework" because -- well, the

4   word "rework."

5       Q.  Why is the word "rework" the basis for

6   categorizing this as adverse?

7       A.  Because "rework" is a broader term in my

8   mind in writing than just a word like "change,"

9   it's a deeper word.  "Rework" means they may have

10  to do things across different layers of their app

11  code.  So "rework" is the word that -- when I read

12  this, that's a negative implication for this app

13  developer.

14      Q.  So you're reading "we would have to rework

15  our app code" as something different from we would

16  have to change our app code?

17      A.  I believe it's a different word and it's a

18  broader word.

19      Q.  So you're reading "rework" to have more

20  negative implications for the business than simply

21  changing the app code?

22      A.  It's a word in my mind that has --

402

1    "rework" is a broader term.  If I have to rework

2    something I really have to get into it.  It's a

3    broader word than "change."

4        Q.  And what is the basis for your

5    understanding of the word "rework"?

6        A.  Basically my basis is my understanding of

7    the English language.

8        Q.  Okay.  If you would look at No. 1076 on

9    the same page.  Why did you categorize this as

10   anticipated -- an anticipated adverse impact?

11       A.  I read the whole thing.  "We need

12   different codes for different models which is a

13   waste of time."  To me facially that is a negative

14   comment, which is a waste of time.  I can't see any

15   other way to interpret that than this person views

16   this as a negative consequence.

17       Q.  This response doesn't say that the app

18   developer anticipates that their business would

19   take any steps in response to the hypothetical,

20   right?

21           MR. POPOFSKY:  Objection to form.

22       A.  Well, I think the phrase "waste of time"

1  presupposes that somebody is going to do something

2  that takes time, and this individual thinks it's a

3  waste of it.  So I think that's an accurate

4  interpretation of just what is written here.

5      Q.  Okay.

6          Please turn to page 5, No. 1392.

7      A.  Okay.

8      Q.  "We would have to change the app codes to

9  match multiple devices"?

10     A.  Yes.

11     Q.  What was your basis for classifying this

12  as an anticipated adverse impact?

13     A.  "We would have to change the app code to

14  match multiple devices," this person has made a

15  decision to service those different multiple

16  devices that are non-compliant with the CDD.

17  That's what I read into this.  So they've made that

18  decision.  They've not made the decision, for

19  example, I'm not changing my app code because I'm

20  not dealing with this anymore.  They're going to do

21  it and they are going to have to do it for multiple

22  different devices.  I believe that requires effort,

1    and therefore I categorize it not only as negative,

2    put in the effort, negative when related to effort

3    bucket.

4        Q.   What is the basis for your assumption that

5    "we would have to do something" means that the

6    Respondent has decided to do it?

7            MR. POPOFSKY:   Objection to form.

8        A.   Because they don't, strictly speaking,

9    have to change their app code given the

10   hypothetical.  The hypothetical says they will need

11   to change their app code if -- if they want their

12   applications to work on these non-compliant

13   devices.  They don't have to change their app code.

14   They could decide I don't care if my app doesn't

15   work on these non-compliant devices, I'm just going

16   to let it go.  That's not what this person is

17   writing about.

18       Q.   So if the person decided that I don't care

19   if my app doesn't work on these non-compliant

20   devices, I'm just going to let it go, would you

21   classify that as an adverse impact?

22           MR. POPOFSKY:   Objection to form,

405

1    foundation, incomplete hypothetical.

2        A.  Say that one more time.

3        Q.  You said that an app developer could

4    decide "I don't care if my app doesn't work on

5    these non-compliant devices, I'm just going to let

6    it go."  If an app developer made that decision,

7    would you classify that as an adverse impact?

8            MR. POPOFSKY:  Same objections.

9        A.  It would depend on exactly how it was

10   worded, but depending on the particular wording of

11   it I might not categorize it as a time issue but

12   rather a development decision, a negative impact on

13   development.  But it would critically depend on the

14   precise wording of it.

15       Q.  So if an app developer decided to make the

16   changes in response to your hypothetical to match

17   so that their app will work on multiple devices,

18   you'd classify that as an adverse impact?

19           MR. POPOFSKY:  Objection to form,

20   incomplete hypothetical.

21       A.  It depends on the exact wording of the

22   answer.  So I'm not going to be able to give you a

419

1     Q.  So your assumption is that it is more

2  beneficial for an app developer to be able to use

3  the standard SDK?

4     A.  That is certainly what the individuals in

5  the upfront in-depth interviews that I did told me.

6  They all like to use the Android SDK because it

7  makes their life easy.

8     Q.  But you don't know one way or the other

9  whether this respondent in 740 would prefer to use

10  progressive Web apps?

11     A.  I think it's clear that in 740 this

12  individual has decided to use progressive Web apps.

13  In that sense they prefer it in the situation that

14  they're facing.  However, absent that particular

15  issue that this individual writes about, when

16  interviewing Web app developers they want to use

17  Android SDK because it makes their life easy.

18     Q.  Does it say that in 740?

19     A.  It does not say it makes my life easy in

20  740.

21     Q.  Is that an assumption that you're reading

22  into 740?

420

1      A.  It is an assumption based on the

2  interviews -- the in-depth interviews that I did at

3  the beginning of this process and how they talked

4  about the Android SDK.

5      Q.  Did any of your in-depth interviews

6  address progressive Web apps?

7      A.  I don't remember.

8      Q.  If you would turn to page 4 and look at

9  No. 1132.

10      A.  Yes.

11      Q.  What was your basis for coding 1132 as

12  anticipating an adverse impact?

13      A.  "This is a perfect example and we run into

14  this scenario all the time and need to customize

15  our code."  So this individual has run into this

16  scenario.  By "this scenario" I mean -- I believe

17  that this individual means the scenario as

18  presented in the hypothetical -- that's what they

19  should be commenting on here -- and therefore they

20  need to customize their code.  In the hypothetical,

21  of course, they will need to customize their code

22  more often if, in fact, they decide to continue

422

1    continue to develop for Android, that's a true

2    statement.

3         Q.  So your assumption in coding 1132 as an

4    adverse impact is that they would need to -- they

5    would both need to and choose to customize their

6    code more often in response to the hypothetical?

7         A.  They appear to -- in the absence of them

8    saying that they're not going to develop for

9    Android, I would assume that they're going to

10   continue choosing to develop for Android.  If they

11   mention that they won't develop for Android

12   anymore, then that would go in a different bucket

13   than the one here, but other than that, I agree

14   with your statement.

15        Q.  And, again, customizing the code or making

16   changes to the app code is part of the hypothetical

17   scenario?

18            MR. POPOFSKY:  Objection to form.

19        A.  The hypothetical is clear that you will

20   need to change app code if you choose to continue

21   to service the Android devices.

22        Q.  But this -- so your assumption in 1132 is

1   that the person would continue to choose to

2   customize their code in response to the

3   hypothetical, correct?

4          MR. POPOFSKY:  Objection, asked and

5   answered.

6       A.  That is an implicit assumption in the

7   specific bucket in which I categorize it as

8   negative.  If I did not make that assumption and

9   assumed instead they would not -- or they had

10  written that they would not service Android, it

11  would still be a negative bucket but it would be in

12  a different bucket.

13      Q.  So either way, you would be classifying

14  this as an adverse impact?

15      A.  Absolutely.  And just -- I think as we go

16  through these questions, I spent a lot of time in

17  these in-depth interviews changing the app code for

18  all these different devices is a major pain point

19  for these people.  They may write inartfully at

20  points in these responses, but overall they don't

21  like it at all.  It's a hard world for them to

22  exist in.

Ronald Wilcox, Ph.D.

424

1      Q.  And the basis for your statement that

2   changing this code is a major pain point for

3   application developers is the 18 in-depth

4   interviews that you conducted as part of this

5   process?

6           MR. POPOFSKY:  Objection to form.

7      A.  There may be other sources of it, but in

8   the main, yes, I learned that from the 18 in-depth

9   interviews.

10      Q.  How many of the participants in the 18

11   in-depth interviews told you that changing the app

12   code was a major pain point?

13      A.  I can't tell you how many would use the

14   word "major pain point" or if any used the word

15   "major pain point."  I will tell you that with --

16   almost universally true across all the people I

17   interviewed they viewed the -- the need to change

18   app code to service different devices or different

19   versions of the software to be just a hard part of

20   their job.

21      Q.  So even knowing that application

22   developers considered making changes to the app

1  pre-survey interviews about cost and benefits, was

2  that in the context of the current world?

3        MR. POPOFSKY:  Objection to form.

4     A.  I would say most of the conversations in

5  the in-depth interviews, except for the

6  hypotheticals that were shown to some of the

7  individuals, were about their current job

8  situation.

9     Q.  So specifically with respect to these

10  cost/benefit discussions that you've just been

11  testifying to, were those conversations about

12  benefits, did those arise in the context of

13  discussing the app developer's current world?

14     A.  For the most part they did.  However,

15  given the hypothetical presented in my survey, I

16  have no reason to believe that their fundamental

17  thinking about cost and benefits would change in

18  any material way.

19     Q.  How many pre-survey interviewees did you

20  have these cost/benefit discussions with?

21     A.  I don't have a number for you, but I will

22  absolutely testify there's some topics that came up

1   again and again from the developers.  The one was

2   the difficulty changing the app code, and the

3   second one was the trade-off between customizing

4   their app code, which would take resources, and the

5   potential loss of customers if they did not.  That

6   was a very strong theme coming out of those

7   interviews.

8        Q.  Are you offering any opinion in this case

9   regarding the app developer's view of the trade-off

10  between customizing their app code and the

11  potential loss of customers?

12        MR. POPOFSKY:  Objection to form.

13        A.  I'm certainly testifying that they

14  discussed that and that is something that they

15  consider when making app development decisions.

16        Q.  Are you offering an opinion in this case

17  about the trade-off that app developers face

18  between customizing their applications and the

19  potential loss of customers?

20        MR. POPOFSKY:  Objection to form.

21        A.  I'm not offering an opinion about any

22  specific trade-offs or mechanisms they use to

454

1      Q.  You're not clear on their use of the

2  term -- word "innovate" in this response.  Wouldn't

3  it have been more appropriate to classify this as

4  an ambiguous response?

5      A.  I think to me the word -- what they're

6  speaking about here is changing the schedule

7  because they are needing to do something they're

8  not doing right now in order to meet customer

9  satisfaction, and I think that's facially negative.

10  They are clearly worried about customer

11  satisfaction.  So I don't think this is ambiguous.

12      Q.  If you would look at the one immediately

13  above that, 1131, "User satisfaction with the

14  application is very high, which has a big impact on

15  us."

16      A.  Yes.

17      Q.  What was your basis for classifying this

18  as an adverse impact?

19      A.  "User satisfaction with the application is

20  very high which has a big impact on us."  So this

21  is a person that's commenting on presumably their

22  current state of the world, and they like the fact

                                                                    455

1    that their user application -- their satisfaction

2    is very high.

3        Q.  And so how did you classify this as an

4    adverse impact, the fact that the developer likes

5    the fact that their current user satisfaction is

6    very high?

7        A.  Well, this is clearly, I mean, something

8    in their current world.  I don't think they would

9    have written this down for the hypothetical unless

10   they were concerned somehow with user satisfaction

11   because I'm asking them about the hypothetical and

12   they're saying, well, our user satisfaction with

13   the application is very high --

14           THE REPORTER:  We have to slow down,

15   please.

16       A.  -- is very high, which is a good thing for

17   us, and I interpret this as something they are

18   concerned about in the hypothetical world.

19       Q.  There's nothing in 1131 that indicates

20   that the application developer anticipates that

21   user satisfaction will decrease in the hypothetical

22   world?

1       A.  Well, this is where I think my

2   interpretation of this is informed by the in-depth

3   interviews again because one of the biggest links

4   these individuals made -- I know I've said this

5   before, but the individual app developers are

6   concerned about user satisfaction on a regular

7   basis, that was clear.  What they worry about is

8   having to customize the app code for different

9   devices has the effect of making it more likely

10  that things will break or things will happen that

11  will lower their consumer satisfaction.

12          So when I give somebody a hypothetical

13  about needing to change the app code and they talk

14  about user satisfaction, it's actually not

15  conceivable to me given the in-depth interviews

16  that what they mean is, oh, we'll have to change

17  the app code and that will be great for user

18  satisfaction.  That just didn't show up in the

19  interviews at all.  They were -- they were worried

20  about the direct linkage between the need to change

21  the code and the user satisfaction.

22          So while this is a bit cryptic -- and I

1   can use the word cryptic here -- I think when they

2   bring up user satisfaction here, they're concerned

3   with user satisfaction relative to the

4   hypothetical.

5       Q.  Is your interpretation that 1131 indicates

6   the application developer is concerned about user

7   satisfaction based on anything other than the

8   pre-survey interviews that you conducted?

9       A.  They state user satisfaction in their

10  writing and it is informed, in fact, by the

11  interviews I did with the app developers up

12  front.

13      Q.  How many app developers in your pre-survey

14  interviews indicated a concern about user

15  satisfaction?

16      A.  Most.

17      Q.  How many?

18      A.  Most would be a number greater than nine.

19      Q.  Greater than -- are you saying that

20  because you think that more than nine --

21      A.  Yes.  This is one of these consistent

22  themes that emerged.  I could elaborate on this for

1  included in the bucket of anticipating adverse

2  impacts, you made a number of assumptions that went

3  beyond the facial response of the respondents; is

4  that fair?

5      MR. POPOFSKY:  Objection, misstates prior

6  testimony.

7      A.  I don't think I made assumptions.  I just

8  read the writing and did the categorization.

9      Q.  There were a number of responses in

10  Appendix J that we looked at this morning that you

11  testified you used your experience in the in-depth

12  interviews to help interpret even where they were

13  not necessarily clear on their face?

14      A.  It is true that I use knowledge from the

15  in-depth interviews in my interpretation of some of

16  the responses.

17      Q.  When you were classifying responses as

18  possibly positive, did you give any of them the

19  benefit of these assumptions or interpretations, or

20  did you limit yourself to responses that were

21  facially positive?

22      MR. POPOFSKY:  Objection to form.

487

1        A.   I categorized things in the positive that

2   were facially positive.  I did make fewer -- in the

3   in-depth interviews the vast majority of the time

4   the individuals talked to me about the situation

5   they were complaining and they were bringing up

6   negative things.  They did not talk about positive

7   things in any measure.  So I didn't hear as much

8   language from them on positive things.  So I

9   didn't -- I would not have known from the in-depth

10  interviews as much as I knew about the negative

11  things simply because there wasn't a lot there that

12  they wanted to talk about.

13            MS. BELLSHAW:  Okay.  No further

14  questions.

15            MR. POPOFSKY:  I just have one further

16  follow-up within the scope of your questions,

17  Counsel.

18                  FURTHER EXAMINATION

19  BY MR. POPOFSKY:

20      Q.  During your in-depth interviews, Professor

21  Wilcox, did you come to an understanding or not

22  come to an understanding that any of your

1   interviewees had oversight responsibilities over

2   back-end developers?

3        A.  There were some job descriptions where

4   they were in charge of teams that would have

5   included back-end developers.

6            MR. POPOFSKY:  Thank you.  No further

7   questions.

8            MS. BELLSHAW:  I have a question.

9                 FURTHER EXAMINATION

10  BY MS. BELLSHAW:

11       Q.  In your in-depth interviews did you

12  specifically discuss with respondents their

13  responsibilities for back-end developers or

14  engineers?

15       A.  I would not have probed the supervisors in

16  any depth on their relationship with their back-end

17  engineers.  I just knew they were part of their

18  team.

19       Q.  How many supervisors did you include in

20  your in-depth interviews that indicated they had

21  responsibilities for oversight of back-end

22  developers?

489

1      A.  "Supervisor" is a broad term.  The

2   individuals who are running the app development

3   teams had different job titles, sometimes like

4   software engineer example, but the key thing is

5   they were running teams in certain cases and those

6   teams would have back-end developers.

7      Q.  How many individual respondents in your

8   in-depth interviews indicated that they had

9   supervisory responsibility for back-end engineers

10  or developers?

11     A.  I don't remember.

12         MS. BELLSHAW:  No further questions.

13         MR. POPOFSKY:  I think therefore with

14  appreciation we're done --

15         THE REPORTER:  I'm sorry.  I can't hear

16  you.

17         MR. POPOFSKY:  Sure.  We have sirens here,

18  for the record.

19         I think with appreciation, then, we're

20  done.  I would ask that this transcript be

21  designated highly confidential pursuant to the

22  protective order for further de-designation as is