# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ARKANSAS, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF INDIANA, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MICHIGAN, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF SOUTH CAROLINA, STATE OF TEXAS, AND STATE OF WISCONSIN | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>██████████████ |
| Plaintiffs, | |
| v. | |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, STATE OF NEBRASKA, STATE OF ARIZONA, STATE OF IOWA, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF UTAH, STATE OF ALASKA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, TERRITORY OF GUAM, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF KANSAS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF PUERTO RICO, STATE OF RHODE ISLAND, STATE OF SOUTH DAKOTA, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>██████████████ |

STATE OF WEST VIRGINIA, AND STATE
OF WYOMING

                          Plaintiffs,

v.

GOOGLE LLC,

                          Defendant.

**PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS**

# TABLE OF CONTENTS

I.  Overview Of Markets ......................................................................................................... 1

    A.  General Search Services Market ............................................................................... 1

    B.  Search Advertising And General Search Text Advertising ...................................... 2

    C.  Scale In General Search Services ............................................................................. 4

II.  Overview Of Search Defaults And Preinstallation ......................................................... 16

III.  Google's Distribution Agreements ................................................................................. 22

    A.  Scope Of Google's Distribution Agreements ......................................................... 22

    B.  Google's Distribution Agreements With Apple ...................................................... 26

        1.  Apple's Search Share And The Safari Browser............................................ 26

        2.  Google As Search Default On The Safari Browser ...................................... 27

        3.  Google's Payments To Apple ....................................................................... 29

        4.  Consideration Of The Value Of The Safari Search Default During
            Negotiations With Apple .............................................................................. 31

    C.  Economic Principles Related To Google's Distribution Agreements .................... 38

    D.  Google's Android Distribution Agreements ........................................................... 41

        1.  Android Operating System And Devices...................................................... 43

        2.  Google's Chrome Browser ........................................................................... 45

        3.  Google's Mobile Application Distribution Agreements (MADA)............... 45

        4.  Google's Revenue Share Agreements (RSA) ............................................... 49

        5.  Google's Payments To Android Partners Under RSAs .................... 51~~51~~~~52~~

        6.  Consideration Of The Value Of The Search Default On Android Devices
            ....................................................................................................................... 52

    E.  Google's Browser Distribution Agreements........................................................... 55

        1.  Third-Party Browsers................................................................................... 55~~55~~~~56~~

        2.  Google's RSAs With Third-Party Browsers................................................ 56~~56~~~~57~~

        3.  Google's Payments To Third-Party Browsers ............................................. 57~~57~~~~58~~

        4.  Consideration Of The Value Of The Search Default On Third-Party
            Browsers ....................................................................................................... 58~~58~~~~59~~

Plaintiffs in both actions captioned above respectfully submit this Counterstatement of Material Facts, under Local Rule 7(h) of the United States District Court for the District of Columbia, in support of their opposition to the Motion for Summary Judgment filed by Defendant Google LLC ("Defendant" or "Google").

## I.   OVERVIEW OF MARKETS

### A.   General Search Services Market

400.[1]   General search services are offered by general search engines, which are "one-stop shops" consumers can use to search the internet for answers to a wide range of queries. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 177, 197–216; Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 90.

401.   General search services are a unique, relevant product market. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 127–242.

402.   A relevant geographic market for general search services consists of general search services provided to consumers in the United States. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 247–264.

403.   After a user enters a query on a general search engine, results appear on a search engine results page (SERP). Pls. Ex. 133, Google Search website, How results are automatically generated.

---

[1]   To avoid any overlap with the numbers in Defendants' Statement of Undisputed Facts in Support of Its Motion for Summary Judgment (ECF No. 423), Plaintiffs begin their counterstatements at 400.

404.    Google and Bing are the only significant U.S. general search engines that crawl and index the web, while other U.S. general search engines syndicate results. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 46–48.

405.    The two leading U.S. general search engine companies today are Google and Bing, with smaller players including Yahoo!, DuckDuckGo, Brave, Ecosia, and Neeva. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 63, ¶¶ 46–48; Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶ 124.

406.    Since 2010, Google has had an average annual market share of 80% or more in the U.S. market for general search services. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 66.

407.    In 2020, Google's share of the U.S. general search services market was nearly 90%, with an even higher share of 94% on mobile devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 433, Figs. 63, 66, 68.

408.    Bing, Google's closest competitor, has a U.S. general search services market share of roughly 6%, and it has not exceeded a 10% market share since 2015. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Figs. 63, 66.

409.    On U.S. mobile devices, Bing's market share is even smaller at roughly 1% in 2021, and it has not exceeded a 2% share since 2016. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 68.

**B.    Search Advertising And General Search Text Advertising**

410.    Most general search engines do not charge consumers a fee. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 26, 82, 129, 527, 1380.

411.    When a consumer uses Google, the consumer provides Google data and attention in exchange for search results. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 125 & n.154, 1223.

412.    Google monetizes a consumer's data and attention by selling ads served in response to the consumer's real-time query. Pls. Ex. 22, Whinston (DOJ Pls.') Initial Report, ¶ 82.

413.    There is a search ads market that consists of advertising that is displayed on the SERP that general or specialized search engines return in response to consumer real-time queries. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 27–29 & § III.D.2.

414.    There is a general search text ads market that is a narrower market wholly contained within the search ads market. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 30 & § III.D.3; Pls. Ex. 134, Jerath (DOJ Pls.' Expert) Initial Report, ¶¶ 113–123.

415.    There is a relevant geographic market for search ads served in response to queries from users located in the United States. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 382–387.

416.    There is a relevant geographic market for general search text ads served in response to queries from users located in the United States. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 417.

417.    General search text ads appear on the SERP of a general search engine and look much like the organic (non-advertising) search result links, i.e., they consist primarily of text and contain little or no pictures or other graphics. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 30, 85.

418.    Google has a market share of roughly 74% in the U.S. search ads market and has had a share over 70% since 2015. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 468, Fig. 79.

419.    Google has a market share of roughly 88% in the U.S. general search text ads market and has had a share of over 80% since at least 2016. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 474, Fig. 81.

420.    Bing, Google's closest competitor, has held a market share of less than 9% in the market for U.S. general search text ads since 2016. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 81.

421.    Google earned approximately ███████ in revenue worldwide from the sale of search ads in 2021. Pls. Ex. 135, Hammer (DOJ Pls.' Expert) Initial Report, Fig. 7 & Appendix D, Schedule A.2.

422.    Google generated approximately ███████ in operating profits worldwide from the sale of search ads in 2021. Pls. Ex. 135, Hammer (DOJ Pls.' Expert) Initial Report, Fig. 16 & Appendix D, Schedule A.2.

### C.    Scale In General Search Services

423.    In the context of general search services, scale generally refers to the size of data a search engine cumulatively has access to when users interact with the search engine. Pls. Ex. 245, ███ (Microsoft) Dep., 49:10–52:16 ████████████████████████ ████████████████ Pls. Ex. 155, Giannandrea (Apple) Dep., 65:5–15 (stating that one way to describe scale "would be the number of queries that you have access to").

424.    Google's scale in the general search services market exceeds its rivals by many multiples. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, § VII.B.1; Pls. Ex. 295, Oard (DOJ Pls.' Expert) Frieder Rebuttal Report, ¶ 105 ████████████████████████

425.    Since at least 2006, Google's employees have recognized that its scale gives it a
significant competitive advantage.

426.    Search engines rely on continuous flows of user data to improve search quality including ranking, search features, and the ability to experiment and innovate. Pls. Ex. 295, Oard (DOJ Pls.' Expert) Frieder Rebuttal Report, § II.C; Pls. Ex. 236, Google presentation: Google is magical (*Oct. 2017), GOOG-DOJ-22859493, at -503 ("With every query, [Google gives] some knowledge, and get[s] a little back. Then we give some more, and get a little more back. These bits add up. After ███████████████, [Google] start[s] lookin' pretty smart! ██████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████



; Pls. Ex. 241, Braddi (Google) CID Dep., 77:21–78:23 (explaining how "volume of searches helps to refine and improve the search quality"); Pls. Ex. 10, ███████ (Microsoft) Dep., 30:15–31:4, 183:2–190:3; Pls. Ex. 245, ███ (Microsoft) Dep., 146:23–149:3; Pls. Ex. 156, Ramaswamy (Neeva) Dep., 118:5–120:7; Pls. Ex. 165, Weinberg (DuckDuckGo) Dep., 120:5–129:5, 316:17–318:9, 328:17–329:4, 350:6–351:21.

427.    In general search, user data fuels a feedback loop that affects product quality and competitiveness. Pls. Ex. 295, Oard (DOJ Pls.' Expert) Frieder Rebuttal Report, § II.C; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, § VII.B; Pls. Ex. 246, ███████

██████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████ Pls. Ex. 10, ██████ (Microsoft) Dep., 298:4–299:24, 330:18–332:4, 333:9–334:19.

428.    Google's scale advantage is particularly significant on mobile. Pls. Ex. 249, Booking.com document: Google, DOJ_BKNG-00001768, at 3 ("Google dominates the search landscape, particularly on mobile with 95% market share. Google's global market share across all platforms as of August 2019 was 92%."), at 5 ("Almost 1/3 of all mobile searches are related to location."); Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 441, Figs. 68, 176; Pls. Ex. 9, ██████ (Microsoft) Dep., 44:9–45:7 ████████████████████████████████

████████████ Pls. Ex. 245, ██████ (Microsoft) Dep., 234:12–235:8 ████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ ; Pls. Ex. 10, ██████ (Microsoft) Dep., 345:11–346:12 ("█████

██████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████



██████████████████████████████████████████

██████████████ 398:11–399:15.

429.   Mobile queries are substantively different than desktop queries. ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

██████████████████████████████ ; Pls. Ex. 245, ████ (Microsoft)

Dep., 52:17–54:1 ████████████████████████████

██████████████████████████

430.   Mobile queries often have a location component. ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

████████████████ ; Pls. Ex. 248, Varian (Google) Dep., 199:21–23 ("Q. Local queries

are more prevalent on mobile devices than on desktops; is that right? A. Yes."); Pls. Ex. 245,

████ (Microsoft) Dep., 232:17–234:4 ████████████████████████████



Pls. Ex. 10, ████ (Microsoft) Dep., 323:12–326:14 ████

431.    Desktop user data is not a full substitute for mobile user data because user data (including search intent and interaction patterns) are substantially different when the consumer is searching on a mobile device than when the consumer is searching on a computer (i.e., a desktop or laptop). ████

████

████

████ ; Pls. Ex. 10, ████ (Microsoft) Dep., 323:12–326:14; Pls. Ex. 245, ████ (Microsoft) Dep., 50:17–54:1; Pls. Ex. 295, Oard (DOJ Pls.' Expert) Frieder Rebuttal Report, ¶¶ 192–193.

432.    Google's scale advantage is particularly significant for answering tail queries. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 983, 987–988, 1004–1009.

433.    Tail queries are queries that occur rarely on general search engines. ████

████

████

████

████ ; Pls. Ex. 242, Lehman (Google) Dep., 240:21–241:12 ("A long-tail concept would be one that in our query stream as a whole, regardless of how it's processed, it's -- it's a concept that's not often mentioned.·For example, a popular celebrity would be a -- not a long-tail concept.·It

would be sort of -- some people call it a 'head concept.' ·On the other hand, like an obscure telegraph system from 1925, or something like that might be a long-tail concept.").

434.    Tail queries and mobile queries tend to overlap because, like tail queries, mobile queries tend to seek uncommon, granular, location-based information. Pls. Ex. 10, ██████ (Microsoft) Dep., 319:15–322:5 ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████ 322:18–323:11 ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Pls. Ex. 9, ██████ (Microsoft) Dep., 234:17–235:22 ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

435.    Access to user feedback for tail queries has a substantial effect on improving the search quality for tail queries. Pls. Ex. 10, ██████ (Microsoft) Dep., 239:10–241:11 ██████

████████████████████████████████████████████

███████████████████████████████████████████

███████ Pls. Ex. 295, Oard (DOJ Pls.' Expert) Frieder Rebuttal Report, ¶¶ 32–33, 93–94.

436.    The scale gap between Google and its competitors makes it difficult for the competitor search engines to match Google's search quality. ████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████; ████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████

437.    The scale gap between Google and its competitors makes it difficult for the competitor search engines to compete for users (increase scale). Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 968–1136; ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

██████████████████; Pls. Ex. 9, ██████ (Microsoft) Dep., 227:11–228:17 ████████████

██████████████████████████████████; Pls. Ex. 10, ███████

(Microsoft) Dep., 254:8–255:11 ████████████████████████████████████

████████████████████████████████████████████████████ 263:21–264:6

(same).

437.1.  "Because of diminishing returns to scale, Google benefits less from additional

queries, than its rivals." Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, ¶ 531; ███

███████████████████████████████

438.    Search engines with greater scale attract more advertisers. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, § VII.B.3; Pls.

Ex. 256, Lowcock (IPG) Dep., 97:1–12 ("Q. So does the fact that Google has more users and

more queries make the platform more -- more attractive to advertisers? A. Yes. Q. And is one of

the reasons advertisers don't purchase more text ads or search ads on Bing because it doesn't

have as many queries or users? A. Yes. Q. So is scale an important factor that advertisers

consider when picking a search advertising platform? A. Yes."); Pls. Ex. 7, ██████████████

(Microsoft) Dep., 50:6–51:2 ██████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ Pls. Ex. 245, █████ (Microsoft) Dep.,

49:15–50:10 ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ Pls. Ex. 165, Weinberg (DuckDuckGo) Dep., 323:4–25 ("[T]he more

volume we have in the marketplace, you think more advertisers will be attracted to the

marketplace in general and that will increase the RPM."); Pls. Ex. 246, ███████████████

███████████████████████████  APLGOOGDOJ-00000091, at -092

█████████████████████████████████████

████████████████████████████████████████████

    438.1.  Having more user-side data (i.e., more scale) allows search engine to better

monetize ads. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████;  Pls. Ex. 258, Google presentation: Search Ads Boot Camp (Day 1)

(*Q4 2019), GOOG-DOJ-23855303, at -539 (stating "Search Ads [heart] Data"); Pls. Ex. 146,

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

███████████████  Pls. Ex. 246, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  Pls. Ex. 22, Whinston (DOJ

Pls.' Expert) Initial Report, ¶¶ 1070–1118, § VII.B.3.

    439.  Greater scale tends to increase advertising revenue. Pls. Ex. 146, ████████

█████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████



; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, § VII.B.3; Pls. Ex. 245, ▮▮▮ (Microsoft) Dep., 49:13–50:10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Pls. Ex. 316, Gomes, (Google) CID Dep., 77:6–24 ("[T]here was a belief that, as we improve the overall search experience, there is hope people come back to Google overall better, more often. So if we target overall growth, for instance, a search gets faster, if we are providing a better user experience, then people come back to us more often. And that includes for things like commercial queries."); Pls. Ex. 10, ▮▮▮ (Microsoft) Dep., 136:20–138:4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

439.1.   Earning more from each query allows search engines to pay more for distribution deals. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 1071–1072, 1177.

439.2.   This allows search engines to secure distribution on browsers, desktop computers, and mobile devices, which, in turn, serves to capture even more search queries for the feedback loop. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 1165–1166, 1177.

440.    With less revenue, rivals are predictably less able to invest in quality

improvements that benefit consumers and advertisers. Pls. Ex. 22, Whinston (DOJ Pls.' Expert)

Initial Report, ¶¶ 1071–1072; Pls. Ex. 246, ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

## II.    OVERVIEW OF SEARCH DEFAULTS AND PREINSTALLATION

441.    The most common way users access general search engines is through

preinstalled search access points. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report,

Fig. 100.

442.    A search access point is a place on a device where a user can enter a search query.

Pls. Ex. 70, Kolotouros (Google) Dep., 96:09–13, 97:18–98:16.

443.    In 2005, OEMs had little interest in distributing Google search without financial

incentives. Pls. Ex. 285, Google presentation: GPS – Mobile Topics (*June 16, 2005), GOOG-

DOJ-01731480, at 2–4.

444.    In 2005, OEMs demanded revenue share to distribute Google search. Pls. Ex. 285,

Google presentation: GPS – Mobile Topics (*June 16, 2005), GOOG-DOJ-01731480, at 2–4.

445.    Being the preset default search engine for a search access point on a preinstalled

and prominently placed app is the most efficient and effective way for a search engine to reach

users. Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶¶ 9–12, 37–39, 54–55, 59–62; ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████; *see also* COMF ¶¶ 441–444, 446–470; Am.

Compl., ECF No. 94, Jan. 15, 2021, ¶ 47 ("Google admits that attaining a preinstalled search

access point, depending on the setting, can encourage utilization of a service").

446.   In the United States, device distributors (e.g., Apple, OEMs, carriers) decide what

apps—and therefore what search access points—to preinstall and where to place those apps on

their devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 737, 810.

447.   Before a device is sold to the consumer, a given preinstalled search access point

on the device can be assigned a preset default search engine to which it will send queries entered

by the consumer. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████

448.    When a user purchases an Apple iPhone, it comes with Apple's Safari browser preinstalled, which has Google as the preset default search engine for queries that users enter in the URL address bar. Pls. Ex. 155, Giannandrea (Apple) Dep., 28:25–29:5, 106:19–22.

449.    Most consumers stick with the preset default search engine that is assigned to each respective search access point on their device (also known as the default out of the box).

███████████████████████████████████████████████████████████████

█████████████████████████████; Pls. Ex. 10, ██████ (Microsoft) Dep., 261:13– 262:17; Pls. Ex. 165, Weinberg (DuckDuckGo) Dep., 314:22–315:13; Pls. Ex. 156, Ramaswamy (Neeva) Dep., 70:4–72:2, 94:9–24; ███████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████; Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶¶ 131–132; Pls. Ex. 87, Murphy (Def.'s Expert) Dep., 94:17–95:3 (explaining that "default status generally will lead to some increase in usage"); *see also* COMF ¶¶ 441–448, 450–470.

450.    Consumers rely on habit in searching the internet. Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶¶ 9, 54–66 ("Given that consumers carry out these searches using familiar interfaces and devices, and that these searches provide immediate feedback, users' search patterns become strongly habituated."), 67–68; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 847.

451.    Consumers often do not make (or even know that they can make) an explicit choice about which general search engine to use for a given search access point. ██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

18

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

███

452.     Even where search users might want to change the preset default search engine for a given search access point, the effort and complexity involved with switching—referred to as "choice friction" by Plaintiffs' expert Professor Antonio Rangel, PhD—biases users to stick with the default option. Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶¶ 37–39, 78–97, 131.

453.     Google's Chief Economist, Hal Varian, regularly reminded Google employees of the "power of defaults." Pls. Ex. 248, Varian (Google), Dep., 267:6–16; Pls. Ex. 219, Email from Varian (Google), Re: Power of defaults (Mar. 27, 2007), GOOG-DOJ-05756465, at -465 (referring to Prof. Varian's "'power of defaults' idea").

454.     Search defaults drive user traffic. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 846–965, § VII.A; Pls. Ex. 87, Murphy (Def.'s Expert) Dep., 94:17–95:3 (explaining that "default status generally will lead to some increase in usage").

455.     Search defaults for search access points tend to be "stickier" on mobile devices than on PCs. █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████; Pls. Ex. 24,

Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 465, Fig. 40.

456.    Google routinely hires or contracts with behavioral economists to consider the

impact of defaults. Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶¶ 25, 57; Pls. Ex. 286,

████████ presentation: 2015 Round Up Full Deck (UNDATED), █████ 000001, at 1–3;

Pls. Ex. 287, █████████ presentation: Work on Mobile Growth (UNDATED),

████ 002874, at 1–3; Pls. Ex. 288, Google document: Maya Shanker Top-Line

(UNDATED), GOOG-DOJ-27097514, at -514–515; Pls. Ex. 289, Google presentation: Google's

Behavioral Science Team: 2018 Google Ads Results (Dec. 2018), GOOG-DOJ-27097279, at

-279.

457.    [Intentionally Left Blank]

458.    [Intentionally Left Blank]

459.    [Intentionally Left Blank]

460.    ████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

461.    Users are unlikely to switch away from a device's preset default search service.

Pls. Ex. 23, Rangel (DOJ Pls.' Expert) Initial Report, ¶ 131; Pls. Ex. 10, ██████ (Microsoft)

Dep., 261:13–262:17; Pls. Ex. 165, Weinberg (DuckDuckGo) Dep., 314:22–315:13; Pls.

Ex. 156, Ramaswamy (Neeva) Dep., 70:4–72:2, 94:9–24; *see also* Pls. Ex. 290, Miller (Google)

Dep., 76:24–77:24.

462.     Bing's share of search queries is much higher on devices (such as Windows PCs and Amazon Fire tablets) where it is the preset default search engine for search access points. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 850–852, Fig. 142.

463.     In Russia, Google's agreement with regulators to introduce a search engine choice screen on Android devices caused Google's share of Android searches to decline ██████. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 953, Fig. 168.

464.     Paying to have Google as the preset default search engine for search access points is the highest cost but highest value way to acquire users. Pls. Ex. 171, Google presentation: iOS Distribution- BD Opportunities (*July 2017), GOOG-DOJ-04279956, at -960.

465.     Organic downloads, paid marketing, and app promotion/integration do not match the likelihood of success that being the preset default search engine has in getting consumers to use Google's search engine. Pls. Ex. 171, Google presentation: iOS Distribution- BD Opportunities (*July 2017), GOOG-DOJ-04279956, at -960.

466.     Google's revenue share payments to device and browser distributors enable Google to reach more users. Pls. Ex. 317, Porat (Google) Dep. 26:13–30:1.

467.     Reaching more users is a key part of Google's consideration for the revenue share payment. Pls. Ex. 317, Porat (Google) Dep. 26:13–30:1.

468.     If rivals won the defaults currently secured by the challenged terms of Google's Distribution Agreements,[2] ████ of Google's U.S. general search market share would shift to rivals. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 105, App. D, at D-16.

---

[2]     As used herein, "Distribution Agreements" comprises, individually and collectively, Google's Information Services Agreement, as discussed in Section III.B.2 herein; Google's Mobile Application Distribution Agreements, as discussed in Section III.D.3 herein; and Google's Revenue Share Agreements, as discussed in Section III.D.4. and Section III.E.2 herein.

469.    Under its Android RSAs, 

Pls.

Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, ¶¶ 403–405.

470.    The size of the default effect is likely smaller on Mozilla's Firefox browser than in other contexts because Firefox is a non-default browser, necessarily used only by people who are technologically savvy enough and motivated enough to override Windows' default. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 472.

## III.    GOOGLE'S DISTRIBUTION AGREEMENTS

### A.    Scope Of Google's Distribution Agreements

471.    In the United States, almost 50% of all queries made on general search engines are covered by the challenged terms of Google's Distribution Agreements.[3] Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 100.

472.    In the United States, ███ of all queries made on general search engines are issued through the default on Chrome on Windows desktops and Apple desktops and mobile devices. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 100.

---

[3] ███████████████████████████████████████ Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 100.

473.    In the United States, roughly 70% of all mobile phone queries made on general search engines (a growing category of searches) are covered by the challenged terms of Google's Distribution Agreements.[4] Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 101.

474.    In the United States, ███████ of all mobile phone queries made on general search engines are issued through the default on Chrome for mobile Apple devices. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 101.

475.    In 2020, ███ of all U.S. general searches went to Google Search through Google's search default in the Safari browser address bar. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 104.

476.    In 2020, ███████ of all U.S. general searches went to Google Search under its Distribution Agreements with carriers and Android OEMs. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 160.

477.    In 2020, ███████ of all U.S. general searches went to Google Search under its Distribution Agreements with third-party browser companies (i.e., Mozilla, Opera, and UCWeb). Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 161.

478.    Google's share of all U.S. queries on Android phones is ███████ Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 142.

479.    The Google search widget accounts for ███████ of Google's query share on Android phones. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 741.

---

[4] ████████████████████████████████████████████████ ████████████████████████████████████████ Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 101.

480.    The Google search widget accounts for ███████ of all U.S. Android queries
████████████. COMF ¶¶ 478–479.

481.    Chrome's address bar accounts for ██████████ of Google's Android query
share. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 742.

482.    Chrome's address bar accounts for ██████████ of all U.S. Android queries
██████████████ COMF ¶¶ 478, 481.

483.    In 2020, the challenged terms of Google's Distribution Agreements drove roughly
████████ queries to Google.[5] Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 90.

484.    Google's control of search access points through its ownership of Chrome and
Android, and its Distribution Agreements are significant barriers to entry and expansion by rivals
and potential rivals. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 506–510.

485.    As a result of Google's Distribution Agreements, consumers are left with less
choice than what they would see in a more competitive market. Pls. Ex. 22, Whinston (DOJ Pls.'
Expert) Initial Report, § VIII.A.

486.    As a result of Google's Distribution Agreements, consumers are left with less
innovation than what they would see in a more competitive market. Pls. Ex. 22, Whinston (DOJ
Pls.' Expert) Initial Report, § VIII.A.

487.    As a result of Google's Distribution Agreements, consumers are left with lower-
quality search offerings than what they would see in a more competitive market. Pls. Ex. 22,
Whinston (DOJ Pls.' Expert) Initial Report, § VIII.A.

---

[5] ██████████████████████████████████████████████
████████████████████████████████████ Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply
Report, Fig. 90.

488.    ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████ ; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 1222–1238.

489.    The absence of competition allows Google to raise the prices and reduce the quality of its search ads products. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 1332–1359.

490.    In the United States, the challenged terms of Google's Distribution Agreements cover roughly 36% of all U.S. search ad revenue.[6] Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 102.

491.    In the United States, default searches on Chrome on Windows desktops and Apple desktops and mobile devices account for ████ of all U.S. search ad revenue. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 102.

492.    In the United States, the challenged terms of Google's Distribution Agreements cover roughly 45% of all general search text ad revenue.[7] Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 103.

---

[6] ██████████████████████████████████████████ Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 102.

[7] ██████████████████████████████████████████ Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 103.

493.    In the United States, default searches on Chrome on Windows desktops and Apple desktops and mobile devices account for ███ of all general search text ad revenue. Pls. Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, Fig. 103.

### B.    Google's Distribution Agreements With Apple

#### 1.    Apple's Search Share And The Safari Browser

494.    In 2020, ████████████ Google search queries in the United States were performed on Apple devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 134.

495.    Roughly 60% of all mobile phones in the United States are iPhones. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 2.

496.    Roughly 27% of all desktop computers in the United States are Macs. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 4.

497.    Apple's Safari browser is the only preinstalled browser on Apple devices. Pls. Ex. 25, Cue (Apple) Dep., 126:3–14.

498.    Apple has never preinstalled third-party browsers, third-party search apps, or any other third-party apps on its devices. Pls. Ex. 25, Cue (Apple) Dep., 118:15–18 ("We don't install any third-party apps.·Never have on iOS."), 126:7–10, 128:10–15; Pls. Ex. 3, Apple 30(b)(6) (Cue) Dep., 90:21–24 (stating with respect to Apple preloading third-party apps: "There are none. We would never do"), 92:15–22; Pls. Ex. 165, Weinberg (DuckDuckGo) Dep., 218:25–219:12.

499.    Apple has no plans ever to preinstall third-party browsers, third-party search apps, or any other third-party apps on its devices. Pls. Ex. 25, Cue (Apple) Dep., 118:15–18, 126:7–10, 128:10–15; Pls. Ex. 3, Apple 30(b)(6) (Cue) Dep., 90:21–24, 92:15–22.

500.   In 2020, ████████████ of Google's total U.S. search query volume came

from searches performed using the Safari browser's address bar. Pls. Ex. 89, Whinston (DOJ

Pls.' Expert) Reply Report, Fig. 90.

### 2.   Google As Search Default On The Safari Browser

501.   The Information Services Agreement (ISA) between Google and Apple, as

amended, 

_____

8   Siri is Apple's voice assistant. Pls. Ex. 25, Cue (Apple) Dep., 44:9–13.

9   Spotlight is Apple's universal search service that is used primarily to search on-device
content, but also gives consumers the option of searching the internet. Pls. Ex. 155,
Giannandrea (Apple) Dep., 89:10–91:6, 96:19–98:7; Pls. Ex. 25, Cue (Apple) Dep., 58:7–
58:18.

505. 

506.

507.

508.

509.    Because Google is the preset search default on the Safari browser, a consumer using Safari can perform a query on a rival search engine only by either (a) navigating to that rival's website, or (b) changing the default search engine in Safari's settings. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 412.

510.  ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

### 3.    Google's Payments To Apple

511.    Since 2005, Google has made payments to Apple to guarantee that it will be the exclusive preset default search engine for the Safari browser on Apple devices. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████

512.  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████

513.   █████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

████████

514.   In 2021, pursuant to the ISA, as amended, Google paid Apple approximately

████████ for searches in the United States. Pls. Ex. 313, Decl. of Schmalbach (DOJ) (Jan. 26,

2023), Appendix A, Table 2.

515.   █████████████████████████████████

███████████████████████████████████████████

████ Pls. Ex. 313, Decl. of Schmalbach (DOJ) (Jan. 26, 2023), Appendix A, Table 1.

516.   In 2021, Google's payments to Apple to be the preset default search engine for

the Safari address bar pursuant to the ISA, as amended, constituted ████████ of Apple's

total operating income for the United States that year. Pls. Ex. 313, Decl. of Schmalbach (DOJ)

(Jan. 26, 2023), Appendix A, Table 1 (indicating ████████ in payments to Apple); Pls.

Ex. 318, Apple 2021 Form 10-K, at 29 (indicating $53.4 billion in operating income for the

Americas).

517.   In 2020, Google's payments to Apple pursuant to the ISA comprised ████████

██████████████████████████ Pls. Ex. 175, ████

████████████████████, APLGOOGDOJ-01163132, at -144; Pls.

Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 718 & Fig. 122.

518.   Defendant's economic expert Prof. Murphy acknowledged that ████████

█████████████████████████████████████████████

519.     In 2021, the total global revenue for Microsoft's "search and news advertising" business, which includes Microsoft Bing, was approximately $9.3 billion. Pls. Ex. 176, Microsoft 2022 10-K, at 95.

520.     ████████████████████████████████████████████████████████

Pls. Ex. 9, ████ (Microsoft) Dep., 239:4–244:22.

521.     ████████████████████████████████████████████████████████ Pls. Ex. 9, ████ (Microsoft) Dep., 239:4–244:22.

### 4.     Consideration Of The Value Of The Safari Search Default During Negotiations With Apple

522.     During negotiations with Apple ████, Google's search finance team modeled the value of Google being the search default for the Safari browser. ████████████

31

523.     During negotiations with Apple ▮▮▮▮, when modeling the value of Google being the search default for the Safari browser, Google's search finance team predicted that Google would recover (or "claw back") ▮▮▮▮▮ of the revenue that it had previously earned from queries conducted through the Safari search default if it lost this position, representing a potential loss to Google of ▮▮▮▮▮▮▮▮▮▮▮▮▮ in net revenue. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

524.     After conducting negotiations with Apple ▮▮▮▮, Google to agree to share ▮▮ of its revenue with Apple to secure Safari's search default. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

525.     Google is not currently aware of a better estimate for the impact of losing the Safari browser search default than the one conducted during Google's ▮▮▮ negotiations with Apple. Pls. Ex. 209, Google 30(b)(6) (Roszak) Dep., 93:15–94:17, 99:5–11.

526.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pls. Ex. 175, ▮▮▮▮▮▮▮▮▮▮▮▮ APLGOOGDOJ-01163132, at -174–179.

527.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Pls. Ex. 175, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ APLGOOGDOJ-01163132, at -176.

528.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



██████████████████████████████████████

█████████████████████████ Pls. Ex. 175, ██████████████████████

███████████ APLGOOGDOJ-01163132, at -177.

529. ███████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████████ ██████████████████████

████████████████████████ *see also* Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial

Report, ¶¶ 894–898, Figs. 155–157.

530. ███████████████████████████████████

████████████████ Pls. Ex. 5, ████ (Microsoft) Dep. (Vol. I), 96:10–99:5, 133:12–

134:8; Pls. Ex. 6, ███ (Microsoft) Dep. (Vol. II), 88:21–92:8, 259:22–261:15; Pls. Ex. 7, ███

███ (Microsoft) Dep., 59:25–61:7, 85:6–85:16, 111:5–115:9, 140:1–142:9, 162:3–163:24,

193:9–196:17, 246:3–247:4; Pls. Ex. 8, █████ (Microsoft) Dep., 128:15–132:21, 134:16–

136:6, 138:10–144:16, 159:15–160:1, 281:15–283:11, 311:02–323:23, 343:18–345:25; Pls.

Ex. 9, █████ (Microsoft) Dep., 10:12–11:13, 44:9–47:12, 50:7–59:8, 68:4–69:5, 88:5–90:15,

106:6–107:12, 114:17–115:1, 132:23–135:8, 137:11–141:11, 146:16–151:14, 233:14–235:22,

237:2–238:25 Pls. Ex. 10, █████ (Microsoft) Dep., 91:22–95:23, 102:2–105:23, 121:11–

129:6, 243:2–252:7.

531. ███████████████████████████████████

█████████████████████████████████ Pls. Ex. 5, ████ (Microsoft) Dep.

(Vol. I), 96:10–99:5, 133:12–134:8; Pls. Ex. 6, █████ (Microsoft) Dep. (Vol. II), 83:13–92:8,

259:22–261:15; Pls. Ex. 7, ███████ (Microsoft) Dep., 59:25–61:7, 111:5–115:9, 140:1–

142:9, 162:3–163:24, 193:9–196:17, 246:3–247:4; Pls. Ex. 8, █████ (Microsoft) Dep., 129:15–

132:21, 134:15–136:6, 138:10–144:16, 281:15–283:11, 311:1–323:23, 343:18–345:25; Pls.

Ex. 9, █████ (Microsoft) Dep., 10:11–11:13, 44:9–47:12, 50:7–59:8, 68:4–69:5, 88:5–90:15,

106:6–107:12, 114:17–115:1, 132:23–135:8, 137:11–141:11, 146:16–151:14, 233:10–235:22,

237:1–238:25 Pls. Ex. 10, ██████ (Microsoft) Dep., 91:22–95:23, 102:2–105:23, 121:11–

129:6, 243:2–252:7.

532.    If Google had lost the Safari search default to another general search engine in

2020, this would have led to a shift of ██████████ of all U.S. search traffic, with Google

losing ████████ of the U.S. queries that it had previously captured through the Safari search

default on Apple's mobile devices, and losing █████████ of the U.S. queries that it had

previously captured through the Safari search default on Apple's macOS devices (desktops and

laptops). Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 888–901 & Fig. 158; Pls.

Ex. 89, Whinston (DOJ Pls.' Expert) Reply Report, App. D, at D-16, Fig. 104.

533.    Prof. Murphy contends that Prof. Whinston's estimate of the impact of the Safari

default is flawed. Pls. Ex. 139, Murphy (Def.'s Expert) Rebuttal Report, ¶¶ 154–158.

534.    In his deposition, Prof. Murphy described Google's ordinary-course projections

regarding the impact of defaults as representing "somebody's estimate" that may be "seat-of-the-

pants ideas" or "a way of justifying what they felt they needed to do," and stated that if Google

"relied upon" these projections in negotiating its distribution agreements, this would not change

his willingness to accept them if he believes they were "mistaken." Pls. Ex. 87, Murphy (Def.'s

Expert) Dep., 366:3–368:6.

535.    When Google has considered how Apple thinks about the Safari default to inform Google's negotiation strategy, Google has analyzed the financial implications to Apple. ██ Ex. 178, Google presentation: NYC [Apple] Overview, Risks, and Opportunities (Oct. 2017), GOOG-DOJ-09093108, at -114–115.

536.    Prof. Murphy claims that "Apple in essence acts as a collective bargaining agent for consumers" when negotiating with Google. Pls. Ex. 67, Murphy (Def.'s Expert) Initial Report, ¶ 238.

537.    ███████████████████████████████████████

███████████████████████████████████████████████ Pls. Ex. 25, Cue (Apple) Dep., 217:9–220:2.

538.    ███████████████████████████████████████

█████████████████████████████ Pls. Ex. 25, Cue (Apple) Dep., 217:2–220:2.

539.    ███████████████████████████████████████

██████████████████████████████████ Pls. Ex. 3, Apple 30(b)(6) (Cue) Dep., at 26:8–28:3.

540.    ███████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

541.    ███████████████████████████████████████

██████████████████████████████████████████████████





542.

543.

544.  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

545.  At various points in negotiating the ISA and its amendments, ████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████

546.    During ███ negotiations with Google, Apple's lead negotiator communicated to Google's CEO that Apple "████████████████████████████████████████ ████████████████████████████████████████████████████" Pls. Ex. 3, Apple 30(b)(6) (Cue) Dep., 140:7–19.

**C.    Economic Principles Related To Google's Distribution Agreements**

547.    A contract between a dominant search supplier and a search distributor may reduce competition even if both parties find the agreement to be in their self-interest. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 285–297.

548.    Search distributors do not act as collective bargaining agents for other distributors or search consumers. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 291–292.

549.    A dominant search supplier will enter into an exclusionary contract because it stands to benefit from reducing the threat posed by competing suppliers. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 293.

550.    A search distributor will be guided by its own financial incentives when determining whether to agree to an exclusionary contract. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 291–293.

551.    A search distributor may profit from an exclusionary contract with a dominant search supplier, even as the contract reduces competition to the detriment of the distributor's consumers, because a dominant supplier may be willing to pay more for a distribution contract than a competing firm would or could. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 293–296.

552.    There is a basic asymmetry between the outcome if a dominant firm wins or if rivals win an exclusionary contract. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 296; Pls. Ex. 267, Baker (Colo. Pls.' Expert) Reply Report ¶ 130 & n.325.

553.     When a dominant search supplier wins an exclusionary contract with a search distributor, its market power is strengthened, and it may gain or protect monopoly profits. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 296.

554.     If a dominant search supplier's rival wins an exclusionary contract and gains strength as a competitor, the most it can hope for is competitive profits. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 296.

555.     As a result of the asymmetry between the outcome if a dominant search supplier wins or if rivals win an exclusionary contract, even if the dominant supplier and the rival are equally efficient, profits are greater when the dominant supplier wins than when a rival wins, and therefore the dominant supplier can offer the distributor more than rivals for the exclusionary contract. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 296.

556.     A "public good" is a commodity or service that is made available to all members of a society. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 291 n.400.

557.     Preservation of competition in general search is a public good. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 291.

558.     Consumers experience the benefits of competition in the form of lower prices and increased quality. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 291 & n.400.

559.     A search distributor's decision to enter into an exclusionary contract affects the competitive process as a whole, meaning the interests of all consumers are at stake. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 291–293.

560.     Even if a distributor were viewed as a "collective bargaining agent" for its own customers, the distributor would not factor in the interests of all consumers when entering into an exclusionary contract. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 291–293.

561.     No party fully factors in the harm that consumers as a whole stand to incur as a result of a reduction in general search competition. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 291–293.

562.     Because no party fully factors in the harm that consumers as a whole stand to incur as a result of a reduction in general search competition, each party is individually more willing to sign an exclusionary contract with Google than would otherwise be the case. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 291–293.

563.     Prof. Murphy has written that "competition by a dominant supplier for exclusivity sometimes may result in harm to consumers." Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶ 297 (quoting Klein, Benjamin & Kevin Murphy, "How Exclusivity Is Used To Intensify Competition For Distribution -- Reply To Zenger," Antitrust Law Journal 77, no. 2 (2011): 691–699).

564.     In his deposition, Prof. Murphy testified that the presence of multiple bidders for a contract is not sufficient to demonstrate that conduct should be deemed permissible competition on the merits. Pls. Ex. 24, Whinston (DOJ Pls.' Expert) Rebuttal Report, ¶¶ 296–297; Pls. Ex. 87, Murphy (Def.'s Expert) Dep., 414:20–415:14 ("Q. If there are multiple bidders for a contract and one wins, will that always represent competition on the merits? A. No. I think you have to look at other things, and I looked at other things here.").

564.1.   In his Rebuttal Report, Prof. Whinston quoted Prof. Murphy, who had stated, "Plaintiffs appear to equate foreclosure with the 'coverage' of Google's arrangements. But the queries that those arrangements 'cover' is not an economically sensible measure of foreclosure." Pls. Ex. 24, Whinston (Pls.' Expert) Rebuttal Report, ¶ 322 (quoting Pls. Ex. 67, Murphy (Def.'s Expert) Initial Report, ¶ 57). Prof. Whinston stated that he agreed with the quotation only "[t]o

the extent that" Prof. Murphy was arguing that absent Google's contracts, rivals would not have won "*all* of the search traffic that the contracts cover." *Id.*

564.2.   Prof. Murphy's reports contain no citation for his assertion that "the extent of potential foreclosure should be limited to the share of sales for which (1) rivals are anticompetitively denied the ability to compete in the actual world and (2) would be able to compete successfully in the but-for world." Pls. Ex. 67, Murphy (Def.'s Expert) Initial Report, ¶ 732.

564.3.   When asked in his deposition to provide a source to support his assertion that "the extent of potential foreclosure should be limited to the share of sales for which (1) rivals are anticompetitively denied the ability to compete in the actual world and (2) would be able to compete successfully in the but-for world," Prof. Murphy "[could not] think of a specific cite for it." Pls. Ex. 87, Murphy (Def.'s Expert) Dep., 393:5–394:6 (discussing Pls. Ex. 67, Murphy (Def.'s Expert) Initial Report, ¶ 732).

### D.   Google's Android Distribution Agreements

565.   In 2020, ███████████████ of all Google search queries in the United States were performed on Android devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 829, Fig. 134.

566.   In the United States, the vast majority of Android devices are sold to consumers by carriers. Pls. Ex. 121, Google presentation: Android Agreements Explainer - ACC, MADA, RSA, DCB (Feb. 2, 2018), GOOG-DOJ-28380959, at -968, -977.

567.   In the United States, carriers purchase Android devices from OEMs. Pls. Ex. 121, Google presentation: Android Agreements Explainer - ACC, MADA, RSA, DCB (Feb. 2, 2018), GOOG-DOJ-28380959, at -968, -977.

568.    For more than a decade, Google has used Mobile Application Distribution Agreements (MADAs), along with Revenue Share Agreements (RSAs), to distribute the Google search engine on Android devices in the United States. ███████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

569.    The MADAs and RSAs are a "belt and suspenders" approach to distributing Google Search on Android devices. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

### 1.    Android Operating System And Devices

570.    Android is a mobile operating system that Google acquired in 2005. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 725.

571.    In 2008, Google released the Android operating system code for free, creating the Android Open Source Project (AOSP). Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 725.

572.    Any manufacturer can use AOSP for its mobile devices. Pls. Ex. 121, Google presentation: Android Agreements Explainer - ACC, MADA, RSA, DCB (Feb. 2, 2018), GOOG-DOJ-28380959, at -963.

573.    Since releasing AOSP, over time Google has placed newly developed features exclusively within its proprietary apps and services (collectively, referred to as Google Mobile Services (GMS)), and has not made those features available through AOSP. Pls. Ex. 121, Google

presentation: Android Agreements Explainer - ACC, MADA, RSA, DCB (Feb. 2, 2018), GOOG-DOJ-28380959, at -966.

574.     Within GMS, Google Play Services (GPS) helps support the functionality of all Android apps, e.g., enabling cloud messaging and location manager functionalities. Pls. Ex. 64, Google presentation: Android Review (*Nov. 5, 2019), GOOG-DOJ-06465054, at -066; Pls. Ex. 99, Jung (Google) Dep., 62:25–63:20.

575.     GPS is used by hundreds of thousands of third-party apps. Pls. Ex. 64, Google presentation: Android Review (*Nov. 5, 2019), GOOG-DOJ-06465054, at -066; Pls. Ex. 99, Jung (Google) Dep., 62:25–63:20.

576.     Google's proprietary version of the Android operating system (Android), which includes GMS, is the only licensable mobile operating system in common use in the United States. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 54, Figs. 2–3 (StatCounter Global Stats).

577.     The only viable Android app store in the United States is Google's Play Store, which OEMs and carriers deem necessary for producing a sellable mobile device. Pls. Ex. 77,

████████████████████████████████████████████████

███████████████████████████████     Pls. Ex. 61, Christensen (Motorola) Dep., 157:11–158:2.

578.     Unlike Android, AOSP does not have an app store. Pls. Ex. 56, Davies (DOJ Pls.' Expert) Initial Report, ¶ 57; Pls. Ex. 121, Google presentation: Android Agreements Explainer - ACC, MADA, RSA, DCB (Feb. 2, 2018), GOOG-DOJ-28380959, at -966.

579.     Unlike Android, AOSP does not have the GPS application programming interfaces that many third-party Android apps require. Pls. Ex. 64, Google presentation: Android

Review (*Nov. 5, 2019), GOOG-DOJ-06465054, at -066–067; Pls. Ex. 99, Jung (Google) Dep., 62:25–63:20.

580.    Other than Apple devices, phones and tablets with the Android operating system make up nearly the entire remaing mobile device marketplace in the United States. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 54, Figs. 2–3 (StatCounter Global Stats).

## 2.    Google's Chrome Browser

581.    In the United States, Google's Chrome browser accounts for roughly 50% of browser usage and 60% of desktop browser usage. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 6.

582.    ███████████████████████████████

███████████████████████████████████

████████████

## 3.    Google's Mobile Application Distribution Agreements (MADA)

583.    Virtually all Android devices sold in the United States have GMS preinstalled and are built under the MADA. Pls. Ex. 158, Email from Braddi (Google), Re: assistant (Aug. 7, 2018), GOOG-DOJ-06446636, at -636; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 727; Pls. Ex. 70, Kolotouros (Google) Dep., 31:7–10.

584.    Under the MADA, if an OEM preinstalls any Google app on an Android device, the OEM must: (1) put on the device's home screen (a) Google's search widget (a search bar or box), (b) the Play Store, and (c) an icon labeled "Google" that provides direct access to preinstalled Google apps; and (2) preinstall 11 Google apps, including the Google Search App (GSA) and Google's Chrome browser. *See, e.g.*, ███████████████████████

███████████████████████████████████

███████████████████████████    Pls. Ex. 160,

Def.'s Resp. to Pls.' Second Set of Contention Interrogatories (Apr. 27, 2022), at 20–21
(response to Contention Interrogatory No. 19).

585. 

586.    The search widget is the single most important search access point on an Android
device. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 741.

587.    The default search engine on the Google search widget cannot be changed from
Google. Pls. Ex. 209, Google 30(b)(6) (Roszak) Dep., 58:22–59:20.

588.    The home screen is the most prominent and valuable real estate on an Android
phone. [redacted] Pls. Ex. 61, Christensen (Motorola) Dep.,
98:1–10; Pls. Ex. 211, [redacted] Pls. Ex. 22, Whinston (DOJ Pls.'
Expert) Initial Report, ¶ 754.

589.    Under the MADA, the Google search widget to occupy an entire row (three-to-
five slots) on the home screen. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 754.

590.

██████ Pls. Ex. 61, Christensen (Motorola) Dep., 98:1–10, 202:8–203:2; 204:8–205:2; Pls. Ex. 211, ████████████████████████████████████████████

████████████████████████████████████

591.    In the past three years, no manufacturer has sold an Android phone into the United States, preinstalled with Google's search widget and an additional search widget for a different general search engine. Pls. Ex. 70, Kolotouros (Google) Dep., 95:8–96:7, 96:14–21; Pls. Ex. 75, Google presentation: Android Agreements, Summary of Current MADA + RSA (May 10, 2018), GOOG-DOJ-04257815, at -819; ████████████████████████████

██████ Pls. Ex. 61, Christensen (Motorola) Dep., 204:17–205:2, 205:18–25; Pls. Ex. 211, ████████████████████████████

592.    In the United States, Android devices have only one search widget preinstalled. Pls. Ex. 75, Google presentation: Android Agreements, Summary of Current MADA + RSA (May 10, 2018), GOOG-DOJ-04257815, at -819; ████████████████████████████

████ Pls. Ex. 70, Kolotouros (Google) Dep., 96:17–21; Pls. Ex. 67, Murphy (Def.'s Expert) Initial Report, ¶ 757 ("Plaintiffs focus on the fact that OEMs may be unlikely to place multiple search widgets on a device.").

593.    The Chrome browser is the second most important search access point on an Android device and defaults to Google out of the box. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 739–742.

594.    Google is the preset default search engine on Chrome when OEMs preinstall the browser on Android devices. Pls. Ex. 70, Kolotouros (Google) Dep., 89:1–5.

595.    Although still disfavored, secondary browsers on Android devices are not unprecedented—Samsung Android devices, for example, come with both Chrome and S-

Browser, Samsung's proprietary browser. Pls. Ex. 72, Google presentation: Healthy Android

(Oct. 2017), GOOG-DOJ-03505506, at -518; ███████████████████████

████████████████████████████████████████

596.    Samsung is a leading manufacturer of Android devices sold in the United States.

Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 79, Fig. 8.

597.    Samsung has a MADA. ████████████████████████

████████████████████████████████████████████

████████████████

598.    Motorola is a leading manufacturer of Android devices sold in the United States.

Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 79 Fig. 8.

599.    Motorola has a MADA. ████████████████████████

█████████████

600.    LG, which used to be a leading Android OEM, also had a MADA, but LG exited

the smartphone business in 2020. ████████████████████████████

████; Pls. Ex. 70, Kolotouros (Google) Dep., 144:5–12; Pls. Ex. 22, Whinston (DOJ Pls.'

Expert) Initial Report, ¶ 79 Fig. 8; Pls. Ex. 159, Google presentation: Android Staples (Aug.

2021), GOOG-DOJ-30356083, at -092.

601.    Having two browsers (Chrome and S-Browser) already preinstalled on its

Android devices deters Samsung from preinstalling a third-party browser, ████████████

████████████████████████████████████████

███████████████████████████████████ Pls.

Ex. 125, Google document: Notes from Samsung MADA discussion on 7/13, 2016 (July 13,

2016), GOOG-DOJ-32294385, at -386–387; ████████████████████████

███████████████████████████████████; ████████████████████████████

████████████████████████████████████████████████████████████

████

### 4.     Google's Revenue Share Agreements (RSA)

602.     Under its RSAs with carriers and OEMs, Google makes monthly payments to the counterparty in exchange for Google being (1) the exclusive general search engine preinstalled on Android devices covered by the RSA, as well as (2) the search default for all search access points on such devices. Pls. Ex. 55, Pichai (Google) Dep., 199:8–11; Pls. Ex. 212, Barton (Google) Dep., 136:3–19; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 761–762, 786.

603.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

604.     ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

605.     ████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████

606.    Google's RSAs with carriers cover Android devices that the carriers purchase

from OEMs and sell to consumers. Pls. Ex. 121, Google presentation: Android Agreements

Explainer - ACC, MADA, RSA, DCB (Feb. 2, 2018), GOOG-DOJ-28380959, at -968; Pls.

Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 767.

607.    Google's RSAs with OEMs cover Android devices that OEMs sell directly to

U.S. consumers. Pls. Ex. 213, ████████████████████████████████

███████████████████████████ Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial

Report, ¶ 767.

608.    █████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

████████████

609.    Some RSAs have allowed the counterparty to earn Google revenue share on a

device-by-device basis. ████████████████████████████████

██████████████

610.    █████████████████████████████████

██████████████████████████████████



611. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 77, 79–81, 786; ██

████████████████████████████████████████████

██████████████████████████

### 5.   Google's Payments To Android Partners Under RSAs

612.   In 2020, pursuant to its RSAs, Google paid ██████████ to carriers for Google to be the exclusive preset default search engine on Android devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 718, Fig. 122.

613.   In 2020, pursuant to its RSAs, Google paid ██████████ to OEMs for Google to be the exclusive preset default search engine on Android devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 718, Fig. 122.

### 6.    Consideration Of The Value Of The Search Default On Android Devices

614.    Google recognizes the "power of the defaults" to drive search traffic to a particular search engine. Pls. Ex. 219, Email from Varian (Google), Re: Power of defaults (Mar. 27, 2007), GOOG-DOJ-05756465, at -465.

615.    [Intentionally Left Blank]

616.    ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

617.    A search engine having preset default status leads to increased usage of that search engine. Pls. Ex. 87, Murphy (Def.'s Expert) Dep., 94:21–95:3 ("I think, in general, what we've seen, and from the empirical evidence, as well as the underlying economics, would be that default status generally will lead to some increase in usage.").

618.    Google's employees recognize that default behavior influences some users and brings more searches to Google. Pls. Ex. 290, Miller (Google) Dep., 76:24–77:24.

619.    Prof. Murphy claims that, if rivals were preset as the search defaults on Android devices, they would receive an additional ██████ of the queries on those devices. Pls. Ex. 87, Murphy (Def.'s Expert) Dep., 533:17–534:12; Pls. Ex. 301, Murphy (Def.'s Expert) Reply Report, ¶¶ 20, 87, 226.

620.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



621.     ██████████████████████████ if Google were to lose the preset

search defaults on all U.S. Android devices, Google would lose between ████████████ of all

U.S. search traffic. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 160.

622.     Google is a public company and pays ███████████ pursuant to its RSAs to

secure search defaults on Android devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial

Report, ¶ 718, Fig. 122.

623.     Preset search defaults on desktops are easier to change than preset search defaults

on mobile devices due to the large screen sizes on desktops. ████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████; ███████████████

████████████████████████████████████████████

████████████████████

624.     Bing's share of search traffic on Windows PCs (desktops and laptops), where it is

the default search service, is ███████████████ higher than its share on macOS devices

(desktops and laptops), where Google is the default. Pls. Ex. 22, Whinston (DOJ Pls.' Expert)

Initial Report, Fig. 142; *see also* Pls. Ex. 266, Baker (Colo. Pls.' Expert) Initial Report, ¶ 260 &

Table 22; Pls. Ex. 267, Baker (Colo. Pls.' Expert) Reply Report, ¶ 117 & n.294.

625.     The poor performance of the Internet Explorer browser likely contributed to a

higher rate of users switching to alternative browsers on Windows than on other platforms. Pls.

Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 459–462.

626.    Google was able to benefit from shortcomings in the Internet Explorer browser through its distribution agreements with nearly every alternative browser used on Windows as well as its ownership of the Chrome browser. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶ 462; ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

627.    [Intentionally Left Blank]

628.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Pls. Ex. 244, Email from ███████████, NO SUBJECT (July 26, 2019), ███████-00057003, at -003–004 (describing ████████████████████████ ███████

629.    Google is ██████████ in its demands for search exclusivity on Android devices sold by Verizon. Pls. Ex. 63, ████████████████, 148:12–21.

630.    ████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

631.    ████████████████████████████████████████████

██████████████████████████████████ Pls. Ex. 225, ████████

632. ████████████████████████████████████

### E.   Google's Browser Distribution Agreements

633.   Since the early 2000s, Google has entered into revenue share agreements with third-party browser companies, such as Opera (2001), Mozilla (2004), and UCWeb (████). Def. Ex. 32, 2004 Mozilla Browser RSA (Nov. 8, 2004), MOZ-LIT-037219; Pls. Ex. 28, Baker (Mozilla) Dep., 62:1–18; Pls. Ex. 226, Opera Press Release, "Opera and Google renew search agreement" (Dec. 20, 2021) ("Opera has had a search distribution agreement with Google (NASDAQ: GOOGL) since 2001.");███████████████████████████████ ████████████████; *see also* Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 813–822 (cataloguing Google's contracts with third-party browsers).

#### 1.   Third-Party Browsers

634.   As of December 2021, third-party browsers accounted for approximately 5% of U.S. browser usage across all devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 6.

635.   As of December 2021, Mozilla's Firefox was the most popular third-party browser. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, Fig. 6.

636.   [Intentionally Left Blank]

637.   [Intentionally Left Blank]

638.    [Intentionally Left Blank]

639.    [Intentionally Left Blank]

640.    [Intentionally Left Blank]

641.    [Intentionally Left Blank]

642.    Although third-party browsers account for only approximately 5% of U.S.

browser usage, they represent the largest distribution vehicle for general search engines, after

accounting for distribution channels controlled by Google, Apple, and Microsoft. Pls. Ex. 22,

Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 739–744, Figs. 6, 134.

643.    Searches on Mozilla's Firefox browser are conducted almost entirely on

computers, rather than mobile devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report,

¶ 865 n.1129; *see also* Pls. Ex. 28, Baker (Mozilla) Dep., 134:9–20.

644.    Third-party browsers like Mozilla generally do not come preinstalled on devices

(which come with a different preinstalled browser out of the box). Pls. Ex. 28, Baker (Mozilla)

Dep., 136:11–15, 137:8–23; Pls. Ex. 182, Mozilla presentation: Protecting the Open Web:

Threats to Browser Competition (Dec. 18, 2019), MOZ-002390, at -403.

645.    It is difficult for third-party browsers to compete with preinstalled browsers on

mobile devices because if third-party browsers are not preinstalled on a device out of the box,

users must find the browser, obtain it, and install it. Pls. Ex. 28, Baker (Mozilla) Dep., 139:20–

140:24.

## 2.    Google's RSAs With Third-Party Browsers

646.    Google's revenue share agreements with third-party browser companies guarantee

that Google will be the preset default search engine across all search access points on the

respective browser (namely the URL address bar), for nearly all instances when the browser is

installed by users on their devices. ████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████; *see also* Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial

Report, ¶¶ 815–822.

647.   ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

648.   ███████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████

649.   ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████

### 3.   Google's Payments To Third-Party Browsers

650.   In 2020, Google paid third-party browser companies approximately ████████

██████ pursuant to revenue share agreements concerning Google preset default search

placements on the counterparties' browsers. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial

Report, ¶ 718, Fig. 122.

651.   Roughly ████ of Mozilla's annual revenue comes from its revenue share

agreement with Google, in exchange for making Google the preset default search engine on

Firefox. Pls. Ex. 28, Baker (Mozilla) Dep., 41:18–24.

652.    Google's revenue share agreement with Mozilla concerning Google preset default search placements on Firefox accounted for roughly ▮▮ of Mozilla's royalty revenues in 2018 and 2019. Pls. Ex. 230, Mozilla document: Mozilla 2019 and 2018 Consolidated Financial Statements (Oct. 16, 2020), MOZ-LIT-000263, at -291.

653.    Mozilla has recognized what it described as the ▮▮▮▮▮▮▮▮▮ in search, has expressed concern about its ▮▮▮▮▮▮▮ and has sought to find ▮▮▮▮▮▮▮ Pls. Ex. 231, Mozilla presentation: Strategic Development: Search Negotiations (Oct. 2014), MOZ-LIT-000903, at 5–6; *see also* Pls. Ex. 234, Email from Bautista (Mozilla), Should we invest ▮▮▮▮ (Apr. 6, 2020), MOZ-LIT-009028, at -028



### 4.    Consideration Of The Value Of The Search Default On Third-Party Browsers

654.    If Google lost the preset default search position on third-party browsers, Google would lose between ▮▮▮▮ of the search traffic that it had previously captured through those defaults on desktop computers. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 908–911, Fig. 161.

655.    If Google lost the preset default search position on third-party browsers, Google would lose between ▮▮▮▮ of the search traffic that it had previously captured through those defaults on mobile devices. Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 908–911, Fig. 161.

656.    Google estimates that losing its position as the preset default search engine on the Opera browser would ▮▮▮▮▮▮ from Opera at risk. Pls. Ex. 232,

Google presentation: Search Headwinds & Challenges (May 2015), GOOG-DOJ-13128963, at -989.

657.　███████████████████████████████

█████████████████████████████████████████

████████████████████████████████  Def. Ex. 43, Mozilla

document: Project Waldo – Phase 1 Final Review (Mar. 2, 2022), MOZ-LIT-045096, at -102–103; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 875–876; Pls. Ex. 67, Murphy (Def.'s Expert) Initial Report, ¶¶ 299–305.

658.　The year after Mozilla switched the search default on Firefox from Google to Yahoo in 2014, Google lost approximately ████ of the search traffic that it had previously captured through the Firefox search default, which cost Google approximately ███████ in search ad revenue. Pls. Ex. 168, Google presentation: UNTITLED (*Apr. 2019) (Assistant conjoint analysis), GOOG-DOJ-02800065, at -071; Pls. Ex. 233, Google presentation: Firefox/Yahoo (May 2015), GOOG-DOJ-04248388, at -389; Pls. Ex. 22, Whinston (DOJ Pls.' Expert) Initial Report, ¶¶ 862–864, 869 & Figs. 145–147.

659.　When Mozilla switched the search default on Firefox from Google to Yahoo in 2014, Mozilla made the change ███████████████████████████████

████████████████  Pls. Ex. 231, Mozilla presentation: Strategic Development: Search Negotiations (Oct. 2014), MOZ-LIT-000903, at 5–6.

660.　When Mozilla switched the search default on Firefox from Google to Yahoo in 2014, Mozilla believed that ███████████████████████████████  and hoped to use this event as an ██████████████████████  Pls. Ex. 243, Mozilla document: Mozilla Opening Mediation Brief in *Yahoo v. Mozilla* (July 17, 2019), MOZ-

LIT-000296, at -302; Pls. Ex. 231, Mozilla presentation: Strategic Development: Search Negotiations (Oct. 2014), MOZ-LIT-000903, at 6.

661.    Sometime after switching the search default on Firefox from Google to Yahoo in 2014, Mozilla ceased to view Yahoo as a viable search default for Firefox and switched that default back to Google. Pls. Ex. 28, Baker (Mozilla) Dep., 81:6–22, 271:8–272:2; *see also id.* at 224:23–225:4.

Dated: January 26, 2023                    Respectfully submitted,


                                           By:____/s/ Kenneth M. Dintzer_____
                                           Kenneth M. Dintzer
                                           Adam Severt
                                           Matthew C. Hammond
                                           Elizabeth S. Jensen
                                           Diana A. Aguilar Aldape
                                           Sarah M. Bartels (D.C. Bar No. 1029505)
                                           R. Cameron Gower
                                           Thomas Greene
                                           Karl E. Herrmann (D.C. Bar No. 1022464)
                                           Matthew Jones (D.C. Bar No. 1006602)
                                           Claire Maddox (D.C. Bar No. 498356)
                                           Michael G. McLellan (D.C. Bar No. 489217)
                                           Veronica N. Onyema (D.C. Bar No. 979040)
                                           Lara E.V. Trager
                                           Catharine S. Wright (D.C. Bar 1019454)


                                           U.S. Department of Justice, Antitrust Division
                                           Technology & Digital Platforms Section
                                           450 Fifth Street NW, Suite 7100
                                           Washington, DC 20530
                                           Telephone: (202) 227-1967
                                           Kenneth.Dintzer2@usdoj.gov

                                           *Counsel for Plaintiff United States of America*


                                           By:____/s/ Margaret Sharp____
                                           Ken Paxton, Attorney General
                                           James Lloyd, Chief, Antitrust Division
                                           Margaret Sharp, Assistant Attorney General
                                           Office of the Attorney General, State of Texas
                                           300 West 15th Street
                                           Austin, Texas 78701
                                           Margaret.Sharp@oag.texas.gov

                                           *Counsel for Plaintiff State of Texas*

By: _____/s/ Matthew Michaloski_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By: _____/s/ Keaton Barnes_____
Keaton Barnes
Arkansas Bar No. 2022161
Assistant Attorney General
Office of Tim Griffin, Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Keaton.Barnes@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*


By: _____/s/ Brian Wang_____
Rob Bonta, Attorney General
Ryan J. McCauley, Deputy Attorney General
Brian Wang, Deputy Attorney General
Henry Cornillie, Deputy Attorney General
Paula Blizzard, Supervising Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By: ___/s/ Lee Istrail___
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: ___/s/ Daniel Walsh___
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: ___/s/ *Philip R. Heleringer*_____
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office of
Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General, Commonwealth
of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


By:___/s/ *Christopher J. Alderman*___
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By:___/s/ *Scott Mertens*_____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: ___/s/ Stephen M. Hoeplinger___
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*


By: ___/s/ Hart Martin___
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney General
Crystal Utley Secoy, Assistant Attorney General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By: ___/s/ Anna Schneider___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By:___*/s/ Mary Frances Jowers*___
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy Attorney
General
Rebecca M. Hartner, Assistant Attorney General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By:___*/s/ Gwendolyn J. Lindsay Cooley*___
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP WEISER
Attorney General

Jonathan B. Sallet
Special Assistant Attorney General

/s/ Jonathan B. Sallet
Jonathan B. Sallet, DC Bar No. 336198
Jon.Sallet@coag.gov
Steven M. Kaufmann,  DC Bar No. 1022365
*(inactive)*
Steve.Kaufmann@coag.gov
Carla Baumel
Carla.Baumel@coag.gov
Elizabeth W. Hereford
Elizabeth.Hereford@coag.gov
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Tel: 720-508-6000

William F. Cavanaugh , Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
212-335-2793
Email: wfcavanaugh@pbwt.com

*Counsel for Plaintiff Colorado*

FOR PLAINTIFF STATE OF NEBRASKA:

MIKE HILGERS
Attorney General

Joseph M. Conrad, Assistant Attorney General
Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant
Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
Joseph.Conrad@nebraska.gov
Colin.snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh , Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
212-335-2793
Email: wfcavanaugh@pbwt.com

*Counsel for Plaintiff Nebraska*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General

Robert A. Bernheim, Unit Chief Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-315
Tucson, Arizona 85701
Tel: (520) 628-6507
Robert.bernheim@azag.gov

*Counsel for Plaintiff Arizona*

FOR PLAINTIFF STATE OF IOWA:

BRENNA BIRD
Attorney General

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Tel: (515) 725-1018
Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff Iowa*


FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General

Elinor R. Hoffmann
Morgan J. Feder
Michael Schwartz
Office of the Attorney General of New York
28 Liberty Street, 21st Floor
New York, NY 10005
212-416-8513
Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff New York*

FOR PLAINTIFF STATE OF NORTH
CAROLINA:

JOSH STEIN
Attorney General

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
919-716-6000
kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff North Carolina*


FOR PLAINTIFF STATE OF TENNESSEE:

JONATHAN SKRMETTI
Attorney General

J. David McDowell
Chris Dunbar
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville.TN 37202
(615) 741-8722
David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov

*Counsel for Plaintiff Tennessee*

FOR PLAINTIFF STATE OF UTAH:

SEAN D. REYES
Attorney General

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
385-881-3742
sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff Utah*


FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
Attorney General

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Jeff.pickett@alaska.gov

*Counsel for Plaintiff Alaska*

FOR PLAINTIFF STATE OF CONNECTICUT:
WILLIAM TONG
Attorney General

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
860-808-5202
Nicole.demers@ct.gov

*Counsel for Plaintiff Connecticut*


FOR PLAINTIFF STATE OF DELAWARE:

KATHY JENNINGS
Attorney General

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
302-577-8924
Michael.undorf@delaware.gov

*Counsel for Plaintiff Delaware*


FOR PLAINTIFF DISTRICT OF COLUMBIA:

BRIAN SCHWALB
Attorney General

Elizabeth Gentry Arthur
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
202-724-6514
Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

FOR PLAINTIFF TERRITORY OF GUAM:

DOUGLAS MOYLAN
Attorney General

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Tel: (671) 475-3324

*Counsel for Plaintiff Guam*


FOR PLAINTIFF STATE OF HAWAI'I:

ANNE E. LOPEZ
Attorney General

Rodney I. Kimura
Department of the Attorney General, State of
Hawai'i
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
808-586-1180
Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff Hawai'i*

FOR PLAINTIFF STATE OF IDAHO:

RAÚL LABRADOR
Attorney General

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
208-334-4114
Brett.delange@ag.idaho.gov
John.olson@ag.idaho.gov

*Counsel for Plaintiff Idaho*


FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General

Elizabeth Maxeiner
Brian Yost
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
773-590-7935
Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov

*Counsel for Plaintiff Illinois*

FOR PLAINTIFF STATE OF KANSAS:

KRIS W. KOBACH
Attorney General

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue., 2nd Floor
Topeka, KS 66612
Tel: (785) 296-3751
Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff Kansas*


FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
Attorney General

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
207-626-8800
Christina.moylan@maine.gov

*Counsel for Plaintiff Maine*

FOR PLAINTIFF STATE OF MARYLAND:

ANTHONY G. BROWN
Attorney General

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6480
swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff Maryland*


FOR PLAINTIFF COMMONWEALTH
MASSACHUSETTS:

ANDREA CAMPBELL
Attorney General

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Fl.
Boston, MA 02108
Tel: (617) 727-2200
William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff Massachusetts*

FOR PLAINTIFF STATE MINNESOTA:

KEITH ELLISON
Attorney General

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-757-1257
Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff Minnesota*


FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General

Michelle Christine Newman
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
775-684-1164
mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff Nevada*

FOR PLAINTIFF STATE OF NEW
HAMPSHIRE:

JOHN FORMELLA
Attorney General

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
603-271-1217
Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff New Hampshire*

FOR PLAINTIFF STATE OF NEW  JERSEY:

MATT PLATKIN
Attorney General

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
973-648-7819
Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAUL TORREZ
Attorney General

Judith E. Paquin
Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Tel: 505-490-4885
jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff New Mexico*


FOR PLAINTIFF STATE NORTH DAKOTA:

DREW WRIGLEY
Attorney General

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
701-328-5570
ealm@nd.gov

*Counsel for Plaintiff North Dakota*

FOR PLAINTIFF STATE OHIO:

DAVE YOST
Attorney General

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
614-466-4328
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff Ohio*


FOR THE PLAINTIFF STATE OKLAHOMA:

GENTNER DRUMMOND
Attorney General

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel: (405) 522-1014
Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff Oklahoma*

FOR PLAINTIFF STATE OREGON:

ELLEN ROSENBLUM
Attorney General

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
503-934-4400
Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff Oregon*

FOR PLAINTIFF COMMONWEALTH
PENNSYLVANIA:

MICHELLE HENRY
Attorney General

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Pennsylvania*

FOR PLAINTIFF TERRITORY PUERTO RICO:

DOMINGO HERNANDEZ
Attorney General

Guarionex Diaz Martinez
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Tel: (787) 721-2900, ext. 1201
gdiaz@justicia.pr.gov

*Counsel for Plaintiff Puerto Rico*


FOR PLAINTIFF STATE RHODE ISLAND:

PETER NERONHA
Attorney General

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
SProvazza@riag.ri.gov

*Counsel for Plaintiff Rhode Island*

FOR PLAINTIFF STATE SOUTH DAKOTA:

MARTY J. JACKLEY
Attorney General

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
605-773-3215
Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff South Dakota*


FOR PLAINTIFF STATE VERMONT:

CHARITY R. CLARK
Attorney General

Christopher J. Curtis
Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
802-828-3170
Ryan.kriger@vermont.gov

*Counsel for Plaintiff Vermont*

FOR PLAINTIFF COMMONWEALTH
VIRGINIA:

JASON S. MIYARES
Attorney General

Tyler T. Henry
thenry@oag.state.va.us
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Tel: (804) 692-0485

*Counsel for Plaintiff Virginia*


FOR PLAINTIFF STATE WASHINGTON:

BOB FERGUSON
Attorney General

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-5419
Amy.hanson@atg.wa.gov

*Counsel for Plaintiff Washington*

FOR PLAINTIFF STATE WEST VIRGINIA:

PATRICK MORRISEY
Attorney General

Douglas Lee Davis
Office of the Attorney General, State of West
Virginia
1900 Kanawha Boulevard, East
Building 6, Suite 402
P.O. Box 1789
Charleston, WV 25305
304-558-8986
Douglas.l.davis@wvago.gov

*Counsel for Plaintiff West Virginia*


FOR PLAINTIFF STATE WYOMING:

BRIDGET HILL
Attorney General

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
(307) 777-6397
Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff Wyoming*