IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS MOTION TO PARTIALLY EXCLUDE THE OPINION OF PLAINTIFFS' EXPERT CHRISTINE M. HAMMER**

Plaintiffs' Opposition fails to explain how Ms. Hammer's benchmarking opinion—which consists of comparisons between the purported profitability of Google's search and search advertising business to that of miscellaneous Internet companies—is an appropriate vehicle for assessing whether Google's profitability tells the Court anything about whether it has monopoly power. Plaintiffs defend aspects of Ms. Hammer's opinions that are not at issue, such as her accounting qualifications, Opp. 2–3; argue that her benchmarking opinion is typical of "ordinary course" accounting, Opp. 12; and contend that Ms. Hammer's benchmarks consist of "reasonable industry comparators," Opp. 19—but Plaintiffs present no authority that supports the use of profitability data from firms that are concededly outside the alleged market as proof of Google's monopoly power. Comparing the profitability of Google Search to Chewy (an online pet supply store), Dropbox (a file hosting service), and Booz Allen Hamilton (a consulting firm) simply does not assist the factfinder in determining whether Google possesses the ability to "raise prices substantially above the competitive level" in the search and search advertising markets alleged here. *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam).

Ms. Hammer's benchmarking opinion is irrelevant to the task at hand, unreliable, and it merits exclusion because it is misleading. Plaintiffs try to use it as evidence of monopoly power, but concede that the benchmarks were not constructed to have anything to do with the relevant market. *See* Mot. Ex. 1, June 6, 2022 Expert Report of Christine Hammer ¶ 92 (conceding that the individual companies in the benchmark groups are not comparable to Google's search and search ads business); Opp. 12 (conceding that companies in the benchmark groups are not "search rivals"). This concession should end the inquiry. Comparing the profitability of businesses with disparate product lines and business models is an inherently unreliable methodology for assessing a firm's economic power, and one that does not find support in accounting or economic treatises.

Granting Google's motion would be consistent with Rule 702 and *Daubert*, and would serve to streamline trial by avoiding the need to demonstrate the vast differences between, on the one hand, Ms. Hammer's view of internal accounting relating to Google's search and search advertising business, and, on the other, the public financial results of the hundred-plus companies against which she compares the Google data.

## ARGUMENT

**I.      Ms. Hammer's Benchmarking Opinion Should Be Excluded Because It Is Irrelevant.**

Google has moved to exclude Ms. Hammer's benchmarking opinion because it is not probative of the relevant legal issues. Mot. 11–13. Plaintiffs' response to this argument is unpersuasive, and the primary case upon which they rely only serves to undermine their position.

**A.      Comparisons to firms outside the relevant market do not aid the fact finder.**

Under controlling precedent, benchmark comparisons to firms outside the relevant market are not probative of monopoly power.[1] Each court's analysis in *Grinnell*, *du Pont*, and *Microsoft* makes clear that monopoly power must be assessed within the relevant market. In *Grinnell*, the Supreme Court found that the defendants' "87% [share] of the accredited central station service business" was evidence of monopoly power, but only "if that business is the relevant market." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Similarly, in *du Pont*, the Supreme Court analyzed the defendant's "power to control prices or exclude competition" in the cellophane market because "[t]he charge was monopolization of cellophane." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391–92, 394 (1956). And in *Microsoft*, the D.C. Circuit assessed

---

[1] Professor Whinston's opinions in this case refer to both market power and monopoly power. *See* Opp. 1–2, 7, 10 (quoting Professor Whinston's expert report, and referring to both market power and monopoly power). The relevant legal issue in this case is "'the possession of monopoly power in the relevant market.'" *Microsoft*, 253 F.3d at 50 (quoting *Grinnell*, 384 U.S. at 570–71); *see also* Mot. 11.

the defendant's ability to "raise prices substantially above the competitive level" in the market for "Intel-compatible PC operating systems." 253 F.3d at 51–58.[2]

Plaintiffs cite *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), for the proposition that "one way to establish a defendant's monopoly power directly is to show large, persistent profit margins." Opp. 14. There, the Court viewed the defendants' record of "identical" price increases for their cigarettes as "circumstantial evidence of the existence of a conspiracy and of a power and intent to exclude competition coming from cheaper grade cigarettes." *Am. Tobacco Co.*, 328 U.S. at 804–06. This was because the defendants continued to "mak[e] tremendous profits" after instituting "higher retail prices," and these profits were attributable to the price changes. *Id.*

The present case is not a conspiracy case where the issue of product profitability among competing firms that manufactured the same product is being used as circumstantial evidence of a conspiracy among such firms. Here, Plaintiffs want to compare the profitability of Google's search and search advertising business to the profitability of disparate other businesses not in the relevant market. This analysis tells the factfinder nothing about whether Google has monopoly power in any alleged relevant market. *See Microsoft*, 253 F.3d at 50; *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1251–53 & n.21 (11th Cir. 2002) (noting that high accounting profits "could just as easily be obtained as a result of good management, superior efficiency, or differences in accounting, none of which is inconsistent with an efficient market").

---

[2] *See also Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1434 (9th Cir. 1995) (explaining that a firm has "market power when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices" (citing Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 501, at 322 (1978))). Monopoly power is more difficult to prove—it is an "extreme degree of market power." *Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1192 n.6 (5th Cir. 1985).

Plaintiffs rely on a single case to support their assertion that Ms. Hammer's benchmark analysis is a proper method for understanding the profitability of Google's search and search advertising business for the purpose of the monopoly power inquiry in this case. *See* Opp. 15–18 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022) [hereinafter *Payment Card*]). While the court in *Payment Card* denied a motion to exclude an expert's opinion comparing the profitability of the firms at issue to other businesses, the case only serves to demonstrate the flaws in Plaintiffs' reasoning. The economic expert in that case opined on whether the defendants, Visa and Mastercard, possessed market power.[3] 2022 WL 15053250, at *19–20. The expert compared the defendants' EBITDA margin to that of only eleven companies. *Id.* at *28; Ex. 9, Excerpt of *Payment Card* Pls.' Mem. Opp'n to Defs.' Mot. Exclude 31–32 (listing companies). These companies were: Cardtronics plc; Fidelity National Information Services, Inc.; Fiserv, Inc.; FleetCor Technologies, Inc.; Global Payments Inc.; GreenSky, Inc.; PayPal Holdings, Inc.; Square, Inc.; The Western Union Company; Total System Services, Inc.; and WEX Inc. Ex. 9 at 31–32. Each of the eleven companies in Professor Harris's benchmark group conducted business "in the payments space[:] two own and operate rival PIN debit networks, several are large payment card processors, one is a large ATM network, and several are identified in [the defense economic expert's] report as competitors to Visa and Mastercard." *Payment Card*, 2022 WL 15053250, at *29 (internal quotation marks omitted). Because each of the eleven comparator companies offered services used to make payments, the companies were at least arguably within a definable antitrust market. *See id.*

---

[3] That case was brought under Section 1 of the Sherman Act. *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 330 F.R.D. 11, 23 (E.D.N.Y. 2019). Thus, the experts in *Payment Card* analyzed market power rather than monopoly power. *See, e.g.*, 2022 WL 15053250, at *19–25.

Conversely, Ms. Hammer's benchmark groups total 174 companies (145 once duplicates are eliminated). *See* Mot. Ex. 1 at Schedules D.1–D.3. Plaintiffs defend this long list as consisting of "technology companies that do business on the Internet," Opp. 18—but this large group undisputedly is an expansive category that includes cloud computing services, online retailers, online dating companies, consulting firms, and gaming platforms. It even includes five of the eleven payment companies from the expert's benchmark in the *Payment Card* litigation.[4] One could not reasonably argue that all of the companies offer search services, nor could one reasonably argue that all of them offer advertising services—and Plaintiffs do not attempt to do so. They concede that these benchmarks were not designed to relate to the relevant market. *See infra*, Part I.B.; *see also* Ex. 8, Excerpts of the Deposition of Christine Hammer (Oct. 10–11, 2022) at 221:14–20, 231:22–25; Opp. 21. And even to the extent that some of the companies do offer search or advertising, Ms. Hammer has not excluded the profitability of other diverse business segments from those companies' profitability figures, in the way that she did for Google. *See* Mot. 15–18.

In this way, Ms. Hammer's benchmark groups fare no better than the Fortune 500 benchmark at issue in *Bailey*, which Plaintiffs concede was problematically "untethered to the company under comparison." Opp. 16 (citing *Bailey*, 284 F.3d at 1239, 1253). Ms. Hammer has justified her selection of three publicly-available, pre-constructed indices as benchmarks because "all of [them] include Alphabet," Opp. 16—a justification that could have just as readily been applied to the Fortune 500. Ms. Hammer's other justification—that her benchmarks relate to the same "industry" as Google, *i.e.* "technology companies that do business on the Internet," Opp. 18—sweeps too broadly to have any legal relevance. An examination of just a handful of the

---

[4] These companies are Fidelity National Information Services, Inc.; FleetCor Technologies, Inc.; Global Payments Inc.; PayPal Holdings, Inc.; and WEX Inc. Mot. Ex. 1 at Schedules D.1, D.3.

companies on these lists reflects that they are similarly "untethered to the company under comparison." *See* Mot. 6–8 (identifying, *e.g.*, 1-800-FLOWERS (provider of gifts), Booz Allen Hamilton (consulting firm), Cimpress (printing company), Dropbox (file hosting service), Roblox (online gaming platform), Stitch Fix (apparel retailer), Vroom (holding company for used car sales platform)). Ms. Hammer's benchmarking opinion is simply not probative of monopoly power.

### B. Plaintiffs' concessions are fatal to Ms. Hammer's benchmarking opinion.

Plaintiffs cannot meet their burden under *Daubert* because they concede that Ms. Hammer's benchmark groups are not intended to relate to the alleged markets. As the proponent of Ms. Hammer's benchmarking opinion, Plaintiffs bear the burden of establishing its admissibility "by a 'preponderance of proof.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)). Plaintiffs' suggestion that Google should offer alternative benchmark indices, *see, e.g.*, Opp. 2, is not correct as a matter of law.[5] It is an attempt to muddy the waters, and one that does not bring Plaintiffs closer to satisfying their burden. *See, e.g.*, *CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc.*, 2006 WL 2054646, at *6 (W.D. Okla. July 24, 2006) ("The burden of establishing the admissibility of the proposed expert testimony lies with the proponent. It is neither the responsibility of the defendant nor of this court to propose alternatives to the method at issue.").

Ms. Hammer could not have been clearer that her benchmark groups were not designed to relate to the economically relevant antitrust market. Mot. 5–6; *e.g.*, Ex. 8 at 221:14–20. She expressly stated that she is not opining that any of the individual companies in her benchmarks are

---

[5] While Google's expert, Dr. Mark Israel, did not look to a pre-constructed, publicly-available index of financial information like Ms. Hammer did, in response to Ms. Hammer's opinions, he did identify the profit margins of some of Google Search's competitors based on documents produced in this litigation— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Opp. Ex. C, Excerpts of August 5, 2022 Expert Rebuttal Report of Mark A. Israel at 83–85; Opp. 21–22.

competitors to Google's search and search advertising business. *Id.* at 231:22–25. Plaintiffs acknowledge in their Opposition that these groups do not consist of Google's "search rivals," Opp. 12, nor do they reflect "general search engines," Opp. 21.

Despite these concessions, Plaintiffs contend that Ms. Hammer's comparisons provide relevant "context." Opp. 2. This contention is meritless as, fundamentally, Plaintiffs are seeking to draw a conclusion about monopoly power in the relevant market from comparisons between the relative profitability of Google Search and various companies engaged in a wide variety of business on the internet. Such comparisons are not just unhelpful; they are misleading, and they do not provide relevant "context." Evidence that Google's search and search advertising business is more profitable than a wide range of internet businesses with varying products is not relevant to the question of whether Google Search possesses monopoly power in the ***relevant*** market. *See Microsoft*, 253 F.3d at 51–58.

Notwithstanding Plaintiffs' clear concessions, they also imply, confusingly, that the industry indices are a proxy for the relevant market. *See, e.g.*, Opp. 5 (explaining that "benchmarks provide important context," and quoting Jae K. Shim et al., *Barron's Dictionary of Accounting Terms* 204 (6th ed. 2014) ("'*Industry comparison*. The ratios of a firm are compared with those of similar firms or with industry averages or norms to determine how the company is faring relative to its competitors.'")); *see also* Opp. 13 (claiming that ▮▮▮▮▮▮ profitability "relative to other companies operating within the same industry classification speaks directly to Plaintiffs' allegations that Google both possesses and exercises monopoly power"); Opp. 18 (analogizing Ms. Hammer's benchmark groups to the benchmark used in *Payment Card*, 2022 WL 15053250, at *29). These arguments only serve to highlight the risk of confusion inherent in Ms. Hammer's benchmarking opinion, which should be excluded.

7

## II.  Ms. Hammer's Benchmarking Opinion Should Be Excluded Because It Is Unreliable.

Relatedly, Ms. Hammer's benchmarking opinion should be excluded because her apples-to-oranges comparisons are contrary to reputable accounting guidance. Mot. 13–16. Plaintiffs rely on accounting textbooks that only call Ms. Hammer's methodology further into question, and they do not, and cannot, establish that her benchmarks are reliable indications of monopoly power.

### A.  Accounting treatises do not support Ms. Hammer's selection of benchmark comparators.

The many accounting treatises cited by Plaintiffs do not support Ms. Hammer's selection of benchmark comparators for the purpose of this antitrust litigation. Opp. 25–27.

First, it may be true that the use of benchmark comparisons is "common and well-accepted" in accounting—but none of the cited sources support Ms. Hammer and Professor Whinston's use of the benchmarks in this context. Plaintiffs cite six accounting treatises that describe general accounting principles or ordinary financial evaluation, but none support the use of benchmarking like Ms. Hammer's in an antitrust monopoly power inquiry. *See* Opp. Exs. E–J; *e.g.*, Opp. Ex. J, Shannon P. Pratt, *The Market Approach to Valuing Businesses* 82 (2001) (describing the use of comparative financial analysis in the context of business valuation). This omission is particularly stark in light of texts that question the reliance on evidence of high accounting profit margins to infer even market power in an antitrust inquiry like this one. *See, e.g.*, Ex. 10, Robert H. Bork & J. Gregory Sidak, *The Misuse of Profit Margins to Infer Market Power*, 9 J. COMPETITION L. & ECON. 511, 512–19 (2013).

Second, it is apparent from these sources that companies with different products are not particularly comparable when looking at profitability—but Ms. Hammer ignored product distinctions in constructing her benchmarking opinion. *See* Opp. Ex. E, James R. Hitchner, *Financial Valuation: Applications and Models* 97 (4th ed. 2017) (explaining that comparisons are

8

"most useful when the companies analyzed are reasonably comparable," including in "business type"); Opp. Ex. H, Clyde P. Stickney et al., *Financial Accounting: An Introduction to Concepts, Methods, and Uses* 163 (13th ed. 2010) ("Comparing retailers with nonretailers for profit margin ratios makes little sense; the noncomparability results from the different business models[.]"); *see also* Ex. 11, Andrew Bloomenthal, *Financial Ratio Analysis: Definition, Types, Examples, and How to Use*, INVESTOPEDIA (last updated Aug. 17, 2022), https://www.investopedia.com/terms/r/ratioanalysis.asp (explaining that "[t]o correctly implement ratio analysis to compare different companies," one should "consider how companies with varying product lines (i.e. some technology companies may offer products as well as services, two different product lines with varying impacts to ratio analysis)"). And Ms. Hammer has conceded that a company's business strategy "always has an impact on profit." Ex. 8 at 402:5–19, 403:6–10. She also agreed that "a company's business model, including what type of product they sell, would be likely to have an impact on a comparison of profit margins from one company to another." *Id.* at 402:15–19. And yet, Ms. Hammer ignored these principles in her comparisons, which isolated two specific business segments within Google, and then compared them to companies with wildly divergent business segments. *See* Mot. 15–18.

Third, the cited treatises also make clear that the selection of benchmark comparators depends on the purpose of the comparison—and Ms. Hammer's reasoning for choosing her benchmarks conflicts with Alphabet's use of these groupings for other purposes. For example, Plaintiffs concede that the discussion in *Horngren's Cost Accounting* relate to benchmarking to "develop *internal* performance standards" whereas Ms. Hammer's benchmark was for "*external* financial accounting comparison purposes." Opp. 28–29 (emphases in original); *see also* Mot. Ex. 7, Charles T. Horngren et al., *Cost Accounting: A Managerial Emphasis* 267–68 (15th ed. 2015)

[hereinafter *Horngren's Cost Accounting*]; Ex. 8 at 395:20–398:8.  While it is true that Alphabet Inc. compares itself to the RDG Internet Composite Index in its 10-K for the purpose of comparing stock performance over time, Mot. Ex. 1 at ¶ 93,[6] that is not the purpose for which Plaintiffs now seek to use that index.  Ms. Hammer compared specific segments within Alphabet to the RDG Internet Composite Index, and Professor Whinston used the comparison as evidence of market power.  Opp. 17.  If the appropriateness of particular comparators varies depending on the purpose for which the benchmark comparison is conducted, then what is appropriate for gauging stock performance over time is not necessarily appropriate for showing monopoly power in an antitrust case.

### B. Ms. Hammer's comparisons are not reliable indications of monopoly power.

That an expert is well-credentialed does not end the *Daubert* inquiry because the expert must also have reliably applied her qualifications to reach an opinion on a relevant matter.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597.  An expert may not export testimony from one discipline, in which she is an expert, to another discipline, in which she is not.  *See United States v. Second Chance Body Armor, Inc.*, 289 F. Supp. 3d 145, 176–77 (D.D.C. 2018).

Plaintiffs cite only accounting treatises to support Ms. Hammer's benchmarking opinion, but—even assuming that Ms. Hammer's methodology is appropriate as a matter of accounting—this does not mean Ms. Hammer can import her methodology wholesale into the antitrust context for a monopoly power analysis.  Despite Plaintiffs' repeated emphasis of Ms. Hammer's qualifications as an accountant, *see, e.g.*, Opp. 2–3, 6, 13, 19, 22, they cannot offer a single example

---

[6] In the same charts cited by Ms. Hammer, Alphabet Inc. also compares its stock performance over time to the S&P 500 and the NASDAQ Composite.  *See* Alphabet Inc., Annual Report (Form 10-K) at 26 (Feb. 1. 2022), https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm.

where she has applied this type of benchmark comparison in an antitrust case for the purpose of opining on monopoly power, *see* Ex. 8 at 29:6–30:23 (testifying that she has never before performed a profitability benchmark analysis in any other antitrust case). Plaintiffs misunderstand the import of this gap. *See* Opp. 12–13. Combined with Plaintiffs' failure to provide a single authority supporting Ms. Hammer's benchmark analysis in this context, this gap is an indication that such far-sweeping benchmarks are not usually used in a monopoly power analysis. *See e.g.*, *Bailey*, 284 F.3d at 1239, 1253–54; *Payment Card*, 2022 WL 15053250, at *29–30.

Plaintiffs' lack of support for their methodology in an antitrust case like this one, coupled with their fumbled reliance on *Horngren's Cost Accounting*, demonstrates the flawed methodology used by Ms. Hammer and in turn relied upon by Professor Whinston. Professor Whinston cited *Horngren's Cost Accounting* to justify his reliance on Ms. Hammer's benchmarks, *see* Mot. Ex. 4, Excerpts of June 6, 2022 Expert Report of Michael D. Whinston at ¶ 544 & n.660, despite Ms. Hammer's express concession that *Horngren's* explanation of benchmarking is inapplicable to her benchmarking opinion, *see* Mot. 14–15; *supra* at 9–10. Professor Whinston thus entirely lacked support for his opinion connecting Ms. Hammer's benchmarking opinion to the monopoly power inquiry—a flaw that Plaintiffs still have not rectified.

## CONCLUSION

For the reasons set forth above and in its Motion, Defendant respectfully requests that the Court exclude Ms. Hammer's testimony regarding her benchmarking opinion, and any reliance thereon.

Dated: February 24, 2023               Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*