IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS
MOTION TO PARTIALLY EXCLUDE THE OPINION
OF PLAINTIFFS' EXPERT MICHAEL WHINSTON**

DOJ Plaintiffs pay lip service to the principle that an expert economist should be limited to opinions on economics. Opp. 6. At times, they even grudgingly acknowledge what that limitation entails, conceding, for example, that economists are not experts in all things impacting commerce. Opp. 12. Given these limits, Plaintiffs seek to characterize Professor Whinston as simply opining on Google's economic incentives. Opp. 10. And they make clear in the specific context of this case that Professor Whinston lacks the expertise necessary to opine on whether "it would be possible for rivals to match Google's search quality without gaining additional scale." Opp. 16. Where Plaintiffs stray, however, is in asking Professor Whinston to opine on technical search engine matters, including the impact of the availability of user search data (or "scale") on search engine quality, and Google's performance in search result latency and data privacy. Such opinions are the province of other experts engaged by DOJ Plaintiffs (and Google) in the case. Professor Whinston's opinions on those topics should be excluded.

In particular, Plaintiffs seek to have Professor Whinston "opine on how search engine quality hinges on scale." Opp. 7. That is not an economic question. It is a highly technical issue for which Google and DOJ have engaged computer science experts. Nothing in Professor Whinston's experience as an industrial economist generally, or with "economies of scale" specifically, qualify Professor Whinston to address that question.

Because of his lack of expertise in these areas, where Professor Whinston opines on scale, latency, and privacy, those opinions are nothing more than improper summary narration. Such testimony does not provide expertise, will not be helpful to the Court, and will only serve to lengthen the trial. There is no need to have Professor Whinston recount testimony or documents with only Plaintiffs' gloss added on subject matters for which he has no expertise.

In the limited instance where he presents additional analysis (a regression that purports to show a relationship between the frequency of queries and quality), Professor Whinston remains utterly unqualified. If an economist came before the court and provided a regression analysis on the causes of a certain cancer, he would be immediately rejected as unqualified. This is not simply a matter of omitted variables. It is a matter of Professor Whinston lacking the expertise to design a reliable regression analysis *on this topic* in the first place. Plaintiffs' argument that because Google has not offered its own model misses that point, and also cannot be squared with this Circuit's precedent.

Plaintiffs have failed to carry their burden of establishing that Professor Whinston's testimony on scale, latency, and privacy is admissible under Rule 702. His testimony on these topics should be excluded.

## **ARGUMENT**

**I.        Professor Whinston's Opinions About Search Engine Scale Should Be Excluded.**

As explained in Google's opening brief, the Court should exclude Professor Whinston's opinions regarding the impact of the availability of user interaction data (or "scale") on search engine quality and competition among search engines for several reasons. First, Professor Whinston's experience as an economist generally, including with the concept of "economies of scale" specifically, does not qualify him to opine on the computer science question of whether and how scale impacts search engine quality. Mot. 10–13. Second, even if Professor Whinston were qualified, his opinions consist mainly of improper narration, and merely put Plaintiffs' gloss on documents and testimony from actual industry participants. Mot. 13–15. Third, Professor Whinston lacks the experience necessary to identify the technical factors that impact search quality and monetization when designing any independent analysis of scale, rendering his regression

2

analyses flawed and not helpful to the fact finder. Mot. 15–18. Plaintiffs' responses on each of these points are unpersuasive.

> A. **Professor Whinston is not qualified to testify on the impact scale has on search engine quality.**

Plaintiffs seem to accept that the key question on search engine scale—whether and how scale impacts search engine quality—falls outside the expertise of an economist. They appear to acknowledge that only an "engineer" is qualified to opine on whether rivals would be able to match Google's quality at lower levels of scale. *See* Opp. 16.[1] One would think that ends the matter. Instead, Plaintiffs suggest that such an opinion represents a "thought experiment" and is "not at issue in this case, nor the point of Prof. Whinston's testimony." *Id.* Those are odd contentions. First, Plaintiffs' amended complaint puts that question front and center. *See* Am. Compl. ¶ 8, ECF No. 94 ("Google's anticompetitive practices are especially pernicious because they deny rivals scale to compete effectively. . . . By using distribution agreements to lock up scale for itself and deny it to others, Google unlawfully maintains its monopolies."); ¶¶ 35–38 (alleging that "[g]reater scale improves the quality of a general search engine's algorithms"). Second, elsewhere in their opposition, DOJ Plaintiffs appear to say that is precisely what Professor Whinston will opine on. Opp. 7 ("Prof. Whinston opines on how search engine quality hinges on scale."). In all events, Professor Whinston lacks the expertise to evaluate whether Google's so-called "scale advantage," *id.*, is the cause of its superior quality or whether search engine quality, more generally, "hinges" on scale. As the record shows, that is an exceedingly technical question. *See* Mot. Ex. 5, ▮

---

[1] In response to Google's argument that Professor Whinston demurred when asked "whether it would be possible for rivals to match Google's search quality without gaining additional scale," Plaintiffs state that "Prof. Whinston is not an engineer, so unsurprisingly he has no opinion on whether it is technically possible for a firm—with unlimited resources—to engineer a search engine on par with Google without first having access to search queries at scale." *Id.*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ Mot. Ex. 7, Excerpts of the Deposition of John Giannandrea (Apr. 22, 2022) at 57:16–58:25 (testifying that the importance of user data "depend[s] on the details of the implementation of your search algorithm"). Indeed, DOJ's actual computer science expert, Professor Douglas Oard, states that, even with his computer science expertise, he does not know whether, for example, doubling the amount of user-side data available to Google's rivals would improve their quality. Ex. 20, Excerpts of the Deposition of Douglas Oard (Oct. 24–25, 2022) at 63:6-64:5.

Nothing in Professor Whinston's experience as an economist generally, or with regard to the concept of "economies of scale" specifically, Opp. 3, can overcome his lack of technical expertise. In trying to salvage his opinions on those grounds, Plaintiffs cite to cases, Opp. 14–15, for the unremarkable proposition that economists do not need industry experience to offer *economic opinions* as applied to that industry. *Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, 2016 WL 7839128, at *1 (D.D.C. Sept. 21, 2016) (economist "qualified to opine on the *economic impact* of copyright infringement" (emphasis added)); *TFWS, Inc. v. Schaefer*, 183 F. Supp. 2d 789, 793 (D. Md. 2002) ("[T]estimony *as to general economic principles*, as applied to the alcoholic beverage industry, is well within [the economic expert's] asserted realm of expertise[.]" (emphasis added)); *Premier Comp Sols. LLC v. UPMC*, 2019 WL 480480, at *5 (W.D. Pa. Feb. 7, 2019) (economist can testify about relevant market without specialized expertise).

Those general principles cannot save Professor Whinston's computer science opinions. Indeed, the very cases DOJ Plaintiffs cite explain that being an industrial economist "does not

4

provide [Professor Whinston] with *carte blanche* to opine on every issue in the case." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) (internal quotation marks omitted). In *Kellwood Co.*, the court accepted the economic opinion of a CPA regarding valuation on the grounds that courts have "accepted expert testimony from financial and economic analysts even when those witnesses lack industry specific knowledge." *Id.* at 309 (internal quotation marks omitted). But the court rejected expert testimony regarding the non-economic "question of what efforts at marketing and promoting would be reasonable and whether Kellwood met those standards." *Id.* at 310. The court stated, "[d]eeming [the expert] qualified as a valuator does not provide him with *carte blance* [sic] to opine on every issue in the case." *Id.* at 311 (alterations and internal quotations marks omitted).[2] Thus, while Professor Whinston's experience as an economist may qualify him to opine on search engine *economics* regardless of his lack of industry experience, it does not qualify him to opine on technical questions, including how the availability of user search data impacts search engine *quality*.

Plaintiffs' attempt to shoehorn his opinions on the relationship between scale of user-interaction data and quality into the economic concept of "economies of scale" fares no better. Certainly, an economist may opine on the traditional economic concept of economies of scale as

---

[2] Plaintiffs' other cited cases are in accord. *See RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 739 (4th Cir. 2015) ("Although [expert] had no prior experience with maritime contracts, his opinion did not call for such expertise" because "his function was to calculate Appellee's damages," which he did by "creat[ing] mathematical formulas" and "applying his formulas."); *Hoffman v. Kansas City Life Ins. Co.*, 2019 WL 2297348, at *5 (D.S.C. May 30, 2019) (expert was "admitted as an expert in claims processing and handling, and not as an expert in all aspects of life insurance, [and therefore] may not testify regarding whether [Defendant's] underwriting process for the [life insurance policy] was appropriate or whether the application for the insurance policy itself violates the standards of care in the life insurance industry"); *Regal Cinemas, Inc. v. W & M Props.*, 90 F. App'x 824, 833 (6th Cir. 2004) (expert "specialized in damages analysis such as the one [he] performed in this case" and testified alongside another expert, who "was offered as an expert in the movie theater industry").

applied to various industries.  Opp. 17–18.[3]  But other than using the word "scale," there is little that connects traditional economies of scale—how production costs decrease at higher volumes of production—with the question of whether and how the availability of user search data impacts the quality of a search engine.

Plaintiffs try to suggest that Professor Whinston's opinions are limited to "how scale affects competition" and are therefore supported by his "expertise in how economies of scale impact the competitive dynamics of a given industry."  Opp. 12.  Plaintiffs say that "[t]he parties' technical scale experts—Profs. Fox and Frieder for Google and Prof. Oard for Plaintiffs—are not so qualified: They can speak to the computer science behind scale, but *not* as to how scale affects competition."  *Id.*  But Plaintiffs' limitation cannot be squared with their earlier, broader formulation of the opinions they in fact seek to elicit:  "Prof. Whinston opines on how search engine *quality* hinges on scale."  Opp. 7 (emphasis added).

Finally, Plaintiffs suggest that Google's expert, Professor Kevin Murphy, "would flunk" Google's qualifications test.  Opp. 15.  Not so.  Unlike Professor Whinston, Professor Murphy does not seek to offer an opinion evaluating the impact of scale on search engine quality.  Instead, Professor Murphy takes *assumptions* about how search volume impacts quality from an actual expert in the field (Professor Fox) and separately applies his own economic analysis.  In particular, Professor Fox created a data reduction experiment ("DRE") to "assess the extent to which the

---

[3] *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 234 n.32 (D.D.C. 2017) (analyzing scale effects from potential "volume-based discounts" in health insurance market); *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122, at *16 (N.D. Ohio Sept. 30, 2015) (assessing whether new entrants in food and drug retail industry can achieve "economies of scale in the market" when they only fulfill a "small quantity of orders"); *Se. Mo. Hospital v. C.R. Bard, Inc.*, 2008 WL 4372741, at *6 (E.D. Mo. Sept. 22, 2008) (assessing whether alleged anticompetitive conduct "depriv[ed class members] from certain economies of scale" and "directly increas[ed] rivals' selling expenses" and "impair[ed] their efficiency" even at scale (internal quotation marks omitted)).

quality of Google's search results depends on the volume of click-and-query data used to train Google's algorithms." Ex. 21, Excerpts of the June 6, 2022 Expert Report of Kevin M. Murphy at 375.  That study measured the impact on the quality of Google's search results when reducing the volume used to train the algorithms to a level approximating Bing's scale, and found that "Google would maintain a considerable search quality lead over Microsoft even with access to greatly reduced click and query data." *Id.* at 377.  Professor Murphy used this DRE as a basis for offering an opinion about competition in the marketplace—that Google's agreements have not, contrary to Plaintiffs' allegations, denied rivals the scale necessary to compete on search quality with Google. *Id.* at 53–54 & nn.121–22.  Plaintiffs do not challenge Professor Murphy's qualifications to opine on competitive conditions, and his reliance upon Professor Fox's *technical* opinion on the impact of search query volume on search result quality is entirely appropriate.[4]

Because Plaintiffs have failed to connect Professor Whinston's opinions on scale with his "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, those opinions should be excluded.

      **B.**      **Professor Whinston's scale opinions are improper narration.**

Because Professor Whinston does not have any expertise that would allow him to offer an opinion about how search quality is impacted by scale, his opinions consist mainly of cherry-picking statements from fact witnesses and adding Plaintiffs' gloss.  Plaintiffs' brief takes the same tact, starting their section titled "Professor Whinston Opines About The Importance of Scale" with multiple paragraphs outlining documents and testimony which Plaintiffs suggest shows that "[p]ast

---

[4] Professor Murphy has other ancillary economic opinions about scale.  For example, he seeks to opine that, contrary to Plaintiffs' view that scale is critical to search engine competitiveness, "Google competed successfully against competitors who possessed the very advantages that Plaintiffs incorrectly claim are necessary for search competitors to thrive." Ex. 21 at 7.

7

and present search executives have recognized the importance of scale."[5]  Opp. 5–6.  But the Court is "entirely capable of reviewing the testimony" that Plaintiffs discuss in their brief and "drawing conclusions" itself.  *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509, at *15 (D.D.C. Nov. 28, 2017) (citing *United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995)).  After the Court hears this testimony the first time, it does not need an economist to repeat it again with Plaintiffs' gloss.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).

Plaintiffs argue that experts are "expected to cite and rely upon case materials to provide the factual basis for their opinions."  Opp. 20.  And they suggest that "Prof. Whinston's opinions on scale are *not* based on mere evidence narration" because "Prof. Whinston reached economic conclusions with respect to scale."  Opp. 20–21.  Again, Google has no issue with Professor Whinston offering economic opinions that are based on *assumptions* about scale's impact on quality that Plaintiffs—separately—attempt to prove as a matter of fact (they have offered no affirmative expert testimony on this issue).  But that is not what he seeks to do; Professor Whinston instead seeks to "outline evidence from industry participants, including Google's top executives, on the relationship between a search engine's scale and its ability to provide a quality search experience," Mot. Ex. 1 at 392, and then *opine* based on those documents and testimony that "search engine quality hinges on scale," Opp. 7.  That is out of bounds.

Beyond recitation of testimony and documents, Plaintiffs suggest that "Prof. Whinston performed substantial empirical work."  Opp. 21.  But from the hundreds of pages of his reports, they can point to only three analyses, none of which in fact advance Plaintiffs' argument.  First,

---

[5] It is important to note that none of this testimony speaks to the question of whether Microsoft can compete on search result quality at its present scale or how much additional scale would be needed to match Google's search quality.

8

Plaintiffs cite to "data analysis to show Google's scale advantage." *Id.* (citing Mot. Ex. 1 at ¶¶ 969–72, Figs. 176–178). ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Second, Plaintiffs cite Professor Whinston's regression analyses which should be excluded for the reasons addressed *infra,* Section I.C., and in Google's Motion (at 15–18). Opp. 21 (citing Mot. Ex. 1 at ¶¶ 1048–68). Third, Plaintiffs cite Professor Whinston's analysis of "how the scale benefits from the Microsoft-Yahoo deal helped improve Bing's organic search results and ad monetization." *Id.* (citing Mot. Ex. 1 at ¶¶ 1150–55, Figs. 201, 204).

Tellingly, for this last analysis, most of the cited paragraphs (and Figures 202 and 203) simply recite Google and Microsoft documents ███████████████████████████████████ ██████████ And far from any "empirical" analysis, Figures 201 and 204 simply plot historical data regarding Google's and Bing's ████████████████████████████████████████ ████████████████████████████████ Professor Whinston's only contribution to this data is adding one line to Figure 201, the date of an internal Google email, and then suggesting *based on dates alone* that the scale added from Yahoo in the Microsoft-Yahoo deal led to █████████ ████████████████████████ This is not an independent economic analysis, "empirical" or otherwise; it is recitation of historical facts with Plaintiffs' gloss. █████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

9

In a final attempt to save Professor Whinston's narration opinions, Plaintiffs cite this Court's opinion in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 34 (D.D.C. 2015), and suggest that Professor Whinston be permitted to act as a "*de facto* summary witness" "synthesizing the voluminous record in this case and highlighting the evidence most relevant for evaluating competition." Opp. 22. Plaintiffs are not offering Professor Whinston as a summary fact witness, but instead filed a set of disclosures under Fed. R. Civ. P. 26(a)(2) to have him testify as an expert under Federal Rule of Evidence 702. Google respectfully submits that having Professor Whinston (or anyone else) repeat the testimony of numerous other fact and expert witnesses to add Plaintiffs' gloss will do nothing but lengthen the trial.

    **C.**    **Professor Whinston's only independent scale analyses are not backed by necessary experience.**

Professor Whinston's only independent analyses relating to scale's supposed impact on search quality and monetization should be excluded because Professor Whinston lacks the necessary experience to design a reliable analysis. Mot. 17. That one knows how to program a computer to perform a regression analysis does not qualify one to offer such an analysis on any topic. If Professor Whinston purported to sponsor a regression analysis on whether a particular chemical caused a particular type of cancer, the Court would not hesitate to exclude him. He is no more qualified to perform a regression analysis on the question of the causes of quality in search engine results. Plaintiffs' arguments that this is simply a question of whether Professor Whinston omitted critical variables misses that critical point. But even if the question were limited to whether his analysis (no doubt because of his lack of subject matter expertise) omitted variables, his analysis would flunk. Plaintiffs do not dispute that Professor Whinston's analyses failed to control for differences in indexing, search features, ranking systems, and latency that could affect

10

quality differences between head, torso, and tail queries.⁶ Mot. 17. Nor do Plaintiffs dispute those are important factors of search quality. *See Coward v. ADT Sec. Sys., Inc.*, 140 F.3d 271, 274 (D.C. Cir. 1998) (exclusion of regression proper where "clearly major variables have been omitted" (internal quotation marks omitted)).

Plaintiffs fault Google for not offering its own regression analysis from Professor Murphy to prove that excluded variables were material to the analysis. Opp. 28. To begin, Google had no need for such an analysis—it has reliable opinions on the impact of scale on search quality from Professors Fox and Frieder, actual experts in the field. And the unreported, out-of-circuit, trial court decision that Plaintiffs cite to suggest that Google must submit its own expert analysis cannot be squared with D.C. Circuit precedent. *Id.* (citing *In re Indus. Silicon Antitrust Litig.*, 1998 WL 1031507 (W.D. Pa. Oct. 13, 1998)). In *Coward*, the D.C. Circuit held that a "regression analysis was so incomplete as to be inadmissible as irrelevant," because it failed to control for major factors. 140 F.3d at 274–75 (internal quotation marks omitted).⁷ Nowhere did the court require the challenging party to put forth a competing regression analysis, and no such competing analysis was discussed by the court. Because the party's theory of the case acknowledged other major factors that were not controlled for in the analysis, the court held that the analysis was "flawed as a matter of law" and therefore should be excluded. *Id.* at 275.⁸ So too here. Professor Whinston

---

⁶ Plaintiffs suggest that Professor Whinston addressed one omitted variable in his reply report: query complexity. Opp. 29. Plaintiffs do not argue that Professor Whinston has cured the other indisputably important variables that Professor Whinston's analysis omitted.

⁷ Despite Google raising *Coward* in its opening brief, Plaintiffs fail to cite it or distinguish it.

⁸ To be sure, *In re Industrial Silicon Antitrust Litigation* cited to a D.C. Circuit case in support of this supposed requirement, *Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir 1987). But *Palmer* also recognized that there are "instances in which the relevance of a factor to the selection process is so obvious that the defendants, by merely pointing out its omission, can defeat the inference of discrimination created by the plaintiffs' statistics." *Id*. at 101.

11

acknowledges that latency is a major factor of search quality, yet he fails to control for how differences in latency (as well as other major factors affecting search quality) may have impacted head, torso, and tail queries. Mot. 17.

Because Professor Whinston is not qualified to opine on which variables other than scale affect search quality and therefore should be included in his regression analyses, and because his analyses omit major variables, his opinion relying on such analyses should be excluded.

## II.     Professor Whinston's Opinions on Latency and Privacy Should Be Excluded.

Professor Whinston's opinions on latency and privacy should be excluded for the same reasons as his scale opinions—he has no specialized experience that qualifies him to assess the quality of Google Search from the perspective of latency or privacy, and as a result his opinions consist solely of improper summary narration. Mot. 18–19.

With respect to Professor Whinston's ability to testify regarding latency and privacy, Plaintiffs contend that his status as an industrial organization economist is enough to permit his opinions. Plaintiffs argue that Professor Whinston offers "an *economic opinion* about how competition affects Google's incentives to compete on product quality, not a technical opinion about the engineering mechanisms through which Google can reduce latency or improve data privacy protections." Opp. 29–30 (emphasis in original). Google does not object to Professor Whinston stating that latency and privacy are aspects of quality and thus competition. Nor does Google object to testimony regarding how economic incentives to invest in quality can be affected by competition. But with no experience in either of these fields,[9] Professor Whinston cannot go

---

[9] To be sure, Google's expert Catherine Tucker is also an economist, but she has spent her career focused on "digital economics, and especially questions of how the increasing use of digital technologies has transformed advertising and questions of privacy." Mot. 6.

12

further and testify to the actual performance of Google's latency and privacy (which are affected by many tradeoffs).

That is precisely what Plaintiffs admit Professor Whinston seeks to do. Plaintiffs' own summary of Professor Whinston's latency opinion states: "Prof. Whinston analyzed the case evidence *to conclude that*, consistent with Google's muted incentives to compete, Google's latency *performance has lagged*." Opp. 8 (emphases added). Similarly, Plaintiffs' summary of his privacy opinion states: "Prof. Whinston opined that because of the absence of search competition, Google *has not improved its Search privacy policies as significantly or quickly as it would have in a more competitive market*." Opp. 9 (emphasis added) (internal quotation marks omitted). Professor Whinston has no relevant experience to analyze Google's "performance" in privacy or latency, nor to assess what level of privacy or latency would be expected in a world without the complained-of conduct. Professor Whinston does not discuss—and does not have the experience to assess—the technical tradeoffs that would allow an equally efficient competitor to reduce latency or increase privacy, all while maintaining relevancy and other aspects of quality.

Because Professor Whinston lacks any relevant scientific or technical experience with search engine latency or privacy, his opinions assessing Google's performance in those areas should be excluded.

### III. Professor Whinston's Opinions on Google's "Comparative" Profitability are Inadmissible.

Google has moved to exclude the benchmarking opinion of DOJ's accounting expert, Christine M. Hammer, in which she compares the profit margins of Search+ to that of other firms, because her selection of comparators is both unreliable and untethered to the alleged relevant antitrust markets. *See generally* ECF No. 416 ("Mot. Exclude Hammer"). Because Professor Whinston relies on Ms. Hammer's flawed benchmark comparison to opine that Google's profits

13

are high, *see* Mot. Ex. 1 at 209–16 (describing Ms. Hammer's benchmarking opinion before concluding that "[t]hese facts support [his] opinion that Google has been highly profitable"), his opinion on Google's comparative profitability should also be excluded.

Professor Whinston does not conduct any independent selection of industry comparators, and therefore has no independent basis to testify about Google's comparative profitability. Instead, he adopts Ms. Hammer's benchmark groups, as well as her rationale for selecting them. *Compare* Mot. Ex. 1 at 213–14 (claiming that Ms. Hammer's benchmarks are "reasonable" because "Alphabet itself is included in the [RDG] index," "Alphabet itself is included in the [Interactive Media & Services] index," and "Alphabet operates in SIC code 7370"), *with* Ex. 22, Excerpts of the Deposition of Christine Hammer (Oct. 10–11, 2022) at 321:5–8 ("A. In each instance, I looked for indices or classifications that Alphabet itself was a part of, and then used those classifications or indices to do my analysis."); Ex. 23, Excerpts of the June 6, 2022 Expert Report of Christine Hammer at Schedules D.1–D.3. Ms. Hammer's rationale is utterly disconnected from Plaintiffs' alleged relevant antitrust markets. *See generally* Mot. Exclude Hammer. And Professor Whinston does not independently opine that Ms. Hammer's benchmarks represent or relate to any alleged relevant markets. Therefore, his opinion should be excluded for the same reasons.

DOJ suggests that "Prof. Whinston performed his own analysis comparing Google's profit margins to those of other firms." Opp. 32. For support, they point to *two* paragraphs addressing this issue in his 688-paragraph-long rebuttal report. *See id.* (citing Mot. Ex. 2 ¶¶ 265–66, Figs. 24–25). These paragraphs describe an analysis "similar to [that] presented in [Professor Whinston's] initial report," in the portion where he relied on Ms. Hammer's opinion. Mot. Ex. 2 at 93 & n.368. Nowhere in these two paragraphs does Professor Whinston justify, let alone identify, the "309 comparison firms in the software and computer services industry" against which

14

he compared Google's profit margins. *See id.* at 92–93. These two stray paragraphs cannot support the weight of his entire comparative profitability opinion.

## **CONCLUSION**

For the reasons set forth above and in its Motion, Defendant respectfully requests that the Court exclude Professor Whinston's testimony regarding scale, latency, privacy, and profitability.

Dated: February 24, 2023            Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: *John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Kenneth C. Smurzynski (D.C. Bar No. 442131)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
ksmurzynski@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*