# Pls. Ex. 98



**P&A**
LAW OFFICES

**RESTRICTION OF
PUBLICATION CLAIMED**

1ST FLOOR, DR. GOPAL DAS BHAVAN • 28, BARAKHAMBA ROAD • NEW DELHI 110 001, INDIA
TELEPHONE: ▮▮▮▮▮▮ • FACSIMILE: +91 11 2335 3761, 2335 0416

September 13, 2019

To,

**Mr. Pranay Kumar Soni,**
Office of the Director General,
Competition Commission of India,
"B" Wing, HUDCO Vishala,
14 Bhikaji Cama Place,
New Delhi – 110 066.

**Ref:**    (i)    Case No. 39 of 2018;

        (ii)    Notice F. No. DG/CCI/IW/1/1/2019/U-I/1219 dated
             July 30, 2019 (the "Notice").

**Sub:**    Reply on behalf of Amazon Development Centre India
        Private Limited (hereinafter referred to as the "Company").

Dear Mr. Soni,

     We, P&A Law Offices ("P&A"), are counsel to Amazon
Development Centre India Private Limited ("Company") in connection
with the above captioned matter. The vakalatnama authorizing P&A has
already been provided to your good offices.



     At the outset, we would like to emphasize that it is the Company's
full and absolute intention to co-operate in this investigation undertaken
by your office. We would also like to take this opportunity to state that
we remain available at all times for any assistance or clarification that

Page 1 of **38**

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000414



CONFIDENTIAL

you may require during the course of the investigation undertaken by your office.

We are submitting, on behalf of the Company, its response to Question Nos. (i) to (vi) mentioned in paragraph No. 3 of the Notice. The response to these questions is provided in **Annexure A** enclosed herewith. The Company is in the process of collecting and compiling the information and documents requested in respect of Question Nos. (i) to (vi) of paragraph No.2 of the Notice ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

████████████████████████████. In order to effectively and comprehensively respond to these queries, it is humbly requested that an additional period of four (4) weeks be granted to provide the information in response to Question Nos. (i) to (vi) of paragraph No.2 of the Notice. It is humbly submitted that the collection of information/documents requested by your office is already underway and it is our endeavour to file the response as soon as possible and if the information becomes available sooner, in advance of the extended time sought for through this letter.

We submit that the instant reply to the Notice contains confidential business information of the Company. We are separately submitting a

PURSUANT TO PROTECTIVE ORDER                                    AMZNDOJ0000415





non-confidential version of the response to the Notice. Accordingly, please find enclosed for your consideration:

(a)     One confidential version of the reply to the Notice along with a CD; and

(b)     Copy of the Vakalatnama authorizing P&A Law Offices.

We reiterate our commitment to fully cooperate in the investigation undertaken by your office and are available at all times for any assistance or clarifications that you may require.

Thanking You,

Yours sincerely,



**For P&A Law Offices**

Page **3** of **38**

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000416

## ANNEXURE A

████████████

**2.   (i) to (vi)**

**Response:**

Information/ documents with respect to Question Nos. (i) to (vi) of

paragraph No.2 of the Notice ████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████ The Company undertakes to provide

this information as soon as it becomes available.

**3.   (i) Brief write up on Licensable Operating System (OS)**
     **installed in Amazon's Fire Smart Mobiles/Tablets sold in India**

**Response:**

1.   Amazon's Fire smart mobile devices and Fire smart tablets run on

the Fire Operating System ("Fire OS").  The Fire OS was initially

developed in 2010-11. ████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████ The Fire OS was ultimately developed as a 'forked'

Page **4** of **38**

████████ ████████ PURSUANT TO PROTECTIVE ORDER   AMZNDOJ0000417

█████████████

derivative[1] of the open source version of Android OS available under the Android Open Source Project[2] and was launched in November 2011, which was also the launch of the Fire tablets. [3]

2.   Amazon's decision relating to developing an operating system ("OS") for smart mobile devices and tablets involved a choice between (i) ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████ ██ █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

---

[1] A 'forked' OS is built on the basis of an open source OS, using code made available by the OS developer. The forked version uses some or all of the source code of an OS and then develops it further, independently. A forked OS will generally have a degree of compatibility with the source OS and benefit from the development experience of the source OS. In relation to Google's Android, forked versions of the Android OS are based on the Android Open Source Project.

[2] The Android Open Source Project repository offers the information and source code needed to create custom variants of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users. The Android Open Source Project is positioned by Google as offering the information and source code needed for an open source operating system.

[3] As regards the Fire devices business, Amazon initially considered launching a variant of ████████████
████████████ This product, however, was not launched and this project was, in fact, cancelled at an advanced stage when prototypes (more specifically, "Engineering Validation Test" units) were being tested. The main reason for the cancellation of this project was ███ concerns that its agreement with Google would be terminated by Google due to ███ supporting a forked version of Android. This led to Amazon developing its own tablet (i.e., the Fire tablet) using a contract manufacturer ("CM") (Quanta) which would operate on the Fire OS.

PURSUANT TO PROTECTIVE ORDER                    AMZNDOJ0000418

[REDACTED]

### _Option 1: Developing a new OS_:

3.    The utility and success of an OS is determined, _inter alia_, by: (a) the presence of a significant number of active apps (for example, apps made available through the Google Play app store and Apple App Store)[4]; (b) willingness of original equipment manufacturers ("OEMs")[5]/original design manufacturers ("ODMs")[6]/contract manufacturers ("CMs")[7] to manufacture devices running on the new OS[8]; and (c) user preference for the new OS.

4.    OS developers can develop a new OS (for smart mobiles/tablets) from scratch; however a new OS is unlikely to succeed and offer meaningful competition to an incumbent OS without a robust 'app and technology ecosystem'.

5.    'App and technology ecosystem' in this context refers to the network of developers who can create apps compatible with a particular OS to make it attractive for users. Such an ecosystem is

---

[4] This will necessarily require the presence of software and content developers producing content [REDACTED]

[5] In the context of OS and digital media devices, OEMs are the device manufacturers that in-license an OS and design and build devices to their own hardware specifications and supply them under their brand. Such OEMs include Samsung, LG, HTC, Sony and Huawei.

[6] ODMs and CMs manufacture digital media devices for a principal, such as Amazon, to meet the principal's design and other specifications. The principal brands and distributes the products manufactured by the ODM/CM. The ODMs/CMs load the OS and other software on to the digital media devices prior to shipping those devices on the instruction of the principal.

[7] _Ibid._

[8] This would ensure [REDACTED]

PURSUANT TO PROTECTIVE ORDER                    AMZNDOJ0000419

often characterized by network effects. For example, OEMs/ODMs/CMs would be more incentivized to manufacture devices compatible with a particular OS if there are more users of such OS. Similarly, more users would be attracted to a particular OS if more developers create apps for such OS and *vice versa.* Therefore, developing a meaningful app and technology ecosystem requires the presence of a sufficient number of app developers, OEMs/ODMs/CMs, technology providers and users. Accordingly, the developer of the new OS would have to overcome two significant barriers to entry in order to be able to viably compete with an incumbent OS such as Android OS. *Firstly*, the developer of a new OS would require the technology related capability to develop a new OS, from scratch. *Secondly*, the developer would also have to overcome the technological barriers to entry, particularly, the application barriers to entry involved in developing an ecosystem which would make the OS commercially viable. In *United States v. Microsoft*,[9] the US Court of Appeals upheld the District Court's observation that the "applications barrier to entry" - stems from two characteristics of the software market: (1) most consumers prefer the OS for which a large number of applications have already been written; and (2) most developers prefer to write

---

[9] 253 F.3d 34 (D.C. Cir. 2001)

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000420

for an OS that already has a substantial consumer base. Consequently, this "chicken-and-egg" situation arising from applications barrier to entry ensures that applications will continue to be written for the already dominant OS, which in turn ensures that consumers will continue to prefer it over other competing OSs.[10]



---

[10] *Ibid* at page 55.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000421



8.

Page **9** of **38**

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000422



9.  Moreover, Google's Mandatory Terms also confer wide unilateral powers on Google. For instance, under the MADA, GMS licensees are required to submit their devices (prior to the launch of such devices) to Google for approval purportedly "*to ensure adherence to the terms and conditions of [the MADA], including but not limited to the Google's Mobile Branding Guidelines*".[19] As a result, GMS



---

[19]  See Clause 4.3 of the Samsung MADA (also available at: http://www.benedelman.org/docs/samsung-mada.pdf). [It is clarified that while the specific language of clause 4.3 of the Samsung MADA has been changed by Google over time, Google continues to include the same principle in its current agreements.]

Page 10 of 38

███████████

licensees cannot distribute Android devices if they do not comply with Google's Android Compatibility Test Suite ("CTS")[20] and Compatibility Definition Document ("CDD"),[21] as the MADA makes the GMS license contingent on devices being Android Compatible Devices.[22] Ostensibly, the CTS and CDD purport to provide technical consistency across Android devices. In reality, Google alone administers the CTS and CDD and retains broad discretion to veto or block distribution of devices.

10. Amazon also understands that Google requires GMS licensees to submit all Android devices to Google for approval, regardless of whether the devices preload GMS[23] or are based on the Android Open Source Project. This requirement under the MADA means that licensees relinquish the 'freedom' that they would otherwise enjoy as a result of using open source software.

---

[20] See https://source.android.com/compatibility/cts-intro.html.

[21]                                                                                          See
https://static.googleusercontent.com/media/source.android.com/en//compatibility/android-cdd.pdf.

█████████████████████████████

█████████████████████████████

PURSUANT TO PROTECTIVE ORDER                AMZNDOJ0000424

11. Amazon evaluated internally whether to license Android OS and GMS because of the barriers created by the absence of GMS (which were and are seen as "must have" apps by customers). However, on balance, Amazon decided against entering into a GMS license because it would be a 'one-way door' and result in ceding too much control to Google over Amazon's current and future devices. Amazon's acceptance of Google's Mandatory Terms would have posed significant constraints on Amazon's business activities. Amazon expected that signing the MADA would have an adverse impact on the use of the Amazon Appstore, Amazon's Silk browser, and potentially any other Amazon app that competes with Google's apps or services because Google mandates pre-installation and premium placement of all the GMS apps on Android devices. The availability of the Google Play app store on Amazon devices would have led to app developers choosing to focus on developing apps for the Google Play app store, which would have made the Amazon Appstore less attractive to end users, and therefore, hindered the growth of the Amazon Appstore business.

12. In conclusion, considering the over-arching powers that are conferred on Google through Google's Mandatory Terms, Amazon decided against choosing the second option.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000425

### *Option 3: Developing a forked version of Android OS using the Android Open Source Project:*

13. The Android Open Source Project purportedly allows any developer to create customized variants (or forks) of the Android OS using the open source code and software stack available under the Android Open Source Project.

14. Amazon chose the third option of forking the open source version of Android released by Google based on the stated objective of Android Open Source Project, which is "to avoid any central point of failure in which one industry player can restrict or control the innovations of any other player."[24] Amazon was attracted to the stated 'openness' of Android, as claimed by Google – namely, that any developer of an open source Android OS could purportedly participate and compete with Google across the wider Android ecosystem.

15. However, Amazon did not realise at that time that this ostensive 'openness' of Android is qualified by the fact that software updates, bug fixes and enhancements are controlled by Google, as a market practice. For instance, the users of open source version of the Android OS usually have delayed access to important software updates, new releases, bug fixes and enhancements included in

---

[24] See https://source.android.com/.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000426

the new versions of Android (which Google develops with its licensed OEMs). Google, therefore, has the power to "break" Android compatibility of the Fire OS with each of its new versions of Android.



16.

17.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000427



Moreover, the restrictions imposed by Google in relation to the access to GMS (which was contingent upon signing the MADA) and other limitations precluding the interoperability of Android apps would continue to serve as a significant impediment to the adoption of smartphone devices running on the Fire OS, irrespective of the availability of a broad range of such devices. Consequently, Amazon had to focus on distributing the Fire OS on the Amazon-

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000428

█████████

branded smart mobile devices only, rather than by partnering with OEMs.

20. Additionally, it is submitted that a vast majority of developers, if not all, develop Android apps primarily for distribution through Google Play. If a developer decides to make its app available for Fire OS devices, it typically makes the work necessary to port the app to Fire OS a secondary priority. This is because the distribution of an app through Google Play enables developers to access far more devices, than for example, through the Amazon Appstore. This increases user demand for the licensable Android OS and incentivises mobile application developers to develop apps compatible with Android OS, thereby, further increasing the value of the Google Play app store for app developers, OEMs/ODMs/CMs and users. These factors contributed towards the eventual failure of █████████.

21. █████████ (i.e., Amazon's program to develop its own branded smartphone, the Fire Phone) was launched in 2014. Foxconn was the ODM manufacturing the Amazon branded Fire Phone. However, █████████ also failed to become a commercial success. It is submitted that the failure of █████████ is attributable, *inter alia*, to (a) the lack of access to GMS on account of Amazon not signing the MADA; (b) the lack of access to Google Play and (c) the lack of associated mobile applications.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000429

███████████████

(ii) **Year wise details** *(in Number)* **of Fire Smart Mobiles and Tablets sold/marketed by your company in India, from 01.04.2011 to 31.03.2019**

**Response:**

Fire Phone

22.   Fire Phones were not launched (for sale) in India and accordingly, Zero (0) Fire Phones have been sold in India till the date of this response.

Fire tablets

23.   Although Fire tablets are not currently offered for sale to customers in India, Fire tablets were offered for sale to customers in India in 2013 and 2014 and approximately ███████████████ such tablets were sold to customers in India during those years.

(iii) **Special features, specification, configuration, availability of App Store/ Apps etc. in Fire Smart Mobiles/ Tablets in India?**

24.   Fire smart phone devices came with and Fire tablets come with pre-installed Amazon Appstore. Amazon Appstore is a proprietary app of Amazon which allows the customers of Amazon to access, select and download a wide selection of apps which are compatible with the Fire OS. It is submitted that Fire smart phone devices were

Page 17 of 38

not launched (for sale) in India. The Fire Phone was discontinued before it could be launched in India.

25. Although Fire tablets are not currently offered for sale to customers in India, Fire tablets were offered for sale to customers in India in 2013 and 2014. However, customers in India could (and still can) order Fire tablets from the Amazon.com (US) marketplace and Amazon will ship those devices to India. Customers in India shopping on the Amazon Appstore on Fire tablets are able to purchase Apps available for sale on the Amazon.com (US) marketplace.

26. The Amazon Appstore app is made available to the customers in India as noted above. At present, the Amazon Appstore app is pre-installed on all Fire Tablet devices and can also be downloaded on any non-Amazon Android devices from Amazon's retail website (i.e., www.amazon.com/androidapp). Apps can be browsed by customers using the Amazon Appstore for Android App, the Amazon Appstore app on Fire tablet devices, or on the Amazon.com website. When purchased using the Appstore app on a device, apps will be downloaded immediately to the device, and when purchased on the website, the customer can choose whether to download the app to the customer's device, or whether to have the app entitled to their Amazon account.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000431

27. In order to assist the Hon'ble DG with the present investigation, information relating to the special features, specification, configuration, availability of app store/apps etc. has been provided. In addition, Amazon is submitting information relating to the background leading to the development of the Amazon Appstore, the efforts undertaken by Amazon in developing the Amazon Appstore and the reasons which, in Amazon's view, have hindered the growth of the Amazon Appstore as a viable alternative to the other app stores.

**Background to the development of the Amazon App Store**

28. As noted above, the Fire smart mobile devices/tablets developed by Amazon operate on Fire OS, a forked version of the Android OS. Despite the Fire OS being a forked version of the Android OS, most of Google's proprietary apps (including those that are part of the GMS) or third party apps using Google Play Services (explained further below) are not directly compatible with the Fire OS and the users of the Fire smart phone devices and tablets cannot access the apps developed for the Android OS or can only use them with limited functionality.

29. An OS and its forked version typically have similar source codes, the portability[25] of apps developed for the original OS to its forked

---

[25] Portability of an app refers to the possibility of using that app with a forked version of the OS for which it was originally developed.

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000432

version depends, *inter alia*, on the placement of Application Programming Interface ("APIs"). APIs are a set of proprietary software code which third-party app developers use to enable their apps to function with an OS and other apps or other services developed for an OS. App developers use APIs to allow their apps to function with an OS, apps and other services. APIs used to create a functionality with GMS apps and services are proprietary to Google. If an app developer uses a Google API, then that app will not work on a non-compatible device (using a 'forked' OS) or will work with reduced functionality.

30. As long as the APIs are embedded in the source code of such OS, an app developed for the original OS can be easily ported to its forked version. If the necessary APIs are not embedded in the source code of the original OS, then non-OS APIs and services become essential in order to run apps (developed for the original OS) on the forked version, thereby, affecting app-portability.

31. When Amazon developed the first generation of its Kindle Fire tablet device in 2011, app portability to an Android fork was high as many services (including APIs) were embedded in the Android Open Source Project. Google thereafter decided to move newer versions of certain important APIs from the source code for Android OS to Google Play services. For example, Google released Google

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000433

█████████████████████

Cloud Messaging for Android in 2012 but then moved it to Google Play services the following year.

32. Google Play services are currently being distributed by Google through the Google Play Store, a proprietary app of Google, which is offered as part of a single package comprising Google's proprietary apps such as Google Maps, Youtube and Gmail. Accordingly, Google Play services are available exclusively on Android Compatible Devices.[26] Forked OS developers (such as Amazon) and developers of a new OS are necessarily required to replicate and replace the requisite APIs (used by these third-party apps) made available through the Google Play services.

33. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ The Amazon Appstore is the proprietary app of Amazon which allows the customers of Amazon to access, select and download apps available on the Amazon Appstore. It was launched on March 22, 2011. The Amazon App Store was developed as part of Amazon's efforts to create a meaningful catalogue of apps for devices using its Fire OS. Amazon also offers APIs which can be

---

[26] See Clause 2.7 of the Samsung MADA. In terms of clause 1.3 of the Samsung MADA, Android Compatible Devices are defined as "Device(s) that: (i) comply with the Android Compatibility Definition document...; and (ii) successfully pass the Android Compatibility Test Suite".

PURSUANT TO PROTECTIVE ORDER                                                AMZNDOJ0000434

used by third party app developers, as part of the Amazon developer program and such APIs can be used with apps on both Fire OS and Android OS. Presently, the Amazon App Store app is pre-installed on all versions of Fire Tablet devices, which are available for purchase on the Amazon.com (US) marketplace by customers located in India and can also be downloaded on any non-Amazon Android devices from Amazon's retail website. As of the second quarter of 2019, the Amazon Appstore offered a selection of ▮▮▮▮ apps worldwide.

34. Amazon offers various "Apps" (including apps for social networks, communication, reference, entertainment and shopping) and "Games" (across various sub-categories, including arcade games, board games, trivia, racing games and casino games) on the Amazon Appstore. Amazon does not typically track which of the top 100 free and paid apps available on the Google Play Store and Apple App Store are currently available in the Amazon Appstore; however based on a review conducted for response to this query, Amazon found that 14 of the top 50 free apps in the Apple App Store and 34 of the top 50 free apps in the Google Play Store are available on the Amazon Appstore. So far in 2019, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Since 2013, there

PURSUANT TO PROTECTIVE ORDER   AMZNDOJ0000435

████████████████

have been approximately ███████████ downloaded from the Amazon Appstore globally.

### Development of Amazon Appstore

35. A wide selection of compatible apps is essential for the success of any OS, including the Fire OS and the devices operating on the Fire OS. ████████████████████████

████████████████████████

████████████████████████

████████████████████████. It is submitted that while the availability of a large number of apps is important for the growth of an app store (and, in turn, the OS), it is the availability of the most popular and the highest grossing apps from the competing app stores that drives the success of an app store (and, in turn, the OS). The measures taken by Amazon for this purpose include:

(a) ***Developing comparable alternatives to GMS apps and ensuring compatibility of third-party apps***: If an OS does not support the most-used Google Play services APIs or offer equivalents to those APIs, porting the app will take much more time for a third-party app developer and may also result in a degraded customer experience. Accordingly, Amazon has invested significant time and resources to develop comparable alternatives to the popular GMS services (such as maps) along with analogues for some of the Google Play

Page **23** of **38**

AMZNDOJ0000436

services APIs so that third-party app developers could use device messaging, maps, in-app purchasing, mobile advertising, analytics and games services in their Fire OS apps. It is clarified that, for a developer to convert its app to use one of these Amazon APIs instead of the Google Play services API, the developer must identify all the instances in which the app calls the Google Play services API, modify the app's code to invoke the Amazon API instead, build the app, and perform rigorous testing of it. In some cases, the app will require further modification if the Google Play services API and Amazon API differ in the features they offer or the way they are called.

(b) ***Dedicated human resources***: Amazon dedicated a large number of employees to educate developers and convince them to make their apps compatible with Fire OS. Amazon also worked with the third-party developers to address the compatibility issues arising in this regard. Amazon has also built a significant content operations team, consisting of hundreds of employees, to review apps prior to distribution, including for content appropriateness, functionality and bugs and errors.

PURSUANT TO PROTECTIVE ORDER                                    AMZNDOJ0000437



36.

37. Moreover, the extent of additional developmental work required by a third-party app developer to make the most popular and the highest grossing apps of Google Play Store compatible with the

---

27   See   https://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/.

PURSUANT TO PROTECTIVE ORDER   AMZNDOJ0000436

Amazon App Store has hindered the growth of the Amazon App
Store. Amazon's review of the 100 highest grossing bestseller apps
available on the Google Play Store (in 2014) indicated that none of
those apps would operate on the Fire OS without any additional
developmental work. This was because all of these apps used one
or more Google Play services to improve the customer experience
or the revenue generated from the app. Accordingly, the
developers of these apps had to replace those services or remove
the functionalities provided by these Google Play services before
porting these apps to the Fire OS. As described below, it is
submitted that app portability involved significant difficulties (in
terms of cumbersome technical process, high costs and time
constraints).

38.  The barriers that prevented Amazon from scaling up its App Store
business are as follows:

**Barriers in the commercial success of Amazon App Store**

(a)  ***Linking of Google's Proprietary Apps:*** As stated above,
the availability of a wide selection of compatible apps makes
an OS more attractive to users. The Android OS comes with
certain proprietary apps of Google, such as Google Maps and
YouTube, which have witnessed strong customer demand.
The developer of a forked version of the Android OS would
only be able to pre-install these apps (which are packaged as

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000439

GMS) on the devices operating on such forked OS, if it enters into the GMS license by signing the MADA. As stated above, the MADA makes the GMS license contingent on devices being Android Compatible Devices.[28] This necessarily implies that in order to be able to make any of Google's proprietary apps available to its users, the developer of a forked OS would be required to (a) agree to Google's Mandatory Terms (including the CDD and ACC); and (b) pre-install all of Google's proprietary apps available as a single package in the GMS. It is submitted that the independent consumer demand for some of the proprietary apps of Google, such as Youtube make it essential for any new OS looking to attract more users. Youtube has 225 million monthly active users in India, on mobile phones alone.[29] By making the developer's access to its proprietary apps contingent upon agreeing to Google's Mandatory Terms, Google is, in fact, linking its proprietary apps to its allegedly 'open' licensable OS.

(b) *Difficulties involved in app portability*: As noted above, third-party app developers build their apps using APIs,

---

[28] See Clause 2.7 of the Samsung MADA. In terms of clause 1.3 of the Samsung MADA, Android Compatible Devices are defined as "Device(s) that: (i) comply with the Android Compatibility Definition document...; and (ii) successfully pass the Android Compatibility Test Suite".

[29] See https://yourstory.com/2018/03/youtube-monthly-user-base-touches-225-million-india-reaches-80-pc-internet-population

PURSUANT TO PROTECTIVE ORDER                                    AMZNDOJ0000440

Majority of the most popular apps on the Google Play Store rely on Google Play services APIs (that are not part of the Android operating system) to provide functionality that is essential to the operation of the apps. For instance, Google's popular Maps API, Cloud Messaging API, In-App Purchasing API, Google+ API, and many other APIs are all made available through Google Play services, not the Android operating system itself. By excluding these APIs from the Android operating system and not making Google Play services available on forked versions of Android, Google prevents apps that use these APIs from running properly on forked versions of Android without any additional developmental work which involves a cumbersome technical process, significant costs and time.

*Technical barriers*: In order for Amazon to make available the Google Play Store apps on the Amazon App Store, Amazon is required to develop comparable alternatives to the GMS apps so as to allow the apps to call on the Amazon APIs instead of the Google Play services APIs. In relation to this process, the Amazon API requires complete feature compatibility with the Google Play services API to avoid breaking app compatibility. Striving for complete feature compatibility with Google Play services APIs requires

Page **28** of **38**

AMZNDOJ0000441

continued investment on Amazon's part to stay updated with any changes Google makes to its APIs, while also limiting Amazon's ability to innovate with its APIs over time. Even if Amazon is able to obtain feature compatibility with a Google Play service, it would always come at a delay. Amazon does not receive the details of new and changed Google Play services until Google makes them publicly available, after which Amazon must update its service to match Google's. For example, the current version of Amazon's Maps API offers interface parity (but not complete feature parity) with version 2 of the Google Maps API, but Google has now released version 3 of its Maps API. Another example is that the Google Play Billing service offers additional flexibility and features to developers, including discounted pricing and free trials, and Amazon had to build this functionality for Amazon Appstore to allow its developers to have the same flexibility as they would in their Google Play Store apps.

*Time Constraints*: While a simple, map-based app may take approximately one week to port from Android to Fire OS, a complex game may take up to seven months to port from Android to Fire OS due to its social features, shared economy and other complex elements. On an average, Amazon estimates that it would take 1-2 weeks (plus testing time) per

Page **29** of **38**

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000442

API for a developer to switch from Google Play services APIs for in-app purchasing and device messaging to Amazon's corresponding APIs and 2-3 weeks (plus testing time) for a developer to switch from Google's Maps API to Amazon's Maps API.

*Cost Constraints*: It is submitted that these are not one-time investments by the developers. Each time a developer updates an app, it must do additional development work to ensure that the updated app works with both the Google and Amazon APIs and must perform testing on both versions. As a result, each Google Play services API used in an app makes it more difficult for that developer to distribute its app for use on forked versions of Android. Further, the widespread usage of those APIs makes it difficult for companies like Amazon to recruit app developers to develop apps for Fire OS, because of the relatively high conversion and maintenance costs developers of sophisticated apps must incur.

(c) 

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000443



Page **31** of **38**

PURSUANT TO PROTECTIVE ORDER

CONFIDENTIAL



(iv) **Whether Google Apps and Services viz Google search engine, Chrome Browser, Google Apps Store are made available by Google in Amazon's Fire Smart Mobiles/Tablets? If yes, the details of terms and conditions under which these services are made available by Google in your Fire Smart Mobiles/Tablets may be provided along with the copy of the agreement(s), if any.**

**Response:**

39. As noted above, Amazon Fire smart phone devices and tablets operate on Amazon's Fire OS which is a forked version of the Android OS. For the reasons provided in paragraphs 7 to 12 above, Amazon has not entered into a GMS license or agreed to Google's Mandatory Terms. Accordingly, Google's proprietary apps and services, including Google Play Store are not available on Amazon's Fire Smart phone devices and tablets.

PURSUANT TO PROTECTIVE ORDER                    AMZNDOJ0000445

████████████████

(v)    **Whether Google Apps and Services can be downloaded by the end users of Amazon's Fire Smart Mobiles/Tablets? If yes, the detail steps/process and technical configuration required to make these services available to the end users may be provided.**

**Response:**

40.    Google's proprietary apps cannot be downloaded by the end users of Amazon's Fire Smart phone devices and tablets; Google submitted their YouTube App for distribution in the Amazon Appstore on June 19, 2019, and the YouTube App is now available to be downloaded from the Amazon Appstore. As stated in the response to Query 3(iv) above, Amazon has not entered into a GMS license or agreed to Google's Mandatory Terms. Hence, the Google Play Store, (which is part of the GMS and from where Google's proprietary apps can be downloaded), is not available to the end users of Amazon Fire Smart phone devices and tablets.

**(vi) Any other information on Bare Android/Android Fork, etc. which you want to share.**

*Impact on non-mobile devices*

41. Amazon believes that in addition to smart mobile phones and tablets, it is important to consider the impact of Google's actions on non-mobile devices such as smart TVs, smart speakers and

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000446

car audio units. Specifically, many smartphone/tablet manufacturers also make non-mobile devices and Google has been leveraging its dominance in mobile to restrain competition in non-mobile devices by requiring these manufacturers to sign AFAs that apply to all Android devices. At a minimum, device manufacturers who only make Android mobile devices should not be prohibited from making forked-Android non-mobile devices (such as TVs or smart speakers) because the AFA was imposed on them only as a condition to licensing GMS for their mobile devices (especially since GMS is considered a must have suite of apps for Android mobile devices).

*Smart TVs and Smart speakers*

42. Apart from the Fire Phone and Fire Tablet, additional Amazon devices including Fire TV devices, the Amazon Cloud Cam, and some Echo and other Alexa digital media devices also run on versions of the Fire OS. In principle, the Fire OS could run equally well on smart devices sold by OEMs. However, since the Fire OS is apparently viewed by Google as 'fragmenting' Android, Amazon is restricted in its ability to license the Fire OS to OEMs (for any of its smart media devices) if those OEMs produce any Android devices (because those OEMs are subject to Google's anti-fragmentation restrictions). Such OEMs risk losing their access to GMS (and certification of their devices) if they supply

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000447

Fire OS devices. Given the market presence of Android, and the fact that Android is the only licensable mobile OS, this restriction affects the vast majority of OEMs who could develop and supply Fire OS smart media devices.

43. Given the breadth of the anti-fragmentation obligations, Amazon has also experienced significant difficulties in finding OEM partners to manufacture smart TVs running its Fire OS. The breadth of the AFA restrictions as they apply to Android licensees is such that OEMs have concerns that manufacturing smart TVs running Fire OS will put their GMS license for other businesses (e.g., smartphone business) at risk, even if the OEMs do not manufacture and supply Android smart TVs. Amazon has explored working with mobile OEMs/ODMs/CMs who also manufacture non-mobile smart media devices, such as smart TVs, to enable those manufacturers to distribute non-mobile smart media devices (including smart TVs) running the Fire OS (e.g., Fire TV Edition (FTVE) for smart TVs). In these discussions with OEMs, at least seven OEMs have indicated that their ability to enter into a manufacturing relationship of this kind with Amazon is either blocked entirely or significantly limited (e.g., in terms of geographic scope) by their contractual commitments to Google and the concern that Google would retaliate against another of the OEM's businesses that produce Android devices. While

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000448



discussions have not progressed beyond preliminary conversations with some of these OEMs, in several cases, the OEM has indicated that it cannot work with Amazon despite a professed desire to do so in connection with smart TVs. In others, the OEM has tried and failed to obtain "permission" from Google. For example, such discussions occurred with Skyworth, TPV (with respect to the Philips brand), UMC (with respect to the Sharp brand), Foxconn (with respect to the Sharp brand), and Panasonic. Panasonic also shared concerns about possible retaliation by Google against its automotive and aviation businesses if it proceeded with FTVE installation on smart TVs.

---

[30] http://www.openautoalliance.net/#about

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000449



Page 37 of 38

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000450



\*\*\*\*\*

PURSUANT TO PROTECTIVE ORDER

AMZNDOJ0000451

BEFORE THE COMPETITION COMMISSION OF INDIA AT NEW DELHI

Case No. 39 of 2018

In Re:

Mr. Umar Javeed and others                                    ...INFORMANTS

Versus

Google LLC and another                                    ...OPPOSITE PARTIES

KNOW ALL to whom these presents shall come that I/We, **Amazon Development Center (India) Private Limited**, do hereby appoint and retain:

P&A Law Offices, an Indian law firm, and its lawyers Mr. Anand S. Pathak (D-370/1986), Mr. Amit Mishra (F-461/2005 Mr. Shashank Gautam (D-645/2013), Ms. Sreemoyee Deb (D-1011/2012), Ms. Anubhuti Mishra (D-3353/2013) and Mr. Param Tandon (D-558/2016) (P&A Law Offices)

(hereinafter called the Advocate/s) to be my/our Advocates in the above noted case and authorize them: -

To act, appear and plead in the above-noted case before the Competition Commission of India (the "Commission") or the Office of the Director General (the "Director General"), National Company Law Tribunal ("Tribunal") or before any other Court or tribunal in which the same may be tried or heard and also before the appellate Courts and/or tribunals, subject to payment of the requisite fees and expenses;

To sign, file, verify and present pleadings, appeals, cross-objections or petitions for executions, reviews, revisions, withdrawals, compromises or other petitions or affidavits or other documents; and to review and inspect the Director General, Commission, Court or Tribunal records as may be deemed necessary or proper for the prosecution of the said case in all its stages;

To file and take back documents, to admit and/or deny the documents of the third party;

To appoint and instruct any other Legal Practitioner(s) authorizing them to exercise the power and authority hereby conferred upon the Advocate whenever they may think fit to do so and to sign the power of attorney on our behalf.

AMZNDOJ0000452

And I/We the undersigned do hereby agree to ratify and confirm all acts done by the Advocates or their substitutes in the matter as my/our own acts, as if done by me/us for all intents and proposes.

And I/We undertake that I/We or my duly authorized agent would appear before the Director General/Commission/Court/Tribunal on all hearings and will inform the Advocates for appearance when the case is called.

And I/We the undersigned do hereby agree not to hold the Advocates or their substitutes, responsible for the result of the said case.

**IN WITNESS WHEREOF** I/We do hereunto set my/our hand to these presents the contents of which have been understood by me on this 16th day of August, 2019.




AMZNDOJ0000453