# Pls. Ex. 103 - Part 1 of 2



**EUROPEAN COMMISSION**
Competition DG

*CASE AT.40099*

*Google Android*

(Only the English text is authentic)

# ANTITRUST PROCEDURE

## Council Regulation (EC) 1/2003

Article 7 Regulation (EC) 1/2003

Date: 18/07/2018

---

This text is made available for information purposes only. A summary of this decision is published in all EU languages in the Official Journal of the European Union.

Parts of this text have been edited to ensure that confidential information is not disclosed. Those parts are replaced by a non-confidential summary in square brackets or are shown as […].

GOOG-DOJ-26429163



EUROPEAN
COMMISSION

Brussels, 18.7.2018
C(2018) 4761 final

**COMMISSION DECISION**

**of 18.7.2018**

**relating to a proceeding under Article 102 of the Treaty on the Functioning of the European Union (the Treaty) and Article 54 of the EEA Agreement**

**(AT.40099 – Google Android)**

(Only the English text is authentic)

**EN**  **EN**

GOOG-DOJ-26429164

# TABLE OF CONTENTS

1.       Introduction ........................................................................................ 10

2.       Undertaking concerned ...................................................................... 12

3.       Procedure ............................................................................................ 13

4.       Google's allegations that the Commission's investigation suffers from procedural
         errors ................................................................................................... 16

4.1.     The Commission's alleged failure to grant access to the file in a timely and complete
         manner ................................................................................................. 17

4.2.     The Commission's alleged failure to provide Google with adequate access to minutes
         of meetings with third parties ............................................................ 18

4.3.     The Commission's alleged failure to assess the evidence properly ........................... 18

4.4.     The Commission's alleged obligation to discount FairSearch's submissions since at
         least November 2015 .......................................................................... 19

5.       Products concerned by this Decision ................................................ 19

5.1.     Smart mobile devices ......................................................................... 20

5.2.     Operating systems for smart mobile devices ..................................... 20

5.3.     Apps .................................................................................................... 21

5.4.     Smart mobile app stores ..................................................................... 22

5.5.     Application programming interfaces (APIs) ....................................... 22

5.6.     General search services ...................................................................... 24

5.7.     Web browsers ..................................................................................... 26

6.       Google's activities in the mobile industry ......................................... 27

6.1.     Overview of Google's business activities ............................................ 27

6.2.     The shift to mobile and Google's response ......................................... 29

6.2.1.   Google Search as default on smart mobile devices ............................ 31

6.2.2.   The development of Android and the Android ecosystem .................... 32

6.2.2.1. The development of Android ............................................................... 32

I.       Android Open Source Project .............................................................. 32

II.      Play Store ............................................................................................ 35

III.     Google Play Services ........................................................................... 36

6.2.2.2. Development of the Android ecosystem .............................................. 38

6.2.2.3. Google's activities at the level of smart mobile devices ...................... 39

6.3.     Google's agreements with members of the Google Android ecosystem ................... 40

6.3.1.   Anti-Fragmentation Agreements ......................................................... 40

6.3.2.   Mobile Application Distribution Agreements ...................................... 45

6.3.3.   Portfolio-based revenue share agreements ......................................... 49

GOOG-DOJ-26429165

6.3.3.1. Portfolio-based revenue share agreements with OEMs ............................ 51

6.3.3.2. Portfolio-based revenue share agreements with MNOs ............................ 53

7.      Relevant Product Markets ........................................................................ 55

7.1.    Principles .................................................................................................. 55

7.2.    Application to this case ............................................................................ 56

7.3.    The licensing of smart mobile OSs ......................................................... 56

7.3.1.  PC OSs and smart mobile OSs ................................................................ 56

7.3.2.  Basic and feature phone OSs and smart mobile OSs ............................... 58

7.3.3.  Smartphone OSs and tablet OSs .............................................................. 58

7.3.4.  Licensable smart mobile OSs .................................................................. 59

7.3.5.  Licensable smart mobile OSs and non-licensable smart mobile OSs ....... 59

7.4.    Android app stores ................................................................................... 64

7.4.1.  Other apps and app stores ....................................................................... 65

7.4.2.  Different Google Android app stores ....................................................... 65

7.4.3.  App stores for other Android devices and app stores for Google Android devices... 66

7.4.4.  App stores for other licensable smart mobile OSs and Android app stores .............. 67

7.4.5.  App stores for non-licensable smart mobile OSs and Android app stores ................ 72

7.5.    General search services ............................................................................ 74

7.5.1.  The provision of general search services constitutes an economic activity .............. 75

7.5.2.  General search services and other online services ................................... 76

7.5.2.1. General search services and content sites from a demand-side perspective ............. 76

7.5.2.2. General search services and specialised search services from a demand-side perspective .................................................................................................. 76

7.5.2.3. General search services and social networking sites from a demand-side perspective ............................................................................................ 78

7.5.2.4. General search services and other online services from a supply-side perspective ... 78

7.5.3.  General search services on PCs and smart mobile devices ...................... 78

7.5.4.  General search services on different smart mobile OSs ........................... 79

7.5.5.  All entry points on smart mobile devices ................................................ 79

7.6.    Non OS-specific mobile web browsers .................................................... 80

7.6.1.  PC web browsers and mobile web browsers ............................................ 80

7.6.2.  Other apps and mobile web browsers ...................................................... 81

7.6.3.  Mobile web browsers for different smart mobile OSs ............................. 82

7.6.4.  OS-specific mobile web browsers and non OS-specific mobile web browsers ......... 83

8.      Relevant Geographic Markets ................................................................. 85

8.1.    Principles relating to geographic market definition ................................. 85

GOOG-DOJ-26429166

8.2.     Application to this case ............................................................................. 85

8.3.     Licensing of smart mobile device operating systems ................................. 85

8.4.     Android app stores ...................................................................................... 87

8.5.     General search services .............................................................................. 88

8.6.     Non OS-specific mobile web browsers ....................................................... 89

9.       Dominance ................................................................................................... 89

9.1.     Principles ..................................................................................................... 89

9.2.     Application to this case ............................................................................... 91

9.3.     Worldwide market (excluding China) for the licensing of smart mobile OSs ........... 92

9.3.1.   Market shares .............................................................................................. 92

9.3.2.   Barriers to entry and expansion ................................................................. 97

9.3.3.   Lack of countervailing buyer power .......................................................... 102

9.3.4.   Non-licensable smart mobile OSs .............................................................. 102

9.3.4.1. Users obtain smart mobile OSs as part of a wider bundle with a smart mobile device
         and take into account a range of factors other than the smart mobile OS when
         purchasing a smart mobile device ............................................................. 103

9.3.4.2. iOS exercises an insufficient indirect constraint on Google's dominant position in the
         worldwide (excluding China) market for licensable smart mobile OSs .................. 108

I.       There are significant price differences between Google Android and iOS devices 109

II.      Users of Google Android devices would face substantial costs when switching to iOS
         devices ......................................................................................................... 113

III.     Users show a significant degree of loyalty to their existing smart mobile OS ........ 117

IV.      App developers are unlikely to stop developing for Google Android and develop
         exclusively for iOS ..................................................................................... 122

9.3.4.3. BlackBerry OS exercises an insufficient indirect constraint on Google's dominant
         position in the worldwide (excluding China) market for licensable smart mobile OSs
         ...................................................................................................................... 124

9.3.5.   The AOSP licence ....................................................................................... 124

9.3.6.   Other Google arguments on dominance in the market for licensable smart mobile
         OSs ............................................................................................................... 127

9.4.     Worldwide market (excluding China) for Android app stores ................................ 128

9.4.1.   Market shares .............................................................................................. 128

9.4.2.   Quantity and popularity of apps available on the Play Store ...................... 132

9.4.3.   Automatic update functionalities of the Play Store .................................... 135

9.4.4.   Google Play Services ................................................................................... 136

9.4.5.   Barriers to entry and expansion ................................................................. 138

9.4.6.   Lack of countervailing buyer power .......................................................... 142

9.4.7.   App stores for non-licensable smart mobile OSs ....................................... 143

**EN**                                    4                                    **EN**

GOOG-DOJ-26429167

9.5.       National markets for general search services ........................................... 148

9.5.1.    Market shares .......................................................................................... 149

9.5.2.    Barriers to entry and expansion............................................................. 153

9.5.3.    Infrequency of user multi-homing and existence of brand effects........................... 158

9.5.4.    Lack of countervailing buyer power ...................................................... 159

9.5.5.    The argument that Google's general search services are offered free of charge ..... 160

9.5.6.    The argument that users in the EEA may use Google's general search service because of the perceived relevance of the results provided by that service............ 161

10.       Abuse of Dominant Position: General Principles ................................... 161

10.1.     Principles................................................................................................ 161

10.2.     Application to this case ......................................................................... 164

11.       Abuse of Google's dominant position: tying relating to its proprietary mobile apps ................................................................................................ 164

11.1.     Principles................................................................................................ 164

11.2.     Summary of the abusive conduct .......................................................... 166

11.3.     Tying of the Google Search app with the Play Store ............................. 167

11.3.1.   The Play Store and the Google Search app are distinct products ........... 167

11.3.2.   Dominance in the worldwide market (excluding China) for Android app stores .... 168

11.3.3.   The Play Store cannot be obtained without the Google Search app ........ 168

11.3.4.   Restriction of competition ..................................................................... 168

11.3.4.1. The tying of the Google Search app with the Play Store provides Google with a significant competitive advantage that competing general search services providers cannot offset .................................................................................... 169

I.        The number of general searches via smart mobile devices has grown significantly 169

II.       Pre-installation is an important channel for the distribution of general search services on smart mobile devices.................................................................................. 169

III.      It is impossible to uninstall the Google Search app on GMS devices .................... 181

IV.       Competing general search services cannot offset the competitive advantage that Google ensures for itself through tying.................................................................... 181

V.        Google's competitive advantage resulting from the tying and the inability of competing general search services to offset that advantage is consistent with the evolution of Google's shares of general search queries.......................................... 191

VI.       Google's other claims and the Commission's response ............................................ 195

11.3.4.2. Google's conduct helps to maintain and strengthen its dominant position in each national market for general search services, increases barriers to entry, deters innovation and tends to harm, directly or indirectly, consumers ............................... 196

11.3.4.3. Google's claims regarding the need for the Commission to consider its conduct in the relevant economic and legal context.................................................................... 198

11.4.     Tying of Google Chrome with the Play Store and the Google Search app.............. 200

**EN**

**EN**

GOOG-DOJ-26429168

11.4.1.   Google Chrome is a distinct product from the Play Store and the Google Search app ............................................................................................................ 200

11.4.2.   Dominance in the worldwide market (excluding China) for Android app stores and in the national markets for general search services ................................................... 201

11.4.3.   The Play Store and the Google Search app cannot be obtained without Google Chrome ................................................................................................................ 201

11.4.4.   Restriction of competition ...................................................................................... 202

11.4.4.1. Tying of Google Chrome with the Play Store and the Google Search app provides Google with a significant competitive advantage that competing non OS-specific mobile web browsers cannot offset ............................................................................ 202

I.        Pre-installation is an important channel for the distribution of mobile web browsers on smart mobile devices ............................................................................................ 202

II.       It is impossible to uninstall Google Chrome on GMS devices ............................... 207

III.      Competing non OS-specific mobile web browser developers cannot offset the competitive advantage that Google ensures for itself through the tying ................. 208

IV.       Google's competitive advantage resulting from the tying and the inability of competing non OS-specific mobile web browsers to offset that advantage is consistent with the evolution of market shares ....................................................... 217

V.        Google's other claims and the Commission's response ........................................... 221

11.4.4.2. Google's conduct deters innovation, tends to harm, directly or indirectly, consumers of mobile web browsers and helps to maintain and strengthen Google's dominant position in each national market for general search services ................................... 222

11.4.4.3. Google's claims regarding the need for the Commission to consider its conduct in its relevant economic and legal context ......................................................................... 225

11.5.     Objective justification and efficiencies ................................................................. 226

11.6.     Duration of the infringements ................................................................................ 228

12.       Abuse of Google's dominant position: the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the AFAs ........... 229

12.1.     Principles ................................................................................................................ 229

12.2.     Summary of the abusive conduct .......................................................................... 229

12.3.     The anti-fragmentation obligations are unrelated to the licensing of the Play Store and the Google Search app ................................................................................... 230

12.4.     Google is dominant in the worldwide market (excluding China) for Android app stores, and in the national markets for general search services ............................... 232

12.5.     The Play Store and the Google Search app cannot be obtained without entering into the anti-fragmentation obligations ..................................................................... 232

12.6.     Restriction of competition ..................................................................................... 233

12.6.1.   Android forks constitute a credible competitive threat to Google .......................... 233

12.6.2.   Google actively monitors compliance with, and enforces, the anti-fragmentation obligations ............................................................................................................. 236

12.6.3.   The anti-fragmentation obligations hinder the development of Android forks ....... 243

**EN**

**EN**

GOOG-DOJ-26429169

12.6.3.1.Coverage, duration and scope of the AFAs ............................................. 243

12.6.3.2.The anti-fragmentation obligations prevent developers of Android forks from finding distribution channels that would enable a rapid scaling up of their operations ....... 244

12.6.3.3.The example of Amazon Fire OS.................................................................... 245

12.6.3.4.The anti-fragmentation obligations prevent OEMs from developing their own forked version of Android .................................................................................. 250

12.6.3.5.The anti-fragmentation obligations make it more difficult for fork developers to find ODMs willing to manufacture their own branded devices ..................................... 251

12.6.3.6.Besides preventing ODMs and OEMs from selling devices running Android forks, the anti-fragmentation obligations create further obstacles that prevent ODMs and OEMs to support Android forks............................................................................. 251

12.6.4. Compatible forks do not constitute a credible competitive threat to Google........... 252

12.6.5. The capability of the anti-fragmentation obligations to restrict competition is reinforced by the unavailability of Google's proprietary APIs to fork developers, which makes it more difficult for Android forks to attract app developers ............ 254

12.6.6. Google's conduct helps to maintain and strengthen Google's dominant position in each national market for general search services, deters innovation, and tends to harm, directly or indirectly, consumers................................................................. 257

12.6.7. Google's claim regarding the need for the Commission to consider its conduct in the relevant economic and legal context ........................................................................ 258

12.7. Objective justification and efficiencies ................................................................... 259

12.8. Google's intention to notify hardware manufacturers of the option to enter into an ACC in place of an AFA ........................................................................................ 268

12.9. Duration of the infringement.................................................................................... 268

13. Abuse of Google's dominant position: Portfolio-Based Revenue share payments conditional on the pre-installation of no competing general search service ........... 268

13.1. Principles................................................................................................................... 268

13.2. Summary of the abusive conduct ............................................................................ 269

13.3. Google's portfolio-based revenue share payments constituted exclusivity payments ................................................................................................................................... 270

13.4. Google's portfolio-based revenue share payments were capable of restricting competition.................................................................................................................. 272

13.4.1. Google's portfolio-based revenue share payments reduced the incentives of OEMs and MNOs to pre-install competing general search services ................................... 273

13.4.1.1.Absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices ........................................................... 273

13.4.1.2.Competing general search services could not have matched Google's portfolio-based revenue share payments to OEMs and MNOs ....................................................... 278

GOOG-DOJ-26429170

13.4.1.3. The portfolio-based revenue share payments were one reason why OEMs and MNOs refrained from pre-installing competing general search services on their Google Android devices ................................................................................................ 292

13.4.2.   Google's portfolio-based revenue share payments made access to the national markets for general search services more difficult ................................................. 294

13.4.2.1. Google's portfolio-based revenue share agreements covered a significant part of the relevant markets ................................................................................................. 294

13.4.2.2. Competing general search services would have been unable to offset the competitive advantage that Google ensured for itself via portfolio-based revenue share agreements, by using alternative distribution channels such as download ............. 298

13.4.3.   Google's portfolio-based revenue share payments deterred innovation.................. 299

13.5.   Objective justification and efficiencies ................................................................ 300

13.6.   Duration of the infringement ............................................................................... 301

14.   Single and continuous infringement ..................................................................... 302

14.1.   Principles ............................................................................................................. 302

14.2.   Application to this case ........................................................................................ 302

14.3.   Duration of the single and continuous infringement ........................................... 307

15.   Jurisdiction .......................................................................................................... 308

15.1.   Principles ............................................................................................................. 308

15.2.   Application to this case ........................................................................................ 308

16.   Effect on trade between Member States ................................................................ 309

17.   Addressees ........................................................................................................... 310

17.1.   Principles ............................................................................................................. 310

17.2.   Application to this case ........................................................................................ 311

18.   Remedies .............................................................................................................. 311

18.1.   Principles ............................................................................................................. 311

18.2.   Application to this case ........................................................................................ 312

18.2.1.   Remedies concerning tying relating to Google's proprietary mobile apps .............. 312

18.2.2.   Remedies concerning the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations in the AFAs ........................................................................................................... 313

18.2.3.   Remedies concerning revenue share agreements conditional on the exclusive pre-installation of Google Search ............................................................................... 314

18.2.4.   Implementation of the remedies ........................................................................... 314

19.   Periodic penalty payments ................................................................................... 315

19.1.   Principles ............................................................................................................. 315

19.2.   Application to this case ........................................................................................ 315

20.   Fines .................................................................................................................... 315

**EN**

**EN**

GOOG-DOJ-26429171

20.1.      Principles ........................................................................................................ 315

20.2.      Intent or negligence ........................................................................................ 317

20.3.      Calculation of the fine .................................................................................... 318

20.3.1.   Joint and several liability ................................................................................ 318

20.3.2.   Single fine ........................................................................................................ 318

20.3.3.   Determination of the basic amount of the fine .......................................... 319

20.3.4.   Value of sales .................................................................................................... 319

20.3.5.   The last full year ............................................................................................. 320

20.3.6.   Gravity .............................................................................................................. 320

20.3.7.   Duration ............................................................................................................ 322

20.3.8.   Additional amount ........................................................................................... 323

20.3.9.   Aggravating and mitigating circumstances ................................................... 323

20.3.10. Deterrence ........................................................................................................ 324

20.3.11. Conclusion: final amount of the fine ............................................................ 324

GOOG-DOJ-26429172

# COMMISSION DECISION

## of 18.7.2018

## relating to a proceeding under Article 102 of the Treaty on the Functioning of the European Union (the Treaty) and Article 54 of the EEA Agreement

### (AT.40099 – Google Android)

(Only the English text is authentic)

THE EUROPEAN COMMISSION,

Having regard to the Treaty on the Functioning of the European Union,[1]

Having regard to the Agreement on the European Economic Area,

Having regard to Council Regulation (EC) No 1/2003, of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty,[2] and in particular Articles 7, 23(2) and 24(1) thereof,

Having regard to the Commission decisions of 15 April 2015 and 20 April 2016 to initiate proceedings in this case,

Having given the undertaking concerned the opportunity to make known its views on the objections raised by the Commission pursuant to Article 27(1) of Regulation No 1/2003 and Article 12 of Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the Treaty,[3]

After consulting the Advisory Committee on Restrictive Practices and Dominant Positions,

Having regard to the final report of the hearing officer in this case,

Whereas:

## 1.    INTRODUCTION

(1)    This Decision is addressed to Google LLC (formerly Google Inc.) ("Google") and to Alphabet Inc. ("Alphabet").

(2)    This Decision establishes that conduct by Google with regard to certain conditions in

---

[1]     OJ, C 115, 9.5.2008, p. 47.

[2]     OJ L 1, 4.1.2003, p. 1. With effect from 1 December 2009, Articles 81 and 82 of the EC Treaty have become Articles 101 and 102, respectively, of the Treaty on the Functioning of the European Union ("TFEU"). The two sets of provisions are, in substance, identical. For the purposes of this Decision, references to Articles 101 and 102 of the TFEU should be understood as references to Articles 81 and 82, respectively, of the EC Treaty where appropriate. The TFEU also introduced certain changes in terminology, such as the replacement of "Community" by "Union" and "common market" by "internal market". Where the meaning remains unchanged, the terminology of the TFEU is used throughout this Decision.

[3]     OJ L 123, 27.4.2004, p. 18.

**EN**

**EN**

agreements associated with the use of Google's smart mobile operating system, Android, and certain proprietary mobile applications ("apps") and services constitutes a single and continuous infringement of Article 102 of the Treaty on the Functioning of the European Union ("TFEU") and Article 54 of the Agreement on the European Economic Area ("EEA Agreement").

(3)   This Decision also establishes that Google's conduct constitutes four separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement, each of which is also part of the single and continuous infringement referred to in recital (2).

(4)   Google is or has been:

(1)   tying the Google Search app with its smart mobile app store, the Play Store;

(2)   tying its mobile web browser, Google Chrome, with the Play Store and the Google Search app;

(3)   making the licensing of the Play Store and the Google Search app conditional on agreements that contain anti-fragmentation obligations, preventing hardware manufacturers from: (i) selling devices based on modified versions of Android ("Android forks"); (ii) taking actions that may cause or result in the fragmentation of Android; and (iii) distributing a software development kit ("SDK") derived from Android; and

(4)   granting revenue share payments to original equipment manufacturers ("OEMs") and mobile network operators ("MNOs") on condition that they pre-install no competing general search service on any device within an agreed portfolio.

(5)   This Decision is structured as follows:

(1)   Section 2 deals with the undertaking concerned by the Decision;

(2)   Section 3 outlines the procedure leading to the adoption of this Decision;

(3)   Section 4 addresses Google's allegations that the Commission's investigation suffers from procedural errors;

(4)   Section 5 describes the products concerned by this Decision;

(5)   Section 6 describes Google's activities in the mobile industry;

(6)   Section 7 describes the relevant product markets affected by this Decision;

(7)   Section 8 describes the relevant geographic markets affected by this Decision;

(8)   Section 9 concludes that Google has a dominant position in the worldwide market (excluding China) for the licensing of smart mobile OSs (Section 9.3), the worldwide market (excluding China) for Android app stores (Section 9.4) and in each national market for general search services in the EEA (Section 9.5);

(9)   Section 10 outlines general principles on abuse of dominant position;

(10)  Section 11 concludes that Google has abused its dominant position in the worldwide market (excluding China) for Android app stores by tying the Google Search app with its smart mobile app store, the Play Store, and by tying its mobile web browser, Google Chrome, with the Play Store and the Google Search app;

GOOG-DOJ-26429174

(11)  Section 12 concludes that Google has abused its dominant position in the worldwide market (excluding China) for Android app stores and the national markets for general search services by making the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the anti-fragmentation agreements;

(12)  Section 13 concludes that Google has abused its dominant position in the national markets for general search services by granting portfolio-based revenue share payments conditional on the pre-installation of no competing general search service;

(13)  Section 14 concludes that the four infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13 constitute a single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement;

(14)  Section 15 concludes that the Commission has jurisdiction to pursue this case;

(15)  Section 16 concludes that Google's conduct has an effect on trade between Member States;

(16)  Section 17 describes the addressees of this Decision;

(17)  Section 18 outlines the remedies imposed by this Decision;

(18)  Section 19 describes the periodic penalty payments necessary to compel Google and Alphabet to bring effectively to an end the separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13 and the single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement described in Section 14, if they have not already done so;

(19)  Section 20 sets out the method for calculating the fine and the amount of the fine imposed; and

(20)  Section 21 presents the Commission's conclusions.

## 2.   UNDERTAKING CONCERNED

(6)   Google is a multinational technology company specialising in Internet-related services and products that include online advertising technologies, search, cloud computing, software and hardware. It offers various services in the territories of all the Contracting Parties to the EEA Agreement. Google is a wholly-owned subsidiary of Alphabet.

(7)   In August 2015, Google announced its intention to create a new holding company, Alphabet. The reorganisation was completed on 2 October 2015. Consequently, Google became a subsidiary of Alphabet on 2 October 2015.

(8)   On 30 September 2017, Google converted from an incorporated entity (Google Inc.) to a limited liability company (Google LLC). In addition, a new holding company (XXVI Holdings Inc.) is now the sole shareholder of Google. XXVI Holdings Inc. is

**EN**                                    12                                    **EN**

GOOG-DOJ-26429175

itself a wholly owned subsidiary of Alphabet.[4]

(9)  According to the consolidated financial statements of Alphabet,[5] its turnover for the fiscal year running from 1 January 2017 to 31 December 2017 was USD 110 855 million (approximately EUR 98 127 million).[6]

## 3.  PROCEDURE

(10)  On 25 March 2013, FairSearch lodged a complaint with the Commission against Google. On 13 June 2013, the Commission sent Google a non-confidential version of that complaint. On 23 August 2013, Google provided comments on the same complaint. On 5 December 2014, the Commission sent FairSearch a non-confidential version of Google's comments. On 7 February 2015, FairSearch provided observations on Google's comments.

(11)  Between 12 June 2013 and 11 March 2016, the Commission sent requests for information pursuant to Articles 18(2) and 18(3) of Council Regulation (EC) No 1/2003 ("Regulation (EC) No 1/2003") to Google, its customers, competitors and other parties active in the smart mobile environment.

(12)  On 16 June 2014, Aptoide S.A. ("Aptoide") lodged a complaint with the Commission against Google. On 27 June 2014, the Commission sent Google a non-confidential version of that complaint. On 8 August 2014, Google provided comments on the same complaint. On 5 December 2014, the Commission sent Aptoide a non-confidential version of Google's comments. On 30 January 2015, Aptoide provided observations on Google's comments.

(13)  On 15 April 2015, the Commission initiated proceedings against Google pursuant to Article 2(1) of Commission Regulation (EC) No 773/2004 ("Regulation (EC) No 773/2004") in relation to a number of Google's practices.

(14)  Also on 15 April 2015, Yandex N.V. ("Yandex") lodged a complaint with the Commission against Google. On 6 May 2015, the Commission sent Google a non-confidential version of that complaint. On 7 August 2015, Google provided comments on the same complaint.

(15)  On 1 June 2015, Disconnect Inc. ("Disconnect") lodged a complaint with the Commission against Google. On 22 June 2015, the Commission sent Google a non-confidential version of that complaint. On 7 August 2015, Google provided comments on the same complaint.

(16)  On 9 June 2015, 8 July 2015, 30 September 2015 and 14 March 2016, the Commission met with Google. The Commission also held a number of meetings with third parties during the proceedings.

(17)  On 19 April 2016, the Commission held a state-of-play meeting with Google.

---

[4]  See Google's response to Question 4 of the request for information of 5 April 2018 (Doc ID 8850). Google LLC is therefore the same legal entity as, and the legal successor of, Google Inc.

[5]  Alphabet's 2017 consolidated statements of income, available at https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf, printed and saved on 3 May 2018.

[6]  Amount converted from USD into EUR using the average annual reference exchange rate published by the European Central Bank for the year 2017, i.e. 1 USD = 0.8870 EUR (https://www.ecb.europa.eu/stats/policy_and_exchange_rates/euro_reference_exchange_rates/html/euro_fxref-graph-usd.en.html).

**EN**

**EN**

GOOG-DOJ-26429176

(18)    On 20 April 2016, the Commission initiated proceedings against Alphabet pursuant to Article 2(1) of Commission Regulation (EC) No 773/2004 and adopted a Statement of Objections addressed to Google and Alphabet.[7]

(19)    On 22 April 2016, after having informed Google, the Commission transferred certain documents in the case file in Case AT.39740 – *Google Search* to the case file in Case AT.40099.

(20)    Following the adoption of the Statement of Objections on 20 April 2016, the Commission granted Google access to its file. To this end, on 3 May 2016, the Commission provided Google with access to part of the case file. Access to the remaining part of the file was granted to Google's external legal and economic advisers subject to twenty-six Non-Disclosure Agreements ("NDAs"), under which such advisers undertook, with Google's agreement, not to reveal to Google any information relating to third parties derived from this part of the file, without the Commission's prior consent. In this context, documents were disclosed to Google's external legal and economic advisors under confidentiality ring arrangements, or access was provided pursuant to five data room procedures, under which Google's external legal and economic advisors accessed the information relating to third parties only at the Commission premises.

(21)    Between 21 September 2016 and 2 October 2017, the Commission sent a non-confidential version of the Statement of Objections to seventeen complainants and interested third parties.

(22)    Between 21 October 2016 and 16 October 2017, the Commission received comments on the Statements of Objections from eleven complainants and interested third parties.

(23)    On 10 November 2016, Google submitted a provisional response to the Statement of Objections. On 23 December 2016 Google submitted a final version of its response to the Statement of Objections (the "Response to the Statement of Objections").

(24)    Google did not request the opportunity to develop its arguments at an oral hearing.

(25)    On 25 January 2017, Google submitted a letter concerning a decision of the Canadian Competition Bureau and provided a copy of an industry report on trends in the mobile apps sector.

(26)    On 6 March 2017, Open Internet Project ("OIP") lodged a complaint against Google. On 15 March 2017, the Commission sent Google a non-confidential version of the complaint. On 14 April 2017, Google provided comments on the complaint.

(27)    Between 8 March 2017 and 10 April 2017, the Commission sent further requests for information pursuant to Articles 18(2) and 18(3) of Regulation (EC) No 1/2003 to Google, its customers, competitors and other parties active in the smart mobile

---

[7]    Hereinafter in this Decision, all references to Google's Response to the Statement of Objections and to other submissions made by Google after the opening of proceedings against Alphabet should be taken to refer to the joint Response to the Statement of Objections submitted by Google and Alphabet and other joint submissions made by Google and Alphabet. Expressions such as "Google argues", "Google submits" or "Google claims" should also be intended as referring to joint submissions made by Google and Alphabet. Equally, expressions such as "provided to Google" and "informed Google" should be intended as referring jointly to information or access to documents provided by the Commission to Google and Alphabet jointly.

**EN**                                                     14                                                     **EN**

GOOG-DOJ-26429177

environment, such as app developers and providers of web-based services.

(28)   On 31 August 2017, the Commission sent Google a letter (the "First Letter of Facts") informing it about pre-existing evidence to which Google already had access but which was not expressly relied upon in the Statement of Objections but which, on further analysis of the Commission's file, could be relevant to support the preliminary conclusions reached in the Statement of Objections. The Commission also informed Google in the First Letter of Facts about additional evidence obtained by the Commission after the adoption of the Statement of Objections.

(29)   Following the adoption of the First Letter of Facts, the Commission granted access to the file to Google. To this end, on 1 September 2017, the Commission provided Google with access to part of the documents added to the case file since 3 May 2016 and access to the remaining part of the documents added to the case file since 3 May 2016 was granted subject to four additional NDAs and two further data room procedures.

(30)   On 15 September 2017 Google submitted a letter requesting full records of the Commission's meetings with third parties relating to the investigation.

(31)   On 23 October 2017, Google submitted a response to the First Letter of Facts (the "Response to the First Letter of Facts").

(32)   On 1 December 2017, Google submitted a letter and term sheet describing changes that it would be ready to implement in the framework of commitments pursuant to Article 9 of Regulation (EC) No 1/2003. After assessing Google's letter and term sheet, the Commission informed Google on 12 February 2018 that it intended to continue the procedure under Article 7 of Regulation (EC) No 1/2003.

(33)   On 28 February 2018, the Commission provided Google with minutes of the meetings and calls that the Commission had with third parties concerning the subject matter of the investigation. The Commission also provided Google with new documents that had been added to the Commission file since the issuing of the First Letter of Facts.

(34)   On 14 March 2018, Google submitted a letter concerning factual and legal developments since the Statement of Objections. In addition, on 14 March 2018 Google sent a letter requesting that Commission investigate whether FairSearch still has a legitimate interest in Case AT.40099 with a view to: (i) rejecting its complaint; and (ii) discounting submissions made by FairSearch since at least November 2015.

(35)   On 27 March 2018, the Commission met with Google.

(36)   On 5 April 2018, the Commission sent a request for information pursuant to Article 18(2) of Regulation (EC) No 1/2003 to Google, concerning Google's corporate structure, value of sales and turnover during the previous full business year.

(37)   On 11 April 2018, the Commission sent Google a letter (the "Second Letter of Facts") informing it about pre-existing evidence to which Google already had access but which was not expressly relied upon in the Statement of Objections or First Letter of Facts but which, on further analysis of the Commission's file, could be relevant to support the preliminary conclusions reached in the Statement of Objections. The Commission also informed Google in the Second Letter of Facts about additional evidence obtained by the Commission after the adoption of the First Letter of Facts.

(38)   Following the adoption of the Second Letter of Facts, the Commission granted access

**EN**                              15                              **EN**

GOOG-DOJ-26429178

to the file to Google. To this end, on 12 April 2018, the Commission provided Google with access to the non-confidential documents in the file added since 1 September 2017. Access to one document was provided subject to an existing NDA.

(39) On 30 April 2018, Google submitted a response to the Commission's request for information.

(40) On 7 May 2018, Google submitted a response to the Second Letter of Facts (the "Response to the Second Letter of Facts"). On the same day, Google also requested the opportunity to develop its arguments at an oral hearing.

(41) On 18 May 2018 the Commission refused Google's request for an oral hearing.

(42) On 11 June 2018, Google submitted a letter entitled "the Commission has failed to assess Google's Android agreements in their relevant economic and legal context".

(43) On 20 June 2018, Google submitted a letter requesting that it be afforded at least 90 days to comply with any remedies that the Commission may impose.

(44) On 21 June 2018, at Google's request, the Commission provided Google with two letters received from third parties.

(45) On 27 June 2018, Google submitted its observations on these letters.

## 4.  GOOGLE'S ALLEGATIONS THAT THE COMMISSION'S INVESTIGATION SUFFERS FROM PROCEDURAL ERRORS

(46) Google claims that the Commission's investigation suffers from a number of procedural errors.

(47) First, the Commission granted access to file in a fragmented, time-consuming and difficult manner that was completed one day before the deadline for the Response to the Statement of Objections. Moreover, the Commission failed to provide Google with direct access to 142 documents.

(48) Second, the Commission has breached Google's rights of defence by not providing it with adequate access to minutes of meeting with third parties.[8]

(49) Third, the Commission has failed to assess the evidence properly by: (i) relying on documents and data that contradict the Commission's findings, (ii) ignoring exculpatory material that has been added to the file, (iii) misrepresenting and mischaracterising the meaning of documents in the case file, (iv) quoting selectively from the documents, (v) relying on speculation and unsupported conjecture as evidence, and (vi) failing to investigate matters that are central to the Commission's case.[9]

(50) Fourth, the Commission should discount submissions made by FairSearch since at least November 2015 because they "*were made on behalf of an entity whose members had no relevant knowledge of the matters at issue and were motivated solely by a common desire to harm Google*".[10]

(51) For the reasons set out in recitals (52) to (61) the Commission's investigation does

---

[8]   Google's Response to the Statement of Objections, Part Eight, pages 336-348 (Doc ID 7117).
[9]   Google's Response to the First Letter of Facts, Executive Summary, pages iv-xii (Doc ID 8598).
[10]  Google's letter of 14 March 2018 concerning FairSearch (Doc ID 8773).

**EN**

**EN**

GOOG-DOJ-26429179

not suffer from any of the alleged procedural errors mentioned in recitals (47) to (50).

**4.1.    The Commission's alleged failure to grant access to the file in a timely and complete manner**

(52)    For the reasons set out in this Section, the Commission granted access to the file in a timely and complete manner.

(53)    First, the Commission struck an appropriate balance between the proper exercise of Google's rights of defence and the right of information providers to protect their business secrets and other confidential information.[11]

(54)    On the one hand, the Commission granted Google access to non-confidential versions of the documents in the Commission's file. The Commission also granted Google's advisors access to entirely unredacted or less redacted versions of documents in the case file subject to thirty NDAs by disclosing documents to Google's advisors subject to confidentiality ring arrangements or pursuant to seven data room procedures.[12]

(55)    On the other hand, the 142 documents mentioned by Google to which the Commission granted Google's advisors access subject to NDAs, contained business secrets and other confidential information within the meaning of Article 339 of the Treaty, Article 27(2) of Regulation (EC) No 1/2003, and Articles 15(2) and 16(1) of Regulation (EC) No 773/2004. Access by Google's advisors was in this case a sufficient and proportionate means to ensure the respect of Google's rights of defence.

(56)    Second, between 3 May and 26 August 2016, the Commission gave Google, directly or through its advisors, access to confidential or non-confidential versions of the documents on the file. Google therefore had a period of almost four months to prepare its Response to the Statement of Objections, which it submitted on 23 December 2016.

(57)    Third, the period of approximately eight months that the Commission granted Google to prepare its Response to the Statement of Objections was, in light of the complexity of the case,[13] sufficient to allow Google to exercise its rights of defence. In particular, Google gave a detailed exposition of its views on each essential allegation made by the Commission.[14]

(58)    Fourth, the Commission's conclusion is not affected by Google's claim that the

---

[11]    Case T-30/91 *Solvay v Commission*, EU:T:1995:115, paragraph 88; Case T-36/91 *ICI v Commission*, EU:T:1995:118, paragraph 98; Joined Cases T-305/94 *LVM v Commission*, EU:T:1999:80, paragraph 1016; Joined Cases T-25/95 etc *Cimenteries and Others v Commission*, paragraph 147; Case T-203/01 *Michelin v Commission*, EU:T:2003:250, paragraph 125; Case T-410/03 *Hoechst v Commission*, EU:T:2008:211, paragraph 153; Case C-450/06 *Varec v Belgian State*, paragraph 52.

[12]    Data rooms took place on 30 August 2016 to 2 September 2016, 7 and 10 October 2016, 3 November 2016, 2 to 6 December 2016, 12 December 2016, 6 September 2017 and 4 October 2017.

[13]    Joined Cases 40/73 etc *Suiker Unie and Others v Commission*, EU:C:1975:174, paragraphs 94 to 99; Case 27/76 *United Brands* v Commission, EU:C:1978:22, paragraphs 270 to 273; Joined Cases T-25/95 etc *Cimenteries and Others v Commission*, paragraph 653; Case T-9/99 *HFB and Others v Commission*, EU:T:2002:70, paragraph 344; Case T-16/99 *Lögstör Rör v Commission*, EU:T:2002:72, paragraph 178; Case T-44/00 *Mannesmannröhren-Werke v Commission*, EU:T:2004:218, paragraph 62.

[14]    See, by analogy Case T-62/98 *Volkswagen v Commission*, EU:T:2000:180, paragraph 313.

EN

EN

GOOG-DOJ-26429180

Commission provided it with less redacted non-confidential versions of certain documents between 26 August 2016 and 22 December 2016.

(59)     In the first place, prior to 26 August 2016, the Commission had provided Google, directly or through its advisors, with access to confidential or non-confidential versions of all documents on the file. The additional information provided to Google between 26 August and 22 December 2016 was limited.

(60)     In the second place, any delay in providing access to certain non-confidential versions of documents was taken into account when granting extensions of the time-limit for Google to respond to the Statement of Objections.

(61)     In the third place, the fact that, following Google's requests, the Commission provided it on an ongoing basis with less redacted non-confidential versions of certain documents is not out of the ordinary in investigations in competition matters.[15]

## 4.2.     The Commission's alleged failure to provide Google with adequate access to minutes of meetings with third parties

(62)     For the reasons set out in this Section, the Commission provided Google with adequate access to minutes of meetings with third parties.

(63)     First, on 28 February 2018 the Commission provided Google with minutes of the meetings and calls that the Commission had with third parties concerning the subject matter of the investigation. These minutes were obtained by agreement with the third parties concerned.

(64)     Second, there are no other documents in the Commission's possession that contain any further account of the meetings concerned.

(65)     Third, Google has not brought forward specific arguments as to how and why the alleged failure of the Commission to provide fuller meeting notes has impeded the effective exercise of its rights of defence.

## 4.3.     The Commission's alleged failure to assess the evidence properly

(66)     For the reasons set out in this Section, the Commission has properly assessed the evidence in this case.

(67)     As a preliminary point, Google's claims are in effect a challenge to the merits of the Commission's assessment of its conduct and are therefore irrelevant to the question of whether the Commission's investigation suffers from a number of procedural errors.

(68)     First, in relation to points (i) to (iv) of Google's claim outlined in recital (49), the fact that the Commission does not make use of all the information contained in a submission does not imply that the submission is, in its entirety, of weak probative value. This is because it is normal that some information is irrelevant or that certain information is supported more convincingly by other evidence.[16]

---

[15]     Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004 (Text with EEA relevance) OJ C 325/7, 22.12.2005, p. 7, paragraph 47.

[16]     Case T-112/07 *Hitachi v Commission*, EU:T:2011:342, paragraph 144; Case T-133/07 *Mitsubishi Electric v Commission*, EU:T:2011:345, paragraph 114.

**EN**                                                    18                                                    **EN**

GOOG-DOJ-26429181

(69)     Second, in relation to point (ii) of Google's claim outlined in recital (49), the Commission has not ignored exculpatory material that has been added to the file. Google has had the opportunity to draw the Commission's attention to allegedly exculpatory evidence in the file and to make arguments based on such allegedly exculpatory evidence.

(70)     Third, in relation to points (i) to (v) of Google's claim outlined in recital (49), it is not necessary for every item of evidence adduced by the Commission to be sufficiently precise and consistent to establish every aspect of the separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13 and the single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement described in Section 14. It is sufficient that the body of evidence relied on by the Commission, viewed as a whole, meets that requirement.[17] In that regard, the Commission may take into account all types of evidence,[18] including evidence submitted by market players, parties to the administrative procedure[19] and non-technical evidence.[20]

(71)     Fourth, in relation to point (vi) of Google's claim outlined in recital (49), the Commission is not required to reply to all the arguments of an undertaking under investigation or to carry out further investigations, where it considers that its investigation of a case is sufficient.[21]

### 4.4.     The Commission's alleged obligation to discount FairSearch's submissions since at least November 2015

(72)     The Commission considers that there are no grounds for discounting FairSearch's submissions since at least November 2015. This is because, irrespective of whether FairSearch still has an ongoing legitimate interest in Case AT.40099, the Commission is entitled to take into account all types of evidence in its investigations.[22]

### 5.     PRODUCTS CONCERNED BY THIS DECISION

(73)     This Decision concerns the following products:

    (1)     smart mobile devices;

    (2)     operating systems for smart mobile devices;

    (3)     apps;

    (4)     smart mobile app stores;

    (5)     application programming interfaces;

    (6)     general search services; and

---

[17]     Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 477.
[18]     Case T-343/06 *Shell Petroleum and Others v Commission*, EU:T:2012:478, paragraph 171.
[19]     Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 79.
[20]     Case T-342/07 *Ryanair v Commission*, EU:T:2010:280, paragraph 136; Case T-175/12 *Deutsche Börse v Commission*, EU:T:2015:148, paragraph 133.
[21]     Case T-141/94 *Thyssen Stahl v Commission*, EU:T:1999:48, paragraph 110; Case T-758/14 *Infineon v Commission*, EU:T:2016:737, paragraph 110.
[22]     Case T-343/06 *Shell Petroleum and Others v Commission*, EU:T:2012:478, paragraph 171.

**EN**                                                    19                                                    **EN**

GOOG-DOJ-26429182

(7)   web browsers.

## 5.1.   Smart mobile devices

(74)   Smart mobile devices are mobile devices with advanced Internet browsing, multimedia and app capabilities. Smart mobile devices are available in a variety of designs, and with a range of different features and hardware components. There are, broadly speaking, two types of smart mobile devices: smartphones and tablets.[23]

(75)   Smartphones are wireless telephones with advanced Internet browsing and app capabilities. Smartphones incorporate hardware and software features that enable them to fulfil many of the functions traditionally associated with state of the art computing.[24] There is no industry standard definition of a smartphone, but rather a spectrum of functionalities.[25] Smartphones vary in terms of size, weight, durability, screen size, audio quality, camera size/zoom, web speed, computer processing power, memory, ease-of-use, optical quality, casing quality/design, and additional multimedia offerings.[26]

(76)   Tablets are mobile devices in the spectrum between a smartphone and a personal computer ("PC"). Tablets are generally operated using a touch screen. Tablets are based on similar hardware to advanced touch-screen based smartphones, and provide a rich multimedia experience along with many of the functions of a PC.[27]

(77)   The distinction between smartphones and tablets is not necessarily clear-cut. Devices combining the characteristics of both smartphones and tablets have been launched. These devices have both full voice transmission capabilities and a relatively large screen size, and are commonly called "phablets".[28]

(78)   Smart mobile devices are sold by OEMs either directly to users or to MNOs, who in turn sell them to users under their respective brands.

## 5.2.   Operating systems for smart mobile devices

(79)   Smart mobile devices need an operating system ("OS") to run on.[29] OSs are system software products that control the basic functions of a computer and enable users to make use of such a computer and run software on it.[30] OSs that are designed to support the functioning of smart mobile devices and the corresponding apps are hereinafter referred to as "smart mobile OSs".

(80)   Smart mobile OSs typically provide a graphical user interface ("GUI"), application programming interfaces ("APIs"), and other ancillary functions. These are required for the operation of a smart mobile device and enable new combinations of functions to offer richer usability and innovations.

---

[23]   Commission decision in Case M.6381 – Google / Motorola Mobility, footnote 13.
[24]   Commission decision in Case M.7202 – Lenovo / Motorola Mobility, paragraph 14.
[25]   For example, in addition to mobile voice and text message communication, the latest smartphones include advanced hardware (e.g. touch-screen interfaces, flash storage, GPS navigation, WI-FI) and software (rich web browsers, full-featured e-mail accounts, a sophisticated user interface etc.), and a range of other functions (including music and video streaming; downloading; playback; video calling; cameras and camcorders; GPS; radio receiver; personal digital assistant functions; USB, Bluetooth etc.).
[26]   Commission decision in Case M.7202 – Lenovo / Motorola Mobility, paragraph 14.
[27]   Commission decision in Case M.7202 – Lenovo / Motorola Mobility, paragraph 15.
[28]   Commission decision in Case M.7047 – Microsoft / Nokia, paragraph 12.
[29]   Commission decision in Case M.6381 – Google / Motorola Mobility, paragraph 22.
[30]   Commission decision in Case COMP/C-3/37.792 – Microsoft, paragraph 37.

**EN**                                      20                                      **EN**

GOOG-DOJ-26429183

(81)   Apps written for a given smart mobile OS will typically run on a smart mobile device using the same OS, regardless of the manufacturer. Figure 1 shows the functions of the smart mobile OS.

**Figure 1: Functions of a smart mobile OS[31]**



(82)   Smart mobile OSs combine the features of a PC OS with touchscreen, cellular, Bluetooth, WiFi, GPS mobile navigation, camera, video camera, speech recognition, voice recorder, music player, near field communication, personal digital assistant ("PDA") and other features. While certain features of a smart mobile device are not dependent upon a technical interface with the smart mobile OS, others require a more substantial technical interface with it. Moreover, certain characteristics such as speed and memory size are at least partially influenced by the quality of the smart mobile OS.[32]

(83)   Smart mobile OSs are developed by vertically integrated OEMs such as Apple Inc. ("Apple") or BlackBerry Limited ("BlackBerry") for captive use in their own smart mobile devices ("non-licensable smart mobile OSs"), or by providers such as Google or Microsoft Corp. ("Microsoft"), which then license their smart mobile OS to OEMs ("licensable smart mobile OSs"). The licensing of a smart mobile OS therefore constitutes an economic activity upstream from the level of sales of smart mobile devices to users.

## 5.3.   Apps

(84)   Apps are types of software through which users can access World Wide Web ("web") content and services on their smart mobile devices. Apps can be "standalone" and serve offline tasks (such as games or photography) or incorporate some form of online service (such as geolocation or integration with social networks).[33] Apps are optimised for the characteristics of smart mobile devices, as compared with PCs, such as reduced text input, limited screen size or convenience of touch-based interfaces.[34]

(85)   Apps can principally be divided into native and non-native ones. Native apps are

---

[31]   Commission decision in Case M.6381 – Google / Motorola Mobility, paragraph 22.
[32]   Commission decision in Case M.6381 – Google / Motorola Mobility, paragraph 23.
[33]   Non-confidential version of the complaint by FairSearch of 25 March 2013 (Doc ID 17), paragraph 25.
[34]   Non-confidential version of the complaint by FairSearch of 25 March 2013 (Doc ID 17), paragraph 25.

GOOG-DOJ-26429184

apps written in a specific programming language of a given device – for example Java for the Android OS.[35] Non-native apps are developed for several smart mobile OSs using a cross-platform SDK.[36]

## 5.4.    Smart mobile app stores

(86)    The development of smart mobile devices has led to the emergence of a new type of software: digital distribution platforms, constituted by online services and related apps that are dedicated to enabling users to download, install and manage a wide range of diverse apps from a single point in the interface of the smartphone.[37] These digital distribution platforms are called smart mobile app stores ("app stores").[38]

(87)    The most widely used app stores are specific to a smart mobile OS ("Play Store" for Google Android,[39] "App Store" for the OS of Apple, iOS, "Windows Mobile Store" for the OS of Microsoft, Windows Mobile,[40] and "BlackBerry World" for the OS of BlackBerry, BlackBerry OS).[41]

(88)    App stores are generally available to users for free. Users only pay to download certain apps or acquire paid content within apps ("in-app purchases"). Developers of revenue-generating apps pay an app store a fixed percentage of their app-related revenues when users pay for the download of apps or make in-app purchases.

## 5.5.    Application programming interfaces (APIs)

(89)    An API is a particular set of rules and specifications that a software program follows in order to access and make use of the services and resources provided by another software program or hardware that also implements that API.

(90)    In essence, APIs allow software programs and hardware, or different software programs, to communicate with each other.

(91)    In the smart mobile device environment, APIs are important as they allow app developers to integrate "cloud" web services directly in their apps. This allows app developers to offload computationally challenging or data intensive tasks to cloud computers,[42] in order not to impact the storage, performance or battery of a smart mobile device.[43] Due to the technical limitations of smart mobile devices compared

---

[35]    Non-confidential responses to Question 17.1 of the request for information of 12 June 2013 to app developers and non-confidential responses to Question 23.1 of the request for information of 12 June 2013 to OEMs.

[36]    Yandex's non-confidential response to Question 17.1 of request for information of 12 June 2013 to app developers (Doc ID 4601) and Nokia's non-confidential response to Question 23.1 of the request for information of 12 June 2013 to OEMs (Doc ID 764).

[37]    Non-confidential version of the complaint by Aptoide of 16 June 2014 (Doc ID 874), page 6, and non-confidential version of the complaint by FairSearch of 25 March 2013 (Doc ID 17), paragraph 85.

[38]    There are also certain app stores developed exclusively for PCs. Those app stores serve a different purpose compared to mobile app stores, as they allow users to download software for PCs rather than smart mobile devices. For this reason, they are not relevant for the purposes of this investigation, which focusses on app stores for Android.

[39]    See Section 6.2.2.1.II.

[40]    In this Decision, references to "Windows Mobile" include all versions and iterations of Microsoft's smart mobile OS, including Windows Phone, Windows RT, Windows Mobile and Windows 10 Mobile.

[41]    Non-confidential version of the complaint by FairSearch (Doc ID 17), paragraph 85.

[42]    Cloud computing is the practice of using a network of remote servers hosted on the Internet to store, manage, and process data, rather than a local server or a personal computer.

[43]    See Jonathan Strickland, "How the Google Cloud Works" (8 August 2011), available at http://computer.howstuffworks.com/cloud-computing/google-cloud1.htm, printed and saved on 11

**EN**

**EN**

GOOG-DOJ-26429185

to PCs, cloud services and related APIs have a particularly important role in the smart mobile environment.[44]

(92)    Google offers APIs that allow app developers to integrate within their apps a number of Google's services. Figure 2 shows how the Google API Client provides an interface for connecting to any of the available Google services such as those related to online games ("Google Play Games") and cloud storage ("Google Drive").

**Figure 2: Google API Client[45]**



(93)    Another example is the integration of Google's mapping, navigation and geolocation service ("Google Maps") within a third party app. This is shown in Figure 3.

---

April 2016 and Preston A. Cox, "Mobile cloud computing" (11 March 2011), available at http://www.ibm.com/developerworks/cloud/library/cl-mobilecloudcomputing/, printed and saved on 11 April 2016.

[44]   See Jonathan Strickland, "How the Google Cloud Works" (8 August 2011), available at http://computer.howstuffworks.com/cloud-computing/google-cloud1.htm, printed and saved on 11 April 2016, and see the comment by Dianne Hackborn, "Android developer at Google", available at http://arstechnica.com/information-technology/2014/02/neither-microsoft-nokia-nor-anyone-else-should-fork-android-its-unforkable/?comments=1&post=26199423#, printed and saved on 11 April 2016.

[45]   See "Accessing Google APIs" (23 February 2016), available at https://developers.google.com/android/guides/api-client, printed and saved on 11 April 2016.

**EN**                              23                              **EN**

GOOG-DOJ-26429186

**Figure 3: Integration of Google Maps within a third party app[46]**



## 5.6.    General search services

(94)    General search[47] services allow users to search for information across the entire Internet. Alternative ways of discovering content include specialised search services, social networks and content sites.

(95)    While the user interface of a general search service may vary depending on whether they are accessed via PCs or smart mobile devices, the underlying technology is essentially the same.

(96)    General search services are generally provided on the basis of search engines. A search engine is a coordinated set of programmes that normally includes: (i) a spider (also called a "crawler" or a "bot") that goes to every page or representative pages on a web site that wants to be searchable and reads it; (ii) a programme that creates an index (sometimes called a "catalogue") from the pages that have been read; and (iii) a programme that allows users to enter a keyword or a string of keywords ("query"), compares it to the entries in the index, and returns the results which are relevant to the query.

(97)    The latter programme is called a search algorithm, which contains processes and formulas that rely on unique signals or "clues" that make it possible to come up with results that are relevant to the query.[48]

---

[46]    See "Accessing Google APIs" (23 February 2016), available at https://developers.google.com/android/guides/api-client, printed and saved on 11 April 2016 and Google's presentation to the case team "AOSP and APIs" (July 2015) (Doc ID 4740).

[47]    "General search" is also known as "online search" or "horizontal search". The Commission uses the terms "general search" throughout this Decision.

[48]    These signals include things like the terms on websites, the freshness of content, the user's location, and the ranking of the website, see "Algorithms", available at https://www.google.com/insidesearch/howsearchworks/algorithms.html, printed and saved on 11 April 2016. They can also include signals coming out of an in-built artificial intelligence system that interprets queries, see, e.g., Jack Clark, "Google Turning Its Lucrative Web Search Over to AI Machines" (26 October 2015), available at http://www.bloomberg.com/news/articles/2015-10-26/google-turning-its-lucrative-web-search-over-to-ai-machines; printed and saved on 11 April 2016; or

**EN**                                    24                                    **EN**

GOOG-DOJ-26429187

(98)     There are three main categories of search algorithms: general search algorithms, specialised search algorithms and search advertisement algorithms. General search algorithms run across all types of pages. Specialised search algorithms are specifically optimised for identifying relevant results for a particular type of information,[49] such as news, local businesses or product information. Specialised search algorithms are used for specialised search services,[50] which are different from general services for a variety of reasons beyond their nature and technical features.

(99)     In addition to the general and specialised search algorithms, a general search service can run a third category of search advertisement algorithms that provides search advertisements matching a user's search query.

(100)    A number of different companies offer general search services. Some of them use their own search engine, such as Google, Microsoft (Bing),[51] Seznam.cz, a.s. ("Seznam")[52] and Orange S.A. ("Orange").[53] Others show results of a third party general search engine (often Google or Bing) with which they have an agreement. This is the case for example of Yahoo Inc. ("Yahoo"),[54] AOL Inc. ("AOL")[55] and InterActiveCorp ("Ask")[56], which return results powered by other general search engines.

(101)    General search services can be accessed on smart mobile devices via a number of different entry points. For instance, for Android, these include the following:

---

Matthew Richardson, Amit Prakash & Eric Brill, "Beyond PageRank: Machine Learning for Static Ranking" (23-26 May 2006), http://www2006.org/programme/files/pdf/3101.pdf, printed and saved on 12 April 2016.

[49]     Google's submission of 7 September 2010, "*Comparing apples with oranges – How Google ranks Universal results from specialized content-specific search algorithms within web search*", paragraph 2 (Doc ID 4774).

[50]     "Specialised search" is also referred to as "vertical search" or "universal search". The Commission uses the terms "specialised search" and "specialised search results" throughout this Decision.

[51]     See Danny Sullivan, "The Microsoft-Yahoo Search Deal, In Simple Terms" (30 June 2009), available at http://searchengineland.com/microsoft-yahoo-search-deal-simplified-23299, printed and saved on 11 April 2016.

[52]     Seznam's non-confidential response to Question 2 of the request for information of 3 October 2011 and its updated response of 26 February 2016 (Doc IDs 4076 and 4371).

[53]     Orange's non-confidential response to Question 1 of the request for information of 3 October 2011 (Doc ID 4594).

[54]     See Danny Sullivan, "The Microsoft-Yahoo Search Deal, In Simple Terms" (30 June 2009), available at http://searchengineland.com/microsoft-yahoo-search-deal-simplified-23299, printed and saved on 11 April 2016.

[55]     See "About AOL Search", available at http://search.aol.com/aol/about?v_t=na#webhome, printed and saved on 11 April 2016, which reads: "*Web search results are Websites listed in order of relevance, with listings with the highest relevance appearing first. These listings are administered, sorted and maintained by Google.*" See also AOLs non-confidential response to Question 8 of the request for information of 19 November 2015 to Search providers (Doc ID 3177).

[56]     Ask operated its own search technology until November 2010. See Tom Krazit, "IAC bows to Google, kills search at Ask.com" (9 November 2010), available at http://news.cnet.com/8301-30684_3-20022253-265.html?tag=mncol;4n, printed and saved on 31 May 2018. Since then, its search results have been fed by a third party. See Charles Arthur, "Ask.com gives up on search on Google takes over-adieu Jeeves" (9 November 2010), available at https://www.theguardian.com/technology/blog/2010/nov/09/ask-com-search-engine-gives-up, printed and saved on 11 April 2016.

**EN**                                           25                                           **EN**

GOOG-DOJ-26429188

(1)   search widget[57] (or Quick Search Bar);

(2)   search app;

(3)   URL line (also called "Omnibox") in web browser;

(4)   search bar in notification area;

(5)   search bar on the lock screen;

(6)   default home page of browser;

(7)   hardware search button;

(8)   soft search button;

(9)   long-press of the home button;

(10)  voice search; and

(11)  search bookmark in browser.

## 5.7.   Web browsers

(102)   Web browsers are software used by users of client PCs, smart mobile devices and other devices to access and interact with web content hosted on servers that are connected to networks such as the Internet.

(103)   Users can access web content through a web browser by typing the relevant Uniform Resource Locator ("URL") into the browser. Alternatively, they can search for specific content via an embedded general search service, either in the same box where the URL can be typed, or in a dedicated "search box".[58]

(104)   In addition, web browsers typically offer a set of additional features. These include the following:

(1)   proxy configuration[59] (to specify how the web browser accesses web content);

(2)   management of plug-ins to handle additional content types (such as Flash or Java programs);

(3)   bookmarking (to keep track of useful web page addresses);

(4)   HTML[60] (Hypertext Markup Language) pre-processing (to filter out unwanted

---

[57]   Widgets are accessible on a user's home screen and offer an at-a-glance view of an app's most important data and functionality. See "Widgets", available at http://developer.android.com/design/patterns/widgets.html, printed and saved on 11 April 2016.

[58]   Whereas on a PC the significant majority of access to web content takes places via the web browser as the general entry point, web content on smart mobile devices is mostly consumed via apps. See Sarah Perez, "Majority of Digital Media Consumption Now Takes Place In Mobile Apps" (21 August 2014), available at http://techcrunch.com/2014/08/21/majority-of-digital-media-consumption-now-takes-place-in-mobile-apps/, printed and saved on 11 April 2016.

[59]   Proxy settings are used to tell the web browser the address of the proxy server. Microsoft describes a proxy server as a "[…] *computer that functions as an intermediary between a web browser (such as Internet Explorer) and the Internet. Proxy servers help improve web performance by storing a copy of frequently used webpages. When a browser requests a webpage stored in the proxy server's collection (its cache), it is provided by the proxy server, which is faster than going to the web. Proxy servers also help improve security by filtering out some web content and malicious software. Proxy servers are used mostly by networks in organizations and companies.*" See "What is a proxy server?", available at http://windows.microsoft.com/en-us/windows-vista/what-is-a-proxy-server, printed and saved on 11 April 2016.

**EN**

**EN**

GOOG-DOJ-26429189

or dangerous content);

(5)   cookie management (allowing users to keep control of small text files deposited by many web pages into web browsers in order to enable recognition of previous visitors);

(6)   pop-up blocker (to manage web page window behaviour);

(7)   tabbed browsing interface (to keep open several web pages at once);

(8)   website certificate checker (to ascertain web page credentials and to protect against phishing);[61]

(9)   offline cache (to keep a copy of accessed online content for later offline usage); and

(10)  history (of visited locations on the web).

## 6.   GOOGLE'S ACTIVITIES IN THE MOBILE INDUSTRY

### 6.1.   Overview of Google's business activities

(105)  Google's business model is based on the interaction between, on the one hand, online products and services it offers free of charge to users and, on the other hand, its online advertising services, from which it derives the majority of its revenues.[62]

(106)  Google's flagship online service for users is its general search service ("Google Search"). When a user enters a query in Google Search, Google's general search results pages return different categories of search results, including generic search results[63] and specialised search results.[64] In addition, Google Search may return a third category of results, namely online search advertisements drawn from Google's auction-based online search advertising platform, AdWords.

(107)  Google offers a number of other products and services free[65] of charge to users. In addition to the smart mobile OS, Android, these include for example a web-based app store ("Play Store"), a web browser ("Google Chrome"), a web-based email account service ("Gmail"), a file storage and editing service offering a suite of office apps (Google Drive), an online mapping, navigation and geolocation service (Google Maps), an online video streaming service ("YouTube") and a social networking

---

[60]   HTML is a standard approved by the International Organisation for Standardisation (ISO/IEC 15445:2000) for the creation of web pages.

[61]   "Phishing" is a fraudulent means used by cybercriminals to obtain sensitive information, such as credit card numbers or bank account numbers, for example by sending emails in which they disguise themselves as a company with which the recipient might have an online account and try to get the recipient to enter his login and password on a fake login page.

[62]   Google's response to the complaint by FairSearch, paragraph 4 (Doc ID 1584). In 2016, online advertising accounted for 88.7% of Google's total revenues, 80% of which was generated via Google's own websites, in particular Google Search's homepage. Source: "Google's Form 10-K Annual Report for the US fiscal year ending 31 December 2016", available at https://abc.xyz/investor/pdf/20161231_alphabet_10K.pdf, printed and saved on 13 June 2017.

[63]   "Generic search results" are also known as "organic search results" or "natural search results". The Commission uses the term "generic search results" throughout this Decision.

[64]   "Specialised search results" are also known as "vertical search results" or "universal search results". The Commission uses the term "specialised search results" throughout this Decision.

[65]   Google offers also some paid services, such as Google Play Music and Movie and for some of the free products there exists also a paid premium version, such as YouTube or Google Drive.

**EN**                                     27                                     **EN**

website ("Google Plus").

(108)    A number of these products and services are also search-driven, such as YouTube and Maps, and thus are of importance for the machine learning aspects of Google's general search service. The latest iteration of Google's machine learning technology used in its search services is called "RankBrain".[66] RankBrain uses mathematical processes and an advanced understanding of language semantics to gradually learn more about how and why people search and apply those conclusions to future search results.[67] It has become an important signal contributing to the result of a general search query.[68]

(109)    Google also collects data via its products and services, such as Chrome, Google Maps, YouTube and Gmail. This ensures that Google receives a steady stream of user information that it can feed back into its search and search advertising business.[69]

(110)    For example, an Android user signed into a Google account and running Google's apps generates a stream of varied signalling information – ranging, for example, from where a user lives, works and commutes to work and which phone numbers on web advertisements it dials.[70] The consumer behaviour and device use data that Google collects from smart mobile devices using Android OS, its proprietary applications and APIs for Android includes:[71]

- contact information (name, address, email address, telephone number);

- account authentication data (username and password);

- demographic information (gender and date of birth);

- information generated by the user through the use of the service (e.g. Gmail messages, user's query including audio, G+ profile, photos, videos and other Google-hosted content);

- credit or debit card details or bank/payment account numbers and associated details (e.g. expiry date/CVV used for Google Payments or identity

---

[66]    See Jack Clark, "Google Turning Its Lucrative Web Search Over to AI Machines" (26 October 2015), available at http://www.bloomberg.com/news/articles/2015-10-26/google-turning-its-lucrative-web-search-over-to-ai-machines, printed and saved on 11 April 2016; or Cade Metz, "AI is transforming Google Search. The rest of the web is next" (02 April 2016), available at http://www.wired.com/2016/02/ai-is-changing-the-technology-behind-google-searches/, printed and saved on 11 April 2016.

[67]    See Jayson DeMers, "What Is Google RankBrain and Why Does It Matter?" (12 November 2015), available at http://www.forbes.com/sites/jaysondemers/2015/11/12/what-is-google-rankbrain-and-why-does-it-matter/#6771c1bc301a, printed and saved on 11 April 2016.

[68]    Jack Clark, see footnote 66, quoting Greg Corrado, a senior research scientist with Google.

[69]    See "Google Product Privacy Guide", available at http://www.google.com/intl/en/policies/technologies/product-privacy/, printed and saved on 11 April 2016. In light of the wide-spread integration of Google's services into third-party apps (see recital (142), data will be even collected if users do not use a Google app.

[70]    See Benedict Evans, "What does Google need from Android? (20 January 2013), available at http://ben-evans.com/benedictevans/2013/1/20/what-does-google-need-from-android, printed and saved on 11 April 2016. Data is also important for the machine learning aspects of search-based services, see e.g. Ben Geier, "This Is Google's Plan to Save YouTube" (18 May 2015), available at http://time.com/3882422/google-youtube/, printed and saved on 12 April 2016.

[71]    Google's response to Question 25 of the request for information of 24 March 2017 (Doc ID 7790).

GOOG-DOJ-26429191

verification);

- transactional records from app, in-app and content purchases on the Play Store; Identity documents (e.g. government issued identity card/passport/bank statements);

- standard information sent to the web host by the browser software (IP address; URL, including referral terms;

- timestamp;[72]

- browser attributes, including browser and OS version;

- information about the content served to the user (advertisement, pages visited, etc.);

- interaction data, such as clicks;

- user preferences and other settings;

- location data;

- cookie data;

- device event information including crashes, system activity, hardware settings; Mobile device data (Hardware and OS version);

- unique device identifiers (e.g. International Mobile Equipment Identity, or "IMEI");

- unique advertising identifier, such as the Android Advertising ID;

- mobile network operator;

- battery and volume state;

- telephony log information, such as phone number, calling-party number, forwarding numbers, time and date of calls, SMS routing information and types of calls (used for Google Voice and Hangouts only); and

- device configuration information, such as installed applications, and app usage data.

(111) The ability to collect and combine different valuable user data from its apps and services allows Google to strengthen its ability to present relevant search responses and relevant search advertisements.[73]

## 6.2. The shift to mobile and Google's response

(112) Google developed its business model in a PC environment where the web browser was the core entry point to the Internet.

---

[72] Timestamps are typically used for logging events or in a sequence of events (SOE), in which case each event in the log or SOE is marked with a timestamp. In filesystems, timestamp may mean the stored date/time of creation or modification of a file.

[73] See "Welcome to the Google Privacy Policy" (version of 19 August 2015), available at https://www.google.com/policies/privacy/, printed and saved on 11 April 2016: "*We use the information we collect from all of our services to [...] offer you tailored content – like giving you more relevant search results and ads.*"

GOOG-DOJ-26429192

(113)   When in the mid-/late 2000s the Internet industry began to shift its focus from PCs to smart mobile devices, Google recognised the opportunities and risks that this shift could bring about for its search-advertising business model.

(114)   In terms of opportunities, Google recognised the potential for a significant increase in the use of Google's services[74] on smart mobile devices and the collection of valuable user data,[75] in particular related to location.[76] Smart mobile devices are a particular source of valuable user data, in particular in combination with other user data.[77] As Google's CEO, Eric Schmidt, explained: "*We are at the point where, between the geolocation capability of the phone and the power of the phone's browser platform, it is possible to deliver personalized information about where you are, what you could do there right now, and so forth—and to deliver such a service at scale.*"[78]

(115)   In terms of risks, the increase in the number of searches on smart mobile devices

---

[74]   See for example, e-mail of 26 May 2009, 5:pm, from [Google Executive] to Sergey Brin and other Google executives in relation to the 2008 Founders' Letter (Doc ID 1305-39872): "*It's hard to believe, but we are on the verge of a tipping point. It is possible that in 2009, more internet capable smartphones will ship than desktop PCs. [...] These changes are opening up opportunities for Google. Today, almost a third of all Google searches in Japan are coming from mobile devices. This is leading indicator of where the rest of the world will be soon. We are committed to optimizing our products (particularly Search!) for the most popular mobile platforms to take advantage of this trend.*"

[75]   See the substantial amounts of consumer behaviour and device use data that Google acquires from Google Android devices, its proprietary applications and APIs for Android, summarised in recital (110).

[76]   See email of 29 May 2010 from [Google Executive] to various Google executives, including [Google Executive] (Doc ID 1305-36754): "*We absolutely do care about this because we need wifi data collection in order to maintain and improve our wifi location service (especially after having Street View wifi data collection discontinued). Our wifi location database is extremely valuable to Google because it is not a competitive market, even worse than the map data market. Skyhook is the only other viable alternative and there would be incredible risk to depend on them.*" Another indication for the importance of location data is that in its Android developer guide material, Google strongly encourages developers to use its proprietary Google Location Services APIs instead of the AOSP location APIs, see https://developer.android.com/guide/topics/location/index.html, printed and saved on 17 August 2017. For more information on how Google collects location data, including via APIs, see the sources in the next footnote.

[77]   Google's response to Question 25 of the request for information of 24 March 2017 (Doc ID 7790). As Oracle points out in its non-confidential response to Question 1 of the request of information of 24 March 2017 and respective Annex C (Doc IDs 7835 and 7838), Google, collects current and historical location data even from devices not connected to a network; see also Keith Collins, "Google collects. Android users' locations even when location services are disabled" (21 November 2017), available at https://qz.com/1131515/google-collects-android-users-locations-even-when-location-services-are-disabled/ (printed and saved on 23 February 2018), Google's location data not only allows it to improve the relevance of its search results and search advertising. It also allows Google to offer additional services, such as allowing advertisers to measure their geographic performance or (physical store visit) ad conversion tracking, see e.g. the entries on "Measuring geographic performance" and "All conversions" on Google AdWords website, available at https://support.google.com/adwords/answer/2453994?hl=en (printed and saved on 13 June 2017) and https://support.google.com/adwords/answer/3419678?hl=en (printed and saved on 11 April 2016). Another indication of the value of location data is that it is traded over marketing platforms similar to the way keywords are traded on search platforms, see "xAd Unveils MarketPlace, the First Self-Service, Fully Transparent Platform for the Buying and Selling of Locations" (23 February 2016), available at http://www.xad.com/press-releases/xad-unveils-marketplace-the-first-self-service-fully-transparent-platform-for-the-buying-and-selling-of-locations/ (printed and saved on 13 June 2017).

[78]   See Eric Schmidt, "Google: Preparing for the Big Mobile Revolution" (20 January 2011), available at http://www.mobileworldlive.com/google-preparing-for-the-big-mobile-revolution/, printed and saved on 11 April 2016.

**EN**                                         30                                         **EN**

GOOG-DOJ-26429193

provided competing general search services with a chance to increase the numbers of search queries and data gathering. Google's 2007 annual report pointed out: *"If we are unable to attract and retain a substantial number of alternative device users to our web search services or if we are slow to develop products and technologies that are more compatible with non-PC communications devices, we will fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business."*[79]

(116)   Another risk was that users would use apps rather than web browsers to access content. Accessing content via apps rather than browsers meant that users would not use Google's general search service to discover content.[80]

(117)   When developing a strategy for responding to the shift to mobile, Google also had to take into account the fact that it was a relatively late entrant in the mobile space and that it was not vertically integrated in the production of smart mobile devices (like Apple).[81]

### 6.2.1.   *Google Search as default on smart mobile devices*

(118)   One step that Google took was to enter into agreements with OEMs and MNOs whereby Google Search became the default general search service on one or more entry points on their smart mobile devices.

(119)   For example, in 2007, Google entered into an agreement with Apple whereby Google Search became the default general search service on all Apple's smart mobile devices since the launch of the iPhone.[82] In 2010, Google Search accounted for more than half of the traffic on the iPhone and almost a third of all mobile Internet traffic.[83]

---

[79]   See *"Google Inc. SEC Form 10-K for Fiscal Year Ended December 31, 2007"*, page 28, available at http://www.sec.gov/Archives/edgar/data/1288776/000119312508032690/d10k.htm, printed and saved on 18 April 2016. On page 31 the report further states: "*More individuals are using non-PC devices to access the internet. If users of these devices do not widely adopt versions of our web search technology developed for these devices, our business could be adversely affected.*" Similar language about the risk that the shift away from PCs to non PC-devices could bring about for Google's business can be found in all of Google's 10-K reports since 2004 until today.

[80]   See Sarah Perez, "Majority of Digital Media Consumption Now Takes Place In Mobile Apps" (21 August 2014), available at http://techcrunch.com/2014/08/21/majority-of-digital-media-consumption-now-takes-place-in-mobile-apps/, printed and saved on 11 April 2016. See "Google Inc. SEC Form 10-K for Fiscal Year Ended December 31, 2012", page 28: "*In addition, search queries are increasingly being undertaken via "apps" tailored to particular devices or social media platforms, which could affect our share of the search market over time*", available at http://www.sec.gov/Archives/edgar/data/1288776/000119312513028362/d452134d10k.htm, printed and saved on 18 April 2016.

[81]   Google's response to the complaint by FairSearch, paragraph 30 (Doc ID 1584).

[82]   Apple's non-confidential response to Question 16 of the request for information of 17 July 2014 (Doc ID 1453). According to Morgan Stanley's "The Mobile Internet Report" (December 2009), page 35, the iPhone held a share of 65% of HTML mobile page views and 50% of mobile Internet and apps usage of all smartphones globally. See Cliff Edwards & Peter Burrows, "Apple, Microsoft Discuss Giving Bing Top iPhone Billing" (20 January 2010), available at http://www.bloomberg.com/bw/technology/content/jan2010/tc20100119_759795.htm, printed and saved on 11 April 2016.

[83]   See Ramu Nagappan, "Report: Google commands more than half of iPhone's Web traffic"(27 January 2010), available at http://www.macworld.com/article/1145926/google_iphone_traffic.html, printed and saved on 11 April 2016.

GOOG-DOJ-26429194

### 6.2.2.  *The development of Android and the Android ecosystem*

(120)   Another step that Google took was the acquisition and development of the mobile operating system, Android (Section 6.2.2.1).

(121)   Google also tried to garner support of a critical mass of OEMs, MNOs and other industry players willing to adapt a new operating system by developing the Android ecosystem, in particular via the Open Handset Alliance ("OHA") (Section 6.2.2.2).[84]

### 6.2.2.1.  The development of Android

### *I.      Android Open Source Project*

(122)   Android[85] is an operating system based on the Linux kernel and built on the programming language Java, albeit with important modifications. This has led to the fact that, while app developers could still use the Java language to write apps for Android, their apps would not run on the Java platform.[86]

**Figure 4: Android stack[87]**



(123)   Google acquired the original developer of Android, Android, Inc., in 2005.[88] It released the first Android version inside Google and the OHA in 2007, with the first

---

[84]     Google's response to the complaint by FairSearch, paragraphs 30 et seq. (Doc ID 1584).
[85]     For an explanation of how "Android" is used in this Decision, please see recital (131).
[86]     See Ruling by the Court of Appeals for the Federal Circuit of 9 May 2014 in *Oracle America, Inc. v. Google Inc.*, page 10, available at http://www.cafc.uscourts.gov/sites/default/files/opinions-orders/13-1021.Opinion.5-7-2014.1.PDF, printed and saved on 18 April 2016.
[87]     See "The Android Source Code", available at https://source.android.com/source/, printed and saved on 11 April 2016.
[88]     Google's response to the complaint by FairSearch, paragraph 19 (Doc ID 1584).

GOOG-DOJ-26429195

commercial Android phones coming out in 2008/9.[89]

(124)   Google makes the source code of Android available for free via the Android Open Source Project ("AOSP")[90] and under an open source[91] licence ("AOSP licence").[92] This means that anybody can access the AOSP source code and create modified versions of it (so-called "Android forks"). These were major selling points to get OEMs and MNOs to join the OHA.[93]

(125)   However, at the same time, Google has an important influence on the key steps of the development of Android.

(126)   First, Google does most of the development of the source code of the Android platform.[94]

(127)   Second, the governance model of Android is run by Google, which determines the roadmap, decides on features and new releases and tightly controls the compatibility of derivatives. Source code contributions by developers other than Google are verified and approved by people in the AOSP governance structure that are typically Google employees.[95] A part of the development of the code is also done privately by

---

[89]   See Kent German, "A brief history of Android phones" (2 August 2011), available at http://www.cnet.com/news/a-brief-history-of-android-phones/, printed and saved on 11 April 2016.

[90]   See "Google and the Open Handset Alliance Announce Android Open Source Availability" (21 October 2008), available at http://www.openhandsetalliance.com/press_102108.html, printed and saved on 13 April 2016.

[91]   "Open Source" denotes a specific way of developing and distributing software. A distribution of open source software (OSS, sometimes augmented as FOSS = Free and Open Source Software) contains at least the source code of the distributed software. It often additionally contains binary versions of the software, that is to say the result of compiling (translating) the source code into a language understood by the machine on which the binary version of the software is supposed to run. For developing software, in many settings this approach has the advantage that it is simple for users to adapt software to their needs. The availability of source code also facilitates the treatment of software bugs (that is to say programming errors) by essentially enlisting many of the software's users as co-developers. The Open Source Initiative operates a license review process to determine whether a given software license complies with the Open Source Definition (http://opensource.org/docs/osd printed and saved on 1 June 2018): there are several dozen approved open source licenses (http://opensource.org/licenses/alphabetical). In addition to the requirement of openly available source code the Open Source Definition also ensures that OSS can be modified and redistributed under the same license terms by its users.

[92]   See "The Benefits & Importance of Compatibility" (14 September 2012), available at http://officialandroid.blogspot.be/2012/09/the-benefits-importance-of-compatibility.html, printed and saved on 13 April 2016. This licence – the "Apache Software License, Version 2.0" – is also the preferred licence for the AOSP, see "Licenses", available at http://source.android.com/source/licenses.html, printed and saved on 13 April 2016.

[93]   See, e.g., Google internal presentation by [Google Executive], "Android – Answers to strategy questions for BOD", 8 October 2010, slide 3 (Doc ID 1790-397): "*Because of its Apache licensing model, we sent a strong signal that we are not controlling the platform;*" "*Because Google was historically seen as threat to operators, giving up control was a key component of operators adopting Android;*" email of 16 January 2012, 09:25 pm, from [Executive] at Orange, to [Google Executive], regarding the intended configuration of Orange devices (ID 1751-764): "*Android's positioning is as an open ecosystem, allowing operators and manufacturers to customise and differentiate, has played a major role in its success.*"

[94]   As of early 2012, Google had already invested over USD [500-600] million in developing Android, see email of 16 January 2012, 09:25 pm, from [Google Executive] to [Executive] at Orange, regarding the intended configuration of Orange devices (ID 1751-764).

[95]   See "Open Governance Index- Measuring the true openness of open source projects from Android to Webkit" (July 2011), page 16, available at http://www.visionmobile.com/product/open-governance-

---

**EN**                                        33                                        **EN**

GOOG-DOJ-26429196

Google.[96]

(128) Third, Google unilaterally decides when the source code of the Android platform is made available. Until October 2016, Google generally worked on the next version of the Android platform and released the source code of the Android platform in tandem with the launch of a flagship device,[97] which between 2010 and 2016 was a Google Nexus device developed together with a chosen OEM.[98] Google has confirmed that it releases the source code of the Android platform only after it has been developed and the first flagship devices have been launched: *"code updates (...) become available shortly after the launch of the newest Android lead device"*.[99] However, Google can delay (and has delayed) the release of the source code further. For example, in March 2011, Google announced that, for the time being, it would not be providing public access to the source code of the then latest version of Android – Honeycomb.[100]

(129) On 4 October 2016, Google unveiled its Pixel phones as the launch device for Android 7.1 Nougat.[101] Google's Pixel phones are no longer developed together with a chosen OEM but rather designed and marketed by Google. Google also declared that it currently has "no plans" to continue to develop Nexus devices together with a chosen OEM.[102]

(130) Google's important influence on the key steps of the development of Android is confirmed by evidence on the Commission's file. According to a report by the Open Governance Index analysing eight open source projects, *"[a]ll in all, Android is the most closed open source project, whilst also the most commercially successful mobile software platform to date."*[103] In its internal documents, Google states that it *"define[s] the standard and shape[s] the [Android] ecosystem"*.[104] [OS provider] indicates that Google holds *"the copyright to source code not released under open source licence, and decides when and to whom to disclose the new versions of*

---

index/, printed and saved on 11 April 2016. As to the roles within Android, see also See "Project Roles", available at http://source.android.com/source/roles.html, printed and saved on 11 April 2016.

[96]   See "Codelines, Branches, and Releases", available at https://source.android.com/source/code-lines.html, printed and saved on 11 April 2016:*"Deep development' on the next version of the platform will happen in private […]."*

[97]   See "Frequently Asked Questions", available at http://source.android.com/source/faqs.html#how-is-the-android-software-developed, printed and saved on 18 April 2016.

[98]   Google's response to the complaint by FairSearch, paragraph 98 (Doc ID 1584).

[99]   Google's response to the complaint by FairSearch, paragraph 98 (Doc ID 1584).

[100]   See Sean Hollister, "Google keeping Honeycomb source code on ice, says it's not ready for other devices" (24 March 2011), available at http://www.engadget.com/2011/03/24/google-keeping-honeycomb-source-code-on-ice-says-its-not-ready/, printed and saved on 11 April 2016.

[101]   See Brian Rakowski, VP Product Management, "Introducing Pixel, our new phone made by Google" (4 October 2016), available at https://blog.google/products/pixel/introducing-pixel-our-new-phone-made-google/, printed and saved on 13 June 2017.

[102]   See Dieter Bohn, "The Google Phone – The inside story of Google's bold bet on hardware", available at http://www.theverge.com/a/google-pixel-phone-new-hardware-interview-2016, printed and saved on 14 June 2017.

[103]   The other open source projects analysed include (in increasing order of openness): Qt, Symbian, MeeGo, Mozilla, WebKit, Linux and Eclipse. VisionMobile, "Open Governance Index. Measuring the true openness of open source projects from Android to WebKit" (July 2011), page 17, available at http://www.visionmobile.com/product/open-governance-index/, printed and saved on 11 April 2016.

[104]   Google internal presentation by [Google Executive], "Android – Answers to strategy questions for BOD", 8 October 2010, slide 4 (Doc ID 1790-397).

**EN**                                    34                                    **EN**

GOOG-DOJ-26429197

*Android source code"*.[105] Apple states that Google has a *"tight control of Android"*.[106] Amazon.com, Inc. ("Amazon") submits that not all versions of Android are made available under an open source licence.[107]

(131)    In this Decision, smart mobile devices that run on any version of Android, including Android forks,[108] are referred to as "Android devices". The versions of Android running on these devices are collectively referred to as "Android". In addition, smart mobile devices approved explicitly or tacitly[109] by Google as "Android compatible" are referred to as "Google Android devices". The versions of Android running on Google Android devices are collectively referred to as "Google Android". The term Google Android, therefore, excludes Android forks. Lastly, smart mobile devices which in addition to running on Google Android also pre-install the mandatory Google apps as defined in Section 6.3.2 are referred to as "GMS devices".

*II.    Play Store*

(132)    Google has offered an app store for Google Android since 2008. An early version of its app store was called Android Market, which in March 2012 was integrated into Google Play and became the Play Store.[110]

(133)    The Play Store is part of Google Mobile Services ("GMS"), the bundle of Google apps and services that Google licenses together.[111]

(134)    Unlike other Google apps, the Play Store is not downloadable and thus needs to be pre-installed by OEMs in order for users to have access to it. While Google does not prohibit the pre-installation of other app stores, developers cannot distribute alternative app stores via the Play Store.[112]

(135)    In order to have access to the Play Store, users need to have a Google Account. A

---

[105]    [OS provider]'s non-confidential response to Question 6 of the request for information of 12 June 2013 to OS providers […].

[106]    Apple's non-confidential response to Question 6 of the request for information of 12 June 2013 to OS providers (Doc ID 749).

[107]    Amazon's non-confidential response to Question 6 of the request for information of 12 June 2013 to OS providers (Doc ID 4187).

[108]    Technically, any modified version of the AOSP code can be considered a fork. Such fork, however, can be either compatible or incompatible with Google's CDD and CTS (see Section 6.3.1). For the purposes of this Decision, any reference to an Android fork is to a non-compatible fork, unless otherwise specified.

[109]    As discussed in footnote 436, the large majority of Google Android devices sold outside of China is accounted for by GMS devices. These devices can only be launched after Google has granted an explicit final approval (see, e.g., the MADAs referred to in footnote 165). In the case of devices that do not pre-install GMS, instead, hardware manufacturers need to send Google a CTS report, but do not need to receive Google's explicit approval before the launch (see, e.g., the MADAs referred to in footnote 164). "Tacit approval", therefore, refers to situations where hardware manufacturers send Google CTS reports for a device, and where Google does not react by disputing that device's compatibility.

[110]    Together with Google Music and the Google eBookstore Android Market became part of the Play Store at that time, see "Introducing Google Play: All your entertainment, anywhere you go" (6 March 2012), available at https://googleblog.blogspot.be/2012/03/introducing-google-play-all-your.html, printed and saved on 12 April 2016.

[111]    For more detail, see Section 6.3.2.

[112]    See section 4.5 of the "Google play developer distribution agreement" (last modified 5 May 2015), available at https://play.google.com/intl/All_uk/about/developer-distribution-agreement.html, printed and saved on 13 April 2016.

GOOG-DOJ-26429198

Google Account requires the creation of a Gmail account, unless the user already has a Google Account.[113]

(136) Apart from allowing users to download apps, the Play Store allows users to rate apps from one to five and is important for other functions, such as payments or the updating of apps.[114]

(137) The Play Store is amongst the most widely used apps for smart mobile devices and the only app store in the list of 25 most visited apps in the US in June 2015.

### Figure 5: Top 25 apps in the US by unique visitors[115]



Top 25 mobile apps by US unique visitors, June 2015

Unique visitors age 18+

*III.*    *Google Play Services*

(138) Google Play Services is a Google proprietary software layer that provides background services and APIs for apps integration with Google's proprietary cloud services.

(139) Google Play Services was launched in 2012[116] and its main components are the

---

113    […] non-confidential briefing paper of 28 January 2016, paragraph 11.4 […].
114    See   "Welcome   to   the   Google   Play   Help   Center",   available   at https://support.google.com/googleplay#topic=, printed and saved on 11 April 2016.
115    Source: Dan Frommer, "These are the 25 most popular mobile apps in America" (18 August 2015), available at http://qz.com/481245/these-are-the-25-most-popular-2015-mobile-apps-in-america/, printed and saved on 11 April 2016.

**EN**

**EN**

GOOG-DOJ-26429199

Google Play Services APK and the Google Play Services client library.[117]

(140) The Google Play Services APK contains the various Google services and runs as a background service in Android. The Google Play Services client library contains the interfaces to the individual Google services and allows Google's proprietary and third party apps to obtain authorisation from users to gain access to these services with their credentials.

(141) Almost all of Google's proprietary apps use Google Play Services.[118]

(142) The Google Play Services library is also integrated in a large number of third party apps that embed Google's services in their apps for functionalities, such as push notifications, location and maps.[119] According to AppBrain, more than 60% of the most downloaded apps in the Play Store use the cloud messaging service of Google through the Google Cloud Messaging library.[120] 45% of all Android apps also contain the library for AdMob, Google's mobile advertising service.[121] Without access to these services, many apps would either crash, or lack important functions.[122]

(143) While Google Play Services and the Play Store are technically two distinct products, they are closely interlinked in a number of ways.

(144) First, the Play Store and Google Play Services are licensed together as part of the GMS bundle, and Google does not license them separately.

(145) Second, at its launch, Google Play Services was automatically delivered through the Play Store on all Android devices on which the Play Store was installed.[123]

(146) Third, any update to Google Play Services automatically comes through the Play

---

[116]   See "Google play services", available at https://plus.google.com/+AndroidDevelopers/posts/J1A5hc1ZnS1, printed and saved on 13 April 2016.

[117]   See "Overview of Google Play Services" (24 September 2015), available at https://developers.google.com/android/guides/overview, printed and saved on 11 April 2016. APK is the abbreviation for Android Application Package and a file format used for installing software on Android (similar to an ".exe" file on Windows).

[118]   See Ron Amadeo, "Balky carriers and slow OEMs step aside: Google is defragging Android" (3 September 2013), available at http://arstechnica.com/gadgets/2013/09/balky-carriers-and-slow-oems-step-aside-google-is-defragging-android/, printed and saved on 11 April 2016.

[119]   See Benedict Evans, "Amazon and Android forks" (22 June 2014), available at http://ben-evans.com/benedictevans/2014/6/21/amazon-and-forks?rq=android%20forks%20amazon, printed and saved on 11 April 2016. According to estimates by Yandex, approximately 65% of the most popular free Android apps use at least one of the API's of Google Play Services; see Yandex's non-confidential response to Question 3 of the request for information of 29 June 2015 to app developers (Doc ID 2031).

[120]   See Rachel King, "I/O 2013: more than half of apps in Google Play now use Cloud Messaging" (16 May 2013), available at http://www.zdnet.com/article/io-2013-more-than-half-of-apps-in-google-play-now-use-cloud-messaging/, printed and saved on 11 April 2016.

[121]   See "Android ad networks" (status: 11 April 2016), available at http://www.appbrain.com/stats/libraries/ad, printed and saved on 11 April 2016. The figures are even higher if you consider new apps or top apps (both 57%), see "Android libraries(/stats/libraries) > "Admob" (status 11 April 2016), available at http://www.appbrain.com/stats/libraries/details/admob/admob, printed and saved on 11 April 2016.

[122]   See, LG Electronics' non-confidential response to Question 24 of the request for information of 21 October 2015 on app stores (Doc ID 2377).

[123]   See Eric Ravenscraft, "Why Google Play Services Are Now More Important Than Android" (31 July 2013), available at http://lifehacker.com/why-google-play-services-are-now-more-important-than-an-975970197, printed and saved on 11 April 2016.

**EN**

**EN**

GOOG-DOJ-26429200

Store, without the need for any action by the user or OEM, as shown in Figure 6.

**Figure 6: The interplay between apps, the Play Store and Google Play Services**[124]



(147)  Fourth, as discussed in Section 9.4.4, a substantial proportion of apps downloaded through the Play Store would not function properly unless Google Play Services is pre-installed on a smart mobile device.

6.2.2.2.  Development of the Android ecosystem

(148)  In order to compete with established companies in the mobile industry, Android needed the support of other industry players, in particular OEMs, MNOs and app developers.[125]

(149)  Accordingly, in 2007, Google established the Open Handset Alliance ("OHA") and tried to convince other companies to join the alliance.

(150)  Among the 34 original founding members of the OHA were a number of important OEMs (e.g. Samsung Electronics ("Samsung"), Motorola, Inc. ("Motorola")), MNOs (e.g. T-Mobile International AG ("T-Mobile"), Telefónica S.A. ("Telefonica")) and other leading technology and mobile industry companies (e.g. Qualcomm Inc. ("Qualcomm"), Intel Corporation ("Intel"), eBay Inc. ("eBay")).[126]

(151)  As the lead developer of the Android platform, Google has implemented a strategy based on different degrees of involvement from OEMs, MNOs and app developers:[127]

    (1)  *OEMs.* Google provides Android for free under the AOSP licence, which allows OEMs to customise their devices to some extent – as long as they still

---

[124]  See "The Android Source Code", available at https://source.android.com/source/, printed and saved on 11 April 2016.

[125]  Google's response to the complaint by FairSearch, paragraphs 27-33 (Doc ID 1584).

[126]  See "Industry Leaders Announce Open Platform for Mobile Devices" (5 November 2007), available at http://www.openhandsetalliance.com/press_110507.html, printed and saved on 13 June 2017. According to its website, the OHA currently has 84 members but it is not obvious to which extent the OHA is still active. The last recorded news date from July 2011, see "Open Handset Alliance", available at http://www.openhandsetalliance.com/index.html, printed and saved on 11 April 2016.

[127]  Google's response to the complaint by FairSearch, paragraph 32 (Doc ID 1584).

**EN**

**EN**

GOOG-DOJ-26429201

qualified as "compatible" and did not lead to fragmentation as defined by Google.[128]

(2) *MNOs.* Google allows MNOs to add apps to devices in order to generate additional revenue in addition to mobile subscription fees. Certain MNOs also receive a share of the revenues that Google achieves with Google Search – subject to exclusivity.[129]

(3) *App developers.* Google ensures[130] that app developers have incentives to participate in the Android ecosystem as when developers write apps for Android, a positive feedback loop ensues: Android becomes more attractive to users, which in turn, makes Android more attractive to developers. For example, a week after the announcement of the establishment of OHA in 2007, the Android SDK was released to enable developers to create apps for the Android platform[131] free of charge, but solely to be used to develop apps that run on Google Android devices.

### 6.2.2.3. Google's activities at the level of smart mobile devices

(152) As mentioned in Section 6.2.2.1, while Google is active at the level of smart mobile devices with its Nexus and Pixel devices, the majority of smart mobile devices are sold by OEMs that run Android with GMS installed. OEMs compete amongst each other, with Google's Nexus and Pixel devices and with the manufacturers of smart mobile devices powered by different smart mobile OSs.

(153) The extent to which competition at the level of smart mobile devices has an impact on Google is explained in detail in Sections 7.3 and 9.3.4. However, in order to understand properly the impact of such competition on Google, it is important to keep in mind Google's business model. Unlike Apple, whose business model is based on vertical integration and the sale of higher-end smart mobile devices, Google's business model is based first and foremost on increasing the audience for its online services so that it can sell its search advertising.[132]

(154) This is why Google has, *inter alia*, entered into an agreement with Apple to become the default general search service for the Safari browser on Apple's smart mobile devices.[133] This agreement allows Google to also achieve substantial revenues on

---

[128]   See Section 6.3.1.

[129]   See Section 6.3.3.

[130]   See, e.g., the description of the "ecosystem"/"virtuous cycle" by Andy Rubin, Senior Vice President of Mobile and Digital Content, in the post "The Benefits & Importance of Compatibility" (14 September 2012), available at http://officialandroid.blogspot.com/2012/09/the-benefits-importance-of-compatibility.html, printed and saved on 11 April 2016. See also [Google Executive], "Android Strategy and Partnerships Overview" (June 2009), page 31 (Doc ID 1348-570): "*Applications aren't just important for direct monetization- we need them to make the ecosystem work [...].*"

[131]   See "Open Handset Alliance Releases Android SDK" (12 November 2007), available at http://www.openhandsetalliance.com/press_111207.html, printed and saved on 13 April 2016.

[132]   See Ben Bajarin, "iOS, Android, and the Dividing of Business Models" (30 June 2014), available at https://techpinions.com/ios-android-and-the-dividing-of-business-models/32237, printed and saved on 11 April 2-16; Bill Gurley, "Above the crowd" (24 March 2011), available at http://abovethecrowd.com/2011/03/24/freight-train-that-is-android/, printed and saved on 11 April 2016; and Liz Laffan, "[Report] A new way of measuring openness, from android to webkit the open governance index [updated]", available at http://www.visionmobile.com/blog/2011/07/the-open-governance-index-measuring-openness-from-android-to-webkit/, printed and saved on 11 April 2016.

[133]   See Section 6.2.1.

GOOG-DOJ-26429202

Apple devices (see Table 16).

## 6.3. Google's agreements with members of the Google Android ecosystem

(155) Google has entered into a number of agreements with members of the Google Android ecosystem, in particular:

(1) *Anti-fragmentation Agreements ("AFAs");*

(2) *Mobile Application Distribution Agreements ("MADAs"); and*

(3) *Revenue share agreements for Google Search.*

(156) The relationship between the AOSP licence, AFAs, MADAs and Google's proprietary apps and intellectual property related to Android can be summarised as follows:

(1) The AOSP licence does not grant hardware manufacturers the right to distribute Google's proprietary apps such as Google Search, Google Chrome, the Play Store and Google Play Services. The AOSP licence further does not grant members of the Android ecosystem the right to use the Android logo and other Android related trademarks that Google owns.[134]

(2) In order to obtain those rights, Google requires hardware manufacturers to enter into a MADA. In order, however, to be eligible to enter into a MADA, Google requires hardware manufacturers first to enter into an AFA.

### 6.3.1. Anti-Fragmentation Agreements

(157) Pursuant to an AFA, hardware manufacturers commit to the following:

(1) *"[COMPANY] will only distribute Products that are either: (i) in the case of hardware, Android Compatible Devices; or (ii) in the case of software, distributed solely on Android Compatible Devices";*

(2) *"[COMPANY] will not take any actions that may cause or result in the fragmentation of Android"; and*

(3) *"[COMPANY] shall not distribute a software development kit (SDK) derived from Android or derived from Android Compatible Devices and [OEM] shall not participate in the creation of, or promote in any way, any third party software development kit (SDK) derived from Android, or derived from Android Compatible Devices".*[135]

(158) These clauses of the AFA referred to in recital (157) are hereinafter referred to as the "anti-fragmentation obligations".

(159) The stated objective of the AFAs *"is to define a baseline implementation of Android that is compatible with third-party apps written by developers."*[136] As explained on

---

[134] See "Google Mobile Brand Guidelines", available at https://source.android.com/source/brands.html, printed and saved on 11 April 2016: *"The use of "Android" on hardware, packaging or marketing materials of device is restricted to Android-compatible devices only"* and "Android" should never be used in the name of your product or as the primary or dominant mark on your packaging or device" However, the Android robot is made available under a Creative Commons licence and can be used, reproduced and modified with proper attribution.

[135] See for example Doc ID 1306-164.

[136] See "Frequently Asked Question", available at http://source.android.com/source/faqs.html#how-does-the-aosp-relate-to-the-android-compatibility-program, printed and saved on 18 April 2016.

GOOG-DOJ-26429203

the Google Android website, "*only devices that are 'Android compatible' may participate in the Android ecosystem, including Google Play; devices that don't meet the compatibility requirements exist outside that ecosystem.*"[137]

(160) In its internal documents, Google also refers to the fact that AFAs are meant to "*Stop [...] our partners and competitors from forking Android and going alone*".[138] In other words, members of the Android ecosystem "*didn't just commit to ship Android-compatible devices; they committed to \*not\* ship incompatible devices*".[139]

(161) In order to build an Android compatible device, hardware manufacturers must comply with the Android Compatibility Definition Document ("CDD") and pass the Compatibility Test Suite ("CTS") (together the "Android compatibility tests").[140] The CDD enumerates the software and hardware requirements of a compatible Android device.[141] The CTS is an automated testing tool that can be run on a target device or simulator to determine compatibility.[142] Both are available via the Android webpage and developed, amended and adopted by Google.[143]

(162) Only hardware manufacturers that pass the Android compatibility tests can use the "Android" name on hardware, packaging or marketing materials of devices.[144] In addition, only those hardware manufacturers can make use of the Android logotype and the Android compatibility trademark.[145]

(163) The conditions for the Android compatibility tests are determined at Google's sole discretion: "*Yandex states that the CDD is "adopted and amended at the sole discretion of Google". This is correct. [...] The fact that Google has the last word on how to define compatibility in the CDD, however, does not mean that Android partners cannot update compatibility criteria with incompatibilities and bugs they discover. In fact, since the CDD and CTS are open source, everybody can contribute. Google considers these contributions carefully, many of which concern bug fixes in the CTS or additional tests for CDD requirements or new Android features.*"[146]

(164) Google has entered into AFAs with hardware manufacturers active throughout the world, including OEMs, contract manufacturers (also known as original design manufacturers, or "ODMs") and chipset manufacturers.

---

137    See "Frequently Asked Questions", available at https://source.android.com/source/faqs.html#how-does-the-aosp-relate-to-the-android-compatibility-program, printed and saved on 18 April 2016.

138    Presentation by [Google Executive] (Doc ID 1305-50462).

139    See email from [Google Executive] of 14 September 2012 (Doc ID 1754-355).

140    See "Android compatibility", available at https://source.android.com/compatibility/, printed and saved on 11 April 2016.

141    See "Compatibility Program Overview", available at https://source.android.com/compatibility/overview.html, printed and saved on 11 April 2016.

142    See "Compatibility Test Suite", available at https://source.android.com/compatibility/cts/index.html, printed and saved on 11 April 2016. The CTS is supplemented by an additional tool, the Compatibility Test Suite Verifier (CTS Verifier), see "Compatibility Program Overview", available at https://source.android.com/compatibility/overview.html#compatibility-test-suite-verifier-cts-verifier, printed and saved on 11 April 2016.

143    Google's response to the complaint by Yandex, paragraphs 56-61 (Doc ID 2118). For more detail, see also Section 6.3.2.

144    See "Brand Guidelines", available at https://source.android.com/source/brands.html, printed and saved on 11 April 2016. In order to obtain the right to use such brand and trademark, hardware manufacturers need to enter into a MADA with Google first.

145    Google's response to the complaint by FairSearch, paragraph 99 (Doc ID 1584).

146    Google's response to the complaint by Yandex, paragraph 59 (Doc ID 2118).

**EN**          41          **EN**

(165)    Figure 7 shows the AFAs that Google has entered into since 2009 with the top 30 hardware manufacturers in terms of sales. It also shows the duration of those agreements.[147]

---

[147]    As discussed in Section 6.3.2, Google has also entered into MADAs with certain hardware manufacturers that contain certain anti-fragmentation clauses which are the same as or similar to the ones indicated in this section.

**EN**                                               42                                               **EN**

GOOG-DOJ-26429205

**Figure 7: List and duration of AFAs entered into by Google and the top 30 hardware manufacturers in terms of sales[148]**



(166)    All the largest OEMs active in the EEA[149] have confirmed that, at present, they have

---

148    Source: Google's response to Question 39 of the request for information of 11 July 2014 and to Question 15 of request for information of 24 March 2017 (Doc ID 1271 and 7894-6) and [...] data (Doc IDs 7866 and 7867). The data indicated by Google in its response appears to be incomplete and underestimates the duration of many AFAs. As regards [AFA signatory]. the 2011 AFA remains in force until negotiations for its amendment are finalised. Source: [AFA signatory] response to Question 1 of the request for information of 28 February 2018 [...].

149    Apart from Apple that only uses its own iOS operating system and Nokia. whose mobile division was purchased by Microsoft in 2013.

**EN**                                    43                                    **EN**

GOOG-DOJ-26429206

ongoing AFAs with Google.[150]

(167)   OEMs that have an AFA with Google have, since at least 2011, accounted for a significant proportion of smart mobile device sales. Given that Google requires hardware manufacturers to enter into an AFA as a condition for entering into a MADA, the percentage of smart mobile devices on a worldwide basis (excluding China) based on a licensable smart mobile OSs sold by OEMs that have entered into AFAs with Google corresponds at the very least[151] to the percentage of devices covered by MADAs, as shown in Table 1.[152]

### Table 1: Coverage of AFAs with OEMs[153]

| Year | AFA coverage |
|------|--------------|
| 2011 | [70-80%] |
| 2012 | [80-90%] |
| 2013 | [90-100%] |
| 2014 | [90-100%] |
| 2015 | [90-100%] |
| 2016 | [90-100%] |

(168)   While the duration of the first AFAs with hardware manufacturers was two years, AFAs now have a typical duration of [5-10] years.[154]

(169)   In addition, Google requires that a hardware manufacturer must have at least three years remaining on the term of an AFA before it can enter into a MADA or a Platform Development Kit ("PDK") agreement.[155] As confirmed by [Google Executive], "[…] *we should renew AFA for any new PDK partner (or MADA) that falls under [0-5] years. We need predictability around compatibility to ensure developers continue to invest in the platform to the benefit of users and everyone involved.*"[156] As a result, once a hardware manufacturer has entered into an AFA, the AFA is normally extended beyond its original duration well before expiry.

---

[150]   In particular, BlackBerry (Doc ID 3510), Dell (Doc ID 3485), HP (Doc ID 3477), HTC (Doc ID 3519), Huawei (Doc ID 3495), Lenovo (Doc ID 3503), LG Electronics (Doc ID 3430), Samsung (Doc ID 3501), Sony (Doc IDs 3458), Toshiba (Doc ID 3472) and ZTE (Doc ID 3488) have confirmed that they have ongoing AFAs with Google.

[151]   The actual coverage is likely to be significantly higher, particularly in 2011 and 2012. This is because, while the figures in Table 1 consider Windows Mobile devices as not covered by AFAs, a large portion of these devices is likely to be sold by OEMs that manufacture both Windows Mobile and Google Android devices and which are thus prohibited by the AFAs to sell devices based on Android forks for the totality of their output (e.g. Samsung, HTC and Sony).

[152]   The Commission concludes the percentage of GMS devices as a better proxy for the coverage of the AFAs than […] sales data. This is because: (i) Google did not provide a complete list of all the AFAs that it entered into with OEMs and (ii) there are a number of inconsistences of coverage values based on […] data (e.g. sales that were registered as sales by an MNO in the […] database did not appear as covered by an AFA since there is no contract between Google and those MNOs).

[153]   Source: Commission's calculations based on […] data (Doc IDs 7866 and 7867).

[154]   See for example AFA with [AFA signatory] of 15 April 2013 […].

[155]   A PDK allows hardware manufacturers to port a smart mobile OS to their hardware. The Android PDK is normally made available to hardware manufacturers between two and three months before major Android updates (see T.C. Sottek, "Google will release an Platform development Kit for hardware developers ahead of each major Android upgrade" (27 June 2012), available at http://www.theverge.com/2012/6/27/3120980/google-announces-platform-development-kit, printed and saved on 11 April 2016.

[156]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1366-2119) and [AFA signatory]'s non-confidential response to Question 46 of the request for information of 17 July 2014 […].

**EN**                                          44                                          **EN**

GOOG-DOJ-26429207

(170)    On 28 March 2017, Google informed the Commission of its intention to notify hardware manufacturers of the option to enter into an "Android Compatibility Commitment" ("ACC") in place of an AFA.[157]

(171)    Contrary to the AFA, the ACC option would permit hardware manufacturers to:

(1)    Manufacture incompatible Android devices for a third party that are marketed under a third-party brand;[158] and

(2)    Supply components to a third party to be incorporated into incompatible Android devices that are marketed under a third-party brand.[159]

### 6.3.2.    Mobile Application Distribution Agreements

(172)    The MADA grants hardware manufacturers a number of rights.

(173)    First, hardware manufacturers have the right to pre-install and distribute a number of Google apps on their Google Android devices.[160]

(174)    Second, hardware manufacturers can sublicense the Google apps to MNOs, other distributors and contractors responsible for testing, evaluation and development.[161]

(175)    Third, hardware manufacturers have the right to use Google's trademarks, subject to the Google Mobile Branding Guidelines.[162]

(176)    The MADA also imposes a number of obligations on hardware manufacturers.

(177)    First, hardware manufacturers "*may not, and may not allow or encourage any third party to: […] (e) take any actions that may cause or result in the fragmentation of Android*".[163]

(178)    Second, all devices running Android, including those on which hardware manufacturers do not pre-install Google's apps, must pass the CTS. Hardware

---

[157]    See letter of Google to the Commission of 28 March 2017 (Doc ID 7579).

[158]    See copy of the ACC template provided by Google on 28 March 2017, clause 2.2(A) (Doc ID 7580).

[159]    See copy of the ACC template provided by Google on 28 March 2017, clause 2.2 (B) (Doc ID 7580).

[160]    See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Sections 1.1(t) and 2.1 […]. The agreement provided [MADA signatory] with a license regarding the following Google apps: Google Play Client, Calendar Sync, Contacts Sync, Gmail, Google+ (including Google+ Photos), Google Play Books, Google Calendar, Google Maps, Google Play Music, Google Partner Setup, Google Search (including Google Now), Google Chrome, Google Services Framework, Google Street View, Google Talk, Google Play Movies, Google Play Newsstand, Google Play Games, Google Drive, Google Backup and Restore, Google Voice Search, Media Uploader, Network Location Provider, Set Up Wizard, YouTube, Google WebView Component, Widevine, Orkut, Google Wallet, Google Shopper, Google Earth, Finance, News & Weather, and Google Voice.

[161]    See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 2.2 […].

[162]    See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 7.2 […], and the "Google Mobile Branding Guidelines" available at https://source.android.com/source/brands.html, printed and saved on 11 April 2016.

[163]    Such actions include, for example, "*distribution of a software development kit (SDK) derived from Android or derived from Android Compatible Devices*." See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 2.3(e) […]. This requirement has been part of the MADA since 2009. See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 July 2009, Section 2.2(g) […].

**EN**                                        45                                        **EN**

GOOG-DOJ-26429208

manufacturers must also send the CTS report to Google.[164]

(179)   Third, hardware manufacturers must send the final software build of their GMS devices for final approval by Google.[165]

(180)   Fourth, once a hardware manufacturer decides to pre-install one or more Google proprietary apps on its devices, it must pre-install all mandatory Google apps.[166]

(181)   While each MADA lists the mandatory and optional Google apps, there may be variations of such lists at country level, since Google may not make all such apps available to hardware manufacturers for pre-installation in every country at the same time (e.g. due to language differences). The variations at country level of the mandatory and optional apps that are available for pre-installation are reflected in the "Google Product Geo-Availability Chart", with which hardware manufacturers should comply and which "*may be updated by Google from time to time*".[167]

(182)   The number of mandatory Google apps has increased at least until 2014. For example, while the MADA entered into by [MADA signatory] in 2009 required the pre-installation of twelve Google apps,[168] [MADA signatory]'s latest MADA, dated 1 March 2014, required the pre-installation of thirty Google apps.[169]

(183)   Pursuant to each MADA, Google has discretion to change the list of mandatory

---

[164]   "[E]*ach of its employees that are designated by Company … is authorized to submit and upload CTS Reports on behalf of Company*". See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 2.7 […].This requirement has been part of the MADA since at least 2011 (for GMS devices) and 2013 (for Google Android devices on which a hardware manufacturer does not pre-install Google's apps). See Mobile Application Distribution Agreement between Google and [MADA signatory], Section 2.7 […] and Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 January 2013, Section 2.7 […].

[165]   See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 4.3 […]. This requirement has been part of the MADA since at least 2011. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 January 2011, Section 4.3 […].

[166]   The MADA refers to mandatory Google apps as "Google Applications", whereas optional apps are referred to as "Optional Google Applications". The Decision refers to mandatory apps as "mandatory Google apps" and optional apps as "optional Google apps". Hardware manufacturers are free to decide whether or not to install optional Google apps. See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Sections 1.1(m), 1.1(t) and 3.3(a) […]. The MADA has referred to optional Google apps since at least January 2011. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 January 2011 […].

[167]   See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 4.3 […].

[168]   Set-up Wizard, Google Phone-top Search, Gmail, Google Calendar, Google Talk, YouTube, Google Maps for Mobile, Google Street View, Contact Sync, Android Market Client, Google Voice Search and Google Street View. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 March 2009, Exhibit A […].

[169]   Google Play Client, Calendar Sync, Contacts Sync, Gmail, Google+ (including Google+ Photos), Google Play Books, Google Calendar, Google Maps, Google Play Music, Google Partner Setup, Google Search (including Google Now), Google Chrome, Google Services Framework, Google Street View, Google Talk, Google Play Movies, Google Play Newsstand, Google Play Games, Google Drive, Google Backup and Restore, Google Voice Search, Media Uploader, Network Location Provider, Set Up Wizard, YouTube, Google WebView Component and Widevine. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 March 2014, Section 1.1(m) […]. This Decision examines only the requirement that hardware manufacturers must pre-install Google Search and Google Chrome.

**EN**

**EN**

Google apps that must be pre-installed.[170] For example, in June 2015, Google decided that a number of mandatory Google apps (Google+, Google Play Books, Google Play Games, Google Play Newsstand, Google Calendar and Google Contacts) should become optional in relation to all hardware manufacturers that had a MADA in place.[171]

(184)   Fifth, hardware manufacturers must place on the device's default home screen[172] the icons which give access to the Google Search app, the Play Store and a folder labelled "Google" ("Google folder") that provides access to a collection of icons for a number of mandatory Google apps.[173] Any other pre-installed Google apps should be placed no more than one level below the home screen.[174]

(185)   Sixth, hardware manufacturers are required to "*set Google Search as the default search provider for all Web search access points, [...]*".[175] In October 2014, Google

---

[170]   See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 1.1(m) [...]: ""*Google Applications" means the machine-readable binary code version of the Google applications listed below which are provided to Company in connection with this Agreement, and any modifications or updates thereto that Google may make available to Company hereunder from time to time in its sole discretion. List of Google Applications (may be changed by Google from time to time)*". Google's discretion to change the list of mandatory Google apps has been foreseen in the MADA since at least January 2011. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 January 2011, Section 1.12 [...].

[171]   See "GMS 3.0 for Android Partners", submitted as annex to [MADA signatory] non-confidential response to the request for information of 17 June 2015 to developers of email applications [...]. This document distinguishes between mandatory apps (Google Chrome, Gmail, Google Search, Google Maps, YouTube, the Play Store, Google Drive, Google Play Music, Google Play Movies, Google Hangouts, Google Photos) and mandatory services (Android System WebView, AndroidForWork, Browser Provider, ConfigUpdater, Google Account Manager, Google Backup Transport, Google Calendar Sync, Google Contacts Sync, Google One Time Init, Google Partner Setup, Google Play Services, Google Services Framework, Google Text-to-speech Engine, Market Feedback Agent, Partner Bookmarks, Setup Wizard and Widevine).

[172]   The default home screen is the default display of the device, prior to any changes made by users, that appears without scrolling in both portrait and landscape modes when the device is in active idle mode (i.e. not in sleep mode). See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 1.1(i) [...].

[173]   For example, the latest MADA entered into between Google and [MADA signatory] determined that the Google folder should include Google Chrome, Gmail, Google+, Google Maps, Google Play Music, Google Play Movies, Google Play Books, Google Play Newsstand, Google Play Games, Google Drive, YouTube, Google Plus Photos and Hangouts. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 3.3(b) [...]. The first MADA provided Google with ample discretion regarding the placement of the Google apps: "*3. Placement Requirements: Google search box on phone top, and other Google Application placement requirements to be defined by Google.*" See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 March 2009, Exhibit A [...]. Since at least 2011, the MADAs have usually required Google Search and the Play Store to be placed "*at least on the panel immediately adjacent to the Default Home Screen.*" See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 January 2011, Section 3.4 [...].

[174]   See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 5 January 2014, Section 3.3(c) [...]. Since at least 2011, the MADAs have usually required these apps to be placed no more than one level below the home screen or the "device top" (which "*means with respect to the default navigation hierarchy of a Device UI, the top-most level screen from which applications can be launched by an End User*"). See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 January 2011, Sections 1.17 and 3.4 [...].

[175]   See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 5 January 2014, Section 3.3(d) [...]. The first MADA containing this provision dated from 1 June 2010: Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 June

---

**EN**

**EN**

GOOG-DOJ-26429210

began to remove the wording of certain MADAs requiring Google Search to be set as the default general search service.[176] However, as of April 2017, there remained a number of MADAs in place with language requiring hardware manufacturers to set Google Search as the default general search service.[177]

(186)  Seventh, hardware manufacturers must ensure that direct access to Google Search is provided by either "*(a) long pressing the "Home" button on Devices with physical navigation buttons, or (b) swiping up on either the navigation bar or "Home" button on Devices with soft navigation buttons*".[178]

(187)  Eighth, hardware manufacturers must "*configure the appropriate Client ID for each Device as provided by Google*".[179] The "Client ID" is a unique alphanumeric code[180] that is incorporated in every GMS device and enables the tracking of usage of Google's apps (e.g. the Google Search app) on the device.

(188)  Ninth, the MADA typically foresees that Google may terminate the MADA and stop licensing its apps if the hardware manufacturer breaches any obligation in the MADA relating to device compatibility.[181] Such obligations include the obligation not to "*take any actions that may cause or result in the fragmentation of Android*"[182] and the obligation for all devices running Android, including those on which a hardware manufacturer does not pre-install Google's apps, to pass the CTS.[183]

(189)  The first hardware manufacturer with which Google entered into a MADA was [MADA signatory] in March 2009.[184] Between March 2009 and April 2017, Google entered into MADAs with at least [200-300] further hardware manufacturers, including major hardware manufacturers such as HTC, Huawei Technologies Co. Ltd. ("Huawei"), Lenovo Group Ltd. ("Lenovo"), LG Electronics Inc. ("LG

---

[176]  2010 [...], which stipulated that "Google Phone Top Search must be set as the default general search service for all search access points on devices". As of 2013 the section on placement requirements in new MADAs states that the OEM shall "ensure that Google Search must be set as the default search provider for all Web search access points, [...] on the Device".

Google's Response to the Statement of Objections, Part Four, page 174, paragraph 44 (Doc ID 7117).

[177]  For a list of agreements where the wording was changed and when, see Annex Q15-16 to Google's response to the request for information of 24 March 2017 (Doc ID 7894-6).

[178]  See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 5 January 2014, Section 3.3(e) [...]. This requirement was first implemented with the so-called "GMS 2.0", i.e. as of November 2013. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 26 November 2013 [...].

[179]  See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 5 January 2014, Section 4.4(e) [...]. This requirement has been part of the MADA since 2009. See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 March 2009, Exhibit A [...].

[180]  Client IDs are unique for each company rather than for each device, see Google's response to Question 48 of the request for information of 11 July 2014 (Doc ID 1263).

[181]  See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 5.2(b) [...].

[182]  See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 2.3(e) [...].

[183]  See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Section 2.7 [...].

[184]  See Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 March 2009 [...].

**EN**

**EN**

GOOG-DOJ-26429211

Electronics"), Samsung and Sony Corporation ("Sony").[185]

(190)  The duration of a MADA is typically been between [0-5] years, after which Google and the hardware manufacturers have negotiated a new MADA or an extension.[186]

(191)  Google has sought to ensure consistency across the MADAs signed with hardware manufacturers. [Licensing practice].[187] One major set of changes, labelled "GMS 2.0", was implemented as of November 2013.[188]

### 6.3.3.   *Portfolio-based revenue share agreements*

(192)  Between 1 May 2010[189] and 31 October 2015,[190] Google was a party to agreements with at least six OEMs ([revenue share partner], [revenue share partner], [revenue share partner], [revenue share partner], [revenue share partner] and [revenue share partner]) and at least four MNOs ([revenue share partner], [revenue share partner], [revenue share partner] and [revenue share partner]) pursuant to which it shared with them search advertising revenues provided that the OEMs and MNOs did not pre-install any competing general search service on any device within an agreed portfolio ("portfolio-based revenue share agreements"). If an OEM or MNO had pre-installed such a service on any device, it would have foregone the revenue share payments not only for that particular device but also for all the other devices in its portfolio on which another general search service may not have been pre-installed.[191]

(193)  A given device could fall within the scope of […] portfolio-based revenue share agreement with […] an OEM or an MNO. If the OEM that manufactured a device and the MNO that distributed that same device both had portfolio-based revenue share agreements with Google, the OEM and the MNO [explanations concerning revenue share agreements with OEMs and MNOs].[192] In practice, the OEM or MNO [explanations concerning revenue share agreements with OEMs and MNOs].[193]

---

[185]  Google's response to Questions 39 and 47 of the request for information of 11 July 2014 (Doc ID 1263) and Annex 39 to Google's response to the request for information of 11 July 2014 (Doc ID 1271) as well as Google's response to Question 15 of the request for information of 24 March 2017 (Doc ID 7892) and Annex Q15-16 to Google's response to the request for information of 24 March 2014 (Doc ID 7894-6).

[186]  See for example Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 February 2014 […] and Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014 […].

[187]  See for example Annex to Google's response to the request for information of 11 July 2014, email discussion between [Google Executives], 'Yet another MADA', between 30 April 2013 and 6 June 2013 (Doc ID 1751-818).

[188]  See document "GMS 2.0" (Doc ID 1404-1851). See also Mobile Application Distribution Agreement between Google and [MADA signatory] of 26 November 2013 […].

[189]  The effective date of the portfolio-based revenue share agreement between Google and [revenue share partner] (see Section 6.3.3.2).

[190]  The end of the term of the portfolio-based revenue share agreement between Google and [revenue share partner] (see Section 6.3.3.1).

[191]  See e.g. [revenue share partner]'s non-confidential response to Question 20 of the request for information of 17 July 2014 […].

[192]  Google's response to Question 48 of the request for information of 11 July 2014 (Doc ID 1263).

[193]  [Revenue share partner]'s non-confidential response to Question 27 of the request for information of 17 July 2014 […]; [Revenue share partner]'s non-confidential response to Question 27 of the request for information of 17 July 2014 […].

**EN**

**EN**

GOOG-DOJ-26429212

(194)   In this regard, [revenue share partner], stated that: "[explanations concerning revenue share agreements with OEMs and MNOs]".[194] Similarly, [revenue share partner] stated that "*The [client ID] specifies to whom Google will pay revenue share. Some of* [revenue share partner]'*s customers in the EEA, e.g.* [revenue share partner]*, have their own client ID and their own revenue share agreement with Google and will receive revenue share on the Android devices sold*".[195]

(195)   Search traffic and revenues generated on OEM and MNO devices were tracked via the Client ID incorporated in every GMS device pursuant to the portfolio-based revenue share agreement.

(196)   The geographic scope of the portfolio-based revenue share agreements with OEMs was worldwide. As for MNOs, the portfolio-based revenue share agreements either applied to all the countries of operation of the given MNO or to those countries where the relevant subsidiaries of the MNO opted into a framework agreement negotiated by the mother company through separate accession agreements with Google.

(197)   As of March 2013, Google began to gradually replace portfolio-based revenue share agreements in the European Union and the Republic of Korea by agreements pursuant to which the payment of revenue shares by Google was conditional on OEMs and MNOs pre-installing no competing general search service on a given device for which revenue shares were paid ("device-based revenue share agreements").[196]

(198)   For the purposes of this decision, any reference to "pre-install" and "pre-installation" refers not only to the pre-installation of the app of a general search service but also to any other means of making available a general search service to users by OEMs and MNOs immediately after the purchase of a device.

(199)   A non-exhaustive list of Google's portfolio-based revenue share agreements with

---

[194]   [Revenue share partner]'s non-confidential response to Question 27 of the request for information of 17 July 2014 […].

[195]   [Revenue share partner]'s non-confidential response to Question 27 of the request for information of 17 July 2014 […].

[196]   These agreement include: a device-based revenue share agreement with [revenue share partner] as of 1 October 2014 until [date] (see Google Search Revenue Share Agreement between Google and [revenue share partner] […], and extensions to Google Search Revenue Share Agreement between Google and [revenue share partner] as from [date] […]; a device-based revenue share agreement with [revenue share partner] signed in March 2013, amending the existing portfolio-based revenue share agreement, and which remained in place until [date] (see Amendment Agreement between Google and [revenue share partner] […], Amendment No. 10 to Mobile Services Distribution Agreement between Google and [revenue share partner] […], Amendment No. 17 to Mobile Services Distribution Agreement between Google and [revenue share partner] […], [revenue share partner]'s non-confidential response to the follow-up to the 8 March 2017 request for information […] and [revenue share partner]'s non-confidential response to Question 8 of the 28 February 2018 request for information […]; a device-based revenue share agreement with [revenue share partner] from 1 September 2014 for a period of [duration] years, then extended until [date] (see Google Search Revenue Share Agreement between Google and [revenue share partner] […] and extensions […]); a device-based revenue share agreement with [revenue share partner] as of 1 December 2013 for a period of [duration] years (see Google Android Search Revenue Share Agreement between Google and [revenue share partner] […]); a device-based revenue share agreement with [revenue share partner] as of 1 August 2013 for a period of [duration] years (see Google Android Search Revenue Share Agreement between Google and [revenue share partner] […]).

**EN**                                              50                                              **EN**

GOOG-DOJ-26429213

OEMs and MNOs is outlined in the following two Sections.

6.3.3.1.  Portfolio-based revenue share agreements with OEMs

(200)   Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 August 2012.[197] The agreement was initially for a period of two years but was later extended to 31 July 2015.[198] Pursuant to the agreement, Google agreed to share [revenue share terms][199] of its net ad revenues[200] in return for [revenue share partner] committing that it "*will not, and will not allow any third party to implement*" on any Wi-Fi only tablet GMS devices with a screen size of 7" or more and that are configured with [revenue share partner]'s Client ID "*any application, product or service which is the same as or substantially similar to Google Search Widget or the Google Mobile Search Service (or any part thereof)*".[201] [Revenue share partner] was, however, entitled to pre-install apps that did not include general search functionality and downloads by users of competing general search services were permitted.[202]

(201)   Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 November 2013 for a period of two years until 31 October 2015.[203] Google agreed to share [revenue share terms] of its net ad revenues in return for [revenue share partner] committing that it "*will not, and will not instruct or encourage any third party to implement*" on GMS devices that are configured with [revenue share partner]'s Client ID "*any application, product or service which is the same as or substantially similar to the Google Search Widget or the Google Mobile Search Service (or any part thereof)*".[204] [Revenue share partner] was, however, entitled to pre-install apps whose primary functionality was not general search and downloads by users of competing general search services were permitted.[205]

(202)   Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 February 2011 for a period ending on 31 December 2012.[206] Google agreed to share [revenue share terms][207] of its net ad revenues in return for [revenue share partner] committing that it "*will not, and will not allow any third party to: implement*" on Google Android devices "*any application, product or service which is the same as or substantially similar to Android Market, Google Phone-top Search or the Google Mobile Search Service (or any part thereof)*".[208] [Revenue share

---

[197]   See Android Search and Google Play Revenue Share Agreement between Google and [revenue share partner] […].

[198]   See Amendment No.1 to Android Search and Google Play Revenue Share Agreement between Google and [revenue share partner] […].

[199]   [Revenue share terms].

[200]   Ad revenues after appropriate deductions.

[201]   See Android Search and Google Play Revenue Share Agreement between Google and [revenue share partner], Clause 3.6 […].

[202]   See Android Search and Google Play Revenue Share Agreement between Google and [revenue share partner], Clause 3.6 […].

[203]   See Search Revenue Share Agreement between Google and [revenue share partner] […].

[204]   See Search Revenue Share Agreement between Google and [revenue share partner], Clause 3.6 […].

[205]   See Search Revenue Share Agreement between Google and [revenue share partner], Clause 3.6 […].

[206]   See Mobile Revenue Sharing Agreement between Google and [revenue share partner] […].

[207]   [Revenue share terms].

[208]   See Mobile Revenue Sharing Agreement between Google and [revenue share partner], Clause 4.10 […].

**EN**

**EN**

GOOG-DOJ-26429214

terms].[209]

(203)  Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 January 2013 for a period of one year until 31 December 2013.[210] Payments under the agreement were subsequently informally extended until March 2014.[211] Google agreed to share [revenue share terms] of its net ad revenues in return for [revenue share partner] committing that it "*will not, and will not allow any third party to implement*" on Google Android mobile phones, tablets and WiFi-only devices that are configured with [revenue share partner]'s Client ID "*any application, product or service which is the same as or substantially similar to Google Search Widget or the Google Mobile Search Service (or any part thereof)*".[212] [Revenue share partner] was, however, entitled to pre-install apps whose primary functionality was not general search and downloads by users of competing general search services were permitted.[213] In addition, the payment of revenue shares was conditioned on [revenue share partner] setting Google Chrome as the default browser on its devices.[214]

(204)  Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 January 2011 for a period of two years ending on 31 December 2012.[215] Google agreed to pay [revenue share terms][216] of its net ad revenues in return for [revenue share partner] committing that it will not "*"pre-install, install, incorporate or otherwise make available*" on any Google Android or non-Android devices, excluding [...] devices[217] that are sold with Google Search, "*any application, product, or service which is the same or substantially similar to a Search Client or the Google Search Services*".[218] [Revenue share partner] also committed not to: (i) pre-install access points to competing general search services; (ii) set the website of a competing general search service as the home page of a pre-installed browser; and (iii) pre-install any app that provides access to a competing general search service. This was a "*non-exhaustive list of activities prohibited*".[219] [Revenue share terms].[220]

(205)  Google and [revenue share partner] entered into a portfolio-based revenue share

---

[209]   See Mobile Revenue Sharing Agreement between Google and [revenue share partner], Clause 4.10 [...].

[210]   See Android Search Revenue Share Agreement between Google and [revenue share partner] [...].

[211]   [Revenue share partner] non-confidential response to Question 30 of the request for information of 17 July 2014 [...].

[212]   See Android Search Revenue Share Agreement between Google and [revenue share partner], Clause 3.6 [...].

[213]   See Android Search Revenue Share Agreement between Google and [revenue share partner], Clause 3.6 [...].

[214]   See Android Search Revenue Share Agreement between Google and [revenue share partner], Clause 2.2 (c) (5) [...].

[215]   See Mobile Services Distribution Agreement between Google and [revenue share partner] [...].

[216]   [Revenue share terms].

[217]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Schedule 3 [...].

[218]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Section 12 [...].

[219]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 12.1 [...].

[220]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 14.1 [...].

**EN**                                          52                                          **EN**

agreement on 1 October 2011 for a period ending on 30 September 2013.[221] Google agreed to share [revenue share terms][222] of its net ad revenues[223] in return for [revenue share partner] committing that it *"shall not pre-install, install, incorporate or otherwise make available"* on any Google Android or non-Android devices that are sold with Google Search *"any application, product or service (or links to any of the foregoing) which is the same or substantially similar to a Search Client or the Google Search Services"*.[224] [Revenue share partner] also committed not to: (i) pre-install access points to competing general *search* services; and (ii) set the website of a competing general search service as the home page of a pre-installed browser. This was a *"non-exhaustive list of activities prohibited"*.[225] [Revenue share terms].[226]

### 6.3.3.2. Portfolio-based revenue share agreements with MNOs

(206)  Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 September 2011 until 30 November 2013.[227] Google agreed to share [revenue share terms][228] of its app sales revenues made through the Play Store on [revenue share partner]'s devices, and in return for the shares of net ad revenues and app revenues, [revenue share partner] committed that *"[n]o widget, pointer, bookmark or application that is substantially similar to Google Search, Google Maps or Android Market may be preloaded on any […]."*[229] This portfolio-based revenue share agreement applied to all [revenue share partner] subsidiaries in the EEA.[230]

(207)  Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 September 2010 for a period of two years until 31 August 2012.[231] Google agreed to share [revenue share terms] of its net ad revenues[232] in return for [revenue share partner] committing that it *"shall not (and shall ensure that Authorised Android OEMs do not and shall use best endeavours to ensure that […] OEMs do not) pre-install, install, incorporate or otherwise make available"* on any GMS or Symbian device on which Google Search is pre-installed *"any application, product or service (or links to any of the foregoing) which is the same as or substantially similar to the Google Search Client [...] or to the Google Search*

---

[221]   See Mobile Services Distribution Agreement between Google and [revenue share partner] […].

[222]   [Revenue share terms].

[223]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Schedule 1 […].

[224]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 12 […].

[225]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 12.1 […].

[226]   See Mobile Services Distribution Agreement between Google and [revenue share partner] Clause 12.2 […].

[227]   See Global Cooperation Agreement between Google and [revenue share partner], Clause 5.1 […].

[228]   [Revenue share terms].

[229]   See Amendment No.5 to Global Cooperation Agreement between Google and [revenue share partner], Exhibit D […].

[230]   [Revenue share partner]'s non-confidential response to Question 48 of the request for information of 22 July 2014 […].

[231]   See Mobile Services Distribution Agreement between Google and [revenue share partner] […].

[232]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 15 […].

**EN**

**EN**

GOOG-DOJ-26429216

*Services".*[233] The limitation applied only to (links to) applications, products, services that had web search as their primary function.[234] The agreement applied to [revenue share partner]'s subsidiaries in [various EEA Member States].[235]

(208)   Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 September 2011 for a period of two years, which was subsequently extended for an additional year until 31 August 2014.[236] Google agreed to share [revenue share terms] of its net ad revenues achieved by Google on Android smartphones and tablets that bear [revenue share partner]'s Client ID in [revenue share terms] and [revenue share terms][237] afterwards[238], in return for [revenue share partner] committing that it *"shall not, and shall not allow any* [revenue share partner] *or any third party [...] to pre-install or preload"* on any Android device *"any Similar Application".*[239] For the purposes of the agreement, Similar Application is defined as an *"application which is the same as or substantially similar to a Google Search Client or the Google Search Services".*[240] The agreement applied to [revenue share partner]'s subsidiaries in [various EEA Member States].[241]

(209)   Google and [revenue share partner] entered into a portfolio-based revenue share agreement on 1 May 2010 for a period of three years.[242] Google agreed to share [revenue share terms] of its net ad revenues in return for [revenue share partner] committing that it *"shall ensure that [...] Google will be the exclusive provider of search and search advertising services presented in response to a Query"* on (i) devices on which Google's general search service is pre-installed;[243] and (ii) other mobile phones distributed by [revenue share partner] that are *"technically capable of running the Google Search Client or Hosted Mobile Search".*[244] The agreement applied to all [revenue share partner] subsidiaries in the EEA.[245]

---

[233]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 13.1 [...].

[234]   See Mobile Services Distribution Agreement between Google and [revenue share partner], Clause 13.2 [...].

[235]   [Revenue share partner]'s non-confidential response to Question 22 of the request for information of 22 July 2014 [...].

[236]   See Google Mobile Search Client Distribution Agreement between Google and [revenue share partner] [...].

[237]   [Revenue share terms].

[238]   See Google Mobile Search Client Distribution Agreement between Google and [revenue share partner], Schedule 1, Clause 1.5 [...].

[239]   See Google Mobile Search Client Distribution Agreement between Google and [revenue share partner], Clause 14.2 [...].

[240]   See Google Mobile Search Client Distribution Agreement between Google and [revenue share partner], Clause 14.1 [...].

[241]   [Revenue share partner]'s non-confidential response to Question 22 of the request for information of 22 July 2014 [...].

[242]   See Mobile Services Agreement between Google and [revenue share partner] [...].

[243]   See Mobile Services Agreement between Google and [revenue share partner], Schedule E [...].

[244]   See Mobile Services Agreement between Google and [revenue share partner], Clause 14 [...].

[245]   [Revenue share partner]'s non-confidential response to Question 22 of the request for information of 22 July 2014 [...].

**EN**                                        54                                        **EN**

GOOG-DOJ-26429217

## 7. RELEVANT PRODUCT MARKETS

### 7.1. Principles

(210) The definition of the relevant product and geographic market in the context of the application of Article 102 TFEU is useful when assessing whether an undertaking has a dominant position and whether that dominant position enables it to prevent effective competition from being maintained on the relevant market by giving it the power to behave to an appreciable extent independently of its competitors, its customers and, ultimately, consumers.[246]

(211) The concept of the relevant market implies that there can be effective competition between the products or services which form part of it and this presupposes that there is a sufficient degree of interchangeability between all the products or services forming part of the same market in so far as a specific use of such products or services is concerned.[247]

(212) An examination to that end cannot be limited solely to the objective characteristics of the relevant products and services, but the competitive conditions and the structure of supply and demand on the market must also be taken into consideration.[248]

(213) The identification of relevant product markets by the Commission derives from the existence of competitive constraints. Undertakings are subject to three main sources of competitive constraints: demand-side substitution, supply-side substitution and potential competition. From an economic point of view, for the definition of the relevant market, demand-side substitution constitutes the most immediate and effective disciplinary force on the suppliers of a given product.[249]

(214) Supply-side substitution may also be taken into account when defining markets in those situations in which its effects are equivalent to those of demand-side substitution in terms of effectiveness and immediacy. There is supply-side substitution when suppliers are able to switch production to the relevant products or services and market them in the short term without incurring significant additional costs or risks in response to small and permanent changes in relative prices. When these conditions are met, the additional production that is put on the market is expected to have a disciplinary effect on the competitive behaviour of the companies involved.[250]

(215) Supply-side substitution is, however, not taken into account at the stage of defining the relevant market when it would entail each time the need to adjust significantly existing tangible and intangible assets, additional investments, strategic decisions or

---

[246] Case 27/76 *United Brands* v *Commission*, EU:C:1978:22, paragraph 10-11; Case 85/76 *Hoffmann-La Roche* v *Commission*, EU:C:1979:36, paragraphs 38-39; Case 322/81 *Nederlandsche Banden Industrie Michelin* v *Commission*, EU:C:1983:313, paragraph 37; Case T-83/91 *Tetra Pak II*, EU:T:1994:246, paragraph 63.

[247] Case 85/76 *Hoffmann-La Roche* v *Commission*, EU:C:1979:36, paragraph 28; Case C-179/16 *F. Hoffmann-La Roche and Others*, EU:C:2018:25, paragraph 51. See also the Commission's Notice on the definition of relevant market for the purposes of Community competition law ("Notice on market definition"), OJ C 372, 9.12.1997, p. 5.

[248] Case 322/81 *Nederlandsche Banden Industrie Michelin* v *Commission*, EU:C:1983:313, paragraph 37; Case T-556/08 *Slovenská pošta* v *Commission*, EU:T:2015:189, paragraph 112; Case C-179/16 *F. Hoffmann-La Roche and Others*, EU:C:2018:25, paragraph 51.

[249] Notice on market definition, paragraph 13.

[250] Notice on market definition, paragraph 20.

GOOG-DOJ-26429218

time delays.[251]

(216)    If certain economic operators are specialised and are active solely on a secondary product or after-market of a primary market, that constitutes in itself a strong indication of the existence of a specific market.[252]

## 7.2.    Application to this case

(217)    The Commission concludes that the relevant product markets are:

(1)    the market for the licensing of smart mobile OSs;

(2)    the market for Android app stores;

(3)    the market for the provision of general search services; and

(4)    the market for non OS-specific mobile web browsers.

## 7.3.    The licensing of smart mobile OSs

(218)    The Commission concludes that the licensing of smart mobile OSs constitutes a separate relevant product market.

(219)    This conclusion is based on the following considerations:

(1)    PC OSs do not belong to the same product market as smart mobile OSs (Section 7.3.1);

(2)    basic and feature phone OSs do not belong to the same product market as smart mobile OSs (Section 7.3.2);

(3)    smart mobile OSs for smartphones and for tablets belong to the same product market (Section 7.3.3);

(4)    all licensable smart mobile OSs belong to the same product market (Section 7.3.4); and

(5)    non-licensable smart mobile OSs do not belong to the same product market as all licensable smart mobile OSs (Section 7.3.5).

### 7.3.1.    PC OSs and smart mobile OSs

(220)    The Commission concludes that PC OSs do not belong to the same product market as smart mobile OSs.

(221)    From a demand-side perspective, OEMs require smart mobile OSs to power their smart mobile devices, and cannot use PC OSs for that purpose. Amazon, for example, stated that "[…] *a PC OEM cannot install a mobile OS on its devices. PC OEMs therefore require a PC OS and mobile handset OEMs require a mobile OS.*"[253] Apple stated that: "*From a demand perspective, the OS used in most, if not all, mobile devices is different from the OS used in PCs. Today, separate OSs have been developed for mobile devices that are simpler and have certain features that are different from OSs for PCs and desktops. Furthermore, apps developed for a mobile OS may not function (or may not function as well) on a device using an OS for PCs*

---

[251]    Notice on market definition, paragraph 23.

[252]    Case T-427/08 *Confédération européenne des associations d'horlogers-réparateurs (CEAHR) v Commission*, EU:T:2010:517, paragraph 108; and Notice on market definition, paragraph 56.

[253]    Amazon's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS providers (Doc ID 4187).

GOOG-DOJ-26429219

*(and vice versa)." [254]* BlackBerry also confirmed that: "[…] *most mobile device OSs cannot be used by consumers to operate computers and most computer OSs cannot be used by consumers to operate mobile devices*".[255]

(222)    From a supply-side perspective, it is true that PC OS suppliers could in principle switch to the development and supply of smart mobile OSs. For example, Apple stated that: "[…] *there is clearly a relationship between OSs for mobile devices (mobile phones and tablets) and OSs for PCs and desktops and the computer programming skills needed to develop a mobile OS are similar to those needed to develop an OS for PCs.*"[256]

(223)    Smart mobile OSs, however, require functionalities that are specific to smart mobile devices and are different from those of PC OSs. For example, Nokia Corporation ("Nokia") stated: "*The hardware requirements for a mobile OS are significantly different from a PCs OS e.g., in terms of processors, memory, display, and power management. In most cases, the applications developed in the mobile environment are also specific to the mobile domain and not shared with the personal computer environment, and vice versa.*"[257] Samsung also indicated that "*Smart mobile device OSs constitute a separate market from PC and Desktop OSs. Smart mobile device OSs are customized for smaller screen sizes, mobile functions, wireless functions, and apps that are better suited for simpler mobile devices rather than PC OSs, which are designed for higher performance CPUs and larger screens, and greater drive storage capabilities.*" [258]

(224)    As a result of those specific functionalities, any switch from PC OSs to smart mobile OSs would require substantial time and investment. This was confirmed by a number of developers of PC OSs. For example, Microsoft stated: "*Total development costs for the modern Windows Phone platform through the end of June 2013 are approximately* [in the millions of dollars]. […] *Windows Phone 7, Microsoft's first release of its modern smartphone OS, took more than* [0-4] *years to develop.*"[259] Apple also indicated that: "[the] *development of iOS required a substantial amount of time and resources (financial and engineering). Apple continually invests significant resources improving iOS, adding new features and functionality.*"[260]

(225)    This was also confirmed by Deutsche Telekom that stated as follows: "*[w]hereas smartphones and tablets are using almost identical OS, PC OS have different*

---

[254]    See Apple's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc 690).

[255]    See BlackBerry's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 3763).

[256]    See Apple's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 690). See also Huawei's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 3998).

[257]    See Nokia's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 764). See also Jolla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS providers (Doc ID 3981) and Mozilla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS providers (Doc ID 3951).

[258]    See Samsung's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 4117).

[259]    See Microsoft's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS developers (Doc ID 3794).

[260]    See Apple's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS developers (Doc ID 749).

**EN**
**EN**

GOOG-DOJ-26429220

*performance capacities. Thus, different market leaders evolved in the OS segment for the different OS product markets. On the market for PC OS Microsoft Windows is still the market leader, whereas it plays only a subordinate role on the mobile and tablet OS market.*"[261]

(226)   Google does not contest the Commission's conclusions as outlined in this Section.

### 7.3.2.   *Basic and feature phone OSs and smart mobile OSs*

(227)   The Commission concludes that basic and feature phone OSs do not belong to the same product market as smart mobile OSs.[262]

(228)   From a demand-side perspective, basic and feature phone OSs cannot be installed on smart mobile devices because of their reduced functionalities. For example, Microsoft stated: "*The ability to install and use applications is a defining characteristic for a smartphone OS that distinguishes it from other types of mobile phones. Indeed, users regularly access all of their most important applications from any one of a number of devices, such as smartphones, tablets, and other computer form factors. Since this activity is not possible with an OS for a feature or basic mobile phone, it is unlikely that they compete in the same market as smartphone OSs*".[263] Nokia also confirmed that: "[…] *mobile OSs for smart mobile devices, unlike basic and feature phones, are designed to support computer-like features and the ability to install and make use of applications with rich capabilities – something that basic or feature phone OSs typically lack.*"[264]

(229)   From a supply-side perspective, those differences in functionalities mean that the development of a smart mobile OS requires significant time and resources, regardless of whether the developer in question has already developed a basic and feature phone OS. This is confirmed by the fact that no developer of basic and feature phone OSs has successfully launched a smart mobile OS in the last five years.

(230)   Google does not contest the Commission's conclusions as outlined in this Section.

### 7.3.3.   *Smartphone OSs and tablet OSs*

(231)   The Commission concludes that smartphone OSs and tablet OSs belong to the same product market.

(232)   From a demand-side perspective, the same OS, or similar versions of it, power both

---

[261]   See Deutsche Telekom's non-confidential response to Question 3 of the request for information of 12 June 2013 to MNOs (Doc ID 625). See also Amazon's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 4187) and Jolla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 3981).

[262]   Basic phone is a category of mobile phone only capable of voice calling and text messaging. Feature phone is a category of mobile phones that adds minimal smartphone features to those of a basic phone, such as rudimental web browsing capabilities.

[263]   See Microsoft's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 377).

[264]   See Nokia's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 764). See also Amazon's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 4187), Jolla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS providers (Doc ID 3981), Mozilla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 3951), Huawei's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 3998) and Microsoft's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 377).

**EN**                                             58                                             **EN**

GOOG-DOJ-26429221

smartphones and tablets. Mozilla Foundation ("Mozilla") stated: "[…] *given that many mobile OSs are designed to run on both smartphones and tablets, mobile OSs for these devices are part of the same market. There are, of course, somewhat different use cases for smartphones and tablets – for example, one would not normally use a tablet to make a voice call – but even so, their underlying platforms remain largely identical.*"[265] Deutsche Telekom also indicated: "[…] *smartphones and tablets are using almost identical OS.*"[266]

(233) From a supply-side perspective, all main OS developers use the same OS to power both smartphones and tablets, or easily adjust a smartphone OS to allow it to run on a tablet (and vice-versa). For example, Apple has confirmed that "*Apple has developed and implemented a single operating system for both its iPhone and iPad products. There are no significant differences from Apple's perspective.*"[267]

(234) Google does not contest the Commission's conclusions as outlined in this Section.

*7.3.4.   Licensable smart mobile OSs*

(235) The Commission concludes that all licensable smart mobile OSs belong to the same product market.

(236) This is because, from a demand-side perspective, OEMs are free to choose between different licensable smart mobile OSs, such as Android and Windows, to power their devices.

(237) Google does not contest the Commission's conclusions as outlined in this Section.

*7.3.5.   Licensable smart mobile OSs and non-licensable smart mobile OSs*

(238) The Commission concludes that non-licensable smart mobile OSs such as iOS and BlackBerry OS do not belong to the same product market as licensable smart mobile OSs.

(239) From a demand-side perspective, OEMs cannot obtain a licence to use iOS or BlackBerry OS because Apple and BlackBerry do not grant licences to third parties.[268]

---

[265] See Mozilla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 3951).

[266] See Deutsche Telekom's non-confidential response to Question 3 of the request for information of 12 June 2013 to MNOs (Doc ID 625). See also Amazon's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 4187), Apple's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 749) and HP's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 4162).

[267] See Apple's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 749). See also Amazon's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 4187), Mozilla's non-confidential response to Question 3 of the request for information of 12 June 2013 to OS developers (Doc ID 3951), HP's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEMs (Doc ID 4162) and Nokia's non-confidential response to Question 3 of the request for information of 12 June 2013 to OEM's (Doc ID 764).

[268] See Apple's non-confidential response to Question 23 of the request for information of 12 June 2013 to OS developers (Doc ID 749) and BlackBerry's non-confidential response to Question 23 of the request for information of 12 June 2013 to OS developers (Doc ID 733). In addition, see Huawei's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 3998); LG Electronics' non-confidential response to Question 4 of the request for information of 12

GOOG-DOJ-26429222

(240)    From a supply-side perspective, neither Apple nor BlackBerry has licensed or announced its intention to license its smart mobile OS to any third party. In addition, Nokia stated that: "[…] *even in the extremely unlikely scenario that Apple would in fact start to license its iOS to competing OEMs, it would probably take at least two years to make all of the required changes in the chipset architecture as well as hardware and software configurations that would be necessary for the OEM to migrate to iOS. Furthermore, iOS has not been designed to be licensed out but to be a part of a closed vertical offering which could make the business case technically unsound and would in any case lead to high development and switching costs both in terms of transition time needed and necessary investments*."[269]

(241)    The Commission's conclusion that non-licensable smart mobile OSs do not belong to the same product market as licensable smart mobile OSs is not affected by Google's claim that the Commission fails to recognise competition between non-licensable and licensable mobile OSs, and in particular from Apple iOS, from the relevant market. In particular, according to Google:

(1)    the Commission itself recognised in the Statement of Objections that non-licensable mobile OSs such as iOS are "competing" against Android;[270]

(2)    Apple iOS competes with Android to attract users and app developers;[271]

(3)    the judgment of the General Court in Case T-310/01 *Schneider Electric* and the Commission's past decisions indicate that integrated and non-integrated operators compete, and must be included, in the same product market. This is why the Commission defined a single market for smart mobile OSs in the *Google/Motorola Mobility* merger decision;[272]

(4)    respondents to requests for information indicate that licensable and non-licensable smart mobile OSs compete with each other;[273]

(5)    the Commission has ignored the relevance of four internal Google documents that identify iOS as a competitor to Android;[274]

(6)    the Commission has considered user substitution as a constraint when defining the relevant markets for app stores and mobile web browsers, but not when defining the relevant market for smart mobile OSs;[275]

(7)    the Commission's assessment conflicts with findings by competition authorities

---

[269]   June 2013 to OEMs (Doc ID 584); and Sony Mobile Communications non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).
        See Nokia's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 764). See also HP's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 4162) and LG Electronics' non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 584).

[270]   Google's Response to the Statement of Objections, Part Two, page 41, paragraph 8 (Doc ID 7117).

[271]   Google's Response to the Statement of Objections, Part Two, pages 41-42, paragraphs 10-13 (Doc ID 7117).

[272]   Google's Response to the Statement of Objections, Part Two, pages 42-44, paragraphs 14-18 (Doc ID 7117); and Google's Response to the First Letter of Facts, Part One, page 4, paragraph 9 (Doc ID 8598).

[273]   Google's Response to the Statement of Objections, Part Two, pages 44-47, paragraph 19 (Doc ID 7117).

[274]   Google's Response to the Statement of Objections, Part Two, page 47, paragraph 20 (Doc ID 7117).

[275]   Google's Response to the Statement of Objections, Part Two, page 47, paragraph 21 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429223

and courts in Australia, Canada and the US;[276]

(8)    the release dates of Android and iOS versions closely track each other;[277] and

(9)    the Commission fails to apply a SSNIP test.[278]

(242)    First, the two references in the Statement of Objections to the fact that non-licensable mobile OSs such as iOS and BlackBerry OS "compete" with Android simply reflect the fact that non-licensable mobile OSs may exercise a degree of constraint on Google's position in the worldwide (excluding China) market for licensable smart mobile OSs because of possible competition between iOS/BlackBerry devices and Google Android devices both at the level of users of smart mobile devices and of app developers (referred hereinafter as "indirect constraint").

(243)    Second, for the reasons explained in Section 9.3.4, the Commission concludes that iOS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs. These reasons confirm that iOS should not be included in the relevant market for licensable smart mobile OSs.

(244)    Third, neither the judgment of the General Court in *Schneider Electric*[279] nor the past Commission decisions cited by Google[280] indicate that integrated and non-integrated players should necessarily be included in the same product market. Moreover, the Commission has never defined a single market for smart mobile OSs, in particular in the *Google/Motorola Mobility* merger decision.

(245)    In the first place, neither the judgment of the General Court in *Schneider Electric* nor any of the past Commission decisions cited by Google indicates that integrated and non-integrated players should necessarily be included in the same product market. Rather, integrated and non-integrated players were included in the same market because: (i) integrated players were also selling their upstream products to third parties; and (ii) the downstream markets were bidding markets featuring large and sophisticated buyers. By contrast, in this case, Apple and BlackBerry do not license their smart mobile OS to any third party. Moreover, the downstream market is the market for end-users where buyers are neither large nor sophisticated.

(246)    Moreover, in a number of the decisions quoted by Google,[281] the Commission only assessed the indirect constraint from integrated players in the competitive assessment, which is in line with the Commission's approach in this case.

(247)    In the second place, the Commission has never defined a single market for smart mobile OSs. In a number of the decisions quoted by Google, including the *Google/Motorola Mobility* merger decision, the Commission left open the question whether licensable and non-licensable smart mobile OSs should be considered part of

---

[276]    Google's Response to the Statement of Objections, Part Two, page 48, paragraphs 22-23 (Doc ID 7117), Google's letter of 25 January 2017 (Doc ID 7135) and Google's letter of 24 April 2017 (Doc ID 7862).

[277]    Google's Response to the Statement of Objections, Part Two, pages 48-49, paragraphs 24-25 (Doc ID 7117).

[278]    Google's Response to the Statement of Objections, Part Two, pages 49-50, paragraph 26 (Doc ID 7117).

[279]    Case T-310/01, EU:T:2002:254.

[280]    Cases M.3653 – *Siemens / VA Tech* and M.7342 – *Alcoa / Firth Rixon.*

[281]    See Cases M.6439 – Agrana / RWA / JV, recital 115, and M.4533 – SCA / P&G (European tissue business), recital 169.

**EN**

**EN**

GOOG-DOJ-26429224

the same market.[282]

(248)   In the third place, in the *Microsoft / Nokia* decision not only did the Commission leave open the question whether licensable and non-licensable smart mobile OSs should be considered part of the same market but it stated that "*Android was in 2012 by far the dominant OS with upwards of 80-90% of the market*".[283]

(249)   Fourth, while respondents to the requests for information may have acknowledged the existence of a degree of competition between iOS and Google Android devices at the level of users of smart mobile devices, they did not indicate that licensable and non-licensable smart mobile OSs can be seen as substitutes from an OEM perspective. For example:

(1)   Apple stated: "*OSs that are not available for licensing by third-party OEMs should not be included in the relevant market. The non-licensable OSs do not constrain the competitive behaviour of licensable OSs. OEMs would not be able to switch to these non-licensable OSs in response to a SSNIP.*"[284]

(2)   […] stated: "[…] *mobile OSs that are not available for licensing should not be included in a mobile OS market for OEMs because proprietary systems like Apple's iOS are not open to third party OEMs.*"[285]

(3)   Sony stated: "*From the perspective of an OEM the only relevant mobile OSs are those which it can competitively license and/or implement, and as for example Apple iOS is proprietary and unavailable for third party OEMs, it should be disregarded in the competitive equation when seen from the OEM's perspective.*"[286]

(250)   Fifth, the four internal Google documents quoted by Google do not support its claim that iOS and Android should be part of the same relevant market for smart mobile OSs.

(251)   In the first place, two of the four documents are from 2010, which is before Google became dominant in the market for licensable smart mobile OSs.

(252)   In the second place, the other two documents (an internal email dated 6 May 2012 and an internal presentation dated October 2011)[287] indicate only that there is a degree of competition between Android and iOS devices at the level of users. These documents do not indicate that licensable and non-licensable smart mobile OSs are part of the same relevant market from an OEM perspective.

(253)   Sixth, the indirect constraint exercised by non-licensable mobile OSs on Android can be relevant when assessing both market definition and dominance. The Commission's

---

[282]   See Cases M.6381 – Google / Motorola Mobility, M.7047 – Microsoft / Nokia, AT.37792 – Microsoft and AT.39530 – Microsoft (Tying).

[283]   See Case M.7047 – Microsoft / Nokia, recital 102.

[284]   See Apple's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 690).

[285]   See […]'s non-confidential response to Question 4 of the request for information of 12 June 2013 […].

[286]   See Sony's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 4389). See also Nokia's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 764) and LG Electronics' non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 584).

[287]   Google mistakenly stated that this document is from 2012 (see Google's Response to the Statement of Objections, page 47, paragraph 20 (Doc ID 7117)).

GOOG-DOJ-26429225

conclusions that non-licensable smart mobile OSs do not belong to the same product market as licensable smart mobile OSs, and that Google holds a dominant position since 2011 in the worldwide market (excluding China) for the licensing of smart mobile OSs are therefore not dependant on whether user substitution and the corresponding indirect constraint exercised by non-licensable mobile OSs on Android is assessed at the stage of market definition or dominance. This is confirmed by the fact that Google responded to the Commission's preliminary conclusions on market definition and dominance in a single section of its Response to the Statement of Objections.

(254)   Seventh, the Commission's assessment is not contradicted by the findings of competition authorities and courts in Australia, Canada and the US quoted by Google.

(255)   In the first place, the 2017 decision of the Australian Competition and Consumer Commission ("ACCC") in the context of the Apple Pay investigation[288] and the 2017 Canadian Competition Bureau ("CCB") Position Statement in the context of the investigation to the obligations on MNOs relating to the sale and marketing of the iPhone in Canada[289] were focussed on Apple's behaviour. Given that Apple does not licence iOS to OEMs, there was no need for the ACCC or the CCB to assess the possible existence of a market for licensable smart mobile OSs.

(256)   In the second place, the 2010 statement of the US Federal Trade Commission ("FTC") in the *Google/AdMob* case[290] relates to in-app advertising rather than to licensable smart mobile OSs. In addition, the statement refers to the fact that "*[i]n any nascent market there will be uncertainty about the path of competition and the durability of early leads in market share*". However, as noted in Section 9.3.1, Google's market shares in the market for licensable smart mobile OSs have been stable and above 90% since 2012.

(257)   In the third place the 2015 judgment of the US Court of Appeals for the Federal Circuit in the *Apple/Samsung* case[291] relates to competition between Apple and Samsung at the level of downstream sales of smart mobile devices. The judgment does not therefore concern competition at the level of licensable smart mobile OSs.

(258)   Eighth, the release dates of Android and iOS versions do not support the existence of an overall market for licensable and non-licensable smart mobile OSs.

(259)   In the first place, release dates of Android and iOS versions are not necessarily indicative of competition between the two OSs. The timing of version releases is likely to be determined by a number of different factors, including the time needed to develop a new OS version.

(260)   In the second place, contrary to what Google claims, release dates of Android and iOS versions do not closely track each other between December 2008 and December 2011. Google misleadingly included in the table at page 48 of its Response to the

---

[288]   See ACCC's determination on applications for authorisation A91546 & A91547 of 31 March 2017.

[289]   See CCB's statement of 6 January 2017 on http://www.competitionbureau.gc.ca/eic/site/cb-bc.nsf/eng/04182.html printed and saved on 5 June 2018.

[290]   Statement of the Commission Concerning Google/AdMob, May 21, 2010. Avaialble at: https://www.ftc.gov/sites/default/files/documents/closing_letters/google-inc./admob-inc./100521google-admobstmt.pdf printed and saved on 5 June 2018.

[291]   *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, December 16, 2015, paragraph 644.

EN

EN

GOOG-DOJ-26429226

Statement of Objections certain intermediate versions only for iOS (for example iOS 4.1 and 4.2) but not for Android. When one removes these intermediate versions, there were seven releases of Android versions and only three releases of iOS versions between December 2008 and December 2011.

(261)   In the third place, the frequency of Android releases decreased after December 2011. This is consistent with the conclusion that, as of 2011, Google achieved a dominant position in the market for licensable smart mobile OS (see Section 9.3) rather than Google's claim that there is an overall market for licensable and non-licensable smart mobile OSs.

(262)   In the fourth place, any comparison based only on release dates of OS updates is not meaningful because, as discussed in Section 9.3.4.1, iOS users generally update their OS faster than Android users.

(263)   Ninth, the Commission is not required to carry out a SSNIP test.

(264)   In the first place, the SSNIP test is not the only method available to the Commission when defining the relevant product market.[292]

(265)   In the second place, the Commission is required to make an overall assessment of all the evidence and there is no hierarchy between the types of evidence that the Commission can rely upon.[293]

(266)   In the third place, a SSNIP test would not have produced a different outcome in this case because OEMs cannot switch to non-licensable smart mobile OSs, regardless of the magnitude of a potential price increase or quality degradation in licensable smart mobile OSs.

(267)   In the fourth place, notwithstanding the fact that SSNIP test may prove unsuitable,[294] when assessing the indirect constraint exercised by non-licensable smart mobile OSs on Android, the Commission has analysed the extent of switching of users (see Sections 9.3.4.1, 9.3.4.2 and 9.3.4.3) and developers (see Section 9.3.4.2.IV) in the event of a small but significant, non-transitory quality degradation of the licensable smart mobile OS.

## 7.4.   Android app stores

(268)   The Commission concludes that Android app stores constitute a separate relevant product market.

(269)   This conclusion is based on the following considerations:

(1)   other apps do not belong to the same product market as app stores (Section 7.4.1);

(2)   different app stores for Google Android devices belong to the same product market (Section 7.4.2);

(3)   app stores for other Android devices belong to same product market as app stores for Google Android devices (Section 7.4.3);

---

[292]   Case T-699/14 *Topps Europe v Commission*, EU:T:2017:2, paragraph 82.

[293]   Case T-342/07 *Ryanair v Commission*, EU:T:2010:280, paragraph 136; Case T-175/12 *Deutsche Börse v Commission*, EU:T:2015:148, paragraph 133.

[294]   Case T-699/14 *Topps Europe v Commission*, EU:T:2017:2, paragraph 82.

**EN**

**EN**

GOOG-DOJ-26429227

(4)    app stores for other licensable smart mobile OSs do not belong to the same product market as app stores for Android devices (Section 7.4.4); and

(5)    app stores for other non-licensable smart mobile OSs do not belong to the same product market as app stores for Android devices (Section 7.4.5).

### 7.4.1.    *Other apps and app stores*

(270)    The Commission concludes that other apps do not belong to the same product market as app stores.

(271)    From a demand-side perspective, app stores serve different purposes than other apps. App stores work as distribution channels, allowing users to search for and download a wide array of other apps. App stores cannot, therefore, be replaced by other apps for such purposes. This is why OEMs need to pre-install on their smart mobile devices at least one app store to allow users to download other apps.[295] Lenovo, for example, stated: "*Devices must have a pre-installed app store with a competitive catalog of apps in order to be relevant. It is not commercially viable to sell a smart phone without an app store.*"[296] Microsoft also stated: "*We believe that it is impossible to compete without an appstore, and OEMs find it very important to include an appstore on their mobile devices.*"[297] According to Nokia: "*A pre-installed app store is an absolute requirement for any device marketed as a mobile device. While technically there are other ways to get apps on mobile devices, such as via certain websites, most consumers are not aware of this and would likely find the device close to unusable without a pre-loaded app store that offered quick access to their personal favorites (apps).*"[298]

(272)    From a supply-side perspective, the development of an app store requires significant time and resources, regardless of whether the developer in question has already developed other apps. In particular, developers of other apps have stated that the time and resources to develop an app store are significant. Microsoft, for example, stated: "*Using* [R&D data] *for fiscal years 2007 to 2014, we roughly estimate that we spent* [millions of dollars] *over this time period to develop appstores for Windows Phone 7, 8 and 8.1.*"[299]

(273)    Google does not contest the Commission's conclusions as outlined in this Section.

### 7.4.2.    *Different Google Android app stores*

(274)    There are a number of different app stores available for Google Android devices.

---

[295]    The installation of apps directly from a website, i.e. without the use of an app store (so-called "side-loading") is allowed on some smart mobile devices, and in particular on Android devices. However, sideloading is technically complex and does not constitute a satisfactory distribution channel (see Section 9.4.5).

[296]    See Lenovo's non-confidential response to Question 5 of the request for information of 21 October 2015 on app stores (Doc ID 2602).

[297]    See Microsoft's non-confidential response to Question 5 of the request for information of 21 October 2015 on app stores (Doc ID 2493).

[298]    See Nokia's non-confidential response to Question 5 of the request for information of 21 October 2015 on app stores (Doc ID 3991). See also SFR's non-confidential response to Question 5 of the request for information of 21 October 2015 (Doc ID 3975) and Deutsche Telekom's non-confidential response to the Question 5 of the request for information of 21 October 2015 (Doc ID 2556).

[299]    See Microsoft's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc IDs 4557). See also Amazon's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

**EN**                                              65                                              **EN**

GOOG-DOJ-26429228

These include the Play Store, the Amazon AppStore, Samsung's Galaxy Apps store, Aptoide, the Opera Software ASA's ("Opera") Mobile Store and the Yandex Store.

(275)   The Commission concludes that these different app stores for Google Android devices ("Google Android app stores") belong to the same product market.

(276)   From a demand-side perspective, an OEM can, in principle, choose from a number of different Google Android app stores for its Google Android devices. For example, Samsung indicated that its Galaxy Apps store is a substitute to the Play Store: "*In terms of features and functionalities, OEM or third party preloaded appstores, such as Galaxy Apps, could be a viable substitute to Google Play.*"[300] As for Amazon's Appstore, Lenovo, for example, stated: "*Amazon's app store is comparable to Google's in terms of its features and functionality. Amazon's app store is also comparable to Google's in terms of price, since OEMs do not have to pay to install the app store. Both Amazon and Google offer the same terms to developers. Amazon app store's quality controls and test process is best in class.*"[301]

(277)   Other OEMs have, however, stated that other Google Android app stores can only be seen as limited substitutes for the Play Store. ZTE Corporation ("ZTE"), for example, stated: "*Currently Play Store is open for ZTE to preload and it makes android apps available worldwide. It serves as the official appstore for the Android operating system. As OEM, currently we will not consider any other pre-installable appstore as substitutable to the Play Store in terms of usage, features, functionalities and price.*"[302] Huawei has also stated: "*From our perspective, Google Play Store is the main pre-installed appstores in EEA market, other pre-installed stores like Amazon App Store have very limit usage. They can be considered as complements to Google Play Store rather than substitutes.*"[303] In addition, LG Electronics stated: "*We think that* [Play Store] *cannot be replaced with another App Store because any other app store does not have more contents than the Google play store.*" [304]

(278)   From a supply-side perspective, even if there is a certain degree of substitutability between different Google Android app stores, it would be difficult for a developer to replicate the features of the Play Store. Those features are discussed in Sections 9.4.4 and 9.4.5.

(279)   In any event, if all Google Android app stores were not part of the same market, such an approach would be less favourable to Google.

(280)   Google does not contest the Commission's conclusions as outlined in this Section.

*7.4.3.   App stores for other Android devices and app stores for Google Android devices*

(281)   The Commission concludes that app stores for other Android devices and app stores for Google Android devices belong to the same product market for app stores for

---

[300]   See Samsung's non-confidential response to Question 6 of the request for information of 21 October 2015 on app stores (Doc ID 2805).

[301]   See Lenovo's non-confidential response to Question 6 of the request for information of 21 October 2015 on app stores (Doc ID 4095).

[302]   See ZTE's non-confidential response to Question 6 of the request for information to app store developers of 21 October 2015 (Doc ID 2840).

[303]   See Huawei's non-confidential response to Question 6 of the request for information to app store developers of 21 October 2015 (Doc ID 2455).

[304]   See LG Electronics' non-confidential response to Question 6 of the request for information to app store developers of 21 October 2015 (Doc ID 2377).

**EN**

66

**EN**

GOOG-DOJ-26429229

Android devices ("Android app stores").

(282)   This is because, from a supply-side perspective, app stores developed for other Android devices can be easily modified so as to make them function on Google Android devices, due to similarities in the source code between different Android OSs. For example, Amazon has developed an app store for its own Android OS (Fire OS), in addition to the Google Android one.[305]

(283)   Google does not contest the Commission's conclusions as outlined in this Section.

### 7.4.4.   App stores for other licensable smart mobile OSs and Android app stores

(284)   The Commission concludes that app stores for other licensable smart mobile OSs do not belong to the same product market as Android app stores.

(285)   From a demand-side perspective, once an OEM has decided to install Android on its devices, it cannot, for technical reasons, pre-install an app store that has not been developed for Android. An OEM would only be able to pre-install a non-Android app store by installing a non-Android OS.

(286)   OEMs would be unlikely to switch to other licensable smart mobile OSs in the event of either a small but significant, non-transitory increase in the percentage of app-related revenues that app developers have to share with an Android app store or a small but significant, non-transitory deterioration of the quality of Android app store (e.g. search functions within the store, presentation of the results, offer of special deals, update features, etc.).[306] This is for a number of reasons.

(287)   First, OEMs would not have any incentive to switch to another licensable smart mobile OS, even on the assumption that all app developers would fully pass on to users a small but significant, non-transitory increase in the percentage of app-related revenues that app developers have to share with an Android app store. This is because users would be unlikely to switch to another smart mobile device with a different OS as (i) the price increase for users would be negligible as Android users spend on average only USD 5 per year on apps[307], and (ii) switching costs and the degree of OS loyalty are high (see recital (471)). As Deutsche Telekom explained, "*The cost of purchasing apps is likely to be comparatively small compared to the cost of changing to a new mobile OS (which might entail a new handset) and time needed to move to another mobile OS for most users. This is because most apps are either free or charge or have a low price. Therefore the price of apps would have to increase very substantially in order to cause switching of users to other OS*".[308]

(288)   Second, OEMs would not have any incentive to switch to another licensable smart mobile OS, even on the assumption of a small but significant non-transitory deterioration of the quality of the Play Store. This is for the reasons set out in recitals

---

[305]   See Amazon's non-confidential response to Question 2 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[306]   Google's survey to developers list several performance parameters important for developers: [Google internal communications on commercial relationships and business strategy]. Source: Google's internal document "Google Play Developer Sentiment Survey, Topline Report", August 2016 (Doc ID 6555-68).

[307]   See Philip Elmer-DeWitt, "Apple's users spend 4X as much as Google's" (27 June 2014), available at http://fortune.com/2014/06/27/apples-users-spend-4x-as-much-as-googles/, printed and saved on 12 June 2018.

[308]   See Deutsche Telekom's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2556).

**EN**

**EN**

GOOG-DOJ-26429230

(289) and (290).

(289)    In the first place, users would be unlikely to switch from an Android device to another smart mobile device with a different licensable smart mobile OS because: (i) the number and quality of apps available for a given smart mobile OS is a more important factor than the features of the app store[309] and Google Android is currently the smart mobile OS with the largest number of available apps[310]; and (ii) switching costs and the degree of OS loyalty are high (see recital (471)).

(290)    In the second place, app developers would be unlikely to switch from developing apps for Google Android devices to developing apps for smart mobile devices with a different licensable smart mobile OS because, in doing so, they would forego access to a large number of users of smart mobile devices. Android devices represented 48% of the smart mobile devices sold worldwide in 2011, 65% in 2012, 75% in 2013, 78% in 2014, 78% in 2015 and 81% in 2016.[311] This was further confirmed by the majority of respondents to Question 17 of the request for information of 21 October 2015 on app stores. Respondents indicated the number of users/coverage of users to be the most important factor that app developers consider when choosing for which mobile OS to develop apps, since this allows them the best monetisation opportunities:

(1)    ZTE: "*Coverage of consumers: Because app developers earn their profits mainly by app downloads, mobile OSs with a large user base are considered more attractive by app developers*".[312]

(2)    Nokia: "*The most important factors for app developers when choosing which mobile OS to develop apps for are the app store, the market share and the user reach of the OS, as app developers are looking for the best monetization opportunities*".[313]

(3)    HTC: "*The most important is number of users of the mobile OS*".[314]

(4)    BlackBerry: "*1. Size of user base and potential addressable market; 2. Revenue/monetisation opportunities*".[315]

(5)    Microsoft: "*In our experience, the most important factor for an app developer*

---

[309]    See Canonical's non-confidential response to Question 7.3 of the request for information to OS developers of 12 July 2013 (Doc ID 268); Mozilla's non-confidential response to Question 7.3 of the request for information of 12 June 2013 to OS developers (Doc ID 3951); LG Electronics' non-confidential response to Question 7.3 of the request for information to OEMs of 12 June 2013 (Doc ID 584); and Samsung's non-confidential response to Question 7.3 of the request for information of 12 June 2013 to OEMs (Doc ID 4117).

[310]    See Section 9.4.2.

[311]    Source: Commission's calculations based on […] data (Doc IDs 7866 and 7867) using sales of smartphones and tablets. For the calculation of Google Android sales, Android fork sales were excluded (namely sales of Fire OS, Flyme, Nokya X and Yun). The tablet sales classified as "Windows&Android" were divided equally between the two mobile OSs.

[312]    See ZTE's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 2840).

[313]    See Nokia's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[314]    See HTC's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 2519).

[315]    See BlackBerry's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 2666).

GOOG-DOJ-26429231

*is the ability to monetize their apps to the largest base of users".*[316]

(6)    Yandex: "*The most critical factor considered by an app developer is the number of end consumers who could potentially be able to download the application of such developer".*[317]

(291)    Third, there is in any event only a limited number of alternative licensable smart mobile OSs that OEMs could switch to. As noted in Section 9.3.1, Microsoft's Windows is the only other licensable smart mobile OS that has an appreciable presence. Windows has, however, only a small share of the worldwide market (excluding China) for licensable smart mobile OSs, which accounted for less than 6% in any year between 2011 and 2016.[318] Windows has also failed to attract nearly as many developers as Android. For example, in September 2015, there were only 669 000 apps available on Windows Mobile Store, which accounted for approximately 30% of the apps available on the Play Store at that time.[319]

(292)    App store providers and OEMs have confirmed that Windows and other licensable smart mobile OSs such as Firefox OS and Tizen do not exercise a significant constraint on Android due to the scarcity of apps available for their OSs:

(1)    ZTE stated: "*Other mobile OSs, such as Windows Phone OS, Firefox OS, Tizen etc. which lack adequate consumers and high-quality apps are very difficult to attract consumer's attention.*"[320]

(2)    Nokia stated: "[…] *when many people purchased Windows Phone and so-called "must have" apps, such as YouTube, were not available on the platform; consumers noted lack of app-availability as a reason why they did not purchase a Windows phone as their next phone, and this was despite the fact that consumers could access YouTube via the browser on the phone.*"[321]

(3)    Telefonica stated: "*In other Ecosystems like Windows Phone and Firefox OS, the lack of a proper ecosystem of apps has biased the perception of the overall ecosystem on the benefit of the 2 main players (iOS and Android) due to the lack of proper support for the most successful apps like WhatsApp, Facebook,*

---

[316]    See Microsoft's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 2493).

[317]    See Yandex's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

[318]    Source: Commission's calculations based on […] data (Doc IDs 7866 and 7867) using sales of smartphones and tablets. The tablet sales classified as "Windows&Android" were divided equally between the two mobile OSs.

[319]    See Liam Tung, "Microsoft by the numbers 2015: 700k Windows Store Apps, 1.2 bn Office users"(30 September 2015), available at http://www.zdnet.com/article/microsoft-by-the-numbers-2015-700k-windows-store-apps-1-2bn-office-users/, printed and saved on 11 April 2016. In March 2017, the number of apps available in the Windows Mobile Store accounted for approximately only 25% of the apps available in the Play Store. Source: "Number of apps available in leading app stores as of March 2017", available at https://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/, printed and saved on 16 August 2017.

[320]    ZTE's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2840).

[321]    Nokia's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

EN

EN

GOOG-DOJ-26429232

*Instagram, etc...*" [322]

(4) Opera stated: "*Windows Phone has been available since late 2011, yet it only commands a very limited global market share. While reviews of Windows Phone-equipped devices and even the Windows Phone platform as such are often favorable, more often than not, the lack of apps is cited as a detriment*". [323]

(5) Yandex stated: "*Windows OS is much less popular among consumers, which results in only a small number of OEMs producing devices which run on the platform, which in turn leads to: incomparably low number of mobile device users and therefore much poorer audience reach; and a limited offering of applications at the application store in comparison to the Play Store and Apple App Store.*" [324]

(293) Fourth, a number of other factors influence the incentives of OEMs to install a certain smart mobile OS on their devices. According to Apple, "*The number and quality of apps available is one of several factors (including design, user-friendliness, speed, etc.) that contribute to the success of an OS*". [325] In addition, Samsung states that a relevant factor, at least for users, appears to be "[…] *cross compatibility, i.e. sharing data with their desktop or laptop computer*", [326] whereas for Sony, a factor is the "*maturity of the platform*". [327]

(294) Fifth, as discussed in Section 9.3.2, OEMs face costs when switching to alternative licensable smart mobile OSs.

(295) From a supply-side perspective, developers of app stores for other licensable smart mobile OSs are unlikely to switch to Android as the development of an app store for a given OS requires significant time and resources. [328] For example, Microsoft, the largest developer of an app store for a non-Android licensable smart mobile OS, has neither developed nor announced any plan to develop an app store for Android.

(296) The Commission's conclusion that app stores for other licensable smart mobile OSs do not belong to the same product market as Android app stores is not affected by Google's claims that:

(1) "*users and app developers will switch to a different mobile platform in the case of a decline in the quality of the app store*" because app stores and smart mobile OSs compete together as a system against other "*mobile platforms*" on

---

[322] Telefonica's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2658).

[323] Opera's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 3534).

[324] Yandex's non-confidential response to Question 19 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

[325] See Apple's non-confidential response to Question 7.3 of the request for information of 12 June 2013 to OEMs (Doc ID 690). See also BlackBerry's non-confidential response to Question 7 of the request for information of 12 June 2013 to OEMs (Doc ID 3763) and LG Electronics' non-confidential response to Question 7.3 of the request for information of 12 June 2013 to OEMs (Doc ID 584).

[326] See Samsung's non-confidential response to Question 7 of the request for information of 12 June 2013 to OEMs (Doc ID 4117).

[327] See Sony Mobile Communications' non-confidential response to Question 7 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).

[328] See Section 9.3.2.

EN

EN

GOOG-DOJ-26429233

price and quality;[329]

(2)    When discussing the impact of a small but significant, non-transitory deterioration in quality of Android app stores, the Commission: (i) does not define what it means by a deterioration in quality, (ii) does not compare the gains and losses of a deterioration in quality, (iii) ignores the effect of a deterioration in quality on app developers;[330]

(3)    Respondents such as HTC, Microsoft, Yandex, Nokia, ZTE and BlackBerry on which the Commission relies in recital (290) indicate that the different app stores are substitutable from the perspective of app developers and users;[331] and

(4)    The Commission's approach implies that each app store of a smart mobile OS developer would hold a dominant position in its own market.[332]

(297)    First, in the event of a small but significant, non-transitory deterioration in the quality of the Play Store, users and app developers would not switch to another "*mobile platform*".

(298)    In the first place, this is for the reasons set out in recitals (288) to (290).

(299)    In the second place, there are a number of reasons why app stores and smart mobile OS do not compete together as a system:

(1)    app stores and smart mobile OS are only components of the smart mobile device and the spending on apps is small compared to the costs of a smart mobile device, as described in Section 9.4.7.

(2)    a user's choice of an app store is determined by its choice of a smart mobile device and the corresponding mobile OS[333] and a user cannot, for technical reasons, install an app store that has not been developed for that OS;

(3)    app stores and smart mobile OSs are separate products satisfying different user needs: a smart mobile OS is a system software that controls the basic functions of a smart mobile device and enables users to make use of new combinations of functions, while an app store is an online platform dedicated to enabling users to download, install and manage apps;

(4)    Google gives access to Android without the Play Store (namely for those OEMs that did not sign the MADA) (see Section 6.2.2); and

(5)    there are several players that offer only one of these products (for example Aptoide, LG Electronics, Opera, SFR and Yandex offer an app store but not a smart mobile OS).

(300)    Second, when discussing the impact of a small but significant, non-transitory deterioration in quality of Android app stores, the Commission:

---

[329]    Google's Response to the Statement of Objections, Part Two, pages 67-72, paragraphs 76-83 and 85-86 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part One, pages 22-23, paragraphs 59-62 (Doc ID 8598).

[330]    Google's Response to the Statement of Objections, Part Two, page 70, paragraphs 83-84 (Doc ID 7117).

[331]    Google's Response to the First Letter of Facts, Part One, page 25, paragraph 67 (Doc ID 8598).

[332]    Google's Response to the Statement of Objections, Part Two, pages 72-73, paragraphs 87-89 (Doc ID 7117).

[333]    Google's Response to the Statement of Objections, Part Two, pages 68, paragraph 78 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429234

(1)   does define what it means by a deterioration in quality (see recital (286));

(2)   does consider the potential losses associated with a deterioration in quality as regards user switching (see recital (289));

(3)   does not ignore the effect of a deterioration in quality on app developers (see recital (290)); and

(4)   has, in any event, also assessed the impact of a small but significant, non-transitory price increase in the percentage of app-related revenues that app developers have to share with Android app stores (see recital (286)).

(301)   Third, HTC, Microsoft, Yandex, Nokia do not state that the different app stores are substitutable from the perspective of app developers and users.

(302)   In the first place, the statements quoted by Google are irrelevant for assessing the substitutability of app stores for other licensable smart mobile OSs and Android app stores. This is because they refer to substitutability between app stores for non-licensable smart mobile OSs and Android app stores.

(303)   In the second place, and in any event, HTC, Microsoft, Yandex and Nokia refer to the importance of user reach and that, as a result, app developers focus on the two largest app stores (Apple AppStore and the Play Store). This is in line with Google's acknowledgment that app developers generally multi-home between the Play Store and the AppStore and do not need to switch away from Google Android.[334]

(304)   In the third place, ZTE and BlackBerry state that users may switch, or have switched, smart mobile device OS but only in the context of large differences in terms of app quality and price.[335]

(305)   Fourth, the Commission's approach does not imply that each app store of a smart mobile OS developer would hold a dominant position in its own market. An assessment of dominance would need to take into account a number of factors specific to each app store that potentially differ from the ones regarding Android app stores, such as the penetration of the respective smart mobile OS.

*7.4.5.*   *App stores for non-licensable smart mobile OSs and Android app stores*

(306)   The Commission concludes that app stores for non-licensable smart mobile OSs such as Apple's AppStore and BlackBerry's BlackBerry World do not belong to the same product market as Android app stores.

(307)   From a demand-side perspective, the app stores of Apple and BlackBerry have been specifically developed for iOS and BlackBerry OS and cannot run on Android.

(308)   From a supply-side perspective, developers of app stores for non-licensable smart mobile OSs are unlikely to start developing app stores for Android due to their vertically integrated business model. For example, neither Apple nor BlackBerry has developed or announced any plan to develop and licence an app store for Android.[336]

(309)   The Commission's conclusion that app stores for non-licensable smart mobile OSs do

---

[334]   Google's Response to the First Letter of Facts, Part One, page 26, paragraph 70 (Doc ID 8598).

[335]   BlackBerry's and ZTE's non-confidential responses Question 16 of the request for information of 21 October 2015 on app stores (ID 2666 and ID 2840)

[336]   Apple's and BlackBerry's non-confidential response to Question 2(i) of the request for information of 21 October 2015 on app stores (Doc IDs 2881 and 2666).

GOOG-DOJ-26429235

not belong to the same product market as Android app stores is not affected by Google's claims that:

(1)     three internal Google documents, Apple's communication to investors and the findings of competition authorities in Australia and the US confirm the substitutability of the Play Store and Apple's AppStore;[337]

(2)     the Play Store and the Apple AppStore have similar characteristics, prices and intended use;[338] and

(3)     the Commission wrongly ignores competition at the level of users and app developers when defining the relevant product market.[339]

(310)   First, the three internal Google documents quoted by Google, Apple's communication to investors and the findings of competition authorities and courts in Australia and the US do not demonstrate the substitutability of the Play Store and Apple's AppStore.

(311)   In the first place, two of the internal documents quoted by Google are from 2010. They are not informative on the degree of competition between, and thus the substitutability of, the Play Store and Apple's AppStore as of 2011 when Google started to hold a dominant position in the worldwide market (excluding China) for Android app stores.

(312)   In the second place, as regards Google's survey of developers in 2016, the fact that Google asked developers in 2016 to compare the performance of the Play Store with Apple's AppStore on various parameters (e.g. testing, guidance, feedback, distribution and payment) does not demonstrate the substitutability of the two app stores. Rather, it simply indicates that, given the absence of significant competitors in the worldwide market (excluding China) for Android app stores, Google uses the AppStore as one of the main references to benchmark the performance of the Play Store, given the AppStore's number of users and app developers and the fact that many app developers multi-home between the Play Store and the AppStore (see recitals (553), (555) and (610)).

(313)   In the third place, as regards Apple's communication of its growth rate and revenues to investors in 2016, the fact that Apple compares the results of its AppStore with those of the Play Store does not demonstrate the substitutability of the two app stores. Rather, it simply indicates that Apple uses the Play Store as one of the main references to benchmark the growth and revenues of the AppStore, given the former's number of users and app developers.

(314)   In the fourth place, the Commission's assessment is not contradicted by the findings of competition authorities and courts in Australia and the US quoted by Google.

(315)   As regards the findings of the ACCC in the context of the Apple Pay investigation,[340] they were focussed on Apple's behaviour. Given that Apple does not licence its AppStore to OEMs, the existence of a market for Android app stores is irrelevant for

---

[337]   Google's Response to the Statement of Objections, Part Two, pages 69-76, paragraphs 82, 93 and 97 (Doc ID 7117), Google's letter of 6 February 2017 (Doc ID 7147), and Google's letter of 24 April 2017 (Doc ID 7862).

[338]   Google's Response to the First Letter of Facts, Part One, page 24, paragraphs 63-65 (Doc ID 8598).

[339]   Google's Response to the Statement of Objections, Part Two, page 75, paragraph 94 (Doc ID 7117).

[340]   See ACCC's determination on applications for authorisation A91546 & A91547 of 31 March 2017.

**EN**

**EN**

GOOG-DOJ-26429236

the purposes of the ACCC's Determination.

(316)    As regards the findings of the US Federal Trade Commission, the focus of its investigation was the mobile advertising market and thus the existence of a market for Android app stores is irrelevant.

(317)    Second, Google's claim about the Play Store and the AppStore having similar characteristics, prices and intended use does not demonstrate that they are in the same market.

(318)    In the first place, the fact that two products may have similar features does not necessarily mean that they are part of the same market. For example, while all spare parts of a product may have similar features, this does not necessarily mean that they are all part of a same relevant market. This would depend, for example, on the compatibility of the different spare parts with the product.

(319)    In the second place, while the Play Store and the AppStore have certain similar characteristics, there are also several differences between these two app stores as described in recital (661), such as regards ratings and data reporting.

(320)    In the third place, the AppStore and the Play Store do not have the same pricing policies. For example, while Google charges developers a one-off registration fee of USD 25, Apple charges a yearly fee of USD 99.[341] In addition, the pricing policies of the AppStore and the Play Store have evolved differently over time. For example, whilst Apple implemented a 15/85 revenue split with certain app developers in June 2016,[342] Google implemented such a split only in January 2018.[343]

(321)    In the fourth place, the intended use of the AppStore and the Play Store are different. Whilst both app stores have the main function of downloading apps, the intended use of the AppStore is to allow users to download apps on iOS devices and intended use of the Play Store is to allow users to download apps on Google Android devices.

(322)    Third, the Commission does not ignore competition at the level of users and app developers. For the reasons explained in Section 9.4.7, the Commission concludes that app stores for non-licensable smart mobile OSs exercise an insufficient indirect constraint on Google's dominant position in the market for Android app stores. These reasons confirm that app stores for non-licensable smart mobile OSs should not be included in the relevant market for Android app stores.

## 7.5.    General search services

(323)    The Commission concludes that the provision of general search services constitutes a separate relevant product market.

(324)    This conclusion is based on the following considerations:

(1)    the provision of general search services constitutes an economic activity (Section 7.5.1);

(2)    general search services and other online services belong to different product

---

[341]    See    https://support.google.com/googleplay/android-developer/answer/6112435?hl=en    and https://developer.apple.com/support/purchase-activation/, printed and saved on 2 July 2018.

[342]    See    https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut, printed and saved on 2 July 2018.

[343]    Google's Response to the First Letter of Facts, Part One, page 27, paragraph 70 (Doc ID 8598).

**EN**

**EN**

GOOG-DOJ-26429237

markets (Section 7.5.2);

(3)     the product market for general search services encompasses searches via PCs and smart mobile devices (Section 7.5.3);

(4)     the product market for general search services encompasses searches via different OSs (Section 7.5.4); and

(5)     the product market for general search services encompasses all entry points on smart mobile devices (Section 7.5.5).

### 7.5.1.    *The provision of general search services constitutes an economic activity*

(325)   The Commission concludes that the provision of general search services constitutes an economic activity for the purposes of the competition rules of the Treaty.

(326)   First, even though users do not pay a monetary consideration for the use of general search services, they contribute to the monetisation of the service by providing data with each query.[344]

(327)   In most cases, a user entering a query enters into a contractual relationship with the operator of the general search service. For example, Google's Terms of Service provide: "*By using our Services, you agree that Google can use such data in accordance with our privacy policies*".[345] In accordance with its privacy policies, Google can store and re-use data relative to user queries.[346] The terms and conditions of competing general search services contain similar provisions.[347] The data which users agree to allow a general search service to store and re-use is of value to the provider of the general search service as it is used to improve the relevance of the search service and to show more relevant advertising.[348]

(328)   Second, offering a service free of charge is an advantageous commercial strategy for two-sided platforms such as general search platforms that connect distinct but interdependent demands. General search services and online search advertising constitute the two sides of a general search platform. Monetisation only occurs on the online search advertising side of the platform, therefore advertisers indirectly fund the general search services offered to users. The level of advertising revenue that a general search platform can obtain is related to the number of users of its general search service: the higher the number of users of a general search service, the wider the audience advertisers can reach and therefore the more the online search advertising side of the platform will appeal to advertisers.

---

[344]   Directive 2005/29/EC of the European Parliament and of the Council of 11 May 2005 concerning unfair business-to-consumer commercial practices in the internal market, OJ L 149/22.

[345]   See "Google Terms of Service" ('Privacy and Copyright Protection' section) (14 April 2014), available at http://www.google.com/intl/en/policies/terms/, printed and saved on 11 April 2016.

[346]   See "Welcome to the Google Privacy Policy" (*'Information we collect'* and *'How we use information we collect'* sections), available at http://www.google.com/intl/en/policies/privacy/, printed and saved on 13 June 2017.

[347]   See "Microsoft Privacy Statement" (January 2016), available at http://www.microsoft.com/PrivacyStatement, printed and saved on 11 April 2016 and "Yahoo Terms of Service", available at https://policies.yahoo.com/us/en/yahoo/terms/utos/index.htm, printed and saved on 11 April 2016.

[348]   See "Welcome to the Google Privacy Policy" ('Information we collect' and *'How we use information we collect'* sections), available at http://www.google.com/intl/en/policies/privacy/, printed and saved on 13 June 2017.

**EN**                                                           75                                                          **EN**

GOOG-DOJ-26429238

(329)   Third, even though general search services do not compete on price, there are other parameters of competition between general search services. These include the relevance of results, the speed with which results are provided, the attractiveness of the user interface and the depth of indexing of the web.

*7.5.2.   General search services and other online services*

(330)   The Commission concludes that general search services belong to a different product market than other online services such as content sites, specialised search services and social networks.

7.5.2.1.   General search services and content sites from a demand-side perspective

(331)   General search services and content sites serve a different purpose. On the one hand, a general search service primarily seeks to guide users to other sites. As Google indicates on its website: "*[O]ur goal is to have people leave our website as quickly as possible.*"[349] On the other hand, while content sites may contain references to other sites, their primary purpose is to directly offer the information, the products or the services users are looking for. Well-known examples of content sites include Wikipedia, IMDb, and websites of newspapers and magazines such as The New York Times or Nature.

(332)   Google does not contest the Commission's conclusions as outlined in this Section.

7.5.2.2.   General search services and specialised search services from a demand-side perspective

(333)   While search results provided by a general search service may sometimes overlap with the results provided by a specialised search service, the two types of search services are complements rather than substitutes.

(334)   First, specialised search services focus on providing specific information or purchasing options in their respective fields of specialisation. By contrast, general search services search the entire Internet and therefore generally return different and more wide-ranging results.

(335)   Second, specialised search services and general search services often rely on different sources of data: the main input for general search services originates from an automated process called "*web crawling*",[350] whereas many specialised search services rely on user input or information supplied by third parties.

(336)   Third, specialised search services and general search services rely on different algorithms for determining and ranking the relevance of search results.[351]

(337)   Fourth, specialised search services are usually monetised in a different way; in addition to relying on online search advertising, they generate revenue from, for

---

[349]   See "ten things we know to be true", available at http://www.google.com/about/company/philosophy/, printed and saved on 11 April 2016.

[350]   See Sergey Brin and Larry Page, "The PageRank Citation Ranking: Bringing Order to the Web"(19 January 1998), available at http://ilpubs.stanford.edu:8090/422/1/1999-66.pdf, printed and saved on 11 April 2016.

[351]   Google's submission of 7 September 2010, "*Comparing apples with oranges – How Google ranks Universal results from specialised content-specific search algorithms within web search*" (Doc ID 4774).

**EN**                                         76                                         **EN**

GOOG-DOJ-26429239

example, paid inclusion, service fees or commissions (pay-per-acquisition fees).[352]

(338)   Fifth, a number of companies offer specialised search services on a standalone basis, without offering general search services.[353]

(339)   Sixth, Google offers and describes its specialised search services as a service distinct from its general search service. Google has a help page on its website which purports to list its different products and services. The page includes a list of Google products and services. It distinguishes between, on the one hand, "*Web Search - Search billions of web pages*", with a link to Google's general search service, and, on the other hand "*Specialized Search*", which includes several different services, including for example "*Google Shopping - Search for stuff to buy*".[354]

(340)   Seventh, reports of specialised market observers such as comScore distinguish between general search services and other search services. [355]

(341)   The Commission's finding that general search services and specialised search services belong to different relevant markets is not affected by Google's claims that:

   (1)   specialised search services exercise a constraint on general search services for the categories of queries for which their search functionalities overlap;[356] and

   (2)   the Commission should have taken into account the constraints from specialised search services in each major query category, which, taken as a whole, constitute a constraint for general search services.

(342)   First, as Google itself admits, specialised search services exercise a constraint on general search services only for the categories of queries for which their search functionalities overlap.

(343)   Second, even for the categories of queries for which their search functionalities overlap, specialised search services offer specific search functionalities for the queries on which they specialise which do not exist, or not to the same extent, on general search services. For example, on search services specialised in travel, users may look for hotels with a certain number of stars, or within a certain range of a city, or they may read user reviews of these hotels. These functionalities are not available to the same extent on a general search service for the same queries.

(344)   Third, the constraints from specialised search services in each major query category taken as a whole do not exercise a sufficient constraint:

   (1)   even though there are several categories of specialised search services, there are many types of queries which are not covered by any of them; and

---

[352]   See "Glossary" available at http://www.searchenginesales.com/glossary/, printed and saved on 6 June 2018.

[353]   Examples include services specialised in search for products such as Shopzilla, LeGuide, Idealo, in search for local businesses such as TripAdvisor and Yelp, in search for flights such as Kayak and EasyVoyage, and in search for financial services such as MoneySupermarket or confused.com.

[354]   See "About Google", available at https://www.google.co.uk/intl/en/about/products/, printed and saved on 11 April 2016.

[355]   See "comScore Releases October 2015 U.S. Desktop Search Engine Rankings" (13 November 2015), available at http://www.comscore.com/Insights/Market-Rankings/comScore-Releases-October-2015-U.S.-Desktop-Search-Engine-Rankings, printed and saved on 11 April 2016.

[356]   Google's Response to the Statement of Objections, Part Two, pages 82-87, paragraphs 122-129 (Doc ID 7117).

**EN**                              77                              **EN**

GOOG-DOJ-26429240

(2)    general search services are the only online services on which users can seek potential relevant results from all categories at the same time.

### 7.5.2.3. General search services and social networking sites from a demand-side perspective

(345)    While social networking sites are a source of traffic to other websites, they are not a substitute for general search services.

(346)    First, general search services and social networking sites perform different functions. While general search services help users to find content they are looking for, social networks lead users to content they might be interested in by offering a means for users to connect and interact with people who, for example, share interests or activities.

(347)    Second, while certain social networks offer a general search function on their websites, so that users do not need to leave the sites to perform a general search, none of these sites uses its own general search technology. Instead, they rely on existing third party search services to power these searches. For example, Facebook previously relied on Microsoft's Bing to provide search results.

(348)    Third, the volume of general searches performed on social networks represents only a small share of the total volume of general searches. For example, in 2011, the number of general searches performed via Facebook in Europe[357] was equivalent to only 3.2% of the number of general searches performed on Google Search, even though Facebook is by far the largest social network.[358] Moreover, Facebook no longer offers a general search function on its website.[359]

(349)    Fourth, […].[360]

(350)    Google does not contest the Commission's conclusions as outlined above.

### 7.5.2.4. General search services and other online services from a supply-side perspective

(351)    Providers of other online services would need to undertake substantial investments in order to provide general search services. This is primarily due to the costs associated with the development of general search algorithms (see further Section 9.5.2).

(352)    Google does not contest the Commission's conclusion as outlined above.

### 7.5.3. *General search services on PCs and smart mobile devices*

(353)    The Commission concludes that the product market for general search services encompasses searches via PCs and smart mobile devices.

(354)    First, from a demand-side perspective, users expect to receive the same general search services regardless of whether they access them via PC or smart mobile devices.

---

[357]    ComScore's definition of Europe does not coincide with the Union or the EEA. In particular, it includes the Russian Federation and Switzerland. However, the Commission concludes that this difference in scope is not substantial enough to significantly alter the meaning of the statistics.

[358]    See Joe Nguyen, "search is Dead! Long Live Search!" (14 June 2011), available at http://www.clickz.asia/3592/search_is_dead_long_live_search, printed and saved on 11 April 2016.

[359]    Facebook's non-confidential response to Question 2 of the request for information of 9 December 2014 (Doc ID 3947).

[360]    Facebook's non-confidential response to Question 4 of the request for information of 9 December 2014 (Doc ID 3947).

**EN**

**EN**

GOOG-DOJ-26429241

(355)   Second, from a supply-side perspective, while the user interface is different, the underlying technology is the same.[361] The infrastructure and volume of data necessary to execute the general search service are also the same irrespective of the point of access.

(356)   Third, and from a supply-side perspective, general search services on PC and smart mobile devices are offered by the same undertakings. For example, Google Search, Bing, Yandex, Yahoo Search and DuckDuckGo are available on PCs and smart mobile devices.

**Table 2: Shares of general searches on PCs and smart mobile devices in Europe, 2016**

|              | Mobile | PC     |
|--------------|--------|--------|
| Google       | 96.7%  | 90.08% |
| Yahoo Search | 1.36%  | 1.86%  |
| Bing         | 0.92%  | 4.77%  |
| Yandex       | 0.73%  | 2.00%  |
| DuckDuckGo   | 0.11%  | 0.2%   |
| Seznam       | 0.07%  | 0.22%  |
| Baidu        | 0.03%  | 0.02%  |
| Mail.ru      | 0.02%  | 0.28%  |

(357)   Google does not contest the Commission's conclusions as outlined in this Section.

*7.5.4.   General search services on different smart mobile OSs*

(358)   The Commission concludes that the product market for general search services encompasses searches on all smart mobile OSs.

(359)   First, from a demand-side perspective, users expect to receive the same general search services regardless of the smart mobile OS via which they access them.

(360)   Second, from a supply-side perspective, while the user interface is different, the underlying technology is the same.[362] The infrastructure and volume of data necessary to execute the general search service are also the same irrespective of the point of access. Moreover, the cost of developing an app to run on a different smart mobile OS is small compared to the overall investment required to develop a general search service (see Section 9.5.2).

(361)   Third, and also from a supply-side perspective, general search services on different smart mobile OSs are offered by the same undertakings. For example, Google Search, Yahoo Search and DuckDuckGo are available on Android, iOS and Windows Phone.

(362)   Google does not contest the Commission's conclusions as outlined in this Section.

*7.5.5.   All entry points on smart mobile devices*

(363)   The Commission concludes that the product market for general search services

---

[361]   Deposition of Andrew Rubin in the Matter of Google, Inc. on 23 August 2012, p. 232. (Doc ID 4772).
[362]   Deposition of Andrew Rubin in the Matter of Google, Inc. on 23 August 2012, p. 232. (Doc ID 4772).

**EN**

**EN**

GOOG-DOJ-26429242

encompasses searches via all entry points on smart mobile devices.

(364) First, from a demand-side perspective, users access entry points interchangeably, depending on which entry point they consider most convenient to use. For example, Yahoo explained that "*In general, the search entry points likely to generate the highest traffic are the ones that are most accessible to the user, such as the quick search bar and "omnibox" in browser*" and that the traffic generated through an entry point "*depends on [...] placement of apps*".[363]

(365) Second, from a supply-side perspective, although the user interfaces may be slightly different, the underlying technology used across entry points is the same. Each entry point provides the same functionality by allowing users to enter their query in a search box and returning a list of results in response to that query.[364]

(366) Google does not contest the Commission's conclusions as outlined in this Section.

**7.6.    Non OS-specific mobile web browsers**

(367) The Commission concludes that non OS-specific mobile web browsers constitute a separate relevant product market.

(368) This conclusion is based on the following considerations:

(1) web browsers for PCs ("PC web browsers") do not belong to the same product market as mobile web browsers (Section 7.6.1);

(2) other apps do not belong to the same product market as mobile web browsers (Section 7.6.2);

(3) mobile web browsers developed for different smart mobile OSs belong to the same product market (Section 7.6.3);

(4) OS-specific mobile web browsers do not belong to the same product market as non OS-specific mobile web browsers (Section 7.6.4).

*7.6.1.   PC web browsers and mobile web browsers*

(369) The Commission concludes that PC web browsers do not belong to the same product market as mobile web browsers.

(370) From a demand-side perspective, PC web browsers and mobile web browsers rely on different technology because of the differences between OS for PCs and smart mobile devices. Amazon observed that "[...] *Web browsers generally have a version which is designed for the desktop and a version which is designed for the mobile device (in the form of an application). This is because the mobile device's small screen will require certain adjustments to be made to maintain user-friendliness. Further, given the greater processing power of desktop PCs, desktop web browsers tend to be quicker than mobile device applications [...].*"[365] Samsung also indicated that "*The two types of browsers are designed for different input methods (mouse events vs. touch events), screen sizes, and different web contents (PC version web*

---

[363]   Yahoo's non-confidential response to Question 2 of the request for information of 20 November 2015 to search providers (Doc ID 3411).

[364]   See Microsoft's non-confidential response to Question 1 of the request for information of 9 December 2015 to search providers (Doc ID 2973).

[365]   See Amazon's non-confidential response to Question 3 of the request for information of 19 October 2015 to web browser providers (Doc ID 3645).

GOOG-DOJ-26429243

*contents vs. Mobile version web contents".*[366]

(371)   From a supply-side perspective, while developers of PC web browsers can switch, and indeed have switched, to the development and supply of mobile web browsers, such a switch takes significant time and requires substantial investments.[367]

(372)   In any event, even if PC web browsers were to belong to the same product market as mobile web browsers, this would not alter the Commission's assessment of Google's conduct (see Section 11.4.4.IV).

(373)   The Commission's conclusion that PC web browsers do not belong to the same product market as mobile web browsers is not affected by Google's claims that:

(1)   almost all developers offer both PC and mobile versions of their web browsers,[368] and

(2)   web browser developers that responded to requests for information indicate that development costs would be low for porting a web browser from PC to mobile.[369]

(374)   First, it is incorrect that almost all developers offer both PC and mobile versions. While developers that originally offered a PC version of their web browsers generally also offer a mobile version, the opposite is not true. For example, Samsung, Huawei, Amazon, BlackBerry, HTC, LG and Sony have never offered a PC web browser. They are also unlikely to do so because they offer their mobile browsers only on their mobile devices.

(375)   Second, a number of web browser developers that responded to requests for information indicate that development costs for porting a mobile web browser from PC to mobile are not low. For example, Samsung observed that "*significant costs are required to build and maintain cloud infrastructure required for mobile browsers and convergence features, and for marketing".*[370]

(376)   The Commission's approach is also consistent with the approach that it took in its *Microsoft (Tying)* decision[371] in which it defined the relevant product market as web browsers for client PC operating systems and excluded web browsers for smart mobile and embedded devices from that market.

### 7.6.2.   *Other apps and mobile web browsers*

(377)   The Commission concludes that other apps do not belong to the same product market as mobile web browsers.

---

[366]   See Samsung's non-confidential response to Question 3 of the request for information of 19 October 2015 to web browser providers (Doc ID 3930).

[367]   See non-confidential responses to Question 5 of the request for information of 19 October 2015 to web browser providers.

[368]   Google's Response to the Statement of Objections, Part Two, page 92, paragraph 149 (Doc ID 7117).

[369]   Google's Response to the Statement of Objections, Part Two, page 92, paragraph 151 (Doc ID 7117).

[370]   See Samsung's non-confidential response to Question 5 of the request for information of 19 October 2015 to web browser providers (Doc ID 3930). See also the responses to Question 5 of the request for information of 19 October 2015 to web browser providers by Access, Alibaba and BlackBerry (Doc IDs 2560, 2898 and 2335).

[371]   Case AT.39530 *Microsoft (Tying)*, Commission decision of 16 December 2009, recitals 17-22.

**EN**

**EN**

GOOG-DOJ-26429244

(378)    From a demand-side perspective, despite the increased use of apps,[372] demand remains for a web browser as a general entry point for accessing and interacting with web content on smart mobile devices. While there is a certain level of substitutability between accessing content via a mobile web browser and a respective dedicated native app, users do not download an app for each web page they visit. As Sony confirmed: "*The market expectation and compliance requirements stipulate that mobile products must include a browser.*"[373]

(379)    From a supply-side perspective, the development of a mobile web browser requires time and resources.[374] It is also unlikely that a developer of other apps would start developing mobile web browsers in response to a small but significant, non-transitory quality deterioration of mobile browsers. This is because it does not make sense for the developer of an app, whose strategy will be dedicated to that specific app, to develop a general purpose mobile web browser.

(380)    Google does not contest the Commission's conclusions as outlined in this Section.

### 7.6.3.    *Mobile web browsers for different smart mobile OSs*

(381)    The Commission concludes that mobile web browsers developed for different smart mobile OSs belong to the same product market.

(382)    On the one hand, from a demand-side perspective, mobile web browsers are specific to the OS for which they are developed to run on.[375] OEMs and MNOs can, therefore, only pre-install web browsers that are developed for the OS on which their devices are running. Moreover, users can only either obtain mobile web browsers together with their smart mobile devices or download those developed for the OS running on their devices.

(383)    On the other hand, from a supply-side perspective, web browsers developed for different smart mobile OSs seem to belong to the same product market.

(384)    First, a number of developers of mobile web browsers offer their web browsers for different mobile OSs, such as Google (Chrome on Android and iOS), Mozilla (Firefox for Android and iOS), Alibaba, Access, and Opera.

(385)    Second, while a certain investment is required to port an app, such as a mobile web browser to a different OS from the one it was originally designed for,[376] such an investment appears to be relatively limited for mobile web browsers. This is because all major OSs include an HTML rendering engine that is designed to be reused in apps on that platform. Moreover, by building on these reusable system components,

---

[372]    See above Section 6.2 and, for example, Opera's non-confidential response to Question 3 of the request for information of 19 October 2015 to web browser providers (Doc ID 4111): "*The most used websites are increasingly replaced with native applications.*"

[373]    See Sony's non-confidential response to Question 3 of the request for information of 19 October 2015 to web browser providers (Doc ID 4122).

[374]    It already requires time and resources to adapt an existing mobile browser to a PC OS or another smart mobile OS; see the non-confidential responses to Question 6 of the request for information of 19 October 2015 to web browser providers.

[375]    See Amazon's non-confidential response to Question 4 of the request for information of 19 October 2015 to web browser providers (Doc ID 3645): "*Web browser applications will generally only function successfully if the device in question has a mobile OS for which the web browser provider has developed a compatible application.*"

[376]    See the non-confidential responses to Question 1 of the request for information of 29 June 2015 to app developers.

**EN**                                        82                                        **EN**

GOOG-DOJ-26429245

it is relatively easy to build a mobile web browser for any mainstream OS.[377] Contrary to switching from the supply of a PC web browser to a mobile web browser, some significant costs, in particular related to building a cloud infrastructure, do not apply when porting a mobile web browser to a different OS.[378]

(386)  Google does not contest the Commission's conclusions as outlined in this Section.

### 7.6.4.  *OS-specific mobile web browsers and non OS-specific mobile web browsers*

(387)  A number of developers of non-licensable smart mobile OSs (for example Apple and BlackBerry) have developed mobile web browsers that are unavailable on any other smart mobile OS ("OS-specific mobile web browsers").

(388)  The Commission concludes that OS-specific mobile web browsers that are available only as part of a non-licensable smart mobile OS do not belong to the same product market as non OS-specific mobile web browsers.

(389)  From a demand-side perspective, OS-specific mobile web browsers that are available only as part of a non-licensable smart mobile OS are not an alternative for OEMs and MNOs as developers of these mobile web browsers do not grant licences to third parties.

(390)  In addition, as the value of a mobile web browser compared to the value of a smart mobile device is small, in the event of a small but significant non-transitory deterioration of the quality of a non OS-specific mobile web browser, it is unlikely that a user would switch to a different smart mobile OS in order to use the corresponding OS-specific mobile web browser.[379]

(391)  From a supply-side perspective, developers of OS-specific mobile web browsers that are available only as part of a non-licensable smart mobile OS are unlikely to start licensing their browsers in the event of a small but significant non-transitory deterioration of the quality of non OS-specific mobile web browsers available on more than one smart mobile OS. This is because the strategy of these developers is based on the tight integration of hardware and software rather than on the licensing of their software to third parties.

(392)  The Commission's conclusion that OS-specific mobile web browsers that are available only as part of a non-licensable smart mobile OS do not belong to the same product market as non OS-specific mobile web browsers is not affected by Google's claims that:[380]

(1)  users do not need to switch mobile OS in the event of a small but significant non-transitory deterioration of the quality of the non OS-specific web browsers because both types of mobile web browsers appear on the same platforms;

---

[377]  See Microsoft's non-confidential response to Question 5 of the request for information to web browser providers of 19 October 2015 (Doc ID 2413) as well as Access' (Doc ID 2560), Apple's (Doc ID 2890) and Samsung's (Doc ID 3930) non-confidential responses to Question 6.iii of the request for information of 19 October 2015 to web browser providers.

[378]  See Samsung's non-confidential response to Question 5 of the request for information of 19 October 2015 to web browser providers (Doc ID 3930).

[379]  See the non-confidential responses to Question 4 of the request for information of 29 June 2015 to app developers.

[380]  Google's Response to the Statement of Objections, Part Two, pages 89-92, paragraphs 140-147 (Doc ID 7117).

**EN**                                  83                                  **EN**

GOOG-DOJ-26429246

(2)    given that Chrome is largely present across all smart mobile OSs, Google cannot afford to degrade Chrome because it would face the threat of users switching, for example, to Safari on the iOS platform or to Edge on the Windows platform;

(3)    both respondents to the requests for information and the Commission's Internet Explorer decision[381] confirm that there is a single market for OS-specific mobile web browsers and non OS-specific mobile web browsers;[382]

(4)    it is technically straightforward to create different versions of web browsers for different smart mobile OSs; and

(5)    Microsoft launched its Edge browser for iOS and Android in October 2017.[383]

(393)    First, as explained in recital (390), as the value of a mobile web browser compared to the value of a smart mobile device is small, in the event of a small but significant non-transitory deterioration of the quality of a non OS-specific mobile web browser, it is unlikely that a user would switch to a different smart mobile OS in order to use the corresponding OS-specific mobile web browser.

(394)    Second, the fact that Chrome is largely present across all smart mobile OSs does not remove any incentive that Google may have to degrade Chrome on Android. This is because, as Google admits,[384] a different version of Chrome exists on each smart mobile OS, with the result that Google could degrade the Chrome version for the Android OS, while keeping the version for iOS the same.

(395)    Third, respondents to requests for information did not confirm that there is a single market for OS-specific mobile web browsers and non OS-specific mobile web browsers.

(396)    In the first place, the fact that companies with OS-specific web browsers that are available only as part of a non-licensable smart mobile OS may experience competition from non OS-specific web browsers (and not necessarily the opposite) helps to explain why respondents to the requests for information that have developed an OS-specific web browser consider Chrome as a competitor to their web browser.

(397)    In the second place, the replies cited by Google refer to the perspective of users, not OEMs and MNOs. While users can choose which device and OS-specific or non OS-specific web browser they want to use, OEMs and MNOs cannot pre-install an OS-specific browser (other than those available for the OS that they pre-install) on a device (see recital (389)).

(398)    Fourth, it is irrelevant that it is technically straightforward to create different versions of web browsers for different smart mobile OSs. What is, however, relevant is that it is unlikely that developers of OS-specific web browsers (e.g. Apple) would start developing and making available their web browsers for other smart mobile OSs in the event of a small but significant non-transitory deterioration of the quality of mobile web browsers available on more than one smart mobile OS (see recital (391)).

---

[381]    Case AT.39530 *Microsoft (Tying)*, Commission decision of 16 December 2009.

[382]    See also Google's Response to the First Letter of Facts, Part One, pages 33-34, paragraph 94 (Doc ID 8598).

[383]    Google's Response to the First Letter of Facts, Part One, page 34, paragraph 95 (Doc ID 8598).

[384]    Google's Response to the Statement of Objections, page 91, footnote 324 (Doc 7117).

**EN**
**EN**

GOOG-DOJ-26429247

(399)    Fifth, Microsoft's launch of Edge for Android and iOS confirms the Commission's conclusions. This is because Microsoft launched Edge for Android and iOS in October 2017 only after Microsoft announced in July 2017 its intention to discontinue active development of its smart mobile OS. By contrast, Microsoft never granted any license to its OS-specific mobile web browser when it was part of its non-licensable smart mobile OS. Since July 2017, Edge has therefore become a non OS-specific mobile web browser.

## 8.    RELEVANT GEOGRAPHIC MARKETS

### 8.1.    Principles relating to geographic market definition

(400)    The relevant geographic market comprises an area in which the undertakings concerned are involved in the supply and demand of the relevant products or services, in which area the conditions of competition are similar or sufficiently homogeneous and which can be distinguished from neighbouring areas in which the prevailing conditions of competition are appreciably different.[385]

(401)    The definition of the geographic market does not require the conditions of competition between traders or providers of services to be perfectly homogeneous. It is sufficient that they are similar or sufficiently homogeneous and, accordingly, only those areas in which the conditions of competition are 'heterogeneous' may not be considered to constitute a uniform market.[386]

### 8.2.    Application to this case

(402)    The Commission concludes that the relevant product markets for the purpose of these proceedings are:

    (1)    the worldwide market (excluding China) for the licensing of smart mobile OSs;

    (2)    the worldwide market (excluding China) for Android app stores;

    (3)    national markets for general search services; and

    (4)    the worldwide market for non OS-specific mobile web browsers.

### 8.3.    Licensing of smart mobile device operating systems

(403)    The Commission concludes that the market for the licensing of smart mobile OSs is worldwide in scope, excluding China.

(404)    First, barriers to entry are low in most of the regions of the world. Apple, for example, stated: "*There are no significant limitations that would prevent an OS from being made available on a worldwide basis, or that would prevent an OEM from licensing an OS for use on a worldwide basis.*"[387] Samsung stated: "*Language specific demand characteristics regarding the relevant OS exist but, in so far as the supply side is concerned, do not constitute an obstacle to swift supply on a global*

---

[385]    Case 27/76 *United Brands v Commission*, EU:C:1978:22, paragraph 44; Case 322/81 *Michelin v Commission*, EU:C:1983:313, paragraph 26.

[386]    Case 27/76 *United Brands*, EU:C:1978:22, paragraphs 11 and 53.

[387]    Apple's non-confidential response to Question 5 of the requests for information of 12 June 2013 to OEMs (Doc ID 690).

GOOG-DOJ-26429248

*basis in accordance with language-related preferences.*"[388]

(405) Second, the agreements between OEMs and OS developers are generally worldwide in scope.[389] Jolla Oy ("Jolla") confirmed: "*OEMs typically license a mobile OS for worldwide use, not for a certain geographical area*".[390] Similarly, BlackBerry stated: "*a single world-wide licence agreement is often entered into between negotiating parties, and [...] mobile devices are often sold on a world-wide scale.*"[391]

(406) Third, conditions of competition are different in China. This is for the following reasons.

(407) In the first place, Google's activities in China are limited.[392] For example, most Google apps, including Google Search, Google Maps, YouTube and the Play Store, are not available in China.[393]

(408) In the second place, a number of OEMs that are active only or predominantly in China have pre-installed Android forks on their devices sold in China. These include OEMs that either have entered into an AFA but do not respect the anti-fragmentation obligations or have never entered into an AFA.[394] An example of an Android fork that has been pre-installed on devices sold in China is Alibaba's Aliyun.[395]

(409) These differences in the competitive landscape in China have been confirmed by OEMs and MNOs. Jolla, for example, stated: "*Android forks are popular especially in China, where there are heavy restrictions to access Google services.*"[396] Nokia also referred to the "[...] *governmental influence on OEM's OS choices being significant in certain regions (e.g. China).*"[397] BlackBerry stated that: "*Many Chinese vendors (e.g. Meizu) use a forked and heavily customized version of Android for devices that are sold in China. The customization removes many of Google's services, (e.g. replacing Google search with Baidu).*"[398] Equally, Deutsche Telekom referred to Chinese players such as "*Alibaba, Baidu or OPhone from China Mobile*" and made clear that "*these products are not relevant in Western European and the*

---

[388]   Samsung's non-confidential response to Question 5 of the requests for information of 12 June 2013 to OEMs (Doc ID 4117).

[389]   See non-confidential responses to Question 5 of the requests for information to MNOs, OEMs, OS providers and app developers of 12 June 2013.

[390]   Jolla's non-confidential response to Question 5 of the requests for information of 12 June 2013 to OS developers (Doc ID 3981).

[391]   BlackBerry's non-confidential response to Question 5 of the requests for information of 12 June 2013 to OEMs (Doc ID 3763).

[392]   See "A new approach to China: an update" (22 March 2010), available at https://googleblog.blogspot.be/2010/03/new-approach-to-china-update.html, printed and saved on 11 April 2016; see Alexa Olesen, "Google China FALLOUT: Google's Exit Angers China"(23 Mai 2010), available at http://www.huffingtonpost.com/2010/03/23/google-china-news-googles_n_509550.html, printed and saved on 11 April 2016.

[393]   See non-confidential Annex Q52 to Deutsche Telekom's response to the request for information of 22 July 2014 for details of Google's activities in China (Doc ID 4636).

[394]   [Google internal communications on commercial relationships and business strategy].

[395]   Google's response to the complaint by FairSearch, paragraphs 66 and 91 (Doc ID 1584).

[396]   Jolla's non-confidential response to Question 7.1 of the requests for information of 12 June 2013 to OS developers (Doc ID 3981).

[397]   Nokia's non-confidential response to Question 5 of the requests for information of 12 June 2013 to OEMs (Doc ID 764).

[398]   BlackBerry's non-confidential response to Question 7.1 of the requests for information of 12 June 2013 to OEMs (Doc ID 3763).

**EN**

**EN**

GOOG-DOJ-26429249

*USA".*[399]

(410) Fourth, it is unlikely that OEMs active in China would successfully sell devices based on a forked version of Android outside of China.[400] This is because the OEMs selling in China that have gained a notable market presence outside China are those which sell Google Android devices, and which have entered into AFAs and MADAs covering their devices sold outside of China. Such OEMs include Huawei, Lenovo, ZTE and Xiaomi.[401]

(411) Google does not contest the Commission's conclusions as outlined in this Section.

### 8.4. Android app stores

(412) The Commission concludes that the market for Android app stores is worldwide in scope, excluding China.

(413) First, barriers to entry are low in most of the regions of the world.[402] SFR, for example, stated: "*appstores are developed, installed and distributed on a global scale, by companies that intend to offer their services on an international basis.*"[403] Similarly, Amazon indicated that "[…] *outside of China, there are no technological differences, trade barriers or legal barriers that would mean that some providers only compete on a narrower basis.*"[404] Aptoide also stated that "*Mobile App Stores operate globally except in markets where there are some restrictions (China).*"[405] Nokia also stated that "[…] *select countries may have trade compliance issues or certain technical and/or business requirements that make it challenging to enter such markets (e.g. China).*"[406]

(414) Second, the fact that there are language differences between different geographic areas does not appear to create obstacles for app store developers. As stated by ZTE, "*Although providers will customize some apps to meet the local requirements, it does not contradict their identity as worldwide operators. Consumers don't care about provider's operation method as long as their requirements are satisfied.*"[407] In addition, according to Huawei, "*Generally speaking, competition takes place at a worldwide level because this is at that level that most of the apps in the appstore*

---

[399]   Deutsche Telekom's non-confidential response to Question 7.1 of the requests for information of 12 June 2013 to MNOs (Doc ID 625). See also HP's non-confidential response to Question 7.1 of the request for information of 12 June 2013 to MNOs (Doc ID 4162).

[400]   See Ruadhan O'Donoghue, "Android forks: why google can rest easy for now" (9 October 2014), available at https://mobiforge.com/news-comment/android-forks-why-google-can-rest-easy-for-now, printed and saved on 11 April 2016.

[401]   See with regard to the latter Amit, "Differences Between MiUi Global and Chinese Version"(5 January 2016), available at http://xiaomiupdate.com/differences-between-miui-global-and-chinese-version/, printed and saved on 11 April 2016.

[402]   See responses to Question 27 of the request for information of 21 October 2015 on app stores.

[403]   See SFR's non-confidential response to Question 27 of the request for information of 21 October 2015 on app stores (Doc ID 3975).

[404]   See Amazon's non-confidential response to Question 27 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[405]   See Aptoide's non-confidential response to Question 27 of the request for information of 21 October 2015 on app stores (Doc ID 2396).

[406]   See Nokia's non-confidential response to Question 27 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[407]   See ZTE's non-confidential response to Question 27 of the request for information of 21 October 2015 on app stores (Doc ID 2840).

**EN**

**EN**

GOOG-DOJ-26429250

*compete. For instance, customers in UK and USA will download the same version of gaming applications, such as Angry Birds. Some of applications like news-related ones may compete at a regional level, but their number is limited.*"[408]

(415)   Third, OEMs can sell smart mobile devices with the same app stores pre-installed in most regions of the world. Android manufacturers, for example, sign a MADA which allows them to sell devices with the Play Store on a worldwide basis, with some limited exceptions.[409]

(416)   Fourth, conditions of competition are different in China. This is for the reasons described in recitals (417) to (419).

(417)   In the first place, as noted above, Google's activities in China are limited. For example, most Google apps, including Google Search, Google Maps, YouTube and the Play Store, are not available in China.

(418)   In the second place, a number of other OEMs and MNOs active in China have successfully developed and commercialised their own app store. For example, in November 2015, the top five app stores in China according to Newzoo and TalkinData were: Myapp (market share: 24%), 360 Mobile Assistant (21%), Baidu Mobile Assistant (19%), MIUI app store (13%) and Wandoujia (7%).[410] These app stores are not available outside China, or have built no significant presence there.

(419)   These differences in the competitive landscape in China were confirmed by OEMs, MNOs and competing app store developers (see recital (413)).

(420)   Fifth, it is unlikely that Chinese app stores would be able to expand successfully to other geographic regions. This is because the OEMs that pre-install their own app stores on devices sold in China pre-install the Play Store on all devices sold outside of China. Examples of these OEMs include Huawei, ZTE, Lenovo, Sony and Xiaomi.[411] In addition, no Chinese app store developer has managed to achieve a meaningful market presence outside of China, and in particular in the EEA.

(421)   Google does not contest the Commission's conclusions as outlined in this Section.

## 8.5.   General search services

(422)   The Commission concludes that the markets for general search services are national in scope.

(423)   First, even though general search services can be accessed by users anywhere in the world, the main general search services offer localised sites in different countries and in a variety of language versions. For example, Google has national sites for each EEA country and in nearly every official language of the Union. Moreover, the

---

[408]   See Huawei's non-confidential response to Question 27 of the request for information of 21 October 2015 on app stores (Doc ID 2455).

[409]   See MADA, clause 4.3, and non-confidential Annex Q52 to Deutsche Telekom's response to the request for information of 22 July 2014 (Doc ID 4636).

[410]   See "Top 10 android app stores China", available at http://www.newzoo.com/free/rankings/top-10-android-app-stores-china/, printed and saved on 11 April 2016.

[411]   See responses by Huawei, ZTE, Lenovo and Sony to Question 2 of the request for information of 21-29 October 2015 on app stores (Doc IDs 2455, 2840, 3908 and 4121). For Xiaomi, see Amit, "Differences Between MiUi Global and Chinese Version"(5 January 2016), available at http://xiaomiupdate.com/differences-between-miui-global-and-chinese-version/, printed and saved on 11 April 2016.

GOOG-DOJ-26429251

majority of users make use of the site of their own country/language when making searches.[412]

(424) Second, there are barriers to the extension of search technology beyond national and linguistic borders.[413] These barriers are one of the reasons why certain smaller general search services in the EEA use their own search technology mainly for websites from their own country and in their own native language, while returning the search results of Google or Bing for their websites in other countries or different languages.[414] Moreover, even for large multinational companies, the costs associated with upsizing search technology to cover sites in other countries and in different languages can be prohibitive.[415]

(425) Google does not contest the Commission's conclusions as outlined in this Section.

## 8.6. Non OS-specific mobile web browsers

(426) The Commission concludes that the market for non OS-specific mobile web browsers is worldwide in scope.

(427) First, the technical framework, functionality and application of mobile web browsers are the same throughout the world.[416] As BlackBerry confirmed: "*Browser competition is global.*"[417]

(428) Second, barriers to entry in terms of import restrictions, transportation costs or technical requirements for mobile web browsers are low.[418]

(429) Third, to the extent there are language-specific demand characteristics, the related costs appear to be insignificant.[419]

(430) Google does not contest the Commission's conclusions as outlined in this Section.

## 9. DOMINANCE

## 9.1. Principles

(431) The purpose of Article 102 TFEU is not to prevent an undertaking from acquiring, on its own merits, a dominant position on a market.[420] The dominant position referred to

---

[412] Annex 2.1 to Google's response to Question 2 of the request for information of 13 July 2010 (Doc IDs 4794 and 4786). Cyprus, Liechtenstein and Luxembourg are the only three countries in the EEA where fewer than 50% of searchers on Google use the Google website of their country.

[413] Orange's non-confidential response to Question 1 of the request for information of 3 October 2011 (Doc ID 4594). See also Seznam's non-confidential response to Question 2 of the request for information of 3 October 2011 and its updated response of 26 February 2016 (Doc IDs 4076 and 4371).

[414] Orange's non-confidential response to Question 1 of the request for information of 3 October 2011 (Doc ID 4594).

[415] Orange's non-confidential response to Question 1 of the request for information of 3 October 2011 (Doc ID 4594).

[416] See non-confidential responses to Question 7 of the request for information to web browser providers of 19 November 2015.

[417] BlackBerry's non-confidential response to Question 7 of the request for information to web browser providers of 19 November 2015 (Doc ID 2335).

[418] See non-confidential responses to Question 7 of the request for information to web browser providers of 19 November 2015.

[419] See Amazon's non-confidential response to Question 7 of the request for information to web browser providers of 19 November 2015 (Doc ID 3645).

[420] Case C-52/09 *Konkurrensverket v TeliaSonera Sverige AB*, EU:C:2011:83, paragraph 24.

EN

EN

GOOG-DOJ-26429252

in Article 102 TFEU relates to a position of economic strength enjoyed by an undertaking which enables it to prevent effective competition being maintained on the relevant market by affording it the power to behave to an appreciable extent independently of its competitors, its customers and ultimately of its consumers.[421]

(432)    A finding of dominance does not require that an undertaking has eliminated all opportunity for competition in the market.[422] A finding of dominance is also not precluded by the existence of competition on a particular market, provided that an undertaking is able to act without having to take account of such competition in its market strategy and without, for that reason, suffering detrimental effects from such behaviour.[423]

(433)    The existence of a dominant position derives in general from a combination of several factors which, taken separately, are not necessarily determinative.[424] One important factor is the existence of very large market shares, which are in themselves, save in exceptional circumstances, evidence of the existence of a dominant position.[425] That is the case where a company has a market share of 50% or above.[426] Likewise, a share of between 70% and 80% is, in itself, a clear indication of the existence of a dominant position in a relevant market.[427]

(434)    A comparison between the market shares of the undertaking concerned and of its competitors is also an important. For example, an undertaking which holds a very large market share for some time, without smaller competitors being able to meet rapidly the demand from those who would like to break away from that undertaking, is by virtue of that share in a position of strength which makes it an unavoidable trading partner and which, already because of this, secures for it, at the very least during relatively long periods, that freedom of action which is the special feature of a dominant position.[428] Similarly, an undertaking that enjoys a market share that is much more important than that of its competitors is a valid indicia of a dominant position.[429]

---

[421]    Case 27/76 *United Brands and United Brands Continental v Commission*, EU:C:1978:22, paragraph 65; Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 38; and Case T-201/04 *Microsoft v Commission*, EU:T:2007:289, paragraph 229.

[422]    Case 27/76 *United Brands and United Brands Continental v Commission*, EU:C:1978:22, paragraph 113.

[423]    Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 70; and Case T-340/03 *France Télécom SA v Commission*, EU:T:2007:22, paragraph 101.

[424]    Case 27/76 *United Brands and United Brands Continental v Commission*, EU:C:1978:22, paragraph 66.

[425]    Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 41; and Case T-65/98 *Van den Bergh Foods v Commission*, EU:T:2003:281, paragraph 154.

[426]    Case C-62/86 *Akzo v Commission*, EU:C:1991:286, paragraph 60; Case T-340/03 *France Télécom SA v Commission*, EU:T:2007:22, paragraph 100; and Case T-336/07 *Telefónica SA v Commission*, EU:T:2012:172, paragraph 150.

[427]    Case T-30/89 *Hilti v Commission*, EU:T:1991:70, paragraph 92; Joined Cases T-191/98, T-212/98 to T-214/98 *Atlantic Container Line and Others* v *Commission,* EU:T:2003:245, paragraph 907; Case T-66/01 *Imperial Chemical Industries v Commission*, EU:T:2010:255, paragraph 257; and Case T-336/07 *Telefónica SA v Commission*, EU:T:2012:172, paragraph 150.

[428]    Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 41; Case T-139/98 *AAMS* v *Commission*, EU:T:2001:272, paragraph 51; Case T-65/98 *Van den Bergh Foods v Commission*, EU:T:2003:281, paragraph 154; and Case T-336/07 *Telefónica SA v Commission*, EU:T:2012:172, paragraph 149.

[429]    Case 27/76 *United Brands v Commission*, EU:C:1978:22, paragraph 111; Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 48; Case T-395/94 *Atlantic Container Line and Others*

**EN**                                    90                                    **EN**

GOOG-DOJ-26429253

(435)   While in recent and fast-growing sectors characterised by short innovation cycles, large market shares may sometimes turn out to be ephemeral and not necessarily indicative of a dominant position,[430] the fact that an undertaking may enjoy high market shares in a fast-growing market cannot preclude application of the competition rules, in particular Article 102 of the Treaty, especially if a fast-growing market does not show signs of marked instability during the period at issue and, on the contrary, a rather stable hierarchy is established.[431]

(436)   Even the existence of lively competition on a particular market does not rule out the possibility that there is a dominant position on that market, since the predominant feature of such a position is the ability of the undertaking concerned to act without being materially constrained by this competition in its market strategy and without for that reason suffering detrimental effects from such behaviour. Thus, the fact that there may be competition on the market is a relevant factor for the purposes of ascertaining whether a dominant position exists, but it is not in itself a decisive factor in that regard.[432]

(437)   The fact that a service is offered free of charge is also a relevant factor to take into account in assessing dominance. Another relevant factor is whether there are technical or economic constraints that might prevent users from switching providers.[433]

(438)   Other important factors when assessing dominance is the existence of countervailing buyer power and barriers to entry or expansion, preventing either potential competitors from having access to the market or actual ones from expanding their activities on the market.[434] Such barriers may result from a number of factors, including exceptionally large capital investments that competitors would have to match, network externalities that would entail additional cost for attracting new customers, economies of scale from which newcomers to the market cannot derive any immediate benefit and the actual costs of entry incurred in penetrating the market.[435] Switching costs are therefore only one possible type of barrier to entry and expansion.

## 9.2.   Application to this case

(439)   For the purpose of this Decision, the Commission concludes that Google holds a

---

v Commission, EU:T:2002:49, paragraph 341; Joined Cases T-191/98, T-212/98 to T-214/98 *Atlantic Container Line and Others* v *Commission,* EU:T:2003:245, paragraph 967; Case T-219/99 *British Airways* v *Commission*, EU:T:2003:343, paragraph 210; Case T-340/03 *France Telecom v Commission*, EU:T:2007:22, paragraph 109; Case T-336/07 *Telefónica v Commission*, EU:T:2012:172, paragraph 163.

[430]   Case T-79/12 *Cisco Systems, Inc. and Messagenet SpA v European Commission*, EU:T:2013:635, paragraph 69.

[431]   Case T-340/03 *France Telecom v Commission*, EU:T:2007:22, paragraphs 107-108.

[432]   Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 70; Case T-340/03 *France Télécom v Commission*, EU:T:2007:22, paragraph 101; Case T-336/07 *Telefónica v Commission*, EU:T:2012:172, paragraph 162.

[433]   Case T-79/12 *Cisco Systems, Inc. and Messagenet SpA v European Commission*, EU:T:2013:635, paragraph 73.

[434]   Case 27/76 *United Brands and United Brands Continental v Commission*, EU:C:1978:22, paragraph 122; and Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 48.

[435]   Case 27/76 *United Brands and United Brands Continental v Commission*, EU:C:1978:22, paragraphs 91 and 122.

EN

EN

dominant position in the following relevant markets since 2011:

(1)    the worldwide market (excluding China) for the licensing of smart mobile OSs;

(2)    the worldwide market (excluding China) for Android app stores; and

(3)    each national market for general search services in the EEA.

### 9.3.    Worldwide market (excluding China) for the licensing of smart mobile OSs

(440)    For the purpose of this Decision, the Commission concludes that Google holds a dominant position in the worldwide market (excluding China) for the licensing of smart mobile OSs since 2011. This conclusion is based on:

(1)    the market shares of Google and competing developers of licensable smart mobile OSs (see Section 9.3.1);

(2)    the existence of barriers to entry and expansion (see Section 9.3.2);

(3)    the lack of countervailing buyer power (see Section 9.3.3); and

(4)    the insufficient indirect constraint from non-licensable smart mobile OSs (see Section 9.3.4).

(441)    Moreover, the Commission's conclusion holds notwithstanding Google's making the source code of Android available for free via the AOSP licence (see Section 9.3.5) and Google's other claims (see Section 9.3.6).

### 9.3.1.    *Market shares*

(442)    For the purpose of calculating shares in the worldwide market (excluding China) for the licensing of smart mobile OSs, the Commission has attributed to Google the share of all Google Android devices.[436] This is because Google: (i) has an important influence on the key steps of the development of Android (see Section 6.2.2.1.I); (ii) controls the licensing of the Android trademarks and brand (see Section 6.3.2); and (iii) controls the implementation of Android on smart mobile devices through the Android compatibility tests (see Section 6.3.1).

(443)    The Commission has, however, not attributed to Google the share of Android devices: (i) running on Android forks developed by third parties regardless of whether these forks pass the Android compatibility tests; and (ii) where the fork

---

[436]    Google has not submitted data regarding the number of smart mobile devices sold with the pre-installed mandatory Google apps. However, evidence in the file shows that in the relevant geographic market, which is worldwide excluding China, practically all Google Android devices are sold with GMS. Therefore, the market shares would have been similarly high if solely GMS devices were taken into account. For example, according to Samsung, "*GMS is pre-installed in full on all of* [Samsung's] *Android-based devices*". See Samsung's non-confidential response to Question 7 of the request for information of 21 October 2015 on app stores (Doc ID 2805). Sony also stated that "*Sony Mobile has only shipped Android Compatible Devices. All devices shipped have had the mandatory GMS applications installed in all countries where GMS is supported.*" See Sony Ericsson's non-confidential response to Question 46 of the request for information of 12 June 2013 to OEMs (Doc ID 4389). Furthermore, LG Electronics indicated that "*Android compatible device without GMS: This category has not existed in our models thus far*". See LG Electronics' non-confidential response to Question 46 of the request for information of 12 June 2013 to OEMs (Doc ID 584). See also HTC's non-confidential response to Question 46 of the request for information of 12 June 2013 to OEMs (Doc ID 3841). Yandex also estimated that the share of Android smartphones sold in Europe with GMS between 2008 and 2015 was close to 100%. See Yandex's non-confidential presentation "Exclusionary Effects of Google's Tying Practices in Contracts with OEMs", slide 24 (Doc ID 4217).

GOOG-DOJ-26429255

developer willingly decides not to apply for the Android compatibility tests. This is because the development of such forks is not generally subject to the monitoring and control of Google. This is the case, for example, for devices based on Amazon's Fire OS.[437]

(444) The Commission has calculated shares in the worldwide market (excluding China) for the licensing of smart mobile OSs by volume and not by value. This is because, as described in Sections 6.1 and recital (514). Google's mobile business model is based on ensuring the widest distribution possible for GMS devices and Google does not earn any royalties from the sale by OEMs of GMS (or Google Android) devices.

(445) Since 2011, Google has enjoyed strong and stable market shares by volume and there has been no effective entry in any EEA country. This provides a good indication of Google's economic strength in the worldwide market (excluding China) for the licensing of smart mobile OS.

(446) As shown in Table 3, Google has been the market leader since 2011 (when its volume-based share was 72%) and its share has since increased to 96.4% in 2016.[438] As explained by [Google Executive]: *"Android is poised for world domination — the success story of the decade."*[439]

**Table 3: Worldwide (excluding China) market shares for licensable smart mobile devices OSs (in volume)[440]**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Google Android | 0.0% | 0.7% | 7.2% | 38.0% | 72.0% | 87.4% | 91.8% | 93.3% | 94.2% | 96.4% |
| Firefox OS | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.0% |
| Linux | 12.3% | 15.4% | 9.0% | 4.8% | 4.2% | 1.8% | 0.6% | 0.3% | 0.1% | 0.1% |

---

[437] According to Google's internal document submitted in response to the request for information of 11 July 2014, "Meet Android. Android Core Troubleshooting Training" (Doc ID 1348-557), slide 22: an Amazon Kindle Fire device is a non-compatible device. See also Google's Response to the Statement of Objections, Part Three, page 105, paragraph 22 (Doc ID 7117).

[438] Even if non-licensable smart mobile device OSs were included in the relevant market, the Commission's finding of Google's economic strength in the worldwide market (excluding China) for licensing of smart mobile OS would not be altered because Google's share would still be significant throughout the period 2011-2016: (i) in 2011, Google's share would have been 45.9%, Apple's share would have been 25.2%; and BlackBerry's share would have been 11.1%; (ii) in 2012, Google's share would have been 59.5%, Apple's share would have been 26.6% and BlackBerry's share would have been 5.2%; (iii) in 2013, Google's share would have been 69.4%, Apple's share would have been 22.1% and BlackBerry's share would have been 2.3%; (iv) in 2014, Google's share would have been 74.9%, Apple's share would have been 19.2% and BlackBerry's share would have been 0.5%; (v) in 2015, Google's share would have been 77.1%, Apple's share would have been 17.9% and BlackBerry's share would have been 0.3% and (vi) in 2016, Google's share would have been 79.3%, Apple's share would have been 17.6% and BlackBerry's share would have been 0.1%. Source: Commission's calculations based on [...] data (Doc ID 7866 and 7867) using sales of smartphones and tablets. For methodology, see footnote 440.

[439] Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-47118).

[440] Source: Commission's calculations based on [...] data (Doc IDs 7866 and 7867) using sales of smartphones and tablets. For the calculation of Google Android market shares, Android forks sales were excluded (namely sales of Fire OS - Amazon.com sales -, Flyme, Nokya X and Yun). The tablet sales classified as "Windows&Android" were divided equally between the two mobile OS. This methodology was applied in all the calculations in this Decision using Google's Android number of devices worldwide (excluding China), in China and in the EEA.

**EN**

**EN**

GOOG-DOJ-26429256

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Maemo/M eeGo | 0.0% | 0.0% | 0.1% | 0.4% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Palm OS | 2.2% | 2.6% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Sailfish OS | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Symbian | 73.0% | 63.5% | 67.2% | 48.6% | 18.9% | 4.3% | 0.4% | 0.3% | 0.2% | 0.1% |
| Tizen | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% |
| webOS | 0.0% | 0.0% | 1.6% | 1.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Windows | 12.5% | 17.8% | 14.4% | 7.1% | 2.8% | 4.0% | 5.7% | 5.0% | 4.5% | 1.9% |
| Fire OS[441] | 0.0% | 0.0% | 0.0% | 0.0% | 1.6% | 2.4% | 1.5% | 0.4% | 0.6% | 1.3% |
| Other | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.0% | 0.0% |

(447)  Google's volume based market shares would not be very different (and most of the times would even be higher) if China were included in the worldwide market for the licensing of smart mobile OSs. This is because OEMs that sell both inside and outside of China such as Huawei, Lenovo, Xiaomi and ZTE have entered into AFAs that cover Android devices, and are enforced, in relation to devices sold within China.[442] The share of supply of Android devices for these OEMs in China, which represent the large majority of devices sold in China, would therefore have to be attributed to Google.[443]

(448)  Google Android also enjoys the largest installed base of licensable smart mobile OSs. In 2014 there were 1.6 billion Google Android smartphones in the world, compared with 46 million Windows Mobile smartphones.[444] In addition, as evidenced by Figure 8, in July 2016 there were 2.156 billion Google Android smartphones in the world, compared with 24 million Windows Mobile smartphones.

---

[441]   The Commission has also included the market shares of Amazon in the worldwide market (excluding China) for the licensing of smart mobile OSs even though Amazon does not currently license its Fire OS. This is because at least in 2012 and 2013 Amazon sought to license its Fire OS to a number of OEMs (see Section 12.6.3.3).

[442]   See the examples of Acer, Huawei, K-Touch and Lenovo mentioned in Section 9.3.4.

[443]   Google's shares in China were: (i) 65.6% in 2011, (ii) 91.5% in 2012; (iii) 96.8% in 2013; (iv) 97.3% in 2014; (v) 94.9% in 2015 and (vi) 94.3% in 2016. Source: Commission's calculations based on [...] data (Doc IDs 7866 and 7867).

[444]   See "Installed base of smartphones by operating system in 2015 (in million units), available at http://www.statista.com/statistics/385001/smartphone-worldwide-installed-base-operating-systems/, printed and saved on 11 April 2016.

EN

EN

GOOG-DOJ-26429257

**Figure 8: Smartphone OS worldwide by installed base in 2015-2016 (in millions)**[445]



(449)     Google Android has been therefore by far the leading OS since 2011 in terms of market shares in the worldwide (excluding China) market for licensable smart mobile devices OSs and the alternative OS included in the relevant market do not exercise a significant constraint on Google Android.

(450)     The Commission's conclusion that since 2011, Google has enjoyed strong and stable market shares by volume and there has been no effective entry in any EEA country is not affected by Google's claims that those market shares:

    (1)     incorrectly exclude Apple;

    (2)     should not attribute to Google, market shares relating to Android devices that it does not manufacture[446] as Android implementations by OEMs/MNOs are not controlled by Google; and

    (3)     should not be based on volume but value of either of the Google Android devices sold by OEMs, advertising revenues made on Google Android or app revenues derived from Google Android.[447]

(451)     First, the Commission has properly excluded Apple from the market share calculations as iOS is not part of the relevant market for licensable smart mobile OSs (see Section 7.3.5). In any event, as discussed in footnote 438, even if non-licensable smart mobile device OSs were included in the relevant market, the Commission's finding of Google's economic strength in the worldwide market (excluding China) for licensing of smart mobile OS would not be altered.

(452)     Second, the Commission has properly attributed to Google, market shares relating to Google Android devices built by OEMs and commercialised by OEMs and MNOs. This is because Google: (i) has an important influence on the key steps of the

---

445    See "Installed base of smartphones by operating system from 2015 to 2016 (in million units)", available at  https://www.statista.com/statistics/385001/smartphone-worldwide-installed-base-operating-systems/, printed and saved on 13 June 2017.

446    An example of a device manufactured by Google is the Pixel phone, see https://madeby.google.com/phone/, printed and saved on 13 June 2017.

447    Google's Response to the Statement of Objections, Part Two, pages 59-63, paragraphs 47-57 (Doc ID 7117); Google's Response to the First Letter of Facts, Part One, pages 20-21 (Doc ID 8598).

**EN**                                                   95                                                   **EN**

GOOG-DOJ-26429258

development of Android (see section 6.2.2.1.I), (ii) controls the licensing of the Android trademarks and brand (see Section 6.3.2) and (iii) controls the implementation of Android on smart mobile devices through the Android compatibility tests (see Section 6.3.1).

(453)   Third, market shares based on the value of Google Android devices sold by OEMs do not provide a good indication of Google's economic strength in the worldwide market (excluding China) for the licensing of smart mobile OS.[448] This is for the reasons set out in recitals (454) and (455).

(454)   In the first place, Google does not derive any revenue from the sale of a Google Android device by a third party OEM and MNOs are free to set their pricing policy independently from Google.

(455)   In the second place, Google has no interest in OEMs and MNOs increasing the price of their devices. If anything, Google would have an interest in OEMs and MNOs maintaining or lowering the price of their devices in order to increase the distribution of Android and its profit-generating services (see as described in Sections 6.1 and 9.3.4, Google's mobile business model is based on ensuring the widest possible distribution for GMS devices).

(456)   Fourth, market shares calculated by value of advertising revenues do not provide a good indication of Google's economic strength in the worldwide market (excluding China) for the licensing of smart mobile OS.

(457)   In the first place, advertising revenues made on the Android platform provide only a limited insight into Google's economic strength because these revenues are only one of the ways that Google monetises its economic strength relating to Android.

(458)   For example, Google obtains substantial amounts of data on consumer behaviour and device use from Google Android devices, its proprietary applications and APIs for Android.[449] Google itself states that "*Google Services collect user data, which are used to provide the Services, to improve the Services and to help show ads that users are more likely to find useful.*"[450] These data can be valuable for Google, even in the absence of direct monetisation through advertising. For example, Amazon stated: "*The behavioural information Google collects via Google Android, the Google APIs, the GMS suite, and other Google services tied to Android would provide tremendous value in improving Google's internet search, online advertising, and other businesses.*"[451] In addition, Oracle stated: "*In addition to allowing Google to maintain and deepen its dominance in online advertising, its data collection has allowed Google to entrench its dominance in search. As the EC is well aware, the advantage conferred to Google by its scale in data – combined with the anti-*

---

[448]   In any event, the shares of Google by value were not substantially different from those by volume. On the basis of […] data (Doc IDs 7866 and 7867), Google's share by value in 2016 was 94.8% while the share of Windows was 4.5%. The value share of Google has been constantly increasing since 2011 when it was 77.8% (for methodology, see footnote 440). The value based market shares have been calculated by the Commission on the basis of […] data on average selling price of the mobile devices per OS.

[449]   Google's response to Question 25 of the request for information of 24 March 2017 (Doc ID 7790). See also footnote 75.

[450]   See Google's response to Question 25 of the request for information of 24 March 2017 (Doc ID 7790).

[451]   See Amazon's non-confidential response to Question 5 of the request for information of 9 March 2017 (Doc ID 8247).

GOOG-DOJ-26429259

*competitive conduct Google employs to protect its position – has raised insurmountable barriers to entry in the markets for general search and in particular specialized search services. […] In addition to giving Google an advantage in search and online advertising, the data Google collects gives it an advantage in optimizing its mobile (and PC) services such as YouTube and Maps, as well as in predictive technologies such as Google Now. For example, one way Google can gain competitive insight into user behaviour is to understand which apps are installed, or removed, by users on its platform.*"[452]

(459)    In the second place, and in any event, the advertising revenue estimates provided by Google whereby it attributes to Google and Apple the revenues made by advertisers on Google Android and iOS respectively do not provide a proper indication of Google's economic strength in the worldwide market (excluding China) for the licensing of smart mobile OS. This is because (i) advertisers (and not smart mobile OS developers) earn these revenues; and (ii) Google fails to take into account the fact that a large proportion of advertising revenues made on iOS devices (as well as on Google Android devices) are earned by Google through Google Search and other services.[453]

(460)    Fifth, market shares calculated by value of app sales do not provide a good indication of Google's economic strength in the worldwide market (excluding China) for the licensing of smart mobile OS. This is because those shares would relate to the Play Store revenues and, if anything, would provide an indication of Google's economic strength at the level of Android app stores, not at the level of licensable smart mobile OSs.

### 9.3.2.    *Barriers to entry and expansion*

(461)    The worldwide market (excluding China) for the licensing of smart mobile OSs is characterised by the existence of a number of barriers to entry and expansion.

(462)    First, developing a smart mobile OS is a costly and time-consuming process. Costs result both from the initial investment in research and development to bring a smart mobile OS to the market and the need to finance the ongoing development of the OS, its new features and releases.

(463)    This has been confirmed by OS developers and by OEMs:

   (1)    BlackBerry "*has historically made billions of dollars in ongoing investments to develop the BlackBerry OS and BlackBerry 10 mobile OSs. These investments include thousands of employees and manhours.*"[454]

   (2)    Jolla noted with respect to MeeGo "*… Nokia and Intel cumulatively invested hundreds of millions euros and thousands of man working years in the*

---

[452]    See Oracle's non-confidential response to Question 1 of the request for information of 24 March 2017 (Doc ID 7835).

[453]    While Google stated that it is unable to allocate how much of the revenues on iOS would need to be attributed to Google (Google's response to Question 21 of the request for information of 24 March 2017, Doc ID 7790), this amount is likely to be substantial. Until 2016, iOS was [sources of Google Search revenues]. In 2016, [sources of Google Search revenues], Google still generated more than EUR […] in advertising revenues on iOS (see Google's response to Question 3 of the request for information of 24 March 2017, Doc ID 7955).

[454]    BlackBerry's non-confidential response to Question 9.3 of the request for information of 12 June 2013 to OEMs (Doc ID 3763).

GOOG-DOJ-26429260

*development of Linux-based next generation mobile OS until mid-2011.*"[455]

(3)   Microsoft has spent "[millions of dollars] *on R&D to develop the Windows client and RT operating systems. Development time varies between versions and is usually between one and three years. Total development costs for the modern Windows Phone platform through the end of June 2013 are approximately* [in the millions of dollars]. *These costs cover* [a range of expenditures]. *Windows Phone 7, Microsoft's first release of its modern smartphone OS, took more than* [0-4] *years to develop.*"[456]

(4)   According to Apple, Google cross-subsidised the development of Android with revenues from mobile advertising, mobile apps and in-app purchases in the Play Store.[457]

(464)   Second, the worldwide market for the licensing of smart mobile device OSs is characterised by network effects. Such network effects arise because, when deciding which licensable smart mobile OS to develop for, app developers consider the revenue potential of that OS[458] and since they "*earn their profits mainly by app downloads, mobile OSs with a large user base are considered more attractive by app developers.*"[459]

(465)   Google's market share and the installed base of Android (see Section 9.3.1) create strong incentives for developers of apps for licensable smart mobile OSs to concentrate their development efforts on Android[460] and not develop apps for other licensable smart mobile OSs ("multi-home").[461] This is for three main reasons.

(466)   In the first place, most app developers have limited resources.[462]

(467)   In the second place, the conversion of apps from one licensable smart mobile OS to another ("porting") is costly and time-consuming.[463] Only few developers would be

---

[455]   Jolla's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS providers (Doc ID 3981).

[456]   Microsoft's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS providers (Doc ID 3794).

[457]   Apple's non-confidential response to Question 7 of the request for information of 12 June 2013 to OS providers (Doc ID 749).

[458]   Non-confidential responses to Question 17 of the request for information of 21 October 2015 on app stores.

[459]   ZTE's non-confidential response to Question 17 of the request for information of 21 October 2015 on app stores (Doc ID 2840).

[460]   Responses to Question 18 of the request for information of 21 October 2015 on app stores.

[461]   See Economic Reports submitted by Google on 21 May 2014 (Doc ID 854).

[462]   See Nokia's non-confidential response to Question 17 of the request for information on app stores of 21 October 2015 (Doc ID 3991): "*application developers usually have limited resources and thus a need to prioritize the leading platforms with larger user audiences*".

[463]   See DailyMotion's non-confidential response to Question 5 of request for information 29 June 2015 to app developers (Doc ID 2003), which states: "*Converting an application to iOS or Windows phone is a completely different process and will require a full rewrite of [the] application. Most of the time, the application will look and behave differently so we cannot really say that it is possible to convert an Android application to iOS or windows phone.*", Yahoo's non-confidential response to Question 5 of request for information 12 June 2015 to app developers (Doc ID 2079), which states: "*Converting an application for another operating system, on the other hand, requires rewriting the vast majority of the code from scratch, thus requiring more resources, costs, and time*" and Amazon's non-confidential response to Question 5 of request for information 12 June 2015 to app developers (Doc ID 4188), which states: "*If an app is written directly in native code, the effort required to convert an app from Android to*

**EN**

**EN**

GOOG-DOJ-26429261

ready to add a third platform to their portfolio, besides Android and iOS (see Section 9.3.4.2.IV), as emphasised by the difficulties of Microsoft to attract developers.[464]

(468)    In the third place, no other licensable smart mobile OS has the same reach as Android.[465] For example, in November 2015, there were 1.8 million apps available on the Play Store, the main app store on Google Android devices, compared to 700 000 on Windows in September 2015[466] and 400 000 on Fire OS in September 2015.[467]

(469)    The existence of network effects in smart mobile OSs and the barriers to entry resulting from them has been confirmed by OS developers, OEMs, app store developers, other app developers, Google's internal documents and a study by an independent consultant:

(1)    Regarding OS developers, Canonical noted that "*there is not yet an OS which can sufficiently compel manufacturers to create devices with an alternative OS. Microsoft is an organisation that is comparable to Google in size and importance, but the Windows mobile OS has consistently failed to compete with Android because it is not able to create a cost efficient manufacturing process, nor is it a scalable OS which will allow manufacturers to create different devices across different retail price points.*"[468]

(2)    Regarding OEMs:[469]

2.1    Sony stated that "*[t]he main reason for consumer uptake is the availability of apps on each platform and the maturity of the platform. In Android's case the vast number of devices and span of price points* [contribute] *to the uptake*".[470]

2.2    According to Lenovo, "*[a]ny new mobile OS would need to reach a certain critical mass of apps in its primary apps store to be appealing to*

---

an operating system like iOS is high because the developer will need to repeat the development process for each operating system – recode the app, integrate with the services available on that operating system and perform testing.*"

[464]    According to Hutchison 3G: "*Windows OS has a lower priority due to the low market share in the mobile world*" - Hutchison 3G's non-confidential response to Question 18 of request for information of 21 October 2015 on app stores (Doc ID 2383).

[465]    According to a survey conducted by Vision Mobile in the third quarter of 2015, "*Android's reach is too large to ignore. (...) Android remains by far the most popular platform overall, targeted by 71% of all mobile developers with 28% only using Android*". – Vision Mobile, State of the Developer Nation Q3 2015, p. 19 (Doc ID 2746).

[466]    See Liam Tung, "Microsoft by the numbers 2015: 700k Windows Store Apps, 1.2 bn Office users"(30 September 2015), available at http://www.zdnet.com/article/microsoft-by-the-numbers-2015-700k-windows-store-apps-1-2bn-office-users/, printed and saved on 11 April 2016.

[467]    Amazon's non-confidential response to Question 4 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[468]    Canonical's non-confidential response to Question 8.1 of the request for information of 12 June 2013 to OS providers (Doc ID 268).

[469]    The majority of OEMs consider that no other smart licensable mobile OS can provide features or characteristics equivalent to the Android OS – Non-confidential responses to Question 8.2 of the request for information of 12 June 2013 to OS providers.

[470]    Sony Mobile Communications' non-confidential response to Question 7 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).

GOOG-DOJ-26429262

*developers/customers which is why it will be difficult for newcomers to enter at this point.*" [471]

2.3      According to Acer Inc. ("Acer"), "*The Android OS is important for our smart mobile device business because it is a very popular, reliable and attractive OS for mobile devices that has been very successful in attracting end-users to Android-based devices. This has been in large part due to the steadily growing availability of quality applications, often for free*".[472]

2.4      According to Huawei, "*Developers pay a lot of attention to the ability and efficiency of the mobile OS in producing revenues for their applications.*"[473]

(3)      Regarding app store developers, according to Aptoide, "*Google Android has become the de facto standard in this market and manufacturers or carriers face considerable barriers to using other operating systems. They would have not only to build their own software (which may not be difficult if they fork the Android source code) but then convince application developers to build software for their new system (which would require developers to rebuild their software and duplicate software maintenance and support tasks). In consequence, the current market situation is that Google's Android is the dominant product in this market, having no significant pressure from competitors.*"[474]

(4)      Regarding other app developers, WP Technology, Inc. ("Wattpad") stated: "*iOS and Android OS both have mass adoption, for our application type is crucial to support these platforms.*"[475] According to Skyhook Wireless ("Skyhook"), "*[i]t is critical to develop client software that will operate on mobile OSs with a large market share, such as the Android OS.*"[476]

(5)      [Google Executive], acknowledged the existence of indirect network effects: "*for every app written for Android, the value of the platform (and in turn the value to consumers who adopt phones based on the platform) increases. As more developers build great apps for Android, more consumers are likely to buy Android phones because of the availability of great software content (Angry Birds, anyone?). As more delighted consumers adopt Android phones, it creates a larger audience for app developers to sell more apps.*"[477] [Google Executive] also said: "*Android now supports a hardware and services ecosystem worth over […] a year. Our apps and ads services have made this possible and work to protect our position.[…] These services inherently rely on*

---

[471]    Lenovo's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 4095).

[472]    Acer's non-confidential response to Question 8 of the request for information of 12 June 2013 to OEMs (Doc ID 507).

[473]    See Huawei's non-confidential response to Question 17 of the request for information to app store developers of 21 October 2015 (Doc ID 2455).

[474]    Non-confidential version of the complaint by Aptoide of 16 June 2014 (Doc ID 874), page 5.

[475]    Wattpad's non-confidential response to Question 27.1 of the request for information of 12 June 2013 to app developers (Doc ID 537).

[476]    Skyhook's non-confidential response to Question 27.1 of the request for information of 12 June 2013 to app developers (Doc ID 542).

[477]    Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1752-532).

**EN**                         **EN**

GOOG-DOJ-26429263

*scale to succeed - – no one partner can easily fragment and replicate the complete platform*".[478]

(6)   The study by the independent consultancy Vision Mobile noted that indirect network effects create "*black oceans*" which make competition with Android "*impossible*".

**Figure 9: Vision Mobile – Assessment of mobile app ecosystem competition[479]**



(470)   Third, OEMs wishing to switch to other licensable smart mobile OSs face switching costs. This is because implementing a smart mobile OS requires lead time and investment from an OEM. For example, Sony has estimated that the initial development cost "*to implement the Android OS on our devices was approximately 50 million Euro, with lead time of 1.5-2 years*".[480] OEMs also invest more in developing Android devices than devices operating on any other licensable smart mobile OS.[481]

(471)   Fourth, the incentives of OEMs to switch to other licensable smart mobile OS providers are further reduced by the fact that users of Android devices face significant costs when switching to another smart mobile OS and exhibit loyalty to their smart mobile OS.[482]

---

[478]   Google's internal document submitted in response to the request for information of 19 December 2014, Presentation by [Google Executive], 8 October 2010, slide 4, Doc ID 1790-397.

[479]   Vision Mobile "Mobile Megatrends 2014", 25 July 2014, slide 28 (Doc ID 2745).

[480]   Sony's non-confidential response to Question 10.1 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).

[481]   Amazon's non-confidential response to Question 8 of the request for information of 12 June 2013 to OS providers (Doc ID 4187).

[482]   See in more detail recitals (522) to (551).

**EN**

**EN**

GOOG-DOJ-26429264

(472)  Fifth, no alternative provider of licensable smart mobile OSs has been able to enter and expand successfully in the worldwide market (excluding China) for the licensing of smart mobile OSs. The share of the second most important player in this market – Microsoft - dropped below 2% in 2016. Microsoft exited the market shortly afterwards (see recital (399)). Other providers including Firefox OS, Tizen or Sailfish have also been unable to gain more than 0.2% market share since their entry in 2012, 2015 and 2013 respectively.

(473)  Except for the elements discussed in Section 9.3.5 and 9.3.6, Google does not contest these findings.

*9.3.3.   Lack of countervailing buyer power*

(474)  The Commission concludes that OEMs have insufficient countervailing bargaining power.

(475)  First, whereas Google accounts for almost the totality of the sales of smart mobile device outside China of the largest OEMs that pre-install Google Android,[483] most of these OEMs individually account for only a relatively small proportion of sales of Google Android outside China.[484]

(476)  Second, the barriers to entry and expansion mean that a threat by the OEMs to promote entry of a supplier of an alternative OS that could be a credible competitive threat to Google, would not be realistic. Such entry or expansion in order to be successful would require significant investments to overcome these barriers and it is unlikely that OEMs would commit to such investments.

(477)  Third, lack of countervailing buyer power is evidenced by the limited negotiations that appear to take place in relation to recent AFAs, which are now "*signed online*"[485], with Google's partners needing only to provide the contact details of the representative signing the AFA on their behalf and click the relevant box in the on-line form to accept the terms of the agreement.[486] This suggests that Google's partners can choose only if they agree to enter into an AFA and are unable to influence any of its terms and conditions.

(478)  Except for the elements discussed in Section 9.3.4, Google does not contest these findings.

*9.3.4.   Non-licensable smart mobile OSs*

(479)  The Commission concludes that non-licensable smart mobile OSs, such as iOS and BlackBerry OS,[487] exercise an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs.

---

[483]  For example, in 2015, Google Android accounted for approximately 99% of the sales outside China of the five largest Android OEMs (Samsung, Huawei, LG Electronics, Sony and ZTE). Source: […] data (Doc IDs 3098, 4632, 4633 and 4710).

[484]  Apart from Samsung, which accounted in 2015 for approximately 36% of the sales of Google Android devices out of China, all other OEMs account for a percentage that is below 10% (Huawei for 5%; LG Electronics for 6%; Sony for 3%; and ZTE for 3%). Source: […] data (Doc IDs 3098, 4632, 4633 and 4710).

[485]  See Huawei's response to the request for information of 11 January 2016 (Doc ID 3493).

[486]  See [AFA signatory]'s AFA of 2015 […].

[487]  iOS and BlackBerry OS are the only non-licensable smart mobile OSs to have been installed on a non-negligible number of smart mobile devices between 1 January 2011 and the date of adoption of this Decision.

**EN**

**EN**

GOOG-DOJ-26429265

(480)    First, users obtain smart mobile OSs as part of a wider bundle with a smart mobile device and take into account a range of factors other than the smart mobile OS when purchasing a smart mobile device (Section 9.3.4.1).

(481)    Second, iOS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs (Section 9.3.4.2).

(482)    Third, BlackBerry OS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs (Section 9.3.4.3).

9.3.4.1.  Users obtain smart mobile OSs as part of a wider bundle with a smart mobile device and take into account a range of factors other than the smart mobile OS when purchasing a smart mobile device

(483)    Users obtain smart mobile OSs as part of a wider bundle with a smart mobile device and take into account a range of factors other than the smart mobile OS when purchasing such a device. These factors include, for example, price of the device, battery life, quality of the device screen, quality of the camera, design of the device, and data storage available on the device. As such, it is unlikely that users would change their purchase behaviour and switch to devices based on non-licensable smart mobile OSs in the event of a small but significant, non-transitory deterioration of the quality of Google Android.[488] This has been confirmed by OEMs and MNOs:

(1)    According to Nokia: "[…] *the operating system is only one relevant factor among many that affect the customer choice (other factors include, inter alia, the overall price of the product, available third-party applications, various hardware elements like screen, camera, radio, available utility software on the product, available services, available operator subsidies, brand, form and style factors.)*"[489]

(2)    According to Microsoft: "*Customers base their purchasing decisions on many factors, including but not limited to operating system features, apps and services, hardware quality and characteristics, reputation, third-party application availability, and price. Every customer is unique, and ranks these factors, or others, differently. Mobile carriers also play a substantial role in driving customer demand and purchasing decisions for smartphones at the point of sale.*" [490]

(3)    According to Samsung: "*In general, consumers consider a number of different factors including device information as exemplified above, as well as the manufacturer's brand image:*[…]."[491]

---

[488]    The Commission considered user switching behaviour in the event of a small but significant, non-transitory deterioration of the quality of Google Android because Google is unlikely to increase the price of Google Android, given that its business model is based on OEMs accessing Google Android on the basis of a royalty-free licence.

[489]    See Nokia's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 764).

[490]    See Microsoft's non-confidential response to Question 17.1 of the request for information of 12 June 2013 to OEMs (Doc ID 377).

[491]    See Samsung's non-confidential response to Question 17.1 of the request for information of 12 June 2013 to OEMs (Doc ID 4117).

**EN**                                    103                                    **EN**

GOOG-DOJ-26429266

(4)     According to HTC: "*In UK & Germany, OS is 7th most important factor in purchasing decision.*"[492]

(5)     According to Eircom Limited ("Eircom"), "[…] *a customer's purchasing decision is based mainly on the hardware as opposed to the mobile OS or mobile services available.*"[493]

(484)   This has also been confirmed by consumer surveys. For example, Nielsen data from an international survey conducted in 2012 indicate that for users in Italy and the United Kingdom, having a "*good operating system*" is only one factor among other criteria such as "*stylish design*" and "*ease of use.*"[494] Furthermore, a 2013 report by Accenture confirms that users are equally or more likely to mention a long range of other factors than the "Operating System" as an important feature when determining which smartphone to purchase, including price, security, screen resolution, screen size, design – look/feel and touchscreen.[495]

(485)   The Commission's conclusion that users take into account a range of factors other than the smart mobile OS when purchasing a smart mobile device is not affected by Google's claim that respondents to the requests for information, the Commission's past decisions and the evidence on file indicates that the smart mobile OS is an important factor, if not the most important factor, in user purchasing decisions.[496]

(486)   First, contrary to what Google claims, the Commission does not conclude that a smart mobile OS is an unimportant component of user purchasing decisions. Rather, the Commission concludes that a smart mobile OS is one important factor in the success of a smart mobile device but that other features are also important, if not more important (see recitals (483) and (484)).[497]

(487)   Second, users of Google Android devices are not sensitive to variations in the quality of their smart mobile OS and would not change their device purchasing behaviour in the event of a small but significant, non-transitory deterioration of the quality of Google Android.

(488)   In the first place, while Google claims that, since 2011, it has been "*relentlessly*" releasing new Android versions,[498] it also recognises that OEMs have consistently failed to deliver punctual updates of the Google Android OS to users.[499] This is also

---

[492]   See HTC's non-confidential response to Question 17.1 of the request for information of 12 June 2013 to OEMs (Doc ID 3841).

[493]   See Eircom's non-confidential response to Question 14.1 of the request for information of 12 June 2013 to MNOs (Doc ID 437).

[494]   Hammerhead Market Research, "Nexus", May 2013, slide 19, (Doc ID 1372-1450).

[495]   See "Accenture Consumer Electronics Products and Services Usage Report", available at https://www.accenture.com/be-en/~/media/Accenture/Conversion-Assets/DotCom/Documents/Global/PDF/Technology_6/Accenture-Consumer-Electronics-Products-and-Services-Usage-Report.pdf, printed and saved on 18 April 2016.

[496]   Google's Response to the Statement of Objections, Part Two, page 50, paragraphs 28-33 (Doc ID 7117); Google's Response to the First Letter of Facts, Part One, page 10, paragraphs 26-29 (Doc ID 8598).

[497]   See also Commission decision in Case M.6381 – Google / Motorola Mobility, paragraph 83; and in Case M.7047 – Microsoft / Nokia, paragraph 104.

[498]   Google's Response to the First Letter of Facts, Part One, page 12, paragraph 29 (Doc ID 8598).

[499]   Google Android OEMs need to adapt OS updates to the specific version of Google Android that is installed on their Google Android devices. As such, OS updates need to be released by individual OEMs after Google releases the code. See for example Google's Response to the Statement of Objections, Part Three, page 123, paragraphs 79 and following (Doc ID 7117).

EN                                            104                                            EN

confirmed by Figure 10 according to which a significant proportion of Google Android users do not use devices running the latest version of the Google Android OS. As of May 2017, only 7.1% of Google Android devices were operating on the latest version of Google Android ("Nougat") that had been released already in October 2016 while more than half were operating on the third newest or older OS.[500] In spite of OEMs consistently failing to deliver punctual updates of the Google Android OS to users, during the period 2011-2016, as shown in Table 3, Google Android's share of devices has consistently increased.

**Figure 10: Breakdown of Google Android devices by releases of OS as of May 2017[501]**

(489)   In the second place, according to a study submitted by Yandex, handset sales do not appear to be related to Google Android updates. In fact, as shown by Figure 11, there is a general upward trajectory of sales of Google Android devices with no evidence that this trend accelerates when a new Google Android OS update is launched or decelerates when a new iOS update is launched.

---

[500]   These findings are also confirmed by the graph included in Google's Response to the First Letter of Facts, Part One, page 12, paragraph 29 (Doc ID 8598).

[501]   See Figure of "*Further evidence on the competitive interaction between licensable and non-licensable OS*", CRA study on behalf of Yandex submitted on 16 June 2017 (Doc ID 8031) extracted from https://developer.android.com/about/dashboards/index.html. The dates of the major releases of Android were as follows: Nougat 2016, Marshmallow 2015, Lollipop 2014, Kitkat 2013, Jelly Bean 2012, Ice Cream Sandwich 2011 and Gingerbread 2010.

**EN**

**EN**

GOOG-DOJ-26429268

**Figure 11: Units sold of Android and iOS phones in Europe, and significant Android and iOS updates**[502]



(490) Third, contrary to what Google claims,[503] Figure 11 does not confirm that the release of an update by Google drives Google Android device sales. This is because, as Google concedes, users cannot immediately benefit from an Android release (*"the average time for OEMs and carriers to deliver Android updates ranges from [...] months to [...] months; and some OEMs/ carriers never update their devices"*).[504] As such, the fact that as of 2013 sales of devices peaked each year in Q4 is because of other factors than yearly Android releases, such as seasonality.

(491) Moreover, contrary to what Google claims, Figure 11 does not confirm the "innovation race" between Google and Apple. Any comparison based only on release dates of OS updates is not meaningful given that updates on Google Android devices take much more time to reach user devices than iOS updates.[505]

---

[502] An Android or iOS update was deemed to be significant and therefore worth being included in the graph if it fell in the top ten, in terms of the number of features added to the OS. Data labels corresponding to a significant Android or iOS updates have an asterisk besides them if they coincided with the introduction of a new model of the Samsung Galaxy S or iPhone respectively (this analysis focused on releases of the Samsung Galaxy S, as Samsung enjoyed the greatest market share among producers of Android phones over the period in question, and Galaxy S is its flagship series). Source: "Further evidence on the competitive interaction between licensable and non-licensable OS", CRA study on behalf of Yandex submitted on 16 June 2017 (Doc ID 8031).

[503] Google's Response to the First Letter of Facts, Part One, page 12, paragraph 29 (Doc ID 8598)

[504] Google's Response to the Statement of Objections, Part Three, page 123, paragraphs 79 and following (Doc ID 7117). See also Google's Response to the First Letter of Facts, Part One, page 12, paragraph 28 (Doc ID 8598) and Figure 10, as well as Google's chart "*Proportion of Android versions installed on devices over time*", which shows that [timing of adoption of Android versions].

[505] Google's Response to the Statement of Objections, Part Three, page 126, footnote 472 (Doc ID 7117);

**EN**                                    106                                    **EN**

GOOG-DOJ-26429269

(492)   Fourth, a survey submitted by Yandex (the "Yandex Survey")[506] indicates that Google Android users are not sensitive to quality variations in Google Android as 59% of Android users do not know which version of Android their devices are running. When asked to identify recently-added features in the Android OS their phone was running, only 37% indicated they were aware of new features. When these 37% of respondents were asked to identify the most important new feature of which they were aware, approximately a third did not provide an answer or said "don't know".

(493)   Fifth, Google's claim that the Yandex Survey shows that certain users consider the smart mobile OS to be the most important factor in choosing a smart mobile device[507] further confirms the Commission's conclusions. This is because the users concerned have already purchased a Google Android device. Given that Google Android users would face substantial costs when switching to iOS devices (see Section 9.3.4.2.II) and show a significant degree of loyalty to Google Android (see Section 9.3.4.2.III), it is not surprising that those users consider it important that their future device is based on Google Android.

(494)   Sixth, an internal Google presentation, prepared by the business consultancy Kantar dated from April 2016[508] and focussed on the United Kingdom, a Member State where Apple has a relatively large share of device sales, indicates that the smart mobile OS brand is only a small factor among those triggering user purchase decisions, [Google internal communications on business strategy]. The same document indicates that the top trigger by far in terms of popularity is the handset brand/model.

---

[506]   "*Further evidence on the competitive interaction between licensable and non-licensable OS*", CRA study on behalf of Yandex submitted on 16 June 2017 (Doc ID 8031), page 8 and following and Google's letter of 14 March 2018 (Doc ID 8768).

[507]   Google's Response to the First Letter of Facts, Part One, page 11, paragraph 28 (Doc ID 8598).

[508]   Appendix 8 to Google's Response to the Statement of Objections (Doc ID 6555-69).

**EN**                          107                          **EN**

GOOG-DOJ-26429270

**Figure 12: Top purchase triggers among Google Android Loyals vs. Switchers[509]**



|  | Android Loyals | Android Prem to iOS | Android Mid/Entry to iOS |
|---|---|---|---|
| Handset Brand Model |  |  |  |
| Cost of Handset bill |  |  |  |
| OS brand |  |  |  |
| Ease of Use |  |  |  |
| Network Carrier Brand |  |  |  |
| **% owning an iPad** |  |  |  |

(495) Moreover, [Google internal communications on business strategy].[510] This shows that: (i) hardware and not OS features are the main reasons why users switch; and (ii) the hardware defects referred to are not dependent on the OS, as Google claims,[511] because higher-end Google Android devices are not said to be affected by the same defects.

(496) Seventh, Google's claim that Figure 12 points at ease of use as the second most important purchase trigger for premium Google Android switchers to iOS[512] does not contradict the Commission's conclusions as: (i) ease of use is not only related to the smart mobile OS of a certain device but also to hardware and the apps pre-installed on the device; and (ii) in any event, the handset brand/model remains by far the main triggering factor.

9.3.4.2. iOS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs

(497) For the reasons set out in this Section, the Commission concludes that iOS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs.

(498) First, there are significant price differences between Google Android and iOS devices.

(499) Second, users of Google Android devices would face substantial costs when switching to iOS devices.

(500) Third, users show a significant degree of loyalty to their existing smart mobile OS.

---

[509] Appendix 8 to Google's Response to the Statement of Objections (Doc ID 6555-69).
[510] Appendix 8 to Google's Response to the Statement of Objections (Doc ID 6555-69). More specifically, according to this document, the main factors for switching are [list of factors related to hardware].
[511] Google's Response to the Statement of Objections, Part Two, page 50, paragraph 30 (Doc ID 7117).
[512] Google's Response to the First Letter of Facts, Part One, page 13, paragraph 29 (Doc ID 8598).

**EN**                                    108                                    **EN**

GOOG-DOJ-26429271

(501)   Fourth, app developers are unlikely to stop developing for Google Android and develop exclusively for iOS.

*I.     There are significant price differences between Google Android and iOS devices*

(502)   More than half of Google Android devices are priced below USD 350, whereas all Apple smartphones have until recently been priced above this threshold. Users that wanted to purchase less expensive smart mobile devices, could not, therefore, switch to iOS devices. It was only in March 2016 that Apple announced the launch of a lower priced device – iPhone SE.[513]

(503)   Figure 13 shows the evolution of the average selling price of Google Android and Apple smartphones in Europe between 2009 and 2014.

**Figure 13: Average selling price of iOS and Android smartphones in Europe, 2009-2014[514]**



(504)   In the period taken into account in Figure 13, Apple smartphones have, on average, cost twice as much as Google Android devices. In addition, the average price difference between Google Android and iOS devices has been increasing, reaching a peak of 181% of Google Android devices average price in the first quarter of 2015. In the second quarter of 2015, the price difference decreased due to the launch of certain higher-end Google Android devices,[515] while remaining in the region of 120% of Google Android devices average price.

(505)   With regard to the differences in prices for devices running on different smart mobile OSs, Google confirmed: "*Almost a quarter of all Android smartphones sold in the EU belong to the lowest price range of USD 50-149. In comparison, iOS and BlackBerry are not present in this segment and Windows Phone has a negligible*

---

[513]   See "*iPhone SE a big step for small*", available at http://www.apple.com/iphone-se/, printed and saved on 12 April 2016.

[514]   Yandex's memorandum '*Why retail competition between Android and Apple does not eliminate Google's ability and incentive to engage in anticompetitive bundling in its dealings with Android device makers*' (Doc ID 3828).

[515]   Notably the Samsung Galaxy S6. See Yandex's memorandum '*Why retail competition between Android and Apple does not eliminate Google's ability and incentive to engage in anticompetitive bundling in its dealings with Android device makers*' (Doc ID 3828).

**EN**                                            109                                            **EN**

GOOG-DOJ-26429272

*presence of 0.5%. Another 21.4% of all Android-based smartphones are sold in the second lowest price range of USD 150-249, whereas no iPhones can be found in this category and only 23.2% of all Windows Phone smartphones and 31.7% of all BlackBerry phones belong to this segment. Taken together, almost half of all Android-based smartphones are sold within the two lowest price ranges, whereas Apple is completely absent and less than a quarter of all Microsoft phones and less than a third of all BlackBerry phones belong to these two price categories. A similar pattern is seen among tablets. The majority of Android-based tablets are sold at a price less than USD 300, while a trivial share of Microsoft tablets (less than 1%) and no Apple tablets are even sold in that price range."* [516]

(506)    Google also provided Figure 14, which shows that more than 80% of Apple's sales are concentrated on sales of smart mobile devices priced above USD 550 whereas only approximately 20% of Google Android devices are sold with prices above USD 550.

**Figure 14: Device price comparison submitted by Google**[517]



(507)    The difference in price ranges between Google Android and iOS devices reflects the different commercial strategies pursued by Apple and Google.

(508)    On the one hand, Apple's strategy is based on vertical integration and the sale of higher-end smart mobile devices.[518]

---

[516]    Google's response to the complaint by FairSearch, paragraph 45 (Doc ID 1584).

[517]    Presentation by [Google Executive], of 9 June 2015, "Android", slide 12 (Doc ID 4712).

[518]    See Apple's 2015 Annual Report (Form 10-K). For the fiscal year ended on 26 September 2015, Apple reported total net sales of USD 234 billion. iPhone sales were USD 155 billion (66.33 % of total net sales), and iPad sales were USD 23 billion (9.93% of total net sales). Apple's strategy is confirmed by business analysts. For example, it has been noted that: "*Microsoft is focused on market share. Samsung is focused on market share. BlackBerry is focussed on market share (and trying to survive). Read any coverage of the smartphone 'wars' and the key metric is market share. Apple is measuring itself in another way... margins.*" (see Ewan Spence, "*Nine Business And Strategy Lessons From Apple And The iPhone 5c and 5s*", 14 September 2013, available at http://www.forbes.com/forbes/welcome/%20-%202715e4857a0b51cd36950324, printed and saved on 11 April 2016).

GOOG-DOJ-26429273

(509)    On the other hand, Google's strategy is to ensure that Google Android is installed on as many smart mobile devices as possible as a way to ensure market penetration for its services and the collection of data used for the purposes of search advertising.[519] As stated in an internal presentation to the Google Board of Directors [Google Executive], "[Google internal communications on business strategy]"[520]

(510)    The different commercial strategies pursued by Apple and Google are reflected in the evolution of share of supply of smart mobile devices using iOS and Google Android.

(511)    As can be seen from Figure 15, Apple's share of supply of smart mobile devices worldwide (excluding China) remained relatively constant between 2009 and 2016, ranging between 15% and 26%, despite the share of devices based on Google Android in the same time period increasing from 4% in 2009 to 80% in 2016.

**Figure 15: OS shares of supply of smart mobile devices worldwide (excluding China)[521]**



(512)    The Commission's conclusion that there are significant price differences between Google Android and iOS devices is not affected by Google's claims.[522] that

---

[519]   See Liz Laffan, "[Report] A new way of measuring openness, from android to webkit the open governance index [updated]", available at http://www.visionmobile.com/blog/2011/07/the-open-governance-index-measuring-openness-from-android-to-webkit/, printed and saved on 11 April 2016, which states: "*Google has made Android available at "less than zero" cost, since Google's core business is not software or search, but driving eyeballs to ads. As is now well understood, Google's strategy has been to subsidise Android such that it can deliver cheap handsets and low-cost wireless Internet access in order to drive more eyeballs to Google's ad inventory.*" See Ben Bajarin, "iOS, Android, and the Dividing of Business Models" (30 June 2014), available at https://techpinions.com/ios-android-and-the-dividing-of-business-models/32237, printed and saved on 11 April 2-16 and see Bill Gurley, "above the crowd" (24 March 2011), available at http://abovethecrowd.com/2011/03/24/freight-train-that-is-android/, printed and saved on 11 April 2016.

[520]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-46984).

[521]   Source: […] data (Doc IDs 7866 and 7867).

[522]   Google's Response to the Statement of Objections, Part Two, pages 57-59, paragraphs 43-46 (Doc ID 7117); Google's Response to the First Letter of Facts, Part One, pages 17-19 (Doc ID 8598).

**EN**                                111                                **EN**

GOOG-DOJ-26429274

(1)     Google Android devices are spread across all price ranges and up to half of Google Android devices users would switch to Apple as a result of a small but significant, non-transitory deterioration of the quality of Google Android;

(2)     [Google confidential sales plans and marketing strategy];

(3)     Android's competition with iOS for users of higher-end devices protects users of lower-end Android devices because Google does not release degraded versions of Android for lower-end devices;

(4)     Apple has started to target heavily users of lower-end Google Android devices with its iPhone C & SE; and

(5)     [Google confidential sales plans and marketing strategy].

(513)   First, Google acknowledges that at least 50% of Google Android devices are sold at prices below those of iOS devices. As a result, the users of those Google Android device are unlikely to switch to iOS devices given that would generally not spend 5-10% more than what they spent on their previous device.[523] As regards the remaining users, they would be unlikely to switch to iOS devices for the reasons set out in Sections 9.3.4.1, 9.3.4.II and 9.3.4.III. This is confirmed by Opera, which explained that "*The only comparable OS in terms of app quantity, variety, and quality is iOS; however, Apple's devices may nonetheless be too expensive for many Android users to consider switching to iOS/Apple*".[524]

(514)   Second, users of lower-end devices are equally valuable for Google because it collects valuable user data from those devices and uses that data to improve its products and serve advertisements on all users.[525] This is confirmed by Google's statement in its internal documents that it has decided to take "[Google internal communications on business strategy]"[526]

(515)   Third, competition between Android and iOS for users of higher-end devices would not protect users of lower-end Android devices. This is because the impact on Google of higher-end Android users switching to iOS would be limited, given that such users would still run searches on Google Search and Google would retain the large majority of revenues from such searches:

(1)     Google Search is set as default on the Safari browser on each smart mobile devices sold by Apple pursuant to a [commercial] agreement between Apple and Google;[527]

(2)     [Information about the compensation Apple receives from Google in connection with that agreement]; and

---

[523]   Whilst there may be exceptions to this principle, this assumption is in line with the rationale of a SSNIP test.

[524]   Opera's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 3534).

[525]   See footnote 75.

[526]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-46984).

[527]   Apple's non-confidential response to Question 16 of the request for information of 17 July 2014 (Doc ID 1453).

GOOG-DOJ-26429275

(3)     Google share of searches on iOS devices is above [90-100]%.[528]

(516)   Fourth, significant price differences remain between Google Android and iOS devices, notwithstanding Apple's launch of the iPhone C & SE.

(517)   In the first place, the cheapest version of Apple's iPhone C launched in September 2013 was priced at USD 550,[529] which was higher than most Google Android devices.[530]

(518)   In the second place, the cheapest version of the iPhone SE as of 18 April 2017 was priced at USD 399,[531] which was still higher than the majority of Google Android devices.[532] In any event, the iPhone SE was launched only in March 2016.

(519)   Fifth, the evidence submitted by Google does not support its claim that [Google confidential sales plans and marketing strategy].

(520)   In the first place, Google bases its claim only on an unrepresentative study carried out in the United Kingdom, where iOS devices are used by a significantly higher percentage of users than in the rest of the EEA.[533]

(521)   In the second place, the study confirms that users of both lower-end and higher-end Google Android devices are unlikely to switch because of customer loyalty. […]% of all users of Android devices in the United Kingdom are unlikely to switch compared to […]% of higher-end users.[534]

*II.     Users of Google Android devices would face substantial costs when switching to iOS devices*

(522)   Users of Google Android devices would face substantial costs when switching to iOS devices.

(523)   These include the need to download and purchase existing apps for the new smart mobile OS, the need to learn and become familiar with a new interface and the need to transfer a large amount of data through often inconvenient and imperfect mechanisms.[535]

(524)   The existence of substantial switching costs has been confirmed by OEMs and

---

[528]   Source: […] data provided by Microsoft in response to Question 13 of the request for information of 10 April 2017 (Annex 5) (Doc ID 8101).

[529]   See "*The iPhone 5C Helps Make a Strong Argument for the iPhone 5S*" (10 September 2013), available at http://techland.time.com/2013/09/10/iphone-5c-C-stands-for-cake/, printed and saved on 17 August 2017. Values indicated are without subsidies. Using a non-subsidised price allows more direct comparisons as it removes the effect of any potential carrier-specific discount. This is also the approach taken by Kantar in a survey submitted by Google, see Appendix 8 to Google's Response to the Statement of Objections (Doc ID 6555-69).

[530]   See Figure 13.

[531]   See https://www.apple.com/shop/buy-iphone/iphone-se/32gb-silver#00,20,30,40,60 (Doc ID 8152).

[532]   See Figure 13.

[533]   See Annex 20, attached to Google's response to the request for information of 24 March 2017, slide 5, according to which iOS's share of smartphones in the United Kingdom was between 30% and 41% in the time period from January 2014 to January 2016 (Doc ID 7791). This compares to a share in the EEA in the time period 2014-2016 of between 19% and 20% (source: […] data (Doc IDs 7866 and 7867).

[534]   See Appendix 8 to Google's Response to the Statement of Objections, page 7 (Doc ID 6555-69).

[535]   Yandex's memorandum 'Why retail competition between Android and Apple does not eliminate Google's ability and incentive to engage in anticompetitive bundling in its dealings with Android device makers' (Doc ID 3828).

**EN**                                        113                                        **EN**

GOOG-DOJ-26429276

MNOs:

(1)   Telefónica stated: "*Once any customer has been using an ecosystem and has purchased several apps for it, it is very unlikely that the specific customer would jump to another ecosystem unless it had a bad experience with it or because of aggressive counter offers from the different devices manufacturers. Most of them, keep loyal to the ecosystem after 1 year of use. The main reason for that loyalty is that there are costs of switching to alternative platforms for end users. These costs include, in addition to that of replacing the device (if it has not been amortized), the following*:

•   *cost of replacing (or* [losing]*) paid-for native apps and music that has been already acquired by the user, and cannot be transferred to any different platform;*

•   *potential loss of network externalities, at least in the case of native apps that are used jointly with other users in the same ecosystem;*

•   *switching costs are higher for users of multiple appliances for the same OS (smartphone, tablet, TV and/or PC) who share content through Cloud services due to stickiness inherent to the ecosystem services.*"[536]

(2)   Jolla stated: "*There is a strong lock-in effect in mobile OSs. If a consumer starts using a certain mobile OS, (s)he is likely to buy the next device based on the same mobile OS. This consumer behaviour is logical because typically switching to next device with the same mobile OS is very easy, and consumer can transfer e.g. contact information, messages, settings, and media content (like pictures or music) easily to the next device. However, switching to device with other mobile OS is usually difficult, requires technical knowledge, time and effort, and results only part of the device content to be transferred. In addition, if a user has purchased applications and change the device with the same OS, (s)he typically can move the applications to the new device without need to purchase them again. However, this is not possible when changing to a device with a different mobile OS. Also the consumer needs to invest in learning the different user logic when switching to another mobile OS.*" [537]

(3)   Sony Mobile Communications Inc. ("Sony Ericsson") stated: "*It is not very likely as most people will not want to learn a new system or re-purchase apps (and for the increasingly large community of mobile gamers, risk losing all the attributes or points they have won over time as they cannot be ported) if they are happy with what they have used.*"[538]

(4)   PT Portugal SGPS SA ("Portugal Telecom") stated: "*The purchase of applications for a specific mobile OS creates loyalty to the OS. The fact that when a user changes from one device to a new one with the same OS the downloaded applications, for free or purchased, are almost automatically available in the new smartphone without any extra effort and cost is of course*

---

[536]   See Telefonica's non-confidential response to Question 14.3 of the request for information of 12 June 2013 to MNOs (Doc ID 4142).

[537]   See Jolla's non-confidential response to Question 11.3 of the request for information of 12 June 2013 to OS providers (Doc ID 3981).

[538]   See Sony Mobile Communications' non-confidential response to Question 17.3 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).

GOOG-DOJ-26429277

*a way of turning the customers loyal to an OS.*"[539]

(5)   Yandex stated: "*apps that were purchased in Google Play for usage on an Android phone would have to be purchased again in the Apple App store after a switch to iPhone. Migrating contacts can be a more straightforward process when the consumer follows a detailed guideline and photos and videos can be transferred using specific data-transferring apps. However, even then significant transaction costs are involved, which many consumers prefer to avoid. A number of other items cannot be transferred at all, as a recent switching guide describes, including:*

- *The Android phone case is not going to be compatible with an iPhone (and the dock might not be either)*
- *Android apps cannot be transferred*
- *Home screen customization is not available to the same extent on iOS*
- *Text messages are not easy to transfer and will like involve premium software options.*"[540]

(6)   Nokia stated: "*Apps also contribute to consumer lock-in to an OS, owing to the lack of interoperability between the OS from different vendors. The threshold of switching becomes greater the more time and money the consumer spends on purchasing and getting accustomed to apps that are only compatible with their relevant platform. This is amplified by the fact that even if the applications were compatible with the new device, there is a tight connection with the application store both on re-installation to a new device (i.e. user account) and updates to the application already purchased from one store.*"[541]

(525)   The existence of substantial switching costs is also confirmed by Apple's launch in September 2015 of a "Move to iOS" app as part of its iOS 9 release, as an attempt to make switching easier.[542]

(526)   Furthermore, the substantial switching costs are not negated by the alleged low cost of repurchasing existing Android apps on an iOS device or the short life span of apps.[543]

(527)   On the one hand, the price paid for the purchase of apps is only one barrier to switching. Other barriers, as described in recitals (523) and (524), include the costs and time of learning to use a new smart mobile OS (including a new set of apps), of porting data, settings and content, of downloading apps on a new device, and of

---

[539]   See Portugal Telecom's non-confidential response to Question 14.3 of the request for information of 12 June 2013 to MNOs (Doc ID 365).

[540]   Yandex's memorandum 'Why retail competition between Android and Apple does not eliminate Google's ability and incentive to engage in anticompetitive bundling in its dealings with Android device makers' (Doc ID 3828).

[541]   Nokia's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[542]   Source: see "*It's easy to make the switch to iPhone*", available at http://www.apple.com/iphone/switch-to-iphone/, printed and saved on 11 April 2016.

[543]   See Section 4 of the RBB economic report and response to the FairSearch complaint "Annex 1 – Assessment of competition between smart mobile platforms", 21 May 2014 (Doc ID 854).

**EN**                                              115                                              **EN**

GOOG-DOJ-26429278

reconfiguring app settings.[544]

(528)   On the other hand, because Google Android users download on average 10 apps per month,[545] even if the life span of a majority of apps were to be short,[546] there would still remain a large number of apps that users would need to transfer to a newly purchased smart mobile device.

(529)   The Commission's conclusion that users of Google Android devices would face substantial costs when switching to iOS devices is not affected by Google's claims that:[547]

(1)   switching costs are irrelevant because competition takes place at the point of purchasing a new smart mobile device;

(2)   Apple strives to make switching from Android to iOS easy via its "Move to iOS" app and by offering users, since May 2017, up to USD 260 credit if they traded in their Android device for an iOS device[548]; and

(3)   switching costs equally exist between licensable OSs, such as Android and Windows, that are part of the same market.

(530)   First, the fact that competition takes place at the point of purchasing a new smart mobile device does not mean that switching costs are irrelevant. On the contrary, switching costs are relevant at the point of purchasing a new mobile device because the fact that a user currently uses a Google Android device influences its purchasing decision when it comes to a new device.

(531)   Second, the Move to iOS app has not eliminated the costs of switching from Android to iOS:

(1)   user reviews as of 19 April 2017 indicate that the Move to iOS app has an average rating in the Play Store of less than 2.8 (out of 5). Furthermore, of the total 93 368 user reviews that the "Move to iOS" app has received, more than 50% (i.e. 47 478 users) rated the app 1 out of 5;[549]

(2)   as the "Move to iOS" app was launched in September 2015, the existence of such an app cannot alter the Commission's conclusion in recital (522) above for the period between January 2011 and August 2015; and

(3)   Google has not submitted any evidence to support its claim that in the US Apple has started offering users a USD 260 credit for switching from Android

---

[544]   See Sony Mobile Communications' non-confidential response to Question 17.3 of the request for information of 12 June 2013 to OEMs (Doc ID 4389); See Portugal Telecom's non-confidential response to Question 14.3 of the request for information of 12 June 2013 to MNOs (Doc ID 365).

[545]   See Benedict Evans, "How many apps do Android and iOS users download?" (16 may 2013), available at http://ben-evans.com/benedictevans/2013/5/16/how-many-apps-do-android-and-ios-users-download, printed and saved on 11 April 2016.

[546]   "*30 days after installation only 54% of apps are still in use by the user. After 60 days this figure falls to 43% and after 90 days only 35% of installed apps are still in use*". See Section 4.3 of the RBB economic report and response to the FairSearch complaint "Annex 1 – Assessment of competition between smart mobile platforms", 21 May 2014 (Doc ID 854).

[547]   Google's Response to the Statement of Objections, Part Two, pages 52-53, paragraph 35 (Doc ID 7117).

[548]   Google's letter of 6 June 2017 (Doc ID 7969).

[549]   See          "Move          to          iOS",          available          at https://play.google.com/store/apps/details?id=com.apple.movetoios&hl=en, printed and saved on 13 June 2017.

GOOG-DOJ-26429279

to iPhone devices. If anything, Google's claim that Apple would offer such credit in the US would confirm that the "Move to iOS" app has not successfully eliminated the costs of switching from Android to iOS.

(532)   Third, the fact that other licensable OSs are part of the same relevant market as Android does not imply that users do not face certain costs when switching between licensable OSs. This is because the Commission has assessed the scope of the relevant product markets starting from the level of the OEMs, i.e. the counterparties that have entered into the AFAs, MADAs and portfolio-based revenue share agreements with Google (see Section 7.2) and, from the perspective of such counterparties, Android and other licensable smart mobile OSs, are substitutable, irrespective of the switching costs faced by users.

III.    *Users show a significant degree of loyalty to their existing smart mobile OS*

(533)   Users show a significant degree of loyalty to their existing smart mobile OS. For example, it has been estimated that in 2015, 82% of Google Android smartphone users purchasing a new smartphone decided to purchase a Google Android device. These figures are slightly higher than the equivalent figure for iOS users (78%).[550]

(534)   A number of app developers, OEMs and MNOs have confirmed such a high degree of customer loyalty:

(1)   according to the Yandex Survey,[551] more than 90% of Google Android smartphone users in the United Kingdom would most likely consider purchasing a new Google Android smartphone;

(2)   Telefónica stated*: "Once any customer has been using an ecosystem and has purchased several apps for it, it is very unlikely that the specific customer would jump to another ecosystem unless it had a bad experience with it or because of aggressive counter offers from the different devices manufacturers. Most of them, keep loyal to the ecosystem after 1 year of use. The main reason for that loyalty is that there are costs of switching to alternative platforms for end users.*"[552]

(3)   Archos S.A. ("Archos") stated: "*There is a great deal of fidelity to the mobile OS. The main reason may not be the fact that applications have been purchased and that consumers want to preserve their investment. This is a very small factor. The main factor is the difficulty to port one's personal data (eg contacts) from a mobile OS to the next. The other factor is that users get used to the way their smart device works and do not want to re-learn a new system.*"[553] These additional factors have also been mentioned by Yandex,

---

[550]   See Don Reisinger, "*Android users more loyal than iOS counterparts, data shows*"(11 August 2015), available at   http://www.cnet.com/news/android-users-more-loyal-than-ios-owners-study-shows/, printed and saved on 11 April 2016.

[551]   Results of online survey of Android users in the United Kingdom conducted by Ipsos MORI. The questionnaire was completed by 1,001 Android users aged 16-75 across Great Britain from its online panel of respondents. Source: "*Further evidence on the competitive interaction between licensable and non-licensable OS*", CRA study on behalf of Yandex submitted on 16 June 2017 (Doc 8031), page 8 and following.

[552]   See Telefonica's non-confidential response to Question 14.3 of the request for information of 12 June 2013 to MNOs (Doc ID 4142).

[553]   See Archos' non-confidential response to Question 17.3 of the request for information of 12 June 2013 to OEMs (Doc ID 3717).

GOOG-DOJ-26429280

Telefónica and Jolla, as mentioned in Section 9.3.4.2.II.

(4)   Belgacom SA/NV ("Belgacom") stated: "*When the customer does not choose to change* [OS], *which mostly is the case, given the relatively high loyalty both for iOS and for Android, the purchased apps can be transferred to the new device with the same OS, because it is linked to the account of the customer. The mere fact of being able to transfer the purchased apps to a device with the same OS makes this loyalty even higher.*"[554]

(5)   Wind stated: "*Customer stickiness to a specific Oss is in our view strictly related to applications the customer has already bought.*"[555]

(535)   The conclusion that users show a significant degree of loyalty to their existing smart mobile OS is not affected by Google's claims that:

(1)   the Commission ignores evidence that a substantial number of users have switched, or would be willing to switch, between Android and iOS;

(2)   the degree of competition for first time buyers of smart mobile devices would be sufficient to protect existing Android device users as Google cannot discriminate between these customer categories;[556]

(3)   with regard to the Yandex Survey, 18% of surveyed customers stated that they did not know which device they were most likely to purchase.[557] Had the Commission considered these customers, it would have concluded that a lower percentage than 90% of users would most likely consider purchasing a new Google Android smartphone; and

(4)   the Commission's reasoning conflicts with the Klemperer economic model, which, according to Google, suggests that when first-time buyers represent a large portion of demand, switching costs can increase competition because firms compete aggressively to win first-time buyers.[558]

(536)   First, the body of evidence does not demonstrate that a substantial number of users have switched, or would switch, between Android and iOS.

(537)   In the first place, the fact that, in the period between 2013 and 2015, 16% of iOS users may have previously used Android confirms that only a minor proportion of Android users have actually switched to iOS.

(538)   In the second place, the fact that, in late 2015 30% of new iPhone buyers may have previously been users of Android[559] is based on a limited period of observation (three months) and represents the highest ever rate of Android switchers. Furthermore,

---

[554]   See Belgacom's non-confidential response to Question 14.3 of the request for information of 12 June 2013 to MNOs (Doc ID 608).

[555]   See Wind's non-confidential response to Question 14.3 of the request for information of 12 June 2013 to MNOs (Doc ID 440).

[556]   Google's Response to the Statement of Objections, Part Two, pages 53-56, paragraphs 36-42 (Doc ID 7117).

[557]   Google's Response to the First Letter of Facts, Part One, page 16, paragraph 38 (Doc ID 8598).

[558]   See Google's Response to the Statement of Objections, Part Two, pages 56-57, paragraphs 41-42 (Doc ID 7117).

[559]   See:   http://www.zdnet.com/article/apple-ceo-android-to-iphone-switchers-will-help-us-smash-74-million-sales-record/, printed and saved 17 August 2017 and Google's Response to the Statement of Objections, Part Two, page 53, paragraph 37 (Doc ID 7117).

**EN**                                    118                                    **EN**

GOOG-DOJ-26429281

given that this period coincides with the launch of a new iPhone, it is likely that switching was influenced by factors related to the hardware elements of that device (e.g. design, camera, screen and battery life), and not only by factors related to the OS (see recital (494)). Moreover, and in any event, even those 30% of new iPhone buyers corresponded to less than 5% of Google Android smartphone sales in that quarter, given that the number of devices sold by Apple in the third quarter of 2015 accounted for a much smaller number as compared to Android sales (i.e. in Q3-2015, iOS sales corresponded only to 48 million smartphones whilst Android sales corresponded to close to 300 million smartphones).[560]

(539)   In the third place, the 2013 report by Accenture referred to in recital (484)[561] does not support Google's claim because it assesses only the importance for users of owning different devices with the same smart mobile OS, and not the costs of switching from one smart mobile OS to another. Moreover, the report assesses the costs of switching between a PC OS and a smart mobile OS and not only between different smart mobile OSs.

(540)   In the fourth place, the statement in the internal Google document entitled "Switcher insights"[562] that […] Samsung Galaxy S5 users in the US switched to iOS in the second half of 2015 does not support Google's claim:

(1)   Samsung Google Android devices are generally higher-end Android devices and therefore more exposed to competition from iOS devices;

(2)   the period of observation coincides with the launch of a new iPhone, so it is likely that switching was influenced by factors related to the hardware of such device (e.g. design, camera, screen and battery life) and not only by factors related to the OS; and

(3)   sales of Apple devices are relatively higher in the US than in the EEA.[563] As such, it is likely that data related to the US would overestimate the competitive constraint exercised by iOS devices on Google Android.

(541)   In the fifth place, the statement in an internal Vodafone document[564] that 20% to 30% of Android users with a Vodafone contract that were due to change device switched to iOS or BlackBerry is based on a limited period of observation (one month). Moreover, even during that one month, around 70% of Android users that were due to change their device purchased an Android device.

(542)   In the sixth place, Orange did not confirm in its response to a request for information[565] the readiness of users to switch from one smart mobile OS to another regardless of the licensable or non-licensable nature of the smart mobile OS. The

---

[560]   Source: […] data (Doc IDs 7866 and 7867).
[561]   See Google's Response to the Statement of Objections, Part Two, page 53, paragraph 37 (Doc ID 7117).
[562]   See Google's Response to the Statement of Objections, Part Two, page 53, paragraph 37 (Doc ID 7117); Appendix 20, Data Room Report (6 December 2016), paragraph 38 (Doc ID 7119).
[563]   In 2016, Apple accounted for 44% of smartphone sales in the US, according to Comscore. See "*comScore Releases June 2013 U.S. Search Engine Rankings*" (12 July 2013), available at https://www.comscore.com/Insights/Rankings/comScore-Reports-January-2016-US-Smartphone-Subscriber-Market-Share, printed and saved on 15 June 2017.
[564]   See Google's Response to the Statement of Objections, Part Two, page 54, paragraph 37 (Doc ID 7117); Appendix 8 to Google's Response to the Statement of Objections (Doc ID 6555-69).
[565]   See Orange's non-confidential response to Question 7 of the request for information of 12 June 2013 to app developers (Doc ID 671).

**EN**

**EN**

GOOG-DOJ-26429282

figures quoted by Google do not refer to switching rates but simply to "loyalty" rates, as measured by Orange on a scale from [0-20%] (minimum, assigned to Windows) to [80-100%] (maximum, assigned to iOS). Moreover, Orange also stated in that same response to a request for information that "*iOS, Android and WP8 have shown high customer loyalty for various reasons amongst which: - Appealing features set including apps, multimedia functionalities, cloud services... - Proposition of brands/form factors*".

(543)   In the seventh place, other respondents to requests for information referred to by Google also did not confirm that users can and do switch between mobile OSs:[566]

(1)   a number of respondents indicated that only a large decrease in the number, range and quality of apps available on Android could trigger a switch to iOS:

(a)   Hutchison 3G: "*We believe that, <u>in a very few cases</u>, the range, quality, number or cost of apps available on pre-installed or downloadable appstores may make consumers switch between OSs.*"[567] (emphasis added)

(b)   ZTE: "*If the quality of the apps <u>cannot meet</u> the needs of consumers, or prices of those apps are significantly higher than other mobile OSs, then consumers would consider switch to other mobile OSs.*"[568] (emphasis added)

(c)   Aptoide: "*The quality and range of apps as well as the huge portfolio of free apps is a key asset to the Android ecosystem. Diversity of apps and services is also a key factor. A <u>drastic change</u> on this would surely affect the Android ecosystem and would allow other OSs to emerge.*"[569] (emphasis added)

(d)   Deutsche Telekom: "*DT considers the switching to another mobile OS caused by changes in the range or quality of apps available in pre-installed and downloadable app stores, or in the price of those apps to be <u>insignificant</u>.*"[570] (emphasis added)

(e)   Huawei: "*if users can easily obtain common apps and the experience meets their requirements, the number of other less common apps and changes in price are <u>unlikely to make</u> them switch to another OS.*"[571] (emphasis added)

(2)   Apple stated that: "*non-licensable OSs do not constrain the competitive*

[566]   See Google's Response to the Statement of Objections, Part Two, page 55, paragraph 37 (Doc ID 7117).
[567]   See Hutchison 3G's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2383)
[568]   See ZTE's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2840).
[569]   See Aptoide's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2396).
[570]   See Deutsche Telekom's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2556).
[571]   See Huawei's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2455).

EN

EN

GOOG-DOJ-26429283

*behaviour of licensable OSs.*"[572]

(3)   The Microsoft internal email referred to by Google is from 2009 and therefore two years before Google became dominant in the worldwide market (excluding China) for licensable smart mobile OSs. In addition, the evidentiary value of the document is put into question by the same quote, which casts doubt on the reliability of the statement: "*Take that for what it is – I think he meant it AND that doesn't mean anything*".

(544)   In the eighth place, the Statista study submitted by Google (the "Statista Survey"), according to which respectively 15% and 46% of the respondents would "*definitely*" or "*maybe*" switch to a different smart mobile OS in the future, does not support Google's claim. This is because:

(1)   Google has not submitted the data underlying the survey;

(2)   the Statista Survey seems to be based on only 517 interviews;

(3)   the question and optional answers in the Statista Survey were ambiguous. In the Statista Survey, users were asked about the possibility of the future use of a different OS in the future and the most selected answer was "Yes, maybe", which does not necessarily imply that it is likely that user will switch OS in the next smart mobile device purchase.[573]

(4)   the Statista Survey appears to cover all users that are planning to purchase a new smartphone, therefore including iOS users as well as users of other OSs such as BlackBerry OS or Windows Mobile; and

(5)   the Statista Survey covers only users in the United Kingdom, where Apple's share of smart mobile devices is relatively higher than in other Member States.[574] As such, it is likely that the survey results related to the United Kingdom would overestimate the Apple's competitive constraint exercised by iOS devices on Google Android devices.

(545)   Second, the degree of competition between OEMs for first-time buyers is insufficient to protect existing Android users.

(546)   In the first place, users obtain smart mobile OSs as part of a wider bundle with a smart mobile device and take into account a range of factors other than the smart mobile OS when purchasing such a device (see Section 9.3.4.1).

(547)   In the second place, between January 2009 and December 2013, when Google Android's share at the level of smart mobile devices grew substantially and first-time buyers represented a relatively higher percentage of smart mobile device users, the degree of competition for first-time buyers of smart mobile devices was insufficient to protect existing Google Android users because Apple was focussing exclusively on higher-end devices and only launched the iPhone C priced at USD 550 in September 2013 (see recital (517)).

(548)   In the third place, since January 2014, the degree of competition for first-time buyers of smart mobile devices has also been insufficient to protect existing Android users

---

[572]   Apple's non-confidential response to Question 4 of the request for information of 12 June 2013 to OEMs (Doc ID 690).

[573]   Google's Response to the First Letter of Facts, Part One, page 17, paragraph 39 (Doc ID 8598).

[574]   See recital (520).

**EN**

**EN**

GOOG-DOJ-26429284

because first time buyers represent a small and declining portion of smart mobile device users. This is confirmed by:

(1) estimates by the business consultancy Kantar that in the 3 months ending July 2015, 75% of smartphones sold in Europe were purchased by users that already owned a smartphone;[575]

(2) […] data which indicates that, between 2014 and 2016, the annual growth rate of sales of smart mobile devices has been small or even negative in Europe (between 9% and -5%);[576] and

(3) Emarketer data according to which the majority of users keep their smart mobile devices for three or less years.[577] This implies that most smart mobile devices sales since January 2014 correspond to the replacement of existing devices.

(549) In the third place, first-time buyers are less likely to react to a small but significant non-transitory deterioration of the quality of Google Android. This is because these buyers are not familiar with the functioning of a smart mobile device OS and are therefore less likely to perceive differences of the quality of Google Android when purchased as part of a bundle with a Google Android device.

(550) Third, it is irrelevant that 18% of users responding to the Yandex Survey stated that they did not know which device they are most likely to purchase. This is because, even taking into account these users, Google Android users that responded to the Yandex Survey were more than 10 times more likely to express an intention to purchase a Google Android device than an iOS device.

(551) Fourth, the Klemperer economic model referred to by Google is not applicable to the facts of this case because that model assumes that initially there are only first-time buyers, whereas this was never the case any point in time since 2011.

*IV.   App developers are unlikely to stop developing for Google Android and develop exclusively for iOS*

(552) App developers are unlikely to stop developing for Google Android and develop exclusively for iOS in the event of a small but significant, non-transitory deterioration of the quality of Google Android.

(553) First, developers generally consider it commercially important to develop apps for Google Android as it is only through Google Android that they can reach the large majority of users worldwide (see recital (290)).

(554) Second, developers that currently develop apps solely for Google Android would not need to cease developing for Google Android if they wished to start developing for

---

[575] See http://www.imore.com/more-android-users-switching-iphone-throughout-europe, printed and saved on 8 June 2018.

[576] […] data (Doc IDs 7866 and 7867). […] data include in Europe the following countries: Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, the Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, the U.K., Bulgaria, Czech Republic, Hungary, Kazakhstan, Poland, Romania, Russia, Serbia, Slovakia, Ukraine and Rest of Central and Eastern Europe.

[577] See  https://www.emarketer.com/Article/Smartphone-Owners-Wait-Years-Replace-Handsets/1014149, printed and saved on 16 August 2017.

GOOG-DOJ-26429285

iOS, given that, on average, developers build apps for between 2.2 and 2.6 OSs.[578]

(555)　Third, a large percentage of Google Android developers already develop apps for both Google Android and iOS. This is confirmed by the following:

(1)　a Google internal document dated August 2016 and authored by [Google Executive] according to which more than [40-50]% of developers for Android also develop apps for iOS.[579]

(2)　a report submitted on behalf of FairSearch, according to which "*the Apple App Store and the Google Play Store have significant overlap among top apps: 92 of the top 100 third party iOS apps are also available on Google Play Store. By the same token, 90 of the top 100 third party Google Play Store apps are available on Apple App Store. This finding suggests that consumers can find the most popular apps on either app store, and that most developers of popular apps multi-home on the Google Play Store and the Apple App Store*";[580] and

(3)　a submission by Yandex, according to which all but one of the top 50 apps in Apple's App Store are present on the Play Store.[581]

(4)　Google's acknowledgment that developers generally multi-home between Google Android and iOS.[582]

(556)　Fourth, the Commission's conclusion that app developers are unlikely to stop developing for Google Android and develop exclusively for iOS is not affected by Google's claims that:

(1)　multi-homing by app developers on Google Android and iOS reduces barriers to users switching from Google Android devices to iOS devices as they make these two type of devices homogeneous;[583]

(2)　Apple and Google compete to lead app developers to develop first on their respective smart mobile OS and users of iOS and Google Android devices attach value to app developers developing first for the OS of their devices;[584] and

(3)　Apple attracted the largest number of app developers.[585]

(557)　In the first place, multi-homing by app developers on Google Android and iOS is not sufficient to make Google Android and iOS devices homogenous. This is because there remain other differences between Google Android and iOS devices including

---

[578]　According to Vision Mobile (Vision Mobile, State of the Developer Nation Q3 2015, p. 19 (Doc ID 2746), the average games developers build apps for 2.6 platforms and the average non-game developer for 2.2.

[579]　See Google's internal document "*Google Play Developer Sentiment Survey, Topline Report*", slide 25, August 2016 (Doc ID 6555-68).

[580]　See "*Assessing the relevant markets for licensable mobile operating systems and Google Android compatible app stores*", Marco Iansiti, Harvard University, submitted by FairSearch on 24 January 2017 (Doc ID 8003)

[581]　See "*CRA addendum on multi-homing by app developers*", CRA, submitted by Yandex on 28 July 2017 (Doc ID 8270).

[582]　Google's Response to the First Letter of Facts, Part One, page 8, paragraph 20 (Doc ID 8598).

[583]　Google's Response to the First Letter of Facts, Part One, page 8, paragraph 20 (Doc ID 8598).

[584]　Google's Response to the First Letter of Facts, Part One, pages 9-10, paragraphs 21-25 (Doc ID 8598).

[585]　Google's Response to the First Letter of Facts, Part One, page 8, paragraph 21 (Doc ID 8598).

**EN**

123

**EN**

GOOG-DOJ-26429286

brand, battery life, quality of the device screen, quality of the camera, design of the device, storage space available on the device (see Section 9.3.4.1), price (see Section 9.3.4.2.I) and availability of apps (such as FaceTime, which is not available on Google Android devices). Moreover, as indicated in Section 9.3.4.2, there remain barriers to switching between Google Android and iOS that are independent of app developers developing for both Google Android and iOS, such as the need for users to learn to use a new OS.

(558)   In the second place, Google has not submitted any evidence to support its claims: (i) that Apple and Google compete to lead app developers to develop first on their respective smart mobile OS and (ii) regarding the value to users of iOS and Google Android devices of app developers developing first for the OS of their devices.

(559)   In the third place, as shown in Figure 15, since 2011, it is Google and not Apple that has attracted the largest number of app developers.

9.3.4.3.   BlackBerry OS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs

(560)   For the reasons set out in this Section, the Commission concludes that BlackBerry OS exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs.

(561)   First, Google Android users switching to BlackBerry smart mobile devices would face similar costs than when switching to iOS devices (see Section 9.3.4).

(562)   Second, BlackBerry does not constitute a significant constraint on Google given that, as footnote 438 indicates, BlackBerry's share of supply of smart mobile devices has fallen significantly since 2009, and was 0.1% of the worldwide market for smart mobile OSs (excluding China) in 2016.

(563)   Third, only a limited number of apps are available on BlackBerry World (234 500).[586]

(564)   Fourth, in November 2015, BlackBerry launched its first device based on Google Android, the BlackBerry Priv.[587]

(565)   Fifth, in July 2016 BlackBerry confirmed that it has discontinued a large number of BlackBerry OS devices whilst it continues developing future Android devices.[588]

(566)   Sixth, it is unlikely that app developers would switch from Google Android to BlackBerry OS, given that by doing so they would only gain access to an insignificant share of the worldwide market for smart mobile OSs (excluding China).

9.3.5.   *The AOSP licence*

(567)   The Commission's conclusion that Google holds a dominant position on the worldwide market (excluding China) for licensable smart mobile OSs is not

---

[586]   Source: "Number of apps available in leading app stores as of March 2017", available at https://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/, printed and saved on 16 August 2017.

[587]   See Ron Amadeo, "BlackBerry CEO won't commit to BB10 devices, hints at leaving handset market" (08 October 2015), available at http://arstechnica.com/gadgets/2015/10/blackberry-ceo-wont-commit-to-bb10-devices-hints-at-leaving-handset-market/, printed and saved on 11 April 2016.

[588]   See https://venturebeat.com/2016/07/05/blackberry-confirms-it-will-no-longer-manufacture-the-bb10-blackberry-classic-smartphone/, printed and saved on 11 June 2018.

**EN**

**EN**

GOOG-DOJ-26429287

precluded by Google's making the source code of Android available for free via the AOSP licence.

(568)   First, the evolution of Google's shares in the worldwide market (excluding China) for licensable smart mobile OSs has shown no rapid variations or fluctuations. On the contrary, since 2011, Google has consistently held very high market shares in the relevant market.

(569)   Second, the barriers to entry and expansion identified in Section 9.3.2 restrict the possibility of OS developers to enter the market and attract sufficient demand. The fact that the Google grants access to Google Android for free means that these barriers are even higher, given that competing OS developers need to compete against Google that does not charge hardware manufacturers any fee.

(570)   Third, the substantial switching costs and OS loyalty – described in Section 9.3.4, mitigate any possible switch of users away from Google Android.

(571)   Fourth, the Commission's conclusion that Google holds a dominant position on the worldwide market (excluding China) for licensable smart mobile OSs, notwithstanding the fact that Google makes the source code of Android available for free via the AOSP licence is not affected by Google's claims[589] that:

(1)   Google Android is constrained by instant free availability of perfect substitutes in unlimited quantities;

(2)   Google cannot charge a price, degrade quality or reduce innovation in relation to Google Android. Due to the open-source nature of Android, there are no barriers to entry in the worldwide (excluding China) market for licensable smart mobile OSs. After an Android version is released, it is available to everyone who wishes to make use of it;

(3)   OS developers are free to take and build on the latest Android release;

(4)   the alleged limitations to Android's open-source nature do not make Android any different from other open-source projects (e.g. Linux kernel);

(5)   Google cannot be considered dominant since Google Android is free; and

(6)   Google cannot be considered dominant since there are no trading relationships between Google and users, OEMs and MNOs.

(572)   First, Google is not constrained by the availability of the AOSP licence for free given that it: (i) has an important influence on the key steps of the development of Android (see Section 6.2.2.1.I); (ii) controls the licensing of the Android trademarks and brand (see Section 6.3.2); and (iii) controls the implementation of Android on smart mobile devices through the Android compatibility tests (see Section 6.3.1). In addition, the very fact that OEMs are in the large majority of instances required to enter into AFAs and MADAs with Google for the commercialisation of their devices implies that Google cannot be considered as "*constrained by the instant free availability of perfect substitutes.*"[590]

(573)   Second, Google can degrade quality or reduce innovation, given that it controls the

---

[589]   See Google's Response to the Statement of Objections, Part Two, pages 63-66, paragraphs 59-69 (Doc ID 7117).
[590]   See Google's Response to the Statement of Objections, Part Two, page 63, paragraph 60 (Doc ID 7117).

GOOG-DOJ-26429288

development and release of Android versions.[591]

(574)   Third, OS developers are not "*free to take and build*" on the latest Android release.

(575)   In the first place, the AFAs mean that OEMs that have entered into these agreements are not "*free to take and build*" on the latest Android release.

(576)   In the second place, developers which intend to "*take over development*" of Android[592] and "*turn [it] to a non-degraded copy*"[593] would also likely need to offer an attractive set of apps and APIs to OEMs. One option to obtain these apps and APIs would be to enter into a licensing agreement with Google in relation to Google's proprietary apps and APIs. However, this would imply that the OS developer would need to enter into an AFA and a MADA and follow the terms of these agreements, which are set by Google. In addition, Google could also refuse the licensing of its apps and APIs. Another option would be to replicate the Google app and APIs ecosystem. That would, however, require time and investment as suggested by the following statements:

(1)   SFR: "*One can estimate that the effort to build something equivalent to GPS is huge, typically hundreds of development man years*".[594]

(2)   Aptoide: "*Cloning the entire GMS API stack (Maps, Messaging, Games, Billing,..) implicates a enormous amount of resources. We had some contact with such a challenge during the development of Nokia X which targeted that goal. Today, would be even more difficult to try that. Is not only the implementation of the technology, but also the effort of convincing the 1.5M Apps developers to integrate them.*"[595]

(577)   In the third place, the Commission's finding is not affected by Google's claim that OEMs have a broad choice of APIs available that replicate Google Play Services.[596] This is because respondents to requests for information confirm that Google's APIs are commercially important for OEMs, regardless of whether they could in principle replace them with other competing APIs.[597]

(578)   In the fourth place, it is irrelevant that apps and APIs belong to different relevant markets than smart mobile OSs. This is because, from an OEM's perspective, smart mobile OSs, APIs and apps are complementary goods, each of which is necessary to commercialise a smart mobile device.

(579)   Fourth, it is irrelevant that the alleged limitations to Android's open-source nature do not make Android any different from other open-source projects. The open-source nature of a product does not preclude the application of Union competition rules to that product.

---

[591]   See Section 6.2.2.1.I.

[592]   See Google's Response to the Statement of Objections, Part Two, page 63, paragraph 60 (Doc ID 7117).

[593]   See Google's Response to the Statement of Objections, Part Two, page 63, paragraph 60 (Doc ID 7117).

[594]   See SFR's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 3975).

[595]   See Aptoide's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 2396).

[596]   Google's Response to the First Letter of Facts, Part One, page 20, paragraph 48 (Doc ID 8598).

[597]   Samsung's non-confidential response to Question 25 of the request for information of 21 October 2015 on app stores (Doc ID 2805) and Yandex's non-confidential response to Question 25 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

GOOG-DOJ-26429289

(580)    Fifth, a finding of dominance is not precluded by the fact that it offers Google Android to OEMs free of charge.

(581)    In the first place, that claim is misleading. While OEMs do not pay a monetary consideration for the use of Google Android, they contribute to the monetisation of Google Android by distributing devices that are used to access Google services.

(582)    In the second place, and in any event, the free nature of a service is only one "*relevant factor in assessing* [...] *market power*".[598] Other equally, if not more, relevant factors in this case include the elements referred in Section 9.3.1, 9.3.2 and 9.3.3.

(583)    Sixth, there are trading relationships between Google and OEMs. Google licenses Android by means of the Apache Software License 2.0 to Android OEMs.

*9.3.6.    Other Google arguments on dominance in the market for licensable smart mobile OSs*

(584)    The Commission's conclusion that since 2011, Google holds a dominant position in the worldwide market (excluding China) for the licensing of smart mobile OSs is not affected by Google's claims that:

(1)    Android's pace of innovation is inconsistent with dominance[599]; and

(2)    Android did not become dominant instantaneously when it overtook Symbian between 2010 and 2011[600].

(585)    First, it is irrelevant whether Android's pace of innovation is inconsistent with dominance. This is because the existence of a degree of innovation does not preclude the existence of dominance, since Google would nonetheless be able to act without having to take account of competition in its market strategy and without for that reason suffering detrimental effects from such behaviour.[601] Moreover, as stated in recital (261), if anything, the decrease in the frequency of Android releases after 2011 is consistent with dominance.

(586)    Second, this Decision does not conclude that Google became dominant in 2011 simply because Google overtook Symbian.

(587)    In the first place, Google's market share in 2011 was 72% and approximately four times larger than those of Symbian.

(588)    In the second place, the Commission's conclusion is based on all the factors referred to in Section 9.3, including barriers to entry, lack of countervailing buyer power and the fact that non-licensable smart mobile OSs such as those of Apple and BlackBerry exercise an insufficient indirect constraint on Google's dominant position in the worldwide market (excluding China) for licensable smart mobile OSs.

(589)    In the third place, the *Google / Motorola Mobility* decision of February 2012 left

---

[598]    Case T-79/12, *Cisco Systems Inc. and Messagenet SpA v Commission*, EU:T:2013:635, paragraph 73.

[599]    See Google's Response to the Statement of Objections, Part Two, pages 66-67, paragraphs 70-72 (Doc ID 7117).

[600]    See Google's Response to the Statement of Objections, Part Two, page 62, paragraph 57 (Doc ID 7117).

[601]    Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 70; Case T-340/03 *France Télécom v Commission*, EU:T:2007:22, paragraph 101; Case T-336/07 *Telefónica v Commission*, EU:T:2012:172, paragraph 162.

**EN**                                     127                                     **EN**

GOOG-DOJ-26429290

open the possibility that Google might have been dominant in 2011.[602]

### 9.4.    Worldwide market (excluding China) for Android app stores

(590)    For the purpose of this Decision, the Commission concludes that Google holds a dominant position in the worldwide market (excluding China) for Android app stores since 2011. This conclusion is based on:

(1)    the market shares of Google and competing Android app stores market shares (Section 9.4.1),

(2)    the quantity and popularity of apps available on the Play Store (Section 9.4.2),

(3)    the automatic update functionalities of the Play Store (Section 9.4.3),

(4)    the fact that the only way for OEMs to obtain Google Play Services is to obtain the Play Store (Section 9.4.4),

(5)    the existence of barriers to entry and expansion (Section 9.4.5),

(6)    the lack of countervailing buyer power of OEMs (Section 9.4.6) and

(7)    the insufficient constraint from app stores for non-licensable smart mobile OSs (Section 9.4.7).

### 9.4.1.    *Market shares*

(591)    For the purpose of assessing shares in the worldwide market (excluding China) for Android app stores, the Commission uses two methods.

(592)    The first method consists in calculating the share of smart mobile devices using Android on which a given app store is pre-installed. This method allows for an assessment of the economic strength of an Android app store at the level of OEMs and MNOs which pre-install app stores on their Android devices.

(593)    The second method consists in calculating the share of a given Android app store on the basis of the number of apps downloaded via that store. This method allows for an assessment of the economic strength of an Android app store at the level of users of Android devices.

(594)    The Commission has, however, not calculated shares on the basis of the revenues earned from sales of apps on a given Android app store. This is because each Android app store developer can obtain value from its app store in one or more ways.[603] Google, for example, monetises the Play Store in three main ways: (i) by charging a fixed percentage of the revenues of app developers; (ii) by in-app advertising powered by Google's AdMob[604] and (iii) by promoting the value of the

---

[602]    Commission decision in Case M.6381 – Google / Motorola Mobility, paragraph 108.

[603]    See non-confidential responses to Question 2.ii of the request for information of 21-29 October 2015 on app stores. It results from these responses that some of the app store developers apply two or three monetisation strategies simultaneously.

[604]    Google is active in the in-app advertising space since its 2010 acquisition of AdMob, which according to AppBrain is the largest provider of in-app advertising services, with coverage of approximately 43% of Android apps. The second player, Chartboost, provides advertising services on 4.11% of Android apps, whereas the third player, AdColony, only covers 1.71% of Android apps (see "*Android ad networks*", available at http://www.appbrain.com/stats/libraries/ad, printed and saved on 11 April 2016).

GOOG-DOJ-26429291

Android ecosystem as a whole.[605] Other Android app store developers may monetise their app stores in different ways.

(595)    Google's share of the worldwide market (excluding China) for Android app stores, whether calculated on the basis of the number of smart mobile devices using Android OS on which a given Android app store is pre-installed or of the number of apps downloaded via each Android app store, provides a good indication of Google's economic strength in that market.

(596)    As shown in Table 4, since 2011, the Play Store has been pre-installed on more than [90-100]% of all smart mobile devices using Android. No other Android app store has achieved such distribution. The second most pre-installed Android app store is Samsung's Galaxy Apps store, which was pre-installed on [30-40]% of Google Android devices during 2014-2016, down from [40-50]% in 2012-2013.

**Table 4: Worldwide (excluding China) shares of pre-installation for app stores on total sales of smart mobile devices using Android (units)[606]**

| App store | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Play Store[607] | [90-100]% | [90-100]% | [90-100]% | [90-100]% | [90-100]% | [90-100]% |
| Amazon Appstore | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [5-10]% | [5-10]% |
| Aptoide | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| LG Electronics[608] | [5-10]% | [5-10]% | [5-10]% | [0-5]% | [0-5]% | [0-5]% |
| Samsung Galaxy Apps | [30-40]% | [40-50]% | [40-50]% | [30-40]% | [30-40]% | [30-40]% |
| SFR | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Yandex | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |

(597)    As for the shares of each Android app store on the basis of the number of apps downloaded via that store, as shown in Table 5, since 2011, over [90-100]% of all apps on Android devices have been downloaded via the Play Store.[609] The market

---

[605]    Internal Google document submitted in response to the request for information of 11 July 2014 (Doc ID 1367-00750).

[606]    The Commission's calculations on the basis of the data accessible to Google in the data room submitted in response to Question 30 of the request for information of 21 October 2015 on app stores, updated with responses from app store providers to the requests for information of 8 March 2017 ([…] and LG), 9 March 2017 (Amazon), 24 March 2017 (Aptoide and SFR) and 31 March 2017 (Yandex), and Google's response to Question 14 of the request for information of 11 May 2015 (Doc ID 3545) and to Question 8 of the request for information of 24 March 2017 (Doc ID 7894-3). The shares in Table 4 add up to more than 100% given that for some devices more than one app store would be pre-installed.

[607]    The Play Store's share of pre-installation was calculated by assuming that all Google Android devices in the relevant geographic market, which is worldwide excluding China, are sold with GMS, as stated in footnote 436.

[608]    Since LG Electronics did not provide data for the years 2011 and 2012, sales of LG Electronics devices were used as a proxy for the number of pre-installations. Source: […] data (Doc IDs 7866 and 7867).

[609]    As discussed in Section 7.4.4, Windows Mobile Store, the only app store for another licensable smart mobile OS with an appreciable market presence, is not part of the relevant market for Android app stores. However, even if Windows Mobile Store were to be included in the relevant market, the market shares of Google would not be significantly different. In particular, Google's shares would have still been above [90-100]% for any year of the period 2011-2016. Source: Commission's calculations on the basis of Annex 2 to Microsoft's response to the request for information of 21 October 2015 on app

GOOG-DOJ-26429292

share of Amazon, the second largest player in the worldwide market (excluding China) for Android app stores, has been decreasing since 2011 and in 2016 was only [0-5]%.

(598)   Moreover, the market share of pre-installed app stores other than the Play Store is insignificant compared to the Play Store, as shown by the example of Samsung's Galaxy Apps, which did not exceed a share of [0-5]%. In addition, no downloadable app store has achieved any meaningful market share. Aptoide, which claims to be the largest "independent" app store outside China, has only achieved a market share of [0-5]% in the period 2011-2016.

**Table 5: Worldwide (excluding China) market shares for Android app stores based on app downloads (units)[610]**

| App store | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Play Store | [90-100]%[611] | [90-100]% | [90-100]% | [90-100]% | [90-100]% | [90-100]% |
| Amazon Appstore | [5-10]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Aptoide | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| LG Electronics | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Opera[612] | [0-5]% | [0-5]% | [0-5]% | - | - | - |
| Samsung Galaxy Apps | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| SFR | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Yandex | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |

(599)   Google's economic strength in the worldwide market (excluding China) for Android app stores has been confirmed by the evidence in recitals (600) to (605):

(600)   First, it has been confirmed by OEMs and MNOs that responded to requests for information:[613]

(1)   According to Orange: "*Google Play has no real competitors on the market and as an application store is a must-have feature for a smartphone, embedding*

---

stores and Annex 6 to Microsoft's response to the request for information of 11 April 2017 (Doc ID 8199).

[610]   Source: Commission's calculations on the basis of data accessible to Google in the data room submitted in response to Question 30 of the request for information of 21 October 2015 on app stores, updated with responses from app store providers to the requests for information of 8 March 2017 ([...] and LG), 9 March 2017 (Amazon), 24 March 2017 (Aptoide and SFR) and 31 March 2017 (Yandex), and Google's response to Question 14 of the request for information of 11 May 2015 (Doc ID 3545) and to Question 8 of the request for information of 24 March 2017 (Doc ID 7894-3).

[611]   Google has provided download data only for the last two months of 2011. This means that the 2011 figures included in the Table underestimate Google position, as they are only based on two months.

[612]   From November 2013, Opera could no longer complete the download itself but instead was required to redirect users to the Play Store (Doc ID 3893). As regards Vodafone, which was included in the Statement of Objections, its only app store in operation during the relevant period was Vodafone Updates, which is a store offering free Vodafone apps and updates to existing Vodafone apps, and therefore is not included in Table 5 (Doc ID 8253).

[613]   The majority of OEMs and MNOs consider that no other app store is currently a viable substitute to the Play Store - see non-confidential responses to Question 6 and Question 13 of the request for information of 21 October 2015 on app stores.

GOOG-DOJ-26429293

*Google Play has become de facto mandatory*"[614] and "*Given the two-sided character of this market (attracting enough developers requires having a large user base and users will reciprocally be attracted to shops offering many apps) it is indeed very difficult to offer an app shop in competition with Google Play given (i) its link with Android OS and (ii) its current size*".[615]

(2)   According to Samsung it would "*not be commercially feasible for an OEM to ship Android devices without Google Play pre-installed due to the variety and number of apps and contents available to users uniquely through the Google Play Store.*"[616]

(601)   Second, it is confirmed by an internal Google document dated 8 October 2010 in which [Google Executive], already stated that Google's app store had become commercially important for OEMs: "*We created the first app store for Android and it got critical mass quickly. The store now has value and partners want access to it because of the number of apps available*".[617]

(602)   Third, it is confirmed by the fact that other Android app stores still have difficulty in attracting developers, despite offering more favourable revenue sharing arrangements (for example, Opera Mobile Store and Aptoide offer a 15/85 split[618] compared with 30/70 split offered by the Play Store until January 2018).

(603)   Fourth, the Commission's conclusion that Google's economic strength in the worldwide market (excluding China) for Android app stores provides a good indication of Google's economic strength in that market is not affected by Google's claims that:

(1)   market shares should be based on value and not pre-installations on smart mobile devices, given that: (i) OEMs pre-install several app stores; and (ii) users switch from pre-installed app stores to a downloaded app store;[619] and

(2)   Apple is the leading app store.[620]

(604)   In the first place, market shares based on value do not provide a good indication of Google's economic strength in the worldwide (excluding China) market shares for Android app stores. This is because, as explained in recital (594), app store developers monetise their app stores in different ways.

---

[614]   Orange's non-confidential response to Question 5 of the request for information of 19 October 2015 to Email service providers (Doc ID 4598).

[615]   Orange's non-confidential response to Question 12 of the request for information of 21 October 2015 on app stores (Doc ID 2479).

[616]   Samsung's non-confidential response to Question 7 of the request for information of 21 October 2015 on app stores (Doc ID 2805).

[617]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1374-1156).

[618]   See "*Opera Software™ and Forbes Digital Commerce™ forge partnership to offer Android developers more revenue opportunities on the Opera Mobile Store*" (22 April 2014), available at http://opera-mobile-store.com/tag/in-app-payment/, printed and saved on 13 June 2017, and https://www.aptoide.com/page/publishers?lang=en, printed and saved on 11 June 2018.

[619]   Google's Response to the Statement of Objections, Part Two, pages 78-80, paragraphs 108-110 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part One, page 29, paragraph 73 (Doc ID 8598).

[620]   Google's Response to the Statement of Objections, Part Two, page 78, paragraphs 104-107 (Doc ID 7117) Google's Response to the First Letter of Facts, Part One, page 29, paragraph 74 (Doc ID 8598).

GOOG-DOJ-26429294

(605)   In the second place, Apple's AppStore and Google's Play Store are in different markets and Apple's AppStore exercises an insufficient indirect constraint on Google's dominant position in the worldwide market (excluding China) for Android app stores (see Section 7.4.5 and Section 9.4.7).[621]

*9.4.2.*   *Quantity and popularity of apps available on the Play Store*

(606)   Google's economic strength in the worldwide market (excluding China) for Android app stores is reinforced by the quantity and popularity of apps available on the Play Store.

(607)   First, as mentioned in Section 6.2.2.1.II, the Play Store is the app store with the largest quantity of apps. As evidenced by Figure 16, the number of apps available in the Play Store has increased rapidly since 2010. The number of apps available reached 1 million in July 2013, 1.8 million in November 2015 and 2.8 million in March 2017.

**Figure 16: Number of apps available in the Play Store[622]**



(608)   By contrast, competing Android app stores have consistently offered fewer apps:

(1)   Aptoide offered only 500 000 apps in January 2016[623] and 910 000 in June

---

[621]   If Apple's AppStore was also included in the relevant market, the market shares of Google would still be above 50% for any year in the period 2012-2016, namely [50-60]% in 2012 and 2013, [60-70]% in 2014 and [70-80]% in 2015 and 2016. Source: Commission's calculations on the basis of data accessible to Google in the data room submitted by Apple as response to Question 30 of the request for information of 21 October 2015 on app stores and to Question 6 of request for information of 31 March 2017. Since Google has been able to provide data only for the last two months of that year, the 2011 figures collected by the Commission including Apple would underestimate Google's position.

[622]   See "*Number of available applications in the Google Play Store from December 2009 to March 2017*", available at http://www.statista.com/statistics/266210/number-of-available-applications-in-the-google-play-store/, printed and saved on 13 June 2017.

[623]   See Jon Russell, "*Aptoide Lands $4M To Grow Its Alternative Android App Store In Emerging Markets*" (5 January 2016), available at http://techcrunch.com/2016/01/05/aptoide-series-a/, printed and saved on 11 April 2016.

**EN**                               132                               **EN**

GOOG-DOJ-26429295

2017[624];

    (2)    Amazon Appstore offered only 400 000 apps in September 2015[625] and approximately [700 000 – 900 000] in April 2017;[626]

    (3)    Samsung Galaxy Apps offered [100 000-150 000] apps in September 2015[627] and [150 000-200 000] apps in March 2017.[628]

(609)    OEMs and app store developers have confirmed that the Play Store is the app store with the largest number of apps:

    (1)    Lenovo stated: "*The Google Play Store is in leading position in terms of the number and variety of apps offered: it has an app for more or less any purpose.*"[629]

    (2)    Amazon stated that its app store "[…] *lags behind the Play Store* [and] […] *it has become increasingly difficult over time to obtain and retain a competitive selection of apps because, as the Play Store continues to grow by virtue of being pre-installed on all licensed Android devices, more and more app developers have focused their development efforts on developing apps that use* [Google Play Services]*".*[630]

    (3)    Sony stated: "*In our view, Google Play Store holds a unique position due to its large amount of content. The variety of the content offered is wide with apps in all kinds of categories.*"[631]

    (4)    Samsung stated: "*[d]evelopers in general aim to distribute their Android apps through the Google Play Store, because it is the market-leading Android store".*[632]

(610)    Second, as can be seen in Figure 17, the Play Store has attracted the largest number of app developers: almost 400 000 developers in 2014 and over 720 000 developers in 2016.[633]

---

[624] See "*Aptoide Your Android App Store*", available at https://www.aptoide.com/page/apps, printed and saved on 13 June 2017.

[625] Amazon's non-confidential response to Question 4 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[626] See Amazon's non-confidential response to Question 2 of the follow up request for information of 11 April 2017 (Doc ID 8276).

[627] Samsung's non-confidential response to Question 2.i of the request for information of 21 October 2015 on app stores (Doc ID 2805).

[628] Samsung's non-confidential response to Question 5 of the request for information of 17 April 2017 (Doc ID 7803).

[629] Lenovo's non-confidential response to Question 3.i of the request for information of 21 October 2015 on app stores (Doc ID 2602).

[630] Amazon's non-confidential response to Question 4 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[631] Sony Mobile Communications' non-confidential response to Question 3 of the request for information of 21 October 2015 on app stores (Doc ID 4121).

[632] Samsung's non-confidential response to Question 25 of the request for information of 21 October 2015 on app stores (Doc ID 2805).

[633] See "*App Stores Start to Mature – 2016 Year in Review*" (24 January 2017), available at http://blog.appfigures.com/app-stores-start-to-mature-2016-year-in-review/, printed and saved on 14 June 2017.

**EN**                                    **EN**

GOOG-DOJ-26429296

**Figure 17: Total number of developers by app store[634]**



(611)   As Samsung stated: "*Another important factor for developers is the fact that Google Play is the indisputable market leader for Android apps, in both number of apps and number of users. Developers of Android apps therefore target distribution through Google Play, and have no reason to exclude Google Play as a distribution channel for their apps.*"[635]

(612)   Third, unlike other Android app stores, the Play Store offers all the most popular apps in terms of number of downloads. These include apps distributed by Facebook, Rovio Entertainment Ltd. ("Rovio Entertainment"), Spotify Ltd. ("Spotify"), Amazon and Netflix Inc. ("Netflix").

(613)   Fourth, OEMs, app developers and users attach significant importance to the quantity of apps available on an app store and whether an app store is able to offer the most popular apps:

   (1)   According to Yandex, "[…] *a number of factors such as the number of active users, number of available applications, popularity among developers, etc.,* [serve] *as important criteria for OEMs to decide which app store shall be pre-installed in order to meet consumers' expectations.*"[636]

   (2)   Orange stated: "*[S]election* [of apps] […] *is an essential criterion for customers and for developers*".[637]

   (3)   Sony stated: "*The number of applications available in an app store must be*

---

[634]   See Ariel, "*App Stores Growth Accelerates in 2014*" (13 January 2015), available at http://blog.appfigures.com/app-stores-growth-accelerates-in-2014/, printed and saved on 11 April 2016.

[635]   Samsung's non-confidential response to Question 20 of the request for information of 21 October 2015 on app stores (Doc ID 2805).

[636]   Yandex's non-confidential response to Question 5 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

[637]   Orange's non-confidential response to Question 2.iii of the request for information of 21 October 2015 on app stores (Doc ID 2479).

GOOG-DOJ-26429297

*very high today in order to be relevant and competitive.*"[638]

(614) The Commission's conclusion that Google's economic strength in the worldwide market (excluding China) for Android app stores is reinforced by the quantity and popularity of apps available on the Play Store is not affected by Google's claim that what matters for users is the quality, and not the quality, of available apps[639]. The Play Store is the Android app store with both the largest quantity and quality of available apps, as measured by popularity.[640]

*9.4.3. Automatic update functionalities of the Play Store*

(615) Google's economic strength in the worldwide market (excluding China) for Android app stores is reinforced by the fact that other Android app stores that are not pre-installed but which can be downloaded to be used in parallel with the Play Store cannot automatically update apps, as confirmed by OEMs, MNOs and app store developers that responded to requests for information:

(1) According to Huawei, "*Google fully controls the package installer and permissions management. Other applications and app stores cannot implement automatic application updates. As a result, only Google Play Store can provide automatic application updates.*"[641]

(2) According to Amazon, "*Software updates, bug fixes and enhancements to apps distributed through the Play Store are also controlled by Google. Google's App Distribution Agreement prohibits developers from updating their apps through any method other than Google Play's update mechanism*"[642] and "*For example, the version of the Amazon Appstore installed by customers on Google Android devices cannot automatically apply app updates and security fixes for downloaded apps, because it lacks the operating system permissions necessary to do so (in contrast, the Amazon Appstore for Fire OS devices can automatically apply app updates and security fixes).*"[643]

(3) According to Vodafone, "*Currently there is no alternative to update apps outside of the Play Store so the Play Store is extremely important.*"[644]

(4) According to Yandex, "*Automatic updating is only available for apps downloaded through the Google Play store. If a user installed an application by downloading the APK file from a website (so called "side-loading"), it cannot be further automatically updated – the only option available for the user in such a case is to install a new APK file manually when one becomes available*" and "*downloadable app stores cannot be integrated in the firmware*

---

[638] Sony's confidential response to Question 61 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).

[639] Google's Response to the Statement of Objections, Part Two, pages 79-80, paragraph 110 (Doc ID 7117).

[640] See recitals (612) and (669).

[641] Huawei's non-confidential response to Question 3.iii of the request for information of 21 October 2015 on app stores (Doc ID 2455).

[642] Amazon's non-confidential response to Question 3.iii of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[643] Amazon's non-confidential response to Question 2 of the request for information of 9 March 2017 (Doc ID 8165).

[644] Vodafone's non-confidential response to Question 3.iii of the request for information of 21 October 2015 on app stores (Doc ID 2399).

**EN**

**EN**

GOOG-DOJ-26429298

> *in the same way as a pre-installed app store and cannot therefore offer automatic updates of mobile applications*".[645]

(616)   Such an automatic update function is important from the perspective of users, developers and OEMs.

(617)   From the perspective of users, as stated by Deutsche Telekom, "*Regarding the update for Apps the PlayStore is considered to be essential from a consumer perspective as manual updates/downloads are rather cumbersome* [...]"[646]

(618)   From the perspective of developers, Huawei stated: "*Application updates can help developers to push the latest versions of their apps to users of Android phones for automatic installation, which is something valuable for developers.*"[647] Opera also stated: "*Update functionality is very important for app developers, because it facilitates app maintenance and because it helps efficiently to migrate users to the latest and most engaging version of the app without having to build their own notification engine, or requiring separate permission of end users to update the app.*"[648]

(619)   From the perspective of OEMs, Hutchison 3G stated that "*The update functionalities are very useful. They mean that app developers do not need to include an update mechanism within the app code.*"[649]

(620)   Google does not contest the Commission's conclusions as outlined in this Section.

### 9.4.4.   Google Play Services

(621)   Google's economic strength in the worldwide market (excluding China) for Android app stores is also reinforced by the fact that the only way for OEMs to obtain Google Play Services is to obtain the Play Store (see Section 6.2.2.1.III).

(622)   First, as explained in Section 6.2.2.1.III the Play Store and Google Play Services are closely interlinked.

(623)   Second, the Google Play Service libraries are integrated in a large number of third party apps and without access to these libraries, many apps would either crash or not function properly:

(1)   according to Hutchison 3G, "[...] *without* [Google Play Services] *the Android OS would be more like a feature phone OS than a smartphone OS*".[650]

(2)   according to Yandex: "*all developers of top 500 paid applications and almost 70% of developers for top 500 free applications rely on one or more APIs*

[645]   Yandex's non-confidential response to Questions 3.iii and 15 of the request for information of 21 October 2015 on app stores (Doc ID 4228).
[646]   Deutsche Telekom's non-confidential response to Question 3.iii of the request for information of 21 October 2015 on app stores (Doc ID 2556).
[647]   Huawei's non-confidential response to Question 3.iii of the request for information of 21 October 2015 on app stores (Doc ID 2455).
[648]   Opera's non-confidential response to Question 24 of the request for information of 21 October 2015 on app stores (Doc ID 3534).
[649]   Hutchison 3G's non-confidential response to Question 3.iii of the request for information of 21 October 2015 on app stores (Doc ID 2383).
[650]   Hutchison 3G's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 2383).

EN                                   136                                   EN

GOOG-DOJ-26429299

*provided by Google via* [Google Play Services] ".[651]

(3)     according to Deutsche Telekom "[Google's] *API's are an essential input for developers. They offer much of the functionality that make apps attractive to customers (such as displaying your position on a map, or voice search functionality)*".[652]

(4)     according to LG Electronics: "*The Play Store* [is] *desired as many of the Google apps and third party apps are developed intimately tied with Google Play Services, they do not function without them being available*".[653]

(624)   Third, if a competing Android app store developer sought to replace the Play Store, it would not only have to develop an app store to compete with it, but also "*its own APIs with similar functionality to* [Google Play Services]".[654] This requires the competing developer to undertake substantial investments to replicate the whole Google ecosystem.[655] This was confirmed by MNOs, app store developers and competing general search services:

(1)     Amazon stated: "*Amazon could not feasibly replicate the full functionalities provided by* [Google Play Services] *APIs. Amazon has invested a significant amount of money, time and other resources, yet has developed analogues for just a small number of the* [Google Play Services] *APIs so that developers may use device messaging, maps, in-app purchasing, mobile advertising, analytics, and games services in their Fire OS apps.*"[656]

(2)     Deutsche Telekom stated: "*The APIs that Google has developed and the services that stand behind them (e.g. Google Maps) have evolved over years and required substantial input of software developers and other investments. It would be highly speculative to estimate the resources needed to develop an app store including the abovementioned functions (including APIs). As a matter of fact, DT submits that in order to effectively compete against Google's Android ecosystem characterized by strong network effects as well as its underlying data analytics business model, a company needs to replicate almost the whole ecosystem.*"[657]

(3)     Yandex stated: "*The development of APIs, although possible, requires a substantial amount of resources and time. The development costs (depending on the number of APIs created) may exceed tens and hundreds of millions of Euros.*"[658] In particular, as regards one of the Google APIs contained in Google

---

[651]   Yandex's non-confidential response to Question 24 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

[652]   Deutsche Telekom's non-confidential response to Question 24 of the request for information of 21 October 2015 on app stores (Doc ID 2556).

[653]   LG Electronics' non-confidential response to Question 24 of the request for information of 21 October 2015 on app stores (Doc ID 2377).

[654]   Yandex's non-confidential response to Question 10 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

[655]   See responses to Question 10 of the request for information of 21 October 2015 on app stores.

[656]   Amazon's non-confidential response to Question 10 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[657]   Deutsche Telekom's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 2556).

[658]   Yandex's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

GOOG-DOJ-26429300

Play Services, namely the Google Maps APIs,[659] Yandex has noted: "*For instance, in order to develop a replacement for Google Maps API, the company needs to have its own maps service and server infrastructure, requiring substantial amount of development time and costs.*"[660]

(625)   Fourth, if a competing Android app store were to replace the Play Store, app developers would have to incur costs when switching to such Android app store. For example, Amazon explained that "[…] *while Amazon has sought to develop its APIs in a way that reduces switching costs for developers, Google has architected its APIs in a way that prevents interoperability and has made it impossible for Amazon to provide a solution that allows for switching between Google APIs and Amazon APIs without additional work on behalf of app developers*" and added that "*if an app is dependent on the Google Maps API (and the developer has not invested the resources necessary to create an alternate version of that app using the Amazon Maps API), that app will not function properly on Fire OS devices and will not be available in the Amazon Appstore for Fire OS*".[661]

(626)   Fifth, contrary to Google's claim,[662] developers of competing app stores find Google proprietary APIs commercially important, regardless of whether they could in principle replace them with other competing APIs (see recital (577)).

### 9.4.5.   Barriers to entry and expansion

(627)   The worldwide market (excluding China) for Android app stores is characterised by the existence of a number of barriers to entry and expansion.

(628)   First, the establishment of a fully-fledged Android app store (including its development and introduction into the market) requires significant investment:

(1)   According to Amazon: "*Excluding the effort to develop APIs, Amazon has dedicated hundreds of employees and tens of millions of dollars each year over the course of several years to develop and commercialize its app store, including engineering, app store operations, business development, developer and consumer marketing, developer relations and support.*"[663]

(2)   According to Sony, "*[t]he cost for developing, marketing and maintaining an app store that is relevant and that can compete with Google Play is prohibitive.*"[664]

(3)   According to Nokia, "*the required resources, costs and time are very significant all together. Engineering wise it would probably require about tens*

---

[659]   According to Google: "*Millions of websites and apps use Google Maps APIs to power location experiences for their users.*" - See "Google Maps for every platform", available at https://developers.google.com/maps/?hl=en, printed and saved on 11 April 2016.

[660]   Yandex's non-confidential response to question 9 of the request for information of 21 October 2015 on app stores (Doc ID 4228).

[661]   Amazon non-confidential response to Questions 1 and 2 of the request for information of 9 March 2017 (Doc ID 8247).

[662]   Google's Response to the Statement of Objections, Part Two, page 81, paragraph 115 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part One, pages 30-31, paragraph 80 (Doc ID 8598).

[663]   See Amazon's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[664]   Sony's non-confidential response to Question 61 of the request for information of 12 June 2013 to OEMs (Doc ID 4389).

GOOG-DOJ-26429301

*of millions of euros once all the development work is done*".[665]

(629)    In addition to development costs there are also commercialisation costs because *"one would still have to market the store"*. [666] This was confirmed by Deutsche Telekom: *"[w]hile the development of an app store (excluding the proprietary APIs or OS capabilities) is generally feasible, however the commercialisation (e.g. 30% revenue share of app sales and/or in-app payments) seems close to impossible due to significant network effects as well as developer and customer lock-in*".[667]

(630)    Commercialisation costs also result from the need to convince users to try a new Android app store in a market where the Play Store has an established position. According to Opera, since *"Google Play* [...] *has established itself over the past few years as the default storefront for Android apps* [...] *[s]ignificant customer education and marketing investment would therefore be required to change this user perception with respect to an alternative appstore*".[668]

(631)    Second, as noted in Section 9.4.3, the establishment of a fully-fledged Android app store requires significant investment in APIs and automatic update functionalities. According to Nokia, developing these functionalities *"[...] would take many man years of effort as this would require other manufacturers to support those APIs in their devices and then developers to use them in their apps"*.[669] According to SFR *"[...] the effort to build something equivalent to* [Google Play Services] *is huge* [...]".[670] Aptoide also observed, on the basis of its past experience concerning Nokia's Android fork, Nokia X, that *"[c]loning the entire GMS API stack (Maps, Messaging, Games, Billing...) implicates a[n] enormous* [amount] *of resources*".[671]

(632)    Third, a developer of a new Android app store would find it difficult to distribute its Android app store. This is for reasons described in recitals (633) to (636).

(633)    In the first place, pre-installation is a key requirement for an app store in order to achieve a sufficient scale and a developer of an Android app store would have to pay an OEM or MNO a revenue share or other fee in exchange for pre-installation. This was confirmed by Amazon that stated: *"[i]n an attempt to reach end users Amazon has in the past agreed to pay a share of revenues or other fees to carriers in exchange for the pre-installation of its apps – adding further cost."*[672] This is because: *"App stores' owners try as much as possible to have their shop pre-installed in the devices as end users usually use the store which is directly available on the*

---

[665]    Nokia's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[666]    Nokia's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[667]    Deutsche Telekom's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 2556).

[668]    Opera's non-confidential response to Question 13 of the request for information of 21 October 2015 on app stores (Doc ID 3534).

[669]    Nokia's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[670]    SFR's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 3975).

[671]    Aptoide's non-confidential response to Question 9 of the request for information of 21 October 2015 on app stores (Doc ID 2396).

[672]    Amazon's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

**EN**                                                                       **EN**

GOOG-DOJ-26429302

*device".[673] In addition, "Preloading remains valuable to users, and hence OEMs, despite full unbundling because most users just use what comes on the device. People rarely change defaults."[674]*

(634)   In the second place, because other Android app stores cannot be downloaded from the Play Store, the only way for users to download non pre-installed app stores on their devices is by means of "side-loading".[675] Users that do not necessarily possess a sufficient degree of technical knowledge may, therefore, be under the impression that no alternative app stores to the Play Store exist on Android devices.[676]

(635)   In the third place, users face a number of other restrictions when they wish to side-load a downloadable Android app store:

(1)   According to Amazon, "[…] *Google ensures the process for consumers to discover and install a downloadable app store is extremely difficult. First, the primary, and perhaps only, way many consumers know how to download an app to their device is through the Play Store. But downloadable app stores are not available through the Play Store, so consumers searching in the Play Store for alternate stores may be left with the impression that no alternate stores exist. Second, even for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure "Unknown Sources" setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that "Your [tablet or phone] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your tablet or loss of data that may result from using these apps."[677]*

(2)   According to Deutsche Telekom: "*The installation of alternative market place apps is possible but Google discourages their use. If a user wants to install an alternative app store he has to navigate to security-settings and allow installation of "unknown sources" which then shows a security warning. Therefore, "normal" customers tend to not download an alternative app store in addition to the PlayStore. In addition, other factors including (i) significant network effects (ii) number of apps, (iii) convenience of user experience, (iv) number of other users using it (no of reviews), (v) ease of download and (ideally automated background-) updating of apps." [678]*

---

[673]   Orange's non-confidential response to Question 12 of the request for information of 21 October 2015 on app stores (Doc ID 2479).

[674]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1361-1060).

[675]   In the context of apps on smart mobile devices side-loading means downloading apps manually from the Internet (through a browser) without using the app store.

[676]   See Amazon's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[677]   See Amazon's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[678]   See Deutsche Telekom's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 2556). See also Mozilla's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 3550).

**EN**                                140                                **EN**

GOOG-DOJ-26429303

(636)   In the fourth place, OEMs and app store developers have confirmed that the role played by downloadable Android app stores is minimal.

(1)   According to Lenovo, it "*is not aware of any mainstream alternative app stores for Android devices other than the Amazon app store*."[679]

(2)   According to ZTE, "*Under normal circumstances, ordinary consumers will not consider replacing pre-loaded appstores with downloadable appstores, unless they think pre-loaded appstores can't meet their requirement, for example they can't find their favorite apps or user experience of pre-loaded appstore is very bad.*" [680]

(3)   According to Amazon: "*Currently, consumers rarely download an app store onto their mobile device when another app store was pre-installed. Downloadable app stores struggle to gain traction because the pre-installed app store has the inbuilt advantage of being front and centre of the end user's experience when they first get their device.*" [681]

(637)   Fourth, Google has gained a first mover advantage in the worldwide market (excluding China) for Android app stores. According to Samsung, "*[c]onsumers tend to be familiar with the interface of the Google Play Store and its features, it being the de-facto standard Android app store*".[682] Nokia has also stated: "*It is important to note that app stores have been evolving for almost a decade now. To start over from scratch, developing and commercialising an app store would not take a decade to get on par but it would most likely take a huge team and a considerable amount of time*".[683]

(638)   This first mover advantage coupled with the existence of indirect network effects on both sides of the two-sided market for Android app stores creates an additional barrier to entry. As stated by Nokia, "*[d]evelopers do not consider any other Android app store as substitutable for the Google Play Store based on the ability to reach end consumers when considering their expected revenues.*"[684] As noted by Amazon, it is therefore "*extremely difficult to establish a meaningful market segment share*" for a new entrant.[685]

(639)   Fifth, a number of players have unsuccessfully tried to enter the worldwide market (excluding China) for Android app stores. For example, in 2010, a number of MNOs created the Android app store, WAC. This project was discontinued, after two years,

---

[679]   See Lenovo's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4095).

[680]   See ZTE's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 2840).

[681]   See Amazon's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

[682]   Samsung's non-confidential response to Question 22 of the request for information of 21 October 2015 on app stores (Doc ID 2805).

[683]   Nokia's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[684]   Nokia's non-confidential response to Question 22 of the request for information of 21 October 2015 on app stores (Doc ID 3991).

[685]   Amazon's non-confidential response to Question 8 of the request for information of 21 October 2015 on app stores (Doc ID 4067).

**EN**

**EN**

GOOG-DOJ-26429304

in 2012 because it did not attract enough developers.[686] As summarised by Orange *"...no MNO or OEM has been able to launch a successful app store competing with Google play. They have made several attempts, but none of them has overcome Google."*[687]

(640)   Sixth, the Commission's conclusion that the worldwide market (excluding China) for Android app stores is characterised by the existence of a number of barriers to entry and expansion is not affected by Google's claims that:

    (1)   the costs associated with building the app store, marketing and developing functionality do not constitute a barrier to entry since they are normal costs of doing business;[688] and

    (2)   competing app stores have successfully entered the market for Android app stores.[689]

(641)   In the first place, the high costs associated with building the app store, marketing and developing functionality constitute a barrier to entry, particularly for an entrant that does not enjoy network and reputation effects and/or that does not have the necessary APIs (see recitals (628) to (630)).

(642)   In the second place, while Samsung and Amazon app stores have been pre-installed on more than 5%, they have not been used in the same proportion as the Play Store to download apps (see Table 5).

*9.4.6.*   *Lack of countervailing buyer power*

(643)   The Commission concludes that OEMs have insufficient countervailing buyer power.

(644)   First, because of the number and quality of apps available on the Play Store, its automatic update functionalities and close ties with Google Play Services (see Sections 9.4.2, 9.4.3 and 6.2.2.1.III), OEMs cannot switch from Google and rely on competing Android app stores.

(645)   Second, the credibility of any threat by OEMs to switch to competing Android app stores will be weak as users expect that OEMs will pre-install the Play Store on Android devices. This is shown in an email from [OEM] Google's customer to Google: *"Please provide me with information how to proceed. My customers in [...] are forcing me to get Google Play at the device but I need your permission. [...] We are facing a big time-pressure from our customers and already losing big orders and money because of this situation."*[690]

(646)   Third, a threat by the OEMs to promote entry of a new Android app store would be unrealistic, because the new app store would have to overcome the barriers to entry and expansion to the market (see Section 9.4.5).

(647)   Fourth, Google has been able to impose on OEMs the Android compatibility tests

---

[686]   Orange's non-confidential response to Question 12 of the request for information of 21 October 2015 on app stores (Doc ID 2479).

[687]   Orange's non-confidential response to Question 43 of the request for information of 22 July 2014 (Doc ID 4575).

[688]   Google's Response to the Statement of Objections, Part Two, page 81, paragraph 116 (Doc ID 7117).

[689]   Google's Response to the Statement of Objections, Part Two, page 82, paragraph 119 (Doc ID 7117).

[690]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1751-01356).

**EN**

**EN**

GOOG-DOJ-26429305

that OEMs have to pass if they wish to pre-install the Play Store on their devices (see Section 6.3.1). The fact that OEMs have accepted to pass these tests indicates that they have insufficient bargaining power vis-à-vis Google.

(648)   Fifth, the bargaining position that Google has vis-à-vis OEMs (including [OEM]) is confirmed by internal emails exchanged with these OEMs. In particular Google has been able to ensure that the [OEM apps store] would not be a strong competitive force against the Play Store:

(1)   An email from [Google Executive] stated: "[Confidential communication with partner]"[691]

(2)   Another email from [OEM Executive] to Google, stated: "[Confidential communication with partner]".[692]

(649)   Sixth, the Commission's conclusion that OEMs have insufficient countervailing buyer power is not affected by Google's claims that OEMs can pre-install their own competing app stores[693]

(650)   In the first place, app stores developed by OEMs are differentiated in their intended use. For example, according to [OEM], "*The purpose of each of these appstores is to serve as a distribution channel for apps, but there are differences in terms of concept and promotional aims. For instance,* [OEM] *concept is a curated storefront specializing in apps that enable special* [OEM] *device features as well as promotions for* [OEM] *device users*".[694]

(651)   In the second place, app stores developed by OEMs do not constitute a sufficient constraint on the Play Store given that they neither offer a similar number of apps (see recital (608)) nor reach an amount of downloads comparable to that of the Play Store (see Table 5).

*9.4.7.   App stores for non-licensable smart mobile OSs*

(652)   For the reasons set out in this Section, the Commission concludes that app stores for non-licensable smart mobile OSs exercise an insufficient indirect constraint on Google's dominant position in the worldwide market (excluding China) for Android app stores.

(653)   First, in order to switch to the app stores for non-licensable smart mobile OSs such as Apple and BlackBerry, users of the Play Store would need to purchase a new smart mobile device as developers of non-licensable smart mobile OSs such as Apple and BlackBerry do not license their app stores.

(654)   Second, users of the Play Store are unlikely to switch to Apple or BlackBerry smart mobile devices in the event of a small but significant, non-transitory increase in the price of the apps distributed on the Play Store.

(655)   In the first place, Android users spend on average only USD 5 per year on apps (see recital (287)), which is far smaller than the price of an Apple or BlackBerry smart

---

[691]   See non-confidential Annex [...] to [OEM]'s submission of 2 February 2016 [...].
[692]   Google's internal document submitted in response to the request for information [...].
[693]   Google's Response to the Statement of Objections, Part Two, page 82, paragraph 120 (Doc ID 7117).
[694]   [OEM]'s non-confidential response to Question 12 of the request for information of 21 October 2015 on app stores [...].

**EN**                                         143                                         **EN**

GOOG-DOJ-26429306

mobile device.[695]

(656)   In the second place, users of the Play Store are unlikely to switch to Apple smart mobile devices because of the price differences between Google Android and Apple devices, the costs of switching to a device based on a different smart mobile OS and the user loyalty to their existing smart mobile OS (see Section 9.3.4). As explained by Opera, "*The only comparable OS in terms of app quantity, variety, and quality is iOS; however, Apple's devices may nonetheless be too expensive for many Android users to consider switching to iOS/Apple*".[696]

(657)   In the third place, users of the Play Store are unlikely to switch to BlackBerry smart mobile devices because of the costs of switching to a device based on a different smart mobile OS and user loyalty to their existing smart mobile OS (see Section 9.3.4) and the fact that BlackBerry accounts for a small part of the worldwide (excluding China) supply of smart mobile devices during 2011-2016.[697] The limited number of apps available on the BlackBerry World (234 500[698]) also constitutes a disincentive for users to switch to BlackBerry.

(658)   Third, instead of increasing the price of apps, Google can require OEMs, as a condition for obtaining the Play Store, to agree to certain requirements such as the pre-installation of a given Google app, without such requirements leading users or app developers to switch away from Google Android devices. Google can act in such a manner given that OEMs do not have credible alternatives to the Play Store and because those requirements would not alter the cost of Google Android devices.

(659)   Fourth, the Commission's conclusion that app stores for non-licensable smart mobile OSs such as Apple and BlackBerry exercise an insufficient indirect constraint on Google's dominant position in the worldwide market (excluding China) for Android app stores is not affected by Google's claims that:

(1)   It cannot charge supra-competitive prices to app developers because competition between the Apple's AppStore and Google's Play Store would lead to developers switching to Apple. Competition between the Apple's AppStore and Google's Play Store is evidenced by (i) parallel innovation between the two app stores; and (ii) recent changes to developers' share of sales revenues in these two app stores;[699]

(2)   A 2017 Commission report entitled "*The competitive landscape of online platforms*" and respondents to the requests for information confirm that the

---

[695]   Android users spend on average USD 5 per year in apps. See Philip Elmer-DeWitt, "Apple's users spend 4X as much as Google's" (27 June 2014), available at http://fortune.com/2014/06/27/apples-users-spend-4x-as-much-as-googles/, printed and saved on 12 June 2018.

[696]   Opera's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 3534).

[697]   BlackBerry sales of smart mobile devices corresponded to approximately 11% in 2011, decreasing to less than 0.01% in 2016. Source: […] data (Doc IDs 7866 and 7867).

[698]   Source: "Number of apps available in leading app stores as of March 2017", available at https://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/, printed and saved on 4 July 2017.

[699]   Google's Response to the Statement of Objections, Part Two, page 73-76, paragraphs 90-100 (Doc ID 7117).

**EN**                                   144                                   **EN**

GOOG-DOJ-26429307

Play Store and Apple's AppStore are substitutes;[700]

(3)   Microsoft and BlackBerry confirmed in their responses to requests for information that users "*switch mobile platforms if a platform's apps become uncompetitive*";[701]

(4)   The fact that the price of apps is far smaller than the price of a smart mobile devices does not support the finding that Google is dominant in the worldwide, secondary, market (excluding China) for Android app stores;[702]

(5)   The Commission considers only the impact of a small but significant non-transitory increase in the price of apps on users of Google Android device that are not considering to purchase a new smart mobile device whereas such an increase would also impact users that are contemplating whether to purchase a new smart mobile device;[703]

(6)   The Commission fails to assess the impact that a small but significant, non-transitory increase in the percentage of app-related revenues that app developers have to share with the Play Store would have on app developers and how this would affect user's app purchasing decisions;[704]

(7)   App developers do not need to switch from the Play Store to the Apple AppStore, but only to prioritise their effort for the Apple AppStore, this being the main element of competition between these two app stores;[705]

(8)   Opera has stated that users would switch smart mobile devices if the app store on their devices "*does not have a sufficient quantity of high-quality apps compared to the apps available on rival mobile OSs*";[706] and

(9)   Switching costs are low given that the increase in Android's share came at the expense of BlackBerry.[707]

(660)   In the first place, the evidence submitted by Google does not support its claim that the alleged parallel innovation between the Apple's AppStore and Google's Play Store results from competitive interaction between Apple's AppStore and Google's Play Store. Indeed, there are several other reasons for the alleged parallel innovation. For example, it may result from a common technological trend and/or copying features/methods between both.

(661)   Moreover, despite these commonalities, there are also several differences between these two app stores, as confirmed by Google.[708] For example, as regards ratings, Google shows an interval estimate of the total number of downloads and only one aggregate rating, while Apple shows users the reviews and rating from an app's most

---

[700]   Google's letter of 14 March 2018 (Doc ID 8768) and Google's Response to the Statement of Objections, Part Two, page 75, paragraph 96 (Doc ID 7117).

[701]   Google's Response to the Statement of Objections, Part Two, page 77, paragraph 101 (Doc ID 7117).

[702]   Google's Response to the Statement of Objections, Part Two, page 77, paragraph 101 (Doc ID 7117).

[703]   Google's Response to the Statement of Objections, Part Two, page 77, paragraph 101 (Doc ID 7117).

[704]   Google's Response to the Statement of Objections, Part Two, page 77, paragraph 101 (Doc ID 7117).

[705]   Google's Response to the First Letter of Facts, Part One, page 26, paragraph 70 (Doc ID 8598).

[706]   Google's Response to the First Letter of Facts, Part One, page 27, paragraph 70 (Doc ID 8598).

[707]   Google's Response to the Statement of Objections, Part Two, pages 77-78, paragraphs 102-103 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part One, page 28, paragraph 70 (Doc ID 8598).

[708]   Google's Response to the First Letter of Facts, Part One, page 27, paragraph 70 (Doc ID 8598).

**EN**                                        145                                        **EN**

recent update by default, with aggregate, all-time available in the app's product page. As regards data, Apple provides a cohort analysis of user retention for up to 30 days[709], a dashboard dedicated to showing subscription data and more comprehensive capabilities in reporting, while Google provides a substantial trending data, such as install/uninstall numbers by user/device by day, the precise number of current installs and ratings data, but provides a more limited breakdown of acquisition sources, when compared to Apple.[710]

(662)   Furthermore, as regards recent changes in developers' revenue shares, whilst Apple implemented its 15/85 price split in June 2016[711], Google announced the change from a 30/70 price split to a 15/85 split to take place only 15 months later, i.e. on January 2018.[712]

(663)   In the second place, the 2017 Commission study entitled "The competitive landscape of online platforms" does not indicate that the Play Store and Apple's AppStore are substitutes. Rather, the study states that: "*Despite [the app stores'] multiplicity, users' preferences have consolidated around two main OS, and over two main apps stores, making competition extremely difficult for the smaller apps stores. Differentiation beyond the existing app stores seems unlikely (at least within the smartphone market)*."[713]

(664)   Moreover, while certain respondents have pointed to the existence of some degree of competition between Apple's AppStore and Google's Play Store at the level of users, several statements from the same respondents indicated that an insignificant number of users would consider switching away from the Android OS due to changes in the range or quality of apps available on the Play Store or the price of those apps:

   (1)   Hutchison 3G: "*We believe that, in a very few cases, the range, quality, number or cost of apps available on pre-installed or downloadable appstores may make consumers switch between OSs.*"[714]

   (2)   Deutsche Telekom: "*DT considers the switching to another mobile OS caused by changes in the range or quality of apps available in pre-installed and downloadable app stores, or in the price of those apps to be insignificant.*"[715]

   (3)   Huawei stated that "*if users can easily obtain common apps and the experience meets their requirements, the number of other less common apps and changes in price are unlikely to make them switch to another OS.*"[716]

---

[709]   Cohort analysis corresponds to a subset of behavioural analytics that takes the data from a given dataset (e.g. an eCommerce platform, web application, or online game) and rather than looking at all users as one unit, it breaks them into related groups for analysis.

[710]   Source: https://www.mobileaction.co/blog/differences-app-store-vs-google-play/, printed and saved on 31 May 2018.

[711]   See   https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut, printed and saved on 2 July 2018.

[712]   Google's Response to the First Letter of Facts, Part One, page 27, paragraph 70 (Doc ID 8598).

[713]   Source: https://ec.europa.eu/jrc/sites/jrcsh/files/jrc106299.pdf, printed and saved on 27 June 2018.

[714]   See Hutchison 3G's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2383).

[715]   See Deutsche Telekom's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2556).

[716]   See Huawei's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2455).

**EN**

**EN**

GOOG-DOJ-26429309

(665)    In the third place, it is irrelevant for the purpose of assessing Google's dominant position in the worldwide market (excluding China) for Android app stores that users switched away from Microsoft and BlackBerry devices to Android devices because the Windows Mobile and BlackBerry World app stores had "*significantly fewer total apps available*".[717] This is because such switching relates to competition between smart mobile OSs, not app stores, given that app developers develop for a given OS, not for a given app store (see Section 7.4.4).

(666)    In the fourth place, the fact that the price of apps is far smaller than the price of a smart mobile device supports the finding that Google is dominant in the worldwide market (excluding China) for Android app stores. This is because the difference in the price of apps and of a smart mobile device is far greater over the lifetime of a device than the examples cited by Google of the difference in the price of coffee consumables and a coffee machine over the lifetime of a coffee machine and in the price of printer ink and a printer over the lifetime of a printer:

   (1)    the amount spent on apps over the lifetime of a smart mobile device corresponds to less than 5% of the total spend on a smart mobile device. This is because users spend on average a maximum of USD 5 on apps per year (see recital (287)), which for an average lifetime of a smart mobile device of 2-3 years[718] amounts to an average total expenditure of USD 15, while the average price of a Google Android device is above USD 300 (see Figure 13).

   (2)    the amount spent on coffee consumables over the lifetime of a coffee machine and on printer ink over the lifetime of a printer can equal or even exceed the total cost of the coffee machine and printer.[719]

(667)    In the fifth place, the reasons described in recitals (654) to (657) for users not to switch OS as a result of a small but significant non-transitory increase in the price of apps apply equally to users of Google Android devices that are contemplating purchasing a new smart mobile device and to users of Google Android devices that are not contemplating purchasing a new smart mobile device. This is because, in the event of such a price increase, both user groups of Google Android devices would have regard to the costs of switching to a device based on a different smart mobile OS and to the price differences between Google Android and Apple smart mobile devices.

(668)    In the sixth place, app developers would be unlikely to switch from the Play Store in the event of a small but significant, non-transitory increase in the percentage of app-related revenues because they would lose access to a large percentage of users whose smart mobile device OS is Android (see recital (290)).

(669)    Moreover, app developers would not need to switch to the Apple AppStore in the

---

[717]   Microsoft non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2493). See also BlackBerry non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 2666)

[718]   See   https://www.emarketer.com/Article/Smartphone-Owners-Wait-Years-Replace-Handsets/1014149 and https://www.statista.com/statistics/619788/average-smartphone-life/ printed and saved on 31 May 2018.

[719]   See Case M.7292 – DEMB/Mondelez/Charger OPCO, Commission decision of 5 May 2015 and Case AT.34330 – Pelikan / Kyocera, Commission decision of 22 September 1995, recital 62 where the Commission concluded that "*the cost of supplies (i.e. toner and inks) can amount to as much as 70% of the total cost of ownership of the equipment*".

**EN**                                    147                                    **EN**

event of such small but significant, non-transitory increase in the percentage of app-related revenues because many app developers multi-home between the PlayStore and the Apple AppStore.[720] According to a Google internal document from August 2016 by [Google Executive], more than [40-50]% of developers for Android also develop apps for iOS.[721] A report submitted on behalf of FairSearch also indicates that "*the Apple App Store and the Google Play Store have significant overlap among top apps: 92 of the top 100 third party iOS apps are also available on Google Play Store. By the same token, 90 of the top 100 third party Google Play Store apps are available on Apple App Store. This finding suggests that consumers can find the most popular apps on either app store, and that most developers of popular apps multi-home on the Google Play Store and the Apple App Store*".[722] A submission by Yandex also indicates that all but one of the top 50 apps in Apple's App Store is present on the Play Store.[723]

(670)   As a result of this, users would also be unlikely to switch to another OS because they would not face a reduction on the number of apps available on Android app stores since developers would not have any incentive to switch to a different smart mobile OS.

(671)   In the seventh place, Google has not submitted any evidence to support its claims:

  (1)   regarding the alleged value to Apple or Google of app developers developing first for their OS; and

  (2)   that because of such alleged value, users would switch from Android devices to Apple devices in the event of a delay in the timing for the launch of apps in the Play Store.

(672)   In the eighth place, Opera did not generally state that users would switch smart mobile devices if the app store on their devices were to have an insufficient number of high-quality apps. Rather, Opera simply referred to the example of the Windows Mobile Phone, which has significantly fewer apps compared to Google Android (see recital (291)). Moreover, Opera also stated that "*Apple's devices may nonetheless be too expensive for many Android users to consider switching to iOS/Apple*".[724]

(673)   In the ninth place, the fact that the increase in the share of Google Android's devices may have come at the expense of BlackBerry devices does not necessarily indicate that switching costs are low. Rather, in the case of BlackBerry, it is more likely that such switching occurred because of overall user dissatisfaction with the BlackBerry devices, including the limited number of available apps (see recital (657)).

## 9.5.   National markets for general search services

(674)   For the purpose of this Decision, the Commission concludes that Google holds a

---

[720]   See non-confidential replies to Question 18 of the request for information of 21 October 2015.

[721]   Source: Google's internal document "*Google Play Developer Sentiment Survey, Topline Report*", slide 25, August 2016 (Doc ID 6555-68).

[722]   "*Assessing the relevant markets for licensable mobile operating systems and Google Android compatible app stores*", Marco Iansiti, Harvard University, submitted by FairSearch on 24 January 2017 (Doc ID 8003).

[723]   See "*CRA addendum on multi-homing by app developers*", CRA, submitted by Yandex on 28 July 2017 (Doc ID 8270).

[724]   See Opera's non-confidential response to Question 16 of the request for information of 21 October 2015 on app stores (Doc ID 3534).

**EN**

**EN**

GOOG-DOJ-26429311

dominant position in each national market for general search services in the EEA since 2011. This conclusion is based on:

(1)  The market shares of Google and competing general search services market shares (Section 9.5.1),

(2)  The existence of barriers to expansion and entry (Section 9.5.2),

(3)  The infrequency of user multi-homing and the existence of brand effects (Section 9.5.3) and

(4)  The lack of countervailing buyer power (Section 9.5.4).

(675)  The Commission's conclusion is not affected by the fact that general search services are offered free of charge (Section 9.5.5) and that users in the EEA may use Google's general search service because of the perceived relevance of the results provided by that service (Section 9.5.6).

### 9.5.1.  Market shares

(676)  Since at least 2011, Google has enjoyed strong and stable market shares across the EEA and there has been no effective entry in any EEA country. This provides a good indication of Google's economic strength in each national market for general search services in the EEA.

(677)  The Commission has used market shares by volume[725] as a proxy for two reasons. First, market shares by value do not constitute a useful indicator of economic strength in the national markets for general search services because those services are provided free of charge. Second, despite its best efforts, the Commission has been unable to obtain precise and verifiable values regarding the Revenue Per Search ("RPS") of the main general search services. The general search industry relies on RPS to calculate the average cost paid by advertisers for a query made on a given general search service, because this gives a good indication of the revenue that a general search service can generate.

(678)  There are several methods to calculate market shares by volume.[726] All the methods indicate that since at least 2011, Google has enjoyed high shares in each national market for general search services in the EEA.

(679)  Data by Nielsen (based on page views) indicates that in 2010, Google's share of the national markets for general search services in the EEA was 84.6% in France, 85.3% in Germany, 85.9% in Italy, 91.3% in Spain and 81.3% in the United Kingdom. No competing general search service had a share exceeding 4.1% in any of these five countries.[727]

(680)  Data by AT Internet (based on site visits) similarly indicates that in November 2014, Google's share of the national markets for general search services in the EEA was 93.5% in France, 94% in Germany, 96.7% in Spain and 92.9% in the United

---

[725]  Market shares by volume may provide a conservative indicator of Google's economic strength, in view of the fact that Google's RPS is higher than that of Yahoo and Microsoft, the only significant competing general search services between 2011 and the date of adoption of this Decision.

[726]  Including per number of queries, users, page views or per number of sessions.

[727]  Annex 3.1 to Google's response to Question 3 of the request for information of 13 July 2010, (Doc IDs 4794 and 4787). The Nielsen data includes data until August 2010.

GOOG-DOJ-26429312

Kingdom.[728] No competing general search service had a market share exceeding 3.6% in any of these four countries.

(681)    Data by AT Internet does not cover EEA countries other than France, Germany, Spain and the United Kingdom. The Commission has therefore also looked at data from StatCounter which covers all EEA countries for the period 2008-2016.

**Table 6: Google, Bing and Yahoo market shares in general search in EEA countries in 2016[729]**

| Country in the EEA | Google | Bing | Yahoo! |
|---|---|---|---|
| Austria | 94.2% | 3.5% | 1.8% |
| Belgium | 94.1% | 3.8% | 1.1% |
| Bulgaria | 97.8% | 1.0% | 0.8% |
| Croatia | 97.2% | 1.3% | 1.2% |
| Cyprus | 95.0% | 2.5% | 1.6% |
| Czech Republic | 80.5% | 1.9% | 0.8% |
| Denmark | 95.7% | 2.6% | 1.4% |
| Estonia | 93.1% | 1.8% | 0.7% |
| Finland | 96.3% | 2.3% | 0.9% |
| France | 94.1% | 3.5% | 2.1% |
| Germany | 93.2% | 4.0% | 1.6% |
| Greece | 97.6% | 1.1% | 0.9% |
| Hungary | 97.7% | 1.2% | 0.8% |
| Iceland | 94.5% | 2.9% | 1.9% |
| Ireland | 95.0% | 2.6% | 2.0% |
| Italy | 95.0% | 2.9% | 1.6% |
| Latvia | 94.7% | 1.7% | 1.1% |
| Lichtenstein | 93.2% | 5.1% | 1.2% |
| Lithuania | 96.1% | 1.8% | 1.0% |

---

[728]    See "Search Engine Barometer" (December 2014), available at http://www.atinternet.com/en/resources/resources/search-engine-barometer-december-2014/, printed and saved on 11 April 2016.
[729]    StatCounter data for 2016, downloaded on 22 May 2017, http://gs.statcounter.com/.

**EN**                                         150                                         **EN**

GOOG-DOJ-26429313

| Country in the EEA | Google | Bing | Yahoo! |
|---|---|---|---|
| Luxembourg | 94.2% | 3.3% | 1.9% |
| Malta | 93.0% | 3.8% | 2.7% |
| The Netherlands | 93.9% | 3.7% | 1.3% |
| Norway | 92.6% | 4.6% | 2.1% |
| Poland | 97.4% | 1.4% | 0.5% |
| Portugal | 96.8% | 1.9% | 1.0% |
| Romania | 97.6% | 1.0% | 1.0% |
| Slovakia | 96.7% | 1.9% | 0.9% |
| Slovenia | 97.0% | 1.7% | 0.9% |
| Spain | 95.8% | 2.5% | 1.4% |
| Sweden | 94.1% | 3.9% | 1.6% |
| United Kingdom | 90.4% | 6.1% | 2.9% |

(682)   The only EEA country in which Google did not hold a market share above 90% in 2016 was the Czech Republic. Google has, however, been by far the market leader in the Czech Republic since 2011, when it overtook Seznam.[730]

(683)   Google has also enjoyed high market shares across the EEA for a longer period than the previous market leaders, AltaVista and Lycos, which maintained their leading position for two years (1997 to 1999)[731] and one year (1999 to 2000), respectively.[732]

(684)   Table 7 shows Google's lowest yearly market share since 2008 in each EEA country, as reported by StatCounter.

---

[730]   See Bas van den Beld, "An Analysis of The Battle Between Google and Seznam: A Close Call" (14 January 2011), available at http://www.stateofdigital.com/an-analysis-of-the-battle-between-google-and-seznam-a-close-call/, printed and saved on 11 April 2016. Other reports suggest that Google overtook Seznam even earlier, at the end of 2009. StatCounter data for 2008-2016, downloaded on 22 May 2017, http://gs.statcounter.com/.

[731]   Google's submission of 14 March 2011, "*Innovation in Search (Version II)*", paragraph 3.9 (Doc ID 4771).

[732]   Google's submission of 14 March 2011, "*Innovation in Search (Version II)*", paragraph 3.11 (Doc ID 4771). See Hiawatha Bray, "20 years later, Lycos searches for rebirth" (9 November 2015), available at http://www.betaboston.com/news/2015/09/11/20-years-later-lycos-searches-for-rebirth/, printed and saved on 11 April 2016, see "The History of Web Search Engines", available at http://www.whoishostingthis.com/resources/history-search-engines/, printed and saved on 11 April 2016 and see "Short History of Early Search Engines", available at http://www.thehistoryofseo.com/The-Industry/Short_History_of_Early_Search_Engines.aspx, printed and saved on 18 April 2016.

**EN**                                    151                                    **EN**

GOOG-DOJ-26429314

**Table 7: Google's lowest market shares in general search in EEA countries between 2008 and 2016**[733]

| Country in the EEA | Google's market share |
|---|---|
| Austria | 94.2% |
| Belgium | 94.1% |
| Bulgaria | 96.9% |
| Croatia | 96.6% |
| Cyprus | 92.8% |
| Czech Republic | 53.2% |
| Denmark | 95.3% |
| Estonia | 85.4% |
| Finland | 96.3% |
| France | 93.5% |
| Germany | 93.2% |
| Greece | 95.8% |
| Hungary | 97.0% |
| Iceland | 93.4% |
| Ireland | 93.4% |
| Italy | 95.0% |
| Latvia | 94.6% |
| Liechtenstein | 93.2% |
| Lithuania | 95.7% |
| Luxembourg | 93.5% |
| Malta | 88.6% |
| The Netherlands | 93.8% |
| Norway | 90.5% |

---

[733]   StatCounter data for 2008-2016. downloaded on 22 May 2017. http://gs.statcounter.com/. For Croatia. the reference period includes only the time since Croatia's accession to the Union on 1 July 2013.

**EN**

**EN**

GOOG-DOJ-26429315

| Country in the EEA | Google's market share |
|---|---|
| Poland | 96.8% |
| Portugal | 96.4% |
| Romania | 94.4% |
| Slovakia | 96.6% |
| Slovenia | 68.1% |
| Spain | 95.2% |
| Sweden | 94.1% |
| United Kingdom | 90.2% |

(685) The Commission's conclusion that since at least 2011, Google has enjoyed strong and stable market shares across the EEA and there has been no effective entry in any EEA country is not affected by Google's claim that the alleged tying product is not Google's general search service but the Google Search app.[734] Dominance is assessed in relation to the general search service, which each undertaking may offer in multiple ways (e.g. search app, default on web browsers, etc.).

### 9.5.2. *Barriers to entry and expansion*

(686) The national markets for general search services in the EEA are characterised by the existence of a number of barriers to entry and expansion.

(687) First, the establishment of a fully-fledged general search engine requires significant investments in terms of time and resources. For example, each year between 2009 and 2014, Microsoft invested over USD [millions of dollars] in R&D and capital expenditure in the development and maintenance of the latest version of its general search service launched in June 2009 under the brand name "Bing".[735] Other companies indicate that the costs associated with the establishment of a fully-fledged general search service constitute a barrier to entry. For example, Orange argues that it only operates its own general search technology for French language websites because *"investments are too large to develop such technology for non french language websites"*.[736]

(688) Second, because a general search service uses data to refine the relevance of its general search results pages, it needs to receive a certain volume of queries order to compete viably. The greater the number of queries a general search service receives, the quicker it is able to detect a change in user behaviour pattern and update and improve its relevance. This is supported by internal Google documents[737] and by

---

[734]   Google's Response to the First Letter of Facts, Part One, pages 32-33, paragraph 92 (Doc ID 8598).
[735]   Microsoft's response to Question 1 of the request for information of 8 December 2014 (Doc ID 4717).
[736]   Orange's non-confidential response to Question 1 of the request for information of 3 October 2011 (Doc ID 4594).
[737]   Google document with reference 86978 and Google document with reference Texas 213247 annexed to Google's response to Question 43 of the request for information of 13 July 2010 (Doc IDs 4795, 4791

GOOG-DOJ-26429316

evidence from a number of other general search services.[738]

(689)   A general search service also needs to receive a certain volume of queries in order to improve the relevance of its results for uncommon ("tail") queries. Tail queries are important because users evaluate the relevance of a general search service on a holistic basis and expect to obtain relevant results for both common ("head") and uncommon tail queries.[739] The greater the volume of data a general search service possesses for rare tail queries, the more users will perceive it as providing more relevant results for all types of queries.[740]

(690)   In that regard, there may be diminishing returns to scale in terms of improvements in relevance once the volume of queries a general search service receives exceeds a certain volume.[741] It may also be that the lower success and relevance of a general search service can be explained by other factors, such as the fact that it does not localise its general search results in different countries, that its web index is more limited in depth, or that it is slower in updating its index in order to deliver fresh content to users.[742] Regardless of the veracity of such arguments, however, they remain of limited relevance for the assessment of barriers to entry and expansion on each national market for general search services in the EEA because of the underlying fact that a general search service has to receive at least a certain minimum volume of queries in order to compete viably.

(691)   The relevance of scale is also not called into question by the fact that in the late 1990s, Google was able to overtake the former market leaders, AltaVista and Lycos. At that time, scale was less of a critical factor because the indexing technology of general search services was not yet able to assess user behaviour.[743]

(692)   Third, general search services constantly invest to improve their product and a new entrant would have no choice but to attempt to match these investments. Table 8 shows worldwide capital investments made by Google and Yahoo in their general search services between 2009 and 2015.

---

and 4796). The first document sets out how user behaviour data allowed Google to refine the relevance of search results for "air fares", in a situation where relevant websites did not contain those words. The second document states that users of Google's general search service "*create the first level of network effect for search quality*" and that Google is "*investing in this heavily*".

[738]   Seznam's non-confidential response to Question 3 of the request for information of 3 October 2011 (Doc ID 4076); Orange's non-confidential response to Question 2 of the request for information of 3 October 2011 (Doc ID 4594); and Ask's non-confidential response to Question 2 of the request for information of 3 October 2011 (Doc ID 4304).

[739]   Microsoft's complaint of 31 March 2011, p. 14 (Doc ID 216).

[740]   Orange's non-confidential response to Question 3 of the request for information of 3 October 2011(Doc ID 4594); and Ask's non-confidential response to Question 3 of the request for information of 3 October 2011 (Doc ID 4304).

[741]   Google's submission of 29 August 2011, RBB Economics, "*Response to Microsoft on the Importance of Scale*" (Doc ID 4783).

[742]   Google's submission of 29 August 2011, RBB Economics, "*Response to Microsoft on the Importance of Scale*" (Doc ID 4783).

[743]   See Volker Tresp Siemens, "On the Growing Impact of Machine Learning in Industry", available at http://www.sics.se/~aho/tor/Volker_Tresp_ToR-101125.pdf, printed and saved on 11 April 2016. According to the document, machine learning was only introduced by general search engines in the 2000s, p. 6.

**EN**

154

**EN**

GOOG-DOJ-26429317

**Table 8: Google's and Yahoo's worldwide capital investments in their general search services between 2009 and 2015 in million USD[744]**

|          | 2009 | 2010  | 2011  | 2012  | 2013  | 2014   | 2015  |
|----------|------|-------|-------|-------|-------|--------|-------|
| **Google** | 810  | 4 018 | 3 438 | 3 273 | 7 358 | 10 959 | 9 915 |
| **Yahoo**  | 434  | 714   | 593   | 506   | 338   | 396    | 534   |

(693)   Fourth, the existence of positive feedback effects on both sides of the two-sided platform formed by general search services and online search advertising creates an additional barrier to entry.

(694)   The positive feedback effects on the online search advertising side are due to the link between the number of users of a general search service and the value of the online search advertisements shown by that general search engine. The higher the number of users of a general search service, the greater the likelihood that a given search advertisement is matched to a user and converted into a sale. This in turn increases the price that a general search engine can charge advertisers if their search advertisements are clicked on. The general search engine can then reinvest that revenue in seeking to attract new users of its general search service.

(695)   As regards the positive feedback effects on the general search side of the two-sided platform, they are of two types.

(696)   The first type stem from the fact that a substantial minority of users of a general search service derive a benefit from search advertisements. The fact that advertisers are willing to bid for AdWords results on Google's general search results pages is evidence that at least some users value these advertisements. This is further supported by an economic analysis commissioned by Google, which indicates that [20-30]% of online search users afford equal consideration to AdWords and generic search results returned in response to a query.[745] In addition, of the remaining [70-80]% of users, at least a certain number[746] also consider AdWords results, albeit only after having looked at generic search results.

(697)   The second type stem from the link between the attractiveness of the online search advertising side of a general search platform and the revenue of that platform. The higher the number of advertisers using an online search advertising service, the higher the revenue of the general search platform; revenue which can be reinvested in the maintenance and improvement of the general search service so as to attract more users. Google derives substantial revenue from its online search advertisement business: in 2016, it generated 88.7% of its revenue from its advertisers.[747]

---

[744]   Sources: Google's and Yahoo's 10-K filings from 2009 to 2015, available at http://www.sec.gov/edgar/searchedgar/companysearch.html, printed and saved on 18 April 2016.

[745]   Google's submission of 14 March 2011, "*A guide to network effects, switching costs, and competition in online search*", paragraph 60, first indent (Doc ID 4785). [70-80]% of relevant users are reported to have either not considered AdWords results returned with a query or looked at them after considering the generic search results returned with that same query. The corollary is thus that [20-30]% gave equal consideration to both the AdWords and generic search results returned with a query.

[746]   The figure is not made available by the report.

[747]   See "Google's Form 10-K Annual Report for the US fiscal year ending 31 December 2016", available at https://abc.xyz/investor/pdf/20161231_alphabet_10K.pdf, printed and saved on 13 June 2017.

GOOG-DOJ-26429318

(698)    Fifth, certain general search services have access to data sources which cannot be indexed by competing general search services, either by their nature or for contractual reasons. For example, Google has scanned the holdings of several libraries and publishers as part of its Google Books and Google Scholar projects. The home page of Google Books offers users the possibility to: "*[s]earch the world's most comprehensive index of full-text books.*"[748]

(699)    The existence of barriers to entry and expansion is supported by a number of additional factors.

(700)    First, in the last ten years, a number of companies have exited the national markets for general search services in the EEA, either completely or by abandoning their general search technology in favour of third party technology. For example, Yahoo! abandoned its general search technology, including in the EEA, in 2009 and now relies on Bing's general search technology to power its portal.[749] Equally, Ask.com abandoned its general search technology, including in the EEA, in November 2010 and now relies on Google's general search technology to power its portal.[750]

(701)    Second, a number of smaller players still present on certain national markets for general search services in the EEA have been unable to expand and are contemplating interrupting their general search services in the EEA in the near future. This is the case of voila.fr, one of the first general search services in France, which currently offers general search services restricted to French language websites.[751]

(702)    Third, since 2007, there has been only one significant entrant on the national markets for general search services in the EEA, Microsoft, which launched the latest version of its general search service, Bing, in 2009.[752] Since 2009, however, Bing's market shares have never exceeded 6% in any EEA country.[753] Microsoft's general search service was [not profitable] for [a period of time].[754]

(703)    While a number of start-ups have attempted to launch competing general search services in the last ten years, none of them has been able to establish a significant market presence. Several have either stopped providing general search services or chosen instead to provide complementary types of services that do not compete with

---

[748]    See "Google books", available at http://books.google.com/, printed and saved on 18 April 2016.

[749]    Google's submission of 14 March 2011, "*Innovation in Search (Version II)*", paragraph 3.10 (Doc ID 4771).

[750]    See Tom Krazit, "IAC bows to Google, kills search at Ask.com" (9 November 2010), available at http://news.cnet.com/8301-30684_3-20022253-265 html?tag=mncol;4n, printed and saved on 31 May 2018.

[751]    Orange's non-confidential response to Question 3 of the request for information of 8 December 2014 (Doc ID 4577). Voila fr's share of the French general search market decreased from 3.6% in 2005 to 0.3% in December 2014. See Nielsen rating's figures as quoted in Google's response to Question 3 of the request for information of 13 July 2010 (Doc ID 4794), and see "Search Engine Barometer" (November 2014), available at http://www.atinternet.com/en/documents/search-engine-barometer-november-2014/, printed and saved on 11 April 2016.

[752]    The latest version of Microsoft's general search engine launched in June 2009 is called "Bing". Previous versions were called Live Search, Windows Live Search, and MSN Search.

[753]    Nielsen rating's figures as quoted in Google's response to Question 3 of the request for information of 13 July 2010 (Doc ID 4794), and StatCounter data for 2009-2016, downloaded on 22 May 2017, http://gs.statcounter.com/.

[754]    Microsoft's response to Question 1 of the request for information of 8 December 2014 (Doc ID 4717).

**EN**                                    156                                    **EN**

GOOG-DOJ-26429319

Google's general search service in the EEA.

(704)    In June 2008, Kosmix, at the time a search service specialised in health matters, was reported to have attempted to start providing a general search service.[755] Soon after, however, it changed its business model and became a platform integrating a number of specialised search services.[756]

(705)    In July 2008, former employees of Google launched a general search service called Cuil. At launch, Cuil claimed that its index of the web was deeper than Google's[757] and certain industry observers considered that Cuil had the potential to compete against Google.[758] Within a few weeks of launch, however, Cuil's share of a hypothetical global general search services market decreased from 0.11% to 0.01%,[759] and on 17 September 2010, Cuil went offline.[760]

(706)    In April 2010, another general search service called DuckDuckGo, offered only in English, was launched. Its traffic, however, remains marginal. In December 2014, it processed only 221 million searches.[761] This represented less than 0.8% of all general searches performed in the US in December 2014. Because of its US origin and the fact that it is only offered in English, it is likely that DuckDuckGo's shares of the national markets for general search services in the EEA are even lower. In addition, DuckDuckGo is dependent on third party technology for its general search services. As DuckDuckGo explains on its website: "*While our indexes are getting bigger, we do not expect to be wholly independent from third-parties. Bing and Google each spend hundreds of millions of dollars a year crawling and indexing the deep Web. It costs so much that even big companies like Yahoo and Ask are giving up general crawling and indexing. Therefore, it seems silly to compete on crawling and, besides, we do not have the money to do so.*"[762]

(707)    In October 2010, a general search service called Blekko, offered only in English, was launched. Blekko's distinctive feature was that it allowed users to mark the sites they visit with special attributes ("slashtags") which other users could use to focus their queries. However, similar to DuckDuckGo, its traffic remained marginal. In June

---

[755]    See Kosmix, available at https://www.crunchbase.com/organization/kosmix, printed and saved on 12 April 2016.

[756]    See Greg Sterling, "Walmart Buys Former Search Engine Kosmix To Power Social And Mobile Shopping" (19 April 2011), available at http://searchengineland.com/walmart-buys-former-search-engine-kosmix-to-power-social-and-mobile-shopping-73599, printed and saved on 11 April 2016.

[757]    See Michael Liedtke, "Ex-Google engineers debut 'Cuil' way to search" (28 July 2008), available at http://www.nbcnews.com/id/25884709, printed and saved on 11 April 2016.

[758]    See Danny Sullivan, "Cuil Launches-Can This Search Start-up Really Best Google?" (28 July 2008), available at http://searchengineland.com/cuil-launches-can-this-search-start-up-really-best-google-14459, printed and saved on 11 April 2016.

[759]    See "Cuil - latest stats" (11 August 2008), available at http://blog.statcounter.com/2008/08/cuil-latest-stats/, printed and saved on 11 April 2016.

[760]    See Danny Goodwin, "Cuil is Stone Cold-Another 'Google Killer' Bites the Dust" (18 September 2010), available at https://searchenginewatch.com/sew/news/2050586/cuil-stone-cold-another-google-killer-bites-dust, printed and saved on 11 April 2016.

[761]    See "DuckDuckGo queries per day (1y avg)", available at https://duckduckgo.com/traffic.html, printed and saved on 11 April 2016.

[762]    See "Sources", available at https://duck.co/help/results/sources, printed and saved on 11 April 2016.

**EN**                                      157                                      **EN**

GOOG-DOJ-26429320

2013, it reported an average of only 5 million searches per day.[763] This represented less than 0.8% of all general searches performed in the US in June 2013.[764] Because of its US origin and the fact that it was only offered in English, it was likely that Blekko's shares of the national markets for general search services in the EEA were even lower. In addition, because it relied on human input to generate and curate slashtags, Blekko could not generate large-scale real time search results comparable to entirely automated general search engines such as Google or Bing. This is supported by an internal Google document.[765] Blekko stopped providing general search services at the end of March 2015.[766]

(708)    Google does not contest the Commission's conclusions as outlined in this Section.

### 9.5.3.    *Infrequency of user multi-homing and existence of brand effects*

(709)    Only a minority of users in the EEA that use Google's general search service as their main general search service actually use other general search services (a behaviour known as "multi-homing"). This is confirmed by a number of factors.

(710)    First, a Keystone survey commissioned by Microsoft quantified how often Google users in five EEA countries (France, Germany, Italy, Spain and the United Kingdom) use other general search services.[767] The survey was performed between December 2010 and April 2011 and defined as a multi-homer a user that conducts at least 5% of all its queries on at least two distinct general search services. Based on that definition, the survey found that only 12% of users in Germany, Italy and Spain multi-home. As for France and the United Kingdom, the percentage of users that multi-home was respectively 15% and 21%.

(711)    The Keystone survey also found that users that use Google as their primary general search service in these five EEA markets are significantly less likely to multi-home than users that use Bing or Yahoo as their primary general search service in those markets. Table 9 summarises the proportion of users that multi-home, depending on their primary general search service.

---

[763]    See Greg Sterling, "Blekko Lays Off Eight, Raises $6 Million More" (5 June 2013), available at http://searchengineland.com/blekko-lays-off-eight-raises-6-million-more-162122, printed and saved on 11 April 2016.

[764]    See "comSore Releases June 2013 U.S. Search Engine Rankings" (12 July 2013), available at http://www.comscore.com/Insights/Press-Releases/2013/7/comScore-Releases-June-2013-US-Search-Engine-Rankings, printed and saved on 11 April 2016.

[765]    Google document with reference 73538 annexed to Google's response to Question 43 of the request for information of 13 July 2010 (Doc IDs 4795 and 4793). Internal email exchange between 30 July 2010 and 2 August 2010.

[766]    See Matt McGee, "Goodbye Blekko: Search Engine Joins IBM's Watson Team" (27 March 2015), available at http://searchengineland.com/goodbye-blekko-search-engine-joins-ibms-watson-team-217633, printed and saved on 11 April 2016.

[767]    Microsoft's submission of 26 May 2011, Keystone, "*User Multi-Homing in Europe*", p. 7 (Doc ID 4714).

GOOG-DOJ-26429321

**Table 9: Multi-homing by users depending on their primary general search service[768]**

| Country | France | Germany | Italy | Spain | United Kingdom |
|---|---|---|---|---|---|
| **Google** | 12% | 9% | 10% | 10% | 16% |
| **Bing** | 72% | 70% | 84% | 79% | 72% |
| **Yahoo** | 71% | 72% | 65% | 80% | 76% |

(712)   Second, because of the strength of the Google brand.[769] users trust in the relevance of search results provided by Google. This further dissuades users of Google from multi-homing. This is supported by internal Google documents[770] and third party studies.[771]

(713)   Third, even if a significant number of users of Google's general search service were to multi-home, switching costs are in any event only one possible type of barrier to entry and expansion. Barriers to entry and expansion can also derive for example from the need for large investments or network effects (see Section 9.5.2).

(714)   Google does not contest the Commission's conclusions as outlined in this Section.

*9.5.4.   Lack of countervailing buyer power*

(715)   The Commission concludes that OEMs. MNOs and users of Google's general search services each have insufficient countervailing buyer power.

(716)   First, OEMs and MNOs that pre-install Google's search service in exchange for a share of Google's revenues (see Section 6.3.3) have had to accept the revenue shares offered by Google and the percentage of revenue shares offered by Google has decreased over time.[772] The fact that OEMs have accepted these shares indicates that they have insufficient bargaining power vis-à-vis Google:

    (1)   According to [revenue share partner]. "*Google issues template agreements and*

---

[768]   Source: Microsoft's submission of 26 May 2011. Keystone. "User Multi-Homing in Europe" (Doc ID 4714).

[769]   In a 2011 study of the most valuable global brands. WPP company Millward Brown Optimor found Google to be the second strongest brand in the world. In the preceding four years. Google was considered the strongest brand in the world (available at http://www.wpp.com/wpp/press/2011/may/09/apple-becomes-worlds-most-valuable-brand-says/. printed and saved on 27 June 2018).

[770]   Google document with reference 144271 annexed to Google's response to Question 43 of the request for information of 13 July 2010. (Doc IDs 4792 and 4795). Internal email exchange between 29 and 30 July 2008 in which Google employees discuss user rating experiments that they had performed to compare Yahoo's and Google's general search results pages after an industry analyst had published a paper in which he stated that Yahoo performed better than Google for certain queries. An employee concludes that "*when it comes to branded competitive SxS* [side by side comparisons]. *it's impossible to ask our raters to be impartial - they are much more familiar with Google products and Google results and in general favor Google's UI* [User Interface] *over the others*".

[771]   An eye tracking experiment indicated that participants trusted Google's ability to position results by their relevance to the query. When the participants selected a link to follow from Google's general search result pages. they favoured links in a higher position. even if the abstracts themselves were less relevant. See Pan. Bet al. "*In Google we trust: Users' decisions on rank, position, and relevance*". Journal of Computer-Mediated Communication. 2007.

[772]   See Section 6.3.3.

GOOG-DOJ-26429322

*it is very difficult to negotiate the terms (including the* [revenue share terms]*)"*.[773]

(2) According to [revenue share partner], it had "*not been able to increase the* [revenue share terms]. *According to the Google Search Revenue Share Agreement effective 1 September 2014,* [revenue share partner]*'s Revenue Share has decreased from* [revenue share terms] *to* [revenue share terms]. *[...]* [revenue share partner]*'s only way of increasing Google's Relevant Revenues has been to sell more devices*".[774]

(3) According to [revenue share partner], "*[it] has not been able to increase the* [revenue share terms]. *In fact,* [revenue share terms] *set by Google have consistently decreased over time whilst the obligations placed on the MNO to attain such revenue shares have increased [...] and the obligations on Google decreased.*"[775]

(4) [Revenue share partner][776], [revenue share partner][777] and [revenue share partner][778] have made similar statements.

(717) Second, users are unable to exercise any bargaining strength vis-à-vis Google as they each represent only a small proportion of the volume of total general search queries.

(718) Google does not contest the Commission's conclusions as outlined in this Section.

*9.5.5.* *The argument that Google's general search services are offered free of charge*

(719) The Commission concludes that a finding of dominance is not precluded by the fact that Google offers its general search services free of charge.

(720) First, the evolution of Google's shares of each national market for general search services in the EEA has shown no rapid variations or fluctuations. On the contrary, since at least 2011, Google has consistently held very high market shares in each national market for general search services in the EEA.

(721) Second, barriers to entry and network effects make it difficult for actual or potential competing general search services from offering competitive or innovative services in an economically sustainable manner (see Section 9.5.2).

(722) Third, because of the infrequency of user multi-homing and the existence of brand effects (see Section 9.5.3) it is unlikely that a substantial proportion of its users would switch general search services in the event of a small but significant non-transitory deterioration of the quality of Google's general search services.

(723) Fourth, the Commission's conclusion that a finding of dominance is not precluded by

---

[773]   [Revenue share partner] non-confidential response to Question 26 of the request for information of 22 July 2014 […].

[774]   [Revenue share partner] non-confidential response to Question 25 of the request for information of 17 July 2014 […].

[775]   [Revenue share partner] non-confidential response to Question 26 of the request for information of 22 July 2014 […].

[776]   [Revenue share partner] non-confidential response to Question 26 of the request for information of 22 July 2014 […].

[777]   [Revenue share partner] non-confidential response to Question 26 of the request for information of 22 July 2014 […].

[778]   [Revenue share partner] non-confidential response to Question 25 of the request for information 17 July 2014 […].

**EN**

**EN**

GOOG-DOJ-26429323

the fact that Google offers its general search services free of charge is not affected by Google's claims that:

(1) the Commission should have assessed instead whether Google could degrade quality and innovation in search without sufficient marginal users switching to competing services to render the degradation unprofitable.

(2) a Eurobarometer survey from April 2016, which states that nearly eight in ten users would switch general search services if they were to consider the search results provided not to be useful.[779]

(724) In the first place, the Commission has assessed and established that it is unlikely that a substantial proportion of its users would switch general search services in the event of a small but significant non-transitory deterioration of the quality of Google's general search service (see recital (722)).

(725) In the second place, respondents to the April 2016 Eurobarometer survey did not indicate that they would switch general search service in the event of a small but significant non-transitory deterioration of the quality of a general search service. Rather, respondents were asked how they would react if a general search service were to provide results that are "not useful". This would constitute a more fundamental deterioration in the quality of a general search service than that resulting from a small but significant non-transitory deterioration of the quality of the service.

9.5.6. *The argument that users in the EEA may use Google's general search service because of the perceived relevance of the results provided by that service*

(726) A finding of dominance is also not precluded because users in the EEA may use Google's general search service because of the perceived relevance of the results that service provides.

(727) Rather, this is a factor to be taken into account in assessing whether Google's conduct is abusive. Irrespective of the reasons or the causes for which Google has a dominant position on the national markets for general search in the EEA, this does not relieve it of its special responsibility not to allow its behaviour to impair genuine, undistorted competition on the internal market.[780]

## 10.   ABUSE OF DOMINANT POSITION: GENERAL PRINCIPLES

### 10.1.   Principles

(728) The concept of abuse is an objective one relating to the behaviour of an undertaking in a dominant position which is such as to influence the structure of a market where, as a result of the very presence of the undertaking in question, the degree of competition is weakened and which, through recourse to methods different from those which condition normal competition, has the effect of hindering the maintenance of the degree of competition still existing in the market or the growth of

---

[779] Google's Response to the Statement of Objections, Part Two, pages 87-89, paragraphs 130-136 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part One, pages 32-33, paragraphs 90-91 (Doc ID 8598).

[780] Case T-228/97 *Irish Sugar v Commission*, EU:T:1999:246, paragraph 112; Joined Cases C-395/96 P and C-396/96 P *Compagnie Maritime Belge Transports and Others v Commission*, EU:C:2000:132, paragraph 37; Case T-201/04 *Microsoft v Commission*, EU:T:2007:289, paragraph 229.

GOOG-DOJ-26429324

that competition.[781]

(729)    A dominant undertaking has a special responsibility not to impair, by conduct falling outside the scope of competition on the merits, genuine undistorted competition in the internal market.[782] It follows from the nature of the obligations imposed by Article 102 TFEU that, in specific circumstances, an undertaking in a dominant position may be deprived of the right to adopt a course of conduct or take measures which are not in themselves abuses and which would even be unobjectionable if adopted or taken by non-dominant undertakings.[783]

(730)    An abuse of a dominant position does not necessarily have to consist in the use of the economic power conferred by a dominant position.[784] Moreover, Article 102 TFEU gives no explicit guidance as to what is required in relation to where on the markets the abuse took place.[785] Accordingly, the actual scope of the special responsibility imposed on a dominant undertaking must be considered in the light of the specific circumstances of each case which show that competition has been weakened. It follows that certain conduct on markets other than the dominated markets and having effects either on the dominated markets or on the non-dominated markets themselves can be categorised as abusive.[786]

(731)    Article 102 TFEU and Article 54 of the EEA Agreement list a number of abusive practices. These are merely examples, not an exhaustive enumeration of the sort of abuses of dominant position prohibited by the TFEU and the EEA Agreement.[787]

(732)    Article 102 TFEU and Article 54 of the EEA Agreement prohibit both abusive practices which may cause damage to consumers directly but also those which cause consumers harm through their impact on competition.[788] Article 102 of the Treaty and Article 54 of the EEA Agreement apply, in particular, to the conduct of a dominant undertaking that, through recourse to methods different from those governing normal competition on the basis of the performance of commercial operators, has the effect, to the detriment of consumers, of hindering the maintenance of the degree of competition existing in the market or the growth of that competition.[789] Since the structure of competition on the market has already been

---

[781]    Case C-549/10 P *Tomra v Commission*, EU:C:2012:221, paragraph 17; Case C-457/10 P *AstraZeneca v Commission*, EU:C:2012:770, paragraph 74.

[782]    Case 322/81 *Nederlandsche Banden Industrie Michelin v Commission*, EU:C:1983:313, paragraph 57; Case T-228/97 *Irish Sugar v Commission*, EU:T:1999:246, paragraph 112; Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraph 23; and Case C-457/10 P *AstraZeneca v Commission*, EU:C:2012:770, paragraph 134.

[783]    Case 322/81 *Nederlandsche Banden-Industrie Michelin v Commission*, EU:C:1983:313, paragraph 57; Case T-111/96 *ITT Promedia v Commission* [1998] EU:T:1998:183, paragraph 139.

[784]    Case 6/72 *Europemballage and Continental Can v Commission*, EU:C:1973:22, paragraph 27; Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 91; and Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 354.

[785]    Case T-83/91 *Tetra Pak v Commission*, EU:T:1994:246, paragraphs 113-116.

[786]    Case C-333/94 P *Tetra Pak v Commission*, EU:C:1996:436, paragraphs 24-25; Case C-52/09 *Konkurrensverket v TeliaSonera Sverige AB*, EU:C:2011:83, paragraph 26.

[787]    Case 6/72 *Europemballage and Continental Can v Commission*, EU:C:1973:22, paragraph 26; Case C-280/08 P *Deutsche Telekom v Commission*, EU:C:2010:603, paragraph 173; Case C-52/09 *Konkurrensverket v TeliaSonera Sverige AB*, EU:C:2011:83, paragraph 26.

[788]    Case 6/72 *Europemballage and Continental Can v Commission*, EU:C:1973:22, paragraph 26.

[789]    Case 85/76 *Hoffmann-La Roche v Commission*, EU:C:1979:36, paragraph 91; Case C-62/86 *Akzo v Commission*, EU:C:1991:286, paragraph 69; Case C-552/03 P *Unilever Bestfoods v Commission*,

**EN**                                        162                                        **EN**

GOOG-DOJ-26429325

weakened by the presence of the dominant undertaking, any further weakening of the structure of competition may constitute an abuse of a dominant position.[790] It follows that fixing an appreciability threshold for the purposes of determining whether there is an abuse of a dominant position is not justified.[791]

(733) Concerning the effects of the dominant undertaking's conduct, while they must not be of a purely hypothetical nature, they do not necessarily have to be concrete.[792] It is sufficient that the conduct tends to restrict competition or is capable of having that effect,[793] regardless of its success.[794] The Commission is not therefore required to demonstrate that a particular practice has actual anti-competitive effects.[795]

(734) It is for a dominant undertaking to provide justification for its conduct to be caught by the prohibition set out in Article 102 TFEU.[796]

(735) Such an undertaking may demonstrate, for that purpose, either that its conduct is objectively necessary or that the exclusionary effect produced may be counterbalanced, outweighed even, by advantages in terms of efficiency that also benefit consumers.[797]

(736) In that last regard, a dominant undertaking must demonstrate that four cumulative conditions are met:[798]

(1) The efficiency gains likely to result from its conduct counteract any likely negative effects on competition;

---

EU:C:2006:607, paragraph 129; Case C-95/04 P *British Airways*, EU:C:2007:166, paragraph 66; Case C-171/05 P *Piau v Commission*, EU:C:2006:149, paragraph 37; Case C-52/07 *Kanal 5 and TV 4*, EU:C:2008:703, paragraph 25; Case C-202/07 P *France Télécom v Commission*, EU:C:2009:214, paragraph 104; Case C-280/08 P *Deutsche Telekom v Commission*, EU:C:2010:603, paragraph 174; Case C-52/09 *TeliaSonera Sverige*, EU:C:2011:83, paragraph 27; Case C-457/10 P *AstraZeneca v Commission*, EU:C:2012:770, paragraph 74; Case C-549/10 P *Tomra Systems and Others v Commission*, EU:C:2012:221, paragraph 17; Case C-209/10 *Post Danmark*, EU:C:2012:172, paragraph 24; Case C-170/13 *Huawei Technologies*, EU:C:2015:477, paragraph 45; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 26.

[790]   Case 85/76 *Hoffmann-La Roche* v *Commission*, EU:C:1979:36, paragraph 123; Case T-65/89 *BPB Industries and British Gypsum* v *Commission*, EU:T:1993:31, paragraph 95; Case T-83/91 *Tetra Pak v Commission*, EU:T:1994:246, paragraph 114; Joined Cases T-24/93 and others *Compagnie Maritime Belge v Commission*, EU:T:1996:139, paragraph 106; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 72.

[791]   Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 73; Case C-525/16 *Meo- Serviços de Comunicações e Multimédia*, EU:C:2018:270, paragraph 29.

[792]   Case C-52/09 *TeliaSonera Sverige*, EU:C:2011:83, paragraph 64; Case T-336/07 *Telefónica and Telefónica de España v Commission*, EU:T:2012:172, paragraph 268, confirmed on appeal in Case C-295/12 P, EU:C:2014:2062, paragraph 124; Case T-398/07 *Spain v Commission*, EU:T:2012:173, paragraph 90; Case C-457/10 P *AstraZeneca v Commission*, EU:C:2012:770, paragraph 112; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 65.

[793]   Case C-549/10 P *Tomra Systems and Others v Commission*, EU:C:2012:221, paragraph 68.

[794]   Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 347, confirmed on appeal in Case C-457/10 P, EU:C:2012:770, paragraphs 109 and 111.

[795]   Case T-336/07 *Telefónica and Telefónica de España v Commission*, EU:T:2012:172, paragraph 273.

[796]   Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraphs 40-42; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraphs 47-49; Case T-201/04 *Microsoft v Commission*, EU:T:2007:289, paragraph 688.

[797]   Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraph 41.

[798]   Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraph 42; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 49.

**EN**                                        163                                        **EN**

GOOG-DOJ-26429326