# Pls. Ex. 103 - Part 2 of 2

(2)     Those gains have been, or are likely to be, brought about as a result of its conduct;

(3)     its conduct is necessary for the achievement of those gains in efficiency; and

(4)     its conduct does not eliminate effective competition, by removing all or most existing sources of actual or potential competition.

## 10.2.   Application to this case

(737)   In Sections 11 to 13, the Commission applies the principles summarised in Section 10.1 to Google's conduct. Section 11 applies those principles to the tying of the Google Search app with the Play Store and of Google Chrome with the Play Store and the Google Search app. Section 12 applies those principles to the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the AFAs. Section 13 applies those principles to revenue share payments conditional on the pre-installation of no competing general search services on any smart mobile device within an agreed portfolio.

(738)   In Section 14, the Commission concludes that the different forms of conduct described in Sections 11 to 13 constitute: (i) separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement; and (ii) a single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement.

(739)   The different forms of conduct described in Sections 11 to 13 constitute a single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement because they:

(1)     pursue an identical objective. They are part of an overall "carrot-and-stick" strategy vis-à-vis OEMs and MNOs to protect and strengthen Google's dominant position in general search services and thus its revenues via search advertisements. They ensure that Google acquires traffic and valuable user data that it can collect and combine; and

(2)     are complementary in that Google creates an interlocking interdependence between them. For example, in order to enter into a MADA, an OEM must enter into, and abide by the terms of an AFA and in order to enter into a revenue share agreement, an OEM must first enter into a MADA (and thus also an AFA). Also, if an OEM were to pre-install a competing general search service exclusively on one or more of its Android devices instead of Google Search, it would no longer be able to pre-install on those devices any of the mandatory GMS apps and services, including the Play Store.

## 11.   ABUSE OF GOOGLE'S DOMINANT POSITION: TYING RELATING TO ITS PROPRIETARY MOBILE APPS

(740)   Google's conduct with respect to its proprietary mobile apps involves tying.

## 11.1.   Principles

(741)   The abusive tying of two products or services is a particular form of conduct covered by Article 102 TFEU, in particular Article 102(d) TFEU. In order for tying to be liable to be caught by the prohibition under Article 102 TFEU, it is sufficient that the

**EN**                                      164                                      **EN**

GOOG-DOJ-26429327

following conditions are met:[799]

(1)   the tying and tied products are two separate products;

(2)   the undertaking concerned is dominant in the market for the tying product;

(3)   the dominant undertaking does not give its customers or end users a choice to obtain the tying product without the tied product; and

(4)   the tying is capable of restricting competition.

(742)   If these conditions are met, it is for the dominant undertaking, which bears the burden of proof, to demonstrate the existence of any objective justification for its conduct.[800]

(743)   Regarding the first condition referred to in recital (741), the distinctness of two products has to be assessed by reference to customer demand and not, for example, whether the tying product was regularly offered without the tied product.[801] A range of factors are relevant to this assessment, including the nature and technical features of the products concerned, the facts observed on the market such as the presence of independent companies specialising in the manufacture and sale of the tied product,[802] the history of the development of the products concerned and the commercial practice of the dominant undertaking.[803]

(744)   Complementary products can constitute separate products for the purposes of Article 102 TFEU, in particular Article 102(d) TFEU.[804] This is because, for example, customers may wish to obtain complementary products together, but from different sources.[805]

(745)   Moreover, the technical integration of one product into another does not mean that the two products are no longer separate for the purposes of Article 102 TFEU.[806] Equally, even when the tying of two products is consistent with commercial usage or when there is a natural link between the two products, such tying may nonetheless constitute an abuse unless it is objectively justified.[807]

(746)   Regarding the third condition referred to in recital (741), a dominant undertaking can apply compulsion or coercion either directly to end users or via its customers that pass on such coercion to end users. Such compulsion or coercion can be of a contractual nature, a technical nature, or both.[808]

(747)   Coercion or compulsion can still exist where the party accepting the tied product is

---

[799]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraphs 859, 862, 864, 867, 869, and 1144-1167.

[800]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraphs 859 and 869.

[801]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraphs 917 and 919.

[802]   Case T-30/89 *Hilti* v *Commission,* EU:T:1991:70, paragraph 67; Case T-83/91 *Tetra Pak v Commission,* EU:T:1994:246, paragraphs 82 and 137; Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 927.

[803]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 925.

[804]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 921.

[805]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 922.

[806]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 935.

[807]   Case C-333/94 P *Tetra Pak* v *Commission,* EU:C:1996:436, paragraphs 36-37; Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 942.

[808]   Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 963.

**EN**

**EN**

GOOG-DOJ-26429328

not charged a separate price for that product.[809]

(748)    Equally, compulsion or coercion can still exist where the party accepting the tied product is not required to use it or is entitled to use the same product supplied by a competitor of the dominant undertaking.[810]

(749)    Regarding the fourth condition referred to in recital (741), Article 102 TFEU does not require demonstration of actual or potential anti-competitive effects in classical tying cases. Indeed, in *Hilti*[811] and *Tetra Pak II*,[812] it was sufficient to assume that the tying of a specific product has by its very nature a foreclosure effect. In *Microsoft*, however, the General Court explained that while it is true that Article 102 TFEU as a whole does not contain any reference to the anti-competitive effect of bundling, the fact remains that, in principle, conduct will be regarded as abusive only if it is capable of restricting competition.[813] As already explained in Section 10.1, the concept of abuse covers not only practices which may prejudice consumers directly but also those which may indirectly prejudice them by impairing an effective competitive structure.[814]

(750)    When conducting such an examination, it is relevant to consider whether, *inter alia*, the tying: (i) reduces the incentives of users to choose a product from among those of other suppliers than the dominant undertaking;[815] (ii) creates disincentives for customers of the dominant undertaking to offer the products of other suppliers of the product that is tied;[816] or (iii) encourages third parties to develop products that implement only the underlying technology on which is based the product that is tied.[817]

(751)    Regard must also be given as to whether there are technical or economic constraints that prevent users from downloading several apps on their devices or whether such apps may be free, easy to download and take up little space.[818]

## 11.2.    Summary of the abusive conduct

(752)    Since at least 1 January 2011, Google has tied the Google Search app[819] with the Play Store. The Commission concludes that this conduct constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores.

---

[809]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraphs 967-969.

[810]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 970.

[811]    Case T-30/89 *Hilti* v *Commission*, EU:T:1991:70, paragraphs 100-101.

[812]    Case T-83/91 *Tetra Pak* v *Commission*, EU:T:1994:246, paragraphs 136-137; and Case C-333/94 P *Tetra Pak v Commission*, EU:C:1996:436, paragraph 37.

[813]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 867. See also Case T-203/01 *Michelin* v *Commission*, EU:T:2003:250, paragraphs 237-239.

[814]    Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36, paragraph 125; and Case T-228/97 *Irish Sugar v Commission*, EU:T:1999:246, paragraph 232.

[815]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 1041.

[816]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 1043.

[817]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraphs 1060-1077.

[818]    Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 1044; Case T-79/12 *Cisco Systems and Messagenet v Commission*, EU:T:2013:635, paragraph 79.

[819]    The Google Search app can be accessed through the Google Search icon and widget, as well as Google Now. See, for example, Mobile Application Distribution Agreement between Google and [MADA signatory] of 1 May 2014, Sections 1.1(m) and 3.3(b)(i) [...].

**EN**

**EN**

GOOG-DOJ-26429329

(753)   Since 1 August 2012,[820] Google has tied Google Chrome with the Play Store and the Google Search app. The Commission concludes that this conduct constitutes an abuse of Google's dominant positions in the worldwide market (excluding China) for Android app stores and the national markets for general search services.

## 11.3.   Tying of the Google Search app with the Play Store

(754)   The Commission concludes that the tying of the Google Search app with the Play Store constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores because: (i) the Play Store and the Google Search app are distinct products (Section 11.3.1); (ii) Google is dominant in the worldwide market (excluding China) for Android app stores (Section 11.3.2); (iii) the Play Store cannot be obtained without the Google Search app (Section 11.3.3); and (iv) the tying of the Google Search app with the Play Store is capable of restricting competition (Section 11.3.4).

(755)   The Commission further concludes that Google has not demonstrated the existence of any objective justification for the tying of the Google Search app with the Play Store (Section 11.5).[821]

### 11.3.1.   The Play Store and the Google Search app are distinct products

(756)   For the reasons set out in this Section, the Play Store and the Google Search app are distinct products.

(757)   First, the Play Store and the Google Search app provide the following distinct functionalities to users:

   (1)   the Play Store enables users to download, install and manage a wide range of diverse apps from a single point in the interface of the smartphone;

   (2)   the Google Search app enables users to search for information across the entire Internet.

(758)   Second, a number of undertakings such as Yahoo and Seznam supply general search services on a stand-alone basis, independently of Android app stores.

(759)   Third, Google develops and markets versions of the Google Search app that are designed to work on other smart mobile OSs such as Apple's iOS or Microsoft's Windows Phone OS.

(760)   Fourth, the Google Search app, as well as other competing general search apps, can be downloaded via other non-Android app stores.

(761)   Fifth, despite the tying of the Google Search app with the Play Store, OEMs sought the installation of the Play Store on their smart mobile devices separately from the Google Search app.[822]

(762)   Google does not contest the Commission's conclusions as outlined in this Section.

---

[820]   The date when Google Chrome first became a mandatory Google app in a MADA. See Section 1.13 of the Mobile Application Distribution Agreement between Google and [MADA signatory] […].

[821]   All objective justifications put forward by Google regarding the tying of its proprietary mobile apps are assessed together in Section 11.5.

[822]   See Google internal email referring to an instance when [MADA signatory] wanted to license only the Play Store and the Gmail app (Doc ID 1374-1937).

**EN**                                    167                                    **EN**

*11.3.2.   Dominance in the worldwide market (excluding China) for Android app stores*

(763)   As set out in Section 9.4, Google holds a dominant position in the worldwide market (excluding China) for Android app stores since 2011.

*11.3.3.   The Play Store cannot be obtained without the Google Search app*

(764)   For the reasons set out in this Section, the Commission concludes that OEMs[823] cannot obtain the Play Store without the Google Search app.

(765)   First, OEMs can pre-install the Play Store on their Google Android devices only if they license and pre-install the GMS bundle, including the Google Search app.[824]

(766)   Second, users cannot obtain the Play Store without simultaneously obtaining the Google Search app.

(767)   Third, OEMs that wish to install a different general search app on their GMS devices can do so only alongside the Google Search app.

(768)   Fourth, it is irrelevant that OEMs may not be required to pay anything extra for the Google Search app.

(769)   In the first place, while Google does not charge for the Google Search app, it monetises that app through advertising via the general search service offered through the Google Search app.

(770)   In the second place, the conclusion that Google ties the Google Search app with the Play Store does not depend on OEMs having to pay for the Google Search app.[825]

(771)   Fifth, it is irrelevant that users may not be obliged to use the Google Search app which they find pre-installed on their GMS devices and that they can download on their devices a competing general search app. The conclusion that Google ties the Google Search app with the Play Store does not depend on users being forced to use the Google Search app or prevented from using a competing general search app.[826]

(772)   Google does not contest the Commission's conclusions as outlined in this Section.

*11.3.4.   Restriction of competition*

(773)   The Commission concludes that the tying of the Google Search app with the Play Store is capable of restricting competition because it:

   (1)   provides Google with a significant competitive advantage that competing general search services providers cannot offset (Section 11.3.4.1); and

   (2)   helps Google to maintain and strengthen its dominant position in each national market for general search services, increases barriers to entry, deters innovation and tends to harm, directly or indirectly consumers (Section 11.3.4.2).

(774)   Moreover, the Commission's conclusion that the tying of the Google Search app with the Play Store is capable of restricting competition is not affected by Google's claims

---

[823]   Insofar as ODMs and chipset manufacturers, which have entered into a MADA, pre-install mandatory Google apps on smart mobile devices, the conclusions reached by the Commission in Sections 11.3 and 11.4 equally apply to them.

[824]   See Section 6.3.2.

[825]   Case T-201/04 *Microsoft v Commission,* EU:T:2007:289, paragraphs 967-969.

[826]   Case T-201/04 *Microsoft v Commission,* EU:T:2007:289, paragraph 970.

**EN**                                                168                                                **EN**

GOOG-DOJ-26429331

regarding the need for the Commission to consider that tying in its relevant economic and legal context (Section 11.3.4.3).

11.3.4.1. The tying of the Google Search app with the Play Store provides Google with a significant competitive advantage that competing general search services providers cannot offset

(775)    The Commission concludes that, via the tying, Google is able to ensure for its general search service a significant competitive advantage that competing general search services cannot offset by other methods of distributing general search services on smart mobile devices. This is for the following reasons:

(I)    the number of general searches via smart mobile devices has grown significantly;

(II)    pre-installation is an important channel for the distribution of general search services on smart mobile devices;

(III)    it is impossible to uninstall the Google Search app on GMS devices;

(IV)    competing general search services cannot offset the competitive advantage that Google ensures for itself through tying; and

(V)    Google's competitive advantage resulting from the tying and the inability of competing general search services to offset that advantage is consistent with the evolution of market shares.

(776)    Moreover, contrary to Google's claims, when assessing the competitive advantage that Google ensures itself via the tying of the Google Search app with the Play Store, the Commission is not required to make a finding of "*indirect network effects*" with respect to the Google Search app or to undertake certain "*empirical work*" (VI).

*I.    The number of general searches via smart mobile devices has grown significantly*

(777)    The number of general searches via smart mobile devices has grown significantly and since 2015, more general search queries have been undertaken on smart mobile devices than on PCs.[827] While general search queries carried out worldwide with Google Search on smart mobile devices accounted for [20-30]% of all Google Search general search queries in 2012, they accounted for [50-60]% in 2015 and [50-60]% in 2016.[828]

*II.    Pre-installation is an important channel for the distribution of general search services on smart mobile devices*

(778)    Pre-installation is an important channel for the distribution of general search services on smart mobile devices.

(779)    Pre-installation is important for service providers because it can increase significantly on a lasting basis the usage of the service provided by the app. This significant increase in usage is the reason why service providers, including Google, remunerate OEMs and MNOs for pre-installing their apps (on an exclusive or non-exclusive basis), for setting their services as default ("default setting"), and/or placing apps in a premium position on smart mobile devices ("premium

---

[827]    Google's response to Question 14 of the request for information of 24 March 2017 (Doc ID 7894-5).
[828]    Google's response to Question 14 of the request for information of 24 March 2017 (Doc ID 7894-5).

GOOG-DOJ-26429332

placement").[829]

(780)  As Google itself acknowledges with respect to the pre-installation of apps:

(1)  "*Pre-loading these apps and placing Search on the home screen is unquestionably valuable to Google.*"[830]

(2)  "*In addition to preinstalling their own apps and services, OEMs and carriers also sell preinstallation to app developer to gain additional revenue that lowers their costs.*"[831]

(781)  The reason why pre-installation, like default setting or premium placement, can increase significantly on a lasting basis the usage of the service provided by an app is that users that find apps pre-installed and presented to them on their smart mobile devices are likely to "stick" to those apps. HP described the creation of a "*status quo bias*" in the form of premium placement and default setting as follows: "*Premium placement and default settings give applications and services located in those positions the advantage of being the first things users see when they start to interact with their device. Users are more likely to try these applications/services based on their prominent visibility and once they are using them, they usually continue to do so. It is an easy way to obtain new users and deliver almost automatic stickiness for an application or service.*"[832]

(782)  Users are unlikely to look for, download, and use alternative apps, at least when the app that is pre-installed, premium placed and/or set as default already delivers the required functionality to a satisfactory level. As Nokia indicated in relation to pre-installation: "*Where a product is preloaded by default, consumers tend to stick to this product at the expense of competing products – even if the default product is inferior to competing products.*"[833] In order to overcome the *status quo* bias and see users looking for alternatives, service providers need to convince users that their service is significantly better than the alternative that is already pre-installed, premium placed or set as default.[834]

(783)  Regarding the Google Search app, as a result of the MADA, it is pre-installed on a large number of smart mobile devices. In 2016, approximately 260 million smartphones were sold in Europe,[835] of which approximately 197 million smartphones or 76% were Google Android devices.[836] Practically all of these Google Android smartphones had the Google Search app pre-installed with the rest of the

---

[829]  Appendix 2 of Google's Response to the Statement of Objections, page 17 (Doc ID 8303-12).

[830]  Appendix 2 of Google's Response to the Statement of Objections, page 17 (Doc ID 8303-12).

[831]  Google's Response to the Statement of Objections, Executive Summary, page xvii (Doc ID 7117).

[832]  See, for example, HP's non-confidential response to Question 55 of the request for information of 12 June 2013 to OEMs (Doc ID 4162).

[833]  Nokia's non-confidential response to Question 17 of the request for information of 29 June 2015 to app developers (Doc ID 4360).

[834]  See Yandex's non-confidential response to Question 35.1 of the request for information of 12 June 2013 to app developers (Doc ID 4601):"[…] *download levels of mobile applications that are competing with preinstalled mobile applications tend to be low if the pre-installed service is of comparable or even (insubstantially) worse quality.*"

[835]  Source: […] data (Doc ID 7866 and 7867).

[836]  Source: […] data (Doc ID 7866 and 7867). In 2014, approximately 206.7 million smartphones were sold in Europe, of which approximately 156.6 million smartphones or 75.7% were Google Android devices (Source: […] (Doc IDs 3098, 4632, 4633 and 4710)).

**EN**

**EN**

GOOG-DOJ-26429333

GMS bundle.[837]

(784)   Furthermore, in 2016, approximately 1.65 billion smart mobile devices were sold worldwide (including China), of which approximately 1.33 billion or 81% were Google Android devices.[838] Approximately 918 million smart mobile devices or 56% of the total number of all smart mobile devices, i.e. practically all Google Android devices outside China, had the Google Search app pre-installed together with the rest of the GMS bundle.[839] These 918 million smart mobile devices in 2016 constitute a far higher number than any competing general search service would be able to achieve by way of pre-installation of its app on smart mobile devices. By way of comparison, from the total smart mobile devices sold worldwide (including China) in 2016, only approximately 21 million or 1.3% were sold with Windows Mobile on which Google's main competitor, Bing, was set as the default general search service.[840]

(785)   By tying the Google Search app with the Play Store, Google therefore ensures that distribution of the Google Search app is as wide on smart mobile devices as the number of GMS devices.

(786)   The importance of pre-installation as a channel for the distribution of general search services on Google Android devices is confirmed by (i) internal Google documents, (ii) Google's Response to the Statement of Objections, (iii) responses by third parties to requests for information, and (iv) a comparison of the use and revenues of the Google Search app and other GMS apps on Google Android devices, where they are pre-installed, with their use on other smart mobile devices, where they are not pre-installed.

(787)   First, the importance of pre-installation is confirmed by internal Google documents:

(1)   [Google Executive], stated in an internal email dated 14 November 2008 that "*I guess my biggest concern (and* [Google Executive]*) is GMA* [Google's general search service] *because of revenue implications of not getting a pre-load (underlying assumption that GMA prominetly* [sic] *present leads to more searches, particularly with voice). How can we address this concern? Could we minimally require GMA to preload on Android (or all platforms) as a necessary condition for any GMS deals?*"[841]

(2)   [Google Executive], stated in an internal email dated 1 November 2010 that "*Preloading remains valuable to users, and hence OEMs, despite full*

---

[837]   See Section 9.3.1.

[838]   Source: […] data (Doc ID 7866 and 7867). In 2014, approximately 1.53 billion smart mobile devices were sold worldwide (including China), of which approximately 1.2 billion smart mobile devices or 78.4% were Google Android devices (Source: […] (Doc IDs 3098, 4632, 4633 and 4710)).

[839]   Source: […] data (Doc ID 7866 and 7867) and Section 9.3.1, in particular footnote 436, which explains that (excluding China) practically all Google Android devices in the world are sold with GMS.

[840]   Source: […] data (Doc IDs 7866 and 7867). The low tablet sales figures classified as "Windows&Android" were divided equally between the two smart mobile OSs. There is no Bing app on Windows Mobile and thus Bing is not pre-installed on Windows Mobile devices. However, Bing is set as default on three entry points on Windows Mobile phones: the hardware button ("HardKey"), the Cortana digital assistant tile on the home screen and the address bar in the native browser (see Microsoft's non-confidential response to Question 2 of the request for information of 20 November 2015 to search providers (Doc ID 2980)).

[841]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-381).

GOOG-DOJ-26429334

*unbundling* [i.e. the fact that Google apps are not only pre-installed but also available for download on the Play Store] *because most users just use what comes on the device. People rarely change defaults*".[842]

    (3)    In another internal Google email dated 26 April 2011, [Google Executive] stated the following: "*Do we really need exclusivity terms? The current* [non-US] *terms give pretty much the same effect. OEM preinstall default under MADA + carrier revshare incentive with non-duplication + volume targets* [search deals] *= many hurdles for a carrier seeking to change the default. They'd need >$ from the alternative search AND EITHER persuade the OEM to seek (and get from us) an exception to their MADA to allow preinstallation of another search provider with preinstall of other GMS, OR ship a device with no GMS presinstalled* [sic] *at all* [MADA requirements]. *In practice, shipping without all GMS doesn't happen except in edge cases, like (previously) America Movil. All developed markets have users who expect and demand GMS.*"[843]

(788)    Second, the importance of pre-installation is confirmed by Google's Response to the Statement of Objections, where Google acknowledges that "*Pre-loading these apps and placing Search on the home screen is unquestionably valuable to Google.*"[844]

(789)    Third, the importance of pre-installation is confirmed by third party responses to requests for information:

    (1)    Nokia stated that: "*Preloading of apps (as opposed to the availability of apps for downloading) plays a critical role for developers because being prominently visible on a smartphone's home screen or near to the home screen inevitably increases the likelihood of consumers trying out the app.*"[845]

    (2)    Amazon stated that: "*Having an app pre-installed on a device significantly improves that app's discoverability by end users. That benefit increases the more prominently the app appears on the device,*"[846] and "[…] *premium placement of preinstalled applications has a significant impact on their use* […]. [T]*he presence of pre-installed mobile applications in many cases limits user willingness to try competing mobile applications.*"[847]

    (3)    Hutchison 3G stated that: "*It is very powerful to have an application preloaded as opposed to a bootstrap or even a marketing recommendation to use the app. As with any other service, if it is within reach, the likelihood to use it is greater.*"[848]

---

[842]    Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1361-1060).

[843]    Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1347-1623).

[844]    See Appendix 2 of Google's Response to the Statement of Objections, page 17 (Doc ID 8303-12).

[845]    Nokia's non-confidential response to Question 17.2 of the request for information of 12 June 2013 to OEMs (Doc ID 764).

[846]    See Amazon's non-confidential response to Question 17 of the request for information to app developers of 29 June 2015 (Doc ID 8230).

[847]    See Amazon's non-confidential response to Question 35 of the request for information of 12 June 2013 to OS developers (Doc ID 3612).

[848]    See Hutchison 3G's non-confidential response to Question 51 of the request for information of 12 June 2013 to MNOs (Doc ID 392).

**EN**                          **EN**

GOOG-DOJ-26429335

(4) Yandex stated that: "[t]*he most efficient distribution channel is pre-installation by the OEM. OEMs mainly pre-install those services that potentially can generate additional revenue for them.* [Information about revenues]. *Most of our discussions with OEMs* [confidential commercial information] *concern the pre-installation of Yandex search.*"[849]

(5) Yandex submitted an analysis which indicates that Yandex's general search share in Russia in May 2015 was [2-5] times higher on Android devices where its search widget was pre-installed on the home screen and its general search service was set as default in the pre-installed mobile web browser, compared to when Yandex's general search service was not pre-installed at all.[850]

**Figure 18: Yandex's share of general search queries on smart mobile devices depending on various scenarios of pre-installation and default setting**



(6) Yahoo stated that it "*expects that traffic generated by its search services would be higher if its search services were preinstalled than if not preinstalled, regardless of whether Google's search engine is also preinstalled on the same device.*"[851]

(7) Qwant stated that: "*pre-installation* [...] *will likely highly increase our traffic.*"[852]

(8) At the end of 2008, Microsoft signed a pre-installation agreement with Verizon, pursuant to which, in the US in 2010 and 2011, its general search service was pre-installed alongside Google on six models of Google Android devices. The traffic resulting from this agreement accounted for [15-25]% of the entire volume of mobile general search queries to Bing in the US during

---

[849] Yandex's non-confidential response to Question 25.5 of the request for information of 12 June 2013 to app developers (Doc ID 4601).

[850] Yandex's presentation of 5 November 2015 (Doc ID 4216, 8193 and 8139).

[851] Yahoo's non-confidential response to Question 10 of the request for information of 20 November 2015 to Search providers (Doc ID 3411).

[852] Qwant's non-confidential response to Question 9 of the request for information of 20 November 2015 to Search providers (Doc ID 3236).

**EN**

**EN**

GOOG-DOJ-26429336

this period.[853]

(790)   Fourth, the importance of pre-installation is confirmed by a comparison between the use and revenues of Google's GMS apps on Google Android (where they are pre-installed) with their use and revenues on other smart mobile devices (where they are not).

(791)   In the first place, a study submitted by FairSearch indicates that the usage of each app in the GMS bundle is consistently higher on GMS devices where it is pre-installed than on iOS devices, where users must download each app (see Table 10).[854] The study looked at monthly usage (one of the industry's usual standard for measuring app usage) in the United Kingdom for February 2016 using […] data. For the Google Search app, 17% of users of iOS devices used the downloaded Google Search app, whereas 76% of users of Google Android devices had used the pre-installed Google Search app.

**Table 10: Comparison of usage of Google apps (Pre-installation vs download on Android/iOS devices), United Kingdom survey, February 2016[855]**

| Google Applications | iOS % Reach | Android % Reach |
|---|---|---|
| *Google Applications preinstalled on all smartphones* | | |
| Google Drive (Mobile App) | 1.873 | 39.118 |
| YouTube (Mobile App) | 50.438 | 68.918 |
| Google Search (Mobile App) | 17.405 | 75.538 |
| Google Maps (Mobile App) | 22.445 | 59.212 |
| Google Play Movies (Mobile App) | 0.263 | 4.048 |
| Gmail (Mobile App) | 11.58 | 57.521 |
| Google Play Music (Mobile App) | 0.436 | 14.516 |
| *Google Applications preinstalled on some smartphones* | | |
| Google Photos (Mobile App) | 0.679 | 19.789 |
| Hangouts (Mobile App) | 0.879 | 8.318 |
| Google+ (Mobile App) | 0.863 | 15.215 |
| Google Docs (Mobile App) | 0.707 | 7.702 |
| *Google Applications not preinstalled on smartphones* | | |
| Google Earth (Mobile App) | 1.693 | 3.103 |
| Google Authenticator (Mobile App) | 0.5 | 0.837 |

(792)   An alternative way of visualising the importance of pre-installation contained in the figures in Table 10 is to present the figures comparing the usage of GMS apps on Android and on iOS in a graph, with the monthly percentage audience on Android on the y-axis and monthly percentage audience on iOS on the x-axis. As Figure 19 indicates, all of Google's apps are above the 45° line, meaning that for each of them their monthly audience and thus the percentage of users on Android devices that used

---

[853]   Microsoft's non-confidential response to Question 10.1 of the request for information of 20 November 2015 to Search providers (Doc ID 4634).

[854]   "*Assessing the relevant markets for licensable mobile operating systems and Google Android compatible app stores*", Table 7, Marco Iansiti, Harvard University, submitted by FairSearch on 24 January 2017 (Doc ID 8003).

[855]   "*Assessing the relevant markets for licensable mobile operating systems and Google Android compatible app stores*", Table 7 and paragraphs 169-179, Marco Iansiti, Harvard University, submitted by FairSearch on 24 January 2017 (Doc ID 8003). "Reach" means percentage of users who use the app at least once a month (monthly audience). The term "smartphones" that is used in connection with pre-installation (or lack thereof) of certain Google apps relates to the Google Android devices that the study uses as a benchmark for measuring the "reach" of the respective app in comparison to iOS devices.

**EN**                                            174                                            **EN**

GOOG-DOJ-26429337

that app at least once a month is higher than the percentage of users on iOS devices that used that app. The apps which are closest to the 45° line are Google apps that are not pre-installed on GMS devices. Google Search is the Google app with the highest absolute difference (see the exact numbers in Table 10).

**Figure 19: Percentage of users that used a given pre-installed Google app at least once a month (i.e. monthly audience) on their Google Android/iOS device, United Kingdom survey, February 2016[856]**



(793)    In the second place, […] data comparing general search queries on Google Android and Windows Mobile devices in France, Germany, Italy, Spain and the United Kingdom between 2014 and 2017, indicates that on Windows Mobile devices, where Google Search is not pre-installed and Bing is set as the default general search service, Google Search accounted for [10-20]% to [40-50]% of general search queries. By contrast, on Google Android devices in these countries, where Google Search is practically always pre-installed, it accounted for [90-100]% of general search queries.

---

[856]    "*Assessing the relevant markets for licensable mobile operating systems and Google Android compatible app stores*", Figure 6, Marco Iansiti, Harvard University, submitted by FairSearch on 24 January 2017 (Doc ID 8003).

**EN**                                    175                                    **EN**

GOOG-DOJ-26429338

**Table 11: General search queries shares for general search services providers on Windows Mobile and Google Android[857]**

General search queries shares on Windows Mobile
devices for largest EU countries

|  | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| AOL | [0-10]% | [0-10]% | [0-10]% | [0-10]% |
| Ask | [0-10]% | [0-10]% | [0-10]% | [0-10]% |
| Bing | [50-60]% | [60-70]% | [70-80]% | [80-90]% |
| Google | [40-50]% | [30-40]% | [20-30]% | [10-20]% |
| Yahoo | [0-10]% | [0-10]% | [0-10]% | [0-10]% |

General search queries shares on Google Android
devices for largest EU countries

|  | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| AOL | [0-10]% | [0-10]% | [0-10]% | [0-10]% |
| Ask | [0-10]% | [0-10]% | [0-10]% | [0-10]% |
| Bing | [0-10]% | [0-10]% | [0-10]% | [0-10]% |
| Google | [90-100]% | [90-100]% | [90-100]% | [90-100]% |
| Yahoo | [0-10]% | [0-10]% | [0-10]% | [0-10]% |

(794)    In the third place, data provided by Google on worldwide revenues per apps and services included in the GMS suite, summarised in Table 12, indicates that it obtains significantly higher revenues with its general search app on Google Android devices, where its general search app was pre-installed, than on iOS devices where its general search app was not pre-installed. According to that data, Google's worldwide revenues with its general search app on Google Android devices were […]% higher in 2014, […]% higher in 2015 and […]% higher in 2016 than with its general search app on iOS devices. This difference cannot be explained by the fact that the search volume on Google Android devices is higher than on iOS devices, given that Google's total revenues on Android devices were only […]% higher in 2014, […]% higher in 2015 and […]% higher in 2016 than on iOS devices.

---

[857]    Source: […] data provided by Microsoft in response to Question 13 of the request for information of 10 April 2017 (Annexes 5 and 5A) (Doc IDs 8101 and 8102). For 2017, the data concerns only the first two months. The data included in the tables covers France, Germany, Italy, Spain and the United Kingdom and relates to smartphone and tablets.

**EN**

**EN**

GOOG-DOJ-26429339

**Table 12: Google's worldwide revenues with the Google Search app and other GMS services on Google Android and iOS devices (million EUR)[858]**

| Revenues from apps | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|
| | Google Android | iOS | Google Android | iOS | Google Android | iOS |
| **Google Search app revenues** | [...] | [...] | [...] | [...] | [...] | [...] |
| **Total search revenues** | [...] | [...] | [...] | [...] | [...] | [...] |
| **Total GMS apps and services revenues** | [...] | [...] | [...] | [...] | [...] | [...] |

(795)   Fifth, the importance of pre-installation as a channel for the distribution of general search services on smart mobile devices is not affected by Google's claims that:

(1)   pre-installation on Google Android devices cannot be regarded as an important channel for the distribution of general search services on smart mobile devices because, between 2013 and 2015, queries on Google Search conducted on Google Android devices only accounted for [10-20]% to [20-30]% of the total number of queries on Google Search in the EEA;[859]

(2)   the Commission should disregard all third party responses to requests for information cited in recitals (787) to (789) that were not accompanied by any internal data or empirical studies;[860]

(3)   some of the third party responses to requests for information cited in recitals (787) to (789) are incomplete, incorrect or irrelevant;[861]

(4)   the studies and data described in recitals (790) to (794) are unreliable, based on flawed methodology and fail to include data related to general searches via browsers;[862] and

(5)   Google Search's high usage share on PCs demonstrates that pre-installation under the MADA is not a cause for its higher shares on Android compared to non-Android devices.[863]

(796)   In the first place, the fact that Google Android devices accounted for [10-20]% to [20-30]% of general search queries on Google Search in the EEA between 2013 and 2015 confirms the importance of pre-installation as a channel for the distribution of general search services on smart mobile devices. This is because:

---

[858]   Source: Google's response to Questions 1 to 5 of the request for information of 24 March 2017, Appendix A (Doc ID 7955).

[859]   Google's Response to the Statement of Objections, Part Four, pages 184-185, paragraph 73 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 63, paragraph 8 (Doc ID 8598).

[860]   Google's Response to the First Letter of Facts, Part Three, page 67, paragraphs 18-19; page 68, paragraphs 20, and 22; page 74, paragraph 29; page 75, paragraph 30; page 78, paragraph 42 (Doc ID 8598).

[861]   Google's Response to the First Letter of Facts, Executive Summary, pages ix-x; Part Three, page 67, paragraph 18; Part Three, page 68, paragraphs 21-23 (Doc ID 8598).

[862]   Google's Response to the First Letter of Facts, Part Three, pages 69-73, paragraphs 24-26; see also Google's Response to the Statement of Objections, Part Four, page 187-192, paragraphs 77-89 (Doc ID 7117).

[863]   Google's Response to the First Letter of Facts, Part Three, page 72, paragraph 25 (Doc ID 8598).

**EN**                                      177                                      **EN**

(1)   in almost all national markets for general search services in the EEA, [10-20]% to [20-30]% of general search queries on Google Search was equivalent to [1-6] times more than the combined [5-10]% of queries that all competing general search services achieved in 2016 in total across all platforms. Moreover, consistent with the significant growth in the number of general searches via smart mobile devices (see recital (777)), in 2016, Google Android devices accounted for [20-30]% of general search queries on Google Search in the EEA.[864]

(2)   the vast majority of the remaining [70-80]% to [80-90]% of general search queries on Google Search in the EEA were from browsers on iOS, Google Chrome on PCs, and other browsers on PCs. On all of these browsers, Google Search was set as default:

(a)   approximately [10-20]% to [20-30]% of Google Search queries carried out in the EEA in 2013-2016 were from iOS devices[865] and Google Search was set as default on the Safari browser on each smart mobile device sold by Apple (see Section 6.2.1);[866]

(b)   approximately [20-30]% to [20-30]% of Google Search queries carried out in the EEA in 2013-2016 were from Google Chrome on PCs[867] and OEMs of PCs were required to set Google Search as the default general search service in Google Chrome;[868] and

(c)   approximately [10-20]% to [20-30]% of Google Search queries carried out in the EEA in 2013-2016 were from other PC web browsers, such as Safari, Opera and Firefox and, with the exception of Microsoft's Internet Explorer/Edge, all major PC web browsers were required to set Google Search as the default general search service on their PC web browsers.[869]

(3)   general search queries via smart mobile devices are a particular source of valuable location data (see recital (114)) that allows general search services to

---

[864]   Google's response to Question 14 of the request for information of 24 March 2017 (Doc ID 7894-5).

[865]   Source: Google's response to Question 14 of the request for information of 24 March 2017 (Doc ID 7894-5).

[866]   Apple's non-confidential response to Question 16 of the request for information of 17 July 2014 (Doc ID 1453).

[867]   This figure is obtained by multiplying, for each year during the period 2013-2016, the usage share of the browser Google Chrome on PCs in the EEA (source: StatCounter data for 2013-2016, downloaded on 22 May 2017, http://gs.statcounter.com/) by the percentage of Google general search queries on PCs in the EEA (source: Google's response to Question 14 of the request for information of 24 March 2017, Doc ID 7894-5).This assumes that, generally, searches are done via the general search services pre-set on the web browser and Chrome's usage share for PC web browsers corresponds to the number of search queries via Google Chrome for PC (e.g. for 2016, the estimated percentage of Google general search queries on PCs that were conducted via Google Chrome would be [50-60]%, which corresponds to the usage share of Chrome on PC web browsers in 2016).

[868]   See Google's response to Question 13 of the request for information of 24 March 2017 (Doc ID 7790).

[869]   This figure is obtained by multiplying, for each year of the period 2013-2016, the usage share of the browsers Safari, Opera and Firefox on PCs in the EEA (source: StatCounter data for 2013-2016, downloaded on 22 May 2017, http://gs.statcounter.com/) by the percentage of Google general search queries on PCs in the EEA (source: Google's response to Question 14 of the request for information of 24 March 2017, Doc ID 7894-5). As with Google Chrome, this assumes that, generally, searches are done via the general search services pre-set on the web browser and the web browser's usage share for PC corresponds to number of search queries on a given PC web browser.

**EN**                                          178                                          **EN**

GOOG-DOJ-26429341

improve their general search and search advertising results (see recitals (687) to (691) and (693) to (697)).

(797)   In the second place, the third party responses to requests for information cited in recitals (787) to (789) are consistent with a body of evidence of high probative value including internal Google documents and confirm that pre-installation can increase significantly on a lasting basis the usage of the service provided by the Google Search app.

(798)   In the third place, Google's criticisms of certain third party responses to requests for information cited in recitals (787) to (789) are misleading or incorrect:

(1)   Google is wrong to claim that Amazon did not provide any data to support its response to Question 35 of the request for information.[870] While Google quotes Amazon's statement that "[it] *does not have any available data on the extent to which users download mobile applications that compete with mobile applications pre-installed on devices*," that statement continues with "[...] *except the information provided in response to Questions 36 to 39 below in relation to pre-installed applications with premium placement or default settings*".

(2)   Google is wrong to claim that the fact that Qwant indicated that both pre-installation and being set as default would likely significantly increase traffic indicates that pre-installation is not an important channel for the distribution of general search services on smart mobile devices.[871] Rather, Qwant's response confirms that pre-installation, like being set as default, is one important channel for the distribution of general search services on smart mobile devices. Indeed, as explained in more detail in recital (818) and Section 6.3.3, Google sets Google Search as default on Google Chrome and has entered into agreements with OEMs and MNO to ensure that Google Search was the only pre-installed general search service and set as default on any pre-installed third party mobile web browsers.

(3)   Google is wrong to claim that Microsoft's pre-installation deal with Verizon indicates that pre-installation is not an important channel for the distribution of general search services on smart mobile devices.[872] As explained in recital (789)(8), the traffic resulting from Microsoft's agreement with Verizon covering only six phones accounted for [15-25]% of the entire volume of mobile general search queries to Bing in the US. During the two years of the agreement for these six phones, Bing's share of search queries on smart mobile devices in the US market grew from almost zero in 2009 to approximately 1.5% in December 2011.[873]

(4)   Google is wrong to claim that the analysis submitted by Yandex, part of which is contained in Figure 18 in recital (789)(5), indicates that pre-installation is not an important channel for the distribution of general search services on smart

---

[870]   Google's Response to the First Letter of Facts, Part Three, page 67, paragraph 18 (Doc ID 8598), referring to Doc ID 3612.

[871]   Google's Response to the First Letter of Facts, Part Three, page 68, paragraphs 21-22 (Doc ID 8598).

[872]   Google's Response to the First Letter of Facts, Part Three, page 68, paragraph 23 (Doc ID 8598).

[873]   Source: StatCounter data for 2009-2011, downloaded on 22 May 2017, http://gs.statcounter.com/.

**EN**

**EN**

GOOG-DOJ-26429342

mobile devices.[874] The analysis confirms the importance of pre-installation for the amount of traffic achievable by a general search service, notwithstanding the facts that: (i) Yandex may enjoy stronger brand recognition in Russia than in the EEA, (ii) the analysis is based on a comparison of 20-30 OEMs/OSs/models, the majority of which appear only in one pre-installation/default condition, and (iii) it uses a simple average. This is for the following reasons:

(a)   while the analysis is based on information from Russia, it provides a more general insight into the impact of pre-installation on the usage of a well-established general search service (see further recital (814)(3)). The analysis indicates that pre-installation had an impact on Yandex's share of general search queries, even when the comparison across different pre-installation/default conditions is confined to the same OS, or even within the same model;[875] and

(b)   the fact that the analysis is based on a simple average, by which all entries are given equal weight in the calculation, does not in itself make it biased, not representative or not relevant.

(799)   In the fourth place, Google's criticisms, and claims regarding, the studies and data described in recitals (791) to (793) are misleading or incorrect:

(1)   Regarding Google's criticism[876] that the FairSearch study cited in recitals (791) and (792) fails to take into account the importance of general search queries from web browsers, the importance of such queries does not alter the fact that pre-installation is an important channel for the distribution of general search services on smart mobile devices. According to data submitted by Google,[877] pre-installation of the Google Search app is the single most important search entry point for general search queries on GMS devices accounting for [40-50]% of all searches in 2016.

(2)   Moreover, Google Search is set as default for all queries not only on Google Chrome but also other major mobile web browsers, including the Safari browser on iOS.

(3)   Regarding Google's claim[878] that the […] data cited in recital (793) is contradicted by general search query estimates from the web usage statistics provider NetMarketShare indicating that there is no material difference between Google's share of general search queries on Android devices where the Google Search app is pre-installed and on Windows Mobile devices where the Google Search app is not pre-installed, the NetMarketShare estimates are

---

[874]   Google's Response to the Statement of Objections, Part Four, page 211, paragraph 127 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, pages 65-66, paragraph 17 (Doc ID 8598).

[875]   See non-confidential version of Yandex's data submission of 24 November 2015 "*Additional data on slides 20 and 25 (CRA Draft 2015-11-23).xlsx*" with respect to the data underlying slide 20 of Yandex's presentation of 5 November 2015 (Doc ID 8193), access to the confidential data was given via data room from 30 August to 2 September 2016.

[876]   Google's Response to the First Letter of Facts, Part Three, page 69-70, paragraph 24 (Doc ID 8598).

[877]   Source: Google's response to Question 11 of the request for information of 24 March 2017 (Doc ID 7894-4).

[878]   Google's Response to the Statement of Objections, Part Four, page 211, paragraph 127 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Three, page 71-72, paragraph 25 (Doc ID 8598).

**EN**                                    180                                    **EN**

GOOG-DOJ-26429343

contradicted by actual internal search user data for 2015 and 2016 provided by Microsoft and Google.[879] That data confirms that Google's share of general search queries on Android devices, where the Google Search app is pre-installed, is significantly higher than on Windows Mobile devices, where the Google Search app is not pre-installed. Moreover, given that Google has not submitted the data underlying the NetMarketShare estimates, the Commission cannot verify the veracity of these figures and whether they might be the result of a calculation error – similar to that for the download figures for the Google Search app on Windows Mobile submitted by Google.[880]

(800)    In the fifth place, Google is wrong to claim[881] that Google Search's high usage share on PCs demonstrates that pre-installation under the MADA is not a cause for its higher usage shares on Android compared to non-Android devices. As the share figures in Table 2 and Figure 20 indicate, Google's share of general search queries is consistently higher on smart mobile devices than on PC.

*III.    It is impossible to uninstall the Google Search app on GMS devices*

(801)    Only Google, but not OEMs and MNOs, can uninstall the Google Search app on GMS devices. The most that a competing general search service can, therefore, achieve on a GMS device is that its general search app is pre-installed side-by-side with the Google Search app.

(802)    While Google does not contest this fact, it claims that this irrelevant because users can download one or more competing general search apps on their GMS devices and/or set another general search service than Google as default.[882]

(803)    As explained in Section 11.3.4.1.II, a significant number of users will not, however, download any competing general search app but rather use the general search app which is pre-installed on their GMS devices, Google Search. For example, on Windows Mobile devices –where Google's general search service is neither pre-installed nor set as default – Bing accounted for [50-60]% to [80-90]% of general search queries in 2014-2017 (see recital (793)).

*IV.    Competing general search services cannot offset the competitive advantage that Google ensures for itself through tying*

(804)    The competitive advantage that Google ensures for itself cannot be offset by competing general search services using alternative distribution channels, such as downloads or agreements with developers of mobile web browsers whereby the competing general search service would be set as default in the URL line, the

---

[879]    Annex 1 to Microsoft's response to the request for information of 10 April 2017 accessible to Google in the data room and Appendix C to Google's response to the request for information of 24 March 2017 (Doc ID 7894-5). The Commission's calculations of general search query shares for Bing based on Microsoft and Google's data are conservative and favourable to Google. This is because when calculating query shares on Windows Mobile devices, with respect to searches via Bing, the Commission has attributed queries on Windows Mobile devices only to Bing. By contrast, with respect to Google Search, the Commission has attributed queries on all smart mobile devices other than Android to Google Search (and, unlike for Bing, not only on Windows Mobile devices). This is because Google was not able to separately report search queries on Windows Mobile devices.

[880]    See footnote 901.

[881]    Google's Response to the First Letter of Facts, Part Three, page 72, paragraph 25 (Doc ID 8598).

[882]    Google's Response to the Statement of Objections, Part Four, page 209, paragraph 125 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 76, paragraph 36 (Doc ID 8598).

GOOG-DOJ-26429344

browser's home page or appear as a bookmark.[883]

> a)   *Downloads cannot offset the competitive advantage that Google ensures for itself*

(805)   Downloads of general search apps cannot be compared in reach and effectiveness to the pre-installation of the Google Search app on GMS devices. This is because, as explained in more detail in Section 11.3.4.1.II, users that find general search apps pre-installed on their GMS devices are, on average, less likely to download alternative general search apps, in particular when the pre-installed app already delivers the required functionality.

(806)   This is confirmed by the elements set out in recitals (807) to (816).

(807)   First, this is confirmed by a number of third-party respondents to requests for information:

> (1)   As explained by Yahoo, "[p]*re-installation significantly influences adoption and application use, because most users do not uninstall pre-loaded software or replace a pre-loaded choice with a competing application*"[884] and "[o]*nly a small percentage of users download applications that compete with the preinstalled choices.*"[885]

> (2)   As explained by Yandex, "[…] *download levels of mobile applications that are competing with preinstalled mobile applications tend to be low if the pre-installed service is of comparable or even (insubstantially) worse quality.*"[886]

> (3)   As explained by AOL, "*Users are more likely to make use of a pre-installed mobile application for email services, which is subject to premium placement, than to search out and separately download a competing mobile application that provides the same service, features or functionality.*"[887]

> (4)   As explained by Nokia, "[…] *when a competing application is already pre-installed on the device, it makes it even less likely that the consumer will seek out an alternative application on an app store, and makes it far less likely that the consumer will use competing apps unless there is a compelling reason to do so*"[888] and "[a]*lthough end-users may technically be able to download competing online services from Google Play or another app store or website,*

---

[883]   Bookmarks are shortcuts to websites which can be set by the web browser vendor and later modified by users.

[884]   Yahoo's non-confidential response to Question 35 of the request for information of 12 June 2013 to app developers (Doc ID 789).

[885]   Yahoo's non-confidential response to Question 35.1 of the request for information of 12 June 2013 to app developers (Doc ID 789).

[886]   Yandex's non-confidential response to Question 35.1 of the request for information of 12 June 2013 to app developers (Doc ID 4601). Contrary to Google's Response to the First Letter of Facts, Part Three, page 78, paragraph 42 (Doc ID 8598), the incidence when Apple decided to pre-install Apple Maps in lieu of Google Maps on iOS devices does not contradict this statement because, despite being regarded as clearly inferior at the time, users continued to use the pre-installed Apple Maps in large numbers, as explained in more detail in recital (931).

[887]   AOL's non-confidential response to Question 29 of the request for information of 17 June 2015 to developers of e-mail applications (Doc ID 2088).

[888]   Nokia's non-confidential response to Question 35 of the request for information of 12 June 2013 to OEMs (Doc ID 763).

**EN**

**EN**

GOOG-DOJ-26429345

*in practice very few do.*"[889]

(808)    Second, this is confirmed by the fact that, overall, competing general search apps were downloaded on [0-5]% of the number of new devices sold during 2011-2016 on which the Google Search app was pre-installed.

**Table 13: Number of downloads of competing general search apps worldwide from the Play Store in 2011-2016[890] (in thousands)**

| General search apps | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Naver | […] | […] | […] | […] | […] | […] |
| Nate | […] | […] | […] | […] | […] | […] |
| Daum | […] | […] | […] | […] | […] | […] |
| Yandex | […] | […] | […] | […] | […] | […] |
| Bing Search | […] | […] | […] | […] | […] | […] |
| DuckDuckGo | […] | […] | […] | […] | […] | […] |
| Yahoo Search | […] | […] | […] | […] | […] | […] |
| Seznam | […] | […] | […] | […] | […] | […] |
| Others | […] | […] | […] | […] | […] | […] |
| **Total number of downloads of competing general search apps** | […] | […] | […] | […] | […] | […] |
| **Total number of Google Search pre-installations[891]** | 215.092 | 379.425 | 594.272 | 808.200 | 916.293 | 917.909 |
| **Total as % of Google Search pre-installations** | [0-5]% | [5-10]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |

(809)    Many of the downloads in Table 13 are of general search apps by Naver, Nate and Daum, which are active almost exclusively in the Republic of Korea. If only the EEA is considered, the number of downloads of competing general search apps is considerably smaller, also in relative terms (see Table 14). Overall, competing general search apps were downloaded on [0-5]% of all GMS devices in the EEA during the period 2011-2016.

---

[889]    Nokia's non-confidential response to Question 35.1 of the request for information of 12 June 2013 to OEMs (Doc ID 763).

[890]    Source: Annex Q7 to Google's response to Question 7 of the request for information of 24 March 2017 (Doc ID 7894-2) and […] data (Doc ID 7866 and 7867).

[891]    The total number of Google Search pre-installations corresponds to the number of GMS devices, i.e., Google Android devices outside China. See footnotes 436 and 440.

**EN**

**EN**

GOOG-DOJ-26429346

**Table 14: Number of downloads of competing general search apps in the EEA from the Play Store in 2011-2016[892] (in thousands)**

| General search apps | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Naver | [...] | [...] | [...] | [...] | [...] | [...] |
| Nate | [...] | [...] | [...] | [...] | [...] | [...] |
| Daum | [...] | [...] | [...] | [...] | [...] | [...] |
| Yandex | [...] | [...] | [...] | [...] | [...] | [...] |
| Bing Search | [...] | [...] | [...] | [...] | [...] | [...] |
| DuckDuckGo | [...] | [...] | [...] | [...] | [...] | [...] |
| Yahoo Search | [...] | [...] | [...] | [...] | [...] | [...] |
| Seznam | [...] | [...] | [...] | [...] | [...] | [...] |
| Others | [...] | [...] | [...] | [...] | [...] | [...] |
| **Total number of downloads of competing general search apps** | [...] | [...] | [...] | [...] | [...] | [...] |
| **Total number of Google Search pre-installations[893]** | 59.928 | 119.762 | 174.217 | 196.349 | 203.740 | 197.375 |
| **Total as % of Google Search pre-installations** | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |

(810)    The annual number of downloads of competing general search apps from the Play Store in each EEA country was minimal, with the exception of the Czech Republic (see Table 15).

**Table 15: Number of annual downloads of competing general search apps per Member State from the Play Store, 2011-2016[894]**

| Country in the EEA | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Austria | [...] | [...] | [...] | [...] | [...] | [...] |
| Belgium | [...] | [...] | [...] | [...] | [...] | [...] |
| Bulgaria | [...] | [...] | [...] | [...] | [...] | [...] |

---

[892]    Source: Annex Q7 to Google's response to Question 7 of the request for information of 24 March 2017 (Doc ID 7894-2) and [...] data (Doc ID 7866 and 7867).

[893]    The total number of Google Search pre-installations corresponds to the number of Google Android devices in the EEA because practically all Google Android devices are sold with GMS, as explained in footnote 436. The percentages may be slightly under-estimated given that the download figures regard the EEA and not Europe.

[894]    Annex Q7 to Google's response to Question 7 of the request for information of 24 March 2017 (Doc ID 7894-2).

**EN**

**EN**

GOOG-DOJ-26429347

| | | | | | | |
|---|---|---|---|---|---|---|
| Croatia | [...] | [...] | [...] | [...] | [...] | [...] |
| Cyprus | [...] | [...] | [...] | [...] | [...] | [...] |
| Czech Republic | [...] | [...] | [...] | [...] | [...] | [...] |
| Denmark | [...] | [...] | [...] | [...] | [...] | [...] |
| Estonia | [...] | [...] | [...] | [...] | [...] | [...] |
| Finland | [...] | [...] | [...] | [...] | [...] | [...] |
| France | [...] | [...] | [...] | [...] | [...] | [...] |
| Germany | [...] | [...] | [...] | [...] | [...] | [...] |
| Greece | [...] | [...] | [...] | [...] | [...] | [...] |
| Hungary | [...] | [...] | [...] | [...] | [...] | [...] |
| Iceland | [...] | [...] | [...] | [...] | [...] | [...] |
| Ireland | [...] | [...] | [...] | [...] | [...] | [...] |
| Italy | [...] | [...] | [...] | [...] | [...] | [...] |
| Latvia | [...] | [...] | [...] | [...] | [...] | [...] |
| Lichtenstein | [...] | [...] | [...] | [...] | [...] | [...] |
| Lithuania | [...] | [...] | [...] | [...] | [...] | [...] |
| Luxembourg | [...] | [...] | [...] | [...] | [...] | [...] |
| Malta | [...] | [...] | [...] | [...] | [...] | [...] |
| The Netherlands | [...] | [...] | [...] | [...] | [...] | [...] |
| Norway | [...] | [...] | [...] | [...] | [...] | [...] |
| Poland | [...] | [...] | [...] | [...] | [...] | [...] |
| Portugal | [...] | [...] | [...] | [...] | [...] | [...] |
| Romania | [...] | [...] | [...] | [...] | [...] | [...] |
| Slovakia | [...] | [...] | [...] | [...] | [...] | [...] |
| Slovenia | [...] | [...] | [...] | [...] | [...] | [...] |
| Spain | [...] | [...] | [...] | [...] | [...] | [...] |
| Sweden | [...] | [...] | [...] | [...] | [...] | [...] |
| United Kingdom | [...] | [...] | [...] | [...] | [...] | [...] |

(811)     Third, the Commission's conclusion that downloads of general search apps cannot be

**EN**                                    185                                    **EN**

GOOG-DOJ-26429348

compared in reach and effectiveness to the pre-installation of the Google Search app on GMS devices is not affected by Google's claims that:

(1)    the Play Store allows for the downloading of apps (including of general search apps) for free and in an easy and convenient way;[895]

(2)    consumer communication and social networking apps such as WhatsApp, Facebook and Instagram have been successful on Android and not been impeded by the pre-installation of competing GMS apps such as Google Hangout, Google Photos and Google+;[896]

(3)    downloads of competing general search apps can offset any advantage that Google derives from the pre-installation of the Google Search app;[897] and

(4)    the low download figures of competing general search apps in the EEA "*can only be plausibly explained*" by user preferences for Google Search and are not the result of the pre-installation requirement under the MADA. This is confirmed by the high daily download figures of the Google Search app and corresponding low download figures for competing general search apps, including Seznam, Naver and Yandex on iOS devices in France, Germany and the UK.[898]

(812)    In the first place, even though the Play Store allows for the downloading of apps (including of general search apps) for free and in an easy and convenient way, this does not alter the fact that competing general search services must expend resources to compete against Google, the dominant general search service with strong brand recognition (see recital (712)). As a result of the MADA, they also need to overcome the *status quo* bias that Google creates through pre-installation of its general search app and convince users that their service is significantly better (see recitals (781) to (782)). Moreover, certain users still remain reluctant to download apps.[899]

(813)    In the second place, unlike competing general search services, developers of competing consumer communication and social networking apps can offset the competitive advantage that Google ensures for itself by the pre-installation of competing GMS apps, such as Google Hangout, Google Photos and Google+. This is because users need to download the consumer communication and social networking apps that are used by their friends or other contacts because otherwise they cannot communicate with them. This is not the case for general search apps.

(814)    In the third place, download figures of general search apps on non-Android smart mobile devices and in geographic areas in which competing local general search services achieve more than a negligible share of queries (the Czech Republic, the

---

[895]    Google's Response to the Statement of Objections, Part Four, pages 192-193, paragraphs 90-93 (Doc ID 7117); Google's letter of 27 June 2018, page 4 (Doc ID 8949).

[896]    Google's Response to the Statement of Objections, Part Four, pages 197-198, paragraphs 99-100 (Doc ID 7117); Google's letter of 25 January 2017 (Doc ID 7135); and Google's Response to the First Letter of Facts, Part Three, page 79, paragraph 43 (Doc ID 8598).

[897]    Google's Response to the Statement of Objections, Part Four, pages 201-202, paragraphs 109-111 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 74, paragraph 28 and pages 77-78, paragraphs 40-41 (Doc ID 8598).

[898]    Google's Response to the Statement of Objections, Part Four, pages 205-206, paragraphs 115-116 and also pages 198-199, paragraphs 101-102 (Doc ID 7117).

[899]    See recital (923) and the evidence referred to therein.

GOOG-DOJ-26429349

Republic of Korea and Russia[900] confirm that the downloading of general search apps is incapable of offsetting the advantage that Google derives from pre-installation:

(1) in the month of February 2016, 17% of users of iOS devices in the United Kingdom had used their downloaded Google Search app, whereas 76% users of Google Android devices had used the pre-installed Google Search app installed (see recital (791));

(2) between 2013 and 2016, on average [10-20]% of worldwide users of Windows Mobile devices had downloaded the Google Search app;[901]

(3) In Russia and the Republic of Korea, Google faces incumbents, Yandex and Naver, whose general search algorithms are built around the Russian and Korean languages, respectively. This allowed them to become market leaders and to develop strong brands for general search on PCs before Google.[902] However, in these countries, Google's share of general search queries is also higher on smart mobile devices where it benefits from the importance of pre-installation than on PCs. According to 2016 StatCounter data: (i) in Russia, Google's share of general search queries on PCs was 47% and Yandex's share was 46% while on smart mobile devices Google's share was 65% and Yandex's share was 32%; and (ii) in the Republic of Korea, Google's share of general search queries on PCs was 66% and Naver's share was 24%, while on smart mobile devices Google's share was 71% and Naver's share was 27%.[903]

(4) The situation is similar in the Czech Republic where Google faces the incumbent Seznam, whose general search algorithms are built around the Czech language. Google's share of general search is higher on smart mobile devices where it benefits from the importance of pre-installation than on PCs. During the period 2009 to 2016, Google's share of general search queries was between 53% and 80% on PCs, 82% and 98% on smartphones, and 77% and

[900] Google's Response to the Statement of Objections, Part Four, page 200, paragraph 107 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 80, paragraph 43 (Doc ID 8598).

[901] Source: Microsoft's response to Question 10 and Annex 4 of the request for information of 10 April 2017 (Doc ID 8103) and […] data (Doc ID 7866 and 7867). In its Response to the First Letter of Facts, Part Three, pages 81-82, paragraph 47 (Doc ID 8598), Google wrongly claims that in 2016, [90-100]% of all users of Windows Mobile devices had downloaded the Google Search app. Google's claim is based on a calculation error: while Google based its calculations on download figures of the Google Search app on all smart mobile devices, as regards the device sales figures, it did not take the figure for all devices but excluded Windows Mobile tablets. When the sales of tablets are included, the result of the calculation is that in 2016, [20-30]% of all users of all Windows Mobile devices had downloaded the Google Search app.

[902] For an overview, see, e.g., Alesia Krush, "Google Vs. Naver: Why Can't Google Dominate Search in the Republic of Korea", available at https://www.link-assistant.com/blog/google-vs-naver-why-cant-google-dominate-search-in-korea/, printed and saved on 13 June 2017; Clay Dillow, "Yandex searches past its language barrier," (13 November 2013), available at http://fortune.com/2013/11/13/yandex-searches-past-its-language-barrier/, printed and saved on 13 June 2017.

[903] Source: StatCounter data for 2016, downloaded on 22 May 2017, http://gs.statcounter.com/. While Google claims that StatCounter for the Republic of Korea is unreliable and provided figures that show higher shares for Naver (Google's Response to the Statement of Objections, Part Four, page 221, footnote 740 (Doc ID 7117)), it did not challenge the fact that Google's share is higher on mobile devices than on PC.

**EN** **EN**

GOOG-DOJ-26429350

85% on tablets.[904]

(815)   In the fourth place, if user preferences were the only plausible explanation for the low download figures of competing general search apps on Google Android users should download the Google Search app and/or use Google Search on devices where Google Search is not pre-installed and/or set as default. However, as indicated in recital (793), Google's share of general search queries is lower on Windows Mobile devices where the Google Search app is not pre-installed (or Google Search set as the default search engine on the native browser), than on Google Android where the Google Search app is pre-installed.

(816)   Moreover, the allegedly high daily download figures of the Google Search app and low download figures for competing general search apps on iOS devices in France, Germany and the United Kingdom do not contradict the Commission's finding on the importance of pre-installation:

   (1)   Pre-installation does not play any role on iOS devices because no general search app is pre-installed on such devices.[905] Rather, users have to download all general search apps (see recital (791)).

   (2)   Less than 20% of users of iOS and Windows Mobile devices have downloaded the Google Search app (see recitals (791) and (814)(1)).

   (3)   The download figures for the general search apps of Seznam, Naver and Yandex in France, Germany and the UK are not meaningful. As explained in recital (814)(3), the strength of the algorithms of these competing search services are built around the Czech, Korean and Russian languages, respectively and the number of people in France, Germany and the UK that are regularly looking for content in Czech, Korean or Russian and thus might consider downloading the general search apps of Seznam, Naver or Yandex can be assumed to be limited.

   *b)   Agreements with mobile web browser developers cannot offset the competitive advantage that Google ensures for itself*

(817)   Agreements with developers of mobile web browsers cannot be compared in reach and effectiveness to the pre-installation of the Google Search app on GMS devices. This is for reasons described in recitals (818) to (822).

(818)   First, in March 2017, Chrome held a usage share of approximately 75% of non OS-specific mobile web browsers in Europe and 58% worldwide (and thus even higher on Google Android devices).[906] Google does not, however, allow any other general search service than Google Search to be set as default on Chrome.[907]

(819)   Second, as explained in Section 11.4.4.1, by tying Google Chrome to the Play Store and the Google Search app, Google ensures an advantage for Google Chrome that competing mobile web browsers cannot offset.

---

[904]   Source: StatCounter data for 2009-2016, downloaded on 22 May 2017, http://gs.statcounter.com/.
[905]   Google Search has, however, been the default general search service on all of Apple's smart mobile devices since 2007. See recitals (119) and (796).
[906]   Source: StatCounter data for 2017, downloaded on 22 May 2017, http://gs.statcounter.com/.
[907]   See non-confidential responses to the request for information […] ([…]; […]; […]); Google's response to Question 13 of the request for information of 24 March 2017 (Doc ID 7790).

GOOG-DOJ-26429351

(820)   Third, as explained in Section 11.3.4.2, several OEMs understood that the MADAs required them to set Google Search as the default general search service on pre-installed mobile web browsers.

(821)   Moreover, even if the MADAs did not require OEMs to set Google Search as default on their pre-installed mobile web browser, Google Search would still be set as default on Google Chrome (see recital (818)).

(822)   In addition, between 2011 and 2016, Google's had revenue share agreements with OEMs and MNOs covering between [50-60]% and [80-90]%[908] of all Google Android devices sold in the EEA pursuant to which the OEMs and MNOs were required to set Google Search as the default general search service for all pre-installed mobile web browsers on their GMS devices.

> c)   *Pre-installation agreements with OEMs and MNOs cannot offset the competitive advantage that Google ensures for itself*

(823)   Contrary to what Google claims,[909] pre-installation agreements with OEMs and MNOs cannot be compared in reach and effectiveness to the pre-installation of the Google Search app on GMS devices. This is for the reasons described in recitals (824) to (834).

(824)   First, OEMs are unlikely to pre-install an additional general search app to the mandatory Google Search app. OEMs need to balance the potential upside with the potential downside. In particular, they need to balance the potential revenues that they would get from installing an additional general search app to the Google Search app with the cost of the transaction and other costs related to factors such as user experience and support. That balance generally weighs against OEMs deciding to pre-install an additional general search app to Google's. This is for the reasons described in recitals (825) to (829).

(825)   In the first place, the share of potential revenues that OEM would get from one or more additional general search app services would be low, given that Google has enjoyed shares in most national markets of 90% and as explained at recital (796), Google would still be set as default on the other major entry points, in particular web browsers.

(826)   In the second place, OEMs would have to incur transaction costs when entering into pre-installation agreements with other general search services and such costs are unlikely to be justified for a small volume of devices. Google itself recognised the existence of such transaction costs when contemplating a revenue share agreement with [OEM] regarding Android Market, the predecessor of the Play Store.[910]

---

[908]   As explained in more detail in footnote 1314: (i) in 2011 and 2012, respectively, nearly [70-80]% and [80-90]% of Google Android devices sold in the EEA were covered by revenue share agreements with Google; (ii) in 2013 and 2014, respectively, [70-80]% and [60-70]% of Google Android devices sold in the EEA were covered by revenue share agreements with Google; and (iii) in 2015 and 2016, respectively, [60-70]% and [50-60]% of all Google Android devices sold in the EEA were covered by revenue share agreements with Google. Source: [...] data (Doc IDs 3098, 4632, 4633 and 4710).

[909]   Google's Response to the Statement of Objections, Part Four, page 183, paragraphs 69-70 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 76, paragraph 36 (Doc ID 8598); Google's letter of 27 June 2018, pages 2 and 4 (Doc ID 8949).

[910]   See email from [Google Executive], to [Google Executive], of 9 April 2012 (Doc ID 1373-2125), quoted and explained further in recital (1222)(2).

**EN**

**EN**

GOOG-DOJ-26429352

(827)   In the third place, given that the MADA requires OEMs to take a bundle of 12-30 apps, OEMs would have to be mindful which of Google's mandatory GMS apps to duplicate (if any). This is because the duplication of too many apps can negatively impact user experience, for instance, because users will be repeatedly prompted to make decisions about which app to use or set as default. For example, [OEM] decided in 2014 to stop pre-installing certain apps ([…]) that duplicated mandatory Google apps, after Google rejected its request to limit the number of mandatory Google apps and exclude from the GMS.[911]

(828)   Google itself recognised that the duplication of too many Google mandatory apps could be considered as "bloatware" and negatively impact user experience.

(1)   In an internal Google email dated 10 January 2012, [Google Executive], explained that "*Given the extensive user dissatisfaction with "bloatware" on devices, we need to be very cautious about what we allow OEMs to preload;*"[912]

(2)   In an email of 18 April 2014, [Google Executive], wrote to [OEM] that having the [OEM] widget promoting application downloads from the [app store] rather than the Play Store "*would highlight duplication of services that we're all working so hard to avoid*".[913]

(829)   In the fourth place, the duplication of too many mandatory Google apps can cause issues with the storage space of some devices. For example, Hutchison 3G has indicated that: "*An agreement to pre-install an app is often not concluded with a third party for any one or more of the following reasons (i) the OEM has rejected the request by the MNO because of lack of space in the system memory of the device model [...] The device system memory includes the Operating System (Android), the OEM apps, the GMS apps and the MNO apps (for branded or 3rd party preloads). When an OEM rejects a request to pre-install an app due to lack of space in the memory system, this will be a result of all of these features. In the last few years, the number of pre-installed OEM and GMS apps on Android devices has increased, and there is less opportunity for MNOs to customise devices with other pre-installed apps (third party or proprietary)*".[914]

(830)   Second, the MADA prevents OEMs from pre-installing exclusively a competing general search app on their Google Android devices. Exclusive pre-installation increases the value for competing general search app providers, not at least because it allows OEMs to offer competing general search service providers more than being pre-installed side-by-side with Google, the market leader with shares in excess of 90% and strong brand recognition (see recital (712)). As Yandex pointed out, while "*pre-installation alongside Google would be of some benefit to an alternative general search provider such as Yandex […] given the importance of default status*

---

[911]   See the discussion between Google and [OEM] summarised in the e-mail from [Google Executive], to several of its colleague on 17 January 2014, submitted in response to the request for information of 11 July 2014 (Doc ID 1356-165) and [OEM]'s non-confidential response to Question 9 of the request for information of 31 July 2015 […].

[912]   See Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1347-829).

[913]   See non-confidential Annex […].

[914]   Hutchison 3G's non-confidential response to Question 23 of the request for information of 22 July 2014 (Doc ID 4283).

GOOG-DOJ-26429353

*and pre-installation on home screen, a level playing field will not be established unless there is a meaningful competition for default status instead of Google.*"[915]

(831)   An OEM that accepts to pre-install exclusively a competing general search app on their Google Android devices can, however, no longer enter into a MADA because the Google Search app is one of the mandatory apps in the GMS bundle. Thus, in order to pre-install exclusively a competing general search app on its devices, an OEM would need to find a replacement for the Play Store, the dominant Android app store as well as for the remaining GMS bundle, including other leading Google apps, such as Google Chrome, Google Maps or YouTube.

(832)   Third, the MADA prevents MNOs from requesting that OEMs pre-install exclusively a competing general search app on Google Android devices. This is because nearly all OEMs have also entered into the MADA, pursuant to which the Google Search app must be pre-installed on the device.

(833)   Fourth, Google's revenue share agreements with OEMs and MNOs require the exclusive pre-installation of the Google Search app for [50-60]% to [80-90]%[916] of all Google Android devices in the EEA, which prevents Google's competitors from even being able to achieve for side-by-side pre-installation of their general search service app on Google Android devices (see Section 13.4.2.1).

(834)   Fifth, even Bing, Google Search's main competitor, has not been pre-installed on any Google Android device between 2011 and 2016, with the exception of one model of device released in the US in 2011 (see recital (789)(8)).[917]

V.   *Google's competitive advantage resulting from the tying and the inability of competing general search services to offset that advantage is consistent with the evolution of Google's shares of general search queries*

(835)   Google's competitive advantage resulting from the tying and the inability of competing general search services to offset that advantage is consistent with the evolution of Google's shares of general search queries.

(836)   Since at least 2011, Google's share of general search queries is higher on smart mobile devices than on PCs in all the countries in the EEA and the difference between PC and smart mobile devices increased in almost all national markets for general search services.[918] According to StatCounter data,[919] during the period 2009

---

[915]   Yandex's presentation of 5 November 2015 (Doc ID 4216).
[916]   With respect to the underlying figures for these coverage numbers, see footnote 908.
[917]   See Microsoft's non-confidential response to Question 10.1 of the request for information of 20 November 2015 to Search providers (Doc ID 4634). In 2017, Microsoft entered into a revenue share agreement with ZTE for the sale of certain Google Android devices worldwide, including the EEA. See Microsoft's non-confidential response to Question 4 of the request for information of 10 April 2017 (Doc ID 8095) and Google's Data Room Report of 4 October 2017, paragraph 14 (Doc ID 8610).
[918]   The only exceptions are the Czech Republic, Estonia, Malta, Romania and Slovenia, see StatCounter data for 2009-2016, downloaded on 22 May 2017, http://gs.statcounter.com/.
[919]   Source: StatCounter data for 2009-2017, downloaded on 22 May 2017, http://gs.statcounter.com/. StatCounter definition of Europe does not coincide with the Union or the EEA. In particular, it also includes Albania, Andorra, Belarus, Bosnia and Herzegovina, Macedonia, Moldova, Montenegro, Russia, Serbia, Switzerland, Turkey and Ukraine. However, the Commission concludes that this difference in scope is not substantial enough to significantly alter the meaning of the statistics.

GOOG-DOJ-26429354

to March 2017, Google's monthly share of general search queries in Europe[920] was consistently between 87% and 95% on PCs, 94% and 99% on smartphones and 90% and 98% on tablets.[921]

**Figure 20: Google's share of general search queries by type of device in Europe, (2009 - March 2017)[922]**



(837)   Moreover, Google's share of general search queries on Google Android devices does not seem to be explained by a substantial quality advantage of the Google Search app in the eyes of Android users. In the Play Store, as of April 2017: (i) the Google Search app had an average rating of 4.4 (5.8 million reviews); (ii) the Bing Search app of 4.3 (73 thousand reviews); (iii) the Yahoo Search app of 4.2 (28 thousand reviews); (iv) the Seznam app of 4.3 (39 thousand reviews) and (v) the Yandex app of 4.4 (219 thousand reviews).[923]

(838)   The Commission's conclusion that Google's competitive advantage resulting from the tying and the inability of competing general search services to offset that advantage is consistent with the evolution of shares of search queries is not affected by Google's claims that:

   (1)   shares of general search queries can change for several reasons and the StatCounter data does not prove that the pre-installation of the Google Search app on practically all Google Android devices is the cause of the increase of Google's share of general search queries on smart mobile devices;[924]

---

[920]   The situation in each EEA country was similar, with Google's monthly share of general search services for the period 2009-2016 oscillating between 86% and 99% on PCs, 94% and 100% on smartphones and 89% and 99% on tablets. The only exception was the Czech Republic where Google's share of general search services was between 53% and 80% on PCs, 81% and 99% on smartphones, and 77% and 85% on tablets. Source: StatCounter data for 2009-2016, downloaded on 22 May 2017, http://gs.statcounter.com/.

[921]   Source: StatCounter data for 2009-2017, downloaded on 22 May 2017, http://gs.statcounter.com/. Data on tablets is collected by StatCounter only as of 2012.

[922]   Source: StatCounter data for 2009-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.

[923]   See data retrieved on April 2017, available at https://play.google.com/store.

[924]   Google's Response to the Statement of Objections, Part Four, pages 220-221, paragraphs 146-148 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429355

(2)  Google's share of general search queries was at its highest on smart mobile devices in 2009;[925]

(3)  the StatCounter data actually confirms that the increase of Google's share of general search queries on smart mobile devices is not caused by the pre-installation of the Google Search app on all GMS devices since the data from January 2011 to December 2015 in Figure 20 indicates: (i) a continuous decrease in Google's share of queries on smart mobile devices; (ii) a parallel development of Google's share of general search queries on PCs and smart mobile devices; (iii) variations in Google's share of general search queries on smart mobile devices in different Member States; and (iv) Google's high market shares on PC show that " *user preference for Google Search over rivals*" and "*marketplace choice is decisive*", rather than the tying, is responsible for the increase of Google's share of general search queries on smart mobile devices;[926] and

(4)  the reason for the increase of Google's share of general search queries on smart mobile devices is Google Search's superior quality, as confirmed by other evidence in the Commission's file, including evidence submitted by Google, responses by third parties to requests for information, and results of surveys.[927]

(839)  First, the Commission is not required to demonstrate that the pre-installation of the Google Search app on practically all Google Android devices is the sole cause of the increase in Google's share of general search queries. In any event, this Decision demonstrates that the pre-installation of the Google Search app provides a significant competitive advantage that competing general search services cannot offset.

(840)  Second, Google's claim that its share of general search queries was at its highest on smart mobile devices in 2009 is misleading. In 2009, Google Android devices accounted only for 4.4% of all smart mobile devices sold on a worldwide base (excluding China).[928] By contrast, Google appears to have had revenue sharing agreements in place with major OEMs of smartphones and MNOs that ensured that Google was set as default on their devices,[929] and in particular on the Safari browser on Apple's iPhone, which accounted for a large part of general searches on mobile devices in 2009.[930]

(841)  Third, the StatCounter data does not confirm that the pre-installation of the Google Search app on practically all GMS devices had no impact on Google's share of

---

[925]  Google's Response to the First Letter of Facts, Part Three, page 84, paragraph 53 (Doc ID 8598),

[926]  Google's Response to the Statement of Objections, Part Four, pages 221-223, paragraphs 149-150 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Three, pages 82-83, paragraphs 50-53 (Doc ID 8598).

[927]  Google's Response to the Statement of Objections, Part Four, pages 223-226, paragraphs 151-158 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 84, paragraph 53 (Doc ID 8598).

[928]  Source: […] data (Doc IDs 7866 and 7867).

[929]  While the Commission did not explicitly investigate agreements prior to 2011, the Commission's file contains several earlier revenue share agreements or agreements that refer to such agreements with major OEMs and MNOs, see e.g. [revenue share partner] […], [revenue share partner] […], [revenue share partner] […], [revenue share partner] […], and [revenue share partner] […].

[930]  Ramu Nagappan, "Report: Google commands more than half of iPhone's Web traffic"(27 January 2010), available at http://www.macworld.com/article/1145926/google_iphone_traffic.html, printed and saved on 11 April 2016.

**EN**                                                        193                                                        **EN**

general search queries of smart mobile devices.

(842)   In the first place, Google's share of queries on smart mobile devices did not decrease continuously during the period between 2009 and March 2017:

(1)   Regarding smartphones, with one exception in the second half of 2009, Google's share in Figure 20 for smartphones moved in a narrow 2-3% bracket between approximately 95% and 98%. Moreover, since December 2015, Google's share of general search queries has remained stable at approximately 98%.

(2)   Regarding tablets (which accounted for more than 20% of all smart mobile devices in each of the years covered in Figure 20), Google's share decreased from approximately 98% in 2012 to approximately 90% in the second half of 2013, before increasing again to approximately 98% at the beginning of 2014. Since mid-2014, it has remained relatively stable at approximately 94%.

(843)   In the second place, Google's share of general search queries on PC and smart mobile devices has developed differently over time and differed by approximately 10% as of the beginning of 2017:

(1)   Regarding PCs, Google's share remained around 94% for the most part of the period between 2009 and the second half of 2012 before decreasing to approximately 88% during the period between the second half of 2013 and the beginning of 2017;

(2)   Regarding smartphones, see recital (842)(1); and

(3)   Regarding tablets (which accounted for more than 20% of all smart mobile devices in each of the years covered in Figure 20), see recital (842)(2).

(844)   In the third place, it is irrelevant that Google's share of general search queries on smart mobile devices varies in different Member States. Such variations reflect the fact that search markets are national in scope and the competitive situation differs somewhat from Member State to Member State. Moreover, national variations do not alter the fact that Google's share of general search queries is higher on smart mobile devices than PCs in all national markets for general search in the EEA and that, unlike on Google Android, the Google Search app is not pre-installed on PCs.

(845)   In the fourth place, contrary to Google's claim,[931] Google's high shares on PCs are not merely the result of user preferences. Google is also set as default search service on Chrome and all other major PC browsers, with the exception of Microsoft's Internet Explorer/Edge.

(846)   Fourth, the increase in Google's share of general search queries on smart mobile devices cannot solely be explained by Google Search's alleged superior quality.

(847)   In the first place, Google's actual conduct contradicts its claim that the Commission should ignore the ratings on Google Play. Ratings based on user feedback are an important factor for Google's algorithm behind how search results are displayed to users of the Play Store and for the decision of users to download apps.[932] Moreover,

---

[931]   See Google's Response to the First Letter of Facts, Part Three, page 83, paragraph 53 (Doc ID 8598).

[932]   See "*9 Ways to Master the Google Play Store Ranking*" (26 November 2015), available at https://www.mobilecore.com/9-ways-to-master-the-google-play-store-ranking/, printed and saved on 13 June 2017 and "*How mobile users make app install decisions on Google Play and the App Store*" (24

GOOG-DOJ-26429357

Google advertises the importance of such ratings as a factor for being discovered by users in the Play Store.[933]

(848)   In the second place, Google Search's alleged superiority is not demonstrated by the fact that Google Search had the highest rating of any available general search service app, aside from Yandex, in April 2016. The average rating of the Google Search app in the Play Store in April 2016 was only 0.1-0.2 points higher than that of the competing general search service apps of Bing, Yahoo and Seznam.

(849)   Moreover, average ratings can change over time. For example, on 11 January 2018, the average rating of the Google Search app on the Play Store was the same as that of Bing and DuckDuck Go (4.4) and lower than that of Yandex (4.5).[934]

(850)   In the third place, as explained in recital (816), the allegedly high daily download figures of the Google Search app and corresponding low download figures for Seznam, Naver and Yandex on iOS devices in France, Germany and the United Kingdom to which Google refers in support of the alleged superiority of Google Search[935] are not meaningful.

(851)   In the fourth place, to the extent Google refers to other evidence in support of Google Search's alleged superiority and user preference, the Decision shows that this alleged superiority or user preference is insufficient to overcome the *status quo* bias resulting from pre-installation (see for example, the data in recitals and (791) and (793), or the statements by Google's own employees in recital (787)).

*VI.   Google's other claims and the Commission's response*

(852)   Google also more generally claims that the Commission has failed in two respects to conduct an analysis of the "competitive effects" of the tying of the Google Search app with the Play Store in line with the decisions adopted in Case AT.37792 *Microsoft* and AT.39530 *Microsoft (Tying)* and the judgment in Case T-201/04 *Microsoft*:

(1)   the judgment in Case T-201/04 *Microsoft* requires the Commission to make a finding of "*indirect network effects*" with respect to the Google Search app;[936] and

(2)   unlike in its decisions in Cases AT.37792 *Microsoft* and AT.39530 *Microsoft (Tying)*, the Commission has failed to: (i) assess the question of alternative means of access and user engagement; (ii) conduct a survey on download figures; (iii) examine the actual development of usage shares; and (iv) examine

---

January 2017), available at https://www.tune.com/blog/mobile-users-make-app-install-decisions-google-play-app-store/, printed and saved on 13 June 2017.

[933]   See, for example, "*Get discovered on Google Play search*": "*Google Play search factors in the overall experience of your app based on user behavior and feedback. Apps are ranked based on a combination of ratings, reviews, downloads, and other factors* [...]," available at https://support.google.com/googleplay/android-developer/answer/4448378?hl=en, printed and saved on 11 January 2018.

[934]   Data retrieved on 11 January 2018, available at https://play.google.com/store.

[935]   Google's Response to the Statement of Objections, Part Four, pages 225-226, paragraph 157 (Doc ID 7117).

[936]   Google's Response to the Statement of Objections, Part Four, pages 180-181, paragraph 63 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429358

carefully alternative explanations for changes in usage.[937]

(853)    Google's claims are unfounded.

(854)    First, the judgment in Case T-201/04 *Microsoft* does not require the Commission to make a finding of "*indirect network effects*" with respect to the Google Search app. While the presence of indirect network effects was one factor that the Commission took into consideration in its decision in Case AT.37792 *Microsoft*, nothing in the judgment in Case T-201/04 provides that the Commission is generally required to make such a finding when analysing the effects of tying.

(855)    Moreover, and in any event, contrary to Google's allegation,[938] general search services do exhibit network effects. In particular, as explained in more detail in Section 9.5.2, the greater the number of queries a general search service receives, the quicker it is able to detect a change in the pattern of user behaviour and update and improve the relevance of its search results and related search advertising.

(856)    Second, like in Cases AT.37792 *Microsoft* and AT.39530 *Microsoft (Tying)*,[939] the Commission has, in this case, assessed the question of alternative means of access and user engagement, such as downloading and access via the web browser, examined the actual development of usage shares on the basis of usage data from third party surveys and data, and examined carefully alternative explanations for changes in usage shares, including alleged qualitative superiority. As for the alleged omission to conduct a survey on download figures, the Commission did not need to conduct such a survey because it obtained actual download figures from Google and third parties.

(857)    Moreover, and in any event, the Commission is not required to apply rigorously an identical framework of assessment in all tying cases. Rather, the Commission must make an overall assessment in each given case and can take account of a range of tools for the purposes of that assessment.[940]

11.3.4.2. Google's conduct helps to maintain and strengthen its dominant position in each national market for general search services, increases barriers to entry, deters innovation and tends to harm, directly or indirectly, consumers

(858)    For the reasons set out in this Section, the Commission concludes that the tying of the Play Store and the Google Search app helps Google to maintain and strengthen its dominant position in each national market for general search services, increases barriers to entry, deters innovation and tends to harm, directly or indirectly, consumers.

(859)    First, Google's conduct makes it harder for competing general search services to gain

---

[937]    Google's Response to the Statement of Objections, Part Four, pages 181-182, paragraph 64, and page 292, paragraph 93 (Doc ID 7117).

[938]    Google's Response to the Statement of Objections, Executive Summary, page xvii, last point in table and same table under Part Four, page 157, paragraph 10; pages 180-181, paragraph 63 (Doc ID 7117).

[939]    Case AT.39530 *Microsoft (Tying)*, recitals 39-54; AT.37792 – Microsoft, recitals 849-878, 900-926, 947-954.

[940]    Case T-210/01 *General Electric v Commission*, EU:T:2005:456 paragraph 519; Case T-343/06 *Shell Petroleum and Others v Commission*, EU:T:2012:478, paragraph 171; Case T-342/07 *Ryanair v Commission*, EU:T:2010:280, paragraph 136; Case T-175/12 *Deutsche Börse v Commission*, EU:T:2015:148, paragraph 133; Case T-699/14 *Topps Europe v Commission*, EU:T:2017:2, paragraph 82.

**EN**                                                      196                                                      **EN**

GOOG-DOJ-26429359

search queries and the respective revenues and data needed to improve their services.

(860) Google's conduct does so in a number of ways:

(1) It makes it harder for competing general search services from gaining a sufficient volume of queries to expand and become or remain viable competitors. As Amazon states with respect to the growing segment of voice related search: " *If Google is [...], its control over Android to harm competition in the voice assistant segment and position itself as the default voice assistant for customers, the large volume of voice inquiries and requests passing through Google's voice service will provide Google with even more behavioural data that it can use to improve its search and advertising services, further reinforcing its position in those market segments*."[941]

(2) It prevents competing general search services from achieving revenues associated with these search queries.[942] Such additional revenues would have allowed competing general search services to improve their services and deploy innovative solutions for users.

(3) It prevents competing general search services from acquiring the valuable user data associated with these search queries.[943]

(861) Second, Google's conduct increases barriers to entry by shielding Google from competition from general search services that could challenge its dominant position in the national markets for general search services:

(1) Competing general search services must spend resources to overcome the *status quo* advantage conferred by pre-installation (see recital (812)); and

(2) Google's conduct prevents competing general search services from bidding for exclusive pre-installation on Google Android devices, despite exclusive pre-installation being the most effective way for competing general search services to obtain queries and compete against Google (see recital (830)).

(862) Third, by making it harder for competing general search services to gain search queries including the respective revenues and data needed to improve their services, Google's conduct reduces the incentives of competing general search services to invest in developing innovative features, such as innovation in algorithm and user experience design.[944] For example, as explained in recital (1213), some general search services that have a more focused offering in a particular language or targeting a specific group of users and which are important to improve the user

---

[941] Amazon's non-confidential response to Question 5 of the request for information of 9 March 2017 (Doc ID 8247).

[942] See "*Comments on the Theory of Harm in the Google Android Statement of Objections*", CRA report submitted on behalf of Yandex on 23 November 2016, paragraphs 28-33 (Doc ID 7330).

[943] See, also the 2008 statement by Jonathan Rosenberg, formerly Google's Senior Vice President of Product Management and Marketing, indicates how the positive feedback loop of more users, more information and more advertisers works in Google's favour: "[...] *So more users more information, more information more users, more advertisers more users, more users more advertisers, it's a beautiful thing, lather, rinse repeat, that's what I do for a living. So that's ... 'the engine that can't be stopped'*". See the US Senator Richard Blumenthal, Press Release: Blumenthal Continues to Press Google on Market Power and Competition Policy, 28 September 2011, https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-continues-to-press-google-on-market-power-and-competition-policy-, printed and saved on 2 July 2017.

[944] See presentation by Hubert Burda Media of 20 October 2014, pages 22-42 (Doc ID 3566).

GOOG-DOJ-26429360

experience. As a consequence of Google's conduct, they may not be able to achieve the scale and access to users that would allow them to invest in research and development with respect to those innovative features.

(863)    Fourth, Google's conduct is capable of harming, directly or indirectly, consumers who, as a result of Google's interference with the normal competitive process, may see less choice of general search services available.[945]

(864)    Sixth, the Commission's conclusion that the tying of the Play Store and the Google Search app helps Google to maintain and strengthen its dominant position in each national market for general search services is not affected by Google's claims that:

(1)    Android devices accounted for only between [10-20]%-[20-30]% of queries on Google Search between 2013 and 2015;[946] and

(2)    Google's conduct coincided with a period of improvement of its general search service.[947]

(865)    In the first place, as explained in recital (796), [10-20]% to [20-30]% of general search queries via Google Search was equivalent to [1-6] times more than the combined [5-10]% of queries in total across all platforms that all competing general search services achieved in 2016. This further hindered the maintenance of the degree of competition still existing in the national markets for general search services, where competition is already weakened as a result of the very presence of Google.

(866)    In the second place, even if Google's conduct were to have coincided with a period of improvement of its general search service, Google neither claims nor demonstrates that its conduct has not affected the incentives and ability of competing general search services to improve their services. Moreover, absent the tying of the Google Search app with the Play Store, Google may have improved its general search service to a greater degree.

11.3.4.3.  Google's claims regarding the need for the Commission to consider its conduct in the relevant economic and legal context

(867)    Google claims that its conduct is incapable of restricting competition when assessed in its relevant economic and legal context.

(868)    First, assessing whether Google's conduct is capable of restricting competition requires the Commission to demonstrate that "*there would have been greater competition absent the impugned conduct*" and to "*consider in that context, the interactions among different sides of*" the Android platform.[948]

(869)    Second, an assessment of its conduct in the relevant economic and legal context as of 2009 when Google began to enter into MADAs "*would have revealed that this practice is incapable of restricting competition and in fact promoted competition*".[949]

---

[945]    See presentation by Hubert Burda Media of 20 October 2014, pages 22-42 (Doc ID 3566).
[946]    Google's Response to the Statement of Objections, Part Four, pages 184-185, paragraph 73 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 63, paragraph 8 (Doc ID 8598).
[947]    Google's Response to the Statement of Objections, Part Four, page 227, paragraph 160 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Three, page 84, paragraph 54 (Doc ID 8598).
[948]    Google's letter of 11 June 2018, paragraphs 6 and 11-15 (Doc ID 8890).
[949]    Google's letter of 11 June 2018, paragraph 20 (Doc ID 8890).

GOOG-DOJ-26429361

(870)   Google's claims are unfounded.

(871)   First, Google fails to clarify whether the conduct to which it refers is only the tying of the Google Search app with the Play Store[950] or the MADA as a whole.[951] However, for the purposes of this Decision, the Commission concludes that Google's conduct is only the tying of the Google Search app with the Play Store, and not the MADA as a whole, because only the former constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores.

(872)   Second, the Commission is not required to demonstrate in a general manner that "*there would have been greater competition*" absent the tying of the Google Search app with the Play Store. Rather, the Commission is required to demonstrate that the tying is capable of restricting competition on the relevant markets, namely the national markets for general search services.

(873)   Third, when assessing the capability of the tying of the Google Search app with the Play Store to restrict competition on the national markets for general search services, the Commission has *inter alia* analysed whether there could have been greater competition on those markets, absent the tying (see Section 11.3.4). This includes an analysis of Google's share of general search queries and the ability of competing general search services to grow their share of queries by being set as default on smart mobile devices on which the Google Search app is not pre-installed, such as Windows Mobile (see recitals (790) to (794)).

(874)   Fourth, when assessing the capability of the tying of the Google Search app with the Play Store to restrict competition on the relevant markets, the Commission has also taken account of the nature of interactions among the different sides of the Android platform. This includes the facts that: (i) on GMS devices, OEMs cannot obtain the Play Store without the Google Search app (see Section 11.3.3), (ii) pre-installation is an important channel for the distribution of general search services on smart mobile devices, including GMS devices (see Section 11.3.4.1.II); and (iii) competing general search services cannot offset the competitive advantage that Google ensures for itself through the pre-installation of the Google Search app on GMS devices (see Section 11.3.4.1.IV).

(875)   To the extent, however, that Google's claim about the "*interactions among different sides*" of the Android platform relates to whether the tying may give rise to benefits on the national markets for general search services and/or on other markets, the Commission has assessed and dismissed such a claim in its analysis of objective justification and efficiencies (see Section 11.5).

(876)   Fifth, when assessing the capability of the tying of the Google Search app with the Play Store to restrict competition on the national markets for general search services,

---

[950]   Google's letter of 11 June 2018, paragraph 20 (Doc ID 8890), paragraphs 2-4, 13, 18-21, 28 and 31; Google's Response to the Statement of Objections, Part Four, pages 174-176, paragraphs 45-48 (Doc ID 7117); Google's Response to the Statement of Objections, Executive Summary, Section IV; Part One, page 9, paragraph 15 and page 28, paragraph 69; Part Four, page 157, paragraph 13; and page 180, paragraph 61 (Doc ID 7117).

[951]   Google's letter of 11 June 2018, paragraph 20 (Doc ID 8890), paragraphs 14-17 and 24-27; Google's Response to the Statement of Objections, Executive Summary, Section IV; Part One, page 8, paragraph 10; and Part Four, page 175, paragraphs 46-47 (Doc ID 7117).

**EN**                                    199                                    **EN**

GOOG-DOJ-26429362

the Commission is required to undertake such an assessment as of January 2011, when it concludes that Google became dominant in the worldwide market (excluding China) for Android app stores and not as of 2009 when Google began to enter into MADAs.

**11.4.    Tying of Google Chrome with the Play Store and the Google Search app**

(877)    The Commission concludes that the tying of Google Chrome with the Play Store and the Google Search app[952] constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores and in the national markets for general search services because: (i) Google Chrome is a distinct product from the Play Store and the Google Search app (Section 11.4.1); (ii) the Play Store and the Google Search app cannot be obtained without Google Chrome (Section 11.4.2); (iii) Google is dominant in the worldwide market (excluding China) for Android app stores and in the national markets for general search services (Section 11.4.3); and (iv) the tying of Google Chrome with the Play Store and the Google Search app is capable of restricting competition (Section 11.4.4).

(878)    The Commission further concludes that Google has not demonstrated the existence of any objective justification for the tying of Google Chrome with the Play Store and the Google Search app (Section 11.5).[953]

*11.4.1.    Google Chrome is a distinct product from the Play Store and the Google Search app*

(879)    The Commission concludes that Google Chrome is a distinct product from the Play Store and the Google Search app.

(880)    First, Google Chrome provides distinct functionalities to users as:

(1)    Google Chrome enables users to view web pages through a network such as the Internet or a company intranet;

(2)    the Play Store enables users to download, install and manage a wide range of diverse apps from a single point in the interface of the smartphone; and

(3)    Google Search app enables users to search for information across the entire Internet.

(881)    Second, a number of undertakings such as Huawei and LG Electronics supply mobile web browsers on a stand-alone basis, independently of Android app stores and general search services.

(882)    Third, Google develops and markets versions of Google Chrome that are designed to work on other smart mobile OSs such as Apple's iOS or Microsoft's Windows Phone OS.

(883)    Fourth, Google Chrome, as well as other competing non OS-specific mobile web browsers, can be downloaded via other non-Android app stores such as the Apple AppStore.

---

[952]    The Play Store and the Google Search app are licensed through a single licence agreement, i.e. the MADA. The same reasoning as outlined in Section 11.4 would apply if Google were to make the licensing of either only the Play Store or the Google Search app subject to pre-installing Google Chrome, given that Google is dominant in the worldwide market (excluding China) for Android app stores and each national market for general search services.

[953]    All objective justifications put forward by Google regarding tying relating to its proprietary mobile apps are assessed together in Section 11.4.4.3.

**EN**                                            200                                            **EN**

GOOG-DOJ-26429363

(884) Fifth, despite the tying of Google Chrome with the Play Store and the Google Search app, OEMs continue to seek to license the Play Store and the Google Search app without Google Chrome.[954]

(885) Google does not contest the Commission's conclusions as outlined in this Section.

*11.4.2.* *Dominance in the worldwide market (excluding China) for Android app stores and in the national markets for general search services*

(886) As set out in Sections 9.4 and 9.5, the Commission concludes that since 2011, Google holds a dominant position in: (i) the worldwide market (excluding China) for Android app stores; and (ii) each national market for general search services in the EEA.

*11.4.3.* *The Play Store and the Google Search app cannot be obtained without Google Chrome*

(887) The Commission concludes that OEMs cannot obtain the Play Store and the Google Search app without Google Chrome.

(888) First, OEMs can pre-install the Play Store and the Google Search app on their Google Android devices only if they license and pre-install the GMS bundle, including Google Chrome.[955]

(889) Second, users cannot obtain the Play Store and the Google Search app without simultaneously obtaining Google Chrome.

(890) Third, OEMs that wish to install a different mobile web browser on their GMS devices can do so only alongside Google Chrome.

(891) Fourth, it is irrelevant that OEMs may not be required to pay anything extra for Google Chrome.

(892) In the first place, while Google does not charge for Google Chrome, it monetises that app through advertising via the general search service offered through the Google Chrome.

(893) In the second place, the conclusion that Google ties Google Chrome with the Play Store and the Google Search app does not depend on OEMs having to pay a certain price for Google Chrome.[956]

(894) Fifth, it is irrelevant that users are not obliged to use Google Chrome which they find pre-installed on their GMS devices and that they can download on their devices a competing non OS-specific mobile web browser. The conclusion that Google ties Google Chrome with the Play Store and the Google Search app does not depend on users being forced to use Google Chrome or prevented from using a competing non OS-specific mobile web browser.[957]

(895) Google does not contest the Commission's conclusions as outlined in this Section.

---

[954] See for example Google internal email referring to an instance in which [MADA signatory] wanted to license only the Play Store and the Gmail app (Doc ID 1374-1937).
[955] See Section 6.3.2.
[956] Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraphs 967-969.
[957] Case T-201/04 *Microsoft* v *Commission,* EU:T:2007:289, paragraph 970.

**EN**

**EN**

GOOG-DOJ-26429364

*11.4.4.   Restriction of competition*

(896)   The Commission concludes that the tying of Google Chrome with the Play Store and the Google Search app is capable of restricting competition because it:

   (1)   provides Google with a significant competitive advantage that competing non OS-specific mobile web browsers cannot offset (Section 11.4.4.1); and

   (2)   deters innovation, tends to harm, directly or indirectly, consumers of mobile web browsers and helps to maintain and strengthen Google's dominant position in each national market for general search services (Section 11.4.4.2).

(897)   Moreover, the Commission's conclusion that the tying of Google Chrome with the Play Store and the Google Search app is capable of restricting competition is not affected by Google's claims regarding the need for the Commission to consider that tying in its relevant economic and legal context (Section 11.4.4.3).

11.4.4.1. Tying of Google Chrome with the Play Store and the Google Search app provides Google with a significant competitive advantage that competing non OS-specific mobile web browsers cannot offset

(898)   The Commission concludes that, via the tying, Google is able to ensure for its mobile web browser a significant competitive advantage that competing non OS-specific mobile web browsers cannot offset by other methods of distributing mobile web browsers on smart mobile devices. This is for the following reasons:

   (I)   pre-installation is an important channel for the distribution of mobile web browsers on smart mobile devices;

   (II)   it is impossible to uninstall Google Chrome on GMS devices;

   (III)   competing non OS-specific mobile web browser developers cannot offset the competitive advantage that Google ensures for itself through the tying; and

   (IV)   Google's competitive advantage resulting from the tying and the inability of competing non OS-specific mobile web browsers to offset that advantage is consistent with the evolution of market shares.

(899)   Moreover, contrary to Google's claims, when assessing the competitive advantage that Google ensures itself via the tying of Google Chrome with the Play Store and the Google Search app, the Commission is not required to make a finding of "*indirect network effects*" with respect to the Google Chrome or to undertake certain "*empirical work*" (V).

*I.        Pre-installation is an important channel for the distribution of mobile web browsers on smart mobile devices*

(900)   Pre-installation is an important channel for the distribution of mobile web browsers on smart mobile devices (see recitals (779) to (782)).

(901)   In 2016, approximately 1.65 billion smart mobile devices were sold worldwide (including China), of which approximately 1.33 billion or 81% were Google Android devices.[958] Approximately 918 million smart mobile devices or 56% of the total

---

[958]   Source: [...] data (Doc ID 7866 and 7867). In 2014, approximately 1.53 billion smart mobile devices were sold worldwide (including China), of which approximately 1.2 billion smart mobile devices or 78.4% were Google Android devices (Source: [...] (Doc IDs 3098, 4632, 4633 and 4710)).

GOOG-DOJ-26429365

number of all smart mobile devices sold in 2016, i.e. practically all Google Android devices outside China, had the GMS bundle pre-installed.[959] These 918 million smart mobile devices in 2016 constitute a far higher number than any competing non OS-specific mobile web browser would be able to achieve by way of pre-installation on smart mobile devices. By way of comparison, Samsung, the OEM with the highest sales volume of Google Android devices, could pre-install its mobile web browser, Samsung Internet only on the 336 million smart mobile devices it sold in 2016.[960]

(902)   By tying Google Chrome with the Play Store and the Google Search app on Google Android devices, Google therefore ensures that distribution of Google Chrome is as wide on smart mobile devices worldwide as the number of GMS devices.

(903)   The importance of pre-installation as a channel for the distribution of web browsers on Google Android devices is confirmed by: (i) an internal Google document; (ii) responses by third parties to requests for information; (iii) a comparison of the revenues that Google derives on Google Android devices from general search queries via Google Chrome (which is pre-installed) and non-Chrome browsers (which are not pre-installed); (iv) a comparison of the revenues that Google derives on iOS devices from general search queries via Google Chrome (which is not pre-installed) and via the only major non-Chrome browser, Safari (which is pre-installed); and (v) a comparison of the reach of Google Chrome on GMS devices where it is pre-installed with its reach on iOS devices where it has to be downloaded by users.

(904)   First, the importance of pre-installation as a channel for the distribution of mobile web browsers on smart mobile devices is confirmed by an internal Google document dated April 2012 in which [Google Executive], stated that "*I'm not sure if I follow this logic. Are you saying that oems will ship phones without a browser? Surely they'll ship with SOMETHING, and it will take memory. Make chrome mandatory and tackle the engineering problem of making our system smaller. This is precisely what i was talking about in leadership yesterday. The solution to making a great Google product isn't to make our technology optional.*"[961]

(905)   Second, the importance of pre-installation is confirmed by responses by third parties to requests for information:

(1)   According to Mozilla, "[t]*he vast majority of users never change the default browser. Even fewer download a second browser. Thus, while the default setting remains the most powerful influence on application usage, being pre-loaded on a device is still of value, because it lowers the barriers to adoption by a user. The hierarchy of commercial significance for default and pre-install options is as follows*:

*1 - Pre-loaded and default - All but guarantees widespread adoption*

*2 - Pre-loaded and non-default - Increases adoption*

---

[959]   Source: […] data (Doc ID 7866 and 7867) and Section 9.3.1.
[960]   Source: […] data (Doc IDs 7866 and 7867).
[961]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1373-2120).

**EN**                                     203                                     **EN**

GOOG-DOJ-26429366

*3 - Not pre-loaded - Limits adoption to tech-savvy users who are actively seeking an alternative browser. This is a very small user segment.*"[962]

(2) According to Samsung, "[i]*n the example of Safari, the only browser pre-installed on iOS devices, even 90% usage is estimated in some cases.*"[963]

(3) According to a survey submitted by Opera,[964] in 2013, 72% of the 1500 respondents in Germany, Poland and the United Kingdom used on a regular basis the mobile web browser that was pre-installed on their smart mobile device. In addition, 16% of the 1500 respondents did not consider any other factor (such as quality, ease of use, speed, security or other features) and continued to use a mobile web browser solely because it was pre-installed.

(4) According to Yandex, on a set of otherwise identical [OEM] smart mobile devices, the usage share of the Yandex browser was [5-10]% on the devices in which the Yandex browser was not pre-installed and [20-30]% on the devices in which it was pre-installed.[965] In addition, the usage share of the Yandex browser was [0-5]% on [device name][966] smartphones, where the Yandex browser was not pre-installed, as opposed to [60-70]% on [device name] devices, where the Yandex browser was pre-installed.[967]

(906) Third, the importance of pre-installation is confirmed by a comparison between the revenues that Google derives on Google Android devices from general search queries via Google Chrome (which is pre-installed) and non-Chrome browsers (which are not pre-installed). According to data on worldwide revenues from general search queries conducted on web browsers provided by Google and summarised in Table 16, the revenues that Google derives on Google Android devices from general search queries via Google Chrome are higher than the revenues that Google derives on Google Android devices from general search queries via other mobile web browsers: […]% higher in 2014, […]% higher in 2015 and […]% higher in 2016. Given that search revenues can be considered as a proxy for the usage of mobile web browsers[968], this shows that the usage of Google Chrome is higher on devices where it is pre-installed.

(907) Fourth, the importance of pre-installation is confirmed by a comparison between the revenues that Google derives on iOS devices from general search queries via Safari

---

[962] Mozilla's non-confidential response to Question 39 of the request for information of 12 June 2013 to app developers (Doc ID 4166).

[963] Samsung's non-confidential response to Question 8 of the request for information of 19 October 2015 to web browser providers (Doc ID 3930).

[964] See non-confidential Appendix 1 to Opera's response to the request for information of 1 December 2015 (Doc ID 4639). The survey was conducted by On Device in 2013 and covered smartphone users in Brazil, Germany, India, Indonesia, Japan, Mexico, Poland, Russia, South Africa, United Kingdom and US. The data mentioned in recital (905)(3) concerns only the three EEA countries (Germany, United Kingdom and Poland). The respondents that continued to use on a regular basis the mobile web browser that was pre-installed on their smart mobile device were (i) the Android users that indicated that they use more regularly Google Chrome or the default mobile web browser; and (ii) the iOS users that indicated that they use more regularly Safari or the default mobile web browser.

[965] CRA presentation of 5 November 2015, slide 19. Internal analysis based on […] (Doc ID 4452).

[966] [Information about device].

[967] CRA presentation of 5 November 2015, slide 19. Internal analysis based on […] (Doc ID 4452).

[968] The more the users make use of a web browser, the greater the revenues associated with search services via that web browser.

GOOG-DOJ-26429367

(which is pre-installed) and Google Chrome (which is not pre-installed).[969] According to data on worldwide revenues from general search queries conducted on web browsers provided by Google and summarised in Table 16, the revenues that Google derives on iOS devices from general search queries via Safari are higher than the revenues that Google derived from search queries via Google Chrome: [...]% higher in 2014, [...]% higher in 2015 and [...]% higher in 2016. Given that search revenues can be considered a proxy for the usage of mobile web browsers, this also shows that the usage of Google Chrome is higher on devices where Google Chrome is pre-installed.

**Table 16: Google's worldwide revenues from search queries via mobile web browsers on Android and on iOS (million EUR)[970]**

| Revenues with browsers | 2014 | | 2015 | | 2016 | |
|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| | Android | iOS | Android | iOS | Android | iOS |
| **Google Chrome** | [...] | [...] | [...] | [...] | [...] | [...] |
| **Non-Chrome** | [...] | [...] | [...] | [...] | [...] | [...] |

(908)    Fifth, the reach of Google Chrome on GMS devices where it is pre-installed is much higher than on iOS devices where it is not pre-installed:

    (1)    in 2016, Google Chrome was downloaded on approximately [30-40] million iOS devices.[971]

    (2)    in the same year, approximately 258 million iOS devices, where Safari is pre-installed, were sold worldwide;[972] and

    (3)    Google Chrome was therefore downloaded on only approximately [10-20]% of iOS devices worldwide sold in 2016.

(909)    Sixth, the Commission's conclusion that pre-installation is an important channel for the distribution of mobile web browsers on smart mobile devices is not affected by Google's claims that:

    (1)    the Opera survey mentioned in recital (905)(3) is not probative given that (i) only a small number of respondents indicated that the pre-installation of a web browser is a factor that they take into account when deciding which mobile web browser to use;[973] (ii) the survey did not verify whether the mobile web browser that users reported as being their "default" option was actually the pre-installed mobile web browser;[974] and (iii) Google Chrome's usage share

---

[969]    See the importance of Safari and Chrome on iOS devices on https://www.zdnet.com/article/which-browser-is-most-popular-on-each-major-operating-system/, printed and saved on 12 June 2018.

[970]    Source: Annex A to Google's response to Questions 1 to 5 of the request for information of 24 March 2017 (Doc ID 7955).

[971]    Apple's non-confidential response to Question 4 of the request for information of 31 March 2017 (Doc ID 8091).

[972]    Source: [...] data (Doc ID 7866 and 7867).

[973]    Google's Response to the First Letter of Facts, Part Three, page 89, paragraph 70 (Doc ID 8598).

[974]    Google's Response to the Statement of Objections (Doc ID 7117), Appendix 20, Data Room Report (6 December 2016) pages 9-10 (Doc ID 7014) and Google's Response to the First Letter of Facts, Part Three, page 89, paragraph 70 (Doc ID 8598).

**EN**

**EN**

GOOG-DOJ-26429368

worldwide is high even on PCs where it is not pre-installed;[975]

(2)   the difference in revenues that Google derived on Google Android and iOS devices from general search queries via Google Chrome is significantly lower when the fact is taken into account that approximately four times as many Google Android devices as iOS devices were sold worldwide as of July 2016.[976] Moreover, the difference in Google Chrome's revenues on Android and iOS can be explained by the fact that Google Chrome faces competition from the Safari browser on iOS devices but not on Google Android devices;[977] and

(3)   downloads on iOS devices of mobile web browsers such as Google Chrome for iOS are limited because of constraints on the design of mobile web browsers that operate on iOS devices, as confirmed by an article from the ArsTechnica website.[978] Moreover, Apple data from 2012-2016 indicates that Google Chrome represented […]% of downloads of mobile web browsers on iOS devices.[979]

(910)   In the first place, Google's criticisms of the Opera survey are unfounded:

(1)   the number of respondents replying that the pre-installed mobile web browser was a factor in deciding which web browser to use is not as small as Google suggests. This is because that reply was presented in a list of possible multiple replies as "*None, I just use the brow*[s]*er that came with my mobile*". Respondents would therefore only select that reply if they did not consider any of the other multiple replies (e.g. speed, ease and simplicity of use, having a list of recently visited sites) as relevant;

(2)   it is irrelevant that the Opera survey did not verify that the mobile web browser that users reported as being their "default" option was actually the pre-installed mobile web browser, rather than the mobile web browser that the user had downloaded and set as the default. This is because 79% of Android and iOS users that responded to the Opera survey replied that the mobile web browser that they use regularly is the one pre-installed on their devices i.e. "Google Chrome" (for Android devices) and "Safari" (for iOS devices); and

(3)   Google Chrome's usage share in the EEA on Google Android devices is higher than on PCs despite Google having launched Google Chrome on Google Android devices four years later than on PCs.[980] Google Chrome's worldwide share is slightly lower on non OS-specific mobile web browsers than on PC web browsers because of the presence of UC Browser in the non OS-specific mobile web browsers market, the focus of which is mainly on Asian

---

[975]   Google's Response to the First Letter of Facts, Part Three, page 89, paragraph 70 (Doc ID 8598).

[976]   Google's Response to the First Letter of Facts, Part Three, page 91, paragraph 73 (Doc ID 8598).

[977]   Google's Response to the First Letter of Facts, Part Three, page 91, paragraph 73 (Doc ID 8598).

[978]   Google's Response to the First Letter of Facts, Part Three, page 90, paragraph 71 (Doc ID 8598).

[979]   Google's Response to the Statement of Objections, pages 244-245 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Three, page 90, paragraph 72 (Doc ID 8598).

[980]   See "*Google Chrome now live*" (2 September 2008), available at https://googleblog.blogspot.be/2008/09/google-chrome-now-live.html, printed and saved on 23 June 2017 and "*Introducing Chrome for Android*" (7 February 2012), available at https://chrome.googleblog.com/2012/02/introducing-chrome-for-android.html, printed and saved on 23 June 2017.

**EN**

**EN**

GOOG-DOJ-26429369

countries.[981]

(911)   In the second place, in relation to Google Chrome's revenues on Android and iOS:

(1)   the difference in revenues that Google derived on Google Android and iOS devices from general search queries via Google Chrome remains significant when the fact is taken into account that approximately four times as many Google Android devices as iOS devices were sold worldwide as of July 2016. Revenues per user that Google derived from general search queries via Google Chrome on Google Android devices were […]% higher in 2014, […]% higher in 2015 and […]% higher in 2016 compared to revenues per user that Google derived from general search queries via Google Chrome on iOS devices;[982] and

(2)   the difference in revenues that Google derived on Google Android and iOS devices from general search queries via Google Chrome cannot be solely explained by the fact that Google Chrome faces competition from the Safari browser on iOS devices. This is because, on Google Android devices, Google Chrome also faces competition from other mobile web browsers such as UC Browser, Opera and Firefox (see Figure 21 and Figure 22).

(912)   In the third place, in relation to downloads of Google Chrome on iOS devices in 2016:

(1)   if, as the ArsTechnica article cited by Google suggests, downloads on iOS devices of mobile web browsers are limited because of constraints on the design of mobile web browsers that operate on iOS devices, this should not affect Google Chrome for iOS because as of 2015 at the latest, it already used the best version of Apple's engine which allowed it to improve its design;[983] and

(2)   what is relevant to illustrate the importance of pre-installation is not the relative percentage of downloads of mobile web browsers on iOS devices that Google Chrome represents, but the fact that the absolute number of those downloads ([30-40] million in 2016) remained low as compared to the number of pre-installations of Safari (258 million in 2016).

*II.*   *It is impossible to uninstall Google Chrome on GMS devices*

(913)   Nobody but Google can uninstall Google Chrome on GMS devices. The most that a competing non OS-specific mobile web browser can achieve on a Google Android device is that its mobile web browser is pre-installed side-by-side with Google Chrome. As explained by Sony, "*It is not possible to uninstall Chrome and for Sony*

---

[981]   See Jon Russel, "*Mobile browser-maker UCWeb, another global tech firm under the radar, crosses 500m users*", available at   http://thenextweb.com/asia/2014/03/21/mobile-browser-maker-ucweb-another-global-tech-firm-under-the-radar-crosses-500m-users/#!BqGdJ, printed and saved on 11 April 2016.

[982]   These figures are obtained by dividing the revenues of Google Chrome on Android by four and then by the revenues of Google Chrome on iOS. Source: Annex A to Google's response to Questions 1 to 5 of the request for information of 24 March 2017 (Doc ID 7955).

[983]   A. Cunningham, ArsTechnica, "*New Chrome for iOS is finally as fast and stable as Safari*," January 27, 2016, available at: https://arstechnica.com/gadgets/2016/01/new-chrome-for-ios-is-finally-as-fast-and-stable-as-safari/ printed and saved on 12 June 2018.

GOOG-DOJ-26429370

*Mobile it is mandatory by contract.*"[984]

(914)   While Google does not contest this fact, it claims that this is irrelevant because users can download one or more competing mobile web browsers on their GMS devices and set one of them as the default.[985]

(915)   The Commission does not question that users can download competing non-OS specific mobile web browsers on their GMS devices and set one of them as the default. Rather, it concludes that, because of the importance of pre-installation, a significant number of users will not download any competing non-OS specific mobile web browser but rather use Google Chrome which is pre-installed on their GMS devices (see recitals (917) to (931)).

III.   *Competing non OS-specific mobile web browser developers cannot offset the competitive advantage that Google ensures for itself through the tying*

(916)   The competitive advantage that Google ensures for itself cannot be offset by competing non OS-specific mobile web browser developers using alternative distribution channels such as downloads or the possibility for OEMs and MNOs to pre-install a competing mobile web browser.

    a)   *Downloads cannot offset the competitive advantage that Google ensures for itself*

(917)   Downloads cannot be compared in reach and effectiveness to the pre-installation of Google Chrome on GMS devices. This is because users that find a mobile web browser pre-installed on their GMS devices are, on average, less likely to download alternative mobile web browsers, in particular when the pre-installed mobile web browser already delivers the required functionality.

(918)   First, this is confirmed Mozilla statement that "*The browser is one of those core functional applications that users expect to be preinstalled. The vast majority of user behavior suggests they use what is preinstalled on the device. It requires a tech-savvy user to consider other browsers (including for performance, features available, extensibility, privacy, open source etc.) that are available and know they can be installed and used as an alternative choice. Therefore, the browser that is the default and preinstalled one on the device will automatically get mass majority usage and adoption as lowest barrier to use.*"[986]

(919)   Second, this is confirmed by the number of downloads of competing non OS-specific mobile web browsers from the Play Store (see Table 17). In 2016, none of these mobile web browsers achieved a number of downloads that was comparable to the number of pre-installed Google Chrome browsers: (i) the UC Browser was downloaded on only [20-30]% of GMS devices sold in 2016; (ii) the Opera mobile web browser was downloaded on only [10-20]% of GMS devices sold in 2016; and (iii) the Firefox mobile web browser was downloaded on only [0-10]% of GMS devices sold in 2016. In 2013, 2014 and 2015, the number of downloads of the UC

---

[984]   See Sony Mobile Communications' non-confidential response to Question 2(v) of the request for information of 19 October 2015 to web browser providers (Doc ID 4122).

[985]   Google's Response to the Statement of Objections, Part Four, pages 237-241, paragraphs 177-187 (Doc ID 7117).

[986]   Mozilla's non-confidential response to Question 35.2 of the request for information of 12 June 2013 to app developers (Doc ID 4166).

GOOG-DOJ-26429371

Browser and Opera mobile web browser on GMS devices sold in each year was even lower.

(920)   Third, this is confirmed by the fact that the total number of downloads on GMS devices of competing non-OS specific mobile web browsers from the Play Store is low compared with the number of devices on which Google Chrome was pre-installed. In 2016, competing non OS-specific mobile web browsers were downloaded on less than [40-50]% of the GMS devices sold during that year. Similarly, during the period 2013-2016, competing non OS-specific mobile web browsers were downloaded on approximately [30-40]% of GMS devices sold during that period.

**Table 17: Number of downloads on GMS devices of competing non OS-specific mobile web browsers worldwide from the Play Store in 2013-2016[987] (in thousands)**

| Mobile browsers | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| UC Browser | […] | […] | […] | […] |
| Opera | […] | […] | […] | […] |
| Firefox | […] | […] | […] | […] |
| Yandex | […] | […] | […] | […] |
| VC Browser | […] | […] | […] | […] |
| Puffin Browser | […] | […] | […] | […] |
| Web Browser | […] | […] | […] | […] |
| Dolphin | […] | […] | […] | […] |
| Adblock Browser | […] | […] | […] | […] |
| Other | […] | […] | […] | […] |
| **Total number of downloads of competing mobile web browsers** | […] | […] | […] | […] |
| **Total number of Google Chrome pre-installations[988]** | 594.272 | 808.200 | 916.293 | 917.909 |
| **Total as % of Google Chrome pre-installations** | [10-20]% | [20-30]% | [30-40]% | [40-50]% |

(921)   Fourth, if only the EEA is considered, the number of downloads on GMS devices of competing non OS-specific mobile web browsers from the Play Store is considerably lower in relative terms (see Table 18). The UC Browser, the most downloaded

---

[987]   Source: Annex Q6 to Google's response to Question 6 of the request for information of 24 March 2017 (Doc ID 7894-1) and […] data (Doc ID 7866 and 7867).

[988]   The total number of Google Chrome pre-installations corresponds to the number of GMS devices, i.e., Google Android devices outside China. See footnotes 436 and 440.

GOOG-DOJ-26429372

mobile web browser on GMS devices worldwide, was downloaded on less than [0-5]% of GMS devices sold in the EEA in 2016. This can be explained by the focus of this mobile web browser which is mainly on Asian countries.[989] Similarly, the Opera mobile web browser was downloaded on less than [0-5]% of GMS devices sold in the EEA in 2016. This can be explained by the focus of this mobile web browser on African countries.[990] The Firefox mobile web browser, the most downloaded competing non OS-specific mobile web browser in the EEA, was downloaded on [0-10]% of GMS devices sold in 2016.

(922)     Fifth, in the EEA, the total number of downloads on GMS devices of competing non OS-specific mobile web browsers from the Play Store during the period 2013-2016, corresponded to less than [10-20]% of GMS devices on which Google Chrome was pre-installed.

**Table 18: Number of downloads on GMS devices of competing non OS-specific mobile web browsers in the EEA from the Play Store in 2013-2016[991] (in thousands)**

| Mobile browsers | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Firefox | [...] | [...] | [...] | [...] |
| Opera | [...] | [...] | [...] | [...] |
| Adblock Browser | [...] | [...] | [...] | [...] |
| UC Browser | [...] | [...] | [...] | [...] |
| Free Adblocker Browser | [...] | [...] | [...] | [...] |
| Puffin Browser | [...] | [...] | [...] | [...] |
| Dolphin | [...] | [...] | [...] | [...] |
| Web Browser | [...] | [...] | [...] | [...] |
| Seznam.cz | [...] | [...] | [...] | [...] |
| Other | [...] | [...] | [...] | [...] |
| **Total number of downloads of competing mobile web browsers** | [...] | [...] | [...] | [...] |
| **Total number of Google Chrome pre-installations[992]** | 174,217 | 196,349 | 203,740 | 197,375 |

---

[989]     See footnote 981.
[990]     See "*State of the Mobile Web Africa 2016*", available at https://blogs.opera.com/news/wp-content/uploads/sites/2/2016/11/SMWAfrica-Opera-report-2016-01-WEB-1.pdf printed and saved on 13 June 2017. Opera's share of queries on smart mobile devices was 55% in Africa in 2016. Source: StatCounter data for 2016, downloaded on 22 May 2017. http://gs.statcounter.com/.
[991]     Source: Annex Q6 to Google's response to Question 6 of the request for information of 24 March 2017 (Doc ID 7894-1) and [...] data (Doc ID 7866 and 7867).
[992]     The total number of Google Chrome pre-installations corresponds to the number of GMS devices, i.e., Google Android devices in Europe. See footnote 440.

GOOG-DOJ-26429373

| Total as % of Google Chrome pre-installations | [5-10]% | [5-10]% | [10-20]% | [10-20]% |
|---|---|---|---|---|

(923) Sixth, certain users remain reluctant to download apps and prefer to use the pre-installed mobile web browser. A survey provided by Opera indicated that, in 2013, 79% of Android and iOS users used regularly the mobile web browser that was pre-installed on their devices.[993] Furthermore, when the pre-installed web browser already delivers the required functionality to a satisfactory level, users are less likely to look for, download, and use alternative web browsers (see Section 11.4.4.1.I).

(924) Seventh, the Commission's conclusion that downloads cannot be compared in reach and effectiveness to the pre-installation of Google Chrome on GMS devices is not affected by Google's claims that:

(1) users can and do download competing non OS-specific mobile web browsers, as confirmed by Opera[994] and the 2017 App Annie Report, which indicates that UC Browser was the sixth most downloaded app in the world in 2016;[995]

(2) limitations on device storage space do not prevent downloads;[996]

(3) downloads of Firefox on Google Android devices have increased significantly since August 2012.[997] and in 2017, Firefox experienced a strong increase in the number of downloads on smart mobile devices, as confirmed by a blog post by Mozilla;[998]

(4) users can freely download mobile web browsers that best suit their individual preferences, as confirmed by the situation in the Republic of Korea, where Samsung Internet and Naver are the leading mobile web browsers;[999]

(5) while being pre-installed is no guarantee of usage, being downloaded is a sign that users intend to try out the app and use the download channel;[1000] and

(6) downloads have proved successful for other categories of apps, such as maps where there have been significant downloads of Google Maps on iOS devices, despite the pre-installation of Apple Maps.[1001]

(925) In the first place, the Commission does not contest that users can download web browsers from app stores. However:

(1) such downloading does not offset Google's pre-installation advantage on GMS

---

[993] See non-confidential Appendix 1 to Opera's response to the request for information of 1 December 2015 (Doc ID 4639).

[994] Google's Response to the Statement of Objections, Part Four, pages 237-241, paragraphs 177-187 (Doc 7117), Google's Response to the First Letter of Facts, Part Three, pages 95-96, paragraphs 84-86 (Doc ID 8598) and Google's Response to the Second Letter of Facts, Part One, pages 2-4, paragraphs 1-7 (Doc ID 8876).

[995] See Google's letter of 14 March 2018 (Doc ID 8768).

[996] Google's Response to the Statement of Objections, Part Four, pages 238-239, paragraph 181 (Doc ID 7117).

[997] Google's Response to the Statement of Objections, Part Four, pages 239-240, paragraph 183 (Doc ID 7117).

[998] See Google's letter of 14 March 2018 (Doc ID 8768).

[999] Google's Response to the Statement of Objections, Part Four, page 238, paragraph 181 (Doc ID 7117).

[1000] Google's Response to the First Letter of Facts, Part Three, page 96, paragraph 86 (Doc ID 8598).

[1001] Google's Response to the First Letter of Facts, Part Three, page 96, paragraph 86 (Doc ID 8598).

**EN**

**EN**

GOOG-DOJ-26429374

devices resulting from the tying of Google Chrome with the Google Search app and the Play Store; and

(2)   Opera's statements relied on by Google are contradicted by Opera's previous statements made in response to a request for information by the Commission pursuant to Article 18 of Regulation (EC) No 1/2003:

*"We believe the availability of the Chrome browser as the default browser application, pre-installed and available on the home-screen on Android phones limits Opera's ability to compete for the default position on all Android devices, which in turn would have enabled Opera to achieve on the merits a higher market share, active user number, brand awareness and revenues than is currently the case."*[1002]

*"While we strongly believe that OEMs' pre-installation of Chrome has reduced the number of downloads of our mobile browsers from Google Play, we do not have accurate estimates on the magnitude of this effect."*[1003]

(3)   In the case of UC Browser, the greater frequency of downloads worldwide can be explained by the focus of this mobile web browser, which is mainly on Asian countries (see recital (910)(3)).

(926)   In the second place, as explained in recitals (827) to (829), duplication of Google apps can cause issues with the storage space of some devices and negatively impact the user experience on smart mobile devices.

(927)   In the third place, while between 2013 and 2016, the total annual number of downloads of Firefox on Google Android devices increased from [0-50] million to [0-50] million, the number of additional GMS devices on which Google Chrome was pre-installed annually increased from 594 million to 918 million.[1004]

(928)   Moreover, as regards the alleged strong increase in the number of downloads of Firefox on smart mobile devices in 2017, the total number of downloads of Firefox would still remain low compared to the number of GMS devices on which Google Chrome was pre-installed. Moreover, the blog post by Mozilla[1005] does not provide any breakdown of the alleged increase in the number of downloads of Firefox between iOS and Google Android devices.

(929)   In the fourth place, according to StatCounter, Google Chrome, and not Samsung Internet and Naver, is the leading mobile web browser in Republic of Korea with a 64% usage share of non OS-specific mobile web browsers in 2016.[1006]

(930)   In the fifth place, even if being downloaded were a sign that users intend to try out the app, downloads of competing non-OS specific mobile web browsers in the EEA remain insignificant in number (see recitals (921) and (922)). Moreover, this would

---

[1002]   Opera's non-confidential response to Question 12 of the request for information of 19 October 2015 to web browser providers (Doc ID 8734-41).

[1003]   Opera's non-confidential response to Question 12 of the request for information of 19 October 2015 to web browser providers (Doc ID 8734-41).

[1004]   See Table 17.

[1005]   See N. Nguyen, Mozilla Blog, Early Returns on Firefox Quantum Point to Growth, December 12, 2017, available at https://blog.mozilla.org/press-uk/2017/12/12/early-returns-on-firefox-quantum-point-to-growth/ printed and saved on 13 June 2018.

[1006]   Source: StatCounter data for 2016, downloaded on 22 May 2017, http://gs.statcounter.com/.

GOOG-DOJ-26429375

not alter the importance of pre-installation as a channel for the distribution of web browsers on Google Android devices (see Section 11.4.4.1.I).

(931)   In the sixth place, the example of the Apple Maps app on iOS devices confirms the importance of pre-installation as compared to downloads. A significant number of users of iOS devices continue to use the pre-installed Apple Maps app rather than the Google Maps app, notwithstanding the perception that the service offered by the Apple Maps is of lesser quality than that offered by Google Maps.[1007]

> b)   *Pre-installation agreements with OEMs and MNOs cannot offset the competitive advantage that Google ensures for itself*

(932)   Pre-installation agreements with OEMs and MNOs cannot be compared in reach and effectiveness to the pre-installation of Google Chrome on GMS devices. This is for the reasons described in recitals (933) to (946).

(933)   First, OEMs and MNOs are reluctant to pre-install applications when they duplicate services because of issues with the storage space of certain devices (see also recital (829)).

(934)   This is confirmed by the evidence described in Section 11.3.4.1.IV.c) and the following:

>   (1)   according to [OEM], [information on pre-installation of applications].[1008]
>
>   (2)   according to Sony, its policy since 2012 is to stop pre-installing its mobile web browser "*to focus on the end-user experience and avoid duplication.*"[1009] In addition "*Since 2012 Q3, the internal recommendation has been to include Chrome only, and from 2015 the internal direction is that the Sony Mobile browser is included only when there is a strong justification, i.e. that customer requirements can't be met with the Chrome browser. The number of markets where the* [Sony Mobile] *browser is provided is declining and the current prediction is that the Sony Mobile browser will not be included in any EEA Member State markets during 2016.*"[1010] Sony indicated that its "Chrome-only" approach is due to the fact that (i) it is impossible to uninstall Google Chrome and (ii) it is mandatory as a result of the MADA, for Sony to pre-install Google Chrome.[1011]

(935)   Second, even if a competing mobile web browser were also pre-installed, it cannot be set as the default web browser:

>   (1)   according to Orange: "*it's not possible to set a browser by default* [...] *To avoid such experience, OEM as Sony & Motorola stopped the development of their*

---

[1007]   See "*Why 3.5 times more Apple users choose Apple Maps over Google Maps*", available at http://fortune.com/2015/06/16/apple-google-maps-ios/ printed and saved on 13 June 2017. See "*Apple Maps vs. Google Maps: A year in analysis*" available at https://www.imore.com/apple-maps-vs-google-maps-year-analysis/ printed and saved on 9 July 2018.

[1008]   See [OEM]'s non-confidential response to Question 8 of the request for information of 19 October 2015 to web browser providers […].

[1009]   See Sony Mobile Communications' non-confidential response to Question 2(v) of the request for information of 19 October 2015 to web browser providers (Doc ID 4122).

[1010]   See Sony Mobile Communications' non-confidential response to Question 2(iv) of the request for information of 19 October 2015 to web browser providers (Doc ID 4122).

[1011]   Sony Mobile Communications' non-confidential response to Questions 2(iv) and 2(v) of the request for information of 19 October 2015 to web browser providers (Doc ID 4122).

**EN**

213

**EN**

GOOG-DOJ-26429376

*browser and use only Chrome. Therefore, when end users click on an URL, they will be prompted to select between different browsers. This may have a negative impact on the customer experience (except advanced users). Therefore, MNOs/OEMs will be incited to accept Google's default setting in order to avoid this hurdle for the user."*[1012]

(2)    […], an Android device manufacturer informed […] in 2013 that it had been *"recently notified by Google that we are not allowed to set a default Browser on the device as it breaks their certification rules. Previously, we were able to do this but with their new certification process, this is not allowed. We can currently only preload the app on our device."* In the same year, another manufacturer informed […] of the same issue.[1013] […] also reported discussions with MNOs about pre-installing [web browser] on Android devices in which MNOs have told […] that they could not pre-install [web browser] because *"OEMs have told them that their agreements with Google will not allow for the pre-installation or default setting of any applications that are competitive with applications existing in or applications that may in the future exist as a part of Google Mobile Services (GMS)."*[1014] As one MNO explained to […], *"we could not pre-load another browser on their android devices. There was no exception to this, as it was the OEM who said this was not possible"*.[1015]

(936)    Third, the number of pre-installations on Google Android devices of each competing non OS-specific mobile web browser is significantly lower than the number of pre-installations on Google Android devices of Google Chrome.[1016] As indicated in Table 19:

(1)    the competing non OS-specific mobile web browser with the highest number of pre-installations worldwide is Samsung's browser, being pre-installed on [20-30]% of Google Android devices in 2016, i.e. approximately half of the numbers of pre-installation of Google Chrome;[1017]

(2)    Opera Browser and UC Browser were pre-installed on respectively [10-20]% and [5-10]% of Google Android devices sold worldwide in 2016.[1018] Moreover, when considering only the EEA, Opera Browser and UC Browser were pre-installed on less than 5%[1019] of the Google Android devices in the EEA, given

---

[1012]    See Orange's non-confidential response to Question 38 of the request for information of 22 July 2014 (Doc ID 4575).

[1013]    See […].

[1014]    See […].

[1015]    See […].

[1016]    Given that competing non OS-specific mobile web browsers did not distinguish between pre-installations in GMS devices and Google Android devices, for the case of pre-installations, the base value for comparison is the total number of Google Android devices instead of GMS devices (which are used in Table 17 and Table 18). The Commission compares the percentage of pre-installations of Chrome on Google Android devices, which is less than 100%, with the percentage of pre-installations of competing web browsers. See footnote 489.

[1017]    Source: Annex Q6 to Google's response to Question 6 of the request for information of 24 March 2017 (Doc ID 7894-1) and […] data (Doc ID 7866 and 7867).

[1018]    Source: data accessible to Google in the data room submitted in response to the requests for information of 31 March 2017 (Alibaba) and 3 April 2017 (Opera) and […] data (Doc ID 7866 and 7867).

[1019]    Source: data accessible to Google in the data room submitted in response to the requests for information of 31 March 2017 (Alibaba) and 3 April 2017 (Opera) and […] data (Doc ID 7866 and 7867).

GOOG-DOJ-26429377

their focus respectively on countries in Africa and Asia;[1020]

(3)  Huawei's mobile web browser was pre-installed on [5-10]% of the new Google Android devices in 2016 worldwide; and

(4)  all the other mobile web browsers were pre-installed on less than 5 % of the Google Android devices sold in 2016 worldwide. For example, Mozilla achieved until mid-2015 only [0-250 000] pre-installations of its Firefox browsers on Google Android devices[1021] i.e. less than 1% than the number of Google Android devices.

**Table 19: Percentage of pre-installations of mobile web browsers on Google Android devices worldwide in 2013-2016**

| Mobile browsers | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| % of Google Chrome on Google Android devices | 64.1% | 67.3% | 71.4% | 69.0% |
| % of non-Chrome on Google Android devices | [50-60]% | [40-50]% | [50-60]% | [50-60]% |
| Of which: | | | | |
| HTC | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Huawei | [5-10]% | [5-10]% | [0-5]% | [5-10]% |
| LG | [5-10]% | [0-5]% | [0-5]% | [0-5]% |
| Mozilla | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Opera | [0-5]% | [5-10]% | [10-20]% | [10-20]% |
| Samsung | [30-40]% | [20-30]% | [20-30]% | [20-30]% |
| Sony | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| UC Browser | [0-5]% | [0-5]% | [0-5]% | [5-10]% |
| Yandex | [0-5]% | [0-5]% | [0-5]% | [0-5]% |

(937)  Fourth, the Commission's conclusion that pre-installation agreements with OEMs and MNOs cannot be compared in reach and effectiveness to the pre-installation of Google Chrome on GMS devices is not affected by Google's claims that:

(1)  Table 19 shows that competing non OS-specific mobile web browsers were pre-installed on a similar proportion of Google Android devices;[1022]

(2)  Table 19 does not include several mobile web browsers (VC browser, Puffin

---

[1020]  As regards Alibaba, see footnote 981. As regards Opera, see footnote 990.

[1021]  See Mozilla's non-confidential response to Question 9 of the request for information of 21 October 2015 (Doc ID 4165).

[1022]  Google's Response to the First Letter of Facts, Part Three, pages 92-93, paragraphs 77 and 79 (Doc ID 8598).

**EN**                                    215                                    **EN**

browser, Dolphin browser, Web Browser and Adblock Browser);[1023]

(3)  Table 19 underestimates the number of pre-installations of Opera on Google Android devices because it does not take into account instances where OEMs pre-installed Opera's browser but users did not activate it;[1024]

(4)  there is no reason why a competing non OS-specific mobile web browser could not obtain even greater pre-installations if they are attractive since neither users nor OEMs would object to the pre-installation of more than one mobile web browser, as confirmed by the fact that Samsung pre-installs its own Samsung Internet browser on the default home screen on its devices alongside Google Chrome;[1025]

(5)  consumer communication and social networking apps such as WhatsApp, Facebook and Instagram have been successful on Android and have not been impeded by the pre-installation of competing GMS apps such as Google Hangout, Google Photos and Google+;[1026]

(6)  data from Vodafone and Orange indicates significant pre-installation by these MNOs on Google Android devices of apps that compete with GMS apps;[1027]

(7)  what matters is not pre-installation but whether users actually try out and use the pre-installed app;[1028] and

(8)  OEMs do not pre-install competing non OS-specific mobile web browsers for reasons unrelated to the tying of Google Chrome such as low volumes, functionality requirements, localisation and tight production/launch schedules.[1029]

(938)  In the first place, Table 19 does not show that, worldwide, competing non OS-specific mobile web browsers were pre-installed on a similar proportion of Google Android devices between 2013 and 2016. Rather, it indicates that, worldwide between 2013 and 2016:

(1)  each competing non OS-specific mobile web browser was pre-installed on a significantly lower number of Google Android devices than Google Chrome; and

(2)  all competing non OS-specific mobile web browsers were collectively pre-installed on a lower number of Google Android devices than Google Chrome.

(939)  In the second place, the worldwide share of mobile web browsers not included in Table 19 is insignificant. For example, the worldwide share of each non OS-specific

---

[1023]  Google's Response to the First Letter of Facts, Part Three, pages 92-93, paragraphs 77 and 79 (Doc ID 8598).

[1024]  Google's Response to the First Letter of Facts, Part Three, pages 92-93, paragraphs 77 and 79 (Doc ID 8598).

[1025]  Google's response to complaint by OIP, paragraphs 55, 65 and 75 (Doc ID 7787) and Google's Response to the Statement of Objections, Part Four, pages 229-236, paragraphs 166-173 (Doc ID 7117).

[1026]  Google's Response to the Statement of Objections, Part Four, page 228, paragraph 164 (Doc ID 7117).

[1027]  Google's Response to the Statement of Objections, Part Four, pages 227-228, paragraph 163 and 165 (Doc ID 7117).

[1028]  Google's Response to the First Letter of Facts, Part Three, page 92, paragraph 78 (Doc ID 8598).

[1029]  Google's Response to the Statement of Objections, Part Four, page 236 paragraph 174 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429379

mobile web browser not included in Table 19 was below 0.2% in 2016.[1030]

(940)   In the third place, even though Table 19 does not take into account instances where OEMs pre-installed, but users did not activate, Opera's browser, this does not alter the fact that pre-installation agreements with OEMs and MNOs cannot be compared in reach and effectiveness to the pre-installation of Google Chrome on GMS devices. This is because Opera was pre-installed on less than 5% of the Google Android devices in the EEA.[1031]

(941)   In the fourth place, given that the MADA requires OEMs to take a bundle of 12-30 apps, OEMs would have to be mindful to avoid duplicating Google apps as this would negatively impact the user experience on their devices (see recital (827)).

(942)   Moreover, regarding the [OEM] browser, [confidential commercial information], [OEM] noted that "Google's requirement imposed on device manufacturers to pre-install Chrome browser as a precondition to accessing the Google apps contained in the Google Mobile Services ("GMS") suite poses a competitive challenge to rival browser developers".[1032]

(943)   In the fifth place, unlike competing mobile web browsers, developers of competing consumer communication and social networking apps can offset the competitive advantage that Google ensures for itself by the pre-installation of competing GMS apps such as Google Hangout, Google Photos and Google + (see recital (813)).

(944)   In the sixth place, the data from Vodafone and Orange concerns the pre-installation of apps in general and not of competing mobile web browsers in particular.

(945)   In the seventh place, Google's claim that the way an app is distributed is not relevant is contradicted by the evidence about the importance of pre-installation as a channel for the distribution of web browsers on Google Android devices (see recitals (903) to (908).

(946)   In the eighth place, even if there were other reasons why OEMs do not pre-install competing non OS-specific mobile web browsers, this would not alter the fact that Google's conduct makes it more difficult to pre-install competing non OS-specific mobile web browsers. This is because OEMs and MNOs are reluctant to pre-install applications when they duplicate services as explained in recitals (933) and (934).

*IV.*   *Google's competitive advantage resulting from the tying and the inability of competing non OS-specific mobile web browsers to offset that advantage is consistent with the evolution of market shares*

(947)   Google's competitive advantage resulting from the tying and the inability of developers of non OS-specific mobile web browsers to offset that advantage are consistent with the evolution of Google's general share queries.

(948)   According to StatCounter data,[1033] Google's usage share on non OS-specific mobile

---

[1030]   Source: StatCounter data for 2016, downloaded on 22 May 2017, http://gs.statcounter.com/.

[1031]   Source: data accessible to Google in the data room submitted in response to the requests for information 3 April 2017 and [...] data (Doc ID 7866 and 7867).

[1032]   See [OEM]'s non-confidential response to Question 8 of the request for information of 19 October 2015 to web browser providers [...].

[1033]   Source: StatCounter data for 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/. StatCounter data is based on aggregate data collected by StatCounter on a sample exceeding 15 billion page views per month collected from across the StatCounter network of more than 3 million websites.

**EN**                                        217                                        **EN**

GOOG-DOJ-26429380

web browsers, has increased both in Europe and worldwide between August 2012 (when Google Chrome became a mandatory Google app) and March 2017.

(949)   In Europe, Google Chrome's usage share of non OS-specific mobile web browsers increased from 4.7% in August 2012 to 74.9% in March 2017 whereas the usage share of most other non OS-specific mobile web browsers decreased or remained insignificant: (i) the usage share of AOSP-based browsers[1034] decreased from 74.5% to 8.2%; (ii) the usage share of Opera decreased from 15.9% to 1.4%; and (iii) the usage share of Firefox decreased from 0.9% to 0.2%. The only exception is the Samsung Internet browser, the market share of which increased after its introduction as a pre-installed browser in Samsung devices at the beginning of 2016, but has then stabilised at approximately 12% market share.

**Figure 21: Usage share of non OS-specific mobile web browsers in Europe between August 2012 and March 2017**



(950)   Worldwide, Google Chrome's usage share of non OS-specific mobile web browsers increased from 2.0% in August 2012 to 58.3% in March 2017 whereas the usage share of most other non OS-specific mobile web browsers either decreased or remained insignificant: (i) the usage share of AOSP-based browsers decreased from 42.4% to 6.4%; (ii) the usage share of Opera decreased from 30.2% to 6.6%; and (iii) Firefox's usage share decreased from 0.8% to 0.1%. The only exceptions are the Samsung Internet browser, the market share of which increased after its launch as a pre-installed browser at the beginning of 2016, but then stabilised at 7%, and UC Browser, the market share of which increased from 12.8% to 20.2%. In the case of UC Browser, its usage and growth is explained by the focus of this web browser on Asian countries.[1035]

---

[1034]   The Commission calculated the usage share data of non OS-specific mobile web browsers by disregarding the usage share data attributed by StatCounter to OS-specific mobile web browsers.
AOSP-based browsers are those developed on top of the web browser apps made available through the Android Open Source Project. OEMs such as [OEM], Huawei, LG Electronics, Samsung or Sony have pre-installed this type of browser on their GMS devices. These browsers are referred to by StatCounter as "Android browsers". See non-confidential responses to Question 2(iii) of the request for information of 15 October 2015 to web browser providers.

[1035]   See footnote 981.

**EN**                                              218                                              **EN**

GOOG-DOJ-26429381

**Figure 22: Usage share of non OS-specific mobile web browsers worldwide between August 2012 and March 2017**



(951)   According to StatCounter data, Google Chrome's usage share also increased proportionally more on non OS-specific mobile web browsers than on PC web browsers during that period:

   (1)   In Europe, Google Chrome's usage share on non OS-specific mobile web browsers increased from 4.7% to 74.9% from August 2012 to March 2017 on non OS-specific mobile web browsers, whereas usage share on PC web browsers increased from 32.1% to 53.4%.[1036]

   (2)   Worldwide, Google Chrome's usage share on non OS-specific mobile web browsers increased from 2.0% to 58.3% from August 2012 to March 2017 on non OS-specific mobile web browsers, whereas usage share on PC web browsers increased from 34.7% to 62.8%.[1037]

(952)   According to StatCounter data, between August 2012 and March 2017, Google Chrome also enjoyed an increase in usage share and became the leader in terms of usage on all mobile web browsers, including OS-specific web browsers, both in Europe and worldwide. In Europe, Google Chrome's usage share on mobile web browsers increased from 1.7% to 48.3% from August 2012 to March 2017, and worldwide, Google Chrome's usage share on mobile web browsers increased from 1.0% to 45.0% from August 2012 to March 2017.[1038]

(953)   According to StatCounter data, Google's usage share on all web browsers worldwide also increased during that period. Google Chrome's usage share on all web browsers increased from 29.9% in August 2012 to 52.9% in March 2017 whereas the usage share of Internet Explorer and Firefox, the two web browsers that had similar usage shares to Google Chrome in August 2012, decreased from 29.1% to 4.2% and 20.3%

---

[1036]   Source: StatCounter data for 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.
[1037]   Source: StatCounter data for 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/. See Google's Response to the Statement of Objections, Part Four, pages 238-239, paragraph 181 (Doc ID 7117).
[1038]   Source: StatCounter data for 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.

**EN**                              219                              **EN**

to 6.7% respectively.[1039]

(954)   The increase in Google Chrome's usage share on non OS-specific mobile web browsers does not seem to be explained by a substantial quality advantage in the eyes of Android users. According to Play Store ratings data as of April 2017: (i) Google Chrome had an average rating of 4.3 (7.4 million reviews); (ii) Opera Browser had an average rating of 4.3 (2.2 million reviews); (iii) Opera Mini had an average rating of 4.4 (3.2 million reviews); (iv) Firefox had an average rating of 4.4 (2.8 million reviews); (v) UC Browser had an average rating of 4.5 (13.9 million reviews); and (vi) the UC Browser Mini had an average rating of 4.4 (2.8 million reviews).[1040]

(955)   In particular, despite being rated more highly on the Play Store than Google Chrome, Firefox continues to struggle to gain adoption on smart mobile devices (0.1% usage share on mobile web browsers in Europe in March 2017), despite much broader adoption on PCs (20.9% usage share on PC web browsers in Europe in March 2017)

(956)   The Commission's conclusion that Google's competitive advantage resulting from the tying and the inability of developers of non OS-specific mobile web browsers to offset that advantage are consistent with the evolution of Google's general share queries is not affected by Google's claim that:

   (1)   Google Chrome's worldwide share on PC web browsers is higher than on non OS-specific mobile web browsers;

   (2)   Google Chrome did not experience an increase in usage share on non OS-specific mobile web browsers between August 2012 and early 2014. It also did not overtake the AOSP browser share until mid-2014, approximately two years after the tying began;

   (3)   Google Chrome's usage share on non OS-specific mobile web browsers decreased from late 2015 to early 2016;[1041]

   (4)   Google Chrome high usage in mobile is due to technical superiority and to the fact that it is the most used PC web browser;[1042]

   (5)   the rankings on the Play Store do not reflect quality;[1043] and

   (6)   the reason for Firefox's low share is due to significant drawbacks with the browser, which have not only kept its share on mobile low, but have also caused it to lose significant share on PC web browsers.[1044]

(957)   First, while Google Chrome's worldwide share on PC web browsers (62.8% in March 2017) is slightly higher than on non OS-specific mobile web browsers (58.3% in March 2017), in the EEA, Google Chrome's market share on non OS-specific mobile

---

[1039]   Source: StatCounter data for 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.
[1040]   See data retrieved on April 2017, available at https://play.google.com/store.
[1041]   Google's Response to the Statement of Objections, Part Four, pages 227-249 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Three, pages 91, 96-97, paragraphs 74 and 90 (Doc ID 8598).
[1042]   Google's Response to the Statement of Objections, Part Four, pages 227-249 (Doc ID 7117)
[1043]   Google's Response to the Statement of Objections, Part Four, pages 225-226, paragraph 157 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Three, page 98, paragraph 91 (Doc ID 8598).
[1044]   Source: StatCounter data 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/. Google's Response to the First Letter of Facts, Part Three, page 98, paragraph 92 (Doc ID 8598).

**EN**
**EN**

GOOG-DOJ-26429383

web browsers (74.9% in March 2017), where it is pre-installed, is already higher than on PC web browsers (53.4% in March 2017), despite the fact that Google launched Google Chrome on Google Android devices four years later than on PCs (2012 versus 2008).[1045]

(958)     Moreover, Google Chrome's worldwide share is slightly lower on non OS-specific mobile web browsers than on PC web browsers because of the presence of UC Browser, the focus of which is mainly on Asian countries (see recital (910)(3)).

(959)     Second, Google Chrome did experience an increase in usage share on non OS-specific mobile web browsers between August 2012 and early 2014 (from 2% to 14.4%). Moreover, after overtaking AOSP web browsers in mid-2014, Google Chrome's usage continued to increase and was nine times higher than that of AOSP web browsers in March 2017.

(960)     Third, the decrease in Google Chrome's usage share on non OS-specific mobile web browsers during the first two months of 2016 was caused by the Samsung Internet browser, the usage share of which increased after Samsung began pre-installing it on its Galaxy devices. However, as of March 2016, the usage share of the Samsung Internet browser worldwide stabilised at approximately 7%, while Google Chrome's share started increasing again in March 2016.[1046] By the end of 2016, Google Chrome's usage share was already higher than before Samsung began pre-installing the Samsung Internet browser on its Galaxy devices.[1047]

(961)     Fourth, Google Chrome's usage share on non OS-specific mobile web browsers cannot be explained by its superior quality. This is because on iOS devices, users do not download Google Chrome to such an extent as to match its presence on GMS devices (see recital (908)). Moreover, Google's share of non OS-specific mobile web browsers developed differently and it is now significantly higher in the EEA than its share on PCs.

(962)     Fifth, Google's actual conduct contradicts its claim that the Commission should ignore the ratings on the Play Store (see recital (847)).

(963)     Sixth, in April 2017 users of Firefox attributed a higher average rating in the Play Store to this mobile web browser than users of Google Chrome.[1048] Moreover, on PC, Firefox is still the second most important web browser as regards usage share both in the EEA and worldwide.[1049]

*V.       Google's other claims and the Commission's response*

(964)     Google more generally claims that the Commission has failed in two respects to conduct an analysis of the competitive advantage that Google ensures itself via the tying of Google Chrome with the Play Store and the Google Search app in line with

---

[1045]     See    "*Google    Chrome    now    live*"    (2    September    2008),    available    at https://googleblog.blogspot.be/2008/09/google-chrome-now-live.html, printed and saved on 23 June 2017    and    "*Introducing    Chrome    for    Android*"    (7    February    2012),    available    at https://chrome.googleblog.com/2012/02/introducing-chrome-for-android.html, printed and saved on 23 June 2017.

[1046]     Samsung's worldwide market share (i.e. 7%) underestimates the share at the level of Samsung devices, the only devices where Samsung Internet is pre-installed.

[1047]     See Figure 21.

[1048]     See data retrieved on April 2017, available at https://play.google.com/store.

[1049]     Source: StatCounter data for 2012-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.

GOOG-DOJ-26429384

the decisions adopted in Case AT.37792 *Microsoft* and AT/39530 *Microsoft (Tying)* and the judgment in Case T-201/04 *Microsoft*:

(1)   the judgment in Case T-201/04 *Microsoft* requires the Commission to make a finding of "*indirect network effects*" with respect to the Google Chrome;[1050] and

(2)   unlike in its decisions in Cases AT/37792 *Microsoft* and AT/39530 *Microsoft (Tying)*, the Commission has failed to: (i) assess the question of alternative means of access and user engagement; (ii) conduct a survey on download figures; (iii) examine the actual development of usage shares; and (iv) examine carefully alternative explanations for changes in usage.[1051]

(965)   Google's claims are unfounded.

(966)   First, the judgment in Case T-201/04 Microsoft does not require the Commission to make a finding of "*indirect network effects*" with respect to Google Chrome. While the presence of indirect network effects was one factor that the Commission took into consideration in its decision in Case AT.37792 *Microsoft*, nothing in the judgment in Case T-201/04 provides that the Commission is generally required to make such a finding when analysing the effects of tying.

(967)   Second, the Commission has, in this case, assessed the question of alternative means of access and user engagement, such as downloading and pre-installing, examined the actual development of usage shares and examined carefully alternative explanations for changes in usage shares. As for the alleged omission to conduct a survey on download figures, the Commission did not need to conduct such a survey because it obtained actual download figures from Google and third parties.

(968)   Third, and in any event, the Commission is not required to apply rigorously an identical framework of assessment in all tying cases. Rather, the Commission must make an overall assessment in each given case and can take account of a range of tools for the purposes of that assessment.[1052]

11.4.4.2. Google's conduct deters innovation, tends to harm, directly or indirectly, consumers of mobile web browsers and helps to maintain and strengthen Google's dominant position in each national market for general search services

(969)   For the reasons set out in this Section, the Commission concludes that the tying of Chrome with the Play Store and the Google Search app deters innovation in relation to mobile web browsers, tends to harm, directly or indirectly, consumers and helps to maintain and strengthen Google's dominant position in each national market for general search services.

---

[1050]   Google's Response to the Statement of Objections, Part Four, pages 180-181, paragraph 63 (Doc ID 7117).

[1051]   Google's Response to the Statement of Objections, Part Four, pages 181-182, paragraph 64, and page 292, paragraph 93 (Doc ID 7117).

[1052]   Case T-210/01 *General Electric v Commission*, EU:T:2005:456 paragraph 519; Case T-343/06 *Shell Petroleum and Others v Commission*, EU:T:2012:478, paragraph 171; Case T-342/07 *Ryanair v Commission*, EU:T:2010:280, paragraph 136; Case T-175/12 *Deutsche Börse v Commission*, EU:T:2015:148, paragraph 133; Case T-699/14 *Topps Europe v Commission*, EU:T:2017:2, paragraph 82.

**EN**                                      222                                      **EN**

GOOG-DOJ-26429385

(970)    First, Google's conduct deters innovation in relation to mobile web browsers because it prevents the development of non-OS specific mobile web browsers with innovative features. Moreover, as a result of Google's conduct, competing non OS-specific mobile web browsers must spend resources to overcome the advantage conferred by pre-installation (see recital (861)).

(971)    Second, Google's conduct is capable of harming, directly or indirectly, consumers who, as a result of Google's interference with the normal competitive process may see less choice of mobile web browsers.

(972)    Third, Google's conduct helps it to maintain and strengthen its dominant position in each national market for general search services and, thus, its revenues via search advertisements. This is for the reasons set out in recitals (973) to (977).

(973)    In the first place, Google Search is set as the default general search service on Google Chrome and OEMs cannot change this setting. In Google's own words: "*Chrome, as a proprietary Google product, is distributed to OEMs with Google Search as the default search service. Proprietary software is generally licensed for distribution as a machine-readable binary code. Unlike open-source software, where the source code is written in a computer programming language that can be read and modified by software developers before it is compiled by them into binary code to be uploaded onto hardware, proprietary software is already compiled by the licensor into binary code that the distribution partner has to implement as licensed. OEMs cannot modify Chrome's binary code as this would infringe Google's copyright and its position under IP law*".[1053]

(974)    In the second place, in 2016, [30-40]% of all general search queries on Google Android devices were conducted via Google Chrome.[1054] Moreover, the other main search entry point on Google Android devices is the Google Search app (including the widget), which covered [40-50]% of all general search queries on Google Android devices in 2016.[1055] As explained in Section 11.3 Google also ties the Google Search app entry point to the licensing of the Play Store.

(975)    In the third place, the majority of general search services that responded to the request for information to general search services confirmed that the mobile web browser is an important entry point for general search services.[1056]

(976)    In the fourth place, Google's conduct prevents competing general search services to gain search queries and the respective revenues and data needed to improve their services (see recital (859)).

(977)    In the fifth place, there are several examples of competing general search services that were able to grow their share of general search queries by being set as default in pre-installed or downloadable web browsers:

(1)    In India and Brazil, where Bing was pre-installed and set as the default general

---

[1053]    Source: Google's response to Question 13 of the request for information of 24 March 2017 (Doc ID 7790).

[1054]    Source: Google's response to Question 11 of the request for information of 24 March 2017 (Doc ID 7894-4).

[1055]    Source: Google's response to Question 11 of the request for information of 24 March 2017 (Doc ID 7894-4).

[1056]    See non-confidential responses to Question 2 of the request for information of 20 November 2015 to Search providers.

**EN**                                          223                                          **EN**

search service on the mobile web browser of the Nokia Asha 501, Bing's query share was [20-30]% and [30-40]% respectively on such devices as opposed to less than [0-10]% in any EEA country.[1057]

(2)   Prior to June 2013 in Mexico, no general search service was pre-installed and set as the default general search service on the mobile web browser of the Nokia Asha 501 and Bing's query share on such devices was less than [0-10]%. By contrast, six months after Bing was pre-installed and set as default on the mobile web browser on those devices in July 2013, Bing's query share was [50-60]% on such devices.[1058]

(3)   In November 2014, Yahoo's general search service replaced Google as the default provider of general search services in the US for the newest release of Mozilla's PC and mobile web browser, Firefox 34. By contrast, Google Search remained the default general search service in earlier versions of Firefox, including the previous release, Firefox 33. A month after this change, Yahoo's query share on the Firefox 34 browser was 29% compared to 10% on the Firefox 33 browser. This resulted in an increase in Yahoo's share of general search queries in the US from 8.9% in November 2014 to 9.5% in April 2015.[1059] As for Google's query share, it was 63% on Firefox 34 and 82 % on Firefox 33.[1060] Although Google argues that the increase in Yahoo's market share was minimal and that it lost the market share it had gained after the agreement with Firefox one year after it was implemented,[1061] the Commission concludes that the decrease in Yahoo's share from 9.5% in April 2015 to 7.6% in October 2015 can be justified in part by the decrease in Firefox's usage share on all web browsers in the US during the same period.[1062] In addition, the relevant figure is the increase of Yahoo's share from 10% to 29%, as the evolution of the share in general search services is only a reflexion of the penetration of the devices where Firefox 34 was present.

(4)   In October 2015, the Yandex general search app was pre-installed and set as default on Windows Phone devices in Turkey. On these devices, Yandex's query share was approximately ten times higher than on other smart mobile devices in Turkey during the same time period.[1063]

(978)   Fourth, the Commission's conclusion that the tying of Google Chrome with the Play Store and the Google Search app helps Google to maintain and strengthen its dominant position in each national market for general search services is not affected by Google's claims that:

---

[1057]   Microsoft's non-confidential internal document submitted in response to the request for information of 17 July 2014 (Doc ID 4176), slides 4 and 21.

[1058]   Microsoft's non-confidential internal document submitted in response to the request for information of 17 July 2014 (Doc ID 4174), slides 3 and 4.

[1059]   Source: StatCounter data for 2009-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.

[1060]   See "*Report: Yahoo Search Share Up After Firefox Deal, Google Down*" (7 January 2015), available at http://searchengineland.com/report-yahoo-search-share-firefox-deal-google-212288, printed and saved on 6 April 2016.

[1061]   Google's Response to the First Letter of Facts, Part Three, pages 99-100, paragraph 98 (Doc ID 8598).

[1062]   Source: StatCounter data, downloaded on 22 May 2017, http://gs.statcounter.com/.

[1063]   Yandex's non-confidential response to Question 2 of the request for information of 20 November 2015 to Search providers (Doc ID 4219).

**EN**                                224                                **EN**

GOOG-DOJ-26429387

(1)     its conduct coincided with a period of improvement of Google Chrome;[1064]

(2)     Google Chrome allows users to switch the default of the web browser to competing general search services; and

(3)     OEMs are free to pre-install other web browsers.[1065]

(979)   In the first place, even if Google's conduct were to have coincided with a period of improvement of Google Chrome, Google neither claims nor demonstrates that its conduct has not affected the incentives and ability of competing non OS-specific mobile web browsers to improve their browsers.

(980)   Moreover, absent the tying of Google Chrome with the Play Store and the Google Search app, Google may have improved Google Chrome to a greater degree.

(981)   In the second place, users are unlikely to change general search service when the default service on the web browser already delivers the required functionality to a satisfactory level.

(982)   In the third place, as described in recital (933), OEMs and MNOs are reluctant to pre-install applications when they duplicate services.

11.4.4.3. Google's claims regarding the need for the Commission to consider its conduct in its relevant economic and legal context

(983)   Google claims that its conduct is incapable of restricting competition when assessed in its relevant economic and legal context.

(984)   First, assessing whether Google's conduct is capable of restricting competition requires the Commission to demonstrate that "*there would have been greater competition absent the impugned conduct*" and to "*consider in that context, the interactions among different sides of*" the Android platform.[1066]

(985)   Second, an assessment of its conduct in the relevant economic and legal context as of 2009 when Google began to enter into MADAs "*would have revealed that this practice is incapable of restricting competition and in fact promoted competition*".[1067]

(986)   Google's claims are unfounded.

(987)   First, Google fails to clarify whether the conduct to which it refers is only the tying of Google Chrome with the Play Store and the Google Search app[1068] or the MADA as a whole.[1069] However, for the purposes of this Decision, the Commission

---

[1064]   Google's Response to the Statement of Objections, Part Four, page 249, paragraphs 200-202 (Doc ID 7117).

[1065]   Google's Response to the First Letter of Facts, Part Three, page 99, paragraph 96 (Doc ID 8598).

[1066]   Google's letter of 11 June 2018, paragraphs 6 and 11-15 (Doc ID 8890).

[1067]   Google's letter of 11 June 2018, paragraph 20 (Doc ID 8890).

[1068]   Google's letter of 11 June 2018, paragraphs 2-4, 13, 18-21, 28 and 31 (Doc ID 8890); Google's Response to the Statement of Objections, Part Four, pages 174-176, paragraphs 45-48 (Doc ID 7117); Google's Response to the Statement of Objections, Executive Summary, Section IV; Part One, page 9, paragraph 15 and page 28, paragraph 69; Part Four, page 157, paragraph 13; and page 180, paragraph 61 (Doc ID 7117).

[1069]   Google's letter of 11 June 2018, paragraphs 14-17 and 24-27 (Doc ID 8890); Google's Response to the Statement of Objections, Executive Summary, Section IV; Part One, page 8, paragraph 10; and Part Four, page 175, paragraphs 46-47 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429388

concludes that Google's conduct is only the tying of Google Chrome with the Play Store and the Google Search app, and not the MADA as a whole, because only the former constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores and the national markets for general search services.

(988)    Second, the Commission is not required to demonstrate in a general manner that "*there would have been greater competition*" absent the tying of Google Chrome with the Play Store and the Google Search app. Rather, the Commission is required to demonstrate that the tying is capable of restricting competition on the relevant markets, namely the worldwide market for non-OS specific web browsers and the national markets for general search services.

(989)    Third, when assessing the capability of the tying of Google Chrome with the Play Store and the Google Search app to restrict competition on the relevant markets, the Commission has *inter alia* analysed whether there could have been greater competition on those markets, absent the tying (see Section 11.4.4). Regarding the worldwide market for non-OS specific web browsers, this includes an analysis of the usage of Google Chrome on smart mobile devices on which it is not pre-installed, such as iOS (see recitals (907) and (908)). Regarding the national markets for general search services, this includes an analysis of the ability of competing general search services to grow their share of general search queries by being set as default in pre-installed or downloadable web browsers (recital (977)).

(990)    Fourth, when assessing the capability of the tying of Google Chrome with the Play Store and the Google Search app to restrict competition on the relevant markets, the Commission has also taken account of the nature of interactions among the different sides of the Android platform. This includes the fact that: (i) on GMS devices, OEMs cannot obtain the Play Store and the Google Search app without Google Chrome (see Section 11.4.3); (ii) pre-installation is an important channel for the distribution of mobile web browsers on smart mobile devices, including GMS devices (see Section 11.4.4.1.I); (iii) competing mobile web browsers cannot offset the competitive advantage that Google ensures for itself through the pre-installation of Google Chrome on GMS devices (see Section 11.4.4.1.III); and (iv) Google Search is set as the default general search service on Google Chrome and OEMs cannot change this setting (see Section 11.4.4.2).

(991)    To the extent, however, that Google's claim about the "*interactions among different sides*" of the Android platform relates to whether the tying may give rise to benefits on the worldwide market for non-OS specific mobile web browsers, the national markets for general search services and/or on other markets, the Commission has assessed and dismissed such a claim in its analysis of objective justification (see Section 11.5).

(992)    Fifth, when assessing the capability of the tying of Google Chrome with the Play Store and the Google Search app to restrict competition on the worldwide market for non-OS specific mobile web browsers and the national markets for general search services, the Commission is required to undertake such an assessment as of August 2012, when Google added Google Chrome as a mandatory app in a MADA and not as of 2009 when Google began to enter into MADAs.

## 11.5.    Objective justification and efficiencies

(993)    Google claims that the tying of the Google Search app with the Play Store and the

GOOG-DOJ-26429389

tying of Google Chrome with the Play Store and the Google Search app is objectively justified for the following reasons:

(1)     It is a legitimate way for Google to monetise its investments in Android and its non-revenue-generating apps;[1070]

(2)     It allows Google to offer the "*consistent out-of-the-box experience that users expect, and facilitates competition with Apple and other vertically integrated or closed mobile platforms*";[1071] and

(3)     It allows Google to license the Play Store for free because the value of the Play Store to OEMs and users correlates with the value to Google of the promotion by OEMs of Google's general search service.[1072] By contrast, if Google were to charge OEMs a uniform up-front licence fee for the Play Store, such a fee would make lower-end devices [assessment of the impact of a licence fee] and decrease competition with Apple.[1073]

(994)     For the reasons set out in recitals (995) to (1008), the Commission concludes that Google has not demonstrated that the tying of the Google Search app with the Play Store and the tying of Google Chrome with the Play Store and the Google Search app is objectively justified.

(995)     First, Google has not demonstrated that the tying of the Google Search app with the Play Store and the tying of Google Chrome with the Play Store and the Google Search app is necessary to monetise its investment in Android and its non-revenue-generating apps.

(996)     In the first place, Google would still have been able to monetise substantially the Play Store. With the Play Store alone, Google already achieved revenues of approximately EUR […] in 2011, EUR […] in 2012, EUR […] in 2013, EUR […] in 2014, EUR […] in 2015 and EUR […] in 2016.[1074]

(997)     In the second place, Google would still have benefitted from the valuable user data it gathers via Google Android devices, namely the information about the characteristics of the devices, such as hardware identifiers, the information about the device carrier, the device's time zone and which Google Accounts the user chooses to add to the device, location data as well as data from the usage of Google Play Services (e.g. contact information, demographic information, transactional records, etc.).[1075]

(998)     In the third place, Google would still have benefitted from a significant stream of revenue from search advertising, given its market shares on PCs (see Section 9.5.1).

---

[1070]   Google's response to the complaint by FairSearch, para 122 (Doc ID 1584) and Appendix 2 of Google's Response to the Statement of Objections, page 16 (Doc ID 8303-12).

[1071]   Google's Response to the Statement of Objections, Part Four, page 250, paragraph 208 (Doc ID 7117), Appendix 1 of Google's Response to the Statement of Objections, page 11, paragraph 38 (Doc ID 8303-2), and Appendix 2 of Google's Response to the Statement of Objections, page 16 (Doc ID 8303-12); Google's letter of 27 June 2018, page 1-2 (Doc ID 8949).

[1072]   Appendix 3 of Google's Response to the Statement of Objections, pages 15-17 (Doc ID 8303-13).

[1073]   Google's Response to the Statement of Objections, Part Four, pages 250-251, paragraphs 209-210 (Doc ID 7117), Appendix 1, page 12 (Doc ID 8303-2), Appendix 3, page 17-19 and 21 (Doc ID 8303-13) and Appendix 2, page 16 (Doc ID 8303-12).

[1074]   These include fees charged to developers as well as advertising revenues. Source: Annex A to Google's response to Questions 1 to 5 of request for information of 24 March 2017 (Doc ID 7955) and to Question 20 to 22 of request for information of 11 July 2014 (Doc ID 1268).

[1075]   See Section 9.3.1.

**EN**

**EN**

GOOG-DOJ-26429390

(999)   In the fourth place, Google has not demonstrated that it would not have had an interest in developing Android in order to counter the risks to its search-advertising business model resulting from the shift to mobile (see Section 6.2).

(1000)   Second, Google has not demonstrated that the tying of the Google Search app with the Play Store and the tying of Google Chrome with the Play Store and the Google Search app is necessary in order to provide a consistent out-of-the-box experience for users.

(1001)   In the first place, while users may benefit from having a general search app or mobile web browser pre-installed on their Google Android devices, they do not benefit from Google requiring OEMs to pre-install the Google Search app and Google Chrome. On the contrary, users would benefit if OEMs had the flexibility to pre-install (exclusively) competitive products for some or all of their devices, allowing them to differentiate their products.

(1002)   In the second place, OEMs can satisfy user demand for an "out-of-the-box" experience by assembling different applications from different providers rather than the tying.

(1003)   In the third place, there are less restrictive means available to Google in order to compete with the "look-and-feel" of vertically integrated competitors, such as design and interface guidelines. In fact, Google itself issues guidelines to improve the integration of third-party apps in the Android OS.[1076]

(1004)   Third, Google has not demonstrated that the tying of the Google Search app with the Play Store and the tying of Google Chrome with the Play Store and the Google Search app is necessary to avoid the need for Google to charge OEMs a fee for the Play Store.

(1005)   In the first place, given that it achieves substantial revenues through the Play Store Google's interest would be to have the Play Store installed on the largest possible number of Google Android devices.

(1006)   In the second place, the business model of many app stores is to provide their services for free to OEMs, with monetisation resulting from the revenues generated from the download of apps by users.[1077]

(1007)   In the third place, the value of the Play Store to users is already reflected in the amount that they spend on apps that they download via the Play Store. The greater the amount that users spend on apps that they download via the Play Store, the greater the value to them of the Play Store.

(1008)   In the fourth place, Google could set lower license fees for lower-end devices, instead of setting the same fixed fee for all devices.

## 11.6.   Duration of the infringements

(1009)   With regard to the tying of the Google Search app with the Play Store, the

---

[1076]   See "*Up and running with material design*", available at http://developer.android.com/design/index.html, printed and saved on 12 April 2016.

[1077]   See non-confidential replies to Question 2(iii) of the request for information of 21 October 2015 on app stores. Amazon's non-confidential response: "*Both mobile apps are pre-installed on certain Android and Blackberry devices pursuant to arrangements under which Amazon pays the carrier a revenue share or other fee in exchange for the pre-installation*" (Doc ID 8184).

**EN**

**EN**

GOOG-DOJ-26429391

Commission concludes that the start date of the infringement is 1 January 2011, the date as of which the Commission concludes that Google is dominant in the market for Android app stores (see Section 9.4). The infringement is ongoing.

(1010)   With regard to the tying of Google Chrome with the Play Store and the Google Search app, the Commission concludes that the start date of the infringement is 1 August 2012, the date when Google Chrome first became a mandatory Google app in a MADA (see Section 11.1). The infringement is ongoing.

## 12.   ABUSE OF GOOGLE'S DOMINANT POSITION: THE LICENSING OF THE PLAY STORE AND THE GOOGLE SEARCH APP CONDITIONAL ON THE ANTI-FRAGMENTATION OBLIGATIONS IN THE AFAs

### 12.1.   Principles

(1011)   In order for conduct that makes the conclusion of a contract concerning a product or service subject to the acceptance of a supplementary obligation to be liable to be caught by the prohibition under Article 102 TFEU, it is sufficient that the following conditions are met:[1078]

(1)   the supplementary obligation is unrelated to the subject of the contract;

(2)   the undertaking concerned is dominant in the market on which it offers the product or service;

(3)   the supplementary obligation leaves the other party with no choice to obtain the product or service other than by accepting the supplementary obligation; and

(4)   the supplementary obligation is capable of restricting competition.

(1012)   If these conditions are met, it is for the dominant undertaking, which bears the burden of proof, to demonstrate the existence of any objective justification for its conduct.[1079]

(1013)   Even when there is a link between the supplementary obligation and the subject of the contract, this does not mean that these two are not dissociable in economic and commercial terms for the purpose of competition rules.[1080]

(1014)   An undertaking in a dominant position is not entitled to take steps on its own initiative to eliminate products which, rightly or wrongly, it regards as unlawful.[1081]

### 12.2.   Summary of the abusive conduct

(1015)   Since at least 1 January 2011, Google makes the licensing of the Play Store and the Google Search app conditional on hardware manufacturers agreeing to the anti-fragmentation obligations in the AFAs.[1082]

(1016)   The Commission concludes that this conduct constitutes an abuse of Google's

---

[1078]   Case T-201/04 *Microsoft v Commission,* EU:T:2007:289, paragraphs 859, 862, 864, 867, 869, and 1144-1167.

[1079]   Case T-201/04 *Microsoft v Commission,* EU:T:2007:289, paragraphs 859 and 869.

[1080]   Case T-201/04 *Microsoft v Commission,* EU:T:2007:289, paragraph 939.

[1081]   Case T-30/89 *Hilti* v *Commission*, EU:T:1991:70, paragraph 118; Case T-65/89 *BPB Industries and British Gypsum v Commission*, EU:T:1993:31, paragraph 118; Case T-128/98 Aéroports de Paris v Commission, EU:T:2000:290, paragraph 174.

[1082]   See Section 6.3.1.

**EN**                                    229                                    **EN**

GOOG-DOJ-26429392

dominant positions in the worldwide market (excluding China) for Android app stores and the national markets for general search services. This is because: (i) entering into the anti-fragmentation obligations is unrelated to the licensing of the Play Store and the Google Search app (see Section 12.3); (ii) Google is dominant in the worldwide market (excluding China) for Android app stores, and in the national markets for general search services (see Section 12.4); (iii) the Play Store and the Google Search app cannot be obtained without entering into the anti-fragmentation obligations (see Section 12.5); (iv) the anti-fragmentation obligations are capable of restricting competition (see Section 12.6).

(1017)  The Commission further concludes that Google has not demonstrated the existence of any objective justification for the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations (see Section 12.7).

(1018)  The Commission finally concludes that Google's intention to notify hardware manufacturers of the option to enter into an ACC in place of an AFA does not alter the fact that Google still makes the licensing of the Play Store and the Google Search app conditional on hardware manufacturers agreeing to the anti-fragmentation obligations in the AFAs (see Section 12.8).

## 12.3.  The anti-fragmentation obligations are unrelated to the licensing of the Play Store and the Google Search app

(1019)  The Commission concludes that the anti-fragmentation obligations are unrelated to the licensing of the Play Store and the Google Search app.[1083]

(1020)  First, the anti-fragmentation obligations are neither naturally nor by way of commercial usage part of a contract for the licensing of Android app stores or general search apps. For example, Microsoft and Amazon do not provide their app stores and general search app (in the case of Microsoft) to third parties under analogous or even similar obligations related to the use of a certain smart mobile OS.

(1021)  Second, the anti-fragmentation obligations constrain the freedom of action of hardware manufacturers with regard to the whole of their device portfolio and not just the devices on which the Play Store and the Google Search app are pre-installed.

(1022)  Third, hardware manufacturers have requested waivers from the anti-fragmentation obligations.[1084]

(1023)  The Commission's conclusion that the anti-fragmentation obligations are unrelated to the licensing of the Play Store and the Google Search app is not affected by Google's claims that:

(1)  the "*commercial norm*" is far more restrictive than the AFAs as Apple, Microsoft and BlackBerry prevent any incompatible variants of their OSs;

(2)  the anti-fragmentation obligations facilitate the licensing of Google proprietary

---

[1083]  The Play Store and the Google Search app are both licenced through the MADA. The same reasoning would apply if Google were to make the licensing of either only the Play Store or only the Google Search app subject to entering into the anti-fragmentation obligations, given that Google is dominant in the worldwide market (excluding China) for Android app stores and each national market for general search services.

[1084]  See for example Google's internal documents submitted in response to the request for information of 11 July 2014 (Doc ID 1305-49014 and Doc ID 1751-01365).

GOOG-DOJ-26429393

apps; and

(3)   the Commission's position is at odds with its own policy in the digital economy and its decision in *Microsoft* as the AFA's objective is to promote interoperability.[1085]

(1024)   First, the fact that Apple, BlackBerry and Microsoft have adopted a proprietary business model and do not license their app stores and general search apps does not indicate that anti-fragmentation obligations are by way of commercial norm part of a contract for the licensing of Android app stores or general search apps.

(1025)   Moreover, and in any event, it is difficult to speak of "*commercial norm*" in relation to the licensing of Android app stores and general search apps when such licensing is [90-100]% controlled by Google.[1086] A commercial usage which is acceptable in a normal situation, on a competitive market, may not be acceptable in the case of a market where competition is already restricted.[1087]

(1026)   Second, Google's claim that the anti-fragmentation obligations facilitate the licensing of Google proprietary apps is irrelevant for the assessment of whether the anti-fragmentation obligations are related to the licensing of the Play Store and the Google Search app.

(1027)   In the first place, while a contractual obligation may well facilitate the commercial success of a given product or service, this does not mean that such an obligation is by its nature or according to commercial usage connected to the product or service.

(1028)   In the second place, even if there were a link between the anti-fragmentation obligation, on the one hand, and app stores and general search apps on the other hand, this would not mean that the anti-fragmentation obligations are not dissociable from app stores and general search apps in economic and commercial terms for the purpose of the competition rules.[1088] This is confirmed by the following:

(1)   Google has developed a version of its general search app for iOS and Windows devices and does not make its distribution via the Apple AppStore and Windows Mobile Store subject to anti-fragmentation obligations;

(2)   None of the general search service providers listed in Table 5, apart from Google, make the distribution of their general search apps via the Play Store subject to anti-fragmentation obligations; and

(3)   The anti-fragmentation obligations cover both devices on which the Play Store and the Google Search app are pre-installed and devices on which the Play Store and the Google Search app are not pre-installed. This confirms that the anti-fragmentation obligations are unrelated to the licensing of the Play Store and the Google Search app, at least as regards devices on which the Play Store and the Google Search app are not pre-installed.

(1029)   In the third place, Google's claim is based on the assumption that anti-fragmentation obligations are necessary to protect the Android ecosystem. As discussed in Section

---

[1085]   See Google's Response to the Statement of Objections, Part Three, pages 131-133, paragraphs 105-110 (Doc ID 7117).
[1086]   Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 940.
[1087]   Case T-83/91 *Tetra Pak* v *Commission*, EU:T:1994:246, para 137.
[1088]   Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289, paragraph 939.

**EN**

**EN**

GOOG-DOJ-26429394

12.7, this is not the case.

(1030) Third, Google's anti-fragmentation obligations do not simply promote "interoperability" between Google Android devices. They also prevent AFA signatories from selling devices based on competing Android forks (see Sections 6.3.1 and 12.6.3).

## 12.4. Google is dominant in the worldwide market (excluding China) for Android app stores, and in the national markets for general search services

(1031) As set out in Sections 9.4 and 9.5, the Commission concludes that since 2011, Google holds a dominant position in: (i) the worldwide market (excluding China) for Android app stores; and (ii) each national market for general search services in the EEA.

## 12.5. The Play Store and the Google Search app cannot be obtained without entering into the anti-fragmentation obligations

(1032) The Commission concludes that hardware manufacturers cannot obtain the Play Store and the Google Search app without entering into the anti-fragmentation obligations.

(1033) First, hardware manufacturers can pre-install the Play Store and the Google Search app on their Android devices only if they enter into the anti-fragmentation obligations. This is confirmed by the following internal Google documents:

   (1) An internal email by [Google Executive], dated 17 July 2014: "*AFA must always be signed with the MADA and this clearly states that only compatible Android devices can be distributed, regardless of whether GMS is included or not.*"[1089]

   (2) An internal email by [Google Executive], dated 11 February 2011: "*No support from google without AFA. No access to our [software] without AFA. No GMS agreement without AFA (They want and will need a GMS agreement to enable the low cost project).*"[1090]

   (3) An internal email by [Google Executive], dated 11 February 2011: "*I've been discussing with Larry* [Page, founder of and at the time CEO at Google] *what it means to run mobile at Google. Who develops Android apps is really his decision. But I think everyone understands how the android strategy hinges on us licensing a bundle of google apps in order to […] stop people from forking android […].*"[1091]

(1034) Second, Google has acknowledged that it enters into a MADA, which grants a licence to pre-install the Play Store and the Google Search app, only with hardware manufacturers who have entered into the anti-fragmentation obligations. In particular, Google explained that "*Adoption of the AFA and baseline compatibility specifications is encouraged by Google through the offering of its own suite of*

---

[1089]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1754-885).

[1090]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1754-740).

[1091]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1790-93).

GOOG-DOJ-26429395

*proprietary apps (i.e., the GMS) royalty-free under the Mobile Application Distribution Agreement ("MADA") to OEMs."*[1092] In addition, Google stated that: *"Signing the AFA will make commercial incentives available (while still optional), namely the royalty-free licensing of Google's proprietary apps under the terms of a MADA."*[1093]

(1035)   Google does not contest these findings.

## 12.6.   Restriction of competition

(1036)   The Commission concludes that the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations is capable of restricting competition. This is the following reasons:

  (1)   Android forks constitute a credible competitive threat to Google (Section 12.6.1);

  (2)   Google actively monitors compliance with, and enforces, the anti-fragmentation obligations (Section 12.6.2);

  (3)   The anti-fragmentation obligations hinder the development of Android forks (Section 12.6.3);

  (4)   Compatible forks do not constitute a credible competitive threat to Google (Section 12.6.4); and

  (5)   The capability of the anti-fragmentation obligations to restrict competition is reinforced by the unavailability of Google's proprietary APIs to fork developers, which makes it more difficult for Android forks to attract app developers (Section 12.6.5);

  (6)   Google's conduct helps to maintain and strengthen Google's dominant position in each national market for general search services, deters innovation, and tends to harm, directly or indirectly, consumers (Section 12.6.6).

(1037)   Moreover, the Commission's conclusion that the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations is capable of restricting competition is not affected by Google's claims regarding the need for the Commission to consider that licensing in its relevant economic and legal context (Section 12.6.7).

### 12.6.1.   *Android forks constitute a credible competitive threat to Google*

(1038)   For the reasons set out in this Section, the Commission concludes that Android forks constitute a credible competitive threat to Google.

(1039)   First, the fact that the source code for AOSP is already available for free[1094] means that the investment and time required to fork Android would be lower than the

---

[1092]   See Google's response to the complaint by FairSearch, para. 38 (Doc ID 1584).

[1093]   See Google's response to the complaint by FairSearch, para. 85 (Doc ID 1584). As explained in Section 6.3.2, in some instances, MADAs have been explicitly made conditional upon the respect of the terms in the AFA. In other cases, obligations equivalent to those contained in the AFAs were also included in the MADAs. The validity of the latter was conditional upon compliance with those obligations.

[1094]   See "The Android Source Code", available at https://source.android.com/source/, printed and saved on 11 April 2016.

GOOG-DOJ-26429396

investment and time required to develop a completely new smart mobile OS. For example, Amazon stated that the cost of developing its forked version of Android, Fire OS, has been in the range of "*tens of millions of dollars*"[1095] and Alibaba's Aliyun, which according to Google is a forked version of Android, required [less than 50 million] of investments.[1096]

(1040)   These investments, even if considerable, are significantly less than the investments required to develop an entirely new smart mobile OS. For example, Microsoft stated that: "*Total development costs for the modern Windows Phone platform through the end of June 2013 are* [in the millions of dollars]. […] *Windows Phone 7, Microsoft's first release of its modern smartphone OS, took more than* [0-4] *years to develop.*"[1097]

(1041)   Second, the similarities between Google Android and Android forks mean that many apps can run on Android forks with the need for no or only minor adjustments:

(1)   Microsoft stated: "*If that application exclusively calls APIs that are part of the native AOSP version of Android and also targets the same Android OS version as the fork uses, additional development work should be minimal because most Android forks retain the AOSP APIs.*"[1098]

(2)   Nokia also stated that approximately half of Google Android apps could work on devices running on its forked version of Android, Nokia X, without any adjustments: "[…] *our experience from the launch of the Nokia X line of devices, which ran an OS that was based on AOSP, was that while [approximately 90%] of apps developed for Android could be made to work on Nokia X devices, [approximately half] of these apps required modification for full functionality.*"[1099]

(1042)   Third, for apps that require additional development for porting (see Section 12.6.5), it is generally[1100] easier to port an app from Google Android to an Android fork than to port an app from Google Android to a different smart mobile OS:[1101]

(1)   Rovio Entertainment stated: "*Porting an application from one Android fork to another is generally a relatively small effort, taking from a few man-days to a few man-weeks. However, if the target platform is missing some critical feature that is hard to replace, a port might take considerably longer. Porting from Android to a completely different OS, such as iOS, depends very much on how well the application has been insulated from the OS APIS (for example by using middle-ware). The effort will typically be larger than needed for ports between Android forks, ranging from a few man-days to several man-years*

---

[1095]   See Amazon's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS developers (Doc ID 4187).

[1096]   See Alibaba's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS developers (Doc ID 3910).

[1097]   See Microsoft's non-confidential response to Question 19.1 of the request for information of 12 June 2013 to OS developers (Doc ID 3794).

[1098]   See Microsoft's non-confidential response to Question 3 of the request for information of 29 June 2015 to app developers (Doc ID 2040).

[1099]   See Nokia's non-confidential response to Question 3 of the request for information of 29 June 2015 to app developers (Doc ID 4360).

[1100]   See, however, Section 12.6.5 in relation to APIs.

[1101]   See responses to Questions 1 and 2 of the request for information of 29 June 2015 to app developers.

**EN**

**EN**

[…]."[1102]

(2)   Garmin Ltd. ("Garmin") stated: "*The efforts to write or convert an App in a complete different OS (like iOS or WindowsPhone) varies significantly from OS to OS or case by case. In average it consumes 5 times more cost, efforts and resources than a port to an Android fork.*"[1103]

(3)   MapQuest stated: "*Converting an app for a fork typically requires an additional 5-10% above the cost /time required to develop the app originally for Android. The process is much the same but uses differences services. When "converting" to a different operating system, it takes virtually 100% as long as the development time for the original app, because MapQuest builds its apps and features from scratch.*"[1104]

(1043)   The Commission's conclusion that Android forks constitute a credible competitive threat to Google is not affected by Google's claims that:

(1)   no demand exists for licensing "purpose-built"[1105] incompatible Android variants such as Amazon Fire OS and Aliyun;[1106]

(2)   Android licensors would have an incentive to ensure full compatibility with Google's CDD and CTS regardless of the AFAs;[1107] and

(3)   "*Nokia recognized the commercial value of CDD compliance and worked with us to make the Nokia X compatible, even though Nokia had no AFA obligations*".[1108]

(1044)   First, there was demand from certain OEMs to commercialise devices running Android forks such as Amazon Fire OS and Aliyun. The anti-fragmentation obligations prevented, however, developers of Android forks from satisfying that demand (see Section 12.6.3).

(1045)   Second, absent the AFAs, OEMs would not necessarily have an incentive to ensure full compatibility with Google's CDD and CTS.

(1046)   In the first place, it is true that Android fork developers have an incentive to limit incompatibilities so as to facilitate the porting by app developers of their apps from Google Android. This is confirmed by the following:

---

[1102]   See Rovio Entertainment's non-confidential response to Question 5 of the request for information of 29 June 2015 to app developers (Doc ID 4277).

[1103]   See Garmin's non-confidential response to Question 5 of the request for information of 29 June 2015 to app developers (Doc ID 1997).

[1104]   See MapQuest's non-confidential response to Question 5 of the request for information of 29 June 2015 to app developers (Doc ID 4503).

[1105]   Google defines "purpose built" forks as those which "*deliberately substitute different APIs and hardware requirements for those the CDD specifies and promote those differences to developers and users.*" (see Google's Response to the Statement of Objections, page 122, paragraph 75 (Doc ID 7117)). As examples of these "purpose built" forks, Google refers to Fire OS and Aliyun.

[1106]   See Google's Response to the Statement of Objections, Part Three, pages 135-141, paragraphs 118-135 (Doc ID 7117).

[1107]   Google's Response to the Statement of Objections, Part Three, pages 135-136, paragraph 120 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Two, pages 42-43, paragraphs 17-19 (Doc ID 8598).

[1108]   See Google's Response to the Statement of Objections, Part Three, page 140, paragraph 132 (Doc ID 7117).

EN                                     235                                     EN

GOOG-DOJ-26429398

(1) Nokia, which stated that: "*Nokia's goal for the AoL project was to employ AOSP based Linux as the primary low and mid-tier OS, to offer Nokia services as opposed to services of the platform owner like Google, and to maximize compatibility between the AOSP OS on Nokia X devices and proprietary Android, such that applications developed for Android would be able to function (as unchanged as possible) on Nokia's devices*";[1109]

(2) Microsoft, which stated that: "*Because OEMs who create Android forks want to make the porting of existing Android applications as easy as possible for third-party developers, OEMs creating Android forks are highly incentivized to retain API compatibility with AOSP Android and their operating systems largely resemble official Android OEM devices (with the exception of Google Play Services support for developers)*";[1110] and

(3) The fact that, in July 2013, 75% of the apps in the Play Store were compatible with Fire OS,[1111] even though, as recognised by Google, Amazon Fire OS is not a compatible fork.

(1047) In the second place, however, certain incompatibilities may be desirable as they could allow the creation of innovative features that may be valued by users and app developers. As described in Section 6.2.2.1.I, Google created Android by breaking compatibility with Java.

(1048) In the third place, if Android licensors did indeed have an incentive to ensure full compatibility with Google's CDD and CTS regardless of the AFAs, it would have been unnecessary for Google to make the licensing of the Play Store and the Google Search app conditional on hardware manufacturers agreeing to the anti-fragmentation obligations. However, Google itself claims that "*AFAs are indispensable for Android to succeed*".[1112]

(1049) Third, contrary to what Google claims, Nokia did not work with Google to make the Nokia X fully compatible with Google's CDD and CTS, even though Nokia had no AFA obligations. Rather, as Nokia explained: "[…] *Nokia's assessment at the time of developing the Nokia X devices was that meeting Google's compatibility requirements (and signing the agreements) would have put excessive limitations on Nokia's differentiation intent.*"[1113] Indeed, [information concerning bilateral commercial negotiations and discussions].[1114]

### 12.6.2. *Google actively monitors compliance with, and enforces, the anti-fragmentation obligations*

(1050) The Commission concludes that Google actively monitors compliance with, and

---

[1109] See Nokia's non-confidential response to the request for information to OEMs of 18 July 2014, paragraph 28 (Doc ID 8231).

[1110] See Microsoft's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 2040).

[1111] See Amazon's non-confidential response to Question 3 of the request for information to app developers of 29 June 2015 (Doc ID 4188).

[1112] Google's Response to the Statement of Objections, Part Three, page 113, Section C (Doc ID 7117).

[1113] See Nokia's non-confidential response to the request for information of 18 July 2014, paragraph 32 (Doc ID 8231).

[1114] See Nokia's non-confidential response to the request for information of 18 July 2014, paragraphs 33-34 (Doc ID 3993): [information concerning bilateral commercial negotiations and discussions].

**EN**

**EN**

GOOG-DOJ-26429399

enforces, the anti-fragmentation obligations.

(1051)   First, Google has intervened in a number of cases to enforce compliance with the anti-fragmentation obligations. This is because, in the words of [Google Executive], "*Marketing a non-compatible device is literally an act of war in Android-ville.*"[1115]

(1052)   For example, at the beginning of 2011, [AFA signatory] launched devices in China based on its own […] forked version of Android. After "*some serious communication with* [AFA signatory] *team*",[1116] Google started "*pushing hard to ask* [AFA signatory] *give up their so called* […]"[1117] and eventually obtained a commitment from [AFA signatory] to "*remove all the non compatible features in the next build*".[1118]

(1053)   In the meantime, Google advised [app developer], one of the most successful games developed for smart mobile devices, to refrain from implementing certain modification to their […] app requested by [AFA signatory] to ensure compatibility with […].[1119]

(1054)   Similarly, in September 2012, "*Acer (an AFA signatory) adopted Alibaba's Aliyun OS which turned out to be a "forked" version of Android*"[1120] for the launch of the A800 smartphone in China. Upon learning of Acer's conduct, Google approached Acer requesting clarifications on what it thought was a potential breach of the AFA.[1121] In the words of [Google Executive], Acer's reaction was […].[1122] Acer cancelled the upcoming press conference for the launch of the device that was planned to be based on Aliyun, and ultimately abandoned the project.[1123] As a reaction, Alibaba publicly stated: "*Our partner received notification from Google that if the new product launch with Aliyun went ahead, Google would terminate Android product cooperation and related technical authorization with Acer*".[1124] Google publicly reacted by stating that: "*[Acer has] committed to building one Android platform and to not ship non-compatible Android devices […]. Non-*

---

[1115]   See email from [Google Executive] of 28 February 2011 (Doc ID 1373-1979).

[1116]   See Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1751-01365).

[1117]   See Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-42438).

[1118]   See Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1751-01365).

[1119]   See Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-42438).

[1120]   Google's response to the complaint by FairSearch, paragraph 91 (Doc ID 1584).

[1121]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1364-2114).

[1122]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1754-355).

[1123]   See Bruce Einhorn, "The Acer Smartphone That Never was" (15 September 2012), available at http://www.bloomberg.com/bw/articles/2012-09-13/the-acer-smartphone-that-never-was, printed and saved on 11 April 2016.

[1124]   See Rip Empson, "Alibaba VP In Response To Google Smackdown: "Will Someone Please Ask Google To define Android?" (14 September 2012), available at http://techcrunch.com/2012/09/14/alibaba-vp-in-response-to-google-smackdown-will-someone-please-ask-google-to-define-android/, printed and saved on 11 April 2016.

**EN**                                    237                                    **EN**

GOOG-DOJ-26429400

*compatible versions of Android, like Aliyun, weaken the ecosystem.*"[1125]

(1055)   Second, Google has terminated, or threatened to terminate, its Android-related agreements with hardware manufacturers that do not comply with the anti-fragmentation obligations.

(1056)   A first example was in 2009 when [AFA signatory] sought to include in its AFA wording that would limit the anti-fragmentation obligations. In response, [Google Executive], stated: "*I'd like you and* [Google executive] *(cc'd)* [both Google employees] *to sit down with them and explain they would be in violation of the [AFA] if they ship an incompatible device, and if they ship ANY non-compatible device then I'd like the GMS license for all devices to terminate.*"[1126]

(1057)   A second example was in 2011 when [AFA signatory], began to sell devices based on Aliyun OS in China.[1127] In response, Google contacted [AFA signatory] to remind it of its obligations under the AFA. As described by [Google Executive], "*We should work with* [AFA signatory] *to address the issues, but if they refuse to work with us on this, we should just cut them off. Regardless of whether they knew Alibaba was based on Android, they know now. They need to ensure every Alibaba device they ship is fully compatible. If the devices are not compatible, we'll go through the typical escalation path (myself,* [Google Executive]*), and if we're unable to reach resolution, we'll have to cut them off.*" [Google Executive] also made clear that "*[…] we cut off the partners who don't fulfill their obligations under our agreements: no GMS, no early access, no technical support -- nothing.*"[1128] Eventually, in this case, Google "*ended up terminating* [AFA signatory] *MADA.*"[1129]

(1058)   A third example was also in 2011 when [AFA signatory] was considering selling a non-compatible device based on a forked version of Android developed by [AFA signatory]. In response, [Google Executive], noted that if [AFA signatory] proceeded, this would be "*Probably a good opportunity to set an example on what the consequences are if they chose to ignore protecting compatibility in Android*".[1130] In response, [Google Executive], instructed: "*Cut them off if they fragment. Including revoking Gms license*".[1131]

(1059)   A fourth example was also in 2011 when Google learned that [AFA signatory] and [AFA signatory] were considering manufacturing as ODMs Amazon's Kindle Fire tablet based on Fire OS. In response, [Google Executive], stated in an internal email:

---

[1125]   See James Trew, "Google wants 'better compatibility' for Android, Alibaba says 'Aliyun is separate', Acer takes the brunt of it" (15 September 2012), available at http://www.engadget.com/2012/09/15/google-wants-better-compatibility-for-android/, printed and saved on 11 April 2016.

[1126]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1760-615).

[1127]   See Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1370-1585).

[1128]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1751-1344).

[1129]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1364-2114).

[1130]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-49014).

[1131]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1305-49014).

**EN**

**EN**

GOOG-DOJ-26429401

*"I'd suggest we reach out to* [AFA signatory] *explaining they are in breach and informally to* [AFA signatory] *to reinforce what compatibility is about. I met the CEO and Chairmen of both companies at a gathering together with Eric* [Schmidt, at the time CEO of Google] *in* [...] *last week and both companies were eager to connect with us in general. I predict they know they have reason to worry, but drool over the amazon volumes as the opportunistic ODMs they are."* [1132]

(1060)   Third, since late 2011, Google has included a clause in the MADAs pursuant to which MADA signatories needed to submit CTS reports to prove device compatibility, even for devices that are not GMS devices, i.e. which do not pre-install any of Google's proprietary apps. [1133] Google can use these reports to ensure that no device launched by a MADA signatory is based on a fork.

(1061)   Fourth, Google itself informally tests the compatibility of Android devices. For example, in correspondence with Huawei, Google refers to a device built by [AFA signatory] for the [MNO]. [Google Executive], states *"We bought this device from a shop* [...]. *I will check the device with our* [AFA signatory]*, the user agent definitely is not compatible with CDD. This is a very serious issue we will push* [AFA signatory] *to solve this issue."* [1134]

(1062)   Fifth, any waiver of the anti-fragmentation obligations is granted sporadically [1135] and at Google's full discretion. [1136] As confirmed by Google, [1137] there is no example of an exempted device which runs on a fork developed by a third party, such as Amazon or Alibaba.

(1063)   The Commission's conclusion that Google actively monitors compliance with, and enforces, the anti-fragmentation obligations is not affected by Google's claims that:

(1)   the language used by Google in its internal and external correspondence simply indicates that Google helps partners to ensure that their devices are compatible and more attractive to developers and users; [1138]

(2)   OEMs and app developers have confirmed to the Commission that fragmentation is a threat to the Android ecosystem; [1139]

---

[1132]   See email by [Google Executive] of 19 November 2011 (Doc ID 1305-50364).

[1133]   See Google's internal document submitted in response to the request for information of 11 July 2014, Section 2.7 of the MADA template for 2011 attached to [Google Executive] email of 14 December 2014, (Doc ID 1751-287). See also Google's internal documents submitted in response to the request for information of 11 July 2014, emails from [Google Executive] of 14 December 2011 (Doc ID 1751-287), and from [Google Executive] of 10 December 2012 (Doc ID 1751-287).

[1134]   See Annex XII attached to [AFA signatory]'s non-confidential response to the request for information of 17 July 2014 [...].

[1135]   See Google's internal documents submitted in response to the request for information of 11 July 2014, email from [Google Executive] of 1 March 2011 (Doc ID 1364-2044) (*"we rarely give exemptions"*); and email from [Google Executive] of 11 February 2011 (Doc ID 1371-1561) (*"This is rather a very serious issue for Google. We treat incompatible devices very seriously and exceptions are rarely given."*)

[1136]   For example, see AFA between Google and [AFA signatory], clause 2.1, *"Except as may be specifically authorised by Google in writing and in Google's sole discretion, the following terms shall apply:* [...]*"* [...].

[1137]   Google's Response to the Statement of Objections, Part Three, page 133, paragraph 109 (Doc ID 7117).

[1138]   Google's Response to the Statement of Objections, Part Three, page 143, paragraph 141 (Doc ID 7117).

[1139]   Google's Response to the Statement of Objections, Part Three, pages 111-113, paragraph 40 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Two, page 36-40 (Doc ID 8598).

**EN**                                          239                                          **EN**

GOOG-DOJ-26429402

(3)    Google objected to [AFA signatory], [AFA signatory], [AFA signatory], [AFA signatory] and [AFA signatory] (see recital (1107)) devices because of hardware deficiencies.[1140] Moreover, Google exceptionally granted AFA exemptions to [AFA signatory] and [AFA signatory] devices;[1141]

(4)    it is irrelevant that, in September 2012, Google approached Acer regarding the latter's intended launch of the A800 smartphone in China based on Alibaba's Aliyun OS because the Aliyun OS is not part of the relevant worldwide (excluding China) market for licensable smart mobile OS;[1142]

(5)    Google objected to Aliyun devices because they supported pirated versions of Google apps;[1143]

(6)    even if Google were to monitor and enforce compliance with CDD and CTS, the Commission has failed to identify individual CDD/CTS clauses that would restrict competition or to cite examples in which Google modified such clauses to hinder competition;[1144]

(7)    not only are CDD and CTS public documents, but Google helps OEMs to comply with CDD and CTS requirements by drafting new CDD releases in response to partner feedback and not retroactively making CDD and CTS more restrictive;[1145]

(8)    any monitoring and/or enforcement by Google of the anti-fragmentation obligations does not prevent AFA signatories from supplying non-Android devices;[1146] and

(9)    any monitoring and/or enforcement of the anti-fragmentation obligations does not, in any event, prevent fork developers from referencing to Android and using the Android robot.[1147]

(1064)  First, the language used by Google in its internal and external correspondence is suggestive of Google imposing and enforcing the anti-fragmentation obligations rather than of helping partners to ensure that their devices are compatible and more attractive to developers and users (e.g. *"Marketing a non-compatible device is literally an act of war in Android-ville"*[1148]; *"we cut off the partners who don't fulfill their obligations under our agreements: no GMS, no early access, no technical*

---

[1140]  See Google's Response to the Statement of Objections, Part Three, page 143, paragraph 141 and footnote 551 (Doc ID 7117).

[1141]  Google's Response to the Statement of Objections, Part Three, page 143, paragraph 141 (Doc ID 7117).

[1142]  Google's Response to the Statement of Objections, Part Three, pages 140-141, paragraph 133 (Doc ID 7117).

[1143]  See Google's Response to the Statement of Objections, Part Three, page 141, paragraph 134 (Doc ID 7117).

[1144]  See Google's Response to the Statement of Objections, Part Three, page 141, paragraph 135 and page 144, paragraph 142 (Doc ID 7117).

[1145]  Google's Response to the Statement of Objections, Part Three, pages 102-104, paragraph 16; page 142, paragraph 140 (Doc ID 7117).

[1146]  Google's Response to the Statement of Objections, Part Three, page 109, paragraphs 32-33 (Doc ID 7117).

[1147]  Google's Response to the Statement of Objections, Part Three, page 108, paragraph 31 (Doc ID 7117).

[1148]  See email from [Google Executive] of 28 February 2011 (Doc ID 1373-1979).

**EN**

**EN**

GOOG-DOJ-26429403

*support -- nothing*"[1149]).

(1065)   Second, the fact that certain OEMs and app developers have informed the Commission that fragmentation is a threat to the Android ecosystem does not mean that AFAs are the appropriate means to tackle alleged issues relating to fragmentation.

(1066)   Google attached to its Response to the Statement of Objections 36 letters from OEMs and app developers supporting Google's views about the dangers of fragmentation.[1150] However the probative value of such letters is limited: 20 out of 36 of the letters are based on an identical template and they were not submitted to the Commission independently by their authors, but through the intermediary of Google. It appears likely that the authors of the 36 letters were influenced by Google when drafting or signing those letters.

(1067)   Third, Google has not submitted any evidence to support its claim that it objected to [AFA signatory], [AFA signatory], [AFA signatory], [AFA signatory] and [AFA signatory] devices because of hardware deficiencies:

(1)   In the case of [AFA signatory], the email referred to by Google concedes that "*most of the Android app can run on* [[device name] devices]". The alleged hardware deficiencies do not therefore seem to have prevented most of the Android apps from running on [AFA signatory]'s fork;[1151]

(2)   In the case of [AFA signatory], the statement by a Google employee according to which "*our mutual goal is to have all phones be compatible and able to run applications*" does not demonstrate that [AFA signatory]'s devices were affected by hardware deficiencies.[1152] It rather only explains that, from Google's perspective, [AFA signatory] should have complied with the anti-fragmentation obligations;

(3)   In the case of [AFA signatory], the correspondence does not demonstrate that [AFA signatory]'s products were affected by hardware deficiencies. It rather suggests that [AFA signatory]'s choices were due to an intention to differentiate its products from other Google Android devices. This is confirmed by statements by [Google Executive] ("*I think they understand but are culturally inclined to ignore/believe they can wiggle through an unreasonable exception.* [...] *For the DPF I am not sure what the gap is, they should be able to build it compatibly - but probably commercially chose not to*.") and by [Executive] of [AFA signatory]: ("[AFA signatory] *needs the function to be different [from others]*");

(4)   In the case of [AFA signatory], Google admits that it did not object to this

---

[1149]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1751-1344).

[1150]   See Annex I to Google's Response to the SO. See also Google's letter of 27 June 2018, pages 2 and 4 (Doc ID 8949).

[1151]   Email from [Google Executive] to [Google Executive], "*Re: [AFA signatory] AFA exception details update*," March 3, 2011, GOOG-ECDRD-00367006.R, pp. 1-2 (Doc ID 1751-1365).

[1152]   See Email from [Google Executive] to [Google Executive] et al., October 23, 2009, GOOG-ECDRD-00404894 (Doc ID 8303-61).

**EN**                                    241                                    **EN**

GOOG-DOJ-26429404

device due to hardware deficiencies.[1153] Rather, Google objected to it because of a differentiated and customised user interface that was implemented upon request of a MNO, [...]; and

(5)  In the case of [AFA signatory], Google has not submitted any evidence to support its claim that [AFA signatory]'s devices were affected by hardware deficiencies. If anything, the internal correspondence quoted at recital (1107) suggests that [AFA signatory]'s intention was to create a tablet to compete against other Android-based tablets (i.e. to "*create anti-Kindle Fire device, e.g. using AOSP code without Google's approval & Android Compatibility, and building our own services & apps on top of it.*")

(1068) Moreover, it is irrelevant that Google exceptionally granted AFA exemptions to [AFA signatory] and [AFA signatory] devices as those exemptions were only temporary and were explicitly granted under the condition that [AFA signatory] and [AFA signatory] would comply with the anti-fragmentation obligations going forward.[1154]

(1069) Fourth, the fact that Google approached Acer regarding the latter's intended launch of the A800 smartphone in China based on Alibaba's Aliyun OS is a relevant example of how Google enforces the anti-fragmentation obligations, regardless of the geographic market to which that conduct relates. Moreover, Alibaba had ambitions to develop its Aliyun business across the world, including in the EEA.[1155]

(1070) Fifth, it is irrelevant that Google objected to Aliyun devices because they supported pirated versions of Google apps. If Google, rightly or wrongly, regarded those devices as infringing its intellectual property rights, it should have pursued those infringements by means of the remedies provided by intellectual property laws and not by means of the anti-fragmentation obligations.

(1071) Sixth, the Commission is not required to identify specific CDD/CTS clauses that restrict competition or to cite examples in which Google modified such clauses to hinder competition. It is sufficient that the Commission has established that the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the AFAs is capable of restricting competition.

(1072) Moreover, and in any event, Google may change the specific CDD/CTS clauses at any time, given that it has the right to amend them unilaterally.[1156]

(1073) Seventh, it is irrelevant that: (i) CDD and CTS are public documents; (ii) Google allegedly drafts new CDD releases in response to partner feedback and (iii) Google would not retroactively make CDD and CTS more restrictive. This is for the following reasons:

(1)  Google has the right to amend the CDD/CTS parameters unilaterally, including, in principle, the right to change these parameters retroactively;[1157]

(2)  Google can and does amend in a more restrictive sense CDD and CTS

---

[1153]  See Google's Response to the Statement of Objections, Part Three, page 143, footnote 551 (Doc ID 7117).

[1154]  Google's Response to the Statement of Objections, Part Three, page 143, paragraph 141 (Doc ID 7117).

[1155]  See [...].

[1156]  See Section 6.3.1.

[1157]  See Section 6.3.1.

**EN**

**EN**

GOOG-DOJ-26429405

parameters. For example, it has been reported that in the Android Nougat CDD Google introduced stringent requirements concerning user interface[1158] and graphics;[1159] and

(3)   Google has a wide margin in the interpretation of the parameters defining compatibility. An email dated 6 August 2010 from [Google Executive], stated that: "*It's not like it isn't obvious to the OEMs that we are using compatibility as a club to make them do things we want, and that just weakens their motivation to be compatible.*"[1160]

(1074)   Eighth, it is irrelevant that AFAs allow signatories to supply non-Android devices[1161] as competing licensable smart mobile OSs do not constitute a credible alternative to Android.[1162] Google was only able to point to 21 instances of devices pre-installing a licensable smart mobile OS different from Android.[1163] As of 5 May 2017, approximately a third of those devices have been discontinued.[1164]

(1075)   Ninth, it is irrelevant that fork developers can reference Android and use the Android robot.[1165] This is because, despite their ability to reference Android and use the Android robot, fork developers are in any event prevented by the anti-fragmentation obligations from finding distribution channels that would enable a rapid scaling up of their operations (see Sections 12.6.3.2 and 12.6.3.3).

*12.6.3.   The anti-fragmentation obligations hinder the development of Android forks*

(1076)   The Commission concludes that the anti-fragmentation obligations hinder the development of Android forks in a number of ways.

12.6.3.1. Coverage, duration and scope of the AFAs

(1077)   As discussed in Section 6.3.1, Google has concluded AFAs with more than 100 distinct hardware manufacturers, software developers and other entities. The coverage of these agreements is substantial, as all the major players at each level of the smart mobile device supply chain have entered into these agreements.

(1078)   Furthermore, the duration of the AFAs is long, and Google requires that AFAs be renewed as soon as the remaining duration of the agreement falls below [0-5] years (see Section 6.3.1).

(1079)   In addition, in the case where a hardware manufacturer would be interested in selling even only one GMS device, it would have to commit not to pre-install an Android fork on all other devices.

---

[1158]   See "Sony is not to blame for leaving the Xperia Z3 off the Android Nougat list", available at http://www.xperiablog.net/2016/08/30/sony-is-not-to-blame-for-leaving-the-xperia-z3-off-the-android-nougat-list/, saved and printed on 13 June 2018.

[1159]   See "Google Forbids OEMs From Customizing Android Nougat's Notification System", available at http://wccftech.com/google-nougat-notification-system/, saved and printed on 10 July 2018.

[1160]   See Google's internal documents submitted in response to the request for information of 11 July 2014, email from [Google Executive] of 6 August 2010 (Doc ID 1305-3564).

[1161]   Google's Response to the Statement of Objections, Part Three, page 109, paragraphs 32-33 (Doc ID 7117).

[1162]   See Section 9.3.

[1163]   See Appendix 13 to Google's Response to the Statement of Objections (Doc ID 8303-6).

[1164]   On the basis of public information, this appears to be the case for the following models: Acer Allegro, HP Palm Pre 2, HTC 7 Surround, Samsung Focus, Sharp FX and Dell Venue Pro.

[1165]   Google's Response to the Statement of Objections, Part Three, page 108, paragraph 31 (Doc ID 7117).

EN                                                243                                                EN

GOOG-DOJ-26429406

(1080)   Google does not contest these findings.

12.6.3.2. The anti-fragmentation obligations prevent developers of Android forks from finding distribution channels that would enable a rapid scaling up of their operations

(1081)   The anti-fragmentation obligations prevent developers of Android forks from finding distribution channels that would enable a rapid scaling up of their operations. Such rapid scaling up is important in view of the indirect network effects which characterise smart mobile OSs (see Section 9.3.2).

(1082)   The most immediate and natural strategy for a developer of an Android fork would be to enter into agreements for the licensing of its fork with OEMs already active in the supply of smart mobile devices. This is because OEMs possess the technical knowledge to develop smart mobile devices, and a recognisable brand in the eyes of users that would increase the likelihood of a successful commercialisation of those devices.

(1083)   A strategy based on the licensing of a fork and the rapid scaling up of the business would, therefore, constitute a serious competitive threat to Google. As pointed out by [Google Executive], in the context of the opportunity to grant a GMS licence to Cyanogen Inc. ("Cyanogen"), the developer of a compatible fork: "*Actually, the more I think about this,* [the more] *I'm getting nervous. Basically we are allowing a software company to distribute a version of our OS without having to be a hardware manufacturer themselves. Basically, they are operating much like we do, with the goal of getting their software ("unencumbered" by hardware) scaled to as many devices as possible. In some ways doesn't that make them more dangerous than Amazon?*"[1166]

(1084)   The anti-fragmentation obligations prevent, however, the competitive threat of a strategy based on the licensing of a fork and the rapid scaling up of the business from materialising.

(1085)   An example of this is provided by Alibaba's failure to gain traction outside China, in spite of its ambitions to develop its Aliyun business across the world, including in the EEA.[1167] As discussed in Section 12.6.2, "*In September 2012, Google objected to the launch of the intended Acer A800 product incorporating YunOS*".[1168] In spite of the wide availability of Aliyun within China, Alibaba has failed to establish a meaningful presence outside China […].[1169]

(1086)   The Commission's conclusion that the anti-fragmentation obligations prevent developers of Android forks from finding distribution channels that would enable a rapid scaling up of their operations is not affected by Google's claims that:

---

[1166]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1751-1058). Eventually, Google decided not to provide a licence to Cyanogen, despite Cyanogen OS being compatible, and to provide a GMS licence to the hardware manufacturer selling phones based on Cyanogen OS instead, as "*We are not comfortable licensing GMS to be distributed as part of other software distributions.*" See Google's internal document submitted in response to the request for information of 11 July 2014, email by [Google Executive] of 5 February 2014 (Doc ID 1751-1058).

[1167]   See […]

[1168]   See Alibaba's non-confidential response to Question 25.1 of the request for information of 12 June 2013 (Doc ID 6122).

[1169]   See […].

**EN**

**EN**

GOOG-DOJ-26429407

(1)   AFAs are intended to prevent only "corner cutting"[1170] by OEMs and not purpose-built incompatible forks;[1171]

(2)   While the Commission recognised in the SO that Cyanogen OS is "*a competitive threat*" to Android, it fails also to recognise that Cyanogen OS, as a compatible fork, is helped, not hindered, by compliance with the CDD and CTS;[1172] and

(3)   Notwithstanding the anti-fragmentation obligations and the fact that it is "*notorious for featuring pirated versions of popular apps*"[1173], Aliyun has developed a meaningful presence in China.

(1087)   First, as Google acknowledges, the anti-fragmentation obligations actually prevent not only "corner cutting" versions of Android but also purpose-built forks.[1174] In this regard, Google's alleged intent of preventing "corner cutting" is irrelevant.

(1088)   Second, the Commission did not recognise in the SO that Cyanogen posed "*a competitive threat*" to Google given that Cyanogen pre-installed Google proprietary apps in its devices and had to comply with the terms set by Google.[1175] Rather, the Commission simply referred to the development of Cyanogen OS as an example confirming that Google is concerned about strategies based on the licensing of a fork and the rapid scaling up of the business. In any event, as of December 2016 Cyanogen stopped operations and ceased developing Cyanogen OS.[1176]

(1089)   Third, it is irrelevant that Aliyun has developed a meaningful presence in China notwithstanding the anti-fragmentation obligations or that Aliyun's devices may be notorious for featuring pirated versions of popular apps.

(1090)   In the first place, as noted in Section 8.2, conditions of competition are different in China.

(1091)   In the second place, as an undertaking in a dominant position, Google is not entitled to take steps on its own initiative to eliminate Aliyun's products which, rightly or wrongly, it considers as featuring pirated versions of popular apps.

12.6.3.3. The example of Amazon Fire OS

(1092)   Another illustration of the fact that the anti-fragmentation obligations prevent developers of Android forks from finding distribution channels that would enable a rapid scaling up of their operations is the example of Fire OS, a forked version of

---

[1170]   According to Google, "*A corner-cutting OEM, by contrast, does not seek to tap into a distinct ecosystem. Rather, corner cutters seek to maintain compatibility with the CDD except where the OEM decides to jettison a CDD-specified feature as not worth the costs (for example, testing costs).*" (Google's Response to the Statement of Objections, Part Three, page 122, paragraph 75 (Doc ID 7117)).

[1171]   Google's Response to the Statement of Objections, Part Three, pages 121-123, paragraphs 72-78 (Doc ID 7117).

[1172]   Google's Response to the Statement of Objections, Part Three, page 106, paragraph 24 (Doc ID 7117).

[1173]   Google's Response to the First Letter of Facts, Part Two, page 57, paragraphs 71-72 (Doc ID 8598).

[1174]   Google's Response to the Statement of Objections, Part Three, page 133, paragraph 109 (Doc ID 7117).

[1175]   As explained in footnote 1166, Google provided a GMS licence to the hardware manufacturer selling phones based on Cyanogen OS. As such, Cyanogen had to comply with the terms of the AFAs and MADAs when distributing devices manufactured by that hardware manufacturer, even if it had not itself entered into any such agreement with Google.

[1176]   See https://techcrunch.com/2016/12/24/cyanogen-failed-to-kill-android-now-it-is-shuttering-its-services-and-os-as-part-of-a-pivot/, saved and printed on 13 June 2018.

Android developed by Amazon that is generally considered as a high-quality fork of Android.[1177] Google considers Fire OS as an example of "purpose built" Android fork, which "*deliberately substitute different APIs and hardware requirements for those the CDD specifies and promote those differences to developers and users.*"[1178]

(1093)   In addition to pre-installing Fire OS on its own branded tablets called "Kindle Fire" and branded smartphones called "Fire phone", Amazon entered into discussions with a number of important OEMs concerning the licensing of Fire OS as of early 2012.[1179]

(1094)   While those discussions continued throughout the course of 2012-2013,[1180] they did not progress because of the concern of the OEMs that selling devices with Fire OS would be a breach of the provisions of their current or soon to be agreed AFAs with Google:

(1)   [AFA signatory] showed interest in cooperating with Amazon but expressed concerns about the anti-fragmentation obligations in its AFA. As noted in an internal email of 8 January 2013 from an Amazon employee, "[AFA signatory]*: [...] They were forthcoming and open about their concerns. They are interested in pursuing if we can solve for Anti-Fragmentation issues. [...] Anti-Fragmentation Issue: This is the main issue for them. They confirmed they have anti frag agreement for the duration of their Android relationship. They said "We don't want to piss off Google.*"[1181] The negotiations with [AFA signatory] did not progress further.

(2)   [AFA signatory] also raised issues related to the anti-fragmentation obligations in its AFA. As noted in an internal email of 10 January 2013 from an Amazon employee, " [AFA signatory] - *interested, but stated the anti-fragmentation agreement blocks them from working with us and asked us to get Google to consent*"[1182] The negotiations with [AFA signatory] did not progress further.

(3)   [AFA signatory] showed initial interest in cooperating with Amazon. However, as stated in an email of 10 January 2013 by an Amazon employee, "*It's unclear if they signed the AFA but there was definitely an Android-based tablet that showed up in the wild and we heard that* [Google Executive] *vetoed an Android netbook that went through the full CTS testing.*"[1183] A few days later, in an internal report dated 21 January 2013, it is stated that: "*They remain interested in the project, and we will follow up next week in the Bay Area. [AFA signatory] did ask about AFA; we said that we knew of other companies*

---

[1177]   See James Kendrick, "Fire OS: Better than Android for the masses" (20 June 2014), available at http://www.zdnet.com/article/fire-os-better-than-android-for-the-masses/, printed and saved on 12 April 2016.

[1178]   Google's Response to the Statement of Objections, Part Three, page 122, paragraph 75 (Doc ID 7117).

[1179]   See Amazon's non-confidential response to Question 1 of the request for information of 29 July 2015 (Doc ID 4063).

[1180]   See Amazon's non-confidential response to Question 1 of the request for information of 29 July 2015 (Doc ID 4063).

[1181]   See Amazon's non-confidential Annex 5C in response to the request for information of 28 July 2014 (Doc ID 4069).

[1182]   See Amazon's non-confidential Annex 5C in response to the request for information of 28 July 2014 (Doc ID 4069).

[1183]   See Amazon's non-confidential Annex 5C in response to the request for information of 28 July 2014 (Doc ID 4069).

**EN**                                                   246                                                   **EN**

GOOG-DOJ-26429409

*that were operating outside the AFA and encouraged them not to sign AFA. Separately,* [AFA signatory] *told [Amazon's persons] that they will be launching 7" and 10" Android tablets in the fall. Given this information, we have some concerns that* [AFA signatory] *may have already signed the AFA, and [the negotiation team] may not have been aware of this.*"[1184] Eventually, after having confirmed that it had entered into an AFA with Google, [AFA signatory] terminated discussions.[1185]

(4)   [AFA signatory] engaged in negotiations with Amazon. After a number of negotiation rounds, an employee of [AFA signatory] wrote to Amazon on 22 November 2013: "*I actually reviewed the existing Anti- Fragmentation Agreement (AFA) with Google. Unfortunately it seems difficult or impossible to collaborate Fire OS based Phone project with Amazon unless you to clarify not to use any Android assets for Fire Os. If you plan to use Fire Os [...],* [AFA signatory] *can't proceed this project as partner unfortunately. I assume all of Android phone manufactures have same condition.*"[1186] The negotiations with [AFA signatory] did not progress further.

(5)   As soon as it was contacted by Amazon, [AFA signatory] replied that the AFA prevented it from working with Amazon.[1187]

(6)   [AFA signatory] is the company that engaged for the longest period in negotiations with Amazon. As noted in an internal Amazon report: "*Early in the* [licensing] *program we believed there was an opportunity to create a FireOS platform with multiple OEMs building devices powered by FireOS. After talking with the major OEMs (*[AFA signatory]*,* [AFA signatory]*,* [AFA signatory]*,* [AFA signatory]*,* [AFA signatory]*,* [AFA signatory]*,* [AFA signatory]*,* [AFA signatory]*, and* [AFA signatory]*) it's clear that* [AFA signatory] *is our best and potentially only co-branded partner. Other tier 1 OEMs are unwilling to risk violating Google's Anti-Fragmentation Agreement.*"[1188]

Initially, [AFA signatory] reassured Amazon that "*they [...] are not currently restricted by the Google AFA.*"[1189] However, at a meeting between Google and [AFA signatory] executives on 19 October 2013, Google reminded [AFA signatory] of the anti-fragmentation obligations in its AFA. As stated in an email by [AFA signatory executive], at [AFA signatory], "*In my meeting with them* [Google Executive]. *[...] they seems quite sensitive on Windows phone and [Amazon] case. For [Amazon],* [Google Executive] *said they need to pass*

[1184]   See Amazon's non-confidential Annex 5B in response to the request for information of 28 July 2014 (Doc ID 4069).
[1185]   See Amazon's non-confidential Annex 4 in response to the request for information of 28 July 2014 (Doc ID 4059).
[1186]   See Amazon's non-confidential Annex 5D in response to the request for information of 28 July 2014 (Doc ID 4069).
[1187]   See Amazon's non-confidential Annex 4 in response to the request for information of 28 July 2014 (Doc ID 4059).
[1188]   See Amazon's non-confidential Annex 5A in response to the request for information of 28 July 2014 (Doc ID 4069).
[1189]   See Amazon's non-confidential Annex 5B in response to the request for information of 28 July 2014 (Doc ID 4069).

**EN**                                          247                                          **EN**

GOOG-DOJ-26429410

*cts test. They are ok not supporting gms but cts compatibility test must have. Otherwise Google will have a big problem with* [AFA signatory]."[1190]

On 22 October 2013, [Google Executive], said: "[AFA signatory] *knows that compatibility is a requirement even when they act as an odm. This has been communicated to* [AFA signatory executive] *who agreed.*"[1191]

In an internal email of 24 October 2013, [AFA signatory executive], elaborated on the anti-fragmentation obligations and Google's interpretation of them and stated: "*In general, Google doesn't want manufacturer to modify Android (although it's an open source) to fit in different platforms [...] and Google has its own plan to control the manufacturers for developing Android products*".[1192]

[AFA signatory executive], answered: "*I assume* [AFA signatory executive] *and everyone else relevant to [Amazon] developments knows about this and won't be fragmenting Android*".[1193]

Whilst it is possible that at some point [AFA signatory] had the impression that Amazon wanted to pass the Android compatibility tests,[1194] it subsequently became clear to [AFA signatory] that Amazon Fire OS was an Android fork. Nonetheless, [AFA signatory] decided not to raise the issue with Amazon as pointed out in an internal email of [...] by [AFA signatory executive]: "[AFA signatory executive] *had a meeting with [Amazon] (*[Amazon Executive] – *who you've met a few times) today, and as I suspected they are not planning CTS certification. We need to make sure we discuss this while we're together to understand what this means and what our next steps are.* [AFA signatory executives]– *please don't follow up with [Amazon] right now as* [Amazon Executive] *antenna was raised when* [AFA signatory executive] *asked and* [Amazon Executive] *said asked if "there was anything that [Amazon] should be worried about.*"[1195]

Amazon's plan to license its Fire OS was eventually withdrawn before [AFA signatory] could make a final decision.[1196]

(1095)   The Commission's conclusion that the anti-fragmentation obligations prevented Amazon from finding distribution channels is not affected by Google's claims that:

(1)   the Commission has brought forward no evidence that the anti-fragmentation obligations caused the failure of Amazon's efforts to license Fire OS;

---

[1190]   See [AFA signatory]'s non-confidential Annex [...] in response to the request for information of 17 July 2014 [...].

[1191]   See email by [Google Executive] of 22 October 2013, Doc ID 1754-120.

[1192]   See [AFA signatory]'s non-confidential Annex [...] in response to the request for information of 17 July 2014 [...].

[1193]   See [AFA signatory]'s non-confidential Annex [...] in response to the request for information of 17 July 2014 [...].

[1194]   See [AFA signatory]'s non-confidential Annex [...] in response to the request for information of 17 July 2014 [...].

[1195]   See [AFA signatory]'s non-confidential Annex [...] in response to the request for information of 17 July 2014 [...].

[1196]   See Amazon's non-confidential response to Question 1 of the request for information of 29 July 2015 (Doc ID 4063).

**EN**                                                         248                                                         **EN**

(2)    the fact that Amazon's failure to attract OEMs was not caused by the anti-fragmentation obligations is confirmed by the fact that Amazon was unable to conclude an agreement with two OEMs that had not entered into AFAs;

(3)    Amazon failed to license Fire OS for reasons that had nothing to do with the anti-fragmentation obligations, namely: (i) Amazon's lack of carrier support; (ii) the high price of Amazon own branded devices such as the Fire Phone; (iii) the lack of Google proprietary apps; (iv) the fact that app developers also found Amazon OS unattractive and (v) the fact that Amazon decided on its own volition not to enter negotiations with an OEM that is not listed in recital (1094); and

(4)    the Commission has not referred to any example of Amazon trying to license Fire OS after 2013, nor to any exemption request submitted to Google in relation to Fire OS devices. Amazon itself realised that the licensing of Fire OS was a failed business model, as shown by its decision to partner subsequently with BLU and Motorola to launch Google Android devices.[1197]

(1096)   First, the Commission is not required to demonstrate that the anti-fragmentation obligations were the sole cause of the failure of Amazon's efforts to license Fire OS.

(1097)   Moreover, the body of evidence relied on by the Commission, including contemporaneous internal Amazon documents and contemporaneous correspondence between Amazon and OEMs, demonstrates that the anti-fragmentation obligations were an important cause of the failure of Amazon's efforts to license Fire OS. The licensing of Fire OS could have allowed Amazon to build a network of important OEMs, including [AFA signatory], [AFA signatory], [AFA signatory], [AFA signatory] and [AFA signatory]. This would have had a positive impact on the Amazon ecosystem, allowing Amazon to develop better and more efficient OS and apps, capable of competing more effectively with Google proprietary apps. This is confirmed by Amazon's statements that:

(1)    "*In the absence of Google's anti-fragmentation agreements with OEMs, [Amazon's attempts to license Fire OS] would almost certainly have achieved a different outcome*";[1198] and

(2)    Due to the existence of indirect network effects, achieving scale is "*absolutely critical*" in successfully distributing a smart mobile OS.[1199]

(1098)   Second, the two OEMs that had not entered into AFAs represented a small share of sales of smart mobile devices and were at the time focussed on selling devices based on their own smart mobile OS rather than on licensable smart mobile OSs.

(1099)   Third, Google's claim that Amazon failed to license Fire OS for reasons that had nothing to do with the anti-fragmentation obligations is incorrect.

---

[1197]   Google's Response to the Statement of Objections, Part Three, page 137, paragraph 126 (Doc ID 7117); Appendix 5 to Google's Response to the Statement of Objections (Doc ID 8302); Google's Response to the First Letter of Facts, Part Two, pages 57-58, paragraphs 75-76 (Doc ID 8598); Appendix 1 to Google's Response to the First Letter of Facts, Part Two (Doc ID 8599).

[1198]   See Amazon's non-confidential response to Question 3 of the request for information of 29 July 2015 (Doc ID 4063).

[1199]   See Amazon's non-confidential response to Question 2 of the request for information of 29 July 2015 (Doc ID 4063).

**EN**

**EN**

GOOG-DOJ-26429412

(1100)   In the first place, absent the anti-fragmentation obligations, MNOs could have supported devices based on a licensed version of Fire OS at the same time as the Amazon-branded Fire Phone. Such support is common practice in the industry, as exemplified by the fact that MNOs supported at the same time devices manufactured by Google Android OEMs and the "Google-branded" Nexus models.[1200]

(1101)   In the second place, absent the anti-fragmentation obligations, OEMs may have priced devices based on a licensed version of Fire OS lower than the Amazon Fire Phone released in 2014. This is confirmed by the fact that [AFA signatory] and [AFA signatory], which were involved in negotiations with Amazon, were focussed at the time on manufacturing and distributing lower-end Google Android devices.

(1102)   In the third place, the fact that Amazon devices lacked Google proprietary apps does not mean that users would find them unattractive. Amazon's Kindle Fire tablet based on Fire OS, which also lacks Google proprietary apps, has generally received positive reviews by industry experts.[1201]

(1103)   In the fourth place, absent the anti-fragmentation obligations, it is likely that app developers would have found Fire OS even more attractive. This is confirmed by the fact that, notwithstanding the anti-fragmentation obligations, there were approximately [700 000 – 900 000] apps available for Fire OS as of April 2017.[1202]

(1104)   In the fifth place, it is irrelevant that Amazon might have decided by its own volition not to enter negotiations with one specific OEM that is not listed in recital (1094). This is because, in any event, that OEM had entered into an AFA, with the result that its commercial behaviour would likely have been be affected by the anti-fragmentation obligations.

(1105)   Fourth, given the anti-fragmentation obligations, it is unsurprising that, after the failure of its attempts to license Fire OS, Amazon chose to devise an alternative strategy to ensure the distribution of its mobile services and launched Google Android devices in cooperation with BLU and Motorola.

12.6.3.4. The anti-fragmentation obligations prevent OEMs from developing their own forked version of Android

(1106)   The Commission concludes that the AFAs prevent OEMs from developing their own forked version of Android. OEMs would be well-placed to develop an Android fork as some of them are, or have been, active in the development of smart mobile OSs (e.g. Samsung with Tizen). OEMs could therefore use their technical knowledge to develop their own forked versions of Android and either license the forks to third parties or incorporate them in their own smart mobile devices.

---

[1200]   See Amazon's non-confidential response to Question 1 of the request for information of 29 July 2015 (Doc ID 4063).

[1201]   See for example 'Amazon Fire HD 10 review: affordable tablet that's great for Netflix addicts' available at   https://www.theguardian.com/technology/2017/oct/12/amazon-fire-hd-10-review-tablet-affordable-netflix-ipad-pro-hands-free-alexa-good-screen-solid-battery,   printed and saved on 13 June 2018; 'Amazon Fire HD 8 (2017)', which rates the Kindle Fire as "*excellent*", available at https://www.pcmag.com/article2/0,2817,2492123,00.asp,   printed and saved on 13 June 2018; and 'Amazon   Fire   tablet   review:   The   bargain   Alexa   tablet',   available   at http://www.expertreviews.co.uk/amazon/amazon-fire, printed and saved on 13 June 2018.

[1202]   See Amazon's non-confidential response to Question 2 of the follow up request for information of 11 April 2017 (Doc ID 8276).

GOOG-DOJ-26429413

(1107)  For example, in 2012, [AFA signatory] was considering building a tablet based on a forked version of Android. As stated by [AFA signatory executive], there was "*some pre-study activity if* [AFA signatory] *should create anti-Kindle Fire, e.g. using AOSP code without Google's approval & Android Compatibility, and building our own services on top of it.*" As [AFA signatory] recognised, however, "*we* [AFA signatory] *are also Google licensees. There is a strong concern if we'd violate the agreement by doing Kindle Fire-type product, while doing our Android phone/tablet business as usual.*" Furthermore, "*we cannot make devices based on the Android framework which are not Android Compatible*".[1203] [AFA signatory] eventually abandoned the project.[1204]

12.6.3.5. The anti-fragmentation obligations make it more difficult for fork developers to find ODMs willing to manufacture their own branded devices

(1108)  The Commission concludes that the anti-fragmentation obligations make it more difficult for fork developers to find ODMs willing to manufacture their own branded devices.

(1109)  If a fork developer is unable to license its fork to OEMs due to the anti-fragmentation obligations, an alternative strategy would be for that developer to resort to an ODM for the manufacturing of self-branded smart mobile devices. As indicated by Amazon, however, "*[AFA agreements with ODMs] cause friction in the contracting process and result in critical time delays as partners attempt to work through the business risks of possibly contravening the anti-fragmentation restrictions and facing harsh penalties from Google. Ultimately, the anti-fragmentation agreements force Amazon to pay a higher price, to agree to other contractual concessions, or to assume more risk and expense in the form of providing broad indemnification to partners in order to be able to finalize a deal with a [ODM] partner. Given the importance of time to market in manufacturing smart mobile devices and achieving scale in distributing a mobile OS such as Fire OS, the anti-fragmentation clauses ensure that any potential distributors of forked Android are prevented from becoming credible competitors to Google*"[1205] (see also Recital (1059)).

(1110)  The Commission's conclusion that the anti-fragmentation obligations make it more difficult for fork developers to find ODMs willing to manufacture their own branded devices is not affected by Google's claim that ODMs can still cooperate with fork manufacturers, as long as a device is compatible when transferred by an ODM to a firm such as Amazon.[1206] This is because the anti-fragmentation obligations still prevent ODMs from selling devices that comply with the requirements set by fork developers, when those requirements are different from those set by Google.

12.6.3.6. Besides preventing ODMs and OEMs from selling devices running Android forks, the anti-fragmentation obligations create further obstacles that prevent ODMs and OEMs to support Android forks

(1111)  The Commission concludes that besides preventing ODMs and OEMs from selling

---

[1203]  See non-confidential Annex 44 to [AFA signatory]'s response to the request for information of 17 July 2014 […].

[1204]  See [AFA signatory]'s response to the request for information of 5 April 2016 […].

[1205]  See Amazon's non-confidential response to Question 7 of the request for information of 29 July 2015 (Doc ID 4063).

[1206]  Google's Response to the Statement of Objections, Part Three, page 108, paragraph 29 (Doc ID 7117).

GOOG-DOJ-26429414

devices running Android forks, the anti-fragmentation obligations create further obstacles that prevent ODMs and OEMs to support Android forks.

(1112)  First, by preventing chipset manufacturers from pre-installing an Android fork and a set of apps inside the chipsets they supply to OEMs or ODMs, the anti-fragmentation obligations make it more difficult for fork developers to convince ODMs and OEMs to sell devices based on their fork. For example, [Google Executive], stated that assisting [ODM] in achieving full compatibility, with a view to leading them to sign an AFA, "*helps to reduce the compatibility issue in China.*"[1207]

(1113)  Second, the anti-fragmentation obligations prevent OEMs or ODMs from supporting in any other way the development of Android forks, as this would contravene clause 2.1 of the AFA.[1208] Such support could include: (i) cooperating in the development of such forks; (ii) providing technical assistance to the fork developer; and (iii) distributing, participating in the creation of, or promoting in any way, an SDK for the development of apps for a fork.

*12.6.4.   Compatible forks do not constitute a credible competitive threat to Google*

(1114)  The Commission concludes that compatible forks do not constitute a credible competitive threat to Google.

(1115)  On the one hand, in principle, a developer of an Android fork could decide to cooperate with Google and pass the Android compatibility tests in order to avoid facing the restrictions posed by the anti-fragmentation obligations.

(1116)  On the other hand, the need to pass the Android compatibility tests would confer on Google a high degree of control over such a compatible fork.[1209] This would both make the development of compatible forks commercially less attractive and reduce the likelihood that they would exercise a strong competitive constraint on Google.

(1117)  First, it is confirmed by internal Amazon documents and exchanges between Amazon and Google from 2012.

(1118)  In an undated internal document (likely to be from 2014) assessing whether the Fire OS should pass the Android compatibility tests, Amazon stated that "*Google maintains significant control over the Android ecosystem, which means that there is risk that Google could block our ability to launch a product or a new service. For example, Google may interpret the Mobile Application Distribution Agreement (MADA) and Anti-Fragmentation Agreement (AFA) in ways that disadvantage us. Google also sets the rules for Android compatibility through the Compatibility Test Suite (CTS) and the Compatibility Definition Document (CDD) and it could change CTS or the CDD in ways that negatively impact our devices.*"[1210] This position was reinforced by the fact that, in Amazon's view, entering into an agreement with Google was a "*one-way door and could give Google significant leverage over our current and future Android-based device programs*".[1211]

---

[1207]   See email by [Google Executive] of 1 September 2011 (Doc ID 1371-00800).
[1208]   "*[COMPANY] will not take any actions that may cause or result in the fragmentation of Android*".
[1209]   See Sections 6.3.1 and 6.3.2.
[1210]   See Amazon's non-confidential Annex 2 in response to the request for information of 28 July 2014 (Doc ID 3942).
[1211]   See Amazon's non-confidential Annex 2 in response to the request for information of 28 July 2014 (Doc ID 8166).

**EN**

**EN**

GOOG-DOJ-26429415

(1119)  Amazon was also concerned that the prospect of having to apply for the Android compatibility tests would have a chilling effect on the development of its fork as "*We could be prohibited from developing new categories of devices using "vanilla" AOSP because Google does not have a clear policy on how to handle compatibility on new device categories.*"[1212]

(1120)  Similar concerns where highlighted by an email by [Amazon Executive], to [Google Executive], in which [Amazon Executive] sent on 25 May 2012 when Amazon was exploring the possibility of entering into Google's compatibility programme: "[exchange between Amazon and Google about Google's compatibility programme]."[1213]

(1121)  In the same email correspondence, [Amazon Executive] explains that: "[exchange between Amazon and Google about Google's compatibility programme]."[1214]

(1122)  Second, it is confirmed by a response to a request for information by Nokia, in which Nokia indicates that its "*assessment at the time of developing the Nokia X devices was that meeting Google's compatibility requirements (and signing the agreements) would have put excessive limitations on Nokia's differentiation intent.*"[1215]

(1123)  Third, it is confirmed by Alibaba, which states that "[information about Aliyun's development]"[1216]

(1124)  The Commission's conclusion that compatible forks do not constitute a credible competitive threat to Google is not affected by Google's claims that:

(1)  the anti-fragmentation obligations leave sufficient space for intra-brand competition between different variants of Google Android at the level of smart mobile OS,[1217] apps and APIs;[1218]

(2)  Alibaba's statements cannot support the Commission's position given that Alibaba itself considers that Aliyun is not an Android fork;[1219] and

(3)  the anti-fragmentation obligations have not prevented any specific innovation.[1220]

(1125)  First, it is irrelevant that the anti-fragmentation obligations may leave some space for intra-brand competition between different variants of Google Android. This is because it is sufficient that the anti-fragmentation obligations further hinder the maintenance of the degree of competition still existing in the worldwide market

---

[1212]  See Amazon's non-confidential Annex 2 in response to the request for information of 28 July 2014 (Doc ID 3942).

[1213]  See email by [Amazon Executive] to [Google Executive] of 25 May 2012 (Doc ID 1366-31).

[1214]  See email by [Amazon Executive] to [Google Executive] of 25 May 2012 (Doc ID 1366-31).

[1215]  See Nokia's non-confidential response to the request for information of 18 July 2014, paragraph 32 (Doc ID 8231).

[1216]  See Alibaba's non-confidential response to Question 25.3 of the request for information of 12 June 2013 (Doc ID 6122).

[1217]  Google's Response to the Statement of Objections, Part Three, pages 104-108, paragraphs 20-27 and page 144, paragraph 143 (Doc ID 7117); Google's Response to the First Letter of Facts, Part Two, pages 13-14, paragraphs 31-34 (Doc ID 8598).

[1218]  Google's Response to the Statement of Objections, Part Three, pages 106-107, paragraph 25, page 142, paragraphs 138-140 (Doc ID 7117).

[1219]  Google's Response to the First Letter of Facts, Part Two, page 49, paragraph 43 (Doc ID 8598).

[1220]  Google's Response to the First Letter of Facts, Part Two, pages 47-49, paragraphs 35-42 (Doc ID 8598).

**EN**

**EN**

(excluding China) for licensable smart mobile OSs and the national markets for general search services, where competition is already weakened as a result of the very presence of Google on those markets.

(1126)  Moreover, and in any event, the degree of intra-brand OS competition between different variants of Google Android at the level of smart mobile OSs, apps and APIs is weak.

(1127)  In the first place, regarding intra-brand competition at the level of smart mobile OSs, Google controls the CDD/CTS parameters and, as such, the degree of variation that a compatible fork may exhibit.[1221] For example, Cyanogen stated: "*To the best of our knowledge, no mobile OEM has explicitly refrained from entering an agreement with Cyanogen or limited the scope or terminated an agreement with Cyanogen due to requirements imposed by Google, but the OEMs have informally expressed concerns about Google's position and attitude towards Cyanogen and wonder whether Google will change its compatibility requirements to make it more difficult or impossible for a Cyanogen OS device to meet Google's compatibility requirements.*"[1222]

(1128)  Moreover, developers of compatible forks such as Cyanogen have not achieved any meaningful commercial success outside of China. For example, in 2016, less than 1 million devices running Cyanogen's version of Android were sold on a worldwide basis (excluding China).[1223] In addition, as of December 2016, Cyanogen stopped operations and ceased developing its Cyanogen OS.[1224]

(1129)  In the second place, regarding intra-brand competition at the level of apps and APIs level, such competition is irrelevant for the purposes of assessing the effect of the anti-fragmentation obligations at the level of smart mobile OSs. This is because apps and APIs serve different purposes from smart mobile OSs.

(1130)  Second, Alibaba's statement at recital (1123) supports the Commission's conclusion that compatible forks do not constitute a credible competitive threat to Google because both the Commission and Google (see recital (408)) consider that Aliyun is an Android fork. In any event, Alibaba's response is provided […].

(1131)  Third, in any event, this Decision demonstrates that the anti-fragmentation obligations allowed Google to interfere with the ability of Android fork developers to distribute OSs that presented different and distinctive features (see recitals (1056) to (1059), (1117) to (1123) and (1107)).

*12.6.5.  The capability of the anti-fragmentation obligations to restrict competition is reinforced by the unavailability of Google's proprietary APIs to fork developers, which makes it more difficult for Android forks to attract app developers*

(1132)  The Commission concludes that the capability of the anti-fragmentation obligations to restrict competition is reinforced by the unavailability of Google's proprietary APIs to fork developers, which makes it more difficult for Android forks to attract app developers.

---

[1221]  See Sections 6.3.1 and 6.3.2.

[1222]  See Cyanogen non-confidential response to Question 27 of the request for information of 21 September 2015 (Doc ID 5275).

[1223]  Source: […] data (Doc ID 7866 and 7867).

[1224]  See    https://techcrunch.com/2016/12/24/cyanogen-failed-to-kill-android-now-it-is-shuttering-its-services-and-os-as-part-of-a-pivot/, printed and saved on 13 June 2018.

GOOG-DOJ-26429417

(1133)   A large number of developers for Google Android make use of Google's proprietary APIs.[1225] Given that Google's proprietary APIs are not available to fork developers, app developers wishing to port an app from Google Android to an Android fork have to replace all the APIs linking to Google cloud services. Developers of apps that make use of Google proprietary APIs therefore face additional porting costs to develop apps for forks.

(1)   According to Opera: "*As apps begin to rely more and more on Google's extended set of network APIs that are part of Google's Android but not of Android forks, these apps will not work on Android forks. To the extent these apps are the apps that users desire, the appeal of such forks would be reduced and thus their ability to compete with Google's Android. Opera Software uses the Google Cloud Messaging ("GCM") for synchronization. This API is only available on Google-approved devices. It would be prohibitive for Opera to replace this API on devices made by manufacturers that have not signed up for [Google Play Services].*"[1226]

(2)   According to Facebook: "[…] *Porting an app that critically relies on Google cloud services functionality to an AOSP variant without Google cloud services or a comparable framework could be very challenging—despite the "source code similarity" of both operating systems.*"[1227]

(3)   According to Amazon: "*It is difficult to estimate the time and cost involved because it is dependent on the functionality and sophistication of the app, as well as the process the developer used to build the app. On one end of the spectrum, Amazon has seen a simple, map-based app take approximately one week to port from Android to Fire OS. On the other end of the spectrum, Amazon has seen a complex game take seven months to port from Android to Fire OS due to its social features, shared economy and other complex elements. On average, Amazon estimates that it would take 1-2 weeks (plus testing time) per API for a developer to switch from Google Play services APIs for in-app purchasing and device messaging to Amazon's corresponding APIs and 2-3 weeks (plus testing time) for a developer to switch from Google's Maps API to Amazon's Maps API. And these are not one-time investments by the developers. Each time a developer updates an app, it must do additional development work to ensure the updated app works with both the Google and*

---

[1225]   Yandex estimates that approximately 65% of the most popular free Android apps in the Play Store use at least one of Google's proprietary APIs (see Yandex's non-confidential response to Question 3 of the request for information of 29 June 2015 to app developers (Doc ID 2031). In addition, both Yandex and Opera state that Google only permits paid apps to be distributed via the Play Store if they use Google's in-app billing API, and therefore it can be presumed that all paid apps also use at least that API (see Yandex's non-confidential response to Question 3 of the request for information of 29 June 2015 to app developers (Doc ID 2031), and Opera's non-confidential response to Question 3 of the request for information of 29 June 2015 to app developers (Doc ID 2133)). Furthermore, almost the totality of the app store providers that responded to the request for information stated that when developing apps for Google Android devices, developers tend to use Google Play Services APIs instead of potentially competing APIs (see responses to Question 25 of the request for information of 21 October 2015 on app stores).

[1226]   See Opera's non-confidential response to Question 10 of the request for information of 29 June 2015 to app developers (Doc ID 2133).

[1227]   See Facebook's non-confidential response to Question 1 of the request for information of 29 June 2015 to app developers (Doc ID 4395).

GOOG-DOJ-26429418

*Amazon APIs and must perform testing on both versions.*"[1228]

(1134)   The Commission's conclusion that the capability of the anti-fragmentation obligations to restrict competition is reinforced by the unavailability of Google's proprietary APIs to fork developers is not affected by Google's claims that:

(1)   the Commission's argument that Google's proprietary APIs are essential to a fork's success undermines its argument that forks constitute a credible competitive threat for Google;[1229]

(2)   many alternative APIs, including from Amazon, are available;[1230] and

(3)   contrary to allegations by certain third parties, Google has never migrated over time APIs from AOSP to Google Play Services.[1231]

(1135)   First, the Commission does not argue that Google's proprietary APIs are essential to a fork's success. Rather, it simply concludes that the unavailability of Google's proprietary APIs on Android forks makes it more difficult for Android forks to attract app developers (see recitals (1132) and (1133)).

(1136)   Moreover, and in any event, porting an app from Google Android to a completely different smart mobile OS remains comparatively more difficult than porting an app from Google Android to an Android fork, even taking into account the absence of Google's proprietary APIs on the Android fork. This is for the following reasons:

(1)   many apps can run on Android forks with the need for no or only minor adjustments (see recital (1041); and

(2)   an app developer porting an app from Google Android to another smart mobile OS would have to overcome not only the potential barriers constituted by the absence of Google's proprietary APIs on that OSs, but also the fact that Google Android and other OSs have different source codes (see recital (1042)).

(1137)   Second, the Commission does not argue that alternative APIs, including from Amazon, are not available. Rather, it simply concludes that Google proprietary APIs are commercially important for app developers (see Section 9.4.4). The fact that Amazon developed a complete suite of APIs alternative to Google's is not surprising, given that this was made necessary by the lack of availability of Google proprietary APIs on Android forks.

(1138)   Third, Google's claim that it has never migrated APIs from AOSP to Google Play Services is irrelevant. This is because the unavailability of Google's proprietary APIs on Android forks makes it more difficult for Android forks to attract app developers regardless of whether those APIs previously existed on AOSP.

---

[1228]   See Amazon's non-confidential response to Question 4 of the request for information of 29 June 2015 to app developers (Doc ID 4188).

[1229]   See Google's Response to the Statement of Objections, Part Three, page 136, paragraph 122 (Doc ID 7117).

[1230]   Google's Response to the First Letter of Facts, Part Two, pages 58-59, paragraphs 80-82 (Doc ID 8598).

[1231]   Google's Response to the First Letter of Facts, Part Two, pages 60-61, paragraphs 83-86 (Doc ID 8598).

GOOG-DOJ-26429419

**12.6.6.** *Google's conduct helps to maintain and strengthen Google's dominant position in each national market for general search services, deters innovation, and tends to harm, directly or indirectly, consumers*

(1139)   For the reasons set out in this Section, the Commission concludes that the anti-fragmentation obligations maintain and strengthen Google's dominant position in each national market for general search services, deter innovation, and tend to harm, directly or indirectly, consumers.

(1140)   First, by hindering the development of Android forks and eliminating a credible competitive threat to Google Android, Google's conduct helps to maintain and strengthen Google's dominant position in each national market for general search services. This is because devices based on Android forks can be used by competing general search services as a channel for the distribution of their search apps and services. For example, Amazon on Fire OS devices and Nokia on Nokia X devices pre-installed Bing instead of Google Search.[1232] By hindering the development of Android forks, Google raises barriers to the entry or expansion of competing search apps and services and, thus, protects its search advertising revenues.

(1141)   Second, the anti-fragmentation obligations reduce the incentives of market participants to develop Android forks providing smart mobile devices with distinctive features and with additional functionalities (see for example recitals (1056) to (1059), (1117) to (1123) and (1107)).

(1142)   Third, Google's conduct also tends to harm, directly or indirectly, consumers, who as a result of Google's interference with the normal competitive process may see less choice of smart mobile OSs and general search services. An illustration of this is provided by the example of Fire OS, a forked version of Android developed by Amazon that is generally considered as a high-quality fork of Android and which was prevented from finding distribution channels by the anti-fragmentation obligations (see Section 12.6.3.3).

(1143)   Fourth, the Commission's conclusion that the anti-fragmentation obligations help Google to maintain and strengthen its dominant position in each national market for general search services is not affected by Google's claims that there remain distribution channels other than Android forks for competing general search services.[1233]

(1144)   It is irrelevant that there remain distribution channels other than Android forks for competing general search services. This is because it is sufficient that the anti-fragmentation obligations further hinder the maintenance of the degree of competition still existing in national markets for general search services, competition which is already weakened as a result of the very presence of Google on those markets.

(1145)   In addition, the anti-fragmentation obligations makes it harder for competing general search services to achieve better distribution on smart mobile devices, which would

---

[1232]   See Austin Carr,"Bing Now default Search Engine on Amazon's Kindle Fire: Is Apple next?" (09 July 2012), available at http://www.fastcompany.com/3001129/bing-now-default-search-engine-amazons-kindle-fire-apple-next, printed and saved on 11 April 2016, and see "Microsoft Mobile Apps", available at https://www.microsoft.com/en/mobile/apps/x/, printed and saved on 18 April 2016.

[1233]   Google's Response to the Statement of Objections, Part Three, page 109, paragraph 33 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429420

allow them to gain additional search queries and the respective revenues and data needed to improve their services (see recitals (859), (860) and (1140)).

*12.6.7.   Google's claim regarding the need for the Commission to consider its conduct in the relevant economic and legal context*

(1146)   Google claims that is conduct is incapable of restricting competition when assessed in its relevant economic and legal context.

(1147)   First, assessing whether Google's conduct is capable of restricting competition requires the Commission to demonstrate that "*there would have been greater competition absent the impugned conduct*" and to "*consider in that context, the interactions among different sides of*" the Android platform.[1234]

(1148)   Second, an assessment of its conduct in the relevant economic and legal context as of 2008 when Google began to enter into AFAs would indicate that "*AFAs have not restricted, but promoted, competition*".[1235]

(1149)   Google's claims are unfounded.

(1150)   First, the Commission is not required to demonstrate in a general manner that "*there would have been greater competition*" absent the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations. Rather, the Commission is required to demonstrate that the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations is capable of restricting competition in the relevant markets, namely the worldwide (excluding China) market for licensable smart mobile OSs and the national markets for general search services.

(1151)   Second, when assessing the capability of the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations to restrict competition on the relevant markets, the Commission has *inter alia* analysed whether there could have been greater competition on those markets, absent the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations (see Section 12.6). Regarding the worldwide (excluding China) market for licensable smart mobile OSs, this includes an analysis of the likelihood that certain players, such as Amazon, would have developed and commercialised Android forks in the absence of the conduct (see Sections 12.6.1 to 12.6.3). Regarding the national markets for general search services, this includes an analysis of the general search services pre-installed by competing Android forks (see recital (1140)).

(1152)   Third, when assessing the capability of the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations to restrict competition on the relevant markets, the Commission has also taken account of the nature of interactions among the different sides of the Android platform. Regarding the worldwide (excluding China) market for licensable smart mobile OSs, this includes the fact that: (i) the Play Store and the Google Search app cannot be obtained without entering into the anti-fragmentation obligations (see Section 12.5); (ii) many apps can run on Android forks with the need for no or only minor adjustments (see recital

---

[1234]   Google's letter of 11 June 2018, paragraphs 6 and 11-15 (Doc ID 8890).
[1235]   Google's letter of 11 June 2018, paragraph 23 (Doc ID 8890).

GOOG-DOJ-26429421

(1041)); and (iii) for apps that require additional development for porting, it is generally easier to port an app from Google Android to an Android fork than to port an app from Google Android to a different smart mobile OS (see recital (1042)). Regarding the national markets for general search services, this includes the fact that devices based on Android forks can be used by competing general search services as a channel for the distribution of their search apps and services (recital (1140)).

(1153) To the extent, however, that Google's claim about the "*interactions among different sides*" of the Android platform relates to whether the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations may give rise to benefits on the worldwide (excluding China) market for licensable smart mobile OSs, on the national markets for general search services and/or on other markets, the Commission has assessed and dismissed such a claim in its analysis of objective justification (see Section 12.7).

(1154) Fourth, when assessing the capability of the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations to restrict competition on the worldwide (excluding China) market for licensable smart mobile OSs and the national markets for general search services, the Commission is required to undertake such an assessment as of January 2011, when it concludes that Google became dominant in those markets, not as of 2008 when Google began to enter into AFAs.

## 12.7.   Objective justification and efficiencies

(1155) Google claims that the licensing of the Play Store and the Google Search app conditional on hardware manufacturers agreeing to the anti-fragmentation obligations is objectively justified for the following reasons:

(1)   the anti-fragmentation obligations are necessary to ensure the interoperability of the Android ecosystem. Moreover, alternative smart mobile OS providers have more restrictive business models;[1236]

(2)   the anti-fragmentation obligations are necessary to prevent fragmentation that would be detrimental to the Android ecosystem;[1237]

(3)   the anti-fragmentation obligations are necessary to protect Google's reputation;[1238]

(4)   the anti-fragmentation obligations are necessary to prevent OEMs from "cutting corners";

(5)   the anti-fragmentation obligations are necessary to prevent free riding on technical support such as early release of the Android source code or developer boot camps;[1239]

---

[1236]   Google's Response to the Statement of Objections, Part Three, pages 113-115, paragraphs 42-48 (Doc ID 7117).

[1237]   Google's Response to the Statement of Objections, Part Three, pages 113-115, paragraphs 42-48 (Doc ID 7117).

[1238]   Google's Response to the Statement of Objections, Part Three, pages 148-149, paragraphs 167-171 (Doc ID 7117).

[1239]   Google's Response to the Statement of Objections, Part Three, page 145, paragraph 151 (Doc ID 7117) and Appendix 2, page 20 (Doc ID 8303-12).

**EN**

**EN**

GOOG-DOJ-26429422

(6)    Google introduced the AFA before it became dominant;

(7)    the anti-fragmentation obligations were not meant to be misleading;

(8)    the Commission has failed to carry out a balancing of the anti-competitive and pro-competitive effects of the anti-fragmentation obligations.[1240]

(1156)   For the reasons set out in recitals (1157) to (1183), the Commission concludes that Google has not demonstrated that the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations is objectively justified.

(1157)   First, Google has not demonstrated that the anti-fragmentation obligations are necessary to ensure the interoperability of the Android eco-system.

(1158)   In the first place, the anti-fragmentation obligations are not limited to promoting "*interoperability*" but also prohibit OEMs from supporting through different means Android forks that could be pre-installed on devices competing with GMS devices (see Section 12.6.3).

(1159)   In the second place, Google profited significantly from the declared open-source distribution of Android, as can be seen from the slide in Figure 23, included in an internal presentation to Google's board of directors by [Google Executive].[1241]

### Figure 23: Google internal document on open source

**How do we retain control of something we gave away?**

- We credit Android's rapid adoption to the fact that we made it available under an open source license

- Because of its Apache licensing model, we sent a strong signal that we are not controlling the platform (vs. GPL or dual license model)

- Because Google was historically seen as a threat to operators, giving up control was a key component of operators adopting Android

- This is one reason Android is considered one of the most commercially successful Linux distributions

**Conclusion: Open source reduces friction**

(1160)   Against that background, Google cannot now claim that the anti-fragmentation obligations are necessary to minimise the negative consequences for Google resulting from greater competition from Android forks that are connected to developing an OS in an open source environment.[1242]

(1161)   In the third place, it is irrelevant that alternative smart mobile OS providers may have

---

[1240]   Google's Response to the First Letter of Facts, Part Two, pages 40-41, paragraphs 9-12 (Doc ID 8598).

[1241]   See Google internal presentation by [Google Executive], "Android – Answers to strategy questions for BOD", 8 October 2010, slide 3 (Doc ID 1790-397).

[1242]   As noted in an internal presentation by Google, for example, "*We don't work directly in the open for several reasons (patents, fragmentation, competition...)*" (emphasis added) (Google's internal document submitted in response to the request for information of 11 July 2014, presentation by [Google Executives] of 30 September 2010 (Doc ID 1348-546)).

GOOG-DOJ-26429423

more restrictive business models[1243] as:

(1)     Apple, BlackBerry and Microsoft have not decided to adopt an open source business model; and

(2)     Android was considered the "*most closed*" among the open source software reviewed by VisionMobile.[1244]

(1162)   In the fourth place, Google's intention to notify hardware manufacturers of the option to enter into an ACC in place of an AFA confirms that Google could have implemented less restrictive measures than the anti-fragmentation obligations as originally worded.

(1163)   Second, Google has not demonstrated that fragmentation would be detrimental to the Android ecosystem.

(1164)   In the first place, Google itself contributes significantly to the fragmentation of the Android ecosystem. This is primarily because, as discussed in Section 9.4.4, by preventing fork developers from pre-installing its proprietary APIs, Google Play Services, Google has created an artificial distinction between two categories of Android devices: GMS devices that pre-install Google Play Services and other devices that do not pre-install Google Play Services. This is confirmed by:

(1)     A specialised press report, according to which: "[…] *the most commonly used version of Android is actually a fork by Google itself.*"[1245]

(2)     Amazon's statement, according to which: "*The 'openness' of Android was one of the key factors that made Android attractive to developers. Google subsequently moved APIs out of open source Android to Google Play services, leading to a significant drop in portability. For example, Google released Google Cloud Messaging for Android in 2012 but then moved it to Google Play services the following year. Since then, all new significant APIs that Google releases are available exclusively through Google Play services. The APIs that remain open source are not updated at the same rate as the corresponding closed source versions. For example, open source Android contains an early version of the Location API that has not been updated to match the more feature-rich Google Play services version. As a result, an app using the open source version of the Location API would offer lower-quality location-based services that consume more battery power than one using the Location API available through Google Play services, an option no developer would choose when given both as options. And apps using the Google Play services version of the Location API will not work on forked versions of Android without modification. […] Having secured the successful adoption of the Google Android OS, the Google Play app store, and the Google Mobile*

---

[1243]   Google's Response to the Statement of Objections, Part Three, pages 118-119, paragraphs 57-61 (Doc ID 7117).

[1244]   See "Open Governance Index- Measuring the true openness of open source projects from Android to Webkit" (July 2011), page 16, available at http://www.visionmobile.com/product/open-governance-index/, printed and saved on 11 April 2016.

[1245]   See Michael H, "The Google Android fork: Google Play services, Android 4.4, and the Nexus experience" (14 October 2013), available at http://www.phonearena.com/news/The-Google-Android-fork-Google-Play-services-Android-4.4-and-the-Nexus-Experience_id48229, printed and saved on 11 April 2016.

**EN**

**EN**

GOOG-DOJ-26429424

*Services ("GMS") app suite by effectively all OEMs and developers, Google is taking more and more steps to create a closed ecosystem, despite its assertions of an open ecosystem.*"[1246]

(3)   Nokia's statement, according to which: "*Google itself has contributed to its fragmentation by releasing two separate versions of the OS: AOSP and Android OS, as well as releasing such a great number of different successive versions of Android OS, which Google develops in secret, which is unlike common practice in open source software development.*"[1247]

(4)   Opera's statement, according to which: "*Android is additionally prone to fragmentation when the Google proprietary network APIs that are part of GPS are not supported on forks of the open-source components of Android. Therefore, apps designed to run on Google's Android and making use of Google's proprietary network APIs do not run on the Android forks that do not include the proprietary APIs.*"[1248]

(5)   Yandex's statement, according to which: "[…] *an example of this form of fragmentation would be the creation of AOSP-based mobile devices without access to the APIs contained in GPS. This type of fragmentation is caused by Google's approach to distributing its APIs only within a single package, which is available to device manufacturers only if they pre-install GPS on the device (for more details, please see above). Absent these APIs, such applications will simply not operate —despite the similarity of the source code — even on a pure AOSP-based device.*"[1249]

(1165)   In the second place, "fragmentation" can be a source of competition and innovative products, as confirmed by the fact that Google itself created Android by breaking compatibility with Sun Microsystem's Java.[1250]

---

[1246]   See Amazon's non-confidential response to Question 10 of the request for information to app developers of 29 June 2015 (Doc ID 8230).

[1247]   See Nokia's non-confidential response to Question 14 of the request for information to app developers of 29 June 2015 (Doc ID 4360).

[1248]   See Opera's non-confidential response to Question 14 of the request for information to app developers of 29 June 2015 (Doc ID 2133).

[1249]   See Yandex's non-confidential response to Question 14 of the request for information to app developers of 29 June 2015 (Doc ID 2031).

[1250]   See in this regard District Court. Oracle America Inc. v. Google Inc., U.S. Court of Appeals for the Federal Circuit, May 14, 2014, "*Google and Sun began discussing the possibility of Google "taking a license to use and to adapt the entire Java platform for mobile devices." [...] They also discussed a "possible co-development partnership deal with Sun under which Java technology would become an open-source part of the Android platform, adapted for mobile devices." [...] The parties negotiated for months but were unable to reach an agreement. The point of contention between the parties was Google's refusal to make the implementation of its programs compatible with the Java virtual machine or interoperable with other Java programs. Because Sun/Oracle found that position to be anathema to the "write once, run anywhere" philosophy, it did not grant Google a license to use the Java API packages. When the parties' negotiations reached an impasse, Google decided to use the Java programming language to design its own virtual machine—the Dalvik virtual machine ("Dalvik VM")—and "to write its own implementations for the functions in the Java API that were key to mobile devices. [...] Although Android uses the Java programming language, it is undisputed that Android is not generally Java compatible*". See also US Court of Appeals for the Federal Circuit, Oracle America Inc. v. Google Inc, March 27, 2018, "*In the prior appeal, we noted that "Google's competitive desire to achieve commercial 'interoperability' ... may be relevant to a fair use analysis." But, although several amici in this appeal discuss interoperability concerns, Google has abandoned the arguments it once*

GOOG-DOJ-26429425

**Figure 24: Oracle's view on Google's use of Java**

**What is Oracle's interest?**
*The Determination of fair use does not change the facts.*



"The Android platform uses the Java programming language, but petitioner purposely designed Android not to be compatible with the Java platform or interoperable with Java programs."
DONALD B. VERRILLI, JR., United States Solicitor General, May, 2015

(1166)   The fact that fragmentation can bring significant benefits is also confirmed by third-party respondents to requests for information:

(1)   EA, which stated: "*The development of Android forks has provided consumers with more choice and in our view the impact on the fragmentation of the Android ecosystem benefits consumers as a result.*"[1251]

(2)   Yandex, which stated: "*Whilst the development of Android forks certainly has an impact on the fragmentation of the Android ecosystem in terms of additional development being required to adapt applications for various versions of the OS, the benefits of fragmentation outweigh the downsides. The creation of forked versions of the Android OS promotes innovation, provides consumers with a wider choice of mobile devices suitable for their needs and ensures that device manufacturers have optionality to make their device stand out from the competition by incorporating innovative features that might have been rejected by the owner of the source code for the original OS.*"[1252]

(3)   Nokia, which stated: "*The impact [of Android forks] is merely on fragmenting the commercial ecosystem – not so the technical compatibility.*"[1253]

(4)   Skyhook, which stated: "*The availability of Android forks is important to Skyhook's business, as the proliferation of alternative operating systems*

---

*made about interoperability. This change in course is not surprising given the unrebutted evidence that Google specifically designed Android to be incompatible with the Java platform and not allow for interoperability with Java programs.*

[1251]   See EA Swiss Sarl's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 2043).

[1252]   See Yandex's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 2031).

[1253]   See Nokia's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 4360).

**EN**

**EN**

GOOG-DOJ-26429426

*increases the markets into which Skyhook can offer its location services.*"[1254]

(5)   Opera, which stated: "*Android forks have certainly increased the level of fragmentation in the Android ecosystem. Two identical devices, one running a Google-approved version of Android including GPS, and another running a version of Android without GPS, will offer different APIs for applications. Also, the two devices may offer access to different search engines and pre-installed applications. As such, fragmentation allows a greater variety of devices and may allow some competition to occur.*"[1255]

(6)   Amazon, which stated: "*Android forks should be a positive development for the community and end users, and should be allowed to evolve and flourish without Google throttling their development by the imposition of wide-sweeping restrictions. If allowed to develop, Android forks increase the diversity of standalone operating systems, features, and functionality, thereby conferring a broad range of benefits on developers and users, including a greater diversity and flexibility in device functionality, and consequently increased ability to cater services to a wider range of mobile devices and users.*"[1256]

(1167)   In the third place, Google has never defined precisely what "*fragmentation*" as referred to in the AFAs means. Whilst the obligation to sell only compatible devices could be interpreted in light of the CDD and CTS compatibility requirement,[1257] the same cannot be said for the AFA clause according to which "*[COMPANY] will not take any actions that may cause or result in the fragmentation of Android*".[1258]

(1168)   The fact that Google has never defined the concept of fragmentation is confirmed by an internal Google document and third-party respondents to requests for information:

(1)   [Google Executive], stated in internal correspondence: "*We will not and cannot define fragmentation. Unless* [Google Executive] *wants to define it (which I doubt), we need to leave the language [of the AFA] as is.*"[1259]

(2)   Sony's stated that: "*The term "fragmentation" is not defined in the AFA, and Google may change its interpretation of "fragmentation" at any time and in its sole discretion.*"[1260]

(3)   Asus stated that "*The definition and scope of Anti-Fragmentation in ASUS' AFA (Document 7) with Google were vague. Google simply stipulated in the AFA entered into by and between ASUS and Google on March 4th, 2011 that ASUS will not take any actions that may cause or result in the fragmentation of*

---

[1254]   See Skyhook's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 2114).

[1255]   See Opera's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 2133).

[1256]   See Amazon's non-confidential response to Question 16 of the request for information to app developers of 29 June 2015 (Doc ID 4188).

[1257]   In any event, Google maintains a large margin of discretion in the interpretation of these requirements (see recital (163)).

[1258]   See Section 6.3.1.

[1259]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1760-686).

[1260]   See Sony's non-confidential response to Question 44 of the request for information to OEMs of 17 July 2014 (Doc ID 8289).

GOOG-DOJ-26429427

*Android. However, they failed to make any further interpretation of what may constitute "fragmentation" of Android."*[1261]

(4) Amazon stated that "*There is no clear definition of the term "fragmentation" in the context of open source mobile operating systems. [...] The concept of "fragmentation" and the corresponding prohibition against "anti-fragmentation" in the context of open source mobile operating systems seem to be a commercial concept that Google has constructed largely to control how open source Android can be commercialized by its competitors. [...] Google does not provide any explanation or specific example of what constitutes fragmentation*".[1262]

(5) Nokia stated that "*Interestingly, Google does not itself give a definition of fragmentation. Google's AFA prohibits any "actions that may cause or result in the fragmentation of Android [OS]", but fragmentation remains undefined in the AFA*".[1263]

(1169) In the fourth place, as discussed in Section 12.6.1, one of the benefits of developing an Android fork instead of a full-fledged alternative smart mobile OS would be to have access to the wide pool of apps developed for Google Android. As such, fork developers have an incentive to minimise incompatibilities.

(1170) In the fifth place, Android fork developers would have an incentive to set up credible and efficient systems to ensure the correct functioning of apps on devices running their Android fork. Amazon, for example, has invested significant resources in ensuring a high level of quality across the apps developed for Fire OS.[1264]

(1171) In the sixth place, as regards Google's claims of technical failures on Amazon devices and in Asia:

(1) Google cites only one example of a technical failure related to Amazon Fire OS devices[1265] across the [700 000 – 900 000][1266] apps developed for the Fire OS. This is negligible both in absolute terms and relative to the instances of technical failures reported in relation to Google Android devices;[1267] and

---

[1261]   See Asus' non-confidential response to Question 44 of the request for information to OEMs of 17 July 2014 (Doc ID 3703).

[1262]   See Amazon's non-confidential response to Question 14 of the request for information to app developers of 29 June 2015 (Doc ID 4188).

[1263]   See Nokia's non-confidential response to Question 14 of the request for information of 21 October 2015 on app stores (Doc ID 4360).

[1264]   See Amazon's non-confidential response to Questions 4 and 8 of the request for information of 21 October 2015 on app stores (Doc ID 4067) and Amazon's non-confidential response to Question 3 of the request for information of 9 March 2017 (Doc ID 8247).

[1265]   Google's Response to the Statement of Objections, Part Three, page 128, paragraph 92 (Doc ID 7117).

[1266]   See Amazon's non-confidential response to Question 2 of the follow up request for information of 11 April 2017 (Doc ID 8276).

[1267]   For example, certain Android devices were found transmitting owners' personal data to a server in China (see "Secret Back Door in Some U.S. Phones Sent Data to China, Analysts Say" (15 November 2016), available at https://www.nytimes.com/2016/11/16/us/politics/china-phones-software-security.html?_r=0, printed and saved on 13 June 2017). In addition, common Android technical flaws recently found include: "QuadRooter", which affects devices incorporating Qualcomm chipsets running Android versions 4.3 and earlier and allows low-privileged apps to access sensitive data by invoking permissions that are requested by millions of apps available in the Play Store (see "Critical Qualcomm security bug leaves many phones open to attack" (5 May 2016), available at

GOOG-DOJ-26429428

(2)   The fact that devices sold in Asia have a relatively higher rate of technical failure than devices sold in Europe and the US may depend on several reasons that are independent from Google's claim[1268] that AFA coverage is allegedly lower in Asia because of the following:

    (1)   According to Google's data,[1269] devices in Europe have a higher failure rate than the US ([30-40]% vs [20-30]%), despite AFAs covering both Europe and the US (see Section 6.3.1);

    (2)   Google has not substantiated its claim that OEMs "*largely*" do not sign AFAs in "*Asia*". It is only in China that certain OEMs do not seem to have signed AFAs (see Section 8.3); and

    (3)   In any event, OEMs such as Huawei, Lenovo, Xiaomi and ZTE, which represent the large majority of devices sold in China (see recital (447)), have entered into AFAs that cover and are enforced for devices sold in China.

(1172)   Third, Google has not demonstrated that the anti-fragmentation obligations are necessary to protect its reputation.

(1173)   In the first place, users of devices running Android forks cannot access Google proprietary apps, given that Google only enters into MADAs with OEMs that commit not to sell Android forks. As such, in the absence of any Google trademark associated with devices running Android forks, there is no basis for users to attribute to Google the responsibility for any technical failures of those devices. Thus, while there may be an objective justification for Google to have in place a reasonable, fair and objective programme for the verification of GMS devices, with a view to ensuring the quality and uniformity of the user experience and the correct functioning of its proprietary apps, there is no such justification for Google's interference with the freedom of OEMs to sell devices based on Android forks that do not pre-install Google proprietary apps.

(1174)   In the second place, any scope for confusion between GMS devices and devices running Android forks is reduced by the fact that the use of the "Android" name, logo and custom typeface is limited by Google's branding guidelines, which for example provide that:

    (1)   unless expressly authorised by Google through written agreement, the Android logo and custom typeface may not be used (with or without the Android robot);

---

https://arstechnica.com/security/2016/05/5-year-old-android-vulnerability-exposes-texts-and-call-histories/, printed and saved on 15 June 2017); "Certifi-gate mRST", a flaw in two mobile Remote Support Tool plug-ins used by many OEMs running Android versions up to 5.1. Attackers could exploit it by sneaking a bogus app onto a phone which exploits the flaw in a way that elevates the attacker's permissions. From that point on, the attacker would have complete remote control over the smartphone (see "Certifi-gate flaw in Android remote support tool exploited by screen recording app" (25 August 2015), available at http://www.pcworld.com/article/2975825/certifi-gate-flaw-in-android-remote-support-tool-exploited-by-screen-recording-app.html, printed and saved on 13 June 2017); and "Stagefright", which affects a media playback component of Android called Stagefright. Attackers could exploit the issue by sending a malicious video message to almost any Android handset, which would execute automatically (see "The 'Stagefright' exploit: What you need to know (17 August 2015), available at http://www.androidcentral.com/stagefright, printed and saved on 15 June 2017).

[1268]   Google's Response to the Statement of Objections, Part Three, page 127 (Doc ID 7117).
[1269]   Google's Response to the Statement of Objections, Part Three, page 127, paragraph 89 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429429

(2) the use of "Android" on hardware, packaging or marketing materials of device is restricted to Google Android devices only; and

(3) "Android" should never be used in the name of products or as the primary or dominant mark on packaging or devices.[1270]

(1175) In the third place, to the extent that there would remain scope for confusion between GMS devices and devices running Android forks, Google could put in place revised policies of licensing its "Android" and "Android compatible" trademarks for use on devices meeting the CDD and CTS. Google could also unilaterally decide to use the "Google" brand to identify those devices that are meeting the CDD and CTS or pre-install Google proprietary apps.

(1176) Moreover, the MADAs already contain mandatory branding requirements that leave significant discretion to Google and that need to be fully implemented by OEMs. For example, the MADAs mandate OEMs to show, upon device boot, an Android brand feature or Google trademark, to be determined by Google in its sole discretion.[1271]

(1177) Fourth, Google has not demonstrated that the anti-fragmentation obligations are limited to prevent "corner cutting". On the contrary, and as acknowledged by Google,[1272] the anti-fragmentation obligations also prevent the commercialisation of Android forks, which could constitute a competitive threat to Google.[1273]

(1178) Fifth, Google has not demonstrated that the AFAs are necessary to prevent free riding on technical support such as early release of the Android source code or developer boot camps.

(1179) In the first place, it is inherent to open source software that information related to it can be used to develop forked versions of that software.

(1180) In the second place, Google could identify and address any unauthorised disclosure of information pertaining to pre-release versions of Android. This is because [Google commercial practice].[1274]

(1181) In the third place, mere technical support such as "developer boot camps" that Google offers OEMs cannot justify the imposition of a blanket ban against the commercialisation of Android forks. Google could address any free riding on technical support provided at developer boot camps by less restrictive measures such as contractual non-disclosure obligations that could be limited to the information obtained during developer boot camps.

(1182) Sixth, it is irrelevant for the purposes of assessing the existence of an objective justification that Google introduced the anti-fragmentation obligations before it was dominant or that the anti-fragmentation obligations may not have been meant to mislead. These factors are incapable of altering the fact that the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations as

---

[1270] See "Brand guidelines", available at https://source.android.com/setup/start/brands, printed and saved on 11 April 2016.

[1271] See for example MADA between Google and [MADA signatory] of […] March 2014, clause 3.3.g. […].

[1272] Google's Response to the Statement of Objections, Part Three, pages 122-123, paragraphs 72-77 (Doc ID 7117).

[1273] See Section 12.6.1.

[1274] See Annex Q.22 to Google's response to the request for information of 24 March 2017 (Doc ID 7793).

**EN**                                    267                                    **EN**

GOOG-DOJ-26429430

of 2011 is not objectively justified.

(1183)   Seventh, the Commission is not required to carry out a balancing of the anti-competitive and pro-competitive effects of those obligations because Google has not demonstrated that the anti-fragmentation obligations are necessary.

## 12.8.   Google's intention to notify hardware manufacturers of the option to enter into an ACC in place of an AFA

(1184)   The Commission concludes that Google's intention to notify hardware manufacturers of the option to enter into an ACC in place of an AFA does not alter the fact that Google still makes the licensing of the Play Store and the Google Search app conditional on hardware manufacturers agreeing to the anti-fragmentation obligations in the AFAs.[1275]

(1185)   First, while the ACCs would allow OEMs to manufacture Android incompatible devices under a third party brand and AFA signatories to supply components for incorporation in Android incompatible devices under a third party brand, it would still not allow OEMs to manufacture Android incompatible devices under their own brand (alone or in conjunction with the brand of the Android fork developer).

(1186)   Second, and in any event, as of the date of the adoption of this Decision, Google has not submitted any evidence regarding the number of hardware manufacturers that it has notified of the option to enter into an ACC or how many hardware manufacturers have exercised that option.

## 12.9.   Duration of the infringement

(1187)   The Commission concludes that the start date of the infringement is 1 January 2011, the date as of which the Commission concludes that Google is dominant in the worldwide market (excluding China) for Android app stores and the national markets for general search services. The infringement is still ongoing.

## 13.   ABUSE OF GOOGLE'S DOMINANT POSITION: PORTFOLIO-BASED REVENUE SHARE PAYMENTS CONDITIONAL ON THE PRE-INSTALLATION OF NO COMPETING GENERAL SEARCH SERVICE

## 13.1.   Principles

(1188)   An undertaking which is in a dominant position on a market and ties purchasers – even if it does so at their request – by an obligation or promise on their part to obtain all or most of their requirements exclusively from that undertaking, abuses its dominant position within the meaning of Article 102 of the Treaty and Article 54 of the EEA Agreement, whether the obligation is stipulated without further qualification or whether it is undertaken in consideration of the grant of a rebate or payment. The same applies if the undertaking in question, without tying the purchasers by a formal obligation, applies, either under the terms of agreements concluded with these purchasers or unilaterally, a system of loyalty rebates or payments, that is to say, discounts or payments conditional on the customer's obtaining all or most of its requirements — whether the quantity of its purchases be large or small — from the undertaking in a dominant position ("exclusivity rebates" or "exclusivity

---

[1275]   See Section 6.3.1.

GOOG-DOJ-26429431

payments").[1276] Exclusivity payments are therefore presumed to constitute an abuse of dominant position within the meaning of Article 102 of the Treaty and Article 54 of the EEA Agreement.[1277]

(1189) Where, however, the dominant undertaking concerned seeks to rebut the presumption of abuse by submitting, during the administrative procedure, on the basis of supporting evidence, that its exclusivity payments were not capable of restricting competition and, in particular, of producing the alleged foreclosure effects,[1278] the Commission is not only required to analyse, first, the extent of the undertaking's dominant position on the relevant market and, secondly, the share of the market covered by the exclusivity payments, as well as the conditions and arrangements for granting the payments in question, their duration and their amount, it is also required to assess the possible existence of a strategy aiming to exclude competitors that are at least as efficient as the dominant undertaking from the market.[1279]

(1190) The analysis of the capacity to foreclose is also relevant in assessing whether a system of exclusivity payments which, in principle, falls within the scope of the prohibition laid down in Article 102 of the Treaty and Article 54 of the EEA Agreement, may be objectively justified.[1280]

(1191) The exclusionary effect arising from such exclusivity payments, which is disadvantageous for competition, may be counterbalanced, or outweighed, by advantages in terms of efficiency which also benefit the consumer.[1281] That balancing of the favourable and unfavourable effects of exclusivity payments on competition can be carried out only after an analysis of the intrinsic capacity of those payments to foreclose competitors which are at least as efficient as the dominant undertaking.[1282]

## 13.2.   Summary of the abusive conduct

(1192) The Commission concludes that between 1 January 2011 and 31 March 2014, Google abused its dominant position in the national markets for general search services by granting revenue share payments to OEMs and MNOs on condition that they pre-install no competing general search service on any device within an agreed portfolio.

(1193) This conclusion is based on the following considerations:

(1) Google's portfolio-based revenue share payments constituted exclusivity payments (Section 13.3); and

(2) the presumption that the grant of such exclusivity payments constitutes an

---

[1276]   Case 85/76 *Hoffmann-La Roche* v *Commission*, EU:C:1979:36, paragraph 89; Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 137.

[1277]   Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36, paragraph 89; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 27.

[1278]   Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 138.

[1279]   Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 139.

[1280]   Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 140.

[1281]   Case C-95/04 P *British Airways*, EU:C:2007:166, paragraphs 85 and 86; Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraphs 40 and 41; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraphs 47 and 48; Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 140.

[1282]   Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 140.

**EN**

**EN**

GOOG-DOJ-26429432

abuse of dominant position is borne out in the circumstances of the present case by the Commission's analysis of the capability of Google's portfolio-based revenue share payments to restrict competition (Section 13.4).

(1194)  The Commission further concludes that Google has not demonstrated the existence of any objective justification for the grant of portfolio-based revenue share payments, nor that those payments were counterbalanced or outweighed by advantages in terms of efficiency that also benefit the consumer (Section 13.5).

## 13.3. Google's portfolio-based revenue share payments constituted exclusivity payments

(1195)  Between at least 1 January 2011 and 31 March 2014, Google granted payments to OEMs and MNOs on condition that they pre-installed no competing general search service on any device within an agreed portfolio. With the exception of the agreement between Google and [revenue share partner], the agreed portfolio consisted of at least all GMS devices.

(1196)  As a result, if an OEM or MNO had pre-installed a competing general search service on any device within an agreed portfolio, it would have had to forego the revenue share payments not only for that particular device but also for all the other devices in that portfolio.[1283]

(1197)  In the case of all OEMs to whom Google granted portfolio-based revenue share payments, the number of non-GMS devices outside the agreed portfolio was small and mostly included devices running on Windows Phone.[1284] [Revenue share partner] had the lowest share of devices running on Google Android[1285] of [85-90]%. The portfolio-based revenue share payments made by Google to OEMs except for [revenue share partner] were therefore conditioned on the OEMs obtaining from Google all of their requirements for general search services on an important segment of smart mobile devices, which in turn also constituted all or almost all of their requirements for general search services on smart mobile devices.

(1198)  In the case of [revenue share partner], the portfolio-based revenue share payments were conditioned on [revenue share partner] obtaining from Google all of its requirements for general search services on Wi-Fi only tablet devices with a screen size of 7" or more, which represented [50-60%] and [70-80%] of [revenue share partner]'s Google Android devices in 2012 and 2013, respectively.[1286]

(1199)  In the case of all MNOs to whom Google granted portfolio-based revenue share payments, GMS devices were sold alongside other smart mobile devices, including

---

[1283]  See e.g. [revenue share partner]'s non-confidential response to Question 20 of the request for information of 17 July 2014 […].

[1284]  See Annex 6 to [revenue share partner]'s non-confidential response to Question 29 of the request for information of 17 July 2014 […]; [revenue share partner] non-confidential response to Question 29 of the request for information of 17 July 2014 […]; [revenue share partner]'s non-confidential response to Question 29 of the request for information of 17 July 2014 […]; Annex 4 to [revenue share partner]'s non-confidential response to Question 29 of the request for information of 17 July 2014 […]; Annex 29 to [revenue share partner]'s non-confidential response to Question 29 of the request for information of 17 July 2014 […].

[1285]  Practically all Google Android devices sold by these OEMs outside China were GMS devices (see footnote 436).

[1286]  […] attached to [revenue share partner]'s non-confidential response to Question 27 of the request for information of 17 July 2014 […].

GOOG-DOJ-26429433

devices running Windows Phone and iOS. The portfolio-based revenue share payments were therefore conditioned on the MNOs obtaining from Google all their requirements for pre-installed general search services on devices in the agreed portfolio, which constitutes an important segment of smart mobile devices.

(1200)   Google's internal documents confirm that the purpose of the portfolio-based revenue share payments was to ensure that OEMs and MNOs obtained from Google all of their requirements for general search services on the devices included in their agreed portfolio. This purpose was clearly spelt out in an internal conversation in 2011 relating to the negotiation of a revenue share agreement between Google and [MNO]:

(1)   [Google Executive], explained the following: "*Non-duplication of services is the same as exclusivity as long as it applies across \*all\* devices (or all Android devices).*[…] *I think this approach is really important otherwise Bing or Yahoo can come and steal away our Android search distribution at any time, thus removing the value of entering into contracts with them. Our philosophy is that we are paying revenue share \*in return for\* exclusivity.*"

(2)   [Google Executive] the Google employee negotiating the contracts with European MNOs, replied "*If it's too constraining, they might prefer not to sign anything. But I get your point.*

(3)   In response, [Google Executive], explained to her that "*The exclusive across all the android search entry points is very strategic to mobile search, the nightmare scenario is for* [Microsoft] *(or others) to come and scoop us by simply paying more, we know they have shown an appetite to do this in the past and will likely do so again to gain traction, as such,* [Google Executive's] *suggested approach is much preferred if possible, this also sets the desired precedent going forward for other android partnerships in your region.*"

(4)   Finally, [Google Executive] added "*America Movil, Verizon, and AT&T were all examples of large carriers that wanted to ship without Google* [...] *and did. AT&T shipped Yahoo on Android phones. Verizon shipped Bing. America Movil shipped Yahoo. We need to incentivize carriers to ship Google by using the same approach as we at Google have used for many years: "We will pay you revenue share in return for exclusive default placement". This contract is an exchange. Without the exclusivity, we are not "getting" anything. Without an exclusive search deal, a large carrier can and will ship alternatives to Google (as seen with Verizon, AT&T, and America Movil).* […] *Our philosophy is that we are paying revenue share \*in return for\* exclusivity.*"[1287]

(1201)   Google's internal documents also confirm that Google was aware that its portfolio-based revenue share payments may give rise to antitrust concerns. In 2013-2014, following an "*antitrust risk analysis*" Google amended its portfolio-based revenue share agreements in "*countries/markets where* [its] *search share and that of Android are high and where* [it] *faces an aggressive antitrust regulator and/or active complainants*".[1288] This amendment resulted in the carve-out of the Union and the

---

[1287]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1362-440).

[1288]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1753-683).

GOOG-DOJ-26429434

Republic of Korea of the territorial scope of the portfolio-based revenue share payments.

(1202) The Commission's conclusion that the portfolio-based revenue share payments constituted exclusivity payments is not affected by Google's claims that:[1289]

(1) OEMs and MNOs are not customers of general search services that have a requirement which is exclusively fulfilled by Google;

(2) Google's portfolio-based revenue share payments did not constitute exclusivity payments because users could access competing general search services on devices by downloading competing general search service apps or through mobile web browsers; and

(3) only a small portion of general search queries that originated from Google Android devices were covered by portfolio-based revenue share agreements.

(1203) First, OEMs and MNOs do have requirements for general search services insofar as they provide users with smart mobile devices that offer general search service functionalities.

(1204) Second, the conclusion that the portfolio-based revenue share payments constitute exclusivity payments does not depend on whether users could access competing general search services by downloading competing general search service apps or through mobile web browsers. This is because had an OEM or MNO pre-installed a competing general search service on any device within an agreed portfolio, it would have had to forego the revenue share payments not only for all the general search queries on that particular device but also on all the other devices in that portfolio.

(1205) Third, Google's claim that only a small portion of general search queries that originated from Google Android devices were covered by portfolio-based revenue share agreements is in effect a challenge to the Commission's assessment of the capability of the portfolio-based revenue share payments to restrict competition and is addressed in Section 13.4.2.

## 13.4. Google's portfolio-based revenue share payments were capable of restricting competition

(1206) The presumption that Google's portfolio-based revenue share payments constituted an abuse of a dominant position is borne out in the circumstances of the present case by the Commission's analysis of the capability of Google's portfolio-based revenue share payments to restrict competition. This is for the following reasons:

(1) Google's portfolio-based revenue share payments reduced the incentives of OEMs and MNOs to pre-install competing general search services (Section 13.4.1);

(2) Google's portfolio-based revenue share payments made access to the national markets for general search services more difficult (Section 13.4.2); and

(3) Google's portfolio-based revenue share payments deterred innovation (Section 13.4.3).

---

[1289] Google's Response to the Statement of Objections, Part Five, pages 262-271, paragraphs 28-58 (Doc ID 7117).

GOOG-DOJ-26429435

(1207)  As part of this assessment, the Commission has *inter alia* assessed and taken into account: (i) the extent of Google's dominant position on the national markets for general search services (see Section 9.5), (ii) the share of the general search services in the EEA covered by the portfolio-based revenue share payments (see Section 13.4.2), and (iii) the conditions and arrangements for Google's portfolio-based revenue share payments, as well as their duration and amount (see Sections 6.3.3 and 13.3).

13.4.1.   *Google's portfolio-based revenue share payments reduced the incentives of OEMs and MNOs to pre-install competing general search services*

(1208)  Google's portfolio-based revenue share payments reduced the incentives of OEMs and MNOs to pre-install competing general search services. This is for the following reasons:

> (1)   absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices (see Section 13.4.1.1);

> (2)   a competing general search service could not have matched Google's portfolio-based revenue share payments to OEMs and MNOs (see Section 13.4.1.2); and

> (3)   the portfolio-based revenue share payments were one cause of the OEMs and MNOs refraining from pre-installing competing general search services on their Google Android devices (see Section 13.4.1.3).

(1209)  Given that the MADAs were in place during the whole duration of Google's portfolio-based revenue share payments, the Commission's analysis of the capability of the portfolio-based revenue share payments to restrict competition takes account of the requirement under the MADAs that Google Search is pre-installed on all GMS devices.

(1210)  Given that practically all Google Android devices sold outside China are GMS devices, this requirement under the MADA meant that the most that a competing general search service could achieve on a Google Android device of an OEM or MNO that received portfolio-based revenue share payments was that its general search service was pre-installed in addition to Google Search.

13.4.1.1. Absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices

(1211)  For the reasons set out in this Section, the Commission concludes that, absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices.

(1212)  First, competing general search services would have had an interest to offer revenue shares or other monetary compensation in return for pre-installation:

> (1)   as Google has acknowledged, "*OEMs and MNOs often look for opportunities to generate additional revenues beyond device sales. These opportunities include monetizing the available screen space of devices by offering exclusive preinstallation to various app developers. Just as supermarkets sell (premium) shelf space to suppliers, so, too, do OEMs and MNOs seek to generate additional revenues by monetizing the 'real estate' of the smartphone's screen.*

**EN**                                            273                                            **EN**

GOOG-DOJ-26429436

> *Monetizing this space enables OEMs and MNOs to generate additional revenues that can be used, among others, to invest in their devices or to drive down device prices to the benefit of end users, further promoting competition.*"[1290]

(2) in an internal discussion, [Google Executive] explained that "*America Movil, Verizon, and AT&T were all examples of large carriers that wanted to ship without Google [...] and did. AT&T shipped Yahoo on Android phones. Verizon shipped Bing. America Movil shipped Yahoo. [...] Without an exclusive search deal, a large carrier can and will ship alternatives to Google (as seen with Verizon, AT&T, and America Movil). [...] Our philosophy is that we are paying revenue share \*in return for\*exclusivity.*"[1291]

(1213) Second, OEMs and MNOs may have wanted to offer differentiated products and improve user experience. For example, OEMs and MNOs may have wanted to pre-install different general search services because certain services have a more focused offering in a particular language (e.g. Seznam[1292]) or target a specific group of users that devote more attention to certain issues such as privacy (e.g. DuckDuckGo, Qwant), ease of search (e.g. Kikin's "Touch-to-Search" functionality) or lack of adult content (e.g. Qwant Junior).[1293] This was confirmed by [Google Executive], in an internal discussion in 2007 about Google's distribution agreement with Apple: "*I think we should encourage them to have Yahoo as a choice in the pull down or some other easy option. I don't think it is a good user experience nor the optics is great for us to be the only provider in the browser.*" [Google Executive], responded "*I agree [Google Executive]*".[1294]

(1214) Third, the pre-installation of competing general search services alongside Google would have increased the traffic to those services:

(1) According to Yahoo, it "*expects that traffic generated by its search services would be higher if its search services were preinstalled than if not preinstalled, regardless of whether Google's search engine is also preinstalled on the same device.*"[1295]

(2) According to Qwant, "*A pre-installation [...] will likely highly increase our traffic.*"[1296]

(3) According to Microsoft, at the end of 2008, it signed a pre-installation

---

[1290] Google's response to the complaint by Yandex, paragraph 36 (Doc ID 2118).

[1291] Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1362-440).

[1292] Seznam's non-confidential response to Question 8 of the request for information of 20 November 2015 to Search providers (Doc ID 4561).

[1293] See "*DuckDuckGo Privacy*", available at https://duckduckgo.com/privacy, printed and saved on 14 April 2016; "*Your privacy and Qwant*", available at https://www.qwant.com/privacy, printed and saved on 14 April 2016; and "Kikin's 'touch to search' service set for Android debut on the Vodafone Smart Tab II" available at http://blog.vodafone.co.uk/2013 /02/18/kikins-touch-to-search, printed and saved on 14 April 2016.

[1294] Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1790-50).

[1295] Yahoo's non-confidential response to Question 10 of the request for information of 20 November 2015 to Search providers (Doc ID 3411).

[1296] Qwant's non-confidential response to Question 9 of the request for information of 20 November 2015 to Search providers (Doc ID 3236).

EN

EN

GOOG-DOJ-26429437

agreement with Verizon pursuant to which, in the US in 2010 and 2011, its general search service was pre-installed alongside the Google Search service on six models of Google Android devices.[1297] Contrary to Google's claim that the evolution of Bing shares from January 2009 in the US does not show any significant increase,[1298] during the two years in which the agreement was in force, Bing's share of general search queries on smart mobile devices in the US increased from approximately zero in 2009 to approximately 1.5% in December 2011.[1299] Moreover, as explained in recital (789)(8), the traffic resulting from Microsoft's agreement with Verizon covering only six phones accounted for [15-25]% of the entire volume of mobile general search queries to Bing in the US in 2010 and 2011.

(4)   According to Yandex, "*The traffic difference between situations where a search engine is not pre-installed and where it is pre-installed as a secondary search engine (i.e., without being the default search engine) can be up to a factor of 2-3, especially for the markets where the search engine's brand is already widely known.*"[1300]

(5)   According to Seznam, it made significant efforts to achieve pre-installation deals with various players in the market, without success: "*We have been trying to establish cooperation with mobile operators for seven years. Negotiations have been ongoing with all operators, focusing on offers of cooperation in the distribution of our mobile services and search services, subsequently joined by mobile applications. We communicate at all levels, i.e. product – sale – hardware/distribution. We are seeking the opportunity to distribute our own mobile services and applications by way of preinstallation in mobile devices (Android mobiles and tablets […]).*"[1301]

(1215)   Fourth, Google was willing to pay for being pre-installed as a second general search service on non-Google Android devices. For example, [revenue share partner] explained that in 2009 it had concluded a revenue share agreement with Google, pursuant to which it added 'Google pointers' to Windows Phones that were sold with Bing set as the default general search service. [Revenue share partner] "*didn't have intention to exclude any search engine but to provide Google search as an option in* [revenue share partner] *Windows phone products*".[1302]

(1216)   Fifth, Google acknowledges that, absent the portfolio-based revenue share payments, "*an OEM could […] promote a rival search provider and deliver no incremental query volume to Google, but collect payment from Google nonetheless*".[1303] This is also confirmed by an internal discussion at Google in which [Google Executive], explained "*Deals we can close with standard terms are the following: MADA +*

---

[1297]   Microsoft's non-confidential response to Question 10.1 of the request for information of 20 November 2015 to Search providers (Doc ID 4634).

[1298]   Google's Response to the First Letter of Facts, Part Three, page 68, paragraph 23 (Doc ID 8598)).

[1299]   Source: StatCounter data for 2011-2017, downloaded on 22 May 2017, http://gs.statcounter.com/.

[1300]   Yandex's non-confidential response to Question 10 of the request for information of 20 November 2015 to Search providers (Doc ID 4219).

[1301]   Seznam's non-confidential response to Question 19 of the request for information of 30 July 2014 (Doc ID 4289).

[1302]   [Revenue share partner]'s non-confidential response to Question 22 of the request for information of 17 July 2014 […].

[1303]   Google's response to the complaint by Yandex, paragraph 42 (Doc ID 2118).

GOOG-DOJ-26429438

*search revshare deals with small OEMs […] What we can lose if we don't sign with carriers and don't do any activity with retailers is difficult to estimate, but as they control the last mile to the customer, it could be significant.*"[1304]

(1217)   Sixth, the Commission's conclusion that, absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices, is not affected by Google's claims that:

(1)   absent the portfolio-based revenue share payments, OEMs and MNOs would not have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices because of Google's superior quality. This is confirmed by the fact that OEMs and MNOs, which either never entered into a portfolio-based revenue share agreement with Google or whose agreement expired, have not pre-installed competing general search services on their Google Android devices;[1305]

(2)   the Commission has not demonstrated that pre-installation would have increased the traffic of competing general search services, and relies only on statements by competing general search services;[1306] and

(3)   had, absent the portfolio-based revenue share agreements, OEMs and MNOs pre-installed a competing general search service in addition to Google Search, this would have reduced their revenues.[1307]

(1218)   In the first place, Google is wrong to claim that OEMs and MNOs would not have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices because of Google's alleged superior quality. This is for three reasons.

(1219)   First of all, certain OEMs, which either never entered into a portfolio-based revenue share agreement with Google or whose agreement expired, have pre-installed competing general search services on at least some of their Google Android devices:

(1)   In February 2017, Microsoft and ZTE entered into a revenue share agreement for the sale of certain Google Android devices worldwide, including the EEA, with Bing set as the default general search service on ZTE's proprietary web browser, as well as for the sale of certain quantities of Google Android devices with the Bing search app pre-installed on those devices.[1308] While Google claims that (i) ZTE has limited presence in the EEA, (ii) the quantity of devices on which Bing will be pre-installed is *de minimis*, and (iii) the agreement is not portfolio-based and was only entered into in February 2017,[1309] none of these factors alters the fact that the agreement shows that, absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial

---

[1304]   Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1365-1959).

[1305]   Google's Response to the Statement of Objections, Part Five, pages 279-291, paragraphs 83-87 (Doc ID 7117).

[1306]   Google's Response to the Statement of Objections, Part Five, pages 289, paragraph 86 (Doc ID 7117).

[1307]   Google's Response to the Statement of Objections, Part Five, pages 290, paragraph 87 (Doc ID 7117).

[1308]   Microsoft's non-confidential response to Question 4 of the request for information of 10 April 2017 (Doc ID 8095) and Google's Data Room Report of October 4, 2017 (Doc ID 8610).

[1309]   Google's Response to the First Letter of Facts, Part Four, page 106, paragraph 16 (Doc ID 8598).

GOOG-DOJ-26429439

interest in pre-installing competing general search services on at least some of their Google Android devices.

(2)  [Search provider] entered into revenue share agreements with two OEMs whereby the [search provider] mobile search widget and links to the [search provider]'s home page on the default web browser were pre-installed on those OEMs' devices worldwide, including a small number in the EEA.[1310] While Google claims that the two OEMs are not obliged to pre-install [search provider]'s services on their devices under the agreements,[1311] none of these factors alter the fact that the agreement shows that, absent the portfolio-based revenue share payments, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices.

(1220)  In addition, a competing general search service entered into a revenue share agreement with the mobile web browser developer, Mozilla, [terms of the agreement].[1312] While Google claims that this agreement is irrelevant since Mozilla is not an OEM or an MNO and [terms of the agreement],[1313] this does not alter the fact that the agreement shows that Mozilla considers that OEMs and MNOs have a commercial interest in pre-installing the Mozilla browser with a competing general search service [terms of the agreement].

(1221)  Further, the fact that Google entered into portfolio-based revenue share agreements indicates that, notwithstanding its alleged superior quality, Google considered that, absent those agreements, OEMs and MNOs would have had a commercial interest in pre-installing competing general search services on at least some of their Google Android devices. This is confirmed by the internal Google evidence cited in recital (1200).

(1222)  Moreover, there are several reasons unrelated to Google's alleged superior quality that can explain why OEMs and MNOs that either never had or ceased to have portfolio-based revenue share agreements with Google did not pre-install competing general search services on their Google Android devices:

(1)  Opportunities for competing general search services to achieve pre-installation on Google Android devices not subject to portfolio-based revenue share payments from Google were limited to smaller OEMs and MNOs because Google had in place portfolio-based revenue share agreements with the most important OEMs.[1314] Most of those smaller OEMs accounted, on an individual

---

[1310]  [Search provider]'s non-confidential response […].

[1311]  Google's Response to the First Letter of Facts, Part Four, page 105, paragraph 15 (Doc ID 8598).

[1312]  Mozilla's non-confidential response to the Questions of the request for information dated 8 May 2017 (Doc ID 8170).

[1313]  Google's Response to the First Letter of Facts, Part Four, page 107, paragraph 17 (Doc ID 8598).

[1314]  In 2011 and 2012, respectively, nearly [70-80]% and [80-90]% of Google Android smartphones sold in Europe were covered by portfolio-based revenue share payments: [revenue share partners and revenue share information]. As of 2013, when portfolio-based revenue share agreements started to be replaced by device-based revenue share payments, nearly [20-30]% of Google Android smartphones were covered by portfolio-based revenue share payments, [revenue share partners and revenue share information]. In 2014, [revenue share partner], portfolio-based revenue share payments accounted for over [0-10]% of Google Android smartphones sold in Europe, [revenue share partners and revenue share information]. As smartphones represent the large majority of Google Android devices sold by the OEMs that entered into a portfolio-based revenue share agreement with Google, the data provides a

GOOG-DOJ-26429440

basis, for less than 1% of total smart mobile devices sales.[1315]

(2)    OEMs would have to incur transaction costs when entering into portfolio-based revenue share agreements with competing general search services and such costs would not have been justified for a small volume of devices. Google itself recognised the existence of such transaction costs in an internal Google email dated 9 April 2012 in which [Google Executive] stated the following when discussing whether Google should enter into a revenue share agreement with [OEM] regarding Android Market, the predecessor of the Play Store: "*We have thoroughly reviewed* [OEM] - *both mobile and TV - for consideration for Android Market revenue share, it seems that the volume is not meaningful for both Google and partner to justify our (legal, business, finance) resources spent on the agreement and payout*."[1316] While Google claims that this email is not probative because it concerned a revenue share agreement for its app store rather than its general search service, it has not explained why there would be any material difference in transaction costs associated with revenue share agreements relating to app stores and general search services.

(3)    Due to the MADA, OEMs are unlikely to pre-install an additional general search app to the mandatory Google Search app (see recitals (824) to (829)).

(1223)  In the second place, the Commission has demonstrated that pre-installation is an important channel for the distribution of general search services on smart mobile devices (see Section 11.3.4.1.II). This conclusion is based not only on statements by competing general search services, but also on evidence of increases in search queries to Yandex following the pre-installation of Yandex's general search services on Android devices in Russia (see recital (789)(5)) and to Bing following the pre-installation of Bing on six Verizon Google Android devices in the US (see recital (1214)(3)).

(1224)  In the third place, Google has not submitted any evidence to support its claim that, absent the portfolio-based revenue share agreements, had OEMs and MNOs pre-installed a competing general search service in addition to Google Search, this would have reduced their revenues.

13.4.1.2. Competing general search services could not have matched Google's portfolio-based revenue share payments to OEMs and MNOs

(1225)  The Commission concludes that a competing general search service could not have matched Google's portfolio-based revenue share payments because it would have been unable to offer an OEM or MNO a sufficient absolute amount of revenues to compensate them for the loss of Google's payments across its entire portfolio of Google Android devices. This is for the reasons set out in this Section.

(1226)  First, for the reasons set out in recitals (1227) to (1238), an OEM or MNO could not realistically have expected a competing general search service to capture more than the following share of general search queries carried out on Google Search on their

---

reasonable approximation of the sales of smart mobile devices sold under such agreements. See also footnote 1375. Source: […] data (Doc IDs 3098, 4632, 4633 and 4710).

[1315]   Source: […] data (Doc IDs 7866 and 7867).

[1316]   Doc ID 1373-2125.

**EN**

**EN**

GOOG-DOJ-26429441

portfolio of Google Android devices:[1317]

   (1)   [0-5]% if an OEM or MNO would have pre-installed an additional general search app, but not set that competing general search service as default on web browsers' entry points;

   (2)   22.5% if an OEM or MNO would have pre-installed an additional general search app and also set that competing general search service as default on web browsers' entry points.

(1227)   In the first place, pursuant to the MADA, the Google Search app had to be pre-installed on all GMS devices (which includes all devices of the portfolio of each OEM and MNO), and placed on the devices' home screen. Therefore, the app of the competing general search service could only have been pre-installed in addition to the Google Search app, and could not have been displayed more prominently.

(1228)   In the second place, different OEMs and different employees within Google took differing views as to whether the MADA also required OEMs to set Google Search as the default general search service on their pre-installed mobile web browsers.

(1229)   On the one hand, the following internal Google email, responses by OEMs to requests for information and correspondence between, on the one hand, Google and, on the other hand, OEMs indicate that the MADA required OEMs to set Google Search as the default general search service on their pre-installed mobile web browsers:

   (1)   An internal Google email of 7 September 2011 from [Google Executive], to [Google Executive] at Google, which states that "*We told* [OEM] *that Phone-top search (aka Google Search) must be the default search for all Web search access points [per MADA 3.4.(4)]. We defined Default Search as: 1. Search initiated from Q SB (the widget) 2. Search initiated by pressing the physical Search Button on the device 3. Search initiated from URL address bar on Default Browser*".[1318]

   (2)   Responses by [OEM], [OEM] and [OEM] to requests for information reporting that they effectively interpreted the requirements of the MADA as covering searches carried out on the URL line of the browser:

      (1)   [OEM] indicated that "*Pursuant to paragraph 3.4(4) of the 2011 MADA, Google's Phone Top Search was set as the default search provider on* [web browser] *during the term of the 2011 MADA. No exceptions were applied during this period*;[1319]

---

[1317]   These figures correspond to the additional queries a competing general search service would have been able to capture as compared to the amount of queries where Google Search was the only pre-installed search app and the default search service on all entry points of a Google Android device.

[1318]   See Google's internal document submitted in response to the request for information of 11 July 2014, email from [Google Executive] of 7 September 2011 (Doc ID 1371-764).

[1319]   Google's Phone Top Search is a separate app which displays the Google Search widget, Google's Response to the Second Letter of Facts, Part Two, page 11, paragraph 23 (Doc ID 8876). Notwithstanding that, the usage made by [OEM] in this statement is consistent with the one made in Google's internal email as shown in recital (1229)(1), as a generic reference to Google search services. [OEM]'s non-confidential response to Question 11 of the 28 February 2018 request for information […].

**EN**
**EN**

GOOG-DOJ-26429442

(2)     [OEM] indicated that "*the said passage* [of the 2014 MADA] *covers the search entry points of (a) the URL line of the browser(s) (sometimes also referred to as "Omnibox") and (b) any other search entry points within the browser (e.g. homepage or bookmarks)*";[1320] and

(3)     [OEM] indicated that "*under Section 3.3(4) of* [the 2013] *MADA, all web search entry points are set default as Google Search. While this list is not exhaustive, it includes the following search entry points: Android Search Widget, Android Chrome Search, Android device search, the search bar at the home screen that defaults to the Google search engine, the Google search app (part of GMS) that defaults to the Google search engine, the Google Chrome default search that defaults to Google search engine as well as "Omnibox" and homepage and bookmarks*".[1321]

(3)   Correspondence between, on the one hand, Google and, on the other hand, BlackBerry, Huawei, Lenovo and Motorola, dated November 2016 whereby Google informed those OEMs of modifications in the terms of the MADA by which they no longer needed to comply with any provision of the MADA that "*required Google Search to be set as the default search provider for any and all web search access points or intents on the device*" suggesting that the MADA previously required these OEMs to set Google Search as the default general search service on their pre-installed mobile web browsers.[1322]

(1230)  On the other hand, the following internal Google email and responses by OEMs to requests for information indicate that the MADA did not require OEMs to set Google Search as the default general search service on their pre-installed mobile web browsers:

(1)   An internal Google email of 18 May 2011 from [Google Executive], to [Google Executive], which states that "*Since the browser is a very large source of search traffic for us (relative to the Phone Top Search widget) we really want a commitment to make Google the homepage on the browser if at all possible when we do a search rev share deal*" show that certain Google employees understood the MADA not to include such a requirement.[1323]

(2)   Responses to requests for information from [OEM] and [OEM]:

(1)     [OEM] indicated that "*According to* [OEM]'s *understanding of the 2013 MADA (as amended in 2014), Section 3.3 does not cover (1) the URL line of the browser (also referred to as "Omnibox") and (b) any other search entry points within the browser (e.g. homepage or bookmarks)*";[1324] and

---

[1320]   See [OEM]'s non-confidential response to Question 6 of the request for information of 8 March 2017 […]. […].

[1321]   See [OEM]'s non-confidential response to Question 7 of the request for information of 8 March 2017 […]. [OEM] indicated that its interpretation of the MADA has not changed over time.

[1322]   See Google's letters to BlackBerry of 8 November 2016 (Doc ID 7745-11), to Huawei of 28 November 2016, as referred to in Huawei's non-confidential response to Question 2 the request for information of 8 March 2017 (Doc ID 7472), to Lenovo of 8 November 2016 (Doc ID 8089-7), and to Motorola of 8 November 2016 (Doc ID 8089-9).

[1323]   See Google's internal document submitted in response to Statement of Objections, email from [Google Executive] of 18 May 2011 (Doc ID 6555-77).

[1324]   See [OEM]'s non-confidential response to Question 9 of the request for information of 8 March 2017 […].

GOOG-DOJ-26429443

(2)   [OEM] indicated that "*the passage* [relevant section of the 2014 MADA] *does not cover the URL line of the browser*".[1325]

(1231)   Where an OEM interpreted the MADA as requiring it to set Google Search as the default general search service on the pre-installed mobile web browsers on the devices the OEM manufactures and which are distributed by it or by an MNO, the most that a competing general search service could therefore achieve on a GMS device was that its general search service app was pre-installed side-by-side with the Google Search app.

(1232)   By contrast, where an OEM interpreted the MADA as not requiring it to set Google Search as the default general search service on the pre-installed mobile web browsers on the devices the OEM manufactures and which are distributed by it or by an MNO, the most that a competing general search service could therefore achieve on a GMS device was that its general search service app was pre-installed side-by-side with the Google Search app and set as the default on pre-installed mobile web browsers other than Chrome ("Other Browsers").

(1233)   In the third place, where an OEM interpreted the MADA as requiring that OEM to set Google Search as the default general search service on the pre-installed mobile web browsers, that OEM, or an MNO distributing its devices[1326] could not reasonably have expected such a competing general search service to capture from Google Search more than [0-5]% of the general search queries carried out on the Google Android devices in its portfolio.

(1234)   The figure has been calculated based on the following:

(1)   An OEM or MNO could not reasonably have expected a competing general search app to capture from the Google Search app more than a share of queries that was typically obtained by competing general search services on PCs worldwide during the period in which portfolio-based revenue share agreements were in place.

(2)   According to StatCounter data,[1327] the maximum combined annual query share of all competing general search services on PCs worldwide in the period 2011-2014 was 12%.

(3)   According to data provided by Google, the distribution per entry point of Google Search queries carried out worldwide on Google Android devices in 2014-2016 was the following:[1328]

(a)   Approximately [30-40]% originated from the Google Search app; and

(b)   Approximately [60-70]% originated from mobile web browser entry

---

[1325]   See [OEM]'s non-confidential response to Question 9 of the request for information of 8 March 2017 […].

[1326]   See recital (193).

[1327]   Source: StatCounter data for 2011-2014, downloaded on 22 May 2017, http://gs.statcounter.com/. For tablets, StatCounter provides marker share data only as of August 2012.

[1328]   Given that Google was unable to provide data for the period 2011-2013, these calculations are based on data of search queries by entry point during the period 2014-2016. Source: Google's response to Question 11 of the request for information of 24 March 2017 (Doc ID 7894-4). Google does not contest the use of 2014-2016 data and presents its version of the calculations based on this data. See Google's Response to the First Letter of Facts, Part Four, pages 114-116, paragraphs 37-38 (Doc ID 8598).

**EN**                                    281                                    **EN**

GOOG-DOJ-26429444

points. Of these [60-70]% : (i) approximately [20-30]% originated from the URL line of Chrome, on which no competing general search service could be set as default (see recital (796)(2)(b) and (973)); (ii) approximately [10-20]% originated from the URL bar of Other Browsers; and (iii) approximately [20-30]% originated from the Google Search homepage.[1329]

    (4)    The figure of [0-5]% therefore corresponds to 12% (the maximum cumulative market share that competing general search services obtained on PCs worldwide in the period 2011 to 2014) of the [30-40]% of the Google search queries carried out worldwide on Google Android devices via the Google Search app.[1330]

(1235)    The figure of [0-5]% is conservative and favourable to Google for the following reasons:

    (1)    it reflects the combined share of all competing general search services and not just the share of the largest one;

    (2)    during the period 2011-2014, Google Search queries represented 88% to 91% of all general search queries on PCs worldwide;[1331]

    (3)    the combined share of all competing general search services on PCs worldwide in the period 2011-2014 was higher than the combined market share of all competing general search services on smart mobile devices during that same period (Google Search queries represented 94% to 98% of all general search queries on smartphones);[1332] and

    (4)    for this share to be achieved, an OEM or MNO would have had to pre-install the competing general search app on all devices of its portfolio.

(1236)    In the fourth place, where an OEM interpreted the MADA as not requiring that OEM to set Google Search as the default general search service on Other Browsers an OEM, or an MNO distributing its devices, could not reasonably have expected such a competing general search service to capture from Google Search more than 22.5% of Google Search queries carried out on the Google Android devices in its portfolio.

(1237)    The figure of 22.5% of queries corresponds to the sum of the maximum [0-5]% of Google Search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search (see recital (1233)) and the maximum [10-20]% of Google Search queries originating from the URL bar of Other Browsers (see recital (1234)(3)(b)) that an OEM or MNO could reasonably

---

[1329]    These correspond to Google Search queries originating from the mobile web browser with the user navigating to Goolge Search homepage, clicking on a bookmark or in the other ways in which a general search service can be used when a different one is set as default.

[1330]    Because the data provided by Google on the distribution per entry point of Google Search queries does not provide information per search entry point for specific OEMs/MNOs, the Commission assumes that the share of general search queries originating from the general search app for each OEM and MNO is equal to the same share at the aggregate level.

[1331]    Source: StatCounter data for 2011-2014, downloaded on 22 May 2017, http://gs.statcounter.com/. For tablets, StatCounter provides marker share data only as of August 2012.

[1332]    Source: StatCounter data for 2011-2014, downloaded on 22 May 2017, http://gs.statcounter.com/. For tablets, StatCounter provides marker share data only as of August 2012.

GOOG-DOJ-26429445

have expected the competing general search service to capture from Google Search when set as default on Other Browsers.

(1238)   For the same reasons as explained in recital (1235), the figure of 22.5% is conservative and favourable to Google.

(1239)   Second, each OEM and MNO that entered into portfolio-based revenue share agreements received payments from Google equal to between [revenue share terms] of the revenues that Google derived from search advertisements covered by the portfolio-based revenue share agreements on the OEM's and MNO's devices for the duration of those agreements. This is shown in the last column of Table 20.

**Table 20: Percentage ranges of portfolio-based revenue share payments**

| OEM | Percentage (range) of revenue shares in the agreement | Minimum monthly revenue share actually paid |
|---|---|---|
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1333] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1334] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1335] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1336] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1337] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1338] |

---

[1333]   [Revenue share partner] non-confidential response to Question 24 of the request for information of 17 July 2014 […].

[1334]   [Revenue share partner] non-confidential response to Question 24 of the request for information of 17 July 2014 […].

[1335]   [Revenue share partner] did not report the share of Google's revenue paid under their portfolio-based revenue share agreement, but submitted that payments were made for each month in which the agreement was in place. In light of the terms of the agreement it can be assumed that the payment represented [revenue share terms] of Google's Search revenue on [revenue share partner] devices. Annex 3-Q24 to [revenue share partner]'s non-confidential response to Question 24 of the request for information of 17 July 2014 […] and Section 6.3.3.1. Google did not contest this assumption.

[1336]   [Revenue share partner] did not report the share of Google's revenue paid under their portfolio-based revenue share agreement, but submitted that payments were made for each month in which the agreement was in place. In light of the terms of the agreement it can be assumed that the payment represented [revenue share terms] of Google's Search revenue on [revenue share partner] devices. See [revenue share partner]'s non-confidential email of 1 April 2016 […] and Section 6.3.3.1. Google did not contest this assumption.

[1337]   Non-confidential Annex 4 to [revenue share partner]'s response to Question 24 of the request for information of 17 July 2014 […].

**EN**                                              283                                              **EN**

GOOG-DOJ-26429446

| MNO | | |
|---|---|---|
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1339] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1340] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1341] |
| [Revenue share partner] | [Revenue share terms] | [Revenue share terms][1342] |

(1240)   Third, each OEM and MNO that entered into portfolio-based revenue share agreements received payments covering only [70-80]% of Google general search queries.[1343] This is because Google did not grant portfolio-based revenue share payments for the [20-30]% of queries via mobile web browsers that originated from the Google Search homepage.

(1241)   Fourth, a competing general search service would have been unable to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices, irrespective of whether an OEM interpreted the MADA as requiring that OEM to set Google Search as the default general search service on the pre-installed mobile web browsers.

(1242)   In the first place, where the OEM interpreted the MADA as not requiring that OEM to set Google Search as the default general search service on Other Browsers, a competing general search service would have never been able to compensate an OEM, or an MNO distributing its devices, for the loss of the Google's payments across its entire portfolio of Google Android devices.

(1243)   In such a scenario, and where an OEM or MNO would have sought to pre-install a

---

[1338]   [Revenue share partner] did not report the share of Google's revenue paid under their portfolio-based revenue share agreement, but submitted that payments were made for each month in which the agreement was in place. In light of the terms of the agreement it can be assumed that the payment represented at least [revenue share terms] of Google's Search revenue on [revenue share partner] devices. See non-confidential Annex 24 to [revenue share partner]'s response to Question 24 of the request for information of 17 July 2014 [...] and Section 6.3.3.1. Google did not contest this assumption.

[1339]   [Revenue share partner] did not report the share of Google's revenue paid under their portfolio-based revenue share agreement, but submitted that payments were made for each month in which the agreement was in place, at least as of May 2010. In light of the terms of the agreement it can be assumed that the payment represented at least [revenue share terms] of Google's Search revenue on [revenue share partner] devices. See [...] to [revenue share partner]'s non-confidential response to Question 25 of the request for information of 22 July 2014 [...].

[1340]   Non-confidential [...] to [revenue share partner]'s non-confidential response to Question 25 of the request for information of 22 July 2014 [...].

[1341]   [Revenue share partner]'s non-confidential response to Question 25 of the request for information of 22 July 2014 [...] and Annex 25.1 to [revenue share partner]'s response to the request for information of 22 July 2014 [...].

[1342]   [...] to [revenue share partner]'s response to Question 25 of the request for information of 17 July 2014 [...].

[1343]   Google's Response to the First Letter of Facts, Part Four, page 115, paragraph 38 (Doc ID 8598).

**EN**                                        284                                        **EN**

competing general search service and set it as default on the pre-installed mobile web browsers on all devices in the portfolio:

(1)　for an OEM or MNO that received a [revenue share terms] portfolio-based revenue share payment from Google, a competing general search service would have had to offer a share of its revenues greater than 100% in order to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices. This is because a revenue share of [140-150]% over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search would have been approximately equal to a revenue share of [revenue share terms] over [70-80]% of Google Search general search queries covered by Google revenue share payments;[1344]

(2)　for an OEM or MNO that received a [revenue share terms] portfolio-based revenue share payment from Google, a competing general search service would have had to offer a share of its revenues greater than [70-80]% in order to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices. This is because a revenue share of [70-80]% over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search would have been approximately equal to a revenue share of [revenue share terms] over the [70-80]% of Google Search general search queries covered by Google revenue share payments;[1345]

(3)　for an OEM or MNO that received a [revenue share terms] portfolio-based revenue share payment from Google, a competing general search service would have had to offer a share of its revenues greater than [50-60]% in order to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices. This is because a revenue share of [50-60]% over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search would have been approximately equal to a revenue share of [revenue share terms] over [70-80]% of Google Search general search queries covered by Google revenue share payments;[1346] and

(4)　for an OEM or MNO that received a [revenue share terms] portfolio-based revenue share payment from Google, a competing general search service would still have had to offer a share of its revenues greater than [30-40]% in order to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices. This is because a revenue share of [30-40]% over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search would have been approximately equal to a revenue share of [revenue share terms] over [70-80]% of Google Search

---

[1344]　This is based on the assumption that a competing general search service could obtain the same average revenue per search as Google and has the same operational costs as Google.

[1345]　Ibid.

[1346]　Ibid.

GOOG-DOJ-26429448

general search queries covered by Google revenue share payments.[1347]

(1244)   Moreover, given that a competing general search service would have been unlikely to be pre-installed on all the Google Android devices of the portfolio of an OEM or MNO (see recitals (824) to (832)), in order for a competing general search service to be able to offer an OEM or MNO a stream of revenue greater than Google's:

(1)   for a [revenue share terms] portfolio-based revenue share payment to be profitable, it would have to have been pre-installed on more than [70-80]% of that OEM's or MNO's portfolio of Google Android devices;

(2)   for a [revenue share terms] portfolio-based revenue share payment to be profitable, it would have to have been pre-installed on more than [50-60]% of that OEM's or MNO's portfolio of Google Android devices;

(3)   for a [revenue share terms] portfolio-based revenue share payment to be profitable, it would have to have been pre-installed on more than or [30-40]% of that OEM's or MNO's portfolio of Google Android devices.

(1245)   This is because a 100% revenue share payment by a competing general search service over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search on: (i) [70-80]%, (ii) [50-60]% or (iii) [30-40]% of that OEM's or MNO's portfolio of Google Android devices would have matched a portfolio-based revenue share payment by Google of [revenue share terms] of Google search queries covered by Google revenue share payments on that OEM's or MNO's entire portfolio of Google Android devices.

(1246)   In the case of a [revenue share terms] portfolio-based revenue share payment, a competing general search service would have been unable to offer an OEM or MNO a stream of revenue greater than Google's and still make any profit from the agreement, even if it would have been pre-installed on the entirety of the devices of that OEM's or MNO's portfolio of devices. This is because a 100% revenue share payment by a competing general search service over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search would not have matched a portfolio-based revenue share payment by Google of [revenue share terms] over the [70-80]% of Google search queries covered by Google revenue share payments on that OEM's or MNO's entire portfolio of Google Android devices.

(1247)   The percentage of pre-installation on Google Android devices that would have to have been achieved by a competing general search service in order to match Google's portfolio-based revenue share payments would have been significantly higher than the percentage of the OEM's portfolio of Google Android devices on which a competing general search service achieved pre-installation under any of the portfolio-based revenue share agreements concluded between a competing general search services and OEMs described in recital (1219).[1348]

---

[1347]   Ibid.

[1348]   For example, according to Google's Data Room Report of October 4, 2017 the agreement between ZTE and Microsoft "*specifies that ZTE will preload Bing on just* [thousands of] *devices,* [a percentage] *of which will be shipped in the US. The remaining [percentage] will moreover be split among EEA countries and Australia*". As regards [search provider]'s agreements with OEMs, [search provider]'s

GOOG-DOJ-26429449

(1248)   In addition, for competing general search services that have a more focused offering in terms of languages or targeting a specific group of users an OEM or MNO would have pre-installed them only on a small sub-set of their portfolio of devices, given that an OEM or MNO would not realistically have expected that such general search service would have captured a substantial share of queries on all devices. Taking the example of Seznam, which is focused on Czech language queries, during the period 2014-2016, even if it had captured all the general search queries on Google Android devices in the Czech Republic, which could only be the case in the absence of the MADA, it could not have achieved more than [0-5]% of worldwide general search queries on Google Android devices,[1349] and therefore would not have been able to match Google's portfolio-based revenue share payments across an OEM's or MNO's portfolio of Google Android devices.

(1249)   Finally, competing general search services would have had to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices while being pre-installed only on new devices. This is because a competing general search service could not have been pre-installed on the devices already sold to users and on which an OEM or MNO obtained portfolio-based revenue share payments from Google.

(1250)   As a result, a competing general search service would have had to offer a revenue share payment greater than 100% in order to compensate an OEM or MNO for the loss of a:

   (1)   [Revenue share terms] portfolio-based revenue share payment from Google once an OEM or MNO had sold more than [20-30]% of the Google Android devices sold during the period in which the portfolio-based revenue share agreement was in place;

   (2)   [Revenue share terms] portfolio-based revenue share payment from Google once an OEM or MNO had sold more than [40-50]% of the Google Android devices sold during the period in which the portfolio-based revenue share agreement was in place; and

   (3)   [Revenue share terms] portfolio-based revenue share payment from Google once an OEM or MNO had sold more than [60-70]% of Google Android devices sold during the period in which the portfolio-based revenue share agreement was in place.

(1251)   This is because a 100% portfolio-based revenue share payment by a competing general search service over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search on the remaining: (i) [70-80]%, (ii) [50-60]% or (iii) [30-40]% of an OEM's or MNO's Google Android devices would have matched a portfolio-based revenue share payment by Google of [revenue share terms] over [70-80]% of Google search queries covered by Google revenue share

---

non-confidential response [...] indicates that the [search provider]'s mobile search widget and links to the [search provider]'s home page on the default web browser were pre-installed on a small number of devices in the EEA under the revenue share agreements entered into by [search provider] with OEMs. There are no examples of agreements between a competing general search service and a MNO.

[1349]   Source: Google's response to Question 14 of the request for information of 24 March 2017 (Doc ID 7894-4).

**EN**                                              287                                              **EN**

payments on an OEM's or MNO's entire portfolio of Google Android devices.[1350]

(1252)   In the case of a [revenue share terms] portfolio-based revenue share payment, a competing general search service would have had to offer a revenue share payment greater than 100% even if no device had already been sold during the period in which the portfolio-based revenue share agreement was in place. This is because a 100% revenue share payment by a competing general search service over the 22.5% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to capture from Google Search would not have matched a portfolio-based revenue share payment by Google of [revenue share terms] over the [70-80]% of Google search queries covered by Google revenue share payments on that OEM's or MNO's entire portfolio of Google Android devices.

(1253)   In the second place, where an OEM interpreted the MADA as requiring that OEM to set Google Search as the default general search service on the pre-installed mobile web browsers, a competing general search service would also never have been able to compensate an OEM, or an MNO distributing its devices, for the loss of Google's payments across its entire portfolio of Google Android devices.

(1254)   In such a scenario, even if it had been willing to forego all its revenues from search advertisements and offer an OEM or MNO a revenue share of 100% on the entirety of the devices of the portfolio, a competing general search service would have been unable to offer an OEM or MNO a stream of revenue greater than what Google offered under even a [revenue share terms] portfolio-based revenue share payments.[1351] This is because a revenue share of 100% over the [0-5]% of the Google Search general search queries that an OEM or MNO could reasonably have expected the competing general search service to have captured from Google Search would not have matched a revenue share of [revenue share terms] over the [70-80]% of Google Search general search queries covered by Google revenue share payments.

(1255)   Moreover, a competing general search service would have had to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices, while being pre-installed only on a limited number of its devices (see recitals (1244) to (1248)).

(1256)   Fifth, the Commission's conclusion that a competing general search service would have been unable to offer an OEM or MNO a sufficient absolute amount of revenues to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices is not affected by Google's claims that:

   (1)   the MADA did not require Google Search to be set as the default general search service on the pre-installed mobile web browsers on GMS devices;[1352]

   (2)   when assessing whether a competing general search service could have

---

[1350]   In the case of portfolio-based revenue share payments equal to [Revenue share terms] a competing general search service would have had to offer a revenue share payment of more than 100% in order to compensate an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices even if there were no devices already sold to users.

[1351]   This is based on the assumption that a competing general search service could obtain the same average revenue per search as Google and has the same operational costs as Google.

[1352]   Google's Response to the First Letter of Facts, Part Four, page 109, paragraphs 25-31 (Doc ID 8598) and Google's Response to the Second Letter of Facts, Part Two, pages 6-14, paragraphs 12-30 (Doc ID 8876).

**EN**                                          288                                          **EN**

GOOG-DOJ-26429451

compensated an OEM or MNO for the loss of portfolio-based revenue share payments, the Commission failed to consider the ability of equally efficient competing general search services to match the portfolio-based revenue share payments;[1353]

(3)     a competing general search service that was attractive to users could reasonably have expected to capture from Google Search much higher shares of general search queries than those calculated by the Commission. Such a share of general search queries would have been at least equivalent to that achieved by Seznam in the Czech Republic;[1354]

(4)     the Commission's conclusion that a competing general search service would have been able to capture from Google Search only a small proportion of the queries conducted on a Google Android device is inconsistent with the conclusion that Google's conduct has the capability to foreclose competition;[1355]

(5)     a competing general search service would have been able to offer a revenue share payment also on the general search queries via mobile web browsers that originate from a general search service's homepage, thereby reducing the percentage of revenue share needed to match Google's portfolio-based revenue share payments;[1356]

(6)     the [revenue share terms] portfolio-based revenue share payments are "gross" figures, from which Google deducted […]%. This resulted in an effective rate of Google's portfolio-based revenue share payments rate of only [revenue share terms], respectively;[1357]

(7)     the Commission does not establish the "incremental costs", i.e. the additional costs that Google or a competing general search service would incur when responding to an additional search query;[1358]

(8)     the Commission provides no evidence why a competing general search service would have been pre-installed only on a portion of Google Android devices. Moreover, the infrequent pre-installation of competing general search services reflects Google's higher quality;[1359]

---

[1353]   Google's Response to the Statement of Objections, Part Five, page 274, paragraph 65 (Doc ID 7117) and Google's Response to the Second Letter of Facts, Part Two, pages 23-24, paragraphs 65-67 (Doc ID 8876).

[1354]   Google's Response to the First Letter of Facts, Part Four, page 116, paragraph 38 (Doc ID 8598) and Google's Response to the Second Letter of Facts, Part Two, page 17, paragraph 44-45 (Doc ID 8876).

[1355]   Google's Response to the Statement of Objections, Part Five, pages 268-270, paragraphs 50-52 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Four, pages 103-105, paragraphs 8-9 and 13-14 (Doc ID 8598).

[1356]   Google's Response to the First Letter of Facts, Part Four, page 115, paragraph 38 (Doc ID 8598) and Google's Response to the Second Letter of Facts, Part Two, pages 14-15, paragraphs 33-38 (Doc ID 8876).

[1357]   Google's Response to the First Letter of Facts, Part Four, page 115, paragraph 38 (Doc ID 8598).

[1358]   Google's Response to the Second Letter of Facts, Part Two, page 21, paragraphs 52-54 (Doc ID 8876).

[1359]   Google's Response to the Second Letter of Facts, Part Two, page 17-18, paragraphs 46 and 48 (Doc ID 8876).

**EN**                                        289                                        **EN**

GOOG-DOJ-26429452

(9)    even if an OEM or MNO would have been willing to pre-install a competing general search service only on a portion of its devices, it would have been free to enter into agreements with multiple competing general search services which, collectively, could have matched Google's payments across its entire portfolio of Google Android devices;[1360]

(10)   the Commission fails to analyse the lifespan of devices already sold to users relative to new devices and to consider whether devices already sold to users generate as much revenue as new devices;[1361] and

(11)   in light of points (1) to (10) of this recital, a competing general search service could have matched Google's payments while still earning positive revenues from the general search queries on all the devices within an OEM's or MNO's portfolio.[1362]

(1257)   In the first place, the Commission has demonstrated that a competing general search service could not have matched Google's portfolio-based revenue share payments irrespective of whether an OEM interpreted the MADA as requiring it to set Google Search as the default general search service on the pre-installed mobile web browsers (see recital (1241)).

(1258)   Moreover, for the reasons set out in recital (1228) above, certain OEMs and Google's employees considered that the MADA required Google Search to be set as the default general search service on pre-installed mobile web browsers.

(1259)   In the second place, when assessing whether a competing general search service could have compensated an OEM or MNO for the loss of Google's payments across its entire portfolio of Google Android devices, the Commission has considered the ability of equally efficient competing general search services to match the portfolio-based revenue share payments, namely competing general search services with the same operational costs and generating the same revenue per search as Google.

(1260)   In the third place, the maximum share of queries that a competing general search service could reasonably have expected to capture from Google Search would not have been at least equivalent to the share of general search queries achieved by Seznam in the Czech Republic. That share is an exception in the EEA, due to the fact that Seznam was the incumbent general search service in the Czech Republic before it was overtaken by Google and its general search algorithms are built around the Czech language. Indeed, Seznam enjoys a minimal share of queries in countries other than the Czech Republic.

(1261)   Moreover, a competing general search service that was attractive to users could not reasonably have expected to capture from Google Search a share of general search queries higher than the maximum combined share of general search queries achieved by competing general search services on PCs:

(1)    on PCs, general search services typically compete side-by-side through being set as the default general search service on the different web browsers pre-

---

[1360]   Google's Response to the Second Letter of Facts, Part Two, page 17, paragraph 46 (Doc ID 8876).

[1361]   Google's Response to the Second Letter of Facts, Part Two, page 17, paragraph 47 (Doc ID 8876).

[1362]   Google's Response to the Statement of Objections, Part Four, pages 168-174, paragraphs 37-44 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Four, pages 109-112 and 114-116, paragraphs 24-31 and 38 (Doc ID 8598).

**EN**                                                      **EN**

GOOG-DOJ-26429453

installed on PCs. On smart mobile devices, a competing general search service app would be competing with the Google Search app in a similar way, by being pre-installed side-by-side with the Google Search app; and

(2)    a competing general search service would not have benefited from the same scale advantage as Google. As explained in Section 9.5.2, because a general search service uses data to refine the relevance of its general search results pages, it needs to receive a certain volume of queries in order to compete viably. In addition, the higher the number of users of a general search service, the greater the likelihood that a given search advertisement is matched to a user and converted into a sale. This in turn increases the price that a general search service can charge advertisers if their search advertisements are clicked on. The general search service can then reinvest that revenue in seeking to attract new users of its general search service. This scale advantage is reflected in the lower share of queries achieved by competing general search services as compared with Google Search.

(1262)   In the fourth place, the Commission's conclusion that a competing general search service would have been able to capture from Google Search only a small proportion of the queries conducted on a Google Android device is consistent with the conclusion that Google's conduct has the capability to foreclose competition. While the [0-5]% of the Google Search general search queries that an OEM or MNO could reasonably have expected a competing general search service to have captured from Google Search would have been a small amount for Google, it would have constituted a significant amount of additional queries for competing general search services, which were, and still are, much smaller than Google.

(1263)   Moreover, what might initially have been a small amount of queries could have been competitively significant in the context of gaining an initial foothold with regard to an OEM or MNO or more generally in terms of achieving scale and/or commercial credibility with a view to future growth.

(1264)   In the fifth place, a competing general search service would also not have offered a revenue share payment on the general search queries via mobile web browsers that originate from a general search service's homepage. This is because: (i) Google did not grant revenue share payments for the [20-30]% of queries via mobile web browsers that originated from the Google Search homepage;[1363] and (ii) such queries would have originated from the homepage of the competing general search service even in absence of any revenue share agreement between an OEM or MNO and the competing general search service.

(1265)   In the sixth place, the […]% that Google deducted from the [revenue share terms] portfolio-based revenue share payments was, as Google recognises, to cover Google's operational costs.[1364] It is therefore irrelevant that the [revenue share terms] portfolio-based revenue share payments were "gross" figures from which Google deducted […]% because a competing general search service which is as-efficient as Google would, by definition, have had to deduct a similar percentage from any payments to cover its operational costs.

---

[1363]   Google's Response to the First Letter of Facts, Part Four, page 115, paragraph 38 (Doc ID 8598).
[1364]   Google's Response to the Second Letter of Facts, Part Two, page 21, paragraph 54 (Doc ID 8876).

**EN**                                                      291                                                      **EN**

GOOG-DOJ-26429454

(1266)   In the seventh place, the operational costs deducted by Google from its revenue share payments were directly proportional to the volume of queries carried out on an OEM's or MNO's smart mobile device as they were set as a percentage of the revenues associated to those queries (i.e. […]% of the revenues). Therefore, they provide a good proxy of the "incremental costs" associated with general search queries.

(1267)   Moreover, in order to operate in a sustainable manner, a competing general search service would have to cover not only its operational costs, but also a share of its fixed costs, in particular R&D costs. As described in Section 9.5.2, a fully-fledged general search service requires significant and continuous investments in terms of time and resources. In addition, general search services constantly invest to improve their product and a competing general search service would have no choice but to attempt to match these investments.

(1268)   In the eighth place, as set out in recitals (824) to (829), the lower number of pre-installations of competing general search services does not reflect competition on the merits, but it is the result of the requirements of the MADA on OEMs to take a bundle of 12-30 apps, including the Google Search app.

(1269)   In the ninth place, an OEM or MNO would not have realistically entered into agreements with multiple competing general search services in order to match Google's payments across its entire portfolio of Google Android devices. This is because an OEM or MNO would have:

  (1)   been unlikely to pre-install a competing general search service in addition to Google Search on most of the Google Android devices within its portfolio (see recitals (824) to (829));

  (2)   been unlikely to find a number of competing general search services that would each have wanted to be pre-installed on Google Android devices sold in different geographic areas and/or to different user groups; and

  (3)   had to incur multiple transaction costs that would not be justified for a small volume of devices (see recital (1222)(2)).

(1270)   In the tenth place, smart mobile devices generally continue to generate revenue share payments to OEMs and MNOs for several years after being sold, given that as set out in recital (548), the majority of users replace their devices within three years. In addition, devices already on the market should generate similar revenues as new devices, given that Google has submitted no evidence that the usage of general search services on devices would decline over time.

(1271)   In the eleventh place, for the reasons set out in recitals (1240) to (1249), a competing general search service could not have matched Google's payments across its entire portfolio of Google Android devices, while still earning positive revenues from the search queries on the devices.

13.4.1.3. The portfolio-based revenue share payments were one reason why OEMs and MNOs refrained from pre-installing competing general search services on their Google Android devices

(1272)   For the reasons set out in this Section, the Commission concludes that the portfolio-based revenue share payments were one reason why OEMs and MNOs refrained from pre-installing competing general search services on their Google Android devices.

**EN**                                            292                                            **EN**

GOOG-DOJ-26429455

(1273)  First, [revenue share partner] "*considered installing* [search service] *within the scope of not infringing* [revenue share partner]'s *contractual obligation with Google.* [...] *but* [revenue share partner] *ultimately did not pursue any options other than Google search. This decision was influenced by the terms of the* [revenue share agreement] *and also by internal strategy.*"[1365]

(1274)  Second, in 2012 [revenue share partner] explored the possibility of making [search service] the default general search service on a mobile web browser that would have been pre-installed in addition to Google Chrome. While this would have allowed [revenue share partner] to "*also potentially get the revenue share from* [search service]", [revenue share partner] ultimately concluded that "*to entitle overall Google revshare* [...], *the default has to be Google and non-duplication of search service.*"[1366]

(1275)  Third, prior to the amendment of [revenue share partner]'s portfolio-based revenue share agreement in March 2013, [revenue share partner] sought a waiver from Google in order to pre-install [search service] on Google Android devices sold in [geographic area] without losing the benefit of the portfolio-based revenue share payments. After Google rejected such a waiver request, "[Revenue share partner] *chose not to pursue the matter further and did not preload* [search service]."[1367]

(1276)  Fourth, between 2008 and 2014, Seznam unsuccessfully sought to pre-install its general search app on the Google Android devices of MNOs: "*Unfortunately, all our efforts generally grind to a halt with the oral off-the-record statement: 'we are unable to change mobile phone firmware for licensing and financial reasons'.*"[1368]

(1277)  Fifth, in 2012 [Partner J] attempted to pre-install the Yandex search widget on the second screen of certain of its Google Android devices. However, [Partner J] subsequently removed the Yandex widget and informed Yandex that this was because it violated its agreement with Google.[1369]

(1278)  Sixth, the Commission's conclusion that the portfolio-based revenue share payments were one reason for the OEMs and MNOs refraining from pre-installing competing general search services is not affected by Google's claims that:[1370]

    (1)  the evidence from [revenue share partner] should be dismissed on the grounds that any discussions were at an early stage;

    (2)  Yandex's submission concerning Partner J should be dismissed on the grounds that there is no evidence to suggest that Partner J was forced to remove Yandex's widget; and

---

[1365]  [Revenue share partner]'s non-confidential response to Questions 22 and 22.1 of the request for information of 17 July 2014 [...].

[1366]  Google's internal document submitted in response to the request for information of 11 July 2014 (Doc ID 1372-413).

[1367]  [Revenue share partner]'s non-confidential response to Question 23 of the request for information of 17 July 2014 [...].

[1368]  Seznam's non-confidential response to Question 19 of the request for information of 30 July 2014 (Doc ID 4289).

[1369]  Yandex's non-confidential response to Question 22 of the request for information of 30 July 2014 (Doc ID 4603).

[1370]  Google's Response to the Statement of Objections, Part Five, pages 282-291, paragraph 85-87 (Doc ID 7117).

**EN**

**EN**

GOOG-DOJ-26429456

       (3)    there are many reasons why OEMs and MNOs refrained from pre-installing competing general search services, unrelated to the portfolio-based revenue share agreements.

(1279)    In the first place, [revenue share partner]'s discussions were not all at an early stage:

       (1)    [Revenue share partner]'s discussions with the [search service], were sufficiently advanced that [revenue share partner] and [search service] had entered into a [cooperation agreement];[1371] and

       (2)    [Revenue share partner]'s discussions with [search service] were sufficiently advanced that [revenue share partner] sought a waiver from Google in order to pre-install [search service] on Google Android devices sold in [geographic area].[1372]

(1280)    In the second place, Yandex's statement in response to the Commission's request for information reports Yandex's understanding of why Partner J removed the Yandex widget, and the underlying document from Partner J provided by Yandex refers to Partner J's contractual obligations with Google.

(1281)    In the third place, the fact that there may be other reasons why OEMs and MNOs refrained from pre-installing competing general search services does not alter the fact that the portfolio-based revenue share payments were one such reason.

*13.4.2. Google's portfolio-based revenue share payments made access to the national markets for general search services more difficult*

(1282)    The Commission concludes that Google's portfolio-based revenue share payments made access to the national markets for general search services more difficult.

(1283)    First, Google's portfolio-based revenue share payments reduced the incentives of the OEMs and MNOs that received such payments to pre-install competing general search services (see Section 13.4.1).

(1284)    Second, Google's portfolio-based revenue share agreements covered a significant part of the national markets for general search services (see Section 13.4.2.1).

(1285)    Third, competing general search services would have been unable to offset the competitive advantage that Google ensured for itself via the portfolio-based revenue share agreements, by using alternative distribution channels such as downloads (see Section 13.4.2.2).

13.4.2.1.Google's portfolio-based revenue share agreements covered a significant part of the relevant markets

(1286)    For the reasons set out in this Section, the Commission concludes that Google's portfolio-based revenue share agreements covered a significant part of the relevant national markets for general search services.

(1287)    First, Google portfolio-based revenue share agreements covered both the most significant OEMs distributing Google Android smartphones in the EEA, in terms of shares of sales, namely [revenue share partner], [revenue share partner] and [revenue

---

[1371]    [Revenue share partner]'s non-confidential response to Question 22 of the request for information of 17 July 2014 […].

[1372]    [Revenue share partner]'s non-confidential response to Question 23 of the request for information of 17 July 2014 […].

**EN**                **EN**

GOOG-DOJ-26429457

share partner], and the major MNOs active in the EEA, namely [revenue share partner], [revenue share partner] and [revenue share partner].

(1288)   In the first place, the sales made by OEMs that had entered into a portfolio-based revenue share agreement with Google covered approximately [80-90]% of the Google Android smartphones sold in Europe 2011-2012. Taking into account that Google Android smartphones represented approximately 56%[1373] of all the smartphones sold in Europe in 2011-2012, the portfolio-based revenue share agreements with OEMs thus covered approximately [40-50]%[1374] of the smartphones sold in Europe during that period. This represented a significant coverage in terms of smart mobile devices in the EEA.

**Table 21: Share of Google Android smartphones sold in Europe by OEM under portfolio-based revenue share payments with Google between 2011 and 2014[1375]**

| OEMs | Revenue share % | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| [Revenue share partner] | [Revenue share terms] | N/A | N/A | […]% | […]% |
| [Revenue share partner] | [Revenue share terms] | […]% | […]% | N/A | N/A |
| [Revenue share partner] | [Revenue share terms] | N/A | N/A | […]% | […]% |
| [Revenue share partner] | [Revenue share terms] | […]% | […]% | N/A | N/A |
| [Revenue share partner] | [Revenue share terms] | […]% | […]% | […]% | N/A |
| **Total coverage** | | **[70-80]%** | **[80-90]%** | **[20-30]%** | **[5-10]%** |

(1289)   In the second place, this estimate of the coverage of the portfolio-based revenue share agreements with OEMs is conservative and favourable to Google. This is because it does not include the additional devices that were covered by the portfolio-based revenue share agreements between Google and MNOs.[1376]

---

[1373]   Source: […] (Doc IDs 3098, 4632, 4633 and 4710).
[1374]   This figure is obtained by multiplying [80-90]% by 56%.
[1375]   Source: […] data (Doc IDs 3098, 4632, 4633 and 4710). As smartphones represent the large majority of Google Android devices sold by the OEMs that entered into a portfolio-based revenue share agreement with Google, the data provides a reasonable approximation of the sales of smart mobile devices sold under such agreements. [Revenue share partner]'s sales, for which the portfolio-based revenue share agreement covered only tablets, are not reported in the table. Finally, devices running on the following, non-Google Android, OSs have been excluded from the calculations: Fire, Flyme OS, and Nokia X.
[1376]   The […] data used in Table 21 included sales data relating to two of the MNOs that received portfolio-based revenue share payments from Google, namely [revenue share partner] and [revenue share

**EN**

**EN**

GOOG-DOJ-26429458

(1290)   Second, Google Search queries originating from smart mobile devices grew constantly in the period between 2012 and 2014 and represented approximately [30-40]% of the Google Search queries carried out in the EEA in 2014.[1377]

(1291)   Third, Google was pre-installed on the large majority of the remaining smart mobile devices.

(1292)   In the first place, as of 2013 Google began to replace portfolio-based revenue share agreements with device-based revenue share agreements (namely as regards [revenue share partner], [revenue share partner] and [revenue share partner]).[1378] These device-based revenue share agreements covered [50-60]% and [60-70]% of the GMS smartphones sold in 2013 and 2014, respectively.[1379]

(1293)   In the second place, Google Search is set as default on the Safari browser on each smart mobile device sold by Apple, pursuant to a [commercial] agreement between Apple and Google (see recital (515)(1)).[1380]

(1294)   Fourth, general search queries from Google Android devices accounted for [10-20]% and [10-20]% of total Google search queries carried out in the EEA in 2013 and 2014 respectively.[1381]

(1295)   Fifth, the Commission's conclusion that Google's portfolio-based revenue share agreements covered a significant part of the relevant markets for general search services, is not affected by Google's claims that:

(1)   portfolio-based revenue share agreements did not cover a significant part of the markets for general search services since they covered only a portion of the general search queries on Google Android devices while there are other channels to access the market;[1382]

(2)   on the basis the Commission's assessment as laid out in the Statement of Objections, the impact of Google's portfolio-based revenue share payments would have been minimal as the [0-5]% of queries at the device level a competing general search service could achieve if it had been pre-installed, would have represented only 0.4% to 0.9% of the overall market for general search services;[1383] and

(3)   any advantage that resulted from pre-installation of Google's general search services on GMS devices does not amount to anti-competitive foreclosure and that the Commission, contrary to Cases AT.37792 *Microsoft* and AT.39530

---

partner]. According to the [...] data, these MNOs accounted for approximately [0-5]% of the total Google Android smartphones sold in Europe in 2011, [0-5]% in 2012 and [0-5]% in 2013. Source: [...] data (Doc IDs 3098, 4632, 4633 and 4710).

[1377]   Source: Google's response to Question 14 of the request for information of 24 March 2017 (Doc ID 7894-5).

[1378]   See recital (197).

[1379]   Source: [...] data (Doc IDs 3098, 4632, 4633 and 4710).

[1380]   Apple's non-confidential response to Question 16 of the request for information of 17 July 2014 (Doc ID1453).

[1381]   Google was unable to provide the same level of disaggregation per OS for 2011 and 2012.

[1382]   Google's Response to the Statement of Objections, Part Five, pages 293-294, paragraphs 94-99 (Doc ID 7117) and Google's Response to the First Letter of Facts, Part Four, page 113, paragraph 35 (Doc ID 8598).

[1383]   Google's Response to the Statement of Objections, Part Five, pages 294-295, paragraphs 100-101 (Doc ID 7117).

GOOG-DOJ-26429459

*Microsoft (Tying)*, has not produced any empirical evidence to show that it does.[1384]

(1296)   In the first place, Google's portfolio-based revenue share agreements covered a large number of Google Android devices sold in the EEA (see recitals (1287) to (1289)).

(1297)   Moreover, the portion of the general search queries on Google Android devices covered by portfolio-based revenue share agreements was significant both because of the rapidly growing volume of search queries that take place on these devices (see recital (1289) and because such queries are a particular source of valuable location data (see recital (114)) that allows general search services to improve their general search and search advertising results (see recitals (688) to (691) and (693) to (697)).

(1298)   In addition, the vast majority of the remaining general search queries on Google Search in the EEA were originated from entry points where Google Search was pre-installed or set as default, namely (i) Google Chrome browser on PCs, (ii) search app and web browsers default on Google Android devices of [revenue share partner], [revenue share partner] and [revenue share partner] via device-based revenue share payments from 2013 onwards, (iii) Safari browser on iOS via [a commercial] agreement with Apple, and (iv) other browsers on PCs via default agreements with developers (see recital (796)).

(1299)   In the second place, the impact of the portfolio-based revenue share payments was not minimal.

(1300)   First of all, as explained in Section 13.4.1.II, whilst [0-5]% of the Google Search queries on Google Android devices would have been a small amount for Google, it would have constituted a significant amount of additional queries for competing general search services, which were, and still are, much smaller than Google.

(1301)   Moreover, what might initially have been a small amount of queries could have been competitively significant in the context of gaining an initial foothold with regard to an OEM or MNO or more generally in terms of achieving scale and/or commercial credibility with a view to future growth.

(1302)   In addition, the portfolio-based revenue share agreements were offered during the strategically important phase of the shift in the focus of the Internet industry from PCs to smart mobile devices (see Section 6.2).

(1303)   In the third place, as in Cases AT.37792 *Microsoft* and AT.39530 *Microsoft (Tying)*,[1385] the Commission has, in this case, assessed the question of the actual development of usage shares on the basis of usage data from third party surveys and data, and examined carefully alternative explanations for changes in usage shares, including alleged qualitative superiority

(1304)   Moreover, and in any event, the Commission is not required to apply an identical framework of assessment in all cases. Rather, the Commission must make an overall assessment in each given case and can take account of a range of tools for the

---

[1384]   Google's Response to the Statement of Objection, Part Five, pages 291-292, paragraphs 89-93 (Doc ID 7117).

[1385]   Case AT.39530 *Microsoft (Tying)*, recitals 39 to 54; AT.37792 – Microsoft, recitals 849 to 878, 900 to 926 and 947 to 954.

**EN**                                   297                                   **EN**

GOOG-DOJ-26429460

purposes of that assessment.[1386]

13.4.2.2. Competing general search services would have been unable to offset the competitive advantage that Google ensured for itself via portfolio-based revenue share agreements, by using alternative distribution channels such as download

(1305)   The Commission concludes that competing general search services would have been unable to offset the competitive advantage that Google ensured itself via portfolio-based revenue share agreements by using alternative distribution channels such as downloads.

(1306)   First, pre-installation is an important channel for the distribution of general search services on smart mobile devices (see Section 11.3.4.1.II). Through its portfolio-based revenue share agreements, Google was therefore able to ensure for itself a competitive advantage over competing general services.

(1307)   Second, competing general search services would have been unable to offset this competitive advantage, by using alternative distribution channels such as download (see Section 11.3.4.1.IV).

(1308)   Third, Google's competitive advantage resulting from the portfolio-based revenue share agreements and the inability of competing general search services to offset that advantage is consistent with the evolution of shares of the national markets for general search services (see Section 11.3.4.1.V).

(1309)   Fourth, the Commission's conclusion that competing general search services would have been unable to offset the competitive advantage that Google ensures itself via portfolio-based revenue share agreements by using alternative distribution channels such as downloads, is not affected by Google's claims that:

(1)   users do not face barriers to downloading competing general search services apps or accessing them via mobile web browsers;[1387]

(2)   Google Search's share during the alleged infringements is not consistent with foreclosure;[1388] and

(3)   Google Search obtained queries on the basis of the quality of its general search service and thus the vast majority of search queries would have gone to Google Search regardless of the portfolio-based revenue share agreements.[1389]

(1310)   In the first place, downloads and accessing competing general search services via mobile web browsers would have been unable to offset the competitive advantage that Google ensured for itself. In particular, as set out in Section 11.3.4.1.IV, downloads of general search apps and agreements with developers of mobile web browsers cannot be compared in reach and effectiveness to the pre-installation of the

---

[1386]   Case T-210/01 *General Electric v Commission*, EU:T:2005:456 paragraph 519; Case T-343/06 *Shell Petroleum and Others v Commission*, EU:T:2012:478, paragraph 171; Case T-342/07 *Ryanair v Commission*, EU:T:2010:280, paragraph 136; Case T-175/12 *Deutsche Börse v Commission*, EU:T:2015:148, paragraph 133; Case T-699/14 *Topps Europe v Commission*, EU:T:2017:2, paragraph 82.

[1387]   Google's Response to the Statement of Objections, Part Five, pages 291-292, paragraph 89-93 (Doc ID 7117).

[1388]   Google's Response to the Statement of Objections, Part Five, page 297, paragraph 107-109 (Doc ID 7117).

[1389]   Google's Response to the First Letter of Facts, Part Four, page 117, paragraph 43 (Doc ID 8598).

**EN**

**EN**

GOOG-DOJ-26429461

Google Search app on GMS devices.

(1311)   In the second place, Google's competitive advantage and the inability of competing general search services to offset that advantage is consistent with the evolution of Google's shares of general search queries. In particular, as set out in Section 11.3.4.1.V, Google's share of general search queries (i) was higher on mobile devices than on PCs and the difference even increased during the period during which the portfolio-based revenue share agreements were in force and (ii) does not seem to be explained by a substantial quality advantage of the Google Search app in the eyes of Android users.

(1312)   In the third place, as set out in recitals (846) to (851), Google's share of general search queries on smart mobile devices cannot solely be explained by Google Search's alleged superior quality.

*13.4.3.   Google's portfolio-based revenue share payments deterred innovation*

(1313)   For the reasons set out in this Section, the Commission concludes that Google's portfolio-based revenue share payments deterred innovation.

(1314)   First, the portfolio-based revenue share payments prevented the launch of Google Android devices pre-installed with general search services other than Google Search. Absent Google's conduct, users would, therefore, have had a wider choice, for example in terms of quality or range of products. For instance, as explained in recital (862), as a consequence of Google's conduct some general search services with a more focused offering may not be able to achieve the scale and access to users that would allow them to invest in research and development with respect to their specific features.

(1315)   Second, by preventing competing general search services from gaining incremental search queries and the respective revenues and data needed to improve their services, Google's conduct reduced the incentives of competing general search services to invest in developing innovative features, such as innovation in algorithm and user experience design.

(1316)   In the first place, Google's conduct made it harder for competing general search services to gain a sufficient volume of queries to expand and become or remain viable competitors (see recital (860)(1)).

(1317)   In the second place, Google's conduct prevented competing general search services from achieving revenues associated with these search queries. Such additional revenues would have allowed competing general search services to improve their services and deploy innovative solutions for users (see recital (860)(2)).

(1318)   In the third place, Google's conduct also prevented competing general search services from acquiring the valuable user data associated with these search queries (see recital (860)(3)).

(1319)   Third, the portfolio-based revenue share payments reduced the incentives of Google to improve the quality of its general search service as it did not need to compete on the merits with competing general search services.

(1320)   Fourth, the Commission's conclusion that Google's portfolio-based revenue share payments deterred innovation is not affected by Google's claim that the Commission

**EN**

**EN**

GOOG-DOJ-26429462

overlooks the improvements that Google made to its general search service during the period in which the agreements were in place.[1390]

(1321)   In the first place, even if Google's conduct coincided with a period of improvement of its general search service, Google neither claims nor demonstrates that its conduct has not affected the incentives and ability of competing general search services to improve their services.

(1322)   In the second place, absent Google's portfolio-based revenue share payments, Google may have improved its general search service to a greater degree.

### 13.5.   Objective justification and efficiencies

(1323)   Google claims that the portfolio-based revenue share agreements were objectively justified because they were necessary to:

   (1)   convince OEMs and MNOs to *"produce devices for the nascent Android ecosystem"*;[1391]

   (2)   ensure that Google recouped its investment in Android;[1392] and

   (3)   allow Google Android devices to compete against Apple's devices, by lowering their prices, improving their quality and allowing OEMs and MNOS to invest more in R&D.[1393]

(1324)   For the reasons set out in this Section, the Commission concludes that Google has not demonstrated that the portfolio-based revenue share agreements are objectively justified.

(1325)   First, even assuming that the portfolio-based revenue share agreements may have been necessary at some earlier point to convince OEMs and MNOs to sell devices for the *"nascent Android ecosystem"*, they were no longer necessary as of January 2011 when Google Android devices represented already more than 40% of the smart mobile devices sales worldwide and Android was therefore no longer "nascent".[1394]

(1326)   Moreover, and in any event, via the portfolio-based revenue share agreements, Google was paying OEMs and MNOs to be set as the exclusive general search service on those devices, not to convince them to sell Google Android devices.

(1327)   Second, Google has not demonstrated that the portfolio-based revenue share agreements were necessary to ensure that Google recouped its investment in Android. For the reasons set out in Section 11.4.4.3, absent the portfolio-based revenue share agreements, Google would still have been able to significantly monetise Android.

(1328)   Third, Google has not demonstrated that the portfolio-based revenue share agreements were necessary to allow Google Android devices to compete against

---

[1390]   Google's Response to the Statement of Objections, Part Five, pages 297-298, paragraphs 110-112 (Doc ID 7117).

[1391]   Google's Response to the Statement of Objections, Part Five, page 298, paragraph 115 (Doc ID 7117) and Appendix 2, page 21 (Doc ID 8303-12).

[1392]   Google's response to the complaint by Yandex, paragraph 41 (Doc ID 2118).

[1393]   Google's Response to the Statement of Objections, Part Five, pages 298-300, paragraphs 116, 120-121 (Doc ID 7117) and Appendix 1 of Google's Response to the Statement of Objections, pages 12-13 paragraph 45 (Doc ID 8303-2).

[1394]   Source: […] data (Doc IDs 7866 and 7867).

**EN**

300

**EN**

GOOG-DOJ-26429463

Apple.

(1329)   In the first place, Google could have offered monetary incentives such as revenue share or lump-sum payments for OEMs and MNOs to pre-install its general search services or prominently place it on the first screen of devices, without requiring exclusive pre-installation. This is confirmed by the fact that Google currently offers OEMs and MNOs monetary incentives to prominently place its general search service on the first screen of devices.[1395]

(1330)   In the second place, if Google had not paid for exclusivity, competing general search services would have had an interest in offering revenue shares or other monetary compensation in return for pre-installation (see recital (1212)).

(1331)   In the third place, the portfolio-based revenue share agreements were not necessary to lower the prices of Google Android devices. This is because OEMs and MNOs, which either never entered into a portfolio-based revenue share agreement with Google or whose agreement expired, also offered low-priced devices[1396] and invested substantially in R&D.[1397]

(1332)   Moreover, the portfolio-based revenue share agreements were not necessary to (i) convince OEMs to sell Google Android devices, (ii) decrease OEMs' and MNOs' costs, (iii) improve the quality of devices or (iv) induce more investment in R&D. This is because, after the expiry of the portfolio-based revenue share agreements, Google neither claims nor demonstrates that OEMs and MNOs changed their pricing and R&D behaviour.

## 13.6.   Duration of the infringement

(1333)   The Commission concludes that the start date of the infringement was 1 January 2011, the date as of which the Commission concludes that Google is dominant in each national market for general search services in the EEA (see Section 9.5). The infringement ended on 31 March 2014, the date that the portfolio-based revenue share agreement between Google and [revenue share partner] ended (see Section 6.3.3.1).

(1334)   The Commission's conclusion that the end date of the infringement was 31 March 2014 is not affected by Google's claim that the portfolio-based revenue share agreements covered only [20-30]% of Google Android devices as of 2013.[1398]

(1335)   In the first place, the agreements continued to cover a significant proportion of Google Android devices, which were an important and growing channel for the distribution of general search services (see Section 13.4.2.1).

(1336)   In the second place, the effects of certain portfolio-based agreements that were in

---

[1395]   See [revenue share partner]'s non-confidential response to Question 2 of the request for information of 8 March 2017 […]; [revenue share partner]'s non-confidential response to Question 3 of the request for information of 8 March 2017 […]; Amendment Agreement to the Google Android Search Revenue Share Agreement between Google and [revenue share partner] […] and Google Mobile Revenue Share Agreement between Google and [revenue share partner] […].

[1396]   According to […] data, for example, the average price of [OEM] and [OEM]'s smartphones (i.e. respectively USD [100-120] and USD [120-140] in 2016), two of the largest OEMs that have not signed a revenue share agreement with Google, is approximately half of the average price of Google Android devices (Source: […] data (Doc ID 7866 and 7867)).

[1397]   See example of [OEM] R&D investments described in the […] printed and saved on 2 July 2018.

[1398]   Google's Response to the Statement of Objections, Part Six, page 329, paragraph 63 (Doc ID 7117).

GOOG-DOJ-26429464

place in 2011 and 2012 continued because:

(1)   the majority of users replace their devices within three years (see recital (548)); and

(2)   [revenue share partner] and [revenue share partner] continued to receive portfolio-based revenue share payments with respect to existing Google Android devices on which Google Search was exclusively pre-installed, even after those agreements had been amended to become device-based revenue share agreements respectively in March 2013 and December 2013.[1399]

## 14.   SINGLE AND CONTINUOUS INFRINGEMENT

### 14.1.   Principles

(1337)   The concept of a single and continuous infringement relates to a series of actions which form part of an overall plan because their identical objective distorts competition within the internal market.

(1338)   For the purposes of characterising various instances of conduct as a single and continuous infringement, it is necessary to establish whether they complement each other inasmuch as each of them is intended to deal with one or more consequences of the normal pattern of competition and, by interacting, contribute to the realisation of the objectives intended within the framework of that overall plan. In that regard, it is necessary to take into account any circumstance capable of establishing or casting doubt on that complementary link, such as the period of application, the content (including the methods used) and, correlatively, the objective of the various actions in question.[1400]

### 14.2.   Application to this case

(1339)   For the reasons set out in Sections 11 to 13, the Commission concludes that the following conduct constitute separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement:

(1)   the tying of the Google Search app with the Play Store;

(2)   the tying of Google Chrome with the Play Store and the Google Search app;

(3)   the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations in the AFAs; and

(4)   the grant of revenue share payments to OEMs and MNOs on condition that they pre-installed no competing general search service on any device within an agreed portfolio.

(1340)   For the reasons set out in recitals (1341) to (1355), the Commission further concludes that these different forms of conduct described in Sections 11 to 13

---

[1399]   See Mobile Services Distribution Agreement between Google and [revenue share partner] […] and Google Android Search Revenue Share Agreement between Google and [revenue share partner] […].

[1400]   Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 892, referring to Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P *Aalborg Portland and Others* v *Commission*, EU:C:2004:6, paragraph 258; Joined Cases T-101/05 and T-111/05 *BASF and UCB* v *Commission* EU:T:2007:380, paragraphs 179 and 181.

**EN**                                                     302                                                     **EN**

constitute a single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement.

(1341)   First, the different forms of conduct described in Sections 11 to 13 pursue an identical objective, namely to protect and strengthen Google's dominant position in general search services[1401] and thus its revenues via search advertisements.[1402] Figure 25 illustrates the interplay of the different forms of conduct described in Sections 11 to 13 and the related flow of traffic, data and revenues to Google.

**Figure 25: Interplay between the different forms of conduct in Sections 11 to 13 and the related flow of traffic, data and revenues to Google[1403]**



(1342)   The fact that the different forms of conduct described in Sections 11 to 13 pursue an identical objective is confirmed by the elements set out in recitals (1343) to (1348).

(1343)   In the first place, contemporaneous evidence confirms[1404] that through the different forms of conduct described in Sections 11 to 13, Google implemented an overall "carrot-and-stick" strategy vis-à-vis hardware manufacturers and MNOs in order to

---

[1401]   This has also been observed by some industry analysts, which have characterised Google's Android strategy as the "building of moats" to protect "Google's economic castle": search, see Bill Gurley, "above the crowd" (24 March 2011), available at http://abovethecrowd.com/2011/03/24/freight-train-that-is-android/, printed and saved on 11 April 2016, see VW Staff, "How Strong Is The Moat Of Google Inc (GOOG)?" (23 January 2013), available at http://www.valuewalk.com/2013/01/how-strong-is-the-moat-of-google-inc-goog/?all=1, printed and saved on 12 April 2016; Stijn Schuermans, "Flatten, Expand, Mine: The three pillars of Google's strategy" (21 November 2011), available at http://www.visionmobile.com/blog/2011/11/flatten-expand-mine-the-three-pillars-of-googles-strategy/, printed and saved on 12 April 2016 and Vision Mobile, "Open Governance Index" (2011), available at http://www.visionmobile.com/blog/2011/07/the-open-governance-index-measuring-openness-from-android-to-webkit/, printed and saved on 11 April 2016.

[1402]   See presentation by [Google Executive], "Android Strategy and Partnerships Overview" (June 2009), pages 10 and 11 (Doc ID 1348-570): "*As a platform, it is not intended to directly generate any revenue for Google*" and "*Android drives revenues through search ads*".

[1403]   See complaint by OIP of 6 March 2017, page 19 (Doc ID 7285).

[1404]   See Google's internal document submitted in response to the request for information of 11 July 2014, Google internal presentation by [Google Executive], "Android – Answers to strategy questions for BOD", 8 October 2010, slides 5 and 6 (Doc ID 1790-397), titled: "*Carrots are healthy food, but carrying a stick can save lives*". See also Google internal confidential presentation "Android Eng All-hands", 10 November 2010, slides 13 and 14 (Doc ID 1367-1115).

GOOG-DOJ-26429466

protect and strengthen its dominant position in general search services. Google's carrots-and-stick strategy was summed up in the two slides depicted in Figure 26 taken from a 2010 presentation by [Google Executive]:[1405]

### Figure 26: Summary of Google's carrots-and-stick strategy





(1344)   In the second place, as one Google executive explained with respect to the implementation of one aspect of the carrot-and-stick strategy: *"Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic to Google."*[1406] Another Google executive described Google's intention to protect and strengthen its dominant position in general search services as follows:

---

[1405]   "Android – Answers to strategy questions for BOD", 8 October 2010, slides 5-6 (Doc ID 1790-397).
[1406]   Email of 26 April 2011, from [Google Executive] to [Google Executive] both Google business development (Doc ID 1362-440).

**EN**                                      304                                      **EN**

GOOG-DOJ-26429467

*"Every time I see an Android device shipping with Bing I die a little."*[1407]

(1345)   In the third place, as regards the tying of the Google Search app with the Play Store and the tying of Google Chrome with the Play Store and the Google Search app, this protects and strengthens Google's dominant position in the national markets for general search services because:

(1)   the Google Search app and Google Chrome are the two most important entry points for Google's general search service on Google Android devices;[1408] and

(2)   the tying of the Google Search app with the Play Store and of Google Chrome with the Play Store and the Google Search app ensures that an ever increasing percentage of smart mobile devices within the EEA were sold with the Google Search app and Google Chrome pre-installed (from approximately 46% in 2011 to approximately 80% in 2016).[1409]

(1346)   In the fourth place, as regards the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations, it ensures that Google's partners and competitors cannot develop Android forks outside of Google's control, and on which competing general search services could be pre-installed and set as default.[1410]

(1347)   In the fifth place, as regards the portfolio-based revenue share agreements, they ensure that no competing general search service was pre-installed on Google Android devices in addition to Google Search.[1411] As [Google Executive] described in an internal email to a colleague in Google's business development unit in 2011: *"The exclusive across all the android search entry points is very strategic to mobile search, the nightmare scenario is for [Microsoft] (or others) to come and scoop us by simply paying more, we know they have shown an appetite to do this in the past and will likely do so again to gain traction [...]. This contract is an exchange. Without the exclusivity, we are not "getting" anything. Without an exclusive search deal, a large carrier can and will ship alternatives to Google (as seen with Verizon, AT&T, and America Movil)."*[1412]

(1348)   In the sixth place, the different forms of conduct described in Sections 11 to 13 prevent competing general search services from acquiring traffic and valuable user data (see recitals (859), (860), (976), (1145) and (1315)). These traffic and valuable user data could be used by general search services to improve their product offering, thereby achieving better opportunities to compete with Google.[1413] For example, the

---

[1407]   Email of 9 August 2010, 3:56 AM from [Google Executive] to [Google Executive] (Doc ID 1305-1446).

[1408]   See recitals (799)(1), (973), (974) and (1234)(3).

[1409]   See footnote 438 (and also recitals (783) and (901)).

[1410]   See Google's internal document submitted in response to the request for information of 11 July 2014, Google internal presentation by [Google Executive], "Android – Answers to strategy questions for BOD", 8 October 2010, slide 5 (Doc ID 1790-397): *"Stop our partners and competitors from forking Android and going alone."*

[1411]   See Section 13.2.

[1412]   Email of 26 April 2011, 16:56, from [Google Executive] to [Google Executive] both Google business development (Doc ID 1362-440).

[1413]   See Amazon's non-confidential response to Question 5 of the request for information of 9 March 2017 (Doc ID 8247); Oracle's non-confidential response to Question 1 of the request for information of 24 March 2017 (Doc ID 7835). As to the different kind of data that Google collects, see recital (110) and Google's response to Question 25 of the request for information of 24 March 2017 (Doc ID 7790).

**EN**                                    305                                    **EN**

GOOG-DOJ-26429468

combination of different data gathered also through GMS devices helps Google to create "super-profiles" of Internet users in order to improve its behavioural advertising capabilities.[1414] The advertising, in turn, provides the revenues for Google's efforts to improve its services and collect more data (see recitals (109), (327), (328), (459), (688) to (691) and (695)).

(1349) Second, the different forms of conduct described in Sections 11 to 13 are complementary in that Google creates an interlocking interdependence between them. This is illustrated by a number of examples.

(1350) In the first place, in order to enter into a MADA, an OEM must enter into, and abide by the terms of an AFA.[1415] Hence, in order to be able to pre-install the Play Store and the other Google apps in the GMS, an OEM must enter into, and abide by the terms of both the AFA and the MADA.

(1351) In the second place, in order to enter into a revenue share agreement, an OEM had first to enter into a MADA (and thus also an AFA). Hence, in order to receive compensation for the pre-installation of the Google Search app on its devices an OEM had to enter into all three agreements: an AFA, a MADA and a revenue share agreement.

(1352) In the third place, if an OEM were to pre-install exclusively on one or more of its Android devices a competing general search service instead of Google Search, it would no longer be able to pre-install on those devices any of the mandatory Google apps and services, including the Play Store. The interdependence of revenue share agreement and MADA also allowed Google the pre-installation of its others apps and services without needing to pay for their pre-installation. If an OEM wanted to receive a revenue share for Google Search, it could not take Google Search alone but had to also pre-install Google's other mandatory apps and services without being remunerated. In addition, OEMs were prevented from offering exclusivity to any provider of apps and services that competed with the ones in the mandatory GMS bundle.

(1353) Third, the Commission's conclusion that the different forms of conduct described in Sections 11 to 13 constitute a single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement is not affected by Google's claims that:

(1) the objective of the different forms of conduct was to create an "*attractive, compatible, and vibrant*" mobile eco-system;[1416] and

(2) Google uses the data it collects in order to improve its general search service,

---

[1414] Oracle's non-confidential response to Question 1 of the request for information of 24 March 2017 (Doc ID 7835); see also complaint by Consumer Watchdog and Privacy Rights Clearing House with the US Federal Trade Commission against Google's change in its privacy policy allowing it to combine data (16 December 2016), available at http://www.consumerwatchdog.org/resources/ftc_google_complaint_12-5-2016docx.pdf, printed and saved on 3 July 2017.

[1415] See Section 6.3.1, and for example, Google's internal document submitted in response to the request for information of 11 July 2014, email of [Google Executive], of 11 February 2011 (Doc ID 1754-740): "*No support from google without AFA. No access to our [software] without AFA. No GMS agreement without AFA (They want and will need a GMS agreement to enable the low cost project).*"

[1416] Google's Response to the First Letter of Facts, Part Five, page 119, paragraphs 1-4 and page 121, paragraphs 9-12 (Doc ID 8598); Appendix 1 to Google's Response to the Statements of Facts (Doc ID 6555-2).

**EN**                                    306                                    **EN**

GOOG-DOJ-26429469

which is pro-competitive.[1417]

(1354) In the first place, there is no incompatibility between the Commission's conclusion that the different forms of conduct described in Sections 11 to 13 pursue the identical objective of protecting and strengthening Google's dominant position in general search services and Google's claim that they pursue the objective of creating an "*attractive, compatible, and vibrant*" mobile eco-system. Google developed Android precisely because it recognised the opportunities and risks that the shift in the focus of the Internet industry from PCs to smart mobile devices could bring about for its dominant position in general search services.[1418]

(1355) In the second place, it is irrelevant that Google uses the valuable user data it collects in order to improve its general search service. The Commission does not object to Google collecting data in order to improve its general search service but to the fact the different forms of conduct described in Sections 11 to 13 prevent competing general search services from acquiring traffic and valuable user data to expand and become or remain viable competitors.

**14.3.    Duration of the single and continuous infringement**

(1356) The Commission concludes that the duration of the single and continuous infringement is 2 748 days.

(1357) The start date of the single and continuous infringement is 1 January 2011. This is because since that date, Google: (i) holds a dominant position in the worldwide market (excluding China) for Android app stores and in each national market for general search services in the EEA; and (ii) was engaged in the following conduct:

(1) the tying of the Google Search app with the Play Store;

(2) the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations in the AFAs; and

(3) the grant of revenue share payments to OEMs and MNOs on condition that they pre-installed no competing general search service on any device within an agreed portfolio.

(1358) The single and continuous infringement is still ongoing as Google continues to engage in the following conduct:

(1) the tying of the Google Search app with the Play Store;

(2) the tying of Google Chrome with the Play Store and the Google Search app; and

(3) the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations in the AFAs.

(1359) While Google contests each of the separate infringements, it does not contest the Commission's conclusions set out in this Section with respect to the duration of the single and continuous infringement.

---

[1417] Google's Response to the First Letter of Facts, Part Five, page 120, paragraphs 5-8 (Doc ID 8598).
[1418] See recitals (113) to (117).

GOOG-DOJ-26429470

## 15.    JURISDICTION

### 15.1.    Principles

(1360)    The Union competition rules set out in Articles 101 and 102 TFEU are intended to prevent collective or unilateral conduct of undertakings limiting competition within the internal market. While Article 101 TFEU prohibits agreements and practices which have as their object or effect the prevention, restriction or distortion of competition 'within the internal market', Article 102 TFEU prohibits the abuse of a dominant position 'within the internal market or in a substantial part of it'.[1419]

(1361)    In order to justify the Commission's jurisdiction, it is sufficient that a conduct is either implemented in the EEA ("implementation test") or is liable to have immediate, substantial and foreseeable effects in the EEA ("qualified effects test").[1420] These two approaches for establishing the Commission's jurisdiction are alternative.[1421]

(1362)    The criterion of implementation is satisfied by mere sale within the Union, irrespective of the location of sources of supply or of production plants.[1422]

(1363)    The qualified effects test allows the application of Union competition law to be justified under public international law when it is foreseeable that the conduct in question will have an immediate and substantial effect in the Union.[1423] In this regard, it is sufficient to take account of the probable effects of conduct on competition in order for the foreseeability criterion to be satisfied.[1424]

### 15.2.    Application to this case

(1364)    The Commission concludes that it has jurisdiction to apply Article 102 TFEU and Article 54 and of the EEA Agreement to Google's conduct as described in this Decision.

(1365)    First, Google's conduct is implemented in the EEA, given that OEMs and MNOs had to comply with the terms of the AFAs, MADAs and portfolio-based revenue sharing agreements when supplying devices in the EEA.

(1366)    Second, Google's conduct is capable of having substantial, immediate and foreseeable effects in the EEA.

(1367)    In the first place, Google's conduct is capable of having substantial effects in the EEA, given that Google Android devices sold into the EEA represented between 45% and 76% of smart mobile devices sold into the EEA between 2011 and 2017.[1425]

(1368)    In the second place, Google's conduct is capable of having immediate effects in the EEA given that the AFAs, MADAs and portfolio-based revenue sharing agreements

---

[1419]    Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 42.
[1420]    Joined Cases 89/85, 104/85, 114/85, 116/85, 117/85 and 125/85 to 129/85 *Ahlström Osakeyhtiö and Others* v *Commission*, EU:C:1988:447, paragraphs 11 to 18; Case T-102/96 *Gencor* v *Commission* EU:T:1999:65, paragraphs 89 to 101.
[1421]    Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraphs 40-46.
[1422]    Joined Cases 89/85, 104/85, 114/85, 116/85, 117/85 and 125/85 to 129/85 *Ahlström Osakeyhtiö and Others (Wood Pulp)* v *Commission*, EU:C:1988:447, paragraph 17; Case T-102/96 *Gencor* v *Commission* EU:T:1999:65, paragraph 87.
[1423]    Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 49.
[1424]    Case C-413/14 P *Intel Corp. v Commission*, EU:C:2017:632, paragraph 51.
[1425]    Source: […] data (Doc ID 7866 and 7867).

**EN**

**EN**

GOOG-DOJ-26429471

influenced the behaviour of OEMs and MNOs (see Sections 11, 12 and 13), including those active in the EEA.

(1369)   In the third place, Google's conduct is capable of having foreseeable effects in the EEA, given that OEMs and MNOs had to comply with the terms of the AFAs, MADAs and portfolio-based revenue sharing agreements when supplying devices into the EEA.

(1370)   Third, the Commission's conclusion that it has jurisdiction to apply Article 102 TFEU and Article 54 of the EEA Agreement to Google's conduct described in this Decision is not affected by Google's claims that:

(1)    the majority of the AFAs, MADAs and portfolio-based revenue sharing agreements were concluded and implemented outside the EEA; and

(2)    the Commission has not demonstrated that Google's conduct would harm competition immediately, substantially and foreseeably.[1426]

(1371)   In the first place, the fact that Google's agreements with OEMs and MNOs were concluded outside the EEA is irrelevant as the AFAs, MADAs and portfolio-based revenue sharing agreements were implemented in the EEA, given that OEMs and MNOs had to comply with the terms of their agreements with Google when supplying devices into the EEA.

(1372)   In the second place, the Commission only has to demonstrate that Google's conduct is capable of having substantial, immediate and foreseeable effects in the EEA, not that Google's conduct would harm competition immediately, substantially and foreseeably.

## 16.    EFFECT ON TRADE BETWEEN MEMBER STATES

(1373)   According to settled case-law, the effect on trade criterion consists of three elements.

(1374)   First, "*trade*" must be affected. The concept of trade is not limited to traditional exchanges of goods and services across borders, but covers all cross-border economic activity. It also encompasses practices affecting the competitive structure of the internal market by eliminating or threatening to eliminate a competitor operating within the territory of the Union.[1427]

(1375)   Second, a practice must be capable of having an effect on trade between Member States.[1428] In other words, it must be foreseeable with a sufficient degree of probability on the basis of a set of objective factors of law or fact that the practice in question has an influence, direct or indirect, actual or potential, on the pattern of trade between Member States.[1429] Where a dominant undertaking engages in exclusionary conduct in more than one Member State, such conduct is normally, by

---

[1426]   Google's Response to the Statement of Objections, Part Six, pages 302-306 (Doc ID 7117).

[1427]   Joined Cases 6/73 and 7/73 *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v Commission*, EU:C:1974:18, paragraphs 32-33; Joined Cases T-24/93 and others *Compagnie Maritime Belge v Commission*, EU:T:1996:139, paragraph 203.

[1428]   Case 322/81 *NV Nederlandsche Banden Industrie Michelin v Commission*, EU:C:1983:313, paragraph 104; Case C-41/90 *Höfner and Elsner v Macrotron*, EU:C:1991:161, paragraph 32; and Case T-228/97 *Irish Sugar v Commission*, EU:T:1999:246, paragraph 170.

[1429]   Case 5/69 *Franz Völk v Établissement J. Vervaecke* EU:C:1969:35, paragraph 5/7.

GOOG-DOJ-26429472

its very nature, capable of affecting trade between Member States.[1430]

(1376) Third, the effect on trade between Member States must be "*appreciable*". This is assessed primarily with reference to the position of an undertaking on a relevant product market.[1431] The stronger the position of an undertaking, the more likely it is that the effect on trade between Member States of a practice will be appreciable.[1432]

(1377) In the present case, the Commission concludes that the different forms of conduct described in Sections 11 to 13 separately and collectively have an appreciable effect on trade between Member States for the reasons set out in recitals (1378) to (1381).

(1378) First, Google's economic activities related to smart mobile OSs, app stores, general search and browsers are, by their very nature, cross-border in scope.

(1379) Second, the different forms of conduct described in Sections 11 to 13 affect the competitive structure of the internal market by eliminating or threatening to eliminate competitors operating within the territory of the European Union.

(1380) Third, the different forms of conduct described in Sections 11 to 13 have been implemented in all Member States.

(1381) Fourth, since 2011, Google holds a dominant position in the worldwide market (excluding China) for the licensing of smart mobile OSs, the worldwide market (excluding China) for Android app stores and in each national market for general search services in the EEA.

(1382) Google does not contest the Commission's conclusions as outlined in this Section.

## 17. ADDRESSEES

### 17.1. Principles

(1383) Article 102 TFEU is addressed to undertakings. The concept of an undertaking refers to any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed.[1433] The term "undertaking" must also be understood as designating an economic unit even if in law that economic unit consists of several persons, natural or legal.[1434]

(1384) When such an economic entity infringes the competition rules, it falls, according to the principle of personal responsibility, to that entity to answer for that infringement.[1435] However, the infringement of competition law must be imputed unequivocally to a legal person on whom fines may be imposed and the statement of objections must be addressed to that person. It is also necessary that the statement of objections indicates in which capacity a legal person is called on to answer the

---

[1430]   Guidelines on the effect on trade concept contained in Articles 81 and 82 of the Treaty, OJ C 101, 27.4.2004, p. 81, paragraph 75.

[1431]   Case 5/69 *Franz Völk v Établissement J. Vervaecke*, EU:C:1969:35, paragraph 5/7.

[1432]   Case T-65/89 *BPB Industries and British Gypsum v Commission*, EU:T:1993:31, paragraph 138.

[1433]   Case C-90/09 P *General Química and Others v Commission*, EU:C:2011:21, paragraph 34 and the case-law cited.

[1434]   Case C-90/09 P *General Química and Others* v *Commission*, EU:C:2011:21, paragraph 35 and the case-law cited.

[1435]   Case C-90/09 P *General Química and Others* v *Commission*, EU:C:2011:21, paragraph 36 and the case-law cited.

**EN**

**EN**

GOOG-DOJ-26429473

allegations.[1436]

(1385) The principle of economic continuity means that liability may be attributed to the legal successor of the legal person responsible for the infringement of the competition rules.[1437]

(1386) A parent company that owns 100% (or almost 100%) of a subsidiary has the ability to exercise decisive control over such subsidiary. In such a case, there exists a rebuttable presumption that the parent company also in fact exercises that control without the need for the Commission to adduce further evidence on the actual exercise of control (the parental liability presumption).[1438]

## 17.2.   Application to this case

(1387) For the reasons set out in this Decision, the Commission concludes that Google LLC, as the legal successor of Google Inc., has directly participated in the separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13 and the single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement described in Section 14.2.

(1388) The Commission also holds Alphabet Inc. jointly and severally liable as of 2 October 2015 for the separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13 and the single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement described in Section 14.2.

(1389) Alphabet Inc. holds 100% of Google since 2 October 2015 and is therefore presumed to exercise decisive influence over Google LLC, the legal successor of Google Inc., since that date. Alphabet has not provided any evidence to rebut the presumption that it has exercised decisive influence over Google since that date.

## 18.   REMEDIES

## 18.1.   Principles

(1390) Article 7(1) of Regulation (EC) No 1/2003 provides that where the Commission finds that there is an infringement of Article 102 TFEU and Article 54 of the EEA Agreement it may, by decision, require the undertaking concerned to bring such infringement to an end. For this purpose, it may also impose on the undertaking concerned any behavioural or structural remedies which are proportionate to the infringement committed and necessary to bring the infringement effectively to an end.

(1391) It follows that a decision pursuant to Article 7(1) of Regulation (EC) No 1/2003 may include an order to "*do certain acts or provide certain advantages which have been wrongfully withheld as well as prohibiting the continuation of certain action, practices or situations which are contrary to the Treaty*".[1439] The Commission may

---

[1436]   Case C-97/08 P *Akzo Nobel and Others v Commission*, EU:C:2009:536, paragraph 57.

[1437]   Case C-448/11 P *SNIA v Commission*, EU:C:2013:801, paragraph 22.

[1438]   Case C-90/09 P *General Química and Others* v *Commission*, EU:C:2011:21, paragraph 39-40 and the case-law cited.

[1439]   Joined Cases 6/73 and 7/73 *Commercial Solvents*, EU:C:1974:18, paragraph 45; Joined Cases C-241/91 P and C-242/91 P *RTE and ITP v Commission*, EU:C:1995:98, paragraph 90.

**EN**

311

**EN**

require the undertaking concerned to submit to it proposals with a view to bringing the situation into conformity with the requirements of the Treaty.[1440]

(1392)   The requirement that a remedy has to be effective[1441] empowers the Commission to require an undertaking to refrain from adopting any measures having an equivalent object or effect as the conduct identified as abusive.[1442] Any remedy must also apply in relation to the infringement that has been established[1443] and be proportionate to the objective sought, namely re-establishment of compliance with the rules infringed.[1444] If anti-competitive effects continue after the practices which caused them have ceased, the Commission remains competent to act with a view to eliminating or neutralising them.[1445]

## 18.2.   Application to this case

(1393)   Google and Alphabet should be required to bring the separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13 and the single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement described in Section 14.2 (together referred to hereinafter as the "Infringement") effectively to an end, if they have not already done so, and to refrain from adopting any practice or measure having an equivalent object or effect.[1446] In the event that Google and Alphabet were not to bring the Infringement effectively to an end or were to adopt a practice or measure having an equivalent object or effect, the Commission may by decision impose any remedies which are proportionate and necessary to bring the Infringement or that practice or measure effectively to an end.

### 18.2.1.   *Remedies concerning tying relating to Google's proprietary mobile apps*

(1394)   Google and Alphabet should refrain from licensing the Play Store to hardware manufacturers only on condition that they pre-install the Google Search app.

(1395)   Second, Google and Alphabet should refrain from licensing the Play Store and/or the Google Search app to hardware manufacturers only on condition that they pre-install Google Chrome.

(1396)   Third, Google and Alphabet should refrain from adopting any practice or measure having an equivalent object or effect. This shall include at least the following:

(1)   Google and Alphabet cannot make the obtaining by hardware manufacturers and users of the Google Search app with the Play Store conditional on any payment or discount that would remove or restrict the freedom of hardware manufacturers and users to pre-install the Play Store without the Google Search app;

(2)   Google and Alphabet cannot punish or threaten hardware manufacturers and users that pre-install the Play Store without the Google Search app, including by making use of one or more of Google's other proprietary apps, APIs, the

---

[1440]   Joined Cases 6/73 and 7/73 *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v Commission*, EU:C:1974:18, paragraph 45.
[1441]   Joined Cases 6/73 and 7/73 *Commercial Solvents*, EU:C:1974:18, paragraph 46.
[1442]   Case T-83/91 *Tetra Pak v Commission*, EU:T:1994:246 paragraphs 220-21.
[1443]   Joined Cases 6/73 and 7/73 *Commercial Solvents*, EU:C:1974:18, paragraph 45.
[1444]   Joined Cases C-241/91 P and C-242/91 P *RTE and ITP v Commission*, EU:C:1995:98, paragraph 93.
[1445]   Case C-119/97 P *Ufex and Others v Commission*, EU:C:1999:116, paragraph 94.
[1446]   Case T-83/91 *Tetra Pak*, :EU:T:1994:226, paragraphs 217-222.

**EN**

**EN**

GOOG-DOJ-26429475

Android SDK or the Android PDK;

(3)   Google and Alphabet cannot make the obtaining by hardware manufacturers and users of Google Chrome with the Play Store and/or the Google Search app conditional on any payment or discount that would remove or restrict the freedom of hardware manufacturers and users to pre-install the Play Store and/or the Google Search app without Google Chrome; and

(4)   Google and Alphabet cannot punish or threaten hardware manufacturers or users that pre-install obtain the Play Store and/or the Google Search app without Google Chrome, including by making use of one or more of Google's other proprietary apps, APIs, the Android SDK or the Android PDK.

(1397)   Recitals (1394) to (1396) are without prejudice to any proportionate and necessary remedies that the Commission may by decision impose in the event that Google and Alphabet were not to bring the Infringement effectively to an end or would adopt a practice or measure having an equivalent object or effect.

*18.2.2.   Remedies concerning the licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations in the AFAs*

(1398)   First, Google and Alphabet should refrain from licensing of the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations in the AFAs. This shall not affect Google's ability to put in place reasonable, fair and objective measures that would only be limited in scope to GMS devices and that would not, therefore, affect hardware manufacturers' commercial freedom to sell non-GMS devices based on Android forks.

(1399)   Second, Google and Alphabet should refrain from adopting any practice or measure having an equivalent object or effect. This shall include at least the following:

(1)   Google and Alphabet must refrain from licensing the Play Store and the Google Search app on condition that hardware manufacturers enter into the anti-fragmentation obligations contained in any other agreements (e.g. MADAs or revenue sharing agreements);

(2)   Google and Alphabet cannot make the grant of a royalty-free or discounted licence to the Play Store or the Google Search app conditional on an obligation not to sell devices based on Android forks;

(3)   Google and Alphabet cannot make the obligation not to sell devices based on Android forks conditional on any payment or discount;

(4)   Google and Alphabet cannot use one or more of Google's other proprietary apps, APIs, the Android SDK or the Android PDK to remove or restrict the freedom of hardware manufacturers to sell devices based on Android forks;

(5)   Google and Alphabet cannot impose on hardware manufacturers any obligation to pre-install one or more of Google's proprietary apps that would remove or restrict the freedom of third parties to sell devices based on Android forks; and

(6)   Google and Alphabet cannot punish or threaten hardware manufacturers that sell devices based on Android forks.

(1400)   Recitals (1398) and (1399) are without prejudice to any proportionate and necessary remedies that the Commission may by decision impose in the event that Google and

**EN**                                          313                                          **EN**

GOOG-DOJ-26429476

Alphabet were not to bring the Infringement effectively to an end or would adopt a practice or measure having an equivalent object or effect.

18.2.3. *Remedies concerning revenue share agreements conditional on the exclusive pre-installation of Google Search*

(1401) First, to the extent that Google and Alphabet have not already done so, Google and Alphabet should refrain from granting payments to OEMs and MNOs on condition that they pre-install no competing general search service on any device within an agreed portfolio.

(1402) Second, Google and Alphabet should refrain from adopting any practice or measure having an equivalent object or effect.

(1403) This is without prejudice to any proportionate and necessary remedies that the Commission may by decision impose in the event that Google and Alphabet were not to bring the Infringement effectively to an end or would adopt a practice or measure having an equivalent object or effect.

18.2.4. *Implementation of the remedies*

(1404) Google and Alphabet are granted 90 days from the date of the notification of this Decision to implement measures that bring the Infringement effectively to an end. A 90 days period is appropriate to implement such measures, given that Google may have to put in place certain technical arrangements, in addition to the removal of the contractual conditions from Google's agreements with OEMs.[1447]

(1405) Google and Alphabet should be required to notify the Commission, within 60 days from the date of notification of this Decision, of the measures by means of which they intend to bring the Infringement effectively to an end. That communication should be sufficiently reasoned and detailed to enable the Commission to make a preliminary assessment as to whether those measures will ensure that the Infringement is brought to an end effectively and in accordance with the principles set out in Sections 18.2.1 to 18.2.3. Any statements by the Commission to Google and Alphabet or silence on the part of the Commission between the 60 day deadline and 90 day deadline should not be interpreted as an indication that the intended measures communicated by Google and Alphabet will ensure that the Infringement is brought to an end effectively.

(1406) The Commission is entitled to monitor the implementation by Google and Alphabet of the remedies ordered in this Decision. For those purposes, it is entitled to use the powers of investigation provided for in Regulation No (EC) 1/2003.[1448]

(1407) Considering the variety of the measures that Google and Alphabet may take to bring the Infringement effectively to an end, Google and Alphabet should provide the Commission with periodic reports on the measures taken to ensure compliance with this Decision. The first of those reports should be submitted on the day when Google and Alphabet bring the Infringement effectively to an end. Thereafter, reports should be submitted every six months for a period of five years from the date of submission of the first report.

---

[1447]   Google's letter of 20 June 2018 (Doc ID 8906).
[1448]   Case T-201/04, *Microsoft v Commission*, EU:T:2007:289, paragraph 1265.

**EN**                                    314                                    **EN**

GOOG-DOJ-26429477

## 19.   PERIODIC PENALTY PAYMENTS

### 19.1.   Principles

(1408)   Pursuant to Article 24(1)(a) of Regulation (EC) No 1/2003 and Article 5 of Council Regulation (EC) No 2894/94, the Commission may, by decision, impose on undertakings or associations of undertakings periodic penalty payments not exceeding 5% of the average daily turnover in the preceding business year per day and calculated from the day specified in the decision, in order to compel them to put an end to an infringement, in accordance with a decision taken pursuant to Article 7 of Regulation (EC) No 1/2003.

### 19.2.   Application to this case

(1409)   The Commission concludes that it is necessary to impose periodic penalty payments pursuant to Article 24(1)(a) of Regulation (EC) No 1/2003 and Article 5 of Council Regulation (EC) No 2894/94 if Google and Alphabet were to fail to: (i) implement measures that bring the Infringement effectively to an end within 90 days from the date of notification of this Decision; (ii) notify the Commission within 60 days from the date of notification of this Decision of the specific measures by means of which they intend to bring the Infringement effectively to an end; and (iii) provide the Commission with periodic reports every six months, for a period of five years, on the action taken to comply with this Decision.

(1410)   In setting the level of the periodic penalty payments, the Commission has taken into account the need to impose periodic penalty payments sufficient to ensure compliance by Google and Alphabet with this Decision. The Commission has also taken into account the need to set periodic penalty payments that are sufficient to ensure compliance by other undertakings of a similar size and with similar financial resources.

(1411)   Consequently, if Google and Alphabet were to fail to comply with any of the requirements set out in recital (1409), the Commission hereby imposes a daily periodic penalty payment of 5% of Alphabet's average daily turnover in the business year preceding such failure to comply.

## 20.   FINES

### 20.1.   Principles

(1412)   Pursuant to Article 23(2)(a) of Regulation (EC) No 1/2003 and Article 5 of Council Regulation (EC) No 2894/94 of 28 November 1994 concerning arrangements for implementing the EEA Agreement,[1449] the Commission may by decision impose fines on undertakings, where, either intentionally or negligently, they infringe Article 102 TFEU and Article 54 of the EEA Agreement.

(1413)   An infringement of Article 102 of the Treaty or Article 54 of the EEA Agreement is committed intentionally or negligently where the undertaking concerned cannot be unaware of the anticompetitive nature of its conduct, whether or not it was aware that it was infringing the competition rules of the Treaty.[1450] Regarding an undertaking in

---

[1449]   OJ L 305, 30.11.1994, p. 6.
[1450]   Case T-83/91, *Tetra Pak v Commission*, EU:T:1994:246, paragraph 239, upheld on appeal in Case C-333/94 P, EU:C:1996:246, paragraph 48; Case T-229/94 *Deutsche Bahn v Commission*,

GOOG-DOJ-26429478

a dominant position, the undertaking is aware of the anti-competitive nature of its conduct where it is aware of the essential facts justifying both the finding of a dominant position on the relevant market and the finding by the Commission of an abuse of that dominant position.[1451]

(1414) Where the Commission establishes the existence of a single and continuous infringement consisting of several separate infringements, it may impose a single fine and is not required to break down the amount of the fine between the separate infringements or to state specifically how it took into account each of the separate infringements.[1452]

(1415) Pursuant to Article 23(3) of Regulation (EC) No 1/2003, in fixing the amount of the fines, the Commission must have regard to all relevant circumstances and particularly to the gravity and the duration of the infringement. In doing so, the Commission sets the fines at a level sufficient to ensure deterrence. The Commission ensures that any aggravating or mitigating circumstances are reflected in the fines imposed.

(1416) In setting the fines to be imposed, the Commission will refer to the principles laid down in its Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003 ("the Guidelines on Fines").[1453]

(1417) First, the Commission defines the basic amount of the fine.[1454] That amount is to be set by reference to the value of sales,[1455] that is, the value of the undertaking's sales of goods or services to which the infringement directly or indirectly relates in the relevant geographic area in the EEA. The value of sales will be assessed before VAT and other taxes directly related to the sales.[1456]

(1418) In determining the basic amount of the fine to be imposed, the Commission takes the value of the undertaking's sales to which the infringement directly or indirectly relates in the relevant geographic area within the EEA.

(1419) The amount of the value of sales taken into account corresponds to a percentage which may be set at a level of up to 30% of the value of sales.[1457] The choice of a

---

EU:T:1997:155, paragraph 130; Case T-271/03, *Deutsche Telekom v Commission*, EU:T:2008:101, paragraph 295 upheld on appeal in Case C-280/08 P, EU:C:2010:603, paragraph 124; Case T-336/07, *Telefónica SA v Commission*, EU:T:2012:172, paragraph 319, upheld on appeal in Case C-295/12 P, EU:C:2014:2062, paragraph 156; Case C-681/11 *Schenker & Co. and Others*, EU:C:2013:404, paragraph 37; Case T-286/09, *Intel Corp. v Commission*, EU:T:2014:547, paragraph 1601; Case T-472/13 *Lundbeck v Commission*, EU:T:2016:449, paragraph 762.

[1451] Case 322/81, *NV Nederlandsche Banden Industrie Michelin v Commission*, EU:C:1983:313, paragraph 107; Case T-336/07, *Telefónica SA v Commission*, EU:T:2012:172, paragraph 320; Case T-286/09, *Intel Corp. v Commission*, EU:T:2014:547, paragraph 1601.

[1452] Joined Cases 100/80 to 103/80 *Musique Diffusion française and Others v Commission*, EU:C:1983:29, paragraph 127; Case T-83/91 *Tetra Pak v Commission*, EU:T:1994:246, paragraph 236; Joined Cases T 25/95 etc *Cimenteries CBR and Others v Commission*, EU:T:2000:77, paragraph 4761; Case T-203/01 *Michelin v Commission*, EU:T:2003:250, paragraph 265; Case T-73/04 *Carbone-Lorraine v Commission*, EU:T:2008:416, paragraphs 47-48; Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 906; Case T-446/05 *Amann & Söhne and Cousin Filterie v Commission*, EU:T:2010:165, paragraphs 154-155.

[1453] OJ C 210, 1.9.2006, p. 2.

[1454] Paragraph 10 of the Guidelines on Fines.

[1455] Paragraph 13 of the Guidelines on Fines.

[1456] Paragraph 17 of the Guidelines on Fines.

[1457] Paragraph 21 of the Guidelines on Fines.

GOOG-DOJ-26429479

given percentage will depend on the degree of gravity of the infringement.

(1420)   The proportion of the value of sales resulting from that percentage will then be multiplied by the duration of the infringement.[1458]

(1421)   The Commission may also include in the basic amount an additional amount of 15% to 25% of the value of sales, irrespective of duration.[1459]

(1422)   Second, where applicable, the Commission will adjust the basic amount upwards or downwards to take into account aggravating or mitigating circumstances.[1460] Those circumstances are listed non-exhaustively in points 28 and 29 of the Guidelines on Fines.[1461]

(1423)   Third, the Commission is particularly concerned with the need to ensure that fines have a sufficiently deterrent effect. To that end, the Commission may increase the fine to be imposed on an undertaking which has a particularly large turnover beyond the sales of goods or services to which the infringement relates.[1462]

(1424)   Fourth, pursuant to Article 23(2) of Regulation (EC) No 1/2003, the fine for an infringement shall not exceed 10% of the undertaking's total turnover in the preceding business year.

## 20.2.    Intent or negligence

(1425)   In the present case, the Commission concludes that, contrary to what Google claims,[1463] Google and Alphabet have committed the Infringement intentionally or at least negligently.

(1426)   First, Google and Alphabet could or should not have been unaware of the fact that Google held a dominant position in at least the worldwide market (excluding China) for Android app stores and the national markets for general search services in the EEA (see Section 9).

(1427)   In the first place, Google and Alphabet ought to have been familiar with the principles governing market definition in competition cases and, where necessary, taken appropriate legal advice regarding the definition of the markets for Android app stores and for general search services.[1464]

(1428)   In the second place, Google and Alphabet ought to have been familiar with the significance of Google's strong and stable market shares in the worldwide market (excluding China) for Android app stores and the national markets for general search services in the EEA.[1465]

(1429)   In the third place, it is irrelevant that past merger decisions left open the possible existence of a separate market for licensable smart mobile OSs. This is because the Decision does not establish that Google's conduct constitutes an abuse of its dominant position in the worldwide market (excluding China) for the licensing of

---

[1458]    Paragraph 19 of the Guidelines on Fines.
[1459]    Paragraph 25 of the Guidelines on Fines.
[1460]    Paragraph 27 of the Guidelines on Fines.
[1461]    Paragraph 11 of the Guidelines on Fines.
[1462]    Paragraph 30 of the Guidelines on Fines.
[1463]    Google's Response to the Statement of Objections, Part Six, pages 308-319 (Doc ID 7117).
[1464]    Case T-336/07 *Telefónica SA v Commission*, EU:T:2012:172, paragraph 323.
[1465]    Case T-336/07 *Telefónica SA v Commission*, EU:T:2012:172, paragraphs 324-325.

EN

EN

GOOG-DOJ-26429480

smart mobile OSs, only in the worldwide market (excluding China) for Android app stores and the national markets for general search services in the EEA.

(1430)   Moreover, and in any event:

(1)   in the *Google / Motorola Mobility* merger decision, the Commission left open whether licensable and non-licensable smart mobile OSs should be considered as part of the same market;[1466] and

(2)   In the *Microsoft / Nokia* merger decision, the Commission both left open whether licensable and non-licensable smart mobile OSs should be considered as part of the same market and stated that "*Android was in 2012 by far the dominant OS with upwards of 80-90% of the market*".[1467]

(1431)   Second, the conduct described in Sections 11 to 13 consists of agreements voluntarily entered into by Google.

(1432)   Third, Google and Alphabet could or should not have been unaware of the fact that the conduct described in: (i) Section 11.3 constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores; (ii) Section 11.4 constitutes an abuse of Google's dominant position in the worldwide market (excluding China) for Android app stores and in the national markets for general search services; (iii) Section 12 constitutes an abuse of Google's dominant positions in the worldwide market (excluding China) for Android app stores and the national markets for general search services; and (iv) Section 13 constituted an abuse of Google's dominant position in the national markets for general search services. The Commission and the Court of Justice of the European Union have repeatedly condemned practices by undertakings in a dominant position that abusively tie two products or services,[1468] make the conclusion of a contract concerning a product or service subject to the acceptance of a supplementary obligation[1469] and make payments conditional on exclusivity.[1470]

## 20.3.   Calculation of the fine

### 20.3.1.   *Joint and several liability*

(1433)   The Commission has concluded that Alphabet is jointly and severally liable for the Infringement as of 2 October 2015 (see Section 17.2).

(1434)   The Commission therefore concludes that Google and Alphabet should be held jointly and severally liable to pay the fine insofar as it relates to the period from that date.

### 20.3.2.   *Single fine*

(1435)   Given that the different forms of conduct constituting the single and continuous infringement, consisting of the infringements of Article 102 TFEU and Article 54 of

---

[1466]   Case M.6381 – Google / Motorola Mobility, recital 30.

[1467]   Case M.7047 – Microsoft / Nokia, recital 102.

[1468]   Case T-30/89 *Hilti* v *Commission*, EU:T:1991:70; Case T-83/91 *Tetra Pak v Commission*, EU:T:1994:246; Case C-333/94 P *Tetra Pak v Commission*, EU:C:1996:436; and Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289.

[1469]   Ibid.

[1470]   Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36; Case T-66/01 *Imperial Chemical Industries v Commission*, EU:T:2010:255.

**EN**

**EN**

GOOG-DOJ-26429481

the EEA Agreement described in Sections 11 to 13, pursue an identical objective, namely to protect and strengthen Google's position in general search services and thus its revenues via search advertisements (see recital (1341)), the Commission therefore concludes that a single fine should be imposed on Google and Alphabet.

20.3.3. *Determination of the basic amount of the fine*

20.3.4. *Value of sales*

(1436)   The Commission concludes that the Infringement directly or indirectly relates to at least the gross revenues generated by Google on GMS devices via clicks on search advertisements drawn from Google's auction-based online search advertising platform, AdWords. This is because the Infringement pursues an identical objective, namely to protect and strengthen Google's position in general search services and thus its revenues via search advertisements.

(1437)   For the purpose of the value of sales, the Commission therefore uses the gross revenues generated by Google on GMS devices via clicks on search advertisements when users, located in the EEA, click on such advertisements, irrespective of whether those advertisements are displayed on google.com or a Google national website in the EEA.[1471]

(1438)   The Commission's conclusion that the Infringement directly or indirectly relates to at least the gross revenues generated by Google on GMS devices via clicks on search advertisements drawn from Google's auction-based online search advertising platform, AdWords, is not affected by Google's claims that the Commission ought to exclude from the value of sales:

(1)   revenues generated via clicks on search advertisements when users navigate to Google Search by typing the Google URL into a mobile web browser;[1472] and

(2)   payments made by Google for the placement of its search advertisements on non-Google, third-party, websites ("traffic acquisition costs").[1473]

(1439)   First, the Commission is entitled to include in the value of sales revenues generated by Google on GMS devices via clicks on search advertisements when users navigate to Google Search by typing the Google URL into a mobile web browser. This is because the Infringement helps to maintain and strengthen Google's dominant position in each national market for general search services, markets which include all search entry points.

(1440)   Second, the Commission is entitled to include in the value of sales Google's gross revenues including traffic acquisition costs, for the reasons set out in recitals (1441) to (1444).

(1441)   In the first place, the wording of the second subparagraph of Article 23(2) of Regulation No 1/2003 refers to the total turnover of the undertaking concerned, without any deduction.[1474]

(1442)   In the second place, and in any event, Google's traffic acquisition costs are an

---

[1471]   The Commission used the revenues provided by the Google in response to its request for information of 5 April 2018 (Doc ID 8850).

[1472]   Google's Response to the Statement of Objections, Part Six, page 321 (Doc ID 7117).

[1473]   See Google's response to the request for information of 5 April 2018 (Doc ID 8850).

[1474]   Case T-410/09 *Almamet v Commission*, EU:T:2012:676, paragraph 225.

**EN**                                    319                                    **EN**

GOOG-DOJ-26429482

integral part of Google's search revenues and a component of the price charged to advertisers for Google's services.[1475] Consequently, traffic acquisition costs are a component of the overall sales price.[1476]

(1443) In the third place, it is irrelevant whether traffic acquisition costs constitute a significant part of Google's gross revenues[1477] or that such costs are predetermined as a specific portion of Google's gross revenues and thus readily identifiable.[1478]

(1444) In the fourth place, not to take gross turnover into account in some cases (but to do so in others) would require a threshold to be established, in the form of a ratio between net and gross turnover, which would be difficult to apply and would give scope for endless and insoluble disputes.[1479]

### 20.3.5.  *The last full year*

(1445) The Commission concludes that, contrary to Google's claim,[1480] there are no exceptional reasons to deviate from the basic principle that the fine should be based on Google's gross revenues generated on GMS devices via clicks on search advertisements in 2017, the last full business year of the single and continuous infringement.[1481]

(1446) Google's gross revenues generated on GMS devices via clicks on search advertisements in 2017 reflect economic reality because they take into account the size and economic power of Google and Alphabet and the scale of the Infringement.

### 20.3.6.  *Gravity*

(1447) The Commission concludes that the proportion of the value of sales to be used to establish the basic amount of the fine should be 11%.

(1448) In reaching this conclusion, the Commission takes into account the factors set out in recitals (1449) to (1460).

(1449) First, the relevant markets affected by the Infringement are of significant economic importance. This means that any anticompetitive behaviour on these markets is likely to have had a considerable impact.

(1450) Second, the Commission and the Court of Justice of the European Union have already repeatedly condemned practices by undertakings in a dominant position that make the conclusion of a contract concerning a product or service subject to the

---

[1475] Joined Cases T 25/95 etc *Cimenteries CBR and Others v Commission*, EU:T:2000:77, paragraph 5030.

[1476] Case T-406/08 *ICF v Commission*, EU:T:2013:322, paragraphs 175-176; Case T-410/09 *Almamet v Commission*, EU:T:2012:676, paragraph 225.

[1477] Case T-254/12 *Kühne + Nagel International and Others v Commission*, EU:T:2016:113, paragraph 247, confirmed on appeal in Case C-261/16 P, EU:C:2018:56, paragraphs 80-85; Case T-265/12 *Schenker v Commission*, EU:T:2016:111, paragraph 263; Case T-267/12 *Deutsche Bahn and Others v Commission*, EU:T:2016:110, paragraph 207; Case T-270/12 *Panalpina World Transport (Holding) and Others v Commission*, EU:T:2016:109, paragraph 131.

[1478] Case T-254/12 *Kühne + Nagel International and Others v Commission*, EU:T:2016:113, paragraph 251; Case T-270/12 *Panalpina World Transport (Holding) and Others v Commission*, EU:T:2016:109, paragraph 132.

[1479] Case C-272/09 P *KME Germany and Others v Commission*, EU:C:2011:810, paragraph 53; Case C-389/10 P *KME Germany and Others v Commission*, EU:C:2011:816, paragraph 62.

[1480] Google's Response to the Statement of Objections, Part Seven, pages 325-326, paragraph 52-54 (Doc ID 7117).

[1481] Paragraph 13 of the Guidelines on Fines.

**EN**

**EN**

GOOG-DOJ-26429483

acceptance of a supplementary obligation[1482] and that make payments conditional on exclusivity.[1483]

(1451) Third, throughout the duration of the Infringement, Google not only held a dominant position in the worldwide market (excluding China) for the licensing of smart mobile OSs, the worldwide market (excluding China) for Android app stores and the national market for general search services in the EEA, but its market shares were generally above 90% in all relevant markets (see Section 9).

(1452) Fourth, the whole EEA was covered by the Infringement.

(1453) Fifth, the Commission's conclusion that the proportion of the value of sales to be used to establish the basic amount of the fine should be 11% is not affected by Google's claim[1484] that the proportion of the value of sales to be used to establish the basic amount of the fine should be set at "*the lowest end of the gravity scale*" because: (i) the economic importance of the relevant markets is "*in large part*" a result of Google's "*own efforts*" in the "*growth and success of the industry*"; (ii) any assessment that the Infringement is likely to have had a considerable impact on the relevant markets requires "*specific, credible and adequate evidence*"; (iii) Google's market shares were not generally above 90% in all the relevant markets; and (iv) the proportion of the value of sales used to establish the basic amount of the fine in the *Intel* case involving "*naked restrictions*" was 5%.

(1454) In the first place, it is irrelevant whether the significant economic importance of the relevant markets at stake may be "*in large part*" a result of Google's "*own efforts*" in the "*growth and success of the industry*". The Commission does not generally object to Google's "*efforts*", only to Google's abusive conduct that was not objectively necessary for the "*growth and success of the industry*" (see Sections 11.5, 12.7 and 13.5).

(1455) In second place, the finding that the Infringement is likely to have had a considerable impact on the relevant markets relates to its capability to restrict competition on the relevant markets (see Sections 11.3.4, 11.4.4, 12.6 and 13.4 for this analysis) in the light of the size of the revenues generated by Google on those markets.

(1456) In the third place, since at least 2011, Google has enjoyed high shares in each national market for general search services in the EEA (see Section 9.5). In addition, its market shares were indeed above 90% in all relevant markets for most of the years concerned by the infringement (see Table 3, Table 4 and Table 5).

(1457) In the fourth place, the Commission's earlier decision-making practice does not in itself serve as a legal framework for the imposition of fines in competition matters, since that framework is defined solely in Regulation (EC) No 1/2003 and in the Guidelines on Fines.[1485] Accordingly, the fact that the Commission has imposed fines in the past at a specific level for certain categories of infringements does not prevent

---

[1482]   See for example Case T-30/89 *Hilti* v *Commission*, EU:T:1991:70; Case T-83/91 *Tetra Pak* v *Commission*, EU:T:1994:246; Case C-333/94 P *Tetra Pak v Commission*, EU:C:1996:436; and Case T-201/04 *Microsoft* v *Commission*, EU:T:2007:289.

[1483]   See for example Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36.

[1484]   Google's Response to the Statement of Objections, Part Six, page 326 and 327 (Doc ID 7117).

[1485]   Case T-472/13 *Lundbeck v Commission*, EU:T:2016:449, paragraph 810.

**EN**                                    321                                    **EN**

GOOG-DOJ-26429484

it from setting new fines at a higher level, if raising of penalties is deemed necessary in order to ensure the implementation of Union competition policy.[1486]

(1458) Moreover, previous decisions imposing fines may be relevant from the point of view of observance of the principle of equal treatment only where the facts of the cases in those other decisions, such as markets, products, the countries, the undertakings and periods concerned, are comparable to those of the present case.[1487]

(1459) The facts in the *Intel* case are, however, not comparable to those in this case as the two cases concern different products, undertakings, practices, market coverage and time periods.

(1460) In the fifth place, a gravity percentage of 11% is considerably below the upper limit of the scale referred to in paragraph 21 of the Guidelines on Fines that can go up to 30%.

### 20.3.7. Duration

(1461) The Commission concludes that the single and continuous infringement, consisting of the infringements of Article 102 TFEU and Article 54 of the EEA Agreement described in Sections 11 to 13, started on 1 January 2011 and is still ongoing (see Section 14.3). The Commission therefore uses the date of adoption of this Decision as the end date of the single and continuous infringement for the purpose of calculating the fine. The Commission concludes that the duration of the single and continuous infringement is 2 748 days (approx. 7.52 years).

(1462) Alphabet is jointly and severally liable with Google for the single and continuous infringement as of 2 October 2015 (see Section 17.2). Therefore, the duration of the single and continuous infringement for which Alphabet is jointly and severally liable is 1 013 days (approx. 2.77 years).

(1463) The Commission's conclusion regarding the duration of the single and continuous infringement is not affected by Google's claims that:

(1) "*the period of dominance for fine calculation purposes ought only to start after its market shares have been high for a long enough period to be treated as stable*";[1488] and

(2) it has voluntarily "*phased out*" certain practices before or during the Commission's investigation.

(1464) First, for the reasons discussed at Section 9, the period of dominance for fine calculation purposes ought to start in 2011 and not at a later date. Should the Commission impose a fine on Google with regard to only part of the period of the single and continuous infringement, the objective of applying a deterrent fine would not be fulfilled with regard to the remaining part of the period of the infringement.

(1465) Moreover, Google could not have been unaware of the fact that it held a dominant position in at least the worldwide market (excluding China) for Android app stores and the national markets for general search services in the EEA (see recitals (1426) to (1428)).

---

[1486] Case C-295/12 P *Telefónica and Telefónica de España v Commission*, EU:C:2014:2062, paragraph 190.
[1487] See among others Case T-84/13 *Samsung SDI and Others v Commission*, EU:T:2015:611, paragraph 203; Case T-92/13 *Philips v Commission*, EU:T:2015:605, paragraph 205.
[1488] Google's Response to the Statement of Objections, Part Six, pages 328-329 (Doc ID 7117).

**EN**

322

**EN**

GOOG-DOJ-26429485

(1466)   Second, it is irrelevant for the purposes of duration whether Google may have voluntarily *"phased out"* certain practices before or during the Commission's investigation because, as of the date of this Decision, the single and continuous infringement is still ongoing (see Section 14.3).

### 20.3.8.   Additional amount

(1467)   The Commission concludes that the basic amount should include an additional amount in order to deter undertakings of a similar size and with similar resources from entering into the same type of infringements as Google and Alphabet.

(1468)   In light of the factors set out in recitals (1448) to (1452), the additional amount should be 11% of the value of sales in 2017.

(1469)   The Commission's conclusion that the basic amount should include an additional of 11% of the relevant value of sales is not affected by Google's claim that an additional amount "*has never been applied in Article 102 TFEU cases and it is not warranted for cases such as the present.*"

(1470)   First, the Commission has applied an additional amount in Article 102 TFEU cases.[1489]

(1471)   Second, point 25 of the Guidelines on Fines provides that the Commission can impose an additional amount in the case of non-cartel infringements.[1490]

### 20.3.9.   Aggravating and mitigating circumstances

(1472)   The Commission concludes that there are no aggravating or mitigating circumstances that should result in an increase or decrease in the basic amount of the fine.

(1473)   That conclusion is not affected by Google's claims[1491] that: (i) there is uncertainty surrounding the legal characterisation of Google's conduct; (ii) Google effectively cooperated with the Commission by arranging meetings with Commission staff and assisting the Commission with respect to access to file; (iii) any infringement was not intentional; and (iv) Google has voluntarily "*changed*" certain of its practices before or during the Commission's investigation.

(1474)   First, there is no uncertainty surrounding the legal characterisation of Google's practices (see recital (1450)).

(1475)   Second, Google's alleged cooperation cannot be considered an effective cooperation beyond Google's legal obligations.[1492] Moreover, it did not assist the Commission in establishing the existence of Google's and Alphabet's single and continuous infringement with less difficulty.[1493]

---

[1489]   See AT.39740 – Google Search (Shopping), recitals 749-750; AT.39813 – Baltic Rail, recitals 383-384.

[1490]   Case T-587/08 *Del Monte v Commission*, EU:T:2013:129, paragraph 784; Case T-370/09 *GDF Suez v Commission*, EU:T:2012:333, paragraph 431; Case T-472/13 *Lundbeck v Commission*, EU:T:2016:449, paragraph 824.

[1491]   Google's Response to the Statement of Objections, Part Six, pages 331-332 (Doc ID 7117).

[1492]   Paragraph 29 of the Guidelines on Fines. Case T-384/09 *SKW v Commission*, EU:T:2014:27, paragraph 186.

[1493]   Case T-128/11 *LG Display and LG Display Taiwan v Commission*, EU:T:2014:88, paragraph 215; Case C-411/15 P *Timab Industries et Cie financière et de participations Roullier v Commission*, EU:C:2017:11, paragraph 85.

**EN**                                    323                                    **EN**

GOOG-DOJ-26429486

(1476)   Third, Google and Alphabet have committed the Infringement intentionally or at least negligently.

(1477)   Fourth, the fact that Google has voluntarily changed certain of its practices does not constitute a mitigating circumstance, given that:

(1)   Google's tying of the Google Search app with the Play Store, tying of Google Chrome with the Play Store and the Google Search app (Section 11) and licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the AFAs (Section 12) remain ongoing and abusive; and

(2)   it was only on 28 March 2017, and not immediately after the Commission launched its investigation, that Google informed the Commission of its intention to notify hardware manufacturers of the option to enter into an ACC in place of an AFA. Moreover, the ACC would not alter the fact that Google still makes the licensing of the Play Store and the Google Search app conditional on hardware manufacturers agreeing to the anti-fragmentation obligations in the AFAs (see recital (1185)).

*20.3.10. Deterrence*

(1478)   The Commission pays particular attention to the need to ensure that fines have a sufficiently deterrent effect. To that end, the Commission may increase a fine to be imposed on an undertaking which has a particularly large turnover beyond the sales of goods or services to which the infringement relates.[1494]

(1479)   In this case, the Commission considers that whilst there may be grounds to increase the fine, the level of the fine as calculated above in recitals (1433) to (1477) is already sufficient to ensure deterrence.

*20.3.11. Conclusion: final amount of the fine*

(1480)   The Commission concludes that the final amount of the fine to be imposed on Google amounts to EUR 4 342 865 000, of which EUR 1 921 666 000 jointly and severally with Alphabet.

(1481)   Alphabet's turnover in the business year ending 31 December 2017 was EUR 98 127 million. As the amount of the fine set out in recital (1480) is below 10% of that figure no adaptation is necessary pursuant to Article 23(2) of Regulation (EC) No 1/2003.

HAS ADOPTED THIS DECISION:

*Article 1*

1. Google LLC and Alphabet Inc. have infringed Article 102 of the Treaty and Article 54 of the EEA Agreement by participating in a single and continuous infringement consisting of four separate infringements, namely:

(a)   the tying of the Google Search app with the Play Store;

(b)   the tying of Google Chrome with the Play Store and the Google Search app;

---

[1494]   Paragraph 30 of the Guidelines on Fines.

GOOG-DOJ-26429487

(c) the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the anti-fragmentation agreements; and

(d) the grant of revenue share payments to OEMs and MNOs on condition that they pre-installed no competing general search service on any device within an agreed portfolio.

2. The single and continuous infringement has been taking place since the following dates:

(a) 1 January 2011 as regards Google LLC;

(b) 2 October 2015 as regards Alphabet Inc.

The single and continuous infringement is continuing as at the date of adoption of this Decision.

3. The four separate infringements that constitute the single and continuous infringement have been taking place, or took place, since the following dates:

– as regards Google LLC:

(a) 1 January 2011 for the tying of the Google Search app with the Play Store, the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the anti-fragmentation agreements and the grant of revenue share payments to OEMs and MNOs on condition that they pre-installed no competing general search service on any device within an agreed portfolio; and

(b) 1 August 2012 for the tying of Google Chrome with the Play Store and the Google Search app; and

– as regards Alphabet Inc., 2 October 2015 for the tying of the Google Search app with the Play Store, the tying of Google Chrome with the Play Store and the Google Search app, and the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the anti-fragmentation agreements.

The infringement regarding the grant of revenue share payments to OEMs and MNOs on condition that they pre-installed no competing general search service on any device within an agreed portfolio ended on 31 March 2014 as regards Google LLC. Alphabet Inc. did not participate in that infringement.

The infringements regarding the tying of the Google Search app with the Play Store, the tying of Google Chrome with the Play Store and the Google Search app and the licensing of the Play Store and the Google Search app conditional on the anti-fragmentation obligations in the anti-fragmentation agreements are continuing as at the date of adoption of this Decision.

*Article 2*

For the single and continuous infringement consisting of four separate infringements referred to in Article 1, the following fine is imposed:

Google LLC: EUR 4 342 865 000, of which EUR 1 921 666 000 jointly and severally with Alphabet Inc.

The fine shall be paid in euros, within three months of the date of notification of this Decision, to the following bank account held in the name of the European Commission:

**EN**

**EN**

GOOG-DOJ-26429488

BANQUE ET CAISSE D'EPARGNE DE L'ETAT
1-2, Place de Metz
L-1930 Luxembourg

IBAN: LU02 0019 3155 9887 1000
BIC: BCEELULL
Ref.: European Commission – BUFI/AT.40099

After the expiry of that period, interest shall automatically be payable at the interest rate applied by the European Central Bank to its main refinancing operations on the first day of the month in which this Decision is adopted, plus 3.5 percentage points.

Where an undertaking referred to in Article 1 lodges an appeal, that undertaking shall cover the fine by the due date, either by providing an acceptable financial guarantee or making a provisional payment of the fine in accordance with Article 90 of Commission Delegated Regulation (EU) No 1268/2012.[1495]

*Article 3*

The undertaking referred to in Article 1 shall within 90 days of notification of this Decision, bring effectively to an end the single and continuous infringement consisting of four separate infringements referred to in that Article insofar as it has not already done so. The undertaking referred to in Article 1 shall also, within 90 days of notification of this Decision, bring effectively to an end each of the four separate infringements referred to in that Article insofar as it has not already done so.

The undertaking referred to in Article 1 shall refrain from repeating any act or conduct described in that Article, and from any act or conduct having the same or equivalent object or effect.

*Article 4*

The undertaking referred to in Article 1 shall notify the Commission, within 60 days from the date of notification of this Decision, of the specific measures through which it intends to comply with this Decision.

The undertaking referred to in Article 1 shall provide the Commission with periodic reports on the measures taken to comply with this Decision. The first of those reports shall be sent on the day on which the undertaking brings effectively to an end the single and continuous infringement consisting of four separate infringements and each of the four separate infringements referred to in that Article. Subsequent reports shall be submitted every six months from that day, for a period of five years from that day.

*Article 5*

If the undertaking referred to in Article 1 fails to comply with any of the orders set out in Articles 3 and 4, the Commission hereby imposes a daily periodic penalty payment of 5% of its average daily turnover in the business year preceding such a failure to comply.

---

[1495] Commission Delegated Regulation (EU) No 1268/2012 of 29 October 2012 on the rules of application of Regulation (EU, Euratom) No 966/2012 of the European Parliament and of the Council on the financial rules applicable to the general budget of the Union, OJ L 362, 31.12.2012, p. 1.

**EN**                    326                    **EN**

GOOG-DOJ-26429489

*Article 6*

This Decision is addressed to Google LLC and Alphabet Inc., both of 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States of America.

This Decision shall be enforceable pursuant to Article 299 of the Treaty and Article 110 of the EEA Agreement.

Done at Brussels, 18.7.2018

*For the Commission*

*Margrethe VESTAGER*
*Member of the Commission*

**EN**                                                 **EN**

GOOG-DOJ-26429490