**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

**REPLY IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.   The Court Should Enter Summary Judgment on the Browser Agreements Conduct..........4

    A.   *Microsoft* Protects Competition on the Merits...........................................................4

    B.   The Browser Agreements Are the Product of Competition on the Merits ..............6

        1.   The Browser Agreements Are Not Analogous to the Conduct
           Condemned in *Microsoft*..............................................................................7

           a.   Microsoft's Agreements with IAPs ................................................8

           b.   Microsoft's Agreements with OEMs ..............................................9

           c.   Microsoft's Agreements with ISVs ..............................................10

        2.   Google Competes to Supply an Input Sought by Apple, Mozilla,
           and Other Browser Developers................................................................11

           a.   Apple, Mozilla, and Other Browser Developers Are Not
              Merely "Distributors" of Search Services....................................12

           b.   Plaintiffs' Invocation of the Public Good Cannot Forestall
               Summary Judgment ......................................................................14

           c.   No Factual Disputes Need to Be Resolved Before Entering
              Judgment in Google's Favor ........................................................15

        3.   Plaintiffs Offer No Evidence That Google's Participation in the
           Process of Selecting a Default Search Engine Harms Competition ..........19

II.  The Court Should Enter Summary Judgment on the Android MADA and RSA
    Conduct ..........................................................................................................................22

    A.   The Android Agreements at Issue Do Not "Foreclose a Substantial Share"
        of the Alleged Markets..........................................................................................22

    B.   The Alleged Effects of the Android Agreements Cannot Be Aggregated
        with Non-Exclusionary Conduct...........................................................................25

III. Plaintiffs Have Abandoned Any Claims with Respect to ACCs and AFAs,
    Conduct Concerning Assistant and Internet of Things, and Android Design
    Decisions........................................................................................................................28

    A.   Plaintiffs Abandon Their Complaints' Assertions of Anticompetitive
        Effects in Search Based on ACCs and AFAs .......................................................28

    B.   Plaintiffs Abandon Their Complaints' Assertions of Anticompetitive
        Effects in Search Based on Google's Assistant and Internet of Things
        Practices ...............................................................................................................29

    C.   Plaintiffs Assert No Exclusionary Conduct Based on Google's Android
        Design Decisions .................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98 (3d Cir. 1992).........................................................24

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983).............................12, 21

*Church & Dwight Co. v. Mayer Labs.*, Inc., 868 F. Supp. 2d 876 (N.D. Cal. 2012) ..................24

*City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981) ..................................27

*Eatoni Ergonomics, Inc. v. Res. in Motion Corp.*, 826 F. Supp. 2d 705 (S.D.N.Y. 2011)...........26

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) .............*passim*

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999)..................................................27

*Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984)................................................14

*Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999)........22

*Momenian v. Davidson*, 2020 WL 999204 (D.D.C. Mar. 1, 2020) .........................................28, 29

*New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021)......................................................27

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc) .................................................14

*Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997)..............................24

*Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42 (7th Cir. 1996)......................................18

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999)..............................12, 14

*Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011).................................22

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961).................................................22, 24

*United States v. Hammermill Paper Co.*, 429 F. Supp. 1271 (W.D. Pa. 1977)............................24

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam)......*passim*

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999)...........................................5, 8

*United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122 (D.C. Cir. 1981).................30

███████████████████████████████

Plaintiffs' Opposition confirms that the unrebutted facts adduced in discovery have undermined the key pillars of their Complaints.  For example, their allegations that Google is the *de facto* exclusive search engine in web browsers such as Apple's Safari and Mozilla's Firefox have confronted undisputed evidence that those companies can and do promote rival search engines in their browsers, ████████████████████████████████████

███████████████████████████████████████████████.  Likewise, the Complaints' allegations that Google engaged in an unlawful "strategy to ward off competition for mobile search distribution" have been met with unrebutted evidence that companies such as Apple and Mozilla decided to design their browsers with a user-changeable default search engine and chose Google as the default because it was the best product, preferred by the overwhelming majority of their users.  And Plaintiffs' claims regarding Google's revenue share agreements with Android device manufacturers and wireless carriers have been shown to lack the requisite effect on competition among search engines, just as Plaintiffs have abandoned their claims regarding Google's Android compatibility agreements and Google Assistant for the same reason.  The remnants of Plaintiffs' case are predicated on a handful of legal errors, and resolving them clears the way for summary judgment on all counts.

The Browser Agreements.  First, Plaintiffs skip a crucial step in their application of *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam).  Stating a *prima facie* case of exclusionary conduct under Section 2 requires showing not only that the challenged conduct has the requisite "anticompetitive effect," but also that it "does so through a means other than competition on the merits."  *Id.* at 62; *see, e.g.*, *id.* at 58, 65.  Plaintiffs' arguments regarding the significance of being selected as the default search engine by a third-party browser developer such as Apple or Mozilla do not speak to whether those agreements reflect "a form of vigorous

competition" that the antitrust laws protect, rather than one of the "exclusionary acts" that they potentially condemn.  *Id.* at 58; *see* Section I.A.

Plaintiffs cannot fill this gap in their case by analogizing Google's agreements with third-party browser developers to the contracts condemned in *Microsoft*.  The browser agreements——lack the restrictions found to have harmed competition in *Microsoft*, and in fact more closely resemble the conduct that withstood scrutiny.  *E.g.*, *Microsoft*, 253 F.3d at 67-68; *see* Section I.B.1.

In the absence of any unlawful restrictions in Google's browser agreements, Plaintiffs critique the parties' incentives, including by attempting to recast Apple and Mozilla as mere distributors or dealers of search services.  Plaintiffs' argument misapplies the undisputed facts, which confirm that customer-instigated agreements to obtain inputs like the ones at issue here "are a normal competitive tool," not an exclusionary device.  *E.g.*, *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 995-96 (10th Cir. 2022); *see* Section I.B.2.

At the end of the day, Plaintiffs' attack on the browser agreements rests on their apparent conviction that search competition would be sharpened if companies like Apple and Mozilla were left to pursue an inferior option for a default search engine or redesign their products altogether, even though Google is their first choice based on legitimate considerations of quality and price. While it should be sufficient to say that the antitrust laws do not exist to punish a successful competitor or hold an umbrella over less-efficient rivals, *e.g.*, *Microsoft*, 253 F.3d at 58, it is also the case that Plaintiffs' theory does not withstand summary judgment even on its own terms.  In particular, there is no triable evidence that Google competing to be the default search engine in third-party browsers such as Safari and Firefox has harmed "the competitive *process*" in relation to whichever counterfactual world Plaintiffs envision.  *Id.*; *see* Section I.B.3.

The Android Agreements.  Plaintiffs' claims regarding Google's agreements with Android original equipment manufacturers (OEMs) (such as Samsung and Motorola) and wireless carriers that sell Android devices (such as Verizon and T-Mobile) should not survive summary judgment because they do not "foreclose competition in a substantial share of the line of commerce affected." *Microsoft*, 253 F.3d at 69.  The agreements at issue here do not even arguably affect all searches conducted on Android devices because, as Plaintiffs concede, "[a] portion of Google's searches are conducted by users who are not affected by the default," and who "would search with Google no matter how their devices were configured."  Opp. 19.[1]  According to DOJ's own expert economist, if all Android devices in the U.S. were configured with a search engine choice screen— such that no user could "follow the default, whatever it is," *id.*—rival search engines would gain approximately 1% of all U.S. general search queries.  That level of purported foreclosure is insubstantial as a matter of law.  *See* Section II.A.  Plaintiffs cannot circumvent this conclusion by arguing that all of their allegations must be assessed "contextually" or in the "aggregate" because conduct that has an insubstantial effect on competition cannot be rendered unlawful by the presence of other conduct that reflects competition on the merits.  *See* Section II.B.

Finally, Plaintiffs offer no argument to support their allegations that Google has engaged in exclusionary conduct with respect to its agreements to maintain baseline compatibility standards for Android devices or Google's conduct respecting Google Assistant, and confirm they mount no challenge to Google's unilateral decisions about which apps to develop open source.  This conduct has neither excluded competitors nor harmed competition in any relevant market.  *See* Section III.

---

[1] Citations to "Opp." refer to Plaintiffs' Memorandum in Opposition to Defendant Google's Motion for Summary Judgment, ECF 476.

**ARGUMENT**

**I.     The Court Should Enter Summary Judgment on the Browser Agreements Conduct**

**A.     *Microsoft* Protects Competition on the Merits**

Google's opening brief explained that Plaintiffs cannot advance a *prima facie* case under Section 2 unless they demonstrate that the challenged agreements are "exclusionary, rather than merely a form of vigorous competition." *Microsoft*, 253 F.3d at 58; *e.g.*, Mot. 24.  Plaintiffs ignore this inquiry by arguing that Google's agreements with browser developers such as Apple and Mozilla have the effect of increasing the number of queries that Google receives in relation to a world in which it is not the default search engine in Safari, Firefox, or other browsers.  *E.g.*, Opp. 9-10, 22-23.  For present purposes, none of that is in dispute.  But it is not enough for Plaintiffs to show that being the default search engine in a browser is an important source of queries for general search engines.

As *Microsoft* makes clear, alleged monopolists are allowed—and indeed encouraged—to compete on the merits.  *E.g.*, *Microsoft*, 253 F.3d at 68.  An asserted monopolist that maintains its position "as a consequence of a superior product" or its superior "business acumen" does not engage in unlawful "exclusionary conduct."  *Id.* at 58.  Plaintiffs implicitly assume, contrary to *Microsoft*, that all contracts through which an alleged monopolist secures a market opportunity that may otherwise be available to a rival must be subject to analysis for anticompetitive foreclosure. *E.g.*, Opp. 18-19.  But the D.C. Circuit did ***not*** condemn Microsoft's practices merely because they had the effect of increasing Microsoft's share relative to its rivals; rather, the court condemned particular conduct that "ha[d] a substantial effect in protecting Microsoft's market power, ***and d[id] so through a means other than competition on the merits.***"  *Microsoft*, 253 F.3d at 62 (emphasis added); *see, e.g.*, *id.* at 65 ("Because Microsoft's conduct, through something other

than competition on the merits, has the effect of significantly reducing usage of rivals' products and hence protecting its own operating system monopoly, it is anticompetitive.").

For example, to promote the use of its Internet Explorer (IE) browser over Netscape's Navigator browser, Microsoft offered internet access providers (IAPs) not only the ability to bundle IE for free to their subscribers, but also "a bounty for each customer the IAP sign[ed] up for service using the IE browser." *Id.* at 67.  The district court condemned Microsoft's promotional payments to IAPs on the ground that they "act[ed] to preserve its monopoly," but the D.C. Circuit reversed. *Id.* at 67-68.  In confirming the legality of Microsoft offering promotional payments to IAPs for the use of IE by their subscribers, the court explained that "[t]he rare case of price predation aside, the antitrust laws do not condemn even a monopolist for offering its product at an attractive price." *Id.* at 68.  The court reached that conclusion *even though* "IAPs constitute[d] one of the two major channels by which browsers can be distributed," *id.* at 70, and *even though* "[b]rowser usage share is important because" a browser "must have a critical mass of users in order to attract software developers," *id.* at 60.  Moreover, the D.C. Circuit reached this conclusion notwithstanding the district court's finding that these promotional payments contributed to a "surge" in IE usage. *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 70-71 (D.D.C. 1999).

Neither *Microsoft* nor any other Section 2 precedent precludes an alleged monopolist from competing on the merits to gain promotional opportunities to attract customers at the expense of its rivals, *even if* there are purportedly few avenues available for reaching those customers, scale is allegedly an important determinant of quality, and the promotion increases use of the defendant's product.  The challenged conduct may be considered exclusionary only if it is carried out "through something other than competition on the merits." *Microsoft*, 253 F.3d at 65; *see, e.g., id.* at 50,

56, 62. Plaintiffs err insofar as they assume that all agreements that purportedly result in an alleged monopolist winning a commercial advantage in the marketplace are *prima facie* anticompetitive.

### B.   The Browser Agreements Are the Product of Competition on the Merits

Plaintiffs have not identified any factual disputes that need to be resolved before concluding that the browser agreements are the product of lawful competition on the merits.

First, the agreements with Apple, Mozilla, and other browser developers do not contain any terms that impermissibly restrict competition.   Although Plaintiffs emphasize that the "contractual terms … are the subject of this lawsuit," Opp. 26, they have never actually identified any particular provisions that they consider legally infirm, apart from the core bargain of paying a revenue share to a browser in exchange for being set as the default search engine.   That basic framework—which has been used by all manner of browser makers and search engines for nearly two decades—is not exclusionary.   Beyond competing to provide a particular input valued by browser developers such as Apple and Mozilla, Google has not restrained them or their customers from dealing with rival search engines.   For these reasons and others, Google's contracts with these companies are unlike any of the conduct condemned in *Microsoft*, and in fact more closely resemble the agreements deemed lawful by the D.C. Circuit.   *See* Section I.B.1.

Second, undisputed facts confirm that Google's agreements with browser developers are the consequence of their decision to design their products with a default search engine.   This design decision, which has been independently selected by countless browsers over the last two decades, creates a "customer-instigated" competition that Google has won based on quality and price—the hallmarks of competition on the merits.   Plaintiffs contend that Apple, Mozilla, and other browser developers should not be trusted to select their preferred default search engine because "distributors" may suffer malign incentives.   *E.g.*, Opp. 26.   Plaintiffs' characterization is wrong as a matter of law; browser developers are not mere "distributors" of search services, and Section

2 of the Sherman Act does not bar non-parties in the position of Apple or Mozilla from dealing with a purportedly dominant supplier, even on an allegedly exclusive basis.  *See* Section I.B.2.

Third, Plaintiffs offer no evidence that preventing Google from competing to be the default search engine would promote competition in search.  At bottom, Plaintiffs' case is predicated on the assumption that if companies that currently prefer to set Google as the default in their browsers are instead forced to pursue their second (*i.e.*, inferior) choice, then another search engine will receive additional queries and improve in quality as a result.  *E.g.*, Opp. 6-7, 22-23.  But the assertion that competitors could benefit if Google is restrained from continuing to compete for opportunities made available by independent browser developers is not evidence that there has been any harm to "the competitive *process*" that the antitrust laws are intended to protect. *Microsoft*, 253 F.3d at 58.  Indeed, the antitrust laws do not sanction such judicial re-engineering of the competitive process.  *See* Section I.B.3.

### 1. The Browser Agreements Are Not Analogous to the Conduct Condemned in *Microsoft*

Google's brief explained that its agreements with Apple, Mozilla, and other browser developers are not exclusive or *de facto* exclusive because, among other things, the contracts have never prevented them from promoting rival search engines in their browsers.  *E.g.*, Mot. 28-31. Plaintiffs respond that the browser agreements "are at least as exclusionary as the agreements found anticompetitive in *Microsoft*," Opp. 19, and cite passages detailing the restrictions that Microsoft imposed on IAPs, OEMs, and independent software vendors.  But an examination of the D.C. Circuit's analysis of these provisions only serves to highlight that the agreements at issue here bear no resemblance to those condemned in *Microsoft*, and instead are similar to those upheld by the court as a matter of law.

### a. Microsoft's Agreements with IAPs

Plaintiffs reference Microsoft's agreements with IAPs such as America Online (AOL), *e.g.*, Opp. 17, 45, but they fail to address much of the D.C. Circuit's opinion, which reversed all but one of the bases on which the district court imposed liability in connection with Microsoft's IAP conduct. As discussed, the appellate court reversed the district court with respect to all of what the district court referred to as Microsoft's "inducements" to IAPs to promote IE. *E.g.*, *Microsoft*, 84 F. Supp. 2d at 70-71; *see* Section I.A. Google's browser arrangements bear far closer resemblance to Microsoft's "inducements" to IAPs than to Microsoft's restrictive agreements. Indeed, the D.C. Circuit deemed Microsoft's promotional arrangements with IAPs lawful even though the district court found that users preferred the rival Netscape browser and that "Microsoft made substantial sacrifices, including the forfeiture of significant revenue opportunities, in order to induce IAPs to … distribute access software that came with Internet Explorer." *Microsoft*, 84 F. Supp. 2d at 70. Yet even with these findings in the record—none of which is present here—the D.C. Circuit concluded that payments to IAPs to induce them to promote IE instead of Netscape's browser were lawful competition on the merits. *Microsoft*, 253 F.3d at 68.

The D.C. Circuit affirmed the district court's judgment regarding IAPs only with respect to Microsoft's restrictive agreements with companies such as AOL, whereby AOL could "not promote any non-Microsoft browser, nor provide software using any non-Microsoft browser except at the customer's request, and even then AOL [could] not supply more than 15% of its subscribers with a browser other than IE." *Id.* Nothing in Google's browser agreements even remotely resembles these restrictions. Browser developers such as Apple and Mozilla have always been able to promote other search engines to their customers, including through app stores, as bookmarks or sponsored "tiles" displayed in the browser interface, and as secondary default

███████████████████████████

options available in the browsers' settings.  *E.g.*, SOGI ¶¶ 69, 79, 81, 164, 170.[2]  Furthermore, Google's agreements do not limit the number of end users who may use another search engine or the compensation that browser developers may obtain from rival search engines for promotional opportunities.  *E.g.*, SOGI ¶¶ 93, 95-96, 160-63, 171.  Plaintiffs' brief all but ignores these distinctions, which lay bare the difference between Microsoft's imposition of anticompetitive restrictions on IAPs and Google winning a competition arising from design choices established by browser developers.

### b.  Microsoft's Agreements with OEMs

Plaintiffs also cite passages detailing the restrictions that Microsoft imposed on OEMs that made Windows computers.  *E.g.*, Opp. 19.  There is no comparison between Google's participation in a competitive process sponsored by browser makers for the selection of an input into their software and Microsoft's effort to ***prevent*** OEMs from being able to consider alternatives to Microsoft's pre-installed browser.  *E.g.*, *Microsoft*, 253 F.3d at 61-62.  Because Google's contracts with browser developers lack any provisions that resemble the express restrictions in Microsoft's OEM license agreements, Plaintiffs assert that the agreements "create[] financial incentives … to increase the number of search queries … sen[t] to Google, and thereby affect[]" the developer's "decision-making including with respect to product design."  *E.g.*, SOGI ¶¶ 76-79, 164-66; *see, e.g.*, Opp. 24-26.  ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[2] Citations to "SOGI" refer to Plaintiffs' Statement of Genuine Issues, ECF 476-1.

███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████  In all events, as already shown, creating an incentive to boost traffic by continuing to offer an attractive deal is precisely the conduct *Microsoft* upheld.  *E.g., Microsoft*, 253 F.3d at 67-68 (upholding Microsoft's provision of an attractive IE access kit and practice of paying a "bounty" for each customer "sign[ed] up for service using the IE browser").

### c.    Microsoft's Agreements with ISVs

Plaintiffs also invoke Microsoft's contracts with independent software vendors (ISVs), including for the proposition "that agreements establishing Microsoft as a 'default' provider were exclusive contracts."  Opp. 44 (citing *Microsoft*, 253 F.3d at 75-76).  Apart from the use of the word "default," however, there is no meaningful similarity between Microsoft's ISV agreements and Google's browser agreements.  The ISV agreements required software developers to base their applications on incompatible technologies that made certain features unusable to consumers using a rival browser.  *E.g.*, *Microsoft*, 253 F.3d at 75 (explaining that the agreements with ISVs required them "to make their Java applications reliant on Windows-specific technologies and to refrain from distributing to Windows users JVMs that complied with Sun's standards"); *id.* at 72 (describing the requirement that ISVs use "Microsoft's 'HTML Help,' which is accessible only with Internet Explorer, to implement their applications' help systems").  Google's agreements with browser developers, by contrast, involve the setting of a user-changeable default for a software feature designed by the developers and do not otherwise affect the operation of rivals' services in third-party browsers such as Safari and Firefox.  *E.g.*, SOGI ¶¶ 65-67, 79, 81, 83.

\* \* \*

In the absence of any particular restriction in the browser agreements that purportedly harms competition, Plaintiffs focus on the core bargain of paying a revenue share in exchange for being set as the default upon first use.  *E.g.*, Opp. 21-23, 37-38.  Yet Plaintiffs do not argue that the revenue shared with Apple or any other browser developer represents predatory pricing, and "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price."  *Microsoft*, 253 F.3d at 68.  Moreover, the same arrangement that Plaintiffs now attempt to label exclusionary has been agreed to by numerous browsers and other search engines that are not alleged to have monopoly power. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████  The browser agreements lack the kinds of restrictions at issue in *Microsoft*, and Plaintiffs offer no basis for condemning a non-predatory payment for default placement in any context, ████████████████████████████

██████████████████████████████████.

### 2.    Google Competes to Supply an Input Sought by Apple, Mozilla, and Other Browser Developers

As Google explained in its opening brief, it is undisputed that Apple and Mozilla—along with countless other browser developers, including Microsoft, DuckDuckGo, and Brave—have long decided to design their browsers with a single default search engine.  *E.g.*, Mot. 31-34.  While both Apple and Mozilla believe this design offers the best experience for their own customers,

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

████████████████████████████████████████████

████████████████████████████████████. Both companies further these

objectives by periodically reevaluating their search relationships, including considering whether

to set a different search engine as the default. *E.g.*, SOGI ¶¶ 10, 41, 52-54, 107, 126, 154.

In short, Apple, Mozilla, and certain other browser developers establish a competition for

the default status in their browsers and negotiate the deal that they deem most favorable. To the

extent that the resulting agreements with Google can be considered "exclusive" at all, it is the

consequence of the browser developers using default status as "a normal competitive tool" to

"stimulate price competition" among search engines. *EpiPen*, 44 F.4th at 989. Courts evaluating

indistinguishable examples of "customer-instigated exclusivity" have concluded that they "are not

particularly concerned about the anticompetitive effects of the arrangement." *Id.* at 995; *see, e.g.*,

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 523-25 (5th Cir. 1999); *Barry Wright*

*Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236-38 (1st Cir. 1983).

> ### a.   Apple, Mozilla, and Other Browser Developers Are Not Merely "Distributors" of Search Services

Plaintiffs attempt to downplay these dispositive facts by asserting that Apple and Mozilla

are mere "distributors" of search services, *e.g.*, Opp. 24-26, but that categorization is wrong as a

matter of law. In this context, "an end user is any buyer who cannot directly pass along the

increased cost of a good to a downstream market participant." *EpiPen*, 44 F.4th at 995. For

example, a company that "makes and installs nuclear plant pipe systems" has its own downstream

customers, but for the purpose of ascertaining the anticompetitive effect of an allegedly exclusive

deal, it is still properly considered the end user of "shock absorbers used in building" those "pipe

systems." *Barry Wright*, 724 F.2d at 229, 237-38; *see EpiPen*, 44 F.4th at 996 (explaining that

because the counterparty in *Barry Wright* "was an end user, it was highly unlikely the requirements

contract was anticompetitive"). Similarly, in *EpiPen* health insurance plans were "end users because they must ultimately pay the balance for any covered drug," even though the drugs are provided to the insurer's customers rather than consumed by the insurer.  *Id.* at 995.

Undisputed facts confirm that a browser developer internalizes the increased cost or decreased quality of its default search service, just as a manufacturer feels the pinch when a supplier of a key input raises its quality-adjusted prices.

As Mozilla's CEO put it, "the quality of the search experience, whether it works for your users, whether people like it is … one of the handful of things that are most critical about a browser." Google's Ex. 31 at 34:1-13.  Those are the words of an independent product developer buying an input that affects consumers' perceptions of its own product, not a mere "distributor" of search services that can "directly pass along the increased cost of a good to a downstream market participant."  *EpiPen*, 44 F.4th at 995.

The upshot is that the browser agreements cannot be characterized as exclusionary payoffs. Rather, the agreements are "a normal competitive tool" used by browser developers to build the best product for their customers and negotiate the best price for the valuable promotional

opportunities they create.  *See id.* at 989.  Courts have repeatedly upheld such arrangements, even when they are characterized as exclusive or entered into by an intermediary that provides the service at issue to its own customers.  *E.g.*, *id.* at 995-96, 1006; *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452-54 (6th Cir. 2007) (en banc) (dismissing challenge to alleged monopolist's payments to retailers in exchange for the retailers' agreement to sell only one brand of a product to their own customers); *Stearns*, 170 F.3d at 524-25 (affirming summary judgment for alleged monopolist because "the decision to sole-source a contract or adopt a particular specification was always ultimately in the hands of the consumer," where the "consumer" was a municipality rather than the ultimate end-users of the project); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 924-25 (1st Cir. 1984) (explaining that "antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold," where the "buyer" was an insurer rather than the insured).

### b.    Plaintiffs' Invocation of the Public Good Cannot Forestall Summary Judgment

In connection with their baseless argument that browser developers are mere "distributors" of search services, Plaintiffs assert that "the preservation of competition" is a "public good" that "cannot be entrusted to private firms to protect."  Opp. 25.  Plaintiffs do not cite a single case endorsing this rationale, and their own elaboration of the theory reveals how far it strays from precedent.  According to Plaintiffs, it is not only Apple and other browser developers that fail to "factor in the interests of all consumers" when negotiating a business deal, but "***any party*** that deals with Google (***or any other economic actor*** for that matter)" because "each negotiates according to its own incentives."  *Id.* at 25 n.13 (emphasis added).  Given that every economic transaction purportedly involves some degree of self-interest, Plaintiffs' commentary proves too much; it therefore cannot aid in resolving the "challenge" of "distinguishing between exclusionary

14

███████████████████████████████████

acts, which reduce social welfare, and competitive acts, which increase it." *Microsoft*, 253 F.3d at 58. The law plainly does not prohibit dealing with an alleged monopolist, just as it does not bar an alleged monopolist from offering the best deal. *E.g.*, *id.* at 68 (noting that "offering a customer an attractive deal is the hallmark of competition").

Furthermore, and contrary to Plaintiffs' assertions, precedent teaches that a customer dealing with an alleged monopolist in fact can have "every interest in promoting new competition" and will "not be enticed by present exclusivity discounts if the discounts expose it to exploitation by a dominant supplier in the future." *EpiPen*, 44 F.4th at 996; *see id.* at 995 (explaining that "[b]uyers are unlikely to 'shoot themselves in the feet' by signing exclusive contracts that entrench the seller 'as a monopolist that then can apply the squeeze'"). ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████ This is "the competitive *process*" that the antitrust laws are designed to protect in furtherance of the public good, *see Microsoft*, 253 F.3d at 58, and there is no precedent for Plaintiffs' attempt to short circuit that process and impose their preferred outcome.

      **c.**     **No Factual Disputes Need to Be Resolved Before Entering Judgment in Google's Favor**

Plaintiffs allude to a handful of purported factual disputes regarding Apple and Mozilla, *e.g.*, Opp. 27, 39, but in each instance their assertions are either immaterial or support the conclusion that the browser agreements are not anticompetitive.

To begin with, it makes no difference whether ████████████████████████

████████████████████████████████████████

15



*See* Opp. 27.  This assertion is immaterial because Plaintiffs "make no contentions" regarding whether any of Google's agreements harmed competition prior to 2012,[3]

█████  Moreover, ████████████████████████ did not give rise to any purported exclusivity because Apple had decided to make Google the only search engine integrated with Safari's search box when it released Safari ████████████████.  SOGI ¶¶ 3, 5.  Nor did Google's payments induce subsequent exclusivity, as Apple integrated other search engines ███████████████████ after it began sharing revenue with Google.  *E.g.*, SOGI ¶¶ 65-75.

When Apple has identified an alternative that it prefers it has pursued that alternative, as it did in setting a different default search engine in certain markets outside the U.S.  *E.g.*, SMF ¶¶ 36-37.  Again, however, Plaintiffs

---

[3] Google's Ex. 79 (DOJ Pls.' 2d Supp. Resps. to Google's 2d Interrogs.) at 12; Google's Ex. 80 (Col. Pls.' 2d Supp. Resps. to Google's 2d Interrogs.) at 6; *see also* Google's Ex. 130 (Whinston (DOJ Pls.' Expert) Tr.) at 48:6-49:1, 55:17-21, 58:18-59:4 (opining that the challenged agreements have harmed competition "from 2014 on" but offering no opinion about earlier years); Google's Ex. 131 (Baker (Colo. Pls.' Expert) Tr.) at 267:22-269:10, 298:3-299:18 ("My opinion is that Google's conduct has harmed competition since at least 2016, and I don't know whether it did before then….").

███████████████████████████████████████████

point to no evidence that Apple prefers a different browser design today or that it preferred one at any point since its agreement with Google purportedly became anticompetitive.  *E.g.*, SMF ¶ 7.[4]

      Third, the observation that Apple and Google ████████████████████████████████ ████████████████████████████ does not render them anticompetitive.  *See* Opp. 27.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████  ███████████████  ████████████

██████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████

███████████  ████████████████████  ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[4] Plaintiffs dispute some of Google's related statements ██████████████████████████ █

██████████████████████████████████████████  *E.g.*, SOGI ¶ 239.

███████████████████████████████████████  In particular, the DOJ did not object to Microsoft's design decision because search engines such as Google and Yahoo could still compete with Microsoft's search engine by offering incentives to Windows OEMs; it was "relatively straightforward" for users to change the default; and Microsoft would not use downloads to override the default set by the OEM or user.  *See* Google's Ex. 132 (Joint Status Report on Microsoft's Compliance with the Final Judgments, *United States v. Microsoft Corp.*, No. 98-1232-CKK, ECF 827 (D.D.C. May 12, 2006)) at 13-14.  Microsoft continues to configure its Edge browser with Bing as the default search engine (or, in some operating system "modes," the only integrated search engine, such that the user cannot change the default without "switching out of" the applicable "mode").  *E.g.*, SOGI ¶¶ 86, 88.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

In the same passages, Plaintiffs cite statements that [REDACTED]

[REDACTED]

[REDACTED] *See* Opp. 27 (citing COMF ¶¶ 542-45).[5]  As Google explained in its opening brief, there is no dispute that Apple meets with and evaluates other search engines to decide whether to set them as the default upon first use, or whether to promote them in other ways in Safari or elsewhere on its devices.  *E.g.*, Mot. 11-12; SOGI ¶¶ 52, 54, 69, 73, 87.  This is evidence of the competitive process that resulted in Apple choosing Google on the merits, not a fact that precludes summary judgment.  *See, e.g.*, *EpiPen*, 44 F.4th at 995; *Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (explaining that even if "[e]xclusive contracts make the market hard to enter in" the interim, they "cannot stifle competition over the longer run, and competition of this kind drives down the price … to the ultimate benefit of consumers").

Fourth, Plaintiffs contend that "Google's history with Mozilla highlights another factual dispute," purportedly because in 2014 "Mozilla adopted Yahoo as the default search engine on Firefox [REDACTED]

[REDACTED] Opp. 39.  As with Plaintiffs' characterization of the Apple agreement, the present dispute is not about the facts themselves, but rather about their legal implication.  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[5] Citations to "COMF" refer to Plaintiffs' Counterstatement of Material Facts, ECF 476-2.

████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Plaintiffs cannot demonstrate that ████████████████

████████████████████████ is a "means of illicit exclusion," as opposed to "a form of vigorous

competition." *Microsoft*, 253 F.3d at 58

### 3.    Plaintiffs Offer No Evidence That Google's Participation in the Process of Selecting a Default Search Engine Harms Competition

Even assuming, contrary to the analysis set forth above, that Plaintiffs could identify some

material factual dispute concerning the terms of Google's agreements with browser developers or

the process that led to them, summary judgment would still be warranted because Plaintiffs have

not identified a cognizable harm to competition.  Plaintiffs do not appear to contend that the Court

can or should order third parties such as Apple and Mozilla to modify the design of their browsers

or forgo the opportunity to earn revenue from search engines willing to pay for default placement.

*See* Opp. 26.  And as Plaintiffs acknowledge, "[t]he likely competitive effects" of the challenged

conduct are "ideally examined relative to a 'but-for' world" without that conduct.  SOGI ¶ 235.

Yet Plaintiffs do not explain why requiring Apple, Mozilla, and other browser developers to pursue

their second (*i.e.*, inferior) choice rather than continuing to do business with their first will benefit

"the competitive *process*," as opposed to merely providing a windfall to whichever less-efficient

provider takes Google's place.  *Microsoft*, 253 F.3d at 58.  Put another way, Plaintiffs have not

identified evidence that allowing Google to compete vigorously to be the default search engine in

third-party browsers harms competition in relation to any world in which Google must sit on the

sidelines and refrain from competing for default placement.

This is not a question of remedies that Plaintiffs can defer, but rather an integral part of

their burden to demonstrate that conduct they seek to condemn in this case "indeed has the requisite

anticompetitive effect."  *Id.* at 58-59 (explaining that "the Government … must demonstrate that

██████████████████████████████

the monopolist's conduct harmed competition, not just a competitor").  To offer one example: Plaintiffs contend that Google's ███ agreement with Apple is anticompetitive, yet they offer no triable evidence of what a more competitive process might have looked like, which leaves them with no evidence of identifiable harm to competition.  Plaintiffs do not say, for instance, whether Google was obligated to walk away from its ██████ relationship with Apple without trying to negotiate a new deal; whether it should have insisted that Apple redesign Safari to remove the default search engine; ████████████████████████████████ ██████; or whether the purported anticompetitive effect is attributable to a particular provision that could have been omitted from the agreement.  Even under Plaintiffs' erroneous view that they need not demonstrate that Apple was restrained from pursuing a competition-enhancing course of action that it preferred to its agreement with Google, *e.g.*, Opp. 25, Plaintiffs still must show that the agreement harmed competition in relation to whatever alternative they consider lawful.  *E.g.*, *id.* at 15; SOGI ¶ 235.  In this respect, Plaintiffs' case suffers a fatal failure of proof.

Plaintiffs' repeated assertion that a search engine will receive additional queries if it is the default in a popular browser is not evidence of an anticompetitive effect.  *E.g.*, Opp. 22-23.  It is axiomatic that if one firm is barred from competing for particular opportunities in the market, then those opportunities may flow to another firm instead.  But that is not a basis for imposing liability under Section 2.  "The successful competitor, having been urged to compete, must not be turned upon when he wins."  *Microsoft*, 253 F.3d at 58.  ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

20



Opp. 23.  Plaintiffs have described nothing more than

As Plaintiffs acknowledge,

Opp. 22.

Plaintiffs do not cite any precedent holding that a non-predatory payment is anticompetitive

*See, e.g.*, *Barry Wright*, 724 F.2d at 237-38 (reasoning that the buyer "is not a small firm" that the defendant "could likely bully into accepting a contract that might foreclose new competition," and concluding that if the buyer "believed that the long-term nature of the contracts significantly interfered with new entry, or inhibited the development of a new source of supply, it is difficult to understand why it would have sought the agreement").

Given the absence of triable evidence that Google's agreements with Apple, Mozilla, and other browser developers "harm the competitive *process*," the Court should enter summary judgment with respect to those agreements.  *Microsoft*, 253 F.3d at 58.

## II.    The Court Should Enter Summary Judgment on the Android MADA and RSA Conduct

### A.    The Android Agreements at Issue Do Not "Foreclose a Substantial Share" of the Alleged Markets

Google's opening brief explained that its Android agreements with certain OEMs and wireless carriers do not have "the requisite anticompetitive effect" under Section 2 because there is no triable evidence that those agreements collectively "foreclose competition in a substantial share of the line of commerce affected." *Microsoft*, 253 F.3d at 69 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)); *see* Mot. 41-43.  Although "exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation," *Microsoft*, 253 F.3d at 70, the degree of purported foreclosure in this case is so far below the applicable threshold that it is insubstantial as a matter of law.  *See, e.g.*, *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011) (reasoning in a Section 2 case that "'foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent,' and while high numbers do not guarantee success for an antitrust claim, 'low numbers make dismissal easy'").  In particular, DOJ's expert economist posits that ***approximately 1%*** of all U.S. queries might shift from Google to rival general search engines if Android devices shipped with a search engine choice screen instead of a default search engine.  SOGI ¶ 248.  And even if every Android OEM and wireless carrier "exclusively" pre-installed a rival search engine instead of Google (a but-for world that none of Plaintiffs' experts opine would exist even in the absence of the allegedly exclusive provisions), the percentage of all general search queries that might flow to those rivals according to DOJ's expert would fall below the level that courts deem "substantial."  *See* SOGI ¶ 251; *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1143 (D. Minn. 1999).  In short,

the percentage of queries that Google purportedly receives on account of the Android agreements at issue is insufficient to support Plaintiffs' claim.[6]

Plaintiffs respond that the percentages calculated by DOJ's expert and cited in Google's brief have "no bearing on the foreclosure analysis" because "[f]oreclosure is properly calculated by measuring the volume of distribution closed off to rivals," *i.e.*, "the share of the market rivals might otherwise compete for." Opp. 48-49. Yet Plaintiffs' own analysis of the agreements confirms that their alleged effect must be measured incrementally. As Plaintiffs put it, "[a] portion of Google's searches are conducted by users who are not affected by the default; they would search with Google no matter how their devices were configured." *Id.* at 19. Those queries cannot be part of "the volume" that is purportedly "closed off to rivals" under Plaintiffs' theory of the case because they are not shifted from one search provider to another based on which one is set as the default. In other words, by Plaintiffs' own logic, the "share of the market rivals might otherwise compete for" in this case does not equal all queries conducted on a device subject to the challenged agreements, Opp. 48-49, but rather the number of queries "conducted by users who follow the default, whatever it is," *id.* at 19. And the analysis performed by DOJ's expert indicates that if Android devices in the U.S. were pre-configured with a choice screen instead of a default search engine, then more than 9 of 10 users would select Google. SOGI ¶¶ 245-48.

---

[6] The Colorado Plaintiffs' expert economist, Professor Baker, did not offer an opinion regarding the percentage of queries that might shift from Google to other search engines if Android devices were configured with a choice screen, and he is "not taking a view one way or the other about" whether any browser would have implemented a choice screen in a world without the challenged agreements. Google's Ex. 131 at 300:25-301:4. Professor Baker provided an "illustrative calculation" of the purported effect of "one of Google's rivals reach[ing] an exclusive default agreement" with certain OEMs and carriers, but the percentage of queries that purportedly might shift under his analysis does not exceed the range set forth by DOJ's expert, *see* Pls.' Ex. 266 (Baker (Colo. Pls.' Expert) Opening Rep.) ¶¶ 251, 262-63, and he is "not offering an opinion about whether any of those firms would have reached an exclusive preinstalled default agreement with a general search firm other than Google in the but-for world," Google's Ex. 131 at 318:14-24.

Furthermore, Plaintiffs' assertion that all queries entered on Android devices "covered by" the challenged RSAs are potentially "foreclosed" not only contradicts their own theory of the case, but also contravenes established doctrine. The Supreme Court articulated the "substantial share" requirement in *Tampa Electric*, which established a "qualitative substantiality test," whereby "the degree of market foreclosure is only one of the factors involved in determining the legality of an exclusive dealing arrangement." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111 (3d Cir. 1992). Courts therefore consider whether a method of quantifying foreclosure "overstates the actual foreclosure effect" in light of "the realities of the market." *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 913 (N.D. Cal. 2012) (vacated in part on other grounds, 2012 WL 1745592). In cases like this one, where the alleged effect of the conduct on the channel at issue is incremental, courts have adjusted the quantitative measure of alleged foreclosure accordingly. *E.g.*, *id.* at 914 (concluding that "if there is any tax effect or coercive impact due to the [challenged] program, it does not exist with respect to the entire shelf space covered by the program" because "the vast majority of shelf space devoted to [the defendant] would have been stocked with [the defendant's] product even in the absence of the [challenged] program"); *United States v. Hammermill Paper Co.*, 429 F. Supp. 1271, 1282 (W.D. Pa. 1977) (explaining that "the market share represented by [the defendant's] previous supply to [two merchants] is not subject to foreclosure" in light of evidence "that this relationship was likely to continue" even without the challenged merger).[7]

---

[7] To be clear, there may be cases where the total coverage of the challenged agreements is the appropriate starting point for assessing quantitative foreclosure, just as there may be cases where exclusive agreements do not foreclose any share of the market at all. *See, e.g.*, *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market.").

███████████████████████████████

There is no question that Plaintiffs' reliance on the total coverage of the Android RSAs massively overstates any foreclosure in this case.  While the choice screen analysis presented by DOJ's expert is sufficient to prove the point, Google's success in attracting users on Microsoft Windows PCs offers another illustration.  Even though Google has not been pre-installed on any PCs in the U.S. since 2015 (and was pre-installed on only a small fraction in earlier years), it attracted approximately ███ of all general search queries entered on PCs in 2021.  SOGI ¶¶ 205-06; Google's Ex. 9 (Murphy (Google's Expert) Opening Rep.) ¶¶ 83-85, 91-94.  ██████████

████████████████████████████████████

██████████████████████████████ Because an agreement to be the default search service on a device does not foreclose other effective ways for rivals to reach the user of that device, the total "coverage" of the agreement is not a sensible measure of alleged foreclosure.

In addition to advancing a flawed argument regarding the proper measure of foreclosure, Plaintiffs assert that there is "a significant factual dispute, making summary judgment improper." Opp. 48.  But Plaintiffs do not identify any material facts that need to be determined in order to conclude that the challenged Android agreements do not foreclose a substantial share of the alleged markets.  There is no evidence that the degree of foreclosure approaches a level that any court has deemed "substantial," and those agreements therefore do not have the "requisite anticompetitive effect." *Microsoft*, 253 F.3d at 69.

### B. The Alleged Effects of the Android Agreements Cannot Be Aggregated with Non-Exclusionary Conduct

Finally, Plaintiffs' assertion that any anticompetitive effects should be analyzed "contextually" or in the "aggregate" cannot salvage their claims.  *E.g.*, Opp. 3-4, 17-18.  The examples Plaintiffs cite involve consideration of the effect of different forms of conduct that ***were***

██████████████████████████

*each found to be exclusionary*.  For example, the *Microsoft* court noted that even though ISVs were "a relatively small channel for browser distribution," Microsoft's "exclusive deals" with ISVs held "greater significance because … Microsoft had largely foreclosed the two primary channels to its rivals" by engaging in exclusionary conduct with respect to those other two channels. *Microsoft*, 253 F.3d at 72; *see id.* at 64 (concluding that certain restrictions on OEM's "violate § 2 of the Sherman Act"); *id.* at 71 (holding "that Microsoft's exclusive contracts with IAPs are exclusionary devices, in violation of § 2 of the Sherman Act").  By contrast, the D.C. Circuit did *not* invalidate conduct that comprised competition on the merits or was not exclusionary merely because Microsoft also engaged in *other* conduct that the court condemned.  *See id.* at 78.

Plaintiffs seek to engage in precisely the kind of aggregation that *Microsoft* precludes by lumping together the Android agreements with other conduct that is not exclusionary at all.  For the reasons discussed above in Section I, Google's agreements with Apple, Mozilla, and other browser developers are the product of competition on the merits.  And Plaintiffs have not even alleged that Google's successful development of the Chrome browser is anticompetitive—nor could they, given that an alleged "monopolist does not violate the Sherman Act simply by developing an attractive product." *Microsoft*, 253 F.3d at 68.  These forms of conduct therefore cannot be "aggregated" in an attempt to conjure a substantial effect on competition.  *See, e.g.*, *Eatoni Ergonomics, Inc. v. Res. in Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011) (rejecting "the unworkable proposition that business conduct that does not offend the antitrust laws may violate the Sherman Act once it is combined with other lawful business conduct").[8]

---

[8] The Colorado Plaintiffs double down on this flawed approach by asserting that "Google benefits from default status" with regard to "███" of the search queries which were made in 2021 using Google Search." Colo. Pls.' Opp. 32.  This irrelevant and misleading figure includes searches conducted using the Google Search App (iGSA) and Chrome browser on Apple devices, *see id.*,

As a judge on this Court recently observed, "decisions that do allow for 'course of conduct' Section 2 liability, which is itself controversial, usually explain that the doctrine is necessary in cases involving individual acts that are lawful in themselves only because, when evaluated in a vacuum, those acts lack the requisite substantial effect on competition." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 46-47 (D.D.C. 2021). Google's motion does not ask the Court to evaluate the alleged effect of any of the Android agreements in isolation, but rather assumes for present purposes that Google's RSAs with every Android OEM and carrier will be considered in the aggregate. The law does not support any further aggregation, as agreements that collectively do not have the requisite effect on competition are not rendered unlawful when viewed in light of other conduct that is a form of competition on the merits. *See, e.g.*, *Microsoft*, 253 F.3d at 78; *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) (rejecting the notion "that the degrees of support for each legal theory should be added up"); *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981) (confirming that even when the grounds for potential Section 2 liability "are interrelated and interdependent" the court must "analyze the various issues individually" and "rejecting the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of … section 2 of the Sherman Act"); *Facebook*, 549 F. Supp. 3d at 46-47 (declining to aggregate "[u]nilateral refusals to deal" with other conduct because such refusals are "tolerated by antitrust law").

---

even though Apple has never pre-installed iGSA or Chrome on any device, and even though rival search apps and browsers can be downloaded in the same manner as iGSA and Chrome, *see* SOGI ¶¶ 85-87, 90. The Colorado Plaintiffs' figure also includes searches conducted using the Chrome browser on Microsoft Windows PCs, *see* Colo. Pls.' Opp. 32, even though PC manufacturers "exclusively" pre-install Microsoft's browser and set Bing as the default search engine pursuant to agreements with Microsoft. *See* SOGI ¶¶ 205-06; Google's Ex. 9 ¶¶ 83, 87-92.

### III.    Plaintiffs Have Abandoned Any Claims with Respect to ACCs and AFAs, Conduct Concerning Assistant and Internet of Things, and Android Design Decisions

The Court should also grant summary judgment with respect to three categories of conduct that, the Oppositions confirm, Plaintiffs no longer assert harm competition.  "Plaintiffs [have] forfeited these arguments by failing even to remotely develop them in their briefing."  *Momenian v. Davidson*, 2020 WL 999204, at *8 (D.D.C. Mar. 1, 2020) (granting summary judgment).

### A.    Plaintiffs Abandon Their Complaints' Assertions of Anticompetitive Effects in Search Based on ACCs and AFAs

Plaintiffs alleged that Google's Android Compatibility Commitments (ACCs) and Anti-Fragmentation Agreements (AFAs) harmed search competition by inhibiting "pathway[s] for distribution of general search services other than Google."  DOJ Pls.' Am. Compl. ¶¶ 126-32; Colo. Pls.' Compl. ¶¶ 115-16.  Google demonstrated that Plaintiffs failed to adduce any triable evidence supporting this theory.  Mot. 43-46.  Plaintiffs' Oppositions offer nothing in response.  Indeed, Plaintiffs outright abandon any assertion of exclusionary conduct based on ACCs/AFAs.  These agreements are entirely absent from Plaintiffs' Counterstatement of Material Facts, which excludes ACCs/AFAs from the Android-related "Distribution Agreements" they "challenge[]."  COMF ¶ 468 & n.21 (including **only** MADAs/RSAs).  And they make no claim that ACCs/AFAs, mentioned solely in passing (Opp. 13 n.7), comprise anticompetitive conduct.[9]  *See, e.g.*, *id.* at 30-35.

Plaintiffs discarded their ACC/AFA theories because no triable evidence supported them.  Plaintiffs concede that the compatibility commitments those agreements prescribe do not concern

---

[9] The same holds for the Colorado Plaintiffs, who merely advert to ACCs/AFAs in their separate statement of facts (Colo. Pls.' SMF ¶¶ 45-46) and do not mention them at all in their separate brief.

the search service or browser an OEM installs or sets as the default.  SOGI ¶¶ 275, 277–79.[10]

Because Plaintiffs have jettisoned their infirm ACC/AFA theories, the Court should grant

summary judgment insofar as Plaintiffs' claims encompass a theory that those agreements are

exclusionary or harm search competition.  *See Momenian*, 2020 WL 999204, at *8.

> **B.     Plaintiffs Abandon Their Complaints' Assertions of Anticompetitive Effects in Search Based on Google's Assistant and Internet of Things Practices**

Plaintiffs also promised evidence that Google's Assistant and Internet of Things ("IoT")

practices harm search competition.  *E.g.*, DOJ Pls.' Am. Compl. ¶¶ 80, 139-41, 164-65, 166.d-e;

Colo. Pls.' Compl. ¶¶ 10, 12, 48, 127-43, 205.  Plaintiffs now paint those allegations as in

"anticipation of a rebuttal argument Google has not made."  Opp. 50 n.21.  Such revisionism only

confirms, as Google demonstrated, that the record lacks evidence of anticompetitive effects in

search from Assistant- and IoT-related conduct.  Mot. 47-48.  Summary judgment insofar as

Plaintiffs' claims encompass a theory that such conduct harms search competition or is

exclusionary is accordingly appropriate.

> **C.     Plaintiffs Assert No Exclusionary Conduct Based on Google's Android Design Decisions**

Plaintiffs' Oppositions also confirm that they make no claim of anticompetitive conduct

from Google's release of certain services through proprietary licenses rather than through the

---

[10] DOJ Pls.' Am. Compl. ¶ 126.  Plaintiffs likewise assert no triable theory of competitive harm based on Professor Whinston's baseless assertion that "AFAs/ACCs" supposedly give Google power to "disrupt the profitability of any OEM or MNO that implements a rival general search engine" on their compatible Android devices.  Pls.' Ex. 24 (Whinston (DOJ Pls.' Expert) Rebuttal Rep.) ¶ 346.  With good reason.  Plaintiffs adduce no evidence that Google mis-wielded compatibility commitments to block search rivals.  Plaintiffs also concede that neither ACCs nor AFAs (unlike MADAs) require signatories to preview any devices to Google prior to launch. SOGI ¶¶ 292-93; Opp. 13 n.7.

Android Open Source Project (AOSP) or Google's decisions respecting investment in, or how or whether to include in AOSP, certain early open-source Android applications.

With respect to Android, Plaintiffs challenge *only* Google's "distribution agreements." Opp. 3-4, 18, 30-32, 45. They identify *no* challenge to Google's offering services through proprietary licenses or decisions made in connection with early AOSP apps. Nor do Plaintiffs answer Google's showing that there is no evidence of harm to search competition from such conduct, even if challenged. Mot. 48-50. While Plaintiffs point to Google's offering of certain services proprietarily in contending that Google Mobile Services are a "must have" (COMF ¶¶ 573-77), Plaintiffs do not argue that such licensing choices were anticompetitive or unlawful. Nor could they. Google had the right "to refuse to license" proprietary innovations on an open-source basis. *United States v. Studiengesellschaft Kohle, m.b.H*, 670 F.2d 1122, 1127 (D.C. Cir. 1981); *see* Mot. 49-50. Plaintiffs conspicuously make no argument that Google's decisions with regard to AOSP apps harmed competition.

Because Plaintiffs abandon any contention that Google's Android design decisions comprise anticompetitive conduct, the Court should grant summary judgment to the extent Plaintiffs' claims encompass a theory that such conduct harms search competition or is exclusionary.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment on all counts of the DOJ Plaintiffs' Amended Complaint, and on all counts of the Colorado Plaintiffs' Complaint insofar as it incorporates by reference the DOJ Plaintiffs' allegations.

Dated: February 27, 2023

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*