## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ██████████████ |
| Defendant. | |

## REPLY IN SUPPORT OF DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

I.  Plaintiffs Seek to Evade Their *Prima Facie* Burden by Misreading the Law ...................3

    A.  Plaintiffs Incorrectly Focus Only on the Claimed Harm, Ignoring the Threshold Question of Whether the Conduct is Exclusionary.................................3

    B.  Plaintiffs Improperly Aggregate the Alleged Conduct ............................................6

    C.  Plaintiffs Distract from the Relevant Questions with Their Emphasis on Google's Alleged Monopoly Power .......................................................................9

II.  The Court Should Grant Summary Judgment on Plaintiffs' SVP Claims .........................10

    A.  Plaintiffs Identify No Actionable Antitrust Conduct with Respect to Google's Specialized Units....................................................................................10

        1.  Unable to Dispute that Google's Specialized Units Improve Google's SERP, Plaintiffs Incorrectly Recast the Legal Standard ...........11

        2.  What Plaintiffs Characterize as "Visibility-Limitation Practices" are Lawful Product Designs, and Plaintiffs Provide No Legal Support for Their Contention that Google's Design Choices Constitute Anticompetitive Conduct.........................................................14

    B.  Plaintiffs Identify No Actionable Antitrust Conduct with Respect to Google's Data Contracts with SVPs ..........................................................................19

    C.  Plaintiffs' SVP Claims Independently Fail Because Plaintiffs Cannot Demonstrate an Anticompetitive Effect in the Alleged Relevant Markets............20

III.  The Court Should Grant Summary Judgment on Plaintiffs' SA360 Claim.......................25

    A.  Plaintiffs' SA360 Claim Fails Because the Evidence Shows at Most Transient Delay, Not Harm to Competition..........................................................25

    B.  Plaintiffs Fail to Provide Evidence of Competitive Harm ....................................27

        1.  Plaintiffs Fail to Substantiate Their "Foreclosure" Theory ......................27

        2.  None of Plaintiffs' "Disputed" Facts Show Competitive Harm ...............28

## TABLE OF AUTHORITIES

### CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) ....................................................................................................................13, 14, 15

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997) ..................................................................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ......................6

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002)...........................8

*Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666 (D.C. Cir. 2005)...........8, 10

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)....................................................19

*In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ..............8

*In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d. Cir. 2017)................................29

*Intergraph Corp. v. Intel Corp*, 195 F.3d 1346 (Fed. Cir. 1999)...........................6, 8, 19

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ...........................................................8

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ...............8

*Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986) ..............................................................................................................19

*Pacific Bell Tel. Co. v. linkLine Comm'cns, Inc.*, 555 U.S. 438 (2009) ........................19

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)......................................................24

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .......................... *passim*

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999)............................5, 13

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000)...........................5, 7

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...............10, 19

*Williamsburg Wax Museum, Inc. v. Hist. Figures, Inc.*, 810 F.2d 243 (D.C. Cir. 1987) .............25

Colorado Plaintiffs' ("Plaintiffs") Opposition raises no issue of material fact and summary judgment in Google's favor is warranted on all of Plaintiffs' claims.  The undisputed facts and governing case law make clear that Plaintiffs have not met and cannot meet their *prima facie* burden of showing (a) exclusionary conduct that (b) had a substantial adverse effect on competition.

Google's SERP Design and Data Contracts.  As Plaintiffs acknowledge, the websites of Specialized Vertical Providers ("SVPs") often rank highly on Google's SERP, and SVPs enjoy the free traffic that results when users click on links to their websites.  Many SVPs also successfully bid for text advertisements on Google's SERP, and receive substantial additional traffic from those advertisements.  And SVPs also gain search traffic when they are featured within Google's specialized units, where Google displays them on pages relevant to the user's search journey.  A few SVPs, however, complain this is not enough: they want Google to redesign certain units on the SERP so they are featured even more prominently inside those units.

The Sherman Act imposes no obligation on Google to design its SERP to best serve the interests of SVP competitors.  The challenged designs indisputably improved Google's search results for users, which disposes of Plaintiffs' claims.  Plaintiffs do not cite a single case that endorses their far-fetched antitrust liability theory.  And indeed, the D.C. Circuit's decision in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam), precludes their claim.  The *Microsoft* decision confirms that where the challenged design improved the product, there is no antitrust liability—regardless of whether there exists some alternative, hypothetical design that might have also improved the product while better serving the interests of rivals.  For good reason: courts are not well-equipped to second-guess product design decisions that are better made and evaluated by the market.  The unbounded scope of Plaintiffs' theory only

confirms the practical impossibility of courts dictating and administering product design and development.  In this case, given that there is by definition limited space on Google's SERP, and nearly infinite potential SERP designs, almost any design decision by Google could be cast as a decision to "limit[] the visibility" or "raise[] the cost of customer acquisition" of one type of entity or another.  Opp. 5, 16.[1]  *See* Section II.A.

There is likewise no basis for antitrust liability for the negotiated terms of the data contracts that Google enters with SVPs.  Plaintiffs have no support for their contention that Google is required, as a matter of antitrust law, to provide more compensation and/or attribution to SVPs in exchange for the data those SVPs provide pursuant to the parties' contracts.  *See* Section II.B.

Additionally, Plaintiffs have not provided evidence of any harm to their claimed relevant markets resulting from Google's conduct vis-à-vis SVPs.  Plaintiffs' Opposition does not explain how stronger SVPs would lead to more competition in the general search markets (which Plaintiffs define to exclude SVPs)—let alone provide evidence to support that contention.  In lieu of providing evidence of specific effects, they urge this Court to treat all conduct "cumulative[ly]," Opp. 2, but that approach fails as a matter of law.  As an alternative theory, Plaintiffs offer speculation from their expert, which does not suffice to create an issue of disputed material fact.  *See* Section II.C.

Google's SA360 Search Advertising Tool.  Plaintiffs' Opposition regarding its SA360 allegations similarly offers a grand narrative unsupported by specific evidence.  Plaintiffs claim that ██████████████████████████████████████████████ allowed Google to "entrench" itself in search advertising.  Opp. 34.  But Plaintiffs' theory cannot be squared with the

---

[1] Citations to "Opp." refer to the Plaintiff States' Memorandum in Opposition to Defendant Google LLC's Motion for Summary Judgment, ECF 491.

record: by Plaintiffs' own measure, ████████████████████████████████████

████████████████████████████ and ████████████████████████████████████████

There is also no dispute that Google has built four of the Microsoft tools about which Plaintiffs

complain, ████████████████████████████

Plaintiffs' argument boils down to the contention that Google should have built these features sooner, because rival Microsoft would prefer it that way.  A theory of transient harm, unsupported by evidence, cannot sustain this claim at summary judgment.  *See* Section III.A.

Nor have Plaintiffs substantiated any harm to competition.  Plaintiffs speculate about the possibility of spend shift, but evidence in the record refutes this speculation.  In any event, there is no plausible scenario in which a purported spend shift of *less than one percent* of Plaintiffs' own estimate of the total U.S. search advertising market reflects substantial harm to competition.  *See* Section III.B.

Search Distribution Agreements.  Google's reply brief in support of its motion for summary judgment on claims brought by both the DOJ Plaintiffs and the Colorado Plaintiffs addresses the failure of Plaintiffs' claims as they pertain to Google's search distribution agreements.

Because Plaintiffs' Opposition raises no dispute of material fact, summary judgment should be granted in full.

## ARGUMENT

I.   **Plaintiffs Seek to Evade Their *Prima Facie* Burden by Misreading the Law**

A.   **Plaintiffs Incorrectly Focus Only on the Claimed Harm, Ignoring the Threshold Question of Whether the Conduct is Exclusionary**

Plaintiffs ignore entirely their burden to show that the challenged conduct is exclusionary as a matter of law.  The Sherman Act requires Plaintiffs to establish that Google maintained monopoly power "through anticompetitive means," *Microsoft*, 253 F.3d at 51, which means that

Plaintiffs must show *both* that Google engaged in exclusionary conduct as opposed to lawful "vigorous competition" (*i.e.*, the act must "harm the competitive *process*") *and* that Google's conduct in fact had substantial adverse effects on competition, *see id* at 58-59; Mot. 19-20. Plaintiffs' Opposition focuses only on the latter.

      *Microsoft* makes clear that Plaintiffs cannot leapfrog over the first half of their *prima facie* burden.  The *Microsoft* court separately assessed not only the *effects* of the challenged conduct, but also whether the conduct was unlawfully exclusionary in the first instance (as opposed to lawful competition).  For example, in affirming the district court's finding of liability for Microsoft taking its Internet Explorer browser ("IE") out of the Windows "Add/Remove Programs" utility, the D.C. Circuit highlighted the finding below that Microsoft's product change did not "mak[e] [its] own browser more attractive to consumers."  *Microsoft*, 253 F.3d. at 65.  In the very next sentence, the court explained, "[b]ecause Microsoft's conduct, *through something other than competition on the merits*, has the effect of significantly reducing usage of rivals' products and hence protecting its own operating system monopoly, it is anticompetitive." *Id.* (emphasis added). Notably, in characterizing this holding, Plaintiffs omit the court's conclusion that the conduct was "something other than competition on the merits" because it did not constitute a product improvement; Plaintiffs instead focus exclusively on the assessment of anticompetitive effects. Opp. 29.  The *Microsoft* court's analysis of other challenged conduct proceeded in the same manner as the Add/Remove Programs analysis, addressing *both* the nature *and* the effect of the conduct.  *See, e.g.*, 253 F.3d at 62 (holding license provision prohibiting OEMs from modifying initial boot sequence is anticompetitive conduct "[b]ecause this prohibition has a substantial effect

in protecting Microsoft's market power, *and does so through a means other than competition on the merits*") (emphasis added).[2]

That the *Microsoft* court did not focus only on claimed effects on competition (as Plaintiffs urge this Court to do) is likewise clear in its treatment of Microsoft's conduct in developing and offering an IE "Access Kit" ("IEAK").  The IEAK was an undisputed product improvement.  *See United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 71 (D.D.C. 1999).  The D.C. Circuit reversed the district court's Section 2 liability finding on that conduct precisely because the district court failed to recognize that the conduct was not exclusionary:  "[A] monopolist does not violate the Sherman Act simply by developing an attractive product.  Therefore, Microsoft's development of the IEAK does not violate the Sherman Act."  *Microsoft*, 253 F.3d at 68 (internal citation omitted). The court did not consider or even address the district court's finding that this conduct had contributed to preserving the applications barrier to entry, because consideration of effects was unnecessary once the conduct was determined not to be exclusionary.  *See id.* at 71; *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 41 (D.D.C. 2000).

Plaintiffs' reading of *Microsoft* is not only contrary to the court's analysis of each of the liability findings; as addressed in more detail below (*see infra* Section I.B), it would allow for essentially unbounded potential liability for any procompetitive behavior by an alleged monopolist whose success in the marketplace impacts competitors—an outcome that courts have long been careful to avoid.

---

[2] The *Microsoft* court at times characterizes the *prima facie* inquiry in shorthand fashion as assessing "anticompetitive effects."  *E.g.*, 253 F.3d. at 65 ("[W]e consider first whether the suspect actions had an anticompetitive effect.").  But, as the examples demonstrate, its analysis makes plain that it is not only the effect of the conduct but also the nature of the conduct that must be examined.

### B.    Plaintiffs Improperly Aggregate the Alleged Conduct

Another tactic Plaintiffs deploy in their effort to avoid summary judgment is to contend that the Court must consider "all conduct"—*exclusionary or not*—that supposedly "creates or amplifies competitive harm." Opp. 24. The cases on which Plaintiffs rely, however, do not support considering the challenged conduct in the aggregate without first considering whether each category of conduct is exclusionary and in fact has some anticompetitive effect on its own.

Plaintiffs rely primarily on *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Opp. 24. In that case, the Court merely concluded that "the character and effect *of a conspiracy* are not to be judged by dismembering it and viewing its separate parts." 370 U.S. at 699 (emphasis added). The Court was focused on whether sufficient evidence existed to infer "the necessary causal connection between [the] antitrust violations and petitioner's injury," not on the preliminary question whether the complained-of conduct was exclusionary or competition on the merits. *Id*. at 700. In any event, "*Continental Ore* did not hold . . . that the degrees of support for each legal theory should be added up." *Intergraph Corp. v. Intel Corp*, 195 F.3d 1346, 1367 (Fed. Cir. 1999). To the contrary, each "legal theory must be examined for its sufficiency and applicability, on the entirety of the relevant facts." *Id*.

Nor does *Microsoft* support Plaintiffs' contention. Plaintiffs describe *Microsoft* as having "examined the interaction among different contracts and categories of conduct," pointing to the court's treatment of the OEM license restrictions and Microsoft's exclusive deals with Internet Service Vendors. Opp. 22 (citing *Microsoft*, 253 F.3d at 64, 75-76). But the *Microsoft* court did

not, as Plaintiffs do here, lump together both exclusionary and non-exclusionary conduct in assessing whether there was an anticompetitive effect.[3]

In fact, the *Microsoft* court's analysis expressly *rejected* the approach Plaintiffs urge here, as illustrated by its analysis of a range of challenged conduct in the IAP distribution channel.  The district court had aggregated anticompetitive effects arising from three categories of conduct impacting the IAP channel: (1) licensing IE and the IEAK for free; (2) exclusive dealing arrangements with certain IAPs; and (3) rebates to those same IAPs in exchange for upgrading users to packages with IE rather than its competitor, Netscape Navigator.  The district court found that these "inducements and restrictions" collectively "contributed significantly to preserving the applications barriers to entry."  *Microsoft*, 87 F. Supp. 2d at 41.  The D.C. Circuit reversed the district court's liability finding for two of the three categories of conduct:  licensing IE and IEAK for free and rebates to IAPs.  253 F.3d at 68.  In doing so, the court analyzed the conduct separately to determine whether it was competitive or exclusionary, and effects from competitive acts were thereafter excluded from the analysis.  The court considered only Microsoft's exclusive deals with certain IAPs in assessing whether the plaintiffs had met their *prima facie* burden of showing harm to competition.  *Id.* at 70-71; *see also id.* at 78 (declining to invalidate categories of conduct "not in themselves unlawful" when set in the context of conduct held exclusionary).

In sum, under *Microsoft*, the Court can consider whether conduct has an anticompetitive effect sufficient to meet Plaintiffs' *prima facie* burden only *after* first concluding that the conduct is exclusionary, that is, not competition on the merits.  Plaintiffs therefore cannot save their claims

---

[3] With respect to the OEM licenses, the court treated those as one category of exclusionary conduct (license restrictions) and considered the total foreclosure resulting from all of that related conduct. But the D.C. Circuit did *not* consider the effect of any lawful conduct when determining whether the agreements were anticompetitive.  *See* 253 F.3d at 78 (declining to consider otherwise lawful conduct anticompetitive when considered with conduct the court condemned).

by asserting that disparate lawful conduct somehow works together to preserve Google's alleged monopoly. *See Microsoft*, 253 F.3d at 78; *see also Intergraph*, 195 F.3d at 1367 (plaintiffs cannot prove a Section 2 violation with only "a fraction of validity to each of the basic claims"). What Plaintiffs label a "compartmentalized analysis," Opp. 6, is in fact the approach followed by the *Microsoft* court and thus by Google here: first assessing whether each form of conduct is exclusionary or competition on the merits, and then proceeding to determine whether Plaintiffs have met their burden to demonstrate that any exclusionary conduct has had an anticompetitive effect. *See also In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("For the sake of accuracy, precision, and analytical clarity, we must evaluate [defendant's] allegedly exclusionary conduct separately."); *Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 672-77 (D.C. Cir. 2005) (court separately evaluates the "competitive significance" of five different categories of alleged anticompetitive conduct).

The remaining cases that Plaintiffs cite, *see* Opp. 24-25, likewise do nothing to advance their argument because none of those cases conclude that non-exclusionary conduct nonetheless can be considered as the basis for a violation of Section 2 because of some other conduct. To the contrary, in each of those cases, the court concluded that the conduct at issue was in fact exclusionary and therefore could support a finding of liability under Section 2. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015) (concluding defendants' "hard [product] switch crosse[d] the line from persuasion to coercion and [was] anticompetitive); *LePage's Inc. v. 3M*, 324 F.3d 141, 154, 159, 162 (3d Cir. 2003) (explaining bundled rebates offered in exchange for purchases bridging multiple product lines were exclusionary and further magnified other exclusive dealing practices); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783-88 (6th Cir. 2002) (concluding there was sufficient evidence for jury to find systematic

tortious activity was "exclusionary conduct without a sufficient justification" and defendant "maintained its monopoly power by engaging in such conduct").

Finally, Plaintiffs wrongly assert that "Google does not dispute that both its SA360 conduct and its SVP conduct reinforce the distribution agreements or that the distribution agreements enable this other conduct." Opp. 25. The assertion that these disparate categories of alleged conduct reinforce each other has no basis in fact. Plaintiffs' arguments boil down to the assertion that, because Google has a large market share in the alleged general search markets, SVPs and other advertisers are more likely to do business with Google, which contributes to a cycle whereby rival general search engines are less likely to win distribution deals. Opp. 4-6, 25-28 (labeling this theory a "monopoly feedback loop"). But possessing monopoly power or improving the desirability of products does not violate the Sherman Act. Moreover, Plaintiffs offer no evidence that Google's actions with respect to SVPs or SA360 have any impact on competition in the alleged general search markets (*see infra* Sections II.C & III.A & B).

## C.   Plaintiffs Distract from the Relevant Questions with Their Emphasis on Google's Alleged Monopoly Power

Rather than providing evidence to establish both anticompetitive conduct and harm to competition in a relevant market, Plaintiffs focus on Google's alleged market share and monopoly power. *See* Opp. 1, 8, 47-49. Whether Google possesses monopoly power in any relevant antitrust market is not an issue presently before the Court. *See* Mot. 15. While Google disagrees with Plaintiffs' monopoly power assertions, Google's disagreement is not the basis of its summary judgment motion. Instead, Google's motion centers on the separate question of whether Plaintiffs have met their *prima facie* burden of showing that Google has (1) engaged in exclusionary conduct that (2) has had a substantial anticompetitive effect. Plaintiffs cannot substitute a focus on market

power for answers to these questions.  *See, e.g.*, *Verizon Commc'ns v. Law Offices of Curtis V.*
*Trinko, LLP*, 540 U.S. 398, 407 (2004); *Covad*, 398 F.3d at 672.

## II.     The Court Should Grant Summary Judgment on Plaintiffs' SVP Claims

### A.     Plaintiffs Identify No Actionable Antitrust Conduct with Respect to Google's Specialized Units

As a threshold matter, is it important to understand the designs at issue in the challenged
verticals, given that SVPs appear in web results and text ads on Google's SERP and when a user
interacts with the at-issue specialized units.  The information presented in specialized units on the
SERP is different in kind than what appears in web results and text ads—it is structured
information that conveys particular types of information (*e.g.*, images, availability, reviews) about
particular types of entities (*e.g.*, hotels, flights, restaurants).  Pls.' RSMF ¶¶ 56, 58, 100, 102, 131,
133.[4]  This structured information is the focus of Plaintiffs' challenge—they object that SVPs are
not presented as among the types of information that appear in the unit on the SERP (before a user
clicks on the unit).  Opp. 18 ("SVPs cannot appear in results in the free listings . . . .").  Plaintiffs
also object to the fact that, for local services ads, "SVPs cannot purchase ads in their own name
and cannot appear prominently in the tile of local services ads," and, "when a user clicks on an ad
paid for by the SVP featuring the name of a supplier, the consumer is directed to another Google
site, not the SVP's site."  Opp. 18.  Finally, Plaintiffs complain that "Google also often prohibits
SVPs from buying local search ads displaying their brand name in Google's local universal."  Opp.
18.

---

[4] Citations to "Pls.' RSMF" refer to the Plaintiff States' Response to Google's Statement of
Material Facts as to Which There is No Genuine Issue, ECF 465-2.

1.     **Unable to Dispute that Google's Specialized Units Improve Google's SERP, Plaintiffs Incorrectly Recast the Legal Standard**

Plaintiffs confirm that they are not challenging "the existence of universals, the inclusion of prices and non-SVPs in them, and the way Google selects the order in which the SERP features should appear."  Opp. 41.  That is so because they cannot, and do not, dispute the foundational factual points establishing that Google's introduction of the challenged units improved Google Search by providing new benefits to users: namely, that the specialized units present users with a wealth of structured information about a specific topic beyond what was available from the web results and text ads on the remainder of the SERP (*e.g.*, Pls.' RSMF ¶ 16); that one of the reasons Google launched the specialized units was that Google believed they provided a better user experience than just presenting web results and text ads (*e.g.*, Pls.' RSMF ¶¶ 11, 16, 17, 24, 29); that Google conducted testing for each of the challenged units confirming that the units improved the user experience (*e.g.*, Pls.' RSMF ¶¶ 70, 71, 78–81, 109-11, 142–144, 147–149, 173–176)[5]; and that Google used the same processes and methods for assessing whether to implement these product changes as it uses to test other contemplated design changes in the ordinary course (*e.g.*, Pls.' RSMF ¶¶ 36-54, 70, 78, 109-11, 147-49, 173).[6]

Plaintiffs' first line of response is not to challenge these undisputed facts, but to contend that whether the specialized units improve Google's SERP is not the right legal question.

---

[5] The "disputes" Plaintiffs identify in response to the cited paragraphs do not actually identify evidence that contradicts the stated fact.  Plaintiffs' purported disputes are rather legal arguments that Google should have tested a different design and followed a different methodology, which fail for the reasons stated *infra* Section II.A.2.

[6] Plaintiffs highlight that Google *also* considered, beyond user experience, the monetization potential of various verticals.  Opp. 3.  This is, of course, perfectly consistent with making a product improvement to better compete, but it is immaterial to the question before the Court, and Plaintiffs themselves do not argue otherwise.

Plaintiffs' argument misconstrues the applicable law.  Namely, Plaintiffs argue that under *Microsoft*, the court must disregard whether the design change improved a product and instead consider the supposed effect of a product design change on competitors.  Opp. 23, 28-29.  That is not the law as reflected in *Microsoft* or elsewhere:  the plaintiff's *prima facie* burden requires proof that the conduct is of the ***nature*** courts condemn as exclusionary.  Where the product design improved the product (compared to the prior design, not a hypothetical alternative design Plaintiffs might prefer), it is lawful procompetitive conduct and not exclusionary conduct as a matter of law.

The *Microsoft* court's analyses of challenged product designs reflect this consistent approach.  As previously discussed, the court reversed the IEAK liability finding because "a monopolist does not violate the Sherman Act simply by developing an attractive product."  253 F.3d at 68.  At the same time, the court affirmed the challenge to Microsoft's exclusion of IE from the "Add/Remove Programs" utility in Windows, but only after determining that Microsoft's design change was *not* a product improvement (it did not make Microsoft's "browser more attractive to consumers"), and therefore was not "competition on the merits."  *Id.* at 65.

Particularly instructive is the *Microsoft* court's reversal of the district court's imposition of liability for Microsoft's development and promotion of its Java Virtual Machine (JVM).  At issue was Microsoft's decision only to include "native" (Windows) calls in its JVM¸ and not those of its rival Sun's JVM.  The district court acknowledged that Windows calls were slightly easier for developers to use, and likely caused Java applications to run faster on Windows.  But the district court found that, although Microsoft could have included support for both methods at little cost, Microsoft deliberately chose not to in order to impair cross-platform compatibility and thereby preserve the applications barrier to entry that helped Microsoft maintain its Windows monopoly. *See Microsoft*, 84 F. Supp. 2d at 106 ("Far from being the unintended consequence of an attempt

to help Java developers more easily develop high-performing applications, incompatibility was the intended result of Microsoft's efforts.").  Moreover, Microsoft omitted Sun's method even though its inclusion would further have improved its JVM.  *See id.* ("Microsoft easily could have implemented Sun's native method along with its own in its developer tools and its JVM, thereby allowing Java developers to choose between speed and portability.").

The D.C. Circuit reversed.  It was of no moment that Microsoft's JVM would have been improved even more if it allowed for the creation of applications compatible with both Microsoft's and Sun's JVMs or that Microsoft could have achieved that result at little to no cost.  Instead, the question was simple: was the Microsoft JVM a genuine product improvement?  The court concluded that the JVM was an improvement because it "allow[ed] applications to run more swiftly and [did] not itself have any anticompetitive effect."  *Microsoft*, 253 F.3d at 75.  The fact that the JVM was an improvement was the end of the court's analysis.

Notably, Plaintiffs do not cite a single case where a product design that indisputably improved the product (as is the case here) was found to constitute anticompetitive conduct.  Nor do Plaintiffs have any response—other than their misreading of *Microsoft*—to the authorities cited in Google's motion emphasizing that courts must be particularly cautious when evaluating product improvements.  *See* Mot. 21-22, 27-28.

In an attempt to distinguish *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010), Plaintiffs argue that even though Google improved its search results when it introduced specialized units, Google engaged in "anticompetitive conduct distinct from the introduction" of those units.  Opp. 30.  But the challenged "restrictions" (Opp. 18-19) associated with these specialized units have been in place since their introduction and are part of the product design.  They cannot be cast as "associated" conduct under *Allied*, Opp. 30, and

Plaintiffs do not cite any authority that would support such a reading or even attempt to explain how these aspects of the specialized units are somehow "distinct" from their design.

Plaintiffs' other proffered bases to distinguish *Allied* fare no better.  They argue that *Microsoft* controls, Opp. 29, but identify no tension between the two cases—nor is there any, particularly as applied here to a clear case of product improvement.  Both cases recognize that genuine improvements, such as upgraded performance and ease of use, are competition on the merits.  Mot. 20.  Plaintiffs also note that *Allied* involved "the introduction of a new product." Opp. 29.  But *Allied* cannot be read to be limited to new products; indeed, the court characterized the product at issue as "an improvement over previous designs" and expressly held that that any "*design change* that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct."  *Id*. at 998-99, 1002 (emphasis added).

> 2.  **What Plaintiffs Characterize as "Visibility-Limitation Practices" are Lawful Product Designs, and Plaintiffs Provide No Legal Support for Their Contention that Google's Design Choices Constitute Anticompetitive Conduct**

Plaintiffs' other principal response to the undisputed evidence showing that Google improved its product in introducing the challenged units is to focus narrowly on what they call Google's SVP "visibility-limitation practices," Opp. 19, and argue that Google's SERP would be even better if it afforded SVPs greater visibility, Opp. 40-42.  This invitation for the Court to assess and compare the relative competitive merits of different hypothetical product designs has no basis in antitrust law and in fact was rejected by the D.C. Circuit in *Microsoft* (*see supra* pp. 12-13). Plaintiffs cite not a single case where the sort of conduct they challenge was held anticompetitive.

Each of the factual "disputes" Plaintiffs raise is legally immaterial because those facts do not create a genuine issue for trial as to whether Google's design marked a product improvement:

**Claim that Google should have tested a different design.**  Plaintiffs downplay the extensive testing that Google performs for each change to its SERP, including those surrounding the introduction of the specialized units at issue here.  Opp. 40.  They claim that the only relevant analysis would be a test that compared a SERP with and without those aspects of Google's design that they now challenge—that is, one assessing the "difference in user satisfaction between the presence or absence of an SVP in any SERP feature." *Id.*

That is not the law (as *Microsoft's* JVM holding confirms), nor would that be a sensible requirement.  For one, Google tests its product design changes *before* launching them, and Plaintiffs' proposed testing requirement would impose on Google the burden to *ex ante* (1) identify all possible third-party complaints to its contemplated product design and (2) run tests on each iteration of possible complaint.  Google's purpose in designing and implementing product design changes is to improve its products for its users, not guard against all possible criticisms and complaints from non-users.  But even setting aside the difficulty, if not impossibility, of making those *ex ante* determinations, antitrust law does not require companies to test alternative iterations before implementing a change that the company has determined would improve the product.  Such a requirement would be debilitating to innovation and would harm consumers.  *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 1000.  As applied to Google, especially given the unbounded nature of Plaintiffs' critique here, Google would be crippled from making virtually any change for fear that it would be subject to an after-the-fact attack based on a hypothetical new design.

**Contention that the challenged units would be more helpful to users if they included SVPs.**  Plaintiffs make the related argument that Google's specialized units are "likely" providing lower quality information than if they included SVPs.  Opp. 39-40; *see, e.g.*, Pls.' RSMF ¶ 39.  They point to the fact that SVP websites are often ranked highly in Google's web results and

similarly, that SVP text ads are often displayed on the SERP, noting that the ranking of web results and the text ad auction take into account the predicted relevance to the user.  Opp. 40.  The gist of their argument is that this shows Google recognizes SVP websites are relevant and useful to users. Plaintiffs again focus on the wrong question.  That Google's algorithms rank SVPs highly does not tell one anything about the legally relevant question: whether Google's SERP design is a product improvement *relative to the prior design*.  Their contention also fails for the separate reason that it is undisputed that Google's overall SERP design principles include that there should be a variety of information displayed on the SERP and that information should not be duplicative. Pls.' RSMF ¶¶ 5, 18, 43, 84, 214.

**Comparison to Google's design of specialized results in other units.**  Plaintiffs contend that the fact that SVPs appear prominently in other specialized units "undercuts Google's claim that users benefit from its visibility limits [in the challenged units]."  Opp. 40-41.  But again Plaintiffs incorrectly recast the question to whether there is some *better* design, and fail to explain how Google designing its specialized units differently depending on the circumstances surrounding a particular commercial sector supports the contention that Google's conduct is exclusionary.  And Plaintiffs' argument ignores the obvious harm to innovation that would occur if Google were forced to design every specialized unit in the same manner for fear that doing otherwise would somehow be used as proof of anticompetitive conduct.

**Reliance on their economist's click-through rate analysis.**  Plaintiffs argue that their expert's click-through rate analysis suffices to create a dispute of material fact.  They contend that his finding that click-through rates (meaning, the percentage of users who click or tap on a particular portion of the SERP) for ███████████████████████████████ █████████████ creates a "material dispute about whether specialized units satisfy users

better than weblinks and text ads and whether the prohibition on SVPs appearing in particular pages of the specialized units advances user satisfaction." Pls.' RSMF ¶ 29. Once again, this argument falls in the category of the claim that there is some unspecified better design that Google should have adopted. As set forth in Google's motion, the extent to which users click on the challenged units as compared to elsewhere on the SERP is irrelevant to the question of whether Google's design is an improvement on the prior SERP design. *See* Mot. 29. Plaintiffs have no answer to this point. *See* Opp. 29 n.10. Beyond that fatal flaw, on the undisputed facts, Professor Baker's misleading and erroneous analysis is irrelevant for a number of additional reasons: (1) there is no dispute that Google SERP design principles require there to be a variety of information, and that information should not be duplicative, Pls.' RSMF ¶¶ 5, 18, 43, 84, 214; (2) there is no dispute that the units themselves can serve a user's information needs without the user actually clicking on the unit, rendering click-through rates an inaccurate proxy for user satisfaction, Pls.' RSMF ¶¶ 17-19, 56, 102, 133, 166, 187, 199; and (3) there is no dispute that the units appear alongside other SERP elements such as text ads and web results so that multiple user information needs can be served, Pls.' RSMF ¶¶ 55, 99, 130, 163, 186, 198.

**Reliance on a Google study.** Plaintiffs contend that there is internal Google documentary evidence that "users preferred the inclusion of SVPs." *E.g.,* Pls.' RSMF ¶ 50. Plaintiffs rely on an ablation study conducted by Google in 2016, which, according to Plaintiffs, ███████████████ ████████████████████████████████████████████████████████████ *Id.* (citing Pls.' Exs. 209 and 237).[7] But Plaintiffs' evidence merely goes to show, at most, that users prefer SVPs to be included among the booking links *in the immersive and detail pages—*

---

[7] An "immersive" provides users more information when the user clicks on certain aspects of a specialized unit. *See* Mot. at 6-7.

*where it is undisputed that Google has designed its product to include them. See* Pls.' RSMF ¶¶ 97, 128. This single study therefore does not demonstrate that Google's failure to design its hotels unit to include SVP links elsewhere in the unit constitutes exclusionary conduct.

* * *

Plaintiffs' theory as to how product designs can be characterized as anticompetitive is unbounded and utterly unworkable in the real world. The same charges they make here can be said of countless product design decisions by scores of companies: (1) the product design decision "harms" the interests of a competitor; and (2) there exists some hypothetical design that better advances the interests of that competitor, which the plaintiff argues is also better for consumers. Never mind that the company determined that the design in fact improved the product; so long as a competitor can identify some aspect of the design that is unfavorable to their interests, they can mount a Section 2 challenge. Here, of course, this legal theory has another twist: Plaintiffs claim that the complaining SVPs are not competitors in the alleged relevant product markets, but Google should have somehow accommodated them with more favorable product designs because doing so would help the SVPs partner with rival general search engines and that would in turn enhance competition among general search engines.

The practical infeasibility of their legal theory is further highlighted by the testimony of Plaintiffs' main economic expert who repeatedly refused to identify how Google could design its SERP to avoid the concerns raised by Plaintiffs, remarkably dismissing that inquiry as related solely to remedies and one that he had not considered. Google's Ex. 117 (Baker Tr.) at 54:10-18, 70:13-72:22, 89:24-90:12, 99:10-20, 108:6-15, 109:24-110:14, 122:18-123:1, 130:23-132:22. But far from relating only to remedies, it goes to the central issue of the practical impossibility of administering the novel *liability* standard Plaintiffs press. Their own expert cannot identify a

design that passes muster; he instead looks only to whether the design adversely affects some third parties—a result that will likely always arise given the practical limitations on product designs.

In sum, because the challenged design is a product improvement, and because Plaintiffs identify no unlawful associated conduct, they cannot meet their *prima facie* burden.

## B.   Plaintiffs Identify No Actionable Antitrust Conduct with Respect to Google's Data Contracts with SVPs

Plaintiffs' theory regarding Google's contracts with SVPs boils down to the contention that the terms of those negotiated contracts are too favorable to Google.  Opp. 42-44.  For the reasons set forth in Google's motion—which go ignored by Plaintiffs—that theory is not cognizable under federal antitrust law.

Plaintiffs complain that Google uses its "monopoly power over access to customers as a lever" to force SVPs to provide data to Google on terms unfavorable to the SVPs.  Opp. 42.  Even if this complaint had merit, however, it is black letter law that the possession of monopoly power and charging of "monopoly prices" does not violate Section 2.  *See* Mot. 29-31 (citing, *inter alia*, *Pacific Bell Tel. Co. v. linkLine Comm'cns, Inc.*, 555 U.S. 438, 447-48 (2009)); *see also Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). Plaintiffs offer no case support in response.

That certain SVPs—namely ███████████—claim dissatisfaction with the terms of their licensing agreements (Opp. 43) is irrelevant.  The Sherman Act does not require Google to offer advertisements to SVPs on their preferred terms.  *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) ("profit-seeking behavior alone is insufficient to establish antitrust liability"); *Intergraph*, 195 F.3d at 1354 ("[T]he Sherman Act does not convert all harsh commercial actions into antitrust actions."); *Olympia Equip. Leasing Co. v. Western Union*

19

*Telegraph Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) ("There is a difference between positive and negative duties, and the antitrust laws, like other legal doctrines sounding in tort, have generally been understood to impose only the latter.").

It is plain that Plaintiffs' complaints relating to Google's licensing agreements with SVPs flunk the threshold inquiry under *Microsoft*—is the conduct exclusionary?  Plaintiffs attempt to cover up the legal failings of their theory by claiming that there are disputes of fact.  While Google certainly disagrees with Plaintiffs' characterizations of the agreements and their contentions regarding the manner in which the data is used, the Court need not wade into those disputes. Accepting all of Plaintiffs' factual characterizations, their legal theory has no legs.

### C.    Plaintiffs' SVP Claims Independently Fail Because Plaintiffs Cannot Demonstrate an Anticompetitive Effect in the Alleged Relevant Markets

Plaintiffs concede that they must show harm to competition in the alleged relevant general search markets—and further that the conduct at issue is alleged to have harmed SVPs, who are outside of Plaintiffs' proffered markets.  *See* Mot. 31-32; Opp. 22-23, 39-40.  They contend that the *target* of the challenged conduct need not itself be in the alleged market, but Google does not argue otherwise for purposes of this motion.  Opp. 21, 47.

Where the parties disagree is over the existence of record evidence supporting a connection between the challenged conduct and harm to competition in Plaintiffs' general search markets—a burden that is unquestionably more difficult to prove when the supposed target of the alleged conduct is outside the alleged relevant markets.  Most fundamentally, Plaintiffs have no answer to the question at the core of their harm-to-competition theory:  What basis is there to believe that **stronger** SVPs would somehow increase competition among general search engines?  Plaintiffs themselves claim that stronger SVPs would be ***less*** incentivized to partner with Google, and on their logic, the same is true of other general search engines.  Opp. 38 ("The stronger and better-

known SVPs become, the more loyalty they can build among customers and the more likely users are to eschew Google Search to navigate directly to them."). Faulty logic aside, Plaintiffs rest their case on conjecture, not evidence. Plaintiffs' inability to substantiate their theory surely explains why Plaintiffs spent much of their brief resisting any evaluation of the SVP-related conduct separate from their search distribution and SA360 theories.

First, the only support Plaintiffs cite for their contention that "Google's conduct limits SVPs' investment incentives" is their expert economist's reports. Opp. 45 (citing Pls.' Ex. 2 (Baker Reb. Rep.) ¶ 61; Pls.' Ex. 3 (Baker Reply Rep.) ¶¶ 14, 23, 41, 160, 178). Those reports cite *no* record evidence regarding SVPs' investment incentives, ████████████████████████

████████ The parties deposed over a dozen SVP witnesses in this case, and subpoenaed document discovery from dozens more, yet nowhere in his three reports does Professor Baker cite any evidence of the so-called "visibility limitations" causing an SVP in the United States to fail to invest in its own growth. In short, Plaintiffs' only proffered support for their investment theory is their expert's theoretical say-so. The same is true with respect to their contention that "Google's data requirements disincentivize SVPs from using their data to strike better deals with Google [search] rivals." Opp. 45 (citing Pls.' Ex. 1 (Baker Opening Rep.) ¶¶ 324-25). The cited expert report paragraphs identify no record evidence whatsoever.

Second, there is likewise no evidence that this has happened to such an extent that any SVP's quality suffered such that its purported value as a partner to rival general search engines has decreased. All Plaintiffs offer is the vague assertion that the challenged conduct makes SVPs "less attractive, and less valuable, as partners for [general search firms] and for other nascent threats to Google's monopolies." Opp. 45. Here, as above, the citations are to their expert's reports—which

cite nothing from the voluminous record evidence whatsoever regarding any link between the challenged conduct and SVPs' purported value as partners.  *See* Opp. 45 (citing Pls.' SMF ¶ 188).[8]

Third, there is no evidence that any general search engine has forgone partnering with SVPs as a result of the challenged conduct.  Plaintiffs concede as much but contend that this is too high a bar, and that "the issue is not whether Google's conduct has foreclosed *any* partnership but rather whether, but for Google's conduct, more or stronger partnerships would be likely."  Opp. 47; *see also* Opp. 23 (arguing they need not "show with exactitude the outcomes caused by the conduct").  But Plaintiffs fall well short of even that lesser standard.

To begin with, Plaintiffs cite not a shred of evidence from any SVP supporting their contention that "more or stronger" partnerships between SVPs and other general search engines "would be likely" in the but-for world.  Opp. 47.  The only SVP evidence cited is the deposition of a single ▮▮▮▮▮ witness, *id.* at 46-47, but that testimony is inapposite for a number of reasons.  First, the cited testimony was in response to a *question not about the challenged conduct vis-à-vis SVPs and any resulting impact on SVPs*, but rather: "And what do you think would happen if there were more economically viable alternatives to replace traffic on Google?"  Pls.' Ex. 187 ▮▮▮▮▮ ▮▮▮▮▮ at 245:20-22.  Second, Plaintiffs' quote drops the first part of the witness's answer, which makes clear that the answer was given in the context ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮  And finally, Plaintiffs omit the witness's later testimony, where he acknowledges that he did not have ▮▮▮▮▮▮▮▮▮▮ on that topic and that it was ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮  Google's Ex. 121 ▮▮▮

---

[8] Citations to "Pls.' SMF" refer to the Plaintiff States' Statement of Material Facts as to Which There is No Genuine Issue, ECF 465-1.

████████████ at 282:11-22.  That Plaintiffs stretch this testimony so wildly to try to support their theory demonstrates how lacking the record evidence is.

Plaintiffs also rely on the testimony of a Microsoft witness, but it is not—contrary to Plaintiffs' characterization, Opp. 5 (citing Baker Reply Rep. ¶ 179 and Pls.' SMF ¶ 189), 17—about Microsoft's ability to partner with SVPs and obtain access to their travel and local data. ██████████████████████████████ the witness did not testify that Microsoft experienced any difficulty in doing so.  The witness testified as to ██████████ ████████████████████████████████ Google's Ex. 122 ██████████ (Microsoft) Tr.) at 30:3-34:12.  That ██████ has nothing to do with the so-called "visibility limitations" in the specialized units or the data agreements.

Plaintiffs are thus left with ████████████████████████ ████████████████████████████████ ██████████████████████ See Opp. 5-6 (citing Pls.' SMF ¶ 190); see also Opp. 44.  Plaintiffs cite no testimony from SVPs on this point, nor do they cite any evidence from Microsoft that exclusive relationships with SVPs would meaningfully change Bing's offerings from what they are today.  That an SVP would chose not to enter into an exclusive deal with Microsoft and forgo the benefits it receives from also sharing data with Google is hardly evidence of harm to competition among general search engines.  In fact, Plaintiffs point to no evidence that Google has entered into such "exclusive relationships," much less any such relationship that denied Microsoft access to SVP data it needs to compete.

The remaining record citations relate to Google's strategy in Japan:  Plaintiffs cite evidence reflecting that Google contemplated ████████████████████████████████

████████████████ Pls.' SMF ¶ 191; *see also* Pls.' SMF ¶¶ 192, 193.  But, again, the existence (and importance) of partnerships between general search engines like Google and Microsoft and SVPs is not in dispute—the question on which Plaintiffs lack evidence is the connection between Google's so-called "restrictions" and the relationships between SVPs and competing general search engines such that the challenged conduct could have an anticompetitive effect in the claimed relevant markets.  The ████ example says nothing on that issue.

Finally, there is no evidence that, if there were more effective partnerships between SVPs and other general search engines, competition in the alleged relevant markets would be enhanced.  Plaintiffs rest on vague assertions that "consumers would benefit from stronger partnerships in a competitive world," but have no supporting evidence.  Opp. 6 (citing Pls.' SMF ¶ 199, ███████████ ████████████████████████████████████████████████████████).

Separately from the general-search-engine partnership theory, Plaintiffs at times suggest a different theory altogether—that "stronger relationships with SVPs could aid the growth of innovative challengers to Google's monopoly."  Opp. 45.  Here, Plaintiffs rely on complaints brought by entities (namely, ██████████) that Plaintiffs describe as outside the relevant market.  *See* Opp. 46.  Any such theory is not cognizable under Section 2, as that is not harm to *competition* in the alleged relevant markets.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008) (rejecting Section 2 claim where there was no "harm to competition in the monopolized market").  Plaintiffs try to elide this critical distinction with statements like "harm to SVPs harms the competitive process in multiple respects," Opp. 46, but do not actually dispute that they must show anticompetitive effects in the claimed relevant markets.

**III.    The Court Should Grant Summary Judgment on Plaintiffs' SA360 Claim**

**A.    Plaintiffs' SA360 Claim Fails Because the Evidence Shows at Most Transient Delay, Not Harm to Competition**

Plaintiffs contend that Google should have built five SA360 features for Microsoft more quickly ██████████████████████████. As there is no dispute that Google has built four of the features, ████████████████████████ summary judgment should be granted for lack of any proof of harm to competition in the alleged relevant markets.

Antitrust plaintiffs must make a showing of "significant and more-than-temporary harmful effects on *competition*." *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (internal citation omitted) (emphasis in original); *see also Williamsburg Wax Museum, Inc. v. Hist. Figures, Inc.*, 810 F.2d 243, 251-52 (D.C. Cir. 1987) (affirming summary judgment for defendant where, because of a temporary decline in competition among suppliers, a second supplier could not deliver product for about a year).  Plaintiffs' attempt to distinguish *American Professional Testing* on the ground of "ongoing" Google conduct, Opp. 37, ignores undisputed facts that ████████████████████████ ██████████████████   It is undisputed that Google built SA360 features for Microsoft ████████ ████████████████████.  Pls.' RSMF ¶¶ 267, 269, 278, 291, 310.  SA360 ████ ████████████████████████████████████ launched support for the four other features a year ago when it released a new version of SA360 after a multi-year platform rebuild.  Pls.' RSMF ¶¶ 278, 289-91, 308-12.

Even viewing the facts in the light most generous to Plaintiffs, any purported delay lasted

████████████████████████████████████████████

████████████████████████████████████████████

Pls.' RSMF ¶¶ 269, 308-12.  But even this substantially overstates any improper delay.  The

experience of other SEM tool providers shows that the development of such features takes significant time. ████████████████████████████████████

████████████████████ Pls.' RSMF ¶ 282. ████████████████████████████

████████████████████████████████████████████████████

████████████ Pls.' RSMF ¶ 283. ████████████████████████████

████████████ Pls.' RSMF ¶ 285.[9]  Further underscoring the reasonableness of its conduct,

████████████████████████████████████████████████████

████████████████ Pls.' RSMF ¶¶ 294-95.

In the absence of any evidence of actual harm to competition, Plaintiffs instead attempt to exclude facts set forth in the Declaration of Eduardo Indacochea on the grounds that certain paragraphs reflect information that post-dates June 2022.  The Indacochea Declaration, however, simply reaffirms what he testified to in his deposition during discovery: that as of his May 2, 2022, deposition, Google's project to build ████████████████████████████

████████████████████████████████████████████████████

Google's Ex. 118 (Indacochea (Google) Tr.) at 109:1-112:9; Google's Ex. 80 (Indacochea (Google) Decl.) ¶ 7.  Plaintiffs do not dispute other evidence confirming that Google was developing ████████████████████████████.  *See* Pls.' RSMF ¶¶ 272, 309 (citing Google's Ex. 109).

Finally, ████████████████████████████████████████████

████████████████████████████████████████████████████

---

[9] Google's timing in developing the features at issue also is consistent with ████████████████████████

████████████████████████████████████████████████

████████████████████████████ fail to create a genuine issue of material fact.  Pls.'
RSMF ¶¶ 288, 291, 310, 312-13; Pls.' SMF ¶ 118; Opp. 15, 33.  It is undisputed that Google's
successor SA360 platform, which Google announced publicly in February 2022, includes both
dynamic search ads and responsive search ads for Microsoft.  Pls.' RSMF ¶¶ 310-12; Mot. 43-
44.[10]  A trial on these facts is unnecessary.[11]

## B.    Plaintiffs Fail to Provide Evidence of Competitive Harm

In the face of undisputed facts showing mere transient delay, Plaintiffs offer a morass of
facts in a bid to show competitive harm in the purported relevant markets.  None suffices.

### 1.    Plaintiffs Fail to Substantiate Their "Foreclosure" Theory

Plaintiffs alleged that Google caused competitive harm by using SA360 as a gatekeeper to
search advertising, foreclosing advertisers from accessing Microsoft Ads and foreclosing rivals
from effectively competing.  *See, e.g.*, Colo. Compl. ¶ 162.  But Plaintiffs have not proven that
any share of their purported market is foreclosed, much less a substantial share.  Indeed, ██

████████████████████████████████████████████████████████████

████████████████████████ Opp. 11; Google's RSMF ¶ 79.  But, as SA360 is just one of
four SEM tools, any impact of Google's alleged "delay" is far less than that.  Accordingly, the

---

[10] In support of their contention that dynamic search ads and responsive search ads "remain partially supported on SA360," Plaintiffs cite to a Google public page listing the Microsoft Ads features available on the *legacy* version of SA360.  Pls.' RSMF ¶¶ 310, 312.  Plaintiffs do not dispute that the cited public page refers to the legacy version of SA360, Pls.' RSMF ¶ 267 (citing same public page which "list[s] features for legacy SA360 platform"), nor do they dispute that dynamic search ads and responsive search ads are supported in the *new* SA360 platform, Pls.' RSMF ¶¶ 310-12.

[11] For these same reasons, the Court need not tangle with Plaintiffs' confusing citation to two pre-*linkLine*, district court cases for the proposition that "duty to deal" cases are inapplicable.  Opp. 30-31.  While Plaintiffs misapply these cases, as Google made clear in its opening brief, the Court need not decide this to grant summary judgment given the numerous independent reasons why Plaintiffs' claims fail.

Court should not infer harm to competition based on purported substantial foreclosure.

**2.     None of Plaintiffs' "Disputed" Facts Show Competitive Harm**

Without a coherent theory, much less proof, of harm, Plaintiffs simply proclaim that "[n]umerous disputed material facts exist." Opp. 34-35. By "numerous," Plaintiffs appear to mean four enumerated points on page 35 of their Opposition, none of which shows harm to competition that might raise a genuine dispute that precludes summary judgment.



This speculative, "scintilla" of evidence does not create a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

12

28

Even if Plaintiffs could substantiate this estimate, it is, by their own measure, just a drop in the relevant market bucket. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Plaintiffs have cited no authority for the proposition that such a miniscule impact on the alleged relevant market is sufficiently cognizable harm to competition.

Second, Plaintiffs' contention that "Google's own documents," show that Google Ads' auction-time bidding (not Microsoft Ads' auction-time bidding) "causes a 15–30% increase in conversions and ad revenue" carries no water at summary judgment. Opp. 35. Plaintiffs ask the Court to "follow[] logically" from this fact to the "reasonable conclusion" that advertiser spend shifted from Microsoft to Google and that "advertisers spent less money on Microsoft Ads." Opp. 35. Such speculation cannot defeat summary judgment: it says nothing about spend on Microsoft Ads or the potential future performance of Microsoft Ads' auction-time bidding feature on SA360. *See In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 167 (3d Cir. 2017) ("A plaintiff cannot satisfy the summary judgment burden based on speculation alone."). More than 35 advertisers were subpoenaed for documents in this litigation, yet Plaintiffs fail to present evidence from a single one to support their claim that advertisers bought fewer ads on Bing because SA360 launched an auction-time bidding integration with Google Ads, but did not do so at the same time for Microsoft Ads.

Third, despite Plaintiffs' assertion that it is "costly" or "burdensome" for the large advertisers who use SEM tools to switch to using Microsoft's native tools that offer auction-time

bidding, they did not dispute that all advertisers have the option.[13]  Opp. 35; Pls.' RSMF ¶¶ 257-58.  The simple fact that only certain customers exercised the option to switch (or not to switch) is not sufficient to defeat summary judgment.  Even if "chang[ing] [an] SEM tool" or "managing ad campaigns with multiple SEM tools or with native tools alone" is "costly and burdensome," Plaintiffs do not dispute that advertisers are nonetheless free to exercise any or all of these options if they are dissatisfied with SA360—*and that several have done so*.  Pls.' RSMF ¶¶ 257.  Plaintiffs also do not dispute that all Microsoft Ads features are available on Microsoft Ads' native tool, nor do they dispute that █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████  Pls.' RSMF ¶¶ 246-47, 280, 282.

Finally, as explained in Section III.A, Plaintiffs have raised no genuine issue about the reasonableness of Google's timing in building of features—their entire claim is that Google should have started sooner.

## CONCLUSION

For the foregoing reasons, and for those stated in the accompanying reply brief addressing the DOJ Plaintiffs' and Colorado Plaintiffs' claims with respect to Google's distribution agreements, Google is entitled to summary judgment on all of Plaintiffs' claims.

---

[13] Plaintiffs' own exhibits show how commonly advertisers purchase ads through channels other than SEM tools.  Pls.' Ex. 127 (GOOG-DOJ-24793794) at -801 (showing that ████████ ███).
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Dated: February 27, 2023                Respectfully submitted,

                                        WILLIAMS & CONNOLLY LLP

                                        By: */s/ John E. Schmidtlein*
                                        John E. Schmidtlein (D.C. Bar No. 441261)
                                        Benjamin M. Greenblum (D.C. Bar No. 979786)
                                        Colette T. Connor (D.C. Bar No. 991533)
                                        680 Maine Avenue, SW
                                        Washington, DC 20024
                                        Tel: 202-434-5000
                                        jschmidtlein@wc.com
                                        bgreenblum@wc.com
                                        cconnor@wc.com

                                        WILSON SONSINI GOODRICH & ROSATI P.C.
                                        Susan A. Creighton (D.C. Bar No. 978486)
                                        Franklin M. Rubinstein (D.C. Bar No. 476674)
                                        Wendy Huang Waszmer (D.C. Bar No. 1631078)
                                        1700 K Street, NW
                                        Washington, DC 20006
                                        Tel: 202-973-8800
                                        screighton@wsgr.com
                                        frubinstein@wsgr.com
                                        wwaszmer@wsgr.com

                                        ROPES & GRAY LLP
                                        Mark S. Popofsky (D.C. Bar No. 454213)
                                        2099 Pennsylvania Avenue, NW
                                        Washington, DC 20006
                                        Tel: 202-508-4624
                                        Mark.Popofsky@ropesgray.com

                                        Matthew McGinnis (admitted *pro hac vice*)
                                        Prudential Tower
                                        800 Boylston Street
                                        Boston, MA 02199
                                        Tel: 617-951-7703
                                        Matthew.McGinnis@ropesgray.com

                                        *Counsel for Defendant Google LLC*