IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA, ET AL.,   )
                                    )
          Plaintiffs,               )
                                    )    CV No. 20-3010
       vs.                          )    Washington, D.C.
                                    )    April 13, 2023
GOOGLE LLC,                         )    9:32 a.m.
                                    )
          Defendant.                )
_____)
```

TRANSCRIPT OF
HEARING ON MOTIONS FOR SUMMARY JUDGMENT PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For DOJ Plaintiffs:          Kenneth M. Dintzer
                             U.S. DEPARTMENT OF JUSTICE
                             1100 L Street, NW
                             Washington, D.C.
                             (202) 307-0340
                             Email:
                             kenneth.dintzer2@usdoj.gov


For Plaintiff
State of Colorado:           Jonathan Bruce Sallet
                             COLORADO DEPARTMENT OF LAW
                             Consumer Protection Section,
                             Antitrust Unit
                             Ralph L. Carr
                             Colorado Judicial Center
                             1300 Broadway
                             Suite 7th Floor
                             Denver, CO 80203
                             (720) 508-6000
                             Email: jon.sallet@coag.gov

APPEARANCES CONTINUED:

For Defendant Google:          John E. Schmidtlein
                               WILLIAMS & CONNOLLY LLP
                               725 12th St., NW
                               Washington, D.C. 20005
                               (202) 434-5000
                               Email: jschmidtlein@wc.com

Court Reporter:                William P. Zaremba
                               Registered Merit Reporter
                               Certified Realtime Reporter
                               Official Court Reporter
                               E. Barrett Prettyman CH
                               333 Constitution Avenue, NW
                               Washington, D.C. 20001
                               (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

1                P R O C E E D I N G S

2           COURTROOM DEPUTY:  All rise.  This court is in

3  session; the Honorable Amit P. Mehta presiding.

4           THE COURT:  Good morning.  Please be seated,

5  everyone.

6           COURTROOM DEPUTY:  Good morning, Your Honor.

7  This is Civil Action 20-3010, United States of America,

8  et al., versus Google LLC.

9             Ken Dintzer for the DOJ Plaintiffs.

10          Jonathan Sallet for the state plaintiffs.

11          And John Schmidtlein for the defendant.

12          THE COURT:  Okay.  Good morning, everyone, and

13  welcome.

14          Just bear with me for one second while I get

15  organized here.

16          This is what all your work has been reduced to,

17  I hope you know that.

18          Okay.  All right.  Welcome again, everybody.  It's

19  nice to be with all of you this morning.

20          Before we begin, let me just say the following.

21  I want to thank everyone for your hard work and all the

22  submissions.  It's been a long road.  I know everybody has

23  spent a lot of sleepless nights and a lot of time and effort

24  over the course of the last year and a half; and I'm really

25  grateful.  I had a lot to go over the last many days, and

1    I'm looking forward to having a conversation with everybody

2    this morning.

3              So anything we need to discuss before we begin?

4              Okay.  With that, why don't we start with

5    Mr. Schmidtlein.

6              MR. SCHMIDTLEIN:  Good morning, Your Honor.

7    John Schmidtlein for Google.

8              I have two binders with slides I'd like to hand up

9    and also share with my colleagues over here.

10             And, Your Honor, as we did with the tutorial, what

11   I've tried to do is I've handed you a set of slides that

12   I think the large majority of them are public or

13   publishable.

14             There are a handful of slides that I will refer to

15   during argument today that contain confidential information.

16   But as we did during the tutorial, what I'm going to do is

17   sort of, for those, I will point you to your binder.  So you

18   will have them, and your clerk will have them as well so you

19   can follow along.

20             But they will not be shown on the screen, and

21   I will do my level best to describe them in a way that

22   respects the confidential information because I don't want

23   to seek or request some sort of closure of the courtroom so

24   we can talk freely.

25             THE COURT:  And I should have said at the outset

1    to the parties, if I inadvertently begin talking about

2    something that's otherwise under seal, because you can

3    imagine I've not done a comparison of what's redacted and

4    what isn't, do not hesitate to just interrupt me and stop

5    me, okay?

6              MR. SCHMIDTLEIN:  Okay.

7              And if you'll indulge me for one more moment, I

8    would like to take a moment and introduce my team here --

9              THE COURT:  Okay.

10             MR. SCHMIDTLEIN:  -- at counsel's table, because

11   Your Honor is absolutely right; the work that went into all

12   of this took a lot of individuals' efforts.

13             First of all, I've got my partners from

14   Williams & Connolly, Graham Safty, Colette Connor, and

15   Ken Smurzynski.  My colleagues Wendy Waszmer and

16   Susan Creighton from Wilson Sonsini, and Mark Popofsky from

17   Ropes & Gray.  And we also have here Lara Kollios, who is a

18   director at Google legal.

19             THE COURT:  Welcome.

20             MR. SCHMIDTLEIN:  So these folks -- and as you

21   know, many, many more were involved in a lot of the hard

22   work that hopefully distilled itself into materials that

23   were useful and helpful to you even if probably a little bit

24   with more than you would have liked.

25             So with that, let me -- let's dive right in.  And

1    I want to try to get right to the questions that Your Honor

2    posed in your order from earlier this week.

3              As you know, our summary judgment motions focus on

4    sort of the second element in a Section 2 monopolization

5    case.  Different courts refer to it in slightly different

6    ways.  Some people kind of refer to it as the conduct

7    element.

8              But your order, as I understood it, you were

9    looking for guidance from us as to, consistent with

10   *Microsoft*, what's the framework for analyzing that second

11   element, because we're not here arguing about monopoly power

12   and relevant market.  Google obviously vigorously contests

13   those, but that's not on the table for summary judgment.

14             And I would submit to Your Honor that under the

15   *Microsoft* D.C. Circuit decision, in order for a plaintiff to

16   sort of meet its burden for the second prong, however you

17   denominate it, they need to do two things.  First, they need

18   to establish that the conduct at issue is the product of

19   competition on the merits.

20             The *Microsoft* court, in various different

21   places -- and we'll talk a little bit about some of the

22   specifics -- but in various different places to that

23   opinion, it talks about competition on the merits.

24             And in that first element, when you look at

25   pages 58 and 59, which I know we're all focused on here, the

 1    Court also talks about it in terms of:  Does the conduct

 2    harm the competitive process?  Okay?

 3              So there has to be some example examination of the

 4    nature of the conduct, because, as the Court also teaches in

 5    various places, conduct that is pro-competitive or conduct

 6    that is a superior product or competition on the merits

 7    cannot, as a matter of law, violate the antitrust laws,

 8    regardless of its effect.  And the Court, again, in various

 9    different places, reminds us that harm to a competitor is

10    not -- doesn't meet the burden.

11              And even having an effect doesn't meet the burden.

12    It's almost like anti-competitive effects, which, again, is

13    a phrase that's seen in various parts of the opinion.  You

14    could think of it as one competition on the merits or is it

15    anti-competitive conduct?

16              And then, second, what are the effects?  Are there

17    actually anti-competitive effects that flow from that

18    conduct?  Because if the conduct is inherently

19    pro-competitive, it, by definition, can't have

20    anti-competitive effects.

21              THE COURT:  So let me just make sure I -- there

22    are a couple of -- a handful of dimensions to this question.

23    And the parties seem to have some disagreement, but maybe

24    ultimately they don't.

25              The first is this concept of what I will just

1   refer to as disaggregating the conduct; that is, looking at

2   the conduct individually to answer the first question, which

3   is:  Is there an anti-competitive effect?

4          And then the second question, it seems to me, is:

5   If there's a determination as to anti-competitive effect for

6   some conduct, how does one then evaluate the conduct in its

7   totality?

8          And to be more precise, what I mean by that is,

9   if, say for hypothetically, there are five alleged types of

10  conduct that are anti-competitive, if the Court determines

11  that A and B are anti-competitive, even though C on its own

12  may not be anti-competitive, it can be, depending upon, one,

13  who the actor is if it's a monopolist and, two, whether the

14  type of conduct might rise to anti-competitive effect when

15  combined with the other conduct.

16         Would you agree with that general framework?

17         MR. SCHMIDTLEIN:  I agree that you have to look at

18  each category of conduct on its own, and I think the

19  D.C. Circuit did that --

20         THE COURT:  Right.

21         MR. SCHMIDTLEIN:  -- in fairly painstaking detail.

22         And other courts have done it, too, that we cited

23  you to, including the *Covad Communications* decision as well.

24         THE COURT:  Right.

25         MR. SCHMIDTLEIN:  But what I would say to

1    Your Honor is you have to look at each category of conduct.
2    And you have to apply, from a prima facie standpoint, each
3    prong to each category, because, as we know from the
4    *Microsoft* decision, the D.C. Circuit went and picked out
5    very specific types of conduct that the District Court had
6    found comprised or qualified as anti-competitive effects or,
7    you know, under that broad rubric.  And the D.C. Circuit
8    identified various aspects of the conduct that it said, no,
9    that's competition on the merits it.  That conduct actually
10   doesn't rise.  And they go and they find, therefore, there
11   can be no liability for that conduct --
12            THE COURT:  Right.
13            MR. SCHMIDTLEIN:  -- full stop.
14            THE COURT:  So -- and I should have added a third
15   point to my thinking of this; and that is, in your view,
16   there is a certain category -- and maybe the D.C. Circuit
17   doesn't say this quite explicitly.  There's a certain
18   category of conduct that is either per se considered
19   competitive or perhaps even presumptively so.
20            For example, price cutting, the building of a
21   larger factory, even product innovation in certain
22   circumstances.  There are certain categories that the
23   Circuit doesn't even subject to this balancing test of
24   whether there's some pro-competitive reason for the conduct.
25   You know, a lower bid in a contract, in a contract bidding

1    process.

2         And if there are -- if there's conduct of that

3    nature, either conduct that is determined to be

4    pro-competitive or conduct that's alleged to be

5    anti-competitive but doesn't have anti-competitive effects,

6    is it your view that that conduct then gets put on the shelf

7    and cannot be considered by the Court in assessing either

8    overall anti-competitive effect or even individual

9    anti-competitive effect for different conduct?

10        Does that make sense?

11        MR. SCHMIDTLEIN:  That is absolutely correct,

12   Your Honor, and I can give you some examples.

13        So, for example, when the Court was evaluating

14   various aspects of conduct in connection with Microsoft's

15   agreements with Internet access providers, or IAPs --

16        THE COURT:  Right.

17        MR. SCHMIDTLEIN:  -- the Court looked at various

18   things like Microsoft bundling Internet Explorer, giving it

19   away for free, offering -- actually offering bounties if

20   Internet access providers would bundle Internet Explorer,

21   developing what they called the IEAK, these things, and

22   offering that for free.  They looked at that conduct, which

23   the District Court had found was part of other Internet

24   access provider conduct.  And the D.C. Circuit very clearly

25   said, that's competition on the merits.

```
 1              THE COURT:  Right.

 2              MR. SCHMIDTLEIN:  That's sort of offering a

 3    product, either developing an innovative, attractive

 4    product, pricing it attractively, that is all sort of almost

 5    protective -- protected competition on the merits.

 6              And even though the District Court found that that

 7    conduct, with others, resulted in Internet Explorer usage

 8    going up, Netscape Navigator usage going down, they said, We

 9    don't even need to get to those effects.

10              THE COURT:  Right.  Okay.

11              MR. SCHMIDTLEIN:  Second example, because I want

12    to turn to your question about the second prong, the effects

13    piece, because there's another example from the Court that I

14    would direct your attention to, which has to do with

15    Internet content providers, or ICPs.

16              There, Your Honor, we actually had the flip, the

17    reverse situation, where the District Court made a very

18    specific finding that same types of restrictions, Microsoft

19    was able to impose restrictions, force the Internet content

20    providers to agree to not promote Internet Navigator, doing

21    things that were not competition on the merits that got

22    Internet Explorer usage, not because it was better, but

23    because they had Windows monopoly and they needed to have a

24    relationship with Microsoft.  So we had no competition on

25    the merits there.
```

1          But the District Court made a very specific

2     finding that I don't see, though, that actually the

3     government had made its case that that conduct had a,

4     I think the language was, a substantial deleterious effect

5     on Navigator's usage.  In other words, I don't see a

6     connection between that and sort of flipping shares in the

7     browser market, which, of course, was the theory as to harm

8     to the OS market.

9          And in that instance, even though the District

10    Court had said liability, the D.C. Circuit said, No, no.

11    That -- if you haven't actually drawn the line between no

12    competition on the merits for that conduct and substantial

13    anti-competitive effect, that, too, that category of conduct

14    doesn't state the prima facie case.

15          THE COURT:  Can I --

16          MR. SCHMIDTLEIN:  So -- go ahead, Your Honor.

17          THE COURT:  That's all right, because I also want

18    to get to the merits.  And, you know, we have, believe it or

19    not, somewhat limited time today.

20          But two follow-up questions.  One is, given the

21    posture of where we are right now, is your brief -- is your

22    motion for summary judgment limited just to the argument

23    that the plaintiffs have not made out their prima facie

24    case; or is it that even if they have made out their prima

25    facie case, Google has offered pro-competitive reasons for

```
 1    the conduct that I can, as a matter of law, determine do not
 2    constitute a violation of Section 2?
 3              MR. SCHMIDTLEIN:  Our position -- and this applies
 4    to actually both motions.
 5              THE COURT:  Right.
 6              MR. SCHMIDTLEIN:  Our position is that the
 7    plaintiffs have not made out their prima facie case; in
 8    other words, you don't have to look at pro-competitive
 9    justifications or, more specifically, pro-competitive
10    effects that might, sort of, cause you to have to engage in
11    a balancing.
12              Our position is, there's no balancing required.
13              THE COURT:  Right.
14              MR. SCHMIDTLEIN:  And that they have either
15    because, and we'll talk a little bit about, you know, sort
16    of, for our motions this morning, we're talking about
17    browser agreements primarily and then Android agreements.
18              On the browser agreements, competition on the
19    merits.  They don't even get out of the first bucket.  I
20    mean, they technically can't show anticompetitive effects
21    because any of the effects were pro competitive as a matter
22    of, sort of, privileged competition.
23              And then on the Android agreements, our argument
24    is they haven't met the second prong.  They haven't hit the
25    substantial anticompetitive effects.  We don't even need to
```

1    get into offering all of the pro-competitive justifications

2    for the Android agreements.

3              THE COURT:  Okay.

4              So none of your arguments, you contend, have to do

5    with the pro-competitive reasons that Google might offer at

6    a trial.

7              MR. SCHMIDTLEIN:  That is correct.

8              Our position -- and, again, we believe that, as

9    part of the analysis, particularly as to the browser

10   agreements, I mean, there's necessarily a bit of a

11   discussion around, this is competition on the merits, but

12   we're not offering what I call the typical pro-competitive

13   justifications --

14             THE COURT:  Right.

15             MR. SCHMIDTLEIN:  -- as part of a balancing, if

16   that makes sense.

17             THE COURT:  It does.  It does.

18             MR. SCHMIDTLEIN:  All right.

19             So as I alluded to, we think that the *Microsoft*

20   decision, sort of, requires this two-step process to

21   establish a prima facie case.

22             Is it competition on the merits?  And then even if

23   it's not deemed to be competition on the merits, have the

24   plaintiffs actually proven, brought forward at this time

25   evidence of anti-competitive effects?  And we would submit

1    for Your Honor that they have failed as to the levels of

2    conduct here for different reasons, depending on the

3    conduct.

4            So turning to our slides, and we'll jump in, if

5    that's okay with Your Honor.  So we're talking about three

6    categories of conduct that are implicated in the two cases

7    for this morning, primarily going to be talking about the

8    first two:  The Browser Default Search Engine Agreements and

9    then the Android Mobile Device Search Distribution

10   Agreements.

11           The third bullet here, Android Compatibility

12   Agreements, Design Decisions, Google Assistant and IoT

13   conduct, there was a lot of that pled in the complaint and

14   it appears to have disappeared for purposes of summary

15   judgment.  You may want to ask them about that, but we don't

16   understand their briefs as continuing to maintain any claims

17   over that, so I'm not going to say anything much about that,

18   and I'm going to focus on the first two.

19           So this is what we've been talking about, this

20   two-step analysis.  And again, we think of the first step as

21   really examining the conduct at issue and whether the

22   supposed anti-competitive conduct or the conduct that's

23   causing some sort of harm, is it the result of a competitive

24   process and thereby harmed consumers?  And the fact that it

25   might harm a competitor, obviously that might be of

1    interest, but that by itself is not enough.

2            And I think it's important when we think about

3    this first prong to kind of go back and reorient around the

4    conduct that was at issue in *Microsoft*, okay?

5            THE COURT:  So can you just -- I agree.

6            So let me ask you just quite directly:  Why isn't

7    the -- let's start with the agreement with Apple.  Why, at a

8    minimum, is that not the kind of exclusive dealing

9    arrangement that is similar to the agreements that Microsoft

10   had struck with the various ISPs?  In that case, Microsoft

11   had reached agreement with 14 of the 15 top Internet service

12   providers.  The deals were either truly exclusive in the

13   sense that the deals did not permit the ISP to use a browser

14   other than IE, other agreements were effectively exclusive.

15           So why isn't this that?  In other words, Google

16   has gone out, it's made deals with Apple, it's made deals

17   with various OEMs, it's made deals with Mozilla, to become

18   the default browser.  And by virtue of being -- excuse me,

19   the default search engine.  By virtue of being the default

20   search engine, it prevents other search engines from

21   occupying that default position.  So why isn't that enough

22   by itself to at least establish the prima facie case and get

23   the plaintiffs to a trial?

24           MR. SCHMIDTLEIN:  Because in *Microsoft*, the reason

25   that that conduct was deemed not competition on the merits,

1    there were several really key important factual -- facts

2    that were established in *Microsoft* that not only are absent

3    in this case, they're actually 180 degrees different.

4           One, the record in *Microsoft* was very clear that

5    the way that they were able to get those restrictions, the

6    way they were able to get those exclusivity provisions, was

7    because they had a monopoly on the Windows operating system.

8    They entered into agreements with OEMs and other people,

9    even the threatening conduct to Apple.  They had a monopoly

10   in Windows, and they went to people, like the OEMs, who

11   needed that Windows license.  Without a Windows license,

12   they couldn't make computers.

13          THE COURT:  Right.

14          MR. SCHMIDTLEIN:  And they said, if you want the

15   Windows license, you are going to have to agree to take our

16   browser, pre-load it, and not distribute rivals or they're

17   going to do all sort of things to hinder Netscape, which was

18   the superior product, which was the more popular product at

19   the time, and which Microsoft's internal documents made

20   clear they viewed as a threat and so was born a whole course

21   of conduct directed at getting -- reducing the usage.

22          They didn't go out and compete on the merits and

23   say, I have a browser that is superior, I'd like you to use

24   it and pre-load it.  They didn't do that.  They leveraged

25   Windows.

1          THE COURT:  So I agree with you on the OEM

2    licensing agreements in *Microsoft*.  This is different in the

3    sense that -- although I suppose, in a sense, it may depend

4    on how one defines the use of leverage of another product.

5          But help me with the IAPs, because the IAPs in

6    that case did not depend upon, as I understand it, operating

7    on the Windows system, operating system.  And so in theory,

8    the IAPs could have gone out and made deals with Netscape,

9    but, for whatever reason, did not.

10         MR. SCHMIDTLEIN:  Right.

11         And the reason there is --

12         THE COURT:  Or were not able to.

13         MR. SCHMIDTLEIN:  They, too, the inducements that

14   Microsoft offered them, in other words, placement on

15   Windows, promotion on Windows -- remember, it's hard to

16   remember back in the '90s, there was only one way any of us

17   got on the Internet.  It was from a computer.

18         THE COURT:  Right.

19         MR. SCHMIDTLEIN:  Not a laptop, not any other type

20   of device.  It was from a computer, and they were the

21   monopolist.  That was the Gateway.  When you fired up that

22   computer -- I can barely remember this -- when you fired up

23   that computer, you probably remember getting promotions or

24   offers from Earthlink or, you know, various people who

25   wanted to offer you Internet access.

1          THE COURT:  Right.

2          MR. SCHMIDTLEIN:  That was the key promotional

3    place where people were presented with the opportunity.

4          And what *Microsoft* said was, if you want to

5    continue to have that privilege and that opportunity, you

6    need to stop bundling or promoting or distributing Netscape,

7    and that, I would suggest to you, is not competition on the

8    merits.

9          How could Netscape have pushed back and said,

10   well, gee, don't -- don't -- resist Microsoft's offer for

11   that.  And, you're right, the OEM license is sort of the

12   most obvious.  But I believe Judge Jackson found with

13   respect to all of these, even like going to Apple and

14   saying, we're going to pull Mac Office off of Apple

15   computers, Mac Office was a critical application for Apple,

16   and they found that's the reason they went and they agreed

17   to stop distributing Netscape.

18          THE COURT:  So the plaintiffs make, I think, a

19   similar argument, not quite perhaps as stark, when it comes

20   to the MATA in the Android devices, and specifically they

21   seem to contend that -- and you'll have to help me factually

22   for a moment -- but that the Google Play Store is the only

23   game in town when it comes to applications for Android

24   devices.  And because it is the only game in town for

25   applications for Android devices, any Android -- any product

1    that runs on an Android device has to have the Google Play

2    Store in it.  It can't compete otherwise.

3              MR. SCHMIDTLEIN:  We're not arguing -- for

4    purposes of summary judgment here today --

5              THE COURT:  Okay.

6              MR. SCHMIDTLEIN:  -- we're not arguing the first

7    prong on the Android.

8              THE COURT:  Okay.  All right.

9              MR. SCHMIDTLEIN:  We have lots of pro-competitive

10   justifications on the back end there, but we have not raised

11   the competition-on-the-merits point on the Android

12   agreements.

13             THE COURT:  Okay.

14             MR. SCHMIDTLEIN:  What we're saying on the browser

15   agreements, and we can go through some of the evidence if we

16   have the time, but on the browser agreements, our position

17   is, unlike Microsoft, where Microsoft had this leverage and

18   they got all this distribution not because they had the

19   better product, not because the OEMs or the IAPs didn't want

20   to have the option of having Netscape to promote or

21   distribute, they did.  They had historically.  They already

22   had these existing relationships, and Microsoft went in and

23   said, "no more."

24             And on the browser agreements that we have with

25   Apple and Mozilla and others, it is 180 degrees the

1   opposite.

2          THE COURT:  So let's get to what I think -- and

3   maybe I'm oversimplifying this -- what the plaintiff's case

4   comes down to when it comes to anti-competitive quality of

5   Google's relationship with Apple and Mozilla, and that is

6   this issue of scale and network effects, right?

7          The idea here is that because of the very nature

8   of the product, because Google's search engine gets better

9   and becomes more effective and allows Google to be

10  innovative because of when more people use it, I don't think

11  there's any disagreement about that, the more users there

12  are of a particular search engine, the better that search

13  engine has the capacity to become; that Google, by virtue of

14  having locked in these default agreements year after year

15  after year is at a not just a competitive advantage, it is

16  at a anti-competitive advantage relative to other search

17  engines.  No search engine can possibly hope to acquire the

18  scale that Google has over the last ten years, because it

19  doesn't sit in the default position.

20         So why is that, in your view, not, at a minimum,

21  enough to get these folks to a trial on the question of

22  whether these are anti-competitive agreements in violation

23  of the Sherman Act?

24         MR. SCHMIDTLEIN:  Because, again, unlike

25  *Microsoft*, and there were -- you can argue there were

1   network effects involved in *Microsoft* as well, offering a

2   superior product, winning business on the merits is never

3   unlawful.

4          There are all sorts of businesses out there who,

5   if I get a very large market share, I have a bigger plant, I

6   get to buy my inputs to make my product at much larger

7   scale.

8          I mean, scale effects -- you know, they may make

9   it sound as like scale effects make this case different.

10  There are scale effects in practically every industry in the

11  country.

12         THE COURT:  I couldn't agree with you more.

13  I mean, there's no doubt -- I mean, think about a law firm,

14  right?  If, for example, a law firm is serving a corporate

15  client, every two years that corporate client decides to

16  compete, other law firms can compete for the business, but

17  the law firm that has it first has an incumbency advantage

18  that the other competitors don't.  And so Google certainly

19  has an incumbency advantage, and I don't think that by

20  itself is what's anticompetitive.

21         What seems to me to be unique about this is that

22  the product gets better just by virtue of having the

23  default.  And what I mean by that is it now has an input

24  that makes it naturally better.  A lawyer doesn't become

25  naturally better because he has that initial relationship or

1    she has that relationship with the company.  There's some

2    incumbency advantage.

3           But Google, by virtue of having defaults year

4    after year after year, where the most users come to search,

5    gathers more data, has the ability to return more-accurate

6    and more-efficient and better search results.

7           And there is this, as they've suggested, this --

8    what's the word I'm looking for? -- self-reinforcing quality

9    to these agreements that makes it, what they would say,

10   impossible for any rival search engine to truly compete on

11   the merits now.

12          MR. SCHMIDTLEIN:  That is no different than saying

13   a corporation that operates at such large scale, that its

14   costs are always going to be lower than their rivals'.

15          My marginal cost to produce is always going to be

16   significantly below my rivals', and so I can always go out

17   and win the business with a lower price.

18          As long as that lower price is not predatory, it's

19   lawful.  That is competition on the merits.

20          The quality issue here, the scale effect here, is

21   no different than the scale effects that produce lower

22   prices and competition on all sorts of other dimensions.

23          THE COURT:  So isn't it different in the following

24   respect?  Help me understand.

25          Let's take Apple, for example.  At this point in

```
 1   time, what incentive does Apple have to not grant Google the

 2   default?  In other words, the next-biggest competitor is

 3   Bing.  Bing is, what, 10 percent of the search market

 4   overall, give or take?

 5            Even if Bing were comparable in terms of its

 6   search quality, Bing cannot return the revenue that an

 7   agreement with Apple does just because of the numbers.

 8            Google has, let's just use a number, 10X the

 9   number of users.  Because it has 10X the number of users,

10   the revenue that gets returned from the revenue share

11   portion of that agreement is always going to be greater,

12   such that Bing can never hope to compete against Apple --

13   excuse me, against Google head to head.

14            And so doesn't that make this a little bit

15   different than what you've suggested in terms of

16   otherwise -- that scale -- I agree with you that scale by

17   itself can't be always anti-competitive.

18            MR. SCHMIDTLEIN:  But everything you're just

19   describing there, Your Honor, if Google has more

20   customers -- and, remember, if -- and Google's returning

21   better revenue per query, that's because they're returning

22   better search results and better search ads.  That means

23   it's the superior product.

24            I mean, in the case we're talking about, Apple,

25   the evidence in this case is 100 percent undisputed.  Apple
```

1   and Mozilla constantly evaluate other rivals.  They're

2   constantly looking at search quality.

3           They're evaluating it because it matters

4   enormously for their products.  They have chosen -- and the

5   testimony is undisputed -- that having a single default

6   search engine is the best product.

7           THE COURT:  Is there ever a world, in your view,

8   in which Bing could compete against Apple -- excuse me,

9   against Google for default with Apple?

10          I mean, I will note -- and I won't specify the

11  details on the record -- that Mr. Nadella's testimony in his

12  deposition about what he was prepared to sacrifice as a

13  strategy in order to compete with Apple -- with Google.  I

14  keep saying "Apple."  Excuse me.

15          I mean, doesn't that testimony, at a minimum,

16  demonstrate that by virtue of the scale and the

17  self-reinforcing qualities of the scale, that Bing just

18  can't compete?

19          MR. SCHMIDTLEIN:  They can't compete because their

20  product is not superior.

21          The antitrust laws do not require third parties to

22  redesign their products, products that they believe they

23  need to compete hard for.

24          Look at the testimony with respect to Mozilla, a

25  the third party.  They did switch.  They were able to

1    switch.  They switched to Yahoo!  And their users didn't

2    like it.

3              Now, that's competition on the merits.

4              Is Google -- when Yahoo! comes back to Google and

5    says -- or I'm sorry.

6              When Mozilla comes back to Google and says, We

7    switched to Yahoo!  Users left us.  We were harmed as a

8    company.  We'd like you to be the -- we'd like you to

9    compete to be the default search engine again.

10             At that point, Google is supposed to say what

11   exactly?

12             "I'm sorry.  I'm not allowed.  I'm too big"?

13             THE COURT:  Well, that's a question I have for the

14   plaintiffs, which is:  Well, what was Google supposed to

15   have done?

16             MR. SCHMIDTLEIN:  I mean, these defaults --

17             THE COURT:  Were they not have to gone to Apple or

18   Mozilla and said, "Sorry.  We can't be with the default

19   anymore.  We've just gotten too good"?

20             MR. SCHMIDTLEIN:  And remember this, Judge:  These

21   agreements with Apple and Mozilla that Google, when they

22   first entered into them, were done when the volume of search

23   queries on the Safari browser --

24             THE COURT:  Right.

25             MR. SCHMIDTLEIN:  -- were --

1          THE COURT:  30 percent --

2          MR. SCHMIDTLEIN:  Not even.

3          THE COURT:  -- or even smaller.

4          MR. SCHMIDTLEIN:  I mean, when it was first --

5          THE COURT:  Or maybe that was Google overall.

6   I'm sorry.

7          MR. SCHMIDTLEIN:  I mean, this was when Mac

8   computers were the tiny also-ran to the Windows monopoly.

9   There were no phones.  Everybody had to search the Internet

10  on a computer.

11         Mozilla was a browser that wasn't preloaded

12  because Microsoft certainly wouldn't preload Mozilla.

13         So these were tiny, tiny slivers of search queries

14  back then.  Google does a deal with them.  Their products

15  are successful.  Google's product is wildly successful.  And

16  years later, yes, the search queries have grown.

17         But the same competitive pressure still exists on

18  Google to win those deals.  As I said, they lost the Yahoo!

19  deal.  And if anybody thinks you can push Apple around, try

20  again.

21         THE COURT:  But does the record, at least at a

22  minimum -- I mean, you've suggested that there is

23  competition.  And there's certainly evidence that from time

24  to time Apple, for example, has done comparisons on search

25  quality.  There have been negotiations or at least

```
 1    discussions, let's call it that, between Microsoft and
 2    Apple.
 3              In your view, is that sufficient to demonstrate
 4    true competition on the merits?  In other words, is that, in
 5    your view -- look, that's competition on the merits.  It
 6    doesn't have to be any more formal than that.  Apple doesn't
 7    have to, on a -- you know, every two years, open up the
 8    default to competitive bidding.
 9              MR. SCHMIDTLEIN:  It absolutely has, over time,
10    opened it up and has considered other alternatives.
11              I don't know what the competition otherwise would
12    look like.  I mean, again, I don't want to get into all the
13    nitty-gritty details, but there's certainly no shortage of
14    communications between Microsoft and Apple about the default
15    on the Safari browser.  And there's certainly not -- you
16    know, there's no shortage of things.
17              And, in fact, as we've laid out, they actually
18    have agreements with them.  They actually do promote
19    Microsoft.  There are bookmarks.  They're on the drop-down
20    menu.
21              There are commercial terms for both Mozilla and
22    Apple where they promote other rivals.  And they make it --
23    their testimony is, and if people don't want to use Google,
24    we try to make it easy to switch, because we'll get paid
25    something if they switch as well.
```

1          THE COURT:  But you would agree, I don't think

2     you've -- I don't think you're disputing this, that being

3     the default search engine carries substantial advantages

4     that not being the default -- in other words, being the

5     default gives you substantial advantages in terms of

6     attracting search users -- in other words, Google wouldn't

7     want to be in the same position as Microsoft with respect to

8     Apple.

9          MR. SCHMIDTLEIN:  Well, Google is in the same

10    position as Microsoft on Apple.  It's on all the Windows

11    devices.

12         Google has zero distribution on Windows devices.

13         THE COURT:  Right, but I'm talking about on Apple

14    devices.

15         MR. SCHMIDTLEIN:  Right, but my point is --

16         THE COURT:  Right.

17         MR. SCHMIDTLEIN:  -- Google's market share on

18    those devices is substantial.  It is the overwhelming

19    majority search queries on Windows devices are Google.

20         The number one search query on Bing --

21         THE COURT:  Is Google?

22         MR. SCHMIDTLEIN:  -- Google.

23         Okay.  So is there an advantage?  Absolutely,

24    there's an advantage.  Does Google want to be associated

25    with the Apple brand and have people, when they're using

 1    these incredibly popular devices, to be able to find Google

 2    easily if they use Safari and search a lot?  Absolutely.

 3    But is it impossible?  No.

 4            When Google first came along, they were the little

 5    guy.  They jumped over the big guys who had so much more

 6    scale.  And they have always had or for many, many years

 7    have had a very, very substantial share of usage on Windows

 8    devices where they have no defaults.  They have no preloads.

 9    They have nothing.

10            They're faced -- Bing has the preload, the

11    default, and there's -- if the case ever gets to trial,

12    there will be evidence that Bing goes out of its way to make

13    it extraordinarily difficult to change all of those things,

14    because they know Google has been so successful on their

15    devices.

16            So there's no competition on Windows at this

17    point.  Microsoft is able to get those predistributions

18    through some of the same tactics that they used to get some

19    of the other things years ago.  They have relationships with

20    the OEMs.  The OEMs need those relationships.

21            So is there an advantage?  Absolutely, Your Honor.

22    There's absolutely an advantage, but it's not

23    insurmountable.

24            THE COURT:  In your view -- let me make sure I

25    understand.  I think this in some sense goes back to where

1    we were at the beginning.

2              In your view because these are contracts and

3    agreements that have been obtained and secured by Google

4    through what you describe as competition on the merits, in

5    your view, we don't even need to think about market

6    foreclosure; is that right?

7              MR. SCHMIDTLEIN:  Correct.

8              THE COURT:  Okay.

9              MR. SCHMIDTLEIN:  Absolutely.

10             If -- and, again, when we look at the

11   D.C. Circuit's treatment of -- they talked about paying

12   bounties to IAPs to carry Internet Explorer.  That's not a

13   problem.

14             THE COURT:  But it seems to me that -- and this

15   seems to be true in other circuits as well, which is that

16   there are categories of conduct.  And I think I would agree

17   with you, there are some categories of conduct that are just

18   either per se pro-competitive or presumptively

19   pro-competitive.

20             But it doesn't seem to me that an exclusive deal

21   falls in that category, that whatever the case may be of how

22   you got the exclusive deal, whether anybody else could bid

23   in the manner that you've suggested, an exclusive deal still

24   has to be subjected to our foreclosure analysis, because

25   anything that is exclusive, if it shuts off too much of the

1    marketplace, can potentially be a Section 2 violation

2    because -- don't you agree with that?

3            MR. SCHMIDTLEIN:  Well, first of all, we disagree

4    that these deals are exclusive.

5            THE COURT:  Right.

6            MR. SCHMIDTLEIN:  There's nothing exclusive about

7    Google on Apple devices.

8            THE COURT:  Well, it's exclusive with respect to

9    being the default, on one --

10           MR. SCHMIDTLEIN:  Default on one access.

11           THE COURT:  -- on Apple devices.

12           But on Android, it's the default at every single

13   search entry point, except for somebody who may download the

14   Bing app.

15           MR. SCHMIDTLEIN:  Correct.

16           And on Android, we're talking about the exact

17   foreclosure point you're making.

18           THE COURT:  All right.  Got you.  Okay.

19           MR. SCHMIDTLEIN:  I agree with you on that.

20           But on Apple -- and, you know, in our opening

21   motion, we sort of gave -- we razzed the government, saying,

22   You alleged these agreements were exclusive or de facto

23   exclusive.

24           They're not exclusive or de facto exclusive.  Look

25   at all the different ways that Bing gets promoted or Yahoo!

1    gets promoted on these devices.

2            Apple hasn't cordoned off all iPhones against

3    Bing.  You can download it from the app store.  There's a

4    million different ways you can use Bing on Apple devices.

5            It's not exclusive in the same way that any of

6    these other cases that historically have dealt with

7    exclusive dealing; in other words, *LePage's*, right?

8    Distributors of teeth.  It's -- no, you can't -- if I call

9    that distributor and say, I want those teeth --

10           THE COURT:  It seems to be the plaintiffs' case

11   really rests on two, in some sense, economic theories.  One

12   is, is this one of scale and network effects.  And two, with

13   respect to Apple, the sort of stickiness of the default.  In

14   other words, because Google gets better and has certain

15   network effects from contract to contract, it's harder for

16   the others to compete.  And two, once it has the default,

17   it's very difficult to compete because people don't change.

18           MR. SCHMIDTLEIN:  Well, we know that's not true

19   because people --

20           THE COURT:  Because people do want Microsoft

21   devices.

22           MR. SCHMIDTLEIN:  People switched away from Yahoo!

23   on Mozilla and people switch away from the defaults on

24   Windows.  We know that is empirically not true.

25           So, you know, again, back to your question of the

1   case law out there, and really what makes competition on the

2   merits different is, Microsoft coerced all of these other

3   parties to take their product.  They didn't win the browser

4   war through competition on the merits.

5        The D.C. Circuit suggested, if you just made a

6   good product and charged nothing for it, you can win.

7   That's allowed.  That's what Google is doing here on the

8   browser agreements.  We've made a great product and we've

9   priced it competitively.

10        They're the ones who came up with the product

11   design.  They're the ones who've all testified, we want to

12   have a single default that's easy to switch.  That's how we

13   want to build our product, and that we have set up this

14   competition on the merits.  It's a fair fight.

15        THE COURT:  Can I ask you, because we're -- it's

16   not quite 45 minutes, but I want to try and stay as much on

17   time as we can, though we could be here for days on end, can

18   you tell me what your view is of how the foreclosure

19   analysis should be conducted --

20        MR. SCHMIDTLEIN:  Sure.

21        THE COURT:  -- on the Android agreements?  And

22   there seems to be some disagreement as to how that should be

23   done and what matters, and I've taken you away from your

24   PowerPoint, so...

25        MR. SCHMIDTLEIN:  No, no.  There's a slide that

1    I want to direct your attention to, Your Honor.

2              If you look, I think, at tab 48 in the binder we

3    handed to you, hopefully this -- so I think when we think

4    about the foreclosure question, this does go to that -- you

5    know, that second anti-competitive effects.  And that's what

6    the D.C. Circuit said when it was analyzing, you know,

7    various aspects, and particularly the IAP agreement, the

8    aspect of the IAPs that were exclusive deals.

9              And what the D.C. Circuit said there was, we have

10   to see if there's anti-competitive effects.  And for

11   purposes of exclusive dealing, we actually have a very

12   specific test for that, because exclusive dealing is,

13   I think the D.C. Circuit said, presumptively lawful.  So we

14   need something.  They used the words, a "screening

15   function," and the screening function is substantial

16   foreclosure.  So how do we measure substantial foreclosure?

17   Well, again, what is the anti-competitive effect?

18             And the anti-competitive effect here is, well, how

19   much share of the market has Microsoft really been precluded

20   from?  If these agreements didn't exist, what would the --

21   you know, what's the effect actually been?  Because remember

22   in *Microsoft*, the judge had a litany of evidence showing

23   these exclusives go into place, the shares shifted, okay?

24   So we've pressed on that issue here in this case.

25             And even the plaintiff's expert, Dr. Winston, this

1    is what he wrote in his second report.  "The likely

2    competitive effects of Google's behavior locking up search

3    access points to the challenged agreements is ideally

4    examined relative to a but-for world," okay?

5              Now, in some cases, the courts do look at -- they

6    just sort of, without discussion, they just say, well, how

7    much of the contract, how much share or business sort of

8    goes through contracts that are sort of covered?

9              THE COURT:  Right.  It's not just as simple as

10   35 percent of search is done through Apple and, therefore,

11   35 percent of the market is foreclosed.

12             MR. SCHMIDTLEIN:  Right.

13             I mean, that's sort of like the outerbounds.  And

14   in many cases like the *Tampa Electric* case which you may

15   have looked at --

16             THE COURT:  I have.

17             MR. SCHMIDTLEIN:  -- they never really got to the

18   question of, well, is it sort of what's covered by the

19   contract or how much share would have shifted if there

20   wasn't the exclusivity in the contract?  Because the fight

21   there was over the relevant market.  And once the relevant

22   market fell out, the share was sort of irrelevant.

23             And that's candidly how a lot of these cases go.

24   They're almost like merger cases.  Once you decide the

25   relevant market, sort of the shares work themselves out.

1              But in this case, even the plaintiffs acknowledge

2     that there are a lot of users out there who won't switch.

3     And so we pressed them and they, under their analysis, I've

4     set forth on the screen here, here are the three numbers

5     that are on the table, if you will, for Your Honor.

6              Plaintiff's experts have acknowledged if, in the

7     Android world, if instead of the supposed exclusive

8     agreements, every Android device used a choice screen, they

9     say, 1 percent share shifts.

10             If every Android device didn't come preloaded with

11    Google, it comes preloaded with Microsoft as the default, a

12    pretty bizarre world, one that their experts acknowledge

13    isn't actually the world that would exist.  That would never

14    be the actual world.  But even in that make-believe world,

15    11 to 13 percent.

16             There is not a single case that we've been able to

17    find that says that percentage equals substantial

18    foreclosure.

19             I know you've seen the language in the

20    D.C. Circuit that talks about, well, it was 40 to 50 percent

21    at least in Section 1.  Maybe we can go a little bit -- we

22    can go lower than that in Section 2.  However much lower you

23    can go, you can't get there.

24             And the last one, the estimated coverage number

25    there, that's a number that's under seal.  I'm not going to

1    say it in open court.  There's no case that touches on that

2    number either.

3            These numbers, whichever one you pick, are not

4    substantial foreclosure as a matter of law.

5            And under the facts of this case, the 1 percent

6    and the 11 to 13 percent, those are grossly overinflated as

7    well, but those are at least in the ballpark of trying to

8    get at what is the actual effect.

9            In the District Court in *Microsoft*, they looked at

10   what were the share shifts.  They didn't look at, gee, what

11   theoretically might have happened.  They were actually

12   looking for share shifts to try to assess substantial

13   foreclosure.

14           And we've cited to Your Honor a couple of cases,

15   the *Church & Dwight* case and the paper mill case, where

16   courts actually did, at least as one of the factors in

17   assessing foreclosure, they did look at this question of,

18   well, gee, in the but-for world, in those cases, there still

19   would have been a relationship between the parties at issue.

20   And so that coverage number is not the real number to look

21   at.  At least it's a factor you need to think about.

22           THE COURT:  Right.

23           And it wouldn't make much sense here because, as

24   you've said, there are some users who won't make the switch,

25   no matter what the default is.

1              MR. SCHMIDTLEIN:  No; that's right.  There will be

2       a loyal -- I mean, even the plaintiff's expert says, if you

3       put a choice screen up on every Android device, nine out of

4       ten people would pick Google.

5              So if that's the case, one might wonder, it seems

6       pretty logical to have Google as the default if that's the

7       world we're in.

8              THE COURT:  Can I ask?  Maybe I'm just missing

9       something.  Why has there not been a similar foreclosure

10      analysis done with respect to the Apple agreement?

11             MR. SCHMIDTLEIN:  They've done a -- they've done a

12      similar --

13             THE COURT:  Is it in the record?  Because I may

14      have just missed it.

15             MR. SCHMIDTLEIN:  We --

16             THE COURT:  Not in the way this Android.

17             MR. SCHMIDTLEIN:  Yeah.  It's in there, but we

18      haven't focused on that.

19             THE COURT:  Okay.

20             MR. SCHMIDTLEIN:  I mean, it's obviously a

21      number -- it's some numbers higher than this, I mean, based

22      on their analyses.

23             THE COURT:  Okay.

24             MR. SCHMIDTLEIN:  And it probably is somewhere in

25      the record because you've got everything in the record at

1   this point.

2          THE COURT:  Well, the reason I ask is because

3   ultimately the question, at least potentially, and I think

4   I know what your answer is, that should I not be at least

5   thinking of the foreclosure number as a whole.  I mean,

6   I think your answer is probably "no" because each of these

7   individual agreements itself is not anticompetitive either

8   for the reasons that they're on the merits or they don't

9   have a substantial foreclosure rate; I get that.

10          But, I mean, it would be helpful -- well, let me

11   ask you this:  Is that your position, that I should not be

12   aggregating the foreclosure numbers?

13          MR. SCHMIDTLEIN:  If you conclude, as we --

14          THE COURT:  Because I think everybody agrees --

15   I'm sorry to interrupt you, but the market here is not just

16   "search on Android," it's not just "search on Apple."  It is

17   the search market in general.  And so it seems to me that I

18   ought to be thinking about the full market foreclosure and

19   not just as it relates to a particular set of agreements or

20   device.

21          MR. SCHMIDTLEIN:  If you agree with us that the

22   Apple agreements are competition on the merits, right, those

23   are lawful agreements.  Winning a lawful agreement is --

24          THE COURT:  Doesn't matter what the foreclosure

25   is.

1    MR. SCHMIDTLEIN:  -- is not foreclosure?

2    THE COURT:  Right.

3    MR. SCHMIDTLEIN:  They had the opportunity and

4  they lost.  That's not foreclosure.

5    So if you agree with us on Apple, then there's

6  nothing to aggregate with the Android.

7    And you surely can't aggregate -- there's a line

8  in their brief where they say, oh, and you can also consider

9  the fact that Google gets searched from Chrome on Windows.

10    Our getting searched from Chrome on Windows should

11  be counted in a foreclosure analysis?  That's crazy.  Or

12  Chrome on Apple devices.  We're not preloaded on Apple

13  devices any more than Apple is not preloaded on Android

14  devices.

15    So our position is, the only thing that you should

16  be looking at for Android is the number or the supposed flip

17  foreclosure on Android.  You can't aggregate those things if

18  you conclude that the other distribution we have is lawful

19  and is contestable and available for others to win.

20    THE COURT:  So, Mr. Schmidtlein, it's almost

21  10:30.  I'm going to give you a few more minutes in your

22  opening argument.  I know I've taken you way off course of

23  where you want to be.

24    MR. SCHMIDTLEIN:  No; that's --

25    THE COURT:  So that you don't feel like you've

```
1    been up there and not gotten to make some of the points that

2    you want to make.

3                MR. SCHMIDTLEIN:  No, Your Honor.  I think --

4    actually, I very much appreciate your questions because

5    I think you've -- in the course of our conversation, I think

6    I've been able to make a lot of the points.

7                I mean, I think the key points here, as we've just

8    talked about on the Android agreements, we're talking only

9    about foreclosure.  Foreclosure equals is really the proxy

10   for that second prong of substantial anti-competitive

11   effects.  Their expert agrees that this, sort of, but-for

12   world is really the best way to measure that.  And even

13   under his hypothetical not really real world, almost like

14   imaginary worlds, there is not a single case that says those

15   types of numbers merit substantial foreclosure.

16               Coming back to Apple just very, very briefly, the

17   case law, whether it's *EpiPen*, whether it's *Berry & Wright*,

18   other cases we've cited, if the supposed exclusivity or

19   whatever the supposed restriction is -- and we would suggest

20   to you being the preset default isn't a quote-unquote

21   restriction.  It's a product choice that a third party has

22   made.

23               When that product choice and that supposed

24   restriction is instigated by the customer, that should tell

25   you a lot about whether the product of the competition for
```

1    that is really anticompetitive.

2            There's no coercion here.  There is no evidence

3    that those parties did not have full opportunity to evaluate

4    competition on the merits.  And that makes this case 180

5    degrees different from *Microsoft* and all the other exclusive

6    dealing cases where you had a monopolist who had the ability

7    to coerce the customers into taking restrictions they didn't

8    want.

9            Here, their version of restrictions comes from the

10   very customers who want our products, who have sponsored

11   this competition.

12           Now, that --

13           THE COURT:  Can I ask you one question?  And I'm

14   going to ask the same question of the plaintiffs; and that

15   is, what is your understanding of the consumer harm that

16   arises from these agreements?

17           MR. SCHMIDTLEIN:  There is none.

18           Here's their theory of the case, Your Honor.

19   There are three buckets of people:

20           Loyal Google users, substantial majority.

21           Loyal Bing users.  Loyal DuckDuckGo users.  Small

22   minority of users.

23           There's no evidence in this case, and I asked

24   their expert:  Is it your opinion that anything Google has

25   done has prevented any loyal Bing user or loyal DuckDuckGo

 1   user from getting access to their products?  No opinion.

 2   They're not saying that.

 3              So what are we talking about?  We're talking about

 4   those people who don't switch from the default.

 5              And their theory is the people who don't care

 6   enough to switch, we, the government, should switch them,

 7   because we think that's better.

 8              We're going to switch them.  We're going to block

 9   Google from being able to compete on the merits, even though

10   the people who make those products, the people who -- the

11   browser developers -- and there's record evidence.

12              I think Your Honor even made a reference to this

13   earlier, like what's the difference between a search engine

14   and a browser, right?  I mean, that's a fair question.

15   That's a very fair question.  A lot of people associate the

16   quality of their browse with the quality of the search

17   engine that's gets attached to it.

18              For the people who are more ambivalent, the

19   consumer harm -- how is there consumer harm that they're not

20   getting the inferior search engine that the overwhelming

21   majority of people prefer, that Apple and Mozilla should

22   somehow design their browser so that those people get an

23   inferior search engine?  There is zero consumer harm here

24   whatsoever.  Competition on the merits is working exactly

25   how it's supposed to.

1            Thank you, Your Honor.

2            THE COURT:  All right.  Thank you,

3   Mr. Schmidtlein.

4            All right.  Before we turn to the plaintiffs,

5   I want to take a short break because if I don't, that means

6   our court reporter will have been going for a very long

7   time.

8            So it's a little after 10:30 now.  Why don't we

9   just take about ten minutes, and we will pick back up a

10  little after 10:40.

11           See everybody shortly.

12           COURTROOM DEPUTY:  All rise.

13           This court stands in recess.

14           (Recess from 10:33 a.m. to 10:44 a.m.)

15           COURTROOM DEPUTY:  All rise.  This Honorable Court

16  is again in session.

17           THE COURT:  Please be seated, everyone.

18  Thank you.

19           Please have a seat, everybody.  Thank you.

20           MR. SALLET:  Good morning, Your Honor.  I'm

21  Jonathan Sallet, representing the state plaintiffs.

22  I'm going to take 30 seconds.

23           THE COURT:  I think I know who you are.

24           MR. SALLET:  Thank you, Your Honor.

25           The motion that's being argued is jointly directed

1    to all plaintiffs and the DOJ Plaintiffs.

2              For purposes of efficiency, we're asking

3    Mr. Dintzer from the DOJ to make an argument on our behalf

4    as to these issues.

5              This afternoon when I argue, I will discuss the

6    relationship between this conduct and other forms of

7    conduct, but I will endeavor not to repeat any of the

8    discussions of factual issues that Mr. Dintzer will discuss.

9              THE COURT:  All right.  Thank you, Mr. Sallet.

10             Mr. Dintzer.

11             MR. DINTZER:  Good morning, Your Honor.

12             THE COURT:  The floor is yours.  Welcome.

13             MR. DINTZER:  First, we've handed up two copies of

14   our PowerPoint.  We also have portions of that that are --

15   have been redacted in the public version.  They will have

16   red squares around them.

17             And there's actually a specific slide there, the

18   Apple terms slide, that we will get to at some point that

19   is -- Apple has asked to redact a lot of their terms.  So

20   I will reference it when it comes up when we want to talk

21   about the specific terms of the Apple agreement.

22             And with that, unless the Court has anything else,

23   I'll go ahead.

24             THE COURT:  Go ahead.

25             MR. DINTZER:  May it please the Court, Your Honor,

1    I know you asked us to start with your question, and I

2    promise I will.

3              But I have to answer a question that you asked my

4    colleague at the bar about consumer harm.  I thought I would

5    just answer that real quickly before we go deeper.

6              You asked about, is there any consumer harm?

7              And he referenced the loyal users and how could

8    they possibly be harmed.

9              Your Honor, everybody who uses a search engine has

10   been harmed by the conduct here because of the lack of

11   innovation that a competitive market would have provided all

12   of us, as well as, on the advertising side, advertisers have

13   been harmed for the last 12 years by having to pay rates

14   that were not set at a competitive level.

15             So I'll get back to that, but the harm has

16   manifested itself throughout time and throughout the entire

17   society as far as the impact.  And that doesn't matter which

18   search engine you use.  Competition benefits everyone at the

19   granular level, at the question level.

20             So with that, I will turn to what the Court asked

21   us, where the Court asked us to be, which is sort of the

22   framework overview, and I've put up slide 3.

23             And the Court has already been talking about it,

24   but it's nice to just have a visual representation.  This is

25   the D.C. Circuit section framework.  Part 1 is monopoly

1    power.  Part 2 is exclusionary conduct.

2            It is true that the defendants are not raising

3    monopoly power, but it is worth at least visiting for just a

4    moment what that power is.  And so our next slide is

5    slide 4.

6            And in the relevant markets, Google's market share

7    ranges between 74 percent and 89 percent in the three

8    relevant markets.  So we're getting close to 90 percent on

9    the general search market, and this has been a durable

10   monopoly that has lasted for more than 12 years.

11           So that's -- they don't challenge that, they don't

12   raise it, but it's important as a backdrop to everything

13   else we're going to talk about.

14           Then we go to slide 7.  And this is the

15   exclusionary conduct framework that we'll be working with.

16           And as the defense has said, they're only raising

17   issues on the first point, which is the plaintiffs' burden.

18   And then they do seem to be weaving in some justification

19   without actually saying that it is, but we'll focus on the

20   anti-competitive effects.

21           What are the anti-competitive effects just

22   briefly?  We're going to get deep into it.

23           It's the terms of the agreement.  So what you

24   heard from Mr. Schmidtlein is he wanted to talk about how

25   people have talked about the agreement, how people

1    negotiated the agreement.  He didn't want to talk about the

2    terms.

3              And the terms are the thing that are

4    anti-competitive.  Those are the things that lock in the

5    defaults, which the Court recognized were important, lock in

6    the defaults for years and give Google control over that

7    default.

8              That is the exclusionary conduct that we've

9    alleged, and that is the place where the Court should be

10   thinking about and really that the defense has -- I mean --

11   has made an effort to talk about anything but that.

12             But in their motions for summary judgment, they

13   raise issues on the competitive effects.

14             We know that contracts such as Google for

15   defaults, they're exclusionary.  They satisfy this prong

16   because they have in the past.  They satisfied it in

17   *Microsoft*.  They satisfied it in *ZF Meritor, LePage's*.

18   Limiting the options available to competitors create

19   barriers to entry, make it more difficult for them to

20   compete.  That is the very nature of a Section 2 violation

21   when you've got monopoly power.

22             So that's the conduct that did not speak its name

23   in the other side's presentation, but is at the core of our

24   presentation.

25             THE COURT:  So let me ask you whether there's

```
1    some -- the extent to which there's daylight between the two
2    sides on the analytical framework.
3            First question, it seems to me, is Google
4    separates the prima facie case into two component parts.
5    One is, is the conduct of the kind that is a product of
6    competition or something else?  And if it is something else
7    and only if it's something else, do you then evaluate its
8    anti-competitive effect?
9            Do you agree with that bifurcation, sort of
10   two-step element of your prima facie case?
11           MR. DINTZER:  Not at all, Your Honor.
12           There are certain things that generally don't harm
13   competition.
14           So cutting your price or improving your product
15   generally don't harm competition.  We haven't raised any
16   issues about them here, and they generally don't have an
17   anti-competitive effect.
18           So the analysis there, whether you want to say you
19   don't have to consider anti-competitive effect or you just
20   look at it and say you this type of conduct rarely, if ever,
21   causes anti-competitive effect, we can do generally.  You
22   can always come up with a hypothetical where there might be
23   a problem or a specific case, but generally there's not a
24   problem.  That's not the conduct we have here.
25           So the test is just -- I mean, the test is what
```

 1    *Microsoft* said.  It's one anti-competitive effect.  Some

 2    conduct is generally not problematic.  And the *Microsoft*

 3    court found some of the conduct that Microsoft was doing was

 4    not problematic, and other conduct is.  So it is just a

 5    one-part test.

 6           And what Google said --

 7           THE COURT:  Just to be more -- and maybe I'm going

 8    to step on Mr. Sallet's toes here in a moment.  But -- and

 9    I think this is what I was suggesting earlier, which is,

10    look, there's just some conduct that is either per se

11    competitive or highly presumptively competitive, and then

12    there's other conduct that clearly is not.

13           Where would you put product innovation on that

14    spectrum?

15           MR. DINTZER:  I'm not going to quite buy into the

16    per se or presumptive, but into the category of stuff that

17    is generally not harmful, product innovation is definitely

18    there.

19           You can generally improve your product, and

20    that -- even if you're a monopolist; and depending on

21    circumstances, generally that is not going to raise a

22    problem.

23           THE COURT:  Okay.

24           MR. DINTZER:  And that's not the case here,

25    because Google, to the extent -- we want Google to increase

1    the products faster.  And we believe competition would have

2    made them do that.

3             So this is not a question about Google innovating

4    or -- this is a question about them signing agreements with

5    other parties, distributors, and saying in those agreements,

6    "You can't distribute it for anybody else."  That's what

7    this case is about.

8             It's not about them trying to improve their

9    product.

10            Now, so Google's framework is --

11            THE COURT:  So the second part of that -- so

12   I think, in some sense, there's not a lot of daylight on

13   that first issue.

14            I mean, it seems to me both sides agree, generally

15   speaking, that there is, in some sense, a spectrum of

16   competitive conduct to that which is sort of highly

17   questionably anti-competitive.

18            But let me ask you the next question, which is

19   that in terms of aggregating the harm and aggregating the

20   effect -- and the states really do take issue with this.

21   I think you do, too.

22            But Google's position, as I understand

23   Mr. Schmidtlein to say, is that, look, if there is some

24   conduct, Judge, that you think is not anti-competitive, it

25   doesn't have anti-competitive effect, whether it's -- and

1   let's just say, hypothetically, I were to agree that the

2   Apple agreement is not anti-competitive, when you are

3   ultimately determining whether there's an anti-competitive

4   effect and you've met, you know, whether to grant summary

5   judgment, I can't consider, even if there's a nominal

6   anti-competitive effect, even some nominal foreclosure,

7   whatever the foreclosure may be with the Apple agreement,

8   I can't consider that overall in deciding -- I can't

9   consider that in terms of deciding whether there is a

10  disputed, generally disputed material fact as to a Section 2

11  violation.

12          Would you agree with that?

13          MR. DINTZER:  No, Your Honor.

14          It kind of turns the analysis backwards.

15          The way that the analysis should be is, the Court

16  should be looking at all the conduct that's going on in the

17  market.

18          And if we put up the *Microsoft* principles here,

19  that would be slide 8.  What you'll see and what *Microsoft*

20  said is the critical question is, how does the monopolist's

21  conduct effect the competition?

22          And so instead of atomizing everything and looking

23  at things in siloed and a formalism of, well, we're only

24  going to look for this type of conduct or this type of

25  conduct, the better analysis, the way that the *Microsoft*

1    court did it is review all the conduct for anti-competitive

2    effects without rigid formalism, consider the effects of the

3    conduct taken together and then take market realities into

4    account.  And I can give the Court an example.  Let's put up

5    slide 10.

6             So one of the things that the *Microsoft* court

7    considered was the ISVs.  And it turned out that the ISVs

8    had a rather small portion of the -- of the -- it wasn't a

9    big channel for it.

10            THE COURT:  Right.

11            But the difference is that the ISVs, at least the

12   conduct, the nature of the conduct was such that it had the

13   potential for being anticompetitive.

14            The reason the ISVs wouldn't otherwise give rise

15   to a Section 2 violation is that on its own, it wouldn't

16   have had an anti-competitive effect in a meaningful way.  It

17   wouldn't have been a substantial anti-competitive effect.

18   So the reason it becomes meaningful is because, taken

19   together with what is determined to be anticompetitive, it

20   does create a larger market foreclosure.

21            MR. DINTZER:  Yes.

22            THE COURT:  That's why it made sense there.

23            Let me just -- let me read the following to you

24   from *EpiPen* and let me see if you agree with this or not.

25            MR. DINTZER:  Sure.

1          THE COURT:  This is on page 982:

2          Real-world monopolists may engage in allegedly

3    exclusionary conduct which does not fit within a single

4    paradigm.  Instead, exhibiting characteristics of several

5    common forms of alleged misconduct.

6          In these situations, the courts disaggregate the

7    exclusionary conduct into its component parts before

8    applying the relevant law.

9          Fast-forward, in granting summary judgment to

10   Mylan on Sanofi's monopolization claim, the District Court

11   disaggregated Mylan's alleged exclusionary conduct into

12   several common forms of alleged misconduct; and after

13   applying the relevant law, concluded that considered

14   separately or together, the facts presented no triable

15   issue.

16         It then goes on to say:  Sanofi argues that that

17   was mistaken because the District Court took a vulcanized

18   view of the evidence that badly missed the forest through

19   the trees.

20         After all, Sanofi should have received the full

21   benefit of all its proof without tightly compartmentalizing

22   the various factual components.

23         Tenth Circuit says:  We reject this argument.  For

24   the sake of accuracy, provision, and analytical clarity, we

25   must evaluate Mylan's allegedly exclusionary conduct

1    separately.  Only then can we evaluate the evidence in

2    totality to see if there's any synergistic effect, if any

3    synergistic effect saves Sanofi's case.

4              Do you agree with that approach?

5              MR. DINTZER:  I -- I agree that -- the short

6    answer is no.

7              I agree that for ease of analysis, you can -- the

8    Court can look at the Android contracts and the Mozilla and

9    Apple contracts.  But ultimately, there is -- I mean, we've

10   put it in three markets, but in each of the markets, the

11   Court has to answer the simple question of is there

12   anti-competitive harm?  And if there is, then the ball goes

13   to the other side and they have to show pro-competitive

14   justification.

15             The *Microsoft* court said look at all of it.  Look

16   at the -- and I'll give the Court an example.  Google said,

17   you know, the government's complaining about Chrome.  Okay.

18   We have got alleged that Chrome -- we're not making any

19   allegations in the browser market.  We're not alleging that

20   Chrome is anticompetitive.  But Chrome has defaults.  Google

21   sets all those defaults to Google.  Those defaults are off

22   the table for competitors.  And so when considering -- so

23   that's not anti-competitive conduct, not being challenged

24   here at least.  And nevertheless, when considering this

25   market, the Court needs to consider, as I read in *Hovenkamp*,

1    it said they need to consider the whole market and need to

2    consider what is available for the competitors to get.

3            THE COURT:  So you think conduct that is perfectly

4    lawful, or at least as far as the allegations here have been

5    made, ought to be part of the mix?  I mean --

6            MR. DINTZER:  Yes.  Yes, Your Honor.  Those are

7    the market realities.

8            THE COURT:  There's a -- I don't have the case

9    name in front of me, but there's a case out there, and it's

10   cited in *Areeda* and *Hovenkamp* in the section that was cited

11   by you all -- or maybe it was in the amicus brief

12   actually -- that stands for the proposition that in a

13   situation, for example, where somebody has exclusivity due

14   to intellectual property rights, right?  There's some bucket

15   of products for which there are intellectual property rights

16   and they can be dealt with in an exclusive manner.  But the

17   other bucket of products that doesn't have intellectual

18   property rights and can't be dealt with in an exclusive

19   manner.

20           We don't consider the actor's lawful conduct of

21   maintaining the exclusivity with respect to that which it

22   has property rights over.  That has to be taken out of the

23   market.  And I guess why the same thing doesn't apply here,

24   at least as it relates to Google's use of Google in Chrome.

25           MR. DINTZER:  Let me put it this way, Your Honor.

1          If things -- the Court -- as the *Dentsply* case

2     said, the Court needs to look at the whole picture.  So if

3     things that are not being challenged nevertheless impact the

4     market and such, they turbo charge the impact of the conduct

5     that is being challenged, the Court needs to -- it can't

6     turn a blind eye and say, oh, we're not going to pretend

7     that Google has -- and it's a significant percentage.  I'm

8     not going to say it here -- of the default market tied up

9     with Chrome, the Court can't pretend that that doesn't

10    exist.  The Court needs to look at the market realities.

11         And so --

12         THE COURT:  But even in *Microsoft*, I mean, the

13    only reason the ISV, for example, was considered -- the ISV

14    relationship was considered anti-competitive was because

15    Microsoft had, the Court found, had acted anti-competitively

16    with respect to the two primary channels of distribution,

17    which was through the OEMs and through the Internet service

18    providers.

19         But that's not what we have here.  We've got, at

20    least with respect to Chrome, Google is doing something, the

21    same way that Microsoft does with respect to, you know,

22    Bing, with respect to Edge, right?

23         MR. DINTZER:  Yes.

24         THE COURT:  They always default Bing to Edge, and

25    the government is not coming in and saying "that's

1    anticompetitive," are you?

2         MR. DINTZER:  Let's put up slide 5.

3         Your Honor, I would start with the point that

4    there are things that monopolists can't do.

5         So Google spent some time talking about what its

6    rivals do and what the District Court said in *Microsoft* and

7    I believe it was referencing a dissenting opinion from

8    Justice Scalia.  And what the Court said in *Dentsply*:

9    Behavior that otherwise might comply with antitrust law may

10   be impermissibly exclusionary when practiced by a

11   monopolist.

12        So the fact that Microsoft does something does not

13   mean that Google can do it.

14        THE COURT:  Right.  I understand that.

15        MR. DINTZER:  So separate from that, I don't want

16   to go too far down --

17        THE COURT:  Let me ask you.

18        Sorry to interrupt you, but is it the government's

19   position that the developer of a browser that installs its

20   own search engine as the default is engaging in exclusionary

21   conduct?  Let's leave aside for a moment whether the actor

22   is a monopolist or not.

23        MR. DINTZER:  If that is the only thing they did,

24   then I -- I can't sign -- I don't want to make policy here,

25   so I'm not going to sign off on it's never.

1          But generally speaking, doing what you want with

2     your own products and making them better, that is not

3     exclusionary conduct, and that's certainly not being

4     challenged here.

5               THE COURT:  Right.  Google doesn't have to compete

6     the default for Chrome.

7               MR. DINTZER:  No.  And we're not saying that it

8     does.

9          All we're saying is with respect to Chrome, all

10    we're saying is, is that it is a market reality.  Then when

11    looking at the other conduct, the conduct with Apple and

12    with Mozilla and with Android, the fact is, is that Chrome

13    is taking a fair number of defaults off the table.  That

14    is -- and that's what *Microsoft* says.  That's the *Microsoft*

15    principle, is look at all of it.  And if the Court finds

16    that, well, that doesn't effect things, then it doesn't.

17    But --

18              THE COURT:  You'll forgive me.

19         But didn't Microsoft, with respect to some

20    conduct, for example, the Java machine, right, the Court

21    said, look, the Java machine is faster, it's better, that's

22    not anticompetitive.  It didn't then say, well, the Java

23    machine, while that's lawful, we're going to consider its

24    effect in the mix of all the other lawful conduct.  Maybe it

25    was because there was so much other unlawful conduct, it's

1    not an issue.

2              MR. DINTZER:  That's fair, Your Honor.

3              THE COURT:  But it's not as if they determined

4    that the Java machine, which was otherwise lawful, that

5    whatever anti-competitive effect that had could come in to

6    the calculus.  That didn't happen.

7              MR. DINTZER:  That didn't happen.

8              On the other hand, I don't recall anywhere in

9    *Microsoft* where there was an allegation that the effects of

10   the conduct that was found to be not exclusive, not

11   violated, had an effect on the conduct that was found to be

12   violative of Section 2.

13             And so I don't want to go too far down the rabbit

14   hole, Your Honor.  I mean, it is important that the Court

15   look at the entire market.

16             What Google says is, look, let's just perform this

17   exclusivity test that it pulls mostly from Section 1 and

18   says, just look at exclusivity.

19             And what *Microsoft* generally says is, no, look at

20   everything and consider it.  And for analysis purposes, it's

21   easier to do it in groups of contracts.  But ultimately, all

22   of the effects go to the market, and so ultimately, the

23   question is, is what's that effect?

24             And so turning more to -- the Court asked about

25   the agreement with Apple and asked, is that exclusionary

 1    conduct?

 2            And, of course, it's not -- Google wants to talk

 3    about the negotiation for Apple and all the people showing

 4    up and stuff.  The question is really the terms.  Are the

 5    terms exclusionary.  And had the answer is, yes, that there

 6    are a range of terms in that agreement limit what Apple can

 7    do.

 8            THE COURT:  But that's true by definition of an

 9    exclusionary agreement, right?

10            MR. DINTZER:  Sure.

11            THE COURT:  An exclusive agreement.

12            By definition, its terms are exclusive.  But that

13    doesn't make it per se anticompetitive.  And, at a minimum,

14    at a minimum, what the Court in *Microsoft* says you need to

15    do is look at how much the market it forecloses.

16            But, I mean, it can't just be that the terms are

17    exclusive, because then in that case, every exclusive

18    agreement would be anticompetitive by definition.

19            MR. DINTZER:  Your Honor, the question is, is

20    whether there is an exclusionary effect and whether that

21    effect, if so, that doesn't mean that we win our Section 2

22    case.  All it means is, is that if there's an exclusionary

23    effect, any exclusionary effect, then Google is required --

24            THE COURT:  Help me with the following

25    hypothetical.  We live in a different world than the one

1   that we live in now and Apple says, look, we are going to

2   make it an open competition to be our next default browser,

3   okay?  And let's assume that Google has equal quality to

4   Bing, they both have the same number of users.  I understand

5   that's not the world we live in.  Google wins that

6   competition.

7           In your view, is that exclusionary conduct?  Is

8   that anticompetitive to have entered into that kind of

9   contract?

10          MR. DINTZER:  Two questions on your hypothetical,

11  Your Honor.

12          The first is, I assume in the hypothetical Google

13  has a monopoly power?  We're just stipulating that?  Okay.

14          And the second question is, have they spent the

15  last 12 years using their monopoly power to make sure that

16  their rivals did not get defaults?

17          So even if they're equal now, have they spent the

18  last 12 years performing exclusionary conduct so the world

19  we find ourselves in now is one where, for whatever reason,

20  Google has an advantage that it wouldn't have had if it

21  hadn't done that.

22          THE COURT:  Am I wrong that -- you know, maybe

23  again, I was oversimplifying this when I was discussing this

24  with Mr. Schmidtlein.

25          Does your case essentially come down to the

1    network effects issue?  Which is that Google is where it is

2    today because of network effects -- that is, because it's

3    been in the poll position year after year after year, it has

4    more users.  Because it has more users, it's had the ability

5    to create a search engine that is just by definition better

6    than everyone else's.

7              MR. DINTZER:  The Court is articulating a

8    causation requirement that the plaintiffs don't carry.

9              So *Microsoft* said, We don't have to come up with a

10   but-for world to try to say what the world would have looked

11   like instead.

12             So our case comes down to two primary things,

13   Your Honor, it comes down to the fact that Google has

14   engaged in this conduct, that these exclusionary contracts

15   for 12 years, as a monopolist, that have -- that have

16   limited the ability of its rivals to get these defaults,

17   which are important, and that it's particularly harmful in

18   this kind of market where there is scale effects.

19             So --

20             THE COURT:  But as to your first point, it is the

21   case that a monopolist can enter into an exclusive deal.

22             MR. DINTZER:  If a monopolist enters into an

23   exclusive deal, then, I mean, it needs to -- I mean --

24             THE COURT:  Right.  It's not a per se violation of

25   Section 2 for a monopolist to enter into a exclusive deal.

1          MR. DINTZER:  It absolutely is not --

2          THE COURT:  Right.

3          MR. DINTZER:  -- because the monopolist has the

4    ability to go to the second prong of the --

5          THE COURT:  Right.

6          MR. DINTZER:  -- exclusionary analysis and show

7    the pro-competitive justifications.

8          THE COURT:  Right.

9          MR. DINTZER:  But does it say?

10         THE COURT:  No, no, no, no, no.

11         The second prong of the analysis is how much of

12   the market that exclusive deal forecloses before the

13   monopolist even has to show any pro-competitive

14   justification.

15         MR. DINTZER:  So this is where we go back to the

16   framework.

17         We believe that the Court doesn't need to and

18   shouldn't apply the exclusionary -- the exclusive dealing

19   framework that is encouraged by Google.

20         The Court should instead simply look at all the

21   conduct and identify the anti-competitive effects, the harms

22   to competition, the harms to -- the barriers to entry and

23   say, "That's enough," and then throw the ball to Google to

24   show the pro-competitive justifications.

25         Google is asserting that the Court should use this

1    exclusive dealing analysis, which we believe is unnecessary.

2    It's not called for by *Microsoft*.  It's unnecessary.  It

3    cabins the analysis.

4         THE COURT:  I'm just really -- but that's what the

5    Court in *Microsoft* did.

6         You know, again, I read from *EpiPen*.  But, you

7    know, it's taking types of conduct or, to put it

8    differently, it's taking a universe of conduct and

9    disaggregating it into certain types.  The D.C. Circuit did

10   that in *Covad 2*.  In fact, it used the words "types of

11   conduct."

12        You seem to be saying, "No.  Just ignore all of

13   that.  Throw it all together in a ball and see if there's

14   some anti-competitive effect that then shifts the burden to

15   them."

16        I don't think that's what the analysis is.

17        MR. DINTZER:  When the Court looked at the OEMs,

18   so the OEMs, they had been found not to have exclusive

19   contracts.  And the Court, nevertheless, it performed the

20   type of analysis that we'd encourage here, which is the

21   Court looked at their range of the conduct.  They identified

22   three types of conduct:  Prohibited removing desktop icons,

23   prohibited altering the initial boot sequence, prohibited

24   altering Windows desktop.  Very similar type of conduct that

25   we have here.  This is --

1        THE COURT:  I'm not necessarily disagreeing with

2   you that this is all conduct of a similar light.  Maybe the

3   Apple, Mozilla is in one bucket.  Maybe the Android is in a

4   separate bucket.  Or maybe they're together.  But the bottom

5   line is they've got to fall within some framework that the

6   Court then has to apply.  I don't think you can just throw

7   it all in a bucket and say, "Well, you take all this

8   together.  And what's the output?  There's some

9   anti-competitive effect."  I just don't see any court doing

10  that.

11        MR. DINTZER:  Your Honor, once -- I mean, but that

12  is what the Court did with the OEMs.  The Court said, Look,

13  we've got a monopolist.  We've got this conduct, and it did

14  not apply in exclusive dealing analysis.  We've got this

15  conduct.  And this conduct is anti-competitive.  It is the

16  exact type of exclusionary conduct that we have here.  And

17  it concluded that those agreements were anti-competitive.

18  It looked at the terms, and that was it.

19        And so that is the analysis that -- now, I want to

20  be clear, Your Honor.  If the Court applied an exclusive

21  dealing analysis, we absolutely can satisfy that.  We just

22  believe that it requires the Court to go through this

23  formalism that is not necessary when really the question for

24  Microsoft is, is there anti-competitive effects?  And once

25  we show that there are some, any, then it is incumbent --

1    because Google is a monopolist, it is incumbent upon them to
2    then show that those are pro-competitive.  And then we have
3    the bottom one where we wrestle over who's right.  But
4    that's the nature of what *Microsoft* asked us to do.
5              So -- but we believe that the agreement with Apple
6    satisfies the effects prong.  The fact --
7              THE COURT:  So we're not here yet.  We're not
8    here, I think, at this stage of the proceedings.  But what
9    if Apple comes in and says, okay, "It's just a better
10   product, and we want to be in an exclusive deal with Google.
11   We want to give Google the default.  It's in our interest,
12   Apple, Inc., in our interest to have Google as the default."
13             Is that a Section 2 violation?
14             MR. DINTZER:  Absolutely, Your Honor.
15             I mean, the fact that after 12 years of violating
16   Section 2, Google is the last entity standing -- and,
17   I mean, we can't reward a monopolist.  We can't, by saying,
18   "Well, look, you've dispatched your competition.  You're the
19   best now because you've dispatched your competition through
20   improper means over the last 12 years."
21             And so if --
22             THE COURT:  Well, let me ask you the question that
23   I posed to Mr. Schmidtlein, at least previewed.  What would
24   you have Google do?
25             In other words, Apple has set a default.  Their

1    browser is designed to have a default.  Mozilla, same thing.

2    Android, I understand there's a greater ambiguity.

3    Ultimately, it seems that designers of these products prefer

4    to have a single default.

5              What should Google have done and when should it

6    have done it to avoid acting as a monopolist?

7              MR. DINTZER:  So let me go to the factual part of

8    that, first, which is that there's no reason to assume that

9    default is the natural state of things and that the evidence

10   will show -- and we certainly disagree with Google, and we

11   put in our proposed findings, that Apple did not start that

12   way, that the idea of competition was something that --

13             THE COURT:  I agree with you there's one piece of

14   evidence in which somebody said that once upon a time we

15   contemplated having a choice at the start and Google said,

16   "No rev share," but that's it.

17             MR. DINTZER:  It's more than that.  If the

18   Court -- I'd be happy to show the Court a slide.

19             THE COURT:  I'll be happy to take a look if

20   there's more.

21             MR. DINTZER:  I can show the Court a slide right

22   now just to --

23             THE COURT:  But even if that's case --

24             MR. DINTZER:  But the bottom line is --

25             THE COURT:  -- unless Google is responsible for

1    it, what does it matter?

2                In other words, I mean, I can't be sitting here in

3    judgment of the design decisions that Apple has made, right?

4    I mean, Apple can choose whether it wants to have a default

5    or not.

6                MR. DINTZER:  Absolutely.  I could not agree more

7    Your Honor.

8                What Apple can't do -- what Google can't do -- so

9    Apple is not a party here.

10               Apple can decide it wants a default.  It can

11   decide it wants Google in the default.  At least it could be

12   for all of this.  We're not talking remedy, so I'm going to

13   take that off the table.

14               Apple could have decided 12 years ago to put

15   Google in the default.  And even though Google was the

16   monopolist, that wouldn't be an issue.

17               We get to the issue when Apple signs a contract

18   with Google and Google in the contract says, "Thou shalt

19   have no one else."  That is a Section 2 violation.

20               THE COURT:  But hang on.

21               That's what Apple did at the very beginning with

22   Google; in other words, I think it's 2004, if my memory

23   serves.

24               In 2004, Apple, you know, Apple introduces Safari.

25   Safari has a default setting.  And they enter into an

1    exclusive contract with Google to be the default search

2    engine, right?  That's 2004.  I think in 2003, the same

3    thing happens with Mozilla, right?

4              Is it your position that that contracting at that

5    time was a violation of Section 2?

6              MR. DINTZER:  Well, our complaint doesn't go back

7    that far, Your Honor.

8              THE COURT:  No, but I'm just trying to figure

9    out --

10             MR. DINTZER:  As a factual --

11             THE COURT:  -- at what point in the government's

12   theory that Google becomes a monopolist that's entering --

13   that's violating Section 2.  When along -- because it's been

14   doing this all along.

15             So if it wasn't violating Section 2 in 2003 and

16   2004, at what point did it begin to violate?  Because the

17   terms haven't really changed all that much.

18             MR. DINTZER:  Okay.  So, yes, the terms have

19   changed.  As new access points have become available, they

20   have.

21             THE COURT:  Fair enough.

22             But the basic conduct -- you know, outlines --

23             MR. DINTZER:  And it being reentered into, so

24   we're not talking about one contract that's been held over

25   the time.  The percentages have changed as well.

1          So the question of when did it happen, Your Honor,

2    it happened after Google's market share and Google's power

3    crested over a certain point and it became a monopolist.

4    And once it became a monopolist, whether it could have

5    continued to stay in those contracts is an esoteric

6    question.

7          THE COURT:  It's actually not an esoteric

8    question.

9          So let's say, hypothetically, that Rubicon was

10   crossed in 2010.

11         MR. DINTZER:  Okay.

12         THE COURT:  Say hypothetically that's when the

13   Rubicon was crossed; it became a monopolist in the

14   government's view.

15         MR. DINTZER:  So when --

16         THE COURT:  Hang on.

17         MR. DINTZER:  When --

18         THE COURT:  Hang on.

19         At that point, what would you have had Google do

20   to avoid a Section 2 violation?  Should they have sat it out

21   on the sidelines?

22         MR. DINTZER:  No, not at all.

23         THE COURT:  What should have done --

24         MR. DINTZER:  They could have written a letter to

25   Apple and said, "Look, we find ourselves in a position where

1    we're a monopolist now, so we're not going to enforce terms

2    that limit who you can do business with because we

3    understand that may be a Section 2 violation."

4                THE COURT:  But there's a default.  By definition,

5    they can agree to have a default with one other competitor,

6    I mean, one other search engine, one search engine.

7                MR. DINTZER:  They could have a choice screen,

8    Your Honor.  So by definition --

9                THE COURT:  Yes, but Apple is not before me.

10               MR. DINTZER:  Right.

11               THE COURT:  I can't say, "You know what, Apple?

12   You're the one that's creating the conditions of the

13   monopoly."

14               MR. DINTZER:  It's -- and we're not.

15               THE COURT:  Because there's nothing in any of the

16   contracts between Google and Apple that says, "Apple, you've

17   got to design Safari to only have a default."

18               MR. DINTZER:  When Google -- okay.

19               So there's the factual question, which we'll put

20   aside, as to who was the party that asked for the

21   exclusivity, okay?  That is a contested fact.  We've put in

22   facts.  I can identify -- I can show more to the Court right

23   now.

24               But putting aside the factual question, the legal

25   question, Your Honor, is that once you become a monopolist,

```
 1    you have a duty to not participate in certain types of
 2    conduct that will exclude your rivals because you have the
 3    ability to exclude your rivals, and doing it harms
 4    competition.
 5            So in this case, this -- I mean, you said 2010.
 6    Our complaint, we know that Google had market power before
 7    2010.  When it re-entered these contracts, knowing that it
 8    was a monopolist -- and it knew it was a monopolist.  That's
 9    why it made all these efforts to hide all these documents.
10    I mean, we saw, all this communicate with care, where
11    they're intentionally trying to hide things.  Why are they
12    doing that?  Because they know they're a monopolist.
13            THE COURT:  I don't want to sound like a broken
14    record here, but help me understand, again, I haven't heard
15    you say back in 2003, 2004 when these contracts were first
16    entered, that constitutes a Sherman Act -- excuse me, a
17    Section 2 violation, in part because Google may not have had
18    monopoly power in the market at that point.  Fine.
19            At some point, they do cross that rubicon.
20            MR. DINTZER:  Yes.
21            THE COURT:  You know, it gets up to 80 percent,
22    whatever the case may be in general search.
23            MR. DINTZER:  Yes.
24            THE COURT:  What should Google have done?  Should
25    they have just bowed out?
```

 1              MR. DINTZER:  No, Your Honor.

 2              THE COURT:  What should they have done at that

 3      point?  In your view, in the United States' view, what

 4      should Google have done at that point to avoid a Section 2

 5      violation?

 6              MR. DINTZER:  We have not challenged the

 7      possibility that Google, back then, could have paid for

 8      traffic with, you know, if you send us a query, we might --

 9      we can pay for it.  What we have challenged is that they

10      have entered exclusive agreements, okay.

11              So one thing that they could have done is entered

12      non-exclusive agreements that did not tell their

13      counterparties what they could and couldn't do, and --

14              THE COURT:  But I guess I don't understand that,

15      because it's a default.  There's one partner, right?

16              MR. DINTZER:  Respectfully, Your Honor, that's --

17              THE COURT:  I don't understand how it could have

18      been --

19              MR. DINTZER:  Sure.

20              THE COURT:  How Google could have said, at least

21      with respect to Apple and Mozilla, look, you can't -- we've

22      crossed the rubicon here, we are now a monopolist.  We're

23      going to say to you, Apple, you really need to offer a

24      choice screen, because if you don't offer a choice screen,

25      then we're going to violate Section 2.  Why does Google have

1   to do that?

2           MR. DINTZER:  Because they're a monopolist.

3           But that's not the only thing that they could do.

4   Another thing that they could do -- Apple has the

5   technology -- all of these browsers have the technology of

6   sending queries to different places.  Apple could answer

7   some of the questions themselves.  The point is, is that

8   they have an exclusive agreement.

9           THE COURT:  There's been a lot more criticism of

10  what Apple did or didn't do than what Google did, which is

11  that Google seems to have just said, look, here's the

12  playing field -- look, I'm more sympathetic to this issue of

13  scale, and we'll talk about that in a moment.  But in terms

14  of what they did, which is there's a single -- there's only

15  one playing field.  That's it.  It's one.  And we're asking

16  to be the person that occupies it, the company that occupies

17  it, because by definition, nobody else can be on the same

18  field.  It's a default.

19          MR. DINTZER:  Okay.

20          So, Your Honor, we reject that hypothetical both

21  because that's not factually what happened.  Google said, we

22  want the exclusivity and so you're going to give us

23  exclusivity or we're not going to pay.

24          The second thing is, is that -- so factually what

25  Your Honor is saying actually did not happen.

1          But beyond that, the fact that a customer

2    initiates a term, so let's go to slide 14.  The fact that a

3    customer initiates a term, even if that happened, which that

4    did not happen here, as *Areeda* & *Hovenkamp*, it said, it

5    matters little whether one views exclusive dealing as

6    imposed by the dominant firm or agreed upon by the dominant

7    firm in its deals.  It's because it's the terms that matter.

8    Google can't enter as a monopolist.  All monopolists have

9    things they can't do.  That's the nature of being a

10   monopolist.  And one of the things Google can't do is enter

11   into a contract that requires Apple to make Google the

12   default.

13          Apple can set Google as the default; they

14   absolutely could.  But they couldn't do it pursuant to a

15   contract that required them to do it.  That was -- and to

16   say that Apple wanted to be -- I mean, the idea that any

17   entity wants to be under a harsher set of circumstances --

18              THE COURT:  Why would Apple do that?

19              MR. DINTZER:  Why would Apple do what, Your Honor?

20              THE COURT:  What you've just suggested.  Because

21   you've now just said what Apple should have done is

22   sacrificed billions of dollars.

23              MR. DINTZER:  No, Your Honor.

24              THE COURT:  Right.

25              No, no.  I mean, I thought -- I guess what

1    you're -- you're contemplating a world in which Apple could

2    have put in a different default and then lost billions of

3    dollars in the revenue sharing it gets by virtue of having

4    Google in the default position.  I agree with you that that

5    makes it much harder to compete for the default.  I agree

6    with that 100 percent.  But I'm not sure whether that's

7    anticompetitive.

8            MR. DINTZER:  But, Your Honor, that's not what

9    we're saying.  Apple can put whoever they want as the

10   default.

11           THE COURT:  Right.

12           MR. DINTZER:  They're not a party here.  They

13   could -- before Google had 12 years of anti-competitive

14   conduct, they could have reached an agreement where Google

15   could pay them for whatever traffic was sent.

16           What Google couldn't do is -- I mean, I'm --

17   you're imagining a world, Your Honor, where Apple said,

18   look, look, we want to sign a contract that's exclusive,

19   that limits our ability to do something.

20           But that's not the way anybody signs a contract,

21   okay?  I mean, Apple would have wanted to do what it could.

22   Google would have been the one that said, look, we want to

23   limit your ability to use our rivals.

24           And so could Google have paid for traffic if it

25   started 12 years ago without exclusionary terms?  That is

 1   something -- so you're asking the question.  That's what it

 2   could do.

 3             It can't say, look -- and so maybe Apple ships

 4   some of its computers with Google, some of it is with

 5   Microsoft.  Maybe it ships all of them with Google.

 6             THE COURT:  So you're saying that it would have

 7   been lawful for Apple and Google to have the same rev share

 8   agreement it has minus the default term.  And even if Apple

 9   then unilaterally said, you know what, we're going to make

10   Google the default out of the box, that would have been

11   okay.

12             MR. DINTZER:  Twelve years ago.

13             THE COURT:  But not today?

14             MR. DINTZER:  Well, I mean, now the Court is

15   asking after having had illegal agreements for 12 years,

16   that, I mean, the whole world isn't what it would be.

17             THE COURT:  I just thought I heard you say that

18   Google could have struck an agreement to have revenue for

19   traffic, but it couldn't have an agreement to get revenue

20   for traffic in exchange for the default.

21             MR. DINTZER:  In exchange for exclusivity on the

22   default?

23             THE COURT:  Right.

24             MR. DINTZER:  No, it could not.

25             THE COURT:  Okay.

 1            So what you're saying is that it would have been

 2    lawful for Apple and Google -- or for Google at some point,

 3    what it should have said is, look, we're going to change the

 4    terms of this contract.  We still want the rev share, but

 5    we're not going to make the default a condition of the rev

 6    share?

 7            MR. DINTZER:  If they had done that 12 years ago,

 8    I mean, that is not -- that is not an exclusionary term as

 9    long as -- I mean, obviously --

10            THE COURT:  Even if -- right, okay.

11            But even if Apple had said, it's in our interest

12    to choose Google because they've got the most traffic,

13    right, because they've got the most traffic, we're going to

14    get the most ad revenue from Google as the default, that

15    would have been okay?

16            MR. DINTZER:  Well, so there's a buried assumption

17    in there, Your Honor, that I just want to address.

18            One of the reasons that Google -- that Apple --

19    that Google is so attractive to its contracting parties,

20    including Apple, is this:  Google is able to earn monopoly

21    rents on its ads.  Apple gets a percentage of those rents.

22    So to the extent that it's doing business with a monopolist,

23    that monopolist has the ability to pay in a way -- I mean,

24    Mr. Schmidtlein suggested that this was because Apple has --

25    I mean, Google has this superior product, but --

1          THE COURT:  Can I ask, is that on the record?

2   Maybe it's there, because I have to confess, I did not see a

3   lot of discussion about monopoly rents in the ad market.

4   This was largely about search, at least the briefing was.

5          MR. DINTZER:  I mean, that's because that's what

6   the defendants have raised.

7          But we have three markets here, Your Honor.  And

8   we have alleged monopolies in all three and misconduct in

9   all three.

10          But the monopoly profits, I mean, the way that

11   Google charges advertisers, yes, I mean, we're going to put

12   on --

13          THE COURT:  Is there an expert --

14          MR. DINTZER:  -- a case about this.

15          THE COURT:  Do you have an expert that says that

16   in his opinion or her opinion that the ad rates Google

17   charges are monopolistic?

18          MR. DINTZER:  We will show --

19          THE COURT:  And that if there was a more level

20   playing field, that the ad rates would go down?

21          MR. DINTZER:  So under *Microsoft*, we don't have to

22   put on a but-for world, and so we don't have a but-for

23   world.

24          We are -- we have an expert who will say that

25   Google's profits are way disproportionate to anybody else

1   and that they are -- that they arise from monopoly profits,

2   yes.

3           And, Your Honor, you asked, competitors in

4   entrance could have bid for slices of the traffic to improve

5   there both on the scale side and just to improve their

6   product so that it was out there more.

7           The thing that these exclusive agreements have

8   done is they have made sure -- I mean, look, Google knows

9   what it's doing.  It's paying a lot of money, and we can go

10  to the slide.

11          I can't say it out loud, but Google --

12          THE COURT:  No; I know how much money it's paying.

13          MR. DINTZER:  And they have paid it for years.

14  They're paying billions of dollars for these defaults

15  because -- I mean, Google keeps trying to say, well, people

16  want us, it's because people want us.

17          And if it was because people want it, they

18  wouldn't have to pay for the defaults.  The defaults matter

19  and the defaults are attractive to their rivals because they

20  are the best form of distribution.  That's why Google is

21  paying so much for them.

22          Google's ability to pay so much for them because

23  it is making monopoly rents on the ads it sells means that

24  it can to business in a way with these counterparties that

25  its rivals simply cannot.  And, I mean, there's just simply

1   no other way to think about that.

2           So Google has raised the competition-on-the-merits

3   issues.  It says that rivals are -- if rivals compete for a

4   contract, then they get a free pass, they're done.

5           The Court raised the question, and of course, the

6   Court was right about it, it doesn't tell us anything about

7   the terms.  The fact that a rival showed up, rivals show up

8   in every single one of these Section 2 cases, *Dentsply*,

9   *LePage's*.

10          Rivals showed up.  They tried to bid.  They

11  couldn't do it because they're facing a monopolist who has

12  advantages and it tells us nothing about the illegal terms.

13  So just because rivals show up doesn't mean that Google can

14  put illegal terms into their contract.

15          So the idea of competition on the merits because a

16  rival showed up means that they get a pass under

17  anti-competitive conduct.  There's no case that's held that,

18  and we would ask the Court to not break new ground there.

19          The second thing that they say is customer

20  initiation.  They raise the thing that the Court said.

21  Customer initiation, what about that?  Okay.  Well, so

22  *Microsoft* court ignored customer initiation.  They did not

23  look at what customers and distributors' views were.  They

24  focused on the contractual terms.

25          And at most in other Circuits, as part of a

1    Section 2 analysis, it's been considered.

2            So Google likes to cite *EpiPen*, so let's go to

3    slide 15.

4            What the Court said in *EpiPen* was "This does not

5    mean that exclusive dealing arrangements instigated by the

6    customer cannot be anti-competitive."

7            So that goes directly to what Your Honor was

8    asking.  What happens if they instigate it?

9            And the answer is, you go through a full-on

10   analysis, which is what the Court did in *EpiPen*.

11           You don't -- so the same conclusion was reached in

12   *Race Tires* and *Menasha* that this is not some panacea, some

13   pass where the Court doesn't have to go through the full-on

14   analysis of what the anti-competitive effect was.

15           Also -- and this is important -- Apple is not the

16   customer.  Apple is a distributor.  Apple is getting -- and

17   Apple's interests don't line up with the rest of them.  Its

18   interests are in doing its best for its shareholders.  And

19   that's fine.  But its goal is to make as much money for its

20   shareholders.

21           They are not the police for competition.

22   Section 2 is the police for competition.  Competition is a

23   public good that needs to be protected against -- when

24   monopolists cross the line.

25           And so the fact that Google is -- that Apple is

1  merely a distributor means that they will take the

2  opportunity to take advantage of the monopoly rents that

3  Google makes, and even if it means they're not promoting

4  competition in the market.

5          And the people who pay are you and I and everybody

6  else who does a search on a search engine, whether Google's

7  or someone else's, or a rival that never got to enter, that

8  is not as good as we would have seen in a competitive

9  market.

10          THE COURT:  Can I ask you a question about that

11  point?

12          If I understand you correctly, the consumer harm

13  is the absence of innovation, correct?

14          MR. DINTZER:  I mean, that is one of them.

15          THE COURT:  That's one.

16          MR. DINTZER:  There's also the increased prices in

17  the ad market and, I mean, and absence of entry and the

18  like.

19          But, generally, yes.

20          THE COURT:  Okay.

21          Is it the government's position, do you think the

22  case law essentially says that I should presume that there

23  has been a lack of innovation or, to put it differently,

24  there would have been more innovation but for these

25  agreements?

1          And I'm not -- you know, let's put it this way.

2    There hasn't been a lack of innovation from Google.  It has

3    innovated.  I think you would concede that's the case.  But

4    it seems to me the government's view is that there would be

5    more innovation, perhaps by others, and maybe even by Google

6    itself.

7          MR. DINTZER:  Yes.

8          THE COURT:  But how do I know that?  How do I come

9    to that conclusion?

10          MR. DINTZER:  So *Microsoft* takes care of that for

11    the Court, because *Microsoft* basically says that we don't

12    have to show causation.  They call it a toothless -- they

13    use a different term, which I --

14          THE COURT:  Right.  I had to look it up myself.

15          MR. DINTZER:  And I promised myself not to say

16    words I can't pronounce in court, but they say that the

17    causation standard is a toothless standard.

18          And the point of it being is that we don't --

19    I mean, it wouldn't be fair to make a plaintiff, after

20    12 years, try to show what the world would have been -- in

21    the same way that they say that we don't have to show a

22    but-for world -- what the world would have been if Google

23    hadn't been doing this for the past 12 years.

24          So the Court doesn't have to do that.  All the

25    Court has to do is "Monopolist, yes.  Anti-competitive

1    conduct, exclusionary conduct, yes."

2            At that point, the burden is on Google.  Show us

3    why it's okay.  And if they can't show us why it's okay,

4    then really they can't -- they shouldn't be doing the

5    anti-competitive conduct, regardless of, I mean, we're going

6    to presume that if they're doing this anti-competitive

7    conduct, it is harming competition.

8            And I'll give the Court an example.  If the

9    Court -- we'll go to slide 9.

10           And what they say -- they're talking about the

11   OEMs, and this is what the Court said:  "Microsoft reduced

12   rival browsers' usage share by not improving its own product

13   but, rather, by preventing OEMs from taking actions that

14   could, could increase rivals' share of usage."

15           That was enough.

16           The word "could."  Not "would."  Not "we have to

17   find it."  But if it could increase, then that was enough to

18   find that there was anti-competitive conduct.

19           And so it is not a heavy burden for the Court to

20   carry -- or for the plaintiffs to carry here.  All we have

21   to do --

22           THE COURT:  Can I ask a question, and I know I'll

23   get in trouble for doing this because I'm going to paint

24   outside the lines a little bit.

25           But how -- if you're right that there has been

1    this depression of innovation, how does the government

2    explain something like the introduction of ChatGPT into

3    Bing, which is forcing Google to introduce its own AI

4    capacity into its search engine?

5                 MR. DINTZER:  Okay.

6                 THE COURT:  I know that hasn't been the subject of

7    this, but, you know, I've got to ask.

8                 MR. DINTZER:  Okay.  No.  And it's a fair

9    question.

10                So let me make two observations about it -- three

11   observations about ChatGPT.

12                The first is that Google, I think it was five days

13   after Microsoft announced it, Google announced that they had

14   one.

15                And what's really interesting about it is that

16   Google had one and they didn't bother releasing it.

17                And so the fact that they had one and didn't

18   release it, AT&T had a number of innovations like the fax

19   machine that they didn't feel like people needed and so that

20   they didn't release it because they were monopolists and

21   they didn't have to.  So that's all public stuff that we've

22   all seen.  And, I mean, it makes you go, "Hmm."  But the

23   real thing about -- but it shows what real competition will

24   do.

25                But the real thing about ChatGPT is this,

1    Your Honor:  This is a monopoly maintenance case.  What has

2    been going on in the past 12 years, 10 years -- we filed the

3    complaint that's at ten years, and it's been two years since

4    then -- the past 12 years is that Google has been

5    maintaining its monopoly.

6            None of that has to do with ChatGPT.  It has to do

7    with the fact that they have reduced competition.  Would we

8    have seen ChatGPT six years earlier?  Would we have seen

9    five other competitors competing for search that we don't --

10   that have simply left the market or never entered?  They

11   looked at it and were like, "We can't get distribution."

12           So those are questions none of us can answer, but

13   we don't have to.  If -- the fact that there is still

14   innovation is not enough to protect Google.  The fact --

15   because that doesn't tell us where we would have been.

16           And where we would have been with 12 more years of

17   competition going back to the date of our complaint clearly

18   would have been a better market for everyone.

19           Let's see.  I did want to get to exclusive dealing

20   just briefly, Your Honor.

21           The terms of the Apple agreement, if the Court

22   goes to this slide 18, which is Apple's confidential

23   information -- I can't put it up here.

24           But the Court will see at slide 18 the date ranges

25   in the Apple agreement.  And it has a list of

1    anti-competitive terms, two of which I'm allowed to say,

2    which -- the first of which is that Apple must use Google as

3    the default Safari search and that they can't replace their

4    browser and use one that has a different search engine.  But

5    there are two others there as well.

6            Those are exclusive terms.  That's all anybody

7    needs.  If the Court decides to do an exclusive dealing

8    asset, that's it.  Those are exclusive terms.  That's

9    exclusivity.

10           And Google gets those things.  Nobody else can get

11   those things.  That's enough to satisfy that element.  And

12   so we would get -- and Google doesn't even protest the idea

13   that their Android side, that they have exclusivity.  So

14   that's enough on exclusivity.

15           On foreclosure, the Court --

16           THE COURT:  I'm sorry.

17           Would you agree that this is different than

18   *Microsoft* and the OEM licensing terms in that this is the

19   same market?  In other words, in *Microsoft*, Microsoft was

20   using its leverage in one market to foreclose competition in

21   a different market.

22           MR. DINTZER:  It was.

23           I think there's two things to say about it.  One

24   is, so it's more obvious here.  So that was a harder case

25   because it was a bank shot.

1          And the second one was, it was just nascent

2    competition there.  It's not that the competition was there

3    and was being crushed.  It was the possibility of

4    competition.  That was enough for the Court to find.

5    So this is the easy -- yes, that was the harder case; this

6    is the easier case.

7          With respect to foreclosure, what we'll go to

8    slide 25, where the D.C. Circuit made it clear -- we agree

9    with plaintiffs that a monopolist's use of exclusive

10   contracts in certain circumstances may give rise to a

11   Section 2 violation, even though the contracts foreclose

12   less than the 40 or 50 percent share usually required in

13   order to establish a Section 1 violation.

14         What's really important here is that they're

15   making a distinction between Section 1 and Section 2.  And

16   why that's so important -- and that there's no magic number

17   with Section 2.

18         Why that's really important is, Google cites a lot

19   of Section 1 cases to the Court.  So those cases simply have

20   nothing to do with the facts here.

21         So, for example, they cite *Sterling*.  They quote

22   *Sterling*.  They say*, "Sterling* stands for X."  The portion

23   that they quote about *Sterling* is all about Section 1, not

24   about Section 2.

25         So in Section 2 what the *Microsoft* court said is,

 1    for lack -- for, like, IAPs, they didn't do percentages.

 2    They just said, "Look, this is one of two major distribution

 3    channels, and it's exclusive."

 4              That's it.  That's -- and we know that -- well,

 5    two exclusive distribution channels, browsers and Android.

 6    And Google has monopolized the defaults for both of them.

 7              So that type of analysis, exclusivity plus a major

 8    distribution channel, that's enough to satisfy according to

 9    *Microsoft*.

10              THE COURT:  So is there a specific foreclosure

11    analysis?  Let's talk about foreclosure because --

12              MR. DINTZER:  Sure.

13              THE COURT:  -- I guess two questions.

14              One is, does the record reflect a foreclosure

15    analysis with respect to the Apple contract?  One.

16              And, two, what is your position on how foreclosure

17    is to be calculated?

18              MR. DINTZER:  Okay.

19              So I do not recall -- I believe that we have

20    calculated it, but I do not have that standing here.

21              What I can put up is the overall foreclosure

22    number, slide 26.

23              So what this is, is this has two things, and this

24    answers both of the Court's questions in reverse order.  So

25    I'll go to the second bullet first.

1          Google's distribution contracts result in

2   50 percent foreclosure of general search, 45 percent of

3   general search text ads, and 36 percent of all search ads.

4          That means those searches come through defaults

5   covered by their distribution contracts.  So, obviously,

6   those are big enough numbers to satisfy Microsoft if we have

7   to go to numbers, which we don't believe we do.

8          What is the proper way of measuring it?  So Google

9   does the old switcheroo.  It says, well, the government only

10  has 1 percent.  But then it cites -- it references cases

11  that are using coverage.  So the proper measure is coverage.

12  Google cites cases that use coverage.  *EpiPen* uses coverage.

13  They find 31 percent.  So they really like *EpiPen*, but they

14  don't like the fact that it uses a coverage analysis.

15         Why use a coverage analysis?  Because it's easy to

16  do and it tells the Court how -- you don't have to establish

17  a but-for world.  It tells the Court what percentage of the

18  defaults, in this case of the market, is being put

19  off-limits for the rival.

20         THE COURT:  If there's a disagreement about the

21  method for calculating foreclosure, is that a legal question

22  I should resolve?  Or do you think that's a factual dispute

23  that I need to hear evidence about?

24         MR. DINTZER:  I think, Your Honor, that we go back

25  to where I started, which is *Microsoft* says you need to look

1    at what's going on in the market.  And so coverage tells the

2    Court what's going on in the market.  And so coverage -- and

3    every court that has done --

4              THE COURT:  But you would agree with me that

5    coverage -- well, would you agree with me that the coverage

6    can't be the number?  In other words, you don't mean to

7    suggest that somehow the foreclosure rate includes Chrome.

8              MR. DINTZER:  These do not include Chrome?

9              THE COURT:  Okay.

10             So it doesn't include Chrome.

11             Does it include people, no way, no how, who would

12    ever switch from Google?

13             MR. DINTZER:  Yes, because those are part of the

14    coverage numbers -- I mean, this is the number --

15             THE COURT:  I thought your expert said otherwise.

16             MR. DINTZER:  So every court that has looked at

17    this has used the coverage number, even the charter court

18    that Google cites their first analysis.

19             I'm sorry.  The --

20             THE COURT:  So is it really foreclosure if -- and,

21    again, I don't know you don't like the but-for worlds here.

22    But is it really foreclosure if the government were to get

23    what it -- say, hypothetically, what -- well, is it -- if

24    there were a choice, however one defines it, and the vast

25    majority of users chose Google, how can we say that it's the

1    agreements that are foreclosing the market, as opposed to

2    Google's product?

3              MR. DINTZER:  Okay.  So we're 12 years' deep into

4    a monopolist engaging in Section 2 conduct.  So asking

5    anything about what is happening right now and saying,

6    "Well, look, everybody loves them because they're the

7    biggest," it's not fair, because they've had 12 years to

8    wipe out the competition that people might love as much or

9    even more.

10             So what's going on now, I mean, that's one of the

11   reasons.  And *Microsoft* said it's -- let's go -- I mean,

12   let's go with to slide 29.

13             They recognized that asking to require the

14   Section 2 liability to turn on a plaintiff's ability or

15   inability to reconstruct the hypothetical marketplace absent

16   a defendant's anti-competitive conduct would only encourage

17   monopolists to take more and earlier anti-competitive

18   action.

19             It can't be that the Court needs to look at the

20   but-for world.  Constructing the but-for world is not fair.

21             And what it does is, it conflates foreclosure.

22   How much of the market is being put off limits by Google's

23   conduct with the effects now of that conduct as a snapshot

24   in time?

25             And that's what our expert -- when our expert

1    calculated the 1 percent number, that's what he was doing.

2    He was simply taking a snapshot now of what a choice screen

3    and what exclusive would look like now.  He was not creating

4    a but-for world.  He did not go back 12 years and even try

5    to figure out what would happen with all these other

6    competitors, got scale, got access to defaults.

7            *Microsoft* says we don't have to do it, and we

8    haven't done it, and it's not part of the measure of

9    foreclosure.

10           None of those cases that Google cites, that Google

11   likes, have a number that's based on the but-for world.

12           The *Church* case does cite that number as an

13   alternative, but first it calculates, and that's just a

14   District Court case in California, it's not a Circuit Court

15   case, but it -- not to denigrate the District Courts in

16   northern California, which are near and dear to my heart.

17           THE COURT:  It's okay by me.

18           MR. DINTZER:  But they actually calculated

19   foreclosure at 45 to 50 percent, and so they actually did

20   the coverage.  Coverage is an important number.  It tells

21   the Court what's off limits.

22           And in this case, along with significant

23   foreclosure that we saw in that slide, what we also see is

24   that under the market realities in this case, slide 27, what

25   we see, there are some market realities that turbocharge the

1    foreclosure that we just saw.  The first is the durable

2    monopoly that Google controls.  The second, as the Court has

3    identified, are the network effects.  The scale strengthens

4    the barriers.  It's a repeating cycle that continually gets

5    worse.

6            Chrome we've discussed, and we believe that it's a

7    market reality the Court needs to consider.

8            Finally, the length of the contracts.  And I can't

9    say this number.  It is on slide 18, the Apple data slide.

10   But it is a significant length of time, and that contributes

11   to the market realities that turbocharge the foreclosure

12   that we've seen.

13           That 11 percent is -- it is --

14           THE COURT:  Could I ask you?

15           Is it your view that -- look, it seems to me that

16   no case has had a comparable product to a search engine.

17   And what I mean by that is, it is a product that grows in

18   its capacity just by virtue of more users.

19           And this is different than even a social network,

20   right?  I understand social networks, more users make it

21   more beneficial to the users, but this is a case where the

22   product itself improves the more people that use it.

23           MR. DINTZER:  Yes.

24           THE COURT:  So should a company like Google, which

25   has -- well, should Google, because of the nature of its

1    product, because of the nature of its product, I mean,

2    should it be held to a different -- well, should it be

3    considered more -- should I look at it more closely as a

4    monopolist and its conduct because of the nature of the

5    product?  Does that make sense?

6              Look, I'm just trying to figure out, because

7    there's no comparable case here in terms of the kinds of

8    scale and network effects that you're talking about.  It

9    just doesn't exist.  For every single time Google -- at

10   least according to your theory, every time it enters into

11   one of these default agreements, it has the ability to get

12   more data.  More data means better analytics.  Better

13   analytics means better search results.  Better search

14   results means more customers.  More customers means better

15   ad revenue, right?  I mean, that's the theory.

16             MR. DINTZER:  That is the theory.

17             THE COURT:  That's the network effects.

18             MR. DINTZER:  And the practice, yes, it is,

19   Your Honor.

20             The scale makes this -- I mean, there are other

21   like operating systems, there are other places where we do

22   see, you know, you have an operating system, so more people

23   write software for your operating system and so you're a

24   better operating system and so more people write software

25   for your operating system.

1          But even something as simple as the *McWane* case

2    which was, I believe, pipes, in the *McWane* case, they said

3    that the exclusive contract, it kept the rivals from getting

4    enough scale to build a foundry which would allow them to

5    cut costs.  So scale is not something -- this is not a new

6    theory about, you know, the import of scale.  It's just that

7    scale is particularly important here and a particularly

8    effective means for Google to exclude their rivals.

9          So if the Court is asking, should we really hold

10   Google to a standard of being, look, what you're doing with

11   your defaults is fundamentally affecting your rivals, yes,

12   that's why -- I mean, the truth is, if there was no scale

13   here, this would still be a Section 2 violation, okay.  But

14   the scale shows how nefarious this process is because we're

15   sitting here 12 years later going that by exclusive -- by

16   getting the exclusives on all these defaults, it's keeping

17   its rivals from competing so we don't have those people

18   competing in the market.

19         THE COURT:  Mr. Dintzer, you're slightly over an

20   hour, and I just want to make sure you've gotten the

21   opportunity to make the points you want to make.

22         MR. DINTZER:  No; I appreciate that.

23         The last thing that I'll do, I'll just do the

24   closing, Your Honor, and I'll get out of here.

25         The last thing I'll do is, we talked about a lot

1    of legal disputes, but I would like to take just a second to

2    note the fact disputes.  Let's go to slide 31.

3            Even if the Court rejects our reading of the law,

4    which we hope of course it doesn't, we have the effect of

5    Google's agreements have had on rivals and potential

6    entrants into the competitive process.  These are all

7    questions of fact.  Whether the contracts substantially

8    foreclose rivals.  Question of fact.  And we have got the

9    citations to the record that show the disputes there.  The

10   importance of the defaults, the extent of which defaults

11   drive traffic, the significance of alternative forms of

12   distribution.

13           Let's go to slide 32.

14           Whether the Apple ISA and the Mozilla RSA were

15   customer instigated, those are big questions that are

16   challenged.  These are citations to the COMF and the other

17   documents.

18           Whether Apple and Mozilla are distributors or end

19   users.  We believe they are distributors, which means the

20   whole instigation thing really doesn't even matter.  And

21   whether the contracts are exclusive.  Those are all factual

22   questions, Your Honor, that alone would be the basis of

23   rejecting Google's motion for summary judgment.

24           And with that, unless the Court has any other

25   questions, I appreciate the Court's time and attention here.

1          THE COURT:  No.  Thank you, Mr. Dintzer;

2    I appreciate your presentation.

3          Mr. Schmidtlein.

4          MR. SCHMIDTLEIN:  All right.

5          Your Honor, let me jump in, first and foremost, on

6    this question of the conversation you were having with

7    Mr. Dintzer about this Safari browser and how it came to

8    have a default, okay?

9          We deposed people from Apple, and we asked them

10   the questions about the history, and here's what Eddy Cue

11   said.  He is a senior vice president, reports to Tim Cook.

12   He's worked at Apple since 1989.  He was their 30(b)(6)

13   witness on all of these types of topics.

14         "What does it mean to be the default search engine

15   in the Safari browser?

16         "Well, you got to go back to the beginning before

17   Safari or when Safari was coming out, people would type in a

18   URL.  Example being www.google.com, and then they would do

19   the search.  We thought we had a really innovative, clever,

20   and I think an amazing idea as it turned out.

21         "So what we did is when somebody types in a type

22   of text, it goes and searches Google automatically rather

23   than having to type in Google.com.  It provides the results.

24   That's what we do.  The customer gets the results

25   automatically."

1           This is the press release, 2003.  Your Honor

2    almost got it.  The first rev share deal was '05.  The

3    Mozilla deal was '04.  But --

4           THE COURT:  I was off by a year.

5           MR. SCHMIDTLEIN:  But you are in the neighborhood.

6           This is the press release from Apple.  And look

7    what they call out.  "Google search capabilities build into

8    the user interface for convenient quick searching on the

9    web's most popular search engine."

10          Mr. Cue then goes on:  "We added the capability of

11   customers having the option to switch which search provider

12   that field would search in for customer type-ins."

13          Here's the question:  "Is it possible to have more

14   than one default search engine on the browser?"

15          "No, it's not possible.  You pick one."

16          That's Apple's testimony.

17          All of this imaginary, gee, they could just like

18   randomly start sending searches on the Safari browser to

19   four or five different search engines.  It's an interesting

20   idea.  Not one that anybody's ever dreamed of at Apple or

21   Mozilla or anywhere else.

22          THE COURT:  So then what's the answer to the

23   government's fundamental question, which is, why pay for the

24   default then?  In other words, if it doesn't have the great

25   value that Google ascribes to it -- it clearly does, it's

```
1    paying a lot of money on an annual basis to multiple
2    sources -- why pay for the default?  Because it also does
3    have the effect of keeping somebody else out from being the
4    default.
5              MR. SCHMIDTLEIN:  It doesn't.
6              THE COURT:  Well, I understand that there are ways
7    to switch things, except for on the Android device which I
8    gather the widget has to stay as Google.
9              MR. SCHMIDTLEIN:  Yeah.
10             I mean, we've got slides.  You can -- if you pull
11   out -- if you have an iPhone, you pull it out, you hit the
12   "settings," you hit "Safari," you hit "search engine," you
13   switch it.
14             THE COURT:  No; I know.  But --
15             MR. SCHMIDTLEIN:  You can -- you get my point.
16             THE COURT:  But apparently, at least as a fact
17   dispute, or maybe it's a fact question of how many people
18   really do that.  There's clearly value in the default.
19   There's plenty of documentation that suggests Google
20   understands the value in the default, because whether it's
21   hard or not to switch, the human mind doesn't really think
22   about switching except for in a case that -- except for when
23   it comes to Microsoft.  I understand that.
24             MR. SCHMIDTLEIN:  No.
25             But here's what we know.  People switch when it's
```

```
1    not Google.

2              If people want to -- and as I've said, they've not

3    said, people who want Bing get Bing.

4              What we're talking about is are there a group of

5    people who might be ambivalent or who might not go to the

6    trouble to switch and the people at Apple and the people at

7    Mozilla and the other browsers, they have a decision.

8              So for those people, I care about those people.  I

9    care about their experience on my browser.  Which search

10   engine do I want those people to have set as the default?

11   Because me, Apple, I think it's the best.

12             They make this claim that you can't trust Apple.

13   You can't trust Mozilla.  They don't care about the

14   customer.  What?  Apple doesn't care about the customer?

15   Mozilla doesn't care about the customer?

16             They don't claim that the Safari browser is a

17   monopolist.  They certainly don't claim that Firefox is a

18   monopolist in browsers.  They care deeply about the search

19   experience on their browsers, and they pick Google because

20   it's the best.  And providing the best experience, even to

21   people who may not care that much, matters.

22             THE COURT:  Sorry, Mr. Schmidtlein.

23             So answer the question that I asked you and then

24   interrupted you from answering, which is:  Why pay for the

25   defaults?  In other words, if Google is so confident in the
```

1   quality of its product, why pay for the defaults?

2          MR. SCHMIDTLEIN:  I was trying to answer it.

3          There are some people who, if it is set to

4   something else, they may not switch.  They may not try

5   Google.  We want them to have the product available.

6          And certainly back when these agreements started

7   in 2002 and all of the searching on the Internet or nearly

8   all of it was being done on Microsoft devices, this was a

9   way for us to expose our product to others.

10         THE COURT:  But doesn't that answer make the

11  government's point, which is that Google is paying to keep

12  as customers some number of people who may be ambivalent?

13         I don't know what that number is.  It may not be a

14  big number, but some number of people Google values enough

15  who they fear might switch, and there have been various

16  percentages in the documentations that might reflect that

17  switching number, if it didn't have the default?

18         MR. SCHMIDTLEIN:  They're paying to expose their

19  product and make it available.  Whether people switch or not

20  is up to the user.

21         But there is certainly value -- and, of course,

22  Google wants to be associated with Apple's products.

23  Absolutely they want to be on that device.  There's nothing

24  wrong or nefarious about that.

25         Their economist says we should pay more.  Their

1    economist says, "Gee, if there was more competition, you'd

2    actually pay Apple more for that spot."

3            There's nothing nefarious.  It's nothing more than

4    a price -- a reversed price cut.  People do that all the

5    time in competition.  They want their product to be

6    available.

7            So when Apple comes to us and says -- he says,

8    "Why isn't it possible?"

9            Well, the idea behind the whole field is there's

10   this field you type into and it automatically goes.  That's

11   the beauty and why it's worked so well.  It just works.  The

12   customer doesn't have to think or do anything about it.

13           But the idea is, let's just make it so that out of

14   the box, without any changes, without any customer having to

15   do anything, they would get the best results possible.

16           And I've got more slides.  If you go into your

17   binder there, this is tab 14, Your Honor.  Mr. Cue goes in

18   and describes the process by which they think about and they

19   choose the default.

20           And, you know, we've made these next -- these are

21   obviously in the record, Your Honor.  But it describes how

22   they think about the default, the process they go through to

23   decide who to get the default.

24           THE COURT:  So is it a fact question for me to

25   resolve now or at trial as to whether -- I mean, you've

1  suggested it's pretty easy.  At the end of the day, the

2  default is helpful, but it's not -- doesn't foreclose

3  anybody from switching over to a different search engine.

4        Government says, "Look, it's a really sticky --

5  there's a real sticky quality to it.  A lot of people just

6  don't switch even if it's easy to switch."

7        Is that not a fact question I need to ultimately

8  decide at a trial?

9        MR. SCHMIDTLEIN:  No.

10        I mean, there is certainly no -- there's no debate

11  that there's value to it and that there are definitely

12  incremental volumes of query that you pick up.

13        If I may, Your Honor --

14        THE COURT:  Yes.

15        MR. SCHMIDTLEIN:  -- hand up, these are a set of a

16  slides based on evidence in the record.

17        This is a little bit of what we talked about

18  before, Your Honor.  This provides market share numbers for

19  Google versus Bing.  And highlighted there, we have Bing's

20  share versus Google's share on Windows, and then it compares

21  it with macOS and others.

22        And then the other share -- the other slides there

23  show you, contrast for you the default status of Bing on

24  Windows devices and the lack of default status for Google.

25        So, yes, defaults matter.  But is the record in

1    this case undisputed that Google gets a lot of traffic on

2    places where it's not the default?  The absolutely.

3           Microsoft has the default on all of those Windows

4    devices, and yet people search for Google.

5           So the idea that somehow Google shouldn't be

6    allowed to compete when Apple comes to it and says, "I have

7    a default.  I'd like you to compete for it" -- and,

8    Your Honor, I want to hand up, and we have a slide on this

9    as well, but it's not for publication.

10          This is a letter that was written by Mozilla's

11   counsel to the United States Department of Justice one month

12   before this lawsuit was filed.  And in this letter, Mozilla

13   describes to the Department of Justice, in great detail, the

14   issues that will occur and befall Mozilla if they are not

15   allowed to have Google as a potential competitor to be the

16   default on their browser.

17          And we asked Mozilla's CEO the same set of

18   questions about the default.  The concept of a default

19   search has always been there.  When we made a computer

20   product, Firefox 1.0, the prevalent or the existence of

21   multiple search engines in the product has always been

22   there.

23          They promote and they've got various other places

24   where you can find other search engines on their browser,

25   but there's only one default.

1           You want the browser to work when it starts.  And

2    so the default's in Firefox, the default's in the search

3    box, the Awesome Bar, they call it in Firefox, is what

4    happens if the user makes no choice.

5           We're very big on choice, and so it's always been

6    a key principle of our search philosophy that users have a

7    choice.  We try make it easy for people to pick a different

8    search engine if they want it.

9           I asked her, "Has Mozilla ever considered offering

10   a search engine choice screen to users?

11          "Our experience is that, you know, people like

12   opening up the browser and being able to do what they want

13   to do.  So, yeah, we thought about it from the very early

14   days and decided the best consumer experience was to have

15   the default, the thing that people who don't want to think

16   about search engines expect, and then to make it very easy

17   after that.

18          "Consumers are a force.  They make decisions about

19   what works for them, and so we're always trying to balance

20   what it is that makes a product work, that consumers vote

21   and say, 'This is helping me.' How are we moving our mission

22   forward in those products?

23          "And so we felt, A, consumers are choosing Google.

24   We're making search easy for them, and we added choice in a

25   product in a way that no one else had or even thought of.

1   We're making it easy.  That's a pretty good balance."

2            So, again, product design decisions made by

3   third-party browsers that Your Honor said are not before

4   you.  They haven't sued them.  There's nothing

5   anti-competitive.

6            And Mr. Dintzer, I think, even acknowledged, well,

7   yeah, Apple could make Google the default.  They're

8   apparently hung up on the fact that the contract just

9   provides what they're going to do with Google.

10           There's nothing nefarious about the contract

11  saying, "Okay.  We're going to pay a rev share.  And as part

12  of this, here's what our obligation is.  If the search comes

13  in the Safari box, we're sending it to you."

14           It doesn't bar Apple from providing another search

15  bar that defaults to Google, a different search widget.  It

16  doesn't bar Apple from preloading Bing on the devices.  All

17  these other things.  It's not an exclusive agreement like

18  any other agreement that they cite.

19           Mr. Dintzer made reference to *ZF Meritor*, to

20  *Dentsply*, to *LePage's*.  Your Honor, I implore you, go back

21  and re-read those cases carefully.  I know you've read them.

22  Those cases all involve situations like *Microsoft*, where

23  those monopolists were able to leverage their monopoly to

24  impose restrictions on their customers.

25           None of those cases involve a situation like this,

1    which is a lot closer to *EpiPen*, where the customer comes

2    and says, "This is how I want my product to work.  This is

3    how I want the competition to work.  Please compete for that

4    product, even if that means the monopolist wins and the

5    rivals lose out."

6              THE COURT:  So is it a fact question then if this

7    was a race -- say it's a 400-meter race.  Is it a fact

8    question of whether the default puts Google ahead by

9    200 meters?

10             MR. SCHMIDTLEIN:  Absolutely not.  Absolutely not.

11             And there's no -- there is no -- well, I'm sorry.

12   You said it was a how-many-meter race?

13             THE COURT:  400.

14             MR. SCHMIDTLEIN:  Yeah, there's no -- there's

15   certainly no factual dispute that the default is a 200-meter

16   advantage.

17             But what we, I think what we can say is, you can

18   rely on -- or the browsers here have every incentive to make

19   sure that there is competition in search.

20             Apple doesn't want to wake up one day and find

21   that Google is the only person they have to deal with in

22   search.

23             THE COURT:  But I guess the government's response

24   is, "Sure."  I don't think they're disputing that Apple,

25   Mozilla, they have every incentive to ensure they have the

1   best search engine installed in their browser.

2           I guess the question is, even with that being the

3   case, to use my tortured hypothetical or tortured analogy,

4   is there ever a scenario in which somebody who's starting at

5   the beginning and who has a 200-meter disadvantage could

6   ever win the 400-meter race if they're starting halfway

7   behind?

8           MR. SCHMIDTLEIN:  Yeah, and the answer is -- well,

9   the answer is yes because --

10          THE COURT:  No matter how much -- you know, maybe

11  even if you give the person who's at the starting line

12  better shoes or give them, you know, a few -- a fewer less

13  hurdles to jump over, whatever the case may be.

14          MR. SCHMIDTLEIN:  And the answer to that is yes.

15  Google was 200 meters behind in 1998.  Google was 350 meters

16  behind in 2008 when it introduced Chrome after years and

17  years of monopoly behavior by Microsoft on Internet

18  Explorer.  Google was 350 meters behind in a 400-meter race,

19  and they've come around and they've surpassed them, okay?

20          There is -- and I want to touch on something,

21  because Mr. Dintzer keeps harping on 12 years of

22  anti-competitive conduct, 12 years, 12 years.

23          This is a monopoly maintenance case, not a

24  monopoly acquisition case.  They've never told us when

25  Google first became a monopolist, but it was more than

1     12 years ago, okay?

2             They won't identify, like, when Google

3     specifically, but 12 years ago, Google's market share was

4     very, very high.  So even under their theory, whenever this

5     conduct supposedly crossed the magic line, Google was

6     already ahead, Google was already ahead.

7             So Google was ahead back in the 2000s when they

8     had almost none of this distribution.  They've never said --

9     and you can check him because they're always very careful

10    about this.  They've never said Google acquired its monopoly

11    because of any contract.  They've never said that.  And

12    that's really, really important.

13            Now, they try to suggest -- they cite the language

14    in *Microsoft* around -- I'm going to try to get it right,

15    Your Honor -- "edententialist."  And I think it's really

16    important to understand what the Court was talking about

17    there, because there's -- people have been trying to blur

18    this for years in the antitrust world.

19            There's two separate questions.

20            Has the plaintiff proved substantial

21    anti-competitive effects?  Which in *Microsoft* they did.

22    There are extensive findings of fact not challenged on

23    appeal in the case, and I'll hand these up, substantial

24    findings of fact, where the District Court Judge

25    concluded -- and Microsoft didn't challenge these on

```
1    appeal -- substantial findings of fact saying restrictive

2    behavior led to shoot-up in IE share, reduction in Navigator

3    share, or reduction in Java distribution, okay?

4           That was -- that met substantial anti-competitive

5    effects.

6           The "edententialist" test language that comes at

7    the end --

8           THE COURT:  Right.

9           MR. SCHMIDTLEIN:  -- is very, very different.

10           THE COURT:  It's whether they collectively -- no?

11           MR. SCHMIDTLEIN:  I think what -- the argument,

12    I believe, that Microsoft was making that was rejected there

13    was, well, yeah -- and this goes to the triple bank shot,

14    which I'm going to talk later with Mr. Sallet because he's

15    got the ultimate triple bank shot for his case -- what

16    Microsoft said there was, okay, even if we've reduced the

17    browser share or we've reduced Java, you know what, that

18    stuff was never going to become the middle ware threat we

19    thought that would actually become a means to reduce the

20    application's barrier at entry and erode our monopoly power.

21    So even if we did all this stuff, it turns out not to have

22    mattered.

23           And the Court there said, wait a minute, time out,

24    that's -- we're not going to reward you from, sort of, like

25    killing off all of this supposed potential competitive
```

1    technology before it had a chance to flower.  That's not the

2    test.  That's a separate test --

3              THE COURT:  Right.

4              MR. SCHMIDTLEIN:  -- than the effects test.  So

5    I just wanted to make sure we sort of had that point.

6              THE COURT:  Mr. Schmidtlein, I'm going to just ask

7    you to wrap up.

8              MR. SCHMIDTLEIN:  Okay.

9              The only last thing I'll repeat on is to, again,

10   look carefully on this question of, can you sort of

11   aggregate effects across?  Because I know you had some

12   exchanges about that.

13             And I think the answer is clear in *Microsoft*.

14   Different categories of conduct cannot be aggregated.  You

15   have to deal with them individually.  You might have a

16   situation where most popular channel for distribution

17   exclusive, let's just assume out, which was OEMs.  Second

18   most popular IAPs, we have restrictions there, problematic.

19   Then we get to ISVs and anti-competitive conduct, not as

20   much foreclosure.

21             I can look -- in that situation, I can look back

22   and say, okay, maybe not on its own, but I can look at the

23   other effects there, because I have found that that conduct

24   is illegal.  It's not competition on the merits.

25             But then when they got to the ICP's conduct said,

1   anti-competitive conduct, I really don't see any real

2   effects, nothing really of -- that, no liability.

3            So again, I think you do need to line these up all

4   sort of individually.  And if you conclude that any category

5   of conduct on its own is competition on the merits, you

6   surely cannot include that because that would be like

7   saying, if Google had gone out, per Mr. Dintzer, and didn't

8   have any exclusivity as to Apple, if Apple just chose us out

9   of the blue, and we got all their search queries, you

10  certainly can't come in and say, oh, well, when I look at

11  Android, you have to look at the fact that Google won Apple

12  on the merits.

13           Thanks for your patience this morning, Your Honor.

14           THE COURT:  No.  I appreciate it, Mr. Schmidtlein.

15           Before we adjourn, I want to ask Mr. Dintzer one

16  question that I did not ask, and I should have, and I don't

17  mean to open the door to another rebuttal here.  But can I

18  just ask you to address the point -- and I should have asked

19  the question while you were up -- about switching that

20  happens on Microsoft's browsers, the point that

21  Mr. Schmidtlein has made about, look, it's not as sticky as

22  the government would have you believe, the defaults, because

23  when we're looking at Microsoft's products, there's a large

24  amount of switching that's happening to Google?

25           MR. DINTZER:  So let's start at the beginning.

1          On places where Microsoft has the defaults on its

2     browser, its usage, I believe Google's chart shows, its

3     usage is significantly higher in places than it doesn't have

4     the defaults, which shows that getting the default matters.

5     So we believe that their numbers show defaults do matter,

6     and that's -- the question of why people are changing

7     defaults on Microsoft's computers is a more complicated one.

8          They do it, to some extent, but what happens is,

9     to a significant extent is this, people decide that they

10    don't necessarily like, especially the Internet Explorer and

11    perhaps Edge, and they decide that they want a new browser,

12    so they download the Chrome browser that comes fortified

13    with Google as the default, and they start using that

14    browser.

15         And it looks like, oh, well these people have

16    chosen a new search engine, but that's not necessarily so.

17    They have chosen a new browser.  And it's the question --

18         THE COURT:  But that assumes people can

19    distinguish between the browser and the search engine.

20         MR. DINTZER:  No.

21         Actually, it assumes the opposite, Your Honor.

22    It assumes that people maybe can't.

23         And so when they're downloading -- they say, look,

24    I'm not thrilled with my browser, it's kind of slow,

25    I'm going to download Chrome or Firefox.  Both of those

```
 1    have -- they default to Google.  And so Google likes to

 2    count those as people making the decision to use Google

 3    search.  That's far from clear, certainly --

 4              THE COURT:  But even in your view, even if all of

 5    those folks who are downloading Chrome, it's because they

 6    think they're downloading the search functionality of Chrome

 7    or the search engine, they're still -- the evidence shows

 8    that the default is still meaningful, notwithstanding the

 9    degree of switching that's happening.

10              MR. DINTZER:  Absolutely.

11              In fact, it shows what -- I mean, what could be

12    if --

13              THE COURT:  If it was 95 percent switchover, then

14    perhaps you wouldn't have a leg to stand on, but it's less

15    than that.

16              MR. DINTZER:  It's -- and I think I know the

17    number, but I'm not sure I'm allowed to say the number, so

18    I'm not going to test the waters, but it's a significant

19    number, compared to where Microsoft does not.

20              And the last thing is, it's easier to switch on a

21    computer.  So a lot of what the numbers that we're talking

22    about are phones.  And the fact that people are switching on

23    a computer doesn't tell us as much about -- I mean, defaults

24    are stickier on phones because they're smaller and people

25    just -- they just want to press the buttons.
```

1            And so there are a number of reasons why.  But the

2    upshot is, is that that does not mean the defaults don't

3    matter or that everybody loves Google so they should be

4    allowed to be a monopolist.

5            THE COURT:  All right.  Thank you.

6            MR. DINTZER:  Thank you, Your Honor.

7            THE COURT:  All right, everyone.  Thank you very

8    much for the presentations this morning.

9            So we will reconvene at 1:30 and we will then

10   resume then.  Thank you all very much.  We'll see you

11   shortly.

12           Don't wait for me, please.

13           COURTROOM DEPUTY:  This Court stands in recess.

14           THE COURT:  No need to wait for me.  Thank you,

15   everyone.

16           (Recess from 12:25 p.m. to 1:30 p.m.)

17           COURTROOM DEPUTY:  All rise.  This Honorable Court

18   is again in session.

19           THE COURT:  Please be seated, everyone.

20   Thank you.

21           Okay.  Welcome back, everybody.

22           Ready for round two?

23           Mr. Schmidtlein.

24           MR. SCHMIDTLEIN:  Thank you, Your Honor.

25           I'm going to hand up two sets of slides that we've

1    prepared for this afternoon's argument while we get up and

2    running here, Your Honor.

3              So we'll try to kind of, as we did this morning,

4    talk a little bit about the framework.  I know we've

5    obviously covered some ground on that in connection with the

6    issues we discussed this morning.  I think some of it sort

7    of overlaps.  I don't think -- we're certainly not

8    suggesting that a different framework applies.

9              THE COURT:  Right.

10             MR. SCHMIDTLEIN:  But I think you previewed at

11   least one of the types of conduct that features very

12   prominently or more prominently this afternoon than this

13   morning, which is this question of product design,

14   improvement, and things like that.  So we'll spend -- we'll

15   probably spend a little bit more time talking to you a

16   little bit about that.

17             THE COURT:  Okay.

18             MR. SCHMIDTLEIN:  I'm obviously happy to answer

19   questions.

20             The conduct at issue in the Colorado plaintiff's

21   case really involves four categories.  The specialized unit

22   product designs, and there are particular specialized units

23   within Google that have been the focus of the states'

24   allegations and in the case.

25             Google's data licensing agreement terms with

1    specialized vertical providers.  If you hear me slip into

2    SVPs, that that's what I'm referring to.  And those are

3    companies like booking.com or Expedia or others who provide

4    kind of a specialized vertical search experience.

5           The third category in their claims involves SA360,

6    which is a search engine marketing tool.  This is software

7    that advertisers can use to buy ads across different

8    advertising platforms, and allegations or complaints they

9    have about whether Google's SEM tool has adopted particular

10   Microsoft ads features on the time frame that they would

11   prefer.

12          Search distribution, also as part of their

13   complaint, given that we talked about this morning, I'm not

14   going to talk about it this afternoon.  I know Mr. Sallet

15   wants to talk about it.  And, you know, I'll deal with that

16   probably on rebuttal, because I can anticipate what

17   Mr. Sallet probably wants to say, which is, if for some

18   reason any part of the search distribution, the DOJ case,

19   survives summary judgment, somehow you should be able --

20   they should be able to smuggle in any or all of the rest of

21   their case sort of with that because of some effect that I,

22   candidly, can't wrap my head around.  But maybe we'll get to

23   that later today.

24          So let's jump in.  This is the framework.  As we

25   talked about this morning, our position is that in terms of

 1   evaluating this anti-competitive effects question that

 2   Your Honor posed, there are two steps to it.

 3           The competition on the merits step that we talked

 4   about, you know, obviously with a big lean this afternoon in

 5   on this product design question, because we do believe that

 6   product design cases have analyzed that question as a

 7   threshold question.

 8           And it's not just sort of other Circuits and other

 9   courts that we have pointed to in our briefs.  We've also

10   talked about the Microsoft D.C. Circuit opinion and its

11   treatment of various aspects of product design in that case.

12           Even if you get over that hurdle, you still have

13   to show the substantial anti-competitive effects in the

14   market.  And we'll talk a little bit about that because our

15   position is really with respect to all three categories of

16   conduct I'm talking about this afternoon, plaintiffs' case

17   fails on the second prong as well.  And our position is that

18   plaintiffs' case fails on the first prong at least on the

19   first two, the product design and the data agreement.

20           So with respect to the product design challenge,

21   let's start off with that one.  The plaintiffs' position is,

22   and they have to prove, consistent with this claim, that

23   Google's design of certain specialized units is somehow not

24   competition on the merits.  And their position is that

25   Google should have somehow designed these units differently

1    to provide more promotion of specialized vertical providers.

2              And then, secondly, that somehow a failure to

3    provide more promotion -- because it's not as if they didn't

4    provide any promotion.  We've got some search engine results

5    pages to show you, a little similar to what we did at the

6    tutorial, to give that some context.

7              Their position is that if the SVPs had gotten more

8    promotion, even though they're not competitors in the

9    relevant market, according to them, that -- so that alone

10   doesn't show anti- -- effects in the general search engine

11   mark because they're not in the search engine market.  So

12   their theory goes, if I'd had that, then somehow that would

13   have made me more attractive to partner with a search

14   engine.  And if I somehow done sort of some different or

15   better partnership with a search engine, IE, Microsoft or

16   Yahoo! or somebody else -- then that would have made the

17   search engine more competitive, and that would have led to

18   more competition in the general search engine market.

19             Mr. Dintzer made a remark this morning about how

20   he thought the search distribution case was easier than the

21   bank shot case that the DOJ had in Microsoft, because in

22   Microsoft, the product that Microsoft -- or products they

23   were trying to get rid of weren't actually in the relevant

24   market.  It was Java or it was Navigator.

25             I would suggest to Your Honor, if that was a bank

1    shot, this is a triple bank shot.

2          And unlike in Microsoft where there were lots and

3    lots of internal documents within Microsoft saying, "Gee,

4    you know what?  These people have posed this threat to us.

5    Even though they're not in the market, they posed this

6    middleware threat.  We better get rid of them because if

7    they flourish, they will wind up being able to erode the

8    applications' barrier to entry, which is so important to our

9    monopoly position."

10          THE COURT:  Can I start out with a couple of

11   fundamental questions?

12          One is, is it your position that the law in this

13   area with respect to product design and, in fact, improved

14   product design, that that is -- let me back up.

15          I don't think there's a factual dispute in this

16   case that Google's introduction of verticals is a product

17   improvement.  Maybe I'm wrong.  But I thought that was

18   something that the Colorado plaintiffs have conceded.

19          If that is a concession, is it in your view that

20   under the antitrust law, that that is a per se competitive

21   practice, pro-competitive practice, or is it still subject

22   to the kind of balancing inquiry that was done in Microsoft?

23          MR. SCHMIDTLEIN:  If the -- the claim is that the

24   harm or the effects in the market that the plaintiffs are

25   focused on flows from the introduction of the new, improved

1   product, that is absolutely competition on the merits, that

2   is privileged.  That cannot, as a matter of law, violate the

3   antitrust laws.  That is our position.

4          We believe the D.C. Circuit's treatment in

5   Microsoft is certainly consistent with that.  And that is

6   certainly the position adopted by various other courts, the

7   *Allied versus Tyco* case being probably the most prominent.

8   But we absolutely do believe that is the law.

9          And the way in which the D.C. Circuit analyzed

10  some of the product improvement cases in there, I think,

11  informs that.  And I'm happy to sort of segue into that

12  unless Your Honor has another question.

13         THE COURT:  No.

14         I mean, I think -- if I understand what you're

15  saying -- I'm just looking for the right portion of the

16  opinion.

17         But the bottom line is that there is a portion of

18  the opinion that says, you know, courts are reluctant, and

19  should be reluctant, to evaluate -- or view as

20  anti-competitive product improvements, but that doesn't mean

21  it is per se protected.  And then sort of leaves it at that.

22         And then from time to time looks at product

23  improvements without really necessarily talking about the

24  actual balancing that they seem to suggest.

25         MR. SCHMIDTLEIN:  Yeah, I think --

1          THE COURT:  Maybe -- I'm sorry.  Hold on.

2          MR. SCHMIDTLEIN:  I think, Your Honor, going back

3     to the first slide we had up, I think I've got the quote --

4     I may have the quote that you are looking for there in the

5     second bullet under No. 1.

6          "As a general rule, courts are properly very

7     skeptical about claims that competition has been harmed by a

8     dominant firm's product design changes."

9          Okay?

10         That can doesn't speak to improvements.

11         THE COURT:  Right.

12         And I think that's the question, is that -- you're

13    right.  The Circuit said, "Courts are properly very

14    skeptical about claims that competition has been harmed by

15    competition has been harmed by dominant firm's product

16    design changes."

17         It goes on to say, "This is all more true in a

18    market such as this one in which the product itself is

19    rapidly changing.  Traditional deference to product

20    innovation, however, does not mean that a monopolist's

21    product design decisions are per se lawful."

22         And then the case that you've cited,

23    *Allied Orthopedics* case from the Ninth Circuit, seems to

24    acknowledge that the D.C. Circuit's decision in Microsoft

25    may be a little bit different than its own.

1          MR. SCHMIDTLEIN:  I think they're not sure if it's

2     exactly analytically the same, but they come out the same.

3          THE COURT:  Right.

4          MR. SCHMIDTLEIN:  And I would actually suggest

5     that -- I would actually suggest that the two courts are the

6     same and here -- go ahead.

7          THE COURT:  Because the examples that flow from

8     that introductory -- those introductory legal principles,

9     I don't think there's any real contention, there was any

10    real contention in Microsoft that those were "product

11    improvements."  They were essentially just different ways of

12    integrating the two products together, it seems to me.

13          But then when it came to the Java machine, there

14    really wasn't any real question about anti-competitive

15    effects.  And, ultimately, whatever balancing that they may

16    have suggested here early on in the opinion sort of

17    disappears by the time we get to the Java machine

18    discussion.

19          MR. SCHMIDTLEIN:  Yeah.

20          I mean, there's not sort of rigid --

21          THE COURT:  Right.

22          MR. SCHMIDTLEIN:  -- consistency, I suppose, in

23    every respect.

24          But here's what I guess I would say.  The passage

25    you just quoted about product improvement in *Microsoft* cites

1    several cases.

2              THE COURT:  Right.

3              MR. SCHMIDTLEIN:  I believe the *Foremost* case and

4    *Peripherals* and *California Computers*.

5              THE COURT:  Right.

6              MR. SCHMIDTLEIN:  And I believe in all three of

7    those cases, Courts reached sort of similar, I think,

8    positions as to what we're advancing here, which is, if the

9    product is, in fact, an improvement, then you're not going

10   to wind up sort of doing any sort of a balancing test.  And

11   so those three cases, I think, are absolutely consistent

12   with our position.

13             And, in fact, because those cases pre-dated the

14   *Allied* case, when you read the *Allied* case, *Allied*, of

15   course, looks back -- because these are all Ninth Circuit

16   cases.  *Allied* looked back at those.

17             THE COURT:  They speak of it in terms of this

18   associated conduct and whatever that means.

19             MR. SCHMIDTLEIN:  That's right.

20             And they do talk about, if you have some other

21   conduct that's really driving the anti-competitive effect --

22             THE COURT:  Right.

23             MR. SCHMIDTLEIN:  -- well, then the fact that it

24   might be attached to a product design change doesn't

25   necessarily immunize you.

1        And I think the Java example you pointed to is

2   super important because, as you properly note, there are a

3   couple of different instances, and we've sort of tried to

4   summarize them on the screen here, of things that I think

5   the D.C. Circuit thought about or considered, arguably, as

6   product design changes.

7        And the Java virtual machine is sort of the most,

8   I think, squarely on point with our facts.

9        THE COURT:  Right.

10       MR. SCHMIDTLEIN:  In that instance, Microsoft

11  developed a product that was an improvement.

12       I'm sorry.  Go ahead, Your Honor.

13       THE COURT:  I'm sorry.

14       I want to -- sorry.

15       Just in terms of staying with first legal

16  principles for a moment, let's say, hypothetically, I do get

17  to the question of anti-competitive effect here, that

18  I think that the Circuit requires me to at least consider

19  it.  In your view -- let me back up.

20       There are a number of instances in Microsoft where

21  the Court's conclusions -- and essentially, it's essentially

22  affirming what the District Court's findings of fact were.

23  At least as I read the District Court's opinion in that

24  case, there weren't exactly a lot of citations to the

25  factual findings in that case.

1           But all that said, in terms of anti-competitive

2   effect, some of it seemed very theoretical; that because of

3   this potential integration, it blocks another browser from

4   being integrated into Microsoft's operating -- onto the

5   desktop, for example, of a computer.

6           I guess what I'm wondering is, is that enough to

7   establish anti-competitive effect, that is, the theoretical

8   possibility, even though there may not be actual concrete

9   facts to support that's in fact what is happening, or do I

10  need a factual predicate in the record to point to to say,

11  look, this product development is anti-competitive because

12  it's having the effect that the plaintiffs say it is?  It's

13  a poorly-worded question, but hopefully you get my point.

14          MR. SCHMIDTLEIN:  No; understood.

15          And I think the answer is, absolutely, you need to

16  show an actual effect.  This is not a merger case where we

17  are trying to evaluate what are the likely future effects of

18  what's going to happen in the market if the merger is

19  allowed to be consummated.  This is necessarily a

20  backwards-looking exercise.

21          I mean, we've all been running around the country

22  deposing SVPs.  We've certainly gotten lots of documents

23  from Microsoft and other general search engines.

24          Under this theory, the triple-bank-shot theory,

25  they need to demonstrate, one, that these product -- this

1    product design has somehow resulted in a harm to an SVP even

2    though the SVPs appear in search ads, they appear in organic

3    search results and, as I'll show you hopefully in a bit,

4    they also appear further into the Google unit.

5              THE COURT:  Right.

6              MR. SCHMIDTLEIN:  So you first have to show that.

7              THE COURT:  I mean, their contention is -- and,

8    again, we're getting little bit further ahead than I mean

9    to -- but their contention is, and at least there's some

10   evidentiary support for the first proposition, which is SVPs

11   have been weakened as a result of the design change because

12   they now have to pay more per consumer, acquisition costs.

13   In other words, because they are prior to the change -- in

14   the old design, their ads were more prominent.  Now it's a

15   page removed, the SVPs are at least adversary affected in

16   that one way.

17             Then the question -- that still doesn't answer the

18   question, the ultimate question of, well, how is that

19   anti-competitive in the markets that they've alleged?

20             MR. SCHMIDTLEIN:  That's right.

21             THE COURT:  And so my -- and I'll have this

22   question for Mr. Sallet, which is, is it enough to theorize

23   that the weakening of these SVPs somehow makes them weaker

24   in the view of the rival search engines?

25             MR. SCHMIDTLEIN:  Yeah.  And the answer to that,

1    again, I think consistent with *Microsoft*, is that that's

2    absolutely not.

3         I mean, I think in *Microsoft*, there were very

4    specific findings that Judge Jackson made that the specific

5    complaint conduct resulted in lower browser usage on

6    Navigator.  The markets flipped.  IE was a distant second

7    and it flipped.  IE became first.  And he found as a matter

8    of factual record that there was causation, anti-competitive

9    effect, between the conduct and the actual market impact.

10        They have to do the same here.  They can't come in

11   with an expert who just opines, as a matter of theory,

12   I think that it's possible that if an SVP was weaker, then

13   maybe they wouldn't do another deal with Microsoft.

14        Microsoft has dozens and dozens of deals with

15   SVPs.  They have lots of data that they help run specialized

16   units that are as similar, if not identical, to what Google

17   operates.  They have not come forward with a single shred of

18   evidence that an SVP didn't do a deal or that somehow the

19   SVP would have helped improve Bing in some undescribed way

20   and that that in turn would have made Bing a better

21   competitor to Google.  There is none of that.

22        And, again, I don't mean to be a broken record.

23   I talked this morning about the D.C. Circuit's finding with

24   respect to ICPs, where the Court found -- and, again,

25   focused on the District Court's failure -- or I shouldn't

1   say "failure."  The District Court made a finding.  I don't

2   see that there is a connection between what the Court found

3   to be noncompetition on the merits, the restrictions on

4   those ICPs from being able to work with other browsers, I

5   don't see a connection between that and actual browser

6   usage.

7           THE COURT:  So what about the following thesis

8   that, at least in my view, doesn't seem to be as developed,

9   which is, Google fears -- or has concerns about SVPs because

10  if customers understand the value of SVPs, they will skip

11  over Google.  They'll go straight to -- you know, they'll go

12  to their browser, www.kayak.com, boom, I don't have to go to

13  Google, bypass Google.  It will reduce the number of users

14  or inquiries that Google has, which, in turn, could

15  impact -- well, that's how it affects Google, reduced

16  queries.

17          So is that not enough in your -- in other words,

18  there is some arguable harm to Google from users going

19  directly to the SVPs that's been theorized here as the

20  reason why Google might want to diminish the significance of

21  SVPs in search results.

22          MR. SCHMIDTLEIN:  So we absolutely agree with --

23  our position is Google does compete with SVPs.  We

24  absolutely, sort of, agree with that.

25          But they say we don't for purposes of the relevant

1   market.  They say they're not in the relevant market.  So

2   harming them all by itself doesn't answer the question.

3   That's first.

4            Second, though, is, Google's response to that

5   being:  We're going to build a specialized unit that tries

6   to, for example, when somebody says "hotels New York," we're

7   going to show them hotels that are in New York.  We're not

8   going to just send them a bunch of blue links where you can

9   go somewhere else to try to search for hotels in New York.

10            What Google has done is try to compete with them.

11   They're doing what you would want -- the antitrust laws

12   would want Google to say, if you see a competitive threat,

13   as Your Honor has posed, what do you do about it?  Well, you

14   try to answer the question yourself.  There's absolutely

15   nothing wrong with that.

16            And as Your Honor noted, what Google did was a

17   product improvement.  It enhanced Google's search to be able

18   to better serve users who are making those queries.  It --

19            THE COURT:  Sorry.

20            So in the process, there is this -- you know,

21   we've talked about that product improvement, quote, should

22   be skeptical of.  However, if there is associated conduct,

23   then that could still be subject to Section II scrutiny.

24            It seems to me that to the extent that there is

25   such conduct here, is the fact that Google has, I'll put

1   this just generally, discriminated against SVPs in two ways,

2   and for reasons in which it's not clear to me why they've

3   done it.

4          One is, SVPs cannot place ads in the vertical, in

5   the specialized -- or on the first page.  Once you put up

6   search, the box comes up.  You'll can correct me if I am

7   wrong, other ads can be placed in there but not of SVPs.

8   Maybe I'm wrong about that.  But I thought SVPs were shut

9   out, whereas others are not.  That's one.

10         Two, the other way in which they're discriminated

11  against is that there's discrimination between verticals.

12  So in hotels and airlines, for example, SVPs don't get to

13  advertise in that box, but in vacation rentals, for example,

14  my understanding is that Google does let them advertise in

15  the box.

16         So is that not the kind of associated conduct that

17  causes competitive harm that I can consider notwithstanding

18  the fact that this is a product improvement?

19         MR. SCHMIDTLEIN:  Yeah; I don't think that

20  qualifies as associated conduct, because what you're --

21  I think what you're still articulating is itself the design

22  of the product, okay?

23         I think associated conduct, I think the classic

24  example of that are what are sometimes people refer to as

25  the product hop drug cases; in other words, a branded

```
 1   pharmaceutical manufacturer who faces competition from a
 2   generic introduces a new version.
 3              THE COURT:  And then withdraws the old one.
 4              MR. SCHMIDTLEIN:  And then withdraws the old one.
 5              So in that situation, what you've really got is
 6   withdrawing the vertical is the problem -- I mean,
 7   I'm sorry, the generic is the problem.  It's not the
 8   introduction of the new version of the drug.  That's,
 9   I think, fundamentally different than what we're dealing
10   with here.
11              What we're dealing with here really is unhappiness
12   about the fundamental design.
13              THE COURT:  Am I wrong that, for example, the
14   hotel verticals that have up, you do -- Google does show ads
15   in that vertical for some, of some advertisers, correct?
16              MR. SCHMIDTLEIN:  I don't believe it's ads in this
17   page that we're looking at.
18              THE COURT:  Okay.
19              Not within the -- they're not ads of other
20   providers in the box?
21              MR. SCHMIDTLEIN:  Not on this page.
22              Let me run through here and maybe that might help.
23              So what we're looking at here is, you know, an
24   exemplar of --
25              THE COURT:  Right.
```

1          MR. SCHMIDTLEIN:  -- the first SERP that you would

2    get with this query.  And at the top you see ads, including

3    ads by SVPs.  Then you've got the Google -- they call this

4    the "hotels unit."

5          THE COURT:  Right, the unit.

6          MR. SCHMIDTLEIN:  And then below that, you have

7    what they -- you know, organic such results, which also

8    include SVPs.

9          THE COURT:  Right.

10          MR. SCHMIDTLEIN:  So --

11          THE COURT:  So to be clear, my question is, within

12    the unit on that page --

13          MR. SCHMIDTLEIN:  Yeah.

14          THE COURT:  -- is there any advertising that's

15    displayed in the unit on that first page?

16          MR. SCHMIDTLEIN:  So on this page, and this is

17    sort of a blow-up of that unit, these are Google generated

18    results that are not ads.

19          If you click on this page, if you click on sort of

20    the view 1,209 hotels at the bottom there, in other words,

21    you find this interestingly enough, you've chosen basically,

22    when presented with three buckets, ads that you could search

23    one of those places, Google's unit, where you can search, or

24    the organics below where you can search.  If somebody

25    chooses this and they want to go deeper into it, this is the

1  page where more hotels, and here you do see ads.

2           THE COURT:  Right.

3           And if you click on the hotel itself, it will give

4  you options to go to the SVPs.

5           MR. SCHMIDTLEIN:  And that's this page.

6           THE COURT:  Right.

7           MR. SCHMIDTLEIN:  So once you have actually

8  settled in on a hotel that you have enough interest in that

9  you might want to book it, you click on that, we display

10 SVPs.

11          And the complaint they have is, gee, we should

12 somehow appear here.

13          Well, let me give you an example of, sort of, why

14 that's a problem.

15          THE COURT:  Can I ask a slightly different

16 question?

17          MR. SCHMIDTLEIN:  Sure.

18          THE COURT:  Which is above the unit, I understood

19 the plaintiffs to say that SVP advertising, Google does not

20 allow SVP advertising above the unit in certain verticals.

21 So, for example, flights or hotels.  Above-the-unit

22 advertising, and you've got an example here where there is

23 above-the-unit advertising, SVPs don't get that real estate?

24          MR. SCHMIDTLEIN:  No.  I mean, if we go back here.

25          THE COURT:  That's a misunderstanding then on my

1   part.

2           MR. SCHMIDTLEIN:  Yeah.

3           If you go back to the page I've got up here, this

4   is actually the full page, and those top two there are

5   Expedia and Booking.com, those are ads and those are SVPs.

6   So they are not excluded at all from this page except when

7   Google's hotel unit, in other words, Google gets a query for

8   hotels New York, Google's tested and said, I'm going to show

9   the actual hotels.

10          THE COURT:  And if there is a search done in

11  something that prompts a vertical or a unit box to show up,

12  is the SERP, will the SERP always appear in this fashion,

13  that is, some advertising up top, the unit box, and then

14  organic links, or are there instances in which there's no

15  advertising even included above the unit?

16          MR. SCHMIDTLEIN:  It depends.  It's a good

17  question because there are a lot of different technically

18  like vertical units.

19          THE COURT:  Right.

20          MR. SCHMIDTLEIN:  I think with respect to the ones

21  that are at issue in this case, I think there are ads that

22  appear -- that are eligible to appear at the top.  Certainly

23  I know for local hotels and local services, and I believe

24  there are instances where you can get it for flights, too.

25  But you certainly have organic results below.

1           And, again, the claim in this case is not that

2     we're excluding them from ads on the first page.  What

3     they're complaining about is --

4           THE COURT:  Right, not being in the unit.

5           MR. SCHMIDTLEIN:  Well, they're complaining about

6     this -- the first page of the unit, they say, Gee, there may

7     be some information in here that Google got from us.

8           In other words, Google is gathering information

9     about hotels from all sorts of different places, from the

10    hotel.  They may be crawling the web, getting information

11    from the web about the hotel.  They may be getting it from

12    multiple different SVPs, lots of different places.  They

13    build this all out, and then they decide which pieces to

14    spit out on this page.

15          But the fact that they're not providing some

16    border with respect to the -- and, by the way, the star

17    reviews there are Google reviews.

18          So what they're complaining about, apparently, is,

19    we should have some reference on this page.

20          And the problem that you can see from this is,

21    going back to the page, what we call the immersive's page

22    where we do actually do display them --

23          THE COURT:  Right.

24          MR. SCHMIDTLEIN:  -- for this particular hotel,

25    you'll see on this particular one, there are five hotels

 1    offering the same price.

 2                THE COURT:  Or -- you mean not five hotels, but

 3    five different SVPs for the same hotel.

 4                MR. SCHMIDTLEIN:  Correct.  Correct.  Thank you.

 5                There are five different SVPs.  And when I asked

 6    their witness, their expert witness, I said, "So tell me,

 7    what am I supposed to do -- what was Google supposed to do

 8    with this page if it has five different SVPs who all have

 9    that same price there?"

10                And his answer was, "I have no opinion on that.

11    That's for remedy."

12                I said, "Well, what is the exact design?  Explain

13    to me what the alternative design was that Google refused to

14    implement that you claim was better."

15                And the consistent answer from all of their

16    witnesses has been, "I have no opinion on that."

17                THE COURT:  Can I go back to the question I asked

18    earlier, which is about this disintermediation theory.

19                I think we're in -- Google does not compete in the

20    market for general search with the SVPs, nor advertising, at

21    least as it's been defined.  Maybe there's some broader

22    digital ad market --

23                MR. SCHMIDTLEIN:  That's our position, correct.

24                THE COURT:  -- but that's not what's going on

25    here.

1        MR. SCHMIDTLEIN:  Not for summary judgment.

2        THE COURT:  Right, not for summary judgment

3    purposes.

4        But is there not -- again, you know, again, this

5    is the theory, that Google is harmed by greater traffic to

6    the SVPs and that Google's search dominance, if you will,

7    gets weakened because fewer people are going to Google.

8    That also means they're not going to Bing.  But they're not

9    going to Google, because they're going straight to the SVP

10   web page.

11       MR. SCHMIDTLEIN:  That's not their theory.

12       Their theory, very specifically, is an SVP by

13   itself is incapable of competing with Google in a way that

14   would erode its monopoly, because they know, they know that

15   once they open that up, their proof of Google's monopoly

16   power goes out the window.  There's a zillion SVPs competing

17   for all sorts of queries.

18       Think about Amazon.

19       THE COURT:  Right.  No, no.

20       MR. SCHMIDTLEIN:  Right?

21       They very, very intentionally pled this very

22   narrow, relevant market specifically because the theory

23   you're postulating there is a dead end for them.

24       And that is, candidly, like, one of our -- would

25   be one of our theories at trial on relevant market is,

```
 1    Google faces pockets of competition all over the place.  And
 2    you have to look at all of those.
 3                THE COURT:  Your view is that there is no general
 4    search market --
 5                MR. SCHMIDTLEIN:  Correct.
 6                THE COURT:  -- per se?
 7                There is just a market for digital ads, period.
 8    And that includes not only SVPs but includes Facebook; it
 9    includes --
10                MR. SCHMIDTLEIN:  On ad sides.
11                THE COURT:  On the ad side.
12                That's what I mean.  If I said "general search,"
13    I meant "ad."  Excuse me.
14                MR. SCHMIDTLEIN:  On the ad side, there's a
15    million places for advertisers to look to target particular
16    users.
17                THE COURT:  Right.
18                MR. SCHMIDTLEIN:  And on the search side, for
19    people like you and I, if we're going to look to search for
20    something, depending on what we're searching for, we have
21    all sorts of different options, not just limited to Bing,
22    Yahoo!
23                THE COURT:  So since we're talking about
24    advertising, maybe this is a good time to segue to the
25    Google 360 issues.
```

1          MR. SCHMIDTLEIN:  Okay.

2          THE COURT:  At least as I understand it, your

3     arguments are largely two.

4          One, that this is a transitory -- you know, to the

5     extent it is and ever was anti-competitive, it's transitory.

6          And two is that even if it has -- even if it's

7     more than transitory, the plaintiffs haven't carried any

8     burden in showing what the anti-competitive harm is, right?

9          MR. SCHMIDTLEIN:  That's correct.

10          THE COURT:  So let's start with the second

11     argument, which is, there is information in the record about

12     how much Microsoft has estimated.  Whether it's a "back of

13     the napkin -- "back of the envelope, on the napkin" kind of

14     estimate or not, there's some estimate that Microsoft's ad

15     business has been harmed by not having realtime option in

16     360 for its ads, one.

17          Two, even if you were to dismiss that as weak, why

18     isn't it sufficient that Google itself has evidence that its

19     advertising revenue has improved by virtue of having

20     realtime auction bidding for its ads?  In other words, why

21     isn't it a reasonable inference to think if Google's revenue

22     would have gone up, so too would have Microsoft's, even if

23     you're going to dispute with me how well the number has been

24     produced.

25          MR. SCHMIDTLEIN:  Two points.

1          The auction -- the auction time bidding feature,

2     they may be called the same thing, or sort of described, but

3     it's not the exact same.  I mean, one is a feature that

4     Google built based on its own technology and using different

5     parameters and features.  It may be sort of in a similar

6     way.

7          But Google's position is, these are not commodity

8     products.  They're not sort of the same thing.  So proof

9     that Google's introduction of it may have had some lift in

10    Google's spend -- and, by the way, there's no evidence that

11    whatever that lift was -- in other words, if this helps

12    somebody bid more effectively on Google, there is zero

13    evidence that a single advertiser left Microsoft and went to

14    Google, as opposed to an advertiser saying, "Oh, this is

15    allowing me to get more return to advertise more

16    effectively.  I'm going to spend less on Facebook, or

17    I'm going to spend less on something else."  There is zero

18    causation.

19          THE COURT:  But is there any dispute -- I'm sorry

20    to interrupt, but is there any dispute that this sort of

21    technology, and Google touts it, is -- permits or allows for

22    more efficient ad placement and ad use by a company?

23          In other words, I want to place an ad.  It's much

24    more effective for me to place the ad using -- on Google

25    because of this technology than it would be on Bing.

1          MR. SCHMIDTLEIN:  Yeah, there's no evidence in the

2     record as to how many people use it.  There's no evidence in

3     the record as to, again, causation.  There really hasn't

4     been any development by the plaintiffs in this case of what

5     that actual effect has been.

6          And I will -- Your Honor, I will hand up to you

7     the exhibit.  This is the -- this is the napkin.

8          THE COURT:  Right.

9          MR. SCHMIDTLEIN:  This is the napkin, okay, that,

10    basically, this entire causation theory hangs on.  This is

11    the napkin the plaintiffs have produced.

12         THE COURT:  Right.

13         MR. SCHMIDTLEIN:  And we asked, when you look at

14    this email string, there are four individuals, all who

15    worked at Microsoft at the time.  Three of them we deposed.

16    And we asked them, "Can you explain what this is based on?"

17         None of them had the details.  Zero.

18         So, you know, the government --

19         THE COURT:  Isn't that a weight issue than a --

20         MR. SCHMIDTLEIN:  Absolutely not, Your Honor.

21         If this was -- and, by the way, this is what their

22    expert witness relies on.

23         If you had an expert witness --

24         THE COURT:  Which is why I've asked you about the

25    flip side, which is that even if this is not enough, that,

1    you know, Google seems to have -- the evidence seems to be

2    that Google has benefited from the technology.

3          MR. SCHMIDTLEIN:  Whether Google has benefited

4    from the technology or not says nothing about whether they

5    have benefited at Microsoft's expense and whether, whatever

6    that benefit is, qualifies as a substantial effect on the

7    advertising market.

8          By the way, this has -- they've made no connection

9    of this to search.  This all pertains to ads.  So there

10   is -- I would suggest to Your Honor, they had, as you are

11   painfully aware, data that could fill a spaceship.  They had

12   data from Google.  They had data from Microsoft.

13         They could have run any number of analyses to try

14   to compare exactly what we're talking about here.  They

15   could have done an analysis of Microsoft.  How did your

16   advertising go before and after you did various things in a

17   real study, something that you might actually find to be

18   admissible at a trial.  They had the exact same opportunity

19   to look at Google's data to try to figure out, "Hey, since

20   you introduced this and your SEM tools started using this,

21   do we see, amongst the SA360 customers, do we see people

22   moving their spend from one to the other?"  Zero.  Zero.

23         I respectfully submit to Your Honor *Microsoft*, the

24   D.C. Circuit requires that type of evidence.  They require

25   some of it.  You can't just have somebody come in and say,

1   "Gee, I think this might have improved our product," and

2   that's all -- that's all I need to say.

3           That's certainly not enough to show a competitive

4   effect marketwide, because even the little -- the numbers

5   that they show there, I mean, Microsoft is a billion-dollar

6   search ads company.  So you couple that with the transient

7   harm, and the numbers there only -- those numbers there,

8   they refer to three features, not the one that's at issue.

9           THE COURT:  Right.

10          Isn't there at a minimum evidence that Microsoft

11  values this technology, that Microsoft -- at least

12  Microsoft, whether it puts a number on it or not, there's

13  evidence in the record as to, hopefully I'm not speaking out

14  of school here, but about Microsoft's approach to Google at

15  some point in time to develop this technology?

16          So, I mean, why isn't that sort of proof, in and

17  of itself, that Microsoft views the technology that Google

18  has as something that would have benefited them and made

19  them more competitive in placement of ads?

20          MR. SCHMIDTLEIN:  So I think the undisputed facts

21  here are Microsoft claims to have launched this technology,

22  I think the papers, they claim they launched this technology

23  on their own ads platform in 2016.

24          They didn't come to Google and ask for it until

25  2019, okay?

1          And if I can direct your attention to the slide we

2    have up right now, this shows the various different ways

3    that advertisers can buy ads.  You've got what we call the

4    ad platform front end.  That's basically, you can go and buy

5    Google ads directly.  You don't need what they call an SEM

6    tool to buy Google ads.

7          And, similarly, Bing ads has its own front-end

8    tool.

9          THE COURT:  Right.

10          But you would agree those are -- the big

11    disadvantage of those tools is that they don't permit, as

12    I understand it, the effectiveness of ad comparison across

13    different platforms, right?

14          MR. SCHMIDTLEIN:  But the overwhelming majority of

15    ad spend in the United States does not go through the, SEM

16    tools.  The majority -- I can't say the percentage.  It's in

17    the briefs.  The plaintiffs' experts have taken a position

18    as to what percentage of ad spend goes through these tools.

19          I will represent to you it is somewhere between

20    Adley Rutschman's and Austin Hays' batting average right

21    now.

22          THE COURT:  Okay.

23          MR. SCHMIDTLEIN:  So it is not 500, unfortunately.

24    It's not 50 percent.  So it is a fraction of the whole

25    market.  And if Microsoft thought this is such critical

1    technology, A, they could have come to us sooner; or if

2    advertisers think it's such critical technology, they can go

3    and spend directly on Microsoft.

4            THE COURT:  And I'm not looking for numbers, but

5    with respect to Google's own ads and the placement of ads on

6    Google, is it the case that more of its advertisers place

7    ads directly through Google ads or through SA360?

8            MR. SCHMIDTLEIN:  I'm trying to remember if that

9    number is even in the record --

10           THE COURT:  If you know.  It may not be.

11           MR. SCHMIDTLEIN:  -- at this point.

12           But there is certainly no evidence -- the

13   plaintiffs say, well, gee, it's costly to switch.  Well, as

14   I noted, the entire SEM market is a minority, and SA360 is

15   only one part of that minority.  Other SEM tools, at least

16   one other SEM tool provider has the auction-time bidding.

17           THE COURT:  Right.

18           MR. SCHMIDTLEIN:  The others haven't adopted it

19   yet, just like Google hasn't.

20           So, again, the notion that this delay, and it's

21   not that -- Google's testing it.  It's not that Google

22   hasn't engaged with Microsoft on it.  But this supposed

23   delay, it can't translate into a substantial

24   anti-competitive effect.

25           There's just no evidence that a single

1    advertiser -- and we subpoenaed dozens of advertisers in

2    this case.  We deposed advertisers in this case.  Not a

3    single one, not a single one said, you know what, I'm an

4    SA360 customer, and if I'd had this technology sooner, I

5    would have moved X number of dollars to Microsoft.

6              We deposed Microsoft people.  I don't believe

7    there was any testimony of them identifying any advertiser

8    who said I'm sorry, I'm going to have to leave you because

9    I don't have this technology.

10             THE COURT:  So I think what maybe I'm going to

11   anticipate wrongly what Mr. Sallet will say, which is that

12   even if that's so, that is, Judge, you have to assume -- or

13   not assume, but for purposes of summary judgment in

14   evaluating the conduct, you have to view that alongside

15   Google's monopoly power in the general search market.  So

16   the fact that nobody has made the switch -- or let me put it

17   differently.  Sorry.

18             Nobody testified that we otherwise would have

19   moved ad spend over to Microsoft, if we had this tool,

20   doesn't win the day for you because ultimately, the ad

21   placement still reflects the monopoly power Google has in

22   the ad space and that this is just another way of

23   reinforcing that monopoly power.

24             MR. SCHMIDTLEIN:  I still think they have to make

25   a prima facie showing that whatever this feature is, it

1    matters enough that it translates into some objective,

2    identifiable conduct in the market.

3              THE COURT:  So we've come full circle, because

4    that's some of the issues I've had in trying to understand

5    what the showing needs to be following Microsoft.  Because

6    seemed to be in Microsoft, some of it was theoretical, some

7    of it was more concrete in terms of actual market impacts.

8              MR. SCHMIDTLEIN:  Yeah.

9              I mean, I think the judge there, again, presented

10   with an array of conduct that both individually and

11   collectively produced this very significant shift in usage

12   was comfortable saying, I have substantial anti-competitive

13   effects.

14             D.C. Circuit didn't rubber stamp all of it.

15   D.C. Circuit went back and looked carefully.

16             And, again, the ICPs, not good enough.  When the

17   judge failed to make a finding that the ICPs had an actual

18   effect, the judge said, I'm sorry, no liability for that.

19             So you're right, Your Honor.  There wasn't sort of

20   this very categorical specific -- and that's why I handed

21   up, I think, earlier this morning, I handed up for you a

22   series of slides that tried to excerpt a bunch of the

23   factual findings, because, you know, as I'm sure you're

24   doing the same thing I am, which is flipping back between

25   these very, very voluminous documents.  And it's, you know,

```
 1   it's challenging because there's lots of different conduct.
 2          But I do believe that that rigor is required here.
 3   And I don't believe -- I think they're trying to -- they're
 4   trying to hide behind the "edententialist" test.  And I
 5   would submit to you that is not the test.  That's not the
 6   test for substantial anti-competitive effects.  That was the
 7   test to respond -- that was the response to Microsoft's --
 8          THE COURT:  Causation argument.
 9          MR. SCHMIDTLEIN:  -- gee, you haven't shown that
10   the monopoly would have fallen as a result of this.  And
11   that's not an argument we're making here.  That's not the
12   specific argument we're making.
13          I think the combination of, they've built four of
14   the five, the other is being tested, this is sort of a
15   temporary delay, and we've got a napkin and nothing else,
16   I think under those circumstances, they absolutely fail the
17   prima facie case.  All right.
18          THE COURT:  If there's anything else you want to
19   add.
20          MR. SCHMIDTLEIN:  The last thing I will add has to
21   do with the data contracts, and I'll just make, sort of, a
22   passing reference to that.
23          I mean, it really isn't featured very much in the
24   complaint.  It seems to us to be essentially, you know, SVPs
25   provide data voluntarily to Google if they want to advertise
```

1    on Google.  We need -- you know, to the extent they have,

2    for example, hotel availability or pricing or, you know,

3    various things, we say, you know, share with us the data you

4    have with that.  That will allow us to make better decisions

5    for search results, will allow us to make better decisions

6    for whether your ads are relevant.

7              THE COURT:  Right.

8              I mean, I don't know that it's that -- let me put

9    it this way.  I mean, I think the record is pretty clear

10   that the SVPs feel that they have no choice other than to

11   advertise on Google.

12             MR. SCHMIDTLEIN:  Right.

13             THE COURT:  And that they could not operate

14   without doing so, one.

15             And two, that not only do they turn the data over,

16   but Google uses it not only with respect to SVP advertising

17   but also for its own purposes.

18             MR. SCHMIDTLEIN:  It uses it to improve its

19   product.

20             THE COURT:  Right.

21             MR. SCHMIDTLEIN:  And, again, there's nothing

22   anticompetitive about that.

23             Their beef, more or less, is well, gee, we wish

24   you would pay us for it.

25             THE COURT:  Can I ask you this?

1          Is there in the record any evidence -- you've

2   talked about partnerships between SVPs and Microsoft.  But

3   is there a similar term in those contracts, to your

4   knowledge, that SVPs provide data to Microsoft in exchange

5   for -- I shouldn't say in exchange -- as a term of

6   advertising with Microsoft?

7          MR. SCHMIDTLEIN:  Absolutely.  Absolutely.

8          They absolutely provide the data, because

9   Microsoft needs the data, too.  They need the data to be

10  able to know whether to service them --

11         THE COURT:  And are the terms, to your knowledge,

12  of those -- of the data agreements insofar as whatever those

13  partnership agreements are, do they allow Microsoft to use

14  the data for its own purposes?

15         MR. SCHMIDTLEIN:  As --

16         THE COURT:  In the same way that Google does?

17  That is to say --

18         MR. SCHMIDTLEIN:  There is no claim in this case

19  that somehow Google is limiting the data in a way that is

20  blocking Microsoft from being able to do whatever it wants

21  with the data.

22         I don't know that the contracts are 100 percent

23  identical.  There is one SVP who gets paid for reviews data.

24         THE COURT:  Right.

25         MR. SCHMIDTLEIN:  A very, very modest amount of

```
1   money to supply -- to be the exclusive supplier of reviews

2   to Microsoft, because unlike Google who collects its own

3   reviews, Microsoft doesn't do that.

4             THE COURT:  Last question.

5             Is there any anti-trust consequence, in your view,

6   to the testimony that was supplied by Microsoft that somehow

7   their weakened position makes them less attractive to

8   exclusive deals with SVPs?

9             MR. SCHMIDTLEIN:  Well, given Microsoft's sordid

10  history with exclusive deals, it's a little bit ironic that

11  they would like to try to lock up content exclusively on

12  their -- as one -- on one of their units.

13            But the fact that they've failed to be able to do

14  that is nothing more than a reflection of a rational

15  economic choice by an SVP.

16            In other words, if I'm an SVP, I can't imagine

17  somebody at an SVP going to their boss saying, I've got a

18  great idea.  Let's give all of our data exclusively to Bing

19  and not give any of it to Google.  That's a winning strategy

20  for us, because we will somehow make Bing so strong that

21  they're going to be a much more effective provider in

22  search.

23            I mean, that's nothing more than saying, you know,

24  Google is very, very attractive.  Google sends these SVPs a

25  ton of business for free.  There's a lot of organic links
```

```
 1    down there that get clicked on.  And they don't have to

 2    advertise.

 3            If the advertising is not what they call "ROI

 4    positive," in other words, if they're not making money on

 5    the ads, they won't advertise.  They advertise on Google

 6    because it's good for their business.

 7            So all of that, the fact that somebody would say,

 8    you know what, I'm not going to -- I'm not going to forego

 9    that, that's a reflection of Google's quality.

10            Now, they can grouse and say, oh, well, it's

11    because Google is so big.  It's because Google does a

12    really, really good job.

13            Anyway.  Thank you, Your Honor.

14            THE COURT:  Thank you, Mr. Schmidtlein.

15            All right.  So let's just take about ten minutes

16    so our court reporter has a moment or two.

17            So it's about 2:25 now.  We'll resume just a

18    little after 2:35.  Thank you all very much.

19            COURTROOM DEPUTY:  All rise.

20            This Court stands in recess.

21            (Recess from 2:28 p.m. to 2:39 p.m.)

22            COURTROOM DEPUTY:  All rise.  This Honorable Court

23    is again in session.  Be seated and come to order.

24            THE COURT:  Please be seated, everyone.

25    Thank you.
```

1          All right.  Mr. Sallet, we're ready when you are.

2          MR. SALLET:  Your Honor, my colleague is going to

3     hand up some slides.  As with the practice throughout the

4     day, there are some that are redacted, under seal.  I will

5     speak to those, but they will not be publicly displayed, and

6     I will try to use descriptions that don't go farther than

7     the kind of descriptions used throughout the day.

8          Your Honor, our complaint is filed on behalf of

9     38 jurisdictions.  And if I make a point, Mr. Schmidtlein

10    very generously introduced the lawyers at his table.  We

11    have lawyers from many states, some of which are at the

12    table, some of which are in the back of the court who worked

13    hard on these papers over the holiday season.  And we've

14    worked together because we think it's important that the

15    Court understand that, as you do, that we have brought a

16    separate complaint, because we are alleging a bigger,

17    broader set of anti-competitive conduct, and we believe

18    looking at all of that conduct and how it works together is

19    necessary to understand the full scope and the full harm of

20    Google's actions.

21         Your Honor, our position today is very simple.

22    We believe Google has provided no basis for this Court to

23    determine that any of the conduct on which we rely is

24    incapable of creating anti-competitive effect.  And

25    we believe Google has provided no basis for this Court to

1    say that we should be barred from introducing at trial

2    evidence of how the pieces of this conduct work together and

3    each contribute to the overall harm that's created.

4         For purposes of summary judgment, we believe that

5    taking the factual disputes in our favor and along with

6    reasonable inferences, we have demonstrated a triable case

7    in which we do establish a prima facie case that includes

8    three pieces of harm.  My counting is slightly different

9    than Mr. Schmidtlein's, but it's just because the

10   categorization is slightly different.

11        One, are the Search Distribution Agreements that

12   was the subject of discussion this morning.  Second is a set

13   of SVP conduct that we believe works together; namely, the

14   exclusion in some verticals from prominent parts of the SERP

15   of SVPs, hotels, flights, local search, local services, but

16   also the fact that in order to purchase certain kinds of

17   ads, Google requires -- this is uncontested for the purpose

18   of this motion -- requires that SVPs turn over data that is

19   used by Google for its own purposes and that limits how SVPs

20   can use that data on a differentiated basis with other

21   general search engines.

22        And third category, SA360, where we believe -- and

23   Your Honor correctly anticipated our view -- that with the

24   advertising monopoly that is unquestioned for purposes of

25   this motion, because there's no challenge to market

1    definition, and with the conduct that we believe informs the

2    Search Distribution Agreements, advertisers have been

3    limited in their choice, limited in their ability to use a

4    general search engine that's an alternative to Google, and,

5    therefore, Google is able to have a free hand with which to

6    conduct -- engage in additional harm.  It's got a free hand

7    because advertisers, and very importantly, Google concedes

8    for this motion, SVPs are among the largest advertisers on

9    Google, the advertisers find themselves weakened and their

10   choices weakened by the Search Distribution Agreements.

11           They are further weakened by the SA360, and I will

12   show you a timeline that I think absolutely disputes the

13   story of kind of collegial working along throughout 2019 and

14   '20.  And then when it comes to the SVPs who are harmed as

15   advertisers through the search distribution agreements,

16   harmed as advertisers through the addition of SA360 conduct,

17   then face another set of conduct that limits them and rivals

18   from working together to boost competition.

19           That is our case.

20           And, Your Honor, because Google takes the position

21   that there is no anti-competitive effect anywhere, it has

22   never in its papers engaged with our notion that

23   anti-competitive effects in one can work with

24   anti-competitive effects in another, even though, as

25   Your Honor noted, at least in two places, actually, with

1    *Microsoft* -- well, let's take ISVs.  The Court very clearly

2    looked at the effect with the ISVs of the other kinds of

3    agreements.

4            Google says, as a matter of law, it's not

5    permissible to do that.  *Microsoft* does do it.

6            THE COURT:  I think, Mr. Sallet, what Google says

7    or Google's position is, not that there can't be that sort

8    of synergistic quality to anti-competitive effects; in other

9    words, there are some circumstances in which some small

10   anti-competitive conduct that has a minor effect on the

11   market can be amplified by related conduct.  And the example

12   there is obviously there were three main channels; one and

13   two were anti-competitive, so that made three

14   anti-competitive too.

15           I think the question is slightly different, which

16   is that if there are different kinds of -- different types

17   of conduct --

18           MR. SALLET:  Yes.

19           THE COURT:  -- and maybe you disagree with this

20   analysis, and I was going to ask you to also address your

21   view of EpiPen and what I read earlier.

22           But if there's different types of conduct and if

23   the Court concludes that one type of conduct, say, for

24   example, product development, innovation, that is not

25   anti-competitive, whether somehow that can be pulled up as

1    also having an anti-competitive effect because some other

2    type of conduct does have an anti-competitive effect.

3              MR. SALLET:  They would have to work together,

4    Your Honor.

5              We -- our case is that they work together.

6              But let me, if I could, go -- Your Honor, there's

7    an old joke among politicians.  They say if they're the last

8    speaker at a long dinner late into the evening, they get up

9    and they say, "We're at the point in the program where

10   everything that can be said has been said, but not by

11   everybody."

12             That's the way I feel confronting the *Microsoft*

13   framework, so I hope you'll allow me just to take a minute

14   and talk about it.

15             Google is trying to jump the queue.  It is trying

16   to create a new first phase in a three-part test.  The three

17   part -- the three procedural steps in *Microsoft* are very

18   plain.  Prima facie effect is anti-competitive effects --

19   prima facie case is anti-competitive effects.  That's the

20   very first sentence of the very first principle when it goes

21   through its principles.

22             Then a monopolist gets to give non-pretextual

23   pro-competitive justifications.  And if it does that, then

24   the Court weighs.

25             Google is trying to come to a world in which, if

1    it can show something about products without looking at

2    anti-competitive effects, it can block the government from

3    ever introducing evidence of anti-competitive effects, where

4    what the *Microsoft* court said was, "We want to look at

5    anti-competitive effects first, and then the monopolist can

6    put in a defense of justification."

7            THE COURT:  But even the *Microsoft* court did not

8    say that conduct that it deemed lawful, conduct it deemed to

9    be competitive --

10            MR. SALLET:  Yes.

11            THE COURT:  -- like the Java machine, the Court

12    didn't say, "Well, I'm going to view the Java machine's

13    anti-competitive effects," because there were.  I mean,

14    obviously, it's a better machine; and so, therefore, it has

15    some anti-competitive effects at least on the competitor --

16            MR. SALLET:  Yes.

17            THE COURT:  -- maybe not on the marketplace.

18            MR. SALLET:  Yes.

19            THE COURT:  But it didn't then sort of shoehorn

20    and pull that up and say, "All right.  Well, look, the

21    anti-competitive effects here are also true for the product

22    development because there is, you know, bad action going on

23    elsewhere."

24            There has to be room, it seems to me, under

25    *Microsoft's* framework, for there to be some lawful conduct

 1    that doesn't then get piggybacked onto the unlawful conduct.

 2              MR. SALLET:  The question, Your Honor, is:  How do

 3    we decide what's lawful?

 4              In the Java discussion, what the Court said very

 5    plainly -- and it's the end of a sentence that Google quotes

 6    but doesn't reference.  It talks about the "JVM, however,

 7    does allow applications to run more swiftly, and" -- one of

 8    the most important conjunctions used in the Microsoft

 9    opinion -- "and does not itself have any anti-competitive

10    effect."

11              The Court starts that passage by saying, "In order

12    to violate the antitrust laws, the incompatible product must

13    have an anti-competitive effect that outweighs any

14    pro-competitive justification."

15              Then it talks about the product.

16              So when we're talking about lawful, Your Honor,

17    what the *Microsoft* court is telling us, that there is some

18    kinds of practices that it looks at, and courts look at it

19    and say, "Well, okay, they don't have anti-competitive

20    effects."

21              But what Microsoft doesn't do is to say, "We skip

22    looking at anti-competitive effects."

23              Here's an example, Your Honor.

24              People say, I think Your Honor this morning,

25    "Well, lower prices might be non-predatory."

1            Lower prices might be -- you know, maybe that's

2    not -- maybe that's legal.

3            It's legal if one examines and finds no

4    anti-competitive effects.

5            In this courthouse, the *Surescripts* case involving

6    the FTC involves loyalty discounts.  I'm no expert in that

7    case.  But loyalty discounts are lower prices, but they come

8    with conditions that impact competition adversely.

9            This was the case that the FTC brought against

10    Intel some years ago.  Loyalty discounts.

11            So one can't do what Google is saying.  Google is

12    saying, "Look at us and look what we designed.  And maybe we

13    talked to one other party, and you can tell whether there's

14    anti-competitive effects."

15            No.  What *Microsoft* does, and it's very

16    intentional about this, is to ask:  "Okay, what's the effect

17    on the competitive world in which the monopolist is

18    operating?"

19            And that competitive world view is capacious,

20    right?  In *Microsoft*, that's not even just looking at inside

21    the operating system.  It's looking at browsers, Internet

22    access providers, application developers.

23            So, Your Honor, our view simply is, as with this

24    Java example, there are circumstances where the Court

25    absolutely does find no competitive effects.

1            We do not believe, as a matter of summary judgment

2     law, that can be said about any of the conduct that we

3     allege here, including the search distribution agreements.

4            THE COURT:  Can I give you -- and I'd like to get

5     to the merits in a moment here.

6            MR. SALLET:  Yes, sir.

7            THE COURT:  But the Java machine is one.

8            You know, the IEK --

9            MR. SALLET:  Yes.

10           THE COURT:  -- and the offering of the IE, you

11    know, access kits --

12           MR. SALLET:  Yes.

13           THE COURT:  -- and Internet Explorer --

14           MR. SALLET:  Yes.

15           THE COURT:  -- free of charge or even at a

16    negative price --

17           MR. SALLET:  Yes.

18           THE COURT:  -- again, the Court there says, "Look,

19    that's allowed."

20           MR. SALLET:  Yes.

21           THE COURT:  Even if you're a monopolist, you can

22    give things away for free.

23           MR. SALLET:  Yes.

24           THE COURT:  And it didn't then say, "Well, wait a

25    minute.  You know, by Microsoft giving things away for free,

1    that actually is anti-competitive because it's engaging in

2    all this other anti-competitive conduct."

3                 They didn't do that.

4                 MR. SALLET:  Correct.

5                 I'm not saying that that's what they should have

6    done.

7                 What I'm saying is Google is wrong, as a matter of

8    law, in suggesting that there's ever a way to say a

9    plaintiff, the government, cannot introduce evidence of

10   anti-competitive effects.

11                In that case, the IEK, if one looks at pages 41

12   and 42 of the conclusions of law that are cited in the

13   paragraph that you're viewing, it appears that what the

14   District Court did was to center not on giving away stuff

15   for free, but the exclusive distribution agreements.

16                And so it's not surprising that the D.C. Circuit

17   said, "Well, this other stuff, there was no real finding of

18   anti-competitive effects attached to it.  But as to the

19   exclusive dealing arrangements, that's Category V in the IAP

20   list."

21                Well, it goes on and finds there is

22   anti-competitive effects.

23                So, Your Honor, just to be clear, I am not

24   suggesting that it is required that the Court find

25   anti-competitive effects, but, rather, that the question of

```
1   whether conduct is lawful turns on whether, for example, the
2   lower price is by itself.
3           The case law tends to use this word:  Well, a
4   price simply, merely, without anything else.  Courts assess
5   that, and they can find no anti-competitive effects.  But
6   they always need to look to see whether it connects to other
7   conduct --
8               THE COURT:  Sure.
9               MR. SALLET:  -- that creates the effects.
10              THE COURT:  Sure, but usually the conduct is
11  fairly explicit --
12              MR. SALLET:  Yes.
13              THE COURT:  -- in other words, and direct --
14              MR. SALLET:  Yes.
15              THE COURT:  -- such as lower price if there's an
16  exclusive --
17              MR. SALLET:  Yes.
18              THE COURT:  -- arrangement.
19          A lower price if you buy a different product, some
20  kind of tying agreement.
21              MR. SALLET:  Yes.
22              THE COURT:  Look, I think the question, to put it
23  very concretely, is this, Mr. Sallet -- again, this is all
24  hypothetical.
25          Say I were to agree with Google that, for example,
```

1   there has not been shown anti-competitive effect with

2   respect to, say, the SVP theory.

3            Does it then fall out of your case in a way that,

4   if we move to a trial on the other two aspects of it -- that

5   is, the market -- the -- sorry, the distribution agreements

6   and SA360, that that's the only -- those are the only two

7   issues that then could be considered for purposes of whether

8   there's a Section II violation?

9            MR. DINTZER:  Of course.

10           THE COURT:  Or do they all rise and fall together,

11  in your view?

12           MR. SALLET:  I don't believe they all rise and

13  fall together, but I do believe they all rise and that

14  there's a factual issue around what the effects would be;

15  that would be decided at trial.

16           So I want to give you a case, Your Honor.  It's

17  the case that's called *Namenda*.  It's slide 7 in your

18  packet.

19           It's an unusual case, perhaps, but it has one --

20  this is a case, Your Honor -- this is very important -- that

21  Google relies on, I believe it's page 8 of its reply, okay?

22  Google cites this approvingly.

23           And at the top of the slide, this is what --

24  Google has a parenthetical that says, "Concluding

25  defendant's hard switch crossed the line from persuasion to

 1    coercion was anti-competitive."

 2              But what it doesn't do is tell you what the

 3    Second Circuit actually said about the hard switch.

 4              This was a drug called Namenda.  There were two

 5    kinds.

 6              THE COURT:  Right.

 7              MR. SALLET:  What the Court looks at is the

 8    combination of the conduct.  And this is a situation where

 9    the Court thinks neither standing alone is anti-competitive.

10              THE COURT:  Actually, I disagree with you or the

11    Second Circuit in saying that that is the kind of conduct

12    that you can consider together.  I mean, that's a case in

13    which --

14              MR. SALLET:  Yes.

15              THE COURT:  -- you know, the patent period was

16    about to expire.  It was one -- two pills.  They developed a

17    one-pill formulation, and just as the patent was going to

18    expire, they withdrew the two-pill formulation so that the

19    generic could not enter the market.

20              MR. SALLET:  Yes.

21              THE COURT:  So everybody now had to move over.

22              And the Court said, look, introducing the one-pill

23    formation on its own, nothing wrong with that, that's

24    competitive, but when you are forcing -- when you are

25    withdrawing the two-pill formulation for no other reason,

1   apparent reason, than just blocking your competition, the

2   generics, then that's anticompetitive.

3          MR. SALLET:  Yes.

4          THE COURT:  And that makes sense to me.  And

5   I don't think anybody -- even Mr. Schmidtlein -- would

6   disagree with that.

7          MR. SALLET:  So then let me talk about the conduct

8   in this case that we allege.

9          We allege -- well, actually, Mr. Schmidtlein,

10  I think, I could be wrong on this, and I apologize if I am,

11  I thought you used the term "array of conduct" when you were

12  talking about the *Microsoft* case.  But if Mr. Schmidtlein

13  did, his expert certainly did, and I'd like to show you --

14         THE COURT:  I'm sorry.  Because you turned,

15  I didn't hear what you had said, Mr. Sallet.

16         MR. SALLET:  I'm sorry?

17         THE COURT:  What did you say?  Because you turned

18  the other direction.

19         MR. SALLET:  "Array of conduct."

20         THE COURT:  Array, okay.

21         MR. SALLET:  So on slide 6, this was an expert,

22  Professor Elzinga, who was testifying about the SVP conduct.

23  So, actually, it was me.  I took this deposition.

24         I asked him, "Wouldn't one create a but-for world

25  by starting with the allegations of exclusionary conduct?"

1          He says, "Yes.  I think it's difficult to define

2     precisely what we mean by the but-for world here because the

3     allegations cover an array of conduct, not all of which I'm

4     examining."

5          This is correct, we are alleging an array of

6     conduct.  And no Google expert looked at the relationship

7     between the three forms of conduct.  But I'd like to take a

8     minute and describe them.

9          The first step is the Search Distribution

10    Agreement.  It is our contention -- Mr. Dintzer talked about

11    it, I'm not going to repeat it -- that the effect of those

12    is to help Google maintain its monopoly power in a manner

13    that deprives its rivals of users and limits their scale.

14         That acquisition of continued or even higher

15    monopoly power, as I said before, gives Google a free hand.

16    Because now when it's dealing with advertisers or users,

17    they don't have a competitive alternative of the kind they

18    might have had in a but-for world.  That's the allegation.

19    And this then plays into the other pieces.  So let's start

20    with SA360.

21         SA360, one of the things we hear from Google is,

22    well, you know, nobody wanted the Microsoft ad features.

23    Now, I'm going to show you a timeline before we finish,

24    Your Honor, that shows that's not true, what Google's

25    narrative is, but it's very important.

1    When Google uses one set of conduct to push

2    advertising rivals to the edge of the marketplace so they

3    don't have many users, which makes it not very attractive to

4    ads, and then says, well, there's not much demand for it,

5    that, at the minimum, is highly ironic.

6    Google is engaged in the conduct that causes them

7    to be less competitive and then uses it as an excuse to

8    favor itself in a tool that's designed precisely to offer

9    advertisers the benefits of Google and its rivals.  That's

10   one example.

11   Yes.

12   THE COURT:  So in your estimate, I mean, Mr. --

13   I guess I'd ask you to do two things:

14   One is, Mr. Schmidtlein said that there's nothing

15   in the record that shows an advertiser who came in and said,

16   well, if I had the SA360 tool and the realtime auctioning

17   for Microsoft, I would have shifted some of my ad spend to

18   Microsoft.  One, he says there's no evidence of that.  I

19   guess the question is, do you agree?

20   And, two, in your view, does it even matter if

21   there is nothing like that in the record?

22   MR. SALLET:  Your Honor, it doesn't matter,

23   because, Your Honor, when there's a monopoly, it means

24   there's not a lot of competition.  So a consequence of that

25   is there's not a lot of evidence of how competition

1   operates.  It's the effect of the monopoly, so it's not very

2   surprising that there's not a lot of evidence.  But there is

3   more than enough facts to demonstrate that there is impact,

4   and I'd like to go through a few things.  And I think this

5   supports both disputed facts and a reasonable inference.

6               In our statement of material facts 104, Google's

7   own calculation auction-time bidding results in a 15 to

8   30 percent increase in conversions and ad revenue.

9               Conversions in this instance might be, for

10  example, a sale, does someone come and buy something?  Now,

11  Google says that's --

12              THE COURT:  Mr. Sallet.

13              MR. SALLET:  I apologize.

14              THE COURT:  That's okay.  I want to just get on

15  with where you are.

16              So you say 104?

17              MR. SALLET:  Yes.

18              THE COURT:  Okay.  This is your fact 104?

19              MR. SALLET:  Yes.

20              THE COURT:  Correct.  Okay.

21              MR. SALLET:  Okay.

22              Then 105, which is disputed, Your Honor, this is a

23  factual dispute, we believe the evidence shows, we intend it

24  to show that numerous advertisers determine that the lack of

25  SA360 support for auction-time bidding on Microsoft ads

1    resulted in less efficient Bing campaigns.  That's 105.

2            106, Google gives a description -- I won't read

3    it, it's under seal -- of the importance of the feature and

4    estimates how much of the spend on Google ads is run through

5    its auction-time bidding.

6            And then, Your Honor, there's another point to

7    which you came to.  In November of 2019, Microsoft Office to

8    pay for the support of this auction-time bidding feature,

9    and Google dismisses that.

10           This evidence shows, supports a reasonable

11   inference at summary judgment, that the tool would be a

12   benefit to advertisers and that Google -- well, let's say it

13   this way -- was not as interested in supporting it as it

14   makes out in its reply papers.

15           And we believe it demonstrates that there is harm

16   to Microsoft in its inability to provide advertisers with

17   this tool through SA360.

18           THE COURT:  Can I ask you, do you think this

19   conduct can stand alone?  In other words, say, again,

20   hypothetical world, I conclude that the distribution

21   agreements are not anti-competitive, can this stand alone,

22   in your view?

23           MR. SALLET:  I believe that it cannot be denied at

24   summary judgment, because you've -- because we would then

25   have a situation, Your Honor, where we have SA360 and SVP

1    conduct.  We would show that they worked together.  Google,

2    having never credited any anti-competitive effects, has said

3    nothing in its papers to doubt our assertion that they would

4    work together.

5           Would it be as strong a case as if search

6    distribution were in it?  I'm not debating that point.  But

7    they don't actually attack any combination of conduct.  And

8    so I do not believe, Your Honor, that there would be any

9    basis to keep us from going to trial on the conduct.

10          But, Your Honor, could I go to another example of

11   the array of -- okay.

12          In fact, Your Honor, if I could, could I stay on

13   SA360 for a second?  I'd like to show you three slides which

14   are a timeline.  They're all under seal.  It's 14, 15, and

15   16 in your deck.  And I'd like to just highlight a couple of

16   the dates.

17          On slide 14, in September 2019, Google introduces

18   its auction-time bidding.  Mr. Schmidtlein said, well, where

19   was Microsoft?  Well, no, they didn't show up and ask that

20   they be supported first, I guess.  But in September 2019,

21   Google integrates it and finds the benefits that we've

22   noted.

23          Then comes November.  This is slide 15.  There's a

24   request for support of 27 features that were viewed by

25   Microsoft as equivalent to features already supported by

1   Google.  Doesn't happen.  Microsoft Office to pay.  The

2   suggestion is dismissed.

3            And then in January of 2020, something very

4   important -- and this document was in the record and we've

5   passed it up separately to you, but you can see what Google

6   says to Microsoft in January of 2020, a statement that goes

7   right to the heart of Google's notion that advertisers

8   weren't interested in it, because the conversation is about

9   advertiser outreach.

10           And then on the next slide in September 2020 --

11           THE COURT:  I'm sorry.  Just to be clear.

12           MR. SALLET:  I apologize.

13           THE COURT:  In other words, what you're saying is

14   that this document, I'm not sure I have it in front of me,

15   but the document suggests that what Google said to Microsoft

16   was stop asking advertisers to lobby you.

17           MR. SALLET:  Yes.

18           THE COURT:  You, Google.

19           MR. SALLET:  Yes.

20           THE COURT:  And want to start lobbying us.

21           MR. SALLET:  Yes.

22           And the timeline is important here, because in

23   November of 2019, Google decides it's not going to support

24   the Microsoft features.  Doesn't tell Microsoft until March.

25   So in January, it says, well, don't have advertisers come to

1 us, trying to keep the heat off Google before it informs

2 Microsoft that it's not getting the support.

3   THE COURT:  So here's a question.  So should I

4 view this through the lens of a, sort of, refusal to deal

5 paradigm, you know, leave aside for the moment whether

6 Google has some business justification for refusing to

7 develop this, but is that the paradigm under which I ought

8 to look at this or some other paradigm?

9   MR. SALLET:  I think the paradigm is the Microsoft

10 paradigm.  The Microsoft paradigm is, is the conduct

11 exclusionary in the sense that it creates anti-competitive

12 effects?

13   It's open to Google in the rebuttal stage to come

14 and say we had really good reasons we didn't want to ever

15 hear from advertisers at the beginning of 2020.  That is

16 open to them.  They argue it as if they don't get to say

17 that upfront, they never get to say it.  They absolutely get

18 to do that.

19   But then the Court, if that's done, would have to

20 weigh the pro against the anti-competitive effects.

21   THE COURT:  But -- okay.  I mean, it just seems to

22 me that -- and maybe I'm overthinking it -- is that there

23 ought to be some construct around it, and this seems to me

24 to be a classic refusal to deal.

25   MR. SALLET:  Yes.

1          THE COURT:  In other words, we are refusing

2     Microsoft's overture to improve our product in a way that

3     would benefit us, Microsoft.  And one response that Google

4     could say is, we don't have to do that.

5          MR. SALLET:  Correct.  And it would not fall --

6          THE COURT:  And that seams to me to be a classic

7     sort of refusal to deal case.

8          MR. SALLET:  It's not, Your Honor.  Could I

9     explain why?

10          THE COURT:  Sure.

11          MR. SALLET:  The classic refusal-to-deal cases,

12     *Trinko*, *Aspen*, *Lauderdale*'s, *Comcast* versus *Viamedia*,

13     *Lorain Journal*.  *Lorain Journal* is very important.

14          In *Lorain Journal*, it's not treated as a refusal

15     to deal case, but the -- it's a local newspaper and a local

16     radio.  The newspaper says to advertisers, I won't sell your

17     ads if you do business with the radio station.  The

18     Supreme Court says, illegal.

19          But here's the thing about *Trinko*.  *Trinko* deals

20     with a circumstance, *linkLine* as well, where a company wants

21     nothing to do with another company, nothing.  In both cases,

22     an FCC reg, a federal communications commission reg requires

23     some kind of dealing.

24          But in the *Trinko* court, Verizon never voluntarily

25     would have dealt with this other company.

1           THE COURT:  Right.

2           MR. SALLET:  And the *Trinko* opinion goes into the

3  *Prudential* considerations if a judge had to construct a

4  relationship.

5           The *Trinko* construct does not apply where a firm

6  engages in voluntarily dealing.  And here, Google

7  voluntarily went into the business of supplying a

8  cross-platform tool whose only value was to provide access

9  to it and its competitors.  It is to be assessed under the

10  Microsoft framework, Your Honor.

11           THE COURT:  Okay.

12           MR. SALLET:  So another example of how the conduct

13  fits together is the question of partnerships and SVPs

14  between -- yes, sir.

15           THE COURT:  Before you go there, let me ask one

16  fact question and one practical question.

17           The fact question is, what -- I'll ask it in

18  reverse.  What are we doing here if it is undisputed that

19  Google is going to install the very auction time bidding

20  that you have complained it hasn't done since -- it wouldn't

21  have even been 2019, maybe, but say at the earliest in 2019,

22  when it also came online for Google, what are we doing here,

23  and what do we need a trial for, and what remedy is even on

24  the table -- and I understand that's in the future, if we

25  get there -- if Google has already come to parity or to

1   offer parity to Microsoft in terms of ad support through

2   SA360?

3            MR. SALLET:  We would do three things, Your Honor,

4   at the liability phase.

5            Google -- Microsoft, excuse me, went in 2019 and

6   asked for 27 features.

7            On the timeline that I showed you, you'll see the

8   date of what happened on slide 16 on September '20 where

9   Google makes an offer to develop some of those, a minority,

10  but seemingly conditioned on the fact that Microsoft gives

11  up the others.

12           So the first question we would look at is, what's

13  the continuing pattern of conduct that is anti-competitive,

14  not just this one feature?

15           Secondly, we would ask ourselves, as to the

16  feature, the auction-time bidding that -- what harm accrued

17  during the time of delay, right?  Justice delayed is justice

18  denied, and at the moment we have a denial.

19           But if Google somehow has a deathbed conversion in

20  August of this year and says, "We'll support it," that by

21  itself does not erase the continuing harm of past action.

22           And then, third, we're talking about ads that

23  improve -- that new features get established all the time.

24  So Google could be playing or a monopolist could play a

25  shell game.  You want 27.  I'll give you two here, two here,

1    two here.  Now five more come down.  I'll give you three

2    here, such that there's a rolling pattern of exclusion.

3    This would all be -- these would all be important issues to

4    delve into at trial.

5             And we believe there is harm and it would be

6    continuing.  And, frankly, such support, if accorded right

7    before trial, would actually demonstrate that Google could

8    have done it all along and that it would make our case of

9    delay.

10            But, Your Honor, could I go?  I know I'm about

11   halfway through my time.

12            Let's talk about SVPs for a minute.

13            We don't attack the universals.  That's a product

14   feature.  We don't attack it in any way.  The record is very

15   clear on this.

16            What we say is that in selected verticals, Google

17   has made a combination of actions that take the SVPs off a

18   prominent part of the SERP in order to display information

19   that's different than the kind of information that's shown

20   in the text ads or the blue links, the organic links that

21   come below, okay?  That's not made up.

22            Statement of material facts 33, undisputed for

23   purposes of this motion.  Over time, Google has altered its

24   SERP for commercial queries to increasingly display its own

25   search universals above the unpaid blue links.  But we are

```
1    not attacking the introduction.  But sometimes in some

2    verticals, that's coupled with exclusion from the vertical

3    itself.

4              Our view, Your Honor, is that --

5              THE COURT:  Excluded from the SERP, not from the

6    vertical altogether.

7              MR. SALLET:  I apologize.  From the universal.

8    I misspoke.

9              That the -- the universal is introduced, no

10   problem.  It's then coupled with the exclusion from the

11   universal.

12             THE COURT:  Mr. Sallet, can I ask you the

13   following, which is, the theory -- your contention is that

14   this was done to weaken SVPs.

15             MR. SALLET:  Yes, Your Honor.

16             THE COURT:  How does that square with what doesn't

17   seem to be a motive to weaken the SVPs?  And the reason

18   I say this is everybody agrees that the SVPs are among the

19   largest advertisers on Google.

20             MR. SALLET:  Yes.

21             THE COURT:  Right?

22             MR. SALLET:  Yes.

23             THE COURT:  So what advantage is there to Google?

24   What incentive is there to Google to sideline advertising by

25   SVPs?
```

1          MR. SALLET:  It forces them to buy the monopoly

2    text ads.

3          THE COURT:  I'm sorry.  Do what?

4          MR. SALLET:  It induces them to buy the monopoly

5    text ads instead of appearing for free in the universals.

6          So statement of material facts 166, the demotion

7    of blue links --

8          THE COURT:  But I thought the SVPs were going to

9    do that anyway.

10         MR. SALLET:  Well --

11         THE COURT:  In other words, I thought the

12   complaint was, "We want to advertise with Google."

13         MR. SALLET:  Yes.

14         THE COURT:  And by doing this, it's just that our

15   ads had been moved to a different place.

16         I don't think the SVPs would say, "We're not" --

17   well, for example, there's not evidence, as I understand

18   it -- and you tell me if I'm wrong -- that, for example, the

19   price of those above the unit ads has increased following

20   the redesign.

21         MR. SALLET:  Your Honor, here's what evidence

22   shows, and I could give you some numbers.

23         What happens is, you take SVPs from appearing for

24   free off a prominent part of the SERP.  You demote the blue

25   links so fewer people look at them.  It's very --

1           THE COURT:  Right.

2           MR. SALLET:  And I won't go through this, but --

3    okay.  And the effect --

4           THE COURT:  I got all that.

5           MR. SALLET:  -- is that the demotion has forced

6    SVPs to purchase more ads from Google to maintain

7    visibility.  That's what Google agrees to for purposes of

8    this motion in paragraph -- in statement of material

9    fact 166.

10          So what Google has done is it's monopolized the

11   text ad market to other conduct, both search distribution

12   and SA360.  Then it engages in additional conduct that this

13   says, "Forced SVPs to purchase more ads."  That's Google's

14   motivation.

15          Second motivation -- but could I just -- one --

16   could I return just to the question of product design?

17   Because I would like to make this plain.  We do not believe

18   the exclusion of the SVPs is product design.  We don't

19   believe it.  We think it's pretextual.  Under the rebuttal

20   framework of Microsoft, it has to be non-pretextual.  And

21   this is what -- why we think that.

22          Your Honor, Google makes a lot of having this very

23   robust, multifactor process for deciding on product design

24   like the universals.  There's something called an ablation

25   study.  There's an experiment.  There's an internal

1    committee.  There's a launch report.  You've got sal- --

2    you've got consumer survey.  Very robust.

3         But when it comes to these exclusions, in its

4    summary judgment papers, Google has not identified a single

5    experiment, study, or test assessing the difference in user

6    satisfaction between the presence or the absence of an SVP

7    in a SERP feature, and yet that is the gravamen of our

8    allegation.

9         THE COURT:  Help me understand this, Mr. Sallet,

10   because if -- because I thought the theory was slightly

11   different, which was, I thought it was that the demoting of

12   the SVPs somehow maintained Google's monopoly and search.

13        MR. SALLET:  It does.  And let me.

14        THE COURT:  Hold on for a moment.

15        MR. SALLET:  It's a fair point, Your Honor.

16   I want to just -- I was just wanting to make the point that

17   even in a world of product innovation, we think this is not

18   product innovation.  It's clearly contested.

19        But let me go to that point --

20        THE COURT:  But hang on.

21        I mean, a monopolist doesn't violate the

22   Sherman Act by doing things necessarily that enhances its

23   bottom line.

24        MR. SALLET:  No.

25        THE COURT:  You can charge monopoly rates.  You

```
1    can develop a product that makes your rivals' product

2    incompatible, right?  That's all fair game.

3            So why is it not fair game to redesign the SERP

4    and to introduce units that cause an SVP to have to

5    advertise or spend more to get above the unit?  I don't

6    understand why that -- okay.  Maybe there's harm to the

7    SVPs, but they're not a competitor.

8            MR. SALLET:  Right.

9            THE COURT:  So where's the competitive harm in

10   that?

11           MR. SALLET:  The competitive harm is this:

12   There's a natural incentive for SVPs and general search

13   engines to work together.  They each have something the

14   other doesn't.

15           General search engines, in a competitive world,

16   multiple general search engines would have users.  And SVPs

17   want to find new customers.  So they want to find people who

18   might not know that they carry a certain product or don't

19   know them at all.  So the SVPs want to be present when users

20   are using general search engines, okay?

21           But the other way -- and this is also uncontested

22   in the record.  The general search engines have a reason to

23   want the SVPs.

24           General search engines crawl the web.  That's

25   great.  If I post a blog and I want everybody to see it, I'm
```

1   giving it away for free, I would love to have a general

2   search engine think I'm relevant to a user query.  In my

3   case, it would be unlikely, I admit.

4            But what the general search engines can't do and

5   what Google has never spent the money to invest is get the

6   specialized data.

7            THE COURT:  Right.  They can't get the realtime

8   data.  But, again, I think that even further underscores the

9   point I was asking about earlier, which is, what is the

10   incentive of Google to weaken the SVPs?

11            One, it's not -- I don't know why you would do

12   something to weak your most -- one of your better

13   advertisers.

14            And, two, importantly, as you've just said, if the

15   idea is to weaken the SVPs, why would you want to weak a

16   source of data that's vital to the operation of your search

17   engine?

18            MR. SALLET:  If weakening them makes you more

19   money and --

20            THE COURT:  What's the proof of that?

21            MR. SALLET:  That's -- well, we will introduce

22   evidence.

23            But the statement 166 that I think it is, where

24   Google agrees that the effect of this is that they buy more

25   ads.

1           But, Your Honor, I want to come to the

2   partnerships point.  You've asked me about it.

3           If I could ask you to look at page 11 of the

4   slides.  This is under seal.  I'm going to try to be very

5   careful about this.  Because this is evidence of why Google

6   is worried and why it would take action.

7           What's happening here is there's a company that's

8   out of market, okay?  I'm not going to name the company,

9   but --

10           THE COURT:  Tell me the page again.

11           MR. SALLET:  I'm sorry.  It's slide 10.

12           And it's discussed in our opposition on pages 45

13   and 46.

14           Okay.  There's this company that's out of market.

15   It wants to provide information to people who use, for

16   example, smartphones, okay?

17           It wants to take -- get content from SVPs because

18   it thinks users will like them.

19           The SVPs have a lot of content online.  People

20   haven't installed their apps.  The SVPs still have it.

21           What happens here -- and this is a bank shot.

22   It's a Google bank shot -- is Google goes to the OEM, the

23   manufacturer of the smartphone, invoking its revenue sharing

24   agreement to limit, to get so that the OEM limits the

25   ability of the out-of-market firm to have robust SVP data

1    available to users.  It's very plain.

2            THE COURT:  How does that work?  Maybe I'm not

3    following.

4            MR. SALLET:  Yes.

5            THE COURT:  I mean, how does an OEM prevent a

6    third-party application from acquiring data?

7            MR. SALLET:  And --

8            THE COURT:  What about the agreement with Google

9    would allow Google to insist that the OEM can prevent that

10   kind of data acquisition by a third party?  I don't

11   understand that.

12           MR. SALLET:  And I'm going to try to answer your

13   question as well as I can without revealing the sealed data.

14           We discuss it in our opposition.  It's listed

15   here.

16           But what happens is, the revenue share agreement

17   provides limitations on certain other activities.  And what

18   happens in this instance is the invocation of the revenue

19   service agreement has the effect on the OEM of worrying that

20   if it empowers this out-of-market rival with all of its data

21   from SVPs, it will run afoul of the revenue share agreement.

22           So it does have the power to decide what apps

23   appear on its devices and which ones it wants to partner

24   with.  And so what it says it you've got to scale back the

25   use of SVP data.

1           Now, Your Honor, I'm simply citing this because

2    I think this shows motivation of Google to try to limit the

3    SVPs from working with partners -- that's our theory -- in a

4    manner that would provide users with greater information.

5           This is one example.  And if I might, Your Honor,

6    could I go to the other one?

7           If you go back to slide 9, so in the

8    United States, Google is an established and durable

9    monopoly, but it's not true everywhere.

10          In Japan, for example, there's one of the rare

11   countries where Google has a real advertising rival.  It's

12   called Yahoo! Japan.  It's separate from the U.S. Yahoo!

13   But it's real competition there.

14          And when it is in the unusual position of being

15   not dominant, this is an internal slide that shows the

16   importance of SVP partnerships.  That's what's in statement

17   of material fact 191.  It's not redacted.  I won't read the

18   rest.  But what this shows is that in the usual circumstance

19   where Google is more of a challenger than an incumbent, it

20   thinks about how to work with SVPs.

21          If you look at the slide, there's the logo of a

22   very prominent SVP that appears in the center of it.  And

23   the text on the left emphasizes why working with these SVPs

24   would be beneficial to the search function.

25          And so what we have is two natural experiments.

 1    There's more, Your Honor, but two natural experiments, which
 2    really, I believe, would pass muster for summary judgment.
 3    When Google is more of challenger, it wants to think about
 4    working with SVPs.  When it's an incumbent and a new kind of
 5    way of providing data -- information to users comes along,
 6    it invokes a distribution agreement to limit that.
 7            THE COURT:  I guess I'm confused about --
 8            MR. SUNSHINE:  Yes, Your Honor.
 9            THE COURT:  -- two key things.
10            One is, you seem to suggest that because they've
11    demoted SVPs in this particular way, that they are no longer
12    working with them.  Surely, they are.
13            MR. SALLET:  Not working with them, Your Honor?
14            THE COURT:  That they're not working with them.
15    But surely, they are.
16            MR. SALLET:  Absolutely.
17            THE COURT:  Google continues to have partnerships
18    with SVPs.
19            MR. SALLET:  Yes.
20            THE COURT:  Whether the terms are more or less
21    favorable to SVPs seems to me to rise and fall on market
22    dynamics that are relevant in the United States, one.
23            Two, we've spent a lot of time talking about --
24    well, we've spent some time talking about what are
25    anti-competitive effects other than the ones that I thought

```
 1   were you primary --
 2              MR. SALLET:  So can I come --
 3              THE COURT:  -- which is that Google's treatment of
 4   SVPs through this new product design weakens SVPs by
 5   weakening SVPs in two ways.
 6              One, SVPs invest less money in structured data.
 7              MR. SALLET:  Yes.
 8              THE COURT:  And, two, that because they have been
 9   weakened, they are less attractive to other general search
10   engines --
11              MR. SALLET:  Yes.
12              THE COURT:  -- to partner with.
13              MR. SALLET:  Yes.
14              THE COURT:  I am having a lot of trouble following
15   that, other than just being able to logically explain it,
16   because it seems to me, at least as far as I can tell, the
17   sole basis for those two leaps from treating the SVP poorly
18   to making them less favorable to -- or to harming search
19   because they're less favorable to general search, is nothing
20   more than the theorizing of your expert, without any factual
21   support.
22              And I have looked at the expert report.  It just
23   sits there without citation to any other evidence in the
24   record.
25              MR. SALLET:  Yes, Your Honor.  Let me give you
```

1    some evidence.

2           But, first, can I set the concept here?  And I

3    perhaps have not gotten to it as quickly as Your Honor would

4    have liked.

5           What we posit is that in a competitive

6    marketplace, SVPs and rivals would be able to create

7    stronger partnerships than they do today.  We believe -- and

8    Your Honor alluded to this -- that what Google has done is

9    degraded both sides of that bargain, right?  There's a deal

10   to be made between rivals and SVPs.

11          Google has used different tactics to degrade both.

12          THE COURT:  But in what way?

13          MR. SALLET:  Yes, Your Honor.

14          THE COURT:  Tell me how.

15          MR. SALLET:  Okay.

16          THE COURT:  Because the undisputed evidence is,

17   one, Microsoft has lots of partnerships with SVPs.

18          MR. SALLET:  Yes.

19          THE COURT:  It gets data from SVPs, right?

20          MR. SALLET:  Yes.

21          THE COURT:  That's undisputed.

22          Two, Microsoft has recently signed up with an SVP

23   that, as I understand it, is exclusive to Microsoft, a

24   local.  Maybe I'm misunderstanding the relationship between

25   that new SVP and Microsoft, but I thought it was an

1   exclusive relationship with Microsoft.  So how -- I don't

2   understand your theory compared with the facts on the

3   ground.

4            MR. SALLET:  Yes.  I'm going to take the rivals

5   and then the SVPs in that order, if that's okay, because

6   it's the combination of the two.

7            The rivals have fewer users to provide because of

8   the other anti-competitive conduct.  And this statement of

9   material fact, 189, has quotes from Microsoft, very

10  specifically on this point.  This is clear -- this is clear

11  evidence that Google's conduct has made rivals less

12  attractive to SVPs.

13           But the simple articulation of this is, if the

14  conduct limits --

15           THE COURT:  You'll forgive me.

16           I thought that testimony is to exclusive

17  contracts.

18           I mean, the testimony was in the context of

19  exclusive agreements.  It wasn't partnerships as a whole.

20  It was exclusive agreements with SVPs.  Microsoft was

21  saying, because we don't have the same market penetration as

22  Google, we are in a weaker position to have exclusive

23  agreements with SVPs, which, frankly, makes sense.

24           MR. SALLET:  I believe, Your Honor, that a reading

25  of that record shows that the weakness is not limited to

1    exclusives, but exclusives were used as an example by the

2    witness.

3              In other words, if Microsoft has no presence in

4    one part of the business because it has no users, then it is

5    weaker positioned, whether it's an exclusive or not.

6              THE COURT:  This goes back to a question I put on

7    the table and then interrupted you, I think.  I'm sorry.

8              What is your thesis as to how SVP partnerships

9    with Microsoft could be improved?

10             MR. SALLET:  Yes.

11             THE COURT:  What's the material in that?

12             MR. SALLET:  Yes.  They could be improved if the

13   elimination of exclusionary impacts on Microsoft led it to

14   be able to acquire more users and close the scale gap.  And

15   it could be improved if the SVPs were not limited in two

16   different ways.

17             We've talked about the visibility limits and the

18   increased customer acquisition costs.  But what we haven't

19   emphasized is that there's also the question of data.

20             And, again, we have --

21             THE COURT:  Let me ask you, Mr. Sallet, is there a

22   single SVP representative that has said on this record,

23   since Google's launching of these verticals in which we are

24   excluded in the way that you've said in some of them, that

25   it has been harder for us to form the kind of partnerships

1   with Microsoft that we would like to have or with

2   DuckDuckGo, has anybody said that?

3          MR. SALLET:  Here's what's been said.  You may

4   regard this as not responsive.  But I want to tell you on

5   the record what's in the record, and we think it's very

6   important.

7          On page 47 of our opposition --

8          THE COURT:  Brief or Statement of Facts?

9          MR. SALLET:  Of our opposition, Your Honor.

10         THE COURT:  Opposition brief?

11         MR. SALLET:  Yes, sir, yes.

12         THE COURT:  Okay.

13         MR. SUNSHINE:  And now I'm going to have to look

14  at it, Your Honor, in case there's some chance I

15  misremembered the number.  But let me look.

16         THE COURT:  Okay.  I'm on page 47.

17         MR. SALLET:  Your Honor, I apologize.

18         THE COURT:  I mean, you write here on page 47

19  that, "Similarly, here, the issue is not whether Google's

20  conduct has foreclosed any partnership, but, rather, whether

21  but for Google's conduct, more or stronger partnerships

22  would be likely."

23         And, again, that goes to the question I'm asking

24  you, which is:  Is there any evidence?

25         MR. SALLET:  Yes.

1          THE COURT:  All you need is one --

2          MR. SALLET:  Yes.

3          THE COURT:  -- one SVP representative who says,

4     "Before Google made the change, we were a much more

5     attractive partner to Microsoft.  But since then, we have

6     been degraded in the following ways that makes us less

7     attractive to Microsoft, DuckDuckGo, or me or whoever it

8     may be."

9          Is there any such testimony?

10          MR. SALLET:  The closest we have, Your Honor,

11     appears at the top of page 47.  It's a block quote.  An SVP

12     executive is asked, "How would the world change if there

13     were equal-sized players?"

14          And the answer is -- and I'm going to not quote

15     it, but I think I can characterize it as, "You might see

16     more differentiation in the consumer experience."

17          In other words, he's being asked to posit how the

18     relationship would affect working with rivals and what would

19     the outcome --

20          THE COURT:  Isn't that evidence to support your

21     distribution theory and not your SVP theory?  In other

22     words, okay, I understand he's saying this, but it seems to

23     me that is a reflection of theory one, which is the

24     distribution monopolization through the tie-ups for

25     default -- excuse me, not tie-ups -- through the default

1    agreements, not the maltreatment of SVPs in the way that

2    you've suggested.

3             MR. SUNSHINE:  So there's one very important --

4    first of all, raising the cost to the visibility limits

5    does, in fact, impact the SVPs, having them spend money on

6    the monopoly, which obviously affects the resources that

7    they have available.

8             But in addition, in the question of having to turn

9    over data as a requirement to buy certain ads, this is

10   statement of material facts 183:  "Google also mandates that

11   the SVPs provide it with data."  Exactly the formulation of

12   that is not on the record.  But if Your Honor would look at

13   it, and goes on and says, "Thus restricting SVP's control

14   over the valuable data."

15            So I believe a reasonable inference from this is

16   that the SVPs are limited in the way they can use data with

17   third parties.

18            THE COURT:  But wasn't that the case before?

19            MR. SALLET:  Before these requirements?

20            THE COURT:  No.

21            In other words, hasn't it always been with the

22   case, pursuant to partnerships with SVPs, that SVPs have to

23   provide data?  Or are you suggesting that somehow when the

24   SERP changed and disfavored SVPs, that somehow then the data

25   requirements changed?

1          MR. SALLET:  Your Honor, I'm suggesting that

2    Google is using its monopoly power, gained through other

3    means, because the SVPs have no other choice.  And there's

4    evidence in the record from two SVPs on this precise point,

5    that the SVPs give Google data to use for its own purposes

6    and then in a manner which limits their ability to work with

7    other SVPs, that they would not do in a competitive market.

8    I believe it's statements of material fact 183 and 184 --

9          THE COURT:  So, okay.

10          MR. SALLET:  -- testimony from SVPs.

11          THE COURT:  That's a competitive market for what?

12    In other words --

13          MR. SALLET:  Correct.  Great.

14          THE COURT:  Okay.  So you've identified direct

15    harm to SVPs.

16          MR. SALLET:  Right.

17          THE COURT:  Okay.  Fine.  But that's not who your

18    theory revolves around.

19          MR. SALLET:  Correct.

20          THE COURT:  We're not here to protect the SVPs.

21          MR. SALLET:  That's right.

22          THE COURT:  We're here to protect three markets

23    that you've identified.  And I'm still having trouble

24    understanding how this ties up with those markets.

25          MR. SALLET:  It ties up this way.  This is an

1    inference, Your Honor.

2           If -- suppose in a competitive market there were

3    multiple general search engines with significant collections

4    of users, and one of them had a demographic that skewed much

5    younger than the others.

6           In a competitive marketplace where the SVPs

7    control the data, they could go to that -- let's call it

8    search engine B.  I don't know.  I didn't mean Bing, so I'll

9    call it D.  I don't mean DuckDuckGo.  I'll mean Z.  I don't

10   think there is a Z -- and say, you know, you have a lot of

11   young users.

12          So for hotel rooms, we're going to create a

13   differentiated offer.  We're going to give you prices that

14   only you have as part of a student discount, and we're not

15   going to give it to Google or anybody else.

16          They could create that kind of consumer

17   differentiation in a competitive marketplace.  They can't do

18   it given the uncompetitive demands that Google places on

19   them now that controls their data and its use with third

20   parties.  That's the kind of competition that one could

21   expect.

22          THE COURT:  I thought I heard you say that

23   previously, which is that somehow the data agreement --

24          MR. SALLET:  Yes.

25          THE COURT:  -- the data-sharing agreement limits

1    the SVPs, and now we're really getting a little far afield

2    here, but limits how they can share their own data.

3              MR. SALLET:  Yes.

4              THE COURT:  How's that?  And where's that in

5    the --

6              MR. SALLET:  It's in statement of material facts

7    183.  It's in the description of what kind of data must be

8    provided to Google and the relationship of that data to data

9    that applies to any competitor.

10             THE COURT:  But all that says is -- I mean, I'll

11   just call it a, sort of, a favored nation clause.

12             MR. SALLET:  Correct.

13             THE COURT:  And why is that a problem?

14             MR. SALLET:  Because it means you can't create a

15   specialized offering with a different general search engine.

16             THE COURT:  Sure, it does.  I mean, it couldn't be

17   exclusive.

18             MR. SALLET:  Correct.

19             That's right, you can't -- yes, Your Honor.

20   It's like an MFN in this sense.  You can't go and say to

21   somebody else, look, I'm going to make you an offer, you're

22   the only person who's going to get the student discount.

23             THE COURT:  Is there record evidence that SVPs

24   have asked for a different contract term and Google has

25   refused?

1          MR. SALLET:  Yes.  There is evidence that they

2    pushed back and said, this isn't reasonable commercial

3    value, and there's evidence that they would not do it in a

4    competitive marketplace, and they're only doing it because

5    they have no place else to go but Google.  That's,

6    I believe, paragraphs 183 and 184.  Yes.  I'm sorry.  184

7    and 185.

8          THE COURT:  Right.  184 talks about complaints

9    generally.

10          MR. SALLET:  Yes.  And 185.

11          This is an SVP that very specifically says that it

12    has no place else to go and so it gives into data terms that

13    it would not agree to in a competitive marketplace.

14          And combined with the other conduct, Your Honor,

15    this has more than enough potential, we think, for purposes

16    of summary judgment, we've demonstrated a prima facie case

17    that the combination of conduct in here has degraded the

18    ability of input suppliers -- that's basically what an SVP

19    is in terms of content -- and Google rivals to work together

20    in a way that would benefit competition with stronger

21    partnerships.

22          So, Your Honor, if I might, there's one last

23    point.  I said I was going to take you through the array of

24    conduct and the ways it works.  We've talked about SA360,

25    Google taking advantage of demand it has lowered.  We've

1   talked about SVPs in multiple ways.  We've talked about

2   SA360, but there's a last one.

3           The SA360 and SVP conduct makes the rivals weaker

4   still.  So take SA360.  There's already weakness from the

5   Search Distribution Agreements, but then SA360 operated in a

6   way which we believe does not include any pro-competitive

7   justifications that disadvantages Google rivals even more.

8           The additional weakness from these two pieces of

9   conduct feed back into future Search Distribution

10  Agreements.  It comes full circle.  The Search Distribution

11  Agreements give Google a free hand to engage in this

12  additional conduct, and the additional conduct weakens

13  rivals and makes it harder for them to get scale that would

14  make them competitive for future distribution agreements.

15          This is the feedback loop that we discuss on

16  page 27 of our brief.

17          THE COURT:  Can I ask you a different question?

18          MR. SALLET:  Yes.

19          THE COURT:  That's similar to the one I asked just

20  a few moments ago, which is, is there any record evidence

21  that an SVP has gone to Google and said, we would like to

22  negotiate whatever agreement we have with you to allow us to

23  place ads in the units and gone to them and done that, and

24  Google has said, no, absolutely not?  Is there any evidence

25  that Google has refused to deal on that issue?

1          Because I will tell you, as you know, there is

2    evidence that that very kind of negotiation happens with the

3    rival about --

4               MR. SALLET:  Yes.

5               THE COURT:  -- right?

6               MR. SALLET:  Yes.

7               THE COURT:  So is there evidence that that

8    hasn't -- or has happened and Google hasn't agreed to even

9    bargain on the issue?

10              MR. SALLET:  I want to -- could I rephrase your

11   question, Your Honor?  Because as Mr. Schmidtlein said --

12   no, I just don't want to give you an incorrect -- because in

13   like the hotel unit, there are no ads, so the request would

14   be, would we be eligible to appear?

15              THE COURT:  Right.

16              MR. SALLET:  It wouldn't be a request that the ads

17   be placed for the first time.  So I just want to say --

18              THE COURT:  No.

19              But I don't see why -- I mean, look, Google can --

20   they've designed it.  If, for example, the SVPs came to them

21   and said, Google, we'd like to be in the units, what's it

22   going to take?  Maybe they would be able to negotiate some.

23   But I'm not sure that's even happened.

24              MR. SALLET:  Because of the continued dominance.

25              We know that SVPs have said they wanted more.  We

1    know -- there's record evidence that they want more from

2    Google.

3                THE COURT:  But the SVPs aren't without leverage,

4    Mr. Sallet.  They aren't.  They are not shrinking violets

5    here, because they have a valuable commodity that Google

6    wants, and that is realtime data.

7                MR. SALLET:  Yes.

8                THE COURT:  Google doesn't have that.  They have

9    admitted it.  They can't get it by crawling the web.  They

10   need to make these partnerships with SVPs and others to get

11   it.

12               MR. SALLET:  Yes.

13               THE COURT:  So it's not as if they are fully at

14   the mercy of Google to strike agreements about ad placement,

15   ad price, what have you.

16               MR. SALLET:  Your Honor, we believe the facts will

17   show that they do not have the bargaining leverage they

18   would have in a competitive market and they, therefore, are

19   agreeing to terms of which they complain, and there's a very

20   specific example involving a different SVP.

21               There are these ads called local services ads that

22   appear at the top of the page.  Your Honor asked this

23   morning, well, aren't there some ads at the top of the page?

24   I think Your Honor was referring to these so-called local

25   services ads.

1          THE COURT:  Right.  That's what I was talking

2     about, the Chicago plumbers.

3          MR. SALLET:  Yes, exactly right.  Those are local

4     services ads.

5          As you know, our view is that the SVPs are

6     degraded because they're not allowed to buy the ads

7     featuring their own name and the traffic can't go to their

8     own website, okay?  There is in the record, and I don't have

9     a citation for it, but I'm sure one of my colleagues will

10    hand it to me, an SVP that tried to see if that could work

11    even given the limitations, and concluded it could not.  And

12    it was unable to get a different way to appear in those ads.

13         So we have an SVP that tried to work in the system

14    and we have an experiment, I think it was 2019, and it

15    didn't work.  So that the SVPs -- well, the SVPs are

16    practical.  The same executive whose testimony is on 147 --

17    page 47 of the opposition, later in his testimony -- and

18    this is actually on a slide, let's see if I can find it --

19    talked about -- well, let me just say it plainly.

20         Businesspeople faced with a dominant monopoly

21    don't spend a lot of time creating business strategies that

22    they think are built for a world that does not and will not

23    exist, and that's the testimony.  And that's just a

24    practical fact of business life, and it's totally

25    understandable.

1          So, Your Honor, I know I am over time, and I

2     wondered if I could just take one more moment just on the

3     question of disputed facts because it's obviously a critical

4     issue for summary judgment.

5          We think there are critical disputed facts

6     throughout the case.  On SA360, we believe that it's nearly

7     impossible for online marketers to avoid advertising on

8     Google, making use of SA360 vital.  We cite many

9     advertisers.  This is statement of material facts 106,

10    talking about the essential nature of Google's advertising.

11    Google disputes this.  This is a question for trial.

12          Secondly, Google -- there's a kind of ad -- Google

13    says some ads that we say are unsupported are supported.

14    There's a real dispute about this, Your Honor.  I think

15    what's happening is there's a new version of SA360, there's

16    an old version.  The new version supports that the old ones

17    don't.  So it's not clear to us.  There is now a dispute

18    about whether SA360 fully supports some features, and that's

19    a disputed fact.

20          I've talked about other disputed facts around

21    switching costs, around the importance of -- around the

22    expected performance and efficiency enhancements of these

23    features.

24          On SVPs, I've given you an example out of Japan.

25    I've given you an example out of the use of the RSA with an

```
 1    OEM.  We've just talked about testimony from an SVP.  And
 2    I've noted for you the uncontested, for this purpose, notion
 3    that the visibility limits increase SVP customer acquisition
 4    costs and the limitations on the use of the data.  And I've
 5    tried, Your Honor, with hopes of some success, of
 6    demonstrating that Google's conduct weighs down both sides
 7    of the perspective bargaining table.
 8          And, Your Honor, I think this is important.  What
 9    Google is doing when it's saying let's slice the conduct
10    into different pieces is trying to prevent us, and frankly,
11    the Court, from looking at all the relevant evidence.  If
12    you've got two parties to a deal and you're adversely
13    affecting both, it's clearly legitimate to look at them
14    together.  That's what we believe is an example of our case.
15          And then, Your Honor, there are, of course, in the
16    default agreements, a series of disputed facts.  One that
17    comes from us, I mean, I won't repeat what Mr. Dintzer said,
18    but -- and Mr. Schmidtlein has disputed this, right?  But we
19    take as relevant Google's prediction that it would lose a
20    lot of search traffic if a competitor was a default search
21    engine.
22          DOJ says, look, the preset default search engine
23    is the most efficient and effective way.  Google argues that
24    that's wrong.  That's Google's right.  That's what the
25    rebuttal case is all about, but it's clear that these are
```

1   clearly disputed facts for purposes of trial.

2           So, Your Honor, I would just make one last point.

3   In thinking about the standard of summary judgment, which

4   I will say Your Honor knows better than I do, the importance

5   is of the disputed facts but also inference.  Inference is

6   not unimportant, and it's simply the application of the

7   kinds of expertise that experts have and that lawyers can

8   think about as a matter of logic.

9           But the only point I want to make is that in the

10  *Microsoft* case, on pages 106 and 107, the *Microsoft* court

11  says we have found a causal connection between Microsoft's

12  exclusionary conduct and its continuing position in the

13  operating systems only through inference.

14          Inference is legitimate.  It has to be reasonable.

15  But we believe, Your Honor, that the disputed facts and the

16  reasonable inferences more than support the view that a

17  factfinder at trial could find a prima facie case that

18  involves all of the conduct working together in adding to

19  harm.

20          Thank you, Your Honor.

21          THE COURT:  Mr. Sallet, thank you very much;

22  I appreciate it.

23          All right.  Mr. Schmidtlein.

24          MR. SCHMIDTLEIN:  All right.

25          I am -- I know I've told you before, be wary of

 1   lawyers who say they're going to be brief because that's --

 2   that rarely -- we rarely keep that promise.  But given

 3   your patience today, I am actually going to try to adhere

 4   to that.

 5              Just a couple of things, Your Honor.

 6              First, I think Mr. Sallet, you heard say on a

 7   number of occasions, "We're not complaining about the

 8   universal.  We're not taking issue with the universal."

 9              That -- what that really translates into, "We

10   don't disagree that it was a product improvement."

11              This was a product improvement.  What they

12   disagree with is, when you look at this -- and I've

13   confirmed, Your Honor, there are no ads in this.  In other

14   words, the hotels can't buy ads in this, okay?

15              THE COURT:  Is that right?

16              MR. SCHMIDTLEIN:  Correct.

17              THE COURT:  There's no advertising in the units,

18   period?

19              MR. SCHMIDTLEIN:  Not on this page.

20              THE COURT:  Right.  No.  I got it, because --

21              MR. SCHMIDTLEIN:  So there's no advertising here.

22   Query "hotel in New York," Google is ranking hotels based

23   upon all sort of data that it has that it believes --

24   including, you know, information about maybe where the

25   person is who submits the query, all sort of things.  They

1    are ranking and trying to come up with --

2           THE COURT:  So what you're saying is if I put in

3    the search, I'll get Holiday Inn; Mr. Sallet puts, it's

4    going to be the Waldorf that comes back?

5           MR. SCHMIDTLEIN:  Potentially.  Potentially,

6    that's exactly right, Your Honor.

7           MR. SALLET:  Your Honor, we would object to that.

8           MR. SCHMIDTLEIN:  That is potentially correct,

9    Your Honor.

10          What Google is doing here is -- and really this is

11   what -- this is what their case boils down to.  If you go

12   back here, they've got ads at the top that they are buying

13   because they're making money; they're converting.  It's

14   beneficial to them, as you said.

15          What they're unhappy about -- and they have

16   organic results below, okay?

17          THE COURT:  Can I ask you, is it an undisputed

18   fact that with respect to the main universals, flights,

19   hotels, local, that SVPs have the opportunity to advertise

20   above the unit in the way that you've shown --

21          MR. SCHMIDTLEIN:  Correct.

22          THE COURT:  -- here?

23          MR. SCHMIDTLEIN:  Correct.

24          THE COURT:  That's undisputed?

25          MR. SCHMIDTLEIN:  Absolutely.  Absolutely.

213

1            And what they want is, you know, they bid up

2      there; they get placement at the top.

3            If their results or the quality of their website

4      is good, they're at the bottom -- not the bottom, but

5      they're below the universal.

6            And what they're really unhappy about is, this

7      universal, this page here competes with them.  They'd like

8      to turn the clock back to just free links.

9            And Google introducing this to compete with them

10     on the merits, they don't like.  And that is exactly what

11     *Microsoft* says.  That's that sort of product improvement,

12     there is not a case anywhere that says -- so here's

13     Google -- and this is what he said to you.  He said, "You

14     know what?  Google never tested the version of the product

15     that we say is better."

16            How could that rule possibly work?  That Google is

17     supposed to, before it can release a new product, a new

18     iteration of a universal, it has to dream up every possible

19     hypothetical iteration of the product that a competitor

20     might object to.  When you read, like, the *Allied versus*

21     *Tyco* case, that's exactly why the Ninth Circuit and *Areeda &*

22     *Hovencamp* say that can't be the rule.

23            So if you have a product improvement -- and Java,

24     if you go back and you look at the District Court and the

25     D.C. Circuit, the Court specifically said there, it's a

1    product improvement because, yeah, you know what?  The

2    applications that will run on this that are written to the

3    Java virtual machine, they run faster.

4           The Court also found -- and I think the findings

5    of fact, I've got.  But it's probably in our belief.  But

6    the findings of fact, if you look at the District Court,

7    also were on Java.  Microsoft could have also made it

8    compatible with Sun at virtually no cost.  There wasn't a

9    problem.  This wasn't an accident or an oversight.  They

10   intentionally didn't do that because they didn't want to

11   help this competitor.

12          So Google is not obliged to try to predict or help

13   every single product design that somebody might actually

14   dream up.  So that's number one.

15          Number two, really appreciate, obviously, your

16   careful attention to what I know is an absolute mountain of

17   paper back there and all the exhibits.

18          Your questions to Mr. Sallet about the data

19   agreements are right on point.  There is not -- they

20   basically are now coming forward to suggest that some sort

21   of MFN provision in Google's agreement, which is basically,

22   "Hey, if you offer data, some category type of data to

23   somebody else, you have to make it available to us, too.

24   Whether we use it or not or how we use it is another

25   question, but we want to make sure you're not disadvantaging

1  us with somebody else."

2          No evidence that anyone complained about that.

3  You're absolutely right on that.

4          You pressed him on that question, and he gave you

5  kind of a vague, "Well, there was an advertiser who claimed

6  that if there was more competition and alternatives, then

7  maybe the terms would be better."

8          Well, that's a pretty -- that's basically just

9  saying, "Well, gee, if I had two search advertisers who were

10  closer in share, maybe I'd have better terms."

11          Nobody has come and said, I would like that

12  provision loosened in some way because I've got some

13  harebrained idea that I'm going to cook up some new feature

14  with someone else that I don't want to give to you, Google.

15  Zero evidence.  Zero evidence that Microsoft ever asked for

16  that either.  So the data-sharing agreements fail entirely.

17          And then we get to SA360.  And, again, we've heard

18  a lot about advertisers.  And I've handed you the documents

19  suggesting, "Well, gee, you know, people can't figure out

20  ways to figure out what the spend shift would be.  And, you

21  know, we can get an inference from all of these things."

22          Your Honor, my colleagues, these good people here,

23  we ran all over the United States during COVID taking

24  depositions, subpoenaing people from all over the place,

25  okay?  The time for the evidence, you know, is now.

1          It's great to write a complaint that theorizes

2     about these things.  It's great to write an expert report,

3     pay an expert who can concoct just about anything.

4          And I'm glad to see that you have the same

5     reaction I did.  I asked that expert witness in a

6     deposition:  "Name for me any advertiser that failed to

7     switch or, you know, was somehow harmed by these things."

8          Nothing.

9          So now is the time.  You can have an inference,

10     but you've got to have some evidence that you actually can

11     infer from.  They've got nothing.

12          And I guess I'll just leave you with -- you know,

13     Mr. Sallet spent a lot of time up here trying to weave all

14     of these different pieces, what I call the triple bank shot.

15          You may remember, back in the 1990s, there was a

16     famous McDonald's commercial with Larry Bird and

17     Michael Jordan.  And it started off as a game of shot-making

18     with easy shots.  And the winner would get the McDonald's

19     lunch.  And by the end, bird and Jordan are outside the

20     arena on top of some sky scape scraper saying, "Off the

21     backboard, off the scoreboard, off the this, nothing

22     but net."

23          I would suggest to you Mr. Sallet is trying the

24     equivalent of that.  And with all due respect to Mr. Sallet,

25     he's not Larry Bird, and he's not Michael Jordan.

1          This theory is unlike anything I've heard of or

2    seen.  It requires real evidence, and they have not produced

3    it for you.

4          Thank you for your patience today, Your Honor.

5          THE COURT:  All right.  Thank you,

6    Mr. Schmidtlein.

7          All right.  Thank you, all.  I really appreciate

8    it.  This has been informative and interesting, to say the

9    least.  So thank you, everyone.

10          Let's just briefly talk about next steps.  And

11    this is, of course, divorced completely from whatever the

12    decision may be on summary judgment.

13          We have sort of two open matters.

14          One is the various motions in limine on the

15    experts.

16          And then, two, we've got the sanctions motion.  So

17    let's take what I think is, arguably, easier of the two, and

18    that's the *Daubert* motions.

19          You all had communicated to us that there was an

20    ideal date by which I would rule on those.  And making no

21    promises in terms of your trial preparation, what is that

22    ideal date?

23          MR. SCHMIDTLEIN:  Your Honor, I don't -- I believe

24    that the plaintiffs have suggested that, because we had

25    discussed at some point a date by which we would submit to

1   you sort of summaries of expert reports, that sort of

2   resolving the scope of the *Dauberts* might be -- you know,

3   might impact how we prepare those summaries.

4           Google's position is, we'll prepare the summaries.

5           THE COURT:  Do we have a date for the summaries?

6           MR. DINTZER:  July 18th.

7           MR. SCHMIDTLEIN:  July 18th.

8           And Google's position, quite frankly, Your Honor,

9   is:  Decide the *Dauberts* whenever you want to decide the

10  *Dauberts*.  I mean, we're not sitting here on, going to stand

11  on format and say, "Well, we can't submit these things until

12  you've decided the *Dauberts*."  So we'll submit those -- or

13  we'll deal with those whenever you're ready to deal with

14  them.

15          I will say, I think there's an argument that

16  actually some of the *Daubert* motions might go away,

17  depending on how you rule on summary judgment.  Obviously,

18  they all go away if you grant summary judgment.

19          But if there are -- there actually are pieces of

20  the *Dauberts* -- or *Dauberts* that would probably go away or

21  be much more limited depending on some of your rulings if

22  you were to grant some of the motions.

23          THE COURT:  Okay.

24          MR. SCHMIDTLEIN:  So a long way of saying, decide

25  the *Dauberts*, from our position, you know, whenever you can.

1          MR. DINTZER:  And, Your Honor, we did put that

2    date forward in the sense that, obviously, if there aren't

3    experts, if any of the experts are removed, then the parties

4    wouldn't have to write their summaries.

5          We didn't suggest that that should drive the

6    process.  So, obviously, we are sympathetic to the Court's

7    burden and willing to deal with the *Dauberts* at the

8    Court's -- I mean, obviously, we're going to start preparing

9    them for trial.  That would help us --

10         THE COURT:  Just to put a fine point on this, all

11   of your experts, regardless of who they are -- understand

12   that they need to be available in the month of September,

13   early October.

14         That's not an issue, correct?

15         MR. DINTZER:  That's not an issue for us,

16   Your Honor, although --

17         THE COURT:  Okay.

18         MR. DINTZER:  -- that does -- there's -- I just

19   put a bookmark there on the trial length that we -- and a

20   request that we'd like to talk about.

21         But, no --

22         THE COURT:  You're not going to lengthen it, are

23   you?  You want to narrow it to a few weeks?

24         MR. DINTZER:  Well, what we'd like to do is begin

25   the discussion of how long it might take.  And what we'd

1  like is, we could engage in that discussion with Google and

2  then put -- submit something to the Court.  When we talked

3  about this, I think it's about two years ago --

4            THE COURT:  Not quite.

5            MR. DINTZER:  -- and you asked me for a certain

6  amount of time, and I put it in.  Then you put a certain

7  amount of time in the records as a placeholder, I believe.

8            So it's something that would help us prepare our

9  presentations and the like if that's a conversation we could

10  have now.

11            THE COURT:  Okay.

12            Well, I don't know that we need to have it today.

13  But I will state the obvious, which is that there have been

14  events since we've met and you all entered that -- we

15  entered that scheduling order that have changed the

16  composition and complexion of my docket.

17            MR. DINTZER:  And we understand that, Your Honor.

18            THE COURT:  We'll do what we can.

19            MR. DINTZER:  What we ask -- our ask right now is

20  simply maybe we have a date that we put on the calendar in

21  the next two weeks that we could talk to Google, we could

22  get our positions and then we could file something.

23            THE COURT:  Okay.  Let's -- yes.  But let's circle

24  back to that in a moment.

25            MR. DINTZER:  Sure.

1          THE COURT:  While you're up there, Mr. Dintzer.

2          MR. DINTZER:  Yes, sir.

3          THE COURT:  Let's talk about the sanctions motion.

4          MR. DINTZER:  Sure.

5          And actually, even before that, if I could answer

6    a question that you asked maybe an hour and a half ago for

7    citations with respect to Apple's foreclosure, if I could

8    just give that to you so the Court would have it on the

9    record.  It's in plaintiffs' brief at 47, 48, and the COMF

10   at No. 475.

11          THE COURT:  Okay.  Thank you.

12          MR. DINTZER:  Sure.

13          Yes, Your Honor, with respect to sanctions.

14          THE COURT:  So I've read the papers, and I think

15   the question is twofold.  One is -- and the second question

16   really, in some sense, drives the first.

17          What is the purpose, do you think, that will be

18   served by a hearing?  And, two, what possible remedy do you

19   think could be informed by having a hearing?

20          MR. DINTZER:  The hearing would give the

21   opportunity -- so there's two parts of our request.

22          First, we've asked for some chance to take a

23   30(b)(6) and from declarations.  That would help us to help

24   the Court understand the breadth of the conduct.  The

25   hearing would allow us to present some of that.  But also it

1    would allow -- it would allow us to show the Court what the

2    evidence is and to hear from the witnesses.

3          In the communicate-with-care discussion, at one

4    point, I believe the Court said, you know, before I could

5    issue sanctions of this type, I would want to have a

6    hearing.  And so one of the considerations is, is the

7    understanding that if the Court felt the hearing was

8    necessary, we believe that the Court can rule on what we've

9    provided and conclude that sanctions are necessary.  They've

10   destroyed documents.

11         THE COURT:  But what would they look like?

12   I'm just trying to -- you know, we're talking about a lot of

13   work for what, at the end of the day, is not a request for

14   dismissal.  It's not going to be a request for an adverse

15   jury instruction because there's no jury.  I'm not --

16   there's not legal fees at issues here.  Maybe you want the

17   costs for filing a motion.

18         So what is there that you think is proportionate

19   to the conduct, even if I were to agree with you that it's

20   intentional, that would cause you to think that we ought to

21   spend some more energy about -- on this issue?

22         MR. DINTZER:  Well, first, there is the finding

23   that Google has destroyed documents and the Court saying

24   that they're sanctioned.  We believe that there is value in

25   that in and of itself that parties -- I mean, I'm going

1    state the obvious here -- should not destroy documents and

2    hide the fact that they're destroying documents.  So

3    we believe that even if there was no remedy, that that is of

4    true value, that a record needs to be made that they have

5    done this.

6              But beyond that, Your Honor, we can ask for

7    adverse inferences.  There's case law that says we can ask

8    for adverse inferences.  And we believe that given the scope

9    of this, and we're not talking like three documents ended up

10   in a shredder, given the years of this, the planning that

11   went behind it, the depth of this, that that should be

12   something that we should be able to seek.  And other

13   remedies, potential shift in burdens.

14             And so the first step, of course, is to get the

15   finding of sanctions, which we believe, like I said, the

16   Court could do on the filings that we've done, or we'd be

17   happy to have argument on it.

18             The remedy for that presumably would be tied to

19   the breadth of it.  If the Court doesn't feel it needs a

20   hearing, we would still want to have this opportunity to get

21   the declarations and to get a 30(b)(6) so we can complete

22   the record.

23             But we believe that -- I mean, there's no doubt

24   that they destroyed documents.  I mean, and they've already

25   been sanctioned by one court.  They've done it improperly.

1    They've -- I mean, they're in the wrong.

2            The Court should sanction -- as a first step, the

3    Court should sanction them so that we're clear that doing

4    this is wrong.

5            And then the second step is what kind of -- what

6    could the Court do to try to balance the loss of years and

7    years of documents?  An adverse inference, a shift in

8    burdens.  And as we go forward and we find out the breadth

9    of what they've done, which is what our request for the

10   30(b)(6) and the declarations, then that helps us inform

11   what the ask would be.

12           THE COURT:  Okay.

13           I mean, let me just -- we're all together so I'll

14   just share with you what my impressions of this are.

15           I guess the impressions are threefold.  One is,

16   you're right, I think, that there are un -- highly likely, I

17   shouldn't say that -- highly likely that there were chats

18   that were relevant that were not preserved.  You know, given

19   the number of people, number of custodians, the topics, the

20   fact that you've shown that some custodians were cognizant

21   of the fact that, you know, the off-switch meant that they

22   weren't being preserved, it's certainly a reasonable

23   inference that there was -- that had Google preserved all of

24   that, there would be some additional relevant material.

25   I'm not prepared to say how much or how important.  That's

1    one.

2            Two, I think the communications from Google,

3    particularly to the Department of Justice in this case,

4    informative, but not fully so, okay?  The portions that are

5    arguably left out, specifically what the specific policy was

6    and practice was with respect to turning it off, isn't

7    explicitly stated, not clear to me that that was intentional

8    to do that.

9            Third, which is, it's not as if they didn't

10   provide a lot of -- you know, some degree of information,

11   whether it's to your colleagues in another investigation, or

12   to the Texas plaintiffs who are plaintiffs in this case,

13   about the functionality here.

14           There are numerous statements about how at least

15   when the switch is on, that preservation, how it would be

16   conducted.  There is some express statements that are

17   acknowledged by particularly Texas, about -- agree, it's in

18   a different case -- about the treatment of the off switch

19   and what that meant for preservation.

20           And if one of Google's lawyers is to be believed,

21   an express statement to Department of Justice lawyers

22   shortly after this suit was filed in a separate

23   investigation -- well, I'm sorry.  A statement by a Google

24   lawyer that's reflected in an affidavit and in the

25   investigative phase of the state's case here in which a

 1    lawyer has said that we said, you know, we expressly said

 2    during the meeting that if the thing was set off, if the

 3    chat function was off, they weren't going to be preserved.

 4    I believe that's right.

 5              So, yeah, this was in the DOJ ad tech

 6    investigation, pardon me.

 7              MR. DINTZER:  Right.

 8              THE COURT:  So -- and I will say, I don't fully

 9    agree with the plaintiffs' position that it doesn't matter

10    what you did or didn't know.  And I say that because if you

11    did know and didn't do anything about it, it's a little hard

12    to say that -- well, let's put it differently.

13              If you did know and you didn't say anything about

14    it, whatever harm there is today could have been staunched

15    much earlier.  So those are the things that I've come away

16    with from these sanctions motions, the sanctions papers.

17              Now, do we need a hearing -- do we need discovery

18    and a hearing to sort of flesh those impressions out

19    further?  I guess the question to you is, what do you think?

20              MR. DINTZER:  Well, so, I mean, I guess there's

21    two questions, Your Honor.  I mean, if the Court will

22    indulge me, I'll respond to what the Court said, but if not,

23    I mean, I understand the Court's impressions.

24              We have been in front of the Court for two and a

25    half years now.  And, I mean, it's a rhetorical question,

```
 1    but it's not really.  If we had genuinely known that they

 2    were destroying documents of chats from amongst their

 3    people, I mean, genuinely had this as an understanding, oh,

 4    they're destroying these chats, I would hope that the Court

 5    would believe that neither I nor anyone on my team would

 6    say, oh, that's fine.  So we did not have -- however they

 7    want to piece these together, we did not have active

 8    knowledge of any of that.  There's not even a claim that we

 9    had active knowledge.

10              THE COURT:  And to be clear, just when you say

11    "we," you mean the lawyers in this room?

12              MR. DINTZER:  Yes, or the lawyers on my team.

13              THE COURT:  And whether something like this could

14    be -- knowledge could be imputed through other plaintiffs,

15    to other parts of Department of Justice even within the

16    Antitrust Division.

17              MR. DINTZER:  Even if it could, and we don't

18    believe it can, even if it could, okay, they're destroying

19    documents inconsistent with a promise that they made about

20    preserving things.  And the fact that they're saying it's

21    okay because we left some breadcrumbs, it's not.  They did

22    not write --

23              THE COURT:  To be clear, I'm not saying it's okay,

24    Mr. Sallet [sic].  And I'm not saying that's an excuse.

25    What I'm suggesting is that it bears on the ultimate remedy,
```

 1    if there is to be one.

 2            MR. DINTZER:  And I appreciate that.

 3            The second thing is, there's no assertion that we

 4    knew that their people were flipping this off so that they

 5    could have discussions which they intentionally --

 6    especially which they intentionally wanted to preserve,

 7    I mean, not preserve because they knew that could be

 8    discoverable.  That's -- I mean, no one claims we knew that.

 9    And that's about as bad as you can get.

10            And so the first question, I understand the Court

11    wants to go -- is asking us about remedy.  But the first

12    step is, they should be sanctioned.  I mean, they should --

13    even if we couldn't come to a remedy.  And so we would

14    say -- and we're happy to have the hearing before the

15    decision about whether they should be sanctioned, but

16    we believe that -- I mean, the destruction of documents, the

17    intentional hiding of information by the employees, if not

18    Google, and they're responsible for them, is --

19            THE COURT:  Are there a core of witnesses,

20    document custodians for whom that question of whether they

21    turned the switch off is more important than others?

22            MR. DINTZER:  Well, I would say that the ones who

23    are likely to appear at trial, they have some bearing, but I

24    would -- the problem with it is this.  There are somebody

25    who we said, look, there's not many documents for Fred, and

1   so we're not even going to depose Fred because the documents

2   don't look so good.  But it may be that the reason that

3   there were no documents for Fred is because Fred spent all

4   his time in the off-setting where he made sure that nothing

5   was preserved.

6           So there might be -- he might have been a fabulous

7   witness that we would have deposed that would be coming to

8   trial.  So, I mean, that's one of the -- that's always the

9   problem, and it's the problem for the people who destroyed

10  the documents, that they create a situation where we don't

11  know what was destroyed.

12          It's almost certain that some material since these

13  people were in fact using this to hide their chats from

14  discovery, it's almost certain that something would have

15  been useful.  And whether it would have added more

16  witnesses, I can only assume yes.

17          So what we would ask for is, the first thing is

18  they rely on the fact that they sent out a letter and notice

19  to all their people, and yet they won't share it with us and

20  they say, well, it's privileged.  And they argued that,

21  okay, we have a challenge that it's privileged, but they

22  can't rely on it, they can't use it as a sword and a shield.

23  If it's privileged, they can't rely on it, or they can give

24  it to us, we can find out what they said to their people.

25  That's one.

1          Two is the people who are testifying for them and

2    the people who still work for them, we should get

3    declarations from them and have them say under oath whether

4    they did this or not.  We know some from the *Epic* case, we

5    should have a complete record.

6          And the third one is a 30(b)(6).  And in that,

7    we won't list the questions, but we can explore it.  We can

8    gather that information.  If the Court feels that a hearing

9    is not necessary and especially if the Court is willing to

10   take notice of what happened in the *Epic* case, the

11   transcripts and everything, and we understand that the Court

12   is pressed on time, we could take this information and

13   create a submission and at that point, you know, either an

14   argument or maybe it's not even necessary, but we think that

15   the very first step in all of this is, at least should be,

16   that they be sanctioned.  If that decision needs to come

17   after the steps to gather more information, then we

18   understand that as well.  But those are our asks.

19          The hearing is -- I mean, as in any argument, is

20   really for the Court's benefit.  If the Court believes that

21   it's better for us to gather this stuff and submit it or a

22   different method of providing this information, then we

23   understand that and will work with the Court in the best way

24   to do that.

25          THE COURT:  Okay.

1          All right.  Mr. Schmidtlein, do you want to be

2     heard?  Or Mr. Sallet?  I didn't mean to skip over you,

3     but -- or...

4          MR. CAVANAUGH:  Your Honor, Bill Cavanaugh on

5     behalf of Colorado and Nebraska.

6          Your Honor, on your question about what should the

7     remedy be, I think that's going to turn to large extent on

8     what arguments and contentions are made at trial and then

9     for Your Honor to take that in consideration in judging

10    credibility of witnesses and in the findings of fact.

11         So I think it will end up being quite specific as

12    to what the remedies should be based on what arguments are

13    made.  If argument is made about the absence of evidence,

14    well, there's a reason for that.  There's a reason there's

15    an absence of evidence.

16         And the Court can take that into consideration in

17    determining the credibility of a witness and in making

18    findings of fact.  So I think -- I don't think the issue of

19    remedies needs to be dealt with in the near term.

20         I do think the issue -- to Mr. Dintzer's point,

21    I think the issue is, has there been sanctionable conduct

22    here?  That does need to be determined in the short term.

23    What the remedies are, I think that's probably well down the

24    road, Your Honor.

25         THE COURT:  Okay.  Thank you, Mr. Cavanaugh.

1          Mr. Schmidtlein.

2          MR. SCHMIDTLEIN:   Briefly, Your Honor.

3          I know you haven't asked for argument on the

4  motion.   I guess just a couple of things that I want to make

5  clear for the record here today.

6          We'd categorically reject Mr. Dintzer's framing

7  and characterization of intentional destruction.   What we're

8  disagreeing about here is methods of preservation, okay?

9          Just so the record's clear, the idea that there

10  were people at Google intentionally destroying documents we

11  categorically reject.   We don't think they've established

12  that.

13          But to your points about sort of the timing and

14  what -- you know, what we sort of do next, I tend to agree

15  with Mr. Cavanaugh that, at the end of the day, you can

16  evaluate, if we have a trial, if whatever issues are left,

17  whatever witnesses get called at any trial, you can

18  evaluate -- you're going to have to -- I guess they're going

19  to ask you to instruct yourself; but you're going to have to

20  evaluate sort of where that fits into the ultimate evidence.

21  I don't think we need a hearing on that sooner rather than

22  later.   I know you've got a lot on your plate.   And I think

23  that, you know, sort of evaluating all that can wait until

24  trial, quite frankly.

25          I think the questions that you've asked are fair

1    ones around you do need to establish prejudice.  And, you

2    know, we've put before you the record of how relevant --

3    I mean, it's not as if chats were not preserved here.  There

4    were a lot of chats preserved and actually reviewed and very

5    few produced and none yet substantively used in the case.

6            I know you can always sort of wonder, well, gee,

7    maybe there's other stuff out there.

8            There's no evidence in the record in this case

9    that anybody here, a custodian in this case, was

10   intentionally flipping, you know, the settings on and off to

11   avoid discoverable evidence in these cases.

12           Are people aware of the preservation if they're

13   talking about sensitive things?  Of course, they are.  Of

14   course, they are.

15           But there's no evidence of anybody who is a

16   witness in this case intentionally trying to avoid or

17   destroy evidence that would be relevant to these

18   proceedings.  And I think that is something that we trust

19   that you're going to evaluate as you try to figure out, A,

20   is it sanctionable conduct?  Because you have to find

21   prejudice there.  And then, B, what, if any, remedy is

22   appropriate?  But, you know, we leave that in your good

23   hands.

24           THE COURT:  Okay.

25           I guess one last question for the plaintiffs; and

 1    that is, are you asking for a sanction, if any, in

 2    connection with the summary judgment motions?

 3            MR. DINTZER:  If I could just ask the Court for a

 4    little clarity.

 5            When you say --

 6            THE COURT:  Well, what I mean by that is, you

 7    know, say, ultimately, you're going to ask for something

 8    that you've suggested, which is some kind of adverse

 9    inference or some kind of change in burden or even if that

10    could even be an appropriate sanction.  Is that something

11    you want me to consider as a matter of -- in connection with

12    the evidentiary presentation at summary judgment?  Or are

13    you content to just let this ride until having a remedy at

14    trial?

15            MR. DINTZER:  Our feeling on this, Your Honor, is

16    that we hope we've convinced you that we should win on the

17    summary judgment motion and it not be necessary.

18            If the Court were to find that summary judgment

19    were to be granted against the DOJ Plaintiffs because of an

20    absence of evidence on a particular point, then clearly the

21    fact that Google's employees may have destroyed those

22    documents to ensure that there was an absence of evidence --

23    we don't believe there is.  We believe that there is -- that

24    we've provided enough record evidence that the Court doesn't

25    need to get there.  But if the Court did get there, so I

1  hate to put it like that, but that is where we are left.

2          THE COURT:  Okay.

3          MR. DINTZER:  If the Court did get there and was

4  prepared to provide -- to rule against the DOJ Plaintiffs

5  because of an absence of a material fact because we hadn't

6  supported some fact, then the fact that there's document

7  destruction and sanction hanging over the defendants, that

8  obviously would need to be resolved.

9          THE COURT:  Okay.

10          MR. DINTZER:  That's what I would --

11          THE COURT:  That's a fair answer.

12          MR. SALLET:  Mr. Cavanaugh is going to let me come

13  back up.

14          During this substantive argument, at one point

15  Mr. Schmidtlein got up and said, Your Honor, in *Microsoft*,

16  there's evidence.  There's no evidence here.

17          In *Microsoft*, the CEO of Microsoft wrote some

18  emails that were very damaging.  Since that time, people

19  have learned different ways not to have information

20  recorded.

21          We believe that there's an odd paucity of evidence

22  supporting what Google claims are pro-competitive

23  justifications.

24          Your Honor, because of our view of the law, we

25  think that need not be resolved for summary judgment.  So

236

```
 1    we're perfectly willing to believe that even if they could
 2    show something at trial, that would not affect whether we
 3    can create -- can assure a prima facie case.
 4           But, Your Honor, if the Court believes that there
 5    is -- that Mr. Schmidtlein's point is important that there's
 6    an absence of evidence, particularly as to pro-competitive
 7    justifications and that factors into the Court's thinking
 8    about whether we pass muster on summary judgment, then we
 9    would have a circumstance where the question of the chats
10    could become very important to the question of -- to the
11    issue of disputed facts at trial.  Because of our view of
12    the law and the facts, we believe that is not necessary.
13    But I wanted to simply get a specific identification to
14    support Mr. Dintzer's approach.
15           MR. SCHMIDTLEIN:  Very briefly, Your Honor, the --
16    we've -- I'm not going to give the highlight reel of
17    everything we've talked about today.  But you've heard
18    argument today on a lot of legal issues.  You've heard
19    argument around what are the legal significance of certain
20    undisputed facts.
21           The question of whether the browser agreements are
22    competition on the merits, there's no chat that's going to
23    change that.  The Safari default, the Mozilla, the Firefox
24    default, those operate the way they are.  The contracts are
25    what they are.
```

1           THE COURT:  Right.

2           MR. SCHMIDTLEIN:  The substantial foreclosure on

3    Android, you've got the data on that.

4           Are the verticals product improvement, all of

5    those issues.

6           THE COURT:  Yes.

7           Look, I think at the end of the day what we're

8    talking about, most likely, is intent evidence.  That's

9    obviously -- it's not as important here as it would be in a

10   criminal case.  I get it.

11          MR. SCHMIDTLEIN:  Right.

12          THE COURT:  But it could be part of the background

13   and relevant to --

14          MR. SCHMIDTLEIN:  I don't agree with that.

15          My point simply is, you'd have to conclude -- and

16   there's D.C. Circuit law on this, where courts have granted

17   summary judgment in the face of a sanctions motion.  And

18   they've done it because they've concluded that whatever

19   inference from whatever spoliation they may have found could

20   not disturb the undisputed fact or the legal hole in the

21   case, and that is our position.

22          THE COURT:  Understood.

23          MR. SCHMIDTLEIN:  But, obviously, we trust you to

24   adjudicate that.

25          Thank you.

1          THE COURT:  Okay.

2          All right.  Well, I think we'll just leave it

3     there.  Let me give it some further thought after having

4     talked to you all, and we'll let you know what to do.

5          MR. DINTZER:  Could I just put one more thing in

6     front of the Court just so we...

7          With respect to Google has recently produced more

8     documents that we had not gotten in fact discovery that they

9     indicated was a mistake and a failure for them to do it.

10         We have so far received 173,000 pages, 32 banker

11    boxes equivalent.  We are in the process of reviewing them,

12    of course.  And at this point, we have not made a

13    determination.  But, of course, with this kind of a

14    production, I mean, we all know the drill.  We may need to

15    re-open depositions and the like.  And I just want to put --

16    you know, we're trying never to surprise the Judge.  So

17    I just wanted to put that on your radar.

18         THE COURT:  Okay.

19         That's unwelcomed news.

20         All right.  So stay tuned.  We'll get you some

21    further information about next steps as soon as we can.

22    I'm not here next week, so it may not be next week but

23    certainly soon after.

24         Thank you, everyone.  Have a good evening and rest

25    of your day.  Thank you.

239

1          Please don't wait for me, everyone.

2          COURTROOM DEPUTY:  And this Court stands in

3    recess.

4          (Proceedings concluded at 4:30 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__April 13, 2023_____      

William P. Zaremba, RMR, CRR

**COURTROOM
DEPUTY: [9]** 3/2 3/6
45/12 45/15 119/13
119/17 157/19 157/22
239/2
**MR. CAVANAUGH: [1]**
231/4
**MR. DINTZER: [124]**
46/11 46/13 46/25
50/11 51/15 51/24
53/13 54/21 54/25 56/5
57/6 57/25 58/23 59/2
59/15 59/23 60/7 61/2
61/7 62/10 62/19 63/10
64/7 64/22 65/1 65/3
65/6 65/9 65/15 66/17
67/11 68/14 69/7 69/17
69/21 69/24 70/6 71/6
71/10 71/18 71/23
72/22 72/24 73/7 73/10
73/14 73/18 74/20
74/23 75/1 75/6 75/16
75/19 76/2 76/19 77/19
77/23 78/8 78/12 79/12
79/14 79/21 79/24 80/7
80/16 81/5 81/14 81/18
81/21 82/13 85/14
85/16 86/7 86/10 86/15
88/5 88/8 90/22 92/12
92/18 93/24 94/8 94/13
94/16 95/3 96/18 97/23
98/16 98/18 99/22
116/25 117/20 118/10
118/16 119/6 169/9
218/6 219/1 219/15
219/18 219/24 220/5
220/17 220/19 220/25
221/2 221/4 221/12
221/20 222/22 226/7
226/20 227/12 227/17
228/2 228/22 234/3
234/15 235/3 235/10
238/5
**MR. SALLET: [122]**
45/20 45/24 158/2
161/18 162/3 163/10
163/16 163/18 164/2
166/6 166/9 166/12
166/14 166/17 166/20
166/23 167/4 168/9
168/12 168/14 168/17
168/21 169/12 170/7
170/14 170/20 171/3
171/7 171/16 171/19
171/21 173/22 174/13
174/17 174/19 174/21
175/23 177/12 177/17
177/19 177/21 178/9
178/25 179/5 179/8
179/11 180/2 180/12
181/3 183/7 183/15
183/20 183/22 184/1
184/4 184/10 184/13
184/21 185/2 185/5
186/13 186/15 186/24
187/8 187/11 188/18

190/7 190/12 192/13
192/16 192/19 193/2
193/7 193/11 193/13
193/25 194/13 194/15
194/18 194/20 195/4
195/24 196/10 196/12
197/3 197/9 197/11
197/17 197/25 198/2
198/10 199/19 200/1
200/10 200/13 200/16
200/19 200/21 200/25
201/24 202/3 202/6
202/12 202/14 202/18
203/1 203/10 204/18
205/4 205/6 205/10
205/16 205/24 206/7
206/12 206/16 206/17
212/7 235/12
**MR. SCHMIDTLEIN:
[179]** 4/6 5/6 5/10 5/20
8/17 8/21 8/25 9/13
10/11 10/17 11/2 11/11
12/16 13/3 13/6 13/14
14/7 14/15 14/18 16/24
17/14 18/10 18/13
18/19 19/2 20/3 20/6
20/9 20/14 21/24 23/12
24/18 25/19 26/16
26/20 26/25 27/2 27/4
27/7 28/9 29/9 29/15
29/17 29/22 31/7 31/9
32/3 32/6 32/10 32/15
32/19 33/18 33/22
34/20 34/25 36/12
36/17 39/1 39/11 39/15
39/17 39/20 39/24
40/13 40/21 41/1 41/3
41/24 42/3 43/17 101/4
102/5 103/5 103/9
103/15 103/24 105/2
105/18 107/9 107/15
111/10 111/14 112/8
112/14 114/9 114/11
115/4 115/8 119/24
120/10 120/18 124/23
125/25 126/2 127/1
127/4 127/19 127/22
128/3 128/6 128/19
128/23 129/10 130/14
131/6 131/20 131/25
133/22 135/19 136/4
136/16 136/21 137/1
137/6 137/10 137/13
137/16 138/5 138/7
138/17 138/24 139/2
139/16 139/20 140/5
140/24 141/4 141/23
142/1 142/11 142/20
143/5 143/10 143/14
143/18 144/1 144/9
144/25 146/1 146/9
146/13 146/20 147/3
148/20 149/14 149/23
150/8 150/11 150/18
151/24 152/8 153/9
153/20 154/12 154/18
154/21 155/7 155/15

210/24 211/16 211/19
211/21 212/5 212/8
212/21 212/23 212/25
217/23 218/7 218/24
232/2 236/15 237/2
237/11 237/14 237/23
**MR. SUNSHINE: [3]**
192/8 197/13 199/3
**THE COURT: [430]**

,

**'04 [1]** 102/3
**'05 [1]** 102/2
**'20 [2]** 160/14 181/8
**'90s [1]** 18/16
**'This [1]** 109/21

**0**

**0340 [1]** 1/15

**1**

**1 percent [1]** 93/10
**1,209 [1]** 137/20
**1.0 [1]** 108/20
**10 [4]** 24/3 54/5 89/2
189/11
**100 [3]** 24/25 78/6
155/22
**104 [3]** 174/6 174/16
174/18
**105 [2]** 174/22 175/1
**106 [3]** 175/2 208/9
210/10
**107 [1]** 210/10
**10:30 [2]** 41/21 45/8
**10:33 a.m [1]** 45/14
**10:40 [1]** 45/10
**10:44 a.m [1]** 45/14
**10X [2]** 24/8 24/9
**11 [3]** 37/15 38/6 189/3
**11 percent [1]** 97/13
**1100 [1]** 1/14
**12 [24]** 47/13 48/10
63/15 63/18 64/15
68/15 68/20 70/14
78/13 78/25 79/15 80/7
86/23 89/2 89/4 89/16
95/3 95/7 96/4 99/15
112/21 112/22 112/22
113/3
**12 years [2]** 86/20
113/1
**12:25 [1]** 119/16
**12th [1]** 2/3
**13 [4]** 1/5 37/15 38/6
240/7
**1300 [1]** 1/20
**14 [5]** 16/11 77/2
106/17 176/14 176/17
**147 [1]** 207/17
**15 [5]** 16/11 84/3 174/7
176/14 176/23
**16 [2]** 176/15 181/8
**166 [3]** 184/6 185/9
188/23
**173,000 [1]** 238/10
**18 [3]** 89/22 89/24 97/9

**183 [4]** 199/10 200/8
202/7 203/6
**184 [4]** 200/8 203/6
203/6 203/8
**185 [2]** 203/7 203/10
**189 [1]** 195/9
**18th [2]** 218/6 218/7
**191 [1]** 191/17
**1989 [1]** 101/12
**1990s [1]** 216/15
**1998 [1]** 112/15
**1:30 [2]** 119/9 119/16

**2**

**20-3010 [2]** 1/4 3/7
**200 [1]** 112/15
**200 meters [1]** 111/9
**200-meter [2]** 111/15
112/5
**20001 [1]** 2/8
**20005 [1]** 2/3
**2000s [1]** 113/7
**2002 [1]** 105/7
**2003 [4]** 71/2 71/15
74/15 102/1
**2004 [5]** 70/22 70/24
71/2 71/16 74/15
**2008 [1]** 112/16
**2010 [3]** 72/10 74/5
74/7
**2016 [1]** 148/23
**2019 [10]** 148/25
160/13 175/7 176/17
176/20 177/23 180/21
180/21 181/5 207/14
**202 [3]** 1/15 2/4 2/9
**2020 [4]** 177/3 177/6
177/10 178/15
**2023 [2]** 1/5 240/7
**25 [1]** 91/8
**26 [1]** 92/22
**27 [5]** 96/24 176/24
181/6 181/25 204/16
**29 [1]** 95/12
**2:25 [1]** 157/17
**2:28 p.m [1]** 157/21
**2:35 [1]** 157/18
**2:39 [1]** 157/21

**3**

**30 [7]** 27/1 45/22
101/12 221/23 223/21
224/10 230/6
**30 percent [1]** 174/8
**3010 [2]** 1/4 3/7
**307-0340 [1]** 1/15
**31 [2]** 93/13 100/2
**32 [2]** 100/13 238/10
**3249 [1]** 2/9
**33 [1]** 182/22
**333 [1]** 2/8
**35 [1]** 36/11
**35 percent [1]** 36/10
**350 [1]** 112/18
**350 meters [1]** 112/15
**354-3249 [1]** 2/9
**36 [1]** 93/3

**38 jurisdictions [1]**
158/9

**4**

**40 [2]** 37/20 91/12
**400 [1]** 111/13
**400-meter [3]** 111/7
112/6 112/18
**41 [1]** 167/11
**42 [1]** 167/12
**434-5000 [1]** 2/4
**45 [4]** 34/16 93/2 96/19
189/12
**46 [1]** 189/13
**47 [6]** 197/7 197/16
197/18 198/11 207/17
221/9
**475 [1]** 221/10
**48 [2]** 35/2 221/9
**4:30 p.m [1]** 239/4

**5**

**50 [4]** 37/20 91/12
96/19 149/24
**50 percent [1]** 93/2
**500 [1]** 149/23
**5000 [1]** 2/4
**508-6000 [1]** 1/22
**58 [1]** 6/25
**59 [1]** 6/25

**6**

**6000 [1]** 1/22

**7**

**720 [1]** 1/22
**725 [1]** 2/3
**74 percent [1]** 48/7
**7th [1]** 1/21

**8**

**80 [1]** 74/21
**80203 [1]** 1/21
**89 percent [1]** 48/7

**9**

**90 [1]** 48/8
**95 [1]** 118/13
**982 [1]** 55/1
**9:32 [1]** 1/16

**A**

**a.m [3]** 1/6 45/14 45/14
**ability [16]** 23/5 43/6
64/4 64/16 65/4 74/3
78/19 78/23 80/23
82/22 95/14 98/11
160/3 189/25 200/6
203/18
**ablation [1]** 185/24
**able [27]** 11/19 17/5
17/6 18/12 25/25 30/1
30/17 37/16 42/6 44/9
80/20 109/12 110/23
121/19 121/20 124/7
133/4 134/17 155/10
155/20 156/13 160/5
193/15 194/6 196/14

**able... [2]** 205/22 223/12
**about [231]** 5/1 6/11 6/21 6/23 7/1 11/12 13/15 13/16 15/5 15/7 15/15 15/17 15/19 16/2 21/11 22/13 22/21 24/24 25/12 28/14 29/13 31/5 31/11 32/6 32/16 35/4 37/20 38/21 40/18 42/8 42/9 42/25 44/3 44/3 45/9 46/21 47/4 47/6 47/23 48/13 48/24 48/25 49/1 49/10 49/11 50/16 52/3 52/4 52/7 52/8 56/17 59/5 61/24 62/3 71/24 76/13 81/3 81/4 81/14 83/1 83/6 83/6 83/12 83/21 85/10 87/10 88/10 88/11 88/15 88/23 88/25 90/23 91/23 91/23 91/24 92/11 93/20 93/23 95/5 98/8 99/6 99/25 101/7 101/10 103/22 104/4 104/8 104/9 104/13 104/14 104/15 104/18 105/24 106/12 106/18 106/22 107/17 108/18 109/13 109/16 109/18 110/10 113/10 113/16 115/12 116/19 116/21 118/22 118/23 120/4 120/16 121/9 121/13 121/14 121/15 121/25 122/4 122/10 122/14 122/16 123/19 123/25 126/7 126/14 127/14 127/25 128/20 129/5 132/23 133/7 133/9 134/13 134/21 135/8 136/12 140/3 140/5 140/9 140/11 140/18 141/18 142/18 143/23 144/11 146/24 147/4 147/14 148/14 154/22 155/2 157/15 157/17 162/14 163/1 164/6 164/15 164/16 165/16 166/2 170/3 170/16 171/7 171/12 171/22 172/10 177/8 179/19 181/22 182/10 182/12 188/9 189/2 189/5 190/8 191/20 192/3 192/7 192/23 192/24 196/17 203/8 203/24 204/1 204/1 205/3 206/14 207/2 207/19 208/10 208/14 208/18 208/20 209/1 209/25 210/3 210/8 211/7 211/24 212/15 213/6 214/18 215/2 215/18 216/2 216/3 217/10 219/20 220/3 220/3

225/13 225/14 225/17 225/18 226/11 226/13 227/19 228/9 228/11 228/15 231/6 231/13 232/8 232/13 233/13 236/8 236/17 237/8 238/21
**above [10]** 138/18 138/20 138/21 138/23 139/15 182/25 184/19 187/5 212/20 240/4
**above-titled [1]** 240/4
**absence [9]** 85/13 85/17 186/6 231/13 231/15 234/20 234/22 235/5 236/6
**absent [2]** 17/2 95/15
**absolute [1]** 214/16
**absolutely [39]** 5/11 10/11 28/9 29/23 30/2 30/21 30/22 31/9 65/1 67/21 68/14 70/6 77/14 105/23 108/2 111/10 111/10 118/10 125/1 125/8 128/11 130/15 132/2 133/22 133/24 134/14 146/20 153/16 155/7 155/7 155/8 160/12 165/25 178/17 192/16 204/24 212/25 212/25 215/3
**access [12]** 10/15 10/20 10/24 18/25 32/10 36/3 44/1 71/19 96/6 165/22 166/11 180/8
**accident [1]** 214/9
**accorded [1]** 182/6
**according [3]** 92/8 98/10 123/9
**account [1]** 54/4
**accrued [1]** 181/16
**accuracy [1]** 55/24
**accurate [1]** 23/5
**acknowledge [3]** 37/1 37/12 126/24
**acknowledged [3]** 37/6 110/6 225/17
**acquire [2]** 21/17 196/14
**acquired [1]** 113/10
**acquiring [1]** 190/6
**acquisition [6]** 112/24 131/12 172/14 190/10 196/18 209/3
**across [3]** 115/11 121/7 149/12
**Act [3]** 21/23 74/16 186/22
**acted [1]** 58/15
**acting [1]** 69/6
**action [5]** 3/7 95/18 163/22 181/21 189/6
**actions [3]** 87/13 158/20 182/17
**active [2]** 227/7 227/9
**activities [1]** 190/17

**actor [1]** 57/20
**actor's [1]** 57/20
**actual [11]** 37/14 38/8 125/24 130/8 130/16 132/9 133/5 139/9 146/5 152/7 152/17
**actually [50]** 7/17 9/9 10/19 11/16 12/2 12/11 13/4 14/24 17/3 28/17 28/18 35/11 35/21 37/13 38/11 41/16 42/4 46/17 48/19 57/12 72/7 76/25 96/18 96/19 106/2 114/19 117/21 123/23 127/4 127/5 138/7 139/4 140/22 147/17 160/25 167/1 170/3 170/10 171/9 171/23 176/7 182/7 207/18 211/3 214/13 216/10 218/16 218/19 221/5 233/4
**ad [32]** 80/14 81/3 81/16 81/20 85/17 98/15 141/22 143/10 143/11 143/13 143/14 144/14 145/22 145/22 145/23 145/24 149/4 149/12 149/15 149/18 151/19 151/20 151/22 172/22 173/17 174/8 181/1 185/11 206/14 206/15 208/12 226/5
**ad spend [1]** 149/15
**add [2]** 153/19 153/20
**added [4]** 9/14 102/10 109/24 229/15
**adding [1]** 210/18
**addition [2]** 160/16 199/8
**additional [6]** 160/6 185/12 204/8 204/12 204/12 224/24
**address [3]** 80/17 116/18 161/20
**adhere [1]** 211/3
**adjourn [1]** 116/15
**adjudicate [1]** 237/24
**Adley [1]** 149/20
**Adley Rutschman's [1]** 149/20
**admissible [1]** 147/18
**admit [1]** 188/3
**admitted [1]** 206/9
**adopted [3]** 121/9 125/6 150/18
**ads [68]** 24/22 80/21 82/23 93/3 93/3 121/7 121/10 131/2 131/14 135/4 135/7 136/14 136/16 136/19 137/2 137/3 137/18 137/22 138/1 139/5 139/21 140/2 143/7 144/16 144/20 147/9 148/6 148/19 148/23 149/3 149/5 149/6 149/7 150/5 150/5 150/7

159/17 173/4 174/25 175/4 179/17 181/22 182/20 184/2 184/5 184/15 184/19 185/6 185/13 188/25 199/9 204/23 205/13 205/16 206/21 206/21 206/23 206/25 207/4 207/6 207/12 208/13 211/13 211/14 212/12
**advancing [1]** 128/8
**advantage [14]** 21/15 21/16 22/17 22/19 23/2 29/23 29/24 30/21 30/22 63/20 85/2 111/16 183/23 203/25
**advantages [3]** 29/3 29/5 83/12
**adversary [1]** 131/15
**adverse [5]** 222/14 223/7 223/8 224/7 234/8
**adversely [2]** 165/8 209/12
**advertise [11]** 135/13 135/14 145/15 153/25 154/11 157/2 157/5 157/5 184/12 187/5 212/19
**advertiser [8]** 145/13 145/14 151/1 151/7 173/15 177/9 215/5 216/6
**advertisers [31]** 47/12 81/11 121/7 136/15 143/15 149/3 150/2 150/6 151/1 151/2 160/2 160/7 160/8 160/9 160/15 160/16 172/16 173/9 174/24 175/12 175/16 177/7 177/16 177/25 178/15 179/16 183/19 188/13 208/9 215/9 215/18
**advertising [25]** 47/12 121/8 137/14 138/19 138/20 138/22 138/23 139/13 139/15 141/20 143/24 144/19 147/7 147/16 154/16 155/6 157/3 159/24 173/2 183/24 191/11 208/7 208/10 211/17 211/21
**affect [2]** 198/18 236/2
**affected [1]** 131/15
**affecting [2]** 99/11 209/13
**affects [2]** 133/15 199/6
**affidavit [1]** 225/24
**affirming [1]** 129/22
**afield [1]** 202/1
**afoul [1]** 190/25
**after [23]** 21/14 21/15 23/4 23/4 45/8 45/10 55/12 55/20 64/3 64/3 68/15 72/2 79/15 86/19

242

109/17 112/16 147/16 157/18 225/22 230/17 238/3 238/23
**afternoon [5]** 46/5 120/12 121/14 122/4 122/16
**afternoon's [1]** 120/1
**again [42]** 3/18 7/8 7/12 14/8 15/20 21/24 26/9 27/20 28/12 31/10 33/25 35/17 45/16 63/23 66/6 74/14 94/21 110/2 115/9 116/3 119/18 131/8 132/1 132/22 132/24 140/1 142/4 142/4 146/3 150/20 152/9 152/16 154/21 157/23 166/18 168/23 175/19 188/8 189/10 196/20 197/23 215/17
**against [12]** 24/12 24/13 25/8 25/9 33/2 84/23 135/1 135/11 165/9 178/20 234/19 235/4
**aggregate [4]** 41/6 41/7 41/17 115/11
**aggregated [1]** 115/14
**aggregating [3]** 40/12 52/19 52/19
**ago [11]** 30/19 70/14 78/25 79/12 80/7 113/1 113/3 165/10 204/20 220/3 221/6
**agree [8]** 4/16 8/17 11/20 16/5 17/16 18/1 22/12 24/16 29/1 31/16 32/2 32/19 40/21 41/5 50/9 52/14 53/1 53/12 54/24 56/4 56/5 56/7 69/13 70/6 73/5 78/4 78/5 90/17 91/8 94/4 94/5 133/22 133/24 149/10 168/25 173/19 203/13 222/19 225/17 226/9 232/14 237/14
**agreed [3]** 19/16 77/6 205/8
**agreeing [1]** 206/19
**agreement [42]** 16/7 16/11 24/7 24/11 35/7 39/10 40/23 46/21 48/23 48/25 49/1 53/2 53/7 61/25 62/6 62/9 62/11 62/18 68/5 76/8 78/14 79/8 79/18 79/19 89/21 89/25 110/17 110/18 120/25 122/19 168/20 172/10 189/24 190/8 190/16 190/19 190/21 192/6 201/23 201/25 204/22 214/21
**agreements [72]** 10/15 13/17 13/17 13/18 13/23 14/2 14/10 15/8 15/10 15/12 16/9 16/14 17/8 18/2 20/12 20/15

**agreements... [56]**
20/16 20/24 21/14
21/22 23/9 26/21 28/18
31/3 32/22 34/8 34/21
35/20 36/3 37/8 40/7
40/19 40/22 40/23 42/8
43/16 52/4 52/5 67/17
75/10 75/12 79/15 82/7
85/25 95/1 98/11 100/5
105/6 155/12 155/13
159/11 160/2 160/10
160/15 161/3 166/3
167/15 169/5 175/21
195/19 195/20 195/23
199/1 204/5 204/10
204/11 204/14 206/14
209/16 214/19 215/16
236/21
**agrees [5]** 40/14 42/11
183/18 185/7 188/24
**ahead [10]** 12/16 46/23
46/24 111/8 113/6
113/6 113/7 127/6
129/12 131/8
**AI [1]** 88/3
**aided [1]** 2/10
**airlines [1]** 135/12
**al [2]** 1/3 3/8
**all [179]** 3/2 3/16 3/18
3/19 3/21 5/11 5/13
6/25 11/4 12/17 14/1
14/18 17/17 19/13 20/8
20/18 22/4 23/22 28/12
29/10 30/13 32/3 32/18
43/5 45/2 45/4 45/12
45/15 46/1 46/9 47/11
50/11 53/16 54/1 55/20
55/21 56/15 56/21
57/11 60/9 60/9 60/15
60/24 61/21 62/3 62/22
65/20 66/12 66/13 67/2
67/7 67/7 70/12 71/14
71/17 72/22 74/9 74/9
74/10 76/5 77/8 79/5
81/8 81/9 86/24 87/20
88/21 88/22 90/6 91/23
93/3 96/5 99/16 100/6
100/21 101/4 101/13
102/17 105/7 105/8
106/4 108/3 110/16
110/22 114/21 114/25
116/3 116/9 118/4
119/5 119/7 119/10
119/17 121/20 122/15
126/17 128/6 128/15
130/1 130/21 134/2
139/6 140/9 140/13
141/8 141/15 142/17
143/1 143/2 143/21
146/14 147/9 148/2
148/2 152/14 153/17
156/18 157/7 157/15
157/18 157/19 157/22
158/1 158/18 163/20
167/2 168/23 169/10
169/12 169/13 172/3

182/3 182/8 185/4
187/2 187/19 190/20
198/1 199/4 202/10
209/11 209/25 210/18
210/23 210/24 211/23
211/25 214/17 215/21
215/23 215/24 216/13
216/24 217/5 217/7
217/7 217/19 218/18
219/10 220/14 224/13
224/23 229/3 229/19
230/15 231/1 232/23
237/4 238/2 238/4
238/14 238/20
**all right [5]** 12/17 20/8
153/17 163/20 210/24
**allegation [3]** 61/9
172/18 186/8
**allegations [6]** 56/19
57/4 120/24 121/8
171/25 172/3
**allege [3]** 166/3 171/8
171/9
**alleged [10]** 8/9 10/4
32/22 49/9 55/5 55/11
55/12 56/18 81/8
131/19
**allegedly [2]** 55/2
55/25
**alleging [3]** 56/19
158/16 172/5
**Allied [7]** 125/7 126/23
128/14 128/14 128/14
128/14 128/16 213/20
**Allied Orthopedics [1]**
126/23
**allow [12]** 99/4 138/20
154/4 154/5 155/13
162/13 164/7 190/9
204/22 221/25 222/1
222/1
**allowed [10]** 26/12
34/7 90/1 108/6 108/15
118/17 119/4 130/19
166/19 207/6
**allowing [1]** 145/15
**allows [2]** 21/9 145/21
**alluded [2]** 14/19 194/8
**almost [9]** 7/12 11/4
36/24 41/20 42/13
102/2 113/8 229/12
229/14
**alone [5]** 100/22 123/9
170/9 175/19 175/21
**along [9]** 4/19 30/4
71/13 71/14 96/22
159/5 160/13 182/8
192/5
**alongside [1]** 151/14
**already [8]** 20/21 47/23
113/6 113/6 176/25
180/25 204/4 223/24
**also [31]** 4/9 5/17 7/1
7/4 12/17 27/8 41/8
46/14 84/15 85/16
96/23 103/2 121/12
122/9 131/4 137/7

161/20 162/1 163/21
180/22 187/21 196/19
199/10 210/5 214/4
214/7 214/7 221/25
**also-ran [1]** 27/8
**altered [1]** 182/23
**altering [2]** 66/23
66/24
**alternative [5]** 96/13
100/11 141/13 160/4
172/17
**alternatives [2]** 28/10
215/6
**although [2]** 18/3
219/16
**altogether [1]** 183/6
**always [18]** 23/14
23/15 23/16 24/11
24/17 30/6 50/22 58/24
108/19 108/21 109/5
109/19 113/9 139/12
168/6 199/21 229/8
233/6
**am [11]** 63/22 135/6
136/13 141/7 152/24
167/23 171/10 193/14
208/1 210/25 211/3
**amazing [1]** 101/20
**Amazon [1]** 142/18
**ambiguity [1]** 69/2
**ambivalent [3]** 44/18
104/5 105/12
**AMERICA [1]** 1/3 3/7
**amicus [1]** 57/11
**AMIT [2]** 1/10 3/3
**Amit P. Mehta [1]** 3/3
**among [3]** 160/8 162/7
183/18
**amongst [2]** 147/21
227/2
**amount [4]** 116/24
155/25 220/6 220/7
**amplified [1]** 161/11
**analogy [1]** 112/3
**analyses [2]** 39/22
147/13
**analysis [33]** 14/9
15/20 31/24 34/19 37/3
39/10 41/11 50/18
53/14 53/15 53/25 56/7
61/20 65/6 65/11 66/1
66/3 66/16 66/20 67/14
67/19 67/21 84/1 84/10
84/14 92/7 92/11 92/15
93/14 93/15 94/18
147/15 161/20
**analytical [2]** 50/2
55/24
**analytically [1]** 127/2
**analytics [2]** 98/12
98/13
**analyzed [2]** 122/6
125/9
**analyzing [2]** 6/10 35/6
**Android [35]** 13/17
13/23 14/2 15/9 15/11
19/20 19/23 19/25

32/12 32/16 34/21 37/7
37/8 37/10 39/3 39/16
40/16 41/6 41/13 41/16
41/17 42/8 56/8 60/12
67/3 69/2 90/13 92/5
103/7 116/11 237/3
**announced [2]** 88/13
88/13
**annual [1]** 103/1
**another [11]** 11/13
18/4 76/4 110/14
116/17 125/12 130/3
132/13 151/22 160/17
160/24 175/6 176/10
179/21 180/12 214/24
225/11
**answer [31]** 8/2 40/4
40/6 47/3 47/5 56/6
56/11 62/5 76/6 84/9
89/12 102/22 104/23
105/2 105/10 112/8
112/9 112/14 115/13
120/18 130/15 131/17
131/25 134/2 134/14
141/10 141/15 190/12
198/14 221/5 235/11
**answering [1]** 104/24
**answers [1]** 92/24
**anti [133]** 7/12 7/15
7/17 7/20 8/3 8/5 8/10
8/11 8/12 8/14 9/6 10/5
10/5 10/8 10/9 12/13
14/25 15/22 21/4 21/16
21/22 24/17 35/5 35/10
35/17 35/18 42/10
48/20 48/21 49/4 50/8
50/17 50/19 50/21 51/1
52/17 52/24 52/25 53/2
53/3 53/6 54/1 54/16
54/17 56/12 56/23
58/14 58/15 61/5 65/21
66/14 67/9 67/15 67/17
67/24 78/13 83/17 84/6
84/14 86/25 87/5 87/6
87/18 90/1 95/16 95/17
110/5 112/22 113/21
114/4 115/19 116/1
122/1 122/13 125/20
127/14 128/21 129/17
130/1 130/7 130/11
131/19 132/8 144/5
144/8 144/22 152/12
153/6 158/17 158/24
160/21 160/23 160/24
161/8 161/10 161/13
161/14 161/25 162/1
162/2 162/18 162/19
163/2 163/3 163/5
163/13 163/15 163/21
164/9 164/13 164/19
164/22 165/4 165/14
167/1 167/2 167/10
167/18 167/22 167/25
168/5 169/1 170/1
170/9 175/21 176/2
178/11 178/20 181/13
192/25 195/8
**anti-competitive [1]**
58/15
**anti-trust [1]** 156/5
**anticipate [2]** 121/16
151/11
**anticipated [1]** 159/23
**anticompetitive [16]**
13/20 13/25 22/20 40/7
43/1 54/13 54/19 56/20
59/1 60/22 62/13 62/18
63/8 78/7 154/22 171/2
**antitrust [10]** 1/19 7/7
25/21 59/9 113/18
124/20 125/3 134/11
164/12 227/16
**any [74]** 13/21 15/16
18/16 18/19 19/25
19/25 21/11 23/10 28/6
33/5 41/13 43/25 46/7
47/6 50/15 56/2 56/2
56/18 62/23 65/13 67/9
67/25 73/15 77/16
100/24 106/14 106/14
110/18 113/11 116/1
116/4 116/8 121/18
121/20 123/4 127/9
127/9 127/14 128/10
137/14 144/7 145/19

**anti-competitive [130]**
7/12 7/15 7/17 7/20 8/3
8/5 8/10 8/11 8/12 8/14
9/6 10/5 10/5 10/8 10/9
12/13 14/25 15/22 21/4
21/16 21/22 24/17 35/5
35/10 35/17 35/18
42/10 48/20 48/21 49/4
50/8 50/17 50/19 50/21
51/1 52/17 52/24 52/25
53/2 53/3 53/6 54/1
54/16 54/17 56/12
56/23 58/14 61/5 65/21
66/14 67/9 67/15 67/17
67/24 78/13 83/17 84/6
84/14 86/25 87/5 87/6
87/18 90/1 95/16 95/17
110/5 112/22 113/21
114/4 115/19 116/1
122/1 122/13 125/20
127/14 128/21 129/17
130/1 130/7 130/11
131/19 132/8 144/5
144/8 144/22 152/12
153/6 158/17 158/24
160/21 160/23 160/24
161/8 161/10 161/13
161/14 161/25 162/1
162/2 162/18 162/19
163/2 163/3 163/5
163/13 163/15 163/21
164/9 164/13 164/19
164/22 165/4 165/14
167/1 167/2 167/10
167/18 167/22 167/25
168/5 169/1 170/1
170/9 175/21 176/2
178/11 178/20 181/13
192/25 195/8

**A**

**any... [32]** 145/20 146/4 147/13 151/7 151/7 155/1 156/5 156/19 158/23 164/9 164/13 166/2 176/2 176/7 176/8 182/14 193/20 193/23 197/20 197/24 198/9 202/9 204/6 204/20 204/24 216/6 219/3 227/8 230/19 232/17 233/21 234/1
**anybody [12]** 27/19 31/22 52/6 78/20 81/25 90/6 107/3 171/5 197/2 201/15 233/9 233/15
**anybody's [1]** 102/20
**anymore [1]** 26/19
**anyone [2]** 215/2 227/5
**anything [16]** 4/3 15/17 31/25 43/24 46/22 49/11 83/6 95/5 106/12 106/15 153/18 168/4 216/3 217/1 226/11 226/13
**anyway [2]** 157/13 184/9
**anywhere [1]** 61/8 102/21 160/21 213/12
**apologize [5]** 171/10 174/13 177/12 183/7 197/17
**app [2]** 32/14 33/3
**apparent [1]** 171/1
**apparently [3]** 103/16 110/8 140/18
**appeal [2]** 113/23 114/1
**appear [12]** 131/2 131/2 131/4 138/12 139/12 139/22 139/22 190/23 205/14 206/22 207/12 228/23
**APPEARANCES [2]** 1/12 1/24
**appearing [2]** 184/5 184/23
**appears [4]** 15/14 167/13 191/22 198/11
**Apple [132]** 16/7 16/16 17/9 19/13 19/14 19/15 20/25 21/5 23/25 24/1 24/7 24/12 24/24 24/25 25/8 25/9 25/13 25/14 26/17 26/21 27/19 27/24 28/2 28/6 28/14 28/22 29/8 29/10 29/13 29/25 32/7 32/11 32/20 33/2 33/4 33/13 36/10 39/10 40/16 40/22 41/5 41/12 41/12 41/13 42/16 44/21 46/18 46/19 46/21 53/2 53/7 56/9 60/11 61/25 62/3 62/6 63/1 67/3 68/5 68/9 68/12 68/25 69/11 70/3 70/4 70/8 70/9

70/21 70/24 70/24 72/25 73/9 73/11 73/16 73/16 75/21 75/23 76/4 76/6 76/10 77/11 77/13 77/16 77/18 77/19 77/21 78/1 78/9 78/17 78/21 79/3 79/7 79/8 80/2 80/11 80/18 80/20 80/21 80/24 84/15 84/16 84/16 84/25 89/21 89/25 90/2 92/15 97/9 100/14 100/18 101/9 101/12 102/6 102/20 104/6 104/11 104/12 104/14 106/2 106/7 108/6 110/7 110/14 110/16 111/20 111/24 116/8 116/8 116/11
**Apple's [5]** 84/17 89/22 102/16 105/22 221/7
**application [4]** 19/15 165/22 190/6 210/6
**application's [1]** 114/20
**applications [4]** 19/23 19/25 164/7 214/2
**applications' [1]** 124/8
**applied [1]** 67/20
**applies [3]** 13/3 120/8 202/9
**apply [6]** 9/2 57/23 65/18 67/6 67/14 180/5
**applying [2]** 55/8 55/13
**appreciate [9]** 42/4 99/22 100/25 101/2 116/14 210/22 214/15 217/7 228/2
**approach [3]** 56/4 148/14 236/14
**appropriate [2]** 233/22 234/10
**approvingly [1]** 169/22
**apps [2]** 189/20 190/22
**April [2]** 1/5 240/7
**are [267]**
**area [1]** 124/13
**Areeda [3]** 57/10 77/4 213/21
**aren't [4]** 206/3 206/4 206/23 219/2
**arena [1]** 216/20
**arguable [1]** 133/18
**arguably [3]** 129/5 217/17 225/5
**argue [3]** 21/25 46/5 178/16
**argued [2]** 45/25 229/20
**argues [2]** 55/16 209/23
**arguing [3]** 6/11 20/3 20/6
**argument [22]** 4/15 12/22 13/23 19/19 41/22 46/3 55/23 114/11 120/1 144/11

218/15 223/17 230/14 230/19 231/13 232/3 235/14 236/18 236/19
**arguments [4]** 14/4 144/3 231/8 231/12
**arise [1]** 82/1
**arises [1]** 43/16
**around [16]** 14/11 16/3 27/19 46/16 112/19 113/14 121/22 130/21 169/14 178/23 200/18 208/20 208/21 208/21 233/1 236/19
**arrangement [2]** 16/9 168/18
**arrangements [2]** 84/5 167/19
**array [8]** 152/10 171/11 171/19 171/20 172/3 172/5 176/11 203/23
**articulating [2]** 64/7 135/21
**articulation [1]** 195/13
**as [234]** 4/10 4/16 4/18 5/20 6/3 6/6 6/8 6/9 7/4 7/7 7/14 8/1 8/5 8/23 9/3 9/6 12/7 13/1 13/21 14/8 14/9 14/15 14/19 15/1 15/16 15/20 17/20 18/6 19/19 22/1 22/9 23/7 23/18 23/18 25/12 26/7 27/18 28/17 28/25 29/7 29/10 31/4 31/15 34/16 34/17 34/22 36/9 36/9 37/11 38/4 38/6 38/16 38/23 39/6 40/5 40/13 40/19 42/7 46/4 47/12 47/12 47/17 47/17 48/12 48/16 49/14 52/22 53/10 56/25 57/4 57/4 57/24 58/1 59/20 61/3 64/15 64/20 68/12 69/6 71/10 71/19 71/25 73/20 77/4 77/5 77/8 77/13 78/9 80/8 80/9 80/14 83/25 84/19 85/8 85/8 90/2 90/5 95/1 95/8 95/23 96/12 97/2 98/3 99/1 99/1 101/20 103/8 103/16 104/2 104/10 105/12 106/25 108/9 108/15 110/11 115/19 116/8 116/21 116/21 117/13 118/2 118/23 120/3 121/12 121/24 122/6 122/17 123/3 125/2 125/19 126/6 126/18 128/8 129/2 129/5 129/23 131/3 131/11 132/7 132/11 132/16 133/8 133/19 134/13 134/16 135/20 135/24 141/21 144/2 144/17 145/14 146/2 146/3 147/6 147/10 148/13 148/18 149/11

153/12 155/3 155/12 155/15 156/12 158/3 158/15 160/14 160/16 160/24 161/4 161/25 165/23 166/1 167/7 167/18 168/15 170/17 172/15 173/7 175/13 175/13 176/5 176/5 176/25 178/16 179/14 179/20 181/15 184/17 188/14 190/13 190/13 193/16 193/16 194/3 194/3 194/23 195/19 195/21 196/1 196/8 197/4 198/15 199/9 201/14 205/1 205/11 206/13 207/5 209/19 210/8 212/14 216/17 220/7 224/2 224/8 225/9 227/3 228/9 228/9 229/22 230/18 230/19 231/11 233/3 233/19 234/11 236/6 237/9 237/9 238/21 238/21
**as one [1]** 156/12
**ascribes [1]** 102/25
**aside [4]** 59/21 73/20 73/24 178/5
**ask [47]** 15/15 16/6 34/15 39/8 40/2 40/11 43/13 43/14 49/25 52/18 59/17 68/22 81/1 83/18 85/10 87/22 88/7 97/14 115/6 116/15 116/16 116/18 138/15 148/24 154/25 161/20 165/16 173/13 175/18 176/19 180/15 180/17 181/15 183/12 189/3 196/21 204/17 212/17 220/19 220/19 223/6 223/7 224/11 229/17 232/19 234/3 234/7
**asked [37]** 43/23 46/19 47/1 47/3 47/6 47/20 47/21 61/24 61/25 68/4 73/20 82/3 101/9 104/23 108/17 109/9 116/18 141/5 141/17 146/13 146/16 146/24 171/24 181/6 189/2 198/12 198/17 202/24 204/19 206/22 215/15 216/5 220/5 221/6 221/22 232/3 232/25
**asking [13]** 46/2 76/15 79/1 79/15 84/8 95/4 95/13 99/9 177/16 188/9 197/23 228/11 234/1
**asks [1]** 230/18
**aspect [1]** 35/8
**aspects [5]** 9/8 10/14 35/7 122/11 169/4
**Aspen [1]** 179/12
**asserting [1]** 65/25

**assertion [2]** 176/3 228/3
**assess [2]** 38/12 168/4
**assessed [1]** 180/9
**assessing [3]** 10/7 38/17 186/5
**asset [1]** 90/8
**Assistant [1]** 15/12
**associate [1]** 44/15
**associated [7]** 29/24 105/22 128/18 134/22 135/16 135/20 135/23
**assume [7]** 63/3 63/12 69/8 115/17 151/12 151/13 229/16
**assumes [3]** 117/18 117/21 117/22
**assumption [1]** 80/16
**assure [1]** 236/3
**atomizing [1]** 53/22
**attached [3]** 44/17 128/24 167/18
**attack [3]** 176/7 182/13 182/14
**attacking [1]** 183/1
**attention [5]** 11/14 35/1 100/25 149/1 214/16
**attracting [1]** 29/6
**attractive [11]** 11/3 80/19 82/19 123/13 156/7 156/24 173/3 193/9 195/12 198/5 198/7
**attractively [1]** 11/4
**auction [11]** 144/20 145/1 145/1 150/16 174/7 174/25 175/5 175/8 176/18 180/19 181/16
**auction-time [7]** 150/16 174/7 174/25 175/5 175/8 176/18 181/16
**auctioning [1]** 173/16
**August [1]** 181/20
**Austin [1]** 149/20
**Austin Hays' [1]** 149/20
**automatically [3]** 101/22 101/25 106/10
**availability [1]** 154/2
**available [11]** 41/19 49/18 57/2 71/19 105/5 105/19 106/6 190/1 199/7 214/23 219/12
**Avenue [1]** 2/8
**average [1]** 149/20
**avoid [6]** 69/6 72/20 75/4 208/7 233/11 233/16
**aware [2]** 147/11 233/12
**away [12]** 10/19 33/22 33/23 34/23 166/22 166/25 167/14 188/1 218/16 218/18 218/20 226/15

**A**

**Awesome [1]** 109/3

**B**

**back [52]** 16/3 18/16
19/9 20/10 26/4 26/6
27/14 30/25 33/25
42/16 45/9 47/15 65/15
71/6 74/15 75/7 89/17
93/24 96/4 101/16
105/6 110/20 113/7
115/21 119/21 124/14
126/2 128/15 128/16
129/19 138/24 139/3
140/21 141/17 144/12
144/13 152/15 152/24
158/12 190/24 191/7
196/6 203/2 204/9
212/4 212/12 213/8
213/24 214/17 216/15
220/24 235/13
**backboard [1]** 216/21
**backdrop [1]** 48/12
**background [1]** 237/12
**backwards [2]** 53/14
130/20
**backwards-looking [1]**
130/20
**bad [2]** 163/22 228/9
**badly [1]** 55/18
**balance [3]** 109/19
110/1 224/6
**balancing [8]** 9/23
13/11 13/12 14/15
124/22 125/24 127/15
128/10
**ball [3]** 56/12 65/23
66/13
**ballpark [1]** 38/7
**bank [10]** 90/25 114/13
114/15 123/21 123/25
124/1 130/24 189/21
189/22 216/14
**banker [1]** 238/10
**bar [5]** 47/4 109/3
110/14 110/15 110/16
**barely [1]** 18/22
**bargain [2]** 194/9
205/9
**bargaining [2]** 206/17
209/7
**barred [1]** 159/1
**Barrett [1]** 2/7
**barrier [2]** 114/20
124/8
**barriers [3]** 49/19
65/22 97/4
**based [7]** 39/21 96/11
107/16 145/4 146/16
211/22 231/12
**basic [1]** 71/22
**basically [8]** 86/11
137/21 146/10 149/4
203/18 214/20 214/21
215/8
**basis [7]** 100/22 103/1
158/22 158/25 159/20
176/9 193/17

**be [253]**
**bear [1]** 3/14
**bearing [1]** 228/23
**bears [1]** 227/25
**beauty [1]** 106/11
**became [5]** 72/3 72/4
72/13 112/25 132/7
**because [227]** 4/22 5/2
5/10 6/11 7/4 7/18 9/3
11/11 11/13 11/22
11/23 12/17 13/15
13/21 16/24 17/7 18/5
19/24 20/18 20/19 21/7
21/8 21/10 21/18 21/24
22/25 24/7 24/9 24/21
25/3 25/19 27/12 28/24
30/14 31/2 31/24 32/2
33/14 33/17 33/19
33/20 34/15 35/12
35/21 36/20 38/23
39/13 39/25 40/2 40/6
40/14 42/4 44/7 45/5
47/10 49/16 51/25
54/18 55/17 58/14
60/25 62/17 64/2 64/2
64/4 65/3 68/1 68/19
71/13 71/16 73/2 73/15
74/2 74/12 74/17 75/15
75/24 76/2 76/17 76/21
77/7 77/20 80/12 80/13
80/24 81/2 81/5 82/15
82/16 82/17 82/19
82/22 83/11 83/13
83/15 86/11 87/23
88/20 89/15 90/25
92/11 93/15 94/13 95/6
95/7 97/25 98/1 98/4
98/6 99/14 103/2
103/20 104/11 104/19
112/9 112/21 113/9
113/11 113/17 114/14
115/11 115/23 116/6
116/22 118/5 118/24
121/16 121/21 122/5
122/14 123/3 123/11
123/21 124/6 127/7
128/13 128/15 129/2
130/2 130/11 131/11
131/13 133/9 135/20
139/17 142/7 142/9
142/14 142/22 145/25
148/4 151/8 151/20
152/3 152/5 152/23
153/1 155/8 156/2
156/20 157/6 157/11
157/11 158/14 158/16
159/9 159/25 160/7
160/20 162/1 163/13
163/22 167/1 171/14
171/17 172/2 172/16
173/23 175/24 175/24
177/8 177/22 185/17
186/10 186/10 189/15
189/17 191/1 192/10
193/8 193/16 193/19
194/16 195/5 195/7
195/21 196/4 200/3

205/11 205/12 205/24
206/5 207/6 208/3
211/1 211/20 212/13
214/1 214/10 215/12
217/24 222/15 226/10
227/21 228/7 229/1
229/3 233/20 234/19
235/5 235/5 235/24
236/11 237/18
**become [8]** 16/17
21/13 22/24 71/19
72/25 114/18 114/19
236/10
**becomes [3]** 21/9
54/18 71/12
**beef [1]** 154/23
**been [83]** 3/16 3/22
15/19 27/25 30/14 31/3
35/19 35/21 37/16
38/19 39/9 42/1 42/6
45/6 46/15 47/10 47/13
47/23 48/9 54/17 57/4
64/3 66/18 71/13 71/24
75/18 76/9 78/22 79/7
79/10 80/1 80/15 84/1
85/23 85/24 86/2 86/20
86/22 86/23 87/25 88/6
89/2 89/3 89/4 89/15
89/16 89/18 105/15
108/19 108/21 109/5
113/17 120/23 126/7
126/14 126/15 130/21
131/11 133/19 141/16
141/21 144/15 144/23
146/4 146/5 160/2
162/10 169/1 180/21
184/15 193/8 196/25
197/3 198/6 199/21
217/8 220/13 223/25
226/14 226/24 229/6
229/15 231/21
**befall [1]** 108/14
**before [31]** 1/10 3/20
4/3 45/4 47/5 55/7
65/12 73/9 74/6 78/13
101/16 107/18 108/12
110/3 115/1 116/15
147/16 172/15 172/23
178/1 180/15 182/7
198/4 199/18 199/19
210/25 213/17 221/5
222/4 228/14 233/2
**begin [5]** 3/20 4/3 5/1
71/16 219/24
**beginning [6]** 31/1
70/21 101/16 112/5
116/25 178/15
**behalf [3]** 46/3 158/8
231/5
**behavior [4]** 36/2 59/9
112/17 114/2
**behind [7]** 106/9 112/7
112/15 112/16 112/18
153/4 223/11
**being [39]** 16/18 16/19
29/2 29/4 29/4 32/9
42/20 44/9 45/25 54/13

71/23 77/9 86/18 91/3
93/18 95/22 99/10
101/18 103/3 105/8
109/12 112/2 124/7
125/7 130/4 133/4
134/5 140/4 153/14
155/20 191/14 193/15
198/17 224/22 231/11
**belief [1]** 214/5
**believe [77]** 12/18 14/8
19/12 25/22 37/14 52/1
59/7 65/17 66/1 67/22
68/5 92/19 93/7 97/6
99/2 100/19 114/12
116/22 117/2 117/5
122/5 125/4 125/8
128/3 128/6 136/16
139/23 151/6 153/2
153/3 158/17 158/22
158/25 159/4 159/13
159/22 160/1 166/1
169/12 169/13 169/21
174/23 175/15 175/23
176/8 182/5 185/17
185/19 192/2 194/7
195/24 199/15 200/8
203/6 204/6 206/16
208/6 209/14 210/15
217/23 220/7 222/4
222/8 222/24 223/3
223/8 223/15 223/23
226/4 227/5 227/18
228/16 234/23 234/25
235/21 236/1 236/12
**believed [1]** 225/20
**believes [3]** 211/23
230/20 236/4
**below [7]** 23/16 137/6
137/24 139/25 182/21
212/16 213/5
**beneficial [3]** 97/21
191/24 212/14
**benefit [6]** 55/21 147/6
175/12 179/3 203/20
230/20
**benefited [4]** 147/2
147/3 147/5 148/18
**benefits [7]** 47/18
173/9 176/21
**Berry [1]** 42/17
**best [13]** 4/21 25/6
42/12 68/19 82/20
84/18 104/11 104/20
104/20 106/15 109/14
112/1 230/23
**better [40]** 11/22 20/19
21/8 21/12 22/22 22/24
22/25 23/6 24/21 24/22
24/22 33/14 44/7 53/25
60/2 60/21 64/5 68/9
89/18 98/12 98/12
98/13 98/13 98/14
98/24 112/12 123/15
124/6 132/20 134/18
141/14 154/4 154/5
163/14 188/12 210/4
213/15 215/7 215/10

71/23 77/9 86/18 91/3
93/18 95/22 99/10
101/18 103/3 105/8
109/12 112/2 124/7
125/7 130/4 133/4
134/5 140/4 153/14
155/20 191/14 193/15
198/17 224/22 231/11
**between [25]** 12/6
12/11 28/1 28/14 38/19
44/13 46/6 48/7 50/1
73/16 91/15 117/19
132/9 133/2 133/5
135/11 149/19 152/24
155/2 172/7 180/14
186/6 194/10 194/24
210/11
**beyond [2]** 77/1 223/6
**bid [6]** 9/25 31/22 82/4
83/10 145/12 213/1
**bidding [12]** 9/25 28/8
144/20 145/1 150/16
174/7 174/25 175/5
175/8 176/18 180/19
181/16
**bifurcation [1]** 50/9
**big [10]** 26/12 30/5
54/9 93/6 100/15
105/14 109/5 122/4
149/10 157/11
**bigger [2]** 22/5 158/16
**biggest [2]** 24/2 95/7
**Bill [1]** 231/4
**billion [1]** 148/5
**billion-dollar [1]** 148/5
**billions [3]** 77/22 78/2
82/14
**binder [3]** 4/17 35/2
106/17
**binders [1]** 4/8
**Bing [35]** 24/3 24/3
24/5 24/6 24/12 25/8
25/17 29/20 30/10
30/12 32/14 32/25 33/3
33/4 43/21 43/25 58/22
58/24 63/4 88/3 104/3
104/3 107/19 107/23
110/16 132/19 132/20
142/8 143/21 145/25
149/7 156/18 156/20
175/1 201/8
**Bing's [1]** 107/19
**bird [3]** 216/16 216/19
216/25
**bit [16]** 5/23 6/21 13/15
14/10 24/14 37/21
87/24 107/17 120/4
120/15 120/16 122/14
126/25 131/3 131/8
156/10
**bizarre [1]** 37/12
**blind [1]** 58/6
**block [3]** 44/8 163/2
198/11
**blocking [2]** 155/20
171/1
**blocks [1]** 130/3
**blog [1]** 187/25
**blow [1]** 137/17
**blow-up [1]** 137/17
**blue [6]** 116/9 134/8
182/20 182/25 184/7
184/24
**blur [1]** 113/17
**boils [1]** 212/11

Case 1:20-cv-08042-APM Document 232 Filed 04/14/23 Page 246 of 276

**B**

book [1] 138/9
booking.com [2] 121/3
139/5
bookmark [1] 219/19
bookmarks [1] 28/19
boom [1] 133/12
boost [1] 160/18
boot [1] 66/23
border [1] 140/16
born [1] 17/20
boss [1] 156/17
both [17] 13/4 28/21
52/14 63/4 76/20 82/5
92/6 92/24 117/25
152/10 174/5 179/21
185/11 194/9 194/11
209/6 209/13
bother [1] 88/16
bottom [8] 67/4 68/3
69/24 125/17 137/20
186/23 213/4 213/4
bounties [2] 10/19
31/12
bowed [1] 74/25
box [10] 79/10 106/14
109/3 110/13 135/6
135/13 135/15 136/20
139/11 139/13
boxes [1] 238/11
brand [1] 29/25
branded [1] 135/25
breadcrumbs [1]
227/21
breadth [3] 221/24
223/19 224/8
break [2] 45/5 83/18
brief [8] 12/21 41/8
57/11 197/8 197/10
204/16 211/1 221/9
briefing [1] 81/4
briefly [6] 42/16 48/22
89/20 217/10 232/2
236/15
briefs [3] 15/16 122/9
149/17
broad [1] 9/7
broader [2] 141/21
158/17
Broadway [1] 1/20
broken [2] 74/13
132/22
brought [3] 14/24
158/15 165/9
browse [1] 44/16
browser [49] 12/7
13/17 13/18 14/9 15/8
16/13 16/18 17/16
17/23 20/14 20/16
20/24 26/23 27/11
28/15 34/3 34/8 44/11
44/14 44/22 56/19
59/19 63/2 69/1 90/4
101/7 101/15 102/14
102/18 104/9 104/16
108/16 108/24 109/1
109/12 112/1 114/17
117/2 117/11 117/12
117/24 130/3 132/5
133/5 133/12 236/21
browsers [10] 76/5
92/5 104/7 104/18
104/19 110/3 111/18
116/20 133/4 165/21
browsers' [1] 87/12
Bruce [1] 1/17
bucket [6] 13/19 57/14
57/17 67/3 67/4 67/7
buckets [2] 43/19
137/22
build [5] 34/13 99/4
102/7 134/5 140/13
building [1] 9/20
built [3] 145/4 153/13
207/22
bullet [3] 15/11 92/25
126/5
bunch [2] 134/8 152/22
bundle [1] 10/20
bundling [2] 10/18
19/6
burden [10] 6/16 7/10
7/11 48/17 66/14 87/2
87/19 144/8 219/7
234/9
burdens [2] 223/13
224/8
buried [1] 80/16
business [16] 22/2
22/16 23/17 36/7 73/2
80/22 82/24 144/15
156/25 157/6 178/6
179/17 180/7 196/4
207/21 207/24
businesses [1] 22/4
Businesspeople [1]
207/20
buttons [1] 118/25
buy [14] 22/6 51/15
121/7 149/3 149/4
149/6 168/19 174/10
184/1 184/4 188/24
199/9 207/6 211/14
buying [1] 212/12
bypass [1] 133/13

**C**

cabins [1] 66/3
calculated [4] 92/17
92/20 96/1 96/18
calculates [1] 96/13
calculating [1] 93/21
calculation [1] 174/7
calculus [1] 61/6
calendar [1] 220/20
California [3] 96/14
96/16 128/4
call [15] 14/12 28/1
33/8 86/12 102/7 109/3
137/3 140/21 149/3
149/5 157/3 201/7
201/9 202/11 216/14
called [10] 10/21 66/2
145/22 169/17 170/4
185/24 191/12 206/21

came [8] 30/4 34/10
101/7 127/13 173/15
175/7 180/22 205/20
campaigns [1] 175/1
can [158] 4/19 4/24 5/2
8/12 9/11 10/12 12/15
13/1 16/5 18/22 20/15
21/17 21/25 22/16
23/16 24/12 27/19 32/1
33/3 33/4 34/6 34/15
34/17 34/17 37/21
37/22 37/23 39/8 41/8
43/13 50/21 50/22
51/19 54/4 56/1 56/7
56/8 57/16 59/13 62/6
64/21 67/6 67/21 69/21
70/4 70/10 70/10 73/2
73/5 73/22 73/22 75/9
76/17 77/13 78/9 81/1
82/9 82/24 83/13 85/10
87/22 89/12 90/10
92/21 94/25 103/10
103/15 108/24 111/17
111/17 113/9 115/10
115/21 115/21 115/22
116/17 117/18 121/7
121/16 124/10 126/10
134/8 135/6 135/7
135/17 137/23 137/24
138/15 139/24 140/20
141/17 146/16 149/1
149/3 149/4 150/2
154/25 157/10 159/20
160/23 161/11 161/25
162/10 163/1 163/2
163/5 165/13 166/2
164/4 166/21 168/5
170/12 175/18 175/19
175/21 177/5 183/12
186/25 187/1 190/9
190/13 193/2 193/16
194/2 198/15 199/16
202/2 204/17 205/19
207/18 210/7 212/17
213/17 215/21 216/3
216/9 216/10 218/25
220/18 222/8 223/6
223/7 223/21 227/18
228/9 229/16 229/23
229/24 230/7 230/7
231/16 232/15 232/17
232/23 233/6 236/3
236/3 238/21
can't [69] 7/19 13/20
20/2 24/17 25/18 25/19
26/18 33/8 37/23 41/7
41/17 52/6 53/5 53/8
53/8 57/18 58/5 58/9
59/4 59/24 62/16 68/17
68/17 70/2 70/8 70/8
73/11 75/21 77/8 77/9
77/10 79/3 82/11 86/16
87/3 87/4 89/11 89/23
90/3 94/6 95/19 97/8
104/12 104/13 116/10
117/22 121/22 132/10
147/25 149/16 150/23

188/4 188/7 201/17
202/14 202/19 202/20
206/9 207/7 211/14
213/22 215/19 218/11
229/22 229/22 229/23
candidly [3] 36/23
121/22 142/24
cannot [11] 7/7 10/7
24/6 82/25 84/6 115/14
116/6 125/2 135/4
167/9 175/23
capabilities [1] 102/7
capability [1] 102/10
capacious [1] 165/19
capacity [2] 21/13 88/4
97/18
care [11] 44/5 74/10
86/10 104/8 104/9
104/13 104/14 104/15
104/18 104/21 224/23
careful [3] 113/9 189/5
214/16
carefully [3] 110/21
115/10 152/15
Carr [1] 1/19
carried [1] 144/7
carries [1] 29/3
carry [5] 31/12 64/8
87/20 87/20 187/18
case [153] 6/5 12/3
12/14 12/24 12/25 13/7
14/21 16/10 16/22 17/3
18/6 21/3 22/9 24/24
24/25 30/11 31/21
33/10 34/1 35/24 36/14
37/1 37/16 38/1 38/5
38/15 38/15 39/5 42/14
42/17 43/4 43/18 43/23
50/4 50/10 50/23 51/24
52/7 56/3 57/8 57/9
58/1 62/17 62/22 63/25
64/12 64/21 69/23 74/5
74/22 81/14 83/17
85/22 86/3 89/1 90/24
91/5 91/6 93/18 96/12
96/14 96/15 96/22
96/24 97/16 97/21 98/7
99/1 99/2 103/22 108/1
112/3 112/13 112/23
112/24 113/23 114/15
120/21 120/24 121/18
121/21 122/11 122/16
122/18 123/20 123/21
124/16 125/7 126/22
126/23 128/3 128/14
128/14 129/24 129/25
130/16 139/21 140/1
146/4 150/6 151/2
151/2 153/17 155/18
159/6 159/7 160/19
162/5 162/19 165/5
165/7 165/9 167/11
168/3 169/3 169/16
169/17 169/19 169/20
170/12 171/8 171/12
176/5 179/7 179/15
182/8 188/3 197/14

208/6 209/14 209/25
210/10 210/17 212/11
213/12 213/21 223/7
225/3 225/12 225/18
225/25 230/4 230/10
233/5 233/8 233/9
233/16 236/3 237/10
237/21
cases [30] 15/6 33/6
36/5 36/14 36/23 36/24
38/14 38/18 42/18 43/6
83/8 91/19 91/19 93/10
93/12 96/10 110/21
110/22 110/25 122/6
125/10 128/1 128/7
128/11 128/13 128/16
135/25 179/11 179/21
233/11
categorical [1] 152/20
categorically [2] 232/6
232/11
categories [7] 9/22
15/6 31/16 31/17
115/14 120/21 122/15
categorization [1]
159/10
category [13] 8/18 9/1
9/3 9/16 9/18 12/13
31/21 51/16 116/4
121/5 159/22 167/19
214/22
Category V [1] 167/19
causal [1] 210/11
causation [8] 64/8
86/12 86/17 132/8
145/18 146/3 146/10
153/8
cause [3] 13/10 187/4
222/20
causes [3] 50/21
135/17 173/6
causing [1] 15/23
Cavanaugh [4] 231/4
231/25 232/15 235/12
center [3] 1/20 167/14
191/22
CEO [2] 108/17 235/17
certain [21] 9/16 9/17
9/21 9/22 33/14 50/12
66/9 72/3 74/1 91/10
122/23 138/20 159/16
187/18 190/17 199/9
220/5 220/6 229/12
229/14 236/19
certainly [25] 22/18
27/12 27/23 28/13
28/15 60/3 69/10
104/17 105/6 105/21
107/10 111/15 116/10
118/3 120/7 125/5
125/6 130/22 139/22
139/25 148/3 150/12
171/13 224/22 238/23
Certified [1] 2/6
certify [1] 240/2
CH [1] 2/7
challenge [5] 48/11

Case 1:20-cv-08012-AP Document 538-9 Filed 04/14/22 Page 247 of 276

**C**

challenge... [4] 113/25 122/20 159/25 229/21
challenged [9] 36/3 56/23 58/3 58/5 60/4 75/6 75/9 100/16 113/22
challenger [2] 191/19 192/3
challenging [1] 153/1
chance [3] 115/1 197/14 221/22
change [10] 30/13 33/17 80/3 128/24 131/11 131/13 198/4 198/12 234/9 236/23
changed [6] 71/17 71/19 71/25 199/24 199/25 220/15
changes [4] 106/14 126/8 126/16 129/6
changing [2] 117/6 126/19
channel [3] 54/9 92/8 115/16
channels [4] 58/16 92/3 92/5 161/12
characteristics [1] 55/4
characterization [1] 232/7
characterize [1] 198/15
charge [3] 58/4 166/15 186/25
charged [1] 34/6
charges [2] 81/11 81/17
chart [1] 117/2
charter [1] 94/17
chat [2] 226/3 236/22
ChatGPT [8] 88/2 88/11 88/25 89/6 89/8 chats [7] 224/17 227/2 227/4 229/13 233/3 233/4 236/9
check [1] 113/9
Chicago [1] 207/2
choice [19] 37/8 39/3 42/21 42/23 69/15 73/7 75/24 75/24 94/24 96/2 109/4 109/5 109/7 109/10 109/24 154/10 156/15 160/3 200/3
choices [1] 160/10
choose [3] 70/4 80/12 106/19
chooses [1] 137/25
choosing [1] 109/23
chose [2] 94/25 116/8
chosen [4] 25/4 117/16 117/17 137/21
Chrome [22] 41/9 41/10 41/12 56/17 56/18 56/20 56/20 57/24 58/9 58/20 60/6 60/9 60/12 94/7 94/8 94/10 97/6 112/16

118/6
Church [2] 38/15 96/12
circle [3] 152/3 204/10 220/23
Circuit [34] 6/15 8/19 9/4 9/7 9/16 9/23 10/24 12/10 34/5 35/6 35/9 35/13 37/20 47/25 55/23 66/9 91/8 96/14 122/10 125/9 126/13 126/23 128/15 129/5 129/18 147/24 152/14 152/15 167/16 170/3 170/11 213/21 213/25 237/16
Circuit's [4] 31/11 125/4 126/24 132/23
circuits [3] 31/15 83/25 122/8
circumstance [3] 179/20 191/18 236/9
circumstances [7] 9/22 51/21 77/17 91/10 153/16 161/9 165/24
citation [2] 193/23 207/9
citations [4] 100/9 100/16 129/24 221/7
cite [6] 84/2 91/21 96/12 110/18 113/13 208/8
cited [7] 8/22 38/14 42/18 57/10 57/10 126/22 167/12
cites [7] 91/18 93/10 93/12 94/18 96/10 127/25 169/22
citing [1] 191/1
Civil [1] 3/7
claim [11] 55/10 104/12 104/16 104/17 122/22 124/23 140/1 141/14 148/22 155/18 227/8
claimed [1] 215/5
claims [7] 15/16 121/5 126/7 126/14 148/21 228/8 235/22
clarity [2] 55/24 234/4
classic [4] 135/23 178/24 179/6 179/11
clause [1] 202/11
clear [22] 17/4 17/20 67/20 91/8 115/13 118/3 135/2 137/11 154/9 167/23 177/11 182/15 195/10 195/10 208/17 209/5 224/3 225/7 227/10 227/23 232/5 232/9
clearly [10] 10/24 51/12 89/17 102/25 103/18 161/1 186/18 209/13 210/1 234/20
clerk [1] 4/18
clever [1] 101/19
click [4] 137/19 137/19

clicked [1] 157/1
client [2] 22/15 22/15
clock [1] 213/8
close [2] 48/8 196/14
closely [1] 98/3
closer [2] 111/1 215/10
closest [1] 198/10
closing [1] 99/24
closure [1] 4/23
CO [1] 1/21
coag.gov [1] 1/22
coerce [1] 43/7
coerced [1] 34/2
coercion [2] 43/2 170/1
cognizant [1] 224/20
Colette [1] 5/14
Colette Connor [1] 5/14
colleague [1] 47/4 158/2
colleagues [5] 4/9 5/15 207/9 215/22 225/11
collections [1] 201/3
collectively [2] 114/10 152/11
collects [1] 156/2
collegial [1] 160/13
Colorado [6] 1/17 1/18 1/20 120/20 124/18 231/5
COLUMBIA [1] 1/1
combination [6] 153/13 170/8 176/7 182/17 195/6 203/17
combined [2] 8/15 203/14
Comcast [1] 179/12
come [34] 23/4 37/10 50/22 61/5 63/25 64/9 86/8 93/4 112/19 116/10 127/2 132/10 132/17 147/25 148/24 150/1 152/3 157/23 162/25 165/7 174/10 177/25 178/13 180/25 182/1 182/21 189/1 193/2 212/1 215/11 226/15 228/13 230/16 235/12
comes [27] 19/19 19/23 21/4 21/4 26/4 26/6 37/11 43/9 46/20 64/12 64/13 68/9 103/23 106/7 108/6 110/12 111/1 114/6 117/12 135/6 160/14 176/23 186/3 192/5 204/10 209/17 212/4
COMF [2] 100/16 221/9
comfortable [1] 152/12
coming [5] 42/16 58/25 101/17 214/20 229/7
commercial [4] 28/21 182/24 203/2 216/16
commission [1] 179/22

committee... [1] 236/7
commodity [2] 145/7 206/5
common [2] 55/5 55/12
communicate [2] 74/10 222/3
communicated [1] 217/19
communications [4] 8/23 28/14 179/22 225/2
companies [1] 121/3
company [12] 23/1 26/8 76/16 97/24 145/22 148/6 179/20 179/21 179/25 189/7 189/8 189/14
comparable [3] 24/5 97/16 98/7
compare [1] 147/14
compared [2] 118/19 195/2
compares [1] 107/20
comparison [2] 5/3 149/12
comparisons [1] 27/24
compartmentalizing [1] 55/21
Compatibility [1] 15/11
compatible [1] 214/8
compete [26] 17/22 20/2 22/16 22/16 23/10 24/12 25/8 25/13 25/18 25/19 25/23 26/9 33/16 33/17 44/9 49/20 60/5 78/5 83/3 108/6 108/7 111/3 133/23 134/10 141/19 213/9
competes [1] 213/7
competing [5] 88/9 99/17 99/18 142/13 142/16
competition [88] 6/19 6/23 7/6 7/14 9/9 10/25 11/5 11/21 11/24 12/12 13/18 13/22 14/11 14/22 14/23 16/25 19/7 20/11 23/19 23/22 26/3 27/23 28/4 28/5 28/11 30/16 31/4 34/1 34/4 34/14 40/22 42/25 43/4 43/11 44/24 47/18 50/6 50/13 50/15 52/1 53/21 63/2 63/6 65/22 68/18 68/19 69/12 74/4 83/2 83/15 84/21 84/22 84/22 85/4 87/7 88/23 89/7 89/17 90/20 91/2 91/2 91/4 95/8 106/1 106/5 111/3 111/19 115/24 116/5 122/3 122/24 123/18 125/1 126/7 126/14 126/15 136/1 143/1 160/18 165/8 171/1 173/24 173/25 191/13 201/20 205/20 215/6 236/22

competitive [197] 7/2 7/5 7/12 7/15 7/17 7/19 7/20 8/3 8/5 8/10 8/11 8/12 8/14 9/6 9/19 9/24 10/4 10/5 10/5 10/8 10/9 12/13 12/25 13/8 13/9 13/21 14/1 14/5 14/12 14/25 15/22 15/23 20/9 21/4 21/15 21/16 21/22 24/17 27/17 28/8 31/18 31/19 35/5 35/10 35/17 35/18 36/2 42/10 47/11 47/14 48/20 48/21 49/4 49/13 50/8 50/17 50/19 50/21 51/1 51/11 51/11 52/16 52/17 52/24 52/25 53/2 53/3 53/6 54/1 54/16 54/17 56/12 56/13 56/23 58/14 61/5 65/7 65/13 65/21 65/24 66/14 67/9 67/15 67/17 67/24 68/2 78/13 83/17 84/6 84/14 85/8 86/25 87/5 87/6 87/18 90/1 95/16 95/17 100/6 110/5 112/22 113/21 114/4 114/25 115/19 116/1 122/1 122/13 123/17 124/20 124/21 125/20 127/14 128/21 129/17 130/1 130/7 130/11 131/19 132/8 134/12 135/17 144/5 144/8 148/3 148/19 150/24 152/12 153/6 158/17 158/24 160/21 160/23 160/24 161/8 161/10 161/13 161/14 161/25 162/1 162/2 162/18 162/19 162/23 163/2 163/3 163/5 163/9 163/13 163/15 163/21 164/9 164/13 164/14 164/19 164/22 164/4 165/14 165/15 165/25 167/1 167/2 167/10 167/18 167/22 167/25 168/5 169/1 170/1 170/9 170/24 172/17 173/7 175/21 176/2 178/11 178/20 181/13 187/9 187/11 187/15 192/25 194/5 195/8 200/7 200/11 201/2 201/6 201/17 203/4 203/13 204/6 204/14 206/18 235/22 236/6
competitively [2] 34/9 58/15
competitor [12] 7/9 15/25 24/2 73/5 108/15 132/21 163/15 187/7 202/9 209/20 213/19 214/11
competitors [9] 22/18 49/18 56/22 57/2 82/3

**C**

competitors... [4] 89/9
96/6 123/8 180/9
complain [1] 206/19
complained [2] 180/20
215/2
complaining [5] 56/17
140/3 140/5 140/18
211/7
complaint [13] 15/13
71/6 74/6 89/3 89/17
121/13 132/5 138/11
153/24 158/8 158/16
184/12 216/1
complaints [2] 121/8
203/8
complete [2] 223/21
230/5
completely [1] 217/11
complexion [1] 220/16
complicated [1] 117/7
comply [1] 59/9
component [2] 50/4
55/7
components [1] 55/22
composition [1]
220/16
comprised [1] 9/6
computer [10] 2/10
18/17 18/20 18/22
18/23 27/10 108/19
118/21 118/23 130/5
computer-aided [1]
2/10
computers [6] 17/12
19/15 27/8 79/4 117/7
128/4
concede [1] 86/3
conceded [1] 124/18
concedes [1] 160/7
concept [3] 7/25
108/18 194/2
concerns [1] 133/9
concession [1] 124/19
conclude [6] 40/13
41/18 116/4 175/20
222/9 237/15
concluded [6] 55/13
67/17 113/25 207/11
237/18 239/4
concludes [1] 161/23
Concluding [1] 169/24
conclusion [2] 84/11
86/9
conclusions [2]
129/21 167/12
concoct [1] 216/3
concrete [2] 130/8
152/7
concretely [1] 168/23
condition [1] 80/5
conditioned [1] 181/10
conditions [2] 73/12
165/8
conduct [211] 6/6 6/18
7/1 7/4 7/5 7/5 7/15
7/18 7/18 8/1 8/2 8/6
8/6 8/10 8/14 8/15 8/18

9/18 9/24 10/2 10/3
10/4 10/6 10/9 10/14
10/22 10/24 11/7 12/3
12/12 12/13 13/1 15/2
15/3 15/6 15/13 15/21
15/22 15/22 16/4 16/25
17/9 17/21 31/16 31/17
46/6 46/7 47/10 48/1
48/15 49/8 49/22 50/5
50/20 50/24 51/2 51/3
51/4 51/10 51/12 52/16
52/24 53/16 53/21
53/24 53/25 54/1 54/3
54/12 54/12 55/3 55/7
55/11 55/25 56/23 57/3
57/20 58/4 59/21 60/3
60/11 60/11 60/20
60/24 60/25 61/10
61/11 62/1 63/7 63/18
64/14 65/21 66/7 66/8
66/11 66/21 66/22
66/24 67/2 67/13 67/15
67/15 67/16 71/22 74/2
78/14 83/17 87/1 87/1
87/5 87/7 87/18 95/4
95/16 95/23 95/23 98/4
112/22 113/5 115/14
115/19 115/23 115/25
116/1 116/5 120/11
120/20 122/16 128/18
128/21 132/5 132/9
134/22 134/25 135/16
135/20 135/23 151/14
152/2 152/10 153/1
158/17 158/18 158/23
159/2 159/13 160/1
160/6 160/16 160/17
161/10 161/11 161/17
161/22 161/23 162/2
163/8 163/8 163/25
164/1 166/2 167/2
168/1 168/7 168/10
170/8 170/11 171/7
171/11 171/19 171/22
171/25 172/3 172/6
172/7 173/1 173/6
175/19 176/1 176/7
176/9 178/10 180/12
181/13 185/11 185/12
195/8 195/11 195/14
197/20 197/21 203/14
203/17 203/24 204/3
204/9 204/12 204/12
209/6 209/9 210/12
210/18 221/24 222/19
231/21 233/20
conducted [2] 34/19
225/16
confess [1] 81/2
confident [1] 104/25
confidential [3] 4/15
4/22 89/22
confirmed [1] 211/13
conflates [1] 95/21
confronting [1] 162/12
confused [1] 192/7
conjunctions [1] 164/8

12/6 120/5 133/2 133/5
147/8 210/11 234/2
234/11
connects [1] 168/6
CONNOLLY [2] 2/2
5/14
Connor [1] 5/14
consequence [2]
156/5 173/24
consider [17] 41/8
50/19 53/5 53/8 53/9
54/2 56/25 57/1 57/2
57/20 60/23 61/20 97/7
129/18 135/17 170/12
234/11
consideration [2]
231/9 231/16
considerations [2]
180/3 222/6
considered [12] 9/18
10/7 28/10 54/7 55/13
58/13 58/14 84/1 98/3
109/9 129/5 169/7
considering [2] 56/22
56/24
consistency [1] 127/22
consistent [6] 6/9
122/22 125/5 128/11
132/1 141/15
constantly [2] 25/1
25/2
constitute [1] 13/2
constitutes [1] 74/16
Constitution [1] 2/8
construct [3] 178/23
180/3 180/5
Constructing [1] 95/20
consumer [13] 1/18
43/15 44/19 44/19
44/23 47/4 47/6 85/12
109/14 131/12 186/2
198/16 201/16
consumers [4] 15/24
109/18 109/20 109/23
consummated [1]
130/19
contain [1] 4/15
contemplated [1]
69/15
contemplating [1] 78/1
contend [2] 14/4 19/21
content [7] 11/15
11/19 156/11 189/17
189/19 203/19 234/13
contention [6] 127/9
127/10 131/7 131/9
172/10 183/13
contentions [1] 231/8
contestable [1] 41/19
contested [2] 73/21
186/18
contests [1] 6/12
context [2] 123/6
195/18
continually [1] 97/4
continue [1] 19/5
continued [4] 2/1 72/5

continues [1] 192/17
continuing [5] 15/16
181/13 181/21 182/6
210/12
contract [25] 9/25 9/25
33/15 33/15 36/7 36/19
36/20 63/9 70/17 70/18
71/1 71/24 77/11 77/15
78/18 78/20 80/4 83/4
83/14 92/15 99/3 110/8
110/10 113/11 202/24
contracting [2] 71/4
80/19
contracts [24] 31/2
36/8 49/14 56/8 56/9
61/21 64/14 66/19 72/5
73/16 74/7 74/15 91/10
91/11 93/1 93/5 97/8
100/7 100/21 153/21
155/3 155/22 195/17
236/24
contractual [1] 83/24
contrast [1] 107/23
contribute [1] 159/3
contributes [1] 97/10
control [3] 49/6 199/13
201/7
controls [2] 97/2
201/19
convenient [1] 102/8
conversation [5] 4/1
42/5 101/6 177/8 220/9
conversion [1] 181/19
conversions [2] 174/8
174/9
converting [1] 212/13
convinced [1] 234/16
cook [2] 101/11 215/13
copies [1] 46/13
cordoned [1] 33/2
core [2] 49/23 228/19
corporate [2] 22/14
22/15
corporation [1] 23/13
correct [26] 10/11 14/7
31/7 32/15 85/13 135/6
136/15 141/4 141/4
141/23 143/5 144/9
167/4 172/5 174/20
179/5 200/13 200/19
202/12 202/18 211/16
212/8 212/21 212/23
219/14 240/3
correctly [2] 85/12
159/23
cost [3] 23/15 199/4
214/8
costly [1] 150/13
costs [7] 23/14 99/5
131/12 196/18 208/21
209/4 222/17
could [107] 7/14 18/8
19/9 25/8 31/22 34/17
47/7 61/5 70/6 70/11
70/14 72/4 72/24 73/7
75/7 75/11 75/13 75/17
75/20 76/3 76/4 76/6

104 78/1 78/13 78/14
78/15 78/21 78/24 79/2
79/18 79/24 82/4 87/14
87/14 87/16 87/17
97/14 102/17 110/7
112/5 118/11 133/14
134/23 137/22 147/11
147/13 147/15 150/1
154/13 162/6 169/7
170/19 171/10 176/10
176/12 176/12 179/4
179/8 181/24 181/24
182/7 182/10 184/22
185/15 185/16 189/3
191/6 196/9 196/12
196/15 201/7 201/16
201/20 205/10 207/10
207/11 208/2 210/17
213/16 214/7 220/1
220/9 220/21 220/21
220/22 221/5 221/7
221/19 222/4 223/16
224/6 226/14 227/13
227/14 227/17 227/18
228/5 228/7 230/12
234/3 234/10 236/1
236/10 237/12 237/19
238/5
couldn't [9] 17/12
22/12 75/13 77/14
78/16 79/19 83/11
202/16 228/13
counsel [1] 108/11
counsel's [1] 5/10
count [1] 118/2
counted [1] 41/11
counterparties [2]
75/13 82/24
counting [1] 159/8
countries [1] 191/11
country [2] 22/11
130/21
couple [8] 7/22 38/14
124/10 129/3 148/6
176/15 211/5 232/4
coupled [2] 183/2
183/10
course [18] 3/24 12/7
17/20 41/22 42/5 62/2
83/5 100/4 105/21
128/15 169/9 209/15
217/11 223/14 233/13
233/14 238/12 238/13
court [186] 1/1 2/5 2/7
3/2 6/20 7/1 7/4 7/8
8/10 9/5 10/7 10/13
10/17 10/23 11/6 11/13
11/17 12/1 12/10 38/1
38/9 45/6 45/13 45/15
46/22 46/25 47/20
47/21 47/23 49/5 49/9
51/3 53/15 54/1 54/4
54/6 55/10 55/17 56/8
56/11 56/15 56/16
56/25 58/1 58/2 58/5
58/9 58/10 58/15 59/6
59/8 60/15 60/20 61/14
61/24 62/14 64/7 65/17

**C**

court... [128] 65/20
65/25 66/5 66/17 66/19
66/21 67/6 67/9 67/12
67/12 67/20 67/22
69/18 69/18 69/21
73/22 79/14 83/5 83/6
83/18 83/20 83/22 84/4
84/10 84/13 86/11
86/16 86/24 86/25 87/8
87/9 87/11 87/19 89/21
89/24 90/7 90/15 91/4
91/19 91/25 93/16
93/17 94/2 94/3 94/16
94/17 95/19 96/14
96/14 96/21 97/2 97/7
99/9 100/3 100/24
113/16 113/24 114/23
119/13 119/17 132/24
133/1 133/2 157/16
157/20 157/22 158/12
158/15 158/22 158/25
161/1 161/23 162/24
163/4 163/7 163/11
164/4 164/11 164/17
165/24 166/18 167/14
167/24 170/7 170/9
170/22 178/19 179/18
179/24 209/11 210/10
213/24 213/25 214/4
214/6 220/2 221/8
221/24 222/1 222/4
222/7 222/8 222/23
223/16 223/19 223/25
224/2 224/3 224/6
226/21 226/22 226/24
227/4 228/10 230/8
230/9 230/11 230/20
230/23 231/16 234/3
234/18 234/24 234/25
235/3 236/4 238/6
239/2
**Court found [1]** 132/24
**Court's [11]** 92/24
100/25 129/21 129/22
129/23 132/25 219/6
219/8 226/23 230/20
236/7
**courthouse [1]** 165/5
**courtroom [1]** 4/23
**courts [16]** 6/5 8/22
36/5 38/16 55/6 96/15
122/9 125/6 125/18
126/6 126/13 127/5
128/7 164/18 168/4
237/16
**Covad [2]** 8/23 66/10
**Covad
Communications [1]**
8/23
**cover [1]** 172/3
**coverage [16]** 37/24
38/20 93/11 93/11
93/12 93/12 93/14
93/15 94/1 94/2 94/5
94/5 94/14 94/17 96/20
96/20
**covered [4]** 36/8 36/18

**COVID [1]** 215/23
**crawl [1]** 187/24
**crawling [2]** 140/10
206/9
**crazy [1]** 41/11
**create [12]** 49/18 54/20
64/5 162/16 171/24
194/6 201/12 201/16
202/14 229/10 230/13
236/3
**created [1]** 159/3
**creates [2]** 168/9
178/11
**creating [4]** 73/12 96/3
158/24 207/21
**credibility [2]** 231/10
231/17
**credited [1]** 176/2
**Creighton [1]** 5/16
**crested [1]** 72/3
**criminal [1]** 237/10
**critical [6]** 19/15 53/20
149/25 150/2 208/3
208/5
**criticism [1]** 76/9
**cross [3]** 74/19 84/24
180/8
**cross-platform [1]**
180/8
**crossed [5]** 72/10
72/13 75/22 113/5
169/25
**CRR [2]** 240/2 240/8
**crushed [1]** 91/3
**Cue [3]** 101/10 102/10
106/17
**custodian [1]** 233/9
**custodians [3]** 224/19
224/20 228/20
**customer [20]** 42/24
77/1 77/3 83/19 83/21
83/22 84/6 84/16
100/15 101/24 102/12
104/14 104/14 104/15
106/12 106/14 111/1
151/4 196/18 209/3
**customers [12]** 24/20
43/7 43/10 83/23 98/14
98/14 102/11 105/12
110/24 133/10 147/21
187/17
**cut [2]** 99/5 106/4
**cutting [2]** 9/20 50/14
**CV [1]** 1/4
**cycle [1]** 97/4

**D**

**D.C [4]** 1/5 1/14 2/3 2/8
**D.C. [28]** 6/15 8/19 9/4
9/7 9/16 10/24 12/10
31/11 34/5 35/6 35/9
35/13 37/20 47/25 66/9
91/8 122/10 125/4
125/9 126/24 129/5
132/23 147/24 152/14
152/15 167/16 213/25
237/16

8/19 9/4 9/7 9/16 10/24
12/10 34/5 35/6 35/9
35/13 37/20 47/25 66/9
91/8 122/10 125/9
129/5 147/24 152/14
152/15 167/16 213/25
**D.C. Circuit's [4]** 31/11
125/4 126/24 132/23
**damaging [1]** 235/18
**data [64]** 23/5 97/9
98/12 98/12 120/25
122/19 132/15 147/11
147/12 147/12 147/19
153/21 153/25 154/3
154/15 155/4 155/8
155/9 155/9 155/12
155/14 155/19 155/21
155/23 156/18 159/18
159/20 188/6 188/8
188/16 189/25 190/6
190/10 190/13 190/20
190/25 192/5 193/6
194/19 196/19 199/9
199/11 199/14 199/16
199/23 199/24 200/5
201/7 201/19 201/23
201/25 202/2 202/7
202/8 202/8 203/12
206/9 209/4 211/23
214/18 214/22 214/22
215/16 237/3
**data-sharing [2]**
201/25 215/16
**date [10]** 89/17 89/24
181/8 217/20 217/22
217/25 218/5 219/2
220/20 240/7
**dated [1]** 128/13
**dates [1]** 176/16
**Daubert [2]** 217/18
218/16
**Dauberts [8]** 218/2
218/9 218/10 218/12
218/20 218/20 218/25
219/7
**day [9]** 107/1 111/20
151/20 158/4 158/7
222/13 232/15 237/7
238/25
**daylight [2]** 50/1 52/12
**days [4]** 3/25 34/17
88/12 109/14
**de [2]** 32/22 32/24
**de facto [2]** 32/22
32/24
**dead [1]** 142/23
**deal [28]** 27/14 27/19
31/20 31/22 31/23
64/21 64/23 64/25
65/12 68/10 102/2
102/3 111/21 115/15
121/15 132/13 132/18
178/4 178/24 179/7
179/11 179/15 194/9
204/25 209/12 218/13
218/13 219/7

35/11 35/12 43/6 65/18
66/1 67/14 67/21 77/5
84/5 89/19 90/7 136/9
136/11 167/19 172/16
179/23 180/6
**deals [14]** 16/12 16/13
16/16 16/16 16/17 18/8
27/18 32/4 35/8 77/7
132/14 156/8 156/10
179/19
**dealt [5]** 33/6 57/16
57/18 179/25 231/19
**dear [1]** 96/16
**deathbed [1]** 181/19
**debate [1]** 107/10
**debating [1]** 176/6
**decide [13]** 36/24
70/10 70/11 106/23
107/8 117/9 117/11
140/13 164/3 190/22
218/9 218/9 218/24
**decided [4]** 70/14
109/14 169/15 218/12
**decides [3]** 22/15 90/7
177/23
**deciding [3]** 53/8 53/9
185/23
**decision [10]** 6/15 8/23
9/4 14/20 104/7 118/2
126/24 217/12 228/15
230/16
**decisions [7]** 15/12
70/3 109/18 110/2
126/21 154/4 154/5
**deck [1]** 176/15
**declarations [4]**
221/23 223/21 224/10
230/3
**deemed [4]** 14/23
16/25 163/8 163/8
**deep [2]** 48/22 95/3
**deeper [2]** 47/5 137/25
**deeply [1]** 104/18
**default [105]** 15/8
16/18 16/19 16/19
16/21 21/14 21/19
22/23 24/2 25/5 25/9
26/9 26/18 28/8 28/14
29/3 29/4 29/5 30/11
32/9 32/10 32/12 33/13
33/16 34/12 37/11
38/25 39/6 42/20 44/4
49/7 58/8 58/24 59/20
60/6 63/2 68/11 68/12
68/25 69/1 69/4 69/9
70/4 70/10 70/11 70/15
70/25 71/1 73/4 73/5
73/17 75/15 76/18
77/12 77/13 78/2 78/4
78/5 78/10 79/8 79/10
79/20 79/22 80/5 80/14
90/3 98/11 101/8
101/14 102/14 102/24
103/2 103/4 103/18
103/20 104/10 105/17
106/19 106/22 106/23
107/2 107/23 107/24

103/2 108/3 108/7
108/16 108/18 108/18
108/25 109/15 110/7
111/8 111/15 117/4
117/13 118/1 118/8
198/25 198/25 209/16
209/20 209/22 236/23
236/24
**default's [2]** 109/2
109/2
**defaults [36]** 23/3
26/16 30/8 33/23 49/5
49/6 49/15 56/20 56/21
56/21 60/13 63/16
64/16 82/14 82/18
82/18 82/19 92/6 93/4
93/18 96/6 99/11 99/16
100/10 100/10 104/25
105/1 107/25 110/15
116/22 117/1 117/4
117/5 117/7 118/23
119/2
**defendant [3]** 1/7 2/2
3/11
**defendant's [2]** 95/16
169/25
**defendants [3]** 48/2
81/6 235/7
**defense [2]** 48/16
49/10 163/6
**deference [1]** 126/19
**define [1]** 172/1
**defined [1]** 141/21
**defines [2]** 18/4 94/24
**definitely [2]** 51/17
107/11
**definition [9]** 7/19 62/8
62/12 62/18 64/5 73/4
73/8 76/17 160/1
**degrade [1]** 194/11
**degraded [4]** 194/9
198/6 203/17 207/6
**degree [2]** 118/9
225/10
**degrees [3]** 17/3 20/25
43/5
**delay [5]** 150/20
150/23 153/15 181/17
182/9
**delayed [1]** 181/17
**deleterious [1]** 12/4
**delve [1]** 182/4
**demand [2]** 173/4
203/25
**demands [1]** 201/18
**demographic [1]** 201/4
**demonstrate [5]** 25/16
28/3 130/25 174/3
182/7
**demonstrated [2]**
159/6 203/16
**demonstrates [1]**
175/15
**demonstrating [1]**
209/6
**demote [1]** 184/24
**demoted [1]** 192/11
**demoting [1]** 186/11

**demotion [2]** 184/6 185/5

**denial [1]** 181/18
**denied [2]** 175/23 181/18
**denigrate [1]** 96/15
**denominate [1]** 6/17
**Dentsply [4]** 58/1 59/8 83/8 110/20
**Denver [1]** 1/21
**DEPARTMENT [7]** 1/13 1/18 108/11 108/13 225/3 225/21 227/15
**depend [2]** 18/3 18/6
**depending [8]** 12 15/2 51/20 143/20 218/17 218/21
**depends [1]** 139/16
**depose [1]** 229/1
**deposed [5]** 101/9 146/15 151/2 151/6 229/7
**deposing [1]** 130/22
**deposition [3]** 25/12 171/23 216/6
**depositions [2]** 215/24 238/15
**depression [1]** 88/1
**deprives [1]** 172/13
**depth [1]** 223/11
**describe [3]** 4/21 31/4 172/8
**described [1]** 145/2
**describes [3]** 106/18 106/21 108/13
**describing [1]** 24/19
**description [2]** 175/2 202/7
**descriptions [2]** 158/6 158/7
**design [32]** 15/12 34/11 44/22 70/3 73/17 110/2 120/13 122/5 122/6 122/11 122/19 122/20 122/23 124/13 124/14 126/8 126/16 126/21 128/24 129/6 131/1 131/11 131/14 135/21 136/12 141/12 141/13 185/16 185/18 185/23 193/4 214/13
**designed [5]** 69/1 122/25 165/12 173/8 205/20
**designers [1]** 69/3
**designs [1]** 120/22
**desktop [3]** 66/22 66/24 130/5
**destroy [2]** 223/1 233/17
**destroyed [6]** 222/10 222/23 223/24 229/9 229/11 234/21
**destroying [5]** 223/2 227/2 227/4 227/18 232/10
**destruction [3]** 228/16

**detail [2]** 8/21 108/13
**details [3]** 25/11 28/13 146/17
**determination [2]** 8/5 238/13
**determine [3]** 13/1 158/23 174/24
**determined [4]** 10/3 54/19 61/3 231/22
**determines [1]** 8/10
**determining [2]** 53/3 231/17
**develop [4]** 148/15 178/7 181/9 187/1
**developed [3]** 129/11 133/8 170/16
**developer [1]** 59/19
**developers [2]** 44/11 165/22
**developing [2]** 10/21 11/3
**development [4]** 130/11 146/4 161/24 163/22
**device [9]** 15/9 18/20 20/1 37/8 37/10 39/3 40/20 103/7 105/23
**devices [24]** 19/20 19/24 19/25 29/11 29/12 29/14 29/18 29/19 30/1 30/8 30/15 32/7 32/11 33/1 33/4 33/21 41/12 41/13 41/14 105/8 107/24 108/4 110/16 190/23
**did [60]** 4/10 4/16 8/19 16/13 18/6 18/9 20/21 25/25 38/16 38/17 43/3 49/22 54/1 59/23 63/16 66/5 66/9 67/12 67/13 69/11 70/21 71/16 72/1 75/12 76/10 76/10 76/14 76/25 77/4 81/2 83/22 84/10 89/19 96/4 96/19 101/21 113/21 114/21 116/16 120/3 123/5 134/16 147/15 147/16 163/7 167/14 171/13 171/13 171/17 216/5 219/1 226/10 226/11 226/13 227/6 227/7 227/21 230/4 234/25 235/3
**didn't [45]** 17/22 17/24 20/19 26/1 34/3 35/20 37/10 38/10 43/7 49/1 60/19 60/22 61/6 61/7 76/10 88/16 88/17 88/19 88/20 88/21 92/1 105/17 113/25 116/7 123/3 132/18 148/24 152/14 163/12 163/19 166/24 167/3 171/15 176/19 178/14 201/8 207/15 214/10 214/10 219/5 225/9 226/10 226/11 226/13 231/2

**difference [3]** 15/4 54/11 186/5
**different [75]** 6/5 6/5 6/20 6/22 7/9 10/9 15/2 17/3 18/2 22/9 23/12 23/21 23/23 24/15 32/25 33/4 34/2 43/5 62/25 76/6 78/2 86/13 90/4 90/17 90/21 97/19 98/2 102/19 107/3 109/7 110/15 114/9 115/14 120/8 121/7 123/14 126/25 127/11 129/3 136/9 138/15 139/17 140/9 140/12 140/12 141/3 141/5 141/8 143/21 145/4 149/2 149/13 153/1 159/8 159/10 161/15 161/16 161/16 161/22 168/19 182/19 184/15 186/11 194/11 196/16 202/15 202/24 204/17 206/20 207/12 209/10 216/14 225/18 230/22 235/19
**differentiated [2]** 159/20 201/13
**differentiation [2]** 198/16 201/17
**differently [5]** 66/8 85/23 122/25 151/17 226/12
**difficult [4]** 30/13 33/17 49/19 172/1
**digital [2]** 141/22 143/7
**dimensions [2]** 7/22 23/22
**diminish [1]** 133/20
**dinner [1]** 162/8
**Dintzer [17]** 1/13 3/9 46/3 46/8 46/10 99/19 101/1 101/7 110/6 110/19 112/21 116/7 116/15 123/19 172/10 209/17 221/1
**Dintzer's [3]** 231/20 232/6 236/14
**direct [5]** 11/14 35/1 149/1 168/13 200/14
**directed [2]** 17/21 45/25
**direction [1]** 171/18
**directly [6]** 16/6 84/7 133/19 149/5 150/3 150/7
**director [1]** 5/18
**disadvantage [2]** 112/5 149/11
**disadvantages [1]** 204/7
**disadvantaging [1]** 214/25
**disaggregate [1]** 55/6
**disaggregated [1]** 55/11
**disaggregating [2]** 8/1 66/9

**disagreed [2]** 161/19 170/10 171/6 211/10 211/12
**disagreeing [2]** 67/1 232/8
**disagreement [4]** 7/23 21/11 34/22 93/20
**disappeared [1]** 15/14
**disappears [1]** 127/17
**discount [2]** 201/14 202/22
**discounts [3]** 165/6 165/7 165/10
**discoverable [2]** 228/8 233/11
**discovery [3]** 226/17 229/14 238/8
**discriminated [2]** 135/1 135/10
**discrimination [1]** 135/11
**discuss [5]** 4/3 46/5 46/8 190/14 204/15
**discussed [4]** 97/6 120/6 189/12 217/25
**discussing [1]** 63/23
**discussion [9]** 14/11 36/6 81/3 127/18 159/12 164/4 219/25 220/1 222/3
**discussions [3]** 28/1 46/8 228/5
**disfavored [1]** 199/24
**disintermediation [1]** 141/18
**dismiss [1]** 144/17
**dismissal [1]** 222/14
**dismissed [1]** 177/2
**dismisses [1]** 175/9
**dispatched [2]** 68/18 68/19
**display [4]** 138/9 140/22 182/18 182/24
**displayed [2]** 137/15 158/5
**disproportionate [1]** 81/25
**dispute [10]** 93/22 103/17 111/15 124/15 144/23 145/19 145/20 174/23 208/14 208/17
**disputed [14]** 53/10 53/10 174/5 174/22 208/3 208/5 208/19 208/20 209/16 209/18 210/1 210/5 210/15 236/11
**disputes [6]** 100/1 100/2 100/9 159/5 160/12 208/11
**disputing [2]** 29/2 111/24
**dissenting [1]** 59/7
**distant [1]** 132/6
**distilled [1]** 5/22
**distinction [1]** 91/15
**distinguish [1]** 117/19
**distribute [3]** 17/16

**distributing [2]** 19/6 19/17
**distribution [37]** 15/9 20/18 29/12 41/18 58/16 82/20 89/11 92/2 92/5 92/8 93/1 93/5 100/12 113/8 114/3 115/16 121/12 121/18 123/20 159/11 160/2 160/10 160/15 166/3 167/15 169/5 172/9 175/20 176/6 185/11 192/6 198/21 198/24 204/5 204/9 204/10 204/14
**distributor [3]** 33/9 84/16 85/1
**distributors [4]** 33/8 52/5 100/18 100/19
**distributors' [1]** 83/23
**DISTRICT [23]** 1/1 1/1 1/10 9/5 10/23 11/6 11/17 12/1 12/9 38/9 55/10 55/17 59/6 96/14 96/15 113/24 129/22 129/23 132/25 133/1 167/14 213/24 214/6
**District Court's [1]** 129/22
**disturb [1]** 237/20
**dive [1]** 5/25
**Division [1]** 227/16
**divorced [1]** 217/11
**do [167]** 4/11 4/16 4/21 5/4 6/17 11/14 13/1 14/4 17/17 17/24 25/21 28/18 33/20 35/16 36/5 48/18 50/7 50/9 50/21 52/2 52/20 52/21 56/4 59/4 59/6 59/13 61/21 62/7 62/15 68/4 68/24 70/8 70/8 72/19 73/2 74/19 75/13 76/1 76/3 76/4 76/10 77/9 77/10 77/14 77/15 77/18 77/19 78/16 78/19 78/21 79/2 81/15 83/11 85/21 86/8 86/8 86/24 86/25 87/21 88/24 89/6 89/6 90/7 91/20 92/1 92/19 92/20 93/7 93/16 99/23 99/23 99/25 101/18 101/24 103/18 104/10 106/4 106/12 106/15 109/12 109/13 110/9 116/3 117/5 117/8 122/5 125/8 128/20 129/16 130/9 132/10 132/13 132/18 132/13 134/13 136/14 138/1 140/22 140/22 141/7 141/7 147/21 147/21 147/23 153/2 153/21 154/15 155/13 155/20 156/3 156/13 158/15 159/7 161/5 161/5

**D**

do... [49] 164/2 164/21 165/11 166/1 167/3 169/10 169/13 170/2 173/13 173/19 175/18 176/8 178/18 179/4 179/17 179/21 180/23 181/3 184/3 184/9 185/17 188/4 188/11 194/7 200/7 201/17 203/3 206/17 210/4 214/10 218/5 219/24 220/18 221/17 221/18 223/16 224/6 225/8 226/11 226/17 226/17 226/19 230/24 231/1 231/20 232/14 233/1 238/4 238/9

do you [3] 50/7 50/9 173/19

Do you have [1] 81/15

docket [1] 220/16

document [5] 177/4 177/14 177/15 228/20 235/6

documentation [1] 103/19

documentations [1] 105/16

documents [24] 17/19 74/9 100/17 124/3 130/22 152/25 215/18 222/10 222/23 223/1 223/2 223/9 223/24 224/7 227/2 227/19 228/16 228/25 229/1 229/3 229/10 232/10 234/22 238/8

does [68] 7/1 8/6 10/10 14/17 14/17 24/1 24/7 27/14 27/21 29/24 35/4 53/20 54/20 55/3 58/21 59/12 59/12 60/8 63/25 65/9 70/1 75/25 84/4 85/6 88/1 92/14 93/9 94/11 95/21 96/12 98/5 101/14 102/25 103/2 118/19 119/2 126/20 133/23 135/14 136/14 138/19 141/19 149/15 155/16 157/11 161/5 162/2 162/23 164/7 164/9 165/15 165/25 169/3 173/20 174/10 180/5 181/21 183/16 186/13 190/2 190/5 190/22 199/5 202/16 204/6 207/22 219/18 231/22

doesn't [73] 7/10 7/11 9/10 9/17 9/23 10/5 12/14 21/19 22/24 24/14 25/15 28/6 28/6 31/20 40/24 47/17 52/25 57/17 57/23 58/9 60/5 60/16 60/16 62/13 62/21 65/17 71/6 83/6 83/13 84/13 86/24

100/4 100/20 102/24 103/5 103/21 104/14 104/15 105/10 106/12 107/2 110/14 110/16 111/20 117/3 118/23 123/10 125/20 126/10 128/24 131/17 133/8 134/2 151/20 156/3 164/1 164/6 164/21 170/2 173/22 177/1 177/24 183/16 186/21 187/14 206/8 223/19 226/9 234/24

doing [30] 11/20 34/7 51/3 58/20 60/1 67/9 71/14 74/3 74/12 80/22 82/9 84/18 86/23 87/4 87/6 87/23 96/1 99/10 128/10 134/11 152/24 154/14 180/18 180/22 184/14 186/22 203/4 209/9 212/10 224/3

DOJ [10] 1/13 3/9 46/1 46/3 121/18 123/21 209/22 226/5 234/19 235/4

dollar [1] 148/5

dollars [4] 77/22 78/3 82/14 151/5

dominance [2] 142/6 205/24

dominant [6] 77/6 77/6 126/8 126/15 191/15 207/20

don't [142] 4/4 4/22 7/24 11/9 12/2 12/5 13/8 13/19 13/25 15/15 19/10 19/10 21/10 22/18 22/19 28/11 28/12 28/23 29/1 29/2 31/5 32/2 33/17 40/8 41/25 44/4 44/5 45/5 45/8 48/11 48/11 50/12 50/15 50/16 50/19 57/8 57/20 59/15 59/24 61/8 61/13 64/8 64/9 66/16 67/6 67/9 74/13 75/14 75/17 75/24 81/21 81/22 84/11 84/17 86/11 86/18 86/21 89/9 89/13 93/7 93/14 93/16 94/6 94/21 94/21 96/7 99/17 104/13 104/16 104/17 105/13 107/6 109/15 111/24 116/1 116/16 117/10 119/2 119/12 120/7 124/15 127/9 132/22 133/1 133/5 133/12 133/25 135/12 135/19 136/16 138/23 149/5 149/11 151/6 151/9 153/3 154/8 155/22 157/1 158/6 164/19 169/12 171/5 172/17 173/3 176/7 177/25 178/16 179/4 182/13 182/14

187/18 188/11 190/10 195/1 195/21 201/8 201/9 201/9 205/12 205/19 207/8 207/21 208/17 211/10 213/10 215/14 217/23 220/12 226/8 227/17 229/2 229/10 231/18 232/11 232/21 234/23 237/14 239/1

done [45] 5/3 8/22 26/15 26/22 27/24 34/23 36/10 39/10 39/11 39/11 43/25 63/21 69/5 69/6 72/23 74/24 75/2 75/4 75/11 77/21 80/7 82/8 83/4 94/3 96/8 105/8 123/14 124/22 134/10 135/3 139/10 147/15 167/6 178/19 180/20 182/8 183/14 185/10 194/8 204/23 223/5 223/16 223/25 224/9 237/18

door [1] 116/17

doubt [3] 22/13 176/3 223/23

down [14] 11/8 21/4 28/19 59/16 61/13 63/25 64/12 64/13 81/20 157/1 182/1 209/6 212/11 231/23

download [4] 32/13 33/3 117/12 117/25

downloading [3] 117/23 118/5 118/6

dozens [3] 132/14 132/14 151/1

Dr. [1] 35/25

Dr. Winston [1] 35/25

drawn [1] 12/11

dream [2] 213/18 214/14

dreamed [1] 102/20

drill [1] 238/14

drive [2] 100/11 219/5

drives [1] 221/16

driving [1] 128/21

drop [1] 28/19

drop-down [1] 28/19

drug [1] 135/25 136/8 170/4

DuckDuckGo [5] 43/21 43/25 197/2 198/7 201/9

due [2] 57/13 216/24

durable [3] 48/9 97/1 191/8

during [6] 4/15 4/16 181/17 215/23 226/2 235/14

duty [1] 74/1

Dwight [1] 38/15

dynamics [1] 192/22

**E**

each [8] 8/18 9/1 9/2

187/13

earlier [10] 6/2 44/13 51/9 89/8 95/17 141/18 152/21 161/21 188/9 226/15

earliest [1] 180/21

early [3] 109/13 127/16 219/13

earn [1] 80/20

Earthlink [1] 18/24

ease [1] 56/7

easier [5] 61/21 91/6 118/20 123/20 217/17

easily [1] 30/2

easy [1] 28/24 34/12 91/5 93/15 107/1 107/6 109/7 109/16 109/24 110/1 216/18

economic [2] 33/11 156/15

economist [2] 105/25 106/1

Eddy [1] 101/10

edententialist [3] 113/15 114/6 153/4

edge [4] 58/22 58/24 117/11 173/2

effect [71] 7/8 7/11 8/3 8/5 8/14 10/8 10/9 12/4 12/13 23/20 35/17 35/18 35/21 38/8 50/8 50/17 50/19 50/21 51/1 52/20 52/25 53/4 53/6 53/21 54/16 54/17 56/2 56/3 60/16 60/24 61/5 61/11 61/23 62/20 62/21 62/23 62/23 66/14 67/9 84/14 100/4 103/3 121/21 128/21 129/17 130/2 130/7 130/12 130/16 132/9 146/5 147/6 148/4 150/24 152/18 158/24 160/21 161/2 161/10 162/1 162/2 162/18 164/10 164/13 165/16 169/1 172/11 174/1 185/3 188/24 190/19

effective [5] 21/9 99/8 145/24 156/21 209/23

effectively [3] 16/14 145/12 145/16

effectiveness [1] 149/12

effects [83] 7/12 7/16 7/17 7/20 9/6 10/5 11/9 11/12 13/10 13/20 13/21 13/25 14/25 21/6 22/1 22/8 22/9 22/10 23/21 33/12 33/15 35/5 35/10 36/2 42/11 48/20 48/21 49/13 54/2 54/2 61/9 61/22 64/1 64/2 64/18 65/21 67/24 68/6 95/23 97/3 98/8 98/17 113/21 114/5 115/4 115/11 115/23 116/2

11/21 122/13 123/10 124/24 127/15 130/17 152/13 153/6 160/23 160/24 161/8 162/18 162/19 163/2 163/3 163/5 163/13 163/15 163/21 164/20 164/22 165/4 165/14 165/25 167/10 167/18 167/22 167/25 168/5 168/9 169/14 176/2 178/12 178/20 192/25

efficiency [2] 46/2 208/22

efficient [4] 23/6 145/22 175/1 209/23

effort [2] 3/23 49/11

efforts [2] 5/12 74/9

either [12] 9/18 10/3 10/7 11/3 13/14 16/12 31/18 38/2 40/7 51/10 215/16 230/13

Electric [1] 36/14

element [6] 6/4 6/7 6/11 6/24 50/10 90/11 eligible [2] 139/22 205/14

elimination [1] 196/13

else [29] 31/22 46/22 48/13 50/6 50/6 50/7 52/6 70/19 76/17 81/25 85/6 90/10 102/21 103/3 105/4 109/25 123/16 134/9 145/17 153/15 153/18 168/4 201/15 202/21 203/5 203/12 214/23 215/1 215/14

else's [2] 64/6 85/7

elsewhere [1] 163/23

Elzinga [1] 171/22

email [4] 1/15 1/22 2/4 146/14

emails [1] 235/18

emphasized [1] 196/19

emphasizes [1] 191/23

empirically [1] 33/24

employees [2] 228/17 234/21

empowers [1] 190/20

encourage [2] 66/20 95/16

encouraged [1] 65/19

end [14] 20/10 34/17 100/18 107/1 114/7 142/23 149/4 149/7 164/5 216/19 222/13 231/11 232/15 237/7

endeavor [1] 46/7

ended [1] 223/9

energy [1] 222/21

enforce [1] 73/1

engage [5] 13/10 55/2 160/6 204/11 220/1

engaged [4] 64/14 150/22 160/22 173/6

engages [2] 180/6 185/12

**E**

**engaging [3]** 59/20 95/4 167/1
**engine [53]** 15/8 16/19 16/20 21/8 21/12 21/13 21/17 23/10 25/6 26/9 29/3 44/13 44/17 44/20 44/23 47/9 47/18 59/20 64/5 71/2 73/6 73/6 85/6 88/4 90/4 97/16 101/14 102/9 102/14 103/12 104/10 107/3 109/8 109/10 112/1 117/16 117/19 118/7 121/6 123/4 123/10 123/11 123/14 123/15 123/17 123/18 160/4 188/2 188/17 201/8 202/15 209/21 209/22
**engines [18]** 16/20 21/17 102/19 108/21 108/24 109/16 130/23 131/24 159/21 187/13 187/15 187/16 187/20 187/22 187/24 188/4 193/10 201/3
**enhanced [1]** 134/17
**enhancements [1]** 208/22
**enhances [1]** 186/22
**enormously [1]** 25/4
**enough [28]** 16/1 16/21 21/21 44/6 65/23 71/21 87/15 87/17 89/14 90/11 90/14 91/4 92/8 93/6 99/4 105/14 130/6 131/22 133/17 137/21 138/8 146/25 148/3 152/1 152/16 174/3 203/15 234/24
**ensure [2]** 111/25 234/22
**enter [7]** 64/21 64/25 70/25 77/8 77/10 85/7 170/19
**entered [10]** 17/8 26/22 63/8 74/7 74/16 75/10 75/11 89/10 220/14 220/15
**entering [1]** 71/12
**enters [2]** 64/22 98/10
**entire [4]** 47/16 61/15 146/10 150/14
**entirely [1]** 215/16
**entity [2]** 68/16 77/17
**entrance [1]** 82/4
**entrants [1]** 100/6
**entry [6]** 32/13 49/19 65/22 85/17 114/20 124/8
**envelope [1]** 144/13
**Epic [2]** 230/4 230/10
**EpiPen [10]** 42/17 54/24 66/6 84/2 84/4 84/10 93/12 93/13 111/1 161/21
**equal [3]** 63/3 63/17 198/13

**equals [2]** 37/17 42/9
**equivalent [3]** 176/25 216/24 238/11
**erase [1]** 181/21
**erode [3]** 114/20 124/7 142/14
**esoteric [2]** 72/5 72/7
**especially [3]** 117/10 228/6 230/9
**essential [1]** 208/10
**essentially [6]** 63/25 85/22 127/11 129/21 129/21 153/24
**establish [8]** 6/18 14/21 16/22 91/13 93/16 130/7 159/7 233/1
**established [4]** 17/2 181/23 191/8 232/11
**estate [1]** 138/23
**estimate [3]** 144/14 144/14 173/12
**estimated [2]** 37/24 144/12
**estimates [1]** 175/4
**et [2]** 1/3 3/8
**et al [1]** 3/8
**evaluate [12]** 8/6 25/1 43/3 50/7 55/25 56/1 125/19 130/17 232/16 232/18 232/20 233/19
**evaluating [5]** 10/13 25/3 122/1 151/14 232/23
**even [105]** 5/23 7/11 8/11 9/19 9/21 9/23 10/8 11/6 11/9 12/9 12/24 13/19 13/25 14/22 17/9 19/13 24/5 27/2 27/3 31/5 35/25 37/1 37/14 39/2 42/12 44/9 44/12 51/20 53/5 53/6 58/12 63/17 65/13 69/23 70/15 77/3 79/8 80/10 80/11 85/3 86/5 90/12 91/11 94/17 95/9 96/4 97/19 99/1 100/3 100/20 104/20 107/6 109/25 110/6 111/4 112/2 112/11 113/4 114/16 114/21 118/4 118/4 122/12 123/8 124/5 130/8 131/1 139/15 144/6 144/6 144/17 144/22 146/25 148/4 150/9 151/12 160/24 163/7 165/20 166/15 166/21 171/5 172/14 173/20 180/21 180/23 186/17 188/8 204/7 205/8 205/23 207/11 221/5 222/19 223/3 227/8 227/15 227/17 227/18 228/13 229/1 230/14 234/9 234/10 236/1
**evening [1]** 162/8

**events [1]** 220/14
**ever [13]** 25/7 30/11 50/20 94/12 102/20 109/9 112/4 112/6 144/5 163/3 167/8 178/14 215/15
**every [18]** 22/10 22/15 28/7 32/12 37/8 37/10 39/3 62/17 83/8 94/3 94/16 98/9 98/10 111/18 111/25 127/23 213/18 214/13
**everybody [16]** 3/18 3/22 4/1 27/9 40/14 45/11 45/19 47/9 85/5 95/6 119/3 119/21 162/11 170/21 183/18 187/25
**everyone [14]** 3/5 3/12 3/21 45/17 47/18 64/6 89/18 119/7 119/15 119/19 157/24 217/9 238/24 239/1
**everything [8]** 24/18 39/25 48/12 53/22 61/20 162/10 230/11 236/17
**everywhere [1]** 191/9
**evidence [79]** 14/25 20/15 24/25 27/23 30/12 35/22 43/2 43/23 44/11 55/18 56/1 69/9 69/14 93/23 107/16 118/7 132/18 144/18 145/10 145/13 146/1 146/2 147/1 147/24 148/10 148/13 150/12 150/25 155/1 159/2 163/3 167/9 173/18 173/25 174/2 174/23 175/10 184/17 184/21 188/22 189/5 193/23 194/1 194/16 195/11 197/24 198/20 200/4 202/23 203/1 203/3 204/20 204/24 205/2 205/7 206/1 209/11 215/2 215/15 215/15 215/25 216/10 217/2 222/2 231/13 231/15 232/20 233/8 233/11 233/15 233/17 234/20 234/22 234/24 235/16 235/14 235/21 236/6 237/8
**evidentiary [2]** 131/10 234/12
**exact [5]** 32/16 67/16 141/12 145/3 147/18
**exactly [10]** 26/11 44/24 127/2 129/24 147/14 199/11 207/3 212/6 213/10 213/21
**examination [1]** 7/3
**examined [1]** 36/4
**examines [1]** 165/3
**examining [2]** 15/21

**example [48]** 7/3 9/20 10/13 11/11 11/13 22/14 23/25 27/24 54/4 56/16 57/13 58/13 60/20 87/8 91/21 101/18 129/1 130/5 134/6 135/12 135/13 135/24 136/13 138/13 138/21 138/22 154/2 161/11 161/24 164/23 165/24 168/1 168/25 173/10 174/10 176/10 180/12 184/17 184/18 189/16 191/5 191/10 196/1 205/20 206/20 208/24 208/25 209/14
**examples [2]** 10/12 127/7
**except [5]** 32/13 103/7 103/22 103/22 139/6
**excerpt [1]** 152/22
**exchange [4]** 79/20 79/21 155/4 155/5
**exchanges [1]** 115/12
**exclude [3]** 74/2 74/3 99/8
**excluded [3]** 139/6 183/5 196/24
**excluding [1]** 140/2
**exclusion [5]** 159/14 182/2 183/2 183/10 185/18
**exclusionary [30]** 48/1 48/15 49/8 49/15 55/3 55/7 55/11 55/25 59/10 59/20 60/3 61/25 62/5 62/9 62/20 62/22 62/23 63/7 63/18 64/14 65/6 65/18 67/16 78/25 80/8 87/1 171/25 178/11 196/13 210/12
**exclusions [1]** 186/3
**exclusive [73]** 16/8 16/12 16/14 31/20 31/22 31/23 31/25 32/4 32/6 32/8 32/22 32/23 32/24 32/24 33/5 33/7 35/8 35/11 35/12 37/7 43/5 57/16 57/18 61/10 62/11 62/12 62/17 62/17 64/21 64/23 64/25 65/12 65/18 66/1 66/18 67/14 67/20 68/10 71/1 75/10 75/12 76/8 77/5 78/18 82/7 84/5 89/19 90/6 90/7 90/8 91/9 92/3 92/5 96/3 99/3 99/15 100/21 110/17 115/17 156/1 156/8 156/10 167/15 167/19 168/16 194/23 195/1 195/16 195/19 195/20 195/22 196/5 202/17
**exclusively [2]** 156/11 156/18
**exclusives [4]** 35/23

**exclusivity [16]** 17/6 36/20 42/18 57/13 57/21 61/17 61/18 73/21 76/22 76/23 79/21 90/9 90/13 90/14 92/7 116/8
**excuse [10]** 16/18 24/13 25/8 25/14 74/16 143/13 173/7 181/5 198/25 227/24
**executive [2]** 198/12 207/16
**exemplar [1]** 136/24
**exercise [1]** 130/20
**exhibit [1]** 146/7
**exhibiting [1]** 55/4
**exhibits [1]** 214/17
**exist [5]** 35/20 37/13 58/10 98/9 207/23
**existence [1]** 108/20
**existing [1]** 20/22
**exists [1]** 27/17
**expect [2]** 109/16 201/21
**expected [1]** 208/22
**Expedia [2]** 121/3 139/5
**expense [1]** 147/5
**experience [7]** 104/9 104/19 104/20 109/11 109/14 121/4 198/16
**experiment [3]** 185/25 186/5 207/14
**experiments [2]** 191/25 192/1
**expert [24]** 35/25 39/2 42/11 43/24 81/13 81/15 81/24 94/15 95/25 95/25 132/11 141/6 146/22 146/23 165/6 171/13 171/21 172/6 193/20 193/22 216/2 216/3 216/5 218/1
**expertise [1]** 210/7
**experts [8]** 37/6 37/12 149/17 210/7 217/15 219/3 219/3 219/11
**expire [2]** 170/16 170/18
**explain [5]** 88/2 141/12 146/16 179/9 193/15
**explicit [1]** 168/11
**explicitly [2]** 9/17 225/7
**explore [1]** 230/7
**Explorer [8]** 10/18 10/20 11/7 11/22 31/12 112/18 117/10 166/13
**expose [2]** 105/9 105/18
**express [2]** 225/16 225/21
**expressly [1]** 226/1
**extensive [1]** 113/22
**extent [10]** 50/1 51/25 80/22 100/10 117/8

**E**

extent... [5] 117/9
134/24 144/5 154/1
231/7
extraordinarily [1]
30/13
eye [1] 58/6

**F**

fabulous [1] 229/6
face [2] 160/17 237/17
Facebook [2] 143/8
145/16
faced [2] 30/10 207/20
faces [2] 136/1 143/1
facie [17] 9/2 12/14
12/23 12/25 13/7 14/21
16/22 50/4 50/10
151/25 153/17 159/7
162/18 162/19 203/16
210/17 236/3
facing [1] 83/11
fact [78] 15/24 28/17
41/9 53/10 59/12 60/12
64/13 66/10 68/6 68/15
73/21 77/1 77/2 83/7
84/25 88/17 89/7 89/13
89/14 93/14 100/2
100/7 100/8 103/16
103/17 106/24 107/7
110/8 111/6 111/7
113/22 113/24 114/1
116/11 118/11 118/22
124/13 128/9 128/13
128/23 129/22 130/9
134/25 135/18 140/15
151/16 156/13 157/7
159/16 174/18 176/12
180/16 180/17 181/10
185/9 191/17 195/9
199/5 200/8 207/24
208/19 212/18 214/5
214/6 223/2 224/20
224/21 227/20 229/13
229/18 231/10 231/18
234/21 235/5 235/6
235/6 237/20 238/8
fact 166 [1] 185/9
factfinder [1] 210/17
facto [2] 32/22 32/24
factor [1] 38/21
factors [2] 38/16 236/7
factory [1] 9/21
facts [29] 17/1 38/5
55/14 73/22 91/20
129/8 130/9 148/20
174/3 174/5 174/6
182/22 184/6 195/2
197/8 199/10 202/6
206/16 208/3 208/5
208/9 208/20 209/16
210/1 210/5 210/15
236/11 236/12 236/20
factual [19] 17/1 46/8
55/22 69/7 71/10 73/19
73/24 93/22 100/21
111/15 124/15 129/25
130/10 132/8 152/23
193/20
factually [3] 19/21
76/21 76/24
fail [2] 153/16 215/16
failed [4] 15/1 152/17
156/13 216/6
fails [2] 122/17 122/18
failure [4] 123/2 132/25
133/1 238/9
fair [15] 34/14 44/14
44/15 60/13 61/2 71/21
86/19 88/8 95/7 95/20
186/15 187/2 187/3
232/25 235/11
fairly [2] 8/21 168/11
fall [6] 67/5 169/3
169/10 169/13 179/5
192/21
fallen [1] 153/10
falls [1] 31/21
famous [1] 216/16
far [9] 47/17 57/4 59/16
61/13 71/7 118/3
193/16 202/1 238/10
farther [1] 158/6
fashion [1] 139/12
Fast [1] 55/9
Fast-forward [1] 55/9
faster [3] 52/1 60/21
214/3
favor [2] 159/5 173/8
favorable [3] 192/21
193/18 193/19
favored [1] 202/11
fax [1] 88/18
FCC [1] 179/22
fear [1] 105/15
fears [1] 133/9
feature [10] 145/1
145/3 151/25 175/3
175/8 181/14 181/16
182/14 186/7 215/13
featured [1] 153/23
features [12] 120/11
121/10 145/5 148/8
172/22 176/24 176/25
177/24 181/6 181/23
208/18 208/23
featuring [1] 207/7
federal [1] 179/22
feed [1] 204/9
feedback [1] 204/15
feel [5] 41/25 88/19
154/10 162/12 223/19
feeling [1] 234/15
feels [1] 230/8
fees [1] 222/16
fell [1] 36/22
felt [2] 109/23 222/7
few [6] 41/21 112/12
174/4 204/20 219/23
233/5
fewer [4] 112/12 142/7
184/25 195/7
field [7] 76/12 76/15
76/18 81/20 102/12
106/9 106/10
figure [7] 71/8 96/5
98/6 147/19 215/19
215/20 233/19
file [1] 220/22
filed [4] 89/2 108/12
158/8 225/22
filing [1] 222/17
filings [1] 223/16
fill [1] 147/11
Finally [1] 97/8
find [25] 9/10 30/1
37/17 63/19 72/25
87/17 87/18 91/4 93/13
108/24 111/20 137/21
147/17 160/9 165/25
167/24 168/5 187/17
187/17 207/18 210/17
224/8 229/24 233/20
234/18
finding [8] 11/18 12/2
132/23 133/1 152/17
167/17 222/22 223/15
findings [12] 69/11
113/22 113/24 114/1
129/22 129/25 132/4
152/23 214/4 214/6
231/10 231/18
finds [4] 60/15 165/3
167/21 176/21
fine [5] 74/18 84/19
200/17 219/10 227/6
finish [1] 172/23
fired [2] 18/21 18/22
Firefox [1] 104/17
108/20 109/2 109/3
117/25 236/23
Firefox 1.0 [1] 108/20
firm [7] 22/13 22/14
22/17 77/6 77/7 180/5
189/25
firm's [2] 126/8 126/15
firms [1] 22/16
first [66] 5/13 6/17 6/24
7/25 8/2 13/19 15/8
15/18 15/20 16/3 20/6
22/17 26/22 27/4 30/4
32/3 46/13 48/17 50/3
52/13 63/12 64/20 69/8
74/15 88/12 90/2 92/25
94/18 96/13 97/1 101/5
102/2 112/25 122/18
122/19 126/3 129/15
131/6 131/10 132/7
134/3 135/5 137/1
137/15 140/2 140/6
162/16 162/20 162/20
163/5 172/9 176/20
181/12 194/2 199/4
205/17 211/6 221/16
221/22 222/22 223/14
224/2 228/10 228/11
229/17 230/15
fit [1] 55/3
fits [2] 180/13 232/20
five [11] 8/9 88/12 89/9
102/19 140/25 141/2
141/3 141/5 141/8
flesh [1] 226/18
flights [4] 138/21
139/24 159/15 212/18
flip [3] 11/16 41/16
146/25
flipped [2] 132/6 132/7
flipping [4] 12/6
152/24 228/4 233/10
floor [2] 1/21 46/12
flourish [1] 124/7
flow [2] 7/17 127/7
flower [1] 115/1
flows [1] 124/25
focus [4] 6/3 15/18
48/19 120/23
focused [5] 6/25 39/18
83/24 124/25 132/25
folks [5] 5/20 21/21
118/5
follow [2] 4/19 12/20
follow-up [1] 12/20
following [11] 3/20
23/23 54/23 62/24
133/7 152/5 183/13
184/19 190/3 193/14
198/6
force [2] 11/19 109/18
forced [2] 185/5
185/13
forces [1] 184/1
forcing [2] 88/3 170/24
foreclose [4] 90/20
91/11 100/8 107/2
foreclosed [2] 36/11
197/20
forecloses [2] 62/15
65/12
foreclosing [1] 95/1
foreclosure [48] 31/6
31/24 32/17 34/18 35/4
35/16 35/16 37/18 38/4
38/13 38/17 39/9 40/5
40/9 40/12 40/18 40/24
41/1 41/4 41/11 41/17
42/9 42/9 42/15 53/6
53/7 54/20 90/15 91/7
92/10 92/11 92/14
92/16 92/21 93/2 93/21
94/7 94/20 94/22 95/21
96/9 96/19 96/23 97/1
97/11 115/20 221/7
237/2
forego [1] 157/8
foregoing [1] 240/3
foremost [2] 101/5
128/3
forest [1] 55/18
forgive [2] 60/18
195/15
form [2] 82/20 196/25
formal [1] 28/20
formalism [3] 53/23
54/2 67/23
format [1] 218/11
formation [1] 170/23
forms [5] 46/6 55/5
55/12 100/11 172/7
formulation [4] 170/17
170/18 170/25 199/11
forth [1] 37/4
fortified [1] 117/12
forward [8] 4/1 14/24
55/9 109/22 132/17
214/20 219/2 224/8
found [7] 9/6 10/23
11/6 19/12 19/16 51/3
58/15 61/10 61/11
66/18 115/23 132/7
132/24 133/2 210/11
214/4 237/19
foundry [1] 99/4
four [4] 102/19 120/21
146/14 153/13
fraction [1] 149/24
frame [1] 121/10
framework [17] 6/10
8/16 47/22 47/25 48/15
50/2 52/10 65/16 65/19
67/5 120/4 120/8
121/24 162/13 163/25
180/10 185/20
framing [1] 232/6
frankly [5] 182/6
195/23 209/10 218/8
232/24
Fred [4] 228/25 229/1
229/3 229/3
free [4] 10/19 10/22
83/4 156/25 160/5
160/6 166/15 166/22
166/25 167/15 172/15
184/5 184/24 188/1
204/11 213/8
freely [1] 4/24
front [6] 57/9 149/4
149/7 177/14 226/24
238/6
front-end [1] 149/7
FTC [2] 165/6 165/9
full [11] 9/13 40/18
43/3 55/20 84/9 84/13
139/4 152/3 158/19
158/19 204/10
full-on [2] 84/9 84/13
fully [4] 206/13 208/18
225/4 226/8
function [4] 35/15
35/15 191/24 226/3
functionality [2] 118/6
225/13
fundamental [3]
102/23 124/11 136/12
fundamentally [2]
99/11 136/9
further [7] 131/4 131/8
160/11 188/8 226/19
238/3 238/21
future [4] 130/17
204/24 204/9 204/14

**G**

gained [1] 200/2
game [6] 19/23 19/24
181/25 187/2 187/3
216/17

**G**

gap [1] 196/14
Gateway [1] 18/21
gather [4] 103/8 230/8
230/17 230/21
gathering [1] 140/8
gathers [1] 23/5
gave [2] 32/21 215/4
gee [15] 19/10 38/10
38/18 102/17 106/1
124/3 138/11 140/6
148/1 150/13 153/9
154/23 215/9 215/19
233/6
general [28] 8/16 40/17
48/9 74/22 93/2 93/3
123/10 123/18 126/6
130/23 141/20 143/3
143/12 151/15 159/21
160/4 187/12 187/15
187/16 187/20 187/22
187/24 188/1 188/4
193/9 193/19 201/3
202/15
generally [16] 50/12
50/15 50/16 50/21
50/23 51/2 51/17 51/19
51/21 52/14 53/10 60/1
61/19 85/19 135/1
203/9
generated [1] 137/17
generic [3] 136/2 136/7
170/19
generics [1] 171/2
generously [1] 158/10
genuinely [2] 227/1
227/3
get [97] 3/14 6/1 11/9
12/18 13/19 14/1 16/22
17/5 17/6 21/2 21/21
22/5 22/6 28/12 28/24
30/17 30/18 37/23 38/8
40/9 44/22 46/18 47/15
48/22 57/2 63/16 64/16
70/17 79/19 80/14 83/4
83/16 87/23 89/11
89/19 90/10 90/12
94/2 98/11 99/24
103/15 104/3 106/15
106/23 113/14 115/19
120/1 121/22 122/12
123/23 124/6 127/17
129/16 130/13 135/12
137/2 138/23 139/24
145/15 157/1 162/8
164/1 166/4 174/14
178/16 178/17 178/17
180/25 181/23 187/5
188/5 188/7 189/17
189/24 202/22 204/13
206/9 206/10 207/12
212/3 213/2 215/17
215/21 216/18 220/22
223/14 223/20 223/21
228/9 230/2 232/17
234/25 234/25 235/3
236/13 237/10 238/20
gets [22] 10/6 21/8

32/25 33/1 33/14 41/9
44/17 74/21 78/3 80/21
90/10 97/4 101/24
108/1 139/7 142/7
155/23 162/22 194/19
getting [15] 17/21
18/23 41/10 44/1 44/20
48/8 84/16 99/3 99/16
117/4 131/8 140/10
140/11 178/2 202/1
give [37] 10/12 24/4
41/21 49/6 54/4 54/14
56/16 68/11 76/22 87/8
91/10 112/11 112/12
123/6 138/3 138/13
156/18 156/19 162/22
166/4 166/22 169/16
181/25 182/1 184/22
193/25 200/5 201/13
201/15 204/11 205/12
215/14 221/8 221/20
229/23 236/16 238/3
given [11] 12/20
121/13 156/9 201/18
207/11 208/24 208/25
211/2 223/8 223/10
224/18
gives [5] 29/5 172/15
175/2 181/10 203/12
giving [4] 10/18 166/25
167/14 188/1
glad [1] 216/4
go [84] 3/25 9/10 12/16
16/3 17/22 20/15 23/16
35/4 35/23 36/23 37/21
37/22 37/23 46/23
46/24 47/5 48/14 59/16
61/13 61/22 65/4 65/15
67/22 69/7 71/6 77/2
81/20 82/9 84/2 84/9
84/13 87/9 88/22 91/7
92/25 93/7 93/24 95/11
95/12 96/4 100/2
100/13 101/16 104/5
106/16 106/22 110/20
127/6 129/12 133/11
133/11 133/12 134/9
137/25 138/4 138/24
139/3 141/17 147/16
149/4 149/15 150/2
158/6 162/6 174/4
176/10 180/15 182/10
185/2 186/19 191/6
191/7 201/7 202/20
203/5 203/12 207/7
212/11 213/24 218/16
218/18 218/20 224/8
228/11
go ahead [5] 12/16
46/23 46/24 127/6
129/12
goal [1] 84/19
goes [24] 30/12 30/25
36/8 55/16 56/12 84/7
89/22 101/22 102/10
106/10 106/17 114/13
123/12 126/17 142/16

177/6 180/2 189/22
196/6 197/23 199/13
going [130] 4/16 11/8
11/8 15/7 15/17 15/18
17/15 17/17 19/13
19/14 23/14 23/15
24/11 37/25 41/21
43/14 44/8 44/8 45/6
45/22 48/13 48/22 51/7
51/15 51/21 53/16
53/24 58/6 58/8 59/25
60/23 63/1 70/12 73/1
75/23 75/25 76/22
76/23 79/9 80/3 80/5
80/13 81/11 87/5 87/23
89/2 89/17 94/1 94/2
95/10 99/15 110/9
110/11 113/14 114/14
114/18 114/24 115/6
117/25 118/18 119/25
121/14 126/2 128/9
130/18 133/18 134/5
134/7 134/8 139/8
140/21 141/24 142/7
142/8 142/9 142/9
143/19 144/23 145/16
145/17 151/8 151/10
156/17 156/21 157/8
157/8 158/2 161/20
163/12 163/22 170/17
172/11 172/23 176/9
177/23 180/19 184/8
189/4 189/8 190/12
195/4 197/13 198/14
201/12 201/13 201/15
202/21 202/22 203/23
205/22 211/1 211/3
212/4 215/13 218/10
219/8 219/22 222/14
222/25 226/3 229/1
231/7 232/18 232/18
232/19 233/19 234/7
235/12 236/16 236/22
gone [7] 16/16 18/8
26/17 116/7 144/22
204/21 204/23
good [22] 3/4 3/6 3/12
4/6 26/19 34/6 45/20
46/11 84/23 85/8 110/1
139/16 143/24 152/16
157/6 157/12 178/14
213/4 215/22 229/2
233/22 238/24
Good morning [1] 4/6
GOOGLE [415]
Google 360 [1] 143/25
Google LLC [1] 3/8
Google's [64] 21/5
21/8 24/20 27/15 29/17
36/2 48/6 52/10 52/22
57/24 72/2 72/2 81/25
82/22 85/6 93/1 95/2
95/22 100/5 100/23
107/20 113/3 117/2
120/25 121/9 122/23
124/16 134/4 134/17
137/23 139/7 139/8

145/7 145/9 145/10
147/19 150/5 150/21
151/15 157/9 158/20
161/7 172/24 174/6
177/7 185/13 186/12
193/3 195/11 196/23
197/19 197/21 208/10
209/6 209/19 209/24
214/21 218/4 218/8
225/20 234/21
Google.com [1]
101/23
got [57] 5/13 11/21
18/17 20/18 31/22
32/18 36/17 39/25
49/21 56/18 58/19 67/5
67/13 67/13 67/14
73/17 80/12 80/13 85/7
88/7 96/6 96/6 100/8
101/16 102/2 103/10
106/16 108/23 114/15
115/25 116/9 123/4
126/3 136/5 137/3
138/22 139/3 140/7
149/3 153/15 156/17
160/6 185/4 186/1
186/2 190/24 209/12
211/20 212/12 214/5
215/12 216/10 216/11
217/16 232/22 235/15
237/3
gotten [7] 26/19 42/1
99/20 123/7 130/22
194/3 238/8
government [12] 12/3
32/21 44/6 58/25 88/1
93/9 94/22 107/4
116/22 146/18 163/2
167/9
government's [9]
56/17 59/18 71/11
72/14 85/21 86/4
102/23 105/11 111/23
Graham [1] 5/14
Graham Safty [1] 5/14
grant [4] 24/1 53/4
218/18 218/22
granted [2] 234/19
237/16
granting [1] 55/9
granular [1] 47/19
grateful [1] 3/25
gravamen [1] 186/7
Gray [1] 5/17
great [8] 34/8 102/24
108/13 156/18 187/25
200/13 216/1 216/2
greater [4] 24/11 69/2
142/5 191/4
gritty [1] 28/13
grossly [1] 38/6
ground [3] 83/18 120/5
195/3
group [1] 104/4
groups [1] 61/21
grouse [1] 157/10
grown [1] 27/16

grows [1] 97/17
guess [19] 57/23 75/14
77/25 92/13 111/23
112/2 127/24 130/6
173/13 173/19 176/20
192/7 216/12 224/15
226/19 226/20 232/4
232/18 233/25
guidance [1] 6/9
guy [1] 30/5
guys [1] 30/5

**H**

had [89] 3/25 9/5 10/23
11/16 11/23 11/24 12/3
12/3 12/10 16/10 16/11
17/7 17/9 20/17 20/18
20/21 20/22 27/9 30/5
30/6 30/7 35/22 41/3
43/6 43/6 54/8 54/12
54/16 58/15 58/15 61/5
61/11 62/5 63/20 64/4
66/18 72/19 74/6 74/17
78/13 79/15 80/7 80/11
86/14 88/13 88/16
88/17 88/18 95/7 97/16
100/5 101/19 109/25
113/8 115/1 115/5
115/11 116/7 123/7
123/12 123/21 126/3
145/9 146/17 146/23
147/10 147/11 147/12
147/18 151/4 151/19
152/4 152/17 170/21
171/15 172/18 173/16
178/14 180/3 184/15
201/4 215/9 217/19
217/24 224/23 227/1
227/3 227/9 238/8
hadn't [3] 63/21 86/23
235/5
half [3] 3/24 221/6
226/25
halfway [2] 112/6
182/11
hand [13] 4/8 61/8
107/15 108/8 113/23
119/25 146/6 158/3
160/5 160/6 172/15
204/11 207/10
handed [6] 4/11 35/3
46/13 152/20 152/21
215/18
handful [2] 4/14 7/22
hands [1] 233/23
hang [4] 70/20 72/16
72/18 186/20
hanging [1] 235/7
hangs [1] 146/10
happen [8] 61/6 61/7
72/1 76/25 77/4 96/5
130/18 177/1
happened [8] 38/11
72/2 76/21 77/3 181/8
205/8 205/23 230/10
happening [6] 95/5
116/24 118/9 130/9
189/7 208/15

**H**

**happens [10]** 71/3 84/8
109/4 116/20 117/8
184/23 189/21 190/16
190/18 205/2
**happy [6]** 69/18 69/19
120/18 125/11 223/17
228/14
**hard [9]** 3/21 5/21
18/15 25/23 103/21
158/13 169/25 170/3
226/11
**harder [6]** 33/15 78/5
90/24 91/5 196/25
204/13
**harebrained [1]** 215/13
**harm [37]** 7/2 7/9 12/7
15/23 15/25 43/15
44/19 44/19 44/23 47/4
47/6 47/15 50/12 50/15
52/19 56/12 85/12
124/24 131/1 133/18
135/17 144/8 148/7
158/19 159/3 159/8
160/6 175/15 181/16
181/21 182/5 187/6
187/9 187/11 200/15
210/19 226/14
**harmed [13]** 15/24
26/7 47/8 47/10 47/13
126/7 126/14 126/15
142/5 144/15 160/14
160/16 216/7
**harmful [2]** 51/17
64/17
**harming [3]** 87/7 134/2
193/18
**harms [3]** 65/21 65/22
74/3
**harping [1]** 112/21
**harsher [1]** 77/17
**has [184]** 3/16 3/22 7/3
11/14 12/25 16/16 20/1
21/13 21/18 22/17
22/17 22/19 22/23
22/25 23/1 23/5 24/8
24/9 24/19 27/24 28/9
28/10 29/12 30/10
30/14 31/24 33/14
33/16 35/19 39/9 42/21
43/24 43/25 46/19
46/22 47/9 47/15 47/23
48/9 48/10 48/16 49/10
49/11 56/11 56/20
57/13 57/22 57/22 58/7
63/3 63/13 63/20 64/3
64/4 64/13 65/3 65/13
67/6 68/25 70/3 70/25
76/4 79/8 80/23 80/24
80/25 83/2 83/11 85/23
86/2 86/25 87/25 89/1
89/4 89/6 89/6 89/25
90/4 92/6 92/23 93/10
94/3 94/16 94/17 97/2
97/16 97/25 98/11
100/24 103/8 108/3
108/19 108/21 109/9
112/5 113/20 116/21

126/7 126/14 126/15
131/1 132/14 133/9
133/14 134/10 134/13
134/25 141/8 141/16
144/6 144/12 144/15
144/18 144/19 144/23
146/5 147/2 147/3
147/8 148/18 149/7
150/16 151/16 151/21
153/20 157/16 158/22
158/25 160/21 161/10
162/10 163/14 163/24
169/1 169/19 169/24
176/2 178/6 180/25
181/19 182/17 182/23
184/19 185/5 185/10
185/20 186/4 188/5
190/19 191/11 194/8
194/11 194/17 194/22
195/9 195/11 196/3
196/4 196/22 196/25
197/2 197/20 202/24
203/12 203/15 203/17
203/25 204/21 204/24
204/25 205/8 209/18
210/14 211/23 213/18
215/11 217/8 222/23
226/1 231/21 238/7
**hasn't [10]** 33/2 86/2
88/6 146/3 150/19
150/22 180/20 199/21
205/8 205/8
**hate [1]** 235/1
**have [436]**
**haven't [15]** 12/11
13/24 13/24 39/18
50/15 71/17 74/14 96/8
110/4 144/7 150/18
153/9 189/20 196/18
232/3
**having [28]** 4/1 7/11
20/20 21/14 22/22 23/3
25/5 47/13 69/15 78/3
79/15 101/6 101/23
102/11 106/14 130/12
144/15 144/19 162/1
176/2 185/22 193/14
199/5 199/8 200/23
221/19 234/13 238/3
**Hays' [1]** 149/20
**he [22]** 22/25 25/12
36/1 47/7 48/24 49/1
96/1 96/2 96/3 96/4
101/11 101/12 106/7
123/20 132/7 172/1
173/18 213/13 213/13
215/4 229/4 229/6
**He didn't [1]** 49/1
**he said [2]** 213/13
213/13
**he's [6]** 101/12 114/14
198/17 198/22 216/25
216/25
**head [3]** 24/13 24/13
121/22
**hear [6]** 93/23 121/1
171/15 172/21 178/15

**heard [10]** 48/24 74/14
79/17 201/22 211/6
215/17 217/1 231/2
236/17 236/18
**hearing [14]** 1/9
221/18 221/19 221/20
221/25 222/6 222/7
223/20 226/17 226/18
228/14 230/8 230/19
232/21
**heart [2]** 96/16 177/7
**heat [1]** 178/1
**heavy [1]** 87/19
**held [3]** 71/24 83/17
98/2
**help [15]** 18/5 19/21
23/24 62/24 74/14
132/15 136/22 172/12
186/9 214/11 214/12
219/9 220/8 221/23
221/23
**helped [1]** 132/19
**helpful [5]** 5/23 40/10
107/2
**helping [1]** 109/21
**helps [2]** 145/11
224/10
**her [2]** 81/16 109/9
**here [132]** 3/15 4/9 5/8
5/17 6/11 6/25 15/2
15/11 20/4 21/7 23/20
23/20 34/7 34/17 35/18
35/24 37/4 37/4 38/23
40/15 42/7 43/2 43/9
44/23 47/10 50/16
50/24 51/8 51/24 53/18
56/24 57/4 57/23 58/8
58/19 59/24 60/4 66/20
66/25 67/16 68/7 68/8
70/2 70/9 74/14 75/22
77/4 78/12 81/7 87/20
89/23 90/24 91/14
91/20 92/20 94/21 98/7
99/7 99/13 99/15 99/24
100/25 111/18 116/17
120/2 127/6 127/16
128/8 129/4 129/17
132/10 133/19 134/25
136/10 136/11 136/22
136/23 138/1 138/12
138/22 138/24 139/3
140/7 141/25 147/14
148/14 148/21 153/2
153/11 163/21 166/3
166/5 172/2 177/22
180/6 180/18 180/22
181/25 181/25 182/1
182/2 189/7 189/21
190/15 194/2 197/18
197/19 200/20 200/22
202/2 203/17 206/5
211/21 212/10 212/12
212/22 213/7 215/22
216/13 218/10 222/16
223/1 225/13 225/25
231/22 232/5 232/8
233/3 233/9 235/16

**here's [13]** 43/18 76/11
101/10 102/13 103/25
110/12 127/24 164/23
178/3 179/19 184/21
197/3 213/12
**hesitate [1]** 5/4
**Hey [2]** 147/19 214/22
**hide [5]** 74/9 74/11
153/4 223/2 229/13
**hiding [1]** 228/17
**high [1]** 113/4
**higher [3]** 39/21 117/3
172/14
**highlight [2]** 176/15
236/16
**highlighted [1]** 107/19
**highly [5]** 51/11 52/16
173/5 224/16 224/17
**him [3]** 113/9 171/24
215/4
**hinder [1]** 17/17
**his [10]** 25/11 36/1
42/13 81/16 114/15
141/10 158/10 171/13
207/17 229/4
**historically [2]** 20/21
33/6
**history [2]** 101/10
156/10
**hit [4]** 13/24 103/11
103/12 103/12
**Hmm [1]** 88/22
**hold [3]** 99/9 126/1
186/14
**hole [2]** 61/14 237/20
**holiday [2]** 158/13
212/3
**Honor [183]** 3/6 4/6
4/10 5/11 6/1 6/14 9/1
10/12 11/16 12/16 15/1
15/5 24/19 30/21 35/1
37/5 38/14 42/3 43/18
44/12 45/1 45/20 45/24
46/11 46/25 47/9 50/11
53/13 57/6 57/25 59/3
61/2 61/14 62/19 63/11
64/13 67/11 67/20
68/14 70/7 71/7 72/1
73/8 73/25 75/1 75/16
76/20 76/25 77/19
77/23 78/8 78/17 80/17
81/7 82/3 84/7 89/1
89/20 93/24 98/19
99/24 100/22 101/5
102/1 106/17 106/21
107/13 107/18 108/8
110/3 110/20 113/15
116/13 117/21 119/6
119/24 120/2 122/2
123/25 125/12 126/2
129/12 134/13 134/16
146/6 146/20 147/10
147/23 152/19 157/13
158/2 158/8 158/21
159/23 160/20 160/25
162/4 162/6 162/4
162/6 164/23 164/24

167/23 167/23 169/16
169/20 172/24 173/22
173/23 174/22 175/6
175/25 176/8 176/10
176/12 179/8 180/10
181/3 182/10 183/4
183/15 184/21 185/22
186/15 189/1 191/1
191/5 192/1 192/8
192/13 193/25 194/3
194/8 194/13 195/24
197/9 197/14 197/17
198/10 199/12 200/1
201/1 202/19 203/14
203/22 205/11 206/16
206/22 206/24 208/1
208/14 209/5 209/8
209/15 210/2 210/4
210/15 210/20 211/5
211/13 212/6 212/7
212/9 215/22 217/4
217/23 218/8 219/1
219/16 220/17 221/13
223/6 226/21 231/4
231/6 231/9 231/24
232/2 234/15 235/15
235/24 236/4 236/15
**HONORABLE [5]** 1/10
3/3 45/15 119/17
157/22
**hop [1]** 135/25
**hope [7]** 3/17 21/17
24/12 100/4 162/13
227/4 234/16
**hopefully [5]** 5/22 35/3
130/13 131/3 148/13
**hopes [1]** 209/5
**hotel [12]** 136/14 138/3
138/8 139/7 140/10
140/11 140/24 141/3
154/2 201/12 205/13
211/22
**hotels [18]** 134/6 134/7
134/9 135/12 137/4
137/20 138/1 138/21
139/8 139/9 139/23
140/9 140/25 141/2
159/15 211/14 211/22
212/19
**hour [2]** 99/20 221/6
**Hovencamp [1]** 213/22
**Hovenkamp [3]** 56/25
57/10 77/4
**how [77]** 8/6 18/4 19/9
31/21 34/12 34/18
34/22 35/16 35/18 36/6
36/7 36/19 36/23 44/19
44/25 47/7 48/24 48/25
53/20 62/15 65/11
75/17 75/20 82/12 86/8
86/8 87/25 88/1 92/16
93/16 94/11 94/25
95/22 99/14 101/7
103/17 106/21 109/21
111/2 111/3 111/12
112/10 123/19 131/18
133/15 144/12 144/23
146/2 147/15 158/18

**how... [27]** 159/2
159/19 164/2 173/25
175/4 180/12 183/16
190/2 190/5 191/20
194/14 195/1 196/8
198/12 198/17 200/24
202/2 213/16 214/24
218/3 218/17 219/25
224/25 224/25 225/14
225/15 233/2
**How's [1]** 202/4
**how-many-meter [1]**
111/12
**however [7]** 6/16 37/22
94/24 126/20 134/22
164/6 227/6
**human [1]** 103/21
**hung [1]** 110/8
**hurdle [1]** 122/12
**hurdles [1]** 112/13
**hypothetical [11]**
42/13 50/22 62/25
63/10 63/12 76/20
95/15 112/3 168/24
175/20 213/19
**hypothetically [6]** 8/9
53/1 72/9 72/12 94/23
129/16

**I**

**I also [1]** 12/17
**I am [6]** 152/24 167/23
193/14 208/1 210/25
211/3
**I apologize [4]** 171/10
174/13 177/12 183/7
**I appreciate [2]** 101/2
210/22
**I assume [1]** 63/12
**I believe [20]** 19/12
59/7 92/19 99/2 114/12
117/2 128/3 128/6
139/23 169/21 175/23
192/2 195/24 199/15
200/8 203/6 217/23
220/7 222/4 226/4
**I can [16]** 10/12 13/1
18/22 23/16 73/22
73/22 92/21 115/21
115/21 115/22 121/16
135/17 190/13 193/16
198/15 229/16
**I can't [9]** 53/5 53/8
53/8 59/24 73/11 82/11
86/16 89/23 156/16
**I couldn't [1]** 22/12
**I did [4]** 81/2 89/19
116/16 216/5
**I didn't [1]** 171/15
**I don't [21]** 21/10 29/2
59/15 66/16 67/6
111/24 120/7 124/15
127/9 135/19 136/16
151/6 153/3 169/12
171/5 201/9 217/23
226/8 231/18 232/21
237/14

**I don't have [4]** 7/25
133/12 151/9 207/8
**I don't recall [1]** 61/8
**I guess [18]** 57/23
75/14 77/25 92/13
111/23 112/2 127/24
130/6 173/13 176/20
192/7 216/12 224/15
226/19 226/20 232/4
232/18 233/25
**I have [13]** 4/8 17/23
22/5 26/13 47/3 81/2
108/6 115/23 141/10
141/16 152/12 177/14
193/22
**I haven't [1]** 74/14
**I hope [2]** 3/17 162/13
**I just [10]** 67/9 79/17
80/17 99/20 115/5
185/15 205/17 238/5
238/15 238/17
**I know [22]** 3/22 6/25
37/19 40/4 41/22 45/23
47/1 82/12 87/22 88/6
110/21 115/11 118/16
120/4 121/14 139/23
182/10 208/1 210/25
214/16 232/3 233/6
**I mean [108]** 8/8 14/10
22/8 22/13 22/13 22/23
24/24 25/10 25/15
26/16 27/4 27/22 28/12
36/13 39/2 39/20 39/21
40/5 40/10 42/7 44/14
49/10 50/25 52/14 57/5
58/12 61/14 62/16
64/23 64/23 67/11
68/15 68/17 70/2 70/4
73/6 74/5 77/16 78/16
78/21 79/16 80/8 80/23
80/25 81/5 81/10 81/11
82/8 82/15 82/25 85/14
85/17 86/19 87/5 88/22
94/14 95/11 97/17 98/1
98/20 99/12 103/10
106/25 107/10 118/11
118/23 125/14 127/20
130/21 131/7 131/8
132/3 136/6 138/24
145/3 148/5 148/16
152/9 153/23 154/9
156/23 170/12 173/12
178/21 186/21 190/5
195/18 197/18 202/10
205/19 209/17 218/10
222/25 223/23 223/24
224/1 224/13 226/20
226/21 226/23 226/25
227/3 228/7 228/12
229/8 233/3 234/6
238/14
**I meant [1]** 143/13
**I misspoke [1]** 183/8
**I say [2]** 183/18 226/10
**I should [6]** 4/25 9/14
40/11 85/22 93/22
116/16
**I stay [1]** 176/12

**I think [100]** 4/12 8/18
12/4 16/2 19/18 21/2
30/25 31/16 35/2 35/13
40/3 40/6 40/14 42/5
42/5 42/7 44/12 45/23
51/9 52/12 52/21 68/8
70/22 71/2 86/3 88/12
93/24 101/20 104/11
110/6 111/17 113/15
114/11 115/13 118/16
120/6 120/10 125/10
125/14 125/25 126/2
126/3 126/12 127/1
127/8 128/11 129/1
129/4 129/18 130/15
132/1 132/3 132/12
135/21 135/23 135/23
136/9 139/20 139/21
141/19 148/1 148/22
152/9 152/21 153/3
153/13 153/16 154/9
160/12 161/6 161/15
164/24 168/22 171/10
172/1 174/4 178/9
188/23 191/2 196/7
198/15 206/24 208/14
209/8 211/6 214/4
217/17 218/15 220/3
221/14 224/16 225/2
231/7 231/21 231/23
232/22 232/25 233/18
237/7 238/2
**I thought [14]** 47/4
77/25 94/15 124/17
135/8 171/11 184/8
184/11 186/10 186/11
192/25 194/25 195/16
201/22
**I understand [15]** 18/6
52/22 59/14 63/4 69/2
97/20 103/6 103/23
149/12 180/24 184/17
194/23 198/22 226/23
228/10
**I want [23]** 3/21 6/1
11/11 33/9 34/16 35/1
45/5 67/19 108/8 111/2
111/3 112/20 116/15
129/14 145/23 174/14
186/16 187/25 189/1
197/4 205/10 210/9
232/4
**I wanted [1]** 236/13
**I was [9]** 51/9 63/23
63/23 102/4 105/2
161/20 186/16 188/9
203/23
**I will [22]** 4/14 4/17
4/21 7/25 25/10 46/5
46/7 46/20 47/2 47/20
146/6 146/6 149/19
153/20 158/4 158/6
160/11 205/1 210/4
218/15 220/13 226/8
**I would [1]** 123/25
**I'd [14]** 4/8 17/23 69/18
108/7 123/12 151/4

**I'll [28]** 46/23 47/15
56/16 69/19 87/8 87/22
92/25 99/23 99/23
99/24 99/25 113/23
115/9 121/15 131/3
131/21 134/25 153/21
180/17 181/25 182/1
201/8 201/9 202/10
212/3 216/12 224/13
238/22
**I'm not sure [3]** 78/6
177/14 205/23
**I'm sorry [17]** 26/5
26/12 27/6 90/16 94/19
111/11 126/1 129/12
136/7 151/8 152/18
177/11 184/3 189/11
196/7 203/6 225/23
**I'm sure [2]** 152/23
207/9
**I've [30]** 4/11 4/11 5/3
5/13 34/23 37/3 41/22
42/6 47/22 88/7 104/2
106/16 126/3 139/3
146/24 152/4 156/17
208/20 208/24 208/25
209/2 209/4 210/25
211/12 214/5 215/12
215/18 217/1 221/14
226/15
**IAP [2]** 35/7 167/19
**IAPs [9]** 10/15 18/5
18/5 18/8 20/19 31/12
35/8 92/1 115/18
**icons [1]** 66/22
**ICP's [1]** 115/25
**ICPs [5]** 11/15 132/24
133/4 152/16 152/17
**idea [14]** 21/7 69/12
77/16 83/15 90/12
101/20 102/20 106/9
106/13 108/5 156/18
188/15 215/13 232/9
**ideal [2]** 217/20 217/22
**ideally [1]** 36/3
**identical [2]** 132/16
155/23
**identifiable [1]** 152/2
**identification [1]**
236/13
**identified [6]** 9/8 66/21
97/3 186/4 200/14
200/23
**identify [3]** 65/21 73/22
113/2
**identifying [1]** 151/7
**IE [6]** 16/14 114/2
123/15 132/6 132/7
166/10
**IEAK [1]** 10/21
**IEK [2]** 166/8 167/11
**ignore [1]** 66/12
**ignored [1]** 83/22
**II [2]** 134/23 169/8
**illegal [5]** 79/15 83/12
83/14 115/24 179/18
**imaginary [2]** 42/14
102/17
**imagine [2]** 5/3 156/16
**imagining [1]** 78/17
**immersive's [1]** 140/21
**immunize [1]** 128/25
**impact [9]** 47/17 58/3
58/4 132/9 133/15
165/8 174/3 199/5
218/3

**I'm [126]** 3/24 4/1 4/16
15/17 15/18 21/3 23/8
26/5 26/12 26/12 26/12
27/6 29/13 37/25 39/8
40/15 41/21 43/13
45/20 45/22 51/7 51/15
58/7 59/25 66/4 67/1
70/12 71/8 76/12 78/6
78/16 86/1 87/23 90/1
90/16 94/19 98/6
111/11 113/14 114/14
115/6 117/24 117/25
118/17 118/17 118/18
119/25 120/18 121/2
121/13 122/16 124/17
125/11 125/15 126/1
129/12 129/13 130/6
135/8 136/7 139/8
145/16 145/17 145/19
148/13 150/4 150/8
151/3 151/8 151/8
151/10 152/18 152/23
156/16 157/8 157/8
163/12 165/6 167/5
167/7 171/14 171/16
172/3 172/11 172/23
176/6 177/11 177/14
178/22 182/10 184/3
184/18 187/25 188/2
189/4 189/8 189/11
190/2 190/12 191/1
192/7 194/24 195/4
196/7 197/13 197/16
197/23 198/14 200/1
200/23 202/21 203/6
205/23 207/9 215/13
216/4 222/12 222/15
222/25 224/25 225/23
227/23 227/24 227/25
236/16 238/22
**I'm going [17]** 4/16
15/18 45/22 51/7
114/14 115/6 117/25
119/25 145/17 151/8
163/12 172/23 189/4
195/4 198/14 202/21
215/13
**I'm just [5]** 66/4 71/8
98/6 125/15 222/12
**I'm not [21]** 26/12
37/25 51/15 59/25 67/1
86/1 117/24 118/18
121/13 148/13 150/4
157/8 157/8 167/5
172/11 176/6 189/8

**I**

**impacts [2]** 152/7
196/13

**impermissibly [1]**
59/10

**implement [1]** 141/14
**implicated [1]** 15/6
**implore [1]** 110/20
**import [1]** 99/6
**importance [5]** 100/10
175/3 191/16 208/21
210/4

**important [32]** 16/2
17/1 48/12 49/5 61/14
64/17 84/15 91/14
91/16 91/18 96/20 99/7
113/12 113/16 124/8
129/2 158/14 164/8
169/20 172/25 177/4
177/22 179/13 182/3
197/6 199/3 209/8
224/25 228/21 236/5
236/10 237/9

**importantly [2]** 160/7
188/14

**impose [2]** 11/19
110/24

**imposed [1]** 77/6
**impossible [3]** 23/10
30/3 208/7

**impressions [4]**
224/14 224/15 226/18
226/23

**improper [1]** 68/20
**improperly [1]** 223/25
**improve [8]** 51/19 52/8
82/4 82/5 132/19
154/18 179/2 181/23
**improved [7]** 124/13
124/25 144/19 148/1
196/9 196/12 196/15
**improvement [15]**
120/14 124/17 125/10
127/25 128/9 129/11
134/17 134/21 135/18
211/10 211/11 213/11
213/23 214/1 237/4
**improvements [4]**
125/20 125/23 126/10
127/1
**improves [1]** 97/22
**improves the [1]** 97/22
**improving [2]** 50/14
87/12
**imputed [1]** 227/14
**inability [2]** 95/15
175/16
**inadvertently [1]** 5/1
**Inc [1]** 68/12
**incapable [2]** 142/13
158/24
**incentive [6]** 24/1
111/18 111/25 183/24
187/12 188/10
**include [6]** 94/8 94/10
94/11 116/6 137/8
204/6
**included [1]** 139/15

**includes [5]** 94/7
143/8 143/9 159/7
**including [5]** 8/23
80/20 137/2 166/3
211/24
**incompatible [2]**
164/12 187/2
**inconsistent [1]**
227/19
**incorrect [1]** 205/12
**increase [5]** 51/25
87/14 87/17 174/8
209/3
**increased [3]** 85/16
184/19 196/18
**increasingly [1]**
182/24
**incredibly [1]** 30/1
**incremental [1]** 107/12
**incumbency [3]** 22/17
22/19 23/2
**incumbent [4]** 67/25
68/1 191/19 192/4
**indicated [1]** 238/9
**individual [2]** 10/8 40/7
**individually [4]** 8/2
115/15 116/4 152/10
**individuals [1]** 146/14
**individuals' [1]** 5/12
**inducements [1]** 18/13
**induces [1]** 184/4
**indulge [2]** 5/7 226/22
**industry [1]** 22/10
**infer [1]** 216/11
**inference [15]** 144/21
174/5 175/11 199/15
201/1 210/5 210/5
210/13 210/14 215/21
216/9 224/7 224/23
234/9 237/19
**inferences [4]** 159/6
210/16 223/7 223/8
**inferior [2]** 44/20 44/23
**inform [1]** 224/10
**information [21]** 4/15
4/22 89/23 140/7 140/8
140/10 144/11 182/18
182/19 189/15 191/4
192/5 211/24 225/10
228/17 230/8 230/12
230/17 230/22 235/19
238/21
**informative [2]** 217/8
225/4
**informed [1]** 221/19
**informs [3]** 125/11
160/1 178/1
**inherently [1]** 7/18
**initial [2]** 22/25 66/23
**initiates [2]** 77/2 77/3
**initiation [3]** 83/20
83/21 83/22
**Inn [1]** 212/3
**innovated [1]** 86/3
**innovating [1]** 52/3
**innovation [15]** 9/21
47/11 51/13 51/17
85/13 85/23 85/24 86/2

**innovations [1]** 88/18
**innovative [3]** 11/3
21/10 101/19
**input [2]** 22/23 203/18
**inputs [1]** 22/6
**inquiries [1]** 133/14
**inquiry [1]** 124/22
**ins [1]** 102/12
**inside [1]** 165/20
**insist [1]** 190/9
**insofar [1]** 155/12
**install [1]** 180/19
**installed [2]** 112/1
189/20
**installs [1]** 59/19
**instance [1]** 12/9
129/10 174/9 190/18
**instances [4]** 129/3
129/20 139/14 139/24
**instead [6]** 37/7 53/22
55/4 64/11 65/20 184/5
**instigate [1]** 84/8
**instigated [3]** 42/24
84/5 100/15
**instigation [1]** 100/20
**instruct [1]** 232/19
**instruction [1]** 222/15
**insurmountable [1]**
30/23
**integrated [1]** 130/4
**integrates [1]** 176/21
**integrating [1]** 127/12
**integration [1]** 130/3
**Intel [1]** 165/10
**intellectual [3]** 57/14
57/15 57/17
**intend [1]** 174/23
**intent [1]** 237/8
**intentional [5]** 165/16
222/20 225/7 228/17
232/7
**intentionally [8]** 74/11
142/21 214/10 228/5
228/6 232/10 233/10
233/16
**interest [5]** 16/1 68/11
68/12 80/11 138/8
**interested [2]** 175/13
177/8
**interesting [3]** 88/15
102/19 217/8
**interestingly [1]**
137/21
**interests [2]** 84/17
84/18
**interface [1]** 102/8
**internal [4]** 17/19
124/3 185/25 191/15
**Internet [21]** 10/15
10/18 10/20 10/20
10/23 11/7 11/15 11/19
11/20 11/22 16/11
18/17 18/25 27/9 31/12
58/17 105/7 112/17
117/10 165/21 166/13
**interrupt [4]** 5/4 40/15

**interrupted [2]** 104/24
196/7
**introduce [5]** 5/8 88/3
167/9 187/4 188/21
**introduced [4]** 112/16
147/20 158/10 183/9
**introduces [3]** 70/24
136/2 176/17
**introducing [4]** 159/1
163/3 170/22 213/9
**introduction [6]** 88/2
124/16 124/25 136/8
145/9 183/1
**introductory [2]** 127/8
127/8
**invest [1]** 188/5 193/6
**investigation [3]**
225/11 225/23 226/6
**investigative [1]**
225/25
**invocation [1]** 190/18
**invokes [1]** 192/6
**invoking [1]** 189/23
**involve [2]** 110/22
110/25
**involved [7]** 5/21 22/1
**involves [4]** 120/21
121/5 165/6 210/18
**involving [2]** 165/5
206/3
**IoT [1]** 15/12
**iPhone [1]** 103/11
**iPhones [1]** 33/2
**ironic [2]** 156/10 173/5
**irrelevant [1]** 36/22
**is [949]**
**Is that right [1]** 211/15
**is there [22]** 8/3 25/7
44/19 47/6 56/11 67/24
81/13 92/10 112/4
137/14 145/20 155/1
155/3 156/5 183/23
183/24 196/21 197/24
198/9 202/23 204/24
205/7
**ISA [1]** 100/14
**isn't [18]** 5/4 16/6
16/15 16/21 23/23
37/13 42/20 79/16
106/8 144/18 144/21
146/19 148/10 148/16
153/23 198/20 203/2
225/6
**ISP [16]** 16/13
**ISPs [1]** 16/10
**issue [33]** 6/18 15/21
16/4 21/6 23/20 35/24
38/19 52/13 52/20
55/15 61/1 64/1 70/16
70/17 76/12 120/20
139/21 146/19 148/8
169/14 197/19 204/25
205/9 208/4 211/8
219/14 219/15 222/5
222/21 231/18 231/20
231/21 236/11
**issues [16]** 46/4 46/8

7/49/13 50/16 83/3
108/14 120/6 143/25
152/4 169/7 182/3
222/16 232/16 236/18
237/5
**ISV [2]** 58/13 58/13
**ISVs [7]** 54/7 54/7
54/11 54/14 115/19
161/1 161/2
**it [674]**
**It assumes [1]** 117/22
**it would be [6]** 40/10
79/16 145/25 182/5
225/15 237/9
**it's [252]**
**It's like [1]** 202/20
**iteration [2]** 213/18
213/19
**its [84]** 6/16 7/8 8/6
8/11 8/18 12/3 23/13
24/5 30/12 49/22 50/7
54/15 55/7 55/21 59/5
59/19 60/23 62/12
64/16 77/7 79/4 80/19
80/21 82/25 84/17
84/18 84/18 84/19
84/19 87/12 88/3 88/4
89/5 90/20 97/18 97/25
98/1 98/4 99/17 105/1
113/10 115/22 116/5
117/1 117/2 117/2
122/10 126/25 142/14
144/16 144/18 144/20
145/4 149/7 150/6
154/17 154/18 155/14
156/2 159/19 160/22
162/21 169/21 170/23
175/5 175/14 175/16
176/3 176/18 180/9
182/23 182/24 186/3
186/22 189/23 190/20
190/23 200/2 200/5
201/19 210/12
**itself [22]** 5/22 16/1
16/22 22/20 24/17 40/7
47/16 86/6 97/22
126/18 134/2 135/21
138/3 142/13 144/18
148/17 164/9 168/2
173/8 181/21 183/3
222/25

**J**

**Jackson [2]** 19/12
132/4
**January [3]** 177/3
177/6 177/25
**Japan [3]** 191/10
191/12 208/24
**Java [19]** 60/20 60/21
60/22 61/4 114/3
114/17 123/24 127/13
127/17 129/1 129/7
163/11 163/12 164/4
165/24 166/7 213/23
214/3 214/7
**job [1]** 157/12

**J**

**John [3]** 2/2 3/11 4/7
**John Schmidtlein [2]** 3/11 4/7
**jointly [1]** 45/25
**joke [1]** 162/7
**jon.sallet [1]** 1/22
**Jonathan [3]** 1/17 3/10 45/21
**Jonathan Sallet [2]** 3/10 45/21
**Jordan [3]** 216/17 216/19 216/25
**Journal [3]** 179/13 179/13 179/14
**jschmidtlein [1]** 2/4
**judge [13]** 1/10 19/12 26/20 35/22 52/24 113/24 132/4 151/12 152/9 152/17 152/18 180/3 238/16
**Judge Jackson [2]** 19/12 132/4
**judging [1]** 231/9
**judgment [34]** 1/9 6/3 6/13 12/22 15/15 20/4 49/12 53/5 55/9 70/3 100/23 121/19 142/1 142/2 151/13 159/4 166/1 175/11 175/24 186/4 192/2 203/16 208/4 210/3 217/12 218/17 218/18 234/2 234/12 234/17 234/18 235/25 236/8 237/17
**Judicial [1]** 1/20
**July [2]** 218/6 218/7
**jump [5]** 15/4 101/5 112/13 121/24 162/15
**jumped [1]** 30/5
**jurisdictions [1]** 158/9
**jury [2]** 222/15 222/15
**just [153]** 3/14 3/20 5/4 7/21 7/25 12/22 16/5 16/6 21/15 22/22 24/7 24/8 24/18 25/17 26/19 31/17 34/5 36/6 36/6 36/9 39/8 39/14 40/15 40/16 40/19 42/7 42/16 45/9 47/5 47/24 48/3 48/21 50/19 50/25 51/4 51/7 51/10 53/1 54/23 61/16 61/18 62/16 63/13 64/5 66/4 66/12 67/6 67/9 67/21 68/9 69/22 71/8 74/25 76/11 77/20 77/21 79/17 80/17 82/5 82/25 83/13 89/20 91/1 92/2 96/13 97/1 97/18 98/6 98/9 99/6 99/20 99/23 100/7 102/17 106/11 106/13 107/5 110/8 115/5 115/6 115/17 116/8 116/18 118/25 118/25 122/8 125/15 127/11 127/25 129/15 132/11 134/8 135/1 143/7

150/25 151/22 153/21 157/15 157/17 159/9 162/13 165/20 167/23 170/17 171/1 174/14 176/15 177/11 178/21 181/14 184/14 185/15 185/16 186/16 186/16 188/14 193/15 193/22 202/11 204/19 205/12 205/17 207/19 207/23 208/2 208/2 209/1 210/2 211/5 213/8 215/8 216/3 216/12 217/10 219/10 219/18 221/8 222/12 224/13 224/14 227/10 232/4 232/9 234/3 234/13 238/2 238/5 238/6 238/15 238/17

**justice [9]** 1/13 59/8 108/11 108/13 181/17 181/17 225/3 225/21 227/15
**justification [6]** 48/18 56/14 65/14 163/6 164/14 178/6
**justifications [10]** 13/9 14/1 14/13 20/10 65/7 65/24 162/23 204/7 235/23 236/7
**JVM [1]** 164/6

**K**

**keep [5]** 25/14 105/11 176/9 178/1 211/2
**keeping [2]** 99/16 103/3
**keeps [2]** 82/15 112/21
**Ken [2]** 3/9 5/15
**Ken Smurzynski [1]** 5/15
**Kenneth [1]** 1/13
**kenneth.dintzer2 [1]** 1/16
**kept [1]** 99/3
**key [5]** 17/1 19/2 42/7 109/6 192/9
**killing [1]** 114/25
**kind [33]** 6/6 16/3 16/8 50/5 53/14 63/8 64/18 117/24 120/3 121/4 124/22 135/16 144/13 158/7 160/13 168/20 170/11 172/17 179/23 182/19 190/10 192/4 196/25 201/16 201/20 202/7 205/2 208/12 215/5 224/5 234/8 234/9 238/13
**kinds [7]** 98/7 159/16 161/2 161/16 164/18 170/5 210/7
**kits [1]** 166/11
**knew [4]** 74/8 228/4 228/7 228/8
**know [151]** 3/17 3/22 5/21 6/3 6/25 9/3 9/7

22/8 28/7 28/11 28/16 30/14 32/20 33/18 33/24 33/25 35/5 35/6 35/21 37/19 40/4 41/22 45/23 47/1 49/14 53/4 56/17 58/21 63/22 66/6 66/7 70/24 71/22 73/11 74/6 74/12 74/21 75/8 79/9 82/12 86/1 86/8 87/22 88/6 88/7 92/4 94/21 98/22 99/6 103/14 103/25 105/13 106/20 109/11 110/21 112/10 112/12 114/17 115/11 118/16 120/4 121/14 121/15 122/4 124/4 125/18 133/11 134/20 136/23 137/7 139/23 142/4 142/14 142/14 144/4 146/18 147/1 150/10 151/3 152/23 152/25 153/24 154/1 154/2 154/3 154/8 155/10 155/22 156/23 157/8 163/22 165/1 166/8 166/11 166/25 170/15 172/22 178/5 182/10 187/18 187/19 188/11 201/8 201/10 205/1 205/25 206/1 207/5 208/1 210/25 211/24 213/1 213/14 214/1 214/16 215/19 215/21 215/25 216/7 216/12 218/2 218/25 220/12 222/4 222/12 224/18 224/21 225/10 226/1 226/10 226/11 226/13 229/11 230/4 230/13 232/3 232/14 232/22 232/23 233/2 233/6 233/10 233/22 234/7 238/4 238/14 238/16

**knowing [1]** 74/7
**knowledge [5]** 155/4 155/11 227/8 227/9 227/14
**known [1]** 227/1
**knows [2]** 82/8 210/4
**Kollios [1]** 5/17

**L**

**lack [6]** 47/10 85/23 86/2 92/1 107/24 174/24
**laid [1]** 28/17
**language [4]** 12/4 37/19 113/13 114/6
**laptop [1]** 18/19
**Lara [1]** 5/17
**Lara Kollios [1]** 5/17
**large [5]** 4/12 22/5 23/13 116/23 231/7
**largely [2]** 81/4 144/3
**larger [3]** 9/21 22/6 54/20

183/19
**Larry [2]** 216/16 216/25
**Larry Bird [2]** 216/16 216/25
**last [20]** 3/24 3/25 21/18 37/24 47/13 63/15 63/18 68/16 68/20 99/23 99/25 115/9 118/20 153/20 156/4 162/7 203/22 204/2 210/2 233/25
**lasted [1]** 48/10
**late [1]** 162/8
**later [6]** 27/16 99/15 114/14 121/23 207/17 232/22
**Lauderdale's [1]** 179/12
**launch [1]** 186/1
**launched [2]** 148/21 148/22
**launching [1]** 196/23
**law [28]** 1/18 7/7 13/1 22/13 22/14 22/16 22/17 34/1 38/4 42/17 55/8 55/13 59/9 85/22 100/3 124/12 124/20 125/2 125/8 161/4 166/2 167/8 167/12 168/3 223/7 235/24 236/12 237/16
**lawful [18]** 23/19 35/13 40/23 40/23 41/18 57/4 57/20 60/23 60/24 61/4 79/7 80/2 126/21 163/8 163/25 164/3 164/16 168/1
**laws [5]** 7/7 25/21 125/3 134/11 164/12
**lawsuit [1]** 108/12
**lawyer [3]** 22/24 225/24 226/1
**lawyers [8]** 158/10 158/11 210/7 211/1 225/20 225/21 227/11 227/12
**lean [1]** 122/4
**leaps [1]** 193/17
**learned [1]** 235/19
**least [38]** 16/22 27/21 27/25 37/21 38/7 38/16 38/21 40/3 40/4 48/3 54/11 56/24 57/4 57/24 58/20 68/23 70/11 75/20 81/4 98/10 103/16 120/11 122/18 129/18 129/23 131/9 131/15 133/8 141/21 144/2 148/11 150/15 160/25 163/15 193/16 217/9 225/14 230/15
**leave [6]** 59/21 151/8 178/5 216/12 233/22 238/2
**leaves [1]** 125/21
**led [3]** 114/2 123/17

**left [8]** 26/7 89/10 145/13 191/23 225/5 227/21 232/16 235/1
**leg [1]** 118/14
**legal [2]** 5/18 73/24 93/21 100/1 127/8 129/15 165/2 165/3 222/16 236/18 236/19 237/20
**legitimate [2]** 209/13 210/14
**length [3]** 97/8 97/10 219/19
**lengthen [1]** 219/22
**lens [1]** 178/4
**LePage's [4]** 33/7 49/17 83/9 110/20
**less [16]** 91/12 112/12 118/14 145/16 145/17 154/23 156/7 173/7 175/1 192/20 193/6 193/9 193/18 193/19 195/11 198/6
**let [38]** 3/20 5/25 7/21 16/6 30/24 40/10 49/25 52/18 54/23 54/23 54/24 57/25 59/17 68/22 69/7 88/10 101/5 124/14 129/19 135/14 136/22 138/13 151/16 154/8 162/6 171/7 180/15 186/13 186/19 193/25 196/21 197/15 207/19 224/13 234/13 235/12 238/3 238/4
**let's [44]** 5/25 16/7 21/2 23/25 24/8 28/1 53/1 54/4 59/2 59/21 61/16 63/3 72/9 77/2 84/2 86/1 89/19 92/11 95/11 95/12 100/2 100/13 106/13 115/17 116/25 121/24 122/21 129/16 144/10 156/18 157/15 161/1 172/19 175/12 182/12 201/7 207/18 209/9 217/10 217/17 220/23 220/23 221/3 226/12
**let's see [1]** 207/18
**letter [4]** 72/24 108/10 108/12 229/18
**level [5]** 4/21 47/14 47/19 47/19 81/19
**levels [1]** 15/1
**leverage [6]** 18/4 20/17 90/20 110/23 206/3 206/17
**leveraged [1]** 17/24
**liability [6]** 9/11 12/10 55/4 116/2 152/18 181/4
**license [4]** 17/11 17/11 17/15 19/11
**licensing [3]** 18/2 90/18 120/25
**life [1]** 207/24

**L**

**lift [2]** 145/9 145/11
**light [1]** 67/2
**like [81]** 4/8 5/8 7/12
10/18 17/10 17/23
19/13 22/9 26/2 26/8
26/8 28/12 36/13 36/14
36/24 41/25 42/13
44/13 64/11 74/13
85/18 88/2 88/18 88/19
89/11 92/1 93/13 93/14
94/21 96/3 97/24 98/21
100/1 102/17 108/7
109/11 110/17 110/22
110/25 113/2 114/24
116/6 117/10 117/15
120/14 121/3 139/18
142/24 143/19 150/19
156/11 163/11 166/4
171/13 172/7 173/21
174/4 176/13 176/15
185/17 185/24 189/18
197/1 202/20 204/21
205/13 205/21 213/7
213/10 213/20 215/11
219/20 219/24 220/1
220/9 222/11 223/9
223/15 227/13 235/1
238/15
**liked [2]** 5/24 194/4
**likely [7]** 36/1 130/17
197/22 224/16 224/17
228/23 237/8
**likes [3]** 84/2 96/11
118/1
**limine [1]** 217/14
**limit [6]** 62/6 73/2
78/23 189/24 191/2
192/6
**limitations [3]** 190/17
207/11 209/4
**limited [10]** 12/19
12/22 64/16 143/21
160/3 160/3 195/25
196/15 199/16 218/21
**limiting [2]** 49/18
155/19
**limits [15]** 78/19 93/19
95/22 96/21 159/19
160/17 172/13 189/24
195/14 196/17 199/4
200/6 201/25 202/2
209/3
**line [12]** 12/11 41/7
67/5 69/24 84/17 84/24
112/11 113/5 116/3
125/17 169/25 186/23
**lines [1]** 87/24
**linkLine [1]** 179/20
**links [9]** 134/8 139/14
156/25 182/20 182/20
182/25 184/7 184/25
213/8
**list [3]** 89/25 167/20
230/7
**listed [1]** 190/14
**litany [1]** 35/22
**little [24]** 5/23 6/21

45/8 45/10 77/5 87/24
107/17 120/4 120/15
120/16 122/14 123/5
126/25 131/8 148/4
156/10 157/18 202/1
226/11 234/4
**little bit [1]** 37/21
**live [3]** 62/25 63/1 63/5
**LLC [2]** 1/6 3/8
**LLP [1]** 2/2
**load [2]** 17/16 17/24
**lobby [1]** 177/16
**lobbying [1]** 177/20
**local [11]** 139/23
139/23 159/15 159/15
179/15 179/15 194/24
206/21 206/24 207/3
212/19
**lock [3]** 49/4 49/5
156/11
**locked [1]** 21/14
**locking [1]** 36/2
**logic [1]** 210/8
**logical [1]** 39/6
**logically [1]** 193/15
**logo [1]** 191/21
**long [7]** 3/22 23/18
45/6 80/9 162/8 218/24
219/25
**longer [1]** 192/11
**look [100]** 6/24 8/17
9/1 13/8 25/24 28/5
28/12 31/10 32/24 35/2
36/5 38/10 38/17 38/20
50/20 51/10 52/23
53/24 56/8 56/15 56/15
58/2 58/10 60/15 60/21
61/15 61/16 61/18
61/19 62/15 63/1 65/20
67/12 68/18 69/19
72/25 75/21 76/11
76/12 78/18 78/18
78/22 79/3 80/3 82/8
83/23 86/14 92/2 93/25
95/6 95/19 96/3 97/15
98/3 98/6 99/10 102/6
107/4 115/10 115/21
115/21 115/22 116/10
116/11 116/21 117/23
130/11 143/2 143/15
143/19 146/13 147/19
163/4 163/20 164/18
165/12 165/12 166/18
168/6 168/22 170/22
178/8 181/12 184/25
189/3 191/21 197/13
197/15 199/12 202/21
205/19 209/13 209/22
211/12 213/24 214/6
222/11 228/25 229/2
237/7
**looked [15]** 10/17
10/22 36/15 38/9 64/10
66/17 66/21 67/18
89/11 94/16 128/16
152/15 161/2 172/6
193/22

8/1 23/8 25/2 38/12
41/16 53/16 53/22
60/11 116/23 125/15
126/4 130/20 136/17
136/23 150/4 158/18
163/1 164/22 165/20
165/21 209/11
**looks [6]** 117/15
125/22 128/15 164/18
167/11 170/7
**loop [1]** 204/15
**loosened [1]** 215/12
**Lorain [3]** 179/13
179/13 179/14
**Lorain Journal [3]**
179/13 179/13 179/14
**lose [2]** 111/5 209/19
**loss [1]** 224/6
**lost [3]** 27/18 41/4 78/2
**lot [44]** 3/23 3/23 3/25
5/12 5/21 15/3 33/20
36/23 37/2 42/6 42/25
44/15 46/19 52/12 76/9
81/3 82/9 91/18 99/25
103/1 107/5 108/1
111/1 118/21 129/24
139/17 156/25 173/24
173/25 174/2 185/22
189/19 192/23 193/14
201/10 207/21 209/20
215/18 216/13 222/12
225/10 232/22 233/4
236/18
**lots [8]** 20/9 124/2
124/3 130/22 132/15
140/12 153/1 194/17
**loud [1]** 82/11
**love [2]** 95/8 188/1
**loves [2]** 95/6 119/3
**lower [14]** 9/25 23/14
23/17 23/18 23/21
37/22 37/22 132/5
164/25 165/1 165/7
168/2 168/15 168/19
**lowered [1]** 203/25
**loyal [7]** 39/2 43/20
43/21 43/21 43/25
43/25 47/7
**loyalty [1]** 165/6 165/7
165/10
**lunch [1]** 216/19

**M**

**Mac [3]** 19/14 19/15
27/7
**machine [12]** 60/20
60/21 60/23 61/4 88/19
127/13 127/17 129/7
163/11 163/14 166/7
214/3
**machine's [1]** 163/12
**macOS [1]** 107/21
**made [51]** 11/17 12/1
12/3 12/23 12/24 13/7
16/16 16/16 16/17
17/19 18/8 34/5 34/8
42/22 44/12 49/11 52/2

82/8 91/8 106/20
108/19 110/2 110/19
116/21 123/13 123/16
123/19 132/4 132/20
133/1 147/8 148/18
151/16 161/13 182/17
182/21 194/10 195/11
198/4 214/7 223/4
227/19 229/4 231/8
231/13 231/13 238/12
**magic [2]** 91/16 113/5
**main [2]** 161/12 212/18
**maintain [3]** 15/16
172/12 185/6
**maintained [1]** 186/12
**maintaining [2]** 57/21
89/5
**maintenance [2]** 89/1
112/23
**major [2]** 92/2 92/7
**majority [7]** 4/12 29/19
43/20 44/21 94/25
149/14 149/16
**make [64]** 7/21 10/10
17/12 19/18 22/6 22/8
22/9 24/14 28/22 28/24
30/12 30/24 37/14
38/23 38/24 42/1 42/2
42/6 44/10 46/3 49/19
59/24 62/13 63/2 63/15
77/11 79/9 80/5 84/19
86/19 88/10 97/20 98/5
99/20 99/21 99/21
104/12 105/10 105/19
106/13 109/7 109/16
109/18 110/7 111/18
115/5 151/24 152/17
153/21 154/4 154/5
156/20 158/9 182/8
185/17 186/16 202/21
204/14 206/10 210/2
210/9 214/23 214/25
232/4
**make-believe [1]** 37/14
**makes [24]** 14/16
22/24 23/9 34/1 43/4
78/5 85/3 88/22 98/20
109/4 109/20 131/23
156/7 171/4 173/3
175/14 181/9 185/22
187/1 188/18 195/23
198/6 204/3 204/13
**making [19]** 32/17
56/18 60/2 82/23 91/15
109/24 110/1 114/12
118/2 134/18 153/11
153/12 157/4 193/18
208/8 212/13 216/17
217/20 231/17
**maltreatment [1]** 199/1
**mandates [1]** 199/10
**manifested [1]** 47/16
**manner [6]** 31/23
57/16 57/19 172/12
191/4 200/6
**manufacturer [2]**
136/1 189/23

**many [13]** 3/25 5/21
5/21 30/6 30/6 36/14
103/17 111/12 146/2
158/11 173/3 208/8
228/25
**March [1]** 177/24
**marginal [1]** 23/15
**mark [2]** 5/16 123/11
**Mark Popofsky [1]**
5/16
**market [98]** 6/12 12/7
12/8 22/5 24/3 29/17
31/5 35/19 36/11 36/21
36/22 36/25 40/15
40/17 40/18 47/11 48/6
48/9 53/17 54/3 54/20
56/19 56/25 57/1 57/7
57/23 58/4 58/8 58/10
60/10 61/15 61/22
62/15 64/18 65/12 72/2
74/6 74/18 81/3 85/4
85/9 85/17 89/10 89/18
90/19 90/20 90/21
93/18 94/1 94/2 95/1
95/22 96/24 96/25 97/7
97/11 99/18 107/18
113/3 122/14 123/9
123/11 123/18 123/24
124/5 124/24 126/18
130/18 132/9 134/1
134/1 141/20 141/22
142/22 142/25 143/4
143/7 147/7 149/25
150/14 151/15 152/2
152/7 159/25 161/11
169/5 170/19 185/11
189/8 189/14 189/25
190/20 192/21 195/21
200/7 200/11 201/2
206/18
**market share [4]** 29/17
72/2 107/18 113/3
**marketers [1]** 208/7
**marketing [1]** 121/6
**marketplace [9]** 32/1
95/15 153/17 173/2
194/6 201/6 201/17
203/4 203/13
**markets [9]** 48/6 48/8
56/10 56/10 81/7
131/19 132/6 200/22
200/24
**marketwide [1]** 148/4
**MATA [1]** 19/20
**material [15]** 53/10
174/6 182/22 184/6
185/8 191/17 195/9
196/11 199/10 200/8
202/6 208/9 224/24
229/12 235/5
**materials [1]** 5/22
**matter [27]** 7/7 13/1
13/21 38/4 38/25 40/24
47/17 70/1 77/7 82/18
100/20 107/25 112/10
117/5 119/3 125/2
132/7 132/11 161/4
166/1 167/7 173/20

# M

matter... [5] 173/22
210/8 226/9 234/11
240/4
mattered [1] 114/22
matters [7] 25/3 34/23
77/5 104/21 117/4
152/1 217/13
may [43] 8/12 15/15
18/3 22/8 31/21 32/13
36/14 39/13 46/25 53/7
55/2 59/9 73/3 74/17
74/22 91/10 104/21
105/4 105/4 105/12
105/13 107/13 112/13
126/4 126/25 127/15
130/8 140/6 140/10
140/11 145/2 145/5
145/9 150/10 197/3
198/8 216/15 217/12
229/2 234/21 237/19
238/14 238/22
may be [1] 198/8
maybe [49] 7/23 9/16
21/3 27/5 37/21 39/8
51/7 57/11 60/24 63/22
67/2 67/3 67/4 79/3
79/5 81/2 86/5 103/17
112/10 115/22 117/22
121/22 124/17 126/1
132/13 135/8 136/22
141/21 143/24 151/10
161/19 163/17 165/1
165/2 165/12 178/22
180/21 187/6 190/2
194/24 205/22 211/24
215/7 215/10 220/20
221/6 222/16 230/14
233/7
McDonald's [2] 216/16
216/18
McWane [2] 99/1 99/2
me [110] 3/14 3/20 5/4
5/5 5/7 5/25 7/21 8/4
16/6 16/18 18/5 19/21
22/21 23/24 24/13 25/8
25/14 30/24 31/14
31/20 34/18 40/10
40/17 49/25 50/3 52/14
52/18 54/23 54/23
54/24 57/9 57/25 59/17
60/18 62/24 68/22 69/7
73/9 74/14 74/16 86/4
88/10 94/4 94/5 96/17
97/15 101/5 104/11
106/24 119/12 119/14
121/1 123/13 124/14
127/12 129/18 129/19
134/24 135/2 135/6
136/22 138/13 141/6
141/13 143/13 144/23
145/15 145/24 151/16
154/8 162/6 162/13
163/24 171/4 171/7
171/23 177/14 178/22
178/23 179/6 180/15
181/5 184/18 186/9
186/13 186/19 189/2
193/25 194/14 195/15
196/21 197/15 198/7
198/23 198/25 207/10
207/19 216/6 220/5
224/13 225/7 226/6
226/22 234/11 235/12
238/3 239/1
me.' [1] 109/21
mean [143] 8/8 13/20
14/10 22/8 22/13 22/13
22/23 24/24 25/10
25/15 26/16 27/4 27/7
27/22 28/12 36/13 39/2
39/20 39/21 40/5 40/10
42/7 44/14 49/10 50/25
52/14 56/9 57/5 58/12
59/13 61/14 62/16
62/21 64/23 64/23
67/11 68/15 68/17 70/2
70/4 73/6 74/5 74/10
77/16 77/25 78/16
78/21 79/14 79/16 80/8
80/9 80/23 80/25 81/5
81/10 81/11 82/8 82/15
82/25 83/13 84/5 85/14
85/17 86/19 87/5 88/22
94/6 94/14 95/10 95/11
97/17 98/1 98/15 98/20
99/12 101/14 103/10
106/25 107/10 116/17
118/11 118/23 119/2
125/14 125/20 126/20
127/20 130/21 131/7
131/8 132/3 132/22
136/6 138/24 141/2
143/12 145/3 148/5
148/16 152/9 153/23
154/8 154/9 156/23
163/13 170/12 172/2
173/12 178/21 186/21
190/5 195/18 197/18
201/8 201/9 201/9
202/10 202/16 205/19
209/17 218/10 219/8
222/25 223/23 223/24
224/1 224/13 226/20
226/21 226/23 226/25
227/3 227/11 228/7
228/8 228/12 228/16
229/8 230/19 231/2
233/3 234/6 238/14
meaningful [3] 54/16
54/18 118/8
means [22] 24/22 45/5
62/22 68/20 82/23
83/16 85/1 85/3 93/4
98/12 98/13 98/14
98/14 99/8 100/19
111/4 114/19 128/18
142/8 173/23 200/3
202/14
meant [3] 143/13
224/21 225/19
measure [4] 35/16
42/12 93/11 96/8
measuring [1] 93/8
mechanical [1] 2/10
meeting [1] 226/2
MEHTA [2] 1/10 3/3
memory [1] 70/22
Menasha [1] 84/12
menu [1] 28/20
mercy [1] 206/14
merely [2] 85/1 168/4
merger [3] 36/24
130/16 130/18
merit [2] 2/6 42/15
Meritor [2] 49/17
110/19
merits [46] 6/19 6/23
7/6 7/14 9/9 10/25 11/5
11/21 11/25 12/12
12/18 13/19 14/11
14/22 14/23 16/25
17/22 19/8 20/11 22/2
23/11 23/19 26/3 28/4
28/5 31/4 34/2 34/4
34/14 40/8 40/22 43/4
44/9 44/24 83/2 83/15
115/24 116/5 116/12
122/3 122/24 125/1
133/3 166/5 213/10
236/22
met [4] 13/24 53/4
114/4 220/14
meter [6] 111/7 111/12
111/15 112/5 112/6
112/18
meters [4] 111/9
112/15 112/15 112/18
method [2] 93/21
230/22
methods [1] 232/8
MFN [2] 202/20 214/21
Michael [2] 216/17
216/25
Michael Jordan [2]
216/17 216/25
Microsoft [195] 6/10
6/15 6/20 9/4 10/18
11/18 11/24 14/19 16/4
16/9 16/10 16/24 17/2
17/4 18/2 18/14 19/4
20/17 20/17 20/22
21/25 22/1 27/12 28/1
28/14 28/19 29/7 29/10
30/17 33/20 34/2 35/19
35/22 37/11 38/9 43/5
49/17 51/1 51/2 51/3
53/18 53/19 53/25 54/6
56/15 58/12 58/15
58/21 59/6 59/12 60/14
60/14 60/19 61/9 61/19
62/14 64/9 66/2 66/5
67/24 68/4 79/5 81/21
83/22 86/10 86/11
87/11 88/13 90/18
90/19 90/19 91/25 92/9
93/6 93/25 95/11 96/7
103/23 105/8 108/3
110/22 112/17 113/14
113/21 113/25 114/12
114/16 115/13 117/1
118/19 121/10 122/10
123/22 124/2 124/3
124/22 125/5 126/24
127/10 127/25 129/10
129/20 130/23 132/1
132/3 132/13 132/14
144/12 145/13 146/15
147/12 147/15 147/23
148/5 148/10 148/11
148/12 148/17 148/21
149/25 150/3 150/22
151/5 151/6 151/19
152/5 152/6 155/2
155/4 155/6 155/9
155/13 155/20 156/2
156/3 156/6 161/1
161/5 162/12 162/17
163/4 163/7 164/8
164/17 164/21 165/15
165/20 166/25 171/12
172/22 173/17 173/18
174/25 175/7 175/16
176/19 176/25 177/1
177/6 177/15 177/24
177/24 178/2 178/9
178/10 179/3 180/10
181/1 181/5 181/10
185/20 194/17 194/22
194/23 194/25 195/1
195/9 195/20 196/3
196/9 196/13 197/1
198/5 198/7 210/10
210/10 213/11 214/7
215/15 235/15 235/17
235/17
Microsoft's [16] 10/14
17/19 19/10 116/20
116/23 117/7 130/4
144/14 144/22 147/5
148/14 153/7 156/9
163/25 179/2 210/11
middle [1] 114/18
middleware [1] 124/6
might [38] 8/14 13/10
14/5 15/25 15/25 38/11
39/5 50/22 59/9 75/8
95/8 104/5 104/5
105/15 105/16 115/15
128/24 133/20 136/22
138/9 147/17 148/1
164/25 165/1 172/18
174/9 187/18 191/5
198/15 203/22 213/20
214/13 218/2 218/3
218/6 219/25 229/6
229/6
mill [1] 38/15
million [2] 33/4 143/15
mind [1] 103/21
minimum [8] 16/8
21/20 25/15 27/22
62/13 62/14 148/10
173/5
minor [1] 161/10
minority [4] 43/22
150/14 150/15 181/9
minus [1] 79/8
minute [5] 114/23
123/22 124/2 124/3
124/22 125/5 126/24
127/10 127/25 129/10
129/20 130/23 132/1
132/3 132/13 132/14
144/12 145/13 146/15
147/12 147/15 147/23
148/5 148/10 148/11
148/12 148/17 148/21
149/25 150/3 150/22
151/5 151/6 151/19
152/5 152/6 155/9
155/13 155/20 156/2
156/3 156/6 161/1
161/5 162/12 162/17
163/4 163/7 164/8
164/17 164/21 165/15
165/20 166/25 171/12
172/22 173/17 173/18
174/25 175/7 175/16
176/19 176/25 177/1
177/6 177/15 177/24
177/24 178/2 178/9
178/10 179/3 180/10
181/1 181/5 181/10
185/20 194/17 194/22
194/23 194/25 195/1
195/9 195/20 196/3
196/9 196/13 197/1
198/5 198/7 210/10
210/10 213/11 214/7
215/15 235/15 235/17
235/17
minutes [4] 34/16
41/21 45/9 157/15
misconduct [3] 55/5
55/12 81/8
misremembered [1]
197/15
missed [2] 39/14 55/18
missing [1] 39/8
mission [1] 109/21
misspoke [1] 183/8
mistake [1] 238/9
mistaken [1] 55/17
misunderstanding [2]
138/25 194/24
mix [2] 57/5 60/24
Mobile [1] 15/9
modest [1] 155/25
moment [15] 5/7 5/8
19/22 48/4 51/8 59/21
76/13 129/16 157/16
166/5 178/5 181/18
186/14 208/2 220/24
moments [1] 204/20
money [11] 82/9 82/12
84/19 103/1 156/1
157/4 188/5 188/19
193/6 199/5 212/13
monopolies [1] 81/8
monopolist [47] 8/13
18/21 43/6 51/20 59/11
59/22 64/15 64/21
64/22 64/25 65/3 65/13
67/13 68/1 68/17 69/6
70/16 71/12 72/3 72/4
72/13 73/1 73/25 74/8
74/8 74/12 75/22 76/2
77/8 77/10 80/22 80/23
83/11 86/25 95/4 98/4
104/17 104/18 111/4
112/25 119/4 162/22
163/5 165/17 166/21
181/24 186/21
monopolist's [3] 53/20
91/9 126/20
monopolistic [1] 81/17
monopolists [7] 55/2
59/4 77/8 84/24 88/20
95/17 110/23
monopolization [3] 6/4
55/10 198/24
monopolized [2] 92/6
185/10
monopoly [48] 6/11
11/23 17/7 17/9 27/8
47/25 48/3 48/10 49/21
63/13 63/15 73/13
74/18 80/20 81/3 81/10
82/1 82/23 85/2 89/1
89/5 97/2 110/23
112/17 112/23 112/24
113/10 114/20 124/9
142/14 142/15 151/15
151/21 151/23 153/10
159/24 172/12 172/15
173/23 174/1 184/1
184/4 186/12 186/25

**M**

monopoly... **[4]** 191/9
199/6 200/2 207/20
month **[2]** 108/11
219/12
more **[116]** 5/7 5/21
5/24 8/8 13/9 17/18
20/23 21/9 21/10 21/11
22/12 23/5 23/5 23/6
24/19 28/6 30/5 41/13
41/21 44/18 48/10
49/19 51/7 61/24 64/4
64/4 69/17 69/20 70/6
73/22 76/9 76/12 81/19
82/6 85/24 86/5 89/16
90/24 95/9 95/17 97/18
97/20 97/21 97/22 98/3
98/3 98/12 98/12 98/14
98/14 98/22 98/24
102/13 105/25 106/1
106/2 106/3 106/16
112/25 117/7 120/12
120/15 123/1 123/3
123/7 123/13 123/17
123/18 126/17 131/12
131/14 138/1 144/7
145/12 145/15 145/15
145/22 145/24 148/19
150/6 152/7 154/23
156/14 156/21 156/23
164/7 174/3 182/1
185/6 185/13 187/5
188/18 188/24 191/19
192/1 192/3 192/20
193/20 196/14 197/21
198/4 198/16 203/15
204/7 205/25 206/1
208/2 210/16 215/6
218/21 222/21 228/21
229/15 230/17 238/5
238/7
more-accurate **[1]** 23/5
more-efficient **[1]** 23/6
morning **[23]** 3/4 3/6
3/12 3/19 4/2 4/6 13/16
15/7 45/20 46/11
116/13 119/8 120/3
120/6 120/13 121/13
121/25 123/19 132/23
152/21 159/12 164/24
206/23
most **[15]** 19/12 23/4
80/12 80/13 80/14
83/25 102/9 115/16
115/18 125/7 129/7
164/8 188/12 209/23
237/8
mostly **[1]** 61/17
motion **[15]** 12/22
32/21 45/25 100/23
159/18 159/25 160/8
182/23 185/8 217/16
221/3 222/17 232/4
234/17 237/17
motions **[11]** 1/9 6/3
13/4 13/16 49/12
217/14 217/18 218/16
218/22 226/16 234/2

185/15 191/2
motive **[1]** 183/17
mountain **[1]** 214/16
move **[2]** 169/4 170/21
moved **[3]** 151/5
151/19 184/15
moving **[2]** 109/21
147/22
Mozilla **[31]** 16/17
20/25 21/5 25/1 25/24
26/6 26/18 26/21 27/11
27/12 28/21 33/23
44/21 56/8 60/12 67/3
69/1 71/3 75/21 100/14
100/18 102/3 102/21
104/7 104/13 104/15
108/12 108/14 109/9
111/25 236/23
Mozilla's **[2]** 108/10
108/17
Mr **[3]** 115/6 171/15
173/12
Mr. **[77]** 4/5 25/11
41/20 45/3 46/3 46/8
46/9 46/10 48/24 51/8
52/23 63/24 68/23
80/24 99/19 101/1
101/3 101/7 102/10
104/22 106/17 110/6
110/19 112/21 114/14
116/7 116/14 116/15
116/21 119/23 121/14
121/17 123/19 131/22
151/11 157/14 158/1
158/9 159/9 161/6
168/23 171/5 171/9
171/12 172/10 173/14
174/12 176/18 183/12
186/9 196/21 205/11
206/4 209/17 209/18
210/21 210/23 211/6
212/3 214/18 216/13
216/23 216/24 217/6
221/1 227/24 231/1
231/2 231/20 231/25
232/1 232/6 232/15
235/12 235/15 236/5
236/14
Mr. Cavanaugh **[3]**
231/25 232/15 235/12
Mr. Cue **[2]** 102/10
106/17
Mr. Dintzer **[15]** 46/3
46/8 46/10 99/19 101/1
101/7 110/6 110/19
112/21 116/7 116/15
123/19 172/10 209/17
221/1
Mr. Dintzer's **[3]**
231/20 232/6 236/14
Mr. Nadella's **[1]** 25/11
Mr. Sallet **[23]** 46/9
114/14 121/14 121/17
131/22 151/11 158/1
161/6 168/23 174/12
183/12 186/9 196/21
206/4 210/21 211/6

216/23 216/24 227/24
231/2
Mr. Sallet's **[1]** 51/8
Mr. Schmidtlein **[27]**
4/5 41/20 45/3 48/24
52/23 63/24 68/23
80/24 101/3 104/22
116/14 116/21 119/23
157/14 158/9 171/5
171/9 171/12 173/14
176/18 205/11 209/18
210/23 217/6 231/1
232/1 235/15
Mr. Schmidtlein's **[2]**
159/9 236/5
much **[42]** 15/17 22/6
30/5 31/25 34/16 35/19
36/7 36/7 36/19 37/22
38/23 42/4 60/25 62/15
65/11 71/17 78/5 82/12
82/21 82/22 84/19 95/8
95/22 104/21 112/10
115/20 118/23 119/8
119/10 144/12 145/23
153/23 156/21 157/18
173/4 175/4 198/4
201/4 210/21 218/21
224/25 226/15
multifactor **[1]** 185/23
multiple **[6]** 103/1
108/21 140/12 187/16
201/3 204/1
must **[4]** 55/25 90/2
164/12 202/7
muster **[2]** 192/2 236/8
my **[38]** 4/9 4/21 5/8
5/13 5/15 9/15 22/6
22/6 23/15 23/16 29/15
47/3 70/22 96/16
103/15 104/9 111/2
112/3 117/24 121/22
130/13 131/21 133/8
135/14 137/11 138/25
158/2 159/8 173/17
182/11 188/2 207/9
215/22 220/16 224/14
227/5 227/12 237/15
Mylan **[1]** 55/11
Mylan's **[2]** 55/11
55/25
myself **[2]** 86/14 86/15

**N**

Nadella's **[1]** 25/11
name **[5]** 49/22 57/9
189/8 207/7 216/6
namely **[1]** 159/13
Namenda **[2]** 169/17
170/4
napkin **[6]** 144/13
144/13 146/7 146/9
146/11 153/15
narrative **[1]** 172/25
narrow **[2]** 142/22
219/23
nascent **[1]** 91/1
nation **[1]** 202/11

naturally **[2]** 22/24
22/25
nature **[11]** 7/4 10/3
21/7 49/20 54/8 64/24
77/9 97/25 98/1 98/4
208/10
Navigator **[5]** 11/8
11/20 114/2 123/24
132/6
Navigator's **[1]** 12/5
near **[2]** 96/16 231/19
nearly **[2]** 105/7 208/6
Nebraska **[1]** 231/5
necessarily **[8]** 14/10
67/1 117/10 117/16
125/23 128/25 130/19
186/22
necessary **[8]** 67/23
158/19 222/8 222/9
230/9 230/14 234/17
236/12
need **[43]** 4/3 6/17 6/17
11/9 13/25 19/6 25/23
30/20 31/5 35/14 38/21
57/1 57/1 62/14 65/17
75/23 93/23 93/25
107/7 116/3 119/14
130/10 130/15 130/25
148/2 149/5 154/1
155/9 168/6 180/23
198/1 206/10 219/12
220/12 226/17 226/17
231/22 232/21 233/1
234/25 235/8 235/25
238/14
needed **[3]** 11/23 17/11
88/19
needs **[15]** 56/25 58/2
58/5 58/10 64/23 84/23
90/7 95/19 97/7 152/5
155/9 223/4 223/19
230/16 231/19
nefarious **[4]** 99/14
105/24 106/3 110/10
negative **[1]** 166/16
negotiate **[2]** 204/22
205/22
negotiated **[1]** 49/1
negotiation **[2]** 62/3
205/2
negotiations **[1]** 27/25
neighborhood **[1]**
102/5
neither **[2]** 170/9 227/5
net **[1]** 216/22
Netscape **[7]** 11/8
17/17 18/18 19/6 19/9
19/17 20/20
Netscape Navigator **[1]**
11/8
network **[10]** 21/6 22/1
33/12 33/15 64/1 64/2
97/3 97/19 98/8 98/17
networks **[1]** 97/20
never **[19]** 22/2 24/12
36/17 37/13 59/25 85/7

110 112/24 113/8
113/10 113/11 114/18
160/22 176/2 178/17
179/24 188/5 213/14
238/16
nevertheless **[3]** 56/24
58/3 66/19
new **[25]** 71/19 83/18
99/5 117/11 117/16
117/17 124/25 134/6
134/7 134/9 136/2
136/8 139/8 162/16
181/23 187/17 192/4
193/4 194/25 208/15
208/16 211/22 213/17
213/17 215/13
New York **[5]** 134/6
134/7 134/9 139/8
211/22
news **[1]** 238/19
newspaper **[2]** 179/15
179/16
next **[12]** 24/2 48/4
52/18 63/2 106/20
177/10 217/10 220/21
232/14 238/21 238/22
238/22
next-biggest **[1]** 24/2
nice **[2]** 3/19 47/24
nights **[1]** 3/23
nine **[1]** 39/3
Ninth **[3]** 126/23
128/15 213/21
nitty **[1]** 28/13
nitty-gritty **[1]** 28/13
no **[149]** 1/4 9/8 9/11
12/4 12/10 12/10
12/11 13/12 20/23
21/17 22/13 23/12
23/21 27/9 28/13 28/16
30/3 30/8 30/8 30/16
33/8 34/25 34/25 38/1
38/25 39/1 40/6 41/24
42/3 43/2 43/2 43/23
44/1 53/13 55/14 56/6
60/7 61/19 65/10 65/10
65/10 65/10 65/10
66/12 69/8 69/16 70/19
71/8 72/22 75/1 77/23
77/25 77/25 79/24
82/12 83/1 83/17 88/8
91/16 94/11 94/11
97/16 98/7 99/12 99/22
101/1 102/15 103/14
103/24 107/9 107/10
107/10 109/4 109/25
111/11 111/11 111/14
111/15 112/10 114/10
116/2 116/14 117/20
119/14 125/13 126/5
130/14 138/24 139/14
141/10 141/16 142/19
142/19 143/3 145/10
146/1 146/2 147/8
150/12 150/25 152/18
154/10 155/18 158/22
158/25 159/25 160/21
165/3 165/6 165/15

**N**

no... **[39]** 165/25
167/17 168/5 170/25
172/6 173/18 176/19
183/9 186/24 192/11
196/3 196/4 199/20
200/3 203/5 203/12
204/24 205/12 205/13
205/18 211/13 211/17
211/20 211/21 214/8
215/2 217/20 219/21
221/10 222/15 223/3
223/23 228/3 228/8
229/3 233/8 233/15
235/16 236/22
**nobody [6]** 76/17
90/10 151/16 151/18
172/22 215/11
**nominal [2]** 53/5 53/6
**non [4]** 75/12 162/22
164/25 185/20
**non-exclusive [1]**
75/12
**non-predatory [1]**
164/25
**non-pretextual [2]**
162/22 185/20
**noncompetition [1]**
133/3
**none [10]** 14/4 43/17
89/6 89/12 96/10
110/25 113/8 132/21
146/17 233/5
**northern [1]** 96/16
**not [449]**
**note [3]** 25/10 100/2
129/2
**noted [5]** 134/16
150/14 160/25 176/22
209/2
**nothing [30]** 30/9 32/6
34/6 41/6 73/15 83/12
91/20 105/23 106/3
106/3 110/4 110/10
116/2 134/15 147/4
153/15 154/21 156/14
156/23 170/23 173/14
173/21 176/3 179/21
179/21 193/19 216/8
216/11 216/21 229/4
**notice [2]** 229/18
230/10
**notion [4]** 150/20
160/22 177/7 209/2
**notwithstanding [2]**
118/8 135/17
**November [2]** 175/7
176/23 177/23
**now [49]** 12/21 22/23
23/11 26/3 36/5 43/12
45/8 52/10 63/1 63/17
63/19 67/19 68/19
69/22 73/1 73/23 75/22
77/21 79/14 95/5 95/10
95/23 96/2 96/3 106/25
113/13 131/12 131/14
149/2 149/21 157/10
157/17 170/21 172/16

191/1 197/13 201/19
202/1 208/17 214/20
215/25 216/9 220/10
220/19 226/17 226/25
**number [47]** 24/8 24/9
24/9 29/20 37/24 37/25
38/2 38/20 38/20 39/21
40/5 41/16 60/13 63/4
88/18 91/16 92/22 94/6
94/14 94/17 96/1 96/11
96/12 96/20 97/9
105/12 105/13 105/14
105/14 105/17 118/17
118/17 118/19 119/1
129/20 133/13 144/23
147/13 148/12 150/9
151/5 197/15 211/7
214/14 214/15 224/19
224/19
**numbers [17]** 24/7
37/4 38/3 39/21 40/12
42/15 93/6 93/7 94/14
107/18 117/5 118/21
148/4 148/7 148/7
150/4 184/22
**numerous [2]** 174/24
225/14
**NW [3]** 1/14 2/3 2/8

**O**

**oath [1]** 230/3
**object [2]** 212/7 213/20
**objective [1]** 152/1
**obligation [1]** 110/12
**obliged [1]** 214/12
**observations [2]** 88/10
88/11
**obtained [1]** 31/3
**obvious [4]** 19/12
90/24 220/13 223/1
**obviously [21]** 6/12
15/25 39/20 80/9 93/5
106/21 120/5 120/18
122/4 161/12 163/14
199/6 208/3 214/15
218/17 219/2 219/6
219/8 235/8 237/9
237/23
**occasions [1]** 211/7
**occupies [2]** 76/16
76/16
**occupying [1]** 16/21
**occur [1]** 108/14
**October [1]** 219/13
**odd [1]** 235/21
**OEM [9]** 18/1 19/11
90/18 189/22 189/24
190/5 190/9 190/19
209/1
**OEMs [13]** 16/17 17/8
17/10 20/19 30/20
30/20 58/17 66/17
66/18 67/12 87/11
87/13 115/17
**off [30]** 19/14 31/25
33/2 41/22 56/21 59/25
60/13 70/13 93/19

114/25 122/21 178/1
182/17 184/24 216/17
216/20 216/21 216/21
224/21 225/6 225/18
226/2 226/3 228/4
228/21 229/4 233/10
**off-limits [1]** 93/19
**off-setting [1]** 229/4
**off-switch [1]** 224/21
**offer [11]** 14/5 18/25
19/10 75/23 75/24
173/8 181/1 181/9
201/13 202/21 214/22
**offered [2]** 12/25 18/14
**offering [11]** 10/19
10/19 10/22 11/2 14/1
14/12 22/1 109/9 141/1
166/10 202/15
**offers [1]** 18/24
**Office [4]** 19/14 19/15
175/7 177/1
**Official [1]** 2/7
**oh [8]** 4/8 58/6 116/10
117/15 145/14 157/10
227/3 227/6
**okay [114]** 3/12 3/18
4/4 5/5 5/6 5/9 7/2
11/10 14/3 15/5 16/4
20/5 20/8 20/13 29/23
31/8 32/18 35/23 36/4
39/19 39/23 51/23
56/17 63/3 63/13 68/9
71/18 72/11 73/18
73/21 75/10 76/19
78/21 79/11 79/25
80/10 80/15 83/21
85/20 87/3 87/3 88/5
88/8 92/18 94/9 95/3
96/17 99/13 101/8
110/11 112/19 113/1
114/3 114/16 115/8
115/22 119/21 120/17
126/9 135/22 136/18
144/1 146/9 148/25
149/22 164/19 165/16
169/21 171/20 174/14
174/18 174/20 174/21
176/11 178/21 180/11
182/21 185/3 187/6
187/20 189/8 189/14
189/16 194/15 195/5
197/12 197/16 198/22
200/9 200/14 200/17
207/8 211/14 212/16
215/25 218/23 219/17
220/11 220/23 221/11
224/12 225/4 227/18
227/21 227/23 229/21
230/25 231/25 232/8
233/24 235/2 235/9
238/1 238/18
**old [7]** 93/9 131/14
136/3 136/4 162/7
208/16 208/16
**once [11]** 33/16 36/21
36/24 67/11 67/24
69/14 72/4 73/25 135/5

one **[160]** 3/14 5/7 7/14
8/6 8/12 12/20 17/4
18/4 18/16 29/20 32/9
32/10 33/11 33/12
37/12 37/24 38/3 38/16
39/5 43/13 50/5 51/1
51/5 54/6 62/25 63/19
67/3 68/3 69/13 70/19
71/24 73/5 73/6 73/6
73/12 75/11 75/15
76/15 76/15 77/5 77/10
78/22 80/18 83/8 85/14
85/15 88/14 88/16
88/17 90/4 90/20 90/23
91/1 92/2 92/14 92/15
94/24 95/10 98/11
102/14 102/15 102/20
108/11 108/25 109/25
111/20 116/15 117/7
120/11 122/21 124/12
126/18 130/25 131/16
135/4 135/9 136/3
136/4 137/23 140/25
142/24 142/25 144/4
144/16 145/3 147/22
148/8 150/15 150/16
151/3 151/3 154/14
155/23 156/12 156/12
159/11 160/23 161/12
161/23 164/7 165/3
165/11 165/13 166/7
167/11 169/19 170/16
170/17 170/22 171/24
172/21 173/1 173/10
173/14 173/18 179/3
180/15 180/16 181/14
185/15 188/11 188/12
191/5 191/6 191/10
192/10 192/22 193/6
194/17 196/4 198/1
198/3 198/23 199/3
201/4 201/20 203/22
204/2 204/19 207/9
208/2 209/16 210/2
214/14 217/14 221/15
222/3 222/6 223/25
224/15 225/1 225/20
228/1 228/8 229/8
229/25 230/6 233/25
235/14 238/5
**one-part [1]** 51/5
**one-pill [2]** 170/17
170/22
**ones [8]** 34/10 34/11
139/20 190/23 192/25
208/16 228/22 233/1
**online [3]** 180/22
189/19 208/7
**only [34]** 17/2 18/16
19/22 19/24 41/15 42/8
48/16 50/7 53/23 56/1
58/13 59/23 73/17 76/3
76/14 93/9 95/16
108/25 111/21 115/9
143/8 148/7 150/15
154/15 154/16 169/6
169/6 180/8 201/14

one **[160]** ... (continued)
210/14 229/16

**open [9]** 28/7 38/1 63/2
116/17 142/15 178/13
178/16 217/13 238/15
**opened [1]** 28/10
**opening [3]** 32/20
41/22 109/12
**operate [2]** 154/13
236/24
**operated [1]** 204/5
**operates [3]** 23/13
132/17 174/1
**operating [12]** 17/7
18/6 18/7 98/21 98/22
98/23 98/24 98/25
130/4 165/18 165/21
210/13
**operation [1]** 188/16
**opines [1]** 132/11
**opinion [16]** 6/23 7/13
43/24 44/1 59/7 81/16
81/16 122/10 125/16
125/18 127/16 129/23
141/10 141/16 164/9
180/2
**opportunity [10]** 19/3
19/5 41/3 43/3 85/2
99/21 147/18 212/19
221/21 223/20
**opposed [2]** 95/1
145/14
**opposite [2]** 21/1
117/21
**opposition [6]** 189/12
190/14 197/7 197/9
197/10 207/17
**option [3]** 20/20
102/11 144/15
**options [3]** 49/18
138/4 143/21
**order [12]** 6/2 6/8 6/15
25/13 91/13 92/24
157/23 159/16 164/11
182/18 195/5 220/15
**organic [7]** 131/2
137/7 139/14 139/25
156/25 182/20 212/16
**organics [1]** 137/24
**organized [1]** 3/15
**Orthopedics [1]**
126/23
**OS [1]** 12/8
**other [137]** 8/15 8/22
10/23 12/5 13/8 16/14
16/14 16/15 16/20 17/8
18/14 18/19 21/16
22/16 22/18 23/22 24/2
25/1 28/4 28/10 28/22
29/4 29/6 30/19 31/15
33/6 33/7 33/14 34/2
41/18 42/18 43/5 46/6
49/23 51/4 51/12 52/5
56/13 57/17 60/11
60/24 60/25 61/8 68/25
70/2 70/22 73/5 73/6
83/1 83/25 89/9 90/19
94/6 96/5 98/20 98/21

**other... [81]** 100/16
100/24 102/24 104/7
104/25 107/22 107/22
108/23 108/24 110/17
110/18 115/23 122/8
122/8 125/6 128/20
130/23 131/13 133/4
133/17 135/7 135/10
135/25 136/19 137/20
139/7 140/8 144/20
145/11 145/23 147/22
150/15 150/16 153/14
154/10 156/16 157/4
159/20 161/2 161/8
162/1 165/13 167/2
167/17 168/6 168/13
169/4 170/25 171/18
172/19 175/19 177/13
178/8 179/1 179/25
184/11 185/11 187/14
187/21 190/17 191/6
192/25 193/9 193/15
193/23 195/8 196/3
198/17 198/21 199/21
200/2 200/3 200/7
200/12 203/14 208/20
211/13 223/12 227/14
227/15 233/7
**others [15]** 11/7 20/25
33/16 41/19 86/5 90/5
105/9 107/21 121/3
135/9 150/18 181/11
201/5 206/10 228/21
**otherwise [9]** 5/2 20/2
24/16 28/11 54/14 59/9
61/4 94/15 151/18
**ought [5]** 40/18 57/5
178/7 178/23 222/20
**our [94]** 6/3 13/3 13/6
13/12 13/16 13/23 14/8
15/4 17/15 20/16 31/24
32/20 34/13 41/10
41/15 42/5 43/10 45/6
46/3 46/14 48/4 49/23
62/21 63/2 64/12 68/11
68/12 69/11 71/6 74/6
78/19 78/23 80/11
89/17 95/25 95/25
100/3 105/9 109/6
109/11 109/21 110/12
114/20 121/25 122/9
122/14 122/17 124/8
125/3 128/12 129/8
133/23 141/23 142/24
142/25 148/1 156/18
157/16 158/8 158/21
159/5 159/23 160/19
160/22 162/5 165/23
172/10 174/6 176/3
179/2 182/8 183/4
184/14 186/7 189/12
190/14 191/3 197/7
197/9 204/16 207/5
209/14 214/5 218/25
220/8 220/19 220/22
221/21 224/9 230/18
234/15 235/24 236/11

**ourselves [3]** 63/19
72/25 181/15
**out [68]** 9/4 12/23
12/24 13/7 13/19 16/16
17/22 18/8 22/4 23/16
28/17 30/12 34/1 36/22
36/25 37/2 39/3 54/7
57/9 57/22 71/9 72/20
74/25 79/10 82/6 82/11
95/8 96/5 98/6 99/24
101/17 101/20 102/7
103/3 103/11 103/11
106/13 111/5 114/21
114/23 115/17 116/7
116/8 124/10 127/2
135/9 140/13 140/14
142/16 147/19 148/13
169/3 175/14 189/8
189/14 189/25 190/20
208/24 208/25 215/19
215/20 224/8 225/5
226/18 229/18 229/24
233/7 233/19
**outcome [1]** 198/19
**outerbounds [1]** 36/13
**outlines [1]** 71/22
**output [1]** 67/8
**outreach [1]** 177/9
**outset [1]** 4/25
**outside [2]** 87/24
216/19
**outweighs [1]** 164/13
**over [33]** 3/24 3/25 4/9
15/17 21/18 28/9 30/5
36/21 49/6 57/22 68/3
68/20 71/24 72/3 99/19
107/3 112/13 122/12
133/11 143/1 151/19
154/15 158/13 159/18
170/21 182/23 199/9
199/14 208/1 215/23
215/24 231/2 235/7
**overall [6]** 10/8 24/4
27/5 53/8 92/21 159/3
**overinflated [1]** 38/6
**overlaps [1]** 120/7
**oversight [1]** 214/9
**oversimplifying [2]**
21/3 63/23
**overthinking [1]**
178/22
**overture [1]** 179/2
**overview [1]** 47/22
**overwhelming [3]**
29/18 44/20 149/14
**own [25]** 8/11 8/18
54/15 59/20 60/2 87/12
88/3 115/22 116/5
126/25 145/4 148/23
149/7 150/5 154/17
155/14 156/2 159/19
170/23 174/7 182/24
200/5 202/2 207/7
207/8

**P**
**P. [1]** 3/3

**packet [1]** 169/18
**page [35]** 55/1 131/15
135/5 136/17 136/21
137/12 137/15 137/16
137/19 138/1 138/5
139/3 139/4 139/6
140/2 140/6 140/14
140/19 140/21 140/21
141/8 142/10 169/21
189/3 189/10 197/7
197/16 197/18 198/11
204/16 206/22 206/23
207/17 211/19 213/7
**page 27 [1]** 204/16
**pages [6]** 6/25 123/5
167/11 189/12 210/10
238/10
**pages 41 [1]** 167/11
**pages 45 [1]** 189/12
**pages 58 [1]** 6/25
**paid [5]** 28/24 75/7
78/24 82/13 155/23
**painfully [1]** 147/11
**painstaking [1]** 8/21
**paint [1]** 87/23
**panacea [1]** 84/12
**paper [2]** 38/15 214/17
**papers [8]** 148/22
158/13 160/22 175/14
176/3 186/4 221/14
226/16
**paradigm [7]** 55/4
178/5 178/7 178/8
178/9 178/10 178/10
**paragraph [2]** 167/13
185/8
**paragraphs [1]** 203/6
**parameters [1]** 145/5
**pardon [1]** 226/6
**parenthetical [1]**
169/24
**parity [2]** 180/25 181/1
**part [25]** 10/23 14/9
14/15 47/25 48/1 51/5
52/11 57/5 69/7 74/17
83/25 94/13 96/8
110/11 121/12 121/18
139/1 150/15 162/16
162/17 182/18 184/24
196/4 201/14 237/12
**Part 1 [1]** 47/25
**Part 2 [1]** 48/1
**participate [1]** 74/1
**particular [9]** 21/12
40/19 120/22 121/9
140/24 140/25 143/15
192/11 234/20
**particularly [8]** 14/9
35/7 64/17 99/7 99/7
225/3 225/17 236/6
**parties [13]** 5/1 7/23
25/21 34/3 38/19 43/3
52/5 80/19 199/17
201/20 209/12 219/3
222/25
**partner [5]** 75/15

**partners [2]** 5/13 191/3
**partnership [3]** 123/15
155/13 197/20
**partnerships [14]**
155/2 180/13 189/2
191/16 192/17 194/7
194/17 195/19 196/8
196/25 197/21 199/22
203/21 206/10
**parts [6]** 7/13 50/4 55/7
159/14 221/21 227/15
**party [9]** 25/25 42/21
70/9 73/20 78/12 110/3
165/13 190/6 190/10
**pass [5]** 83/4 83/16
84/13 192/2 236/8
**passage [2]** 127/24
164/11
**passed [1]** 177/5
**passing [1]** 153/22
**past [5]** 41/9 86/23
89/2 89/4 181/21
**patent [2]** 170/15
170/17
**patience [3]** 116/13
211/3 217/4
**pattern [2]** 181/13
182/2
**paucity [1]** 235/21
**pay [20]** 47/13 75/9
76/23 78/15 80/23
82/18 82/22 85/5
102/23 103/2 104/24
105/1 105/25 106/2
110/11 131/12 154/24
175/8 177/1 216/3
**paying [8]** 31/11 82/9
82/12 82/14 82/21
103/1 105/11 105/18
**penetration [1]** 195/21
**people [96]** 6/6 17/8
17/10 18/24 19/3 21/10
28/23 29/25 33/17
33/19 33/20 33/22
33/23 39/4 43/19 44/4
44/5 44/10 44/10 44/15
44/18 44/21 44/22
48/25 48/25 62/3 82/15
82/16 82/17 85/5 88/19
94/11 95/8 97/22 98/22
98/24 99/17 101/9
101/17 103/17 103/25
104/2 104/3 104/5
104/6 104/6 104/8
104/8 104/10 104/21
105/3 105/12 105/14
105/19 106/4 107/5
108/4 109/7 109/11
109/15 113/17 117/6
117/9 117/15 117/18
117/22 118/2 118/22
118/24 124/4 135/24
142/7 143/19 146/2
147/21 151/6 164/24
184/25 187/17 189/15
189/19 215/19 215/22

**per [13]** 9/18 24/21
31/18 51/10 51/16
62/13 64/24 116/7
124/20 125/21 126/21
131/12 143/6
**percent [28]** 24/3
24/25 27/1 36/10 36/11
37/9 37/15 37/20 38/5
38/6 48/7 48/7 48/8
74/21 78/6 91/12 93/2
93/2 93/3 93/10 93/13
96/1 96/19 97/13
118/13 149/24 155/22
174/8
**percentage [6]** 37/17
58/7 80/21 93/17
149/16 149/18
**percentages [3]** 71/25
92/1 105/16
**perfectly [2]** 57/3
236/1
**perform [1]** 61/16
**performance [1]**
208/22
**performed [1]** 66/19
**performing [1]** 63/18
**perhaps [7]** 9/19 19/19
86/5 117/11 118/14
169/19 194/3
**period [2]** 143/7
170/15 211/18
**Peripherals [1]** 128/4
**permissible [1]** 161/5
**permit [2]** 16/13
149/11
**permits [1]** 145/21
**person [5]** 76/16
111/21 112/11 202/22
211/25
**perspective [1]** 209/7
**persuasion [1]** 169/25
**pertains [1]** 147/9
**pharmaceutical [1]**
136/1
**phase [3]** 162/16 181/4
225/25
**philosophy [1]** 109/6
**phones [3]** 27/9 118/22
118/24
**phrase [1]** 7/13
**pick [7]** 38/3 39/4 45/9
102/15 104/19 107/12
109/7
**picked [1]** 9/4
**picture [1]** 58/2
**piece [3]** 11/13 69/13
227/7
**pieces [8]** 140/13
159/2 159/8 172/19
204/8 209/10 216/14
218/19
**piggybacked [1]** 164/1
**pill [4]** 170/17 170/18

**P**

pill... [2] 170/22 170/25
pills [1] 170/16
pipes [1] 99/2
place [13] 19/3 35/23
49/9 135/4 143/1
145/23 145/24 150/6
184/15 203/5 203/12
204/23 215/24
placed [2] 135/7
205/17
placeholder [1] 220/7
placement [7] 18/14
145/22 148/19 150/5
151/21 206/14 213/2
places [16] 6/21 6/22
7/5 7/9 76/6 98/21
108/2 108/23 117/1
117/3 137/23 140/9
140/12 143/15 160/25
201/18
plain [3] 162/18 185/17
190/1
plainly [1] 164/5
207/19
plaintiff [5] 1/17 6/15
86/19 113/20 167/9
plaintiff's [6] 21/3
35/25 37/6 39/2 95/14
120/20
plaintiffs [34] 1/4 1/13
3/9 3/10 12/23 13/7
14/24 16/23 19/18
26/14 37/1 43/14 45/4
45/21 46/1 46/1 64/8
87/20 91/9 124/18
124/24 130/12 138/19
144/7 146/4 146/11
150/13 217/24 225/12
225/12 227/14 233/25
234/19 235/4
plaintiffs' [8] 33/10
48/17 122/16 122/18
122/21 149/17 221/9
226/9
planning [1] 223/10
plant [1] 22/5
plate [1] 232/22
platform [3] 148/23
149/4 180/8
platforms [2] 121/8
149/13
play [3] 19/22 20/1
181/24
players [1] 198/13
playing [4] 76/12 76/15
81/20 181/24
plays [1] 172/19
please [9] 3/4 45/17
45/19 46/25 111/3
119/12 119/19 157/24
239/1
pled [2] 15/13 142/21
plenty [1] 103/19
plumbers [1] 207/2
plus [1] 92/7
pockets [1] 143/1
point [62] 4/17 9/15

29/15 30/17 32/13
32/17 40/1 46/18 48/17
59/3 64/20 71/11 71/16
72/3 72/19 74/18 74/19
75/3 75/4 76/7 80/2
85/11 86/18 87/2
103/15 105/11 115/5
116/18 116/20 129/8
130/10 130/13 148/15
150/11 158/9 162/9
175/6 176/6 186/15
186/16 186/19 188/9
189/2 195/10 200/4
203/23 210/2 210/9
214/19 217/25 219/10
222/4 230/13 231/20
234/20 235/14 236/5
237/15 238/12
pointed [2] 122/9
129/1
points [8] 36/3 42/1
42/6 42/7 71/19 99/21
144/25 232/13
police [2] 84/21 84/22
policy [2] 59/24 225/5
politicians [1] 162/7
poll [1] 64/3
poorly [2] 130/13
193/17
poorly-worded [1]
130/13
Popofsky [1] 5/16
popular [5] 17/18 30/1
102/9 115/16 115/18
portion [5] 24/11 54/8
91/22 125/15 125/17
portions [2] 46/14
225/4
posed [6] 6/2 68/23
122/2 124/4 124/5
134/13
posit [2] 194/5 198/17
position [46] 13/3 13/6
13/12 14/8 16/21 20/16
21/19 29/7 29/10 40/11
41/15 52/22 59/19 64/3
71/4 72/25 78/4 85/21
92/16 121/25 122/15
122/17 122/21 122/24
123/7 124/9 124/12
125/3 125/6 128/12
133/23 141/23 145/7
149/17 156/7 158/21
160/20 161/7 191/14
195/22 210/12 218/4
218/8 218/25 226/9
237/21
positioned [1] 196/5
positions [2] 128/8
220/22
positive [1] 157/4
possibility [3] 75/7
91/3 130/8
possible [7] 102/13
102/15 106/8 106/15
132/12 213/18 221/18
possibly [2] 21/17 47/8

post [1] 187/25
postulating [1] 142/23
posture [1] 12/21
potential [7] 54/13
100/5 108/15 114/25
130/3 203/15 223/13
potentially [5] 32/1
40/3 212/5 212/5 212/8
power [19] 6/11 48/1
48/3 48/4 49/21 63/13
63/15 72/2 74/6 74/18
114/20 142/16 151/15
151/21 151/23 172/12
172/15 190/22 200/2
PowerPoint [2] 34/24
46/14
practical [3] 180/16
207/16 207/24
practically [1] 22/10
practice [5] 98/18
124/21 124/21 158/3
225/6
practiced [1] 59/10
practices [1] 164/18
pre [3] 17/16 17/24
128/13
pre-dated [1] 128/13
pre-load [2] 17/16
17/24
precise [2] 8/8 200/4
precisely [2] 172/2
173/8
precluded [1] 35/19
predatory [2] 23/18
164/25
predicate [1] 130/10
predict [1] 214/12
prediction [2] 209/19
predistributions [1]
30/17
prefer [3] 44/21 69/3
121/11
prejudice [2] 233/1
233/21
preload [2] 27/12
30/10
preloaded [5] 27/11
37/10 37/11 41/12
41/13
preloading [1] 110/16
preloads [1] 30/8
preparation [1] 217/21
prepare [3] 218/3
218/4 220/8
prepared [4] 25/12
120/1 224/25 235/4
preparing [1] 219/8
presence [2] 186/6
196/3
present [2] 187/19
221/25
presentation [4] 49/23
49/24 101/2 234/12
presentations [2]
119/8 220/9
presented [4] 19/3
55/14 137/22 152/9

preservation [1] 217/8
225/15 225/19 232/8
233/12
preserve [2] 228/6
228/7
preserved [7] 224/18
224/22 224/23 226/3
229/5 233/3 233/4
preserving [1] 227/20
preset [2] 42/20 209/22
president [1] 101/11
presiding [1] 3/3
press [3] 102/1 102/6
118/25
pressed [4] 35/24 37/3
215/4 230/12
pressure [1] 27/17
presumably [1] 223/18
presume [2] 85/22
87/6
presumptive [1] 51/16
presumptively [4] 9/19
31/18 35/13 51/11
pretend [2] 58/6 58/9
pretextual [3] 162/22
185/19 185/20
pretty [6] 37/12 39/6
107/1 110/1 154/9
215/8
Prettyman [1] 2/7
prevalent [1] 108/20
prevent [3] 190/5
190/9 209/10
prevented [1] 43/25
preventing [1] 87/13
prevents [1] 16/20
previewed [2] 68/23
120/10
previously [1] 201/23
price [15] 9/20 23/17
23/18 50/14 106/4
106/4 141/1 141/9
166/16 168/2 168/4
168/15 168/19 184/19
206/15
priced [1] 34/9
prices [6] 23/22 85/16
164/25 165/1 165/7
201/13
pricing [2] 11/4 154/2
prima [17] 9/2 12/14
12/23 12/24 13/7 14/21
16/22 50/4 50/10
151/25 153/17 159/7
162/18 162/19 203/16
210/17 236/3
prima facie [3] 162/18
162/19 236/3
primarily [2] 13/17
15/7
primary [3] 58/16
64/12 193/1
principle [3] 60/15
109/6 162/20
principles [4] 53/18
127/8 129/16 162/21
prior [1] 131/13
privilege [1] 19/5

alleged [5] 13/22
125/2 229/20 229/21
229/23
pro [26] 7/5 7/19 9/24
10/4 12/25 13/8 13/9
13/21 14/1 14/5 14/12
20/9 31/18 31/19 56/13
65/7 65/13 65/24 68/2
124/21 162/23 164/14
178/20 204/6 235/22
236/6
pro-competitive [24]
7/5 7/19 9/24 10/4
12/25 13/8 13/9 14/1
14/5 14/12 20/9 31/18
31/19 56/13 65/7 65/13
65/24 68/2 124/21
162/23 164/14 204/6
235/22 236/6
probably [11] 5/23
18/23 39/24 40/6
120/15 121/16 121/17
125/7 214/5 218/20
231/23
problem [14] 31/13
50/23 50/24 51/22
136/6 136/7 138/14
140/20 183/10 202/13
214/9 228/24 229/9
229/9
problematic [3] 51/2
51/4 115/18
procedural [1] 162/17
proceedings [6] 1/9
2/10 68/8 233/18 239/4
240/4
process [12] 7/2 10/1
14/20 15/24 99/14
100/6 106/18 106/22
134/20 185/23 219/6
238/11
produce [2] 23/15
23/21
produced [7] 2/10
144/24 146/11 152/11
217/2 233/5 238/7
product [117] 6/18 7/6
9/21 11/3 11/4 17/18
17/18 18/4 19/25 20/19
21/8 22/2 22/6 22/22
24/23 25/6 25/20 27/15
34/3 34/6 34/8 34/10
34/13 42/21 42/23
42/25 50/5 50/14 51/13
51/17 51/19 52/9 68/10
80/25 82/6 87/12 95/2
97/16 97/17 97/22 98/1
98/1 98/5 105/1 105/5
105/9 105/19 106/5
108/20 108/21 109/20
109/25 110/2 111/2
111/4 120/13 120/22
122/5 122/6 122/11
122/19 122/20 123/22
124/13 124/14 124/16
125/1 125/10 125/20
125/22 126/8 126/15
126/18 126/19 126/21

**P**

product... [42] 127/10
127/25 128/9 128/24
129/6 129/11 130/11
130/25 131/1 134/17
134/21 135/18 135/22
135/25 148/1 154/19
161/24 163/21 164/12
164/15 168/19 179/2
182/13 185/16 185/18
185/23 186/17 186/18
187/1 187/1 187/18
193/4 211/10 211/11
213/11 213/14 213/17
213/19 213/23 214/1
214/13 237/4
production [1] 238/14
products [19] 25/4
25/22 25/22 27/14
43/10 44/1 44/10 52/1
57/15 57/17 60/2 69/3
105/22 109/22 116/23
123/22 127/12 145/8
163/1
Professor [1] 171/22
profits [3] 81/10 81/25
82/1
program [1] 162/9
prohibited [3] 66/22
66/23 66/23
prominent [6] 125/7
131/14 159/14 182/18
184/24 191/22
prominently [2] 120/12
120/12
promise [3] 47/2 211/2
227/19
promised [1] 86/15
promises [1] 217/21
promote [5] 11/20
20/20 28/18 28/22
108/23
promoted [2] 32/25
33/1
promoting [2] 19/6
85/3
promotion [5] 18/15
123/1 123/3 123/4
123/8
promotional [1] 19/2
promotions [1] 18/23
prompts [1] 139/11
prong [13] 6/16 9/3
11/12 13/24 16/3 20/7
42/10 49/15 65/4 65/11
68/6 122/17 122/18
pronounce [1] 86/16
proof [5] 55/21 142/15
145/8 148/16 188/20
proper [2] 93/8 93/11
properly [3] 126/6
126/13 129/2
property [4] 57/14
57/15 57/18 57/22
proportionate [1]
222/18
proposed [1] 69/11
proposition [2] 57/12

protect [3] 89/14
200/20 200/22
protected [3] 11/5
84/23 125/21
Protection [1] 1/18
protective [1] 11/5
protest [1] 90/12
prove [1] 122/22
proved [1] 113/20
proven [1] 14/24
provide [16] 121/3
123/1 123/3 123/4
153/25 155/4 155/8
175/16 180/8 189/15
191/4 195/7 199/11
199/23 225/10 235/4
provided [6] 47/11
158/22 158/25 202/8
222/9 234/24
provider [4] 10/24
102/11 150/16 156/21
providers [10] 10/15
10/20 11/15 11/20
16/12 58/18 121/1
123/1 136/20 165/22
provides [4] 101/23
107/18 110/9 190/17
providing [5] 104/20
110/14 140/15 192/5
230/22
provision [3] 55/24
214/21 215/12
provisions [1] 17/6
proxy [1] 42/9
Prudential [1] 180/3
public [4] 4/12 46/15
84/23 88/21
publication [1] 108/9
publicly [1] 158/5
publishable [1] 4/13
pull [4] 19/14 103/10
103/11 163/20
pulled [1] 161/25
pulls [1] 61/17
purchase [2] 159/16
185/6 185/13
purpose [3] 159/17
209/2 221/17
purposes [19] 15/14
20/4 35/11 46/2 61/20
133/25 142/3 151/13
154/17 155/14 159/4
159/19 159/24 169/7
182/23 185/7 200/5
203/15 210/1
pursuant [2] 77/14
199/22
push [2] 27/19 173/1
pushed [2] 19/9 203/2
put [46] 10/6 39/3
47/22 51/13 53/18 54/4
56/10 57/25 59/2 66/7
69/11 70/14 73/19
73/21 78/2 78/9 81/11
81/22 83/14 85/23 86/1
89/23 92/21 93/18
95/22 134/25 135/5

168/22 196/6 212/2
219/1 219/10 219/19
220/2 220/6 220/6
220/20 226/12 233/2
235/1 238/5 238/15
238/17
puts [3] 111/8 148/12
212/3
putting [1] 73/24

**Q**

qualified [1] 9/6
qualifies [2] 135/20
147/6
qualities [1] 25/17
quality [14] 21/4 23/8
23/20 24/6 25/2 27/25
44/16 44/16 63/3 105/1
107/5 157/9 161/8
213/3
queries [10] 26/23
27/13 27/16 29/19 76/6
116/9 133/16 134/18
142/17 182/24
query [8] 24/21 29/20
75/8 107/12 137/2
139/7 188/2 211/22
211/25
question [114] 7/22
8/2 8/4 11/12 21/21
26/13 33/25 35/4 36/18
38/17 40/3 43/13 43/14
44/14 44/15 47/1 47/3
47/19 50/3 52/3 52/4
52/18 53/20 56/11
61/23 62/4 62/19 63/14
67/23 68/22 72/1 72/6
72/8 73/19 73/24 73/25
79/1 83/5 85/10 87/22
88/9 93/21 100/8 101/6
102/13 102/23 103/17
104/23 106/24 107/7
111/6 111/8 112/2
115/10 116/16 116/19
117/6 117/17 120/13
122/1 122/5 122/6
122/7 125/12 126/12
127/14 129/17 130/13
131/17 131/18 131/18
131/22 134/2 134/14
137/11 138/16 139/17
141/17 156/4 161/15
164/2 167/25 168/22
173/19 178/3 180/13
180/16 180/16 180/17
181/12 185/16 190/13
196/6 196/19 197/23
199/8 204/17 205/11
208/3 208/11 214/25
215/4 221/6 221/15
221/15 226/19 226/25
228/10 228/20 231/6
233/25 236/9 236/10
236/21
questionably [1] 52/17
questions [21] 6/1
12/20 42/4 63/10 76/7

100/7 100/15 100/22
100/25 101/10 108/18
113/19 120/19 124/11
214/18 226/21 230/7
232/25
queue [1] 162/15
quick [1] 102/8
quickly [2] 47/5 194/3
quite [9] 9/17 16/6
19/19 34/16 51/15
218/8 220/4 231/11
232/24
quote [8] 42/20 91/21
91/23 126/3 126/4
134/21 198/11 198/14
quote-unquote [1]
42/20
quoted [1] 127/25
quotes [2] 164/5 195/9

**R**

rabbit [1] 61/13
race [6] 84/12 111/7
111/7 111/12 112/6
112/18
Race Tires [1] 84/12
radar [1] 238/17
radio [2] 179/16 179/17
raise [4] 48/12 49/13
51/21 83/20
raised [5] 20/10 50/15
81/6 83/2 83/5
raising [3] 48/2 48/16
199/4
Ralph [1] 1/19
ran [2] 27/8 215/23
randomly [1] 102/18
range [2] 62/6 66/21
ranges [2] 48/7 89/24
ranking [2] 211/22
212/1
rapidly [1] 126/19
rare [1] 191/10
rarely [3] 50/20 211/2
211/2
rate [2] 40/9 94/7
rates [4] 47/13 81/16
81/20 186/25
rather [6] 54/8 87/13
101/22 167/25 197/20
232/21
rational [1] 156/14
razzed [1] 32/21
re [3] 74/7 110/21
238/15
re-entered [1] 74/7
re-open [1] 238/15
re-read [1] 110/21
reached [4] 16/11
78/14 84/11 128/7
reaction [1] 216/5
read [12] 54/23 56/25
66/6 110/21 110/21
128/14 129/23 161/21
175/2 191/17 213/20
221/14
reading [2] 100/3

ready [3] 119/22 158/1
218/13
real [19] 38/20 42/13
47/5 55/2 88/23 88/23
88/25 107/5 116/1
127/9 127/10 127/14
138/23 147/17 167/17
191/11 191/13 208/14
217/2
Real-world [1] 55/2
realities [6] 54/3 57/7
58/10 96/24 96/25
97/11
reality [2] 60/10 97/7
really [58] 13/24 15/21
17/1 33/11 34/1 35/19
36/17 42/9 42/12 42/13
43/1 49/10 52/20 62/4
66/4 67/23 71/17 75/23
87/4 88/15 91/14 91/18
93/13 94/20 94/22 99/9
100/20 101/19 103/18
103/21 107/4 113/12
113/12 113/15 116/1
116/2 120/21 122/15
125/23 127/14 128/21
136/5 136/11 146/3
153/23 157/12 157/12
178/14 192/2 202/1
211/9 212/10 213/6
214/15 217/7 221/16
227/1 230/20
realtime [6] 2/6 144/15
144/20 173/16 188/7
206/6
reason [20] 9/24 16/24
18/9 18/11 19/16 40/2
54/14 54/18 58/13
63/19 69/8 121/18
133/20 170/25 171/1
183/17 187/22 229/2
231/14 231/14
reasonable [9] 144/21
159/6 174/5 175/10
199/15 203/2 210/14
210/16 224/22
reasons [9] 12/25 14/5
15/2 40/8 80/18 95/11
119/1 135/2 178/14
rebuttal [5] 116/17
121/16 178/13 185/19
209/25
recall [2] 61/8 92/19
received [2] 55/20
238/10
recently [2] 194/22
238/7
recess [7] 45/13 45/14
119/13 119/16 157/20
157/21 239/3
recognized [2] 49/5
95/13
reconstruct [1] 95/15
reconvene [1] 119/9
record [49] 17/4 25/11
27/21 39/13 39/25
39/25 44/11 74/14 81/1

**R**

**record... [40]** 92/14
100/9 106/21 107/16
107/25 130/10 132/8
132/22 144/11 146/2
146/3 148/13 150/9
154/9 155/1 173/15
173/21 177/4 182/14
187/22 193/24 195/25
196/22 197/5 197/5
199/12 200/4 202/23
204/20 206/1 207/8
221/9 223/4 223/22
230/5 232/5 233/2
233/8 234/24 240/3
**record's [1]** 232/9
**recorded [2]** 2/10
235/20
**records [1]** 220/7
**red [1]** 46/16
**redact [1]** 46/19
**redacted [4]** 5/3 46/15
158/4 191/17
**redesign [3]** 25/22
184/20 187/3
**reduce [2]** 114/19
133/13
**reduced [6]** 3/16 87/11
89/7 114/16 114/17
133/15
**reducing [1]** 17/21
**reduction [2]** 114/2
114/3
**reel [1]** 236/16
**reentered [1]** 71/23
**refer [6]** 4/14 6/5 6/6
8/1 135/24 148/8
**reference [6]** 44/12
46/20 110/19 140/19
153/22 164/6
**referenced [1]** 47/7
**references [1]** 93/10
**referencing [1]** 59/7
**referring [2]** 121/2
206/24
**reflect [2]** 92/14 105/16
**reflected [1]** 225/24
**reflection [3]** 156/14
157/9 198/23
**reflects [1]** 151/21
**refusal [5]** 178/4
178/24 179/7 179/11
179/14
**refused [3]** 141/13
202/25 204/25
**refusing [2]** 178/6
179/1
**reg [2]** 179/22 179/22
**regard [1]** 197/4
**regardless [3]** 7/8 87/5
219/11
**Registered [1]** 2/4
**reinforcing [3]** 23/8
25/17 151/23
**reject [4]** 55/23 76/20
232/6 232/11
**rejected [1]** 114/12
**rejecting [1]** 100/23

**rejects [1]** 100/3
**related [1]** 161/11
**relates [2]** 40/19 57/24
**relationship [13]** 11/24
21/5 22/25 23/1 38/19
46/6 58/14 172/6 180/4
194/24 195/1 198/18
202/8
**relationships [3]** 20/22
30/19 30/20
**relative [2]** 21/16 36/4
**release [5]** 88/18 88/20
102/1 102/6 213/17
**releasing [1]** 88/16
**relevant [24]** 6/12
36/21 36/21 36/25 48/6
48/8 55/8 55/13 123/9
123/23 133/25 134/1
142/22 142/25 154/6
188/2 192/22 209/11
209/19 224/18 224/24
233/2 233/17 237/13
**relies [2]** 146/22
169/21
**reluctant [2]** 125/18
125/19
**rely [5]** 111/18 158/23
229/18 229/22 229/23
**remark [1]** 123/19
**remedies [4]** 223/13
231/12 231/19 231/23
**remedy [12]** 70/12
141/11 180/23 221/18
223/3 223/18 227/25
228/11 228/13 231/7
233/21 234/13
**remember [9]** 18/15
18/16 18/22 18/23
24/20 26/20 35/21
150/8 216/15
**reminds [1]** 7/9
**removed [2]** 131/15
219/3
**removing [1]** 66/22
**rentals [1]** 135/13
**rents [5]** 80/21 80/21
81/3 82/23 85/2
**reorient [1]** 16/3
**repeat [4]** 46/7 115/9
172/11 209/17
**repeating [1]** 97/4
**rephrase [1]** 205/10
**replace [1]** 90/3
**reply [2]** 169/21 175/14
**report [4]** 36/1 186/1
193/22 216/2
**reporter [2]** 2/5 2/6 2/6
2/7 45/6 157/16
**reports [2]** 101/11
218/1
**represent [1]** 149/19
**representation [1]**
47/24
**representative [2]**
196/22 198/3
**representing [1]** 45/21
**request [9]** 4/23
176/24 205/13 205/16

222/14 224/9
**require [3]** 25/21 95/13
147/24
**required [6]** 13/12
62/23 77/15 91/12
153/2 167/24
**requirement [2]** 64/8
199/9
**requirements [2]**
199/19 199/25
**requires [5]** 14/20
67/22 77/11 129/18
147/24 159/17 159/18
179/22 217/2
**resist [1]** 19/10
**resolve [2]** 93/22
106/25
**resolved [2]** 235/8
235/25
**resolving [1]** 218/2
**resources [1]** 199/6
**respect [33]** 19/13
23/24 25/24 29/7 32/8
33/13 39/10 57/21
58/16 58/20 58/21
58/22 60/9 60/19 75/21
91/7 92/15 122/15
122/20 124/13 127/23
132/24 139/20 140/16
150/5 154/16 169/2
212/18 216/24 221/7
221/13 225/6 238/7
**respectfully [2]** 75/16
147/23
**respects [1]** 4/22
**respond [2]** 153/7
226/22
**response [4]** 111/23
134/4 153/7 179/3
**responsible [2]** 69/25
228/18
**responsive [1]** 197/4
**rest [14]** 84/17 121/20
191/18 238/24
**restricting [1]** 199/13
**restriction [3]** 42/19
42/21 42/24
**restrictions [8]** 11/18
11/19 17/5 43/7 43/9
110/24 115/18 133/3
**restrictive [1]** 114/1
**rests [1]** 33/11
**result [4]** 15/23 93/1
131/11 153/10
**resulted [4]** 11/7 131/1
132/5 175/1
**results [17]** 23/6 24/22
98/13 98/14 101/23
101/24 106/15 123/4
131/3 133/21 137/7
137/18 139/25 154/5
174/7 212/16 213/3
**resume [2]** 119/10
157/17
**return [4]** 23/5 24/6
145/15 185/16
**returned [1]** 24/10

24/21
**rev [6]** 69/16 79/7 80/4
80/5 102/2 110/11
**revealing [1]** 190/13
**revenue [16]** 24/6
24/10 24/10 24/21 78/3
79/18 79/19 80/14
98/15 144/19 144/21
174/8 189/23 190/16
190/18 190/21
**reverse [3]** 11/17 92/24
180/18
**reversed [1]** 106/4
**review [1]** 54/1
**reviewed [1]** 233/4
**reviewing [1]** 238/11
**reviews [5]** 140/17
140/17 155/23 156/1
156/3
**revolves [1]** 200/18
**reward [2]** 68/17
114/24
**rhetorical [1]** 226/25
**rid [2]** 123/23 124/6
**ride [1]** 234/13
**right [162]** 3/18 5/11
5/25 6/1 8/20 8/24 9/12
10/16 11/1 11/10 12/17
12/21 13/5 13/13 14/14
14/18 17/13 18/10
18/18 19/1 19/11 20/8
21/6 22/14 26/24 29/13
29/15 29/16 31/6 32/5
32/18 33/7 36/9 36/12
38/22 39/1 40/22 41/2
44/14 45/2 45/4 46/9
54/10 57/14 58/22
59/14 60/5 60/20 62/9
64/24 65/2 65/5 65/8
68/3 69/21 70/3 71/2
71/3 73/10 73/22 75/15
77/24 78/11 79/23
80/10 80/13 83/6 86/14
87/25 95/5 97/20 98/15
101/4 113/14 114/8
115/3 119/5 119/7
120/9 125/15 126/11
126/13 127/3 127/21
128/2 128/5 128/19
128/22 129/9 131/5
131/20 136/25 137/5
137/9 138/2 138/6
139/19 140/4 140/23
142/2 142/19 142/20
143/17 144/8 146/8
146/12 148/9 149/2
149/9 149/13 149/20
150/17 152/19 153/17
154/7 154/12 154/20
155/24 157/15 158/1
163/20 165/20 170/6
177/7 180/1 181/17
182/6 183/21 185/1
187/2 187/8 188/7
194/9 194/19 200/16
200/21 202/19 203/8
205/5 205/15 207/1

203/3 209/18 209/24
210/23 210/24 211/15
211/20 212/6 214/19
215/3 217/5 217/7
220/19 224/16 226/4
226/7 231/1 237/1
237/11 238/2 238/20
**rights [4]** 57/14 57/15
57/18 57/22
**rigid [2]** 54/2 127/20
**rigor [1]** 153/2
**rise [14]** 3/2 8/14 9/10
45/12 45/15 54/14
91/10 119/17 157/19
157/22 169/10 169/12
169/13 192/21
**rival [10]** 23/10 83/7
83/16 85/7 87/12 93/19
131/24 192/20 191/11
205/3
**rivals [37]** 17/16 25/1
28/22 59/6 63/16 64/16
74/2 74/3 78/23 82/19
82/25 83/3 83/3 83/7
83/10 83/13 99/3 99/8
99/11 99/17 100/5
100/8 111/5 160/17
172/13 173/2 173/9
194/6 194/10 195/4
195/7 195/11 198/18
203/19 204/3 204/7
204/13
**rivals' [4]** 23/14 23/16
87/14 187/1
**RMR [2]** 240/2 240/8
**road [2]** 3/22 231/24
**robust [3]** 185/23
186/2 189/25
**ROI [1]** 157/3
**rolling [1]** 182/2
**room [2]** 163/24
227/11
**rooms [1]** 201/12
**Ropes [1]** 5/17
**round [1]** 119/22
**RSA [2]** 100/14 208/25
**rubber [1]** 152/14
**rubicon [4]** 72/9 72/13
74/19 75/22
**rubric [1]** 9/7
**rule [7]** 126/6 213/16
213/22 217/20 218/17
222/8 235/4
**rulings [1]** 218/21
**run [8]** 132/15 136/22
147/13 164/7 175/4
190/21 214/2 214/3
**running [2]** 120/2
130/21
**runs [1]** 20/1
**Rutschman's [1]**
149/20

**S**

**SA360 [28]** 121/5
147/21 150/7 150/14
151/4 159/22 160/11
160/16 169/6 172/20

**S**

SA360... [18]  172/21
173/16 174/25 175/17
175/25 176/13 181/2
185/12 203/24 204/2
204/3 204/4 204/5
208/6 208/8 208/15
208/18 215/17

sacrifice [1]  25/12
sacrificed [1]  77/22
Safari [16]  26/23 28/15
30/2 70/24 70/25 73/17
90/3 101/7 101/15
101/17 101/17 102/18
103/12 104/16 110/13
236/23

Safty [1]  5/14
said [113]  4/25 9/8
10/25 11/8 12/10 12/10
17/14 19/4 19/9 20/23
26/18 27/18 35/6 35/9
35/13 38/24 48/16 51/1
51/6 53/20 56/15 56/16
57/1 58/2 59/6 59/8
60/21 64/9 67/12 69/14
69/15 72/25 74/5 75/20
76/11 76/21 77/4 77/21
78/17 78/22 79/9 80/3
80/11 83/20 84/4 87/11
91/25 92/2 94/15 95/11
99/2 101/11 104/2
104/3 110/3 111/12
113/8 113/10 113/11
114/16 114/23 115/25
126/13 130/1 139/8
141/6 141/12 143/12
151/3 151/8 152/18
162/10 162/10 163/4
164/4 166/2 167/17
170/3 170/22 171/15
172/15 173/14 173/15
176/2 176/18 177/15
188/14 196/22 196/24
197/2 197/3 203/2
203/23 204/21 204/24
205/11 205/21 205/25
209/17 212/14 213/13
213/13 213/25 215/11
222/4 223/15 226/1
226/1 226/1 226/22
228/25 229/24 235/15

sake [1]  55/24
sal [1]  186/1
sale [1]  174/10
Sallet [27]  1/17 3/10
45/21 46/9 114/14
121/14 121/17 131/22
151/11 158/1 161/6
168/23 171/15 174/12
183/12 186/9 196/21
206/4 210/21 211/6
212/3 214/18 216/13
216/23 216/24 227/24
231/2

Sallet's [1]  51/8
same [34]  11/18 27/17
29/7 29/9 30/18 33/5
43/14 57/23 58/21 63/4

84/11 86/21 90/19
108/17 127/2 127/2
127/6 132/10 141/1
141/3 141/9 145/2
145/3 145/8 147/18
152/24 155/16 195/21
207/16 216/4

sanction [5]  224/2
224/3 234/1 234/10
235/7

sanctionable [2]
231/21 233/20

sanctioned [5]  222/24
223/25 228/12 228/15
230/16

sanctions [9]  217/16
221/3 221/13 222/5
222/9 223/15 226/16
226/16 237/17

Sanofi [2]  55/16 55/20
Sanofi's [2]  55/10 56/3
sat [1]  72/20
satisfaction [1]  186/6
satisfied [2]  49/16
49/17

satisfies [1]  68/6
satisfy [5]  49/15 67/21
90/11 92/8 93/6
saves [1]  56/3
saw [3]  74/10 96/23
97/1

say [130]  3/20 8/9 8/25
9/17 15/17 17/23 23/9
26/10 33/9 36/6 37/9
38/1 41/8 50/18 50/20
52/23 53/1 55/16 58/6
58/8 60/22 64/10 65/9
65/23 67/7 72/9 72/12
73/11 74/15 75/23
77/16 79/3 79/17 81/24
82/11 82/15 83/19
86/15 86/16 86/21
87/10 90/1 90/23 91/22
94/23 94/25 97/9
109/21 111/7 111/17
115/22 116/10 117/23
118/17 121/17 126/17
127/24 129/16 130/10
130/12 133/1 133/25
134/1 134/12 138/19
140/6 147/25 148/2
149/16 150/13 151/11
154/3 155/5 155/17
157/7 157/10 159/1
161/23 162/7 162/9
163/8 163/12 163/20
164/19 164/21 164/24
166/24 167/8 168/25
169/2 171/17 174/16
175/12 175/19 178/14
178/16 178/17 179/4
180/21 182/16 183/18
184/16 201/10 201/22
202/20 205/17 207/19
208/13 210/4 211/1
211/6 213/15 213/22
217/8 218/11 218/15

226/10 226/12 226/13
227/6 227/10 228/14
228/22 229/20 230/3
234/5 234/7

say that [1]  224/17
saying [46]  19/14
20/14 23/12 25/14
32/21 44/2 48/19 52/5
58/25 60/7 60/9 60/10
66/12 68/17 76/25 78/9
79/6 80/1 95/5 110/11
114/1 116/7 124/3
125/15 145/14 152/12
156/17 156/23 164/11
165/11 165/12 167/5
167/7 170/11 177/13
195/21 198/22 209/9
212/2 215/9 216/20
218/24 222/23 227/20
227/23 227/24

says [57]  26/5 26/6
37/17 39/2 42/14 55/23
60/14 61/16 61/18
61/19 62/14 63/1 68/9
70/18 73/16 81/15 83/3
85/22 86/11 93/9 93/25
96/7 105/25 106/1
106/7 106/7 107/4
108/6 111/2 125/18
134/6 147/4 161/4
161/6 166/18 169/24
172/1 173/4 173/18
174/11 177/6 177/25
179/16 179/18 181/20
185/13 190/24 198/3
199/13 202/10 203/11
208/13 209/22 210/11
213/11 213/12 223/7

scale [32]  21/6 21/18
22/7 22/8 22/9 22/10
23/13 23/20 23/21
24/16 24/16 25/16
25/17 30/6 33/12 64/18
76/13 82/5 96/6 97/3
98/8 98/20 99/4 99/5
99/6 99/7 99/12 99/14
172/13 190/24 196/14
204/13

Scalia [1]  59/8
scape [1]  216/20
scenario [1]  112/4
scheduling [1]  220/15
Schmidtlein [31]  2/2
3/11 4/5 4/7 41/20 45/3
48/24 52/23 63/24
68/23 80/24 101/3
104/22 115/6 116/14
116/21 119/23 157/14
158/9 171/5 171/9
171/12 173/14 176/18
205/11 209/18 210/23
217/6 231/1 232/1
235/15

Schmidtlein's [2]
159/9 236/5

school [1]  148/14
scope [3]  158/19 218/2

scoreboard [1]  216/21
scraper [1]  216/20
screen [10]  4/20 37/4
37/8 39/3 73/7 75/24
75/24 96/2 109/10
129/4

screening [2]  35/14
35/15

scrutiny [1]  134/23
se [19]  9/18 31/18
51/10 51/16 62/13
64/24 124/20 125/21
126/21 143/6

seal [6]  5/2 37/25
158/4 175/3 176/14
189/4

sealed [1]  190/13
seams [1]  179/6
search [168]  15/8 15/9
16/19 16/20 16/20 21/8
21/12 21/12 21/16
21/17 23/4 23/6 23/10
24/3 24/6 24/22 24/22
25/2 25/6 26/9 26/22
27/9 27/13 27/16 27/24
29/3 29/6 29/19 29/20
30/2 32/13 36/2 36/10
40/16 40/16 40/17
44/13 44/16 44/20
44/23 47/9 47/18 48/9
59/20 64/5 71/1 73/6
73/6 74/22 81/4 85/6
85/6 88/4 89/9 90/3
90/4 93/2 93/3 93/3
97/16 98/13 98/13
101/14 101/19 102/7
102/9 102/11 102/12
102/14 102/19 103/12
104/9 104/18 107/3
108/4 108/19 108/21
108/24 109/2 109/6
109/8 109/10 109/16
109/24 110/12 110/14
110/15 111/19 111/22
112/1 116/9 117/16
117/19 118/3 118/6
118/7 121/4 121/6
121/12 121/18 123/4
123/10 123/11 123/13
123/15 123/17 123/18
123/20 130/23 131/2
131/3 131/24 133/21
134/9 134/17 135/6
137/22 137/23 137/24
139/10 141/20 142/6
143/4 143/12 143/18
143/19 147/9 148/6
151/15 154/5 156/22
159/11 159/15 159/21
160/2 160/4 160/10
160/15 166/3 172/9
176/5 182/25 185/11
186/12 187/12 187/15
187/16 187/20 187/22
187/24 188/2 188/4
188/16 191/24 193/9
193/18 193/19 201/3

206/8 202/15 204/5
204/9 204/10 209/20
209/20 209/22 212/3
215/9

searched [2]  41/9
41/10

searches [3]  93/4
101/22 102/18
searching [3]  102/8
105/7 143/20
season [1]  158/13
seat [1]  45/19
seated [5]  3/4 45/17
119/19 157/23 157/24
second [36]  3/14 6/4
6/10 6/16 7/16 8/4
11/11 11/12 13/24 35/5
36/1 42/10 52/11 63/14
65/4 65/11 76/24 83/19
91/1 92/25 97/2 100/1
115/17 122/17 126/5
132/6 134/4 144/10
159/12 170/3 170/11
176/13 185/15 221/15
224/5 228/3

Second Circuit [2]
170/3 170/11

secondly [3]  123/2
181/15 208/12
seconds [1]  45/22
section [43]  1/18 6/14
13/2 32/1 37/21 37/22
47/25 49/20 53/10
54/15 57/10 61/12
61/17 62/21 64/25
68/13 68/16 70/19 71/5
71/13 71/15 72/20 73/3
74/17 75/4 75/25 83/8
84/1 84/22 91/11 91/13
91/15 91/15 91/17
91/19 91/23 91/24
91/25 95/4 95/14 99/13
134/23 169/8

Section 1 [5]  37/21
61/17 91/13 91/15
91/23

Section 2 [13]  74/17
75/4 75/25 83/8 84/1
84/22 91/11 91/15
91/17 91/24 91/25 95/4
95/14

Section II [2]  134/23
169/8

secured [1]  31/3
see [35]  12/2 12/5
35/10 45/11 53/19
54/24 56/2 66/13 67/9
81/2 89/19 89/24 96/23
96/25 98/22 116/1
119/10 133/2 133/5
134/12 137/2 138/1
140/20 140/25 147/21
147/21 168/6 177/5
181/7 187/25 198/16
205/19 207/10 207/18
216/4

seek [2]  4/23 223/12
seem [9]  7/23 19/21

**seem... [7]** 31/20 48/18 66/12 125/24 133/8 183/17 192/10
**seemed [2]** 130/2 152/6
**seemingly [1]** 181/10
**seems [26]** 8/4 22/21 31/14 31/15 33/10 34/22 39/5 40/17 50/3 52/14 69/3 76/11 86/4 97/15 126/23 127/12 134/24 147/1 147/1 153/24 163/24 178/21 178/23 192/21 193/16 198/22
**seen [8]** 7/13 37/19 85/8 88/22 89/8 89/8 97/12 217/2
**segue [2]** 125/11 143/24
**selected [1]** 182/16
**self [2]** 23/8 25/17
**self-reinforcing [2]** 23/8 25/17
**sell [1]** 179/16
**sells [1]** 82/23
**SEM [7]** 121/9 147/20 149/5 149/15 150/14 150/15 150/16
**send [2]** 75/8 134/8
**sending [3]** 76/6 102/18 110/13
**sends [1]** 156/24
**senior [1]** 101/11
**sense [18]** 10/10 14/16 16/13 18/3 18/3 30/25 33/11 38/23 52/12 52/15 54/22 98/5 171/4 178/11 195/23 202/20 219/2 221/16
**sensitive [1]** 233/13
**sent [2]** 78/15 229/18
**sentence [2]** 162/20 164/5
**separate [7]** 59/15 67/4 113/19 115/2 158/16 191/12 225/22
**separately [3]** 55/14 56/1 177/5
**separates [1]** 50/4
**September [5]** 176/17 176/20 177/10 181/8 219/12
**sequence [1]** 66/23
**series [2]** 152/22 209/16
**SERP [11]** 137/1 139/12 139/12 159/14 182/18 182/24 183/5 184/24 186/7 187/3 199/24
**serve [1]** 134/18
**served [1]** 221/18
**serves [1]** 70/23
**service [4]** 16/11 58/17 155/10 190/19
**services [5]** 139/23

**serving [1]** 207/4
**session [4]** 3/3 45/16 119/18 157/23
**set [18]** 4/11 34/13 37/4 40/19 47/14 68/25 77/13 77/17 104/10 105/3 107/15 108/17 158/17 159/12 160/17 173/1 194/2 226/2
**sets [2]** 56/21 119/25
**setting [2]** 70/25 229/4
**settings [2]** 103/12 233/10
**settled [1]** 138/8
**several [4]** 17/1 55/4 55/12 128/1
**shalt [1]** 70/18
**share [38]** 4/9 22/5 24/10 29/17 30/7 35/19 36/7 36/19 36/22 37/9 38/10 38/12 48/6 69/16 72/2 79/7 80/4 80/6 87/12 87/14 91/12 102/2 107/18 107/20 107/20 107/22 110/11 113/3 114/2 114/3 114/17 154/3 190/16 190/21 202/2 215/10 224/14 229/19
**shareholders [2]** 84/18 84/20
**shares [3]** 12/6 35/23 36/25
**sharing [4]** 78/3 189/23 201/25 215/16
**she [1]** 23/1
**shelf [1]** 10/6
**shell [1]** 181/25
**Sherman [3]** 21/23 74/16 186/22
**Sherman Act [1]** 186/22
**shield [1]** 229/22
**shift [4]** 152/11 215/20 223/13 224/7
**shifted [3]** 35/23 36/19 173/17
**shifts [4]** 37/9 38/10 38/12 66/14
**ships [2]** 79/3 79/5
**shoehorn [1]** 163/19
**shoes [1]** 112/12
**shoot [1]** 114/2
**shoot-up [1]** 114/2
**short [3]** 45/5 56/5 231/22
**shortage [2]** 28/13 28/16
**shortly [3]** 45/11 119/11 225/22
**shot [11]** 90/25 114/13 114/15 123/21 124/1 124/1 130/24 189/21 189/22 216/14 216/17
**shot-making [1]** 216/17

**should [64]** 4/25 9/14 34/19 34/22 40/4 40/11 41/10 41/15 42/24 44/6 44/21 49/9 53/15 53/16 55/20 65/20 65/25 69/5 69/5 72/20 72/23 74/24 74/24 75/2 75/4 77/21 80/3 85/22 93/22 97/24 97/25 98/2 98/2 98/3 99/9 105/25 116/16 116/18 119/3 121/19 121/20 122/25 125/19 134/21 138/11 140/19 159/1 167/5 178/3 219/5 223/1 223/11 223/12 224/2 224/3 228/12 228/12 228/15 230/2 230/5 230/15 231/6 231/12 234/16
**should sanction [1]** 224/2
**shouldn't [6]** 65/18 87/4 108/5 132/25 155/5 224/17
**show [45]** 13/20 56/13 65/6 65/13 65/24 67/25 68/2 69/10 69/18 69/21 73/22 81/18 83/7 83/13 86/12 86/20 86/21 87/2 87/3 100/9 107/23 117/5 122/13 123/5 123/10 130/16 131/3 131/6 134/7 136/14 139/8 139/11 148/3 148/5 160/12 163/1 171/13 172/23 174/24 176/1 176/13 176/19 206/17 222/1 236/2
**showed [4]** 83/7 83/10 83/16 181/7
**showing [5]** 35/22 62/3 144/8 151/25 152/5
**shown [6]** 4/20 153/9 169/1 182/19 212/20 224/20
**shows [16]** 88/23 99/14 117/2 117/4 118/7 118/11 149/2 172/24 173/15 174/23 175/10 184/22 191/2 191/15 191/18 195/25
**shred [1]** 132/17
**shredder [1]** 223/10
**shrinking [1]** 206/4
**shut [1]** 135/8
**shuts [1]** 31/25
**sic [1]** 227/24
**side [8]** 47/12 56/13 82/5 90/13 143/11 143/14 143/18 146/25
**side's [1]** 49/23
**sideline [1]** 183/24
**sidelines [1]** 72/21
**sides [5]** 50/2 52/14 143/10 194/9 209/6
**sign [3]** 59/24 59/25 78/18

**significance [3]** 100/11 133/20 236/19
**significant [7]** 58/7 96/22 97/10 117/9 118/18 152/11 201/3
**significantly [2]** 23/16 117/3
**signing [1]** 52/4
**signs [2]** 70/17 78/20
**siloed [1]** 53/23
**similar [12]** 16/9 19/19 39/9 39/12 66/24 67/2 123/5 128/7 132/16 145/5 155/3 204/19
**similarly [2]** 149/7 197/19
**simple [5]** 36/9 56/11 99/1 158/21 195/13
**simply [13]** 65/20 82/25 82/25 89/10 91/19 96/2 165/23 168/4 191/1 210/6 220/20 236/13 237/15
**since [10]** 89/3 101/12 143/23 147/19 180/20 196/23 198/5 220/14 229/12 235/18
**single [18]** 25/5 32/12 34/12 37/16 42/14 55/3 69/4 76/14 83/8 98/9 132/17 145/13 150/25 151/3 151/3 186/4 196/22 214/13
**sir [4]** 166/6 180/14 197/11 221/2
**sit [1]** 21/19
**sits [1]** 193/23
**sitting [3]** 70/2 99/15 218/10
**situation [9]** 11/17 57/13 110/25 115/16 115/21 136/5 170/8 175/25 229/10
**situations [2]** 55/6 110/22
**six [1]** 89/8
**sized [1]** 198/13
**skeptical [3]** 126/7 126/14 134/22
**skewed [1]** 201/4
**skip [3]** 133/10 164/21 231/2
**sky [1]** 216/20
**sleepless [1]** 3/23
**slice [1]** 209/9
**slices [1]** 82/4
**slide [42]** 34/25 46/17 46/18 47/22 48/4 48/5 48/14 53/19 54/5 59/2 69/18 69/21 77/2 82/10 84/3 87/9 89/22 89/24 91/8 92/22 95/12 96/23 96/24 97/9 97/9 100/2 100/13 108/8 126/3 149/1 169/17 169/23 171/21 176/17 176/23 177/10 181/8 189/11

**slide 4 [1]** 48/5
**slides [13]** 4/8 4/11 4/14 15/4 103/10 106/16 107/16 107/22 119/25 152/22 158/3 176/13 189/4
**slightly [7]** 6/5 99/19 138/15 159/8 159/10 161/1 186/10
**slip [1]** 121/1
**slivers [1]** 27/13
**slow [1]** 117/24
**small [3]** 43/21 54/8 161/9
**smaller [2]** 27/3 118/24
**smartphone [1]** 189/23
**smartphones [1]** 189/16
**smuggle [1]** 121/20
**Smurzynski [1]** 5/15
**snapshot [2]** 95/23 96/2
**so [377]**
**so I think [5]** 35/3 148/20 151/10 231/11 231/18
**So it's [5]** 45/8 157/17 206/13 208/17 220/8
**so my [1]** 131/21
**So this is [4]** 15/19 52/3 65/15 91/5
**so-called [1]** 206/24
**social [2]** 97/19 97/20
**society [1]** 47/17
**software [3]** 98/23 98/24 121/6
**sole [1]** 193/17
**some [138]** 4/23 6/6 6/21 7/3 7/23 8/6 9/24 10/12 15/23 20/15 23/1 30/18 30/18 30/25 31/17 33/11 34/22 36/5 38/24 39/21 42/1 46/18 48/18 50/1 51/1 51/3 51/10 52/12 52/15 52/23 53/6 57/14 59/5 60/19 66/14 67/5 67/8 67/25 74/19 76/7 79/4 79/4 80/2 84/12 84/12 96/25 105/3 105/12 105/14 115/11 117/8 120/5 120/6 121/17 121/21 123/4 123/6 123/14 125/10 128/20 130/2 131/9 132/19 133/18 136/15 136/15 139/13 140/7 140/15 140/19 141/21 144/14 145/9 147/25 148/15 152/1 152/4 152/6 152/6 158/3 158/4 158/11 158/12 159/14 161/9 161/9 162/1 163/15 163/25 164/17 165/10 168/19 173/17 178/6 178/8 178/23

| | | | |
|---|---|---|---|
| **some...** [42] 179/23 181/9 183/1 184/22 192/24 194/1 196/24 197/14 205/22 206/23 208/13 208/18 209/5 214/20 214/22 215/12 215/12 215/13 216/10 216/20 217/25 218/16 218/21 218/22 221/16 221/22 221/25 222/21 224/20 224/24 225/10 225/16 227/21 228/23 229/12 230/4 234/8 234/9 235/6 235/17 238/3 238/20 | 13/10 13/15 13/22 14/20 15/23 17/17 19/11 32/21 33/13 36/6 36/7 36/8 36/13 36/18 36/22 36/25 42/11 47/21 50/9 52/16 114/24 115/5 115/10 116/4 120/6 121/21 122/8 123/14 125/11 125/21 127/16 127/20 128/7 128/10 128/10 129/3 129/7 133/24 137/17 137/19 138/13 145/2 145/5 145/8 145/20 148/16 152/19 153/14 153/21 161/7 163/19 178/4 179/7 202/11 211/23 211/25 213/11 214/20 217/13 218/1 218/1 226/18 232/13 232/14 232/20 232/23 233/6 | **square** [1] 183/16 **squarely** [1] 129/8 **squares** [1] 46/16 **St** [1] 2/3 **stage** [2] 68/8 178/13 **stamp** [1] 152/14 **stand** [4] 118/14 175/19 175/21 218/10 **standard** [4] 86/17 86/17 99/10 210/3 **standing** [3] 68/16 92/20 170/9 **standpoint** [1] 9/2 **stands** [6] 45/13 57/12 91/22 119/13 157/20 239/2 **star** [1] 140/16 **stark** [1] 19/19 **start** [15] 4/4 16/7 47/1 59/3 69/11 69/15 102/18 116/25 117/13 122/21 124/10 144/10 172/19 177/20 219/8 **started** [5] 78/25 93/25 105/6 147/20 216/17 **starting** [4] 112/4 112/6 112/11 171/25 **starts** [2] 109/1 164/11 **state** [7] 1/17 3/10 12/14 45/21 69/9 220/13 223/1 **state's** [1] 225/25 **stated** [1] 225/7 **statement** [14] 174/6 177/6 182/22 184/6 185/8 188/23 191/16 195/8 197/8 199/10 202/6 208/9 225/21 225/23 **statements** [3] 200/8 225/14 225/16 **states** [11] 1/1 1/3 1/10 3/7 52/20 108/11 149/15 158/11 191/8 192/22 215/23 **states'** [2] 75/3 120/23 **station** [1] 179/17 **status** [2] 107/23 107/24 **staunched** [1] 226/14 **stay** [5] 34/16 72/5 103/8 176/12 238/20 **staying** [1] 129/15 **stenography** [2] 2/10 **step** [12] 14/20 15/20 15/20 50/10 51/8 122/3 172/9 223/14 224/2 224/5 228/12 230/15 **steps** [5] 122/2 162/17 217/10 230/17 238/21 **Sterling** [4] 91/21 91/22 91/22 91/23 **stickier** [1] 118/24 **stickiness** [1] 33/13 **sticky** [3] 107/4 107/5 116/21 | 118/7 118/8 122/12 124/21 131/17 134/23 135/21 151/21 151/24 189/20 200/23 204/4 223/20 230/2 **stipulating** [1] 63/13 **stop** [5] 5/4 9/13 19/6 19/17 177/16 **store** [3] 19/22 20/2 33/3 **story** [1] 160/13 **straight** [2] 133/11 142/9 **strategies** [1] 207/21 **strategy** [2] 25/13 156/19 **Street** [1] 1/14 **strengthens** [1] 97/3 **strike** [1] 206/14 **string** [1] 146/14 **strong** [2] 156/20 176/5 **stronger** [3] 194/7 197/21 203/20 **struck** [2] 16/10 79/18 **structured** [1] 193/6 **student** [2] 201/14 202/22 **study** [3] 147/17 185/25 186/5 **stuff** [9] 51/16 62/4 88/21 114/18 114/21 167/14 167/17 230/21 233/7 **subject** [5] 9/23 88/6 124/21 134/23 159/12 **subjected** [1] 31/24 **submission** [1] 230/13 **submissions** [1] 3/22 **submit** [9] 6/14 14/25 147/23 153/5 217/25 218/11 218/12 220/2 230/21 **submits** [1] 211/25 **subpoenaed** [1] 151/1 **subpoenaing** [1] 215/24 **substantial** [27] 12/4 12/12 13/25 29/3 29/5 29/18 30/7 35/15 35/16 37/17 38/4 38/12 40/9 42/10 42/15 43/20 54/17 113/20 113/23 114/1 114/4 122/13 147/6 150/23 152/12 153/6 237/2 **substantially** [1] 100/7 **substantive** [1] 235/14 **substantively** [1] 233/5 **success** [1] 209/5 **successful** [3] 27/15 27/15 30/14 **such** [14] 23/13 24/12 49/14 54/12 58/4 126/18 134/25 137/7 149/25 150/2 168/15 | 232/2 182/6 198/9 **sued** [1] 110/4 **sufficient** [2] 28/3 144/18 **suggest** [13] 19/7 42/19 94/7 113/13 123/25 125/24 127/4 127/5 147/10 192/10 214/20 216/23 219/5 **suggested** [12] 23/7 24/15 27/22 31/23 34/5 77/20 80/24 107/1 127/16 199/2 217/24 234/8 **suggesting** [8] 51/9 120/8 167/8 167/24 199/23 200/1 215/19 227/25 **suggestion** [1] 177/2 **suggests** [2] 103/19 177/15 **suit** [1] 225/22 **Suite** [1] 1/21 **summaries** [1] 218/1 218/3 218/4 218/5 219/4 **summarize** [1] 129/4 **summary** [33] 1/9 6/3 6/13 12/22 15/14 20/4 49/12 53/4 55/9 100/23 121/19 142/1 142/2 151/13 159/4 166/1 175/11 175/24 186/4 192/2 203/16 208/4 210/3 217/12 218/17 218/18 234/2 234/12 234/17 234/18 235/25 236/8 237/17 **Sun** [1] 214/8 **super** [1] 129/2 **superior** [7] 7/6 17/18 17/23 22/7 24/23 25/20 80/25 **supplied** [1] 156/6 **supplier** [1] 156/1 **suppliers** [1] 203/18 **supply** [1] 156/1 **supplying** [1] 180/7 **support** [14] 130/9 131/10 174/25 175/8 176/24 177/23 178/2 181/1 181/20 182/6 193/21 198/20 210/16 236/14 **supported** [4] 176/20 176/25 208/13 235/6 **supporting** [2] 175/13 235/22 **supports** [4] 174/5 175/10 208/16 208/18 **suppose** [3] 18/3 127/22 201/2 |
| **somebody** [18] 32/13 57/13 69/14 101/21 103/3 112/4 123/16 134/6 137/24 145/12 147/25 156/17 157/7 202/21 214/13 214/23 215/1 228/24 | | | |
| **somehow** [23] 44/22 94/7 108/5 121/19 122/23 122/25 123/2 123/12 123/14 131/1 131/23 132/18 138/12 155/19 156/6 156/20 161/25 181/19 186/12 199/23 199/24 201/23 216/7 | **sorts** [5] 22/4 23/22 140/9 142/17 143/21 **sound** [2] 22/9 74/13 **source** [1] 188/16 **sources** [1] 103/2 **space** [1] 151/22 **spaceship** [1] 147/11 **speak** [4] 49/22 126/10 128/17 158/5 **speaker** [1] 162/8 **speaking** [3] 52/15 60/1 148/13 | | |
| **someone** [3] 85/7 174/10 215/14 | | | |
| **something** [39] 5/2 28/25 35/14 39/9 50/6 50/6 50/7 58/20 59/12 69/12 78/19 79/1 88/2 99/1 99/5 105/4 112/20 124/18 139/11 143/20 145/17 147/17 148/18 163/1 174/10 177/3 185/24 187/13 188/12 220/2 220/8 220/22 223/12 227/13 229/14 233/18 234/7 234/10 236/2 | **specialized** [11] 120/21 120/22 121/1 121/4 122/23 123/1 132/15 134/5 135/5 188/6 202/15 **specific** [16] 9/5 11/18 12/1 35/12 46/17 46/21 50/23 92/10 132/4 132/4 152/20 153/12 206/20 225/5 231/11 236/13 **specifically** [9] 13/9 19/20 113/3 142/12 142/22 195/10 203/11 213/25 225/5 **specifics** [1] 6/22 **specify** [1] 25/10 **spectrum** [2] 51/14 52/15 | | |
| **sometimes** [2] 135/24 183/1 | | | |
| **somewhat** [1] 12/19 | | | |
| **somewhere** [3] 39/24 134/9 149/19 | | | |
| **Sonsini** [1] 5/16 | | | |
| **soon** [2] 238/21 238/23 | | | |
| **sooner** [3] 150/1 151/4 232/21 | **spend** [17] 120/14 120/15 145/10 145/16 145/17 147/22 149/15 149/18 150/3 151/19 173/17 175/4 187/5 199/5 207/21 215/20 222/21 | **stenography** [2] 2/10 | |
| **sordid** [1] 156/9 | | **step** see above | |
| **sorry** [29] 26/5 26/12 26/18 27/6 40/15 59/18 90/16 94/19 104/22 111/11 126/1 129/12 129/13 129/14 134/19 136/7 145/19 151/8 151/17 152/18 169/5 171/14 171/16 177/11 184/3 189/11 196/7 203/6 225/23 | **spent** [9] 3/23 59/5 63/14 63/17 188/5 192/23 192/24 216/13 229/3 **spit** [1] 140/14 **spoliation** [1] 237/19 **sponsored** [1] 43/10 | **still** [20] 27/17 31/23 | **substantive** see above **substantively** see above **success** see above **successful** see above **such** see above **supposed** [14] 15/22 26/10 26/14 37/7 41/16 42/18 42/19 42/23 44/25 114/25 141/7 141/7 150/22 213/17 **supposedly** [1] 113/5 |
| **sort** [74] 4/17 4/23 6/4 | | | |

**S**

Supreme [1] 179/19
Supreme Court [1] 179/18
sure [30] 7/21 30/24 34/20 54/25 62/10 63/15 75/19 78/6 82/8 92/12 99/20 111/19 111/24 115/5 118/17 127/1 138/17 152/23 168/8 168/10 177/14 179/10 202/16 205/23 207/9 214/25 220/25 221/4 221/12 229/4
surely [4] 41/7 116/6 192/12 192/15
Surescripts [1] 165/5
surpassed [1] 112/19
surprise [1] 238/16
surprising [2] 167/16 174/2
survey [1] 186/2
survives [1] 121/19
Susan [1] 5/16
Susan Creighton [1] 5/16
SVP [40] 131/1 132/12 132/18 132/19 138/19 138/20 142/9 142/12 154/16 155/23 156/15 169/2 171/22 175/25 186/6 187/4 189/25 190/25 191/16 191/22 193/17 194/22 194/25 196/8 196/22 198/3 198/11 198/21 203/11 203/18 204/3 204/21 206/20 207/10 207/13 209/1 209/3
SVP's [1] 199/13
SVPs [115] 121/2 123/7 130/22 131/2 131/10 131/15 131/23 132/15 133/9 133/10 133/19 133/21 133/23 135/1 135/4 135/7 135/8 135/12 137/3 137/8 138/4 138/10 138/23 139/5 140/12 141/3 141/5 141/8 141/20 142/6 142/16 143/8 153/24 154/10 155/2 155/4 156/8 156/24 159/15 159/18 159/19 160/8 160/14 180/13 182/12 182/17 183/14 183/17 183/18 183/25 184/8 184/16 184/23 185/6 185/13 185/18 186/12 187/7 187/12 187/16 187/19 187/23 188/10 188/15 189/17 189/19 189/20 190/21 191/3 191/20 191/23 192/4 192/11 192/18 192/21 193/4 193/4 193/5 193/6

**T**

tab [2] 35/2 106/17
table [11] 5/10 6/13 37/5 56/22 60/13 70/13 158/10 158/12 180/24 196/7 209/7
tactics [2] 30/18 194/11
take [38] 5/8 17/15 23/25 24/4 34/3 45/5 45/9 45/22 52/20 54/3 67/7 69/19 70/13 85/1 85/2 95/17 100/1 157/15 161/1 162/13 172/7 182/17 184/23 189/6 189/17 195/4 203/23 204/4 205/22 208/2 209/19 217/17 219/25 221/22 230/10 230/12 231/9 231/16
taken [6] 34/23 41/22 54/3 54/18 57/22 149/17
takes [2] 86/10 160/20
taking [10] 43/7 60/13

194/19 195/5 195/12 195/20 195/23 196/15 199/1 199/5 199/11 199/16 199/22 199/22 199/24 200/3 200/4 200/5 200/7 200/10 200/15 200/20 201/6 202/1 202/23 204/1 205/20 205/25 206/3 206/10 207/5 207/15 207/15 208/24 212/19
swiftly [1] 164/7
switch [34] 25/25 26/1 28/24 28/25 33/23 34/12 37/2 38/24 44/4 44/6 44/6 44/8 94/12 102/11 103/7 103/13 103/21 103/25 104/6 105/4 105/15 105/19 107/6 107/6 118/20 150/13 151/16 169/25 170/3 216/7 224/21 225/15 225/18 228/21
switched [3] 26/1 26/7 33/22
switcheroo [1] 93/9
switching [8] 103/22 105/17 107/3 116/19 116/24 118/9 118/22 208/21
switchover [1] 118/13
sword [1] 229/22
sympathetic [2] 76/12 219/6
synergistic [3] 56/2 56/3 161/8
system [9] 17/7 18/7 18/7 98/22 98/23 98/24 98/25 165/21 207/13
systems [2] 98/21 210/13

talk [24] 4/24 6/21 13/15 46/20 48/13 48/24 49/1 49/11 62/2 76/13 92/11 114/14 120/4 121/14 121/15 122/14 128/20 162/14 171/7 182/12 217/10 219/20 220/21 221/3
talked [24] 31/11 42/8 48/25 99/25 107/17 121/13 121/25 122/3 122/10 132/23 134/21 155/2 165/13 172/10 196/17 203/24 204/1 204/1 207/19 208/20 209/1 220/2 236/17 238/4
talking [36] 5/1 13/16 15/5 15/7 15/19 24/24 29/13 32/16 42/8 44/3 44/3 47/23 59/5 70/12 71/24 87/10 98/8 104/4 113/16 118/21 120/15 122/16 125/23 143/23 147/14 164/16 171/12 181/22 192/23 192/24 207/1 208/10 222/12 223/9 233/13 237/8
talks [6] 6/23 7/1 37/20 164/6 164/15 203/8
Tampa [1] 36/14
target [1] 143/15
teaches [1] 7/4
team [3] 5/8 227/5 227/12
tech [1] 226/5
technically [2] 13/20 139/17
technology [17] 76/5 76/5 115/1 145/4 145/21 145/25 147/2 147/4 148/11 148/15 148/17 148/21 148/22 150/1 150/2 151/4 151/9
teeth [2] 33/8 33/9
tell [16] 34/18 42/24 75/12 83/6 89/15 118/23 141/6 165/13 170/2 177/24 184/18 189/10 193/16 194/14 197/4 205/1
telling [1] 164/17
tells [5] 83/12 93/16 93/17 94/1 96/20
temporary [1] 153/15
ten [5] 21/18 39/4 45/9 89/3 157/15
tend [1] 232/14
tends [1] 168/3
Tenth [1] 55/23
term [11] 77/2 77/3 79/8 80/8 86/13 155/3 155/5 171/11 202/24 231/19 231/22

test [18] 9/23 35/12 50/25 50/25 51/5 61/17 114/6 115/2 115/2 115/4 118/18 128/10 153/4 153/5 153/6 153/7 162/16 186/5
tested [3] 139/8 153/14 213/14
testified [2] 34/11 151/18
testifying [2] 171/22 230/1
testimony [16] 25/5 25/11 25/15 25/24 28/23 102/16 151/7 156/6 195/16 195/18 198/9 200/10 207/16 207/17 207/23 209/1
testing [1] 150/21
Texas [1] 225/12 225/17
text [7] 93/3 101/22 182/20 184/2 184/5 185/11 191/23
than [52] 5/24 16/14 23/12 23/14 23/21 24/15 28/6 37/22 39/21 41/13 48/10 62/25 64/6 69/17 76/10 90/17 91/12 97/19 101/23 102/14 106/3 112/25 115/4 117/3 118/15 120/12 123/20 126/25 131/8 136/9 144/7 145/25 146/19 154/10 156/4 156/23 158/6 159/9 171/1 174/3 182/19 191/19 192/25 193/15 193/20 194/7 201/5 203/15 210/4 210/16 228/21 232/21
thank [31] 3/21 45/1 45/2 45/18 45/19 45/24 46/9 101/1 119/5 119/6 119/7 119/10 119/14 119/20 119/24 141/4 157/13 157/14 157/18 157/25 210/20 210/21 217/4 217/5 217/7 217/9 221/11 231/25 237/25 238/24 238/25
thank you [27] 45/1 45/2 45/18 45/19 45/24

Thanks [1] 116/13
that [1509]
that's [243]
their [100] 12/23 12/24 13/7 15/16 23/14 25/4 25/19 25/22 26/1 27/14 28/23 30/14 34/3 37/3 37/12 39/22 41/8 42/11 43/9 43/18 43/24 44/1 44/5 44/16 44/22 46/19 49/12 52/8 63/15 63/16 66/21 68/25 75/12 82/5 82/19 83/14 90/3 90/13 93/5 94/18 99/8 101/12 104/9 104/19 105/18 105/25 105/25 106/5 108/16 108/24 110/23 110/24 112/1 113/4 116/9 117/5 121/5 121/12 121/21 122/24 123/7 123/12 131/7 131/9 131/14 132/12 141/6 141/6 141/15 142/11 142/22 142/25 146/21 147/22 148/23 154/23 156/7 156/12 156/12 156/17 157/6 160/3 160/3 160/9 172/13 189/20 200/6 201/19 202/2 207/7 207/7 212/11 213/3 213/3 219/4 227/2 228/4 229/13 229/19 229/24
them [96] 4/12 4/18 4/18 4/21 15/15 18/14 26/22 27/14 28/18 37/3 44/6 44/8 46/16 49/19 50/16 52/2 52/4 52/8 60/2 66/15 68/1 77/15 78/15 79/5 82/21 82/22 84/17 85/14 92/6 95/6 99/4 101/9 105/5 109/19 109/24 110/4 110/21 112/12 112/19 115/15 123/9 124/6 129/4 131/23 134/2 134/7 134/8 134/10 135/14 140/2 140/22 142/23 146/15 146/16 146/17 148/18 148/19 151/7 155/10 156/7 160/17 172/8 173/6 178/16 184/1 184/4 184/25 187/19 188/18 189/18 192/12 192/13 192/14 193/18 196/24 199/5 201/4 201/19 204/13 204/14 204/23 205/20 209/13 212/14 213/7 213/9 218/14

**them... [9]** 219/9 224/3
228/18 230/1 230/2
230/3 230/3 238/9
238/11

**themselves [3]** 36/25
76/7 160/9

**then [123]** 7/16 8/4 8/6
10/6 13/17 13/23 14/22
15/9 27/14 41/5 48/14
48/18 50/7 51/11 54/3
55/16 56/1 56/12 59/24
60/10 60/16 60/22
62/17 62/23 64/23
65/23 66/14 67/6 67/25
68/2 68/2 75/7 75/25
78/2 79/9 83/4 87/4
87/17 89/4 93/10
101/18 102/10 102/22
102/24 104/23 107/20
107/22 109/16 111/6
115/19 115/25 118/13
119/9 119/10 123/2
123/12 123/16 125/21
125/22 126/22 127/13
128/9 128/23 131/17
132/12 134/23 136/3
136/4 137/3 137/6
138/25 139/13 140/13
160/14 160/17 162/22
162/23 163/5 163/19
164/1 164/15 166/24
169/3 169/7 171/2
171/7 172/19 173/4
173/7 174/22 175/6
175/24 176/23 177/3
177/10 178/19 181/22
183/10 185/12 195/5
196/4 196/7 198/5
199/24 200/6 204/5
209/15 215/6 215/17
217/16 219/3 220/2
220/6 220/22 224/5
224/10 230/17 230/22
231/8 233/21 234/20
235/6 236/8

**then I [1]** 59/24

**theoretical [3]** 130/2
130/7 152/6

**theoretically [1]** 38/11

**theories [2]** 33/11
142/25

**theorize [1]** 131/22

**theorized [1]** 133/19

**theorizes [1]** 216/1

**theorizing [1]** 193/20

**theory [30]** 12/7 18/7
43/14 44/5 71/12 98/10
98/15 98/16 99/6 113/4
123/12 130/24 130/24
132/11 141/18 142/5
142/11 142/12 142/22
146/10 169/2 183/13
186/10 191/3 195/2
198/21 198/21 198/23
200/18 217/1

**there [288]**

**there's [171]** 8/5 9/17

14/10 21/11 22/13 23/1
27/23 28/13 28/15
28/16 29/24 30/11
30/16 30/22 32/6 33/3
34/25 35/10 38/1 41/5
41/7 43/2 43/23 44/11
46/17 49/25 50/1 50/23
51/10 51/12 52/12 53/3
53/5 56/2 57/8 57/9
57/14 62/22 66/13 67/8
69/2 69/8 69/13 69/20
73/4 73/15 73/19 75/15
76/9 76/14 76/14 80/16
82/25 83/17 85/16
90/23 91/16 93/20 98/7
103/18 103/19 105/23
106/3 106/9 107/5
107/10 107/11 108/25
110/4 110/10 111/11
111/14 111/14 113/17
113/19 116/23 124/15
127/9 127/20 131/9
134/14 135/11 139/14
141/21 142/16 143/14
144/14 145/10 146/1
146/2 148/12 150/25
153/1 153/18 154/21
156/25 159/25 161/22
162/6 165/13 167/8
168/15 169/8 169/14
173/4 173/14 173/18
173/23 173/24 173/25
174/2 175/6 176/23
182/2 184/17 185/24
185/25 185/25 186/1
187/6 187/12 189/7
189/14 191/10 191/21
192/1 194/9 196/19
197/14 199/3 200/3
203/3 203/22 204/2
204/4 206/1 206/19
208/12 208/14 208/15
208/15 211/7 211/21
218/15 219/18 221/21
222/15 222/16 223/7
223/23 226/20 227/8
228/3 228/25 231/14
231/14 231/14 233/7
233/8 233/15 235/6
235/16 235/16 235/21
236/5 236/22 237/16

**thereby [1]** 15/24

**therefore [5]** 9/10
36/10 160/5 163/14
206/18

**these [89]** 5/20 10/21
19/13 20/22 21/14
21/21 21/22 23/9 26/16
26/20 27/13 30/1 31/2
32/4 32/22 33/1 33/6
34/2 35/20 35/23 36/23
38/3 40/6 43/16 46/4
55/6 64/14 64/16 69/3
74/7 74/9 74/9 74/15
76/5 82/7 82/14 82/24
83/8 85/24 94/8 96/5
98/11 99/16 100/6

106/20 106/20 107/15
110/17 113/23 113/25
116/3 117/15 122/25
124/4 128/15 130/25
131/23 137/17 145/7
149/18 152/25 156/24
158/13 182/3 186/3
191/23 196/23 199/19
204/8 206/10 206/21
206/24 208/22 209/25
215/21 215/22 216/2
216/7 216/14 218/11
226/16 227/4 227/7
229/12 233/11 233/17

**thesis [2]** 133/7 196/8

**they [432]**

**They'd [1]** 213/7

**they'll [1]** 133/11
133/11

**they're [84]** 17/3 17/16
24/21 25/1 25/3 28/19
29/25 30/10 32/24
34/10 34/11 36/24 40/8
44/2 44/19 48/16 49/15
63/17 67/4 74/11 74/12
76/2 78/12 82/14 83/4
83/11 85/3 87/6 87/10
91/14 95/6 105/18
110/7 110/9 111/24
112/6 113/9 117/23
118/6 118/7 118/24
123/8 123/11 124/5
127/1 134/1 134/11
135/10 136/19 140/3
140/5 140/15 140/18
142/8 142/8 142/9
145/8 153/3 153/3
156/21 157/4 162/7
176/14 187/7 192/14
193/19 203/4 207/6
211/1 212/13 212/13
212/15 213/4 213/5
213/6 222/24 223/2
224/1 227/4 227/18
227/20 228/18 232/18
233/12

**they've [32]** 23/7 39/11
39/11 67/5 80/12 80/13
95/7 104/2 108/23
112/19 112/19 112/24
113/8 113/10 113/11
131/19 135/2 147/8
153/13 156/13 192/10
205/20 212/12 216/11
222/9 223/24 223/25
224/1 224/9 232/11
237/18 237/18

**thing [30]** 41/15 49/3
57/23 59/23 69/1 71/3
75/11 76/3 76/4 76/24
82/7 83/19 83/20 88/23
88/25 99/23 99/25
100/20 109/15 115/9
118/20 145/2 145/8
152/24 153/20 179/19
226/2 228/3 229/17
238/5

10/21 11/21 17/17
28/16 30/13 30/19
41/17 49/4 50/12 53/23
54/6 58/1 58/3 59/4
60/16 64/12 69/9 74/11
77/9 77/10 90/10 90/11
90/23 92/23 103/7
110/17 120/14 129/4
147/16 154/3 166/22
166/25 172/21 173/13
174/4 181/3 186/22
192/9 211/5 211/25
215/21 216/2 216/7
218/11 226/15 227/20
232/4 233/13

**think [172]** 4/12 7/14
8/18 12/4 14/19 15/20
16/2 16/2 19/18 21/2
21/10 22/13 22/19 29/1
29/2 30/25 31/5 31/16
35/2 35/3 35/3 35/13
38/21 40/3 40/6 40/14
42/3 42/5 42/5 42/7
44/7 44/12 45/23 51/9
52/12 52/21 52/24 57/3
66/16 67/6 68/8 70/22
71/2 83/1 85/21 86/3
88/12 90/23 93/22
93/24 101/20 103/21
104/11 106/12 106/18
106/22 109/15 110/6
111/17 111/24 113/15
114/11 115/13 116/3
118/6 118/16 120/6
120/7 120/10 124/15
125/10 125/14 125/25
126/2 126/3 126/12
127/1 127/9 128/7
128/11 129/1 129/4
129/8 129/18 130/15
132/1 132/3 132/12
135/19 135/21 135/23
135/23 136/9 139/20
139/21 141/19 142/18
144/21 148/1 148/20
148/22 150/2 151/10
151/24 152/9 152/21
153/3 153/13 153/16
154/9 158/14 160/12
161/6 161/15 164/24
168/22 171/5 171/10
172/1 174/4 175/18
178/9 184/16 185/19
185/21 186/17 188/2
188/8 188/23 191/2
192/3 196/7 197/5
198/15 201/10 203/15
206/24 207/14 207/22
208/5 208/14 209/8
210/8 211/6 214/4
217/17 218/15 220/3
221/14 221/17 221/19
222/18 222/20 224/16
225/2 226/19 230/14
231/7 231/11 231/18
231/18 231/20 231/21
231/23 232/11 232/21

thinking [6] 9/15 40/5
40/18 49/10 210/3
236/7

**thinks [4]** 27/19 170/9
189/18 191/20

**third [15]** 9/14 15/11
25/21 25/25 42/21
110/3 121/5 159/22
181/22 190/6 190/10
199/17 201/19 225/9
230/6

**third-party [2]** 110/3
190/6

**this [455]**

**This is [1]** 3/7

**those [95]** 4/17 6/13
11/9 17/5 17/6 27/18
29/18 30/13 30/17
30/20 33/9 38/6 38/7
38/18 40/22 41/17
42/14 43/3 44/4 44/10
44/22 49/4 52/5 56/21
56/21 57/6 67/17 68/2
72/5 80/21 89/12 90/6
90/8 90/10 90/11 91/19
93/4 93/6 94/13 96/10
99/17 100/15 100/21
104/8 104/8 104/10
108/3 109/22 110/21
110/22 110/23 110/25
117/25 118/2 118/5
121/2 127/8 127/10
128/7 128/11 128/13
128/16 133/4 134/18
137/23 139/4 139/5
139/5 143/2 148/7
149/10 149/11 153/16
155/3 155/12 155/12
158/5 169/6 172/11
181/9 184/19 193/17
200/24 207/3 207/12
217/20 218/3 218/12
218/13 226/15 226/18
230/18 234/21 236/24
237/5

**Thou [1]** 70/18

**though [14]** 8/11 11/6
12/2 12/9 34/17 44/9
70/15 91/11 123/8
124/5 130/8 131/2
134/4 160/24

**thought [23]** 47/4
77/25 79/17 94/15
101/19 109/13 109/25
114/19 123/20 124/17
129/5 135/8 149/25
171/11 184/8 184/11
186/10 186/11 192/25
194/25 195/16 201/22
238/3

**threat [5]** 17/20 114/18
124/4 124/6 134/12

**threatening [1]** 17/9

**three [28]** 15/5 37/4
43/19 48/7 56/10 66/22
81/7 81/8 81/9 88/10

**T**

**three... [18]** 122/15 128/6 128/11 137/22 146/15 148/8 159/8 161/12 161/13 162/16 162/16 162/17 172/7 176/13 181/3 182/1 200/22 223/9

**three-part [1]** 162/16

**threefold [1]** 224/15

**threshold [1]** 122/7

**thrilled [1]** 117/24

**through [37]** 20/15 30/18 31/4 34/4 36/8 36/10 55/18 58/17 58/17 67/22 68/19 84/9 84/13 93/4 106/22 136/22 149/15 149/18 150/7 150/7 160/15 160/16 162/21 174/4 175/4 175/17 178/4 181/1 182/11 185/2 193/4 198/24 198/25 200/2 203/23 210/13 227/14

**throughout [6]** 47/16 47/16 158/3 158/7 160/13 208/6

**throw [3]** 65/23 66/13 67/6

**Thus [1]** 199/13

**tie [2]** 198/24 198/25

**tie-ups [2]** 198/24 198/25

**tied [2]** 58/8 223/18

**ties [2]** 200/24 200/25

**tightly [1]** 55/21

**Tim [1]** 101/11

**time [57]** 3/23 12/19 14/24 17/19 20/16 24/1 27/23 27/24 28/9 34/17 45/7 47/16 59/5 69/14 71/5 71/25 95/24 97/10 98/9 98/10 100/25 106/5 114/23 120/15 121/10 125/22 125/22 127/17 143/24 145/1 146/15 148/15 150/16 174/7 174/25 175/5 175/8 176/18 180/19 181/16 181/17 181/23 182/11 182/23 192/23 192/24 205/17 207/21 208/1 215/25 216/9 216/13 220/6 220/7 229/4 230/12 235/18

**timeline [5]** 160/12 172/23 176/14 177/22 181/7

**timing [1]** 232/13

**tiny [3]** 27/8 27/13 27/13

**Tires [1]** 84/12

**titled [1]** 240/4

**today [15]** 4/15 12/19 20/4 64/2 79/13 121/23 158/21 194/7 211/3 217/4 220/12 226/14

**toes [1]** 51/8

**together [26]** 54/3 54/19 55/14 66/13 67/4 67/8 127/12 158/14 158/18 159/2 159/13 160/18 162/3 162/5 169/10 169/13 170/12 176/1 176/4 180/13 187/13 203/19 209/14 210/18 224/13 227/7

**told [2]** 112/24 210/25

**ton [1]** 156/25

**too [14]** 8/22 12/13 18/13 26/12 26/19 31/25 52/21 59/16 61/13 139/24 144/22 155/9 161/14 214/23

**took [3]** 5/12 55/17 171/23

**tool [11]** 121/6 121/9 149/6 149/8 150/16 151/19 173/8 173/16 175/11 175/17 180/8

**tools [5]** 147/20 149/11 149/16 149/18 150/15

**toothless [2]** 86/12 86/17

**top [12]** 16/11 137/2 139/4 139/13 139/22 169/23 198/11 206/22 206/23 212/12 213/2 216/20

**topics [2]** 101/13 224/19

**tortured [2]** 112/3 112/3

**totality [2]** 8/7 56/2

**totally [1]** 207/24

**touch [1]** 112/20

**touches [1]** 38/1

**touts [1]** 145/21

**town [2]** 19/23 19/24

**Traditional [1]** 126/19

**traffic [13]** 75/8 78/15 78/24 79/19 79/20 80/12 80/13 82/4 100/11 108/1 142/5 207/7 209/20

**transcript [3]** 1/9 2/10 240/3

**transcription [1]** 2/10

**transcripts [1]** 230/11

**transient [1]** 148/6

**transitory [3]** 144/4 144/5 144/7

**translate [1]** 150/23

**translates [2]** 152/1 211/9

**treated [1]** 179/14

**treating [1]** 193/17

**treatment [5]** 31/11 122/11 125/4 193/3 225/18

**trees [1]** 55/19

**triable [2]** 55/14 159/6

**trial [30]** 14/6 16/23 21/21 30/11 106/25

159/1 149/4 169/15 176/9 180/23 182/4 182/7 208/11 210/1 210/17 217/21 219/9 219/19 228/23 229/8 231/8 232/16 232/17 232/24 234/14 236/2 236/11

**tried [7]** 4/11 83/10 129/3 152/22 207/10 207/13 209/5

**tries [1]** 134/5

**Trinko [6]** 179/12 179/19 179/19 179/24 180/2 180/5

**triple [5]** 114/13 114/15 124/1 130/24 216/14

**triple-bank-shot [1]** 130/24

**trouble [4]** 87/23 104/6 193/14 200/23

**true [11]** 28/4 31/15 33/18 33/24 48/2 62/8 126/17 163/21 172/24 191/9 223/4

**truly [2]** 16/12 23/10

**trust [5]** 104/12 104/13 156/5 233/18 237/23

**truth [1]** 99/12

**try [27]** 6/1 27/19 28/24 34/16 38/12 64/10 86/20 96/4 105/4 109/7 113/13 113/14 120/3 134/9 134/10 134/14 147/13 147/19 156/11 158/6 189/4 190/12 191/2 211/3 214/12 224/6 233/19

**trying [26]** 38/7 52/8 71/8 74/11 82/15 98/6 105/2 109/19 113/17 123/23 130/17 150/8 152/4 153/3 153/4 162/15 162/15 162/25 178/1 209/10 212/1 216/13 216/23 222/12 233/16 238/16

**tuned [1]** 238/20

**turbo [1]** 58/4

**turbocharge [2]** 96/25 97/11

**turn [12]** 11/12 45/4 47/20 58/6 95/14 132/20 133/14 154/15 159/18 199/8 213/8 231/7

**turned [5]** 54/7 101/20 171/14 171/17 228/21

**turning [3]** 15/4 61/24 225/6

**turns [3]** 53/14 114/21 168/1

**tutorial [3]** 4/10 4/16 123/6

**Twelve [1]** 79/12

**two [87]** 4/8 6/17 8/13 12/20 14/20 15/6 15/8

33/11 33/12 33/16 46/13 50/1 50/4 50/10 58/16 63/10 64/12 88/10 89/3 90/1 90/5 90/23 92/2 92/5 92/13 92/16 92/23 113/19 119/22 119/25 122/2 122/19 127/5 127/12 135/1 135/10 139/4 144/3 144/6 144/17 144/25 154/15 157/16 160/25 161/13 169/4 169/6 170/4 170/16 170/18 170/25 173/13 173/20 181/25 181/25 182/1 188/14 191/25 192/1 192/9 192/23 193/5 193/8 193/17 194/22 195/6 196/15 200/4 204/8 209/12 214/15 215/9 217/13 217/16 217/17 220/3 220/21 221/18 221/21 225/2 226/21 226/24 230/1

**two-pill [2]** 170/18 170/25

**two-step [3]** 14/20 15/20 50/10

**twofold [1]** 221/15

**Tyco [2]** 125/7 213/21

**tying [1]** 168/20

**type [19]** 8/14 18/19 50/20 53/24 53/24 66/20 66/24 67/16 92/7 101/17 101/21 101/23 102/12 106/10 147/24 161/23 162/2 214/22 222/5

**type-ins [1]** 102/12

**types [14]** 8/9 9/5 11/18 42/15 66/7 66/9 66/10 66/22 74/1 101/13 101/21 120/11 161/16 161/22

**typical [1]** 14/12

**U**

**U.S [2]** 1/13 191/12

**ultimate [4]** 114/15 131/18 227/25 232/20

**ultimately [11]** 7/24 40/3 53/3 56/9 61/21 61/22 69/3 107/7 127/15 151/20 234/7

**un [1]** 224/16

**unable [1]** 207/12

**uncompetitive [1]** 201/18

**uncontested [3]** 159/17 187/21 209/2

**under [25]** 5/2 6/14 9/7 37/3 37/25 38/5 42/13 77/17 81/21 83/16 96/24 113/4 124/20 126/5 130/24 153/16 158/4 163/24 175/3

96/14 178/7 180/9 185/19 189/4 230/3

**underscores [1]** 188/8

**understand [40]** 15/16 18/6 23/24 30/25 52/22 59/14 63/4 69/2 73/3 74/14 75/14 75/17 85/12 97/20 103/6 103/23 113/16 125/14 133/10 144/2 149/12 152/4 158/15 158/19 180/24 184/17 186/9 187/6 190/11 194/23 195/2 198/22 219/11 220/17 221/24 226/23 228/10 230/11 230/18 230/23

**understandable [1]** 207/25

**understanding [5]** 43/15 135/14 200/24 222/7 227/3

**understands [1]** 103/20

**understood [4]** 6/8 130/14 138/18 237/22

**undescribed [1]** 132/19

**undisputed [12]** 24/25 25/5 108/1 148/20 180/18 182/22 194/16 194/21 212/17 212/24 236/20 237/20

**unfortunately [1]** 149/23

**unhappiness [1]** 136/11

**unhappy [2]** 212/15 213/6

**unilaterally [1]** 79/9

**unimportant [1]** 210/6

**unique [1]** 22/21

**unit [24]** 1/19 120/21 131/4 134/5 137/4 137/5 137/12 137/15 137/17 137/23 138/18 138/20 138/21 138/23 139/7 139/11 139/13 139/15 140/4 140/6 184/19 187/5 205/13 212/20

**UNITED [10]** 1/1 1/3 1/10 3/7 75/3 108/11 149/15 191/8 192/22 215/23

**United States [5]** 108/11 149/15 191/8 192/22 215/23

**United States of [1]** 3/7

**United States' [1]** 75/3

**units [10]** 120/22 122/23 122/25 132/16 139/18 156/12 187/4 204/23 205/21 211/17

**universal [8]** 183/7 183/9 183/11 211/8 211/8 213/5 213/7

**U**

universal... [1] 213/18
universals [5] 182/13
182/25 184/5 185/24
212/18
universe [1] 66/8
unlawful [3] 22/3 60/25
164/1
unless [4] 46/22 69/25
100/24 125/12
unlike [5] 20/17 21/24
124/2 156/2 217/1
unlikely [1] 188/3
unnecessary [2] 66/1
66/2
unpaid [1] 182/25
unquestioned [1]
159/24
unquote [1] 42/20
unsupported [1]
208/13
until [5] 148/24 177/24
218/11 232/23 234/13
unusual [2] 169/19
191/14
unwelcomed [1]
238/19
up [88] 4/8 11/8 12/20
18/21 18/22 28/7 28/10
34/10 34/13 36/2 39/3
42/1 45/9 46/13 46/20
47/22 50/22 53/18 54/4
58/8 59/2 62/4 64/9
74/21 83/7 83/7 83/10
83/13 83/16 84/17
86/14 89/23 92/21
105/20 107/12 107/15
108/8 109/12 110/8
111/20 113/23 114/2
115/7 116/3 116/19
119/25 120/1 124/7
124/14 126/3 128/10
129/19 135/5 135/6
136/14 137/17 139/3
139/11 139/13 142/15
144/22 146/6 149/2
152/21 152/21 156/11
158/3 161/25 162/8
163/20 176/19 177/5
181/11 182/21 194/22
200/24 200/25 212/1
213/1 213/18 214/14
215/13 216/13 221/1
223/9 231/11 235/13
235/15
upfront [1] 178/17
upon [6] 8/12 18/6
68/1 69/14 77/6 211/23
ups [2] 198/24 198/25
upshot [1] 119/2
URL [1] 101/18
us [61] 6/9 7/9 18/16
26/7 40/21 41/5 47/1
47/12 47/21 47/21 68/4
75/8 76/22 82/16 82/16
83/6 83/12 87/2 87/3
89/12 89/15 105/9
106/7 112/24 116/8

150/1 153/24 154/3
154/4 154/5 154/24
156/20 164/17 165/12
176/9 177/20 178/1
179/3 196/25 198/6
204/22 208/17 209/10
209/17 214/23 215/1
217/19 219/9 219/15
220/8 221/23 221/25
222/1 224/10 228/11
229/19 229/24 230/21
usage [13] 11/7 11/8
11/22 12/5 17/21 30/7
87/12 87/14 117/2
117/3 132/5 133/6
152/11
usdoj.gov [1] 1/16
use [40] 16/13 17/23
18/4 21/10 24/8 28/23
30/2 33/4 47/18 57/24
65/25 78/23 86/13 90/2
90/4 91/9 93/12 93/15
97/22 112/3 118/2
121/7 145/22 146/2
155/13 158/6 159/20
160/3 168/3 189/15
190/25 199/16 200/5
201/19 208/8 208/25
209/4 214/24 214/24
229/22
used [12] 30/18 35/14
37/8 66/10 94/17 158/7
159/19 164/8 171/11
194/11 196/1 233/5
useful [2] 5/23 229/15
user [7] 43/25 44/1
102/8 105/20 109/4
186/5 188/2
users [42] 21/11 23/4
24/9 24/9 26/1 26/7
29/6 37/2 38/24 43/20
43/21 43/21 43/22 47/7
63/4 64/4 64/4 94/25
97/18 97/20 97/21
100/19 109/6 109/10
133/13 133/18 134/18
143/16 172/13 172/16
173/3 187/16 187/19
189/18 190/1 191/4
192/5 195/7 196/4
196/14 201/4 201/11
uses [7] 47/9 93/12
93/14 154/16 154/18
173/1 173/7
using [11] 29/25 63/15
90/20 93/11 117/13
145/4 145/24 147/20
187/20 200/2 229/13
usual [1] 191/18
usually [2] 91/12
168/10

**V**

vacation [1] 135/13
vague [1] 215/5
valuable [2] 199/14
206/5

103/18 103/20 105/11
107/11 133/10 180/8
203/3 222/24 223/4
values [2] 105/14
148/11
various [21] 6/20 6/22
7/5 7/8 7/13 9/8 10/14
10/17 16/10 16/17
18/24 35/7 55/22
105/15 108/23 122/11
125/6 147/16 149/2
154/3 217/14
vast [1] 94/24
Verizon [1] 179/24
version [8] 43/9 46/15
136/2 136/8 208/15
208/16 208/16 213/14
versus [6] 3/8 107/19
107/20 125/7 179/12
213/20
vertical [10] 121/1
121/4 123/1 135/4
136/6 136/15 139/11
139/18 183/2 183/6
verticals [9] 124/16
135/11 136/14 138/20
159/14 182/16 183/2
196/23 237/4
very [85] 9/5 10/24
11/17 12/1 17/4 21/7
22/5 30/7 30/7 33/17
35/11 42/4 42/16 42/16
43/10 44/15 45/6 49/20
66/24 70/21 109/5
109/13 109/16 113/4
113/4 113/9 114/9
114/9 119/7 119/10
120/11 126/6 126/13
130/2 132/3 142/12
142/21 142/21 142/21
152/11 152/20 152/25
152/25 153/23 155/25
155/25 156/24 156/24
157/18 158/10 158/21
160/7 161/1 162/17
162/20 162/20 164/4
165/15 168/23 169/20
172/25 173/3 174/1
177/3 179/13 180/19
182/14 184/25 185/22
186/2 189/4 190/1
191/22 195/9 197/5
199/3 203/11 205/2
206/19 210/21 230/15
233/4 235/18 236/10
236/15
Viamedia [1] 179/12
vice [1] 101/11
view [41] 9/15 10/6
21/20 25/7 28/3 28/5
30/24 31/2 31/5 34/18
55/18 63/7 72/14 75/3
75/3 86/4 97/15 118/4
124/19 125/19 129/19
131/24 133/8 137/20
143/3 151/14 156/5
159/23 161/21 163/12

173/20 175/22 178/4
183/4 207/5 210/16
235/24 236/11
viewed [2] 17/20
176/24
viewing [1] 167/13
views [3] 77/5 83/23
148/17
vigorously [1] 6/12
violate [2] 7/7 71/16
75/25 125/2 164/12
186/21
violated [1] 61/11
violating [3] 68/15
71/13 71/15
violation [18] 13/2
21/22 32/1 49/20 53/11
54/15 64/24 68/13
70/19 71/5 72/20 73/3
74/17 75/5 91/11 91/13
99/13 169/8
violative [1] 61/12
violets [1] 206/4
virtual [2] 129/7 214/3
virtually [1] 214/8
virtue [9] 16/18 16/19
21/13 22/22 23/3 25/16
78/3 97/18 144/19
virtue of [1] 16/18
visibility [4] 185/7
196/17 199/4 209/3
visiting [1] 48/3
visual [1] 47/24
vital [2] 188/16 208/8
volume [1] 26/22
volumes [1] 107/12
voluminous [1] 152/25
voluntarily [4] 153/25
179/24 180/6 180/7
vote [1] 109/20
vs [1] 1/5
vulcanized [1] 55/17

**W**

wait [6] 114/23 119/12
119/14 166/24 232/23
239/1
wake [1] 111/20
Waldorf [1] 212/4
want [110] 3/21 4/22
6/1 11/11 12/17 15/15
17/14 19/4 20/19 28/12
28/23 29/7 29/24 33/9
33/20 34/11 34/13
34/16 35/1 41/23 42/2
43/8 43/10 45/5 46/20
49/1 50/18 51/25 59/15
59/24 60/1 61/13 67/19
68/10 68/11 74/13
76/22 78/9 78/18 78/22
80/4 80/17 82/16 82/16
82/17 89/19 99/20
99/21 104/2 104/3
104/10 105/5 105/23
106/5 108/8 109/1
109/8 109/12 109/15
111/2 111/3 111/20

116/15 117/11
118/25 129/14 133/20
134/11 134/12 137/25
138/9 145/23 153/18
153/25 163/4 169/16
174/14 177/20 178/14
181/25 184/12 186/16
187/17 187/17 187/19
187/23 187/25 188/15
189/1 197/4 205/10
205/12 205/17 206/1
210/9 213/1 214/10
214/25 215/14 218/9
219/23 222/5 222/16
223/20 227/7 231/1
232/4 234/11 238/15
wanted [10] 18/25
48/24 77/16 78/21
115/5 172/22 205/25
228/6 236/13 238/17
wanting [1] 186/16
wants [16] 62/2 70/4
70/10 70/11 77/17
105/22 121/15 121/17
155/20 179/20 189/15
189/17 190/23 192/3
206/6 228/11
war [1] 34/4
ware [1] 114/18
wary [1] 210/25
was [211] 10/13 10/23
11/19 11/22 12/4 12/7
15/13 16/4 16/25 17/4
17/6 17/17 17/18 17/20
18/16 18/17 18/20
18/21 19/2 19/4 19/15
25/12 26/14 27/4 27/5
27/7 27/11 35/6 35/9
36/21 36/22 37/20 51/3
51/3 51/9 54/7 54/12
55/17 57/10 57/11
58/13 58/14 58/14
58/17 59/7 60/25 60/25
61/4 61/9 61/10 61/11
63/23 63/23 67/18
69/12 70/15 71/5 72/9
72/13 73/20 74/8 74/8
77/15 78/15 80/24 81/4
81/4 81/19 82/6 82/17
83/6 84/4 84/7 84/11
84/14 87/15 87/17
87/18 88/12 90/19
90/22 90/24 90/25 91/1
91/1 91/2 91/3 91/3
91/4 91/5 96/1 96/2
96/3 99/2 99/12 101/12
101/17 102/2 102/3
102/4 105/2 105/8
105/8 106/1 108/10
108/12 109/14 111/7
111/12 112/15 112/15
112/18 112/25 113/3
113/5 113/6 113/7
113/16 114/4 114/12
114/12 114/13 114/16
114/18 115/17 118/13
123/20 123/24 123/24
123/25 124/17 124/22

**was... [79]** 127/9
129/11 132/6 132/8
132/12 134/16 141/7
141/10 141/13 141/14
144/5 145/11 146/21
151/7 152/6 152/7
152/12 153/6 153/7
156/6 159/12 161/20
163/4 165/9 167/14
167/17 170/1 170/4
170/15 170/16 170/17
171/21 171/22 171/23
175/13 176/19 177/4
177/16 180/8 183/14
184/12 186/10 186/11
186/11 186/16 188/9
194/25 195/18 195/20
195/20 203/23 206/24
207/1 207/12 207/14
209/20 211/10 211/11
215/5 215/6 216/7
216/15 217/19 222/7
223/3 224/23 225/5
225/6 225/7 225/22
226/2 226/3 226/5
229/5 229/11 233/9
234/22 235/3 238/9
**Washington [4]** 1/5
1/14 2/3 2/8
**wasn't [10]** 27/11
36/20 54/8 71/15
127/14 152/19 195/19
199/18 214/8 214/9
**Waszmer [1]** 5/15
**waters [1]** 118/18
**way [64]** 4/21 17/5
17/6 18/16 30/12 33/5
39/16 41/22 42/12
53/15 53/25 54/16
57/25 58/21 69/12
78/20 80/23 81/10
81/25 82/24 83/1 86/1
86/21 93/8 94/11 105/9
109/25 125/9 131/16
132/19 135/10 140/16
142/13 145/6 145/10
146/21 147/8 151/22
154/9 155/16 155/19
162/12 167/8 169/3
175/13 179/2 182/14
187/21 192/5 192/11
194/12 196/24 199/1
199/16 200/25 203/20
204/6 207/12 209/23
212/20 215/12 218/24
230/23 236/24
**ways [14]** 6/6 32/25
33/4 103/6 127/11
135/1 149/2 193/5
196/16 198/6 203/24
204/1 215/20 235/19
**wc.com [1]** 2/4
**we [444]**
**we believe [31]** 14/8
52/1 65/17 66/1 68/5
100/19 125/4 158/17
158/22 158/25 159/4

182/5 194/7 204/6
206/16 208/6 209/14
210/15 222/8 222/24
223/3 223/8 223/15
223/23 228/16 234/23
235/21 236/12
**we will [7]** 45/9 46/18
81/18 119/9 119/9
156/20 188/21
**we won't [1]** 230/7
**we'd [9]** 26/8 26/8
66/20 205/21 219/20
219/24 219/25 223/16
232/6
**we'll [25]** 6/21 13/15
15/4 28/24 48/15 48/19
73/19 76/13 87/9 91/7
119/10 120/3 120/14
120/14 121/22 122/14
157/17 181/20 218/4
218/12 218/13 220/18
238/2 238/4 238/20
**we're [104]** 6/11 6/25
13/16 14/12 15/5 19/14
20/3 20/6 20/14 24/24
32/16 34/15 39/7 41/12
42/8 44/3 44/8 44/8
46/2 48/8 48/13 48/22
53/23 56/18 56/19 58/6
60/7 60/9 60/10 60/23
63/13 68/7 68/7 70/12
71/24 73/1 73/1 73/14
75/22 75/25 76/15
76/23 78/9 79/9 80/3
80/5 80/13 81/11 87/5
95/3 99/14 104/4 109/5
109/19 109/24 110/1
110/11 110/13 114/24
116/23 118/21 120/7
128/8 131/8 134/5
134/6 134/7 136/9
136/11 136/17 136/23
140/2 141/19 143/19
143/20 143/23 147/14
153/11 153/12 158/1
162/9 164/16 181/22
184/16 200/20 200/22
201/12 201/13 201/14
202/1 211/7 211/8
218/10 219/8 222/12
223/9 224/3 224/13
228/14 229/1 232/7
236/1 237/7 238/16
**we've [58]** 15/19 26/19
28/17 34/8 34/8 35/24
37/16 38/14 42/7 42/18
46/13 49/8 56/9 58/19
67/13 67/13 67/14
73/21 75/21 88/21 97/6
97/12 103/10 106/20
114/16 114/17 119/25
120/4 122/9 123/4
129/3 130/21 130/22
134/21 152/3 153/15
158/13 176/21 177/4
192/23 192/24 196/11
203/16 203/24 203/25

217/16 220/14 221/22
222/8 223/16 233/2
234/16 234/24 236/16
236/17
**weak [3]** 144/17
188/12 188/15
**weaken [4]** 183/14
183/17 188/10 188/15
**weakened [7]** 131/11
142/7 156/7 160/9
160/10 160/11 193/9
**weakening [3]** 131/23
188/18 193/5
**weakens [2]** 193/4
204/12
**weaker [5]** 131/23
132/12 195/22 196/5
204/3
**weakness [3]** 195/25
204/4 204/8
**weave [1]** 216/13
**weaving [1]** 48/18
**web [5]** 140/10 140/11
142/10 187/24 206/9
**web's [1]** 102/9
**website [2]** 207/8
213/3
**week [3]** 6/2 238/22
238/22
**weeks [2]** 219/23
220/21
**weigh [1]** 178/20
**weighs [2]** 162/24
209/6
**weight [1]** 146/19
**welcome [5]** 3/13 3/18
5/19 46/12 119/21
**well [112]** 4/18 8/23
19/10 22/1 26/13 26/14
28/25 29/9 31/15 32/3
32/8 33/18 35/17 35/18
36/6 36/18 37/20 38/7
38/18 40/2 40/10 47/12
53/23 60/16 60/22 67/7
68/18 68/22 71/6 71/25
79/14 80/16 82/15
83/21 90/5 92/4 93/9
94/5 94/23 95/6 97/25
98/2 101/16 103/6
106/9 106/11 108/9
110/6 111/11 112/8
114/13 116/10 117/15
122/17 128/23 131/18
133/15 134/13 138/13
140/5 141/12 144/23
150/13 150/13 154/23
156/9 157/10 161/1
163/12 163/20 164/19
164/25 166/24 167/17
167/21 168/3 171/9
172/22 173/4 173/16
175/12 176/18 176/19
177/25 179/20 184/10
184/17 188/21 190/13
192/24 206/23 207/15
207/19 215/5 215/8
215/9 215/19 218/11

225/23 226/12 226/20
228/22 229/20 230/18
231/14 231/23 233/6
234/6 238/2
**Wendy [1]** 5/15
**Wendy Waszmer [1]**
5/15
**went [10]** 5/11 9/4
17/10 19/16 20/22
145/13 152/15 180/7
181/5 223/11
**were [87]** 5/21 5/23 6/8
11/21 13/21 16/12
16/14 17/1 17/2 17/5
17/6 18/12 18/20 19/3
21/25 21/25 24/5 25/25
26/7 26/17 26/22 26/25
27/8 27/9 27/13 30/4
31/1 32/22 35/8 38/10
38/11 47/14 49/5 53/1
67/17 74/15 83/23
88/20 89/11 94/22
94/24 100/14 101/6
110/23 116/19 123/23
124/2 127/10 127/11
129/22 131/14 132/3
135/8 144/17 161/12
161/13 163/13 168/25
170/4 171/11 176/6
176/24 184/8 193/1
196/1 196/15 198/4
198/13 201/2 214/7
215/9 218/22 222/19
224/17 224/18 224/18
224/20 227/2 228/4
229/3 229/13 232/10
233/3 233/4 234/18
234/19 235/18
**weren't [5]** 123/23
129/24 177/8 224/22
226/3
**what [343]**
**what's [29]** 5/3 6/10
22/20 23/8 35/21 36/18
44/13 61/23 67/8 88/15
91/14 94/1 94/2 95/10
96/21 102/22 130/18
141/24 164/3 165/16
181/12 188/20 189/7
191/16 196/11 197/3
197/5 205/21 208/15
**whatever [23]** 18/9
31/21 42/19 53/7 61/5
63/19 74/22 78/15
112/13 127/15 128/18
145/11 147/5 151/25
155/12 155/20 204/22
217/11 226/14 232/16
232/17 237/18 237/19
**whatsoever [1]** 44/24
**when [95]** 6/24 8/14
10/13 16/2 18/21 18/22
19/19 19/23 21/4 21/10
26/4 26/6 26/21 26/22
27/4 27/7 29/25 30/4
31/10 35/3 35/6 42/23
46/5 46/20 46/20 49/21

60/10 63/23 66/17
67/23 69/5 70/17 71/13
72/1 72/12 72/15 72/17
73/18 74/7 74/15 84/23
95/25 101/17 101/21
103/22 103/25 105/6
106/7 108/6 108/19
109/1 112/16 112/24
113/2 113/7 115/25
116/10 116/23 117/23
127/13 128/14 134/6
137/22 139/6 141/5
146/13 152/16 158/1
160/14 162/20 164/16
170/24 170/24 171/11
172/16 173/1 173/23
180/22 186/3 187/19
191/14 192/3 192/4
199/23 209/9 211/12
213/20 220/2 225/15
227/10 234/5
**whenever [4]** 113/4
218/9 218/13 218/25
**where [75]** 11/17 12/21
19/3 20/17 23/4 28/22
30/8 30/25 38/15 41/8
41/23 43/6 47/21 49/9
50/22 51/13 57/13 61/9
63/19 64/1 64/18 65/15
68/3 72/25 74/10 78/14
78/17 84/13 89/15
89/16 91/8 93/25 97/21
98/21 108/2 108/24
110/22 111/1 113/24
115/16 117/1 118/19
124/2 129/20 130/16
132/24 134/8 137/23
137/24 138/1 138/22
139/24 140/22 159/22
162/9 163/3 165/24
170/8 174/15 175/25
176/18 179/20 180/5
181/8 188/23 191/11
191/19 201/6 211/24
229/4 229/10 232/20
235/1 236/9 237/16
**where's [2]** 187/9
202/4
**whereas [1]** 135/9
**whether [61]** 8/13 9/24
15/21 21/22 31/22
42/17 42/17 42/25
49/25 50/18 52/25 53/3
53/4 53/9 59/21 62/20
62/20 70/4 72/4 77/5
78/6 85/6 100/7 100/14
100/18 100/21 103/20
105/19 106/25 111/8
114/10 121/9 144/12
147/3 147/4 147/5
148/12 154/6 155/10
161/25 165/13 168/1
168/1 168/6 169/7
178/5 192/20 196/5
197/19 197/20 208/18
214/24 225/11 227/13
228/15 228/20 229/5

**W**

whether... [4] 230/3
236/2 236/8 236/21
which [133] 6/25 7/12
8/2 10/22 11/14 12/7
17/17 17/18 17/19 25/8
26/14 31/15 36/14
47/17 47/21 48/17 49/5
50/1 51/9 52/16 52/18
55/3 57/15 57/21 58/17
61/4 64/1 64/17 66/1
66/20 69/8 69/14 73/19
76/10 76/14 77/3 78/1
84/10 86/13 88/3 89/22
90/1 90/2 90/2 93/7
93/25 96/16 97/24 99/2
99/4 100/4 100/10
100/19 102/11 102/23
103/7 104/9 104/24
105/11 106/18 111/1
112/4 113/21 114/14
115/17 117/4 120/13
121/6 121/17 124/8
125/9 126/18 128/8
131/10 131/22 133/9
133/14 135/2 135/10
137/7 138/18 139/14
140/13 141/18 144/11
146/24 146/25 151/11
152/24 158/11 158/12
158/23 159/7 160/5
161/9 161/15 162/25
165/17 170/13 172/3
173/3 174/22 175/7
176/13 178/7 183/13
186/11 188/9 190/23
192/1 193/3 195/23
196/23 197/24 198/23
199/6 200/6 201/23
204/6 204/20 206/19
210/3 214/21 217/20
217/25 220/13 223/15
224/9 225/9 225/25
228/5 228/6 234/8
whichever [1] 38/3
while [5] 3/14 60/23
116/19 120/1 221/1
who [68] 5/17 8/13
17/10 18/24 22/4 30/5
32/13 34/10 37/2 38/24
43/6 43/10 43/10 44/4
44/5 44/10 44/10 44/18
45/23 47/9 73/2 73/20
81/24 83/11 85/5 85/6
94/11 104/3 104/5
104/5 104/21 105/3
105/12 105/15 106/23
109/15 112/5 118/5
121/3 132/11 134/18
136/1 141/8 146/14
151/8 155/23 156/2
158/12 160/14 171/22
173/15 187/17 189/15
198/3 200/17 211/1
211/25 215/5 215/9
216/3 219/11 225/12
228/22 228/25 229/9
230/1 230/2 233/15

112/11 202/22
who've [1] 34/11
whoever [2] 78/9 198/7
whole [9] 17/20 40/5
57/1 58/2 79/16 100/20
106/9 149/24 195/19
whom [1] 228/20
whose [2] 180/8
207/16
why [50] 4/4 16/6 16/7
16/15 16/21 21/20 39/9
45/8 54/22 57/23 74/9
74/11 75/25 77/18
77/19 82/20 87/3 87/3
91/16 91/18 93/15
99/12 102/23 103/2
104/24 105/1 106/8
106/11 117/6 119/1
133/20 135/2 138/13
144/17 144/20 146/24
148/16 152/20 179/9
185/21 187/3 187/6
188/11 188/15 189/5
189/6 191/23 202/13
205/19 213/21
widget [2] 103/8
110/15
wildly [1] 27/15
will [65] 4/14 4/17 4/18
4/18 4/20 4/21 7/25
25/10 30/12 37/5 39/1
45/6 45/9 46/5 46/7
46/8 46/15 46/18 46/20
47/2 47/20 69/10 74/2
81/18 81/24 85/1 88/23
89/24 108/14 119/9
119/9 124/7 133/10
133/13 138/3 139/12
142/6 146/6 146/6
149/19 151/11 153/20
154/4 154/5 156/20
158/4 158/5 158/6
160/11 188/21 189/18
190/21 205/1 206/16
207/9 207/22 210/4
214/2 218/15 220/13
221/17 226/8 226/21
230/23 231/11
William [3] 2/5 240/2
240/8
WILLIAMS [2] 2/2 5/14
willing [3] 219/7 230/9
236/1
Wilson [1] 5/16
Wilson Sonsini [1]
5/16
win [9] 23/17 27/18
34/3 34/6 41/19 62/21
112/6 151/20 234/16
wind [2] 124/7 128/10
window [1] 142/16
Windows [23] 11/23
17/7 17/10 17/11 17/11
17/15 17/25 18/7 18/15
18/15 27/8 29/10 29/12
29/19 30/7 30/16 33/24
41/9 41/10 66/24

winner [1] 216/18
winning [3] 22/2 40/23
156/19
wins [2] 63/5 111/4
Winston [1] 35/25
wipe [1] 95/8
wish [1] 154/23
withdrawing [2] 136/6
170/25
withdraws [2] 136/3
136/4
withdrew [1] 170/18
within [7] 55/3 67/5
120/23 124/3 136/19
137/11 227/15
within the [1] 136/19
without [16] 17/11
36/6 48/19 54/2 55/21
78/25 106/14 106/14
125/23 154/14 163/1
168/4 190/13 193/20
193/23 206/3
witness [10] 101/13
141/6 141/6 146/22
146/23 196/2 216/5
229/7 231/17 233/16
witnesses [6] 141/16
222/2 228/19 229/16
231/10 232/17
won [1] 116/11
won't [12] 25/10 37/2
38/24 113/2 157/5
175/2 179/16 185/2
191/17 209/17 229/19
230/7
wonder [2] 39/5 233/6
wondered [1] 208/2
wondering [1] 130/6
word [3] 23/8 87/16
168/3
worded [1] 130/13
words [43] 12/5 13/8
16/15 18/14 24/2 28/4
29/4 29/6 33/7 33/14
35/14 66/10 68/25 70/2
70/22 86/16 90/19 94/6
102/24 104/25 131/13
133/17 135/25 137/20
139/7 140/8 144/20
145/11 145/23 156/16
157/4 161/9 168/13
175/19 177/13 179/1
184/11 196/3 198/17
198/22 199/21 200/12
211/14
work [27] 3/16 3/21
5/11 5/22 36/25 109/1
109/20 111/2 111/3
133/4 159/2 160/23
162/3 162/5 176/4
187/13 190/2 191/20
200/6 203/19 207/10
207/13 207/15 213/16
222/13 230/2 230/23
worked [6] 101/12
106/11 146/15 158/12
158/14 176/1

48/15 160/13 160/18
191/3 191/23 192/4
192/12 192/13 192/14
198/18 210/18
works [5] 106/11
109/19 158/18 159/13
203/24
world [42] 25/7 36/4
37/7 37/12 37/13 37/14
37/14 38/18 39/7 42/12
42/13 55/2 62/25 63/5
63/18 64/10 64/10 78/1
78/17 79/16 81/22
81/23 86/20 86/22
86/22 93/17 95/20
95/20 96/4 96/11
113/18 162/25 165/17
165/19 171/24 172/2
172/18 175/20 186/17
187/15 198/12 207/22
worlds [2] 42/14 94/21
worried [1] 189/6
worrying [1] 190/19
worse [1] 97/5
worth [1] 48/3
would [199] 5/8 5/24
6/14 8/16 8/25 10/20
11/14 14/25 19/7 23/9
28/11 29/1 31/16 35/20
36/19 37/13 37/13
38/19 39/4 40/10 42/19
47/4 47/11 51/13 52/1
53/12 53/19 59/3 62/18
64/10 68/23 72/19
77/18 77/19 78/21
78/22 79/6 79/10 79/16
80/1 80/15 81/20 83/18
85/8 85/24 86/3 86/4
86/20 86/22 87/16 89/7
89/8 89/15 89/16 89/18
90/12 90/17 94/4 94/5
94/11 95/16 96/3 96/5
99/4 99/13 100/1
100/22 101/17 101/18
102/12 106/15 114/19
116/6 116/22 121/10
123/12 123/16 123/17
123/25 127/4 127/5
127/24 132/19 132/20
134/11 134/12 137/1
142/14 142/24 144/22
144/22 145/25 147/10
148/18 149/10 151/5
151/18 153/5 153/10
154/24 156/11 157/7
162/3 169/14 169/15
171/5 173/17 175/11
175/24 176/1 176/3
176/5 176/8 178/19
179/3 179/5 179/25
181/3 181/12 181/15
182/3 182/3 182/5
182/7 182/8 184/16
185/17 187/16 188/1
188/3 188/11 188/15
189/6 190/9 191/4
191/24 192/2 194/3

198/6 197/1 197/22
198/12 198/18 198/18
199/12 200/7 200/3
203/13 203/20 204/13
204/21 205/13 205/14
205/22 206/18 209/19
210/2 212/7 215/7
215/11 215/20 216/18
216/23 217/20 217/25
218/20 219/9 220/8
221/8 221/20 221/23
221/25 222/1 222/1
222/5 222/11 222/20
223/18 223/20 224/11
224/24 225/15 227/4
227/5 227/5 228/13
228/22 228/24 229/7
229/7 229/14 229/15
229/17 233/17 235/8
235/10 236/2 236/9
237/9
wouldn't [16] 27/12
29/6 38/23 54/14 54/15
54/17 63/20 70/16
82/18 86/19 118/14
132/13 171/24 180/20
205/16 219/4
wrap [2] 115/7 121/22
wrestle [1] 68/3
Wright [1] 42/17
write [7] 98/23 98/24
197/18 216/1 216/2
219/4 227/22
written [3] 72/24
108/10 214/2
wrong [14] 63/22
105/24 124/17 134/15
135/7 135/8 136/13
167/7 170/23 171/10
184/18 209/24 224/1
224/4
wrongly [1] 151/11
wrote [2] 36/1 235/17
www.google.com [1]
101/18
www.kayak.com [1]
133/12

**Y**

Yahoo [10] 26/1 26/4
26/7 27/18 32/25 33/22
123/16 143/22 191/12
191/12
yeah [17] 39/17 103/9
109/13 110/7 111/14
112/8 114/13 125/25
127/19 131/25 135/19
137/13 139/2 146/1
152/8 214/1 226/5
year [12] 3/24 21/14
21/14 21/15 23/3 23/4
23/4 64/3 64/3 64/3
102/4 181/20
years [47] 21/18 22/15
27/16 28/7 30/6 30/19
47/13 48/10 49/6 63/15
63/18 64/15 68/15
68/20 70/14 78/13

**Y**

years... [31] 78/25
79/12 79/15 80/7 82/13
86/20 86/23 89/2 89/2
89/3 89/3 89/4 89/8
89/16 95/7 96/4 99/15
112/16 112/17 112/21
112/22 112/22 113/1
113/3 113/18 165/10
220/3 223/10 224/6
224/7 226/25
years' [1] 95/3
yes [91] 27/16 54/21
57/6 57/6 58/23 62/5
71/18 73/9 74/20 74/23
81/11 82/2 85/19 86/7
86/25 87/1 91/5 94/13
97/23 98/18 99/11
107/14 107/25 112/9
112/14 161/18 163/10
163/16 163/18 166/6
166/9 166/12 166/14
166/17 166/20 166/23
168/12 168/14 168/17
168/21 170/14 170/20
171/3 172/1 173/11
174/17 174/19 177/17
177/19 177/21 178/25
180/14 183/15 183/20
183/22 184/13 190/4
192/8 192/19 193/7
193/11 193/13 193/25
194/13 194/18 194/20
195/4 196/10 196/12
197/11 197/11 197/25
198/2 201/24 202/3
202/19 203/1 203/6
203/10 204/18 205/4
205/6 206/7 206/12
207/3 220/23 221/2
221/13 227/12 229/16
237/6
yet [6] 68/7 108/4
150/19 186/7 229/19
233/5
York [5] 134/6 134/7
134/9 139/8 211/22
you [574]
you know [2] 18/24
142/4
you'd [2] 106/1 237/15
you'll [9] 5/7 19/21
53/19 60/18 135/6
140/25 162/13 181/7
195/15
you're [44] 19/11 24/18
29/2 32/17 51/20 68/18
73/12 76/22 78/1 78/1
78/17 79/1 79/6 80/1
87/25 98/8 98/23 99/10
99/19 125/14 126/12
128/9 135/20 135/21
142/23 144/23 152/19
152/23 166/21 167/13
177/13 202/21 209/12
212/2 214/25 215/3
218/13 219/22 221/1
224/16 232/18 232/19

you've [47] 24/15
27/22 29/2 31/23 37/19
38/24 39/25 41/25 42/5
49/21 53/4 68/18 68/19
73/16 77/20 77/21
99/20 106/25 110/21
126/22 136/5 137/3
137/21 138/22 149/3
155/1 175/24 186/1
186/2 188/14 189/2
190/24 196/24 199/2
200/14 200/23 209/12
212/20 216/10 218/12
224/20 232/22 232/25
234/8 236/17 236/18
237/3
young [1] 201/11
younger [1] 201/5
your [294]
Your Honor [177] 3/6
4/6 4/10 5/11 6/1 6/14
9/1 10/12 11/16 12/16
15/1 15/5 24/19 30/21
35/1 37/5 38/14 43/18
44/12 45/1 45/24 46/11
46/25 47/9 50/11 53/13
57/6 57/25 59/3 61/2
61/14 62/19 63/11
64/13 67/11 67/20
68/14 70/7 71/7 72/1
73/8 73/25 75/1 75/16
76/20 76/25 77/19
77/23 78/8 78/17 80/17
81/7 82/3 84/7 89/1
89/20 93/24 98/19
99/24 100/22 101/5
102/1 106/17 106/21
107/13 107/18 108/8
110/3 110/20 113/15
110/6 119/24 120/2
122/2 123/25 125/12
126/2 129/12 134/13
134/16 146/6 146/20
147/10 147/23 152/19
157/13 158/8 158/21
159/23 160/20 160/25
162/4 162/6 164/2
164/16 164/23 164/24
165/23 167/23 169/16
169/20 172/24 173/22
173/23 174/22 175/6
175/25 176/8 176/10
176/12 179/8 180/10
181/3 182/10 183/4
183/15 184/21 185/22
186/15 189/1 191/1
191/5 192/1 192/8
192/13 193/25 194/3
194/8 194/13 195/24
197/9 197/17 198/10
199/12 200/1 201/1
202/19 203/14 203/22
205/11 206/16 206/22
206/24 208/1 208/14
209/5 209/8 209/15
210/2 210/4 210/15
210/20 211/5 211/13

215/22 217/4 217/23
218/8 219/1 219/16
220/17 221/13 223/6
226/21 231/4 231/6
231/9 231/24 232/2
234/15 235/15 235/24
236/4 236/15
your patience [1]
211/3
yours [1] 46/12
yourself [2] 134/14
232/19

**Z**

Zaremba [3] 2/5 240/2
240/8
zero [9] 29/12 44/23
145/12 145/17 146/17
147/22 147/22 215/15
215/15
ZF [2] 49/17 110/19
ZF Meritor [2] 49/17
110/19
zillion [1] 142/16