## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |

## PLAINTIFF STATES'
## PRETRIAL BRIEF

### INTRODUCTION

Google stands astride the most important entrance to the Internet, maintaining its search-related monopolies at the expense of people who use general search engines every day and the companies that pay to advertise on Google. As a result of Google's conduct, its rivals are unable to effectively compete due to having less scale and fewer users. In the coming weeks, U.S. Plaintiffs and Plaintiff States will show that Google uses multiple means to that illegal end, acting in a manner that discourages innovation and violates the fundamental bedrock of American antitrust law, the Sherman Act of 1890.

**LEGAL STANDARDS**

Section 2 of the Sherman Act makes it unlawful for a firm to "monopolize" and that includes monopoly maintenance.  *See* 15 U.S.C. § 2.  The offense of monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

### A.    Market Definition

The relevant market comprises two dimensions: (1) the product market, which "identifies the product and services with which the defendants' products compete," and (2) the geographic market, which "identifies the geographic area in which the defendant competes."  *Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004).  In this case there is no dispute that the relevant geographic market is the United States.[1]

To determine which products fall within the same market, a court looks to whether they are reasonable substitutes.  This analysis hinges upon two factors: the products' functional interchangeability and the cross-elasticity of their demand.  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015).  Functional interchangeability "refers to whether buyers view similar products as substitutes."  *Id.*  Similarly, cross-elasticity of demand refers to the interplay of price-driven substitution and the "ease and speed with which customers can substitute [the product] and the desirability of doing so."  *Id.* (quoting *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008)).  Notably "the mere fact that a firm may be termed a competitor in the

---

[1] Expert Report of Mark Israel, at p. 80 n.149.

overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *FTC v. Staples*, 970 F. Supp. 1066, 1075 (D.D.C. 1997).

Thus, courts look at both (1) the Supreme Court's *Brown Shoe* practical indicia of a product market; and (2) economic analysis. *Sysco*, 113 F. Supp. 3d at 27 (listing the factors as "the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). The *Brown Shoe* indicia serve as "evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).

### B.    Monopoly Power

A firm has monopoly power if it has "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level. *Microsoft*, 253 F.3d at 51. Also, complete exclusion is not required to show that a monopolist's conduct harms the competitive process. *Id*. at 64 ("although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones"). Plaintiffs can establish monopoly power with either direct evidence or indirect evidence. *Id.* Indirect evidence is the most familiar – market shares – but direct evidence can be just as helpful. *See FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460-61 (1986) (cited in *Microsoft*, 253 F.3d at 51).

### C.    Anticompetitive Effects

A monopolist's conduct must have an "'anticompetitive effect,'" that is, "it must harm the competitive process and thereby harm consumers." *Microsoft*, 253 F.3d at 58. However, harm to one or more competitors by itself will not suffice. *See Major League Baseball Props.,*

*Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008).  Therefore, to prove harm to competition, plaintiffs may introduce evidence demonstrating the monopolist's power over price or some other dimension of competition, obtained through exclusionary conduct.

Significantly, the antitrust laws look beyond pricing alone to assess the existence of market power.  However, the ability to charge higher prices to advertisers is probative of market power.  *See Lorain J. Co. v. United States*, 342 U.S. 143 (1951); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 475-76 (7th Cir. 2020).  The relevance of advertiser prices in this case is clear because it is advertisers who generate revenues for general search engines.

### RELEVANT MARKETS

Google exercises substantial market power in three relevant markets defined by Plaintiff States: general search services, general search text advertising, and general search advertising.

**A.    General Search Services in the United States is a Relevant Product Market.**

General search services allow consumers to find responsive information on the internet by entering keyword queries in a general search engine such as Google, Bing, or DuckDuckGo. The Court will hear testimony indicating that Bing is Google's closest substitute.  And Plaintiffs will demonstrate why more specialized forms of search cannot provide a good substitute for the breadth of general search.

First, as the Pretrial Brief filed by the U.S. Plaintiffs explains,[2] the breadth of general search offers consumers a "one-stop shop" to conveniently access an extremely large and diverse volume of information across the internet.  Second, the Court will hear testimony—including by Dr. Israel, Google's own expert—showing that important types of queries, like navigational queries, can only be performed on a general search engine.  Third, as Professor Baker will

---

[2] *See* U.S. Plaintiffs' Pre-Trial Brief, Sec. II.A.1.

explain, less than half of the results presented by Google in response to a query provide information from the vertical in which the query is classified.[3]   Finally, the Court will hear testimony showing that search on a Specialized Vertical Providers ("SVPs") is complementary to general search, as many queries to general search services help consumers discover and navigate to SVPs where they can actively conduct a transaction such as buying a product or booking a flight.

**B.      General Search Text Advertising and General Search Advertising Markets in the United States Are Both Relevant Markets.**

General search text advertising and general search advertising are both relevant product markets for evaluating Google's conduct (with the former entirely contained within the latter). Both ad markets nest within the U.S. Plaintiffs' "search advertising" product market.

General search text ads are ads sold by general search engines, typically placed just above or below the organic search results, often known as the "blue links" that appear on a Search Engine Results Page ("SERP").  The text ads resemble the blue links but are labeled with a subtle notation that they are "ads" or "sponsored."  Advertisers will testify about the unique attributes of general search text ads including that they are a must-have form of advertising for advertisers regardless of the vertical in which they operate.

General search advertising encompasses all advertisements sold by a general search engine that appear on a SERP in response to a general search query.  Beyond general search text ads, a general search engines' SERP may include vertically focused general search ads, like product listing ads, local ads and hotel ads, and universals (which, unlike product listing ads, for example, bring users to immersives, which are linked pages with additional vertical information).

---

[3] *See* PSX00868, at 30–31.

The suppliers for the market for general search and general search ads are virtually identical because virtually all general search firms are advertising-supported.

Advertisers view vertically focused general search ads as having similar, but not an identical, attributes as general search text ads.  Google recognizes this point in its pitch to advertisers.  For example, in one internal email, a Google employee explains that product listing ads (often known as shopping ads) and general search text ads both appear on a general search engines' SERP and, accordingly, both provide a way to "'Gain[] Holistic Search Share' by owning the SERP."[4]  Advertisers will confirm this view.

But advertisers will testify that no other type of ad can substitute for general search ads.  Accordingly, in response to increasing Google Ad prices, they would shift spend between types of general search ads or, if sufficient inventory is available, to Bing, but not to other ad types.  As Plaintiff States' marketing expert, Professor Amaldoss, will explain, and advertiser testimony will confirm, three unique aspects of general search advertising drive advertiser's view that such ads are distinct from other ad types: consumer mindset, ad eligibility, and ad functionality differences.

      1.   <u>Consumer Mindset</u>

General search text ads and other general search ads differ from other advertising channels because they more effectively target different consumer mindsets than online display ads, social media ads, non-digital ads, and ads provided by SVPs, giving them distinct purposes and advertising customers.  Advertisers buy a portfolio of advertisements from different advertising channels to ensure they are reaching all the different mindsets of their target audience.  Different ad channels target consumers at distinct mindsets, from awareness of a need

---

[4] PSX00272.

to consideration of products satisfying that need to purchasing a specific product.  Advertisers often think of these mindsets as a funnel.

Ads on SVPs are not substitutes for general search text or other general search ads.  SVP ads are limited to targeting a relatively narrow range of consumer mindsets, i.e., consumers who have already chosen to visit that specific SVP's website and who are, on average, more likely to make their purchase on that specific site because both the search and transaction can be completed there.  By contrast, general search advertising is effective in reaching consumers who are still considering which product to buy from among different choices offered by different SVPs.[5]

Take the practice of "conquesting" for example.  Google sells text ads even where a user has entered a company's brand name, for example, where a user enters a Google query "running shoes Company A" and sees a SERP with a text ad featuring a direct competitor, Company B. Why would Company B be willing to pay for an ad where the user has already suggested an interest in its competitor?  Precisely because a user on a general search engine may not have made up their mind.  In contrast, on an SVP or retailer website (such as Amazon), the user has more likely made a decision because they are on the site where they can complete the transaction (and, in fact, do not see the variety of choices presented on a Google SERP, such as ads from Amazon's direct online competitors).  Finally, advertisers will testify that social media ads are best suited for promoting consumer engagement, and display ads for stoking awareness.  Neither compares to general search advertising in targeting consumers considering products or closer to purchase.  Indeed, because of these differences in purpose between the ad types, advertisers and

---

[5] PSX00970, at 37, 43-44 (ad agency presentation to a client describing how consumers on Amazon and Walmart are closer to purchase than consumers on Google and Bing, who are in turn closer than those targeted by social and display advertisements).

marketing firms often group their ad buying departments into separate units for social and display, search, and retail (or SVP) advertising.

### 2. Availability

Not all ad types are useful to all advertisers. Consequently, advertisers will testify that the relevance of advertising depends on their ad buying needs. For example, a financial services firm that does not sell physical products would have no inclination to purchase product listing ads or other out-of-segment vertically focused ads on a general search engine or an SVP ad on a retailer like Amazon. These advertisers have no reasonable substitute for general search text ads. And for advertisers who have products but decline to sell them on SVP platforms, they cannot substitute SVP ads for general search ads. These include other SVPs or other businesses that do not choose to patronize an SVP rival or, in the case of a retailer, to advertise on an SVP that would be selling their goods to their customers.

### 3. Functionality

Finally, general search ads (including general search text ads) are functionally different from most SVP ads. When clicked upon, most SVP ads will only direct a user to a page within that SVP, not to a third-party site. General search ads, in contrast, click out from the search engine to the website of an advertiser's choice—in most cases, its own website. Having users appear on their own sites is valuable to advertisers because it allows them to collect data on the encounter and manage the customer relationship, which is important to building customer loyalty.

### MONOPOLY POWER

#### A. Indirect Evidence

To show indirect evidence of monopoly power, a 65% market share coupled with barriers to entry is sufficient. *See, e.g.*, *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209,

224 (D.D.C. 2022).  Google commands a large and durable share of each market, which indicates substantial market power.  Google's general search services market share has increased from 80% in 2012 to nearly 90% today, and Google maintains approximately a 90% market share in both general search text advertising and general search advertising (and Google's share has been at least 80% since 2012).

Additionally, significant barriers to expansion and entry protect Google's share of that market.  Experts will testify that the creation, maintenance, and growth of a general search engine (and thus its corollary advertising products) requires a significant capital investment, access to effective distribution, highly complex technology, and adequate scale.

The Court will hear testimony about the relationship between the expense of maintaining a general-purpose search engine and the small number of those search engines on the market. Professor Baker will also note that only two general search engines—Google and Bing— maintain a comprehensive search index, a fundamental component of a general search engine.

Would-be competitors also face barriers that Google itself created: the exclusive distribution arrangements central to this case that squelch access to the scale crucial to search quality and revenue growth.  Several witnesses will testify to the importance of scale and its impact on competitive entry, including:

- Employees of general search engine competitors to Google, who will explain the importance of scale to search-result quality and revenue growth, especially when it comes to tail (or rare) queries;

- General search engine competitors will also describe the challenges they have faced in their efforts to overcome Google's monopoly;

- Google employees will testify that Google's ranking systems and search quality/advertising quality experiments benefit from massive amounts of user data that they believe are the most effective way to improve search quality; and

- Advertisers will highlight the importance of advertising on general search engines with many users and will explain that Bing's lack of scale limits it as an alternative to Google, making it difficult for advertisers to shift spending from Google to Bing.

## B.     Direct Evidence

Witness testimony will also demonstrate direct evidence of Google's monopoly power in each market such as Google ignoring potential competitive pressure when making decisions about its search products and advertising pricing.  For example, Google employees have testified that when designing its user interface, Google simply does not consider whether design changes will cause users to switch away to a different search engine.  And as to pricing, they will explain that Google does not study Bing's auction model or its pricing, and more tellingly, that Google can modify ad auctions to raise prices.  Only a monopolist can afford to disregard its competitors' business strategies.

Countless advertisers describe advertising on Google as essential or nearly so, which indicates that they would not readily switch to advertise on rival general search firms.  That includes SVPs, which continue to rank among the largest purchasers of Google Ads despite practices that they believe increase their cost of acquiring customers.  Google increases its monopoly advertising revenues by limiting the manner in which certain SVPs can appear in specific vertical segments and demoting blue links.  Yet SVPs do not abandon Google even in the face of conduct to which they object.  Why?  Because SVPs, like other advertisers, do not

view rival search engines as meaningful advertising alternatives.  Advertisers, including SVPs, will testify that they are unable to advertise effectively on Google's only general search advertising competitor, Microsoft, because of its smaller scale and fewer users.[6]

Google's high price-cost margins on general search text advertising indicate that Google does not expect many advertisers to respond to its high price relative to cost by buying general search text ads or other general search ads from other general search firms.  Together, Google's control of pricing, indispensability to advertisers, and high price-cost margins are all direct evidence of monopoly power, and bulwark the inference drawn from Google's durable market share.

### ANTICOMPETITIVE CONDUCT

Google's exclusionary conduct includes (1) Google's default distribution agreements with Android devices, Apple, and browsers; and (2) Google's operation of SA360 in a manner that harms advertisers by failing to implement valuable Microsoft Ads features.  This conduct produces anticompetitive effects for both consumers who use general search services and advertisers and marketers, who rely upon general search services and related advertising offerings to attract consumers to their websites.

---

[6] The Court has ruled that Plaintiff States may not proceed on their view that Google harms SVPs in a manner that makes them weaker partners for Google's rivals.  Accordingly, Plaintiff States are not relying on evidence of conduct directed against certain SVPs to show harm to competition, merely as direct evidence of monopoly power.  That evidence cannot be used for one purpose does not render it ineligible to be used for a distinct, relevant purpose.  *See* Pls.' Opp. To Def.'s Mot. in Limine to Preclude Evid., Testimony, or Arg. Concerning Abandoned Conduct Allegations, ECF. No. 649, 2–3.

A. **Google's Default Distribution Agreements Are Exclusionary, Weakening Its Rivals' Ability to Compete.**

Google's default distribution agreements raise user switching costs and therefore maintain Google's monopoly in general search services.  They do so by fueling Google's scale advantage and diminishing general search rivals' ability to compete.  By keeping Google's rivals at a small scale, Google has likewise made them less attractive business partners to companies who would otherwise assist in improving those rivals' products.

As a result, Google's rivals are weaker and disadvantaged in their dealing with other firms that could help them mount a stronger challenge to Google.  These "downstream," *see* Summary Judgment Memorandum Opinion, ECF No. 626, at 54, impacts hinder the ability of Google rivals to compete.  Because of the lower demand for Bing ads that come from the default distribution agreements, independent Search Engine Marketing ("SEM") tool providers have less interest in supporting new Microsoft features, which hampers Microsoft's ability to gain more advertisers.  Because of Bing's significantly fewer users, especially on mobile, SVPs have little interest in working with Microsoft, except, perhaps, as an after-thought.[7]  Yet their presence is important to Google's competitors.  As a Microsoft executive said when responding to questions asking him to explain why Microsoft values partnerships:

> So if you're looking at a particular hotel, it's great to know that the review from Booking, for example, understanding what that is, and then understanding what Tripadvisor, for example, is saying.  And so it builds trust, it builds credibility.  It provides the ability for us to really just to provide a comprehensive answer, and that's critical.  Having comprehensive, trusted answers is really what you're

---

[7] ███████████  Dep. Tr. at 81:1-16; *see id*. at 134:8-136:21 ("Because our reliance on Google has actually only increased.  Bing has gone down and it is kind of not relevant anymore. It has been pushed out.")

looking for when you're looking—you know, when you're doing it—making a search.[8]

In other words, Google's rivals understand that they cannot take on Google without the distribution and content provided by other companies.

Of course, the monopoly power Google has maintained through its exclusionary conduct enables it to increase the prices for its advertising and diminish its effectiveness without losing advertisers. For instance, Google has been able to profitably increase prices, while reducing advertiser control and transparency over the Google advertisements they purchase.[9] This approach would be unlikely to prevail in a more competitive market. Plaintiff States will introduce evidence at trial demonstrating that advertising prices are lower in markets in which Google faces true competition, such as Japan.

More competition would also lead to greater innovation. For example, as a result of browsers' exclusive default agreements with Google, DuckDuckGo, a rival focused on privacy, ███████████████████████████████████████████████████████████████ ████████████████████████████████.[10] This stands in stark contrast to Google's strategies in other parts of the world where it faces more robust competition. There it focuses on creating, not limiting, innovation.[11]

---

[8] ██████████████ (Microsoft) Dep. Tr. at 31:4-16; *see id.* at 32:10-16 ("one of the things that is really important is a lot of these searches are done on mobile, and so we don't have access to mobile signal, in large part. And so that's—that's—you know, it's important that we—we collect that signal via partners and partners can provide that to us.")

[9] *See* U.S. Plaintiffs' Pre-Trial Brief, Sec. II(D)(1)–(2).

[10] *See also* U.S. Plaintiffs' Pre-Trial Brief, Introduction.

[11] *See also* U.S. Plaintiffs' Pre-Trial Brief, Sec. II(B)(4).

**B.    Google's SA360 Conduct Harms Its Own Advertisers and Weakens Its Rivals.**

The harm advertisers experience from Google's default distribution is compounded by Google's failure to support new features for Microsoft Ads.  Advertisers have expressed concern with SA360's failure to adopt Microsoft Ads features and, in a Google-conducted survey, asked for better integration with Microsoft Ads.  Google refused to respond to advertiser demand. Instead, SA360 advertisers are left unable to use SA360, easily the largest SEM tool provider, to buy the general search ads from Microsoft that would best work to their advantage.

Specifically, advertisers and Microsoft witnesses will show how Google further harmed Microsoft by failing to integrate Microsoft's auction-time bidding features into SA360.  First, SA360's sophisticated customers told Google that lack of support for Microsoft Ads auction-time bidding made their ad campaigns less efficient.[12]  Major advertisers expressed concern that Google's operation of SA360 is "Google centric" resulting in less efficient ad spending.[13]

Second, Google knew that integrating auction-time bidding had great value for advertisers: auction-time bidding came to account for ██% of SA360 ad spend on Google Ads,[14] demonstrating advertiser interest in real-time bidding strategies.  Google's own documents show that auction-time bidding increases conversions and ad revenue results by 15–30%.[15]  Google expected auction-time bidding "to drive $███████████████████████████

---

[12] See PSX00441 at 3-5 (describing advertiser ██████ switching two Bing ad campaigns from SA360 to Microsoft Ads' native tool); PSX00440 at 1 (describing advertiser ████'s switching five Bing ad campaigns from SA360 to Microsoft Ads' native tool); Jason Krueger (Google) Dep. Tr. at 282:7–13.

[13] PSX00578 at 1.

[14] PSX00386

[15] PSX00386

████ [16]  That expected improvement as applied to Microsoft was confirmed when Skai, a competing SEM tool, began supporting Microsoft Ads auction-time bidding over three years ago, resulting in a ██% increase in sales conversion for advertisers using Microsoft real-time bidding.

Google itself knew that advertisers were being disadvantaged.  When confronted with the disparity between older bidding strategies and the new real-time bidding strategy implemented by auction-time bidding, a Google SA360 staffer was "not terribly surprised" that testing of Microsoft auction-time bidding showed performance improvements "for [the] same reason google ATB [auction-time bidding] does."[17]  Indeed, even when advertisers complained to Microsoft about the lack of auction-time bidding making their campaigns less efficient, Google did not act.  The financial impact on Microsoft has been significant.[18]

Finally, the better-optimized campaigns obviously would improve its standing with important advertisers.  But, with SA360 as the dominant SEM tool, Microsoft has been blocked from optimizing for its customers with the lion's share of SEM-tool ad spend.[19]

## CONCLUSION

Plaintiffs will show at trial that Google has market power in three relevant markets and that its conduct has harmed competition in each of those markets.

---

[16] PSX00419

[17] PSX00441

[18] PSX01117; *see also* PSX00746.

[19] PSX01117

Dated: August 28, 2023

Respectfully submitted,

FOR PLAINTIFF STATE OF COLORADO

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365 (inactive)
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mails: Jon.Sallet@coag.gov
         Steve.Kaufmann@coag.gov
         Elizabeth.Hereford@coag.gov
         Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

Joseph M. Conrad
Assistant Attorney General
Colin P. Snider
Assistant Attorney General
Matthew K. McKinley
Special Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mails: Joseph.Conrad@nebraska.gov
            Colin.Snider@nebraska.gov
            Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF ARIZONA

Robert A. Bernheim, Unit Chief Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-315
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

FOR PLAINTIFF STATE OF NEW YORK

Elinor R. Hoffmann
Morgan J. Feder
Michael Schwartz
Office of the Attorney General of New
York
28 Liberty Street, 21st Floor
New York, NY 10005
Telephone: (212) 416-8513
E-Mails: Elinor.hoffmann@ag.ny.gov
          Morgan.feder@ag.ny.gov
          Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH CAROLINA

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mails: kchoksi@ncdoj.gov
          jabram@ncdoj.gov
          jmarx@ncdoj.gov
          jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF
TENNESSEE

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville.TN 37202
Telephone: (615) 741-8722
E-Mails: David.McDowell@ag.tn.gov
          Chris.Dunbar@ag.tn.gov
          austin.ostiguy@ag.tn.gov
          Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

FOR PLAINTIFF STATE OF UTAH

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
         tpincock@agutah.gov

*Counsel for Plaintiff State of Utah*

FOR PLAINTIFF STATE OF ALASKA

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF
DELAWARE

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

FOR PLAINTIFF TERRITORY OF
GUAM

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324

*Counsel for Plaintiff Territory Guam*

FOR PLAINTIFF STATE OF CONNECTICUT

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

FOR PLAINTIFF DISTRICT OF COLUMBIA

Elizabeth Gentry Arthur
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

FOR PLAINTIFF STATE OF HAWAI'I

Rodney I. Kimura
Department of the Attorney General, State of Hawai'i
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

FOR PLAINTIFF STATE OF IDAHO

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-4114
E-Mails: Brett.delange@ag.idaho.gov
          John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF ILLINOIS

Elizabeth Maxeiner
Brian Yost
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mails: Elizabeth.maxeiner@ilag.gov
          Brian.yost@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue., 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

FOR PLAINTIFF STATE OF MAINE

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

FOR PLAINTIFF STATE OF
MARYLAND

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mails: swalker@oag.state.md.us
          ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH
MASSACHUSETTS

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Fl.
Boston, MA 02108
Telephone: (617) 727-2200
E-Mails: William.matlack@mass.gov
          Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*

FOR PLAINTIFF STATE MINNESOTA

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA

Michelle Christine Newman
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mails: mnewman@ag.nv.gov
         ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW HAMPSHIRE

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

FOR PLAINTIFF STATE OF NEW JERSEY

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO

Judith E. Paquin
Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mails: jpaquin@nmag.gov
         ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE NORTH DAKOTA

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

FOR PLAINTIFF STATE OHIO

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mails:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

FOR THE PLAINTIFF STATE OKLAHOMA

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Telephone: (405) 522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OREGON

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH PENNSYLVANIA

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mails: jbetsko@attorneygeneral.gov
         twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

FOR PLAINTIFF TERRITORY PUERTO RICO

Guarionex Diaz Martinez
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

FOR PLAINTIFF STATE RHODE ISLAND

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

FOR PLAINTIFF STATE SOUTH
DAKOTA

Yvette K. Lafrentz
Office of the Attorney General of South
Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

FOR PLAINTIFF COMMONWEALTH
VIRGINIA

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

FOR PLAINTIFF STATE WEST
VIRGINIA

Douglas Lee Davis
Office of the Attorney General, State of
West Virginia
1900 Kanawha Boulevard, East
Building 6, Suite 402
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

FOR PLAINTIFF STATE VERMONT

Christopher J. Curtis
Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: Ryan.kriger@vermont.gov

*Counsel for Plaintiff State of Vermont*

FOR PLAINTIFF STATE WASHINGTON

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE WYOMING

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff State of Wyoming*