# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████████ |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████████ |
| Defendant. | |

## DEFENDANT GOOGLE LLC'S PRE-TRIAL BRIEF

Defendant Google LLC submits this pre-trial brief in accordance with the Court's August 3, 2023 Minute Order.  Per the Court's direction, Google addresses four disputed issues not raised as grounds for summary judgment:  market definition and monopoly power (Part I), Plaintiffs' flawed conception of "scale" (Part II), procompetitive justifications (Part III), and the failings of the Colorado Plaintiffs' "duty to deal" theory with respect to SA360 (Part IV).

I.   **Plaintiffs Will Not Show that Google Possesses Monopoly Power in Properly Defined Relevant Markets**

Plaintiffs must prove that Google possesses "monopoly power in the relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (per curiam) (internal quotation marks omitted).  They will be unable to do so at trial.

A firm has monopoly power if it has "the ability to cut back the market's total output and so [profitably] raise price" "substantially above the competitive level."  *Id.* at 51 (internal quotation marks omitted); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power means that "by restricting its own output" the defendant "can restrict marketwide output and, hence, increase marketwide prices").

For purposes of defining monopoly power, the relevant market must include all products "reasonably interchangeable by consumers for the same purposes" because "the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level."  *Microsoft*, 253 F.3d at 51-52 (internal quotation marks omitted).  "Stated another way, a product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same."  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015).

"Whether goods are 'reasonable substitutes' depends on two factors:  functional interchangeability and cross-elasticity of demand.  'Functional interchangeability' refers to whether buyers view similar products as substitutes."  *Id.*  Cross-elasticity of demand depends not

only on price but also on the "ease and speed with which customers can substitute the product and the desirability of doing so." *Id.* at 25-26 (cleaned up). In applying these principles, the analysis of reasonable interchangeability "begins by examining the most narrowly-defined product," testing whether it is a relevant product market, and if not, considering "the next broadest product grouping." *Id.* at 26 (internal quotation marks omitted).

As applied here, determining the relevant market requires one to identify the set of products that serve as important competitive constraints on Google: the products and firms to which Google would lose search queries (in the short and long run) if the quality of its search offering declined, as well as the products and firms to which Google would lose sales if the return on investment on its search advertising offering declined.

### A. User-Side Market Definition

Plaintiffs' proposed market for "general search services" includes only general search engines such as Google, Bing, Yahoo!, and DuckDuckGo. It excludes specialized vertical providers (SVPs) such as Amazon, Yelp, and Expedia, as well as other popular places users go to search for information such as TikTok and Instagram. By defining the relevant market to include only general search engines, Plaintiffs distort the commercial reality that users routinely substitute other search providers for general search engines—such as Amazon when they shop, or Expedia when they travel—and thereby improperly exclude many of Google's strongest competitors from the relevant market.

Plaintiffs' rationale for excluding these search provider competitors is that they do not serve *all* categories of searches. But Plaintiffs thereby improperly "cluster" different categories of queries, when the evidence shows that competition takes place at the query level. If, for example, a query for televisions on Google becomes less useful, what alternative methods of searching

would a consumer then consider?  Or if a query for a flight between two cities on Google becomes less useful, what alternatives would a consumer consider?  The answer to these questions will differ depending on the query and, in many cases, the competition from SVPs will be greater than the competition from other general search engines.  Expert economic analysis confirms this.  As Google's economic expert Dr. Mark Israel will testify, ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████   *See* Figs. 1 & 2.  Therefore, Amazon and Yelp are closer competitors to Google in these verticals than other general search engines like Bing.

In overlooking this competition, Plaintiffs' hypothesized general search services market fails to identify the products that users view as reasonable substitutes.  Moreover, by including search providers that are less close substitutes (query search results by other general search engines) and excluding search providers that are closer substitutes (query search results by SVPs), Plaintiffs' market violates basic principles of market definition.[1]

Plaintiffs' experts' "clustering" of different products is only appropriate in two situations, neither of which applies here.  *First*, clustering may be used for "analytical convenience" when "market shares and competitive conditions are likely to be similar" for several related items, such that the clustered whole accurately represents competitive conditions in each constituent part.  *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016) (internal quotation marks omitted).  Plaintiffs cannot show this commonality of competitive conditions across query categories.  To the contrary, the Court will hear testimony that the competitive conditions are very different in different "vertical" search categories.  Further, Dr. Israel will present evidence that

---

[1] That the search results of general search engines, SVPs, and other search providers offer different features does not mean that they do not offer users attractive alternatives to one another and thus constrain each other competitively.

user preferences for general search engines like Google versus SVPs like Amazon and Expedia differ significantly by "vertical" search category.  Accordingly, Plaintiffs' sole focus on supply-side functional differences between general search engines and other specialized vertical providers (and other websites like Facebook and TikTok where users increasingly search) fails to recognize the different competitive constraints that Google faces across many popular categories of search queries, including those queries that are mostly likely to monetize with digital advertising.

*Second*, clustering may be appropriate when the products are purchased as a bundle, and therefore "combining in a single market a number of different products or services . . . reflects commercial realities."  *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).  Plaintiffs invoke this "bundling" rationale, claiming that consumers seek "the convenience of a 'one-stop shop'" provided by general search engines but not SVPs.  DOJ Amended Compl. ¶¶ 88-90.  Dr. Israel will present empirical evidence that, unlike supermarkets for example, users do not engage in "one-stop shopping" for the many different query categories Plaintiffs lump into "general search services."  Rather, users typically search for information in short, single-topic sessions.  Users can readily access a variety of alternatives, including SVPs, other general search engines, or apps like Instagram for each new search session.

DOJ Plaintiffs' expert economist Dr. Michael Whinston speculates that it might be time-consuming or "mentally costly" for users to select different providers for different types of searches, such as deciding to use Amazon for shopping.  But this speculation, not surprisingly, is at odds with user traffic data, which shows users choose which search service to use on a query-by-query and vertical-by-vertical basis.  Indeed, Dr. Whinston's assertion is refuted even by the evidence he cites.  For example, he cites a Bank of America research report for the proposition that 25% of users start on Google when buying something online, but the full sentence from that

report says "58% of users search Amazon first when shopping online, while 25% search Google first."[2]   As another example, Dr. Whinston cites to the frequency with which users enter "navigational" queries—queries where the user searches by the name of the desired website instead of by the url, for example by entering "amazon" in the browser bar instead of "amazon.com."  In that instance, however, the user has already incurred the "mental cost" to select Amazon and is not seeking the "breadth and depth" of the results that general search engines provide.

### B.  Ad-Side Market Definition

Plaintiffs must satisfy the same principles of customer demand substitution for their three claimed relevant advertising markets: (i) "search advertising" (DOJ Plaintiffs), (ii) "general search advertising" (Colorado Plaintiffs), and (iii) "general search text advertising" (both sets of Plaintiffs).  DOJ Amended Compl. ¶¶ 97, 101; Colorado Compl. ¶ 59.  Plaintiffs emphasize qualitative differences between search ads and other ad formats, but as Dr. Israel will explain, the key goal of advertisers is to generate a return on investment by reaching users across their journey to purchase, not only when they are on Google but also when they are on Meta, Amazon, or any number of other sites on the Internet.  Because advertisers buy the attention of a particular set of users, the relevant question is whether the user attention that *advertisers* can buy from different advertising platforms is reasonably substitutable across different digital options.  If so, then those other options must be included in the relevant advertising markets.

Dr. Israel conducts a detailed examination of how advertisers approach the issue and their actual substitution patterns.  The evidence will show that advertisers ███████████████████ ████████████████████████████████████████████████████████████████████

---

[2] BofA Global Research, "Internet 2020 Year-Ahead," at 33, Dec. 18, 2019, https://interney.files.wordpress.com/2019/12/bofa-internet-2020-year-ahead.pdf.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████     ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████     Google's search ads compete with a wide range of other digital advertisements—advertisements that Plaintiffs exclude from the relevant market.

The evidence will also show that Meta (including Facebook), Amazon and others compete more closely with Google for advertisers than do general search engines like Bing and DuckDuckGo. As Dr. Israel will testify, Google users are far more likely to use Amazon, Facebook, and other sites within the same hour than they are to use other general search engines like Bing. (Bing and DuckDuckGo users also are as or more likely to use Facebook or Amazon as they are to use Google.) The next-closest substitute for an advertiser switching away from a Google ad therefore is likely to be an ad shown not on Bing but on Amazon or Meta.

Plaintiffs' approach to advertising-side market definition is entirely qualitative. Their approach is based on a theory that different types of advertising rigidly occupy different positions in the "purchase funnel," a theoretical construct from a century ago that describes the different steps consumers may take before buying a product. As Dr. Israel, Google expert Dr. Randolph Bucklin, and Google and third-party fact witnesses will testify, this theoretical construct has been rendered largely inapplicable because consumers' purchase journey in the digital era is far more nuanced and non-linear than the static "funnel" assumes, as shown by the fact that (i) advertisers use return on investment to allocate their advertising dollars; (ii) advertisers use a wide range of digital ad formats to reach users close to making a purchase (*e.g.*, product ads on Meta and

Amazon); and (iii) advertisers that are seeking an alternative channel to access Google Search users are much more likely to find those same users on Amazon or Meta properties than on a general search engine. Indeed, as Dr. Bucklin will explain, the "purchase funnel" does not accurately characterize consumers' purchase journeys in today's online world. Rather, search and other forms of advertising all work across the different stages of the funnel, making the metaphor inapt as a framework for defining modern advertising markets that include digital ads.

### C. Monopoly Power

Monopoly power "may be proven through direct evidence of supracompetitive prices and restricted output." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). In the absence of direct evidence, "monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51.

In this case, Plaintiffs' failure to establish any properly defined relevant antitrust market, either on the user side or advertiser side, precludes an inference of monopoly power as a matter of law. *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 177 (1965). The proper inclusion of strong competitors like Amazon, Expedia, Meta, and Yelp in the relevant markets demonstrates that Google faces substantial competitive constraints for both users and advertisers. This point is demonstrated by the fact that on the user side, Google's share of user traffic has *decreased* while the search traffic captured by SVPs has *increased* over time. On the advertiser side, while Google's share of digital advertising revenue has never exceeded 40%, it is well below that level today, losing share to platforms such as Amazon and Meta. *See* Figs. 3 & 4. No court has found such a level, much less an eroding level, supportive of monopoly power.

Nor is there direct evidence sufficient to establish monopoly power in any proffered relevant market. Indeed, Plaintiffs will not be able to provide any evidence regarding the output,

prices, or quality that they hypothesize should have prevailed absent the challenged conduct. Rather, the evidence on output, price, and quality indicates that Google competes in a fiercely competitive marketplace. On the user side, Google witnesses will detail the intense continuing investments Google makes to compete, including the launch of thousands of product improvements every year, from generative artificial intelligence capabilities to enhancing the breadth and depth of local results to new flight search interfaces. These improvements explain why the total number of queries served by general search engines—*i.e.*, output in the purportedly monopolized market—have more than doubled in the past decade. *See* Fig. 5. Similarly, on the advertiser side, Google witnesses will describe the investments Google makes to continue to improve its search advertising products—including improving auction design to promote higher quality ads, tools to help advertisers improve the quality of their ads, user interfaces, and product usability for advertisers—leading to greater access to user attention for advertisers (more clicks), and more revenue for advertisers (more sales) and Google. Indeed, digital advertising has consistently *exceeded* expectations over the past decade by growing faster than even industry sources projected. *See* Fig. 6.

In the face of this direct evidence that output is expanding, and even faster than expected, Plaintiffs allege that Google has the "power to manipulate the quantity of ad inventory and auction dynamics in ways that allow it to charge advertisers more than it could in a competitive market." DOJ Amended Compl. ¶ 168. In Plaintiffs' view, Google can unilaterally decide what its search ads cost for advertisers. But it is advertisers, not Google, who determine what to bid for an ad, and advertisers routinely lower their bids, as they evaluate their return on investment. As Dr. Israel will explain, in the aggregate, Google updates have generated additional economic benefits for both Google *and* advertisers, and Google's quality-adjusted prices have been flat.

Plaintiffs' theory fails to account for the role of ad quality in the auction.  Advertisers (and not Google) set a maximum bid, and pay no more (and often less) than that maximum bid.  The highest bid does not automatically win, and high-quality ads may (i) cost less and (ii) have a greater chance to be shown on the search engine results page.  That is because Google has determined that, over the long term, low-quality ads turn users away from Google, which would lead to a loss of advertisers and, consequently, revenue.  Thus, Google is incented to design its auction to deliver high quality ads to users and value to advertisers, both of which have benefited over time from continual improvements to Google's auction.  This is evidence of responsiveness to the marketplace, not unilateral power over it.

Many of Google's quality improvements create new value for advertisers, and while it is true that they also increase Google revenue, this simply reflects Google sharing in the additional value created.  Plaintiffs focus on the Google revenue increases without accounting for the additional value provided to advertisers.

Plaintiffs also contend that Google's profitability demonstrates that Google has monopoly power.  But as Dr. Israel will testify, Google's profits are in line with the profits of its peers, and therefore do not provide evidence that Google possesses monopoly power.

## II.    Diminishing Returns to Scale

Plaintiffs allege that Google's search promotion contracts deprive rivals of the user interaction data they need to compete with Google, particularly on mobile.  Google does not deny that user data can improve search quality, but Google will show that there are diminishing returns to scale, that Microsoft has sufficient scale to compete, and that there are many aspects of search that can be improved without additional scale.

**Empirical testing of Plaintiffs' scale arguments.**   The Court will hear testimony about two different tests of Plaintiffs scale allegations, one conducted by Google and one natural experiment. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

The Court will also hear testimony by Prof. Edward Fox, Google's other computer science expert, about a data reduction experiment (DRE) designed and overseen by Prof. Edward Fox.  The experiment showed that the loss of quality from retraining Google's algorithms at Microsoft's scale (*i.e.*, volume of queries / user interaction data) was far less than the current quality gap between Google and Microsoft.  The DRE showed that there are diminishing returns to scale, that additional query volume is unlikely to benefit a firm of Microsoft's size with Google's technology, and that factors other than scale must explain the quality gap between Microsoft and Google.  Google's own engineers will corroborate the findings of the DRE, explaining that there are diminishing returns to scale and that many other factors influence search quality.

**Many factors contribute to search quality.**   The Court will also hear testimony from Prof. Frieder regarding how a variety of factors apart from scale impact search quality.  For example, █████████████████████████████████████████████

████████████████████████████████████████.  Further, Google invested early on in mobile search quality, anticipating the growth in mobile devices, and in international markets. ████████████████████████████████████

Google also pioneered advances in online and offline experimentation, helping the entire industry conduct more experiments with less query volume; it developed better search features and ranking systems; and it invested earlier and more heavily in data centers to reduce latency.  Thus, Google owes its quality advantage over rivals to its "superior skill, foresight, and industry."  *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.).

Finally, and contrary to Plaintiffs' allegation that "the scale necessary to successfully compete today is greater than ever," DOJ Amended Compl. ¶ 95, Dr. Frieder will present evidence that modern machine learning systems, including those used by Google, use less data than earlier systems.[3]

## III.    Google's Procompetitive Justifications Dispose of Plaintiffs' Claims

If the Court finds that Plaintiffs have established substantial harm to competition and thus satisfy their *prima facie* burden under Section 2, the Court will consider procompetitive justifications.  *Microsoft*, 253 F.3d at 59.  Procompetitive justifications include "a nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal," such as by increasing output, improving quality, reducing price, and/or intensifying competition.  *Id.*  Examples of procompetitive justifications accepted by courts include, to name a few, improving device security, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 971 (9th Cir. 2023), improving product performance, *Microsoft*, 253 F.3d at 67, enhancing inter-brand competition, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007), developing a "novel business practice" that proves "beneficial to consumers in the long run," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir.

---

[3] Dr. Mark Israel will also offer opinions demonstrating that Google's supposed scale advantage does not prevent Microsoft from profitably monetizing search queries through its search advertising business.

2020), and enabling a business to compete by offering a "favorable price," *Barry Wright v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983).

Where the defendant identifies a procompetitive justification for the challenged conduct, "then the burden shifts back to the plaintiff to rebut that claim"; the plaintiff retains the burden to "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Microsoft*, 253 F.3d at 59. Plaintiffs successfully rebut procompetitive justifications if they demonstrate "that *substantially* less restrictive means exist to achieve any proven procompetitive benefits." *NCAA v. Alston*, 141 S. Ct. 2141, 2162 (2021) (emphasis added). In making the judgment whether a substantially less restrictive means was available, "antitrust courts must give wide berth to business judgments before finding liability." *Id.* at 2163. Put simply, "antitrust law does not require businesses to use anything like the *least* restrictive means of achieving legitimate business purposes." *Id.* at 2161 (emphasis added). Otherwise, "a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements." *Id.* (internal quotation marks omitted). Importantly, any proffered reasonable alternative must (i) achieve *all* legitimate justifications, not merely some, *see id.* at 2162; and (ii) an *ex ante* reasonable and available option for the defendant to have implemented, not some "after-the-fact scheme," *S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F. Supp. 825, 1083 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir 1984).

As explained in Google's Oppositions to Plaintiffs' Motions *in Limine*, there is no shortage of procompetitive benefits flowing from the conduct Plaintiffs challenge:

   ***Apple, Mozilla, and Other Browser Defaults.*** The evidence will show that Google successfully competed on the merits—that is, on the basis of product quality and price—for browser defaults, including for Apple's Safari and Mozilla's Firefox. As Apple's Eddy Cue stated:

"the reason we have always picked Google [for the Safari default] is because they are by far the best search engine available."[4]  Cue continued:  Apple's "experience with [Google] had been very positive from a user point of view.  Customers liked it.  They were making it better and better.  So we liked giving customers the best solution."[5]

The evidence will show that the reasons behind Mozilla's switch back to Google after selecting Yahoo! as the default search engine for its Firefox browser confirms the same.  And the evidence will further show that ███████████████████████████████████████ ███████████████████  In short, Google wins competitions that browser suppliers create for choosing their default search service by offering the best product at the best price.  That is quintessential "competition on the merits."  *Microsoft*, 253 F.3d at 59.

Such competition to become the default search engine on browsers creates an important procompetitive benefit:  increasing search usage and thus expanding search output.  As both Google's economic expert Dr. Kevin Murphy and fact witnesses will explain, competition for becoming the default search engine increases search usage by providing users convenient access to a high-quality search service.  In addition, revenue share payments to browser developers provide critical funds for their ongoing investments in technology improvements and innovations—which improves browser functionality and allows users to conduct more searches, again expanding search output.

Google's success in competitions to become the default search engine on third-party browsers on the basis of price and quality produces additional procompetitive benefits.  To name just one:  Browsers and search engines are important complements to one another.  Winning the

---

[4] Apple 30(b)(6) (E. Cue) Dep. Tr. at 121:17-19.

[5] *Id.* at 41:22-42:3.

default by offering lower price and higher quality enhances browser competition, which increases usage of the web, and with it, usage of search (output).

***Google's MADAs and RSAs.*** Google's MADAs and RSAs with Android OEMs and Carriers also produce significant procompetitive benefits, including for search. The agreements underpin an innovative business model that has greatly benefited consumers and search competition by fostering the success of the Android platform, an innovative mobile platform that today provides the most significant competition to market-leading Apple in the United States. The evidence will show that Google has invested in Android to improve user access to the Internet on mobile devices, which increases search output. Google's MADAs and RSAs, offered since Android's earliest days—when the nascent Android platform had no substantial usage—have played and continue to play a key role in facilitating that output-expanding competition.

The evidence will show that Google's MADAs help Android compete against iOS by providing a consistent out-of-the box baseline set of services comparable to those Apple offers on the iPhone, among other ways. Offering a consistent out-of-the-box experience helps Android attract users away from Apple and facilitates vibrant competition among OEMs offering diverse Android devices. The MADAs also generate procompetitive efficiencies by providing high-quality Google services royalty-free in exchange for placement and promotion of Google services that monetize if used by consumers. Promotion of Google's revenue-generating services both support the zero-royalty MADA license and fund continuing Android investments, which facilitates OEM entry, expansion, and lower-priced devices. Increasing the supply of quality mobile devices at low prices, in turn, boosts search output. Reengineering the MADAs, as Plaintiffs demand, would undermine these important benefits without boosting search competition.

Google's RSAs with OEM and Carrier partners reflect successful competition by Google

for incremental promotion of its search services. Google's RSAs also enhance Android competition against Apple, which (as explained) benefits users by enhancing search competition. Competing for incremental promotion of quality Google services such as Google Search and Chrome—whether in the form of defaults, placement, or exclusive preinstallation— makes Android devices more attractive in competing against iOS devices, ultimately working to the benefit of consumers in the form of enhanced output in search, among other things.

   *SA360.*  Apart from the absence of a duty to deal (*see* Part III), Google's ongoing development and design of its search engine marketing tool, SA360, also creates numerous procompetitive benefits. SA360 is a cross-platform tool that allows advertisers to easily purchase digital advertising from several different sources, benefitting advertisers. Imposing a duty on Google to interoperate with every feature demanded by Microsoft for its own Bing Ads platform on the timetable and terms Microsoft demands would undermine Google's incentives to develop new innovative features. The evidence will also show that Google rolled out features across all search engines and for specific search engines like Bing in response to customer demand. Forcing Google to interoperate on rivals' preferred terms and timelines, in particular if such terms did not reflect customer demand, would unreasonably impose costs and promote free riding.

   Plaintiffs cannot rebut the procompetitive justifications for any of the above categories of conduct. The entirely ex-post, unreasonable reimagining of Google's business practices that Plaintiffs' experts advance falls well short of achieving all the procompetitive benefits of Google's challenged conduct. Plaintiffs similarly cannot show that Google's justifications are pretextual. Google competed for browser defaults long before, Plaintiffs assert, that competitive conduct caused any harm. Google's MADA has retained essentially the same form since Android's launch, a tell-tale sign of the MADA's procompetitive efficiencies. Google RSAs,

15

which helped nascent Android to succeed and continue to play a key role in competing with Apple's iOS, have become *more* permissive over time. "[Q]uibble[s]" over whether a practice perfectly advances its procompetitive objectives cannot establish pretext. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 228 (D.C. Cir. 1986). That would amount to the very "second-guess[ing]" based on judgments of "degrees of reasonable necessity" that the Supreme Court warned against. *Alston*, 141 S. Ct. at 2161 (internal quotation marks omitted).

## IV.   Google Had No Duty to Deal and Thus Colorado Plaintiffs' SA360 Claim Fails

The Colorado Plaintiffs' allegations regarding Google's purported delay in implementing Microsoft Bing Ads functions in Google's SA360 SEM tool invoke a "duty to deal" theory that fails to identify exclusionary conduct for reasons courts time and again have confirmed. Even an alleged monopolist has no obligation "to cooperate with its competitors." *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. Apr. 27, 2023) (cleaned up). Instead, "as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). This rule reflects the hesitance of courts to impose an "obligation to provide [one's] rivals with a 'sufficient' level of service" or "to deal under terms and conditions that [those] rivals find commercially advantageous." *Id*. at 444, 450. "[T]he judiciary is ill suited" to "manage corporations' business affairs." *Meta*, 66 F.4th at 305.

There is a limited exception to this general rule. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Supreme Court upheld a verdict finding liability when a monopolist (Aspen Skiing Company) first voluntarily agreed to a joint venture with a rival (Aspen Highlands) and then later discontinued the venture even when the evidence suggested the arrangement remained profitable. As the Court later explained, this holding fell "at or near the outer boundary of § 2 liability." *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S.

16

398, 409 (2004).  "The 'larger anticompetitive enterprise' that characterizes an *Aspen Skiing*
violation, crucially, cannot simply be an intent to harm—or, the flip side of the same coin, to avoid
helping—a rival or rivals."  *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 26 (D.D.C. 2021).

Rather, to invoke that limited exception and find a monopolist's refusal to deal unlawful,
the alleged monopolist's conduct must satisfy three conditions.  *See id.* at 27.  *First*, "there must
be a preexisting voluntary and presumably profitable course of dealing between the monopolist
and rival."  *Id.* (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013));
*see also Trinko*, 540 U.S. at 404-05, 407, 409.  "[U]nadulterated unilateral conduct—situations in
which no course of dealing ever existed—won't trigger antitrust scrutiny."  *Novell*, 731 F.3d at
1074.  *Second*, the refusal to deal must involve "products that the defendant already sells in the
existing market to other similarly situated customers."  *Qualcomm,* 969 F.3d at 994; *Facebook*,
549 F. Supp. 3d at 27.  *Third*, "[t]he monopolist's discontinuation of the preexisting course of
dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive
end."  *Facebook*, 549 F. Supp. 3d at 27 (quoting *Novell*, 731 F.3d at 1075).  Even when a duty to
deal exists, as long as the monopolist has "valid business reasons" for the refusal to deal, the refusal
does not violate Section 2.  *Aspen Skiing*, 472 U.S. at 597.

Google's purported delay in implementing Bing Ads functions in Google's SA360 tool
does not come close to meeting the necessary conditions to create a duty to deal.  First, Google
had never before provided or supported an integration for the Bing Ads auction-time bidding
functionality, nor had it agreed to build and support the functionality that the Colorado Plaintiffs
accuse it of delaying.  Rather, Google's feature design and development are guided by its own
SA360 customers' priorities, technical feasibility, and engineering resources.  Indeed, the evidence
will show that the testing of Google Ads auction-time bidding—for which there was ample

customer demand—spanned multiple years and participation of over a hundred advertisers to determine if the feature could be viably launched.  Google had valid business reasons to build and launch features based on its customers' own priorities and the resources needed to meet higher demand features.  Because a "prior history of dealing . . . is a necessary element of" a refusal-to-deal claim, *Facebook*, 549 F. Supp. 3d at 28, the lack of any pre-existing, voluntary course of dealing here means Plaintiffs' claim of a Section 2 violation is dead on arrival.  *Trinko*, 540 U.S. at 409; *Meta*, 66 F.4th at 305 (explaining Facebook's policy was not unlawful "to the extent it applied to apps with which Facebook had no prior course of dealing").

Second, Plaintiffs' theory on SA360—that Google should have *more quickly* offered the same SA360 support for Bing Ads as it did for Google Ads—plainly cannot satisfy the requirement to show a refusal to deal in "products that the defendant already sells in the existing market to other similarly situated customers."  *Qualcomm*, 969 F.3d at 994 (citing *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004)).  The evidence will show that Google possessed valid business reasons for building out the Bing Ads features on its own timetable, not Microsoft's, including customer priorities, technical and resource constraints.  In any event, Google's purportedly delayed implementation of the disputed functionality is distinct from the conduct found to be anticompetitive in *Aspen Skiing* (and *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)), where "the defendants refused to provide to their competitors' *products that were already sold in a retail market to other customers*."  *MetroNet*, 383 F.3d at 1133 (emphasis added).  Here, Google has not previously offered advertising customers an integration of the Bing auction-time bidding functionality in Search Ads 360.  As the court explained in *MetroNet*, absent such circumstances, a duty to deal claim is not administrable.  *Id.* ("[I]f the defendant does not already provide the product in an existing market or otherwise make it available to the public, the

court will have to delineate the defendant's sharing obligations, and '[a]n antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations.'" (second alteration in original) (quoting *Trinko*, 540 U.S. at 415)).

Finally, the absence of a prior course of dealing also means that Plaintiffs cannot establish the third condition, that Google discontinued a *profitable* course of conduct specifically to achieve long-term anticompetitive ends. The reason that the termination of a voluntary and profitable prior course of dealing is a prerequisite for any refusal to deal claim is that it may suggest an unlawful "willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. But here, where there was no prior course of dealing, Plaintiffs will not be able to establish "a willingness to sacrifice short-term profits, let alone in a manner that was irrational but for its tendency to harm competition." *Novell*, 731 F.3d at 1076.

The limited nature of Plaintiffs' theory on SA360—that Google should have *more quickly* offered the same SA360 support for Bing Ads as it did for Google Ads—bears emphasis. The evidence will show that Google possessed valid business reasons for building out the Bing Ads features on its own timetable, not Microsoft's, including customers' priorities, technical and resource constraints. But in any event, Google's purportedly delayed implementation of the disputed functionality is distinct from the conduct found to be anticompetitive in *Aspen Skiing*. Even if Google were found to have actually delayed the institution of new features, that is not the same as *terminating* support for Bing Ads in SA360. The launch of Google's new platform did not terminate support for any Bing Ads features, and instead included support for even more features than before (including four of the five features Plaintiffs identify as at issue). That is, purportedly delaying the introduction of new and different features is not the same as terminating existing features, and there can be no Section 2 violation on that basis. *See Qualcomm*, 969 F.3d

at 993-994 (finding no violation where defendant had never engaged in practice that plaintiffs desired); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1019 (E.D. Mo. 2018) (disagreeing that *Aspen Skiing* applied because prior course of dealing with defendant as a retail pharmacy was distinct from challenged course of dealing with defendant as mail-order pharmacy), *aff'd*, 911 F.3d 505, 518 (8th Cir. 2018).

Firms are meant to "compete[] rather than collude[]." *Novell*, 731 F.3d at 1078. Whether or not Google could have offered the relevant features more quickly, Google had no duty to "deal with [Microsoft] on [Microsoft's] preferred terms." *Meta*, 66 F.4th at 306. Like the plaintiffs' claims in *Meta*, Plaintiffs' SA360 claim boils down to the oft-rejected assertion that the Sherman Act imposes on a purported monopolist a duty to make life easier for its competitors. *Id*. at 305-06; *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (explaining monopolists have no duty to help competitors "survive or expand"). The Sherman Act does no such thing, and Plaintiffs' SA360 claim therefore fails.

Beyond the fatal deficiency of the lack of any duty to deal, the Colorado Plaintiffs' SA360 theory fails because Google's conduct caused no competitive harm. ███████████████

████████████████████████████████████████████████████████████████

█████████ It will be undisputed that there existed alternative paths for advertisers, including buying directly from Microsoft's ad platform and other competing tools that offered Bing functionality that SA360 temporarily lacked. And Google will show that any transitory, minimal harm to Microsoft does not give rise to a harm to competition in the general search advertising market or any other.

## CONCLUSION

Google looks forward to presenting its case at trial.

Dated:  August 28, 2023                    Respectfully submitted,

                                           WILLIAMS & CONNOLLY LLP

                                           By: /s/ John E. Schmidtlein
                                           John E. Schmidtlein (D.C. Bar No. 441261)
                                           Benjamin M. Greenblum (D.C. Bar No. 979786)
                                           Colette T. Connor (D.C. Bar No. 991533)
                                           680 Maine Avenue, SW
                                           Washington, DC 20024
                                           Tel: 202-434-5000
                                           jschmidtlein@wc.com
                                           bgreenblum@wc.com
                                           cconnor@wc.com

                                           WILSON SONSINI GOODRICH & ROSATI P.C.
                                           Susan A. Creighton (D.C. Bar No. 978486)
                                           Franklin M. Rubinstein (D.C. Bar No. 476674)
                                           Wendy Huang Waszmer (D.C. Bar No. 1631078)
                                           1700 K Street, NW
                                           Washington, DC 20006
                                           Tel: 202-973-8800
                                           screighton@wsgr.com
                                           frubinstein@wsgr.com
                                           wwaszmer@wsgr.com

                                           ROPES & GRAY LLP
                                           Mark S. Popofsky (D.C. Bar No. 454213)
                                           2099 Pennsylvania Avenue, NW
                                           Washington, DC 20006
                                           Tel: 202-508-4624
                                           Mark.Popofsky@ropesgray.com

                                           Matthew McGinnis (admitted *pro hac vice*)
                                           Prudential Tower
                                           800 Boylston Street
                                           Boston, MA 02199
                                           Tel: 617-951-7703
                                           Matthew.McGinnis@ropesgray.com

                                           *Counsel for Defendant Google LLC*