# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, STATE OF
ARKANSAS, STATE OF CALIFORNIA,
STATE OF FLORIDA, STATE OF GEORGIA,
STATE OF INDIANA, COMMONWEALTH
OF KENTUCKY, STATE OF LOUISIANA,
STATE OF MICHIGAN, STATE OF
MISSISSIPPI, STATE OF MISSOURI, STATE
OF MONTANA, STATE OF SOUTH
CAROLINA, STATE OF TEXAS, AND
STATE OF WISCONSIN,

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

## PLAINTIFFS' PRE-TRIAL BRIEF

August 28, 2023

## Table of Contents

INTRODUCTION ........................................................................................................... 1

I.     LEGAL FRAMEWORK ....................................................................................... 2

II.    ARGUMENT ........................................................................................................ 4

    A.    Plaintiffs Have Properly Defined The Relevant Markets ............................... 4

        1.    General Search Services Is A Relevant Product Market ......................... 5

        2.    General Search Text Ads And Search Ads Are Relevant Product Markets ....... 5

        3.    The Relevant Geographic Market Is The United States ........................ 7

    B.    Google Possesses Monopoly Power In General Search Services And The Related Advertising Markets ................................................................. 7

        1.    Google Maintains A Dominant Share Of All Relevant Markets ............ 8

        2.    General Search Services And The Related Advertising Markets Are Protected By Entry Barriers ........................................................... 9

        3.    Direct Evidence Of Google's Monopoly Power ................................ 10

        4.    Google's Purported "Need" To Innovate Does Not Cut Against A Finding Of Monopoly Power And Runs Counter To The Evidence ................ 12

    C.    Google's Contracts Constitute The Anticompetitive Conduct In The Relevant Search Advertising Markets ........................................................ 13

    D.    Google's Maintenance Of Its Monopoly Causes Anticompetitive Effects In The Advertising Markets ...................................................................... 13

        1.    Google Has Exercised Its Monopoly Power By Substantially Increasing Search Advertising Prices ................................................................... 13

        2.    Using Its Monopoly Power, Google Has Reduced Advertisers' Ability To Manage Their Ad Campaigns And Control Their Ad Spend ............... 13

    E.    The Anticompetitive Effects In This Case Outweigh Any Procompetitive Justifications ................................................................................... 14

        1.    Google's Defense That There Is Competition For The Browser Contracts Is Illusory ........................................................................... 15

        2.    Google's Customer-Instigation Defense Also Fails, As Google's Partners Sought More Flexibility ................................................................ 16

   3.    **Any Product Quality Defense Does Not Excuse Google's Use Of Restrictive Agreements To Lock Up Search Distribution** ........................................ 18

   4.    **RSA Pass Through Is Similarly Not Pro-Competitive** ........................................ 19

   5.    **The Android MADAs Do Not Offer A "Promotional Benefit"** ........................ 20

**CONCLUSION** ........................................................................................................ 20

## **Table of Authorities**

**Cases**

*Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ................................................................ 19

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d. Cir. 2007) ............................... 19

*Chase Mfg., Inc. v. Johns Manville Corp.*, 2023 WL 5341501 (10th Cir. Aug. 21, 2023) ........... 3

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ........................................... 8

*FTC v. Surescripts*, 424 F. Supp. 3d 92 (D.D.C. 2020) ................................................ 4

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ........................ 9

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ........................................................................... 16

*Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ....................................... 16

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) .................................................. 4

*Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ............................... 19

*NCAA v. Alston*, 141 S. Ct. 2141 (2021) ........................................................... 19

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ................ 5

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ....................................... 4

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) .................................... 3, 15, 19

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ......................... 5

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................ 7

*\*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (*en banc*) .................................. passim

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ....................................... 4


**Other Authorities**

2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2017) ............................ 3, 7

August 3, 2023 Summary Judgment Order (ECF No. 624) ................................................ passim

## <u>INTRODUCTION</u>

Each day, people use their phones, computers, and tablets to search the internet. Where is the nearest coffee shop? When is Beyoncé's newest album coming out? How do I play pickleball? In the United States, nearly 90 percent of these searches rely on Google. Google also has durable monopolies in related markets for general search text ads and search ads with market shares of 88 and 74 percent, respectively. Google pays billions of dollars each year to maintain these monopolies by ensuring that it is the default search engine for iPhones, Android phones, and most third-party browsers, such as Mozilla's Firefox.

Google's use of contracts to maintain default status denies rival search engines access to critical distribution channels and, by extension, the data necessary to improve their products. With each search query routed to Google, its search engine improves, providing the next user with more accurate results. This in turn attracts more users, who generate more data and who help attract more advertising revenue. Thus, although Google benefits from this feedback loop, its rivals face an insurmountable—and still growing—difference in scale. Ultimately, because Google's exclusionary contracts deprive rivals of the opportunity to provide more accurate results, only Google has the full opportunity to improve. As the Court recognized and Google's counsel conceded, being the default is like having a 200-meter head start in a 400-meter race. *See* Apr. 13, 2023 Hrg. Tr. 111:6–16, 112:2–7. Fueled by defaults, today Google has 16 times more fresh search data than Bing, its nearest competitor.

Google's anticompetitive conduct harms consumers—even those who prefer its search engine—because Google has not innovated as it would have with competitive pressure. Even more, Google's restrictive agreements undermine the ability of its competitors and potential entrants to offer consumers more attractive general search services. One example is that



Google's ███████████████ with ███ prevents ███ from pre-setting a different, more private search engine (e.g., ███████) as its default ███████ ███████. This restriction reduces Google's and rivals' incentives to compete on privacy and leads consumers to enjoy less innovation in this area.

Google's anticompetitive conduct harms advertisers as well, by allowing the company to raise prices and reduce ad quality. *First*, Google designed its ad auction algorithms to include adjustable variables (internally known as "pricing knobs"); Google, then, "tunes" the variables to increase advertiser prices. *Second*, Google has lessened the quality of the advertisements it sells by taking away advertisers' control over when and where their ads appear. Google has also reduced advertisers' visibility into where and why Google displays ads, impeding advertisers' ability to optimize advertising and lower costs. The monopoly profits Google extracts from advertisers ultimately help pay for Google's default distribution agreements, which fuel Google's scale advantage and further reduces rivals' ability to compete.

Consistent with the Court's order, Plaintiffs preview the trial evidence regarding market definition, monopoly power, conduct and effects in the advertising markets, and the insufficiency of Google's likely procompetitive justifications.[1]

## I.     LEGAL FRAMEWORK

Under the D.C. Circuit's decision in *United States v. Microsoft*, Plaintiffs may establish a violation of Section 2 of the Sherman Act by demonstrating "the possession of monopoly power

---

[1]   In its August 3, 2023 minute order, the Court indicated that the parties should limit pre-trial briefs "to disputed issues not raised in the summary judgment motions (e.g., market definition, market share, procompetitive justifications)." *See* August 3, 2023 Summary Judgment Order (ECF No. 624) ("SJ Order") at 4 ("At this stage, Google is not contesting the markets as Plaintiffs have defined them. Nor does it dispute that it possesses monopoly power in those markets."); *see generally* ECF Nos. 422, 476, and 522 (Google and Plaintiffs did not brief anticompetitive effects in the ad markets).

in the relevant market" and "the willful . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 253 F.3d 34, 50 (D.C. Cir. 2001) (*en banc*). In a monopoly maintenance case such as this one, the operative question is *not* whether the defendant has acquired its monopoly through anticompetitive means, but whether, once acquired, the defendant used anticompetitive means to maintain its monopoly. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196 (3d Cir. 2005) ("While we may assume that Dentsply won its preeminent position by fair competition, that fact does not permit maintenance of its monopoly by unfair practices."); *see also* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 618(3) (4th ed. 2017) ("[T]he monopoly may have been created by skill but later maintained by exclusionary practices; in that case, §2 clearly applies to the maintenance of monopoly power.").

As the Court acknowledged in its summary judgment order (*see* SJ Order at 30), "exclusive contracts that foreclose a substantial part of [a] relevant market[]" may constitute unlawful monopoly maintenance.[2] *Microsoft* declined to adopt a rigid test for assessing foreclosure. 253 F.3d at 70 (exclusive contracts may violate Section 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation" (citation omitted)); *see also* ECF No. 476 at 16–18 (citing cases). Consistent with *Microsoft*, courts routinely measure foreclosure by estimating the volume of distribution closed

---

[2]  This Court need not analyze the challenged exclusionary conduct "under any solitary framework." *Chase Mfg., Inc. v. Johns Manville Corp.*, 2023 WL 5341501, at *25 (10th Cir. Aug. 21, 2023). The Court should "look[] to the reality of the [relevant] market and the practical effect of [the defendant's] conduct." *Id.* at *26. In undertaking this analysis, exclusive-dealing precedent may be instructive, but it is not the sole path to Section 2 liability. *See id.* at 26–32. This is consistent with the *Microsoft* Court's analysis of OEM agreements, which shows how exclusionary contracts can violate Section 2 even when not analyzed as exclusive deals. *See* ECF No. 476 at 16–18 (citing cases).

off to rivals (i.e., coverage), not the volume of sales these rivals would have won in some but-for world. *See Microsoft*, 253 F.3d at 69 (foreclosure concerns exclusive contracts' limitations on "the *opportunities* for other traders to enter into or remain in that market" (emphasis added) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)).[3] Indeed, *Microsoft* expressly rejects the requirement of a but-for world that a lost-sales analysis would require. 253 F.3d at 79 ("To require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action.").

Finally, evidence of intent can "bear[] on the 'likely effect of the monopolist's conduct.'" SJ Order at 22. Plaintiffs will introduce evidence at trial of Google's intent to maintain its monopoly, including Google's deliberate destruction and concealing of evidence that could demonstrate its liability. *See, e.g.*, ECF Nos. 495-1, 571. Accordingly, Google's documents and testimony should be considered with this intent in mind.

## II.   ARGUMENT

### A.   Plaintiffs Have Properly Defined The Relevant Markets

General search services, general search text ads, and search ads each constitute a relevant product market. "'Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level,' . . . the relevant market must include all products 'reasonably interchangeable by consumers for the same purposes.'" *Microsoft*, 253 F.3d

---

[3]   *See also FTC v. Surescripts*, 424 F. Supp. 3d 92, 102 (D.D.C. 2020) ("Exclusivity provisions covering about 40–50% of the relevant market have been found to foreclose competition illegally, and Surescript's loyalty program allegedly places 70–80% of [two] markets into effectively exclusivity contracts." (citations omitted)); *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) (endorsing *Microsoft*'s focus on the foreclosure "of the available *opportunities* for browser distribution" (emphasis added) (quoting *Microsoft*, 253 F.3d at 70–71)); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (finding 85 percent foreclosure because only 15 percent of the market was not covered by the disputed contracts).

at 51–52 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc*., 792 F.2d 210, 218 (D.C. Cir. 1986); *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 391 (1956)).

### 1.    General Search Services Is A Relevant Product Market

The evidence will confirm that general search services is a product market. General search engines can answer all types of search queries and provide a wide breadth of search results, as compared to specialized search services or other websites that are limited to specific topics, such as discounted hotels or airline fares. For example, Yelp can find you a pizzeria, but is no help when it comes to the symptoms of strep throat. Thus, Google as well as other industry participants understand that a general search engine is a "one-stop shop" for users, which cannot reasonably be replaced by specialized search services. Indeed, Google's own documents support a determination that general search services is a relevant product market.[4]

### 2.    General Search Text Ads And Search Ads Are Relevant Product Markets

In 2020, Google's Chief Economist, Hal Varian, concluded that "there is a market for search advertising of course."[5] Plaintiffs agree. At trial, Plaintiffs will demonstrate the existence of two related search advertising markets: (1) a market of general search text ads (text ads), which are primarily text, appear on the search engine results page (SERP) of a general search engine, and are served in response to a consumer's real-time query; and (2) a broader market of search ads, which encompasses any ads shown on a SERP in response to a consumer's real-time search query, including text ads, shopping ads, and travel ads.

---

[4]   UPX0332 at 13 (Google lists only itself and Microsoft as "general purpose search engines"); *see also* SJ Order at 6 (describing the market as "General Search Services" and noting that "Google and Bing are the two leading general search engines in the United States.").

[5]   UPX0452 at 1.

Although the presence of a real-time query distinguishes all search ads from other forms of advertising, text ads are distinct from other types of search ads in several key ways. Plaintiffs will call Prof. Michael Whinston (an expert in economics and industrial organization) and Prof. Kinshuk Jerath (an expert in advertising) who will explain that text ads are available to a broader range of advertisers; can advertise virtually any product or service (unlike other search ads, which typically focus on a narrower area or specialty); and give advertisers a greater degree of control over the content and targeting of their ads. For example, unlike Google shopping ads, text ads are available to advertise both products and services. Moreover, both Google and advertisers believe that advertisers need to simultaneously use both text ads and other search ads *on the same SERP*, underscoring that text ads are distinct from other search ads.[6]

Text ads and other search ads are unique even within digital advertising formats because they respond to the content of a user's search query, which reveals that user's real-time intent (i.e., interest) at the moment the user conducts the search. This feature gives advertisers the ability to target consumers immediately in response to consumers' self-declared intent. As Prof. Jerath will explain, no other form of advertising is returned in response to a real-time user query.[7] Google itself acknowledges this distinction, conceding that "SearchAds are fundamentally different than DisplayAds because they are targeted to the user's query (and thus are relevant to the user's task in a different way than an awareness-generating ad)."[8] In contrast, social or display ads, as the trial record will show, target users by inferring intent from the users'

---

[6]  *See* UPX1013 at 3 ("[U]ser intent and advertiser value is different across the units, and as a result advertisers are not bidding on the same thing on Shopping and Text ads").

[7]  UPX0026 at 1 (2018 Val Harian report states: "[s]earch ads are an effective form of advertising since queries are a strong signal of user interest and intent and the ads appear immediately after the query is entered").

[8]  UPX0459 at 1.

characteristics or past conduct, instead of reaching the user at the time that the user expresses a commercial intent.[9] For these and other reasons, search ads serve different advertiser objectives than other digital ad channels.[10]

### 3. The Relevant Geographic Market Is The United States

Google does not appear to dispute that the United States is the relevant geographic market for general search services, text ads, and search ads.[11]

### B. Google Possesses Monopoly Power In General Search Services And The Related Advertising Markets

Courts assess monopoly power using both direct and indirect evidence. *Microsoft*, 253 F.3d at 57 ("Microsoft cites no case, nor are we aware of one, requiring direct evidence to show monopoly power in any market. We decline to adopt such a rule now."). Because direct proof of monopolization is rarely available, courts typically examine market structure in search of circumstantial evidence of monopoly power. *See* Areeda & Hovenkamp ¶ 531a, at 156; *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). To that end, "monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51.

Google easily meets this threshold given its enduring market share in each relevant product market, which are each subject to high barriers to entry. Further, the trial record will reveal direct evidence of Google's monopoly power—by way of the company's high profit margins and ability to raise prices for advertisers above a competitive level. Finally, any

---

9   UPX0413 at 1 ("[Q]uery terms are a far stronger signal of user intent than past behavior"); UPX0029 at 1 (noting "Google has no direct competitor to Facebook's ad offering").

10  UPX0033 at 32 (distinguishing "Display Buyer," "Search Buyer," and "Social Buyer.").

11  *See* Mark Israel Dep. 188:16–20 ("Q. Well, the geographic market for the search ad side of the case is the United States, right? A. That's my understanding. Q. And you're not contesting that? A. I'm not contesting that.").

argument by Google that competitive pressures force it to innovate—thus cutting against a finding of monopoly power—runs counter to the evidence.

### 1. Google Maintains A Dominant Share Of All Relevant Markets

As the Court already acknowledged, Google is a dominant player in general search services as well as the related advertising markets. *See, e.g.*, SJ Order at 2 (noting that although there are other general search engines, "their market penetration pales in comparison to Google's"); *id.* ("[B]ecause of its large market share in general search services, Google also holds a superior market position in various search-related advertising markets.").

Evidence at trial will show that as of 2020, Google had a market share of more than 89 percent for general search services—a number that Google has never contested.[12] In the last twelve years, Google's market share in general search has not dipped below 70 percent. Indeed, Google concluded as early as 2009 that its market share for general search was 71 percent.[13] To that end, Google laps its nearest competitor Bing, whose current market share is six percent overall—with a one percent share for mobile devices—and never more than 10 percent since 2015. The trial evidence will also show that Google has a market share of 88 percent for text ads and 74 percent for search ads, comfortably exceeding monopoly levels.[14] *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 47–48 (D.D.C. 2022) (shares above 70 percent "comfortably exceed[ed] the levels that courts ordinarily find sufficient to establish monopoly power." (internal citations omitted)); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195,

---

[12] *See also* UPX0476 at 14 (Q3 2019 internal share figures broken up by desktop and mobile); SJ Order at 2 ("In 2020, Google's share of the U.S. general search services market was nearly 90%, and even higher on mobile devices.").

[13] UPX0499 at 1 (Dr. Varian reminded Penny Chu to "make sure that we are consistent in calling this 'query share' rather than market share.'").

[14] *See* UPX0006 at 4.

1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.").

> **2.** **General Search Services And The Related Advertising Markets Are Protected By Entry Barriers**

Significant barriers to entry in the general search industry protect Google's monopoly power. *Microsoft*, 253 F.3d at 51; *id*. at 55 (referring to scale). Dr. Varian put it succinctly: "It is very, very expensive to implement general search."[15] He has further observed that "Google is [an] ad supported general purpose search engine. There aren't very many of these in part because they are very expensive to build and maintain."[16] Google's former head of search estimated that a search engine needs at least ███████ annually in research and development even "before you build a search ads business to pay for it."[17] For its part, ████ estimates that a search engine's operating costs could be ████ annually.[18] Barriers are similarly high in search advertising. Running a search advertising business requires significant costs, such as the engineers required to design and run the ad auctions, as well as the cost of an ad sales team.

The need for scale creates a significant barrier to entry for both search and search advertising. Scale in general search and search advertising is two sides of the same coin given that advertising sales fund almost all general search engines. During trial, Plaintiffs will demonstrate the importance of scale and how Google's conduct has increased its scale advantage at the expense of competition. But the Court need not look any further than Google's own words to understand scale's importance. Google knows that a search engine "get[s] better as you have more users" because its quality improves on metrics such as personalization, refinements, and

---

[15] UPX0330 at 2.
[16] UPX0333 at 1.
[17] UPX0266 at 4.
[18] UPX0267 at 46.

the ability to decipher what the user is searching for.[19] "Large-scale machine learning[,]" Google posits, reveals that "[t]he more we learn from our users, the better we can serve them."[20]

Scale is also important in search advertising, and Google's documents reflect this importance. For example, in 2017 Google ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████"[21] Moreover, Google's monopoly means no other general search engine has the search ad or text ad inventory to accommodate significant shifts in ad business.[22]

Neeva's recent entry—and abrupt exit—underscores the difficulty of starting a general search engine. Google's former Senior VP for Advertising Sridhar Ramaswamy, who was a key catalyst in growing Google from a $1 billion to a $100 billion company, founded Neeva, the world's first advertisement-free, subscription search engine. Despite garnering interest in the industry, Neeva announced that it was exiting the general search services market in May 2023, citing "the unnecessary friction required to change default search settings."[23] The trial record will establish that Neeva could not get the distribution necessary to grow.

### 3. Direct Evidence Of Google's Monopoly Power

Plaintiffs will also introduce direct evidence of Google's monopoly power. Evidence of a firms' ability to profitably raise prices without causing competing firms to expand output and drive down prices is direct evidence of monopoly power. *Microsoft*, 253 F.3d at 51. *Microsoft*

---

[19]  UPX0177 at 1.

[20]  UPX0228 at 16; *see also* UPX0251 at 49 ("machine learning" requires "meaningful data").

[21]  UPX0021 at 21, 24; *see also* UPX0231 at 2 (describing ad click data as a "*huge* quality signal.").

[22]  *See* UPX0435 at 10 (Booking.com regulatory filing).

[23]  Sridhar Ramaswamy & Vivek Raghunathan, *Next Steps for Neeva*, Neeva Blog (May 20, 2023), https://neeva.com/blog/may-announcement (visited June 2, 2023) (attached as Ex. A).

similarly dictates that pricing a product without regard to the competition is direct evidence of monopoly power. *Id*. at 58. Here, the trial evidence will show that Google has used its control of its ad auctions to repeatedly raise search ad prices without considering competitors.[24]

Google sells search advertising through real-time auctions occurring every time a consumer enters a commercial query. For each eligible ad, Google creates an "Ad Rank" that determines which ad appears in which SERP slot. Advertisers submit bids representing the maximum that they will pay for a click on their ad, and the Ad Rank incorporates the bid and Google's assessment of the ad's value to Google. If the ad is clicked, Google charges the advertiser a cost per click (or CPC) based on the runner-up's Ad Rank. Importantly, all else equal, the higher the *runner-up's* Ad Rank, the more expensive the winner's CPC.[25]

Google acknowledges it "directly affect[s] pricing through tunings of [its] auction mechanisms."[26] Google regularly uses its "pricing knobs" to increase CPCs by modifying the variables used in Ad Rank and other auction algorithms.[27] ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████.[28] Prof. Whinston will testify that this has all the hallmarks of an exercise of monopoly power in the relevant advertising markets.

Supporting the conclusion that Google is a monopolist, the Court will hear testimony from Christine Hammer, an accounting expert, who will explain that Google turns an exceptionally high profit margin—██ percent—on its search and search advertising businesses.

---

[24] *See*, *e.g.*, UPX0521 at 5 (reflecting a price increase of three percent in 2018 without any change in click-through rate or "click quality").

[25] *See* UPX0889 at 4–7 (describing auction process).

[26] UPX0509 at 3.

[27] *Id*.

[28] *See* UPX0725 at 8–9 (2018 "Search Ads Price Index Creation & Results").

4.      **Google's Purported "Need" To Innovate Does Not Cut Against A Finding Of Monopoly Power And Runs Counter To The Evidence**

Google may argue that it faces competitive pressures to innovate, which cut against a finding of monopoly power. But the factual record will show that Google's anticompetitive conduct ensures it does not face robust competition. A good example is Google's "Go Big in Europe" campaign. After a July 2018 European Commission ruling prevented Google from holding default search engine status on Android devices in Europe, the company created an initiative to "[i]mprove [the] [s]earch experience" in France and Germany by implementing "new best-in-class or exclusive experiences."[29] Another example is Google's decision in 2018 to improve the quality of "Nav Suggestions," where a user searching on Google.com with a navigational query (e.g., "Facebook") could go directly to the destination page without stopping at a SERP. Internal pushback blocked this innovation because Google could not monetize the query if the user did not visit the SERP.[30] So users continued to be unnecessarily rerouted.

The evidence at trial will also demonstrate that Google's conduct harms consumers by slowing or obstructing search innovation. In contrast to what would be required in a competitive environment, Google has not needed to devote the time, effort, and energy to improve its products. Prof. Whinston will testify that because Google faces limited competition, the quality of its search services is lowered. Thus, the trial record will show that even consumers who prefer Google's search engine have been harmed by the company's monopolistic practices.

---

[29]  UPX0749 at 4.
[30]  UPX0762 at 1.

12

C.      **Google's Contracts Constitute The Anticompetitive Conduct In The Relevant Search Advertising Markets**

As Plaintiffs will demonstrate at trial, Google's default distribution agreements for Android and Apple devices, as well as with third-party distributors such as Mozilla, ensure Google locks up critical distribution channels for general search engines. These agreements constitute anticompetitive conduct in the relevant search advertising markets under *Microsoft*. 253 F.3d at 58–59. Just as Google's agreements maintain its monopoly in general search, those same agreements cement its monopolies in text ads and search ads.

D.      **Google's Maintenance Of Its Monopoly Causes Anticompetitive Effects In The Advertising Markets**

At trial, Plaintiffs will demonstrate that Google's anticompetitive conduct harms competition in the relevant search advertising markets in two critical respects—price and quality.

1.      **Google Has Exercised Its Monopoly Power By Substantially Increasing Search Advertising Prices**

As explained above when demonstrating Google's monopoly power (*see* Section II.B.3), the trial evidence will show that Google has imposed substantial price increases on advertisers that would be unlikely in a competitive market. Indeed, Google's own documents will show that Google has implemented price increases on multiple occasions without losing sufficient advertisers to make the price increases unprofitable.[31] Google's executives, moreover, have calculated that the company can profitably raise prices as much as █ percent.[32]

2.      **Using Its Monopoly Power, Google Has Reduced Advertisers' Ability To Manage Their Ad Campaigns And Control Their Ad Spend**

In addition to increasing prices, Google's monopoly power has enabled it to reduce the quality of products it offers advertisers. For example, the trial record will show that Google's

---

[31] *See*, *e.g.*, UPX0521 at 5 (reflecting a price increase of █ percent in 2018).
[32] UPX0519 at 1.

changes over time to keyword matching have reduced advertisers' control over when and where their text ads appear in response to search queries. These changes make it easier for advertisers to match queries while making it harder for them to avoid the ones they do not want. Google has also reduced the information reported to advertisers about queries that match to their keywords and where their ads appear on the SERP.

Separately and collectively, these actions have impeded advertisers' ability to assess and manage their text-ad spend, control and optimize their text-ad campaigns, and make informed decisions about their marketing efforts. Google has thus created obstacles to advertisers' ability to identify and address wasteful or inefficient ad spend. Indeed, one of Google's largest advertisers, ████, has expressed that it was "frustrate[d]" Google was "hiding the source of traffic, and . . . continually reducing the quality of reporting data" it provided.[33]

### E.   The Anticompetitive Effects In This Case Outweigh Any Procompetitive Justifications

At trial, Plaintiffs will demonstrate that Google has maintained its durable monopolies in general search services—and the related advertising markets that fund it—by cutting off the air supply to Google's rivals, denying them access to user data and the scale needed to compete.

Once Plaintiffs make an affirmative showing of anticompetitive effects, Google must establish procompetitive justifications. *See Microsoft*, 253 F.3d at 58–59. If the Court finds that Google carries this burden, which it should not, Plaintiffs will then have an opportunity to rebut Google's showing. *Id*. at 59. Here, any procompetitive justifications that Google offers at trial will be non-cognizable or contrary to the evidence. In any event, the trial record will confirm that any purported benefits are outweighed by the anticompetitive effects in this case.

---

[33] UPX0061 at 1; *see also id*. ("We want control for where we do and do not show our ads.").

1.    **Google's Defense That There Is Competition For The Browser Contracts Is Illusory**

At summary judgment, Google argued that even if the browser contracts at issue are exclusive, they nonetheless reflect "a form of vigorous competition." ECF No. 422 at 38 (quoting *Microsoft*, 253 F.3d at 58) (internal quotation marks omitted). In its summary judgment order, the Court observed that this argument "is better suited for the procompetitive prong of the *Microsoft* analysis." SJ Order at 39. As Plaintiffs demonstrated in our opposition brief, Google fails to cite any case law supporting its novel proposition that an exclusionary contract may be justified because a monopolist successfully outbid its rivals. *See* ECF No. 476 at 27–30 (citing cases). Indeed, precedent makes clear that the question in a monopoly maintenance case is not how the monopolist obtained its monopoly, but whether it has maintained that monopoly through unlawful means. *Dentsply*, 399 F.3d at 196.

In any event, Plaintiffs will show that the harmful effects of Google's search distribution contracts—particularly given the importance of scale—outweigh any possible defense that Google won these contracts through competitive means. Ultimately, and for more than a decade, Google has maintained its monopolies by wielding the contracts—at the cost of billions of dollars annually—as a shield to prevent rivals from gaining access to the user data and scale needed to compete effectively. Google understands the severe disadvantages that its rivals now face in any attempt to secure default positions with distributors. For example, in 2015, ███

███████████████████████████████████

███████████████████████████████████

█████████ ███████████████████████████

---

[34] *See* UPX0143 at 8 ███████████████████████
███████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████

The Court should similarly reject the likely testimony of Google's expert Prof. Kevin

Murphy that competition for the contract can stand in for competition for users and advertisers.

Given the realities of this market, any remnant of competition that exists for these default

contracts is plainly insufficient to protect consumers. *See Kodak Co. v. Image Tech. Servs., Inc.*,

504 U.S. 451, 466–67 (1992) ("Legal presumptions that rest on formalistic distinctions rather

than actual market realities are generally disfavored in antitrust law.").

### 2. Google's Customer-Instigation Defense Also Fails, As Google's Partners Sought More Flexibility

Plaintiffs anticipate that Google will, as it did at summary judgment, claim that its

partners instigated[35] the contracts at issue, and that this ameliorates any anticompetitive concern.

*See, e.g.*, ECF No. 422 at 38 (citing *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales*

*Pracs. & Antitrust Litig.*, 44 F.4th 959, 995 (10th Cir. 2022)). As an initial matter, and as

explained in Plaintiffs' opposition to Google's summary judgment motion, this argument runs

counter to well-established law. *See* ECF No. 476 at 24–27 (citing cases).

Furthermore, the trial record will demonstrate that Google instigated many of the

restrictive contract terms. Indeed, the record will show that Google's partners—including OEMs,

carriers, and Apple—wanted more flexibility than what they ultimately received under their

contracts with Google. In particular, ██████ bristled repeatedly at the ██████ restrictive nature,

---

[35] In its order, the Court discussed Google's "customer instigation" and "competition for the
contract" arguments together, and ultimately determined that "Google cannot prevail at this
stage based on a 'competition for the contract' theory" because such argument "is better
suited for the procompetitive prong of the *Microsoft* analysis." SJ Order at 39.

proposing a variety of alternatives that would allow ███ to offer Google's general search engine to customers while retaining the flexibility in how ███ offered search on its ███. For example, in ███, ███ sought to offer ███████████████████████ ███████████████.[36] Google refused.[37] That same year, ███ proposed ████████████████████████████ "███ ████████████ ████████████████████████████████████ ██████ Google again refused. Instead, Google sought to "ensure the language is clear w[ith] r[espect] t[o] default – ███████████████████████████████ In ███, Google rejected ███ request to have "████████████████████████ to set Google as the default search provider."[40] A similar request in ███ was also rejected.[41] Ultimately, the ███ ███ reflects years of Google imposing ever greater restrictions over ███ desire for flexibility, and ███ accepting the restrictions from the only search engine with scale on mobile.

The trial record will similarly show that Google's Android partners pushed back on the restrictive nature of the revenue share agreements (RSAs) and the Mobile Application Distribution Agreements (MADAs). For example, during contract negotiations in 2008, ███ attempted to remove the exclusivity provision from its RSA[42] but was ultimately unsuccessful.[43]

---

[36] UPX0126 at 5.

[37] UPX0072 at 1.

[38] UPX0964 at 1.

[39] UPX0670 at 1.

[40] UPX0675 at 2 (███ redline: "███████████████████████████████ ███████████████████████; UPX0605 at 6.

[41] UPX0570 at 4.

[42] UPX0544 at 1 ("███ appears to have removed commitments that Google will be the ONLY default search wherever it is placed. In other words, they could put Yahoo & MSN at the same level of prominence (despite the fact we are paying out rev share).").

[43] UPX5533 at 7 ¶ 5 (2008 ███ RSA agreement includes a "Default Exclusivity" provision).

For its part, in 2018, ███ pushed against exclusivity and wanted flexibility to include other competing services on its devices.[44]

Browsers also took issue with Google's restrictive terms. For example, ███ sought an alternative to Google and signed a contract with ███ to encourage competition in search, welcoming the ████████ to ████ [45] However, the trial testimony will show that to win the ███ default from Google in 2014, ███ needed to offer a ███ million annual financial guarantee—roughly ███ million more than Google was paying for the ███ default. ████████████████████████████ ████████

Ultimately, the factual record will refute Google's customer-instigation argument. In any event, any evidence that Google's partners were willing to share in monopoly profits does not outweigh the anticompetitive effects of Google's conduct, as Plaintiffs will demonstrate at trial.

### 3.      Any Product Quality Defense Does Not Excuse Google's Use Of Restrictive Agreements To Lock Up Search Distribution

A theme that will likely permeate Google's presentation at trial is its view that the company offers a quality search product that many users prefer. But Google's conduct undermines this argument, as the monopolist feels the perpetual need to pay ***billions*** annually to ensure that consumers are routed to its search engine. To that end, whether Google gained its monopoly status initially because of product quality or because of user preference is irrelevant. Because this is a monopoly maintenance case, liability depends on how Google has *maintained* its monopoly—here, by using restrictive contracts that guarantee default status and thus

---

[44] *See*, *e.g.*, UPX1026 at 4 (███ redlined proposal).

[45] UPX0107 at 1; *see also* UPX0105 at 11.

[46] *See* UPX0898 at 1 ("The ███ team has been under continual pressure to increase monetization of the SERP" and noting various increases in ad load and size).

perpetuate its scale advantages over rivals. *See Dentsply*, 399 F.3d at 196. Moreover, Google's view that its product is superior does not justify its use of restrictive contracts that ensure it alone enjoys default status. In a Section 2 case, a justification is insufficient when the same benefits could be reasonably achieved through less anticompetitive means (such as paying for search traffic). *See*, *e.g.*, *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d 297, 308 (3d. Cir. 2007) (anticompetitive conduct includes "[c]onduct that impairs the opportunities . . . in an unnecessarily restrictive way").

Furthermore, the possibility that a monopolist's conduct makes a product more attractive to some consumers is not an absolute defense to liability under Section 2. *Cf. NCAA v. Alston*, 141 S. Ct. 2141, 2163 (2021) (while firms can seek to "introduc[e] a new product into the marketplace," that does not "mean[] a party can relabel a restraint as a product feature and declare it 'immune from § 1 scrutiny'" (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 n.7 (2010))); *see also Microsoft*, 253 F.3d at 59 (applying a burden shifting framework). Ultimately, competition is a public good. *See Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

Finally, and in a similar vein, any argument from Google that its product innovations provide a procompetitive justification for its conduct should be rejected for the reasons demonstrated in Section II.B.4 above.

### 4.     RSA Pass Through Is Similarly Not Pro-Competitive

In his report, Google's expert Prof. Murphy argued that Google's revenue share agreements for Android devices, Apple devices, and third-party distributors constitute a form of price competition that results in payments to distributors that are passed on to consumers—in the form of lower prices for device and telephone service or greater quality. In particular, he asserted that revenue share payments lower the cost of developing and selling devices and providing

19

wireless services. Notably, Prof. Murphy fails to offer evidence supporting this theory. And, as Prof. Whinston will explain, Google's exclusionary contract provisions have likely led to **_lower_** revenue share payments.

**5.      The Android MADAs Do Not Offer A "Promotional Benefit"**

Finally, Google may contend that the MADAs result in "promotional benefits." But the "promotions" Google references are the exclusionary defaults at issue. Anticompetitive effects are not "benefits" to anyone but Google and its shareholders.

## **<u>CONCLUSION</u>**

As the evidence will demonstrate at trial, Google's persistent conduct has allowed it to unlawfully maintain durable monopolies in general search services, general search text ads, and search ads. The Court should hold[47] that Google has violated Section 2 of the Sherman Act.

---

[47] Per the Court's December 12, 2021 order, liability and damages in this case are bifurcated. ECF No. 264. As a result, the appropriate remedies for Google's conduct are properly addressed in post-trial proceedings, should Plaintiffs prevail on the merits.

Dated: August 28, 2023                         Respectfully submitted,

                                               */s/ Kenneth M. Dintzer*
                                               Kenneth M. Dintzer
                                               Veronica N. Onyema (D.C. Bar #979040)
                                               Diana A. Aguilar Aldape
                                               Sarah M. Bartels (D.C. Bar #1029505)
                                               Meagan K. Bellshaw
                                               David E. Dahlquist
                                               Kerrie J. Freeborn (D.C. Bar #503143)
                                               Jeremy M. P. Goldstein
                                               R. Cameron Gower
                                               Sara T. Gray
                                               Thomas Greene
                                               Joshua Hafenbrack (D.C. Bar #1017128)
                                               Matthew C. Hammond
                                               Karl E. Herrmann (D.C. Bar #1022464)
                                               Ian D. Hoffman
                                               Elizabeth S. Jensen
                                               Matthew Jones (D.C. Bar #1006602)
                                               Claire M. Maddox (D.C. Bar #498356)
                                               Michael G. McLellan (D.C. Bar #489217)
                                               Erin Murdock-Park (D.C. Bar #1019993)
                                               Lillian Okamuro (D.C. Bar #241035)
                                               Michael A. Rosengart (D.C. Bar #1671047)
                                               Eric L. Schleef
                                               Adam T. Severt
                                               Lara E.V. Trager
                                               Emma N. Waitzman
                                               Catharine S. Wright (D.C. Bar #1019454)

                                               U.S. Department of Justice
                                               Antitrust Division
                                               Technology & Digital Platforms Section
                                               450 Fifth Street NW, Suite 7100
                                               Washington, DC 20530
                                               Telephone: (202) 227-1967
                                               Kenneth.Dintzer2@usdoj.gov

                                               *Counsel for Plaintiff*
                                               *United States of America*

By: ___*/s/ Margaret Sharp*___
James Lloyd, Chief, Antitrust Division
Margaret Sharp, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Margaret.Sharp@oag.texas.gov

*Counsel for Plaintiff State of Texas*


By: _____*/s/ Matthew Michaloski*
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director,
Consumer Protection Division
Matthew Michaloski, Deputy Attorney General
Christi Foust, Deputy Attorney General
Ryan Frasher, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By: : _____*/s/ Matthew M. Ford*
Matthew M. Ford
Arkansas Bar No. 2013180
Assistant Attorney General
Office of the Arkansas Attorney General Tim
Griffin
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

By: ___*/s/ Brian Wang*_____
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Brian Wang, Deputy Attorney General
Carolyn Danielle Jeffries, Deputy Attorney
General
Office of the Attorney General,
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*


By: ___*/s/ Lee Istrail*___
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney
General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*


By: ___*/s/ Daniel Walsh*_____
Christopher Carr, Attorney General
Margaret Eckrote, Deputy Attorney General
Daniel Walsh, Senior Assistant Attorney
General
Charles Thimmesch, Assistant Attorney
General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

23

By: ___ */s/ Philip R. Heleringer* ___
Daniel Cameron, Attorney General
J. Christian Lewis, Commissioner of the Office
of Consumer Protection
Philip R. Heleringer, Executive Director of the
Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director
of the Office of Consumer Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


By: ___ */s/ Christopher J. Alderman* ___
Jeff Landry, Attorney General
Christopher J. Alderman, Assistant Attorney
General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
AldermanC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By: ___ */s/ Scott Mertens* ___
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

24

By: _____/s/ Stephen M. Hoeplinger_____
Stephen M. Hoeplinger
Assistant Attorney General
Missouri Attorney General's Office
815 Olive St., Suite 200
St. Louis, Missouri 63101
Stephen.Hoeplinger@ago.mo.gov

*Counsel for Plaintiff State of Missouri*


By: _____/s/ Hart Martin_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney
General
Crystal Utley Secoy, Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By: _____/s/ Anna Schneider_____
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, Montana 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: _____ */s/ Rebecca M. Hartner*
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Rebecca M. Hartner, Assistant Attorney
General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
rhartner@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: _____ */s/ Gwendolyn J. Lindsay Cooley* _____
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2023, I caused the foregoing **PLAINTIFFS' PRE-TRIAL BRIEF** to be filed with the Clerk of Court using the Court's Electronic Document Filing System and electronically served copies on all counsel of record.

*/s/ Karl E. Herrmann*
Karl E. Herrmann
*Counsel for Plaintiff United States of America*
