## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | **FILED UNDER SEAL** |
| Defendant. | |
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | **FILED UNDER SEAL** |
| Defendant. | |

### JOINT STATUS REPORT

Pursuant to the Court's Order, ECF No. 610 (June 30, 2023), the parties in *United States v. Google LLC* and *State of Colorado v. Google LLC* submit the following Joint Status Report identifying any disputes between the parties or between a party and a non-party, and the parties' and non-parties' respective positions.

1

on these exhibits; and (4) order the parties to implement redactions on 400 additional exhibits identified by Plaintiffs consistent with Plaintiffs' proposed redactions to the 22 disputed exemplars.

### B.      Colorado Plaintiffs' Position Statement

Plaintiff States agree with DOJ Plaintiffs' position statement.

## V.    Google's Position Statement Regarding Issues Relating to Confidentiality

Google seeks to minimize the need to close the courtroom during trial in this case,[8] while at the same time ensuring that it does not suffer competitive harm by virtue of the public disclosure of its trade secrets and commercially sensitive information.  *See United States v. Hubbard*, 650 F.2d 293, 315 (D.C. Cir. 1980) (explaining that "courts have refused to permit their files to serve … as sources of business information that might harm a litigant's competitive standing") (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).  The potential competitive harm to Google is compounded by both the nature and volume of information at issue.  This case centers on agreements that remain in effect today and are subject to renegotiation when their terms expire in the future, as well as highly technical products (*i.e.*, search and digital advertising) that depend on confidential research and development for both innovation and the avoidance of manipulation and gaming by outside actors.  Plaintiffs' final

---

[8] The agreed portions of the Parties' proposed order on the use of confidential information at trial (ECF No. 628-1) contain multiple provisions designed to ensure that the courtroom is kept open as much as practicable.  *See* Paragraph 1 ("The Parties and non-Parties are expected to use their best efforts to work together to allow the courtroom to be kept open as much as practicable…."); Paragraph 2 ("The Parties shall endeavor to prepare their presentations and examinations to maximize keeping the courtroom open…."); Paragraph 3 ("To the extent that the examination of a witness requires the courtroom to be closed, the Parties shall, to the extent practicable, coordinate and organize the sequence of examination topics to group the confidential information at the beginning or end of an examination to minimize the number of times and the duration the courtroom needs to be closed…."); Paragraph 5 ("Counsel shall prepare their opening arguments to allow for the court to remain open to the public….").

exhibit lists include ***more than 2,000*** documents produced by Google in this matter,[9] many of which contain the types of information that courts routinely seal in order to protect a party's competitive standing, including proprietary engineering and product design techniques; confidential commercial agreements and internal negotiation analyses; and non-public financial, pricing, and product data.  *See Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 671 (D.C. Cir. 2017) (observing that "[f]or documents containing sensitive business information and trade secrets," the pertinent "factors often weigh in favor of sealing").

While the volume and sensitivity of Google's confidential information at issue is clear (as detailed further below and in the five accompanying declarations from Google employees familiar with the relevant products and information), whether and how the documents will actually be used in the trial is far from certain.  The number of Google-produced documents on Plaintiffs' exhibit lists far exceeds—by many multiples—the number of documents that Plaintiffs could plausibly use with witnesses at trial or otherwise present to the Court during the course of trial.  And even for the relatively small fraction of exhibits that are ultimately admitted at trial, much of the sensitive information contained within them will never be the subject of questioning or otherwise a focus of the proceedings before the Court.

These realities provide all the more reason to proceed deliberately and with careful consideration of the first and final *Hubbard* factors; that is, the need for public access to the documents at issue and the purposes for which the documents were introduced—factors which include an analysis of the relevance of the information to the Court's ultimate decision. *Hubbard*, 650 F.2d at 317, 320-21; *see EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409

---

[9] The DOJ Plaintiffs' list identifies 1,439 Google-produced documents; the Colorado Plaintiffs' list identifies 588.

(D.C. Cir. 1996) (holding that while "[a] court's decrees, its judgments, its orders, are the quintessential business of the public's institutions[,] [o]ther portions of the record—such as documents filed with the court or introduced into evidence—often have a private character, diluting their role as public business").  Where it is either not feasible to conduct the full six-factor *Hubbard* analysis or where the *Hubbard* balancing does not yield a clear result at this stage in the proceedings, the final decision can and should be deferred until after trial.[10]

Against this backdrop, Google addresses in Part 1 below the recurring categories of information reflected in Google's documents that generally merit sealing at this stage in the proceedings.  Google has grouped the information at issue categorically for ease of analysis and reference.  Google has conducted a document-by-document determination for the 30 "exemplar" exhibits identified by the DOJ Plaintiffs to assess the likelihood of harm to its commercial standing from the disclosure of each document, and will do the same for the remainder of the trial exhibits.[11]  As addressed in Part 2, Google has proposed a workable process for maximizing

---

[10] *See, e.g.*, *In re McCormick & Co., Inc., Pepper Prods., Mktg. & Sales Practices Litig.*, 316 F. Supp. 3d 455, 470 (D.D.C. 2018) (denying motion to unseal exhibits because "at this stage the Court lacks the necessary information to apply the *Hubbard* factors to these documents" and allowing further consideration if "it later become[s] apparent that these documents are necessary to the Court's … decision"); *United States v. Anthem Inc.*, No. 1:16-cv-01493, 2016 WL 11164059, at *1 (D.D.C. Nov. 20, 2016) (observing that "[w]ith respect to the first and final [*Hubbard*] factors, namely, the need for public access to the documents at issue and the purposes for which the documents were introduced during the judicial proceedings, the Special Master lacks sufficient information to conclude that either factor outweighs the Defendants' interests in maintaining the confidentiality of these documents because the documents have not yet been used at trial," and concluding that "factors one and six are better assessed during and following trial when it is clear precisely how and to what extent the parties rely upon these materials").

[11] At the DOJ Plaintiffs' suggestion, the Parties' discussions to date have centered on 30 "exemplar" trial exhibits selected by the DOJ Plaintiffs.  Of the 30, Google has accepted the DOJ Plaintiffs' position regarding the unsealing in full or in part of seven documents (UPX099, UPX0140, UPX0178, UPX0251, UPX0452, UPX0465, UPX0483), and the DOJ Plaintiffs have agreed to seal one document (UPX7002).  The remaining 22 documents are disputed and require resolution from the Court.  Google identifies each document, which category or categories the

public access to the proceedings while avoiding harm to Google and Non-Parties through public disclosure of commercially sensitive information and minimizing the need for Court intervention during trial.

Google respectfully requests that the Court direct the Parties to apply the substantive principles described in Part 1 in determining which information contains sealable material in the first instance (*i.e.*, pending a subsequent assessment based on whether and how each document is actually used at trial), consistent with the process described in Part 2 and in the Parties' proposed stipulated order.  *See* ECF No. 628-1.

### 1.    Google's Proposed Categories of Confidential Information Likely to Contain Sealable Material

Based on the types of confidential Google information produced in the case and the content of the 30 exemplar trial exhibits selected by the DOJ Plaintiffs, Google has identified five categories of information that generally merit sealing at this stage in the proceedings. Google identifies categories not because it intends to apply confidentiality determinations mechanically, but rather to serve as a means to receive the Court's input and guide the determinations, particularly in light of the substantial volume of commercially sensitive information spread across the thousands of Google-produced documents on the Parties' exhibit lists.  Google will consider each document at issue individually, consistent with its burden under *Hubbard*.  Even within the DOJ Plaintiffs' set of 30 exemplars, Google has agreed to the public display of documents that fall into each of the five categories based on its individualized review. In other words, the five categories described below are relevant examples of instances where the

---

document falls in, and the relevant Google employee declaration, in the chart contained in Part 1. (The Colorado Plaintiffs separately identified three exemplar documents for discussion with Google, but those documents are not presently at issue and therefore are not specifically addressed in this submission.)

"common law tradition of public access to records of a judicial proceeding" often yields to the goal of avoiding disclosure of documents "that might harm a litigant's competitive standing," *Hubbard*, 650 F.2d at 314-15, especially at this stage of the proceedings where it is unknown how and to what extent the Parties will actually rely upon the individual documents.

In support of its position, Google is submitting declarations from five Google employees: Erin Simon, an in-house counsel responsible for supporting the product teams that develop and operate Google Search (Google's Ex. A); Michael Zwibelman, an in-house counsel responsible for providing legal advice to the product and engineering teams that develop and operate the ads that run on Google.com (Google's Ex. B); Elizabeth Daly, an in-house counsel responsible for supporting the legal aspects of Google's negotiation and analysis of the Information Services Agreement with Apple Inc. (Google's Ex. C); Sang Eun (Kate) Lee, an in-house counsel who provides legal support to the product and business teams that develop and distribute the Android mobile operating system and Google applications that are developed to run on the Android operating system (Google's Ex. D); and Irene Bondar, a director of strategy and operations whose responsibilities include oversight of the financial performance of Google's Search and Advertising businesses (Google's Ex. E). These individuals have reviewed the exemplar documents that fall within their respective areas of expertise and have identified those that contain information that is commercially sensitive and would harm Google's competitive standing if released. Their declarations outline the reasons that disclosure of the information is likely to harm Google's competitive standing.

In identifying the types of information that it generally seeks to seal, Google has taken into account not only the "strong presumption in favor of public access to judicial proceedings," *Nat'l Children's Ctr.*, 98 F.3d at 1409, but also the level of public interest in this case in

30

particular.  Although Google has no desire to seal more than is necessary to protect its legitimate interests, the observation that a case is "high-profile" should not serve as a rationale for damaging a party's competitive standing through compelled disclosure of commercially sensitive documents.  Moreover, in cases in which governments seek to enforce antitrust law, courts recognize that "[p]rotecting an entity's 'competitive standing' through retained confidentiality in business information has been recognized as an appropriate justification for the restriction of public or press access."  *New York v. Microsoft Corp.*, No. 98-cv-1233, 2002 WL 1315804, at *1 (D.D.C. May 8, 2002) (citing *Nixon*, 435 U.S. at 598).  And even when a "trial dr[aws] an extraordinary amount of attention from the public and the media," the court's sealing decisions should "remain mindful of the parties' right to access [the] courts upon terms which will not unduly harm their competitive interest."  *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 727 F.3d 1214, 1217, 1228-29 (Fed. Cir. 2013).

The below chart groups the disputed exhibits from the DOJ Plaintiffs' exemplar set by category and identifies the Google declaration that addresses each exhibit.[12]  A number of the exemplar documents contain more than one form of commercially sensitive information and therefore have been placed in multiple categories for purposes of this summary chart.

| Category | Applicable Disputed Exemplar Exhibits | Applicable Google Declarations |
|---|---|---|
| Non-public algorithms and engineering and design techniques used by Google | UPX0058, 0190, 0213, 0239, 0456, 0457, 0509, 0806 | Simon (UPX0190, 0213, 0239, 0806) <br><br> Zwibelman (UPX0058, 0456, 0457, 0509) |

---

[12] As noted above, Google has accepted the DOJ Plaintiffs' position regarding the unsealing in full or in part of seven documents (UPX099, UPX0140, UPX0178, UPX0251, UPX0452, UPX0465, UPX0483), and the DOJ Plaintiffs have agreed to seal one document (UPX7002). The remaining 22 documents are disputed and identified here.

| Google's consideration of potential changes to a product and assessments of a competitor's product design or strategic options | UPX0002, 0058, 0148, 0170, 0509, 0749, 0794, 0811 | Simon (UPX0749, 0794, 0811)<br><br>Zwibelman (UPX0058, 0509)<br><br>Daly (UPX0002, 0148)<br><br>Lee (UPX0170) |
|---|---|---|
| Confidential contracts | UPX5308, 5314, 5336, UPX5530 | Daly (UPX5308, 5314)<br><br>Lee (UPX5336, 5530) |
| Discussions regarding a negotiating position or potential contract term | UPX0143, 0749 | Simon (UPX0749)<br><br>Daly (UPX0143) |
| Non-public financial, pricing, and product usage data | UPX002, 0143, 0148, 0170, 0456, 0457, 0486, 0574, 0749, 0794, 0811, 6007 | Simon (UPX0749, 0794, 0811)<br><br>Zwibelman (UPX0456, 0457)<br><br>Daly (UPX002, 0143, 0148)<br><br>Lee (UPX0170, 0574)<br><br>Bondar (UPX0486, 6007) |

### a)   Non-public Algorithms and Engineering and Design Techniques Used by Google

Google seeks to seal documents regarding the confidential techniques and algorithms underlying the design and operation of Google Search and Search Ads.  Google has devoted tremendous resources, both financial and in terms of engineering time and talent, to developing and improving Search and Search Ads.  Disclosing the non-public aspects of its proprietary systems would cause significant harm to Google's competitive standing in at least two important ways.

*First*, revealing confidential technical details about Google's systems creates the opportunity for competitors to benefit from the public disclosure of Google's innovations.  With these insights, competitors could, for example, more easily copy Google's techniques, without having to invest in the costly and time-consuming research and development undertaken by

32

Google.  *E.g.*, Simon Decl. ¶¶ 6-9, 11-12, 14; Zwibelman Decl. ¶¶ 4-5, 8-10, 12.  In many instances, Google's confidential techniques for improving aspects of its search engine—such as the algorithmic models for ranking search results or conducting an auction to determine which ads to display in response to a query—are trade secrets, which plainly warrant sealing.[13]  And even for information that may not qualify for trade secret protection, it is well established that "[c]ourts will generally grant motions to seal when the materials contain … other confidential research, development, or commercial information' to prevent harm to a litigant's standing in the marketplace."  *Vista India, Inc. v. Raaga, LLC*, No. 07-cv-1262, 2008 WL 834399, at *2 (D.N.J. Mar. 27, 2008).[14]

   *Second*, the proper functioning of Google Search and Search Ads depends upon preserving confidentiality.  Every day certain website owners attempt to find ways to surface low-quality webpages—*e.g.*, sites containing misinformation, machine-generated text, or malicious links—on Google's search results page.[15]  Simon Decl. ¶ 5.  And many other website owners attempt to push their sites toward the top of Google's search results page in the hope of gaining more visibility.  *Id.*  To ensure that Google is serving the most relevant and useful results

---

[13] *E.g.*, *Hubbard*, 650 F.2d at 315 ("The public has in the past been excluded, temporarily or permanently, from court proceedings or the records of court proceedings … to protect trade secrets."); *In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008) (observing in the context of a request to seal that a "trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it").

[14] *E.g., Rich v. Hewlett-Packard Co.*, No. 06-cv-03361, 2009 WL 10628294, at *2 (N.D. Cal. Dec. 14, 2009) (sealing information that "could harm HP's competitive position in the market because it would provide insight into how HP's products are designed and how its printers operate from a technical standpoint").

[15] As one of the DOJ Plaintiffs' exemplar documents puts it: "The discipline of a Google search engineer might be called 'adversarial information retrieval'; that is, we must find relevant, high-quality documents in the face of relentless efforts to deceive us." UPX0213 at -721.

to its users, and to combat efforts at gaming Google's search algorithms, Google keeps confidential many of the details surrounding the past and current operation of its search engine. *Id.* Disclosure of this confidential information would harm Google's competitive standing by allowing website owners to take steps that diminish the quality of Google Search results, and by forcing Google to expend even greater resources to make responsive changes to its search algorithms solely to attempt to combat the effect of the unnecessary disclosure of its sensitive technical information. *Id.*

Similar concerns apply to Google's Search Ads auction, which allows advertisers to bid to place their ads in response to applicable user queries. For the reasons detailed in Mr. Zwibelman's sealed declaration, Google keeps confidential many of the details surrounding the past and current operation of its search ads auction in order to improve the quality of the auction. *E.g.*, Zwibelman Decl. ¶¶ 7, 11-12. As further detailed in Mr. Zwibelman's sealed declaration, Google's competitive standing would suffer from disclosures that reveal Google's experimentation and innovation in auction design because, among other things, those disclosures could enable certain actors to disrupt the operation of the auction and thereby drive away advertisers that wish to participate. *E.g.*, *id.* ¶¶ 11-12.

As a general matter, Google seeks to seal rather than redact confidential documents describing commercially sensitive aspects of the operation of Google Search and Search Ads because the systems that operate them represent decades of innovation and learning of countless current and former Google employees. Nevertheless, as with every other category of information outlined here, Google will individually assess each document reflecting confidential technical information to minimize sealing and will attempt to prepare redacted versions where a Party believes that would assist the trial presentation. For example, Google seeks to seal one of

Plaintiffs' exemplars because the specific non-public ranking models and techniques discussed on many pages of the presentation will be of value to competitors in what the document itself describes as an "[a]ctive area of research (work from Microsoft, Facebook, Google)" that has produced "[b]ig gains in Search quality metrics." UPX0239 at -651; *see, e.g.*, *id.* at -648, -654, -656, -661.  Conversely, Google does not seek to seal another of Plaintiffs' exemplars relating to Google Search (UPX0251)—even though it also contains examples of contemplated techniques and analyses of issues arising from particular categories of queries—based on a holistic consideration of the likelihood that disclosure of the topics described in the document will affect Google's competitive standing.

> **b)** **Google's Consideration of Potential Changes to a Product and Assessments of a Competitor's Product Design or Strategic Options**

Another category of information presented by the exemplar exhibits that merits sealing at this stage in the proceeding under the *Hubbard* factors consists of Google's confidential analyses of contemplated changes to Google's products or services as well as its confidential assessments of other companies' products or strategic business decisions.  It is well established that "a company's internal strategies, marketing research . . . , and product development plans provide compelling reasons to seal." *In re ConAgra Foods, Inc.*, No. 11-cv-05379, 2014 WL 12577132, at *5 (C.D. Cal. July 11, 2014).[16]

In this case, the disclosure of confidential documents reflecting proposed product changes presents many of the risks outlined in the previous section with respect to techniques used in

---

[16] *See, e.g.*, *United States v. Anthem, Inc.*, No. 1:16-cv-01493, 2017 WL 8893757, at *2-3 (D.D.C. Jan. 18, 2017) (explaining that disclosure of confidential "competitive analyses" and "product analyses" would create an unjustified risk that "Anthem's competitors would be able to strategize methods to more effectively compete with Anthem, and providers and customers would have an unfair advantage when negotiating contracts with Anthem").

Google Search or Search Ads.  Google experiments extensively before implementing proposed product and engineering changes, and confidential techniques and designs considered and either rejected or sent back to the drawing board for refinement have significant value to competitors. Competitors could, for example, either copy Google's proposals or better strategize against Google with knowledge of the tradeoffs or disadvantages Google identified in the course of its confidential research and development.  *E.g.*, Simon Decl. ¶¶ 13-14, 16; Zwibelman Decl. ¶¶ 4-5, 10, 12.  Moreover, discussions of whether or how to make a particular change frequently involve discussions of the currently implemented techniques, and therefore present the same issues identified in Part 1.a, above.  *E.g.*, Zwibelman Decl. ¶¶ 4-5, 7, 9, 12.; Simon Decl. ¶¶ 13-14, 16.  If Google were forced to disclose confidential information about techniques it has adopted (or evaluated and decided not to adopt), then Google's competitive standing would be harmed by attempts to copy or exploit those techniques.  *E.g.*, Zwibelman Decl. ¶¶ 5, 9, 12; Simon Decl. ¶¶ 6-9, 12-14, 16.

A similar degree of commercial sensitivity attaches to Google's confidential analyses of competitors' products or strategic decision-making.  Competitors would obtain a significant unearned advantage if they could access Google's internal assessments of perceived strengths and weaknesses of the companies' respective products or insight into how Google might respond to specific developments in the marketplace.  UPX0148, addressed in Ms. Daly's sealed declaration, provides a concrete example of the types of analyses that, if disclosed, would unnecessarily jeopardize Google's competitive standing in relation to its competitors.[17]  Daly Decl. ¶¶ 9-10.

---

[17] *See, e.g.*, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, No. 2:12-cv-0692, 2013 WL 12141532, at *11 (W.D. Pa. Sept. 16, 2013) (sealing "UPMC's business strategy with regard to a

### c)      Confidential Contracts

The Parties' exhibit lists collectively include more than 650 Google-produced contracts: Plaintiffs' final exhibit lists include 667 contracts produced by Google; Google's exhibit list includes 118 (most of which are also on Plaintiffs' lists).[18]  Google generally seeks to seal its confidential agreements listed on the Parties' exhibit lists in order to prevent the significant competitive harm that likely would result from disclosure of the commercially sensitive provisions contained therein.  To be clear, it is not Google's position that all of the terms of all of the contracts are commercially sensitive, and the Parties have been able to describe the agreements at an acceptable level of generality in open court on a number of occasions.  Certain of the contracts may thus be appropriate for redaction, to the extent a Party wishes to use the document at trial.  The DOJ Plaintiffs' position, however, is much too narrow, as it leaves unredacted many commercially sensitive provisions, including those that differ across agreements.  With respect to the revenue share agreements, for example, the DOJ Plaintiffs apparently contend that the only provisions that should be redacted from agreements currently in effect are (i) the revenue share percentages; (ii) the agreement termination date, and (iii) those terms they consider "irrelevant" to the case, such as choice-of-law and indemnification provisions.

There are at least two significant forms of competitive harm that likely would result from disclosure of the commercially sensitive provisions in Google's contracts.

---

particular competitor's product, including UPMC's strategy regarding how it managed its treatment of that product while negotiating with its competitor," and noting that "[r]evealing this material will tend to provide UPMC's competitors with information as to what factors UPMC considers relevant in assessing whether a competitor poses a threat to UPMC's interests").

[18] The Parties' exhibit lists additionally contain more than 150 contracts produced by Non-Parties, many of which are identical to the Google-produced version, but consisting of the version from that party's files.

*First*, allowing Google's competitors to access the commercially sensitive terms of its agreements would give those competitors a one-sided advantage in future negotiations with each of Google's counterparties by placing those competitors in the unusual situation of knowing the bargains Google struck.  Daly Decl. ¶¶ 5-7; Lee Decl. ¶¶ 5-6, 8.  There is no sound basis for allowing competitors to negotiate with full or partial knowledge of the compromises Google and its counterparties have reached through hard-fought bilateral negotiations.[19]

*Second*, Google's competitive standing would be further undermined in future negotiations because each of Google's partners would know the details of the terms agreed to by every other partner.  Daly Decl. ¶¶ 5-7; Lee Decl. ¶¶ 5, 7-8.  Google would lose the ability to engage in individualized negotiations if it were uniquely forced to disclose its confidential agreements.  Daly Decl. ¶¶ 5-7; Lee Decl. ¶¶ 5-8.[20]

Sealing the contracts themselves would not meaningfully impede the parties' ability to present their cases in open court.  Indeed, both sides have already made extensive arguments in open court—including at the tutorial in September 2022 and the summary judgment hearing in

---

[19] *See, e.g.*, *Anthem*, 2016 WL 11164059, at *2 (granting request to seal trial exhibits where "[d]isclosure of these documents risks causing Anthem significant competitive harm because it would grant Anthem competitors insight into Anthem's business strategy, pricing structure, market analyses, and related concerns"); *SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003) (sealing on the basis that an agreement "contains information about terms and conditions of the distributorship arrangement … that might give other firms an unearned competitive advantage—unearned because the issue of public disclosure arises from the adventitious circumstance of the agreement's having become caught up in litigation and as a result having become filed in court").

[20] *See United States v. Anthem Inc.*, No. 1:16-cv-01493, 2017 WL 8893757, at *3 (D.D.C. Jan. 18, 2017) (allowing sealing of trial materials containing Anthem's confidential information based upon declarations indicating that "[a]s a result of disclosure, … providers and customers would have an unfair advantage when negotiating contracts with Anthem"); *Elec. Arts*, 298 F. App'x at 569 (granting mandamus petition and ordering the sealing of information such as the "pricing terms, royalty rates, and guaranteed minimum payment terms" of a license agreement because, among other things, these terms are information that "plainly falls within the definition of 'trade secrets'").

April 2023—regarding Google's agreements with browser developers (such as Apple and

Mozilla) and with Android device manufacturers and wireless carriers (such as Samsung and T-

Mobile).  Moreover, Google has already agreed to unseal documents that describe the

agreements at issue without divulging sensitive information specific to a particular counterparty.

In addressing one of the DOJ Plaintiffs' exemplars (UPX0574), for example, Google agreed to

unseal slides (such as the one at Bates ending -970) that do not describe specific counterparties

while redacting slides (such as the ones at Bates ending -968 and -969) that contain

commercially sensitive financial terms from agreements with specific counterparties.

### d) Discussions Regarding a Negotiating Position or Potential Contract Term

In addition to the confidential contracts described above, Google generally seeks to seal

documents regarding negotiation positions and potential contract terms evaluated internally or

proposed to a counterparty on a confidential basis.  All or nearly all of the documents in question

relate to partners with whom Google has a current relationship and with whom it intends to

engage in future negotiations about the challenged agreements.  *E.g.*, Daly Decl. ¶¶ 12-13

(describing the competitive sensitivity of certain internal Google analyses regarding Apple).

Google's negotiations with those partners would be profoundly affected were they to obtain

access to Google's internal assessments.  *E.g.*, *id.* ¶¶ 9, 11, 12.  This is a quintessential example

of the kind of harm to competitive standing that justifies sealing.[21]  In addition to affecting future

---

[21] *E.g.*, *Apple*, 727 F.3d at 1225 (concluding that the district court abused its discretion by
unsealing certain exhibits to pre- and post-trial filings because "if Apple's and Samsung's
suppliers have access to their profit, cost, and margin data, it could give the suppliers an
advantage in contract negotiations, which they could use to extract price increases for
components," and which "would put Apple and Samsung at a competitive disadvantage
compared to their current position"); *United States v. Anthem Inc.*, No. 1:16-cv-01493, 2017 WL
8894396, at *2-3 (D.D.C. Jan. 5, 2017) (sealing "confidential Anthem rate information,
strategies for negotiating with providers and related entities, and Anthem's analyses of its

negotiations between Google and its partners, disclosure of Google's internal analyses or its proposals to counterparties would also give an unfair advantage to competitors vying for the same opportunities.  *E.g.*, Daly Decl. ¶ 13.[22]

The approach Google has proposed would not necessitate closing the courtroom for every examination about a negotiation, as the parties can ask witnesses whether they relied on a particular financial model or proposed a specific term without displaying the document at issue to members of the public.  Furthermore, Google has not objected to the unsealing of confidential internal documents that describe in general terms the objectives stated by Google employees, even with respect to specific negotiations.  With one of DOJ Plaintiffs' exemplars, for instance, Google agreed to unseal portions of a 2018 email in which an employee outlines point-by-point objectives for negotiating with a key partner, including a characterization of an overall "goal" for those negotiations.  UPX0140 at -986.  By contrast, Google seeks to seal another exemplar because of the specificity with which Google employees in that instance detailed a list of particular terms that were contemplated or modeled internally during negotiations with a key partner.  UPX0143 at -822-23.  As indicated, Google is not making sweeping determinations about entire categories of information, but rather is making every effort to assess the likelihood of harm to its commercial standing from the disclosure of each document individually.

---

relationship with providers and other Anthem business partners" because "disclosure would grant the healthcare providers with whom Anthem contracts unfair insight into Anthem's business strategy, reimbursement rates, and approach to provider negotiations").

[22] *See In re Qualcomm Litig.*, No, 3:17-cv-00108, 2019 WL 1557656, at *3 (S.D. Cal. Apr. 10, 2019) (sealing "exhibits that detail sensitive financial terms, royalty agreements, proprietary business strategies, and confidential licensing negotiations" because disclosure "would harm [parties'] competitive standing by concurrently releasing such information to market competitors").

e)      **Non-public Financial, Pricing, and Product Usage Data**

For many of the same reasons, Google seeks to seal its confidential financial, pricing, and product usage data.  Disclosing the amounts Google has invested in particular projects or business units and the returns on those investments would give competitors a significant unearned advantage by allowing them to identify potential opportunities based on Google's efforts and resulting internal data.  *E.g.*, Bondar Decl. ¶¶ 4-6.  Similarly, Google's competitive standing would be undermined by compelled disclosure of its non-public information regarding how consumers use its products and services or the ways in which it prices and markets its offerings.  *E.g.*, Simon Decl. ¶¶ 15-16.  Courts around the country routinely seal these kinds of internal records to protect the competitive standing of companies of all sizes.[23]

To be clear, Google is not seeking to seal every document that contains financial or product usage data. In addressing Plaintiffs' exemplars, for example, Google agreed to unseal a 2016 document reflecting an attempt to use internal Google data to estimate Google Search usage on Windows devices following certain changes by Microsoft.  UPX0099.  And it agreed to Plaintiffs' proposal for redactions to a 2021 description of a proposal for generating and analyzing internal data on the competitive landscape.  *See* UPX0483.  Conversely, Google seeks to seal a 2019 presentation that is full of non-public data relating to financial performance and

---

[23] *E.g.*, *Apex.AI, Inc. v. Langmead*, No. 5:23-cv-02230, 2023 WL 4157629, at *2 (N.D. Cal. June 23, 2023) ("[A] company's financial records, such as receipts, accounts receivable, and expenses are also confidential information which should be sealed."); *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500, 2021 WL 1222122, at *6 (S.D.N.Y. Mar. 31 2021) (approving redactions to "confidential information about Microsoft's business models, including details of Microsoft's sources of revenue and the amounts of its revenue and sales; quantitative details about Microsoft's user base for certain offerings; quantitative details about usage of specific product features; [and] specific revenue amounts from certain offerings" because "if that information were to be disclosed, it could indeed harm Microsoft or advantage its competitors").

projections, usage patterns and product proposals for different query types, marketing strategies, and potential partnerships. *See* UPX0749; Simon Decl. ¶¶ 15-16.

As with the other categories addressed above, Plaintiffs should be able to conduct examinations in open court without the wholesale unsealing of documents that contain detailed accounts of commercially sensitive Google data. Whether the examination involves Google or a third party, there would rarely seem to be significant commercial sensitivity surrounding the mere fact that a company keeps certain financial data, attempts to estimate the impact of a potential agreement, or analyzes how consumers use its products. The risk of commercial harm more often arises from the disclosure of the resultant analysis itself, which generally need not be revealed in order to preserve the public's right of access to the proceedings.[24]

Finally, the Court should reject any attempt by Plaintiffs to impose a temporal cutoff on the sealing of non-public financial information (or any other category of information, for that matter). In correspondence on this subject, Plaintiffs have argued for the unsealing of information from prior to 2020 because the Stipulated Protective Order in this case provides that in general "[m]aterial that is more than three (3) years old at the time of production is presumptively not entitled to protection as Highly Confidential Information but can be Confidential Information if non-public…." ECF No. 98 at 4. But that argument ignores that the same provision expressly carves out material that "discloses current or future business practices or competitive strategies," that is, it recognizes that such material may be considered "Highly

---

[24] *E.g.*, *Anthem*, 2016 WL 11164059, at *5 (sealing trial exhibits that "risk[ed] causing Cigna significant competitive harm by granting its competitors insight into Cigna's sales, pricing, provider rate, membership, estimated market share, … and related sensitive financial information"); *Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.*, No. 3:10-cv-891, 2010 WL 6790538, at *2 (M.D. Fla. Oct. 28, 2010) ("Courts have found that a company's interest in the privacy of its financial records and the terms of confidential agreements … often outweigh the public right of access").

Confidential"; and further ignores that under the Stipulated Protective Order, "Confidential" information may merit sealing.  The Order's definition of "Confidential Information" includes "trade secret[s]," and access to "Confidential Information" is tightly restricted by the Order in light of the sensitivity of the material produced in this case.  ECF No. 98 at 1(b), 12.  In any event, Google is making individualized determinations about each document for purposes of trial.  Although the age of the document is a factor that affects the likelihood that disclosure will cause unwarranted harm, it is rarely dispositive.  As the examples cited above indicate, there will be instances where recent Google documents need not be sealed, but there will also be instances where older material remains highly commercially sensitive.

2.     <strong>Google's Proposed Process for Addressing Sealable Material</strong>

Applying the guidance the Court provides regarding the categories and exemplar exhibits described above, Google will identify those Google-produced documents on the Parties' exhibit lists that contain commercially sensitive material meriting sealing at this stage in the proceedings.[25]  In addition, for those documents that contain material that merits sealing but for which a Party believes that having a redacted version of the document would facilitate keeping the courtroom open during an examination or otherwise make their presentation more efficient (that is, there is material that can be disclosed publicly and that would be the subject of the questioning), Google will prepare a redacted version.[26]  Google has proposed reasonable outside

---

[25] Plaintiffs originally agreed that it did not make sense for this categorization exercise to occur until the Parties reached agreement on the exemplar exhibits, or, failing that, received Court guidance.  They later (on August 2) requested that Google perform this exercise by August 8.  Upon receiving the Court's guidance, Google will work as expeditiously as possible to complete its document-by-document analysis.

[26] *See, e.g.*, *McCormick*, 316 F. Supp. 3d at 470 (observing that "redaction would be inefficient and ineffectual" where "much of the proprietary and non-proprietary information is interspersed").

43

limits on the number of documents for which Plaintiffs may request redactions, given the burden involved in parsing the often lengthy and technical documents line-by-line to ensure that Google's commercially sensitive information remains confidential.[27]  Specifically, Google has offered to redact up to 100 documents of Plaintiffs' choosing pre-trial, and to accommodate requests by Plaintiffs to redact a reasonable number of additional exhibits during trial, provided the documents are identified with adequate time to allow Google's outside counsel to consult with the appropriate Google employees.[28]

As memorialized in the agreed provisions of the Parties' proposed protective order, Google will use its best efforts to narrow confidentiality designations for the purposes of trial in accordance with the principles set forth in *Hubbard*, 650 F. 2d 293, and to work in good faith to reach agreement with Plaintiffs on the confidential treatment of documents and information prior to the start of trial.  Plaintiffs' positions to date, however, leave Google concerned that the overly burdensome process they propose combined with their intransigence on recognizing the sensitivity of the information at issue will lead to unnecessary burden on Google both before and during trial.

The Parties' disagreement on process consists of two closely related issues: (1) whether Plaintiffs should have the unilateral ability to "reject" Google's proposed redactions such that Google must raise each and every disputed redaction to the Court else Plaintiffs disclose the information; and (2) whether, during trial, Plaintiffs can use information that has been designated

---

[27] *See, e.g.*, *id.* (sealing exhibits because, among other things "many of the documents refer to details of internal operations that may not be revealing to a layperson's eye, but may be of use to defendants' competitors").

[28] Google originally proposed to redact 50 exhibits prior to trial, and doubled its offer to 100 exhibits.  Plaintiffs responded by demanding 400 exhibits to be redacted before trial, far more than they could ever possibly hope to use at trial, and an unlimited number during trial.

as confidential on 48-hours notice to Google (or the non-party whose confidential information is at issue). Specifically, Plaintiffs' proposal places the burden on the party whose confidential information is at stake to, within 48 hours, either agree to disclosure or raise the issue with the Court. ECF No. 628-1 (Paragraph 1, Plaintiffs' proposed language). It imposes no obligation on the party seeking to disclose confidential information to provide adequate advance notice, nor does it limit the number of such requests a Party may make.

Plaintiffs' approach puts far too much risk and burden on Google and non-parties, and fails to recognize both the often time-intensive nature of assessing confidentiality (particularly given Plaintiffs' position that redacted exhibits should be prepared wherever possible), as well as the fact that how a document is used at trial and whether and the extent to which it features in the Court's ultimate decision bears on the sealing analysis. Given that disclosure has permanent and irrevocable consequences for the party whose sensitive business information is at stake, whereas interim non-disclosure can be subsequently adjusted, whether after trial or after the Court's ultimate decision, courts (and parties) commonly apply a more prudential and conservative approach than what Plaintiffs press for here. Under Google's proposed language, material that has been designated as confidential shall not be revealed in open court unless "the Party or non-Party who so designated the material has agreed, or the Court has ordered, that the information may be publicly disclosed." ECF No. 628-1 (paragraph 1, Google's proposed language). Upon receipt of a request from a Party to publicly disclose information designated as confidential, "the Party or non-Party who so designated the material shall respond with their position on publication within 72 business hours." *Id.* This ensures that the Party seeking to use the information is able to obtain a timely response, while also incentivizing early notice on the part

of the Party who seeks to disclose the information.  Google's proposed order further directs the Parties "to minimize the number of such requests made during trial."  *Id.*

Google's proposed language recognizes the sensitivity of the confidential information and the permanency of public use of the document, and provides the Parties and Non-Parties with reasonable time to apply redactions and resolve any confidentiality disputes.  While of course the Parties and Non-Parties are obliged to work in good faith to resolve any disputes over redactions, to the extent that any disputes remain, Google also anticipates that its proposed language will protect against both unnecessary requests for Court intervention and the unnecessary disclosure of confidential information.

### 3.    Conclusion

For the foregoing reasons, Google respectfully requests that the Court direct the Parties to apply the substantive principles described above in Part 1 in determining which materials may be sealed in the first instance, following the process for managing sealable material described above in Part 2.