IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>       Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>**FILED UNDER SEAL** |
| State of Colorado, *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>       Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>**FILED UNDER SEAL** |

## **DECLARATION OF MICHAEL ZWIBELMAN**

I, Michael Zwibelman, declare as follows:

  1.  I am currently employed by Google LLC ("Google") as a senior product counsel. I graduated from The University of Chicago Law School in 1999 and have been an in-house counsel for Google since 2010, based in Mountain View (2010-16) and San Francisco (2016-present). I am a member in good standing of the State Bar of California.

  2.  Since 2011, I have been the Google in-house counsel ("product counsel") principally responsible for providing legal advice to the product and engineering teams that develop and operate the ads that run on Google.com ("Google Search Ads" or "Search Ads"). I

1

frequently receive information from Google employees regarding proposed changes to Search Ads products as well as evaluations of competitors' digital advertising products and strategic objectives.

3. In my role as product counsel for Google Search Ads, I periodically evaluate the commercial sensitivity of information relating to Search Ads products and assess whether disclosing particular information would harm Google's competitive standing. For example, I frequently advise internal teams in determining which information about the operation of Google Search Ads should be disclosed in blog posts, public help pages, and other public-facing materials, and which materials submitted to regulators should be subject to confidential treatment. I understand that the plaintiffs in this case have sought Google's views on whether particular documents should be made public at trial, and I have reviewed certain documents that relate to Google Search Ads.

4. I have reviewed UPX0058 (GOOG-DOJ-29814123 and GOOG-DOJ-20699762), which appears to be a May 5, 2020 email thread with the subject "[Privileged and Confidential] Thoughts on SQR Privacy Progress" and a deck titled "Search Query Report." The document contains commercially sensitive information, including analyses of proposed changes to the reporting that Google provides to advertisers who purchase Google Search Ads. In particular, the document includes an internal consideration of options for providing information about the performance of Google Search Ads that certain advertisers may find valuable while at the same time minimizing external disclosure of information about Google Search users (such as their search history). The document also reflects proprietary assessments of the impact on reporting delivered to advertisers under various scenarios. *E.g.*, UPX0058 (GOOG-DOJ-29814123 and GOOG-DOJ 20699762) at -764, -765, -777, and -779.

5. Disclosure of the document will impair Google's competitive standing by allowing other companies that sell digital ads to build on or replicate Google's contemplated solutions for balancing the often conflicting objectives referenced above without engaging in the intensive research on anonymization and data security that underlies Google's assessments.

6. Moreover, disclosure will harm Google's standing with its customers by providing an incomplete picture of the internal deliberations regarding proposed product changes designed to address the interests of advertisers and users. For example, to balance advertisers' interest in reporting data against users' interest in data privacy, Google must consider and test a range of options and assess how they might be received by Google's customers. *E.g.*, UPX0058 (GOOG-DOJ-29814123 and GOOG-DOJ 20699762) at -764, -766, and -779. Google's competitive standing would be harmed if our employees could not work through potential product improvements and weigh the pros and cons of various options without having incomplete pieces of their internal deliberations subject to scrutiny from advertisers and users.

7. In addition, revealing strategies that Google uses to preserve user privacy could allow certain advertisers to game the system to obtain user information that is not otherwise shared externally. *E.g.*, UPX0058 (GOOG-DOJ-29814123 and GOOG-DOJ 20699762) at -768 and -782. For example, knowing exactly which anonymization thresholds Google uses (and how it does so) could allow entities that want to gather more user data to circumvent Google's standards, which would undermine user trust in Google and harm Google's competitive standing in relation to privacy-sensitive users.

8. I have reviewed UPX0456 (GOOG-DOJ-27876273), which appears to be a document titled "Launch: Momiji V1," and I have also reviewed UPX0457 (GOOG-DOJ-27877257), which appears to be a document titled "'Polyjuice' rGSP + eFP

launch." Both documents contain confidential descriptions of aspects of the Search Ads auction, which determines which ads, if any, will be displayed on the Google search results page. For a number of reasons, this information is highly commercially sensitive and would cause significant harm to Google's competitive standing if released.

9. Google has invested extensively in developing proprietary techniques for designing and implementing a Search Ads auction that satisfies the objectives of both Search users and advertisers. The documents in question include descriptions of issues related to auction dynamics, experiments devised and conducted by Google to identify potential changes, and the results of those experiments. *E.g.*, UPX0456 (GOOG-DOJ-27876273) at -275, -276, and -277; UPX0457 (GOOG-DOJ-27877257) at -258, -260, and -267. A number of other companies run large digital ads auctions, and the public disclosure of Google's confidential techniques and experimentation would severely undermine Google's competitive standing by allowing them to copy Google's innovations without making the same investments of their own.

10. In particular, these documents contain highly sensitive information about a years-long effort at Google known as Advertiser Experiments (a/k/a Advertiser Response), which developed innovative and highly technical analyses that measure how advertisers using Google Search Ads respond to changes to our auction algorithms and systems. The Advertiser Experiments effort was the result of countless hours of engineering work, the disclosure of which would harm Google by allowing our competitors to copy our analyses without investing the considerable time and expense of developing their own algorithms.

11. Moreover, our systems face constant and evolving pressure from actors who seek to game the Search Ads auction. For example, some advertisers might use techniques designed to drive competing advertisers out of the auction, depriving these competitors of the ability to

compete fairly and equally for the attention of Google Search users.  *E.g.*, UPX0456 (GOOG-DOJ-27876273) at -274; UPX0457 (GOOG-DOJ-27877257) at -258.  Disclosing descriptions of non-public auction dynamics (that Google has identified and sought to address) will harm Google's competitive standing by (a) making it easier for bad actors to game the system, (b) making it more difficult for smaller and less experienced advertisers to participate fully in the auction, (c) undermining advertiser trust in our systems, and (d) potentially driving away our advertiser customers.

        12.      I have reviewed UPX0509 (GOOG-DOJ-04451958 and GOOG-DOJ-11452869), which appears to be, respectively, a January 2019 email thread with the subject line "How should AQ think about Pricing? – Invitation to comment," and an accompanying document titled "How should AQ think about Pricing?"  This email thread and document likewise contains confidential descriptions of Google's Search Ads auction, including a Google employee's commercially sensitive discussion of experiments to consider, potential changes to evaluate, and ways of thinking about advertisers' responses to competitors' offerings.  *E.g.*, UPX0509 (GOOG-DOJ-04451958 and GOOG-DOJ-11452869) at -958, -869, -871, -872, and -874-004.  As discussed, the ways in which Google evaluates changes to our Search Ads auction—and how to measure and analyze advertiser response to those changes—are proprietary and commercially sensitive.  Like the documents referenced above, disclosure would undermine Google's competitive standing by allowing competitors that facilitate digital ads auctions to copy aspects of Google's models without investing in their own experiments, or to adjust their competitive strategies based on their one-sided access to Google's internal analyses.  And as discussed above, disclosure would allow certain advertisers to game the system by taking advantage of non-public details about the Search Ads auction while providing a partial and unfair view of a Google

employee's internal deliberations regarding potential changes. *E.g.*, UPX0509 (GOOG-DOJ-04451958 and GOOG-DOJ-11452869) at -958, -871, and -872.

*   *   *   *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of August 2023, in San Francisco.

DocuSigned by:<br>*Michael Zwibelman*<br>—1755DAE0865B48B...<br>Michael Zwibelman