**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ARKANSAS, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF INDIANA, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MICHIGAN, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF SOUTH CAROLINA, STATE OF TEXAS, AND STATE OF WISCONSIN | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████ |
| Plaintiffs, | |
| v. | |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, STATE OF NEBRASKA, STATE OF ARIZONA, STATE OF IOWA, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF UTAH, STATE OF ALASKA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, TERRITORY OF GUAM, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF KANSAS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF PUERTO RICO, STATE OF RHODE ISLAND, STATE OF SOUTH DAKOTA, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████ |

NOTICE OF ERRATA

RECEIVED

DEC 2 8 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ARKANSAS, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF INDIANA, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MICHIGAN, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF SOUTH CAROLINA, STATE OF TEXAS, AND STATE OF WISCONSIN<br><br>                                   Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>                                   Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████████ |
| STATE OF COLORADO, STATE OF NEBRASKA, STATE OF ARIZONA, STATE OF IOWA, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF UTAH, STATE OF ALASKA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, TERRITORY OF GUAM, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF KANSAS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF PUERTO RICO, STATE OF RHODE ISLAND, STATE OF SOUTH DAKOTA, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>███████████████ |

**Declaration In Support of Motion Reconsideration 59e**

1

## DECLARATION IN SUPPORT OF MOTION TO INTERVENE

I swear the following is true and correct under threat of prosecution and penalty of perjury.

1. Alphabet, Google, TimeWarner/AOL, IAC, AskJeeves, Inc., and other defendants conspired to allocate over 50% of the general search marketplace to the Google search property through the aforementioned bid rigging schemes which exchanged the benefits among the co-conspirators of the "Special Agreement Hiring Policy" offered by Google. (Exhibit #2)

2. Secondly, once the conspiracy succeeded in allocating market share of over 50% of the general search market to Google, all co-conspirators knew that Google would more then double its then current cost per click advertising rates.

3. All the co-conspirators stood to benefit and continue to benefit from aiding in the conspiracy to allocate and preserve over 50% of the general search market for Google because they all had or have commercial agreements in which Google sold or sells their paid search advertising and all such agreements are structured as revenue shares.

4. Therefore, for example, the IAC/AskJeeves commercial agreement with Google allows IAC/AskJeeves to receive greater then 70% of the revenue generated from Google's sale of search advertising. Thus, as the conspiracy continues to succeed and Google can continue to charge more then double the paid click advertising rates as compared to the rates before Google had captured over 50% of the general search market, IAC/AskJeeves knew that they are instantly sharing and will continue to share in the benefits of the monopoly power they had helped allocate to Google.

5. The co-conspirators knew based on their internal data and review of Intermix's internal data that Google could only grow to over 50% share of the general search market by locking up the rights to Myspace.com's commercial search agreement.

6. Defendants' conduct injured Plaintiff by lowering the value of MySpace upon its acquisition by News Corp and reducing the competition in the general search marketplace since 2005 through the present as described above. And Plaintiff will continue to be harmed unless this Court grants the relief requested including permanent injunctive relief.

7. Google provided information about Myspace.com directly to News Corporation before News Corporation made offer to acquire Intermix in 2005.

i. News Corp Director KPC's Perkins 2008 interview disclosed:

Q: "Did Rupert Murdoch bring the MySpace acquisition to the News Corp board?

Perkins: "Yes. And he discussed it with me a little bit ahead of that. I was very enthusiastic about. He discussed another one with me, which I won't mention, that I was unenthusiastic about. It was acquired by somebody else and it has fizzled. For a long time I was Rupert's listening post in Silicon Valley."

Q: "Why were you enthusiastic about it? A lot of people thought he was kind of razy."

Perkins: "Because of Google. And because these things can take off. I thought it was a good bet. The people were impressive."
(Valley Boy: Part 1 of an Interview with VC Pioneer Thomas J. Perkins January 17, 2008)

8. At all relevant times, News Corp. shared a common director with the single largest shareholder in Google. News Corp. was able to purchase Intermix at a severe discount by purchasing it during a time when (i) Google was withholding a bid for exclusive search engine contract for myspace.com, and when (ii) Yang and Carlick directed Intermix not to renew an exclusive search engine contract with Yahoo or any other search engine in order to have Google

wait on a bid for a search engine contract until AskJeeves (which was being routed search traffic

through Revenue Science from myspace.com) was purchased by IAC.

    9. According to Federal Judge Koh and the magistrate findings in the Hi-Tech employee

antitrust case related to employee no poach agreements:

> i. "Prior to 2007, Campbell served as a consultant to Google in a role that Campbell himself described as "informal[]"28 Google provided a consultant agreement that it asserts memorialized the relationship between Google and Campbell. The court notes, however, that the copy of the 2002 agreement Google attached to its motion was dated sometime in April 2007,29 and Campbell admitted in his subsequent deposition that he did not sign the agreement until 2007 when he signed a subsequent part-time employment agreement.30 But Campbell stated in a sworn declaration that from January 2002 until 2007 his role with Google mirrored the duties listed in the subsequent agreement,"

> ii. "and so the court looks to the agreement for elucidation of Campbell's status at Google. In the agreement, Campbell's duties include serving as an "advisor to Google's management and Board of Directors with respect to Google's corporate and business strategy" and advising "on issues relating to its organizational development and internal business processes.""

> 10. Other evidence supports Campbell played an important advisory role at Google:

> iv. "In a separate declaration, Alan Eustace ("Eustace"), Senior Vice President of Knowledge at Google, stated that Campbell served as a "senior advisor" and that because of that role, Eustace often included Campbell in "emails regarding Google's business operations and internal corporate strategy, including confidential and highly sensitive matters related to Google's compensation practices, policies and strategies."33 The communications both Plaintiffs and Google submitted further reveal Campbell's importance at Google. Throughout the operative period in this case, he was in ongoing communication with Google's executives and advised them about how to deal with employees leaving Google."

> v. "This evidence suffices to show that Campbell's role at Google was that of a functional equivalent of an employee even before an employment agreement was executed."

> (Exhibit #3)

    11. An October 2013 ruling in the same case further described the role and history of

Intuit Chairman Bill Campbell, Google, and the unlawful secret agreements,

"These agreements extended to other Defendants. On February 18, 2005, Bill Campbell (Chairman of Intuit Board of Directors, Co- Lead Director of Apple, and advisor to Google) assisted Steve Jobs (Co-Founder, Former Chairman, Former CEO of Apple) in entering into an agreement with Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) at Google. See id., Ex. 17 (email from Bill Campbell to Steve Jobs informing Steve Jobs that Eric Schmidt "got directly involved and firmly stopped all efforts to recruit anyone from Apple"). That same day, Danielle Lambert (Apple Head of Human Resources) ordered her staff to "[p]lease add Google to your 'hands-off' list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know. Please be sure to honor our side of the deal." Id., Ex. 23. Later that year, Arnnon Geshuri (Google Recruiting Director) was asked to create a formal "Do Not Cold Call" list of companies, including Apple, which had "special agreements" with Google not to compete for employees. See id., Ex. 27. "The draft was presented to Google's Executive Management Group, a committee consisting of Google's senior executives, including Eric Schmidt, Larry Page (Google Co-Founder), Sergey Brin (Google Co- Founder), and Shona Brown (former Google Senior Vice President, Business Operations). See id., Ex. 28. Eric Schmidt approved the list. See id. (email from Eric Schmidt stating "[t]his looks very good."). When Shona Brown asked Eric Schmidt whether he had any concerns with sharing information regarding the "Do Not Call" list with Google's competitors, Eric Schmidt responded that he preferred that it be shared "verbally[,] since I don't want to create a paper trail over which we can be sued later?" Id., Ex. 41. Shona Brown responded: "makes sense to do orally. i agree." Id."  (Id.)

12. No later than March 2005, AskJeeves and Google entered into the Sensitive Company Agreement which placed anti-competitive and restrictive measures on the hiring capabilities of Google, according to the following material terms:

"Executive Recruiting: Inform EMG [i.e. Executive Management Group] of any Director level or above candidate who we have engaged and who is starting the interview process at Google.  (Exhibit #5)

**THE GOOGLE AND TIMEWARNER/AOL "SPECIAL AGREEMENT"**

13. Google had grown the number of undisclosed illegal agreements in place significantly from its initial "Special Agreement" with AskJeeves. As of March 6, 2005 or earlier, TimeWarner/AOL had joined the conspiracy violating Federal antitrust statues.

i. Page 3 of Document 428-10, is titled: "Special Agreement Hiring Policy Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies". Below the title is a bold line and under The bold line the document further states,

"Due to our partnerships, the following companies (and by association, their subsidiaries listed in Appendix B) fall under the "Sensitive" companies list:"

"Parent Companies:" lists "AOL, Inc."

ii. Page 9-10 of Document 428-10, has list titled: "Appendix B" and in such section "AOL, Inc." is listed

iii. In addition, AOL is listed as the Parent Company in "Appendix B" for another Company it owns, "Advertising.com". (Id.)

14. In exchange, AskJeeves asked Google to enter into a Sensitive Company Agreement with AskJeeves, whereby Google agreed not to solicit any of AskJeeve's directorial executives or above candidates. AskJeeves secret "gentlemen's agreement" with Google was largely responsible for AskJeeves getting acquired for $1.8 billion dollars on July 19, 2005 from IAC. IAC required Google to extend the long term unlawful anti competitive economic benefit to its new subsidiary AskJeeves through the "gentlemen's agreement" that restrained normal hiring practices by the technology companies and suppressed the salaries for employees, unlawfully creating lower operating costs and higher profits.

15. Both Intermix and its Myspace subsidiary were free to get the benefits of selecting a new Search Partner by the end of July 2005 when its Yahoo two year commercial agreement ends. Internal Document For Intermix-

'Network Fiscal 2006;Major Drivers and Q2 Objectives: "3. Key business relationships end: Adknowledge (e-mail); Overture (Search)" (Exhibit #6)

16. May or June 2005 update to Board, Myspace lists as among its 'New Features' "Develop and improve search capabilities" with a hand written note by one of Directors:"Site Search" emphasizing importance of topic. (Exhibit #7)

17. Internal Document for Intermix Board Meeting in June 2005 states:

> "Still reliant on two major revenue streams" listing

> "Overture Search"[3] as one (Exhibit #8).

18. Intermix had separated into two search engine divisions, the Myspace Search division headed by Myspace, Inc. CEO Chris DeWolfe and the Intermix Search divison headed by its CEO Rosenblatt. Both divisions were in discussions with Yahoo and Google to sign new Search Partnership agreements prior or after signing a July 18, 2005 acquisition agreement with News Corp. I am aware because I oversaw the 2003 search engine partner competition for Intermix (then called eUniverse) culminating in my selection of a multi-year arrangement giving exclusivity to Yahoo, over Google. (Exhibit #9). Therefore, The company had a great opportunity based on the current economic environment as well as a duty to shareholders to try to consummate a new commercial search agreement with one of the top two potential partners, Yahoo or Google, on the best possible terms prior to September 30, 2005.

19. Intermix and News Corp on July 18, 2005 tout new Myspace.com data making it even more compelling for Google or Yahoo to desire consummating a commercial paid search agreement with Intermix:

> "In June the site served more than 8 percent of all ads on the Internet, putting it in the company of Web Giants Yahoo!, Google, and AOL." (Intermix/News Corporation, PR Newswire, July 18, 2005)

In fact, Intermix and its MySpace subsidiary, were already in discussions with both Google and Yahoo prior to time of the Shareholder vote in September 2005

20. After raising $4.4 billion dollars in its August 2005 secondary, Google agrees not to pursue an acquisition attempt of Intermix or to pursue an online search engine commercial agreement with Myspace, Inc. , and further pays and facilitates thru a promise for search engine default exclusivity from Myspace.com,  hundreds of millions of dollars in undisclosed cash payments to managers of Myspace (Exhibit #10) so that they a) support the scheme to delay consummating a commercial search agreement until after the September 30, 2005 shareholder vote to approve the News Corp acquisition offer b) fabricate and understate financial forecast information being provided to Intermix's investment bankers creating fairness opinions for the Board's review of the News Corporation $12.00 per share offer vii) Intermix scuttles Yahoo's attempt to complete an online paid search agreement prior to the closing of the September 30, 2005 News Corporation acquisition by a) spiking a key presentation in June 2005 to mislead Yahoo as it is courting Intermix b) The CEO of Intermix passes on confidential information to News Corporation regarding Yahoo and Intermix business meetings. (Exhibit #11)

21. After IAC acquires AskJeeves on July 19, 2005, IAC in theory should have aggressively sought to consummate a commercial paid search agreement with Myspace, Inc. or its parent Intermix. Instead there is no such effort.

22. AOL's declining share of the online search audience evidence by early 2005 should have made AOL a candidate to aggressively pursue completing a commercial search agreement with Myspace, Inc. or its parent Intermix, instead AOL joins the conspiracy and discontinues any such effort. xiii) Co-conspirators siphoning, hijacking, and misappropriating Intermix and Myspace search traffic through a) terminating an existing Intermix commercial distribution partnership b) employing an intermediary broker Revenue Scienceto inflate AOL's

8

share of search market to create the "$20b dream" xiv) 2014 evidence unsealed in Federal

Court that News Corporation engaged in illegal "gentlemens agreement" links to

self described "Promise me in blood" deal admitted by co-defendants through a News

Corporation employee published 2009 book titled "Stealing Myspace" and that included a tying

agreement involving AOL's Jonathan Miller becoming head of Fox Interactive while Google's

Tim Armstrong becomes head of Time/Warner's internet group, AOL.

23. Myspace.com email evidence confirms Google's failure to pursue a commercial

search agreement with Intermix or Myspace, Inc. is part of the antitrust conspiracy led by the

Director of the "Special Agreement" counterparty, AskJeeves which benefits the most from

Google's granting of the "Special Agreement" benefits.

24. CEO of Myspace, Inc. Chris DeWolfe emailed the Myspace Board Yang, Sheehan,

Rosenblatt, May 17, 2005 at 5:44pm:

> Subject: 'follow up from board meeting'
> "we cannot work with Google due to our association with Intermix" (Exhibit #12)

25. Google and Doerr induce AskJeeves to force Yang to use his position on Myspace,

Inc. Board to block and delay a commercial search agreement with Google. Yang's email

confirms the scheme in reply to Myspace fellow Director DeWolfe's May 17, 2005 email,

stating:

> "This is in the spirit of what was discussed" (Exhibit #13)

26. An internal MySpace Board meeting powerpoint, or about June 2005 is further

evidence of the scheme. Page of presentation states, (Exhibit #14)

> "Google refuses to work with us because MIX is a majority owner."

27. When the Yahoo Contract with Intermix ended in June 2005, Intermix and its wholly owned subsidiary Myspace, Inc., manipulated and pressured by Carlick and Yang, declined to renew it.

28. Intermix and Myspace were left without a commercial search engine partnership and the revenue available through running a competitive bidding process.

29. Yahoo did not have a Sensitive Company Agreement with AskJeeves, and Google did, which is why Yang and Carlick, board of director members for AskJeeves, decided to not renew the search engine contract with Yahoo (one of Google's and AskJeeves' competitors), and instead waited to sell the search engine rights to Google (per Google's request) once News Corp. purchased Intermix. These above facts were kept secret between Google and Ask.com and were unknown and unknowable to Plaintiff at the time.

30. Yang and Carlick sought and Google agreed to enforce a secret "gentlemen's agreement" in which Google would not cold call and recruit AskJeeves employees. This was a key concession that publicly traded AskJeeves needed to protect its business starting in 2004 and that IAC required in order to consummate its acquisition of AskJeeves on July 19, 2005.

    i.    Peretsman and Allen & Company whose employed one partner on the board of IAC and another partner on the board of News Corp earned over $100 million dollars for advising and leading Google's $4.4 billion dollar secondary in September 2005. Peretsman also according to an October 19, 2006 Fortune magazine article by Eugenia Levenson:,

> "helped broker Google's 11th-hour, $1 billion bid for a 5% stake in AOL (and an advertising partnership) that thwarted an AOL – Microsoft alliance."

**Scheme To Inflate Search Audience of TimeWarner/AOL**

31. In addition to the benefits AOL, IAC, and AskJeeves received from Google's agreement to operate under the terms of the aforementioned "sensitive agreement" protocol, the

conspirators also benefited in 2005 from the creation of a false narrative surrounding the

purported organic growth of their online search business audiences.

32. The value of the online audiences of the top paid search companies

such as Google, Yahoo, and AskJeeves/IAC have since at least 2004 have been increasingly

followed by analysts and the public. Focus often is on monthly 3rd party audited audience or

share of U.S. search market tracking services such as Comscore and Nielsen Netratings.An April

2005 Piper Jaffray & Co report on Paid Search states:

> "Network Effect Critical in Paid Search' Like other successful Internet companies (e.g.
> Ebay), Google benefits from the network effect. The strength of Google and its affiliate
> network (i.e., AOL AskJeeves) encourages advertisers to join (approximately 200,000)
> which in turn leads to more affiliates to join and so on. We believe this network effect has
> been a key component in the increases in CPC rates as the competition among advertisers
> for search placement intensifies. We believe that large networks such as Google and
> Yahoo have CPC rates that are double on average that of smaller networks. Additionally,
> we believe the strength of the Google network as well as the Yahoo network has created
> barriers to entry for smaller players looking to enter paid search."

> "Termination of Distribution Partnership. Several of Google's partners account for a large
> percentage of its revenue. AOL, for example, accounted for 12% of Google's gross
> revenues in 2004. Should AOL and other large partners terminate their agreements,
> Google could face a substantial revenue decline. Given that Google's Network websites
> accounted for 49% of its gross revenues in 2004, it is clear that the continuation of key
> distribution partnerships is crucial to Google's success."

33. In early 2005, AOL had suffered a precipitous year over year decline in its share of

the online search audience. Based on the data publicly disclosed by Comscore, AOL's share of

the search market had decreased by more then 33% by March 2005 to a 8.9 percent share as

compared to March 2004 when AOL held a 13.4 percent share. AOL's decline was steady during

this period, for example, AOL's share of the search market had dropped to 9.1 percent for the

month of November 2004.

34. While AskJeeves had gained significant market share by March 2005 due to its acquisition of ISH a year prior, the public marketplace had now realized its organic growth was not continuing after the acquisition and the majority of this search traffic was derived from adware/spyware products.

35. For AOL, the false narrative was that they had reversed a declining share of the online search marketplace, and that their online search business was growing again and so valuable it could command a $1 billion dollar investment from Google that valued the company at $20 billion. A Cnet December 16, 2005 article by Ernest Schmeltzer titled "AOL to stick with Google" reports on Google's winning $1 billion purchase of 5% of AOL and gives background of a purported multi-month bidding contest stating,

> "The talks escalated in recent months to focus on a broad, longterm partnership that News.com's source described as a "game- changing deal for the media business. Under the proposal, Microsoft and AOL would have combined their advertising forces," and

> "Then, AOL suddenly told Microsoft early on Friday that the deal was off the table, opting to forge stronger ties with its current advertising partner, Google."

36. Intermix was aware by July 2005 of $20 billion dollar valuation Google will place on AOL for its investment that closes in December 2005.

37. In furtherance of the conspiracy, beginning on or around June 2005, AskJeeves secretly arranged for an interim search provider, through a small private company, Revenue Science, to act as a search engine traffic broker for Intermix and myspace.com.

i. Defendant Rosenblatt in a May or June 2005 email indicates "I expect revenues to ramp even more significantly in the coming quarters as we hire more sales people, institute better targeting and search technologies via profiles (i.e. Revenue Science launched this month)." (Exhibit #16)

ii. Resume of Andrew Chen who lists under 'Experience', 'Director of Product Marketing Revenue Science June 2003 - November 2006' and states:

"I also led team's to handle the company's initiatives around Myspace" (Exhibit #17)

Revenue Science and or its web service or site or technology platform began receiving or managing or handling Intermix and/or Myspace's Search traffic or a portion of each or both's search traffic or selling other advertising for Intermix, Inc. on or about June 2005.

38. However, Revenue Science secretly filtered traffic through AOL and Ask.com which in turn sent such traffic to Google which was the exclusive commercial search engine provider for both companies. AOL and IAC's AskJeeves division both received anartificial spike in search traffic. This, in turn, increased the value of AOL and IAC Corporation because investors attributed their increases in search traffic as organic.

39. Time WarnerAOL's AOL subsidiary and IAC's AskJeeves subsidiary immediately benefit and indeed publicly brag of unexpected gains in their Paid Search divisions in a July 21, 2005 press release made by these companies in conjunction with Comscore. The press release cites the percentage share of the U.S. "search marketplace" attributed to AskJeeves & AOL compared to the previous 12 month percentage share.

"DOUBLE-DIGIT GROWTH IN SEARCH SEEN BY AOL AND ASK JEEVES FROM Q1 TO Q2 2005, WHILE TOP SEARCH PLAYERS GOOGLE AND YAHOO! MAINTAIN CONSISTENT GROWTH, ACCORDING TO NIELSEN//NETRATINGS"

"Newly Released June 2005 Search Share Data Reports Google at 47 Percent, Yahoo! at 22 Percent and MSN at 12 Percent; My Way Search Makes its Way into Top Five Rankings for the First Time"

"NEW YORK– July 21, 2005 – Nielsen//NetRatings, a global leader in Internet media and market research, reported today Q1 and Q2 search growth for the top five search engines. AOL and Ask Jeeves rose 15 and 16 percent, respectively, in the number of searches conducted, while Google and Yahoo! maintained single digit growth "

13

"While growth in searches was modest among the 'Big Three' search engines, the fourth and fifth biggest search engines, AOL and Ask Jeeves, grew three times as fast," said Ken Cassar, director of strategic analysis, Nielsen//NetRatings. "While it's far too early to say that Google needs to watch its back, a resurgent AOL makes the game a lot more interesting."

GOOGLE AND YAHOO "TIPPY" SEARCH INDUSTRY COMPETITION

40. One of the most read and reviewed analysis of the online search market and the relative values of such market and its players in 2005 was an HBS study titled, "Google Inc" released in late 2006 by Professor Eisenmann.

41. Eisenmann's analysis was combined with author and researcher Amy Shuen's research and additional studies in her 2008 publication, *"Web 2.0 A Strategy Guide by O'Reilly" (Amy Shuen, 2008 Oreilly Media)* concluding that,

> "AOL helped tip the paid search market to make Google's average U.S. search revenue per query more than triple that of its competitors. Positive network effects explain why the value of AOL's 7-9% market share points were worth as much as $4 billion to Google, "

42. Below are additional highlights from the book that details the impetus and validates the valuation/transaction economics behind Google's $1 billion dollar investment for 5% of AOL that closed in December 2005, a $20 billion valuation.:

i.   "Google is the big winner in online advertising, dominating in the U.S. and internationally. It not only generated the most global online revenue in 2006, but it also grew at nearly two times the rate of its peers."

ii.  "Google's amazing success makes it easy to forget that it faced at least two critical make-or-break junctures"

iii. "A back-of-the-envelope calculation shows why 7% to 9% market share in a tippy market with strong positive effects can be worth $4.45 billion, not just $100 million"

iv.    "By protecting its 7% to 9% of AOL's share of traffic, Google protected all of its 50% of paid search traffic from a precipitous decline in RPS (revenue per search).

v.    "RBC Capital Markets estimated that Google's RPS exceeded Yahoo's by at least 40%.'

vi.    "Looking at simplified numbers may make this easier to see. If the entire industry made $12 billion in total online ad revenue and there were 400 billion inquiries, the industry-wide RPS for 2005 would be .3 cents. Google's ad revenue was $8 billion, and its queries totaled 200 billion. This would imply an RPS of .4 cents for Google and 2 cents for all others. So if Google's share is around 50% at the end of 2005, losing AOL would mean a decline of overall paid search share to 43%. This would have caused the advertiser base to contract in response, as well as the average RPS. If Google fell to a 2 cent RPS as a result of negative network effects and falling out of its dominant leadership position, it would not only lose 28 billion queries at .04 (7% share), but also 172 billion queries at .02 in revenue."

vii.    "An extra $100 million for AOL's traffic is a tiny price to pay for avoiding a possible loss of $4.56 billion in a tippy market in which the leader is just at the 50% point"

viii.    "The tippy market example involving Google, AOL, and Microsoft in 2005."

ix.    "search market shares in 2005 reveal that Google was in a fairly vulnerable position because it was clearly in the battle zone for a tippy market, with AOL playing the swing vote."

x.    " the clearly dominant 50+ market share leader in a tippy and highly networked two-sided market, like the search market, could receive more than 2 times the average revenue per search query compared to search engines such as MSN or AskJeeves"

xi.    "Markets with strong network effects also tend to be "winner-take-all" or "winner-take-most." Even leading companies can be vulnerable to a swing vote of six or seven market-share points.

xii.    "AOL played a decisive role" in "the tippy race between Google, Yahoo!, and Microsoft."

43. April 2005 Piper Jaffray report; "Network Effect Critical in Paid Search'"

"Google benefits from the network effect. "

"The strength of Google and its affiliate network (i.e., AOL AskJeeves) encourages advertisers to join (approximately 200,000) which in turn leads to more affiliates to join"

"network effect" "a key component in the increases in CPC rates"
"Several of Google's partners account for a large percentage of its revenue."

"AOL, accounted for 12% of Google's gross revenues in 2004. "

"Should AOL and other large partners terminate their agreements, Google could face a substantial revenue decline."

"Google's Network websites accounted for 49% of its gross revenues in 2004"

"continuation of key distribution partnerships is crucial to Google's success."

44. According to company documents and testimony of former head of online search and CEO and founder of MySpace.com and Issuer, Issuer had opportunity to run an auction and consummate a new commercial paid search agreement as of at least August 2005 between Google, Yahoo, Microsoft, AskJeeves, or AOL. Yet no action is taken by Intermix to replace the expired Yahoo paid search agreement with a new search auction partnership before September 30, 2005.

45. Google successfully raised $4.4 billion dollars in August 2005 yet despite recommending to KPC's Perkins a News Corp Director that they acquire the company, Google fails to make an offer for Intermix or Myspace's available commercial search agreement partnership.

**Search Contacts of Carlick and Yang fail to materialize in 2005.**

46. Further, since AskJeeves was one of Google's largest partners in Paid Search, both of the interlocked Directors, Carlick or Yang, could have facilitated Intermix's CEO or business development executives to connect with Google and helped facilitatea Search Partnership transaction prior to shareholder vote on September 30, 2005. So both of these men were search

engine market experts and had direct connections with and at the top levels of Google, Inc. to facilitate getting a new Search Engine auction started between Intermix and Google.

47. There is additional 3rd party data evidence that confirms the aforementioned antitrust conspiracy contained in sections A, B, C, D listed below:

## A. 2005 INFLATED TIMEWARNER/AOL COMSCORE

48. TimeWarner/AOL's Comscore ratings, purporting to be the accurate share the company possesses of the online paid search audience share of the market, had been rapidly declining through out 2004 and by March 2005 had dropped to an 8.9% share of the marketplace compared to over 13% in 2004.

49. Inexplicably and against all explanation, TimeWarner/AOL's Comscore ratings reverse the decline trend, and from June through September 2005, each month Time/Warner/AOL reports above 9% share of the marketplace, peaking at 9.9% in July 2005. Then from September 2005 through July 2006, TimeWarner/AOL is able to work with its co-conspirators to manipulate the 3rd party auditing of search share percentage to show a more gradual decline of the ranking of its online search business.

50. This allows TimeWarner/AOL to create a compelling story to get more analysts recommending that institutional investors purchase their stock, increasing the market capitalization of the public company which allows insiders to sell their stock at higher inflated prices and to recognize, earn, and be granted existing and new bonus arrangements. As the NY Times describes the deal:

> "The deal is a coup for Mr. Parsons because less than a year ago, Wall Street and even people within the company were treating AOL as a declining asset and as a drag on Time Warner. The deal is meant to confirm Time Warner's claim that AOL is worth $20 billion, a number man had said was too high."

("TimeWarner To Sell 5% AOL Stake To Google For $1 Billion", Matthew Ingram,December 17, 2005)

51. Approximately a year later, after TimeWarner/AOL loses the benefit of hijacking myspace.com's "share of online searches" to inflate the share of online searches reported by Comscore, and the company has to disclose its true metrics for June 2006 Share of Online Searches (Source: comScore ):

52.  TimeWarner/AOL's "Share of Online Searches" dropped from 9.9% to 5.6%, an over 44% drop which is so staggering and unheard of in the five year history Comscore was tracking "share of online searches" that the only explanation is TimeWarner/AOL had inflated its "share of online searches" back in July 2005.

July 2006 vs. July 2005 (Total U.S. Internet Users☐)

|  | Jul-05 | Jun-06 |  |
|---|---|---|---|
| Total Internet Population | 100% | 100% | |
| Google Sites | 36.5 | 44.7 | |
| Yahoo! Sites | 30.5 | 28.5 | |
| MSN-Microsoft Sites | 15.5 | 12.8 | |
| **Time Warner Network** | **9.9** | **5.6** | |
| Ask Network | 6.1 | 5.1 | |

## B. SUPPRESSION THEN DISAPPEARANCE OF OCTOBER 2005 MYSPACE COMSCORE AUDIENCE REPORTED TO PUBLIC

53. Defendants manipulate what they report to the 3rd party traffic audit companies like Comscore to hide the fast growing MySpace.com unique user audience proving the defendants had been hiding a parallel notdisclosed fast growing Search Engine audience and therefore undisputed asset that had never been disclosed to Intermix shareholders prior to September30, 2005. This is proven by the following facts:

54. In November 2005, Comscore discloses a list of Search engine assets ranked by # of unique users visiting each search websites,for October 2005 showing unique users at top search sites, and Myspace search was listed with 8,083,000 million unique users, ranked #7 to AOL's 36.0 million unique users or about 25% the size of AOL's audience:

OCTOBER 2005- COMSCORE

| | |
|---|---|
| Google | 75,281,000 |
| Yahoo Search | 68,031,000 |
| MSN Search | 49,748,000 |
| Ask Jeeves | 43,705,000 |
| AOL Search | 36,092,000 |
| Yahoo Mail | 20,270,000 |
| MySpace Search | 8,082,000 |

55. Without explanation, MySpace search disappears from Comscore after the October 2005 unique user data is released as Comscore does not disclose future months using the same measure as the one time unique user numbers provided in October 2005, and Comscore posts the remainder of 2005 months with a % share of U.S. audience instead.

56. AOL, IAC's AskJeeves, and Google meanwhile all benefit and increase their % share of U.S. Audience between June 2005 through July 2006. While there is no explanation for how or why MySpace Search has disappeared from Comscore after appearing in Comscore's October 2005 report.

## C. 2006 Re-Introduction of Myspace Search

57. Comscore then without explanation re-introduces MySpace Search in April 2006 and purports it is the first time MySpace Search has possessed sufficient unique users to appear in the Comscore top monthly U.S. share of search market.

|  | Comscore April 2006 |
|---|---|
| Google | 43.1% |
| Yahoo | 28% |
| MSN | 12.9% |
| AOL | 6.9% |
| ASKJeeves | 5.8% |
| MySpace.com | 0.6% |

58. However the evidence proves the defendants actively manipulated and gamed the 3rd party traffic audit firms like Comscore and Nielsen Netratings. Comscore's purported to be accurate April 2006 'MySpace Search' is significantly smaller then the October 2005 'MySpace Search' was.

59. Whats uncontested is that MySpace's overall unique user audience grows steadily and significantly between June 2005 and April 2006. The data and evidence would leave a fact finder to conclude that Comscore has simply redistributed unique users from MySpace Search in October 2005, stopped using the same measure and definition Comscore uses for October 2005, and then effectively transferred MySpace Search unique users to AOL, AskJeeves, and Google to allow these properties to increase their monthly % share of U.S. search market while claiming such increase has come from organic growth, impressing their respective shareholders and the media.

60. Next, the co-defendants attempt to craft the story of the sudden 2006 public

appearance of Myspace's large share of the online search marketplace

i. May 12, 2006 article by John Battelle is released online, "Another Hitwise: Myspace Sends 8.2% of Traffic to Google, Implications,":

"I had an email request from Bambi Francisco. Bambi was curious as to the percentage of traffic myspace.com supplied to the major search engines. After running a few reports, I was somewhat shocked to see that myspace.com was the #1 Upstream provider of traffic to Google, supplying an astonishing 8.2% of all traffic (the net closes provider was MSN @ 4.0%).(for week of May 6, 2006) " and

"Going back to the beginning of last year, Myspace provided less than 1% of all Google traffic. While Myspace.com still doesn't have its own search offering, **the shear volumes of traffic sent to external search engines could be directed internally with the right acquisition and promotion of its own search offering,"**

"There are a lot of other insights in the piece. I've had Myspace again on my mind after talking Weds with Jon Miller, CEO of AOL. The thing that struck me was how Miller mentioned Myspace in the same breath as Google, AOL, Yahoo, Ebay and Amazon. It had made it into the majors as far as he was concerned."

ii. May 22, 2006, Cnet's Anne Broache publishes story, 'Google Retains Lead in U.S. search market."

"For the first time, the search engine operated by the social networking site Myspace.com appeared in the rankings. The company held a distant 6th place in the market share rankings—grabbing only about half a percent—in April, but Comscore indicated it may be worth keeping an eye on the smaller player "due to the site's remarkable popularity.""

61. In June 2006, Comscore releases US Audience for May 2006 for Search engines, listing

i.   Myspace.com Search at 0.7%, up from 0.6% in April 2006
ii.  AOL is listed at 6.7% for April 2006, Ask Network 5.3%, and MSN 12.9%, Yahoo 27.9% and Google 44.1**%.**
iii. Myspace has 53 million Search Queries in May 2006 vs. AOL's 499 million vs AskJeeves' 392 million

62. Google further attempts to craft the explanation for the sudden re- appearance of

Myspace's share of search audience with a June 16, 2006 BusinessWeek Article by Steve

Rosenbush, 'Mining for Gold on MySpace', which states:

"Myspace already drives a huge amount of traffic to search engines. It generates 100 million searches a month. In fact, 5% of all searches on the Web and 8% of all searches on google are originated by people who come directly from MySpace. "

"Myspace the google Enabler?

"According to data collected by Hitwise, an Internet traffic tracking service, nearly 10.8% of Google's traffic was coming from Myspace.com for the week ending July 29, 2006. Had Fox gone with Yahoo or Microosft, it could have been a serious blow to Google.' Now let's step back a minute. Myspace has shot up in traffic over time, but until recently, I never heard any connection suggesting that Google was somehow gaining because of that popularity. Google was popular because it was Google and generated its own weather. Now suddenly, Google might potentially lose 10 percent of its traffic to its site?

That's especially amazing to digest, considering that Google had no search partnership with Myspace at the time. The web search box at Myspace was (and still is for the moment, despite the Google- Myspace deal) powered by Yahoo. If anyone would lose this "massive" amount of traffic, it should be Yahoo. And since Yahoo clearly didn't fight tooth and nail for Myspace, I don't think that search box was generating much.

So how's Google getting all this supposed traffic from Myspace. I don't know ---and Hitwise doesn't seem to know, either. Let's go to the Hitwise post on Myspace traffic: Myspace and Google: what do the Numbers Say?:

In January of this year, Google received a little over 4% of their traffic from MySpace in our U.S. sample. As of the week ending July 29th, that percentage has grown to almost 11%, making MySpace the #1 upstream site for Google."

**COMSCORE IN AUGUST 2006 REVISES ITS DATA**

63. July 18, 2006, Comscore releases new data for June 2006. However, on same day in press release, Comscore provides look back data that revises previous metrics for June 2005, May 2006, and June 2006. This data shows,

|  | *June 2005* | *May 2006* | *June 2006* |
|---|---|---|---|
| Google Sites | 36.9% | 44.2% | 44.7% |
| Yahoo Sites | 30.4% | 28.0% | 28.5% |
| MSN | 15.7% | 13.1% | 12.8% |

| **Time Warner/AOL** | N/A | N/A | **5.6%** |
|---|---|---|---|
| ASK Network | 6.0% | 5.3% | 5.1% |

Comscore pulls the June 2005 data and claims the real data is not available and Replaces it with

a 'N/A', strong evidence that defendant's had indeed manipulated and misappropriated

Myspace's search traffic before the September 30, 2005 Intermix shareholder vote. Several

articles published in the aftermath further confirm the scheme:

i. **August 21, 2006- Comscore Figures Show First Google Decline for Nearly a year, but what to believe?"** (Danny Sullivan SearchEngineWatch.com)

"let's go back to May 2006. Did you know after Comscore released figures, they revised those? There was no big press release about it. It was an asterik mention as part of the June 2006 figures. different? Let's compare."

June 2006 Revised  by Comscore

| "Company | Original | Revised | Difference |
|----------|----------|---------|------------|
| Google | 44.1% | 44.2% | 0.1% |
| Yahoo | 27.9% | 28.0% | 0.1% |
| MSN | 12.9% | 13.1% | 0.2% |
| **AOL** | **6.7%** | **n/a** | **????** |
| ASK | 5.3% | 5.3% | 0.0% |
| **Myspace** | **0.7%** | **n/a** | **????** |
| Others | 2.4% | 9.4% | 7.0%" |

**"AOL is the mystery player, Comscore gave no figure for May 2006. Actually, it did -- 6.7 percent. But the following month, it clawed back that figure, saying:** "Due to a definitional change occuring with June 2006 data, trended data for the Time-Warner Network are not available"

**"Since we don't have a May 2006 figure, we can't tell if the June 2006 figure for AOL -- 5.6 percent -- was a gain from or loss to Google and Yahoo."**

**"Myspace The Search Monster?"**

"Also notice how Myspace disappears off the chart, in the revised figures. What happened?"

"Let's go back to April 2006. That's the first time that out of the blue, we get search figures for Myspace. ComScore told us:

"ComScore told us: 'Myspace.com has been added to the search engine rankings for April 2006, coming in at 6th place with 43 million search queries performed (0.6 percent share of the U.S. search market). "

"Back to Myspace. Last month, BusinessWeek cut loose with a big article about who it was seeking a search suitor, since it was such a big search powerhouse:

'Myspace already drives a huge amount of traffic to search engines. It generates 100 million searches a month. In fact, 5% of all searches on the Web and 8% of all searches on Google are originated by people who come diretly from Myspace.'

**"Wow, pretty stunning numbers. And figures that frankly, I didn't believe. As I wrote in my review:**

"The story also gives new, amazing stats that MySpace generates 5 percent of all searches on the web. Hmm. Just a month ago, this was said to be 0.6% of all searches in the US, according to comScore. And 8 percent of all searches on Google come via MySpace? I'm checking with the BusinessWeek author, because those stats just don't make sense."

**"I did email the reporter, but I never heard back. But five percent of all searches on the -eight percent of all Google searches -- those are incredible numbers, if true.**

'But they seem so untrue when you look at the 100 million figures per month stat that BusinessWeek also gives us. The Ask network --- with a 5 percent share of just US searches -- generates 340 million searchers per month according to comScore. If Myspace really had 5 percent of ALL SEARCHES WEB-WIDE, then it should have far, far more than 300 million searches per month, much less 100 million."

## D. Graphs Confirm Antitrust Scheme Misappropriated Search Audience

64. Graphs of the companies with the largest share of paid search audiences viewed over a 12-18 month period reveal the signatures of manipulation and are confirmatory evidence of the scheme by the co-conspirators. show how Intermix and Myspace search audience was diverted to and counted for benefit of TimeWarner/AOL, IAC/AskJeeves, and Google to inflate and manipulate their search audience share

65. Reviewing the Nielsen Netratings graph created and provided by SearchEngineWatch.com shows:

i.      "Others" online search traffic which included Myspace.com and Intermix online search traffic was diverted to TimeWarner/AOL and AskJeeves starting in July 2005. This caused "Others" share of online search traffic to decrease sharply by August 2005 while TimeWarner/AOL's share of online search traffic increased sharply by August 2005 and AskJeeves' share of online search traffic increased albeit more gradually.

ii.     Google after decreasing each month between May 2005 through August 2005 suddenly has a sharp increase in October and December 2005 as Google also gets the benefit of

all of the diverted search traffic from both TimeWarner/AOL and AskJeeves because both

companies use Google as their paid search partner. (Exhibit #20)

**2005**

66. According to Judge Koh,

" in 2005, after hearing that Google was trying to recruit employees from Apple's Safari team, Steve Jobs (Co-Founder, Former Chairman, Former CEO of Apple) threatened Sergey Brin (Google Co-Founder), stating, as Brin recounted, "if you [Brin] hire a single one of these people that means war." *Id*., Ex. 1871. "

In an email to Google's Executive Management Team as well as Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), Sergey Brin advised: "lets [sic] not make any new offers or contact new people at Apple until we have had a chance to discuss." *Id.*

" on February 18, 2005, Campbell  reported to Apple's Steve Jobs: "Eric told me that he got directly involved and firmly stopped all  efforts to recruit anyone from Apple."[1] ). That same day, Apple's head of HR reported to her staff: "Please add Google to your 'hands- off' list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know. Please also be sure to honor our side of the deal." Harvey Decl., Ex. B [231APPLE073139].

i. "When Google's interests conflicted with Intuit's interests, Campbell demonstrated he was acting in his Intuit capacities, not as a functional employee of Google. When Google recruited Intuit employees, Campbell did not assist Google in the attempt. Instead, Campbell wrote Google's Jonathan Rosenberg, demanding: "Are you guys nuts?" Harvey Decl., Ex. J [GOOG-HIGH TECH-00057458] (emphasis added). Case 5:11-cv-02509-LHK Document 347-3 Filed 03/12/13 Page 9

"The only three direct communications with attorneys are instructive. The first was written by Google's Senior Vice President & General Counsel, Kent Walker, to Schmidt, Brown, Bock, and Campbell (at his intuit.com email address). Mr. Walker sent this email on April 24, 2008,and Google has withheld it in its entirety with the oblique explanation: "Email seeking, containing, and reflecting legal advice of Kent Walker* regarding employment matter."

"In another redacted document, attorney Walker discussed the issue regarding the impact  that competition would have on hiring as a business matter in contemporaneous communications.  (Id.)

**2006**

67.   Google further forced Apple's Steve Jobs to accept the Google desired exclusive

Search default arrangements it sought by taking advantage of its control of the majority of

Apple's Board of Directors,

68. One way this played out was thru the fact the same Board was overseeing an

investigation into Apple senior executives potential securities violations and improper

accounting practices related to CEO Steve Jobs' stock option issuance practices.

69. This was further detailed in an Apple Dec 15, 2006 announcement:

"On October 4, 2006, Apple Computer, Inc. (Apple or the Company) announced that the
special committee of its board of directors had reported its findings after a three month
investigation into Apple's historical stock option practices. Apple initiated this voluntary
independent investigation after a management review discovered irregularities in past
stock option grants."

"The Company and its independent auditors are reviewing the findings of the
independent investigation and recent accounting guidance published by the SEC. As a
result of these reviews, management has concluded, and the audit committee agrees, that
Apple will need to restate its historical financial statements to record non-cash charges
for compensation expense relating to past stock option grants. The Company is in the
process of finalizing its conclusions regarding the amount of such charges, the resulting
tax and accounting impact, and which periods require restatement. Consequently, Apple
was unable to file its Form 10-K for the year ended September 30, 2006 by the required
filing date of December 14, 2006. The Company currently anticipates that the Form 10-K
will be filed on or before the 15th calendar day following the prescribed due date
according to Rule 12b-25, together with its Form 10-Q for the quarter ended July 1, 2006.
"

70. Judge Koh found:

"to support Google's rapid growth, which included hiring "several thousand employees
per year from 2006 to 2009," Google employed "as many as 800 recruiters while also
working with external recruiting agencies." See id., Ex. 25, at 7-8. Google also
determined that "[p]assive sourcing will play an increasingly larger role in recruiting as
we move forward as a company." Harvey Suppl. Decl., Ex. 14 (Google 2006 Sourcing
Diagnostic). "

Further, Defendants appear to have been particularly concerned about their ability to
recruit employees for positions within the Technical Class. For example, shortly prior to
Google's anti- solicitation agreement with Apple, Google determined that it needed to
"dramatically increase the engineering hiring rate." Cisneros Decl., Ex. 1753. Thus,

Google stated that it would "need to drain competitors to accomplish this rate of hiring." *Id.*; *see also* Harvey Suppl. Decl., Ex. 14 (Google 2006 Sourcing Diagnostic) (documenting a large "hiring gap" for engineering positions).

71. Such findings are consistent with Google's employment of a strategy to aggressively target a vulnerable company like Apple by leveraging its recruiting firepower.

72. Also part of the strategy was that Google using its control of a majority of the Apple board could handily acquire the names of all the Apple employees, their roles, the value to the organization such employees held, and their sensitive compensation details. Judge Koh revealed some of the Google directors' roles in this dual director seizure of Apple's Board starting in 2006:

> *"Apple and Google.* In 2006, while Arthur D. Levinson ("Mr. Levinson") sat on the boards of both Apple and Google, these two companies entered into an express "Do Not Cold Call" agreement identical to the "Do Not Cold Call" agreement between Apple and Adobe. *Id.* ¶ 79.

**2007**

73. Judge Koh's findings regarding contact between Google and Apple in early 2007 reflect a key Google strategy playing out, which is that Google despite already having a no poach agreement in place with Apple, has strategically unleashed its third party recruiters against Apple's brower and mobile divisions which is knows will rile Apple CEO Steve Jobs.

74. It also allowed Google to maintain a certain degree of unaccountability when it becomes noticed by passing the blame to the third party recruiters as if they had simply went rogue when contacting Apple's browser and mobile employees to the increasing ire of Steve Jobs.

75. This carrot and stick strategy by Google is designed and indeed ultimately delivers to it the victory over rival Yahoo to lock up a new deal for exclusive default search engine position in all Apple products.

"In February and March 2007, Apple contacted Google to complain about suspected violations of the agreement. In response, Google conducted an internal investigation and reported its findings back to Apple. *Id.* ¶ 84."

"According to an unredacted court filing made public in the civil litigation on Friday, the now-deceased Jobs emailed Schmidt in March 2007 about an attempt by a Google employee to recruit an Apple engineer. Schmidt was also an Apple board member at the time.

"I would be very pleased if your recruiting department would stop doing this," Jobs wrote. Schmidt forwarded Job's email onto other, undisclosed recipients. "Can you get this stopped and let me know why this is happening?" Schmidt wrote. Google's staffing director responded that the employee who contacted the Apple engineer "will be terminated within the hour."

*"Google and Intuit.* In June 2007, Google entered into an express "Do Not Cold Call" agreement with Intuit that was identical to Google's earlier agreement with Apple, and identical to the earlier agreements between Apple and Adobe, and between Apple and Pixar. *Id.* ¶ 103. At this time, Google CEO Eric Schmidt ("Mr. Schmidt") sat on Apple's board of directors, along with Mr. Levinson, who continued to sit on the boards of both Apple and Google. *Id."*

76. Although on this last point, Koh's belief is contravened by multiple sources of evidence including the initial U.S. DOJ complaint filed in 2011 which mentions the no poach was unilateral only, flowing towards Intuit, the Sheryl Sandberg testimony, and the direct testimony of Bill Campbell in his 2013 deposition which is consistent the 2007 arrangement was a one sided unilateral concession made to Intuit,

"Q.   All right.  Was it your understanding that having made that request at the -- your understanding was reciprocal, that Intuit would not do that to Google if Google agreed not to do it to Intuit?

A.   No.

Q.   So it was your understanding that Intuit was free to do what you just described you didn't want Google doing; is that right?

A.   The chances of -- you know, with the science factor that is so high at Google, there was literally no chance that Intuit was going to be able to take, you know -- the overlap was not -- was mostly one way.   In other words, we might have some people that interested them, but we really weren't going to be able to get people into our company when we had, you know, more traditional applications and not science stuff."

77. According to the evidence put into the record in this case, on April 20, 2007

Yahoo's (Croll) emails to Apple Subject: Yahoo/Boomer

> "Agreement – Terms" "Default search setting in the Safari search field, default
> homepage, default bookmarks,
> Default custom toolbar"
> "Default Providers Apple, Google, Yahoo, AOL(?)"
> "Apple Distribution of Safari for Windows"
> "Equal Prominence on the List of Default Providers"
> "Yahoo Distribution of Safari for Windows"
> "5 years". (Exhibit #21)

78. In April 2007, Google learns thru its control of the majority of the Directors sitting on

the Apple Board that Yahoo has provided Apple with a non-exclusive Search partnership for

Safari and counters it by secretly entering into an additional" SERVICES AND

COMPENSATION " agreement with that month which is back dated to 2002.

While the compensation section is redacted, the agreement purports Campbell:

> "will act as an advisor to Google's management and Board of Directors with respect
> to Google's corporate and business strategy. Consultant will also advise Google. on
> issues relating to its organizational development and internal business processes, "
> ("Exhibit #21)

79. May 4, 2007 Yahoo (Croll) email to Apple (Sewell) Subject Search Agreement

> "Thanks for a really productive call this morning. Here is our proposal for the
> Safari agreement" (Ex. UPX1034)

Attaches a non-exclusive License Agreement stating "the Apple Software will provide a

fair means for the user to choose the default search service.."and change the default setting"

80. Google learns of the May 4th meeting between Yahoo and Apple, and Apple's receipt

of a new proposal from Yahoo to be a "non exclusive" search provider for Safari under which

Apple would have no exclusive default search service but instead Apple would "provide a fair

means or the user to choose the default search service and change the default setting"

81. Google counters Yahoo by entering into a new secret agreement with Apple lead director Bill Campbell on May 24, 2007, which it calls an "exempt position of Part Time Google Advisor" providing for more compensation and notably refraining from identifying Campbell's role at Apple despite naming his Intuit role:[1]

> "Conflicting Employment. I agree that, during the term of my employment with Google, I will not engage in any other employment, occupation, or consulting directly related to the business in which Google is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to Google. Google is aware that I provide advice from time to time for other companies and that I currently serve as the Chairman of the Board of Intuit Inc., as well as serving as a member of the boards of other companies. " (Id.)

82. June 1, 2007 Apple (Croll) emailed Google (Shardell) Subject:  "Google/Safari Amendment" which is a non exclusive search agreement:

> "Here is our proposed amendment to the contract which allows end-users the option to choose their search default in Safari." (Ex UPX0677)
> "Amendment Two to Information Services Agreement"
> "Selection off Default Web Search Provider. On ffirst launch or set-up of the Software Apple in its sole discretion may either make Google the default web search provider appearing within the search box of the Software or provide a means for the user to choose the default web search provider." Ex. UPX0678

83. On June 4, 2007 Goog (Shardell) emails to Goog (Sundar) updating him about the negotiations with Apple not only just regarding Google's desire to have its search engine included in Apple's products but also Google's new focus on launching a competing browser to Apple's Safari while using Apple's technology to do so:

> "Net Revenue 2005 $59.9M.

> "Google default (and exclusive) search provider in Safari browser"

---

[1] "You are being offered employment at Google based on your personal skills and experience, and not due to your knowledge of any confidential, proprietary or trade secret information of a prior or current employer. Should you accept this offer, we do not want. you to make use of or disclose any such information or to retain or disclose any materials from a prior or current employer. "

"50% Net Revenue Share"
"Term through January 2008"
"Strategic considerations with respect to supporting PC version of Safari vis a vis Chrome launch plans"
"Revenue share seems rich for non-default and non-exclusive deal"

84. This internal email reveals a key dispute that is playing out between Google and Apple while revealing the increasing fact that Apple recognized by this time Google was a fierce competitor seeking to compete against Apple in the web browser market as Shardell reports to Sundar "Key issues" that include "Apple uncooperative vis a vis Google's efforts on Chrome utilizing their open source platform".

85. June 6, 2007, Goog (Braddi) emails Apple (Phil)

"in our effort to bridge the gap in term length extension desired by apple we wish to propose the following"
"Mac Safari browser". "extend term length" "until (redacted) 2009")
"iPhone search" "2010"
"Windows Safari browser" "2007 or until (redacted 2008)
"We could have done this better if we had more time and not just a few days to consider the extension and the added products. This extension gives us another (redacted) months with our current Mac Safari relationship, adds the iphone to the scope of the agreement and for a term of (redacted) yrs from now and gives us both one year to test the Windows browser or Apple users"

**Unilateral No Poach Intuit: Third Bill Campbell Benefit Received Over Two Months**

86.   Judge Koh notes Bill Campbell's on June 6th "insisted" to have Intuit added to the Google no poach agreement:

"Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google) also insisted that Google and Intuit enter into a non-compete agreement. Although Google's "non-solicit policy" initially "cover[ed] only 18 Intuit employees," "Bill [Campbell] requested that Intuit be added fully to the Do Not Call list." Id., Ex. 31 (email, dated June 6, 2007, between Arrnon Geshuri (Google Recruiting Director) and Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO)). Thus, by June 12, 2007, Intuit was added fully to the list. Id., Ex. 26; id. Ex. 30 ("please update the DNC list to now include Intuit 100% do not call."); see also Decl. of Dean Harvey ("Harvey Decl."), Ex. 25 at 13, ECF No. 248 (stating that "Google's [Do Not Cold Call] policy for Intuit began in April 2006 and was broadened in June 2007 to include all Intuit employees."). "  (Id.)

32

87.  What Judge Koh did not realize at the time is that Bill Campbell was able to extract this benefit from Google as an economic concession, a payment benefit for Campbell's work inducing Apple's Jobs to agree to direct his team to stand down from continuing to press for a non exclusive no default search provider structure, to stop exploring closing a search partnership with Yahoo, and to accept Google's sent on June 6th Search engine exclusive default for Apple's Safari browser terms.

88.  Critically, the benefit Google granted to Intuit at Intuit Chairman Campbell's insistence on June 6th was a unilateral agreement. Supporting this fact was the testimony of Sheryl Sandberg who explained in a 2013 deposition the difference between the first limited no poach arrangement she had put in place with Intuit in 2006 while working at Google covering a small group of individuals as opposed to the 2007 arrangement:

> "5. In approximately April 2006, while employed at Google, I led the team that was involved in exploring potential partnership opportunities with Intuit, Inc. ("Intuit"). As a precursor to those discussions, Google agreed, at Intuits request, 'to not solicit the Intuit employees who would be involved in the discussion and/or the potential partnership. I do not recall the specific number of employees from Intuit who were covered by this agreement, but I believe it was less than twenty employees.
>
> 6. I understand Plaintiffs allege that, approximately a year later, in 2007, Google placed all Intuit employees on a firmwide "Do Not Cold Call" list and instructed Google employees not to solicit employees from Intuit. To the best of my recollection, I was not involved in the alleged 2007 decision to add Intuit to an alleged "Do Not Cold Call" or similar list. To the best of my knowledge, the alleged decision was not taken as a result of, or in connection with, my team's work in 2006 in exploring a partnership between Google and Intuit."

89. Koh further found:

> "these agreements were negotiated by a small group of intertwining high-level executives at the Defendant firms. For example, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) was personally involved in Apple's anti-solicitation agreements with Adobe, Google, and Pixar. With regard to Apple's agreement with Google, Mr. Jobs contacted Sergey Brin (Google Co-Founder) directly, which led Mr. Brin to recognize that "[b]asically, [Mr. Jobs] said 'if you hire a single one of these people that means war.'" Cisneros Decl., Ex. 1871. The next day, Bill Campbell

33

(Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), a friend of Mr. Jobs, informed Mr. Jobs that "Eric Schmidt told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple." Cisneros Decl., Ex. 199. Moreover, it was upon Mr. Campbell's suggestion that Google agreed to enter into its anti-solicitation agreement with Intuit, of which Mr. Campbell was Board Chairman. Cisneros Decl., Ex. 597. "Case5:11-cv-02509-LHK Document771 Filed03/28/14 Page5 of 8

i.     Judge Koh also found,

"the same small group of intertwining high-level executives were involved in strictly enforcing the agreements. For example, when a Google recruiter contacted an Apple engineer, Steve Jobs (Co- Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) forwarded the message to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO), who had the recruiter terminated within the hour. *Id.* at 36. Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google) similarly emailed Sergey Brin (Google Co-Founder), stating that "Steve Jobs called me again and is pissed that we are still recruiting his browser guy." *Id.* at 36.

Moreover, Judge Koh determined,

"there is evidence that the Defendants shared confidential compensation information with each other despite the fact that they considered each other competitors for talent. For example, Adobe saw itself as in a talent war with Google and Apple and that Adobe was in a six-horse compensation race against Google, Apple, Intuit, and three others. *Id.* at 47. Apple also viewed Google and Intel as peer companies in terms of competition for talent. *Id.* at 48. Adobe benchmarked its compensation against Google, Apple, and Intel, while Google compared its compensation to Apple, Intel, Adobe, and Intuit; and Intel benchmarked against Apple and Google. *Id.* at 47-48. "

Judge Koh states for the record,

"For instance, when a recruiter from Google's engineering team contacted an Apple employee in 2007, Steve Jobs forwarded the message to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) and stated, "I would be very pleased if your recruiting department would stop doing this." *Id.*, Ex. 24. Google responded by making a "public example" out of the recruiter and "terminat[ing] [the recruiter] within the hour." *Id.* The aim of this public spectacle was to "(hopefully) prevent future occurrences." *Id.*; *see also* Cisneros Decl., Ex. 1869 (email from Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google) to Sergey Brin (Google Co-Founder), stating "Steve just called me again and is pissed that we are still recruiting his browser guy."); Shaver Decl., Ex. 25 (email from Steve Jobs to Eric Schmidt) ("I am told that Googles [sic] new cell phone software group is relentlessly recruiting in our iPod group. If this is indeed true, can you put a stop to it?").

ii.    Judge Koh notes the harm that came from the scheme:

"By "prevent[ing] future occurrences" of Google's recruitment of Apple employees, see Shaver Decl., Ex. 24, Apple employees were deprived of learning about potential job opportunities at Google from more than 800 Google recruiters, as well as Google's external recruiting agencies. See Harvey Decl., Ex. 25, at 7-8. In fact, Google even declined to hire some former Apple engineers after Steve Jobs let it be known that he'd "strongly prefer that [Google] not hire these guys." Cisneros Decl., Ex. 653.

iii.   Judge Koh notes:



From August 29, 2006, to July 31, 2009, when ▮▮▮▮▮▮▮▮▮▮▮ Eric

Schmidt was Google's CEO and sat on the boards of both Apple and Google. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pls. Ex. 14,

Apple, Form 8-K (Aug. 31, 2006) (appointment of Eric Schmidt (CEO, Google) to the Board of

Directors); Pls. Ex. 15, Apple, Schedule 14A, Proxy Statement & Notice of 2010 Annual

Meeting of Shareholders (Dec. 23, 2009).

90. June 8, Apple (Phil) emails Google

"we will move forward to extend the deal with the terms you proposed" (Exhibit #23)

i. June 8, Google (Braddi) emails team

"Pls ensure the language is clear wrt default -ensure there are not 2 versions of the browser for example (ie an option with Y to get around the default and payment issue).

92. The evidence regarding the role of Bill Campbell and the no poach agreements including the

emails sent between Apple CEO Steve Jobs, Google, and Campbell contradicts the 30(b)(6)

testimony of Eddie Cue which incorrectly states:

57. The ISA and the amendments thereto have been negotiated at arms-length, with Google and Apple each making compromises to reach an agreement that the parties deem mutually beneficial. Cue (Apple) Tr. 99:2-100:12 (Ex. 2); Apple 30(b)(6) (Cue) Tr. 127:15- 128:9 (Def. Ex. 3).

93. Evidence shows Google also was able to secure the Comcast search exclusive default position by agreeing to provide the economic benefit of a no poach agreement starting no later then 2007. (see Exhibit #24)

| | |
|---|---|
| From: | Tim Carter Redacted@google.com> |
| Sent: | Thursday, April 28, 2011 12:20 PM |
| To: | Chris Barton Redacted@google.com> |
| Cc: | Anne Laurenson Redacted@google.com>; Steve Cheng Redacted@google.com>; John Lagerling Redacted@google.com>; Nick Solaro Redacted@google.com>; Hugo Barra Redacted@google.com> |
| Subject: | Re: Platforms |

# Redacted

On 26 April 2011 16:56, Chris Barton Redacted@google.com> wrote:
Tim,

America Movil, Verizon, and AT&T were all examples of large carriers that wanted to ship without Google ... and did. AT&T shipped Yahoo on Android phones. Verizon shipped Bing. America Movil shipped Yahoo. We need to incentivize carriers to ship Google by using the same approach we at Google have used for many years: "We will pay you revenue share in return for exclusive default placement". This contract is an exchange.

We have used this type of exchange in syndication deals (AOL, Ask Jeeves), Toolbar deals (Real Networks, Adobe), PCOEM deals (Dell, Sony), and numerous mobile deals for many years.

Without the exclusivity, we are not "getting" anything. Without an exclusive search deal, a large carrier can and will ship alternatives to Google (as seen with Verizon, AT&T, and America Movil).

Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic to Google. You can bet that Microsoft and Yahoo will enter contracts for search on Android through carrier deals if we do not.

Chris

Ex. No.