# EXHIBIT F

Google Confidential



**GOOGLE MOBILE
REVENUE SHARE AGREEMENT**

| Google | **Google LLC**<br>**Google Asia Pacific**<br>**Pte. Ltd.**<br>**Google Ireland Limited**<br>**Google Commerce**<br>**Limited**<br><br>*Address for Legal*<br>*Notices:* | **Mobile Partnerships:** Tristan Wang<br>**Partner Engineering:** Alan Huang<br>**Google Legal:** Michael Klepich |
|---|---|---|

**COMPANY CONTACT DETAILS**

| | Company Contact Information: | Company Technical Contact: | Company Legal Notices to: |
|---|---|---|---|
| **Attention:** | **William Dowie** | **Paul Wang** | **Overseas Legal Counsel** |
| **Title:** | **Head of Partnerships** | **Assistant Head of ROM Development Dept.** | **Overseas Legal Counsel** |
| **Address, City, State, Postal Code, Country:** | | | |
| **Phone:** | | | |
| **Fax:** | | | |
| **Email:** | William Dowie @oneplus.com | Paul Wang @oneplus.com | contract@oneplus.com,<br>CC:<br>legal@oneplus.com |

**Effective Date:** February 1, 2020

1

*Google Mobile Revenue Share Agreement*





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416651

**EXHIBIT 626-001**

Google Confidential

---

**Term**: Starting on the Effective Date and continuing for a period of two (2) years from the Effective Date ("**Initial Term**").

**Renewal Term**: This Agreement will automatically renew for a period of one (1) year upon expiration of the Initial Term ("**Renewal Term**"), unless either party notifies the other in writing of its intent to not renew the Agreement no later than sixty (60) days prior to the expiration of the Initial Term. The Initial Term and the Renewal Term are collectively referred to herein as the "**Term**."

---

This Google Mobile Revenue Share Agreement, including all attachments (collectively referred to as the "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made between:

**GOOGLE LLC**, organized in the state of Delaware, **GOOGLE ASIA PACIFIC PTE. LTD.**, organized in Singapore, **GOOGLE IRELAND LIMITED**, organized in Ireland, and **GOOGLE COMMERCE LIMITED**, organized in Ireland (In this Agreement, "**Google**" will mean Google LLC, Google Asia Pacific Pte. Ltd., Google Ireland Limited, and/or Google Commerce Limited as the context requires.), on the one hand; and

**ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD**, business address at 18/F, Tower C, Tai Ran Building, No. 8 Tai Ran Road, Futian District, Shenzhen, a company duly registered under the laws of the People's Republic of China ("**Company**"), on the other hand.

**BACKGROUND**

A.  Company desires to receive, and Google wishes to share, portions of Ad Revenue and, as applicable, Play Transaction Revenue from Company's Android phones and tablets, as set out in the Agreement below;

B.  Company is willing to ensure on its Android phones and tablets an enhanced experience for end users, which results in monetization opportunities for Company, as set out in the Agreement below; and

C.  Nothing in this Agreement is intended to restrict Company from entering into revenue sharing agreements with other parties that are not in violation of this Agreement, or to restrict end users from installing or using alternatives to the Google Applications on Company's Android phones and tablets.

**AGREEMENT**

**1.    DEFINITIONS**

1.1    "**Active Device**" means on or after the applicable Launch Date, an Optimized Device or Premier Device that has checked-in to Google servers via Google Applications at least once in the 28 days before the Measurement Date (Security) (as defined in Section 1.22).

1.2    "**Ad**" means an advertisement served by Google to an End User under this Agreement.

1.3    "**Ad Revenues**" means any and all revenues that Google and its Affiliates recognize in accordance with GAAP in any period during the Term from an Ad that appears on a Results Page and for which revenue is recognized on the basis of an End User's click on the Ad (cost per click, or CPC).

2

Google Mobile Revenue Share Agreement

Google Confidential

1.4 "**Affiliate(s)**" means, with respect to Google or Company, any current or future company controlling, controlled by, or under common control with Google or Company, as the case may be, where "control" means ownership, directly or indirectly, of the shares of a company representing fifty percent (50%) or more of the voting rights in such company for the portion of the Term during which such company meets this criteria.

1.5 "**Alternative Assistive Service**" means any assistive service that is substantially similar to Google Assistant (as determined by Google in its sole discretion).

1.6 "**Alternative Functions**" means any applications, features, or functionality that are substantially similar to the following (as determined by Google in its sole discretion): Chrome Browser, Communications Suite, Gboard, Gmail, Google Calendar, Google Discover, Google Lens, Google News, Google One, Google Pay, and Google Podcasts. Alternative Functions may be changed by Google with 90 days in its sole discretion with prior notice to Company.

1.7 "**Alternative Play Service**" means any service that is substantially similar to Google Play (as determined by Google in its sole discretion).

1.8 "**Alternative Search Service**" means any search service that is substantially similar to Google Search (as determined by Google in its sole discretion).

1.9 "**Alternative Service**" means any Alternative Search Service, Alternative Visual Search Service, Alternative Assistive Service, Alternative Play Service, or Alternative Functions.

1.10 "**Alternative Visual Search Service**" means any visual search service that is substantially similar to Google Lens, excluding such a service that: (a) is solely developed, branded, owned, and made available by Company only for Devices, and (b) does not incorporate or rely upon any third-party commercial or consumer service (in each case as determined by Google in its sole discretion).

1.11 "**Android**" means the open-source application framework, libraries, runtime, and kernel which are published at http://android.googlesource.com (or successor sites) as integrated in accordance with the instructions published at https://source.android.com (or successor sites), and any software development kits (SDK) made available at http://developer.android.com (or successor sites).

1.12 "**Android Compatible Device(s)**" means, for each version of Android, phones and tablets that comply with the Android Compatibility Definition document, which can be found at the Android compatibility website (http://source.android.com/compatibility (or successor sites) and which may be updated from time to time).

1.13 "**Application Dock**" means the collection of applications on the bottom row of the Default Home Screen which is also visible in the same location and format on all screens (except on the Minus One Screen) regardless of End User's subsequent swipes to the left or the right.

1.14 "**Assistant Access Point**" refers to the following points on a Device (which Google may update in its sole discretion): the Google Assistant app, Google.com (or the applicable local country Google domain), the assist intent when invoked via long press on the home button or via a hardware or other physical affordance on the Device, the Google Gesture, the Google Hotword, the Google Search Application, and Messages (if preloaded); and excludes points on any other Google, Company, or third-party service or applications.

1.15 "**Authorized SOC**" means a system-on-a-chip manufacturer.

1.16 "**Basic Device**" means a Device that meets the requirements set out in Section 4.1.

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416653

**EXHIBIT 626-003**

Google Confidential

1.17 "**Chrome Browser**" means the machine-readable binary code version of the Google Chrome browser.

1.18 "**Client Application**" means any application, plug-in, helper, component, or other executable code that runs on an End User's Device.

1.19 "**Client ID(s)**" means the unique alphanumeric code(s) that Google or a carrier provides to Company pursuant to this Agreement that is used to identify Ad Revenue on Devices or Play Transaction Revenue on Premier Devices.

1.20 "**Communications Suite**" means the portfolio of Google's proprietary communications applications comprised of Messages, Contacts, Google Duo, and Phone (with associated software).

1.21 "**Compliance Target (Letter)**" means that, as measured 120 days after the applicable Release Date ("**Measurement Date (Letter)**"), for at least 90% of Device Models (rounded up to the nearest whole number) of Active Devices, at least 25% of the Active Devices of the applicable Device Model have had a Letter Upgrade performed, unless otherwise agreed with Google in writing. As an illustrative example only, if on the Measurement Date (Letter), Company has released 11 Device Models of Active Devices, for no fewer than ten of those Device Models at least 25% of the Active Devices that make up such Device Model must have had a Letter Upgrade performed.

1.22 "**Compliance Target (Security)**" means that, as measured on the 28th day of a particular calendar month ("**Measurement Date (Security)**"), for each Device Model of Active Premier Devices, at least 25% of the Active Premier Devices of the applicable Device Model have had a Security Update performed with a security patch level no more than 90 days old as at the Measurement Date (Security).

1.23 "**Contacts**" means Google's contacts management Android application.

1.24 "**Deduction**" for any period during the Term means twenty percent (20%) of Ad Revenues or twenty percent (20%) of Play Transaction Revenues, as applicable, for such period.

1.25 "**Default Functions**" means the following applications, features, or functionality offered by Google: Chrome Browser, Gboard, Gmail, Google Assistant, Google Calendar, Google Discover, Google Lens, Google Pay, Google Play, Google Search app. Messages, and Phone (Dialer). Default Functions may be changed by Google in its sole discretion with 90 days prior notice to Company.

1.26 "**Default Home Screen**" means the layout(s) of icons and widgets (prior to any changes made by End User) that are visible across all display(s) on a Device immediately after a Launcher starts, including the lock screen and/or the notification tray. For clarity, if a Device has multiple displays, then such Device has (1) multiple Default Home Screens if it has multiple layouts such as a foldable device; and (2) only one Default Home Screen if it only has a single layout across multiple displays.

1.27 "**Destination Page**" means any web page (or equivalent) which may be accessed by clicking on any portion of any Valid Result or Ad.

1.28 "**Device**" means each Android Compatible Device manufactured by Company or a Company Affiliate and approved by Google that is sold or distributed during the Term under the MADA or, for Devices distributed in the EEA, the EMADA.

1.29 "**Device Model**" refers (1) on and after April 1, 2020 (or a later date, in which case Google will

4



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416654

**EXHIBIT 626-004**

Google Confidential

provide Company with a written notice no later than January 31, 2020), to "Product" as defined in the Google Mobile Services (GMS) Requirements found at https://support.google.com/androidpartners_gms/answer/7351400, as may be updated from time to time, and (2) prior to April 1, 2020, to a Device as it is sold and marketed to the End User.

1.30 "**EEA**" means those countries set forth in https://support.google.com/androidpartners_gms/answer/9071728 (or such other URL as may be provided by Google from time to time).

1.31 "**EMADA**" means, for Devices distributed within the EEA, the current and effective European Mobile Application Distribution Agreement entered into between Google and Company (including any related amendments or extensions).

1.32 "**End User**" means a human end user of a Device.

1.33 "**Fraudulent Act**" means an act which (a) directly or indirectly generates queries, actions, impressions of, or clicks on Valid Results or Ads through any automated, deceptive, fraudulent, or other invalid means (including, click spam, robots, macro programs, and Internet agents); or (b) encourages or requires End Users or any other persons, either with or without their knowledge, to take actions regarding Ads through any methods that are manipulative, deceptive, malicious, or fraudulent (including by either clicking on Ads or offering incentives that, in any such case, are manipulative, deceptive, malicious, or fraudulent).

1.34 "**Gesture**" means a specific movement-activated trigger that enables movement commands on a Device which can be provided by either Google (a "**Google Gesture**"), Company (a "**Company Gesture**"), or a third party.

1.35 "**Gmail**" means the email service offered by Google.

1.36 "**Google Applications**" means the machine-readable binary code version of the Google applications found at https://support.google.com/androidpartners_gms/topic/9159858 (or such other URL as may be provided by Google from time to time).

1.37 "**Google Assistant**" means the assistive service offered by Google that may be accessed or invoked from a Device via the Assistant Access Points.

1.38 "**Google Calendar**" means the service offered by Google for managing calendars.

1.39 "**Google Discover**" (formerly known as Google Feed) means the service offered by Google that collates and presents certain information and content to the End User on their Device, which may include information and content drawn from the End User's search history and topics selected by the End User to follow.

1.40 "**Google Duo**" or "**Duo**" means the video calling application offered by Google.

1.41 "**Google Keyboard**" or "**Gboard**" means the keyboard application offered by Google for Android.

1.42 "**Google Lens**" means the visual search service offered by Google.

1.43 "**Google News**" means the application offered by Google that offers End Users access to breaking news stories.

1.44 "**Google One**" means the subscription service offered by Google that includes cloud storage

5



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416655

**EXHIBIT 626-005**

Google Confidential

and other subscription member benefits.

1.45   "**Google Pay**" means the services offered by Google that facilitate in-store payments (and/or other NFC transactions), in-app remote payments, and peer-to-peer payments. Google Pay functionality may be accessed from the Google Pay application or via various methods on an Android-operated device, including via a Google Pay wallet shortcut, a hardware shortcut (such as a long press on the device power button), a unique gesture with the device, or locational proximity of the device to a compatible NFC reader.

1.46   "**Google Photos**" means the photo and video gallery application offered by Google.

1.47   "**Google Photos OEM APIs**" means the Google-provided application programming interfaces relating to Google Photos that are intended to (1) enable device OEMs to badge, edit, and interact with non-standard photos and videos, and (2) enable End Users to select certain Google Photos photo filters directly through Company's camera application on the Photos Devices (or as otherwise set out in the relevant API documentation provided by Google from time to time), and (in each case of (1) and (2)) that are provided to Company from time to time by Google.

1.48   "**Google Play**" means the marketplace created and operated by Google, by which digital content, media, and services, including apps, games, books, magazines, video, music or other digital content, media, and services (including subscriptions) are distributed. Google reserves the right to re-name such marketplace from time to time.

1.49   "**Google Podcasts**" means the services offered by Google for accessing spoken audio that may be accessed from the Google Podcasts app, Google Search, Google Assistant, Google Discover, Google Podcasts for web, hyperlinks, or other distribution mechanisms.

1.50   "**Google Product Geo Availability Chart**" means the list of Google Applications and associated information (including geo-availability) set out at https://docs.google.com/spreadsheets/d/1fyVh5eQCdPy2tX4JpwH3uMIukDoWy-RsFWrxgaXk_w4/edit#gid=1812606466 (as such URL may be changed or replaced by Google at its sole discretion from time to time).

1.51   "**Google Search**" means the search and advertising services offered by Google at Google.com (or another domain owned by Google or its Affiliates at which a similar service is offered) that may be accessed from the Google Search Application, the Chrome Browser, the Google-provided widget (through which Google Lens and the Google Assistant may be accessed), third-party browsers, keyboards, and Launchers of a Device.

1.52   "**Google Search Application**" means the Google application that includes the following services or features (which Google may update from time to time in its sole discretion): (1) access to Google Search via the Google Search service icon and Google Discover and/or its successors; (2) handling of voice searches and search intents; and (3) access to the Google Assistant.

1.53   "**Hotword**" means a voice-activated trigger that enables voice commands on a Device which can be provided by either Google (a "**Google Hotword**"), Company (a "**Company Hotword**"), or a third party.

1.54   "**including**" means "including without limitation."

1.55   "**Intellectual Property Rights**" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, and any and all other proprietary rights, as well as, any and all applications,

6

Google Mobile Revenue Share Agreement



GOOG-PLAY-000416656

**EXHIBIT 626-006**

Google Confidential

renewals, extensions, restorations, and reinstatements thereof, now or hereafter in force and effect worldwide.

1.56 "**Launch**" means the initial distribution of a Device Model in accordance with the terms of this Agreement.

1.57 "**Launch Date**" means, for any Device Model, the first date on which at least five thousand (5,000) Devices of any Device Model have checked into Google servers via the Google Mobile Services (GMS) applications.

1.58 "**Launcher**" means a user interface that is (1) initiated by the KEYCODE_HOME key event in Android (e.g. pressing on the "home" button or any applicable gesture intended to invoke the Default Home Screen), or (2) started after initial boot-up or subsequent power up of the Device.

1.59 "**Letter Upgrades**" means installation of the then latest version of Android made available by Google at http://source.android.com (or any successor sites).

1.60 "**Liability**" means any liability, whether under contract, tort, or otherwise, including for negligence.

1.61 "**MADA**" means the current and effective Mobile Application Distribution Agreement entered into between Google and Company (including any related amendments or extensions).

1.62 "**Messages**" means Google's Standard Based Messaging Application that may be used to receive and send standards-based messages (including SMS, MMS, and RCS messages).

1.63 "**Minus One Screen**" means the screen accessed by the End User by swiping their finger once from left to right on the Default Home Screen.

1.64 "**Net Ad Revenue**" means Ad Revenue minus the Deduction for such period.

1.65 "**Net Play Transaction Revenue**" means Play Transaction Revenue minus the Deduction for such period.

1.66 "**Optimized Device**" means a Device that meets the requirements set out in Section 5.1.

1.67 "**Phone**" means Google's voice calling application.

1.68 "**Play Transaction**" means the purchase of individual third-party applications, games, and in-app purchases made by an End User within the Google Play application installed on a Device. For the sake of clarity, a Play Transaction does not include (1) any first- or third-party subscription service purchased through Google Play (including Play Pass), (2) purchases made using direct carrier billing or gift cards, (3) purchases made using any type of loyalty program (e.g., loyalty credits or points), promotional credits or coupons, (4) any subscriptions for Google's Stadia cloud gaming service and Google One, or (5) purchases of any movies, TV shows, video, books, magazines, news, or content. Additionally, Play Transaction Revenue does not include any revenue generated from advertising in Google Play.

1.69 "**Play Transaction Revenues**" means gross amount spent by end users on Play Transactions through the Google Play app on Optimized Devices and Premier Devices *less* (1) applicable Transaction Taxes; (2) adjustments, refunds, chargebacks and reversals; and (3) the portion paid to developers.

1.70 "**Plus One Screen**" means the screen accessed by the End User by swiping their finger once from right to left on the Default Home Screen.

7



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416657

**EXHIBIT 626-007**

Google Confidential

1.71    "**Premier Device**" means a Device that meets the requirements set out in Section 6.1.

1.72    "**Query**" means any End User query input through a Search Access Point or an Assistant Access Point.

1.73    "**Release Date**" means any day during the Term on which Google makes available the then latest version of Android at http://source.android.com (or any successor sites).

1.74    "**Results Page**" means the results page rendered through the Search Access Points and the Assistant Access Points in response to a Valid Query but does not include (1) any Google-owned and -operated site or application (e.g., YouTube, Google Maps, etc.) that runs within Google.com or the applicable Google local country domain, and/or (2) any site or application that is linked to from a results page.

1.75    "**Search Access Point**" means the places on a Device, which Google determines in its sole discretion and specifies in writing (as may be modified from time to time via written notice by Google), that are capable of utilizing or invoking Google Search, including those access points listed in Attachment B for Basic Devices, and if Company configures Devices as Optimized Devices, those access points listed in Attachment C, and if Company configures Devices as Premier Devices, those access points listed in Attachment D.

1.76    "**Search Launcher Services API**" means API and library sets provided by Google to enhance Google Search Application features on Devices or successor APIs and library sets as designated by Google.

1.77    "**Security Updates**" means installation of every element of a Google-approved security patch on a Device as set out in https://source.android.com/security/bulletin (or successor sites) such that all common vulnerabilities and exposures identified by Google and posted in the public security bulletin for the date of the update, are fixed, unless otherwise approved by Google in writing.

1.78    "**Service Access Point**" means an Assistant Access Point, a Search Access Point, or, for Optimized Devices and Premier Devices, the Google Play application.

1.79    "**Shared Net Ad Revenue**" means Shared Net Basic Ad Revenue for Basic Devices, and if Company complies with the requirements to receive Shared Net Optimized Ad Revenue or Shared Net Premier Ad Revenue on a Device-by-Device basis, such revenue as applicable.

1.80    "**Shared Net Basic Ad Revenue**" has the meaning set forth in Attachment A.

1.81    "**Shared Net Optimized Ad Revenue**" has the meaning set forth in Attachment A.

1.82    "**Shared Net Optimized Play Transaction Revenue**" has the meaning set forth in Attachment A.

1.83    "**Shared Net Play Transaction Revenue**" has the meaning set forth in Attachment A.

1.84    "**Shared Net Premier Ad Revenue**" has the meaning set forth in Attachment A.

1.85    "**Shared Net Premier Play Transaction Revenue**" has the meaning set forth in Attachment A.

1.86    "**Standards-Based Messaging Application**" means an Android Application that enables standards-based messaging (i.e., standards-based messaging services provided (by Telecom Operators, historically) to End Users including SMS, MMS, and RCS).

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416658

**EXHIBIT 626-008**

Google Confidential

1.87 "**Taxes**" means all government-imposed charges, including taxes, duties, imposts, and withholdings, but not taxes based on Google's or Company's net income, net worth, asset value, property value, or employment.

1.88 "**Telecom Operator(s)**" means a company that provides wireless service that allows End Users to access the Internet.

1.89 "**Territory**" or "**Territories**" means the country or countries in which distribution of one or more Google Applications is permitted as set forth in the Google Product Geo-Availability, which Google may update in its sole discretion, except that Turkey will not be a Territory.

1.90 "**Transaction Taxes**" means Taxes that are imposed on the purchase price or cost of goods or services, including value-added taxes (VAT), goods and services taxes (GST), sales taxes, and transfer taxes.

1.91 "**Valid Query**" means a Query received by Google which: (1) contains the applicable Client ID as specified by Google to Company; (2) is not generated by any Fraudulent Act, as reasonably determined by Google; and (3) has not been modified, deleted, or appended in whole or in part by Company except as technically required in order to fulfill the obligations of this Agreement.

1.92 "**Valid Result**" means a search or assistive result(s) on a Results Page that results from a Valid Query as determined solely by Google.

2. **SCOPE**

2.1 Company will ensure that all Devices that Company sells or distributes in the Territory, and all Devices that Company's Affiliates sell or distribute in the Territory, meet the requirements of a Basic Device (as set forth in Section 4.1), except for Devices distributed solely in Russia where Company and/or Company's Affiliates may choose on a Device-by-Device basis whether to configure a Device as a Basic Device. Subject to Section 13.1 (Shared Revenue), Company may choose on a Device-by-Device basis to configure a Basic Device so that it meets the additional requirements for an Optimized Device (as set forth in Section 5.1) or a Premier Device (as set forth in Section 6.1). For the avoidance of doubt, Company is under no obligation to configure any Basic Device so that it meets the additional requirements of an Optimized Device or a Premier Device.

2.2 Company is responsible for all acts and omissions of Company Affiliates in connection with Devices, as though such acts and/or omissions were carried out by Company itself. For the sake of clarity, any act or omission of a Company Affiliate that would be a breach of this Agreement if carried out by Company, will be deemed to be a breach of this Agreement by Company.

3. **SET UP REQUIREMENTS**

3.1 In respect of any Device under this Agreement, Company must meet the following requirements (the "**Setup Requirements**"):

(a) correct implementation on the Device of the appropriate Client ID(s) in compliance with the following:

Google may provide Company with more than one Client ID (e.g., for Basic Devices, Optimized Devices, and Premier Devices (where applicable) for each of Google Search, Google Assistant, Google Play, etc.). To ensure correct payment of applicable type(s) of shared revenue, Company will (i) ensure that the appropriate Client ID(s) for a particular Device is/are correctly implemented (as instructed by Google) on such

9

Google Mobile Revenue Share Agreement



GOOG-PLAY-000416659

**EXHIBIT 626-009**

Google Confidential

Device prior to its distribution, and (ii) use the applicable Client ID(s) for all Valid Queries. Upon request by Company's Telecom Operator partners, Company may implement such Telecom Operator's Client ID(s) in place of Company's Client ID(s). If a Device includes both Telecom Operator Client IDs (e.g. for Google Search) and Company Client IDs (e.g. for Google Assistant or Google Play), then any payments under this Agreement for the shared revenue associated with each Client ID will be made to the applicable party (i.e. Company or Telecom Operator) to whom each Client ID has been assigned. Google may modify Client IDs from time to time in its sole discretion upon notice to Company, and Company will implement the modified Client ID(s) on all applicable Devices within 60 calendar days after Google's notice to Company, including Devices already distributed if necessary at Google's request and with Google's approval. For the sake of clarity, Company may not change the Client ID(s) assigned by Google without Google's prior written instruction or consent, may only implement Client IDs on Devices as instructed by Google, and may not add new Client IDs to any devices other than the Devices; and

(b)     correct implementation on the Device of (i) the Search Launcher Services API to ensure support for (1) Google Discover on Minus One Screen, (2) Google Hotword and (3) search interface prewarming, and (ii) the applicable setup screens in connection with the out-of-box experience, in accordance with guidelines and instructions provided by Google.

## 4.     BASIC DEVICE

4.1     **Device Requirements**. For any Device to qualify as a Basic Device, and for Company to receive Shared Net Basic Ad Revenue for such Device under this Agreement in accordance with Section 13 and Attachment A, the following requirements must be met:

(a)     Company must comply with all Setup Requirements (as set forth in Section 3.1);

(b)     The Device must comply with all requirements set forth in Attachment B (Basic Service Access Points); and

(c)     The Device must comply with Section 4.2 (Basic Device Configuration).

4.2     **Basic Device Configuration.** Company will not and will not allow any third party to do any of the following with respect to Basic Devices except as specified in Section 8 (Permitted Activities):

(a)     include in any manner on a Basic Device (including via over-the-air prompt, out-of-box experience, or non-End User-initiated download or update) (i) any active Hotword or active Gesture that invokes an Alternative Assistive Service or (ii) any Alternative Assistive Service on the Default Home Screen or the Minus One Screen; or

(b)     (i) change in any manner (A) the default search settings from initial factory settings for Google Applications that are preloaded (in accordance with Attachment B) on a Basic Device or (B) any active Hotword or active Gesture that is preloaded on a Basic Device; or (ii) prompt End Users to change, or engage in any promotion or campaign that suggests to End Users that they change, any of the items in (i).

## 5.     OPTIMIZED DEVICE

5.1     **Device Requirements.** For any Device to qualify as an Optimized Device, and for Company to receive Shared Net Optimized Ad Revenue and Shared Net Optimized Play Transaction Revenue for such Device under this Agreement in accordance with Section 13 and

10

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416660

**EXHIBIT 626-010**

Google Confidential

Attachment A, the following requirements must be met:

(a)  Company must comply with all Setup Requirements (as set forth in Section 3.1);

(b)  The Device must comply with all requirements set forth in Attachment C (Optimized Service Access Points); and

(c)  The Device must comply with Section 5.2 (Optimized Device Configuration).

5.2  **Optimized Device Configuration.** Company will not and will not allow any third party to do any of the following with respect to Optimized Devices except as specified in Section 8 (Permitted Activities):

(a)  include in any manner on an Optimized Device (including via over-the-air prompt, out-of-box experience, or non-End User-initiated download or update) an Alternative Search Service, an Alternative Assistive Service, an Alternative Visual Search Service, or an alternative to Gboard, Google Calendar, or Gmail services, or an application, bookmark, product, service, icon, launcher, Hotword, Gesture, or feature that has the primary purpose of providing access to an Alternative Search Service, an Alternative Assistive Service, an Alternative Visual Search Service, or an alternative to Gboard, Google Calendar, or Gmail services, including by any Hotword or Gesture, except that Company may include Company's first-party visual search service on an Optimized Device under the condition that Company receives Google's prior written approval of Company's first-party visual search service;

(b)  introduce, promote, or suggest (including via over-the-air prompt) an Alternative Search Service, Alternative Assistive Service, Alternative Visual Search Service, or an alternative to Gboard, Google Calendar, or Gmail services to an End User;

(c)  (i) change in any manner (A) the default search settings from initial factory settings for Google Applications that are preloaded (in accordance with Attachment C) on an Optimized Device or (B) Google Search or Google Assistant, including any active Hotword or active Gesture that is preloaded on an Optimized Device; or (ii) prompt End Users to change, or engage in any promotion or campaign that suggests to End Users that they change, any of the items in (i); or

(d)  distribute in Territory other than India.

6.  **PREMIER DEVICE**

6.1  **Device Requirements.** For any Device to qualify as a Premier Device, and for Company to receive Shared Net Premier Ad Revenue and Shared Net Premier Play Transaction Revenue for such Device under this Agreement in accordance with Section 13 and Attachment A, the following requirements must be met:

(a)  Company must comply with all Setup Requirements (as set forth in Section 3.1) including the additional set-up flow integration in the Premier Device Program Requirements (as set forth under Section 6.1(b));

(b)  Company must comply with the requirements for Premier Devices set forth at https://support.google.com/androidpartners/answer/9598755 (as may be updated from time to time by Google or any successor URLs) ("**Premier Device Program Requirements**"). In the event of any direct conflict between (i) the terms in the foregoing URL (or any successor URLs), as it is referred to under this Section 6.1(b) and elsewhere in this Agreement (under Sections 6.1(a) and 6.5(d)), and (ii) the terms

11



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416661

**EXHIBIT 626-011**

Google Confidential

of this Agreement, this Agreement will prevail with respect to the directly conflicting terms;

(c) The Device must comply with all requirements set forth in Attachment D (Premier Service Access Points);

(d) The Device must comply with Section 6.2 (Premier Device Configuration); and

(e) All Default Functions must be set as Device defaults.

6.2 **Premier Device Configuration.** Company will not and will not allow any third party to do any of the following with respect to Premier Devices except as specified in Section 8 (Permitted Activities):

(a) include in any manner on a Premier Device (including via over-the-air prompt, out-of-box experience, or non-End User-initiated download or update) any Alternative Service, or any application, bookmark, product, service, icon, launcher, Hotword, Gesture, or feature that has the primary purpose of providing access to any Alternative Service, except that Company may include Company's first-party visual search service on a Premiere Device under the condition that Company receives Google's prior written approval of Company's first-party visual search service;

(b) introduce, promote, or suggest (including via over-the-air prompt) an Alternative Service to an End User; or

(c) (i) change in any manner (A) the default search settings from initial factory settings for Google Applications that are preloaded (in accordance with Attachment D) on a Premier Device or (B) Google Search, Google Assistant (including any active Hotword or active Gesture), Default Functions, or Google Play, in each case that are preloaded on a Premier Device, or (ii) prompt End Users to change, or engage in any promotion or campaign that suggests to End Users that they change in any manner any of the items in (i).

6.3 **Additional Requirements**

(a) **Product Development.** Google and Company will collaborate in good faith to develop and optimize Android software and Premier Devices, including with respect to device and software testing for Premier Devices. The parties will meet to review Premier Devices and to discuss opportunities for optimization within a reasonable time period prior to Launch and following Launch as mutually determined by the parties. For the sake of clarity, Google's involvement in the technical development of devices intended to qualify as Premier Devices is solely of an advisory nature, and Google is under no obligation to provide direct development, engineering, or related resources, except as otherwise agreed to in this Agreement or in such other agreements as may be entered into between the parties.

(b) **Test Devices Support.** Company will provide Google with up to three (3) Premier Devices for testing and verification purposes ("**Test Devices**") and will use reasonable efforts to provide the Test Devices at a minimum of 8 weeks before initial device factory firmware approval. At Google's request, Company will provide (i) up to 35 additional Test Devices for up to four (4) Device Models each calendar year for country-specific testing and product development purposes with a number to be discussed on a country-by-country basis and (ii) pre-production verification testing samples for the

12

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416662

**EXHIBIT 626-012**

Google Confidential

purpose of Google's testing and verification.

(c)  **Bug Fixes.** If Google notifies Company of bugs that impact the performance of any Google products and services to be preloaded, preinstalled, or otherwise included in accordance with Attachment D (Premier Service Access Points) on Test Devices, Company will troubleshoot and resolve such bugs within a commercially reasonable time period, as mutually agreed to by the parties.

(d)  **Packaging.** All packaging for Premier Devices will adhere to Google branding requirements and technical specifications set forth in the Premier Device Program Requirements (as required under Section 6.1(b)) and be subject to Google's review and written approval.

**7.     Upgrade Obligations**

**7.1    Letter Upgrade Obligations**

(a)  For a period of twenty-four (24) months after the applicable Launch Date, unless otherwise approved by Google in writing, Company will perform Letter Upgrades on Device Models of Optimized Devices and Premier Devices so as to meet the Compliance Target (Letter). Company is solely responsible for implementing the Letter Upgrades or, as applicable, for ensuring that its subcontractor (subject to Section 15.2) implements the Letter Upgrades. As between Google and Company, Company is responsible for bearing all fees and costs associated with the Letter Upgrades (e.g., Telecom Operator's testing and acceptance, Authorized SOC provider support costs, etc.) for itself and, as applicable, any subcontractor. Company will only implement the Letter Upgrades on Device Models using Google's, Company's, or Company's subcontractor's over-the-air infrastructure. Company will promptly inform Google of any stability problems or other problems with meeting the Compliance Target (Letter). Google and Company will work together to resolve such problems through their Technical Account Managers.

(b)  If Company fails to complete Letter Upgrades so as to meet the Compliance Target (Letter), Google may withhold build approvals for any future Optimized Devices or Premier Devices and may reduce the payment to Company under Section 13.1 (Shared Revenue) by the Shared Net Play Transaction Revenue payment.

**7.2    Security Update Obligations**

(a)  For a period of thirty-six (36) months after the applicable Launch Date, unless otherwise approved by Google in writing, Company will implement bimonthly Security Updates on Device Models of Optimized Devices and Premier Devices in order to meet the Compliance Target (Security). Company will implement no less than 6 Security Updates in a calendar year and each Security Update will include security patches for the previous two months. Company is solely responsible for implementing the Security Updates or, as applicable, for ensuring that its subcontractor (subject to Section 15.2) implements the Security Updates. As between Company and Google, Company is responsible for bearing all fees and costs associated with Security Updates (e.g., Telecom Operator's testing and acceptance, etc.) for itself and, as applicable, any subcontractor. Company will only implement the Security Updates on Device Models of Optimized Devices and Premier Devices using Google's, Company's, or Company's subcontractor's over-the-air infrastructure. Company will inform Google of any stability problems or other problems with meeting the Compliance Target (Security). Google and Company will work together to resolve such problems through their Technical Account Managers.

13

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416663

**EXHIBIT 626-013**

Google Confidential

(b)     If Company fails to complete Security Updates so as to meet the Compliance Target (Security), Google may withhold build approvals for any future Optimized Devices or Premier Devices, and may reduce the payment to Company under Section 13.1 (Shared Revenue).

7.3     **Authorized SOCs**.  If the board support packages provided by Authorized SOCs are delayed or of insufficient quality for Company to comply with its upgrade obligations, then Company and Google will in good faith work with the Authorized SOCs.  Google, in its sole discretion, may choose to waive an upgrade obligation for any Device.

## 8.     PERMITTED ACTIVITIES

8.1     **Geographic Exceptions**

(a)     Notwithstanding anything to the contrary in Sections 5.2 or 6.2 or Attachments C or D, for Optimized Devices and Premier Devices that are solely distributed in the jurisdictions listed in Attachment E, Company may preload, distribute, or otherwise install in a folder on the Default Home Screen and/or may preload, distribute, or otherwise install on any screen, other than the Default Home Screen or the Minus One Screen:

(i)     a Company or third-party application or widget that is an Alternative Search Service; and/or

(ii)     a Company or third-party browser that uses an Alternative Search Service.

(b)     Notwithstanding anything to the contrary in Sections 4.2 or 6.2 or Attachments B or D, for Devices that are solely distributed in Russia, Company may preload, distribute, or otherwise install (i) any Alternative Search Service and/or any browser on any screen and (ii) any application that is substantially similar (as determined by Google in its sole discretion) to any Google Application (other than Google Search and Google Chrome) set forth in the Google Product Geo Availability Chart on any screen except the Minus One Screen.

(c)     Notwithstanding anything to the contrary in Sections 4.2 or 6.2 or Attachments B or D for Devices that are solely distributed in the EEA, Company has no obligation to make Google Assistant and Google Lens accessible via the Google-provided widget where the End User has selected a search engine other than Google Search from the search engine choice screen that is displayed on initial device set-up. For the sake of clarity, Company's display of the search engine choice screen in the EEA in accordance with Google's instructions will not be a breach of any Section of this Agreement. For the sake of clarity, Company is still required to implement Google Search Services API on such Devices.

8.2     **End Users.** For the sake of clarity, nothing in this Agreement restricts End Users from installing or using alternatives to Google Applications.

8.3     **Off-Device Promotions.** For the sake of clarity, nothing in this Agreement restricts Company from engaging in off-Device promotions of third-party hardware that feature any Alternative Service, even if such promotions refer to an Alternative Service that is compatible with that hardware (in-store or otherwise), so long as that hardware is not bundled for sale or distribution with Devices and such promotions are not targeted to any group that is comprised of all or substantially all End Users of Devices.

8.4     **Geo Availability of Google Applications**.  Nothing in this Agreement requires Company to

14

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416664

**EXHIBIT 626-014**

Google Confidential

preload or distribute any Google Application on any Device in a country or territory where preload or distribution of such application is not permitted under the Google Product Geo Availability Chart.

9. **COMPANY OBLIGATIONS**

9.1 **MADA and EMADA.** Company is a party to a valid and effective MADA and, for Devices distributed in the EEA, a valid and effective EMADA; and Company will at all times during the Term remain in compliance with the MADA and, for Devices distributed in the EEA, the EMADA.

9.2 **Policy Obligations.** Company will not, and will not allow any third party to:

    (a)    (i) change the order or content of or block or filter any search results or ads provided by Google on Devices (including commingling Valid Results or Ads with non-Google-provided search results or advertising), (ii) display any search results or ads provided by Google to any third parties other than End Users, or (iii) display any search results or ads provided by Google in pop-up, pop-under, exit windows, expanding buttons, or animation or other similar methods on Devices;

    (b)    use information obtained from any Google Application, including (i) click tracking of search results or ads provided by Google on Devices; (ii) recording, collecting, using, or storing any information or data from a Query or result, including any audio data or metadata, received as a result of an End User's use of, or authentication with, any Google Application, including the Google Assistant; or (iii) performing other monitoring of search results or ads provided by Google, except pursuant to Section 9.3 (Monitoring Queries);

    (c)    redirect an End User away from a Destination Page, modify the Destination Page, intersperse any content between any search results or ads provided by Google and any Destination Page, or do or fail to do anything that in any way implies that Google is responsible for any Destination Page;

    (d)    directly or indirectly access, launch, and/or activate Google Search, Google Assistant, or Google Play Store, including Google Play Store Ads, through or from any Client Application or means other than in accordance with Attachment B for Basic Devices, Attachment C for Optimized Devices, and Attachment D for Premier Devices; or

    (e)    preinstall or preload any applications that would violate the Mobile Bundled Apps Policy found    at https://support.google.com/androidpartners_gms/answer/7351400?hl=en&ref_topic=9252245#17-mobile-bundled-appsmba-policies (or such URL as Google may provide from time to time).

9.3 **Monitoring Queries.** Company may only monitor Queries in order to comply with applicable law, if such monitoring does not affect the integrity of any Queries, Valid Results, Google Search, the Google Assistant, Google Lens, Google Applications, or the End User experience. Subject to the foregoing, Company will inform Google of its intention to monitor Queries at least 120 days before Company implements such functionality and will proceed only with Google's prior written approval, which will not be unreasonably withheld.

9.4 **Ad Blocking.** Company will not, and will not allow any third party to, install or otherwise enable any ad blocking functionality on any Device. It will not be a breach of this Section 9.4 if an End User chooses to install or otherwise enables any ad blocking functionality on a Device as long as Company did not preload, or otherwise install, present, promote, or suggest (including via over-the-air prompt) such ad blocking functionality to the End User.

15



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416665

**EXHIBIT 626-015**

Google Confidential

**9.5**     **End User Experience**.  The parties will work together in good faith to improve monetization and the End User experience on the Devices.

**9.6**     **Communications Suite**.

     (a)     If a carrier explicitly requires in writing that Company distribute an alternative, in whole or in part, to the Communications Suite on certain Devices in a certain Territory, then Company will promptly notify Google, and Company and Google will use reasonable efforts to jointly encourage the carrier to adopt the Communications Suite or applicable portion of the Communications Suite.  If such carrier continually resists such joint efforts, then (notwithstanding the requirements in Sections 5.2 (Optimized Device Configuration) and 6.2 (Premier Device Configuration) and Attachments C and D) Company may satisfy the Carrier's requirement on a per-Device and per-Territory basis.

     (b)     The parties agree to make commercially reasonable efforts to work towards the milestones and timelines set forth in Attachment F.  Company will not be required to preload the Communications Suite Applications until Google has made reasonable efforts to complete the implementation and testing of the features in Section 1 of Attachment F or as otherwise agreed by the parties.

**10.**     **UPGRADE SUPPORT**

With respect to Optimized Devices and Premier Devices, Google will provide technical collaboration support to Company as it relates to Android operating system upgrades potentially including but not limited to Google's "Keystone" program.  Google and Company will jointly approach Authorized SOCs to incorporate the Devices' SOCs in Google's "Keystone" program.  For the sake of clarity, support from Google will not include any monetary amounts.

**11.**     **MANAGEMENT**

Company and Google will each appoint (1) a partner manager (the "**Partner Manager**") who will be the single point of contact for all business and operational activities and (2) a technical account manager (the "**Technical Account Manager**") who will be the primary point of contact for all technical and deployment activities. Company and Google will notify each other of the name and contact details for their Partner Manager and Technical Account Manager promptly after the Effective Date.  Either party may change its Partner Manager and Technical Account Manager by notifying the other party in writing.

**12.**     **DATA COLLECTION AND REPORTS**

**12.1**     **Data Collection.**  Each party's privacy and security policies will apply with respect to the user information collected by such party.

**12.2**     **Google Summary.** During the Term, by the end of the calendar month following the calendar month in which the Ads were displayed (for Basic Devices, Optimized Devices, and Premier Devices (as applicable)) and the Play Transactions occurred for Optimized Devices and Premier Devices (as applicable), Google will provide Company with a summary of the total amount payable by Google to Company covering Shared Net Ad Revenue and Shared Net Play Transaction Revenue (if Company chooses to configure any Devices as Optimized Devices or Premier Devices) in the aggregate for such calendar month.  For the avoidance of doubt, the above will not apply to any Optimized or Premier Device for which lifetime Shared Net Play Transaction Revenues have already been estimated and paid by Google under Section 13.1.

**12.3**     **Company Summary.** During the Term, within 30 calendar days after the beginning of each

16

*Google Mobile Revenue Share Agreement*



GOOG-PLAY-000416666

**EXHIBIT 626-016**

Google Confidential

calendar quarter, Company will provide Google with a quarterly list of all Device Models and brands of Basic Devices, Optimized Devices, and Premier Devices (as applicable) that qualify for Shared Net Ad Revenue or Shared Net Play Transaction Revenue, or both, for the Device Models and brands expected to be distributed within that current quarter.

**13.    PAYMENT AND TAXES**

13.1    **Shared Revenue.** Subject to the terms and conditions of this Agreement, Google will pay Company the Shared Net Ad Revenue and Shared Net Play Transaction Revenue in accordance with this Section and Attachment A.  Payment may be made by Google as a single payment or as multiple payments in Google's sole discretion.  No Shared Net Ad Revenue or Shared Net Play Transaction Revenue will be payable in respect of a Device where Company is in breach of any provision in Sections 3 through 7 (regarding Device requirements) or Section 9 (Company Obligations) in connection with such Device.  In addition, although Company may choose whether to configure any Devices on a Device-by-Device basis as Optimized Devices or Premier Devices, once a Device first meets the additional requirements to be an Optimized Device or Premier Device (as applicable), and Company is eligible to receive Shared Net Optimized Ad Revenue and Shared Net Optimized Play Transaction Revenue in respect of such Optimized Device, or Shared Net Premier Ad Revenue and Shared Net Premier Play Transaction Revenue in respect of such Premier Device, it will be a breach of the applicable provision(s) in Sections 3 through 6 if Company or any third party acting on Company's instructions: (a) subsequently makes any changes to that Optimized Device or Premier Device (as applicable) so that such Device no longer meets the requirements to be an Optimized Device or Premier Device (as applicable), and/or (b) carries out any acts or omissions in connection with that Optimized Device, or Premier Device (as applicable) that are prohibited under this Agreement.

13.2    **Payment Timing.**  Payment will be made by the last day of the calendar month following the calendar month in which the Ads were displayed and the Play Transactions occurred (for Basic Devices, Optimized Devices, and Premier Devices (as applicable)).  Initially during the Term, Google's obligation to pay Shared Net Play Transaction Revenue to Company in accordance with this Agreement, including Attachment A, will be met by Google's payment of an amount of Shared Net Play Transaction Revenue that is calculated by Google, based on a good faith estimate of the amount of Shared Net Play Transaction Revenue payable to Company over the lifetime of a Device.  This approach will continue to satisfy the requirement for any Shared Net Play Transaction Revenue payable to Company until Google implements its tracking system for Play Transaction Revenue, which will occur by no later than June 30, 2020.  Upon implementation of its Play Transaction Revenue tracking system, Google will notify Company and, thereafter, Google's obligation to pay Shared Net Play Transaction Revenue to Company will be met only by Google's payment of the actual amount of Shared Net Play Transaction Revenue in accordance with Section 13 and Attachment A as such amount is measured via the applicable Client ID(s) designated by Google.

13.3    **Payor.**  In accordance with applicable law and regulations, Google operates multiple local Google Affiliates to process transactions, and payments from Google to Company may be made by one or more of these Google Affiliates, which will satisfy Google's payment obligations under this Agreement.

13.4    **No Other Payment Obligations.** Except as set forth in this Agreement, (a) Google and Company will each retain any and all revenue generated from provision of their respective products or services and (b) neither party will be required to account to the other party or otherwise make any other payment to the other party regarding the Google Applications or Google services, the Devices, or any revenue generated by the other party, unless otherwise agreed in a separate written agreement signed by the parties.

17

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416667

**EXHIBIT 626-017**

Google Confidential

13.5 **Bank Details.** For payment and tax purposes, Company will provide any information reasonably required by Google, including Company's bank account information. Company will not receive Shared Net Ad Revenue for Devices and, if applicable, Shared Net Play Transaction Revenue prior to Google's receipt of such information.

13.6 **Adjustments.** In addition to other rights and remedies Google may have, Google may (a) offset any payment obligations to Company that Google may incur under this Agreement against any product or service fees owed to Google and not yet paid by Company under this Agreement or any other agreement between Company and Google and (b) withhold and offset against its payment obligations under this Agreement, or require Company to pay to Google within 30 calendar days of any invoice, any amounts Google may have overpaid to Company in prior periods under this Agreement.

13.7 **Currency.** All payments due to Company for a percentage of Net Ad Revenue or Net Play Transaction Revenue (as applicable) in accordance with this Section and Attachment A will be in U.S. Dollars. Any charges for converting foreign currency will be Company's responsibility.

13.8 **Taxes.**

(a)    <u>Transaction Taxes</u>. All payments under this Agreement are inclusive of Transaction Taxes. Company is responsible for charging and paying any Transaction Taxes required to be charged by any governmental tax authority in connection with any payment made by Google to Company under this Agreement.

(b)    <u>Withholding Taxes</u>. If Google is required under applicable law to withhold Taxes from its payments to Company and remit such Taxes to any governmental taxing authority, then Google will pay to Company the remaining net amount after such Taxes have been withheld and within a reasonable time frame provide to Company a copy of an official tax receipt, a copy of filed forms with taxing jurisdiction, or other appropriate evidence of any taxes imposed on payments made under this Agreement. Company agrees to timely provide, as soon as reasonably practicable, any tax documentation or certification requested by Google, including IRS Forms W-8 or W-9. Company hereby certifies that any services that it is deemed to perform pursuant to this Agreement are not performed in the United States or Singapore and furthermore agrees to provide written notification to Google at least ninety (90) days prior to any such services being performed in the United States or Singapore.

## 14. TERM AND TERMINATION

14.1 **Term.** This Agreement will commence on the Effective Date and will continue until the end of the Term, unless earlier terminated as provided in Section 14.2 or 14.3.

14.2 **Termination of this Agreement.** Either Google or Company may suspend or terminate this Agreement with immediate effect by giving written notice to the other party if such other party:

(a)    is in material breach of this Agreement where the breach cannot be remedied;

(b)    is in material breach of this Agreement where the breach can be remedied, but such other party fails to remedy that breach within 30 calendar days after receiving written notice of such breach;

(c)    is in material breach of this Agreement more than twice for which written notice is given regardless of whether the second or subsequent breach can be remedied; or

(d)    ceases its business operations or becomes subject to insolvency proceedings and the

18



Google Mobile Revenue Share Agreement

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416668

**EXHIBIT 626-018**

Google Confidential

proceedings are not dismissed within 90 calendar days.

14.3 **Termination of MADA and EMADA.** If the MADA or, for devices distributed in the EEA, the EMADA, is terminated for any reason, this Agreement will automatically terminate.

14.4 **Material Breach.** For purposes of determining whether a "material breach" has occurred, the parties agree that a breach by either party of Section 2 (Scope), Sections 3 through 7 (regarding Device Requirements), Section 9 (Company Obligations), Section 15 (Confidentiality and Publicity), or Section 16 (Intellectual Property Rights) is a material breach of this Agreement. The prior sentence should not be interpreted to imply that a breach of any other Section of this Agreement will not be a material breach of this Agreement.

14.5 **Special Suspension.** Notwithstanding anything to the contrary in this Agreement, if the government or controlling body of any country or territory imposes any law, restriction or regulation that (a) makes it illegal to distribute or make available in such country or territory any Google application or service (e.g., Google Search, Google Assistant, Google Play, etc.) covered under this Agreement, or (b) places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**"), then Google may suspend payments in connection with the applicable Google application(s) or service(s) in such country or territory until the law, restriction or regulation is repealed, nullified or modified so that it is no longer illegal or a Substantial Burden to distribute or make available the applicable Google application(s) or service(s) in such country or territory ("**Special Suspension**"). As a condition to make the Special Suspension, Google will provide Company with prior written proof(s) in the form of laws, restrictions, or regulations issued by the government or controlling body to prove the circumstance provided in this Section has occurred. For the sake of clarity, a party being added to the U.S. Department of Commerce's Entity List or any other action by the U.S. Government that would prohibit Google's ability to perform its obligations under this Agreement constitutes a Substantial Burden, which qualifies for a Special Suspension.

14.6 **Effect of Termination of this Agreement.** Upon expiration or termination of this Agreement for any reason:

(a) all rights and obligations of each party hereunder will immediately terminate except as stated in Section 14.7 (Survival);

(b) Company will not install or have installed any Client ID on any new Device after the date this Agreement expires or terminates; and

(c) Google and Company will each return or destroy all copies of Confidential Information in its possession of which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived backup copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory.

14.7 **Survival.** The provisions of Sections 1 (Definitions), 7.1 (Letter Upgrade Obligations), 7.2 (Security Update Obligations), 9.2 (Policy Obligations), 13.8 (Taxes), 14.6 (Effect of Termination of this Agreement), 14.7 (Survival), 15 (Confidentiality and Publicity), 16 (Intellectual Property Rights), 18 (Limitation of Liability), and 19 (General), and any other clauses which under their terms or by implication ought to survive, will survive expiration or termination of this Agreement.

15. **CONFIDENTIALITY AND PUBLICITY**

19

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 626-019**

Google Confidential

15.1 "**Confidential Information**" is information disclosed by one party (or its Affiliates) to the other party (or its Affiliates) under this Agreement that is marked as confidential or would normally be considered confidential information under the circumstances. Confidential Information does not include information that becomes public through no fault of the recipient, that is independently developed by the recipient, or that is rightfully given to the recipient by a third party without confidentiality obligations.

15.2 **Confidentiality Obligations.** The recipient will not disclose the Confidential Information, except to Affiliates, employees, agents, subcontractors, or professional advisors ("**Delegates**") who need to know it and who have a legal obligation to keep it confidential. The recipient will use the Confidential Information only to exercise rights and fulfill obligations under this Agreement. The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations. The recipient may disclose Confidential Information when required by law after giving reasonable notice to the discloser, if permitted by law.

15.3 **Publicity.** Neither party may make any public statement regarding this Agreement without the other party's prior written approval.

16. **INTELLECTUAL PROPERTY RIGHTS**

Company acknowledges that, as between the parties, Google (and/or its licensors) retains all right, title, and interest, including all Intellectual Property Rights, in and to the Google Applications (including Default Functions), Google Search, the Google Assistant, and Google Play. Company has, and will acquire, no rights in the foregoing. Google acknowledges that, as between the parties, Company (and/or its licensors) retains all right, title, and interest, including all Intellectual Property Rights, in and to the Devices. Google has, and will acquire, no rights in the Devices.

17. **REPRESENTATIONS AND WARRANTIES**

Each party represents and warrants to the other party that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.

18. **LIMITATION OF LIABILITY**

18.1 **Limitations.** Subject to Section 18.2 (Exceptions to Limitations), (a) neither party will be liable (under any theory) for indirect, consequential, incidental, exemplary, or punitive damages, and (b) neither party's aggregate Liability for any claim arising out of or related to this Agreement will exceed US$1,000,000.

18.2 **Exceptions to Limitations.** Nothing in this Agreement excludes or limits either party's Liability for: (a) breaches of confidentiality obligations, (b) violations of the other party's Intellectual Property Rights, (c) Google's failure to pay Shared Net Ad Revenue and, for Premier Devices, Shared Net Play Transaction Revenue payable under this Agreement, (d) Company's failure to comply with the terms of Section 3 through Section 7 (Devices) or Section 9 (Company Obligations) of the Agreement, or (e) matters for which Liability cannot be excluded or limited under applicable law.

18.3 **Exclusive Remedy.** Subject to Section 18.2 (Exceptions to Limitations), to the maximum extent permitted by applicable law, each party's exclusive remedy for breaches of this Agreement will be monetary damages, except that either party may seek injunctive relief in connection with (a) breach or potential breach of Section 15 (Confidentiality and Publicity) and (b) violations of a party's Intellectual Property Rights.

20

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416670

**EXHIBIT 626-020**

Google Confidential

18.4 **Allocation of Risk.** The parties agree that (a) the mutual agreements made in this Section 18 reflect a reasonable allocation of risk, and (b) neither party would enter into this Agreement without these limitations on liability.

## 19. ANDROID PREFERRED DEVICE PROGRAM CO-MARKETING

19.1 From the Effective Date and continuing through December 31, 2020 (inclusive), Company and Google will collaborate to include Eligible Devices (as defined in Attachment H) in the Android Preferred Device Program for the purpose of marketing and selling such Eligible Devices in the EEA through Target Operators (as defined in Attachment H) using mutually agreed channel incentive and co-marketing activities. The terms and conditions of the parties' involvement in this program are more fully described in Attachment H.

## 20. GENERAL

20.1 **Notices.** All notices of termination or breach must be in English, in writing and addressed to the other party's Legal Department. The address for notices to Google's Legal Department is legal-notices@google.com. All other notices must be in English, in writing, and addressed to the other party's Partner Manager. Notice will be treated as given on receipt, as verified by written or automated receipt or by electronic log (as applicable).

20.2 **Assignment.** Neither party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where: (a) the assignee agrees in writing to be bound by the terms of this Agreement, (b) the assigning party remains liable for obligations under this Agreement if the assignee defaults on them, and (c) the assigning party has notified the other party of the assignment. Any other attempt to assign is void.

20.3 **Change of Control.** During the Term, if a party experiences a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction): (a) that party will give written notice to the other party within 30 days after the change of control; and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 calendar days after it receives that written notice.

20.4 **Subcontracting.** Either party may subcontract any of its obligations under this Agreement but will remain liable for all subcontracted obligations and its subcontractors' acts or omissions.

20.5 **Force Majeure.** Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

20.6 **No Waiver.** Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

20.7 **No Agency.** This Agreement does not create any agency, partnership, or joint venture between the parties.

20.8 **No Third-Party Beneficiaries.** This Agreement does not confer any benefits on any third party unless it expressly states that it does.

20.9 **Counterparts.** The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

20.10 **Amendments.** Any amendment must be in writing, signed by both parties, and expressly state that it is amending this Agreement.

20.11 **Entire Agreement.** This Agreement states all terms agreed between the parties and

21



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416671

**EXHIBIT 626-021**

Google Confidential

supersedes all other agreements between the parties relating to its subject matter. In entering into this Agreement, neither party has relied on, and neither party will have any right or remedy based on, any statement, representation, or warranty (whether made negligently or innocently), except those expressly stated in this Agreement.

20.12 **Severability.** If any term (or part of a term) of this Agreement is invalid, illegal, or unenforceable, the rest of the Agreement will continue in force unaffected.

20.13 **Governing Law.** This Agreement is governed by California law, excluding California's choice of law rules. ALL CLAIMS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA, AND THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

[Signature Page Follows]



22

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416672

**EXHIBIT 626-022**

Google Confidential

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD | GOOGLE LLC |
|---|---|

**ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD**

By ~~Runyu Jang~~

Name ~~Runyu Jang~~

Title Legal Representative

Date Feb/26/2020

**GOOGLE LLC**

By

Name Hiroshi Lockheimer
Authorized Signatory

Title

Date 2020.02.26 08:40:23 -08'00'

**GOOGLE COMMERCE LIMITED**

By Fionnuala Meehan

Name Luciane Morein
 Per, Fionnuala Meehan (Board Director)

Title

Date 2020.02.26 15:53:53 Z

**GOOGLE ASIA PACIFIC PTE. LTD.**

By S. Lavanya

Name Lavanya Swetharanyan
Director
Google Asia Pacific Pte. Ltd

Title 2020.02.27 12:24:36 +08'00'

**GOOGLE IRELAND LIMITED**

By

Name Fionnuala Meehan
Luciane Morein
Per, Fionnuala Meehan (Board Director)

Title

Date 2020.02.26 15:54:09 Z

23



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416673

**EXHIBIT 626-023**

Google Confidential

## **ATTACHMENT A**

## **REVENUE SHARE**

**1.** Subject to the terms and conditions of this Agreement (including Section 13 (Payment and Taxes)), during the Term, Google will pay Company revenue share as follows:

(a) Google will pay Company 10% of Net Ad Revenue generated from Ads on a Results Page displayed on a Basic Device in response to a Valid Query from the Search Access Points in the table in Attachment B and from Assistant Access Points (for clarity, those Service Access Points identified in Attachment B as "Not Used in the Calculation of Shared Net Basic Ad revenue" will not be included), provided Company meets all the requirements set forth in Sections 4 (Basic Device), and 10 (Company Obligations) ("**Shared Net Basic Ad Revenue**").

(b) Google will pay Company 10% of Net Ad Revenue generated from Ads on a Results Page displayed on an Optimized Device in response to a Valid Query from the Search Access Points in the table in Attachment C and from Assistant Access Points (for clarity, those Service Access Points identified in Attachment C as "Not Used in the Calculation of Shared Net Optimized Ad Revenue" will not be included), provided Company meets all the requirements set forth in Sections 5 (Optimized Device) and 9 (Company Obligations) ("**Shared Net Optimized Ad Revenue**");

(c) Google will pay Company 5% of Net Play Transaction Revenue generated from Play Transactions on an Optimized Device, provided Company meets all the requirements set forth in Sections 5 (Optimized Device) and 9 (Company Obligations) ("**Shared Net Optimized Play Transaction Revenue**").

(d) Google will pay Company 15% of Net Ad Revenue generated from Ads on a Results Page displayed on a Premier Device in response to a Valid Query from the Search Access Points in the table in Attachment D and from Assistant Access Points (for clarity, those Service Access Points identified in Attachment D as "Not Used in the Calculation of Shared Net Premier Ad Revenue" will not be included), provided Company meets all the requirements set forth in Sections 6 (Premier Device) and 9 (Company Obligations) ("**Shared Net Premier Ad Revenue**", and collectively, Shared Net Basic Revenue, Shared Net Optimized Ad Revenue, and Shared Net Premier Ad Revenue being referred to as "**Shared Net Ad Revenue**"); and

(e) Google will pay Company 20% of Net Play Transaction Revenue generated from Play Transactions on a Premier Device, provided Company meets all the requirements set forth in Sections 6 (Premier Device Requirements) and 9 (Company Obligations) ("**Shared Net Premier Play Transaction Revenue**", and, collectively, Shared Net Optimized Play Transaction Revenue and Shared Net Premier Play Transaction Revenue being referred to as "**Shared Net Play Transaction Revenue**")).

**2.** For all Devices, Google may send uncompensated test Queries and traffic to Google Search or Google Assistant or make uncompensated clicks on Ads or generate uncompensated impressions of or actions regarding Ads at any time. For any Device that Company configures as an Optimized Device or Premier Device, Google may also place uncompensated test transactions in Google Play or make uncompensated clicks on or downloads of applications in Google Play at any time.

24



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416674

**EXHIBIT 626-024**

Google Confidential

## ATTACHMENT B

### BASIC SERVICE ACCESS POINTS

Subject to Section 8 (Permitted Activities), each of the below-listed Service Access Points must meet the Minimum Usage and Placement Requirements.

| Service Access Point Used in the Calculation of Shared Net Basic Ad Revenue in Attachment A | Minimum Usage and Placement Requirements |
|---|---|
| Browser frame on all implemented, preloaded, or otherwise installed Company browsers (aka Omnibox, address bar, in-frame search box) | Set to Google.com or, if applicable, set to send invalid URLs as search query to Google.com. |
| Default home page/start page on all implemented, preloaded, or otherwise installed Company browsers | Set to Google.com or, if applicable, local Google domain in the country in which Basic Device is distributed. |
| New tab page on all implemented, preloaded, or otherwise installed Company browsers | Set to Google.com or, if applicable, local Google domain in the country in which Basic Device is distributed. |
| Google Assistant app | For Basic Devices distributed outside of EEA, Google Assistant app is preloaded and icon is placed on Default Home Screen outside of Google folder.<br><br>For Basic Devices distributed within EEA, Google Assistant app is preloaded and icon is placed on Default Home Screen or Plus One Screen (if Device supports such screen). |

| Service Access Point Not Used in the Calculation of Shared Net Basic Ad Revenue in Attachment A | Minimum Usage and Placement Requirements |
|---|---|
| Google-provided widget | Placed on the Default Home Screen.  Search Launcher Services API is implemented. Google Assistant and Google Lens are accessible via Google-provided widget subject to product availability as determined by Google in its sole discretion. |

25



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416675

**EXHIBIT 626-025**

Google Confidential

| | |
|---|---|
| Implemented, preloaded, or otherwise installed keyboard(s) if search functionality is enabled | Set to Google.com or, if applicable, local Google domain in the country in which Basic Device is distributed. |
| All search intents actions, requests, and defaults on Basic Device, as determined by Google, including "search" and "Web search" intents | Set to Google.com or, if applicable, local Google domain in the country in which Basic Device is distributed. |
| Implemented, preloaded, or otherwise installed Launcher(s) | Set to Google.com or, if applicable, local Google domain in the country in which Basic Device is distributed. |
| Query search box on Minus One Screen (if Basic Device supports such screen) | Shared experience as shown in Attachment G between Google Discover and Company experience, with Google Discover as default. The Minus One Screen experience may be changed in the Device settings by the End User. |

26


Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416676

**EXHIBIT 626-026**

Google Confidential

**ATTACHMENT C**

**OPTIMIZED SERVICE ACCESS POINTS**

Subject to Section 8 (Permitted Activities), (i) all Assistant Access Points and Search Access Points on Optimized Devices must utilize Google Assistant and Google Search, and (ii) each of the below-listed Service Access Points must meet the Minimum Usage and Placement Requirements.

| Service Access Point Used in the Calculation of Shared Net Optimized Ad Revenue in Attachment A | Minimum Usage and Placement Requirements |
|---|---|
| Google-provided widget | Placed on the Default Home Screen. Search Launcher Services API is implemented. Google Assistant and Google Lens are accessible via Google-provided widget subject to product availability as determined by Google in its sole discretion. |
| Browser frame on all implemented, preloaded, or otherwise installed browsers (aka Omnibox, address bar, in-frame search box) | Set to Google.com or, if applicable, set to send invalid URLs as search query to Google.com. |
| Default home page/start page on all implemented, preloaded, or otherwise installed browsers | Set to Google.com or, if applicable, local Google domain in the country in which the Optimized Device is distributed. |
| New tab page on all implemented, preloaded, or otherwise installed browsers | Set to Google.com, or, if applicable, local Google domain in the country in which the Optimized Device is distributed. |
| All search intents, actions, requests and defaults on the Optimized Device, as determined by Google, including "search" and "Web search" intents | Set to Google.com or, if applicable, local Google domain in the country in which the Optimized Device is distributed. |
| All assist and speech recognition intents actions, requests, and defaults on the Optimized Device, as determined by Google | Set to Google Assistant. |
| Implemented, preloaded, or otherwise installed Launcher(s) | Set to Google.com or, if applicable, local Google domain in the country in which Optimized Device is distributed. |
| Google Assistant app | For Optimized Devices distributed outside the EEA, Google Assistant app is preloaded and icon is placed on Default Home Screen outside of Google folder. |
| Chrome Browser | Although Company has no obligation to place the Chrome Browser icon on the Application Dock for an Optimized Device, if Company elects not to place the Chrome Browser icon on |

27



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416677

**EXHIBIT 626-027**

Google Confidential

|  | the Application Dock of an Optimized Device, then Company will not be entitled to any portion of revenue generated from the Chrome Browser for such Device. If Company places the Chrome Browser icon on the Application Dock of an Optimized Device, then Company is entitled to a portion of revenue share from the Chrome Browser for such Device in accordance with this Agreement, including Attachment A. |
| --- | --- |
| Query search box on Minus One Screen (if the Optimized Device supports such screen) | Shared experience as shown in Attachment G between Google Discover and Company experience, with Google Discover as default. The Minus One Screen experience may be changed in the Device settings by the End User. No other services or features will be included. |

| Service Access Point<br>Not Used in the Calculation of Shared Net<br>Optimized Ad Revenue in Attachment A | Minimum Usage and Placement Requirements |
| --- | --- |
| Google Keyboard (Gboard), Google Calendar, and Gmail | Set as default keyboard, calendar, and email, respectively. |
| Google One app icon | Placed inside a Google folder on Default Home Screen.<br><br>Part of the set-up wizard flow will be waived until 2020Q1. Once the implementation guideline is provided by Google, both parties will work together to improve/decide the set-up wizard implementation. |
| Files by Google | Placed inside a Google folder on the Default Home Screen. |
| Google Podcasts and Google News app icons | Placed inside Google folder on Default Home Screen. |
| Google Pay | Pre-installed Google Pay app to Google folder on Default Home Screen.<br><br>Configured the power button long press to invoke Google Pay wallet once this feature becomes available. |

28

Google Mobile Revenue Share Agreement



GOOG-PLAY-000416678

**EXHIBIT 626-028**

Google Confidential

| | |
|---|---|
| | |
| Communications Suite | *Duo:* Placed on Default Home Screen (excluding the lock screen and notification tray). The parties will work together to improve user experience if needed based on user feedback, including optimizing the placement.<br><br>Retain Google-enabled Duo video integrations in Messages, Phone and Contacts. Meet Duo-ready requirement and successfully complete Duo-ready certification. |
| Google Lens (including as accessed via other products and services, except for the Google-provided widget) | Preinstalled on Optimized Device as default visual search service in Company's camera and gallery applications, unless otherwise approved by Google. |

| Service Access Point Used in the Calculation of Shared Net Optimized Play Transaction Revenue in Attachment A | Minimum Usage and Placement Requirements |
|---|---|
| Google Play | Placed on Default Home Screen, only application store on Default Home Screen, and set as default marketplace for applications, games, books, movies, music, and all other digital content (including subscriptions). |

29

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416679

**EXHIBIT 626-029**

Google Confidential

## ATTACHMENT D

## PREMIER SERVICE ACCESS POINTS

Subject to Section 8 (Permitted Activities), (i) all Assistant Access Points and Search Access Points on Premier Devices must utilize Google Assistant and Google Search, and (ii) each of the below-listed Service Access Points and Google Applications must meet the Minimum Usage and Placement Requirements.

| Service Access Point Used in the Calculation of Shared Net Premier Ad Revenue in Attachment A | Minimum Usage and Placement Requirements |
|---|---|
| Google-provided widget | Placed on the Default Home Screen or, for the EEA, on the Plus One Screen. Search Launcher Services API is implemented. Google Assistant and Google Lens are accessible via Google-provided widget subject to product availability as determined by Google in its sole discretion. |
| Browser frame on Chrome Browser (aka Omnibox, address bar, in-frame search box) | Set to Google.com or, if applicable, set to send invalid URLs as search query to Google.com. |
| Default home page/start page on Chrome Browser | Set to Google.com or, if applicable, local Google domain in the country in which Premier Device is distributed. |
| New tab page on Chrome browser | Set to Google.com or, if applicable, local Google domain in the country in which Premier Device is distributed. |
| All search intents actions, requests, and defaults on the Premier Device, as determined by Google, including "search" and "Web search" intents | Set to Google.com or, if applicable, local Google domain in the country in which Premier Device is distributed. |
| All assist and speech recognition intents actions, requests, and defaults on Premier Device, as determined by Google | Set to Google Assistant |
| Implemented, preloaded, or otherwise installed Launcher(s) | Set to Google.com or, if applicable, local Google domain in the country in which Premier Device is distributed. |
| Google Assistant app | For Premier Devices distributed outside of EEA, Google Assistant app is preloaded and icon is placed on Default Home Screen outside of Google folder.<br><br>For Premier Devices distributed within EEA, Google Assistant app is preloaded and icon is placed on the Default Home Screen or Plus One Screen (if Device supports such screen). |

30

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416680

**EXHIBIT 626-030**

Google Confidential

| Google Assistant hardware button on waterfall display (if technically feasible) | The parties will jointly discuss and decide if a software button with haptic features on waterfall displays is technically feasible to invoke Google Assistant on Premier Device and to comply with all the requirements set forth at: https://support.google.com/androidpartners/answer/9598755, or such other updated URL as Google may provide from time to time. |
|---|---|
| | Company will use commercially reasonable efforts to comply with all the "GMS Recommended" Base Actions set forth within the above link. |
| Chrome Browser | Set as a default browser to handle all browser intents. |
| | Chrome Browser  icon is placed on the Application Dock for a Premier Device. |
| Query search box on Minus One Screen (if Premier Device supports such screen) | Reserved for Google Discover |

| Service Access Point or Google Application Not Used in the Calculation of Shared Net Premier Ad Revenue in Attachment A | Minimum Usage and Placement Requirements |
|---|---|
| Communications Suite | *Messages*: Placed on Application Dock and set as the default Standards-Based Messaging Application and in accordance with the instructions provided by Google from time to time. Implement Google's protocol and connection management software associated with Google's standards-based messaging app known as RCS Application (including CarrierServices.apk). |
| | *Duo*: Placed on Default Home Screen (excluding the lock screen and notification tray). The parties will work together to improve user experience if needed based on user feedback, including optimizing the placement. |
| | Retain Google-enabled Duo video integrations in Messages, Phone and Contacts. Meet Duo-ready requirement and successfully complete Duo-ready certification. |
| | *Phone*: Placed on Application Dock and set as default calling service. |

31

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416681

**EXHIBIT 626-031**

Google Confidential

|  | |
|---|---|
|  | *Contacts*: Placed in the Google folder on the Default Home Screen. |
| Google Podcasts and Google News app icons | Placed inside Google folder on Default Home Screen. |
| Google One app icon | Placed inside a Google folder on Default Home Screen.<br><br>Part of the set-up wizard flow will be waived until 2020Q1. Once the implementation guideline is provided by Google, both parties will work together to improve/decide the set-up wizard implementation. |
| Files by Google | Placed inside a Google folder on the Default Home Screen. |
| Google Pay | Pre-installed Google Pay app to Google folder on Default Home Screen.<br><br>Configured the power button long press to invoke Google Pay wallet once this feature becomes available.<br><br>NFC turned on out-of-box for NFC devices; and Google Pay set as default payment service on Premier Device. |
| Google Calendar and Gmail | Set as default calendar and email service, respectively. |
| Google Lens (including as accessed via other products and services, except for the Google-provided widget) | Preinstalled on Premier Device: (a) as default visual search service in Company's camera and gallery application, unless otherwise approved by Google; and (b) with prominent placement in Company's camera and gallery applications as described in the following documentation: camera guidance (available at: https://support.google.com/lens-partners-overview/answer/9432138?hl=en&ref_topic=943 2168, or such other updated URLs as Google may provide from time to time), and gallery guidance (available at: https://docs.google.com/presentation/d/19ZB627 RqAyLyIzWruslBTwpSdkW78Qq1VbQDuae6AV c/edit#slide=id.g62e5bc7f40_0_0 or such other updated URLs as Google may provide from time to time); in each case unless otherwise approved by Google. |

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416682

**EXHIBIT 626-032**

Google Confidential

| Google Keyboard (Gboard) | Set as default keyboard. |
| --- | --- |

| Service Access Point Used in the Calculation of Shared Net Play Transaction Revenue in Attachment A | Minimum Usage and Placement Requirements |
| --- | --- |
| Google Play app | Google Play app is placed on Default Home Screen and set as default marketplace for applications, games, books, movies, music, and all other digital content (including subscriptions). |

33



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416683

**EXHIBIT 626-033**

Google Confidential

**ATTACHMENT E**

1. Australia
2. Brazil
3. EEA
4. India

34

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416684

**EXHIBIT 626-034**

Google Confidential

**ATTACHMENT F**

**Product Features & UX/UI Design**

1. Google and Company will make commercially reasonable efforts to provide the following for Messages, Dialer, and Contacts, respectively:

| Messages | | |
|---|---|---|
| **Feature** | **Estimated Time (from the Effective Date)** | **Approach** |
| FAB | +1 quarter | Google will remove FAB text and leave icon only |
| Fonts | +1 quarter | Google will support device system font |
| No avatar in 1:1 conversation | +2 quarters | Google will support this in Messages (except for non-verified SMS and spam) |
| Company backup support | Currently available | Company can already backup and restore SMS/MMS through Android telephony provider from Android Q and above<br><br>Note: Media attachment backup is in product roadmap for 2020 2H |

| Dialer | | |
|---|---|---|
| **Feature** | **Estimated Time (from the Effective Date)** | **Approach** |
| Fonts | +1 quarter | Google will support font family from Company |
| Caller ID announcement | +2 quarters | Google will support this feature |
| Flip to Shush | +2 quarters | Google will support this feature |
| Incoming call notification | Currently available | Company will perform this from platform level |
| Smart SIM callback | After Android Q update | Company will leverage new Android Q API to tell Dialer which SIM to use |
| MMI code support | +2 quarters | Google will support the existing MMI code provided that Company provides the code list to Google before **January 31, 2020;** for future code support, Google will use commercially reasonable efforts to support new codes |

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416685

**EXHIBIT 626-035**

Google Confidential

|  |  | following the existing OnePlus formats unless the parties mutually agree (email to suffice) to the support of new code formats. |
| --- | --- | --- |
| Call recording | First quarter 2020 | Google will support this feature |
| Gaming mode | +2 quarters | Google will support this feature |
| Zen mode compatibility | +2 quarters | Google will support this feature |
| Company backup support | Currently available | Company can already backup and restore Dialer information through Android telephony provider |

| Contacts | | |
| --- | --- | --- |
| Feature | Est Time (from the Effective Date) | Approach |
| Fonts | +1 quarter | Google will support font family from Company |
| FAB | +1 quarter | Google will remove FAB text and leave icon only |

2. Company and Google will work together in good faith to discuss the addition of the features listed below and define the related implementation plan, as applicable.

| Product Features | Applicable Products | Approach |
| --- | --- | --- |
| Quick input of 2FA Code | Messages | Requires more investigation by Company and Google |
| 2FA Classification and visualization | Messages | Google will consider building and rolling out for all users |
| Keywords blocking | Messages | Google may integrate with the core Android platform in a future release |
| Raise to answer | Dialer, Duo | OnePlus may support this feature in the Android Telephony layer |
| UX/UI Features | Applicable Products | Approach |
| Assisted Dialing | Dialer | Google may enable remotely as each new |

36

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416686

**EXHIBIT 626-036**

Google Confidential

|  |  | region is validated; provided that Company will need to provide a list of target countries and help Google with testing and validating the feature in those target countries |
|---|---|---|
| Contacts vs. Strangers | Dialer | Google will consider building and rolling out for all users |
| Messages info as cards | Messages | Google will consider building this feature to help users stay on top of important information that shows up in their inboxes |

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416687

**EXHIBIT 626-037**

Google Confidential

## ATTACHMENT G

### Shared Minus One Screen Requirements

Below are the design guidelines for the shared Minus One Screen. Company will implement the design depicted below. Both parties will collaborate in good faith to adjust design details for the areas highlighted in red below to provide consistency as End Users switch between the shared Minus One Screen experiences.

**Left**: Google experience as Default

**Right**: User selects Oneplus as Default





38

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416688

**EXHIBIT 626-038**

Google Confidential

## ATTACHMENT H

### ANDROID PREFERRED DEVICE PROGRAM CO-MARKETING ADDENDUM

Subject to the terms and conditions of the Agreement and this Attachment H ("**Addendum**"), during the Program Term (as defined below), Google and Company will collaborate under the Program (as defined below) to promote the sale of Eligible Devices (as defined below) within the EEA (as defined in the Agreement) through Target Operators (as defined below) using certain mutually agreed go-to-market and co-marketing activities. All capitalized terms used but not defined herein will have the meanings ascribed in the Agreement.

### Background

A.  Company intends to enter into agreements with certain Target Operators in respect of the Program pursuant to which Company desires to invest in certain go-to-market and co-marketing activities to promote sales of Eligible Devices through certain Target Operators, and

B.  Google desires to participate in the Program by matching the amount of funds contributed by Company for certain incentive and marketing activities to promote sales of Eligible Devices through certain Target Operators within the EEA from the Effective Date through December 31, 2020, pursuant to the terms and subject to the conditions of this Addendum.

### Agreement

1.  **Definitions.** In addition to the definitions set forth in the Agreement, the following definitions will apply to this Addendum:

1.1.  **"Activation"** means the first registration of an Eligible Device (for clarity, not device model, Search or Chrome, or any other app) with Google servers when such Eligible Device is powered on and connected to the internet.

1.2.  **"Business Day"** means a day in England which is not a Saturday, Sunday, or an English bank or public holiday.

1.3.  **"End User Database"** means any database of contact details of end users to which marketing communications regarding the Eligible Devices may be targeted (either in the form of electronic marketing communications or postal marketing communications).

1.4.  **"Manufacturer Suggested Retail Price"** or **"MSRP"** means an Eligible Device's recommended retail price to end consumers excluding any discounts and any applicable value-added taxes (VAT), as defined at the time of Launch and at the country level for such Eligible Device.

1.5.  **"Program"** means the program, which is currently referred to as the Android Preferred Device Program, aimed at promoting the sale of Eligible Devices within the EEA.

1.6.  **"Select Telecom Operator"** means as of the Effective Date Vodafone, Telefonica, Orange, or Deutsche Telekom, which list may be changed by Google at any time during the Program Term.

1.7.  **"Sell-in"** or **"Sold-in"** means sales of Eligible Devices from Company to Target Operators under the Program, as confirmed by Google through purchase order(s) between Company and Target Operators provided to Google.

39

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416689

**EXHIBIT 626-039**

Google Confidential

**1.8.** **"Sell-out"** or **"Sold-out"** means sales of Eligible Devices from Target Operators to end consumers under the Program, or, if such data is not available for reporting purposes, sales of Eligible Devices into Target Operators' distribution channels under the Program.

**2.** **Territory**

**2.1.** The Program only applies to Eligible Devices distributed and sold through the distribution channels of Target Operators within the EEA. For clarity, no funding will be made for Eligible Devices sold in any country outside of the EEA.

**3.** **Eligible Device**

**3.1.** To be eligible for inclusion in the Program, a Device must meet the following criteria during the Program Term unless otherwise agreed by Google in writing ("**Eligible Device**"):

    (a) Be sold through the channels of any Select Telecom Operator with whom Google has a separate valid and effective agreement in respect of their participation in the Program (each such Select Telecom Operator who meets these conditions, a "**Target Operator**"); and

    (b) Meet all requirements for a Premier Device under the Agreement, or be pre-approved by Google in writing if it does not meet all requirements

**4.** **Program Term**

**4.1.** Unless earlier terminated, this Addendum will commence on the Effective Date and continue through December 31, 2020 (the "**Program Term**").

**4.2.** In addition to the termination rights set forth in Section 13 (Term and Termination) of the Agreement, the following will apply to this Addendum:

    (a) this Addendum will terminate if the Agreement is terminated during the Program Term;

    (b) Google, at its sole direction, may, upon fourteen (14) days' prior written notice to Company, (i) terminate this Addendum with Company or (ii) refuse to invest Program Funds in any specific Target Operator in respect of marketing or other initiatives for future calendar quarters under this Addendum if Company and/or Target Operator does not in good faith:

        (A) execute on the Go-to-market Plan developed between Company and each Target Operator and shared with Google in accordance with Section 5.1 of this Addendum;

        (B) provide Google, in a timely and reliable manner, with agreed upon reporting data in accordance with Sections 7 and 9 of this Addendum; and

        (C) use Google-invested funds for approved activities.

**5.** **Joint**          **Planning**

**5.1.** At least two (2) weeks prior to the end of each calendar quarter during the Program Term, Company will share with Google:

    (a) planned Eligible Devices roadmap for the remainder of the Program Term; and

40

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 626-040**

Google Confidential

(b)     go-to-market plan of activities developed between Company and each Target Operator with the intention of such activities maximizing the Sell-out of Eligible Devices through Target Operators' distribution channels during the next calendar quarter (each such quarterly plan, a "**Go-to-market Plan**"), which may include, by way of example, the following activities:

         (i)     in-store presence with high visibility;

         (ii)     online presence with high visibility;

         (iii)     below-the-line (BTL) campaigns and promotions (e.g. seasonal promotions for Christmas and other holidays);

         (iv)     sales advocacy programs (e.g. contests, bonus, SPIFF (Sales Performance Incentive Fund), call center) and retail training (using Company and Google training materials and key messages);

         (v)     device discounts for employee purchase plans;

         (vi)     featuring the Eligible Devices in base communications and running customer relationship marketing (CRM) campaigns;

         (vii)     outbound telesales;

         (viii)     carrier tariff plan support;

         (ix)     business-to-consumer or business-to-business (not wholesale) price reduction limited time promotions;

         (x)     any other go-to-market activities to promote Sell-out that Google may require the Company to perform from time to time.

**5.2.**     As part of the Go-to-market Plan developed between Company and each Target Operator, Company will propose to Google in respect of the Program:

(a)     Subject to the limitation set forth in Section 8.2 (MSRP Cap), the percentage of the Manufacturer Suggested Retail Price that Company desires to invest in each Eligible Device sold by each Target Operator under the Program;

(b)     Subject to the limitations set forth in Sections 8.2 (MSRP Cap) and 8.3 (Company Contribution), (i) the percentage of the Manufacturer Suggested Retail Price that Company desires Google to invest in each Eligible Device sold by each Target Operator under the Program ("**Proposed Google MSRP %**"), and (ii) the total amount of Program Funds that Company desires Google to invest in the Program (based on the Proposed Google MSRP % and the estimated number of Eligible Devices that will be included in the Program); and

(c)     The marketing and other go-to-market activities for which Program Funds are to be used, including the Program Activities as defined in Section 8.1.

**5.3.**     Google will have sole discretion to approve or reject the proposed marketing and go-to-market activities for which Google's portion of the Program Funds will be used, including the Program Activities. Google will use reasonable efforts to inform Company of its approval or rejection of such proposal within 14 days of receipt. Any Proposed Google MSRP % approved by Google will be referred to as the "**Google MSRP %**". The funds Google and Company each invest for go-to-market and co-marketing activities in connection with the Program are referred to as the "**Program Funds**." Google will only contribute Program Funds towards Program Activities

41

*Google Mobile Revenue Share Agreement*



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416691

**EXHIBIT 626-041**

Google Confidential

(defined in Section 8.1) that are agreed upon as part of a Go-to-market Plan and approved by Google for the use of Google's contribution to Program Funds. For avoidance of doubt, Company may choose to contribute Company's contribution to Program Funds towards co-marketing and go-to-market activities which are not Program Activities, but which are part of a Go-to-market Plan, but Company acknowledges that Google's contribution to Program Funds will be limited to Program Activities only that are part of a Go-to-market Plan and approved by Google.

6. **Marketing** **Support**

6.1. Company will collaborate in good faith with Google to feature selected key messages about Google services and applications, including about Google Play, security, and updateability, in marketing activities for Eligible Devices. Relevant activities and materials may include, as examples:

  (a) Creating or updating the Company website to include Google applications and services;

  (b) Incorporating Google applications and services in retail training collaborations with Target Operator sales associates and customer services agents;

  (c) Retail leaflets, in which Company includes at least the Google-provided logo for each Google application and service featured in such print ad;

  (d) Retail product, in which Company includes each of the Google application and service logos;

  (e) Retail fixtures under the conditions that (i) Company includes the applicable Google applications and services logo(s), and (ii) Company places the Google applications and services in a heightened, prominent placement within the retail; and

  (f) Digital creative assets, in which Company will include a video end card with the logo of each Google application and service featured in such digital creative asset.

6.2. Design and execution of Company promotional activities must adhere to standard Google brand guidelines available at Google's Partner Marketing Hub (currently available at https://partnermarketinghub.withgoogle.com/#/, as may be updated from time to time by Google or any successor URL). Google may require different uses of the Google Trademarks depending on the distribution channels and touchpoints or as otherwise reasonably necessary. All Company-created creatives featuring Google-owned product and services are subject to the standard Google approval process set forth at Google's Partner Marketing Hub.

7. **Reporting** **and** **Audit**

7.1. Within 12 Business Days following the end of each calendar month during the Program Term, Company will provide Google with the following with respect to such recently completed calendar month:

  (a) reporting of Eligible Devices that Company has Sold-in to Target Operators, in each case broken down, for each Eligible Device, by country, Target Operator, SKU (stock keeping unit), and Manufacturer Suggested Retail Price. Any information that Google receives concerning the Manufacturer Suggested Retail Price will be communicated to individuals within Google for the purpose of administering the Program, in particular verifying the payments that Google will make under this Addendum. This information will not be shared with the Pixel team; and

42



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416692

**EXHIBIT 626-042**

Google Confidential

      (b)     evidence (in a form as requested by Google, including invoices) of Program Funds spend by country, Target Operator, and Eligible Device SKU (stock keeping unit), such evidence to include any marketing agency invoice, Target Operator invoice, Manufacturer Suggested Retail Price, and any other information or data Google requires at its sole, reasonable discretion.

**7.2.**     By the 15th day of the calendar month of record during the Program Term, Company will provide Google with a forecast of expected Sell-in and expected Program Funds spend during such calendar month.

**7.3.**     At least six weeks prior to the beginning of each calendar quarter during the Program Term, Company will provide Google with the following projected information for each Eligible Device Sold-in or expected to be Sold-in to each Target Operator for the upcoming calendar quarter:

      (a)     end-user marketing model name and number, if it exists;

      (b)     code name; and

      (c)     any other information that may be reasonably requested by Google.

**7.4.**     Company will keep, for a period of at least one (1) year from the end date of the Program Term, full and detailed accounting, legal and financial records relating to all matters which relate to the performance of its obligations and to payments made by Google in connection with the Program, including any evidence of the completion cost, Program Funds, marketing or other activities, and the satisfaction of any agreed objectives of a Go-to-market Plan ("**Records**").

**7.5.**     During the Program Term and for a period of one (1) year thereafter, if Google has reasonable cause to believe that it has been overcharged or that Company has otherwise breached its obligations under this Addendum, Google or its duly authorised representatives may audit the Records in connection with this Addendum. For the avoidance of doubt, use by Company of Program Funds in a manner inconsistent with the Program or to carry out activities other than the Program Activities agreed upon between the parties under Section 5.2 is also considered an overcharge for the purposes of this Addendum. Any such Records will be Confidential Information under this Agreement. Google or its auditor will only have access to those Records which are reasonably necessary to confirm Company's compliance with its obligations under this Addendum, including the accuracy of the invoices provided by Company. If Company has overcharged Google, or Company materially failed to complete the Program Activities (including meeting any agreed objectives), Company will issue a refund to Google within thirty (30) business days of the date of Google's invoice to Company. The amount will be calculated as the difference between the Program Funds paid by Google and the amount that should have been invoiced. If any audit shows that Google has been overcharged by five per cent (5%) or more, then Company will reimburse Google for all reasonable out-of pocket fees and expenses incurred by Google in connection with the audit.

**8.**     **Program**                                                 **Funds**

**8.1.**     Program Activities. Google will only contribute Program Funds to Company as reimbursement for certain go-to-market and co-marketing activities approved by Google under Section 5.3 that are directly tied to the Sell-out of Eligible Devices through a Target Operator's distribution channels during the Program Term (such activities, the "**Program Activities**") as defined in Section 5.1(b). For the avoidance of doubt, no funding will be provided by Google for any other purpose.

**8.2.**     MSRP Cap. Subject to Section 8.1 (Program Activities) and Section 5 (Joint Planning), the

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        GOOG-PLAY-000416693

**EXHIBIT 626-043**

Google Confidential

amount of Program Funds for which Google will reimburse Company for Program Activities under this Addendum will be limited to:

(a) Up to 7.5% of the Manufacturer Suggested Retail Price of each Eligible Device distributed and sold to End Users in the United Kingdom, France, Germany, Spain, and Italy; and

(b) Up to 2.5% of the Manufacturer Suggested Retail Price of each Eligible Device distributed and sold to End Users in the other countries within the EEA.

The Manufacturer Suggested Retail Price will be established in the go-to-market plan or other relevant evidence provided by Company to Google, subject to verification by Google.

8.3.   <u>Company Contribution</u>. The amount of Company's contribution of Program Funds will at least match on a 1:1 basis the amount of Google's contribution of Program Funds for the Program.

8.4.   <u>Target Operators</u>. Both parties will encourage Target Operators to also invest in marketing and sales initiatives for Eligible Devices included under the Program.

9.      **Payment Process**

9.1.   <u>Obligations</u>.

(a) Company will be responsible for paying Program Funds to Target Operators for both Company and Google for Program Activities.

(b) Google will reimburse Company for the amount of Google's Program Funds that Company paid to Target Operators through payments on a quarterly basis up to, in the aggregate, the Committed Amount. If applicable, a True-Up or True-Down payment may be required pursuant to Section 9.5 (Reconciliation).

9.2.   <u>Committed Amount</u>.

(a) During the Program Term, Google will commit to a total amount of Program Funds spend, subject to any cap under Section 5.2, that it will use to reimburse Company on a quarterly basis for Program Activities. Such amount committed by Google for Program Activities will be set at 85% of the total amount of Program Funds requested by Company from Google and reasonably approved by Google, based upon Google's receipt of Sell-in proof (described in Section 7.1(b)), which is reasonably satisfactory to Google, and approved Go-to-market Plans from Company (described in Section 5.1(b)) (such amount being the "**Committed Amount**"). As an example for illustrative purposes only, if Company has Sold-in 1,000 Eligible Devices at 400 Euros MSRP in Germany to a Target Operator with Google and Company having each agreed to fund Program Funds spend in an amount equal to 7.5% of the MSRP for Eligible Devices in Germany - for clarity, resulting in a total of 15% MSRP spend by both, then the Committed Amount will be set at 25,500 Euros (i.e., 1,000 * 400 Euros * 7.5% * 85%). For the sake of clarity, the Committed Amount will increase during the Program Term as additional Eligible Devices are Sold-in to Target Operators. The Committed Amount will be an aggregate amount for all Eligible Devices, which Company may use across all Eligible Devices. Google will not reimburse Company in excess of the Committed Amount of 85% (i.e., not for the remaining 15% of the requested contribution) except through a possible True-Up in accordance with Sections 9.5 (Reconciliation) below.

(b) The cumulative amount of Program Funds payable by Google to Company at any point

44



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416694

**EXHIBIT 626-044**

Google Confidential

over the Program Term will not exceed either (i) the total Committed Amount (as described under Section 9.2 (Committed Amount)) of Google-approved spend for Program Activities or (ii) the amount of Company's own financial investment in the Program Funds.

9.3.  Invoicing. Subject to receipt and approval by Google of all the required reporting and evidence of Program Funds spend in accordance with Section 7.1, within thirty (30) days following the end of each calendar quarter during the Program Term, Company will invoice Google for reimbursement of the amount of Google's Program Funds spent during the calendar quarter of record in accordance with this Addendum. Company waives any and all rights to any and all Program Funds payable by Google that are not invoiced by Company to Google within ninety (90) calendar days following the end of the relevant Approved Program Activity. Company must include the purchase order (PO) number provided by Google on the relevant invoice. For the sake of clarity, the foregoing will be in addition to those terms and obligations set forth in Section 13 (Payment and Taxes) of the Agreement.

9.4.  Reimbursement. Within thirty (30) business days of receipt and approval by Google of all reporting and proof of Program Funds spend in accordance with Section 7.1 and a qualifying invoice, Google will make a quarterly reimbursement to Company for Google's amount of the Program Funds spend to promote the Sell-out of Eligible Devices through Target Operators in the EEA during the applicable calendar quarter, subject to the limitations set forth in this Addendum (including Section 8 (Funding) and 9.2 (Committed Amount)). If any currency conversion is needed to calculate the amount of the Program Funds spend, the foreign exchange rate will be determined by Google based on current market rates in accordance with reputable sources in Google's sole, reasonable discretion.

9.5.  Reconciliation. Following the expiration or termination of this Addendum, a reconciliation process will be automatically triggered, pursuant to which Google will determine whether the cumulative number of Activations of Eligible Devices by End Users as of the Reconciliation Measurement Date (as defined in Section 9.5(a) below) is greater or less than 85% of the cumulative number of Eligible Devices Sold-in during the Program Term (**"Reconciliation Calculation"**), and thus whether a True-Up or True-Down of the Committed Amount is required.

(a)  Measurement. For purposes of performing the Reconciliation Calculation, cumulative Activations of Eligible Devices by End Users will be measured by Google on March 31, 2021 or, if this Addendum is terminated prior to its expiration date, on the 90th day after the termination date of this Addendum (the "**Reconciliation Measurement Date**").

(b)  True-Up. If the number of cumulative Activations of Eligible Devices by End Users as of the Reconciliation Measurement Date *exceeds* 85% of the cumulative Sell-in number of Eligible Devices during the Program Term, then Google will reimburse Company for the difference between those numbers and the amount of Google's Program Funds spend ("**True-Up**"). For example, if (i) Activations are shown to be 100%, (ii) Company has provided proof of spend of 100% of Google's contribution of Program Funds on Program Activities, and (iii) Google has reimbursed Company for the Committed Amount (i.e., 85% of the agreed Google Program Funds spend), then Google will reimburse Company for the remaining 15% of the Google Program Funds spend. Within 30 days of Google's provision of the data resulting from the Reconciliation Calculation to Company, Company will issue an invoice to Google for the amount of the True-Up, and Google will pay the amount of the True-Up within 30 business days of receipt of the invoice.

(d)  True-Down. If the number of cumulative Activations of Eligible Devices by End Users as of the Reconciliation Measurement Date *is lower* than 85% of the cumulative Sell-in number of Eligible Devices during the Program Term, then Company will reimburse

45

Google Mobile Revenue Share Agreement



GOOG-PLAY-000416695

**EXHIBIT 626-045**

Google Confidential

Google for the difference between those numbers and the amount of Google's Program Funds spend ("**True-Down**"). For example, if (i) Activations are shown to be 70%, (ii) Company has provided proof of spend of 100% of Google's contribution of Program Funds on Program Activities, and (iii) Google has reimbursed Company for the Committed Amount (i.e., 85% of the requested Google Program Funds spend), then Google will have the right to require Company to repay 15% of the Google Program Funds spend. Within 30 days after Google's provision of the data resulting from the Reconciliation Calculation to Company, Google may (A) issue an invoice to Company, and Company will pay the amount of the True-Down within 30 business days of receipt of invoice, or (B) at Google's discretion, offset the amount of the True-Down against any other agreements between Google and Company.

(e) Sell-out Data. If (i) Company desires use of Sell-out data in lieu of the Activations number for the Reconciliation Calculation, or (ii) upon Google's completion of the Reconciliation Calculation using Activations Company reasonably believes that Sell-out of Eligible Devices was substantially greater than the cumulative Activations as measured by Google, then Company may request use of Sell-out data, which must be based on actual purchases and not estimates, for the Reconciliation Calculation. Any use of Sell-out data pursuant to the foregoing sentence must be measured as of March 31, 2021. For the avoidance of doubt, Google will accept only one form of data for purposes of the reconciliation process.

**9.6.** **Marketing Warranties.** Company warrants and undertakes that:

(a) it has or will obtain any necessary consents, licences or permissions in order for Company to perform its obligations under this Addendum;

(b) the content of the marketing materials prepared and used by Company for the Program and the collection and use of data regarding end users in the End User Database: (i) will comply with all applicable laws and regulations, including those relating to direct marketing; and (ii) will not be defamatory of any person; and

(c) it will otherwise comply with all applicable laws, rules, codes of practice, and regulations in connection with the performance of its obligations under this Addendum, including the promotion, communication and provision of all Program Activities under the Program.

**10.** **No End User Personal Data.** No End User Personal Data will be shared under this Addendum from Company to Google, or from Google to Company, unless Company and Google have first entered into a separate written amendment to the Agreement that sets out each party's obligations in respect of the sharing of such Personal Data. In this Section 11, "**Personal Data**" will have the meaning set out in the General Data Protection Regulation (EU) 2016/679.

**11.** **Obligations**

**11.1.** Company will comply with the *Rules for Proper Usage* of Google Trademarks, located at http://www.google.com/permissions/trademark/rules.html.

**11.2.** Company will comply with Google policies notified to Company in advance (which will include branding) (http://www.google.com/permissions/guidelines.html) and the policies contained in the Google Play Partner Toolkit (https://playtoolkit.withgoogle.com/), each of which may be updated from time to time. Google reserves the right to include additional policies with reasonable advance notice to Company.

**12.** **Target Operator and Marketing Agency Discussion**

46

*Google Mobile Revenue Share Agreement*



GOOG-PLAY-000416696

**EXHIBIT 626-046**

Google Confidential

12.1.  For the avoidance of doubt, Company will be solely responsible for all Eligible Devices sales, after-market servicing, and customer support, and Google will not initiate any Sell-in discussions featuring Company with Target Operators or marketing agencies in connection with the Program.

12.2.  Google retains the right, at its sole discretion, to fund any other investments for any Target Operator and/or marketing agency and Company retains the right, at its sole discretion, to engage in other marketing activities with the Target Operators.

47

Google Mobile Revenue Share Agreement



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000416697

**EXHIBIT 626-047**