**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ████████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.* | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ████████████████ |
| Defendant. | |

**PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

February 9, 2024

## TABLE OF CONTENTS

I.  Google Has Illegally Maintained Monopolies In The Relevant Markets For Many
    Years.................................................................................................................................1

II. General Search Services, Search Advertising, And General Search Text Advertising
    In The United States Are Relevant Markets ...............................................................3

    A.  General Search Services, Search Advertising, And General Search Text
        Advertising Are Relevant Product Markets......................................................... 3

        1.  Several Principles Govern The Exercise Of Defining A Relevant Product
            Market ........................................................................................................ 3

        2.  Market-Definition Analysis Must Beware Of The *Cellophane* Fallacy ..... 6

    B.  The United States Is A Relevant Geographic Market ........................................ 7

III. Google Has Monopoly Power In Each Of The Three Relevant Markets .....................7

    A.  Indirect Evidence Proves That Google Has Monopoly Power In Each
        Relevant Market................................................................................................ 7

        1.  For Many Years, Google Has Had A Dominant Market Share In Each
            Relevant Market......................................................................................... 8

        2.  Each Relevant Market Has High Barriers To Entry And Expansion.......... 8

    B.  Direct Evidence Proves That Google Has Monopoly Power In Each Relevant
        Market............................................................................................................... 9

IV. The Evidence Establishes A Prima Facie Case Of Anticompetitive Conduct............11

    A.  The Evidence Establishes A Prima Facie Case Under Section 2 .................... 11

    B.  An Exclusive-Dealing Standard Is Too Narrow For This Action.................... 13

    C.  The Evidence Nonetheless Establishes A Prima Facie Case Under The Overly
        Narrow Exclusive-Dealing Standard ............................................................... 16

        1.  Google's Contracts Are Exclusive............................................................ 16

        2.  Google's Contracts Substantially Foreclose Competition ........................ 19

    D.  Although Not Necessary, Resolving Disputes Pending After Summary
        Judgment Bolsters Plaintiffs' Prima Facie Case............................................. 21

        1.  Measuring Foreclosure Requires No Assessment Of The But-For World 22

a) *Microsoft* Bars A But-For Requirement ...................................... 22

b) The Meaning And Purpose Of Foreclosure Contravene A But-For Analysis............................................................................................ 22

c) Even But-For Analysis Shows Substantial Foreclosure .............. 23

2. User-Downloaded Chrome Queries Exacerbate The Foreclosure Created By Google's Contracts ................................................................................ 25

3. The Foreclosure From Google's Browser And Android Contracts Should Be Aggregated ......................................................................................... 26

**V.      Google Failed To Present Valid Procompetitive Justifications, Let Alone Sufficient Nonpretextual Justifications To Outweigh The Anticompetitive Effects ..................27**

**A.      Google's Justifications Are Invalid .................................................................. 28**

1. Google's Justifications Rely On Out-Of-Market Effects.......................... 28

2. Google's Justifications Lack Sufficient Evidence .................................... 30

3. Google's Justifications Are Not Procompetitive ...................................... 31

4. Google's Justifications Are Pretextual...................................................... 32

5. Any Benefits Arising From Google's Justifications Are Attainable Through Less-Restrictive Alternatives ...................................................... 33

**B.      The Anticompetitive Harm From Google's Contracts Outweighs Any Cognizable Procompetitive Benefits.................................................................. 33**

**VI.     Google's Systematic Destruction Of Unfavorable Evidence Warrants Sanctions Under Rule 37(e) ...................................................................................................34**

**VII.    The Court Has Jurisdiction, And Venue Is Proper ......................................................35**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) ........................................................... 32

*Allen-Maryland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194 (3d Cir. 1994) .............................. 10

*Am. Pres. Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022) .............. 15, 18, 19, 27

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) ............................................... 10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ................................ 33

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) .................................... 12

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................... 3, 4

*Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023) ................................ 15

*Chi. Bd. of Trade v. United States*, 246 U.S. 231 (1918) ................................................... 2

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ............................... passim

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ........................................... 5

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) .............................................. 7, 9

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022) ............................................... 5, 8

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) .............................................. 12, 31

*FTC v. IQVIA Holdings Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) .................................. 4, 5

*FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023) ......................................... 2, 5

*FTC v. Mot. Picture Advert. Serv. Co.*, 344 U.S. 392 (1953) ........................................... 23

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ............................................ 2

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ................................................... 4

*FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ............................................. 31

*FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020) ................................... 15, 18, 20, 23

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023) ........................................... 3, 9, 10

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ....................................... 2, 4, 5, 9

*Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir. 1983)................................ 2

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) .......................... 9

*In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981 (N.D. Cal. 2023) .................. 34, 35

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020) .......................... 29

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) .................................... 31

*Le v. Zuffa, LLC*, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) ..................................................... 20

*\*LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) (*en banc*) ............................................. passim

*Lorain Journal Co. v. United States,* 342 U.S. 143 (1951)......................................................... 15

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ................................................. 5, 18, 32, 33

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958)..................................................................... 1

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)............................................. 31

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ............................................................. 34

*New York v. Meta Platforms, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021) ......................................... 16

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)...................................................... 14

*Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369 (10th Cir. 1979).................... 23

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ................. 2

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1101385 (D. Del. Mar. 8, 2019).... 23

*S. Pac. Commc'ns Co. v. Am. Tel. &Tel. Co.*, 740 F.2d 980 (D.C. Cir. 1984)............................. 9

*Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904 (N.D. Cal. 2021)........................ 20

*Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978) ..................................................... 29

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004) 25

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994).......................................................................... 12

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)..................................................... 23

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982) ... 21

*United States v. Bertelsmann SE & Co. KGAA*, 646 F. Supp. 3d 1 (D.D.C. 2022).................. 3, 4

*United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387 (D. Del. 2003) ............................ 32, 33

**United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ..................................... passim

*United States v. E.I. du Pont de Nemours*, 351 U.S. 377 (1956) ................................... 7

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) ................................... 6

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ............................................. 1, 29

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ..................................... 4, 9

**United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (*en banc*)....................... passim

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) ..................................... 15, 27

*United States v. Phila. Nat'l Bank,* 374 U.S. 321 (1963) ............................................. 29

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ......................................... 9

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)............................................ 29

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)...................................... 16, 19, 30

*W. Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010).......................... 31

**ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir 2012)............................................. passim

**Statutes**

15 U.S.C. § 2 ....................................................................................... 1, 28

15 U.S.C. § 22 ....................................................................................... 35

15 U.S.C. § 26 ....................................................................................... 35

15 U.S.C. § 4 ........................................................................................ 35

28 U.S.C. § 1331 ..................................................................................... 35

28 U.S.C. § 1337 ..................................................................................... 35

28 U.S.C. § 1345 ..................................................................................... 35

28 U.S.C. § 1391 ..................................................................................... 35

**Other Authorities**

Andrew I. Gavil & Steven C. Salop, *Probability, Presumptions and Evidentiary Burdens in Antitrust Analysis*, 168 U. Penn. L. Rev. 2107 (2020) ............................................. 30

Summ. J. Opinion, ECF No. 624 ............................................................................ passim

U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* (2023) ...................................... 5, 6

**Rules**
Fed. R. Civ. P. 37 ................................................................................................... 34, 35

**Treatises**
Phillip E. Areeda et al., *Antitrust Analysis: Problems, Text, and Cases* (8th ed. 2021) ................ 6

Phillip E. Areeda et al., *Antitrust Law* (4th ed. 2015) ........................................................ 19, 20, 25

Richard A. Posner, *Antitrust Law* (2d ed. 2001) ................................................................ 6

Richard A. Posner, *Economic Analysis of Law* (9th ed. 2014) ...................................... 30

Using "sweeping language," Congress designed Section 2 of the Sherman Act to "curb the excesses of monopolists," *LePage's, Inc. v. 3M,* 324 F.3d 141, 146, 169 (3d Cir. 2003) (*en banc*), and preserve "economic liberty" and "free and unfettered competition as the rule of trade," *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). To vindicate these principles, Plaintiffs bring this monopoly-maintenance suit and set forth proposed conclusions of law below.

## I.     Google Has Illegally Maintained Monopolies In The Relevant Markets For Many Years

Section 2 makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. This offense requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Under this test, Plaintiffs' bear a preponderance burden, which the fact finder should assess on an element-by-element basis. *LePage's*, 324 F.3d at 166–67.

Plaintiffs have established that Google illegally maintained monopolies under Section 2. The first element requires defining a relevant market, and proof of the defendant's monopoly power in that market. *See infra* Sections II–III. The second element requires that the defendant engaged in "anticompetitive" or "exclusionary" conduct. *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001) (*en banc*); *infra* Sections IV–V. Because "the means of illicit exclusion, like the means of legitimate competition, are myriad," courts apply a flexible, burden-shifting approach to determine whether defendant's conduct is anticompetitive. *See id.* 58–59; *infra* Sections IV–V.

Courts reviewing Section 2 claims rely on a range of evidence, including documentary evidence from the industry, factual testimony, and expert testimony. Evidence from non-party,

industry participants and ordinary course-of-business documents is especially probative. *See, e.g.*, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 64–65, 69–70 (D.D.C. 2015) (predicting harm based on "[t]he parties' ordinary course documents" and testimony from a "number of industry actors"). Such evidence carries significant weight because courts "assume that economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986).

Conversely, courts often give "little weight to subjective evidence and statements provided by [a defendant's] employees during the course of [antitrust] litigation" because "the bias affiliated with such *ex post facto* testimony is widely recognized and unavoidable." *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 932 (N.D. Cal. 2023); *accord FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1087–88 (N.D. Ill. 2012) (Defendant's executives' testimony "add[ed] little to the analysis" because the executives "would be expected to publicly disavow any improper conduct and not condone such conduct in the future."). Accordingly, the Court should favor contemporaneous documents over inconsistent testimony from Google's employees.

Finally, although intent is not an element of monopolization, *Microsoft*, 253 F.3d at 59, "[t]he Supreme Court has made clear that intent is relevant to proving monopolization," *LePage's*, 324 F.3d at 163. Evidence of intent can be highly probative "because knowledge of intent may help the court to interpret facts and to predict consequences." *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1573 (11th Cir. 1983) (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)); *accord* Summ. J. Opinion, ECF No. 624, at 22. Thus, all facts should be interpreted through the lens of Google's years-long effort to hide and destroy documents related to potential antitrust claims.

## II.    General Search Services, Search Advertising, And General Search Text Advertising In The United States Are Relevant Markets

A relevant market comprises a product market and a geographic market. *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 35 (D.D.C. 2023) [hereinafter *Surescripts II*]. General search services, search advertising, and general search text advertising in the United States are proper relevant markets. Plaintiffs' Post-trial Brief § I [hereinafter PTB]; Plaintiffs' Proposed Findings of Fact §§ IV.A–C [hereinafter PFOF].

"[D]efining a relevant market is not an end unto itself; rather, it is an analytical tool used to ascertain the 'locus of competition.'" *United States v. Bertelsmann SE & Co. KGAA*, 646 F. Supp. 3d 1, 24 (D.D.C. 2022). To define a relevant market, courts apply "a pragmatic, factual approach to the definition of the relevant market and not a formalistic, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).

### A.    General Search Services, Search Advertising, And General Search Text Advertising Are Relevant Product Markets

Plaintiffs have properly defined three relevant product markets—general search services, search advertising, and general search text advertising. Each market is supported by *Brown Shoe* "practical indicia," and a hypothetical monopolist in each market would find it profitable to raise price significantly above competitive levels or reduce quality significantly below competitive levels. PTB §§ I.A–E; PFOF §§ IV.A.1–3, IV.B.1–5, IV.C.1–6.

#### 1.    Several Principles Govern The Exercise Of Defining A Relevant Product Market

A relevant product market "must include all products 'reasonably interchangeable by consumers for the same purposes.'" *Microsoft*, 253 F.3d at 552 (citation omitted). "In other words, courts look at 'whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other.'" *United States*

3

*v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997)). Evidence of some substitution between two products does not require both products to be in a relevant product market. *See H & R Block*, 833 F. Supp. at 54 ("[W]hile providers of all tax preparation methods may compete at some level, this 'does not necessarily require that [they] be included in the relevant product market for antitrust purposes.'" (citation omitted)). The question is not whether there is *any* substitution but whether the products themselves are *reasonably* interchangeable. *Id.*; *see also Sysco*, 113 F. Supp. 3d at 26 ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."); *FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *17 (S.D.N.Y. Jan. 8, 2024) (Competition for advertising dollars in a broader market of differing channels "does not necessarily mean those channels are reasonably interchangeable substitutes that must be included in the relevant product market.").

Under *Brown Shoe*, the contours of a market can be determined by examining such factors as "industry or public recognition . . . , the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325. A relevant market "can exist even if only some of these factors are present." *Staples,* 970 F. Supp. at 1075; *accord IQVIA*, 2024 WL 81232, at *13, *23–24. A product, moreover, can compete in multiple and concentric relevant markets. *Sysco*, 113 F. Supp. 3d at 48–49 (defining concentric markets); *Bertlesmann*, 646 F. Supp. 3d at 27–28 ("[E]ven if alternative submarkets exist . . . , or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." (citations omitted)).

The hypothetical monopolist test, another market-definition tool, asks whether a

hypothetical monopolist of a product or group of products would find it profitable to raise price significantly above competitive levels or reduce quality significantly below competitive levels. U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* §§ 4.3.A–C (2023). A hypothetical monopolist test is not required to define a relevant product market. *See Meta Platforms*, 654 F. Supp. 3d at 912, 919 ("There is 'no requirement to use any specific methodology in defining the relevant market.' . . . As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the [hypothetical monopolist test]." (citations omitted)). When a hypothetical monopolist test is applied, an economic expert may apply the test without constructing a formal econometric model. *See McWane, Inc. v. FTC*, 783 F.3d 814, 829–30 (11th Cir. 2015) (crediting testimony of an economic expert who had applied the hypothetical monopolist test using qualitative evidence rather than econometric analysis); Tr. 8386:25–8387:20 (Israel (Def. Expert)) (It is "more normal than not that [an expert] doesn't do a full quantitative hypothetical monopolist test."). Courts "routinely rely on qualitative economic evidence to define relevant markets." *McWane*, 783 F.3d at 829 (citation omitted). Courts evaluate an expert's testimony against the record as a whole to determine whether that testimony is "consistent with business realities." *Sysco*, 113 F. Supp. 3d at 36–37; *see also IQVIA*, 2024 WL 81232, at *30–31 (considering expert testimony in the context of the record as a whole).

Finally, product markets can be defined around products "where companies offer a product . . . for free but profit in other ways, such as by collecting consumer data or generating ad revenue." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023); *accord FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 45–46, 55 (D.D.C. 2022) (Services "provided free of charge" could qualify as a relevant product market.). In these cases, a monopolist may reduce

product quality or innovation below what would be expected in a competitive market. *See* Merger Guidelines § 4.3.B (Hypothetical monopolist test may entail worsening terms along any dimension of competition, including price, quality, product features, and innovative effort.).

### 2.   Market-Definition Analysis Must Beware Of The *Cellophane* Fallacy

In Section 2 cases such as this one, where a firm has been operating as a monopolist for many years, courts must beware of the *Cellophane* fallacy—the existence of substitution between products resulting from monopoly power rather than reasonable substitutability. Phillip E. Areeda et al., *Antitrust Analysis: Problems, Text, and Cases* ¶ 350(b) (8th ed. 2021) ("[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power."), *quoted favorably in Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 471 (1992). "At a high enough price, even poor substitutes look good to the consumer." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995) (citation omitted). That does not mean these poor substitutes belong in the relevant market, however. The test is whether the products are reasonable substitutes at competitive prices, not monopolized prices. Richard A. Posner, *Antitrust Law* 150 (2d ed. 2001).

Thus, a simple application of the hypothetical monopolist test or the practical indicia (e.g., sensitivity to price increases or other worsening of terms or quality) in a Section 2 case may yield misleading results because the monopolist's conduct has warped substitution patterns. For example, when the cross-elasticity between two products is high, this may suggest that the two products belong in the same product market. *See* Merger Guidelines § 4.3. But cross-elasticity may also be high if customers facing a monopoly price choose poor substitutes instead of paying supracompetitive prices. *See* Posner, *Antitrust Law* 150. Under these circumstances, high cross-elasticity may be evidence of monopoly power rather than evidence that two products

belong in the same market. *See Kodak*, 504 U.S. at 470–71.

**B.      The United States Is A Relevant Geographic Market**

The United States is an appropriate geographic market for each of Plaintiffs' relevant

product markets. PTB § I.F; PFOF ¶¶ 396–397, 455, 500 (§§ IV.A.5, IV.B.7, IV.C.7). The

relevant geographic market is the area "to which consumers can practically turn for alternative

sources of the product and in which the antitrust defendants face competition." *FTC v. Cardinal

Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998) (citation omitted). Here, general search

services provided to users differ materially as between the United States and other countries,

which means a user cannot reasonably substitute a general search service from outside the United

States for one in the United States. PTB § I.F; PFOF ¶¶ 396–397 (§ IV.A.5). Similarly, for

advertisers looking to reach consumers, ads served on search queries made by users located in

other countries are insufficient substitutes for ads on search queries by users located in the

United States. PTB § I.F; PFOF ¶¶ 455, 500 (§§ IV.B.7, IV.C.7).

**III.     Google Has Monopoly Power In Each Of The Three Relevant Markets**

Monopoly power is "the power to control prices or exclude competition." *United States v.

E.I. du Pont de Nemours*, 351 U.S. 377, 391 (1956) (citations omitted). Courts assess monopoly

power using indirect evidence, direct evidence, or both. *Microsoft*, 253 F.3d at 57. Here, both

types of evidence show that Google has monopoly power in each relevant market. PTB § II;

PFOF § V.

**A.      Indirect Evidence Proves That Google Has Monopoly Power In Each
            Relevant Market**

Because "direct proof of monopoly power is only rarely available," courts typically rely

on indirect proof, ordinarily "a firm's possession of a dominant share of a relevant market that is

protected by entry barriers." *Microsoft*, 253 F.3d at 51. For many years, Google's market share in

each relevant market has exceeded the levels courts find sufficient to establish monopoly power, and high barriers to entry and expansion have protected that dominant position. PTB §§ II.A–B; PFOF §§ V.A.1–2, V.B.1–2, V.C.1, V.C.3.

  1.  **For Many Years, Google Has Had A Dominant Market Share In Each Relevant Market**

In 2020, Google's U.S. general search services market share was almost 90% (exceeding 75% since 2009), its U.S. general search text ads market share was 88% (exceeding 80% since 2016), and its U.S. search ads market share was 74% (exceeding 64% since 2012). PTB §§ II.A.1, II.B; PFOF ¶¶ 522, 526, 575, 602–603. Market shares consistently above 65%, when combined with high barriers to entry, establish monopoly power. *Facebook*, 581 F. Supp. at 47–48 (shares above 80% "comfortably exceed[ed] the levels that courts ordinarily find sufficient to establish monopoly power"—60–65% (citations omitted)); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184–88 (3d Cir. 2005) (A market share of 75–80% "is more than adequate to establish a prima facie case of power."). Monopoly power is further supported when a firm holds its dominant share for a long period. *See id.* at 188–89.

  2.  **Each Relevant Market Has High Barriers To Entry And Expansion**

There are significant barriers to entry and expansion in each of the three relevant markets, including (1) scale effects, (2) large capital costs to operate a general search engine and provide search advertising, (3) Google's strong brand recognition and reputation in the general search services market, (4) Google's control of search access points through its anticompetitive distribution agreements and through its ownership of Chrome. PTB §§ II.A.2, II.B; PFOF §§ V.A.2, V.B.2, V.C.3.

"Any market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant

firm should be considered a barrier to entry, *regardless of who is responsible for the existence of that condition*." *Surescripts II*, 665 F. Supp. 3d at 44 (emphasis added) (quoting *S. Pac. Commc'ns Co. v. Am. Tel. &Tel. Co.*, 740 F.2d 980, 1001 (D.C. Cir. 1984)).

Courts recognize high capital costs, economies of scale, network effects, entrenched consumer brand preferences, and the use of exclusive contracts to lock out competitors as barriers to entry and expansion. *E.g.*, *Microsoft*, 253 F.3d at 54–56 (An indirect network effect was a barrier.); *Surescripts II*, 665 F. Supp. 3d at 45 (Indirect network effects were a barrier.); *Sysco*, 113 F. Supp. 3d at 80 (Capital costs and incumbency advantages were barriers.); *H & R Block*, 833 F. Supp. 2d at 75 (The "importance of reputation and brand in driving consumer behavior" were barriers.); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale."); *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990) (A "network of exclusive contracts or distribution arrangements designed to lock out potential competitors" can be a barrier.). A history of failed entry is also indicative of entry barriers. *Cardinal Health*, 12 F. Supp. 2d at 56. PFOF ¶¶ 373, 584.

**B.**   **Direct Evidence Proves That Google Has Monopoly Power In Each Relevant Market**

Although direct evidence of monopoly power is not required, *Microsoft*, 253 F.3d at 57, in this case, direct evidence bolsters the indirect evidence and independently establishes that Google has monopoly power in each of the relevant markets. PTB § II.C; PFOF §§ V.A.4, V.B.4, V.C.5.

Direct evidence shows a firm's "power to control prices or exclude competition." *Microsoft*, 253 F.3d at 51. It is evidence of "something a firm without a monopoly would have

been unable to do" or behavior "difficult to explain unless [the defendant has] a monopoly product." *Id.* at 57–58. Here, direct evidence of Google's monopoly power includes users' low responsiveness to reductions in the quality of Google Search, advertisers' low responsiveness to price increases for Google's text ads, and Google's ability to extract significant profits from advertisers and search distribution partners, without considering rivals' prices. PTB § II.C; PFOF §§ V.A.4, V.B.4, V.C.5.

Although supracompetitive pricing and restricted output are direct evidence of monopoly power, neither one is required. *Microsoft*, 253 F.3d at 56–58. "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946). "Courts have held that the existence of so-called 'calling cards' of a competitive market, such as falling prices and increased output, do not by themselves negate the existence of monopoly power as a matter of law." *Surescripts II*, 665 F. Supp. 3d. at 47. If the presence of technological innovation and declining prices negated monopoly power, "a great many defendants with market power, such as Alcoa in the 1920s and perhaps even the former AT&T telephone monopoly, could be insulated from antitrust attack." *Allen-Maryland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 210–11 (3d Cir. 1994).

This is especially true in fast-moving technology markets where, despite the presence of monopoly power, innovation may lead to output growth and falling costs. For example, in *Microsoft*, the Court held that Microsoft had monopoly power in the Intel-compatible PC market, 253 F.3d at 54–58, although PC shipments were increasing in the period leading up to the district court's decision, PFOF ¶ 530. *See also Allen-Maryland*, 33 F.3d at 210–11 ("Although the

performance of computers has been rapidly increasing as costs for performance have plummeted, it proves too much to say that this improvement is inconsistent with market power.").

Similarly, R&D investment cannot disprove monopoly power. Even monopolists "have reason to invest in R&D" because "innovation can increase an already dominant market share and further delay the emergence of competition." *Microsoft*, 253 F.3d at 57.

## IV. The Evidence Establishes A Prima Facie Case Of Anticompetitive Conduct

If the defendant has monopoly power in a relevant market, as Google does, the Court must consider whether the evidence establishes a prima facie case of anticompetitive conduct. *Microsoft*, 253 F.3d at 58. In this action, the evidence establishes a prima facie case of anticompetitive conduct because Google has harmed the competitive process. Even applying Google's overly narrow and legally inapplicable exclusive-dealing standard, the evidence here nonetheless establishes a prima facie case. Lastly, at summary judgment, this Court deferred ruling on three disputes related to Plaintiffs' prima facie case. Even now, the Court need not resolve these disputes, but doing so bolsters Plaintiffs' prima facie case.

### A. The Evidence Establishes A Prima Facie Case Under Section 2

Because "the means of illicit exclusion, like the means of legitimate competition, are myriad," a flexible standard governs Section 2 challenges. *Microsoft*, 253 F.3d at 58. Under this standard, the evidence establishes a prima facie case if the challenged conduct has an "anticompetitive effect," meaning that it "harm[s] the competitive *process*." *Id.* The evidence need only show that the conduct "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power." *Id.* at 79 (citation omitted). Plaintiffs have established that Google's conduct satisfies this standard. PTB §§ III–V; PFOF §§ VI–VIII.

Two principles are key to assessing harm to the competitive process. First, Section 2 prevents monopolists from engaging in exclusionary conduct directed at current and potential

competitors. *Microsoft*, 253 F.3d at 54. Accordingly, Section 2 prohibits Google from suppressing competition not only from general search engines but also from firms outside the market—such as Apple and Branch—posing nascent threats. *Id.* (explaining that the district court's opinion had committed "no contradiction" in "defin[ing] the relevant market to exclude the 'very competitive threats that gave rise' to the action"). To hold otherwise would reward the prescient monopolist that trimmed the roses before they grew thorns. As *Microsoft* explained, "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Id.* at 79; *accord LePage's*, 324 F.3d at 159 (Section 2 protects against anticompetitive conduct "designed to prevent one or more new or potential competitors from gaining a foothold in the market.").

Second, in establishing harm to the competitive process, the plaintiff need not prove downstream harm, such as increased prices, lost innovation, and reduced quality. *Microsoft*, 253 F.3d at 58 (noting that downstream harm is presumed from harm to competition). Indeed, "if monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract a monopoly price provides no succor to the monopolist." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979), *quoted favorably in Microsoft*, 253 F.3d at 57; *accord FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461–62 (1986) (upholding a finding of "actual, sustained adverse effects on competition" "even absent proof that [the challenged agreement] resulted in higher prices"); *Sullivan v. NFL*, 34 F.3d 1091, 1101 (1st Cir. 1994) (holding that an action could injure competition "regardless of [its] exact price effects"). For example, *Microsoft* found prima facie cases against exclusionary conduct by "simply determin[ing] whether the exclusive agreement foreclosed a substantial share of the

market." *See* Summ. J. Opinion, ECF No. 624, at 37. No proof of higher prices or lower quality was necessary.

The evidence presented to the Court demonstrates that the challenged agreements harm the competitive process. These agreements do so by (1) foreclosing rivals and potential rivals from the most important distribution channels, (2) depriving rivals' of scale, which undermines their product quality and raises barriers to entry and competition; (3) incentivizing Apple not to become a general-search rival through enormous payments under the ISA; (4) including terms in the ISA that prohibit Apple from materially expanding its Suggestions product in Safari; (5) including terms in the ISA requiring Apple to get Google's approval before showing search ads in Spotlight; and (6) thwarting the adoption of a nascent search tool developed by Branch to navigate and discover app content. PTB § III; PFOF §§ VI–VIII. Harm to consumers and advertisers, which the evidence also showed, corroborates and independently demonstrates harm to the competitive process. PTB §§ IV–V; PFOF §§ VIII. Thus, under Section 2 of the Sherman Act and cases such as *Microsoft*, the evidence establishes a prima facie case of harm to competition.

### B.      An Exclusive-Dealing Standard Is Too Narrow For This Action

Courts undertake a flexible, case-specific inquiry to determine whether a monopolist has pursued anticompetitive conduct and thus violated Section 2. *See Kodak*, 504 U.S. at 466–67 (rejecting "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities" in favor of "resolv[ing] antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record'"); *Microsoft*, 253 F.3d at 58.

Some courts have developed standards for analyzing common forms of anticompetitive conduct, such as tying and exclusive dealing. For example, courts have found that agreements that are exclusive and foreclose a substantial share of a relevant market may violate Section 2.

13

*Microsoft*, 253 F.3d at 69. In these cases, courts assess competitive harm by measuring the extent to which the exclusive contracts foreclose competition. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270–71 (3d Cir 2012) (explaining that the exclusive-dealing standard focuses on harm caused by depriving rivals of effective distribution).

Google's conduct, however, exceeds mere foreclosure. As discussed above, Google's agreements harm the competitive process not just by substantially foreclosing competition in the relevant markets but also by (1) depriving rivals' of scale, which undermines their product quality and raises barriers to entry and competition; (2) incentivizing Apple not to become a general-search rival through enormous payments under the ISA; (3) including terms in the ISA that prohibit Apple from materially expanding its Suggestions product in Safari; (4) including terms in the ISA that require Apple to get Google's approval before showing search ads in Spotlight; and (5) thwarting the adoption of a nascent search tool developed by Branch to navigate and discover app content. PTB §§ III.A–B; PFOF §§ VI.B.5, VIII.A, VIII.B.3. A foreclosure analysis is simply the wrong tool to properly weigh or assess these additional harms. For example, Google paying Apple to stunt Suggestions and Spotlight harms competition because a potential rival has *agreed* to a limit on competition, not because the conduct *foreclosed* the rival from competing. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) (Anticompetitive conduct includes "agreements not to compete, with the aim of preserving or extending a monopoly."). To apply a rigid exclusive dealing standard here, therefore, risks obscuring "actual market realities." *Kodak*, 504 U.S. at 466.

Under similar circumstances, courts have opted for the general Section 2 standard, even when harm resulted from agreements blocking access to distribution. Most notably, in *Microsoft*, the D.C. Circuit assessed restrictions in licenses between Microsoft and OEMs that limited

14

OEMs' ability to distribute or promote browsers other than Internet Explorer. 253 F.3d at 61–62. The district court had found that only one of the many OEM agreements "could be termed . . . 'exclusive'" under the law. *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000), *aff'd in part, rev'd in part and remanded*, 253 F.3d 34 (D.C. Cir. 2001). The D.C. Circuit, by contrast, did not apply an exclusive-dealing standard—it did not ask whether the agreements were exclusive or created substantial foreclosure. Instead, the D.C. Circuit found these OEM agreements anticompetitive under the general Section 2 standard because the agreements limited access to "one of the two primary channels for distribution of browsers" and "prevent[ed] OEMs from taking actions that could increase rivals' share of usage." *Microsoft*, 253 F.3d at 61–62. For the D.C. Circuit, what controlled was the effect these agreements had on the competitive process and, ultimately, in reinforcing Microsoft's monopoly.

Similarly, in *Chase Manufacturing, Inc. v. Johns Manville Corp.*, the Tenth Circuit declined to apply "an exclusive-dealing framework" to a manufacturer's conduct, recognizing that "[r]eal-world monopolists may engage in allegedly exclusionary conduct which does not fit within a single paradigm." 84 F.4th 1157, 1170–74 (10th Cir. 2023) ("'[A]nticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy.'" (citations omitted)); *see also Lorain Journal Co. v. United States,* 342 U.S. 143, 143–44, 149–50, 152–53 (1951) (applying general Section 2 principles to condemn a newspaper's refusal to accept local advertising from customers that advertised on a competing radio station); *Am. Pres. Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 229 (D.D.C. 2022) (holding that a plaintiff can challenge a discounting policy under an exclusive-dealing standard even if the plaintiff could not satisfy the predatory-pricing standard); *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 101–02 (D.D.C. 2020)

(same) [hereinafter *Surescripts I*].[1]

In sum, the narrow foreclosure-based standard for exclusive dealing is not sufficient to scrutinize all harm arising from Google's anticompetitive behavior. Exclusive dealing is only one form of exclusionary conduct, and the exclusive-dealing standard is designed to assess only one theory of harm. Thus, consistent with *Microsoft*, Google's agreements are best analyzed under the general Section 2 standard.

### C.    The Evidence Nonetheless Establishes A Prima Facie Case Under The Overly Narrow Exclusive-Dealing Standard

Even if the Court adopts an exclusive-dealing standard—which it should not, *see supra* Section IV.B—Plaintiffs have established a prima facie case under Section 2. Google's agreements are exclusive and create substantial foreclosure in each relevant market.[2]

### 1.    Google's Contracts Are Exclusive

"Generally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *ZF Meritor*, 696 F.3d at 270. Literal exclusivity, however, "is not necessary, because [courts] look past the terms of the contract to ascertain the relationship between the

---

[1] The application of an exclusive-dealing standard in *New York v. Meta Platforms, Inc.* is inapposite here not only because of differences in the challenged conduct but also because the *Meta* plaintiffs themselves had requested an exclusive-dealing standard. *Compare* 549 F. Supp. 3d 6, 32 (D.D.C. 2021) (applying an the "exclusive-dealing doctrine" because the plaintiffs had argued it "appl[ied] to this case"), *with Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 n.11 (7th Cir. 2020) (declining to apply the exclusive-dealing standard because the plaintiff "elected not to pursue exclusive dealing as a distinct theory of liability").

[2] In the D.C. Circuit, exclusivity and substantial foreclosure are the only elements of a prima facie case of exclusive dealing. Summ. J. Opinion, ECF No. 624, at 37 ("[A]t the *prima facie* stage, the Circuit [in *Microsoft*] simply determined whether the exclusive agreement foreclosed a substantial share of the market."). The analyses used in some other circuits include additional factors, namely, the duration of the exclusive contracts, coercion, the contracts' ease of termination, and rivals' use of exclusive dealing. *E.g.*, *ZF Meritor*, 696 F.3d at 271–72. Although this Court must focus on how the elements adopted by the D.C. Circuit support Plaintiffs' claims, the additional factors from other circuits bolster the same conclusion. *E.g.*, PFOF ¶¶ 38, 216, 220–221, 238–244, 250, 255, 274, 281, 286, 300, 308, 740–778, 779–781, 822–862, 1307, 1321.

parties and the effect of the agreement 'in the real world.'" *Id.* (citations omitted). Under this flexible standard, Google's agreements are exclusive because they require partners to distribute Google as the exclusive default and thus ensure rivals cannot obtain default distribution with Google's partners. PTB § III.C.1; PFOF §§ VI.A–C. Any other outcome would invite the creative, well-lawyered monopolist to craft anticompetitive agreements taking advantage of unnecessary formalism.

Most directly, the district court and the D.C. Circuit in *Microsoft* determined that agreements establishing Microsoft's products as the "default" were exclusive; a showing of complete or absolute exclusivity was not required. *Microsoft*, 253 F.3d at 75 ("The District Court found that, although not literally exclusive, the [JVM] deals were exclusive in practice because they required developers to make Microsoft's JVM the default in the software they developed."); *id.* at 76 (agreeing with the district court that a "default clause . . . made the [JVM] Agreements exclusive as a practical matter"); *id.* at 71 (holding that IAP agreements establishing Internet Explorer "as the default browser" constituted unlawful exclusive dealing).[3] Rather, courts properly elevate substance over form by examining an agreement's effect based on the market realities of the companies and industries at issue. Similarly, in *ZF Meritor*, the Third Circuit upheld an exclusive-dealing judgment even though the challenged agreements allowed partners to distribute rivals' products upon consumer request and even though rivals "remained free to

---

[3] As discussed above, the D.C. Circuit found a different set of agreements, the OEM agreements, unlawful without deciding whether the agreements qualified as exclusive. *See Microsoft*, 253 F.3d at 59–69. However, if this Court were to disagree and construe *Microsoft* as holding that the OEM agreements were exclusive deals, that construction would further show the ease of qualifying as exclusive under Section 2. *Id.* at 60–62 (finding support for three independent prima facie cases against provisions in the OEM agreements that prohibited "(1) removing any desktop icons, folders, or 'Start' menu entries; (2) altering the initial boot sequence; and (3) otherwise altering the appearance of the Windows desktop").

market directly" to consumers. 696 F.3d at 287–88.

These cases demonstrate the flexibility of Section 2's exclusivity standard. An agreement qualifies as exclusive not only if it is literally exclusive but also if it is "de facto" or "partially" exclusive. *ZF Meritor*, 696 F.3d at 282–84; *see also McWane*, 783 F.3d at 833–35 (rejecting the defendant's attempt to use "'formalistic distinctions' [to argue] that the specific form of its exclusivity mandate insulated it from antitrust scrutiny").

First, "the law is clear that an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful." *ZF Meritor*, 696 F.3d at 282; *accord Surescripts I*, 424 F. Supp. 3d at 101–02 (holding that the complaint stated a claim for "*de facto* exclusive dealing" (quoting *ZF Meritor*, 696 F.3d at 281)). A contract is de facto exclusive when the contract's practical effect is to prevent the use of a rival product or service. *ZF Meritor*, 696 F.3d at 282–83; *e.g.*, *LePage's*, 324 F.3d at 157–59 (Exclusivity existed under Section 2 where a challenged agreement contained an optional 1% discount conditioned on exclusivity.); *Am. Pres. Lines*, 633 F. Supp. 3d at 227–28 (same for an optional 20% discount conditioned on exclusivity); *Surescripts I*, 424 F. Supp. 3d at 101 (same for an optional discount conditioned on exclusivity even though "some" partners had forgone the discount to work with rivals); *see also Dentsply*, 399 F.3d at 193 (explaining how an "at-will" arrangement that was "technically only a series of independent sales" constituted unlawful exclusive dealing).

Second, "an exclusive dealing claim does not require . . . a contract that covers 100% of the buyer's needs." *ZF Meritor*, 696 F.3d at 282 n.14; *accord Am. Pres. Lines*, 633 F. Supp. 3d at 228 ("[The defendant] does not cite—and the Court has not independently identified—any federal precedent requiring 100% exclusivity."). Instead, an agreement qualifies as exclusive under Section 2 even when its provisions are only "partially" exclusive—meaning they require

18

the partner to use the defendant for a portion of its needs while allowing the partner to use competitors for the rest. *ZF Meritor*, 696 F.3d at 283 (rejecting a "100%" or "complete" exclusivity requirement). For example, in both *ZF Meritor* and *American President Lines*, the challenged agreements qualified as exclusive even though the agreements permitted partners to purchase up to 10% of their needs from the defendants' rivals. *ZF Meritor*, 696 F.3d at 283–84; *Am. Pres. Lines*, 633 F. Supp. 3d at 227–28.

Under Section 2's flexible standard, the challenged agreements are exclusive, PTB § III.C.1; PFOF §§ VI.A–C, particularly when viewed in light of the network and scale effects present in the relevant markets, PTB § III.A; PFOF § III.E. The agreements require partners to distribute Google as the exclusive default on their devices' or browsers' search access points; rivals, by contrast, cannot obtain defaults with Google's partners because the agreements prohibit that distribution. PTB § III.C.1; PFOF § III.F (*see, e.g.*, ¶¶ 223, 245, 259–261, 311–315, 317).[4]

### 2.     Google's Contracts Substantially Foreclose Competition

Under an exclusive-dealing standard, a Section 2 plaintiff must show "substantial" foreclosure to establish a prima facie case. *Microsoft*, 253 F.3d at 68–70. Google's contracts substantially foreclose competition in each relevant market.

Foreclosure is calculated by measuring the percentage of the market covered (or tied up)

---

[4] Even if Google's agreements were not considered exclusive, that would only bolster the need to analyze Google's agreements under the general Section 2 standard. The exclusive-dealing standard is simply not capable of evaluating challenged conduct of all kinds. *Viamedia,* 951 F.3d at 452–53 (When assessing whether "conduct fits into [specialized] categories under Section 2," remain "mindful that we should stay focused on the effect [the challenged] conduct has on competition."); *Microsoft*, 253 F.3d at 59–64 (finding OEM distribution contracts unlawful without ever assessing exclusivity); *see also* Phillip E. Areeda et al., *Antitrust Law* ¶ 651b (4th ed. 2015) (Specialized tests under Section 2 are "'incomplete,' in the sense that they do not account for every type of exclusionary conduct that the law of monopolization should condemn.").

by the challenged agreements. *Surescripts I*, 424 F. Supp. 3d at 102 ("Exclusivity provisions *covering* about 40–50% of the relevant market have been found to foreclose competition illegally, and Surescript's loyalty program allegedly places 70–80% of [two] markets into effectively exclusive contracts." (emphasis added) (citations omitted)); *ZF Meritor*, 696 F.3d at 286 (using coverage to find 85% foreclosure); *Le v. Zuffa, LLC*, 2023 WL 5085064, at *17–18, *29 (D. Nev. Aug. 9, 2023) (endorsing an expert's disputed opinion that coverage was the proper measure of foreclosure); Areeda, *Antitrust Law* ¶ 768b4 n.39 ("Foreclosure is measured by looking at the percentage of the market that is 'tied up' by the exclusive-dealing contract, and thus by considering how much of the market is available to rival sellers.").

The D.C. Circuit has "declined to adopt a rigid test of what degree of foreclosure is required for a successful Section 2 challenge." *See* Summ. J. Opinion, ECF No. 624, at 41–42 (citing *Microsoft*, 253 F.3d at 70). Accordingly, although exclusive dealing may give rise to antitrust liability under either Section 1 or Section 2, exclusive contracts can violate Section 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Id.*

Google's agreements cover and thus foreclose 50% of U.S. general search queries, 45% of U.S. general search text ad revenues, and 36% of U.S. search ad revenues. PTB § III.C.3; PFOF ¶¶ 954, 965–966. Each of these foreclosure amounts is substantial on its own and even more so when considered in light of market realities, such as the importance of scale. *Microsoft*, 253 F.3d at 73–74 (holding that the Apple agreements created substantial foreclosure despite the agreements' accounting for only 15% of *one* distribution channel); *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 917 (N.D. Cal. 2021) (The Ninth Circuit has held "that a contract restricting as little as 24% of the relevant market resulted in a cognizable foreclosure

under section 1, which typically requires a higher level of foreclosure than section 2." (*citing Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1298, 1304 (9th Cir. 1982))).

Economic analysis bolsters the substantiality of these foreclosure numbers. Google's contracts ensure a substantial share of each market would remain with Google even if a rival's service became much more attractive than Google's. PTB § III.C.3; PFOF ¶¶ 955–961, 967. In particular, as long as Google's agreements are in place, at least 33% of U.S. general search service queries, 30% of U.S. general search text ad revenues, and 24% of U.S. search ad revenues will remain with Google, *regardless of any conceivable changes in quality*.[5] PTB § III.C.3; PFOF ¶¶ 955–961, 967. Thus, by any reasonable measure, Google's contracts render a substantial portion of the relevant markets unavailable to competitors.

### D.   Although Not Necessary, Resolving Disputes Pending After Summary Judgment Bolsters Plaintiffs' Prima Facie Case

At summary judgment, this Court deferred ruling on three matters relating to foreclosure: (1) "whether a but-for approach is the appropriate way to measure foreclosure"; (2) "what channels of distribution are included in the foreclosure analysis"; and (3) "whether either the Browser Agreements or Android Agreements, or both, are part of the foreclosure calculus." Summ. J. Opinion, ECF No. 624, at 43. The Court need not resolve these disputes—even if the exclusive-dealing standard governs this action—because Plaintiffs have made their prima facie case either way. Nonetheless, resolving these disputes bolsters Plaintiffs' prima facie case.

---

[5] Although Google's expert Prof. Murphy recognized that some users will not change their search default under any imaginable situation, he declined to estimate how many searches those users account for. PFOF ¶ 964.

1.     **Measuring Foreclosure Requires No Assessment Of The But-For World**

The first open issue from summary judgment is whether to measure foreclosure relative to a but-for world (i.e., the world as it would be had the defendant not engaged in any of the challenged conduct). Doing so is improper, but in any case, Google's foreclosure is substantial even when assessed relative to the but-for world.

a)     *Microsoft* **Bars A But-For Requirement**

First, *Microsoft* anticipated and rejected Google's foreclosure argument. As the D.C. Circuit explained, Section 2 liability does not obligate a plaintiff "to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct." 253 F.3d at 79. Holding otherwise would subvert Section 2 because "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct." *Id.* Even Google's expert conceded he has not identified how the world would have developed but-for Google's contracts. Tr. 10005:12–10006:16 (Murphy (Def. Expert)). Adopting Google's argument would reward the monopolists that muddy the question of what would have happened—how rivals would have grown or developed—absent their misconduct. Such an incentive is fundamentally inconsistent with the Sherman Act's objectives, "particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Microsoft*, 253 F.3d at 79.

b)     **The Meaning And Purpose Of Foreclosure Contravene A But-For Analysis**

Second, a but-for analysis is improper because foreclosure focuses on limits to rivals' *opportunities in the current world*, not on speculative calculations of would have arisen in the but-for world. *Microsoft*, 253 F.3d at 69 (holding that foreclosure concerns exclusive contracts' limitations on "the *opportunities* for other traders to enter into or remain in that market"

(emphasis added) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961));

*LePage's*, 324 F.3d at 158–59 (endorsing *Microsoft*'s focus on the foreclosure of "the available

*opportunities*" for distribution (quoting *Microsoft*, 253 F.3d at 70–71 (emphasis added)));

*Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1374 (10th Cir. 1979)

(explaining that an exclusive agreement creates foreclosure by "restrict[ing] the *opportunities* of

the seller's competitors to *market* their product" (emphasis added)).

Accordingly, courts routinely calculate foreclosure without regard to a but-for world.

*E.g.*, *Microsoft*, 253 F.3d at 67–76 (finding, without any but-for analysis, that the IAP, ISV,

Apple, and JVM agreements each created substantial foreclosure); *Surescripts I*, 424 F. Supp. 3d

at 102 (using coverage to measure foreclosure); *cf. FTC v. Mot. Picture Advert. Serv. Co.*, 344

U.S. 392, 393, 395 (1953) (using coverage to find 75% foreclosure for an exclusive-dealing

claim brought under Section 5 of the FTC Act). Even in the rare instances where a court could

plausibly estimate market-share shifts relative to the but-for world, coverage is nonetheless used

to measure foreclosure. *E.g.*, *ZF Meritor*, 696 F.3d at 286 (using coverage to calculate 85%

foreclosure even though market shares had shifted only 4–10% after the exclusive dealing

began); *accord Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1101385, at *3 (D.

Del. Mar. 8, 2019) ("[O]ur Court of Appeals have affirmed foreclosure findings even when the

foreclosure calculations include sales the defendant would have made despite the alleged

anticompetitive conduct." (citing *ZF Meritor*, 696 F.3d at 278; *Dentsply*, 399 F.3d at 194)).

### c)      Even But-For Analysis Shows Substantial Foreclosure

Third, measuring foreclosure relative to a but-for world would change the analysis only if

the Court did so in a manner that Google's expert has expressly disclaimed.

Google's expert Prof. Kevin Murphy argued that the Court should calculate foreclosure

by comparing rivals' "ability to compete" in the current world to their "ability to compete" in the

but-for world. Tr. 10003:16–10004:10 (Murphy (Def. Expert)). Importantly, he explained that this analysis does *not* involve predicting "the outcome in terms of shares" in the but-for world. *Id.* In other words, Prof. Murphy testified that foreclosure should be calculated by measuring the additional opportunities that rivals would have to compete in the but-for world, not by predicting who would "win[] or lose[]" those additional opportunities. *Id.*

Prof. Murphy's focus on the portion of the market where rivals lack the "ability to compete" is equivalent to Plaintiffs' focus on the portion of the market that is "tied up." Prof. Murphy simply argues for subtracting the share of the market that would be "tied up" in the but-for world from the share of the market that is "tied up" today.

This is a meaningless distinction. The share of the market "tied up" today is Plaintiffs' measure of foreclosure. The share of the market that would be "tied up" in the but-for world is zero. This is because, in a world without Google's anticompetitive agreements, rivals could compete for all queries that are currently covered by those agreements. Thus, after removing the unnecessary subtraction of zero, Prof. Murphy's definition of foreclosure becomes the same as Plaintiffs'.

Only assessing "the outcome in terms of shares" in the but-for world—the method properly rejected by Prof. Murphy—would produce different foreclosure percentages. Calculating foreclosure relative to a but-for world in the manner that Prof. Murphy has proposed would yield the same foreclosure percentages as Plaintiffs' method. *See supra* Section IV.C.2.[6]

---

[6] Despite the similarity between Plaintiffs' approach and Prof. Murphy's, Prof. Murphy concluded that "foreclosure is zero in this case" because, unlike Plaintiffs, he believes that Google's agreements do not tie up even a single query from competition in the current world. Tr. 10006:18–25 (Murphy (Def. Expert)).

2.      **User-Downloaded Chrome Queries Exacerbate The Foreclosure Created By Google's Contracts**

The second open issue from summary judgment is "what channels of distribution" to include in the foreclosure analysis, Summ. J. Opinion, ECF No. 624, at 43, which boils down to whether to consider certain Chrome queries alongside those covered by the Apple, third-party browser, and Android agreements. The Chrome queries are appropriate to consider, but the foreclosure created by Google's agreements is substantial even if those queries are ignored.

When market circumstances—beyond the challenged contracts—limit rivals' opportunities to compete, those circumstances must factor into this Court's consideration of foreclosure. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004) (noting the need to "tak[e] account of other existing foreclosures" when assessing the challenged agreements' foreclosure). For example, "if 30 percent of the market was covered by exclusive-dealing arrangements and an additional 60 percent was covered by manufacturer ownership of stores, then the total of tied-up [i.e., foreclosed] stores would have to be reckoned at 90 percent, with only 10 percent available to rival manufacturers." Areeda, *Antitrust Law* ¶ 1802b n.9.

On Windows and Apple devices (primarily Macs), many users download Google's Chrome browser (like Firefox), which defaults to Google Search (like Firefox). PFOF ¶¶ 968–969. Unlike Firefox queries, however, queries on these user-downloaded versions of Chrome are not foreclosed by the challenged conduct and are thus not included in the foreclosure numbers identified above. *See supra* Section IV.C.2. Nonetheless, these user-downloaded Chrome queries are still unavailable to rivals. PFOF ¶ 969. Thus, user-downloaded Chrome queries—which amount to 20% of the overall general search services market, PFOF ¶ 968—magnify the contracts' foreclosure in each relevant market. PTB § III.C.3; PFOF ¶ 970. Whether the Court

25

includes these Chrome queries in the foreclosure number itself or adjusts the amount of foreclosure needed to establish anticompetitive conduct, these Chrome queries must be accounted for in the foreclosure analysis.

Nonetheless, Google's contracts create substantial foreclosure even without considering user-downloaded Chrome queries. *See supra* Section IV.C.2. Thus, the Chrome queries bolster the need for—but are not necessary for—a finding of substantial foreclosure.

### 3. The Foreclosure From Google's Browser And Android Contracts Should Be Aggregated

The third open issue from summary judgment is "whether either the Browser Agreements or Android Agreements, or both, are part of the foreclosure calculus." Summ. J. Opinion, ECF No. 624, at 43. When applying Section 2, assessing cumulative effects is appropriate even when conduct other than exclusive deals are challenged. Similarly, foreclosure analysis requires aggregation. Thus, the Court should aggregate the browser agreements (i.e., those with Apple and third-party browsers) with the Android agreements or, put differently, view the two types of agreements in "light" of each other. *See Microsoft*, 253 F.3d at 72. To do otherwise, invites the monopolist to do in pieces what it cannot do at once. Nonetheless, even when assessed separately, Google's contracts create substantial foreclosure.

*Microsoft*'s analysis of the ISV contracts demonstrates why the foreclosure of different kinds of agreements must be aggregated. *Microsoft* found that "although the ISV market foreclosure on its own was not significant, the exclusive arrangements with the ISVs were anticompetitive when *aggregated* with the foreclosure occurring through the two main channels of browser distribution," the IAP and OEM channels. Summ. J. Opinion, ECF No. 624, at 27 (emphasis added); *Microsoft*, 253 F.3d at 72 (finding the various ISV agreements collectively created substantial foreclosure despite their "relatively small" size because those agreements

occurred in "light" of IAP and OEM agreements).

The IAP agreements were themselves numerous and heterogenous—entered with 10 ISPs and several additional OLSs. *Microsoft*, 253 F.3d at 67, 70–71. Similarly, the OEM agreements were "many" in number, *id.* at 59–69, and with one exception, found not exclusive by the district court, *Microsoft*, 87 F. Supp. 2d at 52–53. Nonetheless, to assess foreclosure, the court aggregated these dozens of exclusive and non-exclusive agreements—entered with ISVs, ISPs, OLSs, and OEMs. *Microsoft*, 253 F.3d at 72.

Subsequent precedent in this Circuit has employed similar analysis, aggregating foreclosure even when the underlying conduct is much more varied than the contracts challenged here. *E.g.*, *Am. Pres. Lines*, 633 F. Supp. 3d at 228 n.8 (aggregating foreclosure from a loyalty program, exclusive dealing, bundled pricing, and a tying scheme "without attempting to attribute specific percentages to each alleged activity"). Any contrary approach would (1) immunize a monopolist whose product or service is distributed through unconcentrated or differentiated partners and (2) incentivize the monopolist to influence the market's growth to block aggregation.

Thus, assessing foreclosure here requires aggregating the foreclosure from the browser and Android contracts (and viewing that foreclosure in context of the importance of scale). Nonetheless, even without aggregation, the browser and Android agreements create substantial foreclosure, whether viewed in "light" of each other or even in complete isolation. PFOF ¶¶ 728, 804, 864 (showing that the browser (including the ISA) and Android agreements cover, and therefore foreclose, 30.3% and 19.4%, respectively, of the general search services market).

## V.    Google Failed To Present Valid Procompetitive Justifications, Let Alone Sufficient Nonpretextual Justifications To Outweigh The Anticompetitive Effects

When the evidence in a Section 2 case establishes a prima facie case of anticompetitive

conduct, the burden shifts to the defendant to "show[]" a sufficient "procompetitive justification" for this conduct. *Microsoft*, 253 F.3d at 59, 64–65, 67. Google argues that its conduct was justified for a variety of reasons.[7] Each of these arguments fails based on well-established principles for assessing procompetitive justifications. PTB § VI; PFOF § X.

Even if a defendant demonstrates that its procompetitive justifications are valid, the defendant can prevail only if the cognizable benefits outweigh the harm arising from the conduct. Because each of Google's procompetitive justifications fail at the outset, the Court need not reach the balancing stage. But if the Court reaches balancing, the anticompetitive harms from Google's contracts outweigh any cognizable procompetitive benefits. PTB § VII; PFOF § VIII.

### A.      Google's Justifications Are Invalid

In assessing purported procompetitive justifications, Courts reject out-of-market claims, factually unsupported claims, claims that are not procompetitive, pretextual claims, and claims where less competitively restrictive alternatives exist to the defendant's exclusionary conduct. Each of Google's proffered justifications fails one or more of these tests. PTB § VI; PFOF § X.

### 1.      Google's Justifications Rely On Out-Of-Market Effects

Because purported benefits in one market cannot excuse harm elsewhere, Google must prove concrete benefits to competition in the relevant markets. PTB § VI.A.

Section 2's focus on protecting competition in any relevant market derives directly from its text, which prohibits monopolization of "*any part* of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2 (emphasis added). Once the Court identifies that a

---

[7] Google asserts (1) that "competition for the contract" between search rivals justifies any harm to consumers in the relevant markets, (2) that Google's agreements benefit consumers through lower smartphone prices and more innovative browsers, and (3) that Google's RSAs and MADAs lead to a more robust Android ecosystem. PTB § VI.

product or service "makes up a relevant market[,] . . . domination or control of it makes out a monopoly of a 'part' of trade or commerce within the meaning of s 2 of the Sherman Act." *Grinnell*, 384 U.S. at 572. This statutory text alone requires a focus on whether competition is harmed in any of the relevant markets at issue.

The Supreme Court confirms this plain meaning with its reading of the Clayton Act, which has analogous statutory text prohibiting mergers that may harm competition "in any line of commerce." *Id.* at 573. In interpreting Section 7 of the Clayton Act, the Supreme Court has held that anticompetitive effects in one market cannot be "justified by procompetitive consequences in another." *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 370 (1963). The Supreme Court has similarly cautioned against entertaining out-of-market benefits in cases brought under Section 1 of the Sherman Act, even though that section does not have text analogous to "any part" and "any line of commerce." *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).

A rule against cross-market analysis reserves for Congress "value judgments . . . whether competition in the collateral market is more important than competition in the defined market," *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1270 (9th Cir. 2020) (Smith, J., concurring), and avoids burdening courts with balancing harms and benefits that often are not comparable, *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1186 (D.C. Cir. 1978).

To be sure, the effects that a defendant's conduct causes outside the relevant market can be relevant, such as when the conduct harms competition from potential competitors. *Microsoft*, 253 F.3d at 54 ("Nothing in § 2 of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes."). But this is because such conduct can affect in-market competition. *Id.* at 79 (evaluating the potential for

Microsoft's conduct to contribute to its monopoly power in the relevant market). By the same standard, the effect of a defendant's conduct outside of the relevant market is relevant only to the extent the defendant demonstrates that the conduct leads to cognizable in-market effects.

Google has failed to show that its conduct's out-of-market effects have generated procompetitive benefits in the relevant market. PTB § VI; PFOF §§ X.B–C. Accordingly, the Court should reject all Google's proffered justifications that focus on out-of-market effects.

### 2.    Google's Justifications Lack Sufficient Evidence

Google has not satisfied its burden to "show" a sufficient justification for its conduct. *Microsoft*, 253 F.3d at 59, 66; *see also Viamedia,* 951 F.3d at 464 ("This burden-shifting has evolved based on which party has access to the various categories of evidence and information, with any evidence of pro-competitive justifications likely to be under the defendant's control."); *Dentsply*, 399 F.3d at 196–97 ("The Government, having demonstrated harm to competition, the burden shifts to Dentsply to show that [its exclusionary contractual provision] promotes a sufficiently procompetitive objective."); Richard A. Posner, *Economic Analysis of Law* 845 (9th ed. 2014) (Judicial efficiency supports having the "burden of persuasion rest[] on plaintiff for the main claim but the defendant for affirmative defenses, . . . and the burdens of production are allocated accordingly.").

To carry its burden, Google must "specif[y] and substantiate . . . [its] claims." *Microsoft*, 253 F.3d at 66. For example, in *Microsoft*, the court rejected Microsoft's argument that license restrictions were necessary to ensure that Windows remained "a stable and consistent platform." *Id.* at 63–64. Because Microsoft cited only one of its own documents as support, the court found that Microsoft "never substantiate[d] this claim." *Id.*; *see also* Andrew I. Gavil & Steven C. Salop, *Probability, Presumptions and Evidentiary Burdens in Antitrust Analysis*, 168 U. Penn. L. Rev. 2107, 2137 (2020) ("Permitting purely theoretical justifications to satisfy the defendant's

burden in a particular case would amount to a *sub rosa* presumption and would lead to excessive false negatives.").

Google has failed to carry its burden of producing sufficient evidence to demonstrate that its proffered justifications are cognizable. PTB § VI.B; PFOF § X.

### 3. Google's Justifications Are Not Procompetitive

Justifications in antitrust analysis are "confined to a consideration of impact on competitive conditions." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 690 (1978). The Sherman Act "does not support a defense based on the assumption that competition itself is unreasonable." *Id.* at 696; *see also FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 414, 421–24 (1990) (refusing to consider "whether competition is good or bad"); *Ind. Fed'n of Dentists*, 476 U.S. at 463 (rejecting the argument that "an unrestrained market . . . will lead [consumers] to make unwise and even dangerous choices").

Google has argued that its payments to distributors benefit users through lower device prices and better browsers. But benefits arising from sharing monopoly profits are not "procompetitive" and thus cannot absolve a monopolist of liability. *LePage's*, 324 F.3d at 164 (One type of "exclusionary practice" occurs when "a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it."); *W. Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 104–05 (3d Cir. 2010) (In an action challenging a conspiracy to lower insurance payments to a hospital, the justification that consumers benefitted via lower insurance premiums "reflect[ed] a basic misunderstanding of the antitrust law."); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988–89 (9th Cir. 2000) (Cheese makers' argument that a conspiracy depressing milk prices was justified by lower cheese prices for consumers was "contrary to long-established antitrust law."). Put simply, a monopolist cannot purchase the right to monopolize.

Google's proffered justifications are not procompetitive. PTB § VI.B; PFOF § X.

### 4.      Google's Justifications Are Pretextual

For its proffered justifications to prevail, Google must show that the justifications are not "pretextual." *Microsoft*, 253 F.3d at 59; *see also United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 440 (D. Del. 2003) ("Dentsply has failed to meet its burden to show that its exclusive dealing practices here are justified by a non-pretextual, pro-competitive rationale."), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005). In other words, Google must show that the "proffered reasons" for its conduct are "genuine." *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 618, 620 (9th Cir. 1990), *aff'd sub nom. Kodak*, 504 U.S. at 451; *cf. Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (The Title VII burden shifting framework includes a "pretext" step, where the court asks "whether [proffered] reasons are the actual reasons [for the challenged conduct], or whether they are a mask.").

When assessing such claims, courts look to contemporaneous evidence regarding the defendant's motivations. For example, *McWane* found that the defendant's "internal documents belie[d] the notion that the [conduct] was designed for any procompetitive benefit." 783 F.3d at 841. Contemporaneous statements by company executives focused on the anticompetitive aspects of the conduct rather than the rationales offered at trial. *Id.* The court found that these "damning internal documents seem[ed] to be powerful evidence that its procompetitive justifications are 'merely pretextual.'" *Id.* at 841–42.

Likewise, in *Dentsply*, the trial court found that defendant's "pre-litigation rationale for [its conduct] was expressly to exclude competitors from dealers and not to focus dealers or protect Dentsply's investment in promoting artificial teeth." 277 F. Supp. 2d at 453. The court identified a range of evidence that "belie[d] the litigation inspired justification" for the conduct, including evidence that "exclusive dealing with dealers is not necessary to protect promotion."

*Id.* Consequently, the defendant's proffered justifications were not cognizable. *Id.*

As shown by the direct evidence of Google's anticompetitive motives and the evidence of Google's deleting, shielding, and manipulating documents, Google's proffered justifications are pretextual. PTB § VI.B; PFOF § VI–IX (*see, e.g.*, ¶¶ 789–817, 832–862, 1193–1229).

<blockquote>

**5.      Any Benefits Arising From Google's Justifications Are Attainable Through Less-Restrictive Alternatives**
</blockquote>

As Google concedes, its proffered justifications are insufficient to excuse its conduct if a less-restrictive alternative exists. Google Pre-Trial Brief, ECF No. 687, at 12; *accord Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (holding conduct can be exclusionary if it "either does not further competition on the merits or does so in an unnecessarily restrictive way"); *McWane*, 783 F.3d at 841 (rejecting defendant's justification based on preventing "cherry pick[ing]" because this concern could be addressed by pricing changes). Additionally, the existence of less restrictive alternatives is evidence of pretext and weighs against a finding of procompetitive benefits.

Because Google's proffered justifications are attainable through less-restrictive alternatives, these justifications are both insufficient and pretextual. PTB § VI.B; PFOF § X (e.g., ¶¶ 974, 1304–1309, 1342–1344).

<blockquote>

**B.      The Anticompetitive Harm From Google's Contracts Outweighs Any Cognizable Procompetitive Benefits**
</blockquote>

If the defendant carries the burden of showing a sufficient "procompetitive justification," the burden shifts to the plaintiff either "to rebut that claim" or "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Microsoft*, 253 F.3d at 59. Even if the Court finds that Google's proffered justifications have produced cognizable, in-market benefits—and it should not—any such benefits are outweighed by the substantial harms presented in Plaintiffs' prima facie case.

Given the infirmities of each of Google's proffered justifications, the Court need not reach the balancing stage. *See New York v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) ("Because we have determined that Defendants' procompetitive justifications are pretextual, we need not weigh them against the anticompetitive harms."). Nevertheless, the voluminous record in this case demonstrates that the anticompetitive effects of Google's contracts—effects presumptively intended, given Google's efforts to hide evidence—outweigh any purported benefits. PTB § VII; PFOF § X. In short, Google has paid billions of dollars to make itself the only meaningful general search engine in the market. In that position, it visits harm of staggering scale and scope on users and advertisers, including collecting massive amounts of user data and filling search results with overpriced ads. Google's supposed benefits cannot justify those harms.

## VI.   Google's Systematic Destruction Of Unfavorable Evidence Warrants Sanctions Under Rule 37(e)

Rule 37(e) authorizes sanctions where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e); *see also* Mem. Supp. Mot. Sanctions, ECF No. 495-1, at 16–28; Reply Supp. Mot. Sanctions, ECF No. 571, at 10–15.

A party fails to take reasonable steps to preserve ESI when it (1) adopts a document destruction system that erases chats from production in litigations and investigations and then (2) continues to automatically delete the electronic communications of employees involved with the subject matter of a lawsuit and gives its employees "carte blanche to make his or her own call about what might be relevant in [a] complex antitrust case and whether a Chat communication should be preserved." *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 993 (N.D. Cal. 2023); *see also* Mem. Supp. Mot. Sanctions, ECF No. 495-1, at 20–24.

The range of curative measures for a Rule 37(e) violation is "quite broad." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. Indeed, once such a violation is found, the Court may order any measures sufficient to "cure" the resulting "prejudice." Fed. R. Civ. P. 37(e)(1). Such prejudice is plain where "substantive business communications were made on [chats] that plaintiffs will never see, to the potential detriment of their case." *In re Google Play Store*, 664 F. Supp. 3d at 994.

If "the party acted with the intent to deprive another party of the information's use in litigation," a finding of prejudice is not required to find a Rule 37 violation. Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment. And in such a case, Rule 37(e) authorizes, inter alia, a presumption that "the lost information was unfavorable to the party" or entry of a default judgment. Fed. R. Civ. P. 37(e)(2). The requisite intent exists where a company fails to suspend the automatic deletion of electronic communications knowing that its employees discuss matters relevant to the litigation in those communications. *In re Google Play Store*, 664 F. Supp. 3d at 993–94.

Given Google's actions, PFOF § IX, Plaintiffs' requested sanctions are warranted, PTB § VIII.A.

## VII.   The Court Has Jurisdiction, And Venue Is Proper

This Court has subject matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345. The United States has standing under Section 4 of the Sherman Act, 15 U.S.C. § 4, and the States have standing under Section 16 of the Clayton Act, 15 U.S.C. § 26, as parens patriae on behalf of and to protect their general economies and the health and welfare of their residents. This Court has personal jurisdiction over Google; venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because Google transacts business and is found in this District. *See* PFOF ¶ 3.

Dated: February 9, 2024

Respectfully submitted,

*/s/ Karl E. Herrmann*
Kenneth M. Dintzer
R. Cameron Gower
Thomas Greene
Matthew Jones (D.C. Bar #1006602)
Patrick M. Kuhlmann
Catharine S. Wright (D.C. Bar #1019454)
Diana A. Aguilar Aldape
Sarah M. Bartels (D.C. Bar #1029505)
Meagan K. Bellshaw
David E. Dahlquist
Kerrie J. Freeborn (D.C. Bar #503143)
Sara T. Gray
Jeremy M. P. Goldstein
Matthew C. Hammond
Karl E. Herrmann (D.C. Bar #1022464)
Ian D. Hoffman
Elizabeth S. Jensen
Claire M. Maddox (D.C. Bar #498356)
Michael G. McLellan (D.C. Bar #489217)
Erin Murdock-Park (D.C. Bar #1019993)
Lillian Okamuro (D.C. Bar #241035)
Veronica N. Onyema (D.C. Bar #979040)
Michael A. Rosengart (D.C. Bar #1671047)
Eric L. Schleef
Adam T. Severt
Lara E.V. Trager
Emma N. Waitzman

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

By:_____*/s/ Matthew Michaloski*_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Matthew Michaloski, Deputy Attorney
General
Christi Foust, Deputy Attorney General
Jesse Moore, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By:_____*/s/ Diamante Smith*_____
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Diamante Smith, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:_____ /s/ Lee Istrail___
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney
General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: _____ /s/ Matthew M. Ford
Matthew M. Ford
Arkansas Bar No. 2013180
Assistant Attorney General
Office of the Arkansas Attorney General Tim
Griffin
323 Center Street, Suite 200
Little Rock, AR 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

By:_____ /s/ Brian Wang___
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General
(DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By: _____ /s/ Charles Thimmesch_____
Christopher Carr, Attorney General
Robin Leigh, Deputy Attorney General
Jeffrey Stump, Senior Assistant Attorney
General
Charles Thimmesch, Assistant Attorney
General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*


By: _____ /s/ *Philip R. Heleringer* _____
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*

By:_____ */s/ Patrick Voelker*____
Liz Murrill, Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
voelkerp@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By:_____ */s/ Scott Mertens*_____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*


By:____ */s/ Michael Schwalbert*_____
Michael Schwalbert
Missouri Bar No. 63229
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*

By:_____ */s/ Hart Martin* _____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney
General
Crystal Utley Secoy, Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By:___ */s/ Anna Schneider* ___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: _____ */s/ Mary Frances Jowers* _____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Rebecca M. Hartner, Assistant Attorney
General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: */s/ Gwendolyn J. Lindsay Cooley* _____
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

FOR PLAINTIFF STATE OF COLORADO

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365
(inactive) Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

Joseph M. Conrad, Assistant Attorney General
Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mail: Joseph.Conrad@nebraska.gov
Colin.Snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF ARIZONA

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov
         Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

FOR PLAINTIFF STATE OF NEW YORK

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the Attorney General of New York
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH
CAROLINA

Kunal Janak Choksi
Joshua Daniel Abram Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North
Carolina*

FOR PLAINTIFF STATE OF
TENNESSEE

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov


*Counsel for Plaintiff State of Tennessee*


FOR PLAINTIFF STATE OF UTAH

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
tpincock@agutah.gov


*Counsel for Plaintiff State of Utah*


FOR PLAINTIFF STATE OF ALASKA

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov


*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF
CONNECTICUT

Nicole Demers
Office of the Attorney General of
Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF
DELAWARE

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

FOR PLAINTIFF DISTRICT OF
COLUMBIA

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

FOR PLAINTIFF TERRITORY OF GUAM

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324


*Counsel for Plaintiff Territory Guam*


FOR PLAINTIFF STATE OF HAWAI'I

Rodney I. Kimura
Department of the Attorney General, State
of Hawai'i Commerce & Economic
Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov


*Counsel for Plaintiff State of Hawai'i*


FOR PLAINTIFF STATE OF IDAHO

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720 Boise, ID 83720
Telephone: (208) 334-4114
E-Mail: John.olson@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF ILLINOIS

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
           Brian.yost@ilag.gov
           Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

FOR PLAINTIFF STATE OF MAINE

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

FOR PLAINTIFF STATE OF
MARYLAND

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-Mail: William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*

FOR PLAINTIFF STATE OF
MINNESOTA

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW
HAMPSHIRE

Brandon Garod
Office of Attorney General of New
Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

FOR PLAINTIFF STATE OF NEW
JERSEY

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW
MEXICO

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NORTH
DAKOTA

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

FOR PLAINTIFF STATE OF OHIO

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*


FOR THE PLAINTIFF STATE OF OKLAHOMA

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105 Telephone: (405) 522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OF OREGON

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*


FOR PLAINTIFF TERRITORY OF
PUERTO RICO

Guarionex Diaz Martinez
Assistant Attorney General Antitrust
Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

FOR PLAINTIFF STATE OF RHODE
ISLAND

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

FOR PLAINTIFF STATE OF SOUTH
DAKOTA

Yvette K. Lafrentz
Office of the Attorney General of South
Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*


FOR PLAINTIFF STATE OF VERMONT

Christopher J. Curtis, Assistant Attorney
General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*


FOR PLAINTIFF COMMONWEALTH OF
VIRGINIA

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

FOR PLAINTIFF STATE OF
WASHINGTON

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WEST
VIRGINIA

Douglas Lee Davis
Office of the Attorney General, State of
West Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

FOR PLAINTIFF STATE OF WYOMING

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff State of Wyoming*