# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

## PLAINTIFF STATES' RESPONSIVE PROPOSED FINDINGS OF FACT

## REDACTED

## <u>TABLE OF CONTENTS</u>

I.  **Google's Market Definition Arguments Ignore or Misapply Key Evidence** .................. **1**

    A.  Google ignores advertiser testimony that general search ads are not substitutable
(GFOF ¶¶ 1003-07, 1010-16, 1020-24) ......................................................................... 1

    B.  Plaintiffs' experts agree on search ads' place in the marketing funnel
(GFOF ¶¶ 1071-72) ........................................................................................................ 5

    C.  Analysis of user searches should focus on search query results, not queries alone
(GFOF ¶¶ 923, 940, 960, 964, 1042) ............................................................................. 6

    D.  GSE results pages are distinct from GSE metasearch products
(GFOF ¶¶ 947, 951, 958, 959, 1035) ............................................................................. 9

II.  **Google's Admissions Further Prove That Its SA360 Conduct is Anticompetitive** ..... **11**

    A.  Google's SA360 conduct can only be explained by anticompetitive intent
(Google Br. 109-10) ...................................................................................................... 14

    B.  Google's SA360 conduct caused substantial harm to competition (Google Br. 105-09) . 20

    C.  Google's SA360 conduct has no procompetitive benefit (Google Br. 110-11) ............... 26

III.  **Google's Distribution Contracts Deprive Rivals of Scale and Restrict Their Ability
to Enter Into Vital SVP Partnerships (GFOF ¶¶ 1736-43)** ........................................... **27**

I.      **Google's Market Definition Arguments Ignore or Misapply Key Evidence**

      A.      **Google ignores advertiser testimony that general search ads are not substitutable (GFOF ¶¶ 1003-07, 1010-16, 1020-24)**

      1.      Google and Plaintiffs agree that "ads markets should be defined from the perspective of *advertisers*, who are the buyers of advertising."  GFOF ¶ 1016 (emphasis added).[1] At trial, Plaintiffs called live witnesses from some of Google's largest ad buyers, such as ██████ ███████████████████████████████████████████████████ Plaintiffs also called Joshua Lowcock of ad agency IPG, which manages billions of advertising dollars for large U.S. companies. Tr. 3801:19-3802:13; DX3004 at -444.  In contrast, Google did not call a single advertiser to provide live testimony, and instead only called its own employees and experts.

      2.      Plaintiff States rely principally on testimony from advertisers to support their proffered ad markets, whereas Google responds mainly by citing self-serving testimony from its employees and its own documents when it claims that advertisers view search ads as substitutable with any other digital ad format.  *Compare, e.g.*, SFOF ¶¶ 22-29, 32, 35-38, 40-41, 44-65 *with* GFOF ¶¶ 1003-05, 1011-13.[2]  Google's market definition expert, Dr. Israel, also put

---

[1] "JFOF" refers to Plaintiffs' Proposed Findings of Fact (Dkt. 822), "SFOF" refers to Plaintiff States' Proposed Findings of Fact (Dkt. 825), "GFOF" refers to Google's Proposed Findings of Fact (Dkt. 828), and "JRFOF" refers to Plaintiffs' Responsive Proposed Findings of Fact. "States Br." refers to Plaintiff States' Post-Trial Brief (Dkt. 823) and "Google Br." refers to Google's Post-Trial Brief (Dkt. 826).  "SRCOL" refers to Plaintiff States' Responsive Proposed Conclusions of Law.

[2] The limited advertiser testimony cited by Google confirms that advertisers buy ads in a variety of channels because they view different ad formats as *complements* serving distinct purposes across the marketing funnel.  *See infra* ¶¶ 3-8; GFOF ¶¶ 1006-07.  Google also cites testimony from Mr. Dijk of Booking.com in which he said he "will go to whatever channel is generating the best ROI."  GFOF ¶ 1003.  Mr. Dijk explained that, like other major advertisers, Booking.com advertises on different channels to reach customers at different points on the marketing funnel.  JFOF ¶¶ 122, 126-27, 436.  It is undisputed that Booking.com allocates its ad spend based on "several factors for each channel" (and not ROI alone), buys ads on numerous digital ad channels, including Google, Facebook, YouTube, Tik Tok, and online display ads (and

little reliance on advertiser testimony.  Instead, he emphasized (i) the minimal "empirical evidence" in the record; (ii) the perspective of ad *sellers* and tool providers; and (iii) critiques of arguments presented by DOJ's expert, Prof. Whinston.  Tr. 8506:9-8507:11 (Israel).

3.      Dr. Israel opined that search ads, display ads, and social ads are reasonably interchangeable because there are instances where advertisers optimize their total ad spend by shifting some of their budget from one ad format to another.  GFOF ¶ 1010.  But Dr. Israel is not a marketing expert.[3]  The record shows advertisers seek to maintain a diverse *mix* of complementary ad channels to maximize their *overall* ROI and profits.  In other words, advertisers at times move *some* ad spend between ad formats to achieve the best overall use of their advertising budget, and do not move *all* spend to a single, ROI-maximizing format or channel.  *Id.* ¶ 1010; *see* DX3058 at .006 (Estee Lauder invests in a variety of ad types with differing ROIs); SFOF ¶ 64 (same for The North Face).

4.      Advertisers target consumers across the different marketing funnel mindsets (awareness, consideration and purchase) in order to lead consumers to complete a transaction.  SFOF ¶ 23.  If, for example, an advertiser determines it is investing too much in a media channel that targets "awareness" and not enough in a media channel that targets "purchase," the advertiser may rebalance its investments in order to achieve an effective overall marketing strategy.  *Id.* ¶ 24; Tr. 6879:7-11 (Amaldoss) ("If any firm thinks that they will invest all their money only in the purchase phase and [ignore] the other phases, they will hurt themselves.  And

---

not just on a single ROI-maximizing channel), ██████████████████████████ ██████████████████████  JFOF ¶¶ 126, 436; SFOF ¶¶ 84, 99; DX3114 at .042.

[3] Google served expert reports from marketing professor Dr. Randolph Bucklin, but did not call him at trial after stating in its pre-trial brief and its opening statement that Dr. Bucklin would offer opinions concerning ad-side market definition and purported critiques of the marketing funnel.  Dkt. 668 at 6-7; Tr. 106:20-107:1.

that's the idea behind the full-funnel strategy, you have to continuously balance them.").

5.      Advertisers shifting ad spend between ad formats is thus evidence that they use different ad formats together as *complements* in a unified strategy to maximize overall ROI. SFOF ¶¶ 23-24.  While advertisers may shift some spend from one ad format to another to achieve a desired balance across the funnel, no advertiser testified that they would *substitute or replace* general search advertising with advertising in another ad channel.  Tr. 6872:9-14 (Amaldoss).  Mr. Lowcock of IPG explained that an advertiser "wouldn't necessarily move [its spend] out of a channel that might individually look like it's not performing because you know it actually contributes to driving media performance everywhere."  Tr. 3980:8-3981:2.  He specified that two ad products are only substitutable if one would shift budget from one product to another "[b]ased on the purpose[s] [the advertiser] is trying to achieve" and confirmed that advertisers do not view SVP search ads, social ads or display ads as substitutes for general search ads because they serve different purposes for advertisers than general search ads.  Tr. 3824:20-3825:3, 3837:20-3838:8, 3862:25-3863:3, 3954:10-12, 3980:5-3981:2.

6.      Mr. Lowcock further explained that he considers general search ads to be "mandatory" and would not recommend that a client move away from general search ads, even if prices increased by five percent.  JFOF ¶ 498.  Other advertisers likewise testified that they would not substitute another ad channel or format for general search advertising, even if they provide a higher ROI.  SFOF ¶¶ 24, 26-27, 83-86, 99; Raymond (Kohl's) Dep. Tr. 80:4-9, 120:2-16 (Kohl's has "never moved all [its] money out of Google" even though Google search is not its highest ROI channel); Tr. 6552:9-18 (Hurst) (Expedia might "shift some spend to other advertising channels," but has never "spent more on social than search engine marketing").

7.      This understanding that different kinds of advertisements work together in pursuit

of a unified strategy is amply supported by advertiser testimony.  SFOF ¶¶ 24-26.  For example, Christie Raymond of Kohl's (whose testimony Google submitted through deposition designations) testified that her company optimizes ad spend across the marketing funnel, including investment in "mid-funnel" and "upper funnel" channels to ensure it attracts "enough people coming onto the website, so that we then can then use our lower funnel just to drive those conversions."  Raymond (Kohl's) Dep. Tr. 70:21-71:16, 74:13-75:1, 107:2-18.  Ms. Raymond also testified that "video and socials … [and] display" ads were particularly useful to generate traffic as opposed to purchases.  *Id.* at 72:21-73:2.

8.      Clear advertiser testimony that general search advertising is "always on" and a "mandatory" type of advertising further confirms that it is not substituted for other ad channels. JFOF ¶ 435.  In response, Google relies on its own employees claiming advertisers no longer care about ad format due to Google's new advertising product "Performance Max."  GFOF ¶¶ 1011-13.  Notably, no advertiser supported that view.  Further, Google cites no advertiser testimony or documents to support its assertion that its general search ads "closely compete" with Amazon ads, instead relying exclusively on testimony of Google executives and Google documents.[4]  *Id.* ¶¶ 1019-24; c*f.* SFOF ¶¶ 28-29.  Evidence from ad *sellers* (like Google, Microsoft, and ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

---

[4] Google cites internal documents that analyze Amazon's overall business including many areas other than search ads, such as cloud computing, tablets and TV casting devices.  DX0126 at .019. The only internal document Google cites that analyzes ██████████████████████████████ ██████████████████████████████████████████████████

**B.     Plaintiffs' experts agree on search ads' place in the marketing funnel (GFOF ¶¶ 1071-72)**

9.      Plaintiffs' experts agree on the funnel stage that advertisers generally associate with search ads.  *Cf.* GFOF ¶¶ 1071-72.  Plaintiffs' experts uniformly testified that search ads are lower than display and social ads—and thus are *complements* in a typical advertiser's "full funnel" advertising strategy.  Plaintiff States' marketing expert, Prof. Amaldoss, testified that "[s]earch advertising is very effective lower in the funnel" as compared to display and social ads because search ads help advertisers "reach consumers with higher purchase probability."[5]  Tr. 6861:25-6862:5; 6884:14-6885:2.  Prof. Baker relied on Prof. Amaldoss' testimony and likewise testified that display ads are in a different part of funnel than search ads.  Tr. 7039:7-20, 7043:8-12 (Baker).  DOJ Plaintiffs' experts similarly testified that search ads are lower in the funnel than display and social ads.  Tr. 5391:10-23 (Jerath) ("[S]earch ads are most suited and effective for bottom funnel goals and to some extent for mid-funnel goals"); Tr. 4638:22-4640:5 (Whinston) ("[S]earch ads are further down in the funnel" compared to display ads).

10.     Prof. Amaldoss testified extensively that search ads are considered lower in the funnel than social and display ads because search ads are a form of "pull" advertising, whereas social and display ads are "push" advertising.  Tr. 6888:18-6892:90; SFOF ¶¶ 25, 26.  He also presented an empirical analysis of record evidence, which showed that no advertiser placed display or social ads lower in the funnel than search ads.  Tr. 6880:24-6884:6 (Amaldoss); PSXD-10 (Amaldoss slides) at 17, 18.  Prof. Amaldoss further explained that Google search ads have a higher conversion rate than display ads (4.4% versus 0.57%), demonstrating that users

---

[5] Prof. Amaldoss also described a 2019 scholarly article relating to the marketing funnel and explained that the funnel concept is a well-established and "very very basic" concept.  Tr. 6885:15-6886:5 (Amaldoss); PSXD-10 (Amaldoss slides) at 20.

viewing general search ads were closer to purchase (*i.e.*, lower in the funnel) than users viewing display ads.  Tr. 6884:14-6885:13 (Amaldoss); PSXD-10 at 19.  In short, Plaintiffs' experts agree that search ads are lower in the funnel than display and social ads, and advertiser documents and third-party witnesses support that conclusion.

11.     Plaintiff States' experts further explained that SVP users are more likely to be in a purchase mindset than general search engine ("GSE") users because users can almost always complete a purchase on an SVP website, but cannot complete a purchase on a GSE.  Tr. 6877:4-6877:13, 6863:23-6864:12 (Amaldoss) (SVP search ads and general search ads "play[ ] slightly different roles" because of the need to "circulate purchase intent" to a SVP or other marketplace, which causes advertisers to view general search ads as generally reaching users with lower probability of purchase than SVP search ads); Tr. 7034:19-7035:19 (Baker) (contrasting ads on GSEs, where users are more likely to be in research and consideration mindset, with ads on SVPs, where users are typically at a "lower stage" closer to purchase); SFOF ¶¶ 28-29; *accord* GFOF ¶ 944 ("And many SVPs have an advantage as compared to GSEs in that they permit not only to search for a product or service but to complete a purchase or booking as well").  Google employees confirmed this distinction.  SFOF ¶¶ 30-31.  For advertisers who sell products or services for which an SVP does not exist, GSEs alone provide a way to reach high-intent consumers.  Tr. 6864:13-19 (Amaldoss).

12.     Thus, there is complete consensus among Plaintiffs' experts (and the record generally) as to search ads' distinct place in the marketing funnel.

**C.     Analysis of user searches should focus on search query results, not queries alone (GFOF ¶¶ 923, 940, 960, 964, 1042)**

13.     Dr. Israel conducted a query overlap analysis and a user session analysis.  GFOF ¶¶ 923, 940, 960, 964.  Both are flawed, for a similar reason.  Dr. Israel admits that in the user-

side market for search services, the product at issue is "an *answer* to a query," not the query

itself.  Tr. 8605:5-9 (emphasis added).  But his analyses only focus on *queries* entered on GSEs

and SVPs, not the *answers or results* of those queries.  GFOF ¶¶ 923, 940, 960, 964.  This

distinction matters because a user that enters the same *query* on a GSE or an SVP is seeking

different *results*: the GSE user is seeking a broad range of information, whereas the SVP user is

seeking information in the SVP's focal vertical or verticals.  SFOF ¶¶ 15-21, 31.  The GSE user

is also more likely to be in a research and consideration mindset and further from a purchase

mindset than the SVP user.  *Id.*; Tr. 8753:7-23, 8918:3-24, 8528:15-20 (Israel) (Amazon and

GSEs differ because "[Amazon] can give the user exactly what the user wants" and GSEs

"respond[ ] by putting a bunch of [options] on the [results] page"); Tr. 8527:1-8528:20 (Israel)

(Google and Amazon do "different stuff" and so "it's not surprising that I see you on Google and

Amazon for different purposes").  Dr. Israel's overlap and user session analyses thus do not

illuminate anything about demand side substitution because they do not account for differences

in a querying user's purpose or differences in query results.

14.     As to his overlap analysis, Dr. Israel argued that Google, Amazon, and Yelp are

substitutes because they receive many of the same user queries.  GFOF ¶¶ 960, 964.  However,

mere overlap in queries does not mean a GSE and SVP are substitutes in the same market

because users are querying the websites for different purposes.  JRFOF ¶¶ 2216, 2241-42.  Dr.

Israel's analysis actually demonstrates that users view GSEs and SVPs as *complements* because a

user often researches a topic by entering a query on a GSE, then navigates to an SVP and enters

the same query, and then makes a purchase.  Tr. 8728:25-8729:5 (Israel) ("[I]t's very common

for people to use both a general search engine and Amazon" because "you can buy stuff on

Amazon").  Indeed, Dr. Israel conceded "there are elements of complementarity between

[Google and Amazon]."  Tr. 8735:23-8736:22; SFOF ¶¶ 15-21.

15.     Dr. Israel also opined that there is "greater overlap between Google users and users of Meta and Amazon than between Google users and users of Bing, Yahoo, and DuckDuckGo."  GFOF ¶ 1042.  This finding further supports Plaintiffs' ad markets.  Audience overlap (such as between Google and Amazon) suggests that products are complementary because the same users are using the products for different purposes, and *lack* of audience overlap (such as between Google and Bing) suggests that they are substitutes.[6]  Indeed, Dr. Israel acknowledged that he "would expect relatively limited overlap [in users] between the general search engines" because it is "relatively rare" to use two GSEs, but on the other hand, it is "very common" to use both a GSE and Amazon because Amazon does a "lot more" than answering queries.[7]  Tr. 8728:17-8729:5 (Israel).

16.     By contrast, Dr. Baker analyzed query results, the correct user-side product. SFOF ¶ 16.  His analysis shows that while Google categorizes each query in a single vertical, more than half of query results shown in response to a single query are in different vertical than Google's categorization.  *Id.*  This indicates that Dr. Israel's reliance on Google's query categories is misplaced, and that a user querying on a GSE is seeking (and is provided) a breadth

---

[6] S*ee* Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 565 (Fifth Ed. 2023) ("The reason we say that gasoline station A and adjacent station B are in the same relevant market is that the customer does *not* need gasoline from both of them. … By contrast, the driver does need both gasoline and tires, but that hardly suggest that there is a gasoline/tire market.").

[7] There are other flaws in Dr. Israel's overlap analysis, including that he excluded navigational queries while admitting that they are a "significant" type of query on GSEs, but not on SVPs. Tr. 8748:19-8749:1.  Navigational queries are some of Google's most common queries, including shopping-related queries like "Amazon" and "Ebay."  SFOF ¶ 33; JRFOF ¶ 2130.  Dr. Israel's overlap analysis is therefore not an accurate comparison of query overlap between Google and Amazon.  JRFOF ¶¶ 2207, 2216.

of information, reinforcing GSE's one-stop shop nature. *Id.* ¶ 16-19. On the other hand, a user querying on an SVP like Amazon or Yelp is more likely seeking narrower results within the SVP's limited focus, and to complete a transaction on the SVP's website. *Id.* ¶¶ 16, 19, 20.

17.     Dr. Israel also modified Prof. Baker's user session analysis by compressing the time frame for the analysis from 24-hour periods to individual "visits," defined as time periods that end upon five minutes of inactivity on Google. GFOF ¶¶ 923, 940. This significant reduction in the unit of analysis reduced the number of different verticals queried in a session. Tr. 8714:2-25, 8710:1-21 (Israel). However, the 24-hour unit of analysis is supported by Google's ordinary course understanding that users seeking to complete a task use Google search services repeatedly over "numerous disjointed searches/sessions," across multiple verticals, and over an "often long" period of time. PSX00475 at -046 (Google travel strategy document referring to search users' "multi-session travel planning process"); PSX00400 at -695 (Google hotels document indicating that online travel "generally requires numerous disjointed searches/sessions"); PSX00255 at -387, -389 (Google recognizing that ███████████████ ██████████████████████████████████████████████ ████████████ ).[8] Analysis of brief "visits" also is not probative of differences in the results users demand because GSE users receive query results spanning many verticals, even if a user queries different verticals in a single visit. SFOF ¶¶ 16, 19, 20.

**D.    GSE results pages are distinct from GSE metasearch products (GFOF ¶¶ 947, 951, 958, 959, 1035)**

18.     In claiming that SVPs and GSEs compete for users and advertisers, Google

---

[8] Dr. Israel claimed that he followed Google's ordinary course practice of five minutes of inactivity to conduct his analysis, but neither he nor Google cites any document to support that claim. Tr. 8710:4-14 (Israel). Dr. Israel also departed from his five-minute standard when he presented another analysis at trial using thirty minutes of inactivity. Tr. 8522:18-8523:6 (Israel).

conflates its metasearch products, like Google Flights and Google Hotels, with its general search product. Google's metasearch products are separate web pages for various verticals (such as www.google.com/travel); they are not Google's general search engine results page (the relevant product in Plaintiffs' user-side market). Tr. 7584:20-7585:8 (Raghavan) (admitting that DXD-21.005 depicts Google's hotel metasearch product, not its general search engine); SFOF ¶ 30. Both SVPs and Google recognize that metasearch products and GSEs are distinct products because metasearch users have "more intent" and are "probably closer to booking" than GSE users. SFOF ¶ 32 (citing Tr. 6512:1-11 (Hurst), Tr. 9229:13-9230:8 (Holden)). Google's metasearch products are akin to SVPs and compete with SVPs and other metasearch products (like Kayak or TripAdvisor), not with Google's general search product.[9]  *See* GFOF ¶ 947 (citing DXD-21.005, in which Google compares SVPs like Booking.com and Hotels.com with the "similar search results pages and interfaces" of its metasearch products).

19.    SVPs' securities filings likewise describe Google's metasearch products (and not Google's general search product) as potential competitors. *See id.* ¶¶ 951, 958; DX0308 at .013 (Expedia 2022 Form 10-K: "search engines have increased their focus on acquiring or launching travel products ... comparable to [travel SVPs].  For example, Google has continued to add features and functionality to its Google Travel, Google Flights, and Hotel Ads travel metasearch products."); DX0308 at .035 (discussing Google's prioritization of its own "metasearch products such as, Google Hotel Ads and Google Flights, in search results"); ███████████

████████████████████████████████████

20.    Google cites a Booking Holdings filing which states that Booking.com considers

---

[9] Google's metasearch products are also referred to as Google's "vertical products" or its "SVP products."  *See* JRFOF ¶¶ 2132, 2202, 2213, 2217.  Although these products have information related to certain verticals, they differ from search results that appear on a GSE results page.

Google to be a "serious competitor."  GFOF ¶ 951 (citing Tr. 5347:9-12 (Dijk)).  However, Mr.

Dijk of Booking.com explained that Google general search ads (on the SERP) are "not a

competitor to Booking.com," and that Kayak—a metasearch provider owned by Booking

Holdings—faces advertising competition from Google's hotel ads that overwhelmingly appear

on Google's metasearch product.  Tr. 5348:13-19 (Dijk); *see also* Tr. 5311:9-5313:3 (Dijk)

(Booking.com considers ads on metasearch products including Kayak and "Google Hotel Ads"

to be different than general search ads).  Booking's 10-K lists Google and other large tech

platforms like Apple, Alibaba, and Tencent as companies "[w]e currently, or may in the future,

compete with" if they "leverage aspects of their business" into competing offerings, specifically

noting that Google is linking its "meta-search products" to its Google Maps app and "dominant

search functionality."  DX3114 at .006.  This statement does not demonstrate any present

competition between SVPs and general search.  *Compare* GFOF ¶1035 (claiming Expedia listing

Google as a competitor for advertising in its security filings) *with* Tr. 6565:13-19; 6574:15-

6575:4 (Hurst) (Expedia's travel ads are "more of a comparable to Google['s] meta product"

than Google's text ads where "the only real comparable ... [is] Bing").

    21.    Google also cites testimony from Mr. Nadella of Microsoft to argue that Bing

competes with SVPs for users.  GFOF ¶ 959.  However, Mr. Nadella in fact described the

complementary nature of SVPs and GSEs: SVPs are "reliant" on GSEs for traffic (and not *vice

versa*) because GSEs are the "organizing layer" of the internet.  Tr. 3534:7-25 (Nadella).

## II.    <u>Google's Admissions Further Prove That Its SA360 Conduct is Anticompetitive</u>

    22.    It is undisputed that SA360 is alone among major SEM tools in not providing any

support for Microsoft auction-time bidding.  Skai supported Microsoft auction-time bidding by

2020, ██████████████████████████████████████████████████████ GFOF ¶¶

1918-20; SFOF ¶¶ 180-84.

23.     Other SEM tools are unburdened by Google's incentives to operate SA360 to harm its GSE rivals, pad its monopoly profits, and fortify its monopoly power.  SFOF ¶¶ 134-43.  Consequently, all developed support for Microsoft auction-time bidding ███████████████.  *Id.* ¶¶ 180-84.  It is an "impactful feature" commonly requested by customers, and these independent SEM tools all seek to provide comparable feature support across multiple GSEs.  *Id.* ¶¶ 179-84.  Microsoft auction-time bidding on Skai ████████████████ and doubled Home Depot's return on ad spend.  *Id.* ¶¶ 182-83.  Google itself reported that use of auction-time bidding by a "typical advertiser" caused a 15-30% uplift in conversions, ██████████ █████████████████████████████████ GFOF ¶ 1797; SFOF ¶¶ 191, 202.  For these reasons, Google described auction-time bidding as SA360's "most critical" feature.  SFOF ¶ 173.  Given all this evidence, Google itself was "not terribly surprised" when major customers told Google that "microsoft ATB [auction-time bidding] is performing better than intraday [bidding] (for same reason google ATB does)."  *Id.* ¶ 204.

24.     Although the other SEM tools all support auction-time bidding, Google's dominant monopoly power leaves advertisers with no choice but to advertise on Google.  *Id.* ¶¶ 145-46.  As a result, Google can keep advertisers from using SEM tools other than SA360 simply by ensuring that SA360 offers superior support for advertising on Google—even though SA360 offers inferior support for advertising on all other GSEs.  *Id.* ¶ 147-48.

25.     Nearly all Google trial witnesses with SA360-related knowledge no longer work on SA360, and so at most could speculate as to the future of support for Microsoft auction-time bidding.  *See Id.* ¶ 242; GFOF ¶ 1748.  No one from Microsoft could testify about it because there is no evidence Microsoft has had any recent involvement in what, if anything, Google is

currently doing.  At best, Google relies on testimony from Mr. Dischler, a senior executive far

removed from the day-to-day operations of SA360, who stated (without any documentary

support) that testing of Microsoft auction-time bidding was in a "beta" phase.  SFOF ¶ 242; Tr.

1126:19-24 (Dischler).  His testimony was contradicted by Ryan Krueger, who said the testing

was in a "limited alpha" phase.  SFOF ¶ 242.  Neither Mr. Dischler, Mr. Krueger, nor any other

witnesses provided any specificity on the current state or scope of the purported testing or any

timeline for the future release of the feature.

26.     As Google explains, "SA360 implements new or improved functions and features

based on a 'roadmap' planning process that incorporates input from the SA360 product team,

engineering team, and sales and business team."  GFOF ¶ 1774.  In late 2019, SA360's

completed roadmap for the first half of 2020 included initial testing for development of

Microsoft auction-time bidding.  SFOF ¶ 216.  Google then removed the testing from that

roadmap in March 2020 after pressure from senior employees, including Ms. Braddi, who

admitted she did not review the existing roadmap, "didn't know what SA360 was," and was "not

familiar [with] how auction-time bidding actually works."  *Id.* ¶¶ 219, 230.

27.     Google cites several roadmaps that do *not* include Microsoft auction-time

bidding.  GFOF ¶¶ 1822, 1825.  But despite Google's vague assertion that it is "testing" the

feature (*id.* ¶ 1874), it cites *no product roadmap after 2020 that includes Microsoft auction-time

bidding*.  That is unlike Google's treatment of its own auction-time bidding, which appeared on

several roadmaps prior to launch in September 2019.  *See* DX0145 at -110, -141 (H2 2018

roadmap); PSX00453 at -714 (H1 2019 roadmap).  This disparate treatment shows that Google is

not making serious efforts or following its usual process to develop Microsoft auction-time

bidding. ██████████████████████████████████████████████

13

████████████████████████████████████████████████████████

████████████████████████   SFOF ¶ 243.

28.     Auction-time bidding is not the only feature that SA360 supported for Google advertising long before (if ever) it offered comparable support for rival GSEs.  It is undisputed that SA360 supported responsive search ads, dynamic search ads, and local inventory ads for Google over two years before it supported them for Microsoft Ads.  SFOF ¶¶ 250, 255; GFOF ¶¶ 1746, 1783, 1787.  These automated ad types are popular and increase the efficiency of ad spend. SFOF ¶¶ 250-53; GFOF ¶¶ 1800-03.  Yet Google provides no credible explanation for the long delay between support for these features for Google Ads and support for the same features for Microsoft Ads.

29.     ████████████████████████████████████████████

████████████████████████████████████   SFOF ¶ 246.  ████████

████████████████████████████████████████████

████████████   *Id.* ¶ 249.  ████████████████████████████████

████████████████████████████████████████████

████████████   *Id.* ¶ 147.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████   *Id.* ¶¶ 246-47.

**A.     Google's SA360 conduct can only be explained by anticompetitive intent (Google Br. 109-10)**

30.     Google posits various excuses for its failure to develop Microsoft auction-time bidding and other Microsoft Ads features for SA360.  None of them withstands scrutiny.

31.     *First*, Google suggests it needs more time.  Google Br. 109.  Yet, all competing SEM tools supported Microsoft auction-time bidding ████████████████   (*supra* ¶ 22), and

after Skai integrated Google auction-time bidding in 2019, it took less than two years to integrate comparable support for Microsoft.  GFOF ¶ 1877; SFOF ¶ 181.  Mr. Vallez of Skai explained that having "already integrated Google [auction-time bidding], that simplified the process of integrating the Microsoft [auction-time bidding]."  SFOF ¶ 181. ███████████████████

████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████ *Id.* ¶¶ 208, 279.  Even as an outer bound negotiating position, Ms. Braddi in 2020 proposed supporting Microsoft auction-time bidding and several other features by August 2022.  *Id.* ¶ 235.  All of those deadlines have long since passed.

32.     *Second*, although the smaller SEM tool providers all decided to support Microsoft auction-time bidding, Google cites "a lack of customer demand [for Microsoft auction-time bidding]… in late 2019 and early 2020."  Google Br. 109.  Auction-time bidding indisputably provides superior results than intraday bidding, making it *self-evident* that SA360 customers would benefit from access to auction-time bidding for their Bing campaigns as opposed to just intraday bidding.  SFOF ¶¶ 172, 179, 186, 190, 196, 201.  In any event, the evidence shows that Google already had notice of customer demand for Microsoft auction-time bidding by November 2019, when the SA360 sales team listed "Auction time bidding for MSFT" as a "Top 5" requested Microsoft feature.  *Id.* ¶ 197.  That was sufficient demand to proceed with initial testing, which ███████████████████████████ would have allowed Google to further gauge customer demand and performance.  *Id.* ¶ 276; GFOF ¶ 1796.  Google also knew at that time that its customers wanted feature parity generally and that Google auction-time bidding already had been requested by hundreds of customers, had been found to cause

significant uplift in conversions and revenue, ███████████████████████████
███████ SFOF ¶¶ 131-32, 196, 198; GFOF ¶¶ 1790-91.

33.     Thus, when two large customers told Google in 2020 that they were seeing "better performance" and "more conversions" with Microsoft auction-time bidding, Google's Ryan Krueger wrote that he was "not terribly surprised microsoft ATB is performing better than intraday (*for the same reason* google ATB does)."  SFOF ¶¶ 203-04 (emphasis added). ████████
█████████████████████████████████████████████████████████ *Id.* ¶ 203 n.11.
By still not supporting Microsoft auction-time bidding even today, SA360 is disregarding the demand of at least those two customers as well as Home Depot ███████████████
██████████████ and major ad agencies IPG (which manages billions of advertising dollars for many large U.S. companies) ████████████████████████████████████
██████████ *Id.* ¶¶ 127 n.8, 172, 174 (Home Depot "found that auction-time bidding is a very productive strategy and … our standard or default across most of our campaigns"); Tr. 3871:18-24 (Lowcock) ("real-time auction-based bidding is generally preferred" by IPG's clients), SFOF ¶ 206 ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████

34.     Google's internal surveys and planning documents also describe broad customer demand for Microsoft auction-time bidding.  In May 2020, an SA360 customer survey that included 77 American customers listed "Auction-time bidding … [f]or MSFT advertising" and "More Bing parity" as top customer requests.  SFOF ¶ 199 (citing PSX00457 at -740, -747, -748)[10]; *see also id.* ¶ 200. ████████████████████████████████████████

---

[10] Google is wrong when it claims that the request for Microsoft auction-time bidding described

███████████████████████████████████

███████████████████████████████████

████████████████████   *Id.* ¶ 205.

35.     In addition, Google's "lack of demand" argument is unavailing because depressed

advertiser demand for non-Google GSEs is itself a direct effect of Google's exclusionary

distribution contracts.  *Id.* ¶¶ 146, 275, 282-84.  Google cannot rely on the effects of one type of

anticompetitive conduct to justify further anticompetitive conduct.  SRCOL ¶ 24.

36.     *Third*, Google contends it has "technical concerns, in particular concerning

[Microsoft Ads] support for fractional conversions."  Google Br. 109-10.  Google also points to

Microsoft Ads' purported lack of support for campaign-level conversion goals and "latency"

issues.  GFOF ¶¶ 1868, 1872.  None of these concerns prevented all three of Google's SEM tool

competitors from supporting Microsoft auction-time bidding ████████████.  *Supra* ¶ 22.

Google now concedes that lack of fractional conversions is not a technical barrier but rather

something that would "improve[] auction-time bidding's performance."  GFOF ¶ 1831; *see also*

SFOF ¶ 278.  As Mr. Vallez explained, auction-time bidding is a "foundational" feature that

benefits advertisers whether or not they also use fractional conversions, Tr. 6643:2-5, and

Google does not claim that Microsoft auction-time bidding without fraction conversions would

---

in this document only came from a Japanese customer.  GFOF ¶¶ 1857-58.  Next to the listed
feature is a globe graphic with a list of "Teams who voted on the feature."  PSX00457 at -737.
Teams throughout the world, including the U.S., reported demand for Microsoft auction-time
bidding: "AMER [Americas], EMEA [Europe, Middle East, Africa], APAC [Asia-Pacific], GCS
[Global Customer Solutions]."  *Id.* at -740.  The document also is clear that a yellow comment
bubble next to Microsoft auction-time bidding means it was "raised in AMER customer survey,"
and the reference to Japanese company Rakuten is a "not exhaustive" list of customers affected
by the lack of support for the feature.  *Id.* at -737, -740.

be less efficient than intraday bidding.[11]

37.    *Fourth*, Google claims that SA360 has not integrated Microsoft auction-time bidding due to "limited resources."  Google Br. 110.  Again, all of Google's smaller SEM tool competitors allocated resources years ago to develop the feature having recognized that it was both highly beneficial and popular with customers.  *Supra* ¶ 23.  Google would not proceed even with initial testing ███████████████████████████████ (SFOF ¶ 210), despite that testing remaining on a completed 2020 roadmap after cost cutting sessions (*id.* ¶ 216), and despite (as Google admits) Microsoft's offer to "financially reimburs[e] Google for feature development costs."  GFOF ¶ 1848; SFOF ¶ 234.  Google offered no evidence that this initial testing was too costly or resource-intensive.

38.    Google also claims it had an outsized amount of resources devoted to its "Project Amalgam" rebuild of SA360.  Google Br. 103.  Even if that was true, it is undisputed that the new SA360 launched in early 2022 (GFOF ¶ 1783; SFOF ¶ 148), and more time has since elapsed than even Google's own estimates of the time needed to develop Microsoft auction-time bidding.[12]  *Supra* ¶ 31.  Project Amalgam's primary purpose was to provide immediate support for Google Ads features on SA360, thus increasing the disparity in SA360's support for Google and rival GSEs.  SFOF ¶ 148.  Improving support for Google's own search engine is at best "a

---

[11] Google also suggests there was "confusion" about the type of integration that Microsoft was requesting.  GFOF ¶ 1846.  There was no confusion because Microsoft was clear from an initial planning meaning in September 2019 that it sought the same level of integration as SA360 had just released for Google auction-time bidding.  SFOF ¶¶ 208-09.  But even if there was confusion (at least for Ms. Braddi), it is undisputed that Google knew exactly what Microsoft wanted by July 2020, now well over three years ago.  GFOF ¶¶ 1846, 1848; SFOF ¶ 236-38.

[12] Google's claim of limited resources also rings hollow given that it is one of the largest internet-services companies worldwide and in the U.S., with a market capitalization of $1.26 trillion and revenue over $282 billion.  JFOF ¶ 3.

competitively neutral goal" and, at worst, further evidence of conduct intended to harm competition.[13]

39.     *Fifth*, contrary to Google's argument, there is ample evidence that Google's decisions were made with ill intent toward Microsoft.  *Cf.* Google Br. 110.  Internal Google documents state that Google's principal reason for not supporting Microsoft Ads features was that it considered SA360 to be a tool to support ad campaigns "primarily on Google's platform," and thus requests from Microsoft for feature development were "not aligned with [Google's] product or business goals."  SFOF ¶¶ 222-23.  Google tasked Ms. Braddi with negotiating with Microsoft over its SA360 feature requests, despite her lack of knowledge about SA360 or auction-time bidding.  *Id.* ¶¶ 218-19.  She then proceeded to make unreasonable demands and raise false objections that had the desired outcome of avoiding any testing or development of Microsoft auction-time bidding.  *Id.* ¶¶ 234-40.  Ms. Braddi's attempts to explain Google's conduct and her own conduct are not credible and are contrary to the contemporaneous documentary record.  *Id.*

40.     The same Google employees that professed to treating Microsoft evenhandedly (*i.e.*, Ms. Braddi, Amit Varia, and Ryan Krueger) also admitted to routinely destroying or improperly withholding evidence that bears directly on Google's intent in delaying development of Microsoft Ads features, including documents related to "SA360 product decisions," "product feature road map decisions," and SA360's feature "prioritization process."  States Br. 31 n.8 (citing JFOF ¶¶ 1207, 1223).

---

[13] *United States v. Microsoft*, 253 F.3d 34, 72 (D.C. Cir. 2001); *see also id.* at 71 (keeping customers focused on one's own products "is not an unlawful end, but neither is it a procompetitive justification").

**B.**   **Google's SA360 conduct caused substantial harm to competition (Google Br. 105-09)**

41.     There is extensive evidence that Google's SA360 conduct caused substantial harm to SA360's customers, Google's actual and potential GSE rivals, and the competitive process in search ad markets.  SFOF ¶¶ 256-72.  That is more than enough to satisfy the test the Court described at summary judgment: "Google's delayed rollout of SA360 support for Microsoft Ads inhibited or dissuaded advertisers from placing ads on its competitor's search engine, thereby harming competition in the general search advertising market."  Dkt. 624 at 56.

42.     **Harm to customers**: SA360's degraded support for non-Google GSEs (including Bing, DuckDuckGo, and Yahoo!) harms advertisers by decreasing the efficiency of their ad spend on those rival GSEs.  SFOF ¶¶ 257, 263.  Advertisers on SA360 can use auction-time bidding for their Google ad campaigns, but must use intraday bidding for their non-Google ad campaigns.  *Id.* ¶¶ 172, 190, 259.  It is uncontested that auction-time bidding far outperforms intraday bidding, ███████████████████████  *Id.* ¶ 202.  Advertisers' Bing, DuckDuckGo, and Yahoo! campaigns on SA360 thus perform far worse than they would have absent Google's conduct, increasing their costs and decreasing return on ad spend.  *Id.* ¶ 259.  And if advertisers decide instead to increase their ad spend on Google search ads (as Google hopes they will), the resulting denser ad auctions further increase prices.  *Id.* ¶ 262.

43.     Google's principal response is to point out that advertisers could access Microsoft auction-time bidding on the Microsoft Ads native tool or on other SEM tools.  Google Br. 107.  Google then cites a couple anecdotal examples of customers switching SEM tools.  *Id.*

44.     Google's response ignores how its exclusionary distribution contracts and longstanding monopoly power enable it to obtain and keep SA360 users by prioritizing Google Ads features, even while delaying integration of the same features for competing GSEs.  SFOF

20

¶¶ 116-17, 147.  Google's dominant monopoly power leaves advertisers with no choice but to advertise on Google, depresses demand for advertising on rival GSEs, and reduces SEM tool interest in supporting non-Google GSEs.  *Id.* ¶¶ 145-46.  As a result, advertisers tend to use the SEM tool that offers superior support for advertising on Google—which Google ensures is SA360—even if that SEM tool offers inferior support for advertising on all other GSEs.  *Id.* ¶¶ 147-48; PSX00453 at -711 ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋).  In other words, SA360 is "sticky" because it is able to provide greater support for Google Ads features than competing SEM tools, and advertisers must advertise on Google due to its market dominance.  SFOF ¶ 260.

45.     The consequence of SA360's stickiness is that SEM tool rivals struggle to attract customers, despite offering superior support for non-Google GSEs.  *Id.* ¶ 150.  As Mr. Vallez testified, "greater support for Google features on SA360" makes it "more difficult to persuade advertisers to switch to Skai from SA360."  *Id.*  The effect of SA360's stickiness is undisputed: SA360's share among SEM tools has rapidly grown in recent years, even as Google has operated SA360 for its own benefit and at the expense of its customers and GSE rivals.  *Id.* ¶ 151.

46.     The costs of switching SEM tools are significant.  Mr. Booth of Home Depot testified that "it can be painful to move from a [SEM tool] to another," requiring "a big investment" into "retraining," "retooling," and a "cumbersome and painful process."  SFOF ¶ 154.  That process can cause loss of historical conversion data.  *Id.* ▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋ *Id.*  Due to these costs, Mr. Lowcock of IPG testified that his clients rarely switch SEM tools.  *Id.*

47.     There are also "sizeable" costs associated with using multiple SEM tools or an

SEM tool and native tool concurrently.  SFOF ¶ 155.  For that reason, Mr. Lowcock has never recommended "that a single advertiser use multiple SEM tools at the same time," ████████

████████████████████████████████████████

████  *Id.*

48.     The upshot is that Google drives up advertisers' costs and inefficiencies in all directions.  Those that use SA360 must accept less efficient advertising.  And the limited number that do not use SA360 must incur significant short-term and long-term costs of using inferior native or SEM tools, switching from one SEM tool to another, or multihoming.

49.     **Harm to competitors**: There is also ample evidence that Google's SA360 conduct harms Google's GSE rivals and potential entrants.  That includes Bing, DuckDuckGo, and Yahoo!, all of which use Microsoft Ads for the purchase and placement of general search ads.  SFOF ¶¶  263-72.

50.     The evidence shows that advertisers using an SEM tool tend to increase their spend on a particular GSE the more an SEM tool supports that GSE's advertising features.  Thus, Skai's greater support for Microsoft Ads features results in it getting a higher percentage of Bing ad spend than the industry standard.  *Id.* ¶ 264.  And SA360 expects and has found that its greater support for Google Ads features causes increased Google ad spend.  *Id.* ¶ 266.

████████████████████████████████████████

████  Google expected that Google auction-time bidding would "drive ███ billion (USD) for Google within 2 years of launch."  *Id.*

51.     SA360's disparate support for Google Ads features increases Google's share of spend on SA360.  Automated bidding features (like auction-time bidding) automatically allocate and shift an advertiser's budget between campaigns on different GSEs to optimize the spend.  *Id.*

¶ 158.  Thus, spend on SA360 will tend to shift from campaigns using less-efficient intraday bidding to campaigns using more-efficient auction-time bidding.  This effect is ███████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ acknowledged by Google's expert Dr. Israel ("[W]hen an advertiser uses SA360's target return on ad spending bid strategy, it lets SA360 decide how to allocate funds for bidding between and among multiple search engines").  *Id.* ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

52.     This spend-shift effect is also reflected in historical data.  Data presented at trial by Dr. Israel shows that Bing's share of total spend on SA360 decreased over five times more in the eighteen months after SA360's release of Google auction-time bidding in September 2019 than in the eighteen months before (2.25% after September 2019 and 0.4% before).  *Id.* ¶ 268.

53.     Microsoft's ordinary course analyses point in the same direction, showing the significant revenue consequences caused by Google's lack of support for Microsoft auction-time bidding and other key Microsoft Ads features.  *Id.* ¶¶ 269-71.  The estimates ranged from ████ ██████████████████████████ in lost revenue, and were expected to increase the longer SA360 did not support the Microsoft Ads features because ad spend would continue to shift away from less efficient Bing ad campaigns.  *Id.*; ████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████These estimates provide additional evidence of anticompetitive harm.

54.     Google's only response is to claim that Microsoft's calculations are not "substantiate[d]."  Google Br. 108.  Google made the same argument in its pre-trial motion *in limine*, and the Court rejected it.  Dkt. 683 ¶ 2.  As Plaintiff States explained in their opposition to the *in limine* motion, the basis for the lost revenue projections and the underlying calculations are described both in the documents themselves and in designated deposition testimony from Microsoft employees Mr. Utter, Mr. Indacochea, Ms. Heath, and Mr. Van der Kooi.[14]  *See* Dkt. 648.  For example, Mr. Utter explained in a contemporaneous email chain and at his deposition the basis for his initial projection of ▮▮▮▮▮▮▮▮ lost annual revenue and why he expected that amount to increase to ▮▮▮▮▮▮▮.  PSX00754 at -255; Utter Dep. Tr. 179:20-25, 180:24, 182:1-10.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  PSX00745 at -326, -328; Indacochea Dep. Tr. 229:13-25.  Microsoft also conducted the analysis twice, once in 2020 and again in 2021, and reached comparable conclusions, further bolstering their reliability.  SFOF ¶¶ 270-71.  Google cross-examined all of these witnesses at their depositions, and chose not to call any of them at trial for further examination.  In any event, even accepting some imprecision in Microsoft's projections, that Google's SA360 conduct causes its chief rival to lose hundreds of millions of dollars per year— losses that are continuing and accelerating—easily demonstrates substantial harm to competition.

55.     Google contends Microsoft's potential lost revenue is "a small fraction of *Google and Microsoft's* U.S. search advertising revenues."  Google Br. 108 (emphasis added).  It is incorrect to consider the aggregate effect on both Google and Microsoft.  ▮▮▮▮▮▮▮▮▮▮

---

[14] Plaintiff States intended to call one of these Microsoft employees at trial to discuss the lost revenue projections and other topics.  As Plaintiff States informed the Court and Google's counsel during trial, the witness was unavailable for unexpected personal reasons.

████████████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████  *Id.* ¶ 68.  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

56.     **Harm to competition**: More broadly, Google's operation of SA360 harms the competitive process by which GSEs attract advertising customers.  SEM tools are competitively important for Google's rivals because advertisers that use SEM tools are more likely to advertise on multiple GSEs (generally Google and other smaller GSEs).  *Id.* ¶ 129.  That is evident from the fact that such advertisers choose to pay additional SEM tool fees (as opposed to using free native tools) precisely so they can efficiently advertise on both Google and its rivals.  *Id.* ¶ 134.

57.     In competitive search ad markets, the relationship between GSEs, SEM tools, and advertisers would be symbiotic: advertisers want SEM tools that provide consistent support for multiple GSEs, SEM tools seek to provide that cross-engine support, and advertisers reward SEM tools that offer broad cross-engine support by increasing ad spend, resulting in increased revenue to both GSEs (through ad purchases) and the SEM tool (through usage fees).  *Id.* ¶¶ 131-38, 264-66.  Google has leveraged its monopoly power to operate SA360 contrary to the interests of its customers, while "disintermediat[ing]" other SEM tools and creating a "choke point" on rival GSEs' advertising businesses.  *Id.* ¶¶ 151-52.

58.     A third of U.S. search ad revenue comes through an SEM tool and Dr. Israel acknowledged that "SA360 makes up a … reasonably large share of total spending on Bing ads." *Id.* ¶ 153 (in 2021, about ███ of Bing's revenue was through SA360).  Those facts show Microsoft's financial reliance on SEMs tools generally and SA360 specifically, and thus demonstrate the substantial anticompetitive harm caused by Google's SA360 conduct.  *Id.* ¶¶ 152-53.  Moreover, the subset of customers using SEM tools are of particular competitive importance to Google's GSE rivals because they are the actual or potential customers most interested in advertising on multiple GSEs, as opposed to exclusively on Google.  *Id.* ¶¶ 127-28.

### C.     Google's SA360 conduct has no procompetitive benefit (Google Br. 110-11)

59.     Google argues that its decisions in operating SA360 are in furtherance of customer demand and that developing more robust support for Microsoft Ads features would force SA360 to "put its customers' needs to one side."  Google Br. 110.  The evidence shows the opposite: Google's customers consistently want broader support for Microsoft Ads features generally and auction-time bidding specifically, which is why all other SEM tools integrated support for Microsoft auction-time bidding.  SFOF ¶¶ 131-33, 179-84, 195-206.

60.     Next, Google contends that holding it accountable for its anticompetitive conduct would effectively "provide rivals assurances that they need not innovate, but can always force Google to integrate their features on their proposed terms."  Google Br. 110.  However, Plaintiff States seek to ensure competitive conditions that would provide *greater* incentives for all advertising platforms (including Google) to innovate by developing new native tool features, and then seeking to convince SEM tools to integrate those features for the benefit of advertising customers.  It is precisely Google's SA360 conduct, enabled by its monopoly power, that discourages GSE rivals from developing new advertising features and SEM tool rivals from supporting those features that are developed.  SFOF ¶¶ 144-48.

61.     Finally, Google claims that its "operation of SA360 enhances and promotes competition among search engines and their ability to compete for the advertising spend of digital advertisers."  Google Br. 111.  Google cites no evidentiary support for this statement, and it is contradicted by Google's continued growth in its monopoly share of general search advertising and its dominant share among SEM tool providers.  SFOF ¶¶ 68, 151.

62.     In sum, the record demonstrates that Google consistently operates SA360 with degraded support for rival GSEs.  Google's intent in doing so is to protect its search ad monopolies and harm competition, and Google's purported justifications for its conduct are unsupported, false, and pretextual.


## III.    Google's Distribution Contracts Deprive Rivals of Scale and Restrict Their Ability to Enter Into Vital SVP Partnerships (GFOF ¶¶ 1736-43)

63.     Google's exclusionary distribution contracts deprive GSE rivals of the scale necessary to improve the quality of their search engines and thus to effectively compete with Google.  JFOF ¶¶ 985-1066.  In addition to the harms described in Plaintiffs' Proposed Findings of Fact (*see id.*), Google's distribution contracts (i) depress demand for advertising on rival GSEs (SFOF ¶¶ 282-84) and (ii) make rival GSEs less attractive partners for SVPs, causing them to incur greater costs to enter into competitively necessary SVP partnerships (*id.* ¶¶ 285-301).

64.     Google contests these additional harms by claiming that Plaintiff States "failed to prove anticompetitive harm relating to rivals' ability to partner with SVPs."  *See* GFOF ¶¶ 1736-73.  However, the evidence Google cites either confirms Plaintiff States' position or is irrelevant because Google misconstrues the nature of the harm.

65.     Many SVPs make substantial investments in collecting, organizing, and updating valuable data, such as up-to-date information about travel destinations or local businesses.  Tr.

27

6173:14-6174:6 (Barrett-Bowen). Partnering with SVPs to obtain that data is an important way for GSEs to improve the quality of their search results. *Id.*; Tr. 2677:10-2678:9 (Parakhin).



66.

67.

GFOF ¶ 1741(2)(c); Tr. 6187:20-6188:10 (Barrett-Bowen).

(Barrett-Bowen); SFOF ¶ 296.

68.  Google claims

*See* GFOF ¶¶ 1741(1)(j), (2)(e), (4)(c). But it is precisely by offering a *differentiated* product that smaller rivals might effectively compete with Google.

69.  Indeed, Bing and other non-Google GSEs are often *more reliant* than Google on SVP partnerships to improve their search results quality and attract users. SFOF ¶ 288. For example, some data about businesses can be obtained through crawling their websites, but such businesses limit smaller GSEs from crawling their websites while allowing Google to crawl for

free.  Tr. 2677:4-9 (Parakhin); Tr. 6174:8-6175:8 (Barrett-Bowen).  Also, certain smaller businesses expend time and money to update their information on Google (because of its dominant market share), but not on other GSEs.  Tr. 2677:10-2678:9 (Parakhin).  Thus, through its monopoly power, Google has better and cheaper access to content that impacts both the quality and perception of the quality of Bing responses to queries.  SFOF ¶ 287.

70.   Google also relies on evidence that "Microsoft has reached content agreements with over 300 partners since 2005."  GFOF ¶ 1739.  That is a misdirection.  Plaintiff States' theory of harm is not that Google's conduct barred Microsoft and other GSE rivals from entering into any and all content partnerships.



71.   Finally, Google asserts that Microsoft cannot be harmed because it is a large company with significant resources.  GFOF ¶ 1740.  But Microsoft, like all rational businesses, uses a cost-benefit analysis when deciding whether to make investments.  *See* JFOF ¶¶ 1069, 1072, 1075-78; *see also* Tr. 2750:25-2751:11 (Parakhin).



SFOF ¶ 299; Tr. 7138:22-7139:2 (Baker); Tr. 6527:17-6528:10, 6528:16-20, 6529:6-6530:2 (Hurst).

Dated: March 22, 2024          Respectfully submitted,

FOR PLAINTIFF STATE OF COLORADO

PHILIP WEISER
Attorney General of Colorado

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365 (inactive)
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

MIKE HILGERS
Attorney General of Nebraska

Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mail: Colin.Snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov
          Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the Attorney General of New York
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH CAROLINA

JOSHUA STEIN
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF TENNESSEE

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

FOR PLAINTIFF STATE OF UTAH

SEAN REYES
Attorney General of Utah

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff State of Utah*

FOR PLAINTIFF STATE OF ALASKA

TREGARRICK TAYLOR
Attorney General of Alaska

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

FOR PLAINTIFF DISTRICT OF COLUMBIA

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

FOR PLAINTIFF TERRITORY OF GUAM

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira, Chief, Consumer Protection Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324

*Counsel for Plaintiff Territory Guam*

FOR PLAINTIFF STATE OF HAWAI'I

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State of Hawai'i
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

FOR PLAINTIFF STATE OF IDAHO

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720 Boise, ID 83720
Telephone: (208) 334-4114
E-Mail:  John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
           Brian.yost@ilag.gov
           Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

KRIS W. KOBACH
Attorney General of Kansas

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

FOR PLAINTIFF STATE OF MAINE

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

FOR PLAINTIFF STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS

ANDREA CAMPBELL
Attorney General of Massachusetts

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-Mail: William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW HAMPSHIRE

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

FOR PLAINTIFF STATE OF NEW JERSEY

MATTHEW PLATKIN
Attorney General of New Jersey

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NORTH DAKOTA

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

FOR PLAINTIFF STATE OF OHIO

DAVID YOST
Attorney General of Ohio

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

FOR THE PLAINTIFF STATE OF OKLAHOMA

GENTNER DRUMMOND
Attorney General of Oklahoma

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OF OREGON

ELLEN ROSENBLUM
Attorney General of Oregon

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

MICHELLE HENRY
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

FOR PLAINTIFF TERRITORY OF PUERTO RICO

DOMINGO EMANUELLI HERNANDEZ
Attorney General of Puerto Rico

Guarionex Diaz Martinez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

FOR PLAINTIFF STATE OF RHODE ISLAND

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

FOR PLAINTIFF STATE OF SOUTH DAKOTA

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF VERMONT

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

JASON S. MIYARES
Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

FOR PLAINTIFF STATE OF WASHINGTON

ROBERT FERGUSON
Attorney General of Washington

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: <u>Amy.hanson@atg.wa.gov</u>

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WEST VIRGINIA

PATRICK MORRISEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

FOR PLAINTIFF STATE OF WYOMING

BRIDGET HILL
Attorney General of Wyoming

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: <u>Benjamin.peterson2@wyo.gov</u>

*Counsel for Plaintiff State of Wyoming*

## <u>CERTIFICATE ON SERVICE</u>

On March 22, 2024, I served this Plaintiff States' Responsive Proposed Findings of Fact by email on counsel for Google and counsel for DOJ Plaintiffs in the above-captioned matters.

March 22, 2024                                    _/s/ Matthew McKinley_

                                                  Matthew McKinley

                                                  _Counsel for Plaintiff States_