**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO
DEFENDANT'S PROPOSED CONCLUSIONS OF LAW**

March 22, 2024

# TABLE OF CONTENTS

I.  **Plaintiffs Have Proven All Three Alleged Relevant Product Markets** ..................... 1

    A.  Products With Distinct Purposes Are Not Reasonably Interchangeable .............. 1

    B.  An Empirical Analysis Is Not Required To Define A Relevant Market ............. 1

    C.  One-Stop Shopping Can Properly Be A Product Market ..................................... 2

    D.  That Different Ad Channels Broadly Compete For Advertiser Dollars Does Not Mean All Digital Ads Should Be Included In The Relevant Ad Markets ............ 3

    E.  Audience Overlap Is Neither Necessary Nor Determinative ............................... 4

    F.  Distinct Ad Prices Weigh In Favor Of Plaintiffs' Ad Markets ............................ 5

II.  **Google Wields Monopoly Power In Each Of The Three Relevant Markets** ............. 5

    A.  Google's Dominant Market Shares Are Protected By High Barriers To Entry ..... 5

    B.  Google Defines Direct Evidence Of Monopoly Power Too Narrowly ................. 6

III.  **The Evidence Establishes A Prima Facie Case Of Anticompetitive Conduct** ............ 7

    A.  Google's Conduct Is Prima Facie Unlawful Because It Harms Competition ........ 7

        1.  The Law Does Not Require Plaintiffs To Prove A But-For World .......... 8

        2.  Fully Assessing Google's Anticompetitive Harms Requires Accounting For All Its Anticompetitive Conduct ...................................................... 10

    B.  Google's Contracts Are Also Prima Facie Unlawful Because They Are Exclusive And Create Substantial Foreclosure ................................................................. 10

        1.  Google Conflates Prima Facie Standards ............................................. 10

        2.  Google's Contracts Are Exclusive ....................................................... 11

        3.  Google's Contracts Create Substantial Foreclosure .............................. 13

    C.  Google's Contracts Need Not Be Predatory To Violate Section 2 ..................... 17

IV.  **Google Fails To Present Valid Justifications Outweighing Anticompetitive Effects** 17

    A.  Google Has Shown No Valid Justification For Its Browser Agreements ........... 17

        1.  Browsers' Use Of A Single Default Search Engine Is Not Evidence That Google's Agreements Are Procompetitive ........................................... 18

2.      Google's Agreements Do Not Enhance Competition Among GSEs ....... 18

3.      Google's Claims That Its Default Agreements Incentivize Browser
        Improvements Are Unproven And Pretextual....................................... 19

4.      Benefits Outside The General Search Market Are Not Cognizable......... 20

5.      Plaintiffs Have Identified Valid Less Restrictive Alternatives............... 22

B.      Google Has Proven No Valid Justification For Its Android Agreements ........... 23

1.      Demanding Exclusivity In Exchange For Software To OEMs Is Not
        Procompetitive .................................................................................... 23

2.      Google's Alleged Procompetitive Justifications For Its Android
        Agreements Are Pretextual And Do Not Justify Exclusivity ................. 24

3.      Google's RSAs Prevent Competition, Not Free Riding......................... 24

4.      Benefits Outside The Relevant Markets Are Not Cognizable................ 25

# TABLE OF AUTHORITIES

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)................................ 13

*Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999)................................... 5

*Am. Pres. Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022)........................ 10, 17

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983)................................. 18

*Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003) ..................... 4, 5

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992)...................................... 10

*Cmty. Publishers v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995).................................. 7

*Crowder v. LinkedIn Corp.*, 2024 WL 1221956 (N.D. Cal. Mar. 21, 2024) ............................. 11

*Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451 (1992) ........................... 15, 21

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 826 F. Supp. 2d 705 (S.D.N.Y. 2011) ........ 14

*Emigra Grp. v. Fragomen, Del Ray, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330 (S.D.N.Y. 2009)............................................................................................................................ 2

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) ............................................................... 20

*FTC v. IQVIA Holdings Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024)................................. 3, 4

*FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020) ............................................................... 23, 24

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ......................................................... 2, 3

*FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020) .................................................. 17

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................... 1, 2

*FTC v. Whole Foods Mkt.*, 548 F.3d 1028 (D.C. Cir. 2008)...................................................... 2

*Green Country Food Mkt. v. Bottling Grp.*, 371 F.3d 1275 (10th Cir. 2004).............................. 3

*Impax Labs. v. FTC*, 994 F.3d 484 (5th Cir. 2021) ................................................................. 22

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022)................................................................................................... 10, 18

*In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74 (D.D.C. 2006)................. 14

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020)..................................................................................................... 10

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988).... 5

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039 (D. Minn. 2009)....... 5

*Intel Corp. v. Seven Networks, LLC*, 562 F. Supp. 3d 454 (N.D. Cal. 2021) ............................... 1

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022)................................................ 3, 9

*Knutson v. The Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976)................................................. 1

*L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993).................................................. 6

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc)................................................. 10, 12

*M&H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973 (1st Cir. 1984) ............................. 21

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015)............................................. 7, 12, 17, 19

*Mozart Co. v. Mercedes-Benz of N. Am.*, 833 F.2d 1342 (9th Cir. 1987) .................................. 21

*Mytinger & Casselberry, Inc. v. FTC*, 301 F.2d 534 (D.C. Cir. 1962)................................. 15, 16

*N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32 (2d Cir. 2018)................................. 25

*Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679 (1978) ............................................. 20

*NCAA v. Alston*, 141 S. Ct. 2141 (2021) ........................................................................... 20, 22

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)........................................... 21, 22

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ...................................................................... 6

*PepsiCo v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000) ............................................ 2

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) ...................... 19

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)................................................................. 8, 9

*Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978).................................................... 22

*Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949)............................................. 8, 9

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994)......................................................................... 22

*Thurman Indus., Inc. v. Pay N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989)......................... 2

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................ 3

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ......................................... 7, 12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................................. 2

*United States v. H & R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011) ............................................. 5

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ...................... passim

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) ......................................... 12

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ..................................................... 6

*United States v. Visa, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................................. 4

*United States v. Waste Mgmt., Inc.*, 743 F.2d 976 (2d Cir. 1984) .............................................. 6

*\*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ............................ 12, 13, 15, 17

**Statutes**
15 U.S.C. § 1 ............................................................................................................................... 21

15 U.S.C. § 2 ............................................................................................................................... 21

**Other Authorities**
Benjamin Klein & Kevin Murphy, *Exclusive Dealing Intensifies Competition for Distribution*, 75 Antitrust L.J. 433 (2008) ................................................................................................... 13

Benjamin Klein & Kevin Murphy, *How Exclusivity Is Used to Intensify Competition for Distribution—Reply to Zenger*, 77 Antitrust L.J. 691 (2011) ................................................... 14

Memorandum Opinion on Motions for Summary Judgment, ECF No. 624 ....................... 11, 14

**Treatises**
Phillip E. Areeda et al., *Antitrust Law* (5th ed. 2022) .............................................................. 16

## TABLE OF ABBREVIATIONS

| Citation | Post-Trial Filing |
|---|---|
| Def. PCOL | Defendant's Proposed Conclusions of Law, ECF No. 827 |
| Def. PFOF | Defendant's Proposed Findings of Fact, ECF No. 828 |
| Def. PTB | Defendant's Post-Trial Brief, ECF No. 826 |
| Pls. PCOL | Plaintiffs' Proposed Conclusions of Law, ECF No. 821 |
| Pls. PFOF | Plaintiffs' Proposed Findings of Fact, ECF No. 822 (¶¶ 1–1345)<br>Plaintiffs' Response to Defendant's Proposed Findings of Fact (filed Mar. 22, 2024) (¶¶ 2001–2480) |
| Pls. PTB | Plaintiffs' Post-Trial Brief, ECF No. 820 |
| Summ. J. Opinion | Memorandum Opinion on Motions for Summary Judgment, ECF No. 624 |

| Initialism | Full Term |
|---|---|
| GSE | General Search Engine |
| ROI | Return on Investment |
| SVP | Search Vertical Provider |

## I.      Plaintiffs Have Proven All Three Alleged Relevant Product Markets

Google argues that Plaintiffs' markets are too narrow because they exclude reasonable substitutes. Def. PCOL ¶¶ 7, 19. Google's arguments misstate the law and are contrary to the extensive evidence regarding market definition.

### A.      Products With Distinct Purposes Are Not Reasonably Interchangeable

The Court should reject Google's argument that, when defining the relevant markets, Plaintiffs improperly focus on product differences over substitution. Def. PCOL ¶¶ 13, 15, 19, 29. Google cites cases for the uncontroversial position that differentiated products with the *same purpose* may belong in the same market. *Id.* ¶¶ 13, 19, 29. These cases are inapplicable; the evidence shows that consumers and advertisers, as well as other market participants, view the products in the relevant markets as having *different purposes* than products outside those markets; this makes products outside the markets poor substitutes for products inside the markets. Pls. PTB at §§ I.A–D. Indeed, the products excluded from Plaintiffs' markets are complements rather than substitutes. Pls. PTB at 15, 21; Pls. PFOF ¶¶ 430–439, 483–492, 2207, 2210, 2234–2237; *Intel Corp. v. Seven Networks, LLC*, 562 F. Supp. 3d 454, 461 (N.D. Cal. 2021); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 28, 30–31 (D.D.C. 2015).

### B.      An Empirical Analysis Is Not Required To Define A Relevant Market

Google suggests that, to prove a relevant product market, Plaintiffs must offer a quantitative hypothetical monopolist test or other empirical substitution analysis. Def. PCOL ¶ 22; Def. PTB § I.B. There is no such requirement under the law, Pls. PCOL at 4–6; *Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 804 (9th Cir. 1976), and the cases cited by Google do not support its position, Def. PCOL ¶ 22; Def. PTB at 21. In any event, Plaintiffs have offered sufficient evidence, including expert testimony, that a hypothetical monopolist in each market would find it profitable to raise price significantly above competitive levels or reduce quality

significantly below competitive levels. Pls. PTB §§ I.A–E.

### C.     One-Stop Shopping Can Properly Be A Product Market

There are neither facts nor law supporting Google's argument that one-stop shopping is

an invalid basis for defining a general search services market. Def. PCOL § I.A.1. To the

contrary, when consumers demand a one-stop shop, and that offering is not reasonably

interchangeable with other offerings, then the one-stop shop is a proper product market. *United

States v. Grinnell Corp.*, 384 U.S. 563, 571–74 (1966); *FTC v. Whole Foods Mkt.*, 548 F.3d

1028, 1037–41 (D.C. Cir. 2008); *Sysco*, 113 F. Supp. 3d at 26–37; *FTC v. Staples, Inc.*, 970 F.

Supp. 1066, 1075–81 (D.D.C. 1997).

Contrary to Google's argument, Def. PCOL ¶ 9, the evidence showed that consumers

demand the one-stop shop offered by GSEs,[1] and these services are fundamentally different than

those offered by SVPs and social media, Pls. PTB §§ I.A–B. In contrast, the cases cited by

Google emphasize the identical or functionally equivalent nature of products in and out of the

alleged markets. *Thurman Indus., Inc. v. Pay N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.

1989) (products at home centers were functionally equivalent or identical to products at specialty

stores); *Emigra Grp. v. Fragomen, Del Ray, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 360

(S.D.N.Y. 2009) (end products from specialized services and one-stop shops were "identical");

*PepsiCo v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 254 (S.D.N.Y. 2000) ("[F]ountain syrup

delivered by an independent foodservice distributor is no different from fountain syrup delivered

---

[1] Google's view on whether the interests of users and distributors align vacillates. For market definition, Google argues there is no alignment, Def. PCOL ¶ 10; for its competition-for-the-contract argument, Google argues there is near perfect alignment, Def. PTB § III.C; Def. PCOL § III.A.4. In fact, distributors' decisions provide some information for market definition because there is *some* alignment of interests between users and distributors. Pls. PFOF ¶¶ 332–336. But that alignment is not perfect. *Id.* ¶¶ 1232–1241.

by another means of distribution."); *Green Country Food Mkt. v. Bottling Grp.*, 371 F.3d 1275, 1285 (10th Cir. 2004) (no market for packaged drinks when they could be bought individually).

Google argues that its development of vertical search experiences shows that GSEs compete with SVPs. Def. PTB at 13–14. But the fact that Google reacts to SVPs to *some* degree does not mean SVPs belong in the market. *United States v. Microsoft Corp.*, 253 F.3d 34, 53–54 (D.C. Cir. 2001) (en banc); *Staples*, 970 F. Supp. at 1079–80. Indeed, Google has it backwards. Google's development of search verticals shows that they are different products intended to complement, not replace, core GSE functionality. Pls. PFOF ¶¶ 378, 382, 2217, 2219.1. Although Google's vertical offerings make the company more competitive with SVPs, SVPs cannot constrain GSEs because SVPs do not offer the one-stop shop that consumers demand.

**D.      That Different Ad Channels Broadly Compete For Advertiser Dollars Does Not Mean All Digital Ads Should Be Included In The Relevant Ad Markets**

The Court should reject Google's argument that competition for advertiser dollars requires all digital ads be included in a single relevant market. Def. PCOL § I.B.1.

First, Google ignores long-standing precedent defining markets around specific ad types. *See, e.g.*, *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 613 n.31 (1953). More recently, courts have upheld markets for social media advertising and specialized programmatic advertising. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 781–86 (N.D. Cal. 2022); *FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *13 (S.D.N.Y. Jan. 8, 2024).

Second, that different ad types compete in a broad sense "does not necessarily mean those channels are reasonably interchangeable substitutes that must be included in the relevant product market." *IQVIA*, 2024 WL 81232, at *17. Google seeks to blunt its many internal documents supporting Plaintiffs' ad markets by arguing that the fact it "touts the benefits of its search ads [and] distinguishes them from rival ad types" is evidence these ads compete, and

3

therefore Plaintiffs' markets are too narrow. Def. PCOL ¶ 25. The Court should reject Google's attempt to recast these statements as evidence that Search Ads and other digital ads are reasonable substitutes. Unlike in *Berlyn, Inc. v. The Gazette Newspapers*, where the "strongest" evidence plaintiff offered to support its alleged market was a single promotional flier comparing print advertising to TV and radio advertising, 73 F. App'x 576, 583 (4th Cir. 2003), the record here reveals overwhelming evidence of Google and third parties distinguishing Search Ads from other types of digital ads. Pls. PFOF ¶¶ 430–439, 456–499, 2234–2249.

Third, Google claims advertisers shift spend across ad channels when seeking to maximize their ROI, arguing this means that Plaintiffs have improperly excluded reasonable substitutes from the ad markets. Def. PCOL ¶ 20. Advertisers budgeting overall spend to maximize ROI does not mean all digital ads are reasonably interchangeable. *IQVIA*, 2024 WL 81232, at *16–17 (shifting spend across ad channels to maximize ROI did not make channels substitutes); *United States v. Visa, Inc.*, 163 F. Supp. 2d 322, 336–38 (S.D.N.Y. 2001) (finding a general purpose card market, even though "cash and checks compete with general purpose cards as an option for payment by consumers and . . . growth in payments via cards takes share from cash and checks in some instances"); Pls. PFOF ¶¶ 502–513, 2226–2233. Advertisers and Google recognize Search Ads, Text Ads, and other digital ads serve complementary and mutually reinforcing purposes. Pls. PFOF ¶¶ 430–439, 483–492, 2207, 2210, 2234–2237.

### E.    Audience Overlap Is Neither Necessary Nor Determinative

Google's greater audience overlap with SVPs and social media, as compared to other GSEs, does not prove that Plaintiffs' ad markets are too narrow. Def. PCOL ¶¶ 26–27. Although audience overlap may be a factor, it is neither necessary nor determinative. Pls. PFOF ¶¶ 2241–2243; *see also IQVIA*, 2024 WL 81232, at *13 (recognizing market for specialized programmatic advertising, which excluded other digital advertising); *cf. Insignia Sys., Inc. v. News Am. Mktg.*

4

*In-Store, Inc.*, 661 F. Supp. 2d 1039, 1058–59 (D. Minn. 2009) (material dispute where evidence showed that third-party at-shelf, in-store advertising was distinct from other in-store advertising).

Google cites two cases to support its argument. Def. PCOL ¶ 26. Neither stands for the proposition that audience overlap is determinative when defining a relevant advertising market. In fact, *Am. Online, Inc. v. GreatDeals.Net* observed that advertising to AOL email subscribers could be in the same market as advertising to Yahoo email subscribers even though each product presumably reached non-overlapping consumers. 49 F. Supp. 2d 851, 858 (E.D. Va. 1999).

### F.    Distinct Ad Prices Weigh In Favor Of Plaintiffs' Ad Markets

Google argues that the fact Search Ads are more expensive on a cost-per-impression basis "is insufficient to confine a market to search ads." Def. PCOL ¶ 30. As an established *Brown Shoe* factor, distinct prices should be weighed alongside other factors when defining a market. *See, e.g., United States v. H & R Block*, 833 F. Supp. 2d 36, 55–56 (D.D.C. 2011); Pls. PFOF ¶ 2232. Google cites cases that found distinct prices, *unsupported by other evidence*, insufficient to establish separate markets. *Berlyn*, 73 F. App'x at 583; *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988). Here, distinct pricing is one factor among many weighing in favor of Plaintiffs' markets. Pls. PFOF ¶¶ 494–495, 2232.

## II.    Google Wields Monopoly Power In Each Of The Three Relevant Markets

### A.    Google's Dominant Market Shares Are Protected By High Barriers To Entry

Although Google disputes Plaintiffs' relevant markets, Google does not dispute that it enjoys persistently high market share in those markets. Instead, Google challenges only whether its high shares are protected by barriers to entry. The Court should reject Google's arguments.

First, Google argues that its exclusionary contracts *lower* barriers to entry, Def. PCOL ¶ 45; this rests on the false premise that, absent exclusivity, there would be no competition. Whatever competition Google "allows" through its strategy of paying partners to accept

exclusionary terms comes at the expense of true robust competition. The sole case Google cites rejected a claim that anticompetitive conduct aimed at a single firm could be a barrier to entry. *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426–27 (9th Cir. 1993). Google has enacted a network of exclusionary contracts throughout the market that impair competition generally.

Second, Google argues that superior quality is not a barrier to entry, citing two cases concluding that consumer goodwill and effective service are not barriers. Def. PFOF ¶ 44; *United States v. Syufy Enters.*, 903 F.2d 659, 668–69 (9th Cir. 1990); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir. 1984). But the industries implicated by these two cases—movie theaters and waste collection—hardly bear resemblance to the dynamic and pervasive indirect network and scale effects at play here. *See Microsoft*, 253 F.3d at 55; Pls. PTB at 24, 29–31; Pls. PCOL at 8–9.[2]

### B.     Google Defines Direct Evidence Of Monopoly Power Too Narrowly

Google argues that direct evidence of monopoly power must take the form of reduced output and supracompetitive pricing. This is wrong. Monopoly power may be proven through other types of direct evidence, for example, evidence that a firm sets prices "without considering rivals' prices." *Microsoft*, 253 F.3d at 57–58; Pls. PCOL at 10–11. Google's argument rests primarily on a misreading of *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018). There, the Court held that the evidence did not establish anticompetitive effects for a Section 1 claim, but also recognized that such effects can be proven in multiple ways, including evidence that a restraint "decreased quality" or "otherwise stifled competition." *Id.* at 2284, 2287.

---

[2] Google has failed to establish the reliability of Prof. Fox's opinions. *See* Pls.' Mot. to Exclude the Expert Testimony of Edward A. Fox and Memo. in Support, ECF No. 443; Pls.' Reply in Support of Pls.' Mot. to Exclude the Expert Testimony of Edward A. Fox, ECF No. 521; Pls. PFOF ¶¶ 2077–2092. Accordingly, the Court should exclude Prof. Fox's opinions.

Where, as here, a firm offers a product for no monetary cost, courts can and should look to direct evidence relating to quality. *See Cmty. Publishers v. Donrey Corp.*, 892 F. Supp. 1146, 1153 n.8 (W.D. Ark. 1995). In this case, evidence shows that, because it did not face the threat of losing users to rivals, Google did not pursue privacy improvements to general search. Pls. PTB § IV.B. Google argues that its superior quality and continued innovation are inconsistent with the possession of monopoly power in general search services. Def. PCOL ¶ 40. But even monopolists may have *some* incentive to innovate. Pls. PCOL at 11.[3]

Even if output restriction were required to show direct evidence of monopoly power, here, Google's anticompetitive conduct has ensured market participants have less incentive to invest in search quality, which in turn means search quality is not improving and output is not increasing as much as they would in a competitive market. Pls. PTB §§ IV.A & C.

Google also argues that evidence of its ad price increases—a common marker of monopoly power—does not support a finding of monopoly power in the ad markets. Def. PCOL ¶¶ 49–50. But no case cited by Google supports its theory that a defendant can significantly increase prices to capture the value of self-proclaimed quality increases. Pls. PFOF ¶¶ 634.

Finally, even if not direct proof, courts consider pricing evidence when assessing circumstantial evidence of monopoly power. *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190–91 (3d Cir. 2005).

## III.   The Evidence Establishes A Prima Facie Case Of Anticompetitive Conduct

### A.      Google's Conduct Is Prima Facie Unlawful Because It Harms Competition

Google's conduct is prima facie unlawful because it dampens incentives to compete,

---

[3] Google's argument that Plaintiffs cannot show monopoly power without comparing current search quality and output to a but-for world is similarly untethered to the law. *Infra* § III.A.1.

depresses rivals' scale, and excludes nascent or potential competition. Pls. PTB § III; Pls. PCOL at 13. Google (1) ignores these harms, Pls. PTB at 33 (payment-created disincentives), 34 (excluding Spotlight search ads); (2) misconstrues them, Pls. PTB § III.A (depressed scale), § IV (foreclosure-created disincentives); and (3) misstates the relevant facts, Pls. PTB at 29–33 (importance of scale), 33–35 (exclusion of Suggestions and Branch), 42–49 (importance of defaults). Def. PCOL ¶¶ 75–76, 107; Def. PTB at 65–69, 93. Google's anticompetitive intent and sanctionable conduct, which Google has ignored, provide further bases for this prima facie case. Pls. PCOL §§ I, V.A.4, VI; Pls. PTB § VIII.

### 1.     The Law Does Not Require Plaintiffs To Prove A But-For World

Google argues that *Rambus Inc. v. FTC* requires Plaintiffs to define a but-for world to show anticompetitive effects. Def. PTB at 43–44 (citing 522 F.3d 456, 466–67 (D.C. Cir. 2008)); Def. PCOL ¶ 74 (same). *Rambus* cannot and does not support Google's argument.

*Rambus* could not create a but-for requirement for Plaintiffs because preexisting Supreme Court and en banc D.C. Circuit precedent hold otherwise. *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 309–10 (1949); *Microsoft*, 253 F.3d at 78–79. Aware of *Microsoft*, which rejected a but-for requirement for proving causation, Google argues that proving anticompetitive effects mandates a but-for world. Def. PTB at 43–44, 68; Def. PCOL ¶¶ 74–76, 107. But *Microsoft*'s holding and reasoning apply well beyond causation: because a but-for requirement creates a "proof problem" and "would only encourage monopolists to take more and earlier anticompetitive action," no part of "§ 2 liability turn[s] on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct." 253 F.3d at 79. *Standard Oil* likewise explains that requiring "evidence as to what would have happened but for the adoption of the [challenged] practice . . . would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts." 337 U.S. at

309–10. The Court should reject Google's invitation to read *Rambus* to flout these precedents.[4]

In *Rambus*, the FTC found that the defendant had acquired a monopoly through anticompetitive deception because, but-for the deception, a standard setting organization would have (1) adopted technology other than the defendant's or (2) negotiated better terms for the defendant's technology before adopting it. 522 F.3d at 459, 463–67. Although the FTC had *no* finding about which of those outcomes was more likely to have occurred but-for the deception, the agency concluded that the conduct was anticompetitive in either circumstance. *Id.* at 463, 466–67. The D.C. Circuit rejected the FTC's argument and held that the second but-for possibility was not a competitive harm. *Id.* at 466–67. Thus, for the FTC's decision to stand, it needed to show that absent the deception, the standard setting organization would have adopted different technology. Under these unique facts, the court reversed the FTC because—rather than showing that the deception would "tend[]" to harm competition—the Commission had "expressly left open the likelihood" of an outcome that did not harm the competitive process. *Id.* at 463–67; *see also Klein*, 580 F. Supp. 3d at 801 (discussing *Rambus*'s "tending" standard). *Rambus* is thus inapposite for three reasons:

- Unlike in *Rambus*, Plaintiffs' claims are not premised on any specific but-for world. *See* Pls. PTB at 51 (Google's contracts harm competition even when their termination causes little market-share change).

- *Rambus*'s facts were simpler and undisputed: but-for the defendant's conduct, only one of two things could have happened. 522 F.3d at 463–64. Here, the but-for possibilities are endless, Pls. PFOF ¶ 972, and "the defendant," not the plaintiff, should "suffer the uncertain consequences of its own undesirable conduct," *Microsoft*, 253 F.3d at 79.

- *Rambus* had *no* finding about which of the two alternative outcomes was—or even "tend[ed]" to be—more probable. 522 F.3d at 463, 466–67. The evidence here—although necessarily limited by practical realities and Google's destruction of documents—

---

[4] Google's but-for arguments under monopoly power and foreclosure, Def. PTB at 25–28, 44–45, 82–83, 86; Def. PCOL ¶¶ 70–71, 102, fail for the same reasons and more, *infra* § III.B.3.

demonstrates that but for Google's conduct, the relevant markets would have (and certainly would tend to have) more robust competition. Pls. PTB §§ III–V.

### 2.    Fully Assessing Google's Anticompetitive Harms Requires Accounting For All Its Anticompetitive Conduct

Google's argument that a court cannot aggregate different conduct to find anticompetitive effect is misleading. Def. PCOL ¶ 57 (quoting *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022)). Google's favored precedent, *EpiPen*, emphasizes the need to assess conduct not just "separately" but also "in totality [for] any 'synergistic effect.'" 44 F.4th at 982. Circuits around the country, including the D.C. Circuit, agree. *Microsoft*, 253 F.3d at 72 (viewing exclusive ISV agreements in "light" of non-exclusive OEM agreements); *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 270–271 (3d Cir. 2020) ("[W]e look at 'all the acts taken together.'"); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) ("The relevant inquiry is the anticompetitive effect of [the] exclusionary practices considered together," i.e., "taken as a whole rather than considering each aspect in isolation."); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); *Am. Pres. Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 229 n.8 (D.D.C. 2022) (aggregating a loyalty program, exclusive dealing, bundled pricing, and tying).

### B.    Google's Contracts Are Also Prima Facie Unlawful Because They Are Exclusive And Create Substantial Foreclosure

### 1.    Google Conflates Prima Facie Standards

Google argues that even if its conduct has anticompetitive effect, Plaintiffs must show the challenged contracts are exclusive and foreclose a substantial share of the relevant markets. Def. PCOL ¶¶ 61–63, 98. Google does not cite anything to support its argument. Instead, Google

insists that these two additional elements are required because Plaintiffs' case is "predicated on characterizing [Google's conduct] as a form of exclusive or *de facto* exclusive dealing." Def. PCOL ¶ 98; *accord* Def. PCOL ¶ 61. But Plaintiffs have consistently explained that the exclusive-dealing analysis is too narrow to capture harms caused by Google's conduct and thus *not* the best way to assess this case. Pls. PCOL §§ IV.B; Pls. Memo. In Opp. To Def. Mot. For Summ. J., ECF No. 476, § II.A. Thus, this Court need not find exclusivity and substantial foreclosure, *Crowder v. LinkedIn Corp.*, 2024 WL 1221956, at *4 n.3 (N.D. Cal. Mar. 21, 2024), although the evidence shows both, *infra* § III.B.2–3; Pls. PCOL §§ IV.C–D.

Similarly, Google argues that even if its contracts are exclusive and create substantial foreclosure, Plaintiffs must separately prove anticompetitive effects. Def. PCOL ¶ 74. But *Microsoft* repeatedly found exclusive agreements prima facie unlawful after determining the agreements created substantial foreclosure; no separate effects analysis occurred. Summ. J. Opinion at 37. Thus, if the Court chooses to analyze Google's conduct through the lens of exclusive dealing—which it should not, Pls. PCOL § IV.B—a prima facie case can rest on exclusivity and substantial foreclosure alone.[5]

### 2.    Google's Contracts Are Exclusive

The challenged contracts are exclusive under Section 2. Pls. PCOL § IV.C.1; Pls. PTB at 35–42. In response to this evidence, Google offers three flawed attacks.

First, Google argues that the challenged contracts are not exclusive because they leave open non-default distribution channels (e.g., direct navigation, downloadable apps). Def. PCOL ¶¶ 64–65, 99–100; Def. PTB at 37–40, 72, 74, 76, 79. This fails because it (1) overlooks that

---

[5] Nonetheless, Google's conduct causes anticompetitive effects. Pls. PCOL § IV.A; *supra* § III.AIII.A.

Google's agreements are exclusive with respect to defaults and (2) overstates the significance of alternate, inferior distribution channels. Pls. PTB §§ III.C.1–2.

But the distinction between partially or wholly exclusive contracts should not affect the result here. Even under Google's flawed analysis, the contracts are at least partially exclusive, which qualifies as exclusivity under Section 2. Pls. PCOL § IV.C.1. By definition, partially exclusive contracts always leave room for rival distribution, and even wholly exclusive contracts entered with distributors leave room for rivals to distribute directly to consumers or through uncovered distributors. For example, *Microsoft* found exclusivity in four types of distribution contracts, 253 F.3d at 67–76, even though every consumer could access the primary rival through an exception in the contracts or through alternative distribution channels, *id.* at 70 (Netscape could "reach[] any potential user by some means of distribution."); *id.* at 73 (Apple contract limited only "one of the two most important methods of browser distribution" on Apple devices.); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 53 (D.D.C. 2000) ("[E]very PC user worldwide . . . [can] install Navigator. Navigator can be downloaded from the Internet. It is available through myriad retail channels. It can (and has been) mailed directly to an unlimited number of households."), *rev'd in part on other grounds*, 253 F.3d 34 (D.C. Cir. 2001).

Other circuits agree. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 287–88 (3d Cir. 2012) (upholding exclusivity despite partners' ability to distribute rivals upon consumer request); *Dentsply*, 399 F.3d at 185, 191–94 (finding exclusivity despite consumers' ability to access rivals directly, through contract exceptions, and through uncovered distributors); *LePage's*, 324 F.3d at 157–58 (upholding exclusivity for contracts entered with only certain retailers); *McWane*, 783 F.3d at 822, 840 (upholding exclusivity despite contract "exceptions" enabling a rival to achieve a 10%-and-growing market share). Even Google's own expert recognizes that partially exclusive

distribution contracts can harm competition. Benjamin Klein & Kevin Murphy, *Exclusive Dealing Intensifies Competition for Distribution*, 75 Antitrust L.J. 433, 439–40 (2008) (Partially exclusive "shelf space contracts," which curb but do not eliminate the retail shelf space available for rivals, can be anticompetitive if they create enough foreclosure.).[6]

Second, Google confuses de facto exclusivity, Pls. PCOL at 18, when emphasizing how the MADAs and RSAs (theoretically) permit partners to opt out of exclusivity on a device-by-device basis, Def. PCOL ¶ 100; Def. PTB at 72–73, 77–78. Opting a device out of the MADA would render the device functionally unusable, and opting out of the RSA would sacrifice substantial payments. Pls. PFOF ¶¶ 238, 240–244, 257, 273, 294–309, 779–781. Thus, despite the availability of device-by-device exceptions, virtually every Android smartphone sold in the United States complies with the MADAs' and RSAs' exclusive terms. Pls. PFOF ¶¶ 781, 2409. That is quintessential de facto exclusivity. *See* Pls. PCOL at 18.

Third, Google's reliance on *Aerotec International, Inc. v. Honeywell International* is misplaced. Def. PCOL ¶ 62 (quoting 836 F.3d 1171, 1182 (9th Cir. 2016)); Def. PTB at 40–41 (same). *Aerotec* involved one-off purchase agreements with no "exclusive requirements." 836 F.3d at 1182. By contrast, Google's agreements (whether expressly or de facto) require partners to set Google as the exclusive default for years at a time. Pls. PFOF ¶¶ 208–318.

### 3.   Google's Contracts Create Substantial Foreclosure

Although a formulaic foreclosure analysis is not right for this action, Google's contracts create substantial foreclosure. If the Court analyzes foreclosure, which it need not, the Court should reject Google's five arguments.

---

[6] Although alternative distribution does not disprove exclusivity, it is relevant to foreclosure, *ZF Meritor*, 696 F.3d at 283–84, which Plaintiffs' analysis reflects, *infra* § III.B.3.

First, Google argues against aggregating foreclosure by citing inapposite precedent holding that a course-of-conduct claim cannot rest on purely lawful conduct. Def. PTB at 80, 82 (citing *Microsoft*, 253 F.3d at 67–68, 78; *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp*., 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011)). Exclusive-dealing analysis, by contrast, appropriately aggregates foreclosure, even when created by self-distribution and non-exclusive agreements or conduct. Pls. PCOL §§ IV.D.2–3; *see also supra* § III.A.2

Second, Google argues that the challenged contracts create no foreclosure because rivals could have competed against Google before each contract was finalized. Def. PCOL ¶¶ 68–69, 72–73, 101–101(a), 105–106; Def. PTB at 42, 46. That is no different from Google's per se "competition for the contract" defense, which this Court already rejected. Summ. J. Opinion at 35–39. Even Google's expert cannot endorse Google's extreme position. Benjamin Klein & Kevin Murphy, *How Exclusivity Is Used to Intensify Competition for Distribution—Reply to Zenger*, 77 Antitrust L.J. 691, 696 (2011) ("[C]ompetition by a dominant supplier for exclusivity sometimes may result in harm to consumers."). Google's argument also relies on an overstatement of the meager competition it faces, Pls. PTB at 65–66, and on the mistaken belief that foreclosure is measured before the challenged agreements exist, *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 82 (D.D.C. 2006) ("The central question is whether *after the Exclusive Agreements were signed* Mylan's competitors were able to meaningfully compete or whether they were foreclosed from the market." (emphasis added)).

Third, Google argues that the challenged contracts create no foreclosure because rivals can compete against Google's existing contracts by encouraging users to change or circumvent Google's defaults. Def. PCOL ¶¶ 68–68(a), 69, 73, 101, 101(b), 106; Def. PTB at 41–42, 46–47. But countless opinions, including at least two by the D.C. Circuit, have held that distribution

deals can create substantial foreclosure even when other forms of distribution remain available. *See supra* § III.B.2; *Mytinger & Casselberry, Inc. v. FTC*, 301 F.2d 534, 538–39 (D.C. Cir. 1962) (finding substantial foreclosure even if "competitors [could] easily obtain distributors other than those tied exclusively to petitioners"); *see also Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 485 (1992) (conduct necessitating entry into adjacent markets (e.g., browsers) is unlawful because "one of the evils proscribed by the antitrust laws is the creation of entry barriers to potential competitors by requiring them to enter two markets simultaneously").

To be clear, users' ability to change or circumvent defaults is relevant to the assessment of foreclosure. *ZF Meritor*, 696 F.3d at 283–84. But Plaintiffs have accounted for this through conservatively calculated and corroborated foreclosure numbers:

- The foreclosure numerators exclude Google queries and revenue obtained through self-distribution (e.g., user-downloaded Chrome) and non-exclusive third-party distribution (e.g., Google's bookmark on Safari). Pls. PCOL § IV.D.2; Pls. PFOF ¶¶ 954, 965–966.

- The foreclosure numerators exclude queries conducted through covered access points in the rare circumstances where a user changed the Google default and sent queries to a rival. Pls. PFOF ¶¶ 954, 965–966.

- And the foreclosure numbers' significance is corroborated by evidence of the overwhelming importance of defaults, even in the face of implausibly strong competition. Pls. PTB at 42–49, 50.[7]

Fourth, Google overstates the threshold for what foreclosure amount counts as "substantial" in this action. Def. PCOL ¶¶ 73, 106; Def. PTB at 45–46, 83–84. Again, this is not best viewed as a foreclosure case. In any event, the 36–50% foreclosure here is well beyond the threshold for what courts require. Pls. PCOL § IV.C.2; *Mytinger*, 301 F.2d at 538–39 (finding 8.6% foreclosure substantial). And if anything, the context of this action justifies a lower

---

[7] Google complains the supporting economic analysis was undisclosed. Def. PCOL ¶¶ 72, 105; Def. PTB at 45. Cross-examination showed otherwise. Pls. PFOF ¶ 2381.

threshold than usual: Plaintiffs' have brought Section 2, not Section 1, claims, Pls. PCOL at 20–21; Google's monopolies are especially robust, Pls. PTB at 23–24, 26; scale is especially important in the relevant markets, Pls. PTB § III.A.1; and user-downloaded Chrome gives Google control over an additional 20% of general search services, Pls. PCOL § IV.D.2.

Google misleadingly cites a treatise in support of moving the foreclosure goalposts to a higher number. Def. PTB at 46 (citing Phillip E. Areeda et al., *Antitrust Law* ¶ 1807d (5th ed. 2022)); Def. PCOL ¶ 73 (same). The threshold named in the treatise (30 to 40%) applies under Section 1, when the defendant does not have "sufficient power," i.e., the monopoly power needed to harm competition at low foreclosure rates. Areeda ¶ 1821c, *cited in id.* ¶ 1807d n.71. And even for Section 1, the cited paragraph advocates for calculating foreclosure to "reflect th[e] facts," *id.* ¶ 1807d, which Plaintiffs' have done through conservative, corroborated calculations.

Finally, Google argues that its contracts create little-to-no foreclosure because Google is the nation's favorite GSE and would therefore have a similar market share in the but-for world. Def. PCOL ¶¶ 70–71, 102–104, 106; Def. PTB at 43–45, 72, 81–86. This is circular. Google seeks to diminish the importance of scale, an advantage that it has spent billions of dollars to procure and maintain, and without which other rivals would have been able to meaningfully compete. Pls. PFOF ¶¶ 159–207, 740–778, 822–866. More fundamentally, Google misstates the nature of foreclosure, which requires no but-for comparison. *Supra* § III.A.1; Pls. PCOL at 19–20, 22–23; *Mytinger*, 301 F.2d at 537–38 (endorsing coverage as the proper measure of foreclosure because the plaintiff "is entitled to view the situation as it exists"). Even Google's own foreclosure expert rejects Google's market-share approach, Pls. PCOL at 23–24, and for good reason: substantial foreclosure harms the competitive process even when market shares in the but-for world would closely resemble shares in the current world, Pls. PTB at 51.

Google claims support for its but-for argument from *McWane*, which describes "foreclosure [as] one of several factors" relevant to liability. 783 F.3d at 835; Def. PTB at 43. But none of *McWane*'s additional factors endorses Google's market-share comparisons, 783 F.3d at 835, and each of *McWane*'s additional factors supports Plaintiffs' case, Pls. PFOF ¶¶ 216, 220, 250, 255, 274, 281, 286, 300, 308, 629–637, 1071–1092, 1137–1192, 2129, 2256–2265.1, 2280–2299, 2302–2308. Google also questions the utility of foreclosure itself, Def. PCOL ¶ 71; Def. PTB at 43–44, by quoting Prof. Whinston, who notes that he would "ideally" assess anticompetitive effects—not foreclosure—relative to the but-for world, Pls. PFOF ¶¶ 972–973. For the reasons articulated previously, the Court should reject an overly formalistic and cramped foreclosure analysis in favor of a broad effects analysis that meaningfully reflects the facts as presented at trial. *Supra* § III.B.1; Pls. PCOL § IV.B. But if this Court chooses to quantify foreclosure, the Court should adopt Plaintiffs' approach as opposed to Google's, which is riddled with errors and overstatements related to proper methodology.

### C.    Google's Contracts Need Not Be Predatory To Violate Section 2

Lastly, Google proves that not all recycling is good by recasting its "competition for the contract" defense into a new form, arguing that the browser agreements are per se lawful unless Plaintiffs can show they are predatory. Def. PCOL ¶¶ 80–82. Courts have repeatedly rejected this argument, as well as its progenitor. *E.g.*, *Am. Pres. Lines*, 633 F. Supp. 3d at 229 (discounts can constitute unlawful exclusive dealing even when not predatory); *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 101–02 (D.D.C. 2020) (same); *ZF Meritor*, 696 F.3d at 273–81 (same).

## IV.    Google Fails To Present Valid Justifications Outweighing Anticompetitive Effects

### A.    Google Has Shown No Valid Justification For Its Browser Agreements

Google failed to prove any valid benefits from the challenged conduct, let alone benefits sufficient to outweigh the anticompetitive harm of its conduct, *see* Pls. PCOL § V, and the Court

should therefore reject the proposition that the browser agreements are procompetitive.

**1.     Browsers' Use Of A Single Default Search Engine Is Not Evidence That Google's Agreements Are Procompetitive**

Browser agreements are not procompetitive simply because developers design browsers with a default search engine and seek compensation for doing so. Def. PCOL ¶¶ 84–85; Def. PTB at 51–52. Plaintiffs do not challenge developers' ability to set a default—even a Google default—if they so choose. Rather, Plaintiffs challenge the terms in Google's agreements requiring developers to carry a single default set to Google, even if they would choose otherwise.

Google's citations to *EpiPen* and *Barry Wright* are misplaced. *See* Def. PCOL ¶ 84. In both, the defendants' partners were "end user[s]" who had embraced exclusivity and who had every interest in preserving competition. *EpiPen*, 44 F.4th at 986, 995–96; *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 229, 237–38 (1st Cir. 1983). None of those circumstances apply here. Google's partners have bristled at exclusivity, Pls. PFOF ¶¶ 741, 747–761, 805–807, 824, and Google's partners cannot safeguard competition because (1) competition is a public good, *id.* ¶ 1232, and (2) by receiving a share of monopoly profits extracted at the expense of end users and advertisers, distributors can benefit from lost competition, Pls. PTB at 64–65.

**2.     Google's Agreements Do Not Enhance Competition Among GSEs**

Google argues that browsers are designed with a default GSE to stimulate competition for the contract. Def. PCOL ¶¶ 85, 87, 89; Def. PTB at 49, 53, 61. This claim is contradicted by the evidence and contrary to relevant law. Pls. PTB § VI.B.1; Pls. PFOF ¶¶ 1070–1083.

Google is wrong that Mozilla's deal with Yahoo and Microsoft's pitch to Apple prove that Google's agreements motivate rivals to invest in their search engines. Def. PCOL ¶¶ 85, 87, 89; Def. PTB § III.D.2. In the Yahoo deal, Mozilla sought independence from Google, which Mozilla ultimately did not obtain, and Microsoft's pitch to Apple relied on making investments

*after* the deal was executed. Pls. PFOF ¶¶ 1075, 1257–1259, 1277, 2356. Thus, when GSEs try to compete for defaults, Google's agreements block them. *Id.* ¶¶ 762–778, 866.

Google quotes *Race Tires* that "[i]t is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged.*" Def. PCOL ¶ 85 (quoting *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010)). However, the relevant market in *Race Tires* was competitive. 614 F.3d at 83. The court distinguished a competitive market from markets with a "clearly dominant supplier" or where the "market itself is already heavily concentrated." *Id.* at 76. Thus, *Race Tires* actually undermines Google's position here. The court in *McWane* (cited by Google, Def. PCOL ¶ 67) similarly recognized this distinction, noting that "[w]hen a market is competitive, the competition for the exclusive contract is a vital form of rivalry . . . . But, notably, in the absence of such competition, a dominant firm can impose exclusive deals on downstream dealers to strengthen or prolong its market position." 783 F.3d at 827–28 (internal quotation marks and brackets omitted).

### 3.  Google's Claims That Its Default Agreements Incentivize Browser Improvements Are Unproven And Pretextual

Google has not established that its revenue-share payments to browsers caused improvements that encourage people to use search engines more. Pls. PFOF ¶¶ 1294–1296; Def. PCOL ¶ 86; Def. PTB at 54. Nor has Google shown that benefits in the browser market enhance competition in the general search services market. Pls. PFOF ¶¶ 1300–1303; 2399.

Developers have independent incentives to "improve the browser's speed, stability, [and] ease of use." Def. PCOL ¶ 86. The assertion that Google's revenue-share payments give developers an "opportunity to earn more money by . . . encourage[ing] more searching" amounts to an argument that sharing monopoly profits is "procompetitive." *Id.* This justification is invalid. Pls. PCOL § V.A.3. Holding otherwise would invite exclusionary conduct into every

19

industry, provided the monopolist shares a fraction of its supracompetitive profits.

Google conflates its conduct with developers' design decisions, which, of course, are influenced by Google's agreements. *Cf. NCAA v. Alston*, 141 S. Ct. 2141, 2163 (2021) (rejecting the notion that "a party can relabel a restraint as a product feature and declare it immune from § 1 scrutiny" (internal quotation marks omitted)). Browsers could still "work effectively out of the box," Def. PCOL ¶ 86, and even have Google as a default if Google did not require default exclusivity. Google's argument that its agreements "incentivize the developer to select the highest quality search engine," *id.*, boils down to an argument that absent entering a contract setting a default, developers cannot make their own choice of search engine. Pls. PCOL § V.A.3; *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 695 (1978). That a distributor could make an unwise choice does not justify anticompetitive conduct. Pls. PCOL § V.A.3; *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 463 (1986).

Even if Google could establish that its payments have resulted in browser improvements, such payments would likely be higher in a competitive market. Pls. PFOF ¶¶ 1298–1299. As Prof. Whinston explained, in monopolized markets, competition for exclusive agreements results in lower payments. *Id.* ¶¶ 1245–1248. Google also ignores the fact that browsers earn revenue from search agreements that are not exclusive. *Id.* ¶¶ 38, 1307, 1321.

### 4. Benefits Outside The General Search Market Are Not Cognizable

Browsers are outside the relevant markets. Pls. PFOF ¶¶ 323–521. Thus, contrary to Google's argument, Def. PCOL ¶¶ 91–92; Def. PTB § III.D.4, benefits to "browser competition" are irrelevant absent proof—that Google failed to produce—that those benefits improved competition in the market for general search services. Pls. PCOL § V.A.1; Pls. PTB § VI.A.

Google's argument that out-of-market benefits are cognizable because search engines and browsers are "highly complementary," Def. PCOL ¶ 93, is legally and factually flawed.

Section 2 confines the inquiry to a "part of the trade or commerce" among the states, 15 U.S.C. § 2, and the case law and legislative history confirm that only benefits "in the relevant market" are credited. Pls. PTB at 59–60. No exception exists for "complementary" "parts of trade" or "relevant markets." Indeed, Google failed to even define a browser market, much less to supply evidence of benefits to that purported market and how competition in that market connects to competition in search. Pls. PFOF ¶¶ 1294–1303.

None of the cases Google cites suggest otherwise. First, three of the cases involve claims under Section 1, 15 U.S.C. § 1, which lacks the "any part" language in Section 2. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 88 (1984); *Microsoft*, 253 F.3d at 95–96; *M&H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 974 (1st Cir. 1984); Pls. PTB § VI.A. Second, in nearly every case Google cites, the proffered justifications included potential in-market benefits and the courts did not address the issue of cross-market balancing. *Microsoft*, 253 F.3d at 67, 96 ("[P]laintiffs must . . . demonstrat[e] that the anticompetitive effect in the *browser* market is greater than these benefits," which included "enabling users to move seamlessly . . . to the Web *in the same browsing window*."); *Eastman Kodak*, 504 U.S. at 482–483 (defendant claimed that tying repair services to Kodak equipment "best maintain[ed] high quality service for its sophisticated equipment"); *Mozart Co. v. Mercedes-Benz of N. Am.*, 833 F.2d 1342, 1348–51 (9th Cir. 1987) (defendant claimed that tying replacement parts to Mercedes automobiles "maintain[ed] the quality of Mercedes replacement parts."); *M & H Tire Co.*, 733 F.2d at 976, 986 (rule was a "reasonable form of sports regulation," and "parties seem[ed] to agree that advancing participant parity [was] a reasonable goal" and the challenged rule "could lower [defendant's] costs."); Pls. PTB at 61–62. Third, even though *Board of Regents* raised a cross-market justification, the Supreme Court rejected the justification on other grounds—i.e., it rested

21

on the "assumption that competition itself is unreasonable." 468 U.S. at 116–117; Pls. PTB at 62.

Finally, even in the rare instance where a court raised the possibility of balancing anticompetitive effects in one market with procompetitive effects in other markets, the court did not "find it appropriate" to do so and determined that it "need not enter these dangerous waters to resolve the instant dispute." *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994). The court also found out-of-market benefits more relevant if they led to in-market benefits and further cautioned that "courts should . . . maintain some vigilance by excluding justifications that are so unrelated to the challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade." *Id.* at 1112–13.

### 5.    Plaintiffs Have Identified Valid Less Restrictive Alternatives

Google's anticompetitive conduct is unlawful if less-restrictive alternatives may achieve the same procompetitive benefits. Pls. PCOL § V.A.5; Def. PCOL ¶ 95. Importantly, "deficiencies in [Google's] procompetitive benefits . . . influence[] the analysis" of whether less restrictive alternatives exist, and Plaintiffs must show only that "less restrictive means exist to achieve any *proven* procompetitive benefits." *Alston*, 141 S. Ct. at 2162 (emphasis added).

In a familiar attempt to inject an improper but-for causation standard into the analysis, Google argues that a viable less-restrictive alternative requires proof that the alternative "would arise in competition absent the challenge[d] conduct." Def. PCOL ¶ 96. But *Alston*, cited by Google, imposes no such requirement. 141 S. Ct. at 2160 (Plaintiff need only "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."). Nor have lower courts. *See, e.g.*, *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1187–89 (D.C. Cir. 1978). Instead, that the proposed alternative has been used by third parties "may be especially compelling" evidence of feasibility. *Impax Labs. v. FTC*, 994 F.3d 484, 499 (5th Cir. 2021). In the general search services market, Plaintiffs have provided evidence of agreements

22

with unconditional revenue shares and most-favored supplier arrangements. Pls. PFOF ¶¶ 742–751; 1307–1308, 2167–2168, 2171, 2174, 2320–2323.

Even if Google could substantiate cognizable procompetitive benefits that require its agreements, they are far outweighed by the real, concrete harms resulting from its anticompetitive conduct. *Id.* ¶¶ 1230–1344.

### B.     Google Has Proven No Valid Justification For Its Android Agreements

Contrary to Google's claims, there is no evidence that the Android agreements boosted mobile search usage or promoted mobile competition, let alone in a manner that justifies the contracts' competitive harm. Pls. PFOF ¶¶ 157, 1323–1324; Pls. PTB § VI.A–B.2(a), 3; Pls. PCOL § V.A.1–3. To the extent the Android agreements have generated benefits in mobile search, the justification is pretextual. Pls. PFOF ¶¶ 779–821, 1324–1330.

### 1.     Demanding Exclusivity In Exchange For Software To OEMs Is Not Procompetitive

Google argues that requiring default exclusivity in exchange for the MADA reduces the price of smartphones leading to more mobile searches. Def. PCOL ¶ 110; Def. PTB at 90–91. But Google presented no evidence that the MADA has led to low-priced Android phones. Pls. PFOF ¶¶ 1331–1334. Moreover, because Google has incentives to offer its software for free absent the MADA's preinstallation requirements, this argument is pretextual. *Id.* ¶¶ 1312–1317.

Citing *FTC v. Qualcomm*, 969 F.3d 974, 989 (9th Cir. 2020), Google suggests the MADA uses a "contractual restriction" that is ultimately procompetitive. Def. PCOL ¶ 110. But *Qualcomm* does not fit the evidence here. The passage Google cites describes the antisteering provisions challenged in *Ohio v. American Express* as a "unique business model" that forced rivals "to adapt and innovate"—i.e., compete. *Qualcomm,* 969 F.3d at 989 (discussing 138 S. Ct. at 2289–90). A business model's uniqueness does not suggest that it is procompetitive; instead,

the model's *effect* is determinative. *Id.* at 989–90. The MADA's preinstallation and default provisions are neither unique nor procompetitive, but rather mirror previously condemned practices. *See Microsoft*, 253 F.3d at 61. Indeed, the MADA has discouraged competition and reduced search quality. Pls. PFOF ¶¶ 1067–1159.

### 2.   Google's Alleged Procompetitive Justifications For Its Android Agreements Are Pretextual And Do Not Justify Exclusivity

Google argues that the payments in its Android RSAs give OEMs and carriers a financial incentive to increase search on their mobile devices, Def. PCOL ¶¶ 112, 114; Def. PTB § IV.C.1. Even without the Android RSAs, competition among OEMs and carriers provides "a financial incentive to produce high quality mobile devices [with] . . . high-quality user interfaces, affordable data plans, and high-speed data networks." Def. PCOL ¶ 112; Pls. PFOF ¶¶ 1328–1330. The evidence Google cites underscores this point. Def. PFOF ¶ 1688 (quoting T-Mobile's Jeffrey Giard: "We also take a lot of effort to provide our customers with the best handset experience . . . ."). Instead, the actual purpose of the financial incentive—as demonstrated by direct evidence and Google's sanctionable conduct—is to increase and protect Google's default exclusivity, even when Android partners have pushed back. Pls. PFOF ¶¶ 798–817, 1193–1229, 1325–1327; Pls. PCOL §§ V.A.4, VI; Pls. PTB § VIII. Thus, Google's argument is pretextual.

### 3.   Google's RSAs Prevent Competition, Not Free Riding

Google argues that without exclusivity, "partners could promote rivals while earning revenue share on all their Google Search volume, thereby depriving Google of the incremental volume that the higher revenue share is designed to promote." Def. PCOL ¶ 114. This concern finds no support in economics or the record. Pls. PFOF ¶¶ 38, 1307, 1321, 1335–1338, 2468.

If Google offers a revenue share higher than its rivals, then OEMs and carriers would be incentivized to promote Google over rivals, regardless of Google's exclusive provisions. If

instead a rival offers a higher revenue share or a better product, OEMs and carriers will be incentivized to promote the rival unless Google innovates or raises its revenue share. That is the exact competition that Google has eliminated. Under more competitive conditions, revenue-share payments would likely increase, giving OEMs and carriers more financial incentive to boost search. Pls. PFOF ¶¶ 1298–1299. Google's RSAs are designed to prevent competition.

Google argues its RSAs prevent free riding. Def. PTB at 96 (citing *N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 43 (2d Cir. 2018)); Def. PCOL ¶ 114. But the facts in *N. Am. Soccer* are in stark contrast to Google's RSAs. There the sports leagues faced a risk of free riding from teams being underfunded and relying on the investments of others to keep leagues afloat. *Id.* at 43–44. In comparison, where GSEs must compete to be promoted by OEMs and carriers, free riding is not a risk and, thus, preventing it is not a valid procompetitive justification.

### 4. Benefits Outside The Relevant Markets Are Not Cognizable

The Court should reject Google's arguments that the MADAs and RSAs expand search output by promoting competition against iOS. Def. PCOL ¶¶ 113, 115; Def. PTB § IV.C.2. Purported benefits in the smartphone industry are not cognizable. Pls. PCOL § V.A; Pls. PTB § VI.A; *supra* § IV.A.4. And neither those purported benefits nor their "highly complementary" effects in search, Def. PCOL ¶ 116, have any supporting evidence, Pls. PFOF ¶ 2470.

Even if Google could overcome these challenges, Google's purported interest in mobile competition is pretextual and contradicted by the evidence. Pls. PFOF ¶¶ 1318–1320; Pls. PTB § III.B. Through its ISA payments, Google pays Apple more than it pays all Android OEMs and carriers combined without concern about strengthening its smartphone rival. Pls. PFOF ¶¶ 935–936, 2317, 2336; UPXD104 at 19. More important, of course, is that the payments prevent competition from its search rivals. Pls. PTB §§ III.B–C; Pls. PFOF ¶ 2337.

Dated: March 22, 2024

Respectfully submitted,

*/s/ Karl E. Herrmann*
Kenneth M. Dintzer
R. Cameron Gower
Catharine S. Wright (D.C. Bar #1019454)
Emma N. Waitzman
Diana A. Aguilar Aldape
Sarah M. Bartels (D.C. Bar #1029505)
Meagan K. Bellshaw
David E. Dahlquist
Kerrie J. Freeborn (D.C. Bar #503143)
Sara T. Gray
Jeremy M. P. Goldstein
Thomas Greene
Matthew C. Hammond
Karl E. Herrmann (D.C. Bar #1022464)
Ian D. Hoffman
Elizabeth S. Jensen
Matthew Jones (D.C. Bar #1006602)
Claire M. Maddox (D.C. Bar #498356)
Michael G. McLellan (D.C. Bar #489217)
Erin Murdock-Park (D.C. Bar #1019993)
Lillian Okamuro (D.C. Bar #241035)
Veronica N. Onyema (D.C. Bar #979040)
Michael A. Rosengart (D.C. Bar #1671047)
Eric L. Schleef
Adam T. Severt
Lara E.V. Trager

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

By:_____/s/ Matthew Michaloski_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Matthew Michaloski, Deputy Attorney
General
Christi Foust, Deputy Attorney General
Jesse Moore, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By:_____/s/ Diamante Smith_____
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Diamante Smith, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*


By:_____/s/ Lee Istrail_____
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney
General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: _____ */s/ Matthew M. Ford*
Matthew M. Ford
Arkansas Bar No. 2013180
Assistant Attorney General
Office of the Arkansas Attorney General Tim
Griffin
323 Center Street, Suite 200
Little Rock, AR 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*


By: _____ */s/ Brian Wang*
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General
(DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*


By: _____ */s/ Charles Thimmesch*
Christopher Carr, Attorney General
Robin Leigh, Deputy Attorney General
Jeffrey Stump, Senior Assistant Attorney
General
Charles Thimmesch, Assistant Attorney
General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: _____ /s/ *Philip R. Heleringer* _____
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*


By: _____ /s/ *Patrick Voelker* _____
Liz Murrill, Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
voelkerp@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By: _____ /s/ *Scott Mertens* _____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By:_____*/s/ Michael Schwalbert*_____
Michael Schwalbert
Missouri Bar No. 63229
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*


By:_____*/s/ Hart Martin*_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney
General
Crystal Utley Secoy, Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By:___*/s/ Anna Schneider*___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By:_____/s/ Mary Frances Jowers____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Rebecca M. Hartner, Assistant Attorney
General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: */s/ Gwendolyn J. Lindsay Cooley*___
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

FOR PLAINTIFF STATE OF COLORADO

PHILIP WEISER
Attorney General of Colorado

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365
(inactive) Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

MIKE HILGERS
Attorney General of Nebraska

Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant
Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mail: Colin.Snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*


FOR PLAINTIFF STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov
          Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*


FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the Attorney General of New York
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH
CAROLINA

JOSHUA STEIN
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*


FOR PLAINTIFF STATE OF TENNESSEE

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

FOR PLAINTIFF STATE OF UTAH

SEAN REYES
Attorney General of Utah

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff State of Utah*

FOR PLAINTIFF STATE OF ALASKA

TREGARRICK TAYLOR
Attorney General of Alaska

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*


FOR PLAINTIFF STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

FOR PLAINTIFF DISTRICT OF COLUMBIA

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District
of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*


FOR PLAINTIFF TERRITORY OF GUAM

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324

*Counsel for Plaintiff Territory Guam*


FOR PLAINTIFF STATE OF HAWAI‘I

ANNE E. LOPEZ
Attorney General of Hawai‘i

Rodney I. Kimura
Department of the Attorney General, State of
Hawai‘i Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai‘i*

FOR PLAINTIFF STATE OF IDAHO

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720 Boise, ID 83720
Telephone: (208) 334-4114
E-Mail:  John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*


FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
          Brian.yost@ilag.gov
          Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

KRIS W. KOBACH
Attorney General of Kansas

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


FOR PLAINTIFF STATE OF MAINE

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

FOR PLAINTIFF STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*


FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS

ANDREA CAMPBELL
Attorney General of Massachusetts

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-Mail: William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW
HAMPSHIRE

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

FOR PLAINTIFF STATE OF NEW JERSEY

MATTHEW PLATKIN
Attorney General of New Jersey

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*


FOR PLAINTIFF STATE OF NORTH
DAKOTA

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

FOR PLAINTIFF STATE OF OHIO

DAVID YOST
Attorney General of Ohio

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor Columbus, OH
43215
Telephone: (614) 466-4328
E-Mail:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*


FOR THE PLAINTIFF STATE OF
OKLAHOMA

GENTNER DRUMMOND
Attorney General of Oklahoma

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105 Telephone: (405)
522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OF OREGON

ELLEN ROSENBLUM
Attorney General of Oregon

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

MICHELLE HENRY
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

FOR PLAINTIFF TERRITORY OF PUERTO
RICO

DOMINGO EMANUELLI HERNANDEZ
Attorney General of Puerto Rico

Guarionex Diaz Martinez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*


FOR PLAINTIFF STATE OF RHODE
ISLAND

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

FOR PLAINTIFF STATE OF SOUTH DAKOTA

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*


FOR PLAINTIFF STATE OF VERMONT

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

FOR PLAINTIFF COMMONWEALTH OF
VIRGINIA

JASON S. MIYARES
Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*


FOR PLAINTIFF STATE OF WASHINGTON

ROBERT FERGUSON
Attorney General of Washington

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WEST
VIRGINIA

PATRICK MORRISEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West
Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*


FOR PLAINTIFF STATE OF WYOMING

BRIDGET HILL
Attorney General of Wyoming

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff State of Wyoming*