# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

### PLAINTIFF STATES' POST-TRIAL BRIEF

█████████████

## <u>TABLE OF CONTENTS</u>

Introduction ................................................................................................................... 1

I.    Legal Framework ....................................................................................................... 4

II.   Plaintiff States Have Defined Relevant Markets and Proven Google's Monopoly Power in
      Those Markets ........................................................................................................... 7

   A.   General Search Services is a Relevant User-Side Product Market ...................................... 7

   B.   General Search Advertising is a Relevant Advertiser-Side Product Market ........................ 7

      1.   Advertisers consistently view general search ads and SVP search ads as non-
           substitutable ...................................................................................................... 9

      2.   General search ads are useful to more advertisers than SVP search ads ......................... 14

      3.   General search ads and SVP search ads have different features, purchasing methods,
           and pricing ........................................................................................................ 14

   C.   Google has Monopoly Power in Each of the Relevant Markets ........................................ 18

III.  Google's Distribution Contracts Facilitate Two Additional Types of Competitive Harm .... 20

   A.   Google's SA360 Conduct Harms Competition ............................................................. 20

      1.   Google promised neutrality but instead favored its own profits .................................. 21

      2.   Google limits competition by refusing support for Microsoft auction-time bidding ..... 22

      3.   Google also delays cross-engine support for other key Microsoft Ads features ............ 28

      4.   Google's delayed or deferred support for Microsoft Ads features harms competition in
           search advertising markets .................................................................................... 29

   B.   Google's Distribution Contracts Hinder Rivals' Ability to Enter into Cost-Effective
        Contracts with SVPs ............................................................................................. 31

IV.   Google's Ongoing, Voluntary Dealing with Microsoft Ads Renders the "Duty to Deal"
      Doctrine Inapplicable ............................................................................................... 33

Conclusion ................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) .................................... 20

*Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849 (1st Cir. 2016) ............................................. 5

*FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062 (D.N.J. Aug. 4, 2021) *aff'd*, 30 F.4th 160 (3d Cir. 2022) ........................................................................ 9

*FTC v. IQVIA Holdings Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) .............................. *passim*

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) .............................................. 4

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023) .................................... 5, 18

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ............................................. *passim*

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) ..................................... 5, 8, 18

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ............................ 15

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ............................................ 14

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ..................................... 5

*New York v. Facebook*, 549 F. Supp. 3d 6 (D.D.C. 2021) ...................................... 34, 35

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) .......................... 34, 35

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ................................. 35

*Otter Tail Power Co.* v. *United States*, 410 U.S. 366 (1973) ........................................ 34

*Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438 (2009) ................................... 34

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) ..................... 13

*State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469 (7th Cir. 1991) ...... 6, 31

*United States v. Bazaarvoice*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ........................... 13, 18

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ......................... 17

*United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001) ................................... 4, 6, 30, 35

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004)...... 33, 34

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 651c (Fifth Ed. 2023) ................................................................................. 31

**INTRODUCTION**

Google's distribution contracts deprive users and advertisers alike of the benefits of competition, including lower prices, increased quality, and greater innovation.  Joint Brief at 29-58.[1]

That is not the whole story.  First, Google also harmed competition through its operation of SA360, which is enabled by the impact of the exclusionary distribution contracts and general search engine ("GSE") rivals' limited ability to attract advertisers.  Second, as the full impact of Google's monopoly flows "downstream" (SJ Decision at 54), Google's rivals are weakened in their ability to attract SVPs to supply content for rivals' results pages on terms that would prevail in a competitive market.

The distribution contracts allow Microsoft only a slim path through its default on its Edge browser to reach users, and thereby entice advertiser interest.  Google uses SA360 to lodge itself firmly between Microsoft (and GSEs that syndicate Microsoft Ads like DuckDuckGo and Yahoo!) and advertisers.  Advertisers use SA360 because they want to easily place ads on both Google and its rivals.  SFOF ¶¶ 119-28.  But with its dominant market share of general search advertising, Google pads its monopoly profits by making it more difficult for advertisers to efficiently place ads with Google's rivals.  That disadvantages advertisers by advantaging Google, which makes about 150 times more money when an advertiser uses SA360 to buy a Google ad than a non-Google ad.  *Id.* ¶ 141.  Advertisers worried about this dynamic and Google

---

[1] "Joint Brief" refers to Plaintiffs' Post-Trial Brief jointly submitted by DOJ Plaintiffs and Plaintiff States on their overlapping allegations.  "SFOF" refers to Plaintiff States' Proposed Findings of Fact, "JFOF" refers to Plaintiffs' Proposed Findings of Fact jointly submitted by DOJ Plaintiffs and Plaintiff States, and "SCOL" refers to Plaintiff States' Proposed Conclusions of Law.  Citations to "Tr." are to the trial transcript.  "SJ Decision" refers to the Court's Memorandum Opinion on Google's summary judgment motions.  Dkt. 624.

yielded to their concerns with a commitment to not favor itself. *Id.* ¶ 149.  Google did not keep
its word. *Id.* ¶ 148.

As this Court has explained, "[t]he issue is whether Google's delayed rollout of SA360
support for Microsoft Ads inhibited or dissuaded advertisers from placing ads on its competitor's
search engine, thereby harming competition in the general search advertising market."  SJ
Decision at 56.  The evidence is plain that advertisers are both inhibited and dissuaded from
using SA360 to place ads with Google's competitors.

Advertisers using SA360 are inhibited from optimizing Bing ad campaigns because
Google has restricted their ability to employ Microsoft Ads features that Google knows would be
to their advantage, most notably auction-time bidding.  SFOF ¶¶ 257-62.  In late 2020, Google
concluded that use of auction-time bidding increased conversions by ███  even more than the
double-digit increases found a year earlier (15-30% on SA360 and 12% on Skai).  *Id.* ¶¶ 182,
191, 202.  Shortly before Google pulled the plug on testing in 2020, "Auction-time bidding …
[f]or MSFT advertising" was a top requested feature in a Google survey of advertisers—which
Google ignored despite its claim of following advertiser demand.  *Id.* ¶¶ 199, 237.  Importantly,
Google's test of Microsoft auction-time bidding (which would have measured advertiser
demand) survived cost cutting reviews in late 2019 until Google executives intervened, claiming
that "Google builds our tools to assist advertisers with their advertising campaigns … primarily
on Google's platform."  *Id.* ¶¶ 216, 222.

The result is that SA360 advertisers are dissuaded from advertising on Bing.  The proof is
in Google's own pudding.  Google's economic expert Mark Israel proffered a statistical analysis
to demonstrate that the introduction of Google auction-time bidding on SA360 did not harm
Bing.  *Id.* ¶ 268 n.15.  But the data he presented showed exactly the opposite: Bing's market

share declined by 0.4% in the eighteen months before the introduction of Google auction-time bidding and declined by 2.25% in the same time period after the introduction. *Id.* ¶ 268. Google has argued that Plaintiff States must identify specific advertisers that switched from Bing to Google (Tr. 7179:11-21), but Dr. Israel's own analysis tells the larger story, showing that Bing's market share—the sum total of all advertisers' decisions—dropped over five times faster after SA360 supported Google's auction-time bidding.

Google's claimed SA360 justifications fare no better, replete with disregard for advertisers' demand for Microsoft features, (SFOF ¶¶ 195-206), implausible and contradictory explanations (*Id.* ¶¶ 234-39), and sudden, unexplained changes in its willingness to test Microsoft Ads features (*Id.* ¶¶ 209-30). All are pretextual; none is procompetitive. *Id.* ¶ 273-80.

Next, the Joint Brief at pages 29-58 demonstrates widespread harm from Google's distribution contracts. In addition to that direct harm, these contracts also weaken rivals' ability to compete and strengthen their search results pages through content partnerships—a connection the Court has recognized:

> "(1) Google's distribution agreements limit its rivals' ability to attract users,
> (2) this weakens Google's rivals, and make them less attractive partners to SVPs,
> and (3) the inability to form better partnerships with SVPs depresses Google's
> rivals' ability to compete for general search users."

SJ Decision at 54. Plaintiff States have proven each step: the distribution agreements limit rivals' ability to attract users (particularly for mobile searches) and, as a result, Microsoft must pay more for SVP content and has trouble attracting SVP partners, which in turn further depresses Microsoft's ability to compete for users. SFOF ¶¶ 285-96. The mechanism is the same as the harm discussed in the Joint Brief—limiting the ability of rivals to gain users makes them less interesting to any firm that wants a robust source of user traffic, whether as an audience for an ad or in exchange for content. Joint Brief at 30-51; SFOF ¶¶ 288-94.

3

Google has monopoly power in the four markets pleaded by Plaintiff States.  In this brief, Plaintiff States explain why general search advertising—advertising on a GSE results page—is an appropriate antitrust market, principally because advertisers reach the same users with the same unique mindset whether they buy general search text ads or shopping ads.  Google's monopoly power is proven by its market share of over 90%, as well as by direct evidence that when Google drives up SVPs' cost of using Google search ads to acquire customers, SVPs keep buying Google ads because they lack a competitive alternative.

In *United States v. Microsoft Corp.*, the D.C. Circuit held that Microsoft used technical restrictions to unlawfully maintain its monopoly power when its unlawful contractual restrictions proved insufficient.  253 F.3d 34, 64 (D.C. Cir. 2001).  So too here.  Beyond its exclusionary distribution contracts, Google deploys its monopoly power to degrade the efficiency of rival advertising on SA360 and artificially raise costs for rivals, customers, and SVPs alike.  By throwing sand in the gears of a bicycle instead of placing a boulder in the way, Google hopes its conduct will escape scrutiny.  But sticky gears still impede a cyclist's ability to move forward.

## I.      LEGAL FRAMEWORK

In addition to the legal discussion in Plaintiff States' Proposed Conclusions of Law and in Plaintiffs' Joint Proposed Conclusions of Law, Plaintiff States emphasize:

Market definition focuses on demand substitution, *i.e.*, the choices ad buyers and GSE users make between products.  "[T]he general question is whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other."  *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997).  Buyers' choices inform market definition because a properly defined product market includes only those products that constrain a firm's behavior.  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 38-40 (D.D.C. 2015).  If market participants view a product as necessary or a "must-have," that product has low

sensitivity to price changes, is unconstrained by other products' pricing, and is a relevant product market. *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 42 (D.D.C. 2023); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 111 (1984) (affirming antitrust market for college football broadcasts because they "generate[d] an audience uniquely attractive to advertisers").

Some substitution on the edges by some customers is not enough to defeat a proposed market definition because such limited substitution would not restrict a monopolist's ability to profit from disadvantaging its customers or users. *Sysco*, 113 F. Supp. 3d at 33. Indeed, "[i]t would be improper to group complementary goods into the same relevant market just because they occasionally substitute for one another." *Id.* at 31. "Substitution must be effective to hold the primary good to a price near its costs," *id.*, and "[i]solated examples of potential substitutability simply do not outweigh the consistent testimony and representations of industry participants or the empirical evidence provided by [an expert witness]." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018).

The views of a product seller like Google on the relevant product market has minimal significance "on the key questions of product interchangeability and cross-elasticity of demand from the perspective of consumers." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 855 (1st Cir. 2016). For this reason, "[a] market definition which is confined to the seller's perspective is not meaningful." *Id.* Rather, the best evidence to assess buyer demand in ad markets is how ad buyers actually spend money in the marketplace. *See Sysco*, 113 F. Supp. 3d at 30, 42-43. The weight of the evidence here shows advertisers will not abandon general search advertising in general or Google in particular, proving that a product market exists. *Infra* at 9-18. "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes"; rather, the

market "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Sysco*, 113 F. Supp. 3d at 26.

Monopoly power is "the power to control prices or exclude competition." *Microsoft*, 253 F.3d at 51. Direct evidence here shows that SVPs continue to buy ads on Google despite practices, including visibility limitations, that inhibit their ability to use Google to acquire customers because they have no meaningful alternative. *Infra* at 19-20; Joint Brief at 27-29. There is also indirect evidence of Google's monopoly power, including high market shares and barriers to entry. *Infra* at 18-19; Joint Brief at 24-27.

Evidence of Google's intent "may help the court to interpret facts and to predict consequences." *Microsoft*, 253 F.3d at 59; SJ Decision at 22. "When courts consider the 'intent' of a firm charged with monopolization, they look not to whether the firm intended to achieve or maintain a monopoly, but to whether the underlying purpose of the firm's conduct was to enable the firm to compete more effectively." *State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991). The evidence here shows that Google's SA360 conduct was intended to harm competition and lacks any procompetitive justification. SFOF ¶¶ 273-80.

Finally, the Court's summary judgment ruling has, of course, shaped the trial and these post-trial submissions. The Court granted summary judgment on Plaintiff States' claims insofar as they allege "Google's conduct directed at SVPs" is a discrete type of anticompetitive conduct. SJ Decision at 53. Accordingly, those allegations have not been pursued.[2]

Evidence from SVP witnesses is, however, relevant for other purposes. Google agrees

---

[2] Were the Court to rule that search advertising is an appropriate advertising market, that would result, by definition, in SVPs being classified as competitors to Google in that market. This would be contrary to the Court's view in its Summary Judgment Decision that SVPs are out-of-market participants. *See* SJ Decision at 46-49.

that SVP evidence is permissible for proving market definitions and monopoly power.  Dkt. 776

at 3.  And as this Court has recognized, Google's conduct with respect to SVPs can be a

"downstream effect of Google's distribution agreements," as those agreements operate to

"depress[] Google's rivals' ability to compete for general search users."  SJ Decision at 54.  The

evidence here proves those anticompetitive downstream effects.  *Infra* at 31-32.

## II.      PLAINTIFF STATES HAVE DEFINED RELEVANT MARKETS AND PROVEN GOOGLE'S MONOPOLY POWER IN THOSE MARKETS

Plaintiffs States have proven four relevant product markets.  They are the user-side

general search services market and three nested advertiser-side markets: general search text

advertising, general search advertising and search advertising.

### A.      General Search Services is a Relevant User-Side Product Market

General search services is a relevant product market for the reasons described in the Joint

Brief at pages 11-16.  The breadth of general search is illustrated by the fact that even when a

user enters a search for a particular vertical, on average more than half of the results displayed in

response by Google contain information from outside the requested commercial segment.  SFOF

¶ 16.  This is a clear indication that Google itself believes that users are looking for a broad range

of information.  JFOF ¶ 331.  By contrast, searches on SVPs generally only provide results from

a limited number of verticals.  SFOF ¶ 17.

### B.      General Search Advertising is a Relevant Advertiser-Side Product Market

On the advertiser side, the Joint Brief also explains why general search text advertising

and search advertising are relevant product markets.  Joint Brief at 16-23.  In addition, Plaintiff

States have proven that general search advertising is a relevant product market that is broader

than the general search text advertising market and narrower than search advertising.  *See FTC v.*

*IQVIA Holdings Inc.*, 2024 WL 81232, at *24 (S.D.N.Y. Jan. 8, 2024) ("[A] broad product

market may contain smaller markets which themselves constitute relevant product markets for antitrust purposes") (cleaned up).

General search advertising includes all ads that appear on a GSE results page in response to a user query, which overwhelmingly consists of text ads and product listing ads ("PLAs").  In 2019, ▇ of Google search spending was on text ads and about ▇ on PLAs.[3]  SFOF ¶¶ 5, 7.  In addition, text ads account for over ▇ of Google search ad revenue in all advertising categories except retail/shopping (which is only ▇ of total search ad spend).  *Id.* ¶¶ 6-7.

General search ads differ from other digital ads, such as display and social ads, for the same reasons that general search text ads and search ads differ from those other ad types.[4]  Joint Brief at 16-19.  General search advertising is a relevant market because all ads on a GSE's results page reach users who are considering the broad range of choices and destinations provided by a GSE.  *Infra* at 9-12.  Thus, a monopolist could raise prices of general search advertising above competitive levels without enough advertisers moving to a competitor to render the price increase unprofitable.  This is shown by direct evidence of advertiser understanding of  the unique mindset of consumers reached by general search ads.  *Infra* at 12-13.  It is also proven by "practical indicia" of business operations that act as "evidentiary proxies for direct proof of substitutability," *Sysco*, 113 F. Supp. 3d at 27, including the limited utility of

---

[3] The other types of general search ads are hotel ads and local services ads.  SFOF ¶ 7 n.3.

[4] General search ads are not reasonable substitutes for ads on social media sites, which push an ad (say for golf shorts) to a viewer otherwise engaged in a social platform who may or may not be interested in that product.  SFOF ¶ 25.  General search ads, on the other hand, pull a user into an advertiser website only after that user expresses specific interest in the product by entering a relevant search query.  *Id.* ¶ 26.  While there was some testimony about ads on social media sites that respond to a user query, such ads have infinitesimal usage, are not a "viable alternative" to general search ads, and thus have no economic relevance for purposes of defining relevant antitrust markets.  JFOF ¶¶ 584-85; *Tronox*, 332 F. Supp. 3d at 215.

SVP ads to most advertisers, differences in how GSE ads and SVP search ads operate, separate purchasing channels, and advertisers' strategies in allocating their budgets across multiple ad channels.  *Infra* at 14-18.

1.     **Advertisers consistently view general search ads and SVP search ads as non-substitutable**

Advertisers buy ads to reach users in particular consumer mindsets.  SFOF ¶¶ 22-32. Advertisers understand that GSE users are more likely to be in a research or consideration mindset, whereas SVP users are more likely to be in a purchase mindset.  Consequently, advertisers consistently do not view general search ads and SVP search ads as reasonable substitutes.  *See FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *19 (D.N.J. Aug. 4, 2021) *aff'd*, 30 F.4th 160 (3d Cir. 2022) (relying on customer views to determine which products compete).

a.     **Advertisers view general search ads as unique because they reach users expressing their real-time intent and seeking a wide range of choices**

Advertisers use the "marketing funnel" to understand different consumer mindsets and reach these audiences effectively.  Joint Brief at 17-18; SFOF ¶ 23.  Google concedes the continued use of the marketing funnel, JFOF ¶¶ 448, 452, which captures the enduring psychological axiom that a consumer must first be aware of a product, then considers different places to purchase the product, and finally makes the purchase.  SFOF ¶ 23.

Advertiser witnesses consistently testified that different media channels reach different consumer mindsets, and thus complement each other to bolster the success of an overall marketing campaign.  *Id.* ¶ 24.  As a result, not a single advertiser witness testified that general search ads and SVP search ads are reasonable substitutes.  *Id.* ¶¶ 22, 28-29, 32. While there is some evidence of advertisers moving ad spend between channels, "the fact that an agency might

9

shift money around during a campaign does not establish that these alternative channels are substitutes for the distinct features that [the at-issue] advertising provides." *IQVIA*, 2024 WL 81232, at *17.  Rather, advertisers balance their ad investments "over time across the purchase funnel so that [they have a] continuous flow of consumers, from awareness to consideration to purchase."  SFOF ¶ 24.

General search ads are distinct in their ability to reach users in an active research mindset. Only general search ads can reach users seeking the unique breadth of sources and choices found on a GSE, in contrast to the narrower range of information on an SVP.  *Id.* ¶¶ 22, 28-31; JFOF ¶¶ 325-26.  This unique "one-stop shop" nature of GSEs provides a distinct benefit to users.  SFOF ¶¶ 15-20; JFOF ¶¶ 327-33.  GSEs are attractive to advertisers seeking to reach users in the mindset of actively researching a topic without having determined a specific purchase destination.  SFOF ¶¶ 22, 26-31.  As Google itself says: "Google is where people research."  *Id.* ¶ 31.  Dr. Raghavan of Google testified that users "who in any way intend to shop at Amazon might come to Google and do a lot of research on Google before they [shop at Amazon]," and Google internal studies likewise conclude that "69% of people start with Google when going to retail sites and apps on mobile."  *Id.*

It is no coincidence firms that provide GSEs—which provides distinct user services in a relevant product market (Joint Brief at 11-16)—also supply a distinct form of advertising.  GSE users often have not yet decided whether to purchase a product or, even if they have a product in mind, have not decided on a specific brand.  SFOF ¶¶ 28-31, 36-37.  These users are therefore particularly open to influence by sellers, making their attention extremely valuable to advertisers. *Id.* ¶¶ 9, 36-38.  Only general search ads satisfy this distinct advertiser demand by reaching consumers that are actively interested in buying a product, yet open to purchasing from either

that specific advertiser or possibly one of its competitors.  *Id.* ¶¶ 8-9, 26-29, 37-38; *Sysco*, 113 F.

Supp. 3d at 25 (considering whether a product serves a distinct demand to determine reasonable

substitutes).  In other words, the distinct mindset of GSE users both attracts advertisers to buy

general search ads and distinguishes them from other ad types.

General search advertising is also distinct in its ability to drive new customer acquisition

precisely because GSE users are open-minded and interested in a breadth of information.  *See*

SFOF ¶¶ 8-9, 15-16, 28, 37, 44.  Even large, well-known companies like ███████ Booking, and

Expedia rely heavily on general search ads to acquire new customers.  *Id.* ¶¶ 8, 44 (Booking

executive: Google is "the exclusive, dominant ... pool of high-intent, new customers for

[Booking] to find"); (Expedia executive: advertising on Google is "essential" because "[t]here's

not an opportunity to go buy that many high-intent consumers to introduce them to your product

anywhere"); (Amazon executive: general search ads are "highly incremental for early lifecycle

customers").

Advertisers also recognize that all general search ads serve the common and essential

purpose of occupying space on a GSE results page at the moment it is viewed by a user with this

distinct, persuadable mindset, which in turn leads to more "click-through" and "a higher number

of purchases."  *Id.* ¶¶ 8, 10-11.  In fact, Google promotes and sells text ads and PLAs by

convincing advertisers that they need to "own[] the SERP" with multiple ads in order to get

"more potential outcomes in [their] favor."  *Id.* ¶ 11.

The significant use of navigational queries on GSEs further illustrates the distinct value

of general search ads.  Navigational queries are those for which a user intends (initially) to travel

from a GSE to a specific website—*e.g.*, a user types "Amazon" intending to reach Amazon's

website.  *Id.* ¶ 33.  Google commonly sells ads on navigational queries to both the queried

company and that company's competitors. *Id.* ¶ 34.  Those ads for competitors are often

effective: ███ of users shown a competitor's ad after entering a navigational query click on that

ad, indicating that many GSE users who query a specific company are still open to consider and

research other destinations. *Id.* ¶ 37.  As a result, navigational queries generate significant ad

revenues for Google, and advertisers testified that they must buy general search ads for their own

brand name to avoid being "conquested" by competitors buying ads on their brand name. *Id.* ¶¶

34-36.  By contrast, navigational queries simply do not exist for SVP search ads because they do

not navigate to external sites. *Id.* ¶ 38.

### b.  Advertisers understand that SVP users are closer to purchase and less open to research and consideration than GSE users

SVPs sell ads that, like general search ads, are generated in response to a user query.  But

advertisers understand a user querying on an SVP is generally closer to making a purchase than a

user querying on a GSE.  This is because SVPs typically allow users to complete a purchase on

their site, while GSEs do not. *Id.* ¶¶ 28-32.

Advertisers allocate money based on this distinction.  For example, Mr. Lowcock from ad

agency IPG testified that on "a general search engine ... [the user] might be trying to determine

like what I do next, do I need to go buy it, do I need to learn more about [it]" but "[users on] a

retailer website [have a high intent to] make a transaction ... they know what they're looking for,

they intend to buy that product."  Tr. 3860:25-3861:5, 3866:14-20 (Lowcock).  Likewise, Mr.

James from Amazon testified that, compared to other kinds of searches, a user querying on

Amazon is "more interested in making a retail purchase on the Amazon store and therefore their

query would be more formulated towards purchase intent."  SFOF ¶ 20.  Accordingly,

advertisers often use general search ads to "drive [users] to the advertiser's own website or a

destination the advertiser determined," including their own website, a physical location, or an

"ecommerce" SVP like Amazon.  *Id.* ¶ 29.

That SVPs themselves spend billions of dollars to advertise on Google further proves that SVP search ads and general search ads are complements, not substitutes.  *Id.* ¶¶ 42-43; *see SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999) (explaining the importance of customers' "actual behavior" in defining markets).  SVPs advertise on GSEs because users often visit Google to learn about a product and then, research in hand, navigate to SVPs like Amazon to buy the product.  Consistent advertiser testimony and evidence show that SVPs rely on general search ads to drive consumers from consideration on GSEs to purchase on SVPs.  SFOF ¶¶ 28-29, 44-45.  For example, ad agency Tinuiti explained in a client presentation that general search ads "circulate purchase intent" to SVPs and so are higher than SVP search ads in the advertising funnel.  *Id.* ¶ 29.

If, as Google contends, users view Google and Amazon as substitutes, then loyal Amazon shoppers would use Google less and Amazon more.  The truth, however, is the opposite: a Google study found that Amazon Prime members are *more* likely to use Google search.  *Id.* ¶ 31. Google's own documents describe Amazon ads as occupying the lowest part of the funnel and stress that general search ads, in contrast, can "focus on influencing consideration and driving longer-term brand affinity."  *Id.* ¶ 30.  Dr. Israel's overlap analysis illustrates this complementary relationship between Google ads and Amazon ads, *i.e.*, a user enters a query on Google, clicks on an ad purchased by Amazon that directs the user to Amazon's website, and then continues to search and view ads on Amazon.  *Id.* ¶ 21.

The evidence thus shows that general search ads and SVP search ads reach consumers at different mindsets (*i.e.*, at different stages of the funnel) and are not reasonable substitutes. *United States v. Bazaarvoice*, 2014 WL 203966, at *24 (N.D. Cal. Jan. 8, 2014) ("Products that

13

influence consumers immediately prior to making the purchase decision ...  are fundamentally different than products that attempt to influence consumer behavior at other times").

### 2.   General search ads are useful to more advertisers than SVP search ads

General search ads are useful to virtually any type of digital advertiser; SVP search ads are not.  SFOF ¶¶ 39-41.  For many advertisers, SVP search ads are not even a relevant product because there is no major SVP available to advertise on.  Indeed, over 60% of Google's search ad revenue comes from advertisers in verticals without a major SVP.  *See id.* ¶ 42.

By contrast, any advertiser can use general search text ads, which constitute the vast majority of general search advertising.  *Id.* ¶¶ 5-6, 39.  And general search shopping ads require only that an advertiser sell the type of product or service advertised, without any restrictions on the way it is sold.  *Id.* ¶ 49.  Thus, any advertiser selling a physical product can buy a PLA.  *Id*.  Consequently, major ad agencies recommend general search ads for all their clients.  *Id.* ¶ 39.

Even for advertisers in verticals where an SVP is available, there are further practical limitations to buying an SVP search ad.  Most SVPs require that an advertiser sell a product or service on the SVP's own site in order to advertise there.  *Id.* ¶ 49.  SVPs do not buy ads from other SVPs that they consider competitors, whereas SVPs are the largest buyers of general search ads because Google is not a competing seller.  *Id.* ¶¶ 42-43, 46-47.  These varying business considerations further evidence distinct product markets.  *McWane, Inc. v. FTC*, 783 F.3d 814, 828-29 (11th Cir. 2015) (domestic and foreign pipe-fitting are functionally equivalent, but still constitute separate markets because some customers only have domestic projects).

### 3.   General search ads and SVP search ads have different features, purchasing methods, and pricing

General search ads also differ from SVP search ads in terms of functionality, advertiser

buying practices, and price, further demonstrating the distinct demand for general search ads.

> **a. General search ads and SVP search ads have distinct features and are not functionally interchangeable**

The majority of general search ads are text ads and, as the Joint Brief explains, text ads and SVP search ads are not functionally interchangeable.  Joint Brief at 21; JFOF ¶ 479.  That distinction also applies to PLAs and SVP search ads.  Like text ads, PLAs click-out, meaning they can drive users from a GSE to an advertiser's website or physical business, and the GSE does not collect a fee for subsequent purchases.  SFOF ¶¶ 44, 51-57.  Some retailers prefer advertising that can drive such in-store traffic because, as Google witnesses testified, in-store customers tend to purchase more.  *Id.* ¶ 55.  In contrast, SVP search ads only click-in, meaning they lead users to complete a purchase on the SVP's website.  Mr. Lowcock explained that when a user completes a transaction on an SVP, the advertiser "lose[s] access to the data and [] lose[s] access to [its] own customer."  *Id.* ¶ 53.  Google, Microsoft, and advertisers recognize the significance of this customer conversion data.  For example, Google's Jason Krueger testified that advertisers considered customer conversion data to be the "source of truth" for optimizing ad spend.  *Id.* ¶ 167.  Thus, advertisers consider PLAs to have distinct advantages compared to SVP search ads because Google does not act as a middleman in completing transactions.  *Id.* ¶¶ 50-58.

These differences in features and functions show the limited substitutability between general search ads and SVP search ads.  *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 52-57 (D.D.C. 2018) (upholding market for customers with "distinct needs who require ... both the products and value-added services"); *Sysco*, 113 F. Supp. 3d at 29 (same); *IQVIA*, 2024 WL 81232, at *14-16 (finding distinct product markets because "data that advertisers can glean from advertising via [different channels] is ... more limited" than the at-issue ad type).

**b. Advertisers, ad agencies, and ad buying tools are structured to purchase general search ads and SVP search ads as distinct channels**

The evidence also shows that advertisers employ distinct teams with discrete budgets to purchase general search ads and SVP search ads, as do SEM tool provider Skai and global ad agency Dentsu.  SFOF ¶¶ 12-13.  Advertising witnesses explained that their advertiser customers set "a specific budget per channel" *(e.g.*, general search advertising, retail SVP search ads, social) and shift spend more frequently within a specific channel than between channels.  *Id.* ¶ 13.  This demonstrates that general search ads and SVP search ads are widely recognized in the industry as distinct products in distinct product markets.  *See IQVIA*, 2024 WL 81232, at *20 (ad agencies using separate teams to purchase different types of digital ads showed industry recognition of separate markets).

**c. General search ads and SVP search ads are priced differently**

General search ads and SVP search ads have "distinct prices," which further supports distinct advertiser demand.  *Sysco*, 113 F. Supp. 3d at 27.  Platforms typically price ads as cost-per-click or cost-per-thousand impressions.  SFOF ¶ 59.  The cost-per-click of general search ads and retail SVP search ads differ dramatically: Skai calculated that the cost-per-click of Amazon ads was five times greater than general search ads in the shopping vertical.  *Id.* ¶ 60.  Dr. Israel conceded that, under the cost-per-thousand impression metric, there were "very large" differences in prices of general search text ads, Amazon ads, and Instagram ads.  *Id.* ¶ 60.

Faced with these disparate prices, Dr. Israel claimed return on investment ("ROI"), not price, drives advertiser substitution.  *Id.* ¶ 61.  But, as advertisers and Google concluded,

advertisers cannot accurately compare ROI across channels.  *Id.* ¶¶ 61-62.[5]  The evidence shows

advertisers do not—and indeed cannot—substitute across channels based on cross-channel ROI

comparisons.  *Id.* ¶¶ 61-65.  While ROI is useful, it does not supplant prices in defining

advertising markets.  *See IQVIA*, 2024 WL 81232, at *16-17, 23 (relying on cost-per-thousand

impression prices and rejecting defendants' argument that digital advertisers substituted across

channels based on ROI).

General search ads and SVP search ads exhibit different prices by any metric.[6]  If they

were reasonable substitutes, advertisers would shift spend between the two in response to these

disparate prices.  But advertisers do not.  Despite general search ads increasing in price year after

year, Mr. Lowcock continues to recommend that his clients buy general search ads and he would

never recommend his clients use SVP search ads "in place of general search ads."  SFOF ¶¶ 9,

28.  Notably, Google has not conducted any ordinary course empirical analyses of "advertisers

switching their spend between Google search ads and Amazon."  *Id.* ¶ 31.  These pricing

differences and advertiser behavior reflect low cross-elasticity of advertiser demand for these

types of ads, again supporting distinct markets.  *See United States v. H&R Block, Inc.*, 833 F.

Supp. 2d 36, 55-56 (D.D.C. 2011) (despite do-it-yourself and assisted tax preparation services

targeting the same customers, "significant price disparities" showed lack of price competition

---

[5] Dr. Israel conceded that ROI is difficult to calculate, that he did not calculate the ROI for any digital ad type, and that ROI is not dispositive in any antitrust market analysis.  SFOF ¶ 63.

[6] Even if ROI proxied for price (which it does not), general search ads and SVP search ads often have widely divergent ROIs.  SFOF ¶ 64.  According to advertiser comparisons, general search ads have significantly different ROIs than all other digital ad types (including Amazon ads)— and yet advertisers continue to buy both.  *Id.*; PSX00973 at -037. There is also evidence that advertisers buy significantly more general search ads even though they have *lower* ROI, which shows that ROI does not dictate their ad purchasing decisions.  SFOF ¶ 64.

and supported distinct markets).  The best market definition evidence is what advertisers said: despite rising costs, they keep buying general search ads.  SFOF ¶¶ 9, 28, 31, 98-101.

* * *

The evidence is overwhelming that advertisers consistently do not "view Amazon ads as substitutes for shopping ads on general search engines" (Lowcock – IPG); Google ads are "the exclusive, dominant ... pool of high-intent, new customers" (Dijk – Booking); it is "essential" to advertise on Google (Hurst – Expedia); and thus, as a "practical matter [they] cannot stop" purchasing Google general search ads (Stein – Angi).  *Id.* ¶¶ 2, 8, 99.  These advertisers so testified despite the rising costs of general search ads, which belies any cross-elasticity of demand between general search ads and other digital ads.  *Id.* ¶¶ 9, 98-101; *Surescripts*, 665 F. Supp. 3d at 42 (adopting market definition where customer regarded product "as a must-have service" and thus "there would be little sensitivity to price changes"); *Bazaarvoice*, 2014 WL 203966, at *66 (ecommerce service is a relevant market where witnesses testified that buyers "had to have it").  "[T]he consistent testimony and representations of industry participants" is clear: no other ad type is a reasonable substitute for general search ads.  *Tronox*, 332 F. Supp. 3d at 202.

### C.    Google has Monopoly Power in Each of the Relevant Markets

The Joint Brief explains why Google has monopoly power in the general search services, general search text advertising, and search advertising markets.  Joint Brief at 23-29.

Google also has monopoly power in the general search advertising market.  Google's share in this market exceeded 90% in 2021, and competitor entry over the last decade has not eroded this market share.  SFOF ¶¶ 68-69.  Further, entry in this market is constrained by all of the same barriers to enter the general search *services* market because a firm must provide general search services in order to sell general search advertising.  *Id.* ¶ 69; Joint Brief at 24-27.

18

Google's dominant share and the insurmountable entry barriers are sufficient to prove Google's monopoly power.

There is also direct evidence of Google's monopoly power in the general search advertising market, including that Google has generated persistently high profits in its search advertising business, has captured significant surplus from its distribution deals, and has experienced little to no market response to search quality reductions and advertising price increases. Tr. 7049:3-23 (Baker); Joint Brief at 27-29.

Google's conduct towards SVPs is further direct evidence of its monopoly power. SVPs rely on Google for user traffic and to attract new customers, and SVPs are some of Google's largest advertisers (including the top five in 2019), generating billions in annual revenue for Google. SFOF ¶¶ 43, 91, 93, 95. Yet, Google systematically increased the customer acquisition costs of SVPs (and other advertisers) through actions that diminish the visibility of the traditional blue links, thus compelling SVPs to buy more general search ads to maintain visibility. *Id.* ¶¶ 76-87. For example, one SVP increased its spending on Google advertising nearly tenfold between 2015 and 2019 and still received fewer visits. *Id.* ¶ 85.

Despite these increasing costs of acquiring traffic from Google, SVPs continue to buy ads on Google because they have no reasonable alternative. *Id.* ¶¶ 101-02, 106-10. Mr. Dijk of Booking testified that his company does "not have a choice but to work with Google." *Id.* ¶ 101. So too for Expedia. *Id.* Notably, SVPs do not believe that Bing is a viable alternate provider of general search ads. *Id.* ¶¶ 102-08. Mr. Dijk explained that "even if Bing would be far cheaper, it would really not work for us, because we really don't get the scale that we need." *Id.* ¶ 102. Another executive explained that his company continued to buy Google text ads because "there's not a replacement for the volume and intent of consumers." *Id.*

That demand for Google search ads remains high, in the face of increasing customer acquisition costs and decreasing visibility, is direct evidence of Google's monopoly power in the general search advertising market.

## III.   GOOGLE'S DISTRIBUTION CONTRACTS FACILITATE TWO ADDITIONAL TYPES OF COMPETITIVE HARM

### A.   Google's SA360 Conduct Harms Competition

Google operates its SEM tool, SA360, to further entrench its search ad monopolies, which are already insulated from competition by Google's exclusionary distribution contracts.

Google's monopoly power allows it to harm its SA360 customers without incurring the cost of losing those customers to other SEM or native tools.  SA360 is "sticky" because it is able to provide greater support for Google Ads features than competing SEM tools and advertisers must advertise on Google due to its market dominance, which tends to keep advertisers on SA360.  *Id.* ¶¶ 117, 150, 260-61.  And switching to other SEM tools that offer Microsoft auction-time bidding or using multiple SEM tools or native tools concurrently is costly, inefficient, and undermines the principal value of an SEM tool as a unified platform to manage all search ad campaigns.  *Id.* ¶¶ 125-26, 154-56, 261.  Google's SA360 conduct is therefore like "many anticompetitive actions [that] are possible or effective only if taken by a firm that dominates its smaller rivals."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274-75 (2d Cir. 1979).

Ownership of SA360 allows Google to limit rivals in ways that the distribution contracts alone cannot.  Google's distribution contracts are effective at excluding competition because they cover 50% of U.S. general search queries.  JFOF ¶ 954.  The Google default on Google's Chrome browser accounts for another 20% of U.S. general search queries.  *Id.* ¶ 968.  But Google's distribution contracts do not (and cannot) cover queries on Microsoft's Edge browser, which is one of the few remaining browsers without a Google default.  *Id.* ¶ 32.  Because SA360

facilitates the placement of general search ads on all browsers, including Edge, Google can directly impede the ability of advertisers to run efficient ad campaigns on Bing and other GSE rivals that use Microsoft Ads, like DuckDuckGo and Yahoo!.  SFOF ¶¶ 122-23, 263.

The distribution contracts make advertising on the Google search engine indispensable, which allows Google to avoid losing advertising revenue when it degrades SA360's support for advertising on rival GSEs despite the harm to Google's own customers.  *Id.* ¶¶ 145-47.  SA360 has an 83% share in the SEM tool market, making it a "choke point" on Microsoft's search ads business.  *Id.* ¶¶ 151-52.  Google's dominance in search advertising markets and among SEM tool providers makes advertisers reluctant to leave SA360, magnifying the anticompetitive impact of Google's delayed support for Microsoft features.  *Id.* ¶¶ 147, 151, 275; ("Google's dominant search advertising position means that there will inherently be less advertiser demand for Bing features").

### 1.    Google promised neutrality but instead favored its own profits

After Google acquired the SEM tool now called SA360, it understood that advertisers would be concerned that Google would favor its own ads over those of competitors.  *Id.* ¶¶ 122, 139, 142, 149.  Such favoritism would be antithetical to a tool designed to empower advertisers to choose the best advertising available to them.  *Id.*  ¶¶ 125-26.

Advertisers were right to be concerned that Google faced a conflict of interest between the best interest of Google and the best interests of advertisers.  The financial incentives are starkly clear.  *Id.* ¶¶ 134-43.  Google makes over ▮ times more profit when an advertiser uses SA360 to buy a Google ad rather than a non-Google ad, and so is highly incentivized to use SA360 to steer advertisers to buy Google ads.  *Id.* ¶¶ 141-43.  Google has done just this, operating SA360 to provide "day one" support for Google Ads features while delaying or refusing to support comparable Microsoft Ads features.  *Id.* ¶¶ 148-49.

SA360 is an essential way for Google's rivals to attract customers because advertisers that use SEM tools are the most likely to buy both Google and Microsoft ads. *Id.* ¶¶ 125-30 ▮▮▮▮ of SA360 spend is from customers with both Google and Microsoft ad campaigns). By degrading SA360 support for non-Google search engines, Google dissuades advertisers from spending on those search engines and makes ad campaigns on those search engines less efficient, thereby hindering Google's rivals' ability to compete and protecting Google's monopolies from erosion. *Id.* ¶¶ 263-72. This forced advantage for Google Ads on SA360 drives billions of dollars in revenue to Google's search ads business. *Id.* ¶¶ 194, 266 (Google auction-time bidding on SA360 expected to "drive $1-2 billion (USD) for Google within 2 years of launch").

### 2. Google limits competition by refusing support for Microsoft auction-time bidding

Advertisers use SEM tools to manage search ad campaigns on multiple GSEs, such as Google, Bing, DuckDuckGo, or Yahoo!. *Id.* ¶¶ 121-23. SEM tools are particularly useful for large advertisers and ad agencies, which run "hundreds of campaigns" with "thousands of keywords" across multiple GSEs. *Id.* ¶ 127. These large customers represent over ▮▮▮▮ of SA360's business. *Id.* ¶ 128.

Advertisers that use SEM tools want consistent support for advertising on different GSEs (also called "feature parity") because any differences introduce friction and cause cross-engine campaign management to be more difficult and less efficient. *Id.* ¶ 131 ("The more similar an advertiser can make their campaigns … in Google through SA360 to how they participate on Bing through SA360, the more efficient it is"). Google's own documents recognize that SA360 customers want feature parity. *Id.* ¶ 132 ("Basic feature parity with Microsoft Ads is commonly requested by clients"). Independent SEM tool providers, like Skai, Marin, and Adobe, try to

serve their customers by providing consistent cross-engine support for the most popular and valuable features.  *Id.* ¶ 133.

Auction-time bidding is the most salient example of SA360 supporting a Google Ads feature while refusing to support the same feature for Microsoft Ads.  Auction-time bidding refreshes conversion data and user signals in real-time with each user query, and then sets new, optimized ad auction bids for each of the billions of auctions per day.  *Id.* ¶¶ 170-71.  Auction-time bidding is far superior to intraday bidding, the alternate form of autobidding that only updates signals and bids a few times per day.  *Id.* ¶¶ 169, 172.  Amit Varia, a Google Senior Product Manager responsible for managing the SA360 product, described auction-time bidding as SA360's "most critical" feature.  *Id.* ¶ 173.  SA360 support for auction-time bidding is thus important both for advertisers and for GSEs, which rely on SEM tools (and particularly SA360) to allow advertisers to run efficient ad campaigns on the GSE's site.  *Id.* ¶¶ 150, 263-72.

Both the Google Ads and Microsoft Ads native tools supported auction-time bidding since 2016.  *Id.* ¶ 175.  SEM tool Skai integrated both tools' auction-time bidding by 2020, having recognized that it is an "impactful feature" commonly requested by customers.  *Id.* ¶¶ 179-82.  Skai integrated Google's auction-time bidding first (in 2019), which "simplified the process" of integrating Microsoft's auction-time bidding a year later.  *Id.* ¶¶ 180-81.  SEM tool providers Adobe and Marin also partially supported both Google and Microsoft auction-time bidding by 2022.  *Id.* ¶ 184.

By contrast, SA360 released its full integration of Google auction-time bidding in 2019 (like Skai), but, four years later, has still not done so for Microsoft Ads.  *Id.* ¶¶ 186-91, 241. Thus, as of today, SA360 allows advertisers to use auction-time bidding to set bids and place ads on Google's search engine, but only allows advertisers to use the inferior intraday bidding to set

bids and place ads on all non-Google GSEs.  *Id.* ¶ 190.

Google ostensibly has an internal project called Project Byx to develop SA360 support for Microsoft auction-time bidding.  *Id.* ¶ 216.  But Google decided years ago to "defer" that project while maintaining a veneer of progress, as stated explicitly in a 2021 internal Google document recommending that SA360 "slow-roll Byx by doing some minimal work to keep it ticking over."  *Id.* ¶ 243.  Over a year ago at summary judgment, Google vaguely claimed that SA360 was "in the process of building and testing automated bidding features for Microsoft Ads" (Dkt. 435, Ex. 80 ¶ 7), but at trial, Google introduced no direct evidence of the status of Project Byx or when it would be completed.  SFOF ¶ 242.  The limited secondhand testimony was contradictory, with one employee testifying that testing was in a "limited alpha" phase and another saying it was in a broader "beta" phase.  *Id.*  There is thus no reliable evidence of when (if ever) SA360 will support Microsoft auction-time bidding.

### a.  Google knows that advertisers will be better off using Microsoft's auction-time bidding than using intraday bidding

There is no serious doubt that SA360 users will achieve better results using auction-time bidding with Microsoft Ads rather than intraday bidding.  Google admits as much.  Ryan Krueger of Google wrote that he was "not terribly surprised microsoft ATB [auction-time bidding] is performing better than intraday (for same reason google ATB does)."  *Id.* ¶ 204.  Indeed, no witness testified that intraday bidding would be as efficient as auction-time bidding for a purchase of Microsoft ads.

The record demonstrates that auction-time bidding does in fact perform far better than intraday bidding.  When Google released SA360 support for Google auction-time bidding in September 2019, its beta testing had already shown that use of "SA360 auction-time bidding" by a "typical advertiser" resulted in a 15-30% uplift in conversions on Google Ads campaigns.  *Id.* ¶

191.  Google's testing also found a "+███ spend" increase on SA360 by advertisers using Google auction-time bidding.  *Id.* ¶ 194.  Within months, 80% of SA360 customers had adopted Google auction-time bidding, and the SA360 sales team listed "Auction time bidding for MSFT" as a "Top 5" requested Microsoft feature.  *Id.* ¶¶ 197-98.

In May 2020, internal Google documents again listed "Auction-time bidding … [f]or MSFT advertising" as a top requested feature by its SA360 advertisers, and in September 2020 Google employees observed that Google auction-time bidding was providing "consistently strong performance" and "paying rich dividends for our customers & our business."  *Id.* ¶¶ 199-201.  In late 2020, Google determined that use of auction-time bidding with SA360 bid strategies caused a ███ increase in all conversions," and two large customers told Google that they were seeing "better performance" and "more conversions" when they used auction-time bidding on the Microsoft native tool.  *Id.* ¶¶ 202-03.  At the same time, other major customers, including Home Depot and ad agency Dentsu, repeatedly stressed to Google the importance of broad Microsoft Ads feature parity, including for auction-time bidding.  *Id.* ¶ 206.  Home Depot's use of Microsoft auction-time bidding on Skai "dramatically improved performance" and doubled return on ad spend.  *Id.* ¶ 183.  By 2021, an internal Google feature tracking spreadsheet listed "Auction time bidding for MSFT" as the highest priority, defined as requested "consistently from sales/customers."  *Id.* ¶ 205.

In light of these facts, Google cannot credibly claim that there was insufficient advertiser interest to justify the planned conversion sharing test (which Google knew would yield further evidence of advertiser attitudes).  *Id.* ¶ 274.  Google has long known that its customers want support for Microsoft Ads features on SA360 generally and for Microsoft auction-time bidding specifically.  *Id.*  Google also knows that auction-time bidding is highly effectively on both

Google Ads and Microsoft Ads and will undoubtedly outperform intraday bidding.  *Id.*  In fact, any depressed demand is a result of Google's other exclusionary conduct (the distribution contracts), which is not a defense.  *Id.* ¶ 275.

> **b.  Google's refusal to support Microsoft auction-time bidding intentionally harms competition**

Google's refusal to support Microsoft auction-time bidding on SA360 is intended to harm Microsoft and Google's other GSE rivals.  In late 2019, teams at Google and Microsoft developed a protocol for testing the sharing of SA360's Floodlight conversion data with Microsoft Ads, which was a "prerequisite for future integrations such as auction-time bidding." *Id.* ¶ 210.  The proposal called for an initial phase that would require "little, if any, engineering work," followed by an "engineering build out" phase.  *Id.*  The Google team was initially eager to begin the testing, writing that they were "generally aligned with the approach" and "looking forward to getting this test off the ground!"  *Id.* ¶ 211.  The testing was then included on an internal product roadmap for the first half of 2020 after rounds of cost cutting, approval by sales leadership, and executive review.  *Id.* ¶ 216.

Then senior Google executives stepped in.  In December 2019, Joan Braddi (Google Vice President of Partnerships) was tasked with responding to Microsoft's request for development of Microsoft Ads features on SA360, even though she admitted that she "didn't know what SA360 was" or the "purpose of the SA360 tool," was "not familiar [with] how auction-time bidding actually works," and did not review SA360 product development roadmaps.  *Id.* ¶ 219.

Unburdened by knowledge, Ms. Braddi promptly decided that Google should "push back" on Microsoft's request for feature development.  *Id.* ¶ 222.  Writing to an internal Google team, she did not cite technical or resource constraints, but rather depicted SA360's primary purpose as serving Google, not advertisers' interest in using SA360 to buy ads from multiple

26

GSEs:  "Google builds our tools to assist advertisers with their advertising campaigns, measurement, optimization *primarily on Google's platform*; and in some cases these tools can work cross platform but may not be optimized across all platforms."  *Id.* (emphasis added). Likewise, a briefing memo that Ms. Braddi helped prepare states that Google planned to "decline [] the SA360 … requests for parity / feature development" because it was "not aligned with [Google's] product or business goals."  *Id.* ¶ 223.

In January 2020, Google slammed on the brakes, instructing Microsoft not to go forward with the recruitment of advertisers for the planned test.  In March 2020, Google stopped the process entirely, telling Microsoft that it had "elected to defer running an MSFT Auction-time Autobidding test," citing a lack of customer demand.  *Id.* ¶ 230.  By this time, Google already knew that auction-time bidding was highly effective and popular.  *Supra* at 24-25.  That evidence would continue to grow in coming months, including the May 2020 Google presentation listing "Auction-time bidding … [f]or MSFT advertising" as a top requested feature.  SFOF ¶ 199.  Yet, in protracted negotiations starting in May 2020, Ms. Braddi raised objection after objection.  *Id.* ¶¶ 234-40.  For example, in return for Google agreeing to use "commercially reasonable efforts" to develop auction-time bidding and several other Microsoft Ads features over two years (a deadline that has long since passed), Braddi demanded that Microsoft forfeit the ability to seek support for new features regardless of their importance to advertisers.  *Id.* ¶ 235.

Ms. Braddi also rejected two critical components of SA360's auction-time bidding integration, *i.e.*, that Floodlight data is passed to the Microsoft Ads native tool and that SA360 bid strategies are enabled.  *Id.* ¶¶ 236-38.  These components are essential to SA360's integration of Google auction-time bidding, and Google and Microsoft employees understood since late 2019 that they would also be part of the Microsoft auction-time bidding integration.   *Id.* ¶ 237.

Not surprisingly, the discussions soon fell apart, even though they were subject to an executive-level escalation process including Microsoft CEO Mr. Nadella.  *Id.* ¶¶ 232, 239, 240.

SA360's refusal to move forward with Microsoft auction-time bidding was not due to lack of funding or resources.  None of Google's contemporaneous communications with Microsoft indicate insufficient funds or resources.  Rather, Google rejected the auction-time bidding testing only after it had passed several layers of internal review, including cost cutting sessions and approval by sales and executive leadership.  *Id.* ¶ 276.  Google refused even an initial testing phase that required "little, if any, engineering work" and ignored Microsoft's offer to pay for the feature development and testing.  *Id.*  The true reason for Google's refusal, as stated in an internal Google memo, was simply that Microsoft's "requests for parity / feature development" were "not aligned with [Google's] product or business goals."  *Id.*[7]

### 3.    Google also delays cross-engine support for other key Microsoft Ads features

Google also consistently refused or delayed SA360 support for other Microsoft Ads features after supporting the same features for Google Ads.  *Id.* ¶¶ 244-55.  For example, in November 2019, Microsoft identified responsive search ads, dynamic search ads, and local

---

[7] There is no credible evidence of any technical barriers to supporting the Microsoft Ads features.  In several documents, Google employees claim that SA360 cannot support Microsoft auction-time bidding unless Microsoft Ads also supports a feature called fractional conversions, which assigns partial or fractional value to clicks made by a user prior to the last click that resulted in a conversion.  SFOF ¶¶ 277-78.  That issue concerns advertiser preferences, not technical requirements.  *Id.*  Indeed, Microsoft employees wrote at the time that this was a "delay tactic" by Google and was not a "blocker for the [conversion sharing] test or for the general rollout [of auction-time bidding]."  *Id.*  The lack of support for fractional conversions did not impede Skai's, Marin's or Adobe's support for Microsoft auction-time bidding, and Mr. Vallez of Skai testified that customers benefited from using auction-time bidding even without the option of also using fractional conversions.  *Id.*  The fractional conversions feature also is not required even to use Google auction-time bidding; indeed, the default on SA360 is last click attribution, the alternative to fractional conversions.  *Id.*

inventory ads as three priority features (along with auction-time bidding) that SA360 supported

for Google but not for Microsoft. *Id.* ¶¶ 248-50. SA360 finally supported those features in 2022,

over a year after Plaintiff States filed their complaint challenging the wide feature disparity. *Id.* ¶

255.

Microsoft documents likewise describe the "big gaps" in SA360 support for Google and

Bing, the "delayed support for [Microsoft Ads] features in general," and that "feature adoption

gaps are evident as compared to competitors when SA360 does not support Microsoft

Advertising features." *Id.* ¶¶ 246-48. Google employees also acknowledged "our delays" in

supporting Microsoft Ads features, "the fact that other platforms have had support for years," the

overall "slow growth and low feature adoption," and customers' view that "third-party platforms

[*i.e.*, Skai, Marin, and Adobe] were better designed for multiple engines." *Id.* ¶¶ 246-49.

### 4. Google's delayed or deferred support for Microsoft Ads features harms competition in search advertising markets

As the Court explained at summary judgment, "[t]he issue is whether Google's delayed

rollout of SA360 support for Microsoft Ads inhibited or dissuaded advertisers from placing ads

on its competitor's search engine, thereby harming competition in the general search advertising

market." SJ Decision at 56. The record contains ample evidence of this anticompetitive harm.

Google's conduct harms advertisers by diminishing the efficiency of their ad spend on

SA360. Use of auction-time bidding dramatically increases conversions and return on ad spend.

This includes both Google auction-time bidding, which Google considers its "most critical"

SA360 feature and reported as increasing conversions by ██ in late 2020 (up from an initial

reported increase of 15-30%), and Microsoft auction-time bidding, which testing showed

increased conversions by 12% on Skai and doubled Home Depot's return on ad spend. SFOF ¶¶

173, 241, 257. By 2020, over 80% of SA360 customers had "fully adopted" auction-

29

bidding and were "no longer using Intraday bidding on Google Ads campaigns," and Google has long known that Microsoft auction-time bidding and greater feature parity are top customer requests. *Id.* ¶ 258.  Moreover, by denying SA360 customers the ability to efficiently shift ad spend from Google to Bing, Google is able to ensure that more advertisers bid in its search ad auctions, which in turn drives up prices for Google search ads. *Id.* ¶ 259.

Google's conduct also directly harms rival GSEs that use Microsoft Ads to attract customers, including Bing, DuckDuckGo, and Yahoo!, by driving down demand for advertising on these search engines. *Id.* ¶ 263.  As a Microsoft document explains, lack of support for Microsoft Ads features causes "Bing relative ROI [to] suffer" and SEM tool "algorithms would shift budget accordingly." *Id.* ¶ 267.  Data presented by Google's expert, Dr. Israel, shows that Bing's share of total spend on SA360 decreased over five times more in the eighteen months after September 2019 than in the same period before. *Id.* ¶ 268.  And ordinary course analyses conducted by Microsoft in 2020 and 2021 forecast ███████████████████ in annual lost revenues due to SA360's decision not to support Microsoft auction-time bidding and other key features. *Id.* ¶¶ 269-71 (the estimates ranged between █████████ per year).

This is more than enough evidence to satisfy Plaintiff States' burden to show that Google's operation of SA360 perpetuates Google's advertising monopolies.  Like the anticompetitive conduct in *Microsoft*, Google's conduct has "the effect of significantly reducing usage of rivals' products and hence protecting [Google's] own [] monopoly." 253 F.3d at 65.  Put another way, Google violated Section 2 because it "structured its [SA360] product in a way that made it more difficult for rivals or potential rivals to sell their product" and did so in a

manner "designed solely to insulate [Google] from competitive pressure."[8]  Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law ¶ 651c (Fifth Ed. 2023); *Burris*, 935 F.2d at 1481.

### B.    Google's Distribution Contracts Hinder Rivals' Ability to Enter into Cost-Effective Contracts with SVPs

Google's distribution contracts lower the incentives of rivals to invest and innovate

(JFOF ¶¶ 1067-78); depress the scale of current entrants (*Id.* ¶¶ 978-1015); discourage future

entry from Apple and others (*Id.* ¶¶ 1093-125); and in the case of Neeva, hinder its ability to stay

in business (*Id.* ¶¶ 40, 540, 548).  The absence of Neeva as an option for search defaults on major

browsers and operating systems was one reason Neeva exited the general search market.  *Id.* ¶

548 (describing the adverse impact of Google's contracts on Neeva's ability to appear as even

one of the default options).  As Mr. Ramaswamy of Neeva explained, Google's contracts

effectively "freeze the ecosystem in place."  *Id.* ¶ 1120.

The distribution contracts also make it more costly for Google's GSE rivals to strengthen

their search results pages, which they could accomplish by securing content from third parties,

such as well-known SVPs.  This is a direct "downstream effect of Google's distribution

agreements."  SJ Decision at 54.

---

[8] Google did not prove any non-pretextual, procompetitive justification for its refusal to support Microsoft auction-time bidding and other key Microsoft Ads features.  SFOF ¶¶ 273-80. Google's attempts to provide justifications through testimony of its employees at trial were implausible and disproven by the documentary record.  *Id.* In addition, the Court should discount the self-serving testimony of Google's witnesses because nearly all of the SA360-related witnesses that testified at trial improperly withheld or destroyed highly probative evidence. Ryan Krueger routinely used Google Chats with history off, including to discuss "SA360 product decisions" and "product feature road map decisions" (JFOF ¶ 1207); Mr. Varia also used Google Chats with history off, including to discuss SA360's feature "prioritization process" and "roadmap planning" (*Id.*); and Ms. Braddi directed employees to mark emails as privileged even though they did not seek or contain legal advice (*Id.* ¶ 1223).

Google's rivals, including Bing, want to partner with SVPs to improve their search results quality, especially in travel and local verticals.  SFOF ¶ 287.  For example, Microsoft seeks content deals with SVPs "to make sure that the answer[] that we're providing to our users is a great answer" and to obtain important rich data, which impacts both the quality and perception of the quality of Bing responses to queries.  *Id.*

By keeping its GSE rivals at small scale, Google has made them less attractive business partners to SVPs and others that would otherwise view a GSE as a good way to attract user traffic and future customers.  *Id.* ¶¶ 285, 291, 295 (Microsoft executive: "the more traffic you have, the more you have to offer the partner, and so the more the partner's interested in doing a deal with you").  That is true for both ad purchases and content partnerships because SVPs that are disinclined to advertise on Bing are also less interested in "paying" to appear on Bing through a data-for-traffic trade.  *Id.* ¶¶ 283, 286.  Both advertisers and content providers view Bing as "too small" to deliver a significant audience.  *Id.* ¶¶ 106, 283, 285; *id.* ¶ 107 (Expedia cannot shift ad spend from Google to Bing); *id.* ¶ 285 (working with Bing is not a "huge priority [for OpenTable] because it doesn't generate the demand or the traffic or the covers that Google does"); *id.* ¶ 109 (Expedia executive: "The amount of time I spent talking with Bing in my career was zero.  Whereas, with Google, it would have been every month and every quarter").  Microsoft's inability to provide strong mobile results in verticals like travel and local further discourages data-for-traffic deals.  *Id.* ¶¶ 288-92.

When Microsoft █████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████  For example, ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████████   These are losses and

financial penalties that result directly from the exclusionary distribution contracts and serve no

procompetitive purpose.  It is no answer to say that Microsoft is wealthy enough to afford

payments because, under the Sherman Act, a company is not required to make investments if

there is no hope of receiving a return on that investment.  *See* JFOF ¶¶ 1067-78.

## IV.   GOOGLE'S ONGOING, VOLUNTARY DEALING WITH MICROSOFT ADS RENDERS THE "DUTY TO DEAL" DOCTRINE INAPPLICABLE

Google argues that Plaintiff States' SA360 allegations run afoul of the limitations on a

firm's "duty to deal."  Dkt. 668 at 16.  But the relevant case law has no application where a

monopolist maintains an ongoing, voluntary course of dealing.  SCOL ¶¶ 38-45.  Here there is no

doubt that Google wants and needs an ongoing relationship with Microsoft in order to operate

SA360—the opposite of the circumstances in *Verizon Communications, Inc. v. Law Offices of*

*Curtis V. Trinko*, 540 U.S. 398 (2004), in which the defendant did not "voluntarily engage[] in a

course of dealing with its rivals."  *Id.* at 409.  Google asserted the *Trinko* defense at summary

judgment (Dkt. 427 at 34-35), Plaintiff States responded (Dkt. 465 at 30-31), and the Court

rightly declined to take up Google's argument and proceeded to analyze the merits of Plaintiff

States' claims under the normal *Microsoft* three-step framework.  SJ Decision at 54-57.  The

Court should take the same approach now.

Google's characterization of the integration of Microsoft Ads features as an independent

request for dealing subject to *Trinko* is inconsistent with *Trinko*'s facts and reasoning.  *Trinko*

concerned an antitrust claim brought against a firm, Verizon, that had *no* interest in doing

business with the plaintiff but was forced to do so by federal telecommunications regulation.

Relying on the principle that a monopoly generally is free to choose its customers, *Trinko* and

related cases have only been applied to circumstances in which (i) the business relationship was

government mandated, (ii) there was no prior dealing at all, or (iii) any prior dealing had ended. *See Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 448 (2009); *Trinko*, 540 U.S. at 409 (noting that there was no allegation that Verizon would have dealt with the plaintiff "absent statutory compulsion"); *linkLine*, 555 U.S. at 450 (defendant's course of dealing with plaintiffs "arises only from FCC regulations"); *New York v. Facebook*, 549 F. Supp. 3d 6 at 27-28 (D.D.C. 2021); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023).

Thus, by its own terms, *Trinko* has no application where there is a voluntary, ongoing course of dealing. Here, a monopolist has chosen, for its own financial interests, to engage with another marketplace participant. Google voluntarily acquired and for more than ten years has voluntarily operated the SA360 SEM tool that supports Google ads and other GSE ads. SFOF ¶ 124. Google went even further, voluntarily entering into a contract with Microsoft with a binding escalation process for the two companies to resolve disputes, including Google's refusal to support Microsoft auction-time bidding. *Id.* ¶¶ 233-35. Google now says that it is working on supporting Microsoft auction-time bidding and will offer it at some future time. *Id.* ¶ 242. That is not a "refusal" to do anything—it is an exclusionary delay of promised neutrality for the purpose of inflicting further harm on rivals and customers.

Exclusionary conduct occurring within a voluntary, ongoing commercial relationship is entirely actionable under Section 2. *See Trinko*, 540 U.S. at 410 (distinguishing *Otter Tail Power Co.* v. *United States*, 410 U.S. 366 (1973), in which "the defendant was already in the business of providing a service to certain customers … and refused to provide the same service to certain other customers."); SCOL ¶¶ 40-41 (collecting cases). Indeed, that is precisely the circumstance of any meritorious exclusive dealing or tying claim, in which a defendant embeds anticompetitive conduct within a commercial arrangement. *Novell, Inc. v. Microsoft Corp.*, 731

F.3d 1064, 1072 (10th Cir. 2013).

The D.C. Circuit's recent application of *Trinko* in *New York v. Meta* is very different from this case. There, the dealing had stopped and the challenged policy applied to products directly competitive with the Facebook platform. *Meta*, 66 F. 4th at 305 ("Facebook was prohibiting developers from using Facebook's Platform to duplicate Facebook's core products"). By contrast, here Google is in an ongoing and voluntary course of dealing with Microsoft in order to support Bing advertising on Google's cross-engine SEM tool. SFOF ¶¶ 122, 126, 207-11, 233-34. Indeed, not only are Microsoft Ads features not *competitive* with SA360's platform, they are instead a vital *input* to the ability of SA360 to deliver a cross-platform tool to advertisers. *Id.* ¶¶ 125-26. By refusing to develop Microsoft Ads features for SA360, Google hampers third-party advertisers' ability and incentive to buy Bing advertising. *Id.* ¶¶ 257-59. This impacts not just Microsoft, but Microsoft's and Google's mutual customers. *Id.* ¶¶ 257-59, 263-72; *Facebook*, 549 F. Supp. 3d at 31-32 (distinguishing refusals to deal from conduct which, like in *Microsoft*, "interferes with the relationship between rivals and third parties"). That is precisely the type of conduct by a monopolist that the Sherman Act and *Microsoft* forbid.

## **CONCLUSION**

Google's distribution contracts and its SA360 conduct have broadly harmed competition and Google has not shown any procompetitive justification for the specific acts that Plaintiff States allege to be illegal. Even if there were any benefit, it would be outweighed by harm. For the reasons described herein and in the Joint Brief, the Court should hold Google liable for all claims in Plaintiff States' Complaint.

Dated: February 9, 2024          Respectfully submitted,


FOR PLAINTIFF STATE OF COLORADO

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365 (inactive)
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

Joseph M. Conrad, Assistant Attorney General
Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mail: Joseph.Conrad@nebraska.gov
Colin.Snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF ARIZONA

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov
        Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*


FOR PLAINTIFF STATE OF NEW YORK

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the Attorney General of New York
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*


FOR PLAINTIFF STATE OF NORTH CAROLINA

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF TENNESSEE

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*


FOR PLAINTIFF STATE OF UTAH

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff State of Utah*


FOR PLAINTIFF STATE OF ALASKA

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF CONNECTICUT

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*


FOR PLAINTIFF STATE OF DELAWARE

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*


FOR PLAINTIFF DISTRICT OF COLUMBIA

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*


FOR PLAINTIFF TERRITORY OF GUAM

Fred Nishihira, Chief, Consumer Protection Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324


*Counsel for Plaintiff Territory Guam*

FOR PLAINTIFF STATE OF HAWAI'I

Rodney I. Kimura
Department of the Attorney General, State of Hawai'i
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*


FOR PLAINTIFF STATE OF IDAHO

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720 Boise, ID 83720
Telephone: (208) 334-4114
E-Mail:  John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*


FOR PLAINTIFF STATE OF ILLINOIS

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
         Brian.yost@ilag.gov
         Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


FOR PLAINTIFF STATE OF MAINE

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*


FOR PLAINTIFF STATE OF MARYLAND

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-Mail: William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*


FOR PLAINTIFF STATE OF MINNESOTA

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF NEVADA

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW HAMPSHIRE

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*


FOR PLAINTIFF STATE OF NEW JERSEY

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*


FOR PLAINTIFF STATE OF NEW MEXICO

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NORTH DAKOTA

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*


FOR PLAINTIFF STATE OF OHIO

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*


FOR THE PLAINTIFF STATE OF OKLAHOMA

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OF OREGON

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*


FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*


FOR PLAINTIFF TERRITORY OF PUERTO RICO

Guarionex Diaz Martinez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

FOR PLAINTIFF STATE OF RHODE ISLAND

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*


FOR PLAINTIFF STATE OF SOUTH DAKOTA

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*


FOR PLAINTIFF STATE OF VERMONT

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*


FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

FOR PLAINTIFF STATE OF WASHINGTON

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WEST VIRGINIA

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

FOR PLAINTIFF STATE OF WYOMING

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff State of Wyoming*

## <u>CERTIFICATE ON SERVICE</u>

On February 9, 2024, I served this Plaintiff States' Post-Trial Brief by email on counsel for Google and counsel for DOJ Plaintiffs in the above-captioned matters.


February 9, 2024                                    */s/ Matthew McKinley*

                                                   Matthew McKinley

                                                   *Counsel for Plaintiff States*