# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

## PLAINTIFF STATES' PROPOSED CONCLUSIONS OF LAW

███████████

## <u>TABLE OF CONTENTS</u>

I.    Plaintiff States Proved Four Relevant Markets ........................................................ 1

II.   Google Has Monopoly Power in the Relevant Markets .......................................... 5

III.  Google Engaged in Two Types of Anticompetitive Conduct ................................. 8

IV.  The "Duty to Deal" Doctrine is Inapplicable ....................................................... 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239 (S.D.N.Y. 2004) ............................... 13

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)..................................... 9

*Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022)............................................. 4, 6

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ................................................ 6

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................................... 4

*Caribbean Broadcasting System v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998)....... 9

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ................................... 9

*Covad Comm. v. Bell Atlantic Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ........................................ 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................ 6

*Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849 (1st Cir. 2016) .......................................................... 3

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).................................................................................. 7

*FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022)...................................................... 6, 7

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ............................................................ 10

*FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062 (D.N.J. Aug. 4, 2021) ................ 3

*FTC v. IQVIA Holdings Inc.*, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) .................................. 3, 4

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ........................................................... 2, 5

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023)....................................................... 5

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000)...................................................... 6

*FTC v. Sysco*, 113 F. Supp. 3d 1 (D.D.C. 2015)................................................................. 2, 3, 4, 6

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018).............................................................. 3

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ...................................................................... 1

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ............................................. 12, 13, 14

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ........................................................... 4, 7, 10

*McWane, Inc., A Corp., & Star Pipe Prod., Ltd. A Ltd. P'ship.*, 2014 WL 556261 (F.T.C. Jan. 30, 2014) ............................................................................................................................................. 7

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ............................................... 5

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........................... 13

*New York v. Facebook*, 549 F. Supp. 3d 6 (D.D.C. 2021) ......................................................... 14

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ............................................ 14

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ........................................ 13, 14

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) ...................... 7

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ...................................................... 13

*Pacific Bell Telephone Co. v. linkLine Comm., Inc.*, 555 U.S. 438 (2009) ................................. 12

*Parson v. Bright House Networks, LLC*, 2010 WL 5094258 (N.D. Ala. 2010) ........................... 13

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ................. 4

*Safeway v. Abbott Laboratories*, 761 F. Supp. 2d 874 (N.D. Cal. 2011) .................................... 13

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) ...................... 3

*State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469 (7th Cir. 1991) ........... 9

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................. 2

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993) .................................... 6

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .................................................... 10

*United States v. Anthem, Inc.*, 236 F.Supp.3d 171 (D.D.C. 2017) .............................................. 2

*United States v. Dentsply Intern., Inc.*, 399 F.3d 181 (3d Cir. 2005) ............................................ 7

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .................................... 5, 7

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................................ *passim*

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) .......................................................... 2

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003) .................................................. 7

*United States. v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................................ 5

*US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ........... 13

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).......... 12, 13, 14

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020).................................................. 12

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984) ...................................................... 6

**Statutes**

28 U.S.C. §§ 1331, 1337(a), 1345, 1391 ...................................................................... 1

15 U.S.C. § 26.............................................................................................................. 1

15 U.S.C. §§ 2, 4, 22.................................................................................................... 1

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and
      Their Application ¶ 618 (Fifth Ed. 2023)...................................................................... 9

1.      Section 2 of the Sherman Act makes it unlawful "to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.  A monopoly maintenance claim under Section 2 requires proof that the defendant possesses monopoly power in relevant markets and willfully maintained that power through exclusionary conduct.  *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001).  Plaintiffs have the initial burden of proving the Section 2 elements by a preponderance of the evidence.  *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003).

2.      Plaintiffs have proven that Google possesses durable monopoly power in four relevant markets (one user-side market and three advertiser-side markets) and uses exclusive distribution contracts and degraded support for Microsoft Ads features on SA360 to unlawfully maintain its monopoly power.[1]

## I.      PLAINTIFF STATES PROVED FOUR RELEVANT MARKETS

3.      Plaintiff States have proven four relevant product markets.  They are the user-side general search services market and three advertiser-side markets: general search text advertising, general search advertising and search advertising.  Each market is supported by evidence of demand substitution as well as the "practical indicia" of market definition.  JFOF ¶¶ 323-521; SFOF ¶¶ 1-65.[2]

---

[1] There is no dispute that the Court has jurisdiction and Plaintiff States have standing to pursue their claims against Google.  The court has subject matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), 1345.  The Court has personal jurisdiction over Google and venue is proper in this District because Google transacts business and is found in this District.  *See* 15 U.S.C. § 22; 28 U.S.C. § 1391.  Plaintiff States have standing under Section 16 of the Clayton Act, 15 U.S.C. § 26, as parens patriae on behalf of and to protect their general economies and the health and welfare of their residents.

[2] "SFOF" refers to Plaintiff States' Proposed Findings of Fact and "JFOF" refers to Plaintiffs' Proposed Findings of Fact jointly submitted by DOJ Plaintiffs and Plaintiff States.  "SJ Decision" refers to the Court's August 3, 2023 Memorandum Opinion on Google's summary judgment motions.  Dkt. No. 624.

4.      Antitrust markets are defined by a set of products in a particular geography. Plaintiffs need not prove a relevant market "in the same way the corpus delicti must be proved to establish a crime." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966). "This is because '[t]he 'market', as most concepts in law or economics cannot be measured by metes and bounds." *United States v. Anthem, Inc.*, 236 F.Supp.3d 171, 193 (D.D.C. 2017) (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953).

5.      Here, there is no dispute that the United States is the relevant geographic market for all four product markets.  JFOF ¶¶ 396-97, 455, 500; SFOF ¶ 3; *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997) (adopting government's proffered geographic market because it was unchallenged by the defendant).

6.      "[A] product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same." *FTC v. Sysco*, 113 F. Supp. 3d 1, 25 D.D.C. 2015.  Thus, "[b]ecause the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, ... the relevant market must include all products reasonably interchangeable by consumers for the same purposes." *Microsoft*, 253 F.3d at 51-52.

7.      "Whether goods are 'reasonable substitutes' depends on two factors: functional interchangeability and cross-elasticity of demand." *Sysco*, 113 F. Supp. 3d at 25.  Both factors look to the availability of substitute commodities, *i.e.*, "[w]hether there are other products available to consumers which are similar in character or use to the products in question," as well as "how far buyers will go to substitute one commodity for another." *Id.*  Functional interchangeability refers to whether buyers view similar products as substitutes. *Id.*  Cross-elasticity of demand evaluates the "responsiveness of the sales of one product to price changes of the other" and the "ease and speed [and] ... desirability" of substituting between the products. *Id.*

at 25-26.

8.      "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Id.* at 26.   Substitution must be effective to hold the primary good to a price near its costs," *id.* at 31, so "[i]solated examples of potential substitutability simply do not outweigh the consistent testimony and representations of industry participants or the empirical evidence provided by [an expert witness]." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018); *FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *17 (S.D.N.Y. Jan. 8, 2024) ("the fact that an agency might shift money around during a campaign does not establish that these alternative channels are substitutes for the distinct features that [the at-issue] advertising provides").

9.      The best evidence to assess buyer demand is how buyers actually spend money in the marketplace.  *See Sysco*, 113 F. Supp. 3d at 30, 42-43; *FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *19 (D.N.J. Aug. 4, 2021) *aff'd*, 30 F.4th 160 (3d Cir. 2022) (relying on customer views to determine which products compete); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999) (explaining the importance of the "actual behavior" of customers).  On the other hand, courts often give little weight to the views of a product seller like Google "on the key questions of product interchangeability and cross-elasticity of demand from the perspective of consumers." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 855 (1st Cir. 2016).  For this reason, "[a] market definition which is confined to the seller's perspective is not meaningful." *Id.*

10.      In defining a product market, courts look to the Brown Shoe factors for guidance. *Sysco*, 113 F. Supp. 3d at 23-24.  The *Brown Shoe* factors are "industry or public recognition of

the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  The *Brown Shoe* factors as "evidentiary proxies for direct proof of substitutability." *Sysco*, 113 F. Supp. 3d at 23-24.  There are several Brown Shoe factors, but they all serve as "evidentiary proxies for direct proof of substitutability." *Id.*

11.     While courts often rely on expert economic testimony in evaluating market definition, expert testimony is not confined to empirical or econometric analysis.  See *McWane, Inc. v. FTC*, 783 F.3d 814, 829-30 (11th Cir. 2015).  Courts may infer substitutability from expert testimony without the aid of an econometric model.  *Id.*  Economic testimony is evaluated against the record as a whole to determine whether it is "consistent with the business realities" of the market.  *Sysco*, 113 F. Supp. 3d at 37.

12.     There is often no single correct market and courts recognize that "a broad product market may contain smaller markets which themselves constitute relevant product markets for antitrust purposes." *IQVIA*, 2024 WL 81232, at *24 (cleaned up); *see also Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022).  This is because competition may exist at different levels and therefore relevant antitrust markets may overlap.  *See Sysco*, 113 F. Supp. 3d at 49 (recognizing a broadline foodservice distribution market and a narrower market for broadline foodservice distribution to national customers).

13.     If market participants view a product as necessary or a "must-have," that product would have low sensitivity to price changes, would be unconstrained by other products' pricing, and would constitute a relevant product market.  *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 42

(D.D.C. 2023); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 111 (1984) (affirming antitrust market for college football broadcasts because they "generate[d] an audience uniquely attractive to advertisers").

14.     Plaintiff States have proven four relevant markets: the user-side general search services market and the advertiser-side general search text advertising, general search advertising, and search advertising markets, all in the United States.   No other product is "reasonably interchangeable" with general search services, which provide a one-stop-stop for users to seek out information and destinations across the full breadth of the internet, making them unique among digital platforms and other sources of information.  *United States. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 54 (D.D.C. 2011); JFOF ¶¶ 324-33.

15.     Each of the three advertising markets consists of ad products with distinct purposes that advertisers view differently from other ad types.  JFOF ¶¶ 399-418, 458-79; SFOF ¶¶ 4-38.  As compared to other ad types, they have disparate prices, features, buying practices, and customer bases.  JFOF ¶¶ 433, 480-82, 494-97; SFOF ¶¶ 39-65.  Moreover, a hypothetical monopolist in any of the three advertising markets could profitably raise prices above competitive levels.  JFOF ¶¶ 445-46, 498-99.  As a result, each advertising market constitutes a distinct, nested antitrust market.

## II.     GOOGLE HAS MONOPOLY POWER IN THE RELEVANT MARKETS

16.     A firm possesses monopoly power if it has "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

17.     Evidence of monopoly power can be direct or indirect.  *Microsoft*, 253 F.3d at 57. Where both direct and indirect evidence is presented, courts look to both in combination when analyzing monopoly power.  *Staples*, 970 F. Supp. at 1081-1086.

18.     Indirect evidence allows for an inference of monopoly power "from a firm's

possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51. "The principal measure of actual monopoly power is market share." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993); *see also Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984) ("A primary criterion used to assess the existence of monopoly power is the defendant's market share"). Market shares above 70% "comfortably exceeds the levels that courts ordinarily find sufficient to establish monopoly power." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 47-48 (D.D.C. 2022). High market shares that remain stable over time are given additional weight. *Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d at 52.

19.     High barriers to entry and expansion "prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citing *Microsoft*, 352 F.3d at 51). "[O]nly threats that are likely to materialize in the relativity near future" constrain a firm's ability to either raise prices above the competitive level or degrade quality below the competitive level. *Microsoft*, 253 F.3d at 57.

20.     Barriers to entry and expansion include (1) the need for large capital outlays, *Sysco*, 113 F.Supp.3d 1, 80 (D.D.C. 2015); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 171 (D.D.C. 2000); (2) embedded consumer preferences, *Sysco*, 113 F. Supp. 3d at 80 ("even if a newcomer were to make the substantial investment … there is not guarantee that customers will follow"); and (3) indirect and direct network effects, *Microsoft*, 253 F.3d at 55-56; *Facebook*, 581 F. Supp. 3d at 50.

21.     Customers' costs to switch to alternate products can also be a barrier to entry. *Facebook*, 581 F. Supp. 3d at 50-51; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 476-77 (1992). When switching costs are meaningful, they can deter customers from

switching away from a monopolist's product, and thus be more willing to tolerate higher prices or lower quality. *Facebook*, 581 F. Supp. 3d at 50-51. Switching costs include the costs of transferring the consumers history and experience with the existing product or service over to a new one, which may increase the longer the customer used the existing product. *Id*.

22.     In addition, a monopolist's anticompetitive conduct can itself be a barrier to entry. *United States v. Dentsply Intern., Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *McWane, Inc., A Corp., & Star Pipe Prod., Ltd. A Ltd. P'ship.*, 2014 WL 556261 (F.T.C. Jan. 30, 2014) *aff'd McWane, Corp. v. FTC*, 783 F.3d 814 (11th Cir. 2015).

23.     Direct evidence is "something a firm without a monopoly would have been unable to do" or behavior "difficult to explain unless [the defendant has] a monopoly product." *Microsoft*, 253 F.3d at 57–58. If there is direct evidence "that a firm has in fact profitably [controlled prices or excluded competition], the existence of monopoly power is clear." *Id*. at 51. For example, raising costs for customers who feel they must continue buying from the monopolist because they lack alternatives cannot be explained unless the defendant has monopoly power. SFOF ¶¶ 71-112.

24.     Evidence of sustained supracompetitive prices and margins are highly probative of monopoly power. *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("higher-than-competitive profits [are] a strong indication of market power"). Customer sensitivity to increases in prices or degradation of quality are seminal in determining whether a firm exercises monopoly power. *E.I. du Pont*, 351 U.S. at 400. Evidence of price sensitivities may come from the testimony and experience of buyers. *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003). When buyers have nowhere else to turn, a firm controls price and thus wields monopoly power. *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 374 (7th Cir. 1986) ("evidence

that even a steep increase in the price … would not have caused many subscribers to switch to substitute services" implies "a low elasticity of demand … and therefore monopoly power").

25.    Plaintiffs have proven Google's monopoly power in all four relevant markets through use of direct and indirect evidence.  Google's market share in all four markets has long exceeded 70%, and each market is insulated by high barriers to entry and expansion.  JFOF ¶¶ 522-58, 575-85, 602-08; SFOF ¶ 68.  Direct evidence of low user and advertiser responsiveness to price, customer acquisition cost increases, and quality decreases further confirm Google's monopoly power.  JFOF ¶¶ 563-74, 589-601, 627-724; SFOF ¶¶ 70-112.

## III.    GOOGLE ENGAGED IN TWO TYPES OF ANTICOMPETITIVE CONDUCT

26.    Courts use a three-step framework to determine if a monopolist's conduct is anticompetitive and thus violates Section 2.  SJ Decision at 21 (citing *Microsoft*, 253 F.3d at 50).

27.    *First*, Plaintiffs must make a prima facia showing that the conduct has an anticompetitive effect, meaning it "harm[ed] the competitive process and thereby consumers." *Id.  Second*, Google may offer procompetitive justifications for its conduct.  *Id.* at 21.  *Third*, if the non-pretextual procompetitive justifications are unrebutted, Plaintiffs must show that the anticompetitive harm outweighs the procompetitive benefit.  *Id.*

28.    This framework is the default mode of analysis and applies to all conduct challenged by Plaintiff States.  Some courts have developed different rules for discrete categories of conduct not at issue here.  For example, the Court recognized at summary judgment that a showing of "substantial foreclosure" only applies to challenges to exclusive dealing contracts, and thus is inapplicable to the challenge to Google's SA360 conduct since it is not premised on exclusive contracts.  *Id.* at 54 n. 20.

29.    Evidence of Google's intent "may help the court to interpret facts and to predict consequences."  *Microsoft*, 253 F.3d at 59; SJ Decision at 22.  "When courts consider the 'intent'

of a firm charged with monopolization, they look not to whether the firm intended to achieve or maintain a monopoly, but to whether the underlying purpose of the firm's conduct was to enable the firm to compete more effectively.  Did the firm engage in the challenged conduct for a legitimate business reason?  Or was the firm's conduct designed solely to insulate the firm from competitive pressure?"  *State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985)).

30.     At the first step, Plaintiffs must prove conduct that "tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen*, 472 U.S. at 605 n.32).  Courts recognize "the means of illicit exclusion, like the means of legitimate competition, are myriad," *Microsoft*, 253 F.3d at 58, and anticompetitive conduct "can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."  *Caribbean Broadcasting System v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998).

31.     The relevant question is not how Google *obtained* its monopoly power, but rather what actions it has taken to *maintain* that power.  "[E]ven the monopolist whose market position results from superior skill, natural advantages, scale economies, and the like may engage in unlawful exclusionary practices."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 618 (Fifth Ed. 2023).  "[I]f the dominant firm marketed or structured its product in a way that made it more difficult for rivals or potential rivals to sell their product and if this marketing or restructuring was not reasonably necessary to improve the defendant's own product, … then the dominant firm has violated § 2."  *Id.* ¶ 651c.

32.     To prove the prima facie case, Plaintiffs need only show that Google's conduct "reasonably appears capable of making a significant contribution to maintaining monopoly power." *Microsoft*, 253 F.3d at 79.  This "rather edentulous [*i.e.*, toothless] test" does not require "direct proof that [Google's] continued monopoly power is precisely attributable to its anticompetitive conduct" because "[t]o some degree, the defendant is made to suffer the uncertain consequences of its own undesirable conduct." *Id.*  Put another way, "[t]o require that Section 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." *Id.*

33.     At the second step, Google must "specif[y] and substantiate ... [its] claims" and prove that its "conduct serves a purpose other than protecting its … monopoly." *Microsoft*, 253 F.3d at 66-67.  Proffered procompetitive justifications must be "nonpretextual," *Microsoft*, 253 F.3d at 59, and courts evaluate whether the proffered justifications "are merely ... an excuse to cover up different and anticompetitive reasons." *McWane*, 783 F.3d at 841-42.  "The more compelling the prima facie case, the more evidence [Google] must present to rebut it successfully." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001).  In evaluating whether a justification is genuine or pretextual, courts often give greater weight to "contemporaneous email exchanges" and other ordinary course documents rather than "in-court attempts to explain or disavow those documented exchanges." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 70 (D.D.C. 2017); *McWane*, 783 F.3d at 841-42.

34.     Plaintiff States have satisfied the prima facie case of anticompetitive conduct as to both Google's exclusive distribution contracts and its degraded support for Microsoft Ads features on SA360.  JFOF ¶¶ 728-943; SFOF ¶¶ 113-272.

35.     The record establishes that Google's distribution contracts are exclusive and substantially foreclose competition in all relevant markets.  JFOF ¶¶ 728-970.  In addition, Google's distribution contracts harm its rivals through a "downstream effect" of making them less attractive partners to SVPs, thereby further insolating Google's monopolies from erosion.  SFOF ¶¶ 285-301; SJ Decision at 54 (recognizing that Google's conduct with respect to SVPs can be a "downstream effect of Google's distribution agreements" because "Google's distribution agreements limit its rivals' ability to attract users," which "weakens Google's rivals, and make them less attractive partners to SVPs," and, in turn, "depresses Google's rivals' ability to compete for general search users").

36.     The record also establishes that Google operates SA360 to enhance its monopoly profits at the expense of its own customers.  Google does this by denying cross-engine support for key Microsoft Ads features like auction-time bidding, which Google knows that advertisers want because it dramatically improves the productivity of their ad campaigns.  SFOF ¶¶ 195-206, 217-55.  The result is that Google uses its existing monopoly power to harm advertisers, harm Google's rivals, and harm competition in search advertising markets.  SFOF ¶¶ 256-72.

37.     Google has not proven procompetitive justifications for any of its anticompetitive conduct.  As to the exclusive distribution contracts, Google relies on justifications that lack sufficient evidence, are not procompetitive, are pretextual, are improperly premised on out-of-market-effects, and/or are attainable through less-restrictive alternatives.  JFOF ¶¶ 1230-78.  Likewise, all of Google's proffered excuses and procompetitive justifications for its SA360 conduct are pretextual and unsupported by the record.  SFOF ¶¶ 273-80.

## IV.     THE "DUTY TO DEAL" DOCTRINE IS INAPPLICABLE

38.     The right of a private business to choose whom they do business with is a qualified right under the Sherman Act.  *See Lorain Journal Co. v. United States*, 342 U.S. 143,

155 (1951).  Accordingly, "a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  The limited "duty to deal" doctrine has no application where, as here, a monopolist maintains an ongoing, voluntary course of dealing and manipulates that course of dealing to prevent customers from utilizing a rival's product—thus harming both rivals and the monopolist's own customers.

39.     That principle was the basis for the Supreme Court's decisions in *Trinko* and *linkLine* because both concerned regulatory schemes that *compelled* a party to deal with its rivals. *Trinko*, 540 U.S. 398, 409 ("The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion."); *Pacific Bell Telephone Co. v. linkLine Comm., Inc.*, 555 U.S. 438, 450 (2009) (defendant's course of dealing with plaintiffs "arises only from FCC regulations"); *see also Covad Comm. v. Bell Atlantic Corp.*, 398 F.3d 666, 673 (D.C. Cir. 2005) (dismissing antitrust claims because plaintiff "alleges neither that [defendant] had at one time voluntarily dealt with [plaintiff] nor that it would ever have been in [defendant's] interest to have done so.").

40.     The animating concern in *Trinko* is that if a party would never have engaged in a course of dealing absent compulsion, that party's "prior conduct sheds no light upon the motivation of its refusal to deal" and whether it was "prompted not by competitive zeal but by anticompetitive malice."  540 U.S. at 409.  That concern is not present for a voluntary course of dealing, which "supports a presumption that the joint arrangement was efficient and profitable," *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 456 (7th Cir. 2020), and thus permits a reasonable inference that the monopolist's disparate treatment of a rival is motivated by anticompetitive malice.  *See Lorain Journal*, 342 U.S. at 155.

12

41.     Court routinely reject application of the "duty to deal" doctrine in antitrust challenges to voluntary, ongoing business relationships.  *See Trinko*, 540 U.S. at 410 (distinguishing *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), in which "the defendant was already in the business of providing a service to certain customers … and refused to provide the same service to certain other customers"); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 251 n.86 (S.D.N.Y. 2004) (distinguishing *Trinko* from allegation of "a five-year-long course of dealing"); *Safeway v. Abbott Laboratories*, 761 F. Supp. 2d 874, 894 (N.D. Cal. 2011) ("liability under Section 2 could arise if a defendant unilaterally alters a voluntary course of dealing"); *Parson v. Bright House Networks, LLC*, 2010 WL 5094258, at *8 (N.D. Ala. 2010) ("*Trinko* is distinguishable" and a tying claim is actionable where "plaintiff's antitrust claim would exist even absent the FCC's regulations").

42.     Google's broad reading of *Trinko* as applying to *all dealings* between a monopolist and its actual and potential rivals would immunize vast categories of illegal and anticompetitive conduct, such as exclusive dealing or tying claim.  *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 655 (2d Cir. 2015) (defendants' decision to withdraw a product and introduce a new product is anticompetitive because it "sought to deprive consumers [the] choice" of selecting a competitor); *US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) (contractual restraints of trade, beyond exclusive deals or rebate schemes, may violate Section 2).  That is not the law.

43.     A monopolist cannot shield itself from antitrust scrutiny when their conduct interferes with a rival's relationship with their customers.  *Lorain Journal*, 342 U.S. at 149-50. The Court has already recognized this is the core issue here.  SJ Decision at 56 ("The issue is

13

whether Google's delayed rollout of SA360 support for Microsoft Ads inhibited or dissuaded advertisers from placing ads on its competitor's search engine, thereby harming competition in the general search advertising market.").

44.      This type of interference with customer relationships is precisely the assay into the marketplace commonly ascribed to exclusive dealing or tying claims.  *Novell, Inc.*, 731 F.3d 1072 (10th Cir. 2013).  This type of behavior is "categorically different from unilateral conduct that involves only the monopolist's competitors, such as its refusal to deal with them."  *New York v. Facebook*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021); *cf. ZF Meritor v. Eaton Corp.*, 696 F.3d 254, 287 (3rd Cir. 2012) (defendant's conduct "limited the ability of [its rival] to effectively market its products, and limited the ability of [buyers] to choose from a full menu" of products).

45.      The D.C. Circuit's recent application of *Trinko* in *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023), exemplifies this distinction.  In affirming the lower court's grant of a motion to dismiss, the *Meta* court emphasized that the challenged dealing had stopped and that the challenged policy applied to products directly competitive with the Facebook platform.  *Id.* at 305 ("Facebook was prohibiting developers from using Facebook's Platform to duplicate Facebook's core products").  In addition, as explained by the lower court, the challenged conduct was not alleged to have "interfere[d] with the relationship between rivals and third parties."  *Facebook*, 549 F. Supp. 3d at 31-32; *see also Lorain Journal*, 342 U.S. at 149-50, 155.  Here (and unlike in *Meta*), Google's operation of SA360 expressly interfered with the ability of advertisers to use Microsoft features that they would find advantageous.  SFOF ¶¶ 257-62.

Dated: February 9, 2024          Respectfully submitted,


FOR PLAINTIFF STATE OF COLORADO

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365 (inactive)
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

Joseph M. Conrad, Assistant Attorney General
Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mail: Joseph.Conrad@nebraska.gov
Colin.Snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF ARIZONA

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov
        Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*


FOR PLAINTIFF STATE OF NEW YORK

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the Attorney General of New York
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*


FOR PLAINTIFF STATE OF NORTH CAROLINA

Kunal Janak Choksi
Joshua Daniel Abram
Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

17

FOR PLAINTIFF STATE OF TENNESSEE

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*


FOR PLAINTIFF STATE OF UTAH

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff State of Utah*


FOR PLAINTIFF STATE OF ALASKA

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF CONNECTICUT

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF DELAWARE

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

FOR PLAINTIFF DISTRICT OF COLUMBIA

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

FOR PLAINTIFF TERRITORY OF GUAM

Fred Nishihira, Chief, Consumer Protection Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324

*Counsel for Plaintiff Territory Guam*

FOR PLAINTIFF STATE OF HAWAI'I

Rodney I. Kimura
Department of the Attorney General, State of Hawai'i
Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*


FOR PLAINTIFF STATE OF IDAHO

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720 Boise, ID 83720
Telephone: (208) 334-4114
E-Mail:  John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*


FOR PLAINTIFF STATE OF ILLINOIS

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
        Brian.yost@ilag.gov
        Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


FOR PLAINTIFF STATE OF MAINE

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*


FOR PLAINTIFF STATE OF MARYLAND

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-Mail: William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*


FOR PLAINTIFF STATE OF MINNESOTA

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF NEVADA

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW HAMPSHIRE

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*


FOR PLAINTIFF STATE OF NEW JERSEY

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*


FOR PLAINTIFF STATE OF NEW MEXICO

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NORTH DAKOTA

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*


FOR PLAINTIFF STATE OF OHIO

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*


FOR THE PLAINTIFF STATE OF OKLAHOMA

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OF OREGON

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*


FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*


FOR PLAINTIFF TERRITORY OF PUERTO RICO

Guarionex Diaz Martinez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

FOR PLAINTIFF STATE OF RHODE ISLAND

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*


FOR PLAINTIFF STATE OF SOUTH DAKOTA

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*


FOR PLAINTIFF STATE OF VERMONT

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*


FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

FOR PLAINTIFF STATE OF WASHINGTON

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WEST VIRGINIA

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

FOR PLAINTIFF STATE OF WYOMING

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff State of Wyoming*

## <u>CERTIFICATE ON SERVICE</u>

On February 9, 2024, I served this Plaintiff States' Proposed Conclusions of Law by email on counsel for Google and counsel for DOJ Plaintiffs in the above-captioned matters.


February 9, 2024                          */s/ Matthew McKinley*

                                          Matthew McKinley

                                          *Counsel for Plaintiff States*