**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ██████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ██████████████ |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO
DEFENDANT'S PROPOSED FINDINGS OF FACT**

March 22, 2024 [Corrected April 30, 2024]

## TABLE OF CONTENTS

I.     **GOOGLE'S EARLY HISTORY DOES NOT DEMONSTRATE THAT RIVALS CAN SUCCESSFULLY COMPETE TODAY** ............................................................. 2

II.    **GOOGLE'S EXCLUSIONARY CONDUCT DIMINISHES COMPETITION IN THE RELEVANT MARKETS** .................................................................................. 3

III.   **GOOGLE'S SCALE GIVES IT AN ENORMOUS COMPETITIVE ADVANTAGE** ............................................................................................................. 5

     A.     Innovation Opportunities Remain ...................................................................... 5

     B.     Scale Fuels Google's Development Cycle ......................................................... 5

     C.     Scale Fuels Mobile Search Quality ................................................................... 8

     D.     Scale Drives Incentives To Invest And Search Innovation .............................. 11

     E.     Google's Scale Advantages Entrench Its Position In The Search Ads Markets ........ 11

IV.   **THE IMPORTANCE OF SCALE TO SEARCH QUALITY** .................................. 12

     A.     Many Aspects Of A GSE Benefit From User-Side Data ................................. 12

     B.     User-Side Data At Scale Is Vital To A GSE ................................................... 15

     C.     Scale Led To Bing Quality Improvements And Microsoft Acknowledges The Importance Of Scale ........................................................................................ 19

     D.     The Data Reduction Experiment Is Unreliable ............................................... 20

V.    **RIVAL GENERAL SEARCH ENGINE OVERVIEW** ............................................. 28

     A.     Despite Its Massive Investments And Technical Expertise, Microsoft Has Not Been Able To Meaningfully Compete In General Search .................................. 28

     B.     Lack Of Distribution And Scale Limited DuckDuckGo's Growth And Improvement ....................................................................................................... 30

     C.     Yahoo Does Not Pose A Meaningful Competitive Threat To Google ............. 33

     D.     Neeva's Failure Illustrates The Entry Barriers In General Search Services ........ 34

VI.   **VERTICAL/SPECIALIZED SEARCH ENGINES** ................................................. 35

VII.   **ECONOMICS BEHIND SEARCH ENGINE DISTRIBUTION AGREEMENTS** .. 38

     A.     Google's Exclusionary Contracts Provide Incremental Search Volume To Google Because Defaults Dictate Where Many Users Will Search ............................... 38

     B.     Google's Exclusionary Contracts Provide Incremental Search Volume To Google By Requiring Distributors To Give Google Search Prominent Placement .................... 40

     C.     Google's Proposed Benchmarks Are Inapplicable And Outdated ................... 41

     D.     Revenue Share Agreements Can Exist Without Exclusive Default Requirements .... 43

E.     Real-World Precedent Supports Unconditional Revenue Share And Choice Screens43

VIII.  SEARCH DISTRIBUTION/DEFAULT DEALS ................................................... **47**

A.     Google Has A Long History Of Default Distribution On Windows PCs.................. 47

B.     Portal/Homepage Default Deals ............................................................................. 48

C.     Google Had Exclusive Distribution Agreements For Early Mobile Phones ............ 48

D.     Plaintiffs Are Challenging Google's Use Of Exclusionary Contracts, Not Browser Developers' Choices................................................................................................ 48

E.     The Early Days Of Android Distribution Do Not Diminish The Importance Or Impact Of Defaults Or Google's Exclusionary Contracts.................................................... 49

F.     Google's Development Of The Chrome Browser................................................... 49

IX.   MARKET DEFINITIONS ........................................................................................ **51**

A.     General Search Services In The United States Is A Relevant Market ...................... 51

1.     SVPs Are Not Reasonably Interchangeable With GSEs And Do Not Impose A Sufficient Competitive Constraint On A Hypothetical GSE Monopolist ............ 52

2.     Rival GSEs Do Not Impose A Sufficient Competitive Constraint On Google .... 56

3.     Social Media Platforms And Generative AI Systems Do Not Impose Sufficient Competitive Constraints On A Hypothetical GSE Monopolist ......................... 56

B.     Search Ads And Text Ads In The United States Are Relevant Markets.................. 57

1.     Advertisers' Budgeting Of Overall Spend Across Advertising Channels Does Not Show Other Ad Channels Are Reasonably Substitutable For Search Ads .......... 57

2.     Search Ads And Other Digital Ads Are Not Reasonably Interchangeable.......... 60

3.     Advertisers Recognize Text Ads As Distinct Products....................................... 65

4.     Google, Advertisers, And Other Industry Participants Use The Marketing Funnel To Illustrate Distinctions Among Different Advertising Channels..................... 66

X.    GOOGLE HAS MONOPOLY POWER ................................................................... **68**

A.     Google Would Invest And Innovate More, And Increase Quality And Privacy, If Faced With Greater Competitive Pressure .............................................................. 69

B.     Increased Competition Would Drive Greater Innovation ........................................ 69

C.     There Would Be Better Search Privacy Absent Google's Exclusionary Conduct..... 70

D.     Evidence From Advertisers, Google, Industry Participants, And Experts Show Google's Monopoly Power In Both Advertising Markets ....................................... 71

E.     Google Fails To Show Quality Improvements Justified Its CPC Increases ............. 72

1.     Dr. Israel's Quality Metrics Cannot Compute Quality-Adjusted Prices............. 72

2.     Google Has Raised Prices In The Advertising Markets Without Losing Share ... 75

3.      Trends In Digital Advertising Show Google's Durable Monopoly Power .......... 80

4.      Google Reduced The Quality Of Its Search Advertising Products ..................... 81

XI.     **GOOGLE'S EXCLUSIVE DEFAULT AGREEMENTS WITH APPLE AND MOZILLA ARE ANTICOMPETITIVE** ................................................................ **83**

A.      The ISA Excludes Rivals ....................................................................... 83

1.      The ISA Locks Up The Safari Default ............................................... 83

2.      Google Mischaracterizes The ISA Negotiations ............................... 84

3.      The Safari Default Is By Far The Most Important Means Of Search Distribution On Apple Devices ........................................................................................ 85

4.      The ISA Limits Apple's Product Design And Keeps Apple Out Of Search ........ 87

5.      Bing's Inability To Compete For The Safari Default ......................... 90

6.      DuckDuckGo's Inability To Compete For The Safari Default (Including In Private Browsing Mode) .................................................................................... 92

B.      The Mozilla Revenue Share Agreement Excludes Rivals ....................... 93

C.      Google's Agreements With Apple And Mozilla Substantially Foreclose Competition ..................................................................................................................... 96

D.      Google's Browser Default Search Agreements Harm Competition ...................... 100

E.      Browser Default Agreements Harden Google's Monopoly ................................... 103

XII.    **GOOGLE'S EXCLUSIVE DEFAULT AGREEMENTS WITH ANDROID OEMS AND CARRIERS ARE ANTICOMPETITIVE** ................................................. **103**

A.      Google's MADAs Contribute To Exclusivity ....................................... 103

B.      Google's RSAs Contribute To Exclusivity ............................................ 104

C.      Android Partners Are Constrained By Google's MADA And RSA ....................... 106

D.      Google's Android Agreements Have Interfered With Rival Distribution .............. 107

E.      Rivals Have Little Ability To Distribute On Android Today ................................ 109

F.      Google's Android Agreements Substantially Foreclose Competition .................... 111

G.      Branch Metrics, Inc. ........................................................................... 112

H.      Google's Android Agreements Harm Search Competition .................................... 117

I.      Google Has Failed To Demonstrate Its Exclusive Android Agreements Promote Smartphone Competition ..................................................................................... 118

**Appendix: Cited Exhibits Used With A Witness** ........................................................ **APP-1**

**Abbreviations**

| | |
|---|---|
| API | Application Programming Interface |
| CPC | Cost Per Click |
| CPM | Cost Per Mille (thousand impressions) |
| CTR | Click-Through Rate |
| DHP | Default Home Page |
| DRE | Data Reduction Experiment |
| DSE | Default Search Engine |
| EU | European Union |
| GMS | Google Mobile Services |
| GPS | Google Play Services |
| GSA | Google Search App |
| GSE | General Search Engine |
| GTM | Go To Market |
| IS | Information Satisfaction |
| ISA | Information Services Agreement (for Apple) |
| JCA | Joint Cooperation Agreement (for Apple) |
| LTV | Long-Term Value |
| MADA | Mobile Application Distribution Agreement (for Android) |
| MIA | Mobile Incentive Agreement (for Android) |
| ML | Machine Learning |
| MSIA | Mobile Service Incentive Agreement (for Android) |
| OEM | Original Equipment Manufacturer |
| OKR | Objectives And Key Results |
| OS | Operating System |
| pCQ | Predicted Creative Quality |
| pCTR | Predicted Click-Through Rate |
| PLA | Product Listing Ad |
| pLQ | Predicted Landing Page Quality |
| rGSP | Randomized Generalized Second Price |
| ROAS | Return On Ad Spend |
| ROI | Return On Investment |
| RPM | Revenue Per Mille (thousand queries) |
| RSA | Revenue Share Agreement (for Android) |
| SERP | Search Engine Result Page |
| SQR | Search Query Report |
| SVP | Specialized Vertical Provider |
| TAC | Traffic Acquisition Cost |

(Updated by adding entries to version in Plaintiffs' Proposed Findings of Fact, ECF No. 822)

**Citations to Post-Trial Filings**

| Citation | Post-Trial Filing |
|---|---|
| Def. PFOF | Defendant's Proposed Findings of Fact, ECF No. 828 |
| Def. PTB | Defendant's Post-Trial Brief, ECF No. 826 |
| Pls. PCOL | Plaintiffs' Proposed Conclusions of Law, ECF No. 821 |
| Pls. PFOF | Plaintiffs' Proposed Findings of Fact, ECF No. 822 |
| Pls. PTB | Plaintiffs' Post-Trial Brief, ECF No. 820 |
| Pls. RPCOL | Plaintiffs' Response to Defendant's Proposed Conclusions of Law (filed Mar. 22, 2024) |

**Citations to Witness Testimony**

Trial Transcript:
  **Tr. [PP:LL]–[PP:LL] ([*witness last name* ([*affiliation*]))**
  e.g., Tr. 2204:4–2205:21 (Giannandrea (Apple)); Tr. 4610:12–22 (Whinston (Pls. Expert))

Designated Testimony:
  **Des. Tr. [PP:LL]–[PP:LL] ([deponent last name] ([affiliation]) Dep.)**
  e.g., Des. Tr. 21:18–22:1, 41:23–42:10 (James (Amazon) Dep.); Des. Tr. 82:7–22, 83:13–24 (Apple-EC 30(b)(6) Dep.)

| Witness | Appearance in Citations |
|---|---|
| Austin, Alex, Branch Metrics | **(Austin (Branch))** |
| Alberts, Brendan, Dentsu | **(Alberts (Dentsu) Dep.)** |
| Apple 30(b)(6):<br>    Cue, Eduardo (30(b)(6)) | **(Apple-EC 30(b)(6) Dep.)** |
| Baker, W. Mitchell, Mozilla | **(Baker (Mozilla) Dep.)** |
| Barton, Christopher, *former* Google | **(Barton (Google))** |
| Baxter, Timothy, Samsung | **(Baxter (Samsung) Dep.)** |
| Booth, Ryan, The Home Depot | **(Booth (The Home Depot))** |
| Braddi, Joan, Google | **(Braddi (Google))** |
| Chang, Patrick, Samsung Next | **(Chang (Samsung Next))** |
| Christensen, Eric, Motorola | **(Christensen (Motorola) Dep.)** |
| Chu, Penny, Google | **(Chu (Google) Dep.)** |
| Connell, Derrick, *former* Microsoft | **(Connell (Microsoft) Dep.)** |
| Cue, Eduardo, Apple | **(Cue (Apple))** |
| Dacey, Matthew, TripAdvisor | **(Dacey (TripAdvisor) Dep.)** |
| Daniels, Alexander, Thumbtack | **(Daniels (Thumbtack) Dep.)** |
| Dijk, Arjan, Booking.com | **(Dijk (Booking.com))** |
| Dischler, Jerry, Google | **(Dischler (Google))** |
| Edwards, Catherine, Google | **(Edwards (Google) Dep.)** |
| Ezell, Jeffrey, AT&T | **(Ezell (AT&T) Dep.)** |

| Witness | Appearance in Citations |
|---------|------------------------|
| Fitzpatrick, Jennifer, Google | **(Fitzpatrick (Google))** |
| Fox, Edward, Defendant's Expert | **(Fox (Def. Expert))** |
| Fox, Nicholas, Google | **(Fox (Google) Dep.)** |
| Giannandrea, John, Apple & *former* Google | **(Giannandrea (Apple))** |
| Giard, Jeffrey, T-Mobile | **(Giard (T-Mobile) Dep.)** |
| Gomes, Benedict, Google | **(Gomes (Google))** |
| Google 30(b)(6):<br>    Fox, Nicholas (30(b)(6))<br>    Grey, Rachel (30(b)(6) (Sept. 24, 2021))<br>    Grey, Rachel (30(b)(6) (May 5, 2022))<br>    Nayak, P. Pandurang (30(b)(6)) | **(Google-NF 30(b)(6) Dep.)**<br>**(Google-RG1 30(b)(6) Dep.)**<br>**(Google-RG2 30(b)(6) Dep.)**<br>**(Google-PN 30(b)(6) Dep.)** |
| Higgins, Brian, Verizon | **(Higgins (Verizon))** |
| Holden, Richard, Google | **(Holden (Google))** |
| Hurst, Jeff, Expedia Group | **(Hurst (Expedia))** |
| Israel, Mark, Defendant's Expert | **(Israel (Def. Expert))** |
| Jain, Sundeep, *former* Google | **(Jain (Google) Dep.)** |
| James, Mike, Amazon.com | **(James (Amazon) Dep.)** |
| Jerath, Kinshuk, Plaintiffs' Expert | **(Jerath (Pls. Expert))** |
| Juda, Adam, Google | **(Juda (Google))** |
| Kartasheva, Anna, Google | **(Kartasheva (Google))** |
| Kolotouros, James, Google | **(Kolotouros (Google))** |
| Krueger, Ryan, Google | **(R. Krueger (Google))** |
| Lehman, Eric, *former* Google | **(Lehman (Google))** |
| Levine, Zahava, *former* Google | **(Levine (Google) Dep.)** |
| Levy, Daniel, Meta (Facebook) | **(Levy (Meta) Dep.)** |
| Lim, Tracy-Ann, JPMorgan Chase | **(Lim (JPMorgan))** |
| Lowcock, Joshua, Interpublic Group | **(Lowcock (IPG))** |
| McAteer, John, Google | **(McAteer (Google) Dep.)** |
| McCallister, Adrienne, Google | **(McCallister (Google))** |
| Miller, Andrew, Google | **(Miller (Google) Dep.)** |
| Moxley, Emily, Google | **(Moxley (Google) Dep.)** |
| Murphy, Kevin, Defendant's Expert | **(Murphy (Def. Expert))** |
| Nadella, Satya, Microsoft | **(Nadella (Microsoft))** |
| Nayak, P. Pandurang, Google | **(Nayak (Google))** |
| Neil Barrett-Bowen, Microsoft | **(Barrett-Bowen (Microsoft))** |
| Oard, Doug, Plaintiffs' Expert | **(Oard (Pls. Expert))** |
| Osmond, Charlie, Triptease | **(Osmond (Triptease) Dep.)** |
| Parakhin, Mikhail, Microsoft | **(Parakhin (Microsoft))** |
| Perica, Adrian, Apple | **(Perica (Apple) Dep.)** |
| Pichai, Sundar, Google | **(Pichai (Google))** |
| Porat, Ruth, Google | **(Porat (Google) Dep.)** |

| Witness | Appearance in Citations |
|---|---|
| Raghavan, Prabhakar, Google | (Raghavan (Google)) |
| Ramalingam, Ramesh, *former* Yahoo | (Ramalingam (Yahoo) Dep.) |
| Ramaswamy, Sridhar, Neeva & *former* Google | (Ramaswamy (Neeva)) |
| Rangel, Antonio, Plaintiffs' Expert | (Rangel (Pls. Expert)) |
| Raymond, Christie, Kohl's | (Raymond (Kohl's) Dep.) |
| Reid (Hamon Reid), Elizabeth, Google | (Reid (Google)) |
| Ribas, Jordi, Microsoft | (Ribas (Microsoft) Dep.) |
| Rosenberg, Jamie, Google | (Rosenberg (Google)) |
| Roszak, Michael, Google | (Roszak (Google)) |
| Silverman, Andrew, Google | (Silverman (Google) Dep.) |
| Soo, Debby, Booking (OpenTable) | (Soo (OpenTable) Dep.) |
| Stein, Mark, IAC (ANGI) | (Stein (IAC) Dep.) |
| Tinter, Jon, Microsoft | (Tinter (Microsoft)) |
| Utter, Brian, Microsoft | (Utter (Microsoft) Dep.) |
| Vallez, Paul, Skai | (Vallez (Skai)) |
| van der Kooi, Rik, *former* Microsoft | (van der Kooi (Microsoft) Dep.) |
| Varia, Amit, Google | (Varia (Google)) |
| Varian, Hal, Google | (Varian (Google)) |
| Weinberg, Gabriel, DuckDuckGo | (Weinberg (DuckDuckGo)) |
| Whinston, Michael, Plaintiffs' Expert | (Whinston (Pls. Expert)) |
| Yoo, Jonathan, Google | (Yoo (Google)) |

(Updated by adding entries to version in Plaintiffs' Proposed Findings of Fact, ECF No. 822)

2001.   Nothing in Google's Proposed Findings of Fact excuses its anticompetitive conduct.

2002.   Although this is a monopoly maintenance case, many of Google's proposed findings focus on Google's rise to monopoly power, which is not the subject of Plaintiffs' allegations and during which market conditions were much different than they are today. *E.g.*, Def. PFOF §§ I, III.B.1, III.C.1–2, V.A.1–2, V.C.1–2, VIII.B.

2003.   At nearly every turn, Google incorrectly suggests that Plaintiffs must reconstruct the hypothetical marketplace that would have existed absent Google's anticompetitive conduct over the last decade. *E.g.*, Def. PFOF ¶¶ 793–795, 798, 814, 1082, 1084, 1122, 1125, 1418–1419, 1608, 1610, 1619; *see also* Pls. RPCOL § III.A.1.

2004.   Many of Google's proposed findings are unsupported or rely on demonstratives that are not supported by record evidence. *E.g.*, *infra* ¶¶ 2042, 2062, 2085, 2139, 2176, 2224, 2277, 2335, 2347, 2403, 2461, 2466, 2468, 2469, 2470, 2475.

2005.   Repeatedly, Google relies on embedded hearsay contained within exhibits for the truth of the matter asserted even though these exhibits were admitted subject to a hearsay objection at trial.[1]

2006.   To be useful to the Court, Plaintiffs' responsive findings track Google's structure.[2] Given space constraints, Plaintiffs focus on the facts most relevant to the case.

---

[1] Google improperly relies on the following exhibits admitted subject to hearsay objections: DX0081, DX0173, DX0384, DX0386, DX0387, DX0393, DX0415, DX0423, DX0439, DX0479, DX0481, DX0547, DX0696, DX0697, DX0698, DX0714.

[2] The paragraph numbers for Plaintiffs' responses begin at 2001 to avoid any overlap with Plaintiffs' original Proposed Findings of Fact. Plaintiffs have identified in parentheses at the beginning of each response Defendant's Proposed Findings of Fact that are the subject of each response. Any decision by Plaintiffs not to respond to or address a specific paragraph in Defendant's proposed findings is not and should not be viewed as agreement or concession with that paragraph.

# I.   GOOGLE'S EARLY HISTORY DOES NOT DEMONSTRATE THAT RIVALS CAN SUCCESSFULLY COMPETE TODAY

2007.   (Def. PFOF ¶¶ 16–29): In the late 1990s and early 2000s, when there were far more GSE competitors than today, GSEs did not collect and deploy user-side data as they do now. Tr. 10389:23–10390:9 (Oard (Pls. Expert)). It was not until the mid-2000s that GSEs began to collect and deploy user-side data. *Id.* By 2008, Google publicly acknowledged that user-side data was integral to improving its search quality. Tr. 227:1–12, 228:8–229:8 (Varian (Google)) (discussing UPX0862 and explaining, in March 2008, data was integral "to making web search valuable to our users"); *id.* 266:3–269:5 (discussing UPX0856 at -345 quoting Google's Chief Scientist, Peter Norvig's 2010 statement that "We don't have better algorithms than anyone else, we just have more data"). Because of how general search engines now collect and deploy user-side data, Pls. PFOF ¶¶ 159–207 (§ III.E), having a scale advantage is critical to a GSE's success in contrast to the late 1990s and early 2000s, Tr. 10395:9–21 (Oard (Pls. Expert)).

2008.   (Def. PFOF ¶ 30): Google omits key parts of Prof. Whinston's testimony regarding the diminished importance of web links to a GSE's success today. Prof. Whinston explained that, in approximately 2005, "[Google] figured out that user clicks are actually even more valuable or beneficial than using these web links, hyperlinks, then suddenly scale really started to matter." Tr. 5931:2–5932:4 (Whinston (Pls. Expert)).

2009.   (Def. PFOF ¶¶ 31–36). The availability of scale influences a general search engine's ability to invest, including in its index. Pls. PFOF ¶¶ 1067–1125 (§ VIII.B). Thus, indexing is not divorced from scale, *id.* ¶ 168, because "if you don't have scale, you cannot have high quality index." Tr. 2666:21–2667:12 (Parakhin (Microsoft)).

2010.   (Def. PFOF ¶¶ 37, 44–46): Scale fuels GSE development and innovation. Pls. PFOF ¶¶ 159–207 (§ III.E), 978–1066 (§ VIII.A). As early as 2008, Google's Chief Economist

acknowledged that data was "a critical component of future breakthroughs." Tr. 228:23–229:8 (Varian (Google)). It is undisputed that an important way to improve user experience is by "look[ing] at . . . queries and look[ing] at the results and say[ing] how can we be doing better on each of those queries." Def. PFOF ¶ 43 (citing Tr. 8015:18–8017:2 (Gomes (Google))).

2011.   (Def. PFOF ¶¶ 47–52): Google's success on Windows PCs before 2014 does not prove that rivals can compete against Google today. Google did not have to dislodge an established search monopolist with enormous scale. Moreover, to the extent that default agreements were in place on Windows PCs, they applied to desktop queries, for which defaults are less powerful than they are for mobile queries. Pls. PFOF ¶¶ 919–923.

## II.   GOOGLE'S EXCLUSIONARY CONDUCT DIMINISHES COMPETITION IN THE RELEVANT MARKETS

2012.   (Def. PFOF ¶ 53): Google's exclusionary conduct diminishes any competition that exists in the relevant markets. Pls. PFOF ¶¶ 977, 1136, 1231, 1242–1256 (§§ X.A.1.b–c).

2013.   (Def. PFOF ¶ 55): In determining search engine usage, the default effect is greater than search results quality, Pls. PFOF ¶ 878, and default status is the most significant factor in whether a user will switch search engines. Pls. PFOF ¶¶ 868–943 (§ VI.D).

2014.   (Def. PFOF ¶ 58): Google offers users fewer privacy options and, by default, collects more consumer data than it would in a competitive world. Pls. PFOF ¶¶ 1137–1159 (§ VIII.C.2).

2015.   (Def. PFOF ¶¶ 59–60) *Infra* ¶¶ 2226–2233.

2016.   (Def. PFOF ¶¶ 61, 64–69) To the extent ad quality enables a GSE to maintain or increase its user base, Google's scale provides it another advantage over rivals. Google concedes it relies on user-side data to train the machine learning models it uses to predict ad quality and match relevant ads to queries. Def. PFOF ¶ 65. Scale gives Google an advantage in this

functionality, Pls. PFOF ¶¶ 201, 1035–1045 (§§ VIII.A.4.a-b), as well as in monetizing Search Ads by increasing auction pressure and the pool of available ads, Pls. PFOF ¶¶ 202, 1046–1060 (§§ VIII.A.4.c–e) (scale benefits to Search Ads); Tr. 3521:7–3522:9 (Nadella (Microsoft)) (Yahoo syndication deal improved "auction density" on desktop by increasing scale .).

2017.  [Intentionally Left Blank]

2018.  (Def. PFOF ¶¶ 62, 70) In 2015–2016 launches, Google doubled (from two to four) the number of ads that could appear at the top of its SERPs. *Infra* ¶ 2275. In doing so, Google recognized that "there was some level of dissatisfaction with the increase in ad load, but not sufficient to outweigh the benefits to Google." Des. Tr. 164:8–12 (Jain (Google) Dep.) (discussing UPX0746 at -315–16); *id*. 160:12–21; UPX0746 at -314.

2019.  (Def. PFOF ¶¶ 71–74): Because there is no meaningful "competition for the contract" against Google, Pls. PFOF ¶¶ 1249–1255, no rival search engine has secured default distribution for any smartphone or browser since 2014, *id*. ¶ 1262. Google has not shown that the "price competition" it describes benefits end users of search products. Rather, distributors are incentivized to enter contracts with dominant firms, even if those contracts harm the long-term interests of the public and distributors. *Id*. ¶¶ 1231–1248 (§ X.A.1). Google did not present evidence or attempt to quantify how consumers meaningfully benefit from this purported "price competition." *Id*. ¶¶ 1249–1278 (§ X.A.2).

2020.  (Def. PFOF ¶ 75): Because rivals do not win and retain defaults where there is a dominant firm, "competition for the contract" does not reliably lower rivals' barriers to entry or expansion. *Id*. ¶¶ 1242–1248 (§§ X.A.1.b-c). Dominant firms earn monopoly profits and can thus outbid rivals for distribution, and the winner-take-all basis on which firms bid for search distribution makes competition less intense. *Id*. This outcome is due to Google's exclusionary

conduct; if Google paid for non-exclusive distribution, rivals could win distribution on channels where they are strongest. *Id.* ¶¶ 1246–1247. For instance, DuckDuckGo could potentially win— and benefit from the increased scale—if it could bid solely for private-browsing-mode defaults. *Id.* ¶ 1247. Today, Google does not permit Apple or other partners to earn revenue share while presetting a rival as search default for private browsing. *Id.* ¶ 1248 (citing testimony from Mr. Cue that Apple's ISA applies to all Apple devices with a browser); Tr. 3234:4–6, 3234:22– 3238:17 (Tinter (Microsoft)) (discussing proposals for distributing Bing on Samsung devices, including as a private search option).

2021.   (Def. PFOF ¶ 76): Although search quality is an important consideration for a distributor, so are the financial terms GSEs offer. Distributors routinely look to maximize their revenue shares when negotiating with GSEs. PFOF ¶¶ 1100, 1234, 1238–1239 (citing Tr. 2463:15–18, 2464:8–2465:7 (Cue (Apple)) ("economics was an important part" of Apple's negotiations with Google); Des. Tr. 165:4–25 (Giard (T-Mobile) Dep.) (In Google negotiations, T-Mobile seeks "to maximize revenue for T-Mobile and its shareholders.")).

## III.   GOOGLE'S SCALE GIVES IT AN ENORMOUS COMPETITIVE ADVANTAGE

### A.   Innovation Opportunities Remain

2021.1 (Def. PFOF ¶¶ 77–90): Google admits innovation in accomplishing its mission is "never ending." For over a decade, innovation in GSEs has been at a monopolist's pace; Google's insulation from competition via exclusionary conduct has slowed progress toward better products and services, to the detriment of users and advertisers. Pls. PFOF ¶¶ 1079–1081; *infra* ¶ 2263.

### B.   Scale Fuels Google's Development Cycle

2022.   (Def. PFOF ¶¶ 91–111): Scale has driven many of Google's "key innovations." Pls. PFOF ¶ 204 ("[Y]ou do get better as you have more users – that's why [Google has] the best

spell check, the best personalized search, the best refinements, etc." (quoting UPX0177 at -419));

Tr. 222:9–13 (Varian (Google)) (Scale and data are advantages to Google.). Google's spelling,

synonym, and autocomplete systems all rely on user-side data. Pls. PFOF ¶¶ 171–173. For

example, with respect to spelling, Google omits that the mapping from the incorrect spelling to

the correct spelling is found through user-side data: a click signals what the user intended to

search for. UPX0862 at -707. As Google explained, "the Google spell checker is based on our

analysis of user searches compiled from our logs -- not a dictionary." *Id.*

2023.   (Def. PFOF ¶¶ 121–122, 129–130, 134–138): RankBrain and the two main search

components that use BERT, DeepRank and RankEmbedBERT, are all trained on large amounts

of user-side data. UPX0255 at .010–.011 (listing the number of training examples needed for

each); Pls. PFOF ¶¶ 176, 185–186. None of these systems (RankBrain, DeepRank,

RankEmbedBERT) replace Google's traditional ranking systems (like NavBoost), which rely on

tremendous amounts of data. Pls. PFOF ¶¶ 176, 188; Tr. 253:21–254:12 (Varian (Google))

(Ranking search results uses a lot of data.). Rather, these deep learning systems are complements

to traditional systems; for example, in response to a query, Navboost pulls the top relevant

documents and DeepRank works with RankBrain to fine-tune the ranking of those documents.

Tr. 6403:16–6405:13, 6407:14–6408:7 (Nayak (Google)); Des. Tr. 65:15–67:22 (Google-PN

30(b)(6) Dep.). As another example, RankEmbedBERT may add a few webpages to those

already identified by Navboost. Tr. 6451:1–6 (Nayak (Google)). Thus, while newer systems may

use less user-side data, Google's search is still very scale dependent. One salient reason for this

is that new models are computationally expensive and thus can only be deployed on a small

fraction of documents (i.e., to fine tune results), whereas a system like Navboost is cheap and can

be deployed across numerous documents. *See e.g.*, Tr. 6431:1–24, 6447:1–22 (Nayak (Google))

(discussing UPX2029). As measured by Google's metrics, Navboost's function is more impactful on search quality than RankBrain, DeepRank, or RankEmbedBERT. Pls. PFOF ¶ 189.

2024.   (Def. PFOF ¶¶ 132–133): Google would invest and innovate more, and increase quality and privacy, if faced with greater competitive pressure. *Supra* ¶ 2021.1.

2025.   (Def. PFOF ¶¶ 139, 152): Because of Google's access to user-side data, Navboost outperforms deep learning systems in responding to tail queries. Pls. PFOF ¶ 189. Google quotes Eric Lehman; however, in 2020, the engineer who replaced Dr. Lehman, spearheading Google's machine learning efforts, wrote: "Using more data, even noisy data, is always better than using less data. . . . The Navboost Glue data is close to ▮ in size. In contrast, models like RankBrain and RankEmbed are ▮▮▮ in size, with DeepRank and RankBERT being significantly smaller. This likely makes it hard for the models to learn or memorize truly long-tail information on relevance or user preferences." UPX0255 at .009, .014. Moreover, there are drawbacks to using deep learning systems: they are computationally expensive and increase latency. Pls. PFOF ¶ 190; Des. Tr. 200:5–201:9, 207:25–208:15 (Google-PN 30(b)(6) Dep.).

2026.   (Def. PFOF ¶¶ 140–149, 150–151): MUM is a Large Language Model. Des. Tr. 59:22–60:12 (Google-PN 30(b)(6) Dep.). MUM does not rank search results. *Id.* 59:22–61:02. Therefore, MUM did not replace traditional ranking systems like Navboost or QBST. Tr. 1931:21–24 (Lehman (Google)); Tr. 6453:4–15 (Nayak (Google)) (MUM did not make Google's "existing systems obsolete." (quoting UPX2034)). For search, LLM-based systems like MUM and Google's Search Generative Experience (SGE) are computationally expensive and increase latency. Pls. PFOF ¶ 1026; Tr. 1930:21–1931:20 (Lehman (Google)); Tr. 6452:1–24 (Nayak (Google)) (discussing UPX2034); Tr. 8278:12–18 (Reid (Google)); DX0241 at -453 ("Large language models like MUM are expensive to pre-train and then fine-tune for lots of

applications."). LLM systems like MUM produce undesirable, biased, and/or stale results. Pls. PFOF ¶ 394; DX0241 at -453.

2027.   (Def. PFOF ¶¶ 156–163): SGE uses a large language model to summarize webpages returned in response to user queries. Def. PFOF ¶ 156; Tr. 7527:17–24 (Raghavan (Google)); UPX2067 at -441. The LLM that underlies SGE, however, relies on scale-dependent traditional search systems to identify the relevant webpages to summarize. Pls. PFOF ¶ 1023. Thus, generative AI systems like SGE and its underlying LLM have not eliminated the need for scale. Pls. PFOF ¶ 1024; Tr. 3696:15–3697:21 (Ramaswamy (Neeva)) ("[I]t's absolutely not the case that AI models eliminate that need or supplant that need [for scale].").

2028.   (Def. PFOF ¶¶ 164, 324): Testimony from Google witnesses shows that innovations in machine learning and AI are not fundamentally altering how Search works. Google's Senior VP of Seach, Prabhakar Raghavan, explained: "the magic isn't quite here yet." Tr. 7529:9–17 (Raghavan (Google)); UPX2040; Pls. PFOF ¶ 1027.

2029.   (Def. PFOF ¶¶ 165–170): Google Lens is not within a relevant market. Pls. PFOF ¶¶ 323–397 (§ IV.A). Regardless, Google Lens relies on user-side data to learn to identify the objects depicted in users' photos. Dr. Lehman explained: "Take a picture, you're shown some matches, and-- hopefully-- you click on the correct one and teach [Google] something." UPX0251 at -883.

### C.   Scale Fuels Mobile Search Quality

2030.   (Def. PFOF ¶¶ 179, 198–199): Downloadable apps are a poor substitute for general search engines. Unlike SVP (or other) apps, GSEs are one-stop shops that are convenient, provide depth and breadth of information, and are useful for navigation to other sources, even when the user does not know where to look. Pls. PFOF ¶¶ 326–330; *infra* ¶ 2204.

2031.   (Def. PFOF ¶¶ 181–184, 200–201, 203, 207): Google admits mobile search is markedly different than desktop search. Def. PFOF ¶ 181. Mobile users interact with search results differently on mobile devices; these users often "view" or swipe search results instead of clicking. UPX0262 at -990. Mobile users often prefer directly consumable answers through search features as compared to web results (10 blue links). UPX0262 at -990. Google learned these differences by observing its users at scale. UPX1087 at -720 (Google learned user preferences on mobile versus desktop traffic through "LE metrics" [i.e., Live Experiment]); Pls. PFOF ¶¶ 1002–1003. Because of the different ways in which users interact with mobile versus desktop search, around 2013 Google began to collect the mobile interactions and preferences in a system called Glue. UPX0262 at -991 ("Glue was initiated for tackling all of these issues together."). Glue deploys 13 months of user data, providing the signal for whole-page ranking mobile results. Pls. PFOF ¶ 195; UPX0262 at -989–992 (Glue captures user preferences in the "mobile era").

2032.   (Def. PFOF ¶ 185): Google's autocomplete systems rely on user-side data. Pls. PFOF ¶¶ 171–173.

2033.   (Def. PFOF ¶¶ 196–197): Local queries issued on mobile devices tend to be more varied, fine-grained, or tail than local queries on desktop. Pls. PFOF ¶ 1001. By observing users in relation to their location, GSEs learn when and how location affects information sought. As Dr. Lehman explained: "Many search queries can not be understood or served without reference to the user's location. For example, [med tech jobs] thousands of miles away are probably less interesting than opportunities close to home." UPX0213 at -719. Thus, mobile scale is vital for serving high quality results in response to local mobile queries. Pls. PFOF ¶ 1004.

2034.   (Def. PFOF ¶¶ 208–209): Webmasters (1) optimize their websites for the GSE with the most scale and (2) may block smaller GSEs from crawling their websites. Pls. PFOF ¶ 533. Google's scale allowed it to collect "all that information from places around the world," Def. PFOF ¶ 208, while smaller GSEs were prevented from doing the same. Smaller search engines have tried to collectively crawl websites, but Google refuses to participate in the initiative. Tr. 2766:23–2768:4, 2768:24–2769:18 (Parakhin (Microsoft)).

2035.   (Def. PFOF ¶ 210): Google recognizes that the "ground truth" for user satisfaction is live experiments, which require scale. Pls. PFOF ¶¶ 1014–1015. Thus, scale is critical to how a GSE learns about users' expectations and preferences on mobile devices. Pls. PFOF ¶ 1015.

2036.   (Def. PFOF ¶¶ 212–214): Users may have different intents—seek different information—for the same queries, depending on whether they are using a desktop or mobile device. Pls. PFOF ¶ 1002. Mobile/desktop query overlap cannot establish similarity of search. UPX1087 at -723; Tr. 6417:5–14 (Nayak (Google)). As the cited study notes, mobile users have different site preferences from desktop users even when the intents are almost identical, UPX1087 at -723, and mobile queries more frequently have common or casual interpretations than desktop queries, UPX1087 at -725 (noting "high temp" more frequently associated with high temperature metal on desktop and with high fevers on mobile).

2037.   (Def. PFOF ¶¶ 215–218): Much of the query stream is head queries. UPX1079 at -996. For these queries, there is likely overlap between desktop and mobile user-side data. For example, a query like "Taylor Swift" likely seeks the same result on both device types. Tr. 2663:4–2664:6 (Parakhin (Microsoft)). However, the long tail in mobile tends to be location-specific. Pls. PFOF ¶¶ 1001–1002. For mobile users on-the-go, this is a vital part of the query stream. Pls. PFOF ¶ 1004.

2038.   (Def. PFOF ¶¶ 219–220): In 2020, Google launched a project to improve desktop search quality; Google found that it could not simply port over the learnings gleaned from mobile search. UPX0259 at .004.

### D.   Scale Drives Incentives To Invest And Search Innovation

2039.   (Def. PFOF ¶¶ 221–226): A GSE's incentives to invest are driven by its scale. Pls. PFOF ¶¶ 1067–1125 (§ VIII.B). The effect of scale or lack thereof cannot be negated by investing in AI technology or engineering headcount. Pls. PFOF ¶¶ 1016–1021 (§ VIII.A.3.a).

2040.   (Def. PFOF ¶¶ 227–238): Google concedes that, when assessing search quality, it only compares itself to other general search engines. *Infra* ¶ 2221.

2041.   (Def. PFOF ¶¶ 239–241): On desktop, where Bing has greater scale, Bing reduced the search-quality gap. Pls. PFOF ¶ 994; UPX0278 at -973 ("Strong Bing win on Desktop."); Tr. 2302:2–2305:3 (Giannandrea (Apple)); *id*. 2291:13–2294:15 (acknowledging that Bing's mobile search would improve with Apple's traffic).

### E.   Google's Scale Advantages Entrench Its Position In The Search Ads Markets

2042.   (Def. PFOF ¶¶ 242–245, 249): Google's examples of search ad innovations rely largely on an unsupported demonstrative, presented to Dr. Raghavan, listing 15+ items without description. Def. PFOF ¶ 242 (citing Tr. 7349:16–7366:20 (Raghavan (Google)) (discussing DXD-21 at .007–.012)). Dr. Raghavan discussed only five of these; of the four with dates, all predated Dr. Raghavan's involvement in Google's ad business, and all but one predated his employment at Google entirely. Tr. 7283:9–7294:2 (Raghavan (Google)) (started at Google in 2012 and Ads in 2018); *id* at 7349:16–7366:20 (discussing AdWords (2000), second-price auction (2002), long-term value (2011), and match types (2012); DXD-21 at .007–.012). Google also claims credit for innovations copied from other platforms, including Product Listing Ads, which largely mirrored a Bing feature, UPX0047 at .005, and Discovery Ads, which are not

Search Ads and which Google copied from Facebook/Instagram after realizing its search products did not compete with social platforms. Pls. PFOF ¶¶ 426–429 (§ IV.B.1.f).

2043.  (Def. PFOF ¶ 246): *Infra* ¶ 2268.

2044.  (Def. PFOF ¶ 247): *Infra* ¶ 2284.

2045.  (Def. PFOF ¶ 248): The cited testimony relies on click-through rates as a metric for ad quality, which is not an appropriate proxy. *Infra* ¶ 2286. Additionally, Google ignores the many advantages its scale provides its Search Ads products. Pls. PFOF ¶¶ 200–202 (§ III.E.3–4), 1030–1060 (§ VIII.A.4).

2046.  (Def. PFOF ¶¶ 250–252): Google does not consider rivals when changing its Text Ad products, Pls. PFOF ¶¶ 725–727 (§ V.C.6), but does consider other platforms' products to identify advertising markets ***not*** served by Search Ads and Text Ads so that Google can expand its broader advertising business into those markets. Pls. PFOF ¶¶ 111, 426–429 (§ IV.B.1.f).

## IV.   THE IMPORTANCE OF SCALE TO SEARCH QUALITY

### A.   Many Aspects Of A GSE Benefit From User-Side Data

2047.  (Def. PFOF ¶ 254): Google's definition of "user interaction data" excludes important data that GSEs retain from users, including user-specific location data and a user's device type. Pls. PFOF ¶¶ 159–161.

2048.  (Def. PFOF ¶ 255): Google admits that user-side data affects how query results are ranked. User-side data is integral to a search engine's ability to improve its search quality. Pls. PFOF ¶¶ 159–207 (§ III.E).

2049.  (Def. PFOF ¶ 256): Google admits that user-side data affects search quality. That many other factors also affect search quality does not negate that user-side data is vital to a GSE's ability to improve search quality. In 2009, Google's chief economist made the same argument as Google makes here. Tr. 257:16–259:15 (Varian (Google)) (discussing UPX0180 at

-452); UPX0884 at -604. Dr. Udi Manber, then VP of Search, stated that this argument was misleading and wrong. Tr. 258:22–259:15 (Varian (Google)); Pls. PFOF ¶¶ 203–204.

2050.   (Def. PFOF ¶¶ 258–263): Indexing benefits from scale. Tr. 2666:21–2667:12 (Parakhin (Microsoft)); Pls. PFOF ¶ 168.

2051.   (Def. PFOF ¶¶ 258–263): Although GSEs use other signals to improve their search quality, user-side data is the most impactful signal used in ranking. UPX0213 at -717, -722–23. This became truer as GSEs harvested and deployed user-side data more heavily throughout the search stack. *E.g.*, *id.* at -723 (explaining how "clicks" have become more important and displaced the use of other signals); *supra* ¶ 2007.

2052.   (Def. PFOF ¶¶ 264–276): User-side data is important to improving freshness of results. Pls. PFOF ¶¶ 1007–1010. Google has several "instant" systems that aggregate and deploy user-side data within minutes to improve search results. Pls. PFOF ¶ 1008 (citing DX0116). Access to this fresh user-side data allows Google to know when older results should be demoted in comparison to fresh clicks. DX0116 at -409. For example, the query "nice pictures" based on accumulated clicks would normally retrieve pictures of flowers, but in the aftermath of the terrorist attack in Nice, France, Google detected through "fresh" data that users were looking for pictures of that event. *Id.* at -409.

2053.   (Def. PFOF ¶ 277): Location data is user-side data, Pls. PFOF ¶ 161, only available by recording the user's location when a query is submitted, Tr. 2660:1–17 (Parakhin (Microsoft)) ("When you're searching on a cellphone you tend to have very fine-grained location information, or you can ask user to provide that, allow them to provide that. Cellphones, most of them have GPS and high quality location tracking built in."). Location data is integral to improving mobile search quality. Pls. PFOF ¶¶ 1000–1002; Tr. 2660:1–17 (Parakhin

(Microsoft)) (With fine-grained location data the "search engine can return results that are specific to like various particular location you can be in. You can find the closest restaurant to you rather than just restaurant in Washington, D.C. or in some district.").

2054.  (Def. PFOF ¶ 278): Google's systems do not "understand" language per se; rather, Google's systems are trained to "fake an understanding of documents by observing how [its] users react to them and adopting those reactions as [its] own." UPX0196 at -175; UPX0203 at -906 ("A billion times a day, people ask us to find documents relevant to a query. What's crazy is that we don't actually understand documents. Beyond some basic stuff, we hardly look at documents. We look at people."). The deep learning models that Google uses in search are trained on user-side data and do not supplant the heavily scale-dependent systems like Navboost for understanding the relevance of a document (webpage result) to a particular query. UPX0255 at .014 ("[N]one of these deep learning models are as powerful as NavBoost.").

2055.  (Def. PFOF ¶¶ 279–281): "[W]hen thinking about sort of the value of the search result for a query, relevance is the most important consideration." Tr. 1777:15–1778:8 (Lehman (Google)); UPX0213 at -717 ("Relevance is the primary consideration in web ranking."). User-side data is critical to a GSE's ability to improve relevance. Tr. 381:13–21 (Varian (Google)) (discussing UPX0905 at -927); Tr. 2659:16–19 (Parakhin (Microsoft)) (The critical input for relevance is query and click data at scale.). As Dr. Lehman wrote, page quality falls "well behind relevance" as a major consideration in ranking. UPX0213 at -718. Moreover, user-side data *is* useful in determining the quality of a webpage—for example, a back click can indicate the user is unsatisfied with the webpage. Tr. 2644:20–2646:2 (Parakhin (Microsoft)); UPX0191 at -194 (In ranking, "user behavior is often interpreted as a label, e.g. click = good.").

2056.   (Def. PFOF ¶ 282): User-side data allows GSEs to do more than simply memorize clicks. User-side data allows GSEs to "use patterns in click data to anticipate user preferences in new situations." UPX0192 at -770. Many different areas of search benefit from user-side data, including crawling, indexing, query understanding, retrieval, ranking, whole page ranking, the development of search features, and the running of search quality experiments. Pls. PFOF ¶¶ 159–202; Tr. 10273:25–10275:13 (Oard (Pls. Expert)) (discussing UPXD105 at 9).

2057.   (Def. PFOF ¶ 283): Google admits that Navboost relies on user-side data. The cited materials fail to support the proposed finding that Navboost is not the most important signal in Google's retrieval and ranking process. Dr. Lehman's statement addresses only Navboost's ability to understand language. Google engineers agree that Navboost is the most important signal for search quality in Google's ranking and retrieval process. Pls. PFOF ¶¶ 183–207.

2058.   (Def. PFOF ¶¶ 284–288): Both the ranking and contents of search features benefit from user-side data. Pls. PFOF ¶¶ 191–192 (§ III.E.1.f).

2059.   (Def. PFOF ¶ 289): Latency—the speed of serving results—depends on scale. Pls. PFOF ¶ 1016.

**B.     User-Side Data At Scale Is Vital To A GSE**

2060.   (Def. PFOF ¶¶ 290–292, 294): Notwithstanding the presence of diminishing returns, Google's continued use of data shows that its scale gives it a significant advantage over rivals. Pls. PFOF ¶¶ 165–166. Top Google engineers have warned that arguments to the contrary are misleading. Pls. PFOF ¶¶ 203–204; Tr. 257:16–259:15 (Varian (Google)) (discussing UPX0180 at -452). Google admits it deploys user-side data so long as the benefits outweigh the costs (a so-called "sweet spot"). Def. PFOF ¶¶ 290–292. Despite the enormous costs, many of Google's systems, including Navboost, QBST, and GLUE, make use of 13 months of user-side

data, and Google stores anonymized data indefinitely. Pls PFOF ¶¶ 162, 164, 184, 195, 988, 1010.

2061.   (Def. PFOF ¶¶ 293, 308): Google's Navboost system not only memorizes past click-and-webpage pairings but can "look for patterns in click data . . . to predict in new situations." UPX0192 at -770; UPX0213 at -724 ("Navboost has acquired some cross-query generalization; that is, [it] conclude[s] that [a] document . . . is also relevant for some [set of] related queries . . . .").

2062.   (Def. PFOF ¶¶ 295, 308, 329–332): Google's cited materials do not support a finding that other search engines can compete successfully with Google using a fraction of the queries that Google now receives. If this were the case, Google would save money on storage and adopt these more frugal approaches—Google has not. Tr. 7862:2–25 (Fox (Def. Expert)). Neeva's founder, Sridhar Ramaswamy, was unequivocal about the importance of scale to GSEs. Dr. Ramaswamy explained, "[O]ne of the biggest signals that all search engines have relied on for the past 20 years is this thing that you talk about, which is query click information. . . . Because not only does it make your search engine product better, it also gives you very powerful insights into figuring out how to answer queries you have never seen." Tr. 3695:4–3696:14 (Ramaswamy (Neeva)); *see also* Pls. PFOF ¶¶ 159–207 (§ III.E).

2063.   (Def. PFOF ¶¶ 329–332): AI technology has not eliminated the need for scale. Tr. 3696:15–3697:21 (Ramaswamy (Neeva)) ("[I]t's absolutely not the case that AI models eliminate that need or supplant that need [for scale].")). As Dr. Ramaswamy explained, query click data is needed to determine the top results for a particular query. *Id.* AI can only provide a summary of those top results. *Id.*; Tr. 2668:18–2669:4 (Parakhin (Microsoft)). Although Neeva invested in AI technology, it still relied on Bing for its search. Tr. 3671:2–3672:5 (Ramaswamy

(Neeva)). Thus, even when Neeva deployed AI technology, Neeva relied on—and was limited by—Bing's scale and search quality. *Id.*

2064.   (Def. PFOF ¶¶ 295): Google omits context from Dr. Ramaswamy's testimony; Dr. Ramaswamy did not testify that Neeva or any other search engine could successfully compete with Google with only a fraction of Google's queries. *Infra* ¶ 2124.

2065.   (Def. PFOF ¶¶ 295, 329–332): Ultimately, Neeva was not able to "compete successfully" with Google because, among other reasons, it struggled to obtain any distribution due to Google "freez[ing] the ecosystem" through anticompetitive agreements. *Infra* ¶ 2126.

2066.   (Def. PFOF ¶¶ 297–303): Tail queries benefit from scale more than head or torso queries. Tr. 2675:14–24 (Parakhin (Microsoft)); Tr. 10343:10–10345:9 (Oard (Pls. Expert)). That other factors also affect the quality of tail results does not negate that scale is important to tail quality. Pls. PFOF ¶¶ 990–991, 995–996. User-side data allows GSEs to improve search quality even for never-before-issued queries. Tr. 10341:23–10342:24 (Oard (Pls. Expert)); Tr. 3695:6–3696:10 (Ramaswamy (Neeva)).

2067.   (Def. PFOF ¶ 304): Deep learning systems like RankBrain, DeepRank, and RankEmbedBERT are "significantly smaller" than Navboost and Glue. UPX0255 at .014. The smaller size of the deep learning systems "makes it hard for the models to learn or memorize truly long-tail information on relevance or user preferences" like Navboost and Glue. *Id.*

2068.   (Def. PFOF ¶¶ 306–307): Google relies on heavily scale-dependent systems in search, such as Navboost and Glue. Pls. PFOF ¶¶ 184, 195, 988. These scale-dependent systems greatly affect Google's search quality. Pls. PFOF ¶¶ 182–183, 189, 195.

2069.   (Def. PFOF ¶¶ 309–312): Although Google's public BERT model was trained without user-side data, both systems that deploy BERT technology in Google's search stack—DeepRank and RankEmbedBERT—are trained on user-side data. Pls. PFOF ¶¶ 176, 186.

2070.   (Def. PFOF ¶¶ 313–320): Google's deep learning systems have not replaced the need for scale. Pls. PFOF ¶ 188. For example, Navboost works to shrink the size of retrieved documents from tens of thousands to a few hundred. Tr. 6407:14–22 (Nayak (Google)). It is not until the documents have been narrowed in this way that Google deploys its deep learning systems to fine tune the results. *Id.* 6408:5–7. As another example, Google still deploys Glue data to determine how to rank whole-page results (both web results and features) after Google's deep-learning systems have been deployed. *Id.* 6408:8–6409:1.

2071.   (Def. PFOF ¶¶ 321–323): Large language models (like LaMDA, PaLM, and PaLM2) can be trained to predict language sequences (i.e., "generate language") without user-side data. But those models rely on traditional search results—generated using heavily-scale dependent systems—to produce a relevant result. Pls. PFOF ¶ 1022. For example, Google's Seach Generative Experience (SGE) makes use of large language models to summarize webpages responding to user queries. Def. PFOF ¶ 156; UPX2067 at -441. The LLM that underlies SGE relies on scale-dependent traditional search systems to identify the relevant webpages to summarize in response to a user's query. Pls. PFOF ¶ 1023 (citing Tr. 8331:18–24 (Reid (Google)) (Google relies on the search index to verify or confirm Search Generative Experience (AI) responses against the results that it gets from Google search.)).

2072.   (Def. PFOF ¶ 325): That deep learning systems ***can*** be trained without user-side data does not mean that they do not benefit from user-side data. Indeed, RankBrain, DeepRank, and RankEmbedBERT are all trained using user-side data. Pls. PFOF ¶¶ 176, 186.

2073.   (Def. PFOF ¶¶ 326–328): Although OpenAI's GPT model was trained on publicly available data, as deployed by Microsoft in Bing Chat, it relies on Bing's traditional search results. Pls. PFOF ¶ 1023. The GPT model did not eliminate the need for scale. Pls. PFOF ¶ 1024; Tr. 3696:15–3697:21 (Ramaswamy (Neeva)).

## C.    Scale Led To Bing Quality Improvements And Microsoft Acknowledges The Importance Of Scale

2074.   (Def. PFOF ¶¶ 337–338): Bing's search quality improved after incorporating Yahoo's data. Precision, a measure of search quality, rose notably throughout 2011 and into 2012. Tr. 10550:5–10552:3 (Whinston (Pls. Expert) (discussing UPXD106 at 35–36); DX0442 at -269 (noting "huge" improvement for Bing in tail after first launch incorporating Yahoo logs).

2075.   (Def. PFOF ¶¶ 339–340): Contrary to Google's selective citation of UPX0892 and Prof. Oard's testimony, Microsoft believed additional data would improve search quality. A Microsoft engineer explained, "[W]e know that there is no data like more data. . . . Data will determine the winner in the race." UPX0892 at -491. After noting additional data might yield small gains in one model, the engineer explained and depicted (see Figure 21 below) how Bing could "move the entire learning curve up" and thereby increase the returns of "additional training data." *Id.* at -490. The engineer explained that "better features" or a "more powerful" model could move the curve, and that Bing was "actively" working on both. *Id.* at -490. The engineer also explained that that for "narrow segments" of queries (e.g., tail queries) returns from additional training data were greater (i.e., closer to point "A" than "B"). *Id.* at -490. This is consistent with expert testimony on diminishing returns: there is no single line for diminishing returns; rather, different models and data exhibit different returns. Tr. 10346:20–10349:14 (Oard (Pls. Expert)) ("[I]f I'm trying to do head queries, there's one line. And if I'm trying to do tail queries, there's another line."); UPXD105 at 48.

**Figure 21: Moving The Learning Curve**



UPX0892 at -490.

2076.   (Def. PFOF ¶¶ 341–343): Additional scale from Microsoft's Yahoo agreement was valuable. However, it resulted in less additional scale than Microsoft had hoped because Yahoo had to degrade its product to win the Firefox contract. Pls. PFOF ¶ 1261. Firefox users were not a significant source of scale to Microsoft and Bing and so should not be expected to affect quality dramatically. Pls. PFOF ¶ 1260. Moreover, Google responded to competition from Bing by investing more, stabilizing the quality gap. Tr. 10550:9–10551:15 (Whinston (Pls. Expert)) (comparing UPXD106 at 35 (showing DXD-37 at .124) to UPXD106 at 36).

### D.      The Data Reduction Experiment Is Unreliable[3]

2077.   (Def. PFOF ¶¶ 344–345): According to its internal measurements, Google's search quality lead over Bing is about 3–4 IS4@5 on mobile search. UPX0238 at -673. Bing has narrowed the search quality gap for desktop search where it has greater scale. Pls. PFOF ¶ 994.

---

[3] To the extent the Court accepts Google's incorporation by reference of its Opposition to Plaintiffs' Motion to Exclude the Expert Testimony of Edward A. Fox (ECF No. 475) into Google's Proposed Findings of Fact (ECF No. 828 at 96 n.2), Plaintiffs incorporate by reference Plaintiffs' Motion to Exclude the Expert Testimony of Edward A. Fox (ECF No. 443) and Plaintiffs' Reply in Support of Plaintiffs' Motion to Exclude the Expert Testimony of Edward A. Fox (ECF No. 521).

2078.   (Def. PFOF ¶ 346): Prof. Fox never had direct access to Google's search systems. Tr. 7969:14–22 (Fox (Def. Expert)). Prof. Fox's only access was that of normal public use of Google search. *Id.* 7969:20–22.

2079.   (Def. PFOF ¶¶ 348, 401): Google ran a made-for-litigation experiment without controls or supervision. Prof. Fox did not have a written evaluation process for conducting the DRE. Tr. 7948:8–19 (Fox (Def. Expert)). Google, not Prof. Fox, picked which ranking components would be retrained as part of the DRE. *Id.* 7944:22–7945:2. Google, not Prof. Fox, picked which engineers would run the DRE. *Id.* 7935:11–7936:11, 7938:10–14. Prof. Fox did not know the names of the people who ran the experiment, their titles, or roles in the experiment. *Id.* Prof. Fox did not properly validate the DRE. For example, Prof. Fox did not test to see if the Google-selected query sets used to evaluate the quality of the retrained system biased the results. *Id.* 7980:4–24. The only Google engineer Prof. Fox relied on for his understanding of the six retrained components (1) did not know that Prof. Fox was working on the DRE and (2) had never been aware that Google conducted such an experiment. *Id.* 7984:18–7988:1.

2080.   (Def. PFOF ¶¶ 348, 354–355, 371–376, 381, 402): The DRE did not follow standard protocols and procedures Google normally deploys when running ranking experiments. When evaluating changes to a search engine, best industry practice includes having a written evaluation process before the actual testing begins. Tr. 2298:2–16 (Giannandrea (Apple)). Side-by-side comparison is "the best practice in the industry" for evaluating changes to a search engine. *Id.* 2298:8–16. It is also a best practice to separately evaluate desktop and mobile search quality. *Id.* 2299:17–2300:23. In the ordinary course, Google runs thousands of live experiments and typically requires these experiments before changing its ranking algorithms. *Id.* 2315:15–2316:9; Tr. 10328:17–10329:15 (Oard (Pls. Expert)). The DRE deviated from each of these

standard procedures. Tr. 7893:25–7894:14 (Fox (Def. Expert)) (no written protocol); *id.* 7977:1–8 (no separate mobile/desktop evaluation); *id.* 7954:2–3 (no side-by-side experimental design); *id.* 7951:18–24 (no live evaluation).

2081.   (Def. PFOF ¶¶ 349, 363, 382–386): The DRE's results are flawed because of flaws in the experimental design. Ignoring important benefits of user-side data, Prof. Fox concluded that only 3% of Google's search quality results from user-side data. Tr. 7850:3–7850:8 (Fox (Def. Expert)); Tr. 10323:25–10325:1 (Oard (Pls. Expert). Among other things, the DRE was not designed to test the quality effect of user-side data deployed in indexing, spelling correction, and search advertising. Tr. 10273:25–10275:13 (Oard (Pls. Expert)) (discussing UPXD105 at 9). The DRE did not test the effect of user-side data on search features like images or search-feature ranking (i.e., whole-page ranking). *Id.* 10279:21–10281:11, 10284:8–10290:15. Instead, the DRE only reduced data used by ranking components that affected web results. *Id.* 10302:11–10303:6 ("[T]he focus of training just on web ranking is inappropriate . . . .").

2082.   (Def. PFOF ¶ 349): Through its Glue system, Google deploys 13 months of user-side data in whole page ranking. Pls. PFOF ¶ 195; Tr. 10284:8–10285:9 (Oard (Pls. Expert)). Failing to account for this important use of user-side data, fundamentally flaws the experiment because raters evaluated the quality of whole-page ranking not just web result ranking. *Id.* 10286:24–10290:15, 10302:11–10303:6 (discussing UPXD105 at 10–14). As Google acknowledges, for many queries, SERPs are dominated by search features. UPX1114 at -168; Tr. 10289:12–25 (Oard (Pls. Expert)) ("These search features, they fire quite often."); UPX2026 at -183 ("Recent analysis showed that about ██% of SRPs are true '10 blue links' SRPs – that is, web results only."). This is especially true for mobile search, which is the presentation the raters used to evaluate results for the DRE, because (1) Google tends to trigger search features more on

mobile and (2) search features dominate the mobile SERP due to limited screen real estate. UPX1114 at -168; Def. PFOF ¶¶ 190–195. Moreover, the IS4@5 metric (which asks raters to evaluate the top 5 ratings) is position-weighted—meaning the top results affect the IS4 score more—and these search features tend to trigger at the top of the SERP. Tr. 1813:6–1814:25 (Lehman (Google)); Tr. 10289:12–10290:15 (Oard (Pls. Expert)). Thus, the experimental design, by requiring raters to evaluate the top 5 results in mobile presentation, focused the raters on search feature results that were not the focus of the retraining and therefore the raters did not detect differences in the results generated from the frozen system and retrained system. Tr. 10286:24–10291:23, 10302:11–10303:6 (Oard (Pls. Expert)) (discussing UPXD105 at 14). Prof. Fox then used these rater evaluations to conclude that there was no difference in the quality of the retrained system and incorrectly conclude that there is no value in scale. *Id.* 10290:1–15, 10302:11–10303:6.

2083.   (Def. PFOF ¶ 349): The 3.9-point IS4@5 quality gap, central to Prof. Fox's analysis, is overstated for several reasons. First, Google IS4@5 metric is proprietary to Google, and Google uses it to optimize its search quality. Tr. 10304:7–10305:24 (Oard (Pls. Expert)) (discussing UPXD105 at 18). Bing does not—cannot—optimize to IS4@5, so using that metric to assess Google's quality relative to Bing's overstates Google's quality, as Google is essentially teaching to the test. *Id.* Second, to measure the search quality differences between Google and Bing, Google "scrapes" Bing's results. *Id.* 10310:13–10313:16 (discussing UPXD105 at 21). This process degrades Bing's search quality because Google's scrapers withhold user location data from Bing. *Id.*; UPX0220 at -883 ("In the full-page scrape, Bing has no user location so Google is much better." (emphasis omitted)). Thus, the DRE understates Bing's search quality and makes the search quality gap appear larger. Tr. 10310:13–10313:16 (Oard (Pls. Expert)).

Third, the 3.9-point IS4@5 does not account for Bing's superior quality on desktop. *Id.* 10306:20–10309:20 (discussing UPXD105 at 19); UPX0268 at -133 ("On Desktop, Google is comparable to Bing . . . ." (emphasis omitted)); Tr. 7977:5–8 (Fox (Def. Expert)) (denying knowledge of what the IS4@5 gap would be if search quality was evaluated for desktop: "Google made a decision some years ago to do all the rater experiments with mobile. So that's all I know."). Because the DRE does not credit Bing's search quality on desktop, it overstated the search quality gap between Google and Bing. Tr. 10306:20–10309:20 (Oard (Pls. Expert)) (discussing UPXD105 at 19–20). Prof. Fox failed to correct these three measurement deficiencies and thus his reliance on the 3.9-quality gap as the basis of his opinion is flawed. *Id.* 10314:17–10315:20.

2084.   (Def. PFOF ¶¶ 349, 382–386): Prof. Fox's conclusion that only 3% of Google search quality is the result of user-side data and the "rest must be something else" also ignores important benefits of user-side data that cannot be measured by the DRE. Tr. 10315:24–10316:16 (Oard (Pls. Expert)). First, the DRE cannot measure the effect of user-side data on the search-engine-development cycle. *Id.* 10316:17–10318:24. This cycle greatly benefits from user-side data. *Id.* 10316:17–10325:1 (discussing UPXD105 at 26–30, 32); Pls. PFOF ¶¶ 196–199 (§ III.E.2), 1011–1015 (§ VIII.A.2.b). Second, there are effects on search quality that can only be detected through live experiments. Tr. 10325:3–10332:10 (Oard (Pls. Expert)) (discussing UPXD105 at 34–35); Pls. PFOF ¶¶ 1011–1014. Third, because Google used a frozen system as the baseline, the DRE cannot measure the effects of user-side data on freshness. Tr. 10332:11–10333:13, 10335:17–10339:21 (Oard (Pls. Expert)) (discussing UPXD105 at 39–42); Tr. 7965:13–7969:7 (Fox (Def. Expert)) (freshness was not measured in the experiment because he used a "frozen" version of Google's system). Because Prof. Fox fails to account for these

experimental deficiencies, his conclusions substantially understate the beneficial effects of user-side data on search quality. Tr. 10261:21–24 (Oard (Pls. Expert) (discussing UPXD105 at 3).

2085.   (Def. PFOF ¶¶ 350, 387): The cited materials do not support the statement that Bing is at the point of diminishing returns. The DRE was run only on Google's search system. Prof. Fox did not run an experiment on Bing's system and never had access to it. Tr. 7874:11–22 (Fox (Def. Expert)). Based on the DRE, Prof. Fox could not properly reach any conclusion regarding Bing's system. *Id.* 8000:10–8001:5.

2086.   (Def. PFOF ¶¶ 352–353): Prof. Fox did not "retrain" the six components; Google engineers did. Tr. 7938:4–5 (Fox (Def. Expert)).

2087.   (Def. PFOF ¶¶ 364–370): Prof. Fox only purports to measure the impact of the six retrained components on web result ranking (i.e., how the 10 blue links are ranked). Tr. 10302:11–10303:6 (Oard (Pls. Expert)) ("[T]he focus of training just on web ranking is inappropriate[] . . . ."). Because user-side data benefits many other areas that are important to search quality like indexing, spelling correct, search advertising, search features, and whole-page ranking, Pls. PFOF ¶¶ 159–195(§ E.1.), the DRE results are not useful and do not support Prof. Fox's conclusions, Tr. 10314:17–10315:20 (Oard (Pls. Expert)) (discussing UPXD105 at 22).

2088.   (Def. PFOF ¶¶ 377–378): Human rater experiments are blind to aspects of search quality; for example, the quality of "popular" queries. Pls. PFOF ¶ 1013; UPX0204 at -225; Tr. 10325:3–10328:6 (Oard (Pls. Expert)). Because of limitations in human rater experiments, Google regularly uses live experiments as a measurement of "ground truth" for how real users are responding to changes. Pls. PFOF ¶ 1014. Indeed, Google typically does not launch a change to its systems without running a live experiment. *Id.*; Tr. 2315:15–2316:4 (Giannandrea (Apple)); Tr. 10328:7–1029:15 (Oard (Pls. Expert)).

2089.   (Def. PFOF ¶ 388). The DRE showed user-side data has a substantial effect on longtail queries. Tr. 10343:2–10346:19 (Oard (Pls. Expert)) (discussing UPXD105 at 45–46). For longtail queries, the reduction in quality was about 0.5 point in IS4@5. *Id*. 10345:10– 10346:19 (discussing UPXD105 at 45). As Pandu Nayak, Google's VP of Search, explained "[a] half point is a pretty significant difference." Tr. 6323:6–18 (Nayak (Google)); Tr. 10345:10– 10346:19 (Oard (Pls. Expert)) (discussing UPXD105 at 46, showing excerpt of Tr. 6323:8–18 (Nayak (Google))). Moreover, given the experimental flaws, the effect of user-side data on longtail queries is likely understated. Tr. 10343:10–10345:9 (Oard (Pls. Expert)) (The chart on UPXD105 at 45 reflects the effects of user-side data on tail quality as measured by the DRE "with all of its limitations. . . . So the real reduction is probably larger than this . . . .").

2090.   (Def. PFOF ¶¶ 389–395, 399–400, 403): The DRE was a made-for-litigation experiment that Google has not relied on to reduce the amount of training data it actually deploys in Search. *Compare* DXD-26 at .004 *with* DXD-17 at .016 (RankEmbedBERT, DeepRank, and RankBrain still train on the same amount of user-side data); Tr. 6405:20–22 (Nayak (Google)) (Navboost still trains on the same amount of user-side data); *see also* DXD-26 at .004 (explaining that QBST is still trained on same amount of user-side data as Navboost which remains unchanged). Indeed, despite the cost of maintaining and collecting user-side data, Tr. 7862:2–24 (Fox (Def. Expert), Google top search executive, Mr. Raghavan, has not been made aware of the findings of the DRE or any experiment like it, Tr. 7534:21–7535:18 (Raghavan (Google)).

2091.   (Def. PFOF ¶¶ 397–398). The only Google engineer Prof. Fox relied on in his initial report was Dr. Lehman. Tr. 7892:25–7894:15 (Fox (Def. Expert)). Dr. Lehman only remembers talking to Prof. Fox once about "basic getting oriented kinds of questions." Tr.

1826:5–10 (Lehman (Google)). That conversation took place *after* the experiment was completed and two days before Prof. Fox's initial report was submitted. Tr. 7890:21–7891:14 (Fox (Def. Expert)). Indeed, in preparing for his trial testimony, Prof. Fox improperly looked at materials beyond those he used to write his report so that he understood the DRE well enough to answer questions about it. Tr. 7933:17–7936:11 (Fox (Def. Expert)).

2092.   (Def. PFOF ¶¶ 396, 404–406 & n.3) Prof. Fox's report would not pass peer-review. Under peer review, there is a "higher standard" if the underlying codebase for the experiment is not or cannot be produced. Tr. 10264:5–10265:11 (Oard (Pls. Expert)). In those instances, peer-review requires the disclosure of "the details . . . about how things were done so that someone else with access to similar data would be able to run a similar experiment and get similar results." *Id.* 10264:5–10265:11. That is, to pass peer review, sufficient information would need to be disclosed so that the experiment "could be replicated in some way even if it couldn't be reproduced exactly." *Id.* This standard was not met here. *Id.* 10265:12–10266:4. As Prof. Oard explained, "[F]rom the description in [Prof. Fox's] report, it's possible to understand some of what he did and not all of what he did. And I think that it would be difficult for someone with access to comparable systems and comparable data to replicate the study in a way that closely approximates what Professor Fox, his experiment did, because we are missing important details on the experiment." *Id.* Beyond reproducibility, the "peer-review process looks at many other things, such as whether the conclusions are supported by the data, [and] whether the methods are properly applied." *Id.* 10264:5–10265:11. The DRE fails these standards. *Supra* ¶¶ 2079–2085, 2089.

## V. RIVAL GENERAL SEARCH ENGINE OVERVIEW

### A. Despite Its Massive Investments And Technical Expertise, Microsoft Has Not Been Able To Meaningfully Compete In General Search

2093.   (Def. PFOF ¶¶ 407–539): Bing's current share of the general search services market is 5.5%. Tr. 4761:6–24 (Whinston (Pls. Expert)) (discussing UPXD102 at 47).

2094.   (Def. PFOF ¶¶ 416–432): *Infra* ¶¶ 2180–2181.

2095.   (Def. PFOF ¶¶ 443–444): *Infra* ¶¶ 2151–2154, 2196.

2096.   (Def. PFOF ¶¶ 457–465): Microsoft has invested approximately $100 billion in Bing during the past two decades. Pls. PFOF ¶ 538. Any investments in Bing that could improve quality and drive more users, "[Microsoft is] making all of those investments today." Tr. 3515:14–19 (Nadella (Microsoft)).

2097.   (Def. PFOF ¶¶ 457–465): Even with this level of investment, Microsoft has been unable to achieve meaningful scale, particularly in mobile. Tr. 3102:11–3104:25 (Tinter (Microsoft)) ("[I]f I'm going to grow mobile in the United States, I have to either figure out what is my relationship going to be with Apple or . . . Samsung and sort of Android. . . . [T]rust me, we have tried an enormous amount of everything else . . . it's not that we haven't experimented, we haven't tried, we have a litany of things that we've attempted to do to sort of grow, but ultimately it comes down to one of those two things. And if you can't secure one of those two things, it's very, very, very hard to achieve any quality scale.").

2098.   (Def. PFOF ¶ 470): Google's cited material, a single document from June 2009, does not evidence that Microsoft recognized that "more data was not the answer." *Supra* ¶ 2075. Shortly after that email, Microsoft entered a multi-billion-dollar deal to access Yahoo's scale and thus believed data was critically important. Pls. PFOF ¶¶ 31, 55; Des. Tr. 38:22–39:7, 42:11–22, 42:24–43:11, 43:13–19, 43:21–44:4, 44:6–7 (Ramalingam (Yahoo) Dep.); DX0960 at -436

28

(§ 9.1.4(d)) (Microsoft-Yahoo Search and Advertising Services and Sales Agreement (2009)) (setting the aggregate cumulative amount payable to Yahoo at "$██ billion + ████████ ████████"). Top Google search executives acknowledged that scale was vital to Microsoft: "The bottom line is this. If Microsoft had the same traffic we have their quality will improve *significantly*, and if we had the same traffic they have, ours will drop significantly. That's a fact." Pls. PFOF ¶ 205; Tr. 255:17–256:10 (Varian (Google)) ("No one is disputing that point." (quoting UPX0180 at -452)).

2099.   (Def. PFOF ¶¶ 471–476): Microsoft's lack of scale has limited its ability to improve its index. Tr. 2666:21–2667:12 (Parakhin (Microsoft)); Pls. PFOF ¶¶ 1067–1125 (§ VIII.B).

2100.   (Def. PFOF ¶¶ 486–494): The only Bing mobile distribution deals that Google identifies are dated and limited. Since 2011, Bing has been unable to secure a deal to be set as the default search engine on any third-party smartphone in the United States. Def. PFOF ¶¶ 493–494, 903; Pls. PFOF ¶¶ 1263–1278. Bing's inability to secure mobile distribution has limited the level of investment in mobile search that would be economical. Pls. PFOF ¶¶ 1072, 1075–1078.

2101.   (Def. PFOF ¶¶ 496–500): Google cites documents indicating that, as early as 2010, "[m]obile search [wa]s not up for grabs." DX0440 at .002. By that time, "Google already ha[d] 88% of share of the mobile search market; Bing ha[d] 3% and Yahoo ha[d] 9%." DX0440 at .029. Google's distribution agreements have long cemented its control of mobile search.

2102.   (Def. PFOF ¶¶ 502–512): Microsoft has been unable to compete for the Safari and Firefox defaults despite offering ██% revenue share rates. Pls. PFOF ¶¶ 1259, 1263–1278; *infra* ¶¶ 2337–2344, 2355.

2103.   (Def. PFOF ¶¶ 519–521): *Infra* ¶¶ 2362–2363.

2104.   (Def. PFOF ¶¶ 524–537): Bing historically used more machine learning than Google. UPX0266 at -984 ("There is a huge question here about how much ML to use. Bing uses a lot, Google doesn[']t like to."); Tr. 2213:7–15 (Giannandrea (Apple)). When Microsoft partnered with OpenAI, it forced Google to advance the launch of its competing generative AI product, Bard. DX0680 at .001; Tr. 3528:2–3529:2 (Nadella (Microsoft)); see also Tr. 5847:11–23 (Whinston (Pls. Expert)) (When "OpenAI and ChatGPT was announced . . . you saw Google immediately, the next day, declare code red, saying it was throwing engineers on, announce a press conference the next week.").

2105.   (Def. PFOF ¶ 538): Microsoft's AI efforts do not eliminate the need for scale. Pls. PFOF ¶¶ 1022–1029; UPX0242 at -662 (Giannandrea stating that "it[']s a bit of a Hail Mary that [Bing's AI efforts are] going to leapfrog the traditional information retrieval method and beat Google at their own game"); *supra* ¶¶ 2027–2028, 2039, 2062–2063, 2065, 2071–2073.

## B.   Lack Of Distribution And Scale Limited DuckDuckGo's Growth And Improvement

2106.   (Def. PFOF ¶¶ 540–587): DuckDuckGo's current share of the general search services market is 2.1%. Tr. 4761:6–24 (Whinston (Pls. Expert)) (discussing UPXD102 at 47).

2107.   (Def. PFOF ¶¶ 548–554, 579–580, 1117–1119): DuckDuckGo invests strategically to differentiate itself competitively, focusing on user privacy and its proprietary modules. Tr. 1940:2–1942:10, 1968:21–1970:17 (Weinberg (DuckDuckGo)); *id.* 1965:15–1967:16, 1938:17–1939:23 (DuckDuckGo's search modules offer "instant answers," include "maps, directions, weather, news, images," and represent the "innovative portion" of search.); *id.* 1943:3–1945:8 (DuckDuckGo competes by offering greater levels of privacy); Pls. PFOF ¶¶ 77, 354, 564, 765. Apple has integrated all the privacy innovations DuckDuckGo pitched, except search. Tr. 1941:17–1942:10, 2044:10–19 (Weinberg (DuckDuckGo)).

2108.   (Def. PFOF ¶¶ 548–552, 554): DuckDuckGo developed complementary products, specifically a browser, to provide a distribution channel for DuckDuckGo's general search engine. Tr. 1962:6–1963:16 (Weinberg (DuckDuckGo)) ("[W]e made the browser in part – in large part because of the friction in search defaults . . . . [W]e find it easier to get people to adopt our browser than to get people to try to convince them to switch to different search defaults.").

2109.   (Def. PFOF ¶¶ 551–552): In 2020, DuckDuckGo retained $▓▓▓▓ of venture capital funding as working capital. Tr. 2058:25–2059:5 (Weinberg (DuckDuckGo)). The $▓▓ ▓▓▓ in common shares sold by DuckDuckGo shareholders was not available to DuckDuckGo to invest. *Id.* 2059:12–2060:3.

2110.   (Def. PFOF ¶¶ 548–552, 554): Money is not the only resource a general search service needs to grow and innovate: scale and distribution are both limiting factors. Pls. PFOF ¶¶ 541–542, 546–549. Lack of scale limits DuckDuckGo's ability to experiment. Tr. 1967:11– 1968:19, 2088:19–2090:13 (Weinberg (DuckDuckGo)) (DuckDuckGo has "a four-month backlog of experiments," that it could do more quickly with more scale.). DuckDuckGo's lack of scale derives from Google's control of default distribution. *Id.* 1963:19–1964:19 (pitches to be the default search engine in browsers' private browsing modes "hit an obstacle with . . . Google's contracts. And we ultimately decided, this was after like three years of trying this, that it was quixotic exercise because of the contracts."); Pls. PFOF ¶¶ 877, 881.

2111.   (Def. PFOF ¶ 555): The choice screen imposed on European Android devices was flawed in design and execution, making it uneconomical for search engines with lower monetization, like DuckDuckGo, to bid for choice-screen positions. Tr. 1956:20–1957:14, 2137:3–11 (Weinberg (DuckDuckGo)); Tr. 5735:1–5737:19 (Whinston (Pls. Expert)) (The European Android choice screen's poor design is the subject of scholarly research.).

2112.   (Def. PFOF ¶¶ 556–562, 565–566, 574): Google has created an all-or-nothing contest for defaults that blocks privacy-focused search engines like DuckDuckGo from competing for private-browsing users. Pls. PFOF ¶¶ 1245–1247. For years, DuckDuckGo pursued private browsing in Apple's Safari browser, but was blocked by Google's ISA. *Id.* ¶¶ 768–777. And when an opportunity for a privacy-focused default arose in September 2023 with the release of iOS 17, allowing a separate default GSE for private browsing in Safari, Google's ISA with Apple prevented any privacy-focused GSE from being pre-set as that default. *Id.* ¶ 778. Google's search rivals would compete more effectively for incremental searches if given the chance. Pls. PFOF ¶ 1248. Access to incremental queries would bolster competition by giving rivals a chance to take advantage of scale economies to improve their search products. Pls. PFOF ¶ 1247; *id.* ¶¶ 776, 866 (DuckDuckGo's rationale for pursuing private-browsing partnerships with Apple, Samsung, Mozilla, and Opera was to gain scale); *id.* ¶¶ 1062–1066 (Microsoft's rationale for pursuing a partnership with Apple was to gain scale).

2113.   (Def. PFOF ¶ 567): A November 2019 DuckDuckGo survey found that 47% of people who have tried DuckDuckGo have remained users. DX0633 at -062 (12.6 million of 26.8 million triers of DuckDuckGo are current users.). Further, 66% of survey respondents said their first experience with DuckDuckGo mostly or completely met their expectations. *Id.* at -065. More than half of those surveyed who do not use DuckDuckGo gave reasons pertaining to the power of defaults: 33.1% indicated they "do not think about it while searching," 12.5% reported only using their browser's default search engine, and 8.8% said their browser updated and removed DuckDuckGo as the default search engine. *Id.* at -066. More than a fifth of DuckDuckGo's part-time users would use DuckDuckGo more if their device allowed them to change their default or if they knew how to do so. *Id.* at -067.

2114.   (Def. PFOF ¶ 572): Google cites only hearsay in a demonstrative exhibit for proposed facts on DuckDuckGo usage in Europe. DX0633 at -067; DXD-41 at .021.

2115.   (Def. PFOF ¶¶ 576–577): Both DuckDuckGo's and Google's surveys show enormous consumer demand for greater privacy in search, Pls. PFOF ¶¶ 765, 1138, 1139, 1152–1153; UPX0835 at -722–25 (2018 Yahoo presentation about the growing demand for digital privacy, including more private search). Google disregards those expressed user preferences because it does not face meaningful competition in general search. Pls. PFOF ¶¶ 563–567.

2116.   (Def. PFOF ¶ 578): *Supra* ¶ 2113.

## C.   Yahoo Does Not Pose A Meaningful Competitive Threat To Google

2117.   (Def. PFOF ¶¶ 586–604): Yahoo's current share of the general search market is 2.2%. Tr. 4761:6–24 (Whinston (Pls. Expert)) (discussing UPXD102 at 47).

2118.   (Def. PFOF ¶¶ 587–590): The only significant default distribution deal that Yahoo has ever "won" was its 2014 agreement for the Firefox default. Des. Tr. 71:13–16, 71:19–25, 117:16–19, 117:21–118:7, 118:9 (Ramalingam (Yahoo) Dep.). Yahoo found that securing distribution is "near impossible on mobile" given Google's and Apple's control over the only mobile platforms in the United States. *Id.* 96:16–23, 97:1–10 (discussing UPX0836 at -365–366).

2119.   (Def. PFOF ¶ 587): Yahoo's agreement with Apple does not provide for default distribution on any device. The agreement requires Apple to offer Yahoo as a user-selectable choice in Safari on some devices but not others. *Infra* ¶ 2322.

2120.   (Def. PFOF ¶ 587): The ISA has prevented Yahoo from obtaining other forms of distribution on Safari. For example, Google prevented Yahoo from being included on a choice screen on Safari for Windows, Pls. PFOF ¶¶ 746–751; prevented Yahoo from being set as the homepage on Safari, Pls. PFOF ¶¶ 752–754; and prevented Apple from distributing versions of Safari with Yahoo set as default, Pls. PFOF ¶¶ 755–757.

2121.  (Def. PFOF ¶¶ 592–596): Yahoo does not have a web index and recognizes that building one would cost "billions of dollars." Pls. PFOF ¶ 55; Des. Tr. 58:24–59:1, 59:3–6, 59:8–14, 64:5–6, 64:8–18, 64:20–22, 64:24–65:5 (Ramalingam (Yahoo) Dep.).

2122.  (Def. PFOF ¶¶ 603–604): Google suggests, without evidence, that Yahoo failed to implement innovations called for in its 2014 Mozilla agreement. Rather, after making a large guarantee to outbid Google for the Firefox default, the resulting financial pressure forced Yahoo to load its SERP with ads, degrading the user experience. Pls. PFOF ¶¶ 1259, 1261.

**D.    Neeva's Failure Illustrates The Entry Barriers In General Search Services**

2123.  (Def. PFOF ¶¶ 605–631): Neeva exited the general search services market in May 2023. Pls. PFOF ¶ 40.

2124.  (Def. PFOF ¶ 610): Google misrepresents Dr. Ramaswamy's testimony. Neeva was a privacy-focused search engine with a free offering as well as a premium, subscription-based offering. Pls. PFOF ¶¶ 39, 78, 540; Tr. 3734:5–11 (Ramaswamy (Neeva)). For its search engine to generate "self-sustaining" revenue, Neeva needed approximately 2.5% of its target population to become "subscribers as opposed to users." *Id.* 3799:6–24, 3778:9–3779:25. Neeva, however, still relied on Bing's scale for Neeva's search quality. *Id.* 3671:2–3672:5, 3777:7–3778:6 (Neeva provided better results in only narrow categories like "technical queries" about software engineering and programming).

2125.  (Def. PFOF ¶¶ 616–620): Neeva failed despite leveraging AI. *Supra* ¶¶ 2062–2063; *infra* ¶ 2126. AI and machine learning have not displaced the importance of scale. Pls. PFOF ¶¶ 1022–1024; *supra* ¶¶ 2027–2028, 2039, 2063, 2105.

2126.  (Def. PFOF ¶¶ 624–625): Neeva's "inability to ultimately be able to compete in the search market" was due to a lack of distribution. Tr. 3699:13–3701:12 (Ramaswamy (Neeva)); *id.* 3694:7–21 (Neeva's success depended on having a lot of users, and being the

default was "the only way to have a reliable large number of users consistently use your product."). Neeva failed because Google's payments to Apple, other browsers, OEMs, and carriers "basically freeze the ecosystem in place effectively" and "provide an incredibly strong incentive for the ecosystem to not do anything." *Id.* 3796:5–3798:22; *id.* 3710:15–3712:20 ("[W]hen we talk about sort of why Neeva failed, it was simply because we could not get enough users to be in that state where they regularly used Neeva."); Pls. PFOF ¶¶ 540, 548, 877, 882, 888, 897, 903, 933.

2127.   (Def. PFOF ¶¶ 624–625): Users were willing to pay for Neeva. Tr. 3675:22–3677:10 (Ramaswamy (Neeva)) ("[P]eople that stuck with Neeva, several percentage points of them, were perfectly happy to become [Neeva] subscribers."); *id.* 3735:18–3736:16 (Neeva "got pretty comfortable with how we were able to convert users – convert free users to paying ones.").

2128.   (Def. PFOF ¶¶ 630–631): Neeva's acquisition by Snowflake was not considered a success. Tr. 3793:9–3794:8 (Ramaswamy (Neeva)); Pls. PFOF ¶¶ 540, 1120, 1124. Snowflake acquired Neeva for its strong engineering team as well as its crawl and language model capabilities, Tr. 3675:7–19, 3794:17–3795:23 (Ramaswamy (Neeva)), and shut down Neeva's consumer-facing search engine, *id.* 3674:16–3675:19; Pls. PFOF ¶¶ 40, 540.

## VI.   VERTICAL/SPECIALIZED SEARCH ENGINES

2129.   (Def. PFOF ¶ 632): Google would try harder, and do better, to provide quality results if it faced more competition. Pls. PFOF ¶¶ 570, 1079–1092 (§ VIII.B.2), 1126–1159 (§ VIII.C); *infra* ¶ 2256.

2130.   (Def. PFOF ¶ 633): Google defines a commercial query as a query in response to which Google serves an ad. Pls. PFOF ¶ 139. Google shows ads on many navigational queries, where the query seeks a specific website (e.g. "Facebook"). Pls. PFOF ¶ 329; Tr. 8922:18–20 (Israel (Def. Expert)) (Google sells ads in response to navigational queries.).

2131.   (Def. PFOF ¶¶ 635, 654–655): SVPs are not reasonable substitutes for GSEs. Pls. PFOF ¶¶ 378–387 (§ IV.A.4.b); *infra* ¶¶ 2208–2218. Commercial queries make up at most 20% of Google's queries. Tr. 186:17–25 (Varian (Google)); Tr. 8725:15–17 (Israel (Def. Expert)). For the 80% or more of searches where Google is *not* likely to serve an ad, Tr. 186:17–25 (Varian (Google)); Tr. 8725:15–17 (Israel (Def. Expert)), it does not face intense competition.

2132.   (Def. PFOF ¶¶ 637, 641, 644–651): Google's vertical products, such as *google.com/travel* (an SVP) or *shopping.google.com* (an SVP), are available on sites and tabs separate from its GSE. Google also offers vertical search features on its general search results page. Def. PFOF ¶¶ 721, 725. Vertical search features on Google's, or any GSE's, results page—including, *e.g.*, what Google terms "Flights units" or "Local units"—provide only a subset of the depth of information that an SVP would provide. These units include, and are akin to, links that must be clicked on to get further specialized "vertical" results. Def. PFOF ¶¶ 646–647, 700. For example, a user searching for flights on Google's GSE may see results from Google's Flights unit on the SERP; that link, however, takes the user to the Flights vertical product, where Google provides more in-depth information similar to that offered by an SVP.

2133.   (Def. PFOF ¶ 652): An SVP is a digital search engine that provides specialized search results within only a single category of information, *e.g.* travel (Expedia), local (Yelp), shopping (Amazon). Pls. PFOF ¶ 326; Des. Tr. 217:9–12, 217:15–23 (Baker (Mozilla) Dep.); Tr. 187:16–193:18 (Varian (Google)) (discussing UPX0334 at -085). Google's proposed SVP definition improperly includes Google Search and rival GSEs. As Google agrees, SVPs provide depth focused on a "narrower subject matter." Def. PFOF ¶ 942; Pls. PFOF ¶ 356. SVPs also serve results only from databases of proprietary information as opposed to a database of websites from across the internet. Tr. 6511:8–23 (Hurst (Expedia)) (Expedia "return[s] results from its

inventory of supply partners. Whereas, Google's returning results from anything it has scraped on the internet."); Tr. 4616:9–25 (Whinston (Pls. Expert)).

2134.   (Def. PFOF ¶¶ 667–670): SVPs' growth has not come at Google's expense; Google continues to grow both in queries and revenue. Tr. 9899:1–9900:6 (Murphy (Def. Expert)) ("[T]he marketplace has been successful in generating more queries."); Tr. 8552:8–16 (Israel (Def. Expert)). Some SVPs have grown; others failed. Like queries and ad revenue, the ad "pie"—total digital ad spend in the U.S.—is growing over time. Pls. PFOF ¶ 577. Dr. Israel agreed: "[T]o be clear, they're all growing. Google is not shrinking." Tr. 8873:25–8874:21 (Israel (Def. Expert)). Google estimates that its revenue growth will continue in future years. UPX0478 at -589 (projecting continued growth through 2030 (the full period surveyed)).

2135.   (Def. PFOF ¶ 671): Expedia's "record year" in 2022 reflected the resumption of annual growth as part of a rebound following the COVID-19 pandemic. Tr. 6545:5–18 (Hurst (Expedia)).

2136.   (Def. PFOF ¶ 672): SVPs are among the top advertisers on Google. Pls. PFOF ¶ 387. Google refers substantial user traffic to SVPs. Tr. 4614:9–4615:16 (Whinston (Pls. Expert)) (Many SVPs get a "significant amount . . . of their traffic referred from general search engines."); *id.* 5870:21–5871:18, 5885:7–5885:25.

2137.   (Def. PFOF ¶¶ 673–679): *Supra* ¶ 2134. Increased use of SVPs leads to increased, not decreased, use of Google Search. Pls. PFOF ¶¶ 385–386.

2138.   (Def. PFOF ¶¶ 681–684): Google has not invested as much as it would have in the face of competition. Pls. PFOF ¶¶ 1067–1070 (§ VIII.B).

2139.   (Def. PFOF ¶¶ 685–686): Google cites no evidence that any decline in query types was due to cannibalization by SVPs; rather, increased usage of SVPs leads to increased use of Google Search. Pls. PFOF ¶¶ 385–386; *infra* ¶ 2140 (Google's total hotel queries increasing).

2140.   (Def. PFOF ¶¶ 687–694): Google cites DX0046, which shows Google's total hotel queries have increased. DX0046 at .007 (hotel queries on Google ***up 6%***); Des. Tr. 44:10–18 (Osmond (Triptease) Dep.) (Most searches by US consumers for hotel rooms start on Google.).

2141.   (Def. PFOF ¶¶ 696–717, 719–760): *Supra* ¶ 2132.

2142.   (Def. PFOF ¶ 718): *Supra* ¶ 2129.

## VII.   ECONOMICS BEHIND SEARCH ENGINE DISTRIBUTION AGREEMENTS

### A.   Google's Exclusionary Contracts Provide Incremental Search Volume To Google Because Defaults Dictate Where Many Users Will Search

2143.   (Def. PFOF ¶¶ 761–763): Plaintiffs are not challenging the concept of a search default or that distributors may recommend a search engine, set a search default, or preinstall search access points. Plaintiffs are challenging Google's exclusionary contracts that require counterparties to set Google as the exclusive search default. Even if setting a particular GSE as the preinstalled default results in *that* GSE receiving more searches than if a rival were set, Pls. PFOF ¶¶ 867–943 (§ VI.D), that does not mean that it increases *overall* output.

2144.   (Def. PFOF ¶ 763): To the extent defaults provide an implicit recommendation, that effect is likely limited. Google's own research indicates that most Safari users are not aware that they are using Google when typing queries into Safari's search bar. Tr. 7514:19–7515:12 (Raghavan (Google)) (discussing UPX2051 at -520). Even if it were true that a preset search default provides an implicit recommendation to the user from the distributor, this would not change the fact that defaults dictate which GSE many users will use.

2145.   (Def. PFOF ¶ 764): Prof. Whinston's share-shift analysis accounts for the factors Google identifies affecting how many users stick with a default GSE. Pls. PFOF ¶¶ 914–931 (§ VI.D.5).

2146.   (Def. PFOF ¶¶ 765–767): Plaintiffs used the Apple Maps event in the share-shift analysis because Google and Microsoft used the Apple Maps event when estimating the impact of switching the default search on mobile devices. Pls. PFOF ¶¶ 914–931 (§ VI.D.5). These firms—in the ordinary course of business and with high stakes for accuracy—are in the best position to know what real-world events are most informative. Tr. 10497:2–10499:15 (Whinston (Pls. Expert)). Moreover, the estimates based on the Apple Maps event are consistent with estimates derived from other sources. Pls. PFOF ¶¶ 927–929; UPX0821 at -630 (2018 Microsoft notes indicating that Apple "believe[s] in power of defaults and they assume that they will have the same usage share of search as they do of maps" if Bing is set as the default). The fact that the Google Maps app was not launched until three months after Apple made Apple Maps the default does not mean the event is a poor proxy for the impact of a default search switch; Google's analysis using the Apple Maps event was based on the "*sustained* decline of GMM usage on iOS after release of Apple Maps." UPX1050 at -868 (footnote (a)) (emphasis added).

2147.   (Def. PFOF ¶¶ 768–770): *Infra* ¶¶ 2150–2154, 2356–2359.

2148.   (Def. PFOF ¶¶ 771–772): Even if RSA payments incentivize partners to promote search engine usage, payments would likely be *higher* in a competitive market. PFOF ¶¶ 1298–1299 (§ X.B.2.a). Google concedes that non-exclusive agreements like the bookmark agreements incentivize partners to promote search engine usage. Def. PFOF ¶¶ 771–772 ("The same is true of other forms of payments for incremental promotion, such as prominent placement . . . ."). Android OEMs and carriers have independent incentives to improve their devices in ways that

increase search. Pls. PFOF ¶¶ 1328–1330. Google's RSAs and the ISA only incentivize more

*Google* searches—Google uses them to disincentivize Apple's entry and disincentivize the use of

disruptive new technologies such as Branch. Pls. PFOF ¶¶ 832–862 (§ VI.B.5), 1092–1125

(§ VIII.B.3). The RSAs also reduce rivals' and Google's incentives to invest in improving their

search, Pls. PFOF ¶¶ 1071–1092 (§§ VIII.B.1–2), and the ISA reduces Apple's incentive to

invest in search ads, Pls. PFOF ¶¶ 230, 1116–1119. Given these disincentives, Google offers no

calculations as to how the RSAs and the ISA increase the total number of searches (output).

**B.      Google's Exclusionary Contracts Provide Incremental Search Volume To
         Google By Requiring Distributors To Give Google Search Prominent Placement**

2149.   (Def. PFOF ¶¶ 773–776): Google conflates (1) what third parties may choose to

do, e.g., a browser developer choosing to set a single default search or an Android OEM

choosing to place a search widget on the homescreen and (2) Google using contracts to require

that distributors set Google as the exclusive default search and give it prominent placement.

Plaintiffs challenge only the latter. The evidence cited by Google provides no support for a

finding that presenting users with a choice screen would "cause users to abandon use of" general

search services or even reduce that use. The "seamless integration" of the search box and address

bar is not impacted or undone by presenting users with a choice screen upon first use of a

browser or device. In 2005, Google extolled the virtues of choice screens when arguing that

Microsoft should employ a choice screen for IE. UPX0172 at -731–32 (Users "should be given a

simple means of [selecting a default search product] the first time they use the search

functionality" on IE and a choice screen would "place[] control in the hands of the end user,

where it belongs."). Google also ignores that the MADA's and Android RSA's placement

requirements reduce the ability of OEMs and carriers to experiment and create better user

experiences. Pls. PFOF ¶¶ 1323–1330; Des. Tr. 91:21–25, 92:2–93:25 (Ezell (AT&T) Dep.).

### C.  Google's Proposed Benchmarks Are Inapplicable And Outdated

2150.  (Def. PFOF ¶ 777): A large percentage of users will rely on the default search engine even when higher-quality alternatives are available. Pls. PFOF ¶¶ 867–883, 956–964; Tr. 9943:23–9944:7, 9945:3–11 (Murphy (Def. Expert)); Tr. 529:17–531:21, 532:18–535:12 (Rangel (Pls. Expert)).

2151.  (Def. PFOF ¶¶ 778–779, 829–831): Google's success on Windows has little relevance in this action because most of Google's challenged defaults are on mobile devices, Pls. PFOF ¶¶ 83, 223, 254, 923–924, where the power of defaults is greatest, Pls. PFOF ¶¶ 919–923. Neither does Google's success on Windows show (1) that defaults are powerless on desktop or (2) that Prof. Whinston's calculations are flawed.

2152.  (Def. PFOF ¶¶ 778–779, 829–831): Google's success on Windows is largely attributable to users' switching browsers, not default search engines. Tr. 1962:13–1963:2 (Weinberg (DuckDuckGo)); Pls. PFOF ¶ 913. Chrome's share on Windows was above 50% as early as 2016 and was over 80% by 2021. DXD-37 at .038 (relied upon by Prof. Murphy, *e.g.*, Tr 9781:21–9783:5 (Muphy (Def. Expert))). On Windows, where users long suffered from the security and speed failures of Internet Explorer and where Google has had significant Chrome distribution deals, *infra* ¶¶ 2180–2181, using Chrome or Firefox became commonplace. But switching the default search engine within a browser has always been a rarity, even on desktop computers and even on browsers that default to a search engine other than Google. Pls. PFOF ¶ 913; UPX0172 at -731 ("[M]ost end users do not change defaults."); Tr. 1962:13–1963:2 (Weinberg (DuckDuckGo)).

2153.  (Def. PFOF ¶¶ 778–779, 829–831): Historically, Google has never used—or even measured—its overall success on Windows as a means of predicting the power of desktop search defaults. Instead, Google consistently predicted the desktop power of defaults based on data from

Firefox's 2014 default shift to Yahoo. *E.g.*, UPX1050 at -828, -868, -886; Pls. PFOF ¶ 917. In these ordinary-course analyses, Google predicted it would lose 30–45% of the queries running through the address bar of a desktop browser if Google were no longer the default. Pls. PFOF ¶ 917; UPX0173 at -126; Tr. 10549:16–10500:4 (Whinston (Pls. Expert)) (discussing UPXD106 at 19). Prof. Whinston—who relied on ordinary course calculations—conservatively selected 30% as Google's estimate of the desktop power of defaults. Tr. 10497:2–10500:4 (Whinston (Pls. Expert)) (discussing UPXD106 at 19).

2154.   (Def. PFOF ¶¶ 778–779, 829–831): Using Google's overall share on Windows not only conflicts with ordinary-course analysis but also yields a default effect *greater* than the 30% Prof. Whinston used from Google's analyses. At trial, Prof. Murphy emphasized how Google's market share on macOS is only 16 percentage points greater than Google's share on Windows. Tr. 9763:14–22 (Murphy (Def. Expert)); DXD-37 at .056. But this is not an apples-to-apples comparison. First, Prof. Whinston used a percentage change, not a percentage-point change. *Supra* ¶ 2153. Second, Prof. Whinston used a number signifying the percent of default queries Google would lose, not the percent of overall queries Google would lose. *Id*. Converting the overall percentage-point difference on Windows to the percent of default queries Google would lose if it were no longer the default shows a 46% effect. Tr. 5746:11–5747:9, 5747:17–5749:14 (Whinston (Pls. Expert)) (discussing UPXD104 at 30). That 46% effect is well above the 30% effect that Prof. Whinston used from Google's analyses. *Supra* ¶ 2153.

2155.   (Def. PFOF ¶ 780): In 2007, Google examined what influenced a user's choice of search engines and found that default home page setting "trumps" other factors. Pls. PFOF ¶ 878.

2156.   (Def. PFOF ¶¶ 781–782): When presenting search shares on Windows Mobile and Blackberry devices, Google primarily relies on a consultant's single, 2010 presentation and

Mr. Nadella's testimony related to that presentation. DX0440; DX0439 (second version of the presentation in DX0440 containing the same relevant slides). In 2016 and 2018, when Microsoft made business decisions based on the default effects on mobile, Microsoft used different Windows Mobile numbers and did not rely on Blackberry numbers at all. UPX0115 at -142; Pls. PFOF ¶¶ 914–931 (§ VI.D.5). In the ordinary course, Google and Apple also used substantially different numbers for default effects on mobile. *Id*. If the clawback numbers suggested by DX0440 were accurate, it would mean Google' search distribution contracts do not make economic sense. Tr. 10504:16–10506:11 (Whinston (Pls. Expert)). Google also fails to note that DX0440 states, "Google defaults and carrier relationships cement their large query share." DX0440 at -044.

2157.   (Def. PFOF ¶¶ 783–786): *Infra* ¶¶ 2356–2359.

2158.   (Def. PFOF ¶ 787): *Supra* ¶ 2013; *infra* ¶ 2361.

2159.   (Def. PFOF ¶ 788): *Supra* ¶ 2013.

**D.      Revenue Share Agreements Can Exist Without Exclusive Default Requirements**

2160.   (Def. PFOF ¶¶ 789–792): *Infra* ¶¶ 2167, 2320–2323, 2326, 2353.

**E.      Real-World Precedent Supports Unconditional Revenue Share And Choice Screens**

2161.   (Def. PFOF ¶¶ 793–795): Google conflates the methodology for calculating foreclosure with the broader question of analyzing the competitive effects of the challenged conduct. Tr. 5778:4–5781:7 (Whinston (Pls. Expert)). Calculating foreclosure is "an input in some sense to thinking about competitive effects." *Id*.

2162.   (Def. PFOF ¶¶ 793–795): Foreclosure is calculated by determining the percentage of the market that is "tied up" by the challenged contracts. Pls. PFOF ¶ 946. As Prof. Murphy

agrees, foreclosure is **not** calculated by measuring the difference in market shares between this world and the world that would exist without the contracts. Pls. PFOF ¶ 948.

2163.   (Def. PFOF ¶¶ 793–795): Prof. Murphy testified that foreclosure should be calculated by comparing rivals' "ability to compete" in this world to their "ability to compete" in the but-for world. Tr. 10003:16–10004:10 (Murphy (Def. Expert)). Prof. Murphy asserted this approach would produce a different result than attempting to compare rivals' market shares in this world and the but-for world. *Id.* ("[I]t's about the ability to compete in the two worlds," not "who wins or loses," and people should not "confuse the outcome in terms of shares with the ability to compete which are two different things.").

2164.   (Def. PFOF ¶¶ 793–795): In a world without Google's anticompetitive agreements, rivals would have the "ability to compete" for all queries that are currently covered by those agreements. Thus, Prof. Murphy's approach to calculating foreclosure would simply involve subtracting zero from the percentage of the market for which rivals lack the "ability to compete" today. Prof. Murphy provided no support for this proposed technique. Tr. 10004:12–10005:10 (Murphy (Def. Expert)). In any event, it would yield the same foreclosure percentage as Plaintiffs' method. Pls. PCOL at 23–24.

2165.   (Def. PFOF ¶¶ 793–795): As to the broader question of competitive effects, it is impossible to reconstruct the hypothetical marketplace that would exist absent Google's decade-long anticompetitive conduct. Pls. PFOF ¶¶ 972–973. Nevertheless, in his assessment of competitive effects, Prof. Whinston analyzed how competition would be different in but-for worlds in which Google engaged in less restrictive contracting practices. Tr. 5774:14–25, 5776:22–5778:3 (Whinston (Pls. Expert)).

2166.   (Def. PFOF ¶¶ 793–795): In his assessment of competitive effects, Prof. Murphy did not attempt to specify how the world would have developed but-for the challenged conduct. Tr. 10005:12–10006:16 (Murphy (Def. Expert)). Instead, Prof. Murphy focused his analysis on "one of the worlds without defaults that seemed like a reasonable proxy"—a world with choice screens. *Id.* Prof. Murphy disregarded a range of other outcomes that could have arisen but-for the challenged conduct. Pls. PFOF ¶¶ 975–976.

2167.   (Def. PFOF ¶¶ 796–797, 799, 802): Popular forms of search distribution agreements include (1) unconditional revenue share agreements and (2) revenue share agreements with only non-exclusive conditions. Apple and Mozilla routinely enter into such agreements with Google's rival GSEs. *Infra* ¶¶ 2320–2323, 2353. These agreements show that GSEs need not insist on default exclusivity to reach revenue share agreements with distributors.

2168.   (Def. PFOF ¶ 797): Unconditional revenue-share models are also common outside the general search market. Pls. PFOF ¶ 1309.

2169.   (Def. PFOF ¶ 798): *Infra* ¶ 2311; Pls. PFOF ¶¶ 779–862 (§ VI.B).

2170.   (Def. PFOF ¶¶ 800, 815): *Supra* ¶¶ 2143–2148 (§ VII.A).

2171.   (Def. PFOF ¶¶ 803–804): Yandex pays to appear on a choice screen, and Google's search rivals Bing, DuckDuckGo, and Yahoo pay for non-exclusive distribution. Pls. PFOF ¶ 1321. ████████████████████████████████████, JX0024 at -822 (§ 1) (Apple JCA (2014)), akin to contracting to appear on a choice screen.

2172.   (Def. PFOF ¶¶ 807, 809–810, 812): Apple wanted the option but not the obligation to set Google as the default on Apple devices, which would have been compatible with a choice screen. Pls. PFOF ¶¶ 758–761. Apple may have aimed for more choice screens if it

had succeeded in getting a Windows Safari choice screen. Pls. PFOF ¶¶ 747–751. Google refused to modify the ISA to permit Apple to ship Windows Safari with a choice screen. *Id.*

2173.   (Def. PFOF ¶ 813): *Infra* ¶ 2311.

2174.   (Def. PFOF ¶ 814): Parity in the form of most-favored-nations contract clauses are common in other areas. DX0276 at .033 (MFN provisions in the online travel industry). Revenue share payments conditioned on a choice-screen appearance would be at least as favorable to search providers as the current agreements that many search engines enter. UPX1012 at -946 (DuckDuckGo's agreement with Apple); *infra* ¶¶ 2320–2326.

2175.   (Def. PFOF ¶ 816): A choice screen would offer Google incremental promotion relative to a rival having the default (*e.g.*, what happened on Firefox when it switched to Yahoo, Pls. PFOF ¶ 908).

2176.   (Def. PFOF ¶ 817): Choice screens can be a "1-second decision." UPX0749 at -307. Making a choice-screen selection is far less "cumbersome" than navigating between search services on a query-by-query basis, which Dr. Israel claims entails "minim[al]" cost. Tr. 8701:10–22 (Israel (Def. Expert)). Moreover, there is no evidence that the implementation of choice screens makes devices less popular. Android use has grown in Russia after these devices adopted choice screens. Pls. PFOF ¶ 1316.

2177.   (Def. PFOF ¶¶ 818–819, 821): After the EU choice screen was introduced, Google's payments to partners went up. Pls. PFOF ¶ 1299. Partners also have the option to receive payments from other GSEs. UPX0162 at -290 (seeking authority to increase revshare payments given the risk of OEMs partnering with other GSEs in the EU); Tr. 9497:18–23, 9499:14–9500:9 (Rosenberg (Google)) (discussing UPX0162). The relative weakness of Google's EU rivals and Google's "Go Big in Europe" investments both affected rivals' growth

rates after the choice screen was implemented. Pls. PFOF ¶¶ 911–912, 1089–1090. Yandex gained significant market share after the Android choice screen was introduced in Russia. Pls. PFOF ¶ 910.

2178.   (Def. PFOF ¶ 820): In a choice screen scenario, both Google and its rivals would have a much greater incentive to invest. Tr. 10546:19–10549:16 (Whinston (Pls. Expert)); *infra* ¶¶ 2260, 2396–2398. Similarly, Yandex increased investments in Russia after the choice screen. Tr. 10611:16–23 (Whinston (Pls. Expert)). The same investment incentives are present in the United States. Pls. PFOF ¶¶ 911–912, 1067–1070, 1089–1090, 1120.

2179.   (Def. PFOF ¶¶ 822–823): With more competition in GSEs, revenue-share payments to partners would be the product of a competitive process and likely go up, not down. Pls. PFOF ¶¶ 1298–1299. Google has not shown that payments to Apple and Android partners are passed through to consumers. Pls. PFOF ¶¶ 1280–1293; *infra* ¶ 2466.

## VIII.   SEARCH DISTRIBUTION/DEFAULT DEALS

### A.   Google Has A Long History Of Default Distribution On Windows PCs

2180.   (Def. PFOF ¶¶ 824–831): Historically, Google had significant default search distribution on Windows. For example, in January 2009, Google had "81 total distribution partners worldwide," with two partnerships alone "effectively reach[ing] close to 100% of Internet users worldwide." UPX0118 at -493; *accord* UPX0327 at -355–56 (listing PC OEMs Sony, Toshiba, Acer, and Fujitsu as Google's Windows partners in 2010); DX0007 at -446 ("Distribution deals accounted for 17.5% of [worldwide] traffic to Google in Q2 2007."); UPX5193 at -327 (§ 3.2(b)) (Sony RSA (2008)) (extending to 2010 an exclusive RSA that set Google as the default search engine on all search access points on Sony Windows computers); Tr. 7722:15–7723:2 (Pichai (Google)).

2181.   (Def. PFOF ¶¶ 824–831): Today, Google's default search distribution on Windows remains enormous. Google distributes search through exclusive default agreements with Firefox and smaller browsers. PFOF ¶¶ 310–318 (§ III.F.3). And without the need for an agreement, Google distributes itself as the default in the Chrome browser, which is (by far) the most used browser on Windows. Tr. 3584:11–13 (Nadella (Microsoft)).

### B.   Portal/Homepage Default Deals

2182.   (Def. PFOF ¶¶ 832–834): *Supra* ¶¶ 2180–2181 (§ VIII.A).

### C.   Google Had Exclusive Distribution Agreements For Early Mobile Phones

2183.   (Def. PFOF ¶ 842): Early distribution agreements made Google the exclusive default search on mobile phones. *E.g.*, UPX5533 at -124–125 (§ 5) (Sprint RSA (2008)); JX0003 at -160 (§ 6) (Motorola RSA (2005)).

2184.   (Def. PFOF ¶¶ 847–848, 852–856): *Supra* ¶ 2156.

### D.   Plaintiffs Are Challenging Google's Use Of Exclusionary Contracts, Not Browser Developers' Choices

2185.   (Def. PFOF ¶¶ 860–864, 867): Since the 2000s, Google's contracts with browser developers have required that Google be the exclusive default search; this froze the ecosystem. Pls. PFOF ¶¶ 211–215, 313. The ISA has prohibited Apple from adopting product designs that would promote consumer choice in search. Repeatedly, Apple has sought to loosen Google's restrictions and try different product designs, including a choice screen, but Google has rejected all these efforts. Pls. PFOF ¶¶ 740–778 (§ VI.A.2). Google's Android carrier RSAs have also, for many years, required a single search default on preinstalled browsers. *E.g.*, JX0015 at -990 (Exhibit A, § 6) (AT&T RSA (2011)); JX0026 at -278–79 (Exhibit 8, § 2(l)) (Verizon RSA (2014)). Absent Google's exclusionary contracts, consumers likely would have had significantly better and more varied search services. Pls. PFOF ¶ 1126.

2186.   (Def. PFOF ¶¶ 865–866): *Supra* ¶ 2021.

2187.   (Def. PFOF ¶ 868): *Supra* ¶¶ 2143–2144; *infra* ¶ 2196.

**E.     The Early Days Of Android Distribution Do Not Diminish The Importance Or Impact Of Defaults Or Google's Exclusionary Contracts**

2188.   (Def. PFOF ¶ 876): Google considered Android "the greatest opportunity for Search monetization in mobile," and Google has long sought to exclude search rivals from the platform. Pls. PFOF ¶¶ 811–812.

2189.   (Def. PFOF ¶¶ 887–888): Google could, and has incentives to, fund Android without the MADA's exclusivity provisions. Pls. PFOF ¶¶ 1312–1317 (§ X.C.1.a). Google could continue to give Android away, and charge for licenses to distribute its products, as in Europe. Tr. 3418:7–3419:16 (Tinter (Microsoft)) (describing the Google Play Store license fee in Europe). Even assuming the MADA was necessary for Google to promote Android when it was a nascent mobile OS, that is no longer true today.

2190.   (Def. PFOF ¶ 889): Android RSAs do not merely "provide enhanced promotion;" they require search default exclusivity. Pls. PFOF ¶¶ 798–817 (§ VI.B.2). Encouraging Android OEMs and carriers to invest in quality Android devices and take user-enhancing actions, like making regular security updates, does not require Google to exclude other GSEs from Android devices. Pls. PFOF ¶¶ 1343–1344. Google already uses alternative means to promote Android devices—MSIAs—and could use them to incentivize security and OS updates. *Id.* ¶¶ 289–291, 1308.

2191.   (Def. PFOF ¶¶ 894, 901–902): *Supra* ¶ 2021.

2192.   (Def. PFOF ¶ 903): *Infra* ¶¶ 2416–2428 (§§ XII.C–D).

**F.     Google's Development Of The Chrome Browser**

2193.   (Def. PFOF ¶¶ 905–906): *Supra* ¶ 2093.

2194.   (Def. PFOF ¶ 907): The cited evidence does not support a connection between marginal third-party browser improvements and search activity. The only evidence Google cites concerns Chrome's 2008 launch. Google also overlooks the many unrelated reasons why searches have increased with time, such as faster internet speeds and the growing number of webpages. Tr. 10456:17–10458:18 (Whinston (Pls. Expert)) (discussing UPXD106 at 3).

2195.   (Def. PFOF ¶ 908): A browser is not a general search engine. UPX0851 at -393, -410–11; DX0298 at .009.

2196.   (Def. PFOF ¶ 915): Easy access to Google Search is only a small part of Chrome's success; as Google admits, other factors explaining Chrome's success are its simplicity, speed, and security. Def. PFOF ¶ 910; *id.* ¶ 912 (collecting evidence of Chrome's advantages, none of which are its default search engine); Tr. 10067:19–10069:2 (Murphy (Def. Expert)) (agreeing that some users download browsers for reasons unrelated to search and that he did not quantify users who download browsers for the default search engine); *id.* 10072:24–10075:18 (discussing UPXD227, Prof. Murphy's data showing Firefox and Chrome with drastically different market shares when both defaulted to Google); *infra* ¶ 2357.

2197.   (Def. PFOF ¶ 916): Google misinterprets evidence that, in 2010, computer users who switched to Chrome from Internet Explorer or Firefox searched more with Google. DX0023 at -630. The evidence speaks only to "Google searches," not overall searches, and gives no explanation for the increase (e.g., how much of the increase on Internet Explorer was attributable to the difference in search defaults). Tr. 7723:3–7724:24 (Pichai (Google)).

2198.   (Def. PFOF ¶ 919): Even when changing defaults appears easy to an informed observer, defaults have large effects. Pls. PFOF ¶¶ 869–871, 875.

## IX.   MARKET DEFINITIONS

### A.   General Search Services In The United States Is A Relevant Market

2199.   (Def. PFOF ¶ 921): Many queries do not have "an answer." When a user searches on a GSE, the product is the search engine results on the SERP. Pls. PFOF ¶¶ 60–64.

2200.   (Def. PFOF ¶¶ 922–923): Dr. Israel's sessions data analysis, the only support for Google's proposed finding, is flawed. Tr. 10470:8–10472:9 (Whinston (Pls. Expert)). Dr. Israel's Table (DXD-29 at .025) includes all visits, even those where the user performed only a single query or entered the same query phrase several times. Def. PFOF ¶ 922. Visits with only a single query-phrase (even if logged multiple times) do not reveal anything about one-stop shopping—users can take advantage of Google's one-stop shop with a single query. Pls. PFOF ¶¶ 327–333.

2201.   (Def. PFOF ¶¶ 924–925, 928, 955–956): Users "can" pick different search providers, certain users may use a variety of tools, and in some instances may select a search provider on a query or vertical basis—however users most often start on a GSE. Pls. PFOF ¶¶ 327–329, 373–387. As Dr. Israel conceded, "if you have no idea where to look, you could type into a GSE and it may give you an answer." Tr. 8719:14–23 (Israel (Def. Expert)). Dr. Israel noted that, in his experience, to get a response to a very specific query without a GSE "would probably take some experimentation across different sources." *Id*. 8716:20–8717:3.

2202.   (Def. PFOF ¶¶ 926–927): Dr. Israel's analysis of user visits to SVPs and GSEs in auto, flights, and shopping verticals is flawed. The analysis includes all visits to SVPs regardless of whether a user entered a query. Tr. 8757:22–8758:2 (Israel (Def. Expert)) (analysis did not count queries); *id*. 8758:11–21 (Analysis "also could include some additional activity on the SVP."); *id*. 8403:16–8404:5, 8670:3–22. For example, a user checking into a flight on an airline's app was counted as a visit to an SVP. *Id*. 8758:3–21 (Agreeing that for a given user, a visit to an SVP in the analysis may not include a search.). Dr. Israel created his own vertical

51

categories that were not based on Google's or any other ordinary-course classifications. *Id*. 8747:10–12 ("Q. So you made your own categorizations, right? A. Well, yeah, that's fair.").

2203.   (Def. PFOF ¶¶ 928, 929): *Supra* ¶¶ 2131, 2134, 2137; Pls. PFOF ¶¶ 374–377.

### 1.     SVPs Are Not Reasonably Interchangeable With GSEs And Do Not Impose A Sufficient Competitive Constraint On A Hypothetical GSE Monopolist

2204.   (Def. PFOF ¶¶ 932–935): GSEs are also available via apps. Google's Search App comes preloaded on Android devices, Pls. PFOF ¶ 154, and is thus more accessible to users than SVP apps that do not come preloaded. Des. Tr. 139:20–23, 140:1–3 (Baker (Mozilla) Dep.) ("[M]erely having an app in the app store is a very difficult way to compete with the preloaded defaults."); Pls. PFOF ¶ 880 (App downloads are an ineffective method of distribution.). Moreover, not all SVPs are well-known or highly used. *E.g.*, Tr. 8719:8–23 (Israel (Def. Expert)) (Top organic result (CJ Pony Parts) is not well known.). For SVPs that do not come preloaded on a device, users must know of, find, and download an SVP's mobile applications. Des. Tr. 139:20–23, 140:1–24 (Baker (Mozilla) Dep.) (Each user "must make a conscious decision and go through a lot of work to go get your product. Find the app, get it, download it, install it."); Tr. 8717:11–23 (Israel (Def. Expert)) (Users may have to look for or try different SVPs to find the right one for a particular query.).

2205.   (Def. PFOF ¶ 937): As defaults are weaker on desktop, users are more likely to make a query-by-query choice on desktop than mobile, if they make a choice at all. Prof. Whinston's use of desktop data is thus a conservative estimate of the likelihood that a user will start their search on a GSE. The percentage of search sessions beginning on GSEs on mobile devices is therefore likely higher than 77%. Pls. PFOF ¶¶ 867, 909, 918–922.

2206.   (Def. PFOF ¶ 938): Prof. Whinston's analysis includes all queries, including those in verticals where SVPs compete. Tr. 5878:3–7 (Whinston (Pls. Expert)).

2207.   (Def. PFOF ¶ 939): Prof. Whinston properly included navigational queries. A consumer may use a general search engine as a navigational aid, making a specialized search engine a complement, rather than a substitute, to Google. Pls. PFOF ¶¶ 329–330. Failure to include navigational queries ignores an important difference between GSEs and SVPs that partially explains the products commonly being used together. Pls. PFOF ¶¶ 385–386.

2208.   (Def. PFOF ¶¶ 941–942): Plaintiffs agree that SVPs serve "narrower subject matters" than GSEs—SVPs provide depth, not breadth. Pls. PFOF ¶¶ 325–326; Tr. 8428:22–8429:25 (Israel (Def. Expert)) (SVPs provide "vertical-specific depth."); *supra* ¶ 2133.

2209.   (Def. PFOF ¶ 943): All SVPs, even those with strong brand awareness, like Amazon, are reliant on Google to be discovered by users. Pls. PFOF ¶ 387 (SVPs are the top advertisers on Google.); *id.* ¶ 586; Tr. 4614:9–4615:16, 5870:21–5871:18 (Whinston (Pls. Expert)); Tr. 5236:18–5237:23 (Dijk (Booking.com)) ("If you want to be found on the web, you know, there's one door that is controlled by Google, and we need to use the door for our new customers."); Des. Tr. 330:19–332:2; 332:4–334:15 (Connell (Microsoft) Dep.).

2210.   (Def. PFOF ¶ 944): An SVP's ability to facilitate a purchase or booking is a product differentiation between GSEs and SVPs. General search engines and specialized search engines occupy separate markets and are in many cases complements rather than substitutes. Tr. 4608:14–4609:6 (Whiston (Pls. Expert)) ("[P]roduct differentiation really does matter for substitution . . . ."); *id.* 4611:2–4616:8; Pls. PFOF ¶¶ 382–387.

2211.   (Def. PFOF ¶ 945): SVPs do not impose a sufficient competitive constraint on GSEs, in the travel vertical or others, to hinder a hypothetical monopolist of general search services from exercising substantial market power. Pls. PFOF ¶¶ 373–387; *supra* ¶¶ 2131–2132.

2212.   (Def. PFOF ¶ 946): Users cannot perform similar searches on Google and many SVPs because those SVPs only permit searches in predefined ways, for example using drop-down menus rather than a search box. Tr. 6511:8–23 (Hurst (Expedia)) (Expedia "only works with structured queries," which include information like "where you're going, what dates you're going, and how many people are going."); Pls. PFOF ¶¶ 379–380. Further, users searching on different platforms often have different intents. Tr. 7360:25–7362:2 (Raghavan (Google)); Tr. 8752:12–8753:23 (Israel (Def. Expert)).

2213.   (Def. PFOF ¶ 947): Google's travel vertical, *google.com/travel*, and certain travel sites have similar search results pages. Google's general search engine, *google.com*, provides broader results, interleaved with snippets of more specialized content, such as a flights unit. Tr. 8918:17–24 (Israel (Def. Expert)); Pls. PFOF ¶ 380.

2214.   (Def. PFOF ¶ 948): Searches on SVPs are not cannibalizing travel searches on *google.com*. *Supra* ¶¶ 2139–2140.

2215.   (Def. PFOF ¶¶ 949, 951–952): Google identifies other GSEs as its competitors and does not view SVPs as competing for general search queries. Pls. PFOF ¶ 352.

2216.   (Def. PFOF ¶¶ 953, 958): SVPs do not impose a sufficient competitive constraint on GSEs, in the shopping vertical or others, to hinder a hypothetical monopolist of general search services from exercising substantial market power. Pls. PFOF ¶¶ 373–387; *supra* ¶¶ 2131–2132. Increased usage of SVPs leads to increased, not decreased, use of Google Search. Pls. PFOF ¶¶ 385–386.

2216.1 (Def. PFOF ¶¶ 954, 960, 964–965): Dr. Israel's query-comparison analysis is flawed. Even when query terms overlap between Google and Amazon, it does not mean a user is searching with the same intent across both sites. Tr. 8754:19–8757:9 (Israel (Def. Expert))

(Some people searching "Valentines day" on Google probably did not want to shop.); *id.* 8752:12–8753:23; *supra* ¶ 2212. Google's SERP provides many links and search features unavailable on Amazon. Tr. 4617:1–4618:3 (Whinston (Pls. Expert)) (Google provides very different results for the queries in Dr. Israel's query analysis than Amazon (discussing UPXD102 at 10)); Pls. PFOF ¶ 326. Dr. Israel's query analysis does not use Google's ordinary course shopping vertical definition, but instead a definition he created for litigation. Tr. 8746:24–8747:12 (Israel (Def. Expert)). Dr. Israel has not done a similar analysis using Google's own ordinary course definition. *Id.* 8751:15–23. Dr. Israel improperly excludes navigational queries—which often are commercial queries showing ads—and his results are dependent upon that exclusion. *Id.* 8749:7–15; Pls. PFOF ¶ 139; *supra* ¶ 2130.

2217.   (Def. PFOF ¶¶ 961, 967): Google monitoring and responding to shopping SVP innovations is consistent with Plaintiffs' general search services market and with the fact that Google's shopping SVP (at *shopping.google.com*) competes with SVPs in the shopping vertical. *Supra* ¶ 2132; Pls. PFOF ¶ 369 (SVPs identify other SVPs as competition, not GSEs.).

2218.   (Def. PFOF ¶¶ 962, 964–965): SVPs do not impose a sufficient competitive constraint on GSEs, in the local vertical or others, to hinder a hypothetical monopolist of general search services from exercising substantial market power. Pls. PFOF ¶¶ 372–387; *supra* ¶¶ 2131–2132.

2219.   (Def. PFOF ¶ 963): *Supra* ¶ 2212.

2219.1 (Def. PFOF ¶ 966): The fact that some local SVPs may view Google as a competitor is consistent with Plaintiffs' general search services market and with the fact that Google's local services SVP (at *google.com/maps*) competes with other SVPs in the local vertical. For example, results to a local query provided by (1) *yelp.com* and (2) *google.com/maps*

(as opposed to by Google's GSE) are incredibly similar. *Supra* ¶¶ 2132, 2217; Pls. PFOF ¶ 369 (SVPs identify other SVPs, not GSEs, as competition.).

2.      **Rival GSEs Do Not Impose A Sufficient Competitive Constraint On Google**

2220.   (Def. PFOF ¶ 969): Given the current weakness of its rivals, Google often makes business decisions without considering what other GSEs are doing. *E.g.*, Pls. PFOF ¶¶ 1143, 1162. However, to the extent that Google monitors and responds to any rivals, Plaintiffs agree that Google monitors GSEs most closely. Pls. PFOF ¶¶ 352–355.

2221.   (Def. PFOF ¶ 970): The similarity of Google's and Bing's SERPs does not explain the absence of internal Google documents comparing Google Search to SVPs. Pls. PFOF ¶¶ 352–355. Quantitative comparisons are possible for characteristics other than ranking—for example, privacy and latency—yet Google documents only compare Google Search to other GSEs across all axes of search engine competition. *Id.*; Def. PFOF ¶ 970. Google compares itself to other GSEs because they are its closest competitors. Pls. PFOF ¶¶ 346, 352–355, 377.

3.      **Social Media Platforms And Generative AI Systems Do Not Impose Sufficient Competitive Constraints On A Hypothetical GSE Monopolist**

2222.   (Def. PFOF ¶¶ 971–979, 982–987): Google's claims regarding social media lack documentary support: the single document cited, DX0241, is a July 2021 Google "Search Update" presentation, created after this case was filed, calling into question its contents. Social media companies do not impose a sufficient competitive constraint on GSEs to hinder a hypothetical monopolist of general search services from exercising substantial market power. Pls. PFOF ¶¶ 372–387.

2223.   (Def. PFOF ¶¶ 981): Pls. PFOF ¶¶ 349 (Social networks and AI are separate competitive product categories.), 373–387 (Social media platforms and SVPS are not reasonable

substitutes for GSEs.), 391–395 (Generative AI systems, like ChatGPT, are not reasonable substitutes for GSEs.).

### B.     Search Ads And Text Ads In The United States Are Relevant Markets

2224.   (Def. PFOF ¶ 988): Google's claim that the relevant advertising product is the "attention of a targeted audience" relies entirely on Dr. Israel and his unsupported demonstrative. Dr. Israel conceded he did not define the bounds of this or any other product market. Pls. PFOF ¶ 501. Google and advertisers recognize Search Ads and Text Ads as distinct, complementary products from other types of digital ads. *Id*. ¶¶ 430–439 (§ IV.B.2), 483–492 (§ IV.C.3).

2225.   (Def. PFOF ¶¶ 990–998): Google's post-trial brief makes broad, factually incorrect assertions about the Search and Text Ads markets, citing only PFOFs describing ***all*** digital advertising (i.e., both search and non-search). Def. PTB at 35–36 (citing Def. PFOF ¶¶ 990–998, 1018–1035, 1192–1198). As Dr. Israel and other Google witnesses acknowledge, advertising revenue growth on other platforms, whether Amazon, Meta, or TikTok, did not shift Search Ad spend away from Google but rather increased the larger digital advertising "pie." Pls. PFOF ¶ 577. Google has maintained its dominant share of the Search Ads and Text Ads markets for years, *id*. ¶¶ 575–576, 602–603; its Search+ revenue has grown rapidly for a decade, *id*. ¶ 594; and its Search+ gross profit margin routinely exceeded ██% over the same period, *id*. ¶ 595; *id*. ¶¶ 590–601 (§ V.B.4.a).

### 1.     Advertisers' Budgeting Of Overall Spend Across Advertising Channels Does Not Show Other Ad Channels Are Reasonably Substitutable For Search Ads

2226.   (Def. PFOF ¶ 1003): Advertisers do not make Search Ads or Text Ads interchangeable with other ad formats simply by budgeting spend across marketing channels. Pls. PFOF ¶¶ 502–513 (§ IV.D.1). As Dr. Israel concedes, advertisers view different ad types as providing different tools along the path to conversion. Tr. 8863:8–8863:14 (Israel (Def. Expert)).

2227.   (Def. PFOF ¶ 1003): Ad spend in one digital advertising channel affects the ROI of other digital channels, limiting substitution. Pls. PFOF ¶¶ 505, 508; Tr. 5456:22–5458:22 (Jerath (Pls. Expert)) (discussing UPXD103 at 27–28 (excerpting UPX1017 at -395 and Tr. 3980:04–3981:02 (Lowcock (IPG)))); PSX00973 at -025 ████████████████████

████████████████████████████████████████████████

██████████████████████████. Similarly, Google's internal research shows Search Ads purchasers expanding to display ads "does not lead to cannibalized Search spend," but instead correlates with *more* search spend, and the same trend holds for display ad purchasers expanding to Search Ads. UPX1118 at -191; Pls. PFOF ¶¶ 430 (citing UPX1085 at -616 and related testimony), 432.

2228.   (Def. PFOF ¶¶ 1001–1003, 1007): Advertiser testimony—including testimony Google cites—contradicts Google's claims that advertisers freely substitute between channels by comparing relative ROI/ROAS. Pls. PFOF ¶¶ 502–513 (§ IV.D.1). For instance, JPMorgan does not build display budgets based on ROI, *id*. ¶ 507, and does not shift its Text Ad spend to non-search channels, *id*. ¶¶ 411, 489, 504. Similarly, Booking.com recognizes that different ad formats serve different purposes, Tr. 5238:3–5239:6 (Dijk (Booking.com)); Pls. PFOF ¶¶ 126, 135, and it does not substitute between channels based on ROI, DX3148 at .015 (For ROI on different ad channels, "[I]t's not one versus the other. It's always both . . . ."); DX3157 at .003 ("We are not substituting. We're incrementally adding."); *accord* Pls. PFOF ¶ 439 (The Home Depot); Des. Tr. 120:15–120:24 (James (Amazon) Dep.) (Amazon does not allocate spend between Text Ads and PLAs based on ROI and has no set budget to shift between channels); Pls. PFOF ¶ 506 (Skechers).

2229.   (Def. PFOF ¶ 1004): Google's claim that advertisers' ability to measure ROI has "improved over time" contradicts actual advertiser testimony, Pls. PFOF ¶ 511, and Google's internal documents, *id*. ¶¶ 510, 512; UPX0042 at -115 ("Advertisers do care about the incrementality of their advertising spend, but it is difficult to measure."). Properly calculated ROI/ROAS includes only incremental revenue from advertising. Pls. PFOF ¶ 510; Tr. 5452:22– 5454:9, 5659:23–5660:10 (Jerath (Pls. Expert)). Advertisers recognize calculating incremental ROI/ROAS is expensive, difficult, and out of reach for many—issues multiplied when trying to compare ROI/ROAS across channels. Pls. PFOF ¶¶ 510–511. Google and its expert Dr. Israel agree. *Id*. ¶¶ 510, 512; PSX00259 at -946 (2019 Google document noting "a very small percentage" of advertisers, potentially only 10%, can assess ROI).

2230.   (Def. PFOF ¶ 1005): Google concedes that it "does not report overall ROI or ROAS to customers." UPX6026 at -491 (written 30(b)(6) response). In addition, advertisers cannot use Google's tools to calculate incremental ROI/ROAS: In the words of Google's cited witness, Google informs advertisers only that "we sent you so many clicks, here was the average price you paid, and now you go figure out the rest, right." Pls. PFOF ¶ 513 (citing Tr. 7378:18– 7379:15 (Raghavan (Google))). Google relies on Dr. Raghavan to claim Facebook and Amazon offer similar tools but does not claim those platforms' tools calculate incremental ROI/ROAS.

2231.   (Def. PFOF ¶¶ 1006–1007, 1009): MMMs (Marketing/Media Mix Models) and similar optimization software do not substitute between digital ad channels based on channel-specific ROI but instead recognize the complementary functions of different ad channels. Pls. PFOF ¶ 507. For example, Kohl's MMM-driven Search Ad spend remained constant during an ad campaign while spend on other channels varied dramatically. DX0412 at -665; Tr. 8889:22– 8890:22 (Israel (Def. Expert)); Pls. PFOF ¶ 435. Mr. Lowcock testified that, in using IPG's

optimization model, he has "not had the experience where [IPG] would optimize away from search," even in the face of increasing Search Ad prices. Tr. 3960:12–3961:7 (Lowcock (IPG)) (describing "the difference between search and other advertising"). As Dr. Israel conceded, the Estee Lauder document Google relies on categorizes ad channels by their relative effect at different levels of the funnel, with Search Ads dominating the "conversion" level. Tr. 8962:3–8963:19 (Israel (Def. Expert) (discussing DX3058 at .007); DX3058 at .002 ("Nonbrand Text Search" categorized as "Always-On.").

2232.   (Def. PFOF ¶ 1008): Contrary to Dr. Israel's claims, Google recognizes internally that it is "misleading" to "compare efficiency of Search, purchased on a CPC basis, to efficiency of other digital that is purchased on a CPM basis." UPX0843 at -815; Pls. PFOF ¶¶ 136–137. Google's proposed finding attributes price differences to the likelihood of a conversion but omits Dr. Israel's admission that he performed no analysis of actual ROI or conversions when making his price comparison, Tr. 8925:7–8926:15 (Israel (Def. Expert)) (discussing DXD-29 at .062), and Dr. Israel provides no evidence advertisers actually convert pricing between CPMs and CPCs at all, much less "all the time."

2233.   (Def. PFOF ¶¶ 1011–1015): Google's Performance Max is a distinct product and is not substitutable for Search Ads. Pls. PFOF ¶¶ 130, 517–521 (§ V.D.3). Microsoft's "Smart Campaigns" are similar to Performance Max. Tr. 8508:18–8510:7 (Israel (Def. Expert)). Google cites no evidence that MarinOne allocates spend across channels.

## 2.     Search Ads And Other Digital Ads Are Not Reasonably Interchangeable

2234.   (Def. PFOF ¶¶ 1016–1017): Google, advertisers, and other professionals consider Search Ads distinct from, and complementary to, other ad formats, Pls. PFOF ¶¶ 430–439 (§ IV.B.2), and consider Text Ads distinct from, and complementary to, other Search Ads, *id*. ¶¶ 483–492 (§ IV.C.3).

2235.   (Def. PFOF ¶¶ 1018–1026): Amazon's search advertising products are in the Search Ads market. However, like other SVPs, Amazon's search advertising products are not reasonably interchangeable with Text Ads. Pls. PFOF ¶¶ 456–500 (§ IV.C); UPX0432 at -346 (Google list of Amazon/Google overlapping products; Amazon has equivalent product for Shopping Ads but "none" for Text Ads); UPX0424 at -510 (Amazon sponsored product ads "[m]ost comparable to PLAs."). Google acknowledges as much, citing Jerry Dischler's trial testimony that Amazon's shopping ads were "very similar" to Google's shopping ads while not mentioning Text Ads, Def. PFOF ¶ 1023 (citing Tr. 1354:3–15 (Dischler (Google)), and relying on an internal Google presentation listing products "where Amazon and Google compete more or less directly." Def. PFOF ¶ 1021 (citing Tr. 7396:16–19 (Raghavan (Google)) and DX0126 at .019). The presentation identifies shopping ads/PLAs but lacks any reference to Text Ads. *Id.*; Pls. PFOF ¶¶ 5, 482, 577, 579 (showing differences between Amazon ads and Text Ads).

2236.   (Def. PFOF ¶¶ 1018, 1027–1034): The parties agree social ads are "basically display ads" sold by Facebook, Instagram, TikTok, and other social platforms. Def. PFOF ¶ 989; Pls. PFOF ¶ 109. Like other display ads, social ads are not reasonably interchangeable with Search Ads. Pls. PFOF ¶¶ 426–429 (§ IV.B.1.f.) (Google introduced its Discovery/Demand Gen product because Search Ads did not compete with social ads.); *id.* ¶ 437.

2237.   (Def. ¶¶ PFOF 1031–1034): Internally, Google acknowledges that TikTok's rise does not threaten Google's Search Ads and Text Ads. Google's competitive response to TikTok "seek[s] ways of capturing more social budgets from upper funnel formats" and focuses on non-Search Ad products (i.e., photos, YouTube, and feed products). UPX0448 at -520–21 (Google's TikTok "Competitive Strategy POV"); *id.* at -526 (Competitive response to TikTok focuses on

Google's "discovery-focused products," including seeking "social budgets" for YouTube and expanding display formats to YouTube.).

2238.   (Def. PFOF ¶ 1035): SVPs do not offer Text Ads, Pls. PFOF ¶¶ 102, 456–500 (§ IV.C). Thus, SVPs cannot compete for most of the Search Ads market. In addition, the fact that SVPs are among Google's top advertisers, *id*. ¶ 387, shows that Text Ads and other Search Ads are complementary products, *id*. ¶¶ 456–500 (§ IV.C).

2239.   (Def. PFOF ¶ 1037): Both advertisers and Google employees (1) described the declared real-time intent contained in a search query as "powerful" and "some of the strongest intent signals made available," Pls. PFOF ¶¶ 116–117, 128–134, and (2) described inferred intent signals as low information, with limited accuracy, *id*. ¶ 119.

2240.   (Def. PFOF ¶¶ 1038–1040): Latent/inferred intent is inferred from signals such as demographics and behavioral profiles gathered over time. Pls. PFOF ¶¶ 120–121. To target display ads, advertisers use cookies to develop user profiles, *id*. ¶ 421, and privacy initiatives restricting cookies will further reduce the targeting effectiveness of display ads while leaving the targeting effectiveness of Search Ads largely unchanged, *id*. ¶¶ 418, 422.

2241.   (Def. PFOF ¶¶ 1041–1044): Prof. Whinston did not "agree that the question of substitution as to ads products is a question of whether the audiences overlap." Def. PFOF ¶ 1041. Prof. Whinston testified that seven factors affect the substitutability of digital ad products, including targetability and audience overlap. Tr. 4632:20–4635:20 (Whinston (Pls. Expert)) (discussing UPXD102 at 24). Google documents, Google employees, advertisers, industry participants, and Plaintiffs' experts all identify targetability as the most important factor distinguishing Search Ads from other digital ads. Pls. PFOF ¶¶ 399–406 (§ IV.B.1.a); Tr. 4632:20–4635:20 (Whinston (Pls. Expert)); Tr. 5445:24–5447:13 (Jerath (Pls. Expert)).

Dr. Israel focused only on audience overlap.[4] Tr. 8519:14–8522:17 (Israel (Def. Expert)). As Prof. Whinston explained, audience overlap, while relevant, is not necessary for ad substitutability. For example, a hotel in Boston that wants to sell its rooms may consider ads only reaching potential customers from Cleveland interchangeable with ads only reaching potential customers from Kansas City despite the lack of any audience overlap: if Cleveland ad prices go up, the hotel moves its Cleveland spend to Kansas City. Tr. 10485:10–10487:2 (Whinston (Pls. Expert)).

2242.   (Def. PFOF ¶¶ 1043–1044) Advertiser testimony contradicts Google and Dr. Israel's claims about audience overlap. For example, although Google's post-trial brief claims that "an advertiser who wants to reach Google Search users that are currently in the market for a particular product would view advertising on Meta, Amazon, or websites visited by those users as a better alternative than advertising on Bing or DuckDuckGo," Def. PTB at 17–18, actual advertisers testified that their "Google and Bing investments are pretty much interchangeable but distinct and separate from social or display" (The Home Depot) and that their Search Ad spend was "distinct and different and separate" from social and display spend (JPMorgan), Pls. PFOF ¶ 439 (also citing Microsoft and Dentsu); *id.* ¶¶ 436, 489.

2243.   (Def. PFOF ¶ 1045): Advertisers view Search Ads as an "always on" or "mandatory" ad channel, Pls. PFOF ¶ 435, and "distinct and different" from and "not fungible" with display ads, *id.* ¶ 504 (citing Tr. 4856:16–4858:16 (Lim (JPMorgan))). They typically maintain separate budgets for Search Ads and other advertising channels, *id.*, do not shift money between their Search Ads budget and other budgets, *id.*, and do not view other digital ads as

---

[4] Google Panel's devices track users only on desktop computers and Android devices. Tr. 8401:1–8402:24 (Israel (Def. Expert)); Def. PFOF ¶ 1042 (discussing Panel data).

substitutes for Search Ads, *id.* ¶ 436; Tr. 4852:12–4853:6 (Lim (JPMorgan)) (Text Ads are a "consumer demand driven media channel" and distinct from other digital ad formats.); Des. Tr. 272:5–13 (Alberts (Dentsu) Dep.) (Paid social and display are "tangential" to paid search.).

2244.   (Def. PFOF ¶ 1046): Prof. Whinston concluded that a hypothetical monopolist in the Search Ad or Text Ad markets could profitably raise prices or reduce quality by applying economic principles to the trial record, including record evidence of Google's experiments on advertiser price responsiveness and its empirical analysis of ad price movement over time. Tr. 4632:14–4635:20, 6155:3–18 (Whinston (Pls. Expert)). Trial testimony supports Prof. Whinston's conclusion. Pls. PFOF ¶ 629; Tr. 3960:12–3961:7 (Lowcock (IPG)) (IPG would not move away from search even in the face of a price increase.); Pls. PFOF ¶ 632 (describing Google price increases). Dr. Israel explained that it is "more normal than not that someone doesn't do a full quantitative hypothetical monopolist test." Tr. 8386:23–8387:20 (Israel (Def. Expert)).

2245.   (Def. PFOF ¶ 1047): Dr. Israel's Nike analysis was not a hypothetical monopolist test. Dr. Israel did not perform a hypothetical monopolist test. Tr. 8386:23–8387:20 (Israel (Def. Expert)).

2246.   (Def. PFOF ¶¶ 1048–1051): Despite having data for thirteen advertisers who paused Facebook spend during a boycott, Dr. Israel analyzed only Nike. Tr. 8841:8–25 (Israel (Def. Expert)). Dr. Israel's demonstrative regarding substitution between social ads and Search Ads during Nike's boycott, Tr. 8515:10–18 (Israel (Def. Expert)), was contradicted by Nike's own contemporaneous, ordinary-course documents showing its Search Ad spend was relatively unchanged as compared to its social and display ad spend. Pls. PFOF ¶¶ 514–515. Dr. Israel conceded the boycott simulated an infinite price increase for Facebook ads, and that his analysis

could not determine Nike's level of substitution in response to a small price change or tell how much Nike would have reduced Facebook advertising in response to a 5% price increase. Tr. 8842:7–13, 8842:22–8843:10, 8843:11–16 (Israel (Def. Expert)); *id.* 8847:17–8848:12 (discussing UPX2076 at -152); *see* Pls. PTB at 19 (A 5% SSNIP shows monopoly power.).

2247.   (Def. PFOF ¶¶ 1052–1053): In contrast to Dr. Israel's analysis, Prof. Whinston's analysis of the Nike boycott aligned with Nike's own analysis, as described in Nike's contemporaneous, ordinary-course documents. Pls. PFOF ¶¶ 514–515; Tr. 10493:4–10495:9 (Whinston (Pls. Expert)). Dr. Israel's demonstrative illustrated Nike's Search Ad spend rising before, during, and after the boycott, a trend unrelated to the boycott, Tr. 10489:5–10491:15 (Whinston (Pls. Expert)); after Prof. Whinston controlled for this trend, Dr. Israel's result "completely went away," *id.* 10490:25–10491:15, an outcome consistent with Nike's internal analysis. Pls. PFOF ¶¶ 514–515. Additionally, because properly analyzing cross-elasticities requires comparing proportions of spend shift, not absolute dollars, Prof. Whinston conducted his own analysis which showed Nike's non-Meta social ad spend skyrocketed during the boycott—and likely would have grown further but for a lack of available inventory—while Nike's Search Ad spend barely increased. Tr. 10491:16–10493:3, 10494:8–10495:9 (Whinston (Pls. Expert)); Pls. PFOF ¶ 515. This is consistent with Nike shifting its Meta advertising spend to other social media platforms, not to other channels like Search Ads.

### 3.   Advertisers Recognize Text Ads As Distinct Products

2248.   (Def. PFOF ¶¶ 1058–1059): As explained at trial by Google witness Dr. Raghavan, several factors distinguish PLAs and Text Ads. Tr. 7368:24–7369:18 (Raghavan (Google)); Des. Tr. 22:10–23:8 (Jain (Google) Dep.) (Advertisers use Text Ads and PLAs for different purposes.). Advertisers view Text Ads and PLAs as distinct products. Des. Tr. 142:20–143:5 (James (Amazon) Dep.); *id.* 234:9–235:4 ("[T]here are going to be distinct advantages in

65

one ad format over another."); Pls. PFOF ¶¶ 484, 488; *id*. ¶¶ 470–475 (describing differences). Internally, Google describes Text Ads and shopping ads as "siloed in their own world" and not in competition with each other. Pls. PFOF ¶ 484.

2249.  (Def. PFOF ¶¶ 1060–1064): Advertisers do not treat Text Ads as reasonably interchangeable with other Search Ads. Pls. PFOF ¶¶ 474–475; Tr. 5218:11–5219:5 (Booth (The Home Depot)) (Retailer could not shift messaging about a storewide sale from a Text Ad to a shopping ad.). In addition, because most advertisers on Google do not sell physical products, shopping ads are not an option, only Text Ads. Pls. PFOF ¶¶ 480–481 (52.8% of Google's Search Ad revenue comes from advertisers who purchase Text Ads but not shopping ads); Tr. 4848:9–11 (Lim (JPMorgan)) (Text Ads are the only Search Ads JPMorgan purchases.). These advertisers, of course, never shift ad spend from Text Ads to shopping ads on other sites.

### 4. Google, Advertisers, And Other Industry Participants Use The Marketing Funnel To Illustrate Distinctions Among Different Advertising Channels

2250.  (Def. PFOF ¶¶ 1065–1066, 1069–1070): Prof. Jerath's testimony focused on the trial record's "evidence of actual advertiser behavior" showing advertisers, Google's executives, and other industry participants all view (1) Search Ads as distinct from, and complementary to, other types of advertising, and (2) Text Ads as a distinct advertising channel within Search Ads. Pls. PFOF ¶¶ 398–500 (§§ IV.B–C). This includes evidence—which Google ignores—showing that the advertising industry continues to use and rely upon the marketing funnel to describe advertiser goals, consumer stages, and distinctions among different advertising channels. Pls. PFOF ¶¶ 447–454 (§ IV.B.6); Des. Tr. 104:11–18 (Levy (Meta) Dep.); Tr. 5384:5–5386:4 (Jerath (Pls. Expert)). For instance, Google relies upon the testimony of Tracy-Ann Lim of JPMorgan as support for the funnel being an "outdated" concept, while ignoring Ms. Lim's testimony that the funnel was a "great tool to . . . organize budgets." Tr. 4893:8–4894:18 (Lim

(JPMorgan)). Other ad industry participants testified similarly. Tr. 3816:23–3817:1, 3819:6–9, 3824:20–3825:3, 3835:15–3836:16 (Lowcock (IPG)); Tr. 6587:4–17 (Vallez (Skai)); Des. Tr. 269:12–270:7 (James (Amazon) Dep.); Des. Tr. 45:4–47:8 (Alberts (Dentsu) Dep.).

2251.   (Def. PFOF ¶¶ 1069, 1073): Google's continued focus on nonlinear paths to purchase misses the point. As Ms. Lim explained, increasing complexity and nonlinearity in purchase journeys does not collapse differences in the advertiser objectives served by Search Ads, but instead accentuates those differences: "[H]uman behavior is not so linear. One of the reasons why we enjoy the combination of an always-on channel, like paid search, versus the in-and-out strategy of campaigns across other channels is so that you can have that air cover year-round, because you really couldn't possibly predict when somebody is going to be looking for your product or service." Tr. 4893:8–4894:18 (Lim (JPMorgan)).

2252.   (Def. PFOF ¶ 1074): Google's assertion that Prof. Jerath could not identify modern academic articles addressing digital ad channels in the context of the marketing funnel is factually incorrect. Tr. 5384:5–19, 5660:11–5661:4 (Jerath (Pls. Expert).

2253.   (Def. PFOF ¶ 1075). Google supports its claims of interchangeability with a string cite to 13 exhibits produced by 12 advertisers, most cited without explanation or pincite. Plaintiffs called 2 of these 12 advertisers to testify live: The Home Depot and JPMorgan. As with other advertisers, both (1) unequivocally rejected Google's claims of channel interchangeability, Pls. PFOF ¶ 439, and (2) reinforced the unique role of Search Ads, *id*. ¶¶ 129 (The Home Depot), 131 (both), 134 (JPMorgan). The three documents Google specifically discusses also do not support its broad market definition. DX0710 at .004, .010 (Campaign objective was "to raise awareness" and did not recommend "reallocate[ing] Paid Search underspend" to other channels.); DX3057 at .003, .029 (Campaign objective was to "Build Awareness of American's

modern product portfolio" using only television, programmatic, out-of-home (OOH), social media, and print advertising.); Tr. 4918:21–4921:23 (Lim (JPMorgan)) (reviewing DX0660 at .014 and agreeing Search Ads are only associated with lower-funnel campaign goal of account generation).

2254.   (Def. PFOF ¶¶ 1075–1078): Advertisers, Google, and the rest of the advertising industry overwhelmingly described Search Ads and Text Ads as most-suited and effective for lower-funnel goals, *i.e.*, responding to demand and driving conversions. Pls. PFOF ¶¶ 128–137 (§ III.C.2.d). Google's contention that Search Ads *can be used* for other purposes ignores the fact that Search Ads and other channels are *most suited and effective* for different purposes. *Id.* ¶¶ 127, 134, 407–412; Tr. 3836:17–3837:4 (Lowcock (IPG)) (Search Ads are not effective for driving awareness because people cannot search for products of which they are unaware.); *id.* 3885:12–17. Differences in ad pricing, *i.e.*, per impression or per click, and average click rates further reflect how different ad channels align with different goals. Pls. PFOF ¶¶ 136–137.

## X.    GOOGLE HAS MONOPOLY POWER

2255.   (Def. PFOF ¶ 1079): Dr. Israel and Prof. Whinston agree that a monopolist is a firm that can profitably decrease quality from the competitive level, which thus reduces output. Tr. 8387:22–8388:22 (Israel (Def. Expert)) ("So monopoly power, to me, as an economist, requires the ability to raise prices *or decrease quality* without the reduction associated with it and without competitors stepping in to fill that void." (emphasis added)); *id.* 8443:12–8445:2 (monopolist would be expected to "invest[] relatively less" in developing quality); Tr. 10451:20–10453:10 (Whinston (Pls. Expert)) (Where price is zero, "the key variable" for a monopolist is quality—either by reducing quality or not increasing quality as fast as the firm might otherwise—which results in reduced output.).

## A. Google Would Invest And Innovate More, And Increase Quality And Privacy, If Faced With Greater Competitive Pressure

2256.   (Def. PFOF ¶¶ 1080–1081, 1084): Output growth can occur even in monopolized markets. Pls. PFOF ¶ 530. Google would increase its quality, and thus increase output even further, if it faced greater competitive pressure. Pls. PFOF ¶¶ 570, 1079–1092 (§ VIII.B.2), 1126–1159 (§ VIII.C). Google misrepresents Prof. Whinston's testimony. Prof. Whinston testified that Google innovated in search "back in . . . the late 1990s into the beginning of the century." Tr. 5922:1–5 (Whinston (Pls. Expert)). The absence of competition caused by Google's distribution contracts has decreased Google's incentive to invest in quality improvements. Pls. PFOF ¶¶ 572, 1079–1092 (§ VIII.B.2); Tr. 10455:23–10456:16 (Whinston (Pls. Expert)) (in the absence of competition, Google has not needed to invest as much in quality improvements, which reduces search output). Google's "R&D" intensity has not been high relative to other firms. Pls. PFOF ¶ 573. Google's failure to afford users privacy options consistent with their expectations is another way in which Google has avoided investing in quality improvements. Pls. PFOF ¶¶ 1137–1159 (§ VIII.C.2).

2257.   (Def. PFOF ¶ 1083): AI advances will not lower search entry barriers. Neeva failed despite leveraging AI. *Supra* ¶¶ 2062–2063, 2065, 2125–2126. AI cannot make up the delta in search quality between Google and Bing. Tr. 3512:8–3513:9 (Nadella (Microsoft)).

## B. Increased Competition Would Drive Greater Innovation

2258.   (Def. PFOF ¶ 1086–1087): *Supra* ¶ 2256.

2259.   (Def. PFOF ¶¶ 1088–1093): The quality improvements introduced by Google in response to Bing's launch in 2009 were a rare instance of Google responding to rivals by working harder than it would have otherwise. Pls. PFOF ¶¶ 1131–1136 (§ VIII.B.1). Because it is insulated from competition, Google has underinvested in quality improvements. Pls. PFOF

¶¶ 571–574, 1082–1086, 1136, 1143–1150; UPX2026 at -121, -124 ("Users are spending more time waiting. . . Every couple of years we sound the alarm [on latency], have a code yellow. But we keep ending up back here again."). Mr. Nadella's testimony is consistent with this evidence. Tr. 3532:5–3533:2 (Nadella (Microsoft)).

2260.   (Def. PFOF ¶¶ 1094–1096): Google's quality increases, introduced during its "Go Big in Europe" campaign, directly responded to the European Commission's order that Google introduce competition via Android choice screens. Pls. PFOF ¶¶ 911, 1089. Google's documents explain: "Go Big in Europe is product investments ***above and beyond*** business as usual to make sure Google is top of mind for EU users." Pls. PFOF ¶ 1090 (quoting UPX1083 at -055).

2261.   (Def. PFOF ¶ 1098): Google has a greater incentive to invest and innovate when it faces competition. Pls. PFOF ¶¶ 1079–1092 (§ VIII.B.2); *infra* ¶¶ 2271–2279 (§ X.E.1).

2262.   (Def. PFOF ¶ 1099): *Infra* ¶ 2267.

2263.   (Def. PFOF ¶¶ 1101–1102): Google does not contend it has made all investments in search quality it could conceivably make. To the contrary, Google uses a cost-benefit framework when considering potential investments and will thus not make investments that benefit users and advertisers if they are too costly to Google. Pls. PFOF ¶ 1080. Competition changes the cost-benefit equation. Pls. PFOF ¶ 1081.

## C.   There Would Be Better Search Privacy Absent Google's Exclusionary Conduct

2264.   (Def. PFOF ¶¶ 1108–1115): Users cannot alter Google Search's privacy settings to the user's desired privacy levels. For example, 74% of Google's users would prefer that Google store user-side data for one year or less; for signed-in users, however, Google logs and tracks search history for 18 months, by default, and provides few other options. Pls. PFOF ¶¶ 566, 1152–1153. Indeed, in the absence of competition, Google has rejected features allowing

users to match privacy settings to their preferences, such as a "slider" for data-storage duration and pre-set privacy bundles of low, medium, and high privacy. Pls. PFOF ¶¶ 566, 1143–1151.

2265.   (Def. PFOF ¶¶ 1108–1112): Google's privacy settings are not readily accessible nor easily changeable. Jenniffer Fitzpatrick, Google's senior VP in charge of privacy, noted that it can take ten steps to adjust Google's privacy settings, which Prof. Rangel testified constitutes "considerable choice friction." Pls. PFOF ¶ 1158.

2265.1 (Def. PFOF ¶¶ 1116–1123): Due to a lack of competitive pressure, Google declined to pursue privacy initiatives that would have benefited consumers. Pls. PFOF ¶¶ 1143–1151; UPX0501 at -520 (Google wanted to "see evidence" that it was losing users to rivals before "wasting our valuable time" on user privacy.).

### D.   Evidence From Advertisers, Google, Industry Participants, And Experts Show Google's Monopoly Power In Both Advertising Markets

2266.   (Def. PFOF ¶ 1124): Output growth can occur in monopolized markets. Pls. PFOF ¶ 530. In markets where demand is not very responsive, a monopolist need not limit output to raise prices, *id.* ¶ 637. Demand in the Search Ads and Text Ads markets is not very responsive to price changes. Tr. 4791:21–4793:1 (Whinston (Pls. Expert)); Pls. PFOF ¶¶ 629–635, 681–705.

2267.   (Def. PFOF ¶ 1125): The but-for world would be a world absent the anticompetitive conduct in this case. Tr. 5774:19–25 (Whinston (Pls. Expert)). Given the length and breadth of the challenged conduct, an empirical but-for analysis of Search Ad pricing or output is impossible, and neither Prof. Whinston nor Dr. Israel attempted this task. Tr. 6035:25–6036:11 (Whinston (Pls. Expert)); Tr. 8761:2–18 (Israel (Def. Expert)); *supra* ¶ 2245.

2268.   (Def. PFOF ¶¶ 1126, 1130): Numerous advertisers testified they have limited or no alternatives to Google Search Ads. Pls. PFOF ¶¶ 586–588 (Search Ads), 605–607 (Text Ads);

*supra* ¶¶ 2227–2228 (advertisers do not substitute based on ROI/ROAS). At trial, Mr. Discher identified only one advertiser shifting all Google spend to Amazon, and no advertisers shifting all Google spend to Facebook. Tr. 1494:10–1495:10 (Dischler (Google)). Google does not consider other platforms' pricing or auction models when increasing its prices, Pls. PFOF ¶¶ 725–727, and does not regularly or systemically compare the relative prices of its Search Ads or Text Ads to ad products offered by others, UPX6021 at -400, -401.

2269.   (Def. PFOF ¶ 1128): Absent an increase in conversion rates per click, increased CPCs reduce advertiser value. UPX1008 at -933 (mix-adjusted CPC increases "are interpreted as price increases" and "reduce advertiser ROI" absent change in conversion rate).

2270.   (Def. PFOF ¶ 1129): Google's claim that advertisers improved their ROI on Google Search Ads in recent years cites to Mr. Dijk describing Booking.com's ROI on all its marketing spend, not just Google. Tr. 5345:18–25 (Dijk (Booking.com)); DX3114 at .042. Ms. Lim (JPMorgan) described the aftermath of a dramatic COVID-related reduction in Search Ad spend and ascribed ROI changes to COVID volatility. Tr. 4881:3–12 (Lim (JPMorgan)).

## E.   Google Fails To Show Quality Improvements Justified Its CPC Increases

### 1.   Dr. Israel's Quality Metrics Cannot Compute Quality-Adjusted Prices

2271.   (Def. PFOF 1140–1143) Dr. Israel agrees that nominal CPCs for Google's Search Ads have increased. Tr. 8855:11–20 (Israel (Google)); Pls. PFOF ¶¶ 632–633. These increases are direct evidence of Google's market power. Pls. PFOF ¶ 629.

2272.   (Def. PFOF ¶ 1132): Dr. Israel concedes he did not compute quality-adjusted prices for Google's search ads but was merely "report[ing] what Google has done in measuring that." Tr. 8876:17–21, 8856:6–10 (Israel (Def. Expert)). But Google admits internally it cannot calculate the value of a click to an advertiser. UPX0042 at -107 (Google "unsuccessful" at computing good estimates for "[a]dvertiser value per click."); PSX00211 at -137–138 ("[W]e

still aren't able to say what an advertiser's value is."); UPX0727 at -046 (When setting pricing

knobs, "[w]e don't know value, so need to determine based on response and risks.").

2273.   (Def. PFOF ¶¶ 1132–1133, 1138–1139): Google argues that advertisers assess ad

quality by ROI/ROAS, rather than by clicks and CPCs, *e.g.* Def. PFOF ¶ 1128, but Dr. Israel's

price analysis rests entirely on clicks and CPCs, not conversions or ROI/ROAS. As a result,

Dr. Israel ascribes "quality" to, and justifies higher prices for, changes that (1) did not

meaningfully change advertiser's conversion rates, Pls. PFOF ¶ 655, or even (2) increased

conversion costs *before* Google adopted its price increases, *id.* ¶ 624.

2274.   (Def. PFOF ¶ 1133): Fact witness testimony contradicts Dr. Israel's claim that the

rising percentage of ad clicks meaningfully measures ad quality: "[W]e can't draw the

correlation on the click. We have to draw the correlation to the quality of the post-click

experience." Des. Tr. 58:16–59:20 (Jain (Google) Dep); PSX00167 at -219 ("[N]ot all

improvements to CTR are quality improvements. . ."). As Google acknowledges, "advertisers

care, in the end, about conversions/purchases, not clicks." UPX0342 at -864; *supra* ¶ 2269.

2275.   (Def. PFOF ¶¶ 1133–1134; 1136–1137) Dr. Israel also ignores that Google's

SERP changes increased ad clicks regardless of ad quality. In a 2015–16 series of launches

dubbed "Holy Load" and "Holy Grail," Google doubled the number of ads that could appear at

the top of a SERP from two to four, meaning some SERPs showed only ads before the user

scrolled to reach organic results. Des. Tr. 130:18–132:15 (Jain (Google) Dep.) (explaining

UPX0504 at -896); UPX0779 at -361 (post-increase, approximately 15% of queries showing ads

displayed 4 top ads). These did not create new, incremental clicks, but instead shifted clicks from

organic results to ads. UPX0342 at -836 (increasing ratio of ad clicks to organic clicks); Tr.

4146:15–4147:19 (Juda (Google)) (acknowledging writing "[t]he fraction of clicks going to ads

on pages with ads [is] climbing ever higher" in UPX0467 at -332)); Des. Tr. 129:11–130:17;
131:14–132:7 (Jain (Google) Dep.) (most user interface design changes "moved clicks within the
page" instead of adding "completely new whole page clicks.") (explaining UPX0504 at -896
("[A]ll of AdsUI launches have shifted clicks from organic to ads.")).

2276.   (Def. PFOF ¶ 1138) Excess CPC did not measure the quality of ad clicks and
Google cites no document or fact witness describing Excess CPC as capturing quality-adjusted
prices. Rather, Google used Excess CPC to ensure consistent CPC increases regardless of the
actual value of the click to the advertiser. Pls. PFOF ¶¶ 701–704.

2277.   (Def. PFOF ¶ 1139) Google's proposed finding omits that Google concedes it
only calculated Excess CPC between July 2018 and November 2019; the metric does not exist
for launches outside that window. Pls. PFOF ¶¶ 698, 702; UPX6015 at -320–321. Dr. Israel's
testimony that Google calculated negative Excess CPC in 2020 is incorrect, likely resulting from
Google's counsel's erroneous representation earlier in the trial that a 2018 document referencing
Excess CPC dated from 2020. Tr. 7383:24–7384:5 (Raghavan (Google)) (describing DXD-21 at
.020 (excerpting UPX1054 at -056)). Even within that window, Google's cited evidence shows
only that Excess CPC was negative on a single day—June 24, 2018—not throughout the entire
period. DXD-29 at .137 (excerpting 6/24/2018 Excess CPC "snapshot" from UPX1054 at -056).

2278.   (Def. PFOF ¶ 1135): Because of seasonal and other external effects on ad prices,
the best measure of a launch's effect is the "launch doc" memorializing any predicted or
observed CPC increases. Pls. PFOF ¶¶ 144–145. Google tracks these increases through A/B
experiments isolating the launch's effects. Pls. PFOF ¶¶ 145, 1055; Des. Tr. 92:3–93:15 (Jain
(Google) Dep.) (Google's experiment platform uses a "well-defined principled approach" and is
"one of the best experimentation platforms in the world.").

2279.   (Def. PFOF ¶¶ 1135) Google's proposed finding ignores the impact of seasonal effects on CPC for the three launches Google identifies (Butternut Squash, Semantic Exact, and rGSP). The three launches Google cites occurred near the end of the year, when CPCs drop for seasonal reasons, and one shortly preceded COVID. UPX0725 at -969, -979–80 ("holiday period effect" leads to ██% drop in CPCs each January); UPX1054 at -064 ("end of year loss of auction pressure" causes ██ percentage point CPC drop). Google's A/B testing, which controls for seasonal effects, found all three of the launches Google identifies increased CPCs. UPX0442 at -878 (increases of ██% on desktop, ██% on tablet, and ██% on mobile from Butternut Squash); Pls. PFOF ¶ 675 (rGSP); Pls. PFOF ¶ 624 (Semantic Exact). The 2017–2019 Momiji and holistic pricing launches show a clear upward CPC trend in Google's table and in the launch docs. Pls. PFOF ¶¶ 681–685 (experiments), 686–690 (Momiji), 691–705 (Holistic Pricing).

### 2.   Google Has Raised Prices In The Advertising Markets Without Losing Share

#### a)   Google's Auction Uses Pricing Knobs Controlled By Google

2280.   (Def. PFOF ¶¶ 1144–1145) Google's claim that it can "impact" ad pricing but does not "control" ad pricing is a meaningless distinction and contrary to the evidence, which shows (1) Google raised CPCs 5% or as much as 10% for some queries and (2) Google predicted it could raise CPCs as much as 15%. Pls. PFOF ¶¶ 632, 648, 651, 652–676 (§ V.C.5.d); Tr. 1213:14–1214:2 (Dischler (Google)) (no reason to disagree Google would retain enough advertisers to increase revenue if it implemented a 15% price increase); Pls. PFOF ¶¶ 143, 630 (monopolist auctioneer has tools to affect outcome). Google raises ad prices to meet its revenue goals. Pls. PFOF ¶¶ 706–712. Google controls the auction that sets ad prices, Pls. PFOF ¶ 631; Tr. 1197:25–1198:4, 1203:25–1204:6, 1205:6–9 (Dischler (Google)), and uses that control to increase CPCs. Pls. PFOF  ¶ 633; Tr. 1379:22–1380:16 (Dischler (Google)) (conceding Google increased CPCs; claiming it "had to increase CPCs" for ad formats); Tr. 4300:12–25 (Juda

(Google)); UPX0456 at -274 (squashing and format pricing "can effectively set better prices");
UPX0525 at -452 (email to Adam Juda stating "[c]learly, my team is able to find ways to raise
prices"); UPX0727 at -047 ("Likely billions in format pricing + squashing"; opportunity for 10%
RPM increase from format pricing and 5% RPM increase from squashing).

2281.   (Def. PFOF ¶ 1146): Google tunes its auction to ensure advertisers cannot reduce
bids without losing clicks. UPX0042 at -118 ("If [advertisers] lower their bid, they should get
fewer clicks at a lower CPC, or the same number of clicks at the same CPC."); Pls. PFOF ¶ 701.

2282.   (Def. PFOF ¶¶ 1152–1153): Google's ability to raise prices and capture surplus
shows its market power. Tr. 10473:14–10474:2 (Whinston (Pls. Expert)) ("Google has exercised
significant market power by raising prices. And it has done so to capture advertiser surplus, you
know, to try to capture as much of advertiser surplus as it can."). Requiring proof that Google
extract *all* surplus—that is, charges every advertiser precisely its willingness to pay for every
transaction—would set an incomprehensibly high bar for monopoly power, impossible to meet
for products priced through a second-price auction.

2283.   (Def. PFOF ¶ 1154): Google's citations for its price discrimination claims are
misleading. The cited Dr. Israel testimony says nothing about price discrimination and the
evidence of Google's monopoly power is price increases, not price discrimination. Tr. 10473:14–
10474:2 (Whinston (Pls. Expert)); Pls. PFOF ¶¶ 627–724 (§ V.C.5).

      **b)**      **LTV Estimates An Ad's Long-Term Value To Google, Not Advertisers**

2284.   (Def. PFOF ¶¶ 1155–1158, 1161): Google measures blindness to maximize long-
term revenue by ensuring users continue to click on ads. Des. Tr. 53:3–5 (Jain (Google) Dep.));
UPX0505 at -308 (as of 2016, beta "routinely tuned . . . [to] extract surplus from advertisers, so
it is not the case that beta represents real blindness costs"). Similarly, LTV does not "prioritize[]

long-term user experience" but is an estimate of an ad's long-term value to Google, not to users or advertisers. Tr. 4033:4–6 (Juda (Google)); *supra* ¶ 2275 (discussion of Google's ad load).

2285.   (Def. PFOF ¶ 1162): Google does not provide advertisers with the necessary information to increase LTV by any means other than increasing bids. PFOF ¶¶ 713–724 (§ V.C.5.i).

### c)   Google's Ad Launches Increased CPCs

2286.   (Def. PFOF ¶¶ 1167–1168): Although Google claims that increases in overall click-through rates on Google's ads reduce CPCs, Sundeep Jain testified increased overall click-through rates generally *increase* overall CPCs by increasing auction pressure. Des. Tr. 90:15–91:20 (Jain (Google) Dep.). Google's cited testimony does not discuss increases in overall ad click-through rates, instead focusing on the effect of individual advertisers improving their performance on Google's quality metrics relative to other advertisers. Tr. 8561:18–20 (Israel (Def. Expert)) (discussing "*relative predicted* click-through rate[s]" (emphasis added)). That aside, because Google prices Search Ads by CPC, overall increases in click-through rates increase Google's RPM even if CPCs stay the same or decline; Google thus does not need to increase CPCs to benefit from CTR-increasing changes. Des. Tr. 82:24–84:25, 87:6–17 (Jain (Google) Dep.)) (describing 2013–2018 launches identified in UPX0438 and noting bulk of RPM increases resulted from CTR increases).

2287.   (Def. PFOF ¶¶ 1167–1168): Even if Google did improve ad quality, its ability to extract the entire value of increased quality is evidence of monopoly power. Pls. PFOF ¶ 634.

2288.   (Def. PFOF ¶ 1169): It is irrelevant that some of Google's launches did not universally increase all CPCs for all advertisers in all auctions. Google operates on averages, as it must because of scale. Des. Tr. 57:24–58:15 (Jain (Google) Dep.)) ("Almost everything we do

has -- will have better for some and not better for others. So we have to operate on averages.").
The relevant question is whether average CPCs increased. *Id.* They did.

2289.   (Def. PFOF ¶ 1170) *Supra* ¶¶ 2278–2279.

2290.   (Def. PFOF ¶ 1172): Google's proposed finding is unsupported. Google cites
Dr. Israel's testimony about a single 2014 squashing launch, DXD-29 at .134 (excerpting
UPX0442 at -868), which increased ad prices. Dr. Israel ignored Google's stated intention to use
squashing to "increase the thickness of the auction and extract more surplus as necessary,"
UPX0442 at -868.

### i.   Google Used Format Pricing To Raise CPCs

2291.   (Def. PFOF ¶¶ 1173–1177): Dr. Juda's cited justification was limited to the 2012
inception of format pricing, when Google added a format pricing knob to its auction and tuned it
to increase average CPCs. Pls. PFOF ¶ 654; Tr. 1220:5–9 (Dischler (Google)). Dr. Juda offered
no justification for the "many" subsequent format pricing launches, Tr. 1219:12–14 (Dischler
(Google)), including the Momiji launch discussed, which increased format prices even where
"we [Google] have no way to say what formats should cost." Pls. PFOF ¶¶ 686–690 (citing
UPX0507 at .026). Google used format pricing as a knob to meet revenue goals, Pls. PFOF ¶¶
706–710, and extract value, UPX0520 at -825-002 ("[P]robably the bulk of format pricing is
really just a veiled attempt at revenue extraction in thin auctions."); Pls. PFOF ¶¶ 688–690, 658.

### ii.   Google Used Squashing To Raise CPCs, Decreasing Quality

2292.   (Def. PFOF ¶¶ 1179, 1187): Google's squashing launches did not seek to improve
auction quality or benefit smaller advertisers, but rather to increase Google's revenue by
increasing average CPCs at the expense of quality. UPX0442 at -871 ("[A]ll of the revenue gains
are from a pricing increase as intended."); Pls. PFOF ¶¶ 661–663. It targeted "runaway winners"
because they gave Google the most room to increase prices. Pls. PFOF ¶¶ 649–650. Squashing

rarely changed the top ad, *id.* ¶ 665; when it did favor advertisers other than the pre-squashing winner, it did so by focusing less on quality and more on bids, *id.* ¶¶ 660–662.

2293.   (Def. PFOF ¶ 1180): Squashing does not compress the difference between the two highest bidders; it artificially increases lower pCTRs among auction participants. Pls. PFOF ¶ 659; Tr. 8577:24–8581:9 (Israel (Def. Expert)). This reduces ad quality. Pls. PFOF ¶¶660–662.

2294.   (Def. PFOF ¶ 1181): Google's claims regarding quality-adjusted prices are addressed in ¶¶ 2271–2279, 2290, *supra*. Google also acknowledges internally that squashing does not enable it to "share in the value that its quality improvements created" because squashing cannot target price increases at advertisers benefitting from those claimed quality improvements. Pls. PFOF ¶ 664.

2295.   (Def. PFOF ¶ 1182): *Infra* ¶¶ 2282 (addressing surplus). Prof. Israel's claim that Google lacks "incentive" to improve pCTR unless it also raises ad prices is itself evidence of Google's monopoly power. Pls. PFOF ¶ 634 (citing Tr. 1077:15–10479:23 (Whinston (Pls. Expert)) ("[T]here's a different mechanism that can lead Google to introduce quality improvements, which is competition.")).

2296.   (Def. PFOF ¶¶ 1185–1186). Dr. Israel's claim that improving the accuracy of pCTR reduces revenue, DXD-29 at .133, contradicts internal Google documents showing improving pCTR accuracy increases CTRs and, therefore, revenue. UPX0020 at -249 (describing features that "improve pCTR accuracy, which tends to drive click through rates that in turn translate into revenue."); *id.* ("pCTR accuracy → CTR++ → RPM++"); *id.* at -250 (launches which "tremendously improved pCTR prediction accuracy" led to better CTRs, which "in turn translate into RPM.").

### iii.    Google Used rGSP To Raise CPCs

2297.   (Def. PFOF ¶ 1189): Google's description of rGSP ignores a central point: rGSP inflates the runner-up's ad rank; the original winner, when not swapped out, pays a higher price. Pls. PFOF ¶¶ 669–670, 672; UPX0045 at -840 ("Ads pay a higher price to win with certainty."). rGSP does not limit the probability of swapping to times when LTV scores are "close": as of late 2020, rGSP requires an LTV ████████ the runner-up's to avoid swapping. Pls. PFOF ¶ 674.

2298.   (Def. PFOF ¶ 1190): Adam Juda testified he was unsure if his team had seen evidence that rGSP led to better ad quality. Tr. 4182:12–15 (Juda (Google)) ("Q: And do you agree that as of 2019 when rGSP is being tested, your team did not see that any evidence that rGSP led to better quality of ads, correct? A: I'm not sure.") (discussing UPX1045 at -064 ("Does exploration lead to better quality . . . . [H]aven't seen that it does.")); Pls. PFOF ¶ 676 (Google views rGSP swapping as "loss case," not exploration). Even if Google did use rGSP's swapping mechanism for exploration, it does not need to inflate the runner-up's ad rank and increase the winner's CPCs to perform this exploration.

2299.   (Def. PFOF ¶ 1191): Google implemented rGSP because it was a "better pricing knob" with "the ability to raise prices" across all auctions. Pls. PFOF ¶ 667. rGSP increased Google's revenue through CPC increases. *Id.* ¶ 675; *supra* ¶ 2279.

### 3.    Trends In Digital Advertising Show Google's Durable Monopoly Power

2300.   (Def. PFOF ¶¶ 1192–1197): In 2020, Google's share of Search Ad spend and Text Ad spend in the United States were 74% and 88%, respectively, and have been durably high over time. Pls. PFOF ¶¶ 575, 602–603; *supra* ¶¶ 2134, 2225.

2301.   (Def. PFOF ¶ 1198) Barriers to entry for search ads on SVPs remain significant. Pls. PFOF ¶¶ 580–581.

### 4.   Google Reduced The Quality Of Its Search Advertising Products

#### a)   Google's Tools Are Of Limited Use To Advertisers

2302.   (Def. PFOF ¶¶ 1199–1201): Advertisers cannot use Google's Quality Score to effectively optimize search advertising and bidding, Pls. PFOF ¶¶ 721–724, particularly given Google's refusal to disclose price increases to advertisers, Tr. 1225:22–25 (Dischler (Google)).

#### b)   Google Provides No Justification For Removing Advertiser's Ability To Opt-Out Of Keyword Expansions

2303.   (Def. PFOF ¶¶ 1202–1203, 1206–1207): Google repeatedly—and wrongly— asserts advertisers could opt-out of some keyword expansions, at one point relying on a witness who testified that he did not know if advertisers could opt out of semantic match. *Compare* Def. PFOF ¶ 1206 *with* Tr. 7557:22–25 (Raghavan (Google)). As Mr. Dischler testified, and as other evidence confirms, Google provides no such opt-out option. Pls. PFOF ¶¶ 612 (citing Tr. 1478:12–14 (Dischler (Google))); UPX8049 at .003. In 2014, Google eliminated a binary opt-out option and did not include it in subsequent expansions, Pls. PFOF ¶¶ 613–618, instead forcing advertisers to rely on "negative keywords," *id.* ¶ 618, an arduous task made more difficult by Google's refusal to offer match expansions for negative keywords, *id.* ¶ 619, and by Google's reduction of the granularity of the information it provides advertisers, *id.* ¶ 621.

2304.   (Def. PFOF ¶¶ 1202, 1208–1209) Google's match-type expansions increased CPCs and reduced advertiser control. Pls. PFOF ¶¶ 622–624; UPX1116 at -061 (expanding match types create "denser auctions" and "fewer opportunities [for advertiser] to cherrypick traffic"). Counter to its cited executive's claim that Google made the changes to help smaller advertisers, the changes impose disproportionate harm on smaller advertisers, who lack the resources to generate negative keywords automatically or efficiently. Pls. PFOF ¶ 620.

### c)   Privacy Concerns Do Not Justify Google's Degradation Of Its SQR

2305.   (Def. PFOF ¶¶ 1212–1213, 1216): Google's claim that it degraded SQRs to address privacy concerns is pretextual. Internally, Dr. Juda rejected Google's privacy justification, emphasizing that "queries are not PII [personally identifiable information]." UPX0526 at -531; UPX0532 at -566 (same), -567 ("messaging [on privacy rationale] is not strong enough to support proactively briefing a journalist"). Others in the marketing industry share Mr. Juda's opinion. UPX0983 at -162 (SQR change "one of the egregious examples of Google removing transparency from advertisers under the banner of 'privacy' . . . [SQR] data has always [been] inherently anonymized and aggregated."); Tr. 3849:14–3850:7 (Lowcock (IPG)) ("[I]t would be reasonable to continue to share that sort of information [in SQRs] with us without breaching privacy regulations."); Des. Tr. 259:13–260:22 (James (Amazon) Dep.) ("I have no recollection of conversations regarding privacy concerns in the search query report data prior to this change.").

2306.   (Def. PFOF ¶ 1217): Google's proposed finding relies on a press release providing no details about the changes Google claims it made. DX2022.

2307.   (Def. PFOF ¶ 1218): Google's SQR is "more aggregated and less granular" than Microsoft's search query reporting. Google's contention to the contrary misreads the testimony it cites. Tr. 5512:13–5513:3 (Jerath (Pls. Expert)).

2308.   (Def. PFOF ¶ 1219): Google's suggestion its SQR changes did not negatively impact Amazon contradicts Amazon's testimony, Pls. PFOF ¶ 1181 (citing Des. Tr. 156:12–22, 157:3–158:2, 158:4–159:12 (James (Amazon) Dep.)), as well as testimony and evidence from other advertisers, *id.* ¶¶ 1175–1181, and Google's own internal documents. *id.* ¶ 1182.

## XI.   GOOGLE'S EXCLUSIVE DEFAULT AGREEMENTS WITH APPLE AND MOZILLA ARE ANTICOMPETITIVE

### A.   The ISA Excludes Rivals

#### 1.   The ISA Locks Up The Safari Default

2309.   (Def. PFOF ¶¶ 1230–1233): Switching the default search engine in Safari on iOS is not as "easy" as "four taps." Users must first know there is a default search engine in the browser, must discover alternative options, must learn the steps to change the default, and then must take those steps. Pls. PFOF ¶¶ 893–894.

2310.   (Def. PFOF ¶ 1234): Downloading an alternative browser is not a way for Apple users to "easily switch" search engines. Relying on Safari is a "deeply ingrained habit." Pls. PFOF ¶ 731. Users overwhelmingly rely on whatever browser is set as the default on their devices. Pls. PFOF ¶ 880 (Mozilla difficulties competing as non-default browser); Tr. 1962:13–1963:2 (Weinberg (DuckDuckGo)) (same for DuckDuckGo); UPX1050 at -894 (as of 2016, 5% of Google queries on Apple devices came from Chrome and 78% came from Safari); Def. PFOF ¶ 1252 (Safari for Windows failed). This is why Google pays billions for the Safari default.

2311.   (Def. PFOF ¶¶ 1235–1236): The ISA has prohibited Apple from offering a search engine choice screen in Safari on any device since 2005. *E.g.*, JX0002 at -819 (§ 3) (Apple ISA (2005 amend.)); JX0033 at -793 (§ 1(a)) (Apple ISA (2016 amend.). When it does not receive payments from a monopolist, Apple offers choice screens in other contexts. Pls. PFOF ¶ 746.

2312.   (Def. PFOF ¶ 1237): The last time Apple "made a request for a choice screen," Google rejected this request. Pls. PFOF ¶¶ 747–751. Apple did not just "briefly consider[]" introducing a choice screen for Safari for Windows and "ultimately decide[] to ship Google as the default[.]" Def. PFOF ¶¶ 1250–1251. Rather, Apple engaged in contract negotiations with both Yahoo and Google about the choice screen and sent Google a "proposed amendment to the

[ISA] which allows end-users the option to choose their search default in Safari." Pls. PFOF ¶¶ 747–748. Apple acquiesced to shipping Google as the default only after Google told Apple "no default, no rev share." Pls. PFOF ¶ 749; Tr. 4984:8–13 (Braddi (Google)).

2313.   (Def. PFOF ¶ 1238): On multiple occasions, Apple considered offering versions of Safari with different default search engines. Pls. PFOF ¶¶ 755–761 (§§ VI.A.2.c–d). Apple also recognizes that users may desire a different default search engine for private browsing, and Apple executives have expressed interest in setting a second default to a more privacy-focused search engine. Pls. PFOF ¶¶ 762–778 (§ VI.A.2.e).

## 2.   Google Mischaracterizes The ISA Negotiations

2314.   (Def. PFOF ¶¶ 1250–1251): *Supra* ¶ 2312.

2315.   (Def. PFOF ¶¶ 1262–1265): Apple and Google's 2015–16 negotiations regarding revenue share rates were less "intense" than they would have been in a more competitive market. Google "didn't pay the [revenue] share Apple wanted" because Google knew that it was Apple's "only viable option." Pls. PFOF ¶ 570; *id.* ¶¶ 1265–1266 (limitations on Microsoft's ability to pay); Tr. 2464:8–2465:7, 2530:14–2531:13 (Cue (Apple)) (no other GSE was a "valid alternative," and ███████████████████████████); Tr. 10155:14–20 (Murphy (Def. Expert)) (agreeing that Mr. Cue's testimony indicates he did not see competition for the Safari default as "intense").

2316.   (Def. PFOF ¶¶ 1269–1271): *Infra* ¶¶ 2330–2334.

2317.   (Def. PFOF ¶¶ 1248, 1256, 1261, 1266–1267, 1275, 1277–1279): Google downplays the role that its ISA payments play in Apple's decision-making. These payments, which come with no risk to Apple, are 17.5% of Apple's global operating profit. Pls. PFOF ¶ 935. In the 2015–16 negotiation, Apple would have walked away from the deal if Google had not agreed to sufficient economic terms. Pls. PFOF ¶ 1100.

2318.   (Def. PFOF ¶ 1278): Google omits key parts of Mr. Cue's testimony. Mr. Cue testified that the ISA does not place any limitations on how Apple uses Google's payments, "the money is just Apple's to decide how to use it," and the funds are not designated for any specific use within Apple. Tr. 2466:11–17 (Cue (Apple)).

### 3.   The Safari Default Is By Far The Most Important Means Of Search Distribution On Apple Devices

2319.   (Def. PFOF ¶ 1280): Apple does not and would not preinstall third-party applications on its devices. Pls. PFOF ¶ 729.

2320.   (Def. PFOF ¶ 1281): Apple's revenue share agreements with other GSEs do not provide pre-set default distribution. *Infra* ¶¶ 2321–2323. In addition, in many cases, these agreements only provide Apple with the option and not the obligation to include the GSE as a user-selectable choice. Although there are differences, Apple's flexibility under these agreements mirrors the flexibility that Apple sought but was denied in its negotiations with Google. Pls. PFOF ¶¶ 758–761 (§ VI.A.2.d).

2321.   (Def. PFOF ¶ 1282): Apple's agreement with Microsoft states that, on the iPhone, Apple will include Bing as a user-selectable choice in Safari. DX0962 at -054 (§ 2.1). Apple has the option but "no obligation" to include Bing as a user-selectable choice on other Apple platforms, such as Macs. *Id.* at -054 (§ 2.1), -055 (§ 3.1). Apple receives revenue share when users select Bing as their search engine and conduct queries through the search bar. *Id.* at -053 (§§ 1.9, 1.11, 1.16), -057 (§ 8.1).

2322.   (Def. PFOF ¶ 1283): Apple has separate agreements with Yahoo for mobile and desktop. The mobile agreement provides that Apple will include Yahoo as a user-selectable choice in Safari on certain Apple mobile devices, such as the iPhone. DX0924 at -259 (§§ 5.1(a)–(b)). The desktop agreement gives Apple the option but "no obligation" to include Yahoo

as a user-selectable choice on other Apple platforms, such as Macs. DX1027 at -888 (§ 3.1). Apple receives revenue share when users select Yahoo as their search engine and conduct queries through the search bar. DX0924 at -256 (§ 1), -261 (§ 8.1); DX1027 at -886 (§§ 1.7, 1.9, 1.10).

2323.   (Def. PFOF ¶¶ 1284–1285): Apple's agreements with DuckDuckGo and Ecosia provide Apple the option but "no obligation" to make DuckDuckGo and Ecosia user-selectable choices in Safari that the user can select on all Apple platforms. DX0946 at -912 (§§ 2.1, 2.4) (DuckDuckGo); DX0933 at -478 (§ 3) (Ecosia). Apple receives revenue share when users select DuckDuckGo or Ecosia as their search engine and conduct queries through the search bar. DX0946 at -911 (§§ 1.9, 1.11, 1.13), -915 (§ 8.1); DX0950 at -906 (§ 7) (amending DuckDuckGo revenue share rate); DX0933 at -477 (§§ 1.8, 1.9, 1.11), -480 (§ 8.1).

2324.   (Def. PFOF ¶ 1286): *Supra* ¶ 2309.

2325.   (Def. PFOF ¶ 1288): The existence of bookmarks in Safari linking to other GSEs does not undermine the power of the Safari default position and has not stopped Google from paying billions for it. Pls. PFOF ¶¶ 734–736.

2326.   (Def. PFOF ¶¶ 1289–1290): For the platforms on which Apple has the option but not the obligation to include Bing or Yahoo as user-selectable choices, the contractual provisions regarding how Apple will present these choices apply only if Apple decides to include them. DX0963 at -404 (§ 2.5) (applying presentation requirements "[w]hen Apple distributes [Bing]"); DX0924 at -259 (§ 5.2) (applying presentation requirements "when Apple distributes [Yahoo]"). Apple's agreements with DuckDuckGo and Ecosia do not include any requirements as to how Apple will present DuckDuckGo and Ecosia as choices if Apple opts to include them. DX0946; DX0933.

2327.   (Def. PFOF ¶ 1291): The 2013 agreement for Bing to power web search for Siri and Spotlight gave Bing a brief foothold on Apple devices, but Google cut it off in the 2016 ISA amendment. Tr. 3105:8–3109:21 (Tinter (Microsoft)) (The deal represented "a small emergent entry point" for Bing, but just as it was starting to see traction, "it was sort of cut off."); Tr. 3272:11–19 (Tinter (Microsoft)) (Google "effectively bought back Siri and Spotlight" in 2016.); JX0033 at -794–795 (§§ 1(b)–(c)) (Apple ISA (2016 amend.)) (Google will provide the search results for Siri and Spotlight).

2328.   (Def. PFOF ¶ 1292): Given the long duration of ISA extensions, rivals are limited in their ability to compete for the Safari default upon expiration. The JCA had a ten-year term. Pls. PFOF ¶ 216. Two years into that term, Google and Apple signed the 2016 amendment, which had an initial five-year term with options to extend up to ten years and removed Apple's right to unilaterally terminate the agreement. JX0033 at -800 (§ 7) (Apple ISA (2016 amend.)); Pls. PFOF ¶ 221. During the 2016 ISA, Google and Apple signed the 2021 amendment, which began a new five-year term with options to extend up to ten years. Pls. PFOF ¶ 220. Moreover, declining to renew the ISA at any time would require Apple to forfeit Google's revenue share payments. Pls. PFOF ¶¶ 935, 1099–1100, 1265–1266.

**4.      The ISA Limits Apple's Product Design And Keeps Apple Out Of Search**

2329.   (Def. PFOF ¶ 1293): Google's citation to the 2016 ISA omits the limiting phrase "[s]ubject to the Permissible Software Default Use" from both quoted provisions. JX0033 at -793 (§ 1(a)) (Apple ISA (2016 amend.)). This phrase restricts Apple's permissible "innovations" to those that maintain Apple's use of Google Search as the Safari default in a manner "substantially similar to its use" when the 2016 ISA was signed. Pls. PFOF ¶¶ 227–229. Mr. Cue's cited testimony that Apple can "innovate in any way that we wanted" conflicts with the contract's plain language. Tr. 2594:16–2595:20 (Cue (Apple)).

2330.   (Def. PFOF ¶¶ 1294–1297): Google admits that it imposed the "substantially similar" clause to prevent Apple from diverting queries to third parties. Def. PFOF ¶ 1270. This admission conflicts with Google's claim that Apple has made a unilateral product design choice to send all queries to Google, *see* Def. PTB at 47–48.

2331.   (Def. PFOF ¶¶ 1294–1297): Google's admission confirms that it used the ISA to prevent Suggestions from becoming more substitutable for a GSE. Apple uses Suggestions to answers queries directly, as well as to recommend third-party websites to users. Pls. PFOF ¶ 1104. In both cases, Apple acts, in some respects, like Google. Pls. PFOF ¶¶ 61–62. By limiting Apple's ability to perform these functions, Google limits Apple's ability to participate in search. Pls. PFOF ¶¶ 1110–1112.

2332.   (Def. PFOF ¶¶ 1294–1297): Application of the "substantially similar" clause is not limited to instances in which Apple diverts "commercially valuable" queries to "third-party vertical search engine[s]" as Google claims. Def. PFOF ¶ 1270. The clause expressly prohibits *any* Apple design change that would cause the use of Google in Safari to no longer be "substantially similar" to its use in 2016. Pls. PFOF ¶¶ 227, 1108. Although the clause mentions the use of Google "vis-à-vis other providers of internet services," it states that this example is provided "without limitation" to other applications. Pls. PFOF ¶ 227. Thus, the clause applies to instances in which Apple answers queries directly, as well as instances in which Apple diverts queries to third parties.

2333.   (Def. PFOF ¶¶ 1294–1297): The ISA's internal references to the "Permissible Software Default Use" confirm that the clause applies to both of these categories of Suggestions. None of the references mention Apple diverting commercially valuable queries to SVPs. Pls. PFOF ¶¶ 228–229. Rather, they discuss Apple's ability to answer queries directly, such as by

using Siri to respond to queries in Safari. JX0033 at -795 (§ 1(c) (third paragraph)) (Apple ISA (2016 amend.)).

2334. (Def. PFOF ¶¶ 1294–1297): Google's explanation contradicts record evidence. Ms. Braddi testified that the clause freezes in place Apple's "trigger rates" for Suggestions. Pls. PFOF ¶ 1110. The rate at which Apple's Suggestions are "triggered" would be impacted regardless of whether a Suggestion provides an answer directly from Apple or provides a link to a third-party website. Likewise, in an email, Ms. Braddi asked colleagues to measure "the number of queries that do not complete to Google for results" as a means of determining Apple's compliance with the agreement. Pls. PFOF ¶ 1110 (citing UPX2014 at -896). This number would be impacted by a Suggestion regardless of whether the Suggestion provides a direct answer from Apple or a recommendation to a third-party website. Additional documents confirm that Google sought to limit the threat of Suggestions without regard to Google's made-for-litigation distinction. UPX2050 at -652; UPX0895 at -904; UPX0309 at -823 ("Ben [Gomes] would like them to stop using their suggests and offer only ours.").

2335. (Def. PFOF ¶ 1300): The cited testimony does not support Google's proposition that Apple "has no present intention to develop a general search engine in the future."

2336. (Def. PFOF ¶¶ 1298–1303): Apple has ████████████████████████████████ ████████████████████████████████. Pls. PFOF ¶¶ 1095, 1097. Apple has considered ways to "disrupt Google Search" and understands it has the capability to compete more directly with Google. Pls. PFOF ¶¶ 1096, 1098. Google's ISA payments make Apple far less likely to do so because Apple can share in Google's monopoly profits rather than having to compete. Pls. PFOF ¶¶ 1099–1101; Tr. 2542:2–12 (Cue (Apple)) (Apple's next best option would have been to build its own search engine if it could not reach a deal with Google in 2016).

5.     **Bing's Inability To Compete For The Safari Default**

2337.   (Def. PFOF ¶¶ 1305–1337): The size of Google's ISA payments and Google's quality advantage over Bing have both been factors in Bing's inability to compete for the Safari default. UPX1062 at -607 (2015 Microsoft email indicating that the "[c]riteria [for Apple] to decide to move is same as always," including "Money – they have to stay whole" and "Product needs to be good (core relevance)"); DX0434 at -235 (2009 Microsoft email discussing factors including "Apple generates significant revenue from G today" and "significant customer experience risk"); UPX0273 (2016 Apple email discussing the financial implications of switching and the need for a revenue guarantee from Microsoft); Tr. 2526:25–2528:21 (Cue (Apple)) (discussing UPX0273 and Apple's consideration of Bing's quality and monetization).

2338.   (Def. PFOF ¶¶ 1305–1337): Bing's quality disadvantages have been most pronounced in areas where Bing most lacks scale—mobile queries, tail queries, and international queries. Pls. PFOF ¶¶ 979, 981, 990, 994, 1015, 1062, 1276; DX0479 at -068 (2015 Microsoft email identifying concerns with "tail relevance – [Apple] seems concerned that Google has structural advantage" and "country level quality – implied but not raised as issue"); DX0481 at -870 (2015 Microsoft email noting that Apple "questioned our tail relevance" and "Bing international relevance"); UPX0821 at -630 (2018 Microsoft notes indicating that Apple's quality concerns are "really an international issue. They don't worry about US[.]").

2339.   ((Def. PFOF ¶ 1335): Apple's 2021 assessment of Bing confirms that its quality disadvantages are focused in these areas. UPX0260 at -681, -683, -684, -685, -700, -701, -704, -705, -709 (Bing ties Google for relevance and outperforms Google for overall preference on US desktop, but Google significantly outperforms Bing on tail, international, and mobile). This study was a significant undertaking and was conducted consistent with industry best practices. Tr. 2297:11–2298:16, 2298:22–2299:4, 2299:10–2300:23 (Giannandrea (Apple)).

2340.   (Def. PFOF ¶¶ 1305–1337): Bing's monetization disadvantage has also limited its ability to compete for the Safari default. Pls. PFOF ¶¶ 1265–1266. This disadvantage is directly linked to Bing's lack of scale. Pls. PFOF ¶¶ 1046–1066; Tr. 3109:22–3111:15 (Tinter (Microsoft)) (explaining how Bing's lack of scale affects Microsoft's ability to negotiate search distribution deals because of its impact on Microsoft's quality and monetization).

2341.   (Def. PFOF ¶ 1316): In the 2015–16 negotiation with Apple, Microsoft was prepared to agree to a guarantee that would require it to incur billions of dollars in losses. However, Apple was unwilling to commit to sending Microsoft a designated level of traffic, and Microsoft was unwilling to write a blank check. Pls. PFOF ¶¶ 1269–1271.

2342.   (Def. PFOF ¶ 1317): *Supra* ¶ 2100.

2343.   (Def. PFOF ¶ 1331): Google agrees that Apple viewed Microsoft's attempts to contract with Apple in 2018 as "desperate measures." *Accord* Pls. PFOF ¶ 1278. Microsoft's inability to meaningfully compete for the Safari default is not due to Microsoft's "lack of confidence" but rather a lack of scale and the resulting disadvantages in quality and monetization. *Supra* ¶¶ 2337–2340.

2344.   (Def. PFOF ¶¶ 1338–1339): Microsoft has understood from Apple that "splitting" the default and entering into a US-only agreement with Bing is not an option due to the ISA's all-or-nothing nature. Tr. 3282:25–3284:11 (Tinter (Microsoft)) ("What they had represented to us is that their existing agreements with Google were all or nothing. It's literally like it's either we use Google everywhere or we use Google nowhere."); Pls. PFOF ¶¶ 1248, 1275; *id.* ¶¶ 758–761 (§ VI.A.2.d).

6. **DuckDuckGo's Inability To Compete For The Safari Default (Including In Private Browsing Mode)**

2345.   (Def. PFOF ¶¶ 1340–1341): Google agrees that Apple does not currently view DuckDuckGo as a viable option for the default search engine in Safari's standard browsing mode. *Accord* Pls. PFOF ¶ 1252.

2346.   (Def. PFOF ¶¶ 1340–1341): Apple executives expressed interest in implementing DuckDuckGo into Safari's private browsing mode and met repeatedly with DuckDuckGo to discuss possible implementations. Pls. PFOF ¶¶ 762–778 (§ VI.A.2.e).

2347.   (Def. PFOF ¶ 1342): The materials Google cites do not support the proposition that Apple declined to set DuckDuckGo as the default due to concerns that Bing could shut down DuckDuckGo. There is no evidence that Mr. Giannandrea's second-hand statements about click fraud formed the basis for any Apple decision regarding the Safari default. As Mr. Weinberg testified, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████. Tr. 2069:6–2070:17, 2071:18–2072:8 (Weinberg (DuckDuckGo)). Google had the opportunity to ask Microsoft witnesses about any concern over click fraud but did not do so.

2348.   (Def. PFOF ¶ 1343): By introducing a second default search setting in September 2023, Apple recognized that users may desire a different search engine for private browsing. Pls. PFOF ¶ 778. The ISA requires Apple to set both defaults to Google. *Id.* ¶ 223.

2349.   (Def. PFOF ¶ 1344): DuckDuckGo offers users substantially more privacy protections than Google does. Pls. PFOF ¶ 765; Tr. 1943:3–1946:4 (Weinberg (DuckDuckGo)); UPX0991 at -333 (Apple executive recognizing "the implication of recommending DuckDuckGo when customers choose private browsing is that Google does not respect your privacy, which while true would certainly be a public slap in the face").

### B.     The Mozilla Revenue Share Agreement Excludes Rivals

2350.   (Def. PFOF ¶ 1351): Google incorrectly describes the user interface of the Firefox browser. Google bases its description on an outdated blog post (and associated deposition testimony) describing Firefox as it existed in November 2014. Def. PFOF ¶ 1351 (citing DX2036 at .002); Des. Tr. 56:8–12, 56:25–58:4 (Baker (Mozilla) Dep.) (discussing DX2036 and noting, "[t]his one I think is from . . . 2014"). Mozilla changed the Firefox interface shortly thereafter, increasing the clicks required to change the default GSE. UPX0067 at -714.

2351.   (Def. PFOF ¶ 1352): Firefox's "this time, search with" feature affects only the user's instant search and does not change the default GSE for any future searches. Des. Tr. 186:25–187:20, 187:23 (Baker (Mozilla) Dep.). Google's agreement with Mozilla imposes a large financial penalty if Mozilla implements the "this time, search with" feature on mobile devices. The revenue share percentage Google pays Mozilla in the United States drops from ██% to ██% for any queries performed on a mobile browser enabled with this feature. JX0065 at -100 (§ 5), -107 (§ 23(c)) (Mozilla SA (2020 amend.)).

2352.   (Def. PFOF ¶ 1353): Google's agreement with Mozilla prohibits Mozilla from ███████████████████████████████████████████████. JX0031 at -617 (§ 2.1(c)) (Mozilla SA (2016)); *id.* at -613 (§ 1) (defining "Excluded Service Provider(s)"). The agreement also permits Google to ███████████████████████████████████████████████████████ ██████████████████████████████████. *Id.* at -617–618 (§ 2.1(c)).

2353.   (Def. PFOF ¶ 1354): Mozilla's revenue share agreements with Bing, Yahoo, DuckDuckGo, and Ecosia give Mozilla the option but not the obligation to include the GSEs as user-selectable choices in Firefox. Pls. PFOF ¶¶ 38, 1307; DX0991 at -686–687 (Schedule 1 § 2.2) (Microsoft (2019)); DX0984 at -329–330 (§ 4.1.2) (Microsoft (2016)); DX0947 at -954 (§ 2.1) (DuckDuckGo (2014)); DX1020 at -505 (§ 1.1) (Ecosia (2018)).

2354.   (Def. PFOF ¶ 1355): Google's agreement with Mozilla prohibits Mozilla from distributing GSEs other than Google in the Firefox default position. Pls. PFOF ¶ 311.

2355.   (Def. PFOF ¶¶ 1362, 1375–1377): Google downplays the role that its revenue-share payments play in Mozilla's decision-making. These payments make up 80% of Mozilla's revenue. Pls. PFOF ¶ 937.

2356.   (Def. PFOF ¶¶ 1368–1371): One reason Mozilla changed the Firefox default to Yahoo was to stimulate competition in search. Pls. PFOF ¶ 1258. This attempt failed. After making a large financial guarantee to outbid Google for the Firefox default, the resulting financial pressure forced Yahoo to load its SERP with ads, degrading the user experience. Pls. PFOF ¶¶ 1259, 1261; *supra* ¶ 2122.

2357.   (Def. PFOF ¶¶ 1372–1373): Firefox's popularity has been on a consistent decline since 2010. Tr. 10072:24–10074:2 (Murphy (Def. Expert)) (discussing UPXD227). As Prof. Murphy admitted, there was no detectable increase in the pace of user decline on Firefox when the default switched to Yahoo. Tr. 10074:3–14 (Murphy (Def. Expert)). There also was no detectable decrease in (or reversal of) the pace of user decline on Firefox in 2017 attributable to Google regaining the default. Tr. 10074:15–10075:18 (Murphy (Def. Expert)).

2358.   (Def. PFOF ¶ 1374): Mozilla's decision to switch the default GSE from Google to Yahoo immediately increased Yahoo's query share by approximately 20 percentage points and decreased Google's query share by roughly the same amount—a phenomenon that was reversed in 2017 when Mozilla reverted the Firefox default to Google. Pls. PFOF ¶ 908. A 2018 Google presentation estimated that, in 2015, the default switch cost Google a 30% decline in traffic and a 45% decline in revenue from Firefox. UPX0066 at -071. Yahoo estimated that the shift represented a loss of 60–70% of its Firefox queries when the default switched back to Google.

Des. Tr. 130:17–131:15, 131:17–19, 131:21–25, 132:2, 132:11–21 (Ramalingam (Yahoo) Dep.).

Prof. Murphy agreed "that's what we'd expect when you shift the default from one to the other."

Tr. 10072:15–22 (Murphy (Def. Expert)).

2359.   (Def. PFOF ¶ 1374): Firefox is a desktop browser adopted by unusually tech savvy users who are more likely than average to switch their defaults. Pls. PFOF ¶ 909. Thus, relying on these figures to predict the impact of a default change on macOS Safari would underestimate the effects on that platform. *Id*.

2360.   (Def. PFOF ¶ 1378): As Ms. Baker explained, "[t]here aren't many alternatives" to Google. Des. Tr. 271:18–272:2 (Baker (Mozilla) Dep.). Google cites evidence of just one experiment that Mozilla conducted to test Bing near the time of the agreement's expiration, not multiple experiments or experiments involving multiple Google search engine rivals. Des. Tr. 269:20–269:22, 269:25–270:1 (Baker (Mozilla) Dep.).

2361.   (Def. PFOF ¶ 1379): The 2021–22 Mozilla experiment was conducted on desktop, and its results cannot be extrapolated to mobile devices. DX0548 at -115 (The notion that the "[s]ame impact applies to mobile as on desktop . . . is a big assumption since [the experiment] was run only on desktop. Many factors are unknown, including (1) whether the same level of user satisfaction with the search engine carries to a different platform, (2) the difficulty of switching default search engine on mobile devices, etc."). Because Firefox is adopted by unusually tech savvy users who are more likely than average to switch their defaults, the results also cannot be extrapolated to other browsers such as macOS Safari. Pls. PFOF ¶ 909.

2362.   (Def. PFOF ¶¶ 1380–1383): Mozilla's letter to the Department of Justice is an advocacy piece authored by Mozilla's outside counsel during the investigation that preceded this lawsuit and should be given little weight. DX0547 at -532. Mozilla's letter mostly shows that

Google has succeeded in using revenue share payments to align the interests of even its chief browser rivals with its own.

2363.   (Def. PFOF ¶¶ 1380–1383): If anything, Mozilla's letter undermines Google's claim that there is meaningful "competition for the contract." Ms. Baker testified that "[c]ompetition in [the] search market would help us. . . . Because then there are more options." Des. Tr. 271:8–11, 271:14–17 (Baker (Mozilla) Dep.). As the letter notes, Mozilla has no meaningful choice in any supposed "competition for the contract" because choosing Bing would "significantly threaten Mozilla Corporation's competitive and financial viability." DX0547 at -533.

## C.   Google's Agreements With Apple And Mozilla Substantially Foreclose Competition

2364.   (Def. PFOF ¶¶ 1384–1386): Foreclosure is calculated by assessing the percentage of the market that is "tied up" by the contracts when they are in place, not by assessing rivals' ability to secure the contracts for themselves. Pls. PFOF ¶¶ 946–947. The browser agreements and the Android agreements—separately and collectively—substantially foreclose competition. JX0001–JX0099; UPX5002–UPX5606; Pls. PFOF ¶¶ 954, 965–966; Pls. PCOL § IV.C.2; Pls. RPCOL § III.B.3. Economic analysis bolsters this conclusion. Pls. PFOF ¶¶ 955–964, 967.

2365.   (Def. PFOF ¶¶ 1384–1386): Plaintiffs' foreclosure analysis and the supporting economic analysis both account for any ability that rivals have to compete "against" Google's defaults. Pls. RPCOL § III.B.3; Pls. PFOF ¶¶ 867–943 (§ VI.D) (power of defaults).

2366.   (Def. PFOF ¶ 1387): Entering into an exclusive distribution contract is not equivalent to offering a higher-quality or lower-priced product to consumers.

2367.   (Def. PFOF ¶¶ 1388–1399): *Supra* ¶¶ 2337–2340, 2344, 2355–2356.

2368.   (Def. PFOF ¶ 1400): Google's conduct has weakened rivals' ability to compete for default agreements. Pls. PFOF ¶¶ 978–1130 (§§ VIII.A–B); *id.* ¶¶ 1249–1256. Google's contractual requirement that it be set as the exclusive default search engine further prevents rivals from competing to be the default for the queries for which they would be most competitive. *Id.* ¶¶ 1245–1248.

2369.   (Def. PFOF ¶ 1401): Because of the power of defaults, rivals are limited in their ability to compete for queries when Google has an exclusive default agreement in place. Pls. PFOF ¶¶ 867–943 (§ VI.D).

2370.   (Def. PFOF ¶¶ 1402–1409): *Supra* ¶¶ 2320–2323, 2326, 2353.

2371.   (Def. PFOF ¶ 1411): *Supra* ¶¶ 2309, 2350.

2372.   (Def. PFOF ¶ 1412): Users rarely navigate to a search provider's website manually. UPX1050 at -894 (As of 2016, "Safari: Default Search" accounted for 65% of Google queries on Apple devices, and "Safari: Organic Homepage" accounted for only 13%.); UPX0173 at -126 (75% of value of searches performed on Windows PCs attributed to default queries); UPX1111 at .014 (Less than 10% of Google's Android query revenue came from organic queries.); Tr. 23:25–25:2, 25:16–27:3 (Sept. 19, 2023 sealed PM session) (Yoo (Google)) (discussing UPX1111). If doing so was common, Google would not be willing to pay such enormous amounts to acquire default traffic. Pls. PFOF ¶¶ 322, 934–935, 942; Tr. 5727:5–5728:11, 5729:6–19 (Whinston (Pls. Expert)) (discussing UPXD104 at 19) (In 2020, Google paid Apple $██ billion for Safari address bar queries in the United States alone.); Des. Tr. 27:9–28:4 (Porat (Google) Dep.) (The "main point" of Google's TAC payments is to extend distribution to more customers.); *id.* 32:15–22 (Google pays Apple to acquire traffic that it would not otherwise get.).

2373.   (Def. PFOF ¶ 1412): Downloadable search apps provide an inferior user experience and an inferior means of distribution compared to being set as the browser default. Pls. PFOF ¶¶ 737–738. Google makes apps an even less effective means of distribution for rivals; the ISA explicitly bars Apple from providing rival search apps and browsers with any promotion that is not also provided to Google for GSA and Chrome. JX0033 at -796 (§ 3(a)) (Apple ISA (2016 amend.)). Google's own efforts to shift users from Safari to GSA have been largely unsuccessful. UPX0085 at -232 (2015 presentation describing Project Soy efforts); UPX2051 at -519 (2020 Project Cinnamon presentation showing no success from prior work).

2374.   (Def. PFOF ¶ 1413): Google's analysis confirms that approximately 62% of all queries performed on iOS devices are entered through the Safari default. This set of queries is more than five times greater than the number of queries flowing through the next most commonly used search access point. Tr. 6073:23–6074:3 (Whinston (Pls. Expert)) (discussing DXD-16 at .006). Another 7.6% of queries are performed on Chrome, where Google is also the default. *Id.*

2375.   (Def. PFOF ¶ 1414): *Supra* ¶¶ 2356–2359.

2376.   (Def. PFOF ¶ 1416): Foreclosure concerns rivals' ability to compete in the current world (and its future), not what would have happened in the past but for the challenged conduct. Pls. PCOL §§ IV.D.1.a–b. Nonetheless, assessing foreclosure relative to the but-for world would yield the same foreclosure result. Pls. PCOL § IV.D.1.c. As Prof. Whinston testified, coverage is a reasonable measure of foreclosure because all covered queries are affected by the exclusionary provisions in Google's contracts. Pls. PFOF ¶¶ 952–954. In addition, Prof. Whinston testified that Google's contracts make 33% of queries unavailable even to a much stronger rival, which

serves as a "lower bound on the proportion of people who won't change their default." Pls. PFOF ¶¶ 955–956 (citing Tr. 10506:12–10508:2 (Whinston (Pls. Expert))).

2377.   (Def. PFOF ¶ 1417): *Supra* ¶ 2146.

2378.   (Def. PFOF ¶ 1418): The coverage estimate of foreclosure does not rely on an assumption about another search engine winning all browser deals. Prof. Whinston analyzed the impact of rivals winning defaults to measure the power of defaults—namely, to determine the portion of queries that Google's contracts make unavailable even to a much stronger rival. Pls. PFOF ¶¶ 957–959.

2379.   (Def. PFOF ¶ 1419): There is a range of less restrictive alternative agreements that Google could have pursued if it did not engage in the challenged conduct. Choosing one of those alternatives and measuring the associated "share shift" is not a proper means of calculating foreclosure. *Supra* ¶¶ 2161–2166. The alternatives listed by Google would allow rivals to compete for marginal traffic in segments where they have particular strengths, which would increase incentives to invest and benefit competition regardless of what the short-run "share shift" might be. Tr. 5782:9–5783:14, 10522:2–10525:21 (Whinston (Pls. Expert)).

2380.   (Def. PFOF ¶¶ 1420–1422): *Supra* ¶ 2313, 2344, 2346.

2381.   (Def. PFOF ¶ 1423): In his expert reports, Prof. Whinston disclosed the analysis that produced the 33% estimate. Tr. 6097:9–20, 10633:6–10634:3 (Whinston (Pls. Expert)). He offered his trial testimony regarding "a much stronger rival" to illustrate the intuition behind this analysis. Tr. 5755:5–5756:25, 6097:21–24 (Whinston (Pls. Expert)).

2382.   (Def. PFOF ¶ 1425): *Supra* ¶¶ 2151–2156, 2356–2359.

2383.   (Def. PFOF ¶ 1430): *Supra* ¶ 2114.

2384.   (Def. PFOF ¶¶ 1431–1432): Prof. Murphy's estimate of usage share shift in a world with choice screens does not measure foreclosure. As Prof. Murphy testified, foreclosure is not calculated by measuring share shifts relative to a but-for world. *Supra* ¶¶ 2161–2166.

2385.   (Def. PFOF ¶¶ 1431–1432): Prof. Murphy estimated how usage shares would shift in a world with choice screens as part of his broader analysis of competitive effects (*i.e.*, "whether it harms the competitive process"), not to calculate foreclosure. Tr. 10008:8–19 (Murphy (Def. Expert)). Specifically, although he found that choice screens would shift a small portion of usage to rivals, *id.* 9838:16–9839:3, he did ***not*** offer the opinion that this represented the share of queries foreclosed by Google's agreements. Rather, he testified that "foreclosure is zero in this case" because he believes rivals can fully compete for all queries. Pls. PFOF ¶ 964.

2386.   (Def. PFOF ¶¶ 1431–1432): As to competitive effects, Prof. Murphy ignores that competition for choice screen selections would increase incentives to invest, as Google did following implementation of the EU choice screen. Pls. PFOF ¶¶ 911, 1088–1090. Because Prof. Murphy focuses exclusively on "share shifts," his analysis reflects the current weakness of rivals and does not account for any improvements rivals would make if they were able to meaningfully compete for a greater share of the market. Tr. 5737:21–5741:19 (Whinston (Pls. Expert)).

2387.   (Def. PFOF ¶ 1433–1434): Google offers no support for its claims that a choice screen would reduce competition in search. Google has recognized in other contexts that choice screens can be a "victory for users" and "place[] control in the hands of the end user, where it belongs." Pls. PFOF ¶¶ 742–744. Browsers would benefit, not suffer, if there were more competition in the general search market. *Supra* ¶¶ 2179, 2363; *infra* ¶ 2402.

2388.   [Intentionally Left Blank]

**D.    Google's Browser Default Search Agreements Harm Competition**

2389.   (Def. PFOF ¶ 1435): *Supra* ¶ 2143.

2390.   (Def. PFOF ¶¶ 1436–1437): Google failed to show that users prefer having Google preset as the exclusive default search engine over a less restrictive alternative. An out-of-the-box choice screen, for instance, would also provide users a convenient and consistent experience across devices while reducing the harm from Google's conduct. Pls. PFOF ¶¶ 742–744, 872–873. Unconditional revenue shares, another less restrictive alternative, would incentivize rival GSEs to compete harder for search traffic, which would also benefit users. Pls. PFOF ¶¶ 1306–1309; Tr. 10522:4–10527:11 (Winston (Pls. Expert)) (explaining how exclusivity can soften competition).

2391.   (Def. PFOF ¶ 1438): *Supra* ¶ 2144.

2392.   (Def. PFOF ¶ 1439): Given the lack of strong GSE rivals, there is no meaningful competition for search distribution agreements. Pls. PFOF ¶¶ 1249–1256.

2393.   (Def. PFOF ¶ 1440): Google's cited testimony states that Microsoft's quality increased, but it does not attribute that change to Microsoft's efforts to compete against Google for defaults. That Microsoft was still unable to outbid Google shows "competition for the contract" is not a realistic long-term incentive for driving quality improvements. Pls. PFOF ¶¶ 1263–1278 (§ X.A.2.b). Moreover, Google's theory that "default agreements incentivize search engines to make quality improvements" conflicts with its competing narrative that rivals have failed to adequately invest. Def. PFOF ¶¶ 457–486, 548–555, 592–597.

2394.   (Def. PFOF ¶ 1441): Mozilla's Yahoo experiment does not indicate that exclusive default agreements incentivize GSEs to make quality improvements. Rather, it illustrates how those agreements—where Google's rivals must bid for every query—force GSEs to degrade quality to meet the browser company's monetization requirements. Pls. PFOF ¶¶ 1259, 1261; *supra* ¶ 2122.

2395.   (Def. PFOF ¶¶ 1442–1444): *Supra* ¶¶ 2019–2020.

2396.   (Def. PFOF ¶ 1445): OEMs and carriers would benefit from competition in the general search services market because a competitive market would drive up revenue shares. Pls. PFOF ¶¶ 1298–1299. Choice screens benefit distributors by providing Google's rivals a means to gain defaults, increase their distribution, and, eventually, improve their products through the benefits of scale. It is also not necessarily true that a choice screen would reduce the incentive for GSEs to "compete on price." Tr. 10529:1–10531:13 (Whinston (Pls. Expert)) (a search provider would continue to pay under an unconditional or MFN arrangement if its competitors do, since a distributor would otherwise make its rivals the default across the board).  Notably, Google's rivals already pay for non-exclusive search distribution, Pls. PFOF ¶¶ 38, 1307, ███████████ ███████████████████████████████████████, JX0024 at -822 (§ 1) (Apple JCA (2014)) (requiring Apple to include a bookmark for Google Search ███████████████ ███████████████████████████████████); Tr. 5757:10–22 (Whinston (Pls. Expert)) (bookmarks are not counted as queries covered by exclusive defaults because "Yahoo! and Bing and Google are all there"); Tr. 9751:21–9752:20 (Murphy (Def. Expert)).

2397.   (Def. PFOF ¶¶ 1446–1452): Google's distribution contracts *reduce* its incentive to invest in search because Google retains users even if it fails to improve or maintain search quality. Pls. PFOF ¶¶ 1079–1092. Testimony from Microsoft executives, among others, indicate that Google's contracts reduce rivals' incentive to invest and innovate because Google's conduct eliminates opportunities to compete for mobile users. *Id.* ¶¶ 1067–1078; *supra* ¶ 2100.

2398.   (Def. PFOF ¶¶ 1453–1454): The introduction of a choice screen would increase investment in search, as it did in Europe. Pls. PFOF ¶¶ 1089–1090; *supra* ¶ 2396.

### E.     Browser Default Agreements Harden Google's Monopoly

2399.   (Def. PFOF ¶¶ 1457–1462): There is no contemporaneous evidence that Google's revenue-share payments to Apple and third-party browsers result in more innovative and better browsers or that any of the purported benefits are passed through to consumers of general search services. Pls. PFOF ¶¶ 1294–1296 (§ X.B.1.b), 1300–1303 (§ X.B.2.b).

2400.   [Intentionally Left Blank]

2401.   (Def. PFOF ¶ 1463): *Supra* ¶¶ 2362–2363.

2402.   (Def. PFOF ¶¶ 1464–1465, 1467): Purported benefits to browsers from Google's search revenue share payments could be realized without requiring exclusivity. Indeed, Google's rivals already pay browsers for non-exclusive distribution in the United States, and in the face of that behavior, Google would likely do so as well. Pls. PFOF ¶¶ 1306–1308, 1321; *supra* ¶¶ 2320–2323, 2353.

2403.   (Def. PFOF ¶ 1466): There is no contemporaneous evidence of revenue share payments to distribution partners being passed through to consumers in the form of lower device prices. Pls. PFOF ¶¶ 1280–1293. Prof. Murphy's analysis of Apple's service margins is unreliable, as Prof. Murphy himself conceded that the trends he observed could be mere "coincidence" and thus provide no support for Google's purported procompetitive justification. *Id.* ¶¶ 1288–1292.

## XII.  GOOGLE'S EXCLUSIVE DEFAULT AGREEMENTS WITH ANDROID OEMS AND CARRIERS ARE ANTICOMPETITIVE

### A.     Google's MADAs Contribute To Exclusivity

2404.   (Def. PFOF ¶ 1474): Every Android phone sold in the United States has the Google Play Store preinstalled. Pls. PFOF ¶ 241. MADA's device-by-device option is illusory:

OEMs have no choice but to sign the MADA and meet its placement requirements. Pls. PFOF ¶¶ 238, 240–242, 780–781.

2405.  (Def. PFOF ¶ 1475): The OEMs that sell most of the Android phones in the United States—Samsung and Motorola—have MADAs and RSAs; because carriers sign RSAs, OEMs cannot unilaterally reject Google search defaults. Pls. PFOF ¶¶ 232, 821.

2406.  (Def. PFOF ¶ 1476): MADAs prevent non-Google search widgets from being placed on a device's homescreen. Pls. PFOF ¶¶ 789–791; Tr. 17:15–16 (Sept. 19, 2023 sealed PM session) (Yoo (Google)) (agreeing that Google uses the MADA to "secure the widget").

2407.  (Def. PFOF ¶¶ 1477–1478): Microsoft cannot get Edge preinstalled with Bing as the default on Samsung devices because Samsung will not preinstall a third browser in addition to its own S-browser and Chrome. Pls. PFOF ¶ 792. Prior iterations of the MADA included default search requirements until those moved to the RSA. Pls. PFOF ¶ 251.

## B.  Google's RSAs Contribute To Exclusivity

2408.  (Def. PFOF ¶ 1479): Android RSAs do not merely "provide enhanced promotion" for Google products and services. For more than a decade, Google has used RSAs with carriers and Android OEMs to secure default search exclusivity and exclude rival GSEs from accessing this distribution channel. Pls. PFOF ¶¶ 798–817 (§ VI.B.2), 822–831 (§ VI.B.4); Tr. 831:21–25 (Kolotouros (Google)) (agreeing search exclusivity provisions are also an important part of RSAs); Des. Tr. 182:3–5 (Porat (Google) Dep.). Encouraging Android OEMs and carriers to take user-enhancing actions, like making regular security updates, does not require Google to exclude other GSEs from Android devices; OEMs and carriers have their own incentives to provide security and OS updates to end users. Pls. PFOF ¶ 1343.

2409.  (Def. PFOF ¶ 1482): Virtually all Android phones sold to U.S. consumers are covered by an RSA. Pls. PFOF ¶¶ 254, 273, 278, 285, 299, 307.

2410.  (Def. PFOF ¶ 1483): In the case of Android devices sold by U.S. carriers, no one party (carrier or OEM) can unilaterally move away from Google search defaults. Pls. PFOF ¶ 821. Today, T-Mobile's and AT&T's RSAs only have one tier. Pls. PFOF ¶¶ 285, 273. Both Samsung's and Verizon's RSAs have a core tier that include platform-wide search requirements. Pls. PFOF ¶¶ 276, 295. Although the current Android OEM and carrier RSAs have a tier with a device-by-device choice, that option is illusory; virtually all Android devices sold to U.S. consumers meet the RSA's strictest requirements. Pls. PFOF ¶¶ 273, 278, 285, 299, 307.

2411.  (Def. PFOF ¶ 1483): When carriers decide whether to sign an RSA, they do so against the backdrop of the OEM's MADA. Pls. PFOF ¶ 820; Tr. 23:18–24 (Sept. 19, 2023 sealed PM session) (Yoo (Google)) (the MADA requires Google's search app to be on the device regardless of whether the carrier signs an RSA with Google). Mr. Nadella testified that "there's no availability of the default on Android because Google owns it;" trying to get search distribution on Android is "very, very hard because it's home territory for Google;" and, on Android, "Google has carrots and it has massive sticks," including the threat of taking Google Play Store away. Tr. 3500:9–3501:4, 3516:8–3517:25 (Nadella (Microsoft)).

2412.  (Def. PFOF ¶¶ 1484–1485, 1491): Though the Core Tier of Samsung's RSA does not explicitly prohibit alternative search services, it is de facto exclusive. The Core Tier requires Samsung to set Google as the default search for S Browser. Pls. PFOF ¶ 296. When combined with the MADA, rival GSEs are excluded from distribution on Samsung Android devices. Pls. PFOF ¶¶ 245–252, 294–296. Virtually all Samsung devices covered by its RSA (as opposed to a carrier RSA) are enrolled in the Search and Chrome Enhanced Tier. Pls. PFOF ¶ 299.

2413.  (Def. PFOF ¶ 1486): The Core Tier obligation to set Google as the default search on S Browser does not apply to Samsung Android devices sold by carriers; all U.S. carrier RSAs,

however, require them to set Google as the default search on all preinstalled browsers to maximize Google's payments. Thus, the S Browser will have Google set as the default on all Android devices in the United States. Pls. PFOF ¶¶ 260, 272–273, 276–278, 284–285, 299.

2414.   (Def. PFOF ¶ 1494): The Yahoo Mobile App was only carved out from the Preferred Tier of Verizon's RSA when Verizon formerly owned Yahoo. Pls. PFOF ¶ 825.

2415.   (Def. PFOF ¶ 1498): During negotiations for AT&T's 2021 RSA, the Core Tier was removed, "in part," at AT&T's request because the Preferred Tier was more aligned with what AT&T had been doing under the 2018 RSA, and AT&T "certainly didn't think the economics [of the Core Tier] were as attractive [as the economics of the Preferred Tier]." Des. Tr. 178:9–179:18 (Ezell (AT&T) Dep.).

## C.      Android Partners Are Constrained By Google's MADA And RSA

2416.   (Def. PFOF ¶¶ 1508–1511, 1521): Android OEMs and carriers have sought flexibility when it comes to search and have been prevented from preinstalling Google's search rivals. Pls. PFOF ¶¶ 790, 805–809, 822–831 (§ VI.B.4). Any consumer expectations that Google Search would be preinstalled on Android devices arise from Google's MADAs and RSAs, which have required Google to be the exclusive defaults for more than a decade. Pls. PFOF ¶¶ 237, 254.

2417.   (Def. PFOF ¶¶ 1513–1516): Verizon executives were confused about whether the 2014 RSA permitted alternative search services and browsers to be preinstalled; some at Verizon believed that Google's RSA prohibited both. *Compare* UPX0830 at -809 and Des. Tr. 173:8–13, 173:18–175:11, 175:14–23, 176:1–5, 176:13–25, 177:2–4, 177:8–19 (Ramalingam (Yahoo) Dep.) *with* UPX0304 at -606.

2418.   (Def. PFOF ¶ 1517): Verizon "argu[ed] vigorously" to keep the explicit prohibition on alternative search services out of its RSA, but Google would not agree, allowing only a narrow exception in the Preferred Tier of the 2021 RSA for the Yahoo Mobile app but

only as long as Verizon (1) owned Yahoo, (2) placed the app on the plus one screen or device app tray (not the home screen), and (3) made sure the app "didn't allow a punch-out into general search." Pls. PFOF ¶¶ 824–825.

2419.   (Def. PFOF ¶ 1518): Verizon wanted the flexibility to preinstall Yahoo Search without a reduction of the RSA revenue share percentage. Pls. PFOF ¶¶ 822–831 (§ VI.B.4); Tr. 1047:18–24, 1055:23–1056:10 (Higgins (Verizon)) (During negotiations Higgins was "trying to maintain some flexibility for additional possibilities in the future for search.").

2420.   [Intentionally Left Blank]

2421.   (Def. PFOF ¶¶ 1531–1535): Mr. Baxter was not involved in MADA or RSA negotiations nor did he know any details of those agreements. Des. Tr. 107:4–8, 107:10–17, 108:3–5, 108:7–12, 108:14–17, 109:23–110:3, 121:6–8, 121:13–16, 121:18–21, 121:23–24, 122:1 (Baxter (Samsung) Dep.). Google's employees recognize that Samsung would only want certain parts of the MADA bundle if permitted to choose. UPX0312 at -153 ("[W]e require Samsung to take all or nothing, but in [a] hypothetical world where Samsung no longer wants Play store, Maps and YouTube would be the apps that they would independently want….").

2422.   (Def. PFOF ¶ 1536): *Infra* ¶ 2433.

### D.   Google's Android Agreements Have Interfered With Rival Distribution

2423.   (Def. PFOF ¶¶ 1540–1542, 1553, 1555–1556, 1558): Microsoft, Yahoo, and DuckDuckGo have tried to obtain distribution on Android devices. Pls. PFOF ¶ 1252 (citing Des. Tr. 263:11–264:6 (Giard (T-Mobile) Dep.) (T-Mobile considered DuckDuckGo partnership but dismissed it "pretty early on.")); Tr. 3113:21–3117:17 (Tinter (Microsoft)); Tr. 2048:9–2050:1 (Weinberg (DuckDuckGo)) (DuckDuckGo proposed being the default on Samsung's S Browser's private mode.); Pls. PFOF ¶¶ 822–831 (§ VI.B.4). The only rational reason for Google to pay enormous sums and include exclusivity clauses is that partners would, otherwise, meaningfully

distribute rivals. Tr. 3796:5–3798:22 (Ramaswamy (Neeva)) (Google payments disincentivize, e.g., Mozilla's Firefox browser from offering a search engine choice screen because doing so would "represent a disruption to . . . several hundred million dollars of payments that they receive every year."); UPX0134 at -865 ("Without the exclusivity, we are not 'getting' anything. Without an exclusive search deal, a large carrier can and will ship alternatives to Google . . . .").

2424.   (Def. PFOF ¶¶ 1543–1544): Since 2011, the Verizon RSA has been exclusive. Pls. PFOF ¶¶ 276–283. The exceptions that Google highlights in the 2014 and 2021 agreements are trivial and unused. Pls. PFOF ¶¶ 278–279, 282–283.

2425.   [Intentionally Left Blank]

2426.   (Def. PFOF ¶¶ 1545–1547, 1549, 1552, 1554): Google's proposed fact that AT&T, T-Mobile, and Motorola have no interest in maintaining flexibility is illogical: (1) all else equal, a partner would of course prefer the option to act upon any future change in preference, Des. Tr. 165:4–166:20 (Giard (T-Mobile) Dep.) (When negotiating a replacement for the 2017 RSA, T-Mobile sought flexibility.), and (2) the only rational reason Google could have for paying enormous sums and including exclusivity clauses is that Google feared its partners would distribute rivals otherwise, *supra* ¶ 2423. Partners cannot be expected to ask for material exceptions to Google's exclusivity clauses when Google has rejected such exceptions.

2427.   [Intentionally Left Blank]

2428.   (Def. PFOF ¶¶ 1548, 1550–1551): AT&T's and T-Mobile's RSAs have no meaningful exceptions from exclusivity; all their devices are Google exclusive. Pls. PFOF ¶¶ 273, 284–285; Def. PFOF ¶ 1552. Payments, not just quality from consumers' perspective, influences these companies' default decisions. Pls. PFOF ¶¶ 272, 284. If the payments had no effect, Google would not make them. *Supra* ¶ 2423.

### E.    Rivals Have Little Ability To Distribute On Android Today

2429.   (Def. PFOF ¶ 1559): *Supra* ¶¶ 2364–2365; *infra* ¶¶ 2442–2448 (§ XII.F.).

2430.   (Def. PFOF ¶¶ 1560–1568): Rivals have no meaningful opportunity to convince Android OEMs to forgo the MADA or to distribute a second widget in addition to Google's. Pls. PFOF ¶¶ 779–797 (§ VI.B.1); *supra* ¶¶ 2404–2407 (§ XII.A). Any remaining opportunities are prevented or significantly hampered by RSAs. Pls. PFOF ¶¶ 798–821 (§§ VI.B.2–3); *supra* ¶¶ 2408–2415 (§ XII.B). Also, Google's conduct has weakened rivals' ability to compete for both broad and targeted default agreements. Pls. PFOF ¶¶ 978–1130 (§§ VIII.A–B), 1249–1256, 1245–1248.

2431.   [Intentionally Left Blank]

2432.   [Intentionally Left Blank]

2433.   (Def. PFOF ¶¶ 1570–1572): In the United States, the Microsoft Duo exemplifies the exclusivity of Google's MADA: Despite the Duo's large size and Microsoft's ownership of Bing, Microsoft distributes the Google search widget and not the Bing search widget. Pls. PFOF ¶¶ 788, 790. In the European Union, the Duo technically distributes the Google search widget, but the EU search widget shows a choice screen and Microsoft receives a bounty payment for that distribution. Tr. 3418:7–3419:24 (Tinter (Microsoft)); DX0535 at -419 (discussing the "licensing cost offsets" that Microsoft would receive by signing the EMADA and placement agreements); Tr. 10158:7–10160:1 (Murphy (Def. Expert)) (confirming that Google pays a fee to the OEMs in Europe for the placement of Google Search in Chrome).

2434.   (Def. PFOF ¶ 1573): Due to the MADA, rival search widgets are unable to obtain distribution on any Android smartphones in the United States. Pls. PFOF ¶¶ 783–784, 788–791, 1254. And with its prominent and exclusive placement, Google's widget accounts for 50% or more of the revenue from Android queries. Pls. PFOF ¶ 796. Similarly, Google's rivals cannot

effectively compete to convince OEMs and carriers to abandon Google's RSA. Pls. PFOF ¶¶ 1231–1278 (§ X.A).

2435.   (Def. PFOF ¶ 1575): If AT&T opts a device out of exclusivity under the RSA, it will forgo substantial RSA payments for that device. Pls. PFOF ¶ 273. Thus, virtually all AT&T devices are Google exclusive devices. *Id.*

2436.   (Def. PFOF ¶¶ 1577–1578): *Supra* ¶ 2424.

2437.   [Intentionally Left Blank]

2438.   (Def. PFOF ¶¶ 1579–1580): Google's RSA with Samsung has been exclusive since 2011. Pls. PFOF ¶¶ 294–303 (§§ III.F.2.b.iii.a–b). Under the 2017 Samsung RSA, if Samsung had opted a device out of exclusivity, it would forgo substantial RSA payments for that device. Pls. PFOF ¶ 301. The 2020 Samsung RSA is only partially device-by-device: Devices opted out would sacrifice considerable RSA and GTM payments and would remain subject to lower-tier RSA exclusivity restrictions. Pls. PFOF ¶¶ 295–298, 303. Thus, virtually all Samsung devices have been Google exclusive. Pls. PFOF ¶ 299.

2439.   (Def. PFOF ¶ 1581): *Supra* ¶ 2428.

2440.   (Def. PFOF ¶¶ 1583–1586): Google's RSA with Motorola has been exclusive since 2005. Pls. PFOF ¶¶ 304–309 (§ III.F.2.b.iii.c). Under the 2017 Motorola RSA, if Motorola had opted a device out of exclusivity, it would forgo substantial RSA payments for that device. Pls. PFOF ¶ 309; JX0039 at -809 (Exhibit A § 1) (Motorola RSA (2017) (setting the revenue share at ██████ %). Although all payments in the 2020 Motorola RSA were initially based on platform-wide exclusivity, Pls. PFOF ¶ 306, a (conspicuously timed) update made the RSA partially device-by-device: Devices opted out would jeopardize considerable RSA payments and

would remain subject to lower-tier RSA exclusivity restrictions, Pls. PFOF ¶¶ 304–307. Thus, virtually all Motorola devices have been Google exclusive. Pls. PFOF ¶ 307.

2441.   (Def. PFOF ¶¶ 1587–1597): Because of the power of defaults, rivals are limited in their ability to compete for queries when Google has a MADA and RSA in place. Pls. PFOF ¶¶ 867–943 (§ VI.D). This limitation exists (1) even when the process of changing or circumventing defaults appears simple and (2) regardless of how many people in the current state of competition prefer their Android devices' default setup. *Id.*

### F.   Google's Android Agreements Substantially Foreclose Competition

2442.   (Def. PFOF ¶¶ 1599–1600): *Supra* ¶¶ 2364–2365.

2443.   (Def. PFOF ¶ 1602): Regulatory action in the European Union caused Google to curtail the MADA bundle and adopt a search choice screen for the Google search widget, the Google search app, and Chrome. Def. PFOF ¶ 1602; Tr. 2137:3–2138:9 (Weinberg (DuckDuckGo)); UPX8091 at -504–505.

2444.   (Def. PFOF ¶¶ 1604–1608): Because the MADA is unbundled in the EU, OEMs have the option of paying a fee to load GMS apps (including the Play Store) on their devices without preloading the Google search widget, the Google search app, or Chrome. Def. PFOF ¶ 1602; Tr. 10158:20–22 (Murphy (Def. Expert)) (discussing DXD-37 at .110). They also have the alternative of prominently preloading the Google search widget, the Google search app, and Chrome in exchange for a payment from Google that offsets the cost of the Play Store. Tr. 10158:23–10159:5 (Murphy (Def. Expert)); Def. PFOF ¶ 1604. Google offers these payments even though there is a choice screen that assigns the search defaults to the widget, app, and browser. Tr. 10159:14–16 (Murphy (Def. Expert)).

2445.   (Def. PFOF ¶¶ 1604–1608): Thus, in the EU, OEMs may choose to obtain the Play Store effectively for free (as they do in the United States today) while offering a search

choice screen to users. Tr. 10159:2–5, 14–16 (Murphy (Def. Expert)) (discussing DXD-37 at
.110 and agreeing that the payments "roughly net out"). Or, they may choose to deal with
Google's search rivals while still offering the Play Store to their customers.

2446.   (Def. PFOF ¶¶ 1610, 1617–1619): *Supra* ¶ 2376.

2447.   (Def. PFOF ¶¶ 1612–1613): Prof. Murphy's estimate of the potential usage share
shift in a world with choice screens does not measure foreclosure. *Supra* ¶ 2384. This analysis
also ignores that the mere ability for users to select a rival on a choice screen increases
investment incentives for GSEs. *Supra* ¶ 2386.

2448.   (Def. PFOF ¶¶ 1614–1615): With more competition, partners would receive
greater payments than they receive today. Pls. PFOF ¶¶ 1298–1299 (§ X.B.2.a).

## G.    Branch Metrics, Inc.

2449.   (Def. PFOF ¶¶ 1621–1624): For years, Branch has worked to distribute an app-
search tool that identifies and surfaces app content in response to user queries. Pls. PFOF ¶ 832.
Branch named its app-search tool "Discovery" because getting users to discover their apps is
"one of the most challenging things" for companies to overcome "in the app ecosystem." Tr.
2900:4–12 (Austin (Branch)).

2450.   (Def. PFOF ¶¶ 1626, 1636–1638, 1640–1653): Branch's Discovery, as originally
designed, has never been deployed on an Android smartphone. Pls. PFOF ¶¶ 844–845;
Tr. 4497:20–23 (Chang (Samsung Next)) ("Branch's full functionality . . . was not fully
integrated."). A scaled-back version of Branch's app-search tool launched on the Samsung
Galaxy S10 in 2019 and today appears on Android phones sold by Verizon, T-Mobile, and
Motorola; this version offers only a shadow of the functionality Branch developed for Discovery.
Pls. PFOF ¶¶ 837–844, 848–861; Tr. 2942:16–2943:9 (Austin (Branch)) (on Verizon phones,
Branch "reduced its [on-device search product's] functionality dramatically"); *id.* 2943:11–23

(same regarding T-Mobile phones); *id.* 3049:7–18 (same regarding Motorola phones); UPX0693 at -974 (March 8, 2019, email from Samsung describing Branch's launch on Galaxy S10 as "just [the] first step with partial function[ality] of App 'Discovery'"). Limits on Branch's Discovery product—including limiting Discovery's search results on the Galaxy S10 to 25 prescreened apps—made it unlikely that users would discover new apps, defeating the product's original value proposition. Pls. PFOF ¶ 832; Tr. 2900:4–12, 2911:12–2912:11 (Austin (Branch)); UPX0693 at -975 (listing launch partners).

2451.   (Def. PFOF ¶¶ 1626, 1636–1638, 1640–1653): Branch wagered that distributing scaled back versions of its product would still be worthwhile because it gave Branch a "foot in the door with a Samsung or an OEM or a carrier." Tr. 2928:21–2929:15 (Austin (Branch)) ("[E]ven if the product [was] so restricted," Branch could still "build the relationship, build the trust, and maybe [Branch's partners] would be willing to stand up to Google over time and . . . actually introduce the full functionality.").

2452.   (Def. PFOF ¶¶ 1627): Branch's app-search tool requires internet access to enable a range of features, including basic search results. Forcing it to operate without internet access reduces functionality, "hurt[s] the value offered to consumers," and effectively precludes Branch from monetizing. Tr. 2928:13–2930:6, 2982:9–2983:24 (Austin (Branch)); PSX00075 at -499.

2453.   (Def. PFOF ¶¶ 1628–1633): Branch's app-search tool is not a GSE today, but it could provide a substitute for web search in the future because it represents an alternative method of internet information retrieval, allowing users to forgo traditional GSEs entirely. Pls. PFOF ¶¶ 1120–1122; Tr. 5851:5–5852:5 (Whinston (Pls. Expert)) (Branch provides "a measure of one-stop shopping over apps that would be more like a general search engine.").

2454.   (Def. PFOF ¶¶ 1628–1633): To address partners' concerns, Branch and Samsung

NEXT marketed Discovery as a complement to Google's GSE. *See, e.g.,* Tr. 4514:3–14 (Chang

(Samsung Next)) (discussing UPX0686 at -127). Although Branch viewed app and web search

"as different use cases" in the short-term, Branch also "believed that there would be a paradigm

shift once [it] had enough people using this app search product at scale." Tr. 2957:19–24 (Austin

(Branch)); *id.* 3075:25–3076:16 ("[T]he hope was that after we started to show people what's

possible, got them using it, . . . search behavior would shift over to mobile app search.").

2455.   (Def. PFOF ¶¶ 1634–1635): Google understood Branch to be a competitive threat.

Pls. PFOF ¶¶ 851–858; UPX0314 at -751 (email from Jim Kolotouros to Chris Li, "How bad is

this[?]"). Google executives referred to Branch's app-search tool—even with limited

functionality—as a "search experience" and labelled it an alternative search service. Pls. PFOF ¶

851; UPX0694 at -599; *id.* at -202 (Branch's app-search tool "expands the search experience" on

S Finder, "violating their contracts."); UPX0664 at -453–454 (same).

2456.   (Def. PFOF ¶¶ 1634–1635, 1671): Anna Kartasheva's in-court testimony is

contradicted by contemporaneous emails from Google employees, including her own, as well as

Google's actions to thwart distribution of Branch's app-search tool. Pls. PFOF ¶¶ 852–858.

Google's Android team followed Ms. Kartasheva's advice and reached out to Branch distribution

partners, as Ms. Kartasheva acknowledged. Pls. PFOF ¶¶ 853–854, 858; Tr. 2807:1–11

(Kartasheva (Google)); UPX0982 at -686–687; UPX2003 at -990, -992.

2457.   (Def. PFOF ¶¶ 1636, 1638, 1654–1659, 1662): Google's RSA agreements with

Android OEMs and carriers prevented adoption of Branch's app-search tool with its full

functionality. Pls. PFOF ¶¶ 837–847, 1121. Then, as now, Google's RSAs prohibited the

preinstallation of competing or alternative search services. Given the breadth of those exclusivity

clauses, Google's counterparties were concerned that working with Branch could violate their RSAs; some declined partnership on that basis. Pls. PFOF ¶ 1121; UPX0656 at -448–451. In 2020, AT&T explored a partnership with Branch to launch the product with expanded functionality. AT&T's legal counsel advised AT&T that Branch's app-search tool could be considered a competitive search service under the RSA because "it's not black and white or cut and dry," and as a result there were "risks associated with" moving forward. Des. Tr. 239:8–240:5 (Ezell (AT&T) Dep.); *id.* 340:1–341:6 ("I consulted my legal team. They said it was ambiguous, but there was some risk it would be inconsistent with the RSA."). AT&T's concerns were confirmed after it sought Google's opinion of whether AT&T could preinstall Branch's service. *Id.*; UPX0982 at -686–687. In response, "Google indicated they felt that it was inconsistent with the RSA." Des. Tr. 340:1–341:6 (Ezell (AT&T) Dep.). Thus, there was "enough uncertainty" for AT&T to decide an expanded deal with Branch "wasn't worth [it]." *Id.*; Pls. PFOF ¶ 860.

2458.   (Def. PFOF ¶¶ 1640, 1643, 1648): Google's proposed findings omit key language in the 2021 RSAs that blocks efforts to expand the limited functionality of Branch's app-search tool and restricts search innovation more generally. Verizon's and AT&T's RSAs limit S-Finder to its functionality as of the date those agreements were signed—which was substantially scaled back from its original design. Pls. PFOF ¶¶ 837–841; JX0093 at -489 (§ 1.5) (Verizon RSA (2021)) (permitting "the search functionality" within Samsung's S-Finder "as of the Effective Date"); JX0091 at -743 (§ 1.5) (AT&T RSA (2021)) (same). T-Mobile's RSA contains identical language to AT&T's 2018 RSA, which, according to Google, blocked S-Finder's expanded functionality. Pls. PFOF ¶ 1121; JX0095 at -689 (§ 1.3) (T-Mobile RSA (2021)).

2459.   (Def. PFOF ¶¶ 1660–1672): Mr. Austin's and Mr. Chang's testimony and contemporaneous documents are reliable evidence that, in 2019 and 2020, Samsung believed its

RSAs prohibited it from using Branch technology for internet-connected search without curbs to its functionality. *See, e.g.,* Pls. PFOF ¶¶ 837–841. Mr. Austin and Mr. Chang communicated directly with Samsung decisionmakers about Samsung's relationship with Google and Samsung's ongoing RSA negotiations. *See, e.g.*, Tr. 2907:8–2908:5 (Austin (Branch)) (describing ongoing talks with Samsung executives between 2015 and 2019); *id.* 2911:12– 2912:11 (describing Austin's conversations with Samsung product manager about Samsung's limits on Discovery's functionality); UPX1064 at -543; UPX0690 at -427 (Aug. 21, 2020 Slack chat relaying Samsung's takeaways from its negotiations with Google regarding permissibility of connected search under 2020 RSA); Tr. 4551:22–4552:9 (Chang (Samsung Next)) (Information in UPX0690 came directly from Samsung's RSA negotiating team.). Google could have called a percipient witness from its partner Samsung to challenge this testimony but chose not to.

2460.   (Def. PFOF ¶¶ 1664–1672): Under the Federal Rules of Evidence, plaintiffs can rely on out-of-court statements to show Samsung's and the carriers' understanding of facts and their subjective beliefs. Contemporaneous statements by a Samsung executive are admissible to show that Samsung believed "the gating factor" to a Branch partnership was "the Google-Samsung contract terms" and that "anything that can be claimed by Google as 'web search' is something we need to avoid." UPX1064 at -543; Pls. PFOF ¶ 840.

2461.   (Def. PFOF ¶¶ 1660–1661, 1673–1678): DX0614 does not prove that Samsung rejected an expanded partnership with Branch because of a conflict with Samsung's product strategy. Tr. 3045:15–23, 3069:20–3071:10 (Austin (Branch)). After his outreach to Won Jin Lee in DX0614, Mr. Austin spoke to a Samsung executive and close friend of Mr. Lee; after discussing the issue with Mr. Lee, this friend told Mr. Austin that the roadblock was "Google and you have no hope of ever getting past that." Tr. 3069:20–3071:10 (Austin (Branch)).

2462.   (Def. PFOF ¶¶ 1678–1679): Google omits that Samsung's concerns about engagement with Branch's app-search tool were limited to the restricted version of Discovery. Tr. 4591:22–4592:4 (Chang (Samsung Next)) (explaining that Samsung's concerns regarding user engagement in DX0695 concerned the restricted version of Branch's app-search tool).

2463.   (Def. PFOF ¶¶ 1681–1684): Google exaggerates partners' concerns over Branch's app-search tool's users experience and data privacy policies. As Mr. Austin explained, it is "typical[] in the life cycle of [an early] conversation with any distribution partner" for those types of concerns to be raised and then addressed. Tr. 3055:18–3056:2 (Austin (Branch)).

## H.   Google's Android Agreements Harm Search Competition

2464.   (Def. PFOF ¶ 1686): Google failed to show that Android users in the United States prefer having Google set as the exclusive default and placed prominently on their devices. For example, many users do not want the Google Search Widget placed on their default home screens, Pls. PFOF ¶ 1324, and may prefer the product differentiation they are deprived of by the MADA's and RSA's user-interface standardization, *id.* ¶¶ 1325–1327.

2465.   (Def. PFOF ¶ 1688): *Supra* ¶¶ 2143–2144, 2393; Tr. 10157:25–10158:6 (Murphy (Def. Expert)) (no evidence that Google's Android agreements are "intensely contested").

2466.   (Def. PFOF ¶ 1689): There is no compelling evidence that Google's RSA payments encouraged Android OEMs and carriers to develop higher-quality, lower-priced devices or improved data plans and wireless networks. Wireless carriers have independent reasons to invest in improving data plans and wireless networks, and Internet service has expanded considerably for technical and other reasons. Des. Tr. 290:13–291:11 (Ezell (AT&T) Dep.) (explaining that the revenue that AT&T earns from the Google RSA is small compared to its wireless business at large, suggesting that its wireless business would drive AT&T's interest in improving data plans and wireless networks); Tr. 10456:22–10498:18 (Whinston (Pls.

Expert)) (noting that "[t]he Internet has been expanding, connectivity has been improving" over the years). Even if that were not the case, less restrictive alternatives, including unconditional revenue share payments, would have resulted in the same purported benefits.

2467.   (Def. PFOF ¶¶ 1690–1691): *Supra* ¶¶ 2396, 2398.

2468.   (Def. PFOF ¶ 1692): Google cites no evidence supporting Prof. Murphy's opinion that search exclusivity provisions prevent Android OEMs and carriers from acting opportunistically. Pls. PFOF ¶¶ 1335–1338 (§ X.C.2.iii).

2469.   (Def. PFOF ¶ 1693): Correlation is not causation. That search output increased when Google was paying to be the exclusive default on Android devices does not support a factual finding that those payments are responsible for the increase. Pls. PFOF ¶ 1301. Many external factors may have caused the increase in search, including the growth of the Internet, the adoption of smartphones, expanded access to broadband, and improvements in mobile telecommunications technology. *Id.* ¶ 1302.

## I.    Google Has Failed To Demonstrate Its Exclusive Android Agreements Promote Smartphone Competition

2470.   (Def. PFOF ¶¶ 1694–1696): The use of MADAs and RSAs to promote competition within the Android ecosystem and with iOS is not supported by contemporaneous documents. Google primarily uses those agreements to foreclose distribution of competing search services. Pls. PFOF ¶¶ 798–803, 810–820. Google's ISA with Apple—which provides billions every year to Google's chief competitor in the smartphone market—undermines any claim that the MADAs and RSAs promote competition with iOS. *Id.* ¶¶ 1319–1320.

2471.   (Def. PFOF ¶¶ 1697–1701): The MADAs and RSAs do not benefit consumers and make Android more competitive with iOS. Pls. PFOF ¶¶ 1323–1330 (§ X.C.2.i). To the contrary, the rigidity of the "MADA bundle" is inefficient. *Id.* ¶ 1333. And the MADA and RSA

hinder product differentiation. *Id.* ¶¶ 1325–1327; Tr. 10098:3–7 (Murphy (Def. Expert)) ("There certainly are dimension[s] in which [Android OEMs] benefit from differentiation."). OEMs have their own incentives to create positive out-of-the-box experiences for their users and likely would do so absent Google's exclusivity requirements. Pls. PFOF ¶¶ 1328–1329.

2472.   (Def. PFOF ¶ 1702): Google has financial reasons, beyond securing Google Search's preinstallation and prominent placement, for supporting the Google ecosystem and licensing its applications. Notably, Google earns billions from the distribution of its flagship, non-search applications, including Google Play. *Id.* ¶¶ 1312–1317.

2473.   (Def. PFOF ¶¶ 1702–1706, 1708): *Supra* ¶ 2464.

2474.   (Def. PFOF ¶ 1707): Although Android OEMs and carriers retain *some* flexibility to configure their devices in ways they believe best for their users, Google's preinstallation, placement, default, and exclusivity terms thwart OEMs' and carriers' efforts to differentiate and innovate. Pls. PFOF ¶¶ 1325–1330. OEMs and carriers—not Google—are best positioned to craft a user experience tailored to the needs of their users. *Id.* ¶¶ 1328–1329.

2475.   (Def. PFOF ¶¶ 1709–1713): Google cites no supporting evidence that the MADA enables the sale of low-cost Android devices. *Id.* ¶¶ 1331–1334. As Prof. Murphy concedes, there is no data showing a causal link between the MADA and the existence of low-priced Android phones. *Id.* ¶ 1332 (citing Tr. 10185:25–10186:13 (Murphy (Def. Expert)).

2476.   (Def. PFOF ¶ 1714): Google has alternative reasons to ensure its apps are widely available on Android devices. *Id.* ¶¶ 1311–1317 (§ X.C.1.a). Even if Google could not foreclose competition on Android, Google would not abandon revenue-generating distribution channels.

2477.   (Def. PFOF ¶ 1715): There is no contemporaneous evidence that Google would offer distribution partners lower or no revenue share if it could not require default exclusivity.

Google's rivals already pay for non-exclusive search distribution, Pls. PFOF ¶¶ 38, 1307; *supra* ¶¶ 2320–2323, 2353. Google's payments to partners went up when the EU choice screen was introduced, *supra* ¶ 2177, and ███████████████████████████████████████ ██████████████████████████, JX0024 at -822 (§ 1) (Apple JCA (2014)) (requiring Apple to include a bookmark for Google Search ████████████████████████████████████ ██████████████████████); Tr. 6164:21–25 (Whinston (Pls. Expert)).

2478.   (Def. PFOF ¶¶ 1716–1726): *Supra* ¶ 2190.

2479.   (Def. PFOF ¶¶ 1727–1733): Google's negotiation of its MSIAs or "go-to-market" agreements prove that, even without the RSA's exclusivity provisions, Google could support the Android ecosystem and bolster its competitiveness against iOS. Moreover, as Google acknowledges, Def. PFOF ¶ 1728, carriers are already incentivized to invest in Android: "[i]t's not in their best interests to become an iPhone reseller solely." Tr. 9339:13–9340:1 (McCallister (Google)); Des. Tr. 287:8–19 (Giard (T-Mobile) Dep.) ("[T]he more customers chose iOS, the fewer options T-Mobile had for introducing new services or revenue opportunities[.]").

2480.   (Def. PFOF ¶¶ 1733–1735): There is no impediment to Google reallocating its payments from the RSA to the MSIA if more promotional incentive were needed. Google's claim that the current MSIAs are "cumbersome operationally" and subject to "discussion and debate on the deployment of funds," Def. PFOF ¶ 1733, does not indicate that the MSIA cannot be the primary vehicle for promoting Android's competitiveness with iOS.

Dated: March 22, 2024

Respectfully submitted,

*/s/ Karl E. Herrmann*
Kenneth M. Dintzer
Matthew Jones (D.C. Bar #1006602)
Claire M. Maddox (D.C. Bar #498356)
Diana A. Aguilar Aldape
Sarah M. Bartels (D.C. Bar #1029505)
Meagan K. Bellshaw
David E. Dahlquist
Kerrie J. Freeborn (D.C. Bar #503143)
R. Cameron Gower
Sara T. Gray
Jeremy M. P. Goldstein
Thomas Greene
Matthew C. Hammond
Karl E. Herrmann (D.C. Bar #1022464)
Ian D. Hoffman
Elizabeth S. Jensen
Michael G. McLellan (D.C. Bar #489217)
Erin Murdock-Park (D.C. Bar #1019993)
Lillian Okamuro (D.C. Bar #241035)
Veronica N. Onyema (D.C. Bar #979040)
Michael A. Rosengart (D.C. Bar #1671047)
Eric L. Schleef
Adam T. Severt
Lara E.V. Trager
Emma N. Waitzman
Catharine S. Wright (D.C. Bar #1019454)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 227-1967
Kenneth.Dintzer2@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

By:_____*/s/ Matthew Michaloski*_____
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Matthew Michaloski, Deputy Attorney
General
Christi Foust, Deputy Attorney General
Jesse Moore, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov

*Counsel for Plaintiff State of Indiana*


By:_____*/s/ Diamante Smith*_____
Ken Paxton, Attorney General
James Lloyd, Chief, Antitrust Division
Diamante Smith, Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*


By:_____*/s/ Lee Istrail*_____
Ashley Moody, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Nicholas D. Niemiec, Assistant Attorney
General
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: _____ /s/ Matthew M. Ford
Matthew M. Ford
Arkansas Bar No. 2013180
Assistant Attorney General
Office of the Arkansas Attorney General Tim Griffin
323 Center Street, Suite 200
Little Rock, AR 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

By:_____ /s/ Brian Wang
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov

*Counsel for Plaintiff State of California*

By:_____ /s/ Charles Thimmesch
Christopher Carr, Attorney General
Robin Leigh, Deputy Attorney General
Jeffrey Stump, Senior Assistant Attorney General
Charles Thimmesch, Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: _____ /s/ *Philip R. Heleringer* _____
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


By: _____ /s/ *Patrick Voelker* _____
Liz Murrill, Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
voelkerp@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


By: _____ /s/ *Scott Mertens* _____
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By:_____*/s/ Michael Schwalbert*_____
Michael Schwalbert
Missouri Bar No. 63229
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*


By:_____*/s/ Hart Martin*_____
Lynn Fitch, Attorney General
Hart Martin, Special Assistant Attorney
General
Crystal Utley Secoy, Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Hart.Martin@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


By:___*/s/ Anna Schneider*___
Anna Schneider
Bureau Chief
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: _____ /s/ Mary Frances Jowers _____
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Rebecca M. Hartner, Assistant Attorney
General
Office of the Attorney General, State of South
Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*


By: */s/ Gwendolyn J. Lindsay Cooley* _____
Joshua L. Kaul, Attorney General
Gwendolyn J. Lindsay Cooley, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
Gwendolyn.Cooley@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

FOR PLAINTIFF STATE OF COLORADO

PHILIP WEISER
Attorney General of Colorado

Jonathan B. Sallet
Special Assistant Attorney General

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann, DC Bar No. 1022365
(inactive) Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF NEBRASKA

MIKE HILGERS
Attorney General of Nebraska

Colin P. Snider, Assistant Attorney General
Matthew K. McKinley, Special Assistant
Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3840
E-Mail: Colin.Snider@nebraska.gov
Matt.Mckinley@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas Suite 2200
New York, NY 10036-6710
Telephone: (212) 335-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.bernheim@azag.gov
        Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF IOWA

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*


FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the Attorney General of New York
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH
CAROLINA

JOSHUA STEIN
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram Jonathan R. Marx
Jessica Vance Sutton
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov
jmarx@ncdoj.gov
jsutton2@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*


FOR PLAINTIFF STATE OF TENNESSEE

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Chris Dunbar
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
Chris.Dunbar@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

FOR PLAINTIFF STATE OF UTAH

SEAN REYES
Attorney General of Utah

Scott R. Ryther
Tara Pincock
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 142320
Salt Lake City, Utah 84114
Telephone: (385) 881-3742
E-Mail: sryther@agutah.gov
tpincock@agutah.gov

*Counsel for Plaintiff State of Utah*


FOR PLAINTIFF STATE OF ALASKA

TREGARRICK TAYLOR
Attorney General of Alaska

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*


FOR PLAINTIFF STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

FOR PLAINTIFF DISTRICT OF COLUMBIA

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District
of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*


FOR PLAINTIFF TERRITORY OF GUAM

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira, Chief, Consumer Protection
Division
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324

*Counsel for Plaintiff Territory Guam*


FOR PLAINTIFF STATE OF HAWAI'I

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State of
Hawai'i Commerce & Economic Development
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

FOR PLAINTIFF STATE OF IDAHO

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. State St., 2nd Floor
P.O. Box 83720 Boise, ID 83720
Telephone: (208) 334-4114
E-Mail:  John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*


FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
        Brian.yost@ilag.gov
        Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF KANSAS

KRIS W. KOBACH
Attorney General of Kansas

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


FOR PLAINTIFF STATE OF MAINE

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

FOR PLAINTIFF STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Gary Honick
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH OF
MASSACHUSETTS

ANDREA CAMPBELL
Attorney General of Massachusetts

William T. Matlack
Michael B. MacKenzie
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-Mail: William.matlack@mass.gov
Michael.Mackenzie@mass.gov

*Counsel for Plaintiff State of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

Zachary William Biesanz
Office of the Minnesota Attorney General
Consumer, Wage, and Antitrust Division
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mnewman@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW
HAMPSHIRE

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

FOR PLAINTIFF STATE OF NEW JERSEY

MATTHEW PLATKIN
Attorney General of New Jersey

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*


FOR PLAINTIFF STATE OF NORTH
DAKOTA

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

FOR PLAINTIFF STATE OF OHIO

DAVID YOST
Attorney General of Ohio

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor Columbus, OH
43215
Telephone: (614) 466-4328
E-Mail:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*


FOR THE PLAINTIFF STATE OF
OKLAHOMA

GENTNER DRUMMOND
Attorney General of Oklahoma

Caleb J. Smith
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105 Telephone: (405)
522-1014
E-Mail: Caleb.Smith@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

FOR PLAINTIFF STATE OF OREGON

ELLEN ROSENBLUM
Attorney General of Oregon

Cheryl Hiemstra
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.hiemstra@doj.state.or.us

*Counsel for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA

MICHELLE HENRY
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

FOR PLAINTIFF TERRITORY OF PUERTO
RICO

DOMINGO EMANUELLI HERNANDEZ
Attorney General of Puerto Rico

Guarionex Diaz Martinez
Assistant Attorney General Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*


FOR PLAINTIFF STATE OF RHODE
ISLAND

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

FOR PLAINTIFF STATE OF SOUTH
DAKOTA

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South
Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF VERMONT

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney
General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

FOR PLAINTIFF COMMONWEALTH OF
VIRGINIA

JASON S. MIYARES
Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*


FOR PLAINTIFF STATE OF WASHINGTON

ROBERT FERGUSON
Attorney General of Washington

Amy Hanson
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WEST
VIRGINIA

PATRICK MORRISEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West
Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*


FOR PLAINTIFF STATE OF WYOMING

BRIDGET HILL
Attorney General of Wyoming

Benjamin Peterson
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building Cheyenne, WY 82002
Telephone: (307) 777-6397
E-Mail: Benjamin.peterson2@wyo.gov

*Counsel for Plaintiff State of Wyoming*

**Appendix: Cited Exhibits Used With A Witness**

(Cumulative update of version in Plaintiffs' Proposed Findings of Fact, ECF No. 822)

### Cited Exhibits Used With A Trial Witness

| Witness | Transcript | Transcript Pages | Exhibits Cited in Proposed Findings |
|---|---|---|---|
| Amaldoss, Wilfred | 10/24 (PM), 10/25 (AM) | 6856–7012 | N/A |
| Austin, Alex | 9/27 PM, 9/28 AM | 2891-3076 | UPX1064, UPX0656, UPX1064, PSX00075, DX0612, DX0614[5] |
| Baker, Jonathan | 10/25 (AM & PM), 10/26 AM | 7014–7284 | N/A |
| Baker, Mitchell (video) | 11/1 (PM) | 8354–8356, ECF #756-2 | UPX0979, UPX1070, DX0547, DX2036 |
| Barrett-Bowen, Neil | 10/17 PM | 6168–6239 | N/A |
| Barton, Chris | 9/13 (AM) | 312–371 | UPX0134, UPX0544, UPX5533, JX0011 |
| Booth, Ryan | 10/11 AM | 5112–5225 | PSX00676, DX2021, DX2022 |
| Braddi, Joan | 10/10 AM & PM | 4924–5081 | UPX0072, UPX0137, UPX0309, UPX0552, UPX0570, UPX0605. UPX0615, UPX0670, UPX0672, UPX0675, UPX0679, UPX0895, UPX0911, UPX1110, UPX2010, UPX2011, UPX2014, UPXD007, JX0024, JX0033 |
| Chang, Patrick | 10/5 AM & PM | 4483–4594 | UPX0663, UPX0686, UPX0690, UPX0693, PSX00952, DX0695 |
| Christensen, Eric (video) | 11/1 (PM) | 8351–8354, ECF #756-2 | N/A |
| Cue, Eddie | 9/26 AM & PM SEALED & PUBLIC | 2449-2639 | UPX0273, UPX0588, UPX0594, UPX0613, UPX0614, UPX0625, UPX0626, UPX0631, UPX0790, UPX1109, UPX4001, UPX8105, UPXD009, JX0033, JX0097, DX0924, DX0963 |
| Dijk, Arjan | 10/11 AM & PM | 5226–5368 | DX3114, DX3148, DX3157, DXD-13 |
| Dischler, Jerry | 9/18 AM & 9/18 PM SEALED , 9/19 AM & PM PUBLIC | 1126–1509 | UPX0001, UPX0012, UPX0036, UPX0423, UPX0436, UPX0461, UPX0489, UPX0519, UPX0522, UPX2001, PSX00191, PSX00267, DX0187, DX0231, DXD-03 |
| Ezell, Jeffery (video) | 11/9 (AM) | 9628–9630, ECF #771-3 | N/A |
| Fitzpatrick, Jennifer | 11/6 (PM) | 8985–9084 | UPX0981, UPX0996, UPX1044 |
| Fox, Edward | 10/30 (PM), 10/31 (AM) | 7807–8006 | DXD-17, DXD-26 |
| Giannandrea, John | 9/21 PM PUBLIC, 9/22 AM | 2163–2370 | UPX0205, UPX0235, UPX0240, UPX0242, UPX0260, UPX0266, UPX0460, UPX0494, UPX0618, UPX0659, UPX0797, UPX1123, UPXD004, UPXD005, UPXD006, UPXD007, DX0374, DX0376 |
| Giard, Jeffrey (video) | 11/8 (PM) | 9589–9591, ECF #771-1 | N/A |
| Gomes, Benedict | 10/31 (AM & PM) | 8006–8159 | UPX0749, UPX2044 |

[5]   Underlined Exhibits are additions from the version in Plaintiffs' Proposed Findings of Fact, ECF No. 822.

| Witness | Transcript | Transcript Pages | Exhibits Cited in Proposed Findings |
|---|---|---|---|
| Higgins, Brian | 9/18 AM | 1019–1119 | UPX0304, UPX0495, UPX0642, UPX1026, JX0016, JX0026, JX0093 |
| Holden, Richard | 11/7 (AM & PM Public) | 9137–9311 | PSX00385, PSX00524, DX0046, DXD-30 |
| Hurst, Jeff | 10/19 AM | 6499–6580 | DX0308 |
| Israel, Mark | 11/2 (AM & PM), 11/3 (AM), 11/6 (AM & PM) | 8375–8985 | UPX0006, UPX0028, UPX0049, UPX0059, UPX0214, UPX0344, UPX0472, UPX0475, UPX0811, UPX2022, UPX2076, UPX2079, PSX00562, DX3058, DXD-21, DXD-29 |
| Jerath, Kinshuk | 10/11 PM, 10/12 AM & PM | 5369–5661 | UPXD103, UPX0526, DX0187, DX0412, DX0660, DX0710, DX3057, DX3058 |
| Juda, Adam | 10/3 PM, 10/4 AM & PM | 3986–4304 | UPX0008, UPX0009, UPX0010, UPX0032, UPX0043, UPX0059, UPX0459, UPX0465, UPX0467, UPX0509, UPX0811, UPX0842, UPX0889, UPX0925, UPX1045, UPX6058, DXD-11 |
| Kartasheva, Anna | 9/27 AM & PM | 2780-2891 | UPX0131, UPX0150, UPX0609, UPX0664, UPX0694, UPX1067, UPX2003, JX0071 |
| Kolotouros, Jim | 9/14 PM, 9/15 AM | 771–983 | UPX0076, UPX0125, UPX0129, UPX0149, UPX0161, UPX0314, UPX0320, UPX0558, UPX0569, UPX0608, UPX0616, UPX0643, UPX0710, UPX0713, UPX0741, UPX0853, UPX1011, UPX1077, UPX1088, UPX5399, UPX8071, JX0049, JX0099, DX0738 |
| Krueger, Jason | 10/24 AM & PM | 6745–6855 | N/A |
| Krueger, Ryan | 10/4 PM, 10/5 AM | 4305–4481 | N/A |
| Lehman, Eric | 9/20 PM, 9/21 AM | 1748–1935 | UPX0004, UPX0005, UPX0192, UPX0197, UPX0203, UPX0204, UPX0213, UPX0219, UPX0228, UPX0255, UPX0268, UPX0974, UPX1115, DX0241 |
| Levy, Daniel (video) | 11/9 (AM) | 9627, ECF #771-2 | UPX0445, UPX1014, UPX2113, UPX2114, UPX2116, UPX2117 |
| Lim, Tracy-Ann | 10/10 AM | 4836–4923 | UPX0441, DX0660, DX0663 |
| Lowcock, Joshua | 10/3 AM & PM | 3800–3984 | UPX0012, UPX0450, UPX0926, DXD-03 |
| McCallister, Adrienne | 11/7 (PM Public & Sealed) | 9311–9349 | UPX0293, UPX2093, UPX2097 |
| Murphy, Kevin | 11/13 (AM & PM), 11/14 (AM & PM) | 9681–10203 | UPX0050, UPX0095, UPX0116, UPX0128, UPX0134, UPX0170, UPX0315, UPX0323, UPX0580, UPX0615, UPX0675, UPX0677, UPX0678, UPX1033, UPX1034, UPX1050, UPX1064, UPX1083, UPX1128, UPX2012, UPX2086, UPX2087, UPX2143, UPX6024, UPXD005, UPXD009, UPXD227, DXD-37 |
| Nadella, Satya | 10/2 AM & PM | 3486–3665 | UPX0736, DX0440, DX0524, DX0680 |
| Nayak, Pandu | W 10/18 AM W 10/18 PM | 6295–6473 | UPX0860, UPX1082, UPX1087, UPX2022, UPX2026, UPX2029, UPX2033, UPX2034, DXD-17 |
| Oard, Douglas | 11/15 (AM & PM) | 10258–10422 | UPX2086, UPXD105, DX0469 |

| Witness | Transcript | Transcript Pages | Exhibits Cited in Proposed Findings |
|---|---|---|---|
| Parakhin, Mikhail | Tu 9/26 PM PUBLIC<br>W 9/27 AM | 2640–2778 | N/A |
| Pichai, Sundar | 10/30 (AM & PM) | 7637–7806 | UPX0123, UPX0126, UPX0137, UPX0172, UPX0617, UPX0973, UPX1092, UPX1101, UPX2049, UPX2050, DX0023 |
| Raghavan, Prabhakar | 10/26 (AM & PM), 10/27 (AM) | 7289–7602 | UPX0033, UPX0223, UPX0342, UPX0344, UPX0453, UPX0500, UPX0501, UPX0714, UPX0734, UPX0811, UPX2040, UPX2041, UPX2051, UPX7002, UPX7002A, UPX8082, PSX01217, PSX01218, DX0126, DX0183, DX0231, DXD-21 |
| Ramaswamy, Sridhar | M 10/2 PM<br>Tu 10/3 AM | 3666–3799 | UPX0093, UPX0123, UPX0475, UPX0940 |
| Rangel, Antonio | 9/13 (PM), 9/14 (AM & PM) | 515–771 | UPXD101, DX0440, DXD-01 |
| Reid, Elizabeth | 11/1 (AM & PM) | 8196–8349 | UPX0023, UPX2065, UPX2067, DX0241 |
| Rosenberg, Jamie | 11/8 (AM & PM) | 9409–9588 | UPX0129, UPX0296A, UPX0706, UPX0997, UPX2091, UPX2111 |
| Roszak, Mike | 9/19 PM PUBLIC, 9/20 AM & PM | 1533–1744 | UPX0002, UPX0038, UPX0066, UPX0085, UPX0097, UPX0148, UPX0249, UPX0323, UPX0462, UPX0674, UPX1050 |
| Tinter, Jon | 9/28 AM & PM, 9/29 AM | 3088–3428 | UPX0115, UPX0116, UPX0133, UPX0246, UPX0301, UPX0797, DX0434, DX0535 |
| Vallez, Paul | 10/19 AM & PM | 6581–6670 | N/A |
| Varia, Amit | 10/6 AM | 4683–4757 | N/A |
| Varian, Hal | 9/12 (PM), 9/13 (AM & PM ) | 137–272, 373–508 | UPX0026, UPX0123, UPX0151, UPX0178, UPX0180, UPX0184, UPX0334, UPX0340, UPX0411, UPX0452, UPX0472, UPX0499, UPX0856, UPX0862, UPX0884, UPX0902, UPX0905, UPX0910, UPX1001, UPX1066, UPX1085, UPX7001 |
| Weinberg, Gabriel | Th 9/21 AM & PM SEALED & PUBLIC | 1936–2159 | UPX0666, UPX0667, UPX0818, UPX1012, UPX1112, DX0633, DX0946, DX0950 |
| Whinston, Michael | 10/5 PM, 10/6 AM, 10/16 AM & PM, 10/17 AM & PM, 11/16 AM & PM | 4594–4798, 5711–6165, 10451–10662 | UPXD102, UPXD104, UPXD106, DXD-15, DXD-16, DXD-41 |
| Yoo, John | 9/19 PM PUBLIC & SEALED | 1510–1533, 4–28 (SEALED) | UPX0129, UPX0141, UPX0146, UPX0312, UPX0316, UPX1107, UPX1111 |

**Cited Exhibits in Designated Deposition Testimony[6]**

| Witness | Exhibits Cited in Proposed Findings |
|---|---|
| Alberts, Brendan | UPX8099, UPX8100 |
| Baker, Mitchell | UPX0105, UPX0851, UPX0898, UPX0979, UPX1070, DX1012 |
| Baxter, Timothy | N/A |
| Christensen, Eric | N/A |
| Christensen, Jeff | N/A |
| Chu, Penny | UPX0348, UPX0499, UPX0849 |
| Connell, Derrick | N/A |
| Cue, Eduardo (30(b)(6)) | UPX0594, JX0001, JX0002, JX0004, JX0009, JX0024 |
| Dacey, Matthew | N/A |
| Daniels, Alexander | N/A |
| Edwards, Catherine | UPX0732, UPX0740, UPX0768, UPX0795 |
| Ezell, Jeffrey | N/A |
| Fox, Nicholas (30(b)(6)) | UPX0351 |
| Fox, Nicholas | UPX0339, UPX0419, UPX0719, UPX0763, UPX0794*, UPX0810* |
| Geurin, Neil | N/A |
| Giard, Jeffrey | UPX0482, UPX1036 |
| Grey, Rachel (30(b)(6)) (2021) | N/A |
| Grey, Rachel (30(b)(6)) (2022) | N/A |
| Heath, Shirley | N/A |
| Indacochea, Eduardo | N/A |
| Jain, Sundeep | UPX0438*, UPX0504, UPX0728, UPX0746, UPX0779 |
| James, Mike | UPX0061, UPX0443, UPX0511 |
| Lagerling, John | N/A |
| Levine, Zahava | UPX0287, UPX0321, UPX0567 |
| Levy, Daniel | UPX0445, UPX0914, UPX0923, UPX1014*, UPX1015*, UPX1018, UPX1019, UPX1020, UPX2113, UPX2114, UPX2116, UPX2117 |
| Lien, Chris | N/A |
| McAteer, John | N/A |
| Miller, Andrew | UPX0046, UPX0335, UPX0418, UPX0514, UPX0521, UPX0738, UPX2019, UPX2020, PSX00562 |
| Moxley, Emily (30(b)(6)) | N/A |
| Moxley, Emily | UPX0278, UPX0749, UPX0762, UPX0765 |
| Nayak, P. Pandurang (30(b)(6)) | N/A |
| Osmond, Charlie | N/A |

---

[6]   Exhibits marked with an asterisk mean the deposition exhibit is part of the trial exhibit, however there are differences (e.g., the deposition exhibit appears as an attachment, the trial exhibit is in a native format), or the deposition exhibit contains metadata slipsheets not included in the trial exhibit.

| Witness | Exhibits Cited in Proposed Findings |
|---|---|
| Perica, Adrian | UPX0460, UPX0635 |
| Porat, Ruth | <u>UPX0478</u>, UPX0580, UPX0603, UPX0639, UPX0752, UPX6059 |
| Ramalingam, Ramesh | UPX0829, <u>UPX0830</u>, UPX0832, <u>UPX0835</u>, <u>UPX0836</u> |
| Raymond, Christie | DX0412 |
| Ribas, Jordi | <u>UPX0821</u>, <u>DX0481</u>, DX0524 |
| Richardson, Yuki | <u>UPX0173</u>, PSX0322, UPX0325*, UPX0326 |
| Silverman, Andrew | N/A |
| Soo, Debby | N/A |
| Stein, Mark | N/A |
| Stoppelman, Jeremy | N/A |
| Utter, Brian | N/A |
| van der Kooi, Rik | UPX1058* |
| Vlahov, Atanas (30(b)(6)) | UPX0725 |