**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████ |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████ |
| Defendant. | |

**DEFENDANT'S PROPOSED CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.  PLAINTIFFS HAVE NOT PROVEN THE EXISTENCE OF THEIR ALLEGED RELEVANT ANTITRUST PRODUCT MARKETS. .......................................................1

    A.  General Search Services Is Not a Relevant Antitrust Market. ................................2

        1.  The contention that general search services are a "one-stop shop" is not a valid basis for defining a relevant market in this case. ..................3

        2.  Other characteristics of general search engines do not provide a valid basis for defining a relevant market. ....................................................5

        3.  Plaintiffs' invocation of *Cellophane* does not excuse a lack of evidence demonstrating that general search services is a relevant market. .......................................................................................................6

    B.  Search Advertising, General Search Advertising, and General Search Text Advertising Are Not Relevant Antitrust Markets. ....................................................7

        1.  Evidence of advertiser substitution demonstrates that Plaintiffs have not defined valid advertising-side relevant markets. ...........................8

        2.  Plaintiffs' market definitions are fatally flawed because advertisers' next best option generally lies outside the alleged markets. .........................................................................................................10

        3.  The "marketing funnel" and the way in which search queries reveal user intent do not support Plaintiffs' flawed market definitions. ..............11

        4.  Each of Plaintiffs' proposed advertising markets is invalid because of these infirmities. ..................................................................................12

II.  PLAINTIFFS HAVE NOT DEMONSTRATED THAT GOOGLE POSSESSES MONOPOLY POWER IN ANY RELEVANT MARKET. ..............................................13

    A.  Google Does Not Possess Monopoly Power in the Alleged General Search Services Market. ...............................................................................................14

        1.  A consideration of search quality and output does not provide direct evidence of monopoly power, but rather confirms its absence. ...................................................................................................14

        2.  Plaintiffs have not presented sufficient indirect evidence of monopoly power over general search services. .........................................15

    B.  Google Does Not Possess Monopoly Power in Any of the Alleged Advertising Markets. ...............................................................................................17

        1.  Search ads pricing and output does not provide direct evidence of monopoly power, but rather confirms its absence. ....................................17

        2.  Plaintiffs have not presented sufficient indirect evidence of monopoly power over the alleged advertising markets. ............................18

III.  GOOGLE HAS NOT ENGAGED IN EXCLUSIONARY CONDUCT THAT
      COMPRISES THE WILLFUL MAINTENANCE OF MONOPOLY POWER. ..............19

      A.  Google's Agreements with Browser Developers Such as Apple and
          Mozilla Do Not Comprise Exclusionary Conduct. ................................21

          1.  The browser agreements are not exclusive or *de facto* exclusive. .............21

          2.  The browser agreements do not foreclose a substantial share of the
              alleged markets. ...........................................................................24

          3.  Plaintiffs have not demonstrated that the browser agreements
              harmed competition. ....................................................................28

          4.  The browser agreements reflect competition on the merits based on
              search quality and price. .............................................................30

          5.  The browser agreements are justified by numerous procompetitive
              benefits in the alleged markets that stand unrebutted and outweigh
              any asserted harm to competition. .............................................31

          6.  The challenged agreements benefit competition in complementary
              markets that also create benefits in Plaintiffs' alleged markets. ...............34

          7.  Plaintiffs have not identified a valid substantially less restrictive
              alternative. .................................................................................35

      B.  Google's MADAs with Android OEMs and RSAs with Android OEMs
          and Wireless Carriers Do Not Comprise Exclusionary Conduct. .........................36

          1.  The MADAs and RSAs are not exclusive or *de facto* exclusive. .............36

          2.  The Android agreements do not foreclose a substantial share of the
              alleged markets. ...........................................................................37

          3.  Plaintiffs have not demonstrated that the Android agreements
              harmed competition. ....................................................................39

          4.  The Android agreements are justified by numerous procompetitive
              benefits in the alleged markets that stand unrebutted and outweigh
              any asserted harm to competition. .............................................40

          5.  Plaintiffs have not identified a valid substantially less restrictive
              alternative ...................................................................................43

      C.  Google's SA360 Conduct Is Not a Basis for Liability under Section 2. ...............44

          1.  The Colorado Plaintiffs' SA360 claim fails to meet any of the
              prerequisites for an exclusionary refusal to deal ........................................44

          2.  Google had business justifications for its SA360 feature
              development decisions. ...................................................................48

          3.  Google's SA360 conduct is justified by numerous procompetitive
              benefits in the alleged markets that stand unrebutted and outweigh
              any asserted harm to competition. .............................................50

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ......................21, 24, 45

*Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194 (3d Cir. 1994) ....................................5

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) ...................................................................................................................................25, 37, 38

*Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999) ...............................10

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325 (7th Cir. 1986)..........................13, 29

*BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116 (3d Cir. 2021) ........................................................8

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983).........................20, 31, 32

*Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003)......................9, 11

*Blake v. Securitas Sec. Servs.*, 292 F.R.D. 15 (D.D.C. 2013)........................................................29

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ...............................................................................................................................................18

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ........................................13, 17

*CDC Techs., Inc. v. IDEXX Labs., Inc.*, 7 F. Supp. 2d 119 (D. Conn. 1998) (*aff'd*, 186 F.3d 74 (2d Cir. 1999)) ...............................................................................................................38

*Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876 (N.D. Cal. 2012) (*vacated in part on other grounds*, 2012 WL 1745592)........................................................26

*Cnty. of Tuolumne v. Sonoma Cnty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001) ...............................36

*CoStar Grp., Inc v. Com. Real Estate Exch. Inc.*, 619 F. Supp. 3d 983 (C.D. Cal. 2022).......15, 18

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)..............................45, 48

*DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332 (Fed. Cir. 2014) ........................................11

*Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451 (1992) ................................2, 7, 34

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016) ..........................................25

*Emigra Grp. LLC v. Fragomen, Del Rey, Bernsen & Lowey, LLP*, 612 F. Supp. 2d 330 (S.D.N.Y. 2009)........................................................................................................................3, 5

*Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817 (N.D. Cal. 2020) (*aff'd in part*, 67 F.4th 946)..............................................................................................................................13

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)......................................8, 20, 32, 44

*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006).........................................................17

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ..............................................................1

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020).......................................................... *passim*

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ...........................................................1

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015).......................................................4

*FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999) ...................................1

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)..................6

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701 (S.D.N.Y. 1997) ......................................................................................................................6

*Godix Equip. Export Corp. v. Caterpillar, Inc.*, 948 F. Supp. 1570 (S.D. Fla. 1996)..................18

*Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004)........3, 4

*Gross v. Wright*, 185 F. Supp. 3d 39 (D.D.C. 2016) ...........................................................1

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018).................................................7

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ....... *passim*

*In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963 (N.D. Cal. 2023) ................................18

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988) ...........................................................................................................................11

*In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005)........................17

*Kinderstart.com LLC v. Google, Inc.*, 2007 WL 831806 (N.D. Cal. Mar. 16, 2007).....................7

*Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006)..........................15

*L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993) ...................................16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)............................20, 42

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) .......................................5, 12

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ....................................................24

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ........................33

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) .......................................50

*Midwest Radio Co. v. Forum Pub. Co.*, 942 F.2d 1294 (8th Cir. 1991)................................10, 12

*Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999)...26, 39

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342 (9th Cir. 1987)............................34

*Mr. Furniture Warehouse, Inc. v. Barclays Am./Com. Inc.*, 919 F.2d 1517 (11th Cir. 1990) .....................................................................................................................46

*N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32 (2d Cir. 2018) ....20, 32, 33, 42

*NCAA v. Alston*, 141 S. Ct. 2141 (2021)..................................................................35, 36

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)..........................................34

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ..................................44, 45, 48

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ..............................33, 45, 46, 50

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ............................................................... *passim*

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ................................30, 44, 50

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42 (7th Cir. 1996)...........................................33

*PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000)........................................4

*PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322 (N.D. Cal. July 2, 2014)........................38

*Premier Comp Solutions LLC v. UPMC*, 377 F. Supp. 3d 506 (W.D. Pa. 2019)...........................5

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)  ..............2, 8, 15, 18

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002) ..........19, 24, 39

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) .........................32

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008).............................................................25, 28

*Rebel Oil, Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)...................................13, 14, 19

*S.E. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608 (8th Cir. 2011) ....................................................6

*Simon & Simon, P.C. v. Align Tech., Inc.*, 533 F. Supp. 3d 904 (N.D. Cal. 2021).......................22

*Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978) ........................................................35

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999)....................................31

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011) ..............................................26

*Sullivan v. Nat'l Football League*, 34 F.3d 1091 (1st Cir. 1994) .................................................34

*Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) .................................9, 11

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) .......................3, 9

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998)....................................14

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991) ...................................................8

*United States ex rel. Morsell v. NortonLifeLock, Inc.*, 2022 WL 278773 (D.D.C. Jan. 31, 2022) ...........................................................................................................................................30

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).......................................16, 19

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ...........................................1

*United States v. Eastman Kodak Co.*, 853 F. Supp. 1454 (W.D.N.Y. 1994) (*aff'd*, 63 F.3d 95 (2d Cir. 1995)) ....................................................................................................................11

*United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997) ...........................................9, 13

*United States v. Google LLC*, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) ....................................20

*United States v. Hammermill Paper Co.*, 429 F. Supp. 1271 (W.D. Pa. 1977)............................27

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ...... *passim*

*United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001)...............6, 9, 12, 13

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ..................................................16, 29

*United States v. Waste Mgmt., Inc.*, 743 F.2d 976 (2d Cir. 1984) ................................................16

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ........19, 35, 44, 50

*Xerox Corp. v. Media Sci., Inc.*, 660 F. Supp. 2d 535 (S.D.N.Y. 2009) .................................17, 18

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ........................................21, 22, 23

## STATUTES AND RULES

Fed. R. Civ. P. 26(a)(2) ..............................................................................................................30

Section 1 of the Sherman Act, 15 U.S.C. § 1 ...........................................................................27

Section 2 of the Sherman Act, 15 U.S.C. § 2 ....................................................................*passim*

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2022) ...........................................................*passim*

Phillip E. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841 (1989) .........................................................................................................48

Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. 129 (2007) ..........................................................................................................................................3

B. Douglas Bernheim & Michael D. Whinston, *Exclusive Dealing*, 106 J. Pol. Econ. 64 (1998) ........................................................................................................................................22

1.      Each claim for relief asserted by Plaintiffs alleges unlawful monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. DOJ Pls.' Am. Compl. ¶¶ 173-93; Colo. Pls.' Compl. ¶¶ 212-32. To prevail on a Section 2 claim, Plaintiffs must prove "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (per curiam).

## I.      PLAINTIFFS HAVE NOT PROVEN THE EXISTENCE OF THEIR ALLEGED RELEVANT ANTITRUST PRODUCT MARKETS.

2.      Plaintiffs bear the burden of defining a relevant antitrust market. *Gross v. Wright*, 185 F. Supp. 3d 39, 50 (D.D.C. 2016); *see Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[W]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." (brackets omitted)).

3.      "[T]he relevant market is defined as 'the area of effective competition,'" which is "[t]ypically … the 'arena within which significant substitution in consumption or production occurs.'" *Am. Express*, 138 S. Ct. at 2285. A product need not be "fungible to be considered in the relevant market," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956), which should include "all products 'roughly equivalent to another for the use to which they are put,'" *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 14 (D.D.C. 2021) (brackets omitted).

4.      Because Plaintiffs bear the burden of defining a relevant market, an indispensable element of their claims, Google need not prove an alternative definition. *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053 (8th Cir. 1999); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) ("agree[ing] with Defendants that the FTC has not met its burden of establishing its prima facie case because it has not identified a relevant market" where

defendants did not offer a definition but argued that the FTC's market was "overbroad and inconsistent with the commercial realities of the industry").

5.      Judgment should be entered for Google on any claim for which Plaintiffs did not prove the alleged relevant market associated with that claim. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997); *see* Tr. 4602:15-22 (Whinston (DOJ Expert)) ("Q. And why is defining a relevant market important in this case? A. … "[I]t's going to … give the Court information about whether Google can harm competition…. And if the answer is no, then we can all go home, we're done. But if the answer is yes, there's more to look at.").

### A.    General Search Services Is Not a Relevant Antitrust Market.

6.      Plaintiffs define the alleged market for general search services in terms of how consumers search for information online; accordingly, the validity of that market definition must be assessed based on the commercial realities of how consumers use general search engines and whether they view other sources of information not in the asserted relevant market (such as Amazon, Expedia, or TikTok) as reasonably interchangeable. *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 482 (1992); *Microsoft*, 253 F.3d at 81 (explaining that "defining a market for a monopoly maintenance claim" involves providing "a detailed description of the purpose of [the product]—what functions may be included and what are not—and an examination of the substitutes that are part of the market and those that are not").

7.      By excluding from the asserted relevant user-side market all services that consumers use to search for information online other than general search engines, Plaintiffs fail to account for "all products 'reasonably interchangeable by consumers for the same purposes.'" *Microsoft*, 253 F.3d at 52. Plaintiffs accordingly have not shown that these reasonable substitutes fail to prevent a hypothetical monopolist of general search services from exercising substantial market power, which makes the alleged market underinclusive.

**1.    The contention that general search services are a "one-stop shop" is not a valid basis for defining a relevant market in this case.**

8.      Plaintiffs' contention that general search engines offer a "one-stop shop" by providing a wider range of information in response to a wider range of user queries is an inadequate basis on which to conclude that there is a relevant market for general search services. *Emigra Grp. LLC v. Fragomen, Del Rey, Bernsen & Lowey, LLP*, 612 F. Supp. 2d 330, 355 (S.D.N.Y. 2009) ("The existence of one-stop shopping, and a group of customers with a preference or even demand for it, is insufficient to define a relevant market.").

9.      The evidence shows that users generally decide how to search for information on a query-by-query or category-by-category basis, which entails a recurring choice between a general search engine and a website or mobile application that does not offer general search services to satisfy a particular informational need. FOF ¶¶ 637-51, 655-66, 680-94, 920-40, 945-67, 971-87. Accordingly, the relevant market cannot be properly confined to general search services on the ground that their ability to respond to a wide array of queries is itself an "object of demand." *Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004) ("A cluster market exists only when the 'cluster' is *itself* an object of consumer demand."); *see Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374, 1377 (9th Cir. 1989) (rejecting alleged market for "the complete package of commodities and services offered by home center stores" based on contention that this "unique combination of goods and services allows do-it-yourself home remodelers and home repairers to obtain 'everything they need' at one location" and noting that "for any given product sold at a home center, a functionally equivalent or identical product is available for purchase at several more specialized stores"); Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. 129, 158-59 (2007) (explaining that if "sellers produce both bundled and unbundled products, for

example, if software firms sell suites of products … and also sell the individual component programs on a standalone basis," then "a competitive effects analysis limited to a suites market could mislead by ignoring the competitive constraint imposed by sellers of individual components, particularly if some sellers offer only some components and not suites").

10.     Because Plaintiffs define the general search services market in this case from the perspective of users rather than intermediaries, the services that users regard as reasonable substitutes to Google Search are what matter. *Compare* Tr. 8407:15-8410:24, 8965:24-8966:18 (Israel (Google Expert)) *with FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 38 (D.D.C. 2015) (finding that "distributors must offer a particular kind of 'product'" consisting of "a cluster of goods and services … to compete for national customers," such that "the customer's requirements operate to define the product offering itself").

11.     The observation that competitors outside the alleged market each address a narrower range of queries compared to Google does not indicate whether they compete with Google to respond to a significant number of monetizable user queries, particularly given the ease and ubiquity with which consumers use numerous websites and mobile applications. It also improperly ignores evidence that their focus on depth rather than breadth often makes them more effective substitutes to Google for queries within the verticals those providers serve. FOF ¶¶ 667-79, 930-67, 983-87; *see Green Country Food Market*, 371 F.3d at 1284 (rejecting Plaintiffs' attempt to define a market for the "full line of beverage products" distributed by Defendant, including Pepsi and Dr. Pepper, where Plaintiffs "have not offered evidence, for example, that Plaintiffs' customers enter the store with the intent to purchase both Pepsi and Dr. Pepper together and the absence of one of those products would cause the customer to go to another store to purchase both"); *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 250 (S.D.N.Y.

2000) ("Despite one-stop shopping's advantageous features, the evidence does not show that the preference for independent foodservice distributors is so strong so as to eliminate delivery through other means as an acceptable alternative."); *Emigra Grp.*, 612 F. Supp. 2d at 354 (explaining that "[i]f … buyers could and would respond to a price increase by a full line seller by shifting all *or part* of their business to partial line or single product sellers … then a cluster market would not be appropriate" (emphasis added)).

12.     Clustering categories of queries submitted to general search engines into a single market also cannot be justified on the alternative ground of "analytical convenience" where, as here, competition differs within each query category. FOF ¶¶ 634-51, 655-66, 680-94; *see Premier Comp Solutions LLC v. UPMC*, 377 F. Supp. 3d 506, 528-29 (W.D. Pa. 2019).

### 2.     Other characteristics of general search engines do not provide a valid basis for defining a relevant market.

13.     That general search engines offer different features or characteristics than their competitors is also an inadequate basis on which to conclude that there is a relevant market for general search services. *Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 206 (3d Cir. 1994); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001) ("Reasonable interchangeability fully acknowledges differences in product characteristics, reflecting commercial realities."). For example, an observation that Google offers features not available on Amazon (such as links to an index of crawled webpages) while Amazon offers features not available on Google (such as the ability to complete the purchase of many products) is indicative of the ways in which they compete with each other to respond to a significant number of queries, and not evidence that supports the exclusion of Amazon from a relevant market. FOF ¶¶ 632-51, 680-94, 941-44, 955-65, 983-87; *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* at ¶ 562 (5th ed. 2022) (noting that

"consumer perceptions determine the relevance of physical differences" and "consumers may regard products as interchangeable notwithstanding physical differences"); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997).

14.     The "touchstone" of market definition is not the full set of features available through each product, but rather "demand substitution," *i.e.*, "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as reduction in product quality or service." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018); *see S.E. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 613 (8th Cir. 2011).

15.     Plaintiffs have not offered sufficient evidence of how users actually engage with alternatives—including when and how they use other websites and apps to obtain information in response to queries—to justify excluding those reasonably interchangeable alternatives from a properly defined user-side market. FOF ¶¶ 930-67, 971-87; *see Microsoft*, 253 F.3d at 52, 81; *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 182-83 (D.D.C. 2001) (concluding "the government has not met its burden of establishing that the relevant product market is limited" in the manner alleged given "equivocal evidence" of how consumers used products within the alleged market and their potential substitutes).

### 3.     Plaintiffs' invocation of *Cellophane* does not excuse a lack of evidence demonstrating that general search services is a relevant market.

16.     Plaintiffs' invocation of the "*Cellophane* fallacy" neither explains the ample evidence of non-general search engine alternatives that users enjoy nor justifies Plaintiffs' failure to examine how consumers use those potential substitutes. Plaintiffs have not demonstrated that consumers turn to Amazon, Yelp, and other alternatives *because* Google's conduct made rival general search engines poor substitutes to Google for users. Nor have Plaintiffs proven that

Google's competition with specialized vertical search providers (SVPs) is explained by Google degrading its own search quality. Rather, the evidence shows robust competition between Google and these non-general search engine alternatives to meet users' information needs, and that this competition has led Google to improve its search quality. FOF ¶¶ 667-760, 946-67, 976-81.

17.     Plaintiffs accordingly have failed to define a relevant market for general search services. And they have not asserted that Google possesses monopoly power in any other putative user-side market, such as one consisting of a subset of queries.

> **B.     Search Advertising, General Search Advertising, and General Search Text Advertising Are Not Relevant Antitrust Markets.**

18.     Plaintiffs have defined their alleged advertising markets in terms of how advertisers access the attention of potential customers; accordingly, the validity of the ads-side markets must be assessed based on the commercial realities of how advertisers use the ad types within each alleged market and whether they view other forms of advertising (such as social media ads on Instagram or product page ads on Amazon) as reasonably interchangeable. *Eastman Kodak*, 504 U.S. at 482; *Microsoft*, 253 F.3d at 81.

19.     Each of Plaintiffs' alleged ads-side markets is too narrow because Plaintiffs improperly focus on distinctions between the format of ad types instead of advertisers' substitution patterns, thereby failing to include "all products 'reasonably interchangeable by [advertisers] for the same purposes.'" *Microsoft*, 253 F.3d at 52; *see Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) ("[M]any courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising."); *Kinderstart.com LLC v. Google, Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) (concluding "there is no logical basis for distinguishing the Search Ad Market from the larger market for Internet advertising").

### 1. Evidence of advertiser substitution demonstrates that Plaintiffs have not defined valid advertising-side relevant markets.

20.     Digital advertisers generally seek to maximize their return on investment, and the evidence demonstrates that in doing so they routinely substitute between search ads and other forms of digital advertising that Plaintiffs place outside of their asserted markets, such that Plaintiffs' markets impermissibly exclude reasonable substitutes. FOF ¶¶ 999-1015, 1018-35, 1045-63, 1075-78; *see* Areeda & Hovenkamp at ¶ 562 ("[A]ctual shifts between two products in response to—or even without—changes in their relative prices indicate a single market."); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 725-26 (3d Cir. 1991).

21.     Numerous companies offer popular products designed to reallocate advertisers' budgets from search ads to other ad types outside of the alleged markets based on the relative performance of each format, which further constrains a hypothetical monopolist within any of the alleged advertising markets from raising its quality-adjusted price. FOF ¶¶ 1009-15; *see Microsoft*, 253 F.3d at 52; *Queen City Pizza*, 124 F.3d at 437.

22.     In the face of evidence of advertisers substituting into and out of the asserted relevant markets, Plaintiffs did not perform an empirical analysis to demonstrate that any of their alleged markets satisfy the hypothetical monopolist test or an empirical analysis of whether any particular change to Google's search ads auction resulted in substitution. FOF ¶¶ 1045-46, 1065-66; *see Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 121 (3d Cir. 2021).

23.     Plaintiffs cannot meet their burden by asserting that some advertisers are more reluctant to substitute to alternatives than others, or that a particular competitor (*e.g.,* Amazon or Instagram) may not prove attractive to all businesses that currently purchase ads in the alleged markets. "When determining the relevant market, the question is whether a hypothetical

monopolist could *profitably* raise price," such that "it is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced in higher [product] prices." *United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997); *see Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002); *Sungard Data Sys.*, 172 F. Supp. 2d at 191-92 (noting "the government has submitted more than 50 statements from … customers that indicate that they could not switch in response to a SSNIP" but concluding "[t]he government has failed … to show whether this captive group is substantial enough that a hypothetical monopolist would find it profitable to impose such an increase in price" because "the record does not indicate whether the customers cited by plaintiff are representative of the entire universe of … clients").

24.     A contention that advertisers view search ads as important to achieving their objectives or have not shifted more of their budgets away from search ads does not support the existence of a relevant market. Areeda & Hovenkamp at ¶ 562 (explaining that "customers may stick with product A when its price is competitive and yet respond to a significant increase in its price by shifting to product B" so "the two products may belong in the same market even though substantial shifts between them have not been observed"); *Thurman Indus.*, 875 F.2d at 1374 (defining the relevant market by "the group or groups of sellers or producers who have 'actual *or potential* ability to deprive each other of significant levels of business'" (emphasis added)).

25.     And an observation that Google touts the benefits of search ads or distinguishes them from rival ad types does not support Plaintiffs' artificially narrow market definitions, but rather offers additional evidence of the ways in which Google competes with sellers of other ad types for a share of the same advertisers' budgets. *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 583 (4th Cir. 2003) (rejecting plaintiff's argument "that TV and radio are not in

the same product market as print media" and noting that a newspaper "goes to great lengths to show how much better print media is than radio or TV" because it "sees these other media outlets as key competitors"); Areeda & Hovenkamp at ¶ 530 ("Sellers bidding against each other to supply a given customer are usually in the same market….").

      **2.**    **Plaintiffs' market definitions are fatally flawed because advertisers' next best option generally lies outside the alleged markets.**

26.    Because advertisers generally seek to direct their advertisements to the consumers who are likely to be interested in their products, the extent to which overlapping consumers can be targeted using different ad platforms is important in identifying reasonable substitutes, even if the ads are of a different type. FOF ¶¶ 1041-44; *see Midwest Radio Co. v. Forum Pub. Co.*, 942 F.2d 1294, 1297 (8th Cir. 1991) (rejecting alleged market that included only a daily newspaper, radio, and television in a geographic area because "it should include other competitive advertising media, such as billboards, weekly newspapers, and direct mail"); *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (dismissing Section 2 claim predicated on e-mail marketing to AOL subscribers because "[t]here are numerous substitutes for e-mail advertising, some of which are less expensive, including use of the World Wide Web, direct mail, billboards, television, newspapers, radio, and leaflets").

27.    The evidence regarding audience overlap shows that alternatives such as SVPs and social media platforms—which Plaintiffs largely or entirely exclude from each of their relevant markets—are closer substitutes for advertisers to Google Search than another general search engine such as Bing. FOF ¶¶ 1042-43.

28.    The options advertisers use to reach consumers likely to be interested in their products are not a manifestation of the "*Cellophane* fallacy." The evidence shows that comparable audience-overlap patterns persist over time and across general search engines, and it

demonstrates the strength of competitors such as Meta, Amazon, and TikTok that Plaintiffs place partially or entirely outside of their alleged markets. FOF ¶ 1044; *see United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1470 (W.D.N.Y. 1994) (*aff'd*, 63 F.3d 95 (2d Cir. 1995)).

### 3. The "marketing funnel" and the way in which search queries reveal user intent do not support Plaintiffs' flawed market definitions.

29.     Plaintiffs' contention that search ads occupy a particular role within the "marketing funnel" does not support their alleged relevant markets. The evidence demonstrates that Plaintiffs' conception of the funnel is out of step with commercial realities and that other types of digital ads are used for the same "lower funnel" purposes as search ads. An observation that those platforms use different techniques or forms of information to identify pertinent customers or ascertain their intent does not justify excluding them from a relevant product market. FOF ¶¶ 1036-40, 1065-78; *see DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1339 (Fed. Cir. 2014); *Telecor*, 305 F.3d at 1132 ("Reasonable interchangeability does not depend upon product similarity.").

30.     Plaintiffs' assertion that search ads tend to be more expensive on a cost-per-impression basis is insufficient to confine a market to search ads, particularly in light of the evidence that different types of ads are priced similarly when adjusted for the outcomes advertisers seek to achieve. FOF ¶¶ 999-1010; 1126-30; Tr. 8460:5-8466:17 (Israel); *see Berlyn*, 73 F. App'x at 583 (concluding that radio and print advertising "are within the same product market" notwithstanding evidence that radio is a "medium that delivers lower total audiences but a higher concentration of specific target groups, and that the advertising costs have increased substantially with local radio" (brackets and quotations marks omitted)); *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988).

### 4. Each of Plaintiffs' proposed advertising markets is invalid because of these infirmities.

31. The conclusions stated above in Section I.B apply to all three of the alleged advertising markets proffered by Plaintiffs. With respect to their alternative alleged markets (*i.e.*, general search advertising and general search text advertising), Plaintiffs also have not established that rival forms of digital advertising (such as behaviorally targeted ads on social media sites) are any less effective at restraining an alleged monopolist's ability to raise prices above the competitive level than the products plaintiffs include in their markets.

32. The general search advertising market alleged by the Colorado Plaintiffs ignores commercial realities by excluding additional substitutes, including search ads on SVPs such as Amazon, Yelp, and Booking. And their contention that general search ads tend to target consumers in the "middle stage" of the "marketing funnel" rather than the "lower stage" contradicts the DOJ Plaintiffs' asserted market, showing that neither alleged market finds sufficient support in the evidence. FOF ¶¶ 1018-35, 1045-54, 1071, 1075-78; *see Sungard Data Sys.*, 172 F. Supp. 2d at 182-83.

33. The alleged general search text advertising market likewise ignores commercial realities by excluding reasonable substitutes from the market, including product listing ads on general search engines in addition to all search ads on SVPs. The evidence demonstrates that advertisers who purchase both product listing ads and text ads substitute between them. And even among advertisers who do not purchase product listing ads, SVPs and social media platforms are strong competitors for advertising dollars that otherwise could be spent on text ads on Google Search. FOF ¶¶ 1001-15, 1057-64; *see Midwest Radio*, 942 F.2d at 1297; *Mathias*, 152 F. Supp. 2d at 480-81 ("The product market inquiry focuses on the range of products that actually compete in the disputed market.").

34.     The observation that some advertisers purchase only text ads (and not product listing ads), or do not advertise with certain major SVPs, does not show that general search text advertising is a relevant market because not all potential substitutes need to be equally compelling to all customers. *Engelhard*, 126 F.3d at 1306; *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 839 (N.D. Cal. 2020) (*aff'd in part*, 67 F.4th 946) (explaining that "[a]ntitrust law is not concerned with individual consumers or producers," but rather "it is concerned with market aggregates"); *Sungard Data Sys.*, 172 F. Supp. 2d at 191-92.

## II.     PLAINTIFFS HAVE NOT DEMONSTRATED THAT GOOGLE POSSESSES MONOPOLY POWER IN ANY RELEVANT MARKET.

35.     "While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge." *Microsoft*, 253 F.3d at 51 (internal citation omitted). "A firm is a monopolist if it can profitably raise price substantially above the competitive level" because it has "'the ability to cut back on the market's total output.'" *Id.*; *see Am. Express*, 138 S. Ct. at 2288 ("Market power is the ability to raise price profitably *by restricting output*."); *Rebel Oil, Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

36.     "The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output," or "[i]t may also be inferred from the structure and composition of the relevant market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citing *Microsoft*, 253 F.3d at 51).

37.     Although in some cases "monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers," *Microsoft*, 253 F.3d at 51, "[i]n other cases … a firm's share of current sales does not reflect an ability to reduce the total output in the market, and therefore it does not convey power over price," *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1335 (7th Cir. 1986).

Accordingly, even a very high share of a properly defined market is not conclusive, as "[a] court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).

38.     When asking a court to infer the existence of monopoly power, "Plaintiffs must not only show that barriers to entry protect the properly defined … market, but that those barriers are 'significant.'" *Microsoft*, 253 F.3d at 82; *see Tops Markets*, 142 F.3d at 99. "'Entry barriers' are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level," *Microsoft*, 253 F.3d at 51, particularly "'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'" *Rebel Oil*, 51 F.3d at 1439.

A.     **Google Does Not Possess Monopoly Power in the Alleged General Search Services Market.**

1.     **A consideration of search quality and output does not provide direct evidence of monopoly power, but rather confirms its absence.**

39.     Plaintiffs have not presented direct evidence of monopoly power in the alleged general search services market. Google does not charge consumers to use its search engine, let alone supra-competitive prices consistent with monopoly power. And output has not been restricted, but rather has increased significantly throughout the period of alleged monopoly maintenance. FOF ¶¶ 1079-80, 1084; *see Am. Express*, 138 S. Ct. at 2288.

40.     Plaintiffs have not demonstrated possession of monopoly power through assertions regarding a purported diminution in Google's search quality; on the contrary, the evidence shows that Google has consistently exceeded rivals' search quality, has significantly improved search quality during the period of alleged monopoly maintenance, and has continued

to innovate in response to competition and consumer demand throughout that period. FOF ¶¶ 77-90, 112-241, 682-760, 952, 978, 1079-82, 1085-1102.

41.     Plaintiffs' contention that Google did not adopt particular privacy-related features after considering the tradeoffs they entailed or that it purportedly increased investment in response to changed circumstances in the marketplace is not evidence of market power at all and does not reflect a diminution in quality. Plaintiffs have not compared how search quality allegedly varies based on the presence or absence of the challenged conduct or specific competitive pressures, and they acknowledge that Google's quality has been superior over time and across a range of competitive conditions. FOF ¶¶ 1079-82, 1085-1123; *see Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006).

> ## 2.     Plaintiffs have not presented sufficient indirect evidence of monopoly power over general search services.

42.     Because Plaintiffs' proposed general search services market definition is infirm, monopoly power cannot be inferred from the query share figures Plaintiffs offer. *Queen City Pizza*, 124 F.3d at 440-41; *CoStar Grp., Inc v. Com. Real Estate Exch. Inc.*, 619 F. Supp. 3d 983, 994 (C.D. Cal. 2022) (concluding alleged shares "over 90% or 95%" failed to establish market power absent a properly defined market); Tr. 5911:23-5912:1 (Whinston).

43.     Indirect evidence of monopoly power is also absent for the independent reason that Plaintiffs have not established the alleged general search services market is characterized by high barriers to entry. The evidence shows low costs of launching an advertising-funded general search engine by serving search results provided by partners (*e.g.*, as DuckDuckGo has done), decreasing costs of building all aspects of a new general search engine from the ground up due to technological advancements, and the ability of general search engines to achieve profitability with a relatively small share of the alleged market. The evidence likewise demonstrates that user

interaction data exhibits diminishing returns to scale at levels that current rivals have already surpassed, and that new entrants can leverage rapidly improving machine learning technologies that use little or no historical user interaction data. FOF ¶¶ 253-406, 483, 524-53, 605-31, 1083; *see United States v. Baker Hughes Inc.*, 908 F.2d 981, 987-88 (D.C. Cir. 1990) (noting that entry barriers must be "significant" and rejecting the proposition that a defendant must "prove that new competitors will 'quickly' or 'effectively' enter" in response to supracompetitive pricing); *United States v. Syufy Enters.*, 903 F.2d 659, 666-67 (9th Cir. 1990).

44.     Google's superior quality also is not a barrier to entry that supports a finding of monopoly power, particularly in light of the evidence that general search engines can compete successfully with only a small share of the alleged market. FOF ¶¶ 295, 542-53, 1740; *see Syufy*, 903 F.2d at 668-69 (rejecting argument that defendant's "effectiveness as a competitor creates a structural barrier to entry" as "an efficient, vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating," and "[f]ostering an environment where businesses fight it out using the weapon of efficiency and consumer goodwill is what the antitrust laws are meant to champion"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir. 1984).

45.     The agreements Plaintiffs challenge in this case likewise are not properly characterized as an entry barrier; they lower barriers to entry and expansion by allowing search engines to compete for the default in addition to competing to attract users away from the default (as Google has demonstrated by winning users on Windows PCs and mobile devices with Bing set as the default). FOF ¶¶ 47-52, 71-75, 777-88, 824-31, 847-59, 1444; *see L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427 (9th Cir. 1993).

**B.    Google Does Not Possess Monopoly Power in Any of the Alleged Advertising Markets.**

   **1.    Search ads pricing and output does not provide direct evidence of monopoly power, but rather confirms its absence.**

46.    Plaintiffs have not presented direct evidence of monopoly power in the alleged ads-side markets because they have not demonstrated a restriction on the output of advertising in those alleged markets. FOF ¶¶ 1099, 1124-25; *see Am. Express*, 138 S. Ct. at 2288 ("Where … output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."); *Broadcom*, 501 F.3d at 307.

47.    Plaintiffs also have not established the existence of supra-competitive pricing in any of the alleged markets. The cost-per-click increases over time reflected in the "search ads price index" on which Plaintiffs rely are inapposite because, among other things, the index does not account for quality improvements, which must be addressed in any meaningful analysis of pricing patterns. FOF ¶¶ 1131-43; *see In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427-28 (S.D.N.Y. 2005) (concluding a regression analysis showing defendants' conduct "resulted in increased [mobile phone] handset prices" was "essentially worthless" because it failed to test whether the higher "average wholesale price for wireless handsets" was attributable to factors such as "advances in handset features" or "improvements in handset quality").

48.    On a quality-adjusted basis, the price of Google search ads has decreased rather than increased in recent years, and many of the particular launches that Plaintiffs contend increased nominal prices (*e.g.*, launches relating to squashing or rGSP) were followed by periods of declining nominal (and real) prices, which demonstrates that Google does not possess monopoly power in any of the alleged advertising markets. FOF ¶¶ 1132-39, 1169-72; *see Xerox Corp. v. Media Sci., Inc.*, 660 F. Supp. 2d 535, 549-50 (S.D.N.Y. 2009); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 149 (S.D.N.Y. 2006).

49.     Even if Plaintiffs could point to a change that purportedly increased the real price of Google search ads, it would not be evidence of supra-competitive pricing (let alone of *monopoly* power), as Plaintiffs have not accounted for price changes by other companies in the alleged market during the same period or their use of the same techniques for managing ads auctions. FOF ¶¶ 1178, 1183; *see In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 984 (N.D. Cal. 2023); *Godix Equip. Export Corp. v. Caterpillar, Inc.*, 948 F. Supp. 1570, 1582 (S.D. Fla. 1996).

50.     Firms in a competitive market routinely adjust prices for a variety of reasons, and Plaintiffs have offered no evidence that advertisers' return on their investment in Google's search ads has declined. FOF ¶¶ 1126-30; *see Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("One [company] may charge higher prices than other [companies] … not because it has a monopoly but because it is offering better service than the other [companies] in its market."); *Xerox*, 660 F. Supp. 2d at 549.

### 2.     Plaintiffs have not presented sufficient indirect evidence of monopoly power over the alleged advertising markets.

51.     Because each of Plaintiffs' proposed ads-side markets is invalid, monopoly power cannot be inferred from the shares of those asserted markets Plaintiffs advance. *Queen City Pizza*, 124 F.3d at 440-41; *CoStar*, 619 F. Supp. 3d at 994.

52.     Plaintiffs cannot infer monopoly power from the share statistics they present for the additional reason that Plaintiffs failed to show high entry barriers. Plaintiffs' assertions regarding purported barriers to entry in the ads-side markets suffer the same flaws as their contentions regarding the alleged general search services market, including a failure to account for the low costs of launching an advertising-funded general search engine by serving ads provided by partners (*e.g.*, as DuckDuckGo has done) and the decreasing financial resources and user-interaction data entailed in building all aspects of a general search engine that attracts both

users and advertisers. FOF ¶¶ 253-406, 483, 524-53, 605-31, 1083. None of the alleged ads

markets is protected by entry barriers sufficient to infer monopoly power. *Rebel Oil*, 51 F.3d at

1439; *Baker Hughes Inc.*, 908 F.2d at 987-88.

53.     With regard to the DOJ Plaintiffs' search advertising market, indirect evidence of

monopoly power also is lacking for the independent reason that Plaintiffs failed to show

significant barriers to entry for SVPs, which frequently enter the market, have sold an increasing

share of search ads in recent years, and do not encounter the purported barriers identified by

Plaintiffs. FOF ¶¶ 652-79, 990-93, 995, 1192-98; *see R.J. Reynolds Tobacco Co. v. Philip Morris

Inc.*, 199 F. Supp. 2d 362, 383 (M.D.N.C. 2002); *IBM Peripheral EDP Devices Antitrust Litig.*,

481 F. Supp. 965, 981-82 (N.D. Cal. 1979).

54.     Plaintiffs have not sought to establish that Google possesses monopoly power in

any broader market that encompasses forms of digital advertising other than search ads, and

Google's overall share of digital advertising revenue has decreased during the period analyzed

by Plaintiffs' experts, while overall output has grown exponentially and exceeded projections.

FOF ¶¶ 990-98, 1084, 1192-97; *see Am. Express*, 138 S. Ct. at 2288.

## III.   GOOGLE HAS NOT ENGAGED IN EXCLUSIONARY CONDUCT THAT COMPRISES THE WILLFUL MAINTENANCE OF MONOPOLY POWER.

55.     In addition to proving that Google possesses monopoly power in a relevant

market, Plaintiffs must prove it "maintained this [monopoly] power through anticompetitive

means." *Microsoft*, 253 F.3d at 51. "The mere possession of monopoly power … is not only not

unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law

Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Plaintiffs thus must show Google

engaged in "exclusionary conduct" to maintain monopoly power. *Microsoft*, 253 F.3d at 58.

56.     To qualify as exclusionary conduct, the conduct "must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58; *see id.* ("[T]he Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."). And "to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'" that is "substantial." *Id.* at 58, 70.

57.     In determining whether a monopolist's actions have the requisite anticompetitive effect, a court "must evaluate [the defendant's] allegedly exclusionary conduct separately." *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022); *see United States v. Google LLC*, 2023 WL 4999901, at *12-14 (D.D.C. Aug. 4, 2023).

58.     "[I]f a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." *Microsoft*, 253 F.3d at 59. Examples of valid procompetitive justifications include, among other things, "improv[ing] device security," *Epic Games*, 67 F.4th at 986-89; fostering a "novel business practice … that was beneficial to consumers in the long run," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020); "eliminating free riding," *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32, 43-44 (2d Cir. 2018); "enhanc[ing] interbrand competition," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-91 (2007); improving product performance, *Microsoft*, 253 F.3d at 67; and winning a counterparty's business by "guarantee[ing] a stable source of supply" at "a stable, favorable price," *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983).

59.     If the defendant "asserts a procompetitive justification … then the burden shifts back to the plaintiff to rebut that claim." *Microsoft*, 253 F.3d at 59.

60.     Finally, if the "procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id*. "[I]n considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of § 2, [the court's] focus is upon the effect of that conduct, not upon the intent behind it." *Id*.

### A.    Google's Agreements with Browser Developers Such as Apple and Mozilla Do Not Comprise Exclusionary Conduct.

#### 1.   The browser agreements are not exclusive or *de facto* exclusive.

61.     Plaintiffs assert that Google's agreements with browser developers such as Apple and Mozilla are exclusionary because they are exclusive or *de facto* exclusive deals. Exclusive dealing principles therefore govern whether the agreements comprise exclusionary conduct. *EpiPen*, 44 F.4th at 982 ("[C]ourts disaggregate the exclusionary conduct into its component parts before applying the relevant law."); *Microsoft*, 253 F.3d at 68-69.

62.     "A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012). Not all agreements that secure an opportunity otherwise available to rivals involve actual or *de facto* exclusive dealing. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) ("[A] plaintiff must still show that contracts that were induced were exclusive rather than run-of-the-mill contracts, which inevitably foreclose or exclude alternative sellers from some portion of the market, namely the portion consisting of what was bought." (internal quotation marks, brackets, and citation omitted)); *Microsoft*, 253 F.3d at 67-68, 70 (reversing district court's determination that Microsoft violated Section 2 by paying "IAPs a bounty for each customer the IAP signs up for service using the IE browser" even though "IAPs constitute[d] one of the two major channels by which browsers can be distributed").

63.     An exclusive agreement in general is one that by its terms "*forbids the buyer* of the defendant's goods *from purchasing similar goods from a rival as well.*" Areeda & Hovenkamp at ¶ 1800 (emphasis added); *see ZF Meritor*, 696 F.3d at 270 ("An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services *only from a particular seller* for a certain period of time." (emphasis added)). "*[D]e facto* exclusive" dealing refers to terms "that have the 'practical effect' of *preventing buyers from doing business with the monopolist's competitors*." *Simon & Simon, P.C. v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 915-16 (N.D. Cal. 2021) (emphasis added)).

64.     Google's agreements with browser developers are not exclusive or *de facto* exclusive because they neither expressly "forbid" developers "from purchasing similar goods from a rival as well," Areeda & Hovenkamp at ¶ 1800, nor have the "practical effect" of "preventing" developers from "doing business with the monopolist's competitors." *Simon & Simon*, 533 F. Supp. 3d at 916. Browser developers that set Google as the default can and do enter agreements with rival search engines to provide a readily available and easily discoverable option for the user to change the default in the browser, display bookmarks in the browser interface where users can access rival search engines, and accept revenue share payments from rival search engines. FOF ¶¶ 1230-34, 1280-91, 1350-55, 1401-14. The promotion of rival search engines in the same browser where Google is the default shows that the contracts are not exclusive deals. B. Douglas Bernheim & Michael D. Whinston, *Exclusive Dealing*, 106 J. Pol. Econ. 64, 65 (1998) (indicating that an exclusive agreement "*prohibits a retailer or distributor that carries its product from selling certain other products*" (emphasis added)).

65.     The browser agreements are not exclusive or *de facto* exclusive for the further

reason that they do not restrict users' ability to search outside the access point set to Google by

default, which the evidence demonstrates occurs with great frequency. For example:

a)     Only about 60% of general search queries on Apple iOS devices are entered in the

Safari search bar where Google is the default upon first use. Nearly 40% of all queries on iOS

devices are input through other access points, such as user-downloaded browsers, user-

downloaded search apps, or bookmarks where rival search engines appear alongside Google.

Moreover, Google's agreement with Apple does not include any restriction on Apple's ability to

preinstall or otherwise promote another company's search widget or application. FOF ¶¶ 1280-

91, 1402-07, 1412-13.

b)     When Mozilla set Yahoo as the default in Firefox from 2014 to 2017, Google still

received nearly 70% of queries from Firefox users. Firefox is not currently a preinstalled browser

on any major device, and browsers with rival search engines set as the default (such as

Microsoft's Edge or DuckDuckGo's browser) are at least as easy for users to access on a device

where a user has installed Firefox. FOF ¶¶ 769, 783-86, 1410, 1414.

c)     For years Google has received nearly 80% of queries on Windows PCs even

though Microsoft has agreements to set Bing as the default search engine on every pre-installed

access point. And when Bing was the default on Blackberry smartphones, Google received an

even larger percentage of users' queries. FOF ¶¶ 47-52, 770, 777-82, 824-31, 847-59.

66.     Unlike agreements that have been characterized as exclusive or *de facto*

exclusive, Google's agreements with browser developers neither guarantee any volume or

percentage of queries to Google nor restrict the volume or percentage of queries that rivals may

receive. *Microsoft*, 253 F.3d at 68; *ZF Meritor*, 696 F.3d at 277. And as indicated, the evidence

shows that a significant number of smartphone and computer users in fact search outside of the

access points subject to browser default agreements. Browser developers' ability to promote

rivals and users' demonstrated behavior each confirm that the browser agreements are not

exclusive or *de facto* exclusive. *Aerotec*, 836 F.3d at 1182; *see R.J. Reynolds*, 199 F. Supp. 2d at

387 (explaining that the challenged "agreements are not exclusive dealing arrangements"

because "[i]n an exclusive dealing contract, the retailer is forbidden from carrying any competing

products or posting any competitive signs," while the challenged "agreements, in contrast, do not

preclude the display of competing products, do not control the prices at which those products are

offered, and do not provide Defendant with more than its market share of product space").

### 2. The browser agreements do not foreclose a substantial share of the alleged markets.

67. Even if the browser agreements were characterized as actual or *de facto* exclusive

agreements, they could not form a basis for liability because they do not foreclose a "substantial

share" of the alleged markets. *Microsoft*, 253 F.3d at 69 ("[A]n exclusive contract does not

violate the [antitrust laws] unless its probable effect is to 'foreclose competition in a substantial

share of the line of commerce affected.'"); *see EpiPen*, 44 F.4th at 983 ("Courts repeatedly

explain that exclusive dealing agreements are often entered into for entirely procompetitive

reasons and pose very little threat to competition even when utilized by a monopolist.");

*McWane, Inc. v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015) (observing foreclosure "'serves a

useful screening function' as a proxy for anticompetitive harm").

68. Google's agreements with browser developers such as Apple and Mozilla do not

foreclose any share of the alleged relevant markets, let alone a "substantial share." Rival search

engines have not been denied an opportunity to compete for any share of the market because they

can compete both against the default and for the default.

a)      The evidence shows that search engines not set as the default in a browser can and do compete "against the default" by, for example, encouraging users to switch the default or download a different browser or search application, which occurs with great frequency on smartphones and computers. FOF ¶¶ 47-52, 71-75, 777-88, 824-31, 847-59, 1401-14.

b)      The evidence further demonstrates that rival search engines can and do compete "for the default" by offering deals to entice browsers to set their search engine as the default instead of Google. FOF ¶¶ 1304-39, 1365-69, 1384-1400.

69.      Because rival search engines have an opportunity to compete for all users of a browser such as Safari or Firefox, there is no foreclosure. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) ("In analyzing the amount of foreclosure, our concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer."); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997-98 (9th Cir. 2010).

70.      Plaintiffs' approach to calculating foreclosure is flawed in many respects, including that they did not measure or estimate foreclosure against an economically valid but-for world. FOF ¶¶ 793-95, 1418-22; *see Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008) (concluding "the Commission failed to demonstrate that Rambus's conduct was exclusionary" because "if [a third party], in the world that would have existed but for Rambus's deception, would have standardized the very same technologies, Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws").

a)      Plaintiffs contend that instead of entering an agreement in which a browser developer agrees to set Google as the default, Google could have entered a "most-favored supplier" contract in which the developer agrees to give Google the same prominence as any

25

other search engine (*i.e.*, through a choice screen). But Plaintiffs have not shown how many queries rivals purportedly could have received in such a scenario, and the evidence from the choice screen implemented on Android devices in Europe indicates that the number is far smaller than any court has ever deemed "substantial" in an exclusive dealing case. FOF ¶¶ 803-23, 1426-32; *see Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011) (observing that "high numbers do not guarantee success for an antitrust claim," while "low numbers make dismissal easy"); *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1143 (D. Minn. 1999) ("[J]udicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less." (citation omitted)).

　　　b)　　Plaintiffs also contend that Google could have entered an "unconditional" revenue share agreement with browser developers, but again Plaintiffs have not attempted to demonstrate how many queries rivals purportedly could have received in such a scenario, let alone that it reflects an economically valid market outcome. FOF ¶¶ 796-802.

　　　71.　　The percentage of queries "covered by" the challenged agreements is not a valid measure of foreclosure. For one thing, because the purpose of foreclosure is to help assess anticompetitive effects, there is no basis for avoiding the but-for world inquiry that even Professor Whinston concedes is necessary to assess anticompetitive effects. Tr. 5779:18-5780:3 (Whinston) ("When I get to anticompetitive effects, I am thinking about but-for worlds."). For another, the agreements indisputably affect only a fraction of the search queries that flow through the access points subject to the agreements. Plaintiffs' own analysis acknowledges that numerous users would search with Google even if another search engine were the default, which renders "coverage" unreliable as a measure of foreclosure. FOF ¶¶ 1415-16, 1423-25, 1616-19; *see Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 914 (N.D. Cal. 2012)

(*vacated in part on other grounds*, 2012 WL 1745592); *United States v. Hammermill Paper Co.*, 429 F. Supp. 1271, 1282 (W.D. Pa. 1977). And for yet another, any quantitative measure of foreclosure must account for qualitative factors bearing on the ultimate question: the impact of any foreclosure on competition. *Microsoft*, 253 F.3d at 70-71.

72.     Professor Whinston testified at trial about a 33% foreclosure figure—premised on an improper and newly invented analysis not disclosed before trial—that purports to identify the fraction of queries covered by the browser and Android agreements collectively that a superior search rival could not obtain. This figure is invalid for the additional reasons that it failed to account for a superior rival's ability to compete to displace Google as the default and is based on speculation and a hard-wired service with fundamentally different characteristics (*i.e.*, Apple Maps) instead of empirical evidence of what has occurred when a lower-quality search engine has been set as the default (*e.g.*, on Windows PCs, smartphones that preloaded Bing or Yahoo, or in Firefox when Yahoo was the default). FOF ¶¶ 47-52, 764-70, 824-31, 847-59, 1423-25.

73.     Even Plaintiffs' flawed 33% figure does not represent a "substantial share" of any of the alleged markets. While "a monopolist's use of exclusive contracts, *in certain circumstances*, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation," *Microsoft*, 253 F.3d at 70 (emphasis added), the present circumstances do not qualify because rivals can compete both for and against a default. Areeda & Hovenkamp at ¶ 1807d ("The discussion of exclusive dealing suggests that minimum market shares in the range of 30 to 40 percent are required for condemnation. *These numbers presume outright exclusive dealing* and contracts of sufficiently long duration. *When the restraint in question excludes less*, or if rivals are in a

stronger position to bid business away from the defendant, *then foreclosure percentages must reflect those facts*." (emphasis added)); *EpiPen*, 44 F.4th at 988.

       **3.**      **Plaintiffs have not demonstrated that the browser agreements harmed competition.**

74.    Because Plaintiffs "must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect," *Microsoft*, 253 F.3d at 58-59, Plaintiffs cannot satisfy their burden by showing only that Google entered into exclusive or *de facto* exclusive agreements that foreclosed a substantial share of a relevant market. Plaintiffs must also show that those agreements in fact "harmed competition, not just a competitor" in relation to a but-for world in which the purportedly unlawful restrictions did not exist. *Id.* at 59; *see Rambus*, 522 F.3d at 466-67; Tr. 5779:18-5780:3, 6085:15-19 (Whinston).

75.    The evidence does not support Plaintiffs' assertion that the challenged agreements impermissibly deprived rivals of a minimum amount of scale necessary to compete in relation to any but-for world. The evidence instead shows that user interaction data exhibits diminishing returns to scale at levels that current rivals have surpassed, and their shortcomings are due to an array of factors other than scale. On an issue on which Plaintiffs bear the burden, they have not established that shifting queries to an inferior search engine—to the obvious detriment of any users who tend to stick with the default—would provide that search engine with the scale necessary to generate long-term quality improvements that would ultimately change the competitive landscape and redound to the benefit of consumers. FOF ¶¶ 253-631.

76.    The evidence also fails to support Plaintiffs' speculation that the browser agreements impair rivals' incentive to compete in relation to a but-for world, particularly given the significant number of consumers who search outside the default access point on smartphones and computers. FOF ¶¶ 1446-54; *see supra* ¶ 68. Moreover, an impact on rivals' incentives is not

evidence of exclusionary conduct, as price and quality competition often have the same effect.

*Ball Mem. Hosp.*, 784 F.2d at 1338; *Syufy*, 903 F.2d at 668 (explaining that vigorous competition can involve "deterr[ing] competitors by supplying a better product at a lower price").

77.     The evidence likewise does not support the Colorado Plaintiffs' contention that rivals' ability to partner with SVPs has been impermissibly hindered in relation to any but-for world. Rather, the evidence shows that Microsoft has content partnerships with scores of SVPs, and that the few instances where Microsoft was unable to reach a deal were neither attributable to the challenged agreements nor affected Microsoft's ability to compete. FOF ¶¶ 1736-43.

78.     Plaintiffs' assertion at trial that Apple is restricted in its ability to offer "suggestions" to Safari users by the 2016 amendment to the ISA that provides that "Apple's use of the Services as Default in the Web Browser Software will remain substantially similar to its use … as of the Execution Date" is factually incorrect and inadmissible in any event. Plaintiffs offered no evidence at trial that the 2016 agreement limited Apple's ability to provide direct answers to user queries in the Safari browser, nor did Plaintiffs prove that this provision had any impact on Apple's ability to develop its own general search engine. FOF ¶¶ 1269-71, 1293-1303.

79.     Professor Whinston's testimony at trial on this issue is insufficient and inadmissible for several reasons. First, he admitted at trial that he disclosed no opinions in his expert reports prior to trial about this provision. Tr. 6062:12-16 (Whinston). Second, Plaintiffs' Complaints do not include any allegations about a restriction on Apple's ability to offer suggestions to Safari users, and Plaintiffs did not reference any such restriction in response to an interrogatory asking them to identify the contract provisions they claim are anticompetitive. *Blake v. Securitas Sec. Servs.*, 292 F.R.D. 15, 19 (D.D.C. 2013) (explaining that the "overwhelming weight of authority is that preclusion is *required and mandatory* absent some

unusual or extenuating circumstances" for a violation of Rule 26(a)(2)'s requirement on

disclosure of expert testimony); *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 2022 WL

278773, at *4 (D.D.C. Jan. 31, 2022).

> **4.    The browser agreements reflect competition on the merits based on search quality and price.**

80.     For many of the same reasons the browser agreements are not exclusive dealing,

they do not comprise exclusionary conduct because they reflect the outcome of competition on

the merits. Google competes with other search engines on the basis of quality and price to be the

default in browsers designed by firms such as Apple and Mozilla, and those firms have chosen to

set Google as the default based on their determination that it offers the highest-quality experience

for their browsers and customers. FOF ¶¶ 1220-30, 1248, 1256, 1261, 1266-67, 1274-79.

81.     Competing for an opportunity by offering above-cost pricing—which is not

predatory as a matter of law, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451

(2009)—and a superior product is competition on the merits that does not violate Section 2.

*Microsoft*, 253 F.3d. at 68 ("The rare case of price predation aside, the antitrust laws do not

condemn even a monopolist for offering its product at an attractive price, and we therefore have

no warrant to condemn Microsoft for offering either IE or the IEAK free of charge or even at a

negative price."); *id.* ("[A] monopolist does not violate the Sherman Act simply by developing

an attractive product.").

82.     Because competition on the merits is not anticompetitive or exclusionary conduct,

Plaintiffs have not met their *prima facie* burden with regard to the browser agreements. *Id.* at 62,

65 ("Because Microsoft's conduct, *through something other than competition on the merits*, has

the effect of significantly reducing usage of rivals' products and hence protecting its own

operating system monopoly, it is anticompetitive." (emphasis added)); *see id.* at 58 ("The

successful competitor, having been urged to compete, must not be turned upon when he wins.").

> **5.      The browser agreements are justified by numerous procompetitive benefits in the alleged markets that stand unrebutted and outweigh any asserted harm to competition.**

83.     Even if the browser agreements were characterized as exclusive deals that have an

anticompetitive effect, they are supported by business justifications that generate procompetitive

benefits sufficient to outweigh any purported harm to competition.

84.     The evidence shows that for approximately two decades (*i.e.*, starting *before*

Plaintiffs contend that Google's conduct harmed competition), browser developers have

designed their browsers with a single default search engine, and third-party browser developers

have sought compensation from a search engine in exchange for setting it as the default. This

exchange is a "normal competitive tool" in the industry that is not exclusionary, even if the

resulting agreement is characterized as exclusive or *de facto* exclusive. FOF ¶¶ 789-92, 860-68,

1220-30, 1241-79; *see EpiPen*, 44 F.4th at 989 (affirming judgment for defendant on Section 2

claim where "[t]he widespread use of exclusive rebate agreements in the … market … does not

suggest [defendant] acted anticompetitively," but "[r]ather, this demonstrates the market was

functioning properly"); *Barry Wright*, 724 F.2d at 237-38.

85.     The evidence shows that throughout the period Plaintiffs' experts evaluated for

potential anticompetitive effects, Apple and Mozilla continued to design their browsers with a

single, user-changeable default search engine because they believe doing so makes their

browsers more attractive to consumers and stimulates competition from search engines to be the

default. FOF ¶¶ 865-68, 1235-40, 1348-51, 1356-59; *see Stearns Airport Equip. Co. v. FMC

Corp.*, 170 F.3d 518, 524 (5th Cir. 1999) (affirming judgment for defendant under Section 2

where "the decision to sole-source a contract or adopt a particular specification was always

ultimately in the hands of the consumer," *i.e.*, the counterparty); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("It is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*.").

86.     The browser agreements improve search quality and output by enabling the browser to work effectively out of the box; incentivizing the browser developer to select the highest quality search engine; and encouraging the developer to improve the browser's speed, stability, ease of use, and other attributes that encourage users to conduct more searches. Payment of a revenue share underpins these benefits, as browser developers have the opportunity to earn more money by making improvements that encourage more searching. FOF ¶¶ 773-76, 1435-36; *see N. Am. Soccer League*, 883 F.3d at 43 (referencing greater output, enhanced product appeal, improved quality, more secure financial viability, and eliminating free riding as valid justifications); *Barry Wright*, 724 F.2d at 237.

87.     The browser agreements also improve search quality and output by encouraging search engines to make quality improvements to compete for or maintain the default position, which offers the opportunity to win a segment of consumers who are inclined to stick with the default and receive the endorsement of a browser developer as meriting the default selection. FOF ¶¶ 761-64, 1437-41; *see Epic Games*, 67 F.4th at 971; *Microsoft*, 253 F.3d at 59 (describing "enhanced consumer appeal" as a procompetitive justification).

88.     And the browser agreements further enhance search quality and output by introducing price competition that would not otherwise exist given that search engines are available to users at no cost. Search engines have an incentive to compete on multiple dimensions to be the default in addition to competing to attract users directly (*e.g.*, by encouraging them to switch the default or download their search application or browser). FOF ¶¶

71-75, 1442-43; *see N. Am. Soccer League*, 883 F.3d at 43; *Microsoft*, 253 F.3d at 59 (citing "greater efficiency" as a procompetitive justification).

89.     The evidence shows that Apple and Mozilla evaluate rival search engines and decide whether to set Google as the default based on a recurring consideration of quality and price. FOF ¶¶ 1241-79, 1304-47, 1360-79. This form of "competition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004); *see Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (explaining that "[c]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe" because even if "[e]xclusive contracts make the market hard to enter in" the interim, they "cannot stifle competition over the longer run," while "competition of this kind drives down the price … to the ultimate benefit of consumers").

90.     Overturning price and quality competition in the hope that a different outcome may emerge is antithetical to the Sherman Act, which addresses whether "a monopolist's act … harm[s] the competitive *process* and thereby harm[s] consumers," *Microsoft*, 253 F.3d at 58. The Sherman Act neither seeks to restrain a market leader from drawing upon all of its advantages to compete nor authorizes a reallocation of market opportunities in an effort to encourage less efficient rivals to catch up. *EpiPen*, 44 F.4th at 985 (describing how "antitrust became indifferent to the preservation of inefficient competitors"); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) ("Forcing monopolists to 'hold[] an umbrella over inefficient competitors' might make rivals happy but it usually leaves consumers paying more for less.").

33

6.     **The challenged agreements benefit competition in complementary markets that also create benefits in Plaintiffs' alleged markets.**

91.     The browser agreements also benefit browser competition. The quality of the default search engine has a significant impact on the browser; users rely on browser developers to choose a high-quality default; and browser developers rely on search revenue share payments to fund research and development that enhances their product and ability to compete. Benefits to browser competition, in turn, further enhance search competition. FOF ¶¶ 904-07, 1455-67.

92.     There is no dispute that procompetitive benefits that accrue in Plaintiffs' alleged markets are legally cognizable even if the same conduct also produces benefits in other markets. Sept. 1, 2023 Hr'g Tr. 47:21-25; *see Sullivan v. Nat'l Football League,* 34 F.3d 1091, 1113 (1st Cir. 1994) ("[E]vidence of benefits to competition in the relevant market can include evidence of benefits flowing indirectly … that ultimately have a beneficial impact on competition in the relevant market itself."). The evidence shows that enhancing browser competition enhances search output. FOF ¶¶ 1464-67.

93.     The benefits to browser competition that result from Google's agreements are also cognizable irrespective of their benefits to search competition because search engines and browsers are highly complementary, and courts credit justifications in those circumstances even when the benefits lay outside the asserted markets. FOF ¶ 1464; *see Microsoft*, 253 F.3d at 96 (concluding that on remand of Plaintiffs' tying claim, Microsoft "may offer *the same* procompetitive justification for the override" in the *operating system* market even though plaintiffs would seek to show anticompetitive effects "in the *browser* market" that are "greater than these benefits" (first emphasis added)); *see Eastman Kodak*, 504 U.S. at 483-84; *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 111, 115-17 (1984); *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1348-51 (9th Cir. 1987).

94.     The challenged agreements' benefits to competition in complementary markets distinguish cases in which courts have declined to count out-of-market efficiencies on the grounds that the asserted efficiency would not have counted *even if it had accrued in Plaintiffs' alleged market. Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1185-86 (D.C. Cir. 1978) (rejecting NFL's argument that restriction was "'procompetitive' in its effect on the playing field" because it was not a benefit relating to "competition in the economic sense," and therefore would have failed irrespective of whether it was a benefit in or out of the asserted relevant market).

### 7. Plaintiffs have not identified a valid substantially less restrictive alternative.

95.     Plaintiffs cannot rebut a procompetitive justification merely by hypothesizing alternative conduct, but instead must "prove that '*substantially* less restrictive alternative rules' existed to achieve the *same* procompetitive benefits." *NCAA v. Alston*, 141 S. Ct. 2141, 2162 (2021) (emphasis added). "[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes," and "courts should not second-guess 'degrees of reasonable necessity,'" as that "would be a recipe for disaster" given that a "'skilled lawyer' will 'have little difficulty imagining possible less restrictive alternatives to most joint arrangements.'" *Id.* at 2162 (internal citation omitted); *see Trinko*, 540 U.S. at 414.

96.     Plaintiffs have not identified a valid substantially less restrictive alternative for achieving the relevant procompetitive benefits. Plaintiffs' proffered alternatives—namely an "unconditional" revenue share payment or a "most-favored supplier" arrangement—are not substantially less restrictive because they have no real-world basis. The evidence shows they do not reflect agreements between browser developers and search providers that would arise in competition absent the challenge conduct. FOF ¶¶ 416-29, 796-98, 803-814, 832-46, 1304-10, 1318, 1365-66; *see Alston*, 141 S. Ct. at 2161.

97.     Plaintiffs' hypothetical agreements also are not valid less-restrictive alternatives for the independent reason that Plaintiffs did not prove they would preserve most, let alone all, of the procompetitive benefits of Google's browser agreements without increased costs. *Alston,* 141 S. Ct. at 2164; *Cnty. of Tuolumne v. Sonoma Cnty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001) ("[P]laintiffs must also show that an alternative is substantially less restrictive *and* is virtually as effective in serving the legitimate objective *without significantly increased cost.*"). Plaintiffs have not established that a browser developer could generate sufficient revenue from "unconditional" payments to fund improvements to its browser that improve search quality and output. And as for "most-favored supplier" agreements, the evidence shows that browser developers do not want to offer a search engine choice screen in place of a default because doing so would harm their users and decrease their revenue share. FOF ¶¶ 801-02, 815-23, 1235-40, 1268, 1357-59, 1433, 1445.

**B.     Google's MADAs with Android OEMs and RSAs with Android OEMs and Wireless Carriers Do Not Comprise Exclusionary Conduct.**

**1.      The MADAs and RSAs are not exclusive or *de facto* exclusive.**

98.     Plaintiffs' contention that Google's MADAs with Android OEMs and RSAs with Android OEMs and wireless carriers are anticompetitive is predicated on characterizing those agreements as a form of exclusive or *de facto* exclusive dealing, and the claims therefore must be analyzed under the doctrinal rules specific to that theory. *See supra* ¶ 61.

99.     MADAs are not exclusive or *de facto* exclusive. They expressly permit OEMs to preinstall other general search applications and browsers with a different search engine set as the default, and they do not specify the default search service or default browser for any device. FOF ¶¶ 1469-78. Significant search volumes flow through access points that are not addressed by MADAs (*e.g.*, the "hot seat"), such that OEMs can prominently promote rival search engines if

they wish to do so, and MADAs do not block consumers from downloading rival search engines or removing the Google Search widget. MADAs therefore do not comprise actual or *de facto* exclusive dealing. FOF ¶¶ 1560-73, 1587-97; *see supra* ¶¶ 62-66.

100.    Google's current RSAs with Android OEMs and wireless carriers allow the counterparty to determine on a device-by-device basis whether to refrain from preinstalling alternative search services on the device upon first use in order to earn the highest available revenue share percentage. FOF ¶¶ 1479-1507, 1575-86. The agreements do not comprise actual *or de facto* exclusive dealing because the counterparty can decide at any time to preinstall a rival search engine on a device without forfeiting any payments it earns from Google on other devices. *Allied Orthopedic*, 592 F.3d at 997 (concluding "sole-source agreements did not foreclose competition" because counterparties "could choose at anytime to forego the discount offered by [Defendant] and purchase from a generic competitor"). The RSAs also affirmatively preserve users' ability to access rival search engines directly, such as by downloading alternative search applications or browsers (*e.g.*, from the Google Play Store) or by changing the default search engine in Google's Chrome browser. FOF ¶¶ 1587-97; *see Allied Orthopedic*, 592 F.3d at 997.

### 2.    The Android agreements do not foreclose a substantial share of the alleged markets.

101.    Even if MADAs and/or RSAs were considered exclusive or *de facto* exclusive deals, they could not serve as a basis for liability under Section 2 because they do not foreclose a "substantial share" of any of the alleged relevant markets. *Microsoft*, 253 F.3d at 69. Neither MADAs nor RSAs foreclose any share of the alleged markets, let alone a "substantial share."

a)    Rival search engines can compete for incremental promotion on every MADA device, and they can do the same under each device-by-device RSA. FOF ¶¶ 1560-86.

b)      Rivals can also compete to reach users directly, and the evidence shows that user-downloadable browsers and applications are an established means of distributing search directly to users even if every preinstalled search access point is set to a default search engine (as has been the case on Windows PCs, for example, where Google nevertheless receives a significant majority of queries). FOF ¶¶ 47-52, 777-88, 824-31, 1587-97; *see Allied Orthopedic*, 592 F.3d at 997 ("If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market."); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *9 (N.D. Cal. July 2, 2014); *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 7 F. Supp. 2d 119, 121-22 (D. Conn. 1998) (*aff'd*, 186 F.3d 74 (2d Cir. 1999)).

102.    As indicated, Plaintiffs' approach to calculating foreclosure is flawed because they have not measured it against an economically valid but-for world. *See supra* ¶ 70.

103.    No foreclosure is attributable to MADAs in relation to a but-for world where Google Search and Chrome are licensed separately from the MADA. There is no evidence any Android OEM is interested in preinstalling a search rival in place of Google (*i.e.*, by licensing the Play Store but not Google Search), and in Europe where that option is available no OEM has done so (or foregone placing the Google Search widget). FOF ¶¶ 1527-37, 1601-09.

104.    Even if Android RSAs were considered exclusive deals that foreclose a share of the alleged markets, the evidence shows they foreclose fewer than 1% of general search queries. Professor Whinston proffered as a less-restrictive alternative a "most-favored supplier" agreement, where OEMs and carriers could agree to promote Google as prominently as any other search engine (*i.e.*, through a choice screen). Based on Professor Whinston's analysis of the results of the choice screen currently on Android devices in Europe, more than 90% of U.S. users

would select Google, such that fewer than 1% of additional general search queries would be available to rivals. FOF ¶¶ 1610-13; Tr. 6046:16-19 (Whinston).

105.    The DOJ Plaintiffs' previously undisclosed 33% foreclosure figure, which aggregates all Android and browser agreements, is flawed for the reasons stated above, including its failure to examine evidence of what actually occurs when a lower-quality search engine is the default and its failure to consider that a superior rival would win promotional opportunities on Android devices. *See supra* ¶ 72. Any calculation of the proportion of the 33% foreclosure figure attributable to the Android agreements (*i.e.*, 11.6% to 13.5% of all general search queries) is far below what could be considered "substantial." *Minn. Mining & Mfg.*, 35 F. Supp. 2d at 1143 (observing that "judicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less" (citation omitted)); *see* FOF ¶¶ 1617-18.

106.    As indicated, the percentage of queries "covered by" the challenged agreements is not a valid measure of foreclosure, including because rivals can compete for promotion and the agreements indisputably impact only a fraction of the queries that flow through the access points subject to the agreements. *See supra* ¶ 71. Even if "coverage" were a relevant data point, however, the evidence shows the Android agreements "cover" only 19.4% of general search queries. FOF ¶ 1616. A foreclosure percentage that is less than half of what is "usually required" cannot represent a "substantial share," even in a Section 2 case. *Microsoft*, 253 F.3d at 70; *see R.J. Reynolds*, 199 F. Supp. 2d at 388. And for the reasons explained above, there is no evidence of any foreclosure translating into competitive harm. *See supra* ¶¶ 71, 74-77.

### 3.    Plaintiffs have not demonstrated that the Android agreements harmed competition.

107.    As stated above, Plaintiffs have not demonstrated that in relation to any but-for world the challenged agreements impermissibly deprived rivals of a minimum amount of scale

necessary to compete, impermissibly diminished their incentives to compete, or impermissibly impaired their ability to form partnerships with SVPs. *See supra* ¶¶ 74-77.

108.    Plaintiffs' invocation of Branch Metrics does not provide evidence of the requisite anticompetitive effect because, among other things, Branch Metrics' services are not part of Plaintiffs' alleged markets; there is no evidence that Google's agreements with Android OEMs or carriers prevented any third party from preloading any Branch services that it otherwise wanted to license or prevented Branch from partnering with Google's search rivals; and there is no evidence that wider deployment of Branch would facilitate general search engine entry or expansion in the relevant markets. FOF ¶¶ 1620-84; *see Am. Express*, 138 S. Ct. at 2284 (describing plaintiff's "burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*" (emphasis added)); *Qualcomm*, 969 F.3d at 993.

### 4.    The Android agreements are justified by numerous procompetitive benefits in the alleged markets that stand unrebutted and outweigh any asserted harm to competition.

109.    Even if the MADAs and/or RSAs were characterized as exclusive deals that have an anticompetitive effect, they are supported by business justifications that generate procompetitive benefits sufficient to outweigh any purported harm to competition.

110.    MADAs improve search quality and output by enabling the production of high-quality, low-cost smartphones that allow consumers to conduct more searches from mobile devices. The evidence shows Android smartphones are available at lower price points because MADAs allow OEMs to obtain a royalty-free license to Google's valuable proprietary applications and APIs. Without this barter arrangement, Google would charge OEMs a fee to license its proprietary software, which is costly to build and maintain. FOF ¶¶ 869-78, 886-88, 1709-14; *see Qualcomm*, 969 F.3d at 989 (explaining how a "unique business model" that "relies

on" a form of contractual restriction "ultimately benefited consumers by 'increasing the quality and quantity of … transactions,'" such that "what appeared at first to be anticompetitive … was actually procompetitive and innovative").

111.   MADAs also improve search quality and output by making it easy for users to search the web using the high-quality applications that consumers demand, as evidenced by the large and growing average number of queries conducted on Android smartphones. And MADAs have facilitated the proliferation of APIs and an application store that make it especially easy for developers to build and distribute search applications and widgets, and for consumers to download and use them across Android devices. FOF ¶¶ 773-76, 1686-87, 1693, 1696-1702.

112.   Android RSAs improve search quality and output by providing OEMs and carriers a financial incentive to produce high quality mobile devices on which it is easier to search the web and to make infrastructure investments that facilitate web search (*e.g.*, high-quality user interfaces, affordable data plans, and high-speed data networks). The payment of a revenue share underpins this incentive because OEMs and carriers have the opportunity to earn more money by making improvements to their devices, data plans, and wireless networks that encourage more searching. FOF ¶¶ 1688-93, 1727-28.

113.   The RSAs' placement terms, including preloading the Chrome browser in the "hot seat," expand search output by facilitating user access to a high-quality browser and promoting Android's ability to compete with iOS, which further boosts search output. FOF ¶¶ 773-76, 907-19, 1704-08.

114.   The RSAs' preinstallation exclusivity provisions improve search quality and output by aligning incentives and mitigating opportunism by partners to a sufficient degree to enable Google to provide OEMs and carriers the financial incentives to make investments that

facilitate more searching on mobile devices. In the absence of preinstallation exclusivity, partners could promote rivals while earning revenue share on all their Google Search volume, thereby depriving Google of the incremental volume that the higher revenue share is designed to promote. FOF ¶¶ 1690-92; *see N. Am. Soccer League*, 883 F.3d at 43 ("Eliminating free riders can be a procompetitive advantage of alleged restraints on competition.").

115.    MADAs and Android RSAs, both separately and together, promote inter-brand competition against Apple's iOS, which expands search output. MADAs provide a full suite of high-quality applications that consumers expect from a smartphone while allowing consumers to easily port their applications across Android devices. And RSAs give elevated promotion to best-in-class services and applications (such as Google Search and Chrome) that users demand and thereby enhance Android device competition with Apple devices. The evidence shows that this consistent, high-quality user experience facilitates competition between Android and iOS, which includes increasing search quality and output by driving improvements that are central to searching on mobile devices, such as the proliferation of search widgets and larger screens. FOF ¶¶ 887-902, 907-19, 1694-1715; *see Leegin*, 551 U.S. at 890 (recognizing defendant's justification that the challenged contractual restraints "can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product").

116.    Procompetitive benefits that accrue in highly complementary markets should be considered in addition to the aforementioned benefits in Plaintiffs' alleged markets. Mobile devices and mobile platforms, like browsers, are highly complementary in relation to search, and the challenged agreements produce benefits to competition in the economic sense. FOF ¶¶ 1694-95; *see supra* ¶¶ 93-94.

### 5. Plaintiffs have not identified a valid substantially less restrictive alternative.

117.    Plaintiffs have not identified a substantially less restrictive alternative for achieving the MADA's procompetitive benefits. Breaking up the collection of applications included in the MADA is not a valid less restrictive alternative because MADA signatories want to pre-install the Google search widget and Chrome, and have continued doing so in Europe after being given the option to license the Play Store and other applications separately. Unbundling would not enable Google to achieve the efficiency of a consistent, high-quality search experience, and Plaintiffs have not established that the price and quality of Android devices would remain as competitive without the royalty-free availability of proprietary Google software, and therefore have not shown that search output and quality would continue to increase due to the proliferation of low-cost, high-quality smartphones that enable more intensive search usage. FOF ¶¶ 1601-09, 1709-14; *see Qualcomm*, 969 F.3d at 996 (concluding the FTC's position gave "inadequate weight to Qualcomm's reasonable, procompetitive justification" for its allegedly anticompetitive licensing program given that an alternative approach "would require the company to engage in 'multi-level licensing,' leading to inefficiencies and less profit").

118.    Plaintiffs have not demonstrated that substantially all of the procompetitive benefits of the Android RSAs could be achieved through substantially less-restrictive means, let alone without increasing the costs of achieving those benefits. There is no evidence that the price and quality of Android devices would remain as competitive in the U.S. or continue to improve without the incentives that RSAs provide to OEMs and carriers. The evidence instead shows that without the challenged terms Google would offer a lower revenue share, reducing partners' incentives to invest in Android and the availability of low-cost, high-quality smartphones that enable more intensive search usage. FOF ¶¶ 1689-91, 1715.

119.    Although Google offers carriers in the U.S. other financial incentives to promote Android devices, these go-to-market deals are more administratively cumbersome, do not similarly align incentives to promote search quality and output, and would not generate the same level of overall investment in the Android ecosystem if Google could not also compete for elevated promotion of Search on Android devices and re-invest portions of the incremental revenue resulting from that promotion through the Android RSAs. FOF ¶¶ 1731-35; *see Epic Games*, 67 F.4th at 990 (explaining that a valid less restrictive alternative "must be virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost" (brackets and quotations marks omitted)).

**C.    Google's SA360 Conduct Is Not a Basis for Liability under Section 2.**

**1.    The Colorado Plaintiffs' SA360 claim fails to meet any of the prerequisites for an exclusionary refusal to deal.**

120.    "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell*, 555 U.S. at 448. In particular, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408. "Compelling" any party, even a purported monopolist, "to share the source of their advantage … may lessen the incentive for the monopolist, the rival, or both, to invest" and "requires antitrust courts to act as central planners," a "role for which they are ill suited." *Id.* at 407-08.

121.    Refusing to deal with a competitor—including a "refus[al] deal on the rivals' preferred terms"—constitutes exclusionary conduct only in exceptional circumstances. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 306 (D.C. Cir. 2023). Courts accordingly "have been very cautious" in condemning a firm's refusal to cooperate with rivals, *Trinko*, 540 U.S. at 408, and

44

exceptions are "few." *Meta*, 66 F.4th at 305; *see Novell*, 731 F.3d at 1076 (noting a bright-line

rule avoids "the risk of inducing collusion and inviting judicial central planning").

122.    The Colorado Plaintiffs have met none of the three threshold showings required

before analyzing a refusal to deal as potentially exclusionary conduct: (1) a unilateral termination

of a voluntary and profitable course of dealing, (2) for which the only conceivable rationale or

purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from

the exclusion of competition, (3) in order to single out a rival with respect to products that the

defendant already sells in the existing market to other similarly situated customers. *Qualcomm*,

969 F.3d at 993-95; *see Meta*, 66 F.4th at 305-06; *Aerotec*, 836 F.3d at 1184.

123.    *First*, the Colorado Plaintiffs failed to demonstrate that Google "voluntarily

engaged in a course of dealing," with a competitor (Microsoft) that it subsequently terminated.

*Meta*, 66 F.4th at 305; *see Qualcomm*, 969 F.3d at 993-94. There is no evidence of any *prior*

course of dealing that Google *terminated*. The evidence showed that Google historically never

implemented all Microsoft Ads features in SA360 as a matter of routine, never committed to

integrate specific features, and when Google elected to integrate Microsoft Ads features, never

agreed to do so on any specific timeline. Instead, Google's practice was to integrate features

(whether Microsoft Advertising, Google Ads, or others) based on customer demand, technical

feasibility, and resource availability. FOF ¶¶ 1774-81, 1819-22, 1825-29, 1839, 1852-54.

124.    *Second*, the Colorado Plaintiffs did not establish that Google's "only conceivable

rationale or purpose" was "to sacrifice short-term benefits in order to obtain higher profits in the

long run from the exclusion of competition." *Qualcomm*, 969 F.3d at 993 (citations omitted); *see*

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 675 (D.C. Cir. 2005); *Novell*, 731 F.3d at

1075 ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive

effect."). There is no evidence that it would have been profitable for Google to build Microsoft auction-time bidding on Microsoft's timetable in light of the lack of SA360 customer demand at that time and the lack of resources available to build this feature faster. Google's evaluation of and decision to build these complex features over time—based on its customers' demand and prioritization, technical feasibility, and available resources—was not "irrational," let alone "irrational but for" some "anticompetitive effect." *Novell*, 731 F.3d at 1075. Rival SEM tools' varied responses to Microsoft's demands further shows Google did not depart from rational business conduct. FOF ¶¶ 1745-49, 1774-81, 1854-57, 1864-72, 1877-82, 1919-20.

125.    *Third*, there is no evidence that Google singled out and refused to deal with a competitor regarding "products that [it] already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 994. Google did not single out Microsoft in its feature building decisions, but instead treated Microsoft the same as Google treated other engines according to Google's usual and customary practices. FOF ¶¶ 1777-81, 1825-29, 1852-54. It is undisputed that the Microsoft Ads features that were demanded to be built into SA360 were not built into SA360 as of Microsoft's November 2019 requests. FOF ¶¶ 1746, 1786-87, 1819, 1822, 1825-29, 1837-39, 1852-54, 1913.

126.    The Colorado Plaintiffs also failed to establish that any supposed refusal to deal on rivals' preferred terms contributed to monopoly maintenance—that is, the refusal had a significant "anticompetitive effect"—in the asserted relevant market, as it must before a court can impose liability for a violation of Section 2. *Microsoft*, 253 F.3d at 59; *see Mr. Furniture Warehouse, Inc. v. Barclays Am./Com. Inc.*, 919 F.2d 1517, 1523 (11th Cir. 1990) ("It requires a long stretch to call an individual refusal to deal 'monopolizing' when it does nothing to increase the refuser's monopoly power."). There is no evidence that the lack of features (or delayed

implementation of features)—for one competitor, on one of many advertising tools—materially altered competition in any alleged relevant market, let alone in a way that harmed advertisers or users. FOF ¶¶ 1764-69, 1887-92, 1895, 1914-20.

a)    The Colorado Plaintiffs failed to establish the significance of SA360 as a channel for Microsoft Ads as compared to the numerous other ways in which advertisers could place ads on Bing search results pages, and they defined no market in which SA360 competes against other ads channels. FOF ¶¶ 1750-56, 1886-92.

b)    The Colorado Plaintiffs did not substantiate any alleged lost Microsoft revenue attributable to any delayed implementation of Microsoft Ads features in SA360. Indeed, the evidence showed that Google did an analysis in response to Microsoft's concern over alleged "spend shift" after SA360 integrated Google Ads auction-time bidding, and Microsoft Ads spend slightly increased for advertisers who enabled Google Ads auction-time bidding and also had Microsoft Ads campaigns in their portfolio. FOF ¶¶ 1893-95, 1902, 1910-11.

c)    Alternatives to SA360 abound for advertisers interested in Microsoft's automated bidding feature, which Plaintiffs focused on at trial. Automated bidding for Microsoft Ads was available on Skai's SEM tool as of 2020, so any advertiser that prioritized this functionality could switch or multi-home by using more than one SEM tool. Advertisers also could access Microsoft auction-time bidding and other Microsoft Ads features through Microsoft's native tool. Over the period of the alleged SA360 conduct, digital advertising on numerous platforms has grown and there is no evidence suggesting that SA360's feature building had any adverse impact on that growth. FOF ¶¶ 995, 1763-69, 1875, 1887-91.

d)    Additionally, Google has integrated or is in the process of integrating the Microsoft Ads features to which the Colorado Plaintiffs pointed. Any harm to Microsoft has

been merely transient, and the Colorado Plaintiffs have not shown how any deprivation of ad revenue from any delay in integrations harmed Microsoft as a *competitor*. *Meta*, 66 F.4th at 306. Indeed, starting in late 2019, advertisers' spending on Microsoft Ads through SA360 grew, including in the period right after SA360 launched auction-time bidding for Google Ads. FoF ¶¶ 1746-48, 1874, 1890-91, 1893-1914.

> ### 2. Google had business justifications for its SA360 feature development decisions.

127.    Even if Google had a legal duty to deal, Colorado Plaintiffs' SA360 claim fails because the record discloses ample business justifications for Google's feature development decisions and timeline, including lack of customer demand, concerns about technical feasibility, and resource constraints. "[D]enial of access is never *per se* unlawful; legitimate business purpose always saves the defendant." Phillip E. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 852 (1989); *see Covad*, 398 F.3d at 673; FoF ¶¶ 1774-81, 1825-32, 1854-72.

128.    Google's development of Microsoft Ads features over time reflects decision-making based on its understanding of SA360's customers' priorities, resource constraints caused by a multi-year SA360 platform rebuild (Project Amalgam), and the technical complexity of building the Microsoft Ads features, particularly auction-time bidding.

a)    From 2019 until 2021, SA360's feature roadmaps included both Google Ads and Microsoft Ads features (and other third-party ad platform features), as well as other infrastructure and functionality for the SA360 platform.  Upon each roadmap cycle, due to resource constraints and customer priorities, SA360 did not build all features requested by the Google Ads or Microsoft Ads teams. FOF ¶¶ 1774-81, 1786-87, 1825. As of the time of

Microsoft's feature parity demands in November 2019, SA360 had not seen advertiser demand for Microsoft Ads' auction-time bidding functionality. FOF ¶¶ 1855-57, 1864.

       b)     In March 2020, Google advised Microsoft that it would defer a preliminary test to determine whether it was technically feasible to build Microsoft auction-time bidding on SA360 because the resources to develop that functionality had not yet been approved, but that Google remained open to revisiting that decision in future planning cycles based on customer demand for the functionality. At the same time, Google told Microsoft that Google had decided to build three other Microsoft Ads features in the then-current SA360 product roadmap cycle. FoF ¶¶ 1825-26.

       c)     Google launched four of the five features Microsoft demanded (on which Colorado Plaintiffs focused at trial) in Google's new SA360 platform, which was announced publicly in February 2022. FOF ¶¶ 1782-83, 1786-87.

       d)     Google began building a Microsoft Ads auction-time bidding integration for SA360 as it was nearing the end of this resource-intensive, multi-year SA360 platform rebuild. That rebuild included not only four of the features Microsoft demanded, but also multiple other new Microsoft features. FOF ¶¶ 1784-87, 1850-51, 1873.

       e)     As of the time of trial, SA360 was in the customer testing phase of its integration of Microsoft Ads auction-time bidding. FOF ¶¶ 1748-49, 1874, 1917.

      129.    As with its integration of Google Ads auction-time bidding into SA360, integrating Microsoft Ads' auction-time bidding was a highly complex undertaking, which also required Microsoft to develop related features such as fractional conversions and campaign-level level conversion goals. FOF ¶¶ 1828-32, 1867-72, 1913. Google's decision-making and timing for the integration relating to Microsoft Ads features for SA360 was reasonable when compared to the varied responses of the three other major SEM tool providers, none of which provided

49

access to all Microsoft Ads features and functionality, and only one of which (Skai) completed an integration with Microsoft auction-time bidding. FOF ¶¶ 1865-66, 1875-82, 1918-20.

130.    Any remedy the Colorado Plaintiffs could seek would require Google to build features on Microsoft's preferred terms and timeline, which is not judicially administrable because it would require the Court to "delineate the defendant's sharing obligations," *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004), including the parties' "terms of dealing." *Pac. Bell*, 555 U.S. at 452. The lack of an administrable remedy makes it all the more important not to excuse Plaintiffs' failure to meet the requirements of settled law. *Trinko*, 540 U.S. at 415 (reasoning that remedial concerns, including that "[a]n antitrust court is unlikely to be an effective day-to-day enforcer" of proposed "detailed sharing obligations," strongly counseled against recognizing a new duty to deal).

### 3.    Google's SA360 conduct is justified by numerous procompetitive benefits in the alleged markets that stand unrebutted and outweigh any asserted harm to competition.

131.    Google's operation of SA360 promotes competition among search engines by offering advertisers one of many ways to purchase search ads from multiple platforms, including Microsoft Ads. FOF ¶¶ 1750-56, 1770. To compete effectively, Google must make business judgments about which features it will invest in developing. Punishing Google's conduct would diminish its incentive to improve its cross-platform tool in response to advertiser demand—a key factor in deciding which features Google develops for SA360—while discouraging rivals from innovating because they can instead force Google to integrate their features on their proposed terms. FOF ¶¶ 1775-81; *see Novell*, 731 F.3d at 1073.

Dated:  February 9, 2024                    Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _/s/ John E. Schmidtlein_
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted _pro hac vice_)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

_Counsel for Defendant Google LLC_