# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ██████████████ |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ██████████████ |
| Defendant. | |

## DEFENDANT'S RESPONSIVE PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

I.   PLAINTIFFS HAVE NOT PROVEN THE EXISTENCE OF THEIR ALLEGED
     RELEVANT ANTITRUST PRODUCT MARKETS. ........................................................3

     A.   General Search Services Is Not a Relevant Antitrust Market. ..................................3

     B.   Search Advertising, General Search Advertising, and General Search Text
          Advertising Are Not Relevant Antitrust Markets. ...................................................5

II.  PLAINTIFFS HAVE NOT DEMONSTRATED THAT GOOGLE POSSESSES
     MONOPOLY POWER IN ANY RELEVANT MARKET. ..............................................8

     A.   Plaintiffs Have Not Established Monopoly Power Directly. ...................................8

     B.   Plaintiffs Have Not Established Monopoly Power Indirectly. .................................9

III. GOOGLE HAS NOT ENGAGED IN EXCLUSIONARY CONDUCT THAT
     COMPRISES THE WILLFUL MAINTENANCE OF MONOPOLY POWER. ...............9

     A.   Plaintiffs Misinterpret and Misapply the Section Two Framework. .......................9

     B.   Plaintiffs' Abandonment of the Exclusive Dealing Doctrine Does Not
          Lessen Their Section Two Burden. .......................................................................12

     C.   Plaintiffs Misinterpret and Misapply the Exclusive Dealing Framework. ............14

          1.   Plaintiffs have failed to establish that the challenged agreements
               are exclusive or *de facto* exclusive. ...........................................................14

          2.   Plaintiffs misinterpret the role of foreclosure, which is a screen
               applied prior to assessing substantial anticompetitive effects. ..................16

          3.   Plaintiffs erroneously conflate coverage with foreclosure instead of
               evaluating it in relation to an economically valid but-for world. .............16

          4.   Lawful conduct cannot be aggregated in determining whether
               Plaintiffs have shown substantial foreclosure. ...........................................18

     D.   Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from
          the Browser Agreements. .....................................................................................19

     E.   Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from
          the Android Agreements. .....................................................................................21

     F.   Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from
          an Alleged Deprivation of Scale. .........................................................................22

     G.   Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from
          Purportedly Diminished Investment Incentives or Alleged Harm to Search
          Users or Advertisers. ...........................................................................................23

     H.   Plaintiffs Misinterpret the Procompetitive Benefits of the Challenged
          Agreements and Fail to Meet Their Burden under Section Two. ..........................25

     I.   Plaintiffs Have Not Rebutted the Justifications for the Browser
          Agreements. .........................................................................................................27

i

J.     Plaintiffs Have Not Rebutted the Justifications for the Android Agreements. ........................................................................30

K.    Google's SA360 Conduct Is Not a Basis for Liability under Section Two. ..........32

IV.    PLAINTIFFS' REQUEST FOR SANCTIONS SHOULD BE DENIED..........................35

## <u>TABLE OF AUTHORITIES</u>

### CASES

*A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239 (S.D.N.Y. 2004) ................................33

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) ........................................................................................................................................26

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325 (7th Cir. 1986)................................10

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983)........................... *passim*

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).....................................23

*Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003)..............................5

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ..........................................................................................................................................8

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................................3, 5

*Chase Mfg. v. Johns Mansville Corp.*, 84 F.4th 1157 (10th Cir. 2023).........................................14

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977).................................................26

*Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451 (1992) ..........................................27

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), *overruled on other grounds by Chroma Lighting v. GTE Prods.*, 111 F.3d 653 (9th Cir. 1997)................. ................................................................................................................................10, 11, 23

*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006)..........................................................6

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)..................................................................11

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)..................................5

*Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004)............4

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)..............................................................5

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ................... .....................................................................................................................................11, 27, 28, 29

*In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005)........................25

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698 (7th Cir. 1984) ........................19

*Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006)..........................24

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)..........................................................34

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ...........................................................17, 18

*NCAA v. Alston*, 594 U.S. 69 (2021)....................................................................................25, 30

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ..........................................32, 34

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ............................................33, 34

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ....................................................8, 20, 21

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)........................................33

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ...............18, 20, 35

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42 (7th Cir. 1996)...........................28

*Parsons v. Bright House Networks, LLC*, 2010 WL 5094258 (N.D. Ala. Feb. 23, 2010) ...........33

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) .............................6

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)........................................10, 17

*Rebel Oil, Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).................................9

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ...................3

*Safeway, Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874 (N.D. Cal. 2011) .........................................33

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999)...................................27

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004)...................................................................................................16

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994)................................................................26

*Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) ......................................7

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) .........................4

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)..............................................9

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) ...................................................3

*United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997)................................................7

*United States v. Google LLC*, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) ...............................1, 18

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ...... *passim*

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999).....................................*passim*

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000)...........................................14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).........32, 34

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)..................................................23

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)...................................................14

## STATUTES AND RULES

Section 1 of the Sherman Act, 15 U.S.C. § 1................................................................33

Section 2 of the Sherman Act, 15 U.S.C. § 2.......................................................... *passim*

## ABBREVIATIONS

| CITATION | CORRESPONDING FILING |
|---|---|
| FOF | Defendant's Proposed Findings of Fact (ECF 828) |
| RFOF | Defendant's Responsive Proposed Findings of Fact (ECF 856) |
| Google Br. | Defendant's Post-Trial Brief (ECF 826) |
| Google COL | Defendant's Proposed Conclusions of Law (ECF 827) |
| DOJ Br. | Plaintiffs' Post-Trial Brief (ECF 820) |
| DOJ COL | Plaintiffs' Proposed Conclusions of Law (ECF 821) |
| DOJ FOF | Plaintiffs' Proposed Findings of Fact (ECF 822) |
| Colorado Br. | Plaintiff States' Post-Trial Brief (ECF 823) |
| Colorado COL | Plaintiff States' Proposed Conclusions of Law (ECF 824) |
| Colorado FOF | Plaintiff States' Proposed Findings of Fact (ECF 825) |

After years of litigation and a ten-week trial, Plaintiffs failed to prove each of their claims. Confronted with the evidence, their post-trial submissions cast aside both settled law and their original allegations and attempt to replace them with novel theories that are equally unsupported by the record and would turn the Sherman Act on its head.

Plaintiffs' Complaints were based on allegations that Google's browser and Android agreements are exclusive or *de facto* exclusive deals. The Complaints collectively used a variation of the term "exclusive" more than 20 times, and the Court's summary judgment opinion evaluated each of the challenged agreements under the established exclusive-dealing framework. *United States v. Google LLC*, 2023 WL 4999901, at *14-20 (D.D.C. Aug. 4, 2023). Plaintiffs hewed to this framework at trial, where their expert economists attempted to analyze the agreements consistent with the exclusive-dealing paradigm. Tr. 5711:24-5712:13 (Whinston), 7018:3-21 (Baker). In their post-trial submissions, however, Plaintiffs for the first time contend that the exclusive-dealing requirements set forth in antitrust jurisprudence are "too narrow for this action" and urge the Court to "undertake a flexible, case-specific inquiry." DOJ COL at 13. That is because Plaintiffs cannot satisfy the applicable legal standard. The challenged agreements are not exclusive or *de facto* exclusive and do not harm competition because they do not foreclose competition in a substantial share of the alleged markets. But even under Plaintiffs' legally unsupported approach, their claims fail. No precedent condemns the agreements at issue, which reflect decisions by browser developers, Android OEMs, and wireless carriers to set the highest-quality search engine as the default in their browsers or preinstall it on their devices based on a determination of what is best for their customers.

Plaintiffs' dramatic post-trial shift is perhaps most apparent in their contention that Google's agreement with Apple unlawfully deters Apple from entering the alleged markets.

Notwithstanding a lengthy pre-litigation investigation, the theory that Apple has been unlawfully deterred from developing a general search engine by Google competing to be the Safari default appears nowhere in Plaintiffs' Complaints. And despite an extensive discovery process, there is no mention of the theory in Plaintiffs' interrogatory responses. ECF 432-6. Plaintiffs' theory is as radical as it is novel: barred from obtaining the best search service at the best price, Apple would be forced to operate its own general search engine and search advertising business, even though there is no evidence that Apple could or ever wanted to develop a search engine or search advertising platform (much less one that was better than Google's). And Plaintiffs nowhere explain how Google could possibly know that it was prohibited from continuing to compete to provide the default search engine for Safari because, according to Plaintiffs, Apple's driving of the best bargain might deter Apple from building its own search engine. Nor do Plaintiffs explain why Microsoft, or any other search provider, offering a revenue share to be the default on the Safari browser would not, according to Plaintiffs' unorthodox theory, have the same effect of deterring Apple from entering the market. Plaintiffs' attack on a commonplace "build or buy" choice has no precedent in antitrust law and violates due process, as it would be impossible for any firm to know whether the terms another party bargained for would deter its entry.

Plaintiffs' last-minute reshuffling is part of an unprecedented effort to overturn competitive *processes* to impose particular *outcomes,* defying the bedrock principle that the Sherman Act protects competition, not competitors. *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc). Plaintiffs seek to restrain Google from competing as its rivals do and as Google has since long before Plaintiffs identified any purported harm to competition in the hope of inducing consumers to use a lower-quality search engine and compelling non-parties to take actions they testified are not in the best interest of their users. To reach that outcome,

Plaintiffs seek to condemn the use of lawfully acquired scale to deliver a higher-quality, more-efficient service. Protecting competitors from competition is all the more inappropriate given that Plaintiffs rely on superficial evidence of the role of scale while disregarding empirical events and a rigorous experiment. Finally, while Colorado Plaintiffs' SA360 claim fails for its own reasons, they too ask the Court to take an unprecedented step by mandating that Google build all features requested by a competitor (Microsoft) and do so on the competitor's stated timeline.

## I.     PLAINTIFFS HAVE NOT PROVEN THE EXISTENCE OF THEIR ALLEGED RELEVANT ANTITRUST PRODUCT MARKETS.

### A.     General Search Services Is Not a Relevant Antitrust Market.

1.     Although Plaintiffs' market-definition arguments focus on the "practical indicia" described in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), they concede that the pertinent question is whether products they exclude from the alleged markets are "reasonably interchangeable" with the products they include. DOJ Br. at 10; *see Microsoft*, 253 F.3d at 52; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986).

2.     As Colorado Plaintiffs acknowledge, "the 'actual behavior' of customers" is central to determining reasonable interchangeability. Colorado COL ¶ 9. Plaintiffs' user-side market definition is fatally flawed because the actual behavior of customers shows they readily choose between a general search engine (GSE) and services outside Plaintiffs' alleged markets—such as specialized vertical providers (SVPs) and social media platforms—on a query-by-query or category-by-category basis. FOF ¶¶ 637-66, 680-94, 920-87; RFOF ¶¶ 2-11.

3.     Plaintiffs have not met their burden by referencing the *Cellophane* fallacy. They do not point to a single court disregarding evidence of actual substitution based on that theory, and the case they cite rejected the argument. DOJ COL at 6-7; *see United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995). The evidence demonstrates that SVPs like Amazon

and Expedia attract significant numbers of queries that might otherwise be answered by Google Search because they are strong competitors in their own right, not because Google has made other GSEs poor substitutes or degraded its own quality. FOF ¶¶ 667-760, 946-67, 976-81.

4.      Even the "practical indicia" relied on by Plaintiffs do not support their alleged market for general search services. For example:

a)      Plaintiffs contend that GSEs have "peculiar characteristics and uses" because they answer all types of queries (DOJ Br. at 11), but that is not a basis for defining a relevant market where, as here, customers use whichever website or app can best address each query rather than demanding responses to a cluster of disparate queries in a given visit. *Green Country Food Market, Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004).

b)      Plaintiffs contend that GSEs use "unique production facilities" because they crawl and index the web (DOJ Br. at 12), but they ignore the ways in which GSEs also source data and build features in competition with SVPs. FOF ¶¶ 637-51, 680-760; RFOF ¶¶ 6-7. That Google also answers many other types of queries is not sufficient to define a valid antitrust market. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374, 1377 (9th Cir. 1989).

c)      With respect to "industry recognition" (DOJ Br. at 12-13), the record is replete with evidence of Google Search recognizing SVPs and apps such as TikTok as principal competitors and improving Google Search to meet that competition; those companies similarly view Google Search as a principal competitor. FOF ¶¶ 682-94, 930-36, 945-81; RFOF ¶¶ 10-15. Plaintiffs' reference to the views of "browser companies" is inapposite because Plaintiffs admit that their user-side market must be assessed "from a user's perspective." DOJ Br. at 12-13.

d)       Plaintiffs' "public recognition" arguments depend on unsubstantiated assertions that GSEs save "time and mental effort" (DOJ Br. at 13), while the evidence shows that

4

consumers routinely switch between websites and apps, and use Amazon for a shopping search or Yelp for a local query about as often as they start with Google. FOF ¶¶ 930-65, 982-87.

e)      The "practical indicia" that Plaintiffs do not address—such as "distinct customers" and "distinct prices," *Brown Shoe*, 370 U.S. at 525—further undermine their alleged market, as Google and its chief competitors compete for the same consumers and attract them by offering the ability to search for free. FOF ¶¶ 946-66, 973-80.

5.      Plaintiffs do not move the needle by arguing that Google's revenue has increased alongside its competitors' or that consumers who use certain competing services such as Amazon or Facebook may also use Google. DOJ Br. at 14-15. The evidence reflects extraordinary output growth among GSEs, SVPs, and social media platforms, with each vying for a rapidly growing number of user queries. FOF ¶¶ 667-79, 971-77, 1084. When, as here, Google's quality is continually increasing as well, Google's growth does not indicate whether customers would be unable or unwilling "to substitute away from one product to another in response to a price increase or a corresponding non-price change such as reduction in product quality or service." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018).

**B.      Search Advertising, General Search Advertising, and General Search Text Advertising Are Not Relevant Antitrust Markets.**

6.      Plaintiffs' asserted ads-side markets ignore how advertisers actually use ads to achieve their objectives. FOF ¶¶ 1001-78; RFOF ¶¶ 17-21. These shortcomings illustrate why "many courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018); *see Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 583 (4th Cir. 2003).

7.      Plaintiffs' reliance on "practical indicia" does not support their asserted market for search advertising. For example:

a)     Plaintiffs' evidence of "peculiar uses and characteristics" depends on an archaic view of the "marketing funnel" (DOJ Br. at 17) that is at odds with advertisers' objectives and practices, and Plaintiffs fail to account for the practical realities of how ad formats outside the alleged relevant markets—such as social media ads—use powerful signals of consumer interest to accomplish the same objectives as search ads. FOF ¶¶ 1018-40, 1065-78; RFOF ¶ 19.

b)     Plaintiffs' assertions regarding "unique production facilities" (DOJ Br. at 18) overlook important similarities, including that ad types erroneously excluded from their alleged markets often are sold in real time through an auction in order to appeal to a particular user's previously expressed interests. FOF ¶¶ 1009-15, 1025-40; RFOF ¶ 19.

c)     Plaintiffs' argument regarding "distinct prices and sensitivity to price change" (DOJ Br. at 18) elevates superficial distinctions and ignores that advertisers respond to changes in their return on investment across ad types. FOF ¶¶ 999-1015, 1045-64; RFOF ¶¶ 18-21.

d)     The evidence reflects recognition within Google and across the industry that search ads compete with other digital ad types, and even within Plaintiffs' flawed funnel construct, search ads frequently are grouped by advertisers with social and display ads because they are "roughly equivalent to another for the use to which [they are] put" and therefore should not be excluded from a properly defined market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997); *see* FOF ¶¶ 1018-35, 1070-78.

8.     Plaintiffs' contention that the return on investment of ads can be "costly and difficult to calculate" (DOJ Br. at 22) fails because evidence shows advertisers routinely performing such analyses in deciding how to allocate their ad spend. FOF ¶¶ 1001-09. And the assertion that "there is little advertiser substitution in response to Text Ad increases" (DOJ Br. at 22) improperly ignores quality-adjusted prices. FOF ¶¶ 1131-43; *see Freeland v. AT&T Corp.*,

238 F.R.D. 130, 149 (S.D.N.Y. 2006) ("An analysis of price change in a product must account for changes in the product over time 'so that only real price changes will be measured.'").

9.      These shortcomings also undermine Plaintiffs' alleged market for general search text ads. It is immaterial that some advertisers do not buy product listing ads (PLAs) from Google because the evidence shows they would respond to a quality-adjusted price increase by buying ads elsewhere, including on social media sites and the open web. FOF ¶¶ 1045-64; RFOF ¶¶ 18-19. In any event, Plaintiffs cannot place actual substitutes in different markets even if they had proven that some advertisers would not respond, or would not respond in the same way, to a hypothetical price increase. *United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997); *see Telecor Commc'ns v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002).

10.     Furthermore, the evidence shows that advertisers who purchase both text ads and PLAs shift their spend between those ad types based on relative performance. FOF ¶¶ 1060-63. This confirms that Plaintiffs' "practical indicia" argument fails because the purported distinctions between ad types do not deter advertisers from responding to quality-adjusted price changes.

11.     Colorado Plaintiffs' asserted market for general search advertising fails because it relies on the same flawed arguments to exclude social media and display ads. Colorado Br. at 8. Colorado Plaintiffs also exclude search ads sold by SVPs because "GSE users are more likely to be in a research or consideration mindset" and "often have not yet decided whether to purchase a product" (*id.* at 10), which contradicts Plaintiffs' unsubstantiated assertion that *all* search ads are distinctive due to "a high likelihood that the user has actual real-time interest in buying" a product. DOJ Br. at 17. Social media ads, moreover, are likewise used to target undecided consumers, yet placed outside Colorado Plaintiffs' infirm market. FOF ¶¶ 1025-40, 1070-78.

II.     **PLAINTIFFS HAVE NOT DEMONSTRATED THAT GOOGLE POSSESSES MONOPOLY POWER IN ANY RELEVANT MARKET.**

   A.     **Plaintiffs Have Not Established Monopoly Power Directly.**

   12.     It is undisputed that output has not been restricted in any of Plaintiffs' alleged markets, but rather has expanded dramatically. FOF ¶¶ 1084, 1125. Because there is no evidence of an output restriction, Plaintiffs have not established directly that Google possesses monopoly power. *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018).

   13.     Although lack of proof of power to control output is dispositive, Plaintiffs' other assertions also do not provide direct evidence of monopoly power. With respect to the alleged market for general search services, the "ordinary-course experiments" Plaintiffs reference (DOJ Br. at 28) in fact demonstrate the *absence* of monopoly power, because search queries decline meaningfully if a particular aspect of search quality degrades temporarily, even without accounting for the ever-improving quality of other aspects of Google Search. RFOF ¶¶ 16, 31-34. Plaintiffs' ads-side pricing evidence (DOJ Br. at 28) cannot show monopoly power because it fails to account for quality improvements, and the evidence shows that the quality-adjusted price of Google search ads has decreased, not increased. FOF ¶¶ 1131-43; RFOF ¶¶ 38-40.

   14.     Plaintiffs' assertion that Google's "search and related advertising business" has experienced "high operating profit margins" would not support a finding of monopoly power even if they had also proved the necessary restriction on output. DOJ Br. at 27. "[N]ot only do measured rates of return reflect accounting conventions more than they do real profits (or losses) … but there is not even a good economic theory that associates monopoly power with a high rate of return" because "competitive firms may be highly profitable merely by virtue of having low costs as a result of superior efficiency." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995). Tellingly, Plaintiffs' economic experts did not

opine that monopoly power should be inferred from the referenced margins, and DOJ did not call its accounting expert, whose flawed opinion was subject to a *Daubert* motion. ECF 416.

### B.   Plaintiffs Have Not Established Monopoly Power Indirectly.

15.   Plaintiffs also have not established monopoly power through indirect evidence, as they failed to show "significant" barriers to entry. *United States v. Baker Hughes Inc.*, 908 F.2d 981, 987-88 (D.C. Cir. 1990). The examples Plaintiffs cite (DuckDuckGo and Neeva) show that the barriers to attracting millions of general search users and building a valuable business are far lower than they contend. DOJ Br. at 25-26; *see* FOF ¶¶ 542-54, 563-64, 605-31; RFOF ¶¶ 25-29. And unlike cases where entry barriers consist of "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," *Rebel Oil, Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995), the financial resources and user-interaction data involved in entering the alleged markets have been declining rapidly for years due to ongoing advancements in modern machine learning and cloud computing. FOF ¶¶ 253-406, 524-53, 605-31, 1083.

16.   With respect to the alleged search advertising market specifically, Plaintiffs have not established significant barriers to entry because they admit that SVPs, which routinely enter and thrive, do not encounter the barriers alleged by Plaintiffs. DOJ Br. at 12 (arguing that GSEs, but not SVPs, purportedly require "technology and engineers" that "cost billions of dollars each year"); *see* FOF ¶¶ 653-79, 997.

## III.   GOOGLE HAS NOT ENGAGED IN EXCLUSIONARY CONDUCT THAT COMPRISES THE WILLFUL MAINTENANCE OF MONOPOLY POWER.

### A.   Plaintiffs Misinterpret and Misapply the Section Two Framework.

17.   Plaintiffs bear the burden of demonstrating that each form of challenged conduct has a "substantial" anticompetitive effect in the alleged relevant markets in relation to an economically valid but-for world without the conduct at issue. *Microsoft*, 253 F.3d at 58, 62; *see*

*Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008); Tr. 5779:18-5780:3 (Whinston) ("When I get to anticompetitive effects, I am thinking about but-for worlds.").

18.     Plaintiffs have not made the requisite *prima facie* showing merely by identifying purported detrimental effects on existing or "nascent" competitors. *Microsoft*, 253 F.3d at 58; *see* DOJ COL at 11-13. The *Microsoft* court deemed specific conduct exclusionary only after determining that "Microsoft's conduct, *through something other than competition on the merits*, has the effect of significantly reducing usage of rivals' products and hence protecting its own operating system monopoly." 253 F.3d at 65 (emphasis added); *id.* at 58, 62.

19.     Purportedly "foreclosing rivals and potential rivals from the most important distribution channels" and "depriving rivals of scale" (DOJ COL at 13) cannot alone constitute exclusionary conduct because competition on the merits produces those outcomes. After all, "[c]ompetition is a ruthless process," and many "injuries to rivals are byproducts of vigorous competition." *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1338 (7th Cir. 1986).

20.     "A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) (overruled on other grounds by *Chroma Lighting v. GTE Prods.*, 111 F.3d 653 (9th Cir. 1997)). Accordingly, courts have upheld conduct under Section 2 that had the purported effects Plaintiffs ascribe to the challenged agreements, including:

a)     Paying IAPs to promote Microsoft's IE browser, even though "IAPs constituted one of the two major channels by which browsers can be distributed," *Microsoft*, 253 F.3d at 70, a browser "must have a critical mass of users in order to attract software developers," *id.* at 60, and the payments contributed to a "surge" in IE usage, *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 70-71 (D.D.C. 1999); *see Microsoft*, 253 F.3d at 67-68.

b)      Entering agreements that required the largest buyer in the market to "take nearly all" of its requirements for a particular input from an alleged monopolist, even though such agreements "might discourage sellers from entering, or seeking to sell in, a market at all, thereby reducing the amount of competition that would otherwise be available." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 228, 236 (1st Cir. 1983).

c)      "Demand[ing] exclusive or preferred formulary placement," even though that same placement would have otherwise been available to a rival and it influenced customers' purchasing decisions, as indicated by the defendant's share having "dropped from an average of 94% … to about 12%" when it was removed from a particular formulary. *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 970, 979, 1006 (10th Cir. 2022).

d)      Taking advantage of superior scale, including by "improving … efficiency in manufacturing or marketing, even though the effect of doing so will be to maintain or improve [the monopolist's] sales." *Foremost Pro Color*, 703 F.2d at 545.

e)      "[E]xercis[ing] market dominance in the [relevant] markets for many years" through "business practices [that] have played a powerful and disruptive role in those markets," even though that entailed "act[ing] with sharp elbows—as businesses often do." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020).

21.      Plaintiffs further misstate their burden by asserting that the "evidence need only show that the conduct 'reasonably appear[s] capable of making a significant contribution to … maintaining monopoly power.'" DOJ COL at 11 (quoting *Microsoft*, 253 F.3d at 79). The quoted language has no bearing on Plaintiffs' burden to "demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58. Plaintiffs erroneously rely on a separate section of *Microsoft*, which considered conduct the court had *already*

condemned as exclusionary after applying the applicable framework, *id.* at 58-59, and addressed a distinct question not at issue here—how plaintiffs can establish "a causal link between Microsoft's anticompetitive conduct, in particular its foreclosure of Netscape's and Java's distribution channels, and the maintenance of Microsoft's operating system monopoly." *Id.* at 78.

### B. Plaintiffs' Abandonment of the Exclusive Dealing Doctrine Does Not Lessen Their Section Two Burden.

22. Each of the browser and Android agreements must be evaluated under the exclusive-dealing framework, which requires Plaintiffs to show that the challenged terms are exclusive or *de facto* exclusive. Plaintiffs must show not only exclusive dealing, but also substantial foreclosure *and* how that foreclosure substantially harms competition. *Id.* at 69-71.

23. Plaintiffs' contention that the exclusive-dealing framework is "too narrow for this action" or "the wrong tool to properly weigh or assess [the alleged] harms" (DOJ COL at 13-14) is not only contrary to how they pleaded and presented their case, but also unsupported by the law. Courts apply the exclusive-dealing framework to agreements whenever Plaintiffs allege that their terms wholly or largely prohibit partners from dealing with competitors and thereby purportedly harm competition. *Microsoft*, 253 F.3d at 68, 72, 73 (applying exclusive-dealing framework to agreements with IAPs that required exclusive promotion of IE and for IAPs to keep shipments of software using Navigator under a specific percentage, agreements with ISVs that the court characterized as "exclusive agreements" due to their onerous conditions, and an agreement requiring Apple to discontinue preloading Navigator and instead preload IE); *Barry Wright*, 724 F.2d at 237 (applying exclusive-dealing framework to partial requirements contract). That is how Plaintiffs have characterized the agreements throughout, and even now they contend that "Google has illegally maintained [monopoly] power by signing distributors to *exclusive contracts*" that "depriv[e] … rivals of scale" and "stop[]" entry. DOJ Br. at 9 (emphasis added).

12

24. That *Microsoft* "did not apply an exclusive-dealing standard" to "licenses between Microsoft and OEMs" (DOJ COL at 14-15) ignores how those agreements involved conduct and circumstances wholly absent in this case.

a) Microsoft's Windows licensing agreements with OEMs that were condemned by the court included product design limitations and other restrictions on OEMs' ability to design the user interface of their computers, as well as restrictions on how licensees could configure Microsoft's Windows products once licensed, that plainly harmed competition and lacked any legitimate justification. 253 F.3d at 60-61, 64-65. That *Microsoft* declined to apply the exclusive-dealing framework to such agreements, which differ from agreements that Plaintiffs themselves allege are exclusive or *de facto* exclusive, is unremarkable.

b) Two further aspects of Microsoft's OEM license restrictions are absent here. *First*, the license agreements plainly had a significant effect, obviating the purpose of any foreclosure screen. The agreements caused OEMs to cease preloading and promoting Navigator, actions that OEMs previously engaged in because "shortly after its release, consumers were already using Navigator far more than any other browser product." 84 F. Supp. 2d at 29; *see* 253 F.3d at 47. Numerous OEMs—which "pay particularly close attention to consumer demand"— wanted to preinstall Navigator, and it "enjoyed a substantial and growing presence on the desktop of new PCs" until Microsoft's restrictions "caused the number of OEMs offering Navigator, and the number of PCs on which they offer it, to decline dramatically … to an exiguous fraction of what it had been." 84 F. Supp. 2d at 24, 67-69; *see* 253 F.3d at 60-62. The restrictions thus deprived OEMs of the best browser, which "enjoy[ed] dramatic acceptance by the public." 84 F. Supp. 2d at 29; *see* 253 F.3d at 47. In this case, by contrast, the counterparties to the agreements testified that they set Google as the default in their browsers or preinstall it on

their devices because they believe doing so is in the best interest of their customers. FOF ¶¶ 1277-79, 1375-81, 1508-58.

c)      *Second*, the *Microsoft* court also found that "OEMs felt compelled by Microsoft's actions to reduce drastically their distribution and promotion of Navigator." *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 39 (D.D.C. 2000). OEMs were "dependent on Microsoft for Windows" and leading OEMs "needed to do what was necessary to restore its special relationship with Microsoft" so they "stopped pre-installing Navigator." 84 F. Supp. 2d at 36, 67. There is no comparable evidence of coercion here. Counterparties can and do promote rivals without facing retaliation, as evidenced by Mozilla's ability to switch the Firefox default to Yahoo without reprisal and then later switch back to Google. FOF ¶¶ 1365-77.

25.      The other cited case where a court "declined to apply 'an exclusive-dealing framework'" (DOJ COL at 15) involved a defendant "threatening to refuse to supply distributors with" its product, which is not at issue here, and found the exclusive-dealing cases supported the outcome. *Chase Mfg. v. Johns Mansville Corp.*, 84 F.4th 1157, 1166, 1170-75 (10th Cir. 2023).

26.      Even if the Court accepted Plaintiffs' post-trial reframing of their case and declined to apply the exclusive-dealing framework, Plaintiffs still need to prove that the challenged conduct "indeed has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59, 70-71. As shown in Sections III.D-G *infra*, they have failed to do so.

**C.      Plaintiffs Misinterpret and Misapply the Exclusive Dealing Framework.**

**1.      Plaintiffs have failed to establish that the challenged agreements are exclusive or *de facto* exclusive.**

27.      Plaintiffs have not established that any of the challenged agreements (*i.e.*, the browser agreements, MADAs, or RSAs) are exclusive or *de facto* exclusive, which is a threshold requirement of their claims. *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012).

28.     Plaintiffs' assertion that *Microsoft* "determined that agreements establishing Microsoft's products as the 'default' were exclusive" (DOJ COL at 17) misses that Microsoft's IAP and JVM agreements are inapposite here:

a)      Microsoft's IAP agreements imposed a cap, requiring that a counterparty such as AOL "not promote any non-Microsoft browser" and "not supply more than 15% of its *subscribers* with a browser other than IE" in response to subscriber requests. 253 F.3d at 68 (emphasis added). Here, the challenged agreements do not cap the search traffic available to rivals, or bar partners from enabling users to obtain a different search engine or browser, and a significant percentage of users in fact search outside of default access points, including on Apple iPhones, Windows PCs, and mobile devices with a non-Google default. FOF ¶¶ 47-52, 777-88, 847-59, 1401-14; RFOF ¶¶ 65, 86-91. Plaintiffs' reference to other cases involving "provisions [that] are only 'partially' exclusive" is inapposite for the same reason. DOJ COL at 18.

b)      Microsoft's JVM agreements required "that the ISVs use Microsoft's 'HTML Help,' which is accessible only with Internet Explorer," so that "the most popular Web-centric applications w[ould] rely on browsing technologies found only in Windows." 253 F.3d at 71-72. The agreements at issue lack any such technological restriction on dealings with rivals; entering a deal with Google does not bar a partner from later deciding to set a rival search engine as the default (as Mozilla did with Yahoo) or an Android OEM or carrier preinstalling a rival browser or search app on its devices (as Microsoft does with the Surface Duo). FOF ¶¶ 1361-76, 1570-73.

29.     Plaintiffs' unsupported claim that "courts properly elevate substance over form by examining an agreement's effect based on the market realities" in determining whether its terms are exclusive (DOJ COL at 17) reinforces Google's point. In this case, the terms are neither exclusive nor *de facto* exclusive; evidence shows that rivals can compete for the default, against

the default, or both; and "market realities" also show that users readily disregard the default when it is not set to their preferred search engine. FOF ¶¶ 1384-1414; RFOF ¶¶ 91-99.

> **2.    Plaintiffs misinterpret the role of foreclosure, which is a screen applied prior to assessing substantial anticompetitive effects.**

30.    Plaintiffs err in asserting that "exclusivity and substantial foreclosure are the only elements of a prima facie case of exclusive dealing." DOJ COL at 16 n.2, 19-20. The role of the substantial foreclosure requirement is "to screen *out*" cases where exclusive dealing "clearly cannot have the requisite harmful effect upon competition." *Microsoft*, 253 F.3d at 69 (emphasis added); *see id.* (explaining that "the requirement of a significant degree of foreclosure serves a useful screening function" because "exclusivity provisions in contracts may serve many useful purposes"); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("[W]hile low numbers make dismissal easy, high numbers do not automatically condemn, but only encourage closer scrutiny."). The *Microsoft* court applied the substantial-foreclosure screen and *then* considered whether and how the foreclosure indeed translated into the requisite anticompetitive effects on the market. *Microsoft*, 253 F.3d at 70-71.

> **3.    Plaintiffs erroneously conflate coverage with foreclosure instead of evaluating it in relation to an economically valid but-for world.**

31.    Plaintiffs admit that "[f]oreclosure is measured by looking at the percentage of the market that is 'tied up' by the exclusive-dealing contract" (DOJ COL at 20), but here that is *not* synonymous with "the percentage of the market covered" by the challenged agreements. *Id.* at 19. Unlike exclusive dealing—where the agreement's terms preclude a customer from accessing a rival's product from the distributor—the challenged agreements unquestionably do not "tie up" all queries that flow through an access point, and consumers can access rival search engines through the browser or Android device at issue. FOF ¶¶ 1401-14, 1587-97; RFOF ¶¶ 82-112.

32.     While Plaintiffs urge the Court to reject "rigid test[s]" and consider "market realities" (DOJ COL at 20), their approach actually ignores reality. If coverage equaled foreclosure in this case, then Microsoft would have "tied up" every general search query entered on a Windows PC today—and a majority of *all* U.S. general search queries as recently as the early 2010s—even though it receives less than a quarter of those queries. FOF ¶¶ 47-52, 770, 824-31. Coverage is not a cognizable measure of foreclosure where rivals can compete for and against the default (as is the case here) or where the evidence shows that only a fraction of the covered volume is actually "tied up" by the challenged agreement (which is also true here).

33.     Plaintiffs compound their error by arguing that the Court need not "measure foreclosure relative to a but-for world." DOJ COL at 22. Anticompetitive effects must be examined relative to an economically valid but-for world, and Plaintiffs offer no sound explanation for why foreclosure—which is a starting point for assessing anticompetitive effects—warrants an exception. Tr. 6085:15-19 (Whinston); *see Rambus*, 522 F.3d at 466-67 ("[I]f [a third party], in the world that would have existed but for Rambus's deception, would have standardized the very same technologies, Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws."); *McWane, Inc. v. FTC*, 783 F.3d 814, 838 (11th Cir. 2015) (describing exclusive dealing cases where the "targeted rival" gained less market share "than it likely would have *absent the conduct*" (emphasis added)).

34.     Plaintiffs are incorrect that "*Microsoft* anticipated and rejected Google's foreclosure argument." DOJ COL at 22. Plaintiffs wrongly invoke *Microsoft*'s causation analysis (253 F.3d at 79)—an issue that arises *after* determining that conduct harms competition and is not presented here. *Microsoft*'s competitive harm analysis points decisively the other way because the court analyzed how Microsoft's conduct *actually* shifted shares. For example, "after

17

Microsoft began its campaign to protect the applications barrier to entry … Navigator's share fell from above eighty percent in January 1996 to fifty-five percent in November 1997," while "Internet Explorer's share rose from around five percent to thirty-six percent over the same period." 84 F. Supp. 2d at 98-99. In a failure that is fatal to their case, Plaintiffs did not present any comparable evidence, and instead instructed their experts not even to opine on the periods before 2014 and 2016, respectively. Tr. 6092:6-6093:7 (Whinston), 7223:21-7224:10 (Baker).

35.     Plaintiffs' contention that foreclosure should not focus "on speculative calculations" (DOJ COL at 22) confirms the absence of any valid analysis of how rivals would fare "absent the conduct." *McWane*, 783 F.3d at 838. It also cannot rescue Plaintiffs' flawed reliance on theoretical alternatives that do not reflect competitive outcomes (such as unconditional revenue share payments and most-favored supplier arrangements) or inapposite "thought experiments" (such as those used as inputs to Professor Whinston's "Super Duck" hypothetical). In any event, empirical events demonstrate the absence of substantial foreclosure even under Plaintiffs' "parity" hypothetical. FOF ¶¶ 793-823, 1426-32; RFOF ¶¶ 83, 100.

### 4.     Lawful conduct cannot be aggregated in determining whether Plaintiffs have shown substantial foreclosure.

36.     Plaintiffs cannot satisfy the substantial foreclosure requirement by aggregating market share gained from conduct that either was never alleged to be exclusionary or that the Court does not condemn as exclusionary. *Google*, 2023 WL 4999901, at *12-14. The portion of *Microsoft* cited by Plaintiffs (DOJ COL at 26-27) involved consideration of the effect of forms of conduct that were each found to be exclusionary. 253 F.3d at 72; *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) ("Two wrong claims do not make one that is right.").

37.     The percentage of queries entered through user-downloaded versions of the Chrome browser (*e.g.*, on Apple and Windows devices) has no bearing on the analysis because

the ability of users to download Chrome does not foreclose competition in any respect. Plaintiffs have never alleged that Google's successful development of Chrome is anticompetitive, and they are incorrect in asserting that "user downloaded Chrome queries are still unavailable to rivals." DOJ COL at 25. Consumers *chose* to download and use Chrome *over* pre-installed alternatives, and users can change the default search engine in Chrome. FOF ¶¶ 914-19; RFOF ¶ 110.

> **D.** **Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from the Browser Agreements.**

38. Plaintiffs' claims regarding the browser agreements would fail even if those agreements were evaluated outside of the exclusive-dealing framework, or even if they could properly be characterized as exclusive or *de facto* exclusive deals.

39. Plaintiffs have not demonstrated the requisite anticompetitive effect through their last-minute assertion that "Google's payments to Apple incentivize Apple to not enter the relevant markets." DOJ Br. at 33. Plaintiffs did not advance this theory in their Complaints or disclose it in their discovery responses. *See* Introduction *supra*. And for good reason, as it is unsupported by the law and contradicted by the evidence.

40. It is not exclusionary for a firm to purchase an input for its product on attractive terms rather than build the product itself, even if that firm purportedly has the technical ability and financial resources to build the product. "Firms constantly face 'make-or-buy' decisions—that is, decisions whether to purchase a good or service in the market or to produce it internally—and ordinarily the decision, whichever way it goes, raises no antitrust question." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984). The evidence shows that Apple does not believe it would be in the best interest of its company and customers to operate a GSE, and there is no evidence that Apple could operate a GSE that provides a better user experience than Google such that Apple users would be better off. FOF ¶¶ 1293-1303;

RFOF ¶¶ 166-69. Plaintiffs cite no instance of a court finding harm to competition from a "make-or-buy" decision, let alone when a firm such as Apple rationally concludes that it is better off allocating its resources to areas other than vertically integrating into the alleged markets.

41. Plaintiffs' argument that Apple has explored a range of alternatives—including building or acquiring a GSE—but nevertheless decided to set Google as the default in Safari further confirms that the agreement does not impair competition. DOJ Br. at 33-34; *see Barry Wright*, 724 F.2d at 228-29, 237-38 (refusing to condemn an agreement where a buyer "agreed to take nearly all its … requirements from" an alleged monopolist even though the buyer recently had sought "to develop a new source of supply" because if the buyer believed the agreements "significantly interfered with new entry, or inhibited the development of a new source of supply, it is difficult to understand why it would have sought the agreements").

42. The theory that the ISA unlawfully deters Apple from operating a GSE also fails because, according to Plaintiffs, the incremental revenue Google receives from the agreement has always exceeded its payments to Apple. DOJ Br. at 28. Offering above-cost pricing is not predatory as a matter of law, *linkLine*, 555 U.S. at 451, and "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price." *Microsoft*, 253 F.3d. at 68.

43. Plaintiffs' new contention that "the ISA restricts Apple's ability to grow its Suggestions product" (DOJ Br. at 33) was not disclosed before trial and is inadmissible. In any event, Plaintiffs admit that Suggestions is "not a general search engine," and the evidence does not support the assertion that it "one day could become a reasonable substitute." DOJ Br. at 33; *see* RFOF ¶¶ 170-72. The argument therefore does not contribute to Plaintiffs' failed attempt "to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*." *Am. Express*, 585 U.S. at 541 (emphasis added).

44.     Plaintiffs' assertion regarding the "right-of-first refusal to show ads" in Apple's Spotlight feature is also baseless. DOJ Br. at 34. The evidence does not show that Apple wants to "build[] its own Search Ads ability" to show ads in Spotlight (*id.*), let alone that it was dissuaded from doing so by a provision that has never been invoked. RFOF ¶¶ 173-75. And Plaintiffs have not even attempted to demonstrate that this provision has a "substantial" anticompetitive effect in the rapidly growing alleged market for search advertising. *Microsoft*, 253 F.3d at 62.

**E.     Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from the Android Agreements.**

45.     Plaintiffs' claims regarding the MADAs and Android RSAs likewise would fail even if those agreements were evaluated outside of the exclusive-dealing framework, or even if one or both could properly be characterized as exclusive or *de facto* exclusive deals.

46.     Plaintiffs have not demonstrated substantial foreclosure from MADAs or RSAs, let alone how such foreclosure translates into competitive harm inflicted on GSE rivals. Plaintiffs identify no substantial foreclosure relative to a valid but-for world. Even under their parity but-for world foreclosure is trivial (FOF ¶¶ 1426-32), and Plaintiffs fail to show any substantial impact on rivalry for the reasons stated below. *See* Sections III.F-G *infra*. And as Google previously explained, Plaintiffs' Android "coverage" figures do not constitute substantial foreclosure under applicable law. Google COL ¶ 106.

47.     Plaintiffs also have not demonstrated the requisite anticompetitive effect through their contentions regarding Branch's "app-search product." DOJ Br. at 34. The product indisputably is not a GSE, and Branch admittedly never planned or attempted to enter the alleged general search services market—a step Plaintiffs contend would have required substantial investments. FOF ¶¶ 1628-35; *see* DOJ Br. at 24; *Am. Express*, 585 U.S. at 541.

48.     Branch's app-search product is also not analogous to the middleware products in *Microsoft*, which threatened Microsoft's monopoly power because they "could take over some or all of Windows's valuable platform functions" and thereby "erode the applications barrier to entry" that protected Microsoft's monopoly despite not presently competing in the relevant market. 253 F.3d at 53, 55. No evidence shows that the proliferation of Branch's app-search functionality would have lowered barriers to entry for new or existing GSEs. RFOF ¶¶ 266-68. Plaintiffs cannot tie their deficient Branch assertions to harm in the alleged relevant markets.

49.     Moreover, unlike in *Microsoft*, the evidence in this case reflects that Android OEMs and carriers installed the Branch services they wanted but declined to integrate additional Branch functionality because of quality, privacy, and user-experience concerns, as opposed to purported restrictions in the terms of their RSAs. FOF ¶¶ 1636-84; RFOF ¶¶ 273-82.

**F.     Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from an Alleged Deprivation of Scale.**

50.     Plaintiffs' contention that "Google's conduct has harmed the competitive process by … depriving rivals of the scale necessary to compete" (DOJ Br. at 29) is based on a factual premise that Plaintiffs failed to prove. A wide range of evidence—including, among other things, Microsoft's experience after substantially increasing its scale through its partnership with Yahoo and Professor Fox's data-reduction experiment—demonstrates that a purported lack of user-interaction data does not explain rivals' shortcomings. FOF ¶¶ 253-631; RFOF ¶¶ 137-64.

51.     Even if Plaintiffs' theory were not contrary to the evidence, their assertions about Google's use of data would not reflect harm to competition. "A firm that has lawfully acquired a monopoly position is not barred from taking advantage of scale economies by constructing, for example, a large and efficient factory" because "[t]hese benefits are a consequence of size and

Case 1:20-cv-03010-APM   Document 911   Filed 04/30/24   Page 29 of 42

not an exercise of power over the market." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979); *see Foremost Pro Color*, 703 F.2d at 545.

52.     Plaintiffs do not move the needle by arguing that "Google's defaults provide the company with searches it would not otherwise receive" and thus have "deprived rivals of queries." DOJ Br. at 31-32. Competing to win business that otherwise might go to rivals does not show "conduct which unfairly tends to destroy competition itself." *Microsoft*, 253 F.3d at 58. As an opinion cited by Plaintiffs puts it, "just because a firm has monopoly power doesn't mean that the law should prevent it from competing, as it would be absurd to require the monopolist to hold a price umbrella over less efficient entrants." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (cleaned up). That is all the more apparent here, as Plaintiffs seek to restrain the highest-quality search engine from continuing to compete for long-standing opportunities in the hope that some consumers (perhaps unwittingly) will use an admittedly inferior product.

53.     Finally, Plaintiffs have not even provided evidence of the amount of scale purportedly "necessary to compete effectively" (DOJ Br. at 31), let alone that it might be unlocked in an economically valid but-for world. Plaintiffs have not shown, for example, that rivals' quality or efficiency has improved following the introduction of a search engine choice screen on Android devices in Europe, or that Bing achieved superior quality and efficiency due to the defaults it obtained on early smartphones and through Windows, which was the source of more queries than any other operating system until 2016. FOF ¶¶ 47, 407-56.

### G.     Plaintiffs Have Failed to Show the Requisite Anticompetitive Effects from Purportedly Diminished Investment Incentives or Alleged Harm to Search Users or Advertisers.

54.     Plaintiffs have not demonstrated the requisite anticompetitive effects through their theory that the challenged agreements impermissibly diminish investment incentives or harm

users and advertisers. For one thing, just as with Plaintiffs' failed scale contention, the argument is flawed because competition on the merits may impact investment incentives.

55.     For another, the evidence contradicts Plaintiffs' assertion that "Google settles for 'good enough'" (DOJ Br. at 51), as the record demonstrates an uninterrupted commitment to improving quality. FOF ¶¶ 77-252. Plaintiffs cite anecdotal instances where Google—like any company in a competitive market—grappled with inevitable business judgments and tradeoffs, such as how to continue improving quality while managing latency and offering users an optimal range of privacy settings. DOJ Br. at 51-55. But Plaintiffs offer no baseline for measuring Google's investment incentives, and the evidence shows that Google indisputably has been the highest quality search engine throughout the relevant period and has consistently improved due to unrelenting investment and innovation. FOF ¶¶ 77-252, 1085-1102; RFOF ¶¶ 178-200; *see Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006).

56.     The evidence does not show that other GSEs have increased their investments under alternative circumstances, including in response to the introduction of choice screens, receiving additional scale, or being set as the default. Furthermore, the challenged agreements sharpen incentives by facilitating competition for and against the default. FOF ¶¶ 333-43, 1365-73, 1435-54. Google invests in quality so that it will be chosen for default status or elevated promotion *and* so that it will be chosen by the significant number of users who search outside the access points subject to the challenged agreements—a population that accounts for nearly 40% of queries entered on iOS devices, for example. FOF ¶¶ 221-41, 1266-67, 1413, 1451-52. That Microsoft does not want to invest *unless* it is the default in Safari is the opposite of the approach Google took: investing in Search and its complements with no guarantee of success when the vast majority of queries occurred on Windows devices, where Microsoft search engines and

browsers have long enjoyed overwhelming exclusive preinstallation and default status. FOF ¶¶ 47-52, 824-31, 869-90, 904-19. In any event, the Sherman Act does not condone expropriating opportunities from a company that has competed successfully on quality and price in the hope that inferior competitors will improve through business they could not win on the merits.

57.     Plaintiffs' assertion of harm to advertisers (DOJ Br. at 56-58) depends on an unreliable measure of nominal price that is "essentially worthless" in its failure to account for changes in quality. *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427-28 (S.D.N.Y. 2005); *see* FOF ¶¶ 1131-43. And Plaintiffs' contentions regarding "Google's lack of transparency with advertisers" (DOJ Br. at 57) are unsupported by evidence that other search engines provide materially different information and ignore Google's reasoned balancing of other material considerations, including preserving user privacy. FOF ¶¶ 1199-1219.

### H.     Plaintiffs Misinterpret the Procompetitive Benefits of the Challenged Agreements and Fail to Meet Their Burden under Section Two.

58.     Under the burden-shifting framework described in *Microsoft*, "[i]f the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits," then "[t]he plaintiff bears the burden not only of rebutting a proffered justification but also of demonstrating that the anticompetitive effect of the challenged action outweighs it." *Microsoft*, 253 at 59, 67. It is *Plaintiffs* who must show that Google's asserted benefits are illegitimate or unsubstantiated, outweighed by anticompetitive harm, or "that 'substantially less restrictive alternative rules' existed to achieve the same procompetitive benefits." *NCAA v. Alston*, 594 U.S. 69, 100 (2021); *see Microsoft*, 253 F.3d at 59.

59.     There is no merit to Plaintiffs' contention "that Google's arguments are largely pretextual" (DOJ Br. at 67), which is based in large part on their assertions that Google did not contemporaneously document the stated benefits. *Id.* at 69-75. Although many of the

procompetitive benefits are in fact supported by ordinary-course documents and data, that is not required to render them valid, as the "economic utility" of a restriction is based on sources including "scholarly and judicial authority" and the degree to which it is "widely used in our free market economy." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57-58 (1977). For example, in *Microsoft* the D.C. Circuit credited Microsoft's copyright-based justification for preventing OEMs from automatically substituting a different interface after initial boot-up, 253 F.3d at 63, even though the district court condemned that restriction based on contemporaneous documents indicating it was intended to serve Microsoft's own goals, 84 F. Supp. 2d at 61.

60.     Plaintiffs' assertion that documents indicate "search exclusivity was Google's primary goal in negotiating … with Android partners" (DOJ Br. at 74) does not show pretext because it does not demonstrate that Google entered the challenged agreements to prevent rivals from reaching some unspecified scale threshold or to preclude Apple or Branch from operating a GSE. The universal desire to compete to advance business objectives—often at the expense of rivals seeking the same opportunity—does not render pretextual the resulting procompetitive benefits. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1001 (9th Cir. 2010) (rejecting Section 2 claims where documents showed the defendant sought to "add[] customer value by improving performance" and also "hoped its new technology would constitute a barrier to entry" for competitors).

61.     Furthermore, it is not the case that the benefits of the challenged agreements accrue outside the alleged markets. DOJ Br. at 59-62. All of the claimed benefits increase search quality or output, and they are indisputably cognizable even if they originate in complementary markets and "spill[]" or "boomerang back into the search market." Sept. 1, 2023 Hr'g Tr. 47:21-48:6; *see Sullivan v. NFL*, 34 F.3d 1091, 1113 (1st Cir. 1994).

62.     The benefits to competition involving complements to search engines—such as browsers and smartphones—are also cognizable even if those benefits remain outside the alleged markets. Plaintiffs misinterpret the cited cases, including *Microsoft*, where the court held that Microsoft could advance the "the same procompetitive justification" it had substantiated in the market for "operating systems" in defending against claims of "anticompetitive effects in the *browser* market." 253 F.3d at 96; *see also Eastman Kodak v. Image Tech. Servs., Inc.*, 504 U.S. 451, 455-56, 483 (1992) (finding a triable issue under Section 2 as to whether "promot[ing] interbrand equipment competition" in the market for copiers could justify restrictions in the separate alleged markets for "service and parts" for copiers). Plaintiffs' contention that "benefits of the conduct that remain outside of the relevant market do not improve the superiority of the product at issue" (DOJ Br. at 60) fails where, as here, the same consumers use both the product in the alleged market (*e.g.*, a GSE) and the complement (*e.g.*, the smartphone or browser on which searches are entered) and therefore benefit from improvements to the latter. Google Br. at 63 (citing cases crediting efficiencies in complementary markets).

**I.      Plaintiffs Have Not Rebutted the Justifications for the Browser Agreements.**

63.     Throughout the period Plaintiffs' experts evaluated for potential anticompetitive effects, browser developers such as Apple and Mozilla continued an industry-wide practice of designing their browsers with a single default search engine because they believe doing so benefits their products and customers, and they have chosen to set Google as the default based on quality and price—the hallmarks of competition on the merits. FOF ¶¶ 1220-30, 1277-79, 1348-57, 1375-83; RFOF ¶¶ 68-76. The Sherman Act does not condemn these product-design decisions and the resulting agreements, even if they can be characterized as exclusive. *EpiPen*, 44 F.4th at 989, *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir. 1999).

64.     Plaintiffs incorrectly characterize browser developers as "distributors" with compromised incentives. DOJ Br. 63-64. Browser developers are "end users" for present purposes because they internalize any diminished quality or increased cost of their default search service, as exhibited by the harm Mozilla experienced when it set an inferior search engine as the default. FOF ¶¶ 1365-73; RFOF ¶¶ 113-17; *see EpiPen*, 44 F.4th at 995-96 (describing insurers and manufacturers as "end users" even though they have their own customers). That browser developers rely on revenue share payments from search engines does not cast doubt on their incentives, but rather illustrates why they are better positioned than any given consumer to promote continued competition among suppliers. *Id.* at 995; *Barry Wright*, 724 F.2d at 237-38.

65.     Plaintiffs' claim that "competition for exclusive contracts … will always favor the monopolist" (DOJ Br. at 65) is contrary to law, as "[c]ourts repeatedly explain that exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist." *EpiPen*, 44 F.4th at 983; *Paddock Pubs., Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (observing "[e]xclusive contracts make the market hard to enter in" the interim but concluding they "cannot stifle competition over the longer run"). The assertion also assumes that Google is overpaying for default status, when Plaintiffs never offered any such evidence and argued the opposite. DOJ FOF ¶¶ 319-22. And it is contradicted by the evidence of browser developers evaluating and fielding offers from rival search engines in order to make the best decision for their customers. FOF ¶¶ 1304-47, 1378-79.

66.     Plaintiffs are also incorrect in characterizing the competition for browser defaults as "winner-take-all" contests. DOJ Br. 65-66. The evidence shows that significant query volumes flow through access points outside of a browser's search box, and that Apple and Mozilla promote rival search engines in numerous ways in the same browsers where Google is the

default. FOF ¶¶ 1280-92, 1350-55, 1401-14. The evidence also demonstrates that neither Apple nor Mozilla wants to split the browser default among multiple search engines based on device type or browsing mode—a decision that is consistent with how all manner of developers have designed their browsers for two decades. FOF ¶¶ 860-68, 1220-40, 1348-57; RFOF ¶¶ 119-25.

67.     Plaintiffs' argument that competition for default status is "illusory" highlights their misguided focus on *outcomes* rather than whether the challenged conduct substantially "harm[s] the competitive *process* and thereby harm[s] consumers." *Microsoft*, 253 F.3d at 58. As indicated, there is ample evidence of browser developers using defaults as a "competitive tool" to stimulate competition on quality and price. *EpiPen*, 44 F.4th at 989; *see* FOF ¶¶ 1262-67, 1310-39, 1376-69, 1387-1400. Mozilla's selection of Yahoo contradicts Plaintiffs' assertion that browsers will not take chances with Google's rivals. Yahoo then failed to improve (contrary to Plaintiffs' contentions regarding the role of scale) and failed to retain most Firefox users (contrary to Plaintiffs' contentions regarding the "power" of defaults)—failures that prompted Mozilla to switch back to Google (contrary to Plaintiffs' contention that browser developers lack the incentive to provide the best search experience). FOF ¶¶ 1365-79.

68.     The benefits to search quality and output from the browser agreements are not pretextual because of a purported lack of *Google* documentation. DOJ Br. at 69-70. Browser developers such as Apple and Mozilla detailed the importance of building a browser that works out-of-the-box (which makes it easier for users to search), their use of revenue share payments to fund browser improvements (which facilitate more searching), the importance of the default search experience to browser quality (which highlights the complementarity of browsers and search), and the existential threat to independent browsers from not being able to set their preferred default. FOF ¶¶ 1220-30, 1349-60, 1380-83, 1435-67.

69.     Last, Google's revenue share payments to browser partners are not properly characterized as a sharing of monopoly profits, but rather reflect price decreases that generate cognizable in-market efficiencies. FOF ¶¶ 71-76, 1435-67; RFOF ¶¶ 201-14. Plaintiffs' horizontal conspiracy cases (DOJ COL at 31) are inapplicable to the vertical agreements here.

**J.      Plaintiffs Have Not Rebutted the Justifications for the Android Agreements.**

70.     Plaintiffs' arguments regarding the procompetitive benefits of the Android agreements seek to impose an additional burden not found in the case law. Google need not prove that it would "lack incentives to support Android" altogether without the challenged agreements. DOJ Br. at 71. Here, the evidence demonstrates that the MADAs and RSAs—both alone and together—enhance search quality and output.

71.     Plaintiffs have not rebutted the procompetitive benefits of MADAs, including that they facilitate the availability of low-cost Android smartphones, which generate more searches per device than feature phones or iPhones. FOF ¶¶ 1686-93, 1709-14; RFOF ¶¶ 293-96, 302. Plaintiffs misinterpret the evidence in asserting that Android OEMs or users "dislike" the Google Search widget or that there is a lack of differentiation among Android smartphones, as the record reflects precisely the opposite. RFOF ¶¶ 287-89. And contrary to Plaintiffs' contention (DOJ Br. at 72-73), Google has amply substantiated the importance of a consistent, high-quality out-of-the-box experience on Android devices. The easy availability of the most popular search engine encourages users to search more and makes Android devices more competitive with iPhones—a competition that Plaintiffs do not dispute enhances search output. FOF ¶¶ 1686-1715.

72.     Plaintiffs have not established that a "consistent choice screen on all Android phones" (DOJ Br. at 73) would achieve "the same procompetitive benefits" as the MADA. *Alston*, 594 U.S. at 100. They have neither demonstrated that devices with a choice screen generate the same enhanced level of search output, nor shown that Google would have the

same incentive to invest in the Android ecosystem if it could not promote its monetizable

services as the MADA specifies. FOF ¶¶ 1689-91; RFOF ¶¶ 216-22, 299-303.

73.     Plaintiffs have failed to rebut the procompetitive benefits of Android RSAs.

Plaintiffs admit that search output has increased as a result of substantial financial investments

made by Android RSA partners that have led to the "ubiquity of smartphones" and

"improvements in mobile telecommunications technologies" (DOJ Br. at 68), but they argue that

Google has not precisely traced how particular revenue share payments were used. The case law

imposes no such requirement, as courts routinely credit procompetitive justifications without

requiring quantification. *Microsoft*, 253 F.3d at 63, 67; *Barry Wright*, 724 F.2d at 237. Payments

enhance search output regardless whether partners use them, *e.g.*, to design a better smartphone,

build a faster wireless network, or offer a discounted device or data plan. FOF ¶¶ 1686-93.

74.     Plaintiffs have not established a less-restrictive alternative by arguing that

"Google could untether its revenue-share payments from restrictive search term agreements."

DOJ Br. at 68. The evidence shows that these alternatives increase costs, do not achieve the same

benefits of aligning incentives to increase search output, and would reduce payments to partners,

thus lessening their incentive to support Android and grow search output. FOF ¶¶ 1727-35.

DOJ's contention that a world where "Google lost its [putative] monopoly" would produce even

more benefits (DOJ Br. at 67) assumes an impact of the challenged conduct they never proved.

75.     Finally, Google's revenue share payments to Apple do not undermine its

justification that MADAs and RSAs promote competition between Android and iOS, which in

turn increases search output. DOJ Br. at 74-75. Google competes to be the default in Safari (and

pays Apple a negotiated revenue share) because Safari is a popular browser, and Google seeks to

make its services easily accessible to its customers. Google also plainly has an interest in

ensuring that Android competes successfully with iOS—where the MADAs and RSAs underpin that strategy—as DOJ itself argues. DOJ Br. at 71; *see* RFOF ¶¶ 284-303.

### K.    Google's SA360 Conduct Is Not a Basis for Liability under Section Two.

76.     Exclusionary conduct requires proof of a "substantial effect in protecting" Google's asserted monopoly power "through a means other than competition on the merits." *Microsoft*, 253 F.3d at 62; *see id.* at 71. Colorado Plaintiffs err by asserting they need only "show that Google's conduct 'reasonably appears capable of making a significant contribution to monopoly power.'" to prove their *prima facie* case. Colorado COL ¶ 32. The D.C. Circuit held that this "rather edentulous test" describes only what a plaintiff must show as to causation, as explained above. *Microsoft*, 253 F.3d at 79. It is *not* the test for proving exclusionary conduct.

77.     Colorado Plaintiffs have not proven their *prima facie* case of exclusionary conduct with respect to Google's SA360 conduct. As Google demonstrated, it has no duty to deal with Microsoft under *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). Google did not terminate a voluntary and profitable prior course of dealing with Microsoft, did not sacrifice short-term profits in order to harm competition, and did not refuse to deal with Microsoft while dealing with others on the same product. Google COL ¶ 122.

78.     Colorado Plaintiffs paint a picture of a "qualified" and "limited" duty to deal doctrine (Colorado COL ¶ 38), but "there are only a 'few existing exceptions from the proposition that there is no duty to aid competitors.'" *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023). "As 'a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'" *Id.* at 306.

79.     Colorado Plaintiffs also contend the duty to deal doctrine "has no application" where "a monopolist maintains an ongoing, voluntary course of dealing." Colorado COL ¶¶ 38-41; Colorado Br. at 33-35. But this is twice flawed.

80.     First, none of their cases (Colorado COL ¶ 41) stand for the proposition that *any* voluntary dealings between rivals create an obligation for a business to satisfy *all* of its rival's demands as to *all* aspects of the businesses' relationship. Instead, the cases either (1) involve the termination or change of existing terms, and not any obligation to meet a rival's new demands; or (2) do not involve a Section 2 claim at all. *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) (termination of a wholesale power agreement); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239 (S.D.N.Y. 2004) (termination of pricing agreement); *Safeway, Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874 (N.D. Cal. 2011) (change of existing terms); *Parsons v. Bright House Networks, LLC*, 2010 WL 5094258 (N.D. Ala. Feb. 23, 2010) (denying motion to dismiss Section 1 tying claim). Likewise, none hold that a firm's refusal to aid a rival by withholding assistance not previously extended is anticompetitive. Such unilateral conduct does not "trigger antitrust scrutiny." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074-75 (10th Cir. 2013).

81.     Second, Colorado Plaintiffs define "course of dealing" so broadly—voluntarily continuing to "engage with another marketplace participant," Colorado Br. at 34-35—that it would leave the principle that a business has no duty to deal with its rivals a hollow shell. Google did not cede to Microsoft the ability to dictate which features Google builds for SA360, and on which timeline, by offering advertisers the ability to buy advertising on Bing (and other search engines). RFOF ¶ 311. Likewise, that Google and Microsoft entered into a 2016 agreement generally setting forth a dispute resolution process (completely agnostic as to SA360) does not mean that Google suddenly has a duty under the antitrust laws to accede to Microsoft's demands on all aspects of the companies' relationships. RFOF ¶ 312.

82.     Colorado Plaintiffs also seek to evade the duty to deal doctrine because Google's alleged "conduct interferes with a rival's relationship with their customers." Colorado COL ¶ 43

33

(citing *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)). But refusals to aid rivals often interfere with a rival's relationship with their customers, yet universally are analyzed under the duty to deal doctrine. *Novell*, 731 F.3d at 1069 (Microsoft's conduct delayed Novell's roll-out of applications to customers). The conduct here is a far cry from *Lorain Journal*, which involved coercing *customers* into exclusive dealing, not a denial of access to *rivals*. 342 U.S. at 154-55. Here, as in *Trinko*, Google's "alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under . . . refusal-to-deal precedents." 540 U.S. at 410.

83.     Nor can Colorado Plaintiffs evade the duty to deal doctrine by relabeling their claim as "degraded support for Microsoft Ads features on SA360" (Colorado COL ¶¶ 34, 36) and demanding application of the "normal Microsoft three-step framework." Colorado Br. at 33. The D.C. Circuit rejected this argument in *Meta*, which treated allegations that Facebook "degrad[ed] the functionality and distribution of potential rivals' content" as "another way of saying that Facebook refused to deal with its rivals on the rivals' preferred terms." 66 F.4th at 306. The Court reasoned that when, as here, the substance of a claim is that the defendant denied access to rivals, the duty to deal doctrine—and not some other mode of analysis—governs. *Id.*

84.     Imposing a virtually unlimited duty to assist a rival when parties have a "voluntary, ongoing business relationship[]" (Colorado COL ¶ 41) or when purportedly withheld assistance "interferes" with a rival's relationship with customers (Colorado COL ¶¶ 43-44) would "risk reducing incentives both sides have to innovate, invest, and expand"; threaten "judicial complicity in collusion and dampen price competition"; and "require [courts] to become 'central planners,'" an ill-suited role. *Novell*, 731 F.3d at 1073. The adverse consequences for competition of accepting Colorado Plaintiffs' position are particularly acute here, as they seek to convert SA360 into a public utility run at Google's expense for Microsoft's benefit by forcing

Google to deal with Microsoft on Microsoft's preferred terms and timetable. Colorado Plaintiffs do not describe any limits on the Microsoft features that Google must integrate into SA360, the resources Google must expend toward that goal, or the timetable on which Google must comply with Microsoft demands. Colorado Plaintiffs' silence underscores why this Court should adhere to the duty to deal doctrine and find that Colorado Plaintiffs failed to satisfy its elements.

85.     Google's refusal to deal with Microsoft as Microsoft would prefer is "unadulterated unilateral conduct" that does not "trigger antitrust scrutiny." *Id.* at 1074-75; *see linkLine*, 555 U.S. at 444 ("[A] firm with no antitrust duty to deal with its rivals at all is under no obligation to provide those rivals with a 'sufficient' level of service").

## IV.   PLAINTIFFS' REQUEST FOR SANCTIONS SHOULD BE DENIED.

86.     Plaintiffs' sanctions request relies on the same order in the *Google Play* litigation that the parties previously briefed (ECF 601, 602) and that this Court already addressed. June 28, 2023 Hr'g Tr. 19:11-20:6 ("I'm not inclined to [adopt the *Epic* findings].... [T]he record before me, I think, should . . . stand or fall based upon what's happened with respect to this case. And it's not clear to me that the testimony that was elicited in Judge Donato's matter is equally applicable here."). Plaintiffs make no new arguments, and still do not (and cannot) demonstrate that any purportedly missing chat would have changed the factual record in this case or substantively altered Plaintiffs' litigation strategy. Nor can they show that Google acted with an intent to deprive Plaintiffs of relevant information to gain some advantage in this litigation. For all the reasons previously briefed, and as further addressed in Google's response to Plaintiffs' Proposed Findings of Fact, there is no basis on which to sanction Google.

Dated:  March 22, 2024

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
Wendy Huang Waszmer (D.C. Bar No. 1631078)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com
wwaszmer@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

36