```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
      United States of America,    )
 3    et al.,                      )
                                   )
 4                    Plaintiffs,  )
                                   ) CV No. 20-3010
 5                         vs. )    Washington, D.C.
                                   ) September 13, 2023
 6    Google LLC,                  ) 1:35 p.m.
                                   )
 7                    Defendant. )
      _____ )
 8
                     TRANSCRIPT OF BENCH TRIAL
 9           BEFORE THE HONORABLE AMIT P. MEHTA
                UNITED STATES DISTRICT JUDGE
10
      APPEARANCES:
11    For DOJ Plaintiffs:     Kenneth M. Dintzer
                              Joshua Hafenbrack
12                            U.S. DEPARTMENT OF JUSTICE
                              1100 L Street, NW
13                            Washington, D.C.
                              (202) 307-0340
14                            Email:  Kenneth.dintzer2@usdoj.gov
                              Email:  Joshua.hafenbrack@usdoj.gov
15    For Plaintiff
      State of Colorado:      Jonathan Bruce Sallet
16                            COLORADO DEPARTMENT OF LAW
                              Consumer Protection Section
17                            Ralph L. Carr Colorado Judicial Center
                              1300 Broadway, Seventh Floor
18                            Denver, CO 80203
                              (720) 508-6000
19                            Email:  Jon.sallet@coag.gov

20    For Defendant Google:   John E. Schmidtlein
                              Kenneth Smurzynski
21                            WILLIAMS & CONNOLLY LLP
                              725 12th St., NW
22                            Washington, D.C. 20005
                              (202) 434-5000
23                            Email:  Jschmidtlein@wc.com
                              Email:  Ksmurzynski@wc.com
24
      Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
25                        Email:  Janice_e_dickman@dcd.uscourts.gov
                             *   *   *
```

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2                THE COURT:  All right.  Hope everybody had a good

3        lunch break.

4                MR. DINTZER:  Yes, sir.  Thank you.

5                THE COURT:  Ready to proceed?

6                MR. DINTZER:  Yes.

7                THE COURT:  I should have asked, did you all sort of

8        coordinate, in terms of timing, with the rest of Dr. Varian's

9        testimony?

10               MR. DINTZER:  Yes, Your Honor.

11               THE COURT:  Okay.  We're all on the same page in

12       terms of additional time needed with Dr. Varian?

13               MR. SMURZYASKI:  We don't know how much more time

14       there is.

15               MR. DINTZER:  We trimmed some.  So, we're shooting

16       for 30 to 40.

17               MR. SMURZYASKI:  I'm sorry.  So it's 30 or 40 on top

18       of the hour?

19               MR. DINTZER:  No.  We're looking at 30 to 40 minutes

20       right now.

21               MR. SMURZYASKI:  Of additional time?  Of time for the

22       states?

23               MR. DINTZER:  Oh, I don't speak for my colleague.

24               MR. SALLET:  I am in the same position I was last

25       night; 30 minutes or less.
```

```
 1                THE COURT:  Okay.  Very good.  Thank you.
 2                           HAL VARIAN,
 3                DIRECT EXAMINATION (Cont.)
 4    BY MR. DINTZER:
 5    Q.  We'll turn to Exhibit UPX411, Dr. Varian.  This is an email
 6    you wrote; is that right?
 7    A.  I haven't got to it yet.
 8    Q.  Of course.
 9    A.  UPX411.  There it is.  Okay.
10    Q.  Okay.  This is an --
11    A.  I'm still having trouble.  I would like to see the
12    highlighted version, if you have it.
13    Q.  Okay.  We can go down to the bottom, the email that you
14    sent.  This is an April 2nd, 2008 email you wrote to someone
15    named Paul Todd?
16    A.  Okay.
17    Q.  Who is Paul Todd?
18    A.  Let me see his name again.  How it is -- where is it?
19    Q.  It's right there on the third paragraph, Paul Todd.  Here
20    we go.  To:  Paul Todd.
21                Does that make it easier?
22    A.  Yes.  I see Paul Todd now.  I don't know who he is.
23    Q.  Okay.  So let's go back to what you wrote, sir.  You wrote:
24    One way to think about the difference between search and
25    display brand advertising is to say that search ads help
```

1    satisfy demand, while brand advertising helps to create demand.

2        Did you write that?

3    A.  Yes.

4    Q.  And you believed that distinction was true when you wrote

5    it?

6    A.  That's one way of thinking about it.

7    Q.  And that's the way you thought about it when you wrote

8    that.

9    A.  No.  I thought that there's several different ways you

10   might think about display ads, but it's something that demands

11   a visualization, for example.  It might be concerned about

12   that.

13   Q.  Then you write, sir:  When I see a display ad for a new

14   fuel-efficient Toyota, I might think, "Gee, maybe it's time to

15   buy a new car."

16       So that would be an example of a display ad creating

17   demand, right?  That's an example of the thing you talk about

18   in the previous sentence.

19   A.  Exactly.  It's an example of the sentence that I wrote

20   earlier about just making it more specific, with an example.

21   Q.  Perfect.  And then, in fact, in the sentence you say:  The

22   display ad stimulated some latent demand by showing them the

23   picture.

24   A.  Possible, yeah.

25   Q.  And then you write:  When I go to Google and search for

1    Toyota, I'm not trying to satisfy that demand.

2    A.  This is all illustration of the point made in the first

3    sentence, yes.

4    Q.  Okay.  No further questions on that document, sir.

5         What is a retargeted ad?

6    A.  A retargeted ad would occur, for example, when you bought a

7    product and there was a complimentary product that was

8    associated with that.  So, you could buy a product like ski

9    boots and it would suggest ski equipment or ski mittens.

10   Q.  One example of retargeted display ad is you visit a

11   merchant site and then you go off to some other site, and on

12   the second site, you may see an ad for the merchant that you

13   first visited.

14   A.  Yes, you may see such an ad.

15   Q.  I go to Home Depot.  I look at a drill.  I then move on to

16   Williams-Sonoma and while I'm -- or, *The New York Times*, and

17   while I'm reading an article, I see that drill that I

18   considered, right?

19   A.  You may see that, yes.

20   Q.  And that's a retargeted ad.

21   A.  That would be a retargeted ad.

22   Q.  Okay.  And retargeted ads are display ads?

23   A.  Typically, yeah, I would say.  I don't know if it's

24   universally true.

25   Q.  Retargeting can only be used after the user has visited the

1    original website, right?

2    A.  Yes.

3    Q.  Okay.  So, I mean, I have to go to Home Depot before they

4    can show me a drill on *The New York Times*.

5    A.  Yep.

6    Q.  Okay.  And the value of retargeting fades over time.

7    A.  It fades over time?  You mean, time elapsed between the

8    first ad and -- first ad impression and the next ad impression?

9    Q.  Exactly.

10   A.  Okay.  Yes.

11   Q.  So if I visit Home Depot a week ago and they show me a

12   drill when I'm on *The New York Times*, that has less value than

13   if I do it within 24 hours.

14   A.  Less value as in less likely to be clicked?  Is that what

15   you're saying?

16   Q.  Yes.

17   A.  Yes.

18   Q.  Let's go to UPX26.

19   A.  Okay.

20   Q.  There is an online advertising primer that you created; is

21   that right?

22   A.  Yes.

23   Q.  It says that you created it in August 2017 and you updated

24   it in 2018; is that accurate?

25   A.  That's what it says.

457

```
1     Q.  Is that accurate?

2     A.  Yes.

3     Q.  Okay.  And we're only going to do one piece here.  We're

4     going to go to page 2, and we're going to go to D.  And what

5     you wrote here is:  Most of the value of retargeted ads occurs

6     in the first hour or so after the user visits the advertiser's

7     web page.

8           Do you see that?

9     A.  Yes.

10    Q.  You wrote that?

11    A.  I wrote that, yes.

12    Q.  You believed it's true?

13    A.  "Most of the value."

14          It has been explained to me -- this has been

15    explained to me.  I have people who work on retargeting ads.

16    So, yes, this is the answer.  I recognize and I believe it to

17    be true.

18    Q.  Okay.  No further questions on that document, sir.

19          And Facebook delivers display ads; is that right?

20    A.  Can you repeat?

21    Q.  Facebook delivers display ads; is that right?

22    A.  Yes.  I've heard that.

23    Q.  You've never been on Facebook?

24    A.  I don't use Facebook.

25    Q.  Have you ever been on Facebook?
```

1    A.  Only for very brief instances.  If someone mails me

2    something and sends a link to Facebook.  But, basically, I'm

3    not a user of that particular software.

4    Q.  Facebook ads are not search ads, right?

5    A.  Yes, they are not search ads.

6    Q.  Google hasn't performed any empirical analysis of

7    advertisers switching their spend between Google search ads and

8    Facebook?

9    A.  Where did that come from?  What are you --

10   Q.  That came from me.  I'm asking you a question, sir.

11   A.  Okay.  What is it?

12   Q.  Google hasn't performed any empirical analysis of

13   advertisers switching their spend between Google search ads and

14   Facebook?

15   A.  I don't know that.  I don't know of any such study.

16   Q.  You don't know of any --

17   A.  I don't know of any such study.

18   Q.  And Google hasn't performed any empirical analysis of

19   advertisers switching their spend between Google Search ads and

20   Amazon, right?

21   A.  Not that I know of.

22   Q.  You don't even know of anybody who has proposed such a

23   study of those two?

24   A.  I don't know for a fact anybody who has proposed doing

25   that.

1    Q.  Okay.  Let's go to UPX1085.

2    A.  All right.

3    Q.  This is an email you sent in 2017; is that right?

4    A.  Yes.

5    Q.  And you -- well, for the first line it says:  I added a

6    link in the document to some studies of this issue.

7          That's not what I'm focusing on -- oh, I'm sorry.

8          MR. DINTZER:  This is -- we offer this, Your Honor,

9    for admission.

10         THE COURT:  Is there any objection to this document?

11         MR. SMURZYASKI:  Your Honor, we have an objection on

12   the article itself, which is hearsay.

13         MR. DINTZER:  We're happy to have the article kept

14   out.  We just want the email.

15         THE COURT:  Okay.

16   BY MR. DINTZER:

17   Q.  So, in the second sentence you write:  I've attached the

18   most relevant paper.  They show that display ad impressions

19   increase searches by 30 to 45 percent.

20         Do you see that?

21   A.  I see that.

22   Q.  Okay.  And you believed that was true when you wrote it?

23   A.  I don't know what the source of that information is.  What,

24   for example, is the "attached most relevant paper."

25         Where did that -- what is it?

1    Q.  You attached the paper, sir, so I'm asking you.

2    A.  I don't know.  I mean, I don't know what paper was attached

3    there.  It may be at the top -- presumably, at the time I knew,

4    but I don't know that now.

5    Q.  You have the paper in your binder, sir.

6    A.  And what is it called or where in the binder?

7    Q.  It's immediately after the email at UPX1085.

8    A.  UPX --

9    Q.  UPX1085.

10   A.  I'm having trouble finding that.

11           THE COURT:  Can we just bring it up, the next page,

12   since it's on the screen?

13           MR. DINTZER:  Sure.

14   BY MR. DINTZER:

15   Q.  The title is Display Advertising's Competitive Spillovers

16   to Consumer Search.  Do you see that?

17   A.  Yeah.  I'm reading the date.

18   Q.  January 2014.

19   A.  Okay.

20   Q.  Do you know these people, Randall Lewis and Dan Nguyen?

21   A.  Yes, I know Randall Lewis.

22   Q.  So in the email -- you're welcome to look at the

23   attachment, sir, but my question is about the email.

24   A.  Yeah.

25   Q.  You've written:  I've attached the most relevant paper.

1    A.  Okay.

2    Q.  That meant this was the most relevant paper you found on

3    the subject, right?

4    A.  Yes.  But I'm trying to determine the source of this paper.

5    Q.  Well, you should have it in front of you.  I just want to

6    ask you the question.  It says:  They show that display ad

7    impressions increase searches by 30 to 45 percent.

8    A.  Yep.

9    Q.  Your understanding of that means that every time

10   somebody -- there are 100 people who see a display ad, it

11   increases search ads so that the number of search ads goes up

12   by 30 or 45 percent, right?

13   A.  Yeah.  I'm curious about Randall Lewis's association then.

14   Are we certain that this is Google?  Does he say the data used

15   is Google data?  Because for one time he was working for

16   Yahoo!.

17   Q.  It's your email.

18   A.  Yeah, but what I'm asking is the paper lists an affiliation

19   for Randall and for the Diane Tang.

20   Q.  I need you to focus on my questions.  Okay?

21        The point that you're making in the email is that the

22   results were for every 100 times that a display ad was seen,

23   the number of searches related to that go up 30 to 45 percent;

24   is that right?

25   A.  That's what you just said, yes.

1    Q.  That's what you say in the email; is that right?

2    A.  So I'm saying here is a paper.  I don't see a picture of it

3    here.  I don't see the affiliation of the authors, although, I

4    know at least one of the authors.  And I note that this is in

5    2017, which means it might have been conducted in 2016 or 2015;

6    long time ago.

7    Q.  And you're not answering my question, sir.

8         This is the conclusion that you pulled out of that paper

9    that you put in the email; is that correct?

10   A.  I am not vouching, at this stage, for the accuracy of this

11   paper.  I'm just pointing out that people have done work in

12   this area and this is what they found.

13   Q.  And what they found is 100 impressions equals 30 to 45

14   percent more searches.

15   A.  That's what they found in this paper.

16   Q.  Thank you.  No further questions on that document, sir.

17        In an auction, the reserve price is the minimum price

18   that the item will sell for; is that right?

19   A.  Yes.

20   Q.  And text ads are sold to an ad auction; is that right?

21   A.  Yes.

22   Q.  And an ad auction, the reserve price is the minimum that

23   Google will sell the ad click for, right?

24   A.  Yes.

25   Q.  And a monopolist who sells things through an auction could

1    control the auction's outcome by setting a reserve price?

2    A.  It's up to the advertiser to set the reserve price.

3    Q.  A monopolist who sells things to an auction could influence

4    the auction's outcome by setting the reserve price.  So, Google

5    would be setting the reserve price.

6    A.  So, as I understand the procedure, Google suggests a price

7    to the merchant, which a merchant can choose or not choose.

8    Q.  Are you talking about display ads?

9    A.  No.  I'm talking about search ads.

10   Q.  Okay.  So --

11   A.  Oh, well, wait.

12   Q.  So let's make sure we're on the same page.

13   A.  Yeah.

14   Q.  When Google sells a search ad it has an auction, and

15   advertisers bid on that auction.

16   A.  Yes.

17   Q.  And Google decides whether it's going to sell search ads to

18   any of the advertisers who bid.

19   A.  It -- okay.  Yes.

20   Q.  Okay.  And Google sets a reserve price in that text ad

21   auction for the minimum amount that it will accept for the text

22   ad, correct?

23   A.  It depends on the period because this reserve price has

24   been treated differently at different points in time.  But, at

25   least one of those points has the arrangement you described.

1    Q.   Okay.  And, so, then we will get back to my original

2    question, which is that a monopolist who sells things to an

3    auction could influence the auction's outcome by setting the

4    reserve price, correct?

5    A.   Yeah.  That's a general point with auction sales.

6    Q.   True.  I need a yes.

7    A.   Okay.  What is the question again?

8    Q.   A monopolist who sells text ads through an auction can

9    influence the price of the sales with reserve pricing, correct?

10   A.   And that's only applying or specifically applying to text

11   ads?  Because earlier it says "auction," the reserve price.

12   Q.   Let's just do on action.

13   A.   An auction, in general, yes.

14   Q.   A monopolist who sells things through an auction could

15   control the auction's outcome by changing the design of the

16   auction itself?

17   A.   There could be ways to do that, yes.

18   Q.   A monopolist who sells things through an online auction

19   could change the auction's outcome by changing the number of

20   items sold?

21   A.   Tell me what you mean by the "outcome."  The auction

22   outcome?

23   Q.   The price.

24   A.   The price.  Remember, there's several different ads that

25   are shown.  They all have a different price.

1    Q.  Right.  By adding more ads, Google can affect the outcome

2    of the price that is paid for the ads, correct?

3    A.  By changing the outcomes you could change the price, yes.

4    Q.  A monopolist who sells things through an auction could

5    influence the auction's outcome by changing the algorithm that

6    runs the action; is that right?

7    A.  Well, yes.  If he changes the algorithm, you get a

8    different answer.

9    Q.  Finally, sir, a monopolist that wanted to influence the

10   result of an auction would have a number of levers that it

11   could use, correct?

12   A.  Correct, yeah.

13   Q.  Who is Carl Shapiro?

14   A.  Carl Shapiro is a colleague of mine at UC Berkeley.  I've

15   known him for many years.  And he is a outstanding researcher

16   in economics.

17   Q.  He's a noted economist, isn't he?

18   A.  Say what?

19   Q.  A noted economist?

20   A.  He is a noted economist.

21   Q.  He's an economic consultant for Google?

22   A.  Yes.

23            THE COURT:  I'm sorry to interrupt.  On the issue of

24   reserve price, just to make sure I understand, is a reserve

25   price, essentially, the floor that Google would accept for an

1   ad?

2              THE WITNESS:  That is right.

3              THE COURT:  Okay.

4   BY MR. DINTZER:

5   Q.  So, just to double back to what the Court has asked.  So,

6   if the reserve price is here and the reserve price is set by

7   Google, that means it will not accept bids for ad spots below

8   the reserve price, correct?

9   A.  Correct.

10  Q.  Okay.  Carl Shapiro was chief economist for the Department

11  of Justice on two occasion; is that right?

12  A.  That's right.

13  Q.  And you co-wrote an economics textbook with Dr. Shapiro?

14  A.  It's called a trade book, not a textbook.

15  Q.  Fair enough.  Let's go to UPX952.

16             Actually, sir, I'm going to double back because I'm told

17  we need to just lock one thing down.

18             A monopolist who sells things through an auction could

19  control the auction's outcome by changing the number of items

20  sold, by adding more items for sale, correct?

21  A.  Correct.

22             MR. DINTZER:  So, we're talking about Dr. Shapiro and

23  we're at UPX952 and we've got an objection, Your Honor, so

24  we'll offer it.

25             MR. SMURZYASKI:  Your Honor, the objection is to the

1    embedded hearsay in the document.  That is the out-of-court

2    statements of Dr. Shapiro.

3            THE COURT:  I understood him to testify that Carl

4    Shapiro has worked as a consultant for Google.

5            MR. DINTZER:  Yeah.

6            THE COURT:  Is he a consultant at this time?

7            MR. DINTZER:  Yeah.

8            THE COURT:  I'm sorry?

9            MR. DINTZER:  This is in 2020.  Dr. Shapiro was a

10   consultant for Google at that time.

11           THE WITNESS:  I would have to check the records.  I

12   don't know.

13           THE COURT:  Does Google know?

14           MR. SMURZYASKI:  Your Honor, he is not acting on

15   behalf of Google in this email exchange.  He's certainly not a

16   managing agent or the like.

17           THE COURT:  All right.  Well, doesn't have to be a

18   managing agent.  But bottom line is, look, I'll allow this in.

19   I'll take a look at it.  But, you know, the email that is

20   being -- his text, that is, Carl Shapiro's text, it's

21   undoubtedly needed to put what Dr. Varian is going to say in

22   context.

23           MR. SMURZYASKI:  But, Your Honor, I'm objecting to

24   any effort to introduce the portions of Dr. Shapiro for the

25   truth of the matter asserted.

1          THE COURT:  Okay.  Well --

2          MR. SMURZYASKI:  I understand the use of the document

3     more generally.  Thank you, Your Honor.

4          MR. DINTZER:  We believe, Your Honor -- I mean, it's

5     not only an admission -- I mean, he testified that he works for

6     them.  But, also, that it's in Google's emails.

7          THE COURT:  Well, I don't know just because it's in

8     Google's emails turns it into an exception to the hearsay rule.

9     But, look, I think the bottom line is, let's admit it with the

10    understanding that Mr. -- Professor Shapiro's statements are

11    not being considered for the truth.  If you can establish that

12    he, in fact, was a consultant for Google at the time he made

13    these statements, then I'm prepared to reconsider.

14         MR. DINTZER:  I appreciate that, Your Honor.  Given

15    that the witness testified that he was a consultant, we would

16    ask that -- if the Court could simply ask Google to confirm one

17    way or the other.  Then, that would be the easiest way for us

18    to show it.

19         MR. SMURZYASKI:  Your Honor, two observations, one of

20    which is even if he was a consultant, he's still not an

21    agent -- a managing agent in the sense of the hearsay rule, and

22    so that --

23         THE COURT:  Just -- he doesn't have to be a managing

24    agent.  He just needs to be someone who has worked -- making a

25    statement within the scope of, in this case, his consultancy on

1    behalf of the company.  And so that is my question, whether, in

2    fact, his back and forth with Dr. Varian here is within the

3    scope of that consultancy.  And, I guess, I don't know the

4    answer to that, that is the bottom line.

5              MR. SMURZYASKI:  And the record we have is that he's

6    not.

7              THE COURT:  Right.  Which is why I'm saying at this

8    point I'll allow it in for context, and if the government at

9    some point, through another witness or through a stipulation,

10   whatever the case may be, can establish his consultancy status

11   at this time, then I'll reconsider admitting the whole thing.

12             MR. SMURZYASKI:  Understood, Your Honor.

13             THE COURT:  Okay?  As an admission.  For now, we'll

14   allow those portions in just to provide context.

15             MR. DINTZER:  Thank you, Your Honor.

16   BY MR. DINTZER:

17   Q.  So we'll start with your -- Dr. Shapiro's email to you --

18   I'm sorry -- your email to Dr. Shapiro's at the bottom.  Do you

19   see that?

20   A.  Yes.

21   Q.  And this was October 27th, 2020?

22   A.  Yes.

23   Q.  And so that's after the United States filed its complaint

24   in this case; is that right?

25   A.  I don't know.

```
 1    Q.  When the government filed its complaint in this case, did

 2    you read it?

 3    A.  I may read it, but I wouldn't say I would be absolutely

 4    certain to read it.  There's a lot of information.

 5    Q.  I don't understand that answer, sir.

 6    A.  Okay.  Would I read it?

 7    Q.  Not would you.  Did you?

 8    A.  Did I read it?

 9    Q.  Did you read the complaint in this case when the

10    United States filed?

11    A.  When they filed?

12    Q.  Around that time, sir.

13    A.  I probably read it around that time.

14    Q.  And you write to Dr. Shapiro:  I have to talk about

15    antitrust and ecosystems on Thursday, so I went back to see

16    what we said, and I was amazed at how useful it was.

17         Do you see that?

18    A.  Yes.

19    Q.  You wrote:  I was never involved directly in the Android

20    strategy, but it is a great model of building an alliance with

21    multiple parties.

22         Do you see that?

23    A.  Yes.

24    Q.  Okay.  And then Dr. Shapiro writes back to you, right?

25    A.  Well, we haven't read the last sentence here.  It's a great
```

1    model-building alliance with multiple parties, OEMs, carriers,

2    developers, user.  Imagine what the world would look like

3    without Android.

4    Q.  Right.  I didn't ask a question about that, sir.

5    A.  Well, but it was on the page that you presented to me.

6    Q.  It is.

7         Dr. Shapiro writes back to you:  I see the MADA as core

8    to the Android strategy and it's highly procompetitive, not so

9    for the RSAs.

10        Do you see that?

11   A.  Do I see that?  Yes, I see that.

12   Q.  And that was Carl Shapiro's opinion on October 28th, 2020,

13   right?

14   A.  I don't know exactly what Carl was expressing in that

15   phrase.  But, it would be a question for him to answer, not me.

16   Q.  He was writing it to you, sir, right?

17   A.  He was writing it to me.

18   Q.  And you didn't write back and say, I didn't understand what

19   you're talking about, did you?

20   A.  I did not.

21   Q.  Okay.  And that was his opinion on that date, right?

22   A.  He said that -- he wrote an email to that extent on that

23   date, yes.

24   Q.  Okay.

25             THE COURT:  Let me just ask, for Dr. Shapiro, do you

```
 1   recognize what the extension is for his email?  It's @crai.com.
 2   Do you what --
 3               THE WITNESS:  That's his consulting company.
 4               THE COURT:  I'm sorry?
 5               THE WITNESS:  His consulting company.
 6   BY MR. DINTZER:
 7   Q.  And to be clear, Dr. Shapiro was hired as an external
 8   consultant on economic matters by Google; is that right?
 9   A.  At some point, yes.  I don't know when that point was.
10   This is an issue that needs to be resolved.
11   Q.  Right.  And so I want to make sure we're real clear about
12   your testimony, sir.
13          You don't know, when he wrote you this email, if Carl
14   Shapiro was acting as a paid consultant?
15   A.  I don't know that.  But -- whether he was a -- working as a
16   consultant or not at that date.
17   Q.  Okay.
18               MR. DINTZER:  No further questions, Your Honor.  We
19   pass the witness.
20               THE COURT:  Okay.
21               MR. DINTZER:  Oh, I'm sorry.  Actually, we have some
22   housekeeping.  So, the first is, is that the slide from the
23   opening statement that I showed the witness with text and
24   shopping -- or, PLA ads is from UPXD001, the opening slide
25   deck, at 60.  So I just want to get that in.
```

```
 1              The second is, is that we have stickered the --
 2    they're not all beautiful works of art, but we've stickered the
 3    set of demonstratives that I did use with the witness as
 4    UPXD010.  And just for demonstratives, that -- you know, I
 5    don't know if the Court's practice is to move demonstratives in
 6    or not, but we'll sticker them in there.
 7              THE COURT:  Unless there's a request to move it in, I
 8    typically do not permit a demonstrative to come in,
 9    particularly in the context of which this one was done.
10              And just for the record to be clear, Counsel was
11    occasionally writing answers or paraphrasing answers that the
12    witness gave from time to time.
13              MR. DINTZER:  We appreciate that, Your Honor.  So it
14    may show up at some other point, but we wanted to make that
15    formal.
16              And with that -- given that the witness has now
17    acknowledged that Carl Shapiro was an agent, even if he can't
18    say on that date, but was an agent, was -- we would ask to move
19    the exhibit into evidence.
20              THE COURT:  As I said, I'm happy to consider it, but
21    I do need some -- he has testified about two things.  One, he
22    said he has known Dr. Shapiro for a very long time, and we also
23    know that at some point he was actually a consultant.  So it
24    would be important for me to know if in October of 2020 he was,
25    in fact, hired and on a retainer and was a consultant, as
```

 1    opposed to just communicating with another long-time friend and

 2    colleague.  If we can get to the bottom of that answer, then

 3    I'm happy to reconsider.

 4              MR. DINTZER:  Thank you, Your Honor.  So we pass the

 5    witness.

 6              THE COURT:  Mr. Sallet, on behalf of the Colorado

 7    plaintiffs.

 8              MR. SALLET:  We're just moving a few people, Your

 9    Honor.

10                         DIRECT EXAMINATION

11    BY MR. SALLET:

12    Q.  Dr. Varian --

13    A.  Yes?

14    Q.  -- I'm Jonathan Sallet, and I represent the State of

15    Colorado in this proceeding.  How are you this afternoon?

16    A.  Good question.

17    Q.  I'll accept your answer.

18    A.  Okay.

19    Q.  I would like to show you -- yesterday you were shown an

20    exhibit marked UPX334, which we're going to put up on the

21    screen.  It's slide 8.  This, Dr. Varian, you may recall is an

22    NYU presentation you made, and we're showing you the page.

23    It's page 8 that has a chart called Competition.  Do you recall

24    this?

25    A.  Yes.

1    Q.  So, Dr. Varian, one of the rows in this, the fourth from

2    the bottom, is called special-purpose search engines.  Do you

3    see that?

4    A.  Yes.

5    Q.  And the second company listed, the second column over, is

6    Apple.  Do you see that?

7    A.  Um-hum.

8    Q.  And there's a checkmark, correct?

9    A.  Yes.

10   Q.  What is the Apple special-purpose search engine to which

11   you refer here?

12   A.  I believe it was Spotlight or one of those tools that they

13   used.  I -- yeah.  I would have to go back and look at my notes

14   on that.

15   Q.  Could it have been Apple Maps?

16   A.  Apple Maps?

17   Q.  Yes.

18   A.  It could be.  But, Maps -- Maps is already there, Maps.  It

19   shows Apple has maps, Google has maps, Microsoft has maps.

20   Q.  Thank you for taking me there.

21        Do you think that row refers to both Apple Maps and

22   Google Maps?

23   A.  Well, both Google and Apple has maps, as well as Microsoft

24   and, potentially, other software.

25   Q.  Going back to the special search engine.  What about

1    Spotlight do you regard as directly competitive with Google's

2    special-purpose search engine?

3    A.  On maps or whatever other --

4    Q.  Oh, I'm sorry.  Turning your attention to special-purpose

5    search engines.  What is the Google special-purpose search

6    engine to which you refer?

7    A.  Up there?  Well, any of them.  I mean, it has several

8    special-purpose search engines, for example.

9    Q.  What would they be, Dr. Varian?

10   A.  Maps would be one.  Shopping would be one.  Books would be

11   one.  What else?  Hotel search, et cetera.  Those are search

12   engines for specific topics.

13   Q.  So let's, then, talk about Maps for a minute.

14   A.  Okay.

15   Q.  Do I read this chart correctly, that you believe that Apple

16   Maps and Google Maps compete with each other?

17   A.  I would say that they compete with each other, yes.

18   Q.  Going back to the Special-Purpose Search Engines line.  Of

19   the firms listed there other than Google -- Amazon, Apple,

20   Facebook, and Microsoft -- is Apple the only one that Google

21   pays under a search distribution agreement?

22   A.  I don't know the answer to that question.

23   Q.  Do you have any reason to believe that Google has a search

24   distribution agreement with Amazon?

25   A.  I've read of such, yes.

```
1    Q.  You have?

2    A.  Yes.

3    Q.  Can you point us to where we might go to find that, what

4    you read?

5    A.  Well, one of the things you can do is go to Google and type

6    in this question you have, and you would get a list of articles

7    or discussions of this point.

8    Q.  That Amazon has a search distribution agreement with

9    Google; that's your testimony?

10   A.  No.  Special purpose -- it's a special-purpose search

11   engine.

12   Q.  No.  I'm sorry.

13        THE COURT:  Mr. Sallet, why don't you reframe.  I

14   think he was confused.

15        MR. SALLET:  I will.  I'm sure it was on me, Your

16   Honor.

17   BY MR. SALLET:

18   Q.  Dr. Varian, looking at me just for a second, among the

19   firms you list on the row that is titled Special-Purpose Search

20   Engines, Amazon, Facebook, and Microsoft, do any of them have

21   search distribution agreements with Google?

22   A.  I don't know.

23   Q.  You don't know?

24   A.  I do not know.

25   Q.  Thank you.
```

1    A.  Oh, do any of them?

2    Q.  Yes.

3    A.  Sorry.  I misunderstood your question.

4         I know that Apple has a search distribution agreement

5    with Google.  The others, I don't know.

6    Q.  Thank you.

7         Now, yesterday you testified, Dr. Varian, that

8    special-purpose search engines, like Amazon, buy ads on Google

9    Search.  Do you recall that?

10   A.  Amazon buys ads on Google Search?

11   Q.  Yes.

12   A.  That is right.

13   Q.  Yes.  And is it correct that Amazon purchases those Google

14   Search ads because it wishes to attract the attention of

15   consumers who are looking at a Google search engine results

16   page?

17   A.  Could you repeat that, please?

18   Q.  Is it reasonable to conclude that Amazon purchases Google

19   Search ads in order to attract the attention of users who are

20   looking at a Google search engine results page?

21   A.  That could be.

22   Q.  Do you think it's a reasonable -- it would be a reasonable

23   conclusion?

24   A.  I think your question was:  Couldn't it be or --

25   Q.  I'll try it again Dr. Varian.  I'm sorry if I'm confusing.

1          Isn't it true that Amazon, like other companies,

2     purchases Google Search ads to attract the attention of users

3     who are looking at a Google Search results page?

4     A.  Yes.

5     Q.  And by purchasing Google Search ads, such a seller would be

6     able to reach new customers, customers that have not previously

7     done business with it; is that correct?

8     A.  Possibly, yes.

9     Q.  And that would be reasonable to assume because people who

10    hadn't previously done business with a seller might not know of

11    its existence, might not know of its website, might not know of

12    it's app; is that correct?

13    A.  They might not know of its reputation, for example, or

14    brand recognition, et cetera.  There would be a number of

15    things that that search ad link would reveal.

16    Q.  And if they knew of the seller but they didn't know that

17    the seller had introduced a new product, that might be

18    something they could discover on a Google search engine results

19    page; is that correct?

20    A.  They might discover that, yes.

21    Q.  And suppose we have two sellers who are competing against

22    each other -- well, strike that.

23          Suppose we have an online retailer who is competing with

24    Amazon.  That online retailer is going to want to come to

25    advertise with Google rather than appear on Amazon; isn't that

1      correct?

2      A.   Could you rephrase the question or repeat it?

3      Q.   Sure.  I'll try to do it in pieces, Dr. Varian.  But I'm

4      leading only to one question.

5           I'm asking you to consider a circumstance where there's

6      an online retailer who competes with Amazon.

7      A.   Okay.

8      Q.   And I'm asking you whether that online retailer would

9      rather show up with an ad on Google than try to appear on

10     Amazon itself.

11          MR. SMURZYASKI:  Your Honor, I object.  We're in the

12     realm of speculation and opinions.  We have obviously not

13     offered Dr. Varian as an expert in this case.  We're getting

14     hypotheticals and the like.  So, I object.

15          MR. SALLET:  Your Honor, UPX26 is a document

16     Dr. Varian wrote called Online Advertising Primer.  I'm asking

17     him basic methods by which advertisers use Google Ads.  He's

18     written a primer and he's testified on it throughout the course

19     of two days.

20          THE COURT:  I guess what I would say is that -- I

21     don't know if it's speculation, but I think the question is

22     based on his understanding of advertisers' behavior.  And as

23     long as we're limited to his understanding of behavior of

24     advertisers, it's not speculative about any particular

25     advertising, any particular seller, but just based on his

 1   understanding of advertisers' behavior, would he agree with

 2   Mr. Sallet's statement.

 3              MR. SMURZYASKI:   Thank you, Your Honor.

 4   BY MR. SALLET:

 5   Q.  Based on your understanding of advertisers' behavior, would

 6   it be reasonable to believe that an online retailer competing

 7   with Amazon would rather show up on a Google Search results

 8   page than on Amazon itself?

 9   A.  I don't know why that would be preferable.  You say is it

10   preferable or would it be preferable?  I don't know.

11   Q.  I just asked you a question about competition among

12   retailers.  So, based on your experience with advertisers, if

13   competition increased between retailers -- between two or more

14   retailers, would you expect that that would increase the

15   purchase, overall, of Google Search ads?

16   A.  I'm trying to understand this setup.  You've got two

17   competing merchants --

18   Q.  Yes.

19   A.  -- one of them --

20   Q.  No.  I'm just asking.  If you had -- I'm asking you, in

21   your experience with advertisers, if, say, Amazon increases its

22   presence in retail, would you expect other retailers to be

23   buying more Google Search ads?

24   A.  If this merchant increases its spend in some area, would I

25   expect others to increase their spend; is that --

1    Q.   Its competitors, yes.

2    A.   Other competitors to increase their spend?

3    Q.   Yes, yes.

4    A.   Well, not necessarily.  I mean, they could be -- you might

5    buy your skis from one vendor and your snowshoes from another.

6    Q.   If they were sellers of the same product, would that change

7    your answer?

8    A.   The same product?

9    Q.   Yes.

10   A.   So, I would say it depends on the nature of the web search

11   engines here.  I mean -- I don't really understand the

12   question.

13   Q.   I'm asking --

14          MR. SALLET:  And I'll then move on after this, Your

15   Honor --

16   BY MR. SALLET:

17   Q.   -- whether, in your experience with advertisers, one way

18   that they respond to competitive pressures that they feel is to

19   increase their prominence through ads on Google Search results

20   pages; is that true?

21   A.   They could invest in brand building so that people would

22   use their services rather than someone else's.

23   Q.   And that, in your view, would include purchasing ads on

24   Google's search engine results pages?

25   A.   It's possible.  It's one way they could do it.  They could

1    sponsor TV shows.  Lots of different places you can advertise.

2    Q.  Yes.  You're familiar, Dr. Varian, with the company

3    Expedia?

4    A.  Am I familiar with them?

5    Q.  Yes.

6    A.  I have looked at them.

7    Q.  Well, Dr. Varian, not --

8    A.  I'm familiar that way.

9    Q.  Let me ask it this way:  You know what company I'm

10   referring to when I mention the work "Expedia," don't you?

11   A.  It's an online travel agency.

12   Q.  Yes.  Thank you.

13        And it is a big advertiser on Google Search; is that

14   correct?

15   A.  They advertise heavily on Google Search, is my

16   understanding.

17   Q.  And do you think those ads help Expedia acquire customers?

18   A.  I think the advertising is effective, yes.

19   Q.  Is it fair to say that when buying Google Search ads,

20   advertisers want to be seen prominently on the Google Search

21   results page?

22   A.  They hope to appear on search results page, yes.

23   Q.  In prominent positions?

24   A.  Depends on how much they bid.

25   Q.  No, no.  They hope to appear in prominent positions?

1    A.  They hope to, whatever their bid is.

2    Q.  Yes, appear in a prominent position?

3    A.  They hope to, yes.

4    Q.  Yes.  Thank you.

5          And yesterday, Dr. Varian, you testified that Google can

6    satisfy a broad range of information needs for its users.  Do

7    you recall that?

8    A.  Something I said yesterday?

9    Q.  Yes, sir.

10   A.  I think I recall that, yes.

11   Q.  Yes.  Thank you.

12         If one went to Amazon and typed in a keyword query, is

13   it true that one would not get the same broad range of

14   information from Amazon as one would get from Google if one

15   typed in the same query?

16         THE COURT:  Doesn't that depend on the nature of the

17   query, Mr. Sallet?

18         MR. SALLET:  Let me ask the question again.

19   BY MR. SALLET:

20   Q.  Does Amazon provide the same broad range of information to

21   people who enter queries on its website as Google does to users

22   on the Google search engine?

23   A.  They produce somewhat different results, yes.  Because they

24   use different algorithms, different datasets, different

25   history, different understanding of the users.

1    Q.  If you described Google as broad, you would describe Amazon

2    as narrower in the subject matter of the results it provides,

3    correct?

4    A.  Typically, yes.

5    Q.  Looking at a Google SERP, there was some merchants -- in

6    your experience with -- strike that.

7         In your experience with advertisers, if one were to look

8    at a Google SERP, there would be some merchants one would see

9    who one would not see in the same way on Amazon; is that right?

10   A.  That would be correct, yes.

11   Q.  Users on Amazon can complete a purchase on the Amazon site,

12   correct?

13   A.  They can, yes.

14   Q.  Do you agree that a user on Google searching for a retail

15   product needs to go to another site to complete a purchase?

16   A.  Sometimes you need to go to another site, sometimes you

17   don't.

18   Q.  Can you give me an example where one could purchase a

19   product on the Google search engine's results page without

20   navigating to another page, either a Google page or a

21   third-party page?

22   A.  I can't give you a -- give an example.  I would have to

23   experiment.

24   Q.  Turning to your work as, of course, Google's chief

25   economist, in your time at Google, have you analyzed the ratio

1     of paid to nonpaid clicks that websites receive from Google's

2     general-purpose search engine?

3     A.  Please repeat that.

4     Q.  Sure.  In your time at Google, have you analyzed the ratio

5     of paid to nonpaid clicks that websites receive from Google's

6     general-purpose search engine?

7     A.  I personally have not conducted such a examination.

8     Q.  In your time at Google, have you seen such an examination

9     conducted?

10    A.  I've seen such examinations.

11    Q.  And is one of the reasons Google conducts such analysis --

12    strike that.

13          Is it fair to believe that Google conducts such analyses

14    because it wishes to measure the economic impact on a company

15    that's using Google of the different paid and nonpaid results

16    that come from Google?

17    A.  So just to be clear, your last question before this one you

18    talked about looking at this ratio, and I said I had seen such

19    things done.

20    Q.  Correct.  Yes.

21    A.  But I did not say I've seen them done in Google.  I'll just

22    say that I've seen them done somewhere on the web by some

23    party.

24    Q.  I may be misremembering.

25          My question was:  Have you seen a Google -- has Google

1    done any -- in your -- let me strike that.

2    A.  I don't believe -- that's not what I heard.  What I heard

3    was:  Is it done by someone?  And you're saying, is it done by

4    Google?

5    Q.  And what is your answer?

6    A.  I have seen it for someone.  I haven't seen a specific

7    Google attempt, that issue, during my career at Google.

8                MR. SALLET:  Okay.  Your Honor, I would like to

9    approach the witness to show him a transcript of his deposition

10   and -- with a copy to the Court and a citation to Google.

11               MR. SMURZYASKI:  Is this -- I object.

12               THE COURT:  Is it for purposes of impeachment?

13               MR. SALLET:  Yes, sir.

14               THE COURT:  And this goes to the question that was

15   just asked?

16               MR. SALLET:  Yes.

17               THE COURT:  Why don't you just direct defense counsel

18   to the page and lines so they can take a look.  And if there's

19   no objection, then you can confront him with prior testimony.

20               MR. SALLET:  Yes, Your Honor.  This is the deposition

21   transcript of March 2nd, 2022.  Okay?  And it's page 497,

22   line 20, to 498, line 10.

23               May I hand these up?

24               THE COURT:  Sure.

25               Dr. Varian, I'm going to ask you not to open that

1    until the request has been made.

2              Has defense counsel been able to get to the page and

3    lines in question?

4              MR. SMURZYASKI:  Yes, Your Honor.  He can proceed --

5              THE COURT:  I'm sorry?

6              MR. SMURZYASKI:  I have no objection to proceeding by

7    showing this to the witness.

8              THE COURT:  Okay.  Thank you.

9              Mr. Sallet, why don't you direct Dr. Varian to the

10   page and lines you like him to, and then just confirm his

11   testimony from his March 2nd deposition.

12   BY MR. SALLET:

13   Q.  So, Dr. Varian, I would ask you to turn to page 497 of that

14   transcript.

15             MR. SALLET:  Would Your Honor prefer that I not read

16   it aloud?

17             THE COURT:  No.  Read it aloud, then you can ask him

18   to confirm what your question was and what his answer was.

19             MR. SALLET:  Thank you.

20   A.  Okay.  Which lines are they?

21   BY MR. SALLET:

22   Q.  I'm starting on line 22 of page 497, the sentence that

23   begins with the word "Imagine."  And I would like to read it to

24   you, Dr. Varian.

25   A.  I can read it.  If you want to read it, you can do so.

1    Q.   Thank you.

2         So, on line 22, the question:  Imagine a special-purpose

3    search engine gets 100 units of traffic from Google, and we

4    know 60 come from clicking on an ad the special-purpose search

5    engine bought on the Google SERP, and 40 units came from

6    clicking on nonpaid results, that one could calculate a ratio

7    of paid to nonpaid in that record circumstances.  Does Google

8    track that kind of ratio?

9         Line 5, answer:  Yes, one can track that kind of ratio.

10        Line 6:  And to your knowledge, does Google do so?

11        Line 7:  Yes.  And to my knowledge, it does do so.

12        8:  And where would one go to find such tracking?

13        9:  So, in fact, my team follows that metric.  We

14   created that metric, and you would come to me.

15        Is that the question -- is that the answer you gave,

16   Dr. Varian?

17   A.   Can you tell me where the line begins again?

18        THE COURT:  That's all right.  I can read the page.

19   Those were the questions.  Those were his answers.  Let's move

20   forward.

21   BY MR. SALLET:

22   Q.   So, Dr. Varian --

23   A.   Yep.

24   Q.   -- is -- I'm going to back to a question I tried to ask a

25   moment ago.  Is one of the reasons Google measures the ratio of

1   paid to nonpaid results is to understand the economic impact on

2   a company marketing their websites through Google?

3         THE COURT:  I'm going to ask you to close up the

4   transcript and just listen to the question and see if you can

5   answer the question, please.

6         THE WITNESS:  Yeah.

7         Please repose the question.

8   BY MR. SALLET:

9   Q.  Is one of the reasons that Google tracks ratio of paid to

10  nonpaid results for a website is to understand the economic

11  impact on the website, or the marketer, of Google's delivery of

12  paid and nonpaid results?

13  A.  Yes, it's -- a reason to track that is to look at the

14  performance of the system by comparing the organic to the ad

15  clicks.

16        MR. SALLET:  Thank you, Your Honor.

17        Thank you.  Dr. Varian.

18        Your Honor, I have no further questions.

19        THE COURT:  Thank you, Mr. Sallet.

20        All right.  Examination from Google.

21        MR. DINTZER:  Your Honor, would it be okay if I stand

22  over there so I can see what he's --

23        MR. SMURZYASKI:  If I use it, I'll let you.

24        MR. DINTZER:  We would ask that Counsel not write on

25  it.  He's welcome to make his own.

491

```
 1            THE COURT:  How do you intend to use the chart there?
 2    Write on the blank pages?
 3            MR. SMURZYASKI:  If it's reserved for use by the
 4    Department of Justice, I'll use the Elmo.
 5            MR. DINTZER:  He's welcome to use the paper.  I just
 6    don't want him to write on the images that we've already --
 7            THE COURT:  Well, let's just turn to a clean page.  I
 8    didn't know if you were -- this was government property that
 9    Google couldn't use.
10            MR. DINTZER:  Not being territorial at all, Your
11    Honor.  He's welcome to use it.
12            THE COURT:  They don't have charts like this at
13    Google.
14                        CROSS EXAMINATION
15    BY MR. SMURZYASKI:
16    Q.  Good afternoon, Dr. Varian.  You still have the binder in
17    front of you of the exhibits that the Department of Justice
18    provided to you?
19    A.  Could you say that again?
20            THE COURT:  It's right in front of you, Dr. Varian.
21            THE WITNESS:  Yes.
22    BY MR. SMURZYASKI:
23    Q.  If you would start, sir, by turning to UPX960.
24    A.  UPX -- it's at the very end; is that right?
25    Q.  It's most of the way through, I think.
```

1    A.  UPX9 --

2           THE COURT:  Counsel, if you want to come around.

3    A.  I'm having trouble finding this.

4    BY MR. SMURZYASKI:

5    Q.  Let me help you.

6    A.  Okay.  Yes.

7    Q.  Dr. Varian, this document talks about the browser home page

8    in 2007; is that right?

9    A.  Yes.

10   Q.  How was the home page used on a browser 16 years ago, in

11   2007?

12   A.  It's a long time ago, as you suggest.  And it would be used

13   by turning on the browser and then seeing what page comes up

14   from that click.  And that is what they seem to be calling the

15   browser home page.

16   Q.  Today, does a browser home page have any particular

17   significance in the way that Google distributes its search

18   product?

19   A.  No, not really.

20   Q.  If you would turn -- and we'll put it up on the screen for

21   you as well -- to the page that ends in 518.

22   A.  I see that.

23   Q.  And on this page, there is a representation of percent of

24   searchers from homers.  Do you see that?

25   A.  Yes.

1    Q.  And what is your understanding of what that means?

2    A.  My understanding is, for Yahoo! and Microsoft network, it's

3    about 72 percent of the searches come from their home page for

4    their browser -- I mean, for their search engine.

5    Q.  And with respect to Google, what percentage of its searches

6    came through this browser home page in 2007?

7    A.  About 24 percent, according to the diagram.

8    Q.  And what, if anything, does that indicate to you about the

9    importance of a default home page to Google in 2007?

10   A.  That suggests it's not large.

11   Q.  And why was that?

12   A.  Because the world moves on.  At one time the browser was

13   critically important.  And these days, there's a box that

14   allows you to easily use a browser for whatever purposes you

15   want.

16   Q.  How did the other 76 percent of users of Google get to

17   Google in 2007?

18   A.  I don't know.

19   Q.  Do you recall yesterday that you were shown a number of

20   emails where Penny Chu calculated Google's share of some metric

21   as compared to Bing and Yahoo!?

22   A.  Yes.

23   Q.  Did others besides Penny Chu do an analysis that compared

24   Google's performance to other companies on other metrics?

25              MR. DINTZER:  Objection, Your Honor.  Best evidence.

1    Seems to be asking for the contents of a document that we

2    haven't seen.

3            THE COURT:  Well, let him answer the question, first,

4    and we'll see where it goes from there.

5            So re-ask the question, please.

6    BY MR. SMURZYASKI:

7    Q.  Dr. Varian, are you aware of others at Google doing

8    analysis on other companies other than Bing and Yahoo! in which

9    they compared the performance of Google to some other company

10   on a particular metric?

11   A.  There would likely be other units within Google that do

12   that sort of analysis.

13   Q.  For example, comparing Google to Amazon?

14   A.  Well, people were doing sales.  For example, there would be

15   representatives who would deal with Amazon-related issues, and

16   they would want to know the kinds of -- the answers to the

17   questions you described.

18   Q.  As chief economist to Google, were you aware of every study

19   that was done within Google that compared Google to another

20   company?

21   A.  No.

22   Q.  Yesterday, you were asked some questions on search quality.

23   Do you recall those?

24   A.  Yes.

25   Q.  Would you consider yourself to be an expert in search

1    quality?

2    A.  I would not consider myself to be an expert.  We have

3    specialists who deal with that topic.

4    Q.  All right.  And one of the documents we looked at

5    yesterday, and, in fact, today, as well, was UPX180.  Maybe

6    I'll get that up for you.

7    A.  Oh, yes.  Okay.

8    Q.  And, Dr. Varian, do you recall this was a -- if you look at

9    the binder, an email exchange between you and Udi Manber that

10   went back and forth a number of instances; is that right?

11   A.  Yes.

12   Q.  And I want to direct your attention to something you wrote

13   to Mr. Manber on page 3 of this document.

14        And if you see on page 2, it's from you.  And then

15   continuing on to page 3, you write:  Here is what I say on a

16   slide.  Would you disagree with any of this?

17        And then you list out a number of points, including that

18   there are diminishing returns to data.

19        Do you see that?

20   A.  That's my view, yes.

21   Q.  All right.  And then let's move forward -- if we could,

22   Allen -- to Mr. Manber's reply in this email chain to you on

23   that topic.  You wrote:  This slide is fine.

24        What did you understand Mr. Manber to be indicating to

25   you about that point?

1   A.  I can't refer to what I understood in 2009.  That's a long

2   time ago.  And I'm not quite sure what Udi meant at this

3   period, many years later.

4   Q.  Well, if we go -- on the slide you indicated, among other

5   things, that you were going to present a slide that said:

6   There are diminishing returns to data.

7   A.  Right.  Yes.

8   Q.  But, what is your view as to whether there are diminishing

9   returns to data?

10  A.  I believe there are diminishing returns to data.  And as I

11  read this document, I believe that Udi is referring to -- "This

12  slide is fine," he's referring to this slide where I say:

13  There are diminishing returns to data, and, of course, data is

14  more valuable -- or, is valuable.

15          MR. SMURZYASKI:  I am going to borrow this.

16          If I turn it this way, will you be able to see it?

17          MR. DINTZER:  Yes.

18          THE COURT:  I think the problem, then, is the witness

19  can't see.  Why don't you -- Counsel, why don't you put it over

20  on the other side of the courtroom.

21          MR. SALLET:  Do you want me to help you?

22          MR. SMURZYASKI:  A little low on technology, Judge.

23          THE COURT:  This happens when you represent a tech

24  company.

25          MR. SMURZYASKI:  If you could go further up, Allen,

```
 1    in the document.
 2    BY MR. SMURZYASKI:
 3    Q.  There's an email from Mr. Manber at 9:40 p.m. to you in
 4    which he writes a number of things, and one of the things he
 5    writes there at the bottom:  I would not be surprised if
 6    Microsoft is already buying that data.  So, practically, they
 7    might already have 30 percent plus, maybe even more.
 8          And that was something that you received from
 9    Mr. Manber?
10    A.  It looks like it, yes.
11    Q.  And if you go further up in that same email from
12    Mr. Manber, he wrote to you:  I have no doubts that Yahoo!
13    could have competed without Microsoft, if they wanted.
14          Was that another point that Mr. Manber had made to you
15    in 2009?
16    A.  I think this is the first time I've seen that point made in
17    print in this document.  I don't know whether he said this
18    conversationally as well.
19    Q.  I'm not asking about conversationally at the moment,
20    Dr. Varian.  I just want to focus on the email.
21          Is that something that Mr. Manber related to you in this
22    email?
23    A.  Yes.
24    Q.  And in that same section Mr. Manber writes to you, in the
25    second sentence:  There are a lot of factors in the success of
```

1    a search engine.

2    A.  I see that, yes.

3    Q.  Okay.  My fifth grade teacher will be appalled, but

4    hopefully you can read those.

5         Could you now, Allen, go up to the top email in this

6    chain?  In which you wrote to Mr. Manber:  So we agree that,

7    one, the incremental value data is less the more data you have;

8    two, Microsoft can buy data relatively easily; three, Yahoo!

9    could have competed without Microsoft; four, there are lots of

10   factors in the success of a search engine.

11        And then you go on and write:  So, when Mr. Ballmer

12   says, quote, This deal is all emphasis about scale, close

13   quote, one might be tempted to say that his claim is, well,

14   bogus.

15        And you wrote that; correct?

16   A.  Yes.

17   Q.  At the top there, you see Mr. Manber wrote:  No, I do not

18   agree with this.

19   A.  I don't see that.

20   Q.  I'm sorry.

21        Could you highlight that, Allen?  Thank you.

22   A.  Oh.  No, I do not agree with this.

23            Yes, I see that.

24   Q.  Dr. Varian, when you received that, what did you understand

25   Mr. Manber not to agree with?

1   A.  I think that he did not agree with one or more of those

2   statements.

3   Q.  Did you understand Mr. Manber to agree with you, with your

4   statement that the incremental value data is less the more you

5   have?

6   A.  As I read the rest of this exchange, I thought he was

7   agreeing with me about, at least, these four points.  So I

8   said:  So we agree that -- colon, colon, colon.

9         So I was a little surprised to see:  I do not agree

10  with this.

11  Q.  Did Mr. Manber ever express to you the view that your

12  contention that Mr. Ballmer's statement that "This deal is all

13  about scale is bogus," did he agree with that or disagree with

14  that?

15  A.  He did not like the use of the term "bogus."

16  Q.  Why did you use the term "bogus" to describe Mr. Ballmer's

17  description as "all about scale"?

18  A.  It was a funny word, "bogus," and it seemed to me this was

19  kind of a lighthearted claim.  Well, it isn't really all about

20  scale.  There's lots of things that go along with an

21  acquisition.  You hire people, you hire machines, you hire real

22  estate, you hire intellectual property.  But he is saying it's

23  all about scale.  That seemed bogus to me.

24  Q.  Now, we talked about diminishing returns.  Do you recall

25  that?

1    A.   Yes.

2    Q.   Dr. Varian, does what I drew on the chart there, with

3    quality on one axis and data on the other access -- and if I've

4    done it right, a sigmoid curve -- reflects the concept of

5    diminishing returns?

6    A.   It reflects the concept of a variety of different returns,

7    because we see periods where it's growing rapidly and periods

8    where it's growing very slowly.  And, so, it's a way to sort of

9    put information into just that one curve that shows various

10   kinds of returns.

11   Q.   In 2009, when you were having your discussions with

12   Mr. Manber, did Mr. Manber indicate where on such a diminishing

13   return scale -- a curve, excuse me -- either Microsoft or

14   Google landed?

15   A.   I don't believe so.

16   Q.   He didn't indicate, for example, whether Microsoft or

17   Google were at, say, point B or point A?

18   A.   I don't recall him making that point.

19   Q.   Could you turn to UPX151 in your binder, please?

20   A.   UPX1 --

21   Q.   Let me get it for you, sir.

22   A.   All right.  Good.

23   Q.   It's been a long day.  I know.

24   A.   Yes.  Repetition builds -- okay.

25   Q.   And do you recall being asked some questions about this

1   document yesterday?

2   A.  Who being asked these questions?

3   Q.  You, sir.

4   A.  No, no.  But --

5   Q.  Do you recall being asked questions about this document

6   yesterday?

7   A.  Yes.

8   Q.  Okay.  And one of the topics that was discussed was user

9   switching costs.

10  A.  Yes.

11  Q.  And you were directed to some language there, and I want to

12  show you, under User Switching Costs, the second paragraph that

13  you wrote there.

14  A.  Yes.

15  Q.  And in that first sentence in the second paragraph, you

16  write:  The first, and most important way, to do this is to

17  make Google a better product than whatever Microsoft provides.

18       Do you see that?

19  A.  Yes.

20  Q.  Why did you write that?

21  A.  Because I think it's a true statement.  That generally,

22  that's going to be the best way to create switching costs, is

23  to make a product that's far better than your competitor's.

24  Q.  And do you have any understanding as to whether Google

25  pursued that strategy?

1    A.  Google has emphasized quality from the very beginning.

2    Q.  Has that changed over time?

3    A.  I don't believe so, no.

4    Q.  Direct you to 452.

5    A.  Okay.

6    Q.  It's hard to read that.

7    A.  Yes, it's very hard to read.

8    Q.  We'll get it on the screen.

9         Allen, if you could pull up on page 4, the portion

10   below -- beginning with -- I'm sorry.  Scroll up -- where it

11   says "I agree with the point," and then go on.

12   A.  Agree with the point, yes.

13   Q.  All right.  When you were asked questions earlier today,

14   you were asked about that first sentence:  I agree with the

15   point that defending Google's profits is difficult, but I'm

16   going to try anyway.

17        What were the points that you were illustrating there on

18   that question?

19   A.  My point is that Google's profit is due to its performance.

20   It lowered the price of ads online, increases ad effectiveness

21   by using different interfaces.  We built a better mousetrap.

22   So that's why the world is beating at their door.

23   Q.  You continued on with some additional points.  What were

24   you conveying there?

25   A.  So in this one, on point 2, or on --

1    Q.  Two, 3, and 4, yes.

2    A.  Two, 3, and 4.  Okay.

3          If you look at Google's revenue to user, it's on the

4    order of $65 a year.

5          That was just a back-of-the-envelope calculation at

6    that time.  It's a very small amount of money to get the kind

7    of services that you get from Google services.  And Google

8    advertisers, same thing.  It's around 2- to $300 a year --

9    that's pounds, excuse me.  And previously, the kind of

10   advertising quality that you got was only for big

11   multinationals, because only they could afford it, but Google

12   has made this global advertising available to everyone.  So, we

13   have a report about economic import on that -- economic impact

14   on that point.

15         And if you are selling the -- finally, the last point

16   is, if you were selling a unique product that no one else had,

17   you would get a very, very attractive price for that image --

18   that ad that you're offering, because most of our revenue comes

19   from auctions where the advertisers have to compete against

20   each other in order to be shown.  But, if you're selling --

21   you're the only seller of a product, then you get -- basically,

22   just the reservation place is the price they'd sell it to you.

23   Q.  All right.  Allen, if you could bring up the very first

24   paragraph in that email up at the top:  My concern is...

25         Can you read that, Dr. Varian?

1    A.  I can read that.

2    Q.  Okay.  And you write:  My concern is with market, which I

3    usually think involves financial transactions of some sort.

4         What was your observation there?

5    A.  My observation is that a market typically involves

6    financial transactions of one thing or another.  The search on

7    Google does not involve financial transactions of any sort,

8    whereas the ads do.  You're paying the provider for providing

9    the ad.

10   Q.  And what contrast were you drawing there between search

11   activity and ads activity?

12   A.  Well, search activity -- sorry.  Ads activity is paid for,

13   whereas search activity is free to users.

14   Q.  And when you described that as a "market," what did you

15   mean by that?

16   A.  Well, I said that's -- the advertising could involve a

17   market.  You could talk about an advertising industry or

18   advertising market for all media -- TV, focus, prints,

19   et cetera.  And, here, we're just saying we'll do the same

20   logical thing, of looking and defining this for online ads,

21   markets.

22   Q.  In that paragraph, were you distinguishing in any way

23   between any types of ads that could appear in a digital space?

24   A.  In this little sentence, I did not.

25   Q.  Going to ask you to turn to UPX910.

1    A.  Before we go there, could I say something about David

2    Stallibrass and John Fingleton?

3              MR. DINTZER:  Objection, Your Honor.

4              THE WITNESS:  No?  Okay.

5              MR. DINTZER:  Usually, we do the Q&A here.

6              THE COURT:  Well, would you like to ask him a

7    question that he can answer?

8    BY MR. SMURZYASKI:

9    Q.  Dr. Varian, is there something you wanted to add about

10   people with whom you were communicating?

11   A.  Yeah.  They were experts in antitrust, both of them, and a

12   long history of studying this.  I was being appropriately

13   modest in terms of the questions I was addressing to them.  So,

14   when I put quotes around "market," I'm ambiguous about exactly

15   what I mean by that because I want them to clarify the issues

16   to me.

17   Q.  All right.  Let me turn to UPX910.

18              And, Dr. Varian, this is a collection of talking points,

19   and you were asked some questions, particularly on page 2,

20   under Use of Data.

21              And, Allen, if you could blow up that -- yes, that

22   section there.

23   A.  Yes.

24   Q.  There, you make the observation that search ads have a --

25   I'll read it in completely.  Strike that.

1              There, you write:  The vast majority of our profits come

2      from search ads because the signal from a query is so strong.

3      Example of tennis rackets.  Strong indicator of interest in

4      buying a tennis racket, much stronger than what you searched on

5      three days ago.

6              And my question to you is:  What about a website you had

7      visited 15 minutes ago?  Would that give, in your view, a

8      signal of an indication of buying?

9      A.  Yes, that would be a stronger signal.

10     Q.  And you also -- you continue on:  What about -- or, what

11     article you read yesterday.  But if you're reading an article

12     in a tennis magazine, for example, does that provide any sort

13     of signal of intent as to the user's interest in buying tennis

14     rackets?

15     A.  Right.  That's called contextual targeting or context

16     targeting, where you are using the contents of on article to go

17     to recognize user interests and potential purchases.

18     Q.  All right.  The last document I'm going to show you is the

19     very first in the -- well, UPX26.  But, let me help you get to

20     it.

21     A.  Okay.  Oh, yes.

22     Q.  And you were shown on the second page -- well, let's

23     start -- the way the document works, there are sections and

24     subsections, and section 3 is Display Ads.

25              THE COURT:  Sorry, Counselor.  Do you have a sense of

 1    how much you're going to ask him about this document?

 2                MR. SMURZYASKI:  Very little.

 3                THE COURT:  I'm trying to decide whether to break now

 4    or after --

 5                MR. SMURZYASKI:  We can -- we can go two minutes, and

 6    then I think I'll be done with my questions.

 7                THE COURT:  Perfect.  That's all I wanted to know.

 8    BY MR. SMURZYASKI:

 9    Q.  So, you see the heading Display Ads on page 1, under

10    Heading 3?

11                Do you see that, Dr. Varian?

12    A.  Yes.

13    Q.  Okay.  And then continuing on to the second page, there's a

14    Subsection D.  And you were asked about the first sentence, and

15    I want to ask you about the remainder of that paragraph.

16                So the paragraph reads:  Most of the value of retargeted

17    ads occurs in the first hour or so after the user visits the

18    advertiser's web page.  Ideally, the retargeted ad is seen by

19    the user very close in time to the original web page view.

20    This is why we have seen a convergence in search ads and online

21    display ads.  The search ads are shown immediately after the

22    search, before the user clicks an ad, and the retargeted

23    display ads are shown soon after the user visits a merchant's

24    website.  Both ads are in close proximity to the visit to the

25    merchant's site.

1        And my question to you, sir, is:  What did you mean "a

2    convergence in search ads and online display ads" there?

3    A.  Well, search ads we're familiar with.  This is where you

4    type in a search and you get back search results plus some ads.

5        And contextual targeting of the way I have described

6    is another way that people see ads.  It's, namely, they're

7    looking at a web page that has to do with some topic, and so

8    that shows they have an interest in it and that shows it might

9    be a good place for an ad.

10        And, finally, there's retargeting, which I describe

11    here, which is where something they've done in the past has

12    signaled interest in one way or the other, and you see that ad

13    in other content, in new content, even though it may be a few

14    hours or a day or so older.

15        MR. SMURZYASKI:  Thank you, Dr. Varian.  I have no

16    further questions.

17        THE COURT:  No further questions about the document

18    or --

19        MR. SMURZYASKI:  At all.

20        THE COURT:  At all.  Okay.

21        All right.  Is the government going to have a

22    redirect?

23        MR. DINTZER:  Your Honor, if we're going to take a

24    break, it would help us to sort through to make sure we don't

25    waste anybody else's time.

1          THE COURT:  Sure.  All right.  So 3 o'clock now.

2     We'll resume -- a little after 3, so why don't we resume at

3     3:20.  Thank you, everyone.

4          MR. DINTZER:  Thank you, Your Honor.

5          (Recess.)

6          MR. DINTZER:  Your Honor, we have no further

7     questions for the witness.  And I understand he's on his way to

8     catch a plane.  So, we let counsel know so we could do that.

9          THE COURT:  All right.  Terrific.

10         MR. DINTZER:  Oh, I'm sorry.

11         THE COURT:  No.  Go ahead.

12         MR. DINTZER:  We wanted to revisit UPX952, the Carl

13    Shapiro email.  We had a little bit more intelligence, and we

14    would like to share that with the Court.

15         THE COURT:  Okay.

16         MR. DINTZER:  So if I may approach?

17         So, Your Honor, this is copies of Google's privilege

18    log.  The first one is a full line, all the way across.  And

19    then we've printed it out larger for the second and third so

20    that it's a little easier to see.  I'm happy to put it on the

21    Elmo, if the Court would like.

22         But what the Court can see is, is that emails from or

23    communications from Dr. Varian to Carl Shapiro were -- Google

24    has asserted privilege on them for July and August -- I'm

25    sorry -- for July of 2020.  So that was a month and a half

1   before -- two months before they sent the email.  And, so, if

2   Carl Shapiro wasn't working for Google, those would not be

3   privileged.  And so there is an assertion by Google,

4   presumably, that Dr. Shapiro was working for them.

5           And, so, if he wasn't, then we would like these

6   documents.  And if he was, then we would ask that all of UPX952

7   be admitted for the truth.

8           MR. SCHMIDTLEIN:  The fact that Mr. Shapiro may have

9   been working as a consultant on privileged matters does not

10  turn that email from him back to Mr. Varian into a statement by

11  Google.  They have established no foundation of, you know,

12  whether Mr. -- they could have gone and tried to depose

13  Mr. Shapiro about the email.  They didn't.  So, they have no

14  foundation -- they have no foundation for whatever bases or

15  whatever the meaning of the email is.

16          For them to offer that short email for the truth of

17  the matter asserted, based on the fact that he was retained or

18  may have had some retention in some unknown matter

19  not related -- I can tell you this:  It's not related to this

20  case.  There's just no basis to turn that into a statement by

21  Google.

22          The COURT:  Okay.  Look, I think the bottom line is,

23  this is another piece of the puzzle, "this" being the privilege

24  log.  I do think it doesn't provide a full picture.  It's going

25  to be a long trial.  You've got some time to, perhaps, provide

1      some other data.

2              I will say this:  I mean, the -- in a sense -- it

3      isn't really hearsay in the sense that I'm not sure -- well,

4      let me put it differently.

5              Even if this is being asserted for the truth, it's

6      not admissible for that purpose because it's a legal

7      conclusion, and the legal conclusion is mine.  So I wouldn't

8      view it as a factual assertion.  At most, it is one economist's

9      opinion.  Now, whether that should be given some weight or not,

10     okay.  I mean, I know who Carl Shapiro is and we've heard a

11     little bit about him.

12             But, in terms of whether it's -- you know, we really

13     need to seek a hearsay exception.  You know, I know I suggested

14     that, perhaps, that it's not hearsay.  I know I suggested that

15     more information might be helpful, but at the end of the day,

16     I'm not even sure that it falls in that category, even if this

17     is something that's being offered as a statement by a party

18     opponent.

19             So I'll leave it to you to determine whether you want

20     to continue to see if you can obtain information and facts to

21     shore this up.  But, as I said, you know, I think -- you know,

22     this is clearly a legal conclusion about whether a particular

23     contract, specifically whether the RSAs are procompetitive or

24     not procompetitive.  And, you know, that's a legal

25     determination, it seems to me.

1          MR. DINTZER:  With all respect, Your Honor, since

2     he's an economist, it's an economic opinion.

3          THE COURT:  No, I understand.

4          MR. DINTZER:  And, so -- but I --

5          THE COURT:  It's not an opinion, you know, from just

6     some layperson on the streets, and I get that.

7          MR. DINTZER:  And, also, I mean, Google is -- seems

8     to be acknowledging that he's worked -- that he's working for

9     them at this time, and so we've checked the boxes.  So, we

10    would ask -- I understand that the Court may take a finite view

11    of what we're offering, but just for the sake of completing the

12    record, we would ask the Court to move the entire exhibit into

13    evidence.

14         THE COURT:  Okay.  Well, as I said, I'm going to

15    leave that issue open.  I mean, I have a representation from

16    Google's counsel that to the extent Dr. Shapiro was retained by

17    Google, it may not have been on this matter.  If it wasn't on

18    this matter, then it's arguably not within the scope of what he

19    was retained to say on Google's behalf or communicate on

20    Google's behalf.  So, as I said, it just would be helpful to

21    have more facts.

22         But, as I said, at the end of the day, I'm not going

23    to take it as an admission from Google.  It's an opinion by an

24    economist that will weigh in on my ultimate legal

25    determination.

 1                  MR. DINTZER:  Understood, Your Honor.  Thank you.

 2                  THE COURT:  Okay.  All right.

 3                  Is the government ready with the next witness?

 4                  MR. HAFENBRACK:  Yes, Your Honor.  Joshua Hafenbrack

 5      for the United States.

 6                  THE COURT:  Good afternoon, Mr. Hafenbrack.

 7                  MR. HAFENBRACK:  Good afternoon, Your Honor.

 8                  And the government calls Professor Antonio Rangel.

 9                  THE COURT:  Does the court reporter have the spelling

10      of your last name?

11                  MR. HAFENBRACK:  I can do it for him.  It's a tough

12      one.  H-A-F-E-N-B-R-A-C-K.

13                  THE COURT:  I got it right.  It wasn't that hard.

14                          ANTONIO RANGEL,

15      was called as a witness and, having been first duly sworn, was

16      examined and testified as follows:

17                  THE COURT:  Dr. Rangel, welcome.  Why don't you have

18      a seat.

19                  MR. HAFENBRACK:  And, Your Honor, I've got a couple

20      of presentation binders, if I may approach?

21                  THE COURT:  Sure.

22                  MR. HAFENBRACK:  And, Your Honor, you'll see, as we

23      walk through this presentation, that a number of the slides

24      discuss redacted information that's been designated by Google

25      or third parties as confidential.  So we do intend, at the end

1    of Professor Rangel's direct testimony, to offer these slides

2    into evidence for the purpose of, you know, as though he read

3    them into court, which he otherwise would have done, absent the

4    confidentiality issues.

5              THE COURT:  Okay.  I take it there's no objection to

6    the exhibit itself?

7              MR. SCHMIDTLEIN:  I haven't seen it until just right

8    now.

9              THE COURT:  Okay.  All right.  Well, how about we can

10   have a discussion about that?  And, again, this is expert

11   testimony.  It's a little -- it falls in a different category.

12   But, in any event, we'll offer it and go through it with him.

13   If there's something particular Google wants to object to,

14   we'll hear them out.

15             MR. SCHMIDTLEIN:  Sure.  It's a demonstrative.  If

16   they're going to try to offer this for the truth of the matter

17   asserted, I probably am going to object to that.

18             THE COURT:  I think the question is whether -- I

19   don't know what's in here, and so if there are certain types of

20   evidence that could be admitted, even though it's coming in

21   through this PowerPoint, I guess I can take that up.

22             MR. HAFENBRACK:  And the issue, Your Honor, is that

23   the slide deck contains things that Professor Rangel would

24   otherwise say during his testimony that he can't say in open

25   court.

1          THE COURT:  I understand that.  I understand that.

2          MR. HAFENBRACK:  May we proceed?

3          THE COURT:  Sure.

4                         DIRECT EXAMINATION

5      BY MR. HAFENBRACK:

6      Q.  Professor Rangel, please introduce yourself to the Court.

7      A.  Good afternoon.  My name is Antonio Rangel.  I'm a

8      professor of neuroscience, behavioral biology, and economics at

9      Caltech.

10     Q.  And, Professor Rangel, what is your educational background?

11     A.  I have a bachelor's in science in economics from Caltech in

12     1993.  A master in science, Your Honor, from 1998 (sic), in

13     economics.  And from Harvard.  I don't know if I said.  And a

14     Ph.D. in economics from the same university in 1998; '96

15     Master's, '98 Ph.D.

16     Q.  When did you join the Caltech faculty?

17     A.  2006.

18     Q.  And, Professor -- but, before joining the faculty at

19     Caltech, did you teach elsewhere?

20     A.  I did.  I was a professor of economics -- assistant

21     professor of economics from 1998 to 2006 at Stanford

22     University.

23     Q.  And, Professor Rangel, what is your academic specialty?

24     A.  I work at the intersection of behavioral economics and

25     cognitive neuroscience.  And I work in a area that is often

1    called neuroeconomics.  The goal of this is to understand how

2    people, including consumers, make decisions.

3    Q.  And what is behavioral economics, Professor Rangel?

4    A.  Behavior economics is a branch of economics that brings in

5    ideas and concepts from psychology and neuroscience with the

6    goal of improving our understanding of how people make

7    decisions, including consumers, with the goal of making better

8    descriptors, better predictors, better explanations.

9    Q.  And you mentioned behavior economics and neuroeconomics.

10   Is there any distinction between those two categories?

11   A.  I would say it's a difference in emphasis.  Both areas are

12   interested in how people make decisions and what factors affect

13   those decisions.  Behavioral economists tend to focus more only

14   on the behavior, what variables in the environment affect that

15   behavior.

16           Neuroeconomics goes one step beyond that, Your Honor.

17   It seeks, also, to understand what are the neuromechanisms that

18   generate those behaviors.

19   Q.  And what role does behavioral economics play in

20   understanding consumers' economic decisions?

21   A.  Standard, old-style economic models assume that people were

22   these extremely rational machines.  They can absorb all

23   information, process all information without making mistakes,

24   always arriving at the right inference, always making the right

25   choice, with zero computational costs or friction or loss in

1    their heads.

2              Behavioral economics relaxes that assumption by

3    building more realistic models of humans.

4    Q.  And, Professor Rangel, at a high level, what are you

5    planning to testify about today?

6    A.  I will provide testimony about my analysis applying

7    behavioral economics to the problem of search engine defaults.

8    Q.  Did you teach courses on behavioral economics?

9    A.  I have.  Over the years, I have taught many courses on this

10   topic, both at Caltech and at Stanford.

11   Q.  Do you teach general economic courses as well?

12   A.  I do.  My favorite economics course to teach is principles

13   of economics.  It's the first course that students take in

14   college when they arrive, and I taught it on and off for most

15   of my career.  I really enjoy it.

16   Q.  Have you published peer-reviewed academic papers in the

17   field of behavioral economics?

18   A.  I have published about 76 peer-reviewed articles in my

19   career, and I would say the majority of them are in behavioral

20   economics.

21   Q.  Could you discuss for the Court a notable example of a

22   paper you've published in the field of behavioral economics?

23   A.  Sure.  With pleasure.  Of course.  So, here's a problem

24   that we have been obsessed over the years in my laboratory, and

25   that we publish an article on.  When you go to a supermarket

1    aisle and you stand in front of that cereal aisle, there are

2    all of these objects around you.  You move your eyes to make

3    choices until you find what you want.  One fundamental

4    question, Your Honor, was:  What is the role of your eye

5    movements in the process of choice?

6          And even more importantly, if I somehow were able to

7    influence how you move your eyes -- with lighting, with

8    packaging, with product placement -- would I be able to

9    influence your choices?

10          And we built a theoretical model that explains with

11   high accuracy those processes.  And in particular, it showed

12   that if I move your eyes, I can manipulate your fixations.  I

13   can manipulate your choices by quite a bit.

14   Q.  Was that paper published somewhere?

15   A.  Yes.  It was published in a journal called *Nature*

16   *Neuroscience* in 2010.  It's a paper that has had over 1400

17   citations.

18          THE COURT:  That explains the box of cereal I have in

19   my cabinet that I didn't know why I bought it.

20          THE WITNESS:  Yes.

21   BY MR. HAFENBRACK:

22   Q.  Professor Rangel, have you received any award or

23   commendations in the field of behavioral economics?

24   A.  Over the years, Your Honor, I have received a number of

25   awards for my work.  In 2019, I was awarded the Distinguished

1    Scientist Award by the NOMIS Foundation.  I am a past president

2    of the Society for Neuroeconomics.  I am a Fellow of the

3    Association of Psychological Science.  That publishes a lot of

4    work in behavioral economics.  And maybe more important for any

5    scientist who collects data, I have obtained, over the years,

6    around $60 million in grants to carry out this research.

7    Q.  And you mentioned a lab that you're associated with at

8    Caltech.  What's that lab called?

9    A.  Yes.  I do the majority of my work in something called the

10   Rangel Neuroeconomics Lab, Your Honor.  That's where my grad

11   students, associates and I carry out our day-to-day

12   experimental work.  Over the years, on and off, I've also be a

13   codirector of the Caltech Brain Imaging Center.

14          MR. HAFENBRACK:  Your Honor, at this time, the

15   government offers Professor Rangel as an expert in behavioral

16   economics.

17          THE COURT:  Any objection?

18          MR. SCHMIDTLEIN:  No objection.

19          THE COURT:  All right.  So, we'll accept Professor

20   Rangel as an expert in behavioral economics.

21          MR. HAFENBRACK:  Thank you, Your Honor.

22   BY MR. HAFENBRACK:

23   Q.  And, Professor Rangel, have you prepared a slide

24   presentation to assist with your testimony today?

25   A.  I have.

```
 1              MR. HAFENBRACK:  Your Honor, may we publish?

 2              THE COURT:  Yes.

 3    BY MR. HAFENBRACK:

 4    Q.  Professor Rangel, are you familiar with the concept of

 5    defaults as it relates to behavioral economics?

 6    A.  I am.

 7    Q.  And what is a default?

 8    A.  Your Honor, in behavioral economics, a default is an option

 9    that gets chosen by a third party -- not by the consumer --

10    that becomes a choice unless that consumer takes action to

11    change it.  And I thought it would be useful for the Court to

12    see an everyday example.

13              In the diagram that you all can see is a picture of

14    an interface that, in 2023, has become highly familiar to all

15    of us.  When you go to a coffeehouse, when you go to buy a

16    sandwich, we often pay with this credit card interfaces.  And

17    after we initiate payment, we see a diagram that looks like

18    this asking us how much to tip.

19              In an interface without default, you would see

20    several potential tips.  None of them would be pre-highlighted,

21    and the consumer would proceed by selecting explicitly one of

22    them and then completing the transaction.

23              In the interface shown in this slide, one of them is

24    preselected.  And if the consumer does not change it, just does

25    the click to complete the transactions, that becomes a choice.
```

```
 1    Q.  Are defaults a topic that's commonly studied in behavioral

 2    economics?

 3    A.  Yes, they are.  I would go as far as to say, Your Honor,

 4    that it is very hard to think of a good course in behavioral

 5    economics taught at a good university that does not cover this

 6    topic.

 7    Q.  Do you teach defaults in your behavioral economics courses?

 8    A.  I have.

 9    Q.  Professor Rangel, I would like to ask you about your

10    assignment in this case.  Okay?

11         Who hired you as an expert here?

12    A.  The United States Department of Justice.

13    Q.  And what was your assignment?

14    A.  Your Honor, I was given three assignments.  Each one of

15    them is listed in the slide in a separate row.  The first

16    assignment was to evaluate the impact of Google's search engine

17    defaults, what do they do to consumer search.

18         The second one is to compare if this impact is

19    different between mobile devices and personal computers.

20         And, finally, it's to evaluate if the existence of

21    search engine defaults, as well as the existence of defaults in

22    the privacy settings associated with search, affect consumer

23    decisions in search.

24    Q.  Okay.  And how did you carry out your assignment?

25    A.  Your Honor, at a very high level, to carry out my
```

1    assignment I did a number of things.  First, foremost, I have

2    relied on my 20-plus years of teaching and research in this

3    area.  That knowledge is always informing my opinions.

4           But, more specifically, I started my work in this

5    case by going back to the literature in behavioral economics

6    studying defaults, and looking at a large number of the

7    studies, investigating what was the impact of defaults on

8    consumer choice in a very large number of domains.  And just

9    trying to understand, over this whole literature, what is the

10   consensus in behavioral economics about the robustness, the

11   magnitudes of these affects, the mechanisms through which they

12   operate.

13          Then, I took the knowledge from this consensus of

14   behavioral economics and I apply it to the case of search

15   engine defaults.  What does this knowledge says about what

16   happens in this case?

17          But, I didn't stop there.  I also reviewed a large

18   number of case material.  And the goal, Your Honor, for me, was

19   to ask the following question:  Behavioral economics points to

20   clear conclusions about what should happen and why.  I wanted

21   to see if the participants in the market, people who are

22   thinking about this from within these companies, are reaching

23   conclusions and using language or concepts that are similar to

24   the conclusions in behavioral economics.  And the answer is,

25   yes, largely, as you will see.

1          Finally, there are a number of market events that I

2    encounter in which a default has either been added or removed

3    or is different between two similar devices that allow us to

4    ask what data is specific to consumer search, what happens when

5    a default is changed.  And, again, I use that to validate the

6    behavioral analysis and to compare it with the evidence from

7    the case materials.

8    Q.  Did you submit reports in this matter?

9    A.  I did.  I submitted three reports and a summary report.

10   Q.  Did you personally draft those reports?

11   A.  The reports, Your Honor, are drafted by me, with one

12   exception:  That your world has a very unique way of writing

13   footnotes on references, and I needed help with that.

14   Q.  And what conclusions did you reach, Professor Rangel?

15   A.  Your Honor, here are my conclusions at a very high level.

16   I list them in three rows, one conclusion associated with each

17   assignment.  My first conclusion is that search engine defaults

18   generate a sizeable and robust bias in consumer search.

19          My second conclusion is that this default affects,

20   these biases, are stronger in mobile than in personal

21   computers.

22          And, finally, at a high level, that the existence of

23   defaults in search and defaults in privacy affect, also,

24   consumers' privacy choices.

25   Q.  With respect to your first conclusion, Professor Rangel, I

 1    want to ask you about the terms you used there, "a sizeable and

 2    robust bias."

 3          What does "bias" mean in behavioral economics?

 4    A.  Bias, Your Honor, is fundamental -- fundamental concept in

 5    behavioral economics.  A changing in a variable in the

 6    environment -- changing default, changing an interface,

 7    changing the music in the background in a store -- creates a

 8    bias in a decision -- in a consumer decision when it affects

 9    the decision of the consumer without changing the fundamentals

10    of the problem.

11          What are the goods being offered to the consumer?

12    What are the costs and the benefits?  What is information that

13    the consumer has?  Direct impact modulated with other

14    fundamentals being changed.

15    Q.  And what does it mean for a default bias to be sizeable and

16    robust?

17    A.  By "sizeable," I mean that it's large.  That it is of a

18    magnitude that the participants in the market care about.  And

19    in the particular case of search, that, you know, it affects

20    millions of consumers, and it's of sufficient magnitude that

21    these companies are willing to invest billions of dollars to

22    influence them.

23          And by "robust," I mean that a consumer who

24    encounters these product without default is likely to be

25    influenced by them with high probability.

525

```
 1    Q.  Are you offering a qualitative or quantitative opinion?

 2    A.  This is important.  I am offering a qualitative opinion.  I

 3    am not offering a precise opinion of what exactly is the

 4    magnitude of this default in different devices in different

 5    applications.

 6    Q.  Can you give me an example of a decision bias from everyday

 7    life that we might experience?

 8    A.  Sure.  So, Your Honor, to clarify the concept of bias in a

 9    different context, I thought this slide will be useful.  Let me

10    explain.  There are many circumstances in life where

11    decision-makers, consumers, voters are asked -- are shown a

12    list of options, and they have to choose one of them just by

13    crossing or by clicking.

14              And voting, if you do your civic duty and you vote,

15    is one of them.  And what I'm showing you here as an example is

16    a ballot -- an image taken from a study, but it's a real ballot

17    from a primary election in Texas for the Republican party.  And

18    I direct your attention, Your Honor, to the box in the middle.

19              One of the choices these voters were asked to make is

20    for lieutenant governor.  And as you can see, these voters were

21    shown four candidates, and these four candidates were not

22    listed in alphabetical order.

23              Why?  A large number of behavioral economist studies

24    over the years has shown that the order of presentation

25    matters.  Other things equal, candidates that are shown earlier
```

1    are more likely to be selected.  For this reason, in a properly

2    run election -- this is an example of such a properly run

3    election -- the order of the candidates is randomized.

4    Q.  Are you familiar with the concept of choice architecture?

5    A.  I am.

6    Q.  What is choice architecture?

7    A.  Your Honor, choice architecture is another fundamental

8    concept in behavioral economics.  It refers to the idea that

9    the same problem -- exactly the same problem, same option, same

10   cost of benefits can be presented to the consumer in different

11   ways.  You can change the fonts.  You can change the nature of

12   the click buttons.  You can change how easy is to find

13   information related to these things.  And that this variations

14   in the choice architecture, in the details of how things are

15   presented can have a profound impact on the decisions that

16   consumers make.

17   Q.  And can defaults constitute an element of choice

18   architecture?

19   A.  I would argue that defaults are perhaps -- they're not the

20   only one example, but they are the most salient, most common

21   example of default architecture.

22   Q.  And in the field of behavioral economics, is there a

23   consensus about whether defaults affect consumer choice?

24   A.  Yes.  The consensus is that defaults have a powerful impact

25   on consumer decisions.

1    Q.  Can you provide some examples from the behavioral economics

2    literature where defaults have been found to exert that

3    influence?

4    A.  Of course.  Your Honor, in my reports, I go through a large

5    number of many different examples.  But, I thought for the

6    Court, would be useful to see three very famous examples.  Let

7    me discuss the first line there, 401(k) plans.

8             As Your Honor knows, in United States, employees in

9    many companies have the ability to designate a fraction of

10    their wages to be automatically deposited towards retirement

11    and invest in a particular way.  Companies vary in the way they

12    implement the plans.  In reality, in the field, some companies

13    have a default of no contribution.  So after you join the firm,

14    unless you sign up, your plan is not active.  Other companies,

15    when you enter the company, by default sign you to a particular

16    level of contribution and investment plan.

17             And there is a large number of studies who have

18    looked at whether the default used by the company affects both

19    the probability that employees contribute and the magnitude of

20    their contributions.  There are many studies.  Here, I'm

21    quoting just for you a number of the most famous of these

22    studies.  When you compare no default with a 3 percent

23    contribution default, the percent of employees who contribute

24    to the plan goes from 37 percent to 86 percent.  More than

25    double.

1    Q.  And what have behavioral economics studies found with

2    respect to end-of-life care defaults?

3    A.  Yes, of course.  Here is another, what I would consider,

4    high-stakes domain, Your Honor.  This is -- these researchers

5    studied patients who were potentially terminally ill and they

6    were about to reach care.  And in these settings, these

7    patients were given a form that asked them to make specific

8    choice.  Would you like your doctors to engage in

9    comfort-oriented care over aggressiveness medically, or vice

10   versa?

11          And what the researchers did is they compare a

12   situation in which the form had pre-check one, for example, the

13   comfort or social; in the other condition, the other one.  The

14   patients could change the default by simply crossing the other

15   form.  But there was a default that was on the form, the

16   default would have applied.  And what they found, again, is

17   almost 100 percent affect of this default, as you can see by

18   the numbers.

19   Q.  And, finally, Professor Rangel, what about organ donation

20   defaults?

21   A.  Every country in the world, Your Honor, every government in

22   the world has to decide how to run their organ donation

23   program.  Some countries, for example Germany, make the default

24   you are not a donor.  You want to be a donor, you have to opt

25   in.

1            You cross the border to Austria, some would argue --

2     I known this is controversial in some circles, but it's a very

3     similar contrast, very similar economy.  You just cross the

4     border.  Now the default is the opposite.  You are an organ

5     donor unless you opt out.  Numbers have shown that that

6     increases organ donation on the order of 900 percent, 9 times

7     more people are organ donors.  This is a very, very famous

8     example because the consequences are incredibly large.

9     Q.  And, Professor Rangel, in the three examples you just

10    described for the Court, were behavioral economics evaluating

11    real-world behavior or responses in a lab setting?

12    A.  Your Honor, behavioral economists are scientists, and they

13    have used any kind of data that they can get their hands on,

14    from experiment to real-life observation.  The three studies

15    that I just showed you are in real settings with real consumers

16    making real decisions with real stakes.

17    Q.  Are there examples of defaults that biased choice in

18    situations that were high stakes for the person making that

19    choice?

20    A.  Yes.  Your Honor, I would argue -- I think any behavioral

21    economist would argue that the first two examples that I show

22    you in that table, retirement savings and life-of-end care,

23    these are situation in which the defaults have large effects,

24    but the stakes are large.

25            There are also studies in the literature, for

1   example, about health plan selection.  In many companies,

2   employees, every year, need to pick a plan.  Some companies

3   have a default, a forced choice, I think, where you have to

4   choose a plan.  Others re-enroll you in the previous year plan

5   by default.

6         And the studies have shown the impact of the default,

7   and they found, again, very large impacts of defaults that

8   costs consumers thousands of dollars when they are influenced

9   by them.

10  Q.  And how do those examples compare to the stakes of the

11  consumer who is entering a search in a search engine?

12  A.  In my opinion, the stakes in the search engine domain are

13  substantially lower than in the examples that we have just

14  discussed.

15  Q.  Okay.  And are there examples of defaults that have the

16  bias choice where the person making the choice was an expert in

17  that subject matter?

18  A.  Yes, they have.

19  Q.  And what are -- could you find an example for the Court?

20  A.  So one example, Your Honor, that I think is interesting to

21  answer Counsel's question is the following:  There is a study

22  that looks at how decisions at a hospital associated with

23  Cornell University use their prescription software.  As many of

24  you know, these days, after you see your doctor and they have

25  to file a prescription, they use some sort of software.  No

1    longer a pad.  And as you all know, physicians, for many

2    medications, can often choose between a generic or nongeneric

3    medication.  Same substance, very different prices.

4         What these researches did, they compare -- they took

5    the software that the physicians used, and they compare two

6    conditions.  One condition without default, in which at the

7    time of filling out the prescription, the physician had to go

8    and check off the list the generic or nongeneric, or an option

9    in which the generic was preselected as the default.  And if

10   the physician did nothing, that became the choice.  But the

11   physician could, with one click, overturn.

12        And despite the expertise -- these were individuals

13   who used the software repeatedly -- they found on the order of

14   doubling of a tendency to use the generic prescription

15   software.

16   Q.  How does the -- how does that compare to a consumer in

17   search?

18   A.  I would think that based on the case materials that I have

19   seen and common sense, the level of experience of those

20   physicians with that particular interface is much, much --

21   entails much higher expertise than that of a typical consumer.

22   Q.  Professor Rangel, switching topic slightly.

23        Does Google employ behavioral economics in its business?

24   A.  Based on the case materials that I have seen, yes.

25   Q.  And what case materials did you see in that regard?

1    A.  Yes.  Your Honor, I've seen a number of presentations of

2    memos that show that around 2015, Google initiated a

3    collaboration -- I don't know exact contractual term -- but

4    some sort of work with a company called Irrational Labs.  This

5    is a company that provides consulting services -- let me say it

6    like that -- on behavioral economics, and they use them to

7    apply behavioral economics to design products and design

8    marketing companies.

9    Q.  And after Irrational Labs, has Google furthered its

10   investment in behavioral economics?

11   A.  Yes.  A few years later, it looks from the case documents

12   that Google created in-house, I would think it's around 2017,

13   something called the Google Behavioral Economics Team.  This is

14   a team that currently has on the order of 30 people, and it's

15   led by someone called Maya Shankar.  And Maya Shankar was,

16   before starting that team, President Obama's head of behavioral

17   economics at the White House.

18   Q.  Did you observe evidence that pertains to the use of

19   defaults, in particular, by Google's behavioral economics team?

20   A.  Yes.

21   Q.  What did you see?

22   A.  Here is an example, Your Honor, of work by this team,

23   leveraging defaults in product design.  It's not associated

24   with searches.  It is another type of product.  Let me give you

25   the context so this makes sense.

1          New advertisers in Google, based on the context of

2     this materials, have to encounter an interface like this to set

3     up their accounts that asks them to specify a daily budget for

4     how much money they're willing to pay each day for having

5     Google surf their advertisements.  In an interface without a

6     default -- and this is taken as an image, including the red

7     box, Your Honor, from a document from Google -- the

8     advertisement will encounter an interface that has no defaults.

9     They will go to the area in red, fill out the number, move to

10    the next screen, and they would make a choice without being

11    exposed to a default.

12         This team notes that it looked like many

13    advertisers -- many of these new advertisers were specifying

14    budgets that were lower than they thought they could spend.  So

15    they decided -- and I'm using their words, because it's very

16    memorable.  It was very satisfying, as a behavioral scientist,

17    to see this application in the field.  They used the words:

18    Let's approach this with a classical behavioral economics

19    solution, which is defaults, and this is what they did.

20         Slide.

21         So they tested, Your Honor, the introduction of a $10

22    default.  And the way this was implemented is that the

23    advertisers, when they entered this screen in the interface,

24    would have seen this prefilled with a $10.  This is something

25    that many of us has encountered in some shopping sites and

1    things like this.  And they could change it just by clicking

2    there, deleting the number, and modifying.  But if they did

3    nothing, the default applied.

4          And this would be the first time I have to talk about

5    confidential, Your Honor.  But as you can see in the slide,

6    this had a very sizeable impact on this.  In particular, the

7    number that you're seeing there is the percentage of these new

8    advertisers that stop spending the lowest amount.  Basically,

9    they increase their spendings because of this interface --

10         MR. HAFENBRACK:  And just to be clear, Your Honor,

11   the red boxes on these documents were original to the document.

12   You'll see some documents later on with red boxes that we've

13   added for confidentiality.  But these two slides, they were on

14   the document as produced to us.

15   BY MR. HAFENBRACK:

16   Q.  And, Professor Rangel, what was the outcome of this

17   experiment run by the Google behavioral economics team?

18   A.  There are a couple of things about the outcome, Your Honor,

19   that are interesting.  One of them is that as the documents

20   associated with this experiment showed, the team realized that

21   the impact of this default was too powerful because the default

22   acted almost like a point of gravity.  Not only it increase the

23   expenses of advertisers that were spending less, it also

24   reduced the expenses of advertisers that were spending more.

25         So to deal with that, they introduce something called

 1    a smart default, in which this default was only shown -- was

 2    only added to advertisers that were in the low group.  Not

 3    everybody encountered those.  And that was considered

 4    successful.  And it is my understanding that this product was

 5    deployed widely across the company and it generated, according

 6    to the documents, hundreds of millions of dollars in revenue.

 7    Q.  Looking at this slide, does anything stand out to you about

 8    the choice architecture reflected here?

 9    A.  Yes.  This is choice architecture that involves a default

10    that is very salient.  It's very clear that the field has been

11    prefilled, and it has relatively low friction.  It is easy to

12    change.  Just delete and change it in the same screen.

13    Q.  Thank you.

14          Professor Rangel, apart from Google's behavioral

15    economics team, did you observe evidence of --

16                THE COURT:  If I can interrupt.

17                MR. HAFENBRACK:  Sure.

18                THE COURT:  And without telling me the number, was

19    there a number that was associated -- is it just the inverse or

20    the difference between this percentage and 100 of users that

21    actually did make the change?

22                THE WITNESS:  Your Honor, I can only report the data

23    that is on the documents.

24                THE COURT:  Okay.

25                THE WITNESS:  I cannot tell you if the people who

1    change the amount stick to the $10 exactly, which would entail

2    what you're asking, Your Honor, when exactly the $10 or

3    increased over the $10.  This just means that they increase.

4    But, that exact number, of course, is fundamental, but I don't

5    have it.

6                THE COURT:  Thank you.

7                MR. HAFENBRACK:  Your Honor, the document we've been

8    discussing is UPX101, and it's in evidence.

9    BY MR. HAFENBRACK:

10   Q.  Professor Rangel, apart from Google's behavior economics

11   team, did you observe evidence of Google employees or Google

12   business executives discussing the importance of defaults?

13   A.  I have.

14   Q.  And what did you see?

15   A.  So, Your Honor, in my review of substantial amount of case

16   materials -- and I provide many references of this throughout

17   my reports -- I have encountered a lot of mentions by Google

18   personnel about what sometimes is called the power of defaults.

19   But beyond the term, just the idea that these defaults are

20   powerful in moving consumer behavior towards the default.

21                And, as you can see from the table, each row, Your

22   Honor, is a case, a quote on the right-hand side taken from a

23   Google document.  As you can see from the years, they span a

24   wide number of years.  And they emphasize this.  Let me point

25   you, for example, to 2015.

1          2015 is a document about something called Code Red.

2    And this is something that I will come back in my testimony

3    later, Your Honor.  So Apple, at some point, has been worried

4    about losing the Apple default.  And there are multiple

5    presentations that I have encountered in which this potential

6    event, Code Red, is discussed and analyzed in different ways to

7    try to understand how to cope with it.  And in one of those

8    documents, for example, this says:  Our brand is in good

9    standing among iPhone users.  But, our position is still very

10    vulnerable if defaults were to change.

11          This is consistent with the idea that these defaults

12    are perceived by the Google personnel writing this as powerful.

13    And as you can see, there are a number of other quotes there.

14    I won't go through all of them out of respect for the Court's

15    time, but they are consistent with that idea.

16    Q.  And I think you said there that -- you might have misspoke

17    and said "Apple was worried about losing the Apple default."

18          Did you mean Google?

19    A.  I misspoke.  It won't be the last time.  It's exactly the

20    opposite.  Google was worried about losing the Apple search

21    default.

22    Q.  Got it.  That would make more sense.

23          MR. HAFENBRACK:  And just for the record, the

24    documents we just discussed were UPX171, UPX81.

25    BY MR. HAFENBRACK:

1 Q. Professor Rangel, we just saw Google's words about the

2 power of defaults. Did you see conduct by Google that's

3 consistent with your opinion that defaults generate a

4 sizeable bias?

5 A. I have.

6 Q. And what did you see?

7 A. So, Your Honor, the case documents show that Google

8 spends -- the numbers are redacted, but as you can see, many,

9 many billions of dollars across these companies securing these

10 defaults. Google -- as an economist, I react to this as

11 follows: Google is a sophisticated, successful, for-profit

12 corporation. This is consistent with the idea that they

13 understand that these are valuable because they generate --

14 they do search towards Google in ways that are profitable by at

15 least those amounts.

16 Q. Professor Rangel, are you familiar that Google offers many

17 different applications and services beyond search?

18 A. Yes, I am.

19 Q. And have you seen evidence of Google encountering default

20 effects when it tries to introduce a new non-search application

21 into the market?

22 A. Yes, I have. In multiple documents.

23 Q. Could you provide an example?

24 A. Yes. So, Your Honor, I have encountered a number of case

25 documents in which a team at Google is giving a presentation or

1   writing a memo discussing the impact that defaults -- the

2   existence of a default in a competing application has on their

3   ability to compete.  So these are situations in which Google

4   doesn't have the default and is competing against something

5   else that has the default.

6          And this particular presentation is from 2019, from

7   the Google podcast team.  And I highlight for the Court the key

8   section of the document.  There are other podcasting

9   applications besides the Google one that we believe offer an

10  equivalent -- I apologize.  I am giving you the wrong context.

11         This started talking about Apple podcasts, and they

12  refer to Apple podcasts and say:  There are other podcasting

13  applications besides Apple podcasts -- to remind the Court,

14  this is the default application in an iPhone -- that we believe

15  offer an equivalent, equivalent or better user experience.

16  Presumably, they consider Google podcasts among them.  And they

17  go on to say:  But, Apple podcast still has multi-fault -- as

18  you can see there, Your Honor -- share over all other apps

19  combined.

20         This is interesting as a behavioral economist, Your

21  Honor, because this things is attributing, at least, a

22  substantial part of the problems to the existence of a

23  competing default.

24  Q.  And that was UPX938 on that slide.

25         Professor Rangel, did you analyze specific Google search

1    defaults?

2    A.  Yes, I did.

3    Q.  And what Google search defaults did you analyze?

4    A.  Your Honor, I analyzed three general classes of defaults.

5    One is search engine defaults -- Google search engine defaults

6    in Apple devices, iPhones, tablets, iPads -- apologies --

7    search engine defaults on Android phones.  And then there is a

8    number of third-party browsers, like Firefox is a prominent

9    example, but it's not the only one -- that are not the default

10   search engine in any devices in the United States.  But, if the

11   consumer downloads them, they come with Google as the

12   pre-installed default search engine.

13   Q.  Did you mean there that Firefox doesn't come as the default

14   browser on any devices?

15   A.  I did.

16   Q.  So take the example of the iPhone and Android phones.

17   Okay?  If Google is the default search engine on those devices,

18   where are rivals positioned on those devices?

19   A.  So, in a device like the iPhone, Your Honor, that comes

20   preloaded out of the box with Google as the search engine

21   default.  During the setup process, the user does not encounter

22   any cues about these competing search engines.  And if they

23   want to access a competing search engine, they need to take

24   additional series of steps, like changing the default or

25   accessing an application that provides access to that

1    alternative search engine.

2    Q.   Okay.  What conclusions did you reach about the impact of

3    Google Search defaults?

4    A.   Your Honor, this is my conclusion.  I'm repeating what I've

5    said before, but I'm providing a little bit more detail for the

6    Court.

7         So, to repeat, my opinion is that search engine

8    defaults generate a sizeable and robust bias towards the

9    default.  And I want to highlight a couple of mechanisms for

10   why to the Court, Your Honor.

11        My opinion is that the vast majority of individual

12   search instances -- that is, where the consumer goes to a

13   search point and just types a query -- those individual

14   instances are done implicitly by habits.  And I will describe

15   what I mean by that in a second.  It's not a situation in which

16   the consumer stops to think about the search engine.  They just

17   do what they normally do.

18        And then, in situations when they explicitly think

19   about changing the search engine or how they access it, there

20   are additional behavioral biases, as well as choice friction,

21   in carrying out those steps that further strengthen the power

22   of Google defaults.

23   Q.   You mentioned "habit."

24        In the field of behavioral economics, is the concept of

25   habit a significant one?

1    A.  Habit is a fundamental concept, Your Honor, in behavioral

2    economics.

3    Q.  And why is that?

4    A.  The world is a complex place, and it's always -- we're

5    always filled with information and we're constantly making

6    decisions, even if we're not aware, of how do I move my hand?

7    What do I do next?  Pick up my water now or not?  A lot of

8    time.  Because we have limited cognitive capacity and the world

9    is so complex, whenever possible the brain likes learning that

10   certain actions in certain situations are good solutions.  And

11   then, when that situation is encountered, you just apply it

12   automatically, without detailed thinking.

13          Let me give you an example that, again, I think is

14   familiar to consumers in 2023.  So many of us have a coffee

15   habit -- a daily or multi-daily coffee habit.  Some of you may

16   go to a Starbucks.  When you enter a Starbucks and you see the

17   menu, you don't sit there and say, Okay, let's think about

18   every option, every possible combination, every possible price,

19   go through all of them, and then finally make a choice.  It

20   would take forever every time.

21          Instead, by trial and error, you have encountered a

22   drink that works, and you have developed the habit of whenever

23   you enter a Starbucks, you pick that up.  You just -- that's an

24   example.

25   Q.  What conclusions, if any, did you reach about the role of

1    habit in consumer search?

2    A.  My opinion, Your Honor, is that the vast majority of

3    individual searches, or queries, are carried out in habit, and

4    this is why:  Consumers search with high frequency.  And they

5    tend to search with a familiar device, the phone and the

6    application that they tend to use.  And critically, they get

7    feedback immediately.  The query works or the query doesn't

8    work.  Habits develop very strongly in those situations of high

9    repetition and immediate feedback.

10   Q.  And how, if at all, does being the default search engine

11   affect the formation of habits?

12   A.  In my opinion, being the default search engine is favored,

13   is advantageous, to the point of view of these habits.  And

14   this is why:  When a consumer encounters their devices for the

15   first time and they start searching, they start searching with

16   the default search engine, which for many of them is the case,

17   likely.  If that search engine that is the default generates

18   adequate experiences, the consumer will get habitized to that.

19            THE COURT:  Just -- I'll ask a question.  I take it

20   that an experiment could be constructed to evaluate if a --

21   what number of consumers and under what conditions a consumer

22   would switch from a default search engine.

23            Are you aware of any such studies or experiments

24   being conducted?

25            THE WITNESS:  I am aware of experimental work -- and

1    I discuss it in my reports, Your Honor -- that has switched

2    default search engines.  So, for example, there is something

3    called the Waldo Firefox experiment in which they took

4    1 percent of the users, allocated half as a control, they kept

5    the Google default, and half they switched the default though

6    them.  They let it run and they see what happened.  In my

7    opinion, they found a substantial default effect.  I cannot

8    mention the numbers for confidentiality reasons.

9           I want to emphasize one thing, Your Honor.  That is

10   not exactly the experiment that you're asking for because this

11   is not an experiment where you start with a situation where

12   there is no default and somehow all of the options from the

13   point of view of the choice architecture are on an equal basis,

14   and then you have the default.  This is a situation where you

15   start with a default and then you impose on the consumer a

16   change to another thing.

17          It's not quite the same, and there are reasons to

18   worry about that as a precise answer to your question.  But

19   there is data that is qualitatively consistent.

20          THE COURT:  In other words, in that study, when there

21   was a different -- the default search engine was Google, but

22   then it was changed to some other search engine --

23          THE WITNESS:  To Bing.

24          THE COURT:  -- to Bing in half the users.  And for

25   those that were changed to Bing, what was the -- and you don't

1    need to give me numbers, but what was the impact of having Bing

2    as the default?

3              THE WITNESS:  So I cannot mention the number, but a

4    majority of the users in the treatment that had their default

5    switched from Google to Bing did not switch their default back.

6              THE COURT:  And were they advised that the default

7    had changed?

8              THE WITNESS:  No, they were not.  Yeah, they were

9    not.  And there was also multi-fault, many, many times increase

10   in Bing's searcher as the result of that.

11   BY MR. HAFENBRACK:

12   Q.  Professor Rangel, did you see any case documents on how

13   habits affect the way consumers search?

14   A.  I have seen a number of case documents from Google that

15   explicitly mention the role of defaults -- so, I apologize --

16   the role of habits on consumer decisions for tech products.

17   And this table, Your Honor, is organized for the Court in a

18   very similar way, just to save a mental effort on your part.

19             Again, they span a large number of years.  Each row

20   is a document by either -- by Google, or Google Neeva in the

21   last stage, and it emphasizes how important is our habits.  Let

22   me highlight, for example, the first row, which is from this

23   memo that has been discussed during Hal Varian's testimony.  It

24   says:  Recommendation.  Get users addicted to our interface and

25   tools.

1          The word "addicted" is, in behavioral economics

2     parlance, an extreme habit.  The same way of saying the same

3     thing.

4          But, they recognize throughout documents that if you

5     can get users to develop a habit to use that product, the

6     consumer will use that product.

7          MR. HAFENBRACK:  And for the record, the UPX numbers

8     on this slide are UPX151, UPX757, UPX1049.

9     BY MR. HAFENBRACK:

10    Q.  Professor Rangel, if a user is searching in habit mode, are

11    they sitting down to consider the pros and cons of their search

12    engine choice?

13    A.  No.

14    Q.  And did you see evidence consistent with the view that for

15    the vast majority of individual searches, users aren't doing

16    that, considering those pros and cons?

17    A.  There are some documents, in particular the one I'm going

18    to show Your Honor, that are consistent with that view.  Let me

19    give you the context of this document, Your Honor.  This is a

20    letter in 2005 that Google sends to Microsoft, and the context

21    is the following:

22         At that time Microsoft has implemented an upgrade of

23    their operating system that involves new version of Internet

24    Explorer, which is the predecessor of the Bing browser -- I

25    apologize, of the Edge browser -- and Apple is complaining that

1 the way this has been implemented is problematic because

2 Microsoft is importing the search engine defaults from the old

3 version of Internet Explorer to the new one.  If it was your

4 original default, that; if the users change it, that.  Whatever

5 was the default at the time of the system upgrade.

6   And Google is complaining in the document that

7 because users mostly don't change the defaults, that's,

8 basically, a problem because they will stick with Internet

9 Explorer's defaults.  And, in fact -- this is not quoted here

10 in this document -- choice is -- Google is urging Microsoft to

11 use a choice screen in Internet Explorer.

12   They are also, in the last part of the quote, Your

13 Honor, emphasizing that users -- a small fraction of users that

14 are not in this habitual mode and will try to change the

15 default will get frustrated and stop the process.

16   THE COURT:  Let me ask a different question.

17   You used the example of walking into a coffee shop,

18 and a consumer, over the course of time, may try a number of

19 different drinks and then ultimately settles on the drink that

20 matters.

21   Do you view a search engine first-time use

22 differently than the person who is walking into the coffee shop

23 the first time?  In other words, what you've just described as

24 a person walks in the coffee shop the first time actually is

25 actively making a choice before the habit kicks in.

1        Do you see a different pattern with respect to the

2   first time use -- or, user of a search engine -- or, search

3   access point, I should say, to be more precise.

4        THE WITNESS:  I do, Your Honor.  And let me give you

5   an example.  The analogy of your beautiful example for the

6   coffeehouse on the Google defaults would be, the first time you

7   walk into Starbucks, or enter your first coffeehouse, they hand

8   you a coffee, and that's the one you use.  And if it's good --

9   if it's good enough, you just keep using it.  You may explore

10  and you may change when you see a friend, et cetera, but that

11  initial consumption experience is determined by the default.

12       I think for most users that encounter these devices

13  for the first time -- though it's getting harder because kids

14  are learning them earlier and earlier -- but the default is

15  where you to start.  And then you start thinking about

16  switching more if the experience is unsatisfactory, or if, for

17  example, imagine that you go to a friend's house and you

18  encounter -- you have to search in their computer, and you

19  have, over years, developed a very strong preference for a

20  brand, and you know that for your particular search that works

21  well.  But that may be a situation in which, because you have a

22  very strong preference brand, your friend is different, you

23  notice, you do change.

24       But the evidence that I have seen, Your Honor, in the

25  case documents -- which, of course, there is variation among

1    consumers -- but many of them are confused.  They don't know

2    that there is a default.  They don't know what the default

3    search engine is.  They don't know they can be changed.

4         THE COURT:  That was going to be my question because

5    you suggest that, at least, over time, that there may be

6    conditions that arise that might cause people to want to

7    change.  And I guess the question is:  Is it possible to

8    quantify, or have there been experiments that would provide

9    some understanding of what circumstances might cause a person

10   to even consider switching from the default?

11        THE WITNESS:  Yes.  The data -- the data that a tech

12   company has or a search engine has, especially with the ability

13   to run the types of A/B testing that many of these companies do

14   that involve changing settings or offering two different

15   versions of the product and see what happens, tracking the

16   consumer over time, yes.  You can definitely study those things

17   with their resources, yes.

18        THE COURT:  Have you seen any study or experiment

19   like that?

20        THE WITNESS:  I mentioned --

21        THE COURT:  Other than the one you mentioned.

22        THE WITNESS:  There are a handful of experiments that

23   I have seen that are related to this.  Let me mention another.

24   It's not exactly what you want, or at least with the data I

25   have access to, Your Honor, I'm limited to the documents I see.

```
 1                    THE COURT:  Sure.

 2                    THE WITNESS:  Let me give you another example.  There

 3          is reference to a change in defaults by the Brave browser in

 4          several countries around the world in which they introduce

 5          DuckDuckGo as the default.  And they find that over the long

 6          term, the fraction of consumers that search with DuckDuckGo

 7          goes up again, many, many, times.  Has the same flavor,

 8          different countries, different search engine, but none of them

 9          are exactly what you're asking, Your Honor.

10                    THE COURT:  Okay.

11          BY MR. HAFENBRACK:

12          Q.  To the Court's point, Professor Rangel, did you observe

13          evidence as to whether Google's behavioral economics team has

14          ever conducted lab experiments of the kind the Court is asking

15          about?

16          A.  I have seen documents about that.

17          Q.  What did you see?

18          A.  Well, my recollection -- and that was also interesting as a

19          behavioral scientist -- was that in the deposition of Maya

20          Shankar -- to remind the Court, that is the head of the

21          behavioral economics team at Google -- she was asked explicitly

22          if she had ever collected any data for Google about the impact

23          of defaults, has she carry out any studies about the impact of

24          defaults?  And the answer was no.

25          Q.  What does that say to you, if anything, as a behavioral
```

1    scientist?

2    A.   I can, of course, not testify about what happens inside of

3    Google, but the inference as an economist, as a behavioral

4    scientist, is that Google is fairly certain, consistent with

5    the other case documents, that these effects are strong and

6    reliable.  I mean, it's clear that in many other occasions

7    where it's not so clear how to design a product or how

8    particular variables matter, they carry out these experiments.

9    But not in this case.  They seem to know that it works.

10   Q.   But, Professor Rangel, is there a difference in your

11   analysis between a user that's carrying out a search in habit

12   mode versus a user that's sitting down to explicitly consider

13   his or her choice of search engine?

14   A.   It is a fundamental difference, Your Honor.

15   Q.   What is that distinction, Professor Rangel?

16   A.   To answer the question I have to explain another basic

17   concept in behavioral economics.  In behavioral economics, and

18   also in psychology, there is a distinction between two

19   decisionmaking modes.  One is fast, automatic, in which you

20   encounter a situation and very quickly, without conscious,

21   deliberative thinking, you deploy a solution.  That is a

22   program or learn, like the case of habits.  Habits are an

23   example of automatic decisionmaking.

24           Many other decisions are made in explicit or

25   deliberative mode.  Those are situations in which the consumer

1    steps back and now considers more, What are the options?  What

2    are the custom and benefits?  Thinks and makes a decision.

3    It's slower.  It requires substantial more mental effort.

4           And in my opinion, to finish the answer to your

5    question, Counsel, individual searches, individual queries, are

6    largely carried out with habits.  When the consumer,

7    infrequently, at some point, steps back and thinks about

8    changing their default search engine, they do that on explicit

9    mode.

10           THE COURT:  They do what?

11           THE WITNESS:  Explicit or deliberative mode, when

12    they step back.

13           THE COURT:  I see.  Okay.

14    BY MR. HAFENBRACK:

15    Q.  And did you, Professor Rangel, analyze what factors -- what

16    behavioral factors might affect a consumer who is explicitly

17    considering her choice of search engine?

18    A.  I did.

19    Q.  And what did you conclude?

20    A.  So, Your Honor, in my opinion, as you can see in the slide,

21    for a consumer to complete the process of switching the default

22    in this explicit or deliberative mode, four things needs to

23    happen.  First, the consumer needs to be aware that there is a

24    default.  And that may sound trivial to the more sophisticated

25    parts of the population, maybe to the younger parts of the

1    population, but that is not the case for everyone.  And there

2    are case documents that I have encountered multiple times that

3    show that many people are not aware of this, and people are

4    confused, even about what's the default search engine that they

5    have.

6          Second, once they are aware that there is a default

7    and that they could potentially change it, people don't walk

8    around with a map of the alternatives and the pros and

9    benefits.  They have to discover them.  This involves some

10   research, some conversations, some Google searches, some

11   reading, and that requires more mental effort.  After they have

12   somehow reached a consensus in their heads that maybe there is

13   something else that they want to try, they need to figure out

14   how to implement that change.

15         So, for example, if a consumer wants to change a

16   default, let's say in an Android phone or in Safari -- the

17   Safari browser, they need to research it again.  These are not

18   individuals like a very, very narrow class of Google engineers

19   in the back of their heads with the steps to help do these

20   things.  They have to search them.  And then maybe at that

21   point they do it and they print out what are the steps,

22   old-school, they put them next to their device.  And at that

23   point, they need to implement the steps.  All of these things

24   need to be completed successfully before a default change is

25   successfully complete.

1    Q.  And are the four factors that you've listed on this slide

2    examples of what you would consider choice friction?

3    A.  In my view, yes.

4    Q.  And what is choice friction?

5    A.  Your Honor, another fundamental concept in behavioral

6    economics that applies to search engine defaults, the idea of

7    choice friction is that you can have the same decision

8    situation, same options, same items, same benefits and costs,

9    but implementing the decision, the actions, can be more or less

10   difficult.

11          For example, I could show you the font so small that

12   you barely read, and screen your eyes and increase the screen,

13   or I may ask you to leave application a couple of times, or

14   scroll, scroll, scroll.  The more effort is required -- and a

15   lot of this effort is not the calories you spend moving the

16   fingers, it's mental effort, the more choice friction there is.

17   Q.  Does the degree of choice friction affect the impact, or

18   the stickiness, of a particular default?

19   A.  The conclusion from behavioral economics, Your Honor, is

20   that the more choice friction it takes to change the defaults,

21   the sticker the defaults are.

22   Q.  And, Professor Rangel, did you see evidence from Google

23   consistent with that opinion?

24   A.  Yes.

25   Q.  What did you see?

1    A.  So, Your Honor, here is a slide from 2021, from the

2    behavioral economics team, in which they are given -- and I've

3    seen a version of this material multiple times -- in which they

4    are trying to educate others at Google about behavioral

5    economics and how it matters for the products.  And here,

6    talking about reducing friction.  And I emphasize.  I read the

7    yellow part with you.

8         Seemingly small friction points -- small friction

9    points, low choice friction -- in user experiences can have a

10   dramatically disproportionate effect on whether people drop or

11   stick -- in the context of defaults, of whether people drop in

12   the process of changing a default or stick and complete the

13   change.

14   Q.  Any other evidence in a similar vein?

15   A.  Yes.  It's a related document.  Your Honor, this is a

16   document by the other behavioral economics group that had been

17   collaborating with Google, Irrational Labs, that I mentioned

18   before.  And it's emphasizing a similar point, which is that --

19   I'm not going to read it to save the Court's time, but it's

20   emphasizing how this mental efforts, this thinking costs can be

21   ten times larger than what you think it is.  The seemingly

22   trivial mental efforts really matter.

23        MR. HAFENBRACK:  And the last two exhibits were

24   UPX103, UPX848, for the record.

25   BY MR. HAFENBRACK:

1    Q.   Professor Rangel, does Google monitor the choice friction

2    associated with its search defaults?

3    A.   The case documents suggest that the answer is yes.

4    Q.   What case documents did you see in that regard?

5    A.   Well, seen a number of things.  Generally, I've seen a

6    number of memos, presentations, Your Honor, in which Google

7    tracks the number of clicks, or steps, that it takes to change

8    the default in different application devices.  And to put it in

9    context, Your Honor, I mention four things that need to happen,

10   four choices of choice friction that refers about tracking the

11   last step, the number of clicks.

12   Q.   Do Google's contracts with Android manufacturers have

13   provisions that, in your view, create choice friction?

14   A.   Yes.

15   Q.   And how so?

16   A.   So, Your Honor, this is a highly redacted slide, but you

17   can see the material on your page.  And let me explain the

18   context and the key idea that you can read highlighted in

19   yellow.

20          So, Google has assigned these modified MADAs with a

21   number of the Android manufacturers.  This is an example from

22   one with Samsung, but my understanding is that that has

23   happened with other Android manufacturers.  And as you can see

24   in the box in the middle, they are requiring -- or, they're

25   asking in the agreement, that consumers not be provided with

1      too much information, or with information about alternatives,

2      about how to change them, et cetera.

3              And in my view, this introduces choice friction.

4      Remember, again, the four steps of choice friction that I

5      mentioned.  This is about the degree of choice friction for the

6      first steps:  Awareness of the existence of default.  Awareness

7      of options.  Reminders of that.

8              MR. HAFENBRACK:  And for the record, that was

9      UPX5511.

10     BY MR. HAFENBRACK:

11     Q.  Professor Rangel, are you familiar with the Samsung S

12     browser?

13     A.  I am.

14     Q.  And what is that the S browser?

15     A.  It's a browser that comes pre-installed in Android Samsung

16     devices.

17     Q.  And do Google's contracts with Samsung create choice

18     friction with respect to the S browser?

19     A.  Yes, in my opinion.

20     Q.  What did you see in that regard?

21     A.  Your Honor, this is another highly redacted piece, but here

22     is the context.

23              So, at some point around the day of the document --

24     the date of the document, Samsung had implemented a change in

25     the interface for the S browser that facilitated -- reduced the

1   choice friction -- in the language of behavioral economics, the

2   process of changing the default in this browser.  And in this

3   document -- and my understanding is I cannot specify the

4   details -- Google is sending a complaint to Samsung, telling

5   them that that reduction in the choice friction is in violation

6   of the contract.

7   Q.  And --

8   A.  As a result of this -- let me finish, Counsel.

9   Q.  Sure.

10  A.  As a result of this, in the next iteration of the operating

11  system -- or of the software, apologies, that interface was

12  reverted, basically.

13  Q.  And, Professor Rangel, why did you consider that episode

14  significant?

15  A.  I think it's consistent -- and, again, I'm not testifying

16  for Google's motives, I have no expertise on that.  It's

17  consistent with the idea that this degree of choice friction is

18  being monitored and enforced according to the contracts.

19          MR. HAFENBRACK:  And that was UPX149.

20  BY MR. HAFENBRACK:

21  Q.  Professor Rangel, did you analyze the manual steps, the

22  Number 4 on your list of choice friction from earlier, required

23  to change Google's search defaults?

24  A.  I did.

25  Q.  What search defaults did you analyze on a step-by-step

```
 1    basis?

 2    A.  I did a number of them in my devices -- I apologize.  In my

 3    reports.  I talk about changing defaults in iPhones, in

 4    Safaris.  I talk about changing defaults in Chrome.  I talk

 5    about changing the search widget in Android devices.  But I

 6    have, of course, investigated more options.

 7    Q.  Are you familiar with the Android search widget?

 8    A.  I am.

 9    Q.  And what's the Android search widget?

10    A.  The Android search widget, Your Honor, is a search bar that

11    appears in the home screen of Android devices of the box that

12    allows consumers to type a search there without having to open

13    a browser; a search app and, by default, searches with Google.

14    Q.  And did you test out the steps that are required to change

15    the default in the search widget on a particular type of

16    Android device?

17    A.  Yes.  I am -- Your Honor, I have been a iPhone user since I

18    was inspired in 2006 by Steve Jobs, in the initial launch.  But

19    for the purpose of this case, I purchased a Galaxy S22 phone

20    out of the box and went through the experience that a new user

21    of that interface and application should have, and spent

22    considerable time familiarizing myself with that.

23    Q.  And did you prepare a short demonstration for the Court of

24    the steps required to change the search widget in a Samsung

25    Android phone?
```

1    A.  I have.

2    Q.  Could you walk through that for the Court, please?

3    A.  Yes, of course.  So, Your Honor, before I start a

4    demonstration, let me just put it in context so it makes sense.

5         So, what I want to give is a sense of a very specific

6    subcomponent of the choice friction.  This is a sub -- I'm

7    trying to get a sense of what is the experience of an Android

8    consumer who is aware that the defaults are there, has already

9    spent the effort to understand another option, or set of

10   options, and made a choice, and has already done the research

11   about how to do this, and literally has the printout next to

12   them.  So I'm isolating that component, not everything.  I just

13   want to give you a sense of this.

14        So, imagine that you are a consumer and you are

15   searching with a search widget.  And you are a very enlightened

16   consumer, so you want to learn about behavioral economics.  So

17   you type behavioral economics and you press search and you get

18   the results.  And at that point, you see the interface, and you

19   see that the results were generated by Google.  And for some

20   reason -- I'm not testifying about Google's quality or saying

21   anything about why -- the consumer just wants -- remembers that

22   they had one -- they had this piece of paper with instructions

23   and wanted to switch the default to Bing in the bar.

24        What would they have to do?  Now the demonstration

25   really starts.

1           So they would have to leave the application and go to

2     the home page, press Play Store, and then go to the top and

3     type Bing.  They don't have to type exactly Bing search

4     application.  They have to type something that is sufficiently

5     similar.  But not anything will generate Bing.  It has to be

6     sufficiently close.  They press install, and then they go back

7     to the home, leave the application, and then they have to do a

8     different kind of touch, it's a long kind of touch, and the

9     widgets appear and they can click on it -- at least of widgets

10    that are available, click.  You're clicking one of them.

11          And then there are multiple flavors.  You select one

12    of them with a rather long touch, then you press @, and now the

13    bar is there.  Now you want to change it, you're going to take

14    out the Google one, you do a long press there, up, remove, and

15    now you have completed a change.  You had a Google search box,

16    now you have a Bing one.

17          Now, imagine the consumer types, again, behavioral

18    economics, just to test that everything has worked.  Press

19    search.  And now, as you can see, you get a search generated by

20    Bing.

21          And by the way, not intentionally, just casually, the

22    Bing returned a picture of famous behavioral economist.  Not

23    me.  The third one from the left is someone called Dan Ariely,

24    who is the head of Irrational Labs that works with Google.

25    Factoid.

1    Q.  And what is your opinion of the degree of choice friction

2    associated with the steps you just demonstrated?

3    A.  Again, let me emphasize, this only the final part.  But if

4    you only think about that final part, I think this is

5    considerable choice friction.  And this is why, Your Honor:

6         To put it in context, compare what I just show you

7    with the tipping interface or the Google market, for example.

8    It's in your face.  It is one click.  That's it.  This, much

9    more complicated.  So it's not surprising to a behavioral

10   economist that as in the document I showed you earlier, some

11   consumers would try to complete the process.

12   Q.  If a -- take an Android user, a user of this type of

13   Samsung phone.  If they are able to complete the steps you just

14   demonstrated for changing the defaults in the search widget,

15   does that change the Google Search default for other search

16   access points?

17   A.  Not in Android.

18   Q.  Would the user have to complete a separate series of steps

19   to, for example, change the default in the Chrome browser?

20   A.  That is correct.

21   Q.  You analyzed the degree of choice friction associated with

22   changing the default in Apple's Safari browser; is that right?

23   A.  Yes.

24   Q.  What's your opinion about the choice friction associated

25   with Safari?

```
1    A.  I am not ready to provide, literally, ranking of the
2    degrees of choice friction of all of those interfaces.  This is
3    something that I cannot do.  But, I think it's substantial.
4         And, again, especially when you compare it to the
5    examples of the interface of the software prescription, you
6    know, that I have shown you that we know have much lower
7    interfaces, is very far apart, and they already generate
8    sizeable default.
9    Q.  Did you listen to opening statements yesterday?
10   A.  I did.
11   Q.  Did you hear a comment by Google's counsel that if a user
12   wants to change a Google Search default, they can easily do so
13   at zero cost?
14   A.  Yes.
15   Q.  Do you agree with that?
16   A.  No.
17   Q.  Why not?
18   A.  Every action that we take, Your Honor, every action, every
19   thought requires mental effort.  You can argue about how much,
20   but it requires mental effort.  And one key lesson of
21   behavioral economics that I just showed you is shared by
22   behavioral economics team at Google, when we talk about
23   friction, is that everything, every one of these steps matters
24   a lot more than you think.  It really affects consumer
25   behavior.
```

1    Q.  Did you -- switching gears slightly.

2         Did you analyze market evidence on the effect that

3    search defaults have on consumer choice?

4    A.  I have.

5    Q.  And what market evidence did you analyze, Professor Rangel?

6    A.  Your Honor, I have analyzed a number of market events, both

7    for mobile devices and personal computers.  Again, these are

8    market events in which a default has been switched.  And for

9    the purpose of facilitating the discussion, let me talk first

10   about these three in mobile devices.

11   Q.  Okay.  Let's take the first one first.

12        What is your understanding of the Apple Maps default

13   switch?

14   A.  Before 2012, Your Honor, Google Maps, map software for

15   finding direction and other things, is the default in iPhones,

16   in Apple phones.  In 2012, Apple Maps is introduced by Apple

17   and made the default in Apple devices.

18   Q.  And what did the data associated with that default switch

19   from Google Maps to Apple Maps show?

20   A.  So, Your Honor, this is the result of that event.  I wait

21   for you to find it because there are -- takes a while.  It's

22   slide 40, if it helps, Your Honor.

23              THE COURT:  That does help.  Thank you.

24              THE WITNESS:  So while maintaining confidentiality,

25   of course, with what that graph is plotting is the share of map

1    searches in the iPhones that are going through Google, to

2    Google Maps.  And what you can see there, in green, is that the

3    share for Android after the default is changed in Apple

4    doesn't -- the trend doesn't change.  Things keep changing at

5    the same rate.  There's no effect, basically.

6         But the impact for iPhones is immediate, very

7    sizeable, and last quite a while, at least for the period

8    covered in that graph.  That's a large default effect.

9         MR. HAFENBRACK:  And that was UPX97.

10   BY MR. HAFENBRACK:

11   Q.  Professor Rangel, are there any other aspects of the Apple

12   Maps default switch that you considered relevant to your

13   analysis?

14   A.  Yes, there are.

15   Q.  What are those?

16   A.  So, Your Honor, there's some that are -- there are a couple

17   of things that are interesting about this.  The first one is

18   that when Apple Maps is initially introduced, the software is

19   very boggy.  It has a lot of problems and there are a lot of

20   complaints, to the point that you see Apple's CEO publicly come

21   and apologize.  Something you don't see every day.  And as an

22   economist, this is interesting because it shows it's another

23   example of how defaults can be powerful enough to produce these

24   effects, even when the default is assigned to an inferior

25   product.  And this is a quote from Google making the same

1     thing.

2             THE COURT:  And just to be clear, when you say the

3     maps became the defaults, what you mean by that is that it was

4     the Apple Maps app that was on the home screen when it was

5     taken out of the box, and no longer the Google map set,

6     correct?

7             THE WITNESS:  My understanding is that and something

8     else, Your Honor, which is that -- you may have experienced

9     this in the use of your own devices.  Sometime, in a website,

10    you encounter an address and you tap it and an application

11    opens with a map or in an email.  That will be the app that

12    will open with that.

13            THE COURT:  Right.  Okay.

14            THE WITNESS:  The second part, just to

15    complete the -- sorry, Your Honor.

16            THE COURT:  No, no.  Please, go ahead.

17            THE WITNESS:  You asked me to discuss these two

18    things, Counsel.

19    BY MR. HAFENBRACK:

20    Q.  Yes.

21    A.  To remind the Court, earlier we talked about this event

22    called Code Red in which -- and I'm going to get it right this

23    time -- Google worries about losing the Apple default, and

24    there are discussions internally about the implications and

25    what to do.

1          One of the things that you see on the slides, on the

2     decks, in the discussions is Google trying to estimate how much

3     search, how much revenue they're going to lose from that.  And,

4     of course, they need to do that based on the data.  And the

5     documents show that this Google Maps event is used to construct

6     those estimates for mobile devices.

7     Q.  Could you provide an example of a piece of evidence you saw

8     in which Google uses the Google Maps data to project what might

9     happen if it lost the search default on Apple devices?

10    A.  Absolutely.  So, Your Honor, this is another redacted

11    slide, but let me highlight a couple of parts of the document

12    while maintaining confidentiality.

13         So, in the table that you see on the left-hand side,

14    on the upper left, they are providing estimates in the left

15    column of what they call the recovery assumptions.  If Apple

16    were to change the default to something else, how much of the

17    traffic they will get back.  In the top row for mobile, in the

18    bottom for PCs.  Now, that's how much they would get back.

19         What they would lose is 100 percent minus that

20    number.  The loss is 100 percent minus the recovery, which is

21    what is listed there.

22         And please notice that the number that is listed

23    there, it's very substantial, and it's justified by the slide

24    about the Google Maps that I just showed you.

25         MR. HAFENBRACK:  And that was UPX148.

```
 1                THE COURT:  Counsel, just to let you know, it's about

 2    5 of 5.  I'm not sure where you are in your examination.

 3                MR. HAFENBRACK:  Your Honor, I've got, you know,

 4    half -- 20 minutes to half an hour more, probably.

 5                THE COURT:  Okay.  All right.  Why don't we go to 5.

 6    I've got a plea hearing at 5 o'clock, so we'll just continue

 7    with the testimony in the morning.

 8                MR. HAFENBRACK:  Okay.  That sounds great.

 9                So go for five more minutes?

10                THE COURT:  Yes.

11    BY MR. HAFENBRACK:

12    Q.  Professor Rangel, did you analyze search usage on tablet

13    devices in the United States?

14    A.  I have.

15    Q.  And what tablets in particular did you look at?

16    A.  I compare, Your Honor, iPads and Amazon Fire tablets.

17    Q.  Could you describe for the Court the default browser and

18    search engine configuration on those two types of tablet

19    devices?

20    A.  And I will put it here, also, for the Court.

21                In iPad, Your Honor, Safari is the default browser,

22    and it has Google as the search engine default.  And in Fire,

23    Silk is the default browser, and comes with Bing as the

24    default.

25    Q.  And what market evidence did you observe with respect to
```

1    these tablet devices?

2    A.  What you compare -- this is a comparison, Your Honor,

3    between two devices of the same general category, similar

4    screens, similar user interfaces, that come with different

5    defaults.  And we can get a sense of the magnitude of these

6    defaults by comparing the shares of the two default engines,

7    Google and Bing.  And as you can see, again, maintaining

8    confidentiality, these numbers are very big.

9         For example, look at the impact for Bing.  Their

10   share when they are the default in Amazon Fire tablets is many,

11   many times what it is in the iPad.

12        MR. HAFENBRACK:  And this was -- the one document on

13   this slide is UPX945.

14   BY MR. HAFENBRACK:

15   Q.  Professor Rangel, understanding you can't discuss the

16   figures in open court, but can you give us a qualitative sense

17   of the size, the magnitude of the default effect you're

18   observing here?

19   A.  If you take those numbers as the estimate of the default

20   size, this is an enormous effect, compared to the defaults --

21   the body of defaults research.

22   Q.  And how did the size of the default effects you observe

23   here on tablet devices compare to the Code Red projections you

24   just discussed?

25   A.  I mean, these are larger default effects than the Code Red

1    projections.

2    Q.  Professor Rangel, are you familiar with the introduction of

3    a search engine choice screen in Russia?

4    A.  I am.

5    Q.  And first, in matter of terminology, what is a choice

6    screen?

7    A.  Yes.  Your Honor, a choice screen is a procedure, an

8    interface, in which a user is asked explicitly to make a choice

9    about a setting of a device or other software before they can

10   continue using it.

11          In the context of defaults, instead of having that

12   default given by you, you choose.  You have to make a choice.

13          THE COURT:  And this is a choice screen given the

14   first time the product is used?

15          THE WITNESS:  In this particular case, Your Honor,

16   it's -- let me -- the answer depends.  And what happens here,

17   Your Honor, is that in 2017, the Russian Federation antitrust

18   authorities asked Google to start releasing a choice screen

19   starting on that date.  Now, the release is different for new

20   devices than for people who are continued using their old

21   phone.  There's some differences about how this is done.

22   BY MR. HAFENBRACK:

23   Q.  Both --

24   A.  One other thing, sorry, I wanted to say for the Court that

25   may be useful.

```
1    Q.  Of course.

2    A.  The release for existing users, Your Honor, the choice of

3    screen is encountered after a software release.  So there's a

4    software update that fits that.  And as you can imagine, this

5    happens for different users at different times.  So as a

6    behavioral economist, the way I think about Russian choice

7    screen is that it doesn't phase in as a particular date.

8    Instead, it takes about two years to fully face it because

9    different consumers take actions at the choice of screen at

10   different times.

11            THE COURT:  Why don't we take a pause now and --

12            MR. HAFENBRACK:  Of course.

13            THE COURT:  -- we'll stop for the day.

14            So, Dr. Rangel, we'll ask you to return tomorrow.

15   We'll start tomorrow at 9:30.  I'll just ask you not to discuss

16   your testimony with anyone overnight.  And we'll see you

17   tomorrow.

18            THE WITNESS:  Of course, your Honor.  Thank you, sir.

19            THE COURT:  Thank you.

20            THE COURTROOM DEPUTY:  All rise.

21            THE COURT:  Dr. Rangel, why don't you just step down

22   and let me just talk to counsel for a moment.

23            Everybody else, you can have a seat or...

24            So did I understand, if I remember, you said that

25   some portion of Dr. Rangel's testimony you want to do in a
```

```
1      closed session?

2              MR. HAFENBRACK:  Not for our direct.  I understand

3      Google might want to do part of the cross, potentially, in

4      closed session.

5              THE COURT:  Is that right?

6              MR. SCHMIDTLEIN:  I'm going to see if I can configure

7      some of the documents that I might want to use or slides I

8      might want to use in a similar way, and if we can do it, we'll

9      do it that way.

10             THE COURT:  Okay.  Terrific.  Okay.  Good.  Because

11     if we were going to do that, then I was going to perhaps

12     suggest we just start with a closed session in the morning.

13     But it sounds like that may be something we can avoid.

14             MR. HAFENBRACK:  If Google does the cross in open

15     session, we'll also do any redirect in open session.

16             THE COURT:  Okay.  And then after Dr. Rangel, who do

17     we have up tomorrow?

18             MS. BELLSHAW:  Yes, Your Honor.  Meagan Bellshaw for

19     the United States.

20             After Dr. Rangel, we anticipate calling

21     Mr. Kolotouros, who is a Google employee, and we would expect

22     that his testimony may take place, in part, in a confidential

23     session.

24             THE COURT:  Okay.

25             MS. BELLSHAW:  After Mr. Kolotouros is Brian Higgins,
```

1      who is an employee of Verizon.  We also expect that part of his

2      testimony will take place in a confidential session.

3              And then depending on how quickly we move tomorrow,

4      it's a possibility that our next witness would be Mr. Yoo, who

5      is a former Google employee who would also have some part of

6      his testimony in a confidential section.

7              THE COURT:  What's your sense of how many of these

8      folks we'll likely get through tomorrow?

9              MS. BELLSHAW:  I think it is -- it depends on how

10     long Google would also like to question the witnesses.  I think

11     it's most likely that we would get through Mr. Kolotouros and

12     Mr. Higgins' testimony, but it's possible that Mr. Yoo could

13     start.

14             THE COURT:  And is Google intending on using or

15     calling any of these witnesses in their case in chief, so to

16     speak, and doing them in additional direct examination, outside

17     the scope of cross, for either of the first two witnesses?

18             MR. SCHMIDTLEIN:  I expect that we will be within the

19     scope.  But, again, I can't 100 percent anticipate.

20             THE COURT:  Sure.  Understood.

21             MR. SCHMIDTLEIN:  But it's not going to some

22     dramatic --

23             THE COURT:  I recognize that there isn't exactly a

24     bright line between those things, but just thought I would ask.

25             MR. SALLET:  Your Honor, just to note, we will try to

1    be sparing in our questioning.  I do think we will likely have

2    some questions for Mr. Higgins.

3              THE COURT:  Okay.  Okay.  All right.

4              Well, I think we left the one issue open,

5    Mr. Schmidtlein, concerning those market shares.  And if the

6    answer is you need to check overnight, that's fine, but if you

7    had an answer now -- the market shares with respect to the

8    summary judgment decision.

9              MR. SCHMIDTLEIN:  Yeah.  I think we're -- we are

10   working on it.

11             THE COURT:  Okay.  That's fine.  All right.  Well, we

12   can talk about that tomorrow.

13             Okay.  Anything else before we adjourn for the

14   evening?

15             (No response.)

16             THE COURT:  Thank you, everybody.  We'll see you

17   tomorrow morning.

18                              *   *   *

19

20

21

22

23

24

25

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                         Dated this 14th day of September, 2023

8

9

10                         _____

11                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
12                         Room 6523
                           333 Constitution Avenue, N.W.
13                         Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

576

INDEX

Witnesses:

Hal Varian

    Direct Examination (Cont.) By Mr. Dintzer........ 453
    Direct Examination By Mr. Sallet................. 474
    Cross-Examination By Mr. Smurzyaski............. 491

Antonio Rangel

    Direct Examination By Mr. Hafenbrack............ 515


Exhibit:

    UPX1085 Admitted.................................... 459

\*   \*   \*

**$**

**$10** [5] - 533:21, 533:24, 536:1, 536:2, 536:3
**$300** [1] - 503:8
**$60** [1] - 519:6
**$65** [1] - 503:4

**'**

**'96** [1] - 515:14
**'98** [1] - 515:15

**1**

**1** [2] - 507:9, 544:4
**10** [1] - 487:22
**100** [9] - 461:10, 461:22, 462:13, 489:3, 528:17, 535:20, 567:19, 567:20, 573:19
**1100** [1] - 451:12
**12th** [1] - 451:21
**13** [1] - 451:5
**1300** [1] - 451:17
**1400** [1] - 518:16
**14th** [1] - 575:7
**15** [1] - 506:7
**16** [1] - 492:10
**1993** [1] - 515:12
**1998** [3] - 515:12, 515:14, 515:21
**1:35** [1] - 451:5

**2**

**2** [5] - 457:4, 495:14, 502:25, 503:8, 505:19
**20** [2] - 487:22, 568:4
**20-3010** [1] - 451:4
**20-plus** [1] - 522:2
**20001** [1] - 575:13
**20005** [1] - 451:22
**2005** [1] - 546:20
**2006** [3] - 515:17, 515:21, 559:18
**2007** [5] - 492:8, 492:11, 493:6, 493:9, 493:17
**2008** [1] - 453:14
**2009** [3] - 496:1, 497:15, 500:11
**2010** [1] - 518:16
**2012** [2] - 564:14, 564:16
**2014** [1] - 460:18
**2015** [4] - 462:5, 532:2, 536:25, 537:1
**2016** [1] - 462:5

**2017** [5] - 456:23, 459:3, 462:5, 532:12, 570:17
**2018** [1] - 456:24
**2019** [2] - 518:25, 539:6
**202** [2] - 451:13, 451:22
**2020** [5] - 467:9, 469:21, 471:12, 473:24, 509:25
**2021** [1] - 555:1
**2022** [1] - 487:21
**2023** [4] - 451:5, 520:14, 542:14, 575:7
**22** [2] - 488:22, 489:2
**24** [2] - 456:13, 493:7
**27th** [1] - 469:21
**28th** [1] - 471:12
**2nd** [3] - 453:14, 487:21, 488:11

**3**

**3** [9] - 495:13, 495:15, 503:1, 503:2, 506:24, 507:10, 509:1, 509:2, 527:22
**30** [11] - 452:16, 452:17, 452:19, 452:25, 459:19, 461:7, 461:12, 461:23, 462:13, 497:7, 532:14
**307-0340** [1] - 451:13
**333** [1] - 575:12
**37** [1] - 527:24
**3:20** [1] - 509:3

**4**

**4** [4] - 502:9, 503:1, 503:2, 558:22
**40** [5] - 452:16, 452:17, 452:19, 489:5, 564:22
**401(k** [1] - 527:7
**434-5000** [1] - 451:22
**45** [5] - 459:19, 461:7, 461:12, 461:23, 462:13
**452** [1] - 502:4
**453** [1] - 576:4
**459** [1] - 576:9
**474** [1] - 576:4
**491** [1] - 576:5
**497** [3] - 487:21, 488:13, 488:22
**498** [1] - 487:22

**5**

**5** [5] - 489:9, 568:2, 568:5, 568:6
**508-6000** [1] - 451:18
**515** [1] - 576:7
**518** [1] - 492:21

**6**

**6** [1] - 489:10
**60** [2] - 472:25, 489:4
**6523** [1] - 575:12

**7**

**7** [1] - 489:11
**72** [1] - 493:3
**720** [1] - 451:18
**725** [1] - 451:21
**76** [2] - 493:16, 517:18

**8**

**8** [3] - 474:21, 474:23, 489:12
**80203** [1] - 451:18
**86** [1] - 527:24

**9**

**9** [2] - 489:13, 529:6
**900** [1] - 529:6
**9:30** [1] - 571:15
**9:40** [1] - 497:3

**A**

**A/B** [1] - 549:13
**ability** [4] - 527:9, 539:3, 549:12, 575:6
**able** [6] - 479:6, 488:2, 496:16, 518:6, 518:8, 562:13
**absent** [1] - 514:3
**absolutely** [2] - 470:3, 567:10
**absorb** [1] - 516:22
**academic** [2] - 515:23, 517:16
**accept** [5] - 463:21, 465:25, 466:7, 474:17, 519:19
**access** [7] - 500:3, 540:23, 540:25, 541:19, 548:3, 549:25, 562:16
**accessing** [1] - 540:25
**according** [3] - 493:7, 535:5, 558:18

**accounts** [1] - 533:3
**accuracy** [2] - 462:10, 518:11
**accurate** [3] - 456:24, 457:1, 575:4
**acknowledged** [1] - 473:17
**acknowledging** [1] - 512:8
**acquire** [1] - 483:17
**acquisition** [1] - 499:21
**acted** [1] - 534:22
**acting** [2] - 467:14, 472:14
**action** [5] - 464:12, 465:6, 520:10, 563:18
**actions** [3] - 542:10, 554:9, 571:9
**active** [1] - 527:14
**actively** [1] - 547:25
**activity** [5] - 504:11, 504:12, 504:13
**ad** [36] - 454:13, 454:16, 454:22, 455:5, 455:6, 455:10, 455:12, 455:14, 455:20, 455:21, 456:8, 459:18, 461:6, 461:10, 461:22, 462:20, 462:22, 462:23, 463:14, 463:20, 463:22, 466:1, 466:7, 479:15, 480:9, 489:4, 490:14, 502:20, 503:18, 504:9, 507:18, 507:22, 508:9, 508:12
**add** [1] - 505:9
**added** [4] - 459:5, 523:2, 534:13, 535:2
**addicted** [2] - 545:24, 546:1
**adding** [2] - 465:1, 466:20
**additional** [6] - 452:12, 452:21, 502:23, 540:24, 541:20, 573:16
**address** [1] - 566:10
**addressing** [1] - 505:13
**adequate** [1] - 543:18
**adjourn** [1] - 574:13
**admissible** [1] - 511:6
**admission** [4] - 459:9, 468:5, 469:13, 512:23
**admit** [1] - 468:9
**admitted** [2] - 510:7, 514:20
**Admitted.................. ................. [1] - 576:9

578

**admitting** [1] - 469:11
**Ads** [3] - 480:17,
506:24, 507:9
**ads** [57] - 453:25,
454:10, 455:22, 457:5,
457:15, 457:19,
457:21, 458:4, 458:5,
458:7, 458:13, 458:19,
461:11, 462:20, 463:8,
463:9, 463:17, 464:8,
464:11, 464:24, 465:1,
465:2, 472:24, 478:8,
478:10, 478:14,
478:19, 479:2, 479:5,
481:15, 481:23,
482:19, 482:23,
483:17, 483:19,
502:20, 504:8, 504:11,
504:12, 504:20,
504:23, 505:24, 506:2,
507:17, 507:20,
507:21, 507:23,
507:24, 508:2, 508:3,
508:4, 508:6
**advantageous** [1] -
543:13
**advertise** [3] - 479:25,
483:1, 483:15
**advertisement** [1] -
533:8
**advertisements** [1] -
533:5
**advertiser** [2] - 463:2,
483:13
**advertiser's** [2] -
457:6, 507:18
**advertisers** [22] -
458:7, 458:13, 458:19,
463:15, 463:18,
480:17, 480:24,
481:12, 481:21,
482:17, 483:20, 485:7,
503:8, 503:19, 533:1,
533:13, 533:23, 534:8,
534:23, 534:24, 535:2
**advertisers'** [3] -
480:22, 481:1, 481:5
**advertising** [10] -
453:25, 454:1, 456:20,
480:25, 483:18,
503:10, 503:12,
504:16, 504:17, 504:18
**Advertising** [1] -
480:16
**Advertising's** [1] -
460:15
**advised** [1] - 545:6
**affect** [11] - 465:1,
516:12, 516:14,
521:22, 523:23,

526:23, 528:17,
543:11, 545:13,
552:16, 554:17
**affects** [6] - 522:11,
523:19, 524:8, 524:19,
527:18, 563:24
**affiliation** [2] - 461:18,
462:3
**afford** [1] - 503:11
**afternoon** [5] - 474:15,
491:16, 513:6, 513:7,
515:7
**agency** [1] - 483:11
**agent** [7] - 467:16,
467:18, 468:21,
468:24, 473:17, 473:18
**aggressiveness** [1] -
528:9
**ago** [8] - 456:11,
462:6, 489:25, 492:10,
492:12, 496:2, 506:5,
506:7
**agree** [15] - 481:1,
485:14, 498:6, 498:18,
498:22, 498:25, 499:1,
499:3, 499:8, 499:9,
499:13, 502:11,
502:12, 502:14, 563:15
**agreeing** [1] - 499:7
**agreement** [5] -
476:21, 476:24, 477:8,
478:4, 556:25
**agreements** [1] -
477:21
**ahead** [2] - 509:11,
566:16
**aisle** [2] - 518:1
**al** [1] - 451:2
**algorithm** [2] - 465:5,
465:7
**algorithms** [1] -
484:24
**allen** [1] - 503:23
**Allen** [6] - 495:22,
496:25, 498:5, 498:21,
502:9, 505:21
**alliance** [2] - 470:20,
471:1
**allocated** [1] - 544:4
**allow** [4] - 467:18,
469:8, 469:14, 523:3
**allows** [2] - 493:14,
559:12
**almost** [2] - 528:17,
534:22
**aloud** [2] - 488:16,
488:17
**alphabetical** [1] -
525:22
**alternative** [1] - 541:1

**alternatives** [2] -
553:8, 557:1
**amazed** [1] - 470:16
**Amazon** [27] - 458:20,
476:19, 476:24, 477:8,
477:20, 478:8, 478:13,
478:18, 479:1, 479:24,
479:25, 480:6, 480:10,
481:7, 481:8, 481:21,
484:12, 484:14,
484:20, 485:1, 485:9,
485:11, 494:13,
494:15, 568:16, 569:10
**amazon** [1] - 478:10
**Amazon-related** [1] -
494:15
**ambiguous** [1] -
505:14
**America** [1] - 451:2
**AMIT** [1] - 451:9
**amount** [5] - 463:21,
503:6, 534:8, 536:1,
536:15
**amounts** [1] - 538:15
**analogy** [1] - 548:5
**analyses** [1] - 486:13
**analysis** [11] - 458:6,
458:12, 458:18,
486:11, 493:23, 494:8,
494:12, 517:6, 523:6,
551:11, 565:13
**analyze** [8] - 539:25,
540:3, 552:15, 558:21,
558:25, 564:2, 564:5,
568:12
**analyzed** [6] - 485:25,
486:4, 537:6, 540:4,
562:21, 564:6
**Android** [21] - 470:19,
471:3, 471:8, 540:7,
540:16, 553:16,
556:12, 556:21,
556:23, 557:15, 559:5,
559:7, 559:9, 559:10,
559:11, 559:16,
559:25, 560:7, 562:12,
562:17, 565:3
**answer** [26] - 457:16,
465:8, 469:4, 470:5,
471:15, 474:2, 474:17,
476:22, 482:7, 487:5,
488:18, 489:9, 489:15,
490:5, 494:3, 505:7,
522:24, 530:21,
544:18, 550:24,
551:16, 552:4, 556:3,
570:16, 574:6, 574:7
**answering** [1] - 462:7
**answers** [4] - 473:11,
489:19, 494:16

**anticipate** [2] -
572:20, 573:19
**antitrust** [3] - 470:15,
505:11, 570:17
**Antonio** [3] - 513:8,
515:7, 576:6
**ANTONIO** [1] - 513:14
**anyway** [1] - 502:16
**apart** [3] - 535:14,
536:10, 563:7
**apologies** [2] - 540:6,
558:11
**apologize** [5] - 539:10,
545:15, 546:25, 559:2,
565:21
**app** [4] - 479:12,
559:13, 566:4, 566:11
**appalled** [1] - 498:3
**appear** [7] - 479:25,
480:9, 483:22, 483:25,
484:2, 504:23, 561:9
**APPEARANCES** [1] -
451:10
**Apple** [35] - 475:6,
475:10, 475:15,
475:16, 475:19,
475:21, 475:23,
476:15, 476:19,
476:20, 478:4, 537:3,
537:4, 537:17, 537:20,
539:11, 539:12,
539:13, 539:17, 540:6,
546:25, 564:12,
564:16, 564:17,
564:19, 565:3, 565:11,
565:18, 566:4, 566:23,
567:9, 567:15
**Apple's** [2] - 562:22,
565:20
**application** [13] -
533:17, 538:20, 539:2,
539:14, 540:25, 543:6,
554:13, 556:8, 559:21,
561:1, 561:4, 561:7,
566:10
**applications** [4] -
525:5, 538:17, 539:9,
539:13
**applied** [2] - 528:16,
534:3
**applies** [1] - 554:6
**apply** [3] - 522:14,
532:7, 542:11
**applying** [3] - 464:10,
517:6
**appreciate** [2] -
468:14, 473:13
**approach** [4] - 487:9,
509:16, 513:20, 533:18
**appropriately** [1] -

505:12
**apps** [1] - 539:18
**April** [1] - 453:14
**architecture** [9] -
526:4, 526:6, 526:7,
526:14, 526:18,
526:21, 535:8, 535:9,
544:13
**area** [5] - 462:12,
481:24, 515:25, 522:3,
533:9
**areas** [1] - 516:11
**arguably** [1] - 512:18
**argue** [5] - 526:19,
529:1, 529:20, 529:21,
563:19
**Ariely** [1] - 561:23
**arise** [1] - 549:6
**arrangement** [1] -
463:25
**arrive** [1] - 517:14
**arriving** [1] - 516:24
**art** [1] - 473:2
**article** [7] - 455:17,
459:12, 459:13,
506:11, 506:16, 517:25
**articles** [2] - 477:6,
517:18
**aspects** [1] - 565:11
**asserted** [5] - 467:25,
509:24, 510:17, 511:5,
514:17
**assertion** [2] - 510:3,
511:8
**assigned** [2] - 556:20,
565:24
**assignment** [6] -
521:10, 521:13,
521:16, 521:24, 522:1,
523:17
**assignments** [1] -
521:14
**assist** [1] - 519:24
**assistant** [1] - 515:20
**associated** [13] -
455:8, 519:7, 521:22,
523:16, 530:22,
532:23, 534:20,
535:19, 556:2, 562:2,
562:21, 562:24, 564:18
**associates** [1] -
519:11
**association** [1] -
461:13
**Association** [1] -
519:3
**assume** [2] - 479:9,
516:21
**assumption** [1] -
517:2

**assumptions** [1] -
567:15
**attached** [5] - 459:17,
459:24, 460:1, 460:2,
460:25
**attachment** [1] -
460:23
**attempt** [1] - 487:7
**attention** [6] - 476:4,
478:14, 478:19, 479:2,
495:12, 525:18
**attract** [3] - 478:14,
478:19, 479:2
**attractive** [1] - 503:17
**attributing** [1] -
539:21
**auction** [20] - 462:17,
462:20, 462:22,
462:25, 463:3, 463:14,
463:15, 463:21, 464:3,
464:5, 464:8, 464:11,
464:13, 464:14,
464:16, 464:18,
464:21, 465:4, 465:10,
466:18
**auction's** [7] - 463:1,
463:4, 464:3, 464:15,
464:19, 465:5, 466:19
**auctions** [1] - 503:19
**August** [2] - 456:23,
509:24
**Austria** [1] - 529:1
**authorities** [1] -
570:18
**authors** [2] - 462:3,
462:4
**automatic** [2] -
551:19, 551:23
**automatically** [2] -
527:10, 542:12
**available** [2] - 503:12,
561:10
**Avenue** [1] - 575:12
**avoid** [1] - 572:13
**Award** [1] - 519:1
**award** [1] - 518:22
**awarded** [1] - 518:25
**awards** [1] - 518:25
**aware** [9] - 494:7,
494:18, 542:6, 543:23,
543:25, 552:23, 553:3,
553:6, 560:8
**awareness** [2] - 557:6
**axis** [1] - 500:3

**B**

**bachelor's** [1] -
515:11
**back-of-the-**

**envelope** [1] - 503:5
**background** [2] -
515:10, 524:7
**Ballmer** [1] - 498:11
**Ballmer's** [2] - 499:12,
499:16
**ballot** [2] - 525:16
**bar** [3] - 559:10,
560:23, 561:13
**barely** [1] - 554:12
**based** [9] - 480:22,
480:25, 481:5, 481:12,
510:17, 531:18,
531:24, 533:1, 567:4
**bases** [1] - 510:14
**basic** [2] - 480:17,
551:16
**basis** [3] - 510:20,
544:13, 559:1
**beating** [1] - 502:22
**beautiful** [2] - 473:2,
548:5
**became** [2] - 531:10,
566:3
**become** [1] - 520:14
**becomes** [2] - 520:10,
520:25
**BEFORE** [1] - 451:9
**beginning** [2] - 502:1,
502:10
**begins** [2] - 488:23,
489:17
**behalf** [5] - 467:15,
469:1, 474:6, 512:19,
512:20
**behavior** [12] - 480:22,
480:23, 481:1, 481:5,
516:4, 516:9, 516:14,
516:15, 529:11,
536:10, 536:20, 563:25
**Behavioral** [1] -
532:13
**behavioral** [73] -
515:8, 515:24, 516:3,
516:13, 516:19, 517:2,
517:7, 517:8, 517:17,
517:19, 517:22,
518:23, 519:4, 519:15,
519:20, 520:5, 520:8,
521:1, 521:4, 521:7,
522:5, 522:10, 522:14,
522:19, 522:24, 523:6,
524:3, 524:5, 525:23,
526:8, 526:22, 527:1,
528:1, 529:10, 529:12,
529:20, 531:23, 532:6,
532:7, 532:10, 532:16,
532:19, 533:16,
533:18, 534:17,
535:14, 539:20,

541:20, 541:24, 542:1,
546:1, 550:13, 550:19,
550:21, 550:25, 551:3,
551:17, 552:16, 554:5,
554:19, 555:2, 555:4,
555:16, 558:1, 560:16,
560:17, 561:17,
561:22, 562:9, 563:21,
563:22, 571:6
**behaviors** [1] - 516:18
**BELLSHAW** [3] -
572:18, 572:25, 573:9
**Bellshaw** [1] - 572:18
**below** [2] - 466:7,
502:10
**BENCH** [1] - 451:8
**benefits** [5] - 524:12,
526:10, 552:2, 553:9,
554:8
**Berkeley** [1] - 465:14
**best** [3] - 493:25,
501:22, 575:6
**better** [7] - 501:17,
501:23, 502:21, 516:7,
516:8, 539:15
**between** [19] - 453:24,
456:7, 458:7, 458:13,
458:19, 481:13, 495:9,
504:10, 504:23,
516:10, 521:19, 523:3,
531:2, 535:20, 551:11,
551:18, 569:3, 573:24
**beyond** [3] - 516:16,
536:19, 538:17
**bias** [11] - 523:18,
524:2, 524:3, 524:4,
524:8, 524:15, 525:6,
525:8, 530:16, 538:4,
541:8
**biased** [1] - 529:17
**biases** [2] - 523:20,
541:20
**bid** [4] - 463:15,
463:18, 483:24, 484:1
**bids** [1] - 466:7
**big** [3] - 483:13,
503:10, 569:8
**billions** [2] - 524:21,
538:9
**binder** [5] - 460:5,
460:6, 491:16, 495:9,
500:19
**binders** [1] - 513:20
**Bing** [18] - 493:21,
494:8, 544:23, 544:24,
544:25, 545:1, 545:5,
546:24, 560:23, 561:3,
561:5, 561:16, 561:20,
561:22, 568:23, 569:7,
569:9

580

**Bing's** [1] - 545:10
**biology** [1] - 515:8
**bit** [4] - 509:13, 511:11, 518:13, 541:5
**blank** [1] - 491:2
**blow** [1] - 505:21
**body** [1] - 569:21
**boggy** [1] - 565:19
**bogus** [6] - 498:14, 499:13, 499:15, 499:16, 499:18, 499:23
**book** [1] - 466:14
**books** [1] - 476:10
**boots** [1] - 455:9
**border** [2] - 529:1, 529:4
**borrow** [1] - 496:15
**bottom** [10] - 453:13, 467:18, 468:9, 469:4, 469:18, 474:2, 475:2, 497:5, 510:22, 567:18
**bought** [3] - 455:6, 489:5, 518:19
**box** [10] - 493:13, 518:18, 525:18, 533:7, 540:20, 556:24, 559:11, 559:20, 561:15, 566:5
**boxes** [3] - 512:9, 534:11, 534:12
**Brain** [1] - 519:13
**brain** [1] - 542:9
**branch** [1] - 516:4
**brand** [7] - 453:25, 454:1, 479:14, 482:21, 537:8, 548:20, 548:22
**Brave** [1] - 550:3
**break** [3] - 452:3, 507:3, 508:24
**Brian** [1] - 572:25
**brief** [1] - 458:1
**bright** [1] - 573:24
**bring** [2] - 460:11, 503:23
**brings** [1] - 516:4
**broad** [4] - 484:6, 484:13, 484:20, 485:1
**Broadway** [1] - 451:17
**browser** [26] - 492:7, 492:10, 492:13, 492:15, 492:16, 493:4, 493:6, 493:12, 493:14, 540:14, 546:24, 546:25, 550:3, 553:17, 557:12, 557:14, 557:15, 557:18, 557:25, 558:2, 559:13, 562:19, 562:22, 568:17, 568:21, 568:23
**browsers** [1] - 540:8

**Bruce** [1] - 451:15
**budget** [1] - 533:3
**budgets** [1] - 533:14
**building** [4] - 470:20, 471:1, 482:21, 517:3
**builds** [1] - 500:24
**built** [2] - 502:21, 518:10
**business** [4] - 479:7, 479:10, 531:23, 536:12
**buttons** [1] - 526:12
**buy** [6] - 454:15, 455:8, 478:8, 482:5, 498:8, 520:15
**buying** [6] - 481:23, 483:19, 497:6, 506:4, 506:8, 506:13
**buys** [1] - 478:10
**BY** [41] - 453:4, 459:16, 460:14, 466:4, 469:16, 472:6, 474:11, 477:17, 481:4, 482:16, 484:19, 488:12, 488:21, 489:21, 490:8, 491:15, 491:22, 492:4, 494:6, 497:2, 505:8, 507:8, 515:5, 518:21, 519:22, 520:3, 534:15, 536:9, 537:25, 545:11, 546:9, 550:11, 552:14, 555:25, 557:10, 558:20, 565:10, 566:19, 568:11, 569:14, 570:22

---

## C

**cabinet** [1] - 518:19
**calculate** [1] - 489:6
**calculated** [1] - 493:20
**calculation** [1] - 503:5
**calories** [1] - 554:15
**Caltech** [7] - 515:9, 515:11, 515:16, 515:19, 517:10, 519:8, 519:13
**candidates** [4] - 525:21, 525:25, 526:3
**cannot** [5] - 535:25, 544:7, 545:3, 558:3, 563:3
**capacity** [1] - 542:8
**car** [1] - 454:15
**card** [1] - 520:16
**care** [5] - 524:18, 528:2, 528:6, 528:9, 529:22
**career** [3] - 487:7, 517:15, 517:19
**Carl** [13] - 465:13,

465:14, 466:10, 467:3, 467:20, 471:12, 471:14, 472:13, 473:17, 509:12, 509:23, 510:2, 511:10
**Carr** [1] - 451:17
**carried** [2] - 543:3, 552:6
**carriers** [1] - 471:1
**carry** [6] - 519:6, 519:11, 521:24, 521:25, 550:23, 551:8
**carrying** [2] - 541:21, 551:11
**case** [36] - 468:25, 469:10, 469:24, 470:1, 470:9, 480:13, 510:20, 521:10, 522:5, 522:14, 522:16, 522:18, 523:7, 524:19, 531:18, 531:24, 531:25, 532:11, 536:15, 536:22, 538:7, 538:24, 543:16, 545:12, 545:14, 548:25, 551:5, 551:9, 551:22, 553:1, 553:2, 556:3, 556:4, 559:19, 570:15, 573:15
**casually** [1] - 561:21
**catch** [1] - 509:8
**categories** [1] - 516:10
**category** [3] - 511:16, 514:11, 569:3
**CCR** [1] - 575:11
**Center** [2] - 451:17, 519:13
**CEO** [1] - 565:20
**cereal** [2] - 518:1, 518:18
**certain** [6] - 461:14, 470:4, 514:19, 542:10, 551:4
**certainly** [1] - 467:15
**CERTIFICATE** [1] - 575:1
**certify** [1] - 575:3
**cetera** [5] - 476:11, 479:14, 504:19, 548:10, 557:2
**chain** [2] - 495:22, 498:6
**change** [42] - 464:19, 465:3, 482:6, 520:11, 520:24, 526:11, 526:12, 528:14, 534:1, 535:12, 535:21, 536:1, 537:10, 544:16, 547:4, 547:7, 547:14, 548:10, 548:23, 549:7, 550:3,

553:7, 553:14, 553:15, 553:24, 554:20, 555:13, 556:7, 557:2, 557:24, 558:23, 559:14, 559:24, 561:13, 561:15, 562:15, 562:19, 563:12, 565:4, 567:16
**changed** [8] - 502:2, 523:5, 524:14, 544:22, 544:25, 545:7, 549:3, 565:3
**changes** [1] - 465:7
**changing** [22] - 464:15, 464:19, 465:3, 465:5, 466:19, 524:5, 524:6, 524:7, 524:9, 540:24, 541:19, 549:14, 552:8, 555:12, 558:2, 559:3, 559:4, 559:5, 562:14, 562:22, 565:4
**chart** [4] - 474:23, 476:15, 491:1, 500:2
**charts** [1] - 491:12
**check** [4] - 467:11, 528:12, 531:8, 574:6
**checked** [1] - 512:9
**checkmark** [1] - 475:8
**chief** [4] - 466:10, 485:24, 494:18, 573:15
**choice** [66] - 516:25, 518:5, 520:10, 520:25, 522:8, 526:4, 526:6, 526:7, 526:14, 526:17, 526:23, 528:8, 529:17, 529:19, 530:3, 530:16, 531:10, 533:10, 535:8, 535:9, 541:20, 542:19, 544:13, 546:12, 547:10, 547:11, 547:25, 551:13, 552:17, 554:2, 554:4, 554:7, 554:16, 554:17, 554:20, 555:9, 556:1, 556:10, 556:13, 557:3, 557:4, 557:5, 557:17, 558:1, 558:5, 558:17, 558:22, 560:6, 560:10, 562:1, 562:5, 562:21, 562:24, 563:2, 564:3, 570:3, 570:5, 570:7, 570:8, 570:12, 570:13, 570:18, 571:2, 571:6, 571:9
**choices** [6] - 518:3, 518:9, 518:13, 523:24, 525:19, 556:10
**choose** [6] - 463:7, 525:12, 530:4, 531:2,

570:12
**chosen** [1] - 520:9
**Chrome** [2] - 559:4, 562:19
**Chu** [2] - 493:20, 493:23
**circles** [1] - 529:2
**circumstance** [1] - 480:5
**circumstances** [3] - 489:7, 525:10, 549:9
**citation** [1] - 487:10
**citations** [1] - 518:17
**civic** [1] - 525:14
**claim** [2] - 498:13, 499:19
**clarify** [2] - 505:15, 525:8
**class** [1] - 553:18
**classes** [1] - 540:4
**classical** [1] - 533:18
**clean** [1] - 491:7
**clear** [10] - 472:7, 472:11, 473:10, 486:17, 522:20, 534:10, 535:10, 551:6, 551:7, 566:2
**clearly** [1] - 511:22
**click** [8] - 462:23, 492:14, 520:25, 526:12, 531:11, 561:9, 561:10, 562:8
**clicked** [1] - 456:14
**clicking** [5] - 489:4, 489:6, 525:13, 534:1, 561:10
**clicks** [6] - 486:1, 486:5, 490:15, 507:22, 556:7, 556:11
**close** [5] - 490:3, 498:12, 507:19, 507:24, 561:6
**closed** [3] - 572:1, 572:4, 572:12
**CMR** [1] - 575:11
**co** [1] - 466:13
**CO** [1] - 451:18
**co-wrote** [1] - 466:13
**Code** [5] - 537:1, 537:6, 566:22, 569:23, 569:25
**codirector** [1] - 519:13
**coffee** [6] - 542:14, 542:15, 547:17, 547:22, 547:24, 548:8
**coffeehouse** [3] - 520:15, 548:6, 548:7
**cognitive** [2] - 515:25, 542:8
**collaborating** [1] -

555:17
**collaboration** [1] - 532:3
**colleague** [3] - 452:23, 465:14, 474:2
**collected** [1] - 550:22
**collection** [1] - 505:18
**collects** [1] - 519:5
**college** [1] - 517:14
**colon** [3] - 499:8
**Colorado** [4] - 451:15, 451:17, 474:6, 474:15
**COLORADO** [1] - 451:16
**COLUMBIA** [1] - 451:1
**column** [2] - 475:5, 567:15
**combination** [1] - 542:18
**combined** [1] - 539:19
**comfort** [2] - 528:9, 528:13
**comfort-oriented** [1] - 528:9
**coming** [1] - 514:20
**commendations** [1] - 518:23
**comment** [1] - 563:11
**common** [2] - 526:20, 531:19
**commonly** [1] - 521:1
**communicate** [1] - 512:19
**communicating** [2] - 474:1, 505:10
**communications** [1] - 509:23
**companies** [14] - 479:1, 493:24, 494:8, 522:22, 524:21, 527:9, 527:11, 527:12, 527:14, 530:1, 530:2, 532:8, 538:9, 549:13
**company** [17] - 469:1, 472:3, 472:5, 475:5, 483:2, 483:9, 486:14, 490:2, 494:9, 494:20, 496:24, 527:15, 527:18, 532:4, 532:5, 535:5, 549:12
**compare** [13] - 521:18, 523:6, 527:22, 528:11, 530:10, 531:4, 531:5, 531:16, 562:6, 563:4, 568:16, 569:2, 569:23
**compared** [5] - 493:21, 493:23, 494:9, 494:19, 569:20
**comparing** [3] - 490:14, 494:13, 569:6

**comparison** [1] - 569:2
**compete** [4] - 476:16, 476:17, 503:19, 539:3
**competed** [2] - 497:13, 498:9
**competes** [1] - 480:6
**competing** [9] - 479:21, 479:23, 481:6, 481:17, 539:2, 539:4, 539:23, 540:22, 540:23
**Competition** [1] - 474:23
**competition** [2] - 481:11, 481:13
**Competitive** [1] - 460:15
**competitive** [2] - 476:1, 482:18
**competitor's** [1] - 501:23
**competitors** [2] - 482:1, 482:2
**complaining** [1] - 546:25, 547:6
**complaint** [4] - 469:23, 470:1, 470:9, 558:4
**complaints** [1] - 565:20
**complete** [11] - 485:11, 485:15, 520:25, 552:21, 553:25, 555:12, 562:11, 562:13, 562:18, 566:15, 575:5
**completed** [2] - 553:24, 561:15
**completely** [1] - 505:25
**completing** [2] - 512:11, 520:22
**complex** [2] - 542:4, 542:9
**complicated** [1] - 562:9
**complimentary** [1] - 455:7
**component** [1] - 560:12
**computational** [1] - 516:25
**computer** [1] - 548:18
**computers** [3] - 521:19, 523:21, 564:7
**concept** [11] - 500:4, 500:6, 520:4, 524:4, 525:8, 526:4, 526:8, 541:24, 542:1, 551:17, 554:5

**concepts** [2] - 516:5, 522:23
**concern** [2] - 503:24, 504:2
**concerned** [1] - 454:11
**concerning** [1] - 574:5
**conclude** [2] - 478:18, 552:19
**conclusion** [11] - 462:8, 478:23, 511:7, 511:22, 523:16, 523:17, 523:19, 523:25, 541:4, 554:19
**conclusions** [7] - 522:20, 522:23, 522:24, 523:14, 523:15, 541:2, 542:25
**condition** [2] - 528:13, 531:6
**conditions** [3] - 531:6, 543:21, 549:6
**conduct** [1] - 538:2
**conducted** [5] - 462:5, 486:7, 486:9, 543:24, 550:14
**conducts** [2] - 486:11, 486:13
**confidential** [5] - 513:25, 534:5, 572:22, 573:2, 573:6
**confidentiality** [6] - 514:4, 534:13, 544:8, 564:24, 567:12, 569:8
**configuration** [1] - 568:18
**configure** [1] - 572:6
**confirm** [3] - 468:16, 488:10, 488:18
**confront** [1] - 487:19
**confused** [3] - 477:14, 549:1, 553:4
**confusing** [1] - 478:25
**CONNOLLY** [1] - 451:21
**cons** [2] - 546:11, 546:16
**conscious** [1] - 551:20
**consensus** [5] - 522:10, 522:13, 526:23, 526:24, 553:12
**consequences** [1] - 529:8
**consider** [11] - 473:20, 480:5, 494:25, 495:2, 528:3, 539:16, 546:11, 549:10, 551:12, 554:2, 558:13
**considerable** [2] -

582

559:22, 562:5
**considered** [4] -
455:18, 468:11, 535:3,
565:12
**considering** [2] -
546:16, 552:17
**considers** [1] - 552:1
**consistent** [11] -
537:11, 537:15, 538:3,
538:12, 544:19,
546:14, 546:18, 551:4,
554:23, 558:15, 558:17
**constantly** [1] - 542:5
**constitute** [1] - 526:17
**constitutes** [1] - 575:4
**Constitution** [1] -
575:12
**construct** [1] - 567:5
**constructed** [1] -
543:20
**consultancy** [3] -
468:25, 469:3, 469:10
**consultant** [13] -
465:21, 467:4, 467:6,
467:10, 468:12,
468:15, 468:20, 472:8,
472:14, 472:16,
473:23, 473:25, 510:9
**consulting** [3] - 472:3,
472:5, 532:5
**Consumer** [2] -
451:16, 460:16
**consumer** [46] - 520:9,
520:10, 520:21,
520:24, 521:17,
521:22, 522:8, 523:4,
523:18, 524:8, 524:9,
524:11, 524:13,
524:23, 526:10,
526:23, 526:25,
530:11, 531:16,
531:21, 536:20,
540:11, 541:12,
541:16, 543:1, 543:14,
543:18, 543:21,
544:15, 545:16, 546:6,
547:18, 549:16,
551:25, 552:6, 552:16,
552:21, 552:23,
553:15, 560:8, 560:14,
560:16, 560:21,
561:17, 563:24, 564:3
**consumers** [18] -
478:15, 516:2, 516:7,
524:20, 525:11,
526:16, 529:15, 530:8,
542:14, 543:4, 543:21,
545:13, 549:1, 550:6,
556:25, 559:12,
562:11, 571:9

**consumers'** [2] -
516:20, 523:24
**consumption** [1] -
548:11
**Cont** [2] - 453:3, 576:4
**contains** [1] - 514:23
**content** [1] - 508:13
**contention** [1] -
499:12
**contents** [2] - 494:1,
506:16
**context** [18] - 467:22,
469:8, 469:14, 473:9,
506:15, 525:9, 532:25,
533:1, 539:10, 546:19,
546:20, 555:11, 556:9,
556:18, 557:22, 560:4,
562:6, 570:11
**contextual** [2] -
506:15, 508:5
**continue** [4] - 506:10,
511:20, 568:6, 570:10
**continued** [2] -
502:23, 570:20
**continuing** [2] -
495:15, 507:13
**contract** [2] - 511:23,
558:6
**contracts** [3] - 556:12,
557:17, 558:18
**contractual** [1] - 532:3
**contrast** [2] - 504:10,
529:3
**contribute** [2] -
527:19, 527:23
**contribution** [3] -
527:13, 527:16, 527:23
**contributions** [1] -
527:20
**control** [4] - 463:1,
464:15, 466:19, 544:4
**controversial** [1] -
529:2
**convergence** [2] -
507:20, 508:2
**conversationally** [1] -
497:18, 497:19
**conversations** [1] -
553:10
**conveying** [1] - 502:24
**coordinate** [1] - 452:8
**cope** [1] - 537:7
**copies** [1] - 509:17
**copy** [1] - 487:10
**core** [1] - 471:7
**Cornell** [1] - 530:23
**corporation** [1] -
538:12
**correct** [25] - 462:9,
463:22, 464:4, 464:9,

465:2, 465:11, 465:12,
466:8, 466:9, 466:20,
466:21, 475:8, 478:13,
479:7, 479:12, 479:19,
480:1, 483:14, 485:3,
485:10, 485:12,
486:20, 498:15,
562:20, 566:6
**correctly** [1] - 476:15
**cost** [2] - 526:10,
563:13
**Costs** [1] - 501:12
**costs** [7] - 501:9,
501:22, 516:25,
524:12, 530:8, 554:8,
555:20
**counsel** [8] - 487:17,
488:2, 492:2, 509:8,
512:16, 563:11, 568:1,
571:22
**Counsel** [6] - 473:10,
490:24, 496:19, 552:5,
558:8, 566:18
**Counsel's** [1] - 530:21
**Counselor** [1] -
506:25
**countries** [3] - 528:23,
550:4, 550:8
**country** [1] - 528:21
**couple** [6] - 513:19,
534:18, 541:9, 554:13,
565:16, 567:11
**course** [21] - 453:8,
480:18, 485:24,
496:13, 517:12,
517:13, 517:23, 521:4,
527:4, 528:3, 536:4,
547:18, 548:25, 551:2,
559:6, 560:3, 564:25,
567:4, 571:1, 571:12,
571:18
**courses** [4] - 517:8,
517:9, 517:11, 521:7
**court** [5] - 467:1,
513:9, 514:3, 514:25,
569:16
**COURT** [117] - 451:1,
452:2, 452:5, 452:7,
452:11, 453:1, 459:10,
459:15, 460:11,
465:23, 466:3, 467:3,
467:6, 467:8, 467:13,
467:17, 468:1, 468:7,
468:23, 469:7, 469:13,
471:25, 472:4, 472:20,
473:7, 473:20, 474:6,
477:13, 480:20,
484:16, 487:12,
487:14, 487:17,
487:24, 488:5, 488:8,

488:17, 489:18, 490:3,
490:19, 491:1, 491:7,
491:12, 491:20, 492:2,
494:3, 496:18, 496:23,
505:6, 506:25, 507:3,
507:7, 508:17, 508:20,
509:1, 509:9, 509:11,
509:15, 510:22, 512:3,
512:5, 512:14, 513:2,
513:6, 513:9, 513:13,
513:17, 513:21, 514:5,
514:9, 514:18, 515:1,
515:3, 518:18, 519:17,
519:19, 520:2, 535:16,
535:18, 535:24, 536:6,
543:19, 544:20,
544:24, 545:6, 547:16,
549:4, 549:18, 549:21,
550:1, 550:10, 552:10,
552:13, 564:23, 566:2,
566:13, 566:16, 568:1,
568:5, 568:10, 570:13,
571:11, 571:13,
571:19, 571:21, 572:5,
572:10, 572:16,
572:24, 573:7, 573:14,
573:20, 573:23, 574:3,
574:11, 574:16, 575:1
**Court** [29] - 451:24,
466:5, 468:16, 487:10,
509:14, 509:21,
509:22, 512:10,
512:12, 515:6, 517:21,
520:11, 527:6, 529:10,
530:19, 539:7, 539:13,
541:6, 541:10, 545:17,
550:14, 550:20,
559:23, 560:2, 566:21,
568:17, 568:20,
570:24, 575:11
**Court's** [4] - 473:5,
537:14, 550:12, 555:19
**COURTROOM** [1] -
571:20
**courtroom** [1] -
496:20
**cover** [1] - 521:5
**covered** [1] - 565:8
**crai.com** [1] - 472:1
**CRC** [1] - 451:24
**create** [4] - 454:1,
501:22, 556:13, 557:17
**created** [4] - 456:20,
456:23, 489:14, 532:12
**creates** [1] - 524:7
**creating** [1] - 454:16
**credit** [1] - 520:16
**critically** [2] - 493:13,
543:6
**Cross** [1] - 576:5

583

cross [5] - 529:1,
529:3, 572:3, 572:14,
573:17
  CROSS [1] - 491:14
  Cross-Examination
[1] - 576:5
  crossing [2] - 525:13,
528:14
  CRR [2] - 451:24,
575:11
  cues [1] - 540:22
  curious [1] - 461:13
  curve [3] - 500:4,
500:9, 500:13
  custom [1] - 552:2
  customers [3] - 479:6,
483:17
  CV [1] - 451:4

# D

  D.C [4] - 451:4,
451:13, 451:22, 575:13
  daily [3] - 533:3,
542:15
  Dan [2] - 460:20,
561:23
  Data [1] - 505:20
  data [27] - 461:14,
461:15, 495:18, 496:6,
496:9, 496:10, 496:13,
497:6, 498:7, 498:8,
499:4, 500:3, 511:1,
519:5, 523:4, 529:13,
535:22, 544:19,
549:11, 549:24,
550:22, 564:18, 567:4,
567:8
  datasets [1] - 484:24
  date [8] - 460:17,
471:21, 471:23,
472:16, 473:18,
557:24, 570:19, 571:7
  Dated [1] - 575:7
  David [1] - 505:1
  day-to-day [1] -
519:11
  days [4] - 480:19,
493:13, 506:5, 530:24
  deal [5] - 494:15,
495:3, 498:12, 499:12,
534:25
  decide [2] - 507:3,
528:22
  decided [1] - 533:15
  decides [1] - 463:17
  decision [9] - 524:8,
524:9, 525:6, 525:11,
552:2, 554:7, 554:9,
574:8

  decision-makers [1] -
525:11
  decisionmaking [2] -
551:19, 551:23
  decisions [13] - 516:2,
516:7, 516:12, 516:13,
516:20, 521:23,
526:15, 526:25,
529:16, 530:22, 542:6,
545:16, 551:24
  deck [2] - 472:25,
514:23
  decks [1] - 567:2
  default [124] - 493:9,
520:7, 520:8, 520:19,
523:2, 523:5, 523:19,
524:6, 524:15, 524:24,
525:4, 526:21, 527:13,
527:15, 527:18,
527:22, 527:23,
528:14, 528:15,
528:16, 528:17,
528:23, 529:4, 530:3,
530:5, 530:6, 531:6,
531:9, 533:6, 533:11,
533:22, 534:3, 534:21,
535:1, 535:9, 536:20,
537:4, 537:17, 537:21,
538:19, 539:2, 539:4,
539:5, 539:14, 539:23,
540:9, 540:12, 540:13,
540:17, 540:21,
540:24, 541:9, 543:10,
543:12, 543:16,
543:17, 543:22, 544:2,
544:5, 544:7, 544:12,
544:14, 544:15,
544:21, 545:2, 545:4,
545:5, 545:6, 545:4,
547:5, 547:15, 548:11,
548:14, 549:2, 549:10,
550:5, 552:8, 552:21,
552:24, 553:4, 553:6,
553:16, 553:24,
554:18, 555:12, 556:8,
557:6, 558:2, 559:13,
559:15, 560:23,
562:15, 562:19,
562:22, 563:8, 563:12,
564:8, 564:12, 564:15,
564:17, 564:18, 565:3,
565:8, 565:12, 565:24,
566:23, 567:9, 567:16,
568:17, 568:21,
568:22, 568:23,
568:24, 569:6, 569:10,
569:17, 569:19,
569:22, 569:25, 570:12
  defaults [73] - 517:7,
520:5, 521:1, 521:7,

521:17, 521:21, 522:6,
522:7, 522:15, 523:17,
523:23, 526:17,
526:19, 526:23,
526:24, 527:2, 528:2,
528:20, 529:17,
529:23, 530:7, 530:15,
532:19, 532:23, 533:8,
533:19, 536:12,
536:18, 536:19,
537:10, 537:11, 538:2,
538:3, 538:10, 539:1,
540:1, 540:3, 540:4,
540:5, 540:7, 541:3,
541:8, 541:22, 545:15,
547:2, 547:7, 547:9,
548:6, 550:3, 550:23,
550:24, 554:6, 554:20,
554:21, 555:11, 556:2,
558:23, 558:25, 559:3,
559:4, 560:8, 562:14,
564:3, 565:23, 566:3,
569:5, 569:6, 569:20,
569:21, 570:11
  Defendant [2] - 451:6,
451:20
  defending [1] - 502:15
  defense [2] - 487:17,
488:2
  defining [1] - 504:20
  definitely [1] - 549:16
  degree [5] - 554:17,
557:5, 558:17, 562:1,
562:21
  degrees [1] - 563:2
  delete [1] - 535:12
  deleting [1] - 534:2
  deliberative [4] -
551:21, 551:25,
552:11, 552:22
  delivers [2] - 457:19,
457:21
  delivery [1] - 490:11
  demand [5] - 454:1,
454:17, 454:22, 455:1
  demands [1] - 454:10
  demonstrated [2] -
562:2, 562:14
  demonstration [3] -
559:23, 560:4, 560:24
  demonstrative [2] -
473:8, 514:15
  demonstratives [3] -
473:3, 473:4, 473:5
  Denver [1] - 451:18
  DEPARTMENT [2] -
451:12, 451:16
  Department [4] -
466:10, 491:4, 491:17,
521:12

  deploy [1] - 551:21
  deployed [1] - 535:5
  depose [1] - 510:12
  deposited [1] - 527:10
  deposition [4] - 487:9,
487:20, 488:11, 550:19
  Depot [3] - 455:15,
456:3, 456:11
  DEPUTY [1] - 571:20
  describe [5] - 485:1,
499:16, 508:10,
541:14, 568:17
  described [7] -
463:25, 485:1, 494:17,
504:14, 508:5, 529:10,
547:23
  description [1] -
499:17
  descriptors [1] - 516:8
  design [5] - 464:15,
532:7, 532:23, 551:7
  designate [1] - 527:9
  designated [1] -
513:24
  despite [1] - 531:12
  detail [1] - 541:5
  detailed [1] - 542:12
  details [2] - 526:14,
558:4
  determination [2] -
511:25, 512:25
  determine [2] - 461:4,
511:19
  determined [1] -
548:11
  develop [2] - 543:8,
546:5
  developed [2] -
542:22, 548:19
  developers [1] - 471:2
  device [5] - 540:19,
543:5, 553:22, 559:16,
570:9
  devices [27] - 521:19,
523:3, 525:4, 540:6,
540:10, 540:14,
540:17, 540:18,
543:14, 548:12, 556:8,
557:16, 559:2, 559:5,
559:11, 564:7, 564:10,
564:17, 566:9, 567:6,
567:9, 568:13, 568:19,
569:1, 569:3, 569:23,
570:20
  diagram [3] - 493:7,
520:13, 520:17
  Diane [1] - 461:19
  DICKMAN [1] - 575:3
  Dickman [2] - 451:24,
575:11

**difference** [5] - 453:24, 516:11, 535:20, 551:10, 551:14
**differences** [1] - 570:21
**different** [41] - 454:9, 463:24, 464:24, 464:25, 465:8, 483:1, 484:23, 484:24, 484:25, 486:15, 500:6, 502:21, 514:11, 521:19, 523:3, 525:4, 525:9, 526:10, 527:5, 531:3, 537:6, 538:17, 544:21, 547:16, 547:19, 548:1, 548:22, 549:14, 550:8, 556:8, 561:8, 569:4, 570:19, 571:5, 571:9, 571:10
**differently** [3] - 463:24, 511:4, 547:22
**difficult** [2] - 502:15, 554:10
**digital** [1] - 504:23
**diminishing** [8] - 495:18, 496:6, 496:8, 496:10, 496:13, 499:24, 500:5, 500:12
**DINTZER** [44] - 452:4, 452:6, 452:10, 452:15, 452:19, 452:23, 453:4, 459:8, 459:13, 459:16, 460:13, 460:14, 466:4, 466:22, 467:5, 467:7, 467:9, 468:4, 468:14, 469:15, 469:16, 472:6, 472:18, 472:21, 473:13, 474:4, 490:21, 490:24, 491:5, 491:10, 493:25, 496:17, 505:3, 505:5, 508:23, 509:4, 509:6, 509:10, 509:12, 509:16, 512:1, 512:4, 512:7, 513:1
**Dintzer** [1] - 451:11
**Dintzer.......** [1] - 576:4
**direct** [10] - 474:10, 487:17, 488:9, 495:12, 502:4, 514:1, 524:13, 525:18, 572:2, 573:16
**Direct** [3] - 576:4, 576:4, 576:7
**DIRECT** [2] - 453:3, 515:4
**directed** [1] - 501:11
**direction** [1] - 564:15
**directly** [2] - 470:19, 476:1
**disagree** [2] - 495:16, 499:13

**discover** [3] - 479:18, 479:20, 553:9
**discuss** [7] - 513:24, 517:21, 527:7, 544:1, 566:17, 569:15, 571:15
**discussed** [6] - 501:8, 530:14, 537:6, 537:24, 545:23, 569:24
**discussing** [3] - 536:8, 536:12, 539:1
**discussion** [2] - 514:10, 564:9
**discussions** [4] - 477:7, 500:11, 566:24, 567:2
**display** [17] - 453:25, 454:10, 454:13, 454:16, 454:22, 455:10, 455:22, 457:19, 457:21, 459:18, 461:6, 461:10, 461:22, 463:8, 507:21, 507:23, 508:2
**Display** [3] - 460:15, 506:24, 507:9
**disproportionate** [1] - 555:10
**distinction** [4] - 454:4, 516:10, 551:15, 551:18
**Distinguished** [1] - 518:25
**distinguishing** [1] - 504:22
**distributes** [1] - 492:17
**distribution** [5] - 476:21, 476:24, 477:8, 477:21, 478:4
**DISTRICT** [3] - 451:1, 451:1, 451:9
**doctor** [1] - 530:24
**doctors** [1] - 528:8
**document** [39] - 455:4, 457:18, 459:6, 459:10, 462:16, 467:1, 468:2, 480:15, 492:7, 494:1, 495:13, 496:11, 497:1, 497:17, 501:1, 501:5, 506:18, 506:23, 507:1, 508:17, 533:7, 534:11, 534:14, 536:7, 536:23, 537:1, 539:8, 545:20, 546:19, 547:6, 547:10, 555:15, 555:16, 557:23, 557:24, 558:3, 562:10, 567:11, 569:12
**documents** [26] - 495:4, 510:6, 532:11, 534:11, 534:12, 534:19, 535:6, 535:23,

537:8, 537:24, 538:7, 538:22, 538:25, 545:12, 545:14, 546:4, 546:17, 548:25, 549:25, 550:16, 551:5, 553:2, 556:3, 556:4, 567:5, 572:7
**DOJ** [1] - 451:11
**dollars** [4] - 524:21, 530:8, 535:6, 538:9
**domain** [2] - 528:4, 530:12
**domains** [1] - 522:8
**donation** [3] - 528:19, 528:22, 529:6
**done** [18] - 462:11, 473:9, 479:7, 479:10, 486:19, 486:21, 486:22, 487:1, 487:3, 494:19, 500:4, 507:6, 508:11, 514:3, 541:14, 560:10, 570:21
**donor** [3] - 528:24, 529:5
**donors** [1] - 529:7
**door** [1] - 502:22
**double** [3] - 466:5, 466:16, 527:25
**doubling** [1] - 531:14
**doubts** [1] - 497:12
**down** [5] - 453:13, 466:17, 546:11, 551:12, 571:21
**downloads** [1] - 540:11
**dr** [1] - 471:7
**Dr** [59] - 452:8, 452:12, 453:5, 466:13, 466:22, 467:2, 467:9, 467:21, 467:24, 469:2, 469:17, 469:18, 470:14, 470:24, 471:25, 472:7, 473:22, 474:12, 474:21, 475:1, 476:9, 477:18, 478:7, 478:25, 480:3, 480:13, 480:16, 483:2, 483:7, 484:5, 487:25, 488:9, 488:13, 488:24, 489:16, 489:22, 490:17, 491:16, 491:20, 492:7, 494:7, 495:8, 497:20, 498:24, 500:2, 503:25, 505:9, 505:18, 507:11, 508:15, 509:23, 510:4, 512:16, 513:17, 571:14, 571:21, 571:25, 572:16, 572:20
**draft** [1] - 523:10
**drafted** [1] - 523:11

**dramatic** [1] - 573:22
**dramatically** [1] - 555:10
**drawing** [1] - 504:10
**drew** [1] - 500:2
**drill** [4] - 455:15, 455:17, 456:4, 456:12
**drink** [2] - 542:22, 547:19
**drinks** [1] - 547:19
**drop** [2] - 555:10, 555:11
**DuckDuckGo** [2] - 550:5, 550:6
**due** [1] - 502:19
**duly** [1] - 513:15
**during** [4] - 487:7, 514:24, 540:21, 545:23
**duty** [1] - 525:14

## E

**easier** [2] - 453:21, 509:20
**easiest** [1] - 468:17
**easily** [3] - 493:14, 498:8, 563:12
**easy** [2] - 526:12, 535:11
**economic** [11] - 465:21, 472:8, 486:14, 490:1, 490:10, 503:13, 512:2, 516:20, 516:21, 517:11
**Economics** [1] - 532:13
**economics** [71] - 465:16, 466:13, 515:8, 515:11, 515:13, 515:14, 515:20, 515:21, 515:24, 516:3, 516:4, 516:9, 516:19, 517:2, 517:7, 517:8, 517:12, 517:13, 517:17, 517:20, 517:22, 518:23, 519:4, 519:16, 519:20, 520:5, 520:8, 521:2, 521:5, 521:7, 522:5, 522:10, 522:14, 522:19, 522:24, 524:3, 524:5, 526:8, 526:22, 527:1, 528:1, 529:10, 531:23, 532:6, 532:7, 532:10, 532:17, 532:19, 533:18, 534:17, 535:15, 536:10, 541:24, 542:2, 546:1, 550:13, 550:21, 551:17, 554:6, 554:19,

555:2, 555:5, 555:16, 558:1, 560:16, 560:17, 561:18, 563:21, 563:22
**economist** [17] - 465:17, 465:19, 465:20, 466:10, 485:25, 494:18, 512:2, 512:24, 525:23, 529:21, 538:10, 539:20, 551:3, 561:22, 562:10, 565:22, 571:6
**economist's** [1] - 511:8
**economists** [2] - 516:13, 529:12
**economy** [1] - 529:3
**ecosystems** [1] - 470:15
**Edge** [1] - 546:25
**educate** [1] - 555:4
**educational** [1] - 515:10
**effect** [7] - 544:7, 555:10, 564:2, 565:5, 565:8, 569:17, 569:20
**effective** [1] - 483:18
**effectiveness** [1] - 502:20
**effects** [6] - 529:23, 538:20, 551:5, 565:24, 569:22, 569:25
**efficient** [1] - 454:14
**effort** [10] - 467:24, 545:18, 552:3, 553:11, 554:14, 554:15, 554:16, 560:9, 563:19, 563:20
**efforts** [2] - 555:20, 555:22
**either** [5] - 485:20, 500:13, 523:2, 545:20, 573:17
**elapsed** [1] - 456:7
**election** [3] - 525:17, 526:2, 526:3
**element** [1] - 526:17
**Elmo** [2] - 491:4, 509:21
**elsewhere** [1] - 515:19
**email** [40] - 451:14, 451:14, 451:19, 451:23, 451:23, 451:25, 453:5, 453:13, 453:14, 459:3, 459:14, 460:7, 460:22, 460:23, 461:17, 461:21, 462:1, 462:9, 467:15, 467:19, 469:17, 469:18, 471:22, 472:1, 472:13, 495:9, 495:22, 497:3,

497:11, 497:20, 497:22, 498:5, 503:24, 509:13, 510:1, 510:10, 510:13, 510:15, 510:16, 566:11
**emails** [4] - 468:6, 468:8, 493:20, 509:22
**embedded** [1] - 467:1
**emphasis** [2] - 498:12, 516:11
**emphasize** [4] - 536:24, 544:9, 555:6, 562:3
**emphasized** [1] - 502:1
**emphasizes** [1] - 545:21
**emphasizing** [3] - 547:13, 555:18, 555:20
**empirical** [3] - 458:6, 458:12, 458:18
**employ** [1] - 531:23
**employee** [2] - 572:21, 573:1, 573:5
**employees** [5] - 527:8, 527:19, 527:23, 530:2, 536:11
**encounter** [8] - 523:2, 533:2, 533:8, 540:21, 548:12, 548:18, 551:20, 566:10
**encountered** [9] - 533:25, 535:3, 536:17, 537:5, 538:24, 542:11, 542:21, 553:2, 571:3
**encountering** [1] - 538:19
**encounters** [2] - 524:24, 543:14
**end** [6] - 491:24, 511:15, 512:22, 513:25, 528:2, 529:22
**end-of-life** [1] - 528:2
**ends** [1] - 492:21
**enforced** [1] - 558:18
**engage** [1] - 528:8
**engine** [58] - 475:10, 475:25, 476:2, 476:6, 477:11, 478:15, 478:20, 479:18, 482:24, 484:22, 486:2, 486:6, 489:3, 489:5, 493:4, 498:1, 498:10, 517:7, 521:16, 521:21, 522:15, 523:17, 530:11, 530:12, 540:5, 540:7, 540:10, 540:12, 540:17, 540:20, 540:23, 541:1, 541:7, 541:16, 541:19,

543:10, 543:12, 543:16, 543:17, 543:22, 544:21, 544:22, 546:12, 547:2, 547:21, 548:2, 549:3, 549:12, 550:8, 551:13, 552:8, 552:17, 553:4, 554:6, 568:18, 568:22, 570:3
**engine's** [1] - 485:19
**engineers** [1] - 553:18
**engines** [9] - 475:2, 476:5, 476:8, 476:12, 478:8, 482:11, 540:22, 544:2, 569:6
**Engines** [2] - 476:18, 477:20
**enjoy** [1] - 517:15
**enlightened** [1] - 560:15
**enormous** [1] - 569:20
**enroll** [1] - 530:4
**entail** [1] - 536:1
**entails** [1] - 531:21
**enter** [5] - 484:21, 527:15, 542:16, 542:23, 548:7
**entered** [1] - 533:23
**entering** [1] - 530:11
**entire** [1] - 512:12
**envelope** [1] - 503:5
**environment** [2] - 516:14, 524:6
**episode** [1] - 558:13
**equal** [2] - 525:25, 544:13
**equals** [1] - 462:13
**equipment** [1] - 455:9
**equivalent** [3] - 539:10, 539:15
**error** [1] - 542:21
**especially** [2] - 549:12, 563:4
**essentially** [1] - 465:25
**establish** [2] - 468:11, 469:10
**established** [1] - 510:11
**estate** [1] - 499:22
**estimate** [2] - 567:2, 569:19
**estimates** [2] - 567:6, 567:14
**et** [6] - 451:2, 476:11, 479:14, 504:19, 548:10, 557:2
**evaluate** [3] - 521:16, 521:20, 543:20
**evaluating** [1] -

529:10
**evening** [1] - 574:14
**event** [5] - 514:12, 537:6, 564:20, 566:21, 567:5
**events** [3] - 523:1, 564:6, 564:8
**everyday** [2] - 520:12, 525:6
**evidence** [20] - 473:19, 493:25, 512:13, 514:2, 514:20, 523:6, 532:18, 535:15, 536:8, 536:11, 538:19, 546:14, 548:24, 550:13, 554:22, 555:14, 564:2, 564:5, 567:7, 568:25
**exact** [2] - 532:3, 536:4
**exactly** [14] - 454:19, 456:9, 471:14, 505:14, 525:3, 526:9, 536:1, 536:2, 537:19, 544:10, 549:24, 550:9, 561:3, 573:23
**EXAMINATION** [4] - 453:3, 474:10, 491:14, 515:4
**examination** [5] - 486:7, 486:8, 490:20, 568:2, 573:16
**Examination** [4] - 576:4, 576:4, 576:5, 576:7
**examinations** [1] - 486:10
**examined** [1] - 513:16
**example** [54] - 454:11, 454:16, 454:17, 454:19, 454:20, 455:6, 455:10, 459:24, 476:8, 479:13, 485:18, 485:22, 494:13, 494:14, 500:16, 506:3, 506:12, 517:21, 520:12, 525:6, 525:15, 526:2, 526:20, 526:21, 528:12, 528:23, 529:8, 530:1, 530:19, 530:20, 532:22, 536:25, 537:8, 538:23, 540:9, 540:16, 542:13, 542:24, 544:2, 545:22, 547:17, 548:5, 548:17, 550:2, 551:23, 553:15, 554:11, 556:21, 562:7, 562:19, 565:23, 567:7, 569:9
**examples** [11] - 527:1, 527:5, 527:6, 529:9,

529:17, 529:21, 530:10, 530:13, 530:15, 554:2, 563:5
**exception** [3] - 468:8, 511:13, 523:12
**exchange** [3] - 467:15, 495:9, 499:6
**excuse** [2] - 500:13, 503:9
**executives** [1] - 536:12
**exert** [1] - 527:2
**exhibit** [5] - 473:19, 474:20, 512:12, 514:6, 576:8
**Exhibit** [1] - 453:5
**exhibits** [2] - 491:17, 555:23
**existence** [7] - 479:11, 521:20, 521:21, 523:22, 539:2, 539:22, 557:6
**existing** [1] - 571:2
**expect** [6] - 481:14, 481:22, 481:25, 572:21, 573:1, 573:18
**Expedia** [3] - 483:3, 483:10, 483:17
**expenses** [2] - 534:23, 534:24
**experience** [12] - 481:12, 481:21, 482:17, 485:6, 485:7, 525:7, 531:19, 539:15, 548:11, 548:16, 559:20, 560:7
**experienced** [1] - 566:8
**experiences** [2] - 543:18, 555:9
**experiment** [9] - 485:23, 529:14, 534:17, 534:20, 543:20, 544:3, 544:10, 544:11, 549:18
**experimental** [2] - 519:12, 543:25
**experiments** [5] - 543:23, 549:8, 549:22, 550:14, 551:8
**expert** [8] - 480:13, 494:25, 495:2, 514:10, 519:15, 519:20, 521:11, 530:16
**expertise** [3] - 531:12, 531:21, 558:16
**experts** [1] - 505:11
**explain** [3] - 525:10, 551:16, 556:17
**explained** [2] - 457:14,

457:15
**explains** [2] - 518:10, 518:18
**explanations** [1] - 516:8
**explicit** [4] - 551:24, 552:8, 552:11, 552:22
**explicitly** [7] - 520:21, 541:18, 545:15, 550:21, 551:12, 552:16, 570:8
**explore** [1] - 548:9
**Explorer** [3] - 546:24, 547:3, 547:11
**Explorer's** [1] - 547:9
**exposed** [1] - 533:11
**express** [1] - 499:11
**expressing** [1] - 471:14
**extension** [1] - 472:1
**extent** [2] - 471:22, 512:16
**external** [1] - 472:7
**extreme** [1] - 546:2
**extremely** [1] - 516:22
**eye** [1] - 518:4
**eyes** [4] - 518:2, 518:7, 518:12, 554:12

## F

**face** [2] - 562:8, 571:8
**Facebook** [11] - 457:19, 457:21, 457:23, 457:24, 457:25, 458:2, 458:4, 458:8, 458:14, 476:20, 477:20
**facilitated** [1] - 557:25
**facilitating** [1] - 564:9
**fact** [10] - 454:21, 458:24, 468:12, 469:2, 473:25, 489:13, 495:5, 510:8, 510:17, 547:9
**factoid** [1] - 561:25
**factors** [6] - 497:25, 498:10, 516:12, 552:15, 552:16, 554:1
**facts** [2] - 511:20, 512:21
**factual** [1] - 511:8
**faculty** [2] - 515:16, 515:18
**fades** [2] - 456:6, 456:7
**fair** [3] - 466:15, 483:19, 486:13
**fairly** [1] - 551:4
**falls** [2] - 511:16, 514:11

**familiar** [13] - 483:2, 483:4, 483:8, 508:3, 520:4, 520:14, 526:4, 538:16, 542:14, 543:5, 557:11, 559:7, 570:2
**familiarizing** [1] - 559:22
**famous** [4] - 527:6, 527:21, 529:7, 561:22
**far** [3] - 501:23, 521:3, 563:7
**fast** [1] - 551:19
**fault** [2] - 539:17, 545:9
**favored** [1] - 543:12
**favorite** [1] - 517:12
**Federation** [1] - 570:17
**feedback** [2] - 543:7, 543:9
**Fellow** [1] - 519:2
**few** [3] - 474:8, 508:13, 532:11
**field** [8] - 517:17, 517:22, 518:23, 526:22, 527:12, 533:17, 535:10, 541:24
**fifth** [1] - 498:3
**figure** [1] - 553:13
**figures** [1] - 569:16
**file** [1] - 530:25
**filed** [4] - 469:23, 470:1, 470:10, 470:11
**fill** [1] - 533:9
**filled** [1] - 542:5
**filling** [1] - 531:7
**final** [2] - 562:3, 562:4
**finally** [8] - 465:9, 503:15, 508:10, 521:20, 523:1, 523:22, 528:19, 542:19
**financial** [3] - 504:3, 504:6, 504:7
**fine** [4] - 495:23, 496:12, 574:6, 574:11
**fingers** [1] - 554:16
**Fingleton** [1] - 505:2
**finish** [2] - 552:4, 558:8
**finite** [1] - 512:10
**Fire** [3] - 568:16, 568:22, 569:10
**Firefox** [3] - 540:8, 540:13, 544:3
**firm** [1] - 527:13
**firms** [2] - 476:19, 477:19
**first** [44] - 455:2, 455:13, 456:8, 457:6, 459:5, 472:22, 494:3,

497:16, 501:15, 501:16, 502:14, 503:23, 506:19, 507:14, 507:17, 509:18, 513:15, 517:13, 521:15, 522:1, 523:17, 523:25, 527:7, 529:21, 534:4, 543:15, 545:22, 547:21, 547:23, 547:24, 548:2, 548:6, 548:7, 548:13, 552:23, 557:6, 564:9, 564:11, 565:17, 570:5, 570:14, 573:17
**first-time** [1] - 547:21
**fits** [1] - 571:4
**five** [1] - 568:9
**fixations** [1] - 518:12
**flavor** [1] - 550:7
**flavors** [1] - 561:11
**Floor** [1] - 451:17
**floor** [1] - 465:25
**focus** [4] - 461:20, 497:20, 504:18, 516:13
**focusing** [1] - 459:7
**folks** [1] - 573:8
**following** [3] - 522:19, 530:21, 546:21
**follows** [3] - 489:13, 513:16, 538:11
**font** [1] - 554:11
**fonts** [1] - 526:11
**footnotes** [1] - 523:13
**FOR** [1] - 451:1
**for-profit** [1] - 538:11
**forced** [1] - 530:3
**foregoing** [1] - 575:4
**foremost** [1] - 522:1
**forever** [1] - 542:20
**form** [4] - 528:7, 528:12, 528:15
**formal** [1] - 473:15
**formation** [1] - 543:11
**former** [1] - 573:5
**forth** [2] - 469:2, 495:10
**forward** [2] - 489:20, 495:21
**Foundation** [1] - 519:1
**foundation** [3] - 510:11, 510:14
**four** [9] - 498:9, 499:7, 525:21, 552:22, 554:1, 556:9, 556:10, 557:4
**fourth** [1] - 475:1
**fraction** [3] - 527:9, 547:13, 550:6
**free** [1] - 504:13
**frequency** [1] - 543:4
**friction** [31] - 516:25,

535:11, 541:20, 554:2, 554:4, 554:7, 554:16, 554:17, 554:20, 555:6, 555:8, 555:9, 556:1, 556:10, 556:13, 557:3, 557:4, 557:5, 557:18, 558:1, 558:5, 558:17, 558:22, 560:6, 562:1, 562:5, 562:21, 562:24, 563:2, 563:23
**friend** [3] - 474:1, 548:10, 548:22
**friend's** [1] - 548:17
**front** [4] - 461:5, 491:17, 491:20, 518:1
**frustrated** [1] - 547:15
**fuel** [1] - 454:14
**fuel-efficient** [1] - 454:14
**full** [3] - 509:18, 510:24, 575:5
**fully** [1] - 571:8
**fundamental** [8] - 518:3, 524:4, 526:7, 536:4, 542:1, 551:14, 554:5
**fundamentals** [2] - 524:9, 524:14
**funny** [1] - 499:18
**furthered** [1] - 532:9

## G

**Galaxy** [1] - 559:19
**gears** [1] - 564:1
**Gee** [1] - 454:14
**general** [7] - 464:5, 464:13, 486:2, 486:6, 517:11, 540:4, 569:3
**general-purpose** [2] - 486:2, 486:6
**generally** [3] - 468:3, 501:21, 556:5
**generate** [7] - 516:18, 523:18, 538:3, 538:13, 541:8, 561:5, 563:7
**generated** [3] - 535:5, 560:19, 561:19
**generates** [1] - 543:17
**generic** [4] - 531:2, 531:8, 531:9, 531:14
**Germany** [1] - 528:23
**given** [8] - 468:14, 473:16, 511:9, 521:14, 528:7, 555:2, 570:12, 570:13
**global** [1] - 503:12
**goal** [4] - 516:1, 516:6, 516:7, 522:18
**goods** [1] - 524:11

**Google** [215] - 451:5, 451:20, 454:25, 458:6, 458:7, 458:12, 458:13, 458:18, 458:19, 461:14, 461:15, 462:23, 463:4, 463:6, 463:14, 463:17, 463:20, 465:1, 465:21, 465:25, 466:7, 467:4, 467:10, 467:13, 467:15, 468:12, 468:16, 472:8, 475:19, 475:22, 475:23, 476:5, 476:16, 476:19, 476:20, 476:23, 477:5, 477:9, 477:21, 478:5, 478:8, 478:10, 478:13, 478:15, 478:18, 478:20, 479:2, 479:3, 479:5, 479:18, 479:25, 480:9, 480:17, 481:7, 481:15, 481:23, 482:19, 483:13, 483:15, 483:19, 483:20, 484:5, 484:14, 484:21, 484:22, 485:1, 485:5, 485:8, 485:14, 485:19, 485:20, 485:25, 486:4, 486:8, 486:11, 486:13, 486:15, 486:16, 486:21, 486:25, 487:4, 487:7, 487:10, 489:3, 489:5, 489:7, 489:10, 489:25, 490:2, 490:9, 490:20, 491:9, 491:13, 492:17, 493:5, 493:9, 493:16, 493:17, 494:7, 494:9, 494:11, 494:13, 494:18, 494:19, 500:14, 500:17, 501:17, 501:24, 502:1, 503:7, 503:11, 504:7, 509:23, 510:2, 510:3, 510:11, 510:21, 512:7, 512:17, 512:23, 513:24, 514:13, 531:23, 532:2, 532:9, 532:12, 532:13, 533:1, 533:5, 533:7, 534:17, 536:11, 536:17, 536:23, 537:12, 537:18, 537:20, 538:2, 538:7, 538:10, 538:11, 538:14, 538:16, 538:19, 538:25, 539:3, 539:7, 539:9, 539:16, 539:25, 540:3, 540:5, 540:11, 540:17, 540:20, 541:3, 541:22, 544:5, 544:21, 545:5,

545:14, 545:20, 546:20, 547:6, 547:10, 548:6, 550:21, 550:22, 551:3, 551:4, 553:10, 553:18, 554:22, 555:4, 555:17, 556:1, 556:6, 556:20, 558:4, 559:13, 560:19, 561:14, 561:15, 561:24, 562:7, 562:15, 563:12, 563:22, 564:14, 564:19, 565:1, 565:2, 565:25, 566:5, 566:23, 567:2, 567:5, 567:8, 567:24, 568:22, 569:7, 570:18, 572:3, 572:14, 572:21, 573:5, 573:10, 573:14
**Google's** [29] - 468:6, 468:8, 476:1, 482:24, 485:24, 486:1, 486:5, 490:11, 493:20, 493:24, 502:15, 502:19, 503:3, 509:17, 512:16, 512:19, 512:20, 521:16, 532:19, 535:14, 536:10, 538:1, 550:13, 556:12, 557:17, 558:16, 558:23, 560:20, 563:11
**government** [8] - 469:8, 470:1, 491:8, 508:21, 513:3, 513:8, 519:15, 528:21
**governor** [1] - 525:20
**grad** [1] - 519:10
**grade** [1] - 498:3
**grants** [1] - 519:6
**graph** [2] - 564:25, 565:8
**gravity** [1] - 534:22
**great** [3] - 470:20, 470:25, 568:8
**green** [1] - 565:2
**group** [2] - 535:2, 555:16
**growing** [2] - 500:7, 500:8
**guess** [4] - 469:3, 480:20, 514:21, 549:7

## H

**H-A-F-E-N-B-R-A-C-K** [1] - 513:12
**habit** [13] - 541:23, 541:25, 542:1, 542:15, 542:22, 543:1, 543:3, 546:2, 546:5, 546:10,

547:25, 551:11
**habitized** [1] - 543:18
**habits** [10] - 541:14, 543:8, 543:11, 543:13, 545:13, 545:16, 545:21, 551:22, 552:6
**habitual** [1] - 547:14
**HAFENBRACK** [45] - 513:4, 513:7, 513:11, 513:19, 513:22, 514:22, 515:2, 515:5, 518:21, 519:14, 519:21, 519:22, 520:1, 520:3, 534:10, 534:15, 535:17, 536:7, 536:9, 537:23, 537:25, 545:11, 546:7, 546:9, 550:11, 552:14, 555:23, 555:25, 557:8, 557:10, 558:19, 558:20, 565:9, 565:10, 566:19, 567:25, 568:3, 568:8, 568:11, 569:12, 569:14, 570:22, 571:12, 572:2, 572:14
**Hafenbrack** [3] - 451:11, 513:4, 513:6
**Hafenbrack............** [1] - 576:7
**HAL** [1] - 453:2
**Hal** [2] - 545:23, 576:3
**half** [6] - 509:25, 544:4, 544:5, 544:24, 568:4
**hand** [6] - 487:23, 536:22, 542:6, 548:7, 567:13
**handful** [1] - 549:22
**hands** [1] - 529:13
**happy** [4] - 459:13, 473:20, 474:3, 509:20
**hard** [4] - 502:6, 502:7, 513:13, 521:4
**harder** [1] - 548:13
**Harvard** [1] - 515:13
**head** [3] - 532:16, 550:20, 561:24
**Heading** [1] - 507:10
**heading** [1] - 507:9
**heads** [1] - 517:1, 553:12, 553:19
**health** [1] - 530:1
**hear** [2] - 514:14, 563:11
**heard** [4] - 457:22, 487:2, 511:10
**hearing** [1] - 568:6
**hearsay** [7] - 459:12, 467:1, 468:8, 468:21, 511:3, 511:13, 511:14

588

**heavily** [1] - 483:15
**help** [9] - 453:25,
483:17, 492:5, 496:21,
506:19, 508:24,
523:13, 553:19, 564:23
**helpful** [2] - 511:15,
512:20
**helps** [2] - 454:1,
564:22
**hereby** [1] - 575:3
**Higgins** [2] - 572:25,
574:2
**Higgins'** [1] - 573:12
**high** [10] - 517:4,
518:11, 521:25,
523:15, 523:22,
524:25, 528:4, 529:18,
543:4, 543:8
**high-stakes** [1] -
528:4
**higher** [1] - 531:21
**highlight** [5] - 498:21,
539:7, 541:9, 545:22,
567:11
**highlighted** [3] -
453:12, 520:20, 556:18
**highly** [4] - 471:8,
520:14, 556:16, 557:21
**hire** [4] - 499:21,
499:22
**hired** [3] - 472:7,
473:25, 521:11
**history** [2] - 484:25,
505:12
**home** [11] - 492:7,
492:10, 492:15,
492:16, 493:3, 493:6,
493:9, 559:11, 561:2,
561:7, 566:4
**Home** [3] - 455:15,
456:3, 456:11
**homers** [1] - 492:24
**Honor** [136] - 452:10,
459:8, 459:11, 466:23,
466:25, 467:14,
467:23, 468:3, 468:4,
468:14, 468:19,
469:12, 469:15,
472:18, 473:13, 474:4,
474:9, 477:16, 480:11,
480:15, 481:3, 482:15,
487:8, 487:20, 488:4,
488:15, 490:16,
490:18, 490:21,
491:11, 493:25, 505:3,
508:23, 509:4, 509:6,
509:17, 512:1, 513:1,
513:4, 513:7, 513:19,
513:22, 514:22,
515:12, 516:16, 518:4,

518:24, 519:10,
519:14, 519:21, 520:1,
520:8, 521:3, 521:14,
521:25, 522:18,
523:11, 523:15, 524:4,
525:8, 525:18, 526:7,
527:4, 527:8, 528:4,
528:21, 529:12,
529:20, 530:20, 532:1,
532:22, 533:7, 533:21,
534:5, 534:10, 534:18,
535:22, 536:2, 536:7,
536:15, 536:22, 537:3,
538:7, 538:24, 539:18,
539:21, 540:4, 540:19,
541:4, 541:10, 542:1,
543:2, 544:1, 544:9,
545:17, 546:18,
546:19, 547:13, 548:4,
548:24, 549:25, 550:9,
551:14, 552:20, 554:5,
554:19, 555:1, 555:15,
556:6, 556:9, 556:16,
557:21, 559:10,
559:17, 560:3, 562:5,
563:18, 564:6, 564:14,
564:20, 564:22,
565:16, 566:8, 566:15,
567:10, 568:3, 568:16,
568:21, 569:2, 570:7,
570:15, 570:17, 571:2,
571:18, 572:18, 573:25
**HONORABLE** [1] -
451:9
**hope** [5] - 452:2,
483:22, 483:25, 484:1,
484:3
**hopefully** [1] - 498:4
**hospital** [1] - 530:22
**hotel** [1] - 476:11
**hour** [4] - 452:18,
457:6, 507:17, 568:4
**hours** [2] - 456:13,
508:14
**House** [1] - 532:17
**house** [2] - 532:12,
548:17
**housekeeping** [1] -
472:22
**hum** [1] - 475:7
**humans** [1] - 517:3
**hundreds** [1] - 535:6
**hypotheticals** [1] -
480:14

___

# I

**idea** [8] - 526:8,
536:19, 537:11,
537:15, 538:12, 554:6,

556:18, 558:17
**ideally** [1] - 507:18
**ideas** [1] - 516:5
**ill** [1] - 528:5
**illustrating** [1] -
502:17
**illustration** [1] - 455:2
**image** [3] - 503:17,
525:16, 533:6
**images** [1] - 491:6
**Imagine** [1] - 488:23
**imagine** [6] - 471:2,
489:2, 548:17, 560:14,
561:17, 571:4
**Imaging** [1] - 519:13
**immediate** [2] - 543:9,
565:6
**immediately** [3] -
460:7, 507:21, 543:7
**impact** [21] - 486:14,
490:1, 490:11, 503:13,
521:16, 521:18, 522:7,
524:13, 526:15,
526:24, 530:6, 534:6,
534:21, 539:1, 541:2,
545:1, 550:22, 550:23,
554:17, 565:6, 569:9
**impacts** [1] - 530:7
**impeachment** [1] -
487:12
**implement** [3] -
527:12, 553:14, 553:23
**implemented** [4] -
533:22, 546:22, 547:1,
557:24
**implementing** [1] -
554:9
**implications** [1] -
566:24
**implicitly** [1] - 541:14
**import** [1] - 503:13
**importance** [2] -
493:9, 536:12
**important** [6] - 473:24,
493:13, 501:16, 519:4,
525:2, 545:21
**importantly** [1] - 518:6
**importing** [1] - 547:2
**impose** [1] - 544:15
**impression** [2] - 456:8
**impressions** [3] -
459:18, 461:7, 462:13
**improving** [1] - 516:6
**IN** [1] - 451:1
**in-house** [1] - 532:12
**include** [1] - 482:23
**including** [4] - 495:17,
516:2, 516:7, 533:6
**increase** [11] - 459:19,
461:7, 481:14, 481:25,

482:2, 482:19, 534:9,
534:22, 536:3, 545:9,
554:12
**increased** [2] -
481:13, 536:3
**increases** [5] - 461:11,
481:21, 481:24,
502:20, 529:6
**incredibly** [1] - 529:8
**incremental** [2] -
498:7, 499:4
**INDEX** [1] - 576:1
**indicate** [2] - 493:8,
500:12, 500:16
**indicated** [1] - 496:4
**indicating** [1] - 495:24
**indication** [1] - 506:8
**indicator** [1] - 506:3
**individual** [6] -
541:11, 541:13, 543:3,
546:15, 552:5
**individuals** [2] -
531:12, 553:18
**industry** [1] - 504:17
**inference** [2] - 516:24,
551:3
**inferior** [1] - 565:24
**influence** [9] - 463:3,
464:3, 464:9, 465:5,
465:9, 518:7, 518:9,
524:22, 527:3
**influenced** [2] -
524:25, 530:8
**information** [16] -
459:23, 470:4, 484:6,
484:14, 484:20, 500:9,
511:15, 511:20,
513:24, 516:23,
524:12, 526:13, 542:5,
557:1
**informing** [1] - 522:3
**infrequently** [1] -
552:7
**initial** [2] - 548:11,
559:18
**initiate** [1] - 520:17
**initiated** [1] - 532:2
**inside** [1] - 551:2
**inspired** [1] - 559:18
**install** [1] - 561:6
**installed** [2] - 540:12,
557:15
**instances** [4] - 458:1,
495:10, 541:12, 541:14
**instead** [3] - 542:21,
570:11, 571:8
**instructions** [1] -
560:22
**intellectual** [1] -
499:22

**intelligence** [1] - 509:13
**intend** [2] - 491:1, 513:25
**intending** [1] - 573:14
**intent** [1] - 506:13
**intentionally** [1] - 561:21
**interest** [4] - 506:3, 506:13, 508:8, 508:12
**interested** [1] - 516:12
**interesting** [6] - 530:20, 534:19, 539:20, 550:18, 565:17, 565:22
**interests** [1] - 506:17
**interface** [18] - 520:14, 520:19, 520:23, 524:6, 531:20, 533:2, 533:5, 533:8, 533:23, 534:9, 545:24, 557:25, 558:11, 559:21, 560:18, 562:7, 563:5, 570:8
**interfaces** [5] - 502:21, 520:16, 563:2, 563:7, 569:4
**internally** [1] - 566:24
**Internet** [4] - 546:23, 547:3, 547:8, 547:11
**interrupt** [2] - 465:23, 535:16
**intersection** [1] - 515:24
**introduce** [5] - 467:24, 515:6, 534:25, 538:20, 550:4
**introduced** [3] - 479:17, 564:16, 565:18
**introduces** [1] - 557:3
**introduction** [2] - 533:21, 570:2
**inverse** [1] - 535:19
**invest** [3] - 482:21, 524:21, 527:11
**investigated** [1] - 559:6
**investigating** [1] - 522:7
**investment** [2] - 527:16, 532:10
**involve** [3] - 504:7, 504:16, 549:14
**involved** [1] - 470:19
**involves** [5] - 504:3, 504:5, 535:9, 546:23, 553:9
**iPad** [2] - 568:21, 569:11
**iPads** [2] - 540:6,

568:16
**iPhone** [5] - 537:9, 539:14, 540:16, 540:19, 559:17
**iPhones** [5] - 540:6, 559:3, 564:15, 565:1, 565:6
**Irrational** [4] - 532:4, 532:9, 555:17, 561:24
**is..** [1] - 503:24
**isolating** [1] - 560:12
**issue** [7] - 459:6, 465:23, 472:10, 487:7, 512:15, 514:22, 574:4
**issues** [3] - 494:15, 505:15, 514:4
**item** [1] - 462:18
**items** [4] - 464:20, 466:19, 466:20, 554:8
**iteration** [1] - 558:10
**itself** [5] - 459:12, 464:16, 480:10, 481:8, 514:6

## J

**JANICE** [1] - 575:3
**Janice** [2] - 451:24, 575:11
**Janice_e_dickman@ dcd.uscourts.gov** [1] - 451:25
**January** [1] - 460:18
**Jobs** [1] - 559:18
**John** [2] - 451:20, 505:2
**join** [2] - 515:16, 527:13
**joining** [1] - 515:18
**jon.sallet@coag.gov** [1] - 451:19
**Jonathan** [2] - 451:15, 474:14
**Joshua** [2] - 451:11, 513:4
**Joshua.hafenbrack @usdoj.gov** [1] - 451:14
**journal** [1] - 518:15
**jschmidtlein@wc. com** [1] - 451:23
**Judge** [1] - 496:22
**JUDGE** [1] - 451:9
**judgment** [1] - 574:8
**Judicial** [1] - 451:17
**July** [2] - 509:24, 509:25
**JUSTICE** [1] - 451:12
**Justice** [2] - 466:11, 491:4, 491:17, 521:12

**justified** [1] - 567:23

## K

**keep** [2] - 548:9, 565:4
**Kenneth** [2] - 451:11, 451:20
**kenneth.dintzer2@ usdoj.gov** [1] - 451:14
**kept** [2] - 459:13, 544:4
**key** [3] - 539:7, 556:18, 563:20
**keyword** [1] - 484:12
**kicks** [1] - 547:25
**kids** [1] - 548:13
**kind** [9] - 489:8, 489:9, 499:19, 503:6, 503:9, 529:13, 550:14, 561:8
**kinds** [2] - 494:16, 500:10
**knowledge** [5] - 489:10, 489:11, 522:3, 522:13, 522:15
**known** [3] - 465:15, 473:22, 529:2
**knows** [1] - 527:8
**Kolotouros** [3] - 572:21, 572:25, 573:11
**Ksmurzynski@wc. com** [1] - 451:23

## L

**lab** [4] - 519:7, 519:8, 529:11, 550:14
**Lab** [1] - 519:10
**laboratory** [1] - 517:24
**Labs** [4] - 532:4, 532:9, 555:17, 561:24
**landed** [1] - 500:14
**language** [3] - 501:11, 522:23, 558:1
**large** [14] - 493:10, 522:6, 522:8, 522:17, 524:17, 525:23, 527:4, 527:17, 529:8, 529:23, 529:24, 530:7, 545:19, 565:8
**largely** [2] - 522:25, 552:6
**larger** [3] - 509:19, 555:21, 569:25
**last** [12] - 452:24, 470:25, 486:17, 503:15, 506:18, 513:10, 537:19, 545:21, 547:12, 555:23, 556:11, 565:7
**latent** [1] - 454:22

**launch** [1] - 559:18
**LAW** [1] - 451:16
**layperson** [1] - 512:6
**leading** [1] - 480:4
**learn** [2] - 551:22, 560:16
**learning** [2] - 542:9, 548:14
**least** [9] - 462:4, 463:25, 499:7, 538:15, 539:21, 549:5, 549:24, 561:9, 565:7
**leave** [5] - 511:19, 512:15, 554:13, 561:1, 561:7
**led** [1] - 532:15
**left** [5] - 561:23, 567:13, 567:14, 574:4
**left-hand** [1] - 567:13
**legal** [5] - 511:6, 511:7, 511:22, 511:24, 512:24
**less** [8] - 452:25, 456:12, 456:14, 498:7, 499:4, 534:23, 554:9
**lesson** [1] - 563:20
**letter** [1] - 546:20
**level** [6] - 517:4, 521:25, 523:15, 523:22, 527:16, 531:19
**leveraging** [1] - 532:23
**levers** [1] - 465:10
**Lewis** [2] - 460:20, 460:21
**Lewis's** [1] - 461:13
**lieutenant** [1] - 525:20
**life** [5] - 525:7, 525:10, 528:2, 529:14, 529:22
**life-of-end** [1] - 529:22
**lighthearted** [1] - 499:19
**lighting** [1] - 518:7
**likely** [8] - 456:14, 494:11, 524:24, 526:1, 543:17, 573:8, 573:11, 574:1
**limited** [3] - 480:23, 542:8, 549:25
**line** [17] - 459:5, 467:18, 468:9, 469:4, 476:18, 487:22, 488:22, 489:2, 489:9, 489:10, 489:11, 489:17, 509:18, 510:22, 527:7, 573:24
**lines** [4] - 487:18, 488:3, 488:10, 488:20
**link** [3] - 458:2, 459:6, 479:15

**list** [7] - 477:6, 477:19, 495:17, 523:16, 525:12, 531:8, 558:22
**listed** [7] - 475:5, 476:19, 521:15, 525:22, 554:1, 567:21, 567:22
**listen** [2] - 490:4, 563:9
**lists** [1] - 461:18
**literally** [2] - 560:11, 563:1
**literature** [5] - 522:9, 527:2, 529:25
**LLC** [1] - 451:5
**LLP** [1] - 451:21
**lock** [1] - 466:17
**log** [2] - 509:18, 510:24
**logical** [1] - 504:20
**long-time** [1] - 474:1
**look** [15] - 455:15, 460:22, 467:18, 467:19, 468:9, 471:2, 475:13, 485:7, 487:18, 490:13, 495:8, 503:3, 510:22, 568:15, 569:9
**looked** [4] - 483:6, 495:4, 527:18, 533:12
**looking** [11] - 452:19, 477:18, 478:15, 478:20, 479:3, 485:5, 486:18, 504:20, 508:7, 522:6, 535:7
**looks** [4] - 497:10, 520:17, 530:22, 532:11
**lose** [2] - 567:3, 567:19
**losing** [4] - 537:4, 537:17, 537:20, 566:23
**loss** [2] - 516:25, 567:20
**lost** [1] - 567:9
**low** [4] - 496:22, 535:2, 535:11, 555:9
**lower** [3] - 530:13, 533:14, 563:6
**lowered** [1] - 502:20
**lowest** [1] - 534:8
**lunch** [1] - 452:3

**M**

**machines** [2] - 499:21, 516:22
**MADA** [1] - 471:7
**MADAs** [1] - 556:20
**magazine** [1] - 506:12
**magnitude** [6] - 524:18, 524:20, 525:4,

527:19, 569:5, 569:17
**magnitudes** [1] - 522:11
**mails** [1] - 458:1
**maintaining** [3] - 564:24, 567:12, 569:7
**majority** [7] - 506:1, 517:19, 519:9, 541:11, 543:2, 545:4, 546:15
**makers** [1] - 525:11
**managing** [4] - 467:16, 467:18, 468:21, 468:23
**Manber** [16] - 495:9, 495:13, 495:24, 497:3, 497:9, 497:12, 497:14, 497:21, 497:24, 498:6, 498:17, 498:25, 499:3, 499:11, 500:12
**Manber's** [1] - 495:22
**manipulate** [2] - 518:12, 518:13
**manual** [1] - 558:21
**manufacturers** [3] - 556:12, 556:21, 556:23
**map** [5] - 553:8, 564:14, 564:25, 566:5, 566:11
**Maps** [22] - 475:15, 475:16, 475:18, 475:21, 475:22, 476:13, 476:16, 564:12, 564:14, 564:16, 564:19, 565:2, 565:12, 565:18, 566:4, 567:5, 567:8, 567:24
**maps** [7] - 475:19, 475:23, 476:3, 476:10, 566:3
**March** [2] - 487:21, 488:11
**marked** [1] - 474:20
**market** [18] - 504:2, 504:5, 504:14, 504:17, 504:18, 505:14, 522:21, 523:1, 524:18, 538:21, 562:7, 564:2, 564:5, 564:6, 564:8, 568:25, 574:5, 574:7
**marketer** [1] - 490:11
**marketing** [2] - 490:2, 532:8
**markets** [1] - 504:21
**master** [1] - 515:12
**Master's** [1] - 515:15
**material** [3] - 522:18, 555:3, 556:17
**materials** [6] - 523:7, 531:18, 531:24, 531:25, 533:2, 536:16

**matter** [12] - 467:25, 485:2, 510:17, 510:18, 512:17, 512:18, 514:16, 523:8, 530:17, 551:8, 555:22, 570:5
**matters** [6] - 472:8, 510:9, 525:25, 547:20, 555:5, 563:23
**Maya** [3] - 532:15, 550:19
**Meagan** [1] - 572:18
**mean** [27] - 456:3, 456:7, 460:2, 464:21, 468:4, 468:5, 476:7, 482:4, 482:11, 493:4, 504:15, 505:15, 508:1, 511:2, 511:10, 512:7, 512:15, 524:3, 524:15, 524:17, 524:23, 537:18, 540:13, 541:15, 551:6, 566:3, 569:25
**meaning** [1] - 510:15
**means** [5] - 461:9, 462:5, 466:7, 493:1, 536:3
**meant** [2] - 461:2, 496:2
**measure** [1] - 486:14
**measures** [1] - 489:25
**mechanisms** [2] - 522:11, 541:9
**media** [1] - 504:18
**medically** [1] - 528:9
**medication** [1] - 531:3
**medications** [1] - 531:2
**MEHTA** [1] - 451:9
**memo** [2] - 539:1, 545:23
**memorable** [1] - 533:16
**memos** [2] - 532:2, 556:6
**mental** [8] - 545:18, 552:3, 553:11, 554:16, 555:20, 555:22, 563:19, 563:20
**mention** [6] - 483:10, 544:8, 545:3, 545:15, 549:23, 556:9
**mentioned** [7] - 516:9, 519:7, 541:23, 549:20, 549:21, 555:17, 557:5
**mentions** [1] - 536:17
**menu** [1] - 542:17
**merchant** [5] - 455:11, 455:12, 463:7, 481:24
**merchant's** [2] - 507:23, 507:25

**merchants** [3] - 481:17, 485:5, 485:8
**methods** [1] - 480:17
**metric** [4] - 489:13, 489:14, 493:20, 494:10
**metrics** [1] - 493:24
**Microsoft** [16] - 475:19, 475:23, 476:20, 477:20, 493:2, 497:6, 497:13, 498:8, 498:9, 500:13, 500:16, 501:17, 546:20, 546:22, 547:2, 547:10
**middle** [2] - 525:18, 556:24
**might** [25] - 454:10, 454:11, 454:14, 462:5, 477:3, 479:10, 479:11, 479:13, 479:17, 479:20, 482:4, 497:7, 498:13, 508:8, 511:15, 525:7, 537:16, 549:6, 549:9, 552:14, 567:8, 572:3, 572:7, 572:8
**million** [1] - 519:6
**millions** [2] - 524:20, 535:6
**mine** [2] - 465:14, 511:7
**minimum** [3] - 462:17, 462:22, 463:21
**minus** [2] - 567:19, 567:20
**minute** [1] - 476:13
**minutes** [6] - 452:19, 452:25, 506:7, 507:5, 568:4, 568:9
**misremembering** [1] - 486:24
**misspoke** [2] - 537:16, 537:19
**mistakes** [1] - 516:23
**misunderstood** [1] - 478:3
**mittens** [1] - 455:9
**mobile** [6] - 521:19, 523:20, 564:7, 564:10, 567:6, 567:17
**mode** [7] - 546:10, 547:14, 551:12, 551:25, 552:9, 552:11, 552:22
**model** [3] - 470:20, 471:1, 518:10
**model-building** [1] - 471:1
**models** [2] - 516:21, 517:3
**modes** [1] - 551:19
**modest** [1] - 505:13

**modified** [1] - 556:20
**modifying** [1] - 534:2
**modulated** [1] -
524:13
**moment** [3] - 489:25,
497:19, 571:22
**money** [2] - 503:6,
533:4
**monitor** [1] - 556:1
**monitored** [1] - 558:18
**monopolist** [9] -
462:25, 463:3, 464:2,
464:8, 464:14, 464:18,
465:4, 465:9, 466:18
**month** [1] - 509:25
**months** [1] - 510:1
**morning** [3] - 568:7,
572:12, 574:17
**most** [17] - 457:5,
457:13, 459:18,
459:24, 460:25, 461:2,
491:25, 501:16,
503:18, 507:16, 511:8,
517:14, 526:20,
527:21, 548:12, 573:11
**mostly** [1] - 547:7
**motives** [1] - 558:16
**mousetrap** [1] -
502:21
**move** [14] - 455:15,
473:5, 473:7, 473:18,
482:14, 489:19,
495:21, 512:12, 518:2,
518:7, 518:12, 533:9,
542:6, 573:3
**movements** [1] -
518:5
**moves** [1] - 493:12
**moving** [3] - 474:8,
536:20, 554:15
**MR** [153] - 452:4,
452:6, 452:10, 452:13,
452:15, 452:17,
452:19, 452:21,
452:23, 452:24, 453:4,
459:8, 459:11, 459:13,
459:16, 460:13,
460:14, 464:4, 466:22,
466:25, 467:5, 467:7,
467:9, 467:14, 467:23,
468:2, 468:4, 468:14,
468:19, 469:5, 469:12,
469:15, 469:16, 472:6,
472:18, 472:21,
473:13, 474:4, 474:8,
474:11, 477:15,
477:17, 480:11,
480:15, 481:3, 481:4,
482:14, 482:16,
484:18, 484:19, 487:8,

487:11, 487:13,
487:16, 487:20, 488:4,
488:6, 488:12, 488:15,
488:19, 488:21,
489:21, 490:8, 490:16,
490:21, 490:23,
490:24, 491:3, 491:5,
491:10, 491:15,
491:22, 492:4, 493:25,
494:6, 496:15, 496:17,
496:21, 496:22,
496:25, 497:2, 505:3,
505:5, 505:8, 507:2,
507:5, 507:8, 508:15,
508:19, 508:23, 509:4,
509:6, 509:10, 509:12,
509:16, 510:8, 512:1,
512:4, 512:7, 513:1,
513:4, 513:7, 513:11,
513:19, 513:22, 514:7,
514:15, 514:22, 515:2,
515:5, 518:21, 519:14,
519:18, 519:21,
519:22, 520:1, 520:3,
534:10, 534:15,
535:17, 536:7, 536:9,
537:23, 537:25,
545:11, 546:7, 546:9,
550:11, 552:14,
555:23, 555:25, 557:8,
557:10, 558:19,
558:20, 565:9, 565:10,
566:19, 567:25, 568:3,
568:8, 568:11, 569:12,
569:14, 570:22,
571:12, 572:2, 572:6,
572:14, 573:18,
573:21, 573:25, 574:9
**MS** [3] - 572:18,
572:25, 573:9
**multi** [3] - 539:17,
542:15, 545:9
**multi-daily** [1] -
542:15
**multi-fault** [2] -
539:17, 545:9
**multinationals** [1] -
503:11
**multiple** [7] - 470:21,
471:1, 537:4, 538:22,
553:2, 555:3, 561:11
**music** [1] - 524:7

## N

**N.W** [1] - 575:12
**name** [3] - 453:18,
513:10, 515:7
**named** [1] - 453:15
**namely** [1] - 508:6

**narrow** [1] - 553:18
**narrower** [1] - 485:2
**Nature** [1] - 518:15
**nature** [3] - 482:10,
484:16, 526:11
**navigating** [1] -
485:20
**necessarily** [1] - 482:4
**need** [16] - 461:20,
464:6, 466:17, 473:21,
485:16, 511:13, 530:2,
540:23, 545:1, 553:13,
553:17, 553:23,
553:24, 556:9, 567:4,
574:6
**needed** [3] - 452:12,
467:21, 523:13
**needs** [6] - 468:24,
472:10, 484:6, 485:15,
552:22, 552:23
**Neeva** [1] - 545:20
**network** [1] - 493:2
**Neuroeconomics** [2] -
519:2, 519:10
**neuroeconomics** [3] -
516:1, 516:9, 516:16
**neuromechanisms** [1]
- 516:17
**neuroscience** [3] -
515:8, 515:25, 516:5
**Neuroscience** [1] -
518:16
**never** [2] - 457:23,
470:19
**new** [13] - 454:13,
454:15, 479:6, 479:17,
508:13, 533:1, 533:13,
534:7, 538:20, 546:23,
547:3, 559:20, 570:19
**New** [3] - 455:16,
456:4, 456:12
**next** [9] - 456:8,
460:11, 513:3, 533:10,
542:7, 553:22, 558:10,
560:11, 573:4
**Nguyen** [1] - 460:20
**night** [1] - 452:25
**NOMIS** [1] - 519:1
**non** [1] - 538:20
**non-search** [1] -
538:20
**none** [2] - 520:20,
550:8
**nongeneric** [2] -
531:2, 531:8
**nonpaid** [8] - 486:1,
486:5, 486:15, 489:6,
489:7, 490:1, 490:10,
490:12
**normally** [1] - 541:17

**notable** [1] - 517:21
**note** [2] - 462:4,
573:25
**noted** [3] - 465:17,
465:19, 465:20
**notes** [4] - 475:13,
533:12, 575:5
**nothing** [2] - 531:10,
534:3
**notice** [2] - 548:23,
567:22
**Number** [1] - 558:22
**number** [46] - 461:11,
461:23, 464:19,
465:10, 466:19,
479:14, 493:19,
495:10, 495:17, 497:4,
513:23, 518:24, 522:1,
522:6, 522:8, 522:18,
523:1, 525:23, 527:5,
527:17, 527:21, 532:1,
533:9, 534:2, 534:7,
535:18, 535:19, 536:4,
536:24, 537:13,
538:24, 540:8, 543:21,
545:3, 545:14, 545:19,
547:18, 556:5, 556:6,
556:7, 556:11, 556:21,
559:2, 564:6, 567:20,
567:22
**numbers** [8] - 528:18,
529:5, 538:8, 544:8,
545:1, 546:7, 569:8,
569:19
**NW** [2] - 451:12,
451:21
**NYU** [1] - 474:22

## O

**o'clock** [2] - 509:1,
568:6
**Obama's** [1] - 532:16
**object** [5] - 480:11,
480:14, 487:11,
514:13, 514:17
**objecting** [1] - 467:23
**objection** [11] -
459:10, 459:11,
466:23, 466:25,
487:19, 488:6, 493:25,
505:3, 514:5, 519:17,
519:18
**objects** [1] - 518:2
**observation** [4] -
504:4, 504:5, 505:24,
529:14
**observations** [1] -
468:19
**observe** [6] - 532:18,

535:15, 536:11, 550:12, 568:25, 569:22
**observing** [1] - 569:18
**obsessed** [1] - 517:24
**obtain** [1] - 511:20
**obtained** [1] - 519:5
**obviously** [1] - 480:12
**occasion** [1] - 466:11
**occasionally** [1] - 473:11
**occasions** [1] - 551:6
**occur** [1] - 455:6
**occurs** [2] - 457:5, 507:17
**October** [3] - 469:21, 471:12, 473:24
**OEMs** [1] - 471:1
**OF** [5] - 451:1, 451:8, 451:12, 451:16, 575:1
**offer** [8] - 459:8, 466:24, 510:16, 514:1, 514:12, 514:16, 539:9, 539:15
**offered** [3] - 480:13, 511:17, 524:11
**offering** [6] - 503:18, 512:11, 525:1, 525:2, 525:3, 549:14
**offers** [2] - 519:15, 538:16
**OFFICIAL** [1] - 575:1
**Official** [1] - 575:11
**often** [3] - 515:25, 520:16, 531:2
**old** [4] - 516:21, 547:2, 553:22, 570:20
**old-school** [1] - 553:22
**old-style** [1] - 516:21
**older** [1] - 508:14
**once** [1] - 553:6
**one** [100] - 453:24, 454:6, 455:10, 457:3, 461:15, 462:4, 463:25, 466:17, 468:16, 468:19, 473:9, 473:21, 475:1, 475:12, 476:10, 476:11, 476:20, 477:5, 480:4, 481:19, 482:5, 482:17, 482:25, 484:12, 484:13, 484:14, 485:7, 485:8, 485:9, 485:18, 486:11, 486:17, 489:6, 489:9, 489:12, 489:25, 490:9, 493:12, 495:4, 497:4, 498:7, 498:13, 499:1, 500:3, 500:9, 501:8, 502:25, 503:16, 504:6, 508:12, 509:18, 511:8,

513:12, 516:16, 518:3, 520:21, 520:23, 521:14, 521:18, 523:11, 523:16, 525:12, 525:15, 525:19, 526:20, 528:12, 528:13, 530:20, 531:6, 531:11, 534:19, 537:7, 539:9, 540:5, 540:9, 541:25, 544:9, 546:17, 547:3, 548:8, 549:21, 551:19, 556:22, 560:22, 561:10, 561:11, 561:14, 561:16, 561:23, 562:8, 563:20, 563:23, 564:11, 565:17, 567:1, 569:12, 570:24, 574:4
**online** [12] - 456:20, 464:18, 479:23, 479:24, 480:6, 480:8, 481:6, 483:11, 502:20, 504:20, 507:20, 508:2
**Online** [1] - 480:16
**open** [9] - 487:25, 512:15, 514:24, 559:12, 566:12, 569:16, 572:14, 572:15, 574:4
**opening** [3] - 472:23, 472:24, 563:9
**opens** [1] - 566:11
**operate** [1] - 522:12
**operating** [2] - 546:23, 558:10
**opinion** [22] - 471:12, 471:21, 511:9, 512:2, 512:5, 512:23, 525:1, 525:2, 525:3, 530:12, 538:3, 541:7, 541:11, 543:2, 543:12, 544:7, 552:4, 552:20, 554:23, 557:19, 562:1, 562:24
**opinions** [2] - 480:12, 522:3
**opponent** [1] - 511:18
**opposed** [1] - 474:1
**opposite** [2] - 529:4, 537:20
**opt** [2] - 528:24, 529:5
**option** [5] - 520:8, 526:9, 531:8, 542:18, 560:9
**options** [7] - 525:12, 544:12, 552:1, 554:8, 557:7, 559:6, 560:10
**or..** [1] - 571:23
**order** [9] - 478:19, 503:4, 503:20, 525:22,

525:24, 526:3, 529:6, 531:13, 532:14
**organ** [5] - 528:19, 528:22, 529:4, 529:6, 529:7
**organic** [1] - 490:14
**organized** [1] - 545:17
**oriented** [1] - 528:9
**original** [5] - 456:1, 464:1, 507:19, 534:11, 547:4
**otherwise** [2] - 514:3, 514:24
**out-of-court** [1] - 467:1
**outcome** [12] - 463:1, 463:4, 464:3, 464:15, 464:19, 464:21, 464:22, 465:1, 465:5, 466:19, 534:16, 534:18
**outcomes** [1] - 465:3
**outside** [1] - 573:16
**outstanding** [1] - 465:15
**overall** [1] - 481:15
**overnight** [2] - 571:16, 574:6
**overturn** [1] - 531:11
**own** [2] - 490:25, 566:9

## P

**p.m** [2] - 451:5, 497:3
**packaging** [1] - 518:8
**pad** [1] - 531:1
**page** [50] - 452:11, 457:4, 457:7, 460:11, 463:12, 471:5, 474:22, 474:23, 478:16, 478:20, 479:3, 479:19, 481:8, 483:21, 483:22, 485:19, 485:20, 485:21, 487:18, 487:21, 488:2, 488:10, 488:13, 488:22, 489:18, 491:7, 492:7, 492:10, 492:13, 492:15, 492:16, 492:21, 492:23, 493:3, 493:6, 493:9, 495:13, 495:14, 495:15, 502:9, 505:19, 506:22, 507:9, 507:13, 507:18, 507:19, 508:7, 556:17, 561:2
**pages** [3] - 482:20, 482:24, 491:2
**paid** [10] - 465:2, 472:14, 486:1, 486:5,

486:15, 489:7, 490:1, 490:9, 490:12, 504:12
**paper** [18] - 459:18, 459:24, 460:1, 460:2, 460:5, 460:25, 461:2, 461:4, 461:18, 462:2, 462:8, 462:11, 462:15, 491:5, 517:22, 518:14, 518:16, 560:22
**papers** [1] - 517:16
**paragraph** [7] - 453:19, 501:12, 501:15, 503:24, 504:22, 507:15, 507:16
**paraphrasing** [1] - 473:11
**parlance** [1] - 546:2
**part** [11] - 539:22, 545:18, 547:12, 555:7, 562:3, 562:4, 566:14, 572:3, 572:22, 573:1, 573:5
**participants** [2] - 522:21, 524:18
**particular** [23] - 458:3, 480:24, 480:25, 492:16, 494:10, 511:22, 514:13, 518:11, 524:19, 527:11, 527:15, 531:20, 532:19, 534:6, 539:6, 546:17, 548:20, 551:8, 554:18, 559:15, 568:15, 570:15, 571:7
**particularly** [2] - 473:9, 505:19
**parties** [3] - 470:21, 471:1, 513:25
**parts** [3] - 552:25, 567:11
**party** [6] - 485:21, 486:23, 511:17, 520:9, 525:17, 540:8
**pass** [2] - 472:19, 474:4
**past** [2] - 508:11, 519:1
**patients** [3] - 528:5, 528:7, 528:14
**pattern** [1] - 548:1
**Paul** [5] - 453:15, 453:17, 453:19, 453:20, 453:22
**pause** [1] - 571:11
**pay** [2] - 520:16, 533:4
**paying** [1] - 504:8
**payment** [1] - 520:17
**pays** [1] - 476:21
**PCs** [1] - 567:18
**peer** [2] - 517:16,

517:18
**peer-reviewed** [2] - 517:16, 517:18
**Penny** [2] - 493:20, 493:23
**people** [27] - 457:15, 460:20, 461:10, 462:11, 474:8, 479:9, 482:21, 484:21, 494:14, 499:21, 505:10, 508:6, 516:2, 516:6, 516:12, 516:21, 522:21, 529:7, 532:14, 535:25, 549:6, 553:3, 553:7, 555:10, 555:11, 570:20
**perceived** [1] - 537:12
**percent** [20] - 459:19, 461:7, 461:12, 461:23, 462:14, 492:23, 493:3, 493:7, 493:16, 497:7, 527:22, 527:23, 527:24, 528:17, 529:6, 544:4, 567:19, 567:20, 573:19
**percentage** [3] - 493:5, 534:7, 535:20
**perfect** [2] - 454:21, 507:7
**performance** [4] - 490:14, 493:24, 494:9, 502:19
**performed** [3] - 458:6, 458:12, 458:18
**perhaps** [4] - 510:25, 511:14, 526:19, 572:11
**period** [3] - 463:23, 496:3, 565:7
**periods** [2] - 500:7
**permit** [1] - 473:8
**person** [5] - 529:18, 530:16, 547:22, 547:24, 549:9
**personal** [3] - 521:19, 523:20, 564:7
**personally** [2] - 486:7, 523:10
**personnel** [2] - 536:18, 537:12
**pertains** [1] - 532:18
**Ph.D** [2] - 515:14, 515:15
**phase** [1] - 571:7
**phone** [6] - 543:5, 553:16, 559:19, 559:25, 562:13, 570:21
**phones** [3] - 540:7, 540:16, 564:16
**phrase** [1] - 471:15
**physician** [3] - 531:7,

531:10, 531:11
**physicians** [3] - 531:1, 531:5, 531:20
**pick** [3] - 530:2, 542:7, 542:23
**picture** [5] - 454:23, 462:2, 510:24, 520:13, 561:22
**piece** [5] - 457:3, 510:23, 557:21, 560:22, 567:7
**pieces** [1] - 480:3
**PLA** [1] - 472:24
**place** [5] - 503:22, 508:9, 542:4, 572:22, 573:2
**placement** [1] - 518:8
**places** [1] - 483:1
**Plaintiff** [1] - 451:15
**plaintiffs** [1] - 474:7
**Plaintiffs** [2] - 451:3, 451:11
**plan** [7] - 527:14, 527:16, 527:24, 530:1, 530:2, 530:4
**plane** [1] - 509:8
**planning** [1] - 517:5
**plans** [2] - 527:7, 527:12
**play** [1] - 516:19
**Play** [1] - 561:2
**plea** [1] - 568:6
**pleasure** [1] - 517:23
**plotting** [1] - 564:25
**plus** [2] - 497:7, 508:4
**podcast** [2] - 539:7, 539:17
**podcasting** [2] - 539:8, 539:12
**podcasts** [4] - 539:11, 539:12, 539:13, 539:16
**point** [39] - 455:2, 461:21, 464:5, 469:8, 469:9, 472:9, 473:14, 473:23, 477:3, 477:7, 495:25, 497:14, 497:16, 500:17, 500:18, 502:11, 502:12, 502:15, 502:19, 502:25, 503:14, 503:15, 534:22, 536:24, 537:3, 541:13, 543:13, 544:13, 548:3, 550:12, 552:7, 553:21, 553:23, 555:18, 557:23, 560:18, 565:20
**pointing** [1] - 462:11
**points** [11] - 463:24, 463:25, 495:17, 499:7,

502:17, 502:23, 505:18, 522:19, 555:8, 555:9, 562:16
**population** [2] - 552:25, 553:1
**portion** [2] - 502:9, 571:25
**portions** [2] - 467:24, 469:14
**position** [3] - 452:24, 484:2, 537:9
**positioned** [1] - 540:18
**positions** [2] - 483:23, 483:25
**possibility** [1] - 573:4
**possible** [7] - 454:24, 482:25, 542:9, 542:18, 549:7, 573:12
**possibly** [1] - 479:8
**potential** [3] - 506:17, 520:20, 537:5
**potentially** [4] - 475:24, 528:5, 553:7, 572:3
**pounds** [1] - 503:9
**power** [3] - 536:18, 538:2, 541:21
**powerful** [5] - 526:24, 534:21, 536:20, 537:12, 565:23
**PowerPoint** [1] - 514:21
**practically** [1] - 497:6
**practice** [1] - 473:5
**pre** [4] - 520:20, 528:12, 540:12, 557:15
**pre-check** [1] - 528:12
**pre-highlighted** [1] - 520:20
**pre-installed** [2] - 540:12, 557:15
**precise** [3] - 525:3, 544:18, 548:3
**predecessor** [1] - 546:24
**predictors** [1] - 516:8
**prefer** [1] - 488:15
**preferable** [3] - 481:9, 481:10
**preference** [2] - 548:19, 548:22
**prefilled** [2] - 533:24, 535:11
**preloaded** [1] - 540:20
**prepare** [1] - 559:23
**prepared** [2] - 468:13, 519:23
**prescription** [5] - 530:23, 530:25, 531:7,

531:14, 563:5
**preselected** [2] - 520:24, 531:9
**presence** [1] - 481:22
**present** [1] - 496:5
**presentation** [7] - 474:22, 513:20, 513:23, 519:24, 525:24, 538:25, 539:6
**presentations** [3] - 532:1, 537:5, 556:6
**presented** [3] - 471:5, 526:10, 526:15
**president** [1] - 519:1
**President** [1] - 532:16
**press** [6] - 560:17, 561:2, 561:6, 561:12, 561:14, 561:18
**pressures** [1] - 482:18
**presumably** [3] - 460:3, 510:4, 539:16
**previous** [2] - 454:18, 530:4
**previously** [3] - 479:6, 479:10, 503:9
**price** [27] - 462:17, 462:22, 463:1, 463:2, 463:4, 463:5, 463:6, 463:20, 463:23, 464:4, 464:9, 464:11, 464:23, 464:24, 464:25, 465:2, 465:3, 465:24, 465:25, 466:6, 466:8, 502:20, 503:17, 503:22, 542:18
**prices** [1] - 531:3
**pricing** [1] - 464:9
**primary** [1] - 525:17
**Primer** [1] - 480:16
**primer** [2] - 456:20, 480:18
**principles** [1] - 517:12
**print** [2] - 497:17, 553:21
**printed** [1] - 509:19
**printout** [1] - 560:11
**prints** [1] - 504:18
**privacy** [3] - 521:22, 523:23, 523:24
**privilege** [3] - 509:17, 509:24, 510:23
**privileged** [2] - 510:3, 510:9
**probability** [2] - 524:25, 527:19
**problem** [7] - 496:18, 517:7, 517:23, 524:10, 526:9, 547:8
**problematic** [1] - 547:1
**problems** [2] - 539:22,

594

565:19
  **procedure** [2] - 463:6, 570:7
  **proceed** [4] - 452:5, 488:4, 515:2, 520:21
  **proceeding** [2] - 474:15, 488:6
  **proceedings** [1] - 575:6
  **process** [8] - 516:23, 518:5, 540:21, 547:15, 552:21, 555:12, 558:2, 562:11
  **processes** [1] - 518:11
  **procompetitive** [3] - 471:8, 511:23, 511:24
  **produce** [2] - 484:23, 565:23
  **produced** [1] - 534:14
  **product** [24] - 455:7, 455:8, 479:17, 482:6, 482:8, 485:15, 485:19, 492:18, 501:17, 501:23, 503:16, 503:21, 518:8, 524:24, 532:23, 532:24, 535:4, 546:5, 546:6, 549:15, 551:7, 565:25, 570:14
  **products** [3] - 532:7, 545:16, 555:5
  **professor** [4] - 515:8, 515:20, 515:21, 531:22
  **Professor** [42] - 468:10, 513:8, 514:1, 514:23, 515:6, 515:10, 515:18, 515:23, 516:3, 517:4, 518:22, 519:15, 519:19, 519:23, 520:4, 521:9, 523:14, 523:25, 528:19, 529:9, 534:16, 535:14, 536:10, 538:1, 538:16, 539:25, 545:12, 546:10, 550:12, 551:10, 551:15, 552:15, 554:22, 556:1, 557:11, 558:13, 558:21, 564:5, 565:11, 568:12, 569:15, 570:2
  **profit** [2] - 502:19, 538:11
  **profitable** [1] - 538:14
  **profits** [2] - 502:15, 506:1
  **profound** [1] - 526:15
  **program** [2] - 528:23, 551:22
  **project** [1] - 567:8
  **projections** [2] - 569:23, 570:1

  **prominence** [1] - 482:19
  **prominent** [4] - 483:23, 483:25, 484:2, 540:8
  **prominently** [1] - 483:20
  **properly** [2] - 526:1, 526:2
  **property** - 491:8, 499:22
  **proposed** [2] - 458:22, 458:24
  **pros** [3] - 546:11, 546:16, 553:8
  **Protection** [1] - 451:16
  **provide** [12] - 469:14, 484:20, 506:12, 510:24, 510:25, 517:6, 527:1, 536:16, 538:23, 549:8, 563:1, 567:7
  **provided** [2] - 491:18, 556:25
  **provider** [1] - 504:8
  **provides** [4] - 485:2, 501:17, 532:5, 540:25
  **providing** [3] - 504:8, 541:5, 567:14
  **provisions** [1] - 556:13
  **proximity** [1] - 507:24
  **Psychological** [1] - 519:3
  **psychology** [2] - 516:5, 551:18
  **publicly** [1] - 565:20
  **publish** [2] - 517:25, 520:1
  **published** [5] - 517:16, 517:18, 517:22, 518:14, 518:15
  **publishes** [1] - 519:3
  **pull** [1] - 502:9
  **pulled** [1] - 462:8
  **purchase** [4] - 481:15, 485:11, 485:15, 485:18
  **purchased** [1] - 559:19
  **purchases** [4] - 478:13, 478:18, 479:2, 506:17
  **purchasing** [2] - 479:5, 482:23
  **purpose** [17] - 475:2, 475:10, 476:2, 476:4, 476:5, 476:8, 477:10, 477:8, 486:2, 486:6, 489:2, 489:4, 511:6, 514:2, 559:19, 564:9

  **Purpose** [2] - 476:18, 477:19
  **purposes** [2] - 487:12, 493:14
  **pursued** [1] - 501:25
  **put** [14] - 462:9, 467:21, 474:20, 492:20, 496:19, 500:9, 505:14, 509:20, 511:4, 553:22, 556:8, 560:4, 562:6, 568:20
  **puzzle** [1] - 510:23

## Q

  **Q&A** [1] - 505:5
  **qualitative** [3] - 525:1, 525:2, 569:16
  **qualitatively** [1] - 544:19
  **quality** [6] - 494:22, 495:1, 500:3, 502:1, 503:10, 560:20
  **quantify** [1] - 549:8
  **quantitative** [1] - 525:1
  **queries** [3] - 484:21, 543:3, 552:5
  **query** [7] - 484:12, 484:15, 484:17, 506:2, 541:13, 543:7
  **questioning** [1] - 574:1
  **questions** [20] - 455:4, 457:18, 461:20, 462:16, 472:18, 489:19, 490:18, 494:17, 494:22, 500:25, 501:2, 501:5, 502:13, 505:13, 505:19, 507:6, 508:16, 508:17, 509:7, 574:2
  **quickly** [2] - 551:20, 573:3
  **quite** [4] - 496:2, 518:13, 544:17, 565:7
  **quote** [5] - 498:12, 498:13, 536:22, 547:12, 565:25
  **quoted** [1] - 547:9
  **quotes** [2] - 505:14, 537:13
  **quoting** [1] - 527:21

## R

  **racket** [1] - 506:4
  **rackets** [2] - 506:3, 506:14
  **Ralph** [1] - 451:17

  **Randall** [4] - 460:20, 460:21, 461:13, 461:19
  **randomized** [1] - 526:3
  **range** [3] - 484:6, 484:13, 484:20
  **Rangel** [48] - 513:8, 513:17, 514:23, 515:6, 515:7, 515:10, 515:23, 516:3, 517:4, 518:22, 519:10, 519:15, 519:20, 519:23, 520:4, 521:9, 523:14, 523:25, 528:19, 529:9, 531:22, 534:16, 535:14, 536:10, 538:1, 538:16, 539:25, 545:12, 546:10, 550:12, 551:10, 551:15, 552:15, 554:22, 556:1, 557:11, 558:13, 558:21, 564:5, 565:11, 568:12, 569:15, 570:2, 571:14, 571:21, 572:16, 572:20, 576:6
  **RANGEL** [1] - 513:14
  **Rangel's** [2] - 514:1, 571:25
  **ranking** [1] - 563:1
  **rapidly** [1] - 500:7
  **rate** [1] - 565:5
  **rather** [5] - 479:25, 480:9, 481:7, 482:22, 561:12
  **ratio** [8] - 485:25, 486:4, 486:18, 489:6, 489:8, 489:9, 489:25, 490:9
  **rational** [1] - 516:22
  **re** [2] - 494:5, 530:4
  **re-ask** [1] - 494:5
  **re-enroll** [1] - 530:4
  **reach** [5] - 479:6, 523:14, 528:6, 541:2, 542:25
  **reached** [1] - 553:12
  **reaching** [1] - 522:22
  **react** [1] - 538:10
  **read** [31] - 470:2, 470:3, 470:4, 470:6, 470:8, 470:9, 470:13, 470:25, 476:15, 476:25, 477:4, 488:15, 488:17, 488:23, 488:25, 489:18, 496:11, 498:4, 499:6, 502:6, 502:7, 503:25, 504:1, 505:25, 506:11, 514:2, 554:12, 555:6, 555:19, 556:18

595

**reading** [4] - 455:17, 460:17, 506:11, 553:11
**reads** [1] - 507:16
**ready** [3] - 452:5, 513:3, 563:1
**real** [9] - 472:11, 499:21, 525:16, 529:11, 529:14, 529:15, 529:16
**real-life** [1] - 529:14
**real-world** [1] - 529:11
**realistic** [1] - 517:3
**reality** [1] - 527:12
**realized** [1] - 534:20
**really** [9] - 482:11, 492:19, 499:19, 511:3, 511:12, 517:15, 555:22, 560:25, 563:24
**realm** [1] - 480:12
**reason** [4] - 476:23, 490:13, 526:1, 560:20
**reasonable** [5] - 478:18, 478:22, 479:9, 481:6
**reasons** [5] - 486:11, 489:25, 490:9, 544:8, 544:17
**receive** [2] - 486:1, 486:5
**received** [4] - 497:8, 498:24, 518:22, 518:24
**recess** [1] - 509:5
**recognition** [1] - 479:14
**recognize** [5] - 457:16, 472:1, 506:17, 546:4, 573:23
**recollection** [1] - 550:18
**recommendation** [1] - 545:24
**reconsider** [3] - 468:13, 469:11, 474:3
**record** [8] - 469:5, 473:10, 489:7, 512:12, 537:23, 546:7, 555:24, 557:8
**records** [1] - 467:11
**recovery** [2] - 567:15, 567:20
**Red** [5] - 537:1, 537:6, 566:22, 569:23, 569:25
**red** [4] - 533:6, 533:9, 534:11, 534:12
**redacted** [5] - 513:24, 538:8, 556:16, 557:21, 567:10
**redirect** [2] - 508:22, 572:15
**reduced** [2] - 534:24,

557:25
**reducing** [1] - 555:6
**reduction** [1] - 558:5
**refer** [4] - 475:11, 476:6, 496:1, 539:12
**reference** [1] - 550:3
**references** [2] - 523:13, 536:16
**referring** [3] - 483:10, 496:11, 496:12
**refers** [3] - 475:21, 526:8, 556:10
**reflected** [1] - 535:8
**reflects** [2] - 500:4, 500:6
**reframe** [1] - 477:13
**regard** [4] - 476:1, 531:25, 556:4, 557:20
**related** [8] - 461:23, 494:15, 497:21, 510:19, 526:13, 549:23, 555:15
**relates** [1] - 520:5
**relatively** [2] - 498:8, 535:11
**relaxes** [1] - 517:2
**release** [3] - 570:19, 571:2, 571:3
**releasing** [1] - 570:18
**relevant** [5] - 459:18, 459:24, 460:25, 461:2, 565:12
**reliable** [1] - 551:6
**relied** [1] - 522:2
**remainder** [1] - 507:15
**remember** [3] - 464:24, 557:4, 571:24
**remembers** [1] - 560:21
**remind** [3] - 539:13, 550:20, 566:21
**reminders** [1] - 557:7
**remove** [1] - 561:14
**removed** [1] - 523:2
**repeat** [5] - 457:20, 478:17, 480:2, 486:3, 541:7
**repeatedly** [1] - 531:13
**repeating** [1] - 541:4
**repetition** [2] - 500:24, 543:9
**rephrase** [1] - 480:2
**reply** [1] - 495:22
**report** [3] - 503:13, 523:9, 535:22
**reporter** [1] - 513:9
**Reporter** [2] - 451:24, 575:11
**REPORTER** [1] -

575:1
**reports** [8] - 523:8, 523:9, 523:10, 523:11, 527:4, 536:17, 544:1, 559:3
**repose** [1] - 490:7
**represent** [2] - 474:14, 496:23
**representation** [2] - 492:23, 512:15
**representatives** [1] - 494:15
**Republican** [1] - 525:17
**reputation** [1] - 479:13
**request** [2] - 473:7, 488:1
**required** [4] - 554:14, 558:22, 559:14, 559:24
**requires** [4] - 552:3, 553:11, 563:19, 563:20
**requiring** [1] - 556:24
**research** [6] - 519:6, 522:2, 553:10, 553:17, 560:10, 569:21
**researcher** [1] - 465:15
**researchers** [2] - 528:4, 528:11
**researches** [1] - 531:4
**reservation** [1] - 503:22
**reserve** [16] - 462:17, 462:22, 463:1, 463:2, 463:4, 463:5, 463:20, 463:23, 464:4, 464:9, 464:11, 465:24, 466:6, 466:8
**reserved** [1] - 491:3
**resolved** [1] - 472:10
**resources** [1] - 549:17
**respect** [9] - 493:5, 512:1, 523:25, 528:22, 537:14, 548:1, 557:18, 568:25, 574:7
**respond** [1] - 482:18
**response** [1] - 574:15
**responses** [1] - 529:11
**rest** [2] - 452:8, 499:6
**result** [5] - 465:10, 545:10, 558:8, 558:10, 564:20
**results** [21] - 461:22, 478:15, 478:20, 479:3, 479:18, 481:7, 482:19, 482:24, 483:21, 483:22, 484:23, 485:2, 485:19, 486:15, 489:6, 490:1, 490:10, 490:12,

508:4, 560:18, 560:19
**resume** [2] - 509:2
**retail** [2] - 481:22, 485:14
**retailer** [5] - 479:23, 479:24, 480:6, 480:8, 481:6
**retailers** [4] - 481:12, 481:13, 481:14, 481:22
**retained** [3] - 510:17, 512:16, 512:19
**retainer** [1] - 473:25
**retargeted** [10] - 455:5, 455:6, 455:10, 455:20, 455:21, 455:22, 457:5, 507:16, 507:18, 507:22
**retargeting** [4] - 455:25, 456:6, 457:15, 508:10
**retention** [1] - 510:18
**retirement** [2] - 527:10, 529:22
**return** [2] - 500:13, 571:14
**returned** [1] - 561:22
**returns** [9] - 495:18, 496:6, 496:9, 496:10, 496:13, 499:24, 500:5, 500:6, 500:10
**reveal** [1] - 479:15
**revenue** [4] - 503:3, 503:18, 535:6, 567:3
**reverted** [1] - 558:12
**review** [1] - 536:15
**reviewed** [3] - 517:16, 517:18, 522:17
**revisit** [1] - 509:12
**right-hand** [1] - 536:22
**rise** [1] - 571:20
**rivals** [1] - 540:18
**RMR** [1] - 451:24
**robust** [5] - 523:18, 524:2, 524:16, 524:23, 541:8
**robustness** [1] - 522:10
**role** [5] - 516:19, 518:4, 542:25, 545:15, 545:16
**Room** [1] - 575:12
**row** [7] - 475:21, 477:19, 521:15, 536:21, 545:19, 545:22, 567:17
**rows** [2] - 475:1, 523:16
**RSAs** [2] - 471:9, 511:23

596

**rule** [2] - 468:8, 468:21
**run** [6] - 526:2,
528:22, 534:17, 544:6,
549:13
**runs** [1] - 465:6
**Russia** [1] - 570:3
**Russian** [2] - 570:17,
571:6

# S

**S22** [1] - 559:19
**Safari** [5] - 553:16,
553:17, 562:22,
562:25, 568:21
**Safaris** [1] - 559:4
**sake** [1] - 512:11
**sale** [1] - 466:20
**sales** [3] - 464:5,
464:9, 494:14
**salient** [2] - 526:20,
535:10
**SALLET** [24] - 452:24,
474:8, 474:11, 477:15,
477:17, 480:15, 481:4,
482:14, 482:16,
484:18, 484:19, 487:8,
487:13, 487:16,
487:20, 488:12,
488:15, 488:19,
488:21, 489:21, 490:8,
490:16, 496:21, 573:25
**Sallet** [6] - 451:15,
474:6, 474:14, 477:13,
484:17, 490:19
**sallet** [1] - 488:9
**Sallet's** [1] - 481:2
**Sallet.................** [1] -
576:4
**Samsung** [8] - 556:22,
557:11, 557:15,
557:17, 557:24, 558:4,
559:24, 562:13
**sandwich** [1] - 520:16
**satisfy** [3] - 454:1,
455:1, 484:6
**satisfying** [1] - 533:16
**save** [2] - 545:18,
555:19
**savings** [1] - 529:22
**saw** [2] - 538:1, 567:7
**scale** [6] - 498:12,
499:13, 499:17,
499:20, 499:23, 500:13
**SCHMIDTLEIN** [8] -
510:8, 514:7, 514:15,
519:18, 572:6, 573:18,
573:21, 574:9
**Schmidtlein** [2] -
451:20, 574:5

**school** [1] - 553:22
**Science** [1] - 519:3
**science** [2] - 515:11,
515:12
**Scientist** [1] - 519:1
**scientist** [5] - 519:5,
533:16, 550:19, 551:1,
551:4
**scientists** [1] - 529:12
**scope** [5] - 468:25,
469:3, 512:18, 573:17,
573:19
**screen** [20] - 460:12,
474:21, 492:20, 502:8,
533:10, 533:23,
535:12, 547:11,
554:12, 559:11, 566:4,
570:3, 570:6, 570:7,
570:13, 570:18, 571:3,
571:7, 571:9
**screens** [1] - 569:4
**scroll** [4] - 502:10,
554:14
**search** [154] - 453:24,
453:25, 454:25, 458:4,
458:5, 458:7, 458:13,
461:11, 463:9, 463:14,
463:17, 475:2, 475:10,
475:25, 476:2, 476:5,
476:8, 476:11, 476:21,
476:23, 477:8, 477:10,
477:21, 478:4, 478:8,
478:15, 478:20,
479:15, 479:18,
482:10, 482:24,
483:22, 484:22,
485:19, 486:2, 486:6,
489:3, 489:4, 492:17,
493:4, 494:22, 494:25,
498:1, 498:10, 504:6,
504:10, 504:12,
504:13, 505:24, 506:2,
507:20, 507:21,
507:22, 508:2, 508:3,
508:4, 517:7, 521:16,
521:17, 521:21,
521:22, 521:23,
522:14, 523:4, 523:17,
523:18, 523:23,
524:19, 530:11,
530:12, 531:17,
537:20, 538:14,
538:17, 538:20,
539:25, 540:3, 540:5,
540:7, 540:10, 540:12,
540:17, 540:20,
540:22, 540:23, 541:1,
541:7, 541:12, 541:13,
541:16, 541:19, 543:1,
543:4, 543:5, 543:10,

543:12, 543:16,
543:17, 543:22, 544:2,
544:21, 544:22,
545:13, 546:11, 547:2,
547:21, 548:2, 548:18,
548:20, 549:3, 549:12,
550:6, 550:8, 551:11,
551:13, 552:8, 552:17,
553:4, 553:20, 554:6,
556:2, 558:23, 558:25,
559:5, 559:7, 559:9,
559:10, 559:12,
559:13, 559:15,
559:24, 560:15,
560:17, 561:3, 561:15,
561:19, 562:14,
562:15, 564:3, 567:3,
567:9, 568:12, 568:18,
568:22, 570:3
**Search** [22] - 458:19,
460:16, 476:18,
477:19, 478:9, 478:10,
478:14, 478:19, 479:2,
479:3, 479:5, 481:7,
481:15, 481:23,
482:19, 483:13,
483:15, 483:19,
483:20, 541:3, 562:15,
563:12
**searched** [1] - 506:4
**searcher** [1] - 545:10
**searchers** [1] - 492:24
**searches** [13] -
459:19, 461:7, 461:23,
462:14, 493:3, 493:5,
532:24, 543:3, 546:15,
552:5, 553:10, 559:13,
565:1
**searching** [5] -
485:14, 543:15,
546:10, 560:15
**seat** [2] - 513:18,
571:23
**second** [17] - 455:12,
459:17, 473:1, 475:5,
477:18, 497:25,
501:12, 501:15,
506:22, 507:13,
509:19, 521:18,
523:19, 541:15, 553:6,
566:14
**section** [5] - 497:24,
505:22, 506:24, 539:8,
573:6
**Section** [1] - 451:16
**sections** [1] - 506:23
**securing** [1] - 538:9
**see** [103] - 453:11,
453:18, 453:22,
454:13, 455:12,

455:14, 455:17,
455:19, 457:8, 459:20,
459:21, 460:16,
461:10, 462:2, 462:3,
469:19, 470:15,
470:17, 470:22, 471:7,
471:10, 471:11, 475:3,
475:6, 485:8, 485:9,
490:4, 490:22, 492:22,
492:24, 494:4, 495:14,
495:19, 496:16,
496:19, 498:2, 498:17,
498:19, 498:23, 499:9,
500:7, 501:18, 507:9,
507:11, 508:6, 508:12,
509:20, 509:22,
511:20, 513:22,
520:12, 520:13,
520:17, 520:19,
522:21, 522:25,
525:20, 527:6, 528:17,
530:24, 531:25,
532:21, 533:17, 534:5,
534:12, 536:14,
536:21, 536:23,
537:13, 538:2, 538:6,
538:8, 539:18, 542:16,
544:6, 545:12, 546:14,
548:1, 548:10, 549:15,
549:25, 550:17,
552:13, 552:20,
554:22, 554:25, 556:4,
556:17, 556:23,
557:20, 560:18,
560:19, 561:19, 565:2,
565:20, 565:21, 567:1,
567:13, 569:7, 571:16,
572:6, 574:16
**seeing** [2] - 492:13,
534:7
**seek** [1] - 511:13
**seeks** [1] - 516:17
**seem** [2] - 492:14,
551:9
**seemingly** [2] - 555:8,
555:21
**select** [1] - 561:11
**selected** [1] - 526:1
**selecting** [1] - 520:21
**selection** [1] - 530:1
**sell** [4] - 462:18,
462:23, 463:17, 503:22
**seller** [6] - 479:5,
479:10, 479:16,
479:17, 480:25, 503:21
**sellers** [2] - 479:21,
482:6
**selling** [5] - 503:15,
503:16, 503:20
**sells** [9] - 462:25,

463:3, 463:14, 464:2, 464:8, 464:14, 464:18, 465:4, 466:18

**sending** [1] - 558:4

**sends** [2] - 458:2, 546:20

**sense** [14] - 468:21, 506:25, 511:2, 511:3, 531:19, 532:25, 537:22, 560:4, 560:5, 560:7, 560:13, 569:5, 569:16, 573:7

**sent** [3] - 453:14, 459:3, 510:1

**sentence** [12] - 454:18, 454:19, 454:21, 455:3, 459:17, 470:25, 488:22, 497:25, 501:15, 502:14, 504:24, 507:14

**separate** [2] - 521:15, 562:18

**September** [2] - 451:5, 575:7

**series** [2] - 540:24, 562:18

**SERP** [3] - 485:5, 485:8, 489:5

**services** [5] - 482:22, 503:7, 532:5, 538:17

**session** [7] - 572:1, 572:4, 572:12, 572:15, 572:23, 573:2

**set** [6] - 463:2, 466:6, 473:3, 533:2, 560:9, 566:5

**sets** [1] - 463:20

**setting** [6] - 463:1, 463:4, 463:5, 464:3, 529:11, 570:9

**settings** [4] - 521:22, 528:6, 529:15, 549:14

**settles** [1] - 547:19

**setup** [2] - 481:16, 540:21

**Seventh** [1] - 451:17

**several** [5] - 454:9, 464:24, 476:7, 520:20, 550:4

**Shankar** [3] - 532:15, 550:20

**Shapiro** [23] - 465:13, 465:14, 466:10, 466:13, 466:22, 467:2, 467:4, 467:9, 467:24, 470:14, 470:24, 471:25, 472:14, 473:17, 473:22, 509:13, 509:23, 510:2, 510:4, 510:8, 510:13,

511:10, 512:16

**shapiro** [2] - 471:7, 472:7

**Shapiro's** [5] - 467:20, 468:10, 469:17, 469:18, 471:12

**share** [6] - 493:20, 509:14, 539:18, 564:25, 565:3, 569:10

**shared** [1] - 563:21

**shares** [3] - 569:6, 574:5, 574:7

**shooting** [1] - 452:15

**shop** [3] - 547:17, 547:22, 547:24

**shopping** [2] - 472:24, 533:25

**Shopping** [1] - 476:10

**shore** [1] - 511:21

**short** [2] - 510:16, 559:23

**show** [21] - 456:4, 456:11, 459:18, 461:6, 468:18, 473:14, 474:19, 480:9, 481:7, 487:9, 501:12, 506:18, 529:21, 532:2, 538:7, 546:18, 553:3, 554:11, 562:6, 564:19, 567:5

**showed** [7] - 472:23, 518:11, 529:15, 534:20, 562:10, 563:21, 567:24

**showing** [4] - 454:22, 474:22, 488:7, 525:15

**shown** [16] - 464:25, 474:19, 493:19, 503:20, 506:22, 507:21, 507:23, 520:23, 525:11, 525:21, 525:24, 525:25, 529:5, 530:6, 535:1, 563:6

**shows** [6] - 475:19, 483:1, 500:9, 508:8, 565:22

**sic** [1] - 515:12

**side** [3] - 496:20, 536:22, 567:13

**sigmoid** [1] - 500:4

**sign** [2] - 527:14, 527:15

**signal** [4] - 506:2, 506:8, 506:9, 506:13

**signaled** [1] - 508:12

**significance** [1] - 492:17

**significant** [2] - 541:25, 558:14

**Silk** [1] - 568:23

**similar** [11] - 522:23, 523:3, 529:3, 545:18, 555:14, 555:18, 561:5, 569:3, 569:4, 572:8

**simply** [2] - 468:16, 528:14

**sit** [1] - 542:17

**site** [7] - 455:11, 455:12, 485:11, 485:15, 485:16, 507:25

**sites** [1] - 533:25

**sitting** [2] - 546:11, 551:12

**situation** [9] - 528:12, 529:23, 541:15, 542:11, 544:11, 544:14, 548:21, 551:20, 554:8

**situations** [6] - 529:18, 539:3, 541:18, 542:10, 543:8, 551:25

**size** [3] - 569:17, 569:20, 569:22

**sizeable** [9] - 523:18, 524:1, 524:15, 524:17, 534:6, 538:4, 541:8, 563:8, 565:7

**ski** [3] - 455:8, 455:9

**skis** [1] - 482:5

**slide** [27] - 472:22, 472:24, 474:21, 495:16, 495:23, 496:4, 496:5, 496:12, 514:23, 519:23, 520:23, 521:15, 525:9, 533:20, 534:5, 535:7, 539:24, 546:8, 552:20, 554:1, 555:1, 556:16, 564:22, 567:11, 567:23, 569:13

**slides** [5] - 513:23, 514:1, 534:13, 567:1, 572:7

**slightly** [2] - 531:22, 564:1

**slower** [1] - 552:3

**slowly** [1] - 500:8

**small** [5] - 503:6, 547:13, 554:11, 555:8

**smart** [1] - 535:1

**SMURZYASKI** [32] - 452:13, 452:17, 452:21, 459:11, 466:25, 467:14, 467:23, 468:2, 468:19, 469:5, 469:12, 480:11, 481:3, 487:11, 488:4, 488:6, 490:23, 491:3, 491:15, 491:22, 492:4, 494:6, 496:15, 496:22, 496:25, 497:2, 505:8,

507:2, 507:5, 507:8, 508:15, 508:19

**Smurzyaski**............. [1] - 576:5

**Smurzynski** [1] - 451:20

**snowshoes** [1] - 482:5

**social** [1] - 528:13

**Society** [1] - 519:2

**software** [14] - 458:3, 475:24, 530:23, 530:25, 531:5, 531:13, 531:15, 558:11, 563:5, 564:14, 565:18, 570:9, 571:3, 571:4

**sold** [3] - 462:20, 464:20, 466:20

**solution** [2] - 533:19, 551:21

**solutions** [1] - 542:10

**someone** [8] - 453:14, 458:1, 468:24, 482:22, 487:3, 487:6, 532:15, 561:23

**sometime** [1] - 566:9

**sometimes** [3] - 485:16, 536:18

**somewhat** [1] - 484:23

**somewhere** [2] - 486:22, 518:14

**Sonoma** [1] - 455:16

**soon** [1] - 507:23

**sophisticated** [2] - 538:11, 552:24

**sorry** [20] - 452:17, 459:7, 465:23, 467:8, 469:18, 472:4, 472:21, 476:4, 477:12, 478:3, 478:25, 488:5, 498:20, 502:10, 504:12, 506:25, 509:10, 509:25, 566:15, 570:24

**sort** [9] - 452:7, 494:12, 500:8, 504:3, 504:7, 506:12, 508:24, 530:25, 532:4

**sound** [1] - 552:24

**sounds** [2] - 568:8, 572:13

**source** [2] - 459:23, 461:4

**space** [1] - 504:23

**span** [2] - 536:23, 545:19

**sparing** [1] - 574:1

**special** [12] - 475:2, 475:10, 475:25, 476:2, 476:4, 476:5, 476:8, 477:10, 478:8, 489:2, 489:4

**Special** [2] - 476:18, 477:19
**special-purpose** [10] - 475:2, 475:10, 476:2, 476:4, 476:5, 476:8, 477:10, 478:8, 489:2, 489:4
**Special-Purpose** [2] - 476:18, 477:19
**specialists** [1] - 495:3
**specialty** [1] - 515:23
**specific** [7] - 454:20, 476:12, 487:6, 523:4, 528:7, 539:25, 560:5
**specifically** [3] - 464:10, 511:23, 522:4
**specify** [2] - 533:3, 558:3
**specifying** [1] - 533:13
**speculation** [2] - 480:12, 480:21
**speculative** [1] - 480:24
**spelling** [1] - 513:9
**spend** [8] - 458:7, 458:13, 458:19, 481:24, 481:25, 482:2, 533:14, 554:15
**spending** [3] - 534:8, 534:23, 534:24
**spendings** [1] - 534:9
**spends** [1] - 538:8
**spent** [2] - 559:21, 560:9
**Spillovers** [1] - 460:15
**sponsor** [1] - 483:1
**Spotlight** [2] - 475:12, 476:1
**spots** [1] - 466:7
**St** [1] - 451:21
**stage** [2] - 462:10, 545:21
**stakes** [6] - 528:4, 529:16, 529:18, 529:24, 530:10, 530:12
**Stallibrass** [1] - 505:2
**stand** [3] - 490:21, 518:1, 535:7
**standard** [1] - 516:21
**standing** [1] - 537:9
**Stanford** [2] - 515:21, 517:10
**Starbucks** [4] - 542:16, 542:23, 548:7
**start** [14] - 469:17, 491:23, 506:23, 543:15, 544:11, 544:15, 548:15, 560:3, 570:18, 571:15, 572:12, 573:13

**started** [2] - 522:4, 539:11
**starting** [3] - 488:22, 532:16, 570:19
**starts** [1] - 560:25
**State** [2] - 451:15, 474:14
**statement** [9] - 468:25, 472:23, 481:2, 499:4, 499:12, 501:21, 510:10, 510:20, 511:17
**statements** [5] - 467:2, 468:10, 468:13, 499:2, 563:9
**states** [1] - 452:22
**STATES** [2] - 451:1, 451:9
**States** [9] - 451:2, 469:23, 470:10, 513:5, 521:12, 527:8, 540:10, 568:13, 572:19
**status** [1] - 469:10
**stenographic** [1] - 575:5
**step** [6] - 516:16, 552:12, 556:11, 558:25, 571:21
**step-by-step** [1] - 558:25
**steps** [17] - 540:24, 541:21, 552:1, 552:7, 553:19, 553:21, 553:23, 556:7, 557:4, 557:6, 558:21, 559:14, 559:24, 562:2, 562:13, 562:18, 563:23
**Steve** [1] - 559:18
**stick** [4] - 536:1, 547:8, 555:11, 555:12
**sticker** [2] - 473:6, 554:21
**stickered** [2] - 473:1, 473:2
**stickiness** [1] - 554:18
**still** [5] - 453:11, 468:20, 491:16, 537:9, 539:17
**stimulated** [1] - 454:22
**stipulation** [1] - 469:9
**stop** [4] - 522:17, 534:8, 547:15, 571:13
**stops** [1] - 541:16
**store** [1] - 524:7
**Store** [1] - 561:2
**strategy** [3] - 470:20, 471:8, 501:25
**Street** [1] - 451:12
**streets** [1] - 512:6
**strengthen** [1] -

541:21
**strike** [5] - 479:22, 485:6, 486:12, 487:1, 505:25
**strong** [5] - 506:2, 506:3, 548:19, 548:22, 551:5
**stronger** [3] - 506:4, 506:9, 523:20
**strongly** [1] - 543:8
**students** [2] - 517:13, 519:11
**studied** [2] - 521:1, 528:5
**studies** [12] - 459:6, 522:7, 525:23, 527:17, 527:20, 527:22, 528:1, 529:14, 529:25, 530:6, 543:23, 550:23
**study** [9] - 458:15, 458:17, 458:23, 494:18, 525:16, 530:21, 544:20, 549:16, 549:18
**studying** [2] - 505:12, 522:6
**style** [1] - 516:21
**sub** [1] - 560:6
**subcomponent** [1] - 560:6
**subject** [3] - 461:3, 485:2, 530:17
**submit** [1] - 523:8
**submitted** [1] - 523:9
**Subsection** [1] - 507:14
**subsections** [1] - 506:24
**substance** [1] - 531:3
**substantial** [6] - 536:15, 539:22, 544:7, 552:3, 563:3, 567:23
**substantially** [1] - 530:13
**success** [2] - 497:25, 498:10
**successful** [2] - 535:4, 538:11
**successfully** [2] - 553:24, 553:25
**sufficient** [1] - 524:20
**sufficiently** [2] - 561:4, 561:6
**suggest** [5] - 455:9, 492:12, 549:5, 556:3, 572:12
**suggested** [2] - 511:13, 511:14
**suggests** [2] - 463:6, 493:10

**summary** [2] - 523:9, 574:8
**supermarket** [1] - 517:25
**suppose** [2] - 479:21, 479:23
**surf** [1] - 533:5
**surprised** [2] - 497:5, 499:9
**surprising** [1] - 562:9
**switch** [6] - 543:22, 545:5, 560:23, 564:13, 564:18, 565:12
**switched** [4] - 544:1, 544:5, 545:5, 564:8
**Switching** [1] - 501:12
**switching** [10] - 458:7, 458:13, 458:19, 501:9, 501:22, 531:22, 548:16, 549:10, 552:21, 564:1
**sworn** [1] - 513:15
**system** [4] - 490:14, 546:23, 547:5, 558:11

**T**

**table** [4] - 529:22, 536:21, 545:17, 567:13
**tablet** [4] - 568:12, 568:18, 569:1, 569:23
**tablets** [4] - 540:6, 568:15, 568:16, 569:10
**talks** [1] - 492:7
**Tang** [1] - 461:19
**tap** [1] - 566:10
**targeting** [3] - 506:15, 506:16, 508:5
**taught** [3] - 517:9, 517:14, 521:5
**teach** [5] - 515:19, 517:8, 517:11, 517:12, 521:7
**teacher** [1] - 498:3
**teaching** [1] - 522:2
**Team** [1] - 532:13
**team** [16] - 489:13, 532:14, 532:16, 532:19, 532:22, 533:12, 534:17, 534:20, 535:15, 536:11, 538:25, 539:7, 550:13, 550:21, 555:2, 563:22
**tech** [3] - 496:23, 545:16, 549:11
**technology** [1] - 496:22
**tempted** [1] - 498:13
**ten** [1] - 555:21

**tend** [3] - 516:13, 543:5, 543:6
**tendency** [1] - 531:14
**tennis** [4] - 506:3, 506:4, 506:12, 506:13
**term** [5] - 499:15, 499:16, 532:3, 536:19, 550:6
**terminally** [1] - 528:5
**terminology** [1] - 570:5
**terms** [5] - 452:8, 452:12, 505:13, 511:12, 524:1
**terrific** [2] - 509:9, 572:10
**territorial** [1] - 491:10
**test** [2] - 559:14, 561:18
**tested** [1] - 533:21
**testified** [7] - 468:5, 468:15, 473:21, 478:7, 480:18, 484:5, 513:16
**testify** [3] - 467:3, 517:5, 551:2
**testifying** [2] - 558:15, 560:20
**testimony** [19] - 452:9, 472:12, 477:9, 487:19, 488:11, 514:1, 514:11, 514:24, 517:6, 519:24, 537:2, 545:23, 568:7, 571:16, 571:25, 572:22, 573:2, 573:6, 573:12
**testing** [1] - 549:13
**Texas** [1] - 525:17
**text** [8] - 462:20, 463:20, 463:21, 464:8, 464:10, 467:20, 472:23
**textbook** [2] - 466:13, 466:14
**THE** [144] - 451:1, 451:1, 451:9, 452:2, 452:5, 452:7, 452:11, 453:1, 459:10, 459:15, 460:11, 465:23, 466:2, 466:3, 467:3, 467:6, 467:8, 467:11, 467:13, 467:17, 468:1, 468:7, 468:23, 469:7, 469:13, 471:25, 472:3, 472:4, 472:5, 472:20, 473:7, 473:20, 474:6, 477:13, 480:20, 484:16, 487:12, 487:14, 487:17, 487:24, 488:5, 488:8, 488:17, 489:18, 490:3, 490:6, 490:19, 491:1, 491:7, 491:12,

491:20, 491:21, 492:2, 494:3, 496:18, 496:23, 505:4, 505:6, 506:25, 507:3, 507:7, 508:17, 508:20, 509:1, 509:9, 509:11, 509:15, 512:3, 512:5, 512:14, 513:2, 513:6, 513:9, 513:13, 513:17, 513:21, 514:5, 514:9, 514:18, 515:1, 515:3, 518:18, 518:20, 519:17, 519:19, 520:2, 535:16, 535:18, 535:22, 535:24, 535:25, 536:6, 543:19, 543:25, 544:20, 544:23, 544:24, 545:3, 545:6, 545:8, 547:16, 548:4, 549:4, 549:11, 549:18, 549:20, 549:21, 549:22, 550:1, 550:2, 550:10, 552:10, 552:11, 552:13, 564:23, 564:24, 566:2, 566:7, 566:13, 566:14, 566:16, 566:17, 568:1, 568:5, 568:10, 570:13, 570:15, 571:11, 571:13, 571:18, 571:19, 571:20, 571:21, 572:5, 572:10, 572:16, 572:24, 573:7, 573:14, 573:20, 573:23, 574:3, 574:11, 574:16
**theoretical** [1] - 518:10
**they've** [1] - 508:11
**thinking** [6] - 454:6, 522:22, 542:12, 548:15, 551:21, 555:20
**thinks** [2] - 552:2, 552:7
**third** [7] - 453:19, 485:21, 509:19, 513:25, 520:9, 540:8, 561:23
**third-party** [2] - 485:21, 540:8
**thousands** [1] - 530:8
**three** [10] - 498:8, 506:5, 521:14, 523:9, 523:16, 527:6, 529:9, 529:14, 540:4, 564:10
**throughout** [3] - 480:18, 536:16, 546:4
**Thursday** [1] - 470:15
**timing** [1] - 452:8
**tip** [1] - 520:18
**tipping** [1] - 562:7

**tips** [1] - 520:20
**title** [1] - 460:15
**titled** [1] - 477:19
**today** [5] - 492:16, 495:5, 502:13, 517:5, 519:24
**Todd** [5] - 453:15, 453:17, 453:19, 453:20, 453:22
**tomorrow** [8] - 571:14, 571:15, 571:17, 572:17, 573:3, 573:8, 574:12, 574:17
**took** [3] - 522:13, 531:4, 544:3
**tools** [2] - 475:12, 545:25
**top** [7] - 452:17, 460:3, 498:5, 498:17, 503:24, 561:2, 567:17
**topic** [7] - 495:3, 495:23, 508:7, 517:10, 521:1, 521:6, 531:22
**topics** [2] - 476:12, 501:8
**touch** [3] - 561:8, 561:12
**tough** [1] - 513:11
**towards** [4] - 527:10, 536:20, 538:14, 541:8
**Toyota** [2] - 454:14, 455:1
**track** [3] - 489:8, 489:9, 490:13
**tracking** [3] - 489:12, 549:15, 556:10
**tracks** [2] - 490:9, 556:7
**trade** [1] - 466:14
**traffic** [2] - 489:3, 567:17
**transaction** [1] - 520:22
**transactions** [4] - 504:3, 504:6, 504:7, 520:25
**transcript** [6] - 487:9, 487:21, 488:14, 490:4, 575:4, 575:5
**TRANSCRIPT** [1] - 451:8
**travel** [1] - 483:11
**treated** [1] - 463:24
**treatment** [1] - 545:4
**trend** [1] - 565:4
**trial** [2] - 510:25, 542:21
**TRIAL** [1] - 451:8
**tried** [2] - 489:24, 510:12

**tries** [1] - 538:20
**trimmed** [1] - 452:15
**trivial** [2] - 552:24, 555:22
**trouble** [3] - 453:11, 460:10, 492:3
**true** [12] - 454:4, 455:24, 457:12, 457:17, 459:22, 464:6, 479:1, 482:20, 484:13, 501:21, 575:4, 575:5
**truth** [6] - 467:25, 468:11, 510:7, 510:16, 511:5, 514:16
**try** [11] - 478:25, 480:3, 480:9, 502:16, 514:16, 537:7, 547:14, 547:18, 553:13, 562:11, 573:25
**trying** [8] - 455:1, 461:4, 481:16, 507:3, 522:9, 555:4, 560:7, 567:2
**turn** [10] - 453:5, 488:13, 491:7, 492:20, 496:16, 500:19, 504:25, 505:17, 510:10, 510:20
**turning** [4] - 476:4, 485:24, 491:23, 492:13
**turns** [1] - 468:8
**TV** [2] - 483:1, 504:18
**two** [27] - 458:23, 466:11, 468:19, 473:21, 479:21, 480:19, 481:13, 481:16, 498:8, 503:1, 503:2, 507:5, 510:1, 516:10, 523:3, 529:21, 531:5, 534:13, 549:14, 551:18, 555:23, 566:17, 568:18, 569:3, 569:6, 571:8, 573:17
**type** [10] - 477:5, 508:4, 532:24, 559:12, 559:15, 560:17, 561:3, 561:4, 562:12
**typed** [2] - 484:12, 484:15
**types** [6] - 504:23, 514:19, 541:13, 549:13, 561:17, 568:18
**typical** [1] - 531:21
**typically** [4] - 455:23, 473:8, 485:4, 504:5

## U

**U.S** [1] - 451:12
**UC** [1] - 465:14

600

**Udi** [3] - 495:9, 496:2, 496:11
**ultimate** [1] - 512:24
**ultimately** [1] - 547:19
**um-hum** [1] - 475:7
**under** [5] - 476:21, 501:12, 505:20, 507:9, 543:21
**understood** [5] - 467:3, 469:12, 496:1, 513:1, 573:20
**undoubtedly** [1] - 467:21
**unique** [2] - 503:16, 523:12
**UNITED** [2] - 451:1, 451:9
**United** [8] - 469:23, 470:10, 513:5, 521:12, 527:8, 540:10, 568:13, 572:19
**united** [1] - 451:2
**units** [3] - 489:3, 489:5, 494:11
**universally** [1] - 455:24
**university** [2] - 515:14, 521:5
**University** [2] - 515:22, 530:23
**unknown** [1] - 510:18
**unless** [4] - 473:7, 520:10, 527:14, 529:5
**unsatisfactory** [1] - 548:16
**up** [31] - 460:11, 461:11, 461:23, 463:2, 473:14, 474:20, 476:7, 480:9, 481:7, 487:23, 490:3, 492:13, 492:20, 495:6, 496:25, 497:11, 498:5, 502:9, 502:10, 503:23, 503:24, 505:21, 511:21, 514:21, 527:14, 533:3, 542:7, 542:23, 550:7, 561:14, 572:17
**update** [1] - 571:4
**updated** [1] - 456:23
**upgrade** [2] - 546:22, 547:5
**upper** [1] - 567:14
**UPX** [3] - 460:8, 491:24, 546:7
**UPX1** [1] - 500:20
**UPX101** [1] - 536:8
**UPX103** [1] - 555:24
**UPX1049** [1] - 546:8
**UPX1085** [4] - 459:1, 460:7, 460:9, 576:9

**UPX148** [1] - 567:25
**UPX149** [1] - 558:19
**UPX151** [2] - 500:19, 546:8
**UPX171** [1] - 537:24
**UPX180** [1] - 495:5
**UPX26** [3] - 456:18, 480:15, 506:19
**UPX334** [1] - 474:20
**UPX411** [2] - 453:5, 453:9
**UPX5511** [1] - 557:9
**UPX757** [1] - 546:8
**UPX81** [1] - 537:24
**UPX848** [1] - 555:24
**UPX9** [1] - 492:1
**UPX910** [2] - 504:25, 505:17
**UPX938** [1] - 539:24
**UPX945** [1] - 569:13
**UPX952** [4] - 466:15, 466:23, 509:12, 510:6
**UPX960** [1] - 491:23
**UPX97** [1] - 565:9
**UPXD001** [1] - 472:24
**UPXD010** [1] - 473:4
**urging** [1] - 547:10
**usage** [1] - 568:12
**useful** [5] - 470:16, 520:11, 525:9, 527:6, 570:25
**User** [1] - 501:12
**user** [27] - 455:25, 457:6, 458:3, 471:2, 485:14, 501:8, 503:3, 506:17, 507:17, 507:19, 507:22, 507:23, 539:15, 540:21, 546:10, 548:2, 551:11, 551:12, 555:9, 559:17, 559:20, 562:12, 562:18, 563:11, 569:4, 570:8
**user's** [1] - 506:13
**users** [23] - 478:19, 479:2, 484:6, 484:21, 484:25, 485:11, 493:16, 504:13, 535:20, 537:9, 544:4, 544:24, 545:4, 545:24, 546:5, 546:15, 547:4, 547:7, 547:13, 548:12, 571:2, 571:5
**uses** [1] - 567:8

**V**

**validate** [1] - 523:5
**valuable** [3] - 496:14, 538:13

**value** [8] - 456:6, 456:12, 456:14, 457:5, 457:13, 498:7, 499:4, 507:16
**variable** [1] - 524:5
**variables** [2] - 516:14, 551:8
**varian** [2] - 474:12, 484:5
**VARIAN** [1] - 453:2
**Varian** [38] - 452:12, 453:5, 467:21, 469:2, 474:21, 475:1, 476:9, 477:18, 478:7, 478:25, 480:3, 480:13, 480:16, 483:2, 483:7, 487:25, 488:9, 488:13, 488:24, 489:16, 489:22, 490:17, 491:16, 491:20, 492:7, 494:7, 495:8, 497:20, 498:24, 500:2, 503:25, 505:9, 505:18, 507:11, 508:15, 509:23, 510:10, 576:3
**Varian's** [2] - 452:8, 545:23
**variation** [1] - 548:25
**variations** [1] - 526:13
**variety** [1] - 500:6
**various** [1] - 500:9
**vary** [1] - 527:11
**vast** [4] - 506:1, 541:11, 543:2, 546:15
**vein** [1] - 555:14
**vendor** [1] - 482:5
**Verizon** [1] - 573:1
**versa** [1] - 528:10
**version** [4] - 453:12, 546:23, 547:3, 555:3
**versions** [1] - 549:15
**versus** [1] - 551:12
**vice** [1] - 528:9
**view** [16] - 482:23, 495:20, 496:8, 499:11, 506:7, 507:19, 511:8, 512:10, 543:13, 544:13, 546:14, 546:18, 547:21, 554:3, 556:13, 557:3
**violation** [1] - 558:5
**visit** [3] - 455:10, 456:11, 507:24
**visited** [3] - 455:13, 455:25, 506:7
**visits** [3] - 457:6, 507:17, 507:23
**visualization** [1] - 454:11
**vote** [1] - 525:14

**voters** [3] - 525:11, 525:19, 525:20
**voting** [1] - 525:14
**vouching** [1] - 462:10
**vs** [1] - 451:4
**vulnerable** [1] - 537:10

**W**

**wages** [1] - 527:10
**wait** [2] - 463:11, 564:20
**Waldo** [1] - 544:3
**walk** [4] - 513:23, 548:7, 553:7, 560:2
**walking** [2] - 547:17, 547:22
**walks** [1] - 547:24
**wants** [4] - 514:13, 553:15, 560:21, 563:12
**Washington** [4] - 451:4, 451:13, 451:22, 575:13
**waste** [1] - 508:25
**water** [1] - 542:7
**ways** [5] - 454:9, 464:17, 526:11, 537:6, 538:14
**web** [6] - 457:7, 482:10, 486:22, 507:18, 507:19, 508:7
**website** [4] - 456:1, 479:11, 484:21, 490:10, 490:11, 506:6, 507:24, 566:9
**websites** [3] - 486:1, 486:5, 490:2
**week** [1] - 456:11
**weigh** [1] - 512:24
**weight** [1] - 511:9
**welcome** [5] - 460:22, 490:25, 491:5, 491:11, 513:17
**whereas** [2] - 504:8, 504:13
**White** [1] - 532:17
**whole** [2] - 469:11, 522:9
**wide** [1] - 536:24
**widely** [1] - 535:5
**widget** [8] - 559:5, 559:7, 559:9, 559:10, 559:15, 559:24, 560:15, 562:14
**widgets** [2] - 561:9
**WILLIAMS** [1] - 451:21
**Williams** [1] - 455:16
**Williams-Sonoma** [1] - 455:16

601

**willing** [2] - 524:21, 533:4

**wishes** [2] - 478:14, 486:14

**WITNESS** [26] - 466:2, 467:11, 472:3, 472:5, 490:6, 491:21, 505:4, 518:20, 535:22, 535:25, 543:25, 544:23, 545:3, 545:8, 548:4, 549:11, 549:20, 549:22, 550:2, 552:11, 564:24, 566:7, 566:14, 566:17, 570:15, 571:18

**witness** [15] - 468:15, 469:9, 472:19, 472:23, 473:3, 473:12, 473:16, 474:5, 487:9, 488:7, 496:18, 509:7, 513:3, 513:15, 573:4

**witnesses** [4] - 573:10, 573:15, 573:17, 576:2

**word** [3] - 488:23, 499:18, 546:1

**words** [5] - 533:15, 533:17, 538:1, 544:20, 547:23

**works** [8] - 468:5, 473:2, 506:23, 542:22, 543:7, 548:20, 551:9, 561:24

**world** [10] - 471:2, 493:12, 502:22, 523:12, 528:21, 528:22, 529:11, 542:4, 542:8, 550:4

**worried** [3] - 537:3, 537:17, 537:20

**worries** [1] - 566:23

**worry** [1] - 544:18

**write** [15] - 454:2, 454:13, 454:25, 459:17, 470:14, 471:18, 490:24, 491:2, 491:6, 495:15, 498:11, 501:16, 501:20, 504:2, 506:1

**writes** [5] - 470:24, 471:7, 497:4, 497:5, 497:24

**writing** [6] - 471:16, 471:17, 473:11, 523:12, 537:12, 539:1

**written** [2] - 460:25, 480:18

**wrote** [23] - 453:6, 453:14, 453:23, 454:4, 454:7, 454:19, 457:5, 457:10, 457:11,

459:22, 466:13, 470:19, 471:22, 472:13, 480:16, 495:12, 495:23, 497:12, 498:6, 498:15, 498:17, 501:13

## Y

**Yahoo** [5] - 493:2, 493:21, 494:8, 497:12, 498:8

**Yahoo!** [1] - 461:16

**year** [4] - 503:4, 503:8, 530:2, 530:4

**years** [16] - 465:15, 492:10, 496:3, 517:9, 517:24, 518:24, 519:5, 519:12, 522:2, 525:24, 532:11, 536:23, 536:24, 545:19, 548:19, 571:8

**yellow** [2] - 555:7, 556:19

**yesterday** [11] - 474:19, 478:7, 484:5, 484:8, 493:19, 494:22, 495:5, 501:1, 501:6, 506:11, 563:9

**Yoo** [2] - 573:4, 573:12

**York** [3] - 455:16, 456:4, 456:12

**younger** [1] - 552:25

**yourself** [2] - 494:25, 515:6

## Z

**zero** [2] - 516:25, 563:13