```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
      United States of America,    )
 3    et al.,                      )      PUBLIC
                                   )
 4                    Plaintiffs,  )
                                   )  CV No. 20-3010
 5                       vs. )  Washington, D.C.
                                   )  September 15, 2023
 6    Google LLC,                  )  9:30 p.m.
                                   )
 7                    Defendant.   )
      _____)
 8

 9                 TRANSCRIPT OF BENCH TRIAL
                BEFORE THE HONORABLE AMIT P. MEHTA
10                 UNITED STATES DISTRICT JUDGE

11    APPEARANCES:
      For DoJ Plaintiffs:      Kenneth M. Dintzer
12                             U.S. DEPARTMENT OF JUSTICE
                               1100 L Street, NW
13                             Washington, D.C.
                               (202) 307-0340
14                             Email: Kenneth.dintzer2@usdoj.gov

15                             Erin Murdock-Park
                               U.S. DEPARTMENT OF JUSTICE
16                             Antitrust Division
                               450 Fifth Street NW
17                             Washington, DC  20530
                               (202) 445-8082
18                             Email: Erin.murdock-park@usdoj.gov
      For Plaintiff
19    State of Colorado:       William F. Cavanaugh, Jr.
                               PATTERSON BELKNAP WEBB & TYLER LLP
20                             1122 Avenue of the Americas
                               Suite 2200
21                             New York, NY  10036
                               (212) 335-2793
22
      For Defendant Google:    John E. Schmidtlein
23                             WILLIAMS & CONNOLLY LLP
                               725 12th St., NW
24                             Washington, D.C. 20005
                               (202) 434-5000
25                             Email: Jschmidtlein@wc.com
```

```
 1    Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
                                 Official Court Reporter
 2                               United States Courthouse, Room 6523
                                 333 Constitution Avenue, NW
 3                               Washington, DC  20001
                                 202-354-3267
 4                                    *   *   *
```

884



885



886





888









892





894





896





898



899



900













906













912





914



915



916



917



918





920













926









930





932











937



938





940





942









946



947



948









952



953







```
 1
 2
 3
 4
 5
 6
```

 7          (The following proceedings were held in open session:)

 8               MS. MURDOCK-PARK:  May I resume, Your Honor?

 9               THE COURT:  You may.  Thank you.

10                    DIRECT EXAMINATION (Cont.)

11     BY MS. MURDOCK-PARK:

12     Q.  Mr. Kolotouros, I would like to change subjects entirely

13     and talk about your written communications when you were

14     working at Google.

15     A.  Okay.

16     Q.  You've worked at Google for about 20 years?

17     A.  That is correct.

18     Q.  And you were placed on a legal hold in December 2019,

19     during the investigation in this case?

20     A.  Yes.

21     Q.  Placed on another legal hold in January 2021, after the

22     lawsuit was filed?

23     A.  That is correct.

24     Q.  But for over a decade before that, you'd worried about

25     being deposed in an antitrust investigation, right?

1    A.  I recognize that Android was -- had been exposed to

2    potential regulatory action, so I was sensitive to how we

3    conducted the business and what might happen as a result of

4    that.

5    Q.  Okay.  So for -- but for -- you had those concerns for over

6    a decade, right?

7    A.  Since my -- since I joined Android, that was something I

8    was sensitive to, yes.

9    Q.  And because you were concerned about being deposed in an

10   antitrust investigation into Google, you worked to protect

11   Google, right?

12   A.  I wouldn't say I was worried about being deposed.  I was

13   worried that that might be something that might happen as a

14   result of my being in Android.

15   Q.  Okay.  But you worked to protect Google, didn't you?

16   A.  I would say I worked to administer and work within the

17   Android ecosystem in a way that I thought was appropriate, yes.

18   Q.  Okay.  So, just to make sure I'm on the same page, you

19   agree that you worked to protect Google or you disagree?

20   A.  I agree that I did everything I can to make sure that we

21   were doing things in the best possible way for Google and for

22   Android, yes.

23   Q.  So -- and I just want to make sure, because I don't think

24   you're quite answering my question, Mr. Kolotouros.

25           Are you saying you did not work to protect Google?

 1    A.  I think it's safe to say I was working to protect Google

 2    and preserve what the Android ecosystem was meant to deliver to

 3    the ecosystem and to Google.

 4    Q.  Okay.  You wanted to protect Google because you're a loyal

 5    employee, correct?

 6    A.  I think it goes beyond loyalty to wanting to protect the

 7    company.  It's also how we administered the ecosystem to make

 8    sure it was healthy and strong.

 9    Q.  Do you consider yourself to be a loyal Google employee?

10    A.  After 20 years of employment, I believe I'm a loyal

11    employee, yes.

12    Q.  So as a loyal employee, to protect Google you took steps to

13    prevent your written communications from being produced in

14    discovery, right?

15    A.  I don't know if I would frame it that way.

16    Q.  Well, you took steps to copy attorneys on all emails that

17    discussed the MADA, right?

18    A.  Whenever I was discussing anything over email that

19    discusses contracts or commercial terms -- well, mainly

20    contracts or what we focus on, memorialize within my particular

21    part of the business, I would copy an attorney to ensure that

22    my interpretation or characterization of what was discussed in

23    the email was accurate; and if not, invited the attorney to

24    weigh in, if possible, yes.

25    Q.  Okay.  So, you also then copied attorneys on all emails

 1    that discussed the RSAs?

 2    A.  If a contract was being discussed, I would traditionally

 3    copy in an attorney to either ask them a specific question or

 4    invite them to weigh in -- or even unprompted weigh in on

 5    whether or not I'd interpreted the substance of the email

 6    correctly.

 7    Q.  Your job since 2014, at Google, has been working on Android

 8    contracts, right?

 9    A.  Android partners, Android OEMs, some Silicon partners as

10    well.  But, yes, predominantly.

11    Q.  You have instructed other Google employees to copy

12    attorneys on any written communications discussing MADA and

13    RSA; correct?

14    A.  I don't know that I instructed them personally.

15    Q.  Okay.  If we could go to UPX320, which is in evidence.

16         UPX320 is a slide deck titled Android Mobile Search and

17    Assistant Revenue Share Training Agreement.

18    A.  Yes.

19    Q.  Revenue Share Agreement Training, sorry.

20         Do you recall presenting at this training,

21    Mr. Kolotouros?

22    A.  I do.

23    Q.  Do you recall presenting a bright red slide?

24    A.  I do not know if I presented this particular slide.

25    Q.  Okay.  If we could please go to page 102.  Actually, my

1     apologies.

2            Could we go to page 101 first?

3            And 101 is Legal Language Review, and it lists Jim

4     Kolotouros and Helen Tsao, right?

5                THE COURT:  And 701 is the Bates number.

6                THE WITNESS:  The Bates is 701?  Thank you.

7     BY MS. MURDOCK-PARK:

8     Q.  Correct.  You're listed as one of the presenters of Legal

9     Language Review?

10    A.  Yes.

11    Q.  And then, if we go to the next slide, which is page 102,

12    that's the bright red slide we were just talking about?

13    A.  Yes.

14    Q.  And the red slide was presented more than once during this

15    training, correct?

16    A.  I believe it appears earlier in the presentation, but also

17    here as well.

18    Q.  And it appears four times total in the slide deck, does

19    that sound right?

20    A.  I haven't tallied it up, but --

21    Q.  Okay.  Who instructed you to add the red slide to this

22    training?

23    A.  No one instructed me to include it.  I think it was just

24    made part of the deck.

25    Q.  Okay.  Just appeared there?

1    A.  I didn't assemble the deck itself, given there's a lot of

2    content in the deck.  But, it was inserted into the deck, yes.

3    Q.  So the slide is titled Reminder of Confidentiality, right?

4    A.  Yes.

5    Q.  And the paragraph at the bottom of slide 102 starts:

6    Additionally, any written communication regarding Revshare and

7    MADA should include legal.

8         Correct?

9    A.  That is correct.

10   Q.  So your instruction to other Google employees was to add

11   recipients to written communications to increase

12   confidentiality?

13   A.  I think the instruction to include legal is because it is

14   specific to revenue share and MADAs that are all commercial

15   contracts that are entered into with partners across carriers

16   and OEMs.

17   Q.  Okay.  But, the red slide does not say to include attorneys

18   in all meetings that discuss MADA or RSAs, right?

19   A.  It does not, no.

20   Q.  The instructions on the red slide were part of Google's

21   Communicate With Care policy?

22   A.  I don't know if this particular slide made its way into

23   Communicate With Care training which is offered to Google

24   employees generally.

25   Q.  Mr. Kolotouros, you followed the red slide's instructions

1    to include attorneys on any written communication regarding

2    Revshare and MADA.  Do you agree with that?

3    A.  I generally, when discussing contractual terms, whether it

4    be MADA or RSA or other types of contract, include an attorney

5    in such communication, yes.

6    Q.  Okay.

7              MS. MURDOCK-PARK:  Okay.  We can go ahead and take

8    down UPX320 and go to UPX713, which, I, believe there is a

9    relevancy and a speculation objection.

10             THE COURT:  What's the number again?

11             MS. MURDOCK-PARK:  UPX713.

12             THE COURT:  Okay.

13             MR. SCHMIDTLEIN:  This document has --

14             THE COURT:  It's easier if you're near the mic and at

15   the table.  That's one place to do, at least.  That's one

16   access point.

17             MR. SCHMIDTLEIN:  This document has to do with

18   unrelated regulatory issues in Australia.  This has nothing to

19   do with the competition issues that bring us here today.

20             THE COURT:  Okay.

21             MS. MURDOCK-PARK:  Your Honor, the question I have

22   for Mr. Kolotouros is at the very top from his email, which, I

23   believe, ties directly to what we're discussing.

24             THE COURT:  Okay.  I see that.  Okay.

25             MS. MURDOCK-PARK:  If we could pull up UPX713.

1          THE COURT:  So, at least that portion of the email

2    will be admitted.  And the objection is overruled as to that

3    portion of the email.

4          MS. MURDOCK-PARK:  Thank you, Your Honor.

5          If we could go to the e-mail from Mr. Kolotouros

6    dated November 17th, 2020.

7    BY MS. MURDOCK-PARK:

8    Q.  And there is an email that you write:  Attorney-client

9    privilege, adding Rosie.

10          Do you see that?

11   A.  I do.

12   Q.  Rosie Lipscomb is an attorney?

13   A.  That's correct.

14   Q.  And you write:  Adding Rosie as the current path will

15   impact the messages Samsung conveys to the DoJ, and the impact

16   of MADA on their devices, business, and users.

17          So when replying on UPX713, you thought to add an

18   attorney?

19   A.  That is correct.

20   Q.  And you understood that Google's current path could cause

21   Samsung to cooperate with the DoJ in this case, right?

22   A.  I wouldn't interpret that from what I write.

23   Q.  Okay.  Well, this was right after the complaint was filed,

24   correct?

25   A.  The date on this is?

1    Q.   November 17th, 2020.

2    A.   Got it.  I just think that the Paletino situation in

3    Australia was a complicated one, and I wanted to make sure that

4    we had an accurate characterization of what was being conveyed

5    to Samsung in connection with it.

6    Q.   But you were specifically worried about what Samsung would

7    tell the DoJ, right?

8    A.   I don't know if I was worried as much as I wanted to make

9    sure that we had a proper discussion on how Paletino could

10   impact how Samsung is interpreting global obligations around

11   the world with respect to the MADA.

12   Q.   Okay.  We reviewed UPX713 in your third deposition, right?

13   A.   I don't recall if it came up or not.

14   Q.   You do recall being deposed for the third time after DoJ

15   received thousands of belatedly deprivileged documents from

16   Google?

17   A.   I recall being deposed a third time, yes.

18   Q.   We can go ahead and take UPX713 down.

19        Mr. Kolotouros, you discussed MADAs and RSAs over email,

20   but you also discussed MADAs and RSAs over Chat, right?

21   A.   Not substantively, no.

22   Q.   You're saying you never substantively discussed MADA and

23   RSA over Chat?

24   A.   I find it difficult to engage in substantive conversations

25   over Chat, period, with respect to any topic, given the format

1     and the interaction model, which is why I rely on meetings or

2     emails or face-to-face conversations.

3     Q.  If we could pull up UPX8071.

4          And this is a declaration that you wrote in this case,

5     correct?

6     A.  Yes.

7     Q.  Okay.

8          MS. MURDOCK-PARK:  And there's a relevance objection

9     to this, Your Honor.

10          MR. SCHMIDTLEIN:  They want to ask him about it, but

11     I'm not sure -- now that he's on the stand, I don't know if

12     they need to admit his declaration.

13          THE COURT:  I suppose the proper way of doing it is

14     asking, and then -- if he denies it, then you can --

15          MS. MURDOCK-PARK:  I am going to ask questions about

16     the document, Your Honor.

17          THE COURT:  Okay.

18          MS. MURDOCK-PARK:  It is not in the binder, so if I

19     may approach to --

20          THE COURT:  Sure.

21          THE WITNESS:  Thank you.

22     BY MS. MURDOCK-PARK:

23     Q.  If we could go to paragraph 5 of UPX8071.  And if you could

24     look at the language that is at the last sentence on

25     paragraph 5, into the second page.

1          And you write -- or, actually, the entire thing.

2          You say:  From May 1, 2019 to the present, I do not

3     recall any specific instances in which I initiated

4     communication about substantive matters relevant to the

5     above-captioned cases over Google Chat with history off.  From

6     time to time there have may have been some instances in which

7     another employee initiated communication with me about

8     substantive matters relevant to the above-captioned cases over

9     Google Chat with history off, but I do not recall the specifics

10    of any such instance, and I do not recall changing the settings

11    for such Google chats.

12          Right?

13    A.  Yes.

14    Q.  So other employees may have reached out to you to discuss

15    substantive matter over Chat, right?

16    A.  Yes.

17    Q.  So you may have discussed those chats -- or, may have

18    discussed MADA and RSA on those chats?

19    A.  I think I traditionally, or generally, would have deflected

20    or diverted to an email to have a substantive conversation or

21    to a live Chat -- a live conversation, excuse me.

22    Q.  When you say "generally," that does not mean all the time,

23    correct?

24    A.  I can't recall instances where we had substantial

25    conversations over Chat on MADA and RSA.

1          MS. MURDOCK-PARK:  Your Honor, I move to admit

2     UPX8071.

3          MR. SCHMIDTLEIN:  No objection.

4          THE COURT:  All right.  So, it will be admitted.

5     BY MS. MURDOCK-PARK:

6     Q.  So, you mention here "Chat with history off."

7          Google Chat used to be known as Hangouts, right?

8     A.  Yes.

9     Q.  And before February 2023, Google's corporate policy was to

10    default the preservation settings on chats to history off, right?

11    A.  That is correct.

12    Q.  History-off chats would automatically be deleted after

13    24 hours?

14    A.  I don't know what the precise implementation was with

15    respect to deletion or maintenance of chats.

16    Q.  Okay.

17          MS. MURDOCK-PARK:  I would like to go to UPX1088.

18    And this is the Chat Retention Policy, which, I believe,

19    there's another relevance objection.

20          MR. SCHMIDTLEIN:  No objection.  We'll withdraw it.

21          MS. MURDOCK-PARK:  If I may approach?

22          THE COURT:  Okay.

23          THE WITNESS:  Thank you.

24    BY MS. MURDOCK-PARK:

25    Q.  And I would like to draw your attention to the top half of

1   UPX1088, where it shows:  Policy last modified November 18,

2   2020.

3            Do you see that in the very top?

4   A.  Yes.

5   Q.  And the Google Chat Retention Policy wasn't made into a

6   separate policy until November 18th, 2020, right?

7   A.  That's the date I see with the policy being modified, yes.

8   Q.  And under Retention Periods it reads:  A Chat message

9   remains in your view for the following periods, based on sent

10   date, after which it's automatically removed.

11            Do you see that?

12   A.  I do, yes.

13   Q.  And it says:  24 hours, if history is off.

14            Right?

15   A.  Yes.

16   Q.  So if history is off, chats would be deleted every

17   24 hours?

18   A.  I believe that's what the policy states, yes.

19   Q.  Okay.  And history-off chats would be deleted after

20   24 hours, even if someone was on litigation hold, right?

21   A.  I believe that is correct, yes.

22   Q.  And before February 2023, your Chat history default -- or,

23   your Chat default was set to history off, right?

24   A.  I believe so, yes.

25   Q.  And before February 2023, you do not recall ever turning

1    your Google Chat history to history on, right?

2    A.  I do not, that is correct.

3    Q.  But you were aware that you were on litigation hold?

4    A.  I was.

5    Q.  You were actually on more than one litigation hold, right?

6    A.  Yes.

7    Q.  Before Google changed its corporate policy in February

8    2023, what steps did you take to preserve your history of

9    chats?

10   A.  I generally tried to avoid conversations over Chat with

11   history off that dealt with substantive business matters,

12   period.

13   Q.  But, you generally tried to avoid conversations.  That, we

14   just established.  That doesn't mean you didn't have

15   conversations, right?

16   A.  I don't recall specific conversations with history being

17   off where I was having substantive business conversations on

18   topics.

19   Q.  Okay.  But you don't know if you actually had any

20   conversations, right?

21   A.  I can't recall.

22   Q.  If you had a history-off conversation on Chat, would you

23   have attempted to preserve it?

24   A.  If it was substantive, I think I would have tried to

25   preserve it.  But, at the same time, I don't recall having

970

1    substantive business conversations.

2    Q.  How would you have tried to preserve a substantive business

3    conversation on Chat?

4    A.  It would have been to turn history on.

5    Q.  And you never turned history on, correct?

6    A.  I do not recall having turned history on.

7    Q.  Now, you use Google Chat frequently, right?

8    A.  I do.

9    Q.  And several times a day?

10   A.  Yes.

11   Q.  You use Google Chat with your coworkers?

12   A.  I do.

13   Q.  And have any of your coworkers ever asked you to have a

14   history-off Chat?

15   A.  I can't recall.  I don't generally remember all my chats.

16   But I can't recall any offhand.

17   Q.  Okay.  You know that some of your coworkers intentionally

18   take chats about MADA or RSA to history off, right?

19   A.  I'm not aware of that.

20   Q.  Okay.

21               MS. MURDOCK-PARK:  We can go ahead and take down

22   UPX1088.

23               And I want to move to admit, if --

24               THE COURT:  1088 is admitted.

25               MS. MURDOCK-PARK:  Thank you.

1    BY MS. MURDOCK-PARK:

2    Q.  Mr. Kolotouros, you also use Google Chat with your

3    supervisors, correct?

4    A.  Yes.

5    Q.  Okay.  And including your former supervisor, Jamie

6    Rosenberg?

7    A.  Yes.

8    Q.  And you have used Chat with Mr. Rosenberg to discuss

9    Samsung revenue share, right?

10   A.  I can't recall precise instances where I have, but I

11   imagine so, yes.

12   Q.  Mr. Rosenberg also kept his Chat default set to history

13   off, right?

14   A.  I do not know what Mr. Rosenberg set his Chat history to.

15   Q.  Do you recall him ever asking to turn Chat history on?

16   A.  I don't recall him ever asking to turn Chat history on.

17   Q.  You use Google Chat to discuss business with individuals

18   outside of Google, right?

19   A.  No.  That is something I try to avoid generally.

20   Q.  Okay.  So have you ever used Google Chat with an OEM?

21   A.  I think maybe I can count on one hand the number of times I

22   received a Chat from an OEM partner.

23   Q.  Have you ever used Google Chat with anyone at Samsung?

24   A.  Yes.  On personal -- on my personal Chat I have, yes.

25   Q.  But on Google Chat specifically.

1    A.  I don't think so.  Meaning, the exclusive nature of my

2    chats is always with Google employees.  And I'm always

3    surprised when I see someone send a Chat message that is not a

4    Google employee, and that's a very, very, very limited number

5    of times.

6    Q.  You're aware that members of your team used history-off

7    Chat to discuss business with Samsung, right?

8    A.  I am not aware of that.

9    Q.  Are Google employees allowed to use history-off Chats with

10   OEM partners when talking about business?

11   A.  Can you repeat the question, please?

12   Q.  Sure.  Are Google employees allowed to use history-off

13   Chats with OEM partners when talking about business?

14   A.  Are they on a litigation hold or not?

15   Q.  Just generally.

16   A.  I am not familiar with the Chat practices of my colleagues

17   or my employees or team members.

18   Q.  Well, I'm not asking about the actual practices.  I'm

19   talking about Google corporate policy.

20        As a matter of policy, are employees allowed to use

21   history-off Chat with individuals outside of the company to

22   discuss business?

23   A.  I'm actually not sure what the corporate policy is with

24   respect to Google Chat and outside companies.  I'm not sure

25   what the actual policy is.

```
 1    Q.  Okay.  And you personally have --
 2    A.  I -- with respect to third-party Chat services, I think
 3    it's prohibited.  With respect to Google services is where I
 4    don't know what the actual policy is.
 5    Q.  You personally have requested to take conversations off of
 6    email and onto history-off Chat, right?
 7    A.  Off of -- I've requested to have conversations taken off,
 8    you know, to live conversations or meetings.  I don't think
 9    I've ever requested to go to a history-off Chat.
10    Q.  Okay.
11              MS. MURDOCK-PARK:  If we could pull up UPX710.
12              And this is another relevance objection.  And --
13              MR. SCHMIDTLEIN:  No objection, Your Honor.
14              MS. MURDOCK-PARK:  Okay.
15              THE COURT:  710 will be admitted.
16              MS. MURDOCK-PARK:  Thank you, Your Honor.
17    BY MS. MURDOCK-PARK:
18    Q.  UPX710 is a email from Yuki Richardson.  Ms. Richardson is
19    a finance director at Google?
20    A.  That is correct.
21    Q.  And her email is Sugawara@google.com because her maiden
22    name was Sugawara?
23    A.  I believe that's true, yes.
24    Q.  And Ms. Richardson was responding to an email thread that
25    you're on dated March 13th, 2021?
```

1    A.  Yes.

2              MS. MURDOCK-PARK:  And there are some redactions in

3    this email, Your Honor, but they are not about anything we're

4    talking about.

5    BY MS. MURDOCK-PARK:

6    Q.  I would like to draw your attention to the bottom of page 1

7    through the top of page 2, where you're responding in the email

8    chain, correct?

9    A.  Yes.

10   Q.  And you responded in the chain that the conversation was

11   best discussed off email?

12   A.  Yes.

13   Q.  And you asked to take the conversation to Google Chat.

14   A.  Or Hangouts, yes.

15   Q.  And Hangouts is another -- I guess, is the -- what Google

16   Chat used to be referred to?

17   A.  I also treat Hangouts to be the video conferencing service,

18   yes.

19   Q.  Okay.  But, you knew that your Chat -- when you asked to

20   take the conversation to Google Chat, that your Chat would be

21   erased every 24 hours, right?

22   A.  I don't know if that's what I was thinking at this point in

23   time.

24   Q.  But you knew that to be true, that your Chats would be gone

25   after a day?

1    A.  I recognize that history off did not preserve the Chat,

2    yes.

3    Q.  Okay.  That's because deleting chats every 24 hours is the

4    default?

5    A.  I knew that history off meant that the conversation was not

6    preserved, generally, yes.

7    Q.  Okay.  So with respect to using history-off chats, you just

8    went along with the default, right, Mr. Kolotouros?

9    A.  Yes.

10   Q.  Okay.

11        MS. MURDOCK-PARK:  No further questions, Your Honor.

12   I pass the witness.

13        THE COURT:  All right.

14        Mr. Schmidtlein?

15                    CROSS-EXAMINATION

16   BY MR. SCHMIDTLEIN:

17   Q.  Mr. Kolotouros, on that last email that Counsel just showed

18   you, UPX710 --

19        We don't need to put it up.

20        -- but, can you read what the subject line of that email

21   is?

22   A.  Samsung Wear Play Revshare Next Steps.

23   Q.  What does "Samsung Wear Play" refer to?

24   A.  Samsung Wear Play refers to a contractual negotiation that

25   was specific to Samsung wearable devices or watches that were

1    moving to be a collaborative effort with Wear OS, and we were

2    discussing the Play revenue share negotiation and percentages.

3    Q.  Does this document have anything to do with Google's MADA?

4    A.  It does not.

5    Q.  Does this document have anything to do with Google's search

6    revenue share agreements?

7    A.  Search revenue share agreements, no.

8    Q.  We have spent some time here over the last two days going

9    through Google's RSA agreements and MADA agreements with

10   various partners, including Samsung and Motorola.  Would you

11   agree or disagree that those contracts are complex?

12   A.  I would agree that they are complex.

13   Q.  Would you agree or disagree that even amongst Google

14   employees who are involved in those contracts on a regular

15   basis, they are difficult to sometimes understand and even

16   discuss?

17   A.  Yes.

18   Q.  In light of that, do you believe that Chat is -- would be

19   an effective means for having substantive communications about

20   RSAs or MADAs?

21   A.  No.

22   Q.  Mr. Kolotouros, you testified yesterday in reference to a

23   consistent user experience.  Do you recall that?

24   A.  I do.

25   Q.  And I believe you testified that one of the reasons, or the

1    purposes, of the MADA is to provide a consistent user
2    experience; is that right?
3    A.  Yes.
4    Q.  Can you describe for the Court what you meant by a
5    "consistent user experience"?
6    A.  The consistent user experience is meant to assure OEMs and
7    users that, if they're moving from one Android phone to
8    another, whether it be by one OEM's line of devices or another
9    OEM's line of devices, that there is a predictable set of
10   utility in UI that is available out-of-box that increases the
11   preference for that particular user to engage with Android
12   devices amongst different OEMs.
13          So the consistent user experience not just refers --
14   does not refer only to the UI, but also to the existence of
15   applications which have been proven to be popular and are
16   expected on a smartphone and how it's configured.
17   Q.  And does Google believe that providing a consistent user
18   experience across Android devices is important to compete with
19   Apple devices?
20   A.  Yes.
21   Q.  Why is that?
22   A.  The extent to which a user does not know what to expect or
23   does not identify or find services that are expected on the
24   device would render the device out-of-box to be potentially
25   unattractive or not palatable and might migrate them to switch

1    from Android to Apple.  And, so, that predictability or

2    consistency of experience is important to stay competitive.

3    Q.  Do Apple devices across releases, different versions of the

4    iPhone, do those typically provide a consistent user

5    experience?

6    A.  My understanding is that they do.

7    Q.  Is that one of the strengths of Apple's competition, is

8    being able to provide that consistent user experience?

9    A.  My understanding is that when it comes to Apple devices and

10   going from device to device, the quote used is, quote, It just

11   works.  Meaning, there's an elegance to the movement from Apple

12   to Apple phone which makes it very, very easy to continue on an

13   Apple phone, which we try to compete against by having

14   consistent experience and high-quality services available on a

15   device.

16   Q.  Okay.

17            MR. SCHMIDTLEIN:  Your Honor, I would like to hand up

18   DX738 and 739.

19            MS. MURDOCK-PARK:  Your Honor, for the record, these

20   were given to us this morning, so we haven't had a chance to

21   review them.

22            MR. SCHMIDTLEIN:  We'll make a proffer here, Your

23   Honor.  Hopefully, we'll get to this.

24            Your Honor, you asked some questions yesterday of

25   Mr. Kolotouros about some certain contractual provisions and

 1    when -- whether those provisions limited what certain OEMs

 2    could communicate to users in terms of, you know, ways in which

 3    they could either remove things, add things, delete things to

 4    their devices.

 5             THE COURT:  Right.

 6             MR. SCHMIDTLEIN:  And in response to that, our team

 7    pulled together these -- these documents, and that's why we've

 8    provided them first thing this morning.  And I can have

 9    Mr. Kolotouros explain.  I think one of them is a Samsung web

10    page and another is a Motorola web page of content that you can

11    reach -- users can reach to learn about how they can configure

12    their devices.  So, we would move them into evidence.

13             THE COURT:  I'll admit them just based upon the fact

14    that I've been --

15             Obviously, if you all want the opportunity to bring

16    something else forward, you're welcome to do so.

17             MS. MURDOCK-PARK:  Thank you, Your Honor.

18    BY MR. SCHMIDTLEIN:

19    Q.  Mr. Kolotouros, can you just briefly describe for the Court

20    what Exhibits 738 and 739 are?

21    A.  They depict off-device help screens, or help pages, on how

22    devices -- both Samsung and Motorola devices can be configured

23    and customized for the user, including the home screen.

24    Q.  Do they give instructions to the user about how to add or

25    delete applications?

1    A.  They do, including a YouTube video on page 2 of the -- of

2    738.

3    Q.  And if you could put 739 up.

4         And 739 is a Motorola help page with respect to the Moto

5    X Force.

6         What is the Moto X Force, if you know?

7    A.  The Moto X Force, I believe, is a phone.  This is a very

8    old phone with the latest update to Android 6 Marshmallow.  So,

9    this a very old phone from seven, eight, maybe six years ago,

10   and the customizations of home screen options and instructions

11   for the user.

12   Q.  And if you go down just below the picture on that first

13   page, where it starts with:  The latest update.

14        Can you read that in the record?

15   A.  "With the latest update to Android 6 Marshmallow, users now

16   have the option to remove the Google search bar from the home

17   screen and control if an app, such as messaging, email, or

18   voicemail, will display the count of unopened messages."

19   Q.  Can you describe what direction that is providing?

20   A.  It is providing clarity with respect to the new Android

21   update, new Android release, and how the Google search bar can

22   be removed from the home screen.

23             MR. SCHMIDTLEIN:  No further questions, Your Honor.

24             THE COURT:  Any redirect?

25             MS. MURDOCK-PARK:  Briefly, Your Honor.

```
 1                    REDIRECT EXAMINATION

 2    BY MS. MURDOCK-PARK:

 3    Q.  Mr. Kolotouros, did you see DX738 or DX739 before your

 4    testimony today?

 5         Those are the documents your counsel just handed to you.

 6    A.  Oh, I'm sorry.  No, I did not.

 7    Q.  Have you ever personally visited those websites?

 8    A.  I have not.

 9    Q.  When did you first learn that Samsung provided users with

10    directions on how to remove a search widget?

11    A.  How to remove a?

12    Q.  Search widget.

13    A.  This is the first time I'm seeing the actual web pages that

14    show how to remove a search engine.

15    Q.  Have you ever personally attempted to remove a search

16    widget from an Android phone?

17    A.  Yes.

18    Q.  And DX738 and DX739 show that it takes multiple steps to

19    remove a search widget, right?

20    A.  I don't -- the experience on my Samsung S23 is just the

21    long press and the delete.

22    Q.  Okay.  Well, if we could look at UPX738, the top of the

23    second page.

24         It says that:  Available screens and settings may vary

25    by wireless search provider, software version, and device
```

1    model.

2           Right?

3    A.  Yes.

4    Q.  And a user has to first go to the Samsung website to find

5    the instructions, and then might have to go elsewhere to learn

6    how to actually delete the widget?

7    A.  I think general navigation on a device is understood by

8    users, including how to remove apps or delete icons.  So, I

9    don't know if a precondition for that fluency or knowledge is

10   coming to this particular page.

11   Q.  Okay.  But, my question was:  If a user wanted to learn how

12   to delete the widget, they would first have to know to go to

13   the Samsung website, right?

14   A.  That also might be available in the settings or the help on

15   the phone -- the on-device help as well.

16   Q.  There's instructions on the phone on how to remove the

17   widget?

18   A.  I don't know if the settings would then link out to a

19   website.  It's not an experience I've encountered myself.  I'm

20   not sure.

21   Q.  That's not prohibited by the MADA, to provide instructions

22   to a user on how to delete the search widget?

23   A.  I think that if the help or settings function on a phone

24   linked out to a page that had this, that would not be a

25   problem.

```
 1    Q.  But you do not actually know, right?

 2    A.  I do not actually know precisely.

 3    Q.  And I had shown you UPX710, and your counsel asked you a

 4    question about to what the email referred, and you said it

 5    referred to wearables, right?

 6    A.  Yes.

 7    Q.  Are you aware that wearables were part of the Department of

 8    Justice's complaint?

 9    A.  I was not.

10    Q.  Okay.  So, were documents related to wearables part of your

11    litigation hold in this case?

12    A.  I do not recall.

13    Q.  Okay.

14              MS. MURDOCK-PARK:  No further questions.

15              THE COURT:  All right.  Mr. Kolotouros, thank you

16    very much for your time and your testimony.  And safe travels

17    home.

18              THE WITNESS:  Thank you.

19              THE COURT:  All right, everyone.  So, I think it

20    makes sense for us to pause our proceedings for the week.  So

21    we'll resume again Monday morning at 9:30.

22              Mr. Cavanaugh?

23              MR. CAVANAUGH:  Your Honor, if I could just move in

24    the unobjected-to exhibits.  I have our list, if I could just

25    hand that up.
```

1          THE COURT:  Sure.

2          MR. CAVANAUGH:  And that's been provided by counsel

3     to Google.  Thank you, Your Honor.

4          THE COURT:  Thanks, Mr. Cavanaugh.

5          MR. DINTZER:  And, Your Honor, as long as we are sort

6     of doing exhibit list cleanup, if we could -- during my

7     discussion with Dr. Varian, we discussed UPX1066, which was a

8     slide deck that had had a relevancy objection that, I believe,

9     the Court overruled and -- but, we didn't actually move it in,

10    and we would like to go ahead and move it in now.  We could put

11    it up so the Court would have it.  It's this one.

12          And the Court said, I don't think there's a relevancy

13    objection, so I don't think we actually moved it in.

14          THE COURT:  Okay.

15          MR. SMURZYASKI:  Your Honor, if I could address that.

16    I believe the way we resolved it was there was a foundation

17    objection using it with the witness who was there, and we moved

18    on from it.  So moving a document in just sort of now, at

19    random, doesn't seem appropriate.  If they want to use it with

20    a witness and can establish the witness knows something about

21    it, then we can have that discussion.  But, just moving it in

22    in the ether, as it were, seems to be not how we're proceeding

23    in this case.

24          MR. DINTZER:  Your Honor, we moved -- both sides

25    moved over 1,000 documents in without witnesses, and the Court

1    said, for the push, as long as the objections were taken care

2    of, which we have, that the document should come into evidence.

3              THE COURT:  Well, a couple things.  One is, my notes

4    reflect Dr. Varian couldn't recall whether he had had antitrust

5    training and didn't specifically recall this document.

6              MR. DINTZER:  That is correct, Your Honor.

7              THE COURT:  So we have that.  And so, then, the

8    question is, is there an objection to moving this in through

9    stipulation?

10             MR. DINTZER:  There's no standing objection, Your

11   Honor.  The only objection that they had in the objections that

12   they provided us was relevancy.  And it's a 2011 document that

13   has a slide that says:  Thou shalt not say scale, thou shalt

14   not -- it's clearly relevant.  So at that point, based on the

15   rules of the game, we would like to move it in.

16             THE COURT:  Well, I'm not disagreeing with the notion

17   that you necessarily need a witness to move something in.  I'm

18   just asking whether there's any objection otherwise?

19             MR. SMURZYASKI:  Your Honor, we're not going to stand

20   on the relevance objection.  Obviously, talk about the

21   significance of it at some point.

22             THE COURT:  Sure.

23             MR. SMURZYASKI:  Perhaps with a witness, perhaps not.

24   But, we're not standing on the relevance objection.

25             THE COURT:  Very good.  All right.  So, UPX1066,

 1     we'll admit that.

 2               MR. DINTZER:  Thank you, Your Honor.

 3               THE COURT:  I think the last housekeeping matter, Mr.

 4     Schmidtlein, concerned the market shares and what Google's

 5     position is on that.

 6               MR. SCHMIDTLEIN:  Yes, Your Honor.  Let me see if I

 7     got this right.  So, I think one of the -- I think there's two

 8     market shares that we're talking about.

 9               THE COURT:  Right.

10               MR. SCHMIDTLEIN:  One is on page 42 of Your Honor's

11     opinion.  This -- this is a sensitive number, just as when

12     during the last session that was closed and we discussed with

13     Mr. Kolotouros a certain percent of search that came through a

14     certain access point --

15               THE COURT:  Right.

16               MR. SCHMIDTLEIN:  -- we view this in very much a

17     similar vein.  And in light of the fact -- so, I think we have

18     that, number one.

19               Number two, I think in light of the fact, as Your

20     Honor recognizes in your footnote, that plaintiffs seem to

21     implicitly concede that the foreclosure analysis should not

22     include the searches through that access point that's reflected

23     in that percentage, I guess I would argue that I don't think

24     this is so critically important or relevant to Your Honor's

25     disposition on this issue that it needs to be publicly

1      revealed.

2                  THE COURT:  Okay.

3                  MR. SCHMIDTLEIN:  So, again, sort of balancing those

4      factors, we would respectfully ask that that remain sealed.

5                  The other market share number that is at issue is on

6      page, I believe, 18 of Your Honor's order.  And the issue with

7      this one is, I think, a little bit more complicated in the

8      sense that this number, I believe, comes from some expert

9      analysis that was done in the case, and it was derived using a

10     number of parties' data; not just Google's, but also third

11     parties, because it purports to represent a market share

12     figure, you know, in relationship for a product to the entire

13     market, and that necessarily involves third-parties' data.

14                 And for those reasons, I think it does reflect there

15     is some commercial sensitivity.  This is not a number that

16     would otherwise be floating around out in the marketplace.  And

17     for that reason --

18                 THE COURT:  Is it the kind of number that can be

19     traced back to any particular party?  Market share is,

20     obviously, a key issue in these proceedings.

21                 MR. SCHMIDTLEIN:  No, it is.  Again, I don't know

22     that -- there aren't that many competitors in that SEM tool

23     market.  So, I think, certainly, people would get a feel for

24     which party's data were subjected here.  I don't know, in one

25     of the competitor numbers, given this number, whether that

1    would then allow them to also, in addition to getting a sense

2    of Google, would also allow you to get a relative sense of

3    their position.

4            THE COURT:  And, I'm sorry, I should have had this in

5    front of me, and I don't.  But I thought the number concerned

6    percentage of ad placement within Google's SEM tool.  Am I

7    mistaken?  Or maybe that was a different number.

8            MR. SCHMIDTLEIN:  It is a number that purports to

9    represent the percentage of ads placed through Google's tool of

10   the entire market.

11           THE COURT:  Okay.  Okay.  I'm just misrecollecting.

12           MR. SCHMIDTLEIN:  Yeah.  I think indirectly, it

13   obviously gives you some about Google.  And then indirectly, by

14   what's left, it could allow people to making inferences as to

15   the other competitors.

16           THE COURT:  Your thoughts on that?

17           MR. CAVANAUGH:  Your Honor, I would need to check to

18   see what the sources were.  I do know I referenced that in a

19   slide in my opening.  I did redact a number.  But let me just

20   check with my client, and I can tell the Court our position on

21   that on Monday morning.

22           THE COURT:  Okay.  All right.  Is there anything else

23   we need to discuss before we adjourn?

24           MR. SOMMER:  Yes, Judge.  Michael Sommer.  Just, if

25   we can get the lineup for Monday morning?

1     MS. BELLSHAW:  Yes, Your Honor.  We've had Mr. Brian

2  Higgins from Verizon here for a couple of days, so we would

3  like to start him first thing on Monday morning.  And then we

4  understand that Google has asked that Mr. Jerry Dischler also

5  start on Monday, and so we intend to accommodate that request

6  by having him go after Mr. Higgins.

7     THE COURT:  Okay.  Do we think those two will take a

8  full day?

9     MS. BELLSHAW:  I think it's quite possible that

10  they'll take all day.

11     THE COURT:  Okay.  All right.  Well, we will look

12  forward to hearing from them on Monday.  I'm sure Mr. Higgins

13  is anxious to give His testimony.

14     MS. BELLSHAW:  I'm sorry, Your Honor.  I should have

15  said, I believe that both of those witnesses will have some

16  portion of their testimony in a confidential session.

17     THE COURT:  All right.  We'll take it as it comes.  I

18  think probably starting a witness testimony in confidential

19  session is a little awkward, so I don't think we should do

20  that.

21     All right.  So -- okay.  So, anything else?

22     All right.  I think -- hopefully, you all have had

23  discussions with Mr. Douyon about this.  You can leave your

24  stuff here over the weekend and overnight and the like.  We'll

25  be doing our other matters in another courtroom, so you don't

```
1    need to take anything out of here.  And the Courtroom will be

2    locked, obviously, over the weekend.

3              MR. DINTZER:  Thank you, Your Honor.

4              MS. BELLSHAW:  Thank you, Your Honor.

5              THE COURT:  Thank you, everyone.  Have a nice

6    weekend.

7                              *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

991

1             CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                          Dated this 15th day of September, 2023

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2
       WITNESS:
 3
           James Kolotouros - Open Session
 4               Direct Examination By Ms. Murdock-Park............956
                 Cross Examination By Mr. Schmidtlein..............975
 5               Redirect Examination By Ms. Murdock-Park..........981

 6
       EXHIBITS:
 7
           UPX569 Received......................................906
 8         UPX710 Received......................................973
           UPX713 Received......................................963
 9         UPX1066 Received.....................................985
           UPX1088 Received.....................................970
10         UPX8071 Received.....................................967
11                            *   *   *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**1**

**1** [2] - 966:2, 974:6
**1,000** [1] - 984:25
**10036** [1] - 882:21
**101** [2] - 960:2, 960:3
**102** [3] - 959:25, 960:11, 961:5
**1088** [1] - 970:24
**1100** [1] - 882:12
**1122** [1] - 882:20
**12th** [1] - 882:23
**13th** [1] - 973:25
**15** [1] - 882:5
**15th** [1] - 991:7
**17th** [2] - 963:6, 964:1
**18** [2] - 968:1, 987:6
**18th** [1] - 968:6

**2**

**2** [2] - 974:7, 980:1
**20** [2] - 956:16, 958:10
**20-3010** [1] - 882:4
**20001** [2] - 883:3, 991:13
**20005** [1] - 882:24
**2011** [1] - 985:12
**2014** [1] - 959:7
**2019** [2] - 956:18, 966:2
**202** [3] - 882:13, 882:17, 882:24
**202-354-3267** [1] - 883:3
**2020** [4] - 963:6, 964:1, 968:2, 968:6
**2021** [2] - 956:21, 973:25
**2023** [6] - 882:5, 967:9, 968:22, 968:25, 969:8, 991:7
**20530** [1] - 882:17
**212** [1] - 882:21
**2200** [1] - 882:20
**24** [6] - 967:13, 968:13, 968:17, 968:20, 974:21, 975:3

**3**

**307-0340** [1] - 882:13
**333** [2] - 883:2, 991:12
**335-2793** [1] - 882:21

**4**

**42** [1] - 986:10
**434-5000** [1] - 882:24
**445-8082** [1] - 882:17

**450** [1] - 882:16

**5**

**5** [2] - 965:23, 965:25

**6**

**6** [2] - 980:8, 980:15
**6523** [2] - 883:2, 991:12

**7**

**701** [2] - 960:5, 960:6
**710** [1] - 973:15
**725** [1] - 882:23
**738** [2] - 979:20, 980:2
**739** [4] - 978:18, 979:20, 980:3, 980:4

**9**

**9:30** [2] - 882:6, 983:21

**A**

**ability** [1] - 991:6
**able** [1] - 978:8
**above-captioned** [2] - 966:5, 966:8
**access** [3] - 962:16, 986:14, 986:22
**accommodate** [1] - 989:5
**accurate** [3] - 958:23, 964:4, 991:4
**action** [1] - 957:2
**actual** [4] - 972:18, 972:25, 973:4, 981:13
**ad** [1] - 988:6
**add** [5] - 960:21, 961:10, 963:17, 979:3, 979:24
**adding** [2] - 963:9, 963:14
**addition** [1] - 988:1
**additionally** [1] - 961:6
**address** [1] - 984:15
**adjourn** [1] - 988:23
**administer** [1] - 957:16
**administered** [1] - 958:7
**admit** [5] - 965:12, 967:1, 970:23, 979:13, 986:1
**admitted** [4] - 963:2,

967:4, 970:24, 973:15
**ads** [1] - 988:9
**ago** [1] - 980:9
**agree** [6] - 957:19, 957:20, 962:2, 976:11, 976:12, 976:13
**Agreement** [2] - 959:17, 959:19
**agreements** [4] - 976:6, 976:7, 976:9
**ahead** [4] - 962:7, 964:18, 970:21, 984:10
**al** [1] - 882:3
**allow** [3] - 988:1, 988:2, 988:14
**allowed** [3] - 972:9, 972:12, 972:20
**America** [1] - 882:2
**Americas** [1] - 882:20
**AMIT** [1] - 882:9
**analysis** [2] - 986:21, 987:9
**Android** [19] - 957:1, 957:7, 957:14, 957:17, 957:22, 958:2, 959:7, 959:9, 959:16, 977:7, 977:11, 977:18, 978:1, 980:8, 980:15, 980:20, 980:21, 981:16
**answering** [1] - 957:24
**Antitrust** [1] - 882:16
**antitrust** [3] - 956:25, 957:10, 985:4
**anxious** [1] - 989:13
**apologies** [1] - 960:1
**app** [1] - 980:17
**APPEARANCES** [1] - 882:11
**appeared** [1] - 960:25
**Apple** [7] - 977:19, 978:1, 978:3, 978:9, 978:11, 978:12, 978:13
**Apple's** [1] - 978:7
**applications** [2] - 977:15, 979:25
**approach** [2] - 965:19, 967:21
**appropriate** [2] - 957:17, 984:19
**apps** [1] - 982:8
**argue** [1] - 986:23
**assemble** [1] - 961:1
**Assistant** [1] - 959:17
**assure** [1] - 977:6
**attempted** [2] - 969:23, 981:15
**attention** [2] - 967:25, 974:6
**attorney** [7] - 958:21,

958:23, 959:3, 962:4, 963:8, 963:12, 963:18
**attorney-client** [1] - 963:8
**attorneys** [5] - 958:16, 958:25, 959:12, 961:17, 962:1
**Australia** [2] - 962:18, 964:3
**automatically** [2] - 967:12, 968:10
**available** [4] - 977:10, 978:14, 981:24, 982:14
**Avenue** [3] - 882:20, 883:2, 991:12
**avoid** [3] - 969:10, 969:13, 971:19
**aware** [5] - 969:3, 970:19, 972:6, 972:8, 983:7
**awkward** [1] - 989:19

**B**

**balancing** [1] - 987:3
**bar** [2] - 980:16, 980:21
**based** [3] - 968:9, 979:13, 985:14
**basis** [1] - 976:15
**Bates** [2] - 960:5, 960:6
**BEFORE** [1] - 882:9
**belatedly** [1] - 964:15
**BELKNAP** [1] - 882:19
**BELLSHAW** [4] - 989:1, 989:9, 989:14, 990:4
**below** [1] - 980:12
**BENCH** [1] - 882:9
**best** [3] - 957:21, 974:11, 991:6
**beyond** [1] - 958:6
**binder** [1] - 965:18
**bit** [1] - 987:7
**bottom** [2] - 961:5, 974:6
**box** [2] - 977:10, 977:24
**Brian** [1] - 989:1
**briefly** [2] - 979:19, 980:25
**bright** [2] - 959:23, 960:12
**bring** [2] - 962:19, 979:15
**business** [12] - 957:3, 958:21, 963:16, 969:11, 969:17, 970:1, 970:2, 971:17, 972:7,

972:10, 972:13, 972:22
**BY** [12] - 956:11,
960:7, 963:7, 965:22,
967:5, 967:24, 971:1,
973:17, 974:5, 975:16,
979:18, 981:2

## C

**captioned** [2] - 966:5,
966:8
**care** [1] - 985:1
**Care** [2] - 961:21,
961:23
**carriers** [1] - 961:15
**case** [6] - 956:19,
963:21, 965:4, 983:11,
984:23, 987:9
**cases** [2] - 966:5,
966:8
**CAVANAUGH** [3] -
983:23, 984:2, 988:17
**Cavanaugh** [3] -
882:19, 983:22, 984:4
**CCR** [1] - 991:11
**certain** [4] - 978:25,
979:1, 986:13, 986:14
**certainly** [1] - 987:23
**CERTIFICATE** [1] -
991:1
**certify** [1] - 991:3
**chain** [2] - 974:8,
974:10
**chance** [1] - 978:20
**change** [1] - 956:12
**changed** [1] - 969:7
**changing** [1] - 966:10
**characterization** [2] -
958:22, 964:4
**Chat** [49] - 964:20,
964:23, 964:25, 966:5,
966:9, 966:15, 966:21,
966:25, 967:6, 967:7,
967:18, 968:5, 968:8,
968:22, 968:23, 969:1,
969:10, 969:22, 970:3,
970:7, 970:11, 970:14,
971:2, 971:8, 971:12,
971:14, 971:15,
971:16, 971:17,
971:20, 971:22,
971:23, 971:24,
971:25, 972:3, 972:7,
972:16, 972:21,
972:24, 973:2, 973:6,
973:9, 974:13, 974:16,
974:19, 974:20, 975:1,
976:18
**Chats** [3] - 972:9,
972:13, 974:24

**chats** [14] - 966:11,
966:17, 966:18,
967:10, 967:12,
967:15, 968:16,
968:19, 969:9, 970:15,
970:18, 972:2, 975:3,
975:7
**check** [2] - 988:17,
988:20
**clarity** [1] - 980:20
**cleanup** [1] - 984:6
**clearly** [1] - 985:14
**client** [2] - 963:8,
988:20
**closed** [1] - 986:12
**CMR** [1] - 991:11
**collaborative** [1] -
976:1
**colleagues** [1] -
972:16
**Colorado** [1] - 882:19
**COLUMBIA** [1] - 882:1
**coming** [1] - 982:10
**commercial** [3] -
958:19, 961:14, 987:15
**communicate** [1] -
979:2
**Communicate** [2] -
961:21, 961:23
**communication** [5] -
961:6, 962:1, 962:5,
966:4, 966:7
**communications** [5] -
956:13, 958:13,
959:12, 961:11, 976:19
**companies** [1] -
972:24
**company** [2] - 958:7,
972:21
**compete** [2] - 977:18,
978:13
**competition** [2] -
962:19, 978:7
**competitive** [1] -
978:2
**competitor** [1] -
987:25
**competitors** [2] -
987:22, 988:15
**complaint** [2] -
963:23, 983:8
**complete** [1] - 991:5
**complex** [2] - 976:11,
976:12
**complicated** [2] -
964:3, 987:7
**concede** [1] - 986:21
**concerned** [1] - 957:9,
986:4, 988:5
**concerns** [1] - 957:5

**conducted** [1] - 957:3
**conferencing** [1] -
974:17
**confidential** [2] -
989:16, 989:18
**Confidentiality** [1] -
961:3
**confidentiality** [1] -
961:12
**configure** [1] - 979:11
**configured** [2] -
977:16, 979:22
**connection** [1] - 964:5
**CONNOLLY** [1] -
882:23
**consider** [1] - 958:9
**consistency** [1] -
978:2
**consistent** [9] -
976:23, 977:1, 977:5,
977:6, 977:13, 977:17,
978:4, 978:8, 978:14
**constitutes** [1] - 991:4
**Constitution** [2] -
883:2, 991:12
**Cont** [1] - 956:10
**content** [2] - 961:2,
979:10
**continue** [1] - 978:12
**contract** [2] - 959:2,
962:4
**contracts** [6] - 958:19,
958:20, 959:8, 961:15,
976:11, 976:14
**contractual** [3] -
962:3, 975:24, 978:25
**control** [1] - 980:17
**conversation** [8] -
966:20, 966:21,
969:22, 970:3, 974:10,
974:13, 974:20, 975:5
**conversations** [13] -
964:24, 965:2, 966:25,
969:10, 969:13,
969:15, 969:16,
969:17, 969:20, 970:1,
973:5, 973:7, 973:8
**conveyed** [1] - 964:4
**conveys** [1] - 963:15
**cooperate** [1] - 963:21
**copied** [1] - 958:25
**copy** [4] - 958:16,
958:21, 959:3, 959:11
**corporate** [4] - 967:9,
969:7, 972:19, 972:23
**correct** [21] - 956:17,
956:23, 958:5, 959:13,
960:8, 960:15, 961:8,
961:9, 963:13, 963:19,
963:24, 965:5, 966:23,

967:11, 968:21, 969:2,
970:5, 971:3, 973:20,
974:8, 985:6
**correctly** [1] - 959:6
**Counsel** [1] - 975:17
**counsel** [3] - 981:5,
983:3, 984:2
**count** [2] - 971:21,
980:18
**couple** [2] - 985:3,
989:2
**Court** [10] - 883:1,
883:1, 977:4, 979:19,
984:9, 984:11, 984:12,
984:25, 988:20, 991:11
**COURT** [44] - 882:1,
956:9, 960:5, 962:10,
962:12, 962:14,
962:20, 962:24, 963:1,
965:13, 965:17,
965:20, 967:4, 967:22,
970:24, 973:15,
975:13, 979:5, 979:13,
980:24, 983:15,
983:19, 984:1, 984:4,
984:14, 985:3, 985:7,
985:16, 985:22,
985:25, 986:3, 986:9,
986:15, 987:2, 987:18,
988:4, 988:11, 988:16,
988:22, 989:7, 989:11,
989:17, 990:5, 991:1
**Courthouse** [1] -
883:2
**courtroom** [1] -
989:25
**Courtroom** [1] - 990:1
**coworkers** [3] -
970:11, 970:13, 970:17
**CRC** [1] - 883:1
**critically** [1] - 986:24
**CROSS** [1] - 975:15
**CROSS-
EXAMINATION** [1] -
975:15
**CRR** [2] - 883:1,
991:11
**current** [2] - 963:14,
963:20
**customizations** [1] -
980:10
**customized** [1] -
979:23
**CV** [1] - 882:4

## D

**D.C** [4] - 882:5,
882:13, 882:24, 991:13
**data** [3] - 987:10,

987:13, 987:24
**date** [3] - 963:25,
968:7, 968:10
**dated** [2] - 963:6,
973:25
**Dated** [1] - 991:7
**days** [2] - 976:8, 989:2
**DC** [2] - 882:17, 883:3
**dealt** [1] - 969:11
**decade** [2] - 956:24,
957:6
**December** [1] - 956:18
**deck** [7] - 959:16,
960:18, 960:24, 961:1,
961:2, 984:8
**declaration** [2] -
965:4, 965:12
**default** [6] - 967:10,
968:22, 968:23,
971:12, 975:4, 975:8
**Defendant** [2] - 882:7,
882:22
**deflected** [1] - 966:19
**delete** [7] - 979:3,
979:25, 981:21, 982:6,
982:8, 982:12, 982:22
**deleted** [3] - 967:12,
968:16, 968:19
**deleting** [1] - 975:3
**deletion** [1] - 967:15
**deliver** [1] - 958:2
**denies** [1] - 965:14
**Department** [1] -
983:7
**DEPARTMENT** [2] -
882:12, 882:15
**depict** [1] - 979:21
**deposed** [2] - 956:25,
957:9, 957:12, 964:14,
964:17
**deposition** [1] -
964:12
**deprivileged** [1] -
964:15
**derived** [1] - 987:9
**describe** [2] - 977:4,
979:19, 980:19
**device** [9] - 977:24,
978:10, 978:15,
979:21, 981:25, 982:7,
982:15
**devices** [13] - 963:16,
975:25, 977:8, 977:9,
977:12, 977:18,
977:19, 978:3, 978:9,
979:4, 979:12, 979:22
**Dickman** [2] - 883:1,
991:11
**DICKMAN** [1] - 991:3
**different** [3] - 977:12,

978:3, 988:7
**difficult** [2] - 964:24,
976:15
**DINTZER** [6] - 984:5,
984:24, 985:6, 985:10,
986:2, 990:3
**Dintzer** [1] - 882:11
**DIRECT** [1] - 956:10
**direction** [1] - 980:19
**directions** [1] - 981:10
**directly** [1] - 962:23
**director** [1] - 973:19
**disagree** [3] - 957:19,
976:11, 976:13
**disagreeing** [1] -
985:16
**Dischler** [1] - 989:4
**discovery** [1] - 958:14
**discuss** [8] - 961:18,
966:14, 971:8, 971:17,
972:7, 972:22, 976:16,
988:23
**discussed** [12] -
958:17, 958:22, 959:1,
959:2, 964:19, 964:20,
964:22, 966:17,
966:18, 974:11, 984:7,
986:12
**discusses** [1] - 958:19
**discussing** [5] -
958:18, 959:12, 962:3,
962:23, 976:2
**discussion** [3] -
964:9, 984:7, 984:21
**discussions** [1] -
989:23
**display** [1] - 980:18
**disposition** [1] -
986:25
**DISTRICT** [3] - 882:1,
882:1, 882:10
**diverted** [1] - 966:20
**Division** [1] - 882:16
**document** [9] -
962:13, 962:17,
965:16, 976:3, 976:5,
984:18, 985:2, 985:5,
985:12
**documents** [5] -
964:15, 979:7, 981:5,
983:10, 984:25
**DoJ** [5] - 882:11,
963:15, 963:21, 964:7,
964:14
**done** [1] - 987:9
**Douyon** [1] - 989:23
**down** [4] - 962:8,
964:18, 970:21, 980:12
**Dr** [2] - 984:7, 985:4
**draw** [2] - 967:25,

974:6
**during** [4] - 956:19,
960:14, 984:6, 986:12
**DX738** [3] - 978:18,
981:3, 981:18
**DX739** [2] - 981:3,
981:18

## E

**e-mail** [1] - 963:5
**easier** [1] - 962:14
**easy** [1] - 978:12
**ecosystem** [4] -
957:17, 958:2, 958:3,
958:7
**effective** [1] - 976:19
**effort** [1] - 976:1
**eight** [1] - 980:9
**either** [2] - 959:3,
979:3
**elegance** [1] - 978:11
**elsewhere** [1] - 982:5
**email** [23] - 882:14,
882:18, 882:25,
958:18, 958:23, 959:5,
962:22, 963:1, 963:3,
963:8, 964:19, 966:20,
973:6, 973:18, 973:21,
973:24, 974:3, 974:7,
974:11, 975:17,
975:20, 980:17, 983:4
**emails** [3] - 958:16,
958:25, 965:2
**employee** [6] - 958:5,
958:9, 958:11, 958:12,
966:7, 972:4
**employees** [10] -
959:11, 961:10,
961:24, 966:14, 972:2,
972:9, 972:12, 972:17,
972:20, 976:14
**employment** [1] -
958:10
**encountered** [1] -
982:19
**engage** [2] - 964:24,
977:11
**engine** [1] - 981:14
**ensure** [1] - 958:21
**entered** [1] - 961:15
**entire** [3] - 966:1,
987:12, 988:10
**entirely** [1] - 956:12
**erased** [1] - 974:21
**Erin** [1] - 882:15
**erin.murdock** [1] -
882:18
**erin.murdock-park@
usdoj.gov** [1] - 882:18

**establish** [1] - 984:20
**established** [1] -
969:14
**et** [1] - 882:3
**ether** [1] - 984:22
**evidence** [3] - 959:15,
979:12, 985:2
**EXAMINATION** [3] -
956:10, 975:15, 981:1
**exclusive** [1] - 972:1
**excuse** [1] - 966:21
**exhibit** [1] - 984:6
**Exhibits** [1] - 979:20
**exhibits** [1] - 983:24
**existence** [1] - 977:14
**expect** [1] - 977:22
**expected** [2] - 977:16,
977:23
**experience** [12] -
976:23, 977:2, 977:5,
977:6, 977:13, 977:18,
978:2, 978:5, 978:8,
978:14, 981:20, 982:19
**expert** [1] - 987:8
**explain** [1] - 979:9
**exposed** [1] - 957:1
**extent** [1] - 977:22

## F

**face** [2] - 965:2
**face-to-face** [1] -
965:2
**fact** [3] - 979:13,
986:17, 986:19
**factors** [1] - 987:4
**familiar** [1] - 972:16
**February** [4] - 967:9,
968:22, 968:25, 969:7
**Fifth** [1] - 882:16
**figure** [1] - 987:12
**filed** [2] - 956:22,
963:23
**finance** [1] - 973:19
**first** [8] - 960:2, 979:8,
980:12, 981:9, 981:13,
982:4, 982:12, 989:3
**floating** [1] - 987:16
**fluency** [1] - 982:9
**focus** [1] - 958:20
**followed** [1] - 961:25
**following** [2] - 956:7,
968:9
**footnote** [1] - 986:20
**FOR** [1] - 882:1
**Force** [3] - 980:5,
980:6, 980:7
**foreclosure** [1] -
986:21
**foregoing** [1] - 991:4

**format** [1] - 964:25
**former** [1] - 971:5
**forward** [2] - 979:16, 989:12
**foundation** [1] - 984:16
**four** [1] - 960:18
**frame** [1] - 958:15
**frequently** [1] - 970:7
**front** [1] - 988:5
**full** [2] - 989:8, 991:5
**function** [1] - 982:23

**G**

**game** [1] - 985:15
**general** [1] - 982:7
**generally** [10] - 961:24, 962:3, 966:19, 966:22, 969:10, 969:13, 970:15, 971:19, 972:15, 975:6
**given** [4] - 961:1, 964:25, 978:20, 987:25
**global** [1] - 964:10
**Google** [54] - 882:6, 882:22, 956:14, 956:16, 957:10, 957:11, 957:15, 957:19, 957:21, 957:25, 958:1, 958:3, 958:4, 958:9, 958:12, 959:7, 959:11, 961:10, 961:23, 964:16, 966:5, 966:9, 966:11, 967:7, 968:5, 969:1, 969:7, 970:7, 970:11, 971:2, 971:17, 971:18, 971:20, 971:23, 971:25, 972:2, 972:4, 972:9, 972:12, 972:19, 972:24, 973:3, 973:19, 974:13, 974:15, 974:20, 976:13, 977:17, 980:16, 980:21, 984:3, 988:2, 988:13, 989:4
**Google's** [10] - 961:20, 963:20, 967:9, 976:3, 976:5, 976:9, 986:4, 987:10, 988:6, 988:9
**guess** [2] - 974:15, 986:23

**H**

**half** [1] - 967:25
**hand** [3] - 971:21, 978:17, 983:25

**handed** [1] - 981:5
**Hangouts** [4] - 967:7, 974:14, 974:15, 974:17
**healthy** [1] - 958:8
**hearing** [1] - 989:12
**held** [1] - 956:7
**Helen** [1] - 960:4
**help** [6] - 979:21, 980:4, 982:14, 982:15, 982:23
**hereby** [1] - 991:3
**Higgins** [3] - 989:2, 989:6, 989:12
**high** [1] - 978:14
**high-quality** [1] - 978:14
**history** [34] - 966:5, 966:9, 967:6, 967:10, 967:12, 968:13, 968:16, 968:19, 968:22, 968:23, 969:1, 969:8, 969:11, 969:16, 969:22, 970:4, 970:5, 970:6, 970:14, 970:18, 971:12, 971:14, 971:15, 971:16, 972:6, 972:9, 972:12, 972:21, 973:6, 973:9, 975:1, 975:5, 975:7
**history-off** [11] - 967:12, 968:19, 969:22, 970:14, 972:6, 972:9, 972:12, 972:21, 973:6, 973:9, 975:7
**hold** [7] - 956:18, 956:21, 968:20, 969:3, 969:5, 972:14, 983:11
**home** [5] - 979:23, 980:10, 980:16, 980:22, 983:17
**Honor** [33] - 956:8, 962:21, 963:4, 965:9, 965:16, 967:1, 973:13, 973:16, 974:3, 975:11, 978:17, 978:19, 978:23, 978:24, 979:17, 980:23, 980:25, 983:23, 984:3, 984:5, 984:15, 984:24, 985:6, 985:11, 985:19, 986:2, 986:6, 986:20, 988:17, 989:1, 989:14, 990:3, 990:4
**Honor's** [3] - 986:10, 986:24, 987:6
**HONORABLE** [1] - 882:9
**hopefully** [2] - 978:23, 989:22
**hours** [6] - 967:13,

968:13, 968:17, 968:20, 974:21, 975:3
**housekeeping** [1] - 986:3

**I**

**icons** [1] - 982:8
**identify** [1] - 977:23
**imagine** [1] - 971:11
**impact** [3] - 963:15, 964:10
**implementation** [1] - 967:14
**implicitly** [1] - 986:21
**important** [3] - 977:18, 978:2, 986:24
**IN** [1] - 882:1
**include** [7] - 960:23, 961:7, 961:13, 961:17, 962:1, 962:4, 986:22
**including** [5] - 971:5, 976:10, 979:23, 980:1, 982:8
**increase** [1] - 961:11
**increases** [1] - 977:10
**indirectly** [2] - 988:12, 988:13
**individuals** [2] - 971:17, 972:21
**inferences** [1] - 988:14
**initiated** [2] - 966:3, 966:7
**inserted** [1] - 961:2
**instance** [1] - 966:10
**instances** [4] - 966:3, 966:6, 966:24, 971:10
**instructed** [4] - 959:11, 959:14, 960:21, 960:23
**instruction** [2] - 961:10, 961:13
**instructions** [7] - 961:20, 961:25, 979:24, 980:10, 982:5, 982:16, 982:21
**intend** [1] - 989:5
**intentionally** [1] - 970:17
**interaction** [1] - 965:1
**interpret** [1] - 963:22
**interpretation** [1] - 958:22
**interpreted** [1] - 959:5
**interpreting** [1] - 964:10
**investigation** [3] - 956:19, 956:25, 957:10
**invite** [1] - 959:4

**invited** [1] - 958:23
**involved** [1] - 976:14
**involves** [1] - 987:13
**iPhone** [1] - 978:4
**issue** [4] - 986:25, 987:5, 987:6, 987:20
**issues** [2] - 962:18, 962:19
**itself** [1] - 961:1

**J**

**Jamie** [1] - 971:5
**JANICE** [1] - 991:3
**Janice** [2] - 883:1, 991:11
**January** [1] - 956:21
**Jerry** [1] - 989:4
**Jim** [1] - 960:3
**job** [1] - 959:7
**John** [1] - 882:22
**joined** [1] - 957:7
**Jr** [1] - 882:19
**jschmidtlein@wc.com** [1] - 882:25
**JUDGE** [1] - 882:10
**Judge** [1] - 988:24
**JUSTICE** [2] - 882:12, 882:15
**Justice's** [1] - 983:8

**K**

**Kenneth** [1] - 882:11
**kenneth.dintzer2@usdoj.gov** [1] - 882:14
**kept** [1] - 971:12
**key** [1] - 987:20
**kind** [1] - 987:18
**knowledge** [1] - 982:9
**known** [1] - 967:7
**knows** [1] - 984:20
**kolotouros** [1] - 963:5
**Kolotouros** [17] - 956:12, 957:24, 959:21, 960:4, 961:25, 962:22, 964:19, 971:2, 975:8, 975:17, 976:22, 978:25, 979:9, 979:19, 981:3, 983:15, 986:13

**L**

**Language** [2] - 960:3, 960:9
**language** [1] - 965:24
**last** [6] - 965:24, 968:1, 975:17, 976:8, 986:3, 986:12
**latest** [3] - 980:8,

980:13, 980:15
**lawsuit** [1] - 956:22
**learn** [4] - 979:11,
981:9, 982:5, 982:11
**least** [2] - 962:15,
963:1
**leave** [1] - 989:23
**left** [1] - 988:14
**legal** [4] - 956:18,
956:21, 961:7, 961:13
**Legal** [1] - 960:3,
960:8
**light** [3] - 976:18,
986:17, 986:19
**limited** [2] - 972:4,
979:1
**line** [3] - 975:20,
977:8, 977:9
**lineup** [1] - 988:25
**link** [1] - 982:18
**linked** [1] - 982:24
**Lipscomb** [1] - 963:12
**list** [2] - 983:24, 984:6
**listed** [1] - 960:8
**lists** [1] - 960:3
**litigation** [5] - 968:20,
969:3, 969:5, 972:14,
983:11
**live** [3] - 966:21, 973:8
**LLC** [1] - 882:6
**LLP** [2] - 882:19,
882:23
**locked** [1] - 990:2
**look** [3] - 965:24,
981:22, 989:11
**loyal** [4] - 958:4,
958:9, 958:10, 958:12
**loyalty** [1] - 958:6

**M**

**MADA** [16] - 958:17,
959:12, 961:7, 961:18,
962:2, 962:4, 963:16,
964:11, 964:22,
966:18, 966:25,
970:18, 976:3, 976:9,
977:1, 982:21
**MADAs** [4] - 961:14,
964:19, 964:20, 976:20
**maiden** [1] - 973:21
**mail** [1] - 963:5
**maintenance** [1] -
967:15
**March** [1] - 973:25
**market** [8] - 986:4,
986:8, 987:5, 987:11,
987:13, 987:19,
987:23, 988:10
**marketplace** [1] -

**987:16**
**Marshmallow** [2] -
980:8, 980:15
**matter** [3] - 966:15,
972:20, 986:3
**matters** [4] - 966:4,
966:8, 969:11, 989:25
**mean** [2] - 966:22,
969:14
**meaning** [2] - 972:1,
978:11
**means** [1] - 976:19
**meant** [4] - 958:2,
975:5, 977:4, 977:6
**meetings** [3] - 961:18,
965:1, 973:8
**MEHTA** [1] - 882:9
**members** [2] - 972:6,
972:17
**memorialize** [1] -
958:20
**mention** [1] - 967:6
**message** [2] - 968:8,
972:3
**messages** [2] -
963:15, 980:18
**messaging** [1] -
980:17
**mic** [1] - 962:14
**Michael** [1] - 988:24
**might** [6] - 957:3,
957:13, 977:25, 982:5,
982:14
**migrate** [1] - 977:25
**misrecollecting** [1] -
988:11
**mistaken** [1] - 988:7
**Mobile** [1] - 959:16
**model** [2] - 965:1,
982:1
**modified** [2] - 968:1,
968:7
**Monday** [6] - 983:21,
988:21, 988:25, 989:3,
989:5, 989:12
**morning** [6] - 978:20,
979:8, 983:21, 988:21,
988:25, 989:3
**Moto** [3] - 980:4,
980:6, 980:7
**Motorola** [4] - 976:10,
979:10, 979:22, 980:4
**move** [8] - 967:1,
970:23, 979:12,
983:23, 984:9, 984:10,
985:15, 985:17
**moved** [4] - 984:13,
984:17, 984:24, 984:25
**movement** [1] -
978:11

**moving** [5] - 976:1,
977:7, 984:18, 984:21,
985:8
**MR** [32] - 962:13,
962:17, 965:10, 967:3,
967:20, 973:13,
975:16, 978:17,
978:22, 979:6, 979:18,
980:23, 983:23, 984:2,
984:5, 984:15, 984:24,
985:6, 985:10, 985:19,
985:23, 986:2, 986:6,
986:10, 986:16, 987:3,
987:21, 988:8, 988:12,
988:17, 988:24, 990:3
**MS** [37] - 956:8,
956:11, 960:7, 962:7,
962:11, 962:21,
962:25, 963:4, 963:7,
965:8, 965:15, 965:18,
965:22, 967:1, 967:5,
967:17, 967:21,
967:24, 970:21,
970:25, 971:1, 973:11,
973:14, 973:16,
973:17, 974:2, 974:5,
975:11, 978:19,
979:17, 980:25, 981:2,
983:14, 989:1, 989:9,
989:14, 990:4
**multiple** [1] - 981:18
**Murdock** [1] - 882:15
**MURDOCK** [33] -
956:8, 956:11, 960:7,
962:7, 962:11, 962:21,
962:25, 963:4, 963:7,
965:8, 965:15, 965:18,
965:22, 967:1, 967:5,
967:17, 967:21,
967:24, 970:21,
970:25, 971:1, 973:11,
973:14, 973:16,
973:17, 974:2, 974:5,
975:11, 978:19,
979:17, 980:25, 981:2,
983:14
**Murdock-Park** [1] -
882:15
**MURDOCK-PARK** [33]
- 956:8, 956:11, 960:7,
962:7, 962:11, 962:21,
962:25, 963:4, 963:7,
965:8, 965:15, 965:18,
965:22, 967:1, 967:5,
967:17, 967:21,
967:24, 970:21,
970:25, 971:1, 973:11,
973:14, 973:16,
973:17, 974:2, 974:5,
975:11, 978:19,

979:17, 980:25, 981:2,
983:14

**N**

**N.W** [1] - 991:12
**name** [1] - 973:22
**nature** [1] - 972:1
**navigation** [1] - 982:7
**near** [1] - 962:14
**necessarily** [2] -
985:17, 987:13
**need** [6] - 965:12,
975:19, 985:17,
988:17, 988:23, 990:1
**needs** [1] - 986:25
**negotiation** [2] -
975:24, 976:2
**never** [2] - 964:22,
970:5
**new** [2] - 980:20,
980:21
**New** [1] - 882:21
**Next** [1] - 975:22
**next** [1] - 960:11
**nice** [1] - 990:5
**notes** [2] - 985:3,
991:5
**nothing** [1] - 962:18
**notion** [1] - 985:16
**November** [4] - 963:6,
964:1, 968:1, 968:6
**number** [17] - 960:5,
962:10, 971:21, 972:4,
986:11, 986:18,
986:19, 987:5, 987:8,
987:10, 987:15,
987:18, 987:25, 988:5,
988:7, 988:8, 988:19
**numbers** [1] - 987:25
**NW** [4] - 882:12,
882:16, 882:23, 883:2
**NY** [1] - 882:21

**O**

**objection** [17] - 962:9,
963:2, 965:8, 967:3,
967:19, 967:20,
973:12, 973:13, 984:8,
984:13, 984:17, 985:8,
985:10, 985:11,
985:18, 985:20, 985:24
**objections** [2] - 985:1,
985:11
**obligations** [1] -
964:10
**obviously** [5] - 979:15,
985:20, 987:20,
988:13, 990:2

**OEM** [4] - 971:20, 971:22, 972:10, 972:13
**OEM's** [2] - 977:8, 977:9
**OEMs** [5] - 959:9, 961:16, 977:6, 977:12, 979:1
**OF** [5] - 882:1, 882:9, 882:12, 882:15, 991:1
**off-device** [1] - 979:21
**offered** [1] - 961:23
**offhand** [1] - 970:16
**Official** [2] - 883:1, 991:11
**OFFICIAL** [1] - 991:1
**old** [2] - 980:8, 980:9
**on-device** [1] - 982:15
**once** [1] - 960:14
**one** [19] - 960:8, 960:23, 962:15, 964:3, 969:5, 971:21, 976:25, 977:7, 977:8, 978:7, 979:9, 984:11, 985:3, 986:7, 986:10, 986:18, 987:7, 987:24
**open** [1] - 956:7
**opening** [1] - 988:19
**opinion** [1] - 986:11
**opportunity** [1] - 979:15
**option** [1] - 980:16
**options** [1] - 980:10
**order** [1] - 987:6
**OS** [1] - 976:1
**otherwise** [2] - 985:18, 987:16
**out-of-box** [2] - 977:10, 977:24
**outside** [3] - 971:18, 972:21, 972:24
**overnight** [1] - 989:24
**overruled** [2] - 963:2, 984:9

## P

**p.m** [1] - 882:6
**page** [17] - 957:18, 959:25, 960:2, 960:11, 965:25, 974:6, 974:7, 979:10, 980:1, 980:4, 980:13, 981:23, 982:10, 982:24, 986:10, 987:6
**pages** [2] - 979:21, 981:13
**palatable** [1] - 977:25
**Paletino** [2] - 964:2, 964:9
**paragraph** [3] - 961:5,

965:23, 965:25
**PARK** [33] - 956:8, 956:11, 960:7, 962:7, 962:11, 962:21, 962:25, 963:4, 963:7, 965:8, 965:15, 965:18, 965:22, 967:1, 967:5, 967:17, 967:21, 967:24, 970:21, 970:25, 971:1, 973:11, 973:14, 973:16, 973:17, 974:2, 974:5, 975:11, 978:19, 979:17, 980:25, 981:2, 983:14
**Park** [1] - 882:15
**park@usdoj.gov** [1] - 882:18
**part** [5] - 958:21, 960:24, 961:20, 983:7, 983:10
**particular** [6] - 958:20, 959:24, 961:22, 977:11, 982:10, 987:19
**parties** [1] - 987:11
**parties'** [2] - 987:10, 987:13
**partner** [1] - 971:22
**partners** [6] - 959:9, 961:15, 972:10, 972:13, 976:10
**party** [2] - 973:2, 987:19
**party's** [1] - 987:24
**pass** [1] - 975:12
**path** [2] - 963:14, 963:20
**PATTERSON** [1] - 882:19
**pause** [1] - 983:20
**people** [2] - 987:23, 988:14
**percent** [1] - 986:13
**percentage** [3] - 986:23, 988:6, 988:9
**percentages** [1] - 976:2
**perhaps** [2] - 985:23
**period** [2] - 964:25, 969:12
**Periods** [1] - 968:8
**periods** [1] - 968:9
**personal** [2] - 971:24
**personally** [5] - 959:14, 973:1, 973:5, 981:7, 981:15
**phone** [10] - 977:7, 978:12, 978:13, 980:7, 980:8, 980:9, 981:16, 982:15, 982:16, 982:23

**picture** [1] - 980:12
**place** [1] - 962:15
**placed** [3] - 956:18, 956:21, 988:9
**placement** [1] - 988:6
**Plaintiff** [1] - 882:18
**plaintiffs** [1] - 986:20
**Plaintiffs** [2] - 882:4, 882:11
**Play** [4] - 975:22, 975:23, 975:24, 976:2
**point** [6] - 962:16, 974:22, 985:14, 985:21, 986:14, 986:22
**Policy** [2] - 967:18, 968:5
**policy** [12] - 961:21, 967:9, 968:1, 968:6, 968:7, 968:18, 969:7, 972:19, 972:20, 972:23, 972:25, 973:4
**popular** [1] - 977:15
**portion** [3] - 963:1, 963:3, 989:16
**position** [3] - 986:5, 988:3, 988:20
**possible** [3] - 957:21, 958:24, 989:9
**potential** [1] - 957:2
**potentially** [1] - 977:24
**practices** [2] - 972:16, 972:18
**precise** [2] - 967:14, 971:10
**precisely** [1] - 983:2
**precondition** [1] - 982:9
**predictability** [1] - 978:1
**predictable** [1] - 977:9
**predominantly** [1] - 959:10
**preference** [1] - 977:11
**present** [1] - 966:2
**presentation** [1] - 960:16
**presented** [2] - 959:24, 960:14
**presenters** [1] - 960:8
**presenting** [2] - 959:20, 959:23
**preservation** [1] - 967:10
**preserve** [6] - 958:2, 969:8, 969:23, 969:25, 970:2, 975:1
**preserved** [1] - 975:6
**press** [1] - 981:21

**prevent** [1] - 958:13
**privilege** [1] - 963:9
**problem** [1] - 982:25
**proceeding** [1] - 984:22
**proceedings** [4] - 956:7, 983:20, 987:20, 991:6
**produced** [1] - 958:13
**product** [1] - 987:12
**proffer** [1] - 978:22
**prohibited** [2] - 973:3, 982:21
**proper** [2] - 964:9, 965:13
**protect** [8] - 957:10, 957:15, 957:19, 957:25, 958:1, 958:4, 958:6, 958:12
**proven** [1] - 977:15
**provide** [4] - 977:1, 978:4, 978:8, 982:21
**provided** [4] - 979:8, 981:9, 984:2, 985:12
**provider** [1] - 981:25
**providing** [2] - 977:17, 980:19, 980:20
**provisions** [2] - 978:25, 979:1
**PUBIC** [1] - 882:3
**publicly** [1] - 986:25
**pull** [3] - 962:25, 965:3, 973:11
**pulled** [1] - 979:7
**purports** [2] - 987:11, 988:8
**purposes** [1] - 977:1
**push** [1] - 985:1
**put** [3] - 975:19, 980:3, 984:10

## Q

**quality** [1] - 978:14
**questions** [5] - 965:15, 975:11, 978:24, 980:23, 983:14
**quite** [2] - 957:24, 989:9
**quote** [2] - 978:10

## R

**random** [1] - 984:19
**reach** [2] - 979:11
**reached** [1] - 966:14
**read** [2] - 975:20, 980:14
**reads** [1] - 968:8
**reason** [1] - 987:17

**reasons** [2] - 976:25, 987:14
**received** [2] - 964:15, 971:22
**recipients** [1] - 961:11
**recognize** [2] - 957:1, 975:1
**recognizes** [1] - 986:20
**record** [2] - 978:19, 980:14
**red** [7] - 959:23, 960:12, 960:14, 960:21, 961:17, 961:20, 961:25
**redact** [1] - 988:19
**redactions** [1] - 974:2
**redirect** [1] - 980:24
**REDIRECT** [1] - 981:1
**refer** [2] - 975:23, 977:14
**reference** [1] - 976:22
**referenced** [1] - 988:18
**referred** [3] - 974:16, 983:4, 983:5
**refers** [2] - 975:24, 977:13
**reflect** [2] - 985:4, 987:14
**reflected** [1] - 986:22
**regarding** [2] - 961:6, 962:1
**regular** [1] - 976:14
**regulatory** [2] - 957:2, 962:18
**related** [1] - 983:10
**relationship** [1] - 987:12
**relative** [1] - 988:2
**release** [1] - 980:21
**releases** [1] - 978:3
**relevance** [2] - 965:8, 967:19, 973:12, 985:20, 985:24
**relevancy** [4] - 962:9, 984:8, 984:12, 985:12
**relevant** [4] - 966:4, 966:8, 985:14, 986:24
**rely** [1] - 965:1
**remain** [1] - 987:4
**remains** [1] - 968:9
**remember** [1] - 970:15
**Reminder** [1] - 961:3
**remove** [9] - 979:3, 980:16, 981:10, 981:11, 981:14, 981:15, 981:19, 982:8, 982:16
**removed** [2] - 968:10,

980:22
**render** [1] - 977:24
**repeat** [1] - 972:11
**replying** [1] - 963:17
**REPORTER** [1] - 991:1
**Reporter** [3] - 883:1, 883:1, 991:11
**represent** [2] - 987:11, 988:9
**request** [1] - 989:5
**requested** [3] - 973:5, 973:7, 973:9
**resolved** [1] - 984:16
**respect** [9] - 964:11, 964:25, 967:15, 972:24, 973:2, 973:3, 975:7, 980:4, 980:20
**respectfully** [1] - 987:4
**responded** [1] - 974:10
**responding** [2] - 973:24, 974:7
**response** [1] - 979:6
**result** [2] - 957:3, 957:14
**resume** [2] - 956:8, 983:21
**Retention** [3] - 967:18, 968:5, 968:8
**revealed** [1] - 987:1
**revenue** [5] - 961:14, 971:9, 976:2, 976:6, 976:7
**Revenue** [2] - 959:17, 959:19
**Review** [2] - 960:3, 960:9
**review** [1] - 978:21
**reviewed** [1] - 964:12
**Revshare** [3] - 961:6, 962:2, 975:22
**Richardson** [3] - 973:18, 973:24
**RMR** [1] - 883:1
**Room** [2] - 883:2, 991:12
**Rosenberg** [4] - 971:6, 971:8, 971:12, 971:14
**Rosie** [2] - 963:9, 963:14
**rosie** [1] - 963:12
**RSA** [7] - 959:13, 962:4, 964:23, 966:18, 966:25, 970:18, 976:9
**RSAs** [5] - 959:1, 961:18, 964:19, 964:20, 976:20

**rules** [1] - 985:15

## S

**S23** [1] - 981:20
**safe** [2] - 958:1, 983:16
**Samsung** [19] - 963:15, 963:21, 964:5, 964:6, 964:10, 971:9, 971:23, 972:7, 975:22, 975:23, 975:24, 975:25, 976:10, 979:9, 979:22, 981:9, 981:20, 982:4, 982:13
**scale** [1] - 985:13
**SCHMIDTLEIN** [19] - 962:13, 962:17, 965:10, 967:3, 967:20, 973:13, 975:16, 978:17, 978:22, 979:6, 979:18, 980:23, 986:6, 986:10, 986:16, 987:3, 987:21, 988:8, 988:12
**Schmidtlein** [3] - 882:22, 975:14, 986:4
**screen** [4] - 979:23, 980:10, 980:17, 980:22
**screens** [2] - 979:21, 981:24
**sealed** [1] - 987:4
**Search** [1] - 959:16
**search** [12] - 976:5, 976:7, 980:16, 980:21, 981:10, 981:12, 981:14, 981:15, 981:19, 981:25, 982:22, 986:13
**searches** [1] - 986:22
**second** [2] - 965:25, 981:23
**see** [9] - 962:24, 963:10, 968:3, 968:7, 968:11, 972:3, 981:3, 986:6, 988:18
**seeing** [1] - 981:13
**seem** [2] - 984:19, 986:20
**SEM** [2] - 987:22, 988:6
**send** [1] - 972:3
**sense** [4] - 983:20, 987:8, 988:1, 988:2
**sensitive** [3] - 957:2, 957:8, 986:11
**sensitivity** [1] - 987:15
**sent** [1] - 968:9
**sentence** [1] - 965:24
**separate** [1] - 968:6
**September** [2] - 882:5,

991:7
**service** [1] - 974:17
**services** [4] - 973:2, 973:3, 977:23, 978:14
**session** [4] - 956:7, 986:12, 989:16, 989:19
**set** [4] - 968:23, 971:12, 971:14, 977:9
**settings** [6] - 966:10, 967:10, 981:24, 982:14, 982:18, 982:23
**seven** [1] - 980:9
**several** [1] - 970:9
**shalt** [2] - 985:13
**share** [8] - 961:14, 971:9, 976:2, 976:6, 976:7, 987:5, 987:11, 987:19
**Share** [2] - 959:17, 959:19
**shares** [2] - 986:4, 986:8
**show** [2] - 981:14, 981:18
**showed** [1] - 975:17
**shown** [1] - 983:3
**shows** [1] - 968:1
**sides** [1] - 984:24
**significance** [1] - 985:21
**Silicon** [1] - 959:9
**similar** [1] - 986:17
**situation** [1] - 964:2
**six** [1] - 980:9
**slide** [16] - 959:16, 959:23, 959:24, 960:11, 960:12, 960:14, 960:18, 960:21, 961:3, 961:5, 961:17, 961:20, 961:22, 984:8, 985:13, 988:19
**slide's** [1] - 961:25
**smartphone** [1] - 977:16
**SMURZYASKI** [3] - 984:15, 985:19, 985:23
**software** [1] - 981:25
**someone** [2] - 968:20, 972:3
**sometimes** [1] - 976:15
**SOMMER** [1] - 988:24
**Sommer** [1] - 988:24
**sorry** [4] - 959:19, 981:6, 988:4, 989:14
**sort** [3] - 984:5, 984:18, 987:3
**sound** [1] - 960:19
**sources** [1] - 988:18

**specific** [5] - 959:3, 961:14, 966:3, 969:16, 975:25
**specifically** [3] - 964:6, 971:25, 985:5
**specifics** [1] - 966:9
**speculation** [1] - 962:9
**spent** [1] - 976:8
**St** [1] - 882:23
**stand** [2] - 965:11, 985:19
**standing** [2] - 985:10, 985:24
**start** [2] - 989:3, 989:5
**starting** [1] - 989:18
**starts** [2] - 961:5, 980:13
**State** [1] - 882:19
**STATES** [2] - 882:1, 882:10
**states** [1] - 968:18
**States** [2] - 882:2, 883:2
**stay** [1] - 978:2
**stenographic** [1] - 991:5
**Steps** [1] - 975:22
**steps** [4] - 958:12, 958:16, 969:8, 981:18
**stipulation** [1] - 985:9
**Street** [2] - 882:12, 882:16
**strengths** [1] - 978:7
**strong** [1] - 958:8
**stuff** [1] - 989:24
**subject** [1] - 975:20
**subjected** [1] - 987:24
**subjects** [1] - 956:12
**substance** [1] - 959:5
**substantial** [1] - 966:24
**substantive** [11] - 964:24, 966:4, 966:8, 966:15, 966:20, 969:11, 969:17, 969:24, 970:1, 970:2, 976:19
**substantively** [2] - 964:21, 964:22
**Sugawara** [1] - 973:22
**Sugawara@google.com** [1] - 973:21
**Suite** [1] - 882:20
**supervisor** [1] - 971:5
**supervisors** [1] - 971:3
**suppose** [1] - 965:13
**surprised** [1] - 972:3
**switch** [1] - 977:25

**T**

**table** [1] - 962:15
**tallied** [1] - 960:20
**team** [3] - 972:6, 972:17, 979:6
**terms** [3] - 958:19, 962:3, 979:2
**testified** [2] - 976:22, 976:25
**testimony** [5] - 981:4, 983:16, 989:13, 989:16, 989:18
**THE** [49] - 882:1, 882:1, 882:9, 956:9, 960:5, 960:6, 962:10, 962:12, 962:14, 962:20, 962:24, 963:1, 965:13, 965:17, 965:20, 965:21, 967:4, 967:22, 967:23, 970:24, 973:15, 975:13, 979:5, 979:13, 980:24, 983:15, 983:18, 983:19, 984:1, 984:4, 984:14, 985:3, 985:7, 985:16, 985:22, 985:25, 986:3, 986:9, 986:15, 987:2, 987:18, 988:4, 988:11, 988:16, 988:22, 989:7, 989:11, 989:17, 990:5
**thinking** [1] - 974:22
**third** [6] - 964:12, 964:14, 964:17, 973:2, 987:10, 987:13
**third-parties'** [1] - 987:13
**third-party** [1] - 973:2
**thou** [2] - 985:13
**thoughts** [1] - 988:16
**thousands** [1] - 964:15
**thread** [1] - 973:24
**ties** [1] - 962:23
**titled** [1] - 959:16, 961:3
**today** [2] - 962:19, 981:4
**together** [1] - 979:7
**took** [2] - 958:12, 958:16
**tool** [3] - 987:22, 988:6, 988:9
**top** [5] - 962:22, 967:25, 968:3, 974:7, 981:22
**topic** [1] - 964:25
**topics** [1] - 969:18
**total** [1] - 960:18

**traced** [1] - 987:19
**traditionally** [2] - 959:2, 966:19
**Training** [2] - 959:17, 959:19
**training** [5] - 959:20, 960:15, 960:22, 961:23, 985:5
**TRANSCRIPT** [1] - 882:9
**transcript** [2] - 991:4, 991:5
**travels** [1] - 983:16
**treat** [1] - 974:17
**TRIAL** [1] - 882:9
**tried** [4] - 969:10, 969:13, 969:24, 970:2
**true** [4] - 973:23, 974:24, 991:4, 991:5
**try** [2] - 971:19, 978:13
**Tsao** [1] - 960:4
**turn** [3] - 970:4, 971:15, 971:16
**turned** [2] - 970:5, 970:6
**turning** [1] - 968:25
**two** [4] - 976:8, 986:7, 986:19, 989:7
**TYLER** [1] - 882:19
**types** [1] - 962:4
**typically** [1] - 978:4

**U**

**U.S** [2] - 882:12, 882:15
**UI** [2] - 977:10, 977:14
**unattractive** [1] - 977:25
**under** [1] - 968:8
**understood** [2] - 963:20, 982:7
**United** [1] - 883:2
**UNITED** [2] - 882:1, 882:10
**united** [1] - 882:2
**unobjected** [1] - 983:24
**unobjected-to** [1] - 983:24
**unopened** [1] - 980:18
**unprompted** [1] - 959:4
**unrelated** [1] - 962:18
**up** [10] - 960:20, 962:25, 964:13, 965:3, 973:11, 975:19, 978:17, 980:3, 983:25, 984:11
**update** [4] - 980:8,

980:13, 980:15, 980:21
**UPX1066** [2] - 984:7, 985:25
**UPX1088** [3] - 967:17, 968:1, 970:22
**UPX320** [3] - 959:15, 959:16, 962:8
**UPX710** [4] - 973:11, 973:18, 975:18, 983:3
**UPX713** [6] - 962:8, 962:11, 962:25, 963:17, 964:12, 964:18
**UPX738** [1] - 981:22
**UPX8071** [3] - 965:3, 965:23, 967:2
**user** [16] - 976:23, 977:1, 977:5, 977:6, 977:11, 977:13, 977:17, 977:22, 978:4, 978:8, 979:23, 979:24, 980:11, 982:4, 982:11, 982:22
**users** [7] - 963:16, 977:7, 979:2, 979:11, 980:15, 981:9, 982:8
**utility** [1] - 977:10

**V**

**Varian** [2] - 984:7, 985:4
**various** [1] - 976:10
**vary** [1] - 981:24
**vein** [1] - 986:17
**Verizon** [1] - 989:2
**version** [1] - 981:25
**versions** [1] - 978:3
**video** [2] - 974:17, 980:1
**view** [2] - 968:9, 986:16
**visited** [1] - 981:7
**voicemail** [1] - 980:18
**vs** [1] - 882:5

**W**

**Washington** [6] - 882:5, 882:13, 882:17, 882:24, 883:3, 991:13
**watches** [1] - 975:25
**ways** [1] - 979:2
**Wear** [4] - 975:22, 975:23, 975:24, 976:1
**wearable** [1] - 975:25
**wearables** [3] - 983:5, 983:7, 983:10
**web** [3] - 979:9, 979:10, 981:13
**WEBB** [1] - 882:19

**website** [3] - 982:4, 982:13, 982:19
**websites** [1] - 981:7
**week** [1] - 983:20
**weekend** [3] - 989:24, 990:2, 990:6
**weigh** [3] - 958:24, 959:4
**welcome** [1] - 979:16
**widget** [8] - 981:10, 981:12, 981:16, 981:19, 982:6, 982:12, 982:17, 982:22
**William** [1] - 882:19
**WILLIAMS** [1] - 882:23
**wireless** [1] - 981:25
**withdraw** [1] - 967:20
**WITNESS** [4] - 960:6, 965:21, 967:23, 983:18
**witness** [7] - 975:12, 984:17, 984:20, 985:17, 985:23, 989:18
**witnesses** [2] - 984:25, 989:15
**works** [1] - 978:11
**world** [1] - 964:11
**worried** [5] - 956:24, 957:12, 957:13, 964:6, 964:8
**write** [4] - 963:8, 963:14, 963:22, 966:1
**written** [6] - 956:13, 958:13, 959:12, 961:6, 961:11, 962:1
**wrote** [1] - 965:4

## Y

**years** [3] - 956:16, 958:10, 980:9
**yesterday** [2] - 976:22, 978:24
**York** [1] - 882:21
**yourself** [1] - 958:9
**YouTube** [1] - 980:1
**Yuki** [1] - 973:18