```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      United States of America,    )
 3    et al.,                      )        ███████
                                   )
 4                   Plaintiffs, )
                                   ) CV No. 20-3010
 5                       vs. ) Washington, D.C.
                                   ) September 15, 2023
 6    Google LLC,                  ) 9:30 p.m.
                                   )
 7                    Defendant. )
      _____)
 8

 9                   TRANSCRIPT OF BENCH TRIAL
                 BEFORE THE HONORABLE AMIT P. MEHTA
10                 UNITED STATES DISTRICT JUDGE

11    APPEARANCES:
      For DoJ Plaintiffs:       Kenneth M. Dintzer
12                              U.S. DEPARTMENT OF JUSTICE
                                1100 L Street, NW
13                              Washington, D.C.
                                (202) 307-0340
14                              Email:  Kenneth.dintzer2@usdoj.gov

15                              Erin Murdock-Park
                                U.S. DEPARTMENT OF JUSTICE
16                              Antitrust Division
                                450 Fifth Street NW
17                              Washington, DC  20530
                                (202) 445-8082
18                              Email:  Erin.murdock-park@usdoj.gov
      For Plaintiff
19    State of Colorado:        William F. Cavanaugh, Jr.
                                PATTERSON BELKNAP WEBB & TYLER LLP
20                              1122 Avenue of the Americas
                                Suite 2200
21                              New York, NY  10036
                                (212) 335-2793
22
      For Defendant Google:     John E. Schmidtlein
23                              WILLIAMS & CONNOLLY LLP
                                725 12th St., NW
24                              Washington, D.C. 20005
                                (202) 434-5000
25                              Email:  Jschmidtlein@wc.com
```

1    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
2                             United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
3                             Washington, DC  20001
                              202-354-3267
4                                *   *   *

```
1    *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2              THE COURTROOM DEPUTY:  Good morning, Your Honor.

3    This is Civil Action 20-3010, United States of America, et al.

4    versus Google LLC, Kenneth Dintzer for the DoJ plaintiffs,

5    Jonathan Sallet and William Cavanaugh for the plaintiff states.

6              MR. SCHMIDTLEIN:  John Schmidtlein on behalf of

7    Google.

8              THE COURT:  Good morning, everyone.  All right.  So,

9    we are going to begin this morning in a closed session to deal

10   with some confidential material.  We've confirmed that the line

11   is disconnected to the media room.  And let me just confirm

12   that everyone who is present is affiliated in some way with the

13   parties.  If you are not, please let me know.  Okay.  Great.

14             Mr. Kolotouros, why don't you come on back up.

15             MS. MURDOCK-PARK:  Just to confirm, Your Honor, we do

16   have more public material that we'll get to.

17             THE COURT:  All right.  Whenever you're ready,

18   Counsel.

19             THE WITNESS:  Is there any water, by chance?

20             THE COURT:  We'll get you some.

21                  DIRECT EXAMINATION (Cont.)

22   BY MS. MURDOCK-PARK:

23   Q.  Good morning, Mr. Kolotouros.

24   A.  Good morning.

25   Q.  Just one quick question for clarity before we start.
```

1    Yesterday you were referring to partners that elect to load

2    GMS.  Did you mean OEMs assigned a model?

3    A.  Yes.

4    Q.  I would like to go back to the strikes that we were

5    discussing at the close of session.

6    A.  Okay.

7    Q.  And at this time, I would like to pull up UPX149.  And I

8    note that this is one of the documents that Professor Rangel

9    discussed yesterday -- might have been Wednesday, at this

10   point.

11        Mr. Kolotouros, I think you go to page 2.  Are you

12   familiar with UPX149?

13   A.  Yes.

14   Q.  Page 2 of UPX149 starts with an email saying that Samsung

15   violated Section 2.4 of the RSA, correct?

16   A.  It does, yes.

17   Q.  And its subject includes Notice No. 3, correct?

18   A.  Yes.

19   Q.  So, Google sent Samsung an email telling it to stop --

20   telling it to stop doing what it was doing; fair?

21   A.  The email was sent requesting that Samsung comply with the

22   terms of the agreement as specified in the attachment or

23   exhibit, that is correct.

24   Q.  So if we could go to the chart on page 2.  And the second

25   row of the chart mentions:  Quick access panel, drop-down menu,

```
 1    bookmarks on company proprietary browsers.
 2           Right?
 3    A.   Yes.
 4    Q.   And the requirements are set pursuant to Exhibit F of the
 5    Samsung RSA that was in effect at the time?
 6    A.   Yes.
 7    Q.   Let's go to page 3, please, of 149.
 8           And page 3 is Exhibit F of Samsung's 2017 RSA; is that
 9    right?
10    A.   This is page 28 of the contract or --
11    Q.   Well, this -- at the top -- if we could zoom in on the
12    whole chart.
13           The top says Exhibit F.
14    A.   Okay.  Yes.
15    Q.   And so that would be Exhibit F from Samsung's RSA, right?
16    A.   That is correct, yes.
17    Q.   And the middle column of the chart deals with the drop-down
18    menu requirements?
19    A.   Yes.
20    Q.   The bottom middle box -- and this is, I believe, what
21    Professor Rangel was speaking of.  The bottom middle box says
22    that:  Selecting items in the drop-down menu shall not change
23    default.
24           At No. 2, correct?
25    A.   That is correct.
```

1  Q.  So even if Samsung thinks its users would prefer to change

2  the default from the drop-down menu, Samsung cannot configure

3  its devices that way.

4  A.  If Samsung thinks its users should change the default,

5  there's a settings panel -- or, settings that allow for the

6  change of the default in the browser itself.

7  Q.  Right.  But what I'm saying is, if Samsung believes that

8  its users wanted to change the defaults from the drop-down

9  menu, Samsung was not able to allow its users to do that.

10  A.  There was no specification of the default itself being

11  changed in connection with the UI.  So, in that particular user

12  experience, because there was no notification of defaults being

13  changed, we suggested or requested or put in the agreement that

14  the default not be changed, if it's just a single drop-down for

15  a specific query.

16  Q.  Okay.  I don't think you've quite answered my question,

17  Mr. Kolotouros.  What I'm asking is that, if Samsung believed

18  that its users wanted to change the default from the drop-down

19  menu, they were prohibited from permitting their users to do so

20  using the drop-down menu per the terms of the RSA?

21  A.  The preamble of "if Samsung believed," I -- I don't want to

22  represent what Samsung believed in connection with the

23  contractual term.

24  Q.  Okay.  But the contract prohibited Samsung from permitting

25  its users to change the default using the drop-down menu,

1    correct?

2    A.  Through the drop-down menu, that is correct.

3    Q.  The only way the user could change the default search

4    engine in the S browser was to go into the device settings,

5    right?

6    A.  I believe it was available in the browser settings, as

7    opposed to the device settings.  So within browser itself,

8    there's a settings menu that allowed for the change of the

9    search default.

10   Q.  In January 2018, Google was the default search engine for

11   the SBrowser?

12   A.  On a device-by-device election pursuant to the contract,

13   that is correct, if elected by Samsung to enroll the device.

14   Q.  Since we're on this exhibit, I would like to draw your

15   attention to No. 1, which is across all rows on the bottom

16   three boxes.

17          THE COURT:  I'm sorry to interrupt.  When you say "On

18   a default-by-default (sic) contract," were there any contracts

19   with Samsung in which Google was not the default search engine

20   for the SBrowser?

21          THE WITNESS:  In the 2017 contract, Samsung's

22   election of default for SBrowser was device by device.  So,

23   they would just elect on a device-by-device basis when to set

24   the default in SBrowser to Google.  In the 2020 agreement,

25   there was an alternate structure with respect to defaults.

1          THE COURT:  Okay.  What do you mean by that?

2          THE WITNESS:  That was the core tier, or the core

3     device, which would be on a platform basis.

4          THE COURT:  Okay.  Go ahead.

5          MS. MURDOCK-PARK:  Your Honor, we will go to the full

6     RSA in just a few minutes.

7          THE COURT:  Okay.

8     BY MS. MURDOCK-PARK:

9     Q.  Mr. Kolotouros, No. 1 across the bottom three boxes on

10    each --

11    A.  Yes.

12    Q.  -- No. 1 prohibits alternative services from being added to

13    the quick access panel, the drop-down menus, or bookmarks,

14    correct?

15    A.  I think in the drop-down menu alternative services may be

16    present.  And in the quick access panel is where alternative

17    services could not be added, in addition to the bookmarks.

18    Q.  So the no new alternative services for quick access panel,

19    no new alternative services for bookmarks, and in the drop-down

20    menu, alternative services may be present, but Google Search is

21    the default?

22    A.  For the devices where they elect to enroll, Google would be

23    the default, and then there would be quick access to

24    alternative services in the drop-down, that is correct.

25    Q.  And alternative services includes alternative search

1    services?

2    A.  That is correct.

3    Q.  Do you recall any device of Samsung's in the 2017 RSA that

4    was not set to Google as the default search on SBrowser?

5    A.  I don't know what they were doing in Russia or other

6    geography, potentially, but I think generally, SBrowser was

7    setting Google as the default with a couple of carve-outs, I

8    believe, for certain -- not carve-out, just they didn't elect

9    to enroll some devices in certain geographies.

10   Q.  In the United States, do you know approximately how many

11   devices Samsung elected not to enroll?

12   A.  I do not.

13   Q.  It was a small number, right?

14   A.  I don't know how many decided not to enroll or elect.

15   Q.  I would like to go to UPX161 now, which starts with an

16   email from Christian Veer to you and to others.

17   A.  Okay.

18   Q.  And it's a June 20th, 2019, email.

19        If we could actually keep the entire first page on the

20   screen.

21        I just want to confirm that UPX161 discusses -- strike

22   that.

23        If we could go to page 2.

24        And the bottom part of page 2 shows an agenda for GDAF.

25   Do you see that?

1    A.  I do.

2    Q.  And the GDAF is the meeting we were discussing yesterday at

3    the business counsel, right?

4    A.  Yes.

5    Q.  The GDAF agenda states that:  The request to the business

6    counsel was to approve an increase in mobile search revenue

7    share.

8         Right?

9    A.  That is correct.

10   Q.  And the increase was intended to incentivize covering more

11   devices and receiving more exclusivity coverage, right?

12   A.  I don't think that was the exclusive rationale for the

13   increase in the mobile revenue share.

14   Q.  Well, the asks for BC state that:  The mobile search

15   revenue share of ███ billion in 2020 is an increase of

16   ███ million previously approved in 2016.

17        Right?

18   A.  Yes.

19   Q.  And that would grow to ███ billion, which is an increase of

20   ████████ in 2023, right?

21   A.  Yes.

22   Q.  And that would be across Search and Play for carriers and

23   non-Samsung OEMs, right?

24   A.  Yes, that is correct.

25   Q.  And that, obviously, excludes Apple as well, right?

1    A.  That does exclude Apple, that is correct.

2    Q.  So the ███ billion is in addition to the billions of

3    dollars to be paid to Apple and to the billions of dollars to

4    be paid to Samsung?

5    A.  I don't know the precise terms of the Apple deal, but this

6    is separate from the Samsung deal, whose annual payments

7    ████████████████████████████████████

8    Q.  I would like to go to page 4.

9           THE COURT:  Sorry.  Can you, just for a moment --

10   your question was whether there was a request to increase the

11   revenue share --

12          MS. MURDOCK-PARK:  Yes.

13          THE COURT:  -- to ███ billion in 2020?

14          MS. MURDOCK-PARK:  Yes.

15          THE COURT:  Okay.

16          And, Mr. Kolotouros, you confirm that?

17          THE WITNESS:  Yes.  The revenue share was being --

18   the request was to increase it from what had previously been

19   approved.

20          THE COURT:  Okay.  Thank you.

21          MR. McLELLEN:  Sure.

22   BY MS. MURDOCK-PARK:

23   Q.  And to clarify, Mr. Kolotouros, there was an ask to the

24   business counsel in about 2016 or so projecting how much

25   revenue share would be paid to partners through 2020?

```
 1    A.  I believe so.

 2    Q.  Is that accurate?

 3    A.  Yes.

 4    Q.  Okay.  If we could go to Rationale at the bottom of page 4.

 5         And there's a box that says Search and Assistant on the

 6    right, and it says:  EC Ruling --

 7         "EC" means European Commission?

 8    A.  Yes.

 9    Q.  EC ruling created opportunity for rivals to secure full

10    search exclusivity on devices in EEA.

11         And "EEA" is the European Economic Area?

12    A.  That is correct.

13    Q.  Google was concerned that the EC ruling left open an

14    opportunity for rivals to get full search exclusivity on GMS

15    devices, right?

16    A.  It was -- the possibility of OEMs electing to consider

17    alternate structures was available in Europe, that is correct.

18    Q.  If we could go to page 7.

19         And there's a box at the top of the page that says:

20    Percent devices covered with protections for Search, Feed,

21    Play, and Assistant.

22         Do you see that?

23    A.  I do.

24    Q.  And the expected performance under the new deal would be to

25    increase device coverage -- increase RSA device coverage from
```

1    the current about ▮ percent to ▮ percent, right?

2    A.  I think it's the expected performance.  So the expectation

3    or the anticipation was the desire to enroll OEMs in the deals

4    that included a platform component in the foundation of the

5    core tier.

6    Q.  Okay.  So -- but the expected performance, what Google

7    wanted, was to enroll ▮ percent of devices from ▮ percent

8    of OEMs?

9    A.  The goal was to engage with OEMs and find an economic

10   arrangement that would compel them to enroll their devices in

11   these deals and sign the RSA, that is correct.

12   Q.  Okay.  And that means that ▮ percent of Android devices

13   would then be expected to have Google Search defaults, right?

14   A.  For that particular tier, it would be defaults but no

15   exclusivity, that is correct.

16   Q.  And if partners chose to enroll in either of the other

17   tiers, it would mean exclusivity as well, right?

18   A.  In the device-by-device tiers, that is correct.  The

19   premiere tier, I think, it was known as -- or, is known as.

20   Q.  If we could go further down page 7, where there is a

21   Sales/BD section.

22          And it looks like Jim K. is on the left.  That's you,

23   right?

24   A.  I think I'm on the right.  But, yes, to the right of John

25   Gold.

1    Q.  To the right of John Gold on the left side --

2    A.  On the left side of -- yes.

3    Q.  And the first bullet under Cons says: ██████████

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ██████████████████████████████

7        Right?

8    A.  Yes.

9    Q.  ██████████████████████████████?

10   A.  ██████████████████████████████████████

11   ██████████████████████████████████████

12   ████████████████████████████████████████████

13   ██████████████████████████████████████

14   ████████████████████████████████████████

15   ████.

16        ████████████████████████████████████████████

17   ██████████████████?

18   Q.  ████████████████████████████████████

19   ██████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ██████████████████████████.

23   Q.  Go ahead and put the document aside.  And I'm going to ask

24   you about another business council meeting.

25             MS. MURDOCK-PARK:  And I would like to pull up

1    UPX569.  And I believe there is a hearsay and misleading

2    objection on this one.  You can keep it on the screen.

3              I'll note that I'm asking -- or, intend to ask

4    Mr. Kolotouros about an email exchange that he had with his

5    direct report, among other things.

6              MR. SCHMIDTLEIN:  You had me until you said "among

7    other things."  If you're only asking about email exchanges he

8    was involved in, then for that purpose, we have no objection.

9              THE COURT:  Okay.  Well, I guess the question is:  To

10   what portion of the email is there a hearsay objection?  Then,

11   we can have a sense of whether counsel is going to refer to it

12   or not.

13             MS. MURDOCK-PARK:  Well, specifically, I'm going to

14   ask about emails on page 1 with Mr. Kolotouros, and I -- with

15   Mr. Kolotouros and Mr. Lee.

16             THE COURT:  Okay.

17             MS. MURDOCK-PARK:  And then I'm going to page 6,

18   where they are discussing a linked deck.  And I'm going to be

19   asking about the questions on -- or one -- I'm sorry.  Not a

20   linked deck, but one of the business council presentations.

21             MR. SCHMIDTLEIN:  The only issue here, if you'll

22   notice, Your Honor --

23             THE COURT:  Is the feedback at the bottom?

24             MR. SCHMIDTLEIN:  Well -- yeah, the feedback at the

25   bottom.  So if we're excluding that, which, I think, is a third

1    party, which would be part of the hearsay, we can take care of

2    that, if it's just on emails.

3            The other only question, and maybe they can try to

4    establish it with the witness, if you go to the end of the

5    email and you see the Bates number at the bottom there, this

6    actually would be the blank page, I suppose, which is 1693.

7            THE COURT:  Oh, okay.

8            MR. SCHMIDTLEIN:  The third page, that blank page

9    there.  And then if you turn to the next page, which, I think,

10   is the deck, that starts an entirely different Bates range.

11   And I think -- I think what they're trying to suggest is that

12   this is either somehow attached or somehow related, but they're

13   obviously not a singular whole document.  And I think that was

14   sort of our objection, is to considering this as a singular

15   exhibit when they appear to be two separate documents.  But, if

16   they can try to establish it, we're fine with that.

17           THE COURT:  Okay.  All right.  Well, let's --

18           MS. MURDOCK-PARK:  And, Your Honor, this is the way

19   that the document was produced to us.  There are multiple

20   linked documents.  This is one of the documents that was linked

21   to it, based on Google's representation when it produced it.

22           THE COURT:  I now remember that a number of the --

23   Google included hyperlinks in many of its emails to documents,

24   and this is an example of that?

25           MS. MURDOCK-PARK:  I believe so.  I know that it was

```
 1    linked to the document in Relativity from the metadata that

 2    Google produced.

 3              THE COURT:  Okay.  All right.

 4    BY MS. MURDOCK-PARK:

 5    Q.  If we can go to the email from you, Mr. Kolotouros, at

 6    11:54 a.m.  I'm going to start with that.  The subject of the

 7    email is:  Feedback from Buniac on RSA 3.0.

 8         Correct?

 9    A.  Yes.

10    Q.  And this email exchange is with Mr. Lee, who is one of your

11    direct reports?

12    A.  That is correct.

13    Q.  And "Buniac" refers to Sergio Buniac, the president of

14    Motorola?

15    A.  Sergio Buniac, that is correct.

16    Q.  Mr. Lee is providing you information about Motorola's

17    response in those RSA negotiations, correct?

18    A.  I believe that is the context, yes.

19    Q.  And specifically, Mr. Lee is relaying his discussions with

20    Eric Christiansen, who is the executive director of software

21    product management at Motorola?

22    A.  Yes.  I'm not sure of his precise title, but he's someone

23    we interact with frequently at Motorola.

24    Q.  Interact with frequently for RSA negotiations, among other

25    things?
```

1    A.   Among other things, yes.

2    Q.   And halfway down the first page you instruct Mr. Lee to:

3    Hold the line for now.

4         Correct?

5    A.   That is correct.

6    Q.   And you write in the second paragraph:  Critical to the

7    Moto/Lenovo deal is knowing that we are buttoned up so that

8    high-value devices/countries cannot be carved off, and we don't

9    lose tablet volume as well.

10        Right?

11   A.   Yes.

12   Q.   So Google wanted to make sure that high-search-revenue

13   earning devices would be included in the Motorola revenue share

14   agreement?

15   A.   We wanted Motorola to enroll as many of the devices in the

16   premiere tier as possible, which was a device-by-device

17   election, that is correct.

18   Q.   And Google had to ensure that Motorola would not move the

19   high-earning devices to another search provider?

20   A.   We wanted Motorola to enroll as many devices in the deal as

21   possible.

22   Q.   And not enroll them with another search provider?

23   A.   Well, there's -- there were other things in the deal beyond

24   search that cover device configuration, et cetera.  But, that

25   is another possibility, to the extent they do not enroll the

1    device.

2    Q.  And so those concerns with Motorola potentially not

3    enrolling its high-value devices with Google caused Google to

4    seek an alternate deal structure for Motorola?

5    A.  I think the -- one of the -- this is an alternate structure

6    from what is typically done with other OEMs.  I think payout

7    predictability was something Motorola had expressed interest

8    in, which is what made us consider this particular structure.

9    Q.  Let's go to page -- well, actually, let's go to page 4 of

10   the document so we're sure we're talking about the same thing.

11   The BC distribution on Android framework GDAF, correct?

12   A.  Okay.

13   Q.  And the primary presenter, towards the top third, is

14   Christopher Lee, right?

15   A.  Yes.

16   Q.  And he's, again, your direct report?

17   A.  That is correct.

18   Q.  So you were familiar with the distribution on Android

19   framework, right?

20   A.  Yes.

21   Q.  If we can go to page 6.  Towards the top it says:

22   Guarantees from the partner.

23        Do you see that?

24        And by Guarantees for the partner, it reads that:  The

25   proposed deal structure guarantees that ███████████    from

1    Motorola will be Google Forward devices?

2         Right?

3    A.  Yes.

4    Q.  Google Forward is one of the RSA tiers that includes

5    exclusivity, correct?

6    A.  I believe that is correct, yes.

7    Q.  And Google would offer Motorola some potential carve-outs

8    for the full term of the contract, right?

9    A.  Yes.

10   Q.  But those carve-outs should not exceed █ percent of the

11   total volume of noncarrier-controlled devices, right?

12   A.  I'm trying to reconcile the ███████████ element with

13   being enrolled in the premier tier, which is where there was a

14   flexibility to enroll as many or as few devices in the

15   contract.  This is also part of the waiver letter that was sent

16   that we discussed yesterday.

17   Q.  All right.  But I'm asking specifically about this document

18   seeking -- this document seeking the new deal structure with

19   Motorola where it's talking about the Google Forward devices,

20   right?

21   A.  Yes.

22   Q.  And saying that:  Any carve-outs will not exceed █ percent.

23        Correct?

24   A.  Yes.  I guess what I'm trying to correlate is whether

25   Google Forward refers to the foundation tier or the premier

902

```
1    tier.  And I think, to the extent it is focused on the
2    foundation tier, which is how I'm interpreting this, which was
3    a platform commitment, that's where the carve-out exists.  So,
4    I think that the foundation tier is the Google Forward device
5    that does not include exclusivity, for which there is a
6    carve-out for noncarrier-controlled devices.
7    Q.  Let's just see if I can --
8    A.  That's based on my understanding of the contract and the
9    characterization of Google Forward as being part of the
10   foundation tier.
11   Q.  Okay.  If we can go back to UPX1077, which we discussed
12   yesterday.  And I would like to go to slide 7.  I just want to
13   make sure that we're on the same page on everything.
14              THE COURT:  Which document?
15              MS. MURDOCK-PARK:  1077, Your Honor.
16   BY MS. MURDOCK-PARK:
17   Q.  And do you see to the right, in the dark green box, where
18   it says:  Google Forward?
19       Correct?
20   A.  Yes.
21   Q.  And so the Google Forward tier includes Google apps as
22   defaults, all Search Access Points, and Play as the primary
23   exclusive source of third-party downloads, right?
24   A.  Yes.
25   Q.  And that has the ▮ percent search revenue share as today
```

1    bonus; correct?

2    A.  Yes.  But, the difference is that the Motorola deal was not

3    based on a revenue share.  It was based on a ██████████████

4    ██████████, which is why I agree there might be some confusion

5    in the characterization of this as Google Forward with the

6    revenue share component.  Because my understanding of the deal

7    was that ███████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ██████████████████████████.

10           So I think this is where there might be some --

11   because it's an ██████████████████████████████, the

12   Google Forward -- ████████████████████████████████████

13   ███████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ██.

16   Q.  Let's go back to UPX569.  If we can go back to page 6 and

17   the guarantees from the partner.  With respect to the

18   carve-outs won't exceed █ percent, so that means at least

19   █ percent of Motorola devices would be enrolled in the Google

20   Forward tier, right?

21   A.  Yes.

22   Q.  And in exchange, Google would get the exclusivity

23   provisions and the default from the Google Forward tier.

24   A.  The default and the?

25   Q.  Exclusivity provisions in the Google Forward tier.

1  A.  So, I think this is where I'm a little confused.  Because I

2  am correlating the Google Forward devices in this particular

3  deal with the foundation tier, which is where the exclusivity

4  did not exist with respect to Search.

5  Q.  Okay.  But in this document, in 569, it refers to Google

6  Forward, correct?

7  A.  It does, yes.

8  Q.  And the GDAF proposal was accepted by the business council,

9  right?

10  A.  It was, yes.

11  Q.  And Motorola currently has over 95 percent of its devices

12  enrolled in the Google Forward tier?

13  A.  I believe that is -- I believe that's correct.  I guess the

14  question is whether Google Forward is referring to the

15  foundation tier or the premiere tier.  I'm correlating it here

16  with the foundation tier, and, so, I want to make sure we're on

17  the same page with respect to what part of the structure

18  they're actually sitting within when referring to Google

19  Forward.

20  Q.  Okay.  With respect to Motorola's devices currently

21  enrolled in its RSA, are 95 percent of the devices enrolled in

22  the higher-revenue-share paying tier?

23  A.  I believe that is the case.

24          MR. SCHMIDTLEIN:  Objection.  If we can get a

25  clarification as to what part of the world we're talking about,

 1   that might be helpful.

 2            THE COURT:  I'm sorry?

 3            MR. SCHMIDTLEIN:  What part of the world we're

 4   talking about.

 5   BY MS. MURDOCK-PARK:

 6   Q.  Mr. Kolotouros, are over 95 percent of the Motorola devices

 7   in the United States enrolled in the higher-paying tier?

 8   A.  To the extent there's a telecom carrier carve-out, I don't

 9   know if that's included in the calculus or not.

10   Q.  You don't know what percent of devices are enrolled?

11   A.  My fluency with the specificity around the carrier

12   carve-outs, I know there's -- I think there are carrier

13   carve-outs in this particular deal, so I don't know the precise

14   breakdown.

15   Q.  Okay.  Exclusive of carrier carve-outs -- and by "carrier

16   carve-out," can you please explain to the Court what you mean

17   by that?

18   A.  Devices that are arranged or bought by carriers for sale in

19   their stores or through their channel, whether it be online or

20   otherwise.  As in the Google deal with Samsung in 2020, there's

21   a carve-out for carriers so they can configure the device the

22   way the carrier specifies.

23   Q.  And so when we're referring to Motorola devices, we are

24   talking about devices sold directly by Motorola?

25   A.  Those are known as -- so, I think it is safe to say that

1    95 percent of open-market devices in the U.S. are enrolled in

2    the premiere tier.

3    Q.  Okay.  And the 95 percent of devices that are not the

4    carrier carve-out devices are enrolled in the premiere tier in

5    the United States; would that be accurate?

6    A.  I think that 95 percent or more of open-market devices sold

7    by Motorola in the United States are enrolled in the premiere

8    tier.  I think that's correct.

9    Q.  Okay.

10            MS. MURDOCK-PARK:  And, Your Honor, I would move

11   to -- or, ensure that UPX569 is admitted.

12            THE COURT:  Okay.  So 569 will be admitted, if it's

13   not already.

14            MS. MURDOCK-PARK:  Thank you.

15            If we could go to the Motorola Mobile Incentive

16   Agreement, which is UPX5399.

17            THE COURT:  If I could just ask a clarifying

18   question.  When you say "The premiere tier in the United States

19   for Motorola," what does that mean in terms of the agreement as

20   to defaults and the agreement as to exclusivity for that tier

21   of devices?

22            THE WITNESS:  The defaults would be secured in the

23   ████████████████████████████████████████████████████████████████

24   ██████████████████████████████   And that's where the exclusivity

25   would reside with respect to Search -- out-of-box exclusivity

1    would reside with respect to Search.

2              THE COURT:  So -- so when you say "95 percent," what

3    does that cover?  Which of the two tiers that you're talking

4    about does that --

5              THE WITNESS:  I think for a device to be enrolled in

6    the premiere tier, it has to be a foundation tier device.  So,

7    they commit to a certain set of devices in the foundation tier,

8    and then they can, essentially, put a percent of devices into

9    the premiere tier that are sold.  And if they get to a certain

10   percent, they qualify for higher monthly payments.

11             THE COURT:  Okay.

12             THE WITNESS:  But there's not -- ███████████████

13   ████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████.

15             THE COURT:  Thank you.

16             MS. MURDOCK-PARK:  Hopefully my next few questions

17   will help make it even more clear, Your Honor.

18   BY MS. MURDOCK-PARK:

19   Q.  5399 is the 2020 Motorola MIA, correct?  Or mobile

20   incentive agreement?

21             MS. MURDOCK-PARK:  And this is in evidence, Your

22   Honor.

23             THE COURT:  Okay.

24   BY MS. MURDOCK-PARK:

25   Q.  Are you there at the first page, Mr. Kolotouros?

1    A.  Yes, I am.

2    Q.  So this is the 2020 Motorola MIA.

3    A.  Yes, it is.

4    Q.  If we could go to page 23.  And page 23 is Attachment A to

5    the Motorola MIA.  Attachment A sets out the incentive payments

6    for Motorola, right?

7    A.  That is correct.

8    Q.  And if we can pull up Section 1.1, it sets out the

9    ██████████████████████████████████████████████████?

10   A.  Yes.

11   Q.  ████████████████████████████████████████████████████

12   ██████████████████████?

13   A.  Yes.

14   Q.  So as long as Motorola meets the requirements in ████████

15   ████████████████████████████████████████████████?

16   A.  That is correct.

17   Q.  And this is one of the unique provisions that you were

18   seeking as part of the Motorola deal, right?

19   A.  It's part of the unique structure correlated with the

20   Motorola deal, that is correct.

21   Q.  Okay.  And then if we can go to page 24, which lists the

22   premiere tier monthly incentive.

23        So, section 2.1 specifically, it talks about how

24   Motorola can get the premiere tier incentive; if it meets the

25   requirements of Section 5 and 7, right?

1    A.  That is correct.

2    Q.  Okay.  And this is the tier that nearly all of Motorola's

3    devices fall into?

4    A.  I believe so, that is correct.

5    Q.  And part of being in the premiere tier, as you said before,

6    I believe, premiere tier devices must meet all of the

7    foundation tier requirements as well, right?

8    A.  I believe that is correct, yes.

9    Q.  If we can go to page 27, which shows ██████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ██████.

13        Right?

14   A.  That is correct.

15   Q.  And then there's a chart on Attachment B that goes through

16   the Search Access Points and their usage and placement

17   requirements?

18   A.  Yes.

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████

23   █████████

24   ████████████████████████████████████████████████████

25   ███████████████████



Q.  All right.  And earlier we had talked about how the mobile
incentive agreement prohibits Motorola from installing any
alternative search service on eligible devices, right?

A.  Within the premiere tier, I believe that's the case, yes.

Q.  I would like to go to page 3 of UPX5399, and specifically,
Section 1.7, which is towards the top.  And Section 1.7 defines
alternative search service as:

Q.  Okay.  So Google won't pay revenue share on any premiere
tier device that has loaded

is an alternative search service?

 1    A.  If there's an alternative search service preloaded on a

 2    device, as determined by Google, then it cannot be -- it is not

 3    enrolled in a tier and will not count toward the percent

 4    commitment to reach the different tiers within the premiere

 5    tier.

 6    Q.  So we can go ahead and put 5399 aside.  And I would like to

 7    talk a little bit about Samsung.  Specifically, the -- let's

 8    start first with the SBrowser, which is Samsung's browser we

 9    discussed?

10    A.  Yes.

11         THE COURT:  The number 95 percent was raised before.

12    And do I understand you to say that 95 percent of the Motorola

13    devices that are sold in the United States are in the premiere

14    tier as it's just been described?

15         THE WITNESS:  I think that's exclusive of devices

16    ranged by carriers.

17         THE COURT:  Right.  I'm not talking about carriers.

18         THE WITNESS:  So open-market devices, I believe the

19    number is north of 95 percent, but I'm not 100 percent sure.

20         THE COURT:  Just to be precise for a layman like

21    myself, you know, if I go to Best Buy -- I think it's still

22    open, Best Buy?

23         THE WITNESS:  It's still open.

24         THE COURT:  -- go to Best Buy, buy a Motorola phone,

25    95 percent odds are that that's going to be a premiere tier

```
1     device?

2               THE WITNESS:  I think that's correct, yes.

3               THE COURT:  Okay.

4     BY MS. MURDOCK-PARK:

5     Q.  With respect to Samsung's RSA --

6               THE WITNESS:  But I'm curious now, if you go to --

7               THE COURT:  It's hard to keep track of the big box

8     stores.

9               MS. MURDOCK-PARK:  I think there's still one in

10    Bethesda, Your Honor.

11    BY MS. MURDOCK-PARK:

12    Q.  Samsung's RSA permits Samsung to either install Chrome on

13    the application dock or install SBrowser on the application

14    dock, but only if SBrowser is set to Google.com, right?

15    A.  As part of the -- as part of the core tier?

16    Q.  As part of the revenue share -- well, yes, as part of the

17    core tier.

18    A.  We're talking the 2020 deal?

19    Q.  The 2020 deal, yes.

20    A.  So, the 2020 deal, the requirement with respect to SBrowser

21    in the core tier is for the default to be set to Google.

22    Q.  Okay.  And either Chrome has to be on the application dock

23    or SBrowser can be on the application dock, but only if it's

24    set to Google?

25    A.  I think Chrome can be anywhere.  I don't think there's any
```

1    specific -- and, again, forgive me if my memory is off on

2    this -- I think Chrome is not part of the core tier.

3    Q.  Samsung has its own app store, right?

4    A.  They offer the Galaxy store, that is correct.

5    Q.  And if we could go to UPX1011, which we discussed

6    yesterday, but I want to go to Slide 19 -- or, page 19 this

7    time, which is an Executive Summary from Galaxy Store catalog

8    update.  Do you see that, Mr. Kolotouros?

9    A.  This is page --

10   Q.  Page 19 of UPX1077 -- I'm sorry -- 1011.

11   A.  I'm trying to find it in the -- oh, here it is.  I'm sorry.

12   Okay.  I have it.

13   Q.  Google is not worried that the Galaxy store will

14   cannibalize Play Store revenue, correct?

15   A.  We didn't assess that the Galaxy Store was meaningfully

16   impacting Play Store revenue from the bullet.

17   Q.  If we go to the bottom left, where it says:

18   Cannibalization of Play Store revenue/usage by Galaxy Store

19   likely limited.

20        Right?

21   A.  Yes.

22   Q.  And then the bullet next to it reads:  We believe that the

23   cannibalization of Play Store revenue due to Galaxy Store is

24   none to minimal.

25        Right?

1    A.  Yes.

2    Q.  And Galaxy Store also has no notable exclusive titles;

3    correct?

4    A.  At the time this was written or currently?  I'm trying to

5    get a sense for timing.

6    Q.  Either.

7    A.  I'm not fluent with what's in the Galaxy store with respect

8    to titles or what might be considered prominent or popular.

9    Q.  The first sub bullet at the top of the page says:  Zero

10   notable exclusive titles in 2019.

11          Correct?

12   A.  Okay.

13   Q.  We can go ahead and put UPX1011 aside again.

14          MS. MURDOCK-PARK:  And just to confirm, Your Honor,

15   we did talk about UPX1011 yesterday.  I want to make sure it's

16   admitted.

17          THE COURT:  1011 is admitted.

18          MS. MURDOCK-PARK:  Thank you.

19   BY MS. MURDOCK-PARK:

20   Q.  So with respect to the Samsung RSA, it is also structured

21   to include two tiers, right?

22   A.  There's, I think, more than two.  There's the core tier,

23   then there's the Search enhanced qualified, Chrome enhanced

24   qualified, and then Search/Chrome enhanced qualified, which

25   includes different revenue shares, depending on what conditions

1    are met.

2    Q.  Okay.  Well, the platform Y tier is the core qualified

3    devices?

4    A.  That's correct.  And excluding the carve-out for the

5    carriers who range the devices.

6    Q.  And for the rest of our conversation about the RSA, I think

7    we can understand that it excludes the carve-out.  Okay?

8    A.  Okay.  Yes.

9    Q.  And the device-by-device tier is called the enhanced

10   qualified devices, right?

11   A.  Yes.

12   Q.  Let's go to JX21, which is in evidence.  And this is the

13   Samsung 2020 RSA, correct?

14   A.  71 or --

15   Q.  71.

16   A.  Okay.  Yes.

17   Q.  Okay.  Let's go to page 25, which has a chart -- several

18   charts.  One of the first charts.  And I would like to zoom in

19   on paragraph 1(a), which sets out the revenue share for core

20   qualified devices, correct?

21   A.  Yes.

22   Q.  And it shows that Samsung will receive █ percent revenue

23   share for core qualified devices distributed in territories

24   other than Turkey, which would include the United States,

25   right?

1    A.  Yes.

2    Q.  And the service access points, or Search Access Points, are

3    set in Attachment B-1, right?

4    A.  That is correct.

5    Q.  I would like to go to the chart at paragraph 1(b), which is

6    still on page 25 of JX71, where it sets out the revenue share

7    for enhanced tier devices, right?

8    A.  Yes.

9    Q.  And there's -- you had mentioned Search enhanced and Chrome

10   enhanced devices.  There's basically three types of devices in

11   the enhanced tier, correct?

12   A.  That is correct.

13   Q.  So you have Search enhanced or Chrome enhanced or Search

14   and Chrome enhanced, right?

15   A.  That is correct.

16   Q.  The Search enhanced devices have the Search Access Points

17   in C-1, right?

18   A.  Let me check C-1.

19           Yes.

20   Q.  Okay.  And the Search Access Points for Chrome enhanced

21   devices are in Attachment C-2, right?

22   A.  That is correct.

23   Q.  But the Search Access Points for the Search and Chrome

24   enhanced devices have to meet the requirements in both C-1 and

25   C-2?

1    A.   That is correct.

2    Q.   Okay.   Now, I'm not going to go through all the Search

3    Access Points, unless the Court would like to hear them.   But,

4    with respect to the Search enhanced device, one of the

5    requirements is that all Search intents need to be set to the

6    Google search application, correct?

7          And we can go to page 31, if you need to reference it.

8    A.   31 in the contract?

9    Q.   Page 31 of the exhibit, which is Attachment C-1.

10          If we can could zoom up on the first two items in the

11    chart, where it states that "The Search Access Point of the

12    Google-provided widget," let's start with that:   The Google

13    provided widget is set pursuant to the MADA.

14          Correct?

15    A.   That is correct.

16    Q.   And the Google Search application is set pursuant to the

17    MADA, correct?

18    A.   That is correct.

19    Q.   And one of the requirements -- if we could actually go to

20    page 32, which is the Chrome access points -- I'm sorry --

21    page 33.   And the Chrome browser must be set as the only

22    out-of-the-box option, correct?

23    A.   I'm sorry.   I'm looking for the "only out-of-the-box

24    option."

25          Set -- it's set as the default browser and placed in

1    the application dock, or the hot seat -- there's two different

2    terms -- and that's what -- that's what qualifies as a --

3    qualifies Chrome as a paid access point.

4    Q.  Okay.  And the requirements are also set pursuant to the

5    MADA?

6    A.  ███████████████████████████████████████████████████

7    ███████████████████████████████████████████████

8    ███████████████████████████████████████████████████████.

9    Q.  ████████████████████████████████████████████

10   █████████████████████████████████████  says there are other

11   requirements pursuant to the MADA, correct?

12   A.  Yes.

13   Q.  Now, regardless of which of the  ████████████████████████

14   ████████████████████████████████████████████,  Samsung gets

15   ███  percent revenue share on all of those Search Access Points,

16   right?

17   A.  Not all of them.  So, they can elect to do a  ██████████

18   ███████████████████████████,  which has the obligation specified,

19   I believe, in B-1.

20   Q.  If we could go back to page 25, please, that might help

21   clarify my question.

22   A.  So the choice of  █████████████████████████████████████

23   ███████████████████████,  and the manner in which they

24   implement Search and/or Chrome governs whether it's a paid

25   access point on the device as part of that  ███████████████████

1       ██████████

2    Q.  Understood, Mr. Kolotouros.

3           But, my question was specifically with respect to the

4    percentages of revenue, for any Search Access Point that is --

5    that Samsung elects to choose, right, whether it's ████

6    █████████████████████████████████████████████████, they

7    get ██ percent on those Search Access Points?

8    A.  ███████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ███████████████████

11   Q.  And this revenue share is ██ percent, correct?

12   A.  Yes, yes.

13   Q.  And yesterday we discussed, at UPX558, that Samsung had

14   requested ██ percent revenue share, do you recall that, as part

15   of the negotiations of the 2016 MADA?

16   A.  This is from four years prior.  Yes, they had requested

17   ██ percent.

18   Q.  Okay.  And Samsung never received ██ percent search revenue

19   share, correct?

20   A.  That is correct.

21   Q.  2016 or 2020, right?

22   A.  That is correct.

23           THE COURT:  Clarifying question.  So, what is the

24   difference -- the fundamental difference between core qualified

25   devices and enhanced qualified devices?

1    THE WITNESS:  The core qualified devices cover

2    SBrowser search defaults and some Assistant parity with respect

3    to discoverability on the device.  And I think that's it.  You

4    then go to the enhanced tiers, which are device-by-device

5    elections.  Samsung could conceptually only enroll -- make it a

6    Chrome enhanced device by putting Chrome in the hot seat and as

7    the default browser, and then that triggers payment on Chrome

8    as an access point.

9    If they want to enroll it in the search enhanced

10   tier, they can do that, as well, by meeting the terms, and then

11   that is a paid access point.  And then, if they do both, it's a

12   Search and Chrome enhanced access point.  So this is where

13   Samsung has the choice of electing which of these two different

14   categories to enroll the device, or both, and then it triggers

15   the payment on the access points specified in exhibit --

16   Attachment A.

17   THE COURT:  And I thought you said the core qualified

18   devices are -- they're a platform?

19   THE WITNESS:  It's a platform, meaning all devices

20   that have GMS are included, X the telecom client ID carve-out,

21   and there's no exclusivity in the core tier.  It's just the

22   default setting and the parity for the Assistant, I think, if I

23   recall correctly.

24   THE COURT:  Okay.  So in terms of percent of phones

25   that Motorola -- that are sold in the United States, what --

```
 1   where do they land in these various tiers?

 2              THE WITNESS:  I think for --

 3              THE COURT:  I said Motorola.  I mean, Samsung.

 4              THE WITNESS:  I think for Samsung -- and, again, if

 5   we're looking at just open market, noncarrier devices, I think

 6   most, if not all, are going to be enrolled in the Search and

 7   the Chrome enhanced.

 8              THE COURT:  In the enhanced qualified?

 9              THE WITNESS:  In the Search/Chrome enhanced qualified

10   device tier.  ███████████████████████████████████████████████

11   ████████████████████████████████████████████████.

12              THE COURT:  Okay.  So in the last of the, sort of,

13   five rows?

14              THE WITNESS:  Yes.  I think of these five rows, the

15   bottom row on page 25 of Attachment A of the 2020 Samsung RSA

16   is where you would find, I think, where most of their X-Telecom

17   devices are enrolled.

18              THE COURT:  Okay.  What would be the reason for --

19   why would Samsung want to be enrolled in any of these other

20   categories?

21              THE WITNESS:  If they wanted, for example, for

22   SBrowser to be in the hot seat/application dock, they could

23   then just keep -- and have Chrome still in the application

24   folder, which is what the MADA request is, or the preload

25   obligation is, then ██████████████████████████████████████████
```

1    ████████████████████████████████████.  So it's a choice of

2    whether they want to get -- basically, what they want to have

3    is their most prominent browser on the device.

4              THE COURT:  I see.  Okay.  And so what you're saying

5    is that ultimately, what Samsung has decided is that Chrome

6    will be the prominent browser for  █████  its devices sold in

7    the United States --

8              THE WITNESS:  I think --

9              THE COURT:  -- noncarrier.

10             THE WITNESS:  I think that's right.  I think Chrome

11   has elected -- I think Chrome has elected generally, within the

12   United States, to put Chrome in the hot seat, but I don't have

13   the -- I think that's the case, but I don't have the precise

14   number.

15             THE COURT:  Okay.  Thank you.

16             Sorry about that.

17             MS. MURDOCK-PARK:  Of course, Your Honor.

18   BY MS. MURDOCK-PARK:

19   Q.  And with respect to -- I believe we discussed that Google

20   must be set as the default on Chrome, right?  We discussed that

21   earlier?

22   A.  Well, Chrome, as an application, has Google as the default

23   search engine, that is correct.

24   Q.  Okay.  And with respect to Samsung devices in the

25   United States, can you think of any Samsung device that loads a

1    search engine other than Google as the default?

2    A.   I'm not aware of any Samsung devices in the U.S. where they

3    preload another search engine on the device.

4    Q.   Okay.  If we could just briefly go to one more provision --

5    or, two more provisions in this RSA.  First, let's go to --

6            THE COURT:  Can I ask just one more question?

7            MS. MURDOCK-PARK:  Of course.

8            THE COURT:  Just to make sure I understand.

9            The "hot seat," that is what I think of as the bottom

10   row on my iPhone, where those are sort of the most prominent

11   apps?

12           THE WITNESS:  Yes.  So it's the bottom row where, if

13   you're swiping right to left, those are persistent.  And then

14   you're seeing other applications, or other apps, on the phone.

15           THE COURT:  Right.  For example, where my email --

16           THE WITNESS:  It will typically be messages, dialer,

17   browser, camera.  Like, they're the -- and maybe one or two

18   others are the ones that you generally want access to quickly.

19           THE COURT:  Right.

20           THE WITNESS:  Which is why it's called the hot seat.

21           THE COURT:  Gotcha.  All right.

22           THE WITNESS:  Or the application doc, because they're

23   kind of docked in that bottom row.

24   BY MS. MURDOCK-PARK:

25   Q.   Just one more follow-up question, Mr. Kolotouros.

1          With respect to the Samsung devices, ███████████

2     of Samsung devices are enrolled in the tier that requires

3     exclusivity, correct, the premiere tier?

4     A.  I believe ██████████ of devices are enrolled in the

5     search enhanced qualified device.

6     Q.  Okay.

7     A.  Or the Search/Chrome enhanced device, which is the two

8     ranges that have the exclusivity -- the preload exclusivity out

9     of the box.

10    Q.  Okay.  And same question for Motorola.  The premiere tier,

11    the higher revenue tier, where over 95 percent of the devices

12    on Motorola are in the United States, that is the tier that

13    requires exclusivity as well, correct?

14    A.  Yes.

15    Q.  Now, if we could go to page 12 of JX71, and specifically,

16    Section 5.2.  Now, to step back, the requirements for -- the

17    requirement for the enhanced qualified devices are set out in

18    Section 5 of Samsung's RSA, right?

19    A.  I don't know if all the requirements are there, but, yes,

20    this is one place where some requirements are listed.

21    Q.  ████████████████████████████████████████████████████

22    ██████████████████████████████████████████████

23    █████████████████████████████████████████████

24    ████████████████████████████████████████████████████████

25    ████████████████████.

1        Right?

2   A.  Yes.

3   Q.  Okay.  And then let's go to page 3, where there's the

4   definition of alternative search service at Section 1.5.  And

5   the definition of alternative search service in the Samsung RSA

6   is: ████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████.

9        Right?

10  A.  Yes.

11  Q.  And, now, the Samsung 2020 alternative search service

12  provision differs from the Motorola provision that we just read

13  a little bit ago, right?

14  A.  I believe so, yes.

15  Q.  And the Samsung 2020 definition also differs from Samsung's

16  2017 alternative search provision, right?

17  A.  Can I see the -- can I ask what exhibit number the 2017

18  agreement is?

19  Q.  Well, I'm asking if you -- I guess, if you recall.

20  A.  I don't recall the precise delta view, difference, between

21  the two definitions.

22  Q.  Do you recall that there is a difference?

23  A.  Well, I've not looked at the 2017 agreement recently, so I

24  don't want to go just by memory.

25  Q.  Okay.  But the Samsung 2020 alternative search service



10   Q.  All right.  I'm just going to do one more document in

11   sealed session that, hopefully, will be very brief.  If we

12   could go to UPX655, which is in evidence.  And this is an email

13   from you to Rosie Lipscomb and others dated November 22nd,

14   2020, right?

15   A.  Yes.

16   Q.  And you're discussing the Samsung 2020 revenue share

17   agreement?

18   A.  Yes.

19   Q.  The first sentence of the second paragraph you write:  The

20   story will be relatively simple.  We project ▮ billion to

21   flow through Samsung over the next four years, which represents

22   over ▮ percent of Android revenue.

23        Correct?

24   A.  Yes.

25   Q.  Okay.  And so that is Android global revenue?

927

```
 1    A.  I think this number is speaking to all access points on

 2    Samsung, which includes Play revenue and Search revenue, and

 3    the proportion of Android revenue as a whole that it

 4    represents.

 5    Q.  So ███ billion from Samsung devices, right?

 6    A.  Yes.

 7    Q.  And if we go to -- towards the bottom, where there's a

 8    sentence that reads:  Total payout is projected to be

 9    ████████████████████████████████ billion.

10         Right?

11    A.  Yes.

12    Q.  Okay.  So that's █ billion in revenue share to Samsung,

13    correct?

14    A.  It's █ billion in the form of revenue share, ██████████

15    payment from Deal 2, and the go-to-market investment that was

16    done via Deal 3.

17    Q.  And Google could pay Samsung, possibly, more than

18    $█ billion, right?

19    A.  Yes.

20    Q.  Now, you had mentioned that the █ billion includes Play.

21    Do you know what percent of that █ billion includes Play?

22    A.  I believe it's between ██████ percent.

23    Q.  Okay.  And would that be the same with respect to the

24    revenue share?

25    A.  Because there's different structures in nonrevenue shares
```

1    in place with things like Deal 3, I guess -- I'm sorry.  Please

2    repeat the question.

3    Q.  Well, we can strike that.  I don't think we need to go

4    there.

5            We can go ahead and put UPX655 aside.

6            One last question about alternative search services.

7            THE COURT:  Let me try and understand.  So, in this

8    email, you're projecting ■ billion over four years from

9    Samsung devices would flow to Google?

10           THE WITNESS:  Yes.

11           THE COURT:  And then the ▌ billion is an annual

12   number that would be -- or, paid to Samsung as revenue share.

13   Define "large."

14           THE WITNESS:  These are aggregated numbers over four

15   years.  So it's apples to apples on chronology correlated with

16   these numbers.

17           THE COURT:  I see.  Okay.  So the delta between ■

18   and ▌ stays with Google.

19           THE WITNESS:  I don't know if the -- I don't know if

20   the ■ includes or excludes payments made to developers from

21   the Play Store.  But, basically, there's revenue that flows

22   through Samsung devices in the form of access points in Play,

23   and then we pay this projected amount to Samsung through the

24   projected deals that we did with them.

25           THE COURT:  Gotcha.  Thank you.

1    BY MS. MURDOCK-PARK:

2    Q.   And one last question for you, Mr. Kolotouros.

3         With respect to alternative search services that we were

4    just discussing, Google has the sole discretion to decide what

5    is similar to Google Search, right?

6    ████████████████████████████████████████

7    ██████████████████████████████████████████

8    ████████████

9    █████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ███████████

12   Q.   Okay.  But, who defines "similar to Google Search"?  Does

13   Google define what is similar to Google Search?

14   A.   I think -- I think we would have an opinion -- we would

15   have an opinion on what represents "similar search," and we'd

16   discuss it with Samsung, as well, to the extent that they were

17   interpreting it in a different way.

18   Q.   And would Google's opinion be the opinion that would

19   determine whether or not a device included alternative search?

20   A.   Not in our sole discretion.  I think it's a question of the

21   implementation, understanding how it works on the device.

22        MS. MURDOCK-PARK:  I do not have any more

23   confidential questions for Mr. Kolotouros.

24        THE COURT:  Okay.  Nothing on behalf of the plaintiff

25   states, correct?

```
1              MR. CAVANAUGH:  No, Your Honor.

2              THE COURT:  All right.

3              Mr. Schmidtlein?

4                         CROSS-EXAMINATION

5    BY MR. SCHMIDTLEIN:

6    Q.  Okay.  Mr. Kolotouros, just picking up where counsel left

7    off.

8              On this question of the definition of alternative search

9    service, you were asked some questions about that definition,

10   both as to the Samsung agreement and the Motorola agreement,

11   right?

12   A.  Yes.

13   Q.  Do you have any recollection of having any disagreements or

14   issues with either Motorola or Samsung about the interpretation

15   of alternative search service in connection with the

16   definitions in either of the Motorola or Samsung deals that

17   we've been talking about this morning?

18   A.  No.

19   Q.  Have there been any disagreements or conflicts about those

20   definitions?

21   A.  I can't recall having had a disagreement or an argument

22   with Samsung on those definitions.

23   Q.  Okay.

24             THE COURT:  Are you just talking about the

25   definitions themselves or the application of the definitions?
```

931

```
 1              MR. SCHMIDTLEIN:  The definition or the application.
 2              THE WITNESS:  Either.  Neither the definition nor
 3    the -- I don't recall it, during the term of the deal, having
 4    had disagreements or arguments with Samsung on the
 5    interpretation and the application of the definition to
 6    "services on the device."
 7              THE COURT:  Gotcha.
 8    BY MR. SCHMIDTLEIN:
 9    Q.  Going back to UPX655, which is, I think, the document we
10    were just looking at with Counsel.  If you could put that up.
11              Now, again, I want to make sure we get these numbers
12    right because -- with some precision here.  The ███ billion
13    reference in this document, does that refer to all revenues
14    generated through all of -- any part of those devices back to
15    Google?
16    A.  I don't know if it includes YouTube or Maps or other
17    services.  I think this number is specific to Search and Play,
18    including access points correlated with Google Search.
19    Q.  And that -- this number does not take off the top any
20    revenue share payments to any other partners, including
21    Samsung?
22    A.  No.
23    Q.  And this does not include the revenue share payments
24    that -- or, deductions for the revenue share payments that
25    would be made to carriers on those telco carve-out devices,
```

1     correct?

2     A.   This is an aggregate number inclusive of carrier client ID

3     devices in the United States and elsewhere.

4     Q.   Okay.  Now, you were asked some questions today and

5     yesterday --

6              THE COURT:  Sorry to interrupt.  Mr. Schmidtlein,

7     these are global numbers?

8              MR. SCHMIDTLEIN:  These are global numbers.

9              THE COURT:  And that's true, also, with the

10    $█ billion?  So we are comparing apples to apples, right?

11             THE WITNESS:  Yes.

12             MR. SCHMIDTLEIN:  And just sort of while we're on

13    that clarification...

14             THE COURT:  Just to be precise, again, what that

15    means is that there are additional revenue share payments that

16    are expected to go to carriers out of that aggregate number?

17             THE WITNESS:  That is correct, yes.

18    BY MR. SCHMIDTLEIN:

19    Q.   And that would include carriers both in the United States

20    and --

21             THE COURT:  And global.

22    BY MR. SCHMIDTLEIN:

23    Q.   -- and carriers all over the world?

24    A.   That is correct.

25    Q.   And do you have a sense of Android's market share in, sort

1    of, the U.S., sort of, versus ex-U.S.?  Just in a relative

2    sense.

3    A.  In the aggregate or in premium --

4    Q.  First of all, in aggregate.

5    A.  Actually, in the U.S., I don't have an aggregate or kind of

6    rough sense.

7    Q.  How about in the premium?

8    A.  I think it's measured in the teens or 20s in the premium

9    category.

10   Q.  And can you tell Your Honor, what is the premium category?

11   Just as -- in a rough sense.

12   A.  The premium category is generally defined as devices that

13   are over $400 or over $700, depending on where you want to make

14   the cutoff.  But in the over 400 and over $700 category, both

15   Samsung and Android are not doing well.  The revenue share is

16   very, very low.

17   Q.  Okay.  And who is -- who's the major competitor in that

18   segment of the market?

19   A.  Apple.

20   Q.  If we can take a look at -- let's take a look at JX71.

21   This is the -- this is the Samsung agreement.  And,

22   Mr. Kolotouros, is this the Samsung agreement that is in effect

23   today?

24   A.  Yes, it is.

25   Q.  And going to that Attachment A that counsel took you

934

1    through.  So the core qualified device tier, is that tier

2    directed towards devices that Samsung elects to put SBrowser in

3    the hot seat?

4              MS. MURDOCK-PARK:  Objection.  Leading.

5              THE COURT:  It's okay.  I could use some leading

6    here.  That's fine.

7              MR. SCHMIDTLEIN:  Yeah.

8              THE WITNESS:  It applies to --

9              THE COURT:  Hang on for a second.

10             Could you re-ask the question?

11             MR. SCHMIDTLEIN:  Sure.

12   BY MR. SCHMIDTLEIN:

13   Q.  Describe what, sort of, the purpose or what are the types

14   of commitments that are required for the core qualified device

15   tier in the Samsung agreement?

16   A.  It is specific to the default search setting in SBrowser

17   and does not cover where it is placed or whether it's the

18   default on the device.

19   Q.  Okay.  So this tier requires Samsung to make Google the

20   default search on SBrowser; is that right?

21   A.  Yes.

22   Q.  And if Samsung does that, are they eligible for a revenue

23   share on Google revenue generated on the SBrowser?

24   A.  That's correct.

25   Q.  Does that tier have any requirements with respect to Search

1    anywhere else on the device?

2    A.  No.

3    Q.  Does that tier require that Google be set as the default

4    search anywhere else on the device outside of the SBrowser?

5    A.  No.

6    Q.  Moving down to the next, the enhanced qualified device.

7    And, again, I think you made clear that now that we're in this

8    tier, these are all what you call device-by-device

9    requirements?

10   A.  Device-by-device elections.

11   Q.  Device-by-device elections.

12        And would you explain to the Court, clearly, what

13   exactly "device by device" means?

14   A.  It means Samsung can, on a device-by-device basis, decide

15   and elect which devices to enroll in the -- in this particular

16   revenue share tier.

17   Q.  And for the Search enhanced qualified device, in order for

18   Samsung to get a revenue share under that tier, they have to

19   meet certain access point requirements; is that right?

20   A.  That's correct.

21   Q.  And Google Search would have to be set as sort of the

22   default or the specified search service for those access points

23   to qualify for the █ percent revshare; is that right?

24   A.  That's correct.

25   Q.  Now, because this is device by device, Samsung could elect

1      to put device 1 into the deal, meet the requirements and get a

2      payment, but, then, take device 2 and elect not to comply with

3      these requirements, but they would still get paid on device

4      1 -- or device A, is that correct?

5      A.   That's correct.

6      Q.   And that's entirely Samsung's decision, correct?

7      A.   Yes.

8      Q.   I want to ask you about the Chrome enhanced qualified

9      device.

10            THE COURT:  I just have one quick question, short.  I

11     think this may be an elementary question, now obvious.

12            But, anything that is an enhanced qualified device is

13     also a core qualified device?  In other words, it has -- in

14     order to be an enhanced qualified device, you also have to

15     qualify and meet the core qualified device requirements?

16            THE WITNESS:  I believe that is -- I believe that is

17     the case.

18            THE COURT:  Just in terms of --

19            THE WITNESS:  Yeah, I believe that's the case.

20            THE COURT:  -- Venn diagram, but thinking about these

21     in terms of concentric circles.

22            THE WITNESS:  Yeah.  I believe that's the case, yes.

23            THE COURT:  Gotcha.  Okay.

24     BY MR. SCHMIDTLEIN:

25     Q.   Now, and I believe counsel did say this, that you can

1   either -- you could enroll a device either in Search enhanced

2   or Chrome enhanced, correct?

3   A.  I'm sorry.  Can you repeat the question?

4   Q.  Sure.  If you move on to and you decide that you want to

5   enroll a device in the enhanced tier, you could enroll a device

6   either in Search enhanced or Chrome enhanced or both?

7   A.  That's correct.

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ██████████████████████████████

14  Q.  And does Google believe that placing Chrome in the hot seat

15  of an Android device makes the device more attractive to users?

16  A.  We believe so, yes.

17  Q.  Does Google believe that's an important part of setting up

18  an Android device to compete against the iPhone?

19  A.  Yes.

20  Q.  Does Apple set -- put the Safari browser in the hot seat of

21  the iPhone?

22          MS. MURDOCK-PARK:  Objection.  Leading.

23          THE COURT:  I don't think that's a leading question.

24  A.  I don't -- I generally don't know what the placement

25  obligation is of Safari on iPhones.

1    BY MR. SCHMIDTLEIN:

2    Q.  But, does Google view Chrome as in competition with Safari?

3    A.  Yes.

4    Q.  And from Google's perspective, does having a world-class

5    browser preinstalled on a device, what impact does that have on

6    the overall attractiveness of the Android device?

7    A.  We believe that being able to connect to the internet via a

8    browser is a core utility and function on the device.  We think

9    the ability to seamlessly link between devices using Chrome via

10   authentication is extremely important, as well, for a

11   multi-device ecosystem.  So we think Chrome generally provides

12   a browsing experience that persists beyond the phone, to other

13   devices you might have which are valuable for the user from the

14   standpoint of internet browsing and information, et cetera.

15   Q.  Now, Samsung makes its own browser; is that right?

16   A.  Yes.

17   Q.  Does Google have a view as to whether Chrome browser

18   provides a superior browsing experience to the SBrowser?

19   A.  I think we believe that our browsing/browser experience is

20   better on Chrome than on SBrowser, with all respect to Samsung.

21            THE COURT:  One more question before you move away

22   from this.

23            Just to be clear, so if a device is enrolled as an

24   enhanced qualified device, it's not only required to be Google

25   as the defaults on whichever access points, it also requires

1    exclusivity, correct -- out-of-the-box exclusivity?

2            THE WITNESS:  ███████████████████████

3    ███████████████████████  with respect to Search.

4    That's where the exclusivity is invoked, if you would like to

5    put the device in the Search enhanced tier for the out-of-box

6    exclusivity.

7    BY MR. SCHMIDTLEIN:

8    ██████████████████████████████████████████████████

9    ███████████████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████████████████████

12   Q.  And, in fact, in your experience, do all or nearly all

13   Samsung devices come preloaded with at least two browsers?

14   A.  Yes.

15   Q.  And that's because Samsung also preloads the SBrowser?

16   A.  That is correct.

17   Q.  If we could go to UPX129.  This is a document, we went over

18   it yesterday, and I just want to do one quick clarification.

19   If we can go to the third page.

20           MR. SCHMIDTLEIN:  Your Honor, you may recall we went

21   over this document with some figures yesterday.

22   BY MR. SCHMIDTLEIN:

23   Q.  And, again, just to be clear, Mr. Kolotouros, the coverage

24   number there that talks about 2.3 billion actives, 1 billion

25   activations a year, is that a global number or a U.S. number?

1   A.  That's a global number.

2   Q.  Okay.

3           THE COURT:  Do you have a sense of how much longer

4   you'll be in this session?

5           MR. SCHMIDTLEIN:  20 minutes, 25 minutes, maybe.

6           THE COURT:  Okay.  Why don't we go ahead and just --

7   it's almost 11 o'clock.  I want to give our court reporter a

8   break, and then we'll just have to come back and continue in

9   this session.  Okay?

10          MS. MURDOCK-PARK:  Just to confirm, Your Honor, this

11  is only for questions with respect to the closed session,

12  correct?

13          THE COURT:  Correct.

14          MS. MURDOCK-PARK:  We'll have redirect in open, like

15  we did yesterday?

16          THE COURT:  Yes.

17          MS. MURDOCK-PARK:  Thank you.

18          THE COURT:  So we'll resume at 11:15.

19          (Recess.)

20          THE COURT:  All right.  Just to confirm, again, that

21  no one is in the courtroom who is not associated with the

22  parties.

23          All right.  Mr. Schmidtlein, whenever you are ready.

24  BY MR. SCHMIDTLEIN:

25  Q.  Mr. Kolotouros, again, without expecting a precise

1    percentage, but can you give the Court a rough relative sense

2    of what percent of Samsung devices that are sold in the U.S.

3    are covered by the requirements of the Samsung revenue share

4    agreement?

5    A.  I think it is a relatively small percent.

6    Q.  Is it more or less than 10 percent?

7    A.  I think it would be around that percentage, plus or minus.

8    Q.  And to the extent those devices are covered by a revenue

9    share agreement, what party revenue share agreement would they

10   be covered by?

11   A.  They would be covered by a revenue share agreement with a

12   telecom operator, otherwise known as a carrier.

13   Q.  And you've also spent some time testifying here the last

14   two days about the Motorola agreement.  Can you give the Court

15   just a rough sense of, if you have, what Motorola's market

16   share for devices, smart phones, is in the United States?

17   A.  I think it's less than 10 percent.

18   Q.  Okay.  So we've got less than 10 percent.  Of that

19   10 percent, what percentage of those devices are covered by the

20   Motorola RSA versus, potentially, some other RSA?

21   A.  I believe it to be a small percentage.

22        THE COURT:  I'm sorry.  To be clear, because I wasn't

23   following the line of questioning for a moment, but, when you

24   were talking about Samsung, when you were talking about all

25   Samsung devices, you said about 10 percent are covered by the

1    Samsung RSA.  The remaining are covered by carrier RSAs?

2    A.  The vast majority of the devices they sell in the U.S. are

3    within the purview of the carrier revenue share agreements, as

4    opposed to open market.

5           THE COURT:  Appreciate that clarification.

6    BY MR. SCHMIDTLEIN:

7    Q.  Can we go to UPX1077?

8           You recall being shown this, Mr. Kolotouros?  This is a

9    side deck that's entitled Google Distribution on Android

10   Framework, where the GDAF --

11          THE COURT:  What's the number again?

12          MR. SCHMIDTLEIN:  Yes.  1077.

13          THE COURT:  Okay.  Thank you.

14   BY MR. SCHMIDTLEIN:

15   Q.  Just briefly, Mr. Kolotouros, would the programs discussed

16   within the Google distribution on Android framework and the BC

17   deck that we looked at as well, are the overwhelming majority

18   of devices that would be subject to this in the U.S. or outside

19   the U.S.?

20   A.  Outside the U.S.

21   Q.  And am I correct that the figures and the data that are

22   included in 1077 would be reflective of economics for devices

23   predominantly sold outside the U.S.?

24   A.  That is correct.

25   Q.  Now, we also heard testimony and we've seen some documents

1    with respect to the Motorola's current agreement where, I

2    believe, you testified that ███████████████████████████

3    █████████████████████████████████████████████████████

4    ████████████████████████████████████?

5    A.  Yes.

6    Q.  And who raised, or who proposed the idea of the flat

7    payments instead of revenue share?

8    A.  I don't recall who initially had proposed it.  But, I

9    believe it was a concept which Motorola had suggested.

10   Q.  And did Google accommodate that suggestion, or proposal?

11   A.  Yes.

12   Q.  Can we pull up UPX76?

13        This is a -- this is a document that you were shown

14   yesterday.

15        And if we can go to the slide -- the Bates number is

16   184.

17             MS. MURDOCK-PARK:  Your Honor, this was covered

18   yesterday in public session.

19             MR. SCHMIDTLEIN:  I'm going to get to two slides that

20   are not for public session.  I just want to orient him around

21   it.

22   BY MR. SCHMIDTLEIN:

23   Q.  Do you recall being asked some questions about the search

24   entry points?

25   A.  Yes.

```
 1    Q.  Okay.  If you will go to, sort of, two slides in from that,
 2    which is 186.
 3          What does this chart reflect?
 4    A.  It reflects the breakdown of how traffic flows through
 5    different access points on the device in various regions and
 6    overall.
 7    Q.  Okay.  And the second entry under the entry point column is
 8    to QSB; is that right?
 9    A.  Yes.
10    Q.  Remind everybody, what is "QSB," again?
11    A.  The quick search box, quick search bar, otherwise known as
12    the "widget."
13    Q.  The Google widget.
14    A.  Correct.
15    Q.  Okay.  And then going into second column, under U.S., can
16    you read that number for the record?
17    A.  App icon U.S. --
18    Q.  No.  QSB.
19    A.  Oh, I'm sorry.
20          QSB, including mic, ▮ percent in the U.S.
21    Q.  Okay.  And just for the Court, what does "including mic"
22    mean?
23    A.  Those would be voice-to-text queries which are input via
24    the microphone that, I think, was depicted on the widget itself
25    at that time.
```

1    Q.  Okay.  And what does the ▮ percent number tell you about

2    the utility the of Google search widget?

3    A.  It would indicate that it is the very high majority access

4    point that is preferred by users to conduct searches in the

5    United States on an Android device which has GMS preloaded.

6    Q.  And are their some users who prefer not to a have widget --

7    the Google Search widget on their default home screen?

8    A.  Yes.

9    Q.  And the Court has heard some testimony about how you go

10   about doing that, but can you describe for the Court how the --

11   how one would remove the Google search widget, if they wanted

12   to, as an end user?

13   A.  I think it's as simple as a long press on the widget

14   itself, and then hitting the Remove or Delete button which

15   appears when the long press on the widget is performed by the

16   user.

17   Q.  Okay.  And have you seen any data that suggests that people

18   know how to do that?

19   A.  Yes.

20   Q.  Go two slides in.  This is page 188.

21        And what does this -- what does this slide depict?

22   A.  It references that the quick search box itself is removed

23   by users.

24   Q.  You were asked a few questions yesterday about MADA, and

25   specifically around the -- some of the apps that are included

1    in the MADA.  And I believe you were shown a slide that

2    depicted certain of the apps that were deletable.

3    A.  Yes.

4    Q.  And some that were not deletable.

5    A.  Correct.

6    Q.  Can you remind the Court, again, what the deletable apps

7    were?

8    A.  The deletable apps would be Google, Google Drive, Google

9    Photos, YouTube Music, and Google TV.

10   Q.  What are the nondeletable apps?

11   A.  Those would be Google Play, Google Search, Chrome, Maps,

12   Gmail, and YouTube.

13   Q.  And why does Google make those apps nondeletable?

14   A.  Each of those apps has more than 1 billion users on an

15   aggregated global basis.  We find them to be core utilities

16   that are part of an expected smartphone experience out of the

17   box.  So beyond the popularity and the expectation, to the

18   extent the phone is a factory reset for redistribution or as

19   gifting, we think it's important for the phone to have those

20   core utilities on the device at such time of factory reset.

21   And, so, those particular six apps are nondeletable so that

22   there's a store present and a search application present and a

23   browser present and maps, et cetera.

24   Q.  Even though they are nondeletable, can the user remove the

25   visual representation from them on the phone?

 1    A.   Yes.

 2    Q.   And the action that you described for the Judge about

 3    removing the search widget, is that an example of that?

 4    A.   It's a long press on the icon, and then either moving it to

 5    another screen or suppressing the presence of the icon on the

 6    device.

 7    Q.   Okay.

 8            MR. SCHMIDTLEIN:   Your Honor, if I may, I've got a

 9    demonstrative that I would like to mark and show to the

10    witness.

11            MS. MURDOCK-PARK:   I just want to clarify why this is

12    in closed session, after looking through this briefly.

13            MR. SCHMIDTLEIN:   Because we're going to be talking

14    about strategies that other companies could potentially employ,

15    notwithstanding Google's agreements, and we don't think we need

16    to advertise those in open court.

17    BY MR. SCHMIDTLEIN:

18    Q.   Okay.  Mr. Kolotouros, have you seen these slides before?

19    A.   I have.

20    Q.   Okay.  And did you help us put these together?

21    A.   I might have provided some -- I think I provided some

22    recommendations, yes.

23    Q.   So let's go in and look at -- let's go in and look at the

24    third slide.

25            What does this slide represent?

1    A.  The center depicts the default home screen of an Android

2    device that includes the presence of alternate search access

3    points or experiences that could be preloaded on a device in

4    connection with a -- not a compliant device.  The plus one

5    screen is what happens when you do a plus one, or a right to

6    left swipe on a MADA compliant device.  And then the Microsoft

7    folder on the right shows what happens when you invoke the

8    Microsoft folder icon on the default home screen.

9    Q.  And, again, on the default home screen, which is the

10   first -- or, the middle -- the middle screen that's shown on

11   this device, what are the two applications that are in the hot

12   seat?

13   A.  The bottom right is the Bing app icon, and the second from

14   the right in the hot seat is the Edge browser icon.

15   Q.  Okay.  And then the launcher access, that's the Microsoft

16   launcher you were just describing?

17   A.  That is correct.

18   Q.  Okay.  And all of those applications are permitted to be

19   preloaded on a MADA device?

20   A.  That is correct.

21   Q.  And then on the plus-one screen, can you describe what

22   those two widgets are that are depicted there?

23   A.  I believe the top widget represents the Edge browser widget

24   which will launch the actual Edge browser when a search query

25   is typed into that, and the bottom widget is the Bing app

1    widget which would then send the query to the Bing app and then

2    invoke the Bing app experience on the device.

3    Q.  And just to be clear, this is depicting a singular device,

4    just multiple different screens on the device?

5    A.  Yes.  Yes.

6            MS. MURDOCK-PARK:  Can I ask a clarification as to

7    what device this image is representing?

8            MR. SCHMIDTLEIN:  Yep, you can ask the witness that.

9            MS. MURDOCK-PARK:  Okay.  So, you're not going to

10   specify on the demonstrative what devices these represent?

11           MR. SCHMIDTLEIN:  No.  We're showing what a

12   hypothetical device would look like.  Do you want to testify or

13   do you want to ask questions?

14           MS. MURDOCK-PARK:  That's fine.

15           THE COURT:  Counsel, let's move forward, please.

16   Thank you.

17   BY MR. SCHMIDTLEIN:

18   Q.  Go to the next slide.

19           Can you describe what this slide depicts?

20   A.  This is a -- kind of a new form factor within the Android

21   ecosystem which is called a foldable device.  It comes in,

22   basically, kind of a fold, or a flip, variety, and it's

23   depicting different options of implementations with respect to

24   search access points on the outer screen and inner screen of a

25   MADA-compliant device.

1          MR. DINTZER:  Your Honor, Ms. Murdock-Park has the

2     witness, so I don't want to interrupt.  But, as I am watching

3     this, we have an obligation to object.  The courtroom is closed

4     for something that is non -- not sensitive, and as I understand

5     what the witness is talking about, he's talking about things

6     that are compliant, things that Google's partners could do

7     under -- at least according to his testimony, under the

8     contract, which means it's not secretive because it's part of

9     the contract.

10         Now, if their theory is that no one has ever done

11    this and they don't want them to know about it and that's why

12    we have to keep the doors closed, then they should tell the

13    Court that.  Otherwise, we should open the doors.

14         THE COURT:  And that's what I understood

15    Mr. Schmidtlein to be saying that these are.

16         MR. DINTZER:  Secret?

17         MR. SCHMIDTLEIN:  Yeah.  These are strategies that

18    people could employ consistent with our contractual provisions

19    that are, in fact, confidential.

20         THE COURT:  Right.  I mean, that's what I understand,

21    which is that these are theoretically different strategies that

22    could be employed that, in a sense, would be anti -- well,

23    would theoretically allow Google's competitors places on these

24    phones consistent with the requirements.  And so, I guess, the

25    idea is that let's not give our partners any ideas, although, I

1    suspect they have had them.

2            MR. DINTZER:  Respectfully, Your Honor, we did not

3    oppose the closing of the courtroom for the sensitive stuff,

4    but the United States does oppose the closing of the courtroom

5    for strategies that -- I think Google's theory is, is that

6    could be undertaken under the contract.  So, I understand the

7    Court's -- we don't agree with that, but we will object.

8            THE COURT:  Okay.  Well, let's go ahead and just move

9    through this.  We can ultimately decide whether to make the

10   demonstrative public or not.  Okay.

11   BY MR. SCHMIDTLEIN:

12   Q.  And, Mr. Kolotouros, can you identify the various search

13   access points that are reflected on this slide and describe

14   what they are?

15   A.  So, on the left is the when-open inside screen of a

16   foldable device which, I believe, is a Samsung device.  And it

17   depicts the Bing icon in the hot seat, the Edge browser icon in

18   the hot seat, the Microsoft folder on the actual default home

19   screen, and depicts what is available via the folder

20   implication by the user and the access points that are

21   available therein.

22           And then, on the cover screen, this depicts what is

23   on the outer screen of a flip device, like a traditional

24   Motorola Razr device, with respect to a -- I think that's a

25   DuckDuckGo search widget on the outer screen, along with a

1    photo containing multiple search apps and, also, the Microsoft

2    launcher on that outer screen.  And these are all possible

3    under the MADA.

4    Q.  The Court has heard, I think a couple of times, references

5    to launchers.  What can you explain what a launcher is?

6    A.  A launcher is, generally, a user interface for the device

7    itself that OEMs either can customize on their own or deploy

8    through a third party.  The Microsoft launcher is an overall, I

9    believe, experience on a device that governs how the default

10   home screen is implemented, along with the plus-one screen,

11   and, I think, to some extent, navigation.

12            And the launcher then allows for an alternate UI on

13   the device, depending on how it's implement by the OEM and

14   depending on what the launcher does.

15   Q.  Does Google's MADA prohibit the preloading of a launcher

16   icon?

17   A.  No.

18   Q.  Does Google's MADA prohibit an OEM from launching another

19   rival launcher during the boot-up or the -- sort of the

20   out-of-box first turning on of the device?

21   A.  To the extent the launcher itself goes against the MADA

22   obligations upon preload, then, yes, that is not allowed.  But,

23   there's nothing the MADA does not allow with respect to the

24   placement of an icon or some other formative invocation on the

25   device.

 1    Q.  Let's go to the next slide.

 2         So, Mr. Kolotouros, would you describe what is depicted

 3    on the left of DXD2, slide 5?

 4    A.  Yes.  It shows the Microsoft launcher icon on the left, and

 5    then on the right, it shows what happens when the user

 6    activates the launcher.

 7    Q.  Can you describe what the device UI, or the user interface,

 8    has been transformed into when the Microsoft launcher is

 9    invoked?

10    A.  The Google Search widget has been removed and replaced with

11    the -- what looks like the Bing Search widget.  The Google

12    folder has also been removed, the Play Store has persisted, and

13    the -- some apps have been put in the app tray which, I

14    believe, are the Edge browser and Outlook.  So, the folder is

15    gone and the widget is gone and replaced by other services

16    which Microsoft offers.

17              MR. SCHMIDTLEIN:  I have no further questions, Your

18    Honor.

19              THE COURT:  Okay.  Any redirect on the closed

20    portion?

21              MS. MURDOCK-PARK:  Just very, very briefly, Your

22    Honor.

23                      REDIRECT EXAMINATION

24    BY MS. MURDOCK-PARK:

25    Q.  Mr. Kolotouros, the demonstrative you just testified about

1   is a hypothetical, correct?

2   A.  I believe so, yes.

3   Q.  Okay.  So, do the devices on the screen represent actual

4   devices -- I'm sorry.

5          Do the devices in the demonstrative represent actual

6   devices?

7   A.  I think the demonstrative is based on a Samsung A3 device.

8   I do know that Samsung devices do preload a Microsoft folder.

9   I don't know the actual contents of the folder itself on the --

10  on Samsung devices.

11  Q.  Okay.  And I'm asking just specifically about the devices

12  themselves.

13         You're saying that every photo -- or, every phone

14  represented in the demonstrative is a Samsung device?

15  A.  I think with the exception of the flip fold on the final

16  page of the demonstrative, that's a Motorola Razr device, I

17  believe.

18  Q.  Okay.  And on slide 5 of the demonstrative, it looks like

19  these are two different phones?

20  A.  Yes.  They would be different phones based on the phone --

21  the phone icon or the phone aperture for the front-facing

22  camera.

23  Q.  My only question to clarify, because then we can move on to

24  a different subject in open court.

25         But, Google screen -- I'm sorry.

1          Has Google ever told Samsung that they are allowed to

2     make the configurations as shown in the demonstrative?

3     A.  I don't recall ever being in a configuration advising on

4     what Samsung can do with Microsoft on their devices.

5     Q.  Okay.  So all of the configurations are hypothetical,

6     right?

7     A.  They're possible, yes.

8     Q.  And last question.

9          So, to clarify -- you can set the demonstrative aside.

10    I'm not going to ask you more questions about it.

11         To clarify, Google Search is set as the default search

12    engine in the SBrowser, right?

13    A.  Within the current RSA with Samsung, Google is set as the

14    default search engine, that is correct.

15    Q.  Okay.  Thank you.

16              MS. MURDOCK-PARK:  And I think we can move to open

17    session now, Your Honor.

18              THE COURT:  Just one quick clarification.  I think I

19    know the answer, but just to be clear on the record.

20              The demonstrative various configurations across all

21    of those phones, they would not be consistent if the OEM

22    entered into an RSA?

23              THE WITNESS:  I think it depends on the tier of the

24    RSA that's been entered into.

25              THE COURT:  Right.

1          THE WITNESS:  I think the foundation tier, these

2     would be okay, but in the premiere tiers is where it would

3     potentially invoke the alternate search service language.

4          THE COURT:  Okay.  Thank you.

5          All right.  Why don't we go ahead and reconnect the

6     media room, and then we can reopen the courtroom as well.

7        (The following proceedings were held in open session:)

8          MS. MURDOCK-PARK:  May I resume, Your Honor?

9          THE COURT:  You may.  Thank you.

10          DIRECT EXAMINATION (Cont.)

11     BY MS. MURDOCK-PARK:

12     Q.  Mr. Kolotouros, I would like to change subjects entirely

13     and talk about your written communications when you were

14     working at Google.

15     A.  Okay.

16     Q.  You've worked at Google for about 20 years?

17     A.  That is correct.

18     Q.  And you were placed on a legal hold in December 2019,

19     during the investigation in this case?

20     A.  Yes.

21     Q.  Placed on another legal hold in January 2021, after the

22     lawsuit was filed?

23     A.  That is correct.

24     Q.  But for over a decade before that, you'd worried about

25     being deposed in an antitrust investigation, right?

1    A.  I recognize that Android was -- had been exposed to

2    potential regulatory action, so I was sensitive to how we

3    conducted the business and what might happen as a result of

4    that.

5    Q.  Okay.  So for -- but for -- you had those concerns for over

6    a decade, right?

7    A.  Since my -- since I joined Android, that was something I

8    was sensitive to, yes.

9    Q.  And because you were concerned about being deposed in an

10   antitrust investigation into Google, you worked to protect

11   Google, right?

12   A.  I wouldn't say I was worried about being deposed.  I was

13   worried that that might be something that might happen as a

14   result of my being in Android.

15   Q.  Okay.  But you worked to protect Google, didn't you?

16   A.  I would say I worked to administer and work within the

17   Android ecosystem in a way that I thought was appropriate, yes.

18   Q.  Okay.  So, just to make sure I'm on the same page, you

19   agree that you worked to protect Google or you disagree?

20   A.  I agree that I did everything I can to make sure that we

21   were doing things in the best possible way for Google and for

22   Android, yes.

23   Q.  So -- and I just want to make sure, because I don't think

24   you're quite answering my question, Mr. Kolotouros.

25          Are you saying you did not work to protect Google?

1    A.  I think it's safe to say I was working to protect Google

2    and preserve what the Android ecosystem was meant to deliver to

3    the ecosystem and to Google.

4    Q.  Okay.  You wanted to protect Google because you're a loyal

5    employee, correct?

6    A.  I think it goes beyond loyalty to wanting to protect the

7    company.  It's also how we administered the ecosystem to make

8    sure it was healthy and strong.

9    Q.  Do you consider yourself to be a loyal Google employee?

10   A.  After 20 years of employment, I believe I'm a loyal

11   employee, yes.

12   Q.  So as a loyal employee, to protect Google you took steps to

13   prevent your written communications from being produced in

14   discovery, right?

15   A.  I don't know if I would frame it that way.

16   Q.  Well, you took steps to copy attorneys on all emails that

17   discussed the MADA, right?

18   A.  Whenever I was discussing anything over email that

19   discusses contracts or commercial terms -- well, mainly

20   contracts or what we focus on, memorialize within my particular

21   part of the business, I would copy an attorney to ensure that

22   my interpretation or characterization of what was discussed in

23   the email was accurate; and if not, invited the attorney to

24   weigh in, if possible, yes.

25   Q.  Okay.  So, you also then copied attorneys on all emails

1   that discussed the RSAs?

2   A.  If a contract was being discussed, I would traditionally

3   copy in an attorney to either ask them a specific question or

4   invite them to weigh in -- or even unprompted weigh in on

5   whether or not I'd interpreted the substance of the email

6   correctly.

7   Q.  Your job since 2014, at Google, has been working on Android

8   contracts, right?

9   A.  Android partners, Android OEMs, some Silicon partners as

10  well.  But, yes, predominantly.

11  Q.  You have instructed other Google employees to copy

12  attorneys on any written communications discussing MADA and

13  RSA; correct?

14  A.  I don't know that I instructed them personally.

15  Q.  Okay.  If we could go to UPX320, which is in evidence.

16       UPX320 is a slide deck titled Android Mobile Search and

17  Assistant Revenue Share Training Agreement.

18  A.  Yes.

19  Q.  Revenue Share Agreement Training, sorry.

20       Do you recall presenting at this training,

21  Mr. Kolotouros?

22  A.  I do.

23  Q.  Do you recall presenting a bright red slide?

24  A.  I do not know if I presented this particular slide.

25  Q.  Okay.  If we could please go to page 102.  Actually, my

 1    apologies.

 2          Could we go to page 101 first?

 3          And 101 is Legal Language Review, and it lists Jim

 4    Kolotouros and Helen Tsao, right?

 5                THE COURT:  And 701 is the Bates number.

 6                THE WITNESS:  The Bates is 701?  Thank you.

 7    BY MS. MURDOCK-PARK:

 8    Q.  Correct.  You're listed as one of the presenters of Legal

 9    Language Review?

10    A.  Yes.

11    Q.  And then, if we go to the next slide, which is page 102,

12    that's the bright red slide we were just talking about?

13    A.  Yes.

14    Q.  And the red slide was presented more than once during this

15    training, correct?

16    A.  I believe it appears earlier in the presentation, but also

17    here as well.

18    Q.  And it appears four times total in the slide deck, does

19    that sound right?

20    A.  I haven't tallied it up, but --

21    Q.  Okay.  Who instructed you to add the red slide to this

22    training?

23    A.  No one instructed me to include it.  I think it was just

24    made part of the deck.

25    Q.  Okay.  Just appeared there?

1    A.  I didn't assemble the deck itself, given there's a lot of

2    content in the deck.  But, it was inserted into the deck, yes.

3    Q.  So the slide is titled Reminder of Confidentiality, right?

4    A.  Yes.

5    Q.  And the paragraph at the bottom of slide 102 starts:

6    Additionally, any written communication regarding Revshare and

7    MADA should include legal.

8         Correct?

9    A.  That is correct.

10   Q.  So your instruction to other Google employees was to add

11   recipients to written communications to increase

12   confidentiality?

13   A.  I think the instruction to include legal is because it is

14   specific to revenue share and MADAs that are all commercial

15   contracts that are entered into with partners across carriers

16   and OEMs.

17   Q.  Okay.  But, the red slide does not say to include attorneys

18   in all meetings that discuss MADA or RSAs, right?

19   A.  It does not, no.

20   Q.  The instructions on the red slide were part of Google's

21   Communicate With Care policy?

22   A.  I don't know if this particular slide made its way into

23   Communicate With Care training which is offered to Google

24   employees generally.

25   Q.  Mr. Kolotouros, you followed the red slide's instructions

1    to include attorneys on any written communication regarding

2    Revshare and MADA.  Do you agree with that?

3    A.  I generally, when discussing contractual terms, whether it

4    be MADA or RSA or other types of contract, include an attorney

5    in such communication, yes.

6    Q.  Okay.

7              MS. MURDOCK-PARK:  Okay.  We can go ahead and take

8    down UPX320 and go to UPX713, which, I, believe there is a

9    relevancy and a speculation objection.

10             THE COURT:  What's the number again?

11             MS. MURDOCK-PARK:  UPX713.

12             THE COURT:  Okay.

13             MR. SCHMIDTLEIN:  This document has --

14             THE COURT:  It's easier if you're near the mic and at

15   the table.  That's one place to do, at least.  That's one

16   access point.

17             MR. SCHMIDTLEIN:  This document has to do with

18   unrelated regulatory issues in Australia.  This has nothing to

19   do with the competition issues that bring us here today.

20             THE COURT:  Okay.

21             MS. MURDOCK-PARK:  Your Honor, the question I have

22   for Mr. Kolotouros is at the very top from his email, which, I

23   believe, ties directly to what we're discussing.

24             THE COURT:  Okay.  I see that.  Okay.

25             MS. MURDOCK-PARK:  If we could pull up UPX713.

```
 1            THE COURT:  So, at least that portion of the email

 2     will be admitted.  And the objection is overruled as to that

 3     portion of the email.

 4            MS. MURDOCK-PARK:  Thank you, Your Honor.

 5            If we could go to the e-mail from Mr. Kolotouros

 6     dated November 17th, 2020.

 7     BY MS. MURDOCK-PARK:

 8     Q.  And there is an email that you write:  Attorney-client

 9     privilege, adding Rosie.

10            Do you see that?

11     A.  I do.

12     Q.  Rosie Lipscomb is an attorney?

13     A.  That's correct.

14     Q.  And you write:  Adding Rosie as the current path will

15     impact the messages Samsung conveys to the DoJ, and the impact

16     of MADA on their devices, business, and users.

17            So when replying on UPX713, you thought to add an

18     attorney?

19     A.  That is correct.

20     Q.  And you understood that Google's current path could cause

21     Samsung to cooperate with the DoJ in this case, right?

22     A.  I wouldn't interpret that from what I write.

23     Q.  Okay.  Well, this was right after the complaint was filed,

24     correct?

25     A.  The date on this is?
```

964

1    Q.   November 17th, 2020.

2    A.   Got it.  I just think that the Paletino situation in

3    Australia was a complicated one, and I wanted to make sure that

4    we had an accurate characterization of what was being conveyed

5    to Samsung in connection with it.

6    Q.   But you were specifically worried about what Samsung would

7    tell the DoJ, right?

8    A.   I don't know if I was worried as much as I wanted to make

9    sure that we had a proper discussion on how Paletino could

10   impact how Samsung is interpreting global obligations around

11   the world with respect to the MADA.

12   Q.   Okay.  We reviewed UPX713 in your third deposition, right?

13   A.   I don't recall if it came up or not.

14   Q.   You do recall being deposed for the third time after DoJ

15   received thousands of belatedly deprivileged documents from

16   Google?

17   A.   I recall being deposed a third time, yes.

18   Q.   We can go ahead and take UPX713 down.

19        Mr. Kolotouros, you discussed MADAs and RSAs over email,

20   but you also discussed MADAs and RSAs over Chat, right?

21   A.   Not substantively, no.

22   Q.   You're saying you never substantively discussed MADA and

23   RSA over Chat?

24   A.   I find it difficult to engage in substantive conversations

25   over Chat, period, with respect to any topic, given the format

 1   and the interaction model, which is why I rely on meetings or

 2   emails or face-to-face conversations.

 3   Q.  If we could pull up UPX8071.

 4        And this is a declaration that you wrote in this case,

 5   correct?

 6   A.  Yes.

 7   Q.  Okay.

 8             MS. MURDOCK-PARK:  And there's a relevance objection

 9   to this, Your Honor.

10             MR. SCHMIDTLEIN:  They want to ask him about it, but

11   I'm not sure -- now that he's on the stand, I don't know if

12   they need to admit his declaration.

13             THE COURT:  I suppose the proper way of doing it is

14   asking, and then -- if he denies it, then you can --

15             MS. MURDOCK-PARK:  I am going to ask questions about

16   the document, Your Honor.

17             THE COURT:  Okay.

18             MS. MURDOCK-PARK:  It is not in the binder, so if I

19   may approach to --

20             THE COURT:  Sure.

21             THE WITNESS:  Thank you.

22   BY MS. MURDOCK-PARK:

23   Q.  If we could go to paragraph 5 of UPX8071.  And if you could

24   look at the language that is at the last sentence on

25   paragraph 5, into the second page.

1          And you write -- or, actually, the entire thing.

2          You say:  From May 1, 2019 to the present, I do not

3     recall any specific instances in which I initiated

4     communication about substantive matters relevant to the

5     above-captioned cases over Google Chat with history off.  From

6     time to time there have may have been some instances in which

7     another employee initiated communication with me about

8     substantive matters relevant to the above-captioned cases over

9     Google Chat with history off, but I do not recall the specifics

10    of any such instance, and I do not recall changing the settings

11    for such Google chats.

12          Right?

13    A.  Yes.

14    Q.  So other employees may have reached out to you to discuss

15    substantive matter over Chat, right?

16    A.  Yes.

17    Q.  So you may have discussed those chats -- or, may have

18    discussed MADA and RSA on those chats?

19    A.  I think I traditionally, or generally, would have deflected

20    or diverted to an email to have a substantive conversation or

21    to a live Chat -- a live conversation, excuse me.

22    Q.  When you say "generally," that does not mean all the time,

23    correct?

24    A.  I can't recall instances where we had substantial

25    conversations over Chat on MADA and RSA.

 1                 MS. MURDOCK-PARK:  Your Honor, I move to admit

 2      UPX8071.

 3                 MR. SCHMIDTLEIN:  No objection.

 4                 THE COURT:  All right.  So, it will be admitted.

 5      BY MS. MURDOCK-PARK:

 6      Q.  So, you mention here "Chat with history off."

 7           Google Chat used to be known as Hangouts, right?

 8      A.  Yes.

 9      Q.  And before February 2023, Google's corporate policy was to

10      default the preservation settings on chats to history off, right?

11      A.  That is correct.

12      Q.  History-off chats would automatically be deleted after

13      24 hours?

14      A.  I don't know what the precise implementation was with

15      respect to deletion or maintenance of chats.

16      Q.  Okay.

17                 MS. MURDOCK-PARK:  I would like to go to UPX1088.

18      And this is the Chat Retention Policy, which, I believe,

19      there's another relevance objection.

20                 MR. SCHMIDTLEIN:  No objection.  We'll withdraw it.

21                 MS. MURDOCK-PARK:  If I may approach?

22                 THE COURT:  Okay.

23                 THE WITNESS:  Thank you.

24      BY MS. MURDOCK-PARK:

25      Q.  And I would like to draw your attention to the top half of

1    UPX1088, where it shows:  Policy last modified November 18,

2    2020.

3         Do you see that in the very top?

4    A.  Yes.

5    Q.  And the Google Chat Retention Policy wasn't made into a

6    separate policy until November 18th, 2020, right?

7    A.  That's the date I see with the policy being modified, yes.

8    Q.  And under Retention Periods it reads:  A Chat message

9    remains in your view for the following periods, based on sent

10   date, after which it's automatically removed.

11        Do you see that?

12   A.  I do, yes.

13   Q.  And it says:  24 hours, if history is off.

14        Right?

15   A.  Yes.

16   Q.  So if history is off, chats would be deleted every

17   24 hours?

18   A.  I believe that's what the policy states, yes.

19   Q.  Okay.  And history-off chats would be deleted after

20   24 hours, even if someone was on litigation hold, right?

21   A.  I believe that is correct, yes.

22   Q.  And before February 2023, your Chat history default -- or,

23   your Chat default was set to history off, right?

24   A.  I believe so, yes.

25   Q.  And before February 2023, you do not recall ever turning

1     your Google Chat history to history on, right?

2     A.  I do not, that is correct.

3     Q.  But you were aware that you were on litigation hold?

4     A.  I was.

5     Q.  You were actually on more than one litigation hold, right?

6     A.  Yes.

7     Q.  Before Google changed its corporate policy in February

8     2023, what steps did you take to preserve your history of

9     chats?

10    A.  I generally tried to avoid conversations over Chat with

11    history off that dealt with substantive business matters,

12    period.

13    Q.  But, you generally tried to avoid conversations.  That, we

14    just established.  That doesn't mean you didn't have

15    conversations, right?

16    A.  I don't recall specific conversations with history being

17    off where I was having substantive business conversations on

18    topics.

19    Q.  Okay.  But you don't know if you actually had any

20    conversations, right?

21    A.  I can't recall.

22    Q.  If you had a history-off conversation on Chat, would you

23    have attempted to preserve it?

24    A.  If it was substantive, I think I would have tried to

25    preserve it.  But, at the same time, I don't recall having

1    substantive business conversations.

2    Q.  How would you have tried to preserve a substantive business

3    conversation on Chat?

4    A.  It would have been to turn history on.

5    Q.  And you never turned history on, correct?

6    A.  I do not recall having turned history on.

7    Q.  Now, you use Google Chat frequently, right?

8    A.  I do.

9    Q.  And several times a day?

10   A.  Yes.

11   Q.  You use Google Chat with your coworkers?

12   A.  I do.

13   Q.  And have any of your coworkers ever asked you to have a

14   history-off Chat?

15   A.  I can't recall.  I don't generally remember all my chats.

16   But I can't recall any offhand.

17   Q.  Okay.  You know that some of your coworkers intentionally

18   take chats about MADA or RSA to history off, right?

19   A.  I'm not aware of that.

20   Q.  Okay.

21          MS. MURDOCK-PARK:  We can go ahead and take down

22   UPX1088.

23          And I want to move to admit, if --

24          THE COURT:  1088 is admitted.

25          MS. MURDOCK-PARK:  Thank you.

```
 1    BY MS. MURDOCK-PARK:

 2    Q.  Mr. Kolotouros, you also use Google Chat with your

 3    supervisors, correct?

 4    A.  Yes.

 5    Q.  Okay.  And including your former supervisor, Jamie

 6    Rosenberg?

 7    A.  Yes.

 8    Q.  And you have used Chat with Mr. Rosenberg to discuss

 9    Samsung revenue share, right?

10    A.  I can't recall precise instances where I have, but I

11    imagine so, yes.

12    Q.  Mr. Rosenberg also kept his Chat default set to history

13    off, right?

14    A.  I do not know what Mr. Rosenberg set his Chat history to.

15    Q.  Do you recall him ever asking to turn Chat history on?

16    A.  I don't recall him ever asking to turn Chat history on.

17    Q.  You use Google Chat to discuss business with individuals

18    outside of Google, right?

19    A.  No.  That is something I try to avoid generally.

20    Q.  Okay.  So have you ever used Google Chat with an OEM?

21    A.  I think maybe I can count on one hand the number of times I

22    received a Chat from an OEM partner.

23    Q.  Have you ever used Google Chat with anyone at Samsung?

24    A.  Yes.  On personal -- on my personal Chat I have, yes.

25    Q.  But on Google Chat specifically.
```

1    A.  I don't think so.  Meaning, the exclusive nature of my

2    chats is always with Google employees.  And I'm always

3    surprised when I see someone send a Chat message that is not a

4    Google employee, and that's a very, very, very limited number

5    of times.

6    Q.  You're aware that members of your team used history-off

7    Chat to discuss business with Samsung, right?

8    A.  I am not aware of that.

9    Q.  Are Google employees allowed to use history-off Chats with

10   OEM partners when talking about business?

11   A.  Can you repeat the question, please?

12   Q.  Sure.  Are Google employees allowed to use history-off

13   Chats with OEM partners when talking about business?

14   A.  Are they on a litigation hold or not?

15   Q.  Just generally.

16   A.  I am not familiar with the Chat practices of my colleagues

17   or my employees or team members.

18   Q.  Well, I'm not asking about the actual practices.  I'm

19   talking about Google corporate policy.

20        As a matter of policy, are employees allowed to use

21   history-off Chat with individuals outside of the company to

22   discuss business?

23   A.  I'm actually not sure what the corporate policy is with

24   respect to Google Chat and outside companies.  I'm not sure

25   what the actual policy is.

1    Q.  Okay.  And you personally have --

2    A.  I -- with respect to third-party Chat services, I think

3    it's prohibited.  With respect to Google services is where I

4    don't know what the actual policy is.

5    Q.  You personally have requested to take conversations off of

6    email and onto history-off Chat, right?

7    A.  Off of -- I've requested to have conversations taken off,

8    you know, to live conversations or meetings.  I don't think

9    I've ever requested to go to a history-off Chat.

10   Q.  Okay.

11             MS. MURDOCK-PARK:  If we could pull up UPX710.

12             And this is another relevance objection.  And --

13             MR. SCHMIDTLEIN:  No objection, Your Honor.

14             MS. MURDOCK-PARK:  Okay.

15             THE COURT:  710 will be admitted.

16             MS. MURDOCK-PARK:  Thank you, Your Honor.

17   BY MS. MURDOCK-PARK:

18   Q.  UPX710 is a email from Yuki Richardson.  Ms. Richardson is

19   a finance director at Google?

20   A.  That is correct.

21   Q.  And her email is Sugawara@google.com because her maiden

22   name was Sugawara?

23   A.  I believe that's true, yes.

24   Q.  And Ms. Richardson was responding to an email thread that

25   you're on dated March 13th, 2021?

1     A.  Yes.

2               MS. MURDOCK-PARK:  And there are some redactions in

3     this email, Your Honor, but they are not about anything we're

4     talking about.

5     BY MS. MURDOCK-PARK:

6     Q.  I would like to draw your attention to the bottom of page 1

7     through the top of page 2, where you're responding in the email

8     chain, correct?

9     A.  Yes.

10    Q.  And you responded in the chain that the conversation was

11    best discussed off email?

12    A.  Yes.

13    Q.  And you asked to take the conversation to Google Chat.

14    A.  Or Hangouts, yes.

15    Q.  And Hangouts is another -- I guess, is the -- what Google

16    Chat used to be referred to?

17    A.  I also treat Hangouts to be the video conferencing service,

18    yes.

19    Q.  Okay.  But, you knew that your Chat -- when you asked to

20    take the conversation to Google Chat, that your Chat would be

21    erased every 24 hours, right?

22    A.  I don't know if that's what I was thinking at this point in

23    time.

24    Q.  But you knew that to be true, that your Chats would be gone

25    after a day?

1   A.  I recognize that history off did not preserve the Chat,

2   yes.

3   Q.  Okay.  That's because deleting chats every 24 hours is the

4   default?

5   A.  I knew that history off meant that the conversation was not

6   preserved, generally, yes.

7   Q.  Okay.  So with respect to using history-off chats, you just

8   went along with the default, right, Mr. Kolotouros?

9   A.  Yes.

10  Q.  Okay.

11         MS. MURDOCK-PARK:  No further questions, Your Honor.

12  I pass the witness.

13         THE COURT:  All right.

14         Mr. Schmidtlein?

15                     CROSS-EXAMINATION

16  BY MR. SCHMIDTLEIN:

17  Q.  Mr. Kolotouros, on that last email that Counsel just showed

18  you, UPX710 --

19         We don't need to put it up.

20         -- but, can you read what the subject line of that email

21  is?

22  A.  Samsung Wear Play Revshare Next Steps.

23  Q.  What does "Samsung Wear Play" refer to?

24  A.  Samsung Wear Play refers to a contractual negotiation that

25  was specific to Samsung wearable devices or watches that were

1    moving to be a collaborative effort with Wear OS, and we were

2    discussing the Play revenue share negotiation and percentages.

3    Q.  Does this document have anything to do with Google's MADA?

4    A.  It does not.

5    Q.  Does this document have anything to do with Google's search

6    revenue share agreements?

7    A.  Search revenue share agreements, no.

8    Q.  We have spent some time here over the last two days going

9    through Google's RSA agreements and MADA agreements with

10   various partners, including Samsung and Motorola.  Would you

11   agree or disagree that those contracts are complex?

12   A.  I would agree that they are complex.

13   Q.  Would you agree or disagree that even amongst Google

14   employees who are involved in those contracts on a regular

15   basis, they are difficult to sometimes understand and even

16   discuss?

17   A.  Yes.

18   Q.  In light of that, do you believe that Chat is -- would be

19   an effective means for having substantive communications about

20   RSAs or MADAs?

21   A.  No.

22   Q.  Mr. Kolotouros, you testified yesterday in reference to a

23   consistent user experience.  Do you recall that?

24   A.  I do.

25   Q.  And I believe you testified that one of the reasons, or the

1    purposes, of the MADA is to provide a consistent user

2    experience; is that right?

3    A.  Yes.

4    Q.  Can you describe for the Court what you meant by a

5    "consistent user experience"?

6    A.  The consistent user experience is meant to assure OEMs and

7    users that, if they're moving from one Android phone to

8    another, whether it be by one OEM's line of devices or another

9    OEM's line of devices, that there is a predictable set of

10   utility in UI that is available out-of-box that increases the

11   preference for that particular user to engage with Android

12   devices amongst different OEMs.

13          So the consistent user experience not just refers --

14   does not refer only to the UI, but also to the existence of

15   applications which have been proven to be popular and are

16   expected on a smartphone and how it's configured.

17   Q.  And does Google believe that providing a consistent user

18   experience across Android devices is important to compete with

19   Apple devices?

20   A.  Yes.

21   Q.  Why is that?

22   A.  The extent to which a user does not know what to expect or

23   does not identify or find services that are expected on the

24   device would render the device out-of-box to be potentially

25   unattractive or not palatable and might migrate them to switch

1   from Android to Apple.  And, so, that predictability or

2   consistency of experience is important to stay competitive.

3   Q.  Do Apple devices across releases, different versions of the

4   iPhone, do those typically provide a consistent user

5   experience?

6   A.  My understanding is that they do.

7   Q.  Is that one of the strengths of Apple's competition, is

8   being able to provide that consistent user experience?

9   A.  My understanding is that when it comes to Apple devices and

10  going from device to device, the quote used is, quote, It just

11  works.  Meaning, there's an elegance to the movement from Apple

12  to Apple phone which makes it very, very easy to continue on an

13  Apple phone, which we try to compete against by having

14  consistent experience and high-quality services available on a

15  device.

16  Q.  Okay.

17          MR. SCHMIDTLEIN:  Your Honor, I would like to hand up

18  DX738 and 739.

19          MS. MURDOCK-PARK:  Your Honor, for the record, these

20  were given to us this morning, so we haven't had a chance to

21  review them.

22          MR. SCHMIDTLEIN:  We'll make a proffer here, Your

23  Honor.  Hopefully, we'll get to this.

24          Your Honor, you asked some questions yesterday of

25  Mr. Kolotouros about some certain contractual provisions and

1    when -- whether those provisions limited what certain OEMs

2    could communicate to users in terms of, you know, ways in which

3    they could either remove things, add things, delete things to

4    their devices.

5            THE COURT:  Right.

6            MR. SCHMIDTLEIN:  And in response to that, our team

7    pulled together these -- these documents, and that's why we've

8    provided them first thing this morning.  And I can have

9    Mr. Kolotouros explain.  I think one of them is a Samsung web

10   page and another is a Motorola web page of content that you can

11   reach -- users can reach to learn about how they can configure

12   their devices.  So, we would move them into evidence.

13           THE COURT:  I'll admit them just based upon the fact

14   that I've been --

15           Obviously, if you all want the opportunity to bring

16   something else forward, you're welcome to do so.

17           MS. MURDOCK-PARK:  Thank you, Your Honor.

18   BY MR. SCHMIDTLEIN:

19   Q.  Mr. Kolotouros, can you just briefly describe for the Court

20   what Exhibits 738 and 739 are?

21   A.  They depict off-device help screens, or help pages, on how

22   devices -- both Samsung and Motorola devices can be configured

23   and customized for the user, including the home screen.

24   Q.  Do they give instructions to the user about how to add or

25   delete applications?

980

1    A.  They do, including a YouTube video on page 2 of the -- of

2    738.

3    Q.  And if you could put 739 up.

4         And 739 is a Motorola help page with respect to the Moto

5    X Force.

6         What is the Moto X Force, if you know?

7    A.  The Moto X Force, I believe, is a phone.  This is a very

8    old phone with the latest update to Android 6 Marshmallow.  So,

9    this a very old phone from seven, eight, maybe six years ago,

10   and the customizations of home screen options and instructions

11   for the user.

12   Q.  And if you go down just below the picture on that first

13   page, where it starts with:  The latest update.

14        Can you read that in the record?

15   A.  "With the latest update to Android 6 Marshmallow, users now

16   have the option to remove the Google search bar from the home

17   screen and control if an app, such as messaging, email, or

18   voicemail, will display the count of unopened messages."

19   Q.  Can you describe what direction that is providing?

20   A.  It is providing clarity with respect to the new Android

21   update, new Android release, and how the Google search bar can

22   be removed from the home screen.

23             MR. SCHMIDTLEIN:  No further questions, Your Honor.

24             THE COURT:  Any redirect?

25             MS. MURDOCK-PARK:  Briefly, Your Honor.

```
 1                      REDIRECT EXAMINATION

 2    BY MS. MURDOCK-PARK:

 3    Q.  Mr. Kolotouros, did you see DX738 or DX739 before your

 4    testimony today?

 5          Those are the documents your counsel just handed to you.

 6    A.  Oh, I'm sorry.  No, I did not.

 7    Q.  Have you ever personally visited those websites?

 8    A.  I have not.

 9    Q.  When did you first learn that Samsung provided users with

10    directions on how to remove a search widget?

11    A.  How to remove a?

12    Q.  Search widget.

13    A.  This is the first time I'm seeing the actual web pages that

14    show how to remove a search engine.

15    Q.  Have you ever personally attempted to remove a search

16    widget from an Android phone?

17    A.  Yes.

18    Q.  And DX738 and DX739 show that it takes multiple steps to

19    remove a search widget, right?

20    A.  I don't -- the experience on my Samsung S23 is just the

21    long press and the delete.

22    Q.  Okay.  Well, if we could look at UPX738, the top of the

23    second page.

24          It says that:  Available screens and settings may vary

25    by wireless search provider, software version, and device
```

1    model.

2          Right?

3    A.   Yes.

4    Q.   And a user has to first go to the Samsung website to find

5    the instructions, and then might have to go elsewhere to learn

6    how to actually delete the widget?

7    A.   I think general navigation on a device is understood by

8    users, including how to remove apps or delete icons.  So, I

9    don't know if a precondition for that fluency or knowledge is

10   coming to this particular page.

11   Q.   Okay.  But, my question was:  If a user wanted to learn how

12   to delete the widget, they would first have to know to go to

13   the Samsung website, right?

14   A.   That also might be available in the settings or the help on

15   the phone -- the on-device help as well.

16   Q.   There's instructions on the phone on how to remove the

17   widget?

18   A.   I don't know if the settings would then link out to a

19   website.  It's not an experience I've encountered myself.  I'm

20   not sure.

21   Q.   That's not prohibited by the MADA, to provide instructions

22   to a user on how to delete the search widget?

23   A.   I think that if the help or settings function on a phone

24   linked out to a page that had this, that would not be a

25   problem.

```
 1    Q.  But you do not actually know, right?

 2    A.  I do not actually know precisely.

 3    Q.  And I had shown you UPX710, and your counsel asked you a

 4    question about to what the email referred, and you said it

 5    referred to wearables, right?

 6    A.  Yes.

 7    Q.  Are you aware that wearables were part of the Department of

 8    Justice's complaint?

 9    A.  I was not.

10    Q.  Okay.  So, were documents related to wearables part of your

11    litigation hold in this case?

12    A.  I do not recall.

13    Q.  Okay.

14            MS. MURDOCK-PARK:  No further questions.

15            THE COURT:  All right.  Mr. Kolotouros, thank you

16    very much for your time and your testimony.  And safe travels

17    home.

18            THE WITNESS:  Thank you.

19            THE COURT:  All right, everyone.  So, I think it

20    makes sense for us to pause our proceedings for the week.  So

21    we'll resume again Monday morning at 9:30.

22            Mr. Cavanaugh?

23            MR. CAVANAUGH:  Your Honor, if I could just move in

24    the unobjected-to exhibits.  I have our list, if I could just

25    hand that up.
```

1          THE COURT:  Sure.

2          MR. CAVANAUGH:  And that's been provided by counsel

3    to Google.  Thank you, Your Honor.

4          THE COURT:  Thanks, Mr. Cavanaugh.

5          MR. DINTZER:  And, Your Honor, as long as we are sort

6    of doing exhibit list cleanup, if we could -- during my

7    discussion with Dr. Varian, we discussed UPX1066, which was a

8    slide deck that had had a relevancy objection that, I believe,

9    the Court overruled and -- but, we didn't actually move it in,

10   and we would like to go ahead and move it in now.  We could put

11   it up so the Court would have it.  It's this one.

12         And the Court said, I don't think there's a relevancy

13   objection, so I don't think we actually moved it in.

14         THE COURT:  Okay.

15         MR. SMURZYASKI:  Your Honor, if I could address that.

16   I believe the way we resolved it was there was a foundation

17   objection using it with the witness who was there, and we moved

18   on from it.  So moving a document in just sort of now, at

19   random, doesn't seem appropriate.  If they want to use it with

20   a witness and can establish the witness knows something about

21   it, then we can have that discussion.  But, just moving it in

22   in the ether, as it were, seems to be not how we're proceeding

23   in this case.

24         MR. DINTZER:  Your Honor, we moved -- both sides

25   moved over 1,000 documents in without witnesses, and the Court

985

said, for the push, as long as the objections were taken care

of, which we have, that the document should come into evidence.

THE COURT:  Well, a couple things.  One is, my notes

reflect Dr. Varian couldn't recall whether he had had antitrust

training and didn't specifically recall this document.

MR. DINTZER:  That is correct, Your Honor.

THE COURT:  So we have that.  And so, then, the

question is, is there an objection to moving this in through

stipulation?

MR. DINTZER:  There's no standing objection, Your

Honor.  The only objection that they had in the objections that

they provided us was relevancy.  And it's a 2011 document that

has a slide that says:  Thou shalt not say scale, thou shalt

not -- it's clearly relevant.  So at that point, based on the

rules of the game, we would like to move it in.

THE COURT:  Well, I'm not disagreeing with the notion

that you necessarily need a witness to move something in.  I'm

just asking whether there's any objection otherwise?

MR. SMURZYASKI:  Your Honor, we're not going to stand

on the relevance objection.  Obviously, talk about the

significance of it at some point.

THE COURT:  Sure.

MR. SMURZYASKI:  Perhaps with a witness, perhaps not.

But, we're not standing on the relevance objection.

THE COURT:  Very good.  All right.  So, UPX1066,

 1    we'll admit that.

 2              MR. DINTZER:  Thank you, Your Honor.

 3              THE COURT:  I think the last housekeeping matter, Mr.

 4    Schmidtlein, concerned the market shares and what Google's

 5    position is on that.

 6              MR. SCHMIDTLEIN:  Yes, Your Honor.  Let me see if I

 7    got this right.  So, I think one of the -- I think there's two

 8    market shares that we're talking about.

 9              THE COURT:  Right.

10              MR. SCHMIDTLEIN:  One is on page 42 of Your Honor's

11    opinion.  This -- this is a sensitive number, just as when

12    during the last session that was closed and we discussed with

13    Mr. Kolotouros a certain percent of search that came through a

14    certain access point --

15              THE COURT:  Right.

16              MR. SCHMIDTLEIN:  -- we view this in very much a

17    similar vein.  And in light of the fact -- so, I think we have

18    that, number one.

19              Number two, I think in light of the fact, as Your

20    Honor recognizes in your footnote, that plaintiffs seem to

21    implicitly concede that the foreclosure analysis should not

22    include the searches through that access point that's reflected

23    in that percentage, I guess I would argue that I don't think

24    this is so critically important or relevant to Your Honor's

25    disposition on this issue that it needs to be publicly

1    revealed.

2              THE COURT:  Okay.

3              MR. SCHMIDTLEIN:  So, again, sort of balancing those

4    factors, we would respectfully ask that that remain sealed.

5              The other market share number that is at issue is on

6    page, I believe, 18 of Your Honor's order.  And the issue with

7    this one is, I think, a little bit more complicated in the

8    sense that this number, I believe, comes from some expert

9    analysis that was done in the case, and it was derived using a

10   number of parties' data; not just Google's, but also third

11   parties, because it purports to represent a market share

12   figure, you know, in relationship for a product to the entire

13   market, and that necessarily involves third-parties' data.

14             And for those reasons, I think it does reflect there

15   is some commercial sensitivity.  This is not a number that

16   would otherwise be floating around out in the marketplace.  And

17   for that reason --

18             THE COURT:  Is it the kind of number that can be

19   traced back to any particular party?  Market share is,

20   obviously, a key issue in these proceedings.

21             MR. SCHMIDTLEIN:  No, it is.  Again, I don't know

22   that -- there aren't that many competitors in that SEM tool

23   market.  So, I think, certainly, people would get a feel for

24   which party's data were subjected here.  I don't know, in one

25   of the competitor numbers, given this number, whether that

 1    would then allow them to also, in addition to getting a sense

 2    of Google, would also allow you to get a relative sense of

 3    their position.

 4             THE COURT:  And, I'm sorry, I should have had this in

 5    front of me, and I don't.  But I thought the number concerned

 6    percentage of ad placement within Google's SEM tool.  Am I

 7    mistaken?  Or maybe that was a different number.

 8             MR. SCHMIDTLEIN:  It is a number that purports to

 9    represent the percentage of ads placed through Google's tool of

10    the entire market.

11             THE COURT:  Okay.  Okay.  I'm just misrecollecting.

12             MR. SCHMIDTLEIN:  Yeah.  I think indirectly, it

13    obviously gives you some about Google.  And then indirectly, by

14    what's left, it could allow people to making inferences as to

15    the other competitors.

16             THE COURT:  Your thoughts on that?

17             MR. CAVANAUGH:  Your Honor, I would need to check to

18    see what the sources were.  I do know I referenced that in a

19    slide in my opening.  I did redact a number.  But let me just

20    check with my client, and I can tell the Court our position on

21    that on Monday morning.

22             THE COURT:  Okay.  All right.  Is there anything else

23    we need to discuss before we adjourn?

24             MR. SOMMER:  Yes, Judge.  Michael Sommer.  Just, if

25    we can get the lineup for Monday morning?

 1            MS. BELLSHAW:  Yes, Your Honor.  We've had Mr. Brian

 2   Higgins from Verizon here for a couple of days, so we would

 3   like to start him first thing on Monday morning.  And then we

 4   understand that Google has asked that Mr. Jerry Dischler also

 5   start on Monday, and so we intend to accommodate that request

 6   by having him go after Mr. Higgins.

 7            THE COURT:  Okay.  Do we think those two will take a

 8   full day?

 9            MS. BELLSHAW:  I think it's quite possible that

10   they'll take all day.

11            THE COURT:  Okay.  All right.  Well, we will look

12   forward to hearing from them on Monday.  I'm sure Mr. Higgins

13   is anxious to give His testimony.

14            MS. BELLSHAW:  I'm sorry, Your Honor.  I should have

15   said, I believe that both of those witnesses will have some

16   portion of their testimony in a confidential session.

17            THE COURT:  All right.  We'll take it as it comes.  I

18   think probably starting a witness testimony in confidential

19   session is a little awkward, so I don't think we should do

20   that.

21            All right.  So -- okay.  So, anything else?

22            All right.  I think -- hopefully, you all have had

23   discussions with Mr. Douyon about this.  You can leave your

24   stuff here over the weekend and overnight and the like.  We'll

25   be doing our other matters in another courtroom, so you don't

1        need to take anything out of here.  And the Courtroom will be

2        locked, obviously, over the weekend.

3                    MR. DINTZER:  Thank you, Your Honor.

4                    MS. BELLSHAW:  Thank you, Your Honor.

5                    THE COURT:  Thank you, everyone.  Have a nice

6        weekend.

7                                  *   *   *

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                        Dated this 15th day of September, 2023

8

9

10       _____

11                       Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
12                       Room 6523
                         333 Constitution Avenue, N.W.
13                       Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25