IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL.,  )      ███████

                      )

        Plaintiffs,       )

                      )      CV No. 20-3010

     vs.              )      Washington, D.C.

                      )      September 18, 2023

GOOGLE LLC,                        )      9:30 a.m.

                      )

        Defendant.        )      Day 5

_____)      Morning Session


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

```
APPEARANCES:

For DOJ Plaintiffs:          Kenneth M. Dintzer
                             U.S. DEPARTMENT OF JUSTICE
                             1100 L Street, NW
                             Washington, D.C.
                             (202) 307-0340
                             Email:
                             kenneth.dintzer2@usdoj.gov

                             Lara E.V. Trager
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 5th Street NW
                             Washington, D.C. 20001
                             (202) 598-2685
                             Email: lara.trager@usdoj.gov

For Plaintiff
State of Colorado:           Jonathan Bruce Sallet
                             COLORADO DEPARTMENT OF LAW
                             Consumer Protection Section,
                             Antitrust Unit
                             Ralph L. Carr
                             Colorado Judicial Center
                             1300 Broadway
                             Suite 7th Floor
                             Denver, CO 80203
                             (720) 508-6000
                             Email: jon.sallet@coag.gov

                             William F. Cavanaugh, Jr.
                             PATTERSON BELKNAP
                             WEBB & TYLER LLP
                             1133 Avenue of the Americas
                             Suite 2200
                             New York, NY 10036-6710
                             (212) 335-2793
                             Email: wfcavanaugh@pbwt.com

For Defendant Google:        John E. Schmidtlein
                             Graham Safty
                             Kenneth Charles Smurzynski
                             WILLIAMS & CONNOLLY LLP
                             725 12th St., NW
                             Washington, D.C. 20005
                             (202) 434-5000
                             Email: jschmidtlein@wc.com
```

APPEARANCES CONTINUED:

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   E. Barrett Prettyman CH
                                   333 Constitution Avenue, NW
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|

PLAINTIFF's:

| | | | | |
|-----------|--------|-------|----------|---------|
| BRIAN HIGGINS | 1020 | 1084 | 1110 | |
| BRIAN HIGGINS | 1078 | | 1117 | |
| JERRY DISCHLER | 1126 | | | |

– – –

INDEX OF EXHIBITS

– – –

| PLAINTIFF'S | ADMITTED |
|-------------|----------|
| UPX1026 | 1053 |
| UPX0947 | 1057 |
| UPX306 | 1060 |
| UPX495 | 1063 |
| UPX304 | 1066 |
| UPX642 | 1070 |

```
 1                    P R O C E E D I N G S
 2              COURTROOM DEPUTY:  All rise.  The Honorable
 3   Amit P. Mehta presiding.
 4              THE COURT:  Good morning, everyone.
 5              COURTROOM DEPUTY:  Please be seated and come to
 6   order.
 7              Good morning, Your Honor.  This is Civil Action
 8   20-3010, United States of America, et al. versus Google LLC.
 9              Kenneth Dintzer for the DOJ Plaintiffs.
10              Jonathan Sallet and William Cavanaugh for
11   Plaintiff States.
12              John Schmidtlein on behalf of Google.
13              THE COURT:  Okay, everyone.  Good morning and
14   welcome back.  I hope everybody had a nice weekend.
15              All right.  Anything we need to discuss
16   preliminarily before we plow forward?
17              MR. DINTZER:  Nothing for the DOJ Plaintiffs,
18   Your Honor.
19              MR. CAVANAUGH:  No, Your Honor.
20              MR. SCHMIDTLEIN:  No, Your Honor.
21              THE COURT:  All right.  We're ready then with the
22   plaintiffs' next witness.
23              MS. TRAGER:  Good morning, Your Honor.
24   Laura Trager for the United States.
25              THE COURT:  Sorry, last name again.
```

1    MS. TRAGER:  Trager, T-r-a-g-e-r.

2    THE COURT:  Ms. Trager, good morning.

3    MS. TRAGER:  The United States calls Brian Higgins

4    of Verizon.

5    COURTROOM DEPUTY:  Please raise your right hand.

6    (Witness is placed under oath.)

7    COURTROOM DEPUTY:  Thank you.

8    THE COURT:  All right.  Mr. Higgins, welcome.

9    THE WITNESS:  Thank you.

10   THE COURT:  Ready when you are, Ms. Trager.

11   MS. TRAGER:  Your Honor, we have prepared binders

12   for the witness and the Court.  May I approach?

13   THE COURT:  Yes, you may.

14   MS. TRAGER:  Your Honor, I'd also like to note

15   that I understand Verizon's counsel, Judith Zahid of Zelle

16   Law is also here for Verizon and the witness.

17   THE COURT:  Ms. Zahid.

18   MS. ZAHID:  Good morning, Your Honor.

19   THE COURT:  Good morning.

20   MS. TRAGER:  And, Your Honor, as we have raised, a

21   portion of Mr. Higgins' exam will be in closed session

22   pursuant to the Court's practices due to confidentially

23   designations.

24   THE COURT:  Okay.

25

```
 1                          - - -

 2     BRIAN HIGGINS, WITNESS FOR THE PLAINTIFFS, SWORN

 3                     DIRECT EXAMINATION

 4                          - - -

 5     BY MS. TRAGER:

 6          Q    Good morning, Mr. Higgins.

 7          A    Good morning.

 8          Q    As a housekeeping matter, I just handed you a

 9     binder with some documents.  I'll let you know when we're

10     going to turn to those.

11          A    Okay.

12          Q    And, first, would you please say and spell your

13     full name for the record?

14          A    Sure.  It's Brian Higgins.  B-r-i-a-n,

15     H-i-g-g-i-n-s.

16          Q    And where do you work?

17          A    I work at Verizon.

18          Q    And, just briefly, have you and I met before?

19          A    No.

20          Q    And did you talk about the substance of your

21     testimony here today with anyone other than your attorneys?

22          A    No.

23          Q    Did you speak with anyone from Google about your

24     testimony?

25          A    No.
```

1    Q    How long have you worked at Verizon?

2    A    Since 1995.

3    Q    And that puts you at approximately how many years?

4    A    28 years.

5    Q    What is your current title?

6    A    Current title is chief customer experience

7  officer.

8    Q    First, would you please briefly describe Verizon's

9  consumer business in the United States?

10   A    Sure.

11        So the consumer business is made up of two primary

12 segments, you have mobile and then you have home.  And so we

13 provide on the mobile side connectivity and selling devices,

14 servicing those devices, all the end customer support.

15        And then in the home, in a similar fashion, we do

16 all the broadband connectivity, provide pay TV as well,

17 streaming services, and all the hardware that goes with that

18 as well.

19   Q    And we'll be focusing today on the mobile devices.

20   A    Yep, understood.

21   Q    Please describe your current responsibilities as

22 chief customer experience officer.

23   A    So for this role, I have responsibility for all

24 the user experience, customer journeys, and all of our

25 digital platforms, so things like Verizon.com as an example.

1     Q    And how long have you been chief customer

2  experience officer?

3     A    Since July.

4     Q    What title did you hold prior to your current

5  role?

6     A    Senior vice president device marketing and

7  product.

8     Q    And how long were you SVP of device marketing and

9  product?

10    A    Since 2017, until July of this year.  And that was

11 July of 2017.

12    Q    July of 2017.

13         Would you please describe your responsibilities at

14 Verizon starting in July of 2017 when you entered device

15 marketing?

16    A    Sure.

17         When it started off, I had responsibility for the

18 device portfolio, all the promotions that go with that, and

19 also the marketing that's associated with it, and also our

20 accessory portfolio.

21         As the years progressed, I also picked up the

22 product portfolio as well, so that is anything that Verizon

23 might sell that's a product that would sit on top of devices

24 or in association of devices, and also all the products that

25 sit in the home as well, things like your cable boxes,

1    routers, et cetera.

2        Q    During your term in device marketing, were there

3    any devices that Verizon sold in the U.S. that you did not

4    have responsibility for?

5        A    Certainly there were, yes.

6            So there are unlock devices; bring your device,

7    called BYOD, that customers could bring on to the Verizon

8    network.  So we didn't sell those, they would be on the

9    Verizon network.

10       Q    But for those devices that Verizon did sell, did

11   you have responsibility for all devices across the business?

12       A    I did, yes.  My team and I, yep.

13       Q    And while you were in device marketing, did you

14   negotiate commercial contracts with Verizon's partners?

15       A    I mean, my team and I did, correct.

16       Q    And is Google one of those partners?

17       A    Google is one of the partners, yes.

18       Q    Before we focus on those contracts, I'd like to

19   ask you to explain a few things about the U.S. smartphone

20   market as it relates to search in this case.

21           What types of mobile devices does Verizon sell to

22   U.S. consumers?

23       A    I mean, generally, you have iOS iPhone and you

24   have Android devices.  The Android devices will come from a

25   multitude of different manufacturers.

1    Q    You mentioned manufacturers.  Are you familiar

2  with the term "OEM"?

3    A    I am.

4    Q    What does OEM stand for?

5    A    Original equipment manufacturer.

6    Q    And we're going to focus on Android today.

7         Which OEMs does Verizon get the Android devices it

8  sells from?

9    A    It changes over the years.  If I look at today,

10  I'd say the dominant players would be Samsung and Google

11  Pixel.  But over the years, you also had LG, who's no longer

12  selling phones.  Motorola sells phones today.  But we've

13  sold other devices from companies that are no longer with us

14  like Palm and Red, et cetera.  So it's various companies.

15    Q    And are you familiar with the term "preloaded" in

16  the context of mobile applications and services?

17    A    I am.

18    Q    What, if any, Google applications come preloaded

19  on the Android devices that Verizon sells in the U.S.?

20    A    I couldn't give you the full list, but, I mean,

21  there are a number of them.  The Chrome browser is a good

22  example.  Gmail client is another good example.

23    Q    Does an app store come preloaded on the Android

24  devices Verizon sells in the U.S.?

25    A    It does come preloaded on those devices, that's

1    correct.

2        Q    Which one?

3        A    The Google Play Store.

4        Q    And has Verizon sold any Android devices in the

5    U.S. without Google's Play Store preloaded?

6        A    Not that I am aware of.

7        Q    In your view, could Verizon sell an Android

8    smartphone successfully in the U.S. that did not have an app

9    store on it?

10       A    An app store?

11            A device would need to have an app store on it in

12   order to be successful in my opinion.

13       Q    And why is that?

14       A    Because it allows customers to go in and download

15   new applications.

16       Q    While you were --

17       A    In an easy manner, I should say.  It makes it

18   easier and more efficient.

19       Q    And while you were in device marketing, were there

20   any app stores for Android phones that could reasonably

21   replace the Google Play Store?

22       A    There were other app stores.  Samsung devices as

23   an example, has their own app store.  I couldn't give you an

24   opinion about whether or not it could replace it.  I just

25   know there are others that are out there.

1    Q    And how, if at all, do the number of apps

2  available in the Google Play Store compare to the number

3  available in Samsung's app store?

4    A    I don't know.  I've never looked -- I don't have

5  any data to back that up.

6    Q    Okay.

7         And you mentioned Chrome.  Are you familiar with

8  the term "default search engine"?

9    A    Uh-huh, I am.

10   Q    What is the default search engine in the Chrome

11  browser?

12   A    For which devices?  What are you referring to?

13   Q    On Verizon's Android phones in the U.S.?

14   A    On Verizon's Android phones.  Okay.  So it's

15  Google.

16   Q    And how often is Chrome pre-installed on Verizon's

17  Android devices?

18   A    To the best of my knowledge, I believe it is

19  pre-installed all the time on Android devices.

20   Q    And where does the icon for Chrome appear on

21  Verizon and Android smartphones when it's preloaded?

22   A    I couldn't tell you exactly.  It's generally on

23  the home screen though.

24   Q    What is the "home screen"?

25   A    Home screen is the first screen you come up to

1    when you turn on a device.

2         Q    And are you familiar with the term "hot seat"?

3         A    I am.

4         Q    What is the hot seat on a device?

5         A    So the hot seat is generally the first row on the

6    home screen.  It sits -- actually it sits across all the

7    screens, but it's the first row on your device for Android.

8         Q    Can you elaborate on what you mean when you say

9    "it sits across all the screens"?

10        A    Meaning that -- think of it as a permanent row

11   that sits at the bottom of your device.  And as you swipe to

12   what's called a plus-one screen or a plus-two, which are the

13   screens that are to the right, that would remain constant on

14   the screens.

15        Q    And how does the hot seat position compare to

16   other placements on the phone with respect to usage?

17        A    It's generally considered to be preferred,

18   because, again, it's on the home screen and it's persistent

19   across the other screens as well.

20        Q    Setting aside browsers for a moment, Mr. Higgins,

21   are you familiar with the term "search entry point"?

22        A    I am, yes.

23        Q    What is a search entry point?

24        A    Different mechanisms for you to access search on

25   the device.  Could be voice, could be a hardware key.

1    Q    And is the search bar in a browser a search entry

2  point?

3    A    I would consider it that, yes.

4    Q    Are search entry points also sometimes referred to

5  as search access points?

6    A    I'm sure they could be.  I wouldn't refer to it

7  that way but I'm sure it could be.  Yeah.

8    Q    Okay.

9         Other than the browser search bar, what other

10  search entry points come preloaded on Verizon's U.S. Android

11  devices?

12    A    I couldn't tell you exactly.  Again, it varies.

13  Any answer I give you is probably not going to be correct

14  because each one of the devices are somewhat different at

15  times.

16         As an example, Samsung may be configured

17  differently than let's say a Google Pixel device.

18    Q    For those search entry points on Verizon's Android

19  phones in the U.S., are you aware of any that defaults to

20  anything other than Google upon coming out of the box?

21    A    I am not aware of that, no.

22    Q    Okay.

23         And are you familiar with the Google widget?

24    A    Google widget?  Specifically around search or...

25    Q    What is the Google widget, to your knowledge?

1    A    Any widget -- a widget could be anything that you
2    configure on a device for a multitude of different purposes.
3    So could there be a widget that's defined as search.  There
4    could be.  There are widgets for other purposes as well.
5    Time, calendar, whatever it may be.
6    Q    Apologies.  Yes, I did mean to tie it to search.
7         Are you familiar with Google's search widget?
8    A    I am.
9    Q    And what is that?
10   A    It's simply -- think of it as a small piece of
11   software that sits on your device that allows access to
12   search capability.
13   Q    And out of the box, where does the Google Search
14   widget sit on the device?
15   A    Again, any answer I give you is probably not going
16   to be accurate because all the devices, I think, are a
17   little bit different.
18        Generally, I believe it's on the home screen but
19   I couldn't tell you 100 percent that that's the case all the
20   time.
21   Q    Sitting here today, can you think of any Verizon
22   device that Verizon sells in the U.S. where the Google
23   Search widget does not sit across the home screen of the
24   device?
25   A    Can I think of one?  No.  But I couldn't tell you

1    that it's not possible.

2         Q    Okay.

3              So just before we move on, are you aware of any

4    Android phones in the U.S. on which Google is not the

5    default search engine?

6         A    In the U.S.?

7         Q    In the U.S., yes.

8         A    I don't have a view on that.  I don't track all

9    the phones across the U.S.

10        Q    Okay.

11             Mr. Higgins, I'd like to pivot and discuss some

12   terminology.

13             Are you familiar with the term "general search

14   engine"?

15        A    Yes.

16        Q    What is a general search engine?

17        A    General search engine, the way I think of it is

18   just crawling the web to identify general search queries and

19   bring back a response.

20        Q    And what are some examples of general search

21   engines?

22        A    Where is the nearest restaurant to me, what time

23   is it in Barcelona, think of any question you might ask.

24        Q    And that would be a query, what you just

25   described?

1      A      That's the way I would describe it, yes.

2      Q      And what are some examples of providers of general

3  search engines?

4      A      Oh, providers of general search?

5      Q      Yeah.

6      A      So you have Bing, you have DuckDuckGo.  There's

7  Yahoo! as well.  I would consider those all in the general

8  category.

9      Q      Along with Google?

10      A      Along with Google, yes.

11      Q      And are you familiar with the term vertical search

12  provider?

13      A      I am.

14      Q      What is a vertical search provider?

15      A      I think of a vertical search provider of someone

16  that provides responses in a specific area.  So if you take

17  Yelp as an example, and you query Yelp, they're likely going

18  to give you responses tied into restaurants as an example.

19      Q      Okay.

20             Is a general search engine different from a

21  vertical search provider?

22      A      I would view it that way, correct.

23      Q      How so?

24      A      General, again, is general knowledge so anything

25  that's available on the web.  And vertical is specifically

1    focused on a domain, again, using Yelp as an example, maybe

2    around restaurants would be an example.

3        Q    Okay.

4            During your time in device marketing, has Verizon

5    ever set a vertical search provider as the default search

6    engine on a device?

7        A    A vertical search provider as a default search

8    engine?  I am not aware of that happening.

9        Q    Have you ever recommended setting a vertical

10   search provider as the default search engine on a Verizon

11   device?

12       A    Not that I'm aware of, no.

13           I mean, my team and I, not that we're aware of,

14   no.

15       Q    Why not?

16       A    I don't -- I wouldn't see the value in assigning a

17   vertical search engine as a general search -- I mean,

18   generally speaking, the consumers would like to have some

19   search capability on their devices, and the preference would

20   be for a general as opposed to a specific vertical.

21   Verticals could be added later, they could be augmented or

22   in addition to on a device.  But I wouldn't think of that as

23   being the right approach from a device and product

24   standpoint.

25       Q    And now, Mr. Higgins, I'd like to turn our

1    attention to Google's contracts with Verizon.

2              MS. TRAGER:  And, Your Honor, at this time, my

3    questions will delve into content that has been designated

4    confidential by Google and third party Verizon?

5              THE COURT:  Okay.

6              MS. TRAGER:  I should pause here perhaps to see if

7    the States have questions during the open session.

8              THE COURT:  Let me ask you this:  Do you have

9    additional questions that can be done in an open session?

10             MS. TRAGER:  Not based on the designations that we

11   have, Your Honor.

12             THE COURT:  When you say the designations,

13   I'm not sure what you mean.

14             MS. TRAGER:  The material has been designated

15   confidential by both Google and Verizon.

16             THE COURT:  I see.

17             MS. TRAGER:  And it would get into the specifics

18   of that material.

19             THE COURT:  I see.  Okay.

20             MR. SALLET:  We have no questions in the open

21   session.  All of our questions will be reserved for the

22   closed session.

23             THE COURT:  All right.  We will have to then close

24   our session at this point.

25             If you're not affiliated with either side or with

```
 1    Verizon, I'm going to ask you to please leave the courtroom
 2    at this point and then we will re-open it once we have
 3    concluded the confidential portion of the proceedings.
 4                    (██████████ session)
 5                    THE COURT:  All right.  Just to confirm, is
 6    anybody in the courtroom who's remaining either with -- who
 7    is not affiliated with either side?  Okay.
 8                    Before we move forward, I want to have Mr. Douyon
 9    just confirm that the media room has been disconnected
10    before we proceed, so that may take a minute or two.
11                    (Pause)
12                    THE COURT:  Sorry, everyone.  Just bear with us.
13    I want to make sure it's confirmed that it's actually
14    disconnected before we proceed.
15                    (Pause)
16                    THE COURT:  Okay.  Ready to proceed, Counsel.
17                    Ms. Trager.
18                    MS. TRAGER:  Thank you, Your Honor.
19    BY MS. TRAGER:
20        Q    Mr. Higgins, if you would please turn in your
21    binder to JX16.
22                    MS. TRAGER:  And, Your Honor, JX16 is in evidence.
23                    THE COURT:  Yes.
24    BY MS. TRAGER:
25        Q    What is the title of JX16?
```

1    A    Amendment 1 to the Verizon Google co-developed

2  device strategic marketing agreement.

3    Q    And what was the Verizon Google co-developed

4  device strategic marketing agreement?

5    A    Actually, I don't recall which one this is.  This

6  is dated 2011.  So I was not involved in this one.  So

7  I couldn't tell you exactly, other than to say that

8  I believe this is the revenue share partnership agreement

9  that we have between Verizon and Google.  But, again, I

10  wasn't involved in this one.

11    Q    During your term in device marketing, did you

12  negotiate extensions and amendments to this agreement?

13    A    My team and I did, correct.

14    Q    And if you could please turn to page 3 of JX16

15  which is -- I'll see if you've seen some language in here

16  before?

17    A    Yep.

18    Q    If you could direct your attention about halfway

19  down the page, it will also show up on your screen, to the

20  paragraph beginning "Verizon placement requirements"?

21    A    Uh-huh.

22    Q    Are you familiar with the term "Verizon placement

23  requirement"?

24    A    Only in reading it right here.  But it makes sense

25  to what it is, yes.

1    Q    What's your understanding of what a placement

2  requirement is?

3    A    That there's an agreement between the two parties

4  to have specific placement, specific applications or

5  capabilities on a device.

6    Q    Okay.

7         And do you see the fourth requirement in the

8  paragraph beginning "Verizon placement requirements"?

9    A    Yes.

10   Q    And what does number 4 there require?

11   A    So you have Google Search.  I assume this means at

12  the top for general web as a requirement at the top of the

13  devices.

14   Q    And could you read number 4.

15   A    Sure.

16        "Google phone top search must be set as the

17  default -- as the default search provider for all general

18  web search (as defined below).  Access points on the device

19  as set forth in Exhibit 8."

20   Q    And looking now at the next paragraph that begins

21  "General web search means search functionality that produces

22  search results by searching a large proportion of indexable

23  websites."

24        Do you see that paragraph?

25   A    I do.

1     Q    Would you read the last sentence of that

2  paragraph?

3     A    Let's see.

4          "For clarity, the vertical and customizable search

5  functionality such as restaurant search, local business

6  search, application search, and video search is not general

7  web search."

8     Q    And are these definitions consistent with your

9  understanding that we just discussed?

10     A    Differences between what?  General search versus

11  vertical?

12     Q    Exactly.

13     A    I think these are examples, sure.

14     Q    Okay.

15          And you mentioned this contract predates your

16  time?

17     A    Correct.  If it's the 2011 which is what I believe

18  it is, then, yes.

19     Q    Let's set this one aside then.

20     A    Okay.

21     Q    And if you would turn to JX26 in your binder.

22     A    Yeah.

23     Q    Do you recognize this document?

24     A    I do not.  I mean, I know who's signing it here

25  but, again, it's before my time.

1   Q    And what is the date that this became effective?

2   A    2014, if I'm reading it correctly.

3   Q    And let's turn to page 2 and take a look at 3.2.

4        Do you see where it says "The term of the

5   agreement"?

6   A    Yeah, term of the agreement.

7   Q    When was this set to expire?

8   A    June 30th of 2020.

9   Q    So is this the agreement between Google and

10  Verizon that was in place when you entered device marketing?

11  A    I assume so based upon the reading here.

12  Q    If I refer to JX26 as the 2014 agreement or the

13  2014 RSA will that be okay?

14  A    Sure.

15  Q    And what does "RSA" stand for?

16  A    Revenue share agreement.

17  Q    Thank you.

18       And did you negotiate an extension -- or renewal

19  of this agreement with your team?

20  A    Which one?

21  Q    Of JX26?

22  A    The one -- the one starting in 2017, you mean?  Is

23  that -- this one right here you mean or...

24  Q    Yes.  So it looks, from the dates we just looked

25  at, like this 2014 agreement was in place --

1    A    Right.

2    Q    -- until 2020?

3    A    Right.

4         So the one after that then, yes, I was involved in

5    that, correct.

6    Q    Okay.

7         And how, if it at all, did you use this contract

8    when negotiating the next contract?

9    A    To be honest, when I came in, in 2017, I was new

10   to the role.  It's important to note, there's a large team

11   on both sides that negotiate these agreements.

12        So my involvement would be typically in any kind

13   of escalations or any kind of areas where we can't gain

14   agreement.  So I don't -- when I came into the role, I just

15   knew they were working on agreements, and then I was

16   involved where there any kind of issues, to help solve them.

17   Q    At a high level, are you familiar with the terms

18   that were in place when you were negotiating the next

19   agreement?

20   A    Meaning when I came into the role, you're saying,

21   was I familiar with the terms?

22   Q    So towards the end of your role -- when did

23   negotiations for the subsequent agreement begin during your

24   tenure?

25   A    I thought they had started -- I thought we had

1    started the discussions in 2017, but I could be off on that.

2         Q    So by the time the summer of 2020 came around, how

3    many -- for how many years had you at that point been

4    negotiating potential renewal?

5         A    Honestly, it's a stretch for me to tell -- because

6    we try to get ahead of these negotiations.  They take time.

7         I mean, just for context for specific involvement,

8    if I told you I was involved for an hour a month, you know,

9    on these, would probably be an accurate statement, like when

10   we start to get close --

11        I mean, again, it's important to understand,

12   there's a number of discussions between the teams going back

13   and forth, legal teams, et cetera, and then I would get

14   involved whenever there was something where we would try to

15   help resolve something, along with Google as well.  So I'd

16   have folks over on the Google side that I would talk to help

17   break free any kind of issues the teams may have.

18        Q    So if we could turn to page 10 of JX26, do you see

19   the chart titled General Web Search Access Points for

20   Directed Traffic?

21        A    One second.

22        What was it again?  You said it's the?

23        Q    Page 10.

24        A    Yep.

25        Q    It's the page with Bates stamp ending 279 on JX26.

1    A    Yep.

2    Q    Do you recognize this?

3    A    Do I recognize it?

4         I mean, it looks like something we would have in

5    the agreements, yes.

6    Q    And, at a high level, were these the requirements

7    that were in place on Verizon devices when you entered into

8    device marketing in 2017?

9    A    These look like the types of requirements we would

10   have in place, yes.

11   Q    Okay.

12        And did Verizon get anything in exchange for

13   complying with these requirements?

14   A    Yes.

15        So we had an agreement to take certain actions on

16   the Verizon side in partnership with Google.  In exchange

17   for that, there was a revenue share that took place between

18   the two companies.

19   Q    And what percentage revenue share did Verizon

20   receive from Google under the 2014 agreement?

21   A    The 2014, I believe it was ▮ percent.

22   Q    And during your time in device marketing, how much

23   money did Verizon receive annually from Google under the

24   2014 agreement?

25   A    It varied throughout the years.

1    You know, ours was a revenue share on businesses

2  that Google drove so we didn't have any direct insight into

3  their advertising business.  But I would say safely in and

4  around the ██████████ million range, generally speaking.

5    Q    And what is your understanding with respect to

6  whether or not the 2014 RSA required exclusivity for Google

7  Search?

8    A    I'd have to read the agreements.  I couldn't

9  recall off the top of my head.

10    Q    Under the 2014 agreement, even if only at a high

11  level, what was your understanding as to the ability, if

12  any, that Verizon had to preload other general search

13  engines other than Google on to its devices?

14    A    That we had to preload other general search

15  engines?

16    Q    The ability you might have had --

17    A    The ability.

18    Q    -- under the agreement?

19    A    Again, I'd have to read the agreement.  I believe

20  we had flexibility to add others on if I remember correctly.

21    Q    And at some point during the term of this 2014

22  agreement, did Verizon purchase a general search engine?

23    A    Honestly, I -- you're referring to Yahoo!, and

24  I don't have any of the dates -- I'm not sure.  I'd have to

25  Google it to find out what and when we purchased Yahoo!.

1    Q    If I showed you a copy of Verizon's press release

2  announcing the purchase of Yahoo!, would that refresh your

3  recollection?

4    A    Sure.  Of course.  Yes.

5         MS. TRAGER:  Your Honor, may I approach the

6  witness with the document?

7  BY MS. TRAGER:

8    Q    Mr. Higgins, please review the title and date on

9  the first page only.

10   A    Yes.

11   Q    Does that -- reviewing that refresh your

12  recollection of when Verizon acquired Yahoo!?

13   A    It sounds about right.

14   Q    If you could set that aside.

15        Now, that we've refreshed your recollection, when

16  did Verizon acquire Yahoo!?

17   A    Apparently it was June 30th of 2017 or -- I'm

18  sorry -- June 13th of 2017 as I'm reading here.

19   Q    And do you recall approximately when was the

20  agreement after JX26 executed?

21   A    Which one is JX26 again?

22   Q    I'm sorry, the 2014 agreement.  When was the next

23  agreement executed between Google and Verizon, after

24  this 2014?

25   A    Yeah, for some reason, I thought it was in and

```
 1    around the 2017 time frame, but I could be wrong on that

 2    because I read a document that said it was extended until

 3    2020.

 4            There's so many agreements.  Honestly, you'd have

 5    to put them in front of me and then just I'd have a better

 6    idea.

 7            There were a series of them and extensions that

 8    went through.

 9        Q    Do you recall how many extensions you signed?

10        A    I do not.

11        Q    Perhaps flip through tabs JX63, the next nine

12    tabs.

13            MS. TRAGER:  This, for the record, are JX63, 68,

14    69, 74, 78, 80, 84, and 87.  And these are all in evidence.

15        A    Yep, these all look like the typical extension

16    letters that we might have.

17    BY MS. TRAGER:

18        Q    And are these the extensions that you signed?

19        A    Yes.  Yeah.  My name is on them, yep.

20        Q    And how long are each of these?

21        A    I thought they were monthly extensions, but I'd

22    have to -- let's -- 30th -- they appear as though they're --

23    yep, and that sounds about right, I recall them being

24    monthly.

25        Q    Why did you execute so many monthly extensions?
```

1    A    The teams were still working through the details,

2  you know, for the new agreements.

3         You know, as we discussed with Google, we had

4  ongoing investments we were constantly making in the Android

5  ecosystem, it's important that we maintain the partnership.

6  So even though the teams couldn't come to agreement on the

7  terms, we wanted to make sure that the partnerships still

8  stayed in place.

9    Q    And what, if anything, would have happened to the

10 revenue share that Verizon was receiving if the 2014 RSA had

11 expired without a new agreement in place.

12   A    I couldn't tell you because it never expired.

13   Q    Would you expect Verizon to continue to receive

14 rev share without an agreement in place?

15   A    I don't know what Google would do.

16   Q    And after these extensions, do you now recall,

17 having looked at them, when the next agreement was executed?

18   A    Wait, I don't, but if you --

19   Q    That's okay.  I'm not trying to test your memory

20 here.

21   A    Yep.

22   Q    Let's turn to it.

23        If you would turn to JX93 in your binder.

24   A    Okay.

25   Q    Do you recognize this document?

1    A    Yes, looks like one of our revenue share

2    agreements.

3    Q    And when was this executed?  Or the effective date

4    is there on the title?

5    A    Is it on the front?

6    Q    On the front, bottom left, yeah.

7    A    There we go.

8         Yep, June 1st of 2021.

9    Q    And could you elaborate on your role in

10   negotiating this 2021 RSA?

11   A    Again, purely whenever there are times where the

12   teams couldn't reach agreement on the terms.  So,

13   occasionally, I'd be brought in.  The teams would provide me

14   updates.  If they're making progress, fantastic.  If they

15   were not making progress and there was something they needed

16   me to do to help assist, then I would get involved.

17   Q    And did you communicate directly with Google

18   representatives in connection with those negotiations?

19   A    On occasion, yes.

20   Q    And did you receive reports via email from members

21   of your negotiation team regarding the status?

22   A    I did, yes.

23   Q    And did you expect those reports to be accurate?

24   A    Did I expect them to be accurate?  No more or less

25   so than any other email I receive from anyone in the staff.

1    Q    Did you rely on those emails in your business?

2    A    They were important updates, yes, but -- yes.

3    Q    And did you sometimes pass those on to your

4    superiors?

5    A    If I thought it was worth passing along, I would,

6    yes.

7    Q    And who did you report to in negotiating the

8    2021 RSA, which is JX93?

9    A    So I reported to Frank Boulben.

10   Q    And who did Frank Boulben report to at that time?

11   A    Ronan Dunne.

12   Q    What was Mr. Dunne's title during this period?

13   A    He was a CEO of the consumer group.

14   Q    And you mentioned that things were escalated to

15   you when the team had trouble reaching agreement.  Did I --

16   A    Uh-huh.

17   Q    -- understand that right?

18        During the course of negotiations, were there

19   terms specific to search that Verizon and Google had trouble

20   reaching on agreement?

21   A    Specific to search, the only area that I was

22   spending time on was trying to maintain some flexibility for

23   additional possibilities in the future for search and other

24   capabilities but search being one of them.

25   Q    And why was flexibility a priority for Verizon?

1        A    Just because, for any contract, leave this aside,

2   we like to make sure that we're creating flexibility for

3   future possibilities given that it's a multi-year

4   agreements.

5        Q    And did you convey the priority for flexibility to

6   Google during the course of negotiations?

7        A    We told them that it was something that was

8   important to us, yes.

9        Q    And how, if at all, did the terms ultimately

10  agreed to in the 2021 RSA restrict Verizon's ability to

11  preload general search functionality other than Google's?

12       A    We had reached an agreement for general search

13  where we could add on another provider but then there was a

14  modifier in the overall revenue share.

15       Q    Let's focus on the terms that you just described.

16            Let's pull up page 29.

17            And just at a very high level, who shared revenue

18  with whom under the 2021 agreement?

19       A    Google shared revenue with Verizon.

20       Q    And what type of revenue was shared with Verizon

21  under this agreement?

22       A    Again, I don't know exactly because I don't know

23  Google's business, but general understanding was revenue

24  tied to advertising within Google.

25       Q    And what percentage of search ads revenue

1   attributable to new Verizon devices did Google pay to

2   Verizon over the term of the 2021 RSA?

3       A    So I believe we landed, it was ▉ percent, if we

4   were aligning on all the requirements within the agreements.

5            And then there was an additional revenue attained

6   through other marketing initiatives that we were drive --

7   that might get us back up to the ▉ percent.

8       Q    So these three tiers here on page 29, do you see

9   where it says "core devices," "preferred devices," and

10  "qualifying devices"?

11      A    Yes.

12      Q    At a high level, could you explain how these

13  revenue tiers functioned?

14      A    Yes.

15           So what you had was ▉ -- let's start at B, ▉

16  percent was where we had all the agreed upon placements

17  between Google and Verizon.  There was no additional general

18  search capability placed in the device, and then the payment

19  there would be ▉ percent.

20           If you had added on additional search providers,

21  if you go to (a), then it would drop down to the ▉ percent.

22  And then if you go to (c), I believe that was tied to legacy

23  devices, so meaning devices that we had previously sold that

24  are still using the Verizon network.

25      Q    And for the what you called legacy devices that

1    were out in the field, what did the revenue share -- how did

2    the revenue share change when this agreement was executed?

3         A    Previously it was ▆ percent.  And it was lowered

4    to ▆ percent.

5         Q    And at a high level, were there more or fewer

6    requirements -- placement requirements for Verizon at the

7    higher ▆ percent tier versus the ▆ percent tier?

8         A    Again, I'd have to -- I thought the ▆ percent, if

9    I remember correctly, was tied to adding on additional

10   general search providers but it could have been fewer

11   requirements as well, I'd have to look at the agreement to

12   be honest.

13        Q    So if Verizon had preloaded an additional general

14   search functionality on to the phone in addition to Google,

15   what rev share would that have qualified for?

16        A    Then it would be lowered to the ▆ percent.

17        Q    Okay.

18             And during the term of the 2021 RSA, what

19   proportion of new Android devices that Verizon sold in the

20   U.S. were at that ▆ percent tier?

21        A    The new devices that's we sold, I believe, all of

22   them would have been at the ▆ percent tier.

23        Q    And I believe you just mentioned that the revenue

24   share on a device would fall to ▆ percent if Verizon

25   preloaded another general search engine?

1    A    I think that was one of the requirements, correct.

2    Q    And would that revenue share drop even if Google

3  stayed the default search engine on the device?

4    A    I believe that was the case, correct.

5    Q    Okay.

6         And just turning back for a moment to the question

7  of whether or not Verizon would have lost the rev share had

8  the agreement expired without a new agreement in place,

9  would it be helpful for you to refresh on that point to look

10  at a document?

11    A    Meaning there's a requirement you're telling me in

12  there that says that if we don't renew the agreement, there

13  will be no payments coming to Verizon, is that what you're

14  referring?

15    Q    Let me show you a document and we can see if it

16  refreshes your recollection.

17    A    Okay.

18         MS. TRAGER:  May I approach?

19  BY MS. TRAGER:

20    Q    If you would take a look at the email to you on

21  March 9th, 2020 --

22    A    Uh-huh.

23    Q    -- from Mr. Hannan towards the end of that first

24  paragraph and let me know when you've had a chance to review

25  it?

1    A    Yep, give me one sec.

2         Yep, so I read it.

3    Q    Did that refresh your recollection with respect to

4    whether or not Verizon would have...

5    A    This is Anwar's opinion of what might happen.

6    Again, I'm just stating specifically.  I don't know what

7    Google would have done.  If there's a contract stipulation

8    that states that it would, without question, go to zero,

9    that would be helpful.  I'm just -- what I read here is

10   Anwar's opinion on what might happen.  I don't know what

11   Google would do or not do.

12   Q    Did you respond to him with the word "agreed"?

13   A    Are you talking about where I said "Got it.  Do we

14   know when this is going to come our way"?

15        Oh, "Agreed, let's ask -- we should ask for the

16   extension."  It has nothing to do with whether or not

17   there's going to be zero pay -- I just, again, it's

18   important here.  I don't know what Google would do if the

19   contract were to expire.  There's an opinion here, I agree

20   that we should work on an extension.

21   Q    Okay.

22        Let's turn to another document.

23   A    Okay.

24   Q    Please turn to UPX1026 in your binder which is an

25   email family, a parent and an attachment.

1    THE COURT:  I'm sorry, what was the number again?

2    MS. TRAGER:  UPX1026.

3    THE WITNESS:  Okay.

4    Yep, I've got you.

5  BY MS. TRAGER:

6    Q    Do you recognize this document?

7    A    It looks like an email from me to Jamie.

8    Q    Who is Jamie Rosenberg?

9    A    Jamie was a point of contact that I had over at

10 Google at the time for any kind of escalations tied to the

11 revenue share agreement.

12   Q    And what was your understanding of his role with

13 respect to the negotiations of the --

14   A    Partnerships, carrier partnerships.  I'm sure he

15 had other responsibilities but that was one of them.

16       Carrier, meaning the wireless providers.

17       MS. TRAGER:  Your Honor, move to admit UPX1026.

18       MR. SCHMIDTLEIN:  I think it's already in

19 evidence, and no objection.

20       THE COURT:  Okay.  It will be admitted if it's not

21 already admitted.

22       MS. TRAGER:  Okay.

23                          (Plaintiffs' Exhibit UPX1026
                                received into evidence.)
24

25

1    BY MS. TRAGER:

2        Q    And, Mr. Higgins, what is the attachment to

3    UPX1026?

4        A    It looks like it's a redline of the agreement that

5    the teams were working.

6        Q    And whose redline proposal is this?

7        A    I don't know.  Maybe Verizon -- I don't know.

8    Again, so many redlines, I couldn't tell you just by looking

9    at this that, oh, this is our version; oh, no, this is

10   Google's version.  I don't know.

11       Q    If you could take a look at the cover email again.

12            Is this you sending Verizon's proposal to Google?

13       A    This is from Keena.

14            Yeah, it looks like it's updated redlines from us.

15   Are those all our redlines, I don't know.  Are they Google's

16   as well.  I'm just trying to be specific here to say

17   I couldn't tell you if all the redlines are only Verizon's,

18   that's all.

19       Q    Fair.  Fair.

20            Please turn to page 4 of UPX1026 which has the

21   Bates stamp ending 080.  It's page 2 of the redline.

22            And if you would direct your attention to the

23   portion of the table next to the header "Search

24   requirements."

25       A    Uh-huh.

1    Q    Are you there?

2    A    Yep.

3    Q    Okay.

4         Would you please read the language that is struck

5    through next to "Search requirements."

6    A    Sure.

7         It says ████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ██████████████

10   Q    And what does this redline indicate to you with

11   respect to whether or not Verizon wished to accept that

12   term?

13   A    Anything -- if it's something that we ended up

14   striking, which I would assume this is something we ended up

15   striking, I mean, it's a term that we're not in alignment on

16   with Google.

17   Q    And what's your understanding as to what Google

18   was proposing in the language that Verizon struck through

19   here?

20   A    Google preferred to have their search engine as

21   the default on all Android devices.

22   Q    And on -- okay.

23        Let's turn to page 5.

24        This is the page with Bates stamp ending 081.

25        Do you see where Verizon changed ████████████████

1   ███████████████████████████████████████████

2   ██████████████████████████████████████████

3   ███████████

4        A     I do.

5        Q     What was Verizon trying to accomplish with this

6   revision?

7        A     You have to give me one second here.

8              Again, my read here is that we were trying to make

9   sure we had some flexibility for additional search

10  capabilities on devices.

11       Q     Did Verizon hope to preload its owned asset Yahoo!

12  on its devices?

13       A     We had -- there was a request from the Yahoo! team

14  to provide Yahoo! on the devices.  I believe there were a

15  few iterations back and forth on that, correct.

16       Q     Did Verizon ever preload Yahoo!'s general search

17  functionality on any of its devices?

18       A     To the best of my knowledge, no.

19       Q     Let's turn to another document.

20       A     Okay.

21       Q     Please turn to UPX947.

22             Do you recognize this documents?

23       A     I mean, I see it's an assessment from Keena, and

24  an exchange between Chris Emmons and myself.

25       Q     And who is Keena Grigsby at the time of this

1   email?

2        A    Keena worked on the product team in partnerships

3   and she had point for a period of time on some of the

4   negotiations.

5        Q    And what is this email exchange discussing?

6        A    I'd have to read it.

7             So it looks like the -- Keena providing a review

8   of some of the exchanges between the Verizon team and the

9   Google team on certain deal points.

10            MS. TRAGER:  Your Honor, move to admit UPX0947.

11            MR. SCHMIDTLEIN:  No objection, Your Honor.

12            THE COURT:  Okay.

13            947 will be admitted.

14                              (Plaintiffs' Exhibit UPX0947
                                  received into evidence.)
15   BY MS. TRAGER:

16        Q    What is the subject line of this email?

17        A    "Top Verizon asks to Google."

18        Q    And are the top asks, as listed in UPX947,

19   consistent with your recollection?

20        A    This is Keena's assessment, so, again, I -- it's

21   not unusual for someone to provide their view.  It could be

22   the top ask at the time from her perspective.

23        Q    Okay.

24             If you would take a look at the second bullet,

25   discussing Google to increase revenue share to Verizon.

1  Do you see that?

2       A    I do.

3       Q    Was Verizon ultimately successful in getting an

4  increased revenue share under the new agreement?

5       A    We were not.

6       Q    And how, if at all, has the -- well, how has the

7  revenue share percentage Verizon receives from Google

8  changed over time?

9       A    Generally, things have declined in percentage

10 terms, but I'd say in payment terms, just for my time, I'd

11 say they're largely the same.

12      Q    And when the 2021 agreement we just looked at was

13 executed, was the agreement split into two different

14 agreements?

15      A    It was.

16      Q    And setting aside the separate agreement, looking

17 just at the revenue share agreement, did the payments to

18 Verizon under the revenue share agreement stay in line or

19 decrease?

20      A    So the revenue share decreased; but, again, the

21 revenue -- the overall revenue didn't change materially,

22 meaning it didn't go from ███████ million down to zero, as

23 an example.  So there was some fluctuations throughout all

24 the years, but I'd say it stayed very similar over the

25 years.

1    Q    And is that including the funds received under the

2  separate agreement?

3    A    Including the funds under the separate agreement,

4  correct.

5        As far as a breakout, I've never looked at the

6  revenue broken out by the two agreements so I'm looking at

7  it in aggregate.

8    Q    Okay.

9        And according to this email chain in UPX947, those

10  last two bullets under the second bullet we were just

11  looking at, how specifically did the revenue share

12  percentage Google paid to Verizon change over time?

13    A    So it dropped from ■ percent down to ■ percent.

14    Q    And then in 2021?

15    A    2021, then there were the terms that we discussed

16  previously.  You had a ■ percent tier, a ■ percent tier, a

17  ■ percent tier, and then there was a ■ percent adder for

18  specific activities we would engage in between the

19  companies.  Marketing activities, that is.

20    Q    And for devices that remained nonexclusive, am I

21  right in understanding that it fell from ■ percent to

22  ■ percent, had any such devices existed?

23    A    Right.

24        Correct.  It would have dropped down to ■ percent

25  if I recall correctly.

1    Q    Okay.

2         You can set that aside.

3    A    Okay.

4    Q    If we could now turn please to UPX306.

5    A    Yeah.

6    Q    Do you recognize this document?

7    A    It looks like an exchange that I was having with

8    Jim Sullivan and Keena, you know, again, on the terms for

9    the agreement.

10        MS. TRAGER:  Move to Admit UPX306.

11        MR. SCHMIDTLEIN:  No objection.

12        THE COURT:  It will be admitted.

13                        (Plaintiffs' Exhibit UPX306
                             received into evidence.)
14

15   BY MS. TRAGER:

16   Q    Mr. Higgins, if you would please take a look at

17   the bolded number 2 near the bottom of the first page in

18   Ms. Grigsby's email earlier in this email chain that begins,

19   "Google revenue share plus search."

20        Do you see that?

21   A    Yep.

22   Q    And would you read that bullet and the two

23   sub-bullets?

24   A    Sure.

25        It says, "Google revenue share plus search:

1  Google has provided two revenue share options for search

2  exclusivity and nonexclusivity.  Google communicated that

3  this new term as being 'accommodating' to Verizon since we

4  do not want to block our own assets such as Yahoo!

5          "Option 1:  ▇ percent is paid to Verizon if

6  Google is the exclusive search engine on a device.

7          "Option 2 is ▇ percent is paid to Verizon if

8  Google is not the exclusive search engine on a device."

9      Q    And at the time that Google proposed this tiered

10  structure, what did that proposal mean for Verizon at the

11  time?

12      A    At the time, it was viewed as a meaningful

13  reduction in the overall revenue share.

14      Q    And how --

15      A    Potentially.  Potentially meaningful reduction.

16      Q    And how, if at all, did this affect Verizon's

17  financial incentives to extend Google exclusivity in

18  practice?

19      A    Well, our view was that a significant reduction in

20  the revenue share would likely have an associated reduction

21  in the overall revenue coming across, and we utilize those

22  funds, along with other funds, to invest in the Android

23  ecosystem, including promotions, advertising campaigns,

24  digital assets, everything you could imagine to try and

25  promote the Android ecosystem.

1    Q    And in the portion you just read here, how did

2  Google characterize its proposal?

3    A    From what I'm reading here, they're characterizing

4  it as being accommodating.

5    Q    Did you agree it was accommodating?

6    A    I didn't have a discussion about being

7  accommodating or not.

8         Discussions that I had is that I wanted to make

9  sure that we had flexibility for the future, so I didn't

10 have discussions with Google about is this accommodating,

11 yes or no.

12   Q    Okay.  Let's set that one aside.

13        And if we could please turn to UPX495.

14        Do you recognize this document?

15   A    I do.

16   Q    It what is this?

17   A    An exchange between Sampath and myself.

18   Q    And who is Mr. Sampath at the time of this email?

19   A    So Sampath, at the time, he was a CFO within the

20 Yahoo! group, which I believe was called Oath at the time.

21   Q    Was Oath a separate company?

22   A    I believe it was a separate legal entity but

23 within the Verizon family.

24        MS. TRAGER:  Your Honor, move to admit UPX495.

25        MR. SCHMIDTLEIN:  Your Honor, to the extent that

```
 1   they're offering this for statements made by the folks from

 2   Oath for the truth, we object that that's hearsay.  To the

 3   extent that these are being offered for communications on

 4   his behalf, we have no objection.

 5              MS. TRAGER:  That's fine, Your Honor.

 6              THE COURT:  Okay.  All right.  So it will be

 7   admitted subject to that condition.

 8                              (Plaintiffs' Exhibit UPX495
                                     received into evidence.)
 9

10   BY MS. TRAGER:

11      Q    And what were you and Mr. Sampath discussing in

12   this email?

13      A    At the time, Sampath was reaching out to me just

14   about the status on the revenue share -- I'd have to -- can

15   you give me a moment just to read through it quickly?

16      Q    Please.

17      A    Okay.  Yeah.

18              So this exchange, Sampath, again, was with Oath

19   and Yahoo!, ███████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   █████████████████████████████

25      Q    Please look approximately halfway down the page at
```

```
 1    that last full paragraph in Mr. Sampath's email.  Do you see

 2    that?

 3         A     Yep.

 4         Q     And would you read that short paragraph.

 5         A     The one where it says, "The issue is that"?

 6         Q     Beginning with "question."

 7         A     Beginning with the -- oh, question, yep.

 8                    ██████████   ██████████████████████████

 9    ████████████████████████████████████████████████████

10    ██████████████████████████████   █████████████████████

11    ████████████████████████████████████████████████

12    ███████

13         Q     And who's "they" here?

14         A     Hold on.

15               Oh, "they," he was referring to -- I believe he's

16    referring to Google there.

17         Q     And what do the percentages here refer to?

18         A     These are possible percentages depending upon

19    where we landed with the agreements.

20         Q     And what was your understanding of the ██████████

21    Mr. Sampath is referring to?

22         A     So in the exchange we had here, ███████████████

23    ████████████████████████████████████████████████

24    █████████████████████████████████████   ███████████

25    ████████████████████████████████████████████████
```

1    ████████████████████████████.

2        Q    Was Verizon ultimately successful in getting a

3    carve-out in the 2021 agreement that covered Yahoo!'s

4    general search capabilities?

5        A    So a carve-out with no impact to the revenue

6    share, no.

7        Q    Okay.

8             And I see you provided a response to Mr. Sampath's

9    question.

10            Why did you consider Google's insistence on going

11   down from ██ percent to ██ percent punitive?

12       A    Just because of the size of the reduction.  So it

13   seemed large.

14       Q    And how, if at all, did you understand it to

15   reflect the relative economics between the parties?

16       A    Again, I didn't have any insight to Google's

17   business, but we would just take a look at it say, "Okay,

18   looks like we're going from ██ percent down to ██ percent,"

19   and that would be a significant change.

20       Q    Did you request that revenue impact numbers be run

21   on this?

22       A    We would do that constantly.  There wasn't one

23   time.  But the teams would constantly take a look at it as

24   exchanges would go back and forth between the two teams.

25       Q    If you take a look at the language running from

```
 1    page 1 to 2, the last line -- it should be highlighted on
 2    your screen in a moment.
 3              Do you see where you wrote ████████████████
 4    ████████████████████████████████?
 5         A    Yeah, uh-huh.
 6         Q    Let's turn to that.
 7              Mr. Higgins, please set that aside and turn to
 8    UPX304.
 9         A    Yep.
10         Q    Do you recognize this document?
11         A    I do.
12         Q    What is this?
13         A    So we were laying out for Ronan ████████████
14    ████████████████████████████████████████████
15              MS. TRAGER:  Your Honor, move to admit UPX304.
16              MR. SCHMIDTLEIN:  No objection.
17              THE COURT:  304 is admitted.
18                             (Plaintiffs' Exhibit UPX304
19                              received into evidence.)
20    BY MS. TRAGER:
21         Q    And does this email reflect the financial impact
22    modeling that you referred to in the previous email we
23    looked at?
24         A    I assume it's tied to that email.  Again, we do
25    many of these.  I don't know if it's directly tied to that,
```

1067

1    but this was one of the notes that we sent over to Ronan

2    that identified a potential impact that we could see based

3    upon the different scenarios.

4        Q    And do you lay out three options here in UPX304?

5        A    I do.

6        Q    And these are in connection with the deal that was

7    under negotiation with Google?

8        A    Correct.

9        Q    What was the first scenario you lay out?

10       A    █████████████████████████████████████

11   █████████████  ████████████████████████████████

12   ███████████████████████.

13            Again, if I remember correctly, ████████████

14   ██████████████████████████████████████████████

15   ███████████████████████████████████████████

16   ██████████████████████████.

17       Q    ██████████████████████████████████████████?

18       A    ████████████████████████████████████

19   ███████████████████████████████████████████

20   ██████████████████████████████████████████

21       Q    ████████████████████████████████████████████

22   █████████████████████████?

23       A    ████████████████

24       Q    ████████████████████████████████████████████

25   ██████████████████████████?

1068



1    A    ███████████████████████████

2    ███████████████.

3    Q    ██████████████████████████████

4    ████████████████████████████████?

5    A    ██████   ███████████████.

6    Q    ████████████████████████████████████

7    █████████████████████████?

8    A    █████.

9    Q    ███████████████████?

10   A    ████████████████████████████████

11   ██████████████████████████████

12   ██████████   ██████████████████████████

13   ████████████████████████████.

14   Q    ████████████████████████████████████

15   █████████████?

16   A    ██████████████████

17   ██████   ██████████████████████

18   ████████████████.

19   Q    And do you see where you wrote, ████████████

20   ████████████████████████████████

21   ████████"?

22   A    Yes.

23   Q    Why did you assume that?

24   A    Just because, again, at any given moment, we're

25   constantly going back and forth between the teams.  So what

1   we laid out is that this could be one financial scenario

2   under the terms, but there's always a possibility that, in

3   future discussions, maybe some other flexibility could be

4   opened up and there could be additional revenue that comes

5   from that.  That's only reason for that.

6       Q    And do you see a little bit later in that

7   paragraph where you wrote, "We've pushed many, many times

8   for Google to lift this restriction, but we've been told

9   exclusivity is standard in all of their go-forward

10  agreements"?

11      A    I do.

12      Q    What was your understanding with respect to how

13  standard this was in Google's go forward agreements?

14      A    In my discussions with Google, because they're a

15  global company, they wanted to try and keep the terms of

16  their agreements as consistent as possible and that was

17  important for them.

18      Q    You can set that one aside.

19           Let's take a look at UPX642.

20           Do you recognize this document?

21      A    I do.

22      Q    What is this?

23      A    A discussion between, or an exchange, rather,

24  between Ronan and myself.

25      Q    And what is this email exchange discussing?

1    A    For this one, this was Ronan providing his view on

2  flexibility.  We can likely attain with Yahoo!, given that

3  we were unique in the wireless environment.

4         I believe at the time, Ronan had thought we were

5  the only wireless carrier that actually owned a general

6  search company or capability.

7              MS. TRAGER:  Your Honor, move to admit UPX642.

8              MR. SCHMIDTLEIN:  No objection.

9              THE COURT:  It will be admitted.

10                         (Plaintiffs' Exhibit UPX642
                                received into evidence.)

11

12  BY MS. TRAGER:

13    Q    If we could zoom in on Mr. Higgins' November 5th,

14  2019, email at 10:57 a.m., about halfway down the first

15  page.

16         Do you see the paragraph beginning "WRT"?

17    A    Yes.

18    Q    Does that stand for with respect to?

19    A    Yes, it does.

20    Q    And could you read just that small paragraph?

21    A    Sure.

22         "With respect to Yahoo! properties today, meaning

23  the ones we are preloading, do not have general search

24  capabilities outside of the app.  That said, this is where

25  Yahoo! would like to go in the future."

1    Q    Actually, let's turn to the first email in this

2  chain.

3         Well, before we do that, Mr. Higgins, does Verizon

4  still own Yahoo! today?

5    A    Actually, that's a good question.

6         So we have a minority share, I believe.

7    Q    Do you have a sense of what that stake is?

8    A    I could be mistaken, but I believe it's

9  10 percent.

10   Q    And when did Verizon sell the 90 percent share in

11 Yahoo!

12   A    I don't recall exactly.

13        It wasn't that long ago, but I don't have the

14 exact date in mind.

15   Q    Do you recall whether it was before or after the

16 execution of the 2021 RSA?

17   A    I do not.  I do not.

18   Q    If I showed you a copy of the press release --

19   A    Of course.

20   Q    -- would that refresh your recollection?

21   A    Yeah.  I'm just trying to honestly tell you

22 I don't recall.  So if you have something that shows me,

23 I will read it and I will confirm it.

24        MS. TRAGER:  May I approach?

25        THE COURT:  You may.

1   BY MS. TRAGER:

2        Q     If you would please read just the title and the

3   date on that document.

4        A     Sure.

5              It's May 3rd, 2021, Verizon.

6        Q     And then let me know if it refreshed your

7   recollection.

8        A     Okay.

9              Verizon Media to be acquired by Apollo Funds.

10             This refreshes my memory.

11       Q     And now that we've refreshed your recollection,

12   when did Verizon announce that it would sell Yahoo!?

13       A     That would be May 3rd of 2021.

14       Q     Thank you.

15             So turning back to UPX642, can we take a look at

16   your first mail at the beginning of the chain, which starts

17   on page 3 and has a Bates number ending 200.  Do you see

18   that?

19       A     I don't.

20             Which one?  I'm sorry.

21             What's the date and time again?

22             Is it the one right in front of my screen right

23   now?

24       Q     It is.

25             The Bates stamp ends 200, and at the top of the

```
 1   email, it's your email to Ronan and then Donna and Frank at

 2   November 4th, 2019, at 7:58 a.m.  Do you see that?

 3        A    Okay.  Yeah.

 4             THE COURT:  The Bates stamp is the number in the

 5   lower right corner.

 6             THE WITNESS:  Oh, lower right -- got it, got it.

 7   Yep.

 8             Okay.

 9   BY MS. TRAGER:

10        Q    What was your purpose in writing this email?

11        A    Other than misspelling Adrienne's name here.

12   Let's see.  I'm sure it's an update.  Let me just -- give me

13   a moment just to read through it.

14             Yeah.  So this simply looks like an exchange that

15   Adrienne and I had had about, again, an area where the teams

16   could not gain alignment so I was providing an update to

17   Ronan and Vandana on the status and giving some context and

18   color.

19        Q    And what did --

20             THE COURT:  I'm sorry.  Adrienne, just to be

21   clear, is somebody with Google?

22             THE WITNESS:  Sorry.  Yes, she is.

23             She was, at the time, the primary person I was

24   engaging with when there were any disagreements between the

25   two teams or where they couldn't come to agreement rather.
```

1    BY MS. TRAGER:

2         Q    And what did Adrienne McCallister convey to you

3    that you passed on is this email?

4         A    I mean what I state in here is that she had

5    concerns about the fact that standard agreements were

6    important and trying to create something that was specific

7    to Verizon would be problematic.

8              And there are some minor items around Visible,

9    which is an entity of Verizon as well, just some other nits

10   here and there.

11        Q    Sure.

12             Let's please take a look at the last two

13   paragraphs on the page and, first, at that next to last

14   paragraph.

15             Do you see where you wrote, "I can tell you the

16   general tenor of the discussion was less than pliable from

17   my perspective.  My read is that Google will likely come

18   back with a polite but, direct, no, thank you on our

19   requests"?

20        A    I do.  Yep.

21        Q    Why was that your read?

22        A    Just because of discussions Adrienne and I had

23   had.  Again, I tried to give some insight into where I think

24   it might land.

25        Q    And in that first sentence of the next paragraph,

1    you wrote, "If my assumptions are correct, I think we'll be

2    left agreeing to their terms."

3              Do you see that?

4    A    Yes.

5    Q    And is that what ultimately happened?

6    A    I can't say.  Again, moments in time are important

7    here, so I can't say specifically the exact terms.

8              I think she and I were having a discussion so I

9    wasn't looking at any specific terms.  So, actually, I can't

10   give you a direct answer on this because I can't say there

11   was a piece of paper and then we agreed to those terms.

12   There was back and forth.

13   Q    I appreciate that.

14             So with respect to the exception here that you're

15   discussing, is that -- was that the Yahoo! carve-out?

16   A    We were trying to create a carve-out for Yahoo!

17   like -- Yahoo! and Yahoo!-like capabilities, right.

18   Q    And was Verizon successful in getting that

19   exception to cover Yahoo!'s general search functionality?

20   A    Not without a change in the economic terms for the

21   revenue share.

22             MS. TRAGER:  Your Honor, at this time, we have no

23   more questions.  Pass the witness.

24             Actually --

25             MS. ARTHUR:  Your Honor, Elizabeth Arthur.

1    MS. TRAGER:  Actually, just may I ask a couple

2 more questions?

3    THE COURT:  Yeah, sure.

4    MS. TRAGER:  Okay.

5 BY MS. TRAGER:

6    Q    Mr. Higgins, does Verizon have its own app store?

7    A    Today?

8    Q    Yes.

9    A    I believe within the Verizon business team, there

10 is, I'll call it the concept of an application storefront

11 but it's very specific to business.  It wouldn't be on the

12 same scope and scale that you would have today with other

13 larger app stores like at Samsung, Google, Amazon,

14 et cetera.

15    Q    And when Verizon's app store or Samsung's app

16 store is preloaded on a device, is that in addition to the

17 Google Play Store?

18    A    No, there's no -- to be specific, there's no

19 Verizon app store that's loaded on to devices at all.

20 There's -- Samsung, to the best of my knowledge, is loaded

21 on Samsung devices in addition to the Google Play Store.

22    Q    Has Verizon ever offered its own app store?

23    A    We did.

24    Q    When was that?

25    A    Roughly, a decade ago is my best recollection.

1    Q    And what's your understanding as to why Verizon no

2  longer offers that app store?

3    A    So we had an app store that was launched.  We did

4  not get the response we were looking for either from

5  developers or from consumers, and so we shut that app store

6  down.

7    Q    Is it your understanding that one reason that that

8  app store was unsuccessful is because it could not offer

9  consumers enough applications from a scale perspective?

10   A    So we didn't do a study on that.  All I can tell

11  you is that we were not receiving enough applications

12  submitted by developers into The App Store, and we did not

13  have enough consumers taking advantage of the applications

14  that were in there to support the ongoing business.

15   Q    Okay.  Thank you, Mr. Higgins.

16   A    Uh-huh, sure.

17        THE COURT:  Could I ask a question before counsel

18  does?

19        Based on your understanding, was there any

20  relationship between Verizon's decision to sell Yahoo! and

21  the difficulties or the challenges Verizon was having with

22  getting Yahoo! placed as a search engine on its phones?

23        THE WITNESS:  Based on my knowledge?

24        THE COURT:  Correct, your knowledge.

25        THE WITNESS:  Yeah, no.  I had no insight into

```
 1   Yahoo! business, why it was purchased, why it was sold.  No
 2   insight.  Sorry.
 3             THE COURT:  Okay.  Thank you.
 4             MS. TRAGER:  Thank you, Your Honor.
 5             MS. ARTHUR:  Good morning, Your Honor.  I'm
 6   Elizabeth Arthur with the District of Columbia
 7   Attorney General's Office and I have a few questions on
 8   behalf of the Plaintiff States.
 9             THE COURT:  Ms. Arthur, good morning.
10             MS. ARTHUR:  Good morning.
11                         - - -
12   BRIAN HIGGINS, WITNESS FOR THE PLAINTIFFS, SWORN
13                    DIRECT EXAMINATION
14                         - - -
15   BY MS. ARTHUR:
16        Q    Good morning, Mr. Higgins.
17        A    Good morning.
18        Q    I believe you testified to my colleague,
19   Ms. Trager, that you were the senior vice president of the
20   device and consumer product market being started in 2017?
21        A    Correct.
22        Q    And in that role, you negotiated contracts on
23   behalf of Verizon, correct?
24        A    My team and I did, that's correct, yes.
25        Q    And contracts with partners other than Google?
```

1    A    Yes.

2    Q    And can you give an estimate as to how many

3    contracts you negotiated on an annual basis with partners?

4    A    Hundreds.

5    Q    And so Google was -- the Google partnership was a

6    smaller -- a small percentage of the type of contracts?

7    A    Yeah, percentage-wise.  But it's important to

8    note, many of the agreements have to do with promotions.  So

9    I would have to sign agreements for any kind of promotional

10   activity for devices or accessories, and those happen

11   throughout the year.

12   Q    And when you were negotiating those type of

13   agreements with your other partners, was it common to enter

14   into monthly extensions?

15   A    I'm not aware of other agreements where we entered

16   into monthly extensions.  It doesn't mean it didn't happen

17   but I'm not aware of one.

18   Q    And could you explain a little bit more as to why

19   Verizon had to enter into monthly extensions with Google

20   during that time?

21   A    It was simply because we couldn't get to terms at

22   the time, and both parties agreed we wanted to continue to

23   make the investment in the Android ecosystem.  And in order

24   to make sure the partnership remained intact, we agreed to

25   go to monthly terms.

1    Q    And one of those terms, as you have previously

2    testified, was flexibility for Verizon, correct?

3    A    One of the terms we were asking for, you mean?

4    Q    Yes.

5    A    Yes, we were trying to make sure we had

6    flexibility, correct.

7    Q    And why was flexibility so important to Verizon?

8    A    Just for any agreement, you want to try to

9    maintain possibilities for the future.  So things change

10   very rapidly in the technology sector, and we wanted to make

11   sure that we didn't sign any agreements that would limit our

12   capability to either make new services available to

13   customers or at least provide opportunities for our

14   customers to see new services easily.

15   Q    But when Verizon did enter into the 2021 RSA with

16   Google, the flexibility to add an alternative search service

17   was removed, correct?

18   A    Well, you could put someone in but there would be

19   a direct impact on the revenue share.

20   Q    And as you previously testified, Verizon hasn't

21   opted into that different tier?

22   A    We have not, not to my knowledge and not to date.

23   Q    Do you have an understanding based on your

24   conversations with Google, why being the exclusive default

25   was important to Google?

1    A    In discussions that I had had, the view from

2  Google is that they were very focused on the experience on

3  the device and they were very specific about the assets that

4  should be on the device to make sure that, from their view,

5  they could compete effectively against Apple and iPhone.

6    Q    And do you agree with that understanding?

7    A    Do I agree that's important from a product

8  standpoint?

9         I do agree that having the right experience is

10 important, yes.

11   Q    And then how does that reconcile with Verizon's

12 desire to have flexibility?

13   A    Well, it's important to take -- you have two

14 different companies:  Google, that is very focused on the

15 Google experienced on the device and their team is there to

16 drive that which I understand.

17        Verizon has an incentive to try and create a

18 differentiated experience against the other carriers.  So my

19 view is that you have two product teams that have views on

20 trying to create the right experience and the right

21 differentiation in the marketplace and it's just two parties

22 that are trying to get aligned on those agreements.

23        It's not uncommon to have two separate companies

24 have two different views on what the right product

25 experience should be for a consumer.

 1      Q    But currently as we -- as Verizon sells phones

 2  today, Google is the default exclusivity -- exclusive

 3  default search engine on Verizon phones?

 4      A    Yeah, to the best of my knowledge.  I've changed

 5  roles recently but to the best of my knowledge today, that's

 6  correct.

 7      Q    Do you know if Verizon has -- is trying to change

 8  that?

 9      A    Do I know if Verizon -- I do not know just because

10  I'm not involved in the current negotiations.

11           MS. ARTHUR:  If I may have a moment, Your Honor?

12           (Plaintiffs' counsel conferred off the record.)

13           MS. ARTHUR:  Thank you, Mr. Higgins.

14           We'll pass the witness, Your Honor.

15           THE COURT:  Thank you.

16           Just one more question about the Yahoo!

17  acquisition.

18           THE WITNESS:  Yep.

19           THE COURT:  Again, entirely based on your

20  understanding.

21           THE WITNESS:  Yep.

22           THE COURT:  Did the acquisition of Yahoo!, was

23  there a contemplation by Verizon that acquiring Yahoo!, that

24  one of the purposes would be to try and integrate it into

25  its mobile devices for the customer experience that you all

1    wanted to offer?

2              THE WITNESS:  Again, I don't -- if I had some

3    insight there, I would provide it.  I just don't.  When they

4    purchased it, I'm not sure what the thinking was there,

5    whether that was part of it or not.

6              THE COURT:  Okay.  All right.  Thank you.

7              Mr. Schmidtlein.

8              MR. SCHMIDTLEIN:  Your Honor, do you want to take

9    our morning break?

10             THE COURT:  Oh, yeah, that's a good idea.

11             So it's 11:00.  Let's take 15 minutes.  We'll be

12   back around 11:15.

13             I'll ask you not to discuss your testimony with

14   anyone during the break other than your counsel.

15             THE WITNESS:  Of course.

16             THE COURT:  Thank you.

17             COURTROOM DEPUTY:  All rise.  This Court stands in

18   recess.

19             (Recess from 11:00 a.m. to 11:17 a.m.)

20             COURTROOM DEPUTY:  All rise.  The Honorable

21   Amit P. Mehta presiding is again in session.

22             THE COURT:  Thank you, everyone.  Please be

23   seated.

24             All right.  Mr. Schmidtlein, ready when you are.

25             MR. SCHMIDTLEIN:  Thank you, Your Honor.

                              - - -

                       CROSS-EXAMINATION

BY MR. SCHMIDTLEIN:

    Q    Good morning, Mr. Higgins.

    A    Good morning.

    Q    Mr. Higgins, you were asked some questions about
UPX947, if we can pull that up.

         That's in your binder.

    A    Yep.  I've got it on the screen too, though, John.

    Q    Okay.

         And this was an email exchange with you and some
of your colleagues within Verizon; is that right?

    A    Correct.

    Q    And the email that starts about mid-way through
that page is an email from Keena Grigsby?

    A    Correct.

    Q    And who was Keena Grigsby?

    A    Keena at the time was taking a lead or point role
in negotiating back with her counterparts over at Google for
their revenue share agreement.

    Q    Okay.

         Is it fair to say she was more sort of day to day?

    A    Absolutely, yes, day to day.

    Q    More day to day involved than you were at that
point in time?

1    A    Oh, absolutely, yes.

2    Q    Okay.

3         And her email there, and this is November 2018, so

4    this was a year or so after you came on the scene and had

5    responsibility for the Google relationship?

6    A    Correct.

7    Q    Okay.

8         And she's laying out for you there the top Verizon

9    ask to Google; is that right?

10   A    That's what it says here, correct.

11   Q    Okay.

12        And is one of the asks that Verizon was making was

13   as to the second bullet point there, for Google to increase

14   the revenue share that was currently being negotiated?

15   A    Correct.

16   Q    And one of the points that Verizon was prepared to

17   agree to for that was Verizon will not include any other

18   search services similar to Google on the device; is that

19   right?

20   A    That is what Keena had put in here, correct.

21   Q    Okay.

22        And is it fair to say that if these were top

23   Verizon asks to Google at the time, that she would have

24   cleared those with you or you would have been in the know

25   about these asks?

1    A    I would be brought in from time to time, but, you

2    know, the leads at Verizon have full flexibility to

3    negotiate in partnership with their legal teams.  So my

4    point being is that not every single term that they're

5    negotiating back and forth, I wouldn't be made aware of

6    every single term they're debating.

7    Q    Okay.

8         Let me step back a little bit in time.

9         You talked a little bit about, in your testimony,

10   the 2014 agreement, I believe counsel showed you a series of

11   the early agreements?

12   A    Correct.

13   Q    And then the amendments.

14        And I believe you confirmed that the 2014

15   agreement was the operative agreement that you found when

16   you took over in 2017?

17   A    Right.

18        If I remember correctly, that was the baseline

19   agreement, the starting point when I came into the role.

20   Q    And I believe you testified that that 2014

21   agreement did not have any restrictions on Verizon's ability

22   to preload other search engines in addition to Google?

23   A    To the best of my recollection, correct.

24   Q    Okay.

25        Now, prior to 2017 when you took over, were you

1    aware of any instances where, notwithstanding this

2    flexibility that Verizon had, Verizon, in fact, preloaded

3    another general search engine on any Verizon device --

4    Android device -- between 2014 and when you arrived?

5        A    Not in my prior role, I didn't have any visibility

6    or spend time with devices, so I was not aware of anything

7    specifically.

8        Q    Okay.

9             And when you took over the role in 2017, did you

10   begin to educate yourself about the fleet of Android devices

11   that Verizon had out in the marketplace?

12       A    I mean, not of legacy devices, meaning prior

13   devices.  I was more focused on what are the new devices

14   that we're going to be launching.  So the historical, I

15   would say, no, I didn't spend time on that.

16       Q    During the time period from 2017 when you took

17   over to 2021 when you executed the new agreement that you've

18   testified to, did Verizon preload any rival search engines

19   on any Verizon Android devices?

20       A    Not that I'm aware of, no.

21       Q    Okay.

22            During the time period when you took over from

23   2017 until when you executed the agreement in summer of

24   2021, did anyone on your team -- and by that I mean the

25   Verizon wireless team -- recommend to you that Verizon

1    should replace Google Search with Yahoo! or any other

2    general search engine on Verizon Android devices?

3         A    No specific recommendation for replacing that I'm

4    aware of.

5         Q    Now, during this time period when you were -- when

6    you were negotiating with -- when you were negotiating with

7    Google, were you approached by anyone from Microsoft in

8    terms of making an offer to have Bing preloaded on a Verizon

9    Android device?

10        A    I was not approached, no.

11        Q    And are you aware of anyone from -- anyone on your

12   team who was working on the deal with Google, were you aware

13   of anybody from your team being approached by Microsoft with

14   an offer to try to have Bing preloaded on the device?

15        A    I am not aware of that, no.

16        Q    During that time period from 2017 to 2021, were

17   you or anyone on your team approached by anyone from

18   DuckDuckGo about getting DuckDuckGo preloaded on any Verizon

19   Android devices?

20        A    Not that I'm aware of.

21        Q    During the time -- that time period, 2017 to 2021,

22   did anyone on your team indicate to you that they believed

23   that Yahoo!, Bing, or DuckDuckGo had a superior search

24   engine to Google Search?

25        A    I didn't have any recommendations from the team

1  about superiority or not of the search engines.

2      Q    Did you form any opinions during this time period

3  as to whether Verizon's customers would prefer to have

4  Yahoo! Search preloaded on Android devices instead of

5  Google?

6      A    I'm not aware of any customer studies to identify

7  Yahoo! versus anyone else.

8      Q    Did you ever reach the conclusion that

9  Yahoo! Search was a superior search engine to Google?

10     A    I didn't reach that conclusion, but I also didn't

11  do an analysis.  I was simply taking a look at the overall

12  market share when thinking about what the best solution

13  might be for customers.

14     Q    And did you consider or get any information from

15  others indicating that if Verizon did preload Yahoo! Search

16  on the device, how many people would actually use

17  Yahoo! Search?

18     A    I don't remember any analysis relative to use of

19  Yahoo!.

20          There was an analysis that was done on Yahoo!'s

21  side about revenue they thought they could generate, but

22  I don't remember anything specifically to your question.

23     Q    I take it the revenue projections that they were

24  making would at least indirectly have something to do about

25  the usage of Yahoo! Search on their device?

1    A    I don't know that to be specific.

2    Q    Is it fair to say that the revenue projections

3  that even the Yahoo! people gave to you suggested that there

4  was a very small revenue opportunity from preloading Yahoo!

5  on Android devices?

6    A    It was certainly smaller relative to the agreement

7  that we had with Google.

8    Q    It was a lot smaller, wasn't it?

9    A    It was certainly smaller, yes.

10    Q    Now, you went through this morning the 2021

11  agreement and the tiers, the core tier and the preferred

12  tier.

13         And did Verizon do any analyses of what the

14  financial impact would have been if they decided to put

15  Yahoo! into the cores here?

16    A    We would go through a number of different analyses

17  to see what the scenarios might be, and that was what was

18  put forth in mail that I sent to Ronan.  So that was one

19  example on an analysis that we performed.

20    Q    I think you testified to this.  The core tier had

21  no search exclusivity provisions in it at all?

22    A    The core tier -- correct.  There was no, if I

23  remember correctly, no search exclusivity in the core tier.

24    Q    And the way the agreement operated, if Verizon

25  wanted to, let's say, take a single Android device, you

1  know, just take one of the flavors of Samsung or a Motorola

2  device, just one, and try preloading Yahoo! on that device

3  in addition to Google Search to see how the device performed

4  and how consumers, you know, reacted to it, could Verizon do

5  that and still get paid at the preferred tier level on all

6  of the other devices that complied with the preferred tier

7  requirements?

8      A    We had flexibility at the individual device level

9  to try something different at the lower tier, correct.

10     Q    So if Verizon found, you know, a potentially

11  compelling alternative to try in addition to Google Search,

12  could Verizon have configured a device with whatever that

13  new compelling thing was in addition to Google Search and

14  enroll that singular device in the core tier?

15     A    We had the flexibility to do that, correct.

16     Q    And if you did that, you'd still get paid at the

17  preferred tier for all the other devices?

18     A    That is correct.

19     Q    And did Verizon ever -- during the time you still

20  were in this role, did Verizon ever find something else that

21  was compelling enough to explore and try something in the

22  core tier?

23     A    At the time, we did not.  But, importantly, if we

24  were to try something, we'd have to believe that's something

25  that would scale broadly because we have to train all the

1  frontline staff, consumers have to become aware of it.  So

2  it would have to be something we would try with the belief

3  that we think it's going to have a broad-base scale and

4  impact on the business and the customers.

5      Q    Understood.

6           We talked a little bit about carve-outs for Yahoo!

7  this morning, and I want to -- and His Honor has asked some

8  questions about the acquisition of -- by Verizon.

9           Verizon acquired Yahoo! through a company called

10  Oath; is that right?

11     A    No.  We acquired -- there were two assets.  There

12  was AOL, which was acquired at some point, I don't recall

13  the date; then there was Yahoo!.  Those two entities were

14  combined together and then rebranded as Oath.

15     Q    Okay.

16          And to your knowledge, was Yahoo! Search the

17  driving asset behind this acquisition?

18     A    I don't know.  I don't have any direct insight at

19  all.

20     Q    Prior to the acquisition, nobody consulted you

21  about the impact the acquisition of Yahoo! -- of the

22  Yahoo! Search piece of this entity would have on your

23  business?

24     A    No.

25     Q    Can you describe for Your Honor the array of other

```
1    Yahoo! assets that existed in addition to Yahoo! Search?
2         A    Sure.
3              It may have changed but, generally, I think four
4    examples would be news, financials, sports, and I believe
5    mail may have been on there as well, but, again, sometimes
6    it changed.  But those are generally the categories that we
7    would expect.
8         Q    And --
9         A    Finance as well.  Sorry.  Finance in there as
10   well.
11        Q    Right.
12             And were Yahoo! Finance -- just for example, were
13   Yahoo! Finance and Yahoo! Sports much more popular
14   consumer-facing products than Yahoo! Search?
15        A    I don't know exactly.
16             My view was there was greater popularity, but
17   I don't have any data to back that up.
18        Q    We looked earlier around some email communications
19   between, I think, yourself and some of your colleagues who
20   were over in the Yahoo! side of the house, which I think
21   was -- were they in Verizon Media?
22        A    Right, correct.  Verizon Media Group it was
23   called.
24        Q    Okay.
25             And I believe we looked at some email
```

```
 1    correspondence where they were expressing concern to you

 2    about being able to take advantage of Android devices as a

 3    distribution path for some of these Verizon Media assets; is

 4    that fair?

 5         A    That's fair.

 6              MS. TRAGER:  Objection, Your Honor.  To the extent

 7    these statements came from the Oath side of the house as

 8    previously mentioned, they are hearsay.

 9              THE COURT:  Okay.  I think he was just being asked

10    about what he understood.

11    BY MR. SCHMIDTLEIN:

12         Q    Was a primary concern that the Yahoo! side of the

13    house had was making sure that the Yahoo! -- other Yahoo!

14    assets were going to be able to be preloaded on Android

15    devices?

16         A    I don't know that it was a primary concern, but

17    there was interest from the Verizon Media Group in having

18    some assets populated on the devices, correct.

19         Q    And, eventually, Google and Verizon agreed on a

20    carve-out to allow for Yahoo! assets to be preloaded on the

21    device?

22         A    We did at the reduced tier, though, correct.

23         Q    Well, isn't it correct that the Yahoo! home

24    application --

25         A    Oh, I'm sorry.  You're talking specifically about
```

1   the vertical app?  So we did -- correct.  We did create a

2   carve-out for the vertical applications, that's correct.

3        Q    So that Yahoo! could preload sort of the Yahoo!

4   mobile application or the Yahoo! home application on a

5   device, and Verizon would still get paid at the highest

6   tier?

7        A    That is correct.

8        Q    And if they wanted to preload Yahoo! Sports or

9   Yahoo! Finance, you'd still get paid at the highest tier?

10       A    That's correct.

11       Q    And is that the case even though there is search

12  capability with -- inside of those applications?

13       A    That's true.  But, if I remember correctly, we had

14  to make sure that those applications didn't allow a

15  punch-out into general search.

16            THE COURT:  I'm sorry.  What's Yahoo! Home, is

17  that a --

18            THE WITNESS:  So there was -- I don't know if it

19  exists still today, but there was an application where

20  Yahoo! was trying to aggregate multiple services, like

21  finance, sports, et cetera into kind of one super app, if

22  you will.  And that was an app that they were interested in

23  trying to get on devices at the time.  But, again, I don't

24  know if it exists today.

25            MR. SCHMIDTLEIN:  Your Honor, if I can approach,

1    I'd like to show the witness PX987.

2            Your Honor, this has been admitted into evidence

3    already.

4    BY MR. SCHMIDTLEIN:

5        Q    Just take a moment, Mr. Higgins, and familiarize

6    yourself with this one.

7            Do you recognize this document?

8        A    I do.

9        Q    Can you describe what this document is?

10       A    So this is a summary at a very high level that I

11   provided to Ronan Dunne, who's the CEO of the consumer group

12   at the time, on where we landed with the new terms.

13       Q    Okay.

14           And if we -- put this one up.

15           So June 21st, 2021, this is, like, right at the

16   point where the final signatures are on the deal; is that

17   right?

18       A    I believe so.

19           Normally, if I'd send something like this out, the

20   final deal would be routed for signatures in and around this

21   time.

22       Q    Okay.

23           If you look at these, the second paragraph of your

24   email that starts with "these agreements"?

25       A    Uh-huh.

```
 1      Q    "████████████████████████████████████████

 2  ████████████████████████████████████████████████

 3  ████████████████████████████████████████████████

 4  ████████████████████████████████████████████████

 5  █████████████████████████"

 6           Can you describe what you were conveying to

 7  Mr. Ronan -- or Mr. Dunne?  Excuse me.

 8      A    Yep.

 9           What I was trying to get across here is that we

10  have reached terms that ██████████████████████████

11  ███████████.

12           ██████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ██████████████████████████████████████████████

17  ████████████████████████████.

18      Q    You then -- and you --

19           THE COURT:  I'm sorry, Mr. Schmidtlein.

20           ██████████████████████████████████████████

21  █████████████?

22           THE WITNESS:  Correct.  Yes.  Sorry.

23  BY MR. SCHMIDTLEIN:

24      Q    And then you describe the first agreement as the

25  revenue-share agreement --
```

```
 1        A     Uh-huh.

 2        Q     -- which is an extension of the prior agreement

 3   you have.

 4        A     Right.

 5        Q     And you said, this benefits Verizon at

 6   $███ million a year?

 7        A     Roughly, right.

 8        Q     Okay.

 9              And then the second agreement, you describe as a

10   mobile services incentive deal.  Can you describe what that

11   deal was?

12        A     Right.

13              So Google had come back to Verizon with a new

14   architecture in the agreement where you've got a standard

15   revenue share agreement, which is what's stipulated in the

16   prior paragraph, and then a mobile service agreement where

17   we would engage in various marketing activities to try and

18   help build the Android ecosystem.

19        Q     And you conclude that paragraph by saying, the

20   projected revenue benefit for Verizon is ███ million; is

21   that right?

22        A     Correct.

23        Q     So together, Google was going to invest over

24   $███ million in Verizon to try to help grow the Android

25   ecosystem?
```

1   A   That was our estimate at the time, that's correct.

2   Q   Okay.

3       You then say in the next paragraph, "████

4   ████████████████████████████████████████████

5   ███████████████████████████████████████████

6   █████████████."  Do you see that?

7   A   Correct.

8   Q   And when you talked about "█████████████████

9   █████████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████████████████?

12  A       ███████████████████████████████████████

13  ████████████████████████████████████████

14  █████████████████████████████████████████████

15  ████████████████████████████████████████.

16  Q   Okay.

17      And at the top, Mr. Dunne responds, "Awesome.

18  Thanks for the update."

19  A   Uh-huh.

20  Q   And was Mr. Dunne pleased with the way that the

21  Verizon Google deal finally landed?

22  A   I can't speak to how he thought about it, but

23  I know that he had an interest, as did I, in trying to make

24  sure that we finalized the terms at a place that we thought

25  was going to be reasonable.

1    Q    You gave some testimony earlier this morning about

2    changes in the revenue share percentages over time with

3    various Google agreements.

4         Can you describe how the overall payment dollars,

5    what the trend was there over all of the years that you were

6    involved?

7    A    From 2017 through 2021, you mean?

8    Q    As far back as you're aware of numbers.

9    A    Yeah.

10        I believe that it would sit in around the ████████

11   ████ million range in a given year, generally speaking.

12        When I first came on board, I didn't look at it,

13   to be quite honest, so it could have been less than.  But I

14   would say in the outer years, it was close to that dollar

15   amount that I provided.

16   Q    When you were in negotiations with Google over the

17   2021 agreement, did Google communicate to you Google's hope

18   and intention in terms of the investment for the trend and

19   the amount of investment that Google hoped to be able to

20   make with Verizon?

21   A    So they had hoped that it would grow as we worked

22   together to grow the Android market share.

23   Q    So one of the ways in which, both, I guess the

24   revenue share and the marketing incentives agreement worked

25   was the more Verizon Android devices that you successfully

1    sold in competition with iPhone, the more Verizon stood to

2    benefit financially?

3         A    That was our view.

4              So we look at it as a P times Q.  So as the

5    quantity of Android devices increases, our expectation is

6    that the revenue share would likely increase as well.

7              Again, importantly, I don't have any view into the

8    advertising, you know, revenue that Google has, we just made

9    the assumption that more Android devices would lead to

10   greater revenue share.

11        Q    When you were in the role of overseeing the Google

12   relationship, did you also have responsibility for the Apple

13   relationship?

14        A    I did.

15        Q    Okay.

16             And just a few questions about that relationship.

17             Does Verizon have the ability to preload apps on

18   Apple devices?

19        A    We do not have the ability to preload applications

20   on the device, that's correct.

21        Q    Okay.

22             But you do have that flexibility on Android

23   devices?

24        A    We do have that flexibility on Android.

25        Q    Does Apple pay Verizon any revenue share in

1102

```
1    connection with any search revenue it gets on its devices?

2        A    I'm not aware of any revenue share for search

3    revenue.

4        Q    Are you aware of any revenue share for any

5    applications on -- strike that.

6    ██████████████████████████████████████████████████

7    █████████████████████████████████████████

8    ███████████

9       ██    ████████████████████████████████████

10   █████████████████████████████████████████

11   ████████████████████████████████████████████

12      ██    ████████████████████████████████

13      ██    █████████████████████████████████     ████████

14   ████████████████████████████████████████████████

15   █████████████████████████████████████████████

16   ████████████████████

17       Q    Okay.

18            Do you know what percentage, roughly, during this

19   period, what percentage of mobile devices that Verizon sold

20   were Apple devices versus Android devices?

21       A    So over the years, it's been increasing towards

22   Apple and iOS.  Generally I would say today, ████.  So ██

23   is Apple and roughly ██ is Android.

24       Q    And I think as you indicated, Apple's percentage

25   has been going up and Android has been going down?
```

1    A    That is correct.

2         And that's, I want to be very specific here.  This

3    is for Verizon post-pay, which is where I have the insight.

4         Prepay is different, the model is different, the

5    percentages are different.  I'm speaking about Verizon

6    post-pay.

7         THE COURT:  Just to be clear, when you say

8    post-pay phones, you mean -- well, prepay phones are phones

9    that have a minute limit or a data limit, for example.

10        THE WITNESS:  Yeah, and it's -- prepay is more of

11   a grab and go so you just pay by month, correct.

12   BY MR. SCHMIDTLEIN:

13   Q    And who are the Android phone manufacturers that

14   are most popular for -- in Verizon stores?

15   A    It's changed over the years.  Is your question

16   about today?

17   Q    Well, during the time period '17 through today.

18   A    Yeah.

19        I would say some of the more popular ones are

20   Samsung, that used to be LG, who's no longer in the market.

21   Motorola.  And slowly increasing would be Google Pixel as

22   well but still relatively small.

23        So in today, it's primarily Samsung.

24   Q    Do you think there's a benefit to having multiple

25   Android OEMs manufacturing Android devices?

1    A    We like having multiple manufacturers because it

2    creates more possibilities for innovation.  So anytime you

3    can have more partners working, we think that's a benefit to

4    consumers.

5    Q    Is Verizon concerned about the trend in the market

6    of increasing Apple percentages and decreasing Android

7    percentages?

8    A    We're concerned about any imbalance in the market

9    and we feel that, you know, having healthy shares and

10   healthy partners is good for the consumer.

11   Q    What are the ways in which Verizon competes with

12   other mobile carriers to sell mobile phones?

13   A    There are a multitude of different approaches.

14   I'll start off with the network.  So, you know, we invest

15   ██████   billion a year just in building out the network to

16   make sure it's the best in the market.

17        There are promotional activities that we have as

18   well.  So you'll see giving away devices.

19        There are various partnerships that we might have

20   with content partners creating differentiated value props

21   which are the price plans we would have in there.  So

22   there's many, many different factors that we're going to

23   leverage and take a look at to try and create

24   differentiation.

25   Q    And does the price that Verizon pays to acquire a

1  mobile device for resale, is that a significant factor in

2  what the ultimate retail price is?

3       A     Meaning the price that Verizon pays for the

4  device.

5       Q     Correct.

6       A     It is, yes.

7       Q     In other words, just to be clear for Your Honor,

8  Verizon has to buy iPhones in order to, then, re-sell them

9  in its stores?

10      A     Correct, we have to buy all the phones that we

11 sell, correct.

12      Q     And do you have an understanding as to whether

13 Android devices offer a wider array of price points for

14 consumers than iPhones do?

15      A     I would say it's a wider array.

16            Generally, Android will go lower than what you

17 would see for iPhone.

18      Q     Do you think it's important for a smartphone to

19 work seamlessly out of the box when a customer first turns

20 it on?

21      A     I think, for all services, mobile phones being

22 included, working seamlessly out of the box is important,

23 yes.

24      Q     I mean, if a customer is confused or dissatisfied

25 with sort of the initial starting of the device, how can

1   that impact Verizon?

2       A    Right.

3            So we call that an out-of-box experience, so

4   taking it out of the box.

5            If a customer is at all confused, it could result

6   in calls to customer care, it could result in dissatisfied

7   customers coming back to the store, it could result in them

8   returning the devices and switching to another carrier.  So

9   there's a number of different outcomes it could result so we

10  try to make sure it's as seamless as possible.

11      Q    Now, you've answered a lot of questions about your

12  negotiations and your conversations with Google.  Does

13  Verizon also have conversations with Android OEMs about how

14  devices get configured?

15      A    We do.

16      Q    And do OEM --

17           THE COURT:  I'm sorry to interrupt you.

18           I just want it to be mindful of where we are in

19  terms of the closed session and if there are questions that

20  you can ask in an open.

21           MR. SCHMIDTLEIN:  I'm about to finish up

22  altogether.

23           THE COURT:  Okay.

24           MR. SCHMIDTLEIN:  Just -- I have like five minutes

25  left.

1    THE COURT:  Well, I mean, if they are specific to

2  these records that are deemed confidential, then...

3    MR. SCHMIDTLEIN:  Oh.  Let me -- I'll finish those

4  up if -- I understand the Court's -- I understand the

5  Court's issue.

6    THE COURT:  Right.  Okay.

7    So why don't we -- let me just ask this before we

8  proceed.  Does the -- will plaintiffs have any redirect on

9  confidential matters?

10    MS. TRAGER:  Yes, Your Honor.

11    THE COURT:  Okay.  So hang on real quick.

12    Mr. Schmidtlein, do you have any more questions on

13  confidential matters for the witness?

14    MR. SCHMIDTLEIN:  I'm just looking if I can ask

15  the questions on the documents -- just a couple.

16    THE COURT:  Okay.

17    MR. SCHMIDTLEIN:  Can we go to UPX642.

18    THE COURT:  Hang on, Mr. Schmidtlein.

19    MS. TRAGER:  Your Honor, I'm sorry.  I believe

20  these questions can be asked in open session.

21    THE COURT:  Which questions?

22    MS. TRAGER:  We have for redirect.

23    THE COURT:  For redirect?

24    MS. TRAGER:  Yes.

25    THE COURT:  Okay.  Fine.

1      So Mr. Schmidtlein said he had a couple more

2  questions on the record so why don't we turn to that.

3      I'm sorry.  What was the exhibit again?

4      MR. SCHMIDTLEIN:  642.

5  BY MR. SCHMIDTLEIN:

6      Q    And if you look about mid-way down, the email that

7  you wrote on November 5th, and it starts with "for Visible

8  and ███████████

9      Do you see that?

10      A    I do.

11      Q    What are Visible and ██████████

12      A    So Visible is a digital-only brand and mobile

13  phone.  I believe it's a separate legal entity as well

14  within Verizon, still leverages the Verizon network.  But

15  all the branding and the care, et cetera is all separate.

16      Q    ████████████████████

17      A    ████████████████████████████████████████████

18  ██████████████████████████████████   ███████████

19  ████████████████████████████████████████

20  ████████████████████████████████████

21  ████████████████████████████████████

22  ██████████

23      Q    So this would have been like a ██████████████

24      A    You might describe it as that, yes.

25      Q    And is -- what you were communicating here was

```
1    that you were able to do that in connection with the Google

2    agreement?

3         A    Right, but with the associated impacts that I

4    outline here, correct.

5         Q    Right.

6              You might get a decreased rev share on that

7    device?

8         A    Correct.

9         Q    But not more broadly on the other devices in the

10   relationship?

11        A    Correct.

12        Q    Okay.

13             MR. SCHMIDTLEIN:  Okay.  I think that's all I have

14   in confidential.

15             THE COURT:  Okay.  Terrific.

16             MS. TRAGER:  Your Honor, I just have very few

17   questions for confidential session, perhaps two or three.

18             THE COURT:  I'm sorry.  So you do now have

19   redirect on confidential.  Okay.  All right.

20             MS. TRAGER:  I do.  I'm going through these

21   carefully, I believe these need to be done through sealed

22   session.

23             THE COURT:  All right.  Fine.  Let's go ahead --

24   let's do that, and then we'll move back into an open

25   session.
```

1            - - -

2          REDIRECT EXAMINATION

3    BY MS. TRAGER:

4        Q    Mr. Higgins, defense counsel asked you some

5    questions about what Verizon might have done had they

6    identified a potentially compelling alternative to another

7    search option.

8        A    Right.

9        Q    If Verizon had identified a potentially compelling

10   alternative, could Verizon have configured a device on which

11   it replaced Google at the default search access points that

12   were required, like the widget on the home screen, could it

13   have done that and still continued to receive revenue share

14   on the other devices that previously had qualified for the

15   highest tier?

16       A    I'd have to look at the terms.  I don't recall if

17   that was a breach in any way broadly for the agreements.  My

18   best recollection was we could do that, and I believe it

19   goes to zero.  But, again, I'd have to look at the

20   specifics.

21       Q    Is your understanding of the flexibility at the

22   ▌ percent tier that anything would be secondary to Google?

23       A    Correct.

24       Q    Okay.

25            THE COURT:  So when you say "anything would be

1    secondary"?

2    BY MS. TRAGER:

3        Q    Any general search functionality would be in

4    addition to Google on the device.

5        A    Right.

6        Q    Okay.

7             And turning back to the carve-out that defense

8    counsel referred you to with respect to Yahoo! services.  To

9    the best of your recollection, was that carve-out limited to

10   only as long as Verizon owned Yahoo!?

11       A    I don't recall.  Again, I'd have to look at the

12   agreements.  I don't recall directly if it was limited to

13   when we'd owned it.

14       Q    Last question.

15            And defense counsel also point you to the mobile

16   services incentive agreement, in addition to the RSA.

17            Before 2021, there was no mobile services

18   incentive agreement?

19       A    There was not.

20       Q    There was just the RSA?

21       A    That's a new construct, correct.

22            MS. TRAGER:  Thank you, Your Honor.

23            THE COURT:  Okay.  Let's go ahead and reopen the

24   doors and we'll finish up the questioning of Mr. Higgins.

25            (Open court)

1          THE COURT:  Just bear with us.  We're still

2   waiting on confirmation that the media room has been

3   reconnected.

4          (Pause)

5          THE COURT:  All right.  We're ready to proceed,

6   Mr. Schmidtlein.

7   BY MR. SCHMIDTLEIN:

8      Q    Mr. Higgins, are you familiar with a company

9   called Branch Metrics?

10     A    I am.

11     Q    And what is Branch Metrics?

12     A    The only thing I could offer is I believe they

13  specialize in on-device search but they could do other

14  things as well.

15     Q    Do you know whether Verizon personnel have spoken

16  to Branch Metrics about incorporating their technology onto

17  Verizon Android devices?

18     A    I do.

19     Q    And what do you know about those conversations?

20     A    Only that we're in discussions about ways in which

21  we could potentially improve the device experience.

22     Q    Okay.

23          And during the time that you were involved in the

24  Google relationship, did anyone from Google ever reach out

25  to you and instruct you not to work with Branch Metrics?

1    A    No, not with me.

2    Q    Did anyone on your team ever report to you that

3  they had received an outreach from Google instructing them

4  not to work with Branch Metrics?

5    A    No.

6    Q    Do you know whether Verizon actually has

7  incorporated any Branch Metrics technology on to any Android

8  devices?

9    A    I don't, just because it was underway and I've

10 since changed roles so I'm not sure if anything progressed

11 there or not.

12   Q    Okay.

13        MR. SCHMIDTLEIN:  Your Honor, we've marked DX737.

14 BY MR. SCHMIDTLEIN:

15   Q    Now, recognizing, Mr. Higgins, this is an internal

16 email from within Verizon in September of 2010, correct?

17   A    That's what it appears to be, correct.

18   Q    Okay.

19        And you were working at Verizon at the time, but

20 you were not involved in mobile devices at the time?

21   A    I was not.  That's correct.

22        MR. SCHMIDTLEIN:  Your Honor, we're offering this

23 into evidence not for the truth of the matter asserted.

24 I believe we have a hearsay objection.  This is an internal

25 circulation within Verizon at the time where they are

```
 1   attaching various product reviews of a Verizon wireless
 2   device that came with Bing preloaded as the default search
 3   engine.
 4           And we're not offering it for the truth of all the
 5   articles, but we are offering it as a business record and we
 6   have a business record declaration from Verizon as to the
 7   document.
 8           MS. TRAGER:  Your Honor, Mr. Higgins is not on
 9   this document, and he's testified he's not involved with
10   this.  And this is, these are articles.
11           THE COURT:  Well, I guess the question is, if it's
12   been stipulated to as a business record, I think the ground
13   rules have been that you don't need to actually admit it
14   through a witness, that's a foundational witness.
15           Now, if Mr. Higgins hasn't seen this, he can't,
16   presumably, be able to testify to it or provide any
17   additional gloss other than what's in the document itself.
18           MS. TRAGER:  Thank you, Your Honor.
19   BY MR. SCHMIDTLEIN:
20   Q    So -- and just keep it down for now.
21           But, Mr. Higgins, when you were in the mobile
22   device space, would it be common for people within your
23   group to monitor product reviews for Verizon wireless
24   devices?
25   A    We do.
```

1    Q    And are you familiar with the Verizon Fascinate

2    that is the subject of this?

3    A    I don't.  I don't recall this device.

4    Q    Okay.

5         If you'll turn to page, I guess it's 9 of the

6    document, and it's the Bates number 5790, I'm not going to

7    regale you with all the various product reviews that are

8    incorporated in here, but I'll give you an example of one.

9         This is from cnnmoney.com.  "Verizon forces

10   Fascinate users to use Bing?"

11        And it's from a gentleman named Seth Weintraub.

12        It says, "I've been telling my friends and

13   colleagues on Verizon to wait for the Samsung Fascinate.

14   I'm sorry, I was wrong.  Get something else."

15        And it goes on.  "The latest Google Android phone

16   from Verizon is saddled with Bing for all of its search

17   features, according to Engadget's review this morning.  As

18   Google incorporates its search engine into a variety of

19   functions on the Android phone, it just kills the

20   experience."

21        MS. TRAGER:  Your Honor, objection; foundation,

22   relevance.

23        Counsel is reading an article into the record.

24        MR. SCHMIDTLEIN:  I'm going to ask him a question

25   about it, and I've listened to a lot of documents being read

1116

1    into the record by the DOJ.

2            THE COURT:  All right.  Well, let's go ahead and

3    ask him.

4    BY MR. SCHMIDTLEIN:

5        Q    During all your years, were you were in charge of

6    mobile devices and you had agreements with Google that

7    Google was the default search engine on Verizon Android

8    devices, did you ever see a product review like this?

9        A    Well, I -- we certainly had seen product reviews,

10   some positive, some less than positive.

11           Product reviews specifically about this concern

12   that's raised here, no.

13       Q    You never saw a product review where anyone

14   complained about Google Search being preloaded on an Android

15   device?

16       A    No, I don't recall ever seeing one with that

17   complaint.

18       Q    And would you agree that product reviews from

19   reputable tech press and tech reviewers can impact sales of

20   mobile devices?

21       A    We take them seriously because they provide

22   product insights and we know consumers read the reviews as

23   well.  So, yes, we think it's meaningful.

24           MR. SCHMIDTLEIN:  I have no further questions.

25           THE COURT:  All right.  Any redirect from the

```
 1   plaintiffs?

 2            MS. TRAGER:  Yes, Your Honor, briefly.

 3                     -  -  -

 4                REDIRECT EXAMINATION

 5   BY MS. TRAGER:

 6       Q    Mr. Higgins, defense counsel asked you some

 7   questions about Microsoft and DuckDuckGo earlier.

 8            Did Verizon solicit bid from Microsoft or

 9   DuckDuckGo before or while it was negotiating a renewal of

10   its deal with Google?

11       A    During what time frame?

12       Q    During your time in device marketing when you were

13   involved in the negotiations of the RSA?

14       A    I'm not aware of us soliciting bids.

15       Q    Do you have any reason to believe that Microsoft

16   or DuckDuckGo were aware of Verizon's Google agreement

17   expiring?

18       A    I don't have any insight into that and what they

19   may or may not know.

20       Q    Has Verizon ever sold a phone with multiple search

21   widgets on it?

22       A    Ever in the history of Verizon?

23       Q    To your knowledge.

24       A    I struggle to give you an answer.

25            We'd sell 40 to 50 devices every single year,
```

```
 1   they're all different, different leaders in place.  I can't
 2   give you a direct answer there.
 3        Q    Can you think of, sitting here today, any device
 4   on which there were two search widgets that Verizon sold?
 5        A    I'm not aware of one, no, not that I can think of.
 6        Q    Okay.
 7             And, Mr. Higgins, Counsel asked you a few
 8   questions about Branch Metrics.  What, if any, personal
 9   involvement did you have with discussions with Branch
10   Metrics?
11        A    I had discussions with some members of my team.
12   I don't recall having any direct meetings with branch at all
13   but I know the team members did.
14        Q    And what, if any, responsibility do you have for
15   Branch Metrics' implementation, if any, on Verizon devices?
16        A    Well, if at the time if it was something new that
17   was going to come on to a device, I would review it with the
18   team, we'd talk about whether or not we thought it was going
19   to have a beneficial result from a consumer standpoint, and
20   then decide whether or not to move forward.  But we do that,
21   you know, we have hundreds of those conversations in a given
22   year about different things we can do on devices to help
23   differentiate Verizon.
24        Q    And are you familiar with any Branch Metrics'
25   implementation on a Verizon device?
```

1        A    Not that I recall.  Again, I don't recall that

2   anything was ever finalized or anything ever transpired.

3             MS. TRAGER:  Okay.  No further questions,

4   Your Honor.

5             THE COURT:  Okay.

6             Any redirect from Colorado Plaintiffs?

7             MR. CAVANAUGH:  No, Your Honor.

8             THE COURT:  All right.

9             Mr. Higgins, thank you very much for your time and

10  testimony.

11            THE WITNESS:  Okay.

12            Thank you.  I appreciate it.

13            THE COURT:  Good luck.

14            All right.  Plaintiffs ready with their next

15  witness?

16            MR. DAHLQUIST:  Hello, Your Honor.

17            David Dahlquist on behalf of the United States.

18            THE COURT:  Mr. Dahlquist, good morning.

19            MR. DAHLQUIST:  Good to see you again.

20  ███████████████████████████████████████

21  ███████████████████████████  ██████████████████

22  ████████████████████████████████████

23  ████████████

24       █████████████  ████████████

25       █████████████████  ██████████████████

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__September 18, 2023___        

                                       William P. Zaremba, RMR, CRR