1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,
     et al.,                              Civil Action
4                    Plaintiffs,          No. 1:20-cv-3010

5            vs.                          Washington, DC
                                          September 19, 2023
6    GOOGLE, LLC,                         1:37 p.m.

7                    Defendant.           Day 6
     _____/    Afternoon Session
8

9

10               TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE AMIT P. MEHTA
            UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For DOJ Plaintiffs:     KENNETH DINTZER
                             U.S. Department of Justice
14                           1100 L Street, NW
                             Washington, DC 20005
15
                             JOSHUA HAFENBRACK
16                           MATTHEW JONES
                             U.S. Department of Justice
17                           450 Fifth Street, NW
                             Washington, DC 20001
18
                             DAVID DAHLQUIST
19                           U.S Department of Justice
                             209 South LaSalle Street, Suite 600
20                           Chicago, IL 60604

21

22   For Plaintiff          WILLIAM CAVANAUGH, JR.
     State of Colorado:      Patterson, Belknap, Webb & Tyler, LLP
23                           1133 Avenue of the Americas #2200
                             Suite 2200
24                           New York, NY 10036

25

```
1    APPEARANCES CONT:

2    For Plaintiff          JONATHAN SALLET
     State of Colorado:     Colorado Department of Law
3                           CPS/Antitrust Section
                            1300 Broadway, 7th Floor
4                           Denver, CO 80203

5

6    For Defendant Google:  JOHN SCHMIDTLEIN
                            EDWARD BENNETT
7                           Williams & Connolly, LLP
                            680 Maine Avenue, SW
8                           Washington, DC 20024

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:        JEFF HOOK
                            Official Court Reporter
24                          U.S. District & Bankruptcy Courts
                            333 Constitution Avenue, NW
25                          Washington, DC 20001
```

1                        **I N D E X**

2    **WITNESS**                                              **PAGE**

3    JERRY DISCHLER

4      Continued Redirect Examination by Mr. Dahlquist       1476

5      Redirect Examination by Mr. Cavanaugh                 1499

6

7    JONATHAN YOO

8      Direct Examination by Mr. Jones                       1510

9

10   MIKE ROSZAK

11     Direct Examination by Mr. Hafenbrack                  1533

12

13

14                      **E X H I B I T S**

15   **EXHIBIT**                                              **PAGE**

16   Exhibit UPX462:     ......Admitted into evidence......   1550

17   Exhibit UPX2002     ......Admitted into evidence......   1568

18

19

20

21

22

23

24

25

1     **P R O C E E D I N G S**

2          **THE COURT:**  Mr. Dahlquist, we're ready when you are.

3          **CONTINUED REDIRECT EXAMINATION OF JERRY DISCHLER**

4     BY MR. DAHLQUIST:

5          **Q.**  Thank you, Your Honor.

6          Mr. Dischler, welcome back.  Mr. Dischler, before the

7     lunch break, your counsel was asking you questions -- during

8     his part of, the difference between text ads and shopping ads.

9     Do you recall some of that testimony?

10         **A.**  Yes.

11         **Q.**  I believe you stated that you do not agree that text

12    ads and shopping ads are not substitutable -- I think was the

13    word that you used; is that correct?

14         **A.**  Can you repeat that?  There were two negatives there.

15         **Q.**  Let me remove the negatives.  I believe you testified

16    that you believe text ads and shopping ads are substitutable,

17    correct?

18         **A.**  Yes.

19         **Q.**  How do you define substitutability?

20         **A.**  As I mentioned, the advertiser has a singular business

21    objective which is to sell products, and they could use

22    shopping ads or text ads in order to achieve that business

23    objective for the retail advertisers that are eligible to use

24    shopping ads.

25         **Q.**  The majority of advertisers on Google purchase text

1    ads, correct?

2        A.   That's correct.

3        Q.   The majority of revenue that Google earns is from text

4    ads, correct?

5        A.   Yes.

6        Q.   At this point today, does Google have any plans to

7    stop selling either shopping ads or text ads?

8        A.   No, not today.

9        Q.   You intend to continue selling both types of search

10   ads, correct?

11       A.   Yes.

12       Q.   During your testimony with your counsel, you talked

13   about semantic matching.  Do you recall that testimony?

14       A.   Yes, semantic phrase in BMM.

15       Q.   Semantic phrase in BMM, matching -- or those are

16   different types of semantic matching?

17       A.   Yes.

18       Q.   A goal of the semantic matching is to have thicker

19   auctions, correct?

20       A.   That wouldn't be a direct goal, that would be an

21   outcome of semantic matching.

22       Q.   An outcome of semantic matching is thicker auctions,

23   correct?

24       A.   Yes.

25       Q.   And thicker auctions means more bidders, correct?

1    A.   Yeah, another way of saying is that we're better able

2    to match user and advertiser intent.  If more advertisers are

3    eligible because it's easier to buy our ads, that would lead to

4    thicker auctions.

5    Q.   And do you agree that thicker auction means there's

6    more bidders in an auction, correct?

7    A.   Yes, more advertisers would be eligible.

8    Q.   Having more bidders in an auction can lead to higher

9    prices, correct?

10   A.   It could or it couldn't, depending upon what the bids

11   are.

12   Q.   Advertisers do not have the ability to opt out of

13   semantic matching, correct?

14   A.   That's correct.

15   Q.   You also testified with your counsel about a new

16   product at Google called Performance Max; is that correct?

17   A.   Yes.

18   Q.   And this is a newer product that has been rolled out

19   by Google in the last -- how long?

20   A.   Two years.

21   Q.   In the last two years.  And I believe you described it

22   as an AI-driven advertising product; is that correct?

23   A.   Yes.

24   Q.   And AI means artificial intelligence?

25   A.   It does.

1    Q.   And I believe you said it's the fastest growing

2  product at Google, correct?

3    A.   Yes, the fastest growing -- to be specific, the

4  fastest growing advertising product that --

5    Q.   Thank you.

6    A.   -- we've had at Google.

7    Q.   The fastest growing advertising product is Performance

8  Max?

9    A.   Yes.

10   Q.   This is an experimental product or program run through

11  Google Labs, correct?

12   A.   No.

13   Q.   The AI component of Performance Max is an experimental

14  component of Performance Max, correct?

15   A.   No.

16   Q.   Sorry, Your Honor, just a moment.  Let me come back to

17  this question in a moment, I think I have the wrong document.

18  We'll come back to that in a moment, sir.

19        Performance Max is not a replacement for text ads or

20  shopping ads, correct?

21   A.   That's correct.

22   Q.   Advertisers are intended to purchase Performance Max

23  in addition to purchasing shopping ads and text ads, correct?

24   A.   In the case of text ads, that's correct.  In the case

25  of shopping ads, we've actually migrated some advertisers to

1    Performance Max campaigns.

2        Q.   Performance Max is intended to be complementary to

3    your other advertising products in search ads, corrects?

4        A.   Today it's intended to be complementary.  The primary

5    reason for that is because we haven't been able to get the

6    artificial intelligence functionality working for the full

7    variety of use cases.  But for the majority of use cases, we've

8    gotten it working, so now we're complementary.  If we're able

9    to innovate appropriately technically in this automated

10   campaign buying, I see no reason why Performance Max couldn't

11   be the only ad product that we offer in the future.

12       Q.   Today, you do not intend to replace text ads or search

13   ads with Performance Max, correct?

14       A.   We would intend to if we've solved the underlying

15   technical problems.  But we have not been able to do that

16   today, so I can't say one way or the other.

17       Q.   Today, does Google intend to stop selling search ads

18   or text ads because of Performance Max?

19       A.   No.

20       THE COURT:  I'm sorry, can you just describe one more time

21   what Performance Max was?  Because I thought I understood it to

22   be a tool by which to place advertising, but maybe I'm not

23   understanding it correctly.

24       THE WITNESS:  So Performance Max -- let's -- I'll give you

25   by way of analogy.  So if you're buying search ads, then you

1    are buying keywords that correspond to queries.  And then you

2    have certain ad creatives associated with your campaigns.  And

3    for the specific things that you sell, products or services, we

4    drive traffic to your site.  And that's directly from Google

5    Search.

6         Now, Performance Max campaigns goes at this differently.

7    You provide us with creative assets -- let's say that they're

8    text creative assets that could run on search.  There's your

9    shopping feed that could run on the shopping property or on

10   search.  You can provide us with videos that would run on

11   YouTube or with feed-type ads that would run on our feed

12   surfaces.  And then you give us a business objective, like you

13   want to achieve a target cost per acquisition or a target

14   return on your ad spend.  And we'll dynamically create the ads

15   and bid for you in order -- and show them on various surfaces

16   in order to achieve the business objective.

17        Now, for our -- we have an automated shopping ads product

18   that has a subset of the Performance Max features.  And for

19   those advertisers, we're migrating their shopping spend over to

20   Performance Max campaigns directly.  We haven't figured out how

21   to do that for all of our search advertisers.  We'd like to be

22   able to do so if we can make the technology better over time.

23        **THE COURT:**  Thank you for your explanation.

24   **BY MR. DAHLQUIST:**

25        **Q.**  Today, Google still intends to continue selling text

1    ads and search ads in addition to Performance Max, correct?

2         **A.**   Text ads and search ads?

3         **Q.**   I'm sorry, let me restate the question.  Today, Google

4    intends to continue selling text ads and shopping ads, two

5    types of search ads, in addition to Performance Max, correct?

6         **A.**   That's correct.

7         **Q.**   During your testimony with your counsel, you

8    referenced something called a search query report, or an SQR.

9    Do you recall that?

10        **A.**   A search query performance report.

11        **Q.**   Thank you, a search query performance report.  Do

12   advertisers receive search query performance reports?

13        **A.**   Yes.

14        **Q.**   What do advertisers do with search query performance

15   reports?

16        **A.**   They do a number of things.  They use it in order to

17   measure their advertiser effectiveness, or they could use it in

18   order to improve the range of keywords that they use in order

19   to be able to target users that are looking for their products

20   or services.

21        **Q.**   Do you know what the threshold for data is to appear

22   in an SQR?

23        **A.**   I'm not sure what today's threshold is, but I know

24   what it's been in the past.

25        **Q.**   What -- today, do you know the minimum number of

1    impressions that are required to appear in an SQR?

2         A.   Today, I'm not a hundred percent sure, no.

3         Q.   Do you have a guess?

4         A.   I mean, if you're asking me for -- I don't want to

5    hazard a guess.  We have a minimum threshold in order to

6    protect user privacy.  This is the objective that I talked

7    about before in my testimony.

8         Q.   Today, you don't know what the minimum number of

9    impressions it takes to appear in an SQR, correct?

10        A.   That's correct.

11        Q.   Sir, do you know if Google informs advertisers what

12   the minimum threshold is to appear in an SQR?

13        A.   I'm not sure whether we offer that specific -- whether

14   we offer that specific number.  We certainly communicate that

15   there is a minimum threshold, and that it's for the purposes of

16   protecting user privacy.

17        Q.   And I guess that's my question.  Do the advertisers

18   know what the minimum threshold is, do they have any idea?

19        A.   I'm not sure.  I know that they know that we do have a

20   minimum threshold to protect user privacy, we make that very

21   clear in the documentation.

22        Q.   Sir, during your testimony, you talked quite a bit

23   about Facebook, which is owned by Meta, correct?

24        A.   Yes.

25        Q.   Would you agree, sir, that one significant difference

1    is that Google search ads are returned in response to a user

2    query whereas Facebook ads are not?

3         A.  I don't know that it is a significant difference.  I

4    know that it's a difference.

5         Q.  Let me restate the question.  Sir, would you agree

6    that a significant difference between advertising on Google and

7    Facebook is that Google is in response to a query where

8    Facebook is not?

9         A.  That's the same question.  I don't know whether that

10   difference is significant to advertisers.

11        Q.  Sir, I didn't ask if it was significant to

12   advertisers, I'm asking it to you.  You as --

13        A.  Is it significant to me?

14        Q.  Sir, let me re-ask the question.  You, as VP and GM of

15   search ads, do you believe that a significant deference between

16   Facebook and Google advertising is that Google ads are in

17   response to a user query and Facebook's are not?

18        A.  I do not believe it to be a significant difference.

19        Q.  Sir, if you could take a look at your deposition.

20   We're looking at your September 28th deposition, which should

21   be in the binder in front of you.  September 28, 2020, lines --

22   page 78, line three to line nine.  Let me know when you're

23   there, sir.

24        A.  Can you repeat that, please?

25        Q.  Certainly.  September 28th, 2020, page 78, line three

1    through 78, line nine.

2         A.   Yes.

3         Q.   Sir, on September 28th, were you asked the following

4    question and did you give the following answer:

5         "Question:  One significant difference between Facebook

6    and Google's advertising is that Google's SERP advertising is

7    in response to a query whereas Facebook's is not; is that

8    correct?"

9         "Answer:  Google -- that's a statement that I made before,

10   yes."

11        Did you give that -- were you asked that question and did

12   you give that answer?

13        A.   Yes.

14        Q.   Thank you, sir.  If we could turn to one of the

15   documents that your counsel used with you -- and if I can

16   request leave of defense team, DX164.  DX164.  This is a

17   document your counsel showed you, and it's entitled Facebook

18   Update.

19        Do you see that?

20        A.   Yes.

21        Q.   If we could turn to slide 42, which has a Bates stamp

22   ending 064.  Let me know when you're there.

23        A.   Yes.

24        Q.   On page 42, I'm focused on the comments in the bottom.

25   On the second line it says, "M search."  Is that a reference to

1    mobile search, or Google Mobile search?

2       **A.**  Yes.

3       **Q.**  And there's a reference of FB.  Is that a reference to

4    Facebook?

5       **A.**  Yes.

6       **Q.**  The slide states:  "M search vs. Facebook are not

7    directly comparable.  There are fundamental differences in the

8    biz."

9       Do you see that, sir?

10      **A.**  I do.

11      **Q.**  Do you agree that mobile search with Google and

12   Facebook are not directly comparable because there are

13   fundamental differences in the businesses?

14      **A.**  Let me read the full text of this comment.

15      **Q.**  Please.

16      (Witness reviews document)

17      **A.**  The point that the author is making is that Google

18   pays out TAC, traffic acquisition costs, whereas Facebook does

19   not.  So that would be a difference, that we pay out a traffic

20   acquisition cost but Facebook does not.

21      **Q.**  Sir, let me re-ask my question.  Do you agree that

22   mobile search on Google and Facebook are not directly

23   comparable because there are fundamental differences in the

24   business?

25      **A.**  Only on the aspect of traffic acquisition costs do I

1    agree.

2         Q.   And Google pays through TAC its partners in order to

3    receive internet traffic, correct?

4         A.   In some cases, yes.

5         Q.   And are you aware if Facebook pays for traffic

6    acquisition costs?

7         A.   I do -- I believe they do in some cases, but I'm not

8    sure it's as pervasive as it is for Google.

9         MR. DAHLQUIST:   We can put that document aside.   Thank you

10   very much.   If we could switch over to our side, we're going to

11   show a few documents on our side.

12        THE COURT:   Can I ask a quick question.   You've discussed

13   a query as essentially a signal that Google receives of user

14   intent.   What is the comparable signal that the social media

15   apps receive for ad placement?

16        THE WITNESS:   There are several different signals.   One is

17   the one that I described where -- let's say that you go onto

18   Adidas' website and you're looking for shoes.   Adidas would

19   then share that information with Facebook, along with the user.

20   The user would know that the -- Facebook would know that the

21   user is in market for shoes.   They would make that available to

22   Adidas, and then also they might make it available to a

23   competitor like Nike.   The other way is through the content

24   that the user engages with on the site.   So if they are looking

25   at content that's related to a particular domain, then either

1  explicitly or implicitly they would develop a graph of

2  interests for the user, and they would use that for targeting.

3  And the combination of those two things has created extremely

4  effective advertising that works for a large number of

5  advertisers.

6  THE COURT:  So just to use a personal example, my

7  daughter, who's 16, likes to look at people who are sort of

8  makeup artists on TikTok.  TikTok will be able to understand

9  that and therefore present her with makeup/cosmetic related

10  ads?

11  THE WITNESS:  Correct, that would -- and by having

12  relevant ads for the specific types of makeup that she's

13  looking at, based on their understanding of the user, it would

14  increase her propensity to purchase.

15  THE COURT:  Gotcha.  Okay, thank you.

16  BY MR. DAHLQUIST:

17  Q.  Thank you, Your Honor.

18  Continuing on with intent.  A user query is an example of

19  a direct intent into Google, correct?

20  A.  I'm not sure what you mean by a direct intent.

21  Q.  Sure, let me restate the question.  We talked

22  yesterday, and in the Court's question, about examples of user

23  intent.  There's commercial intent, there's a user query

24  intent, and different levels of user intent, correct?

25  A.  I'm not sure what you mean by levels of user intent.

1       **Q.**   Have you ever used the terms of high intent or low

2   intent with respect to an intent of a purchaser or a user to

3   actually purchase a product?

4       **A.**   Yes.

5       **Q.**   And in that reference, is there a difference between a

6   high intent and a low intent with respect to a user query in --

7   at Google?

8       **A.**   A high -- can you restate your question?

9       **Q.**   Let me restate the question.  A search in Google.com

10   is an indicator of high user intent with respect to a future

11   purchase or interest in a product, correct?

12       **A.**   If it's a commercial query that is directly related to

13   a product or service, then it may be high intent.  However,

14   there are also queries that are more general in nature that may

15   not necessarily have a high intent.

16       **Q.**   And how would you compare the user intent between a

17   search in Google versus a Facebook ad?

18       **A.**   Well, Facebook ads can often be very high intent by

19   the mechanism that I just described.  So if a user has gone

20   directly onto Adidas and they're looking for a specific

21   product, and then Facebook knows that they are in the mindset

22   for shopping, then that's extremely high intent, which is why

23   Facebook is able to be so effective.

24       **Q.**   Sir, if we could show you UPX423.  This is in your

25   binder from yesterday.  It will be on the screen as well, but

1    it will be in your binder as well.  But I really want to focus

2    on your e-mail at the very top.  Let me know when you've found

3    it, 423.

4         **A.**  UPX?

5         **Q.**  UPX423.

6         **A.**  I have 461, 489.

7         **MR. SCHMIDTLEIN:**  Yeah, I don't have that one in my

8    binder.

9         **MR. DAHLQUIST:**  Apologies.

10        **THE WITNESS:**  Yeah, I don't have it in my binder I'm

11   afraid.

12        **MR. DAHLQUIST:**  That's why we have another copy; this is

13   redundancy.  Your Honor, permission to approach?

14        **THE COURT:**  You may.

15   **BY MR. DAHLQUIST:**

16        **Q.**  Sir, if you'd take a look at UPX423.  Do you have it

17   now?

18        **A.**  Yes.

19        **Q.**  UPX423 is an e-mail chain from December of 2018.  The

20   title is Re: Tech Crunch - Facebook Relaunches Search Ads to

21   Offset Slowing Revenue.  Do you see that?

22        **A.**  Yes.

23        **Q.**  And it's an e-mail chain that was forwarded to you,

24   and there's an article with that same title.  Do you see that

25   in the e-mail chain?

1    A.   Yes.

2    Q.   And in response, you sent an e-mail to Ms. Joan

3    Braddi.  Who is Joan Braddi?

4    A.   Joan Braddi is one of our partnerships executives.

5    Q.   And at the very top, I'd like to focus on your e-mail

6    where you said:  "Yep, this article is making the rounds.

7    Seems like small money due to low intent today, but will

8    monitor closely."

9    Do you see that?

10    A.   I do.

11    Q.   Sir, do you agree that Facebook, at least as of this

12    e-mail in 2018, was indicative of low intent?

13    A.   Absolutely not, because the e-mail was talking

14    specifically about the Facebook search feature, as you can see

15    in the body of the e-mail.  The Facebook search feature is

16    designed primarily for people to search for users.  Facebook is

17    a high intent property, but the activity of searching on

18    Facebook was low intent at the time that the article was sent

19    around.  So I didn't think it would be a big component of their

20    large and growing ad business.

21    Q.   Do you believe that searches on Google have a higher

22    or lower intent than searches on Facebook?

23    A.   I would say that on average, they have a higher intent

24    than searches on Facebook, because Facebook has many other ways

25    to get intent.  The search feature is just not very important

1    on Facebook for searching for products or services or other

2    commercial things.

3        Q.   Thank you, we're done with that document.  Sir, you

4    also talked about competition with Amazon.  Sir, would you

5    agree that Google provides users with a broader selection by

6    offering a full selection of what's available on the internet

7    in comparison to Amazon where you can only look at the results

8    that are available on Amazon?

9        A.   In some cases, Google has a broader selection.  In

10   other cases, Amazon has a broader selection.

11       Q.   Sir, do you agree that Google provides users with a

12   broader selection, the full selection of the web, while on

13   Amazon you're only able to view the results available on

14   Amazon; yes or no?

15       MR. SOMMER:  Objection, asked and answered.

16       THE COURT:  I don't think he answered it.  You can answer

17   the question.

18       THE WITNESS:  Google offers the full web, to the extent

19   that Google has access to it.  Amazon offers the products that

20   are available at Amazon.  It's possible that some products

21   available at Amazon are not available via Google's access on

22   the web, and Amazon may have their own unique inventory.  I'm

23   not a hundred percent sure, so I can't directly address your

24   statement.

25   BY MR. DAHLQUIST:

1        Q.   Sir, I'll ask one more time.  Do you agree that users

2    on Google have available to them a broader selection, the full

3    selection of the web -- to the extent it's available, however

4    users on Amazon can only view the results that are available on

5    Amazon; yes or no?

6        MR. SOMMER:  Objection, same objection.

7        THE COURT:  Well, that one I think he did answer, so ask

8    the next question.

9    BY MR. DAHLQUIST:

10       Q.   Thank you, Your Honor.  I will move on.

11       We talked a little bit before about shifting advertising

12   budgets.  Advertisers that shift their advertising budgets from

13   Google to Amazon are principally related to retail goods or

14   products, correct?

15       A.   Primarily retail goods or products, but also consumer

16   packaged goods companies as well as some media and

17   entertainment companies have shifted budgets to Amazon for

18   promotion for movies and things of this nature.  But Amazon's

19   ad business is growing and diversifying -- they have media

20   assets, and that's leading to a broader swath of advertisers

21   using Amazon for advertising.

22       Q.   And the retailers or the consumer packaged goods are

23   where they would appear on Google on the shopping ads portion

24   of a search ad?

25       A.   In some cases shopping ads, in some cases text ads

1    actually.  For the manufacturers, they would buy primarily text

2    ads, because they typically don't have a retail presence there,

3    they're manufacturers.

4        Q.  Sir, you're aware of some retailers that do not

5    advertise on Amazon, correct?

6        A.  Yes.

7        Q.  But do advertise on Google, correct?

8        A.  Yes, and some retailers who advertise on Amazon don't

9    advertise on Google.

10        Q.  You talked about some advertisers that have shifted

11   their budgets.  However, would you agree that you're not aware

12   of an advertiser that is interested in terminating their

13   advertising on Google in favor of Facebook or Amazon, but

14   rather they're working to come up with complementary strategies

15   that include both; isn't that correct?

16        A.  I know of advertisers who have dropped Google ad spend

17   to focus on Facebook.  And I believe I know of at least one

18   consumer packaged good manufacturer who stopped spending on

19   Google in favor of investing in Amazon.

20        Q.  And I believe with respect to your first element of

21   Facebook, at your deposition we talked about this, and you

22   could not recall the names of any advertisers that had made

23   that full shift from Google to Facebook, correct?

24        A.  That's correct.

25        Q.  Since the time of your deposition, have you recalled

1    what the name of any advertisers were?

2         A.   No, but I talk to hundreds of advertisers a year.  I

3    know of advertisers who have told us this:  Hey, we're not able

4    to achieve our ROI targets on Google, and so we're going to

5    focus our spend on Facebook.

6         Q.   And out of those hundreds of discussions, you can't

7    remember one today that moved all of their advertising from

8    Google to Facebook, correct?

9         A.   I can't remember the name of an advertiser; I'm sure

10   you could find one.

11        Q.   If we could put up UPX436.  Sir, this should be in

12   your binder.  If it's not, let me know and I'll get you another

13   one.

14        A.   UPX436 --

15        Q.   436.

16        A.   -- is not in my binder.

17        MR. DAHLQUIST:  Okay, apologies.  This is my fault, Your

18   Honor.  Permission to approach?

19        THE COURT:  You may.

20   BY MR. DAHLQUIST:

21        Q.   Apologies, Your Honor.

22        With respect to UPSX436, it is in evidence.  And the last

23   one that I did, UPX423, was in evidence as well.  I apologize

24   for not stating that at the onset.

25        Sir, you have before you UPX436, which is a February 2020

1    e-mail chain.  Do you see that?

2         A.   Yes.

3         Q.   And, again, this is another e-mail exchange between

4    you and Ms. Braddi, correct?

5         A.   Yes.

6         Q.   And the title of the e-mail at the very top is about

7    earnings, correct?

8         A.   I think this is related to -- I believe that this

9    thread is related to an analyst report or something -- no, it's

10   a Seeking Alpha article, which was an editorial report on

11   Alphabet's earnings.

12        Q.   If we can go to the second page, I want to focus on

13   your e-mail down at the bottom.  So UPX436, Bates number 1005.

14   Do you see that?

15        A.   Okay.

16        Q.   There's an e-mail from you on February 26, 2020.  See,

17   "Jerry Dischler wrote"?

18        A.   Yes.

19        Q.   And in this e-mail you state:  "Amazon is growing in

20   advertising.  Based on the best analysis we have, most of this

21   is offline co-op spend coming online, not cannibalizing us."

22        Do you see that, sir?

23        A.   I do.

24        Q.   And do you agree that as of this e-mail in 2020, much

25   of the analysis was showing that co-op spending was coming

1    online and not taking away ads from Google?

2         A.   No, I was actually wrong, and have become increasingly

3    wrong as Amazon's ad business had grown.

4         Q.   As of 2020, when you sent this e-mail, were you

5    correct that Amazon's ad business was not cannibalizing Google?

6         A.   No, I was wrong actually.  Folks did have evidence

7    that Amazon was cannibalizing Google to a greater extent than I

8    realized then.

9         Q.   When did you learn of that change?

10        A.   Probably a few weeks after this back and forth

11   interaction with Joan and McAteer.

12        Q.   Did you send an e-mail to Ms. Braddi and say:  I was

13   wrong?

14        A.   No, I mean, we just updated our materials, and we ran

15   an Amazon competitive analysis, as I think you saw elsewhere in

16   the binder.

17        Q.   And as we talked before, the next line states:  "There

18   is some degree of cannibalization from a slow shift of shopping

19   queries off Google and to Amazon."

20        Do you see that?

21        A.   I do.  But, in fact, that slow shift has turned into a

22   faster shift.

23        Q.   And is that in reference to shopping queries that we

24   were talking about, correct?

25        A.   That's correct.

1    Q.   This does not relate to text ads, your e-mail here,

2    correct?

3    A.   Well, I mean, if shopping queries are -- it would

4    relate to both text ads and product listing ads.  So on a

5    shopping query, we'll show text ads and product listing ads

6    with regard to the query.  And it would negatively affect both

7    text ads' revenue and product listing ads' revenue if fewer

8    people are querying with shopping intent.

9    Q.   Sir, today, does Google plan to continue selling both

10   text ads and shopping ads?

11   A.   Yes.

12   Q.   As separate categories?

13   A.   As in a separate category, what do you mean?

14   Q.   Separate products?

15   A.   Separate products, yes, although some shopping ads are

16   going to become part of Performance Max campaigns increasingly.

17   Q.   Understood.

18   THE COURT:  So what does co-op spending mean?

19   THE WITNESS:  Co-op spending is basically a manufacturer

20   allocates a certain percentage of their marketing spend to give

21   to retailers to advertise their products on their behalf.  And

22   the whole purpose of this e-mail thread actually was that

23   Amazon was going out to its advertisers and saying hey, we'll

24   buy Google ads on your behalf to drive traffic to Amazon so

25   that we can sell your products more effectively, which was sort

1    of a new motion for Amazon.  So we were trying to figure out

2    what to do with that behavior.

3        THE COURT:  Okay, thank you.

4        MR. DAHLQUIST:  Your Honor, at the time we have no further

5    questions, and we pass the witness to our friends at the

6    states.

7        THE COURT:  Mr. Cavanaugh.

8        **REDIRECT EXAMINATION OF JERRY DISCHLER**

9    BY MR. CAVANAUGH:

10       Q.  Good afternoon, Mr. Dischler.  Let's start with DX231.

11   If you folks could put that up, DX231.

12       A.  DX231, let me look for it.

13       Q.  And if you could turn to page 3570.  The heading of

14   this is GMV Drives Revenue, Ads Drive Profitability, correct?

15       A.  Yes.

16       Q.  GMV is gross merchandise value?

17       A.  Yes.

18       Q.  And underneath that in blue -- and I won't provide the

19   percentages --

20       THE COURT:  Mr. Cavanaugh, I'm sorry to interrupt you,

21   what page are you on again in DX231?

22       MR. CAVANAUGH:  3570, Your Honor.

23       THE COURT:  3570 is the Bates.  Okay, thank you.

24   BY MR. CAVANAUGH:

25       Q.  It states:  "Amazon captures nearly X percent of GMV,

1    the X fulfillment including less than X percentage from ads."

2        **A.**  Not less than, it's roughly.

3        **Q.**  So the minus, minus X?

4        **A.**  It's a tilde, 5 percent from ads.

5        **Q.**  Your eyes are younger than mine.  And the bar graph

6    provides the breakdown of where Amazon is capturing their GMV,

7    correct?

8        **A.**  It does, based on the date of the report which was

9    January 19th, 2021, based on our -- this is -- so this chart

10   is a --

11       **Q.**  Sir, I just asked you what the graph reflected.

12       **A.**  It doesn't reflect what you said.

13       **THE COURT:**  I'm sorry, it does or does not?

14       **THE WITNESS:**  It does not.

15   **BY MR. CAVANAUGH:**

16       **Q.**  What does it reflect?

17       **A.**  Amazon's selling fees, the fees that they capture as a

18   percentage of gross merchandise value.

19       **Q.**  And the red bar -- the red portion of that bar

20   reflects what advertising contributes to that, correct?

21       **A.**  Yes.

22       **Q.**  If you could turn to page 3572 in the same document.

23   This is ad revenue growth driven by merchants with GMV less

24   than $10,000,000?

25       **A.**  Yes.

1    Q.  And then the chart on the left hand side allocates

2    those merchants based on a dollar value; is that correct?

3    A.  Okay, yes.

4    Q.  And the heading above that is Amazon's Marketplace is

5    Skewered Towards SMB.  What is an SMB?

6    A.  A small or medium business.

7    Q.  And if we look at the columns on the left hand bar

8    graphs, that's 30 percent are less than $1,000,000?

9    A.  30 percent of revenue is from sellers who sell less

10   than .1 million in GMV.

11   Q.  Oh, .1 --

12   A.  -- according to --

13   Q.  So that would be a hundred thousand dollars?

14   A.  That's correct.  This is according to this analysis.

15   I'm not sure of the provenance of the analysis, but that's --

16   but that's what it's saying.

17   Q.  And if you'd turn to the next page, 35 -- oh, sorry.

18   THE COURT:  GMV stands for, one more time?

19   THE WITNESS:  Gross merchandise value.  I mean, it's

20   basically how much are they selling on the platform, right.  So

21   if they sell less than a hundred thousand dollars on the

22   platform, that's an estimated 30 percent of their -- actually,

23   let me correct my statement.  30 percent of their marketplace

24   revenue -- not their ad revenue, 30 percent of their

25   marketplace revenue is coming from sellers that sell less than

1    a hundred thousand dollars in goods on the platform based on

2    this source.

3    **BY MR. CAVANAUGH:**

4        Q.   Right.  And if we could turn to 3573, following up on

5    some questions you were asked about whether the merchants do or

6    do not have websites.

7        The bar graph on the left hand side provides the

8    breakdown, does it not?

9        A.   It provides the breakdown in percentage of merchants,

10   not necessarily in percentage of advertising revenue.

11       Q.   Thank you.  And the blue represents marketplace

12   websiteless merchants, correct?

13       A.   Yes.

14       Q.   That's merchants that don't have their own websites?

15       A.   Yes, that's right.

16       Q.   And the red is the SMB sellers with websites?

17       A.   Yes.

18       Q.   So those, again, would be the small merchants?

19       A.   Small and medium merchants.

20       Q.   Small and medium merchants?

21       A.   Yes.

22       Q.   And those are the ones -- and they -- the red, they do

23   have websites?

24       A.   Yes.

25       Q.   And then that very narrow yellow line we see, those

1    are large retailers, correct?

2         A.   Yeah, large retailers who typically have websites.

3    This is the way that advertiser distribution works, the large

4    ones drive a large amount of revenue typically.

5         Q.   Let me ask you to turn to DX142, if you could put that

6    up.  Thank you.  And if you could turn to actually the second

7    page -- actually, it's not the second page, 7407.  I believe

8    your counsel showed you this with respect to query growth is

9    slowing.

10        The notes underneath that indicate that the long term

11   trend for commercial portion is slightly increasing, correct?

12        A.   Let me please...

13        (Witness reviews document)

14        A.   The full sentence says that there's a longer term

15   trend that's slightly increasing, but not enough to offset the

16   overall deceleration of queries.

17        Q.   That's interesting, sir, because you left out the

18   phrase after slightly increasing "which can be significant for

19   overall revenue"?

20        A.   Yes, that's -- I'm happy to give you the entire

21   phrase.  But it's not enough to offset the overall deceleration

22   of queries.  And they also mentioned that there was an uptick

23   due to the World Cup happening, so they're not sure whether

24   it's noise.

25        Q.   All right.  And if you could turn to 7429.  The goal

1    in 2019 was to increase commercial visits by 1.5 percent,

2    correct?

3        **A.**   Yes.

4        **Q.**   And am I correct that search -- based on documents we

5    looked at yesterday, search ad revenue grew from 2018 to 2019?

6        **A.**   It did.

7        **Q.**   And search ad revenue grew from 2019 to 2020, did it

8    not?

9        **A.**   It did.

10       **Q.**   And in 2022, you had record search ad revenue, did you

11   not?

12       **A.**   Record means that it grew from 2021?

13       **Q.**   No, meaning your highest ever?

14       **A.**   I believe that to be the case.

15       **Q.**   Google does not show display ads on the search engine

16   results page, correct?

17       **A.**   Correct.  I've answered that before.

18       **Q.**   It shows text and PLAs?

19       **A.**   It shows a number of formats that I enumerated before

20   in my testimony.

21       **Q.**   Now, if Google wanted to show display ads on the SERP,

22   it could do that, right?

23       **A.**   I --

24       **Q.**   Yes or no?

25       **A.**   Sure.

1    Q.   Thank you.  I'll take that as a yes.  Now, you were

2    asked some questions about RGSP and squashing by your counsel?

3    A.   I was.

4    Q.   Do you recall that?

5    A.   Yes.

6    Q.   And if I understood your testimony correctly, Google

7    wants to avoid a winner-take-all approach to its ad auctions,

8    correct?

9    A.   We'd like to, yes.

10   Q.   And Google thinks that changing the results not to

11   have the highest bidder with the highest quality advertiser win

12   the auction is appropriate, right?

13   A.   No.  What it's saying is that there are limitations in

14   our quality system based on its current algorithm.  And by

15   updating the algorithm to create slightly more variety, we may

16   be able to offer higher quality results to the user.

17   Q.   But the result in those instances is that the highest

18   bidder with equal or comparable quality of its ad is not the

19   auction winner in those instances?

20   A.   Based on the quality function that we know has some

21   downsides, and therefore we've updated the quality function in

22   order to allow for randomization in one case and squashing in

23   the other case.  So like comparing a historical quality

24   function to a current quality function saying the historical

25   one is perfect, I think, is an unfair characterization.  We're

1    always updating our quality function in service of the user, so

2    we believe that it is likely to lead to better quality, and the

3    experimental results prove that out.

4        Q.   But the result of what Google does is that the highest

5    bidder with comparable quality of ad is not the auction winner?

6        A.   Not necessarily.  It may be that they have a higher

7    quality ad, that's why we're testing.

8        Q.   And if they have a -- if they have a higher quality

9    ad, can they still lose?

10       A.   I'm not sure what you mean.  The entire process of

11   doing randomized GSP is to try to assess the quality of both ad

12   candidates.

13       Q.   So if you have comparable ads and someone puts in a

14   higher bid, they're not guaranteed to win?

15       A.   It's possible that their ad will show in second place

16   as the result of the RGSP mechanism a small percentage of the

17   time in order for us to learn what is actually the highest

18   quality ad.

19       Q.   And Google has done that for a number of years?

20       A.   A few years since RGSP launched.

21       Q.   And nothing has prevented Google from doing that?

22       A.   That's correct.

23       Q.   Turning to SA360 for a moment.  Google can look at

24   demand for a Google feature on its native tool to see -- to

25   assess how interested advertisers would be in a comparable

1   feature in a comparable native tool, correct?

2      A.   We can, but we often augment that by asking our

3   advertisers what features they would like.

4      Q.   And you do that through your salespeople?

5      A.   Yes, we do it through our salespeople as well as our

6   product managers will interact with advertisers.

7      Q.   And the salespeople make their commissions on sales of

8   Google ads?

9      A.   No, actually the salespeople who are responsible for

10  Search Ads 360, I believe they -- in fact, I'm not even sure if

11  they're commissioned.  They certainly are not commissioned on

12  Google ads, it's based on advertiser success outcomes with the

13  platform product.

14     Q.   Well, one of the things you would look for is feedback

15  from your salespeople who are selling Google ads, correct?

16     A.   Not to my knowledge actually, it's the people who are

17  selling Search Ads 360.  We try to segment that so that we

18  don't create perverse incentives.  We want people to have good

19  outcomes for the tool.

20     Q.   Could you turn to DX120A, and if you could turn to

21  A.014.  Drawing your attention to, under hard cuts:  Bing

22  RLSA/DSA?

23     A.   Yes.

24     Q.   DSA refers to dynamic search?

25     A.   Dynamic search ads.

1    Q.   And RLSA stands for what?

2    A.   Remarketing lists for search ads.  Those are two

3  features that we implemented in our tool that then Bing

4  subsequently implemented in their tool.

5    Q.   And there was -- you were looking at being able to

6  implement that into SA360?

7    A.   That's correct.

8    Q.   But that didn't proceed at this time, right?

9    A.   No, it didn't, along with lots of other features,

10  including Google features.  However, the advertisers could use

11  those features, they would just do so using Microsoft's tool

12  rather than the SA360 tool.

13    Q.   That would require them to go to -- if they were going

14  through SA360, they would then also have to go to the Microsoft

15  native tool, thereby going through two different channels,

16  correct?

17    A.   That's correct.  And advertisers will -- a typical

18  advertiser will -- I mean, we're not perfect, they'll have to

19  use the other channel tools, including Google Ads sometimes, in

20  order to do their daily jobs.

21    Q.   Now, if I look in the third column:  Additional

22  possible cuts that weren't feasible.  So the Bing RLSA/DSA,

23  those were feasible in 2018, correct?

24    A.   Hold on.  Oh, you mean you're saying that this was a

25  hard cut.  I believe that this, in fact, was a hard cut, along

1    with AdWords Universal App Campaigns and lots of other cuts.

2    We only have a certain number of people on the team who can

3    build features.  We prioritize them based on advertiser

4    feedback and our own ability to handle the load.  In some

5    cases, things will be below the line, including features for

6    Facebook and AdWords and Bing.  This happens to be a Bing

7    feature that was below the line.

8         THE COURT:  I'm sorry, can you back up to what bullet

9    point you're on?  I just lost your --

10        MR. CAVANAUGH:  Oh, sure.

11        THE COURT:  I'm sorry.

12        MR. CAVANAUGH:  That's fine, Your Honor.

13        THE COURT:  You were focused on RSA/VTA, is that where

14   you --

15        THE WITNESS:  Bing RLSA and DSA, which is in the middle

16   column about --

17        MR. CAVANAUGH:  On page 14, Your Honor.  You see under

18   hard cuts?

19        THE COURT:  I see, I'm sorry, yes.  I'm now with you.

20   Hard cuts, gotcha.  Sorry about that.

21        MR. CAVANAUGH:  Nothing further, Your Honor.  Thank you,

22   Mr. Dischler.

23        THE COURT:  Mr. Dischler, thank you very much for your

24   time and your testimony.  Safe travels home.

25        MR. DAHLQUIST:  Your Honor, if you'd give us a minute to

1   switch.

2       (Brief interruption)

3       **MR. JONES:**  Good afternoon, Your Honor.  Matthew Jones for

4   the United States.

5       **THE COURT:**  Good afternoon, Mr. Jones.

6       **MR. JONES:**  And just to let the Court know, we have just a

7   brief open session, and then we plan to get into documents that

8   Google designated as confidential.

9       **THE COURT:**  Okay.

10      **MR. JONES:**  The United States calls John Yoo.  Mr. Yoo is

11  the former finance manager for Android partnerships at Google.

12  And Google has agreed that we may treat Mr. Yoo as adverse.

13      **THE COURT:**  Okay.

14      **MR. JONES:**  May I approach with binders?

15      **THE COURT:**  Sure.

16      **DIRECT EXAMINATION OF JONATHAN YOO**

17  BY MR. JONES:

18      **Q.**  Good afternoon, Mr. Yoo.  Would you please state and

19  spell your name for the record.

20      **A.**  My full name?

21      **Q.**  Your full name.

22      **A.**  Jonathan Yoo, J-O-N-A-T-H-A-N, Y-O-O.

23      **Q.**  Sir, you worked at Google from 2016 until March of

24  this year, correct?

25      **A.**  Yes.

1     Q.   You started as the senior financial analyst for

2  Android partnerships?

3     A.   Yes.

4     Q.   In 2019, you were promoted to finance manager for

5  Android partnerships?

6     A.   I believe so.

7     Q.   In that role, you were the finance lead for Android

8  partnerships, correct?

9     A.   Yes.

10     Q.   Your responsibilities included conducting analyses of

11  Google's revenue share agreements with its Android partners,

12  correct?

13     A.   Yes.

14     Q.   Those analyses required you to be familiar with the

15  terms of those agreements?

16     A.   Generally, yes.

17     Q.   From time to time, you were consulted for analysis of

18  these agreements by various teams within Google?

19     A.   Yes.

20     Q.   You were consulted for a financial analysis by Jim

21  Kolotouros?

22     A.   Yes.

23     Q.   The Court heard from Mr. Kolotouros last week.  His

24  team negotiates Android deals, correct?

25     A.   Yes.

1    **MR. JONES:**  Let's pull up UPX141.  Your Honor, UPX141 is

2    in evidence.

3        **THE COURT:**  Okay.

4    BY MR. BENNETT:

5        **Q.**  Do you see the document in front of you, Mr. Yoo?

6        **A.**  Yes.

7        **Q.**  UPX141 is an e-mail that you sent to Jim Kolotouros,

8    Paul Gennai and others within Google on June 18th, 2018,

9    correct?

10       **A.**  Yes.

11       **Q.**  The subject line says:  Request from Phillipp?

12       **A.**  Yes.

13       **Q.**  Let's take a look at your initial e-mail at the bottom

14   of the second page, which has the Bates number ending in 945.

15       Sir, in this e-mail chain, you were helping prepare

16   materials in response to a request from Phillipp Schindler,

17   correct?

18       **A.**  Yes.

19       **Q.**  He's the chief business officer of Google?

20       **A.**  I'm not sure to his exact title.

21       **Q.**  He's a very senior executive?

22       **A.**  Yes.

23       **Q.**  And you understood Mr. Schindler here to be requesting

24   information on the MADA and the RSA, correct?

25       **A.**  Yes.

1    Q.   Those are two types of agreements that Google signs

2    with its Android partners?

3    A.   Yes.

4    Q.   Focusing on your e-mail at the top of the chain, you

5    sent links to two documents for Mr. Schindler, correct?

6    A.   Yes.

7    Q.   Let's take a look at what you sent.  Please flip to

8    the fourth page of the exhibit, which has the Bates number

9    ending in 815.  Are you with me?

10   A.   Uh-huh.

11   Q.   So this is the title page for a slide deck that's

12   called Android Agreements, Summary of Current MADA + RSA,

13   correct?

14   A.   Yes.

15   Q.   And this is one of the documents you sent for

16   Mr. Schindler?

17   A.   I believe so.

18   Q.   This presentation summarizes the MADA and the RSA as

19   of the time that you sent it, correct?

20   A.   No, this was an overview of general terms that we were

21   trying to secure, so perhaps closer to the templates.

22   Q.   Sure, so let's unpack that a bit.  So Google has

23   internal templates for the MADA and the RSA, correct?

24   A.   We put together general templates, so to speak, that

25   is the starting point for negotiations.  And then as

1    negotiations progress, you know, the terms may defer.

2        Q.   Google uses those templates to go out and negotiate

3    deals with Android partners, correct?

4        A.   With certain Android partners that we identify.

5        Q.   And understanding that there may be some variation

6    among agreements, what you were summarizing here for

7    Mr. Schindler were the MADA and RSA templates at this time,

8    correct?

9        A.   Yes.

10       Q.   And based on your work at Google, you understood that

11   Google had revenue share agreements with each of the major

12   distributors of Android phones in the United States, correct?

13       A.   The carriers, yes.

14       Q.   And the OEMs, correct?

15       A.   In the U.S. specifically, just because of the nature

16   of the market, the majority of the devices -- I would say

17   perhaps 80 percent, maybe 90 percent, is just distributed

18   through U.S. carriers which have their own sort of set of

19   contracts.

20       Q.   So let's move forward one page to the one with the

21   Bates number ending in 816, and if we can zoom in on the slide.

22       Sir, this slide is titled Key Partner RSA Overview.  Do

23   you see that?

24       A.   Yes.

25       Q.   And the column on the left lists Android distributors

1    that Google had rev share agreements with as of 2018, correct?

2        A.   Yes, although distributors, I'm not sure how you're

3    defining that.

4        Q.   Google had rev share agreements with the carriers and

5    the OEMs listed here on the left column, fair?

6        A.   Yes.

7        Q.   They're divided into carriers and OEMs, right?

8        A.   Yes.

9        Q.   And those are the two main categories of entities that

10   sell Android phones in the United States, correct?

11       A.   In the United States, again, it would be mostly these

12   U.S. carriers.

13       Q.   That's correct, in the United States, right?

14       A.   Yes.

15       Q.   Okay.  In the carrier section, if you look about seven

16   rows down, you include AT&T, and then close to the bottom you

17   include Sprint, T-Mobile and Verizon.  Do you see those?

18       A.   Yes.

19       Q.   At the time, those were the four major wireless

20   carriers in the United States, right?

21       A.   Yes.

22       Q.   T-Mobile and Sprint have since merged, right?

23       A.   Yes.

24       Q.   But at the time, those were the big four?

25       A.   Yes.

1    Q.   Google had rev share agreements with all of them,

2    right?

3    A.   Yes.

4    Q.   All right.  Let's move to the OEM section.  In the

5    list of OEMs, you include Samsung, LGE and Lenovo.  Do you see

6    those?

7    A.   Yes.

8    Q.   LGE has since exited the smartphone business?

9    A.   Yes.

10   Q.   But at the time, those were the three largest OEM

11   vendors of Android phones in the United States, correct?

12   A.   So as a device manufacturer, they were the

13   manufacturers with a lot of devices sold through U.S. carriers.

14   Although, in the U.S. specifically, a lot of the requirements

15   of what's on the phone is defined by the U.S. carrier deals and

16   what the U.S. carriers then negotiate with their OEM partners.

17   Q.   I understand that, sir.  We'll get to the requirements

18   on the phone.  My question for you now is that this list

19   includes the major OEM manufacturers of Android phones sold in

20   the United States, correct?

21   A.   Yes.

22   Q.   And Google had rev share agreements with all of them?

23   A.   Yes.

24   Q.   Based on your experience at Google, when these

25   companies sold Android devices pursuant to their rev share

1     agreements, those devices were also subject to a MADA, correct?

2          A.   Yes, an RSA is negotiated on top of the MADA.

3          Q.   Carriers themselves don't sign MADAs, correct?

4          A.   Yes.

5          Q.   But the devices that they sell are subject to the

6     MADAs of the underlying OEMs, correct?

7          A.   Yes.

8          Q.   So regardless of whether a carrier or an OEM is

9     selling the device, the OEM's MADA would apply, fair?

10         A.   Yes.

11         Q.   Let's take a look at a summary of terms you sent for

12    Mr. Schindler.  And the Court's already heard some testimony on

13    this topic, so I'll be brief.  The next page has the Bates

14    number ending in 817.  That's a slide with the title Current

15    MADA Terms, But Subject to Change in EEA Region.

16         Do you see that?

17         A.   Yes.

18         Q.   This title is noting that these requirements were

19    subject to change in the European Economic Area, right?

20         A.   Yes.

21         Q.   But the MADA terms on this slide were the ones that

22    were in the template for the United States when you sent the

23    document for Mr. Schindler, right?

24         A.   So we don't make a distinction about whether terms are

25    specific, especially in the MADA, for bound for the U.S.  But

1  these were the -- included in the MADA templates that were then

2  subsequently negotiated.  But I will mention that Samsung, as

3  the largest OEM, had their own negotiated MADA.  This table,

4  from what I can recall, represents the majority of the template

5  that covered, you know, X Samsung OEMs.

6      Q.  And so the MADA template at this time had the terms

7  described on this page, fair?

8      A.  Yes, the template.

9      Q.  And the changes that you noted in the title applied to

10  the EEA region, not the United States, correct?

11      A.  Yes.

12      Q.  I'll direct your attention to the search column on the

13  left side.  Under the terms that you described for

14  Mr. Schindler, the MADA requires Google's search app to be

15  pre-loaded on the device, correct?

16      A.  Yes.

17      Q.  The MADA also requires Chrome to be pre-loaded on the

18  device, correct?

19      A.  Yes.

20      Q.  With its default search engine set to Google?

21      A.  Yes.

22      Q.  And under the MADA, Google's search widget must be

23  placed on the device's default home screen, right?

24      A.  Yes.

25      Q.  And these MADA requirements apply regardless of

1    whether there's also an RSA in place, correct?

2         A.   Sorry, rephrase the question, please.

3         Q.   The MADA requirements listed here -- to the extent

4    they're in a MADA with a particular OEM, these requirements

5    apply regardless of whether there's an RSA in place, right?

6         A.   I'm not exactly understanding your distinction there.

7    But a MADA would be in place, and then an RSA might be

8    negotiated with certain partners on top of that.

9         Q.   Well, isn't an RSA always in place when a MADA is in

10   place?

11        A.   No, there are MADA devices without an RSA.  So a MADA

12   might be the superset, and then RSA might cover some devices.

13        Q.   And if only a MADA's in place and not an RSA, these

14   requirements still apply, right, to the extent that they're in

15   the MADA?

16        A.   The template, and then they're negotiated with each of

17   the partners.

18        Q.   And to the extent that these template terms were

19   incorporated into a particular MADA, they would apply

20   regardless of whether there was also an RSA in place?

21        A.   Yes.

22        Q.   When a device is subject to both a MADA and an RSA,

23   additional requirements apply on top of the ones in the MADA,

24   correct?

25        A.   Yes.

1    Q.  Let's turn forward one page to the slide with the
2    Bates number ending in 818.  Mr. Yoo, this slide summarizes the
3    terms in the RSA template as of the time you sent the document
4    to Mr. Schindler, correct?
5    A.  For generally outside of Samsung.  And I can't recall
6    exactly if these are the templates for the U.S. carriers.
7    Q.  These are the terms that you sent to Mr. Schindler on
8    a slide entitled Current RSA Terms, right?
9    A.  They were meant to represent I guess the averages of
10   the devices that covered -- that were covered in our ecosystem.
11   However, each negotiation yielded different results.  So we
12   tried to capture a lot of the -- I suppose the majority of the
13   devices in the ecosystem.  However, with U.S. carriers
14   specifically, there's a longer history of negotiation and
15   relationship, so there might be differences in individual
16   agreements.
17   Q.  Understanding there may be some variation from
18   agreement to agreement, these were the requirements and the
19   averages on the slide that you put together for Mr. Schindler,
20   correct?
21   A.  Yes.
22   Q.  Let's take a look again at the search column on the
23   left hand side.  Under the terms that you described for
24   Mr. Schindler, in the United States, the RSA requires device
25   exclusivity, correct?

1    A.   Exclusivity until the device is essentially turned on

2    by the user.  And then after the user gets the device, they're

3    free to change everything.  But up to the out-of-the-box

4    experience, from what I recall in the U.S., there was

5    exclusivity.

6    Q.   Under an RSA with device exclusivity, as you note

7    here, the device can't have any alternative search services

8    pre-installed, correct?

9    A.   Device exclusivity, so up until the out-of-the-box

10   experience, yes, there were no other alternative services that

11   could be pre-loaded.

12   Q.   In fact, there can't be any other alternative services

13   pre-installed under device exclusivity, right?

14   A.   The -- so over time -- I can't remember at this time

15   exactly, there were different exceptions provided as well.  So

16   it's not the like never no other apps.  However, in the

17   template of what represented I guess the averages of the

18   devices globally, there were exclusivity provisions on the

19   device up until the out-of-the-box.

20   Q.   And those agreements that had device exclusivity

21   prevented alternative search services from being pre-installed

22   on those devices, correct?

23   A.   Alternative services as defined by the contracts, yes.

24   Q.   Thank you, sir.  Now, under the template RSA terms

25   that you set out for Mr. Schindler, Google's search must also

1    be the default on all access points, right?

2         A.   Yes.

3         Q.   That includes being set as the default search engine

4    on any pre-loaded web browser, right; that would be an access

5    point?

6         A.   Yes.

7         Q.   And, again, under the terms that you set out for

8    Mr. Schindler here, Chrome must be in the hotseat and set as

9    the default browser, correct?

10        A.   Yes, in this template.

11        Q.   And when a device is subject to both a MADA and an RSA

12   that includes these terms, these requirements apply on top of

13   the requirements of the MADA, correct?

14        A.   How I thought about it was that the MADA is a package

15   of apps that an OEM can decide to sign and get on their phone,

16   and then the RSA would get additional affordances.  We prefer

17   placement, such as Chrome in the hotseat or other requirements

18   like security UX.

19        Q.   And we just saw search related-requirements from the

20   MADA template, correct?

21        A.   Yes.

22        Q.   And when a device is subject to a MADA with those

23   requirements and an RSA with these requirements, both sets of

24   requirements apply, correct?

25        A.   Yes.

1    Q.   Thank you.  Let's turn forward one page to the slide

2  with the Bates number ending in 819.  Sir, this is a slide

3  titled Screenshots of Current MADA and RSA Requirements,

4  Subject to Change.

5    Do you see that?

6    A.   Yes.

7    Q.   This slide shows screenshots of two different default

8  home screens?

9    A.   They were -- I can't recall if these were taken from

10  specific devices or if we had sort of put icons together to

11  present a visual aid.

12    Q.   They may just be hypothetical default home screens,

13  fair?

14    A.   They could be, yes.

15    Q.   The screenshot on the left shows a home screen for a

16  hypothetical Android device that's covered only by a MADA,

17  correct?

18    A.   Yes.

19    Q.   And the screenshot on the right shows an example home

20  screen for an Android device that's covered by both a MADA and

21  an RSA, correct?

22    A.   Yes.

23    Q.   Next to each screenshot, the slide lists some

24  requirements in green and some risks in red.  Do you see that?

25    A.   Yes.

1    Q.   And there are green and red boxes on the parts of the

2    screenshots that correspond to those requirements and risks,

3    correct?

4    A.   Yes.

5    Q.   On the left, there are three items written in red text

6    next to the screenshot of the MADA only device.  Do you see

7    those?

8    A.   Yes.

9    Q.   Those were identified as risks of being covered only

10   by a MADA and not an RSA, correct?

11   A.   Yes.

12   Q.   They all involve ways that a rival search engine or

13   browser could be pre-loaded on the device, correct?

14   A.   So they were examples of other apps that could be

15   pre-loaded on a MADA device that we considered might have a

16   certain -- yes, what we identified as potential risks.

17   Q.   The apps discussed in these three items include

18   Microsoft Edge, Microsoft Bing and Cortana, correct?

19   A.   Yes, those are the examples that we chose.

20   Q.   Those are Microsoft's browser, search engine and

21   virtual assistant?

22   A.   Yes.

23   Q.   You identified these as risks in the document you sent

24   for Mr. Schindler, correct?

25   A.   Yes, risks.

1    Q.  Thank you, sir.  Now, the RSA removes these risks,

2    fair?

3    A.  Not necessarily.  It was -- so this is, before a

4    device is turned on and in the hands of the user, what is

5    pre-loaded.  And risk is -- you know, we can think of risk in a

6    number of different ways.  Sometimes it's possible impact to

7    let's say a user experience risk.  Like, for instance, like

8    having two widgets on a device could be confusing for a user.

9    When we were looking at this at the time, we were considering,

10   okay, how do we compete better with iPhones, for instance.  And

11   we did research to understand what users want from a user

12   experience perspective.  One of those things identified was

13   that an iPhone has a clean, sort of predictable interface in

14   each iteration of the device in any device that you can buy.

15   And having two widgets here or two browsers or anything like

16   that constituted some sort of risk that we thought of, whether

17   it was user experience or otherwise.

18   Q.  Sir, I'm not asking you about iPhones, I'm asking you

19   the three risks that are listed next to the MADA only

20   screenshot are not listed next to the RSA screenshot, correct?

21   A.  Yes.

22   Q.  There are no risks listed next to the RSA screenshot?

23   A.  Well, I think it's important to understand what we

24   meant in context of risk.  Because, yes, those three words

25   aren't in red on the right side, but the term risk we thought

1  of as having a variety of different components to it.

2      **Q.**  Bing could not be pre-loaded on the RSA device because

3  it has device exclusivity, correct?

4      **A.**  So it depends on the geography and the agreement.

5      **Q.**  Under the terms that you described for Mr. Schindler,

6  the RSA requires device exclusivity?

7      **A.**  Well, for this template, yes.

8      **Q.**  And Bing being pre-loaded on the device, which is

9  listed next to the MADA screenshot, is not listed as a risk

10  next to the RSA screenshot?

11      **A.**  If we're just talking about the lists here, then, yes,

12  it's not on the right side.

13      **Q.**  In fact, there's a requirement listed next to the RSA

14  screenshot that says no third-party search, right?

15      **A.**  Yes.

16      **Q.**  And that's because, under these terms, a third-party

17  search service could not be pre-loaded on an RSA device, right?

18      **A.**  So this is a very simplified view of search.  Like,

19  for instance, on some RSA devices Amazon was pre-loaded, for

20  instance, or perhaps Yelp or any of those sort of apps.

21  However, in the interest of simplicity for this slide, we took

22  some simplifying assumptions and tried to communicate what we

23  were considering or what was -- what we thought were ways to

24  better compete with like an iPhone, because we were -- our

25  share was declining at this point.

1    Q.   I'm not asking you about iPhones.  In the slide that
2    you sent for Mr. Schindler, it says no third-party search next
3    to RSA, right?
4    A.   Yes, it says no third-party search on it.
5    Q.   Okay.  And based on your work at Google, you
6    understand that the reality is that nearly all Android
7    smartphones sold in the U.S. are subject to both a MADA and an
8    RSA, correct?
9    A.   Yes.
10   Q.   Okay.  With that understanding, let's focus for a
11   moment on the hypothetical MADA-only device on the left.
12       There's a bar across the top, and that's the Google search
13   widget, right?
14   A.   Yes.
15   Q.   It says QSB.  That stands for quick search bar, or do
16   I have that wrong?
17   A.   Quick search bar or query search bar, I can't
18   remember.
19   Q.   Either way, that's the widget?
20   A.   That's the widget, yes.
21   Q.   And there's also a second Bing widget in the middle of
22   the screenshot, right?
23   A.   Yes.
24   Q.   And there's a comment bubble next to that one that
25   says:  Allowed, but not likely.  Do you see that comment

1    bubble?

2         **A.**   Yes.

3         **Q.**   This is saying that even for a hypothetical device

4    subject only to a MADA, an OEM would be unlikely to install a

5    second widget on the home screen, correct?

6         **A.**   Again, from the angle of like a user experience for

7    these devices, what we understood and what we were trying to

8    convey here was that OEMs want to sell devices, they want to be

9    competitive.  And we thought that having two widgets was a

10   little too much, so that OEMs are not likely to put two widgets

11   on a device.

12        **Q.**   The Google widget's already required, right?

13        **A.**   Google widgets are required under the MADA.

14        **Q.**   So if an OEM also installed a Bing widget or a

15   DuckDuckGo widget, there would be two, right?

16        **A.**   There could be two, yes.

17        **Q.**   You're not aware of any Android smartphone sold in the

18   U.S. that have two widgets side by side on the default home

19   screen, are you?

20        **A.**   I'm not aware of any.

21        **Q.**   No further questions on the document, sir.  Can we

22   pull up UPX129, and we'll go straight to page four which has

23   the Bates number ending in 905.  The Court saw this slide

24   during Mr. Kolotouros' testimony, and I'd just like to briefly

25   follow up on it.

1        A.   Sorry, which page?

2        Q.   905.

3        A.   Okay, thank you.

4        Q.   Mr. Yoo, you recognize this slide as depicting the

5    requirements of the MADA as of 2019, correct?  And I'll save

6    you some time, the top says MADA v.2019.  Do you see that?

7        A.   Yes.

8        Q.   There's a large logo on the left.  Do you see that

9    one?

10       A.   Yes.

11       Q.   That's for the Play Store?

12       A.   Yes.

13       Q.   There are a bunch of smaller logos on the right.  Do

14   you see those?

15       A.   Yes.

16       Q.   Those are for the apps that are part of the GMS

17   bundle, correct?

18       A.   Yes.

19       Q.   In order to put the Play Store on its devices, an OEM

20   must sign a MADA, correct?

21       A.   In order to have access to the licenses for all of

22   these apps, they have to sign the MADA.

23       Q.   And that includes the Play Store?

24       A.   Which includes the Play Store, yes.

25       Q.   So if an OEM wanted to put the Play Store on its

1    device, it would need to sign a MADA, correct?

2        A.   Yes.

3        Q.   And if an OEM signs the MADA and puts the Play Store

4    on its device, the OEM must also pre-load the apps in the GMS

5    bundle on the right, correct?

6        A.   Yes.

7        Q.   One of those is the Google Search app which includes

8    the widget?

9        A.   Yes.

10       Q.   Another app in the GMS bundle is Chrome?

11       A.   Yes.

12       Q.   And, sir, based on your work at Google, you understand

13   that if an OEM selling devices in the U.S. wanted to include

14   the Play Store on those devices but not the Google Search app

15   or Chrome, it could not do so, correct?

16       A.   They could negotiate with us for a different MADA.  I

17   mean, that was totally possible.

18       Q.   Sir, is your testimony that if an OEM selling devices

19   in the U.S. just wanted to include the Play Store on those

20   devices but not the Google Search app or Chrome, it could do

21   so?

22       A.   These were negotiated agreements with our OEMs, so it

23   could come out in negotiations.

24       Q.   Sir, do you recall I took your deposition in this

25   case?

1      **A.**  Yes.

2      **Q.**  That was on March 30th and 31st of 2021?

3      **A.**  I can't recall the exact date, but it was...

4      **Q.**  I've handed you a copy of the transcript from the

5   deposition.

6      **A.**  Okay.

7      **Q.**  I'll correct myself, it was on March 30th and 31st of

8   2022.  It shows how long we've been at this.  If you could turn

9   to page 156, behind the first tab, please.  I'm focused on

10  lines 18 through 24 of page 156.  Are you with me?

11      **MR. BENNETT:**  Your Honor, objection, improper impeachment.

12  It's a consistent answer with the question and answer he just

13  gave here in court.

14      **THE COURT:**  Let me just take a look at it.

15      **MR. JONES:**  156, lines 18 through 24.

16      **THE COURT:**  Okay, I'll allow it.  I mean, I understand

17  what the issue is, but go ahead.

18  **BY MR. JONES:**

19      **Q.**  Sir, on March 30th, 2022, did I ask this question and

20  did you give this answer:

21      "Question:  If an OEM selling devices in the U.S. just

22  wanted to include the Play Store on those devices but not the

23  Google Search app or Chrome, it could not do so, right?"

24      "Mr. Greenblum:  Objection to the form."

25      "Answer:  In the current MADA form, no, they could not do

1    that."

2        Did I ask that question and did you give that answer?

3        A.   I gave that answer.  I mean, this deposition process

4    was new to me, and I had forgotten that these are negotiated

5    agreements.  And so, I mean, the template is one way, which I

6    think was what I was trying to answer.

7        Q.   Sir, are you aware of any MADA partner that has the

8    Play Store but not search or Chrome on its device in the United

9    States?

10       A.   I believe Amazon devices, Fire tablets might have --

11       Q.   Are you aware of any smartphones sold in the United

12   States that have the Play Store but not the Google Search app

13   or Chrome?

14       A.   Beyond Amazon sets of devices, which --

15       Q.   I'm asking about smart phones, sir, Android

16   smartphones.

17       A.   I think Microsoft Surface Duo, the foldable phone, I

18   think there were -- we negotiated something different there,

19   too.

20       Q.   Let's talk about the Duo.  The Microsoft Duo has the

21   Google search widget on it, doesn't it?

22       A.   I can't remember, but there were negotiations for

23   that.

24       Q.   You don't know whether the Microsoft Duo has a search

25   widget from Google?

1    A.  I thought it had the Bing widget, but it's been a

2    while.

3        Q.  The Court will hear more about the Microsoft Duo from

4    Mr. Tinter later in the trial.

5        Aside from the devices that you've mentioned, are you

6    aware of any Android smartphones sold in the United States that

7    has the Play Store but not the Google Search app or Chrome?

8        A.  Beyond those devices, I can't recall any other ones.

9        **MR. JONES:**  Your Honor, that's all I have for open

10   session.

11       **THE COURT:**  Okay, good, the timing works out well.  It's

12   about five after, we will continue in a closed session around

13   3:20.

14       Mr. Yoo, I'll ask you not to discuss your testimony during

15   the break, sir.  Thank you.

16       (Recess taken at 3:02 p.m.)

17       (Closed session placed under separate cover)

18       (Back on the record at 4:05 p.m.)

19       **DIRECT EXAMINATION OF MIKE ROSZAK**

20   **BY MR. HAFENBRACK:**

21       Q.  Good afternoon, Mr. Roszak.

22       A.  Hello.

23       Q.  Could you please introduce yourself to the Court?

24       A.  Yes, my name is Mike Roszak.

25       Q.  And where do you currently work, Mr. Roszak?

1       **A.**   I work at Google.

2       **Q.**   Okay.  You recall you and I spoke, at least over Zoom,

3    at your fact deposition in October 2021?

4       **A.**   Yes.

5       **Q.**   And you were deposed twice in this matter, correct?

6       **A.**   Yes.

7       **Q.**   Once as a fact witness, once as a Rule 30(b)(6)

8    corporate witness; is that right?

9       **A.**   Yes.

10      **Q.**   Okay.  Did you meet with attorneys for Google in

11   preparing for your testimony today?

12      **A.**   Yes.

13      **Q.**   For approximately how many hours?

14      **A.**   I don't know, 20 to 30.

15      **Q.**   Mr. Roszak, you started at Google in 2008, correct?

16      **A.**   Yes.

17      **Q.**   And since you've been at Google, you've always worked

18   in the finance department; is that right?

19      **A.**   Yes.

20      **Q.**   And there are dozens and dozens of finance teams at

21   Google, correct?

22      **A.**   It depends how you define teams, but yes, that sounds

23   right.

24      **Q.**   And those teams provide financial analysis for

25   different aspects of Google's business; is that right?

1    A.    They could do financial analysis, financial planning.

2    It could be a wide variety of responsibilities depending on the

3    situation.

4    Q.    Economic modeling, yes?

5    A.    Potentially.

6    Q.    And when we spoke previously in October 2021, your

7    position was finance director; is that right?

8    A.    Yes.

9    Q.    And in that role, you managed a team of about 30

10   people; is that right?

11   A.    Yes.

12   Q.    And your finance team was responsible for providing

13   financial analysis for, among other things, the Google Search

14   product; is that right?

15   A.    For the organic search product engineering team, yes.

16   Q.    Organic meaning distinct from advertising?

17   A.    Yes.

18   Q.    There was a separate team that dealt with the search

19   ads on Google.com, correct?

20   A.    Yes.

21   Q.    And since we last spoke at your deposition in

22   October 2021, you were promoted to vice president of finance;

23   is that right?

24   A.    Yes.

25   Q.    Congratulations on that.

1    A.   Thank you.

2    Q.   Did that promotion occur in May 2022?

3    A.   That sounds right.

4    Q.   Okay.  And do you now report to Alphabet's CFO, Ruth

5    Porat?

6    A.   No.

7    Q.   Do you report to someone who reports to Ms. Porat?

8    A.   Yes.

9    Q.   Okay.  Who's your direct supervisor?

10   A.   Jon Hsu.

11   Q.   Okay.  Could you spell that last name for the court

12   reporter?

13   A.   It's H-S-U.

14   Q.   In your role as VP, do you still oversee the finance

15   team that deals with Google Search?

16   A.   Amongst other areas, yes.

17   Q.   Okay.  Going back to your role as search finance

18   director, on your search finance team, you provided financial

19   modeling for Google Search distribution deals, correct?

20   A.   It would depend on which deals, but we would do that

21   from time to time on -- depending on the partner.

22   Q.   Google enters into distribution agreements for Google

23   Search, correct?

24   A.   Yes.

25   Q.   And those agreements make Google Search the default

1    search engine for certain devices or browsers; is that right?

2        A.   It could depend on the specific deal, but some deals,

3    that would be the case.

4        Q.   And the payments that Google makes to secure defaults

5    are called traffic acquisition costs; is that right?

6        A.   Yes.

7        Q.   TAC for short, T-A-C?

8        A.   Yes.

9        Q.   And default distribution deals are valuable for

10   Google, in your view, because they reduce the friction for

11   users to access Google Search, correct?

12       A.   Yeah, potentially that's one potential benefit, yes.

13       Q.   Let's take the iPhone as an example, sir.  If another

14   search engine, and not Google, was the default search engine on

15   Apple devices, users would need to take some extra action to

16   search with Google, correct?

17       A.   It would depend on the circumstance and what the

18   situation might be, or on Apple, there's other access points as

19   well.

20       Q.   Users could -- in this circumstance where another

21   search engine, not Google, is the default, users could go into

22   the settings menu and change the default back to Google, that's

23   one option, correct?

24       A.   Depending on how it was set up, that could be one

25   option.

1538

1      Q.  And another option, users in this scenario could

2  download Chrome or the Google Search application from the Apple

3  App Store, and use that application instead of Safari, right?

4      A.  That's another potential approach.

5      Q.  Or within safari, users could navigate to Google and

6  search for Google, right?

7      A.  Yes.

8      Q.  And all of those options in that scenario would entail

9  some degree of friction, correct?

10     A.  I'm not totally sure how to define friction, but those

11 would be steps.

12     Q.  It would require extra effort, extra steps, correct?

13     A.  Yeah, potentially, depending on how it was all set up.

14     Q.  And the purpose of paying for defaults is to avoid

15 that friction, right?

16     A.  I mean, not necessarily.  I think it's to make it easy

17 for users that want to come to Google, to be able to come to

18 Google.

19     Q.  Without getting into specifics in open court,

20 Mr. Roszak, your search finance team has projected that if

21 Apple switched the default search engine, a lot of users

22 wouldn't make that effort to still search with Google, correct?

23     A.  I don't know if I would say projected.  We have -- we

24 don't know what would happen in that scenario, and we've had to

25 make guesses.  And we have made some guesses based on some

1539

1    datapoints that are imperfect, but I don't know if I would say

2    projected given, you know, we don't totally know.

3        Q.  What about estimated?  Your search finance team has

4    estimated that if Apple switched the default, a lot of users

5    wouldn't undertake the effort to still use Google, correct?

6        A.  We have -- we had to use some assumptions.  Like, it

7    is a guess, but we did use some estimates that said what that

8    clawback rate might be.

9        Q.  And the -- okay.  Now, Mr. Roszak, Google evaluates

10   distribution agreements, default distribution agreements, to

11   determine if they'll be profitable for the company, correct?

12       A.  Usually, yeah, depending on the deal.  But yes,

13   usually.

14       Q.  And you determine that -- whether a deal will be

15   profitable -- by looking at the incremental revenue you'd

16   expect to gain from the default relative to the traffic

17   acquisition cost required to get that default, correct?

18       A.  All these depend on the deal, and every situation is

19   slightly different.  But for certain deals, we do look at it

20   that way.

21       Q.  And when your team has analyzed the profitability of

22   distribution deals, that's how your team has done it, correct?

23       A.  Again, it depends on the deal, because every deal has

24   unique circumstances of what the degree might be.  But for some

25   distribution deals, yes, we have done that.

1    **Q.**   Including Apple, yes?

2    **A.**   Yes.

3    **Q.**   Including Mozilla, yes?

4    **A.**   Yes.

5    **Q.**   And incremental revenue is revenue that Google would

6    get as the default that you wouldn't expect to get otherwise,

7    correct?

8    **A.**   Again, every deal has its own unique situations, but

9    that is one definition of it.

10   **Q.**   And in general, Mr. Roszak, Google only enters into

11   default distribution deals if the expected incremental revenue

12   exceeds the amount that Google's paying for that default in

13   traffic acquisition costs, correct?

14   **A.**   I would say deals could be entered in for a variety of

15   reasons, and so I don't know if there's a hard and fast rule

16   around that.  But we would try to provide that context of what

17   that would look like as part of the decision framework for

18   whether or not to enter into a deal.

19   **Q.**   To your knowledge, Google has never actually entered

20   into a default distribution deal where the traffic acquisition

21   costs exceeded the expected incremental return, correct?

22   **A.**   Not to my knowledge.

23   **Q.**   Google's a profit maximizing company, correct?

24   **A.**   Well, deals are always -- there's many factors that go

25   into deals.  And so, yeah, there's always a wide variety of

1    variables that go into that.

2       Q.   Now, Mr. Roszak, for your 30(b)(6) deposition, you

3    were designated by Google as the person most knowledgeable to

4    testify about how often users switch search defaults.  Do you

5    recall that?

6       A.   Yes.

7       Q.   Okay.  And to your knowledge, Google does not keep

8    data on how often Google switches -- strike that, let me start

9    over.

10      To your knowledge, Google doesn't keep data on how often

11   users switch the Google search defaults on either Android or

12   Apple devices; is that right?

13      A.   I'm trying to remember all the conversations I had

14   before that.  And so I'm not a hundred percent certain of all

15   the specifics, but that roughly sounds right.

16      Q.   You certainly haven't seen any studies or any data on

17   how often users switch Google search defaults on those two

18   mobile platforms, correct?

19      A.   No, I have not seen that as far as I can recall.

20      Q.   And as part of your 30(b)(6) testimony, you

21   investigated the question, correct?

22      A.   Yes, I believe that was the case.

23      Q.   Now, Mr. Roszak, in 2017, you wrote a document in

24   which you described search advertising as one of the world's

25   greatest business models ever created.

1       Do you recall that?

2       **A.**  Somewhat vaguely.

3       **MR. HAFENBRACK:**  Okay.  Let's pull up UPX38.  And, Your

4   Honor, I have some binders to hand out, if I may approach?

5       **THE COURT:**  You may.

6       **MR. HAFENBRACK:**  Mr. Roszak, we're going to put the

7   documents on the screen in front of you and blow up the

8   portions I'm going to ask you about.  I've given you the binder

9   as well, so you've got multiple things to look at, should you

10  choose to.

11      Your Honor, the United States moves UPX38 into evidence.

12      **MR. BENNETT:**  Your Honor, objection.  He needs to lay some

13  foundation for what it is before he can offer it.

14      **THE COURT:**  That's fair, I just didn't know if it was a

15  stipulated exhibit.

16      **MR. BENNETT:**  It is not, Your Honor.

17      **THE COURT:**  Okay.

18      **MR. HAFENBRACK:**  I'm happy to do that, Your Honor.

19      **THE COURT:**  So before you put it on the public screen, do

20  you want to lay a foundation before.

21  **BY MR. HAFENBRACK:**

22      **Q.**  Take that down for now.  And Mr. Roszak, you recognize

23  this document, correct?

24      **A.**  Somewhat, yes.

25      **Q.**  And you wrote this document, right?

1    A.   Yes.

2    MR. HAFENBRACK:  Your Honor, United States moves UPX38

3    into evidence at this time.

4    MR. BENNETT:  I don't know that's laid any foundation

5    other than he wrote a document, Your Honor.  We don't know

6    whether it has anything to do with his business, Google's

7    business or if it been in a representative capacity, which we

8    haven't heard, Your Honor.

9    THE COURT:  Okay, keep going.

10   BY MR. HAFENBRACK:

11   Q.   I'm happy to keep going.  Mr. Roszak, this was a

12   document that you wrote in preparation for a training at

13   Google, correct?

14   A.   As part of a small group training that I was in, there

15   was an afternoon communications course, and I wrote down a few

16   bullets as part of the tips on presentations as part of that

17   self-contained course.

18   Q.   And this is a document you wrote in July 2017; is that

19   correct?

20   A.   That roughly sounds right.

21   Q.   I'm going to direct your attention to the first bullet

22   point, and I'm going to read that into the record.  It says:

23   "Search advertising" --

24   THE COURT:  Hang on, before you read anything into the

25   record, we need to have it admitted into the record.  So why

1    don't you lay your foundation questions -- or ask your

2    foundation questions, and then we can take up any objections

3    once those foundation questions have been answered.

4    BY MR. HAFENBRACK:

5       Q.   Mr. Roszak, in this document -- this document's about

6    search advertising, correct?

7       A.   This document was for a presentation, it wasn't really

8    about anything other than trying out some of the presentation

9    tips.  It was -- there was no business context or purpose --

10      Q.   The topic --

11      A.   -- specific to this.

12      Q.   The topic you're addressing here is search

13   advertising; is that right?

14      MR. BENNETT:   Your Honor, we'd ask the witness be allowed

15   to finish his answer.

16      THE COURT:   Okay.  I thought he had, but go ahead.

17   BY MR. HAFENBRACK:

18      Q.   The topic that you're addressing here, the subject is

19   search advertising; is that right?

20      A.   That is part of this, yes.

21      Q.   And you're describing advantages that Google has in

22   the search advertising business; is that right?

23      A.   I don't know how I'd describe this.  This whole

24   document is full of hyperbole and exaggeration, because there

25   was no business purpose associated with it, it was part of the

1    presentations course and trying out some of the tips they were

2    offering there.

3        Q.   And you were -- at the time you wrote this, you were a

4    finance director for Google, the Google Search product,

5    correct?

6        A.   Yes.

7        Q.   And you'd worked at Google for almost a decade at this

8    point, correct?

9        A.   Yes.

10       Q.   In the finance department that whole time, correct?

11       A.   Yes.

12       Q.   And you were very familiar with the economics of

13   Google's search business, correct?

14       A.   I don't know I'd say very familiar, I was familiar.

15       Q.   And in this document, you describe how Google is able

16   to ignore demand and focus on supply; is that right?

17       A.   As I mentioned, this whole thing was about hyperbole

18   and exaggeration, saying things I don't believe as part of the

19   presentation in this course.

20       Q.   I'll ask my question again.  In this document, you

21   describe how Google is able to ignore demand and focus on

22   supply, correct?

23       MR. BENNETT:  Objection, Your Honor.  Before counsel reads

24   the document -- or alludes to the contents of the document, we

25   should have it either admitted or not.

1    **THE COURT:**  Well, I think he can ask about the general

2    subject matter of the document.  I don't know if you're in a

3    position, Mr. Hafenbrack, where you want to offer it at this

4    point?

5    **MR. HAFENBRACK:**  Yes, Your Honor, I'd like to offer UPX38

6    into evidence.

7    **MR. BENNETT:**  Assuming the prior objection.

8    **THE COURT:**  Only the prior objection?

9    **MR. BENNETT:**  The ones we --

10   **THE COURT:**  That we discussed --

11   **MR. BENNETT:**  Yes, Your Honor.

12   **THE COURT:**  The only objection was the one in the closed

13   session, correct?

14   **MR. BENNETT:**  Yes, Your Honor.

15   **MR. HAFENBRACK:**  And, Your Honor, I understand the only

16   standing objection to this document is relevancy.

17   **MR. BENNETT:**  Foundation and hearsay.

18   **THE COURT:**  Well, I don't think there's a foundation

19   issue.  He's clearly established the foundation for it.  I

20   don't know that it's -- I'm not sure it's being offered for the

21   truth.  I mean, I don't know whether it's being offered for the

22   truth or not.

23   **MR. HAFENBRACK:**  You know, I don't think this is hearsay,

24   this is something that Mr. Roszak wrote in the course of his --

25   for training at Google, in the course of his duties at Google.

1    **THE COURT:**  So I don't want to be difficult here -- I

2    mean, I think ultimately we can figure this out, but I don't

3    know that this is a business record in the same way as many of

4    the other records that we've seen.  This is something that is

5    sort of tangential.  I mean, yes, it was part of his job

6    duties, but this was in a different setting and so I don't know

7    that it can be considered a business record.  However, I do

8    think there are probably other bases in which to consider it.

9    And if the government wishes to offer it for that reason, I'd

10   be happy to consider that.

11       **MR. HAFENBRACK:**  Yes, Your Honor, I think we're offering

12   it as an opposing party admission.

13       **THE COURT:**  Well, he's not an opposing party.  Look, I

14   think it is the kind of document that if you want to ask him

15   about his opinions and his views, and if he disagrees, you can

16   show him the document and present it to him and confront him

17   with it.  But that can be used for impeachment purposes, which

18   is different than admitting it as a business record, it seems

19   to me.

20       **MR. HAFENBRACK:**  Okay.

21       **THE COURT:**  In other words, look, if you want to ask him

22   isn't it true that you think this, and he either agrees or

23   disagrees -- if he disagrees, then you can confront him with

24   this document, and we can talk about what portions of the

25   document should come in.  Look, bottom line, I know we're in a

1   bench trial here, but we are trying to adhere to the rules of

2   evidence.  I don't think it meets the -- it's not a business

3   record.  It's not something that is -- again, in terms of the

4   statement of a party opponent, it is a statement of an

5   employee.  The question is it going to matter within the scope

6   of his relationship with Google and while it existed.  So the

7   second part of that test is certainly met.  I guess the

8   question is whether it's within the scope of that relationship.

9       MR. HAFENBRACK:  And I think the witness testified it was

10  for a training at Google.

11      MR. SCHMIDTLEIN:  Your Honor, just so we understand what's

12  at stake here, every document they push into evidence they post

13  on their website, and it gets picked up far and wide.  So they

14  haven't laid the foundation, this isn't a business record, and

15  it's totally irrelevant to these proceedings.  So if they think

16  they can get it in as a real document, real evidence, fine.  I

17  haven't heard it yet.

18      MR. HAFENBRACK:  Your Honor, we don't post every document

19  to our website.

20      MR. SCHMIDTLEIN:  Do you want to check that?

21      MR. DINTZER:  Your Honor, since we're going to gang up, we

22  post two to three a day that we believe that the public will

23  have an interest in.  I'm not the guy who posts it, so I can't

24  say about this.  But it's -- we're not dragging everything that

25  gets used in court up there.

1    **THE COURT:**  I mean, this comes as a surprise to me, that

2    the government is posting anything without having sought leave

3    of Court to do so, and that the plaintiffs are doing that.  So

4    that's something I wish I'd been told, particularly if you're

5    exercising your own discretion about what you're posting.  Once

6    it's admitted into evidence, in fairness, it is a public

7    document.  I agree with that, and I don't have any dispute with

8    that basic premise.  But typically, I think a judge is told

9    before evidence in the record is actually put on a publicly

10   available website.

11       **MR. DINTZER:**  I apologize, Your Honor.  It is, of course,

12   only stuff that's public and it's subject to the

13   confidentiality.  We would be happy to file a formal request

14   with the Court, if the Court would prefer us to do it in that

15   way.

16       **THE COURT:**  Okay.  We can sort of put a pin on that for a

17   moment.  Look, let's do this:  How much more do you have in

18   public session with him?

19       **MR. HAFENBRACK:**  I've got maybe 20 minutes after this

20   document.

21       **THE COURT:**  Why don't we keep going, and then we'll see

22   where we are at the end of the day, and we can have a

23   conversation about it.

24       **MR. HAFENBRACK:**  Sure, that sounds good, Your Honor.

25       **Q.**  Mr. Roszak, I'm going to switch gears off of UPX38,

1  ask you about a different topic.  Do you recall having a back

2  and forth with Google's team that deals with the Japanese

3  market about Google's advertising profitability in Japan?

4      A.  I'm somewhat familiar on that.

5      Q.  Okay.  And your team noticed that Google's advertising

6  profits were much lower in Japan relative to other markets,

7  such as the United States and United Kingdom.  Do you recall

8  that?

9      A.  I think I'd want to see the document just to make sure

10  on the specifics of what we're talking about.

11      Q.  Okay.  And do you recall reaching out to folks who

12  deal with the Japanese market at Google to ask them why that

13  was the case?

14      A.  I think only because this came up in our prior

15  conversation.

16      Q.  If you'd turn to 462 in your binder.  And, Your Honor,

17  I believe there's a relevancy objection on this one.

18      MR. BENNETT:  Your Honor, we'll withdraw that objection.

19      THE COURT:  Okay.  So 462 will be admitted.

20      (Exhibit 462 admitted into evidence)

21  BY MR. HAFENBRACK:

22      Q.  Thank you, Your Honor.  You can put that on the

23  screen.  You recognize this e-mail exchange, correct?

24      A.  Yes.

25      Q.  And these are e-mails you sent and received with other

1    employees at Google in April 2017; is that right?

2        A.   Yes.

3        Q.   Let's take a look at the second page.  And at the

4    bottom there, there's an e-mail from you that kicks off the

5    string to a Tomo and an Evan -- and we'll blow that up on the

6    screen for you.  And Tomo refers to Tomo Sakai; is that right?

7        A.   Yes.

8        Q.   And that's S-A-K-A-I.  And Mr. Sakai was on Google's

9    finance team looking after Japanese issues; is that right?

10       A.   Yes, he works for finance -- Google Finance in Japan.

11       Q.   Okay.  And Evan is Evan Sidarto?

12       A.   Yes.

13       Q.   And Mr. Sidarto was the finance lead for Google for

14   all of the Asia-Pacific region; is that right?

15       A.   Yes.

16       Q.   And you see here you wrote in your e-mail that during

17   a chat with the search team, you noticed Google's advertising

18   RPMs were much lower in Japan than the United States or the UK?

19       A.   Correct, yes.

20       Q.   And RPM is an advertising metric, right?

21       A.   Yes.

22       Q.   And specifically, RPM measures revenue per thousand

23   queries; is that right?

24       A.   Yes.

25       Q.   And you wrote this e-mail to Mr. Sakai and Mr. Sidarto

1    to try to understand why Google was getting less advertising

2    revenue on a per query basis in Japan than in other markets; is

3    that right?

4        **A.**  Yes.

5        **Q.**  And you wrote:  "We have some theories about Y Japan

6    reducing auction pressure."  Do you see that?

7        **A.**  Yes.

8        **Q.**  And the "we" there refers to your search finance team;

9    is that correct?

10       **A.**  Not necessarily, I don't recall.

11       **Q.**  Who else might it refer to?

12       **A.**  Well, it says there was a chat with the search team,

13   so it could have been as part of that conversation.  I'm not

14   sure where the theories came from.

15       **Q.**  So either your team or the search team had theories

16   around Y Japan reducing auction pressure; is that right?

17       **A.**  Yes.

18       **Q.**  And Y Japan refers to the Yahoo Japan search engine,

19   correct?

20       **A.**  Yes.

21       **Q.**  And in 2017, did you understand that the Yahoo Japan

22   search engine was a significant competitor to Google in the

23   Japanese market?

24       **A.**  I don't recall what I remembered at the time about --

25   I don't know what I remembered about Yahoo Japan at that time.

1    Q.  Sitting here today, is it your understanding that at

2   the time of this e-mail in 2017, Yahoo Japan was a significant

3   competitor to Google in the Japanese market?

4    A.  I think they are a competitor, yes.

5    Q.  And your team or the search team's theory was that if

6   advertisers split their -- search advertisers split their

7   budget between Google and Yahoo Japan, there might be less

8   auction pressure on Google's search advertising auctions,

9   right?

10    A.  Potentially.  I'm not a hundred percent certain --

11   given I don't deal with ads monetization, I'm not a hundred

12   percent certain on the mechanisms behind that theory, but

13   that's one possible explanation.

14    Q.  You're not a hundred percent certain, but that was the

15   theory you were floating, correct?

16    A.  I don't know if we got to like the root cause of it.

17   One of the theories was just the reducing auction pressure.

18    Q.  Okay.  Is it your understanding that more auction

19   pressure can create more dollars going after the same search

20   terms in a bidding process?

21    A.  Caveating that I'm definitely not an expert on

22   auctions or ads, yeah, that is one potential explanation.

23    Q.  And Google benefits --

24    THE COURT:  I'm sorry, what do you mean by auction

25   pressure?  That's not a term I've heard before.  What do you

1    mean by that?

2        **THE WITNESS:**  So this is caveating this is not -- this is

3    outside of my area of expertise, but I think if there are

4    potentially multiple advertisers interested in the same search

5    term, they might be willing to bid more if they knew that they

6    had to do that in order to --

7        **THE COURT:**  You mean by a sort of more robust auction with

8    multiple bidders, is that what you mean -- more than one

9    bidder?

10       **THE WITNESS:**  Potentially.

11       **THE COURT:**  Okay, thank you.

12   **BY MR. HAFENBRACK:**

13       **Q.**  And more auction pressure might drive up the price

14   that advertisers pay, correct?

15       **A.**  It could.

16       **Q.**  And more -- Google benefits from higher auction

17   pressure in its search advertising auctions, correct?

18       **A.**  Google would make more revenue, yes.

19       **Q.**  Let's take a look at the first page, there's an e-mail

20   there from Mr. Sakai.  We'll blow that up on the screen for

21   you, Mr. Roszak.

22       And you see Mr. Sakai writes -- he addresses you, you see

23   that, right?

24       **A.**  Yes.

25       **Q.**  And he writes to highlight the competitive situation

1  in Japan.  Do you see that?

2      A.  Yes.

3      Q.  And you see in the first bullet point there, Mr. Sakai

4  is explaining that Japan is unique among the major countries

5  where Google operates, correct?

6      A.  I see him saying that, yes.

7      Q.  And the reason Japan is unique is because Google faces

8  significant head-to-head competition with Yahoo Japan for

9  search advertising dollars in that market, right?

10     A.  I see that's what he is implying there.

11     Q.  And you had no basis to disagree with Mr. Sakai's

12  analysis, correct?

13     A.  I disagree with his analysis on the unique part.  I'd

14  look to him for what he would say about the Japanese market.  I

15  don't necessarily look to him for what he would say on markets

16  outside of that.

17     Q.  Did you anywhere in this e-mail or subsequently

18  express to him you disagreed with his statement that Japan is

19  unique among our major countries?

20     A.  No, that's generally not my operating style in a

21  situation like this.

22     Q.  And you see Mr. Sakai wrote that advertisers split

23  their budgets between Yahoo Japan and Google, which makes the

24  auction pressure on Google less, correct?

25     A.  I see him saying that, yes.

1    Q.   And that was consistent with your team or with the

2    search team's theory about Yahoo Japan reducing auction

3    pressure on Google's search advertising auctions, correct?

4    A.   Well, we had several theories, and he also lays out

5    several theories.  But that seems consistent with one of the

6    potential theories.

7    Q.   And that was the theory that you floated in your

8    e-mail that started this chain, correct?

9    A.   Well, we floated several theories at the start of the

10   chain, you just mentioned one.  But there was one of those,

11   yes.

12   Q.   And if you look at the top e-mail, there's an e-mail

13   from Mr. Sidarto.  Again, he was the finance lead for all of

14   Asia-Pacific for Google; is that right?

15   A.   Yes.

16   Q.   And he summarizes the messages you should take away,

17   do you see that?

18   A.   Yes.

19   Q.   And the first point listed is:  "Japan is unique.  We

20   have a big competitor unlike U.S. and UK."  Do you see that?

21   A.   Yes.

22   Q.   You can put that one aside.  Mr. Roszak, was there a

23   period during your career at Google when you provided financial

24   analysis for the Google Maps product?

25   A.   Yes.

1    Q.   And specifically you worked on financial analysis

2    related to Google Maps from 2009 to roughly 2013 or 2014; is

3    that right?

4    A.   It depends.  I was in a different role from around --

5    I'm sorry, did you say 2009?

6    Q.   My question was whether you worked on Google Maps from

7    roughly 2009 to 2013 or '14?

8    A.   From 2009 to about 2013, I had a different job that

9    was partially focused on the like enterprise offering of Maps

10   through a sales channel.  I did not start working with like the

11   Maps product until around 2013, 2014.

12   Q.   Okay.  But before then, you also had some involvement

13   with the Google Maps product area; is that right?

14   A.   Only a very small part of the -- like the enterprise

15   version of it, which is very different than the consumer

16   offering.

17   Q.   Okay.  You recall that before 2012, Google Maps was

18   the default map service on Apple iOS devices?

19   A.   This is before I was working on this part of the

20   business, so I'm not as familiar with it, but that's my rough

21   understanding.

22   Q.   And iOS devices at that time meaning iPhones and

23   iPads; is that correct?

24   A.   I don't know when iPads came about, but iPhones, yes.

25   Q.   And you're aware that Google Maps remained the default

1    map service on iPhones up until 2012, correct?

2         A.   I think that sounds correct.

3         Q.   And at that time, in 2012, Apple launched its own map

4    service called Apple Maps; is that correct?

5         A.   Yes.

6         Q.   And when that happened, when Apple launched Apple

7    Maps, Apple switched the default map service on iPhones from

8    Google Maps to Apple Maps; is that right?

9         A.   Yes.

10        Q.   And the data resulting from that default swap, from

11   Google Maps to Apple Maps, has been an important datapoint for

12   your search finance team, correct?

13        A.   It has been a datapoint that we have used.

14        Q.   And in fact, Google uses that data from the Apple Maps

15   default switch to project the most likely outcome if Google

16   were to lose the search default on iPhones, correct?

17        A.   Kind of what I said before, I don't know if I would

18   use the word project, because we do not know and it is a guess.

19   But it is one datapoint that, imperfect and directional, we

20   have used as potential consideration when trying to model what

21   could happen on defaults.

22        Q.   When you're making those imperfect projections, you

23   use the Google Maps data, correct?

24        A.   It is one datapoint that we have used for discussion

25   and underpinning some of the modeling as a directional

1    estimate.

2        Q.   Let's take a look at the Apple Maps data.  And if you

3    could -- we'll put UPX97 on the screen.  This one's in

4    evidence, Your Honor.  There are a couple of redactions on this

5    document, but we'll work around it in open court, Mr. Roszak.

6    The first page is just a cover sheet, so I've gone straight to

7    the second page.

8        This is an e-mail exchange between you and Carlos Kirjner

9    from June 2020; is that right?

10       A.   Yes.

11       Q.   And Mr. Kirjner was the VP of finance at that time,

12   correct?

13       A.   Yes.

14       Q.   And he was your supervisor, correct?

15       A.   He was -- I might have had two supervisors at this

16   time.  I think he was potentially one of them.

17       Q.   Was the other Cristina Bita?

18       A.   Not at this time I don't think.

19       Q.   Who was your other supervisor at this time, if you

20   recall?

21       A.   I'm a little gray on the dates.  It might have been

22   Kristen Gil.  At some point I shifted to report to Carlos, but

23   I'm not sure on the exact dates.

24       Q.   Fair enough.  So he was at least one of your

25   supervisors at this time, correct?

1    A.  Yes.

2    Q.  And you recall this e-mail exchange, correct?

3    A.  Yeah, I mean, a bit around it, yeah.

4    Q.  Let me direct your attention to your e-mail there at

5  the bottom of the string above the redactions.  I'm going to

6  ask you about what you wrote here.  Look at the first sentence

7  first.  It says:  "This is a bit dated, but here was one of the

8  charts that we had examined around GMM usage on Apple after the

9  iOS default was swapped to Apple's offering compared to Android

10  7DA in blue."  Do you see that?

11    A.  Yes.

12    Q.  A few questions about terminology so we can understand

13  what you're saying here.  GMM refers to Google Mobile Maps; is

14  that right?

15    A.  Either that or Google Maps Mobile.

16    Q.  Okay.  The same concept either way?

17    A.  Yes.

18    Q.  And that's the Google Maps service that was available

19  on iPhones and Android phones at this time, correct?

20    A.  Yes.

21    Q.  And the iOS default swap that you reference here --

22    MR. BENNETT:  Your Honor, just a quick confidentiality

23  issue.  Can we take that down, please?  The redacted version we

24  exchanged is different.  There's a different redaction that's

25  not on the one that was being shown.

1    MR. HAFENBRACK:  That's the redacted version I have.  I'm

2  not sure how yours is different, if you want to bring it to me.

3       (Discussion off the record)

4    MR. HAFENBRACK:  Your Honor, it looks like I had -- there

5  was one additional word that Google wanted redacted.  I'm not

6  sure the government agrees that it should be redacted.

7    THE COURT:  Well, is it something we can still show the

8  witness and put up on the public screen with the redaction?

9  Can you redact on the fly?

10    MR. HAFENBRACK:  I'm not sure if we can redact on the fly,

11  it might be beyond our capabilities here in the courtroom, Your

12  Honor.

13    THE COURT:  Okay.  Why don't we just at least put it up on

14  the parties' screen, and then we'll -- and my screen.  Although

15  we're connected to the media room, so let's just go off the

16  paper.

17    MR. HAFENBRACK:  I can go off the paper and do the best I

18  can with the additional redaction.

19    Q.  The sentence that I was -- we were just talking about,

20  no portion of that sentence is redacted, so we can continue

21  with this line at least.  And the iOS default swap that you're

22  referring here -- referring to here was the swap from Google

23  Maps to Apple Maps, correct?

24    A.  Yes.

25    Q.  And the reference to Android 7DA in blue refers to

1562

1    7-day active users of the Google Maps service; is that right?

2        **A.**   Yes.

3        **Q.**   And a 7-day active user is just someone who's used the

4    app -- meaning Google Maps, at least once in the prior seven

5    days; is that right?

6        **A.**   That's my understanding.

7        **Q.**   Okay.  And I'll direct your attention to the second

8    sentence here -- and I'm going to do this without revealing the

9    extra word that's been redacted.  It says:  "Almost two years

10   later," redacted word, "we're at roughly 40 percent of the

11   prior peak, and assumed the financial loss was greater since

12   the Apple Maps usage was also growing across that time,"

13   correct?

14       **A.**   I think you added the word financial, I think it just

15   said the actual loss.

16       **Q.**   Assumed the actual loss was greater?

17       **A.**   Yes.

18       **Q.**   And it's otherwise correct?

19       **A.**   Yes.

20       **MR. HAFENBRACK:**   Your Honor, I apologize, but it's hard to

21   meaningfully examine the witness on even this sentence with the

22   additional redaction that I've been handed.  And so --

23       **THE COURT:**   I guess I'm not sure what redaction we're even

24   talking about.

25       **MR. HAFENBRACK:**   It's the word "we."

1    MR. BENNETT:  Well, it was redacted.

2    MR. HAFENBRACK:  I apologize, Your Honor, I did not mean

3  to do that.

4    THE COURT:  I'm not sure why that word needed to be

5  redacted.

6    MR. BENNETT:  It discloses which party was where in the

7  numerics that are there, Your Honor.  There are two parties

8  that are discussed in this, and it could be either one -- or it

9  could have been either one until a few minutes ago.

10    THE COURT:  I don't know that grammatically it would work

11  other than -- if you read this grammatically, I suppose you

12  could think it's the other party, but I doubt anybody would

13  read it that way or write it that way.

14    MR. BENNETT:  We were trying to be minimal in our

15  redactions, I guess we probably could have taken a bigger swat

16  at it.

17    THE COURT:  I'm not sure it's something that needed to be

18  redacted in the first place, so go ahead.

19    MR. HAFENBRACK:  Can we publish on the screen again?

20    THE COURT:  Only the numbers and the charts are redacted,

21  correct?

22    MR. HAFENBRACK:  That's right, Your Honor.

23    THE COURT:  That's fine.

24  BY MR. HAFENBRACK:

25    Q.  Can we put that back on the screen.  And I'll read

1    that sentence again, Mr. Roszak, to get it right with the

2    missing word.  Here in the second sentence you wrote:  "Almost

3    two years later, we were at roughly 40 percent of the prior

4    peak, and assumed the actual loss was greater since the Apple

5    Maps usage was also growing across this time," correct?

6         A.   Yes.

7         Q.   And here you were telling Mr. Kirjner that two years

8    after the default swap from Google Maps to Apple Maps, Google

9    Maps usage on iOS devices was at roughly 40 percent of the

10   prior peak, correct?

11        A.   Yes.

12        Q.   And 40 percent of the peak when it was the default

13   service on iOS devices, correct?

14        A.   Yes.

15        Q.   And the inverse of saying Google Maps retained

16   40 percent is that it lost 60 percent, correct?

17        A.   Yes.

18        Q.   And you say in the parenthetical that Google assumed

19   the actual loss was greater than 60 percent, correct?

20        A.   Yes.

21        Q.   And that's because before the default swap, Google

22   Maps usage was growing on iOS devices, correct?

23        A.   Yes.

24        Q.   And absent the loss of the default, the default swap

25   to Apple Maps, you would have expected that trend to continue,

1    correct?

2        A.   It's always hard to know in the future, but yeah, that

3    is one potential extrapolation.

4        Q.   And that's what you were telling Mr. Kirjner, correct?

5        A.   Yes.

6        Q.   And there's a chart here that's been redacted, but a

7    few general questions on that.  This chart is showing usage

8    trends for Google Maps on Android and iOS devices; is that

9    right?

10       A.   Yes.

11       Q.   And the blue line on this chart that the Court can see

12   is the usage trend for Google Maps on Android phones, correct?

13       A.   Yes.

14       Q.   And the red line is Google Maps usage on iOS devices,

15   correct?

16       A.   Yes.

17       Q.   Including iPhones, yes?

18       A.   Yes.

19       Q.   And, again, without revealing any particular figures

20   about the chart, you can see from the chart that during the

21   time period that Google Maps usage declined on iOS devices, it

22   continued to increase on Android phones, correct?

23       A.   Yes.

24       Q.   And is it your understanding that during the time

25   period shown on this chart, Google Maps was the default map

1    service on Android phones?

2         A.   I believe so.

3         Q.   And it remains so today, correct?

4         A.   I believe so.

5         Q.   Now, Mr. Roszak, in December 2012, Google launched a

6    Google Maps application for the iPhone, correct?

7         A.   I'm not sure on the exact timing.

8         Q.   Any reason to dispute December 2012?

9         A.   I have no reason to know one way or the other.  That

10   was before my time, I don't remember the specific timeline in

11   there.

12        Q.   You worked on at least one aspect of the Google Maps

13   service at that time in December 2012; is that right?

14        A.   No, I was not working on this at the time of 2012.  So

15   this would have been going -- looking back before I was

16   responsible for this part of Maps and finance.

17        Q.   Is there friction in downloading the Google Maps

18   application from the Apple App Store?

19        A.   I'm not certain how to answer that.  I mean, there are

20   steps to go to the App Store to install it.

21        Q.   But you're aware that for most of the period depicted

22   on this chart, anyone who wanted to use Google Maps could go

23   into the App Store, download it and use it, correct?

24        A.   I don't know how to define most.  There was definitely

25   a period in here where there was no Google Maps app on iOS.

1   **THE COURT:**  I'm sorry, when you say that, do you mean to

2   say that there was no Google Maps on iOS -- in other words, it

3   wasn't the default, or do you mean to say it wasn't available

4   in the App Store?

5   **THE WITNESS:**  My understanding, caveating before my time,

6   was that we did not have anything in the App Store when the

7   default shifted.  I do not believe, but I'm not a hundred

8   percent, that you could not download Google Maps app.  It

9   didn't exist until we launched it at some time period that you

10  could get it from the App Store.

11  **THE COURT:**  And that happened after the switch is your

12  recollection?

13  **THE WITNESS:**  Yes.  There was some time period in between,

14  it's just I'm not certain on the exact time period.

15  **MR. HAFENBRACK:**  Your Honor, the government would like to

16  offer a new exhibit to clear this up.

17  **THE COURT:**  Okay.

18  **MR. HAFENBRACK:**  This is an exhibit stamped UPX2002.

19  **MR. BENNETT:**  Your Honor, I don't believe -- at least I've

20  not seen this exhibit before.  It's got a really high exhibit

21  number of 2002.  This might be -- I would appreciate a moment

22  to look at it before we start --

23  **THE COURT:**  Okay, sure.

24  (Brief interruption)

25  **MR. BENNETT:**  We're fine with this, Your Honor.

1    **THE COURT:** So 2002 will be admitted.

2    (Exhibit UPX2002 admitted into evidence)

3    BY MR. HAFENBRACK:

4    Q.  Thank you, Your Honor.  Mr. Roszak, you can see this

5    is a Google blog posting?

6    A.  Yes.

7    Q.  The Keyword, is that one of Google's blogs?

8    A.  Yes.

9    Q.  Are you familiar with Daniel Graf?

10   A.  Yes.

11   Q.  Who is Mr. Graf?

12   A.  I see his title on here, it looks like at the time he

13   was director of Google Maps for mobile.

14   Q.  And when you worked on the Google Maps product, did

15   you work with Mr. Graf?

16   A.  I believe he was there for some of the time after I

17   joined.

18   Q.  And you see here the headline is Google Maps is Now

19   Available for iPhone, correct?

20   A.  Yes.

21   Q.  And you see the date is December 12th, 2012, correct?

22   A.  Yes.

23   Q.  And you see the first paragraph there says:  "People

24   around the world have been asking for Google Maps on iPhone.

25   Starting today, we're pleased to announce that Google Maps is

1    here rolling out across the world in the Apple App Store,"

2    correct?

3         A.   Yes.

4         Q.   And so at least as of December 2012, any iPhone user

5    who wanted to could go into the App Store and download and use

6    Google Maps, correct?

7         A.   I don't know if any iPhone user.  It looks like at the

8    end there were certain countries it was in.  But in certain

9    countries it looks like, based on this, that users could go

10   into the App Store and get Google Maps.

11        Q.   Certainly in the United States, correct?

12        A.   It doesn't explicitly state that, but I don't have any

13   reason to think it wouldn't be.

14        Q.   Okay.  Are you aware that -- strike that.

15        You are aware that Apple's CEO, Tim Cook, issued a public

16   apology in 2012 over the performance of Apple Maps, correct?

17        A.   I do remember there was some conversation about that

18   at the time.

19        Q.   Okay.  And is it your understanding that in the time

20   period on the chart that's shown on UPX97, that Google Maps was

21   the superior product relative to Apple Maps?

22        A.   Well, I guess that's hard to answer, because for part

23   of the chart it didn't exist.  And I don't know the -- I don't

24   have a basis for saying which one was the superior product.

25        MR. HAFENBRACK:  You can put that one aside.  Your Honor,

1    I've got a different topic.  I don't know if you want me to

2    keep going?

3         THE COURT:  Why don't we conclude with the witness

4    testimony for the day.  We'll take up the evidentiary issue

5    without the witness on the standard.

6         MR. HAFENBRACK:  Sure.

7         THE COURT:  Mr. Roszak, thank you very much.  We'll

8    continue with your testimony at 9:30 tomorrow morning.  I'd

9    just ask you not to discuss your testimony with anyone

10   overnight.  Thank you, sir.

11        THE WITNESS:  Thank you.

12        (Witness not present)

13        THE COURT:  Let's just return to the question of the

14   admissibility of UPX38 and on which basis.

15        MR. HAFENBRACK:  Yes, Your Honor.

16        THE COURT:  The question in my mind is I'm quite -- I'm

17   firm in my ruling and belief that this does not constitute a

18   business record, that is not an issue for me.  I think the

19   question is whether it is a statement of an opposing party made

20   by an employee of that party while the matter -- while --

21   excuse me, on a matter within the scope of the employment

22   relationship and while it existed.  Clearly it's while he was

23   an employee.

24        I think the question in my mind is what within the scope

25   of that relationship means, and does it extend to this kind of

1    presentation in which he was participating, maybe not

2    optionally, but certainly in his capacity as a Google employee.

3    So that's just the outstanding question in my mind.

4        And then, ultimately, I don't think there's any problem if

5    you want to ask him certain questions about the contents of

6    this and -- well, maybe Google has a different view.  But if

7    you want to ask him whether he has certain beliefs about search

8    advertising, and if he says no, well, then this is a document

9    that could be used for impeachment purposes, although not for

10   the truth if it's used in that manner.

11       **MR. HAFENBRACK:**  The government would like to admit it for

12   the truth.  It's precisely for what Your Honor said, it's -- it

13   is a statement by a Google executive about the company's search

14   advertising business within the scope of his employment.  It

15   was for a training at Google, and he's describing Google's

16   search advertising power.  We think that should -- we think

17   that should come in as substantive evidence.  And if Your Honor

18   has any doubt about that, we'd ask for the opportunity to brief

19   the issue.

20       **THE COURT:**  Well, that's where we may end up.  I don't

21   know that we need full on briefing.  Look, I think the question

22   is -- look, it's one thing if he's having communications within

23   the organization or outside the organization about a subject

24   that is within the scope of his employment.  The question in my

25   mind is whether the rule requires that even if the statement is

1    made within the context of an employment relationship, that it

2    is done at a time where he's actually acting in the capacity

3    relative to the subject matter.

4        And, again, it's one thing to be having a conversation

5    with colleagues about the subject matter.  It's another thing

6    if he's sort of musing about something in a different setting.

7    And that's what I'd like to get to the bottom of before I admit

8    it for substantive purposes.

9        **MR. HAFENBRACK:**  Okay.  We'd stress that this was a

10   company -- a Google training, it wasn't something he was doing

11   as a side light.

12       **THE COURT:**  No, I don't think there's any factual dispute

13   here, it seems to me, as to what the foundation is.  I think

14   the question is just whether it meets that exception -- or it's

15   not an exception, but it's not hearsay.

16       Did you have any further thoughts or want to comment?

17       **MR. BENNETT:**  I think I understand the state of play in

18   that it's usable for impeachment.  If they want to ask him what

19   he believes and he says something, they can say didn't you once

20   write something that said something else.  It is his statement,

21   it's certainly not Google's statement.  The fact that he may

22   have been geographically located at Google -- actually, I

23   thought it was an offsite, but I'll assume that it was at

24   Google.

25       **THE COURT:**  I think this is less of where it was, but what

1    context it was made.

2        MR. BENNETT:  It's just not something made in the course

3    of his work there.  There are some statements about micro and

4    macro economics.  He's a guy who -- finance guy who counts

5    things, he's not someone who assesses the market or market

6    power or any of those things.  If the government's antitrust

7    case needs for -- to prevail this two-page document typed up in

8    five minutes during a training on how to be a public speaker

9    that comes in for the truth, that's maybe a bigger problem than

10   just this document.  But it's not something that has any

11   indicia of reliability.

12       They can question him about it, and he will say -- he

13   already did say:  I don't believe that to be true, I was using

14   hyperbole, because I was told to get the audience's attention

15   by saying things that are somewhat -- you know, I will say

16   outrageous, he didn't use the word outrageous.  But it's the

17   opposite of a trustworthy document, and it will be used for

18   inflammatory purposes.

19       THE COURT:  Again, it's not a matter of trustworthiness,

20   that's not the issue.  It's a matter of the context in which it

21   was made, and whether it was made sort of within the scope of

22   his employment in this context.  And whether it's trustworthy

23   or not in terms of the accuracy of it, you know, if it meets

24   the rule it comes in, and then we can fight about whether it's

25   accurate or not.  And so I think that's the question.

1    So the other question then is just sort of the timing of

2  all of this.  I don't want anybody staying up late at night to

3  draft something for me, we can do our own research.  If you all

4  want to submit something short to us this evening, that's fine.

5  When I say short, I mean three pages.  I don't want any

6  associate on this side or anybody on this side burning the

7  midnight oil any more than you already are.  If you want to

8  just submit something, I can take a look at it in the morning

9  before we reconvene and then issue a ruling.

10    MR. DINTZER:  We appreciate that, Your Honor.

11    MR. BENNETT:  Thank you, Your Honor.

12    MR. HAFENBRACK:  Thank you, Your Honor.

13    THE COURT:  AND then in terms of this practice of posting

14  exhibits, I mean, if you're going to do it, I'd like to --

15    MR. DINTZER:  I've communicated that, Your Honor.  They're

16  taking it down.

17    THE COURT:  Look, I have -- why is someone standing up,

18  have they got an issue?  I'm not sure who you are or who you're

19  representing, but unless you're a lawyer who's appeared, I

20  don't know that there's a basis to be heard.

21    (Inaudible statement from the gallery)

22    THE COURT:  As I said, I don't have a fundamental -- I'm

23  not fundamentally saying you can't do it, all I'm saying is I'd

24  like to have known about it.

25    MR. DINTZER:  And I take full responsibility, and I

1575

1    apologize, Your Honor.  I can tell you that it's 16 exhibits

2    and the opening slides.  Of course, none of it -- all of it

3    redacted consistent with it.  But if -- I mean, I've asked them

4    to take it down, so if the Court will give us permission to do

5    it, then we would prefer it.  But obviously, we certainly did

6    not mean to overstep and do anything that the Court wouldn't

7    want us to do.

8        **THE COURT:**  Mr. Schmidtlein.

9        **MR. SCHMIDTLEIN:**  We'd just like an opportunity to talk

10   with them, because the other issue that's going on here is in

11   the course of these exhibits going up, some of them are

12   e-mails, as you're seeing.  They have people's e-mail addresses

13   that are now being broadcast to the broader world, and we have

14   concerns about that.

15       **THE COURT:**  Well, I can tell you this, you know, it's not

16   a -- it's far from a perfect analogy, but what we've been doing

17   in the January 6th cases is that the government will submit a

18   motion authorizing or requesting that the Court release

19   exhibits that are admitted into evidence on a day of basis.

20   Now, in a case like this, I would want to make sure that what

21   we're talking about is something, A, that's obviously been

22   admitted and, B, is something that is redacted of any

23   personally identifying information and, C, something Google's

24   seen just to make sure that we've got another set of eyes

25   ensuring that what's going out is in fact what is in evidence,

1    and does not contain any information that otherwise should be

2    redacted.  But I acknowledge that once it's in evidence, it's a

3    presumptively public record.  The United States has, in other

4    contexts, posted exhibits on sort of day of.  So I don't

5    fundamentally have an issue with it, I just want to make sure

6    we're all on the same page about how that's going to happen.

7         MR. DINTZER:  Your Honor, I mean, we're happy to involve

8    the Court, if the Court would prefer.  Another way is we could

9    just provide them to Google with 24 hours notice.  And if they

10   have a concern, they'll come to us or come to the Court.  And

11   then if 24 hours pass without them saying anything, then we can

12   post it.

13        THE COURT:  Why don't you all have a conversation before

14   we leave today, talk it through, and then we can talk about it

15   in the morning.  But as I said, I think this is not something

16   that's unusual, but I just want to make sure that all the

17   guardrails are in place to do it right.

18        MR. DINTZER:  Thank you, Your Honor.

19        MR. SCHMIDTLEIN:  Absolutely Your Honor.

20        THE COURT:  Anything else we ought to discuss before we

21   adjourn -- actually, Mr. Cavanaugh, we had one open issue.

22        MR. CAVANAUGH:  We did, and I mentioned it to

23   Mr. Schmidtlein at lunch.  Your Honor, we join United States'

24   view that both numbers should come in.  The SEM percentage

25   is -- doesn't disclose other company's percentages, it's just

1    Google's, and we don't think that's entitled to

2    confidentiality.

3         THE COURT:  Okay.  Well, let me go back, I'll take a look

4    at it -- again, in the context in which it arose, and then

5    we'll make a decision and get out that final redacted version

6    either this evening or tomorrow, okay.

7         Anything else before we break for the day?  All right,

8    thank you all.  I'll see you all tomorrow morning.  Thank you,

9    everybody.

10        (Proceedings adjourned at 5:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## C E R T I F I C A T E

2

3              I, **Jeff M. Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript of

5    the record of proceedings in the above-entitled matter.

6

7

8

9    September 19, 2023                    _____

10            **DATE**                          **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. BENNETT: [1]
1512/3
BY MR.
CAVANAUGH: [4]
1499/8 1499/23
1500/14 1502/2
BY MR. DAHLQUIST:
[7] 1476/3 1481/23
1488/15 1490/14
1492/24 1493/8
1495/19
BY MR.
HAFENBRACK: [9]
1533/19 1542/20
1543/9 1544/3
1544/16 1550/20
1554/11 1563/23
1568/2
BY MR. JONES: [2]
1510/16 1531/17
MR. BENNETT: [21]
1531/10 1542/17
1542/15 1543/3
1544/13 1545/22
1546/6 1546/8
1546/10 1546/13
1546/16 1550/17
1560/21 1562/25
1563/5 1563/13
1567/18 1567/24
1572/16 1573/1
1574/10
MR. CAVANAUGH: [6]
1499/21 1509/9
1509/11 1509/16
1509/20 1576/21
MR. DAHLQUIST: [6]
1487/8 1490/8
1490/11 1495/16
1499/3 1509/24
MR. DINTZER: [7]
1548/20 1549/10
1574/9 1574/14
1574/24 1576/6
1576/17
MR. HAFENBRACK:
[30] 1542/2 1542/5
1542/17 1543/1
1546/4 1546/14
1546/22 1547/10
1547/19 1548/8
1548/17 1549/18
1549/23 1560/25
1561/3 1561/9
1561/16 1562/19
1562/24 1563/1
1563/18 1563/21
1567/14 1567/17
1569/24 1570/5
1570/14 1571/10
1572/8 1574/11
MR. JONES: [7]
1510/2 1510/5 1510/9
1510/13 1511/25
1531/14 1533/8
MR. SCHMIDTLEIN:
[5] 1490/6 1548/10

1548/19 1575/8
1576/18
MR. SOMMER: [2]
1492/14 1493/5
THE COURT: [81]
1476/1 1480/19
1481/22 1487/11
1488/5 1488/14
1490/13 1492/15
1493/6 1495/18
1498/17 1499/2
1499/6 1499/19
1499/22 1500/12
1501/17 1509/7
1509/10 1509/12
1509/18 1509/22
1510/4 1510/8
1510/12 1510/14
1512/2 1531/13
1531/15 1533/10
1542/4 1542/13
1542/16 1542/18
1543/8 1543/23
1544/15 1545/25
1546/7 1546/9
1546/11 1546/17
1546/25 1547/12
1547/20 1548/25
1549/15 1549/20
1550/18 1553/23
1554/6 1554/10
1561/6 1561/12
1562/22 1563/3
1563/9 1563/16
1563/19 1563/22
1566/25 1567/10
1567/16 1567/22
1567/25 1570/2
1570/6 1570/12
1570/15 1571/19
1572/11 1572/24
1573/18 1574/12
1574/16 1574/21
1575/7 1575/14
1576/12 1576/19
1577/2
THE WITNESS: [14]
1480/23 1487/15
1488/10 1490/9
1492/17 1498/18
1500/13 1501/18
1509/14 1554/1
1554/9 1567/4
1567/12 1570/10

**$**

$1,000,000 [1] 1501/8
$10,000,000 [1]
1500/24

**'**

'14 [1] 1557/7

**.**

......Admitted [2]
1475/16 1475/17
.1 [2] 1501/10 1501/11
.1 million [1] 1501/10

**0**

064 [1] 1485/22

**1**

1.5 percent [1] 1504/1
10036 [1] 1473/24
1005 [1] 1496/13
1100 [1] 1473/14
1133 [1] 1473/23
12th [1] 1568/21
1300 [1] 1474/3
14 [1] 1509/17
1476 [1] 1475/4
1499 [1] 1475/5
1510 [1] 1475/8
1533 [1] 1475/11
1550 [1] 1475/14
156 [3] 1531/9
 1531/10 1531/15
1568 [1] 1577/13
16 [2] 1488/7 1575/1
18 [2] 1531/10
 1531/15
18th [1] 1512/8
19 [1] 1473/5
19th [1] 1500/9
1:20-cv-3010 [1]
 1473/4
1:37 [1] 1473/6

**2**

20 [2] 1534/14
 1549/19
20001 [2] 1473/17
 1474/25
20005 [1] 1473/14
2002 [2] 1567/21
 1568/1
20024 [1] 1474/8
2008 [1] 1534/15
2009 [4] 1557/2
 1557/5 1557/7 1557/8
2012 [10] 1557/17
 1558/1 1558/3 1566/5
 1566/8 1566/13
 1566/14 1568/21
 1569/4 1569/16
2013 [4] 1557/2
 1557/7 1557/8
 1557/11
2014 [2] 1557/2
 1557/11
2016 [1] 1510/23
2017 [5] 1541/23
 1543/18 1551/1
 1552/21 1553/2
2018 [6] 1490/19
 1491/12 1504/5
 1508/23 1512/8
 1515/1
2019 [5] 1504/1
 1504/5 1504/7 1511/4
 1529/5
2020 [8] 1484/21
 1484/25 1495/25
 1496/16 1496/24
 1497/4 1504/7 1559/9
2021 [6] 1500/9

1504/12 1531/2
1534/3 1535/6
1535/22
2022 [4] 1504/10
1531/8 1531/19
1536/2
2023 [1] 1473/5
209 [1] 1473/19
2200 [2] 1473/23
 1473/23
24 [4] 1531/10
 1531/15 1576/9
 1576/11
26 [1] 1496/16
28 [1] 1484/21
28th [3] 1484/20
 1484/25 1485/3

**3**

30 [5] 1534/7 1534/14
1535/9 1541/2
1541/20
30 percent [5] 1501/8
1501/9 1501/22
1501/23 1501/24
3010 [1] 1474/4
30th [3] 1531/2 1531/7
 1531/19
31st [2] 1531/2 1531/7
333 [1] 1474/24
35 [1] 1501/17
3570 [3] 1499/13
 1499/22 1499/23
3572 [1] 1500/22
3573 [1] 1502/4
360 [2] 1507/10
 1507/17
3:02 p.m [1] 1533/16
3:20 [1] 1533/13

**4**

40 percent [5] 1562/10
1564/3 1564/9
1564/12 1564/16
42 [2] 1485/21
 1485/24
423 [1] 1490/3
436 [1] 1495/15
450 [1] 1473/17
461 [1] 1490/6
462 [3] 1550/16
 1550/19 1550/20
489 [1] 1490/6
4:05 [1] 1533/18

**5**

5 percent [1] 1500/4
5:05 p.m [1] 1577/10

**6**

60 percent [2] 1564/16
1564/19
600 [1] 1473/19
60604 [1] 1473/20
680 [1] 1474/7
6th [1] 1575/17

**7**

7-day [2] 1562/1
 1562/3
7407 [1] 1503/7
7429 [1] 1503/25
78 [3] 1484/22
 1484/25 1485/1
7DA [2] 1560/10
 1561/25
7th [1] 1474/3

**8**

80 percent [1] 1514/17
80203 [1] 1474/4
815 [1] 1513/9
816 [1] 1514/21
817 [1] 1517/14
818 [1] 1520/2
819 [1] 1523/2

**9**

90 percent [1] 1514/17
905 [2] 1528/23
 1529/2
945 [1] 1512/14
9:30 tomorrow [1]
 1570/8

**A**

A.014 [1] 1507/21
ability [2] 1478/12
 1509/4
able [15] 1478/1
1480/5 1480/8
1480/15 1481/22
1482/19 1488/8
1489/23 1492/13
1495/3 1505/16
1508/5 1538/17
1545/15 1545/21
above [3] 1501/4
1560/5 1578/5
above-entitled [1]
1578/5
absent [1] 1564/24
Absolutely [2] 1491/13
1576/19
access [7] 1492/19
1492/21 1522/1
1522/4 1529/21
1537/11 1537/18
according [2] 1501/12
1501/14
according to [1]
1501/12
accuracy [1] 1573/23
accurate [1] 1573/25
achieve [4] 1476/22
1481/13 1481/16
1495/4
acknowledge [1]
1576/2
acquisition [9] 1481/13
1486/18 1486/20
1486/25 1487/14
1537/5 1539/17
1540/13 1540/20
across [4] 1527/12

**A**

across... [3]  1562/12
1564/5 1569/1
acting [1]  1572/2
action [2]  1473/3
1537/15
active [2]  1562/1
1562/3
activity [1]  1491/17
actual [4]  1562/15
1562/16 1564/4
1564/19
actually [17]  1479/25
1489/3 1494/1 1497/2
1497/6 1498/22
1501/22 1503/6
1503/7 1506/17
1507/9 1507/16
1540/19 1549/9
1572/2 1572/22
1576/21
ad [24]  1480/11
1481/2 1481/14
1487/15 1489/17
1491/20 1493/19
1493/24 1494/16
1497/3 1497/5
1500/23 1501/24
1504/5 1504/7
1504/10 1505/7
1505/18 1506/5
1506/7 1506/9
1506/11 1506/15
1506/18
added [1]  1562/14
addition [3]  1479/23
1482/1 1482/5
additional [6]  1508/21
1519/23 1522/16
1561/5 1561/18
1562/22
address [1]  1492/23
addresses [2]  1554/22
1575/12
addressing [2]  1544/12
1544/18
adhere [1]  1548/1
Adidas [3]  1487/18
1487/22 1489/20
Adidas' [1]  1487/18
adjourn [1]  1576/21
adjourned [1]  1577/10
admissibility [1]
1570/14
admission [1]  1547/12
admit [2]  1571/11
1572/7
admitted [9]  1543/25
1545/25 1549/6
1550/19 1550/20
1568/1 1568/2
1575/19 1575/22
admitting [1]  1547/18
ads [76]  1476/8
1476/8 1476/12
1476/12 1476/16
1476/16 1476/22
1476/22 1476/24

1477/1 1477/4 1477/7
1477/7 1477/10
1478/3 1479/19
1479/20 1479/23
1479/23 1479/24
1479/25 1480/3
1480/12 1480/13
1480/17 1480/18
1480/25 1481/11
1481/14 1481/17
1482/1 1482/1 1482/2
1482/2 1482/4 1482/4
1482/5 1484/1 1484/2
1484/15 1484/16
1488/10 1488/12
1489/18 1490/20
1493/23 1493/25
1493/25 1494/2
1497/1 1498/1 1498/4
1498/4 1498/5 1498/5
1498/10 1498/10
1498/15 1498/24
1499/14 1500/1
1500/4 1504/15
1504/21 1506/13
1507/8 1507/10
1507/12 1507/15
1507/17 1507/25
1508/2 1508/19
1535/19 1553/11
1553/22
ads' [2]  1498/7 1498/7
advantages [1]
1544/21
adverse [1]  1510/12
advertise [5]  1494/5
1494/7 1494/8 1494/9
1498/21
advertiser [10]
1476/20 1478/2
1482/17 1494/12
1495/9 1503/3
1505/11 1507/12
1508/18 1509/3
advertisers [35]
1476/23 1476/25
1478/2 1478/7
1478/12 1479/22
1479/25 1481/19
1481/21 1482/12
1482/14 1483/11
1483/17 1484/10
1484/12 1488/5
1493/12 1493/20
1494/10 1494/16
1494/22 1495/1
1495/2 1495/3
1498/23 1506/25
1507/3 1507/6
1508/10 1508/17
1553/6 1553/6 1554/4
1554/14 1555/22
advertising [37]
1478/22 1479/4
1479/7 1480/3
1480/22 1484/6
1484/16 1485/6
1485/6 1488/4

1493/11 1493/12
1493/21 1494/13
1495/7 1496/20
1500/20 1502/10
1535/16 1541/24
1543/23 1544/6
1544/13 1544/19
1544/22 1550/3
1550/5 1551/17
1551/20 1552/1
1553/8 1554/17
1555/9 1556/3 1571/8
1571/14 1571/16
AdWords [2]  1509/1
1509/6
affect [1]  1498/6
affordances [1]
1522/16
afraid [1]  1490/11
afternoon [7]  1473/7
1499/10 1510/3
1510/5 1510/18
1533/21 1543/15
again [18]  1496/3
1499/21 1502/18
1515/11 1520/22
1522/7 1528/6
1539/23 1540/8
1545/20 1548/3
1556/13 1563/19
1564/1 1565/19
1572/4 1573/19
1577/4
ago [1]  1563/9
agree [14]  1476/11
1478/5 1483/25
1484/5 1486/11
1486/21 1487/1
1491/11 1492/5
1492/11 1493/1
1494/11 1496/24
1549/7
agreed [1]  1510/12
agreement [3]  1520/18
1520/18 1526/4
agreements [20]
1511/11 1511/15
1511/18 1513/1
1513/12 1514/6
1514/11 1515/1
1515/4 1516/1
1516/22 1517/1
1520/16 1521/20
1530/22 1532/5
1536/22 1536/25
1539/10 1539/10
agrees [2]  1547/22
1561/6
ahead [3]  1531/17
1544/16 1563/18
AI [3]  1478/22 1478/24
1479/13
AI-driven [1]  1478/22
aid [1]  1523/11
al [1]  1473/3
algorithm [2]  1505/14
1505/15
allocates [2]  1498/20

1501/1
allow [2]  1505/22
1531/16
allowed [2]  1527/25
1544/14
alludes [1]  1545/24
almost [3]  1545/7
1562/9 1564/2
along [3]  1487/19
1508/9 1508/25
Alpha [1]  1496/10
Alphabet's [2]  1496/11
1536/4
alternative [5]  1521/7
1521/10 1521/12
1521/21 1521/23
although [5]  1498/15
1515/2 1516/14
1561/14 1571/9
always [6]  1506/1
1519/9 1534/17
1540/24 1540/25
1565/2
Amazon [31]  1492/4
1492/7 1492/8
1492/10 1492/13
1492/14 1492/19
1492/20 1492/21
1492/22 1493/4
1493/5 1493/13
1493/17 1493/21
1494/5 1494/8
1494/13 1494/19
1496/19 1497/7
1497/15 1497/19
1498/23 1498/24
1499/1 1499/25
1500/6 1526/19
1532/10 1532/14
Amazon's [5]  1493/18
1497/3 1497/5
1500/17 1501/4
AMERICA [1]  1473/3
Americas [1]  1473/23
AMIT [1]  1473/10
among [4]  1514/6
1535/13 1555/4
1555/19
Amongst [1]  1536/16
amount [2]  1503/4
1540/12
analogy [2]  1480/25
1575/16
analyses [2]  1511/10
1511/14
analysis [14]  1496/20
1496/25 1497/15
1501/14 1501/15
1511/17 1511/20
1534/24 1535/1
1535/13 1535/12
1555/13 1556/24
1557/1
analyst [2]  1496/9
1531/1
analyzed [1]  1539/21
Android [30]  1510/11
1511/24 1511/5 1511/7

1511/11 1511/24
1513/2 1513/12
1514/3 1514/4
1514/12 1514/25
1515/10 1516/11
1516/19 1516/25
1523/16 1523/20
1527/6 1528/17
1532/15 1533/6
1541/11 1560/9
1560/19 1561/25
1565/8 1565/12
1565/22 1566/1
angle [1]  1528/6
announce [1]  1568/25
answered [4]  1492/15
1492/16 1504/17
1544/3
antitrust [2]  1474/3
1573/6
apologies [3]  1490/9
1495/17 1495/21
apologize [2]  1495/23
1549/11 1562/20
1563/2 1575/1
apology [1]  1569/16
app [22]  1509/1
1518/14 1530/7
1530/10 1530/14
1530/20 1531/23
1532/12 1533/7
1538/3 1562/4
1566/18 1566/20
1566/23 1566/25
1567/4 1567/6 1567/8
1567/10 1569/1
1569/5 1569/10
appear [5]  1482/21
1483/1 1483/9
1483/12 1493/23
APPEARANCES [2]
1473/12 1474/1
appeared [1]  1574/19
Apple [27]  1537/15
1537/18 1538/2
1538/21 1539/4
1540/1 1541/12
1557/18 1558/3
1558/4 1558/6 1558/6
1558/7 1558/8
1558/11 1558/14
1559/2 1560/8
1561/23 1562/12
1564/4 1564/8
1564/25 1566/18
1569/1 1569/16
1569/21
Apple's [2]  1560/9
1569/15
application [4]  1538/2
1538/3 1566/6
1566/18
applied [1]  1518/9
apply [8]  1517/9
1518/25 1519/5
1519/14 1519/19
1519/23 1522/12
1522/24

**A**

appreciate [2] 1567/21 1574/10
approach [6] 1490/13 1495/18 1505/7 1510/14 1538/4 1542/4
appropriate [1] 1505/12
appropriately [1] 1480/9
approximately [1] 1534/13
apps [9] 1487/15 1521/16 1522/15 1524/14 1524/17 1526/20 1529/16 1529/22 1530/4
April [1] 1551/1
April 2017 [1] 1551/1
area [3] 1517/19 1554/3 1557/13
areas [1] 1536/16
arose [1] 1577/4
around [10] 1491/19 1533/12 1540/16 1552/16 1557/4 1557/11 1559/5 1560/3 1560/8 1568/24
article [4] 1490/24 1491/6 1491/18 1496/10
artificial [1] 1478/24 1480/6
artists [1] 1488/8
Asia [2] 1551/14 1556/14
Asia-Pacific [2] 1551/14 1556/14
aside [4] 1487/9 1533/5 1556/22 1569/25
aspect [2] 1486/25 1566/12
aspects [1] 1534/25
assess [2] 1506/11 1506/25
assesses [1] 1573/5
assets [3] 1481/7 1481/8 1493/20
assistant [1] 1524/21
associate [1] 1574/6
associated [2] 1481/2 1544/25
assume [1] 1572/23
assumed [4] 1562/11 1562/16 1564/4 1564/18
Assuming [1] 1546/7
assumptions [2] 1526/22 1539/6
attention [6] 1507/21 1518/12 1543/21 1560/4 1562/7 1573/14
attorneys [1] 1534/10
auction [17] 1478/5

1478/6 1478/8 1505/12 1505/19 1506/5 1552/6 1552/16 1553/8 1553/17 1553/18 1553/24 1554/7 1554/13 1554/16 1555/24 1556/2
auctions [9] 1477/19 1477/22 1477/25 1478/4 1505/7 1553/8 1553/22 1554/17 1556/3
audience's [1] 1573/14
augment [1] 1507/2
author [1] 1486/17
authorizing [1] 1575/18
automated [2] 1480/9 1481/17
available [15] 1487/21 1487/22 1492/6 1492/8 1492/13 1492/20 1492/21 1492/21 1493/2 1493/3 1493/4 1549/10 1560/18 1567/3 1568/19
Avenue [3] 1473/23 1474/7 1474/24
average [1] 1491/23
averages [3] 1520/9 1520/19 1521/17
avoid [2] 1505/7 1538/14
aware [12] 1487/5 1494/4 1494/11 1528/17 1528/20 1532/7 1532/11 1533/6 1557/25 1566/21 1569/14 1569/15
away [2] 1497/1 1556/16

**B**

back [12] 1476/6 1479/16 1479/18 1497/10 1509/8 1533/18 1536/17 1537/22 1550/1 1563/25 1566/15 1577/3
Bankruptcy [1] 1474/24
bar [9] 1500/5 1500/19 1500/19 1501/7 1502/7 1527/12 1527/15 1527/17 1527/17
based [17] 1488/13 1496/20 1500/8 1500/9 1501/2 1502/1 1504/4 1505/14 1505/20 1507/12 1509/3 1514/10 1516/24 1527/5 1530/12 1538/25 1569/9

bases [1] 1547/8
basic [1] 1549/8
basically [2] 1498/19 1501/20
basis [6] 1552/2 1555/11 1569/24 1570/14 1574/20 1575/19
Bates [10] 1485/21 1496/13 1499/23 1512/14 1513/8 1514/21 1517/13 1520/2 1523/2 1528/23
become [2] 1497/2 1498/16
behalf [2] 1498/21 1498/24
behavior [1] 1499/2
behind [2] 1531/9 1553/12
belief [1] 1570/17
beliefs [1] 1571/7
believes [1] 1572/19
Belknap [1] 1473/22
below [2] 1509/5 1509/7
bench [2] 1473/9 1548/1
benefit [1] 1537/12
benefits [2] 1553/23 1554/16
BENNETT [1] 1474/6
best [2] 1496/20 1561/17
better [5] 1478/1 1481/22 1506/2 1525/10 1526/24
beyond [3] 1532/14 1533/8 1561/11
bid [3] 1481/15 1506/14 1554/5
bidder [4] 1505/11 1505/18 1506/5 1554/9
bidders [4] 1477/25 1478/6 1478/8 1554/8
bidding [1] 1553/20
bids [1] 1478/10
big [3] 1491/19 1515/24 1556/20
bigger [2] 1563/15 1573/9
binder [10] 1484/21 1489/25 1490/1 1490/8 1490/10 1495/12 1495/16 1497/16 1542/8 1550/16
binders [2] 1510/14 1542/4
Bing [12] 1507/21 1508/3 1508/22 1509/6 1509/6 1509/15 1524/18 1526/2 1526/8 1527/21 1528/14 1533/1

bit [5] 1483/22 1493/11 1513/22 1560/3 1560/7
Bita [1] 1559/17
biz [1] 1486/8
blog [1] 1568/5
blogs [1] 1568/7
blow [3] 1542/7 1551/5 1554/20
blue [5] 1499/18 1502/11 1560/10 1561/25 1565/11 1565/11
BMM [2] 1477/14 1477/15
body [1] 1491/15
both [12] 1477/9 1494/15 1498/4 1498/6 1498/9 1506/11 1519/22 1522/11 1522/23 1523/20 1527/7 1576/24
bottom [8] 1485/24 1496/13 1512/13 1515/16 1547/25 1551/4 1560/5 1572/7
bound [1] 1517/25
box [3] 1521/3 1521/9 1521/19
boxes [1] 1524/1
Braddi [5] 1491/3 1491/3 1491/4 1496/4 1497/12
break [3] 1476/7 1533/15 1577/7
breakdown [3] 1500/6 1502/8 1502/9
brief [5] 1510/2 1510/7 1517/13 1567/24 1571/18
briefing [1] 1571/21
briefly [1] 1528/24
bring [1] 1561/2
broadcast [1] 1575/13
broader [7] 1492/5 1492/9 1492/10 1492/12 1493/2 1493/20 1575/13
Broadway [1] 1474/3
browser [4] 1522/4 1522/9 1524/13 1524/20
browsers [2] 1525/15 1537/1
bubble [2] 1527/24 1528/1
budget [1] 1553/7
budgets [5] 1493/12 1493/12 1493/17 1494/11 1555/23
build [1] 1509/3
bullet [3] 1509/8 1543/21 1555/3
bullets [1] 1543/16
bunch [1] 1529/13
bundle [3] 1529/17 1530/5 1530/10
burning [1] 1574/6

business [28] 1476/20 1476/22 1481/12 1481/16 1486/24 1491/20 1493/19 1497/3 1497/5 1501/6 1512/19 1516/8 1534/25 1541/25 1543/6 1543/7 1544/9 1544/22 1544/25 1545/13 1547/3 1547/7 1547/18 1548/2 1548/14 1557/20 1570/18 1571/14
businesses [1] 1486/13
buy [4] 1478/3 1494/1 1498/24 1525/14
buying [3] 1480/10 1480/25 1481/1

**C**

called [5] 1478/16 1482/8 1513/12 1537/5 1558/4
calls [1] 1510/10
came [3] 1550/14 1552/14 1557/24
campaign [1] 1480/10
campaigns [6] 1480/1 1481/2 1481/6 1481/20 1498/16 1509/1
can [68] 1476/14 1478/8 1480/20 1481/10 1481/22 1484/24 1485/15 1487/9 1487/12 1489/8 1489/18 1491/14 1492/7 1492/16 1493/4 1496/12 1498/25 1503/18 1506/9 1506/23 1507/2 1509/2 1509/8 1514/21 1518/4 1522/15 1525/5 1525/14 1528/21 1541/19 1542/13 1544/2 1546/1 1547/2 1547/17 1547/21 1547/24 1548/16 1549/16 1549/22 1550/22 1553/19 1556/22 1560/12 1560/23 1561/9 1561/10 1561/17 1561/18 1561/20 1563/19 1563/25 1565/11 1565/20 1568/4 1569/19 1572/19 1573/12 1573/24 1574/1 1574/8 1575/1 1575/15 1576/11 1576/14
candidates [1] 1506/12

**C**

cannibalization [1] 1497/18
cannibalizing [3] 1496/21 1497/5 1497/7
capabilities [1] 1561/11
capacity [3] 1543/7 1571/2 1572/2
capture [2] 1500/17 1520/12
captures [1] 1499/25
capturing [1] 1500/6
career [1] 1556/23
Carlos [2] 1559/8 1559/22
carrier [3] 1515/15 1516/15 1517/8
carriers [11] 1514/13 1514/18 1515/4 1515/7 1515/12 1515/20 1516/13 1516/16 1517/3 1520/6 1520/13
case [11] 1479/24 1479/24 1504/14 1505/22 1505/23 1530/25 1537/3 1541/22 1550/13 1573/7 1575/20
cases [10] 1480/7 1480/7 1487/4 1487/7 1492/9 1492/10 1493/25 1493/25 1509/5 1575/17
categories [2] 1498/12 1515/9
category [1] 1498/13
cause [1] 1553/16
CAVANAUGH [5] 1473/22 1475/5 1499/7 1499/20 1576/21
caveating [3] 1553/21 1554/2 1567/5
CEO [1] 1569/15
certain [18] 1481/2 1498/20 1509/2 1514/4 1519/8 1524/16 1537/11 1539/19 1541/14 1553/10 1553/12 1553/14 1566/19 1567/14 1569/8 1569/8 1571/5 1571/7
certainly [9] 1483/14 1484/25 1507/11 1541/16 1548/7 1569/11 1571/2 1572/21 1575/5
certify [1] 1578/4
CFO [1] 1536/4
chain [8] 1490/19 1490/23 1490/25 1496/1 1512/15 1513/4 1556/8 1556/10

change [6] 1497/9 1517/15 1517/19 1521/3 1523/4 1537/22
changes [1] 1518/9
changing [1] 1505/10
channel [2] 1508/19 1557/10
channels [1] 1508/15
characterization [1] 1505/25
chart [11] 1500/9 1501/1 1565/6 1565/7 1565/11 1565/20 1565/20 1565/25 1566/22 1569/20 1569/23
charts [2] 1560/8 1563/20
chat [2] 1551/17 1552/12
check [1] 1548/20
Chicago [1] 1473/20
chief [1] 1512/19
choose [1] 1542/10
chose [1] 1524/19
Chrome [11] 1518/17 1522/8 1522/17 1530/10 1530/15 1530/20 1531/23 1532/8 1532/13 1533/7 1538/2
circumstance [2] 1537/17 1537/20
circumstances [1] 1539/24
Civil [1] 1473/3
clawback [1] 1539/8
clean [1] 1525/13
clear [2] 1483/21 1567/16
clearly [2] 1546/19 1570/22
close [1] 1515/16
closed [3] 1533/12 1533/17 1546/12
closely [1] 1491/8
closer [1] 1513/21
co [5] 1474/4 1496/21 1496/25 1498/18 1498/19
co-op [4] 1496/21 1496/25 1498/18 1498/19
colleagues [1] 1572/5
Colorado [3] 1473/22 1474/2 1474/2
COLUMBIA [1] 1473/1
column [6] 1508/21 1509/16 1514/25 1515/5 1518/12 1520/22
columns [1] 1501/7
combination [1] 1488/3
coming [3] 1496/21 1496/25 1501/25
comment [4] 1486/14 1527/24 1527/25

1572/16
comments [1] 1485/24
commercial [5] 1488/23 1489/12 1492/2 1503/11 1504/1
commissioned [2] 1507/11 1507/11
commissions [1] 1507/7
communicate [2] 1483/14 1526/22
communicated [1] 1574/15
communications [2] 1543/15 1571/22
companies [3] 1493/16 1493/17 1516/25
company [3] 1539/11 1540/23 1572/10
company's [2] 1571/13 1576/25
comparable [9] 1486/7 1486/12 1486/23 1487/14 1505/18 1506/5 1506/13 1506/25 1507/1
compare [1] 1489/16
compared [1] 1560/9
comparing [1] 1505/23
comparison [1] 1492/7
compete [2] 1525/10 1526/24
competition [2] 1492/4 1555/8
competitive [3] 1497/15 1528/9 1554/25
competitor [5] 1487/23 1552/22 1553/3 1553/4 1556/20
complementary [4] 1480/2 1480/4 1480/8 1494/14
component [3] 1479/13 1479/14 1491/19
components [1] 1526/1
concept [1] 1560/16
concern [1] 1576/10
concerns [1] 1575/14
conclude [1] 1570/3
conducting [1] 1511/10
confidential [1] 1510/8
confidentiality [3] 1549/13 1560/22 1577/2
confront [1] 1547/16
confusing [1] 1525/8
Congratulations [1] 1535/25
connected [1] 1561/15
Connolly [1] 1474/7
consider [2] 1547/8 1547/10
consideration [1] 1558/20

considered [2] 1524/15 1547/7
considering [2] 1525/9 1526/23
consistent [4] 1531/12 1556/1 1556/5 1575/3
constitute [1] 1570/17
constituted [1] 1525/16
Constitution [1] 1474/24
consulted [2] 1511/17 1511/20
consumer [4] 1493/15 1493/22 1494/18 1557/15
CONT [1] 1474/1
contain [1] 1576/1
contained [1] 1543/17
content [2] 1487/23 1487/25
contents [2] 1545/24 1571/5
context [8] 1525/24 1540/16 1544/9 1572/1 1573/1 1573/20 1573/22 1577/4
contexts [1] 1576/4
continue [8] 1477/9 1481/25 1482/4 1498/9 1533/12 1561/20 1564/25 1570/8
continued [3] 1475/4 1476/3 1565/22
Continuing [1] 1488/18
contracts [2] 1514/19 1521/23
contributes [1] 1500/20
conversation [6] 1549/23 1550/15 1552/13 1569/17 1572/4 1576/13
conversations [1] 1541/13
convey [1] 1528/8
Cook [1] 1569/15
copy [2] 1490/12 1531/4
corporate [1] 1534/8
correctly [2] 1480/23 1505/6
corrects [1] 1480/3
correspond [2] 1481/1 1524/2
Cortana [1] 1524/18
cosmetic [1] 1488/9
cost [3] 1481/13 1486/20 1539/17
costs [6] 1486/18 1486/25 1487/6 1537/5 1540/13 1540/21
counsel [9] 1476/7 1477/12 1478/15 1482/7 1485/15 1485/17 1503/8 1505/2 1545/23

countries [4] 1555/4 1555/19 1569/8 1569/9
counts [1] 1573/4
couple [1] 1559/4
course [10] 1543/15 1543/17 1545/1 1545/19 1546/24 1546/25 1549/11 1573/2 1575/2 1575/11
court [24] 1473/1 1474/23 1474/23 1510/6 1511/23 1528/23 1531/13 1533/3 1533/23 1536/11 1538/19 1548/25 1549/3 1549/14 1549/14 1559/11 1575/4 1575/6 1575/18 1576/8 1576/8 1576/10 1578/3
Court's [2] 1488/22 1517/12
courtroom [1] 1561/11
Courts [1] 1474/24
cover [3] 1519/12 1533/17 1559/6
covered [6] 1518/5 1520/10 1520/10 1523/16 1523/20 1524/9
CPS [1] 1474/3
CPS/Antitrust [1] 1474/3
create [4] 1481/14 1505/15 1507/18 1553/19
created [2] 1488/3 1541/25
creative [2] 1481/7 1481/8
creatives [1] 1481/2
Cristina [1] 1559/17
Crunch [1] 1490/20
Cup [1] 1503/23
current [7] 1505/14 1505/24 1513/12 1517/14 1520/8 1523/3 1531/25
currently [1] 1533/25
cut [2] 1508/25 1508/25
cuts [5] 1507/21 1508/22 1509/1 1509/18 1509/20
cv [1] 1473/4

**D**

DAHLQUIST [3] 1473/18 1475/4 1476/2
daily [1] 1508/20
Daniel [1] 1568/9
data [8] 1482/21 1541/8 1541/10

**D**

data... [5] 1541/16
1558/10 1558/14
1558/23 1559/2
datapoint [4] 1558/11
1558/13 1558/19
1558/24
datapoints [1] 1539/1
date [4] 1500/8 1531/3
1568/21 1578/10
dated [1] 1560/7
dates [2] 1559/21
1559/23
daughter [1] 1488/7
DAVID [1] 1473/18
day [9] 1473/7
1548/22 1549/22
1562/1 1562/3 1570/4
1575/19 1576/4
1577/7
days [1] 1562/5
DC [5] 1473/5 1473/14
1473/17 1474/8
1474/25
deal [11] 1537/2
1539/12 1539/14
1539/18 1539/23
1539/23 1540/8
1540/18 1540/20
1550/12 1553/11
deals [16] 1511/24
1514/3 1516/15
1536/15 1536/19
1536/20 1537/2
1537/9 1539/19
1539/22 1539/25
1540/11 1540/14
1540/24 1540/25
1550/2
dealt [1] 1535/18
decade [1] 1545/7
deceleration [2]
1503/16 1503/21
December [6] 1490/19
1566/5 1566/8
1566/13 1568/21
1569/4
December 12th [1]
1568/21
December 2012 [4]
1566/5 1566/8
1566/13 1569/4
decide [1] 1522/15
decision [2] 1540/17
1577/5
deck [1] 1513/11
declined [1] 1565/21
declining [1] 1526/25
default [39] 1518/20
1518/23 1522/1
1522/3 1522/9 1523/7
1523/12 1528/18
1536/25 1537/9
1537/14 1537/21
1537/22 1538/21
1539/4 1539/10
1539/16 1539/17
1540/6 1540/11

1540/12 1540/20
1557/18 1557/25
1558/7 1558/10
1558/15 1558/16
1560/9 1560/21
1561/21 1564/8
1564/12 1564/21
1564/24 1564/24
1565/25 1567/3
1567/7
defaults [6] 1537/4
1538/14 1541/4
1541/11 1541/17
1558/21
Defendant [2] 1473/7
1474/6
defense [1] 1485/16
defer [1] 1514/1
deference [1] 1484/15
define [4] 1476/19
1534/22 1538/10
1566/24
defined [2] 1516/15
1521/23
defining [1] 1515/3
definitely [2] 1553/21
1566/24
definition [1] 1540/9
degree [3] 1497/18
1538/9 1539/24
demand [3] 1506/24
1545/16 1545/21
Denver [1] 1474/4
department [6]
1473/13 1473/16
1473/19 1474/2
1534/18 1545/10
depend [4] 1536/20
1537/2 1537/17
1539/18
depending [6] 1478/10
1535/2 1536/21
1537/24 1538/13
1539/12
depends [4] 1526/4
1534/22 1539/23
1557/4
depicted [1] 1566/21
depicting [1] 1529/4
deposed [1] 1534/5
deposition [10]
1484/19 1484/20
1494/21 1494/25
1530/24 1531/5
1532/3 1534/3
1535/21 1541/2
describe [4] 1480/20
1544/23 1545/15
1545/21
described [8] 1478/21
1487/17 1489/19
1518/7 1518/13
1520/23 1526/5
1541/24
describing [2] 1544/21
1571/15
designated [2] 1510/8
1541/3

designed [1] 1491/16
determine [2] 1539/11
1539/14
develop [1] 1488/1
device [36] 1516/12
1517/9 1518/15
1518/18 1519/22
1520/24 1521/1
1521/2 1521/6 1521/7
1521/19 1521/20
1522/11 1522/22
1523/16 1523/20
1524/6 1524/13
1524/15 1525/4
1525/8 1525/14
1525/14 1526/2
1526/3 1526/6 1526/8
1526/17 1527/11
1528/3 1528/11
1530/1 1530/4 1532/8
device's [1] 1518/23
devices [37] 1514/16
1516/13 1516/25
1517/1 1517/5
1519/11 1519/12
1520/10 1520/13
1521/18 1521/22
1523/10 1526/19
1528/7 1528/8
1529/19 1530/13
1530/14 1530/18
1530/20 1531/21
1531/22 1532/10
1532/14 1533/5
1533/8 1537/1
1537/15 1541/12
1557/18 1557/22
1564/9 1564/13
1564/22 1565/8
1565/14 1565/21
difference [10] 1476/8
1483/25 1484/3
1484/4 1484/6
1484/10 1484/18
1485/5 1486/19
1489/5
differences [4] 1486/7
1486/13 1486/23
1520/15
different [25] 1477/16
1487/16 1488/24
1508/15 1520/11
1521/15 1523/7
1525/6 1526/1
1530/16 1532/18
1534/25 1539/19
1547/6 1547/18
1550/1 1557/4 1557/8
1557/15 1560/24
1560/24 1561/2
1570/1 1571/6 1572/6
differently [1] 1481/6
difficult [1] 1547/1
DINTZER [1] 1473/13
direct [12] 1475/8
1475/11 1477/20
1488/19 1488/20

1510/16 1518/12
1533/19 1536/9
1543/21 1560/4
1562/7
directional [2] 1558/19
1558/25
directly [8] 1481/4
1481/20 1486/7
1486/12 1486/22
1489/12 1489/20
1492/23
director [4] 1535/7
1536/18 1545/4
1568/13
disagree [2] 1555/11
1555/13
disagreed [1] 1555/18
disagrees [3] 1547/15
1547/23 1547/23
DISCHLER [9] 1475/3
1476/3 1476/6 1476/6
1496/17 1499/8
1499/10 1509/22
1509/23
disclose [1] 1576/25
discloses [1] 1563/6
discretion [1] 1549/5
discuss [3] 1533/14
1570/9 1576/20
discussed [4] 1487/12
1524/17 1546/10
1563/8
discussion [2] 1558/24
1561/3
discussions [1] 1495/6
display [2] 1504/15
1504/21
dispute [3] 1549/7
1566/8 1572/12
distinct [1] 1535/16
distinction [2] 1517/24
1519/6
distributed [1] 1514/17
distribution [10] 1503/3
1536/19 1536/22
1537/9 1539/10
1539/10 1539/22
1539/25 1540/11
1540/20
distributors [3] 1514/12
1514/25 1515/2
DISTRICT [4] 1473/1
1473/1 1473/10
1474/24
diversifying [1]
1493/19
divided [1] 1515/9
document [42]
1479/17 1485/17
1486/16 1487/9
1492/3 1500/22
1503/13 1512/5
1517/23 1520/3
1524/23 1528/21
1541/23 1542/23
1542/25 1543/5
1543/12 1543/18
1544/5 1544/7

1544/24 1545/15
1545/20 1545/24
1545/24 1546/2
1546/16 1547/14
1547/16 1547/24
1547/25 1548/12
1548/16 1548/18
1549/7 1549/20
1550/9 1559/5 1571/8
1573/7 1573/10
1573/17
document's [1] 1544/5
documentation [1]
1483/21
documents [7] 1485/15
1487/11 1504/4
1510/7 1513/5
1513/15 1542/7
DOJ [1] 1473/13
dollar [1] 1501/2
dollars [5] 1501/13
1501/21 1502/1
1553/19 1555/9
domain [1] 1487/25
done [5] 1492/3
1506/19 1539/22
1539/25 1572/2
doubt [2] 1563/12
1571/18
down [7] 1496/13
1515/16 1542/22
1543/15 1560/23
1574/16 1575/4
download [4] 1538/2
1566/23 1567/8
1569/5
downloading [1]
1566/17
downsides [1] 1505/21
dozens [2] 1534/20
1534/20
draft [1] 1574/3
dragging [1] 1548/24
Drawing [1] 1507/21
drive [5] 1481/4
1498/24 1499/14
1503/4 1554/13
driven [2] 1478/22
1500/23
Drives [1] 1499/14
dropped [1] 1494/16
DSA [4] 1507/22
1507/24 1508/22
1509/15
DuckDuckGo [1]
1528/15
due [2] 1491/7
1503/23
Duo [5] 1532/17
1532/20 1532/20
1532/24 1533/3
during [11] 1476/7
1477/12 1482/7
1483/22 1528/24
1533/14 1551/16
1556/23 1565/20
1565/24 1573/8
duties [1] 1546/25

**D**

duties... [1] 1547/6
DX120A [1] 1507/20
DX142 [1] 1503/5
DX164 [2] 1485/16
 1485/16
DX231 [4] 1499/10
 1499/11 1499/12
 1499/21
dynamic [1] 1507/24
 1507/25
dynamically [1]
 1481/14

**E**

e-mail [38] 1490/2
1490/19 1490/23
1490/25 1491/2
1491/5 1491/12
1491/13 1491/15
1496/1 1496/3 1496/6
1496/13 1496/16
1496/19 1496/24
1497/4 1497/12
1498/1 1498/22
1512/7 1512/13
1512/15 1513/4
1550/23 1551/4
1551/16 1551/25
1553/2 1554/19
1555/17 1556/8
1556/12 1556/12
1559/8 1560/2 1560/4
1575/12
e-mails [1] 1550/25
1575/12
earnings [2] 1496/7
1496/11
earns [1] 1477/3
easier [1] 1478/3
easy [1] 1538/16
Economic [2] 1517/19
1535/4
economics [2] 1545/12
1573/4
ecosystem [2] 1520/10
1520/13
Edge [1] 1524/18
editorial [1] 1496/10
EDWARD [1] 1474/6
EEA [2] 1517/15
1518/10
effective [2] 1488/4
1489/23
effectively [1] 1498/25
effectiveness [1]
1482/17
effort [3] 1538/12
1538/22 1539/5
either [12] 1477/7
1487/25 1527/19
1541/11 1545/25
1547/22 1552/15
1560/15 1560/16
1563/8 1563/9 1577/6
element [1] 1494/20
eligible [3] 1476/23
1478/3 1478/7

else [4] 1552/11
1572/20 1576/20
1577/7
elsewhere [1] 1497/15
employee [4] 1548/5
1570/20 1570/23
1571/2
employees [1] 1551/1
employment [5]
1570/21 1571/14
1571/24 1572/1
1573/22
end [3] 1549/22
1569/8 1571/20
ending [8] 1485/22
1512/14 1513/9
1514/21 1517/14
1520/2 1523/2
1528/23
engages [1] 1487/24
engine [12] 1504/15
1518/20 1522/3
1524/12 1524/20
1537/1 1537/14
1537/14 1537/21
1538/21 1552/18
1552/22
engineering [1]
1535/15
enough [3] 1503/15
1503/21 1559/24
ensuring [1] 1575/25
entail [1] 1538/8
enter [1] 1540/18
entered [2] 1540/14
1540/19
enterprise [2] 1557/9
1557/14
enters [2] 1536/22
1540/10
entertainment [1]
1493/17
entire [2] 1503/20
1506/10
entities [1] 1515/9
entitled [4] 1485/17
1520/8 1577/1 1578/5
enumerated [1]
1504/19
equal [1] 1505/18
especially [1] 1517/25
essentially [2] 1487/13
1521/1
established [1]
1546/19
estimate [1] 1559/1
estimated [3] 1501/22
1539/3 1539/4
estimates [1] 1539/7
et [1] 1473/3
European [1] 1517/19
evaluates [1] 1539/9
Evan [3] 1551/5
1551/11 1551/11
even [5] 1507/10
1528/3 1562/21
1562/23 1571/25
evening [2] 1574/4

1577/6
everybody [1] 1577/9
evidence [21] 1475/16
1475/17 1495/22
1495/23 1497/6
1512/2 1542/11
1543/3 1546/6 1548/2
1548/12 1548/16
1549/6 1549/9
1550/20 1559/4
1568/2 1571/17
1575/19 1575/25
1576/2
evidentiary [1] 1570/4
exact [5] 1512/20
1531/3 1559/23
1566/7 1567/14
exactly [1] 1519/6
1520/6 1521/15
exaggeration [2]
1544/24 1545/18
Examination [8]
1475/4 1475/5 1475/8
1475/11 1476/3
1499/8 1510/16
1533/19
examine [1] 1562/21
examined [1] 1560/8
example [4] 1488/6
1488/18 1523/19
1537/13
examples [3] 1488/22
1524/14 1524/19
exceeded [1] 1540/21
exceeds [1] 1540/12
exception [2] 1572/14
1572/15
exceptions [1] 1521/15
exchange [4] 1496/3
1550/23 1559/8
1560/2
exchanged [1] 1560/24
exclusivity [10]
1520/25 1521/1
1521/5 1521/6 1521/9
1521/13 1521/18
1521/20 1526/3
1526/6
excuse [1] 1570/21
executive [2] 1512/21
1571/13
executives [1] 1491/4
exercising [1] 1549/5
exhibit [11] 1475/15
1475/16 1475/17
1513/8 1542/15
1550/20 1567/16
1567/18 1567/20
1567/20 1568/2
exhibits [5] 1574/14
1575/1 1575/11
1575/19 1576/4
exist [2] 1567/9
1569/23
existed [2] 1548/6
1570/22
exited [1] 1516/8
expect [2] 1539/16

1540/6
expected [2] 1540/11
1540/21 1564/25
experience [7] 1516/24
1521/4 1521/10
1525/7 1525/12
1525/17 1528/8
1537/7 1539/6
experimental [3]
1479/10 1479/13
1506/3
expert [1] 1553/21
expertise [1] 1554/3
explaining [1] 1555/4
explanation [3]
1481/23 1553/13
1553/22
explicitly [2] 1488/1
1569/12
express [1] 1555/18
extend [1] 1570/25
extent [6] 1492/18
1493/3 1497/7 1519/3
1519/14 1519/18
extra [4] 1537/15
1538/12 1538/12
1562/9
extrapolation [1]
1565/3
extremely [2] 1488/3
1489/22
eyes [2] 1500/5
1575/24

**F**

Facebook [37]
1483/23 1484/2
1484/7 1484/8
1484/16 1485/5
1485/17 1486/4
1486/6 1486/12
1486/18 1486/20
1486/22 1487/5
1487/19 1487/20
1489/17 1489/18
1489/21 1489/23
1490/20 1491/11
1491/14 1491/15
1491/16 1491/18
1491/22 1491/24
1491/24 1492/1
1494/13 1494/17
1494/21 1494/24
1495/5 1495/8 1509/6
Facebook's [2]
1484/17 1485/7
faces [1] 1555/7
fact [10] 1497/21
1507/10 1508/25
1521/12 1526/13
1534/3 1534/7
1558/14 1572/21
1575/25
factors [1] 1540/24
factual [1] 1572/12
fair [7] 1515/5 1517/9
1518/7 1523/13
1525/2 1542/14
1559/24

fairness [1] 1549/6
familiar [7] 1511/14
1545/12 1545/14
1545/14 1550/4
1557/20 1568/9
far [3] 1541/19
1548/13 1575/16
fast [1] 1540/15
faster [1] 1497/22
fastest [4] 1479/1
1479/3 1479/4 1479/7
fault [1] 1495/17
favor [2] 1494/13
1494/19
FB [1] 1486/3
feasible [2] 1508/22
1508/23
feature [6] 1491/14
1491/15 1491/25
1506/24 1507/1
1509/7
features [8] 1481/18
1507/3 1508/3 1508/9
1508/10 1508/11
1509/3 1509/5
February [2] 1495/25
1496/16
February 2020 [1]
1495/25
February 26 [1]
1496/16
feed [3] 1481/9
1481/11 1481/11
feed-type [1] 1481/11
feedback [2] 1507/14
1509/4
fees [2] 1500/17
1500/17
few [7] 1487/11
1497/10 1506/20
1543/15 1560/12
1563/9 1565/7
fewer [1] 1498/7
Fifth [1] 1473/17
fight [1] 1573/24
figure [2] 1499/1
1547/2
figured [1] 1481/20
figures [1] 1565/19
file [1] 1549/13
final [1] 1577/5
finance [25] 1510/11
1511/4 1511/7
1534/18 1534/20
1535/7 1535/12
1535/22 1536/14
1536/17 1536/18
1538/20 1539/3
1545/4 1545/10
1551/10 1551/13
1552/8 1556/13
1558/12 1559/11
1566/16 1573/4
financial [11] 1511/1
1511/20 1534/24
1535/1 1535/1
1535/13 1536/18

**F**

financial... [4] 1556/23
1557/1 1562/11
1562/14
find [1] 1495/10
fine [5] 1509/12
1548/16 1563/23
1567/25 1574/4
finish [1] 1544/15
Fire [1] 1532/10
firm [1] 1570/17
first [11] 1494/20
1531/9 1543/21
1554/19 1555/3
1556/19 1559/6
1560/6 1560/7
1563/18 1568/23
five [2] 1533/12 1573/8
flip [1] 1513/7
floated [2] 1556/7
1556/9
floating [1] 1553/15
Floor [1] 1474/3
fly [2] 1561/9 1561/10
focus [8] 1490/1
1491/5 1494/17
1495/5 1496/12
1527/10 1545/16
1545/21
focused [4] 1485/24
1509/13 1531/9
1557/9
Focusing [1] 1513/4
foldable [1] 1532/17
folks [3] 1497/6
1499/11 1550/11
follow [1] 1528/25
following [3] 1485/3
1485/4 1502/4
For Plaintiff [1]
1473/22
foregoing [1] 1578/4
forgotten [1] 1532/4
form [2] 1531/24
1531/25
formal [1] 1549/13
formats [1] 1504/19
former [1] 1510/11
forth [2] 1497/10
1550/2
forward [3] 1514/20
1520/1 1523/1
forwarded [1] 1490/23
found [1] 1490/2
foundation [11]
1542/13 1542/20
1543/4 1544/1 1544/2
1544/3 1546/17
1546/18 1546/19
1548/14 1572/13
four [3] 1515/19
1515/24 1528/22
fourth [1] 1513/8
framework [1] 1540/17
free [1] 1521/3
friction [5] 1537/10
1538/9 1538/10
1538/15 1566/17

friends [1] 1499/5
front [3] 1484/21
1512/5 1542/7
fulfillment [1] 1500/1
full [13] 1480/6
1486/14 1492/6
1492/12 1492/18
1493/2 1494/23
1503/14 1510/20
1510/21 1544/24
1571/21 1574/25
function [5] 1505/20
1505/21 1505/24
1505/24 1506/1
functionality [1] 1480/6
fundamental [4]
1486/7 1486/13
1486/23 1574/22
fundamentally [2]
1574/23 1576/5
further [4] 1499/4
1509/21 1528/21
1572/16
future [3] 1480/11
1489/10 1565/2

**G**

gain [1] 1539/16
gallery [1] 1574/21
gang [1] 1548/21
gave [2] 1531/13
1532/3
gears [1] 1549/25
general [6] 1489/14
1513/20 1513/24
1540/10 1546/1
1565/7
generally [3] 1511/16
1520/5 1555/20
Gennai [1] 1512/8
geographically [1]
1572/22
geography [1] 1526/4
gets [3] 1521/2
1548/13 1548/25
Gil [1] 1559/22
given [3] 1539/2
1542/8 1553/11
globally [1] 1521/18
GM [1] 1484/14
GMM [2] 1560/8
1560/13
GMS [3] 1529/16
1530/4 1530/10
GMV [7] 1499/14
1499/16 1499/25
1500/6 1500/23
1501/10 1501/18
goal [3] 1477/18
1477/20 1503/25
goes [1] 1481/6
good [9] 1494/18
1499/10 1507/18
1510/3 1510/5
1510/18 1533/11
1533/21 1549/24
goods [5] 1493/13
1493/15 1493/16

1493/22 1502/1
GOOGLE [215]
Google's [24] 1485/6
1485/6 1492/21
1511/11 1518/14
1518/22 1521/25
1534/25 1540/12
1540/23 1543/6
1545/13 1550/2
1550/3 1550/5 1551/8
1551/17 1553/8
1556/3 1568/7
1571/15 1572/21
1575/23 1577/1
Google.com [2] 1489/9
1535/19
gotcha [2] 1488/15
1509/20
government [6] 1547/9
1549/2 1561/6
1567/15 1571/11
1575/17
government's [1]
1573/6
Graf [3] 1568/9
1568/11 1568/15
grammatically [2]
1563/10 1563/11
graph [4] 1488/1
1500/5 1500/11
1502/7
graphs [1] 1501/8
gray [1] 1559/21
greater [5] 1497/7
1562/11 1562/16
1564/4 1564/19
greatest [1] 1541/25
green [2] 1523/24
1524/1
Greenblum [1]
1531/24
grew [3] 1504/5 1504/7
1504/12
gross [3] 1499/16
1500/18 1501/19
group [1] 1543/14
growing [10] 1479/1
1479/3 1479/4 1479/7
1491/20 1493/19
1496/19 1562/12
1564/5 1564/22
grown [1] 1497/3
growth [2] 1500/23
1503/8
GSP [1] 1506/11
guaranteed [1]
1506/14
guardrails [1] 1576/17
guess [11] 1483/3
1483/5 1483/17
1520/9 1521/17
1539/7 1548/7
1558/18 1562/23
1563/15 1569/22
guesses [2] 1538/25
1538/25
guy [3] 1548/23
1573/4 1573/4

**H**

H-S-U [1] 1536/13
HAFENBRACK [3]
1473/15 1475/11
1546/3
hand [5] 1501/1
1501/7 1502/7
1520/23 1542/4
handed [2] 1531/4
1562/22
handle [1] 1509/4
hands [1] 1525/4
Hang [1] 1543/24
happen [3] 1538/24
1528/21 1576/6
happened [2] 1558/6
1567/11
happening [1] 1503/23
happens [1] 1509/6
happy [6] 1503/20
1542/18 1543/11
1547/10 1549/13
1576/7
hard [9] 1507/21
1508/25 1508/25
1509/18 1509/20
1540/15 1562/20
1565/2 1569/22
hazard [1] 1483/5
head [2] 1555/8
1555/8
head-to-head [1]
1555/8
heading [2] 1499/13
1501/4
headline [1] 1568/18
hear [1] 1533/3
heard [6] 1511/23
1517/12 1543/8
1548/17 1553/25
1572/20
hearsay [3] 1546/17
1546/23 1572/15
Hello [1] 1533/22
helping [1] 1512/15
hey [2] 1495/3
1498/23
high [10] 1489/1
1489/6 1489/8
1489/10 1489/13
1489/15 1489/18
1489/22 1491/17
1567/20
higher [8] 1478/8
1491/21 1491/23
1506/6 1506/10
1506/8 1506/14
1554/16
highest [6] 1504/13
1505/11 1505/11
1505/17 1506/4
1506/17
highlight [1] 1554/25
historical [2] 1505/23
1505/24
history [1] 1520/14
Hold [1] 1508/24
home [8] 1509/24

1518/23 1523/8
1523/12 1523/15
1523/19 1528/5
1528/18
Honor [65] 1476/5
1479/16 1488/17
1490/13 1493/10
1495/18 1495/21
1499/4 1499/22
1509/12 1509/17
1509/21 1509/25
1510/3 1512/1
1531/11 1533/9
1542/4 1542/11
1542/12 1542/16
1542/18 1543/2
1543/5 1543/8
1544/14 1545/23
1546/5 1546/11
1546/14 1546/15
1547/11 1548/11
1548/18 1548/21
1549/11 1549/24
1550/16 1550/18
1550/22 1559/4
1560/22 1561/4
1561/12 1562/20
1563/2 1563/7
1563/22 1567/15
1567/19 1567/25
1568/4 1569/25
1570/15 1571/12
1571/17 1574/10
1574/11 1574/12
1574/15 1575/1
1576/7 1576/18
1576/19 1576/23
HONORABLE [1]
1473/10
HOOK [3] 1474/23
1578/3 1578/10
hotseat [2] 1522/8
1522/17
hours [1] 1534/13
1576/9 1576/11
Hsu [1] 1536/10
huh [1] 1513/10
hundred [10] 1483/2
1492/23 1501/13
1501/21 1502/1
1541/14 1553/10
1553/11 1553/14
1567/7
hundreds [2] 1495/2
1495/6
hyperbole [3] 1544/24
1545/17 1573/14
hypothetical [4]
1523/12 1523/16
1527/11 1528/3

**I**

icons [1] 1523/10
idea [1] 1483/18
identified [4] 1524/9
1524/16 1524/23
1525/12
identify [1] 1514/4

**I**

identifying [1]  1575/23
ignore [2]  1545/16
1545/21
IL [1]  1473/20
impact [1]  1525/6
impeachment [4]
1531/11 1547/17
1571/9 1572/18
imperfect [3]  1539/1
1558/19 1558/22
implement [1]  1508/6
implemented [2]
1508/3 1508/4
implicitly [1]  1488/1
implying [1]  1555/10
important [3]  1491/25
1525/23 1558/11
impressions [2]  1483/1
1483/9
improper [1]  1531/11
improve [1]  1482/18
Inaudible [1]  1574/21
incentives [1]  1507/18
include [8]  1494/15
1515/16 1515/17
1516/5 1524/17
1530/13 1530/19
1531/22
included [2]  1511/10
1518/1
includes [6]  1516/19
1522/3 1522/12
1529/23 1529/24
1530/7
including [7]  1500/1
1508/10 1508/19
1509/5 1540/1 1540/3
1565/17
incorporated [1]
1519/19
increase [3]  1488/14
1504/1 1565/22
increasing [3]  1503/11
1503/15 1503/18
increasingly [2]  1497/2
1498/16
incremental [4]
1539/15 1540/5
1540/11 1540/21
indicate [1]  1503/10
indicative [1]  1491/12
indicator [1]  1489/10
indicia [1]  1573/11
individual [1]  1520/15
inflammatory [1]
1573/18
information [4]
1487/19 1512/24
1575/23 1576/11
informs [1]  1483/11
initial [1]  1512/13
innovate [1]  1480/9
install [2]  1528/4
1566/20
installed [4]  1521/8
1521/13 1521/21
1528/14

instance [4]  1525/7
1525/10 1526/19
1526/20
instances [2]  1505/17
1505/19
instead [1]  1538/3
intelligence [2]
1478/24 1480/6
intend [4]  1477/9
1480/12 1480/14
1480/17
intended [3]  1479/22
1480/2 1480/4
intends [2]  1481/25
1482/4
intent [29]  1478/2
1487/14 1488/18
1488/19 1488/20
1488/23 1488/23
1488/24 1488/24
1488/25 1489/1
1489/2 1489/2 1489/6
1489/6 1489/10
1489/13 1489/15
1489/16 1489/18
1489/22 1491/7
1491/12 1491/17
1491/18 1491/22
1491/23 1491/25
1498/8
interact [1]  1507/6
interaction [1]  1497/11
interest [3]  1489/11
1526/21 1548/23
interested [3]  1494/12
1506/25 1554/4
interesting [1]  1503/17
interests [1]  1488/2
interface [1]  1525/13
internal [1]  1513/23
internet [2]  1487/3
1492/6
interrupt [1]  1499/20
interruption [2]  1510/2
1567/24
into [30]  1475/16
1475/17 1488/19
1497/21 1508/6
1510/7 1515/7
1519/19 1536/22
1537/21 1538/19
1540/10 1540/18
1540/20 1540/25
1541/1 1542/11
1543/3 1543/22
1543/24 1543/25
1546/6 1548/12
1549/6 1550/20
1566/23 1568/2
1569/5 1569/10
1575/19
introduce [1]  1533/23
inventory [1]  1492/22
inverse [1]  1564/15
investigated [1]
1541/21
investing [1]  1494/19
involve [2]  1524/12

1576/7
involvement [1]
1557/12
iOS [13]  1557/18
1557/22 1560/9
1560/21 1561/21
1564/9 1564/13
1564/22 1565/8
1565/14 1565/21
1566/25 1567/2
iPads [2]  1557/23
1557/24
iPhone [8]  1525/13
1526/24 1537/13
1566/6 1568/19
1568/24 1569/4
1569/7
iPhones [10]  1525/10
1525/18 1527/1
1557/22 1557/24
1558/1 1558/7
1558/16 1560/19
1565/17
irrelevant [1]  1548/15
is a [1]  1500/10
issue [12]  1531/17
1546/19 1560/23
1570/4 1570/18
1571/19 1573/20
1574/9 1574/18
1575/10 1576/5
1576/21
issued [1]  1569/15
issues [1]  1551/9
items [2]  1524/5
1524/17
iteration [1]  1525/14

**J**

J-O-N-A-T-H-A-N [1]
1510/22
January [2]  1500/9
1575/17
January 19th [1]
1500/9
Japan [21]  1550/3
1550/6 1551/10
1551/18 1552/2
1552/5 1552/16
1552/18 1552/18
1552/21 1552/25
1553/2 1553/7 1555/1
1555/4 1555/7 1555/8
1555/18 1555/23
1556/2 1556/19
Japanese [6]  1550/2
1550/12 1551/19
1552/23 1553/3
1555/14
JEFF [3]  1474/23
1578/3 1578/10
JERRY [4]  1475/3
1476/3 1496/17
1499/8
Jim [2]  1511/20 1512/7
Joan [4]  1491/2
1491/3 1491/4
1497/11

job [2]  1547/5 1557/8
jobs [1]  1508/20
JOHN [2]  1474/6
1510/10
join [1]  1576/23
joined [1]  1568/17
Jon [1]  1536/10
JONATHAN [4]  1474/2
1475/7 1510/16
1510/22
JONES [4]  1473/16
1475/8 1510/3 1510/5
JOSHUA [1]  1473/15
JR [1]  1473/22
judge [2]  1473/10
1549/8
July [1]  1543/18
July 2017 [1]  1543/18
June [2]  1512/8
1559/9
June 18th [1]  1512/8
June 2020 [1]  1559/9
Justice [3]  1473/13
1473/16 1473/19

**K**

keep [6]  1541/7
1541/10 1543/9
1543/11 1549/21
1570/2
KENNETH [1]  1473/13
Key [1]  1514/22
Keyword [1]  1568/7
keywords [2]  1481/1
1482/18
kicks [1]  1551/4
kind [3]  1547/14
1558/17 1570/25
Kingdom [1]  1550/7
Kirjner [4]  1559/8
1559/11 1564/7
1565/4
knew [1]  1554/5
knowledge [5]  1507/16
1540/19 1540/22
1541/7 1541/10
knowledgeable [1]
1541/3
known [1]  1574/24
knows [1]  1483/22
Kolotouros [3]  1511/21
1511/23 1512/7
Kolotouros' [1]
1528/24
Kristen [1]  1559/22

**L**

Labs [1]  1479/11
laid [2]  1543/4 1548/14
large [7]  1488/4
1491/20 1503/1
1503/2 1503/3 1503/4
1529/8
largest [2]  1516/10
1518/3
LaSalle [1]  1473/19
last [6]  1478/19
1478/24 1495/22

1511/23 1535/21
1536/11
late [1]  1574/2
later [3]  1533/4
1562/10 1564/3
launched [5]  1506/20
1558/3 1558/6 1566/5
1567/9
Law [1]  1474/2
lawyer [1]  1574/11
lay [3]  1542/12
1542/20 1544/1
lays [1]  1556/4
lead [6]  1478/3 1478/8
1506/2 1511/7
1551/13 1556/13
leading [1]  1493/20
learn [2]  1497/9
1506/17
least [10]  1491/11
1494/17 1534/2
1559/24 1561/13
1561/21 1562/4
1566/12 1567/19
1569/4
leave [3]  1485/16
1549/2 1576/14
left [12]  1501/1 1501/7
1502/7 1503/17
1514/25 1515/5
1518/13 1520/23
1523/15 1524/5
1527/11 1529/8
Lenovo [1]  1516/5
less [11]  1500/1
1500/2 1500/23
1501/8 1501/9
1501/21 1501/25
1552/1 1553/7
1555/24 1572/25
levels [2]  1488/24
1488/25
LGE [2]  1516/5 1516/8
licenses [1]  1529/21
light [1]  1572/11
likely [1]  1506/2
1527/25 1528/10
1558/15
likes [1]  1488/7
limitations [1]  1505/13
line [14]  1484/22
1484/22 1484/25
1485/1 1485/25
1497/17 1502/25
1509/5 1509/7
1512/11 1547/25
1561/21 1565/11
1565/14
lines [3]  1484/21
1531/10 1531/15
links [1]  1513/5
list [2]  1516/5 1516/18
listed [9]  1515/5
1519/3 1525/19
1525/20 1525/22
1526/9 1526/9
1526/13 1556/19
listing [2]  1498/4

**L**

listing... [2]  1498/5
1498/7
lists [4]  1508/2
1514/25 1523/23
1526/11
little [3]  1493/11
1528/10 1559/21
LLC [1]  1473/6
LLP [2]  1473/22
1474/7
load [2]  1509/4 1530/4
loaded [11]  1518/15
1518/17 1521/11
1522/4 1524/13
1524/15 1525/5
1526/2 1526/8
1526/17 1526/19
located [1]  1572/22
logo [1]  1529/8
logos [1]  1529/13
long [3]  1478/19
1503/10 1531/8
longer [2]  1503/14
1520/14
look [35]  1484/19
1488/7 1490/16
1492/7 1499/12
1501/7 1506/23
1507/14 1508/21
1512/13 1513/7
1515/15 1517/11
1520/22 1531/14
1539/19 1540/17
1542/9 1547/13
1547/21 1547/25
1549/17 1551/3
1554/19 1555/14
1555/15 1556/12
1559/2 1560/6
1567/22 1571/21
1571/22 1574/8
1574/17 1577/3
looked [1]  1504/5
looking [11]  1482/19
1484/20 1487/18
1487/24 1488/13
1489/20 1508/5
1525/9 1551/9
1551/9 1566/15
looks [4]  1561/4
1568/12 1569/7
1569/9
lose [2]  1506/9
1558/16
loss [6]  1562/11
1562/15 1562/16
1564/4 1564/19
1564/24
lost [2]  1509/9 1564/16
lot [5]  1516/13
1516/14 1520/12
1538/21 1539/4
lots [2]  1508/9 1509/1
low [5]  1489/1 1489/6
1491/7 1491/12
1491/18
lower [3]  1491/22

1550/6 1551/18
lunch [2]  1476/7
1576/23

**M**

macro [1]  1573/4
MADA [54]  1512/24
1513/12 1513/18
1513/23 1514/7
1517/1 1517/2 1517/9
1517/15 1517/21
1517/25 1518/1
1518/3 1518/6
1518/14 1518/17
1518/22 1518/25
1519/3 1519/4 1519/7
1519/9 1519/11
1519/11 1519/15
1519/19 1519/22
1519/23 1522/11
1522/13 1522/14
1522/20 1522/22
1523/3 1523/16
1523/20 1524/6
1524/10 1524/15
1525/19 1526/9
1527/7 1527/11
1528/4 1528/13
1529/5 1529/6
1529/20 1529/22
1530/1 1530/3
1530/16 1531/25
1532/7
MADA's [1]  1519/13
MADA-only [1]
1527/11
MADAs [2]  1517/3
1517/6
mail [38]  1490/2
1490/19 1490/23
1490/25 1491/2
1491/5 1491/12
1491/13 1491/15
1496/1 1496/3 1496/6
1496/13 1496/16
1496/19 1496/24
1497/4 1497/12
1498/1 1498/22
1512/7 1512/13
1512/15 1513/4
1550/23 1551/4
1551/16 1551/25
1553/2 1554/19
1555/17 1556/8
1556/12 1556/12
1559/8 1560/2 1560/4
1575/12
mails [2]  1550/25
1575/12
main [1]  1515/9
Maine [1]  1474/7
major [5]  1514/11
1515/19 1516/19
1555/4 1555/19
majority [6]  1476/25
1477/3 1480/7
1514/16 1518/4
1520/12

makes [2]  1537/4
1555/23
makeup [3]  1488/8
1488/9 1488/12
makeup/cosmetic [1]
1488/9
making [3]  1486/17
1491/6 1558/22
managed [1]  1535/9
manager [2]  1510/11
1511/4
managers [1]  1507/6
manner [1]  1571/10
manufacturer [3]
1494/18 1498/19
1516/12
manufacturers [4]
1494/1 1494/3
1516/13 1516/19
many [4]  1491/24
1534/13 1540/24
1547/3
map [5]  1557/18
1558/1 1558/3 1558/7
1565/25
Maps [55]  1556/24
1557/2 1557/6 1557/9
1557/11 1557/13
1557/17 1557/25
1558/4 1558/7 1558/8
1558/8 1558/11
1558/11 1558/14
1558/23 1559/2
1560/13 1560/15
1560/18 1561/23
1561/23 1562/1
1562/4 1562/12
1564/5 1564/8 1564/8
1564/9 1564/15
1564/22 1564/25
1565/8 1565/12
1565/14 1565/21
1565/25 1566/6
1566/12 1566/16
1566/17 1566/22
1566/25 1567/2
1567/8 1568/13
1568/14 1568/18
1568/24 1568/25
1569/6 1569/10
1569/16 1569/20
1569/21
March [4]  1510/23
1531/2 1531/7
1531/19
March 30th [3]  1531/2
1531/7 1531/19
market [10]  1487/21
1514/16 1550/3
1550/12 1552/23
1553/3 1555/9
1555/14 1573/5
1573/5
marketing [1]  1498/20
marketplace [4]  1501/4
1501/23 1501/25
1502/11
markets [3]  1550/6

1552/2 1555/15
match [1]  1478/2
matching [7]  1477/13
1477/15 1477/16
1477/18 1477/21
1477/22 1478/13
materials [2]  1497/14
1512/16
matter [10]  1534/5
1546/2 1548/5
1570/20 1570/21
1572/3 1572/5
1573/19 1573/20
1578/5
MATTHEW [2]
1473/16 1510/3
Max [19]  1478/16
1479/8 1479/13
1479/14 1479/19
1479/22 1480/1
1480/2 1480/10
1480/13 1480/18
1480/21 1480/24
1481/6 1481/18
1481/20 1482/1
1482/5 1498/16
maximizing [1]
1540/23
may [18]  1489/13
1489/14 1490/14
1492/22 1495/19
1505/15 1506/6
1510/12 1510/14
1514/1 1514/5
1520/17 1523/12
1536/2 1542/4 1542/5
1571/20 1572/21
May 2022 [1]  1536/2
maybe [6]  1480/22
1514/17 1549/19
1571/1 1571/6 1573/9
McAteer [1]  1497/11
mean [34]  1483/4
1488/20 1488/25
1497/14 1498/3
1498/13 1498/18
1501/19 1506/10
1508/18 1508/24
1530/17 1531/16
1532/3 1532/5
1538/16 1546/21
1547/2 1547/5 1549/1
1553/24 1554/1
1554/7 1554/8 1560/3
1563/2 1566/19
1567/1 1567/3 1574/5
1574/14 1575/3
1575/6 1576/7
meaning [4]  1504/13
1535/16 1557/22
1562/4
meaningfully [1]
1562/21
means [5]  1477/25
1478/5 1478/24
1504/12 1570/25
meant [2]  1520/9
1525/24

measure [1]  1482/17
measures [1]  1551/22
mechanism [2]
1489/19 1506/16
mechanisms [1]
1553/12
media [4]  1487/14
1493/16 1493/19
1561/15
medium [3]  1501/6
1502/19 1502/20
meet [1]  1534/10
meets [3]  1548/2
1572/14 1573/23
MEHTA [1]  1473/10
mention [1]  1518/2
mentioned [6]  1476/20
1503/22 1533/5
1545/17 1556/10
1576/22
menu [1]  1537/22
merchandise [3]
1499/16 1500/18
1501/19
merchants [9]  1500/23
1501/2 1502/5 1502/9
1502/12 1502/14
1502/18 1502/19
1502/20
merged [1]  1515/22
messages [1]  1556/16
met [1]  1548/7
Meta [1]  1483/23
metric [1]  1551/20
micro [1]  1573/3
Microsoft [7]  1508/14
1524/18 1524/18
1532/17 1532/20
1532/24 1533/3
Microsoft's [2]  1508/11
1524/20
middle [2]  1509/15
1527/21
midnight [1]  1574/7
might [18]  1487/22
1519/7 1519/12
1519/12 1520/15
1524/15 1532/10
1537/18 1539/8
1539/24 1552/11
1553/7 1554/5
1554/13 1559/15
1559/21 1561/11
1567/21
migrated [1]  1479/25
migrating [1]  1481/19
MIKE [3]  1475/10
1533/19 1533/24
million [1]  1501/10
mind [4]  1570/16
1570/24 1571/3
1571/25
mindset [1]  1489/21
mine [1]  1500/5
minimal [1]  1563/14
minimum [7]  1482/25
1483/5 1483/8
1483/12 1483/15

**M**

minimum... [2]  1483/18 1483/20
minus [2]  1500/3 1500/3
minute [1]  1509/25
minutes [3]  1549/19 1563/9 1573/8
missing [1]  1564/2
mobile [10]  1486/1 1486/1 1486/11 1486/22 1515/17 1515/22 1541/18 1560/13 1560/15 1568/13
model [1]  1558/20
modeling [3]  1535/4 1536/19 1558/25
models [1]  1541/25
moment [7]  1479/16 1479/17 1479/18 1506/23 1527/11 1549/17 1567/21
monetization [1] 1553/11
money [1]  1491/7
monitor [1]  1491/8
more [22]  1477/25 1478/2 1478/6 1478/7 1478/8 1480/20 1489/14 1493/1 1498/25 1501/18 1505/15 1533/3 1549/17 1553/18 1553/19 1554/5 1554/7 1554/8 1554/13 1554/16 1554/18 1574/7
morning [4]  1570/8 1574/8 1576/15 1577/8
most [5]  1496/20 1541/3 1558/15 1566/21 1566/24
mostly [1]  1515/11
motion [2]  1499/1 1575/18
move [3]  1493/10 1514/20 1516/4
moved [1]  1495/7
moves [2]  1542/11 1543/2
movies [1]  1493/18
Mozilla [1]  1540/3
Mr. [78]  1475/4 1475/11 1476/2 1476/6 1476/6 1499/7 1499/10 1499/20 1509/22 1509/23 1510/5 1510/10 1510/12 1510/18 1511/23 1512/5 1512/23 1513/5 1513/16 1514/7 1517/12 1517/23 1518/14 1520/2 1520/4 1520/7 1520/19 1520/24

1521/25 1522/8 1524/24 1526/5 1527/2 1528/24 1529/4 1531/24 1533/4 1533/14 1533/21 1533/25 1534/15 1538/20 1539/9 1540/10 1541/2 1541/23 1542/6 1542/22 1543/11 1544/5 1546/3 1546/24 1549/25 1551/8 1551/13 1551/25 1551/25 1554/20 1554/21 1554/22 1555/3 1555/11 1555/22 1556/13 1556/22 1559/5 1559/11 1564/1 1564/7 1565/4 1566/5 1568/4 1568/11 1568/15 1570/7 1575/8 1576/21 1576/23
Mr. Cavanaugh [3] 1499/7 1499/20 1576/21
Mr. Dahlquist [2] 1475/4 1476/2
Mr. Dischler [5]  1476/6 1476/6 1499/10 1509/22 1509/23
Mr. Graf [2]  1568/11 1568/15
Mr. Greenblum [1] 1531/24
Mr. Hafenbrack [2] 1475/11 1546/3
Mr. Jones [1]  1510/5
Mr. Kirjner [3]  1559/11 1564/7 1565/4
Mr. Kolotouros [1] 1511/23
Mr. Kolotouros' [1] 1528/24
Mr. Roszak [21] 1533/21 1533/25 1534/15 1538/20 1539/9 1540/10 1541/2 1541/23 1542/6 1542/22 1543/11 1544/5 1546/24 1549/25 1554/21 1556/22 1559/5 1564/1 1566/5 1568/4 1570/7
Mr. Sakai [6]  1551/8 1551/25 1554/20 1554/22 1555/3 1555/22
Mr. Sakai's [1]  1555/11
Mr. Schindler [16] 1512/23 1513/5 1513/16 1514/7 1517/12 1517/23 1518/14 1520/4 1520/7 1520/19

1520/24 1521/25 1522/8 1524/24 1526/5 1527/2
Mr. Schmidtlein [2] 1575/8 1576/23
Mr. Sidarto [3]  1551/13 1551/25 1556/13
Mr. Tinter [1]  1533/4
Mr. Yoo [7]  1510/10 1510/12 1510/18 1512/5 1520/2 1529/4 1533/14
Ms. [4]  1491/2 1496/4 1497/12 1536/7
Ms. Braddi [2]  1496/4 1497/12
Ms. Joan [1]  1491/2
Ms. Porat [1]  1536/7
much [9]  1487/10 1496/24 1501/20 1509/23 1528/10 1549/17 1550/6 1551/18 1570/7
multiple [1]  1542/9
musing [1]  1572/6
must [5]  1518/22 1521/25 1522/8 1529/20 1530/4
myself [1]  1531/7

**N**

name [7]  1495/1 1495/9 1510/19 1510/20 1510/21 1533/24 1536/11
names [1]  1494/22
narrow [1]  1502/25
native [3]  1506/24 1507/1 1508/15
nature [3]  1489/14 1493/18 1514/15
navigate [1]  1538/5
nearly [2]  1499/25 1527/6
necessarily [7] 1489/15 1502/10 1506/6 1525/3 1538/16 1552/10 1555/15
need [4]  1530/1 1537/15 1543/25 1571/21
needed [2]  1563/4 1563/17
needs [2]  1542/12 1573/7
negatively [1]  1498/6
negatives [2]  1476/14 1476/15
negotiate [3]  1514/2 1516/16 1530/16
negotiated [8]  1517/2 1518/2 1518/3 1519/8 1519/16 1530/22 1532/4 1532/18
negotiates [1]  1511/24
negotiation [1]  1520/11

1520/14
negotiations [4] 1513/25 1514/1 1530/23 1532/22
new [5]  1473/24 1478/15 1499/1 1532/4 1567/16
newer [1]  1478/18
next [14]  1493/8 1497/17 1501/17 1517/13 1523/23 1524/6 1525/19 1525/20 1525/22 1526/9 1526/10 1526/13 1527/2 1527/24
night [1]  1574/2
Nike [1]  1487/23
nine [2]  1484/22 1485/1
noise [1]  1503/24
none [1]  1575/2
note [1]  1521/6
noted [1]  1518/9
notes [1]  1503/10
notice [1]  1576/9
noticed [2]  1550/5 1551/17
noting [1]  1517/18
number [18]  1482/16 1482/25 1483/8 1483/14 1488/4 1496/13 1504/19 1506/19 1509/2 1512/14 1513/8 1514/21 1517/14 1520/2 1523/2 1525/6 1528/23 1567/21
numbers [2]  1563/20 1576/24
numerics [1]  1563/7
NW [3]  1473/14 1473/17 1474/24
NY [1]  1473/24

**O**

objection [13]  1492/15 1493/6 1493/6 1531/11 1531/24 1542/12 1545/23 1546/7 1546/8 1546/12 1546/16 1550/17 1550/18
objections [1]  1544/2
objective [5]  1476/21 1476/23 1481/12 1481/16 1483/6
obviously [2]  1575/5 1575/21
occur [1]  1536/2
October [3]  1534/3 1535/6 1535/22
October 2021 [3] 1534/3 1535/6 1535/22
OEM [17]  1516/4 1516/10 1516/16 1516/19 1517/8

1518/3 1519/4
1522/15 1528/14
1528/14 1529/19
1529/25 1530/3
1530/4 1530/13
1530/18 1531/21
OEM's [1]  1517/9
OEMs [9]  1514/14 1515/5 1515/7 1516/5 1517/6 1518/5 1528/8 1528/10 1530/22
off [6]  1497/19 1549/25 1551/4 1561/3 1561/15 1561/17
offer [9]  1480/11 1483/13 1483/14 1505/16 1542/13 1546/3 1546/5 1547/9 1567/16
offered [2]  1546/20 1546/21
offering [6]  1492/6 1545/2 1547/11 1557/9 1557/16 1560/9
offers [2]  1492/18 1492/19
officer [1]  1512/19
Official [2]  1474/23 1578/3
offline [1]  1496/21
offset [3]  1490/21 1503/15 1503/21
offsite [1]  1572/23
often [6]  1489/18 1507/2 1541/4 1541/8 1541/10 1541/17
oil [1]  1574/7
on the [1]  1493/23
once [7]  1534/7 1534/7 1544/3 1549/5 1562/4 1572/19 1576/2
one [63]  1480/16 1480/20 1483/25 1485/5 1485/14 1487/16 1487/17 1490/7 1491/4 1493/1 1493/7 1494/17 1495/7 1495/10 1495/13 1495/23 1501/18 1505/22 1505/25 1507/14 1513/15 1514/20 1514/20 1520/1 1523/1 1525/12 1527/24 1529/9 1530/7 1532/5 1537/12 1537/23 1537/24 1540/9 1541/24 1546/12 1550/17 1553/13 1553/17 1553/22 1554/8 1556/5 1556/10 1556/10 1556/22 1558/19 1558/24 1559/16

**O**

one... [15] 1559/24
1560/7 1560/25
1561/5 1563/8 1563/9
1565/3 1566/9
1566/12 1568/7
1569/24 1569/25
1571/22 1572/4
1576/21
one's [1] 1559/3
ones [6] 1502/22
1503/4 1517/21
1519/23 1533/8
1546/9
online [2] 1496/21
1497/1
only [21] 1480/11
1486/25 1492/7
1492/13 1493/4
1509/2 1519/13
1523/16 1524/6
1524/9 1525/19
1527/11 1528/4
1540/10 1546/8
1546/12 1546/15
1549/12 1550/14
1557/14 1563/20
onset [1] 1495/24
onto [2] 1487/17
1489/20
op [4] 1496/21
1496/25 1498/18
1498/19
open [5] 1510/7
1533/9 1538/19
1559/5 1576/21
opening [1] 1575/2
operates [1] 1555/5
operating [1] 1555/20
opinions [1] 1547/15
opponent [1] 1548/4
opportunity [2]
1571/18 1575/9
opposing [3] 1547/12
1547/13 1570/19
opposite [1] 1573/17
opt [1] 1478/12
option [3] 1537/23
1537/25 1538/1
optionally [1] 1571/2
options [1] 1538/8
order [14] 1476/22
1481/15 1481/16
1482/16 1482/18
1482/18 1483/5
1487/2 1505/22
1506/17 1508/20
1529/19 1529/21
1554/6
organic [2] 1535/15
1535/16
organization [2]
1571/23 1571/23
others [1] 1512/8
otherwise [4] 1525/17
1540/6 1562/18
1576/1
ought [1] 1576/20

out [27] 1478/12
1478/18 1481/20
1486/18 1486/19
1495/6 1498/23
1499/1 1503/17
1506/3 1514/2 1521/3
1521/9 1521/19
1521/25 1522/7
1530/23 1533/11
1542/4 1544/8 1545/1
1547/2 1550/11
1556/4 1569/1
1575/25 1577/5
out-of-the-box [3]
1521/3 1521/9
1521/19
outcome [3] 1477/21
1477/22 1558/15
outcomes [2] 1507/12
1507/19
outrageous [2]
1573/16 1573/16
outside [4] 1520/5
1554/3 1555/16
1571/23
outstanding [1] 1571/3
over [7] 1481/19
1481/22 1487/10
1521/14 1534/2
1541/9 1569/16
overall [3] 1503/16
1503/19 1503/21
overnight [1] 1570/10
oversee [1] 1536/14
overstep [1] 1575/6
overview [2] 1513/20
1514/22
own [9] 1492/22
1502/14 1509/4
1514/18 1518/3
1540/8 1549/5 1558/3
1574/3
owned [1] 1483/23

**P**

p.m [4] 1473/6
1533/16 1533/18
1577/10
Pacific [2] 1551/14
1556/14
package [1] 1522/14
packaged [3] 1493/16
1493/22 1494/18
page [32] 1475/2
1475/15 1484/22
1484/25 1485/24
1496/12 1499/13
1499/21 1500/22
1501/17 1503/7
1503/7 1504/16
1509/17 1512/14
1513/8 1513/11
1514/20 1517/13
1518/7 1520/1 1523/1
1528/22 1529/1
1531/9 1531/10
1551/3 1554/19
1559/6 1559/7 1573/7

1576/6
pages [1] 1574/5
paper [2] 1561/16
1561/17
paragraph [1] 1568/23
parenthetical [1]
1564/18
part [19] 1476/8
1498/16 1529/16
1540/17 1541/20
1543/14 1543/16
1543/16 1544/20
1544/25 1545/18
1547/5 1548/7
1552/13 1555/13
1557/14 1557/19
1566/16 1569/22
partially [1] 1557/9
participating [1] 1571/1
particular [4] 1487/25
1519/4 1519/19
1565/19
particularly [1] 1549/4
parties [1] 1563/7
parties' [1] 1561/14
partner [3] 1514/22
1532/7 1536/21
partners [8] 1487/2
1511/11 1513/2
1514/3 1514/4
1516/16 1519/8
1519/17
partnerships [5]
1491/4 1510/11
1511/2 1511/5 1511/8
parts [1] 1524/1
party [11] 1526/14
1526/16 1527/2
1527/4 1547/12
1547/13 1548/4
1563/6 1563/12
1570/19 1570/20
pass [2] 1499/5
1576/11
past [1] 1442/22
Patterson [1] 1473/22
Paul [1] 1512/8
pay [2] 1486/19
1554/14
paying [2] 1538/14
1540/12
payments [1] 1537/4
pays [3] 1486/18
1487/2 1487/5
peak [4] 1562/11
1564/4 1564/10
1564/12
people [8] 1488/7
1491/16 1498/8
1507/16 1507/18
1509/2 1535/10
1568/23
people's [1] 1575/12
per [3] 1481/13
1551/22 1552/2
percent [24] 1483/2
1492/23 1499/25
1500/4 1501/8 1501/9

1501/22 1501/23
1501/24 1504/1
1514/17 1514/17
1541/14 1553/10
1553/12 1553/14
1562/10 1564/3
1564/9 1564/12
1564/16 1564/16
1564/19 1567/8
percentage [7]
1498/20 1500/1
1500/18 1502/9
1502/10 1506/16
1576/24
percentages [2]
1499/19 1576/25
perfect [3] 1505/25
1508/18 1575/16
performance [24]
1478/16 1479/7
1479/13 1479/14
1479/19 1479/22
1480/1 1480/2
1480/10 1480/13
1480/18 1480/21
1480/24 1481/6
1481/18 1481/20
1482/1 1482/5
1482/10 1482/11
1482/12 1482/14
1498/16 1569/16
perhaps [3] 1513/21
1514/17 1526/20
period [9] 1556/23
1565/21 1565/25
1566/21 1566/25
1567/9 1567/13
1567/14 1569/20
permission [3] 1490/13
1495/18 1575/4
person [1] 1541/3
personal [1] 1488/6
personally [1] 1575/23
perspective [1]
1525/12
pervasive [1] 1487/8
perverse [1] 1507/18
Phillipp [2] 1512/11
1512/16
phone [4] 1516/15
1516/18 1522/15
1532/17
phones [9] 1514/12
1515/10 1516/11
1516/19 1532/15
1560/19 1565/12
1565/22 1566/1
phrase [4] 1477/14
1477/15 1503/18
1503/21
picked [1] 1548/13
pin [1] 1549/16
place [11] 1480/22
1506/15 1519/1
1519/5 1519/7 1519/9
1519/10 1519/13
1519/20 1563/18
1576/17

placed [2] 1518/23
1533/17
placement [2] 1487/15
1522/17
Plaintiff [2] 1473/22
1474/2
plaintiffs [3] 1473/4
1473/13 1549/3
plan [2] 1498/9 1510/7
planning [1] 1535/1
plans [1] 1477/6
PLAs [1] 1504/18
platform [4] 1501/20
1501/22 1502/1
1507/13
platforms [1] 1541/18
play [13] 1529/11
1529/19 1529/23
1529/24 1529/25
1530/3 1530/14
1530/19 1531/22
1532/8 1532/12
1533/7 1572/17
please [9] 1484/24
1486/15 1503/12
1510/18 1513/7
1519/2 1531/9
1533/23 1560/23
pleased [1] 1568/25
point [12] 1477/6
1486/17 1509/9
1513/25 1522/5
1526/25 1543/22
1545/8 1546/4 1555/3
1556/19 1559/22
points [2] 1522/1
1537/18
Porat [2] 1536/5
1536/7
portion [4] 1493/23
1500/19 1503/11
1561/20
portions [2] 1542/8
1547/24
position [2] 1535/7
1546/3
possible [6] 1492/20
1506/15 1508/22
1525/6 1530/17
1553/13
post [4] 1548/12
1548/18 1548/22
1576/12
posted [1] 1576/4
posting [1] 1549/2
1549/5 1568/5
1574/13
posts [1] 1548/23
potential [7] 1524/16
1537/12 1538/4
1553/22 1556/6
1558/20 1565/3
potentially [1] 1535/5
1537/12 1538/13
1553/10 1554/4
1554/10 1559/16
power [2] 1571/16
1573/6

**P**

practice [1]  1574/13
pre [15]  1518/15
 1518/17 1521/8
 1521/11 1521/13
 1521/21 1522/4
 1524/13 1524/15
 1525/5 1526/2 1526/8
 1526/17 1526/19
 1530/4
pre-installed [3]  1521/8
 1521/13 1521/21
pre-load [1]  1530/4
pre-loaded [11]
 1518/15 1518/17
 1521/11 1522/4
 1524/13 1524/15
 1525/5 1526/2 1526/8
 1526/17 1526/19
precisely [1]  1571/12
predictable [1]  1525/13
prefer [4]  1522/16
 1549/14 1575/5
 1576/8
premise [1]  1549/8
preparation [1]
 1543/12
prepare [1]  1512/15
preparing [1]  1534/11
presence [1]  1494/2
present [4]  1488/9
 1523/11 1547/16
 1570/12
presentation [5]
 1513/18 1544/7
 1544/8 1545/19
 1571/1
presentations [2]
 1543/16 1545/1
president [1]  1535/22
pressure [10]  1552/6
 1552/16 1553/8
 1553/17 1553/19
 1553/25 1554/13
 1554/17 1555/24
 1556/3
presumptively [1]
 1576/3
prevail [1]  1573/7
prevented [2]  1506/21
 1521/21
previously [1]  1535/6
price [1]  1554/13
prices [1]  1478/9
primarily [3]  1491/16
 1493/15 1494/1
primary [1]  1480/4
principally [1]  1493/13
prior [7]  1546/7 1546/8
 1550/14 1562/4
 1562/11 1564/3
 1564/10
prioritize [1]  1509/3
privacy [3]  1483/6
 1483/16 1483/20
probably [3]  1497/10
 1547/8 1563/15
problem [2]  1571/4

1573/9
problems [1]  1480/15
proceed [1]  1508/8
proceedings [3]
 1548/15 1577/10
 1578/5
process [3]  1506/10
 1532/3 1553/20
product [27]  1478/16
 1478/18 1478/22
 1479/2 1479/4 1479/7
 1479/10 1480/11
 1481/17 1489/3
 1489/11 1489/13
 1489/21 1498/4
 1498/5 1498/7 1507/6
 1507/13 1535/14
 1535/15 1545/4
 1556/24 1557/11
 1557/13 1568/14
 1569/21 1569/24
products [13]  1476/21
 1480/3 1481/3
 1482/19 1492/1
 1492/19 1492/20
 1493/14 1493/15
 1498/14 1498/15
 1498/21 1498/25
profit [1]  1540/23
profitability [3]  1499/14
 1539/21 1550/3
profitable [1]  1539/11
 1539/15
profits [1]  1550/6
program [1]  1479/10
progress [1]  1514/1
project [2]  1558/15
 1558/18
projected [3]  1538/20
 1538/23 1539/2
projections [1]  1558/22
promoted [2]  1511/4
 1535/22
promotion [2]  1493/18
 1536/2
propensity [1]  1488/14
property [2]  1481/9
 1491/17
protect [2]  1483/6
 1483/20
protecting [1]  1483/16
prove [1]  1506/3
provenance [1]
 1501/15
provide [6]  1481/7
 1481/10 1499/18
 1534/24 1540/16
 1576/9
provided [3]  1521/15
 1536/18 1556/23
provides [5]  1492/5
 1492/11 1500/6
 1502/7 1502/9
providing [1]  1535/12
provisions [1]  1521/18
public [9]  1542/19
 1548/22 1549/6
 1549/12 1549/18

1561/8 1569/15
 1573/8 1576/3
publicly [1]  1549/9
publish [1]  1563/19
pull [3]  1512/1 1528/22
 1542/3
purchase [5]  1476/25
 1479/22 1488/14
 1489/3 1489/11
purchaser [1]  1489/2
purchasing [1]  1479/23
purpose [4]  1498/22
 1538/14 1544/9
 1544/25
purposes [5]  1483/15
 1547/17 1571/9
 1572/8 1573/18
pursuant [1]  1516/25
push [1]  1548/12
put [21]  1487/9
 1495/11 1499/11
 1503/5 1513/24
 1520/19 1523/10
 1528/10 1529/19
 1529/25 1542/6
 1542/19 1549/9
 1549/16 1550/22
 1556/22 1559/3
 1561/8 1561/13
 1563/25 1569/25
puts [2]  1506/13
 1530/3

**Q**

QSB [1]  1527/15
quality [15]  1505/11
 1505/14 1505/16
 1505/18 1505/20
 1505/21 1505/23
 1505/24 1506/1
 1506/2 1506/5 1506/7
 1506/8 1506/11
 1506/18
queries [8]  1481/1
 1489/14 1497/19
 1497/23 1498/3
 1503/16 1503/22
 1551/23
query [19]  1482/8
 1482/10 1482/11
 1482/12 1482/14
 1484/2 1484/7
 1484/17 1485/7
 1487/13 1488/18
 1488/23 1489/6
 1489/12 1498/5
 1498/6 1503/8
 1527/17 1552/2
querying [1]  1498/8
quick [4]  1487/12
 1527/15 1527/17
 1560/22
quite [2]  1483/22
 1570/16

**R**

ran [1]  1497/14
randomization [1]

1505/22
randomized [1]
 1506/11
range [1]  1482/18
rate [1]  1539/8
rather [2]  1494/14
 1508/12
re [3]  1484/14 1486/21
 1490/20
re-ask [2]  1484/14
 1486/21
reaching [1]  1550/11
read [6]  1486/14
 1543/22 1543/24
 1563/11 1563/13
 1563/25
reads [1]  1545/23
ready [1]  1476/2
real [2]  1548/16
 1548/16
reality [1]  1527/6
realized [1]  1497/8
really [3]  1490/1
 1544/7 1567/20
reason [7]  1480/5
 1480/10 1547/9
 1555/7 1566/8 1566/9
 1569/13
reasons [1]  1540/15
recall [24]  1476/9
 1477/13 1482/9
 1494/22 1505/4
 1518/4 1520/5 1521/4
 1523/9 1530/24
 1531/3 1533/8 1534/2
 1541/5 1541/19
 1542/1 1550/1 1550/7
 1550/11 1552/10
 1552/24 1557/17
 1559/20 1560/2
recalled [1]  1494/25
receive [3]  1482/12
 1487/3 1487/15
received [1]  1550/25
receives [1]  1487/13
Recess [1]  1533/16
recognize [3]  1529/4
 1542/22 1550/23
recollection [1]
 1567/12
reconvene [1]  1574/9
record [17]  1504/10
 1504/12 1510/19
 1533/18 1543/22
 1543/25 1543/25
 1547/3 1547/7
 1547/18 1548/3
 1548/14 1549/9
 1561/3 1570/18
 1576/3 1578/5
records [1]  1547/4
red [9]  1500/19
 1500/19 1502/16
 1502/22 1523/24
 1524/1 1524/5
 1525/25 1565/14
redact [2]  1561/9
 1561/10

redacted [16]  1560/23
 1561/1 1561/5 1561/6
 1561/20 1562/9
 1562/10 1563/1
 1563/5 1563/18
 1563/20 1565/6
 1575/3 1575/22
 1576/2 1577/5
redaction [5]  1560/24
 1561/8 1561/18
 1562/22 1562/23
redactions [3]  1559/4
 1560/5 1563/15
Redirect [4]  1475/4
 1475/5 1476/3 1499/8
reduce [1]  1537/10
reducing [4]  1552/6
 1552/16 1553/17
 1556/2
redundancy [1]
 1490/13
refer [1]  1552/11
reference [7]  1485/25
 1486/3 1486/3 1489/5
 1497/23 1560/21
 1561/25
referenced [1]  1482/8
referring [2]  1561/22
 1561/22
refers [6]  1507/24
 1551/6 1552/8
 1552/18 1560/13
 1561/25
reflect [2]  1500/12
 1500/16
reflected [1]  1500/11
reflects [1]  1500/20
regard [1]  1498/6
regardless [4]  1517/8
 1518/25 1519/5
 1519/20
region [3]  1517/15
 1518/10 1551/14
relate [1]  1498/1
 1498/4
related [8]  1487/25
 1488/9 1489/12
 1493/13 1496/8
 1496/9 1522/19
 1557/2
related-requirements
 [1]  1522/19
relationship [6]
 1520/15 1548/6
 1548/8 1570/22
 1570/25 1572/1
relative [4]  1539/16
 1550/6 1569/21
 1572/3
Relaunches [1]
 1490/20
release [1]  1575/18
relevancy [2]  1546/16
 1550/17
relevant [1]  1488/12
reliability [1]  1573/11
remained [1]  1557/25
remains [1]  1566/3

1591

**R**

Remarketing [1]
1508/2
remember [8] 1495/7
1495/9 1521/14
1527/18 1532/22
1541/13 1566/10
1569/17
remembered [2]
1552/24 1552/25
remove [1] 1476/15
removes [1] 1525/1
repeat [2] 1476/14
1484/24
rephrase [1] 1519/2
replace [1] 1480/12
replacement [1]
1479/19
report [9] 1482/8
1482/10 1482/11
1496/9 1496/10
1500/8 1536/4 1536/7
1559/22
reporter [4] 1474/23
1474/23 1536/12
1578/3
reports [3] 1482/12
1482/15 1536/7
represent [1] 1520/9
representative [1]
1543/7
represented [1]
1521/17
representing [1]
1574/19
represents [2] 1502/11
1518/4
request [4] 1485/16
1512/11 1512/16
1549/13
requesting [2] 1512/23
1575/18
require [2] 1508/13
1538/12
required [5] 1483/1
1511/14 1528/12
1528/13 1539/17
requirement [1]
1526/13
requirements [20]
1516/14 1516/17
1517/18 1518/25
1519/3 1519/4
1519/14 1519/23
1520/18 1522/12
1522/13 1522/17
1522/19 1522/23
1522/23 1522/24
1523/3 1523/24
1524/2 1529/5
requires [5] 1518/14
1518/17 1520/24
1526/6 1571/25
research [2] 1525/11
1574/3
respect [6] 1489/2
1489/6 1489/10
1494/20 1495/22

1503/8
response [6] 1484/1
1484/7 1484/17
1485/7 1491/2
1512/16
responsibilities [2]
1511/10 1535/2
responsibility [1]
1574/25
responsible [3] 1507/9
1535/12 1566/16
restate [5] 1482/3
1484/5 1488/21
1489/8 1489/9
result [3] 1505/17
1506/4 1506/16
resulting [1] 1558/10
results [8] 1492/7
1492/13 1493/4
1504/16 1505/10
1505/16 1506/3
1520/11
retail [4] 1476/23
1493/13 1493/15
1494/2
retailers [1] 1493/22
1494/4 1494/8
1498/21 1503/1
1503/2
retained [1] 1564/15
return [3] 1481/14
1540/21 1570/13
returned [1] 1484/1
rev [5] 1515/1 1515/4
1516/1 1516/22
1516/25
revealing [2] 1562/8
1565/19
revenue [25] 1477/3
1490/21 1498/7
1498/7 1499/14
1500/23 1501/9
1501/24 1501/24
1501/25 1502/10
1503/4 1503/19
1504/5 1504/7
1504/10 1511/11
1514/11 1539/15
1540/5 1540/5
1540/11 1551/22
1552/2 1554/18
reviews [2] 1486/16
1503/13
RGSP [3] 1505/2
1506/16 1506/20
right [82] 1501/20
1502/4 1502/15
1503/25 1504/22
1505/12 1508/8
1515/7 1515/13
1515/20 1515/22
1516/2 1516/4
1517/19 1517/23
1518/23 1519/5
1519/14 1520/8
1521/13 1522/1
1522/4 1523/19
1525/25 1526/12

1526/14 1526/17
1527/3 1527/13
1527/22 1528/12
1528/15 1529/13
1530/5 1531/23
1534/8 1534/18
1534/23 1534/25
1535/7 1535/10
1535/14 1535/23
1536/3 1537/1 1537/5
1538/3 1538/6
1538/15 1541/12
1541/15 1542/25
1543/20 1544/13
1544/19 1544/22
1545/16 1551/1
1551/6 1551/9
1551/14 1551/20
1551/23 1552/3
1552/16 1553/9
1554/23 1555/9
1556/14 1557/3
1557/13 1558/8
1559/9 1560/14
1562/1 1562/5
1563/22 1564/1
1565/9 1566/13
1576/17 1577/7
risk [7] 1525/5 1525/5
1525/7 1525/16
1525/24 1525/25
1526/9
risks [9] 1523/24
1524/2 1524/9
1524/16 1524/23
1524/25 1525/1
1525/19 1525/22
rival [1] 1524/12
RLSA [4] 1507/22
1508/1 1508/22
1509/15
RLSA/DSA [2]
1507/22 1508/22
robust [1] 1554/7
ROI [1] 1495/4
role [5] 1511/7 1535/9
1536/14 1536/17
1557/4
rolled [1] 1478/18
rolling [1] 1569/1
room [1] 1561/15
root [1] 1553/16
ROSZAK [24] 1475/10
1533/19 1533/21
1533/24 1533/25
1534/15 1538/20
1539/9 1540/10
1541/2 1541/23
1542/6 1542/22
1543/11 1544/5
1546/24 1549/25
1554/21 1556/22
1559/5 1564/1 1566/5
1568/4 1570/7
rough [1] 1557/20
roughly [8] 1500/2
1541/15 1543/20
1557/2 1557/7

1562/10 1564/3
1564/9
rounds [1] 1491/6
rows [1] 1515/16
RPM [2] 1551/20
1551/22
RPMs [1] 1551/18
RSA [39] 1509/13
1512/24 1513/12
1513/18 1513/23
1514/7 1514/22
1517/2 1519/1 1519/5
1519/7 1519/9
1519/11 1519/12
1519/13 1519/20
1519/22 1520/3
1520/8 1520/24
1521/6 1521/24
1522/11 1522/16
1522/23 1523/3
1523/21 1524/10
1525/1 1525/20
1525/22 1526/2
1526/6 1526/10
1526/13 1526/17
1526/19 1527/3
1527/8
RSA/VTA [1] 1509/13
rule [4] 1534/7
1540/15 1571/25
1573/24
rules [1] 1548/1
ruling [2] 1570/17
1574/9
run [5] 1479/10 1481/8
1481/9 1481/10
1481/11
Ruth [1] 1536/4

**S**

S-A-K-A-I [1] 1551/8
SA360 [4] 1506/23
1508/6 1508/12
1508/14
safari [2] 1538/3
1538/5
Safe [1] 1509/24
Sakai [7] 1551/6
1551/8 1551/25
1554/20 1554/22
1555/3 1555/22
Sakai's [1] 1555/11
sales [2] 1507/7
1557/10
salespeople [5] 1507/4
1507/5 1507/7 1507/9
1507/15
SALLET [1] 1474/2
same [9] 1484/9
1490/24 1493/6
1500/22 1547/3
1553/19 1554/4
1560/16 1576/6
Samsung [4] 1516/5
1518/2 1518/5 1520/5
save [1] 1529/5
saw [3] 1497/15
1522/19 1528/23

saying [17] 1478/1
1498/23 1501/16
1505/13 1505/24
1508/24 1528/3
1545/18 1555/6
1555/25 1560/13
1564/15 1569/24
1573/15 1574/23
1574/23 1576/11
scenario [3] 1538/1
1538/8 1538/24
Schindler [17] 1512/16
1512/23 1513/5
1513/16 1514/7
1517/12 1517/23
1518/14 1520/4
1520/7 1520/19
1520/24 1521/25
1522/8 1524/24
1526/5 1527/2
SCHMIDTLEIN [3]
1474/6 1575/8
1576/23
scope [7] 1548/5
1548/8 1570/21
1570/24 1571/14
1571/24 1573/21
screen [17] 1489/25
1518/23 1523/15
1523/20 1528/5
1528/19 1542/7
1542/19 1550/23
1551/6 1554/20
1559/3 1561/8
1561/14 1561/14
1563/19 1563/25
screens [2] 1523/8
1523/12
screenshot [11]
1523/15 1523/19
1523/23 1524/6
1525/20 1525/20
1525/22 1526/9
1526/10 1526/14
1527/22
screenshots [3] 1523/3
1523/7 1524/2
search [125]
searches [3] 1491/21
1491/22 1491/24
searching [1] 1491/17
1492/1
second [13] 1485/25
1496/12 1503/6
1503/7 1506/15
1512/14 1527/21
1528/5 1548/7 1551/3
1559/7 1562/7 1564/2
section [3] 1474/3
1515/15 1516/4
secure [2] 1513/21
1537/4
security [1] 1522/18
seeing [1] 1575/12
Seeking [1] 1496/10
seems [4] 1491/7
1547/18 1556/5
1572/13

1592

**S**

segment [1] 1507/17
selection [8] 1492/5
1492/6 1492/9
1492/10 1492/12
1492/12 1493/2
1493/3
self [1] 1543/17
self-contained [1]
1543/17
sell [9] 1476/21 1481/3
1498/25 1501/14
1501/21 1501/25
1515/10 1517/5
1528/8
sellers [3] 1501/9
1501/25 1502/16
selling [14] 1477/7
1477/9 1480/17
1481/25 1482/4
1498/9 1500/17
1501/20 1507/15
1507/17 1517/9
1530/13 1530/18
1531/21
SEM [1] 1576/24
semantic [8] 1477/13
1477/14 1477/15
1477/16 1477/18
1477/21 1477/22
1478/13
send [1] 1497/12
senior [2] 1511/1
1512/21
sent [15] 1491/2
1491/18 1497/4
1512/7 1513/5 1513/7
1513/15 1513/19
1517/11 1517/22
1520/3 1520/7
1524/23 1527/2
1550/25
sentence [8] 1503/14
1560/6 1561/19
1561/20 1562/8
1562/21 1564/1
1564/2
separate [6] 1498/12
1498/13 1498/14
1498/15 1533/17
1535/18
September [5] 1473/5
1484/20 1484/21
1484/25 1485/3
September 28 [1]
1484/21
September 28th [3]
1484/20 1484/25
1485/3
SERP [2] 1485/6
1504/21
service [12] 1489/13
1506/1 1526/17
1557/18 1558/1
1558/4 1558/7
1560/18 1562/1
1564/13 1566/1
1566/13

services [8] 1481/3
1482/20 1492/1
1521/7 1521/10
1521/12 1521/21
1521/23
session [7] 1473/7
1510/7 1533/10
1533/12 1533/17
1546/13 1549/18
set [9] 1514/18
1518/20 1521/25
1522/3 1522/7 1522/8
1537/24 1538/13
1575/24
sets [2] 1522/23
1532/14
setting [2] 1547/6
1572/6
settings [1] 1537/22
seven [2] 1515/15
1562/4
several [4] 1487/16
1556/4 1556/5 1556/9
share [9] 1487/19
1511/11 1514/11
1515/1 1515/4 1516/1
1516/22 1516/25
1526/25
sheet [1] 1559/6
shift [5] 1493/12
1494/23 1497/18
1497/21 1497/22
shifted [4] 1493/17
1494/10 1559/22
1567/7
shifting [1] 1493/11
shoes [2] 1487/18
1487/21
shopping [24] 1476/8
1476/12 1476/16
1476/22 1476/24
1477/7 1479/20
1479/23 1479/25
1481/9 1481/9
1481/17 1481/19
1482/4 1489/22
1493/23 1493/25
1497/18 1497/23
1498/3 1498/5 1498/8
1498/10 1498/15
short [3] 1537/7
1574/4 1574/5
show [9] 1481/15
1487/11 1489/24
1498/5 1504/15
1504/21 1506/15
1547/16 1561/7
showed [2] 1485/17
1503/8
showing [2] 1496/25
1565/7
shown [3] 1560/25
1565/25 1569/20
shows [6] 1504/18
1504/19 1523/7
1523/15 1523/19
1531/8
Sidarto [4] 1551/11

1551/13 1551/25
1556/13
side [13] 1487/10
1487/11 1501/1
1502/7 1518/13
1520/23 1525/25
1526/12 1528/18
1528/18 1572/11
1574/6 1574/6
sign [5] 1517/3
1522/15 1529/20
1529/22 1530/1
signal [2] 1487/13
1487/14
signals [1] 1487/16
significant [13]
1483/25 1484/3
1484/6 1484/10
1484/11 1484/13
1484/15 1484/18
1485/5 1503/18
1552/22 1553/2
1555/8
signs [2] 1513/1
1530/3
simplicity [1] 1526/21
simplified [1] 1526/18
simplifying [1] 1526/22
singular [1] 1476/20
site [2] 1481/4 1487/24
Sitting [1] 1553/1
situation [5] 1535/3
1537/18 1539/18
1554/25 1555/21
situations [1] 1540/8
Skewered [1] 1501/5
slide [19] 1485/21
1486/6 1513/11
1514/21 1514/22
1517/14 1517/21
1520/1 1520/2 1520/8
1520/19 1523/1
1523/2 1523/7
1523/23 1526/21
1527/1 1528/23
1529/4
slides [1] 1575/2
slightly [5] 1503/11
1503/15 1503/18
1505/15 1539/19
slow [2] 1497/18
1497/21
slowing [2] 1490/21
1503/9
small [8] 1491/7
1501/6 1502/18
1502/19 1502/20
1506/16 1543/14
1557/14
smaller [1] 1529/13
smart [1] 1532/15
smartphone [2] 1516/8
1528/17
smartphones [4]
1527/7 1532/11
1532/16 1533/6
SMB [3] 1501/5 1501/5
1502/16

social [1] 1487/14
sold [7] 1516/13
1516/19 1516/25
1527/7 1528/17
1532/11 1533/6
solved [1] 1480/14
someone [5] 1506/13
1536/7 1562/3 1573/5
1574/17
sometimes [2] 1508/19
1525/6
somewhat [4] 1542/2
1542/24 1550/4
1573/15
sorry [15] 1479/16
1480/20 1482/3
1499/20 1500/13
1501/17 1509/8
1509/11 1509/19
1509/20 1519/2
1529/1 1553/24
1557/5 1567/1
sort [14] 1488/7
1498/25 1514/18
1523/10 1525/13
1525/16 1526/20
1547/5 1549/16
1554/7 1572/6
1573/21 1574/1
1576/4
sought [1] 1549/2
sounds [6] 1534/22
1536/3 1541/15
1543/20 1549/24
1558/2
source [1] 1502/2
South [1] 1473/19
speak [1] 1513/14
speaker [1] 1573/8
specific [11] 1479/3
1481/3 1483/13
1483/14 1488/12
1489/20 1517/25
1523/10 1537/25
1544/11 1566/10
specifically [6] 1491/14
1514/15 1516/14
1520/14 1551/22
1557/1
specifics [3] 1538/19
1541/15 1550/10
spell [2] 1510/19
1536/11
spend [6] 1481/14
1481/19 1494/16
1495/5 1496/21
1498/20
spending [4] 1494/18
1496/25 1498/18
1498/19
split [3] 1553/6 1553/6
1555/22
spoke [1] 1534/2
1535/6 1535/21
Sprint [2] 1515/17
1515/22
SQR [5] 1482/8
1482/22 1483/1

1483/9 1483/12
squashing [2] 1505/2
1505/22
stake [1] 1548/12
stamp [1] 1485/21
stamped [1] 1567/18
standard [1] 1570/5
standing [2] 1546/16
1574/17
stands [3] 1501/18
1508/1 1527/15
start [5] 1499/10
1541/8 1556/9
1557/10 1567/22
started [3] 1511/1
1534/15 1556/8
starting [2] 1513/25
1568/25
state [6] 1473/22
1474/2 1496/19
1510/18 1569/12
1572/17
stated [1] 1476/11
statement [12] 1485/9
1492/24 1501/23
1548/4 1548/4
1555/18 1570/19
1571/13 1571/25
1572/20 1572/21
1574/21
statements [1] 1573/3
states [28] 1473/1
1473/3 1473/10
1486/6 1497/17
1499/6 1499/25
1510/4 1510/10
1514/12 1515/10
1515/11 1515/13
1515/20 1516/11
1516/20 1517/22
1518/10 1520/24
1532/9 1532/12
1533/6 1542/11
1543/2 1550/7
1551/18 1569/11
1576/3
States' [1] 1576/23
stating [1] 1495/24
staying [1] 1574/2
steps [3] 1538/11
1538/12 1566/20
still [7] 1481/25 1506/9
1519/14 1536/14
1538/22 1539/5
1561/7
stipulated [1] 1542/15
stop [2] 1477/7
1480/17
stopped [1] 1494/18
Store [22] 1529/11
1529/19 1529/23
1529/24 1529/25
1530/3 1530/14
1530/19 1531/22
1532/8 1532/12
1533/7 1538/3
1566/18 1566/20
1566/23 1567/4

**S**

Store... [5] 1567/6
1567/10 1569/1
1569/5 1569/10
straight [2] 1528/22
1559/6
strategies [1] 1494/14
Street [3] 1473/14
1473/17 1473/19
stress [1] 1572/9
strike [2] 1541/8
1569/14
string [2] 1551/5
1560/5
studies [1] 1541/16
stuff [1] 1549/12
style [1] 1555/20
subject [17] 1512/11
1517/1 1517/5
1517/15 1517/19
1519/22 1522/11
1522/22 1523/4
1527/7 1528/4
1544/18 1546/2
1549/12 1571/23
1572/3 1572/5
submit [3] 1574/4
1574/8 1575/17
subsequently [3]
1508/4 1518/2
1555/17
subset [1] 1481/18
substantive [2]
1571/17 1572/8
substitutability [1]
1476/19
substitutable [2]
1476/12 1476/16
success [1] 1507/12
Suite [2] 1473/19
1473/23
summarizes [3]
1513/18 1520/2
1556/16
summarizing [1]
1514/6
summary [2] 1513/12
1517/11
superior [2] 1569/21
1569/24
superset [1] 1519/12
supervisor [3] 1536/9
1559/14 1559/19
supervisors [2]
1559/15 1559/25
supply [2] 1545/16
1545/22
suppose [2] 1520/12
1563/11
sure [40] 1482/23
1483/2 1483/13
1483/19 1487/8
1488/20 1488/21
1488/25 1492/23
1495/9 1501/15
1503/23 1504/25
1506/10 1507/10
1509/10 1510/15

1512/20 1513/22
1515/2 1538/10
1546/20 1549/24
1550/9 1552/14
1559/23 1561/2
1561/6 1561/10
1562/23 1563/4
1563/17 1566/7
1567/23 1570/6
1574/18 1575/20
1575/24 1576/5
1576/16
Surface [1] 1532/17
surfaces [2] 1481/12
1481/15
surprise [1] 1549/1
SW [1] 1474/7
swap [7] 1558/10
1560/21 1561/21
1561/22 1564/8
1564/21 1564/24
swapped [1] 1560/9
swat [1] 1563/15
swath [1] 1493/20
switch [8] 1487/10
1510/1 1541/4
1541/11 1541/17
1549/25 1558/15
1567/11
switched [3] 1538/21
1539/4 1558/7
switches [1] 1541/8
system [1] 1505/14

**T**

T-A-C [1] 1537/7
T-Mobile [2] 1515/17
1515/22
tab [1] 1531/9
table [1] 1518/3
tablets [1] 1532/10
TAC [3] 1486/18
1487/2 1537/7
talk [6] 1495/2 1532/20
1547/24 1575/9
1576/14 1576/14
talked [9] 1477/12
1483/6 1483/22
1488/21 1492/4
1493/11 1494/10
1494/21 1497/17
talking [7] 1491/13
1497/24 1526/11
1550/10 1561/19
1562/24 1575/21
tangential [1] 1547/5
target [3] 1481/13
1481/13 1482/19
targeting [1] 1488/2
targets [1] 1495/4
team [24] 1485/16
1509/2 1511/24
1535/9 1535/12
1535/15 1535/18
1536/15 1536/18
1538/20 1539/3
1539/21 1539/22
1550/2 1550/5 1551/9

1551/17 1552/8
1552/12 1552/15
1552/15 1553/5
1556/1 1558/12
team's [2] 1553/5
1556/2
teams [4] 1511/18
1534/20 1534/22
1534/24
Tech [1] 1490/20
technical [1] 1480/15
technically [1] 1480/9
technology [1] 1481/22
telling [2] 1564/7
1565/4
template [13] 1517/22
1518/4 1518/6 1518/8
1519/16 1519/18
1520/3 1521/17
1521/24 1522/10
1522/20 1526/7
1532/5
templates [7] 1513/21
1513/23 1513/24
1514/2 1514/7 1518/1
1520/6
term [5] 1503/10
1503/14 1525/25
1553/25 1554/5
terminating [1]
1494/12
terminology [1]
1560/12
terms [24] 1489/1
1511/15 1513/20
1514/1 1517/11
1517/15 1517/21
1517/24 1518/6
1518/13 1519/18
1520/3 1520/7 1520/8
1520/23 1521/24
1522/7 1522/12
1526/5 1526/16
1548/3 1553/20
1573/23 1574/13
test [1] 1548/7
testified [3] 1476/15
1478/15 1548/9
testify [1] 1541/4
testimony [18] 1476/9
1477/12 1477/13
1482/7 1483/7
1483/22 1504/20
1505/6 1509/24
1517/12 1528/24
1530/18 1533/14
1534/11 1541/20
1570/4 1570/8 1570/9
testing [1] 1506/7
that in [1] 1554/6
theories [8] 1552/5
1552/14 1552/21
1553/17 1556/4
1556/5 1556/6 1556/9
theory [1] 1553/5
1553/12 1553/15
1556/2 1556/7
thereby [1] 1508/15

therefore [2] 1488/9
1505/21
thicker [5] 1477/18
1477/22 1477/25
1478/4 1478/5
think it [1] 1548/2
third [5] 1508/21
1526/14 1526/16
1527/2 1527/4
third-party [4] 1526/14
1526/16 1527/2
1527/4
thought [9] 1480/21
1522/14 1525/16
1525/25 1526/23
1528/9 1533/1
1544/16 1572/23
thoughts [1] 1572/16
thousand [4] 1501/13
1501/21 1502/1
1551/22
thread [2] 1496/9
1498/22
three [9] 1484/22
1484/25 1516/10
1524/5 1524/17
1525/19 1525/24
1548/22 1574/5
threshold [7] 1482/21
1482/23 1483/5
1483/12 1483/15
1483/18 1483/20
TikTok [2] 1488/8
1488/8
tilde [1] 1500/4
Tim [1] 1569/15
timeline [1] 1566/10
timing [3] 1533/11
1566/7 1574/1
Tinter [1] 1533/4
tips [3] 1543/16 1544/9
1545/1
title [9] 1490/20
1490/24 1496/6
1512/20 1513/11
1517/14 1517/18
1518/9 1568/12
titled [2] 1514/22
1523/3
today [19] 1477/6
1477/8 1480/4
1480/12 1480/16
1480/17 1481/25
1482/3 1482/25
1483/2 1483/8 1491/7
1495/7 1498/9
1534/11 1553/1
1566/3 1568/25
1576/14
today's [1] 1482/23
together [3] 1513/24
1520/19 1523/10
told [4] 1495/3 1549/4
1549/8 1573/14
Tomo [3] 1551/5
1551/6 1551/6
tomorrow [3] 1570/8
1577/6 1577/8

took [2] 1526/21
1530/24
tool [9] 1480/22
1506/24 1507/1
1507/19 1508/3
1508/4 1508/11
1508/12 1508/15
tools [1] 1508/19
top [11] 1490/2 1491/5
1496/6 1513/4 1517/2
1519/8 1519/23
1522/12 1527/12
1529/6 1556/12
topic [6] 1517/13
1544/10 1544/12
1544/18 1550/1
1570/1
totally [4] 1530/17
1538/10 1539/2
1548/15
Towards [1] 1501/5
traffic [11] 1481/4
1486/18 1486/19
1486/25 1487/3
1487/5 1498/24
1537/5 1539/16
1540/13 1540/20
training [7] 1543/12
1543/14 1546/25
1548/10 1571/15
1572/10 1573/8
transcript [3] 1473/9
1531/4 1578/4
travels [1] 1509/24
treat [1] 1510/12
trend [4] 1503/11
1503/15 1564/25
1565/12
trends [1] 1565/8
trial [3] 1473/9 1533/4
1548/1
tried [2] 1520/12
1526/22
true [3] 1547/22
1573/13 1578/4
trustworthiness [1]
1573/19
trustworthy [2] 1573/17
1573/22
truth [5] 1546/21
1546/22 1571/10
1571/12 1573/9
try [4] 1506/11
1507/17 1540/16
1552/1
trying [10] 1499/1
1513/21 1528/7
1532/6 1541/13
1544/8 1545/1 1548/1
1558/20 1563/14
turn [15] 1485/14
1485/21 1499/13
1500/22 1501/17
1502/4 1503/5 1503/6
1503/25 1507/20
1507/20 1520/1
1523/1 1531/8
1550/16

**T**

turned [3] 1497/21
1521/1 1525/4
Turning [1] 1506/23
twice [1] 1534/5
two [27] 1476/14
1478/20 1478/21
1482/4 1488/3 1508/2
1508/15 1513/1
1513/5 1515/9 1523/7
1525/8 1525/15
1525/15 1528/9
1528/10 1528/15
1528/16 1528/18
1541/17 1548/22
1559/15 1562/9
1563/7 1564/3 1564/7
1573/7
two-page [1] 1573/7
Tyler [1] 1473/22
type [1] 1481/11
typed [1] 1573/7
types [5] 1477/9
1477/16 1482/5
1488/12 1513/1
typical [1] 1508/17
typically [4] 1494/2
1503/2 1503/4 1549/8

**U**

U.S [21] 1473/13
1473/16 1473/19
1474/24 1514/15
1514/18 1515/12
1516/13 1516/14
1516/15 1516/16
1517/25 1520/6
1520/13 1521/4
1527/7 1528/18
1530/13 1530/19
1531/21 1556/20
Uh [1] 1513/10
UK [2] 1551/18
1556/20
ultimately [2] 1547/2
1571/4
under [13] 1507/21
1509/17 1518/13
1518/22 1520/23
1521/6 1521/13
1521/24 1522/7
1526/5 1526/16
1528/13 1533/17
underlying [2] 1480/14
1517/6
underneath [2]
1499/18 1503/10
underpinning [1]
1558/25
understood [6]
1480/21 1498/17
1505/6 1512/23
1514/10 1528/7
undertake [1] 1539/5
unfair [1] 1505/25
unique [8] 1492/22
1539/24 1540/8
1555/4 1555/7

1555/13 1555/19
1556/19
UNITED [26] 1473/1
1473/3 1473/10
1510/4 1510/10
1514/12 1515/10
1515/11 1515/13
1515/20 1516/11
1516/20 1517/22
1518/10 1520/24
1532/8 1532/11
1533/6 1542/11
1543/2 1550/7 1550/7
1551/18 1569/11
1576/3 1576/23
Universal [1] 1509/1
unless [1] 1574/19
unlike [1] 1556/20
unlikely [1] 1528/4
unpack [1] 1513/22
unusual [1] 1576/16
up [34] 1494/14
1495/11 1499/11
1502/4 1503/6 1509/8
1512/1 1521/3 1521/9
1521/19 1528/22
1528/25 1537/24
1538/13 1542/3
1542/7 1544/2
1548/13 1548/21
1548/25 1550/14
1551/5 1554/13
1554/20 1558/1
1561/8 1561/13
1567/16 1570/4
1571/20 1573/7
1574/2 1574/17
1575/11
Update [1] 1485/18
updated [2] 1497/14
1505/21
updating [2] 1505/15
1506/1
upon [1] 1478/10
UPSX436 [1] 1495/22
uptick [1] 1503/22
UPX [1] 1490/4
UPX129 [1] 1528/22
UPX141 [3] 1512/1
1512/1 1512/7
UPX2002 [3] 1475/17
1567/18 1568/2
UPX38 [6] 1542/3
1542/11 1543/2
1546/5 1549/25
1570/14
UPX423 [5] 1489/24
1490/5 1490/16
1490/19 1495/23
UPX436 [4] 1495/11
1495/14 1495/25
1496/13
UPX462 [1] 1475/16
UPX97 [2] 1559/3
1569/20
usable [1] 1572/18
usage [9] 1560/8
1562/12 1564/5

1564/9 1564/22
1565/7 1565/12
1565/14 1565/21
use [21] 1476/21
1476/23 1480/7
1480/7 1482/16
1482/17 1482/18
1488/2 1488/6
1508/10 1508/19
1538/3 1539/5 1539/6
1539/7 1558/18
1558/23 1566/22
1566/23 1569/5
1573/16
used [12] 1476/13
1485/15 1489/1
1547/17 1548/25
1558/13 1558/20
1558/24 1562/3
1571/9 1571/10
1573/17
user [36] 1478/2
1483/6 1483/16
1483/20 1484/1
1484/17 1487/13
1487/19 1487/20
1487/21 1487/24
1488/2 1488/13
1488/18 1488/22
1488/23 1488/24
1488/25 1489/2
1489/6 1489/10
1489/16 1489/19
1505/16 1506/1
1521/2 1521/2 1525/4
1525/7 1525/8
1525/11 1525/17
1528/6 1562/3 1569/4
1569/7
users [21] 1482/19
1491/16 1492/5
1492/11 1493/1
1493/4 1525/11
1537/11 1537/15
1537/20 1537/21
1538/1 1538/5
1538/17 1538/21
1539/4 1541/4
1541/11 1541/17
1562/1 1569/9
uses [2] 1514/2
1558/14
using [3] 1493/21
1508/11 1573/13
usually [2] 1539/12
1539/13
UX [1] 1522/18

**V**

v.2019 [1] 1529/6
vaguely [1] 1542/2
valuable [1] 1537/9
value [4] 1499/16
1500/18 1501/2
1501/19
variables [1] 1541/1
variation [2] 1514/5
1520/17

variety [6] 1480/7
1505/15 1526/1
1535/2 1540/14
1540/25
various [2] 1481/15
1511/18
vendors [1] 1516/11
Verizon [1] 1515/17
version [4] 1557/15
1560/23 1561/1
1577/5
versus [1] 1489/17
via [1] 1492/21
vice [1] 1535/22
videos [1] 1481/10
view [6] 1492/13
1493/4 1526/18
1537/10 1571/6
1576/24
views [1] 1547/15
virtual [1] 1524/21
visits [1] 1504/1
visual [1] 1523/11
VP [3] 1484/14
1536/14 1559/11
VTA [1] 1509/13

**W**

wants [1] 1505/7
Washington [5] 1473/5
1473/14 1473/17
1474/8 1474/25
way [15] 1478/1
1480/16 1480/25
1487/23 1503/3
1527/19 1532/5
1539/20 1547/3
1549/15 1560/16
1563/13 1563/13
1566/9 1576/8
ways [4] 1491/24
1524/12 1525/6
1526/23
web [5] 1492/12
1492/18 1492/22
1493/3 1522/4
Webb [1] 1473/22
website [4] 1487/18
1548/13 1548/19
1549/10
websiteless [1]
1502/12
websites [5] 1502/6
1502/14 1502/16
1502/23 1503/2
week [1] 1511/23
weeks [1] 1497/10
welcome [1] 1476/6
weren't [1] 1508/22
what's [4] 1492/6
1516/15 1548/11
1575/25
whereas [3] 1484/2
1485/7 1486/18
who's [4] 1488/7
1536/9 1562/3
1574/19
whole [4] 1498/22

1544/23 1545/10
1545/17
wide [3] 1535/2
1540/25 1548/13
widget [12] 1518/22
1527/13 1527/19
1527/20 1527/21
1528/5 1528/14
1528/15 1530/8
1532/21 1532/25
1533/1
widget's [1] 1528/12
widgets [6] 1525/8
1525/15 1528/9
1528/10 1528/13
1528/18
WILLIAM [1] 1473/22
Williams [1] 1474/7
willing [1] 1554/5
win [2] 1505/11
1506/14
winner [3] 1505/7
1505/19 1506/5
winner-take-all [1]
1505/7
wireless [1] 1515/19
wish [1] 1549/4
wishes [1] 1547/9
withdraw [1] 1550/18
within [12] 1511/18
1512/8 1538/5 1548/5
1548/8 1570/21
1570/24 1571/14
1571/22 1571/24
1572/1 1573/21
without [7] 1519/11
1538/19 1549/2
1562/8 1565/19
1570/5 1576/11
witness [13] 1475/2
1486/16 1499/5
1503/13 1534/7
1534/8 1544/14
1548/9 1561/8
1562/21 1570/3
1570/5 1570/12
word [10] 1476/13
1558/18 1561/5
1562/9 1562/10
1562/14 1562/25
1563/4 1564/2
1573/16
words [3] 1525/24
1547/21 1567/2
work [9] 1514/10
1527/5 1530/12
1533/25 1534/1
1559/5 1563/10
1568/15 1573/3
worked [7] 1510/23
1534/17 1545/7
1557/1 1557/6
1566/12 1568/14
working [6] 1480/6
1480/8 1494/14
1557/10 1557/19
1566/14
works [4] 1488/4

1595

**W**

works... [3]  1503/3
1533/11 1551/10
world [4]  1503/23
1568/24 1569/1
1575/13
world's [1]  1541/24
write [2]  1563/13
1572/20
writes [2]  1554/22
1554/25
written [1]  1524/5
wrong [6]  1479/17
1497/2 1497/3 1497/6
1497/13 1527/16
wrote [15]  1496/17
1541/23 1542/25
1543/5 1543/12
1543/15 1543/18
1545/3 1546/24
1551/16 1551/25
1552/5 1555/22
1560/6 1564/2

**Y**

Y-O-O [1]  1510/22
Yahoo [8]  1552/18
1552/21 1552/25
1553/2 1553/7 1555/8
1555/23 1556/2
year [2]  1495/2
1510/24
years [7]  1478/20
1478/21 1506/19
1506/20 1562/9
1564/3 1564/7
yellow [1]  1502/25
Yelp [1]  1526/20
Yep [1]  1491/6
yesterday [3]  1488/22
1489/25 1504/5
yielded [1]  1520/11
YOO [11]  1475/7
1510/10 1510/10
1510/12 1510/16
1510/18 1510/22
1512/5 1520/2 1529/4
1533/14
York [1]  1473/24
younger [1]  1500/5
YouTube [1]  1481/11

**Z**

zoom [2]  1514/21
1534/2