```
 1                   BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA, et al., .
                                         .  Case Number 20-cv-3010
 4              Plaintiffs,              .
                                         .
 5          vs.                          .
                                         .  Washington, D.C.
 6     GOOGLE LLC,                       .  September 20, 2023
                                         .  1:32 p.m.
 7              Defendant.               .
       - - - - - - - - - - - - - - - - - .
 8

 9                   PUBLIC TRANSCRIPT OF BENCH TRIAL, DAY 7
                             (AFTERNOON SESSION)
10              BEFORE THE HONORABLE AMIT P. MEHTA
                      UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

13     For DOJ Plaintiffs:          KENNETH DINTZER, ESQ.
                                     United States Department of Justice
14                                   1100 L Street Northwest
                                     Washington, D.C. 20005
15
                                     JOSHUA HAFENBRACK, ESQ.
16                                   ERIN MURDOCK-PACK, ESQ.
                                     United States Department of Justice
17                                   450 Fifth Street Northwest
                                     Washington, D.C. 20001
18
                                     DAVID DAHLQUIST, ESQ.
19                                   United States Department of Justice
                                     209 South LaSalle Street
20                                   Suite 600
                                     Chicago, Illinois 60604
21

22

23                      -- continued --

24

25
```

```
 1    APPEARANCES (CONTINUED):

 2    For Plaintiffs State of
      Colorado and State of
 3    Nebraska:                    WILLIAM F. CAVANAUGH, JR., ESQ.
                                   Patterson Belknap Webb & Tyler LLP
 4                                 1133 Avenue of the Americas
                                   Suite 2200
 5                                 New York, New York 10036

 6    For the Defendant:           JOHN SCHMIDTLEIN, ESQ.
                                   EDWARD BENNETT, ESQ.
 7                                 KENNETH SMURZYNSKI, ESQ.
                                   Williams & Connolly LLP
 8                                 680 Maine Avenue Southwest
                                   Washington, D.C. 20024
 9
                                   MICHAEL SOMMER, ESQ.
10                                 Wilson Sonsini Goodrich & Rosati
                                   1301 Avenue of the Americas
11                                 40th Floor
                                   New York, New York 10019
12

13    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
14                                 Room 4704-B
                                   Washington, D.C. 20001
15                                 202-354-3284

16
      Proceedings recorded by stenotype shorthand.
17    Transcript produced by computer-aided transcription.

18

19

20

21

22

23

24

25
```

C O N T E N T S

TESTIMONY

MICHAEL ROSZAK          Cross-Examination............... 1735
                        Redirect Examination........... 1741
                        Recross-Examination............ 1744

ERIC LEHMAN             Direct Examination............. 1748
                        Cross-Examination.............. 1828


EXHIBITS RECEIVED

UPX38................................................. 1857



P R O C E E D I N G S

(Call to order of the court.)

(The following occurred under seal.)













10    Q.    If we could pull UPX38 back up.

11       Mr. Roszak, did you give the speech that these notes are

12    notes for?

13    A.    I expect --

14          THE COURT:   This a little bit out of the scope.

15       He did ask about this.   Pardon me.   Go ahead and ask your

16    question.   Sorry.

17          BY MR. HAFENBRACK:

18    Q.    My question is whether -- UPX38 reflects your notes for a

19    speech you were going to give at a Google training; correct?

20    A.    For a presentation, yes.

21    Q.    And my question is whether you actually gave the

22    presentation that's listed here.

23    A.    I expect I would have done a presentation.   I don't know if

24    I would have said this exactly.   These were notes.   But I expect

25    I would have given some presentation.

1    Q.   Do you recall whether you used these notes as sort of your

2    outline for the presentation?

3    A.   I think I probably would have used them as the outline.   I

4    don't know if I would have followed them.   I actually try in

5    presentations to not have notes.

6    Q.   And when you were giving the presentation, were the other

7    Google employees that were a part of the training, were they the

8    audience for the presentation?

9    A.   I don't know that there really was an audience.   It was

10   much more around like coaching on how to give presentations.   I

11   didn't really view it as audience or anything else, given it was

12   just like -- I mean, it really wasn't audience so much as, you

13   know, how to use some of the tips that they had on

14   presentations.

15   Q.   Okay.   If I could direct your attention to the fifth bullet

16   point that said "we had a few jolts across time," and then you

17   provide two examples of jolts.   One is iOS 7.

18        And that's when Apple changed the Safari search bar

19   configuration; right?

20             MR. BENNETT:   Objection.   Now we are beyond the scope,

21   Your Honor.   I asked about the first full bullets, and that was

22   it.

23             THE COURT:   Let me hear the question first, and then I

24   can decide.   Go ahead.

25             BY MR. HAFENBRACK:

1  Q.   My question is whether the iOS 7 example that you provide

2  was an example where Apple changed the configuration of the

3  Safari browser.

4  A.   Can I answer?  Sorry.

5       Yes, I believe so.

6  Q.   And the second example you provide here is Mozilla

7  switching the default to Yahoo!; right?

8  A.   Yes.

9  Q.   And those are just facts that you included in your

10  presentation; right?

11  A.   Yes.

12  Q.   And you're aware of those facts based on your work at

13  Google; right?

14  A.   Yes.

15  Q.   Okay.  Your counsel --

16            THE COURT:  I will overrule the objection on scope.

17  Go ahead.

18            MR. BENNETT:  Thank you, Your Honor.

19

20

21

22

23

24

25



18          (End of sealed proceedings.)

19          THE COURT:  Mr. Douyon went down to let everybody know

20     the courtroom was reopen.  It's going to take about five minutes

21     to reconnect the line.  Instead of waiting, why don't we plow

22     forward.

23          MR. BENNETT:  Thank you, Your Honor.

24                    RECROSS-EXAMINATION

25          BY MR. BENNETT:

1    Q.   Exhibit 462, it's the Japan RPM e-mail you were asked some

2    questions about.  And there were questions posed to two of your

3    colleagues who, I understand from prior questioning, are the

4    head of finance for Google in Japan and the head of finance for

5    Google in Asia; is that correct?

6    A.   Asia-Pacific, yes.

7    Q.   Asia-Pacific, I'm sorry.

8         And so with those duties, are those people you would turn

9    to if you wanted to understand the dynamics of competition for

10   search advertising in the United States?

11   A.   No, those are not individuals I would reach out to on that.

12             MR. BENNETT:  I have nothing further, Your Honor.

13             THE COURT:  Just for the interest of completeness on

14   the public record, will you re-ask the questions you asked him

15   in closed session and elicit that information?

16             MR. BENNETT:  Oh, sure, Your Honor.  I apologize for

17   that.

18             BY MR. BENNETT:

19   Q.   So I had previously asked you a question about who

20   Mr. Sidarto is.

21        Can you tell us who Mr. Sidarto is?

22   A.   He is the Google finance lead for Asia-Pacific.

23   Q.   And at the bottom of Exhibit -- I guess we need to call up

24   the exhibit as well, 462, and we're looking at the bottom

25   e-mail.

1        At the bottom of 462, are there several bullet points that

2   Mr. Sidarto provided you in response to your question about RPMs

3   in Japan?

4   A.   Yes.

5            MR. BENNETT:  That's all I have, Your Honor.  Thank

6   you.

7            THE COURT:  Okay.  Any redirect?

8            MR. HAFENBRACK:  No, Your Honor.

9            THE COURT:  Mr. Roszak, thank you very much for your

10   time and your testimony, and safe travels home.

11            THE WITNESS:  Thank you.

12            THE COURT:  Okay.  Are plaintiffs ready with their

13   next witness?

14            MR. HAFENBRACK:  Your Honor, if I may, at this time

15   the United States moves into evidence UPX38 under Rule

16   801(d)(2)(D).

17            MR. BENNETT:  Objection, Your Honor.

18            THE COURT:  Let's hold off.  I actually didn't bring

19   my materials with me.  So why don't we take that up at the start

20   of the next break.

21            MR. HAFENBRACK:  Sure, Your Honor.

22            THE COURT:  Or right after the next break, I should

23   say.

24            MR. SOMMER:  Judge, there was one exhibit yesterday

25   that Your Honor received provisionally but DOJ wanted to

1   consider it overnight.  It's DXD03.005.

2           MR. DAHLQUIST:  Yes, Your Honor, and to the extent

3   that's offered as a demonstrative, I have no objection.  But to

4   the extent it's being offered substantively, we would.

5           MR. SOMMER:  We are offering it pursuant -- do you

6   want a copy?

7           THE COURT:  Yes, please.

8           MR. SOMMER:  We are offering it pursuant to 1006, Your

9   Honor.  All of the underlying exhibits that form the data are

10  unobjected to.  It's simply a compilation.

11          THE COURT:  And who prepared it?

12          MR. SOMMER:  Dr. Israel, one of our excerpts.

13          THE COURT:  Any objection to it being admitted as a

14  1006?

15          MR. DAHLQUIST:  I think they have to ask Dr. Israel

16  that in order to get his view on it.

17          THE COURT:  I'm asking you whether you -- well, if

18  you're not prepared to agree to its admissibility, are you

19  reserving the opportunity to question Dr. Israel about his

20  preparation of this?

21          MR. DAHLQUIST:  Yes, Your Honor.

22          THE COURT:  Okay.  So let's just wait, and we can ask

23  Dr. Israel how he created this chart and go from there.

24          MR. SOMMER:  Fine.

25          MR. DAHLQUIST:  Thank you, Your Honor.

1          MS. MURDOCK-PARK:  Good afternoon, Your Honor.  Erin

2     Murdock-Park on behalf of the United States.  We call Eric

3     Lehman as our next witness.

4          ERIC LEHMAN, WITNESS FOR THE GOVERNMENT, SWORN

5          MS. MURDOCK-PARK:  Because Google has asserted

6     confidentiality over some of the subjects of Dr. Lehman's

7     testimony, we expect to conduct both open and closed sessions

8     today.

9          THE COURT:  Okay.

10          MS. MURDOCK-PARK:  I hope to end the public session

11     around our next break time.

12                         DIRECT EXAMINATION

13          BY MS. MURDOCK-PARK:

14     Q.   Good morning, Dr. Lehman.  My name is Erin Murdock-Park.  I

15     represent the United States.

16          You were a distinguished software engineer at Google;

17     correct?

18          THE COURT:  Could we just ask the witness to state his

19     name and spell it.

20          MS. MURDOCK-PARK:  My apologies.

21          BY MS. MURDOCK-PARK:

22     Q.   Mr. Lehman, could you please state and spell your name for

23     the record.

24     A.   Lehman, L-e-h-m-a-n.

25          THE COURT:  Thank you, sir.

```
1              BY MS. MURDOCK-PARK:
2    Q.   And Dr. Lehman, you were a distinguished software engineer
3    at Google?
4    A.   At the end of my time at Google, yes.
5    Q.   And you left Google in November 2022?
6    A.   Yes.
7    Q.   Why did you leave Google?
8    A.   I found that the work was becoming very demanding, and I
9    couldn't balance work with my family responsibilities.
10   Q.   What is your current job?
11   A.   I am a stay-at-home father.
12   Q.   Are you represented by counsel today?
13   A.   Yes.
14   Q.   Whom?
15   A.   Ken, I guess.
16           MR. SMURZYNSKI:  Smurzynski.  It's not easy.
17           MS. MURDOCK-PARK:  Thank you.
18           BY MS. MURDOCK-PARK:
19   Q.   Do you have a pension from Google, Dr. Lehman?
20   A.   A pension?  No.
21   Q.   Do you own Google stock?
22   A.   I don't myself own Google stock.  However, my wife is an
23   employee of YouTube, which is a part of Google, and she does
24   periodically get stock grants.
25   Q.   Do you have any financial interest in the outcome of this
```

1    case?

2    A.   Only to the extent -- only via my wife's employment, I

3    guess.

4    Q.   Now, the questions I'll be asking you today will revolve

5    around the time that you spent working at Google.  Okay?

6    A.   Okay.

7    Q.   Let's talk briefly about your background.  You received a

8    bachelor's, master's, and Ph.D. from MIT; is that correct?

9    A.   That's right.

10   Q.   And you also did a post-doctoral at MIT?

11   A.   That's right.

12   Q.   Then you worked at Google for about 18 years?

13   A.   I think a little over 17.

14   Q.   You always worked in search quality and ranking?

15   A.   Yes, that's right.  I always worked in search quality on

16   ranking with some sort of peripheral things.

17   Q.   Thank you.  At one time, you managed a team of about 50

18   people who worked in search quality; correct?

19   A.   That's right.  Maybe a year or so before I left, I stepped

20   down from management, but the largest group I managed was just

21   before that and was about 50, yes.

22             THE COURT:  What was your Ph.D. in?

23             THE WITNESS:  Theoretical computer science, so

24   combinatorial and probabilistic algorithms.

25             THE COURT:  Thank you.

1        BY MS. MURDOCK-PARK:

2    Q.   Pandu Nayak was your direct supervisor for a time when you

3    were at supervisor?

4    A.   Yeah, for all of my later years at Google, he was my

5    supervisor.

6    Q.   You were familiar with Google's processes for ranking web

7    results; correct?

8    A.   I'm generally familiar, yes.

9    Q.   And you're familiar with Google's efforts to refine and

10   improve its search algorithms?

11   A.   Yes, I'm generally quite familiar.

12   Q.   You're also familiar with Google's use of user interaction

13   data; right?

14   A.   Fairly familiar.  I didn't sit on the team that is most

15   heavily engaged with user interaction data, but I had many

16   connections to it during my time.

17   Q.   Can you briefly explain for the Court what user interaction

18   data is with respect to search quality?

19   A.   Yeah, so here's the idea.  The biggest problem in search

20   is, given a query and a web page, is that web page relevant to

21   the query.  A person can figure that out pretty easy.  They just

22   read the web page and think about it.  But a search engine runs

23   on computers, and they couldn't read.

24        So there's sort of a trick to get around that, which is you

25   show web pages to people and then see their reaction, and that

1    can give you some sort of hint about whether or not the web page

2    is relevant to the query.  So you do a search.  You see five

3    search results.  The person can read the query, can reach the

4    search results, and then they might click on one of those

5    results or skip over one of them, user interaction.  And that

6    gives you some hint about what it is the person read.

7         So I think that's user interaction data you're talking

8    about.

9    Q.   Yes.  So briefly, so user interaction data provides users'

10   feedback about search results?  Is that a fair summarization?

11   A.   Did you say user interaction data provides users?

12   Q.   Provides feedback from the users about their search

13   results.

14   A.   I think that's fair, yeah.

15   Q.   And user interaction data is Google's observation of the

16   user's engagement with the search results?

17   A.   Yes.  So if someone does a search, then they might look at

18   the results for a little bit.  They might click on something,

19   back up, click on something else, maybe swipe through a

20   carousel.  Usually, those events is logged and time-stamped and

21   recorded, and that becomes a body of user interaction data.

22   Q.   So Google sometimes uses the term "clicks" as a shorthand

23   for user interaction data; right?

24   A.   Sometimes, yeah, yeah.  I mean, people who work on this

25   stuff really probably make the fine distinctions, but we can use

1  clicks as sort of a shorthand for user interaction data.

2  Q.   And you mentioned that another team was more heavily used

3  or -- strike that.

4      Which team at Google is most heavily engaged with user

5  interaction data?

6  A.   It's a team that has sort of gone by various names:

7  Navboost, Glue, Tetris, things like that.  It's all kind of the

8  same group of people with their role sort of evolving a little

9  bit over time.

10  Q.   Thank you.  If I use "user data" instead of "user

11  interaction data," will you understand what I mean, or would you

12  prefer I use the whole term?

13  A.   I think we can agree what user data is.

14  Q.   Okay.  So let's talk a little bit more about how Google

15  views the use of user data in its search systems.  And I would

16  like to turn your attention to a slide deck that you authored in

17  2017 titled "Google is magical."  This is UPX228.  And this is

18  admitted, and there are no redactions on this document.

19      Dr. Lehman, you drafted UPX228; correct?

20          MR. SMURZYNSKI:  Your Honor, could the witness be

21  presented with the document before he is questioned about it?

22          MS. MURDOCK-PARK:  Oh, my apologies.  If may I

23  approach.

24          THE WITNESS:  Might you be able to tell me the number

25  one more time?

```
 1            BY MS. MURDOCK-PARK:
 2    Q.   228.  You will notice in the binder, Dr. Lehman, there is
 3    an "open" section, and that's what we will be talking about
 4    publicly.  And there is a "closed" section, and that's what we
 5    will be discussing in the sealed session.
 6         So the first half of the binder will have documents we're
 7    discussing now.  I think it's the sixth tab in.
 8    A.   I see.  It says "closed"?
 9    Q.   Yes.  We're in the "open" section right now at UPX228.
10    A.   Okay.
11    Q.   Do you have the document in front of you, Dr. Lehman?
12    A.   Yes.
13    Q.   Okay.  So did you draft the presentation "Google is
14    magical"?
15    A.   Yes.
16    Q.   And you titled the slide deck "Google is magical" because
17    Google gets search results right even when that doesn't seem
18    possible; correct?
19    A.   There's a somewhat complicated story behind this.  I'm not
20    sure that that quite captures the reason for that.
21    Q.   Okay.  We'll get into a little bit more why you drafted the
22    deck.
23    A.   Okay.
24    Q.   But you presented UPX228 to other Google employees?
25    A.   I just want to check, because I did probably variations on
```

1    this presentation several times.  But yes, yes, I did.

2    Q.   Let's turn to slide 7, which is Bates ending 9499, and this

3    is a graphic titled "this is not how search works."

4         Do you see that?

5    A.   Yes.

6    Q.   Okay.  And the graphic on slide 7 has one set of arrows

7    going from left to right.  The keyboard on the left that

8    has "scoring" over it, that represents Google?

9    A.   That's right.

10   Q.   And the "results" arrow pointing from Google to an artist

11   pallet that's labeled "UX," does "UX" stand for user experience?

12   A.   That's right.

13   Q.   And the second arrow labeled "SERP" going from the UX to a

14   smily person holding a phone, "SERP" stands for search engine

15   results page; right?

16   A.   Search results page, yeah.

17   Q.   Okay.  And so a SERP includes those blue links, the web

18   results?

19   A.   Yeah, blue links, image links, maybe a translation box,

20   weather maps, all kinds of things.

21   Q.   Okay.  And the translation box, maps, those are referred to

22   as search features; right?

23   A.   Yes, those are often called search features.

24   Q.   You write on slide 7 that it the graphic is not false.

25   Specifically, the last line of the user notes, "This is not

1    false, just incomplete.  So incomplete that a search engine

2    built this way won't work very well.  No magic."

3         Right?

4    A.   Yes, that's what I wrote.

5    Q.   So Google needs more than just good engineering to produce

6    this magic; right?

7    A.   So at this time, for the examples that I gave in this

8    presentation, we also needed user feedback data.

9    Q.   And you said you used other versions of this presentation

10   years following this presentation; right?

11   A.   Sorry --

12   Q.   In the years following this presentation.

13   A.   I used portions of this in a subsequent presentation.

14              THE COURT:  I'm sorry.  I don't know if we got when he

15   first developed this and started presenting it.

16              BY MS. MURDOCK-PARK:

17   Q.   You drafted this presentation in 2017; is that right,

18   Dr. Lehman?

19   A.   That sounds about right to me, yes.

20   Q.   If we could go to slide 10, which is Bates ending 9502.

21   It's titled "how search does work."

22        Do you see that graphic, Dr. Lehman?

23   A.   Yes, I do.

24   Q.   And slide 10 has the same graphic we looked at before, but

25   it includes additional information flow from the user back into

1    Google; right?

2    A.   That's right, yes.

3    Q.   And the user is wearing a magic hat?

4    A.   Yes.

5    Q.   And both arrows pointed back to Google have on magic hats

6    as well; right?

7    A.   Yes.

8    Q.   So the arrow going away from the user which is

9    labeled "interaction," that represents user interaction data?

10   A.   Yes.

11   Q.   And the "interaction" arrow points to a graphic of logs.

12   That represents Google logging user data; right?

13   A.   Yes.

14   Q.   And then there's a "learning" arrow going back to Google.

15   That represents Google learning from the user data that it

16   logged; right?

17   A.   That's correct.

18   Q.   Okay.  And part of learning from user data means training

19   Google systems; correct?

20   A.   So learning from user data, there are many different

21   systems that learn from user data.  The word training is most

22   commonly used in connection with machine learning systems, and

23   not all the systems that Google uses to process user data

24   involve machine learning.

25   Q.   Okay.  But some of the systems that Google uses do train on

1    user data; right?

2    A.   Some of the systems that Google uses in ranking search

3    results are machine learning systems that train on user data.

4    Q.   And so in terms of training a system, would one example be

5    something like people misspelling words and Google training its

6    systems to figure out the best way to correct those

7    misspellings?  That's a pretty simple example.

8    A.   Yes.  That's been a very fast-changing system, and I

9    don't -- I'm a little hazy on where user interaction date is --

10   or whether user interaction data is used in that system.  I

11   think it is, but I'm not sure.

12   Q.   The first two lines of your speaker notes read, "The key is

13   a second flow of information in the reverse direction.  As

14   people interact with search, their actions teach us about the

15   world."

16        Do you see that?

17   A.   Yes.

18   Q.   So you were explaining the importance of user data to

19   Google; right?

20   A.   Yeah, I was explaining the importance of user data to

21   Google at that time.

22   Q.   And you write in your last sentence, "We log these actions,

23   and then scoring teams extract both narrow and general

24   patterns."

25        Right?

1    A.    Yes.

2    Q.    Okay.  So user data can improve specific search results,

3    correct, with respect to a specific query?

4    A.    So for each specific query, there's a scoring process for

5    all the results, and then results are ranked by decreasing

6    store.  And the user data may affect the scoring of those

7    individual results and so affect how they're ranked, yes.

8    Q.    And user data can also be used to improve Google's systems

9    more broadly; fair?

10   A.    Which systems?

11   Q.    Well, generally speaking.  There's multiple systems at

12   Google; right?

13           THE COURT:  I think you can be more specific.  It

14   seems like "systems" is a pretty broad word.

15           MS. MURDOCK-PARK:  Certainly, Your Honor.

16           BY MS. MURDOCK-PARK:

17   Q.    I'm not going to get into the specifics in the public

18   session.  So if this is something that we need to talk about in

19   private session or sealed session, please let me know.

20   A.    Okay.

21   Q.    But generally speaking, Google uses multiple systems to

22   rank search results; correct?

23   A.    So the ranking of search results involves many, many

24   components.  Is that answering your question?

25   Q.    Would it be easier if I referred to components rather than

1  systems?  Is that the term that you prefer?

2  A.   Okay.  So we will say the pieces of the ranking system are

3  components.

4  Q.   So there's multiple ranking components; right?

5  A.   Yes, there are multiple ranking components.

6  Q.   And the better that Google utilizes user data, the more

7  inferences that multiple components can make; right?

8  A.   Let's see.  Okay.  So the better -- sorry.  Could you

9  repeat that one?

10  Q.   Let me hopefully ask a better question.

11      Can Google make broader inferences from the more -- strike

12  that.

13      The more user queries that Google has, the more inferences

14  it can make from those queries; right?

15  A.   It's changing pretty fast.  So in one direction, it's

16  better to have more user data.  At the same time, with

17  technology improvements, later systems in some cases require

18  much, much less user data.  So it's a little bit of a

19  complicated picture.

20  Q.   All right.  But the later systems still do require some

21  user data; right?

22  A.   Some later systems require user data, and some do not.

23  Q.   I'd like to go to the next slide on UPX228, which is slide

24  11, and this is, again, the same graphic, but this time, the

25  user, Google, and all four arrows have magic hats; right?

```
1    A.    This is 503?

2    Q.    It is, yes, Bates ending 503.

3    A.    Yes.

4    Q.    Okay.  And in your speaker notes, you write, "The source of

5    Google's magic is this two-way dialogue with users"; right?

6    A.    Yes.

7    Q.    And that's why you put the magic hats on every step in the

8    process?

9    A.    Yeah, to show that information flows through this whole

10   loop, yes.

11   Q.    And you go on to write, "With every query, we give some

12   knowledge and get a little back.  Then we give some more and get

13   a little back.  These bits add up.  After a few hundred billion

14   rounds, we start looking pretty smart"; right?

15   A.    Yes.

16   Q.    Okay.  So Google has dialogues with users billions of times

17   a day; correct?

18   A.    I believe that's right.

19   Q.    And each of these billions of times for each user, Google

20   logs user data; right?

21   A.    Yes.

22   Q.    The final sentence in your speaker notes reads, "This isn't

23   the only way we learn, but the most effective"; right?

24   A.    Yes.

25   Q.    So Google learns in other ways, like its engineers
```

1    developing algorithms; right?

2    A.   Yes, that's one other way that Google learns, and there are

3    others.

4    Q.   Okay.  But when you wrote UPX228, you considered the

5    dialogue with users to be the most effective way that Google

6    learned; right?

7    A.   I think when I wrote this I considered that the most

8    effective way Google learns.  Obviously, the situation is

9    changing rapidly.

10   Q.   So when you wrote this, you considered the most effective

11   way Google learns is the dialogue with users; right?

12   A.   So at that time, yes.

13   Q.   The more searches that people run on Google, the more user

14   data that Google gets; right?

15   A.   So generally, that's true.  As more people do searches,

16   more data Google gets.  However, Google also begins dropping

17   data at some point.  So there's a flow in and a flow out.

18   Q.   The more user data that Google gets, the more it can use

19   that data in various -- in various ways to improve Google

20   systems -- or Google components, the ranking system; right?

21   A.   Let's see.  Could you ask that one --

22   Q.   Sure.  Let me ask it slightly clearer.

23        The more user data that Google has, the more it can use

24   that data to improve Google's ranking components?

25   A.   Well, for whatever volume of data we have, of course, we

1   make copies of it, and each copy goes to a different -- goes to

2   a different ranking component.  So it isn't like we need 20

3   times as much data if we have 20 components.

4       Let's see.  I'm not quite sure I'm getting --

5   Q.   Okay.  How about I ask a different question.

6       Would you agree that the better that Google's ranking

7   components are, the more that users should run searches on

8   Google?

9   A.   So the better the ranking components are, the more users

10  should run?

11  Q.   Google wants more users to run searches on its website,

12  right, on google.com?

13  A.   Well, I don't know about what Google wants.  When I was in

14  play at Google, I wanted to help as many people as possible get

15  access to the information they wanted.

16  Q.   Okay.  And that would -- when you were working at Google,

17  you considered that to be people using Google services; right?

18  A.   Right.  So I wanted to help as many people using Google

19  Search to get access to the information that they wanted.

20  Q.   And the more people that use Google Search, the more money

21  that Google makes; correct?

22  A.   I'm not a finance person.  I think so.

23  Q.   We can go ahead and put UPX228 down, and I want to talk a

24  little bit more about the types of user data.  Okay?

25      Google turns user data into signals; correct?

1    A.   I guess the term "signal" is pretty ambiguous.  I guess we

2    have to be a little bit more specific about what you mean

3    by "signal."

4    Q.   Okay.  You've heard the term "signal" when you were working

5    at Google; right?

6    A.   Yes.

7    Q.   Can you explain in a few sentences for the Court what a

8    signal is in the context of user data?

9    A.   So I guess when I was working on search, people would

10   generally use the term "signal" to mean some sort of chunk of

11   data that's carrying some kind of meaning.

12        So I guess a signal in the context of user data -- I guess

13   that doesn't really change the meaning of signal in the context

14   of user data.  It's a chunk of information that carries some

15   kind of meaning.

16   Q.   Would an example of a signal be if a document contains the

17   same words as a query?

18   A.   One could call that a signal, yeah.

19   Q.   Okay.  And then Google interprets that signal into

20   determining that the document might be relevant to the query;

21   right?

22   A.   So for that particular signal, say counts of the number of

23   times each query term appear in a document, that signal or

24   collection of signals could then be used to help assess the

25   relevance of the document to the query.

1   Q.   I'd like to show you UPX4, which is a Google document

2   titled "life of a click user interaction."

3        And this is admitted.  There are some redactions on the

4   slide.  I'm going to start at slide 2.

5             THE COURT:  Sorry.  Can I just back up for a moment?

6   The term "signal" I understood to be a user action that conveys

7   some type of intent to the search engine that would enable the

8   search engine to process a result.

9        And what I just heard was an example that seems to suggest

10  that the contents of a web page could signal those results.

11       Am I misunderstanding the term, the concept?

12            THE WITNESS:  The word "signal" in the sense that I

13  used it while working on search at Google was fairly broad.

14  Maybe examples would help.  They're not all related to user

15  interactions.

16       So for example, a signal might be how many links on the web

17  are there that point to this web page or what is our estimate of

18  the sort of authoritativeness of this page.

19       So it's a very broad, inclusive term, I would say.

20            THE COURT:  Okay.  I think I understand.  Thank you.

21            BY MS. MURDOCK-PARK:

22  Q.   Do you see UPX4 in front of you, Dr. Lehman?

23  A.   Yes.

24  Q.   Okay.  And you're familiar with UPX4, correct, the slide

25  deck titled "life of a click (user interaction)"?

1  A.   I did not produce this slide deck, and I have not read

2  through it.

3  Q.   Okay.  You reviewed this document at your deposition.

4  A.   Okay.

5  Q.   Correct?  Do you recall that now?

6  A.   No.

7  Q.   Let me ask you some questions on slide 5, and you can tell

8  me if the graphic looks familiar to you.

9  A.   Okay.

10  Q.   Have you seen the graphic at slide 5?  It's Bates ending

11  8265.004.

12  A.   It's the blue -- oh, I see it now, yes.

13  Q.   And the graphic is titled "user interaction signals"?

14  A.   Yes.

15  Q.   Okay.  The top left of the graphic on slide 5 shows a smily

16  faced user; right?

17  A.   Yes.

18  Q.   And then the "queries" area going down from the user is

19  pointing to a cloud labeled "search"; right?

20  A.   Yes.

21  Q.   And those queries are logged by Google; right?

22  A.   Maybe I could just look at this graphic for a minute.

23  Q.   Of course.

24  A.   I'm not sure I understand it yet.

25       Okay.  I guess if the little blue guy is a person using

1   Google Search and the arrow is queries done by that person and

2   the cloud represents, I guess, like Google, then the queries

3   would be flowing to Google's systems, I think.

4   Q.   Okay.  And the queries flowing into Google's system are

5   logged by Google; correct?

6   A.   That's right.  When someone enters a query in the search

7   box, Google receives that and logs it.

8   Q.   And then there's a "results" arrow towards the bottom of

9   the page that's going towards the text box on the right.

10       Do you see that?

11  A.   Yes.

12  Q.   And that represents Google returning search results in

13  response to the user's query?

14  A.   I think so.

15  Q.   Then there's an "interaction" arrow, and I'm going to point

16  to the first one at the top from the smily face to the right

17  side, and we've highlighted it on the screen.

18  It's "interactions" and has a box with some other words in it.

19       Do you see that?

20  A.   Yes.

21  Q.   And those are four categories of user interactions; right?

22  A.   I think so, yeah.

23  Q.   Okay.  Well, let's talk very briefly about those four

24  categories.  The first category listed is "read."  A read

25  interaction measures whether the user gave the result some

1   attention; correct?

2   A.   I'm not sure whether that's read or read.  Is it the user

3   interaction of reading it or -- because we don't necessarily

4   know whether somebody has read something.

5   Q.   Okay.  Google instead refers to things as "attention";

6   correct?  Like the attention that a user may have spent on a

7   website or how long?

8   A.   So I believe that attention usually refers to a person

9   looking at a portion of the search results page.  Because as

10  long as they're on Google, I mean, they're looking at a Google

11  web page, then we have a chance to sort of see what are they

12  doing, we can see are they looking at the top of the page or the

13  bottom or something like that.

14       So I think it's attention to the parts of the search

15  results page as opposed to some page off of Google.

16  Q.   If a user clicks on a document, then there are different

17  lengths of clicks; right?

18  A.   Yeah.  So when someone clicks on a document, at that point

19  they've left Google, and various things could happen.  They

20  could come back to Google later, after some period of time.

21  They could just go away forever and we never see them again.

22       There are also more complicated things like if people do

23  tabbed browsing.  So they will do a search, get a bunch of

24  search results, decide three of them are promising, and they

25  open three tabs, and then things start to get complicated.

```
1    Q.   You've heard the terms "short click" and "long click";
2    right?
3    A.   Yes.
4    Q.   Can you please briefly explain what a short click and a
5    long click are?
6    A.   Yeah, so the precise definitions have varied a lot over the
7    years, but a short click would typically be one where somebody
8    clicks on a search result and then comes back to Google fairly
9    soon after.
10        Whereas, a long click would be they click on something and
11   maybe they come back in two minutes or something.  I don't know
12   how we classify like if somebody clicks on a search result and
13   we just don't see them again for that day.
14   Q.   Okay.  Generally speaking, a short click is associated with
15   a less relevant result; right?
16   A.   It's -- my understanding is that there is a correlation
17   between click duration, but it's fairly weak.  There are just a
18   lot of complications there.  For example, if you're just trying
19   to get the telephone number of something, you search for it.
20   You click on a search result.  You get the phone number, come
21   back.  You're completely happy.
22        Also, media type can have a big effect.  So you do a
23   search.  You click on a video.  You go away.  You watch it for
24   five minutes.  They're saying hey, everyone subscribe to my
25   channel and all that.  So that can sort of protract a click.
```

1          So the click duration, it's a pretty noisy signal, but I

2     think in general the thinking is long clicks are typically

3     better than short clicks.

4     Q.   Let's go back to slide 5 in UPX4 and look at the second

5     category of user data, which is clicks.

6          We've talked about clicks.   That's when somebody just

7     clicks on a web result; right?

8     A.   Sorry.  Slide 5?

9     Q.   It's the slide that's up on the screen right now, slide 5

10    of UPX4.

11    A.   Okay.

12    Q.   And at the top where it has the "interactions" box and then

13    there's the "clicks."

14    A.   You're calling it slide 5.  Is it 004?

15    Q.   It's UPX4, and the Bates number at the bottom is 265.004.

16    A.   Got it.  Okay.

17    Q.   All right.  The second "clicks" under "interactions," do

18    you see that?

19    A.   Yes.

20    Q.   And a click is literally just somebody using their mouse or

21    their finger to click on a result?

22    A.   Yes.

23    Q.   Okay.  The third category listed is "scrolls."  And that's

24    scrolling through the screen like you were discussing earlier?

25    A.   I think so, but I'm not entirely sure.

1    Q.   Is that one of the meanings of scrolls with respect to user
2    interaction data?
3    A.   I'm not sure.
4    Q.   And a "mouse hover," is that how long somebody hovers their
5    mouse over a result before clicking on it?
6    A.   I think it can be how long their mouse hovers over some
7    element on the search page they may or may not click.
8    Q.   Okay.  And for each of these interactions and others,
9    Google tracks them; right?
10   A.   Tracks them?  Well, as -- if you go to Google and you start
11   interacting with the search page, then many of the things you do
12   are sent back to Google and logged.  I'm not sure about the
13   scrolls one, and I'm not sure whether -- I'm not sure whether
14   they log mouse hovers.  In principle, we could, I guess.
15   Q.   Now, there's a second "interactions" arrow on slide 5, and
16   it's in the middle of the page, and it's going from the text box
17   back to the "search" cloud.
18        Do you see that?
19   A.   Yes.
20   Q.   And that arrow refers to Google feeding the logged user
21   data back into Google Search; right?
22   A.   Maybe.  I think that's a reasonable interpretation.
23   Q.   Okay.  We can go ahead and put slide 5 aside, and I would
24   like to talk to you briefly about some differences between
25   mobile and desktop user data.  Okay?

1    A.    Okay.

2    Q.    Desktop queries and mobile queries, they're search intents

3    differ often; right?

4    A.    I don't think the search intents for desktop and mobile

5    queries differ often.  I'm not an expert on this, but my

6    impression is that the two query streams are fairly similar.

7    But again, it's not an area of expertise for me.

8    Q.    Okay.  Well, you're familiar with the term "search

9    intents"; correct?

10   A.    Search intents?  I suspect that that phrase is being used

11   in some specific way that I'm not sure I precisely know.

12   Usually, when someone does a search, we can talk about having --

13   their intent, in plain language what it is they're trying to

14   accomplish.

15         Is that what you mean?

16   Q.    Yes.  So when a user on their mobile phone or their

17   desktop, they enter a search, and they want to get a result

18   back; right?

19   A.    They want something, uh-huh.

20   Q.    And if a desktop user wants to get a certain type of result

21   back -- strike that.  Let me ask a better question.

22         Sometimes people's search intents can differ, depending

23   where they're at, right, their location?

24   A.    Their physical location?

25   Q.    Yes.

1    A.   I guess there could be cases like if you search for DMV and

2    you're in California, you probably want the California DMV, or

3    if you're in a different state, you want a different DMV.

4         Is that what you mean?

5    Q.   Yes, or for example, if I'm in Rochester, New York, and I

6    look up Norton's Pub, then I probably want the local Norton's

7    Pub and not the one in Perth, Australia?

8    A.   That would make sense.

9    Q.   But that's one of the ways that location helps determine

10   somebody's search intent; right?

11   A.   You mean how we might figure out what their intent is based

12   on their location?

13   Q.   Yes, or figure out a user's search intent generally.

14   A.   Right.  So knowing a person's -- a person's location can

15   sometimes help understand what it is they're looking for.

16   Q.   And sometimes mobile users and desktop users have different

17   intents?

18   A.   I think that's probably true, yes.  I think that's true.

19   I'm not sure I could just sort of list off a bunch of examples,

20   but I think that's probably true.

21   Q.   Let's move on and talk about some of the basics of search.

22   The Court has previously heard an overview of this last fall.

23   So we're not going to go through everything again, but I want to

24   make sure we're on the same page.  Okay?

25   A.   Okay.

1    Q.   So I would like to show you UPX204, which is a slide deck

2    titled "ranking for research."  And this is another document

3    that's admitted.

4         You presented UPX204 to the research team at Google;

5    correct?

6    A.   To -- so I presented this to certain researchers at Google

7    who were getting more involved with Search.

8    Q.   Let's go to slide 47, which is Bates ending 4241, and it's

9    a chart that's titled "basic control flow."

10        Do you see that, Dr. Lehman?

11   A.   Yes.

12   Q.   So I want to start at the top right of the page where it

13   says "web documents."

14        You agree with me that there's a lot of documents on the

15   Internet?

16   A.   Yep.

17   Q.   And there's an arrow pointing down to "crawl and indexing,

18   prepare for fast retrieval and scoring"; right?

19   A.   Yes.

20   Q.   So basically, Google crawls the web to get information to

21   use in its search product?

22   A.   Yes.

23   Q.   And that information is arranged and categorized, which

24   makes it easier to search?

25   A.   Yes.

1   Q.   And the top left of slide 47 says "search query," and

2   that's the search query entered into Google by the user?

3   A.   That's right.

4   Q.   Then there's an arrow pointing down into "query rewriter."

5        Query rewriter interprets the query; right?

6   A.   Yes.  I think these things are a little bit dated.  There's

7   also some flows from the search query on other paths.  But yes,

8   query rewriter still exists, and that's its function.

9   Q.   Okay.  And interpreting a query generally or annotating a

10  query means adding additional information to it to help come up

11  with relevant search results?  Would that be a fair

12  characterization?

13  A.   I think that's fair.

14  Q.   So that's stuff like adding synonyms to somebody's search?

15  A.   Yes, that would be an example of an annotation in a query

16  rewriter.

17  Q.   Now, the middle of slide 47 shows the query interpretation

18  process meets the crawling and indexing process, and it's at

19  that point in time where documents are ready to be searched;

20  right?

21  A.   Yes.  Again, there are some other paths now.

22  Q.   Sure.  And this is very, very high level.  I understand

23  it's much, much more complex.

24  A.   So I will stop repeating that if we just agree on it.

25  Okay.

1   Q.   So once Google has -- the documents are ready to be

2   searched, they're retrieved, and they're scored; correct?

3   A.   Yes.  There's a fair amount of complexity there, and that's

4   probably a bit of a simplification, but maybe that's good enough

5   for now.

6   Q.   And the documents, the scored documents are then ranked?

7   A.   Well, let's see.  So in ascorer, documents are given -- are

8   called ascorer scores.  And then in the next step, which is now

9   highlighted in yellow, "super root," there are additional

10  adjustments to those scores.  And then typically, search results

11  are ordered according to those scores in decreasing score order.

12  There are certain exceptions, but that's sort of the typical

13  case.

14  Q.   There's also a step in the basic control flow

15  called "packaging"; right?  Documents are packaged together?

16  A.   Packaging?

17  Q.   Like they're put together before they're sent on to the

18  user?

19  A.   Maybe the packer?  I think that -- if that's the component

20  you're referring to -- and I'm not super familiar with this, but

21  I think the job of the packer is to arrange things visually on

22  the page.

23  Q.   And then search results are returned to the user after they

24  finish through these processes; right?

25  A.   Yes, and then they're sent -- the sort of -- once the page

1    is sort of visually constructed, it would be sent to the user.

2    Q.   Now, slide 47 of UPX204 does not show the logging of the

3    web search results; correct?

4    A.   That's right.

5    Q.   We can go ahead and put UPX204 aside.  And I want to talk a

6    little bit about how Google evaluates its quality as a search

7    engine.  Okay?

8         You would agree with me that high-quality search engines

9    should return high-quality search results?

10   A.   Yep.

11   Q.   And you would agree that there's many aspects of a

12   high-quality search engine?

13   A.   Yes, there are many aspects of -- many aspects of a high-

14   quality search engine or high-quality search results.

15   Q.   So relevancy is one of those important aspects of a high-

16   quality search engine; right?

17   A.   I think when thinking about sort of the value of the search

18   result for a query, relevance is the most important

19   consideration.

20   Q.   Because if I look up "DR," it matters if I'm looking for a

21   doctor or the Dominican Republic, as a fairly simplistic

22   example?

23   A.   That would be sort of a case of an ambiguous query.  Absent

24   any other information, either of those search results could be

25   relevant.

1    Q.   So having more user data helps Google figure out what

2    results might be more relevant; right?

3    A.   So having user data is useful to Google in identifying

4    relevant results for a search query.

5    Q.   Okay.  So like if I put in "DR vacation," it's more likely

6    I'm trying to go to the Dominican Republic on vacation instead

7    of looking for Dr. Vacation?

8    A.   I think so.

9    Q.   And we talked about localized search results.  That's

10   something important to search quality; right?

11   A.   When you say "localized search result," do you mean

12   something like showing the California DMV to somebody in

13   California?

14   Q.   Yes, or where can I watch the Ohio State football game even

15   though I'm in the District of Columbia?

16   A.   And the idea is that -- so in general, showing people

17   search results that are appropriate to their location for a

18   certain query is important, yeah.

19   Q.   So let's go back to UPX204, which we just looked at, and

20   this time I'm going to show you slide 25.  And this is a slide

21   titled "search quality has many aspects."

22        Do you see that?

23   A.   Yep.

24   Q.   And there's relevance and localization as two aspects for

25   search quality?

1    A.    Yep.

2              THE COURT:   What's the Bates number again?

3              MS. MURDOCK-PARK:   This is UPX204 and the Bates ending

4    in 219.

5              THE COURT:   Okay.   Thank you.

6              BY MS. MURDOCK-PARK:

7    Q.    There's other aspects of search quality listed on slide 25

8    that we haven't talked about, like privacy, for example?

9    A.    Privacy, yes.

10   Q.    And the bottom of slide 25 says "capturing everything in a

11   metric is tough"; correct?

12   A.    Yes.

13   Q.    Okay.   So Google uses different yardsticks to measure how

14   well it's meeting its users' needs?

15   A.    So currently, at least when I left Google, the primary

16   measure of search quality is a metric called IS4, information

17   satisfaction version 4, the metric, and maybe it's a higher

18   number now.   That captures many of these aspects of search

19   quality, but it can't get quite all of them.   And so sometimes

20   we use other methods to compliment IS4.

21   Q.    Okay.   So the IS metric, information satisfaction metric,

22   that's human rater-based evaluation; right?

23   A.    That's right, yep.

24   Q.    So it's basically paying people to evaluate search results?

25   A.    Yes, though Google doesn't make those payments directly.

1    It works with an outside vendor.

2    Q.    Okay.  And most changes in ranking over the past few years

3    before you left Google, most changes in ranking tried to

4    maximize the IS score; right?

5    A.    So yes, but I think something we always try to teach search

6    engineers is that making great search is not a game of

7    maximizing metrics.  So metrics can be a useful guide towards

8    great search, but there are a lot of little games you can play

9    to maximize metrics that actually probably don't make the search

10   engine more useful to people.

11       So generally, yes, we hope to find changes that increase IS

12   but in ways that are actually beneficial to people.

13   Q.    Now, you mentioned another metric, the live experiment, or

14   LE, metric; right?

15   A.    That's not a single metric.  It's an experimentation

16   process.

17   Q.    Okay.  And it's -- that's user-based evaluation basically;

18   right?

19   A.    Yes.

20   Q.    Okay.  So it's a live traffic experiment that runs on a

21   percentage of users?

22   A.    Typically, or -- so if we want to experiment with some sort

23   of change to the search engine, then we would by various means

24   expose a subset of Google users to that change, gather data that

25   gives us some insight into the nature of that change.

1    Q.    Okay.  So basically, turning on a new feature in realtime

2    and seeing how users seem to interact with it?

3    A.    So a live experiment is sort of like turning it on,

4    although it can be a bit more complicated than that.

5    Q.    The information satisfaction, or IS, metric and the LE

6    metric don't always agree; right?

7    A.    That's correct.  Sometimes they disagree.

8    Q.    And that's because IS and LE give Google different

9    information about user behavior?

10   A.    Well, the goal of the metrics is not to measure user

11   behavior.  The goal of the metrics is to measure quality of

12   search results.

13   Q.    Okay.  And how users behave or interact with those results;

14   right?

15   A.    No.  The purpose of these metrics is to measure how good

16   our search results are and whether or not they're meeting

17   people's needs.

18   Q.    Okay.  So if we could go to UPX192, and this is another

19   document that is admitted.  I'm going to ask you to look in your

20   binder at page 2, and we're not going to put that up on the

21   page, but just to confirm that you sent the e-mail at 1:32 p.m.

22   on page 2 of UPX192.

23   A.    Okay.  So this is UPX192.

24   Q.    Yes, and the second page.

25   A.    Second page.  Okay.  And you -- so it looks like this is an

1   e-mail thread -- I sent an e-mail, and there's a response or

2   something like that.  Okay.  Then you're saying on the second

3   page, you want to know the date and time of that particular

4   chunk in kind of the middle part of the second page?

5   Q.   I'm just confirming that that -- you wrote the e-mail,

6   including the bullet points, that's on page 2; correct?

7   A.   Yes.

8   Q.   All right.  And then there's some links that are on page 1

9   of UPX192; right?

10   A.   Yes, that's correct, there are some links.

11   Q.   So I would like to go to slide 4, page 4, which is the

12   first slide of the deck titled "unified click prediction."

13        Do you see that?

14   A.   Yes.

15   Q.   And this is a slide deck that you authored?

16   A.   Yes.

17   Q.   Let's go to slide 24.  And it's titled "approximately 1

18   million IS ratings."

19   A.   For slide 24, do you know the --

20   Q.   The end is 787.

21   A.   Okay.

22   Q.   Okay?  We're at slide 24?

23   A.   Yes.

24   Q.   Okay.  And there's a really fuzzy picture on the right side

25   of the slide; correct?

1    A.    That's right.

2    Q.    You write in the second paragraph that IS ratings give only

3    a low-resolution picture of how people interact with search

4    results; correct?

5    A.    Yes.

6    Q.    And so you're conveying -- well, strike that.

7          In the third paragraph, you write, "Useful behavioral

8    patterns may appear in few training instances and thus cannot be

9    learned from IS ratings"; right?

10   A.    Yep.

11   Q.    So you're conveying that information satisfaction is an

12   incomplete evaluation metric by itself?

13   A.    No.  I think that's misinterpreted.  What I'm talking about

14   here is to what extent can you learn about language and the

15   world from these two different data sources.  It's not

16   commenting on the quality of the information satisfaction metric

17   as a tool for evaluating the quality of search results.

18   Q.    Okay.  But you -- by itself, you can't get a full picture

19   of search quality results; would that be fair?

20   A.    By itself, with information satisfaction alone?

21   Q.    Yes.

22   A.    It's the best available single metric we have for measuring

23   the quality of search results, but it's not perfect.

24   Q.    But IS can only give you a fuzzy picture; right?  That's

25   why you put the fuzzy picture on the slide?

1    A.    So the point here, I think -- maybe I could just look at

2    this for a second.

3    Q.    Certainly.  And I'm going to ask you about slide 25 next.

4    So that might help clarify things.

5    A.    Yes, okay, I've had a chance to look at this.

6    Q.    So the IS metric itself doesn't give you a full picture

7    standing alone; right?

8    A.    So the IS metric is the best metric we have for measuring

9    the quality of search results, but in certain -- there are

10   aspects of the quality of search results that it doesn't

11   capture.

12   Q.    But IS -- well, strike that.

13         Let's go to the next slide, slide 25, which is

14   titled "approximately 100 billion clicks."

15         Do you see that?

16   A.    Yes.

17   Q.    And the right side of slide 25 has a high-resolution

18   picture of the earth; correct?

19   A.    Right.

20   Q.    So the first sentence reads that those 100 billion

21   clicks "provide a vastly clearer picture of how people interact

22   with search results"; right?

23   A.    Yeah.

24   Q.    And the second paragraph reads, "A behavior pattern

25   apparent in just a few IS ratings may be reflected in hundreds

1   of thousands of clicks, allowing us to learn second and third

2   order effects"; right?

3   A.   Yep.

4   Q.   So second and third order effects means clicks help give a

5   more in depth understanding of user behavior?

6   A.   Let's see.  No, I don't think that's quite right.  I think

7   what these slides are getting at is if you're trying to

8   understand how people use language or trying to understand facts

9   about the world -- and let me give an example, just sort of

10   trivial.  When people search for something involving a cat,

11   we -- there may be search results that are appropriate to show

12   that don't contain the word cat but do contain the word kitten.

13       So now within -- if you try to learn that fact from our IS

14   rating data, that would be hard.  There just isn't enough data.

15   There wouldn't be very many examples of queries containing cat.

16       On the other hand, if you got a very large volume of click

17   data, then you may have many, many examples of people who have

18   queries that contain the word cat and clicking on search results

19   for -- that contain the word kitten.

20       So these slides are talking about trying to understand

21   language and the world through use of these two data sources.

22   It's not talking about these two metrics or these two approaches

23   to measuring the quality of search results.

24   Q.   So then you would agree that 100 billion clicks gives a lot

25   of information to help understand user behavior; right?

1    A.    So I guess if we define clicks as sort of a record of user

2    behavior, then, you know, 100 billion records of user behavior,

3    yeah, it tells you a lot about user behavior.

4    Q.    Are you saying that the machine learning systems learn

5    better from search logs, if I'm understanding?

6    A.    That's a complicated question.  It's evolved over time.  So

7    Google has used a variety of machine learning systems in search.

8    Many of them -- I don't know how to generalize, actually.

9    They're all over the board.  Some use IS data.  Some use click

10   data.  Some use both.  Some use neither.

11   Q.    Do IS and LE metrics tell you different things about search

12   quality?

13   A.    I think they provide two different perspectives on search

14   quality, with IS as, I think, probably the stronger guide to

15   search quality, but I think live experiments can often provide

16   useful additional information.

17   Q.    Okay.  We can go ahead and take down UPX204.

18         Earlier, we discussed the "Google is magic" slide deck.

19   A.    Right.

20   Q.    And I would like to go to a more recent version of the deck

21   that you created in May 2020.  If we could go to UPX219, and

22   UPX219 is admitted.  This is a deck titled "logging and

23   ranking."

24   A.    Yes.

25   Q.    And you wrote the logging and ranking deck; right?

1    A.   Yes.  And I think as you've noted, parts of it are drawn

2    from that earlier presentation.

3    Q.   If we could go to the speaker notes on page 3.

4         THE COURT:  I'm sorry.  This was prepared when?  2020?

5         BY MS. MURDOCK-PARK:

6    Q.   Mr. Lehman, UPX219 was prepared in May 2020; is that right?

7    A.   I don't know about May.  I think the earlier one was 2017.

8    This was during COVID because it was sort of a cheer-up

9    presentation for the logging team, but beyond that, I don't

10   quite remember.

11   Q.   Was it early in COVID or late in COVID?

12   A.   I don't remember unfortunately.  Probably earlier in COVID.

13   Q.   If we could go to slide 3.  I want to draw your attention

14   to the last sentence that you wrote from your speaker notes,

15   which is, "Effective logging for ranking is central to search,

16   to Google as a whole, and beyond."

17        Do you see that?

18   A.   Yeah.  So I'm trying to tell the logging team that their

19   job, which is not necessarily the world's most pleasant or

20   glamorous job, it matters, it's important.

21   Q.   So it matters to the entire company; right?

22   A.   Let's see.  I don't know about the entire company, but it

23   certainly matters to the Search team and, I think, the Ads team.

24   Q.   Okay.  Well, you wrote that "effective logging is central

25   to Google as a whole"; right?

1    A.    I wrote that.  In context, I'm trying to cheer up this team

2    stuck at home.

3    Q.    Okay.  If we can go to slide 30, which is Bates ending

4    2426, and it's titled "logs to ranking to money."

5          Do you see that?

6    A.    Okay.

7    Q.    Now, the bullets on slide 30 explain why ranking needs user

8    data so much; right?

9    A.    Okay.  I have to reacquaint myself with this.  Sorry.  It's

10   been a long time.

11         Okay.  I've looked through it, yeah.

12   Q.    The second bullet of the slide, you write, "Not just one

13   ranking system learns from search logs.  Learning from logs is

14   the main mechanism behind ranking."

15         Right?

16   A.    That's what it says, yeah.  Again, remember the audience;

17   remember the situation.

18   Q.    And you also write at bullet point 4 that "web ranking is

19   only a part of search, but many search features use web results

20   to understand what a query is about and trigger accordingly."

21   A.    Yes.

22   Q.    Right?  And so search features, I believe we've mentioned

23   those before, but that's stuff like knowledge cards or facts?

24   A.    Yeah, there's a lot of search features, translation things,

25   weather boxes, all kinds of things.

1    Q.   And you also write that other parts of Google benefit from

2    user data, right, like Ads, YouTube, Play?

3    A.   Yes.

4    Q.   And then I would like to turn you to your speaker notes, in

5    the middle of the speaker notes.  Actually, about a third of the

6    way through, you write, "Not one system but a great many within

7    ranking are built on logs.  This isn't just traditional systems

8    like the ones I showed you earlier, but also the most

9    cutting-edge machine learning systems."

10       Right?

11   A.   Yes, it says that.

12   Q.   So both older Google ranking systems and new machine

13   learning systems leverage user data; right?

14   A.   This is as of, I guess, some time around 2020 that was

15   true.  Subsequently, some -- an important machine learning

16   system did not use any user data.

17   Q.   Now, according to your notes, as of this -- certainly, in

18   this slide deck, you say that cutting edge machine learning

19   systems rely on user data to function; right?

20   A.   It says cutting-edge machine learning systems, yes.  Again,

21   that's cutting edge as of this time.  The field has moved very,

22   very fast.

23   Q.   So at the very bottom, you write that you're not in

24   finance, "but grossly speaking, I think a huge amount of Google

25   business is tied to the use of logs in ranking"; right?

1    A.    Yes.

2    Q.    We can go ahead and set the document aside for right now.

3          You would agree with me that user data is used in multiple

4    parts of Google Search processes, right, multiple parts of their

5    ranking components?

6    A.    Right.  There are many ranking components that make use of

7    what we are calling user data or clicks.

8    Q.    Okay.  And other components outside of ranking also utilize

9    user data; right?

10   A.    I know less about those things, but it's the other

11   components.  So I think the Ads team uses user data.  I don't

12   really know how.  That's their world.  And outside of ranking --

13   you're saying in Search outside of ranking, like feature

14   triggering or something like that?

15   Q.    Multiple different aspects.

16   A.    Probably.  I mean, I guess without naming something

17   specific, I'm not sure if there are multiple aspects.  But user

18   data is widely used within Search.  So I wouldn't be surprised

19   if there's something outside of ranking.

20   Q.    And is it used directly in some systems and indirectly in

21   others?

22   A.    Within ranking?

23   Q.    Within ranking or within search as a whole.

24   A.    So I guess I can speak of within ranking.  I'm not sure it

25   would be direct versus indirect use of user data.  I guess I'm

1    not sure what the difference is.

2    Q.   Well, direct as in it's used directly to train a certain

3    components, and indirectly like there's a second component that

4    trains off the first.

5    A.   There are components in Search which make use of user data,

6    and then there are cases where we will take, say, data from that

7    first system and sort of reprocess it and use it in another way,

8    yeah.

9         MS. MURDOCK-PARK:  Your Honor, I'm about to get to

10   another document.  I believe I have another 15 minutes

11   approximately.  I'm happy to push through, or we can take our

12   afternoon break.

13        THE COURT:  Why don't we go ahead and push through

14   until we get to the end of the public session.

15        BY MS. MURDOCK-PARK:

16   Q.   Mr. Lehman, I'd like to show you another slide deck.  This

17   is UPX1115, and it's titled "search quality all hands 2018."

18   A.   Yes.

19   Q.   All hands means all search quality team members; right?

20   A.   Yeah, all members of the search quality team were invited.

21   Q.   Okay.  And you were either at this training or invited to

22   this training?

23   A.   It's not a training really.  It's sort of a get-together to

24   discuss plans and --

25   Q.   Meeting?

1  A.   Sure.

2  Q.   Okay.  But you would have attended or had this deck

3  available to you as one of the search quality team members?

4  A.   It would have been available to me, yes, and I probably was

5  there.

6  Q.   Okay.  If we could go to slide 42, which is Bates ending

7  1529, and it's a slide titled "result previews and language

8  understanding."

9       Do you see that?

10 A.   Yes.

11 Q.   Okay.  And it's got three arrows chasing each other around

12 the words "virtuous cycle"; correct?

13 A.   Yes.

14 Q.   Okay.  People at Google refer to the use of user data

15 within Google Search as a virtuous cycle; correct?

16 A.   I don't know if that's generally true.

17 Q.   You've heard the term "virtuous cycle" refer to the cycle

18 of user data that -- the dialogue that you used in the magic

19 presentation; right?

20 A.   Virtuous cycle used in connection with, let's see, the

21 magic presentation?

22 Q.   Strike that.  Let's start with, you've heard the

23 term "virtuous cycle" used at Google before; correct?

24 A.   I'm sure -- I've probably heard it used in multiple

25 contexts, yeah.

1    Q.   Okay.  And you've heard it referred to with respect to

2    Google Search; right?

3    A.   Yeah, probably multiple contexts even in connection with

4    Google Search, yeah.

5    Q.   So try and break down the self-reinforcing cycle that we've

6    got on UPX1115.  At the upper right side of the screen, there's

7    a smily face with a phone.  And it's above a green arrow;

8    correct?

9    A.   Okay.  So let's see.  Yeah, it's near the green arrow.

10   Q.   And it says "happy users informed user interactions";

11   right?

12   A.   Yes.

13   Q.   And then the green arrow goes down to the blue arrow, and

14   it says "better training data"; right?

15   A.   Yes.

16   Q.   Underneath the blue arrow, there's a bullet that

17   says "better models (ranking, language understanding)"?

18   A.   Yes.

19   Q.   Then the blue arrow feeds into an orange arrow that

20   says "better result previews, better results"; right?

21   A.   Yes.

22   Q.   Okay.  So then orange arrow goes back to the emoji with the

23   happy users and informed user interactions; right?

24   A.   Yes.

25   Q.   So happy users means better data.  Better data means better

1    systems and better results.  And those better systems and better

2    results lead to happier users; right?

3    A.   It's a little bit different.  So the goal here -- to

4    explain the context, when you do a search, you get a bunch of

5    search results, and those are called result previews, because

6    you don't actually know what's on those web pages until you

7    click them and go read.

8         So I think what this slide is talking about is the

9    importance of making sure those result previews give people a

10   good, well, preview of what they're going to find on that web

11   page when they click through.

12        So a really bad thing would be we make a web page look like

13   it's relevant to your query when it's actually not and you go

14   click and you read for 30 seconds and are like wait, this

15   doesn't answer my question.  We're wasting people's time a lot.

16        So better result previews has two benefits.  One is happy

17   users.  We're not sending people off on useless web pages.  And

18   it has a second benefit, which is more informed user

19   interactions.  If people know what they're clicking on, then the

20   clicks become more meaningful.

21        As an extreme, you could imagine if we had a search result

22   page and we just said here are results 1 through 10 and gave you

23   no information, your clicks would be random and meaningless.

24        So by improving result previews, clicks contain more

25   information.  So it isn't the happy users that give better

1    training data.  It's the second bullet point, more informed user

2    interactions.

3    Q.   Okay.  But the slide refers to happy users; right?

4    A.   Yes.

5    Q.   And it refers to better training data going to better

6    models; right?

7    A.   Yes, and that better training data is not coming from the

8    happy users.  The happy users is an important side benefit.  The

9    better training data is coming from more informed user

10   interactions because people can anticipate what's going to be on

11   the web page that they're clicking.

12   Q.   The informed user interactions that Google then logs;

13   right?

14   A.   Yes.  So when people interact with Google, we log those

15   interactions.

16   Q.   Okay.  And by the orange arrow, it says "better result

17   previews, better results"; right?

18   A.   Yeah.  I think the idea, if we're sort of interpreting

19   this, is a cyclic thing.  I think the upper bullet point can

20   kind of be seen as a starting point for going around the circle,

21   and the lower bullet point is kind of something you get on the

22   far side, I think.  I'm not sure.  I didn't make this slide.

23   Q.   Fair to say that Google needs users to sustain the cycle

24   shown in slide 42?  It needs those user interactions?

25   A.   Let's see.  So I have to confess, in looking at this slide,

1    I can follow the reasoning.  Better result previews give you

2    some happy users because people click on results that are

3    relevant to them, and it also gives you more informed user

4    interactions.

5         Okay.  I'm sorry.  I'm trying to work through the reasoning

6    here.

7         I guess the thing is I don't quite understand why it's a

8    cycle.  Because yes, a result of this process is we will get

9    better search results, but I don't see how that leads to better

10   result previews.  So I guess I don't really understand why it's

11   a cycle.

12   Q.   Well, my question is, the cycle breaks if there's no users;

13   right?

14   A.   Yeah, and I guess I'm saying that I don't understand why

15   it's a cycle in the first place.

16   Q.   We can go ahead and put UPX1115 aside.

17        Dr. Lehman, Google has a public position about how much

18   user data it utilizes; right?

19   A.   I don't know that -- I'm not sure.  So this might be

20   getting into some sensitive matters.  I can just go ahead, or I

21   don't know what to do.

22   Q.   How about I show you a slide which is not redacted, and I

23   will ask you some questions on it.

24   A.   Okay.

25   Q.   If we could go to UPX204, and this time to slide 14.  This

1    is Bates ending 208, and it's titled "sensitive topics."

2         Do you see that?

3    A.   Yes.

4    Q.   Okay.  And underneath the picture -- that's Sundar Pichai,

5    Alphabet's CEO; right?

6    A.   Yep.

7    Q.   Underneath the picture of Mr. Pichai, you write, "Do not

8    discuss the use of clicks in search, except on a need to know

9    basis with people who understand not to talk about this topic

10   externally.  Google has a public position.  It is debatable.

11   But please don't craft your own."

12        So Google has a public position on clicks; right?

13   A.   Right.  So I guess I will go ahead and talk about this.  I

14   don't know whether there's trade secret issues here.  I don't

15   really know where the boundary lies.

16   Q.   I mean, if you're concerned, you can answer just yes or no.

17   I don't want to tell you how to testify, obviously, but --

18   A.   So let's see.  So Google has a public position on the use

19   of clicks in search, yes.

20        MR. SMURZYNSKI:  Your Honor, I think we're clearly

21   getting into an area where Dr. Lehman is concerned about

22   revealing trade secrets of Google, and I think that's why we

23   have a closed session, and I think it would be appropriate to

24   ask him further questions on this in the closed session.

25        THE COURT:  Okay.  Why don't we have counsel just run

1    through whatever additional questions she thinks she can elicit

2    testimony on, and then we will see where we are at that point.

3            MS. MURDOCK-PARK:  Thank you, Your Honor.

4            BY MS. MURDOCK-PARK:

5    Q.   By Google's public position on clicks, you're referring to

6    how much user data Google actually uses in its systems; right?

7    A.   No.

8    Q.   Okay.  Google's public position is not entirely accurate

9    about clicks; right?

10           MR. SMURZYNSKI:  Your Honor, I think -- there's a

11   reason there's a public position, and there's a reason --

12           THE COURT:  I would like to just find out what the

13   public position is.  Why don't we start there, because it's

14   public.

15           BY MS. MURDOCK-PARK:

16   Q.   Dr. Lehman, can you please state what Google's public

17   position is on clicks?

18   A.   So I'm not a communications person, but I think the

19   position that we've strived for is to try not to tell search

20   engine optimizers and people who would like to manipulate our

21   search results for their own benefit, to try not to give them a

22   really clear and unambiguous message that we use user data,

23   because they could potentially manipulate it to damage Google

24   and damage the quality of search results for everyone who uses

25   Google.

1    So we have said that we use user feedback data, clicks, in

2    evaluation of our search systems.  And we try to avoid

3    confirming that we use user data in the ranking of search

4    results.  So this has included things, I think, like saying

5    well, there are a lot of challenges with using clicks in ranking

6    of search results, not outright saying we don't do it but not

7    encouraging the belief that we do.

8    The issue here is that pretty much everybody knows Google

9    uses clicks in ranking.  We're already being attacked.  So there

10   are occasionally people who say like wait, why are you guys

11   trying to be secretive about this, because seriously, everybody

12   knows this.

13   And that's the thing, is please don't craft your own

14   position.  And that's why it's debatable.  And that's the debate

15   people have.  They say why are you trying to obscure this issue

16   when it's totally not obscure, everyone knows it.

17   MS. MURDOCK-PARK:  I think that ends the questions I

18   have in public session, Your Honor.

19   THE COURT:  Terrific.  It's a little after 3:15.  We

20   will resume at 3:35.

21   Dr. Lehman, I will ask you to not discuss your testimony

22   with anyone during the break.

23   THE WITNESS:  Okay.

24   THE COURT:  Thank you, sir.

25   (Recess taken from 3:16 p.m. to 3:41 p.m.)

1800

1    (The following occurred under seal.)



















1809















































1832

































1

2

3          (End of sealed proceedings.)

4          THE COURT:  In terms of open items, we've got the

5     Exhibit 38 issue.

6          Does Google wish to be heard on the admissibility of 38,

7     Counsel?

8          MR. BENNETT:  Yes, Your Honor.

9          So the government has moved for the admission of Exhibit

10    38, and they bear the burden, obviously, by a preponderance of

11    the evidence to show that it has a basis to come in.  They've

12    moved only on the grounds of Rule 801(d)(2), and they've

13    emphasized (d)(2)(D) as the basis for that.

14         Their argument, Your Honor, is, I guess, intended to show

15    that Exhibit 38, which Your Honor has seen and heard much of, is

16    a statement by Google.  Google is the party opponent; Mr. Roszak

17    is not the party opponent.

18         And to make that argument, they really focused, the

19    government focuses on half of 801(d)(2)(D).  They focus on the

20    temporal aspect, was -- and this is their brief that was filed,

21    was the witness employed by Google at the time he made the

22    statement.  The statement was from 2017.  As Your Honor heard,

23    Mr. Roszak was, in fact, employed by the government at that

24    point -- not by the government, sorry, by Google at that point.

25    He was a director.  As Your Honor heard, there were dozens and

1    dozens of groups in finance.  He was in one of them.  And so

2    that's the standard that the government puts forth.

3         THE COURT:  Let's sort of cut to the heart of it.  Why

4    do you think his statements don't fall within the scope of the

5    agency or the employee relationship?

6         MR. BENNETT:  So I would submit that some of the

7    statements come close.  The one that the government focused on,

8    counting the bullet points down, Your Honor, it would be the

9    fifth and sixth bullet points.  Those ones come close to what he

10   focused on at Google.  The other statements are clearly not

11   within his wheelhouse.  The statements about -- they're really

12   macroeconomic statements, microeconomic statements, statements

13   about parts of the business where he was not involved.

14        So it's like a lot of other documents Your Honor has

15   seen --

16        THE COURT:  Doesn't that ultimately go to the weight

17   of the questioning -- the weight of what he's saying here?

18        I mean, look, he was the director of finance at the time he

19   did this.  It was a Google-sponsored training.  And he made the

20   decision to provide a -- to give a training speech that involved

21   the area of his knowledge and understanding.

22        Again, I understand it's probably at the outer edges here.

23   It's not at the core as we would see with a communication

24   between colleagues in the context of financial -- you know,

25   discussion about finance.  But the standard is pretty lax,

1    pretty broad.  And the cases that you all have cited don't quite

2    go as far as I think you've suggested they do.

3            MR. BENNETT:  Your Honor, I think the standard is

4    probably most clearly set out in the *Aliotta* case that the

5    government cites.  That's a case where someone who was employed

6    as an accident reconstructionist at a train company made some

7    comments in a deposition about a train accident.

8        And the Court there distinguished those factual statements

9    about a train accident by a train accident reconstructionist

10   from -- and they juxtaposed that with what if he had offered

11   conclusions about this particular train accident.  And they said

12   he was hired to do the former; he wasn't hired to do the latter.

13       There's no basis to think that Mr. Roszak was hired by

14   Google, employed by Google to make the comments in the first

15   four and the sixth bullet point.  That's why the government got

16   up -- I'm sorry, the first four and the seventh bullet point.

17   That's why the government got up and asked about the fifth and

18   sixth, because they know they had to find some sort of hook.

19       So this to me looks like a document that the Court has seen

20   many times where there is hearsay and nonhearsay.  And the best

21   argument the government can make is that there's some

22   nonhearsay.

23       Now, we would ask Your Honor, because those parts that the

24   government talked about were talked about in closed session,

25   those are confidential.  And if the document comes in, it should

1    be redacted, as we have done in many documents, redacting out

2    the things that are -- I would say irrelevant, but I know Your

3    Honor wants to consider the weight, are clearly hearsay.

4        To go back to something Your Honor said a second ago, I

5    think Your Honor said that this was presented by him, he was

6    ordered to give a training.  He wasn't giving a training.  He

7    was taking a training.

8            THE COURT:  No, I understand.

9            MR. BENNETT:  And I think what distinguishes this from

10   the government's lead case is that in that case the declarant,

11   the witness was being deposed.  He was testifying about things

12   that were, at least he was asserting, true, related to his job

13   and they were true.

14       Here, you've got something that the witness has said was

15   not true, wasn't intended to be true.  He was cosplaying Gordon

16   Gekko.  He was saying things that he didn't think were true

17   because it was a part of the training to do that.

18       If they had done a skit, the government certainly wouldn't

19   come in and offer that for the truth of whatever role he was

20   playing.  This is the equivalent of that.

21       So the *Aliotta* case, I think, really is guiding and that

22   there are -- there's a dividing line between things that are in

23   an employee's wheelhouse, what they are hired, what they are

24   employed to do, and things that are not.

25       And if Your Honor looks at --

1        THE COURT:  What the Seventh Circuit said in *Aliotta*,

2   315 F.3d 756, is that the only requirement -- and this was, I

3   think, in a Title VII case, but the only requirement is that the

4   subject matter of the admission match the subject matter of the

5   employee's job description.

6        MR. BENNETT:  And then the Court goes on to say that

7   even though concluding about that accident was the subject

8   matter of his employment, they said that would be excluded

9   because he wasn't employed to make conclusions about that

10  accident.  He was employed to know about accidents generally.

11       Here, we're one step removed from that.  Mr. Roszak is not

12  an economist.  Your Honor, I think, has heard from economists

13  already in this case.  He's not an economist.  He's not a

14  strategy person or a policy person.  He's someone who does

15  financial modeling in a very narrow area of the business.  In

16  fact, he draws that out elsewhere in this memo, that he's

17  talking about other parts of the business, not the part where he

18  works.

19       So this just --

20       THE COURT:  Here's the difficulty of where I find

21  myself, which is that to the extent this is coming in, it does

22  not contain anything that would qualify as confidential.  It

23  doesn't contain a trade secret.  It doesn't contain any

24  financial information that has been sort of in the wheelhouse of

25  what is confidential.

1      Now I'm in the position where the testimony that

2   accompanied this document was done in a closed session.  So all

3   context is lost if this document is admitted and then finds its

4   way into the public space, because in theory it is now a public

5   document if I admit it.

6      So I'm in a little bit of a pickle, in a jam here because

7   of how we have teed this up.

8      So let me just go ahead and rule.  We've got to bring

9   things to a close here today.

10             MR. BENNETT:  If I could just --

11             THE COURT:  Thank you.

12      So look, the relevant provision here is 801(d)(2)(D), and I

13   want to just read a few excerpts from the *Wright & Miller*

14   *Treatise*, which is paragraphs 67 to 76, that covers it.  This is

15   30B, Federal Practice and Procedure, in evidence.

16      Counsel, you can have a seat.

17             MR. BENNETT:  Thank you, Your Honor.

18             THE COURT:  *Wright & Miller* states, "The exemption

19   requires neither adoption nor ratification of the statements by

20   the party.  All that is required is that the agent or employee

21   made the statements during and within the scope of the agency or

22   employee relationship.

23      "With respect to the subject matter, Rule 801(d)(2)(D)

24   abandoned the common law requirement that the agent must have

25   authority to make statements in a given area.  It is no longer

the law that a qualifying statement must be shown to have been
made by the employee at the insistence of her employer.

"Instead, 801(d)(2) takes a broader view, allowing
statements to be admitted over a hearsay objection whenever an
employee or agent speaks on any matter within the scope of his
agency or employment during the existence of that relationship.

"By virtue of this requirement, qualifying statements are
to some degree limited to those the employee is most likely to
be knowledgeable about.  Qualifying statements will arise when
an employee or agent speaks about matters that are or were
within her job responsibilities."

And then finally, the treatise says, "Outside the context
of employee complaints, Courts typically take an unabashedly
broad view of Rule 801(d)(2)(D)'s application, emphasizing that
qualifying statements must simply touch on matters that fall
within the employee or agent's general duties and
responsibilities.

"Stated another way, an employee need only be performing
the duties of his employment when he comes in contact with the
particular facts at issue.  Importantly, the statements must
still concern matters related to the speaker's employment."

And so I think by those standards this comes in as an
801(d)(2)(B) -- excuse me, 801(d)(2)(D) statement.  I will grant
it's on the outer perimeter here, but it nevertheless meets all
of the requirements.  Here you have somebody who is the director

1    of finance, who albeit in a training session made the decision

2    to make a mock presentation, understanding that's what it is,

3    mock presentation about things he understands about the

4    business, about the fundamentals of the business.

5        And they're really broad-stroke statements, obviously, but

6    he doesn't need to be an economist to make statements like this.

7    He has advanced degrees in finance, I assume, or an MBA and is

8    the head of Google Finance.  These are not statements that would

9    fall outside his wheelhouse, so to speak, or outside his areas.

10       I mean, all the other indicia establish that this was a

11   statement made during the course of his employment.  It was a

12   Google-sponsored training.  It was done off-site, presumably

13   sponsored by Google.  It was done on his computer at work or his

14   work-issued computer.  And so all of those indicia establish

15   what is required to meet the elements of the rule.

16       I will just note the handful of cases that Google has cited

17   starting with *Rowell* from the Eleventh Circuit, 2005, is

18   inapposite because in that case the statement was deemed not

19   admissible because there was no evidence that the employee was

20   involved in the decision of how to structure the reduction in

21   force or how to design the performance evaluations used during

22   the nonvoluntary stage of the reduction.  There's also no

23   evidence that the employee had received any information from the

24   employer's upper management to indicate that age was to play a

25   factor in these decisions.

1        As I said, this is different.  This is a topic about which

2   he can speak authoritatively based upon his experience.  I can't

3   remember.  I think he said he had been at Google for

4   approximately ten years by the time this training happened, the

5   entire time in finance.

6        The Seventh Circuit's decision in *Young* notes that the

7   exception or the carve-out from the rule embodies broader

8   exception than the prerules.  The rule simply requires that the

9   statement be made by an individual who is an agent and that the

10  statement be made during a period of the agency and that the

11  matter be within the subject matter of the agency.

12       And the reason in that case the statement was excluded is

13  because the statement was made in a resignation letter, and the

14  Court concluded that essentially the employee was acting as an

15  adversary and no longer inhibited by his relationship with the

16  principal from making erroneous or underhanded comments that

17  could harm the principal.

18       And then finally, the *Blackburn* decision from the Third

19  Circuit, 1999, in which the Court excluded the statement or

20  affirmed the exclusion of the statement where there was no

21  indication that the employee was speaking for UPS on a matter

22  within the scope of his agency employment such that the employee

23  could testify about what he had been told.

24       And then finally is the *Mister* case from the Seventh

25  Circuit, the case involved a report.  What the Court said there

1    is not that the report was inadmissible under 801(d)(2)(D), even

2    if it contained an absurd statement, but rather, it was

3    excludible under Rule 403.  So even though it met the

4    requirements of 802(d)(2)(D), the circuit said it was properly

5    excluded under Rule 403.

6        So again, I think this meets the requirements of

7    801(d)(2)(D).  In terms of the 403 balancing, look, I understand

8    it's somewhat embarrassing to the witness, but it's not

9    substantially -- the probative value -- the likelihood of

10   confusing me or creating embarrassment for the witness and for

11   Google is not substantially outweighed by the probative value of

12   what's in here.

13       He's testified that he doesn't believe a lot of what he's

14   said.  He's provided context for the way in which he said it.

15   So all of that will go to the weight of the ultimate

16   consideration of the statement.

17       But in terms of its admissibility, I think it meets the

18   four corners of the rule.  And so I will admit it.

19       So UPX38 can be admitted.

20       (UPX38 received into evidence.)

21           THE COURT:  I will leave it to you all to discuss

22   whether it ought to be redacted in any way.  Talk about that

23   amongst yourselves, and we can deal with that overnight.  Okay?

24   Or in the morning.

25       One last housekeeping matter.  I think counsel had

1    requested at the -- or in fact, I know you all had requested

2    that we create essentially a Webinar link so that there would be

3    a Webinar available to counsel of record, both for the parties

4    and third parties to access the proceedings.  We allowed that.

5    At the time it was something that was permitted by judicial

6    policy.  That policy expires as of tomorrow.

7         And it's not clear to me whether continuing that Webinar

8    line is something I can do under the current policy.  I can

9    provide everyone with what the policy changes are, and we can

10   talk about it in the morning, but I just wanted everybody to be

11   aware it's something that's been brought to my attention and

12   something I need to consider before the end of the day tomorrow.

13        So let me give these two documents to Mr. Douyon, who can

14   make photocopies of them for you, and you can think about it

15   overnight, and we can talk about it in the morning.

16        Al right.  Is there anything else we need to talk about?

17             MR. CAVANAUGH:  No, Your Honor.

18             MR. DINTZER:  Not from the DOJ plaintiffs, Your Honor.

19             MR. SCHMIDTLEIN:  No, thank you, Your Honor.

20             THE COURT:  Thank you all very much.  Please do not

21   wait for me.  And we will see you tomorrow.

22        (Proceedings adjourned at 5:18 p.m.)

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


       I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.



/s/ Sara A. Wick_____            September 20, 2023___

SIGNATURE OF COURT REPORTER         DATE

## /

**/s** [1] - 1859:8

## 0

**004** [1] - 1770:14

## 1

**1** [3] - 1782:8, 1782:17, 1794:22
**10** [3] - 1756:20, 1756:24, 1794:22
**100** [4] - 1784:14, 1784:20, 1785:24, 1786:2
**10019** [1] - 1733:11
**10036** [1] - 1733:5
**1006** [2] - 1747:8, 1747:14
**11** [1] - 1760:24
**1100** [1] - 1732:14
**1133** [1] - 1733:4
**1301** [1] - 1733:10
**14** [1] - 1796:25
**15** [1] - 1791:10
**1529** [1] - 1792:7
**17** [1] - 1750:13
**1735** [1] - 1734:3
**1741** [1] - 1734:3
**1744** [1] - 1734:4
**1748** [1] - 1734:5
**18** [1] - 1750:12
**1828** [1] - 1734:5
**1857** [1] - 1734:9
**1999** [1] - 1856:19
**1:32** [2] - 1732:6, 1781:21

## 2

**2** [4] - 1765:4, 1781:20, 1781:22, 1782:6
**20** [4] - 1732:6, 1763:2, 1763:3, 1795:24
**20-cv-3010** [1] - 1732:3
**20001** [2] - 1732:17, 1733:14
**20005** [1] - 1732:14
**20024** [1] - 1733:8
**2005** [1] - 1855:17
**2017** [4] - 1753:17, 1756:17, 1787:7, 1848:22
**2018** [1] - 1791:17
**202-354-3284** [1] -

1733:15
**2020** [4] - 1786:21, 1787:4, 1787:6, 1789:14
**2022** [1] - 1749:5
**2023** [2] - 1732:6, 1859:8
**208** [1] - 1797:1
**209** [1] - 1732:19
**219** [1] - 1779:4
**2200** [1] - 1733:4
**228** [1] - 1754:2
**24** [3] - 1782:17, 1782:19, 1782:22
**2426** [1] - 1788:4
**25** [6] - 1778:20, 1779:7, 1779:10, 1784:3, 1784:13, 1784:17
**265.004** [1] - 1770:15

## 3

**3** [2] - 1787:3, 1787:13
**30** [3] - 1788:3, 1788:7, 1794:14
**30B** [1] - 1853:15
**315** [1] - 1852:2
**333** [1] - 1733:13
**38** [4] - 1848:5, 1848:6, 1848:10, 1848:15
**3:15** [1] - 1799:19
**3:16** [1] - 1799:25
**3:35** [1] - 1799:20
**3:41** [1] - 1799:25

## 4

**4** [4] - 1779:17, 1782:11, 1788:18
**403** [3] - 1857:3, 1857:5, 1857:7
**40th** [1] - 1733:11
**42** [2] - 1792:6, 1795:24
**4241** [1] - 1774:8
**450** [1] - 1732:17
**462** [3] - 1745:1, 1745:24, 1746:1
**47** [4] - 1774:8, 1775:1, 1775:17, 1777:2
**4704-B** [1] - 1733:14

## 5

**5** [9] - 1766:7, 1766:10, 1766:15, 1770:4, 1770:8,

1770:9, 1770:14, 1771:15, 1771:23
**50** [2] - 1750:17, 1750:21
**503** [2] - 1761:1, 1761:2
**5:18** [1] - 1858:22

## 6

**600** [1] - 1732:20
**60604** [1] - 1732:20
**67** [1] - 1853:14
**680** [1] - 1733:8

## 7

**7** [4] - 1732:9, 1755:2, 1755:6, 1755:24
**756** [1] - 1852:2
**76** [1] - 1853:14
**787** [1] - 1782:20

## 8

**801(d)(2(** [2] - 1848:12, 1854:3
**801(d)(2)(B** [1] - 1854:23
**801(d)(2)(D** [4] - 1853:12, 1853:23, 1854:23, 1857:1
**801(d)(2)(D)** [3] - 1746:16, 1848:19, 1857:7
**801(d)(2)(D)'s** [1] - 1854:14
**802(d)(2)(D** [1] - 1857:4
**8265.004** [1] - 1766:11

## 9

**9499** [1] - 1755:2
**9502** [1] - 1756:20

## A

**abandoned** [1] - 1853:24
**able** [1] - 1753:24
**above-entitled** [1] - 1859:5
**absent** [1] - 1777:23
**absurd** [1] - 1857:2
**access** [3] - 1763:15, 1763:19, 1858:4
**accident** [7] - 1850:6, 1850:7, 1850:9, 1850:11, 1852:7,

1852:10
**accidents** [1] - 1852:10
**accompanied** [1] - 1853:2
**accomplish** [1] - 1772:14
**according** [2] - 1776:11, 1789:17
**accordingly** [1] - 1788:20
**accurate** [1] - 1798:8
**acting** [1] - 1856:14
**action** [1] - 1765:6
**actions** [2] - 1758:14, 1758:22
**add** [1] - 1761:13
**adding** [2] - 1775:10, 1775:14
**additional** [5] - 1756:25, 1775:10, 1776:9, 1786:16, 1798:1
**adjourned** [1] - 1858:22
**adjustments** [1] - 1776:10
**admissibility** [3] - 1747:18, 1848:6, 1857:17
**admissible** [1] - 1855:19
**admission** [2] - 1848:9, 1852:4
**admit** [2] - 1853:5, 1857:18
**admitted** [9] - 1747:13, 1753:18, 1765:3, 1774:3, 1781:19, 1786:22, 1853:3, 1854:4, 1857:19
**adoption** [1] - 1853:19
**Ads** [3] - 1787:23, 1789:2, 1790:11
**advanced** [1] - 1855:7
**adversary** [1] - 1856:15
**advertising** [1] - 1745:10
**affect** [2] - 1759:6, 1759:7
**affirmed** [1] - 1856:20
**afternoon** [2] - 1748:1, 1791:12
**AFTERNOON** [1] - 1732:9
**age** [1] - 1855:24
**agency** [6] - 1849:5, 1853:21, 1854:6,

1852:10
**agent** [5] - 1853:20, 1853:24, 1854:5, 1854:10, 1856:9
**agent's** [1] - 1854:16
**ago** [1] - 1851:4
**agree** [10] - 1747:18, 1753:13, 1763:6, 1774:14, 1775:24, 1777:8, 1777:11, 1781:6, 1785:24, 1790:3
**ahead** [10] - 1763:23, 1771:23, 1777:5, 1786:17, 1790:2, 1791:13, 1796:16, 1796:20, 1797:13, 1853:8
**aided** [1] - 1733:17
**al** [2] - 1732:3, 1858:16
**albeit** [1] - 1855:1
**algorithms** [3] - 1750:24, 1751:10, 1762:1
**Aliotta** [3] - 1850:4, 1851:21, 1852:1
**allowed** [1] - 1858:4
**allowing** [2] - 1785:1, 1854:3
**alone** [2] - 1783:20, 1784:7
**Alphabet's** [1] - 1797:5
**ambiguous** [2] - 1764:1, 1777:23
**AMERICA** [1] - 1732:3
**Americas** [2] - 1733:4, 1733:10
**AMIT** [1] - 1732:10
**amount** [2] - 1776:3, 1789:24
**annotating** [1] - 1775:9
**annotation** [1] - 1775:15
**answer** [2] - 1794:15, 1797:16
**answering** [1] - 1759:24
**anticipate** [1] - 1795:10
**apologies** [2] - 1748:20, 1753:22
**apologize** [1] - 1745:16
**apparent** [1] - 1784:25
**appear** [2] - 1764:23, 1783:8

**APPEARANCES**[2] - 1732:12, 1733:1
**application** [1] - 1854:14
**approach** [1] - 1753:23
**approaches** [1] - 1785:22
**appropriate** [3] - 1778:17, 1785:11, 1797:23
**area** [6] - 1766:18, 1772:7, 1797:21, 1849:21, 1852:15, 1853:25
**areas** [1] - 1855:9
**argument** [3] - 1848:14, 1848:18, 1850:21
**arise** [1] - 1854:9
**arrange** [1] - 1776:21
**arranged** [1] - 1774:23
**arrow** [21] - 1755:10, 1755:13, 1757:8, 1757:11, 1757:14, 1767:1, 1767:8, 1767:15, 1771:15, 1771:20, 1774:17, 1775:4, 1793:7, 1793:9, 1793:13, 1793:16, 1793:19, 1793:22, 1795:16
**arrows** [4] - 1755:6, 1757:5, 1760:25, 1792:11
**artist** [1] - 1755:10
**ascorer** [2] - 1776:7, 1776:8
**Asia** [4] - 1745:5, 1745:6, 1745:7, 1745:22
**Asia-Pacific** [3] - 1745:6, 1745:7, 1745:22
**aside** [4] - 1771:23, 1777:5, 1790:2, 1796:16
**aspect** [1] - 1848:20
**aspects** [11] - 1777:11, 1777:13, 1777:15, 1778:21, 1778:24, 1779:7, 1779:18, 1784:10, 1790:15, 1790:17
**asserted** [1] - 1748:5
**asserting** [1] - 1851:12
**assess** [1] - 1764:24
**associated** [1] - 1769:14

**assume** [1] - 1855:7
**attacked** [1] - 1799:9
**attended** [1] - 1792:2
**attention** [8] - 1753:16, 1768:1, 1768:5, 1768:6, 1768:8, 1768:14, 1787:13, 1858:11
**audience** [1] - 1788:16
**Australia** [1] - 1773:7
**authored** [2] - 1753:16, 1782:15
**authoritatively** [1] - 1856:2
**authoritativeness** [1] - 1765:18
**authority** [1] - 1853:25
**available** [4] - 1783:22, 1792:3, 1792:4, 1858:3
**Avenue** [4] - 1733:4, 1733:8, 1733:10, 1733:13
**avoid** [1] - 1799:2
**aware** [1] - 1858:11

### B

**bachelor's** [1] - 1750:8
**background** [1] - 1750:7
**bad** [1] - 1794:12
**balance** [1] - 1749:9
**balancing** [1] - 1857:7
**based** [4] - 1773:11, 1779:22, 1780:17, 1856:2
**basic** [2] - 1774:9, 1776:14
**basics** [1] - 1773:21
**basis** [4] - 1797:9, 1848:11, 1848:13, 1850:13
**Bates** [11] - 1755:2, 1756:20, 1761:2, 1766:10, 1770:15, 1774:8, 1779:2, 1779:3, 1788:3, 1792:6, 1797:1
**bear** [1] - 1848:10
**become** [1] - 1794:20
**becomes** [1] - 1752:21
**becoming** [1] - 1749:8
**BEFORE** [2] - 1732:1, 1732:10
**begins** [1] - 1762:16
**behalf** [1] - 1748:2
**behave** [1] - 1781:13

**behavior** [8] - 1781:9, 1781:11, 1784:24, 1785:5, 1785:25, 1786:2, 1786:3
**behavioral** [1] - 1783:7
**behind** [2] - 1754:19, 1788:14
**belief** [1] - 1799:7
**Belknap** [1] - 1733:3
**BENCH** [1] - 1732:9
**beneficial** [1] - 1780:12
**benefit** [4] - 1789:1, 1794:18, 1795:8, 1798:21
**benefits** [1] - 1794:16
**BENNETT** [15] - 1733:6, 1744:23, 1744:25, 1745:12, 1745:16, 1745:18, 1746:5, 1746:17, 1848:8, 1849:6, 1850:3, 1851:9, 1852:6, 1853:10, 1853:17
**best** [4] - 1758:6, 1783:22, 1784:8, 1850:20
**better** [30] - 1760:6, 1760:8, 1760:10, 1760:16, 1763:6, 1763:9, 1770:3, 1772:21, 1786:5, 1793:14, 1793:17, 1793:20, 1793:25, 1794:1, 1794:16, 1794:25, 1795:5, 1795:7, 1795:9, 1795:16, 1795:17, 1796:1, 1796:9
**between** [4] - 1769:17, 1771:24, 1849:24, 1851:22
**beyond** [2] - 1787:9, 1787:16
**big** [1] - 1769:22
**biggest** [1] - 1751:19
**billion** [5] - 1761:13, 1784:14, 1784:20, 1785:24, 1786:2
**billions** [2] - 1761:16, 1761:19
**binder** [3] - 1754:2, 1754:6, 1781:20
**bit** [13] - 1752:18, 1753:9, 1753:14, 1754:21, 1760:18, 1763:24, 1764:2, 1775:6, 1776:4,

1777:6, 1781:4, 1794:3, 1853:6
**bits** [1] - 1761:13
**Blackburn** [1] - 1856:18
**blue** [7] - 1755:17, 1755:19, 1766:12, 1766:25, 1793:13, 1793:16, 1793:19
**board** [1] - 1786:9
**body** [1] - 1752:21
**bottom** [8] - 1745:23, 1745:24, 1746:1, 1767:8, 1768:13, 1770:15, 1779:10, 1789:23
**boundary** [1] - 1797:15
**box** [7] - 1755:19, 1755:21, 1767:7, 1767:9, 1767:18, 1770:12, 1771:16
**boxes** [1] - 1788:25
**break** [6] - 1746:20, 1746:22, 1748:11, 1791:12, 1793:5, 1799:22
**breaks** [1] - 1796:12
**brief** [1] - 1848:20
**briefly** [6] - 1750:7, 1751:17, 1752:9, 1767:23, 1769:4, 1771:24
**bring** [2] - 1746:18, 1853:8
**broad** [6] - 1759:14, 1765:13, 1765:19, 1850:1, 1854:14, 1855:5
**broad-stroke** [1] - 1855:5
**broader** [3] - 1760:11, 1854:3, 1856:7
**broadly** [1] - 1759:9
**brought** [1] - 1858:11
**browsing** [1] - 1768:23
**built** [2] - 1756:2, 1789:7
**bullet** [12] - 1746:1, 1782:6, 1788:12, 1788:18, 1793:16, 1795:1, 1795:19, 1795:21, 1849:8, 1849:9, 1850:15, 1850:16
**bullets** [1] - 1788:7
**bunch** [3] - 1788:23, 1773:19, 1794:4
**burden** [1] - 1848:10

**business** [6] - 1789:25, 1849:13, 1852:15, 1852:17, 1855:4
**BY** [16] - 1744:25, 1745:18, 1748:13, 1748:21, 1749:1, 1749:18, 1751:1, 1754:1, 1756:16, 1759:16, 1765:21, 1779:6, 1787:5, 1791:15, 1798:4, 1798:15

### C

**California** [4] - 1773:2, 1778:12, 1778:13
**cannot** [1] - 1783:8
**capture** [1] - 1784:11
**captures** [2] - 1754:20, 1779:18
**capturing** [1] - 1779:10
**cards** [1] - 1788:23
**carousel** [1] - 1752:20
**carries** [1] - 1764:14
**carrying** [1] - 1764:11
**carve** [1] - 1856:7
**carve-out** [1] - 1856:7
**Case** [1] - 1732:3
**case** [14] - 1750:1, 1776:13, 1777:23, 1850:4, 1850:5, 1851:10, 1851:21, 1852:3, 1852:13, 1855:18, 1856:12, 1856:24, 1856:25
**cases** [5] - 1760:17, 1773:1, 1791:6, 1850:1, 1855:16
**cat** [4] - 1785:10, 1785:12, 1785:15, 1785:18
**categories** [2] - 1767:21, 1767:24
**categorized** [1] - 1774:23
**category** [3] - 1767:24, 1770:5, 1770:23
**CAVANAUGH** [2] - 1733:3, 1858:17
**central** [2] - 1787:15, 1787:24
**CEO** [1] - 1797:5
**certain** [6] - 1772:20, 1774:6, 1776:12, 1778:18, 1784:9,

1791:2
**certainly** [5] - 1759:15, 1784:3, 1787:23, 1789:17, 1851:18
**CERTIFICATE** [1] - 1859:1
**certify** [1] - 1859:3
**challenges** [1] - 1799:5
**chance** [2] - 1768:11, 1784:5
**change** [4] - 1764:13, 1780:23, 1780:24, 1780:25
**changes** [4] - 1780:2, 1780:3, 1780:11, 1858:9
**changing** [3] - 1758:8, 1760:15, 1762:9
**channel** [1] - 1769:25
**characterization** [1] - 1775:12
**chart** [2] - 1747:23, 1774:9
**chasing** [1] - 1792:11
**check** [1] - 1754:25
**cheer** [2] - 1787:8, 1788:1
**cheer-up** [1] - 1787:8
**Chicago** [1] - 1732:20
**chunk** [3] - 1764:10, 1764:14, 1782:4
**circle** [1] - 1795:20
**Circuit** [4] - 1852:1, 1855:17, 1856:19, 1856:25
**Circuit's** [1] - 1856:6
**cited** [2] - 1850:1, 1855:16
**cites** [1] - 1850:5
**clarify** [1] - 1784:4
**classify** [1] - 1769:12
**clear** [2] - 1798:22, 1858:7
**clearer** [2] - 1762:22, 1784:21
**clearly** [4] - 1797:20, 1849:10, 1850:4, 1851:3
**click** [28] - 1752:4, 1752:18, 1752:19, 1765:2, 1765:25, 1769:1, 1769:4, 1769:5, 1769:7, 1769:10, 1769:14, 1769:17, 1769:20, 1769:23, 1769:25, 1770:1, 1770:20,

1770:21, 1771:7, 1782:12, 1785:16, 1786:9, 1794:7, 1794:11, 1794:14, 1796:2
**clicking** [4] - 1771:5, 1785:18, 1794:19, 1795:11
**clicks** [33] - 1752:22, 1753:1, 1768:16, 1768:17, 1768:18, 1769:8, 1769:12, 1770:2, 1770:3, 1770:5, 1770:6, 1770:7, 1770:13, 1770:17, 1784:14, 1784:21, 1785:1, 1785:4, 1785:24, 1786:1, 1790:7, 1794:20, 1794:23, 1794:24, 1797:8, 1797:12, 1797:19, 1798:5, 1798:9, 1798:17, 1799:1, 1799:5, 1799:9
**close** [3] - 1849:7, 1849:9, 1853:9
**closed** [8] - 1745:15, 1748:7, 1754:4, 1754:8, 1797:23, 1797:24, 1850:24, 1853:2
**cloud** [3] - 1766:19, 1767:2, 1771:17
**colleagues** [2] - 1745:3, 1849:24
**collection** [1] - 1764:24
**Colorado** [1] - 1733:2
**Columbia** [1] - 1778:15
**COLUMBIA** [1] - 1732:1
**combinatorial** [1] - 1750:24
**coming** [3] - 1795:7, 1795:9, 1852:21
**commenting** [1] - 1783:16
**comments** [3] - 1850:7, 1850:14, 1856:16
**common** [1] - 1853:24
**commonly** [1] - 1757:22
**communication** [1] - 1849:23
**communications** [1] - 1798:18
**company** [3] -

1787:21, 1787:22, 1850:6
**competition** [1] - 1745:9
**compilation** [1] - 1747:10
**complaints** [1] - 1854:13
**completely** [1] - 1769:21
**completeness** [1] - 1745:13
**complex** [1] - 1775:23
**complexity** [1] - 1776:3
**complicated** [6] - 1754:19, 1760:19, 1768:22, 1768:25, 1781:4, 1786:6
**complications** [1] - 1769:18
**compliment** [1] - 1779:20
**component** [3] - 1763:2, 1776:19, 1791:3
**components** [17] - 1759:24, 1759:25, 1760:3, 1760:4, 1760:5, 1760:7, 1762:20, 1762:24, 1763:3, 1763:7, 1763:9, 1790:5, 1790:6, 1790:8, 1790:11, 1791:3, 1791:5
**computer** [4] - 1733:17, 1750:23, 1855:13, 1855:14
**computer-aided** [1] - 1733:17
**computers** [1] - 1751:23
**concept** [1] - 1765:11
**concern** [1] - 1854:21
**concerned** [2] - 1797:16, 1797:21
**concluded** [1] - 1856:14
**concluding** [1] - 1852:7
**conclusions** [2] - 1850:11, 1852:9
**conduct** [1] - 1748:7
**confess** [1] - 1795:25
**confidential** [3] - 1850:25, 1852:22, 1852:25
**confidentiality** [1] - 1748:6

**confirm** [1] - 1781:21
**confirming** [2] - 1782:5, 1799:3
**confusing** [1] - 1857:10
**connection** [3] - 1757:22, 1792:20, 1793:3
**connections** [1] - 1751:16
**Connolly** [1] - 1733:7
**consider** [3] - 1747:1, 1851:3, 1858:12
**consideration** [2] - 1777:19, 1857:16
**considered** [4] - 1762:4, 1762:7, 1762:10, 1763:17
**Constitution** [1] - 1733:13
**constructed** [1] - 1777:1
**contact** [1] - 1854:19
**contain** [8] - 1785:12, 1785:18, 1785:19, 1794:24, 1852:22, 1852:23
**contained** [1] - 1857:2
**containing** [1] - 1785:15
**contains** [1] - 1764:16
**contents** [1] - 1765:10
**context** [9] - 1764:8, 1764:12, 1764:13, 1788:1, 1794:4, 1849:24, 1853:3, 1854:12, 1857:14
**contexts** [2] - 1792:25, 1793:3
**continued** [1] - 1732:23
**CONTINUED** [1] - 1733:1
**continuing** [1] - 1858:7
**control** [2] - 1774:9, 1776:14
**conveying** [2] - 1783:6, 1783:11
**conveys** [1] - 1765:6
**copies** [1] - 1763:1
**copy** [2] - 1747:6, 1763:1
**core** [1] - 1849:23
**corners** [1] - 1857:18
**correct** [36] - 1745:5, 1748:17, 1750:8, 1750:18, 1751:7, 1753:19, 1754:18, 1757:17, 1757:19,

1758:6, 1759:3, 1759:22, 1761:17, 1763:21, 1763:25, 1765:24, 1766:5, 1767:5, 1768:1, 1768:6, 1772:9, 1774:5, 1776:2, 1777:3, 1779:11, 1781:7, 1782:6, 1782:10, 1782:25, 1783:4, 1784:18, 1792:12, 1792:15, 1792:23, 1793:8, 1859:4
**correlation** [1] - 1769:16
**cosplaying** [1] - 1851:15
**Counsel** [1] - 1848:7
**counsel** [5] - 1749:12, 1797:25, 1853:16, 1857:25, 1858:3
**counting** [1] - 1849:8
**counts** [1] - 1764:22
**course** [3] - 1762:25, 1766:23, 1855:11
**Court** [10] - 1733:13, 1751:17, 1764:7, 1773:22, 1850:8, 1850:19, 1852:6, 1856:14, 1856:19, 1856:25
**COURT** [42] - 1732:1, 1744:19, 1745:13, 1746:7, 1746:9, 1746:12, 1746:18, 1746:22, 1747:7, 1747:11, 1747:13, 1747:17, 1747:22, 1748:9, 1748:18, 1748:25, 1750:22, 1750:25, 1756:14, 1759:13, 1765:5, 1765:20, 1779:2, 1779:5, 1787:4, 1791:13, 1797:25, 1798:12, 1799:19, 1799:24, 1848:4, 1849:3, 1849:16, 1851:8, 1852:1, 1852:20, 1853:11, 1853:18, 1857:21, 1858:20, 1859:1, 1859:9
**court** [1] - 1735:2
**courtroom** [1] - 1744:20
**Courts** [1] - 1854:13
**covers** [1] - 1853:14
**COVID** [4] - 1787:8,

1787:11, 1787:12
**craft** [2] - 1797:11, 1799:13
**crawl** [1] - 1774:17
**crawling** [1] - 1775:18
**crawls** [1] - 1774:20
**create** [1] - 1858:2
**created** [2] - 1747:23, 1786:21
**creating** [1] - 1857:10
**Cross** [2] - 1734:3, 1734:5
**Cross-Examination..**
.............. [2] - 1734:3, 1734:5
**CRR** [1] - 1733:13
**current** [2] - 1749:10, 1858:8
**cut** [1] - 1849:3
**cutting** [4] - 1789:9, 1789:18, 1789:20, 1789:21
**cutting-edge** [6] - 1789:9, 1789:20
**cycle** [12] - 1792:12, 1792:15, 1792:17, 1792:20, 1792:23, 1793:5, 1795:23, 1796:8, 1796:11, 1796:12, 1796:15
**cyclic** [1] - 1795:19

---

**D**

**d)(2)(D** [1] - 1848:13
**D.C** [5] - 1732:5, 1732:14, 1732:17, 1733:8, 1733:14
**DAHLQUIST** [5] - 1732:18, 1747:2, 1747:15, 1747:21, 1747:25
**damage** [2] - 1798:23, 1798:24
**data** [94] - 1747:9, 1751:13, 1751:15, 1751:18, 1752:7, 1752:9, 1752:11, 1752:15, 1752:21, 1752:23, 1753:1, 1753:5, 1753:10, 1753:11, 1753:13, 1753:15, 1756:8, 1757:9, 1757:12, 1757:15, 1757:18, 1757:20, 1757:21, 1757:23, 1758:1, 1758:3, 1758:10, 1758:18, 1758:20, 1759:2, 1759:6,

1759:8, 1760:6, 1760:16, 1760:18, 1760:21, 1760:22, 1761:20, 1762:14, 1762:16, 1762:17, 1762:18, 1762:19, 1762:23, 1762:24, 1762:25, 1763:3, 1763:24, 1763:25, 1764:8, 1764:11, 1764:12, 1764:14, 1770:5, 1771:2, 1771:21, 1771:25, 1778:1, 1778:3, 1780:24, 1783:15, 1785:14, 1785:17, 1785:21, 1786:9, 1786:10, 1788:8, 1789:2, 1789:13, 1789:16, 1789:19, 1790:3, 1790:7, 1790:9, 1790:11, 1790:18, 1790:25, 1791:5, 1791:6, 1792:14, 1792:18, 1793:14, 1793:25, 1795:1, 1795:5, 1795:7, 1795:9, 1796:18, 1798:6, 1798:22, 1799:1, 1799:3
**DATE** [1] - 1859:9
**date** [2] - 1758:9, 1782:3
**dated** [1] - 1775:6
**DAVID** [1] - 1732:18
**DAY** [1] - 1732:9
**deal** [1] - 1857:23
**debatable** [2] - 1797:10, 1799:14
**debate** [1] - 1799:14
**decide** [1] - 1768:24
**decision** [5] - 1849:20, 1855:1, 1855:20, 1856:6, 1856:18
**decisions** [1] - 1855:25
**deck** [15] - 1753:16, 1754:16, 1754:22, 1765:25, 1766:1, 1774:1, 1782:12, 1782:15, 1786:18, 1786:20, 1786:22, 1786:25, 1789:18, 1791:16, 1792:2
**declarant** [1] - 1851:10
**decreasing** [2] - 1759:5, 1776:11

**deemed** [1] - 1855:18
**Defendant** [2] - 1732:7, 1733:6
**define** [1] - 1786:1
**definitions** [1] - 1769:6
**degree** [1] - 1854:8
**degrees** [1] - 1855:7
**demanding** [1] - 1749:8
**demonstrative** [1] - 1747:3
**Department** [3] - 1732:13, 1732:16, 1732:19
**deposed** [1] - 1851:11
**deposition** [2] - 1766:3, 1850:17
**depth** [1] - 1785:5
**description** [1] - 1852:5
**design** [1] - 1855:21
**desktop** [6] - 1771:25, 1772:2, 1772:4, 1772:17, 1772:20, 1773:16
**determine** [1] - 1773:9
**determining** [1] - 1764:20
**developed** [1] - 1756:15
**developing** [1] - 1762:1
**dialogue** [4] - 1761:5, 1762:5, 1762:11, 1792:18
**dialogues** [1] - 1761:16
**differ** [3] - 1772:3, 1772:5, 1772:22
**difference** [1] - 1791:1
**differences** [1] - 1771:24
**different** [16] - 1757:20, 1763:1, 1763:2, 1763:5, 1768:16, 1773:3, 1773:16, 1779:13, 1781:8, 1783:15, 1786:11, 1786:13, 1790:15, 1794:3, 1856:1
**difficulty** [1] - 1852:20
**DINTZER** [2] - 1732:13, 1858:18
**Direct** [1] - 1734:5
**direct** [3] - 1751:2, 1790:25, 1791:2
**DIRECT** [1] - 1748:12
**direction** [2] -

1758:13, 1760:15
**directly** [3] - 1779:25, 1790:20, 1791:2
**director** [3] - 1848:25, 1849:18, 1854:25
**disagree** [1] - 1781:7
**discuss** [4] - 1791:24, 1797:8, 1799:21, 1857:21
**discussed** [1] - 1786:18
**discussing** [3] - 1754:5, 1754:7, 1770:24
**discussion** [1] - 1849:25
**distinctions** [1] - 1752:25
**distinguished** [3] - 1748:16, 1749:2, 1850:8
**distinguishes** [1] - 1851:9
**District** [1] - 1778:15
**DISTRICT** [3] - 1732:1, 1732:1, 1732:10
**dividing** [1] - 1851:22
**DMV** [4] - 1773:1, 1773:2, 1773:3, 1778:12
**doctor** [1] - 1777:21
**doctoral** [1] - 1750:10
**document** [20] - 1753:18, 1753:21, 1754:11, 1764:16, 1764:20, 1764:23, 1764:25, 1765:1, 1766:3, 1768:16, 1768:18, 1774:2, 1781:19, 1790:2, 1791:10, 1850:19, 1850:25, 1853:2, 1853:3, 1853:5
**documents** [12] - 1754:6, 1774:13, 1774:14, 1775:19, 1776:1, 1776:6, 1776:7, 1776:15, 1849:14, 1851:1, 1858:13
**DOJ** [3] - 1732:13, 1746:25, 1858:18
**Dominican** [2] - 1777:21, 1778:6
**done** [6] - 1767:1, 1851:1, 1851:18, 1853:2, 1855:12, 1855:13
**Douyon** [2] - 1744:19, 1858:13

**down** [10] - 1744:19, 1750:20, 1763:23, 1766:18, 1774:17, 1775:4, 1786:17, 1793:5, 1793:13, 1849:8
**dozens** [2] - 1848:25, 1849:1
**Dr** [20] - 1747:12, 1747:15, 1747:19, 1747:23, 1748:6, 1748:14, 1749:2, 1749:19, 1753:19, 1754:2, 1754:11, 1756:18, 1756:22, 1765:22, 1774:10, 1778:7, 1796:17, 1797:21, 1798:16, 1799:21
**DR** [2] - 1777:20, 1778:5
**draft** [1] - 1754:13
**drafted** [3] - 1753:19, 1754:21, 1756:17
**draw** [1] - 1787:13
**drawn** [1] - 1787:1
**draws** [1] - 1852:16
**dropping** [1] - 1762:16
**duration** [2] - 1769:17, 1770:1
**during** [8] - 1751:16, 1787:8, 1799:22, 1853:21, 1854:6, 1855:11, 1855:21, 1856:10
**duties** [3] - 1745:8, 1854:16, 1854:19
**DXD03.005** [1] - 1747:1
**dynamics** [1] - 1745:9

---

**E**

**e-mail** [6] - 1745:1, 1745:25, 1781:21, 1782:1, 1782:5
**early** [1] - 1787:11
**earth** [1] - 1784:18
**easier** [2] - 1759:25, 1774:24
**easy** [2] - 1749:16, 1751:21
**economist** [3] - 1852:12, 1852:13, 1855:6
**economists** [1] - 1852:12
**edge** [4] - 1789:9, 1789:18, 1789:20,

1789:21

**edges** [1] - 1849:22

**EDWARD** [1] - 1733:6

**effect** [1] - 1769:22

**effective** [6] - 1761:23, 1762:5, 1762:8, 1762:10, 1787:15, 1787:24

**effects** [2] - 1785:2, 1785:4

**efforts** [1] - 1751:9

**either** [2] - 1777:24, 1791:21

**element** [1] - 1771:7

**elements** [1] - 1855:15

**Eleventh** [1] - 1855:17

**elicit** [2] - 1745:15, 1798:1

**elsewhere** [1] - 1852:16

**embarrassing** [1] - 1857:8

**embarrassment** [1] - 1857:10

**embodies** [1] - 1856:7

**emoji** [1] - 1793:22

**emphasized** [1] - 1848:13

**emphasizing** [1] - 1854:14

**employed** [7] - 1848:21, 1848:23, 1850:5, 1850:14, 1851:24, 1852:9, 1852:10

**employee** [16] - 1749:23, 1849:5, 1853:20, 1853:22, 1854:2, 1854:5, 1854:8, 1854:10, 1854:13, 1854:16, 1854:18, 1855:19, 1855:23, 1856:14, 1856:21, 1856:22

**employee's** [2] - 1851:23, 1852:5

**employees** [1] - 1754:24

**employer** [1] - 1854:2

**employer's** [1] - 1855:24

**employment** [7] - 1750:2, 1852:8, 1854:6, 1854:19, 1854:21, 1855:11, 1856:22

**enable** [1] - 1765:7

**encouraging** [1] - 1799:7

**end** [6] - 1748:10,

1749:4, 1782:20, 1791:14, 1848:3, 1858:12

**ending** [9] - 1755:2, 1756:20, 1761:2, 1766:10, 1774:8, 1779:3, 1788:3, 1792:6, 1797:1

**ends** [1] - 1799:17

**engaged** [2] - 1751:15, 1753:4

**engagement** [1] - 1752:16

**engine** [12] - 1751:22, 1755:14, 1756:1, 1765:7, 1765:8, 1777:7, 1777:12, 1777:14, 1777:16, 1780:10, 1780:23, 1798:20

**engineer** [2] - 1748:16, 1749:2

**engineering** [1] - 1756:5

**engineers** [2] - 1761:25, 1780:6

**engines** [1] - 1777:8

**enter** [1] - 1772:17

**entered** [1] - 1775:2

**enters** [1] - 1767:6

**entire** [3] - 1787:21, 1787:22, 1856:5

**entirely** [2] - 1770:25, 1798:8

**entitled** [1] - 1859:5

**equivalent** [1] - 1851:20

**ERIC** [2] - 1734:5, 1748:4

**Eric** [1] - 1748:2

**ERIN** [1] - 1732:16

**Erin** [2] - 1748:1, 1748:14

**erroneous** [1] - 1856:16

**ESQ** [9] - 1732:13, 1732:15, 1732:16, 1732:18, 1733:3, 1733:6, 1733:7, 1733:9

**essentially** [2] - 1856:14, 1858:2

**establish** [1] - 1855:10, 1855:14

**estimate** [1] - 1765:17

**et** [1] - 1732:3

**evaluate** [1] - 1779:24

**evaluates** [1] - 1777:6

**evaluating** [1] - 1783:17

**evaluation** [4] - 1779:22, 1780:17, 1783:12, 1799:2

**evaluations** [1] - 1855:21

**events** [1] - 1752:20

**evidence** [6] - 1746:15, 1848:11, 1853:15, 1855:19, 1855:23, 1857:20

**evolved** [1] - 1786:6

**evolving** [1] - 1753:8

**EXAMINATION** [2] - 1744:24, 1748:12

**Examination............** [1] - 1734:3

**Examination............** [1] - 1734:4

**Examination............** [1] - 1734:5

**Examination............** . [2] - 1734:3, 1734:5

**example** [11] - 1758:4, 1758:7, 1764:16, 1765:9, 1765:16, 1769:18, 1773:5, 1775:15, 1777:22, 1779:8, 1785:9

**examples** [5] - 1756:7, 1765:14, 1773:19, 1785:15, 1785:17

**except** [1] - 1797:8

**exception** [2] - 1856:7, 1856:8

**exceptions** [1] - 1776:12

**excerpts** [2] - 1747:12, 1853:13

**excluded** [4] - 1852:8, 1856:12, 1856:19, 1857:5

**excludible** [1] - 1857:3

**exclusion** [1] - 1856:20

**excuse** [1] - 1854:23

**exemption** [1] - 1853:18

**exhibit** [2] - 1745:24, 1746:24

**Exhibit** [5] - 1745:1, 1745:23, 1848:5, 1848:9, 1848:15

**exhibits** [1] - 1747:9

**EXHIBITS** [1] - 1734:8

**existence** [1] - 1854:6

**exists** [1] - 1775:8

**expect** [1] - 1748:7

**experience** [2] - 1755:11, 1856:2

**experiment** [4] - 1780:13, 1780:20, 1780:22, 1781:3

**experimentation** [1] - 1780:15

**experiments** [1] - 1786:15

**expert** [1] - 1772:5

**expertise** [1] - 1772:7

**expires** [1] - 1858:6

**explain** [5] - 1751:17, 1764:7, 1769:4, 1788:7, 1794:4

**explaining** [2] - 1758:18, 1758:20

**expose** [1] - 1780:24

**extent** [5] - 1747:2, 1747:4, 1750:2, 1783:14, 1852:21

**externally** [1] - 1797:10

**extract** [1] - 1758:23

**extreme** [1] - 1794:21

**F**

**F.3d** [1] - 1852:2

**face** [2] - 1767:16, 1793:7

**faced** [1] - 1766:16

**fact** [4] - 1785:13, 1848:23, 1852:16, 1858:1

**factor** [1] - 1855:25

**facts** [3] - 1785:8, 1788:23, 1854:20

**factual** [1] - 1850:8

**fair** [8] - 1752:10, 1752:14, 1759:9, 1775:11, 1775:13, 1776:3, 1783:19, 1795:23

**fairly** [6] - 1751:14, 1765:13, 1769:8, 1769:17, 1772:6, 1777:21

**fall** [4] - 1773:22, 1849:4, 1854:15, 1855:9

**false** [2] - 1755:24, 1756:1

**familiar** [10] - 1751:6, 1751:8, 1751:9, 1751:11, 1751:12, 1751:14, 1765:24, 1766:8, 1772:8, 1776:20

**family** [1] - 1749:9

**far** [2] - 1795:22, 1850:2

**fast** [4] - 1758:8, 1760:15, 1774:18, 1789:22

**fast-changing** [1] - 1758:8

**father** [1] - 1749:11

**feature** [2] - 1781:1, 1790:13

**features** [5] - 1755:22, 1755:23, 1788:19, 1788:22, 1788:24

**Federal** [1] - 1853:15

**feedback** [4] - 1752:10, 1752:12, 1756:8, 1799:1

**feeding** [1] - 1771:20

**feeds** [1] - 1793:19

**few** [6] - 1761:13, 1764:7, 1780:2, 1783:8, 1784:25, 1853:13

**field** [1] - 1789:21

**Fifth** [1] - 1732:17

**fifth** [2] - 1849:9, 1850:17

**figure** [5] - 1751:21, 1758:6, 1773:11, 1773:13, 1778:1

**filed** [1] - 1848:20

**final** [1] - 1761:22

**finally** [3] - 1854:12, 1856:18, 1856:24

**finance** [11] - 1745:4, 1745:22, 1763:22, 1789:24, 1849:1, 1849:18, 1849:25, 1855:1, 1855:7, 1856:5

**Finance** [1] - 1855:8

**financial** [4] - 1749:25, 1849:24, 1852:15, 1852:24

**fine** [2] - 1747:24, 1752:25

**finger** [1] - 1770:21

**finish** [1] - 1776:24

**first** [12] - 1754:6, 1756:15, 1758:12, 1767:16, 1767:24, 1782:12, 1784:20, 1791:4, 1791:7, 1796:15, 1850:14, 1850:16

**five** [3] - 1744:20, 1752:2, 1769:24

**Floor** [1] - 1733:11

**flow** [6] - 1756:25, 1758:13, 1762:17, 1774:9, 1776:14

**flowing** [2] - 1767:3,

1767:4
**flows** [2] - 1761:9, 1775:7
**focus** [1] - 1848:19
**focused** [3] - 1848:18, 1849:7, 1849:10
**focuses** [1] - 1848:19
**follow** [1] - 1796:1
**following** [4] - 1735:3, 1756:10, 1756:12, 1800:1
**football** [1] - 1778:14
**FOR** [2] - 1732:1, 1748:4
**force** [1] - 1855:21
**foregoing** [1] - 1859:3
**forever** [1] - 1768:21
**form** [1] - 1747:9
**former** [1] - 1850:12
**forth** [1] - 1849:2
**forward** [1] - 1744:22
**four** [6] - 1760:25, 1767:21, 1767:23, 1850:15, 1850:16, 1857:18
**front** [2] - 1754:11, 1765:22
**full** [2] - 1783:18, 1784:6
**function** [2] - 1775:8, 1789:19
**fundamentals** [1] - 1855:4
**fuzzy** [3] - 1782:24, 1783:24, 1783:25

## G

**game** [2] - 1778:14, 1780:6
**games** [1] - 1780:8
**gather** [1] - 1780:24
**Gekko** [1] - 1851:16
**general** [4] - 1758:23, 1770:2, 1778:16, 1854:16
**generalize** [1] - 1786:8
**generally** [12] - 1751:8, 1751:11, 1759:11, 1759:21, 1762:15, 1764:10, 1769:14, 1773:13, 1775:9, 1780:11, 1792:16, 1852:10
**get-together** [1] - 1791:23
**given** [3] - 1751:20, 1776:7, 1853:25
**glamorous** [1] -

1787:20
**Glue** [1] - 1753:7
**goal** [3] - 1781:10, 1781:11, 1794:3
**Goodrich** [1] - 1733:10
**GOOGLE** [1] - 1732:6
**Google** [146] - 1745:4, 1745:5, 1745:22, 1748:5, 1748:16, 1749:3, 1749:4, 1749:5, 1749:7, 1749:19, 1749:21, 1749:22, 1749:23, 1750:5, 1750:12, 1751:4, 1752:22, 1753:4, 1753:14, 1753:17, 1754:13, 1754:16, 1754:17, 1754:24, 1755:8, 1755:10, 1756:5, 1757:1, 1757:5, 1757:12, 1757:14, 1757:15, 1757:19, 1757:23, 1757:25, 1758:2, 1758:5, 1758:19, 1758:21, 1759:12, 1759:21, 1760:6, 1760:11, 1760:13, 1760:25, 1761:16, 1761:19, 1761:25, 1762:2, 1762:5, 1762:8, 1762:11, 1762:13, 1762:14, 1762:16, 1762:18, 1762:19, 1762:20, 1762:23, 1763:8, 1763:11, 1763:13, 1763:14, 1763:16, 1763:17, 1763:18, 1763:20, 1763:21, 1763:25, 1764:5, 1764:19, 1765:1, 1765:13, 1766:21, 1767:1, 1767:2, 1767:5, 1767:7, 1767:12, 1768:5, 1768:10, 1768:15, 1768:19, 1768:20, 1769:8, 1771:9, 1771:10, 1771:12, 1771:20, 1771:21, 1774:4, 1774:6, 1774:20, 1775:2, 1776:1, 1777:6, 1778:1, 1778:3, 1779:13, 1779:15, 1779:25, 1780:3, 1780:24, 1781:8, 1786:7,

1786:18, 1787:16, 1787:25, 1789:1, 1789:12, 1789:24, 1790:4, 1792:14, 1792:15, 1792:23, 1793:2, 1793:4, 1795:12, 1795:14, 1795:23, 1796:17, 1797:10, 1797:12, 1797:18, 1797:22, 1798:6, 1798:23, 1798:25, 1799:8, 1848:6, 1848:16, 1848:21, 1848:24, 1849:10, 1849:19, 1850:14, 1855:8, 1855:12, 1855:13, 1855:16, 1856:3, 1857:11
**Google's** [13] - 1751:6, 1751:9, 1751:12, 1752:15, 1759:8, 1761:5, 1762:24, 1763:6, 1767:3, 1767:4, 1798:5, 1798:8, 1798:16
**Google-sponsored** [2] - 1849:19, 1855:12
**google.com** [1] - 1763:12
**Gordon** [1] - 1851:15
**government** [12] - 1848:9, 1848:19, 1848:23, 1848:24, 1849:2, 1849:7, 1850:5, 1850:15, 1850:17, 1850:21, 1850:24, 1851:18
**GOVERNMENT** [1] - 1748:4
**government's** [1] - 1851:10
**grant** [1] - 1854:23
**grants** [1] - 1749:24
**graphic** [12] - 1755:3, 1755:6, 1755:24, 1756:22, 1756:24, 1757:11, 1760:24, 1766:8, 1766:10, 1766:13, 1766:15, 1766:22
**great** [3] - 1780:6, 1780:8, 1789:6
**green** [3] - 1793:7, 1793:9, 1793:13
**grossly** [1] - 1789:24
**grounds** [1] - 1848:12
**group** [2] - 1750:20,

1753:8
**groups** [1] - 1849:1
**guess** [22] - 1745:23, 1749:15, 1750:3, 1764:1, 1764:9, 1764:12, 1766:25, 1767:2, 1771:14, 1773:1, 1786:1, 1789:14, 1790:16, 1790:24, 1790:25, 1796:7, 1796:10, 1796:14, 1797:13, 1848:14
**guide** [2] - 1780:7, 1786:14
**guiding** [1] - 1851:21
**guy** [1] - 1766:25
**guys** [1] - 1799:10

## H

**HAFENBRACK** [4] - 1732:15, 1746:8, 1746:14, 1746:21
**half** [2] - 1754:6, 1848:19
**hand** [1] - 1785:16
**handful** [2] - 1855:16
**hands** [2] - 1791:17, 1791:19
**happier** [1] - 1794:2
**happy** [11] - 1769:21, 1791:11, 1793:10, 1793:23, 1793:25, 1794:16, 1794:25, 1795:3, 1795:8, 1796:2
**hard** [1] - 1785:14
**harm** [1] - 1856:17
**hat** [1] - 1757:3
**hats** [3] - 1757:5, 1760:25, 1761:7
**hazy** [1] - 1758:9
**head** [3] - 1745:4, 1855:8
**heard** [13] - 1764:4, 1765:9, 1769:1, 1773:22, 1792:17, 1792:22, 1792:24, 1793:1, 1848:6, 1848:15, 1848:22, 1848:25, 1852:12
**hearsay** [3] - 1850:20, 1851:3, 1854:4
**heart** [1] - 1849:3
**heavily** [3] - 1751:15, 1753:2, 1753:4
**help** [5] - 1763:14, 1763:18, 1764:24, 1765:14, 1773:15,

1775:10, 1784:4, 1785:4, 1785:25
**helps** [2] - 1773:9, 1778:1
**high** [8] - 1775:22, 1777:8, 1777:9, 1777:12, 1777:13, 1777:14, 1777:15, 1784:17
**high-quality** [4] - 1777:8, 1777:9, 1777:12, 1777:14
**high-resolution** [1] - 1784:17
**higher** [1] - 1779:17
**highlighted** [2] - 1767:17, 1776:9
**hint** [2] - 1752:1, 1752:6
**hired** [4] - 1850:12, 1850:13, 1851:23
**hold** [1] - 1746:18
**holding** [1] - 1755:14
**home** [3] - 1746:10, 1749:11, 1788:2
**Honor** [39] - 1744:23, 1745:12, 1745:16, 1746:5, 1746:8, 1746:14, 1746:17, 1746:21, 1746:25, 1747:2, 1747:9, 1747:21, 1747:25, 1748:1, 1753:20, 1759:15, 1791:9, 1797:20, 1798:3, 1798:10, 1799:18, 1848:8, 1848:14, 1848:15, 1848:22, 1848:25, 1849:8, 1849:14, 1850:3, 1850:23, 1851:3, 1851:4, 1851:5, 1851:25, 1852:12, 1853:17, 1858:17, 1858:18, 1858:19
**HONORABLE** [1] - 1732:10
**hook** [1] - 1850:18
**hope** [2] - 1748:10, 1780:11
**hopefully** [1] - 1760:10
**housekeeping** [1] - 1857:25
**hover** [1] - 1771:4
**hovers** [3] - 1771:4, 1771:6, 1771:14
**huge** [1] - 1789:24
**human** [1] - 1779:22
**hundred** [1] - 1761:13

**hundreds** [1] - 1784:25

**I**

**idea** [3] - 1751:19, 1778:16, 1795:18
**identifying** [1] - 1778:3
**Illinois** [1] - 1732:20
**image** [1] - 1755:19
**imagine** [1] - 1794:21
**importance** [3] - 1758:18, 1758:20, 1794:9
**important** [7] - 1777:15, 1777:18, 1778:10, 1778:18, 1787:20, 1789:15, 1795:8
**importantly** [1] - 1854:20
**impression** [1] - 1772:6
**improve** [5] - 1751:10, 1759:2, 1759:8, 1762:19, 1762:24
**improvements** [1] - 1760:17
**improving** [1] - 1794:24
**inadmissible** [1] - 1857:1
**inapposite** [1] - 1855:18
**included** [1] - 1799:4
**includes** [2] - 1755:17, 1756:25
**including** [1] - 1782:6
**inclusive** [1] - 1765:19
**incomplete** [3] - 1756:1, 1783:12
**increase** [1] - 1780:11
**indexing** [2] - 1774:17, 1775:18
**indicate** [1] - 1855:24
**indication** [1] - 1856:21
**indicia** [2] - 1855:10, 1855:14
**indirect** [1] - 1790:25
**indirectly** [2] - 1790:20, 1791:3
**individual** [2] - 1759:7, 1856:9
**individuals** [1] - 1745:11
**inferences** [3] - 1760:7, 1760:11, 1760:13

**information** [24] - 1745:15, 1756:25, 1758:13, 1761:9, 1763:15, 1763:19, 1764:14, 1774:20, 1774:23, 1775:10, 1777:24, 1779:16, 1779:21, 1781:5, 1781:9, 1783:11, 1783:16, 1783:20, 1785:25, 1786:16, 1794:23, 1794:25, 1852:24, 1855:23
**informed** [7] - 1793:10, 1793:23, 1794:18, 1795:1, 1795:9, 1795:12, 1796:3
**inhibited** [1] - 1856:15
**insight** [1] - 1780:25
**insistence** [1] - 1854:2
**instances** [1] - 1783:8
**instead** [5] - 1744:21, 1753:10, 1768:5, 1778:6, 1854:3
**intended** [2] - 1848:14, 1851:15
**intent** [5] - 1765:7, 1772:13, 1773:10, 1773:11, 1773:13
**intents** [6] - 1772:2, 1772:4, 1772:9, 1772:10, 1772:22, 1773:17
**interact** [6] - 1758:14, 1781:2, 1781:13, 1783:3, 1784:21, 1795:14
**interacting** [1] - 1771:11
**interaction** [25] - 1751:12, 1751:15, 1751:17, 1752:5, 1752:7, 1752:9, 1752:11, 1752:15, 1752:21, 1752:23, 1753:1, 1753:5, 1753:11, 1757:9, 1757:11, 1758:9, 1758:10, 1765:2, 1765:25, 1766:13, 1767:15, 1767:25, 1768:3, 1771:2
**interactions** [16] - 1765:15, 1767:18, 1767:21, 1770:12, 1770:17, 1771:8, 1771:15, 1793:10, 1793:23, 1794:19,

1795:2, 1795:10, 1795:12, 1795:15, 1795:24, 1796:4
**interest** [2] - 1745:13, 1749:25
**Internet** [1] - 1774:15
**interpretation** [2] - 1771:22, 1775:17
**interpreting** [2] - 1775:9, 1795:18
**interprets** [2] - 1764:19, 1775:5
**invited** [2] - 1791:20, 1791:21
**involve** [1] - 1757:24
**involved** [5] - 1774:7, 1849:13, 1849:20, 1855:20, 1856:25
**involves** [1] - 1759:23
**involving** [1] - 1785:10
**irrelevant** [1] - 1851:2
**IS** [17] - 1779:21, 1780:4, 1780:11, 1781:5, 1781:8, 1782:18, 1783:2, 1783:9, 1783:24, 1784:6, 1784:8, 1784:12, 1784:25, 1785:13, 1786:9, 1786:11, 1786:14
**IS4** [2] - 1779:16, 1779:20
**Israel** [4] - 1747:12, 1747:15, 1747:19, 1747:23
**issue** [4] - 1799:8, 1799:15, 1848:5, 1854:20
**issued** [1] - 1855:14
**issues** [1] - 1797:14
**items** [1] - 1848:4
**itself** [4] - 1783:12, 1783:18, 1783:20, 1784:6

**J**

**jam** [1] - 1853:6
**Japan** [3] - 1745:1, 1745:4, 1746:3
**job** [7] - 1749:10, 1776:21, 1787:19, 1787:20, 1851:12, 1852:5, 1854:11
**JOHN** [1] - 1733:6
**JOSHUA** [1] - 1732:15
**JR** [1] - 1733:3
**judge** [1] - 1746:24
**JUDGE** [1] - 1732:10

**judicial** [1] - 1858:5
**Justice** [3] - 1732:13, 1732:16, 1732:19
**juxtaposed** [1] - 1850:10

**K**

**Ken** [1] - 1749:15
**KENNETH** [2] - 1732:13, 1733:7
**key** [1] - 1758:12
**keyboard** [1] - 1755:7
**kind** [6] - 1753:7, 1764:11, 1764:15, 1782:4, 1795:20, 1795:21
**kinds** [2] - 1755:20, 1788:25
**kitten** [2] - 1785:12, 1785:19
**knowing** [1] - 1773:14
**knowledge** [3] - 1761:12, 1788:23, 1849:21
**knowledgeable** [1] - 1854:9
**knows** [3] - 1799:8, 1799:12, 1799:16

**L**

**L-e-h-m-a-n** [1] - 1748:24
**labeled** [4] - 1755:11, 1755:13, 1757:9, 1766:19
**language** [6] - 1772:13, 1783:14, 1785:8, 1785:21, 1792:7, 1793:17
**large** [1] - 1785:16
**largest** [1] - 1750:20
**LaSalle** [1] - 1732:19
**last** [5] - 1755:25, 1758:22, 1773:22, 1787:14, 1857:25
**late** [1] - 1787:11
**latter** [1] - 1850:12
**law** [2] - 1853:24, 1854:1
**lax** [1] - 1849:25
**LE** [4] - 1780:14, 1781:5, 1781:8, 1786:11
**lead** [3] - 1745:22, 1794:2, 1851:10
**leads** [1] - 1779:14
**learn** [6] - 1757:21, 1761:23, 1783:14,

1785:1, 1785:13, 1786:4
**learned** [2] - 1762:6, 1783:9
**learning** [15] - 1757:14, 1757:15, 1757:18, 1757:20, 1757:22, 1757:24, 1758:3, 1786:4, 1786:7, 1788:13, 1789:9, 1789:13, 1789:15, 1789:18, 1789:20
**learns** [5] - 1761:25, 1762:2, 1762:8, 1762:11, 1788:13
**least** [2] - 1779:15, 1851:12
**leave** [2] - 1749:7, 1857:21
**left** [9] - 1749:5, 1750:19, 1755:7, 1766:15, 1768:19, 1775:1, 1779:15, 1780:3
**LEHMAN** [2] - 1734:5, 1748:4
**Lehman** [19] - 1748:3, 1748:14, 1748:22, 1748:24, 1749:2, 1749:19, 1753:19, 1754:2, 1754:11, 1756:18, 1756:22, 1765:22, 1774:10, 1787:6, 1791:16, 1796:17, 1797:21, 1798:16, 1799:21
**Lehman's** [1] - 1748:6
**lengths** [1] - 1768:17
**less** [3] - 1760:18, 1769:15, 1790:10
**letter** [1] - 1856:13
**level** [1] - 1775:22
**leverage** [1] - 1789:13
**lies** [1] - 1797:15
**life** [2] - 1765:2, 1765:25
**likelihood** [1] - 1857:9
**likely** [2] - 1778:5, 1854:8
**limited** [1] - 1854:8
**line** [4] - 1744:21, 1755:25, 1851:22, 1858:8
**lines** [1] - 1758:12
**link** [1] - 1858:2
**links** [6] - 1755:17, 1755:19, 1765:16, 1782:8, 1782:10
**list** [1] - 1773:19

**listed** [3] - 1767:24, 1770:23, 1779:7
**literally** [1] - 1770:20
**live** [4] - 1780:13, 1780:20, 1781:3, 1786:15
**LLC** [1] - 1732:6
**LLP** [2] - 1733:3, 1733:7
**local** [1] - 1773:6
**localization** [1] - 1778:24
**localized** [2] - 1778:9, 1778:11
**location** [6] - 1772:23, 1772:24, 1773:9, 1773:12, 1773:14, 1778:17
**log** [3] - 1758:22, 1771:14, 1795:14
**logged** [6] - 1752:20, 1757:16, 1766:21, 1767:5, 1771:12, 1771:20
**logging** [8] - 1757:12, 1777:2, 1786:22, 1786:25, 1787:9, 1787:15, 1787:18, 1787:24
**logs** [10] - 1757:11, 1761:20, 1767:7, 1786:5, 1788:4, 1788:13, 1789:7, 1789:25, 1795:12
**look** [12] - 1752:17, 1766:22, 1770:4, 1773:6, 1777:20, 1781:19, 1784:1, 1784:5, 1794:12, 1849:18, 1853:12, 1857:7
**looked** [3] - 1756:24, 1778:19, 1788:11
**looking** [9] - 1745:24, 1761:14, 1768:9, 1768:10, 1768:12, 1773:15, 1777:20, 1778:7, 1795:25
**looks** [4] - 1766:8, 1781:25, 1850:19, 1851:25
**loop** [1] - 1761:10
**lost** [1] - 1853:3
**low** [1] - 1783:3
**low-resolution** [1] - 1783:3
**lower** [1] - 1795:21

# M

**machine** [10] - 1757:22, 1757:24, 1758:3, 1786:4, 1786:7, 1789:9, 1789:12, 1789:15, 1789:18, 1789:20
**macroeconomic** [1] - 1849:12
**magic** [10] - 1756:2, 1756:6, 1757:3, 1757:5, 1760:25, 1761:5, 1761:7, 1786:18, 1792:18, 1792:21
**magical** [3] - 1753:17, 1754:14, 1754:16
**mail** [6] - 1745:1, 1745:25, 1781:21, 1782:1, 1782:5
**main** [1] - 1788:14
**Maine** [1] - 1733:8
**managed** [2] - 1750:17, 1750:20
**management** [2] - 1750:20, 1855:24
**manipulate** [2] - 1798:20, 1798:23
**maps** [2] - 1755:20, 1755:21
**master's** [1] - 1750:8
**match** [1] - 1852:4
**materials** [1] - 1746:19
**matter** [10] - 1852:4, 1852:8, 1853:23, 1854:5, 1856:11, 1856:21, 1857:25, 1859:5
**matters** [8] - 1777:20, 1787:20, 1787:21, 1787:23, 1796:20, 1854:10, 1854:15, 1854:21
**maximize** [2] - 1780:4, 1780:9
**maximizing** [1] - 1780:7
**MBA** [1] - 1855:7
**mean** [13] - 1752:24, 1753:11, 1764:2, 1764:10, 1768:10, 1772:15, 1773:4, 1773:11, 1778:11, 1790:16, 1797:16, 1849:18, 1855:10
**meaning** [3] - 1764:11, 1764:13, 1764:15

**meaningful** [1] - 1794:20
**meaningless** [1] - 1794:23
**meanings** [1] - 1771:1
**means** [7] - 1757:18, 1775:10, 1780:23, 1785:4, 1791:19, 1793:25
**measure** [5] - 1779:13, 1779:16, 1781:10, 1781:11, 1781:15
**measures** [1] - 1767:25
**measuring** [3] - 1783:22, 1784:8, 1785:23
**mechanism** [1] - 1788:14
**media** [1] - 1769:22
**meet** [1] - 1855:15
**meeting** [3] - 1779:14, 1781:16, 1791:25
**meets** [4] - 1775:18, 1854:24, 1857:6, 1857:17
**MEHTA** [1] - 1732:10
**members** [3] - 1791:19, 1791:20, 1792:3
**memo** [1] - 1852:16
**mentioned** [3] - 1753:2, 1780:13, 1788:22
**message** [1] - 1798:22
**met** [1] - 1857:3
**methods** [1] - 1779:20
**metric** [16] - 1779:11, 1779:16, 1779:17, 1779:21, 1780:13, 1780:14, 1780:15, 1781:5, 1783:6, 1783:12, 1783:16, 1783:22, 1784:6, 1784:8
**metrics** [8] - 1780:7, 1780:9, 1781:10, 1781:11, 1781:15, 1785:22, 1786:11
**MICHAEL** [2] - 1733:9, 1734:3
**microeconomic** [1] - 1849:12
**middle** [4] - 1771:16, 1775:17, 1782:4, 1789:5
**might** [10] - 1752:4, 1752:17, 1752:18, 1753:24, 1764:20,

1765:16, 1773:11, 1778:2, 1784:4, 1796:19
**Miller** [2] - 1853:13, 1853:18
**million** [1] - 1782:18
**minute** [1] - 1766:22
**minutes** [4] - 1744:20, 1769:11, 1769:24, 1791:10
**misinterpreted** [1] - 1783:13
**misspelling** [1] - 1758:5
**misspellings** [1] - 1758:7
**Mister** [1] - 1856:24
**misunderstanding** [1] - 1765:11
**MIT** [2] - 1750:8, 1750:10
**mobile** [5] - 1771:25, 1772:2, 1772:4, 1772:16, 1773:16
**mock** [2] - 1855:2, 1855:3
**modeling** [1] - 1852:15
**models** [2] - 1793:17, 1795:6
**moment** [1] - 1765:5
**money** [2] - 1763:20, 1788:4
**morning** [4] - 1748:14, 1857:24, 1858:10, 1858:15
**most** [14] - 1751:14, 1753:4, 1757:21, 1761:23, 1762:5, 1762:7, 1762:10, 1777:18, 1780:2, 1780:3, 1787:19, 1789:8, 1850:4, 1854:8
**mouse** [5] - 1770:20, 1771:4, 1771:5, 1771:6, 1771:14
**move** [1] - 1773:21
**moved** [3] - 1789:21, 1848:9, 1848:12
**moves** [1] - 1746:15
**MR** [33] - 1744:23, 1744:25, 1745:12, 1745:16, 1745:18, 1746:5, 1746:8, 1746:14, 1746:17, 1746:21, 1746:24, 1747:2, 1747:5, 1747:8, 1747:12, 1747:15, 1747:21,

1747:24, 1747:25, 1749:16, 1753:20, 1797:20, 1798:10, 1848:8, 1849:6, 1850:3, 1851:9, 1852:6, 1853:10, 1853:17, 1858:17, 1858:18, 1859:19
**MS** [25] - 1748:1, 1748:5, 1748:10, 1748:13, 1748:20, 1748:21, 1749:1, 1749:17, 1749:18, 1751:1, 1753:22, 1754:1, 1756:16, 1759:15, 1759:16, 1765:21, 1779:3, 1779:6, 1787:5, 1791:9, 1791:15, 1798:3, 1798:4, 1798:15, 1799:17
**multiple** [11] - 1759:11, 1759:21, 1760:4, 1760:5, 1760:7, 1790:3, 1790:4, 1790:15, 1790:17, 1792:24, 1793:3
**MURDOCK** [26] - 1732:16, 1748:1, 1748:5, 1748:10, 1748:13, 1748:20, 1748:21, 1749:1, 1749:17, 1749:18, 1751:1, 1753:22, 1754:1, 1756:16, 1759:15, 1759:16, 1765:21, 1779:3, 1779:6, 1787:5, 1791:9, 1791:15, 1798:3, 1798:4, 1798:15, 1799:17
**Murdock** [2] - 1748:2, 1748:14
**MURDOCK-PACK** [1] - 1732:16
**MURDOCK-PARK** [25] - 1748:1, 1748:5, 1748:10, 1748:13, 1748:20, 1748:21, 1749:1, 1749:17, 1749:18, 1751:1, 1753:22, 1754:1, 1756:16, 1759:15, 1759:16, 1765:21, 1779:3, 1779:6, 1787:5, 1791:9, 1791:15, 1798:3, 1798:4, 1798:15, 1799:17

**Murdock-Park** [2] - 1748:2, 1748:14
**must** [4] - 1853:24, 1854:1, 1854:15, 1854:20

# N

**name** [3] - 1748:14, 1748:19, 1748:22
**names** [1] - 1753:6
**naming** [1] - 1790:16
**narrow** [2] - 1758:23, 1852:15
**nature** [1] - 1780:25
**Navboost** [1] - 1753:7
**Nayak** [1] - 1751:2
**near** [1] - 1793:9
**Nebraska** [1] - 1733:3
**necessarily** [2] - 1768:3, 1787:19
**need** [8] - 1745:23, 1759:18, 1763:2, 1797:8, 1854:18, 1855:6, 1858:12, 1858:16
**needed** [1] - 1756:8
**needs** [6] - 1756:5, 1779:14, 1781:17, 1788:7, 1795:23, 1795:24
**never** [1] - 1768:21
**nevertheless** [1] - 1854:24
**new** [2] - 1781:1, 1789:12
**New** [5] - 1733:5, 1733:11, 1773:5
**next** [9] - 1746:13, 1746:20, 1746:22, 1748:3, 1748:11, 1760:23, 1776:8, 1784:3, 1784:13
**noisy** [1] - 1770:1
**nonhearsay** [2] - 1850:20, 1850:22
**nonvoluntary** [1] - 1855:22
**Northwest** [3] - 1732:14, 1732:17, 1733:13
**Norton's** [2] - 1773:6
**note** [1] - 1855:16
**noted** [1] - 1787:1
**notes** [10] - 1755:25, 1758:12, 1761:4, 1761:22, 1787:3, 1787:14, 1789:4, 1789:5, 1789:17, 1856:6

**nothing** [1] - 1745:12
**notice** [1] - 1754:2
**November** [1] - 1749:5
**Number** [1] - 1732:3
**number** [7] - 1753:24, 1764:22, 1769:19, 1769:20, 1770:15, 1779:2, 1779:18

# O

**objection** [3] - 1747:3, 1747:13, 1854:4
**Objection** [1] - 1746:17
**obscure** [2] - 1799:15, 1799:16
**observation** [1] - 1752:15
**obviously** [4] - 1762:8, 1797:17, 1848:10, 1855:5
**occasionally** [1] - 1799:10
**occurred** [2] - 1735:3, 1800:1
**OF** [5] - 1732:1, 1732:3, 1732:9, 1859:1, 1859:9
**off-site** [1] - 1855:12
**offer** [1] - 1851:19
**offered** [3] - 1747:3, 1747:4, 1850:10
**offering** [2] - 1747:5, 1747:8
**OFFICIAL** [1] - 1859:1
**Official** [1] - 1733:13
**often** [4] - 1755:23, 1772:3, 1772:5, 1786:15
**Ohio** [1] - 1778:14
**older** [1] - 1789:12
**once** [2] - 1776:1, 1776:25
**one** [29] - 1746:24, 1747:12, 1750:17, 1752:4, 1752:5, 1753:25, 1755:6, 1758:4, 1760:9, 1760:15, 1762:2, 1762:21, 1764:18, 1767:16, 1769:7, 1771:1, 1771:13, 1773:7, 1773:9, 1777:15, 1787:7, 1788:12, 1789:6, 1792:3, 1794:16, 1849:1, 1849:7, 1852:11, 1857:25
**ones** [2] - 1789:8,

1849:9
**open** [5] - 1748:7, 1754:3, 1754:9, 1768:25, 1848:4
**opponent** [2] - 1848:16, 1848:17
**opportunity** [1] - 1747:19
**opposed** [1] - 1768:15
**optimizers** [1] - 1798:20
**orange** [2] - 1793:19, 1793:22, 1795:16
**order** [5] - 1735:2, 1747:16, 1776:11, 1785:2, 1785:4
**ordered** [2] - 1776:11, 1851:6
**ought** [1] - 1857:22
**outcome** [1] - 1749:25
**outer** [2] - 1849:22, 1854:24
**outright** [1] - 1799:6
**Outside** [1] - 1854:12
**outside** [7] - 1780:1, 1790:8, 1790:12, 1790:13, 1790:19, 1855:9
**outweighed** [1] - 1857:11
**overnight** [3] - 1747:1, 1857:23, 1858:15
**overview** [1] - 1773:22
**own** [5] - 1749:21, 1749:22, 1797:11, 1798:21, 1799:13

# P

**p.m** [5] - 1732:6, 1781:21, 1799:25, 1858:22
**Pacific** [3] - 1745:6, 1745:7, 1745:22
**PACK** [1] - 1732:16
**packaged** [1] - 1776:15
**packaging** [2] - 1776:15, 1776:16
**packer** [2] - 1776:19, 1776:21
**page** [37] - 1751:20, 1751:22, 1752:1, 1755:15, 1755:16, 1765:10, 1765:17, 1765:18, 1767:9, 1768:9, 1768:11, 1768:12, 1768:15, 1771:7, 1771:11, 1771:16, 1773:24,

1774:12, 1776:22, 1776:25, 1781:20, 1781:21, 1781:22, 1781:24, 1781:25, 1782:3, 1782:4, 1782:6, 1782:8, 1782:11, 1787:3, 1794:11, 1794:12, 1794:22, 1795:11
**pages** [3] - 1751:25, 1794:6, 1794:17
**pallet** [1] - 1755:11
**Pandu** [1] - 1751:2
**paragraph** [3] - 1783:2, 1783:7, 1784:24
**paragraphs** [1] - 1853:14
**PARK** [25] - 1748:1, 1748:5, 1748:10, 1748:13, 1748:20, 1748:21, 1749:1, 1749:17, 1749:18, 1751:1, 1753:22, 1754:1, 1756:16, 1759:15, 1759:16, 1765:21, 1779:3, 1779:6, 1787:5, 1791:9, 1791:15, 1798:3, 1798:4, 1798:15, 1799:17
**Park** [2] - 1748:2, 1748:14
**part** [6] - 1749:23, 1757:18, 1782:4, 1788:19, 1851:17, 1852:17
**particular** [4] - 1764:22, 1782:3, 1850:11, 1854:20
**parties** [2] - 1858:3, 1858:4
**parts** [8] - 1768:14, 1787:1, 1789:1, 1790:4, 1849:13, 1850:23, 1852:17
**party** [3] - 1848:16, 1848:17, 1853:20
**past** [1] - 1780:2
**paths** [2] - 1775:7, 1775:21
**pattern** [1] - 1784:24
**patterns** [2] - 1758:24, 1783:8
**Patterson** [1] - 1733:3
**paying** [1] - 1779:24
**payments** [1] - 1779:25
**pension** [2] - 1749:19, 1749:20

**people** [35] - 1745:8, 1750:18, 1751:25, 1752:24, 1753:8, 1758:5, 1758:14, 1762:13, 1762:15, 1763:14, 1763:17, 1763:18, 1763:20, 1764:9, 1768:22, 1778:16, 1779:24, 1780:10, 1780:12, 1783:3, 1784:21, 1785:8, 1785:10, 1785:17, 1792:14, 1794:9, 1794:17, 1794:19, 1795:10, 1795:14, 1796:2, 1797:9, 1798:20, 1799:10, 1799:15
**people's** [3] - 1772:22, 1781:17, 1794:15
**percentage** [1] - 1780:21
**perfect** [1] - 1783:23
**performance** [1] - 1855:21
**performing** [1] - 1854:18
**perimeter** [1] - 1854:24
**period** [2] - 1768:20, 1856:10
**periodically** [1] - 1749:24
**peripheral** [1] - 1750:16
**permitted** [1] - 1858:5
**person** [11] - 1751:21, 1752:3, 1752:6, 1755:14, 1763:22, 1766:25, 1767:1, 1768:8, 1798:18, 1852:14
**person's** [2] - 1773:14
**perspectives** [1] - 1786:13
**Perth** [1] - 1773:7
**Ph.D** [2] - 1750:8, 1750:22
**phone** [4] - 1755:14, 1769:20, 1772:16, 1793:7
**photocopies** [1] - 1858:14
**phrase** [1] - 1772:10
**physical** [1] - 1772:24
**Pichai** [2] - 1797:4, 1797:7
**pickle** [1] - 1853:6
**picture** [11] - 1760:19, 1782:24, 1783:3,

**preparation** [1] - 1747:20
**prepare** [1] - 1774:18
**prepared** [4] - 1747:11, 1747:18, 1787:4, 1787:6
**preponderance** [1] - 1848:10
**prerules** [1] - 1856:8
**presentation** [14] - 1754:13, 1755:1, 1756:8, 1756:9, 1756:10, 1756:12, 1756:13, 1756:17, 1787:2, 1787:9, 1792:19, 1792:21, 1855:2, 1855:3
**presented** [5] - 1753:21, 1754:24, 1774:4, 1774:6, 1851:5
**presenting** [1] - 1756:15
**presumably** [1] - 1855:12
**pretty** [10] - 1751:21, 1758:7, 1759:14, 1760:15, 1761:14, 1764:1, 1770:1, 1799:8, 1849:25, 1850:1
**preview** [1] - 1794:10
**previews** [9] - 1792:7, 1793:20, 1794:5, 1794:9, 1794:16, 1794:24, 1795:17, 1796:1, 1796:10
**previously** [2] - 1745:19, 1773:22
**primary** [1] - 1779:15
**principal** [2] - 1856:16, 1856:17
**principle** [1] - 1771:14
**privacy** [2] - 1779:8, 1779:9
**private** [1] - 1759:19
**probabilistic** [1] - 1750:24
**probative** [2] - 1857:9, 1857:11
**problem** [1] - 1751:19
**Procedure** [1] - 1853:15
**Proceedings** [2] - 1733:16, 1858:22
**proceedings** [3] - 1848:3, 1858:4, 1859:4
**process** [8] - 1757:23, 1759:4, 1761:8,

1765:8, 1775:18, 1780:16, 1796:8
**processes** [3] - 1751:6, 1776:24, 1790:4
**produce** [2] - 1756:5, 1766:1
**produced** [1] - 1733:17
**product** [1] - 1774:21
**promising** [1] - 1768:24
**properly** [1] - 1857:4
**protract** [1] - 1769:25
**provide** [5] - 1784:21, 1786:13, 1786:15, 1849:20, 1858:9
**provided** [2] - 1746:2, 1857:14
**provides** [3] - 1752:9, 1752:11, 1752:12
**provision** [1] - 1853:12
**provisionally** [1] - 1746:25
**Pub** [2] - 1773:6, 1773:7
**PUBLIC** [1] - 1732:9
**public** [17] - 1745:14, 1748:10, 1759:17, 1791:14, 1796:17, 1797:10, 1797:12, 1797:18, 1798:5, 1798:8, 1798:11, 1798:13, 1798:14, 1798:16, 1799:18, 1853:4
**publicly** [1] - 1754:4
**purpose** [1] - 1781:15
**pursuant** [2] - 1747:5, 1747:8
**push** [2] - 1791:11, 1791:13
**put** [9] - 1761:7, 1763:23, 1771:23, 1776:17, 1777:5, 1778:5, 1781:20, 1783:25, 1796:16
**puts** [1] - 1849:2

**Q**

**qualify** [1] - 1852:22
**qualifying** [4] - 1854:1, 1854:7, 1854:9, 1854:15
**quality** [33] - 1750:14, 1750:15, 1750:18, 1751:18, 1777:6, 1777:8, 1777:9,

1777:12, 1777:14, 1777:16, 1778:10, 1778:21, 1778:25, 1779:7, 1779:16, 1779:19, 1781:11, 1783:16, 1783:17, 1783:19, 1783:23, 1784:9, 1784:10, 1785:23, 1786:12, 1786:14, 1786:15, 1791:17, 1791:19, 1791:20, 1792:3, 1798:24
**queries** [12] - 1760:13, 1760:14, 1766:18, 1766:21, 1767:1, 1767:2, 1767:4, 1772:2, 1772:5, 1785:15, 1785:18
**query** [31] - 1751:20, 1751:21, 1752:2, 1752:3, 1759:3, 1759:4, 1761:11, 1764:17, 1764:20, 1764:23, 1764:25, 1767:6, 1767:13, 1772:6, 1775:1, 1775:2, 1775:4, 1775:5, 1775:7, 1775:8, 1775:9, 1775:10, 1775:15, 1775:17, 1777:18, 1777:23, 1778:4, 1778:18, 1788:20, 1794:13
**questioned** [1] - 1753:21
**questioning** [2] - 1745:3, 1849:17
**questions** [9] - 1745:2, 1745:14, 1750:4, 1766:7, 1796:23, 1797:24, 1798:1, 1799:17
**quite** [8] - 1751:11, 1754:20, 1763:4, 1779:19, 1785:6, 1787:10, 1796:7, 1850:1

**R**

**random** [1] - 1794:23
**rank** [1] - 1759:22
**ranked** [3] - 1759:5, 1759:7, 1776:6
**ranking** [40] - 1750:14, 1750:16, 1751:6, 1758:2, 1759:23, 1760:2, 1760:4,

1760:5, 1762:20, 1762:24, 1763:2, 1763:6, 1763:9, 1774:2, 1780:2, 1780:3, 1786:23, 1786:25, 1787:15, 1788:4, 1788:7, 1788:13, 1788:14, 1788:18, 1789:7, 1789:12, 1789:25, 1790:5, 1790:6, 1790:8, 1790:12, 1790:13, 1790:19, 1790:22, 1790:23, 1790:24, 1793:17, 1799:3, 1799:5, 1799:9
**rapidly** [1] - 1762:9
**rater** [1] - 1779:22
**rater-based** [1] - 1779:22
**rather** [2] - 1759:25, 1857:2
**ratification** [1] - 1853:19
**rating** [1] - 1785:14
**ratings** [4] - 1782:18, 1783:2, 1783:9, 1784:25
**re** [1] - 1745:14
**re-ask** [1] - 1745:14
**reach** [2] - 1745:11, 1752:3
**reacquaint** [1] - 1788:9
**reaction** [1] - 1751:25
**read** [14] - 1751:22, 1751:23, 1752:3, 1752:6, 1758:12, 1766:1, 1767:24, 1768:2, 1768:4, 1794:7, 1794:14, 1853:13
**reading** [1] - 1768:3
**reads** [3] - 1761:22, 1784:20, 1784:24
**ready** [3] - 1746:12, 1775:19, 1776:1
**really** [13] - 1752:25, 1764:13, 1782:24, 1790:12, 1791:23, 1794:12, 1796:10, 1797:15, 1798:22, 1848:18, 1849:11, 1851:21, 1855:5
**realtime** [1] - 1781:1
**reason** [4] - 1754:20, 1798:11, 1856:12
**reasonable** [1] - 1771:22

**pieces** [1] - 1760:2
**place** [1] - 1796:15
**plain** [1] - 1772:13
**plaintiffs** [2] - 1746:12, 1858:18
**Plaintiffs** [3] - 1732:4, 1732:13, 1733:2
**plans** [1] - 1791:24
**play** [3] - 1763:14, 1780:8, 1855:24
**Play** [1] - 1789:2
**playing** [1] - 1851:20
**pleasant** [1] - 1787:19
**plow** [1] - 1744:21
**point** [16] - 1762:17, 1765:17, 1767:15, 1768:18, 1775:19, 1784:1, 1788:18, 1795:1, 1795:19, 1795:20, 1795:21, 1798:2, 1848:24, 1850:15, 1850:16
**pointed** [1] - 1757:5
**pointing** [4] - 1755:10, 1766:19, 1774:17, 1775:4
**points** [5] - 1746:1, 1757:11, 1782:6, 1849:8, 1849:9
**policy** [5] - 1852:14, 1858:6, 1858:8, 1858:9
**portion** [1] - 1768:9
**portions** [1] - 1756:13
**posed** [1] - 1745:2
**position** [12] - 1796:17, 1797:10, 1797:12, 1797:18, 1798:5, 1798:8, 1798:11, 1798:13, 1798:17, 1798:19, 1799:14, 1853:1
**possible** [2] - 1754:18, 1763:14
**post** [1] - 1750:10
**post-doctoral** [1] - 1750:10
**potentially** [1] - 1798:23
**Practice** [1] - 1853:15
**precise** [1] - 1769:6
**precisely** [1] - 1772:11
**prediction** [1] - 1782:12
**prefer** [2] - 1753:12, 1760:1

1783:18, 1783:24, 1783:25, 1784:6, 1784:18, 1784:21, 1797:4, 1797:7

**reasoning** [2] - 1796:1, 1796:5
**RECEIVED** [1] - 1734:8
**received** [4] - 1746:25, 1750:7, 1855:23, 1857:20
**receives** [1] - 1767:7
**recent** [1] - 1786:20
**Recess** [1] - 1799:25
**reconnect** [1] - 1744:21
**reconstructionist** [2] - 1850:6, 1850:9
**record** [5] - 1745:14, 1748:23, 1786:1, 1858:3, 1859:4
**recorded** [2] - 1733:16, 1752:21
**records** [1] - 1786:2
**Recross** [1] - 1734:4
**RECROSS** [1] - 1744:24
**RECROSS-EXAMINATION** [1] - 1744:24
**Recross-Examination...........** . [1] - 1734:4
**redacted** [3] - 1796:22, 1851:1, 1857:22
**redacting** [1] - 1851:1
**redactions** [2] - 1753:18, 1765:3
**Redirect** [1] - 1734:3
**redirect** [1] - 1746:7
**reduction** [2] - 1855:20, 1855:22
**refer** [2] - 1792:14, 1792:17
**referred** [3] - 1755:21, 1759:25, 1793:1
**referring** [2] - 1776:20, 1798:5
**refers** [5] - 1768:5, 1768:8, 1771:20, 1795:3, 1795:5
**refine** [1] - 1751:9
**reflected** [1] - 1784:25
**reinforcing** [1] - 1793:5
**related** [3] - 1765:14, 1851:12, 1854:21
**relationship** [4] - 1849:5, 1853:22, 1854:6, 1856:15
**relevance** [3] - 1764:25, 1777:18, 1778:24

**relevancy** [1] - 1777:15
**relevant** [7] - 1751:20, 1752:2, 1764:20, 1769:15, 1775:11, 1777:25, 1778:2, 1778:4, 1794:13, 1796:3, 1853:12
**rely** [1] - 1789:19
**remember** [5] - 1787:10, 1787:12, 1788:16, 1788:17, 1856:3
**removed** [1] - 1852:11
**reopen** [1] - 1744:20
**repeat** [1] - 1760:9
**repeating** [1] - 1775:24
**report** [2] - 1856:25, 1857:1
**REPORTER** [2] - 1859:1, 1859:9
**Reporter** [1] - 1733:13
**represent** [1] - 1748:15
**represented** [1] - 1749:12
**represents** [6] - 1755:8, 1757:9, 1757:12, 1757:15, 1767:2, 1767:12
**reprocess** [1] - 1791:7
**Republic** [2] - 1777:21, 1778:6
**requested** [2] - 1858:1
**require** [3] - 1760:17, 1760:20, 1760:22
**required** [2] - 1853:20, 1855:15
**requirement** [4] - 1852:2, 1852:3, 1853:24, 1854:7
**requirements** [3] - 1854:25, 1857:4, 1857:6
**requires** [2] - 1853:19, 1856:8
**research** [2] - 1774:2, 1774:4
**researchers** [1] - 1774:6
**reserving** [1] - 1747:19
**resignation** [1] - 1856:13
**resolution** [2] - 1783:3, 1784:17
**respect** [5] - 1751:18, 1759:3, 1771:1,

1793:1, 1853:23
**response** [3] - 1746:2, 1767:13, 1782:1
**responsibilities** [3] - 1749:9, 1854:11, 1854:17
**result** [24] - 1765:8, 1767:25, 1769:8, 1769:12, 1769:15, 1769:20, 1770:7, 1770:21, 1771:5, 1772:17, 1772:20, 1777:18, 1778:11, 1792:7, 1793:20, 1794:5, 1794:9, 1794:16, 1794:21, 1794:24, 1795:16, 1796:1, 1796:8, 1796:10
**results** [64] - 1751:7, 1752:3, 1752:4, 1752:5, 1752:10, 1752:13, 1752:16, 1752:18, 1754:17, 1755:10, 1755:15, 1755:16, 1755:18, 1758:3, 1759:2, 1759:5, 1759:7, 1759:22, 1759:23, 1765:10, 1767:8, 1767:12, 1768:9, 1768:15, 1768:24, 1775:11, 1776:10, 1776:23, 1777:3, 1777:9, 1777:14, 1777:24, 1778:2, 1778:4, 1778:9, 1778:17, 1779:24, 1781:12, 1781:13, 1781:16, 1783:4, 1783:17, 1783:19, 1783:23, 1784:9, 1784:10, 1784:22, 1785:11, 1785:18, 1785:23, 1788:19, 1793:20, 1794:1, 1794:2, 1794:5, 1794:22, 1795:17, 1796:2, 1796:9, 1798:21, 1798:24, 1799:4, 1799:6
**resume** [1] - 1799:20
**retrieval** [1] - 1774:18
**retrieved** [1] - 1776:2
**return** [1] - 1777:9
**returned** [1] - 1776:23
**returning** [1] - 1767:12
**revealing** [1] - 1797:22

**reverse** [1] - 1758:13
**reviewed** [1] - 1766:3
**revolve** [1] - 1750:4
**rewriter** [4] - 1775:4, 1775:5, 1775:8, 1775:16
**Rochester** [1] - 1773:5
**role** [2] - 1753:8, 1851:19
**Room** [1] - 1733:14
**root** [1] - 1776:9
**Rosati** [1] - 1733:10
**Roszak** [5] - 1746:9, 1848:16, 1848:23, 1850:13, 1852:11
**ROSZAK** [1] - 1734:3
**rounds** [1] - 1761:14
**Rowell** [1] - 1855:17
**RPM** [1] - 1745:1
**RPMs** [1] - 1746:2
**RPR** [1] - 1733:13
**Rule** [6] - 1746:15, 1848:12, 1853:23, 1854:14, 1857:3, 1857:5
**rule** [5] - 1853:8, 1855:15, 1856:7, 1856:8, 1857:18
**run** [5] - 1762:13, 1763:7, 1763:10, 1763:11, 1797:25
**runs** [2] - 1751:22, 1780:20

## S

**safe** [1] - 1746:10
**Sara** [2] - 1859:3, 1859:8
**SARA** [1] - 1733:13
**satisfaction** [6] - 1779:17, 1779:21, 1781:5, 1783:11, 1783:16, 1783:20
**SCHMIDTLEIN** [2] - 1733:6, 1858:19
**science** [1] - 1750:23
**scope** [4] - 1849:4, 1853:21, 1854:5, 1856:22
**score** [2] - 1776:11, 1780:4
**scored** [2] - 1776:2, 1776:6
**scores** [3] - 1776:8, 1776:10, 1776:11
**scoring** [5] - 1755:8, 1758:23, 1759:4, 1759:6, 1774:18
**screen** [4] - 1767:17,

1770:9, 1770:24, 1793:6
**scrolling** [1] - 1770:24
**scrolls** [3] - 1770:23, 1771:1, 1771:13
**seal** [2] - 1735:3, 1800:1
**sealed** [3] - 1754:5, 1759:19, 1848:3
**Search** [13] - 1763:19, 1763:20, 1767:1, 1771:21, 1774:7, 1787:23, 1790:4, 1790:13, 1790:18, 1791:5, 1792:15, 1793:2, 1793:4
**search** [135] - 1745:10, 1750:14, 1750:15, 1750:18, 1751:10, 1751:18, 1751:19, 1751:22, 1752:2, 1752:3, 1752:4, 1752:10, 1752:12, 1752:16, 1752:17, 1753:15, 1754:17, 1755:3, 1755:14, 1755:16, 1755:22, 1755:23, 1756:1, 1756:21, 1758:2, 1758:14, 1759:2, 1759:22, 1759:23, 1764:9, 1765:7, 1765:8, 1765:13, 1766:19, 1767:6, 1767:12, 1768:9, 1768:14, 1768:23, 1768:24, 1769:8, 1769:12, 1769:19, 1769:20, 1769:23, 1771:7, 1771:11, 1771:17, 1772:2, 1772:4, 1772:8, 1772:10, 1772:12, 1772:17, 1772:22, 1773:1, 1773:10, 1773:13, 1773:21, 1774:21, 1774:24, 1775:1, 1775:2, 1775:7, 1775:11, 1775:14, 1776:10, 1776:23, 1777:3, 1777:6, 1777:8, 1777:9, 1777:12, 1777:14, 1777:16, 1777:17, 1777:24, 1778:4, 1778:9, 1778:10, 1778:11, 1778:17, 1778:21, 1778:25, 1779:7, 1779:16, 1779:18,

1779:24, 1780:5, 1780:6, 1780:8, 1780:9, 1780:23, 1781:12, 1781:16, 1783:3, 1783:17, 1783:19, 1783:23, 1784:9, 1784:10, 1784:22, 1785:10, 1785:11, 1785:18, 1785:23, 1786:5, 1786:7, 1786:11, 1786:13, 1786:15, 1787:15, 1788:13, 1788:19, 1788:22, 1788:24, 1790:23, 1791:17, 1791:19, 1791:20, 1792:3, 1794:4, 1794:5, 1794:21, 1796:9, 1797:8, 1797:19, 1798:19, 1798:21, 1798:24, 1799:2, 1799:3, 1799:6

**searched** [2] - 1775:19, 1776:2

**searches** [4] - 1762:13, 1762:15, 1763:7, 1763:11

**seat** [1] - 1853:16

**second** [19] - 1755:13, 1758:13, 1770:4, 1770:17, 1771:15, 1781:24, 1781:25, 1782:2, 1782:4, 1783:2, 1784:2, 1784:24, 1785:1, 1785:4, 1788:12, 1791:3, 1794:18, 1795:1, 1851:4

**seconds** [1] - 1794:14

**secret** [2] - 1797:14, 1852:23

**secretive** [1] - 1799:11

**secrets** [1] - 1797:22

**section** [3] - 1754:3, 1754:4, 1754:9

**see** [38] - 1751:25, 1752:2, 1754:8, 1755:4, 1756:22, 1758:16, 1760:8, 1762:21, 1763:4, 1765:22, 1766:12, 1767:10, 1767:19, 1768:11, 1768:12, 1768:21, 1769:13, 1770:18, 1771:18, 1774:10, 1776:7, 1778:22, 1782:13, 1784:15, 1785:6, 1787:17, 1787:22,

1788:5, 1792:9, 1792:20, 1793:9, 1795:25, 1796:9, 1797:2, 1797:18, 1798:2, 1849:23, 1858:21

**seeing** [1] - 1781:2

**seem** [2] - 1754:17, 1781:2

**self** [1] - 1793:5

**self-reinforcing** [1] - 1793:5

**sending** [1] - 1794:17

**sense** [2] - 1765:12, 1773:8

**sensitive** [2] - 1796:20, 1797:1

**sent** [6] - 1771:12, 1776:17, 1776:25, 1777:1, 1781:21, 1782:1

**sentence** [4] - 1758:22, 1761:22, 1784:20, 1787:14

**sentences** [1] - 1764:7

**September** [2] - 1732:6, 1859:8

**seriously** [1] - 1799:11

**SERP** [3] - 1755:13, 1755:14, 1755:17

**services** [1] - 1763:17

**session** [13] - 1745:15, 1748:10, 1754:5, 1759:18, 1759:19, 1791:14, 1797:23, 1797:24, 1799:18, 1850:24, 1853:2, 1855:1

**SESSION** [1] - 1732:9

**sessions** [1] - 1748:7

**set** [3] - 1755:6, 1790:2, 1850:4

**seventh** [1] - 1850:16

**Seventh** [3] - 1852:1, 1856:6, 1856:24

**several** [2] - 1746:1, 1755:1

**short** [5] - 1769:1, 1769:4, 1769:7, 1769:14, 1770:3

**shorthand** [3] - 1733:16, 1752:22, 1753:1

**show** [11] - 1751:25, 1761:9, 1765:1, 1774:1, 1777:2, 1778:20, 1785:11, 1791:16, 1796:22, 1848:11, 1848:14

**showed** [1] - 1789:8

**showing** [2] - 1778:12, 1778:16

**shown** [2] - 1795:24, 1854:1

**shows** [2] - 1766:15, 1775:17

**Sidarto** [3] - 1745:20, 1745:21, 1746:2

**side** [6] - 1767:17, 1782:24, 1784:17, 1793:6, 1795:8, 1795:22

**signal** [17] - 1764:1, 1764:3, 1764:4, 1764:8, 1764:10, 1764:12, 1764:13, 1764:16, 1764:18, 1764:19, 1764:22, 1764:23, 1765:6, 1765:10, 1765:12, 1765:16, 1770:1

**signals** [3] - 1763:25, 1764:24, 1766:13

**SIGNATURE** [1] - 1859:9

**similar** [1] - 1772:6

**simple** [1] - 1758:7

**simplification** [1] - 1776:4

**simplistic** [1] - 1777:21

**simply** [3] - 1747:10, 1854:15, 1856:8

**single** [2] - 1780:15, 1783:22

**sit** [1] - 1751:14

**site** [1] - 1855:12

**situation** [2] - 1762:8, 1788:17

**sixth** [4] - 1754:7, 1849:9, 1850:15, 1850:18

**skip** [1] - 1752:5

**skit** [1] - 1851:18

**slide** [60] - 1753:16, 1754:16, 1755:2, 1755:6, 1755:24, 1756:20, 1756:24, 1760:23, 1765:4, 1765:24, 1766:1, 1766:7, 1766:10, 1766:15, 1770:4, 1770:8, 1770:9, 1770:14, 1771:15, 1771:23, 1774:1, 1774:8, 1775:1, 1775:17, 1777:2, 1778:20, 1779:7, 1779:10, 1782:11,

1782:12, 1782:15, 1782:17, 1782:19, 1782:22, 1782:25, 1783:25, 1784:3, 1784:13, 1784:17, 1786:18, 1787:13, 1788:3, 1788:7, 1788:12, 1789:18, 1791:16, 1792:6, 1792:7, 1794:8, 1795:3, 1795:22, 1795:24, 1795:25, 1796:22, 1796:25, 1798:10

**slides** [2] - 1785:7, 1785:20

**slightly** [1] - 1762:22

**smart** [1] - 1761:14

**smily** [4] - 1755:14, 1766:15, 1767:16, 1793:7

**Smurzynski** [1] - 1749:16

**SMURZYNSKI** [5] - 1733:7, 1749:16, 1753:20, 1797:20, 1798:10

**software** [2] - 1748:16, 1749:2

**someone** [6] - 1752:17, 1767:6, 1768:18, 1772:12, 1850:5, 1852:14

**sometimes** [7] - 1752:22, 1752:24, 1772:22, 1773:15, 1773:16, 1779:19, 1781:7

**somewhat** [2] - 1754:19, 1857:8

**SOMMER** [6] - 1733:9, 1746:24, 1747:5, 1747:8, 1747:12, 1747:24

**Sonsini** [1] - 1733:10

**soon** [1] - 1769:9

**sorry** [11] - 1745:7, 1756:11, 1756:14, 1760:8, 1765:5, 1770:8, 1787:4, 1788:9, 1796:5, 1848:24, 1850:16

**sort** [27] - 1750:16, 1751:24, 1752:1, 1753:1, 1753:6, 1753:8, 1764:10, 1765:18, 1768:11, 1769:25, 1773:19, 1776:12, 1776:25, 1777:1, 1777:17, 1777:23, 1780:22,

1781:3, 1785:9, 1786:1, 1787:8, 1791:7, 1791:23, 1795:18, 1849:3, 1850:18, 1852:24

**sounds** [1] - 1756:19

**source** [1] - 1761:4

**sources** [2] - 1783:15, 1785:21

**South** [1] - 1732:19

**Southwest** [1] - 1733:8

**space** [1] - 1853:4

**speaker** [7] - 1758:12, 1761:4, 1761:22, 1787:3, 1787:14, 1789:4, 1789:5

**speaker's** [1] - 1854:21

**speaking** [5] - 1759:11, 1759:21, 1769:14, 1789:24, 1856:21

**speaks** [2] - 1854:5, 1854:10

**specific** [7] - 1759:2, 1759:3, 1759:4, 1759:13, 1764:2, 1772:11, 1790:17

**specifically** [1] - 1755:25

**specifics** [1] - 1759:17

**speech** [1] - 1849:20

**spell** [2] - 1748:19, 1748:22

**spent** [2] - 1750:5, 1768:6

**sponsored** [3] - 1849:19, 1855:12, 1855:13

**stage** [1] - 1855:22

**stamped** [1] - 1752:20

**stand** [1] - 1755:11

**standard** [3] - 1849:2, 1849:25, 1850:3

**standards** [1] - 1854:22

**standing** [1] - 1784:7

**stands** [1] - 1755:14

**start** [8] - 1746:19, 1761:14, 1765:4, 1768:25, 1771:10, 1774:12, 1792:22, 1798:13

**started** [1] - 1756:15

**starting** [2] - 1795:20, 1855:17

**state** [4] - 1748:18, 1748:22, 1773:3, 1798:16

**State** [3] - 1733:2, 1733:2, 1778:14
**statement** [15] - 1848:16, 1848:22, 1854:1, 1854:23, 1855:11, 1855:18, 1856:9, 1856:10, 1856:12, 1856:13, 1856:19, 1856:20, 1857:2, 1857:16
**statements** [19] - 1849:4, 1849:7, 1849:10, 1849:11, 1849:12, 1850:8, 1853:19, 1853:21, 1853:25, 1854:4, 1854:7, 1854:9, 1854:15, 1854:20, 1855:5, 1855:6, 1855:8
**STATES** [3] - 1732:1, 1732:3, 1732:10
**states** [1] - 1853:18
**States** [7] - 1732:13, 1732:16, 1732:19, 1745:10, 1746:15, 1748:2, 1748:15
**stay** [1] - 1749:11
**stay-at-home** [1] - 1749:11
**stenotype** [1] - 1733:16
**step** [4] - 1761:7, 1776:8, 1776:14, 1852:11
**stepped** [1] - 1750:19
**still** [3] - 1760:20, 1775:8, 1854:21
**stock** [3] - 1749:21, 1749:22, 1749:24
**stop** [1] - 1775:24
**store** [1] - 1759:6
**story** [1] - 1754:19
**strategy** [1] - 1852:14
**streams** [1] - 1772:6
**Street** [3] - 1732:14, 1732:17, 1732:19
**strike** [6] - 1753:3, 1760:11, 1772:21, 1783:6, 1784:12, 1792:22
**strived** [1] - 1798:19
**stroke** [1] - 1855:5
**stronger** [1] - 1786:14
**structure** [1] - 1855:20
**stuck** [1] - 1788:2
**stuff** [3] - 1752:25, 1775:14, 1788:23
**subject** [5] - 1852:4, 1852:7, 1853:23,

1856:11
**subjects** [1] - 1748:6
**submit** [1] - 1849:6
**subscribe** [1] - 1769:24
**subsequent** [1] - 1756:13
**subsequently** [1] - 1789:15
**subset** [1] - 1780:24
**substantially** [2] - 1857:9, 1857:11
**substantively** [1] - 1747:4
**suggest** [1] - 1765:9
**suggested** [1] - 1850:2
**Suite** [2] - 1732:20, 1733:4
**summarization** [1] - 1752:10
**Sundar** [1] - 1797:4
**super** [2] - 1776:9, 1776:20
**supervisor** [3] - 1751:2, 1751:3, 1751:5
**surprised** [1] - 1790:18
**suspect** [1] - 1772:10
**sustain** [1] - 1795:23
**swipe** [1] - 1752:19
**SWORN** [1] - 1748:4
**synonyms** [1] - 1775:14
**system** [10] - 1758:4, 1758:8, 1758:10, 1760:2, 1762:20, 1767:4, 1788:13, 1789:6, 1789:16, 1791:7
**systems** [33] - 1753:15, 1757:19, 1757:21, 1757:22, 1757:23, 1757:25, 1758:2, 1758:3, 1758:6, 1759:8, 1759:10, 1759:11, 1759:14, 1759:21, 1760:1, 1760:17, 1760:20, 1760:22, 1762:20, 1767:3, 1786:4, 1786:7, 1789:7, 1789:9, 1789:12, 1789:13, 1789:19, 1789:20, 1790:20, 1794:1, 1798:6, 1799:2

# T

**tab** [1] - 1754:7
**tabbed** [1] - 1768:23
**tabs** [1] - 1768:25
**teach** [2] - 1758:14, 1780:5
**team** [15] - 1750:17, 1751:14, 1753:2, 1753:4, 1753:6, 1774:4, 1787:9, 1787:18, 1787:23, 1788:1, 1790:11, 1791:19, 1791:20, 1792:3
**teams** [1] - 1758:23
**technology** [1] - 1760:17
**teed** [1] - 1853:7
**telephone** [1] - 1769:19
**temporal** [1] - 1848:20
**ten** [1] - 1856:4
**term** [13] - 1752:22, 1753:12, 1760:1, 1764:1, 1764:4, 1764:10, 1764:23, 1765:6, 1765:11, 1765:19, 1772:8, 1792:17, 1792:23
**terms** [5] - 1758:4, 1769:1, 1848:4, 1857:7, 1857:17
**Terrific** [1] - 1799:19
**testified** [1] - 1857:13
**testify** [2] - 1797:17, 1856:23
**testifying** [1] - 1851:11
**testimony** [5] - 1746:10, 1748:7, 1798:2, 1799:21, 1853:1
**TESTIMONY** [1] - 1734:2
**Tetris** [1] - 1753:7
**text** [2] - 1767:9, 1771:16
**THE** [48] - 1732:1, 1732:1, 1732:10, 1744:19, 1745:13, 1746:7, 1746:9, 1746:11, 1746:12, 1746:18, 1746:22, 1747:7, 1747:11, 1747:13, 1747:17, 1747:22, 1748:4, 1748:9, 1748:18, 1748:25, 1750:22, 1750:23, 1750:25,

1753:24, 1756:14, 1759:13, 1765:5, 1765:12, 1765:20, 1779:2, 1779:5, 1787:4, 1791:13, 1797:25, 1798:12, 1799:19, 1799:23, 1799:24, 1848:4, 1849:3, 1849:16, 1851:8, 1852:1, 1852:20, 1853:11, 1853:18, 1857:21, 1858:20
**theoretical** [1] - 1750:23
**theory** [1] - 1853:4
**they've** [3] - 1768:19, 1848:11, 1848:12
**thinking** [2] - 1770:2, 1777:17
**thinks** [1] - 1798:1
**third** [6] - 1770:23, 1783:7, 1785:1, 1785:4, 1789:5, 1858:4
**Third** [1] - 1856:18
**thousands** [1] - 1785:1
**thread** [1] - 1782:1
**three** [3] - 1768:24, 1768:25, 1792:11
**tied** [1] - 1789:25
**time-stamped** [1] - 1752:20
**Title** [1] - 1852:3
**titled** [18] - 1753:17, 1754:16, 1755:3, 1756:21, 1765:2, 1765:25, 1766:13, 1774:2, 1774:9, 1778:21, 1782:12, 1782:17, 1784:14, 1786:22, 1788:4, 1791:17, 1792:7, 1797:1
**today** [4] - 1748:8, 1749:12, 1750:4, 1853:9
**together** [3] - 1776:15, 1776:17, 1791:23
**tomorrow** [3] - 1858:6, 1858:12, 1858:21
**tool** [1] - 1783:17
**top** [6] - 1766:15, 1767:16, 1768:12, 1770:12, 1774:12, 1775:1
**topic** [2] - 1797:9, 1856:1

**topics** [1] - 1797:1
**totally** [1] - 1799:16
**touch** [1] - 1854:15
**tough** [1] - 1779:11
**towards** [3] - 1767:8, 1767:9, 1780:7
**tracks** [2] - 1771:9, 1771:10
**trade** [3] - 1797:14, 1797:22, 1852:23
**traditional** [1] - 1789:7
**traffic** [1] - 1780:20
**train** [8] - 1757:25, 1758:3, 1791:2, 1850:6, 1850:7, 1850:9, 1850:11
**training** [22] - 1757:18, 1757:21, 1758:4, 1758:5, 1783:8, 1791:21, 1791:22, 1791:23, 1793:14, 1795:1, 1795:5, 1795:7, 1795:9, 1849:19, 1849:20, 1851:6, 1851:7, 1851:17, 1855:1, 1855:12, 1856:4
**trains** [1] - 1791:4
**TRANSCRIPT** [1] - 1732:9
**Transcript** [1] - 1733:17
**transcript** [1] - 1859:4
**transcription** [1] - 1733:17
**translation** [3] - 1755:19, 1755:21, 1788:24
**travels** [1] - 1746:10
**treatise** [1] - 1854:12
**Treatise** [1] - 1853:14
**TRIAL** [1] - 1732:9
**trick** [1] - 1751:24
**tried** [1] - 1780:3
**trigger** [1] - 1788:20
**triggering** [1] - 1790:14
**trivial** [1] - 1785:10
**true** [11] - 1762:15, 1773:18, 1773:20, 1789:15, 1792:16, 1851:12, 1851:13, 1851:15, 1851:16
**truth** [1] - 1851:19
**try** [6] - 1780:5, 1785:13, 1793:5, 1798:19, 1798:21, 1799:2
**trying** [11] - 1769:18,

1772:13, 1778:6,
1785:7, 1785:8,
1785:20, 1787:18,
1788:1, 1796:5,
1799:11, 1799:15
**turn** [4] - 1745:8,
1753:16, 1755:2,
1789:4
**turning** [2] - 1781:1,
1781:3
**turns** [1] - 1763:25
**two** [13] - 1745:2,
1758:12, 1761:5,
1769:11, 1772:6,
1778:24, 1783:15,
1785:21, 1785:22,
1786:13, 1794:16,
1858:13
**two-way** [1] - 1761:5
**Tyler** [1] - 1733:3
**type** [3] - 1765:7,
1769:22, 1772:20
**types** [1] - 1763:24
**typical** [1] - 1776:12
**typically** [5] - 1769:7,
1770:2, 1776:10,
1780:22, 1854:13

## U

**ultimate** [1] - 1857:15
**ultimately** [1] -
1849:16
**unabashedly** [1] -
1854:13
**unambiguous** [1] -
1798:22
**under** [8] - 1735:3,
1746:15, 1770:17,
1800:1, 1857:1,
1857:3, 1857:5,
1858:8
**underhanded** [1] -
1856:16
**underlying** [1] -
1747:9
**underneath** [3] -
1793:16, 1797:4,
1797:7
**understood** [1] -
1765:6
**unfortunately** [1] -
1787:12
**unified** [1] - 1782:12
**UNITED** [3] - 1732:1,
1732:3, 1732:10
**United** [7] - 1732:13,
1732:16, 1732:19,
1745:10, 1746:15,
1748:2, 1748:15

**unobjected** [1] -
1747:10
**up** [15] - 1745:23,
1746:19, 1752:19,
1761:13, 1765:5,
1770:9, 1773:6,
1775:10, 1777:20,
1781:20, 1787:8,
1788:1, 1850:16,
1850:17, 1853:7
**upper** [1] - 1793:6,
1795:19, 1855:24
**UPS** [1] - 1856:21
**UPX1115** [3] -
1791:17, 1793:6,
1796:16
**UPX192** [4] - 1781:18,
1781:22, 1781:23,
1782:9
**UPX204** [8] - 1774:1,
1774:4, 1777:2,
1777:5, 1778:19,
1779:3, 1786:17,
1796:25
**UPX219** [3] - 1786:21,
1786:22, 1787:6
**UPX228** [7] - 1753:17,
1753:19, 1754:9,
1754:24, 1760:23,
1762:4, 1763:23
**UPX38** [3] - 1746:15,
1857:19, 1857:20
**UPX38**......................
..............................[1] -
1734:9
**UPX4** [6] - 1765:1,
1765:22, 1765:24,
1770:4, 1770:10,
1770:15
**useful** [4] - 1778:3,
1780:7, 1780:10,
1786:16
**Useful** [1] - 1783:7
**useless** [1] - 1794:17
**user** [114] - 1751:12,
1751:15, 1751:17,
1752:5, 1752:7,
1752:9, 1752:11,
1752:15, 1752:21,
1752:23, 1753:1,
1753:4, 1753:10,
1753:13, 1753:15,
1755:11, 1755:25,
1756:8, 1756:25,
1757:3, 1757:8,
1757:9, 1757:12,
1757:15, 1757:18,
1757:20, 1757:21,
1757:23, 1758:1,
1758:3, 1758:9,

1758:10, 1758:18,
1758:20, 1759:2,
1759:6, 1759:8,
1760:6, 1760:13,
1760:16, 1760:18,
1760:21, 1760:22,
1760:25, 1761:19,
1761:20, 1762:13,
1762:18, 1762:23,
1763:24, 1763:25,
1764:8, 1764:12,
1764:14, 1765:2,
1765:6, 1765:14,
1765:25, 1766:13,
1766:16, 1766:18,
1767:21, 1767:25,
1768:2, 1768:6,
1768:16, 1770:5,
1771:1, 1771:20,
1771:25, 1772:16,
1772:20, 1775:2,
1776:18, 1776:23,
1777:1, 1778:1,
1778:3, 1780:17,
1781:9, 1781:10,
1785:5, 1785:25,
1786:1, 1786:2,
1786:3, 1788:7,
1789:2, 1789:13,
1789:16, 1789:19,
1790:3, 1790:7,
1790:9, 1790:11,
1790:17, 1790:25,
1791:5, 1792:14,
1792:18, 1793:10,
1793:23, 1794:18,
1795:1, 1795:9,
1795:12, 1795:24,
1796:3, 1796:18,
1798:6, 1798:22,
1799:1, 1799:3
**user's** [3] - 1752:16,
1767:13, 1773:13
**user-based** [1] -
1780:17
**users** [27] - 1752:11,
1752:12, 1761:5,
1761:16, 1762:5,
1762:11, 1763:7,
1763:9, 1763:11,
1773:16, 1780:21,
1780:24, 1781:2,
1781:13, 1793:10,
1793:23, 1793:25,
1794:2, 1794:17,
1794:25, 1795:3,
1795:8, 1795:23,
1796:2, 1796:12
**users'** [2] - 1752:9,
1779:14

**uses** [10] - 1752:22,
1757:23, 1757:25,
1758:2, 1759:21,
1779:13, 1790:11,
1798:6, 1798:24,
1799:9
**utilize** [1] - 1790:8
**utilizes** [2] - 1760:6,
1796:18
**UX** [3] - 1755:11,
1755:13

## V

**vacation** [3] - 1778:5,
1778:6, 1778:7
**value** [3] - 1777:17,
1857:9, 1857:11
**variations** [1] -
1754:25
**varied** [1] - 1769:6
**variety** [1] - 1786:7
**various** [5] - 1753:6,
1762:19, 1768:19,
1780:23
**vastly** [1] - 1784:21
**vendor** [1] - 1780:1
**version** [2] - 1779:17,
1786:20
**versions** [1] - 1756:9
**versus** [1] - 1790:25
**via** [1] - 1750:2
**video** [1] - 1769:23
**view** [3] - 1747:16,
1854:3, 1854:14
**views** [1] - 1753:15
**VII** [1] - 1852:3
**virtue** [1] - 1854:7
**virtuous** [5] - 1792:12,
1792:15, 1792:17,
1792:20, 1792:23
**visually** [2] - 1776:21,
1777:1
**volume** [2] - 1762:25,
1785:16
**vs** [1] - 1732:5

## W

**wait** [4] - 1747:22,
1794:14, 1799:10,
1858:21
**waiting** [1] - 1744:21
**wants** [4] - 1763:11,
1763:13, 1772:20,
1851:3
**Washington** [5] -
1732:5, 1732:14,
1732:17, 1733:8,
1733:14

**wasting** [1] - 1794:15
**watch** [2] - 1769:23,
1778:14
**ways** [4] - 1761:25,
1762:19, 1773:9,
1780:12
**weak** [1] - 1769:17
**wearing** [1] - 1757:3
**weather** [2] - 1755:20,
1788:25
**web** [22] - 1751:6,
1751:20, 1751:22,
1751:25, 1752:1,
1755:17, 1765:10,
1765:16, 1765:17,
1768:11, 1770:7,
1774:13, 1774:20,
1777:3, 1788:18,
1788:19, 1794:6,
1794:10, 1794:12,
1794:17, 1795:11
**Webb** [1] - 1733:3
**Webinar** [3] - 1858:2,
1858:3, 1858:7
**website** [2] - 1763:11,
1768:7
**weight** [4] - 1849:16,
1849:17, 1851:3,
1857:15
**wheelhouse** [4] -
1849:11, 1851:23,
1852:24, 1855:9
**whereas** [1] - 1769:10
**whole** [5] - 1753:12,
1761:9, 1787:16,
1787:25, 1790:23
**WICK** [1] - 1733:13
**Wick** [2] - 1859:3,
1859:8
**widely** [1] - 1790:18
**wife** [1] - 1749:22
**wife's** [1] - 1750:2
**WILLIAM** [1] - 1733:3
**Williams** [1] - 1733:7
**Wilson** [1] - 1733:10
**wish** [1] - 1848:6
**WITNESS** [6] -
1746:11, 1748:4,
1750:23, 1753:24,
1765:12, 1799:23
**witness** [9] - 1746:13,
1748:3, 1748:18,
1753:20, 1848:21,
1851:11, 1851:14,
1857:8, 1857:10
**word** [7] - 1757:21,
1759:14, 1765:12,
1785:12, 1785:18,
1785:19
**words** [4] - 1758:5,

1764:17, 1767:18, 1792:12

**work-issued** [1] - 1855:14

**works** [3] - 1755:3, 1780:1, 1852:18

**world** [5] - 1758:15, 1783:15, 1785:9, 1785:21, 1790:12

**world's** [1] - 1787:19

**Wright** [2] - 1853:13, 1853:18

**write** [12] - 1755:24, 1758:22, 1761:4, 1761:11, 1783:2, 1783:7, 1788:12, 1788:18, 1789:1, 1789:6, 1789:23, 1797:7

**wrote** [9] - 1756:4, 1762:4, 1762:7, 1762:10, 1782:5, 1786:25, 1787:14, 1787:24, 1788:1

## Y

**yardsticks** [1] - 1779:13

**year** [1] - 1750:19

**years** [7] - 1750:12, 1751:4, 1756:10, 1756:12, 1769:7, 1780:2, 1856:4

**yellow** [1] - 1776:9

**yesterday** [1] - 1746:24

**York** [5] - 1733:5, 1733:11, 1773:5

**Young** [1] - 1856:6

**yourselves** [1] - 1857:23

**YouTube** [2] - 1749:23, 1789:2