```
                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA, et al., .
                                    .     Case Number 20-cv-3010
           Plaintiffs,              .
                                    .
      vs.                           .
                                    .     Washington, D.C.
  GOOGLE LLC,                       .     September 20, 2023
                                    .     1:32 p.m.
           Defendant.               .
  - - - - - - - - - - - - - - - - - -


                     ███  TRANSCRIPT OF BENCH TRIAL, DAY 7
                            (AFTERNOON SESSION)
                      BEFORE THE HONORABLE AMIT P. MEHTA
                         UNITED STATES DISTRICT JUDGE


  APPEARANCES:

  For DOJ Plaintiffs:          KENNETH DINTZER, ESQ.
                               United States Department of Justice
                               1100 L Street Northwest
                               Washington, D.C. 20005

                               JOSHUA HAFENBRACK, ESQ.
                               ERIN MURDOCK-PACK, ESQ.
                               United States Department of Justice
                               450 Fifth Street Northwest
                               Washington, D.C. 20001

                               DAVID DAHLQUIST, ESQ.
                               United States Department of Justice
                               209 South LaSalle Street
                               Suite 600
                               Chicago, Illinois 60604


                            -- continued --
```

```
APPEARANCES (CONTINUED):

For Plaintiffs State of
Colorado and State of
Nebraska:                    WILLIAM F. CAVANAUGH, JR., ESQ.
                             Patterson Belknap Webb & Tyler LLP
                             1133 Avenue of the Americas
                             Suite 2200
                             New York, New York 10036

For the Defendant:           JOHN SCHMIDTLEIN, ESQ.
                             EDWARD BENNETT, ESQ.
                             KENNETH SMURZYNSKI, ESQ.
                             Williams & Connolly LLP
                             680 Maine Avenue Southwest
                             Washington, D.C. 20024

                             MICHAEL SOMMER, ESQ.
                             Wilson Sonsini Goodrich & Rosati
                             1301 Avenue of the Americas
                             40th Floor
                             New York, New York 10019

Official Court Reporter:     SARA A. WICK, RPR, CRR
                             333 Constitution Avenue Northwest
                             Room 4704-B
                             Washington, D.C. 20001
                             202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

C O N T E N T S

TESTIMONY

MICHAEL ROSZAK         Cross-Examination................ 1735
                       Redirect Examination............ 1741
                       Recross-Examination............. 1744

ERIC LEHMAN            Direct Examination.............. 1748
                       Cross-Examination............... 1828

EXHIBITS RECEIVED

UPX38............................................... 1857

P R O C E E D I N G S

(Call to order of the court.)

(The following occurred under ███)

THE COURT: All right, Mr. Bennett.

MR. BENNETT: Thank you, Your Honor.

MICHAEL ROSZAK, WITNESS FOR THE PLAINTIFFS, RESUMED STAND

CROSS-EXAMINATION (Continued)

BY MR. BENNETT:

Q. Thank you for coming back from lunch. I have a few more minutes of questions for you.

If we could pull up UPX Exhibit 148 and go to Bates Number 5826.

I want to return to this exhibit you were shown this morning, Mr. Roszak. I think when you were asked questions about the Mozilla and the Google Maps for iOS scenarios, you were asked a question about whether the data was observed, and I think you said it wasn't observed.

What did you mean by that?

A. I'm trying to remember the context.

Q. I think the context was about whether this was data that Google observed during those instances or measured during those -- is this data that is the -- that precisely captures what happened with usage with the Firefox change or with the Apple iOS change?

A. I mean, I wouldn't say it's precise. A lot of it is trying

1    to look at trend lines and infer what might be happening based
2    on the trends that we're seeing.  So I'm not -- I'm not trying
3    to remember the specifics, but a lot of it is inferred based on
4    what we are seeing in trend lines like this.
5    Q.   Thank you.  That's helpful.
6         So when you were using -- and let's focus now on the iOS
7    maps information.  When you were using the information relating
8    to the change of iOS maps from Google being the embedded mapping
9    system on iOS to Google -- to Apple launching its own map app,
10   it used that data to make estimates regarding search recovery
11   and other later scenarios.
12        Did you adjust your assumptions to account for the fact
13   that when Apple launched its map, its mapping application and
14   turned away from Google, that Google did not have an app. for
15   iOS, a mapping app. for iOS?
16   A.   No.
17   Q.   And I think it was established that there was a few-month
18   period when Google did not have an iOS mapping app.
19        Is that your recollection?
20   A.   That's my understanding.
21   Q.   And the effect of that period when users were unable to, on
22   a new iPhone or on an iPhone that took the update, unable to
23   access Google Maps, did the effect on users factor into your
24   later calculations or assumptions, rather, regarding estimated
25   recovery?

1  A.  No.

2  Q.  Now, do you know whether or not it's the case on Safari
3  that Apple Maps is hard coded as the default mapping app.?

4  A.  I am not certain.

5  Q.  Do you know whether or not a user of an iOS phone can
6  switch the default mapping app. in iOS -- I'm sorry, in Safari?

7  A.  I am not certain.

8  Q.  Okay.  And I take it, then, in doing your later estimates,
9  you didn't adjust your assumptions for the fact that there's no
10 way to change the default mapping program for Safari?

11 A.  No, we did not adjust for that.

12 Q.  And when you used the Apple Maps scenario in making later
13 estimates, did you adjust your assumptions for different ways
14 that users might use a mapping program as opposed to a search
15 engine?

16 A.  No.

17 Q.  Let's go to Exhibit 462, and if we could pull up the bottom
18 of this e-mail, the e-mail from Evan Sidarto.

19      Mr. Roszak, this is an exhibit you were shown earlier about
20 RPM in Japan.  Do you remember seeing this exhibit earlier?

21 A.  Yes.

22 Q.  And you were focused on the top e-mail.  I want to look at
23 the bottom e-mail.  First of all, let me just establish some
24 basics here.

25      Who is Mr. Sidarto?

1   A.   He is the finance lead for the Asia-Pacific region.
2   Q.   And you had asked him a question that we heard earlier, and
3   he came back with this response about what could account for the
4   different RPMs.  And he starts in his e-mail in the second -- or
5   third sentence, "I don't think any of them are fair comparisons
6   for the U.S., UK, or Australia given the language differences."
7        Is that one of the factors that the Asia-Pacific finance
8   lead told you was affecting RPMs in Japan?
9   A.   Yes.  He says he doesn't think it's a fair comparison,
10  given that.
11  Q.   And he goes on to list several other bullet points about
12  mSearch in Japan is the most mature in the world.
13       What does that mean?
14  A.   It looks like that is saying mobile search, and based on
15  the parenthetical after that, I think he's saying in Japan the
16  percent of mobile search out of all searches is the highest in
17  that market.
18  Q.   And then the next bullet --
19            MR. HAFENBRACK:  Your Honor, I would just note that we
20  did this document in open session.  So I'm not sure it's
21  appropriate to do the cross in close.
22            THE COURT:  Okay.
23            MR. BENNETT:  Two more questions on it.  I can do
24  those in open, or I can do them now.
25            THE COURT:  Why don't we just wait until the session

1    is reopened.  I know it's more efficient to do it, but let's
2    just stay consistent.
3         Thank you for the reminder.
4              BY MR. BENNETT:
5    Q.   Let's go to Exhibit 474 -- I'm sorry, 674.  I can't read my
6    writing.  And I want to go here specifically to Bates ending in
7    914.
8         914 is the spice view that you saw earlier.  I'm not going
9    to go all the way back through it, but I do want to focus you on
10   the table in the lower left where there's some math being done.
11        First, in doing the estimates about how Microsoft might
12   perform or Bing might perform as the default search engine on
13   Apple products, did you consider any uplift, like reputational
14   uplift that Microsoft might enjoy by displacing Google as the
15   default on Apple devices?
16   A.   No.
17   Q.   And did you consider any -- conversely, any reputational
18   harm that Google might suffer by losing that position to Bing?
19   A.   No.
20   Q.   And when you -- there's reference to clawback in here in a
21   couple of places, once with Bookmark and once with additional
22   clawback below that.
23        In estimating those clawbacks, did you take into account
24   any changes that Apple might make to its system to favor a Bing
25   Apple experience over a Google Apple experience for users who

1  might want -- might be interested in switching back to Google?
2  A.   No.
3  Q.   Now, let's finally go to Bates -- same exhibit, Bates 921.
4       First of all, you were shown a couple of decks for NYC
5  scenarios.  Were there several drafts of that sent around?
6  A.   This would have evolved across time.  There were several
7  drafts of the materials.
8  Q.   This is one, I think the government pointed out, is later
9  in time than one of the other ones they showed you.  And I want
10 to focus on the mobile defaults where there is a statement the
11 government asked you about.
12      "Mobile defaults:  Defaults have more prominence in mobile
13 due to screen size and UI."  The government asked you several
14 questions about that.
15      And my question is whether you're aware of any analysis or
16 surveys or anything that was conducted to make that hypothesis
17 that shows up here.
18 A.   I am not aware of any surveys or data or anything that
19 underpin that statement.
20 Q.   Do you know where it came from?
21 A.   I would think it probably came from like a hypothesis from
22 conversations, I guess, of, you know, one assumption to make
23 here.  I don't -- as far as I know, I don't know if there was
24 anything that it was based on other than just a hypothesis.
25           MR. BENNETT:  Thank you.  That's all I have for the

```
 1    closed session, Your Honor.
 2              THE COURT:  What was the last exhibit again, please.
 3              MR. BENNETT:  We were in 674.  I said it incorrectly
 4    the first time.  I apologize for that.
 5              THE COURT:  All right.  Okay.  Before we do that, any
 6    redirect in the closed session?
 7              MR. HAFENBRACK:  Yes, Your Honor.
 8                          REDIRECT EXAMINATION
 9         BY MR. HAFENBRACK:
10    Q.   If we could pull UPX38 back up.
11         Mr. Roszak, did you give the speech that these notes are
12    notes for?
13    A.   I expect --
14              THE COURT:  This a little bit out of the scope.
15         He did ask about this.  Pardon me.  Go ahead and ask your
16    question.  Sorry.
17              BY MR. HAFENBRACK:
18    Q.   My question is whether -- UPX38 reflects your notes for a
19    speech you were going to give at a Google training; correct?
20    A.   For a presentation, yes.
21    Q.   And my question is whether you actually gave the
22    presentation that's listed here.
23    A.   I expect I would have done a presentation.  I don't know if
24    I would have said this exactly.  These were notes.  But I expect
25    I would have given some presentation.
```

1     Q.   Do you recall whether you used these notes as sort of your
2     outline for the presentation?
3     A.   I think I probably would have used them as the outline.  I
4     don't know if I would have followed them.  I actually try in
5     presentations to not have notes.
6     Q.   And when you were giving the presentation, were the other
7     Google employees that were a part of the training, were they the
8     audience for the presentation?
9     A.   I don't know that there really was an audience.  It was
10    much more around like coaching on how to give presentations.  I
11    didn't really view it as audience or anything else, given it was
12    just like -- I mean, it really wasn't audience so much as, you
13    know, how to use some of the tips that they had on
14    presentations.
15    Q.   Okay.  If I could direct your attention to the fifth bullet
16    point that said "we had a few jolts across time," and then you
17    provide two examples of jolts.  One is iOS 7.
18         And that's when Apple changed the Safari search bar
19    configuration; right?
20              MR. BENNETT:  Objection.  Now we are beyond the scope,
21    Your Honor.  I asked about the first full bullets, and that was
22    it.
23              THE COURT:  Let me hear the question first, and then I
24    can decide.  Go ahead.
25              BY MR. HAFENBRACK:

1  Q.   My question is whether the iOS 7 example that you provide
2  was an example where Apple changed the configuration of the
3  Safari browser.
4  A.   Can I answer?  Sorry.
5       Yes, I believe so.
6  Q.   And the second example you provide here is Mozilla
7  switching the default to Yahoo!; right?
8  A.   Yes.
9  Q.   And those are just facts that you included in your
10 presentation; right?
11 A.   Yes.
12 Q.   And you're aware of those facts based on your work at
13 Google; right?
14 A.   Yes.
15 Q.   Okay.  Your counsel --
16          THE COURT:  I will overrule the objection on scope.
17 Go ahead.
18          MR. BENNETT:  Thank you, Your Honor.
19          BY MR. HAFENBRACK:
20 Q.   If you could pull up UPX85.
21      And you can turn to that in your binder if you want, or you
22 can look at it on the screen, whatever you prefer, Mr. Roszak.
23      And you see the date here of your e-mail to Ms. Porat,
24 October 2015; right?
25 A.   Yes.

1  Q.   And then if you go to the third page, back to that same
2  bullet we were talking about earlier, maintaining the Safari
3  default distribution is paramount, it describes the ▮ percent
4  revenue recovery as the dooms-day scenario.
5       Do you see that?
6  A.   Yes.
7  Q.   And subsequent to this e-mail in October 2015, Google
8  started anchoring on the ▮ percent revenue estimate for Apple
9  iPhones; correct?
10 A.   We started using that in our scenarios, yes.
11          MR. HAFENBRACK:  Nothing further, Your Honor.
12          THE COURT:  Okay.  Let's go ahead and open the
13 courtroom up, and we can finish up with Mr. Roszak.  We're just
14 going to need a couple of minutes to make sure we get the media
15 room line reconnected.
16          MR. BENNETT:  I'm embarrassed to go through this.
17 I've got about 30 seconds.
18       (End of sealed proceedings.)
19          THE COURT:  Mr. Douyon went down to let everybody know
20 the courtroom was reopen.  It's going to take about five minutes
21 to reconnect the line.  Instead of waiting, why don't we plow
22 forward.
23          MR. BENNETT:  Thank you, Your Honor.
24                        RECROSS-EXAMINATION
25          BY MR. BENNETT:

1    Q.   Exhibit 462, it's the Japan RPM e-mail you were asked some
2    questions about.  And there were questions posed to two of your
3    colleagues who, I understand from prior questioning, are the
4    head of finance for Google in Japan and the head of finance for
5    Google in Asia; is that correct?
6    A.   Asia-Pacific, yes.
7    Q.   Asia-Pacific, I'm sorry.
8         And so with those duties, are those people you would turn
9    to if you wanted to understand the dynamics of competition for
10   search advertising in the United States?
11   A.   No, those are not individuals I would reach out to on that.
12             MR. BENNETT:  I have nothing further, Your Honor.
13             THE COURT:  Just for the interest of completeness on
14   the public record, will you re-ask the questions you asked him
15   in closed session and elicit that information?
16             MR. BENNETT:  Oh, sure, Your Honor.  I apologize for
17   that.
18             BY MR. BENNETT:
19   Q.   So I had previously asked you a question about who
20   Mr. Sidarto is.
21        Can you tell us who Mr. Sidarto is?
22   A.   He is the Google finance lead for Asia-Pacific.
23   Q.   And at the bottom of Exhibit -- I guess we need to call up
24   the exhibit as well, 462, and we're looking at the bottom
25   e-mail.

```
 1            At the bottom of 462, are there several bullet points that
 2   Mr. Sidarto provided you in response to your question about RPMs
 3   in Japan?
 4   A.    Yes.
 5            MR. BENNETT:  That's all I have, Your Honor.  Thank
 6   you.
 7            THE COURT:  Okay.  Any redirect?
 8            MR. HAFENBRACK:  No, Your Honor.
 9            THE COURT:  Mr. Roszak, thank you very much for your
10   time and your testimony, and safe travels home.
11            THE WITNESS:  Thank you.
12            THE COURT:  Okay.  Are plaintiffs ready with their
13   next witness?
14            MR. HAFENBRACK:  Your Honor, if I may, at this time
15   the United States moves into evidence UPX38 under Rule
16   801(d)(2)(D).
17            MR. BENNETT:  Objection, Your Honor.
18            THE COURT:  Let's hold off.  I actually didn't bring
19   my materials with me.  So why don't we take that up at the start
20   of the next break.
21            MR. HAFENBRACK:  Sure, Your Honor.
22            THE COURT:  Or right after the next break, I should
23   say.
24            MR. SOMMER:  Judge, there was one exhibit yesterday
25   that Your Honor received provisionally but DOJ wanted to
```