1               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

2

   United States of America,   )
3  et al.,              )
                       )  **PUBLIC**
4           Plaintiffs, )
                       ) CV No. 20-3010
5     vs.           ) Washington, D.C.
                       ) September 27, 2023
6  Google LLC,         ) 1:30 p.m.
                       )
7            Defendant. )
  _____)
8

9              TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE AMIT P. MEHTA
10          UNITED STATES DISTRICT JUDGE

11  APPEARANCES:
    For DoJ Plaintiffs:      **Kenneth M. Dintzer**
12                     **Ian Hoffman**
                    U.S. DEPARTMENT OF JUSTICE
13                 1100 L Street, NW
                    Washington, D.C.
14                 (202) 307-0340
                    Email:  Kenneth.dintzer2@usdoj.gov
15                 Email:  Ian.hoffman@usdoj.gov

16                 **David E. Dahlquist**
                    U.S. Department of Justice
17                 209 South LaSalle Street
                    Suite 600
18                 Chicago, IL  60604
                    (202) 805-8563
19                 Email:  David.dahlquist@usdoj.gov

20

    For Plaintiff
21  State of Colorado:        **William J. Cavanaugh, Jr.**
                    Patterson Belknap Webb & Tyler LLP
22                 1133 Avenue of the Americas
                    Suite 2200
23                 New York, NY 10036
                    (212) 335-2793
24                 Email:  Wfcavanaugh@pbwt.com

25

```
 1    For Defendant Google:     John E. Schmidtlein
                                WILLIAMS & CONNOLLY LLP
 2                              725 12th St., NW
                                Washington, D.C. 20005
 3                              (202) 434-5000
                                Email:  Jschmidtlein@wc.com
 4
                                Mark Popofsky
 5                              Matthew McGinnis
                                Ropes & Gray LLP
 6                              2099 Pennsylvania Avenue, NW
                                Washington, DC  20006
 7                              (202) 508-4624
                                Email:  Mark.popofsky@rogesgray.com
 8                              Email:  Matthew.mcginnis@ropesgray.com

 9
      Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
10                              Official Court Reporter
                                United States Courthouse, Room 6523
11                              333 Constitution Avenue, NW
                                Washington, DC  20001
12                              202-354-3267
                                      *   *   *
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          *   *   *   *   *   *   *P R O C E E D I N G S*   *   *   *   *   *   *







2855



2856







2859



2860



2861



2862



2863





2865



2866



2867





2869



















15    (The following proceedings were held in open court:)

16         THE COURT:  Why don't we get started.  And I'm sure

17    the media room will be connected any minute.

18                      DIRECT EXAMINATION

19    BY MR. POPOFSKY:

20    Q.  Good afternoon, Ms. Kartasheva.

21    A.  Good afternoon.

22    Q.  Counsel for the Department of Justice asked you a little

23    bit about your responsibilities during your time before your

24    current position.  What role, if any, did you have in the

25    finding when an alternative search service is under an RSA?

1    A.  None.

2    Q.  What was your role, if any, in monitoring whether OEM or

3    carrier partners complied with Google's MADAs or RSAs?

4    A.  My team only had a responsibility for monitoring compliance

5    for the search and software updates that I mentioned before.

6    That was it.

7            THE COURT:  I'm sorry.  Your team had responsibility

8    for what, again?

9            THE WITNESS:  The monitoring the compliance with

10    Search with the security updates and software updates, which

11    were the additions from my team.

12    BY MR. POPOFSKY:

13    Q.  Now, you were asked about some factfinding you did around

14    S-Finder and Branch in June of 2020.  Do you recall that,

15    Ms. Kartasheva?

16    A.  Yes.

17    Q.  Why were you involved in that, given your responsibilities

18    at the time were in the product where you previously testified?

19    A.  It was Kesh Patel concluded that it was a product question.

20    He knew I and my team were working closely with the product,

21    and that's why he found me, so that I could make a connection

22    to the product, who will be making a decision on the matter.

23            MR. POPOFSKY:  I would like to hand up a

24    demonstrative that we have marked DXD05.006.  May I approach,

25    Your Honor?

```
1              THE COURT:  You may.
2    BY MR. POPOFSKY:
3    Q.  Do you recognize this, Ms. Kartasheva?
4    A.  Yes.
5    Q.  Can you tell the Court what it is?
6    A.  These are the screenshots that I described in one of the
7    emails that I took when I was trying out the Branch experience
8    on the S-Finder.
9    Q.  And that was in June of 2020?
10   A.  Correct.
11   Q.  Now, can you tell the Court what you are depicting on the
12   left-hand screenshot?
13   A.  So, on the left is a consent screen.  So when you start
14   using the S-Finder, and for the first time, you see that it
15   notifies you that the Branch technology is implemented, that it
16   is collecting your data and that it's sending this data to
17   Branch so they can use it in their product.
18   Q.  And on the far right, can you please explain what that is
19   to the Court?
20   A.  So this is the pure on-device search.  That means that the
21   airplane mode off (sic), meaning that device cannot connect to
22   the internet.  All it has to work with is what is physically
23   stored on your device.  And, so, when I type "flower," in this
24   case, it shows me contents of my gallery.  So the pictures that
25   I took, the messages that I sent that contain the word
```

1  "flower," and then the files that I have downloaded with that

2  flower in them.

3  Q.  I believe you testified before the closed session that you

4  didn't like the Branch experience you encountered in June of

5  2020.

6  A.  I did not.

7  Q.  Can you explain to the Court why, using this demonstrative?

8  A.  Because you see on the middle screen, right, devices

9  connected, and provided me with the different set of results

10  when I typed the same query.  And I do not know why these

11  results are shown to me.  It's not particularly relevant.  It's

12  a random collection from the apps that Branch happened to

13  index, right?  And so I typed "flowers," and I see games from

14  the app store, which I never engaged with in my life; Netflix

15  shows about flowers.  Again, why?  Experiences from Yelp and

16  Expedia.  It's just random and not particularly relevant.

17  Q.  And at the very bottom of the screenshot you took, the

18  middle screenshot, it says:  Search using Google.

19      Can you please tell the Court what that is?

20  A.  Yes.  So, ultimately, this experience is what Samsung

21  designed, right?  And so they designed the user experience.

22  And they are giving me an option, if I'm not satisfied with

23  these results, to go and perform general search on Google.

24  Q.  And what is the significance, if any, of that to you in

25  terms of the question of whether Branch's service competes with

 1    Google Search?

 2    A.  I believe that Samsung concluded that they were

 3    complimentary experiences that users would see.

 4              MR. DINTZER:  Objection, Your Honor.  No foundation

 5    as to what Samsung concluded.

 6              THE COURT:  Well, I guess that's fair.  I'll sustain

 7    that objection.

 8              Rephrase the question, please.

 9              MR. POPOFSKY:  Sure.

10    BY MR. POPOFSKY:

11    Q.  What do you take from the presence of Google search at the

12    bottom of the screen, in terms of whether Google Search offers

13    an experience competitive with the Branch experience?

14    A.  Google offers a different and complimentary experience that

15    allows users to search the web.

16    Q.  Earlier in this trial, the Court asked what the difference

17    is between searching with Google in the Google Search widget or

18    Google Search app that Google licenses through the MADA, and

19    search with Google through a third-party search access point

20    here simplified by S-Finder.  What is the difference, if any,

21    in those two experiences?

22    A.  Well, because Google designs the first-party experience in

23    a kind of cohesive way.  It makes sure that the speed and the

24    search experience is optimized.  So, when you type

25    experience -- a search query in Google app or Chrome, you get

 1    results faster and the layout is cleaner than if you're

 2    searching through a third-party access point.

 3    Q.  We can keep this up for now, Andrew, but I would like to

 4    hand out what has been previously submitted into evidence as

 5    JX71.

 6              MR. POPOFSKY:  May I approach, Your Honor?

 7              THE COURT:  Yes.

 8              Let me ask, Ms. Kartasheva -- I sort of asked this

 9    earlier, but will the search results vary depending upon

10    which -- what the access point is in Google?

11              THE WITNESS:  No.  Just the layout.  Because on the

12    app it would look cleaner and it would be organized in kind of

13    neat icons, and in the third-party search, you might just see

14    the row of links, which just might be less appealing visually.

15              THE COURT:  Got it.  Okay.

16              MR. POPOFSKY:  Now, I mean, keeping this up --

17    demonstrative up, Your Honor, because I'm going to return to

18    it, and I do not want this document which is fully under seal

19    to be displayed to the public.

20              THE COURT:  Okay.

21    BY MR. POPOFSKY:

22    Q.  Do you recognize this, Ms. Kartasheva, to be the Samsung

23    RSA that Mr. Dintzer asked you about that was entered into

24    subsequent to June of 2020?

25    A.  Yes.

1   Q.  Can you please -- again, without saying it out loud, turn

2   to the Bates number ending in 394, third page of the agreement,

3   section 1.5?  And do you see that 1.5 contains the definition

4   of alternative search service?

5   A.  Yes.

6   Q.  Can you compare that, please, to the document that

7   Mr. Dintzer had you look at?  I believe it is 2003 that was

8   handed up loose this morning to you.

9   A.  Yes.

10  Q.  Are those the same definition or different in the relevant

11  respect?

12  A.  Different.

13  Q.  Thank you.  You can put that document aside.

14          Ms. Kartasheva, are you aware of Google having ever told

15  an OEM or carrier partner not to implement Branch on its mobile

16  devices?

17  A.  No, I'm not aware of that.  In fact, I am aware of

18  agreements that specifically clarify that S-Finder

19  implementation is permitted.

20  Q.  Are you aware of what decision, if any, was reached after

21  your factfinding in June of 2020, apart from the testimony you

22  just gave?

23  A.  The decision-makers didn't notify me.

24  Q.  Do you have an understanding of whether S-Finder --

25          THE COURT:  I'm sorry.  What decision?

```
 1                MR. POPOFSKY:  The decision with respect to Branch
 2     and AT&T, Your Honor.  Thank you for that clarification.
 3                THE COURT:  Okay.  And the decision-makers didn't
 4     notify you about?
 5                THE WITNESS:  What they had decided.
 6                THE COURT:  What AT&T had decided?
 7                THE WITNESS:  No.  What they have decided about what
 8     to respond to AT&T.
 9                THE COURT:  I see.  Okay.  I understand now.  Thank
10     you.
11                MR. POPOFSKY:  Thank you for slowing me down, Your
12     Honor.  I have a sticky that says:  Go slow.
13     BY MR. POPOFSKY:
14     Q.  Ms. Kartasheva, do you have an understanding of whether
15     Samsung's S-Finder still implements Branch on RSA-enrolled
16     devices.
17     A.  In my personal experience, yes.
18     Q.  How do you know that?
19     A.  My personal device is a Samsung device.  I bought it couple
20     months ago.  It's a 35, so new device that they launched.  And
21     the first time I started it -- and I use S-Finder sometimes
22     when I look for local files, and I saw the same screens and
23     same experience as what was depicted here.
24     Q.  And how do you know that's an RSA-enrolled device?
25     A.  I'm a nerd, so I looked up the client ID.  So when you
```

1    search on Google, you can track the client ID and you can tell

2    whether it's paying RSA ID or not.

3    Q.  With respect to the Branch experience on the device, is it

4    similar or different from that you encountered in June of 2020?

5    A.  Yep, it looked exactly the same.

6    Q.  Same as when it's connected to the internet?

7    A.  Yes.

8    Q.  What do you think of that experience today?

9    A.  Still deeply dislike it.

10   Q.  Pardon?  I didn't hear you.

11   A.  Still deeply dislike it.

12   Q.  Why do you deeply dislike it?

13   A.  It's still same random collection of tidbits rather than a

14   well-structured response to my query.

15            MR. POPOFSKY:  You can take that down, Andrew.

16            No further questions, Your Honor.

17            THE COURT:  Okay.  Thank you.

18            Counsel, any redirect from DoJ?

19            MR. DINTZER:  Yes, Your Honor.

20                       REDIRECT EXAMINATION

21   BY MR. DINTZER:

22   Q.  So, ma'am, the demonstrative -- I don't need to put it up.

23   The Court has it.  You've got the demonstrative in front of

24   you?

25   A.  Yes.

1    Q.  You took those pictures, right?

2    A.  Yes.

3    Q.  Okay.  And you took those pictures, and you actually

4    attached them to UPX694; is that right?

5         You can go in the binder.

6    A.  694, yes.  Because we were -- when we were sending these

7    emails, the pictures kept failing to attach.  And it was just

8    getting annoying where we had to resend and resend, so we just

9    pasted them into the slide deck.

10   Q.  Right.  The demonstrative had this stripped off, but as

11   long as we're going to do it, might as well see the whole

12   context.  While the demonstrative didn't have the heading, the

13   heading you put was:

14        Situation:  Samsung's partnership with Branch expands

15   the search experience via deep linking, violating their

16   contracts.

17        Right?

18   A.  It was, again, my opinion that because it looked

19   substantially similar, I thought that it was a violation.

20   Q.  But you didn't put any of that there.  You just said

21   "violating their contracts."

22        Right?

23   A.  In the --

24   Q.  I'm just talking about in this page that matches the

25   demonstrative, right?

 1    A.  On this page.  But on the email, it's clear that it is my

 2    opinion that I'm conveying.

 3    Q.  And the S-Finder that you use that has Branch -- well,

 4    actually, we'll save that.

 5            MR. DINTZER:  No further questions, Your Honor.

 6            THE COURT:  All right.  Mr. Cavanaugh?

 7            MR. CAVANAUGH:  Nothing, Your Honor.

 8            THE COURT:  All right.

 9            Ms. Kartasheva.  Thank you very much for your time

10    and testimony.  Safe travels home.

11            THE WITNESS:  Thank you.  So lovely.

12            MR. DINTZER:  Your Honor, our next witness will be

13    the former CEO of Branch.  We believe that there's -- we have

14    not done the push -- I suppose we should soon, maybe now.  We

15    need to push in the designated testimony of a lot of witnesses,

16    and I'm not here to handle that now.  What I would like to do,

17    Your Honor, though, is there is a piece of testimony from the

18    deposition of AT&T's executive -- it's just one -- two

19    questions -- that will inform and actually connect the witness

20    we just saw to the witness you are about to see, and was at the

21    response of Google's counsel's questions.

22            THE COURT:  Okay.

23            MR. DINTZER:  And so if I can -- I'm happy to -- I

24    would like to hand it up.  But, if I can read it or if the

25    Court just wants to read it to itself, but that will help set

```
 1    the stage for the next witness.
 2              THE COURT:  So you're just wanting to push this
 3    particular deposition excerpt in at this time?
 4              MR. DINTZER:  Yes, Your Honor.
 5              THE COURT:  I take it this has been designated
 6    already?
 7              MR. DINTZER:  It has.
 8              THE COURT:  All right.  Why don't we just at least
 9    read it in the record, if it's short.
10              MR. DINTZER:  I would appreciate that, Your Honor.
11              THE COURT:  Is it the whole two pages?
12              MR. SCHMIDTLEIN:  I haven't seen this, obviously,
13    before.  It's just been handed to me.  Whether this has been
14    designated or not, obviously, my team can check and verify
15    that.  And I don't know whether there're confidentiality
16    concerns from AT&T over this.
17              MR. DINTZER:  I believe AT&T cleared us, except for
18    the black box, which I would not read.  But if the Court would
19    rather just read it to itself, however --
20              THE COURT:  No.  If it's been cleared -- and you are
21    proposing to read both panels?
22              MR. DINTZER:  Whatever conveniences the Court.
23              THE COURT:  Well --
24              MR. SCHMIDTLEIN:  The counter designations, whether
25    this is complete or not, I can't say sitting here.
```

1          MR. DINTZER:  And Google is welcome -- I mean, they

2    have counter-designated.  It's all coming in.  I just believe

3    this will inform the Court.

4          THE COURT:  All right.  Well, go ahead and read this

5    into the record.  If there's some reason to complete this

6    during this witness's examination, you'll let me know.

7          MR. DINTZER:  So this is an executive at AT&T, and

8    what he was asked -- and I cut out the first part of the

9    question:  I take it that ultimately --

10         THE COURT:  I do think you need to read the whole

11    thing --

12         MR. DINTZER:  The whole thing.

13         "Mr. Cohen asked you a few questions about Branch --"

14         THE COURT:  No, no, no.  You need to identify who the

15    witness is.

16         MR. DINTZER:  His name is Jeff Ezell, E-Z-E-L-L.

17    He's an AT&T witness.

18         "Mr. Cohen asked you a few questions about Branch and

19    the, you know, thought process that went into about how that

20    would intercept or not with the RSAs.  I take it that,

21    ultimately, it was never definitively resolved one way or

22    another whether AT&T's distribution of Branch on its handsets

23    would make that handset ineligible for revshare; is that

24    right?"

25         Answer:  "Well, when you say "definitively

1    determined," I don't know how to answer that in the sense that

2    I consulted my legal team.  They said it was ambiguous, but

3    there was some risk that it would be inconsistent with the RSA.

4    Then one of my team members floated the idea by Google to see

5    what Google's opinion of it was.  And I didn't see the

6    communication on that, but I -- the way it was reported back to

7    me was that Google indicated that they felt it was inconsistent

8    with the RSA.

9           "Whether that's your definition of "definitively

10   resolved" or not, it was enough uncertainty for me that I

11   decided, as well as the device team, who would have been

12   responsible for doing that, we just decided it wasn't worth --"

13          Question:  "Was the --"

14          Answer:  "-- the uncertainty."

15          Question:  "Was the issue ever elevated to more

16   people more senior to you to resolve the uncertainty and decide

17   one way or another whether it made a device ineligible for

18   revshare?"

19          Answer:  "Not that I'm aware of.  My memory of it was

20   that it was kind of a joint discussion that I had with X,

21   potentially Y, who was another person who is a colleague of

22   mine who does services, and we're all at the same level of vice

23   president.  And so I think we collectively made the decision

24   that we wouldn't continue the discussions with Branch, so I

25   don't believe it went above us."

```
 1            So that's just -- as I said, the next witness is the
 2    former CEO of Branch, and he'll be testifying.
 3            MR. SCHMIDTLEIN:  And it will become clear, once Your
 4    Honor sees the fulsome evidence on this, that this is
 5    misleading and it's incomplete.
 6            THE COURT:  All right.  Well, as I said, obviously
 7    Google will have the opportunity, and it doesn't need to,
 8    obviously, wait until the deposition designations are put in,
 9    since this has been introduced during the trial.  And certainly
10    feel free, when it's appropriate, to bring forward whatever
11    else you think completes the testimony.
12            MR. DINTZER:  We appreciate that, Your Honor.
13            THE COURT:  Okay.
14            MR. DINTZER:  And my colleague will call for the next
15    witness.
16            MR. HOFFMAN:  Good afternoon, Your Honor.  Nice to
17    see you again.  The United States next calls Alexander Austin.
18            I'm sorry.  Ian Hoffman for the United States.
19                    ALEXANDER AUSTIN,
20    was called as a witness and, having been first duly sworn, was
21    examined and testified as follows:
22            THE COURT:  Mr. Austin, welcome.
23            THE WITNESS:  Hey.
24    BY MR. HOFFMAN:
25    Q.  Good afternoon, Mr. Austin.  It's nice to meet you.  My
```

1    name is Ian Hoffman, and I represent the United States of

2    America.

3            Can you state your name for the Court and spell your

4    name for the record, please?

5    A.   Sure.  It's Alexander John Austin.  A-L-E-X-A-N-D-E-R; John

6    is J-O-H-N; Austin is A-U-S-T-I-N.

7    Q.   And are you the founder of a company called Branch Metrics

8    or just Branch?

9    A.   I am, yeah.

10   Q.   What is your role at Branch today?

11   A.   I am not currently employed at Branch as of today.

12   Q.   And when did that change?

13   A.   Couple months ago, officially.  In July of this year.

14   Q.   And when did you found Branch?

15   A.   So we started the company -- the actual corporation in

16   2013, actually, in a class in grad school, but we were not

17   focused on deep linking or search at the time.  At that time,

18   it was a different project, that we ended up sunsetting, but

19   the same team continued on.  And then about a year later, in

20   2014, when we were graduating, we decided to focus on Branch

21   full-time.

22   Q.   And what school were you going to when you founded the

23   company that became Branch?

24   A.   This is Stanford, the business school.

25   Q.   And today, how many people does Branch employ?

1    A.  It's probably 450 or so.  I would have -- I'm not sure of

2    the latest numbers, but around that order of magnitude.

3    Q.  Throughout the course of Branch's history, has it raised

4    venture capital funds?

5    A.  Yes.  We have raised quite a bit of venture, around

6    650 million to date so far.

7    Q.  And from whom has Branch raised venture capital funds?

8    A.  So we raised -- the primary investor is New Enterprise

9    Associates, NEA, but we have raised from a number of other

10   investors, including Founders Fund, Playground, primarily from

11   Andy Rubin, who is the one of the founders of Android and

12   worked at Google for a long time, and Samsung Next, which is

13   their venture investment arm.

14   Q.  You mentioned NEA.  Can you explain to the Court what NEA

15   is?

16   A.  New Enterprise Associates.  It's an institutional VC firm

17   that has put in the vast majority of funds into Branch.

18   Q.  And at the time you founded Branch, was there a key product

19   that you envisioned Branch would build?

20   A.  At the time we initially decided, you know, around

21   graduation, we said, okay, you know, deep linking is the focus,

22   which was an idea that we had had, actually, a few years prior,

23   but became sort of the core focus.

24          Within, you know, I would say three to four weeks of

25   that time, the primary mission of the company became building

 1    an app search engine.  And I'm happy to expand more on what
 2    that is, or maybe we'll get to that.
 3    Q.  What do you mean by an "app search engine"?
 4    A.  So, you know, we're entirely focused on mobile phones, on
 5    mobile devices.  And generally when people think about
 6    searching, they think about a Google and searching the web.
 7    And when you search on Google, you primarily get website
 8    results that when you click on, will take you to a browser.
 9         Meanwhile, on a mobile device, most time spent, most
10    users prefer native apps.  And there are difficulties in
11    actually building, you know, an app version of a search engine
12    that, you know, we decided to actually, you know, take on as
13    sort of a core premise.  But the app search engine, the premise
14    is you can basically search across app pages, much like you
15    could on the web, and then when you click on a result, you
16    know, sent directly into the app, to the correct page that you
17    clicked on.  So the results you would see, rather than being
18    websites, would be app pages.
19         THE COURT:  I'm sorry.  When you click on whatever
20    search result, does -- it takes you to the app or to the web
21    page?
22         THE WITNESS:  To the app.  So, you know, an example,
23    you might search for pizza and you might have a Yelp on your
24    phone, but maybe that's sort of the only pizza-related, you
25    know, app.  But there might be food delivery apps or other type

1    of location-specific recommendation apps where you would have

2    results.  And we could show you the Yelp results of a nearby

3    pizza place, but also show you, potentially, a delivery option

4    in app that you might not have heard of before that would let

5    you go adopt that app, become a new customer, and then order

6    delivery of pizza.

7            THE COURT:  So the search is not just limited to

8    those apps a user has placed on their phone?  It is some

9    universal apps that you have deals with?

10           THE WITNESS:  Yeah.  The idea being that, you know,

11   search, generally you're looking for a thing.  It's not

12   necessarily you're searching for any app specifically.  You're

13   trying to, you know, take an action, you know, buy a product,

14   whatever it might be, and the app is more of the platform upon

15   which to take that action.

16           And, you know, discovering apps is very difficult,

17   primarily because of the constraints placed on app developers

18   via at the app store distribution mechanism.  And so the idea

19   that you could discover apps based on what was inside was very

20   exciting.  And I think, you know, web search canonically has

21   opened many options for websites to be discovered by, you know,

22   the first -- the thing that the user is looking for by

23   searching for a specific query, finding a relevant web page,

24   going to the website for the first time and maybe buying a

25   product.  It's one of the primary drivers of traffic for

1    websites.

2         So the idea was we could do the same thing for app

3    companies and open up this entirely new channel.

4    MR. HOFFMAN:

5    Q.   Okay.  Thank you for that explanation.  Let's look at how

6    Branch's app search engine appeared on the phone.

7         So I'll ask Ms. Gattas Johnson to display DX612 on the

8    screen.

9         And we have paper -- we'll have a paper binder for you,

10   too, but you're allowed to look at the screen.

11   A.   That's good.  These slides look familiar.  I think I

12   probably made them.  Thanks.

13   Q.   All right.  Now that we have materials distributed,

14   Mr. Austin, do you see DX0612 on your screen?

15   A.   I do.

16   Q.   Do you recognize this document?

17   A.   I do recognize this.

18   Q.   And can you tell the Court what it is?

19   A.   I believe this is a document that was created primarily to

20   demonstrate to an external distribution partner, such as a

21   Samsung or a carrier like a Verizon, about what the product is,

22   how it works, and how it might be integrated into their

23   devices.

24   Q.   Okay.  And now I'll ask Ms. Gattas Johnson to display page

25   15 of this exhibit that has Bates number ending in 634.

1          Can you walk us through what this slide depicts,

2     Mr. Austin?

3     A.  Sure.  So this is an example screen of an Android device.

4     I'm not entirely sure which device.  Maybe a -- probably, I

5     would guess, like, a Motorola device.  It showcases the search

6     experience before Branch came about.

7          So the idea is that everybody has these phones, and

8     the primary way that they get to apps is by swiping up, and

9     then they see what we refer as the app tray, sometimes called

10    app grid, and there's a search bar at the top.  In that search

11    bar, you can filter the list of apps.  It's a very, very basic

12    functionality that Android had.  You know, most people don't

13    even think twice about it, but the search bar is actually used

14    very frequently, which was exciting to us as a promising, you

15    know, distribution platform for our innovation.

16    Q.  And why in particular did Branch choose to use this swipe-

17    up search bar as the access point for Branch?

18    A.  So, you know, now we'll probably get into the

19    Google-related issues that we face.  But, so, as I mentioned,

20    we sort of focused on app search as the primary, you know,

21    initiative, the primary, you know, mission of the company back

22    in 2014, but we didn't earnestly start developing and focus on

23    distribution of the actual app search engine until probably

24    2017, 2018, in that time.

25          And the reasons being -- maybe just as an aside,

1    quickly, for the sake of, you know, just knowledge -- in order

2    to develop an app search engine, you need to go and work

3    individually with every app company and get them to send you

4    the actual pages inside of the app.  So you have to build the

5    one-on-one relationship with the app, have them develop, write

6    custom code.  And we had spent years and, you know, I think

7    over a couple hundred million dollars developing this database,

8    developing the relationship with app companies to enable the

9    actual development of app search.

10            So, now we're fast-forward 2017, 2018.  We're ready

11    to start thinking about distribution of the app search engine

12    that we had built.  And, you know, maybe very simple-mindedly I

13    went to every search bar that I could possibly think of --

14    browsers, you know, search apps, even, like, a Yelp -- and I

15    said, hey, you want an app search engine in your search bar?

16            And pretty universally the feedback we would get from

17    prominent, popular search bars was, we have a relationship with

18    Google.  We receive large sums of money.  And, you know, unless

19    you can compensate for that, we're not going to use you.  And

20    there's all sorts of restrictions about how the placement would

21    work, et cetera.

22            So, you know, 2018 we uncovered -- and I don't want

23    to say if it was, like, a discovery, but I would say we always

24    knew about the search bar, but we discovered that it actually

25    had a lot of usage.  And what was very promising about it was

1    that Google did not have a product that integrated into this

2    search bar.  So it was a very, very simple UI that was

3    untouched and had a ton of traffic.  And so users were going

4    here getting very basic, limited results, and we had this

5    amazing new functionality that could actually power the

6    experience and potentially get -- you know, solve this problem

7    for users and help app companies.

8            And so the discovery in 2018 of this actually being a

9    very high-traffic search bar, and with the knowledge that

10   Google had not -- well, as we thought at the time -- blocked

11   this off with the contracts that we had encountered in other

12   search bars sort of became the main focus for our product

13   distribution.

14   Q.  Okay.  And for the record, when you say "UI," you mean

15   what?

16   A.  User interface.

17   Q.  Now I'll ask Ms. Gattas Johnson to display the page of this

18   exhibit with Bates number ending in 637.

19           MR. HOFFMAN:  And, Your Honor, I'll also move to

20   admit this Exhibit DX0612.

21           MR. McGINNIS:  Your Honor, Matt McGinnis on behalf of

22   Google.  No objection.

23           THE COURT:  Thank you, Mr. McGinnis.

24           So that exhibit will be admitted.

25   BY MR. HOFFMAN:

1    Q.  Mr. Austin, do you see on the left-hand side there's a

2    phone screen above which it says:  Discovery search results?

3    A.  Yes.

4    Q.  Is "Discovery" the name that Branch gave to its app search

5    engine?

6    A.  I -- very, very early on, I can't remember the exact date,

7    but we canonically described this as a way to solve Discovery

8    for app companies, which were the companies we were working

9    with to get deep links and get the data to build the search

10   product.  Because discovery is one of the most challenging

11   things in the app ecosystem, and so we thought this was a, you

12   know, an apt description for the mission of the company.

13   Q.  Okay.  And can you explain to the Court what the phone

14   screen on the left depicts?

15   A.  Yeah, absolutely.  So, this is our product with an example

16   integration into that on-device search bar that we had just

17   talked about.  So, previously, if you went to the search bar --

18   so, this aside, but if you were -- before Branch integrated and

19   you typed "pizza," you would get nothing unless you had an app

20   named pizza on your phone.

21           In this case, what we've done is we have started to

22   showcase deep app pages across all these apps that a user has,

23   as well as in apps they don't have, enabling that Discovery use

24   case.  So when a user executes pizza, they see, you know, some

25   relevant Yelp deep links because they are a very frequent Yelp

1    user.  And, so, the best experience is:  Let's get them to

2    Yelp.

3            But there are some alternatives, maybe food delivery

4    or, potentially, a Tripadviser, if they're in a destination

5    maybe Yelp doesn't have coverage or whatever.  And then

6    scrolling further, you might see other apps were the user

7    hadn't heard of before where they could potentially solve this

8    sort of pizza intent.

9    Q.  The phone screen on the right, where the title above is

10   Advertising, can you explain to the Court what that phone

11   screen depicts?

12   A.  Perfect.  Yeah.  So, this is just an example for one of our

13   distribution partners of the hypothetical way that we would

14   potentially monetize this product.  And, you know, the

15   parallels to, like, web search are, I think, very helpful.  So

16   in a web search case, if somebody is searching for pizza or

17   Thai food, you would typically get an advertisement that's

18   relevant to that search query.

19           And so we're showcasing an example here where

20   somebody is searching for Thai food, the user has not used or

21   encountered Door Dash before, and so we can actually let Door

22   Dash show an add that's relevant to that user query that might

23   drive the user to adopt Door Dash and then order Thai food from

24   Door Dash.  And then the result of the organic results are

25   shown below that.

1    Q.  And you were talking about Door Dash.  I see to the right

2    of Door Dash there's a box that says in -- I'm color blind --

3    is it blue?

4    A.  It looks bluish, yeah.

5    Q.  If a user clicked on that box, what would happen?

6    A.  They would then go install an app.  Like, in theory, they

7    would not have Door Dash, and then when the user opens up Door

8    Dash, we could potentially take the user to the Thai food

9    section of the Door Dash.  So you can actually bring the

10   context of what the user wanted through the app store, Play

11   Store ecosystem to give a personalized experience after

12   install.  If the user had Door Dash, we could then route the

13   user directly to the Thai food section by opening the Door Dash

14   and then deep linking to the correct page.

15   Q.  Was this a way to monetize the Discovery --

16   A.  Yes.

17   Q.  -- Discovery technology?

18   A.  Yes.  So, generally, I think this has been proven to be

19   very successful in traditional web advertising, and we had very

20   high hopes for and, you know, good early feedback from

21   advertisers that this would be a very promising way to engage

22   new users, and then internally, Branch to, you know, make

23   money.

24   Q.  So you described how consumers could use Discovery.  Could

25   Discovery have been useful to companies that produced apps?

1    A.   Absolutely.  I think I touched briefly on this, but, you

2    know, working with the deep linking product, we were working

3    with, you know, tens of thousand, I think over 100,000

4    different app companies.  And the number one problem that they

5    all face is growth, building relationships with users that they

6    didn't have before.  It's very difficult to do.  So when your

7    options are constrained to the app store or the Play Store

8    where, you know, there's one app portal where you can actually

9    get apps, and very limited real estate to actually discover.

10   And so people are desperate to try to find alternative forms to

11   distribute their applications to end users.

12            And so the idea here of a very heavily used new type

13   of search experience that could showcase their app to a

14   relevant user who is looking for something related to their app

15   was very promising and exciting to app companies as an

16   alternative form of growth that could just generally, you know,

17   relieve the constraints they faced.

18   Q.   So you discovered how -- excuse me.  You've explained how

19   Discovery could be useful to app manufacturers.  Was there a

20   use case for Discovery when it came to mobile carriers or phone

21   manufacturers?

22   A.   Yes.  Absolutely.  So, you know, a few different benefits

23   to the phone manufacturers or the carriers.  And you -- you

24   know, we, like, touched on this a little bit already, but just

25   to reiterate, the number one thing is if you're a Samsung or --

1    Xiaomi or a Verizon, you're trying to find some angle to

2    convince a user to buy your phones over a competitor's phones.

3    And it's an incredibly competitive, low-margin business.

4              So a new feature that can offer differentiation,

5    maybe even developing OEM or a carrier-specific branding on

6    this or some unique features for them was very promising as a

7    way to sell more devices by offering more value to the end

8    user.

9              The second major advantage to them is we were in

10   discussions about sharing revenue, so any of the ad revenue we

11   would make we could potentially share with them a portion of

12   it so they could continue to invest.  And because this real

13   estate had not been touched before, this is all totally

14   incremental, net new revenue for them.  It's not cannibalizing

15   any existing thing.  It's all net new.  And so the premise of

16   100 percent margin net new incremental revenue was also very

17   exciting.

18             Then the third thing, generally, a majority of the

19   conversations when we were working with these folks is around

20   the constraints and difficulties they have with Google, and the

21   idea that there could be another partner that could potentially

22   rival the scale of what Google, you know, is to them in terms

23   of a revenue partner, was extremely exciting to give them some

24   negotiating leverage in their, you know, future discussions

25   with Google.

1    Q.  We've talked about Discovery, as shown on the screen here

2    in front of you.  Was this version of Discovery shown on these

3    slides ever released on phones in the United States?

4    A.  Not in the ideal sense.

5    Q.  What do you mean by that?

6    A.  So, you know, we worked with many different OEM partners,

7    many different carriers for years, for years on end and -- but

8    our first most promising relationship was with Samsung in --

9    you know, I think we started collaborating probably 2018, and I

10   think first set of devices launched in 2019.  But what launched

11   in that first iteration was so restricted and limited that we

12   literally -- you know, days before the launch I was sitting

13   with the Samsung team because they had -- for the prior month

14   or two -- this is probably March 2019, if I -- I believe.  And

15   I would need to check the calendar to be sure exact date of

16   when this meeting happened, but -- and it had been -- like, you

17   know, month after month leading up to this it had been, oh, we

18   need to cut this functionality because Google says it's, like,

19   in conflict or there's a risk to the contract.

20            And we basically got to the point where --

21            MR. McGINNIS:  Objection, Your Honor.

22            THE COURT:  I'll sustain to the extent it's being

23   offered for the truth of the third-party statement.

24            THE WITNESS:  Sorry.

25            THE COURT:  It's okay.

```
1              THE WITNESS:  Do you want me to keep going?
2    BY MR. HOFFMAN:
3    Q.  We'll get to the Samsung story in just a second.
4              But let me ask you this:  Other than Discovery, did
5    Branch create other tools that helped users interact with their
6    apps?
7    A.  We have a number of tools that app companies can use.  The
8    deep linking platform, which is primarily -- you know, it was
9    created as a way to build the dataset to enable this product.
10   And so for the first few years -- this is back when we first
11   started -- the primary, you know, product that we offered, and
12   I think still generally, if you look at Branch, the thing you
13   find most prominently displayed is the product for app
14   developers that helps them do the deep linking.
15             So this offers a lot of value to the end user who
16   now, when they click a link outside of an app, can be sent
17   directly into the app to the right page.  This could be an
18   email you receive on your phone or a text message or a link you
19   see on social media now can open the app directly.  And so it
20   was the, you know, primary benefit, both to the end user and
21   app company of this deep linking product.
22   Q.  Are some of those tools that Branch has produced on phones
23   sold in the United States today?
24   A.  That platform is used by -- you know, I think -- I don't
25   know the exact stats at this point, but I know over 100,000
```

1   applications have integrated that tool and have been creating

2   deep links that help route users to the correct place in their

3   app over the last nine years.

4   Q.  And now back to the Samsung story.  You said you were in

5   negotiations with Samsung over the functionality of Discovery;

6   is that right?

7   A.  That's right, yeah.

8   Q.  And during your initial negotiations with Samsung, did you

9   have some expectation of what Discovery's capabilities would

10  be?

11  A.  Yeah.  I mean, so Samsung invested in Branch in 2015.  And,

12  you know, the team that led the investment, their primary focus

13  is to find new technologies and new products that Samsung could

14  benefit from.  And, so, the partner, the fellow that led that

15  investment, Patrick Chang, since 2015, had been having us meet

16  various Samsung executives, talk about the solution in

17  preparation for when the product was ready, we could actually

18  start a more serious integration conversation.  And that -- you

19  know, in 2018 was when that got much more serious, where the

20  team said, we want to try to launch this on an S10.

21          I think we had shown a variation of that --

22          MR. McGINNIS:  Objection, Your Honor.

23          THE COURT:  Overruled.

24          Go ahead.  You can go ahead and continue.

25  A.  And I think we had probably shown a variation of these

1    slides and actually provided a demonstration of this product

2    for them to, you know, experiment with and try.  And we then

3    started the process to do the integration of targeting the

4    launch that, again, as I mentioned, happened in March 2019.

5    BY MR. HOFFMAN:

6    Q.  I believe you testified in the run-up to March 2019, that

7    Samsung requested reductions to Discovery's functionality; is

8    that correct?

9              MR. McGINNIS:  Objection, Your Honor.

10             THE COURT:  Just ask him what he testified about.  So

11   there's no issue at this point.

12             Go ahead.

13   A.  Yes, absolutely.

14   MR. HOFFMAN:

15   Q.  So, let me ask you -- and I apologize for cutting you off,

16   but let me ask you this:  What reductions in Discovery's

17   functionality did Branch have to make?

18   A.  So, I would say the canonical restriction that we would

19   face is that we could never link to a -- like, the web.  There

20   was this, you know, variations of the feedback that we had

21   heard from a variety of different partners in all the

22   conversations leading up to this.  But then, of course, started

23   to actually impact the functionality -- it was Samsung first --

24   was in no circumstances could you ever link to a website --

25   could your results ever open a browser as a result of, you

1    know, a user interacting with it.  So that was, you know, the

2    first major restriction that we encountered.

3    Q.  And you talked about Branch indexing apps; is that right?

4    A.  That's correct.

5    Q.  Did you give a number of how many apps Branch had indexed?

6    A.  At the -- at this point, when we had -- well, you know, I

7    know to date over 100,000 applications have integrated the

8    tools and sent us data.

9    Q.  In March 2019, when Discovery launched with Samsung, were

10   you allowed to show results from the --

11   A.  Absolutely, yeah.  So, we could potentially show results

12   from all of the apps that Branch had integrated, but also apps

13   that maybe they hadn't, where we had a variation of a way to

14   actually showcase in a less ideal way, but it would potentially

15   link to the web.

16          THE COURT:  Can I -- so, can I just ask you to

17   clarify?  Because I understood you to say the technology for

18   someone who did not have a particular app on their phone, if

19   they were to click on a link, that that would actually require

20   the user to first load the app and then you could head straight

21   to the deep link.  So where does the functionality come from of

22   having to go to a browser in the web first?

23          THE WITNESS:  So our default experience was to do

24   what you just described; however, we do work -- we were, you

25   know, at the time, working with a Yelp and, like, most of the

1    companies on this page that actually do have functional mobile

2    websites.  And Yelp can configure their Branch links to

3    actually go to the website if the app is uninstalled.

4              Everybody here is focused on providing user value.

5    And so if you think about your own experience, let's say you

6    don't have any of these apps that are in this example for

7    pizza, and you click on, you know, Nova Qualta, and it would be

8    very jarring to go to the Play Store as the next step.  So, we

9    would let Yelp then configure, okay, why don't you take them to

10   the mobile website?  Which is less ideal, but then on the site,

11   you can up-sell the app.  So you're at least helping to give a

12   good experience.  But this was a configureable option for app

13   companies, of which they preferred, mostly focused on the end

14   user for that experience.

15   BY MR. HOFFMAN:

16   Q.  You said Branch had indexed thousands of apps.  When

17   Discovery launched on Samsung phones in March 2019, was Branch

18   allowed to display results from thousands of apps?

19   A.  No.  Nowhere near that.  This was -- you know, I think a

20   lot of this revolved around this, you know, fear of linking to

21   websites.  But, Samsung implemented a number of severe product

22   restrictions based on this concept of linking to the web.

23   First was related to this, they limited the set of apps to

24   only, I think, like, 20 or 25 or so apps.  So there was a

25   defined list that they set.  The purpose of this list was to

1    basically constrain the number of apps that they could manually

2    check each one to verify that it never linked to the web.  So

3    it was, like, all in service of trying to prevent, you know,

4    the browser from opening.  And they had a team that, I think,

5    probably even still operates today, still checking these

6    individual 25 apps to verify that they don't open up the web.

7    And there have been bugs where accidently they did, and then,

8    you know, it's a red-alert escalation and we have to swarm to

9    try to fix it and all this other stuff.

10            But that was the intent, was basically constrain it

11    to a number they can manually verify.

12    Q.  And did these changes that Samsung imposed on Discovery,

13    did they affect the usefulness of Discovery for consumers?

14    A.  Absolutely.  I think, you know, you imagine -- your

15    relationship or my relationship and how we imagine the

16    product -- a search product relationship with an end user is a

17    utility.  If you go to your utility -- think about it like

18    flipping a switch.  You flip the switch for your room.  If 75,

19    80, 90 percent of the time it just doesn't work, you're not

20    going to use the switch.  Like, it obviously is not a

21    functional switch.  And the 10 percent of the time that it

22    works is not that useful to you as a person who needs to see.

23            So, to use a search product, you need to see results

24    in every possible, you know, search query you use, so you

25    actually learn that the product exists, you trust it, you

1    potentially use it again.  And the fact that with the

2    restriction of only 25 apps and then the further restriction,

3    which I don't think we've talked about, but hiding apps that

4    were not installed, this is where we agreed, in March, with the

5    Samsung team.  I sat down with the PM at the time, and I'm,

6    like, guys, this is such a broken product that the only

7    possible success criteria for this launch could be if one

8    person accidently searches and sees results and clicks on it.

9            And so we agreed in a room that the success would be

10   one person in the United States, despite launches on millions

11   of devices, interacting with the results.

12   Q.  And you brought up just now the idea of hiding apps.  Could

13   you explain that in a little more detail?

14   A.  So the second restriction that they imposed -- and it

15   wasn't imposed on us, they just actually did it themselves --

16   is if the app was not installed.  So in this example here,

17   let's say you don't have Yelp, Postmates, or Tripadvisor

18   installed, they would just hide all the results.  And so you

19   type pizza, you don't see anything.  And, so, obviously,

20   another restriction.  Back to the light switch example where,

21   like, not a great product if you can't actually show anything.

22   Q.  Okay.  And did these restrictions that Samsung placed on

23   Discovery affect Branch's ability to monetize its product?

24   A.  When -- in the initial, I think, discussions towards the

25   end of 2018, if I recall, we were -- we did a number of

1    different models on the potential revenue for the first launch,

2    and it was very exciting.  We were starting to talk about

3    revenue shares.  Once the Google team at Samsung, the team at

4    Samsung that managed the Google relationship got involved and

5    started imposing all these restrictions, we basically threw our

6    hands up and said, there's no way we can monetize this thing or

7    even model the potential impact because it is so constrained.

8              And that's where we agreed, success is one person

9    clicking on one result, and then we can hopefully develop

10   something better next time around.  So all of the revenue

11   sharing and financial modeling went out the window.  And I

12   think the contract didn't include any, you know, commercial

13   terms like that.

14             THE COURT:  Can I ask you a question?  And hopefully

15   this doesn't touch on anything sensitive.  But when you license

16   this product, is it for a fee or is your revenue to be

17   generated only through ad sales?

18             THE WITNESS:  Only through access.  So, we're not

19   intending to charge Samsung or any OEM or carrier for them to

20   use the product.

21             THE COURT:  Okay.  Thank you.

22             Why don't we take our afternoon break.  It's a little

23   after -- just almost 3:05.  We'll resume at 3:20.

24             Mr. Austin, I'll ask you not to discuss your

25   testimony with anyone during the break, please.  Thank you.

```
1              (Recess.)

2              THE COURT:  All right.  Mr. Hoffman.

3              Just ask someone to shut the door back there, please.

4    Thanks.

5              MR. HOFFMAN:  Thank you, Your Honor.

6    BY MR. HOFFMAN:

7    Q.  Mr. Austin, you've been telling the story of Branch's

8    attempts to integrate Discovery on Samsung's phones.  Let me

9    step back for a second and ask you:  Why did Branch try to

10   integrate Discovery on phones versus, say, having consumers

11   download Discovery from an app store?

12   A.  Great.  I think it's pretty well known, at least in the

13   industry and, you know, something that we've known really since

14   we started, that with utility products like Search, you know,

15   going back to, like, electricity, generally, people use what's

16   available, the defaults.  It's very challenging to get anybody

17   to actually go out of their way and use some sort of

18   alternative app or even download a new app.  If it's not

19   provided them as a default, if it's a utility product.

20             So we did actually develop a number of apps, but for

21   testing and other things, some of which were distributed in

22   stores.  But, you know, for meaningful scale, you have to be

23   preinstalled into a device, into a search bar where people are

24   already operating.  And because we had identified this search

25   bar that was so simple and basic that could be enhanced so much
```

1    by our functionality that existed on every phone, it felt like

2    the perfect opportunity.

3            And then if you look at the market, you know, overall

4    segmentation of OEMs, Samsung is the number one -- I'm not sure

5    if that's still the case, but at the time, for sure, the number

6    one OEM in the world, and, also, when it comes to, you know,

7    more, developed markets, like the United States, has huge

8    market share and it's incredibly important, if not the most

9    important, you know, Android distribution platform for our

10   product.

11   Q.  And you talked about Discovery launching on a Samsung phone

12   in March 2019.  I don't think you said the model.  Do you know

13   what model it was?

14   A.  It was the S10 device.

15   Q.  Okay.  And then you talked about restrictions that Samsung

16   placed on Discovery before it could launch on the S10 in March

17   of 2019, and you mentioned only allowing results from 25 apps.

18   You mentioned hiding apps.  Were there any other restrictions

19   that Samsung insisted on?

20   A.  Related to the Google contract, I don't think so.  But, you

21   know, those are pretty dramatic.

22   Q.  Now, let's turn to something called Deepviews.  Are you

23   familiar with that Branch feature?

24   A.  Absolutely.

25   Q.  And can you explain to the Court what Deepviews are?

 1    A.  So, if we go back to our example of Yelp, looking for

 2    pizza.  If you have the Yelp app, the best, you know, user

 3    pathway is to go strait into Yelp, to the right page inside

 4    with the deep link.  The alternative is to fall back to the

 5    web, if Yelp has a website, which they do.  We developed the

 6    technology that rather than have to send the user to the web,

 7    it was sort of, like, an automatically generated preview of the

 8    page inside the app.

 9         So if it's a pizza restaurant, you don't have Yelp,

10    you click on the Branch search result.  We would basically

11    render instantly that restaurant, maybe a preview image,

12    et cetera, with a big call to action, a big button on the page

13    that says, Download the app, download Yelp to, you know,

14    whatever, check out the menu of this pizza place.

15         So rather than go to the web, we said, hey, well, we

16    don't need the web.  We can just generate this because we know

17    what's inside of Yelp.  Here's a better alternative than

18    falling back to the web.

19    Q.  And those were Deepviews?

20    A.  Deepviews, yeah.

21         THE COURT:  I'm sorry.  That view was created based

22    upon the deep linking or the mobile web version that some app

23    developers have?

24         THE WITNESS:  It depends.  But, generally, like in

25    the case with Yelp, where they're providing us directly because

1    of our direct relationship with them, they would tell us, you

2    know, the    name of the restaurant, the description, a

3    picture of it.  And, so, we have that all provided by them that

4    we could just generate it automatically from our, you know,

5    relationship, rather than need to crawl the web.  You could, in

6    theory, crawl the web to get that information to generate one,

7    but a lot of it was provided directly.

8    BY MR. HOFFMAN:

9    Q.  And how many apps did Branch have relationships with where

10   they could provide Deepviews?

11   A.  I don't know if we had really, like, a precise measure of

12   that at the time, but absolutely in the thousands, I would

13   guess.

14   Q.  Okay.  Thank you.

15        Now I'll ask Ms. Gattas Johnson to display on the screen

16   UPX1064.

17        And you can look at that on your screen, Mr. Austin.

18   I'll ask you -- and you can look in the binder, too, if that's

19   easier.

20   A.  Yeah.  I can read it.  It's just a little small.  That's

21   okay.

22   Q.  I'll ask you:  Do you recognize this email chain?

23   A.  Yes.  I'm aware -- I'm not on this email, but I, you know,

24   was very deeply involved with Colin and Rishi, who were team

25   members at the time who reported in to me, in every email that

1    went to Samsung.

2    Q.  And so how is it that you recognize this e-mail?

3    A.  So, when we first heard the restriction, that we would not

4    be able to link to be web and that would imply that they would

5    need to reduce the number of apps or hide results from end

6    users or other really terrible things, and we said, well, good

7    thing we have this alternative that doesn't go to the web

8    that's called the Deepview that can, you know, provide a user

9    with a preview and -- but, still, you know, rather then give

10   them a jarring experience of falling back to the Play Store,

11   and so let's try that instead.

12   Q.  And, I'm sorry.  I'm going to ask you to set the table a

13   bit more.

14   A.  Sure.  Of course.

15   Q.  There's someone named Junghan Kang referred to in this

16   email.  Can you tell the Court who Junghan, J-U-N-G-H-A-N,

17   K-A-N-G, is?

18   A.  Yeah.  So I think it's pronounced Junghan.  He was -- I

19   would describe him as the project manager for the

20   Branch-Samsung integration in the S10 devices.

21   Q.  And there's someone named Colin Behr, B-E-H-R?

22   A.  That's correct.

23   Q.  Can you tell us who Colin Behr was?

24   A.  Colin was, sort of, the head of all of our partnerships

25   with OEMs, our carriers.  So his official title was VP of

1    Discovery partnerships.

2    Q.  And there's someone named Rishi, R-I-S-H-I; Khatin,

3    K-H-A-T-I-N.

4         Can you tell us who Rishi Khatin was?

5    A.  Rishi was the head of product for our Discovery search

6    platform.  So he, you know, managed the product team that

7    developed and built the product.

8    Q.  Okay.  In looking at the dates on this email chain, were

9    these emails written during the time when Branch and Samsung

10   were working together to integrate Discovery onto Samsung

11   phones?

12   A.  Yeah.  As is typical with our -- you know, when we're --

13   where we would encounter the Google restrictions or barriers,

14   it was later in the relationship, after we had done some sort

15   of engineering and product work where, you know, they would get

16   approval from other teams.  And, so, at this time, Junghan

17   would actually -- I think, built a POC and were, you know,

18   testing it.  And Junghan went to start to get approval from

19   other teams from Samsung prior to launch, and then immediately

20   faced, you know, intense scrutiny from the team that managed

21   the Google relationship.

22   Q.  Okay.

23        MR. HOFFMAN:  So, Your Honor, at this point I would

24   move to admit this Branch document labeled UPX1064.

25        MR. McGINNIS:  Your Honor, we object, obviously, as

1    this contains hearsay.  But if it is offered for purposes other

2    than the truth, no objection.

3            MR. HOFFMAN:  That is correct, Your Honor.  It is

4    offered to show Branch's state of mind and not for the truth of

5    the matter.

6            THE COURT:  Okay.  All right.  So it will be admitted

7    for that limited purpose.

8    BY MR. HOFFMAN:

9    Q.  Mr. Austin, before I cut you off -- and I apologize.

10           Can you explain to us what this email exchange is about?

11   A.  Yeah.  Of course.  So, you know, we were having phone

12   conversations, if not daily, you know, every other day with the

13   team, including Junghan, and it became clear in those

14   conversations that, you know, this Google restriction was going

15   to dramatically impact the functionality of the product.

16           MR. McGINNIS:  Objection, Your Honor.

17           THE WITNESS:  I was present in some of those meetings.

18           THE COURT:  Hang on for a second.

19           Again, if we're all in agreement that to the extent

20   that he understands the reasons for it, the truth is -- it's

21   not being admitted for the truth, but just to move things

22   along.

23           MR. McGINNIS:  Understood, your Honor.

24           MR. HOFFMAN:  Thank you, Your Honor.

25   BY MR. HOFFMAN:

1    Q.  Go ahead.

2    A.  So, it became clear that there were going to be dramatic

3    impediments to the product imposed, and we were actively

4    brainstorming on, you know, technical solutions, product

5    solutions that we could develop to work around the restrictions

6    from Google.  And as I mentioned previously, the primary

7    restriction was that you couldn't show web results, which

8    implied that we couldn't link to the web.

9         And somehow, those were connected in their mind.  I

10    don't know exactly how we tried to fight that, but -- so, we

11    proposed the Deepview as an alternative to falling back to the

12    web in the instance where the app was not installed.  And

13    Junghan is excited that this is a potential solution, and he

14    acknowledges this is a much better experience, but he needs to

15    get approval from the Samsung and Google teams before we could

16    proceed with it.

17    Q.  And was this the first time that Samsung had expressed

18    concerns to you about contractual limitations imposed by

19    Google?

20    A.  Absolutely not.

21    Q.  And do you see where Mr. Kang wrote -- this is the first

22    sentence:  I do realize this is a much better experience versus

23    driving users to app store without preview?

24    A.  I do see that, yeah.

25    Q.  When Mr. Kang was writing about this -- the word "this,"

1    what was your experience -- what was your understanding of what

2    he meant by this?

3              MR. McGINNIS:  Objection, Your Honor.  I'm sorry for

4    keep standing up, but as long as we are clear that this is only

5    elicited for Branch's of mind and not the truth or what Samsung

6    thought about it.

7              THE COURT:  That's clear, Counsel.  Thank you.

8    A.  "This," he's referring to Deepview, where, I think, in the

9    prior email we had shared a document that gave an overview of

10   the Deepview solution to the problem that we were facing here.

11   BY MR. HOFFMAN:

12   Q.  All right.  After Discovery was launched on the S10 in

13   March 2019, did Branch continue to devote resources to improve

14   Discovery?

15   A.  After we faced all the limitations of the product, we, you

16   know, lost a lot of hope that the product in its current

17   instantiation, the broad app search functionality that shows

18   apps that are not installed and could potentially fall back to

19   the web would not be possible with further, you know, OEMs in

20   our conversations as we pursued more distribution.  And, so, we

21   started to dramatically cut back functionality or introduce

22   components of the product, like making Deepview a part of the

23   pitch to other OEMs or carriers, with the intention of trying

24   to not face the same, you know, restraints that we faced with

25   Samsung.

1    Q.  And then at some point after March 2019, did Branch come to

2    suspect that Discovery would no longer appear on Samsung's next

3    flagship phone, which, I guess, would be the S11?

4    A.  So it's a little bit more complicated.  But, generally, we

5    continued to work with the teams throughout, you know, 2019 and

6    then 2020.  And what we encountered, you know, one of the big

7    problems with this initial integration was there was no

8    commercial terms, no revenue generated.  So the main focus was

9    how can we turn this into a revenue-generating business?

10   Because I need to show progress to investors and, you know,

11   we're building a business here.

12        And so we started working with the teams at Samsung

13   responsible for monetization -- and that was throughout, like,

14   early 2020 to mid-2020 -- about developing an expanded

15   integration that tried to fix some of the problems that we

16   faced here, but, also, intended to monetize.

17        And that, you know, faced tremendous headwinds where

18   the entire conversation stalled and, you know, people wouldn't

19   do any further work with us in 2020.  And so -- but I think

20   this old legacy version continued to launch on new devices in

21   its limited instantiation, as far as I understand.

22   Q.  All right.  And now I'll ask Ms. Gattas Johnson to display

23   what's been marked as PSX00075.

24        THE COURT:  I'm sorry.  Just to be clear, your

25   current understanding is to the extent that Branch is on

 1    Samsung devices today, they do not have -- they don't show

 2    ads --

 3              THE WITNESS:  No, they do not show ads.

 4              THE COURT:  Okay.

 5              THE WITNESS:  And they -- they have not changed the

 6    integration on the U.S. devices since that initial S10 launch

 7    in 2019, as far as I know.  I did receive word, I think before

 8    I left, that they were going to remove us completely, but I

 9    don't know the current state of -- you know, if that was done

10    or not.

11    BY MR. HOFFMAN:

12    Q.  All right.  Thank you.

13         And now turning your attention to the document in front

14    of you on the screen labeled PSX00075.  Do you see that,

15    Mr. Austin?

16    A.  I do.

17    Q.  Do you recognize this document?

18    A.  I believe this is from a board presentation where I'm

19    giving an update to the board of directors on our relationship

20    and progress with our Samsung distribution.

21    Q.  And did you have a role in preparing this slide deck?

22    A.  Generally, I made all the slides.  I think I made every

23    slide in the Discovery section at the time.

24    Q.  Okay.

25              MR. HOFFMAN:  Your Honor, we'll move to admit

1    PSX00075.

2          MR. McGINNIS:  Your Honor, this, again, contains

3    embedded hearsay.  No objection to its admission, if offered

4    not for the truth of the hearsay there.

5          THE COURT:  You're referring to the news article?

6          MR. McGINNIS:  It is not just the news article on

7    998, Your Honor, but also the statements on 001.

8          THE COURT:  I don't have Bates number pages here.

9          MR. McGINNIS:  I apologize.  Your Honor, if you look

10   to the left of the page, I believe they're actually --

11         THE COURT:  I see.  Okay.

12         MR. McGINNIS:  -- on the portrait versions there.

13   It's 001, which is some messages, actually, from Samsung; 002,

14   which is also hearsay from Samsung; and 003, which is also

15   hearsay from Samsung.

16         MR. HOFFMAN:  Your Honor, specifically, I intend to

17   ask Mr. Austin about Bates number 4999 and 5000.

18         THE COURT:  Okay.  All right.  So that aborts the

19   issue, it sounds like.  So it will be admitted.

20         MR. HOFFMAN:  Thank you, Your Honor.

21   BY MR. HOFFMAN:

22   Q.  But before we talk about those pages, let's talk about the

23   cover slide.

24         Can you tell us, Mr. Austin, what this cover slide

25   illustrates?

1    A.  So, it's a, you know, a humorous illustration of our, you

2    know, actual serious situation of, you know, we're represented

3    as the tiny little Army men, and Samsung, you know, behind this

4    big fortress.

5    Q.  And how does that represent the situation you were facing

6    at Branch?

7    A.  We always felt like a very small player just trying to

8    break into this, like, fortress.  There's, I don't know, tens

9    of thousands of employees, maybe more.  And, you know, we had

10   faced so many different barriers over the years from this

11   Google contract, so I thought it was an apt representation of

12   the current situation.

13   Q.  Okay.  Thank you.

14        And now I'll ask Ms. Gattas Johnson to displays the page

15   Bates number ending in 4999.

16        Do you see that slide, Mr. Austin?

17   A.  I do, yeah.

18   Q.  And I'll ask you:  What does this slide show?

19   A.  So -- and if I'm giving too much background, just feel free

20   to interrupt me.

21        But, generally, we heard from every OEM, every

22   carrier, you know, many tens of different people who had direct

23   knowledge of the relationship, either had seen the document of

24   the RSA or, you know, worked directly with the team that

25   managed and was responsible for managing the RSA at the OEM

1    arm.

2    Q.   And when you're talking about the RSA, you're referring to

3    what?

4    A.   It's the revenue sharing agreement that Google does with

5    the OEM or the carrier.  So it's an agreement between Google

6    and the OEM or the carrier, in this case Samsung, where they

7    say in order for you to be paid by us, and, you know, here are

8    all the terms of the payment, you must have these type of

9    exclusivity terms.

10          And the one that we continued to hit time and time

11   again was this one referring to, you know, that Google must be

12   the only web search engine on the device.  We did hear from

13   different partners that there were variations of this wording,

14   but I summarized it with this sort of web search engine.

15   Because we found, generally, we could make some initial

16   progress with OEMs or carriers if we described our product as

17   an app search engine, which is not a web search engine.  It is

18   a very different thing and very different product.

19          And, so, whenever we were able to correct -- you

20   know, accurately describe it as an app search engine,

21   conversations would continue until we would get further in them

22   and then start to face more hurdles.

23          And, so, what we have found -- this is in 2020 --

24   that Google was renegotiating their RSA with Samsung and the

25   scope of this exclusivity term was expanding by a very large

1    margin, where already we had faced intense restrictions for

2    just linking to a website, which caused our product to be

3    reduced to, you know, where basically the success was one

4    person using it.

5         Now they were expanding the scope of exclusivity to

6    cover everything that connected to the internet -- any search

7    that connected to the internet.  And, so, it implied that we

8    would need to dramatically change our product to further

9    restrict functionality.  And, you know, we assumed this RSA 3.0

10   language would then be rolled out more broadly across all OEMs

11   and carriers and would largely cause us to have to shut down

12   even the limited product that we had today -- or at that time.

13   Q.  So in response to this knowledge you just shared with us,

14   did Branch attempt to create some workaround?

15   A.  Yeah.  I mean, like --

16   Q.  And, I'm sorry.  Before you go further, let me ask

17   Ms. Gattas Johnson to display the next page of this document,

18   which is Bates number 50000.

19        And go ahead.

20   A.  Yeah.  So, you know, just taking one step back here.

21        At this point, I've been working on this business

22   for -- you know, what is it, 2020 -- you know, six years.  We

23   had raised a lot of money.  We had hired a lot of people.

24   We're not going to just abandon the whole business.  When we

25   face a hurdle, you know, we're going to try to develop some

1      sort of workaround that will allow us to continue operating.

2      And the hope was if we can get, you know, our foot in the door

3      with a Samsung or an OEM or a carrier, even if the product is

4      so restricted, the first version, over time, we can, you know,

5      build the relationship, build the trust, and maybe they would

6      be willing to stand up against Google over time and we would be

7      able to actually introduce the full functionality.

8              So the strategy just continued to sort of take a step

9      back in functionality further and further.  But, you know, it

10     was still -- we viewed a workaround here as a potential foot in

11     the door to enable long-term growth with, you know, every OEM

12     we worked with.  So, in this instance, when we heard now the

13     definition was your search cannot connect to the internet, we

14     basically were, like, okay.  Well, that rules out a whole range

15     of, you know, functionalities.

16             Because if you're trying to search across a broad

17     swath of information, you need to store that in a larger

18     database.  It's very difficult to store all the app information

19     that exists across all apps on somebody's phone.  So you're

20     constrained, really, to a small dataset.  So we reduced the

21     functionality to what we'd termed at this time called offline

22     search.  But, you know, I would say more -- you know, I would

23     say the canonical industry term of the folks who work with this

24     is just device search, you know, where it is only searching

25     things that exist on the device, which would not only hurt the

1    functionality a lot, hurt the value offered to consumers, it

2    also made our ability to monetize incredibly difficult because

3    we can't use any traditional ad system.  We have to build a

4    whole ad system from the ground up.  It was an incredibly

5    costly and difficult workaround.  But, this was the workaround

6    we developed.

7    Q.  You said it was costly.  What resources went into

8    developing Branch's offline search?

9    A.  I mean, the whole team went in to pivot away from our

10    traditional broad app search to this, like, local device search

11    functionality.  We internally called it LDS, local device

12    search.  And, I mean, it was 100-plus people and, I don't know,

13    a couple hundred million dollars.  And, I mean, the focus today

14    with that team that's still working on it is still local device

15    search.  We haven't made any progress on introducing some of

16    the offline -- or, the online functionality.

17    Q.  Ultimately, did Samsung allow Branch to integrate what you

18    labeled as "offline search" onto its phones?

19    A.  They did not.

20    Q.  And do you have an understanding of why Samsung does not

21    allow offline search onto its phones?

22    A.  It was Google.  We heard from the executive responsible --

23            MR. McGINNIS:  Objection, Your Honor.

24            THE WITNESS:  Uhm --

25            THE COURT:  I'll sustain the objection to the extent

1    that he's offering it for the truth, but I'll just hear him out

2    in terms of what his understanding is.

3            Go ahead.

4            THE WITNESS:  The executive that we were working with

5    at the time oversaw the revenue aspect, and so the primary

6    incentive of him was to, you know, build the revenue --

7    additional revenue streams for Samsung, and which this was

8    potentially revenue stream.  And, you know, what we heard from

9    his team and then, also, a close friend of his that met with

10   him, was that Google basically was, like, the primary

11   restriction on functionality.

12   BY MR. HOFFMAN:

13   Q.  You can put that document aside now.

14           Stepping forward to today.  And you may have touched on

15   this.  Forgive me if you have.

16           But, is Discovery loaded on any -- when I say "loaded,"

17   installed on any Samsung devices today?

18   A.  The only version that's installed is the Legacy version

19   from the 2019, 2020 era.  Nothing new has been installed since

20   then.

21   Q.  And at some point, did the Discovery collaboration between

22   Branch and Samsung end?

23   A.  It ended, you know, multiple times.  As we would face a

24   barrier with one team, they would throw their hands up.  We

25   would try to find a new team to work with.  That team would try

1    for a while.  They would throw their hands up.  And so we were

2    constantly looking for new teams to engage with and -- but,

3    yeah, no one is -- like, I don't know if there's any active

4    conversations happening currently.

5    Q.  Okay.  Thank you.

6         So, we'll pivot away from Samsung now and I'll ask you:

7    Did Branch try to make any deals to integrate Discovery on

8    other manufacturers' phones?

9    A.  Yeah.  We talked to every OEM.

10   Q.  And was Branch able to reach any deals to integrate

11   Discovery on other OEM's phones?

12   A.  It depends on the definition.  The first -- the vision of

13   the business, the app search -- the broad app search that could

14   help a user find information across apps did not.  But, that

15   local version that had the greatly restricted functionality and

16   greatly restricted ability to monetize was able to make

17   progress with OEMs where it generally was viewed as not

18   conflicting with the contract.  But, you know, again, was very

19   limited in all those different capacities.

20   Q.  And what did you learn from your negotiations with other

21   manufacturers about the reasons that Branch failed to integrate

22   Discovery on their phones?

23   A.  I mean, we found, generally, that the universal definition

24   was no web search and, so, we could make the case that it was

25   app search, but, still, they were very concerned about linking

1    to the web.  So, this consistently came up across, you know,

2    every major OEM we talked to.  And, so, that was the first

3    thing.

4           And the next largest OEM that we did make progress

5    with, they had some workaround to the Google contract where

6    they would only load Branch on devices that were a year old.

7    They were not allowed to load us on new devices that were

8    shipping from the factory.

9           And I don't know if this was -- like, maybe this was

10   their interpretation of the contract or something, but maybe

11   they felt like it was a sneaky workaround, that it wouldn't get

12   checked, if it happened.  They didn't tell us the exact

13   reasons, but they told us it was because of Google.  And so --

14   which also limits the ability to monetize greatly, because

15   usually a device a year old is a lot less valuable from an

16   advertising perspective than a fresh device.

17          So we would face little, you know, one-off

18   limitations like that, that would further restrict the

19   functionality, but all primarily due to the Google contract.

20   Q.  Which OEM were you referring to in that?

21   A.  Xiaomi was the --

22          THE COURT:  I'm sorry.  What was it?

23          THE WITNESS:  Xiaomi.  It's a Chinese device

24   manufacturer.

25   BY MR. HOFFMAN:

1   Q.  And for the benefit -- I'm going to test you here, but for

2   the benefit of the court reporter, can you spell that?

3   A.  It's X-I-O-M-I -- no.  There's an A in there.  X-I-A-O-M-I.

4   Q.  Thank you.

5   A.  Do you want somebody to check me on that one?

6   Q.  Now, did Branch also try to reach deals with mobile

7   carriers to distribute Discovery on phones that the mobile

8   carriers sold?

9   A.  We did.  Those developed much, much later, but we had been

10  talking to them for years.  I think we maybe first had a

11  conversation with Verizon -- I would need to check records for

12  the exact date, but it was probably around the early days of

13  2018.  But, I don't think we got a contract done there until

14  2021-ish, and by that time the product had changed

15  dramatically, to be the reduced just on-device search

16  functionality.

17  Q.  And what was the point of pursuing mobile carriers?

18  A.  So, the -- there's really two types of markets for phone --

19  you know, when you go buy a phone.  One market is where the

20  person who buys the phone has a relationship with the OEM, the,

21  like, actual device manufacturer, like a Xiaomi or a Samsung,

22  et cetera.

23          Other markets that a user has the relationship with

24  the carrier, like a Verizon or an AT&T.  Most Western markets

25  are carrier owned, so the user will buy their phone from

1    Verizon, from AT&T.  And because Verizon has that relationship,

2    they can mandate what products and services are included on the

3    devices they sell, even if they're sold, you know, a Samsung

4    device, et cetera.

5              So in order for us to access the United States or,

6    like, some Western European markets, we had to build the

7    relationship and get the deals done with the carriers.

8    Q.  Ultimately, was Branch able to get any Discovery deals done

9    with carriers?

10   A.  Not for the broad app search functionality, but we were

11   able to get a deal done with -- and, I think, loaded on a few

12   devices through Verizon, with the limited on-device

13   functionality.

14   Q.  And what did you learn from negotiations with mobile

15   carriers about the reason that Branch failed to integrate with

16   Discovery on their phones?

17   A.  I don't want to sound like a broken record, but that was my

18   life for many years, was just continually, time and again, the

19   Google contract was the primary blocker for us distributing app

20   search.

21             MR. McGINNIS:  Objection, Your Honor.

22             THE COURT:  He's just testifying as to his

23   impression.

24             Go ahead.

25   BY MR. HOFFMAN:

1    Q.  All right.  And now speaking about a specific mobile

2    carrier, AT&T.  Did Branch negotiate with AT&T to have

3    Discovery placed on phones sold by AT&T?

4    A.  We spent a lot of time talking with AT&T.

5    Q.  And I'll ask Ms. Gattas Johnson to display UPX656 on the

6    screen.

7         And before you tell us about it, this document, I have a

8    few questions.  Okay?

9    A.  Okay.  Sure.

10   Q.  Do you recognize this email chain?

11   A.  I was involved with this team, including Gary, you know,

12   throughout all of these conversations.  And most of the replies

13   to this were actually me, you know, guiding him on what to say.

14   Q.  Okay.  Thank you.

15        And I see the name Eli Trowbridge on this email chain.

16   Can you tell us who Eli Trowbridge is?

17   A.  One of the reasons I was very excited about AT&T was Gary

18   Wolfson was actually Eli in his prior role.  I think he had

19   worked at AT&T for many, many years prior to Branch.  But he

20   joined Branch very excited by the premise of app search and the

21   ability to distribute it.  And because he has the deep

22   relationships, I thought this would be, you know, a really easy

23   one for us to get.  It turned out the opposite.

24        Eli took his job, so Eli is responsible for working

25   with potential external third-party partners.  And I'm not sure

1    if it includes Google.  That might be a different team.  But it

2    absolutely includes a Branch.

3    Q.  Just so it's clear, Gary Wolfson moved from AT&T to Branch;

4    is that right?

5    A.  Correct.

6    Q.  And Eli Trowbridge took Gary Wolfson's position?

7    A.  Correct, yeah.  So they'd known each other for a very long

8    time.

9    Q.  Okay.  There's one other name on here, Lynne McKinney.  Can

10   you tell us who Lynne McKinney was?

11   A.  I think she was a supporting member of Eli.  You know, on

12   Eli's team.  So managing, you know, third-party partners for

13   AT&T.

14   Q.  Thank you.

15          MR. HOFFMAN:  Your Honor, I would move to admit

16   UPX0656.

17          MR. McGINNIS:  Your Honor, this document also

18   contains embedded hearsay.  No objection to its admission, if

19   the AT&T emails are not offered for their truth.

20          THE COURT:  Why are the AT&T emails hearsay?

21          MR. McGINNIS:  They're out-of-court statements by

22   witnesses that are not testifying here about AT&T's position.

23          THE COURT:  Well, but if the document is a -- maybe

24   I'm looking at this differently, but if the document is a

25   Branch business record, and understandably this is a statement

1    from someone outside the organization that is speaking in a

2    first person -- or, first-person knowledge.  In other words,

3    that person is not conveying hearsay.  They're not saying this

4    is what someone else told me.

5              MR. McGINNIS:  Your Honor, the statement by a

6    non-Branch employee contained in the business record is an

7    embedded hearsay statement.  That cannot be part of the Branch

8    business record.  This document is covered by a Branch business

9    record.  We aren't objecting to the admission of the Branch

10   statements in there.  But, you know, in basic terms, when you

11   have an out-of-court statement by a witness that is not

12   testifying at this trial, there's obviously no opportunity to

13   ask --

14             THE COURT:  I thought the case that we discussed --

15   and sorry to interrupt you -- but the case we discussed

16   suggested that an embedded hearsay statement that is from a

17   third party still could be admitted for its truth if the person

18   who was making that statement had, essentially, a duty to

19   confirm the accuracy of the statement, right?

20             I mean, that was the circuit case that we talked

21   about the other day.  Now, I would -- for example, the

22   declarant is unknown.  That's certainly a situation which we

23   wouldn't be able to identify whether that person has a duty.

24   But, if this is a statement by an AT&T representative who has a

25   duty to make accurate statements on behalf of AT&T, why can't I

 1    accept that person's statement as -- for the truth of what

 2    AT&T's position is?

 3            MR. McGINNIS:  Well, respectfully, Your Honor, I'm

 4    not sure how the present witness could lay the foundation to

 5    confirm that the AT&T individual had the duty to make that

 6    statement.  All we have is a statement in an email --

 7            THE COURT:  That's a little hard to believe.  I mean,

 8    we're talking about -- you know, these are business

 9    negotiations.  I'm not sure somebody is just going to come in

10    and fabricate what AT&T's position is.  But I don't know.  We

11    can discuss that at some other point.  But let's move forward.

12    But, I mean, we should put a pin on this and figure out what

13    the answer is.

14            MR. McGINNIS:  Understood, Your Honor.  Thank you.

15            MR. HOFFMAN:  Thank you, Your Honor.

16    BY MR. HOFFMAN:

17    Q.  Okay.  So with that said, Mr. Austin, can you look through

18    this document and tell us what this email exchange was about?

19    A.  This is a very typical stage of every discussion that we

20    had.  You know, fortunately this was documented in email, where

21    most of the time these partners, like a carrier, an OEM, are

22    reticent to put anything related to Google concerns or legal

23    concerns about the Google contract in email.

24            They sent us, basically, pretty explicit questions

25    about, like, Branch functionality to confirm against, like,

1    cited Google contractual terms and whether there would be a

2    conflict.  So there's an AT&T person describing the exact

3    Google contractual term and asking, are we in conflict,

4    basically.

5    Q.  Okay.  And I'll ask Ms. Gattas Johnson to pull up the page

6    Bates number -- ending in Bates number 1451, and to display, at

7    the bottom, the paragraph that says:  No. 1.

8         Do you see that, Mr. Austin?

9    A.  I do, yeah.

10   Q.  Can you tell us what paragraph No. 1 is?

11   A.  Yeah.  So, here, it seems like, you know, she's citing a

12   direct request of somebody who is looking at the Google

13   contract, or maybe in an active conversation, you know, maybe

14   directly from Google that is putting the restriction on what

15   Branch could provide.

16   Q.  And when you say "she," who are you talking about?

17   A.  This is Lynne sending the email here.  So she's talking to

18   somebody either on their legal team or directly somebody at

19   Google who is saying the product must not do these things.

20   Q.  And Lynne McKinney of AT&T is writing to Gary Wolfson of

21   Branch?

22   A.  Correct.  That's right.

23   Q.  And let me ask you this:  In paragraph 1, is Lynne McKinney

24   making a statement or asking a question?

25   A.  She's asking us to confirm that Branch's services would not

1    infringe on Google's search requirements, and then in bold

2    there has the specific requirements listed from Google.

3    Q.  Okay.  Thank you.

4        So is this sentence, paragraph No. 1, is it consistent

5    with your understanding of AT&T's concerns about the Google

6    contract?

7    A.  It's consistent with my understanding of their -- their

8    concerns of the contract.  And we were never able to move past

9    these original concerns.

10   Q.  Okay.  You can put that document aside.

11       THE COURT:  Just to be clear, just to return to the

12   issue we've just been talking about -- and maybe this is a

13   sentence-by-sentence issue in some of these emails -- but, for

14   example, the paragraph that was just referenced, that's not

15   being offered for truth.  It's being offered for AT&T's

16   understanding of the impacts of the contract.

17       Now, whether that's true as a legal proposition is a

18   separate matter altogether.  But, the fact that she's conveying

19   AT&T's understanding and requesting information as a result of

20   it, that certainly seems, to me, to be admissible for a

21   non-hearsay purpose.

22       MR. McGINNIS:  Your Honor, I'm happy to have this

23   discussion whenever you prefer.  You know, I think there is a

24   distinction between, obviously, questions that are asked in

25   emails and a statement of a position by an employee or an

 1    individual who is not testifying in this trial.  And I think

 2    what we are hearing is not just a series of questions, but,

 3    also, statements about what AT&T said, believed, did, which I

 4    think is distinct.

 5              THE COURT:  Okay.  Well, like I said, some of this

 6    may be on a -- we may need to revisit some of these.  And I

 7    suppose somebody ought to be keeping track, because if we do

 8    need to do this sentence by sentence, I'm happy to do it.  But

 9    I do think there are distinctions here that avoid some of the

10    hearsay concerns.

11              Go ahead.

12              MR. HOFFMAN:  Thank you, Your Honor.

13    BY MR. HOFFMAN:

14    Q.  Mr. Austin, we talked about -- we're talking about mobile

15    carriers now.  We talked about AT&T.  Let's move to Verizon.

16              Did Branch discuss distribution of Discovery with

17    Verizon on phones that Verizon sold?

18    A.  Yes, we did.

19    Q.  Did Verizon demonstrate any concerns about integrating

20    Discovery on their phones?

21    A.  We had many conversations with Verizon over the years.  By

22    the time we were able to actually meaningfully make progress,

23    the product had changed dramatically and reduced its

24    functionality dramatically to the on-device search

25    functionality, and in that time, they felt like that was not in

 1    direct conflict.

 2            But, there was a stage --

 3    Q.  And I apologize.  But when you say "in direct conflict,"

 4    conflict with what?

 5    A.  Conflict with, you know, the Google RSA terms, what they

 6    were saying.  But, prior conversations in prior years, you

 7    know, with different executives all expressed the same major

 8    concern, about whether or not Branch's solution would be in

 9    compliance with the Google contract.

10    Q.  Okay.  Thank you.

11            Finally, let's talk about T-Mobile.

12            Did Branch discuss distribution of Discovery with

13    T-Mobile?

14    A.  Yes.

15    Q.  And did T-Mobile demonstrate any concern about integrating

16    Discovery on the phones that it sold?

17    A.  Absolutely.  Same story, you know, different faces, all

18    concerned about whether or not Branch was in compliance with

19    the Google contract.

20    Q.  Was a deal to integrate Discovery on T-Mobile phones ever

21    reached?

22    A.  We did achieve a deal with the reduced scope product that

23    we had pivoted to from the original vision in 2020.

24    Q.  Now, reflecting back for a second.  Did the difficulties

25    reaching deals with phone manufacturers and mobile carriers

1    have an effect on Branch, the company?

2    A.  Absolutely, it did.  I mean, I think, you know, as I

3    mentioned prior, our view was that eventually we could build

4    something better than what we had.  But, you know, I'm sitting

5    here today not a Branch employee, in large part due to the

6    challenges we faced with the business -- monetizing it,

7    distributing it, et cetera, et cetera.

8    Q.  Okay.  And specifically, did the loss of Samsung as a

9    Discovery distribution partner effect Branch?

10   A.  Absolutely.  I mean, it was the most important partner.

11   They had invested in us.  It was the most promising

12   relationship.  And the hurdles that we faced there, you know, I

13   would get asked every single board meeting, every discussion

14   with an investor about the status with Samsung.

15           And, you know, I'm a very hopeful person, so still to

16   this day, I would tell you that I would be hopeful, given

17   enough time, that we would be able to reach a deal at some

18   point with the expanded product.  But I don't know if we'll

19   have that chance anymore.

20   Q.  Now, I'm going to ask Ms. Gattas Johnson to display, again,

21   on the screen, PSX0075.

22           MR. HOFFMAN:  This exhibit has already been admitted,

23   Your Honor.  This is, as you see, the Samsung walled-castle

24   document.

25           I'll ask Ms. Gattas Johnson to pull up what's been

1    Bates number -- the page 5004.

2    BY MR. HOFFMAN:

3    Q.  I'll ask you, Mr. Austin, do you recognize this page?

4    A.  I do.

5    Q.  Can you explain to the Court what this page is?

6    A.  So, it became pretty clear at this point, you know, we'd

7    heard a definitive no, that we're not going to proceed at this

8    point in time.  I think this is early 2021.  And, you know, we

9    felt that this was just not right that, like, a great product

10    that adds so much value, that has so much potential to help

11    apps, users, and OEMs, it should not be put in a position where

12    it can't see the light of day because of a restriction like

13    this.  It makes no sense.

14         So, you know, we were considering many different

15    options upon which we could act and try to get some, you know,

16    progress, some relief, and hopefully scale the original vision

17    of the product.

18    Q.  Okay.  And taking a look at the second bullet that refers

19    to the U.S. versus Google case, is that the case you're

20    testifying in here today?

21    A.  That's correct.

22    Q.  Okay.  And what did you hope to accomplish by supporting

23    this case?

24    A.  From my perspective, it felt like really, you know -- I

25    don't fully understand the extent of the law, and so I trust

1    everybody here to make the right call, but --

2              THE COURT:  Appreciate your confidence.

3    A.  -- it felt like there was injustice being done that, as I

4    just described, a product like this could not see the light of

5    day due to, you know, a term in a contract that really wasn't

6    even harmful to Google at all.  And so we had hoped that

7    eventually, if we were able to support this case, that we would

8    see some relief in the ability to scale the product.

9    BY MR. HOFFMAN:

10   Q.  I want to touch on one more topic before wrapping it up.

11             Mr. Austin, have you spoken to any other witnesses in

12   this trial since the trial began?

13   A.  No.

14   Q.  And have you come across any press coverage related to this

15   trial?

16   A.  The first day that it started, I saw a couple articles on

17   *The New York Times* and a couple Tweets.

18   Q.  And how did you come across those Tweets?

19   A.  You know, I'm -- so I'm currently actively a board member

20   at Branch.  I've been, you know, majority of my working life on

21   that company, and so it's very much still a part of my life.

22   And I have a fiduciary duty to watch what's happening, any news

23   coverage of Branch.  And Branch was mentioned in a Tweet.  And

24   I think either an alert I had or somebody sent that to me, and

25   I read it and thought it was very interesting.  And I think

1    I've followed the guy, you know, re-Tweeted it.

2    Q.  Okay.  Were you aware at any time of any rules or court

3    orders prohibiting you from reviewing the press coverage you

4    might come across?

5    A.  I was not.  Although, my counsel let me know, I think last

6    week, that I should not be.  And so I've been -- you know, I

7    hadn't read anything, I think, since the first day anyway.

8    There wasn't that much coverage.  So, the -- you know, I

9    haven't seen anything.  And since he let me know, I have not

10   read any document or seen any Tweets or anything like that.

11   Q.  You said you posted something.  Was that on Twitter?

12   A.  I didn't make a post myself, but I -- I don't know what

13   it's called these days, but re-Tweeted, or something, the

14   Tweet.  I'm not a big Twitter user.

15   Q.  Did you like?  And by that, I mean hit that "like" button.

16   Did you like any of the press coverage that came across your

17   radar?

18   A.  Did I like it?  Like, you mean, did I appreciate --

19          THE COURT:  I don't think he means subjectively.

20          THE WITNESS:  Like, the Tweet I might have liked.

21   I'm not sure.  I would need to check.

22   BY MR. HOFFMAN:

23   Q.  Okay.

24   A.  I believe I did re-Tweet it, though.  I can remember doing

25   that.

1    Q.   Okay.  And why did you re-Tweet that article?

2    A.   I don't really have anyone following me on Twitter; it's

3    primarily, like, Branch employees and investors.  I think

4    everybody has suffered a lot through the process and, you know,

5    I thought it was interesting and related to the suffering we

6    had encountered, that they would also appreciate it.

7    Q.   Did anything that you learned from the two articles -- or,

8    one or two articles that you read in *The New York Times* and the

9    Tweet that you re-Tweeted, did anything you learned from those

10   articles or that Tweet, did that affect at all your testimony

11   today?

12   A.   Absolutely not.

13   Q.   All right.  Finally, can you quantify for the Court the

14   resources, monetary or otherwise, that Branch has invested over

15   the life of the company in its attempts to distribute an app

16   search tool?

17   A.   Yeah.  I mean, hundreds of millions of dollars.  We've

18   raised 650.  I think we have a little less than 200 million in

19   the bank now.  So, you know, $450 million so far.  And many --

20   you know, we have hundreds of employees, so millions and

21   millions of hours spent.

22   Q.   And has Branch recently changed the company's focus?

23   A.   I don't think there's an official change.  But, you know,

24   to be frank, it's -- I think where I'm at today and the current

25   situation with the company, it's unlikely that we'll continue

1    to pursue the original Discovery vision.

2    Q.  And why is that?

3    A.  It just is, you know, taking too long.  I don't think we'll

4    be able to raise more money in this environment, and I just --

5    unclear if it's actually ever going to be possible, just with

6    the current situation we're in.

7            MR. HOFFMAN:  Thank you.

8            I have no further questions, Your Honor.

9            MR. CAVANAUGH:  No questions, Your Honor.

10           THE COURT:  Okay.  Mr. McGinnis?

11           MR. McGINNIS:  Your Honor, before I begin, consistent

12   with Your Honor's comments, I'm going to do my best to do all

13   of this in open session today.  It may require some

14   choreography.  And, obviously, if there are answers that

15   require us to go into closed, we will raise it at the time.

16           THE COURT:  Appreciate it.  Thank you.

17                       CROSS-EXAMINATION

18   BY MR. McGINNIS:

19   Q.  Good afternoon, Mr. Austin.  Nice to see you.

20           So I want to talk -- start by talking a little bit about

21   the implementation of the Branch functionality that exists

22   today on phones.  You are familiar with that, correct?

23   A.  Which product are you talking about?  Deep linking or --

24   Q.  Sure.  We can take a look at that.

25           Actually, just before I get there, you are still on the

 1    board of directors for Branch.

 2    A.  That's correct.

 3    Q.  And you are still an equity holder.

 4    A.  Yes.

 5    Q.  A significant equity holder; correct?

 6    A.  Depends on what you would call "significant."  But, yeah, I

 7    think it's close to 10 percent.

 8              MR. McGINNIS:  Your Honor, may I approach?

 9    BY MR. McGINNIS:

10    Q.  Mr. Austin, you've been handed a demonstrative marked as

11    DXD07, which we can also go and place on the screen.  And feel

12    free to look at either.

13         And to answer your question, I wanted to try to just

14    summarize for the Court the current implementation of Branch

15    functionality on Samsung phones that exist today.

16    A.  Okay.

17    Q.  And I believe this is the version of the functionality that

18    you described as limited or restricted functionality; is that

19    right?

20    A.  Yeah.  I would assume it's the same, yeah.

21    Q.  Let's take a look at page 2 of the demonstrative.  So, on

22    the left side, you have the home screen of the Samsung phone,

23    correct?

24    A.  Yes.

25    Q.  And then to access the app finder -- or, the S-Finder

1    functionality, you can swipe up or swipe down; is that right?

2    A.  I know swipe up.  I'm not sure about the swipe down, but --

3    Q.  Fair enough.  You may know better than I.

4         And then it gives you the opportunity to input something

5    in that search bar at the top?

6    A.  That's right.

7    Q.  If you turn the page, to 003 --

8    A.  Yep.

9    Q.  -- you then have a Settings page that you can access that

10   allows you to identify the different categories of information

11   that you can search through the Finder functionality; is that

12   right?

13   A.  This is if you go into the Settings page, though, which I

14   don't know if it was -- I don't think that was illustrated on

15   the prior slide.

16   Q.  Fair enough.  Fair enough.

17   A.  It's very rare to find -- we had to coach a lot of people

18   how to actually find this page, so it's difficult to encounter.

19   Q.  When you get to the Settings page, if you want to search

20   for nearby places, you then get this little prompt.  Do you see

21   that?

22   A.  I do.

23   Q.  Have you seen that prompt before?

24   A.  I have.  It might have changed since I originally saw it,

25   so I can't recall the specific version that we were involved

1    with back in 2020.  So they might have changed it since then.

2    But, I was aware of the version that we were -- developed back

3    in, like, 2020 era.

4    Q.  And the purpose of this prompt is to ensure that a user

5    consents to the sharing of their information with Branch; is

6    that right?

7    A.  That's correct.

8    Q.  Because as part of the search functionality that Branch

9    employs, Branch actually collects information on its users; is

10    that fair?

11    A.  That's fair, yeah.

12    Q.  And that includes advertising ID; is that right?

13    A.  Yeah, ad ID and, like, some of the other terms listed

14    there.

15    Q.  And queries, I believe, is also included?

16    A.  That's right.

17    Q.  Okay.  And location, which would make sense, right?

18    A.  I think we originally requested lat-long, so latitude and

19    longitude, more precise location for the purposes of showing

20    nearby places.  But we removed that, I think after launch, and

21    I can't remember the exact date.  And so we only just collected

22    the IP address to do the location now.

23    Q.  Thank you.

24        If you go and turn to the next page now, sir.  This,

25    again, illustrates what the search functionality looks like in

1    Finder.  And if you look at 1, this is where you can type -- I

2    think we have "pizza" for example 1 and 2.

3    A.   Yeah.

4    Q.   And then 3 and 4 illustrate the results that you get in the

5    Finder functionality today, and you see there's some results

6    from photographs, for example?

7    A.   Yeah.

8    Q.   And Netflix and YouTube.  And then you have some apps, as

9    well, in the Galaxy Store and the Play Store?

10   A.   Yeah.

11   Q.   And at the bottom, there's that Search with Google button?

12   A.   I do.  I see it.

13   Q.   Just to make sure I understand your testimony, your

14   testimony is that this implementation was restricted by the

15   Google agreement because you could not display or promote apps

16   or suggested links for somebody to click on; correct?

17   A.   I mean, that's a very broad description.  But, there are

18   no -- as I see it in this example, there are no results

19   provided by Branch in this example.  But, if you had opted into

20   that and Yelp was installed, you should, in theory, see, you

21   know, see some Yelp results for pizza from Branch.  But nothing

22   else on this current example shows anything from Branch.

23   Q.   Understood.

24   A.   And that limitation of installed/not installed, link to

25   only 25 apps that they termed it as nearby -- what is it, place

1    apps -- those are restrictions directly from the Google

2    contract.

3    Q.  Right.  And so I want to be clear on this.  So your

4    understanding is the Google contract prohibited you, or Branch,

5    from installing advertisements to apps for downloads, for

6    example; is that correct?

7    A.  I don't think I said that.  But, it prohibited and limited

8    the organic product.  So you -- like as an example that I just

9    gave -- could not show the Yelp results from Branch if Yelp was

10   not installed.  And that restriction of only showing an app

11   when it's installed or, you know, if there is an amazing new

12   Yelp ad for, you know, say, Yelp 2.0, call it Blep, that

13   everyone is downloading now that is not on the list of 25 apps,

14   we couldn't show Blep because of the restriction to 25 apps.

15   Q.  You also testified, sir, that your understanding is that

16   the Google agreement prohibited any internet connection for the

17   implementation; is that right?

18   A.  At the time that this was initially done, it did not.  This

19   was, again, the first version of the product that was done

20   under the premise of web search being the only scope of

21   exclusivity.  After the revision of the RSA -- from what we

22   understood -- to internet search, no further Branch changes

23   were made about the functionality or scope of the product.

24   And, so, that internet component of it was not a factor at the

25   time of implementation of it.

1    Q.  Am I correct, sir, that the current implementation of the

2    Branch technology and S-Finder actually does benefit an

3    internet connection?

4    A.  Yes, it does.  The current -- the version that was launched

5    in 2020 does benefit from an internet connection.

6    Q.  I would like to talk a little bit about the current status

7    of use of this technology, as well.  I know you mentioned a

8    little bit about how, I think, you thought of success in

9    connection with the first version of the product.  Are you

10   familiar with something called daily active users?

11   A.  I am.

12   Q.  What does daily active users refer to?

13   A.  It's the numbers of users that engage with a product daily.

14   Q.  And is this a metric that Branch has from time to time used

15   to track the progress of its Discovery or search functionality?

16   A.  It's a measure that we would use to track the overall

17   distribution of a specific product, whatever it might be,

18   through a partner.

19   Q.  Including app search or Discovery?

20   A.  Not -- it would -- I mean, you know, as I mentioned in the

21   prior testimony, that app search product, as I would describe

22   it, did not make any further progress beyond that initial

23   deployment.  So all the further, you know, DAU and relevant DAU

24   that was tracked was all around the de-scoped, limited version

25   of the product that was the local device search.

1    Q.  Let's talk about the local device version.  Approximately

2    how many daily active users did LDS have in 2020?

3    A.  We hadn't -- I don't think we developed that -- might have

4    had like a prototype.  And I don't know exactly what timeframe.

5    But it was very limited.

6    Q.  And approximately how many daily active users did LDS have

7    in 2022?

8    A.  2022, would have been late last year.  I think we crossed

9    100 million daily active users of the LDS product in 2022.

10   Q.  And this is the local Discovery search product?

11   A.  The limited, you know, apps that are on your phone version

12   of the product.

13   Q.  Understood.  And we'll come back to that in a few minutes.

14        The app search products that Branch has implemented over

15   the years, they do not do web search; correct?

16   A.  It's complicated.  But, generally today, you know, the

17   product that we're scaling that has the most adoption, we would

18   not consider it to do web search.  We have historically,

19   though, you know, in early versions of the product shown web

20   results with -- you know, before we faced all these

21   restrictions.  Because the idea was that we could eventually,

22   you know, show all types of results here.  But this is, like,

23   you know, a future version of the product, not one that was

24   ever scaled meaningfully.

25   Q.  So you're familiar generally with what a web search engine

1    is?

2    A.  Yeah.

3    Q.  In order to have a web search engine, you would need to

4    crawl the web; correct?

5    A.  Yes.

6    Q.  You haven't done that; correct?

7    A.  No.

8    Q.  And if you wanted to have a web search engine you also need

9    to index the web?

10   A.  Let me correct that.  We have deployed web crawling for

11   certain, you know, Edge cases and instances of a broad Branch

12   product suite.  So I don't want to say that we've never done

13   web crawling, but just --

14   Q.  You haven't indexed the web?

15   A.  We have not, no.

16   Q.  You repeatedly have told your partners over the years that

17   you do not do web search?

18   A.  That's correct.

19   Q.  And you've also told your partners that what Branch does

20   addresses a very different use case than what a web search

21   engine does; correct?

22   A.  We did view them as different use cases.  But, you know, we

23   believed that there would be a paradigm shift once we had

24   enough people using this app search product at scale.

25            MR. McGINNIS:  Your Honor, may I approach?

A. It's a lot.

BY MR. McGINNIS:

Q. So, Mr. Austin, you've been handed a binder of documents. I am hopeful we won't be looking at all of these. We will see.

I would like you to first turn to PSX65.

A. P -- is it going to come up on the screen? Okay. I don't know how to find that in there.

Q. They are alphabetical. So it should be about two-thirds of the way.

A. I'll use the screen for now and I can figure that out later.

Q. And, sir, this is a document produced by Branch; correct?

A. That's correct.

Q. And do you recognize this?

A. If it's the document that I think it is, I do. But I would need to see, probably, another page or two to be 100 percent sure.

Q. Fair enough, sir.

MR. McGINNIS: I guess, before we move on, I don't believe plaintiffs have an objection to this, so I would move PSX65 into evidence.

MR. HOFFMAN: No objection, Your Honor.

THE COURT: It will be admitted.

BY MR. McGINNIS:

Q. Mr. Austin, if you can turn to the second page, which is

1    ending 31.

2          Here, this is a slide deck summarizing Branch's local

3    discovery system; correct?

4    A.  That's correct.

5    Q.  And this is the product that you testified about?

6    A.  That's right.

7    Q.  Here your -- what is the purpose of a slide deck like this?

8    A.  I think the specific intent of this one was European

9    carriers were -- you know, we were facing the same hurdles.  In

10   many cases they wouldn't even take second calls with us because

11   there were concerns about Branch's conflict with Google.  And

12   we had had prior conversation was a number of them pitching the

13   original vision of the product, the app search product, the one

14   we had talked about that could do, like, pizza across apps,

15   et cetera.  But now we had pivoted to just the simple on-device

16   search version, we said, Let's go try to make as much progress

17   as we can with this limited version.  Let's make sure they

18   understand the limited scope of this and how it should not be

19   viewed as in conflict with the, you know, RSA terms.

20   Q.  Please turn to 531, sir.  And you'll see that there's a

21   description of the search scope up top.  Do you see?

22   A.  Yes.

23   Q.  It says "No web search" on the third bullet; correct?

24   A.  Yes.

25   Q.  And then if you look down to the product design section,

1    this describes, again, that the search use case for this

2    product is totally different and distinct from Google Search;

3    correct?

4    A.  Yeah.  I mean, it's a very broad kind of marketing

5    statement that -- but, sure, we wrote that.

6    Q.  It's a statement you made to your partners; correct?

7    A.  Yeah.  Yeah, that's fine.

8    Q.  And you also stated to them that there is zero impact on

9    Google Search traffic after implementing Branch?

10   A.  So, you know, we didn't have any data to suggest that, but

11   there was -- you know, we always believed that going and

12   navigating to apps is different and incremental than doing a

13   web search.  But as I mentioned, we had hopes that over time,

14   as people found they could do more in apps, that eventually

15   some of that web search traffic would actually start to migrate

16   over to this new app search engine and just create more

17   competition in web search overall.

18   Q.  What you just testified to is you had no data to actually

19   support that, but that's a statement you made to all your

20   partners; correct?

21   A.  I mean, we had antidotal, we didn't have any data, like an

22   experiment data that suggested the impact.  But it was

23   antidotally confirmed that there as not -- or, you know, no one

24   was complaining to us about it.

25   Q.  Sir, you've also repeatedly told your partners that the app

1    search functionality you were working on is not substantially

2    similar to web search; correct?

3    A.   Yeah.   The intended use case was not to conflict with or

4    overlap with web search because we knew that that would be --

5    you know, generally, if we're trying to scale this thing and

6    our first partner goes live and, you know, Google Search

7    traffic drops 50 percent, they would flip out because we're

8    just too nascent to actually be able to offer a meaningful

9    revenue compensation.   And so they need to be confident that

10   they're not going to see some dramatic impact there.

11   Q.   All right.   Let's spend a little time talking about

12   Samsung.   And just to be clear, the Discovery search product

13   offered by Branch is available on Samsung phones today;

14   correct?

15   A.   As I testified earlier, I don't know -- they were in talks

16   to remove it and I don't know if that actually happened or not.

17   But, you know, a year ago I would say yes, for sure.

18   Q.   Sir, you stepped down as CEO, I believe, within the last

19   month or two; correct?

20   A.   Yeah.

21   Q.   And so no reason to believe that the Branch functionality

22   has disappeared from Samsung phones before you stepped down;

23   correct?

24   A.   Well, they told us that they were probably going to remove

25   it and I don't know when that would happen.   It was such a

1    small amount of traffic, we wouldn't have even seen an impact

2    on the numbers, so --

3    Q.  And -- but so far as you know, sir, that functionality has

4    been available on Samsung phones continuously since 2019,

5    correct?

6    A.  Until the date they removed it, if they have, yes.

7    Q.  You talked a little bit about the initial implementation of

8    the Branch technology on the Samsung phones.  And I believe

9    that's something you stated you started discussing with Samsung

10   in, I believe, 2018?

11   A.  Yeah, we had conversations about a potential integration

12   probably since 2015, but if got more serious in 2018.

13   Q.  That initial version was a proof of concept, correct?

14              THE COURT:  Sorry, it was a what?

15              MR. McGINNIS:  Proof of concept.

16   A.  The first -- the first launch with Samsung on the S10

17   device, it was not intended when we -- in 2018 to be a proof of

18   concept.  But it turned out we, you know, labeled it a proof of

19   concept after we saw the restrictions, because there was no way

20   it was a representation of our real product.

21   BY MR. McGINNIS:

22   Q.  Sir, Samsung told you that that initial version would be a

23   proof of concept trial, correct?

24   A.  It's possible somebody might have said that.  But we did --

25   I think, like, an initial deployment that was considered to

1    approve of concept.  But if there's a document you're referring

2    to, you can pull it up and might refresh my memory.

3    Q.  As part of that initial proof of concept, Samsung requested

4    that you would include apps from -- I think you said 25 apps;

5    is that right?

6    A.  So that 25 -- the 25 app restrictions was not a part of the

7    original scope of the discussions that we had with Samsung in

8    2018.  That was introduced later as a potential limitation on

9    the product functionality primarily to confirm with the Google

10   contract.  That would enable them to do the validation of

11   individual apps and confirm that there's no linking to the web.

12   Q.  Sir, isn't it correct that Samsung actually requested that

13   you identify apps from two different verticals to include in

14   that first proof of concept?  That was not a later concept;

15   correct?

16   A.  I don't recall.  If there's a document that you're

17   referring to, you can show it, I'm happy to review it.

18            MR. McGINNIS:  With apologies, Your Honor.  I have

19   more paper.

20   MR. McGINNIS:

21   Q.  Mr. Austin, you have in front of you PSX71.  Do you see

22   this?

23   A.  I do see it, yeah.

24   Q.  It's a series of emails between you and Samsung in March of

25   2018, correct?

1    A.  That's right.  Very, very early on.

2    Q.  And -- right.  Very early on in the discussions, right?

3    A.  Yeah.

4            MR. McGINNIS:  And I don't believe there's any

5    objection to this, so I would move it into evidence?

6            MR. HOFFMAN:  No objection, Your Honor.

7            THE COURT:  It will be admitted, PSX71.

8    BY MR. McGINNIS:

9    Q.  Mr. Austin, if I can direct your attention to the email on

10   the top of page 2, which is written by you.

11   A.  Yep.

12   Q.  Do you see that?  And this appears to be a summary of

13   action items coming out of a meeting that you held with

14   Samsung; correct?

15   A.  Yes.

16   Q.  This was to sort of lay out the basics of the proof of

17   concept trial that you were discussing with them?

18   A.  That's right.

19   Q.  And in number 4 there was an action item for you.  Do you

20   see that?

21   A.  Yeah.

22   Q.  And that was Branch to select an additional vertical beyond

23   restaurants to include in POC trial?

24   A.  That's right.

25   Q.  POC refers to proof of concept?

1    A.   I know what you're talking about now.

2    Q.   And so Samsung had asked you to -- well, let me step back.

3         Samsung wanted you to include restaurant apps in the

4    proof of concept trial, correct?

5    A.   I think they wanted an additional vertical to be added to

6    the proof of concept.

7    Q.   And the first was restaurants?  That was the first

8    vertical?

9    A.   We'd, I think, provided them a demonstration of

10   restaurants.

11        And also, just to take a step back here, I would need

12   to find the document to -- you know, that would clearly

13   articulate this.  But, let's take a look at the progress from,

14   you know, Branch initial conversations, which I think were,

15   whatever, March of 2018, to device going live, which was March

16   or early April of 2019.  So about a year of conversations.

17   There were multiple phases of this development process, of

18   which there was a proof of concept phase that would determine

19   whether or not we actually went live on the device.

20        The proof of concept phase was, I think, a separate

21   app.  And I would, again, need to confirm the timelines and the

22   scope.  But it was something that they could play with

23   themselves to evaluate whether or not to continue investing.

24   But I'm, you know, pretty confident -- and, you know, I would

25   need to see this document to be sure, because I'm pretty sure

1    we have it really well summarized -- that the POC ended in

2    June, July and then we proceeded with the full integration of

3    the product.  So for the POC phase, which was just a few

4    months, you know, in our first set of conversations, they

5    requested can you add another vertical for us to experiment

6    with before we go forward.  And it seems like we were proposing

7    a few different options.

8            In the actual version that went live, we ended up

9    having, I think, a few different versions of the -- like, you

10   know, other -- sorry, other apps from other verticals added to

11   the product than just those, but it was then reduced to the set

12   of 25.

13   Q.  So, sir, my question was actually very simple.  My question

14   was:  Samsung was -- wanted you to add a second vertical beyond

15   restaurants in the proof of concept trial, correct?

16   A.  Yeah.  And again, proofs of concept being the limited phase

17   in the broader, you know, go live.  But, yeah, for them to

18   experiment with, they wanted one extra vertical.  Because the

19   demo that we had provided them was a single vertical.

20   Q.  And the implementation that went live in 2019 included apps

21   from multiple verticals, correct?

22   A.  Depends on what you would call a vertical.  But it included

23   more than just restaurant vertical.

24   Q.  Sir, you use the "vertical."  Would you agree with me that

25   it included multiple verticals?

1    A.  As defined here, yes, it would be multiple verticals.

2    Q.  Samsung and Branch did then enter into a license agreement,

3    correct?

4    A.  We entered into an agreement.  I don't know the definition

5    of license agreement, but there was an agreement to use the

6    software and deploy it on Samsung devices.

7    Q.  And that's the agreement that was in place before it was

8    implemented on the Samsung S10 phone; correct?

9    A.  Yes.  I don't know the exact timing.  It was very close

10   there on when it went live and when the agreement was done,

11   but --

12   Q.  Fair enough.  Actually, I'm going to show you this

13   document.  It's in your binder right now.

14   A.  Okay.

15          MR. McGINNIS:  Your Honor, this document has been

16   marked "Highly Confidential," so we will not display it on the

17   screen and my questions will be really simple.

18          THE COURT:  Okay.

19   A.  How do I find it?

20   BY MR. McGINNIS:

21   Q.  Sorry, Mr. Austin.  It's DX1036.

22   A.  Did -- oh, I see.  Okay.  Yep.  Oh, it is called a license

23   agreement.

24   Q.  And, sir, I believe if -- you'll see your signature is on

25   page 16 of the document as well?

1    A.  Yes.

2    Q.  Do you recognize this?

3    A.  I do.

4    Q.  This is that agreement between Branch and Samsung that you

5    referred to?

6    A.  Yeah.  License is the correct term, it seems.

7    Q.  Thank you?

8              MR. McGINNIS:  Your Honor, I move this into evidence.

9              MR. HOFFMAN:  No objection, Your Honor.

10             THE COURT:  All right.  DX1036 will be admitted.

11   BY MR. McGINNIS:

12   Q.  Fair to say, Mr. Austin, this describes the scope of what

13   Branch had agreed to license to Samsung in terms of Discovery

14   content and results that could be displayed?

15   A.  I think it's a good -- I don't know if it included the

16   details of the product specifics.  I would need to go, like,

17   review page by page to check.  But, you know, it covered mostly

18   kind of like downside protection of -- I think there was like

19   SLAs and things like that around crashes and other types of

20   stuff.  But it's possible that there was some product

21   requirements documented here as well.

22   Q.  I believe, in terms of the launch of Branch on that

23   Galaxy -- or, excuse me, the Galaxy S10, I believe you said

24   that was a big success; correct?

25   A.  If you go back to my previous testimony, with success being

1    defined as one person clicking on a result, it was a success.

2    Q.  Sir, you informed your board of directors at the time that

3    the launch was a big success, correct?

4    A.  I did.  With that definition provided that it is, you know,

5    one user clicking on one result.  Because generally we viewed

6    this as a stepping stone to further launches with expended

7    scope and functionality.  So, you know, by this time, we're

8    talking six years into the business to finally get our first

9    device live, even with the reduced scope.  I mean it's a huge

10   milestone on the broader vision, if you think in decades.

11   Q.  Sir, in terms of that first implementation, I know you

12   identified some things that you believe were restricted in your

13   view because of the Google agreement.  But fair to say that

14   there were also other broken things from your perspective in

15   that initial implementation?

16   A.  I don't -- I mean, if there's something you're referring

17   to?  I mean, all software development has bugs.  There probably

18   were some bugs along the way, but I don't know if I would say

19   it was broken.  That seems like an aggressive classification.

20          MR. McGINNIS:  Your Honor, may I approach?

21   BY MR. McGINNIS:

22   Q.  Mr. Austin, you were deposed in this case, correct?

23   A.  I was.

24   Q.  I would like you to please turn to page 249.  We don't need

25   to display it for now.  But, 249, and look at line 17 through

1    21.

2        And I'll just read that question.

3        "Any other limitations that is you can identify on

4    Branch's implementation on the Samsung S10?"

5        Answer:  "There were a lot of other broken things, but

6    not necessarily specifically tied to a Google contract, as we

7    can see."

8        Were you asked that question and did you give that

9    answer, sir?

10    A.  Let me just check the context of that.

11        I think what I was referring to here is, like, broken

12    product functionality.  I might need to review the prior few

13    pages, just to confirm with the -- like, broken product

14    functionality, meaning, you know, limited results set for other

15    types of -- you know, issues that we had faced.  Like, you

16    know, as an example, one of the problems that they had was they

17    would show Netflix and Spotify results above our results

18    because they had a deal with Samsung -- excuse me, Spotify and

19    Netflix had a direct deal with Samsung.

20        So anytime Spotify would match or Netflix would

21    match, like, that would pop above the Branch results, which

22    made no sense.  Like, if there's a pizza song, it would show

23    above our results.  So there was just like broken

24    functionality.  And we tried to get them to change that, but it

25    was like, okay, the Netflix team is pushing back on that or

1    whatever.

2    Q.  Sir, just to be clear though, you were asked that question

3    and you gave that answer in your deposition; correct?

4    A.  Yeah, but I'm referring to some of these other, sort of,

5    broken product functionality.  But the constraints that our

6    product saw were primarily Google constraints.

7    Q.  Mr. Austin, you were also asked a number of questions by

8    the plaintiffs regarding PSX75.

9        Can we just display the cover page for that.

10       And you referred to the fact that this was part of a

11   board presentation, right?

12   A.  Yes.

13   Q.  In fact, it's an exert that was taken out of a board

14   presentation and made a separate document?

15   A.  This was, yes.

16   Q.  I would like to show you the full board presentation.

17   A.  Okay.

18   Q.  And this is from April of 2021, which is UPX685, which

19   should be in your binder, sir.

20   A.  It's going to take a couple hours.

21   Q.  This is a lengthy presentation.  We're not going to look at

22   all of the page.  But I want to just touch on a few topics here

23   because this also does talk about a local Discovery search

24   product that you referred to.

25       If you turn, first, to page 403.  The beginning section

```
 1    of this deck, if you just want to thumb through it.  It's your
 2    summary for the board of how Branch's Discovery technology fits
 3    into the market?
 4    A.  Yeah.  Which is the -- DX, you said again?  Or is it on
 5    here?
 6    Q.  It is UPX685, sir.
 7    A.  Okay.  Got it.  Yeah, I'm familiar with these slides.
 8              And what was the slide you wanted to skip to?
 9    Q.  Please turn to 403, sir.
10    A.  Okay.
11    Q.  Here you're describing for your board --
12    A.  Yep.
13    Q.  -- how what Google does versus what Branch does, correct?
14    A.  Yes.
15    Q.  And you state at the top:  Google operates in decreasing
16    market in mobile, correct?
17    A.  Yeah.  And I'm referring specifically to Google web search
18    as a way to navigate and engage with the web.
19    Q.  And that's the black box there at the bottom?
20    A.  That's correct.
21    Q.  And if you turn to the next page, 404, you explain that
22    Branch controls the majority use case, which is that 90 percent
23    red box there, correct?
24    A.  Yeah.  I mean, this is the -- again, in this initial
25    presentation, sort of a hypothetical overview of the strategy.
```

1    It's not saying that we actively today control that, you know,

2    or at the time of this presentation.  But that if we can build

3    this next generation of search and discovery, that in theory we

4    can do what Google did for the web, we can do for the app

5    ecosystem, which is where 90 percent of time spent on phones

6    is.

7    Q.  If you turn to page 405.  I believe should be the next

8    page.

9    A.  Yeah.

10   Q.  This describes, also, how, from your perspective, users

11   interact with their phones and what Branch does versus, for

12   example, direct app access or web search, correct?  And what

13   Branch is trying to do is to take clicks or uses away from the

14   direct app access button and make them part of the Branch app

15   search; correct?

16   A.  Yeah.  So this is data that is collected from a bunch of

17   different sources that gives us a high level estimate.  You

18   know, I wouldn't say it's scientific, they're not scientific

19   numbers, but they are high level estimates from sources.  But

20   the idea was that rather than having people swipe around to get

21   to the apps, we can provide a way to just search to get to the

22   apps directly.

23          And again, this is also describing the reduced scope

24   functionality of on-device search.  So a lot of the examples

25   shown here at this point are not about broad app search.  This

1    is, you know, just getting to apps on your phone, basically.

2    Q.  Because this is -- this board deck is from April of 2021.

3    And this is, I think -- your prior testimony was a local

4    Discovery search is what Branch is doing at that point, right?

5    A.  Yes, that's the main thrust of it.

6    Q.  So let's look at page 409.  And this is -- you've got, on

7    the left side, a description of the old search integration.

8    That was the pre-LDS search description?

9    A.  Yeah.

10    Q.  Then on the right side you have the local discovery system?

11    A.  Yeah.

12    Q.  And below that it says -- there's a reference to CTR.  Do

13    you see that?

14    A.  Yes.

15    Q.  What's CTR?

16    A.  It's the click-through rate.  So the percentage of time

17    somebody does a search that they click on a result.

18    Q.  And the old version had 4 percent, around 4 percent

19    click-through rate; correct?

20    A.  That's correct.

21    Q.  And the new version had 80 percent click-through rate?

22    A.  That's right.

23    Q.  That's a significant improvement; correct?

24    A.  It's -- well, I mean, if your focus is on helping users

25    navigate to apps, then going from, you know, from 4 percent to

1    80 percent is definitely an improvement.  Because our, you

2    know, competition, if you will, at the point was if somebody

3    types F-A-C, the old version of the Android search would return

4    Facebook app.  And so they would get that naturally.  So most

5    of the time they don't need to get anything from Branch.  This

6    is that reduced value add that we had to cut back because we

7    couldn't do broad search.

8          So if people are just searching for apps on their

9    phone and we don't control the app result on the phone, then

10   they're not going to click on our stuff.  So we had to expand

11   to take over that local component.  In the original version of

12   the product people aren't doing searches for Facebook, they're

13   searching for pizza and other things where there aren't app,

14   names to return and so there wasn't considered competition.

15   But in this sold style, with focus on device navigation, it was

16   a significant improvement.

17   Q.  And Branch has routinely tracked or looked at CTR, or click

18   through rate, to determine whether its Discovery search

19   products are actually being successful; correct?

20   A.  Correct.

21   Q.  The other thing you have here on the left side is it says

22   OEM controlled; correct?

23   A.  Yes.

24   Q.  On the right side it says full Branch control.  That was

25   also an improvement from Branch's perspective; correct?

1    A.  Yeah.  Because, as I mentioned, if the OEM is returning the

2    stuff on the device, in this case just the, you know, Facebook

3    app, that's competitive with our local solution.  And this is

4    where we faced a lot of headwinds in getting this product

5    scaled because a lot of OEMs were, like, well, what's value do

6    you add beyond our thing.  If it's not broad search, like

7    what's the value?  And so we had to do a lot of work and, you

8    know, end up paying a lot of money to convince them to let us

9    take this over to get more of those clicks.

10   Q.  That was an improvement, correct, sir?  I think your

11   testimony was yes?

12   A.  With the local device search, this was an improvement for

13   us to have full control over the search results.

14   Q.  Are you familiar with the concept of latency?

15   A.  Yes.

16   Q.  What is latency?  The Court has heard something about this.

17   But very briefly, what is your understanding of latency?

18   A.  In the search context, it is when somebody types a query,

19   how quickly the results show up on the screen.

20   Q.  And poor latency usually leads to a poor user experience,

21   is that fair?

22   A.  Yeah, if the results are slow to respond.  People don't

23   have much patience.

24   Q.  And, in fact, the original version of Branch's discovery

25   functionality that had been implemented had some latency

1    issues; correct?

2    A.  Yeah.  Anything that connects to the internet does require

3    roundtrip to the internet.  So, you know, Google Search, Branch

4    app search all requires internet connectivity and, therefore,

5    ads latency to the request.

6    Q.  And Samsung actually came to Branch and said this latency

7    is an issue, we would like to look at a version that does not

8    connect to try to fix the latency; correct?

9    A.  That was a proposed solution to improve latency.  But it,

10   you know, reduced the scope of functionality.  You can't do

11   broad search and, like, provide a Discovery use case if you're

12   constrained to only provide results from the local device.

13   Q.  Samsung -- just to be clear though, Samsung said the

14   product was slow and they would like you to look at an on-

15   device version to improve latency?

16   A.  Again, in the context of we can't -- for Samsung, we can't

17   provide the full scope of functionality, we can't provide

18   results from the web, you know, we can't provide anything for

19   apps that are not currently installed, then why do you need to

20   go to the -- just why do you need to go to the server and add

21   latency?  You can just do it on-device.  And so in that

22   context, after the product had been de-scoped, yes, they did

23   ask us to move on-device to improve latency.

24   Q.  So that was, just to be clear -- I'm trying to make my

25   question simple so that we can make this efficient.  That was a

1    yes to my question; is that right?

2    A.  But, you know, if you take that out of context, I think it

3    would be misleading.  So I just want to make sure it's clear.

4    Q.  Go ahead and turn to slide 441 of the same deck.  And this

5    is where -- and we can display this.  Thank you.

6         This where the excerpt that the plaintiff's counsel

7    showed you began, right?

8    A.  Yeah.

9    Q.  And I would like to turn to page 443, which I think should

10   be the second page in there.

11   A.  Okay.

12   Q.  And here you've got your description of an RSA 3.0, what

13   your understanding the RSA prohibited; correct?

14   A.  These were provided by a Samsung employee who was in a room

15   with a, you know, team that manages the contract and the Google

16   relationship.  So I think this was taken from an email sent by

17   a Samsung employee.

18   Q.  And just focusing on the RSA 3.0 provision there that

19   refers to that Google must be the only connected search.  Do

20   you see that?

21   A.  I do.

22   Q.  You haven't seen any Google agreements with any OEMs or

23   carriers; correct?

24   A.  I have not, but I could basically reconstruct them, as I've

25   done here, from what I've heard from the various employees of

1    these places.

2    Q.  Right.  And that's what you've done, is you hear snippets

3    of information from different people, you reconstruct it and

4    then this is what you put on the page?

5    A.  This was directly, in this case, from a Samsung employee.

6    You know, from an internal meeting that they had about the RSA

7    3.0 and its constraint on Branch.

8    Q.  Now let's just assume for a minute, sir, that you were

9    incorrect about what that provision actually provides.  You

10   would agree with me, then, that the Google agreement does not

11   actually prohibit Branch's implementation the way that you

12   think it does, correct?

13       That was a loaded question.

14          THE COURT:  That was a bit of a circular question.

15   So do you want rephrase?

16          MR. McGINNIS:  Fair enough.  That's what we get for

17   late in the day, I suppose.  I apologize, Your Honor.

18   BY MR. McGINNIS:

19   Q.  Your understanding that Google's agreements prohibited

20   certain more restricted Branchs in the implementation is based,

21   sir, on your understanding of what the RSA actually prohibits,

22   correct?

23   A.  My understanding on the prohibitions are what the employees

24   who have direct exposure either have seen the document or, you

25   know, are directly talking to the legal team that has seen the

1    document of these various OEMs and carriers, and it's

2    reconstructed from their words.  So it might not be the exact

3    legal terms, but, you know, I imagine that the scope is very

4    similar.  Exactly how it's written might differ.

5    Q.  Please turn to the next page, sir.  And I believe this is a

6    page you were asked about previously; correct?

7    A.  Yes.

8    Q.  And this is sort of a technical description of what the

9    local discovery system does, correct?

10   A.  That's correct.

11   Q.  And two things just to point on this.  I don't want to

12   repeat anything.  At the bottom here, Mr. Austin, you see that

13   there is a reference to zero latency; correct?

14   A.  Yes.

15   Q.  That's something you're highlighting because of the concern

16   that Samsung had raised with respect to the first version of

17   Discovery, correct?

18   A.  I mean, we -- so first off, it's zero latency relative to a

19   network roundtrip.  And it's referring to, probably, network

20   latency because there's still some latency in this version.

21   Even today I think their -- the team is grappling with latency

22   issues and LDS.  But, yeah, the idea was that you don't need to

23   connect to the internet anymore and, therefore, it can provide

24   the results directly from the phone.

25   Q.  Sir, you told your board that this version had zero

1    latency; correct?

2    A.   Zero network latency, which is implied.

3    Q.   This is -- I'm sorry.  I didn't mean to interrupt you.

4    A.   That's fine.

5    Q.   This is also a slide you shared with your partners and

6    pitched them on the fact that this version of the product had

7    zero latency?

8    A.   The words might have changed, but a variation of the slide

9    was -- and it was never pitched as, you know, entirely zero

10   latency.  Of course, there's always some latency.  But it's

11   zero network latency from not having to do the roundtrip.

12   Q.   The right side of the page here, then, refers to -- do you

13   see the column that describes the synchronization of certain

14   analytics and settings in the background every three days?

15   A.   Yeah.

16   Q.   And so that we're clear on that, what the local discovery

17   search version does is actually does connect to Branch servers

18   every three days, correct?

19   A.   Yes.  But it's -- you know, the actual search execution and

20   the experience for the user does not connect to the internet.

21   Q.   Right.  So the everyday search has improved latency because

22   it's just on device, but then every three days Branch is able

23   to refresh the index and ensure that the results provided on

24   device are fresh, correct?

25   A.   Yeah.  But again, with the context here that this is, you

1    know, the reduced scope functionality that doesn't do the

2    ability to search across apps, doesn't really show deep links

3    for apps that are not installed.  You know, all that as the

4    caveat, yes, there is an improvement that you do not need to

5    connect to the internet anymore.

6            But again, in the broad strategy of business, losing

7    the ability to provide broad app search to gain this network

8    latency is not the right tradeoff to be considering.

9            THE COURT:  Can I just ask a clarifying question, as

10   we get to the end of the day, to make sure I understand what

11   the product ended up being.

12           So if I'm using the local -- what becomes the local

13   search functionality, and I've got Yahoo! -- excuse me, not

14   Yahoo! --

15           THE WITNESS:  Yelp.

16           THE COURT:  -- Yelp on my phone and I put in "pizza,"

17   what would come up in response to that, if there's no internet

18   connectivity.

19           THE WITNESS:  The conversion today, actually,

20   unfortunately, nothing because we can't store all of Yelp's

21   information about restaurants and other things on the device.

22   We can basically only respond if you search for Yelp.  So it's

23   very restrictive in terms of the value add to the end user and

24   likability to monetize and other things.  But it happens -- it

25   happens faster.

1          THE COURT:  I see.  And so are there apps in which a

2     search would produce something that is stored within the app on

3     the phone?

4          THE WITNESS:  In a limited capacity, we would

5     restrict the total number of links, deep links per app to a

6     very small quantity, typically like five or ten.  And we

7     doesn't introduce that functionality until way later.  And that

8     was one, sort of, value add, because after we sort of cut out

9     all the core functionality that we had intended to offer, the

10    big question we would get from partners is, well, why do I need

11    to work with you?  And so we were always looking to add

12    features.  In this case it's latency or other things.  There

13    was some reason to keep working with us until we could figure

14    out how to get the broad functionality re-enabled.

15         THE COURT:  So is it the case today, for example,

16    using Yelp, say I frequently order pizza from the same place in

17    my neighborhood.  If I did punch in "pizza," would a Yelp link

18    to that frequently used --

19         THE WITNESS:  Not today.  But that was something we

20    were trying to work on enabling.  We could potentially do that,

21    but it was not a feature that we'd introduced at the time.

22         THE COURT:  And it's not a feature today?

23         THE WITNESS:  No.  And I don't think it will be a

24    feature, unfortunately.

25         THE COURT:  Mr. McGinnis, where are you in your

```
1    examination?

2              MR. McGINNIS:  I would say about halfway through,

3    sir.

4              THE COURT:  Okay.  What does that mean in terms of

5    time?

6              MR. McGINNIS:  Probably 30 to 45 minutes more.

7              THE COURT:  Okay.  All right.  All right.  So why

8    don't we call it a day.

9              And we will have to resume in the morning,

10   Mr. Austin.  Hopefully you'll be able to find somewhere to put

11   your head down this evening in D.C.

12             We'll ask you to return tomorrow morning so we can

13   get started at 9:30.  I'll ask you not to discuss your

14   testimony with anyone overnight.

15             Thank you very much.

16             THE WITNESS:  Thank you.

17             THE COURT:  You can step down.  And they'll take care

18   of the binder.

19             THE WITNESS:  Okay.

20             THE COURT:  Okay.  Just a few housekeeping issues

21   before we end the day.  I think we had requested an order with

22   respect to the exhibit posting.  Maybe we missed it.  But has

23   one be been prepared?  And has that process begun?

24             MR. DAHLQUIST:  Yes, Your Honor.  David Dahlquist.

25             We're working on a draft.  We'll share it with Google
```

 1    tonight, and hopefully we can have it resolved by morning.

 2    We're following your instructions.

 3           THE COURT:  Is the intention to begin this evening

 4    what we discussed yesterday, or to wait for the order?

 5           MR. DAHLQUIST:  With your permission, we would like

 6    to begin without the order.  Or if you prefer, we're happy to

 7    pause it.

 8           THE COURT:  If everybody is operating in good faith

 9    and consistent with what we talked about yesterday, then let's

10    start today.

11           MR. DAHLQUIST:  We provided notice to Google last

12    night, per your instructions.

13           THE COURT:  Okay.  Terrific.

14           MR. DAHLQUIST:  Thank you.

15           THE COURT:  All right.  Not a too indelicate subject:

16    If there is not a continuing resolution or something else by

17    the end of the week, what, if any, impact is that going to have

18    on the Department of Justice and its lawyers in this case?  I

19    know you all love your jobs so much.

20           MR. DINTZER:  We come to work for free, Your Honor.

21           THE COURT:  That's what I'm saying.

22           MR. DINTZER:  So the way this works, Your Honor, if

23    the government shuts down and there's no continuing resolution,

24    we're in a position where we're not funded unless we're

25    deemed -- unless we're deemed -- what's the word?

1          THE COURT:  Essential.

2          MR. DINTZER:  Essential.  It's been a day, Your

3     Honor.  Unless we're deemed essential.  So at that point we

4     would be in a position where we would have to ask the court to

5     stay.

6          THE COURT:  The Court to what?

7          MR. DINTZER:  To stay.

8          THE COURT:  Stay what?

9          MR. DINTZER:  The trial.

10         THE COURT:  Can I deem you essential?

11         MR. DINTZER:  If the Court denied our motion, the

12    natural effect of that would be that we would be likely deemed

13    essential.

14         THE COURT:  Okay.  Well, send me your motion to stay,

15    which I will deny quickly, and then you're essential.

16         MR. DINTZER:  Understood, Your Honor.

17         THE COURT:  Excellent.  Now, look, I understand you

18    may need to rotate people, but I've got to keep this thing

19    moving.

20         MR. DINTZER:  We completely understand.

21         THE COURT:  Presumably, whatever gets passed,

22    everybody will get paid at the end of the day.

23         MR. DINTZER:  We understand, Your Honor.

24         THE COURT:  Okay.  I want to make sure, in terms of

25    these hearsay issues that we've been talking about, I want to

 1    make sure we're keeping track of what the issue is.

 2         MR. DINTZER:  Our plan is, for the Samsung/Branch, is

 3    to file something, hopefully tonight, that lays out what the

 4    Court has said --

 5         THE COURT:  Look, I will just point out one thing to

 6    the Google side of the table, which is that a number of the

 7    questions that were asked were eliciting what you all were

 8    objecting to be hearsay from Samsung.  So there's a goose/

 9    gander issue here.  So let's just be mindful of that.  And if

10    you all want to get out what you all want to get out about what

11    Samsung sold Mr. Austin, then the same ought to apply to the

12    other side, it seems to me.  But just keep that in mind.

13         MR. DINTZER:  We appreciate that, Your Honor.  So

14    either tonight or tomorrow we will be filing a motion --

15    sometime in the next couple of days -- to gather in all the

16    documents that we're dealing with.

17         THE COURT:  I just want to make sure somebody is

18    keeping track.  I'm not terribly good at it, so I'll just make

19    sure you all are keeping track.

20         MR. DINTZER:  We are definitely keeping track.

21         THE COURT:  Okay.  I've got one last thing just on my

22    list, but it's very housekeeping-ish.  So, literally

23    housekeeping.  So anything else?

24         MR. DINTZER:  We do, Your Honor.  So when we did the

25    push of all the documents in, we only did the ones to which

1    there was no objection and there are some categories which

2    Google has objected to which have, over time, not worn well,

3    and we would like to address.  And I have sort of a second

4    push.  And if the Court will hear it, we have an attorney

5    prepared to discuss it.

6              THE COURT:  Have you talked to Google about whether

7    their objection is --

8              MR. DINTZER:  Yes.  They've refused to back down on

9    their objection.

10             THE COURT:  Okay.  What are we talking about?

11             MR. SCHMIDTLEIN:  I have no idea what he's going to

12    present here, other than some large collection of documents

13    that they haven't used with a witness, and I'm not aware of

14    them having some current plan to use with a witness.  So I

15    don't know why we're fighting about these right now.

16             THE COURT:  Okay.  Let's just hear out what the issue

17    is briefly, then I can decide whether you can continue to fight

18    or I'll resolve it.

19             MR. McLELLAN:  Thank you, Your Honor.  Michael

20    McLellan for the United States.

21             And what we're fighting about here are documents that

22    we raised with Google before trial began and several times

23    since, which consists of, you know, basically three categories.

24    One is documents that were produced by Google but what -- but

25    for which they have logged a foundation objection and no other

1    objection.  The other are -- there's about 70-some of those.

2    The other are documents for which -- exhibits, rather, for

3    which Google has lodged only a relevance objection.  There is

4    300-and-some of those.  Several of those have come in over the

5    course.  The objections have either not been maintained or have

6    been overruled.

7            And the third relates to hearsay documents.  And

8    those we're not going to try to push in right now, but we think

9    we've gotten quite a bit of insight from Your Honor on how many

10   of those objections would remain valid, particularly for the

11   third-party documents for which we've got 902(11) declarations.

12   And we think it would be beneficial to have a deadline for both

13   parties to go and maybe update those objections -- there's

14   several hundred of those on both sides -- to see if any remain

15   and to help us discern what we actually need to fight about.

16           So we are going to push in the first two

17   categories -- or would like to.  And the third we would like,

18   as I say, to have the parties update their positions on them

19   and see if there's anything to fight over.

20           THE COURT:  So -- look, I think you ought to talk to

21   Mr. Schmidtlein.  But my view is this:  What I care about is

22   what you're going to try to present with a witness.  We've all

23   talked about, that really is the primary concern of mine.

24   Anything that's un-objected to and then what you want to

25   present to a witness, and which I really do need to resolve an

1    objection.  Or has been happening quite frequently, the

2    objection is withdrawn once the document is introduced.  So I

3    don't know how many such documents fit within the 370 you've

4    just described.

5            MR. McLELLAN:  How many documents that we anticipate

6    using with a live witness?

7            THE COURT:  Correct.

8            MR. McLELLAN:  It would be a subset of those.  And

9    obviously I don't think we're going to be -- well, for example,

10   just to give you some examples, like for the relevance

11   objections, we have relevance objections that were lodged to

12   any AFA agreement, any ACC agreement, documents related to

13   Branch.  Those were lodged before you denied the motion in

14   limine that Google had aimed at the AFA and ACC allegations.

15   We approached them after that motion was denied and asked them

16   to withdraw those objections.  They indicated they did not

17   intend to do so.

18           The same is true for all the documents -- not all,

19   but the vast majority of the documents on our exhibit list

20   related on spoliation of evidence in chats.  Those objections

21   were lodged before Your Honor spoke at the pretrial conference

22   about those issues.  We again approached Google, requested that

23   they withdraw those relevance objections, and they would not.

24           So what we're talking about are a large category of

25   documents that may well not be used with a live witness, but

1    that will be used.  And the difficulty is that we don't have a

2    sense of whether we are now going to need to present these to a

3    live witness -- and this is all true for the foundation ones as

4    well -- whether we need to call someone in to just sit there

5    and go, Is this X, is this X, is this X?  We need some closure

6    on what is actually going to be in evidence without a live

7    witness so that we can basically plan how to most efficiently

8    proceed, instead of spending quite a bit of time laying the

9    foundation and doing these types of things.

10           And the same is true, really, for all the hearsay

11   documents, as well.  We're just trying to figure out what we

12   actually need to do, what the 902(11) declarations actually get

13   us in terms of what will come in, what they will object to

14   despite the 902 request and --

15           THE COURT:  Let me just ask Mr. Schmidtlein:  In

16   terms of what -- this may be the first you're hearing about

17   it -- so what your thinking is about these issues?

18           MR. SCHMIDTLEIN:  We don't believe AFAs and ACCs come

19   into this case unless they're going to use them with a witness.

20   Your Honor has granted summary judgment on those agreements.

21   If they think there is a permissible use with a witness

22   consistent with Your Honor's ruling -- I know we had a

23   discussion about this in the in limine -- I want to hear what

24   it is, but I haven't heard what it is.  And the same is true of

25   documents regarding spoliation.  I don't know what documents

1    they think they're going to push into evidence without using

2    with a witness, why those would be admissible in this case, in

3    any event.

4         So I think we need to be starting to focus on what

5    documents are actually going to be used with witnesses on these

6    things.  The hearsay ones, I think it's pretty difficult for us

7    to just kind of waive off hearsay.  If there are particular

8    ones they want to use with particular witnesses coming up, we

9    will obviously look at those and see if we can't come to an

10   understanding with the government.

11        MR. McLELLAN:  I'm sorry, were you done?

12        MR. SCHMIDTLEIN:  Yeah.

13        MR. McLELLAN:  I think the difficulty -- again, you

14   have said repeatedly that you did not anticipate us needing to

15   present each document through a live witness in order for it to

16   be admitted.  We have these 902(11) declarations.  We want to

17   know what's going to come in without a live witness so we can

18   determine what --

19        THE COURT:  That seems a little easier to me than,

20   perhaps, the other two issues.  But if there is a 902(11)

21   declaration, that ought to at least -- I think, it ought to at

22   least eliminate the hearsay -- at least the first level hearsay

23   objection.  Maybe there's something more to be said about it

24   within the actual document itself.

25        I guess the question is:  How well categorized are

1    these documents?  How well grouped, I should say.  And are they

2    grouped in a manner that we can talk about them collectively?

3    And as opposed to document by document?  Because the truth is,

4    if we can talk about it as groups of records, I'm prepared to

5    devote some time to resolving the issue so that the plaintiffs,

6    and perhaps even Google, don't feel like they need to bring

7    somebody in to allay evidentiary issues that, you know, lay an

8    evidentiary foundation that's being objected to.  You know, we

9    all have an interest in seeing this thing to the end.

10    On the other hand, if it's really getting down to a

11    document-by-document issue, you know, for the most part I think

12    I was hoping we could save that until the end and I could

13    resolve any evidentiary issues in connection with the findings

14    of fact and conclusions of law.  Now, I recognize, as I sit

15    here now, that that is a bit of a problem in the sense that if

16    there is, for example, foundation objection, if the parties are

17    prepared, for example, to produce affidavits that may resolve

18    that kind of thing.  But we ought to probably know what the

19    ground rules are for that sooner rather than later.

20    MR. McLELLAN:  I think that's right, Judge.  And as

21    to the foundation, my understanding is that Google -- I mean,

22    these are Google's documents, they produced them.  There's not

23    argument relating to, obviously, the authenticity of them.  It

24    is that there is some component of the documents for which they

25    believe the speaker lacked the adequate foundation to make,

1    whatever.

2            But to go to the -- I guess to draw back to what you

3    asked --

4            THE COURT:  That seems to be a different issue, to

5    me, however, than -- I haven't seen these documents.  If it's

6    an email from somebody and Google's contention is that person

7    didn't have personal knowledge to make representations about

8    what's in the document, that's not admissibility.  I mean, I

9    suppose it is in some world, it's an admission ability issue.

10   Although, you know, even for business records you don't have to

11   have personal knowledge.  But that seems to me to be a weight

12   issue, that if it really comes down to documents like that, we

13   can deal with that in the context of --

14           MR. SCHMIDTLEIN:  My concern, Your Honor, is they got

15   discovery of millions and millions of documents in this case --

16           THE COURT:  Sure.

17           MR. SCHMIDTLEIN:  -- having nothing to do with any

18   witnesses who were deposed or who are being called at trial.

19   And to the extent they think they're going to push random

20   emails from those people in for the truth of the matter

21   asserted, or for other substantive reasons, I think there's

22   issues with that.  So that's what we're --

23           THE COURT:  I'm glad you raised that, because at

24   least the way I had envisioned this when I issued that order

25   pretrial, was that most of the documents that weren't coming in

1    through live witnesses would have at least come in through

2    depositions.  Now, I don't know if that's true.  I mean, if

3    you're trying to push in something that is contracts,

4    agreements, that's one thing, that's --

5            MR. SCHMIDTLEIN:  We're not objecting.

6            THE COURT:  -- that's not an issue.  I think that's

7    probably a nonissue.  But something else that is more

8    substantive, then I can see why that might raise some issues.

9    But if it is the subject of a deposition, it's been testified

10   to, the deposition itself has been designated, both parties

11   have been had an opportunity to present and have a witness

12   discuss the exhibit, I had envisioned that being the kind of

13   record that wouldn't need to be presented to a live witness and

14   still would be managed to be pushed in.  I don't know how many

15   of these documents here would fit in that category.

16           MR. McLELLAN:  It's a mixed bag, Your Honor.  And for

17   the foundation documents, I'm not in a position to tell you,

18   other than to say it's a mix.  A lot of the relevance ones were

19   not because they are things like contracts.

20           But I think, to the broader point, if I understand

21   you correctly, as to the hearsay, we can sort of put those

22   aside, it sounds like.  If we have a 902(11) declaration, we're

23   in good shape.  For relevance, there are categories that we

24   could make to maybe resolve in one fell swoop.  There will

25   probably be categories that are -- documents that are not

1    easily categor -- you know what I'm trying to say.

2              THE COURT:  Categorized.

3              MR. McLELLAN:  Thank you.  It's late.

4         And we can figure out what that quantity is and if

5    you actually need to deal with them, if there are particular

6    ones we should deal with now, if there are others we should

7    push to later in trial, we can certainly engage in that effort.

8    We just need to have a dialogue that is not one-sided, where we

9    get responses to the questions we ask.  And I think the same is

10   probably true for the foundation ones.

11        I think, for the most part, that there is not a

12   dispute really over the admissibility of them.  It is a dispute

13   over, as you intimated at the beginning, whether -- how

14   convincing the documents are, whether the speaker actually had

15   the personal knowledge that lends -- makes the document

16   convincing.  But these are things we can deal with.  I think if

17   we can take the hearsay issue off the board, some of the

18   foundation and some of the relevance, that's going to do a lot.

19             THE COURT:  I think I've made this observation

20   earlier, which is I would think the case is not going to rise

21   and fall on a document that hasn't been produced at trial.  So

22   I understand the need to make the record, et cetera.  But if

23   there are documents out there in the world that you think are

24   going to be particularly important, I'd urge you to figure out

25   how to get them in front of me, because it's important for me

1    to focus on them and they'll, frankly, be the ones that I

2    remember, more than something just pushed into the record.

3        I'm not saying you that shouldn't do that, but with

4    that in mind, I guess where we are is as follows:  Look, we're

5    not sitting Friday.  Everybody remembers that; correct?  You

6    know, let's -- I'm going to ask you all to take some time on

7    Friday to try to and work through this.  If, at the end of the

8    day, there remains disputes, then let's see if we can group

9    these documents -- put these documents into groups and we'll

10   just have to take some time to try and get to -- try and

11   resolve some of these evidentiary issues.  Okay?

12       MR. McLELLAN:  Sounds great to me.  Thanks, Judge.

13       THE COURT:  I want to avoid -- and I think this is

14   true for both sides, what I want to avoid is a situation where

15   a party is not in a position to introduce a piece of evidence

16   simply because a records custodian wasn't called or something

17   that is really very, you know, procedural in nature.

18       MR. McLELLAN:  That's our intent as well.

19       THE COURT:  Okay.  All right.

20       MR. McLELLAN:  Thank you, Your Honor.

21       THE COURT:  One more scheduling question.  Do we

22   expect to finish -- we're going to tomorrow with Mr. Austin.

23   Do we think we're going to get through Mr. Tinter tomorrow, is

24   that the plan?

25       MR. SCHMIDTLEIN:  Uncertain.  Uncertain.  The

1    plaintiffs have, I believe, four hours of direct testimony that

2    they're going to try to elicit from him tomorrow, and we have

3    substantial cross.

4              THE COURT:  Okay.  And Mr. Tinter is?

5              MR. SCHMIDTLEIN:  Microsoft.

6              MS. BELLSHAW:  He's a senior executive at Microsoft.

7    He may have some scheduling difficulties in returning that

8    we're going to be working through.

9              THE COURT:  Returning as in when?

10             MS. BELLSHAW:  I mean, if he doesn't finish tomorrow,

11   we would expect his testimony to resume on Monday.  We have

12   some preliminary understanding that he has scheduling

13   difficulties, and so we will revert with Microsoft's counsel

14   and do our best to --

15             THE COURT:  I hate to do this because I told my law

16   clerks I would not, just in all candor, the reason we had set

17   Friday as a day off is I actually had another all-day hearing

18   on the books.  It's been cancelled.  I wanted to keep the

19   morning open to try and get more of my motions done.  For those

20   of you who have clerked in the district court, the CJR list

21   deadline is Saturday.  But if it means, you know, convening on

22   Friday to get Mr. Tinter done we'll do it.  But I'm not

23   inviting you all to spill into Friday.  I'll ask you to work to

24   get him done tomorrow, but we have a little bit of a safety

25   valve there.

1          MS. BELLSHAW:  We appreciate that, Your Honor, and we

2     will do our best to move things expeditiously.

3          THE COURT:  I have one status conference tomorrow at

4     9.  I could start earlier in the day, if that would help?  Do

5     you want to come in and start at 8:30, or even earlier?  I've

6     got to pause at 9 o'clock for a quick hearing.

7          It's on Zoom, right, J.C.?  It's on Zoom.  It

8     shouldn't take long.

9          MS. BELLSHAW:  Your Honor, DoJ can start at any time

10    that works for the Court.

11         THE COURT:  All right.  What do we think is a

12    reasonable time to begin to get everything done tomorrow?

13         MR. SCHMIDTLEIN:  We're at your staff's disposal,

14    Your Honor.

15         MS. BELLSHAW:  Yes, Your Honor.

16         THE COURT:  I wake up awful early.  Why don't we try

17    and steal an extra hour, we'll start at 8:30.  It seems like a

18    reason time.  The 9 o'clock hearing will be very short.  So we

19    can probably steal at least another 45 minutes.

20         Is Mr. Austin's counsel here?  Or at least

21    somebody -- if somebody would just let Mr. Austin and his

22    counsel know that we're going to start tomorrow at 8:30.  And

23    we can hopefully get him off the stand quickly.

24         MS. BELLSHAW:  We can let him know, Your Honor.

25    Thank you.

1          THE COURT:  How long do you think your redirect will

2     be of Mr. Austin?

3          MR. HOFFMAN:  At this point, not very long, Your

4     Honor.

5          THE COURT:  All right.  Why don't we start at 8:15,

6     with the goal of trying to finish him up by my 9 o'clock, so

7     that once 9 o'clock comes, I'll take a break and then we can

8     start with Mr. Tinter and try and get him done tomorrow.  Okay?

9          MS. BELLSHAW:  Thank you, Your Honor.

10          THE COURT:  All right.  Anything else from anybody?

11          MR. DINTZER:  Not from the DoJ, Your Honor.

12          MR. SCHMIDTLEIN:  Just to flag, we did make a filing

13     today having to do with the Court's schedule.  But we're

14     available.

15          THE COURT:  I haven't had a chance to read it, but I

16     saw that it was filed.

17          Just one last, quite literally, housekeeping matter.

18     I do not need all of these binders, so we -- we're retaining a

19     copy that you've been providing to my law clerk, but I would

20     invite all of you to please take them back, and so that I've

21     got space to put the new binders on.  Just -- we've run out of

22     room.

23          All right.  We'll see everybody in the morning.

24     Thank you.

25          MS. BELLSHAW:  Thank you.

                    *   *   *

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4   foregoing constitutes a true and accurate transcript of my

5   stenographic notes and is a full, true and complete transcript

6   of the proceedings to the best of my ability.

7                        Dated this 28th day of September, 2023

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3   WITNESSES:

4       ANNA KARTASHEVA
          Open session:
5              Cross Examination by Mr. Popofsky................2877
               Redirect Examination by Mr. Dintzer.............2885
6       ALEXANDER AUSTIN
               Direct Examination by Mr. Hoffman...............2891
7              Cross Examination by Mr. McGinnis...............2949

8

9   EXHIBITS ADMITTED:

        DX0612.........................................2899
10      DX1036.........................................2968

11      PSX65..........................................2958
        PSX71..........................................2964
12      PSX75..........................................2925

13      UPX0656 (Reserved)................................2939
        UPX1064.........................................2920
14
                            *   *   *
15

16

17

18

19

20

21

22

23

24

25

3003

## $

**$450** [1] - 2948:19

## 0

**001** [2] - 2925:7, 2925:13
**002** [1] - 2925:13
**003** [2] - 2925:14, 2951:7

## 1

**1** [6] - 2940:7, 2940:10, 2940:23, 2941:4, 2953:1, 2953:2
**1.5** [2] - 2883:3
**10** [2] - 2911:21, 2950:7
**100** [3] - 2904:16, 2956:9, 2958:16
**100,000** [3] - 2903:3, 2906:25, 2909:7
**100-plus** [1] - 2930:12
**10036** [1] - 2850:23
**1100** [1] - 2850:13
**1133** [1] - 2850:22
**12th** [1] - 2851:2
**1451** [1] - 2940:6
**15** [1] - 2896:25
**16** [1] - 2967:25
**17** [1] - 2969:25
**1:30** [1] - 2850:6

## 2

**2** [3] - 2950:21, 2953:2, 2964:10
**2.0** [1] - 2954:12
**20** [1] - 2910:24
**20-3010** [1] - 2850:4
**200** [1] - 2948:18
**20001** [2] - 2851:11, 3001:13
**20005** [1] - 2851:2
**20006** [1] - 2851:6
**2003** [1] - 2883:7
**2013** [1] - 2892:16
**2014** [2] - 2892:20, 2897:22
**2015** [3] - 2907:11, 2907:15, 2962:12
**2017** [2] - 2897:24, 2898:10
**2018** [14] - 2897:24, 2898:10, 2898:22, 2899:8, 2905:9, 2907:19, 2912:25, 2934:13, 2962:10,

2962:12, 2962:17, 2963:8, 2963:25, 2965:15
**2019** [16] - 2905:10, 2905:14, 2908:4, 2908:6, 2909:9, 2910:17, 2915:12, 2915:17, 2922:13, 2923:1, 2923:5, 2924:7, 2931:19, 2962:4, 2965:16, 2966:20
**202** [4] - 2850:14, 2850:18, 2851:3, 2851:7
**202-354-3267** [1] - 2851:12
**2020** [17] - 2878:14, 2879:9, 2880:5, 2882:24, 2883:21, 2885:4, 2923:6, 2923:14, 2923:19, 2927:23, 2928:22, 2931:19, 2943:23, 2952:1, 2952:3, 2955:5, 2956:2
**2021** [3] - 2945:8, 2971:18, 2974:2
**2021-ish** [1] - 2934:14
**2022** [3] - 2956:7, 2956:8, 2956:9
**2023** [2] - 2850:5, 3001:7
**209** [1] - 2850:17
**2099** [1] - 2851:6
**21** [1] - 2970:1
**212** [1] - 2850:23
**2200** [1] - 2850:22
**249** [2] - 2969:24, 2969:25
**25** [11] - 2910:24, 2911:6, 2912:2, 2915:17, 2953:25, 2954:13, 2954:14, 2963:4, 2963:6, 2966:12
**27** [1] - 2850:5
**28th** [1] - 3001:7

## 3

**3** [1] - 2953:4
**3.0** [4] - 2928:9, 2978:12, 2978:18, 2979:7
**30** [1] - 2984:6
**300-and-some** [1] - 2989:4
**307-0340** [1] - 2850:14
**31** [1] - 2959:1

**333** [2] - 2851:11, 3001:12
**335-2793** [1] - 2850:23
**35** [1] - 2884:20
**370** [1] - 2990:3
**394** [1] - 2883:2
**3:05** [1] - 2913:23
**3:20** [1] - 2913:23

## 4

**4** [5] - 2953:4, 2964:19, 2974:18, 2974:25
**403** [2] - 2971:25, 2972:9
**404** [1] - 2972:21
**405** [1] - 2973:7
**409** [1] - 2974:6
**434-5000** [1] - 2851:3
**441** [1] - 2978:4
**443** [1] - 2978:9
**45** [2] - 2984:6, 2999:19
**450** [1] - 2893:1
**4999** [2] - 2925:17, 2926:15

## 5

**50** [1] - 2961:7
**5000** [1] - 2925:17
**50000** [1] - 2928:18
**5004** [1] - 2945:1
**508-4624** [1] - 2851:7
**531** [1] - 2959:20

## 6

**600** [1] - 2850:17
**60604** [1] - 2850:18
**634** [1] - 2896:25
**637** [1] - 2899:18
**650** [2] - 2893:6, 2948:18
**6523** [2] - 2851:10, 3001:12
**694** [1] - 2886:6

## 7

**70-some** [1] - 2989:1
**725** [1] - 2851:2
**75** [1] - 2911:18

## 8

**80** [3] - 2911:19, 2974:21, 2975:1
**805-8563** [1] - 2850:18

**8:15** [1] - 3000:5
**8:30** [3] - 2999:5, 2999:17, 2999:22

## 9

**9** [5] - 2999:4, 2999:6, 2999:18, 3000:6, 3000:7
**90** [3] - 2911:19, 2972:22, 2973:5
**902** [1] - 2991:14
**902(11** [5] - 2989:11, 2991:12, 2992:16, 2992:20, 2995:22
**998** [1] - 2925:7
**9:30** [1] - 2984:13

## A

**A-U-S-T-I-N** [1] - 2892:6
**abandon** [1] - 2928:24
**ability** [10] - 2912:23, 2930:2, 2932:16, 2933:14, 2936:21, 2946:8, 2982:2, 2982:7, 2994:9, 3001:6
**able** [16] - 2918:4, 2927:19, 2929:7, 2932:10, 2932:16, 2935:8, 2935:11, 2938:23, 2941:8, 2942:22, 2944:17, 2946:7, 2949:4, 2961:8, 2981:22, 2984:10
**aborts** [1] - 2925:18
**absolutely** [14] - 2900:15, 2903:1, 2903:22, 2908:13, 2909:11, 2911:14, 2915:24, 2917:12, 2921:20, 2937:2, 2943:17, 2944:2, 2944:10, 2948:12
**ACC** [2] - 2990:12, 2990:14
**accept** [1] - 2939:1
**access** [10] - 2881:19, 2882:2, 2882:10, 2897:17, 2913:18, 2935:5, 2950:25, 2951:9, 2973:12, 2973:14
**accidently** [2] - 2911:7, 2912:8
**accomplish** [1] - 2945:22
**ACCs** [1] - 2991:18

**accuracy** [1] - 2938:19
**accurate** [2] - 2938:25, 3001:4
**accurately** [1] - 2927:20
**achieve** [1] - 2943:22
**acknowledges** [1] - 2921:14
**act** [1] - 2945:15
**action** [5] - 2895:13, 2895:15, 2916:12, 2964:13, 2964:19
**active** [7] - 2932:3, 2940:13, 2955:10, 2955:12, 2956:2, 2956:6, 2956:9
**actively** [3] - 2921:3, 2946:19, 2973:1
**actual** [9] - 2892:15, 2897:23, 2898:4, 2898:9, 2926:2, 2934:21, 2966:8, 2981:19, 2992:24
**ad** [6] - 2904:10, 2913:17, 2930:3, 2930:4, 2952:13, 2954:12
**add** [9] - 2901:22, 2966:5, 2966:14, 2975:6, 2976:6, 2977:20, 2982:23, 2983:8, 2983:11
**added** [2] - 2965:5, 2966:10
**additional** [3] - 2931:7, 2964:22, 2965:5
**additions** [1] - 2878:11
**address** [2] - 2952:22, 2988:3
**addresses** [1] - 2957:20
**adds** [1] - 2945:10
**adequate** [1] - 2993:25
**admissibility** [2] - 2994:8, 2996:12
**admissible** [2] - 2941:20, 2992:2
**admission** [4] - 2925:3, 2937:18, 2938:9, 2994:9
**admit** [4] - 2899:20, 2919:24, 2924:25, 2937:15
**ADMITTED** [1] - 3002:8
**admitted** [10] - 2899:24, 2920:6,

2920:21, 2925:19, 2938:17, 2944:22, 2958:23, 2964:7, 2968:10, 2992:16
**adopt** [2] - 2895:5, 2901:23
**adoption** [1] - 2956:17
**ads** [3] - 2924:2, 2924:3, 2977:5
**advantage** [1] - 2904:9
**advertisement** [1] - 2901:17
**advertisements** [1] - 2954:5
**advertisers** [1] - 2902:21
**Advertising** [1] - 2901:10
**advertising** [3] - 2902:19, 2933:16, 2952:12
**AFA** [2] - 2990:12, 2990:14
**AFAs** [1] - 2991:18
**affect** [3] - 2911:13, 2912:23, 2948:10
**affidavits** [1] - 2993:17
**afternoon** [6] - 2877:20, 2877:21, 2891:16, 2891:25, 2913:22, 2949:19
**aggressive** [1] - 2969:19
**ago** [3] - 2884:20, 2892:13, 2961:17
**agree** [2] - 2966:24, 2979:10
**agreed** [4] - 2912:4, 2912:9, 2913:8, 2968:13
**agreement** [18] - 2883:2, 2920:19, 2927:4, 2927:5, 2953:15, 2954:16, 2967:2, 2967:4, 2967:5, 2967:7, 2967:10, 2967:23, 2968:4, 2969:13, 2979:10, 2990:12
**agreements** [5] - 2883:18, 2978:22, 2979:19, 2991:20, 2995:4
**ahead** [10] - 2889:4, 2907:24, 2908:12, 2921:1, 2928:19, 2931:3, 2935:24, 2942:11, 2978:4
**aimed** [1] - 2990:14
**airplane** [1] - 2879:21

**al** [1] - 2850:3
**alert** [2] - 2911:8, 2946:24
**Alexander** [2] - 2891:17, 2892:5
**ALEXANDER** [3] - 2891:19, 2892:5, 3002:6
**all-day** [1] - 2998:17
**allay** [1] - 2993:7
**allegations** [1] - 2990:14
**allow** [3] - 2929:1, 2930:17, 2930:21
**allowed** [4] - 2896:10, 2909:10, 2910:18, 2933:7
**allowing** [1] - 2915:17
**allows** [2] - 2881:15, 2951:10
**almost** [1] - 2913:23
**alphabetical** [1] - 2958:8
**alternative** [9] - 2877:25, 2883:4, 2903:10, 2903:16, 2914:18, 2916:4, 2916:17, 2918:7, 2921:11
**alternatives** [1] - 2901:3
**altogether** [1] - 2941:18
**amazing** [2] - 2899:5, 2954:11
**ambiguous** [1] - 2890:2
**America** [2] - 2850:2, 2892:2
**Americas** [1] - 2850:22
**AMIT** [1] - 2850:9
**amount** [1] - 2962:1
**analytics** [1] - 2981:14
**Andrew** [2] - 2882:3, 2885:15
**Android** [5] - 2893:11, 2897:3, 2897:12, 2915:9, 2975:3
**Andy** [1] - 2893:11
**angle** [1] - 2904:1
**aNNA** [1] - 3002:3
**annoying** [1] - 2886:8
**answer** [9] - 2889:25, 2890:1, 2890:14, 2890:19, 2939:13, 2950:13, 2970:5, 2970:9, 2971:3
**answers** [1] - 2949:14
**anticipate** [2] -

2990:5, 2992:14
**antidotal** [1] - 2960:21
**antidotally** [1] - 2960:23
**anytime** [1] - 2970:20
**anyway** [1] - 2947:7
**apart** [1] - 2883:21
**apologies** [1] - 2963:18
**apologize** [5] - 2908:15, 2920:9, 2925:9, 2943:3, 2979:17
**app** [107] - 2880:14, 2881:18, 2881:25, 2882:12, 2894:1, 2894:3, 2894:11, 2894:13, 2894:14, 2894:16, 2894:18, 2894:20, 2894:22, 2894:25, 2895:4, 2895:5, 2895:12, 2895:14, 2895:17, 2895:18, 2896:2, 2896:6, 2897:9, 2897:10, 2897:20, 2897:23, 2898:2, 2898:3, 2898:4, 2898:5, 2898:8, 2898:9, 2898:11, 2898:15, 2899:7, 2900:4, 2900:8, 2900:11, 2900:19, 2900:22, 2902:6, 2902:10, 2903:4, 2903:7, 2903:8, 2903:13, 2903:14, 2903:15, 2903:19, 2906:7, 2906:13, 2906:16, 2906:17, 2906:19, 2906:21, 2907:3, 2909:18, 2909:20, 2910:3, 2910:11, 2910:12, 2912:16, 2914:11, 2914:18, 2916:2, 2916:8, 2916:13, 2916:22, 2921:12, 2921:23, 2922:17, 2927:17, 2927:20, 2929:18, 2930:10, 2932:13, 2932:25, 2935:10, 2935:19, 2936:20, 2948:15, 2950:25, 2954:10, 2955:19, 2955:21, 2956:14, 2957:24, 2959:13, 2960:16, 2960:25, 2963:6, 2965:21, 2973:4,

3005

2973:12, 2973:14, 2973:25, 2975:4, 2975:9, 2975:13, 2976:3, 2977:4, 2982:7, 2983:2, 2983:5

**appealing** [1] - 2882:14

**appear** [1] - 2923:2

**APPEARANCES** [1] - 2850:11

**appeared** [1] - 2896:6

**applications** [3] - 2903:11, 2907:1, 2909:7

**apply** [1] - 2987:11

**appreciate** [8] - 2888:10, 2891:12, 2946:2, 2947:18, 2948:6, 2949:16, 2987:13, 2999:1

**approach** [5] - 2878:24, 2882:6, 2950:8, 2957:25, 2969:20

**approached** [2] - 2990:15, 2990:22

**appropriate** [1] - 2891:10

**approval** [3] - 2919:16, 2919:18, 2921:15

**approve** [1] - 2963:1

**apps** [67] - 2880:12, 2894:10, 2894:25, 2895:1, 2895:8, 2895:9, 2895:16, 2895:19, 2897:8, 2897:11, 2898:14, 2900:22, 2900:23, 2901:6, 2902:25, 2903:9, 2906:6, 2909:3, 2909:5, 2909:12, 2910:6, 2910:16, 2910:18, 2910:23, 2910:24, 2911:1, 2911:6, 2912:2, 2912:3, 2912:12, 2914:20, 2915:17, 2915:18, 2917:9, 2918:5, 2922:18, 2929:19, 2932:14, 2945:11, 2953:8, 2953:15, 2953:25, 2954:1, 2954:5, 2954:13, 2954:14, 2956:11, 2959:14, 2960:12, 2960:14, 2963:4, 2963:11, 2963:13, 2965:3, 2966:10,

2966:20, 2973:21, 2973:22, 2974:1, 2974:25, 2975:8, 2977:19, 2982:2, 2982:3, 2983:1

**April** [3] - 2965:16, 2971:18, 2974:2

**apt** [2] - 2900:12, 2926:11

**argument** [1] - 2993:23

**arm** [2] - 2893:13, 2927:1

**Army** [1] - 2926:3

**article** [3] - 2925:5, 2925:6, 2948:1

**articles** [4] - 2946:16, 2948:7, 2948:8, 2948:10

**articulate** [1] - 2965:13

**aside** [6] - 2883:13, 2897:25, 2900:18, 2931:13, 2941:10, 2995:22

**aspect** [1] - 2931:5

**asserted** [1] - 2994:21

**Associates** [2] - 2893:9, 2893:16

**assume** [2] - 2950:20, 2979:8

**assumed** [1] - 2928:9

**AT&T** [26] - 2884:2, 2884:6, 2884:8, 2888:16, 2888:17, 2889:7, 2889:17, 2934:24, 2935:1, 2936:2, 2936:3, 2936:4, 2936:17, 2936:19, 2937:3, 2937:13, 2937:19, 2937:20, 2938:24, 2938:25, 2939:5, 2940:2, 2940:20, 2942:3, 2942:15

**AT&T's** [8] - 2887:18, 2889:22, 2937:22, 2939:2, 2939:10, 2941:5, 2941:15, 2941:19

**attach** [1] - 2886:7

**attached** [1] - 2886:4

**attempt** [1] - 2928:14

**attempts** [2] - 2914:8, 2948:15

**attention** [2] - 2924:13, 2964:9

**attorney** [1] - 2988:4

**Austin** [37] - 2891:17, 2891:22, 2891:25,

2892:5, 2892:6, 2896:14, 2897:2, 2900:1, 2913:24, 2914:7, 2917:17, 2920:9, 2924:15, 2925:17, 2925:24, 2926:16, 2939:17, 2940:8, 2942:14, 2945:3, 2946:11, 2949:19, 2950:10, 2958:3, 2958:25, 2963:21, 2964:9, 2967:21, 2968:12, 2969:22, 2971:7, 2980:12, 2984:10, 2987:11, 2997:22, 2999:21, 3000:2

**AUSTIN** [2] - 2891:19, 3002:6

**Austin's** [1] - 2999:20

**authenticity** [1] - 2993:23

**automatically** [2] - 2916:7, 2917:4

**available** [4] - 2914:16, 2961:13, 2962:4, 3000:14

**Avenue** [4] - 2850:22, 2851:6, 2851:11, 3001:12

**avoid** [3] - 2942:9, 2997:13, 2997:14

**aware** [5] - 2883:14, 2883:17, 2883:20, 2890:19, 2917:23, 2947:2, 2952:2, 2988:13

**awful** [1] - 2999:16

## B

**background** [2] - 2926:19, 2981:14

**bag** [1] - 2995:16

**bank** [1] - 2948:19

**bar** [14] - 2897:10, 2897:11, 2897:13, 2897:17, 2898:13, 2898:15, 2898:24, 2899:2, 2899:9, 2900:16, 2900:17, 2914:23, 2914:25, 2951:5

**barrier** [1] - 2931:24

**barriers** [2] - 2919:13, 2926:10

**bars** [2] - 2898:17, 2899:12

**based** [4] - 2895:19, 2910:22, 2916:21,

2979:20

**basic** [4] - 2897:11, 2899:4, 2914:25, 2938:10

**basics** [1] - 2964:16

**Bates** [10] - 2883:2, 2896:25, 2899:18, 2925:8, 2925:17, 2926:15, 2928:18, 2940:6, 2945:1

**became** [7] - 2892:23, 2893:23, 2893:25, 2899:12, 2920:13, 2921:2, 2945:6

**become** [2] - 2891:3, 2895:5

**becomes** [1] - 2982:12

**BEFORE** [1] - 2850:9

**began** [3] - 2946:12, 2978:7, 2988:22

**begin** [4] - 2949:11, 2985:3, 2985:6, 2999:12

**beginning** [2] - 2971:25, 2996:13

**begun** [1] - 2984:23

**behalf** [2] - 2899:21, 2938:25

**behind** [1] - 2926:3

**Behr** [2] - 2918:21, 2918:23

**BEHR** [1] - 2918:21

**Belknap** [1] - 2850:21

**BELLSHAW** [8] - 2998:6, 2998:10, 2999:1, 2999:9, 2999:15, 2999:24, 3000:9, 3000:25

**below** [2] - 2901:25, 2974:12

**BENCH** [1] - 2850:9

**beneficial** [1] - 2989:12

**benefit** [6] - 2906:20, 2907:14, 2934:1, 2934:2, 2955:2, 2955:5

**benefits** [1] - 2903:22

**best** [6] - 2901:1, 2916:2, 2949:12, 2998:14, 2999:2, 3001:6

**better** [6] - 2913:10, 2916:17, 2921:14, 2921:22, 2944:4, 2951:3

**between** [6] - 2881:17, 2927:5, 2931:21, 2941:24, 2963:24, 2968:4

**beyond** [4] - 2955:22,

3006

2964:22, 2966:14, 2976:6

**big** [8] - 2916:12, 2923:6, 2926:4, 2947:14, 2968:24, 2969:3, 2983:10

**binder** [7] - 2886:5, 2896:9, 2917:18, 2958:3, 2967:13, 2971:19, 2984:18

**binders** [2] - 3000:18, 3000:21

**bit** [14] - 2877:23, 2893:5, 2903:24, 2918:13, 2923:4, 2949:20, 2955:6, 2955:8, 2962:7, 2979:14, 2989:9, 2991:8, 2993:15, 2998:24

**black** [2] - 2888:18, 2972:19

**Blep** [2] - 2954:12, 2954:14

**blind** [1] - 2902:2

**blocked** [1] - 2899:10

**blocker** [1] - 2935:19

**blue** [1] - 2902:3

**bluish** [1] - 2902:4

**board** [14] - 2924:18, 2924:19, 2944:13, 2946:19, 2950:1, 2969:2, 2971:11, 2971:13, 2971:16, 2972:2, 2972:11, 2974:2, 2980:25, 2996:17

**bold** [1] - 2941:1

**books** [1] - 2998:18

**bottom** [6] - 2880:17, 2881:12, 2940:7, 2953:11, 2972:19, 2980:12

**bought** [1] - 2884:19

**box** [5] - 2888:18, 2902:2, 2902:5, 2972:19, 2972:23

**brainstorming** [1] - 2921:4

**Branch** [138] - 2878:14, 2879:7, 2879:15, 2879:17, 2880:4, 2880:12, 2881:13, 2883:15, 2884:1, 2884:15, 2885:3, 2886:14, 2887:3, 2887:13, 2889:13, 2889:18, 2889:22, 2890:24, 2891:2, 2892:7,

2892:8, 2892:10, 2892:11, 2892:14, 2892:20, 2892:23, 2892:25, 2893:7, 2893:17, 2893:18, 2893:19, 2897:6, 2897:16, 2897:17, 2900:4, 2900:18, 2902:22, 2906:5, 2906:12, 2906:22, 2907:11, 2908:17, 2909:3, 2909:5, 2909:12, 2910:2, 2910:16, 2910:17, 2914:9, 2915:23, 2916:10, 2917:9, 2918:20, 2919:9, 2919:24, 2922:13, 2923:1, 2923:25, 2926:6, 2928:14, 2930:17, 2931:22, 2932:7, 2932:10, 2932:21, 2933:6, 2934:6, 2935:8, 2935:15, 2936:2, 2936:19, 2936:20, 2937:2, 2937:3, 2937:25, 2938:6, 2938:7, 2938:8, 2938:9, 2939:25, 2940:15, 2940:21, 2942:16, 2943:12, 2943:18, 2944:1, 2944:5, 2944:9, 2946:20, 2946:23, 2948:3, 2948:14, 2948:22, 2949:21, 2950:1, 2950:14, 2952:5, 2952:8, 2952:9, 2953:19, 2953:21, 2953:22, 2954:4, 2954:9, 2954:22, 2955:2, 2955:14, 2956:14, 2957:11, 2957:19, 2958:12, 2960:9, 2961:13, 2961:21, 2962:8, 2964:22, 2965:14, 2967:2, 2968:4, 2968:13, 2968:22, 2970:21, 2972:13, 2972:22, 2973:11, 2973:13, 2973:14, 2974:4, 2975:5, 2975:17, 2975:24, 2977:3, 2977:6, 2979:7, 2981:17, 2981:22, 2990:13

**Branch's** [17] - 2880:25, 2893:3,

2896:6, 2912:23, 2914:7, 2920:4, 2922:5, 2930:8, 2940:25, 2943:8, 2959:2, 2959:11, 2970:4, 2972:2, 2975:25, 2976:24, 2979:11

**Branch-Samsung** [1] - 2918:20

**Branchs** [1] - 2979:20

**branding** [1] - 2904:5

**break** [4] - 2913:22, 2913:25, 2926:8, 3000:7

**briefly** [3] - 2903:1, 2976:17, 2988:17

**bring** [3] - 2891:10, 2902:9, 2993:6

**broad** [15] - 2922:17, 2929:16, 2930:10, 2932:13, 2935:10, 2953:17, 2957:11, 2960:4, 2973:25, 2975:7, 2976:6, 2977:11, 2982:6, 2982:7, 2983:14

**broader** [3] - 2966:17, 2969:10, 2995:20

**broadly** [1] - 2928:10

**broken** [9] - 2912:6, 2935:17, 2969:14, 2969:19, 2970:5, 2970:11, 2970:13, 2970:23, 2971:5

**brought** [1] - 2912:12

**browser** [4] - 2894:8, 2908:25, 2909:22, 2911:4

**browsers** [1] - 2898:14

**bugs** [3] - 2911:7, 2969:17, 2969:18

**build** [11] - 2893:19, 2898:4, 2900:9, 2906:9, 2929:5, 2930:3, 2931:6, 2935:6, 2944:3, 2973:2

**building** [4] - 2893:25, 2894:11, 2903:5, 2923:11

**built** [3] - 2898:12, 2919:7, 2919:17

**bullet** [2] - 2945:18, 2959:23

**bunch** [1] - 2973:16

**business** [16] - 2892:24, 2904:3, 2923:9, 2923:11, 2928:21, 2928:24,

2932:13, 2937:25, 2938:6, 2938:8, 2939:8, 2944:6, 2969:8, 2982:6, 2994:10

**button** [4] - 2916:12, 2947:15, 2953:11, 2973:14

**buy** [4] - 2895:13, 2904:2, 2934:19, 2934:25

**buying** [1] - 2895:24

**buys** [1] - 2934:20

**BY** [37] - 2877:19, 2878:12, 2879:2, 2881:10, 2882:21, 2884:13, 2885:21, 2891:24, 2899:25, 2906:2, 2908:5, 2910:15, 2914:6, 2917:8, 2920:8, 2920:25, 2922:11, 2924:11, 2925:21, 2931:12, 2933:25, 2935:25, 2939:16, 2942:13, 2945:2, 2946:9, 2947:22, 2949:18, 2950:9, 2958:2, 2958:24, 2962:21, 2964:8, 2967:20, 2968:11, 2969:21, 2979:18

**C**

**calendar** [1] - 2905:15

**cancelled** [1] - 2998:18

**candor** [1] - 2998:16

**cannibalizing** [1] - 2904:14

**cannot** [3] - 2879:21, 2929:13, 2938:7

**canonical** [2] - 2908:18, 2929:23

**canonically** [2] - 2895:20, 2900:7

**capabilities** [1] - 2907:9

**capacities** [1] - 2932:19

**capacity** [1] - 2983:4

**capital** [2] - 2893:4, 2893:7

**care** [2] - 2984:17, 2989:21

**carrier** [13] - 2878:3, 2883:15, 2896:21, 2904:5, 2913:19, 2926:22, 2927:5,

2927:6, 2929:3,
2934:24, 2934:25,
2936:2, 2939:21
  **carrier-specific** [1] -
2904:5
  **carriers** [18] - 2903:20,
2903:23, 2905:7,
2918:25, 2922:23,
2927:16, 2928:11,
2934:7, 2934:8,
2934:17, 2935:7,
2935:9, 2935:15,
2942:15, 2943:25,
2959:9, 2978:23,
2980:1
  **case** [31] - 2879:24,
2900:21, 2900:24,
2901:16, 2903:20,
2915:5, 2916:25,
2927:6, 2932:24,
2938:14, 2938:15,
2938:20, 2945:19,
2945:23, 2946:7,
2957:20, 2960:1,
2961:3, 2969:22,
2972:22, 2976:2,
2977:11, 2979:5,
2983:12, 2983:15,
2985:18, 2991:19,
2992:2, 2994:15,
2996:20
  **cases** [3] - 2957:11,
2957:22, 2959:10
  **castle** [1] - 2944:23
  **categor** [1] - 2996:1
  **categories** [6] -
2951:10, 2988:1,
2988:23, 2989:17,
2995:23, 2995:25
  **categorized** [2] -
2992:25, 2996:2
  **category** [2] -
2990:24, 2995:15
  **caused** [1] - 2928:2
  **CAVANAUGH** [2] -
2887:7, 2949:9
  **Cavanaugh** [2] -
2850:21, 2887:6
  **caveat** [1] - 2982:4
  **CCR** [1] - 3001:11
  **CEO** [3] - 2887:13,
2891:2, 2961:18
  **certain** [3] - 2957:11,
2979:20, 2981:13
  **certainly** [4] - 2891:9,
2938:22, 2941:20,
2996:7
  **CERTIFICATE** [1] -
3001:1
  **certify** [1] - 3001:3

cetera [8] - 2898:21,
2916:12, 2934:22,
2935:4, 2944:7,
2959:15, 2996:22
  **chain** [4] - 2917:22,
2919:8, 2936:10,
2936:15
  **challenges** [1] -
2944:6
  **challenging** [2] -
2900:10, 2914:16
  **chance** [2] - 2944:19,
3000:15
  **Chang** [1] - 2907:15
  **change** [4] - 2892:12,
2928:8, 2948:23,
2970:24
  **changed** [7] - 2924:5,
2934:14, 2942:23,
2948:22, 2951:24,
2952:1, 2981:8
  **changes** [2] - 2911:12,
2954:22
  **channel** [1] - 2896:3
  **charge** [1] - 2913:19
  **chats** [1] - 2990:20
  **check** [9] - 2888:14,
2905:15, 2911:2,
2916:14, 2934:5,
2934:11, 2947:21,
2968:17, 2970:10
  **checked** [1] - 2933:12
  **checking** [1] - 2911:5
  **Chicago** [1] - 2850:18
  **Chinese** [1] - 2933:23
  **choose** [1] - 2897:16
  **choreography** [1] -
2949:14
  **Chrome** [1] - 2881:25
  **circuit** [1] - 2938:20
  **circular** [1] - 2979:14
  **circumstances** [1] -
2908:24
  **cited** [1] - 2940:1
  **citing** [1] - 2940:11
  **CJR** [1] - 2998:20
  **clarification** [1] -
2884:2
  **clarify** [2] - 2883:18,
2909:17
  **clarifying** [1] - 2982:9
  **class** [1] - 2892:16
  **classification** [1] -
2969:19
  **cleaner** [2] - 2882:1,
2882:12
  **clear** [17] - 2887:1,
2891:3, 2920:13,
2921:2, 2922:4,
2922:7, 2923:24,

2937:3, 2941:11,
2945:6, 2954:3,
2961:12, 2971:2,
2977:13, 2977:24,
2978:3, 2981:16
  **cleared** [2] - 2888:17,
2888:20
  **clearly** [1] - 2965:12
  **clerk** [1] - 3000:19
  **clerked** [1] - 2998:20
  **clerks** [1] - 2998:16
  **click** [14] - 2894:8,
2894:15, 2894:19,
2906:16, 2909:19,
2910:7, 2916:10,
2953:16, 2974:16,
2974:17, 2974:19,
2974:21, 2975:10,
2975:17
  **click-through** [3] -
2974:16, 2974:19,
2974:21
  **clicked** [2] - 2894:17,
2902:5
  **clicking** [3] - 2913:9,
2969:1, 2969:5
  **clicks** [3] - 2912:8,
2973:13, 2976:9
  **client** [2] - 2884:25,
2885:1
  **close** [3] - 2931:9,
2950:7, 2967:9
  **closed** [2] - 2880:3,
2949:15
  **closely** [1] - 2878:20
  **closure** [1] - 2991:5
  **CMR** [1] - 3001:11
  **coach** [1] - 2951:17
  **code** [1] - 2898:6
  **cohen** [2] - 2889:13,
2889:18
  **cohesive** [1] - 2881:23
  **Colin** [4] - 2917:24,
2918:21, 2918:23,
2918:24
  **collaborating** [1] -
2905:9
  **collaboration** [1] -
2931:21
  **colleague** [2] -
2890:21, 2891:14
  **collected** [2] -
2952:21, 2973:16
  **collecting** [1] -
2879:16
  **collection** [3] -
2880:12, 2885:13,
2988:12
  **collectively** [2] -
2890:23, 2993:2

collects [1] - 2952:9
  **color** [1] - 2902:2
  **Colorado** [1] -
2850:21
  **COLUMBIA** [1] -
2850:1
  **column** [1] - 2981:13
  **coming** [4] - 2889:2,
2964:13, 2992:8,
2994:25
  **comments** [1] -
2949:12
  **commercial** [2] -
2913:12, 2923:8
  **communication** [1] -
2890:6
  **companies** [17] -
2896:3, 2898:8,
2899:7, 2900:8,
2902:25, 2903:4,
2903:15, 2906:7,
2910:1, 2910:13
  **company** [12] -
2892:7, 2892:15,
2892:23, 2893:25,
2897:21, 2898:3,
2900:12, 2906:21,
2944:1, 2946:21,
2948:15, 2948:25
  **company's** [1] -
2948:22
  **compare** [1] - 2883:6
  **compensate** [1] -
2898:19
  **compensation** [1] -
2961:9
  **competes** [1] -
2880:25
  **competition** [3] -
2960:17, 2975:2,
2975:14
  **competitive** [3] -
2881:13, 2904:3,
2976:3
  **competitor's** [1] -
2904:2
  **complaining** [1] -
2960:24
  **complete** [3] -
2888:25, 2889:5,
3001:5
  **completely** [2] -
2924:8, 2986:20
  **completes** [1] -
2891:11
  **compliance** [4] -
2878:4, 2878:9,
2943:9, 2943:18
  **complicated** [2] -
2923:4, 2956:16

3008

**complied** [1] - 2878:3
**complimentary** [2] - 2881:3, 2881:14
**component** [3] - 2954:24, 2975:11, 2993:24
**components** [1] - 2922:22
**concept** [19] - 2910:22, 2962:13, 2962:15, 2962:18, 2962:19, 2962:23, 2963:1, 2963:3, 2963:14, 2964:17, 2964:25, 2965:4, 2965:6, 2965:18, 2965:20, 2966:15, 2966:16, 2976:14
**concern** [5] - 2943:8, 2943:15, 2980:15, 2989:23, 2994:14
**concerned** [2] - 2932:25, 2943:18
**concerns** [10] - 2888:16, 2921:18, 2939:22, 2939:23, 2941:5, 2941:8, 2941:9, 2942:10, 2942:19, 2959:11
**concluded** [3] - 2878:19, 2881:2, 2881:5
**conclusions** [1] - 2993:14
**conference** [2] - 2990:21, 2999:3
**confidence** [1] - 2946:2
**confident** [2] - 2961:9, 2965:24
**Confidential** [1] - 2967:16
**confidentiality** [1] - 2888:15
**configure** [2] - 2910:2, 2910:9
**configureable** [1] - 2910:12
**confirm** [8] - 2938:19, 2939:5, 2939:25, 2940:25, 2963:9, 2963:11, 2965:21, 2970:13
**confirmed** [1] - 2960:23
**conflict** [10] - 2905:19, 2940:2, 2940:3, 2943:1, 2943:3, 2943:4, 2943:5, 2959:11, 2959:19,

2961:3
**conflicting** [1] - 2932:18
**connect** [8] - 2879:21, 2887:19, 2929:13, 2977:8, 2980:23, 2981:17, 2981:20, 2982:5
**connected** [7] - 2877:17, 2880:9, 2885:6, 2921:9, 2928:6, 2928:7, 2978:19
**connection** [6] - 2878:21, 2954:16, 2955:3, 2955:5, 2955:9, 2993:13
**connectivity** [2] - 2977:4, 2982:18
**connects** [1] - 2977:2
**CONNOLLY** [1] - 2851:1
**consent** [1] - 2879:13
**consents** [1] - 2952:5
**consider** [1] - 2956:18
**considered** [2] - 2962:25, 2975:14
**considering** [2] - 2945:14, 2982:8
**consistent** [5] - 2941:4, 2941:7, 2949:11, 2985:9, 2991:22
**consistently** [1] - 2933:1
**consists** [1] - 2988:23
**constantly** [1] - 2932:2
**constitutes** [1] - 3001:4
**Constitution** [2] - 2851:11, 3001:12
**constrain** [2] - 2911:1, 2911:10
**constrained** [4] - 2903:7, 2913:7, 2929:20, 2977:12
**constraint** [1] - 2979:7
**constraints** [5] - 2895:17, 2903:17, 2904:20, 2971:5, 2971:6
**consulted** [1] - 2890:2
**consumers** [4] - 2902:24, 2911:13, 2914:10, 2930:1
**contain** [1] - 2879:25
**contained** [1] - 2938:6
**contains** [4] - 2883:3, 2920:1, 2925:2,

2937:18
**content** [1] - 2968:14
**contention** [1] - 2994:6
**contents** [1] - 2879:24
**context** [9] - 2886:12, 2902:10, 2970:10, 2976:18, 2977:16, 2977:22, 2978:2, 2981:25, 2994:13
**continually** [1] - 2935:18
**continue** [9] - 2890:24, 2904:12, 2907:24, 2922:13, 2927:21, 2929:1, 2948:25, 2965:23, 2988:17
**continued** [5] - 2892:19, 2923:5, 2923:20, 2927:10, 2929:8
**continuing** [2] - 2985:16, 2985:23
**continuously** [1] - 2962:4
**contract** [23] - 2905:19, 2913:12, 2915:20, 2926:11, 2932:18, 2933:5, 2933:10, 2933:19, 2934:13, 2935:19, 2939:23, 2940:13, 2941:6, 2941:8, 2941:16, 2943:9, 2943:19, 2946:5, 2954:2, 2954:4, 2963:10, 2970:6, 2978:15
**contracts** [5] - 2886:16, 2886:21, 2899:11, 2995:3, 2995:19
**contractual** [3] - 2921:18, 2940:1, 2940:3
**control** [4] - 2973:1, 2975:9, 2975:24, 2976:13
**controlled** [1] - 2975:22
**controls** [1] - 2972:22
**conveniences** [1] - 2888:22
**convening** [1] - 2998:21
**conversation** [5] - 2907:18, 2923:18, 2934:11, 2940:13, 2959:12

**conversations** [14] - 2904:19, 2908:22, 2920:12, 2920:14, 2922:20, 2927:21, 2932:4, 2936:12, 2942:21, 2943:6, 2962:11, 2965:14, 2965:16, 2966:4
**conversion** [1] - 2982:19
**conveying** [3] - 2887:2, 2938:3, 2941:18
**convince** [2] - 2904:2, 2976:8
**convincing** [2] - 2996:14, 2996:16
**copy** [1] - 3000:19
**core** [3] - 2893:23, 2894:13, 2983:9
**corporation** [1] - 2892:15
**correct** [85] - 2879:10, 2894:16, 2902:14, 2907:2, 2908:8, 2909:4, 2918:22, 2920:3, 2927:19, 2937:5, 2937:7, 2940:22, 2945:21, 2949:22, 2950:2, 2950:5, 2950:23, 2952:7, 2953:16, 2954:6, 2955:1, 2956:15, 2957:4, 2957:6, 2957:10, 2957:18, 2957:21, 2958:12, 2958:13, 2959:3, 2959:4, 2959:23, 2960:3, 2960:6, 2960:20, 2961:2, 2961:14, 2961:19, 2961:23, 2962:5, 2962:13, 2962:23, 2963:12, 2963:15, 2963:25, 2964:14, 2965:4, 2966:15, 2966:21, 2967:3, 2967:8, 2968:6, 2968:24, 2969:3, 2969:22, 2971:3, 2972:13, 2972:16, 2972:20, 2972:23, 2973:12, 2973:15, 2974:19, 2974:20, 2974:23, 2975:19, 2975:20, 2975:22, 2975:25, 2976:10, 2977:1, 2977:8, 2978:13, 2978:23, 2979:12,

2979:22, 2980:6, 2980:9, 2980:10, 2980:13, 2980:17, 2981:1, 2981:18, 2981:24, 2997:5

**Correct** [1] - 2990:7
**correctly** [1] - 2995:21
**costly** [2] - 2930:5, 2930:7
**Counsel** [1] - 2922:7
**counsel** [7] - 2877:22, 2885:18, 2947:5, 2978:6, 2998:13, 2999:20, 2999:22
**counsel's** [1] - 2887:21
**counter** [2] - 2888:24, 2889:2
**counter-designated** [1] - 2889:2
**couple** [8] - 2884:19, 2892:13, 2898:7, 2930:13, 2946:16, 2946:17, 2971:20, 2987:15
**course** [6] - 2893:3, 2908:22, 2918:14, 2920:11, 2981:10, 2989:5
**court** [7] - 2877:15, 2934:2, 2937:21, 2938:11, 2947:2, 2986:4, 2998:20
**COURT** [121] - 2850:1, 2877:16, 2878:7, 2879:1, 2881:6, 2882:7, 2882:15, 2882:20, 2883:25, 2884:3, 2884:6, 2884:9, 2885:17, 2887:6, 2887:8, 2887:22, 2888:2, 2888:5, 2888:8, 2888:11, 2888:20, 2888:23, 2889:4, 2889:10, 2889:14, 2891:6, 2891:13, 2891:22, 2894:19, 2895:7, 2899:23, 2905:22, 2905:25, 2907:23, 2908:10, 2909:16, 2913:14, 2913:21, 2914:2, 2916:21, 2920:6, 2920:18, 2922:7, 2923:24, 2924:4, 2925:5, 2925:8, 2925:11, 2925:18, 2930:25, 2933:22, 2935:22, 2937:20,

2937:23, 2938:14, 2939:7, 2941:11, 2942:5, 2946:2, 2947:19, 2949:10, 2949:16, 2958:23, 2962:14, 2964:7, 2967:18, 2968:10, 2979:14, 2982:9, 2982:16, 2983:1, 2983:15, 2983:22, 2983:25, 2984:4, 2984:7, 2984:17, 2984:20, 2985:3, 2985:8, 2985:13, 2985:15, 2985:21, 2986:1, 2986:6, 2986:8, 2986:10, 2986:14, 2986:17, 2986:21, 2986:24, 2987:5, 2987:17, 2987:21, 2988:6, 2988:10, 2988:16, 2989:20, 2990:7, 2991:15, 2992:19, 2994:4, 2994:16, 2994:23, 2995:6, 2996:2, 2996:19, 2997:13, 2997:19, 2997:21, 2998:4, 2998:9, 2998:15, 2999:3, 2999:11, 2999:16, 3000:1, 3000:5, 3000:10, 3000:15, 3001:1
**Court** [30] - 2851:9, 2851:10, 2879:5, 2879:11, 2879:19, 2880:7, 2880:19, 2881:16, 2885:23, 2887:25, 2888:18, 2888:22, 2889:3, 2892:3, 2893:14, 2896:18, 2900:13, 2901:10, 2915:25, 2918:16, 2945:5, 2948:13, 2950:14, 2976:16, 2986:6, 2986:11, 2987:4, 2988:4, 2999:10, 3001:11
**Court's** [1] - 3000:13
**Courthouse** [1] - 2851:10
**cover** [4] - 2925:23, 2925:24, 2928:6, 2971:9
**coverage** [6] - 2901:5, 2946:14, 2946:23, 2947:3, 2947:8, 2947:16

**covered** [2] - 2938:8, 2968:17
**crashes** [1] - 2968:19
**crawl** [3] - 2917:5, 2917:6, 2957:4
**crawling** [2] - 2957:10, 2957:13
**CRC** [1] - 2851:9
**create** [3] - 2906:5, 2928:14, 2960:16
**created** [3] - 2896:19, 2906:9, 2916:21
**creating** [1] - 2907:1
**criteria** [1] - 2912:7
**cross** [1] - 2998:3
**Cross** [2] - 3002:4, 3002:7
**CROSS** [1] - 2949:17
**CROSS-EXAMINATION** [1] - 2949:17
**crossed** [1] - 2956:8
**CRR** [2] - 2851:9, 3001:11
**CTR** [3] - 2974:12, 2974:15, 2975:17
**current** [13] - 2877:24, 2922:16, 2923:25, 2924:9, 2926:12, 2948:24, 2949:6, 2950:14, 2953:22, 2955:1, 2955:4, 2955:6, 2988:14
**custodian** [1] - 2997:16
**custom** [1] - 2898:6
**customer** [1] - 2895:5
**cut** [6] - 2889:8, 2905:18, 2920:9, 2922:21, 2975:6, 2983:8
**cutting** [1] - 2908:15
**CV** [1] - 2850:4

# D

**D.C** [5] - 2850:5, 2850:13, 2851:2, 2984:11, 3001:13
**DAHLQUIST** [4] - 2984:24, 2985:5, 2985:11, 2985:14
**Dahlquist** [2] - 2850:16, 2984:24
**daily** [7] - 2920:12, 2955:10, 2955:12, 2955:13, 2956:2, 2956:6, 2956:9
**Dash** [11] - 2901:21, 2901:22, 2901:23,

2901:24, 2902:1, 2902:2, 2902:7, 2902:8, 2902:9, 2902:12, 2902:13
**data** [9] - 2879:16, 2900:9, 2909:8, 2960:10, 2960:18, 2960:21, 2960:22, 2973:16
**database** [2] - 2898:7, 2929:18
**dataset** [1] - 2906:9, 2929:20
**date** [7] - 2893:6, 2900:6, 2905:15, 2909:7, 2934:12, 2952:21, 2962:6
**Dated** [1] - 3001:7
**dates** [1] - 2919:8
**DAU** [2] - 2955:23
**David** [2] - 2850:16, 2984:24
**David.dahlquist@ usdoj.gov** [1] - 2850:19
**days** [7] - 2905:12, 2934:12, 2947:13, 2981:14, 2981:18, 2981:22, 2987:15
**DC** [2] - 2851:6, 2851:11
**de** [2] - 2955:24, 2977:22
**de-scoped** [2] - 2955:24, 2977:22
**deadline** [2] - 2989:12, 2998:21
**deal** [10] - 2935:11, 2943:20, 2943:22, 2944:17, 2970:18, 2970:19, 2994:13, 2996:5, 2996:6, 2996:16
**dealing** [1] - 2987:16
**deals** [7] - 2895:9, 2932:7, 2932:10, 2934:6, 2935:7, 2935:8, 2943:25
**decades** [1] - 2969:10
**decide** [2] - 2890:16, 2988:17
**decided** [8] - 2884:5, 2884:6, 2884:7, 2890:11, 2890:12, 2892:20, 2893:20, 2894:12
**decision** [7] - 2878:22, 2883:20, 2883:23, 2883:25, 2884:1, 2884:3, 2890:23
**decision-makers** [2] -

3010

2883:23, 2884:3
**deck** [7] - 2886:9,
2924:21, 2959:2,
2959:7, 2972:1,
2974:2, 2978:4
**declarant** [1] -
2938:22
**declaration** [2] -
2992:21, 2995:22
**declarations** [3] -
2989:11, 2991:12,
2992:16
**decreasing** [1] -
2972:15
**deem** [1] - 2986:10
**deemed** [4] - 2985:25,
2986:3, 2986:12
**deep** [19] - 2886:15,
2892:17, 2893:21,
2900:9, 2900:22,
2900:25, 2902:14,
2903:2, 2906:8,
2906:14, 2906:21,
2907:2, 2909:21,
2916:4, 2916:22,
2936:21, 2949:23,
2982:2, 2983:5
**deeply** [4] - 2885:9,
2885:11, 2885:12,
2917:24
**Deepview** [5] - 2918:8,
2921:11, 2922:8,
2922:10, 2922:22
**Deepviews** [4] -
2915:22, 2915:25,
2916:19, 2917:10
**deepviews** [1] -
2916:20
**default** [2] - 2909:23,
2914:19
**defaults** [1] - 2914:16
**Defendant** [2] -
2850:7, 2851:1
**defined** [3] - 2910:25,
2967:1, 2969:1
**definitely** [2] - 2975:1,
2987:20
**definition** [8] - 2883:3,
2883:10, 2890:9,
2929:13, 2932:12,
2932:23, 2967:4,
2969:4
**definitive** [1] - 2945:7
**definitively** [3] -
2889:21, 2889:25,
2890:9
**delivery** [4] - 2894:25,
2895:3, 2895:6, 2901:3
**demo** [1] - 2966:19
**demonstrate** [3] -

2896:20, 2942:19,
2943:15
**demonstration** [2] -
2908:1, 2965:9
**demonstrative** [10] -
2878:24, 2880:7,
2882:17, 2885:22,
2885:23, 2886:10,
2886:12, 2886:25,
2950:10, 2950:21
**denied** [3] - 2986:11,
2990:13, 2990:15
**deny** [1] - 2986:15
**DEPARTMENT** [1] -
2850:12
**Department** [3] -
2850:16, 2877:22,
2985:18
**depicted** [1] - 2884:23
**depicting** [1] -
2879:11
**depicts** [3] - 2897:1,
2900:14, 2901:11
**deploy** [1] - 2967:6
**deployed** [1] - 2957:10
**deployment** [2] -
2955:23, 2962:25
**deposed** [2] -
2969:22, 2994:18
**deposition** [6] -
2887:18, 2888:3,
2891:8, 2971:3,
2995:9, 2995:10
**depositions** [1] -
2995:2
**describe** [3] -
2918:19, 2927:20,
2955:21
**described** [8] -
2879:6, 2900:7,
2902:24, 2909:24,
2927:16, 2946:4,
2950:18, 2990:4
**describes** [4] -
2960:1, 2968:12,
2973:10, 2981:13
**describing** [3] -
2940:2, 2972:11,
2973:23
**description** [8] -
2900:12, 2917:2,
2953:17, 2959:21,
2974:7, 2974:8,
2978:12, 2980:8
**design** [1] - 2959:25
**designated** [5] -
2887:15, 2888:5,
2888:14, 2889:2,
2995:10
**designations** [2] -

2888:24, 2891:8
**designed** [2] -
2880:21
**designs** [1] - 2881:22
**desperate** [1] -
2903:10
**despite** [2] - 2912:10,
2991:14
**destination** [1] -
2901:4
**detail** [1] - 2912:13
**details** [1] - 2968:16
**determine** [3] -
2965:18, 2975:18,
2992:18
**determined** [1] -
2890:1
**develop** [6] - 2898:2,
2898:5, 2913:9,
2914:20, 2921:5,
2928:25
**developed** [7] -
2915:7, 2916:5,
2919:7, 2930:6,
2934:9, 2952:2, 2956:3
**developers** [3] -
2895:17, 2906:14,
2916:23
**developing** [6] -
2897:22, 2898:7,
2898:8, 2904:5,
2923:14, 2930:8
**development** [3] -
2898:9, 2965:17,
2969:17
**device** [49] - 2879:20,
2879:21, 2879:23,
2884:19, 2884:20,
2884:24, 2885:3,
2890:11, 2890:17,
2894:9, 2897:3,
2897:4, 2897:5,
2900:16, 2914:23,
2915:14, 2927:12,
2929:24, 2929:25,
2930:10, 2930:11,
2930:14, 2933:15,
2933:16, 2933:23,
2934:15, 2934:21,
2935:4, 2935:12,
2942:24, 2955:25,
2956:1, 2959:15,
2962:17, 2965:15,
2965:19, 2969:9,
2973:24, 2975:15,
2976:2, 2976:12,
2977:12, 2977:15,
2977:21, 2977:23,
2981:22, 2981:24,
2982:21

**devices** [18] - 2880:8,
2883:16, 2884:16,
2894:5, 2896:23,
2904:7, 2905:10,
2912:11, 2918:20,
2923:20, 2924:1,
2924:6, 2931:17,
2933:6, 2933:7,
2935:3, 2935:12,
2967:6
**devote** [2] - 2922:13,
2993:5
**dialogue** [1] - 2996:8
**DICKMAN** [1] - 3001:3
**Dickman** [2] - 2851:9,
3001:11
**differ** [1] - 2980:4
**difference** [2] -
2881:16, 2881:20
**different** [33] - 2880:9,
2881:14, 2883:10,
2883:12, 2885:4,
2892:18, 2903:4,
2903:22, 2905:6,
2905:7, 2908:21,
2913:1, 2926:10,
2926:22, 2927:13,
2927:18, 2932:19,
2937:1, 2943:7,
2943:17, 2945:14,
2951:10, 2957:20,
2957:22, 2960:2,
2960:12, 2963:13,
2966:7, 2966:9,
2973:17, 2979:3,
2994:4
**differentiation** [1] -
2904:4
**differently** [1] -
2937:24
**difficult** [7] - 2895:16,
2903:6, 2929:18,
2930:2, 2930:5,
2951:18, 2992:6
**difficulties** [5] -
2894:10, 2904:20,
2943:24, 2998:7,
2998:13
**difficulty** [2] - 2991:1,
2992:13
**DINTZER** [32] -
2881:4, 2885:19,
2885:21, 2887:5,
2887:12, 2887:23,
2888:4, 2888:7,
2888:10, 2888:17,
2888:22, 2889:1,
2889:7, 2889:12,
2889:16, 2891:12,
2891:14, 2985:20,

2985:22, 2986:2, 2986:7, 2986:9, 2986:11, 2986:16, 2986:20, 2986:23, 2987:2, 2987:13, 2987:20, 2987:24, 2988:8, 3000:11

**Dintzer** [3] - 2850:11, 2882:23, 2883:7

**Dintzer.............2885** [1] - 3002:5

**DIRECT** [1] - 2877:18

**direct** [12] - 2917:1, 2926:22, 2940:12, 2943:1, 2943:3, 2964:9, 2970:19, 2973:12, 2973:14, 2979:24, 2998:1, 3002:6

**directly** [14] - 2894:16, 2902:13, 2906:17, 2906:19, 2916:25, 2917:7, 2926:24, 2940:14, 2940:18, 2954:1, 2973:22, 2979:5, 2979:25, 2980:24

**directors** [3] - 2924:19, 2950:1, 2969:2

**disappeared** [1] - 2961:22

**discern** [1] - 2989:15

**discover** [2] - 2895:19, 2903:9

**discovered** [3] - 2895:21, 2898:24, 2903:18

**discovering** [1] - 2895:16

**discovery** [11] - 2898:23, 2899:8, 2900:2, 2900:10, 2959:3, 2973:3, 2974:10, 2976:24, 2980:9, 2981:16, 2994:15

**Discovery** [57] - 2900:4, 2900:7, 2900:23, 2902:15, 2902:17, 2902:24, 2902:25, 2903:19, 2903:20, 2905:1, 2905:2, 2906:4, 2907:5, 2909:9, 2910:17, 2911:12, 2911:13, 2912:23, 2914:8, 2914:10, 2914:11, 2915:11, 2915:16, 2919:1,

2919:5, 2919:10, 2922:12, 2922:14, 2923:2, 2924:23, 2931:16, 2931:21, 2932:7, 2932:11, 2932:22, 2934:7, 2935:8, 2935:16, 2936:3, 2942:16, 2942:20, 2943:12, 2943:16, 2943:20, 2944:9, 2949:1, 2955:15, 2955:19, 2956:10, 2961:12, 2968:13, 2971:23, 2972:2, 2974:4, 2975:18, 2977:11, 2980:17

**Discovery's** [3] - 2907:9, 2908:7, 2908:16

**discuss** [7] - 2913:24, 2939:11, 2942:16, 2943:12, 2984:13, 2988:5, 2995:12

**discussed** [3] - 2938:14, 2938:15, 2985:4

**discussing** [2] - 2962:9, 2964:17

**discussion** [5] - 2890:20, 2939:19, 2941:23, 2944:13, 2991:23

**discussions** [6] - 2890:24, 2904:10, 2904:24, 2912:24, 2963:7, 2964:2

**dislike** [3] - 2885:9, 2885:11, 2885:12

**display** [15] - 2896:7, 2896:24, 2899:17, 2910:18, 2917:15, 2923:22, 2928:17, 2936:5, 2940:6, 2944:20, 2953:15, 2967:16, 2969:25, 2971:9, 2978:5

**displayed** [3] - 2882:19, 2906:13, 2968:14

**displays** [1] - 2926:14

**disposal** [1] - 2999:13

**dispute** [2] - 2996:12

**disputes** [1] - 2997:8

**distinct** [2] - 2942:4, 2960:2

**distinction** [1] - 2941:24

**distinctions** [1] - 2942:9

**distribute** [4] - 2903:11, 2934:7, 2936:21, 2948:15

**distributed** [2] - 2896:13, 2914:21

**distributing** [2] - 2935:19, 2944:7

**distribution** [15] - 2889:22, 2895:18, 2896:20, 2897:15, 2897:23, 2898:11, 2899:13, 2901:13, 2915:9, 2922:20, 2924:20, 2942:16, 2943:12, 2944:9, 2955:17

**DISTRICT** [3] - 2850:1, 2850:1, 2850:10

**district** [1] - 2998:20

**document** [43] - 2882:18, 2883:6, 2883:13, 2896:16, 2896:19, 2919:24, 2922:9, 2924:13, 2924:17, 2926:23, 2928:17, 2931:13, 2936:7, 2937:17, 2937:23, 2937:24, 2938:8, 2939:18, 2941:10, 2944:24, 2947:10, 2958:12, 2958:15, 2963:1, 2963:16, 2965:12, 2965:25, 2967:13, 2967:15, 2967:25, 2971:14, 2979:24, 2980:1, 2990:2, 2992:15, 2992:24, 2993:3, 2993:11, 2994:8, 2996:15, 2996:21

**document-by-document** [1] - 2993:11

**documented** [2] - 2939:20, 2968:21

**documents** [33] - 2958:3, 2987:16, 2987:25, 2988:12, 2988:21, 2988:24, 2989:2, 2989:7, 2989:11, 2990:3, 2990:5, 2990:12, 2990:18, 2990:19, 2990:25, 2991:11, 2991:25, 2992:5, 2993:1, 2993:22, 2993:24, 2994:5, 2994:12, 2994:15, 2994:25, 2995:15, 2995:17, 2995:25,

2996:14, 2996:23, 2997:9

**DoJ** [4] - 2850:11, 2885:18, 2999:9, 3000:11

**dollars** [3] - 2898:7, 2930:13, 2948:17

**done** [22] - 2887:14, 2900:21, 2919:14, 2924:9, 2934:13, 2935:7, 2935:8, 2935:11, 2946:3, 2954:18, 2954:19, 2957:6, 2957:12, 2967:10, 2978:25, 2979:2, 2992:11, 2998:19, 2998:22, 2998:24, 2999:12, 3000:8

**door** [3] - 2914:3, 2929:2, 2929:11

**Door** [11] - 2901:21, 2901:23, 2901:24, 2902:1, 2902:2, 2902:7, 2902:9, 2902:12, 2902:13

**down** [15] - 2884:11, 2885:15, 2912:5, 2928:11, 2951:1, 2951:2, 2959:25, 2961:18, 2961:22, 2984:11, 2984:17, 2985:23, 2988:8, 2993:10, 2994:12

**download** [3] - 2914:11, 2914:18, 2916:13

**Download** [1] - 2916:13

**downloaded** [1] - 2880:1

**downloading** [1] - 2954:13

**downloads** [1] - 2954:5

**downside** [1] - 2968:18

**draft** [1] - 2984:25

**dramatic** [3] - 2915:21, 2921:2, 2961:10

**dramatically** [6] - 2920:15, 2922:21, 2928:8, 2934:15, 2942:23, 2942:24

**draw** [1] - 2994:2

**drive** [1] - 2901:23

**drivers** [1] - 2895:25

**driving** [1] - 2921:23

**drops** [1] - 2961:7

**due** [3] - 2933:19, 2944:5, 2946:5
**duly** [1] - 2891:20
**during** [6] - 2877:23, 2889:6, 2891:9, 2907:8, 2913:25, 2919:9
**duty** [5] - 2938:18, 2938:23, 2938:25, 2939:5, 2946:22
**DX** [1] - 2972:4
**DX0612** [2] - 2896:14, 2899:20
**DX0612........................ ..........................2899** [1] - 3002:9
**DX1036** [2] - 2967:21, 2968:10
**DX1036.................... ..........................2968** [1] - 3002:10
**DX612** [1] - 2896:7
**DXD05.006** [1] - 2878:24
**DXD07** [1] - 2950:11

## E

**e-mail** [1] - 2918:2
**E-Z-E-L-L** [1] - 2889:16
**early** [10] - 2900:6, 2902:20, 2923:14, 2934:12, 2945:8, 2956:19, 2964:1, 2964:2, 2965:16, 2999:16
**earnestly** [1] - 2897:22
**easier** [2] - 2917:19, 2992:19
**easily** [1] - 2996:1
**easy** [1] - 2936:22
**ecosystem** [3] - 2900:11, 2902:11, 2973:5
**Edge** [1] - 2957:11
**effect** [3] - 2944:1, 2944:9, 2986:12
**efficient** [1] - 2977:25
**efficiently** [1] - 2991:7
**effort** [1] - 2996:7
**either** [7] - 2926:23, 2940:18, 2946:24, 2950:12, 2979:24, 2987:14, 2989:5
**electricity** [1] - 2914:15
**elevated** [1] - 2890:15
**Eli** [7] - 2936:15, 2936:16, 2936:18,

2936:24, 2937:6, 2937:11
**Eli's** [1] - 2937:12
**elicit** [1] - 2998:2
**elicited** [1] - 2922:5
**eliciting** [1] - 2987:7
**eliminate** [1] - 2992:22
**email** [26] - 2850:14, 2850:15, 2850:19, 2850:24, 2851:3, 2851:7, 2851:8, 2887:1, 2906:18, 2917:22, 2917:23, 2917:25, 2918:16, 2919:8, 2920:10, 2922:9, 2936:10, 2936:15, 2939:6, 2939:18, 2939:20, 2939:23, 2940:17, 2964:9, 2978:16, 2994:6
**emails** [9] - 2879:7, 2886:7, 2919:9, 2937:19, 2937:20, 2941:13, 2941:25, 2963:24, 2994:20
**embedded** [4] - 2925:3, 2937:18, 2938:7, 2938:16
**employ** [1] - 2892:25
**employed** [1] - 2892:11
**employee** [6] - 2938:6, 2941:25, 2944:5, 2978:14, 2978:17, 2979:5
**employees** [5] - 2926:9, 2948:3, 2948:20, 2978:25, 2979:23
**employs** [1] - 2952:9
**enable** [4] - 2898:8, 2906:9, 2929:11, 2963:10
**enabled** [1] - 2983:14
**enabling** [2] - 2900:23, 2983:20
**encounter** [2] - 2919:13, 2951:18
**encountered** [7] - 2880:4, 2885:4, 2899:11, 2901:21, 2909:2, 2923:6, 2948:6
**end** [19] - 2903:11, 2904:7, 2905:7, 2906:15, 2906:20, 2910:13, 2911:16, 2912:25, 2918:5, 2931:22, 2976:8, 2982:10, 2982:23,

2984:21, 2985:17, 2986:22, 2993:9, 2993:12, 2997:7
**ended** [5] - 2892:18, 2931:23, 2966:1, 2966:8, 2982:11
**ending** [6] - 2883:2, 2896:25, 2899:18, 2926:15, 2940:6, 2959:1
**engage** [5] - 2902:21, 2932:2, 2955:13, 2972:18, 2996:7
**engaged** [1] - 2880:14
**engine** [20] - 2894:1, 2894:3, 2894:11, 2894:13, 2896:6, 2897:23, 2898:2, 2898:11, 2898:15, 2900:5, 2927:12, 2927:14, 2927:17, 2927:20, 2956:25, 2957:3, 2957:8, 2957:21, 2960:16
**engineering** [1] - 2919:15
**enhanced** [1] - 2914:25
**enrolled** [2] - 2884:15, 2884:24
**ensure** [2] - 2952:4, 2981:23
**enter** [1] - 2967:2
**entered** [2] - 2882:23, 2967:4
**Enterprise** [2] - 2893:8, 2893:16
**entire** [1] - 2923:18
**entirely** [4] - 2894:4, 2896:3, 2897:4, 2981:9
**environment** [1] - 2949:4
**envisioned** [3] - 2893:19, 2994:24, 2995:12
**equity** [2] - 2950:3, 2950:5
**era** [2] - 2931:19, 2952:3
**escalation** [1] - 2911:8
**essential** [5] - 2986:1, 2986:3, 2986:10, 2986:13, 2986:15
**Essential** [1] - 2986:2
**essentially** [1] - 2938:18
**estate** [2] - 2903:9, 2904:13
**estimate** [1] - 2973:17
**estimates** [1] -

2973:19
**et** [9] - 2850:3, 2898:21, 2916:12, 2934:22, 2935:4, 2944:7, 2959:15, 2996:22
**European** [2] - 2935:6, 2959:8
**evaluate** [1] - 2965:23
**evening** [2] - 2984:11, 2985:3
**event** [1] - 2992:3
**eventually** [4] - 2944:3, 2946:7, 2956:21, 2960:14
**everyday** [1] - 2981:21
**evidence** [9] - 2882:4, 2891:4, 2958:21, 2964:5, 2968:8, 2990:20, 2991:6, 2992:1, 2997:15
**evidentiary** [4] - 2993:7, 2993:8, 2993:13, 2997:11
**exact** [9] - 2900:6, 2905:15, 2906:25, 2933:12, 2934:12, 2940:2, 2952:21, 2967:9, 2980:2
**exactly** [4] - 2885:5, 2921:10, 2956:4, 2980:4
**Examination** [4] - 3002:4, 3002:5, 3002:6, 3002:7
**examination** [2] - 2889:6, 2984:1
**EXAMINATION** [3] - 2877:18, 2885:20, 2949:17
**examined** [1] - 2891:21
**example** [24] - 2894:22, 2897:3, 2900:15, 2901:12, 2901:19, 2910:6, 2912:16, 2912:20, 2916:1, 2938:21, 2941:14, 2953:2, 2953:6, 2953:18, 2953:19, 2953:22, 2954:6, 2954:8, 2970:16, 2973:12, 2983:15, 2990:9, 2993:16, 2993:17
**examples** [2] - 2973:24, 2990:10
**excellent** [1] - 2986:17
**except** [1] - 2888:17
**excerpt** [2] - 2888:3,

2978:6
**exchange** [2] - 2920:10, 2939:18
**excited** [3] - 2921:13, 2936:17, 2936:20
**exciting** [6] - 2895:20, 2897:14, 2903:15, 2904:17, 2904:23, 2913:2
**exclusivity** [4] - 2927:9, 2927:25, 2928:5, 2954:21
**excuse** [4] - 2903:18, 2968:23, 2970:18, 2982:13
**executes** [1] - 2900:24
**execution** [1] - 2981:19
**executive** [5] - 2887:18, 2889:7, 2930:22, 2931:4, 2998:6
**executives** [2] - 2907:16, 2943:7
**exert** [1] - 2971:13
**exhibit** [7] - 2896:25, 2899:18, 2899:24, 2944:22, 2984:22, 2990:19, 2995:12
**Exhibit** [1] - 2899:20
**EXHIBITS** [1] - 3002:8
**exhibits** [1] - 2989:2
**exist** [2] - 2929:25, 2950:15
**existed** [1] - 2915:1
**existing** [1] - 2904:15
**exists** [3] - 2911:25, 2929:19, 2949:21
**expand** [2] - 2894:1, 2975:10
**expanded** [2] - 2923:14, 2944:18
**expanding** [2] - 2927:25, 2928:5
**expands** [1] - 2886:14
**expect** [2] - 2997:22, 2998:11
**expectation** [1] - 2907:9
**Expedia** [1] - 2880:16
**expeditiously** [1] - 2999:2
**expended** [1] - 2969:6
**experience** [30] - 2879:7, 2880:4, 2880:20, 2880:21, 2881:13, 2881:14, 2881:22, 2881:24, 2881:25, 2884:17, 2884:23, 2885:3,

2885:8, 2886:15, 2897:6, 2899:6, 2901:1, 2902:11, 2903:13, 2909:23, 2910:5, 2910:12, 2910:14, 2918:10, 2921:14, 2921:22, 2922:1, 2976:20, 2981:20
**experiences** [3] - 2880:15, 2881:3, 2881:21
**experiment** [4] - 2908:2, 2960:22, 2966:5, 2966:18
**explain** [10] - 2879:18, 2880:7, 2893:14, 2900:13, 2901:10, 2912:13, 2915:25, 2920:10, 2945:5, 2972:21
**explained** [1] - 2903:18
**explanation** [1] - 2896:5
**explicit** [1] - 2939:24
**exposure** [1] - 2979:24
**expressed** [2] - 2921:17, 2943:7
**extent** [6] - 2905:22, 2920:19, 2923:25, 2930:25, 2945:25, 2994:19
**external** [2] - 2896:20, 2936:25
**extra** [2] - 2966:18, 2999:17
**extremely** [1] - 2904:23
**Ezell** [1] - 2889:16

## F

**fabricate** [1] - 2939:10
**FAC** [1] - 2975:3
**face** [8] - 2897:19, 2903:5, 2908:19, 2922:24, 2927:22, 2928:25, 2931:23, 2933:17
**Facebook** [3] - 2975:4, 2975:12, 2976:2
**faced** [13] - 2903:17, 2919:20, 2922:15, 2922:24, 2923:16, 2923:17, 2926:10, 2928:1, 2944:6, 2944:12, 2956:20,

2970:15, 2976:4
**faces** [1] - 2943:17
**facing** [3] - 2922:10, 2926:5, 2959:9
**fact** [8] - 2883:17, 2912:1, 2941:18, 2971:10, 2971:13, 2976:24, 2981:6, 2993:14
**factfinding** [2] - 2878:13, 2883:21
**factor** [1] - 2954:24
**factory** [1] - 2933:8
**failed** [2] - 2932:21, 2935:15
**failing** [1] - 2886:7
**fair** [12] - 2881:6, 2951:3, 2951:16, 2952:10, 2952:11, 2958:18, 2967:12, 2968:12, 2969:13, 2976:21, 2979:16
**faith** [1] - 2985:8
**fall** [3] - 2916:4, 2922:18, 2996:21
**falling** [3] - 2916:18, 2918:10, 2921:11
**familiar** [7] - 2896:11, 2915:23, 2949:22, 2955:10, 2956:25, 2972:7, 2976:14
**far** [6] - 2879:18, 2893:6, 2923:21, 2924:7, 2948:19, 2962:3
**fast** [1] - 2898:10
**fast-forward** [1] - 2898:10
**faster** [2] - 2882:1, 2982:25
**fear** [1] - 2910:20
**feature** [5] - 2904:4, 2915:23, 2983:21, 2983:22, 2983:24
**features** [2] - 2904:6, 2983:12
**fee** [2] - 2913:16
**feedback** [3] - 2898:16, 2902:20, 2908:20
**fell** [1] - 2995:24
**fellow** [1] - 2907:14
**felt** [8] - 2890:7, 2915:1, 2926:7, 2933:11, 2942:25, 2945:9, 2945:24, 2946:3
**few** [14] - 2889:13, 2889:18, 2893:22, 2903:22, 2906:10,

2935:11, 2936:8, 2956:13, 2966:3, 2966:7, 2966:9, 2970:12, 2971:22, 2984:20
**fiduciary** [1] - 2946:22
**fight** [4] - 2921:10, 2988:17, 2989:15, 2989:19
**fighting** [2] - 2988:15, 2988:21
**figure** [6] - 2939:12, 2958:10, 2983:13, 2991:11, 2996:4, 2996:24
**file** [1] - 2987:3
**filed** [1] - 3000:16
**files** [2] - 2880:1, 2884:22
**filing** [2] - 2987:14, 3000:12
**filter** [1] - 2897:11
**finally** [3] - 2943:11, 2948:13, 2969:8
**financial** [1] - 2913:11
**finder** [1] - 2950:25
**Finder** [14] - 2878:14, 2879:8, 2879:14, 2881:20, 2883:18, 2883:24, 2884:15, 2884:21, 2883:7, 2950:25, 2951:11, 2953:1, 2953:5, 2955:2
**findings** [1] - 2993:13
**fine** [2] - 2960:7, 2981:4
**finish** [3] - 2997:22, 2998:10, 3000:6
**firm** [1] - 2893:16
**first** [47] - 2879:14, 2881:22, 2884:21, 2889:8, 2891:20, 2895:22, 2895:24, 2905:8, 2905:10, 2905:11, 2906:10, 2908:23, 2909:2, 2909:20, 2909:22, 2910:23, 2913:1, 2918:3, 2921:17, 2921:21, 2929:4, 2932:12, 2933:2, 2934:10, 2938:2, 2946:16, 2947:7, 2954:19, 2955:9, 2958:5, 2961:6, 2962:16, 2963:14, 2965:7, 2966:4, 2969:8, 2969:11, 2971:25, 2980:16, 2980:18, 2989:16,

3014

2991:16, 2992:22
**first-party** [1] -
2881:22
**first-person** [1] -
2938:2
**fit** [2] - 2990:3,
2995:15
**fits** [1] - 2972:2
**five** [1] - 2983:6
**fix** [3] - 2911:9,
2923:15, 2977:8
**flag** [1] - 3000:12
**flagship** [1] - 2923:3
**flip** [2] - 2911:18,
2961:7
**flipping** [1] - 2911:18
**floated** [1] - 2890:4
**flower** [3] - 2879:23,
2880:1, 2880:2
**flowers** [2] - 2880:13,
2880:15
**focus** [13] - 2892:20,
2893:21, 2893:23,
2897:22, 2899:12,
2907:12, 2923:8,
2930:13, 2948:22,
2974:24, 2975:15,
2992:4, 2997:1
**focused** [5] - 2892:17,
2894:4, 2897:20,
2910:4, 2910:13
**focusing** [1] - 2978:18
**folks** [2] - 2904:19,
2929:23
**followed** [1] - 2947:1
**following** [3] -
2877:15, 2948:2,
2985:2
**follows** [2] - 2891:21,
2997:4
**food** [7] - 2894:25,
2901:3, 2901:17,
2901:20, 2901:23,
2902:8, 2902:13
**foot** [2] - 2929:2,
2929:10
**FOR** [1] - 2850:1
**foregoing** [1] - 3001:4
**forgive** [1] - 2931:15
**form** [1] - 2903:16
**former** [2] - 2887:13,
2891:2
**forms** [1] - 2903:10
**fortress** [2] - 2926:4,
2926:8
**fortunately** [1] -
2939:20
**forward** [5] - 2891:10,
2898:10, 2931:14,
2939:11, 2966:6

**foundation** [12] -
2881:4, 2939:4,
2988:25, 2991:3,
2991:9, 2993:8,
2993:16, 2993:21,
2993:25, 2995:17,
2996:10, 2996:18
**founded** [2] - 2892:22,
2893:18
**founder** [1] - 2892:7
**Founders** [1] -
2893:10
**founders** [1] - 2893:11
**four** [2] - 2893:24,
2998:1
**frank** [1] - 2948:24
**frankly** [1] - 2997:1
**free** [4] - 2891:10,
2926:19, 2950:12,
2985:20
**frequent** [1] - 2900:25
**frequently** [4] -
2897:14, 2983:16,
2983:18, 2990:1
**fresh** [2] - 2933:16,
2981:24
**Friday** [5] - 2997:5,
2997:7, 2998:17,
2998:22, 2998:23
**friend** [1] - 2931:9
**front** [5] - 2885:23,
2905:2, 2924:13,
2963:21, 2996:25
**full** [8] - 2892:21,
2929:7, 2966:2,
2971:16, 2975:24,
2976:13, 2977:17,
3001:5
**full-time** [1] - 2892:21
**fully** [2] - 2882:18,
2945:25
**fulsome** [1] - 2891:4
**functional** [2] -
2910:1, 2911:21
**functionalities** [1] -
2929:15
**functionality** [57] -
2897:12, 2899:5,
2905:18, 2907:5,
2908:7, 2908:17,
2908:23, 2909:21,
2915:1, 2920:15,
2922:17, 2922:21,
2928:9, 2929:7,
2929:9, 2929:21,
2930:1, 2930:11,
2930:16, 2931:11,
2932:15, 2933:19,
2934:16, 2935:10,
2935:13, 2939:25,

2942:24, 2942:25,
2949:21, 2950:15,
2950:17, 2950:18,
2951:1, 2951:11,
2952:8, 2952:25,
2953:5, 2954:23,
2955:15, 2961:1,
2961:21, 2962:3,
2963:9, 2969:7,
2970:12, 2970:14,
2970:24, 2971:5,
2973:24, 2976:25,
2977:10, 2977:17,
2982:1, 2982:13,
2983:7, 2983:9,
2983:14
**Fund** [1] - 2893:10
**funded** [1] - 2985:24
**funds** [3] - 2893:4,
2893:7, 2893:17
**future** [2] - 2904:24,
2956:23

# G

**gain** [1] - 2982:7
**Galaxy** [3] - 2953:9,
2968:23
**gallery** [1] - 2879:24
**games** [1] - 2880:13
**gander** [1] - 2987:9
**Gary** [5] - 2936:11,
2936:17, 2937:3,
2937:6, 2940:20
**gather** [1] - 2987:15
**Gattas** [11] - 2896:7,
2896:24, 2899:17,
2917:15, 2923:22,
2926:14, 2928:17,
2936:5, 2940:5,
2944:20, 2944:25
**general** [1] - 2880:23
**generally** [18] -
2894:5, 2895:11,
2902:18, 2903:16,
2904:18, 2906:12,
2914:15, 2916:24,
2923:4, 2924:22,
2926:21, 2927:15,
2932:17, 2932:23,
2956:16, 2956:25,
2961:5, 2969:5
**generate** [3] -
2916:16, 2917:4,
2917:6
**generated** [3] -
2913:17, 2916:7,
2923:8
**generating** [1] -
2923:9

**generation** [1] -
2973:3
**given** [2] - 2878:17,
2944:16
**glad** [1] - 2994:23
**goal** [1] - 3000:6
**Google** [104] - 2850:6,
2851:1, 2880:18,
2880:23, 2881:1,
2881:11, 2881:12,
2881:14, 2881:17,
2881:18, 2881:19,
2881:22, 2881:25,
2882:10, 2883:14,
2885:1, 2889:1,
2890:4, 2890:7,
2891:7, 2893:12,
2894:6, 2894:7,
2897:19, 2898:18,
2899:1, 2899:10,
2899:22, 2904:20,
2904:22, 2904:25,
2905:18, 2913:3,
2913:4, 2915:20,
2919:13, 2919:21,
2920:14, 2921:6,
2921:15, 2921:19,
2926:11, 2927:4,
2927:5, 2927:11,
2927:24, 2929:6,
2930:22, 2931:10,
2933:5, 2933:13,
2933:19, 2935:19,
2937:1, 2939:22,
2939:23, 2940:1,
2940:3, 2940:12,
2940:14, 2940:19,
2941:2, 2941:5,
2943:5, 2943:9,
2943:19, 2945:19,
2946:6, 2953:11,
2953:15, 2954:1,
2954:4, 2954:16,
2959:11, 2960:2,
2960:9, 2961:6,
2963:9, 2969:13,
2970:6, 2971:6,
2972:13, 2972:15,
2972:17, 2973:4,
2977:3, 2978:15,
2978:19, 2978:22,
2979:10, 2984:25,
2985:11, 2987:6,
2988:2, 2988:6,
2988:22, 2988:24,
2989:3, 2990:14,
2990:22, 2993:6,
2993:21
**Google's** [7] - 2878:3,
2887:21, 2890:5,

2941:1, 2979:19,
2993:22, 2994:6
  **Google-related** [1] -
2897:19
  **goose** [1] - 2987:8
  **government** [2] -
2985:23, 2992:10
  **grad** [1] - 2892:16
  **graduating** [1] -
2892:20
  **graduation** [1] -
2893:21
  **granted** [1] - 2991:20
  **grappling** [1] -
2980:21
  **Gray** [1] - 2851:5
  **great** [4] - 2912:21,
2914:12, 2945:9,
2997:12
  **greatly** [3] - 2932:15,
2932:16, 2933:14
  **grid** [1] - 2897:10
  **ground** [2] - 2930:4,
2993:19
  **group** [1] - 2997:8
  **grouped** [2] - 2993:1,
2993:2
  **groups** [2] - 2993:4,
2997:9
  **growth** [3] - 2903:5,
2903:16, 2929:11
  **guess** [8] - 2881:6,
2897:5, 2917:13,
2923:3, 2958:19,
2992:25, 2994:2,
2997:4
  **guiding** [1] - 2936:13
  **guy** [1] - 2947:1
  **guys** [1] - 2912:6

# H

  **halfway** [1] - 2984:2
  **hand** [6] - 2878:23,
2879:12, 2882:4,
2887:24, 2900:1,
2993:10
  **handed** [4] - 2883:8,
2888:13, 2950:10,
2958:3
  **handle** [1] - 2887:16
  **hands** [3] - 2913:6,
2931:24, 2932:1
  **handset** [1] - 2889:23
  **handsets** [1] -
2889:22
  **hang** [1] - 2920:18
  **happy** [6] - 2887:23,
2894:1, 2941:22,
2942:8, 2963:17,

2985:6
  **hard** [1] - 2939:7
  **harmful** [1] - 2946:6
  **hate** [1] - 2998:15
  **head** [4] - 2909:20,
2918:24, 2919:5,
2984:11
  **heading** [2] - 2886:12,
2886:13
  **headwinds** [2] -
2923:17, 2976:4
  **hear** [7] - 2885:10,
2927:12, 2931:1,
2979:2, 2988:4,
2988:16, 2991:23
  **heard** [12] - 2895:4,
2901:7, 2908:21,
2918:3, 2926:21,
2929:12, 2930:22,
2931:8, 2945:7,
2976:16, 2978:25,
2991:24
  **hearing** [5] - 2942:2,
2991:16, 2998:17,
2999:6, 2999:18
  **hearsay** [22] - 2920:1,
2925:3, 2925:4,
2925:14, 2925:15,
2937:18, 2937:20,
2938:3, 2938:7,
2938:16, 2941:21,
2942:10, 2986:25,
2987:8, 2989:7,
2991:10, 2992:6,
2992:7, 2992:22,
2995:21, 2996:17
  **heavily** [1] - 2903:12
  **held** [2] - 2877:15,
2964:13
  **help** [7] - 2887:25,
2899:7, 2907:2,
2932:14, 2945:10,
2989:15, 2999:4
  **helped** [1] - 2906:5
  **helpful** [1] - 2901:15
  **helping** [2] - 2910:11,
2974:24
  **helps** [1] - 2906:14
  **hereby** [1] - 3001:3
  **hide** [2] - 2912:18,
2918:5
  **hiding** [3] - 2912:3,
2912:12, 2915:18
  **high** [4] - 2899:9,
2902:20, 2973:17,
2973:19
  **high-traffic** [1] -
2899:9
  **highlighting** [1] -
2980:15

  **Highly** [1] - 2967:16
  **hired** [1] - 2928:23
  **historically** [1] -
2956:18
  **history** [1] - 2893:3
  **hit** [2] - 2927:10,
2947:15
  **HOFFMAN** [40] -
2891:16, 2891:24,
2896:4, 2899:19,
2899:25, 2906:2,
2908:5, 2908:14,
2910:15, 2914:5,
2914:6, 2917:8,
2919:23, 2920:3,
2920:8, 2920:24,
2920:25, 2922:11,
2924:11, 2924:25,
2925:16, 2925:20,
2925:21, 2931:12,
2933:25, 2935:25,
2937:15, 2939:15,
2939:16, 2942:12,
2942:13, 2944:22,
2945:2, 2946:9,
2947:22, 2949:7,
2958:22, 2964:6,
2968:9, 3000:3
  **Hoffman** [4] - 2850:12,
2891:18, 2892:1,
2914:2
  **Hoffman................
2891** [7] - 3002:6
  **holder** [2] - 2950:3,
2950:5
  **home** [2] - 2887:10,
2950:22
  **Honor** [83] - 2878:25,
2881:4, 2882:6,
2882:17, 2884:2,
2884:12, 2885:16,
2885:19, 2887:5,
2887:7, 2887:12,
2887:17, 2888:4,
2888:10, 2891:4,
2891:12, 2891:16,
2899:19, 2899:21,
2905:21, 2907:22,
2908:9, 2914:5,
2919:23, 2919:25,
2920:3, 2920:16,
2920:23, 2920:24,
2922:3, 2924:25,
2925:2, 2925:7,
2925:9, 2925:16,
2925:20, 2930:23,
2935:21, 2937:15,
2937:17, 2938:5,
2939:3, 2939:14,
2939:15, 2941:22,

2942:12, 2944:23,
2949:8, 2949:9,
2949:11, 2950:8,
2957:25, 2958:22,
2963:18, 2964:6,
2967:15, 2968:8,
2968:9, 2969:20,
2979:17, 2984:24,
2985:20, 2985:22,
2986:3, 2986:16,
2986:23, 2987:13,
2987:24, 2988:19,
2989:9, 2990:21,
2991:20, 2994:14,
2995:16, 2997:20,
2999:1, 2999:9,
2999:14, 2999:15,
2999:24, 3000:4,
3000:9, 3000:11
  **Honor's** [2] - 2949:12,
2991:22
  **HONORABLE** [1] -
2850:9
  **hope** [3] - 2922:16,
2929:2, 2945:22
  **hoped** [1] - 2946:6
  **hopeful** [3] - 2944:15,
2944:16, 2958:4
  **hopefully** [7] - 2913:9,
2913:14, 2945:16,
2984:10, 2985:1,
2987:3, 2999:23
  **hopes** [2] - 2902:20,
2960:13
  **hoping** [1] - 2993:12
  **hour** [1] - 2999:17
  **hours** [3] - 2948:21,
2971:20, 2998:1
  **housekeeping** [4] -
2984:20, 2987:22,
2987:23, 3000:17
  **housekeeping-ish** [1]
- 2987:22
  **huge** [2] - 2915:7,
2969:9
  **humorous** [1] - 2926:1
  **hundred** [3] - 2898:7,
2930:13, 2989:14
  **hundreds** [2] -
2948:17, 2948:20
  **hurdle** [1] - 2928:25
  **hurdles** [2] - 2927:22,
2944:12, 2959:9
  **hurt** [2] - 2929:25,
2930:1
  **hypothetical** [2] -
2901:13, 2972:25

# I

**Ian** [3] - 2850:12, 2891:18, 2892:1
**Ian.hoffman@usdoj.gov** [1] - 2850:15
**icons** [1] - 2882:13
**ID** [5] - 2884:25, 2885:1, 2885:2, 2952:12, 2952:13
**idea** [13] - 2890:4, 2893:22, 2895:10, 2895:18, 2896:2, 2897:7, 2903:12, 2904:21, 2912:12, 2956:21, 2973:20, 2980:22, 2988:11
**ideal** [3] - 2905:4, 2909:14, 2910:10
**identified** [2] - 2914:24, 2969:12
**identify** [5] - 2889:14, 2938:23, 2951:10, 2963:13, 2970:3
**IL** [1] - 2850:18
**illustrate** [1] - 2953:4
**illustrated** [1] - 2951:14
**illustrates** [2] - 2925:25, 2952:25
**illustration** [1] - 2926:1
**image** [1] - 2916:11
**imagine** [3] - 2911:14, 2911:15, 2980:3
**immediately** [1] - 2919:19
**impact** [8] - 2908:23, 2913:7, 2920:15, 2960:8, 2960:22, 2961:10, 2962:1, 2985:17
**impacts** [1] - 2941:16
**impediments** [1] - 2921:3
**implement** [1] - 2883:15
**implementation** [14] - 2883:19, 2949:21, 2950:14, 2953:14, 2954:17, 2954:25, 2955:1, 2962:7, 2966:20, 2969:11, 2969:15, 2970:4, 2979:11, 2979:20
**implemented** [5] - 2879:15, 2910:21, 2956:14, 2967:8, 2976:25
**implementing** [1] -

2960:9
**implements** [1] - 2884:15
**implied** [3] - 2921:8, 2928:7, 2981:2
**imply** [1] - 2918:4
**important** [5] - 2915:8, 2915:9, 2944:10, 2996:24, 2996:25
**imposed** [5] - 2911:12, 2912:14, 2912:15, 2921:3, 2921:18
**imposing** [1] - 2913:5
**impression** [1] - 2935:23
**improve** [4] - 2922:13, 2977:9, 2977:15, 2977:23
**improved** [1] - 2981:21
**improvement** [7] - 2974:23, 2975:1, 2975:16, 2975:25, 2976:10, 2976:12, 2982:4
**IN** [1] - 2850:1
**incentive** [1] - 2931:6
**include** [5] - 2913:12, 2963:4, 2963:13, 2964:23, 2965:3
**included** [6] - 2935:2, 2952:15, 2966:20, 2966:22, 2966:25, 2968:15
**includes** [3] - 2937:1, 2937:2, 2952:12
**including** [4] - 2893:10, 2920:13, 2936:11, 2955:19
**incomplete** [1] - 2891:5
**inconsistent** [2] - 2890:3, 2890:7
**incorrect** [1] - 2979:9
**incredibly** [4] - 2904:3, 2915:8, 2930:2, 2930:4
**incremental** [3] - 2904:14, 2904:16, 2960:12
**indelicate** [1] - 2985:15
**INDEX** [1] - 3002:1
**index** [3] - 2880:13, 2957:9, 2981:23
**indexed** [3] - 2909:5, 2910:16, 2957:14
**indexing** [1] - 2909:3
**indicated** [2] - 2890:7,

2990:16
**individual** [4] - 2911:6, 2939:5, 2942:1, 2963:11
**individually** [1] - 2898:3
**industry** [2] - 2914:13, 2929:23
**ineligible** [2] - 2889:23, 2890:17
**inform** [2] - 2887:19, 2889:3
**information** [10] - 2917:6, 2929:17, 2929:18, 2932:14, 2941:19, 2951:10, 2952:5, 2952:9, 2979:3, 2982:21
**informed** [1] - 2969:2
**infringe** [1] - 2941:1
**initial** [14] - 2907:8, 2912:24, 2923:7, 2924:6, 2927:15, 2955:22, 2962:7, 2962:13, 2962:22, 2962:25, 2963:3, 2965:14, 2969:15, 2972:24
**initiative** [1] - 2897:21
**injustice** [1] - 2946:3
**innovation** [1] - 2897:15
**input** [1] - 2951:4
**inside** [5] - 2895:19, 2898:4, 2916:3, 2916:8, 2916:17
**insight** [1] - 2989:9
**insisted** [1] - 2915:19
**install** [2] - 2902:6, 2902:12
**installed** [14] - 2912:4, 2912:16, 2912:18, 2921:12, 2922:18, 2931:17, 2931:18, 2931:19, 2953:20, 2953:24, 2954:10, 2954:11, 2977:19, 2982:3
**installed/not** [1] - 2953:24
**installing** [1] - 2954:5
**instance** [2] - 2921:12, 2929:12
**instances** [1] - 2957:11
**instantiation** [2] - 2922:17, 2923:21
**instantly** [1] - 2916:11
**instead** [2] - 2918:11, 2991:8

**institutional** [1] - 2893:16
**instructions** [2] - 2985:2, 2985:12
**integrate** [9] - 2914:8, 2914:10, 2919:10, 2930:17, 2932:7, 2932:10, 2932:21, 2935:15, 2943:20
**integrated** [6] - 2896:22, 2899:1, 2900:18, 2907:1, 2909:7, 2909:12
**integrating** [2] - 2942:19, 2943:15
**integration** [10] - 2900:16, 2907:18, 2908:3, 2918:20, 2923:7, 2923:15, 2924:6, 2962:11, 2966:2, 2974:7
**intend** [2] - 2925:16, 2990:17
**intended** [4] - 2923:16, 2961:3, 2962:17, 2983:9
**intending** [1] - 2913:19
**intense** - 2919:20, 2928:1
**intent** [4] - 2901:8, 2911:10, 2959:8, 2997:18
**intention** [2] - 2922:23, 2985:3
**interact** [2] - 2906:5, 2973:11
**interacting** [2] - 2909:1, 2912:11
**intercept** [1] - 2889:20
**interest** [1] - 2993:9
**interesting** [2] - 2946:25, 2948:5
**interface** [1] - 2899:16
**internal** [1] - 2979:6
**internally** [2] - 2902:22, 2930:11
**internet** [17] - 2879:22, 2885:6, 2928:6, 2928:7, 2929:13, 2954:16, 2954:22, 2954:24, 2955:3, 2955:5, 2977:2, 2977:3, 2977:4, 2980:23, 2981:20, 2982:5, 2982:17
**interpretation** [1] - 2933:10
**interrupt** [3] - 2926:20, 2938:15,

2981:3
**intimated** [1] -
2996:13
**introduce** [4] -
2922:21, 2929:7,
2983:7, 2997:15
**introduced** [4] -
2891:9, 2963:8,
2983:21, 2990:2
**introducing** [1] -
2930:15
**invest** [1] - 2904:12
**invested** [3] - 2907:11,
2944:11, 2948:14
**investing** [1] -
2965:23
**investment** [3] -
2893:13, 2907:12,
2907:15
**investor** [2] - 2893:8,
2944:14
**investors** [3] -
2893:10, 2923:10,
2948:3
**invite** [1] - 3000:20
**inviting** [1] - 2998:23
**involved** [5] - 2878:17,
2913:4, 2917:24,
2936:11, 2951:25
**IP** [1] - 2952:22
**ish** [1] - 2987:22
**issue** [16] - 2890:15,
2908:11, 2925:19,
2941:12, 2941:13,
2977:7, 2987:1,
2987:9, 2988:16,
2993:5, 2993:11,
2994:4, 2994:9,
2994:12, 2995:6,
2996:17
**issued** [1] - 2994:24
**issues** [14] - 2897:19,
2970:15, 2977:1,
2980:22, 2984:20,
2986:25, 2990:22,
2991:17, 2992:20,
2993:7, 2993:13,
2994:22, 2995:8,
2997:11
**item** [1] - 2964:19
**items** [1] - 2964:13
**iteration** [1] - 2905:11
**itself** [4] - 2887:25,
2888:19, 2992:24,
2995:10

## J

**J.C** [1] - 2999:7
**JANICE** [1] - 3001:3

**Janice** [2] - 2851:9,
3001:11
**jarring** [2] - 2910:8,
2918:10
**Jeff** [1] - 2889:16
**job** [1] - 2936:24
**jobs** [1] - 2985:19
**John** [3] - 2851:1,
2892:5
**JOHN** [1] - 2892:6
**Johnson** [11] - 2896:7,
2896:24, 2899:17,
2917:15, 2923:22,
2926:14, 2928:17,
2936:5, 2940:5,
2944:20, 2944:25
**joined** [1] - 2936:20
**joint** [1] - 2890:20
**Jr** [1] - 2850:21
**jschmidtlein@wc.
com** [1] - 2851:3
**Judge** [2] - 2993:20,
2997:12
**JUDGE** [1] - 2850:10
**judgment** [1] -
2991:20
**July** [2] - 2892:13,
2966:2
**June** [7] - 2878:14,
2879:9, 2880:4,
2882:24, 2883:21,
2885:4, 2966:2
**Junghan** [7] -
2918:15, 2918:16,
2918:18, 2919:16,
2919:18, 2920:13,
2921:13
**JUNGHAN** [1] -
2918:16
**JUSTICE** [1] - 2850:12
**Justice** [3] - 2850:16,
2877:22, 2985:18
**JX71** [1] - 2882:5

## K

**K-H-A-T-I-N** [1] -
2919:3
**Kang** [3] - 2918:15,
2921:21, 2921:25
**KANG** [1] - 2918:17
**KARTASHEVA** [1] -
3002:3
**Kartasheva** [8] -
2877:20, 2878:15,
2879:3, 2882:8,
2882:22, 2883:14,
2884:14, 2887:9
**keep** [7] - 2882:3,
2906:1, 2922:4,

2983:13, 2986:18,
2987:12, 2998:18
**keeping** [6] - 2882:16,
2942:7, 2987:1,
2987:18, 2987:19,
2987:20
**Kenneth** [1] - 2850:11
**kenneth.dintzer2@
usdoj.gov** [1] - 2850:14
**kept** [1] - 2886:7
**Kesh** [1] - 2878:19
**key** [1] - 2893:18
**Khatin** [2] - 2919:2,
2919:4
**kind** [8] - 2881:23,
2882:12, 2890:20,
2960:4, 2968:18,
2992:7, 2993:18,
2995:12
**knowledge** [8] -
2898:1, 2899:9,
2926:23, 2928:13,
2938:2, 2994:7,
2994:11, 2996:15
**known** [3] - 2914:12,
2914:13, 2937:7

## L

**labeled** [4] - 2919:24,
2924:14, 2930:18,
2962:18
**lacked** [1] - 2993:25
**language** [1] -
2928:10
**large** [5] - 2898:18,
2927:25, 2944:5,
2988:12, 2990:24
**largely** [1] - 2928:11
**larger** [1] - 2929:17
**largest** [1] - 2933:4
**LaSalle** [1] - 2850:17
**last** [7] - 2907:3,
2947:5, 2956:8,
2961:18, 2985:11,
2987:21, 3000:17
**lat** [1] - 2952:18
**lat-long** [1] - 2952:18
**late** [3] - 2956:8,
2979:17, 2996:3
**latency** [26] - 2976:14,
2976:16, 2976:17,
2976:20, 2976:25,
2977:5, 2977:6,
2977:8, 2977:9,
2977:15, 2977:21,
2977:23, 2980:13,
2980:18, 2980:20,
2980:21, 2981:1,
2981:2, 2981:7,

2981:10, 2981:11,
2981:21, 2982:8,
2983:12
**latest** [1] - 2893:2
**latitude** [1] - 2952:18
**launch** [13] - 2905:12,
2907:20, 2908:4,
2912:7, 2913:1,
2915:16, 2919:19,
2923:20, 2924:6,
2952:20, 2962:16,
2968:22, 2969:3
**launched** [7] -
2884:20, 2905:10,
2909:9, 2910:17,
2922:12, 2955:4
**launches** [2] -
2912:10, 2969:6
**launching** [1] -
2915:11
**law** [4] - 2945:25,
2993:14, 2998:15,
3000:19
**lawyers** [1] - 2985:18
**lay** [3] - 2939:4,
2964:16, 2993:7
**laying** [1] - 2991:8
**layout** [2] - 2882:1,
2882:11
**lays** [1] - 2987:3
**LDS** [6] - 2930:11,
2956:2, 2956:6,
2956:9, 2974:8,
2980:22
**leading** [2] - 2905:17,
2908:22
**leads** [1] - 2976:20
**learn** [3] - 2911:25,
2932:20, 2935:14
**learned** [2] - 2948:7,
2948:9
**least** [10] - 2888:8,
2910:11, 2914:12,
2992:21, 2992:22,
2994:24, 2995:1,
2999:19, 2999:20
**led** [2] - 2907:12,
2907:14
**left** [9] - 2879:12,
2879:13, 2900:1,
2900:14, 2924:8,
2925:10, 2950:22,
2974:7, 2975:21
**left-hand** [2] -
2879:12, 2900:1
**legacy** [1] - 2923:20
**Legacy** [1] - 2931:18
**legal** [6] - 2890:2,
2939:22, 2940:18,
2941:17, 2979:25,

2980:3
**lends** [1] - 2996:15
**lengthy** [1] - 2971:21
**less** [5] - 2882:14, 2909:14, 2910:10, 2933:15, 2948:18
**level** [4] - 2890:22, 2973:17, 2973:19, 2992:22
**leverage** [1] - 2904:24
**license** [6] - 2913:15, 2967:2, 2967:5, 2967:22, 2968:6, 2968:13
**licenses** [1] - 2881:18
**life** [5] - 2880:14, 2935:18, 2946:20, 2946:21, 2948:15
**light** [3] - 2912:20, 2945:12, 2946:4
**likability** [1] - 2982:24
**likely** [1] - 2986:12
**limine** [2] - 2990:14, 2991:23
**limitation** [2] - 2953:24, 2963:8
**limitations** [4] - 2921:18, 2922:15, 2933:18, 2970:3
**limited** [20] - 2895:7, 2899:4, 2903:9, 2905:11, 2910:23, 2920:7, 2923:21, 2928:12, 2932:19, 2935:12, 2950:18, 2954:7, 2955:24, 2956:5, 2956:11, 2959:17, 2959:18, 2966:16, 2970:14, 2983:4
**limits** [1] - 2933:14
**line** [1] - 2969:25
**link** [12] - 2906:16, 2906:18, 2908:19, 2908:24, 2909:15, 2909:19, 2909:21, 2916:4, 2918:4, 2921:8, 2953:24, 2983:17
**linked** [1] - 2911:2
**linking** [15] - 2886:15, 2892:17, 2893:21, 2902:14, 2903:2, 2906:8, 2906:14, 2906:21, 2910:20, 2910:22, 2916:22, 2928:2, 2932:25, 2949:23, 2963:11
**links** [9] - 2882:14, 2900:9, 2900:25,

2907:2, 2910:2, 2953:16, 2982:2, 2983:5
**list** [7] - 2897:11, 2910:25, 2954:13, 2987:22, 2990:19, 2998:20
**listed** [2] - 2941:2, 2952:13
**literally** [3] - 2905:12, 2987:22, 3000:17
**live** [16] - 2961:6, 2965:15, 2965:19, 2966:8, 2966:17, 2966:20, 2967:10, 2969:9, 2990:6, 2990:25, 2991:3, 2991:6, 2992:15, 2992:17, 2995:1, 2995:13
**LLC** [1] - 2850:6
**LLP** [3] - 2850:21, 2851:1, 2851:5
**load** [3] - 2909:20, 2933:6, 2933:7
**loaded** [4] - 2931:16, 2935:11, 2979:13
**local** [20] - 2884:22, 2930:10, 2930:11, 2930:14, 2932:15, 2955:25, 2956:1, 2956:10, 2959:2, 2971:23, 2974:3, 2974:10, 2975:11, 2976:3, 2976:12, 2977:12, 2980:9, 2981:16, 2982:12
**location** [4] - 2895:1, 2952:17, 2952:19, 2952:22
**location-specific** [1] - 2895:1
**lodged** [4] - 2989:3, 2990:11, 2990:13, 2990:21
**logged** [1] - 2988:25
**long-term** [1] - 2929:11
**longitude** [1] - 2952:19
**look** [29] - 2882:12, 2883:7, 2884:22, 2896:5, 2896:10, 2896:11, 2906:12, 2915:3, 2917:17, 2917:18, 2925:9, 2939:17, 2945:18, 2949:24, 2950:12, 2950:21, 2953:1, 2959:25, 2965:13,

2969:25, 2971:21, 2974:6, 2977:7, 2977:14, 2986:17, 2987:5, 2989:20, 2992:9, 2997:4
**looked** [4] - 2884:25, 2885:5, 2886:18, 2975:17
**looking** [10] - 2895:11, 2895:22, 2903:14, 2916:1, 2919:8, 2932:2, 2937:24, 2940:12, 2958:4, 2983:11
**looks** [2] - 2902:4, 2952:25
**loose** [1] - 2883:8
**losing** [1] - 2982:6
**loss** [1] - 2944:8
**lost** [1] - 2922:16
**loud** [1] - 2883:1
**love** [1] - 2985:19
**lovely** [1] - 2887:11
**low** [1] - 2904:3
**low-margin** [1] - 2904:3
**Lynne** [5] - 2937:9, 2937:10, 2940:17, 2940:20, 2940:23

# M

**ma'am** [1] - 2885:22
**MADA** [1] - 2881:18
**MADAs** [1] - 2878:3
**magnitude** [1] - 2893:2
**mail** [1] - 2918:2
**main** [3] - 2899:12, 2923:8, 2974:5
**maintained** [1] - 2989:5
**major** [4] - 2904:9, 2909:2, 2933:2, 2943:7
**majority** [5] - 2893:17, 2904:18, 2946:20, 2972:22, 2990:19
**makers** [2] - 2883:23, 2884:3
**managed** [5] - 2913:4, 2919:6, 2919:20, 2926:25, 2995:14
**manager** [1] - 2918:19
**manages** [1] - 2978:15
**managing** [2] - 2926:25, 2937:12
**mandate** [1] - 2935:2
**manner** [1] - 2993:2
**manually** [2] - 2911:1, 2911:11

**manufacturer** [2] - 2933:24, 2934:21
**manufacturers** [5] - 2903:19, 2903:21, 2903:23, 2932:21, 2943:25
**manufacturers'** [1] - 2932:8
**March** [13] - 2905:14, 2908:4, 2908:6, 2909:9, 2910:17, 2912:4, 2915:12, 2915:16, 2922:13, 2923:1, 2963:24, 2965:15
**margin** [3] - 2904:3, 2904:16, 2928:1
**Mark** [1] - 2851:4
**mark.popofsky@ rogesgray.com** [1] - 2851:7
**marked** [4] - 2878:24, 2923:23, 2950:10, 2967:16
**market** [5] - 2915:3, 2915:8, 2934:19, 2972:3, 2972:16
**marketing** [1] - 2960:4
**markets** [5] - 2915:7, 2934:18, 2934:23, 2934:24, 2935:6
**match** [2] - 2970:20, 2970:21
**matches** [1] - 2886:24
**materials** [1] - 2896:13
**Matt** [1] - 2899:21
**matter** [5] - 2878:22, 2920:5, 2941:18, 2994:20, 3000:17
**Matthew** [1] - 2851:5
**matthew.mcginnis@ ropesgray.com** [1] - 2851:8
**McGinnis** [49] - 2851:5, 2899:21, 2899:23, 2905:21, 2907:22, 2908:9, 2919:25, 2920:16, 2920:23, 2922:3, 2925:2, 2925:6, 2925:9, 2925:12, 2930:23, 2935:21, 2937:17, 2937:21, 2938:5, 2939:3, 2939:14, 2941:22, 2949:10, 2949:11, 2949:18, 2950:8, 2950:9, 2957:25, 2958:2, 2958:19, 2958:24, 2962:15,

3019

2962:21, 2963:18, 2963:20, 2964:4, 2964:8, 2967:15, 2967:20, 2968:8, 2968:11, 2969:20, 2969:21, 2979:16, 2979:18, 2983:25, 2984:2, 2984:6

**McGinnis................ 2949** [1] - 3002:7

**McKinney** [4] - 2937:9, 2937:10, 2940:20, 2940:23

**McLellan** [12] - 2988:19, 2988:20, 2990:5, 2990:8, 2992:11, 2992:13, 2993:20, 2995:16, 2996:3, 2997:12, 2997:18, 2997:20

**mean** [35] - 2882:16, 2889:1, 2894:3, 2899:14, 2905:5, 2907:11, 2928:15, 2930:9, 2930:12, 2930:13, 2932:23, 2938:20, 2939:7, 2939:12, 2944:2, 2944:10, 2947:15, 2947:18, 2948:17, 2953:17, 2955:20, 2960:4, 2960:21, 2969:9, 2969:16, 2969:17, 2972:24, 2974:24, 2980:18, 2981:3, 2984:4, 2993:21, 2994:8, 2995:2, 2998:10

**meaning** [2] - 2879:21, 2970:14

**meaningful** [2] - 2914:22, 2961:8

**meaningfully** [2] - 2942:22, 2956:24

**means** [3] - 2879:20, 2947:19, 2998:21

**meant** [1] - 2922:2

**meanwhile** [1] - 2894:9

**measure** [2] - 2917:11, 2955:16

**mechanism** [1] - 2895:18

**media** [2] - 2877:17, 2906:19

**meet** [2] - 2891:25, 2907:15

**meeting** [4] - 2905:16, 2944:13, 2964:13, 2979:6

**meetings** [1] - 2920:17

**MEHTA** [1] - 2850:9

**member** [2] - 2937:11, 2946:19

**members** [2] - 2890:4, 2917:25

**memory** [2] - 2890:19, 2963:2

**men** [1] - 2926:3

**mentioned** [13] - 2878:5, 2893:14, 2897:19, 2908:4, 2915:17, 2915:18, 2921:6, 2944:3, 2946:23, 2955:7, 2955:20, 2960:13, 2976:1

**menu** [1] - 2916:14

**message** [1] - 2906:18

**messages** [2] - 2879:25, 2925:13

**met** [1] - 2931:9

**metric** [1] - 2955:14

**Metrics** [1] - 2892:7

**Michael** [1] - 2988:19

**Microsoft** [2] - 2998:5, 2998:6

**Microsoft's** [1] - 2998:13

**mid-2020** [1] - 2923:14

**middle** [2] - 2880:8, 2880:18

**might** [25] - 2882:13, 2882:14, 2886:11, 2894:23, 2894:25, 2895:4, 2895:14, 2896:22, 2901:6, 2901:22, 2937:1, 2947:4, 2947:20, 2951:24, 2952:1, 2955:17, 2956:3, 2962:24, 2963:2, 2970:12, 2980:2, 2980:4, 2981:8, 2995:8

**migrate** [1] - 2960:15

**milestone** [1] - 2969:10

**million** [6] - 2893:6, 2898:7, 2930:13, 2948:18, 2948:19, 2956:9

**millions** [6] - 2912:10, 2948:17, 2948:20, 2948:21, 2994:15

**mind** [5] - 2920:4, 2921:9, 2922:5, 2987:12, 2997:4

**mindedly** [1] - 2898:12

**mindful** [1] - 2987:9

**mine** [2] - 2890:22, 2989:23

**minute** [2] - 2877:17, 2979:8

**minutes** [3] - 2956:13, 2984:6, 2999:19

**misleading** [2] - 2891:5, 2978:3

**missed** [1] - 2984:22

**mission** [3] - 2893:25, 2897:21, 2900:12

**mix** [1] - 2995:18

**mixed** [1] - 2995:16

**mobile** [16] - 2883:15, 2894:4, 2894:5, 2894:9, 2903:20, 2910:1, 2910:10, 2916:22, 2934:6, 2934:7, 2934:17, 2935:14, 2936:1, 2942:14, 2943:25, 2972:16

**Mobile** [4] - 2943:11, 2943:13, 2943:15, 2943:20

**mode** [1] - 2879:21

**model** [3] - 2913:7, 2915:12, 2915:13

**modeling** [1] - 2913:11

**models** [1] - 2913:1

**Monday** [1] - 2998:11

**monetary** [1] - 2948:14

**monetization** [1] - 2923:13

**monetize** [9] - 2901:14, 2902:15, 2912:23, 2913:6, 2923:16, 2930:2, 2932:16, 2933:14, 2982:24

**monetizing** [1] - 2944:6

**money** [5] - 2898:18, 2902:23, 2928:23, 2949:4, 2976:8

**monitoring** [3] - 2878:2, 2878:4, 2878:9

**month** [4] - 2905:13, 2905:17, 2961:19

**months** [3] - 2884:20, 2892:13, 2966:4

**morning** [6] - 2883:8, 2984:9, 2984:12, 2985:1, 2998:19, 3000:23

**most** [19] - 2894:9, 2897:12, 2900:10, 2905:8, 2906:13,

2909:25, 2915:8, 2934:24, 2936:12, 2939:21, 2944:10, 2944:11, 2956:17, 2975:4, 2991:7, 2993:11, 2994:25, 2996:11

**mostly** [2] - 2910:13, 2968:17

**motion** [5] - 2986:11, 2986:14, 2987:14, 2990:13, 2990:15

**motions** [1] - 2998:19

**Motorola** [1] - 2897:5

**move** [14] - 2899:19, 2919:24, 2920:21, 2924:25, 2937:15, 2939:11, 2941:8, 2942:15, 2958:19, 2958:20, 2964:5, 2968:8, 2977:23, 2999:2

**moved** [1] - 2937:3

**moving** [1] - 2986:19

**MR** [158] - 2877:19, 2878:12, 2878:23, 2879:2, 2881:4, 2881:9, 2881:10, 2882:6, 2882:16, 2882:21, 2884:1, 2884:11, 2884:13, 2885:15, 2885:19, 2885:21, 2887:5, 2887:7, 2887:12, 2887:23, 2888:4, 2888:7, 2888:10, 2888:12, 2888:17, 2888:22, 2888:24, 2889:1, 2889:7, 2889:12, 2889:16, 2891:3, 2891:12, 2891:14, 2891:16, 2891:24, 2896:4, 2899:19, 2899:21, 2899:25, 2905:21, 2906:2, 2907:22, 2908:5, 2908:9, 2908:14, 2910:15, 2914:5, 2914:6, 2917:8, 2919:23, 2919:25, 2920:3, 2920:8, 2920:16, 2920:23, 2920:24, 2920:25, 2922:3, 2922:11, 2924:11, 2924:25, 2925:2, 2925:6, 2925:9, 2925:12, 2925:16, 2925:20, 2925:21, 2930:23, 2931:12,

3020

2933:25, 2935:21, 2935:25, 2937:15, 2937:17, 2937:21, 2938:5, 2939:3, 2939:14, 2939:15, 2939:16, 2941:22, 2942:12, 2942:13, 2944:22, 2945:2, 2946:9, 2947:22, 2949:7, 2949:9, 2949:11, 2949:18, 2950:8, 2950:9, 2957:25, 2958:2, 2958:22, 2958:24, 2962:15, 2962:21, 2963:18, 2963:20, 2964:4, 2964:6, 2964:8, 2967:15, 2967:20, 2968:8, 2968:9, 2968:11, 2969:20, 2969:21, 2979:16, 2979:18, 2984:2, 2984:6, 2984:24, 2985:5, 2985:11, 2985:14, 2985:20, 2985:22, 2986:2, 2986:7, 2986:9, 2986:11, 2986:16, 2986:20, 2986:23, 2987:2, 2987:13, 2987:20, 2987:24, 2988:8, 2988:11, 2988:19, 2990:5, 2990:8, 2991:18, 2992:11, 2992:12, 2992:13, 2993:20, 2994:14, 2994:17, 2995:5, 2995:16, 2996:3, 2997:12, 2997:18, 2997:20, 2997:25, 2998:5, 2999:13, 3000:3, 3000:11, 3000:12

**MS** [8] - 2998:6, 2998:10, 2999:1, 2999:9, 2999:15, 2999:24, 3000:9, 3000:25

**multiple** [5] - 2931:23, 2965:17, 2966:21, 2966:25, 2967:1

**must** [4] - 2927:8, 2927:11, 2940:19, 2978:19

## N

**N.W** [1] - 3001:12
**name** [8] - 2889:16, 2892:1, 2892:3,

2892:4, 2900:4, 2917:2, 2936:15, 2937:9
**neighborhood** [1] - 2983:17
**nerd** [1] - 2884:25
**net** [3] - 2904:14, 2904:15, 2904:16
**Netflix** [6] - 2880:14, 2953:8, 2970:17, 2970:19, 2970:20, 2970:25
**network** [5] - 2980:19, 2981:2, 2981:11, 2982:7
**never** [7] - 2880:14, 2889:21, 2908:19, 2911:2, 2941:8, 2957:12, 2981:9
**New** [4] - 2850:23, 2893:8, 2946:17, 2948:8
**new** [23] - 2884:20, 2893:16, 2895:5, 2896:3, 2899:5, 2902:22, 2903:12, 2904:4, 2904:14, 2904:15, 2904:16, 2907:13, 2914:18, 2923:20, 2931:19, 2931:25, 2932:2, 2933:7, 2954:11, 2960:16, 2974:21, 3000:21
**news** [3] - 2925:5, 2925:6, 2946:22
**next** [16] - 2887:12, 2888:1, 2891:1, 2891:14, 2891:17, 2910:8, 2913:10, 2923:2, 2928:17, 2933:4, 2952:24, 2972:21, 2973:3, 2973:7, 2980:5, 2987:15
**Next** [1] - 2893:12
**nice** [3] - 2891:16, 2891:25, 2949:19
**night** [1] - 2985:12
**nine** [1] - 2907:3
**non** [2] - 2938:6, 2941:21
**non-Branch** [1] - 2938:6
**non-hearsay** [1] - 2941:21
**none** [1] - 2878:1
**nonissue** [1] - 2995:7
**notes** [1] - 3001:5
**nothing** [6] - 2887:7, 2900:19, 2931:19,

named [4] - 2900:20, 2918:15, 2918:21, 2919:2
**names** [1] - 2975:14
**nascent** [1] - 2961:8
**native** [1] - 2894:10
**natural** [1] - 2986:12
**naturally** [1] - 2975:4
**nature** [1] - 2997:17
**navigate** [2] - 2972:18, 2974:25
**navigating** [1] - 2960:12
**navigation** [1] - 2975:15
**NEA** [3] - 2893:9, 2893:14
**near** [1] - 2910:19
**nearby** [4] - 2895:2, 2951:20, 2952:20, 2953:25
**neat** [1] - 2882:13
**necessarily** [2] - 2895:12, 2970:6
**need** [49] - 2885:22, 2887:15, 2889:10, 2889:14, 2891:7, 2898:2, 2905:15, 2905:18, 2911:23, 2916:16, 2917:5, 2918:5, 2923:10, 2928:8, 2929:17, 2934:11, 2942:6, 2942:8, 2947:21, 2957:3, 2957:8, 2958:16, 2961:9, 2965:11, 2965:21, 2965:25, 2968:16, 2969:24, 2970:12, 2975:5, 2977:19, 2977:20, 2980:22, 2982:4, 2983:10, 2986:18, 2989:15, 2989:25, 2991:2, 2991:4, 2991:5, 2991:12, 2992:4, 2993:6, 2995:13, 2996:5, 2996:8, 2996:22, 3000:18
**needing** [1] - 2992:14
**needs** [2] - 2911:22, 2921:14
**negotiate** [1] - 2936:2
**negotiating** [1] - 2904:24
**negotiations** [5] - 2907:5, 2907:8,

2932:20, 2935:14, 2939:9

2953:21, 2982:20, 2994:17
**notice** [1] - 2985:11
**notifies** [1] - 2879:15
**notify** [2] - 2883:23, 2884:4
**Nova** [1] - 2910:7
**nowhere** [1] - 2910:19
**number** [28] - 2883:2, 2893:9, 2896:25, 2899:18, 2903:4, 2903:25, 2906:7, 2909:5, 2910:21, 2911:1, 2911:11, 2912:25, 2914:20, 2915:4, 2915:5, 2918:5, 2925:8, 2925:17, 2926:15, 2928:18, 2940:6, 2945:1, 2959:12, 2964:19, 2971:7, 2983:5, 2987:6
**numbers** [4] - 2893:2, 2955:13, 2962:2, 2973:19
**NW** [4] - 2850:13, 2851:2, 2851:6, 2851:11
**NY** [1] - 2850:23

## O

**o'clock** [4] - 2999:6, 2999:18, 3000:6, 3000:7
**object** [2] - 2919:25, 2991:13
**objected** [3] - 2988:2, 2989:24, 2993:8
**objecting** [3] - 2938:9, 2987:8, 2995:5
**objection** [29] - 2881:4, 2881:7, 2899:22, 2905:21, 2907:22, 2908:9, 2920:2, 2920:16, 2922:3, 2925:3, 2930:23, 2930:25, 2935:21, 2937:18, 2958:20, 2958:22, 2964:5, 2964:6, 2968:9, 2988:1, 2988:7, 2988:9, 2988:25, 2989:1, 2989:3, 2990:1, 2990:2, 2992:23, 2993:16
**objections** [8] - 2989:5, 2989:10, 2989:13, 2990:11,

2990:16, 2990:20, 2990:23

**observation** [1] - 2996:19

**obviously** [13] - 2888:12, 2888:14, 2891:6, 2891:8, 2911:20, 2912:19, 2919:25, 2938:12, 2941:24, 2949:14, 2990:9, 2992:9, 2993:23

**OEM** [20] - 2878:2, 2883:15, 2904:5, 2905:6, 2913:19, 2915:6, 2926:21, 2926:25, 2927:5, 2927:6, 2929:3, 2929:11, 2932:9, 2933:2, 2933:4, 2933:20, 2934:20, 2939:21, 2975:22, 2976:1

**OEM's** [1] - 2932:11

**OEMs** [11] - 2915:4, 2918:25, 2922:19, 2922:23, 2927:16, 2928:10, 2932:17, 2945:11, 2976:5, 2978:22, 2980:1

**OF** [4] - 2850:1, 2850:9, 2850:12, 3001:1

**offer** [3] - 2904:4, 2961:8, 2983:9

**offered** [10] - 2905:23, 2906:11, 2920:1, 2920:4, 2925:3, 2930:1, 2937:19, 2941:15, 2961:13

**offering** [2] - 2904:7, 2931:1

**offers** [3] - 2881:12, 2881:14, 2906:15

**Official** [2] - 2851:10, 3001:11

**OFFICIAL** [1] - 3001:1

**official** [2] - 2918:25, 2948:23

**officially** [1] - 2892:13

**offline** [5] - 2929:21, 2930:8, 2930:16, 2930:18, 2930:21

**old** [6] - 2923:20, 2933:6, 2933:15, 2974:7, 2974:18, 2975:3

**on-device** [9] - 2879:20, 2900:16, 2934:15, 2935:12,

2942:24, 2959:15, 2973:24, 2977:21, 2977:23

**once** [5] - 2891:3, 2913:3, 2957:23, 2990:2, 3000:7

**one** [57] - 2879:6, 2887:18, 2889:21, 2890:4, 2890:17, 2893:11, 2895:25, 2898:5, 2900:10, 2901:12, 2903:4, 2903:8, 2903:25, 2911:2, 2912:7, 2912:10, 2913:8, 2913:9, 2915:4, 2915:6, 2917:6, 2923:6, 2927:10, 2927:11, 2928:3, 2928:20, 2931:24, 2932:3, 2933:17, 2934:5, 2934:19, 2936:17, 2936:23, 2937:9, 2946:10, 2948:8, 2956:23, 2959:8, 2959:13, 2960:23, 2966:18, 2969:1, 2969:5, 2970:16, 2983:8, 2984:23, 2987:5, 2987:21, 2988:24, 2995:4, 2995:24, 2996:8, 2997:21, 2999:3, 3000:17

**one-off** [1] - 2933:17

**one-on-one** [1] - 2898:5

**one-sided** [1] - 2996:8

**ones** [8] - 2987:25, 2991:3, 2992:6, 2992:8, 2995:18, 2996:6, 2996:10, 2997:1

**online** [1] - 2930:16

**Open** [1] - 3002:4

**open** [7] - 2877:15, 2896:3, 2906:19, 2908:25, 2911:6, 2949:13, 2998:19

**opened** [1] - 2895:21

**opening** [2] - 2902:13, 2911:4

**opens** [1] - 2902:7

**operates** [2] - 2911:5, 2972:15

**operating** [3] - 2914:24, 2929:1, 2985:8

**opinion** [3] - 2886:18, 2887:2, 2890:5

**opportunity** [5] - 2891:7, 2915:2, 2938:12, 2951:4, 2995:11

**opposed** [1] - 2993:3

**opposite** [1] - 2936:23

**opted** [1] - 2953:19

**optimized** [1] - 2881:24

**option** [3] - 2880:22, 2895:3, 2910:12

**options** [4] - 2895:21, 2903:7, 2945:15, 2966:7

**order** [13] - 2893:2, 2895:5, 2898:1, 2901:23, 2927:7, 2935:5, 2957:3, 2983:16, 2984:21, 2985:4, 2985:6, 2992:15, 2994:24

**orders** [1] - 2947:3

**organic** [2] - 2901:24, 2954:8

**organization** [1] - 2938:1

**organized** [1] - 2882:12

**original** [8] - 2941:9, 2943:23, 2945:16, 2949:1, 2959:13, 2963:7, 2975:11, 2976:24

**originally** [2] - 2951:24, 2952:18

**otherwise** [1] - 2948:14

**ought** [6] - 2942:7, 2987:11, 2989:20, 2992:21, 2993:18

**out-of-court** [2] - 2937:21, 2938:11

**outside** [2] - 2906:16, 2938:1

**overall** [3] - 2915:3, 2955:16, 2960:17

**overlap** [1] - 2961:4

**overnight** [1] - 2984:14

**overruled** [2] - 2907:23, 2989:6

**oversaw** [1] - 2931:5

**overview** [2] - 2922:9, 2972:25

**own** [1] - 2910:5

**owned** [1] - 2934:25

**page** [48] - 2883:2, 2886:24, 2887:1, 2894:16, 2894:21, 2895:23, 2896:24, 2899:17, 2902:14, 2906:17, 2910:1, 2916:3, 2916:8, 2916:12, 2925:10, 2926:14, 2928:17, 2940:5, 2945:1, 2945:3, 2945:5, 2950:21, 2951:7, 2951:9, 2951:13, 2951:18, 2951:19, 2952:24, 2958:16, 2958:25, 2964:10, 2967:25, 2968:17, 2969:24, 2971:9, 2971:22, 2971:25, 2972:21, 2973:7, 2973:8, 2974:6, 2978:9, 2978:10, 2979:4, 2980:5, 2980:6, 2981:12

**pages** [8] - 2888:11, 2894:14, 2894:18, 2898:4, 2900:22, 2925:8, 2925:22, 2970:13

**paid** [2] - 2927:7, 2986:22

**panels** [1] - 2888:21

**paper** [3] - 2896:9, 2963:19

**paradigm** [1] - 2957:23

**paragraph** [5] - 2940:7, 2940:10, 2940:23, 2941:4, 2941:14

**parallels** [1] - 2901:15

**pardon** [1] - 2885:10

**part** [12] - 2889:8, 2922:22, 2938:7, 2944:5, 2946:21, 2952:8, 2963:3, 2963:6, 2971:10, 2973:14, 2993:11, 2996:11

**particular** [6] - 2888:3, 2897:16, 2909:18, 2992:7, 2992:8, 2996:5

**particularly** [4] - 2880:11, 2880:16, 2989:10, 2996:24

**parties** [4] - 2989:13, 2989:18, 2993:16, 2995:10

**partner** [9] - 2883:15, 2896:20, 2904:21,

# P

**p.m** [1] - 2850:6

2904:23, 2907:14, 2944:9, 2944:10, 2955:18, 2961:6
**partners** [15] - 2878:3, 2901:13, 2905:6, 2908:21, 2927:13, 2936:25, 2937:12, 2939:21, 2957:16, 2957:19, 2960:6, 2960:20, 2960:25, 2981:5, 2983:10
**partnership** [1] - 2886:14
**partnerships** [2] - 2918:24, 2919:1
**party** [10] - 2881:19, 2881:22, 2882:2, 2882:13, 2905:23, 2936:25, 2937:12, 2938:17, 2989:11, 2997:15
**passed** [1] - 2986:21
**past** [1] - 2941:8
**pasted** [1] - 2886:9
**Patel** [1] - 2878:19
**pathway** [1] - 2916:3
**patience** [1] - 2976:23
**Patrick** [1] - 2907:15
**Patterson** [1] - 2850:21
**pause** [2] - 2985:7, 2999:6
**paying** [2] - 2885:2, 2976:8
**payment** [1] - 2927:8
**Pennsylvania** [1] - 2851:6
**people** [21] - 2890:16, 2892:25, 2894:5, 2897:12, 2903:10, 2914:15, 2914:23, 2923:18, 2926:22, 2928:23, 2930:12, 2951:17, 2957:24, 2960:14, 2973:20, 2975:8, 2975:12, 2976:22, 2979:3, 2986:18, 2994:20
**per** [2] - 2983:5, 2985:12
**percent** [13] - 2904:16, 2911:19, 2911:21, 2950:7, 2958:16, 2961:7, 2972:22, 2973:5, 2974:18, 2974:21, 2974:25, 2975:1
**percentage** [1] - 2974:16
**perfect** [2] - 2901:12,

2915:2
**perform** [1] - 2880:23
**perhaps** [2] - 2992:20, 2993:6
**permissible** [1] - 2991:21
**permission** [1] - 2985:5
**permitted** [1] - 2883:19
**person** [16] - 2890:21, 2911:22, 2912:8, 2912:10, 2913:8, 2928:4, 2934:20, 2938:2, 2938:3, 2938:17, 2938:23, 2940:2, 2944:15, 2969:1, 2994:6
**person's** [1] - 2939:1
**personal** [5] - 2884:17, 2884:19, 2994:7, 2994:11, 2996:15
**personalized** [1] - 2902:11
**perspective** [5] - 2933:16, 2945:24, 2969:14, 2973:10, 2975:25
**phase** [4] - 2965:18, 2965:20, 2966:3, 2966:16
**phases** [1] - 2965:17
**phone** [31] - 2894:24, 2895:8, 2896:6, 2900:2, 2900:13, 2900:20, 2901:9, 2901:10, 2903:20, 2903:23, 2906:18, 2909:18, 2915:1, 2915:11, 2920:11, 2923:3, 2929:19, 2934:18, 2934:19, 2934:20, 2934:25, 2943:25, 2950:22, 2956:11, 2967:8, 2974:1, 2975:9, 2980:24, 2982:16, 2983:3
**phones** [30] - 2894:4, 2897:7, 2904:2, 2905:3, 2906:22, 2910:17, 2914:8, 2914:10, 2919:11, 2930:18, 2930:21, 2932:8, 2932:11, 2932:22, 2934:7, 2935:16, 2936:3, 2942:17, 2942:20, 2943:16, 2943:20,

2949:22, 2950:15, 2961:13, 2961:22, 2962:4, 2962:8, 2973:5, 2973:11
**photographs** [1] - 2953:6
**physically** [1] - 2879:22
**picture** [1] - 2917:3
**pictures** [4] - 2879:24, 2886:1, 2886:3, 2886:7
**piece** [2] - 2887:17, 2997:15
**pin** [1] - 2939:12
**pitch** [1] - 2922:23
**pitched** [2] - 2981:6, 2981:9
**pitching** [1] - 2959:12
**pivot** [2] - 2930:9, 2932:6
**pivoted** [2] - 2943:23, 2959:15
**pizza** [22] - 2894:23, 2894:24, 2895:3, 2895:6, 2900:19, 2900:20, 2900:24, 2901:8, 2901:16, 2910:7, 2912:19, 2916:2, 2916:9, 2916:14, 2953:2, 2953:21, 2959:14, 2970:22, 2975:13, 2982:16, 2983:16, 2983:17
**pizza-related** [1] - 2894:24
**place** [7] - 2895:3, 2907:2, 2916:14, 2950:11, 2953:25, 2967:7, 2983:16
**placed** [5] - 2895:8, 2895:17, 2912:22, 2915:16, 2936:3
**placement** [1] - 2898:20
**places** [3] - 2951:20, 2952:20, 2979:1
**Plaintiff** [1] - 2850:20
**plaintiff's** [1] - 2978:6
**plaintiffs** [4] - 2958:20, 2971:8, 2993:5, 2998:1
**Plaintiffs** [2] - 2850:4, 2850:11
**plan** [4] - 2987:2, 2988:14, 2991:7, 2997:24
**platform** [6] - 2895:14, 2897:15, 2906:8, 2906:24, 2915:9,

2919:6
**Play** [5] - 2902:10, 2903:7, 2910:8, 2918:10, 2953:9
**play** [1] - 2965:22
**player** [1] - 2926:7
**Playground** [1] - 2893:10
**PM** [1] - 2912:5
**POC** [5] - 2919:17, 2964:23, 2964:25, 2966:1, 2966:3
**point** [25] - 2881:19, 2882:2, 2882:10, 2897:17, 2905:20, 2906:25, 2908:11, 2909:6, 2919:23, 2923:1, 2928:21, 2931:21, 2934:17, 2939:11, 2944:18, 2945:6, 2945:8, 2973:25, 2974:4, 2975:2, 2980:11, 2986:3, 2987:5, 2995:20, 3000:3
**poor** [2] - 2976:20
**pop** [1] - 2970:21
**POPOFSKY** [13] - 2877:19, 2878:12, 2878:23, 2879:2, 2881:9, 2881:10, 2882:6, 2882:16, 2882:21, 2884:1, 2884:11, 2884:13, 2885:15
**Popofsky** [1] - 2851:4
**Popofsky.................. 2877** [1] - 3002:4
**popular** [1] - 2898:17
**portal** [1] - 2903:8
**portion** [1] - 2904:11
**portrait** [1] - 2925:12
**position** [11] - 2877:24, 2937:6, 2937:22, 2939:2, 2939:10, 2941:25, 2945:11, 2985:24, 2986:4, 2995:17, 2997:15
**positions** [1] - 2989:18
**possible** [6] - 2911:24, 2912:7, 2922:19, 2949:5, 2962:24, 2968:20
**possibly** [1] - 2898:13
**post** [1] - 2947:12
**posted** [1] - 2947:11
**posting** [1] - 2984:22
**Postmates** [1] -

2912:17
  **potential** [8] - 2913:1, 2913:7, 2921:13, 2929:10, 2936:25, 2945:10, 2962:11, 2963:8
  **potentially** [15] - 2890:21, 2895:3, 2899:6, 2901:4, 2901:7, 2901:14, 2902:8, 2904:11, 2904:21, 2909:11, 2909:14, 2912:1, 2922:18, 2931:8, 2983:20
  **power** [1] - 2899:5
  **pre** [1] - 2974:8
  **pre-LDS** [1] - 2974:8
  **precise** [2] - 2917:11, 2952:19
  **prefer** [3] - 2894:10, 2941:23, 2985:6
  **preferred** [1] - 2910:13
  **preinstalled** [1] - 2914:23
  **preliminary** [1] - 2998:12
  **premise** [5] - 2894:13, 2904:15, 2936:20, 2954:20
  **preparation** [1] - 2907:17
  **prepared** [4] - 2984:23, 2988:5, 2993:4, 2993:17
  **preparing** [1] - 2924:21
  **presence** [1] - 2881:11
  **present** [8] - 2920:17, 2939:4, 2988:12, 2989:22, 2989:25, 2991:2, 2992:15, 2995:11
  **presentation** [7] - 2924:18, 2971:11, 2971:14, 2971:16, 2971:21, 2972:25, 2973:2
  **presented** [1] - 2995:13
  **president** [1] - 2890:23
  **press** [3] - 2946:14, 2947:3, 2947:16
  **presumably** [1] - 2986:21
  **pretrial** [2] - 2990:21, 2994:25
  **pretty** [8] - 2898:16, 2914:12, 2915:21,

2939:24, 2945:6, 2965:24, 2965:25, 2992:6
  **prevent** [1] - 2911:3
  **preview** [4] - 2916:7, 2916:11, 2918:9, 2921:23
  **previous** [1] - 2968:25
  **previously** [5] - 2878:18, 2882:4, 2900:17, 2921:6, 2980:6
  **primarily** [9] - 2893:10, 2894:7, 2895:17, 2896:19, 2906:8, 2933:19, 2948:3, 2963:9, 2971:6
  **primary** [14] - 2893:8, 2893:25, 2895:25, 2897:8, 2897:20, 2897:21, 2906:11, 2906:20, 2907:12, 2921:6, 2931:5, 2931:10, 2935:19, 2989:23
  **problem** [4] - 2899:6, 2903:4, 2922:10, 2993:15
  **problems** [3] - 2923:7, 2923:15, 2970:16
  **procedural** [1] - 2997:17
  **proceed** [3] - 2921:16, 2945:7, 2991:8
  **proceeded** [1] - 2966:2
  **proceedings** [2] - 2877:15, 3001:6
  **process** [5] - 2889:19, 2908:3, 2948:4, 2965:17, 2984:23
  **produce** [2] - 2983:2, 2993:17
  **produced** [6] - 2902:25, 2906:22, 2958:12, 2988:24, 2993:22, 2996:21
  **product** [98] - 2878:18, 2878:19, 2878:20, 2878:22, 2879:17, 2893:18, 2895:13, 2895:25, 2896:21, 2899:1, 2899:12, 2900:10, 2900:15, 2901:14, 2903:2, 2906:9, 2906:11, 2906:13, 2906:21, 2907:17, 2908:1, 2910:21, 2911:16, 2911:23,

2911:25, 2912:6, 2912:21, 2912:23, 2913:16, 2913:20, 2914:19, 2915:10, 2919:5, 2919:6, 2919:7, 2919:15, 2920:15, 2921:3, 2921:4, 2922:15, 2922:16, 2922:22, 2927:16, 2927:18, 2928:2, 2928:8, 2928:12, 2929:3, 2934:14, 2940:19, 2942:23, 2943:22, 2944:18, 2945:9, 2945:17, 2946:4, 2946:8, 2949:23, 2954:8, 2954:19, 2954:23, 2955:9, 2955:13, 2955:17, 2955:21, 2955:25, 2956:9, 2956:10, 2956:12, 2956:17, 2956:19, 2956:23, 2957:12, 2957:24, 2959:5, 2959:13, 2959:25, 2960:2, 2961:12, 2962:20, 2963:9, 2966:3, 2966:11, 2968:16, 2968:20, 2970:12, 2970:13, 2971:5, 2971:6, 2971:24, 2975:12, 2976:4, 2977:14, 2977:22, 2981:6, 2982:11
  **products** [5] - 2907:13, 2914:14, 2935:2, 2956:14, 2975:19
  **progress** [12] - 2923:10, 2924:20, 2927:16, 2930:15, 2932:17, 2933:4, 2942:22, 2945:16, 2955:15, 2955:22, 2959:16, 2965:13
  **prohibit** [1] - 2979:11
  **prohibited** [5] - 2954:4, 2954:7, 2954:16, 2978:13, 2979:19
  **prohibiting** [1] - 2947:3
  **prohibitions** [1] - 2979:23
  **prohibits** [1] - 2979:21
  **project** [2] - 2892:18, 2918:19
  **prominent** [1] -

2898:17
  **prominently** [1] - 2906:13
  **promising** [7] - 2897:14, 2898:25, 2902:21, 2903:15, 2904:6, 2905:8, 2944:11
  **promote** [1] - 2953:15
  **prompt** [3] - 2951:20, 2951:23, 2952:4
  **pronounced** [1] - 2918:18
  **proof** [14] - 2962:13, 2962:15, 2962:17, 2962:18, 2962:23, 2963:3, 2963:14, 2964:16, 2964:25, 2965:4, 2965:6, 2965:18, 2965:20, 2966:15
  **proofs** [1] - 2966:16
  **proposed** [2] - 2921:11, 2977:9
  **proposing** [2] - 2888:21, 2966:6
  **proposition** [1] - 2941:17
  **protection** [1] - 2968:18
  **prototype** [1] - 2956:4
  **proven** [1] - 2902:18
  **provide** [11] - 2917:10, 2918:8, 2940:15, 2973:21, 2977:11, 2977:12, 2977:17, 2977:18, 2980:23, 2982:7
  **provided** [12] - 2880:9, 2908:1, 2914:19, 2917:3, 2917:7, 2953:19, 2965:9, 2966:19, 2969:4, 2978:14, 2981:23, 2985:11
  **provides** [1] - 2979:9
  **providing** [3] - 2910:4, 2916:25, 3000:19
  **provision** [2] - 2978:18, 2979:9
  **PSX00075** [3] - 2923:23, 2924:14, 2925:1
  **PSX0075** [1] - 2944:21
  **PSX65** [2] - 2958:5, 2958:21
  **pSX65.........................
.......................2958** [1]
- 3002:11
  **PSX71** [2] - 2963:21,

3024

2964:7
**PSX71.......................
.........................2964** [1]
- 3002:11
**PSX75** [1] - 2971:8
**pSX75.......................
.........................2925** [1]
- 3002:12
**PUBLIC** [1] - 2850:3
**public** [1] - 2882:19
**pull** [3] - 2940:5,
2944:25, 2963:2
**punch** [1] - 2983:17
**pure** [1] - 2879:20
**purpose** [5] - 2910:25,
2920:7, 2941:21,
2952:4, 2959:7
**purposes** [2] - 2920:1,
2952:19
**pursue** [1] - 2949:1
**pursued** [1] - 2922:20
**pursuing** [1] - 2934:17
**push** [11] - 2887:14,
2887:15, 2888:2,
2987:25, 2988:4,
2989:8, 2989:16,
2992:1, 2994:19,
2995:3, 2996:7
**pushed** [2] - 2995:14,
2997:2
**pushing** [1] - 2970:25
**put** [17] - 2883:13,
2885:22, 2886:13,
2886:20, 2891:8,
2893:17, 2931:13,
2939:12, 2939:22,
2941:10, 2945:11,
2979:4, 2982:16,
2984:10, 2995:21,
2997:9, 3000:21
**putting** [1] - 2940:14

## Q

**Qualta** [1] - 2910:7
**quantify** [1] - 2948:13
**quantity** [2] - 2983:6,
2996:4
**queries** [1] - 2952:15
**query** [8] - 2880:10,
2881:25, 2885:14,
2895:23, 2901:18,
2901:22, 2911:24,
2976:18
**questions** [16] -
2885:16, 2887:5,
2887:19, 2887:21,
2889:13, 2889:18,
2936:8, 2939:24,
2941:24, 2942:2,

2949:8, 2949:9,
2967:17, 2971:7,
2987:7, 2996:9
**quick** [1] - 2999:6
**quickly** [4] - 2898:1,
2976:19, 2986:15,
2999:23
**quite** [5] - 2893:5,
2989:9, 2990:1,
2991:8, 3000:17

## R

**radar** [1] - 2947:17
**raise** [3] - 2949:4,
2949:15, 2995:8
**raised** [10] - 2893:3,
2893:5, 2893:7,
2893:8, 2893:9,
2928:23, 2948:18,
2980:16, 2988:22,
2994:23
**range** [1] - 2929:14
**rare** [1] - 2951:17
**rate** [4] - 2974:16,
2974:19, 2974:21,
2975:18
**rather** [10] - 2885:13,
2888:19, 2894:17,
2916:6, 2916:15,
2917:5, 2918:9,
2973:20, 2989:2,
2993:19
**re** [6] - 2947:1,
2947:13, 2947:24,
2948:1, 2948:9,
2983:14
**re-enabled** [1] -
2983:14
**re-Tweet** [2] - 2947:24,
2948:1
**re-Tweeted** [3] -
2947:1, 2947:13,
2948:9
**reach** [3] - 2932:10,
2934:6, 2944:17
**reached** [2] - 2883:20,
2943:21
**reaching** [1] - 2943:25
**read** [15] - 2887:24,
2887:25, 2888:9,
2888:18, 2888:19,
2888:21, 2889:4,
2889:10, 2917:20,
2946:25, 2947:7,
2947:10, 2948:8,
2970:2, 3000:15

**ready** [2] - 2898:10,
2907:17
**real** [3] - 2903:9,
2904:12, 2962:20
**realize** [1] - 2921:22
**really** [19] - 2914:13,
2917:11, 2918:6,
2929:20, 2934:18,
2936:22, 2945:24,
2946:5, 2948:2,
2966:1, 2967:17,
2982:2, 2989:23,
2989:25, 2991:10,
2993:10, 2994:12,
2996:12, 2997:17
**reason** [6] - 2889:5,
2935:15, 2961:21,
2983:13, 2998:16,
2999:18
**reasonable** [1] -
2999:12
**reasons** [6] - 2897:25,
2920:20, 2932:21,
2933:13, 2936:17,
2994:21
**receive** [3] - 2898:18,
2906:18, 2924:7
**recently** [1] - 2948:22
**recess** [1] - 2914:1
**recognize** [12] -
2879:3, 2882:22,
2896:16, 2896:17,
2917:22, 2918:2,
2924:17, 2936:10,
2945:3, 2958:14,
2968:2, 2993:14
**recommendation** [1] -
2895:1
**reconstruct** [2] -
2978:24, 2979:3
**reconstructed** [1] -
2980:2
**record** [12] - 2888:9,
2889:5, 2892:4,
2899:14, 2935:17,
2937:25, 2938:6,
2938:8, 2938:9,
2995:13, 2996:22,
2997:2
**records** [4] - 2934:11,
2993:4, 2994:10,
2997:16
**red** [2] - 2911:8,
2972:23
**red-alert** [1] - 2911:8
**Redirect** [1] - 3002:5
**redirect** [2] - 2885:18,
3000:1
**REDIRECT** [1] -
2885:20

**reduce** [1] - 2918:5
**reduced** [11] - 2928:3,
2929:20, 2934:15,
2942:23, 2943:22,
2966:11, 2969:9,
2973:23, 2975:6,
2977:10, 2982:1
**reductions** [2] -
2908:7, 2908:16
**refer** [2] - 2897:9,
2955:12
**reference** [2] -
2974:12, 2980:13
**referenced** [1] -
2941:14
**referred** [4] - 2918:15,
2968:5, 2971:10,
2971:24
**referring** [12] - 2922:8,
2925:5, 2927:2,
2927:11, 2933:20,
2963:1, 2963:17,
2969:16, 2970:11,
2971:4, 2972:17,
2980:19
**refers** [4] - 2945:18,
2964:25, 2978:19,
2981:12
**reflecting** [1] -
2943:24
**refresh** [2] - 2963:2,
2981:23
**refused** [1] - 2988:8
**regarding** [2] - 2971:8,
2991:25
**reiterate** [1] - 2903:25
**related** [10] - 2894:24,
2897:19, 2903:14,
2910:23, 2915:20,
2939:22, 2946:14,
2948:5, 2990:12,
2990:20
**relates** [1] - 2989:7
**relating** [1] - 2993:23
**relationship** [21] -
2898:5, 2898:8,
2898:17, 2905:8,
2911:15, 2911:16,
2913:4, 2917:1,
2917:5, 2919:14,
2919:21, 2924:19,
2926:23, 2929:5,
2934:20, 2934:23,
2935:1, 2935:7,
2944:12, 2978:16
**relationships** [3] -
2903:5, 2917:9,
2936:22
**relative** [1] - 2980:18
**released** [1] - 2905:3

**relevance** [7] - 2989:3, 2990:10, 2990:11, 2990:23, 2995:18, 2995:23, 2996:18
**relevant** [9] - 2880:11, 2880:16, 2883:10, 2895:23, 2900:25, 2901:18, 2901:22, 2903:14, 2955:23
**relief** [2] - 2945:16, 2946:8
**relieve** [1] - 2903:17
**remain** [2] - 2989:10, 2989:14
**remains** [1] - 2997:8
**remember** [4] - 2900:6, 2947:24, 2952:21, 2997:2
**remembers** [1] - 2997:5
**remove** [3] - 2924:8, 2961:16, 2961:24
**removed** [2] - 2952:20, 2962:6
**render** [1] - 2916:11
**renegotiating** [1] - 2927:24
**repeat** [1] - 2980:12
**repeatedly** [3] - 2957:16, 2960:25, 2992:14
**rephrase** [2] - 2881:8, 2979:15
**replies** [1] - 2936:12
**reported** [2] - 2890:6, 2917:25
**reporter** [1] - 2934:2
**REPORTER** [1] - 3001:1
**Reporter** [3] - 2851:9, 2851:10, 3001:11
**represent** [2] - 2892:1, 2926:5
**representation** [2] - 2926:11, 2962:20
**representations** [1] - 2994:7
**representative** [1] - 2938:24
**represented** [1] - 2926:2
**request** [3] - 2940:12, 2977:5, 2991:14
**requested** [7] - 2908:7, 2952:18, 2963:3, 2963:12, 2966:5, 2984:21, 2990:22
**requesting** [1] - 2941:19

**require** [4] - 2909:19, 2949:13, 2949:15, 2977:2
**requirements** [3] - 2941:1, 2941:2, 2968:21
**requires** [1] - 2977:4
**resend** [2] - 2886:8
**Reserved).................
.................2939** [1] - 3002:13
**resolution** [2] - 2985:16, 2985:23
**resolve** [7] - 2890:16, 2988:18, 2989:25, 2993:13, 2993:17, 2995:24, 2997:11
**resolved** [3] - 2889:21, 2890:10, 2985:1
**resolving** [1] - 2993:5
**resources** [3] - 2922:13, 2930:7, 2948:14
**respect** [5] - 2883:11, 2884:1, 2885:3, 2980:16, 2984:22
**respectfully** [1] - 2939:3
**respond** [3] - 2884:8, 2976:22, 2982:22
**response** [4] - 2885:14, 2887:21, 2928:13, 2982:17
**responses** [1] - 2996:9
**responsibilities** [2] - 2877:23, 2878:17
**responsibility** [2] - 2878:4, 2878:7
**responsible** [5] - 2890:12, 2923:13, 2926:25, 2930:22, 2936:24
**restaurant** [5] - 2916:9, 2916:11, 2917:2, 2965:3, 2966:23
**restaurants** [5] - 2964:23, 2965:7, 2965:10, 2966:15, 2982:21
**restraints** [1] - 2922:24
**restrict** [3] - 2928:9, 2933:18, 2983:5
**restricted** [8] - 2905:11, 2929:4, 2932:15, 2932:16, 2950:18, 2953:14, 2969:12, 2979:20

**restriction** [14] - 2908:18, 2909:2, 2912:2, 2912:14, 2912:20, 2918:3, 2920:14, 2921:7, 2931:11, 2940:14, 2945:12, 2954:10, 2954:14
**restrictions** [13] - 2898:20, 2910:22, 2912:22, 2913:5, 2915:15, 2915:18, 2919:13, 2921:5, 2928:1, 2954:1, 2956:21, 2962:19, 2963:6
**restrictive** [1] - 2982:23
**result** [11] - 2894:15, 2894:20, 2901:24, 2908:25, 2913:9, 2916:10, 2941:19, 2969:1, 2969:5, 2974:17, 2975:9
**results** [43] - 2880:9, 2880:11, 2880:23, 2882:1, 2882:9, 2894:8, 2894:17, 2895:2, 2899:4, 2900:2, 2901:24, 2908:25, 2909:10, 2909:11, 2910:18, 2911:23, 2912:8, 2912:11, 2912:18, 2915:17, 2918:5, 2921:7, 2953:4, 2953:5, 2953:18, 2953:21, 2954:9, 2956:20, 2956:22, 2968:14, 2970:14, 2970:17, 2970:21, 2970:23, 2976:13, 2976:19, 2976:22, 2977:12, 2977:18, 2980:24, 2981:23
**resume** [3] - 2913:23, 2984:9, 2998:11
**retaining** [1] - 3000:18
**reticent** [1] - 2939:22
**return** [5] - 2882:17, 2941:11, 2975:3, 2975:14, 2984:12
**returning** [3] - 2976:1, 2998:7, 2998:9
**revenue** [17] - 2904:10, 2904:14, 2904:16, 2904:23, 2913:1, 2913:3, 2913:10, 2913:16, 2923:8, 2923:9,

2927:4, 2931:5, 2931:6, 2931:7, 2931:8, 2961:9
**revenue-generating** [1] - 2923:9
**revert** [1] - 2998:13
**review** [3] - 2963:17, 2968:17, 2970:12
**reviewing** [1] - 2947:3
**revision** [1] - 2954:21
**revisit** [1] - 2942:6
**revolved** [1] - 2910:20
**revshare** [2] - 2889:23, 2890:18
**rise** [1] - 2996:20
**Rishi** [4] - 2917:24, 2919:2, 2919:4, 2919:5
**RISHI** [1] - 2919:2
**risk** [2] - 2890:3, 2905:19
**rival** [1] - 2904:22
**RMR** [1] - 2851:9
**role** [5] - 2877:24, 2878:2, 2892:10, 2924:21, 2936:18
**rolled** [1] - 2928:10
**Room** [2] - 2851:10, 3001:12
**room** [5] - 2877:17, 2911:18, 2912:9, 2978:14, 3000:22
**Ropes** [1] - 2851:5
**rotate** [1] - 2986:18
**roundtrip** [3] - 2977:3, 2980:19, 2981:11
**route** [2] - 2902:12, 2907:2
**routinely** [1] - 2975:17
**row** [1] - 2882:14
**RSA** [20] - 2877:25, 2882:23, 2884:15, 2884:24, 2885:2, 2890:3, 2890:8, 2926:24, 2926:25, 2927:2, 2927:24, 2928:9, 2943:5, 2954:21, 2959:19, 2978:12, 2978:13, 2978:18, 2979:6, 2979:21
**RSA-enrolled** [2] - 2884:15, 2884:24
**RSAs** [2] - 2878:3, 2889:20
**Rubin** [1] - 2893:11
**rules** [3] - 2929:14, 2947:2, 2993:19
**ruling** [1] - 2991:22
**run** [2] - 2908:6, 3000:21

**run-up** [1] - 2908:6

# S

**S-Finder** [11] - 2878:14, 2879:8, 2879:14, 2881:20, 2883:18, 2883:24, 2884:15, 2884:21, 2887:3, 2950:25, 2955:2

**S10** [10] - 2907:20, 2915:14, 2915:16, 2918:20, 2922:12, 2924:6, 2962:16, 2967:8, 2968:23, 2970:4

**S11** [1] - 2923:3
**safe** [1] - 2887:10
**safety** [1] - 2998:24
**sake** [1] - 2898:1
**sales** [1] - 2913:17
**Samsung** [98] - 2880:20, 2881:2, 2881:5, 2882:22, 2884:19, 2893:12, 2896:21, 2903:25, 2905:8, 2905:13, 2906:3, 2907:4, 2907:5, 2907:8, 2907:11, 2907:13, 2907:16, 2908:7, 2908:23, 2909:9, 2910:17, 2910:21, 2911:12, 2912:5, 2912:22, 2913:3, 2913:4, 2913:19, 2915:4, 2915:11, 2915:15, 2915:19, 2918:1, 2918:20, 2919:9, 2919:10, 2919:19, 2921:15, 2921:17, 2922:5, 2922:25, 2923:12, 2924:1, 2924:20, 2925:13, 2925:14, 2925:15, 2926:3, 2927:6, 2927:24, 2929:3, 2930:17, 2930:20, 2931:7, 2931:17, 2931:22, 2932:6, 2934:21, 2935:3, 2944:8, 2944:14, 2944:23, 2950:15, 2950:22, 2961:12, 2961:13, 2961:22, 2962:4, 2962:8, 2962:9, 2962:16, 2962:22, 2963:3, 2963:7,

2963:12, 2963:24, 2964:14, 2965:2, 2965:3, 2966:14, 2967:2, 2967:6, 2967:8, 2968:4, 2968:13, 2970:4, 2970:18, 2970:19, 2977:6, 2977:13, 2977:16, 2978:14, 2978:17, 2979:5, 2980:16, 2987:8, 2987:11

**Samsung's** [4] - 2884:15, 2886:14, 2914:8, 2923:2

**Samsung/Branch** [1] - 2987:2

**sat** [1] - 2912:5
**satisfied** [1] - 2880:22
**Saturday** [1] - 2998:21
**save** [2] - 2887:4, 2993:12
**saw** [7] - 2884:22, 2887:20, 2946:16, 2951:24, 2962:19, 2971:6, 3000:16
**scale** [6] - 2904:22, 2914:22, 2945:16, 2946:8, 2957:24, 2961:5
**scaled** [2] - 2956:24, 2976:5
**scaling** [1] - 2956:17
**schedule** [1] - 3000:13
**scheduling** [3] - 2997:21, 2998:7, 2998:12
**SCHMIDTLEIN** [13] - 2888:12, 2888:24, 2891:3, 2988:11, 2991:18, 2992:12, 2994:14, 2994:17, 2995:5, 2997:25, 2998:5, 2999:13, 3000:12
**Schmidtlein** [3] - 2851:1, 2989:21, 2991:15
**school** [3] - 2892:14, 2892:22, 2892:24
**scientific** [2] - 2973:18
**scope** [17] - 2927:25, 2928:5, 2943:22, 2954:20, 2954:23, 2959:18, 2959:21, 2963:7, 2965:22, 2968:12, 2969:7, 2969:9, 2973:23, 2977:10, 2977:17, 2980:3, 2982:1

**scoped** [2] - 2955:24, 2977:22
**screen** [23] - 2879:13, 2880:8, 2881:12, 2896:8, 2896:10, 2896:14, 2897:3, 2900:2, 2900:14, 2901:9, 2901:11, 2905:1, 2917:15, 2917:17, 2924:14, 2936:6, 2944:21, 2950:11, 2950:22, 2958:6, 2958:10, 2967:17, 2976:19
**screens** [1] - 2884:22
**screenshot** [3] - 2879:12, 2880:17, 2880:18
**screenshots** [1] - 2879:6
**scrolling** [1] - 2901:6
**scrutiny** [1] - 2919:20
**seal** [1] - 2882:18
**search** [157] - 2877:25, 2878:5, 2879:20, 2880:18, 2880:23, 2881:11, 2881:15, 2881:19, 2881:24, 2881:25, 2882:9, 2882:13, 2883:4, 2885:1, 2886:15, 2892:17, 2894:1, 2894:3, 2894:7, 2894:11, 2894:13, 2894:14, 2894:20, 2894:23, 2895:7, 2895:11, 2895:20, 2896:6, 2897:5, 2897:10, 2897:13, 2897:17, 2897:20, 2897:23, 2898:2, 2898:9, 2898:11, 2898:13, 2898:14, 2898:15, 2898:17, 2898:24, 2899:2, 2899:9, 2899:12, 2900:2, 2900:4, 2900:9, 2900:16, 2900:17, 2901:15, 2901:16, 2901:18, 2903:13, 2911:16, 2911:23, 2911:24, 2914:23, 2914:24, 2916:10, 2919:5, 2922:17, 2927:12, 2927:14, 2927:17, 2927:20, 2928:6, 2929:13, 2929:16, 2929:22, 2929:24, 2930:8, 2930:10,

2930:12, 2930:15, 2930:18, 2930:21, 2932:13, 2932:24, 2932:25, 2934:15, 2935:10, 2935:20, 2936:20, 2941:1, 2942:24, 2948:16, 2951:5, 2951:11, 2951:19, 2952:8, 2952:25, 2954:20, 2954:22, 2955:15, 2955:19, 2955:21, 2955:25, 2956:10, 2956:14, 2956:15, 2956:18, 2956:25, 2957:3, 2957:8, 2957:17, 2957:20, 2957:24, 2959:13, 2959:16, 2959:21, 2959:23, 2960:1, 2960:13, 2960:15, 2960:16, 2960:17, 2961:1, 2961:2, 2961:4, 2961:12, 2971:23, 2972:17, 2973:3, 2973:12, 2973:15, 2973:21, 2973:24, 2973:25, 2974:4, 2974:7, 2974:8, 2974:17, 2975:3, 2975:7, 2975:18, 2976:6, 2976:12, 2976:13, 2976:18, 2977:4, 2977:11, 2978:19, 2981:17, 2981:19, 2981:21, 2982:2, 2982:7, 2982:13, 2982:22, 2983:2
**Search** [11] - 2878:10, 2881:1, 2881:12, 2881:17, 2881:18, 2914:14, 2953:11, 2960:2, 2960:9, 2961:6, 2977:3
**searches** [2] - 2912:8, 2975:12
**searching** [11] - 2881:17, 2882:2, 2894:6, 2895:12, 2895:23, 2901:16, 2901:20, 2929:24, 2975:8, 2975:13
**second** [12] - 2904:9, 2906:3, 2912:14, 2914:9, 2920:18, 2943:24, 2945:18, 2958:25, 2959:10, 2966:14, 2978:10, 2988:3

**section** [6] - 2883:3, 2902:9, 2902:13, 2924:23, 2959:25, 2971:25

**security** [1] - 2878:10

**see** [65] - 2879:14, 2880:8, 2880:13, 2881:3, 2882:13, 2883:3, 2884:9, 2886:11, 2887:20, 2890:4, 2890:5, 2891:17, 2894:17, 2896:14, 2897:9, 2900:1, 2900:24, 2901:6, 2902:1, 2906:19, 2911:22, 2911:23, 2912:19, 2921:21, 2921:24, 2924:14, 2925:11, 2926:16, 2936:15, 2940:8, 2944:23, 2945:12, 2946:4, 2946:8, 2949:19, 2951:20, 2953:5, 2953:12, 2953:18, 2953:20, 2953:21, 2958:4, 2958:16, 2959:20, 2959:21, 2961:10, 2963:21, 2963:23, 2964:12, 2964:20, 2965:25, 2967:22, 2967:24, 2970:7, 2974:13, 2978:20, 2980:12, 2981:13, 2983:1, 2989:14, 2989:19, 2992:9, 2995:8, 2997:8, 3000:23

**seeing** [1] - 2993:9

**sees** [2] - 2891:4, 2912:8

**segmentation** [1] - 2915:4

**select** [1] - 2964:22

**sell** [3] - 2904:7, 2910:11, 2935:3

**send** [3] - 2898:3, 2916:6, 2986:14

**sending** [3] - 2879:16, 2886:6, 2940:17

**senior** [2] - 2890:16, 2998:6

**sense** [7] - 2890:1, 2905:4, 2945:13, 2952:17, 2970:22, 2991:2, 2993:15

**sensitive** [1] - 2913:15

**sent** [7] - 2879:25, 2894:16, 2906:16, 2909:8, 2939:24,

2946:24, 2978:16

**sentence** [6] - 2921:22, 2941:4, 2941:13, 2942:8

**sentence-by-sentence** [1] - 2941:13

**separate** [3] - 2941:18, 2965:20, 2971:14

**September** [2] - 2850:5, 3001:7

**series** [2] - 2942:2, 2963:24

**serious** [4] - 2907:18, 2907:19, 2926:2, 2962:12

**server** [1] - 2977:20

**servers** [1] - 2981:17

**service** [4] - 2877:25, 2880:25, 2883:4, 2911:3

**services** [3] - 2890:22, 2935:2, 2940:25

**session** [3] - 2880:3, 2949:13, 3002:4

**set** [10] - 2880:9, 2887:25, 2905:10, 2910:23, 2910:25, 2918:12, 2966:4, 2966:11, 2970:14, 2998:16

**Settings** [3] - 2951:9, 2951:13, 2951:19

**settings** [1] - 2981:14

**several** [3] - 2988:22, 2989:4, 2989:14

**severe** [1] - 2910:21

**shape** [1] - 2995:23

**share** [3] - 2904:11, 2915:8, 2984:25

**shared** [3] - 2922:9, 2928:13, 2981:5

**shares** [1] - 2913:3

**sharing** [4] - 2904:10, 2913:11, 2927:4, 2952:5

**shift** [1] - 2957:23

**shipping** [1] - 2933:8

**short** [2] - 2888:9, 2999:18

**show** [22] - 2895:2, 2895:3, 2901:22, 2909:10, 2909:11, 2912:21, 2920:4, 2921:7, 2923:10, 2924:1, 2924:3, 2926:18, 2954:9, 2954:14, 2956:22, 2963:17, 2967:12, 2970:17, 2970:22, 2971:16, 2976:19,

2982:2

**showcase** [3] - 2900:22, 2903:13, 2909:14

**showcases** [1] - 2897:5

**showcasing** [1] - 2901:19

**showed** [1] - 2978:7

**showing** [2] - 2952:19, 2954:10

**shown** [8] - 2880:11, 2901:25, 2905:1, 2905:2, 2907:21, 2907:25, 2956:19, 2973:25

**shows** [4] - 2879:24, 2880:15, 2922:17, 2953:22

**shut** [2] - 2914:3, 2928:11

**shuts** [1] - 2985:23

**sic** [1] - 2879:21

**side** [9] - 2900:1, 2950:22, 2974:7, 2974:10, 2975:21, 2975:24, 2981:12, 2987:6, 2987:12

**sided** [1] - 2996:8

**sides** [2] - 2989:14, 2997:14

**signature** [1] - 2967:24

**significance** [1] - 2880:24

**significant** [4] - 2950:5, 2950:6, 2974:23, 2975:16

**similar** [4] - 2885:4, 2886:19, 2961:2, 2980:4

**simple** [7] - 2898:12, 2899:2, 2914:25, 2959:15, 2966:13, 2967:17, 2977:25

**simple-mindedly** [1] - 2898:12

**simplified** [1] - 2881:20

**simply** [1] - 2997:16

**single** [2] - 2944:13, 2966:19

**sit** [2] - 2991:4, 2993:14

**site** [1] - 2910:10

**sitting** [4] - 2888:25, 2905:12, 2944:4, 2997:5

**situation** [8] - 2886:14, 2926:2,

2926:5, 2926:12, 2938:22, 2948:25, 2949:6, 2997:14

**six** [2] - 2928:22, 2969:8

**skip** [1] - 2972:8

**SLAs** [1] - 2968:19

**slide** [15] - 2886:9, 2897:1, 2924:21, 2924:23, 2925:23, 2925:24, 2926:16, 2926:18, 2951:15, 2959:2, 2959:7, 2972:8, 2978:4, 2981:5, 2981:8

**slides** [5] - 2896:11, 2905:3, 2908:1, 2924:22, 2972:7

**slow** [3] - 2884:12, 2976:22, 2977:14

**slowing** [1] - 2884:11

**small** [5] - 2917:20, 2926:7, 2929:20, 2962:1, 2983:6

**sneaky** [1] - 2933:11

**snippets** [1] - 2979:2

**social** [1] - 2906:19

**software** [4] - 2878:5, 2878:10, 2967:6, 2969:17

**sold** [8] - 2906:23, 2934:8, 2935:3, 2936:3, 2942:17, 2943:16, 2975:15, 2987:11

**solution** [6] - 2907:16, 2921:13, 2922:10, 2943:8, 2976:3, 2977:9

**solutions** [2] - 2921:4, 2921:5

**solve** [3] - 2899:6, 2900:7, 2901:7

**someone** [8] - 2909:18, 2914:3, 2918:15, 2918:21, 2919:2, 2938:1, 2938:4, 2991:4

**sometime** [1] - 2987:15

**sometimes** [2] - 2884:21, 2897:9

**somewhere** [1] - 2984:10

**song** [1] - 2970:22

**soon** [1] - 2887:14

**sooner** [1] - 2993:19

**sorry** [17] - 2878:7, 2883:25, 2891:18, 2894:19, 2905:24, 2916:21, 2918:12,

3028

2922:3, 2923:24, 2928:16, 2933:22, 2938:15, 2962:14, 2966:10, 2967:21, 2981:3, 2992:11

**sort** [22] - 2882:8, 2893:23, 2894:13, 2894:24, 2897:20, 2899:12, 2901:8, 2914:17, 2916:7, 2918:24, 2919:14, 2927:14, 2929:1, 2929:8, 2964:16, 2971:4, 2972:25, 2980:8, 2983:8, 2988:3, 2995:21

**sorts** [1] - 2898:20
**sound** [1] - 2935:17
**sounds** [2] - 2925:19, 2995:22
**Sounds** [1] - 2997:12
**sources** [2] - 2973:17, 2973:19
**South** [1] - 2850:17
**space** [1] - 3000:21
**speaker** [2] - 2993:25, 2996:14
**speaking** [2] - 2936:1, 2938:1
**specific** [8] - 2895:1, 2895:23, 2904:5, 2936:1, 2941:2, 2951:25, 2955:17, 2959:8
**specifically** [6] - 2883:18, 2895:12, 2925:16, 2944:8, 2970:6, 2972:17
**specifics** [1] - 2968:16
**speed** [1] - 2881:23
**spell** [2] - 2892:3, 2934:2
**spend** [1] - 2961:11
**spending** [1] - 2991:8
**spent** [5] - 2894:9, 2898:6, 2936:4, 2948:21, 2973:5
**spill** [1] - 2998:23
**spoken** [1] - 2946:11
**spoliation** [2] - 2990:20, 2991:25
**Spotify** [3] - 2970:17, 2970:18, 2970:20
**St** [1] - 2851:2
**staff's** [1] - 2999:13
**stage** [3] - 2888:1, 2939:19, 2943:2
**stalled** [1] - 2923:18
**stand** [2] - 2929:6, 2999:23

**standing** [1] - 2922:4
**Stanford** [1] - 2892:24
**start** [16] - 2879:13, 2897:22, 2898:11, 2907:18, 2919:18, 2927:22, 2949:20, 2960:15, 2985:10, 2999:4, 2999:5, 2999:9, 2999:17, 2999:22, 3000:5, 3000:8
**started** [15] - 2877:16, 2884:21, 2892:15, 2900:21, 2905:9, 2906:11, 2908:3, 2908:22, 2913:5, 2914:14, 2922:21, 2923:12, 2946:16, 2962:9, 2984:13
**starting** [2] - 2913:2, 2992:4
**state** [4] - 2892:3, 2920:4, 2924:9, 2972:15
**State** [1] - 2850:21
**statement** [17] - 2905:23, 2937:25, 2938:5, 2938:7, 2938:11, 2938:16, 2938:18, 2938:19, 2938:24, 2939:1, 2939:6, 2940:24, 2941:25, 2960:5, 2960:6, 2960:19
**statements** [5] - 2925:7, 2937:21, 2938:10, 2938:25, 2942:3
**STATES** [2] - 2850:1, 2850:10
**States** [11] - 2850:2, 2851:10, 2891:17, 2891:18, 2892:1, 2905:3, 2906:23, 2912:10, 2915:7, 2935:5, 2988:20
**stats** [1] - 2906:25
**status** [3] - 2944:14, 2955:6, 2999:3
**stay** [4] - 2986:5, 2986:7, 2986:8, 2986:14
**steal** [2] - 2999:17, 2999:19
**stenographic** [1] - 3001:5
**step** [7] - 2910:8, 2914:9, 2928:20, 2929:8, 2965:2, 2965:11, 2984:17

**stepped** [2] - 2961:18, 2961:22
**stepping** [2] - 2931:14, 2969:6
**sticky** [1] - 2884:12
**still** [20] - 2884:15, 2885:9, 2885:11, 2885:13, 2906:12, 2911:5, 2915:5, 2918:9, 2929:10, 2934:12, 2932:25, 2938:17, 2944:15, 2946:21, 2949:25, 2950:3, 2980:20, 2995:14
**stone** [1] - 2969:6
**Store** [6] - 2902:11, 2903:7, 2910:8, 2918:10, 2953:9
**store** [9] - 2880:14, 2895:18, 2902:10, 2903:7, 2914:11, 2921:23, 2929:17, 2929:18, 2982:20
**stored** [2] - 2879:23, 2983:2
**stores** [1] - 2914:22
**story** [4] - 2906:3, 2907:4, 2914:7, 2943:17
**straight** [1] - 2909:20
**strait** [1] - 2916:3
**strategy** [3] - 2929:8, 2972:25, 2982:6
**stream** [1] - 2931:8
**streams** [1] - 2931:7
**Street** [2] - 2850:13, 2850:17
**stripped** [1] - 2886:10
**structured** [1] - 2885:14
**stuff** [4] - 2911:9, 2968:20, 2975:10, 2976:2
**style** [1] - 2975:15
**subject** [2] - 2985:15, 2995:9
**subjectively** [1] - 2947:19
**submitted** [1] - 2882:4
**subsequent** [1] - 2882:24
**subset** [1] - 2990:8
**substantial** [1] - 2998:3
**substantially** [2] - 2886:19, 2961:1
**substantive** [2] - 2994:21, 2995:8
**success** [9] - 2912:7,

2912:9, 2913:8, 2928:3, 2955:8, 2968:24, 2968:25, 2969:1, 2969:3
**successful** [2] - 2902:19, 2975:19
**suffered** [1] - 2948:4
**suffering** [1] - 2948:5
**suggest** [1] - 2960:10
**suggested** [3] - 2938:16, 2953:16, 2960:22
**Suite** [2] - 2850:17, 2850:22
**suite** [1] - 2957:12
**summarize** [1] - 2950:14
**summarized** [2] - 2927:14, 2966:1
**summarizing** [1] - 2959:2
**summary** [3] - 2964:12, 2972:2, 2991:20
**sums** [1] - 2898:18
**sunsetting** [1] - 2892:18
**support** [2] - 2946:7, 2960:19
**supporting** [2] - 2937:11, 2945:22
**suppose** [4] - 2887:14, 2942:7, 2979:17, 2994:9
**suspect** [1] - 2923:2
**sustain** [3] - 2881:6, 2905:22, 2930:25
**swarm** [1] - 2911:8
**swath** [1] - 2929:17
**swipe** [6] - 2897:16, 2951:1, 2951:2, 2973:20
**swiping** [1] - 2897:8
**switch** [5] - 2911:18, 2911:20, 2911:21, 2912:20
**swoop** [1] - 2995:24
**sworn** [1] - 2891:20
**synchronization** [1] - 2981:13
**system** [5] - 2930:3, 2930:4, 2959:3, 2974:10, 2980:9

## T

**T-Mobile** [4] - 2943:11, 2943:13, 2943:15, 2943:20
**table** [2] - 2918:12,

2987:6
**talks** [1] - 2961:15
**targeting** [1] - 2908:3
**team** [35] - 2878:4,
2878:7, 2878:11,
2878:20, 2888:14,
2890:2, 2890:4,
2890:11, 2892:19,
2905:13, 2907:12,
2907:20, 2911:4,
2912:5, 2913:3,
2917:24, 2919:6,
2919:20, 2920:13,
2926:24, 2930:9,
2930:14, 2931:9,
2931:24, 2931:25,
2936:11, 2937:1,
2937:12, 2940:18,
2970:25, 2978:15,
2979:25, 2980:21
**teams** [6] - 2919:16,
2919:19, 2921:15,
2923:5, 2923:12,
2932:2
**technical** [2] - 2921:4,
2980:8
**technologies** [1] -
2907:13
**technology** [8] -
2879:15, 2902:17,
2909:17, 2916:6,
2955:2, 2955:7,
2962:8, 2972:2
**ten** [1] - 2983:6
**tens** [3] - 2903:3,
2926:8, 2926:22
**term** [6] - 2927:25,
2929:11, 2929:23,
2940:3, 2946:5, 2968:6
**termed** [2] - 2929:21,
2953:25
**terms** [22] - 2880:25,
2881:12, 2904:22,
2913:13, 2923:8,
2927:8, 2927:9,
2931:2, 2938:10,
2940:1, 2943:5,
2952:13, 2959:19,
2968:13, 2968:22,
2969:11, 2980:3,
2982:23, 2984:4,
2986:24, 2991:13,
2991:16
**terrible** [1] - 2918:6
**terribly** [1] - 2987:18
**terrific** [1] - 2985:13
**test** [1] - 2934:1
**testified** [10] -
2878:18, 2880:3,
2891:21, 2908:6,

2908:10, 2954:15,
2959:5, 2960:18,
2961:15, 2995:9
**testifying** [6] - 2891:2,
2935:22, 2937:22,
2938:12, 2942:1,
2945:20
**testimony** [16] -
2883:21, 2887:10,
2887:15, 2887:17,
2891:11, 2913:25,
2948:10, 2953:13,
2953:14, 2955:21,
2968:25, 2974:3,
2976:11, 2984:14,
2998:1, 2998:11
**testing** [2] - 2914:21,
2919:18
**text** [1] - 2906:18
**Thai** [5] - 2901:17,
2901:20, 2901:23,
2902:8, 2902:13
**THE** [149] - 2850:1,
2850:1, 2850:9,
2877:16, 2878:7,
2878:9, 2879:1,
2881:6, 2882:7,
2882:11, 2882:15,
2882:20, 2883:25,
2884:3, 2884:5,
2884:6, 2884:7,
2884:9, 2885:17,
2887:6, 2887:8,
2887:11, 2887:22,
2888:2, 2888:5,
2888:8, 2888:11,
2888:20, 2888:23,
2889:4, 2889:10,
2889:14, 2891:6,
2891:13, 2891:22,
2891:23, 2894:19,
2894:22, 2895:7,
2895:10, 2899:23,
2905:22, 2905:24,
2905:25, 2906:1,
2907:23, 2908:10,
2909:16, 2909:23,
2913:14, 2913:18,
2913:21, 2914:2,
2916:21, 2916:24,
2920:6, 2920:17,
2920:18, 2922:7,
2923:24, 2924:3,
2924:4, 2924:5,
2925:5, 2925:8,
2925:11, 2925:18,
2930:24, 2930:25,
2931:4, 2933:22,
2933:23, 2935:22,
2937:20, 2937:23,

2938:14, 2939:7,
2941:11, 2942:5,
2946:2, 2947:19,
2947:20, 2949:10,
2949:16, 2958:23,
2962:14, 2964:7,
2967:18, 2968:10,
2979:14, 2982:9,
2982:15, 2982:16,
2982:19, 2983:1,
2983:4, 2983:15,
2983:19, 2983:22,
2983:23, 2983:25,
2984:4, 2984:7,
2984:16, 2984:17,
2984:19, 2984:20,
2985:3, 2985:8,
2985:13, 2985:15,
2985:21, 2986:1,
2986:6, 2986:8,
2986:10, 2986:14,
2986:17, 2986:21,
2986:24, 2987:5,
2987:17, 2987:21,
2988:6, 2988:10,
2988:16, 2989:20,
2990:7, 2991:15,
2992:19, 2994:4,
2994:16, 2994:23,
2995:6, 2996:2,
2996:19, 2997:13,
2997:19, 2997:21,
2998:4, 2998:9,
2998:15, 2999:3,
2999:11, 2999:16,
3000:1, 3000:5,
3000:10, 3000:15
**themselves** [2] -
2912:15, 2965:23
**theory** [4] - 2902:6,
2917:6, 2953:20,
2973:3
**there're** [1] - 2888:15
**therefore** [2] - 2977:4,
2980:23
**they've** [1] - 2988:8
**thinking** [2] - 2898:11,
2991:17
**third** [13] - 2881:19,
2882:2, 2882:13,
2883:2, 2904:18,
2905:23, 2936:25,
2937:12, 2938:17,
2959:23, 2989:7,
2989:11, 2989:17
**third-party** [7] -
2881:19, 2882:2,
2882:13, 2905:23,
2936:25, 2937:12,
2989:11

**thirds** [1] - 2958:8
**thousand** [1] - 2903:3
**thousands** [4] -
2910:16, 2910:18,
2917:12, 2926:9
**three** [5] - 2893:24,
2981:14, 2981:18,
2981:22, 2988:23
**threw** [1] - 2913:5
**throughout** [4] -
2893:3, 2923:5,
2923:13, 2936:12
**throw** [2] - 2931:24,
2932:1
**thrust** [1] - 2974:5
**thumb** [1] - 2972:1
**tidbits** [1] - 2885:13
**tied** [1] - 2970:6
**timeframe** [1] - 2956:4
**timelines** [1] - 2965:21
**timing** [1] - 2967:9
**Tinter** [4] - 2997:23,
2998:4, 2998:22,
3000:8
**tiny** [1] - 2926:3
**title** [2] - 2901:9,
2918:25
**today** [29] - 2885:8,
2892:10, 2892:11,
2892:25, 2906:23,
2911:5, 2924:1,
2928:12, 2930:13,
2931:14, 2931:17,
2944:5, 2945:20,
2948:11, 2948:24,
2949:13, 2949:22,
2950:15, 2953:5,
2956:16, 2961:13,
2973:1, 2980:21,
2982:19, 2983:15,
2983:19, 2983:22,
2985:10, 3000:13
**together** [1] - 2919:10
**tomorrow** [11] -
2984:12, 2987:14,
2997:22, 2997:23,
2998:2, 2998:10,
2998:24, 2999:3,
2999:12, 2999:22,
3000:8
**ton** [1] - 2899:3
**tonight** [3] - 2985:1,
2987:3, 2987:14
**took** [7] - 2879:7,
2879:25, 2880:17,
2886:1, 2886:3,
2936:24, 2937:6
**tool** [2] - 2907:1,
2948:16
**tools** [4] - 2906:5,

2906:7, 2906:22, 2909:8

**top** [5] - 2897:10, 2951:5, 2959:21, 2964:10, 2972:15
**topic** [1] - 2946:10
**topics** [1] - 2971:22
**total** [1] - 2983:5
**totally** [2] - 2904:13, 2960:2
**touch** [3] - 2913:15, 2946:10, 2971:22
**touched** [4] - 2903:1, 2903:24, 2904:13, 2931:14
**towards** [1] - 2912:24
**track** [8] - 2885:1, 2942:7, 2955:15, 2955:16, 2987:1, 2987:18, 2987:19, 2987:20
**tracked** [2] - 2955:24, 2975:17
**tradeoff** [1] - 2982:8
**traditional** [3] - 2902:19, 2930:3, 2930:10
**traffic** [7] - 2895:25, 2899:3, 2899:9, 2960:9, 2960:15, 2961:7, 2962:1
**TRANSCRIPT** [1] - 2850:9
**transcript** [2] - 3001:4, 3001:5
**travels** [1] - 2887:10
**tray** [1] - 2897:9
**tremendous** [1] - 2923:17
**TRIAL** [1] - 2850:9
**trial** [17] - 2881:16, 2891:9, 2938:12, 2942:1, 2946:12, 2946:15, 2962:23, 2964:17, 2964:23, 2965:4, 2966:15, 2986:9, 2988:22, 2994:18, 2996:7, 2996:21
**tried** [2] - 2921:10, 2923:15, 2970:24
**Tripadviser** [1] - 2901:4
**Tripadvisor** [1] - 2912:17
**Trowbridge** [3] - 2936:15, 2936:16, 2937:6
**true** [10] - 2941:17, 2990:18, 2991:3,

2991:10, 2991:24, 2995:2, 2996:10, 2997:14, 3001:4, 3001:5
**trust** [3] - 2911:25, 2929:5, 2945:25
**truth** [14] - 2905:23, 2920:2, 2920:4, 2920:20, 2920:21, 2922:5, 2925:4, 2931:1, 2937:19, 2938:17, 2939:1, 2941:15, 2993:3, 2994:20
**try** [24] - 2903:10, 2907:20, 2908:2, 2911:9, 2914:9, 2918:11, 2928:25, 2931:25, 2932:7, 2934:6, 2945:15, 2950:13, 2959:16, 2977:8, 2989:8, 2989:22, 2997:7, 2997:10, 2998:2, 2998:19, 2999:16, 3000:8
**trying** [15] - 2879:7, 2895:13, 2904:1, 2911:3, 2922:23, 2926:7, 2929:16, 2961:5, 2973:13, 2977:24, 2983:20, 2991:11, 2995:3, 2996:1, 3000:6
**turn** [16] - 2883:1, 2915:22, 2923:9, 2951:7, 2952:24, 2958:5, 2958:25, 2959:20, 2969:24, 2971:25, 2972:9, 2972:21, 2973:7, 2978:4, 2978:9, 2980:5
**turned** [2] - 2936:23, 2962:18
**turning** [1] - 2924:13
**Tweet** [7] - 2946:23, 2947:14, 2947:20, 2947:24, 2948:1, 2948:9, 2948:10
**Tweeted** [3] - 2947:1, 2947:13, 2948:9
**Tweets** [3] - 2946:17, 2946:18, 2947:10
**twice** [1] - 2897:13
**Twitter** [3] - 2947:11, 2947:14, 2948:2
**two** [14] - 2881:21, 2887:18, 2888:11, 2905:14, 2934:18, 2948:7, 2948:8,

2958:8, 2958:16, 2961:19, 2963:13, 2980:11, 2989:16, 2992:20
**two-thirds** [1] - 2958:8
**Tyler** [1] - 2850:21
**type** [7] - 2879:23, 2881:24, 2894:25, 2903:12, 2912:19, 2927:8, 2953:1
**typed** [3] - 2880:10, 2880:13, 2900:19
**types** [7] - 2934:18, 2956:22, 2968:19, 2970:15, 2975:3, 2976:18, 2991:9
**typical** [2] - 2919:12, 2939:19
**typically** [2] - 2901:17, 2983:6

## U

**U.S** [4] - 2850:12, 2850:16, 2924:6, 2945:19
**UI** [2] - 2899:2, 2899:14
**ultimately** [5] - 2880:20, 2889:9, 2889:21, 2930:17, 2935:8
**un-objected** [1] - 2989:24
**uncertain** [2] - 2997:25
**uncertainty** [3] - 2890:10, 2890:14, 2890:16
**unclear** [1] - 2949:5
**uncovered** [1] - 2898:22
**under** [3] - 2877:25, 2882:18, 2954:20
**understandably** [1] - 2937:25
**understood** [7] - 2909:17, 2920:23, 2939:14, 2953:23, 2954:22, 2956:13, 2986:16
**unfortunately** [2] - 2982:20, 2983:24
**uninstalled** [1] - 2910:3
**unique** [1] - 2904:6
**UNITED** [2] - 2850:1, 2850:10
**United** [10] - 2851:10, 2891:17, 2891:18,

2892:1, 2905:3, 2906:23, 2912:10, 2915:7, 2935:5, 2988:20
**united** [1] - 2850:2
**universal** [2] - 2895:9, 2932:23
**universally** [1] - 2898:16
**unknown** [1] - 2938:22
**unless** [6] - 2898:18, 2900:19, 2985:24, 2985:25, 2986:3, 2991:19
**unlikely** [1] - 2948:25
**untouched** [1] - 2899:3
**up** [42] - 2878:23, 2882:3, 2882:16, 2882:17, 2883:8, 2884:25, 2885:22, 2887:24, 2892:18, 2896:3, 2897:8, 2897:17, 2902:7, 2905:17, 2908:6, 2908:22, 2910:11, 2911:6, 2912:12, 2913:6, 2922:4, 2929:6, 2930:4, 2931:24, 2932:1, 2933:1, 2940:5, 2944:25, 2946:10, 2951:1, 2951:2, 2958:6, 2959:21, 2963:2, 2966:8, 2976:8, 2976:19, 2982:11, 2982:17, 2992:8, 2999:16, 3000:6
**up-sell** [1] - 2910:11
**update** [3] - 2924:19, 2989:13, 2989:18
**updates** [3] - 2878:5, 2878:10
**UPX0656** [2] - 2937:16, 3002:13
**UPX1064** [2] - 2917:16, 2919:24
**UPX1064.................
.........................2920**
[1] - 3002:13
**UPX656** [1] - 2936:5
**UPX685** [2] - 2971:18, 2972:6
**UPX694** [1] - 2886:4
**urge** [1] - 2996:24
**usage** [1] - 2898:25
**useful** [3] - 2902:25, 2903:19, 2911:22

3031

**usefulness** [1] - 2911:13
**user** [39] - 2880:21, 2895:8, 2895:22, 2899:16, 2900:22, 2900:24, 2901:1, 2901:6, 2901:20, 2901:22, 2901:23, 2902:5, 2902:7, 2902:8, 2902:10, 2902:12, 2902:13, 2903:14, 2904:2, 2904:8, 2906:15, 2906:20, 2909:1, 2909:20, 2910:4, 2910:14, 2911:16, 2916:2, 2916:6, 2918:8, 2932:14, 2934:23, 2934:25, 2947:14, 2952:4, 2969:5, 2976:20, 2981:20, 2982:23
**users** [22] - 2881:3, 2881:15, 2894:10, 2899:3, 2899:7, 2902:22, 2903:5, 2903:11, 2906:5, 2907:2, 2918:6, 2921:23, 2945:11, 2952:9, 2955:10, 2955:12, 2955:13, 2956:2, 2956:6, 2956:9, 2973:10, 2974:24
**uses** [1] - 2973:13
**utility** [4] - 2911:17, 2914:14, 2914:19

**V**

**valid** [1] - 2989:10
**validation** [1] - 2963:10
**valuable** [1] - 2933:15
**value** [10] - 2904:7, 2906:15, 2910:4, 2930:1, 2945:10, 2975:6, 2976:5, 2976:7, 2982:23, 2983:8
**valve** [1] - 2998:25
**variation** [4] - 2907:21, 2907:25, 2909:13, 2981:8
**variations** [2] - 2908:20, 2927:13
**variety** [1] - 2908:21
**various** [3] - 2907:16, 2978:25, 2980:1
**vary** [1] - 2882:9

**vast** [2] - 2893:17, 2990:19
**VC** [1] - 2893:16
**venture** [4] - 2893:4, 2893:5, 2893:7, 2893:13
**verify** [4] - 2888:14, 2911:2, 2911:6, 2911:11
**Verizon** [12] - 2896:21, 2904:1, 2934:11, 2934:24, 2935:1, 2935:12, 2942:15, 2942:17, 2942:19, 2942:21
**version** [35] - 2894:11, 2905:2, 2916:22, 2923:20, 2929:4, 2931:18, 2932:15, 2950:17, 2951:25, 2952:2, 2954:19, 2955:4, 2955:9, 2955:24, 2956:1, 2956:11, 2956:23, 2959:16, 2959:17, 2962:13, 2962:22, 2966:8, 2974:18, 2974:21, 2975:3, 2975:11, 2976:24, 2977:7, 2977:15, 2980:16, 2980:20, 2980:25, 2981:6, 2981:17
**versions** [3] - 2925:12, 2956:19, 2966:9
**versus** [5] - 2914:10, 2921:22, 2945:19, 2972:13, 2973:11
**vertical** [10] - 2964:22, 2965:5, 2965:8, 2966:5, 2966:14, 2966:18, 2966:19, 2966:22, 2966:23, 2966:24
**verticals** [5] - 2963:13, 2966:10, 2966:21, 2966:25, 2967:1
**via** [2] - 2886:15, 2895:18
**vice** [1] - 2890:22
**view** [5] - 2916:21, 2944:3, 2957:22, 2969:13, 2989:21
**viewed** [4] - 2929:10, 2932:17, 2959:19, 2969:5
**violating** [2] - 2886:15, 2886:21
**violation** [1] - 2886:19
**vision** [6] - 2932:12,

2943:23, 2945:16, 2949:1, 2959:13, 2969:10
**visually** [1] - 2882:14
**VP** [1] - 2918:25
**vs** [1] - 2850:5

**W**

**wait** [2] - 2891:8, 2985:4
**waive** [1] - 2992:7
**wake** [1] - 2999:16
**walk** [1] - 2897:1
**walled** [1] - 2944:23
**walled-castle** [1] - 2944:23
**wants** [1] - 2887:25
**Washington** [6] - 2850:5, 2850:13, 2851:2, 2851:6, 2851:11, 3001:13
**watch** [1] - 2946:22
**web** [60] - 2881:15, 2894:6, 2894:15, 2894:20, 2895:20, 2895:23, 2901:15, 2901:16, 2902:19, 2908:19, 2909:15, 2909:22, 2910:22, 2911:2, 2911:6, 2916:5, 2916:6, 2916:15, 2916:16, 2916:18, 2916:22, 2917:5, 2917:6, 2918:4, 2918:7, 2921:7, 2921:8, 2921:12, 2922:19, 2927:12, 2927:14, 2927:17, 2932:24, 2933:1, 2954:20, 2956:15, 2956:18, 2956:19, 2956:25, 2957:3, 2957:4, 2957:8, 2957:9, 2957:10, 2957:13, 2957:14, 2957:17, 2957:20, 2959:23, 2960:13, 2960:15, 2960:17, 2961:2, 2961:4, 2963:11, 2972:17, 2972:18, 2973:4, 2973:12, 2977:18
**Webb** [1] - 2850:21
**website** [7] - 2894:7, 2895:24, 2908:24, 2910:3, 2910:10, 2916:5, 2928:2
**websites** [5] -

2894:18, 2895:21, 2896:1, 2910:2, 2910:21
**week** [2] - 2947:6, 2985:17
**weeks** [1] - 2893:24
**weight** [1] - 2994:11
**welcome** [2] - 2889:1, 2891:22
**well-structured** [1] - 2885:14
**Western** [2] - 2934:24, 2935:6
**Wfcavanaugh@pbwt .com** [1] - 2850:24
**whole** [8] - 2886:11, 2888:11, 2889:10, 2889:12, 2928:24, 2929:14, 2930:4, 2930:9
**widget** [1] - 2881:17
**William** [1] - 2850:21
**WILLIAMS** [1] - 2851:1
**willing** [1] - 2929:6
**window** [1] - 2913:11
**withdraw** [2] - 2990:16, 2990:23
**withdrawn** [1] - 2990:2
**witness** [26] - 2887:12, 2887:19, 2887:20, 2888:1, 2889:15, 2889:17, 2891:1, 2891:15, 2891:20, 2938:11, 2939:4, 2988:13, 2988:14, 2989:22, 2989:25, 2990:6, 2990:25, 2991:3, 2991:7, 2991:19, 2991:21, 2992:2, 2992:15, 2992:17, 2995:11, 2995:13
**WITNESS** [27] - 2878:9, 2882:11, 2884:5, 2884:7, 2887:11, 2891:23, 2894:22, 2895:10, 2905:24, 2906:1, 2909:23, 2913:18, 2916:24, 2920:17, 2924:3, 2924:5, 2930:24, 2931:4, 2933:23, 2947:20, 2982:15, 2982:19, 2983:4, 2983:19, 2983:23, 2984:16, 2984:19
**witness's** [1] - 2889:6
**WITNESSES** [1] -

3002:2

**witnesses** [7] - 2887:15, 2937:22, 2946:11, 2992:5, 2992:8, 2994:18, 2995:1

**Wolfson** [3] - 2936:18, 2937:3, 2940:20

**Wolfson's** [1] - 2937:6

**word** [4] - 2879:25, 2921:25, 2924:7, 2985:25

**wording** [1] - 2927:13

**words** [3] - 2938:2, 2980:2, 2981:8

**workaround** [7] - 2928:14, 2929:1, 2929:10, 2930:5, 2933:5, 2933:11

**works** [4] - 2896:22, 2911:22, 2985:22, 2999:10

**world** [3] - 2915:6, 2994:9, 2996:23

**worn** [1] - 2988:2

**worth** [1] - 2890:12

**wrapping** [1] - 2946:10

**write** [1] - 2898:5

**writing** [2] - 2921:25, 2940:20

**written** [3] - 2919:9, 2964:10, 2980:4

**wrote** [2] - 2921:21, 2960:5

## X

**X-I-A-O-M-I** [1] - 2934:3

**Xiaomi** [4] - 2904:1, 2933:21, 2933:23, 2934:21

**XIOMI** [1] - 2934:3

## Y

**Yahoo** [2] - 2982:13, 2982:14

**year** [7] - 2892:13, 2892:19, 2933:6, 2933:15, 2956:8, 2961:17, 2965:16

**years** [16] - 2893:22, 2898:6, 2905:7, 2906:10, 2907:3, 2926:10, 2928:22, 2934:10, 2935:18, 2936:19, 2942:21, 2943:6, 2956:15,

2957:16, 2969:8

**Yelp** [31] - 2880:15, 2894:23, 2895:2, 2898:14, 2900:25, 2901:2, 2901:5, 2909:25, 2910:2, 2910:9, 2912:17, 2916:1, 2916:2, 2916:3, 2916:5, 2916:9, 2916:13, 2916:17, 2916:25, 2953:20, 2953:21, 2954:9, 2954:12, 2982:15, 2982:16, 2982:22, 2983:16, 2983:17

**Yelp's** [1] - 2982:20

**yesterday** [2] - 2985:4, 2985:9

**York** [3] - 2850:23, 2946:17, 2948:8

**YouTube** [1] - 2953:8

## Z

**zero** [8] - 2960:8, 2980:13, 2980:18, 2980:25, 2981:2, 2981:7, 2981:9, 2981:11

**Zoom** [2] - 2999:7