```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
        United States of America,     )
 3      et al.,                       )
                                      )          ███████
 4                        Plaintiffs, )
                                      ) CV No. 20-3010
 5            vs.                     ) Washington, D.C.
                                      ) September 27, 2023
 6      Google LLC,                   ) 1:30 p.m.
                                      )
 7                        Defendant.  )
        _____)
 8

 9                    TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE AMIT P. MEHTA
10                    UNITED STATES DISTRICT JUDGE

11      APPEARANCES:
        For DoJ Plaintiffs:       Kenneth M. Dintzer
12                                Ian Hoffman
                                  U.S. DEPARTMENT OF JUSTICE
13                                1100 L Street, NW
                                  Washington, D.C.
14                                (202) 307-0340
                                  Email:  Kenneth.dintzer2@usdoj.gov
15                                Email:  Ian.hoffman@usdoj.gov

16                                David E. Dahlquist
                                  U.S. Department of Justice
17                                209 South LaSalle Street
                                  Suite 600
18                                Chicago, IL  60604
                                  (202) 805-8563
19                                Email:  David.dahlquist@usdoj.gov

20
        For Plaintiff
21      State of Colorado:        William J. Cavanaugh, Jr.
                                  Patterson Belknap Webb & Tyler LLP
22                                1133 Avenue of the Americas
                                  Suite 2200
23                                New York, NY 10036
                                  (212) 335-2793
24                                Email:  Wfcavanaugh@pbwt.com

25
```

```
1    For Defendant Google:      John E. Schmidtlein
                                WILLIAMS & CONNOLLY LLP
2                               725 12th St., NW
                                Washington, D.C. 20005
3                               (202) 434-5000
                                Email:  Jschmidtlein@wc.com
4
                                Mark Popofsky
5                               Matthew McGinnis
                                Ropes & Gray LLP
6                               2099 Pennsylvania Avenue, NW
                                Washington, DC  20006
7                               (202) 508-4624
                                Email:  Mark.popofsky@rogesgray.com
8                               Email:  Matthew.mcginnis@ropesgray.com

9
     Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
10                              Official Court Reporter
                                United States Courthouse, Room 6523
11                              333 Constitution Avenue, NW
                                Washington, DC  20001
12                              202-354-3267
                                     *   *   *
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1       *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
2                   (The following proceedings are ███████
3              THE COURT:  All right.  Mr. Dintzer, we're in closed
4       session.  Let's proceed.
5              MR. DINTZER:  Thank you, Your Honor.
6              And we're going to move on from the last exhibit.
7       We're going to move on to UPX150.
8                           DIRECT EXAMINATION
9       BY MR. DINTZER:
10      Q.  Ma'am, let me know when you have the document in front of
11      you.
12      A.  I do, yes.
13      Q.  So this is a -- basically, a back-and-forth email between
14      you and Mr. Rosenberg; is that right?
15      A.  Correct.
16      Q.  And was he your boss in November 2020?
17      A.  Either my boss or the boss of my boss.
18      Q.  So one or two levels up?
19      A.  Yeah.
20      Q.  And so we're going to start with the bottom email, which
21      Mr. Rosenberg marks for attorney-client privilege, and then has
22      some -- you know, asks Rosie and Kate for their thoughts.  Do
23      you see that?
24      A.  Yes.
25      Q.  And those are attorneys?
```

1    A.  Correct.

2    Q.  And then he writes -- he writes:  I've been thinking about

3    our new approach to the U.S. carrier RSAs.

4         Do you see that?

5    A.  Yes.

6    Q.  So the carriers are AT&T and Verizon and T-Mobile, right?

7    A.  Correct.

8    Q.  And he's referring to the new template RSA for the U.S.

9    carriers in the fall 2020, right?

10   A.  Yes.

11   Q.  And the template is basically the basic bones of it that

12   has been worked out and that different teams use to reference

13   as a starting point?

14   A.  Generally, yes.

15   Q.  Okay.  And this is about Android devices, right?

16   A.  Yes.

17   Q.  Okay.  And you worked on the new template for the RSA?

18   A.  Parts of it.  My team provided recommendations as an input

19   into the templates.

20   Q.  Okay.  And he writes -- a little father down in the second

21   paragraph, he writes:  I'm wondering about the rationale for

22   reducing new devices from ▮ percent to ▮ percent.

23        Do you see that?

24   A.  Yes.

25   Q.  And he's referring to the revenue share percentage in the

1    template RSA?

2    A.  Correct.

3    Q.  You and your team proposed carriers' RSA be reduced from

4    ■ percent to ■ percent?

5    A.  No.  My team recommended that we created a separate

6    marketing fund that U.S. carrier RSAs will use to have a

7    coordinated set of activities that we would run together in

8    order to better compete with Apple.  That required that the --

9    in order not to increase the overall spend that Google will

10   have, it required that we reduce the revenue share rate.

11   Finance suggested the rates, not my team.

12   Q.  Okay.  And we're going to get to your response to his email.

13   A.  Sure.

14   Q.  He says that the rate was reduced from ■ to ■ percent.

15   You're saying finance did that?

16   A.  They recommended the rate.

17   Q.  And -- but Mr. Rosenberg was concerned that with the lower

18   revenue share percentage, Google's rivals may have an opening

19   to gain some of the contracts, right?  I mean, that's what he

20   was writing about?

21   A.  I think so.

22   Q.  And then he goes on:  We didn't reduce new devices with

23   Samsung except to adjust for new European dynamics.

24        Right, that's what he wrote?

25   A.  Yes.

1    Q.  So the RSA for Samsung was not reduced; is that right?

2    A.  Yes.

3    Q.  Then he writes:  I think the search team will say that's

4    fine --

5         Now, who is the search team?

6    A.  That's the search product team.

7    Q.  Okay.  -- as long as -- and then he has a dash -- in the

8    device-by-device world we're entering, we don't increase the

9    chances that our economics on those devices are not competitive

10   versus what rivals are offering.

11        Do you see that?

12   A.  Yes.

13   Q.  So let's focus first on the "in the device-by-device world

14   we're entering."

15        Do you see that?

16   A.  Yes.

17   Q.  So this is in November 2020.  Leading up to November 2020,

18   Google sought platform contracts for the RSA; is that right?

19   A.  No.  Our -- our OEM agreements were device by device.  Our

20   At&T agreement was device-by-device at the time.  Our Verizon

21   agreement was not only device-by-device, but it also did not

22   have search exclusivity, so the world wasn't the platform.

23   Q.  You left out T-Mobile and Sprint.

24   A.  Yes.

25   Q.  T-Mobile and Sprint were platforms.

1    A.  Yes.  But Jamie's specifically asking in the first line of

2    his email, "as well as revised structures for AT&T and

3    Verizon."

4    Q.  And we'll get to each one.

5        The world that was being left behind, T-Mobile and

6    Sprint were platform exclusivity, right?

7    A.  Yes.  But they don't seem relevant for this email.

8    Q.  And in the world that was being left behind, AT&T was a

9    platform?

10   A.  No, AT&T was not platform.  It was a device-by-device.

11   Q.  But Google had sought platform; AT&T just didn't get it,

12   right?

13   A.  I don't know how to answer that.  It was a device-by-device

14   deal that we had with them.

15   Q.  So let me ask you just generally, before Google went

16   device-by-device in 2020, Google's general preference was for

17   platform devices -- to cover platform of devices for carriers;

18   isn't that correct?

19   A.  I cannot comment on Google's general preference.  All I

20   know is that when I joined Google, and from that on until 2020,

21   our deals with Verizon, AT&T were device-by-device.

22   Q.  We'll come back to that.

23       So then you spoke to the Google Search BD team about the

24   reduction in revenue share rates for carrier, right?  You spoke

25   to that team?

```
1    A.  Did I?

2    Q.  That's -- I'm not saying it says in the document.  I'm

3    asking you.  You spoke to Google's Search BD team about the

4    reduction in revenue rates for U.S. carriers?

5    A.  I personally do not remember speaking to them.

6    Q.  Well, did you tell them about the proposal to go from about

7    █ percent to █ percent?

8    A.  It was not my job.  It was the Android business development

9    team and the strategy team that supported them to work with

10   that team.  I may have been in the conversations, but I

11   wouldn't be the main representative for that deal.

12   Q.  So you were in the conversations where the Search BD team

13   was discussing reducing the revshare rate from █ percent to █

14   percent?

15   A.  It's possible.

16   Q.  I'm not asking you if it's possible, ma'am.  Were you

17   there?  Yes or no?

18   A.  Probably.  It's three years ago.

19   Q.  Okay.  So I am going to ask you very clearly.  Do you

20   recall having any conversation with the Search BD team around

21   this time of decreasing the revenue share rate in the U.S.

22   carriers' RSAs from █ percent to █ percent?

23   A.  To the best recollection, I could have been in those

24   conversations.

25   Q.  Okay.  So let's go ahead to your -- we're going to hand out
```

```
 1    your deposition.
 2    A.  Okay.
 3    Q.  Let's go to page 487, ma'am.
 4              THE COURT:  Which date?
 5              MR. DINTZER:  That's the 8-16-22, Your Honor.
 6    A.  I'm sorry.  Which page?
 7    BY MR. DINTZER:
 8    Q.  487.  487, line 8.
 9         Do you see it, ma'am?
10    A.  Yes.
11    Q.  Okay.  And were you asked this question and gave this
12    answer:
13         Question:  Do you recall having any conversation with
14    the Search BD team around this time about a decrease in the
15    revenue share rate in U.S. carrier RSAs from █ percent to
16    █ percent?
17         Answer:  Yes.  I believe we told them about the
18    proposal.
19         Did I read that correctly?
20    A.  Yes.
21              MR. POPOFSKY:  Counsel, are you using that to refresh
22    her recollection or for some other purpose?
23              MR. DINTZER:  That was impeachment.
24              MR. POPOFSKY:  Well, I would object that it was not
25    an inconsistent statement.
```

```
 1                THE COURT:  All right.  Well, I can tell the
 2    difference between the two.  Let's proceed.
 3                MR. DINTZER:  Thank you, Your Honor.
 4    BY MR. DINTZER:
 5    Q.  And the Google Search BD team was also concerned that with
 6    a lower revenue share percentage, Google's search rivals would
 7    outbid for Google for distribution, right?
 8    A.  Yes.
 9    Q.  So then in UPX150, you responded to Mr. Rosenberg, right?
10    That's what the top email is.
11    A.  Yes.
12    Q.  And you write:  Thank you, Jamie.
13         Do you see that?
14    A.  Yes.
15    Q.  I have been thinking about this a lot and making sure we
16    are not exposing Search/Assistant unnecessarily, and here is my
17    argument -- "my argument" -- in defense of █ percent revenue
18    share.
19         Do you see that?
20    A.  Yes.
21    Q.  You were arguing that Google should only pay █ percent
22    revenue share on the RSAs, correct?
23    A.  I was arguing that the new structure that we were proposing
24    would stand.
25    Q.  Okay.  And you didn't mention that structure here.
```

1    A.  Well, Jamie talked about the structure.

2    Q.  So let's look at what you say.  You write:  I looked at all

3    the sources of traffic on the device and what protections we

4    have.

5         Do you see that?

6    A.  Yes.

7    Q.  Now, this email is about MADA and RSAs, right?

8    A.  No.

9    Q.  No?

10   A.  What is described here is the traffic on the device covered

11   by search revenue agreement with Google.

12   Q.  My question was:  This email is about MADA and RSA?  If you

13   want to look at the next two lines, I believe they expressly

14   say MADA and RSA.

15   A.  It describes the search revenue share device.

16   Q.  And it discusses the MADA and the RSA.

17   A.  You think about the agreements.  There's a MADA provisions,

18   and then there is a search revenue share provisions that are

19   additive to MADA.  I was describing here the device that

20   describes the search revenue share-covered device.  So it will

21   have both the MADA and the search revenue share provisions.

22   Q.  And you write:  I looked at the sources of traffic on the

23   device and what protections we have.

24        Do you see that?

25   A.  Yes.

1    Q.  So -- and you use the word "protections."  You're talking

2    about protecting Google's searches on the device, right?

3    A.  I'm talking about the protections of the Google investment

4    that they make in sharing revenue with our partners.

5    Q.  So you're not -- when you use the word "protections" there,

6    you're not discussing Google's share of searches on the device?

7    A.  No.  I'm talking about the investment that we are making

8    and the money that we are spending to get elevated promotions

9    on search revenue share devices.

10   Q.  You don't say any of that in that sentence, do you?

11   A.  I don't.

12   Q.  Instead, what you say is:  I'm working with Shuting on

13   Yuki's team to develop this better, but here is where we are

14   landing roughly.

15           Who is Shuting?

16   A.  Shuting is the member of finance team.

17   Q.  And who is Yuki?

18   A.  She was her manager.

19   Q.  So you and Shuting were working on this analysis together.

20   Is that a Miss Shuting?

21   A.  It is Miss.  We were not working together.  So if you look

22   at the time when Jamie asked me this question, it was 8 a.m.,

23   and I responded at 4.  It was eight hours.  I asked Shuting:

24   Can you quickly send me the numbers of revenue share -- of

25   revenue distribution on the current RSA device?  And these are

```
1    the numbers that Shuting provided me.

2    Q.  And, so, number one:  MADA protects the widget on the

3    device.

4         Do you see that?

5    A.  I see that it's written.

6    Q.  You wrote it?

7    A.  I wrote it.

8    Q.  Okay.  And it says:  60 percent of the revenue.

9         Do you see that?

10   A.  I see that.

11   Q.  60 percent of search revenue on Android goes through the

12   Google Search widget; is that right?

13   A.  With caveat.  On search -- on device that is covered by the

14   search revenue share agreement, meaning that there's no other

15   search provider on the device, in that case, 60 percent of the

16   revenue flows through the widget.

17   Q.  Okay.  And you didn't put any of that here, right?  In the

18   document you --

19   A.  It's not here.

20   Q.  You just say:  60 percent of the revenue.

21        Right?

22   A.  Yes.

23   Q.  Okay.  And the finance team at Google gave you the

24   60 percent number; is that right?

25   A.  Yes.
```

1    Q.  So you relied on their number, right?

2    A.  Yes.

3    Q.  And you understood that -- from the finance team, that

4    60 percent of the search queries originated from that access

5    point, the widget, right?

6    A.  On the device covered by the search revenue share, yes.

7    Q.  The next thing you write is:  Samsung RSA ensures Chrome is

8    in the Hotseat, set as default browser on carrier devices as

9    well.

10          Do you see that?

11   A.  I see that.  Again, it only applies to a device covered by

12   the search revenue share agreement with the carrier.

13   Q.  Okay.  You don't write that?

14   A.  I did not write that, but that's -- the entirety of this

15   analysis describes a device covered by the search revenue share

16   agreement.

17   Q.  Ma'am, you keep answering questions I'm not asking.  My

18   question was:  Did you see that?

19   A.  Yes.

20   Q.  You wrote that sentence, correct?

21   A.  Yes.

22   Q.  Okay.  And that says:  30 percent of the revenue.

23          Correct?

24   A.  On the search revenue share device, correct.

25   Q.  So when you wrote that sentence, you were telling

1   Mr. Rosenberg, your boss's boss, that 30 percent of the revenue

2   on an Android device that Samsung made came from Chrome when it

3   was set in the Hotseat and set as the default; correct?

4   A.  Which would be true on search revenue share-covered device,

5   yes.

6   Q.  Search revenue share Samsung devices?

7   A.  No.  Carrier devices.

8   Q.  Okay.  You don't say that.

9   A.  I don't say that.

10  Q.  Then the next thing you say is:  Rest of the traffic is

11  10 percent.

12      That's the 60 plus 30 percent.  That leaves 10 percent,

13  right?

14  A.  Correct, that is 100 percent minus 60 minus 30.

15  Q.  The rest of the traffic is 10 percent, which would not be

16  protected on carrier devices in the absence of an RSA.

17      Right?

18  A.  Yes.

19  Q.  My question is, is:  You wrote that, right?

20  A.  Yes, correct.

21  Q.  So, in that sentence you're saying that after the

22  60 percent is protected by the widget and the 30 percent is

23  protected in the Chrome Hotseat, only 10 percent would -- your

24  words -- not -- would not -- would be not protected on carrier

25  devices in the absence of the RSA, right?

1    A.  I did wrote that.  It is a very flawed statement.

2    Q.  Okay.  You write:  This leaves, in the pretty generous

3    case, only about 10 percent of the search revenue of the device

4    to any rival who wants to outbid us -- who wants to buy us

5    out -- I'm sorry -- who wants to buy us out.

6         So, that 10 percent in what you wrote is the unprotected

7    10 percent that somebody else might outbid Google, right?

8    A.  Yes.  I wrote that, but it is a pretty -- it is a flawed

9    sentence because they would be buying us out on the device that

10   is already being paid by us through search revenue share, so

11   it's a bizarre concept.

12   Q.  But it wasn't so bizarre that you didn't write it to your

13   boss's boss, right?

14   A.  I did not think it through.  It's a flawed analysis.

15   Q.  Okay.  The next sentence:  Even if the rival monetizes as

16   well as Google, it will be hard for them to overcome our

17   █ percent revshare offer, as they would have to give up, at

18   the minimum, 150 percent of their monetization.

19        You wrote those words?

20   A.  Yes.

21   Q.  And when you wrote them, you believed they were accurate

22   because you were sending them to your boss's boss, right?

23   A.  Yes.

24   Q.  And what this says is that if a rival like Bing wanted to

25   try for this 10 percent, because the revshare that you were

```
1    offering was already ▆ they would have to bid more than they

2    could ever make on the device.  That's what you wrote, correct?

3    A.  That is what I wrote.

4    Q.  Okay.  And that's why you recommended dropping the revshare

5    from ▆ to ▆ percent would not, as Mr. Rosenberg was

6    concerned, expose the devices for your rivals.  That's what you

7    wrote?

8    A.  That is what I wrote.

9    Q.  Okay.  And then, what you did at the top is you wrote:  AC

10   privileged and confidential.  Rosie, I would appreciate your

11   advise on the below as well as outside counsel perspective on

12   this.

13        You wrote that, right?

14   A.  Yes.

15   Q.  Then, the very next thing you write is:  Thank you, Jamie.

16        Do you see that?

17   A.  Yes.

18   Q.  When you wrote that part at the top, you believed that this

19   would be protected by attorney-client privilege, right?

20   A.  That is not the consideration that I had.  The

21   consideration that I had was that we are discussing a revenue

22   share proposal that Kate and Rosie are advising us on, and I

23   also knew that they were working with outside counsel.  And,

24   so, because we are discussing the structure, it was important

25   to get the input from Rosie and Kate.
```

```
 1    Q.  No further questions on this document, ma'am.
 2              MR. DINTZER:  Your Honor, we pass the witness.
 3              THE COURT:  Permanently, or just for this document,
 4    for just -- for the closed session?
 5              MR. DINTZER:  No, we're done.
 6              THE COURT:  Okay.
 7              MR. CAVANAUGH:  No questions, Your Honor.
 8              THE COURT:  All right.
 9              Mr. Popofsky?
10              Again, we're just limited to this particular
11    document, then we'll reopen the courtroom.
12              MR. POPOFSKY:  Understood, Your Honor.
13              THE COURT:  Thank you, Counsel.
14                           CROSS-EXAMINATION
15    BY MR. POPOFSKY:
16    Q.  Good afternoon, Ms. Kartasheva.
17         I think you mentioned that this seven-and-a-half-hour
18    analysis was, in your words, "very flawed?"
19         Can you tell the Court why, at a high level?
20    A.  Jamie was asking me a question.  Imagine a device that is
21    not covered by Google revenue share.  What would a -- what
22    would that device look like and how much a rival would be able
23    to pay?
24              Instead of performing that analysis, I took the
25    current revenue share device and described that, and that was a
```

1    mistake.  I should not have done that.

2    Q.  So what, if you know, was the search configuration on the

3    devices for which finance provided you data?

4    A.  So these were the revenue share devices, meaning that it

5    was no promotion forward, no presence of alternatives rival

6    services, so there was only Google services promoted.  Chrome

7    was placed in Hotseat and made default, and that's what I

8    described.

9    Q.  And had you set up the thought experiment correctly, what

10    would have been the search configuration on the devices for

11    which you would have had data?

12    A.  I would have started with a MADA device on which we would

13    still have widget, but then, of course, it would be a rival

14    device where they promoting their services, so they would be

15    their services present.  They could have their widget on our

16    screen of the device, on minus one screen.  There could be an

17    icon of the rival service on the home screen of the device.

18    The rival browser -- like Microsoft has H Browser -- would be

19    on the Hotseat and made default, the Bing would be made default

20    engine.  So rival would be actively, obviously, promoting their

21    services there.

22    Q.  And let's put on 150 back up on the screen, if we could,

23    Andrew.

24        Let's look at .1, which Mr. Dintzer directed you to.

25    MADA protects the widget on the device, paren, 60 percent of

1    revenue.

2        Ms. Kartasheva, had you performed the correct analysis,

3    how, if at all, would that 60 percent number have changed?

4    A.  It would be significantly lower, again, because there were

5    be rival services that would be generating traffic to the rival

6    provider.

7    Q.  Let's look at .2, the one about Samsung RSA ensures Chrome

8    is in the Hotseat set as the default browser on carrier devices

9    as well, paren, 30 percent of the revenue.

10        Do you see that?

11   A.  Yes.

12   Q.  What is your perspective on that bullet today?

13   A.  Samsung RSA ensures nothing on the carrier ID devices.  In

14   fact, Samsung revenue share has an explicit carve-out that said

15   on carrier ID devices, Samsung can set the browser defaults to

16   whatever carrier tells them to.  And, of course, if it would be

17   a rival, RSA carrier will tell them to set it to the rival

18   provider.  And Chrome will be placed in the folder, as per

19   MADA, and that generates significantly less traffic to Chrome

20   than when Chrome is placed outside of the folder on Hotseat and

21   default.

22   Q.  And if you had corrected that mistake, Ms. Kartasheva, how,

23   if at all, would it have affected the 30 percent number in .2?

24   A.  Again, significantly lower.

25   Q.  If you corrected the mistakes in both .1 and .2, how would

1    that have affected .3?

2    A.  It would be at least twice that number, because I have seen

3    analysis from finance team that, for example, only accounts for

4    the change in the browser configuration, and they showed the 20

5    percent number.  So I would imagine that it would be at least

6    20 percent, if not higher.

7    Q.  And had you analyzed the device that was not protected by a

8    revenue share agreement, Ms. Kartasheva, how, if at all, would

9    that have affected the 150 percent number Mr. Dintzer pointed

10   you to?

11   A.  So 150 percent is just simply 10 percent, right, the number

12   3 divided by ▮ percent revenue share.  All right.  So, if we

13   are saying the number in 3 is not 10 percent but, say, 20

14   percent, 150 percent would be half of the -- what is stated

15   here.

16   Q.  Now, you conclude in this analysis that the ▮ percent we

17   are offering is the most attractive deal to the carriers.

18        Do you see that?

19   A.  Yes.

20   Q.  What, beyond this analysis, would have supported your

21   conclusion that ▮ percent was attractive to the carriers?

22   A.  Two things.  So, when we were working in our proposal of

23   creating the marketing fund, we looked at the absolute number,

24   or absolute dollars that we would spend with the carrier.  And

25   what we determined that even at this ▮ percent reduced revenue

1    share rate, in absolute dollars, the revenue share carrier

2    would get more money than they were getting in 2018, at the

3    original ■ percent rate.  So their absolutely payout would not

4    decrease, despite the revenue share rate decrease.  And the

5    fact that carriers ultimately signed the deal, so they clearly

6    found it attractive.

7    Q.  Ms. Kartasheva, are you aware of any benefits that Google

8    receives from RSAs that are not reflected in this analysis?

9    A.  Generally, it's my belief that the devices covered by

10   revenue share are able to better compete with Apple because

11   they provide heightened level of security updates and software

12   updates that bring new features to users.

13         They also promote services that have caused a

14   causation effect between usage of the services and loyalty to

15   Android, like Chrome, for example.  And generally promoting,

16   you know, better services.  And that enables Google to compete

17   better with Apple and have more Android devices.  And on

18   Android devices we make Play revenue, for example, besides just

19   the Search revenue.

20         THE COURT:  I'm sorry.  Can you clarify that?  Why is

21   it the RSA promotes that as opposed to just the MADA?

22         THE WITNESS:  So, in MADA, we have a very base level

23   of security obligations in RSA, and that was something that my

24   team had done, is we elevate these requirements and make sure

25   that the users get more frequent security updates and longer

1    software updates.  Meaning that you can keep your old device

2    for many years, and you will continue getting new software

3    features and updates so your device is fresh and -- you know,

4    as if you went and bought a new phone.

5         And that has been a longstanding marketing

6    communication from Apple, that, you know, their devices are

7    more secure and fresh, and that's why you should buy them.  And

8    only with the RSA we were able to fix that, because it was

9    expensive to provide these updates.  It costs money to the

10   carriers and manufacturers, and we wanted to support them and

11   RSA is the good vehicle to do that.  So that's just one

12   example.

13        And promotion of Chrome is another one where we ran

14   studies that showed us that the more frequently users engage

15   with Chrome, the more loyal they are to Android because Chrome

16   is a best browser on mobile, right?  And so having Chrome being

17   easily accessible and kind of, you know, just right at their

18   fingertips enables them to engage with a better service and be

19   more loyal to Google.

20   BY MR. POPOFSKY:

21   Q.  Following up on that set of questions from the Court,

22   Ms. Kartasheva, do you have an understanding of whether

23   complying with the RSA update requirements -- whether it's

24   security or providing Android operating system updates -- is a

25   prerequisite to the search revenue share payment as a general

```
 1    matter?

 2    A.  It is.  Because we want to make sure that the partner is

 3    equally brought into this idea of providing a better service to

 4    users.

 5           MR. POPOFSKY:  No furtherer questions, Your Honor, in

 6    closed session.

 7           THE COURT:  Okay.

 8           Any redirect?

 9           MR. DINTZER:  Yes, Your Honor.

10                    REDIRECT EXAMINATION

11    BY MR. DINTZER:

12    Q.  Ma'am, I'm going to ask you to turn in your binder to

13    UPX131.

14    A.  1 --

15    Q.  Let me know when you're there.

16           THE COURT:  What was the number again, Mr. Dintzer?

17           MR. DINTZER:  131, Your Honor.

18    BY MR. DINTZER:

19    Q.  Are you there, ma'am?

20    A.  Yeah.

21    Q.  This is a slide deck; is that right?

22    A.  Yes.

23    Q.  And it's titled MSFT.  That's Microsoft; is that right?

24    A.  Yes.

25           MR. POPOFSKY:  Your Honor, I'm sorry to interrupt,
```

2874

```
 1    but I believe this is beyond the scope of my cross-examination.
 2             MR. DINTZER:  I guarantee we will drop directly into
 3    his examination of 60 percent.
 4             THE COURT:  Okay.
 5    BY MR. DINTZER:
 6    Q.  It says --
 7             MR. DINTZER:  And this is Android, Your Honor.
 8    BY MR. DINTZER:
 9    Q.  -- Microsoft on Android scenarios.
10         That's what the cover page is, right?
11    A.  Yes.
12    Q.  It has your email on it; is that right?
13    A.  Alongside with the ones from my colleagues, yes.
14    Q.  You and your colleagues put this slide deck together?
15    A.  Yes.
16    Q.  This was December 2017; is that right?
17    A.  Yes.
18    Q.  And so this was a couple of years before you wrote the
19    email that we've been looking at in 2020, right?
20    A.  Yes.
21    Q.  And I'm going to ask you to go to page -- to the eighth
22    page.  It's marked 8250.  Let me know when you're there, ma'am.
23    A.  Yes.
24    Q.  Okay.  And the heading says:  Search and Assistant
25    Reasonably Well-Protected OOB.
```

```
 1              Do you see that?
 2    A.  Yes.
 3    Q.  Okay.  And "OOB" is out of box, correct?
 4    A.  Yes.
 5    Q.  And the screenshot on the left shows Google's -- it says,
 6    in the heading it shows --
 7              Yeah, can we make that -- that's great.
 8              And the picture on the left is the MADA; is that
 9    right -- is a screenshot of a potential outcome out of the
10    MADA; is that right?
11    A.  Yes.
12    Q.  And it shows the default home screen under that scenario,
13    correct?
14    A.  Yes.
15    Q.  So this would be a device with a MADA but not an RSA,
16    right?
17    A.  Yes.
18    Q.  And at the top of the page, at the top of that screen,
19    there's a Google Search widget, right?
20    A.  Yes.
21    Q.  Okay.  And that's required by the MADA, right?
22    A.  Yes.
23    Q.  Okay.  And now, the MADA, if you don't sign an RSA, permits
24    an Android OEM to preload a search competitor's widget on the
25    default home screen, in addition to Google, right?
```

1    A.  Yes.

2    Q.  And that's actually what's shown on this slide.  We've got

3    the Bing widget shown there as well, correct?

4    A.  I believe this shows a theoretical possibility of that

5    widget being there.

6    Q.  This is a hypothetical of what might happen?

7    A.  Yes.  Correct.

8    Q.  And, in fact, next to the Bing search widget is a comment

9    bubble that reads:  Additional search widget allowed but

10    unlikely.

11        Correct?

12    A.  Yes.

13    Q.  And at the bottom, at the bottom, under the -- under this

14    picture of the MADA, it says:  60 percent of search revenue

15    secured.

16        Right?

17    A.  Yes.

18    Q.  And this was not four or five hours.  This was two years

19    before you wrote that 2020 email, correct?

20    A.  I --

21    Q.  That's a yes-or-no question, ma'am.

22    A.  I did not put together that slide.

23    Q.  No, but you put together the deck that had the slide.

24    A.  I can point you to specific slides that I have contributed

25    to in this deck, and these are the only slides that I have made

1    for this deck.  Would you like that?

2    Q.  Ma'am, you've never seen a device that has a second search

3    widget; correct?

4    A.  Yes.  And that's why I agree with the statement that having

5    a second search widget on the exact same screen where our

6    widget appears is not likely; however, it can appear on any

7    other screen of the device or look different.

8            MR. DINTZER:  No further questions, Your Honor.  We

9    pass the witness.

10           THE COURT:  Okay.  All right.  Why don't we reopen

11   the courtroom, and we'll continue with Google's direct

12   examination in open session.  And just give us a minute so we

13   can get the media room lines reconnected.

14           (Pause.)

15           (The following proceedings were held in open court:)

16           THE COURT:  Why don't we get started.  And I'm sure

17   the media room will be connected any minute.

18                      DIRECT EXAMINATION

19   BY MR. POPOFSKY:

20   Q.  Good afternoon, Ms. Kartasheva.

21   A.  Good afternoon.

22   Q.  Counsel for the Department of Justice asked you a little

23   bit about your responsibilities during your time before your

24   current position.  What role, if any, did you have in the

25   finding when an alternative search service is under an RSA?

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                              Dated this 28th day of September, 2023

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25