```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA, et al., .
                                       .  Case Number 20-cv-3010
 4             Plaintiffs,             .
                                       .
 5        vs.                          .
                                       .  Washington, D.C.
 6   GOOGLE LLC,                       .  September 28, 2023
                                       .  1:00 p.m.
 7             Defendant.              .
     - - - - - - - - - - - - - - - - -

 8

 9                      ████  TRANSCRIPT OF BENCH TRIAL, DAY 12
                             (AFTERNOON SESSION)
10                BEFORE THE HONORABLE AMIT P. MEHTA
                     UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For DOJ Plaintiffs:         KENNETH DINTZER, ESQ.
                                  United States Department of Justice
14                                1100 L Street Northwest
                                  Washington, D.C. 20005
15
                                  MEAGAN BELLSHAW, ESQ.
16                                United States Department of Justice
                                  450 Fifth Street Northwest
17                                Washington, D.C. 20001

18   For Plaintiff State of
     Colorado:                    JONATHAN SALLET, ESQ.
19                                Colorado Department of Law
                                  Consumer Protection Section
20                                Antitrust Unit
                                  1300 Broadway
21                                Seventh Floor
                                  Denver, Colorado 80203
22

23

24                      -- continued --

25
```

```
 1    APPEARANCES (CONTINUED):

 2    For Plaintiffs State of
      Colorado and State of
 3    Nebraska:                      WILLIAM F. CAVANAUGH, JR., ESQ.
                                     Patterson Belknap Webb & Tyler LLP
 4                                   1133 Avenue of the Americas
                                     Suite 2200
 5                                   New York, New York 10036

 6    For the Defendant:            JOHN SCHMIDTLEIN, ESQ.
                                     BENJAMIN GREENBLUM, ESQ.
 7                                   Williams & Connolly LLP
                                     680 Maine Avenue Southwest
 8                                   Washington, D.C. 20024

 9    For Microsoft Corporation:    MATTHEW LARRABEE, ESQ.
                                     Dechert, LLP
10                                   1095 Avenue of the Americas
                                     New York, New York 10036

11

12

13    Official Court Reporter:      SARA A. WICK, RPR, CRR
                                     333 Constitution Avenue Northwest
14                                   Room 4704-B
                                     Washington, D.C. 20001
15                                   202-354-3284

16
      Proceedings recorded by stenotype shorthand.
17    Transcript produced by computer-aided transcription.

18

19

20

21

22

23

24

25
```

1                    C O N T E N T S

2                        TESTIMONY

3   JON TINTER          Direct Examination.............. 3230
                        Cross-Examination............... 3282
4

5

6                    EXHIBITS RECEIVED

7   UPX301................................................ 3248
    DX434................................................ 3285
8   DX454................................................ 3287
    DX457................................................ 3289
9   DX466................................................ 3292
    DX679................................................ 3294
10  DX2011............................................... 3322
    DX455................................................ 3333
11  DX472................................................ 3340
    DX452................................................ 3359
12  DX466................................................ 3361

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2          (Call to order of the court.)
 3               THE COURT:  Counsel?
 4          MS. BELLSHAW:  Good afternoon, Your Honor.
 5      So we conferred with Microsoft's counsel over lunch, and
 6  consistent with the Court's guidance, we are going to be able to
 7  proceed for at least some portion of the remainder of the exam
 8  in open session.
 9               THE COURT:  Perfect.  Thank you.  I appreciate the
10  collaboration.
11               MR. LARRABEE:  One request, Your Honor, if you might.
12  Any comfort you could give the witness about reconciling his
13  obligations to testify with his NDA obligations would be greatly
14  appreciated.
15               THE COURT:  Sure.  So this is not legal advice, but
16  most NDAs do have a provision that do allow you to make
17  disclosures if you're required to by court order.  And you are
18  required to appear here, so that this would be testimony under a
19  court order.
20               THE WITNESS:  Okay.  So if my partners call me, I'm
21  going to have them call you.  He told me I have to do it.
22               MS. BELLSHAW:  There are still a few topics that we
23  believe Microsoft has asserted are competitively sensitive that
24  we would ask to do -- or that we would do in closed session, but
25  we're going to proceed for as long as we can in open session.
```

1          COURT REPORTER:  Counsel, could you identify yourself

2     for me.

3          MS. BELLSHAW:  Yes.  My apologies.  Meagan Bellshaw

4     for the United States.

5          JON TINTER, WITNESS FOR THE PLAINTIFFS, RESUMED STAND

6                    DIRECT EXAMINATION (Continued)

7          BY MS. BELLSHAW:

8     Q.   Mr. Tinter, has Microsoft ever proposed working with a

9     distribution partner on privacy-related search innovations?

10    A.   Yes.

11    Q.   Can you describe any of those privacy-related innovations

12    that Microsoft has proposed?

13    A.   There's two that we've discussed at least that come to mind

14    that we sort of discussed with partners.  One was with Samsung.

15         Just as some background for that, Microsoft had done a

16    bunch of work in Bing on what it meant to put a search engine in

17    private mode, which fundamentally mostly changed the data

18    retention policies in terms of what queries got saved, you know,

19    how they were sort of used.  It changed a little bit.  If I

20    remember correctly, it may have changed some things on sort of

21    ad targeting.

22         But we created this concept of private mode, and that is

23    something we had deployed on our own.  Like, for instance, if

24    you are in a browser and you put that browser into private

25    mode -- most browsers have private -- most users don't actually

1    realize that if you -- even if the browser's in private mode, if

2    you go to a search engine, the search engine is not.

3         So we actually came up with a version of Bing that said if

4    your browser is in private mode, Bing will act like a search

5    engine in private mode.  If you have the Bing mobile app., I

6    believe you still can put it into private mode.

7         So at one point in time, we had explored with Samsung

8    whether there was an opportunity where they could essentially

9    create new search entry points on the device, which is an entry

10   point to a private version of search, and could Bing power that,

11   and we had explored that as a potential idea with Samsung.

12        The other thing we had talked about is we had talked to

13   Apple pretty extensively about this idea.  Obviously, they have

14   at various points in time strongly pushed privacy as a value

15   proposition for their phones, and they said you should buy our

16   phones because the extent to which we as a company respect your

17   privacy.

18        What we articulated to them was, hey, search doesn't really

19   do that.  Google collects a very large amount of information

20   about users when they use Google Search.  And so while your

21   phones themselves are very private, the default search

22   experience that you've created on your device is very not

23   private.  And we had talked to them about if we could do things

24   that would be more private.

25        So, for example, one of the ideas that we had was could you

1    do more processing on the device, not on the cloud.  Like so

2    what would it mean?  And again, we never -- we didn't get

3    super-deep into this, but what would it mean if you had to run

4    the ad targeting algorithm on the device versus on the phone?

5    What it would it mean if you had to run some of the

6    personalization algorithms to decide what search results to be?

7    If you kept more key data on the device and it never went to the

8    cloud, you could argue that that was more private.

9        And so we were exploring with them that we thought it was a

10   ripe opportunity for innovation.  It would have required a lot

11   of work on the search engine side to change the way search

12   worked, because it sort of assumes that all the data flows to

13   the cloud.

14       The ability to do that with the device manufacturer that

15   can control the operating system and how you do data handling

16   and processing in the operating system, we thought it was a

17   fruitful theoretical area for innovation.

18       Apple expressed some amount of curiosity about it.  We

19   talked about it a little bit, but it never came to fruition.

20   Q.   How does keeping a search query on the device, or running

21   search on device, relate to privacy?  Like, how does that help

22   with privacy?

23   A.   So, at the most basic level, if the -- if the device -- if

24   the query, if the history of the searches never leave it, then

25   the search engine doesn't have it.  Right?

1    So if you sort of say -- that description alive, you know,

2    my wife yells at me about it all time, which is I search for

3    something on Google or I search for something on Bing, and then

4    four days later, I see an ad for it when I've on X, Y, Z

5    website.  Right?  That's what happens when data goes to the

6    cloud.  Right?  We all knit these services together.  We do ad

7    targeting based on it.  So, you know, information leaks.

8    And if that data never leaves the device, you know, if I go

9    back to that same thing, which is if you do that search on the

10   device and it never leaves on the device, then you can't target

11   based on that search later as an example.  That's one example of

12   how it's more private.

13   And again, that's a lot of, you know, how Apple has always

14   positioned their devices.  Right?  We have these very, very

15   powerful phones.  Because they are powerful, we don't have to

16   send data off to some less trustworthy cloud.

17   Q.   And is this type of on-device search privacy something that

18   Microsoft has been able to develop on its own?

19   A.   No.  We always felt like we would need deep collaboration

20   with a device manufacturer, because it would involve how you did

21   things on the operating system.

22   You also had to have a big enough distribution for it to

23   make it worthwhile; right?  So we couldn't do it on our own.

24   Like, given the app. store app. framework, we couldn't ship a

25   device, as the technical folks have explained it to me, that

1  have that level of privacy value proposition just through the

2  app. store.  We would need it to work with either the OS or the

3  device manufacturer.

4  Q.   And, Mr. Tinter, you mentioned private browsing mode

5  proposal that Microsoft had made to Samsung.  What was Samsung's

6  response to your private browsing mode proposal?

7              MR. GREENBLUM:  Objection.

8              THE WITNESS:  Maybe I wasn't precise --

9              THE COURT:  Hang on, Mr. Tinter.

10      The objection is?

11              MR. GREENBLUM:  On hearsay grounds, Your Honor.

12      Can we just have a standing objection on that on the same

13  basis --

14              THE COURT:  You all have asked questions about what

15  folks have said out of court, too.  So, as I said, it's got to

16  go both ways.

17              MR. GREENBLUM:  Understood, Your Honor.  I won't stand

18  up.  That's something we can work out in the briefing we're

19  going to submit to you.

20              THE COURT:  That's fine.  Thank you.

21      You can answer, Mr. Tinter.

22              THE WITNESS:  First of all, to be precise, if I said

23  "proposal," I apologize.  I don't know that that was -- if

24  proposal is the word that I would have used.  We would have much

25  more informal brainstorming conversations where we would say to

1    Samsung, What if we did this, what if we do that, would that be

2    interesting, would it not be interesting.  There's a formality

3    to proposal that I don't think adequately characterizes the

4    conversation.  It was more ideas that we had that we brought

5    forward.

6        We always had a very strong desire to work with Samsung for

7    the dynamics that I talked about this morning.  It wasn't quite

8    as big as Apple, but we thought that could be a very, very big

9    opportunity.

10       Samsung was always pretty clear with us about their level

11   of concern around working with us on search and what the impact

12   of working with us on search would be on their relationship with

13   Google, which is obviously a multifaceted sort of slightly

14   complicated relationship.

15       I still remember, it sticks with me, because it's one of

16   those funny things you hear in your career that will last with

17   you forever, the way the CEO of Samsung at the time, D.J. Koh,

18   in a meeting with Satya and I described the Google relationship.

19   He's like, in any marriage, there are three rings:  There's your

20   engagement ring, your wedding ring, your suffering.  He's like,

21   we're now in the suffering stage.  But the implication there

22   being that this is a tense relationship, and we're worried, if

23   we get too close with Microsoft on search, that it will be made

24   worse.

25       And so we were mostly with Samsung looking for things

1    around the margins that would not have been purely disruptive,

2    you know, disruptive to kind of that core Google deal.  So we

3    thought -- I think the conversation I had with Samsung was, hey,

4    could we do this private thing, would that be of interest to

5    you, do you think that's something that is sort of adjacent

6    enough that we could sort of get away with it.

7         That's the spirit in which it was brought up, and they

8    ultimately didn't pull on it.

9    Q.   And, I guess, taking a step back and focusing on Samsung,

10   can you describe sort of at a high level for the Court what

11   types of conversations you've had with Samsung regarding search?

12   A.   So as background for people who may be less familiar,

13   Microsoft has a pretty deep partnership with Samsung where we

14   provide the productivity services on their devices.  So every

15   device that they ship comes with Outlook as the mail client; it

16   comes with Office preinstalled.  OneDrive, which is our cloud

17   file storage, is actually integrated in with the photo gallery

18   on the phone.  So the devices -- so we've always had this pretty

19   deep, what we've described with Samsung as the productivity

20   partnership, that we've been working with them for several

21   years.

22        We have obviously always looked for ways to deepen that,

23   and I have pretty regular interactions with my peers at Samsung.

24   Satya as our CEO would have a semiregular cadence of meetings

25   with the CEO of Samsung to again talk about how the overall

1    partnership is going.  We would often explore what are new

2    things that we could go do together.  And in that context, we

3    would, you know, occasionally brainstorm things like the private

4    search idea.

5         I think Satya was always very, very focused on, you know,

6    how do we get search into the relationship, we have such a good

7    relationship, how do we try and get search included in it.

8    Q.   And over the course of your discussions with Samsung, have

9    you come to any conclusions about the likelihood that Microsoft

10   would be able to negotiate a deal with Samsung where Bing was

11   set as the default search on any of the access points on Samsung

12   phones?

13   A.   The conclusion that I had come to was that Samsung would

14   not be willing to enter into a partnership, which changed the

15   kind of what I will call the big entry points, the browser, the

16   widget, the preinstalled search app.

17        And that was a function of, you know, how they communicated

18   to me they were managing the Google relationship and what risks

19   they were taking.  What they communicated to me was that they

20   believed their ability to even negotiate a license agreement

21   that allowed them to do that, as we talked about this morning,

22   you sort of -- they would have needed to negotiate some MADA

23   that allowed them to shift search.  And I ultimately came to the

24   conclusion that that was not going to happen.

25        Which again, the reason I pushed on private and I pushed on

1    sort of other things is I always said, oh -- the coaching I gave

2    to the team and that I tried to give as we had executive

3    strategy conversations was one of let's treat the MADA as a

4    fixed constraint.  Let's treat the fact that Samsung will have

5    Chrome on the device with Google as the search, will have Google

6    as the search in the Samsung Internet application, will have the

7    widget there, and then let's see if there's other things we can

8    figure out how to do.

9        And even in exploration of those other things, there

10   continues to be, you know, massive overhangs of, you know,

11   Samsung's concern about we don't want to make Google mad, we are

12   highly dependent on them for product collaboration on Android,

13   we need them to do these things for us over here, this over

14   there.  And they are very, very -- you know, to this day, even

15   as I've been exploring ideas with them in the last couple of

16   weeks, they're constantly like, hey, Jon, we've got to manage

17   this Google relationship, we have to manage it very carefully.

18   Q.   Mr. Tinter, if I could please have you turn to UPX302 --

19   A.   Yours is the white one; right?

20   Q.   Yes, it is.  302 in your binder.

21   A.   I'm sorry.  Say that again.

22   Q.   UPX302.

23   A.   Correct, yes.

24   Q.   This document has been admitted into evidence, and we are

25   able to show a copy of it on -- a redacted copy of it on the

1    screen.

2    A.    Yep.

3    Q.    Mr. Tinter, is this an e-mail from you to just Mr. Nadella

4    dated December 15, 2019?

5    A.    Yes, it is.

6    Q.    Do you recognize this e-mail?

7    A.    Give me a chance to.

8          Okay, yes, it is an e-mail I sent Satya.

9    Q.    Why did you send UPX302 to Mr. Nadella?

10   A.    So I think it probably explains it there directly in the

11   e-mail.  We had an upcoming executive meeting with Samsung

12   including -- D.J. in here was D.J. Koh, who I believe was the

13   CEO of Samsung Mobile at the time.

14         One of the roles I play in my job is to advise him on how

15   we approach executive meetings, and it was very clear to me that

16   the way we had been approaching the meetings with D.J. to date,

17   which was being pretty aggressively pushing D.J., I really want

18   to work with you on search, was not effective.

19         So this was me providing counsel and guidance to Satya to

20   say let's try a different approach.

21   Q.    If you would look at the first line of the second paragraph

22   of your e-mail in UPX302, you wrote to Mr. Nadella, "We need to

23   take a different approach to how we talk to them about search

24   and browser."

25         Does the "them" there refer to Samsung?

A.    Yes.

Q.    "Right now we are stuck."

Does that reflect your advice to Mr. Nadella about your understanding of Microsoft's position with Samsung on the negotiations over search?

A.    No.  So again, I want to be very clear, there was no negotiation over search.  This was more -- we were in a dynamic, as I described kind of in the entirety of the paragraph, but just so you understand, we would have an executive meeting. Satya would meet with D.J.  He would say, I really want to work with you on search and browser, and D.J. would say, yes, we should explore it.  And D.J. would go down to his team and say go work with Microsoft and explore this, and then we would have people go and sort of have conversations.

As I relate in the thing, I was getting a lot of feedback from Samsung that says we're not going to do this.  D.J. does not want to -- he respects Satya too much and is too polite to come out and say no.  Can you get Satya to stop asking because we get stuck in these not productive cycles.  He asks; D.J. puts down.  We spend a bunch of time and come to the same conclusion every time.

I think the whole paragraph kind of describes the coaching I was giving him and why.

Q.    If you look at the third paragraph, you write, "I have spent some time outlining a more pragmatic short-term approach

1    that gets us working with them on search, browser ads, and news

2    now, while leaving the door open for a bigger search deal in the

3    future."

4        You wrote that; is that right?

5    A.    That sentence?

6    Q.    Yes.

7    A.    Yes.

8    Q.    And why were you proposing a more pragmatic short-term

9    approach with Samsung?

10   A.    So again, it goes back to sort of two things.  One is the

11   dynamic I described in the prior paragraph that we just talked

12   about.  We weren't going anywhere.  We were stuck.  Right?

13       The second thing actually goes back to some of the logic

14   that you and I talked about this morning when we talked about,

15   hey, why did you guys do the Siri and Spotlight deal with Apple,

16   which is, what are the experiments we can do, what are the

17   things that we can do, you know, adjacency on the margins that

18   may work.

19       Because this was so important to us that we had to sort of

20   simultaneously go for the big things, the search default deal on

21   Apple, the search default deal on Samsung, as well as just, you

22   know, drain every available option and alternative to try.

23       And so what I really was doing was saying okay, the big

24   thing's not going to happen, so let's brainstorm some smaller

25   things that we may get traction on.

```
1    Q.   If we could please turn to UPX -- actually, I'm sorry.

2    Before we do that, do you see in your e-mail in UPX302, it looks

3    like you share -- you attach a memo to Mr. Nadella in your

4    e-mail?

5    A.   Yes.

6    Q.   Do you see that?  If you could please turn to UPX133.

7         And this one we will not put on the screen.

8    A.   You said 0133?

9    Q.   Yes.  Thank you.

10   A.   Yes.

11         MS. BELLSHAW:  Your Honor, UPX0133 is also in

12   evidence.

13         THE COURT:  Okay.

14         THE WITNESS:  Okay.  Yeah, I see it.

15         BY MS. BELLSHAW:

16   Q.   So looking at the first section of -- sorry.

17        Is this the memo that you attached to your e-mail in

18   UPX302?

19   A.   Yeah, I believe so.

20   Q.   And who drafted this memo?

21   A.   I don't remember if I drafted this myself or I drafted it

22   with people who are on my team.  But ultimately, I was deeply

23   involved in the drafting and was the one who sent it to Satya.

24   Q.   And what was the purpose of sending the memo in UPX133 to

25   Mr. Nadella?
```

1    A.    So, it was in the context of the e-mail I sent, which is,

2    hey, we need to do a different approach.  And so to get --

3    achieve that, I knew I needed to kind of accomplish two or three

4    things, which is, one, I needed to educate Satya about how -- at

5    a level of detail about how the search on the actual devices

6    work.  Because if you don't carry the device every single day,

7    what does it look like out of the box, you know.  By the time

8    Satya gets a phone, it's -- the Microsoft tech people have taken

9    all the Google stuff off it and put the Microsoft stuff on.  So

10   it's like, hey, here's what these devices actually look like in

11   the real world.

12       I had explained to him my understanding and interpretation

13   of the motivation of Samsung, a history of the conversations,

14   what's going on, what is the feedback that is heard to me that I

15   am relaying to him.

16       And then I want to say, but hey, we're not giving up,

17   here's some things we're going to go try, and maybe you can

18   pitch those things we're going to go try.

19   Q.    So looking at the first paragraph or the first section of

20   UPX133, "Current search adds news and browse experience on

21   Samsung devices."

22       Just at a high level, what was the purpose of this section?

23   A.    That was what I just described, to sort of say in the real

24   world, what does one of these devices look like and how does it

25   work.

1    Q.   And what was the basis for the information that you

2    included in this first section of UPX133?

3    A.   So if I remember -- and part of the reason I'm doing this

4    is because I'm seeing later in the memo we have some pictures,

5    was I think this was a combination of me asking my team that

6    dealt with Samsung every day describe what Samsung does, and

7    let's go walk into a couple retail stores and look at the

8    devices and take pictures and make sure we are right.

9    Q.   If you would look at the second section in the memo, it's

10   partway down the page on UPX133.  There's a section

11   entitled "overview of past partnership discussions."

12        Do you see that?

13   A.   Yes.

14   Q.   Focusing on that first paragraph -- we're not going to put

15   the specific language on the screen, but does this paragraph and

16   this section accurately represent the past discussions that

17   Samsung -- or that Microsoft had had with Samsung about Bing

18   Search?

19   A.   Let me just read the paragraph again, please.

20        Yeah, this was a summary of either conversations with

21   Samsung that I directly had or conversations with Samsung that

22   members of my team had had and briefed me on.

23        So this was my -- this was my belief on, yes, the history.

24   Q.   And was it your understanding, based on these discussions

25   with Samsung and the other information that's reflected in

UPX133, that Microsoft could have competed for the search

default on Samsung phones by offering Samsung more money?

THE COURT:  Sorry.  Could you rephrase the question?

MS. BELLSHAW:  Sure.

BY MS. BELLSHAW:

Q.   Was it your understanding that Microsoft could have

competed for the search default on Samsung devices by offering

Samsung more money?

A.   Sorry.  There was like double-negatives there, but I think

I understand what you're asking.

I did not believe that it was going to be an economic

decision.  In fact, I believed that in some ways, even if the

economics were superior of working with Microsoft, they would

have not moved off Google.  And that was a function both of

direct feedback that they had given me, along with -- it's

interesting.  One of the things that I said to Samsung and --

let me take a step back, or what I said to Samsung won't make

sense.

There was this interesting dynamic we observed as we went

through the various conversations with Apple, which is they

would be on these multiyear partnership cycles.  We would tend

to talk to Apple in the last year of their multiyear partnership

with Google.  We were making increasingly aggressive bids.

They were continuously -- they were continuously kind of

renegotiating with Google then.  And you could see in the kind

1    of report of Google financials that they were paying more as

2    they were renewing this agreement.  In fact, I think a couple of

3    times the Google CFO actually even said on earnings calls,

4    vaguely referred to renegotiated agreements or the impact of the

5    shift to greater levels of mobile.

6        So very clearly, even though we weren't winning, we were

7    helping Apple get more money, and it was costing Google more

8    money.

9        And I remember actually describing to -- because I had

10   gotten friendly with some of the folks at Samsung.  I remember

11   describing to them the dynamics, and I said, let me make you a

12   bid.  Like if nothing else, let me give you a huge number, and

13   then D.J. can take that number to Sundar, and maybe you guys can

14   get a little bit more money like Apple is.  If you're not going

15   to give me search, at least let me help you make search better

16   for you.

17       And that was kind of when they were like, you know, Jon,

18   it's not even worth it, we don't even want to go down this path.

19   Q.   If you would turn to the last page of UPX -- I'm sorry, the

20   second page of UPX113, do you see the heading "pragmatic

21   approach to partnership"?

22   A.   Yes.

23   Q.   Are the ideas -- do you see those three ideas listed here?

24   A.   Yes.

25   Q.   Are these ideas some of the sort of smaller, around the

```
1    margins ideas that you were talking about earlier that Microsoft
2    could think about pursuing with Samsung?
3    A.   Yes.
4    Q.   And has Microsoft been able to negotiate -- I'm sorry.
5         Has Microsoft successfully implemented any of these ideas
6    reflected in UPX113 with Samsung?
7    A.   No.
8    Q.   Have you actually discussed each of the ideas with Samsung?
9    A.   We definitely have discussed idea number 1.  We definitely
10   have discussed idea number 2.  We definitely discussed idea
11   number 3.
12   Q.   Mr. Tinter, if you would please turn to UPX301.
13        And again, this is a document that we're not going to put
14   on the screen.
15        Mr. Tinter, is UPX301 an e-mail that you sent to
16   Mr. Nadella and others at Microsoft?
17   A.   Yes.
18   Q.   On the date reflected there on the e-mail?
19   A.   Yes.
20        MS. BELLSHAW:  Your Honor, we would move to admit
21   UPX301 into evidence.
22        MR. GREENBLUM:  I believe it's in evidence, but no
23   objection.
24        THE COURT:  Okay.  Thank you, Counsel.
25        So it will be admitted if it's not already.
```

1          (Government Exhibit UPX301 received into evidence.)

2              MS. BELLSHAW:  Thank you, Your Honor.

3              BY MS. BELLSHAW:

4    Q.   Mr. Tinter, in the first sentence of UPX301, at the end of

5    the sentence, do you see a reference to the Samsung team?

6    A.   Yes.

7    Q.   Who, if you recall, was on the Samsung team that you were

8    having discussions with as reflected in UPX301?

9    A.   So most likely, it would have been a gentleman named Jay

10   Kim.  So, Jay was the individual who was my counterpart at

11   Samsung who I tended to have most of my conversations with.

12        Jay worked for a gentleman named Patrick Chomet.  So

13   Patrick reported to D.J., Jay reported to Patrick.  Patrick may

14   have been potentially been involved in some of those

15   conversations.  It may have been some folks on Jay's team.  It

16   may have been some of the engineering and product leaders that

17   they work with.

18        But that's the -- my -- based on this note, my assumption

19   is it was most likely Jay.  A lot of what happened to these

20   dynamics was Satya would meet with D.J., and then Jay and I

21   would have to do a follow-up.  One of the first follow-ups is,

22   you know, what happens when you have a conversation in English

23   with someone whose English is not their first language, so it's

24   a little bit, what did you guys hear, oh, we didn't mean that,

25   we meant that.  That tended to be me and Jay who would have

1    those conversations.

2    Q.   And are Mr. Koh, Mr. Chomet, and Mr. Kim all located in

3    Korea?

4    A.   Mr. Kim is located in -- I'm sorry.  Mr. Koh is located

5    in -- I don't know where he's located now.  He's since retired

6    from that role.  At this time, he was in Korea.

7         Mr. Kim was at the time located in Korea.  I think he may

8    have recently relocated to someplace else.  I don't remember

9    where.

10        And Mr. Chomet, I believe his family lives in London, and I

11   think he's located in London but commuted periodically to Korea.

12   Q.   Okay.  Thank you.

13        Has Microsoft ever proposed to Samsung -- withdraw that.

14        Has Microsoft ever had discussions with Samsung about

15   preloading the Edge browser on Samsung devices?

16   A.   Yes.

17   Q.   And can you tell the Court briefly what Microsoft's

18   proposal for browsers on Samsung devices was?

19   A.   Yeah.  So again, I think we had discussed probably two

20   different ideas with them.  Idea number 1, which was always our

21   preference, was -- sorry.

22        Taking a step back, and then we're treading a little bit on

23   the memo we described earlier, when you get a Samsung device

24   today, it has two browsers on it.  It has a Chrome browser, and

25   there's an application called Internet, which is a browser built

by Samsung.  Chrome, as we understand it, as has been

represented to us by Samsung, they're required to install under

their agreements with Google.

We had proposed to them on multiple occasions, why don't

you replace Edge with -- I'm sorry, why don't you replace your

Internet browser with Edge.  Right?  And the basics of our

argument to them was, hey, we have a team that is this big

that's working on the browser, it's working across platform,

this is -- it's twice the size as your team, we're innovating

faster, we're sort of doing more.

And the reason we did this is, if you take a step back,

there was a point in time where Samsung actually gave up

their -- they used to ship a Samsung mail app. and Gmail app. on

the phones, and then they gave up their mail app., and then they

started shipping Gmail and Outlook as a default.

And the reason they did this is, the argument we basically

made is, it's core to Microsoft's business to write mail

application software; it's not core to your business.  We're

going to invest more; we're going to innovate more.  We're going

to do a better job.  Your customers are better off with our mail

app. than yours.  Samsung ultimately came to that conclusion and

replaced the mail app.

We made the same basic argument to them about browser, like

we're going to invest more, we will innovate more, we are more

likely to do it, you should replace Samsung Internet browser

1    with Edge.

2         They decided they did not want to do that.  They were very

3    clear they did not want to do that.

4         We had a brief discussion with them of just installing

5    Edge.  There is a Microsoft folder on the device -- Samsung

6    devices that includes Microsoft applications; maybe we should

7    put Edge in it.

8         Their feedback was, hey, we get a lot of pressure from our

9    customers, we get a lot of pressure from our channel and

10   distribution partners, we get bad reviews in press that we

11   preinstall too many apps. on our devices, we already have two

12   browsers, we don't really need a third one, and so we're not

13   willing to either replace ours with yours or just ship yours as

14   a third option.

15   Q.   And was part of the discussion around preloading the Edge

16   browser on Samsung devices that Edge would be preset to Google

17   as the -- sorry, Bing as the default search engine?

18   A.   So -- no, and I will explain why.

19        Our understanding, as Samsung had sort of represented it to

20   us, which again was consistent with what we believed as we went

21   through the MADA work, was that they had independent

22   obligations.  Right?  So they had an obligation to ship Chrome,

23   and then they independently had an obligation that every browser

24   on the device had to have Google as the search default.

25        So even if they made the decision -- which is why on the

1    device today you have Chrome with Google and you have Samsung

2    Internet with Google.  And so even if was Chrome and Edge or

3    Chrome and Samsung Internet and Edge, all of those devices would

4    have had Google.  So I think even as we were talking about this,

5    we were talking about a compromise that would have had Edge

6    basically with Google on it.

7    Q.    Okay.  I'd like to ask you one more set of questions about

8    your discussions with Apple.  Earlier, you talked about

9    discussions that you had with Apple about Bing's international

10   search quality.

11        Do you recall that?

12   A.    Yeah.

13   Q.    Did Microsoft provide Apple with an investment strategy to

14   improve Bing's international quality over the course of its

15   discussions?

16   A.    So one of the -- and I think we talked about this a little

17   bit this morning.  The frequent conversations, topics of

18   conversation that came up in discussions with Apple was Bing's

19   quality, is Bing good enough to put on our phones.

20        And I think, you know, there was some acknowledged product

21   gaps, and I think in particular when you went to mobile and in

22   particular when you went to international there were real

23   acknowledged product gaps.

24        And one of our beliefs always was that a major contributor

25   to the quality gap was the lack of scale.  Right?  Again, we

1    talked about that dynamic a little bit this morning.

2         So what we would argue to Apple was, A, if we had access to

3    your query volume, we could then use that scale to rapidly

4    improve the quality of Bing and ship a quality product.

5         You then get into a little bit of a chicken and egg

6    problem, which is, we need the scale in order to improve, they

7    don't really want to make the switch until you improve.  Right?

8         And that's the -- one of the tension points that we were

9    trying to resolve.  And we kicked around a bunch of different

10   ideas.  One thing I think we said, hey, could you give us an

11   offline data dump of all the queries, so could we see all the

12   queries, and could we then use the access to that scale to

13   improve the search engine before you make the switch.

14        And I think ultimately, there was a combination of they

15   didn't have access to all of the queries, there were privacy and

16   data handling, so we said that wasn't working.  But that's just

17   one example of things we were brainstorming.

18        What we did believe was we had a playbook that once we had

19   the scale, we knew what investments we needed to make, we knew

20   what engineering work we needed to do that we could improve

21   relatively quickly.  And so one of the arguments -- you know,

22   one of the arguments we had with them is, we said, hey, look,

23   you all have experience in your own mapping product of shipping

24   a product that initially wasn't great, but as soon as you

25   started getting usage and taking advantage of scale, you pretty

rapidly improved it, and then you ultimately, you know, ended up with a decent solid product.

So we could repeat your experience here.  Yes, Bing may be less than optimal in France out of the gate, but Apple Maps was less than optimal in France out of the gate.  And you'll have the same basic dynamic; people continue to use the defaults.

So that was one of the arguments we were making to them.

The other arguments we were making to them is, we said, look, there's going to be a decently long lead time.  Right? And I think we were talking about, you know, from the time we signed a deal until the deal got announced, it could be 12 months, from the time we signed a deal until devices with the new Bing/Apple search experience were in market could have been be another 18 -- could have been 18 months.

There was time when we said there are things that we will start doing during that intermittent period of time, like go license more local data in France so, you know, you will have a better quality with local search results.  So those were the things we can do.

And we tried to put that -- we kind of called it a playbook, like a product quality improvement playbook was the way we described it internally.  And so yeah, we did put that in front of Apple on multiple occasions and say, hey, yeah, this is what we're going to go do.

It was all around trying to get them confident that they

1    could make the switch, and even if there was a short-term dip

2    after they make the switch, we would be able to close the gap

3    fast enough.

4    Q.    If you would please turn to UPX797.

5          And again, this is a document we're not going to put on the

6    screen.

7          Do you recognize UPX797?

8    A.    Yeah.

9    Q.    Is UPX797 a part of this strategic playbook or strategic

10   investment plan that Microsoft provided to Apple during the

11   course of the discussions in the time period reflected in the

12   e-mail on UPX797?

13   A.    Yeah.  So what this e-mail was was we had had a meeting

14   with several executives at Apple.  They had asked several

15   questions around what would you do, how would we -- you know,

16   what investment would you need to make, you have our scale, what

17   are you going to do with this, how much money are you going to

18   have to spend.  So this was sharing our view of the playbook

19   with them.

20         To understand part of what this is is we brought the -- the

21   discussions we had with Apple in 2018 were a little bit

22   different in tone and tenor than the discussions that we had had

23   with Apple previously.  And part of it was the CEOs had had a

24   meeting in mid-2018 where they said, hey, let's go look at

25   search again.  And they said as a mental framework, before we

1   get into detailed negotiations around dividing the pie, let's

2   get a common understanding of what the pie looks like and how

3   big it was.  And so we actually were going through an exercise

4   with Apple that says if you thought about Bing and the Apple

5   search business as a single business, what would that look like,

6   how much revenue would it have, what was the cost structure

7   associated with it.

8       And so one of the questions in there was, you know, to take

9   advantage -- you couldn't just get the scale and then just

10  magically fix.  You get the scale, and now that you had the

11  scale, you would have to make engineering investments to take

12  advantage of the scale.  And so that gets reflected in this

13  shared P&L, and, you know, so this was our saying, hey, look,

14  here's the amount of engineering we would need to spend, here's

15  what these people would do, all in the spirit of how do you then

16  take advantage of the scale.

17  Q.   And in your view, are the -- is the investment plan that's

18  reflected in UPX797, would it make sense for Microsoft to

19  undertake that level of investment in international search

20  quality absent the increase in scaled query volume from a deal

21  with someone like Apple?

22  A.   No.  So -- because again, you have to understand, there's a

23  couple of things going on here.  So for example, one of the

24  reasons why scale matters, right, is a lot of search is

25  experimentation.  Right?  I try tweaking the algorithm.  I try

tweaking the page treatment.  So you do little experiments.  You look at user reactions to the experiments, and those experiments allow you in an iterative way to improve quality.

The great thing about improved scale is you have the capability now to run more simultaneous experiments.  If the minimum size of an experiment is 2 and you have 100, then you can run 50 experiments.  If the minimum size of an experiment is 2 and you have 1,000, then you can run 500 experiments.  Right?

And so one of the reasons we were so excited about getting access to query volume at Apple's scale was you could run more simultaneous experiments.  You still need engineers to write the code, build the experiments, generate the experiments, and realize them and use them to improve the product.

So, of course, it doesn't make sense to hire those engineers if you don't have the query volume to run the experiments on.  Right?  So in a lot of cases, like, there would have been nothing for these people to do, because what they were doing was working on the advanced scale.

The second thing I will say is there were some things here that just -- that just made no financial success -- I'm sorry, financial sense, right, which is, you know, in a world where your business in an individual country is sort of size X, at some point in time investing Y where Y is significantly higher than X sort of ceases to make sense.

We invested ginormous amounts of money in Bing over the

1    years.  I think you've seen kind of the cumulative loss was in

2    the 10s of billions of dollars.  The actual cumulative

3    investment was a multiple of that, because those cumulative

4    losses don't even include the investments that get offset by

5    revenue.

6        But even there, there were some things that, just given the

7    size of the business in France, the size of the business in

8    Germany, it didn't make sense to do a lot of very

9    country-specific work.

10        But if you had access to the scale from Apple, all of a

11   sudden you had a meaningful-sized business.  You could amortize

12   the investment costs over a larger business, and it made more

13   financial sense.

14        MS. BELLSHAW:  Your Honor, at this time, we've

15   completed the questions for the open session.  I have just two

16   documents I would like to cover in the closed session that do

17   involve financial numbers and revenue projections.

18        THE COURT:  Okay.  So it sounds like this will be 15

19   minutes, 20 minutes?

20        MS. BELLSHAW:  I think probably 10 minutes or so.

21        THE COURT:  And then we will have cross.

22        All right.  So we're going to go into closed session for,

23   it seems like, maybe a half hour or so at most.  So if you're

24   not associated with the parties or with Microsoft, I will ask

25   you to please leave the courtroom, and then we will let you back

1    in shortly after that.

2         (Pause.)

3         (The following occurred under █████

4              THE COURT:  All right.  Thank you for your patience,

5    everyone.

6              MS. BELLSHAW:  Thank you, Your Honor.

7              BY MS. BELLSHAW:

8    Q.   Mr. Tinter, would you turn to UPX115 in your binder.

9    A.   Yes.

10   Q.   And UPX115 has been admitted into evidence.

11        Do you recognize this document?

12   A.   Can I take a moment or two to flip through it?

13   Q.   Yes.

14   A.   Just because my toner copy is really bad, can I ask you to

15   put the page that says "Bing/A P&L" up on the screen?

16        I think I know what this is, but there's one thing I want

17   to check that's on that page.

18   Q.   Okay.  I believe that's page 6.

19   A.   That's page -- I think it's page 6.

20        Sorry.  Shit.  That's not what I was looking --

21   Q.   Mr. Tinter --

22   A.   The reason I'm asking, what I'm trying to do, just so you

23   understand is, I'm trying to -- I know what this document is.

24   I'm just trying to place it in time, and I thought one of these

25   places had -- can you go one more page forward, please?

1      Okay.  Yeah.  So this was -- sorry, I just needed to place

2  the document in time.

3  Q.   No, of course.

4  A.   This was a internal presentation we had.  So it was used

5  for Microsoft internal decisionmaking around what the potential

6  economics of the Apple partnership would look like, and this was

7  during the 2016 Apple negotiations.  And that's the reason I was

8  trying to place it in time, was I needed to see where it was.

9      You can go back to the first page.  This was just the page

10  that had dates on it.

11  Q.   UPX115, is this a document that was for internal Microsoft

12  purposes, or did you provide a copy to Apple?

13  A.   This was used for internal discussions.

14  Q.   If we could please turn to page 5 of UPX115, do you see a

15  slide entitled "revenue assumptions"?  It ends in Bates number

16  5142.

17  A.   Yes.

18  Q.   What does this page reflect?

19  A.   So -- my God, even your digital copy is bad.  I apologize

20  for that.

21      So just to give you a sense, and maybe -- let me give you

22  an overview of what the document was so I can explain -- if you

23  don't understand what the document was, this page won't

24  necessarily sort of make sense.

25      And so I described this dynamic this morning of Apple had

1    given us a target number.  They said this is the amount of money

2    we expect to make every year; if you want to do a partnership,

3    you're going to have to demonstrate to us that you can keep us

4    whole at this amount of money.  And that became sort of a target

5    revenue.

6        So one of the questions we then had to ask was, how much

7    revenue do we think we would make.  Right?  And is it greater

8    than or less than what -- you know, what Apple had told us, and

9    then how do we sort of think about it.

10       And then the second question you have to say is, how risky

11   do you think that is.  Obviously, we will have some base case

12   amount we will have to do, but do we think there's a lot of risk

13   or a little bit of risk, and if we had to guarantee it, how

14   risky do we think the guarantee was.  And so that was the

15   modeling exercise that would have been worked on by a

16   cross-functional team.

17       And what this was designed to show is for the line item

18   there that says "revenue," how much money would Apple -- or how

19   much money would we make from the volume and how risky is that.

20   These are the assumptions that we made.

21       Does that make sense?

22   Q.  It does.  Thank you.

23           THE COURT:  It does, yes.

24           BY MS. BELLSHAW:

25   Q.  If I could direct your attention to certain rows and ask

 1    you what the different rows reflect.

 2    A.   Yes.

 3    Q.   If you look under "major inputs," there's a row "U.S.

 4    iPhone incremental vol attach."

 5    A.   Yes.

 6    Q.   What does that row represent?

 7    A.   So if you think about -- let me start with an overly

 8    simplistic view of how to think about the revenue we would get.

 9         It was what we described internally as a P times a Q.

10    Right.  The Q is the number of queries.  The P is the revenue

11    that you get per query.  You estimate both of those.  You

12    multiply them together; you get your total revenue.

13         So the first thing you need to do is say, okay, how many

14    queries am I going to have.  Right?  Which starts off with --

15    and you can think of it as a funnel.  Right?  Which is the

16    number of queries per phone and then the number of phones.  You

17    multiply those together and get the total number of queries.

18         When you think about the number of queries per phone, what

19    you really start with is, how many queries -- how many search

20    queries happen on that phone across all search engines and all

21    entry points.  Right?  Like, what is the total market or total

22    available search queries on a device.

23         And so what you could see here, for instance, our estimate

24    was that was ████  I think that was ██ per month.  But to be

25    honest, it's not labeled here, and so I'm not 100 percent

1    certain it was ▮ per month.

2         And then what you need to do is you have say is, okay, what

3    percentage of those queries are going to flow through Bing.

4    Right?  So what you can see here is, we started off with an

5    assumption that we believe that Google had ▮ percent share on

6    the device.  We thought that would go down to sort of ▮

7         There's actually sort of -- and then we thought we would --

8    I'm sorry.  It's been a long time since I've looked at all this.

9    Sorry.  Let me parse this again.

10        If you see the parenthetical under the "detailed

11   assumptions," "defaults make up ▮ percent of all volume," what

12   that essentially says was an estimate that said we believe that

13   those default entry points were ▮ percent of the total.  So of

14   the ▮ we thought ▮ percent of them were in the defaults.

15        We believed going in that Google had ▮ percent of the

16   defaults, so ▮ percent of the searches that went -- so

17   ▮ percent of ▮ percent belonged to Google.  We started off

18   with a base of ▮ percent.  So ▮ percent of the ▮ percent we

19   thought went to us.

20        What we were modeling here was that we would go from

21   ▮ percent of the defaults to ▮ So basically, think of it as

22   we would go ▮ percent of ▮ to ▮ percent of ▮ and that Google

23   would go from ▮ percent to ▮ -- of ▮ to ▮ percent of ▮

24        I'm sorry.  That was fast through a lot of numbers.  So let

25   me just pause for a second if everyone got it.

```
 1   Q.   Yes.  Thank you.
 2   A.   Okay.  And so then what you sort of see when you go through
 3   all that math is, we thought Bing would end up with █ percent
 4   of the total searches on the device, which was up from -- which
 5   is █ percent incremental because we started with █
 6        Does that make -- that's the underlying math we did there.
 7   Sorry.  That was a lot, but I think it answered the question.
 8              THE COURT:  I'm with you.
 9              MS. BELLSHAW:  I appreciate it.
10              BY MS. BELLSHAW:
11   Q.   Looking at the next two, did you do similar -- and you
12   don't have to --
13   A.   It's the same basic logic.
14   Q.   For iPads and Mac?
15   A.   It was, though you will notice the numbers are different,
16   again because of that dynamic we talked about this morning.  A
17   Mac looks like a PC.  It's actually pretty easy to change the
18   defaults.  It has a keyboard.  It has a big screen.  Defaults
19   matter less.  More people direct navigate.
20        An iPad sits somewhere in the middle.  It's a little less
21   configurable than a PC or a Mac, but it's more configurable than
22   a phone.
23   Q.   If you look all the way on the right, on the line for the
24   Mac, under "comments," do you see where it says "assumed higher
25   churn, as it is easier for user to switch defaults on desktop
```

1    browser"?

2    A.   Yes.

3    Q.   Is that consistent with what you were describing earlier as

4    to it's easier for a user to change their default on a personal

5    computer than it is to change on a smart device?

6    A.   Yeah.  So, for example, if I remember, and it's a long time

7    ago back in this period of time, Safari had a search box, and

8    the search box had a little drop-down, and I think the first

9    choice was Google and the second choice was Yahoo! and the third

10   choice was Bing.  So a user who wanted to change just had to

11   mouse over, click, and change, which was much easier than going

12   on your phone, settings, browser, search engines, everything

13   else.

14       That's the dynamic it describes.

15   Q.   And then did you incorporate this assumption that there

16   would be higher churn on desktop computers than on iPhones into

17   the model that's reflected here?

18   A.   Yeah, which is why again you see the share gains are much

19   less.  Right?  So what we see here is Google -- we believe

20   Google continued to maintain the majority of Mac share.

21            THE COURT:  To be clear, what that means, though,

22   is -- the operating assumption was that at least with respect to

23   Mac, a majority of users of Mac would change the default?

24            THE WITNESS:  It was based off some combination of the

25   following two things:  More people would just start typing

1    google.com, or they would change -- they would just go click and

2    change the default back to Google.

3                THE COURT:  Got you.

4                THE WITNESS:  I don't remember that we specifically

5    split those two, because from the standpoint of modeling, they

6    had the same effect.

7                THE COURT:  Got you.

8                BY MS. BELLSHAW:

9    Q.   One last question on this page, if you look

10   under "comments" on the iPhone line, it says "Bing share on

11   Windows phone in U.S. is 78 percent."

12   A.   Yes.

13   Q.   What is the Windows phone?

14   A.   At this point in time, Microsoft had a phone operating

15   system that was independent that we sold.  At this point in

16   time, that phone operating system actually had Bing as the

17   search default on all the entry points.

18        And so it was a sanity checkpoint of comparison, which is,

19   when you ship a phone in this market with Bing as the default

20   entry points, what happens.  Right?  It was -- is █ percent

21   reasonable or unreasonable?

22        And I think the point we had was, hey, if we can get

23   78 percent on Windows phone, then assuming we're going to get

24   █ percent on an iPhone is not unreasonable.  We used it to sort

25   of sanity check.

1    The other number we used to sanity check was, you know, I

2    talked previously about Apple switching from Google Maps as the

3    default to their own map experience.  And I think even after

4    they switched, the general number was they kept about ▮ percent

5    usage.

6    So again, we were just saying, it's because you're making

7    assumptions and you're making -- the danger in these assumptions

8    is they pile up on top of each other, which is, you know, I

9    assume one thing multiplied by another thing I assume multiplied

10    by another thing, and then all of a sudden, errors in all three

11    can compound.

12    So we would do sanity check math like this to make sure

13    hey, did the errors compound in a way that it doesn't make

14    sense.

15    Q.    And is the 78 percent share reflected there an accurate

16    reflection of Bing's share on Windows mobile?

17    A.    So again, I don't remember.  At the point in time, this was

18    a presentation that was made to our CEO, worked on diligently by

19    me, by members of our finance team.  We would have done

20    everything in our power to be as accurate as we possibly could.

21    I was asking the company to make multibillion dollar

22    investments based on it.  You do your homework.

23    Q.    And that logic would apply to the financial analysis

24    contained in UPX115 more generally?

25    A.    Yeah.  I mean, again, it's sort of we were asking the

1    company to invest billions of dollars to potentially secure a

2    partnership.  You wanted to do the best possible work you can to

3    represent the economics of that.

4    Q.   You referenced -- we talked a little bit in the open

5    session and then you just mentioned here again the numbers that

6    Apple had presented to Microsoft reflecting revenue figures that

7    it wanted Microsoft to hit as part of a deal with Apple.

8         Do you recall that?

9    A.   Yes.

10   Q.   And I think you mentioned in open session that Microsoft

11   did internal calculations involving those numbers, and that's a

12   part of what's reflected here?

13   A.   So what's reflected here -- and I think if you go back

14   to -- I think it's reflected here.  I'm trying to see where it

15   is.  Sorry.

16   Q.   And I am actually not asking for the exact --

17   A.   So yes, it is reflected in this presentation.  Sorry.  The

18   actual numbers were in here somewhere, I thought.

19   Q.   Do you recall generally how matching the revenue figures as

20   Apple suggested would impact the profitability of a search deal

21   for Microsoft?

22   A.   So again, remember -- I want to make sure I understand what

23   you say by matching, because there was two separate things,

24   which is, one, the number was what the number was.  Right?  When

25   a partner opens negotiations and says I need $█ billion in year

1, growing to $█ billion in year 3, you take that as a target.
Yes, you can try and negotiate it, but ultimately, that was the
ask.  Right?

     And then the numbers separately went into how did the
numbers that I talked about this morning, how did the numbers
they gave us compare to what we had previously been
triangulating, which again goes to how much confidence do I have
in my assumptions, because if those assumptions allow me to
relatively accurately back into their numbers, then I feel
better about my assumptions.

     And so we felt better about our assumptions because we were
able to back-end triangulate into the numbers they gave us.  And
then separately, when we did the math -- and this is what's
actually reflected on pages kind of 2 and 3 of this document, is
what the magnitude of the dollar investment for Microsoft would
have been, at least in the first two years.

Q.   And how did the magnitude of the dollar investment for
Microsoft, at least for the two years, compare to the search
revenue that Microsoft expected to generate from a deal with
Apple?

A.   Can you go back to page 2?

Q.   Sure.

A.   That's not much better here.  Sorry.

     So essentially, to help you understand how to read this,
okay, the top line number, the $█ billion, you see that's

what's labeled as "A's quoted number," that was essentially what
Apple said they would need to receive in year 1.

And again, it wasn't the total number.  It was, as labeled
here, we're doing this analysis based on U.S. and
English-speaking markets to start out with.

We then do a whole series of step-downs and step-ups, which
is essentially the first line there was we can't explain it.
Right?  So there was a certain amount of their total
revenue that even when we attempted to -- sorry.  Can you zoom
back out?  It's harder to read this way.

So the first line was, there's a certain amount of this
money that we just can't explain, so let's just assume that that
disappeared in some way, like if it just didn't sort of exist.
Right?

And then there's walking down and through, you know, Google
would have a higher percentage of the defaults on the device
than Bing would.  That's the numbers we talked about on the
prior page with the revenue assumptions.  Bing never got back to
a business as big as Google.

So the next two lines are, well, there's less queries sort
of flowing through the system.  That's reflected in lines 2 and
3.  Lines 4 and 5 reflect that Google would still make more
money than Bing would on an RPM gap, you know, which then takes
you all the way down to, hey, this is now kind of a much smaller
number in terms of how much revenue Apple would sort of get.

1    But then what we said is -- at that point in time, our

2  estimate was that Google was paying Apple ■ percent rev share.

3  I think later, we learned that that was wrong, but that was our

4  estimate at that point in time.  And we said, what if we gave

5  them everything.

6    And so the net result of all of this is a business that

7  Apple purported was making $■ billion from them we thought

8  would only make $■ billion.  Right?  So this allowed us to

9  say, hey, if we're going to do a deal where in year 1 we

10  guarantee them ■, we would have to make an investment of

11  $■ million.

12    And then the bottom of it is the risks, which is, okay,

13  what if our assumptions are wrong and this thing goes south.

14  Right?  And so some of it was line 6, what if when we do this

15  private search, the ads have a significantly lower RPM.  Some of

16  it was what if -- line 7 was all around what if we aren't quite

17  as successful in realizing scale and product in the RPS.  What

18  if we don't do as good of a job in executing and bringing on

19  advertisers.  What if a higher percentage of people shift than

20  don't shift.  What if our costs are higher.

21    And we said, hey, in worst-case scenario, we could be in a

22  position where we're only making $■ billion and have to give

23  Apple ■.  And so even if our baseline was a $■ million

24  investment, we have to be prepared that in certain scenarios

25  we're going to have to make a $■ billion investment.

1    Which, by the way, we were willing to do.  So what was

2   interesting about this was not that there wasn't an appetite to

3   pursue this, because to the point that I talked about earlier,

4   this is just looking at the direct.  It's not looking at that

5   indirect marketplace uplift.  It's not looking at, you know,

6   what do the out-years look like once you have built up a

7   business at scale and improve your business based on this.

8    So strategically, we were prepared to write checks of this

9   size, but we needed to understand and reason over what those

10   checks would be.

11   Q.   And despite Microsoft's willingness to write checks of this

12   size, was Microsoft able to negotiate a search distribution deal

13   with Apple in 2016?

14   A.   No, we did not.  What ended up happening was Apple renewed

15   with Google.  As we understand it, they renewed with Google at a

16   higher revenue share rate, that side dynamic I described earlier

17   where we helped them make more money.  And as a part of that,

18   that was also the deal in which Google effectively bought back

19   Siri and Spotlight.

20   Q.   Mr. Tinter, I have just one more document that I would like

21   to ask you about briefly.  If you would please turn to UPX116.

22   A.   Yes.

23   Q.   This document is also in evidence.

24    Is this an e-mail from a member of your team to Mr. Perika

25   and Mr. Smith at Apple in October 2016?

1    A.    To be precise, Kate actually worked in our finance team.

2    She didn't work in my team.   But yes, she was a Microsoft

3    employee at the time.

4    Q.    Thank you for the clarification.

5          The subject line of this is "baja presentation."

6    A.    Yes.

7    Q.    Do you know what baja refers to there?

8    A.    Baja was an internal code name that Microsoft had for the

9    evaluation of a search partnership with Apple in 2018.

10   Q.    If you would please turn to slide 3 of UPX116.   You will

11   see the first page of a slide deck entitled "baja financial

12   model, September 2018."

13   A.    Yes.

14   Q.    Do you recognize this document?

15   A.    Yeah.   So what this was, and I described this earlier but

16   just to remind everybody, we started an exercise that said if

17   there was a thing called a combined business of Apple Search and

18   Bing Search, what would the P&L for that look like.   Right?   And

19   let's build a financial model.

20         And so we had gone down and had a meeting with Apple, and

21   we had walked them through both an overview of what does the

22   Microsoft Search business look like today, what is the Bing part

23   of that P&L.   We then looked at, you know, kind of how do we

24   think about it.   That's kind of -- if you sort of flip through

25   this presentation, that's essentially what section kind of 1 is.

If you then go to section 2, we then say, hey, Apple, this is what we think your search business is. Right? So this is Microsoft's attempt to build a financial model of Apple's search business. And a lot of this was, let us tell you the assumptions we made, let us tell you the numbers we get, give us some feedback, where are we right, where are we wrong, where can you share data with us to make us smarter. We just started saying this is what it is.

And then section 3 of this was if you put these things together what do they look like, like, what would they look like as a combined business, and then therefore, what would a pro forma joint look like, and then we just talked a little bit about where to go next.

And so again, it's Microsoft business predeal, our estimate of the Apple business predeal, our estimate of what the combined business would look like, which was a lot -- where this was different in 2018 than it was in 2016 is in 2016 we never got to the point of having this level of detailed financial and economic conversation with Apple. Right? We did a bunch of internal modeling, and we said, hey, what if we were willing to guarantee your number, what do you think. We never got that far.

In this case, we actually had pretty detailed conversations. So we were able to have a conversation with Apple that was much more along the lines of, here's what we

1    think would happen if you switched from Google to Bing, what do

2    you guys think would happen, can we come up with a share of

3    joint assumptions, can we come up with a shared perspective and

4    point of view on the economic opportunity together.

5    Q.    And I think you referenced different structures, but what

6    were the different deal structures that Microsoft and Apple were

7    considering at this time in 2018?

8    A.    So we had not gotten to the point of specific, like

9    actually discussing very, very detailed deal structures.  Again,

10   because the initial exercise was, is the product quality good

11   enough and is the economic pie big enough that it's worth us

12   having the next round of detailed conversations.

13        That being said, conceptually, we had brainstormed a couple

14   of different options.  There was a pure commercial deal.

15   Microsoft provides search technology to Apple.  That powers the

16   Apple Search experience.  There is some economics that accompany

17   that commercial deal.

18        There were two variations of that.  We had talked about

19   them in different points in time.  There was kind of a 1A, which

20   is that thing is called Bing.  There was actually a 1B that says

21   what if we called that thing Apple Search or Siri Search or

22   something else, and Apple has strong fans, and they have strong

23   brands, and so what if it was an Apple-branded experience.

24        But fundamentally, it was Microsoft is a search technology

25   platform and search ads platform provider providing a solution

 1    to Apple.

 2         There was a variant that we talked about, which is, what if

 3    we put the search business into a joint venture and that joint

 4    venture then had a commercial relationship with both Apple and

 5    with Microsoft where it could sell search technology services to

 6    Apple for iOS, it could sell search technology services to

 7    Microsoft for Windows, and so we thought, hey, maybe we put this

 8    thing in a JV.

 9         There was actually an idea we kicked around at one point in

10    time about maybe we should flip it, like maybe this would make

11    sense for Microsoft to sell Bing to Apple and then Apple

12    provides a commercial partnership back to Microsoft.  And in a

13    world where they valued control and they maybe wanted to take

14    less of a dependency, that was an option.

15         So everything was on the table.

16    Q.   And why was Microsoft willing to put everything on the

17    table, including selling Bing to Apple?

18              THE COURT:  I'm sorry.  I want to be mindful of time

19    here, not just in our closed session but for the rest of the

20    day, given what time we've told Mr. Tinter he will be off the

21    stand.

22              MS. BELLSHAW:  Yes.  This is my last question on this,

23    and I have one slide that I want to ask him very briefly about,

24    and then I am finished.

25              THE COURT:  Okay.

```
 1              MS. BELLSHAW:  Thank you, Your Honor.

 2              THE WITNESS:  Okay.  It goes back to where we started

 3     this morning, which is, in a world where mobile is the growing

 4     part of the search business and the largest share and that is

 5     where you need to be to compete, in a world where scale matters

 6     tremendously to your ability to compete in mobile, and in a

 7     world where there are fundamentally two gatekeepers to accessing

 8     scale and mobile -- Google is a controller of Android being the

 9     gatekeeper over Samsung and Apple as a gatekeeper over its own

10     device, that -- and where it was very clear, as we discussed

11     earlier, that Google was not going to allow or Samsung was

12     not -- the nature of that Google and Samsung relationship was we

13     weren't going to break Google's control as a gatekeeper, like,

14     Apple was -- it was the thing.  It was really the kind of best

15     most compelling idea that we had.

16          It's not that we didn't have other ideas.  Like, trust me,

17     we brainstormed everything.  Like, I asked myself hard questions

18     all the time, which is, why are you putting so much personal

19     time into this thing, what else are we doing.  We tried a lot

20     throughout this time, throughout history to experiment and

21     invest and get things done.  But we always came back to this was

22     the big idea.  So it was the one that justified the most

23     creative thinking, the most audacious thing.

24     Q.   And then, Mr. Tinter, I just want to ask you, mindful of

25     the time, very briefly about slide 30 of UPX116.
```

1   A.   And I apologize that I never put page numbers on my

2   documents.

3   Q.   It's okay.

4   A.   Can you tell me what the header is?

5   Q.   We've added them for you.  It's the page ending in .028,

6   and the header is "U.S. user retention post deal."

7   A.   Yeah, can you pull that up on the screen and zoom in.

8        This is literally either my best or my most worst work in

9   terms of explainability.

10  Q.   I'm not going to ask you about the details of the slide.  I

11  would just like you to explain in a sentence or two what this

12  slide 30 of UPX116 entitled "U.S. user retention post deal"

13  reflects.

14  A.   So this came back to that dynamic I said, which is if Apple

15  makes a switch and it switches from a Google-powered search

16  experience to a Microsoft-powered search experience, what

17  happened.  Right?

18       In a world where, you know, Google had a -- I'm just making

19  these numbers up.  But if Google had 100 queries per device, if

20  you switched, are you going to have 100?  Are you going to have

21  more than 100?  Are you going to have less than 100?  And this

22  was our attempt to do math to model that.

23  Q.   And was it important that the modeling contained in slide

24  30 of UPX116 was accurate?

25  A.   It was -- accurate is an interesting question when you're

making assumptions and guesses.  So I want to be very clear.
There was a lot of assumptions and guesses that put this into
it, and you are projecting forward versus looking backwards, and
accuracy in some ways is a concept of looking backwards, not
projecting forward.

     This was the highest fidelity estimates that we had based
on the best of our knowledge and our experience and our ability
of what we thought was likely to happen.  And that was important
for two reasons.  One, again, I was going to the company, and I
was asking them to make very large financial investments to
pursue this, and I needed to give them the very best estimate of
what I thought would happen.  And two, I had to sit down with a
partner and try to convince them to make a very risky business
decision, and I had to help them understand what was likely to
happen.

          MS. BELLSHAW:  Thank you, Mr. Tinter.

     We have no further questions at this time, Your Honor.

          THE COURT:  All right.  We will start with Google's
cross-examination in closed session.

     Mr. Greenblum, just in terms of timing, how long do you
think this portion of your examination will be?

          MR. GREENBLUM:  I would estimate, Your Honor, an hour
to an hour and a half of closed, based on the
partnership-related materials that Microsoft's counsel has asked
be done in closed section, communications about what Apple

1    thought, what Samsung thought.

2         THE COURT:  Well, I thought we tried to -- I know you

3    all may not have had those discussions, but I want to -- we're

4    not going to be in closed session for another hour and a half.

5    So we need to figure out what really needs to be done in closed

6    session and focus on those questions at this point.

7         MR. GREENBLUM:  I've tried very hard to do that, and

8    I'm disappointed to tell you that I have an equally long open

9    session.  So part of the problem is that I have -- I do want to

10   get the witness out of here today.  With respect to closed

11   session, I think part of the issue is simply that in order to

12   have the clear understanding of what the actual understandings

13   were of what other people thought, it's in the documents that

14   were marked confidential.

15       I can try to do that impeachment in open session.  I'm just

16   struggling with that, Your Honor.

17         THE COURT:  I guess my point or my current thinking

18   is, after we've now been doing this for about three weeks, is

19   that communication among companies, that's sort of the heart of

20   what's going on here.  If you need e-mails to refresh somebody's

21   recollection about what the other company said, okay, but what

22   we've tried to do, I've tried to do at this point, after having

23   had some experience with this, is narrow this down to numbers,

24   internal strategic discussions, and trade secrets.

25       And so the back and forth between potential business

1    partners about what their views are on each others' products and

2    numbers -- not numbers, but each others' products, I'm not sure

3    that fits into the paradigm I'm talking about.

4        MR. SCHMIDTLEIN:  Judge, we appreciate that.  I think

5    the tricky part is to the extent the negotiations are reflecting

6    strategies and are reflecting sort of competitive offerings

7    being made to these third parties, those are very, very

8    sensitive.  Microsoft views them understandably as sensitive

9    their negotiations with Apple just as Google.

10        So we will try to get around it, but there's a fair amount

11    that, I think, pertains to that that I think is difficult for us

12    to do in open session without revealing to all of the different

13    parties their respective competitive positions.

14        THE COURT:  All right.  Well, why don't we get

15    started.  Let's get started on the financials, and then we will

16    see where we are from there.  We may just need to do this --

17    let's at least get started.

18        MR. GREENBLUM:  May I approach, Your Honor?

19        THE COURT:  Sure.

20        THE WITNESS:  You killed more trees than they did.

21    Does it come out of Google's carbon commitment?

22        THE COURT:  Counsel, if I make predictions about the

23    length of open session -- I mean closed sessions that are wrong,

24    I would welcome being corrected before I make those

25    pronouncements.

1          MR. GREENBLUM:  I'm sorry, Your Honor?

2          THE COURT:  I said, if I make pronouncements about the

3      expected length of a closed session and I am wrong, I would

4      appreciate being corrected about that.

5          But let's move forward.

6          MR. GREENBLUM:  Okay.

7                          CROSS-EXAMINATION

8          BY MR. GREENBLUM:

9      Q.   Good afternoon, Mr. Tinter.  It's nice to see you again.

10     That's not a question.  You don't have to answer.

11         You had several conversations with Apple over the years

12     trying to convince them to change the search default to Bing;

13     correct?

14     A.   Yes; yes.

15     Q.   Those conversations were always timed to implement at a

16     point in time where Apple's contract with Google would expire;

17     correct?

18     A.   To be very precise, we did not know the terms of the Google

19     contracts, and so we could not tell you exactly when they were

20     going to expire.

21         Based on our understanding from the conversations with

22     Apple, they were not looking to break a contract.  And so given

23     the cadence of the conversations, we always assumed they would

24     be timed for expiration.

25     Q.   At the time of your conversations with Apple, your

understanding was that the Google contract was not a limitation
on them in terms of their ability, because we would have been
doing it after the contract with Google was terminated; correct?

A.    That was our understanding, yes.

Q.    In 2009, you proposed --

A.    Sorry.  In the spirit of completeness, it was our
understanding that they would let their agreement terminate and
we would implement afterwards.

There were aspects of their agreements that they discussed
with us that had led them to believe what the future conditions
could/would look like if they replicate it.

So for instance, one of the topics of conversation that we
had pretty consistently with Apple was this idea of splitting.
Right?  Why do you do a single contract for the entire world.
Right?  What if Bing is the best choice for you in the United
States and Google is the best choice for you in Europe.

And in that math that I was just talking to the other folks
about, if we had sort of gotten into it, there's actually math
that said Apple may have been better off if they worked with
Bing in the United States and Google in the rest of the world.

What they had represented to us is that their existing
agreements with Google were all or nothing.  It's literally like
it's either we use Google everywhere or we use Google nowhere.

So what they then said to us is, hey, one of the factors
that goes into our decisionmaking is if we do a split deal and,

 1   therefore, the deal we have is not all or nothing, what would --
 2   if we go to Bing in the United States, what does the Google deal
 3   outside the United States look like, because we're assuming that
 4   not having all or nothing in the contract structure would change
 5   things.
 6       One of the things they had said is, we are very worried
 7   that Google will give us a much less attractive offer if we're
 8   splitting the business and then if it is all or nothing.  That's
 9   where kind of the structure of their existing contracts, while
10   they weren't going to breach them or break them to work with us,
11   it certainly impacted how they thought about future contracting.
12   Q.   I appreciate the context, Mr. Tinter.  Let me just caution
13   that I want to try to get you out of here today, and His Honor
14   wants me to get out of closed session as soon as possible.  So
15   if you could try to keep your answers sort of focused on my
16   question.
17       If there's something I miss, I'm confident Ms. Bellshaw --
18   A.   I thought you did miss it, which is why I shared the
19   context.
20   Q.   Understood.  Thank you.
21       You had some discussions about this with Apple in 2009;
22   correct?
23   A.   I don't -- the 2009 conversations, as I reflect, were
24   principally about making Bing an option in Safari.  I think at
25   one point in time, we had briefly suggested to them, hey, if you

1    want -- we had just done the Yahoo! deal where there was Yahoo!

2    powered by Bing.  I think we had suggested to them, if you guys

3    are interested in Apple powered by Bing, we are very happy to

4    engage that.  They were pretty quickly saying, hey, no, we're

5    not interested, and then the 2009 conversations were focused on

6    making Bing an option.

7    Q.   Could I ask you to turn to DX434 in your binder, please.

8         Your Honor, DX434 is not in evidence.  I believe it's the

9    subject of an objection from the government.

10             MS. BELLSHAW:  No objection, Your Honor, just subject

11   to the briefing that the parties will submit later.

12             THE COURT:  434 will be admitted.

13        (Exhibit DX434 received into evidence.)

14             BY MR. GREENBLUM:

15   Q.   Mr. Tinter, DX434 is an e-mail chain between yourself and

16   other senior executives at Microsoft from November of 2009; is

17   that correct?

18   A.   Yes, that's correct.

19   Q.   Okay.  You were just -- I think if I understood you

20   correctly, you were saying that you weren't sure whether or not

21   at this point in time in 2009 you actually proposed for Bing to

22   be the full search option or the default in Safari on the

23   iPhone.

24        Let me just ask you to look at --

25   A.   That's not what I said, actually.

1    Q.    Okay.  Why don't you clarify, then.

2    A.    I said that we had proposed to them this concept, having

3    done the Yahoo! deal of Yahoo! powered by Bing, and we had

4    suggested that maybe we could do something that is Apple powered

5    by Bing which could be the default.

6    Q.    So you did propose in 2009 that Bing would be the default

7    on the iPhone; correct?

8    A.    Yes.

9    Q.    And you wrote here at the top of the page in the second

10   paragraph, "Apple has made it very clear to us that they are not

11   interested in replacing Google as the default search provider."

12         Correct?

13   A.    Yes.

14   Q.    And that was your understanding of the situation at the

15   time you wrote the e-mail?

16   A.    Yes.

17   Q.    And you also wrote about your understanding of Apple's

18   concern that Bing was generally unproven in the market and

19   represented a significant customer experience risk?

20   A.    That's what I wrote, yes.

21   Q.    And that was your understanding at the time you wrote it;

22   right?

23   A.    Yes.

24   Q.    Okay.  You talk about the apathy and antipathy at Apple

25   towards Microsoft.

1         Do you see that?

2    A.    Yes.

3    Q.    And I take it that was because these companies were

4    competitors and there had been some bad blood in the past?

5    A.    Yeah, I think -- you know, by 2009, the level of

6    competition between the companies was probably maybe lower than

7    it had been historically, but we were not working deeply.  We

8    were not partnering together.  I think sort of some mix of don't

9    care, don't have sort of positive feelings and associations.

10   Q.    Okay.  Can I ask you, moving forward in time, to turn to

11   DX454 in your binder, please, sir.

12   A.    Yes.

13            MR. GREENBLUM:  I believe there's an objection to this

14   one.  I don't know.

15            MS. BELLSHAW:  No objection, Your Honor.

16            THE COURT:  Okay.  So 454 will be admitted.

17      (Exhibit DX454 received into evidence.)

18            BY MR. GREENBLUM:

19   Q.    Sir, this e-mail concerns an approach to Apple to negotiate

20   a deal for Bing to be used in Siri on the iPhone; is that

21   correct?

22   A.    Hold on a second.  Let me familiarize myself with it.

23   Q.    Sure.  Take your time, sir.

24            THE COURT:  Can we put this in time?  The first e-mail

25   is from 2009; correct?

1          MR. GREENBLUM:  Yes, sir.

2          THE COURT:  Okay.

3          THE WITNESS:  Yes, I've refreshed my memory.  Your

4    question?

5          BY MR. GREENBLUM:

6    Q.    Do you recognize this document?

7    A.    I don't particularly remember writing it.  It was clearly a

8    series of e-mails updating senior executives on the

9    conversations.

10   Q.    Okay.  Thank you.  The document concerned a proposal to

11   Apple to use Bing in Siri on the iPhone; correct?

12   A.    Yes, based on where this starts, I believe that is true.

13   Q.    Okay.  And Mr. Ballmer asked some questions about that

14   earlier in the thread after learning of the proposal.

15         Do you see that?

16   A.    Yeah.

17   Q.    And on page 2 of the document, you respond to some of your

18   colleagues regarding this proposed deal.

19         Do you see that e-mail?

20   A.    Yes.

21   Q.    And you say that you've never gotten traction for a deal

22   for a default with Apple for two reasons.

23         Do you see that?

24   A.    Yes.

25   Q.    And the second reason that you list is that Apple is

1    concerned about the brand risk of switching from Bing to Google,

2    similar to backlash they had on Maps?

3    A.    That's what I wrote.

4    Q.    And that was accurate; right?

5    A.    That is what I believed at the time, yes.

6    Q.    And you wrote that that was always their bigger of the two

7    concerns that you listed; right?

8    A.    I did write that.

9    Q.    Okay.  Let me ask you to turn to DX457.

10          There's an objection to this one as well.  Perhaps you

11    could take a look at it while my colleague speaks to it.

12              MS. BELLSHAW:  No objection, Your Honor.

13              THE COURT:  It will be admitted.

14          (Exhibit DX457 received into evidence.)

15              BY MR. GREENBLUM:

16    Q.    DX457 is an e-mail thread from two months later, in July of

17    2013?

18    A.    Yeah.  Hold on.  I'm still familiarizing myself with it.

19    Sorry.

20    Q.    Sure.  Let me know when you're ready.

21    A.    Okay.

22    Q.    A colleague asked you to comment on a PowerPoint

23    presentation that Microsoft was making to the antitrust

24    authorities in Canada?

25    A.    That's where it starts, yes.

Q.   Okay.  You told your colleague that you had feedback on the mobile presentation and that there were a lot of basic factual inaccuracies about the Apple/Google relationship that need to be corrected; is that correct?

A.   That is what I wrote.

Q.   And some of your comments are replicated in the e-mail actually from Mr. Spencer reflecting your in-line comments, the e-mail from Mr. Spencer at 11:54 a.m. on July 24th, 2013?

A.   Yes.

Q.   There was a statement in the presentation that "Microsoft has expressed interest in a Bing distribution deal with Apple, but we continue to be blocked by Google's agreement."

     That was the statement that was in the presentation?

A.   Not having the presentation in front of me and not remembering it, I don't know.  This e-mail appears to be summarizing a statement that was in the presentation.

Q.   I want to save time.  I have the presentation, but let's see if we can do it without it.

     You wrote that that statement was only partially true; right, sir?

A.   That is what I wrote.

Q.   And that's because Apple had been very clear with Microsoft at this point in time that even if their deal with Google expired, they were not prepared to move to Bing; correct?

A.   Correct.

1    Q.    And that was accurate when you wrote it; right?

2    A.    Yes, that's what I believe.

3    Q.    There's a follow-up question.  "Was this due to Bing's

4    quality in certain geographies?  Monetization?"

5          Do you see those follow-up questions?

6    A.    Yes.

7    Q.    Okay.  And then your answer is "mostly product quality";

8    correct?

9    A.    I don't know.  And the reason I don't know is normally in

10   situations like this I would have had the punctuation

11   convention like I did on the prior bullet where it literally

12   says "JT," which is my initials, and then my comment.  I don't

13   have that here, so I don't want to say that that was from me.

14   Q.    I think you did it in a different color, but when --

15   A.    I'm just saying, based on what I'm seeing, I can clearly

16   see that the comment in the first bullet was me.  On this one,

17   I'm not sure.

18   Q.    You agree at this point in time that the issue with Apple

19   was mostly one of product quality; right?

20   A.    That was my reflection of the conversations with them in

21   2013.

22   Q.    Let's turn to DX466.

23         I don't know if you have an objection, Ms. Bellshaw.

24         MS. BELLSHAW:  No objection, Your Honor, just the same

25   subject to later briefing.

1          THE COURT:  Okay.

2     (Exhibit DX466 received into evidence.)

3          BY MR. GREENBLUM:

4  Q.   This is a March 2014 e-mail exchange with several of your

5  colleagues, including Mr. Nadella, regarding preparation for an

6  Apple meeting; is that right?

7  A.   Let me see.  Yes, based on the subject line, yes.

8  Q.   And there's a document attached entitled "Microsoft/Apple

9  partnership."

10          Do you see that?

11  A.   Yes.

12  Q.   Okay.  You wrote in that document, "Google remains the

13  default, but users can change to Bing, and we have access to an

14  API that allows us to prompt the user to change"; is that

15  correct?

16  A.   I don't know.  I don't know if I was the author of this

17  document, one of the authors of this document, if someone else

18  wrote it.  So I don't remember who wrote this particular

19  document.

20  Q.   Well, sitting here today, sir, do you know if that was

21  correct at the time?

22  A.   Say that again, please.

23  Q.   Was it correct at the time that there was an API available

24  for users to switch the default, that they would be prompted

25  to --

1    A.    I talked about that this morning.

2    Q.    Yes.  Okay.  And I think you mentioned that Apple took it

3    away; right?

4            MS. BELLSHAW:  Your Honor, I would just note that this

5    topic was covered in open session earlier today.

6            MR. GREENBLUM:  Because the --  I'm struggling with

7    the memo aspect of it, Your Honor, and Microsoft's counsel

8    telling us that we had to do this in closed session.

9        I'm happy to revisit it in open session and move on.

10           THE COURT:  I guess my response is I understand what

11   Microsoft's counsel has said.  Much of what we've just gone over

12   in the first 15 minutes of this is really not what I would

13   consider something that ought to be in confidential session.

14       Yes, these are statements he's making to his colleagues,

15   but we heard about that in open session previously.  So I would

16   just as well do that in open forum.

17           MR. GREENBLUM:  I'll try to move quickly, Your Honor,

18   and spot places where I'll --

19           THE COURT:  I guess the question is why we can't -- I

20   don't hear Microsoft's counsel jumping up and disagreeing with

21   me.  Maybe it's just because he's being polite.  But usually,

22   lawyers are not.

23           MR. LARRABEE:  We were able to work with the

24   plaintiffs on the break and resolve a lot of this.  Obviously,

25   the opportunity to meet with him about the documents he's going

1    to examine Mr. Tinter about is nonexistent.  So we're in a

2    situation where the designations are what they are.

3        So that's the difference between what we experienced half

4    an hour ago and what we're experiencing right now.

5        We do have concerns about some of this.  Mostly, we're able

6    to work around it, but I can't -- it takes two to collaborate.

7            MR. GREENBLUM:  Let me suggest, Your Honor, if I can

8    jump to some documents that I believe the Court would agree are

9    numbers-oriented, get that done, take the break, and take 20

10    minutes or 15 minutes with Mr. Larrabee and do my best, we can

11    come back to you.

12            THE COURT:  Okay.  I was going to suggest that, but I

13    appreciate it.

14            BY MR. GREENBLUM:

15    Q.    Could you turn to tab 679 in your binder, Mr. Tinter.

16        There's an objection.

17            MS. BELLSHAW:  No objection, Your Honor.

18            THE COURT:  It will be admitted.

19        (Exhibit DX679 received in evidence.)

20            BY MR. GREENBLUM:

21    Q.    This is an e-mail to you from Peter MacDonald; correct?

22    A.    The "from" is Raajeev Ramaraju.

23    Q.    I'm sorry.  You and Mr. MacDonald are both on the chain.  I

24    think there's some e-mails from him earlier in the chain.

25        Regardless, you and he are both are on the chain?

1    A.   Let me review.

2         Yes, he and I are both on the chain.

3    Q.   Mr. MacDonald worked on the search distribution with you?

4    A.   He was on my team for a period of time, yes.

5    Q.   He described to you in this document some analysis that

6    Mozilla had done on the potential impact of switching its

7    default to Bing; is that correct?

8    A.   I need to go read the document first.

9    Q.   I think most of my questions will focus on the first e-mail

10   in the chain, to save you time, Mr. Tinter, so the one from

11   Peter MacDonald on November 3rd.  I should say, the earliest in

12   time e-mail in the chain.

13   A.   The November 3rd, 2017, at 5:52 p.m.?

14   Q.   Yeah.

15   A.   Sorry.  I don't remember what your question was, but I'm

16   now familiar with the thread.

17   Q.   Okay.  He described -- Mr. MacDonald described to you some

18   analysis that Mozilla had done on the potential impact of

19   switching its default to Bing; correct?

20   A.   He describes a test that Mozilla did.

21   Q.   Okay.  He told you that the test Mozilla did showed that

22   after switching its default to Bing for certain users, it saw a

23   ███  percent retention of search volume after 14 days; correct?

24   A.   That is what the first sub-bullet here says.

25   Q.   And that means that Mozilla was telling you that they would

1    lose about ███ their search volume within two weeks if they

2    switched their default to Bing; correct?

3    A.    No.

4    Q.    Tell me why that's incorrect.

5    A.    That was not a forward-looking statement.  It was a

6    backward-looking statement.  It said in their existing test, the

7    users who were switched had a ███ percent search volume

8    retention after 14 days.

9    Q.    Thank you for the clarification.  So in the past tense, in

10   that two-week period, they lost ███ their search volume;

11   correct?

12   A.    They lost ███ percent of their search volume.

13   Q.    Thank you.  He also related that Mozilla had run a funnel

14   test?

15   A.    Yes.

16   Q.    And that test showed that with the default switch to Bing,

17   the search volume eventually dropped to the low to mid-██s?

18   A.    It also says that they had a bug in the test.

19   Q.    Okay.  I don't know what that bug is, and you're happy to

20   explore that with --

21   A.    I don't know what the bug is either, but if you're asking

22   me to -- my reading of this, if someone sent this text to me

23   today in the equivalent situation, is I would have thrown it out

24   because there was a bug.

25   Q.    Did you ever find out what the bug was, sir?

1    A.    It's a long time ago.  If we did, I don't remember.

2    Q.    Mozilla decided not to switch to Bing -- not to switch the

3    default to Bing; is that correct?

4    A.    That is correct.

5    Q.    They switched it first to Yahoo! and then to Google; is

6    that correct?

7    A.    Yeah, I think they went Google, Yahoo!, Google, if I

8    remember correctly.

9    Q.    If you look at a later e-mail in the chain from Rik van der

10   Kooi, do you see that?

11   A.    Yes, I see that.

12   Q.    It's on November 4th at 12:24?

13   A.    Yes.

14   Q.    And Mr. Van der Kooi was the head of search advertising at

15   Microsoft?

16   A.    I don't remember Rik's specific role in 2017.  I believe

17   that it was his role at the time.

18   Q.    And he wrote, "Fundamentally I don't disagree that our

19   retention would be better if we had done more to market the

20   product in recent years."

21   A.    That's not the most important part of his e-mail, though.

22   Q.    Okay.  Thanks.  But that's what he wrote?

23   A.    Yes, but you're taking it out of context.  And if you

24   wanted to understand his e-mail, the first paragraph is

25   infinitely more important than the second.

1    Q.    You don't have any reason to disagree with the opinion that

2    Mr. Van der Kooi expressed on this point; correct?

3    A.    What opinion?

4    Q.    The opinion that the retention would be better if Microsoft

5    had done more to market the product in recent years.

6    A.    I don't have an opinion.

7    Q.    One way or the other?

8    A.    I don't have an opinion one way or the other.  But I would

9    argue on my friend Rik's behalf that you are ignoring the most

10   important part of his sentence.

11          MR. GREENBLUM:  If we could, Your Honor, I'd like to

12   spend some time with Mr. Larrabee to try to trim how much more,

13   hopefully, if any, I need to do in closed, if it would be

14   possible to take the break now.

15          THE COURT:  Okay.  I'm happy to let you do that.  So

16   it's a little bit before 3:00 -- sorry, it's quarter to 3:00.

17   Why don't we plan to resume at 3:00.

18          (Recess taken from 2:44 p.m. to 3:14 p.m.)

19          THE COURT:  All right.  Where are we, Counsel?

20          MR. GREENBLUM:  Your Honor, I think there's just two

21   categories of disagreement.  For the other documents, we're

22   going to try the procedure of me putting the documents in front

23   of the witness, speaking about them generally, making hopefully

24   the record I need to make having the documents in evidence, and

25   taking it with the Court from there.

1          The two categories of disagreement, and we appreciate the

2    help of Mr. Larrabee's team, are, number 1, a 2020 document

3    about the possibility of a partnership with a partner following

4    the filing of this case.  I won't go into more detail than that.

5    There aren't numbers in the document.  So what I heard the Court

6    to tell me is I have to do that in open session.

7          Let me let Mr. Larrabee address that one first.

8          MR. LARRABEE:  I think we made a lot of progress.  My

9    respectful urging of the Court is to let us try this and get as

10   far as we can with the witness.  It does present a risk that we

11   will have one or two documents that we would ask for closed

12   session.  You may question that.  But there's a good chance we

13   could get through all of this without having to have that

14   conversation.

15         THE COURT:  I'm not following.  Are you requesting

16   that we do the closed session for the two documents or --

17         MR. LARRABEE:  I think we should go as far as we can

18   in the open session.  And it may be that the witness and the

19   questioner will find a way to get the information we need.  The

20   documents will still be in evidence and still be confidential,

21   the documents themselves, and maybe that's the solution.

22         It's possible that he will need information or testimony

23   from the witness that would go at the heart of the

24   confidentiality, in which case I may have to stand up.  But

25   we're trying to avoid that.  And definitely, the percentage of

 1    information that's at issue here has gone down significantly.

 2            THE COURT:  Terrific.  I appreciate it, Mr. Larrabee.

 3    I am really grateful for your efforts and your assistance.

 4            MR. GREENBLUM:  I will work as quickly as I can.  I

 5    apologize in advance that it is going to take me a little bit of

 6    time to get reset up.

 7            THE COURT:  That's fine.  It's going to take us a

 8    couple minutes to get reconnected and bring folks in.

 9        So let's go ahead and take that time.

10        (End of sealed session.)

11            MR. GREENBLUM:  I should proceed?

12            THE COURT:  Hang on.  I need to make sure that the

13    media room line is reconnected.

14        Why don't we go ahead and get started.  I assume the line

15    will get connected any moment now.

16            MR. GREENBLUM:  Thank you, Your Honor.

17            BY MR. GREENBLUM:

18    Q.   I want to go back to some questions that you were asked by

19    counsel for the Department of Justice.  You were asked some

20    questions about in the context of your discussions with Apple in

21    2018.

22        Do you recall generally those questions?

23    A.   Generally.

24    Q.   And you were asked some questions about projections that

25    Microsoft made to Apple about what percentage of queries

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick                    September 29, 2023

9    SIGNATURE OF COURT REPORTER         DATE