1                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA, et al., .
                                       .   Case Number 20-cv-3010
4            Plaintiffs,               .
                                       .
5        vs.                           .
                                       .   Washington, D.C.
6    GOOGLE LLC,                       .   October 11, 2023
                                       .   1:33 p.m.
7            Defendant.                .
     - - - - - - - - - - - - - - - - - .
8

9                    TRANSCRIPT OF BENCH TRIAL, DAY 20
                            (AFTERNOON SESSION)
10              BEFORE THE HONORABLE AMIT P. MEHTA
                     UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For DOJ Plaintiffs:          KENNETH DINTZER, ESQ.
                                  United States Department of Justice
14                                1100 L Street Northwest
                                  Washington, D.C. 20005
15
                                  KERRIE FREEBORN, ESQ.
16                                CLAIRE MADDOX, ESQ.
                                  United States Department of Justice
17                                450 Fifth Street Northwest
                                  Washington, D.C. 20001
18
     For Plaintiff State of
19   Colorado:                    JONATHAN SALLET, ESQ.
                                  STEVEN KAUFMANN, ESQ.
20                                Colorado Department of Law
                                  Consumer Protection Section
21                                Antitrust Unit
                                  1300 Broadway
22                                Seventh Floor
                                  Denver, Colorado 80203
23

24                       -- continued --

25

1    APPEARANCES (CONTINUED):

2    For the Defendant:              JOHN SCHMIDTLEIN, ESQ.
                                    Williams & Connolly LLP
3                                   680 Maine Avenue Southwest
                                    Washington, D.C. 20024
4
                                    MICHAEL SOMMER, ESQ.
5                                   Wilson Sonsini Goodrich & Rosati
                                    1301 Avenue of the Americas
6                                   40th Floor
                                    New York, New York 10019
7
     For Bookings.com:             SARA RAZI, ESQ.
8                                   Simpson Thacher & Bartlett LLP
                                    900 G Street Northwest
9                                   Washington, D.C. 20001

10

11

12   Official Court Reporter:       SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
13                                  Room 4704-B
                                    Washington, D.C. 20001
14                                  202-354-3284

15

16   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25

C O N T E N T S

TESTIMONY

ARJAN DIJK              Direct Examination............... 5275
                        Cross-Examination............... 5301
                        Redirect Examination............ 5364

KINSHUK JERATH          Direct Examination............... 5369


EXHIBITS RECEIVED

PSX97............................................... 5294
DX3148.............................................. 5307
DX3131 through 3133, 3135 through 3140,
3143 through 3152, 3157, 3167, 3168................. 5308
DX3114.............................................. 5344
DXD13.0043.......................................... 5357
DXD13.09044......................................... 5358

                    P R O C E E D I N G S

1       (Call to order of the court.)

2   ARJAN DIJK, WITNESS FOR THE PLAINTIFFS, RESUMED STAND

3       THE COURT:  Thank you, everyone.  Please be seated.

4   Mr. Kaufmann, I'm ready to go when you are.

5       MR. KAUFMANN:  Thank you, Your Honor.

6                   DIRECT EXAMINATION (Continued)

7       BY MR. KAUFMANN:

8   Q.   Mr. Dijk, I'd like to talk to you about -- continue with

9   the discussion about acquisition of customers.

10      In general, what percentage of Booking.com's new customers

11  come to Booking.com via Google?

12  A.   This is a very significant amount.  I'm happy to share the

13  details with you in a closed session, but it's a very

14  significant amount of new customers that come to us via Google.

15  Q.   Okay.  And in general, what if we add existing customers to

16  that calculation?  What percentage of Booking.com's customers,

17  new and existing, originate from Google?

18  A.   That's a significant amount.  So clearly, we work really

19  hard to get people back to our platform, but reality is, we're a

20  very low-frequent purchase, as I explained to you.  So for

21  consumers to remember what they did six months ago or 12 months

22  ago is really difficult.

23      So the place they go to is the place they have been

24  conditioned to, which is namely Google.  So without even

1    thinking, and probably most of us here in the room don't

2    realize, that any time when you access the web, you access via a

3    route that is controlled completely, partially, or -- by Google.

4    So when you open your phone, you go to your Safari browser.  You

5    search with something.  Google.  When you open your Android

6    phone, there's a search box.  Default setting is Google.

7        So the reality is that's where consumers start.  Now,

8    that's where they begin, and it means that also existing

9    customers, you know, for us significantly use Google as a main

10   source of traffic.

11   Q.   Okay.  Does Booking.com make an effort to try to get

12   consumers to go directly either to your web page or to your app.

13   on a phone?

14   A.   Yes.

15   Q.   Okay.  And is there a benefit to Booking.com of doing that,

16   of having consumers go directly?

17   A.   Yes.  Clearly, you know, we are fine paying advertising and

18   doing campaigns so -- to really generate awareness and

19   consideration.  But ideally what we want is that people come to

20   us without us having to pay enormous amounts of money to

21   transact on our platform.

22   Q.   So if a consumer accesses Booking.com, the Booking.com app.

23   through a web search on their phone, does Booking.com count that

24   as direct traffic?

25   A.   Well, that depends.  In 99 percent of the cases, that's

1    true, because people will start with Google.  They will click on

2    an ad.  And then they are deep linked, as it is called, to the

3    mobile app.

4    Q.   So is that direct traffic, or is that traffic that is

5    through Google?

6    A.   That is traffic that is through Google.

7    Q.   And in that case, if you -- if a consumer searches for

8    Booking.com and they then click on the ad, does Booking.com pay

9    for that?

10   A.   Well, that is what is called branded PPC, branded pay per

11   click.  Any company to show up in ad results will have to pay

12   for their own brand name.  So, for example, if Airbnb wouldn't

13   be paying Google branded PPC, all other companies in the world

14   could bid on the term "Airbnb" and make it actually very

15   expensive for Airbnb to show up.

16        So every company in the travel industry and outside of the

17   travel industry on their own brand name have to pay money to

18   Google to show up with their own brand name.

19   Q.   Okay.  Let's go to a slightly different situation.  If I

20   open a browser and I type in "Booking.com" and I go straight to

21   the Booking.com website, does Booking.com have to pay for that?

22   A.   That is called navigational search, and that is done in a

23   browser, and the biggest browser in the world is Chrome.  So

24   when you actually do that, you're taken directly to the

25   Booking.com website, and you don't pay for it.

1    This is kind of more because Google has decided not to

2    charge for this, but they probably could, if they wanted to.

3    Q.    And we discussed before lunch what are the organic links,

4    and if a consumer clicks on an organic link, does Booking.com

5    pay for that?

6    A.    No.  Like any other company, if you want to be found on the

7    web -- and it started that way -- you know, you really made sure

8    that you had a very relevant home page.  And when people were

9    looking for specific elements, for example a dog-friendly hotel

10   in Miami, if you would have a dog-friendly hotel in Miami, you

11   could show up in what is called natural search results.

12       The reality is, the natural search results have become

13   irrelevant, because Google started with one ad, two ads, three

14   ads, four ads, five ads.  So it means that, you know, you have

15   to scroll down on desktop, and you have to scroll down multiple

16   times on a mobile phone.

17       And you probably will have heard the joke, you know, if

18   you're on the second page of Google, in the olden days, you

19   might as well be dead.  I don't know if you remember the joke.

20   But that's kind of the reality.

21       So natural search used to be a very significant part of our

22   business.  It's now kind of anemic.

23   Q.    Okay.  Is Booking.com able to rely solely on users

24   navigating directly to its website or its app. on mobile for

25   customer acquisition and growth?

1    A.    No.

2    Q.    Why is that?

3    A.    As I told you, we're a low-frequent purchase.  So an

4    average American will buy once a year, twice a year a trip.  And

5    it means that to be top of mind all the time is incredibly

6    difficult for any company.  And it means that we have to rely

7    for the majority of our new customers on Google, because we need

8    that kind of high-intent traffic to come to us to drive the

9    growth of our company.

10   Q.    So what about returning customers who may be familiar with

11   you but you have this infrequent usage?  How does that balance

12   out?

13   A.    Yeah, so clearly, you know, it's a mix.  It depends on what

14   browser you use.  But very often, we pay also for what we call

15   branded PPC.  So it means that you type in "Booking.com" on the

16   search page, on Google, and then we have to bid on our own

17   trademark.  And other companies can also do that, and they drive

18   up the price very significantly for us.  So we pay again for

19   returning customers to come to Booking, because very often also

20   Google Search is used as a navigational search.

21   Q.    Has Booking.com tried to reduce its reliance on Google?

22   A.    Yes.

23   Q.    And in general terms, without getting into confidential

24   issues, what types of things have you tried?

25   A.    We clearly try to use different advertising platforms, like

```
 1    TikTok and Facebook, television advertising.  But reality is,
 2    this is all in the low-intent and medium-intent space.  So it
 3    means that it's very difficult to attribute a booking to showing
 4    a baseball ad on television.  So that's kind of really, really
 5    difficult.
 6         So we have tried, and one of my key tasks clearly as the
 7    chief marketing officer is to make that work hard, and it almost
 8    pains me to say that I haven't been very effective yet with my
 9    team.
10    Q.   And does that effort to reduce reliance on Google involve
11    attempting to try completely different marketing channels?  You
12    talked about innovative marketing channels earlier.
13    A.   Well, when you really start looking to get to high-intent
14    consumers across the world, we, the travel industry and any
15    company, is completely reliant on Google to open the door to the
16    courtyard.
17         So if you allow me to draw an analogy, if you picture
18    companies having market stalls on a courtyard, there are several
19    doors into a courtyard.  Every door of that courtyard is kind of
20    directly controlled, partially controlled by Google.  So it
21    means that Google really decides, oh, shall we open a door or
22    not.
23         Then on top of that, Google will cherry-pick.  So they
24    cherry-pick industries where they feel they can make more money.
25    What they do, they put a travel stall in front of one of the
```

1    doors.  So it means suddenly that people say, ah, yeah, oh,

2    yeah, I was interested in travel, let me start with Google.

3        So it's a double whammy, if you understand what I mean.

4    And I'm describing Google Hotel Ads to you.

5    Q.   Okay.  And when you say in specific industries, Google then

6    puts in additional barriers for you to reach consumers through

7    hotel ads?

8    A.   Yes.  So Google will cherry-pick the industries where they

9    can monetize.  For example, if you ask the time in

10   San Francisco, this is clearly a noncommercial search query,

11   very difficult to --

12              THE COURT:  Sorry.  What was the query?

13              THE WITNESS:  Time in San Francisco.

14              THE COURT:  Time in San Francisco.

15              THE WITNESS:  Yeah, or your favorite hip-hop band.  I

16   won't make the joke again, but, you know, very difficult to

17   monetize that.  But especially industries like travel in certain

18   areas and industry like financial services, e-commercial ping

19   are very well positioned for Google to monetize.

20              BY MR. KAUFMANN:

21   Q.   Is Booking.com able to look to other general search firms

22   such as Bing as viable marketing alternatives to Google?

23   A.   I would say no.

24   Q.   And why is that?

25   A.   Because the scale is kind of too small.  So even if Bing

would be far cheaper, it would really not work for us, because
we really don't get the scale that we need.

     So to go back to the courtyard analogy, there are four big
gates that Google controls, and there's a little door that Bing
controls.  So you kind of put a lot of people through that.  So
that's the reality.

Q.   Are text ads that Booking.com purchases on Bing generally
less expensive than on Google?

A.   Very difficult to say.  It depends very much on the
keywords and the searches.  But as I told to you, it doesn't
really matter.  I would gladly spend far more with Bing, but I'm
constrained because the demand is clearly not there.

Q.   Okay.  Has Booking.com's general business migrated more to
mobile phones than desktop in recent years?

A.   Yes.

Q.   And how would you describe that in terms of magnitude
generally?

A.   That's an enormous change.  Clearly, ten years ago, people
were not comfortable buying on a mobile phone.  We see now that
more than 50 percent of our bookings go through the mobile app.
So it's a very important channel.

Q.   What is Bing's presence on mobile devices as compared to
Google?

A.   I would call it zero or approaching zero.

Q.   Do you have an understanding as to why Bing's presence on

1   mobile is so much lower than Google's?

2   A.   Yeah, because it's almost impossible to really break in to

3   the conditioned consumer.  So when you're on your iPhone, you go

4   to Safari.

5          MR. SOMMER:  Objection, Your Honor; speculation, no

6   foundation.

7          THE COURT:  It's overruled.  He can answer to the

8   extent of his understanding based upon his industry knowledge

9   and his time at Google.

10          Go ahead.

11          THE WITNESS:  When you open your Safari browser, you

12   know, you type in your search term.  The default setting is

13   Google.  So people don't really realize that, you know.  So

14   that's on the iPhone side.

15          On the Android side, Google completely controls the

16   ecosystem.  The Android's ecosystem, people have preinstalled

17   apps.  The search bar, again, is default Google.

18          Maybe if you allow me, Mr. Kaufmann, the importance of

19   default settings is really, really key.  In my days at Google --

20   I worked there 11 years -- it was clearly understood that being

21   the default is almost everything, because when you're the

22   default 95 percent of people will stick with the default.  Maybe

23   5 percent of people will opt out.  And that kind of realization

24   was very clear.

25          BY MR. KAUFMANN:

Q.   Do the market dynamics that create Booking's dependence on Google apply to the online travel industry generally, or are those unique to Booking.com?

A.   These apply to the online travel industry.  I would actually say online and offline, but online, yes.

Q.   Okay.  Could Booking.com stop buying text ads on Google and sustain its business?

A.   No.

Q.   Let me switch gears a bit, and I want to ask you a few questions about markets outside the United States.

     You mentioned that you operate in markets outside.  Are there --

          MR. SOMMER:  Objection, Your Honor.  Outside the United States is not relevant to this case.

          THE COURT:  We've heard some testimony about other markets and competition in other markets, and maybe that's where this is going.  If it's not relevant, it's not relevant.

     Go ahead.

          BY MR. KAUFMANN:

Q.   Are there markets outside the United States where Booking.com does business in which there is more competition among general search firms?

A.   Yes.  Very limited, to be honest.  It used to be Russia, so where Yandex, the local search engine, has a very strong position.  So we really would divide our marketing budgets

between Yandex and Google.  We, you know, at the moment do not

do business in Russia until things hopefully will go back to

maybe where they were.

Then in South Korea, there's a search engine called Naver

where we also really see that as a viable option.

Interesting enough, in Japan, you have Yahoo!, but then the

ads engine is powered by Google.  So we're back to Google

actually.

Q.   Does Booking.com spend or distribute its marketing budget

differently in those markets, those three markets which you

described and at least Russia previously?

A.   Yes.

Q.   And how do you distribute the marketing spend differently

in those markets?

A.   Well, we clearly always look at return on investment and at

diversification of channels.  So -- and we are a company that is

a, we call it, scaled.  So we're very focused on attracting a

mass audience.  So it means that any channel that can give us

the quantity and area that we need, we will invest in.

Q.   If Microsoft were able to become a stronger alternative to

Google, would Booking.com spend more on Microsoft?

A.   Yes.

Q.   On Bing?  If another search engine were to become a viable

alternative to Google, would Booking.com consider using that --

well, let me rephrase that.

1   If another general search engine were to become a viable

2 alternative to Google, would Booking.com consider using that

3 general search engine as an alternative advertising channel?

4 A. Yes.

5 Q. Now, we talked about organic search traffic briefly before.

6   Would you explain again what organic traffic is?

7 A. So organic traffic is traffic when you type in a keyword in

8 Google, you show up for free, more or less.  And you will

9 remember, that was really the thing that made Google so

10 powerful.  That's when you typed in 20 years ago some keywords,

11 a website that is relevant would show up.  That was kind of the

12 unique thing that was really good.

13   The key problem in kind of more commercial categories, like

14 shopping, travel, anything else, it's kind of impossible now to

15 really use organic results, because I told you Google started 20

16 years ago with one ad, two ads, three ads, four ads, five ads.

17 So it means that if you have to scroll down, you know,

18 endlessly, it's impossible.

19   It also means that smaller companies will never be able

20 almost to show up.  It's very, very, very difficult.

21 Q. In general terms, what proportion of Booking.com's total

22 business are accounted for through organic traffic now?

23 A. It's low, and I'm happy to give you an exact percentage

24 point.

25 Q. How does that compare with, say, five or ten years ago in

terms of the source of business through organic search?

A.    Yeah, it has -- everyone in the travel industry, industry
in general, has seen this really significant tendency of this
going down, down, down, down, down.  And it makes sense.

Q.    You mentioned the proliferation of advertising pushing
organic searches down.  Are there other factors that have pushed
organic searches down on the search engine results page?

A.    Well, it's clearly also how the ads are characterized.  So
it means there's a little word that says "ad."  So it means that
by making that more or less prominent, Google has a lever to
really make it more difficult or easier to differentiate between
natural results and paid results.  So that's one thing.

      Another thing is also what we call audience quality.  So
Google decides when they show ads to you.  And that depends on
the keywords that you put in.

      So if you, for example, would put in "apartments in New
York City," you know, Google will decide if that's a commercial
query or not.

      And you see that also the amount of keywords and search
queries that are being monetized has gone up significantly.  And
for us particularly, it means that what we call audience quality
has gone down, because commercial -- more queries are treated as
a commercial query, if you understand what I mean.

      Sorry to be a bit technical.  Let me know if that answers
your question.

Q.   I think we understand that.  Thank you.

In general terms, how has the reduced relevance of organic results changed Booking.com's marketing strategies?

A.   Well, it means that we have to pay more and more and more for the same.  So if you look also worldwide, the absolute number of search queries on Google haven't gone up, but the revenue has been growing every year with 10, 20 percentage points.  So it means the only way Google is doing that is by just monetizing more, more, more, more out of kind of the same search queries.  So volume hasn't gone up, but the price, you know, has gone up significantly.

Q.   What's the problem with paying Google for ads on its search engine results page?

A.   There's no problem.  I gladly will pay for advertising. The only problem is that if it's a one-sided relationship, that you get dictated, more or less, or imposed, you know, and you're completely relying on one channel, that's kind of the issue.

And we're a big company.  We spend billions in the past years with Google.  And I can tell you, it's a completely one-sided relationship.  We're very friendly with each other, and, you know, you could even say the relationship is wonderful, because I like my account managers.  But reality is that we're in a benevolent dictatorship, which means that we just have to accept any changes that Google makes.

There is no discussion.  There's no kind of real like, oh,

1   do you think this is a good idea or no.  We get this imposed on

2   us.  And it's a fascinating thing when you spend billions, but

3   that's how it is.

4   Q.   Okay.  I would like to talk to you about one of your

5   confidential exhibits, if I may approach, Your Honor.

6           THE COURT:  Sure.

7           MR. SOMMER:  Your Honor, we have an objection on this.

8   We would prefer to be heard at sidebar, if that's okay with Your

9   Honor.

10          THE COURT:  Okay.  Why don't you come on up.

11      (Bench conference.)

12          MR. SOMMER:  Your Honor, our objection to this

13  document is that this was prepared in response to inquiries in

14  the EU.  It's clear, when you flip through it, you will see

15  everything is in Euros.  Your Honor has already ruled on one

16  other document that was in response to an EU inquiry.  That's

17  hearsay and should not be admitted.

18      The same is 100 percent true of this.

19          MR. KAUFMANN:  Your Honor, this is not a submission to

20  the European Commission.  This is an internal business document

21  analyzing their costs and expenses on Booking.com that deals

22  with worldwide expenses, not just --

23          THE COURT:  If he's asked whether this was prepared

24  for the purpose of the European Commission's investigation, what

25  will the answer be?

```
 1              MR. KAUFMANN:  I don't know the answer to that.

 2              THE COURT:  How do you know that it was, in fact,

 3    prepared for business purposes?

 4              MR. KAUFMANN:  We will be able to establish that this

 5    is a business record.  We have a 902.11 declaration.  But I'm

 6    willing to establish the foundation.

 7              THE COURT:  There is an earlier record, and you can

 8    have your declaration.  That's fine.  But if this was something,

 9    for example, that was prepared for a regulator, I don't think it

10    is a business record.

11              MR. KAUFMANN:  This is not something that was

12    submitted to a regulator.  This is an internal -- this is an

13    internal document, and it is different from something submitted

14    to a regulator.

15              MR. SOMMER:  Just so there's no confusion, we're not

16    saying it was submitted to a regulator.  It was prepared as a

17    result of inquiries from regulators.

18         So if you look at the first page, Your Honor, look -- the

19    second bullet point is all about potentially anticompetitive

20    activity, because those were the inquiries.  And that's what

21    they were -- they were gathering data to respond to inquiries in

22    the EU on the subject matter, which is not the business of

23    Booking.com.

24              MR. KAUFMANN:  Your Honor, we've already heard this

25    witness testify about anticompetitive activities and what his
```

perspective is from a business perspective on those types of

issues.

THE COURT:  Let's do this:  Is he familiar with the

document and its creation?

MR. KAUFMANN:  This was prepared by his team.

THE COURT:  So let's go ahead and just get the

foundation.  If this was prepared for the purpose of the

European Commission investigation, it falls clearly on one side.

If it's prepared in response to, for their own internal business

purposes, I think that's a different issue.

MR. SOMMER:  That's not the regularly conducted

business of Booking.  So just because you prepare something as a

business doesn't make it a business record.

THE COURT:  Well, it is if he's going to get up and

testify that this was something that was done as, I think he

testified earlier -- I don't know if this will connect up, for

example, with efforts to move away from Google.  In other words,

are they collecting information as a strategy.

The thing is, given a title that suggests that it had to do

with an internal project --

MR. KAUFMANN:  Your Honor, there's also issues that

were discussed here and not in this same deck but different

versions of this that were raised with Google where they wanted

to raise the problems and concerns they had with Google to be

able to identify what those problems were.  So we're not just

1    talking about something that is framed in terms of a filing, but

2    as a part of the regular business of their dealings with Google.

3            MR. SOMMER:  I have no objection to them inquiring

4    about their dealings with Google.  My objection, I think it's

5    probably clear to Your Honor, is this was created in response to

6    inquiries from regulators.  That's not the normal business of

7    Booking.com.

8            THE COURT:  I'm not sure I agree with that entirely.

9    I mean, it's about the purpose for which the document was

10   created and how it was then maintained and used.

11       So if, for example, what he testifies is that we had this

12   inquiry by the EU, it caused us to think about strategies and

13   ways in which we can move away from Google and we collected

14   information, the fact that it was triggered by the investigation

15   doesn't, I think, negate it being a business record, it seems to

16   me.  But I want to hear what he has to say.

17           MR. SOMMER:  Understood.

18           MR. SCHMIDTLEIN:  There's been an awful lot of leading

19   questions of this witness.  The foundation of this document, try

20   some nonleading questions.

21       (End of bench conference.)

22           THE COURT:  Thank you very much.

23           BY MR. KAUFMANN:

24   Q.   Mr. Dijk, if you could look at Exhibit PSX0097, which is in

25   front of you.

1    Are you familiar with that document?

2    A.    Yes.

3    MR. SOMMER:  We ask that the document be taken down.

4    THE COURT:  Well, I mean, that's fair.  I don't know

5    if it was only for the witness.  I don't know whether it was

6    elsewhere.  But yes, until it's admitted, it shouldn't be put on

7    the screen.

8    BY MR. KAUFMANN:

9    Q.    Was this document prepared by people who work for you?

10   A.    Yes.

11   Q.    And was this -- can you tell us what this document is?

12   A.    This document outlines really has Google has more or less

13   made the paid placements far more dominant and has made us pay

14   far more for the same traffic.

15   Q.    And how does this document inform Booking.com's business

16   strategies going forward?

17   MR. SOMMER:  Objection.

18   THE COURT:  Can we just do it this way:  Sir, can you

19   just describe for me the context in which this document arose.

20   THE WITNESS:  So this document is from October 2019, I

21   believe.  So this is around four years ago.  And we clearly were

22   at the time very concerned with the developments of us having to

23   pay more, more, and more for our Google clicks, and that we

24   became for our new customer acquisition very, very dependent on

25   Google.

1        And this is really the outline of this document that shows

2   kind of how things were in 2015.  Then it contrasted with how

3   things were in 2019.  And then you see that the paid placements

4   have become far more prominent, and it means that if consumers

5   go to a desktop or a mobile phone, the only thing they will see

6   on the screen is an ad.  You have to scroll down then to go to

7   the natural search results.

8        THE COURT:  Okay.  So the next question is, how did

9   Booking use this document once it was created?

10       THE WITNESS:  Yeah, so this is a document that we

11   discussed with our management team, with our board, really to

12   see if we can find solutions.  And it has proven to be very

13   tough, I will be honest with you.

14       THE COURT:  And was this document in any way -- its

15   preparation, was it prompted by regulatory inquiries?

16       THE WITNESS:  Not at all; not at all.

17       THE COURT:  Okay.  Any follow-up questions from either

18   side?

19       MR. KAUFMANN:  No.  I move the admission of PSX97.

20       THE COURT:  All right.  So the witness's answers in

21   combination with the business records declaration I think

22   warrants admission as a business record.

23       So it will be admitted, PSX97.

24       (Exhibit PSX97 received into evidence.)

25       BY MR. KAUFMANN:

1    Q.    Mr. Dijk, this exhibit has a number of portions that have

2    been redacted for confidentiality purposes.  And those will be

3    highlighted on the hard copy that you have, but when those

4    appear on the screen, it will show only as redacted.  I will try

5    to stay away from the redacted information and not ask you about

6    it, and if I delve into that area, you will please correct me.

7    And again, if you would stay away from that, too.

8    A.    No worries.

9    Q.    Okay.  So on the top of what's the second page, if you

10   would go to the executive summary on the second page, please,

11   and that first bullet point, that "Google has consistently

12   introduced changes to the search results page that give paid

13   placements (PPC ads and Google Hotel Ads) more visually

14   prominence and screen real estate, displacing organic (SEO)

15   content."

16        Would you explain what that is, please.

17   A.    I think I explained it already a bit to you.  So it means

18   that, you know, Google has favored the position and size of

19   their ads on their search page.  So it means that consumers will

20   have to work pretty hard to find the natural search results.

21   Q.    Okay.  And what is SEO?

22   A.    SEO is a -- the acronym is search engine optimization, and

23   a synonym would be natural search.  And it's kind of the free

24   search that Google offers companies to be found on the web.

25   Q.    Okay.  And as a part of the executive summary, did

1    Booking.com determine that the -- that Google's optimization of

2    search results page towards paid placements cost Booking.com a

3    certain dollar amount, and did you calculate that amount?

4    A.   Yes.

5    Q.   And is that shown in the executive summary in what is the

6    fourth bullet point?

7    A.   Yes.

8    Q.   And then the next bullet point says, "When we account for

9    our relatively speaking improved visibility within the organic

10   ranking, our estimate increases by almost," and then there's

11   again a confidential number.

12       What is -- could you explain what that is, please.

13   A.   So it more or less says that if we look at everything, our

14   estimate really significantly increases.

15   Q.   If you would go, please, to page 5.  Now, much of this is

16   confidential, but I want to draw your attention to the

17   hypothesis at the very top where it says, "Google is optimizing

18   their search result page (SERP) such that Booking.com gets a

19   smaller fraction of free clicks over time and thus the

20   advertising spend is increased."

21       Is that the hypothesis that your team sought to analyze in

22   this?

23   A.   Yes.

24   Q.   If you could turn to page 9, please.  I'm sorry.  Page 10.

25   You know what?  We can skip this page.  I think we've already

covered this.

Could you explain what the similar dynamics are that you've seen and how that has been affected on mobile as compared to desktops?

A.   Yeah, you can read this.  What you see is that it is really, really difficult to find natural search results on a mobile phone screen.  So you don't have to scroll down one page; you have to scroll down probably three, four pages before you even get to the natural search results.

So I made the little joke to you before, you might as well be dead on page 2 of Google.  This more or less applies even stronger in the mobile area.

Q.   Okay.  If you would turn to page 14, please.  Now, I direct you to the bottom of the page, and what I've -- identified there are PPC, GHA, and total Google spend for 2019 by Booking.com, and the numbers are confidential.

Can you explain what PPC and GHA are, please.

A.   PPC is pay per click.  It's analogous to Google text ads.  So it's really what we're paying on the text ads on Google.

GHA is Google Hotel Ads.  It's the ad unit that Google serves with the price comparisons.

Q.   And are those numbers that we're seeing there, the total spend in 2019, at least through October, that Booking.com spent on Google?

A.   Yes.

1    Q.   Okay.  And if we would turn to page 15, please.  Now, this

2    is largely redacted, and I'm going to want you to explain this

3    page, if you would, please, for the benefit of those of us who

4    can see the highlighted version.

5        Is this the calculation that your team did of the 2015 to

6    2019 costs?

7    A.   Yes.

8    Q.   And when we see the trend lines moving up over time, what

9    does that show us?

10   A.   So it shows that the cost of nonbranded PPC -- so these are

11   general keywords -- are going up and up, that the cost of

12   branded PPC goes up -- and branded PPC is really when people

13   type in "Booking.com" on Google Search -- and that's the organic

14   results are going down.  So the growth we're seeing in each

15   channel, you know, the organic results more or less are not

16   growing as fast or are not growing at all.

17   Q.   Okay.  Now, if you would turn to page 18, please.  Again,

18   this is a largely redacted page.

19       And is this a calculation that your team did of the

20   increased cost to Google as -- from 2015 to 2019 based upon the

21   volume in 2019?

22   A.   Correct.

23   Q.   Okay.  And there is a red box that appears in the original

24   of the document.

25       Do you see that?

1    A.    Yes.

2    Q.    Okay.  And within that red box, is that the increase in

3    cost that your team calculated?

4    A.    Yes.

5    Q.    Okay.  So if I may clarify that, is that number that's in

6    that box, is that the increased cost that Booking.com paid to

7    Google?

8    A.    We actually formulate it a bit differently.  So we would

9    have to spend a significant amount less in 2015.  So we

10   formulate it on the page differently, but it's the same thing,

11   to be fair.

12        I'm trying to be correct.  I'm sorry.

13   Q.    That's fine.  Now, if you would turn to page 24, please.

14        Now, this page results to a specific -- what appears to be

15   a specific change in what was happening at Google in

16   May of 2019.

17        Do you see that?

18   A.    Yes.

19   Q.    Can you explain what that -- what that change was that you

20   observed?

21   A.    Yeah, so this was a design update making the ad units more

22   prominent.  And we saw, therefore, a very big decrease in the

23   free clicks that we used to be getting from the mobile phone.

24   Q.    And over what period of time did this one change occur?

25   A.    We -- we really -- we have to observe it ourselves, because

1    those changes are imposed on us.  So it's not as if we get a

2    notification that, hey, we have changed the ad units.  So this

3    is stuff that just happens, and we react to it.  So it means

4    that we clearly are trying to monitor and adapt as good as we

5    can.

6    Q.   And did you attribute those changes to a decrease in

7    organic clicks?

8    A.   Yes.

9    Q.   And are those shown, then, in the confidential -- the first

10   confidential number that is highlighted on the bottom of the

11   page?

12   A.   Yes.

13   Q.   And did you also notice a decrease in your growth rate from

14   organic results or search engine optimization?

15   A.   Yes.

16   Q.   And what we're talking about here is actually a decrease in

17   growth for Booking.com, because it's a growing business; is that

18   right?

19   A.   Yes, but also the reality that we have to pay more, more,

20   and more to get more or less to the same results or be able to

21   grow our business.

22             MR. KAUFMANN:  I have nothing further at this time and

23   pass the witness, Your Honor.

24             THE COURT:  All right.  Thank you, Counsel.

25             MR. SOMMER:  Judge, can I have one second?

1          Oh, you guys are going?  Sorry.  Never mind.

2              MS. FREEBORN:  We have no questions for this witness.

3              MR. SOMMER:  Okay.  Thank you, Judge.

4                        CROSS-EXAMINATION

5              BY MR. SOMMER:

6    Q.   Mr. Dijk, good afternoon.  My name is Michael Sommer.  Good

7    to meet you.

8    A.   Good to meet you, Mr. Sommer.

9    Q.   In your testimony just before the lunch break, you were

10   asked, does Booking.com sell any advertising, and your answer

11   was "quite minimal."

12          Do you remember that response?

13   A.   Yes.

14   Q.   But you also mentioned what you refer to as commission

15   partners.

16          Do you recall that?

17   A.   No.

18   Q.   Do you recall saying, "There are some partners who pay

19   Booking to appear higher up on the results page"?  Do you

20   remember discussing that?

21   A.   Yes.  I did not use the word "commission partners."

22   Q.   That's what I was going to follow up on.

23          Does Booking use the term "preferred partners"?

24   A.   Yes.

25   Q.   And just so we're clear here, whether you want to say it's

1  advertising or not, let me make sure we understand the elements

2  of what's going on here.

3      Booking takes money from hotels and other travel-related

4  sources so that those companies' ads can appear higher on the

5  Booking.com page; is that a fair description?

6  A.  Yes.

7  Q.  And Booking is charging that money and accepting that money

8  so that the advertiser can feature its ad higher up than what

9  you described as an organic result; is that also fair?

10  A.  In our business, there is no such thing as an organic

11  result, because hotels or partners will always pay a commission.

12  That's a difference.

13      Also, the big difference is that, you know, all our

14  partners have a choice.  There are at least 10, 12 different

15  OTAs that any hotel partner or accommodation partner can choose

16  between.

17      The point I made is that for our high-intent traffic, we do

18  not have a choice but to work with Google.

19  Q.  I wasn't asking about that, so let me try one more time.

20      The way you designate these people who have paid

21  Booking.com money to appear higher up, if I'm right, is a yellow

22  thumbs up; is that right?

23  A.  Correct.

24  Q.  So the people who don't pay don't get the yellow thumbs up;

25  is that right?

1    A.    Yes.  You're asking the same question but the other way

2    around; no?

3    Q.    Did you understand my question?

4    A.    I hope so.

5    Q.    Okay.  And the people that don't pay Booking.com, they

6    appear lower on Booking.com's site than the people who do pay

7    and get the thumbs up; correct?

8    A.    Yes.  To be clear, everyone pays to be a part of our

9    platform.  We're a store.  So it means that, you know, everyone

10   will have to pay to show up, and we pay a commission when people

11   book with us.  So it means also that if a company, you know,

12   shows up high but does not get booked, they will never pay.  So

13   a guest will have to stay at a property.  Then, actually, they

14   will pay for that.

15   Q.    So since everybody has to pay, the preferred partners, the

16   ones -- those who get the thumbs up, they're paying more; is

17   that right?

18   A.    Correct.

19          THE COURT:  I'm sorry.  Just to be clear, much like

20   the payment with a click on Google, do I understand you

21   correctly that the higher payment from a partner would only be

22   if a user clicked and then made a purchase or booking?

23          THE WITNESS:  Yeah, that's how our model works.  So

24   any partner, vacation rental, hotel, will only pay for our

25   services the moment a booking has happened.

1          THE COURT:  Okay.  Thank you.

2          BY MR. SOMMER:

3     Q.   All right.  We will come back to that in a moment, sir.  I

4     want to follow up on a term I heard you use a few times in your

5     direct testimony, and that term is "direct."

6          Does that refer to users coming to Booking.com in a manner

7     Booking.com describes as direct?  Is that a term you guys use?

8     A.   Yes.

9     Q.   I want to make sure I understand what direct means.  Direct

10    means people coming to Booking in a manner that Booking does not

11    have to pay someone for; correct?

12    A.   Yes.

13    Q.   Okay.

14    A.   Although you could argue that our brand advertising, for

15    example, is very difficult to attribute to a booking, but

16    indeed, if there's no direct link between, you know, seeing an

17    ad and a click, we would call that direct.

18    Q.   I want to try one more time.  Within the -- the realm of

19    direct, does that -- is that people who come to Booking in a way

20    that Booking does not have to pay someone for?  Is that right?

21    A.   Correct.

22    Q.   So, for example, direct would be anyone coming to Booking

23    by typing "Booking.com" in a URL; correct?

24    A.   That's a navigational search.  It depends on the browser

25    you're in.  But yes.

1    Q.    Okay.  On any browser, if someone types in on the URL

2    "Booking.com" and comes to Booking.com, Booking.com does not pay

3    for that; is that correct?

4    A.    Correct.

5    Q.    Okay.  And it also includes anyone coming to Booking from

6    your app. on any device.  You don't pay for that; right?

7    A.    No.

8    Q.    And that's direct; correct?

9    A.    No.

10   Q.    That's not direct?

11   A.    No.

12   Q.    Now I'm confused again, because I thought direct was

13   someone coming to you where you didn't have to pay for it.

14   A.    I think I explained it earlier, that a very significant

15   part of our traffic in a mobile app. comes from Google Search.

16   It's called deep linking.  I mentioned this one hour ago, and

17   I've been very clear about that.  So I wouldn't call that

18   direct.  That's kind of paid traffic.

19   Q.    Okay.  Now, during your tenure at Booking -- it's been

20   about three and a half years; is that right?

21   A.    No, four and a half years.

22   Q.    Four and a half years.  My math is bad.

23         Has there been an emphasis on generating more direct

24   traffic?

25   A.    Yes.

1    Q.   And has Booking succeeded in generating more direct

2    traffic?

3    A.   Moderately.

4    Q.   You're aware that Booking has quarterly earnings calls;

5    correct?

6    A.   Yes, I'm a part of those.

7    Q.   Okay.  And those are done every quarter for analysts and

8    shareholders and any other member of the public that's

9    interested in listening in; correct?

10   A.   Yes.

11   Q.   And then those are transcribed and posted on the website

12   for some period of time; correct?

13   A.   Yes.

14   Q.   And even when they're taken down from the website, they're

15   maintained at Booking in case anyone needs to go see what

16   someone said at one of the earnings calls; correct?

17   A.   Yes.

18   Q.   And that's a part of the regular business of Booking

19   Holdings; correct?

20   A.   Yes.

21   Q.   Okay.  I'm going to get you a binder.

22   A.   You're scaring me.  Those are big binders.

23   Q.   I'd like you to open up in your binder to -- and the

24   exhibits are in numerical order.  Can you turn to 3148, please.

25        Are you there, sir?

1    A.    Yes.

2    Q.    Okay.  And this is the Q1 2019 earnings call; correct?

3          It should say it right on the cover, right under Booking

4    Holdings, Inc.  Do you see that?

5    A.    02-03-2021.

6    Q.    Are you at 3148?

7    A.    3138, yes.

8    Q.    3148.

9    A.    Oh, 48.  I'm sorry.

10   Q.    I'll try to be more clear.

11         3148 is the Q1 2019 earnings call; correct?

12   A.    Correct.

13         MR. SOMMER:  Your Honor, we offer DX3148 in evidence.

14         MR. KAUFMANN:  No objection.

15         THE COURT:  It will be admitted.

16     (Exhibit DX3148 received into evidence.)

17         MR. SOMMER:  And, Your Honor, to save a little time,

18   the other earnings calls that I am offering into evidence are

19   all from the period 2019 to 2023.  They are DX3131 through 3133,

20   3135 through 3140, 3143 through 3152, 3157, and 3167 and 3168.

21         I offer each of those.

22         THE COURT:  Let me just make sure Mr. Douyon got all

23   those numbers.  Otherwise, I'm going to ask you to repeat those.

24         The court reporter got those as well?

25         Terrific.  Because I did not.

1         All right.  Any objection to admitting those?

2              MR. KAUFMANN:  Having not reviewed them all at this

3     time, but assuming they are as Mr. Sommer represented, there's

4     no objection.

5              MR. SOMMER:  Scout's honor.

6              THE COURT:  They will be admitted, subject to any

7     future objections.

8         (Exhibits DX3131 through 3133, 3135 through 3140, 3143

9     through 3152, 3157, 3167, and 3168 received into evidence.)

10             BY MR. SOMMER:

11    Q.   Let's go ahead and take a look at 3148, and if you could

12    turn to page 3 of that report.  There's a paragraph, the second

13    one from the bottom, just before the bottom, that begins "we are

14    pleased."  You can look at your monitor as well, Mr. Dijk, if

15    that's helpful.

16        Do you see the second sentence says, "Our direct channel is

17    growing faster than our pay channels"?  Do you see that?

18    A.   Yes.

19    Q.   Okay.  And I take it, sir, that if something was said in an

20    earnings call, would you accept it as accurate?

21    A.   Yes.

22    Q.   Okay.  So this was in Q1 2019.  The direct channel was

23    growing.  And was that just before you got there?

24    A.   Yes.

25    Q.   Okay.  Let's turn to DX3145, which is the Q4 2019 earnings

1    call, on page 5.  And on that page, it says -- I'm sorry.  I

2    started before you.

3         Are you there, sir?

4    A.   I see it on the screen.  So you have to give me a little

5    time to find it.

6    Q.   3145, page 5.

7    A.   Page 4, you said, or page 5?

8    Q.   Page 5.

9    A.   Yeah.

10   Q.   Do you see where it says, "In each quarter of 2019, our

11   direct channel grew faster than our primary pay channels and our

12   direct channel increased its share for the year"?  Do you see

13   that?

14   A.   Yes.

15   Q.   Just so we're clear, what are the pay channels?  That's

16   when you pay for advertising; correct?

17   A.   Yes.

18   Q.   Moving forward, I'm just going to cover a couple more of

19   these.  DX3140 is the Q1 2021 earnings call, 3140.  And I'm

20   going to ask you to turn to page 5 and the paragraph

21   beginning "mobile bookings."

22        Do you see the second sentence -- withdrawn.

23        Next sentence, "Our direct channel gained share both

24   sequentially and year on year."

25        Do you see that?

1    A.    Yes.

2    Q.    So in 2019 and into 2020, the direct channel was growing;

3    correct?

4    A.    Yes.

5    Q.    Let's look at 3132, at page 8, please, the bottom

6    paragraph.  "The direct channel increases as a percentage of our

7    room nights in the first quarter relative to the first quarter

8    of 2022."

9         Do you see that?

10   A.    Yes.

11   Q.    So fair to say, sir, since you've arrived -- and if you

12   want to take the credit, you may, but since you've arrived, the

13   direct channel has continued to grow; is that fair?

14   A.    Yes.

15   Q.    And again, the direct channel is Booking not paying someone

16   to get those customers; correct?

17   A.    Correct.

18   Q.    Let me show you an exhibit that has been marked

19   confidential by Booking.  Is there a way we can just have it

20   shown to the -- this is, just for the record, PSX94A.

21        It should be in the binder; correct?  It's in your binder,

22   and Your Honor has it.

23        And if you could turn -- do you see at the bottom, if you

24   turn in a few pages, you see there are black numbers at the

25   bottom that have been placed?

```
 1                    THE COURT:  Sorry.  Did you say 394?  3194?  What's
 2       the number again?
 3                    MR. SOMMER:  PSX94A.  94, PSX94.
 4                    THE WITNESS:  Oh, is it in the back?
 5                    BY MR. SOMMER:
 6       Q.   If you could turn to page 11.  Stamped at the bottom,
 7       it's .011.  Just let me know when you're there, sir.
 8       A.   Okay.
 9       Q.   I wanted to ask you about some of the terminology in the
10       middle of the page.  Do you see where it says "interco"?
11       A.   Yes.
12       Q.   Okay.  And is that referring to related assets, you know,
13       some of Booking's partners, like Priceline, Kayak?  Is that
14       right?
15       A.   Yeah, it's mainly Agoda, Priceline, and Kayak.
16       Q.   Is that indicating traffic to Booking is coming from those
17       partners?
18       A.   So it's partners who have signed up with Booking.com that
19       we have made available to our sister brands.  So if they book
20       the property on Agoda, we would call this intercompany.
21       Q.   And then the next one under that is meta, m-e-t-a.  We've
22       heard that in a very different context in this case.
23            That's not the company that owns Facebook; correct?
24       A.   Correct.
25       Q.   So meta is referring to traffic search engines like
```

1    Expedia, Hotels, Skyscanner, et cetera; is that right?

2    A.    No.

3    Q.    No?  Okay.  Why don't you tell me, then.

4    A.    So the meta channels are what we call price comparison

5    channels.  So Google Hotel Ads would be a part of that.  Other

6    providers would be companies like Trivago and Trip Advisor.

7    Q.    Okay.  And then the last one I will ask you about is SP.

8          Do you see that?

9    A.    Yes.

10   Q.    That refers to strategic partners?

11   A.    Yes.

12   Q.    Those are Booking's strategic partners; correct?

13   A.    These are partners we work with.  An example could be

14   for -- as an example, United Airlines being a partner of

15   Booking.com.

16   Q.    Now, do you see on this chart, and I'm not going to reveal

17   any numbers because I know it's been marked confidential, there

18   is -- there are some entries for what's called PPC nonbrand and

19   PPC brand.

20         Do you see that?

21   A.    Yes.

22   Q.    That's paid search; correct?

23   A.    Yes.  So PPC brand is when you type in Booking.com in the

24   search engine and that we have to pay for our trademark.  And

25   PPC nonbrand is general terms like hotels.

1  Q.   And then SEO nonbrand and SEO brand would be what you

2  described before about organic results; correct?

3  A.   Correct.

4  Q.   Sir, would it be fair to say, and again without getting

5  into any numbers here, that from 2019 to 2023 Booking increased

6  its direct channel?  Correct?

7  A.   Yes.

8  Q.   Okay.  And it actually reduced its paid search, the red and

9  the green; correct?

10  A.   As a relative percentage, yes, not in absolute terms.

11  Q.   I'm just going off of -- I mean, you created this chart;

12  right?

13  A.   But you asked me -- you said it's bigger.  I'm clarifying

14  that these are relative percentages.  So it means the absolute

15  amount we're paying is actually higher.

16  Q.   That's because you're paying more overall; correct?

17  A.   Yes.

18  Q.   But the relative percentages, the paid search is going down

19  compared to, for example, direct search?

20  A.   Correct.

21  Q.   Or direct customers; correct?

22  A.   Correct.

23  Q.   And at least as of this chart, as of 2023, if we want to

24  know the percentage of traffic from paid search, we would add

25  together the PPC brand and the PPC nonbrand; is that correct?

1    A.    Correct.

2    Q.    Okay.  Now, one of the ways Booking has succeeded in

3    increasing its traffic from other than paid search is that

4    Booking has industry-leading retention numbers when it comes to

5    its users; is that correct?

6    A.    Yes.  The way we have increased our direct channel is that

7    customers who have booked with us once, that we have them come

8    back direct.  I explained to you, for us to get to new

9    customers, we rely completely on Google to get those to us.

10   Q.    I wasn't asking about new customers.  I was asking about

11   customer retention, which is by definition existing customers;

12   correct?

13   A.    We have been able to increase our direct percentage,

14   because customers are coming back to us.

15   Q.    Okay.  And if we look quickly at DX3136, which is the Q1

16   2022 earnings call, 3136, at page 4 -- by the way, who is Glenn

17   Fogel?

18   A.    He is the CEO of Booking.com and the CEO and president of

19   Booking Holdings.

20   Q.    And we see at page 4, Mr. Fogel says, "In March, our unique

21   active customers at Booking.com were within 95 percent of 2019

22   levels, driven by strong growth in returning customers who had

23   not made a previous booking in over a year."

24        Do you see that?

25   A.    Yes.

1    Q.   And that was true; correct?

2    A.   Yes.

3    Q.   And so when you described earlier to us that customers

4    completely forget about Booking and start all over again on

5    Google, that's not these people being described by Mr. Fogel,

6    the returning customers; correct?

7    A.   No, I don't think that I said "completely."  I said -- but

8    I have to look up what I said.

9    Q.   Let me rephrase my question.

10   A.   Yeah.

11   Q.   The people being described by Mr. Fogel as these returning

12   customers, those are not people going back to Google to find

13   their way to you; they're coming back to you directly.  Correct?

14   A.   Correct.

15   Q.   Another way Booking has succeeded in increasing direct

16   traffic is increased use of its app.; correct?  I think you

17   mentioned that earlier.

18   A.   Yes.

19   Q.   And would you agree that the app. captures high-intensity

20   consumers?

21   A.   I'm not sure if I understand.

22   Q.   Let me rephrase it, then.

23        People who come to Booking on your app. are those people

24   looking to -- who are interested in booking a trip, from your

25   perspective?  Do they fall into that category?

1    A.    Not always.

2    Q.    Okay.  And do you recall that some of the earnings calls --

3    or I think all of the earnings calls from 2019 forward have

4    discussed increasing traffic on the app. and the importance of

5    doing that?

6    A.    Yes.

7    Q.    And would you agree with me that one of the particular

8    important aspects of the app. is that younger users are more

9    likely to use an app. on a phone?  Would you agree with that?

10    A.    In broad terms, yes.  It depends on where you are in the

11    world, but in U.S., I would say so, yes.

12    Q.    During your direct testimony, you said that Booking is

13    completely and utterly dependent on Google for new customers.

14          Do you remember that?

15    A.    Yes.

16    Q.    Okay.  That's a bit of an exaggeration; correct?

17    A.    No.

18    Q.    Do you remember saying those same words at your deposition?

19    A.    Along those lines for sure.

20    Q.    In fact, you said it twice.  If you want me to show you the

21    transcript, I'm happy to.

22    A.    I told you, I can't remember my breakfast from yesterday.

23    So March 2022 is far away.

24    Q.    In fact, do you recall telling us that you probably had

25    used those actual words, "dominant" and "one-sided," in written

1    communications?  Do you remember talking about that at your

2    deposition?

3    A.    Yes.

4    Q.    In fact, you reviewed your deposition before you came in

5    here today; right?  You read it?

6    A.    I did a couple of days ago.

7    Q.    Okay.  And you were asked if you could identify a single

8    such document or e-mail where you had written those words.

9          Do you remember that?

10   A.    No.

11   Q.    No?  Okay.

12               MR. SOMMER:  Let me see if -- may I approach, Your

13   Honor?

14               THE COURT:  Yes.

15               MR. SOMMER:  Your Honor, there's two volumes, March 8

16   and March 9, 2022.  I'm handing up two sets.

17               BY MR. SOMMER:

18   Q.    Sir, if you could turn to page 72 of the March 8, and I

19   would ask you to read to yourself at page 72 at lines -- you can

20   go back as far as you want, but I'm really focusing you on

21   lines 8 through 12 --

22   A.    So page 17?

23   Q.    72.  And they're numbered down the side.  And I'm asking

24   you to focus on lines 8 through 12.

25          Have you had a chance to read those lines?

```
 1    A.   Not yet.

 2    Q.   Okay.  Just look up when you have.

 3    A.   I think I've read it, if I understood it.

 4    Q.   And the question I have is whether that refreshes your

 5    memory that you were asked about writing the words "dominant"

 6    or "one-sided" and that you could not point to a document.

 7         Does it refresh your memory?

 8    A.   Yes.

 9    Q.   Do you also recall that you said at the deposition that you

10    could do a Gmail search to find such documents?

11         Do you remember that coming up?

12    A.   Yes.

13    Q.   And you found no such documents; right?

14    A.   I'm not sure if I've done the search.

15    Q.   As you sit here today, there's not a single document that

16    you can identify for us where you used the words "dominant"

17    or "one-sided" to describe Booking's relationship with Google;

18    isn't that right?

19    A.   I would have to look that up, and I'm happy to do that.

20    Q.   Earlier today, you used an analogy of Google controlling

21    all the doors.

22         Do you remember that?

23    A.   Yes.

24    Q.   At your deposition, do you remember using a similar one,

25    that Google controlled the only ferry to the island?
```

1    A.    I actually used the word "bridge," I think.

2    Q.    That one I'm not going to quibble with you over because I

3    think it's sort of the same.

4    A.    It's the same thing.

5    Q.    It was ferry, but that's okay.  I'll stick with bridge or

6    ferry or door for these purposes.

7         Let me show you a demonstrative that we're going to put up

8    on the screen, hopefully.

9         And by saying it's the only door, Google controls the only

10   door or the only ferry or the only bridge, your point was that

11   for anybody to get to Booking they've got to go through Google?

12   That was the point; right?

13             MS. FREEBORN:  Could we get a copy of the

14   demonstrative, please?

15             MR. SOMMER:  Sure.

16             BY MR. SOMMER:

17   Q.    That was the point; correct?

18   A.    Yes.

19   Q.    Let's look at the demonstrative.  What we see here is a

20   desktop with Microsoft Edge.

21        Do you see that?

22   A.    Yes.

23   Q.    That's an image, okay.  If we go to the next slide, some

24   of -- back it up for a second.

25        At the very top, do you see the URL line?  We're typing

1    in "Booking.com."  Do you see that?

2    A.    Yes.

3    Q.    Let's go to the next page.  And that brings you to

4    Booking.com; correct?

5    A.    Yes.

6    Q.    So that's a way a user --

7            MR. KAUFMANN:  Could we get these demonstratives?

8            MR. SOMMER:  I'm sorry.  I thought it was handed to

9    you.

10           BY MR. SOMMER:

11   Q.    Mr. Dijk, this is a way that someone could get to

12   Booking.com without going over Google's bridge?  Yes or no?

13   A.    I explained also that there's a little door that sometimes

14   opens, because this is a factual correct statement.  The point

15   is that it's kind of irrelevant because Microsoft Edge doesn't

16   even have 10 percent market share.

17   Q.    So since Microsoft is so small, it is another door.  It's

18   not a Google-controlled door, but it's a small door; fair?

19   A.    Yes.  And you heard me say that almost every door is either

20   fully controlled or partially controlled by Google.

21   Q.    What I heard you say, sir, again, and I don't want to

22   quibble with you, is that there was only one bridge and only one

23   ferry, and they were both controlled by Google.

24        That's what you told us; correct?

25   A.    In quantitative terms, that's exactly what I said.

Q.   So let make sure we have a clear record.  The first image
I've shown you is a bridge or a ferry that does not involve
Google that could get a consumer to Booking; correct?  Yes or
no?

A.   Yes, but it's a bridge that cannot carry anything.  It
doesn't carry a car.  It doesn't carry a person.  It's factually
correct, but to tell it in my words is that I would gladly show
up much more on Edge.  It's only available on Windows machines
desktop.  The name of the game, you asked me that before, is
actually mobile.  This is kind of completely nonexistent on
mobile.

Q.   Let's go to the next slide.

     This is a web browser with Mozilla Firefox.  Are you
familiar with that?

A.   Yeah.

Q.   Okay.  And again, we could type in "Booking.com" on the
URL, and you get to Booking without Google operating the ferry;
correct?

A.   It's the exact same story as Microsoft Edge.

Q.   It's low volume is what you're saying; right?

A.   It's irrelevant almost.  The share of Google Chrome is
around 80 percent worldwide.  So it means there are a couple
other niche browsers that almost no one uses -- when you go
through a mobile phone, Safari has the default search engine
with Google --

1    Q.    That was my next slide.

2          Safari -- typing in on the URL on Safari doesn't involve

3    Google even if it's the default; correct?

4    A.    That's a navigational search, correct.  But if you would

5    misspell or if you would only do "booking," you would actually

6    come out on the Google Search page when you use Safari.

7    Q.    If you do a general search on Bing, that also gets you --

8    as opposed to the URL, that also gets you to Booking without

9    Google controlling the ferry; correct?

10   A.    Yes, but I explained to you that it's very small.

11   Q.    Sir, if you could answer yes or no, that would move things

12   along.  If the answer is no, tell me it's no.  If it's yes, tell

13   me it's yes.  If you don't know or don't think you can answer it

14   yes or no, tell me that.  But I do want to try to move this

15   along.  Okay?

16         So I will ask my question again.  If you type on the search

17   bar in Bing, that would take you to Booking.com, a link to

18   Booking.com that wouldn't use Google at all; correct?

19   A.    Yes.

20   Q.    Thank you.

21   A.    I find these very obvious questions, because I gladly will

22   explain everything, but I feel that --

23              THE COURT:  Once plaintiffs' counsel gets up, they

24   have the opportunity to ask you for clarification.  So if

25   there's clarification to be had, they can elicit it.  But you

1    should answer Mr. Sommer's questions, and it will move much more

2    smoothly.

3        Thank you.

4            THE WITNESS:  Thank you.

5            BY MR. SOMMER:

6    Q.    The same would be true with typing in a search on Yahoo! or

7    DuckDuckGo.  I understand they may be small volume, but they

8    would get you to Booking.com without Google; correct?

9    A.    No.

10   Q.    Okay.

11   A.    Yahoo! is powered by Google.  So it means that the whole

12   search engine is driven by Google in the U.S.

13   Q.    If I go onto the Yahoo! general search engine and type in

14   "Booking.com," is that controlled by Google?

15   A.    If you go to -- not a navigational search.  But if you

16   would go to Yahoo!, you would indeed click on ads.

17   Q.    If I do a navigational search on the Yahoo! general search

18   engine, is that controlled by Google?

19   A.    I would say so, yes.

20   Q.    If I type in a URL in Safari "Booking.com," that brings you

21   to Booking.com; correct?

22   A.    Yes.

23   Q.    And that's not controlled by Google; correct?

24   A.    Correct.

25   Q.    Okay.  I think we have the point.

1          By the way, to the extent Booking is getting new users from
2     Google, from Google we're talking about now, some of that is
3     traffic that Google sends your way for free; correct?
4     A.    We talked about natural search, yes.
5     Q.    Just so it's clear, if someone types in the Google
6     URL "Booking.com," you don't get charged for that; right?
7     A.    Yes.  If you're in Google Search, you get a search page
8     where we have to pay --
9     Q.    Not the search page, sir.  Listen to the question.
10          If someone goes onto Google and goes to the URL and
11     types --
12     A.    You don't go to Google.  You go to a web browser.  So you
13     either go to Chrome, Safari, or another browser.  You don't go
14     to Google.  When you go to Google, it's a search page.
15     Q.    In fact, we saw in your chart that we looked at a moment
16     ago that less than ███████ was -- of your traffic was paid
17     search; correct?
18     A.    I thought that was redacted.
19     Q.    I'm just using a very general number, not a specific.
20     A.    No, I don't think that's the agreement.
21     Q.    I apologize.  I don't know how we can -- it's very
22     difficult to make a record with all these confidential
23     documents.  I'm going to try harder.
24     A.    I'm happy to answer any question in the closed session.
25     Q.    I will try harder.

1          THE COURT:  Question and answer.  Put the dialogue

2     aside.

3          If we need a closed session, I fully realize we may need to

4     do one, but let's continue along until it becomes necessary.

5          BY MR. SOMMER:

6     Q.   Mr. Dijk, one of the reasons that Booking takes money from

7     preferred partners so that they can appear higher is to help

8     Booking make a profit; correct?

9     A.   Yes.

10    Q.   Okay.  And that's one of the things Booking tries to do;

11    right?  It tries to generate revenue in order to make a profit;

12    fair?

13    A.   Yes.

14    Q.   Okay.  Do you recall that at your deposition you refused to

15    answer a question because you said it was stupid?

16    A.   Yes.

17    Q.   Okay.

18    A.   And I stand by that, by the way, if you read the full

19    transcript.

20    Q.   Do you recall what happened next after you refused to

21    answer a question because you said it was stupid and

22    condescending?

23         By the way, do you remember what the question was?

24    A.   The question was something along the lines, does a company

25    need to make profit?  And it's kind of the same as does a human

1    being need to breathe.  The answer is yes.  So that's the reason
2    I got irritated.
3         Also, counsel was actually very, I would say, aggressive.
4    So I responded in that way.
5    Q.  I'm going to read to you exactly what did happen so we all
6    know.  The question is at page 115, if you want to follow along
7    in your transcript of the second day, which is March 9th.
8              MR. KAUFMANN:  Your Honor, objection.  We're going way
9    far afield here.
10             MR. SOMMER:  It goes to bias, Your Honor.
11             THE COURT:  Agreed.  Overruled.
12             BY MR. SOMMER:
13   Q.  It's at page 115, starting at line 4, sir.  Just look up
14   when you're there.  Page 115.
15        "Question:  Are you saying" --
16   A.  I'm sorry.  Can I take a bit of time to read --
17   Q.  We're going to read it together.  I'm going to read it out
18   loud.  So you can follow along.
19   A.  I prefer to read it, if you don't mind.
20   Q.  I'm going to proceed with my examination.
21        Are you saying that --
22             THE COURT:  Hang on.  Let's make sure he's on the
23   page.
24        Are you on the page?
25             THE WITNESS:  115.

1           MR. SOMMER:  115, line 4.

2           BY MR. SOMMER:

3    Q.   "Question:  Are you saying that a company is not entitled

4    to do things to try to make a profit?

5           "Answer:  This is a condescending and a stupid question.

6           "Question:  Yes, I remember from yesterday as well, you

7    thought my questions were condescending and stupid.  I'm sorry

8    you feel that way.  But I am entitled to ask you a question.

9    And my question is, are you saying that a company is not allowed

10   to try to make a profit?

11          "Answer:  I'm not answering that.

12          "Question:  You're not going to answer that?  I don't think

13   you can do it.  I asked you a question.

14          "Answer:  What will you do?  What will you do, Chul?  I'm

15   curious."

16          Do you remember that exchange with the Google counsel?

17   A.   Yes.

18   Q.   And his name was Chul.  Do you remember that?

19   A.   Yes.

20   Q.   Let me ask you this, Mr. Dijk:  Are you so bitter at your

21   former employer that you were actually challenging Google's

22   lawyer to a fight at your deposition?

23   A.   No.

24          THE COURT:  I think we can move on from that.

25          BY MR. SOMMER:

1  Q.   You never answered the question that day.  I would like the

2  answer now.

3       Is a company entitled to take steps in order to make a

4  profit?

5  A.   Yes.

6            THE COURT:  Mr. Sommer, it's 3:00.  I'm just curious

7  about timing.

8            MR. SOMMER:  I've got about an hour to go, sir.

9            THE COURT:  Let's take our break, then.  It is 3:00.

10  We will resume where we left off at 3:15.

11       Counsel?

12            MS. RAZI:  If I may, Sara Razi for Booking.

13       Mr. Sommer revealed a confidential number in his

14  cross-examination.  I would ask that that number be redacted

15  from the transcript.

16            THE COURT:  We can certainly do that.  Just to be

17  clear, so there's no confusion, it was -- my understanding, it's

18  not a specific number but a bound, but I'm happy to remove that

19  from the public record if you think it's appropriate to do so,

20  since it's a third-party piece of information.

21       All right.  We will see everybody shortly.  Thank you all

22  very much.

23       (Recess taken from 3:00 p.m. to 3:16 p.m.)

24       (Call to order of the court.)

25            THE COURT:  All right.  Mr. Sommer, Mr. Dijk, keep

1    moving forward.

2            BY MR. SOMMER:

3    Q.    Just a couple of follow-up questions from your testimony

4    this morning.

5            You discussed very briefly Google's relationship with Apple

6    as the default search engine.

7            Do you remember that?

8    A.    Specifically on the Safari browser, yes.

9    Q.    Okay.  Now, while you were at Google, you played no role at

10   all in negotiating that contract, did you?

11   A.    Correct.

12   Q.    Okay.  And you were not on the internal Google team --

13   there was actually a team -- that assessed that agreement;

14   correct?

15   A.    I was a part of a bigger team to look at the overall plan B

16   if the deal would fall through.

17   Q.    Okay.  That wasn't my question.

18           You were not on the internal Google team that was assessing

19   the relationship with Apple; correct?

20   A.    Correct.

21   Q.    And you never did any analysis while at Google, you, about

22   the importance of being the default search engine, did you?

23   A.    I did.

24   Q.    You did an analysis of the importance of being a default

25   search engine?  You did that while at Google?

A.    Yes.

Q.    And what -- do you remember what that was called?

A.    I run a growth marketing team, together with behavioral
scientists, that we would look at, you know, the power of
defaults and what we could do to really make sure that Google
would be preferred.

Q.    That Google would be preferred, you said?

A.    Preferred or -- that's bad English.  You know, how, for
example, in the EU, you also had to choose between browsers, and
then we do studies to really look at how we could make sure that
Google would show up in the most advantageous way.

Q.    In European browsers?  Did I understand that?

A.    No, that's not what I said.

Q.    I'm sorry.

A.    I said in Europe, there were requirements potentially to
open up search engines, and then we would actually together with
my team mock up the different scenarios, and we would really
look at how we do the best.

Q.    So that focus was on potential dealings in Europe.  Maybe
my question was an imprecise one.

      Did you do any analysis while at Google to assess the
importance of Google's relationship with Apple and being the
default search engine?

A.    I answered that already.  No.

Q.    One of the things you talked about during your direct

1    examination was this analysis -- we saw an exhibit -- of the

2    impact of the declining SEO.

3        Do you remember that?

4    A.    Yes.

5    Q.    Okay.  Do you know who Glenn Fogel is?

6    A.    Yes.

7    Q.    In 2019, was his title president, chief executive officer,

8    and director?

9    A.    Yes.

10   Q.    Okay.  Can you find in your binder, please, DX3167.  This

11   is the earnings call.  It's dated November 19th, 2019.  If we

12   could put that up on the screen at page .006.  And at the very

13   bottom, the last five words, "just talk about your dependency

14   on," and then it goes to the next page.  "Just talk about your

15   dependency on Google SEO, on organic search and just talk about

16   your overall marketing mix and how that's needed to change over

17   the last couple of years."

18       Do you see that question from one of the analysts?  Very

19   bottom of page 6, going on to the top of page 7.

20   A.    Yes.

21   Q.    And here's what Glenn Fogel said:  "So, we said on the call

22   that it's a small channel for us."  Let me stop there for a

23   minute.

24       What Mr. Fogel is referring to is the SEO channel; correct?

25   A.    Yes.

Q.   Okay.  "It's a small channel for us.  I said, yeah, we saw
some headwinds and it's a small channel for us in terms of mix,
so we built this company."  Let me stop there for a moment.

     "This company" is referring to Booking; correct?
A.   It's referring to Booking Holdings.  In those days, he was
still the CEO of and president of Booking Holdings, not
Booking.com.
Q.   And just so the judge understands, can we agree without
revealing any numbers that Booking.com represents the
overwhelming majority of Booking Holdings?
A.   Yes.
Q.   So let me continue reading.  "So we built this company,
really built the company on pay-for-performance marketing."  Let
me stop there for a moment.

     That's paid search; correct?
A.   Yes.
Q.   Let me go on.  "And it's no secret that we did it with
Google."  Let me stop there for a moment.

     So what the president and CEO of Booking Holdings is saying
is that Booking Holdings was built with Google; correct?

     "We did it with Google."  Do you see that?
A.   I agree with that when you say "built."
Q.   Well, it says "built" in the line before, "we built the
company."  But I'll go on.

     "And Google and us had a very good relationship together.

1    We both benefited tremendously.  We continue to look, though.

2    It's got a song going on."

3        Do you see that?

4    A.    Yes.

5    Q.    Okay.  So at least Mr. Fogel here was expressing the view

6    that the relationship with Google was very good and it was

7    beneficial to Booking; correct?

8    A.    Yes.

9    Q.    And that the SEO was a small channel; that's how it's

10   described?

11   A.    In 2019, yes.

12   Q.    Okay.  Let me ask you this:  You described, in talking

13   about Google, I think your words were first it had one ad, then

14   two ads, then three ads, then four ads, then five ads.

15       Do you remember that?

16   A.    Yes.

17   Q.    You know well, don't you, from your years at Google that

18   Google has never had more than four top-side ads?  Don't you

19   know that?

20   A.    We experimented with many.

21   Q.    Since 2016, Google has never once had more than four

22   top-side ads; isn't that true?

23   A.    Correct.

24   Q.    Let me just show you a demonstrative.  By the way, the

25   preferred partners that Booking takes money from, do you know

how many of those will show up on a page before you get to a

nonpreferred partner?

A.    I don't know.

Q.    Okay.  Let's go to a demonstrative we put together, which

is DXD13.0024.  We will go through that together.

Now, you may not agree with my terminology.  The red, I

added.  I called it "ad."  It's designed to represent you're

getting paid by a preferred partner, just so we're not quibbling

over terminology.  Okay?

A.    My only point is, everyone pays, you know.  So --

Q.    I understand.  This is preferred partners.

A.    Yeah, but the difference is, everyone pays.  So you cannot

talk about paid and nonpaid.  Everything is paid.

Q.    Assume for a moment that in the red arrow it

says "preferred partner."  Okay?

A.    Yes.

Q.    We see to the right, next to the name of the hotel, we see

that yellow thumb-up I refer to; right?

A.    Yes.

Q.    So let's move this forward.  And in terms of preferred

partners, that's three.  Keep going.  Four, five, six, seven.

Keep going.  Eight, nine, ten.

Now, again, I don't want to quibble over the word

"organic."

A.    I will quibble between ad and organic because it's not

1   correct.

2   Q.   I was going to say, I'm going to change my word "organic,"

3   because I know you've made it clear everyone pays.  But where

4   the green arrow, this would be the first one that's not a

5   preferred partner, correct, after nine preferred partners?

6   A.   Correct.

7   Q.   Okay.  Now, you mentioned Bing in your direct testimony as

8   well; correct?  You mentioned Bing a few times; right?

9   A.   Yes.

10  Q.   Do you know how many top-side ads Bing has before you get

11  to organic results?

12  A.   I would have to look it up.

13  Q.   Okay.  So here's the same search, "hotels in Waikiki," that

14  we just looked at for Booking.com.  Do you see there are five

15  ads before you get to the first organic result?  Do you see

16  that?

17  A.   Yes.

18  Q.   And now let's look for the same search -- hold on.  Just

19  one second.  I'm getting the signal from the team.

20       Oh, okay.  Let's scroll it forward.  It's not five.  It's

21  more.  Six, seven, eight.  Okay.  Stop it there.

22       So it's actually eight before we get to the first organic

23  result; correct?

24  A.   Yes.

25  Q.   Okay.  Now let's go forward for the same search on

1    Google, "hotels in Waikiki."  And we see four, and we get to --

2    the next one is an organic result.

3        Do you see that?

4    A.   Yes.

5    Q.   So your testimony to the judge twice this morning about how

6    Google puts five ads on top before you get to any organic

7    results was incorrect, wasn't it?

8    A.   Based on the search results now, yes.

9    Q.   But you've known since 2016, because you were an employee

10   at Google, that there are only four top-side ads, didn't you?

11   A.   Yes.

12   Q.   You knew that?

13   A.   Yes.

14   Q.   Okay.  Let me turn to a different aspect of Booking's

15   relationship with Google that we just touched on.  Let's go to

16   DX31 -- wait.  We may have just done that.  Hold on.

17       3157.  This is the earnings call of March 12, 2019.  And

18   let's go to page 13.  Let me just make sure you have the number,

19   sir.  3157, page 13.

20   A.   It's not in my binder, but I can --

21              THE COURT:  It may be in the sleeve there.

22              MR. SOMMER:  May I approach, Your Honor?  I think

23   maybe it didn't get punched.

24              THE WITNESS:  Yes.

25              BY MR. SOMMER:

1   Q.   Thank you.  And page -- sorry.  Page 15 -- 13 -- excuse me,

2   13.  No, 15, .015.  Tell me when you're there.

3   A.   Yes.

4   Q.   Are you ready?

5   A.   Yes.

6   Q.   Okay.  So this is Mr. Fogel again at the top of the page,

7   and he describes the following about his relationship --

8   Booking's relationship with Google.  "So we've had a wonderful

9   relationship with Google since as long as I've been at the

10  company.  I've been now with us for almost 20 years."

11       Do you see that?

12  A.   Yes.

13  Q.   He goes on to say, "The interesting thing is that Google

14  continues to make changes, and we continue to benefit from these

15  changes."  Let me stop there for a moment.

16       You described some changes that Google made in your direct

17  testimony this morning; correct?

18  A.   Yes.

19  Q.   What Mr. Fogel is describing is that in response to

20  Google's changes Booking has benefited.

21       Do you see that?

22  A.   Yes.

23  Q.   Let me go on.  "Historically, we've worked very closely

24  together with them as they made changes.  Many times, Google has

25  tested out new things with us first to see what the results

5338

1    could be."

2        Do you see that?

3    A.   Yes.

4    Q.   Collaborative effort; right?

5    A.   Yes.

6    Q.   Okay.  "We believe we will continue to have this very good

7    relationship going forward."

8        Let me just skip to the next paragraph for a moment where

9    it says -- beginning of the next paragraph.  "I believe in the

10   long run we will continue to have a good relationship" with

11   them.  "We will continue to get the benefits, the ROIs that we

12   want to see."

13       Do you see that?

14   A.   Yes.

15   Q.   Okay.  Now, a moment ago -- you can take that down.  A

16   moment ago, we read -- no, let's go there, DX3186, which is the

17   transcript of the September 10, 2019, call, and let's go to

18   page -- hold on one second.  I think it's page stamped -- page

19   005.

20            THE COURT:  It may not be in the binder, 3186.

21            MR. SOMMER:  3186 is not in the binder.  Was that the

22   one we just looked at a moment ago that wasn't punched?

23            THE COURT:  That was 3157.

24            MR. SOMMER:  Let's go by the screen, then, 3186, and I

25   will distribute it at the next break.

```
 1              BY MR. SOMMER:
 2    Q.    David Ian Goulden, do you know who he is?
 3    A.    Yes.
 4    Q.    He was the chief financial officer and executive vice
 5    president for Booking Holdings; correct?
 6    A.    Yes.
 7    Q.    Let's take a look at what he said in the paragraph
 8    starting "sure," but the second sentence.  It's being
 9    highlighted.  "So we work very closely with Google and we do
10    very well in both AdWords and Google Hotel Ads.  And we believe
11    that we take great advantage of all the optimization features
12    that Google offers in these products, because they're
13    sophisticated products, and we also work with them well and
14    optimize your placement and your ROIs."
15          Do you see that?
16    A.    Yes.
17    Q.    And that was a true statement; correct?
18    A.    Yes.
19    Q.    Let me shift gears again.
20          By the way, before I do, are you aware of Mr. Fogel or
21    Mr. Goulden ever issuing a statement in any of the earnings
22    calls, in any 10-K, in any regulatory filing, or in any publicly
23    consumable source that Booking's relationship with Google was
24    one of one-sidedness and dominance?
25    A.    No.
```

1    Q.    Now, we just saw a moment ago, sir, the acronym "ROI."

2          Did you see that in a couple of those statements?

3    A.    Yes.

4    Q.    And that is return on investment; right?

5    A.    Yes.

6    Q.    Do you recall being interviewed by a publication called

7    Marketing Trends on June 21st of this year?  Did I get it wrong?

8    A.    No, but I do a lot of interviews.  Probably, yes.

9    Q.    Okay.  We have a short clip from that video, which I will

10   play to you, and maybe it will refresh your recollection.  It's

11   very brief.  And it's marked as DX3160.

12         (Video played.)

13             BY MR. SOMMER:

14   Q.    So first question, do you remember giving that interview?

15   A.    Yes.  It's Variety -- it doesn't matter, but it's picked up

16   by other publications.

17   Q.    Ready?

18   A.    Yes.

19   Q.    Do you remember giving that interview?

20   A.    Yes.

21   Q.    And the statements you made were true?

22   A.    Yes.

23   Q.    And so the way Booking determines its ad spend is driven by

24   the key thing, which is ROI; correct?

25   A.    Yes.

1    Q.   And would you agree, in your experience, that even beyond

2    Booking.com, for marketers making decisions about where to

3    invest their advertising dollars, return on investment is the

4    key thing?  Do you agree with that?

5    A.   Yes.

6    Q.   In fact, you gave another interview -- let me just get this

7    one out.  This one is a little earlier.  So you might not

8    remember this one.  But this was at the Skift Forum Europe 2020.

9    That was on June 30th, 2020.

10        Do you remember that one?

11   A.   Yes.

12   Q.   You do remember that one.  Okay.  Rather than teeing it up,

13   let me just read a part from that.  "Well, we manage, you know,

14   our marketing budget to very strict ROIs."

15            MR. KAUFMANN:  Your Honor, he's just introducing prior

16   testimony or statements.  It has no relevance within this

17   context.

18            THE COURT:  How many more of these do you have?

19            MR. SOMMER:  I can rephrase it.  I can rephrase.

20            BY MR. SOMMER:

21   Q.   In 2020, was it your view that Booking would manage its

22   budget to very strict ROIs?

23   A.   Yes.

24   Q.   Okay.  And would you agree that that was something Booking

25   was obsessed about?

A.    I probably would have said that, yeah.

Q.    I like the word "obsessed," because we heard it from a

witness yesterday that also said ROI is an obsession with

marketing people.

      That has always been your view; correct?

A.    Yes.

Q.    And in looking at ROI, would you agree that the key job of

a marketer is to figure out how we should spend and in what

channels?  Would you agree with that?

A.    Yes.

Q.    And would you also agree that when it comes to picking

channels, you're very agnostic?  Would you agree with that?

A.    Yes.

Q.    And by agnostic, what that means is you will go to whatever

channel is generating the best ROI; correct?

A.    Yes.  And volume, I would add that --

Q.    Thank you.

A.    -- because a very small channel might have a huge ROI, but

it's kind of irrelevant, if you know what I mean.

Q.    Okay.  So I think we navigated that one.  You also used the

word "optimized" in the context of ROI.

      Do you remember that?

A.    Yes.

Q.    And by optimize, do you mean that you're trying to optimize

the ROI for a particular channel against other channels?  Is

1  that what you mean by "optimize"?

2  A.   Or you're trying to optimize within channels.

3  Q.   Okay.  And among channels; correct?

4  A.   Among channels, too.

5  Q.   Okay.  If you have to pay more, does ROI go down?

6  A.   It depends.

7  Q.   Because there are other factors that could impact that; is

8  that right?

9  A.   Yes.

10  Q.   But if we were to say keeping everything else equal, if

11  price goes up, then ROI would go down; correct?

12  A.   The interesting thing that nothing really stays equal, I

13  would say, in this space.  But yes, yeah.

14  Q.   In a hypothetical example, you would say yes?

15  A.   Yes.

16  Q.   Okay.  Now, I think I heard you say this morning that

17  Google is raising prices.  Did I hear that, or did I mishear,

18  that Google has been raising prices?  Did I mishear that?

19  A.   I'd have to look it up.  I think I've said that costs have

20  increased.  I don't think -- because it's an auction model, so

21  it means that it's a model where people bid towards each other.

22  So it means that the notion of raising prices probably doesn't

23  apply.

24  Q.   Let's -- thank you for that.  Let's turn in your binder

25  to -- are the 10-Ks in this binder?  I just need one of them.  I

 1    will hand it out, the 2022.

 2         You know that Booking Holdings files a 10-K with the United

 3    States Securities and Exchange Commission every year; correct?

 4    A.   Yes.

 5    Q.   And you're also aware that top executives from Booking

 6    certify the results and the statements in the 10-K; correct?

 7    A.   Yes.

 8    Q.   And do you play a role in preparing them at all?

 9    A.   Not a 10-K.

10         MR. SOMMER:  Your Honor, at this time, I would offer

11    into evidence DX3114, which is the 2022 10-K.

12         This is admitted?

13         THE COURT:  I haven't said it, but any objection?

14         MR. KAUFMANN:  No objection.

15         THE COURT:  Then it will be admitted.

16         (Exhibit DX3114 received into evidence.)

17         BY MR. SOMMER:

18    Q.   By the way, before I jump into this document, just a couple

19    last questions on ROI.

20         Is it accurate to say that Booking has a target ROI with

21    its ads on Google?

22    A.   Yes.

23    Q.   And is it also accurate to say that it will adjust its ad

24    spend on those ads to achieve its ROI goals?

25    A.   Provided the volume is coming in.

1    Q.   Okay.  And would it also be accurate to say that Booking

2    has met its ROI goals on its ads with Google?

3    A.   I think they could have been much better, but yes.

4    Q.   I appreciate that.  Thank you.

5         I want to point out a couple of things in this 10-K, most

6    recent 10-K.  Just give me one second.  Sorry.  Too much paper.

7         You know what, sir?  I'm going to come back to that so I

8    don't waste time.  Oh, I think I found it.

9         At page 40, do you see where it says -- and I will try to

10   direct you there -- "in recent years, we observed periods of

11   stable or increasing ROI"?

12             THE COURT:  Hang on, Mr. Sommer.  I'm not sure he's at

13   the page, and if you can blow up whatever is up on the screen so

14   we have it.

15             MR. SOMMER:  Sorry.

16             THE COURT:  That's okay.

17             BY MR. SOMMER:

18   Q.   Page 40, second paragraph down.  It's on the screen.  "In

19   recent years, we observed periods of stable or increasing ROIs."

20        Do you see that?

21   A.   Yes.

22   Q.   Okay.  So that means either -- that means that the ROIs

23   have either stayed level or your ROIs have gone up in recent

24   years; correct?

25   A.   Yes.

1    Q.   And on the same page -- actually, it's not the same page.

2    That's enough for that.  Let me move on.  Next relationship with

3    Google issue.

4         Would you agree that Booking is a competitor of Google?

5    A.   I would agree that Google is a competitor, not necessarily

6    with Google Search and Google Hotel Ads.

7    Q.   Let me make sure I understood it.  Is Booking a competitor

8    with Google in any regard?

9    A.   There were products like Book on Google that were directly

10   competing with Booking.com, yes.

11   Q.   So today, is Booking a competitor with Google?

12   A.   If you look at Google Search and Google Hotel Ads, I would

13   not qualify these as competitors.  Google Travel, depending on

14   the vertical where you're in, I would call out as a competitor.

15   Q.   There's a confidential document.  We looked at it briefly a

16   moment ago.  PSX94.  I think it was toward the back of the

17   binder.  We're not going to put that up on the screen.  Just

18   tell me when you're there so I can guide you.

19   A.   PS --

20   Q.   PSX94.

21   A.   Which binder?

22   Q.   Not the 10-K binder.  Tell me when you're there, sir.

23   A.   Yes.

24   Q.   And could you look at the first page?

25   A.   Yes.

```
 1    Q.   And do you see where there's a reference to Google and
 2    competitor?
 3    A.   Yes.
 4    Q.   Okay.  I'm going to give counsel a moment to let me know if
 5    they object to that word right before "competitor" being said.
 6              MS. RAZI:  No objection.
 7              MR. SOMMER:  Thank you.
 8              BY MR. SOMMER:
 9    Q.   What is written there, sir, is "Google is a serious
10    competitor."
11         That's what's written there; correct?
12    A.   Yes.
13    Q.   And do you know the year of that document?
14    A.   No.  January 2020, I can see it.
15    Q.   Thank you.  Let's go back -- may I approach one more time?
16    I'm going to give you back the 2022 10-K.  I'm going to take it
17    out of the binder.  Can you turn to page 3.  Excuse me.  Page 4.
18    Let's put that up on the screen, page 4, please.  All right.
19    It's .006 is page 4.
20         Do you see the section called "competition" on that page?
21    Sir, to help you, the preprinted number is 4 and then the .006
22    at the bottom.
23         Are you with me?
24    A.   Yes.
25    Q.   Do you see the "competition "section there from the most
```

1    recent 10-K?

2    A.    Yes.

3    Q.    And what it says is, "We compete globally with both online

4    and traditional travel and restaurant reservation and related

5    services.  The markets for the services we offer are intensely

6    competitive, constantly evolving, and subject to rapid change,

7    and current and new competitors can and do launch new services

8    at a relatively low cost.  Some of our current and potential

9    competitors, such as," and then we see Google.

10          Do you see that?

11   A.    Yes.

12   Q.    And let's just go to --

13   A.    Let me also clarify here very clearly.  This is a Booking

14   Holdings statement.  I'm talking here on the basis of

15   Booking.com.  If you would look at this with the eyes of Kayak,

16   one of our sister brands, clearly, Google is a very serious

17   competitor.  Google Search Ads and Google Hotel Ads is not a

18   competitor to Booking.com.  So to clarify this to you that you

19   understand that.

20   Q.    Thank you.  And if you go a little further in the same

21   paragraph, it says, "For example, Google's online travel

22   offerings have grown rapidly in this area by linking travel

23   search services to its dominant search functionality through

24   flight, hotel, and alternative accommodations meta-search

25   products, and by integrating its hotel meta-search products and

1    restaurant information and reservation products in its Google

2    Maps app."

3         Do you see that?

4    A.   Yeah.

5    Q.   Do any of those aspects compete with Booking.com?  Is it

6    your testimony that none of that competes with Booking.com?

7    A.   Yes.  We've written this down, yeah.

8    Q.   Huh?  I'm sorry.

9    A.   Yes.

10   Q.   Yes, it does compete with Booking.com, or yes, it does not

11   compete with Booking.com?  Let me try one more time.

12        These examples of Google given here that we just read

13   together here, do those various areas of Google's business

14   compete with Booking.com?

15   A.   I think I explained it already to you.

16   Q.   I'm just trying to follow up to see if your view is none of

17   this competes with Booking.com.

18   A.   How could it be my view?  It's written down here.  This is

19   a 10-K statement.  Of course, it's truthful.

20        So I explain to you that Google Search Ads and Google Hotel

21   Ads are not directly competition for Booking.com.  There have

22   been many other areas where Google is actually a competitor to

23   Booking.com, especially also to Booking Holdings, especially

24   when you talk about a company like Kayak.

25   Q.   I think I understand.

1      Are you aware, sir, if we pulled up the binder I dropped on

2   the ground there and looked at the 10-Ks for 2021, 2020, '19,

3   '18, '17, that we would see a similar "competition" section as

4   this, noting the intense competition in this field and that

5   Google is a competitor?  Would you dispute that?

6   A.   No.

7   Q.   Now, Booking faces competition from other platforms as

8   well; right?

9   A.   Yes.

10  Q.   As we just read, new services can be -- withdrawn.

11      If we look at that same 10-K, at page 11, which is stamped

12  .013, just look up when you're there, and let's blow up the

13  bottom portion of the page.  Okay.

14      Do you see the bullet points at the bottom?  The first one

15  is "online travel reservation services."

16  A.   Yes.

17  Q.   And that, for example, would be something like Expedia;

18  correct?

19  A.   Correct.

20  Q.   Okay.  And that's one of Booking.com's competitors;

21  correct?

22  A.   Yes.

23  Q.   And then the next one is "online accommodation search

24  and/or reservation services that are focused primarily on

25  alternative accommodations."

1          That would be like Airbnb and Vrbo; correct?

2    A.    Correct.

3    Q.    And Booking.com competes with them here in the United

4    States; correct?

5    A.    Correct.

6    Q.    And we see "travel service providers."  That would be like

7    airlines or the car rental companies; right?

8    A.    Yes.

9    Q.    If we go to the next page, we will ask you about one more

10   bullet point at the top.  "Large online companies, including

11   search, social networking, and marketplace companies."

12         Do you see that?

13   A.    Yes.

14   Q.    And that would be, for example, Google, Facebook, Amazon?

15   That would fall into that category; correct?

16   A.    Correct.

17   Q.    Now, if we look at page 17 of the 10-K, and highlight the

18   middle paragraph beginning "furthermore."  Look up when you're

19   there.  It's .019.

20         Are you there?

21   A.    Yes.

22   Q.    And this is talking about, you know, other potential

23   competitive pressures; right?  We see that in the first line.

24         Do you see that?

25   A.    I'm reading the paragraph.

1    Q.    Sure.

2    A.    Yes.

3    Q.    And one of the competitive pressures identified here is

4    machine learning, AI.

5          Do you see that?

6    A.    Yes.

7    Q.    And what that's referring to specifically at this time was

8    Chat -- the launch of or the release of ChatGPT; correct?

9    A.    It doesn't get mentioned there.

10   Q.    I'm sorry?

11   A.    It doesn't get mentioned.

12   Q.    I'm asking if that's your understanding of what is being

13   referred to here.  Let me ask a different question.

14   A.    No, I don't think so.  I don't think it has anything --

15   ChatGPT is a part of that, but there's general machine learning

16   notion.  Also, this is December 2022.  So I really have to look

17   it up, but I really don't think that ChatGPT was a thing then.

18   Q.    Fair enough.

19   A.    Yeah.

20   Q.    The point here of this paragraph is you never really know

21   where that next competitive threat or new technology may come

22   from, and that is a threat not only to your business but to any

23   business; fair?

24   A.    Yes.

25   Q.    And as we saw before, your industry is an intensely

1    competitive industry; correct?

2    A.    Yes.

3    Q.    And would you say that is true of the digital advertising

4    industry as a whole, intensely competitive?

5    A.    If -- no.

6    Q.    Okay.  From your perspective, sir, is Google one of your

7    largest competitors, looking into the future?

8    A.    I don't know.

9              THE COURT:  Mr. Sommer, could I interrupt for a

10   moment?

11       Could I ask you to clarify one thing for me.  I should know

12   this.  But the difference between a Kayak and a Booking is that

13   a Kayak is essentially a price comparison website, and in order

14   to complete the booking, it links you to the original site

15   itself?

16             THE WITNESS:  Correct.

17             THE COURT:  Whereas, on Booking.com, you can actually

18   complete the reservation --

19             THE WITNESS:  Pay, many occasions, yes.

20             THE COURT:  -- on the site?

21             THE WITNESS:  Yeah.

22             THE COURT:  So does Booking consider Airbnb a

23   competitor because Booking also offers people's private homes

24   for reservations, or is it that you believe hotels and people's

25   private homes for accommodations are competitors?  Maybe it's

 1    both.

 2            THE WITNESS:  No, so it's really because we're also a

 3    very big vacation rental provider.  So in U.S., we're probably a

 4    distant third.  In Europe, we're probably a little bit bigger

 5    than Airbnb in the specific vacation rental space.  So if you

 6    look for a home in Italy, I can recommend you use Booking.

 7            THE COURT:  Okay.  I'd like to use that search right

 8    now.

 9            THE WITNESS:  Yes, exactly.

10        But clearly, we see -- I see Airbnb as a significant

11    competitor.

12            THE COURT:  Understood.  I just wasn't sure whether it

13    was because of what you've just described or because you viewed

14    hotel accommodations as direct competitors with vacation

15    rentals.

16            BY MR. SOMMER:

17    Q.  Last topic, sir.  You described through your direct

18    testimony, I'll put it in this way, some of the challenges that

19    Google has imposed on Booking; fair?

20    A.  Yes.

21    Q.  Okay.  I want to turn, then, to the final part.  That's

22    Booking's performance, how it's doing, so we can see for

23    ourselves how those challenges have impacted Booking.

24        So you're aware, sir, that the 10-K for Booking Holdings

25    reports revenue on a consolidated basis; correct?  So it's all

1    the companies combined; right?

2    A.    Yes.

3    Q.    And again, I'm going to respect the numbers.  So let me do

4    it this way:  In your binder, if you can find DX3156.  We're not

5    going to put this up anywhere.  3156.

6          And just so -- once you're there, I'll describe what it is.

7    This is one page from your deposition on March 8th, and it's

8    from page 56 of that day of the deposition.

9          Do you see, sir, at line 13, you identified the percentage

10   of Booking.com revenue to Booking Holdings?  Do you see that?

11   A.    Yes.

12   Q.    Is that still true today, approximately?

13   A.    Approximately.

14   Q.    And you go on at the bottom, at page 20, you identify --

15   since Booking is all over the world, you identify the percentage

16   of revenue that's in the U.S.

17         Do you see that at line 25?

18   A.    Yes.

19   Q.    Is that accurate today still?

20   A.    Directionally.

21              MR. SOMMER:  Okay.  Your Honor, in order to avoid any

22   confidentiality issues, I'm going to offer DX3156, I guess,

23   under seal.  Does that make sense?

24              MR. KAUFMANN:  No objection.

25              THE COURT:  These are not numbers reflected in a 10-K

1    or other public filing?

2            MR. SOMMER:  Those two numbers I looked for in 10-Ks

3    and didn't see them.  So I was trying to be sensitive.

4            THE WITNESS:  The only caveat I want to give with

5    these numbers, this is the middle of the Corona epidemic.  So

6    those numbers were slightly skewed.  You can imagine that Kayak

7    and flights, when people were grounded, et cetera, et cetera.

8    So those numbers would look a little different if we looked at

9    it now.

10            BY MR. SOMMER:

11   Q.   We're going to look at a broader spectrum of numbers in a

12   second.

13        Would you agree that Booking has had a relationship with

14   Google since 2005, give or take a year or two?

15   A.   Yes.

16   Q.   Okay.  And let me put up on the screen -- these are all

17   public numbers from your 10-Ks -- a demonstrative, which is --

18   hold on.  42?  Thank you.

19        And as I said, these are all public numbers.  And let's --

20   these are from the 10-Ks.  Let's just start with the comment you

21   just made.

22        We see a precipitous drop there in 2020, going into 2021;

23   correct?

24   A.   Yeah.

25   Q.   That was the pandemic?

1    A.    Yes.

2    Q.    People were not doing much traveling and going out to

3    restaurants in that time; right?

4    A.    Correct.

5    Q.    But other than that unfortunate event, Booking has been on

6    a steady trajectory up; correct?

7    A.    Yes.

8    Q.    In fact, if we try to factor out the pandemic, we could

9    draw a line, and it looks like a pretty continuing trend of

10    increased revenue; correct?

11    A.    Yes.

12            MR. SOMMER:  Okay.  Your Honor, I will offer DXD13.00,

13    the prior one, 43, pursuant to FRE 1006.

14            MR. KAUFMANN:  Your Honor, we haven't had opportunity

15    to review these or to assess them.

16            MR. SOMMER:  Subject to their review.

17            THE COURT:  Okay.  Subject to review, it certainly

18    would qualify.

19        (Exhibit DXD13.0043 received into evidence.)

20            BY MR. SOMMER:

21    Q.    Can we agree in 2022 revenue surpassed prepandemic levels?

22    Correct?

23    A.    Yes.

24    Q.    Again, just to be clear, while this chart is showing

25    Booking Holdings, if we made a separate chart for Booking.com,

1    it would look pretty much the same; correct?

2    A.   Correct.

3    Q.   All right.  Let's go to the next demonstrative, which is

4    DX3133.  I'm not sure.  Let's see it when it comes up.

5         This is the gross bookings.  One of the things that Booking

6    measures in terms of its performance is something called gross

7    bookings; correct?

8    A.   Yes.

9    Q.   This chart, again taken from the 10-K, shows gross bookings

10   from 2006 to 2022.  We see the same pandemic influence drop;

11   correct?

12   A.   Yes.

13   Q.   Again, other than that, it's a pretty positive trajectory;

14   correct?

15   A.   Yes.  I'm very proud of it.

16            MR. SOMMER:  Your Honor, under the same caveat, we

17   offer DXD13.09044 in evidence under FRE 1006.

18            MR. KAUFMANN:  The same reservation.

19            THE COURT:  Okay.

20        (Exhibit DXD13.09044 received into evidence.)

21            BY MR. SOMMER:

22   Q.   Let's go to the next one, which is stock price chart.  We

23   took this from various sources on the Internet, but let me see

24   if you would agree with it.

25        From January 2006 -- and again, I've chosen that starting

 1    time because that's when the relationship with Google started.

 2    Do you recall, if you have any memory at all, that the stock

 3    price was $22.32?

 4    A.    I wish.  No.

 5    Q.    You wish you had bought it then?

 6    A.    Exactly.

 7    Q.    But you know today that at least as of September 2023 the

 8    stock price was over $3,100; correct?

 9    A.    Yes.

10    Q.    So by each of these measures that we've just looked at,

11    revenue, Booking's stock price, Booking.com and Booking Holdings

12    have seen remarkable growth and success from 2006 to the

13    present; would you agree?

14    A.    Yes.

15    Q.    Would you also agree that this type of meteoric growth

16    would not have been possible without the traffic Google has sent

17    to Booking since 2006?

18    A.    Yes.

19    Q.    Let me ask you to turn to DX3169.  This has been marked

20    confidential.

21    A.    DX -- could you repeat?

22    Q.    3169.  The top e-mail is dated December 14, 2020.  Are you

23    on that one?

24    A.    Yes.

25    Q.    Without putting it on the screen, I want to draw you

1    halfway down the page.  You write an e-mail to David Goulden.

2         Do you see that?

3    A.   Yes.

4    Q.   Do you see the third sentence, which starts with the

5    words "we have"?

6    A.   Yes.

7    Q.   Okay.  I'm going to give counsel for Booking a moment to

8    object if they want to.  I want to read the first 13 words of

9    that sentence, starting with "we have."

10             MS. RAZI:  No objection.

11             MR. SOMMER:  Thank you.

12             BY MR. SOMMER:

13   Q.   All right.  Let me read it.  What you wrote is, "We have

14   grown big in past years on the back of Google Search."

15        That's what you wrote; right?

16   A.   Yes.

17   Q.   And that was true?

18   A.   Yes.  I could have added a sentence that we're fully

19   reliant on Google, you know.  I could have done that.

20   Q.   Thank you.

21   A.   Clearly, we have become very successful.  I'm very proud of

22   that.

23   Q.   Thank you.

24   A.   But --

25   Q.   Let me ask you this:  In the years you've been at the

1    company, the four and a half years, has anyone sent a thank you

2    note to Google that you're aware of?

3                THE COURT:  All right, Counsel.

4                MR. SOMMER:  Sorry, Judge.

5                THE COURT:  Are we done?

6                THE WITNESS:  Also, it's starting to be very clear.

7    You're intimating --

8                THE COURT:  Let's get through this.

9                BY MR. SOMMER:

10   Q.   Last four final questions.

11        Would you agree that the cost per click that Google charges

12   Booking has remained quite stable during your tenure at Booking?

13   A.   Cost per click is not an ROI measure.  If you show -- so

14   you're factually correct, but it means that if you show many

15   more ads and you get clicks that don't convert as well, it

16   doesn't mean anything for us.

17   Q.   Let me put my question to you again, and maybe you can

18   answer my question.

19        Would you agree that the cost per click that Google charges

20   Booking has remained quite stable during your tenure at Booking?

21   A.   I have to look it up, but yes.

22   Q.   Is it a yes, or you have to look it up?

23   A.   No, but the interesting thing is, we don't really look at

24   cost per click, because it's about conversions and ROI.

25   Q.   Do you have your March 9th transcript there -- your

1    deposition transcript in front of you there, the March 9th one?

2         May I assist the witness?

3              THE COURT:  Sure.

4              BY MR. SOMMER:

5    Q.    If you could turn to page 107, at line 11 to 13.

6    A.    Yes.

7    Q.    Just look up when you've had a chance to read that.

8    A.    Yes.

9    Q.    Does that refresh your recollection, sir, that you told us

10   under oath that the cost per click has remained quite stable in

11   the past years?

12   A.    Yes.

13   Q.    Would you agree that Booking has -- I already asked that

14   one.  Never mind.

15        And would you agree that the decline of SEO, which you took

16   us through that chart earlier, fewer organic results, that that

17   has not materially impacted Booking?  Would you agree with that?

18   A.    No.

19   Q.    You would not agree with that?

20        Can you, in the same depo transcript, turn to page 126 --

21   127, I'm sorry, lines 2 through 7.

22        Do you remember being asked this question and giving this

23   answer:

24        "Question:  Is it fair to -- is it fair to say that this,

25   whatever was happening with search engine optimization, that

```
 1    your competitors may have seen a decline, but you, Booking.com,

 2    weren't as impacted?

 3         "Answer:  Right."

 4         Do you remember being asked that question and giving that

 5    answer?

 6              MR. KAUFMANN:  Your Honor, objection.  I don't think

 7    that's impeaching in any way.  It's a different question and a

 8    different answer.

 9              THE COURT:  You have to forgive me.  I wasn't on the

10    same page.

11              MR. SOMMER:  I'll rephrase.

12              THE COURT:  Can you send me to the right page?

13              MR. SOMMER:  127, lines 2 through 7.

14              THE COURT:  I'm sorry.  This is which date?

15              MR. SOMMER:  March 9th.

16              THE COURT:  I'm on the wrong one.  Sorry.  Okay.

17              BY MR. SOMMER:

18    Q.   Last question, sir -- last two questions.

19         It is Booking that decides what to bid in Google's ad

20    auctions; correct?

21    A.   Yes.

22    Q.   Okay.  And Booking makes that bid in the auction based on

23    its own determination of what its ROI objective is; correct?

24    A.   Correct.

25              MR. SOMMER:  If I could have one moment, Judge.
```

 1          Nothing further.  Thank you, sir.

 2          THE COURT:  Thank you, Mr. Sommer.

 3     Mr. Kaufmann, redirect?

 4          MR. SOMMER:  Your Honor, I was handed a note that I

 5     neglected to offer the stock chart, which under the same ground

 6     rules they can check it, but I did want to make that offer.

 7          MR. KAUFMANN:  I believe the stock chart were

 8     different sources and different information.  That may require

 9     someone else to verify.  The others were from 10-Ks.

10          THE COURT:  Take a look and let me know.  But I think

11     the general proposition is it's not in dispute.

12                    REDIRECT EXAMINATION

13          BY MR. KAUFMANN:

14     Q.   Mr. Dijk, you were just asked some questions about cost per

15     click and stability of cost per click, and I believe that you

16     were suggesting that those might not be the best metric to

17     assess what was going on, and I was wondering how ROI or other

18     metrics might be more relevant.

19     A.   So cost per click is a metric, but clearly, if you have to

20     pay for many more clicks that you normally would get for free,

21     that's one thing, or you would have to pay for search queries

22     that normally would not be commercial queries.

23          So it means that there's something that we call audience

24     quality.  So imagine that ads are shown on search queries, where

25     before that, you know, no ads were shown.  The cost per click

might be the same, but it means that we're getting less quality

of customers who have not the kind of conversion that we see in

the clicks that we used to have before.

Sorry.  It's a bit complicated, but I hope I've explained

it.

MR. KAUFMANN:  If I could ask your counsel to look at

DX3169.

MR. SOMMER:  That's a confidential document.  I just

read from it, I believe.

MR. KAUFMANN:  I'm asking for Mr. Dijk's counsel,

counsel for Booking.com to look at that.

And the sentence that Mr. Sommer read, he just read the

first few words.  I would like to read all the way to the comma,

if that's okay with you.

MS. RAZI:  Yes.

BY MR. KAUFMANN:

Q.   Mr. Dijk, if you would turn to DX3169.

A.   Yes.

Q.   That sentence that Mr. Sommer asked you about is, "We have

grown big in the past years on the back of Google Search."  And

then there's a but.  It says, "But with Google Search not

growing that fast anymore."

And could you explain to us what the reference is to Google

Search not growing as fast anymore?

A.   So you see that Google grew really quickly in the past 25

1    years, but that the number of times that people are searching is

2    kind of leveling off.  So we track the number of travel searches

3    per year, and you see that this is not really growing anymore.

4    People are using increasingly different media.

5         And this is very pronounced in other parts in the world.

6    For example, people are spending more time on other media and

7    not necessarily searching as much anymore.

8    Q.   When you're talking about return on investment, you're

9    talking about -- that we've seen in your 10-Ks and reported,

10   that's return on investment for all of the advertising that

11   Booking Holdings does?

12   A.   Correct.

13   Q.   Okay.  And while you've been able to manage that return on

14   investment well, could that return on investment have been

15   better?

16              MR. SOMMER:  Objection; speculation.

17              THE COURT:  It's overruled.  Go ahead.

18              THE WITNESS:  Yes.

19              BY MR. KAUFMANN:

20   Q.   And what types of things would you have looked for to get

21   better return on investment for your advertising spend?

22   A.   Clearly, as a company always trying to improve and become

23   better, and we think that we could have grown faster, could have

24   achieved more, you know, on -- when we would have had kind of

25   better ROIs.

1    Q.   Mr. Sommer asked you about direct traffic.  Do you remember

2    those questions about --

3    A.   Yeah.

4    Q.   -- direct traffic?

5         And you've been able to grow direct traffic at Booking.com.

6    And what has been the investment that you've had to make in

7    order to grow that direct traffic?

8    A.   So the key thing clearly is to attract new customers and do

9    that at a certain rate and be able to turn them into more loyal

10   customers.

11        So as a company, we're maturing, and I'm very proud that

12   we've been able to increase direct, but it's also a function of

13   us becoming more mature, because we have more customers and are

14   able to retain them better, and we have introduced programs for

15   people to really come back to us direct, like our Genius

16   program.

17             THE COURT:  Sorry.  What program?

18             THE WITNESS:  Genius program.  It's our loyalty

19   program, like -- I probably shouldn't say it, like Marriott

20   Bonvoy or hotel loyalty programs.

21             BY MR. KAUFMANN:

22   Q.   Right.  Okay.  And what has been the cost to Booking.com in

23   general terms in terms of securing the direct traffic growth?

24   A.   Well, to get to direct growth, we have to invest a lot in

25   new customer acquisition, and the moment we stop that, you know,

it will be very difficult to, you know, build our loyal customer
base.

In financial service and in our business, we call it
speedboating. You have to start -- you have to be on the
speedboat and have to be going, because otherwise, it will be
very difficult to grow a more loyal customer base.

Q.  So I want to return to the relationship with Google and
Booking.com. I believe you said that Booking.com spends a very
large sum annually with Google. I think you mentioned that in
court before.

Because of that, do you have to work with Google in terms
of your relationship and how you're going to spend that money
with Google?

A.  Yeah. And also for clarity purposes, we do have a very
good relationship. I worked myself 11 years at Google. I had
the best professional time of my life. I made friends for life.
I left in very high standing. And we have a very good personal
relationship. I know most of the senior people very, very well
and deeply respect them. So there's no issues with that, and I
would characterize that as a very good relationship.

But this relationship is -- clearly, one-sided is a word
that can be added to a good relationship.

MR. KAUFMANN:  Thank you.

No further questions, Your Honor.

THE COURT:  All right. Let me just make sure. To the

```
 1    extent either side wants to put into the record anything that's
 2    confidential -- it's either in evidence already, or do we need
 3    to have a very brief closed session in order to elicit any
 4    confidential information?
 5              MR. KAUFMANN:  From the plaintiff states' perspective,
 6    Your Honor, we have gotten all the information in.  There have
 7    been times when Mr. Dijk has not been able to testify, but the
 8    document is in evidence.
 9              THE COURT:  As long as the evidence is in and the
10    record has been made.
11              MR. SOMMER:  For Google, we have no need for a closed
12    session.
13              THE COURT:  Terrific.  Thank you.
14         Mr. Dijk, thank you very much for being here.  Thank you
15    for your time and testimony.
16         You can just leave that there.
17              THE WITNESS:  Thank you.
18              MS. MADDOX:  Good afternoon, Your Honor.  Claire
19    Maddox for the United States.
20         May we proceed?
21              THE COURT:  You may.
22              MS. MADDOX:  Your Honor, the United States calls
23    Professor Kinshuk Jerath.
24         KINSHUK JERATH, WITNESS FOR THE PLAINTIFFS, SWORN
25              THE COURT:  Professor Jerath, welcome.
```

1          THE WITNESS:  Thank you for your flexibility in

2     accommodating my situation in the last two weeks.

3          THE COURT:  Not to worry.  We are happy to have you

4     here.  I am sorry for your loss.

5          MS. MADDOX:  Your Honor, I have a few comments before

6     we begin.

7          For the Court's reference, our intention is to do Professor

8     Jerath's entire presentation in open court.  There are a few

9     redactions in the slide deck that we'll be handing up, but the

10    paper copy will have red boxes, as has been the practice.

11         As with previous experts, at the conclusion of Professor

12    Jerath's examination, I'm going to move to enter the deck into

13    evidence to complete the testimony of what he would have been

14    able to say in an open session.

15         And to the extent the underlying exhibits are not already

16    in evidence, we believe we can address admissibility questions

17    and request that the deck be provisionally admitted.

18         MR. SOMMER:  Until we see the deck --

19         THE COURT:  Right.  That's why we will wait until the

20    end.

21         MS. MADDOX:  As Your Honor may recall and just

22    referenced, the original intention was to call Professor Jerath

23    before some of the other ads witnesses.  So my intention is not

24    to retread ground that's already been covered there.  To the

25    extent that it's needed or helpful to set the stage for

1    Professor Jerath's testimony, I may call back to some of those

2    concepts.  But again, the intention is to minimize overlap of

3    previous witnesses.

4            THE COURT:  Okay.  I appreciate that.

5            MS. MADDOX:  And similarly, Professor Jerath's slide

6    deck may have some slides with details that we may just cover at

7    a higher level.  We may use them for reference in the event Your

8    Honor has any questions or follow-up.

9            THE COURT:  Okay.  Thank you.

10                          DIRECT EXAMINATION

11           BY MS. MADDOX:

12   Q.    Good morning, Professor Jerath.

13   A.    Good afternoon.

14   Q.    Could you please state and spell your name for the record.

15   A.    My name is Kinshuk Jerath.  First name is K-i-n-s-h-u-k.

16   And my second name is Jerath, J-e-r-a-t-h.

17   Q.    And what is your academic training?

18   A.    So, I have a bachelor of technology degree in computer

19   science and engineering from Indian Institute of Technology

20   Bombay.

21       After that, I started a Ph.D. at the Wharton School at

22   University of Pennsylvania.  I finished that Ph.D. in 2008.  The

23   degree is in operations and information management, and my

24   dissertation was in marketing.

25           THE COURT:  I'm sorry.  Say that last part again.

1          THE WITNESS:  My dissertation was in marketing.

2          BY MS. MADDOX:

3     Q.    What positions have you held since obtaining your Ph.D.?

4     A.    So in 2008, I joined as an assistant professor of marketing

5     at the Tepper School of Business at Carnegie Mellon University.

6     I was there for five years.  Then I joined Columbia Business

7     School in 2013, and I was tenured there in 2016.  And now I'm a

8     full professor in marketing there with an endowed chair.

9     Q.    Have you held any administrative or service roles at

10    Columbia Business School?

11    A.    Yes.  Currently, I'm the chair of the marketing division at

12    the school, and also, I'm an advisor in digital marketing to the

13    media and technology program.

14    Q.    What courses have you taught at Columbia Business School?

15    A.    I've taught a number of courses.  Most important and

16    primarily, I teach the course on digital marketing.  So that's

17    sort of the flagship course on digital marketing at Columbia.  I

18    developed that course.  I've been teaching it for the last many

19    years.  And now other faculty also teach that course.

20          Besides that, I've taught courses in retailing.  I've

21    taught courses in customer management and some other courses in

22    marketing, like the foundational core course in marketing.

23          And these are mainly to MBA students.

24    Q.    Your digital marketing course, what does that cover?

25    A.    So it covers all the important topics in digital marketing.

1    Really start with the purchase funnel, which is the way

2    consumers make purchases, and then the next step we take is talk

3    about different kinds of ad channels, like display advertising,

4    search advertising, social media influence on marketing, look at

5    return metrics like return on investment, ROI, how to measure

6    that, attribution, how to build campaigns, manage campaigns,

7    optimize campaigns.

8    Q.    Have you engaged in any research?

9    A.    Yes.  I've been engaging in research for the last 15 to 20

10   years.

11   Q.    And have you published any peer-reviewed articles?

12   A.    Yes.  In the last ten years, I've published more than 20

13   peer-reviewed articles in the top marketing journals.

14   Q.    And what were the subject matters of those peer-reviewed

15   articles?

16   A.    The main subject matter has been digital marketing, a lot

17   on search advertising, as well as other types of advertising and

18   display.  Also, I've published on retailing, customer

19   management, kind of a marked general interest in marketing

20   topics.

21   Q.    Have you ever received any awards or other recognition?

22   A.    Yes, I have.  I've received various awards.  So there's an

23   institute called MSI, Marketing Science Institute.  It's an

24   institute that brings together practitioners and academics.  And

25   they nominated me as a scholar in their opening class of

1    scholars -- MSI Scholar is the title -- in 2018.

2        And also, my papers have been nominated for and received

3    various best paper awards.

4    Q.   Are you involved in any academic journals?

5    A.   Yes.  Besides publishing in journals, I'm also on the

6    editorial boards of and in the senior editorial positions at

7    multiple marketing and management journals, like Journal of

8    Marketing Research, which is the flagship marketing journal,

9    Marketing Science, another very prominent one, Management

10   Science, Quantitative Marketing and Economics, and some others.

11   Q.   Are you involved in any industry associations?

12   A.   Yes.  Besides MSI, which is Marketing Science Institute

13   that I just told you about, I'm also involved in other

14   associations, like one such as ARF, which is the Advertising

15   Research Foundation.  That is another association that brings

16   together academics and practitioners.

17   Q.   Have you ever had any speaking engagements or presented

18   papers?

19   A.   Yes.  In the last ten years, I've had more than 80 invited

20   or peer-reviewed speaking engagements.

21   Q.   Have you ever done any consulting?

22   A.   Yes.  I've consulted for several companies, starting all

23   the way from small start-ups to large companies in many

24   different kinds of industries, and mostly this consulting has

25   been around digital marketing areas.

1    Q.   How do you stay current on issues in digital marketing?

2    A.   So I -- the way to stay current is really through my

3    research and teaching.  I'm teaching again at Columbia Business

4    School a number of MBA students who are very sharp.  So to teach

5    them, you always stay current.  I mean, again -- so the research

6    brings me -- we always stay current based on the research and

7    also talking to practitioners through all these associations and

8    reading industry reports regularly and so forth.

9    Q.   Have you been recognized by any court as an expert in

10   digital marketing or online advertising?

11   A.   Yes, I have been.

12          MS. MADDOX:  Your Honor, at this point, we would like

13   to offer Professor Jerath as an expert in digital marketing.

14          MR. SOMMER:  No objection.

15          THE COURT:  So we will recognize Professor Jerath as

16   an expert in digital marketing.

17          BY MS. MADDOX:

18   Q.   Professor Jerath, have you prepared a slide presentation to

19   assist with your testimony?

20   A.   Yes, we have.

21          MS. MADDOX:  Your Honor, may we present Professor

22   Jerath with his slide presentation?

23          THE COURT:  Sure.

24          MS. MADDOX:  May I approach?

25          BY MS. MADDOX:

1   Q.   Professor Jerath, did the United States give you a

2   particular assignment with regards to this case?

3   A.   Yes.  So my assignment was to describe certain digital

4   advertising products in the United States, the characteristics

5   and users of these products, primarily from an advertiser point

6   of view.

7        In addition to that, I was also asked to review reports

8   submitted by Google's experts and respond to those.

9            MS. MADDOX:  Your Honor, for the record, the slide

10  presentation has been marked as UPXD103.

11           BY MS. MADDOX:

12  Q.   Professor Jerath, how did you carry out that assignment?

13  A.   I drew upon my knowledge in research and teaching and other

14  industry interactions.  I also did an extensive study of many

15  documents that were produced in the case.

16       While starting this assignment, I had certain perspectives

17  and views on these issues, and my study helped me confirm those,

18  and I'm offering those as my opinions.

19  Q.   Can we turn to the second slide, please.  Thank you.

20       Does this slide give an overview of your testimony today?

21  A.   Yes, it does.

22  Q.   Would you please summarize your high-level conclusions?

23  A.   Yes.  I'm offering the four opinions.  At a high level, the

24  first one is that general search text ads, or text ads for

25  short, are a distinct product category of advertising; second,

1  that search ads more broadly, so this includes text ads as well

2  as other kinds of search ads, so search ads more broadly are a

3  distinct product category of advertising.

4      The third opinion I'm offering is that effectively

5  providing text ads and other search ads requires significant

6  resources, and advertisers have few alternatives apart from

7  Google for these ads.

8      And the fourth opinion is that Google harms advertisers

9  through its withholding of information and through its control

10  of the ad auction.

11  Q.   Before we dive into your opinions, let's step back and get

12  an overview of the advertising industry generally.

13      Can you give us a sense of the size of the advertising

14  industry?

15  A.   Yes, please, could we go to the next slide.

16      So this plot gives a sense of the size of the advertising

17  industry.  This is total media ad spend in the U.S. in 2021 in

18  billions.  And we can see that the digital industry -- digital

19  ad spending was about $211 billion in 2021.

20  Q.   The second bar here is labeled -- let's see.

21      The categories of advertising here under "digital," how

22  would you describe those?

23  A.   You mean from TV downwards?

24  Q.   Yes.

25  A.   Yeah, so that would be traditional advertising.  It

1    includes TV, newspaper, print.  So newspaper and magazines fall

2    into print, radio, and out-of-home, which you think of as

3    billboards.  So these are traditional media that have been

4    existing for like many decades now.  This is traditional

5    advertising.

6    Q.  And I see that eMarketer is the source of the data on this

7    slide.  Does eMarketer give a further breakdown of digital

8    advertising spend?

9    A.  Yes, please go to the next step.

10       So as per standard industry practice, eMarketer has broken

11   down the digital ad spend into display and search.  You can see

12   that these are primary categories, and there are some others,

13   like lead generation and so on.  And search specifically is

14   about $86 billion, again in the U.S. in 2021.

15   Q.  Can you briefly describe display ads?

16   A.  So display ads are basically banner ads and also video ads

17   on websites and apps. on desktop and mobile phones.

18   Q.  And the Court has heard testimony about text ads and other

19   types of search ads.  To orient our discussion, can you very

20   briefly describe those ad types?

21   A.  Yes, please, could you go to the next slide.

22       So this is --

23       THE COURT:  I'm sorry to interrupt.  Will you be

24   defining "lead generation" in a moment?  I didn't want to jump

25   ahead.

1          MS. MADDOX:  That's quite all right.  Actually, that

2     was not a question I had.

3          So please, Professor Jerath.

4          THE COURT:  Can you define what "lead generation" is?

5          THE WITNESS:  So lead generation, you can think of it

6     as, suppose Dell launches a new laptop, and it would -- can give

7     this laptop to some people to review, some experts to review.

8     And they would write reviews and also have a link there.

9          So suppose I go and read that review and I click on that

10    link and go to the Dell website.  Then that's called a lead, and

11    the reviewer would then be paid directly for that.

12         So that's one example of lead generation.

13         You can think of credit card.  If you want to go out and

14    buy a credit card or get a new credit card, you can go to like

15    nerdwallet.com and search, and then you click from there.

16         So that's called lead generation, also sometimes called

17    affiliate marketing.

18              THE COURT:  Thank you.

19              THE WITNESS:  Sure.

20              BY MS. MADDOX:

21    Q.   As I mentioned, the Court has heard testimony about types

22    of search ads.  Can you very briefly describe those ad types?

23    A.   Yes.  So this slide describes that, and I know, Your Honor,

24    that you've heard testimony on this.  So I will be very quick.

25         The red rectangle contains text ads.  Again, the query here

1    is "best gaming laptops."  These are all results in response to

2    that.  So the red rectangle has text ads.  You can see they're

3    mainly text.  The blue one is organic listings.  So that's not

4    an ad.  And the results on top are shopping ads, which I put

5    under "other search ads" in this case.

6    Q.   Are shopping ads sometimes referred to as PLAs, or product

7    listing ads, or product ads?

8    A.   Yes.

9    Q.   Can you give us examples of search ads -- of other search

10   ads that are not text ads?

11   A.   Sure.  Please go to the next slide.

12        So this contains some examples.  These are sponsored

13   product ads on Amazon on the left, and hotel ads or, more

14   generally, travel ads on a website like Expedia.

15   Q.   And I've heard you use the term "marketing" and the

16   term "advertising."

17        How do you use those terms?

18   A.   So by advertising, I'm referring to firms paying owners of

19   other media to insert their messages into that media, like TV

20   display, search, all of these.

21        Marketing is a broader category.  It includes advertising,

22   but it also includes other activities that firms do to pursue

23   consumers, but they don't involve like direct payment.  So

24   search engine optimization would be a marketing activity,

25   because it can't pay the search engine to ensure your result,

1    but you do things in the background to do it.

2         E-mail typically would be.  So sometimes it involves

3    creation of media, because the firm would create the e-mail and

4    then send them to people.

5         So those I'm calling marketing.

6    Q.   And with that overview, I would like to lay out some

7    foundational concepts.

8         When you teach your students about digital marketing, where

9    do you start?

10   A.   So when I teach about digital marketing, I start with the

11   idea of the consumer purchase funnel.  So this slide shows the

12   consumer purchase funnel.  Yeah, so this is where I start.

13   Q.   Okay.  And the Court has heard testimony regarding the

14   funnel already.  Can you briefly state why you start with the

15   consumer purchase funnel?

16   A.   What advertisers and marketers want to do is to influence

17   and persuade consumers to purchase their products.  So it is

18   good to know of the process of how consumers make a purchase.

19   And the consumer purchase funnel is a conceptual model of how

20   consumers make purchases.

21   Q.   Can you explain in a sentence or two -- and I know that's

22   condensing a lot of information you teach in your class.  Can

23   you explain in a sentence or two what the consumer purchase

24   funnel is?

25   A.   Sure.  So you can look at the graphic on the left here.

It's actually a slide from my teaching slides.  The idea of a funnel is, a consumer purchase doesn't happen immediately.  It's a gradual process typically and it's a stage-wise process.

So you first make the consumer aware of your product.  Then you get them interested in your product.  Then you increase the desire in them that they want your product.  And after that, hopefully, they will take the purchase action.  So those are the stages.

Also, the top two stages are often called top funnel, so where there's an interest.  Desire and action are often called bottom funnel.  And sometimes interest and desire are grouped together as mid-funnel.

Q.   What is the principal idea behind having these stages?

A.   The principal idea behind these stages is almost tautological.  Right?  The idea is that, look, you can't purchase something unless you desire it, and you can't desire something unless you're interested in it, and you can't be interested in something unless you are aware of it.

So that's really the idea of having these stages.

Q.   Why do you use the term "funnel"?

A.   So that brings us to point 2 on the top of the slide.  Point 1 was stages.  So point 2 is the successive narrowing.

So this is an empirical generalization.  This is just saying that look, you make a lot of people aware, but only some of them get interested, and only some others -- and some of them

5383

1    get desirous of the product and even fuel purchase.  So you get

2    this inverted triangle shape, and that's why it's called the

3    funnel.

4    Q.   Does the funnel require a linear path through the stages

5    that you identified?

6    A.   Not necessarily.  Consumers can skip stages in some cases.

7    Consumers can be at a stage and then go back to another stage.

8    Let's say they forget about a product.  So they can go back, up

9    and down.  It doesn't have to be linear.

10    Q.   And does the funnel apply only to products?

11    A.   It applies to products and services.

12    Q.   Can the funnel vary from the one you use here on slide 6 of

13    UPXD103?

14    A.   Yes.  There are different versions of the funnel that

15    exist.  Different practitioners, different academics, they can

16    use slightly different versions.  I know, for example, Google in

17    some internal documents has used a three-stage funnel.  So there

18    can be variations.

19    Q.   Do different funnel variations depict different ideas?

20    A.   They depict the same ideas, the same fundamental ideas,

21    which are the number 1 and number 2 ideas over there, that there

22    are stages, and then there is successive narrowing over stages.

23    Q.   How, if at all, are funnel concepts helpful to advertisers?

24    A.   So the funnel helps advertisers again think through the

25    purchase process, and then for different stages of the funnel

1    that consumers may be in, advertisers can think of the goals

2    that they need to meet for their campaigns and also sort of

3    align which channels of advertising they would want to use to

4    meet those goals.

5    Q.    Have you ever heard anyone refer to the consumer purchase

6    funnel as an outdated model?

7    A.    Some people say that.  But even those people, when they

8    talk about advertiser goals and what -- consumer stages, they're

9    very much talking the language of the funnel:  Awareness,

10   conversion, and so forth.

11        So I would say that rather than calling it outdated, I

12   would call it timeless.  These are -- again, these are timeless

13   concepts that advertisers use.  And even now, in my experience,

14   many or most of the advertisers, they use the funnel ideas.

15        On the academic side, there is a lot of research going on

16   on the funnel.  Like even just last week, I came across a

17   research paper published in a top management journal which was

18   studying the congruence between the funnel and how modern -- how

19   consumers purchase in this modern environment.

20            THE COURT:  Would you -- there's been some suggestion

21   that these stages, while helpful concepts, in reality really

22   have blurred over time and, in particular, blurred with respect

23   to digital marketing.

24        Would you agree with that assessment?

25            THE WITNESS:  No, I don't agree.  So digital

1   marketing -- so the funnel has been around for more than 100

2   years since it was first proposed.  And what digital has done is

3   only added a few more channels.  Right?

4       So that doesn't undo the funnel idea.  Like I said, it's a

5   timeless idea.  Yes, there's better tracking of consumers, but

6   that doesn't mean that the funnel concept is not useful.  Right?

7       Right now, a new channel of media that's coming up is

8   virtual reality.  And so maybe advertisers will reach out to

9   consumers through virtual reality channels also.  That doesn't

10  mean that now the funnel, we need a new model of consumer

11  purchasing.

12      So over time over the last 100 years -- so when TV was not

13  there, I mean, we didn't talk about it in the context of the

14  funnel, but then TV is there, so we do talk about it.  Now there

15  are more channels and Internet, so we talk that.  Again, what

16  Internet has done is that it's helped trackability.

17      But as I just mentioned, Your Honor, like, the funnel idea

18  is a solid, timeless idea, and even last week, as I said, there

19  was this new paper that I saw that was really studying this

20  congruence between okay, if this is the click string that we

21  have for a consumer online, how do we map that back to funnel

22  stages, because that really helps with this.

23      It's a -- again, it's a simple idea, but it's a very useful

24  idea.  And I think it has stayed the test of time because it is

25  a simple idea, and you can reduce very complicated things back

1    to this sort of simple framework, which then helps thinking.  So

2    thinking, again, with consumer goals, what campaign goals, and

3    things like budget allocation and so forth.

4         THE COURT:  Just one more question, and this is

5    perhaps not relevant to anything other than my own curiosity,

6    which is:  Pre-Internet and the marketing revolution that was

7    brought on by the Internet, what would be a type of advertising

8    that would be bottom funnel?

9         THE WITNESS:  That's a very good question.  So I

10   think --

11        THE COURT:  I've been at this for four weeks.

12        THE WITNESS:  So truly speaking, there was -- it was

13   difficult to find the channel that would very nicely target

14   bottom funnel.  So what advertisers would do -- let's think of

15   TV ads.  You can think of -- think of a car, for example.  And

16   I'm sure you've been exposed to this.  So there are brand ads.

17   Like they show a nice car driving on some beautiful scenic

18   highway or whatever.  So that's a branding ad for a car.

19        But you probably also saw ads where, you know, there's like

20   the local dealership and this guy shouting in the mic, Come and

21   get it today or whatever, and we have $3,000 off.  So that kind

22   of ad was meant for bottom funnel.

23        So the sort of the high-experience ad, you can say, is for

24   okay, you start liking the brand, BMW or whatever.  The guy

25   shouting in the mic is like for people who already know.

They're sort of in the bottom of the funnel.  This will be the call to action.  So that is one kind of ad channel.

What search has really done, and we will discuss this more, is that because of consumer goals, it tells somebody that look, I want information on this right now.  So then you know that, oh, this person is interested, and so they are in the bottom of the funnel, because they're clearly aware and interested. That's why they searched.  So now they have traversed the top of the funnel, and now they're sort of in the middle to bottom of the funnel, and so we can send them ads there.

The other thing I would say is that this is not an advertising channel but more of a marketing channel, as I explained a few minutes back the difference.

But pre-Internet, a very important lower funnel marketing channel was salespeople, because you could talk to a salesperson, they could ask you a couple of questions and figure out where you are in the funnel.  And if you already have done your research on the product -- let's say you want to buy a washing machine.  You've done your research, and you know I've got to give them the deal.  Versus if you just walk in to Macy's or whatever, Home Depot, and you say, oh, tell me something about washing machines, you know, my machine is not working so well.  So then they will figure out, oh, this person is in the upper funnel.

So it's much more like personalized in that sense.

1          I hope that --

2               THE COURT:  That does.  It seems to me one other

3     example is Yellow Pages.

4               THE WITNESS:  Yeah, absolutely.  So Yellow Pages, it's

5     great that you bring that up, Your Honor.  Yellow Pages is

6     something that search as an offering has totally demolished

7     Yellow Pages as a market.  But otherwise, yes, Yellow Pages was

8     that where the idea was the consumer who is ready to buy

9     something, you know, they'll open up the Yellow Pages and figure

10    out.

11         In fact, I give the example of Yellow Pages in my class as

12    sort of a channel that's been replaced by search and is

13    basically nonexistent.

14              THE COURT:  I'm sure your students don't know what a

15    Yellow Pages is.

16         Sorry, Counsel.  Thank you.

17              MS. MADDOX:  No, you're quite all right.  Thank you,

18    Your Honor.

19              BY MS. MADDOX:

20    Q.   Professor Jerath, what characteristics do advertisers

21    consider when they're building out their ad strategies and

22    campaigns?

23    A.   Please, could you go to the next slide.

24         So these are two primary characteristics that advertisers

25    consider when they're thinking of ad channels.  So on the left

1    is targeting, and on the right is which funnel goal or goals is

2    that ad channel most suited and effective for.

3    Q.   What do you mean by targeting?

4    A.   So targeting, when a company produces a product, they have

5    kind of a certain kind of people in mind that this product will

6    resonate most with these people.  Targeting refers to the effort

7    that their ads should go to these people.  The relevant people

8    should see the ad.  That's what ad targeting is.

9    Q.   And what does it mean for targeting to be based on inferred

10   intent from signals, as you have here on slide 7?

11   A.   So targeting inferred intent, inferred intent from signals

12   means that advertisers look for signals in data from consumers

13   based on which they could figure out, oh, this person wants this

14   or is interested in the following.

15        So what are these signals?  They are data signals, as I

16   said.  So they could be expected audience composition.  If I

17   know the demographics of someone, that could tell me something

18   about what they're generally interested in.

19        Behavioral profiles like past online behavior and recent

20   online behavior, that's another signal.  And then context, like

21   what am I doing at this moment, that could also inform what are

22   the signals.

23        I just want to say that many of these signals, like these

24   data signals on the Internet, they can be useful certainly, but

25   they are also sometimes low information.  They're temporally

1    distant.  Like if I saw a car website a week back, then it's not

2    really clear if I'm interested in that right now or something

3    else.  So there's temporal distance.  And that's why I have the

4    starred point that these inferences from signals can be limited

5    in accuracy.

6    Q.    What does it mean for targeting to be based on declared

7    intent in realtime, as you have here on slide 7?

8    A.    So I think I can explain this with the context of a search

9    query, and I also did a few minutes ago.  When a consumer types

10   a query in a search engine, they're literally telling the search

11   engine at this time, Tell me about this.  Right?  Tell me more

12   about this.  I want more information about this.  So that's

13   declared intent in realtime.  I'm telling you.  Or I could, for

14   example, tell the salesperson, right, as I said, the other kind

15   of channel.  So that's declared intent in realtime.

16   Q.    Why not say declared intent from signals?

17   A.    So I'm not putting the word "signals" here because a

18   specification of a query is basically a statement of an intent,

19   and there's nothing left to infer.  And therefore, I'm not using

20   the word "signal" here.

21   Q.    I'd like to look on the right side of slide 7 here.  How

22   does this second characteristic factor into your consideration

23   of which advertising channels align with different stages of a

24   funnel?

25   A.    So again, a different advertising channel, and we discussed

1    this, align with different stages of the funnel.  I think the

2    key phrase here is "most suited and effective," that advertisers

3    are spending billions of dollars, tens of billions of dollars on

4    advertising every year.  And they have campaigns, and campaigns

5    have goals.

6        So advertisers really want to figure out and understand

7    like for this goal, which channel -- for meeting this particular

8    goal of the campaign, which channel is most suited and most

9    effective.

10   Q.   Where do the ad channels that you discussed a few moments

11   ago, where do they fall along these two characteristics?

12   A.   Yes, please, could you go to the next slide.

13       So let's look at the top row, which talks about traditional

14   display and social media.  In terms of targeting, these channels

15   work with inferred intent from signals, and in terms of the

16   funnel goals, they align -- they're most suited and effective

17   for top funnel and to some extent mid-funnel goal, top funnel

18   goal being awareness and interest.

19       And going to the second row, that's search ads, so text ads

20   and other search ads.  The targeting here is declared intent

21   based on the query we just discussed.  And the -- this channel,

22   search ads are most suited and effective for bottom funnel goals

23   and to some extent for mid-funnel goals.

24   Q.   Can traditional display or social advertising reach

25   consumers in other parts of the funnel?

A.    Yes, they can reach consumers in other parts of the funnel,
but they're most suited and effective for top funnel goals.

THE COURT:  Would you include -- social media has some
search capability, and people now can use it to search for
products, services.

Do you include that in your search ads definition?

THE WITNESS:  So in my search ads definition, anything
that is in response to a query is an -- so the way I think about
it is that anything in -- an ad shown in response to a search is
a search ad, whatever it is, including social media.

I just want to sort of highlight the fact that search ads
on social media are very small in percentage of ads on social
media.  So the vast majority of advertising on social media is
display.  It's awareness generation.  It's not search.

There's a reason for that.  This is -- obviously, I've been
studying this for a long time.  The reason is that -- think
about why you go to a search engine.  You go to a search engine
to leave it as soon as possible and go to the right place.

Why do you go to Facebook or why do people go to Facebook?
Why do people go to Instagram?  Why do people go to TikTok?
They don't go to one of these websites to leave that website.
They go to that website to interact with friends, to enjoy the
videos, enjoy the photos and stuff.  So they're not in the mode
to go somewhere else.  And therefore, they're much less
responsive to search ads which would take them out of that

1    experience.

2         But the -- the display ads are not taking them out of that

3    experience.  Video ads are not -- they're sort of adding to that

4    experience, or you could say maybe they're aligned sometimes,

5    but it varies whether you're on the same website or on the same

6    app. or whatever.

7         So yes, there is some search advertising on Facebook, for

8    example, but it's very, very small.  It's not really a big

9    phenomenon at all.

10              THE COURT:  All right.

11         Counsel, before we continue, why don't we wrap up for the

12   day, because I actually have a 5:00 hearing as well.

13         So we'll wrap up for the day, Professor Jerath.  We'll

14   continue tomorrow at 9:30.  I'll ask you, please, to not discuss

15   your testimony with anyone overnight.  And we look forward to

16   seeing you tomorrow.

17         Don't wait for me, everyone.  I just have one thing I want

18   to mention to everybody -- and Professor Jerath, you're welcome

19   to step down.

20         I just had one quick housekeeping heads-up I wanted to let

21   everybody know about in terms of not so much our scheduling but

22   the courthouse scheduling.

23         Next Monday at 10:00 a.m., there is a hearing in U.S. v.

24   Trump.  And so I will just remind you again on Friday, but you

25   may need a little extra time to get into the courthouse that

1     morning.  All right?

2         Anything else before we adjourn?

3             MR. DINTZER:  Yes, Your Honor.  Can we have a minute?

4             THE COURT:  Sure.

5             MR. DINTZER:  So two things related.  The first is

6     that Professor Whinston will be coming back next Monday.  That's

7     the plan.  So we wanted to give the Court a heads-up on reading

8     the summary and the like.

9             THE COURT:  Okay.

10            MR. DINTZER:  The second thing is, after Professor

11    Whinston and after the current witness, we'll have one more fact

12    witness for the DOJ plaintiffs that will come down the road on

13    the 24th.  So we're pretty close to done.

14        What we would like and the ask for the Court is this:  We

15    have not had an update from Google about their witness list

16    since September 5th, which is fine.  That was what was called

17    for.  But what we have now is we have seen ten Google employees

18    or former employees already in our case.  They have 14 fact

19    witnesses.  I believe all of them are Google employees.  So what

20    we're looking at now, of course, is, until they tell us

21    otherwise, having to prepare for all 14.  A lot of them are

22    overlapping.

23        So what we would ask the Court -- we've asked them, and

24    they've refused.  We'd ask the Court to ask them to update that

25    list, pull off anybody who they're not going to call or tell us

1    to downgrade anybody who they're unlikely to call so that we can

2    efficiently prepare for who they plan to call.

3            THE COURT:  Okay.  Does that mean we are still sort of

4    on track for finishing up the 24th/25th from the plaintiffs'

5    side?

6            MR. SALLET:  Yeah.  We have two experts that week.

7    There is one Google employee who has been pushed back to that

8    week, Krueger.

9            MR. SCHMIDTLEIN:  Yes.

10           MR. SALLET:  So we're still looking, probably 26th

11   we'll be done, and there's a fourth witness that week,

12   Mr. James.  So there's four witnesses remaining in the

13   plaintiffs' case for that week.

14           THE COURT:  All right.

15           MR. SCHMIDTLEIN:  Your Honor put in place every

16   Wednesday evening, the party whose case we're in, you have to

17   disclose your witnesses for the following week.  And once we get

18   to a point where -- and we have asked them -- we will actually

19   be bringing a witness next Wednesday.  Pursuant to the

20   conversation we had about some of the scheduling issues and us

21   sort of being pushed back, we do have a witness who we're going

22   to bring and we're going to put on on direct next Wednesday

23   before we officially sort of start our case, because we do have

24   a witness for the 26th that needs to go on on the 26th.  So

25   hopefully, they are going to be done then.

1          Once our case is up or once we're officially into our case,

2     on that Wednesday, we will make our disclosures.

3          THE COURT:  I guess the question is whether you

4     have -- your current thinking is whether you have pared back

5     your intention with respect to number.  I guess you haven't

6     disclosed order, but presumably, you've disclosed some witness

7     list.

8          MR. SCHMIDTLEIN:  We did originally on September 5th

9     actually disclose the order.  That is now getting rejumbled,

10    because we've got availability issues.  And until we see all of

11    their experts testify fully, we have not made any decisions

12    about sort of finally dropping witnesses.  But once we've got, I

13    think, Professor Whinston done, even though I know we have the

14    final witness will come after that, I imagine next week we're

15    going to be in a position to make some better judgments about

16    where we are on certain witnesses, even though they won't be

17    final.

18         THE COURT:  Okay.  Mr. Dintzer?

19         MR. DINTZER:  Yes, Your Honor.  To quote

20    Mr. Schmidtlein, we've been at this for three years.  They've

21    had civil discovery on all of our people.  And we only have two

22    witnesses left after this one:  Professor Whinston, who is

23    already started, and then a fact witness from Amazon.

24         So if at this point, having put on ten Google employees,

25    and I believe five or six of them they informed us they wanted

 1     to direct -- I can get the Court the exact number -- if they

 2     don't know which witnesses they are absolutely not going to call

 3     or unlikely to call, then we would ask the Court to ask them to

 4     go back and sharpen their pencil and think about it and give us

 5     something that resembles -- I mean, we've been moving along.

 6     We've got a lot more information on the table.  They can give us

 7     something that's more reliable so we don't have to have 14

 8     people preparing 14 outlines that may result in I don't know how

 9     many witnesses.

10          So we would ask the Court to ask them to do that.

11               THE COURT:  Okay.  Well, I think I will do that.  I'm

12     not sure I need to do it today.  We're still a couple weeks off

13     before we see the second Google witness.  Presumably, you

14     already know who is coming next week out of order.  So you know

15     who that person is.

16          And then I think once -- Mr. Schmidtlein has represented

17     that once we're done with Professor Whinston they will be in a

18     position to provide additional information.  I think that

19     will -- since we still have days of testimony from the States

20     expected, I think we will be in a better position to get a final

21     or close to final assessment.

22               MR. SCHMIDTLEIN:  Just in fairness here, they have in

23     mid-trial dropped several witnesses, witnesses who our people

24     had been prepared and ready to take, and for whatever reason, we

25     got very late notification that these witnesses were not going

1    to be called.

2        So we will be happy, again as soon as Professor Whinston is

3    done, to be in a position to re-evaluate and provide some

4    updates.

5            THE COURT:  All right.  That sounds like it will be

6    Monday or Tuesday of next week.

7            MR. DINTZER:  Thank you, Your Honor.

8            THE COURT:  Okay.  All right.  Anything else?

9            MR. DINTZER:  Not from the DOJ plaintiffs, Your Honor.

10           MR. SALLET:  Not from the States, Your Honor.

11           MR. SCHMIDTLEIN:  No, Your Honor.

12           THE COURT:  Okay.  So I guess one question is, is it

13   the expectation that we'll finish with Dr. Jerath tomorrow, and

14   then is there a fact witness available after that?

15           MR. SALLET:  No, Your Honor, for the reasons we've

16   discussed.

17           THE COURT:  I wanted to confirm that's the present

18   thinking.

19       All right.  I don't have anything, and so we will see

20   everybody in the morning.

21       (Proceedings adjourned at 5:06 p.m.)

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick                    October 12, 2023
SIGNATURE OF COURT REPORTER         DATE

## $

**$211** [1] - 5377:19
**$22.32** [1] - 5359:3
**$3,000** [1] - 5386:21
**$3,100** [1] - 5359:8
**$86** [1] - 5378:14

## '

**'17** [1] - 5350:3
**'18** [1] - 5350:3
**'19** [1] - 5350:2

## /

**/s** [1] - 5399:8

## 0

**005** [1] - 5338:19
**006** [3] - 5331:12, 5347:19, 5347:21
**011** [1] - 5311:7
**013** [1] - 5350:12
**015** [1] - 5337:2
**019** [1] - 5351:19
**02-03-2021** [1] - 5307:5

## 1

**1** [2] - 5382:22, 5383:21
**10** [5] - 5288:7, 5296:24, 5302:14, 5320:16, 5338:17
**10-K** [16] - 5339:22, 5344:2, 5344:6, 5344:9, 5344:11, 5345:5, 5345:6, 5346:22, 5347:16, 5348:1, 5349:19, 5350:11, 5351:17, 5354:24, 5355:25, 5358:9
**10-Ks** [7] - 5343:25, 5350:2, 5356:2, 5356:17, 5356:20, 5364:9, 5366:9
**100** [3] - 5289:18, 5385:1, 5385:12
**10019** [1] - 5273:6
**1006** [2] - 5357:13, 5358:17
**107** [1] - 5362:5
**10:00** [1] - 5393:23
**11** [6] - 5272:6, 5283:20, 5311:6, 5350:11, 5362:5,

**5368**:15
**1100** [1] - 5272:14
**115** [5] - 5326:6, 5326:13, 5326:14, 5326:25, 5327:1
**12** [6] - 5275:22, 5302:14, 5317:21, 5317:24, 5336:17, 5399:8
**126** [1] - 5362:20
**127** [2] - 5362:21, 5363:13
**13** [7] - 5336:18, 5336:19, 5337:1, 5337:2, 5355:9, 5360:8, 5362:5
**1300** [1] - 5272:21
**1301** [1] - 5273:5
**14** [6] - 5297:13, 5359:22, 5394:18, 5394:21, 5397:7, 5397:8
**15** [4] - 5298:1, 5337:1, 5337:2, 5373:9
**17** [2] - 5317:22, 5351:17
**18** [1] - 5298:17
**19th** [1] - 5331:11
**1:33** [1] - 5272:6

## 2

**2** [6] - 5297:11, 5362:21, 5363:13, 5382:21, 5382:22, 5383:21
**20** [8] - 5272:9, 5286:10, 5286:15, 5288:7, 5337:10, 5355:14, 5373:9, 5373:12
**20-cv-3010** [1] - 5272:3
**20001** [3] - 5272:17, 5273:9, 5273:13
**20005** [1] - 5272:14
**20024** [1] - 5273:3
**2005** [1] - 5356:14
**2006** [4] - 5358:10, 5358:25, 5359:12, 5359:17
**2008** [2] - 5371:22, 5372:4
**2013** [1] - 5372:7
**2015** [4] - 5294:2, 5298:5, 5298:20, 5299:9
**2016** [3] - 5333:21, 5336:9, 5372:7

**2018** [1] - 5374:1
**2019** [23] - 5293:20, 5294:3, 5297:15, 5297:23, 5298:6, 5298:20, 5298:21, 5299:16, 5307:2, 5307:11, 5307:19, 5308:22, 5308:25, 5309:10, 5310:2, 5313:5, 5314:21, 5316:3, 5331:7, 5331:11, 5333:11, 5336:17, 5338:17
**202-354-3284** [1] - 5273:14
**2020** [8] - 5310:2, 5341:8, 5341:9, 5341:21, 5347:14, 5350:2, 5356:22, 5359:22
**2021** [6] - 5309:19, 5350:2, 5356:22, 5377:17, 5377:19, 5378:14
**2022** [10] - 5310:8, 5314:16, 5316:23, 5317:16, 5344:1, 5344:11, 5347:16, 5352:16, 5357:21, 5358:10
**2023** [6] - 5272:6, 5307:19, 5313:5, 5313:23, 5359:7, 5399:8
**21st** [1] - 5340:7
**24** [1] - 5299:13
**24th** [1] - 5394:13
**24th/25th** [1] - 5395:4
**25** [2] - 5355:17, 5365:25
**26th** [3] - 5395:10, 5395:24

## 3

**3** [2] - 5308:12, 5347:17
**30th** [1] - 5341:9
**3132** [1] - 5310:5
**3133** [3] - 5274:9, 5307:19, 5308:8
**3135** [2] - 5274:9, 5307:20, 5308:8
**3136** [1] - 5314:16
**3138** [1] - 5307:7
**3140** [4] - 5274:9, 5307:20, 5308:8, 5309:19
**3143** [3] - 5274:9, 5307:20, 5308:8

**3145** [2] - 5309:6
**3148** [5] - 5306:24, 5307:6, 5307:8, 5307:11, 5308:11
**3152** [3] - 5274:9, 5307:20, 5308:9
**3156** [1] - 5355:5
**3157** [6] - 5274:9, 5307:20, 5308:9, 5336:17, 5336:19, 5338:23
**3167** [3] - 5274:9, 5307:20, 5308:9
**3168** [2] - 5307:20, 5308:9
**3168..................** [1] - 5274:9
**3169** [1] - 5359:22
**3186** [3] - 5338:20, 5338:21, 5338:24
**3194** [1] - 5311:1
**333** [1] - 5273:12
**394** [1] - 5311:1
**3:00** [3] - 5328:6, 5328:9, 5328:23
**3:15** [1] - 5328:10
**3:16** [1] - 5328:23

## 4

**4** [9] - 5309:7, 5314:16, 5314:20, 5326:13, 5327:1, 5347:17, 5347:18, 5347:19, 5347:21
**40** [2] - 5345:9, 5345:18
**40th** [1] - 5273:6
**42** [1] - 5356:18
**43** [1] - 5357:13
**450** [1] - 5272:17
**4704-B** [1] - 5273:13
**48** [1] - 5307:9

## 5

**5** [7] - 5283:23, 5296:15, 5309:1, 5309:6, 5309:7, 5309:8, 5309:20
**50** [1] - 5282:20
**5275** [1] - 5274:3
**5294** [1] - 5274:8
**5301** [1] - 5274:3
**5307** [1] - 5274:8
**5308** [1] - 5274:9
**5344** [1] - 5274:10
**5357** [1] - 5274:10
**5358** [1] - 5274:11
**5364** [1] - 5274:4

**5369** [1] - 5274:5
**56** [1] - 5355:8
**5:00** [1] - 5393:12
**5:06** [1] - 5398:21
**5th** [2] - 5394:16, 5396:8

## 6

**6** [2] - 5331:19, 5383:12
**680** [1] - 5273:3

## 7

**7** [6] - 5331:19, 5362:21, 5363:13, 5389:10, 5390:7, 5390:21
**72** [3] - 5317:18, 5317:19, 5317:23

## 8

**8** [5] - 5310:5, 5317:15, 5317:18, 5317:21, 5317:24
**80** [2] - 5321:22, 5374:19
**80203** [1] - 5272:22
**8th** [1] - 5355:7

## 9

**9** [2] - 5296:24, 5317:16
**900** [1] - 5273:8
**902.11** [1] - 5290:5
**94** [1] - 5311:3
**95** [2] - 5283:22, 5314:21
**99** [1] - 5276:25
**9:30** [1] - 5393:14
**9th** [4] - 5326:7, 5361:25, 5362:1, 5363:15

## A

**a.m** [1] - 5393:23
**able** [15] - 5278:23, 5281:21, 5285:20, 5286:19, 5290:4, 5291:25, 5300:20, 5314:13, 5366:13, 5367:5, 5367:9, 5367:12, 5367:14, 5369:7, 5370:14
**above-entitled** [1] - 5399:5

**absolute** [3] - 5288:5, 5313:10, 5313:14
**absolutely** [2] - 5388:4, 5397:2
**academic** [3] - 5371:17, 5374:4, 5384:15
**academics** [3] - 5373:24, 5374:16, 5383:15
**accept** [2] - 5288:24, 5308:20
**accepting** [1] - 5302:7
**access** [2] - 5276:2
**accesses** [1] - 5276:22
**accommodating** [1] - 5370:2
**accommodation** [2] - 5302:15, 5350:23
**accommodations** [4] - 5348:24, 5350:25, 5353:25, 5354:14
**account** [2] - 5288:22, 5296:8
**accounted** [1] - 5286:22
**accuracy** [1] - 5390:5
**accurate** [5] - 5308:20, 5344:20, 5344:23, 5345:1, 5355:19
**achieve** [1] - 5344:24
**achieved** [1] - 5366:24
**acquisition** [4] - 5275:10, 5278:25, 5293:24, 5367:25
**acronym** [2] - 5295:22, 5340:1
**action** [3] - 5382:7, 5382:10, 5387:2
**active** [1] - 5314:21
**activities** [2] - 5290:25, 5380:22
**activity** [2] - 5290:20, 5380:24
**actual** [1] - 5316:25
**ad** [39] - 5277:2, 5277:8, 5277:11, 5278:13, 5280:4, 5286:16, 5287:9, 5294:6, 5297:20, 5299:21, 5300:2, 5302:8, 5304:17, 5333:13, 5334:7, 5334:25, 5340:23, 5344:23, 5363:19, 5373:3, 5377:10, 5377:17, 5377:19, 5378:11, 5378:20,

5379:22, 5380:4, 5386:18, 5386:22, 5386:23, 5387:2, 5388:21, 5388:25, 5389:2, 5389:8, 5391:10, 5392:9, 5392:10
**adapt** [1] - 5300:4
**add** [3] - 5275:16, 5313:24, 5342:16
**added** [4] - 5334:7, 5360:18, 5368:22, 5385:3
**adding** [1] - 5393:3
**addition** [1] - 5376:7
**additional** [2] - 5281:6, 5397:18
**address** [1] - 5370:16
**adjourn** [1] - 5394:2
**adjourned** [1] - 5398:21
**adjust** [1] - 5344:23
**administrative** [1] - 5372:9
**admissibility** [1] - 5370:16
**admission** [2] - 5294:19, 5294:22
**admitted** [8] - 5289:17, 5293:6, 5294:23, 5307:15, 5308:6, 5344:12, 5344:15, 5370:17
**admitting** [1] - 5308:1
**Ads** [11] - 5281:4, 5295:13, 5297:20, 5312:5, 5339:10, 5346:6, 5346:12, 5348:17, 5349:20, 5349:21
**ads** [83] - 5278:13, 5278:14, 5281:7, 5282:7, 5284:6, 5285:7, 5286:16, 5287:8, 5287:14, 5288:12, 5295:13, 5295:19, 5297:18, 5297:19, 5302:4, 5323:16, 5333:14, 5333:18, 5333:22, 5335:10, 5335:15, 5336:6, 5336:10, 5344:21, 5344:24, 5345:2, 5361:15, 5364:24, 5364:25, 5370:23, 5376:24, 5377:1, 5377:2, 5377:5, 5377:7, 5378:15, 5378:16, 5378:18, 5378:19,

5379:22, 5379:25, 5380:2, 5380:4, 5380:5, 5380:6, 5380:7, 5380:9, 5380:10, 5380:13, 5380:14, 5386:15, 5386:16, 5386:19, 5387:10, 5389:7, 5391:19, 5391:20, 5391:22, 5392:6, 5392:7, 5392:11, 5392:12, 5392:25, 5393:2, 5393:3
**advantage** [1] - 5339:11
**advantageous** [1] - 5330:11
**advertiser** [3] - 5302:8, 5376:5, 5384:8
**advertisers** [15] - 5377:6, 5377:8, 5381:16, 5383:23, 5383:24, 5384:1, 5384:13, 5384:14, 5385:8, 5386:14, 5388:20, 5388:24, 5389:12, 5391:2, 5391:6
**advertising** [42] - 5276:17, 5279:25, 5280:1, 5286:3, 5287:5, 5288:14, 5296:20, 5301:10, 5302:1, 5304:14, 5309:16, 5341:3, 5353:3, 5366:10, 5366:21, 5373:3, 5373:4, 5373:17, 5375:10, 5376:4, 5376:25, 5377:3, 5377:12, 5377:13, 5377:16, 5377:21, 5377:25, 5378:5, 5378:8, 5380:16, 5380:18, 5380:21, 5384:3, 5386:7, 5387:12, 5390:23, 5390:25, 5391:4, 5391:24, 5392:13, 5393:7
**Advertising** [1] - 5374:14
**advisor** [1] - 5372:12
**Advisor** [1] - 5312:6
**AdWords** [1] - 5339:10
**affected** [1] - 5297:3
**affiliate** [1] - 5379:17
**afield** [1] - 5326:9

**AFTERNOON** [1] - 5272:9
**afternoon** [3] - 5301:6, 5369:18, 5371:13
**aggressive** [1] - 5326:3
**agnostic** [2] - 5342:12, 5342:14
**ago** [17] - 5275:22, 5275:23, 5282:18, 5286:10, 5286:16, 5286:25, 5293:21, 5305:16, 5317:6, 5324:16, 5338:15, 5338:16, 5338:22, 5340:1, 5346:16, 5390:9, 5391:11
**Agoda** [2] - 5311:15, 5311:20
**agree** [29] - 5292:8, 5315:19, 5316:7, 5316:9, 5332:8, 5332:22, 5334:6, 5341:1, 5341:4, 5341:24, 5342:7, 5342:9, 5342:11, 5342:12, 5346:4, 5346:5, 5356:13, 5357:21, 5358:24, 5359:13, 5359:15, 5361:11, 5361:19, 5362:13, 5362:15, 5362:17, 5362:19, 5384:24, 5384:25
**agreed** [1] - 5326:11
**agreement** [2] - 5324:20, 5329:13
**ahead** [6] - 5283:10, 5284:18, 5291:6, 5308:11, 5366:17, 5378:25
**AI** [1] - 5352:4
**aided** [1] - 5273:16
**Airbnb** [7] - 5277:12, 5277:14, 5277:15, 5351:1, 5353:22, 5354:5, 5354:10
**airlines** [1] - 5351:7
**Airlines** [1] - 5312:14
**al** [1] - 5272:3
**align** [4] - 5384:3, 5390:23, 5391:1, 5391:16
**aligned** [1] - 5393:4
**allocation** [1] - 5386:3
**allow** [2] - 5280:17, 5283:18
**allowed** [1] - 5327:9
**almost** [10] - 5280:7,

5283:2, 5283:21, 5286:20, 5296:10, 5320:19, 5321:21, 5321:23, 5337:10, 5382:14
**alternative** [6] - 5285:20, 5285:24, 5286:2, 5286:3, 5348:24, 5350:25
**alternatives** [2] - 5281:22, 5377:6
**Amazon** [3] - 5351:14, 5380:13, 5396:23
**AMERICA** [1] - 5272:3
**American** [1] - 5279:4
**Americas** [1] - 5273:5
**AMIT** [1] - 5272:10
**amount** [8] - 5275:13, 5275:15, 5275:19, 5287:19, 5296:3, 5299:9, 5313:15
**amounts** [1] - 5276:20
**analogous** [1] - 5297:18
**analogy** [3] - 5280:17, 5282:3, 5318:20
**analysis** [4] - 5329:21, 5329:24, 5330:21, 5331:1
**analysts** [2] - 5306:7, 5331:18
**analyze** [1] - 5296:21
**analyzing** [1] - 5289:21
**Android** [2] - 5276:5, 5283:15
**Android's** [1] - 5283:16
**anemic** [1] - 5278:22
**annually** [1] - 5368:9
**Answer** [4] - 5327:5, 5327:11, 5327:14, 5363:3
**answer** [19] - 5283:7, 5289:25, 5290:1, 5301:10, 5322:11, 5322:12, 5322:13, 5323:1, 5324:24, 5325:1, 5325:15, 5325:21, 5326:1, 5327:12, 5328:2, 5361:18, 5362:23, 5363:5, 5363:8
**answered** [2] - 5328:1, 5330:24
**answering** [1] - 5327:11
**answers** [2] - 5287:24, 5294:20
**anticompetitive** [2] -

5290:19, 5290:25
**Antitrust**[1] - 5272:21
**apart**[1] - 5377:6
**apartments**[1] - 5287:16
**apologize**[1] - 5324:21
**app**[15] - 5276:12, 5276:22, 5277:3, 5278:24, 5282:20, 5305:6, 5305:15, 5315:16, 5315:19, 5315:23, 5316:4, 5316:8, 5316:9, 5349:2, 5393:6
**appear**[6] - 5295:4, 5301:19, 5302:4, 5302:21, 5303:6, 5325:7
**APPEARANCES**[2] - 5272:12, 5273:1
**Apple**[3] - 5329:5, 5329:19, 5330:22
**applies**[2] - 5297:11, 5383:11
**apply**[4] - 5284:2, 5284:4, 5343:23, 5383:10
**appreciate**[2] - 5345:4, 5371:4
**approach**[5] - 5289:5, 5317:12, 5336:22, 5347:15, 5375:24
**approaching**[1] - 5282:24
**appropriate**[1] - 5328:19
**apps**[2] - 5283:17, 5378:17
**area**[4] - 5285:19, 5295:6, 5297:12, 5348:22
**areas**[4] - 5281:18, 5349:13, 5349:22, 5374:25
**ARF**[1] - 5374:14
**argue**[1] - 5304:14
**ARJAN**[2] - 5274:3, 5275:3
**arose**[1] - 5293:19
**arrived**[2] - 5310:11, 5310:12
**arrow**[2] - 5334:14, 5335:4
**articles**[3] - 5373:11, 5373:13, 5373:15
**aside**[1] - 5325:2
**aspect**[1] - 5336:14
**aspects**[2] - 5316:8, 5349:5

**assess**[3] - 5330:21, 5357:15, 5364:17
**assessed**[1] - 5329:13
**assessing**[1] - 5329:18
**assessment**[2] - 5384:24, 5397:21
**assets**[1] - 5311:12
**assignment**[4] - 5376:2, 5376:3, 5376:12, 5376:16
**assist**[2] - 5362:2, 5375:19
**assistant**[1] - 5372:4
**association**[1] - 5374:15
**associations**[3] - 5374:11, 5374:14, 5375:7
**assume**[1] - 5334:14
**assuming**[1] - 5308:3
**attempting**[1] - 5280:11
**attention**[1] - 5296:16
**attract**[1] - 5367:8
**attracting**[1] - 5285:17
**attribute**[3] - 5280:3, 5300:6, 5304:15
**attribution**[1] - 5373:6
**auction**[3] - 5343:20, 5363:22, 5377:10
**auctions**[1] - 5363:20
**audience**[5] - 5285:18, 5287:13, 5287:21, 5364:23, 5389:16
**availability**[1] - 5396:10
**available**[3] - 5311:19, 5321:8, 5398:14
**Avenue**[3] - 5273:3, 5273:5, 5273:12
**average**[1] - 5279:4
**avoid**[1] - 5355:21
**awards**[3] - 5373:21, 5373:22, 5374:3
**aware**[10] - 5306:4, 5339:20, 5344:5, 5350:1, 5354:24, 5361:2, 5382:4, 5382:18, 5382:24, 5387:7
**awareness**[4] - 5276:18, 5384:9, 5391:18, 5392:14
**awful**[1] - 5292:18

## B

**bachelor**[1] - 5371:18
**background**[1] - 5381:1
**bad**[2] - 5305:22, 5330:8
**balance**[1] - 5279:11
**band**[1] - 5281:15
**banner**[1] - 5378:16
**bar**[3] - 5283:17, 5322:17, 5377:20
**barriers**[1] - 5281:6
**Bartlett**[1] - 5273:8
**base**[2] - 5368:2, 5368:6
**baseball**[1] - 5280:4
**based**[9] - 5283:8, 5298:20, 5336:8, 5363:22, 5375:6, 5389:9, 5389:13, 5390:6, 5391:21
**basis**[2] - 5348:14, 5354:25
**beautiful**[1] - 5386:17
**became**[1] - 5293:24
**become**[7] - 5278:12, 5285:20, 5285:23, 5286:1, 5294:4, 5360:21, 5366:22
**becomes**[1] - 5325:4
**becoming**[1] - 5367:13
**BEFORE**[1] - 5272:1, 5272:10
**begin**[2] - 5276:8, 5370:6
**beginning**[3] - 5309:21, 5338:9, 5351:18
**begins**[1] - 5308:13
**behavior**[2] - 5389:19, 5389:20
**behavioral**[2] - 5330:3, 5389:19
**behind**[2] - 5382:13, 5382:14
**Bench**[1] - 5289:11
**bench**[1] - 5292:21
**BENCH**[1] - 5272:9
**beneficial**[1] - 5333:7
**benefit**[3] - 5276:15, 5298:3, 5337:14
**benefited**[1] - 5333:1, 5337:20
**benefits**[1] - 5338:11
**benevolent**[1] - 5288:23
**best**[6] - 5330:18, 5342:15, 5364:16,

5368:16, 5374:3, 5380:1
**better**[9] - 5345:3, 5366:15, 5366:21, 5366:23, 5366:25, 5367:14, 5385:5, 5396:15, 5397:20
**between**[9] - 5285:1, 5287:11, 5302:16, 5304:16, 5330:9, 5334:25, 5353:12, 5384:18, 5385:20
**beyond**[1] - 5341:1
**bias**[1] - 5326:10
**bid**[5] - 5277:14, 5279:16, 5343:21, 5363:19, 5363:22
**big**[9] - 5282:3, 5288:18, 5299:22, 5302:13, 5306:22, 5354:3, 5360:14, 5365:20, 5393:8
**bigger**[3] - 5313:13, 5329:15, 5354:4
**biggest**[1] - 5277:23
**billboards**[1] - 5378:3
**billion**[3] - 5377:19, 5378:14
**billions**[5] - 5288:18, 5289:2, 5377:18, 5391:3
**binder**[16] - 5306:21, 5306:23, 5310:21, 5331:10, 5336:20, 5338:20, 5338:21, 5343:24, 5343:25, 5346:17, 5346:21, 5346:22, 5347:17, 5350:1, 5355:4
**binders**[1] - 5306:22
**Bing**[11] - 5281:22, 5281:25, 5282:4, 5282:7, 5282:11, 5285:23, 5322:7, 5322:17, 5335:7, 5335:8, 5335:10
**Bing's**[2] - 5282:22, 5282:25
**bit**[8] - 5284:9, 5287:24, 5295:17, 5299:8, 5316:16, 5326:16, 5354:4, 5365:4
**bitter**[1] - 5327:20
**black**[1] - 5310:24
**blow**[2] - 5345:13, 5350:12
**blue**[1] - 5380:3
**blurred**[2] - 5384:22
**BMW**[1] - 5386:24

**board**[1] - 5294:11
**boards**[1] - 5374:6
**Bombay**[1] - 5371:20
**Bonvoy**[1] - 5367:20
**Book**[1] - 5346:9
**book**[2] - 5303:11, 5311:19
**booked**[2] - 5303:12, 5314:7
**Booking**[79] - 5279:19, 5291:12, 5294:9, 5301:19, 5305:5, 5305:19, 5306:1, 5306:4, 5306:15, 5306:18, 5307:3, 5310:15, 5310:19, 5311:16, 5313:5, 5314:2, 5314:4, 5314:19, 5315:4, 5315:15, 5315:23, 5316:12, 5319:11, 5321:3, 5321:17, 5322:8, 5324:1, 5325:6, 5325:8, 5325:10, 5328:12, 5332:4, 5332:5, 5332:6, 5332:10, 5332:19, 5332:20, 5333:7, 5333:25, 5337:20, 5339:5, 5340:23, 5341:21, 5341:24, 5344:2, 5344:5, 5344:20, 5345:1, 5346:4, 5346:7, 5346:11, 5348:13, 5349:23, 5350:7, 5353:12, 5353:22, 5353:23, 5354:6, 5354:19, 5354:23, 5354:24, 5355:10, 5355:15, 5356:13, 5357:5, 5357:25, 5358:5, 5359:11, 5359:17, 5360:7, 5361:12, 5361:20, 5362:13, 5362:17, 5363:19, 5363:22, 5366:11
**booking**[16] - 5280:3, 5301:23, 5302:3, 5302:7, 5303:22, 5303:25, 5304:10, 5304:15, 5304:19, 5304:20, 5304:22, 5314:23, 5315:24, 5322:5, 5353:14
**Booking's**[9] - 5284:1, 5311:13, 5312:12, 5318:17,

5336:14, 5337:8, 5339:23, 5354:22, 5359:11

**Booking.com** [88] - 5275:12, 5276:11, 5276:15, 5276:22, 5276:23, 5277:8, 5277:20, 5277:21, 5277:25, 5278:4, 5278:23, 5279:15, 5279:21, 5281:21, 5282:7, 5284:3, 5284:6, 5284:21, 5285:9, 5285:21, 5285:24, 5286:2, 5289:21, 5290:23, 5292:7, 5296:1, 5296:2, 5296:18, 5297:15, 5297:23, 5298:13, 5299:6, 5300:17, 5301:10, 5302:5, 5302:21, 5303:5, 5304:6, 5304:7, 5304:23, 5305:2, 5311:18, 5312:15, 5312:23, 5314:18, 5314:21, 5320:1, 5320:4, 5320:12, 5321:16, 5322:17, 5322:18, 5323:8, 5323:14, 5323:20, 5323:21, 5324:6, 5332:7, 5332:9, 5335:14, 5341:2, 5346:10, 5348:15, 5348:18, 5349:5, 5349:6, 5349:10, 5349:11, 5349:14, 5349:17, 5349:21, 5349:23, 5351:3, 5353:17, 5355:10, 5357:25, 5359:11, 5363:1, 5365:11, 5367:5, 5367:22, 5368:8

**Booking.com's** [8] - 5275:11, 5275:17, 5282:13, 5286:21, 5288:3, 5293:15, 5303:6, 5350:20

**bookings** [5] - 5282:20, 5309:21, 5358:5, 5358:7, 5358:9

**Bookings.com** [1] - 5273:7

**bottom** [22] - 5297:14, 5300:10, 5308:13, 5310:5, 5310:23, 5310:25, 5311:6,

5331:13, 5331:19, 5347:22, 5350:13, 5350:14, 5355:14, 5382:11, 5386:8, 5386:14, 5386:22, 5387:1, 5387:6, 5387:9, 5391:22

**bought** [1] - 5359:5

**bound** [1] - 5328:18

**box** [4] - 5276:6, 5298:23, 5299:2, 5299:6

**boxes** [1] - 5370:10

**brand** [10] - 5277:12, 5277:17, 5277:18, 5304:14, 5312:19, 5312:23, 5313:1, 5313:25, 5386:16, 5386:24

**branded** [6] - 5277:10, 5277:13, 5279:15, 5298:12

**branding** [1] - 5386:18

**brands** [2] - 5311:19, 5348:16

**break** [4] - 5283:2, 5301:9, 5328:9, 5338:25

**breakdown** [1] - 5378:7

**breakfast** [1] - 5316:22

**breathe** [1] - 5326:1

**bridge** [7] - 5319:1, 5319:5, 5319:10, 5320:12, 5320:22, 5321:2, 5321:5

**brief** [2] - 5340:11, 5369:3

**briefly** [7] - 5286:5, 5329:5, 5346:15, 5378:15, 5378:20, 5379:22, 5381:14

**bring** [2] - 5388:5, 5395:22

**bringing** [1] - 5395:19

**brings** [6] - 5320:3, 5323:20, 5373:24, 5374:15, 5375:6, 5382:21

**broad** [1] - 5316:10

**broader** [2] - 5356:11, 5380:21

**broadly** [2] - 5377:1, 5377:2

**Broadway** [1] - 5272:21

**broken** [1] - 5378:10

**brought** [1] - 5386:7

**browser** [12] - 5276:4,

5277:20, 5277:23, 5279:14, 5283:11, 5304:24, 5305:1, 5321:13, 5324:12, 5324:13, 5329:8

**browsers** [3] - 5321:23, 5330:9, 5330:12

**budget** [4] - 5285:9, 5341:14, 5341:22, 5386:3

**budgets** [1] - 5284:25

**build** [2] - 5368:1, 5373:6

**building** [1] - 5388:21

**built** [7] - 5332:3, 5332:12, 5332:13, 5332:20, 5332:22, 5332:23

**bullet** [6] - 5290:19, 5295:11, 5296:6, 5296:8, 5350:14, 5351:10

**Business** [5] - 5372:5, 5372:6, 5372:10, 5372:14, 5375:3

**business** [31] - 5278:22, 5282:13, 5284:7, 5284:21, 5285:2, 5286:22, 5287:1, 5289:20, 5290:3, 5290:5, 5290:10, 5290:22, 5291:1, 5291:9, 5291:12, 5291:13, 5292:2, 5292:6, 5292:15, 5293:15, 5294:21, 5294:22, 5300:17, 5300:21, 5302:10, 5306:18, 5349:13, 5352:22, 5352:23, 5368:3

**buy** [4] - 5279:4, 5379:14, 5387:18, 5388:6

**buying** [2] - 5282:19, 5284:6

**BY** [46] - 5275:8, 5281:20, 5283:25, 5284:19, 5292:23, 5293:8, 5294:25, 5301:5, 5304:2, 5308:10, 5311:5, 5317:17, 5319:16, 5320:10, 5323:5, 5325:5, 5326:12, 5327:2, 5327:25, 5329:2, 5336:25, 5339:1, 5340:13, 5341:20, 5344:17,

5345:17, 5347:8, 5354:16, 5356:10, 5357:20, 5358:21, 5360:12, 5361:9, 5362:4, 5363:17, 5364:13, 5365:16, 5366:19, 5367:21, 5371:11, 5372:2, 5375:17, 5375:25, 5376:11, 5379:20, 5388:19

**C**

**calculate** [1] - 5296:3

**calculated** [1] - 5299:3

**calculation** [3] - 5275:17, 5298:5, 5298:19

**campaign** [2] - 5386:2, 5391:8

**campaigns** [9] - 5276:18, 5373:6, 5373:7, 5384:2, 5388:22, 5391:4

**cannot** [2] - 5321:5, 5334:12

**capability** [1] - 5392:4

**captures** [1] - 5315:19

**car** [6] - 5321:6, 5351:7, 5386:15, 5386:17, 5386:18, 5390:1

**card** [3] - 5379:13, 5379:14

**Carnegie** [1] - 5372:5

**carry** [4] - 5321:5, 5321:6, 5376:12

**Case** [1] - 5272:3

**case** [13] - 5277:7, 5284:14, 5306:15, 5311:22, 5376:2, 5376:15, 5380:5, 5394:18, 5395:13, 5395:16, 5395:23, 5396:1

**cases** [2] - 5276:25, 5383:6

**categories** [3] - 5286:13, 5377:21, 5378:12

**category** [5] - 5315:25, 5351:15, 5376:25, 5377:3, 5380:21

**caused** [1] - 5292:12

**caveat** [2] - 5356:4, 5358:16

**CEO** [4] - 5314:18,

5332:6, 5332:19

**certain** [7] - 5281:17, 5296:3, 5367:9, 5376:3, 5376:16, 5389:5, 5396:16

**certainly** [3] - 5328:16, 5357:17, 5389:24

**CERTIFICATE** [1] - 5399:1

**certify** [2] - 5344:6, 5399:3

**cetera** [3] - 5312:1, 5356:7

**chair** [2] - 5372:8, 5372:11

**challenges** [2] - 5354:18, 5354:23

**challenging** [1] - 5327:21

**chance** [2] - 5317:25, 5362:7

**change** [7] - 5282:18, 5299:15, 5299:19, 5299:24, 5331:16, 5335:2, 5348:6

**changed** [2] - 5288:3, 5300:2

**changes** [9] - 5288:24, 5295:12, 5300:1, 5300:6, 5337:14, 5337:15, 5337:16, 5337:20, 5337:24

**channel** [37] - 5282:21, 5285:18, 5286:3, 5288:17, 5298:15, 5308:16, 5308:22, 5309:11, 5309:12, 5309:23, 5310:2, 5310:6, 5310:13, 5310:15, 5313:6, 5314:6, 5331:22, 5331:24, 5332:1, 5332:2, 5333:9, 5342:15, 5342:18, 5342:25, 5385:7, 5386:13, 5387:2, 5387:12, 5387:15, 5388:12, 5389:2, 5390:15, 5390:25, 5391:7, 5391:8, 5391:21

**channels** [23] - 5280:11, 5280:12, 5285:16, 5308:17, 5309:11, 5309:15, 5312:4, 5312:5, 5342:9, 5342:12, 5342:25, 5343:2,

5343:3, 5343:4,
5373:3, 5384:3,
5385:3, 5385:9,
5385:15, 5388:25,
5390:23, 5391:10,
5391:14
**characteristic** [1] -
5390:22
**characteristics** [4] -
5376:4, 5388:20,
5388:24, 5391:11
**characterize** [1] -
5368:20
**characterized** [1] -
5287:8
**charge** [1] - 5278:2
**charged** [1] - 5324:6
**charges** [2] - 5361:11,
5361:19
**charging** [1] - 5302:7
**chart** [11] - 5312:16,
5313:11, 5313:23,
5324:15, 5357:24,
5357:25, 5358:9,
5358:22, 5362:16,
5364:5, 5364:7
**Chat** [1] - 5352:8
**ChatGPT** [3] - 5352:8,
5352:15, 5352:17
**cheaper** [1] - 5282:1
**check** [1] - 5364:6
**cherry** [1] - 5280:23,
5280:24, 5281:8
**cherry-pick** [3] -
5280:23, 5280:24,
5281:8
**chief** [3] - 5280:7,
5331:7, 5339:4
**choice** [2] - 5302:14,
5302:18
**choose** [2] - 5302:15,
5330:9
**chosen** [1] - 5358:25
**Chrome** [3] - 5277:23,
5321:21, 5324:13
**Chul** [2] - 5327:14,
5327:18
**City** [1] - 5287:17
**civil** [1] - 5396:21
**Claire** [1] - 5369:18
**CLAIRE** [1] - 5272:16
**clarification** [2] -
5322:24, 5322:25
**clarify** [4] - 5299:5,
5348:13, 5348:18,
5353:11
**clarifying** [1] -
5313:13
**clarity** [1] - 5368:14
**class** [3] - 5373:25,

5381:22, 5388:11
**clear** [16] - 5283:24,
5289:14, 5292:5,
5301:25, 5303:8,
5303:19, 5305:17,
5307:10, 5309:15,
5321:1, 5324:5,
5328:17, 5335:3,
5357:24, 5361:6,
5390:2
**clearly** [23] - 5275:19,
5276:17, 5279:13,
5279:25, 5280:6,
5281:10, 5282:12,
5282:18, 5283:20,
5285:15, 5287:8,
5291:8, 5293:21,
5300:4, 5348:13,
5348:16, 5354:10,
5360:21, 5364:19,
5366:22, 5367:8,
5368:21, 5387:7
**click** [19] - 5277:1,
5277:8, 5277:11,
5297:18, 5303:20,
5304:17, 5323:16,
5361:11, 5361:13,
5361:19, 5361:24,
5362:10, 5364:15,
5364:19, 5364:25,
5379:9, 5379:15,
5385:20
**clicked** [1] - 5303:22
**clicks** [8] - 5278:4,
5293:23, 5296:19,
5299:23, 5300:7,
5361:15, 5364:20,
5365:3
**clip** [1] - 5340:9
**close** [2] - 5394:13,
5397:21
**closed** [5] - 5275:14,
5324:24, 5325:3,
5369:3, 5369:11
**closely** [2] - 5337:23,
5339:9
**collaborative** [1] -
5338:4
**collected** [1] -
5292:13
**collecting** [1] -
5291:18
**Colorado** [3] -
5272:19, 5272:20,
5272:22
**Columbia** [5] - 5372:6,
5372:10, 5372:14,
5372:17, 5375:3
**COLUMBIA** [1] -
5272:1

**combination** [1] -
5294:21
**combined** [1] - 5355:1
**comfortable** [1] -
5282:19
**coming** [13] - 5304:6,
5304:10, 5304:22,
5305:5, 5305:13,
5311:16, 5314:14,
5315:13, 5318:11,
5344:25, 5385:7,
5394:6, 5397:14
**comma** [1] - 5365:13
**comment** [1] -
5356:20
**comments** [1] -
5370:5
**commercial** [6] -
5281:18, 5286:13,
5287:17, 5287:22,
5287:23, 5364:22
**commission** [4] -
5301:14, 5301:21,
5302:11, 5303:10
**Commission** [3] -
5289:20, 5291:8,
5344:3
**Commission's** [1] -
5289:24
**communications** [1] -
5317:1
**companies** [12] -
5277:13, 5279:17,
5280:18, 5286:19,
5295:24, 5312:6,
5351:7, 5351:10,
5351:11, 5355:1,
5374:22, 5374:23
**companies'** [1] -
5302:4
**company** [25] -
5277:11, 5277:16,
5278:6, 5279:6,
5279:9, 5280:15,
5285:16, 5288:18,
5303:11, 5311:23,
5325:24, 5327:3,
5327:9, 5328:3,
5332:3, 5332:4,
5332:12, 5332:13,
5332:24, 5337:10,
5349:24, 5361:1,
5366:22, 5367:11,
5389:4
**compare** [1] - 5286:25
**compared** [3] -
5282:22, 5297:3,
5313:19
**comparison** [2] -
5312:4, 5353:13

**comparisons** [1] -
5297:21
**compete** [5] - 5348:3,
5349:5, 5349:10,
5349:11, 5349:14
**competes** [3] -
5349:6, 5349:17,
5351:3
**competing** [1] -
5346:10
**competition** [8] -
5284:16, 5284:21,
5347:20, 5347:25,
5349:21, 5350:3,
5350:4, 5350:7
**competitive** [6] -
5348:6, 5351:23,
5352:3, 5352:21,
5353:1, 5353:4
**competitor** [14] -
5346:4, 5346:5,
5346:7, 5346:11,
5346:14, 5347:2,
5347:5, 5347:10,
5348:17, 5348:18,
5349:22, 5350:5,
5353:23, 5354:11
**competitors** [8] -
5346:13, 5348:7,
5348:9, 5350:20,
5353:7, 5353:25,
5354:14, 5363:1
**complete** [3] -
5353:14, 5353:18,
5370:13
**completely** [11] -
5276:3, 5280:11,
5280:15, 5283:15,
5288:17, 5288:19,
5314:9, 5315:4,
5315:7, 5316:13,
5321:10
**complicated** [2] -
5365:4, 5385:25
**composition** [1] -
5389:16
**computer** [2] -
5273:16, 5371:18
**computer-aided** [1] -
5273:16
**concept** [1] - 5385:6
**concepts** [5] - 5371:2,
5381:7, 5383:23,
5384:13, 5384:21
**conceptual** [1] -
5381:19
**concerned** [1] -
5293:22
**concerns** [1] -
5291:24

**conclusion** [1] -
5370:11
**conclusions** [1] -
5376:22
**condensing** [1] -
5381:22
**condescending** [3] -
5325:22, 5327:5,
5327:7
**conditioned** [2] -
5275:25, 5283:3
**conducted** [1] -
5291:11
**conference** [2] -
5289:11, 5292:21
**confidential** [16] -
5279:23, 5289:5,
5296:11, 5296:16,
5297:16, 5300:9,
5300:10, 5310:19,
5312:17, 5324:22,
5328:13, 5346:15,
5359:20, 5365:8,
5369:2, 5369:4
**confidentiality** [2] -
5295:2, 5355:22
**confirm** [2] - 5376:17,
5398:17
**confused** [1] -
5305:12
**confusion** [2] -
5290:15, 5328:17
**congruence** [2] -
5384:18, 5385:20
**connect** [1] - 5291:16
**Connolly** [1] - 5273:2
**consider** [5] -
5285:24, 5286:2,
5353:22, 5388:21,
5388:25
**consideration** [2] -
5276:19, 5390:22
**consistently** [1] -
5295:11
**consolidated** [1] -
5354:25
**constantly** [1] -
5348:6
**Constitution** [1] -
5273:12
**constrained** [1] -
5282:12
**consulted** [1] -
5374:22
**consulting** [2] -
5374:21, 5374:24
**consumable** [1] -
5339:23
**Consumer** [1] -
5272:20

**consumer** [20] - 5276:22, 5277:7, 5278:4, 5283:3, 5321:3, 5381:11, 5381:12, 5381:15, 5381:19, 5381:23, 5382:2, 5382:4, 5384:5, 5384:8, 5385:10, 5385:21, 5386:2, 5387:4, 5388:8, 5390:9
**consumers** [23] - 5275:22, 5276:7, 5276:12, 5276:16, 5280:14, 5281:6, 5294:4, 5295:19, 5315:20, 5373:2, 5380:23, 5381:17, 5381:18, 5381:20, 5383:6, 5383:7, 5384:1, 5384:19, 5385:5, 5385:9, 5389:12, 5391:25, 5392:1
**contains** [2] - 5379:25, 5380:12
**content** [1] - 5295:15
**context** [7] - 5293:19, 5311:22, 5341:17, 5342:21, 5385:13, 5389:20, 5390:8
**continue** [10] - 5275:9, 5325:4, 5332:12, 5333:1, 5337:14, 5338:6, 5338:10, 5338:11, 5393:11, 5393:14
**continued** [2] - 5272:24, 5310:13
**Continued** [1] - 5275:7
**CONTINUED** [1] - 5273:1
**continues** [1] - 5337:14
**continuing** [1] - 5357:9
**contract** [1] - 5329:10
**contrasted** [1] - 5294:2
**control** [1] - 5377:9
**controlled** [11] - 5276:3, 5280:20, 5318:25, 5320:18, 5320:20, 5320:23, 5323:14, 5323:18, 5323:23
**controlling** [2] - 5318:20, 5322:9
**controls** [4] - 5282:4,

5282:5, 5283:15, 5319:9
**conversation** [1] - 5395:20
**conversion** [2] - 5365:2, 5384:10
**conversions** [1] - 5361:24
**convert** [1] - 5361:15
**copy** [3] - 5295:3, 5319:13, 5370:10
**core** [1] - 5372:22
**Corona** [1] - 5356:5
**correct** [122] - 5295:6, 5298:22, 5299:12, 5302:23, 5303:7, 5303:18, 5304:11, 5304:21, 5304:23, 5305:3, 5305:4, 5305:8, 5306:5, 5306:9, 5306:12, 5306:16, 5306:19, 5307:2, 5307:11, 5307:12, 5309:16, 5310:3, 5310:16, 5310:17, 5310:21, 5311:23, 5311:24, 5312:12, 5312:22, 5313:2, 5313:3, 5313:6, 5313:9, 5313:16, 5313:20, 5313:21, 5313:22, 5313:25, 5314:1, 5314:5, 5314:12, 5315:1, 5315:6, 5315:13, 5315:14, 5315:16, 5316:16, 5319:17, 5320:4, 5320:14, 5320:24, 5321:3, 5321:7, 5321:18, 5322:3, 5322:4, 5322:9, 5322:18, 5323:8, 5323:21, 5323:23, 5323:24, 5324:3, 5324:17, 5325:8, 5329:11, 5329:14, 5329:19, 5329:20, 5331:24, 5332:4, 5332:15, 5332:20, 5333:7, 5333:23, 5335:1, 5335:5, 5335:6, 5335:8, 5335:23, 5337:17, 5339:5, 5339:17, 5340:24, 5342:5, 5342:15, 5343:3, 5343:11, 5344:3, 5344:6, 5345:24, 5347:11, 5350:18,

5350:19, 5350:21, 5351:1, 5351:2, 5351:4, 5351:5, 5351:15, 5351:16, 5352:8, 5353:1, 5353:16, 5354:25, 5356:23, 5357:4, 5357:6, 5357:10, 5357:22, 5358:1, 5358:2, 5358:7, 5358:11, 5358:14, 5359:8, 5361:14, 5363:20, 5363:23, 5363:24, 5366:12, 5399:4
**correctly** [1] - 5303:21
**cost** [17] - 5296:2, 5298:10, 5298:11, 5298:20, 5299:3, 5299:6, 5348:8, 5361:11, 5361:13, 5361:19, 5361:24, 5362:10, 5364:14, 5364:15, 5364:19, 5364:25, 5367:22
**costs** [3] - 5289:21, 5298:6, 5343:19
**counsel** [10] - 5322:23, 5326:3, 5327:16, 5328:11, 5347:4, 5360:7, 5365:6, 5365:10, 5365:11, 5393:11
**Counsel** [3] - 5300:24, 5361:3, 5388:16
**count** [1] - 5276:23
**couple** [10] - 5309:18, 5317:6, 5321:22, 5329:3, 5331:17, 5340:2, 5344:18, 5345:5, 5387:16, 5397:12
**course** [8] - 5349:19, 5372:16, 5372:17, 5372:18, 5372:19, 5372:22, 5372:24, 5394:20
**courses** [5] - 5372:14, 5372:15, 5372:20, 5372:21
**COURT** [103] - 5272:1, 5275:4, 5281:12, 5281:14, 5283:7, 5284:15, 5289:6, 5289:10, 5289:23, 5290:2, 5290:7, 5291:3, 5291:6, 5291:14, 5292:8, 5292:22, 5293:4, 5293:18, 5294:8,

5294:14, 5294:17, 5294:20, 5300:24, 5303:19, 5304:1, 5307:15, 5307:22, 5308:6, 5311:1, 5317:14, 5322:23, 5325:1, 5326:11, 5326:22, 5327:24, 5328:6, 5328:9, 5328:16, 5328:25, 5336:21, 5338:20, 5338:23, 5341:18, 5344:13, 5344:15, 5345:12, 5345:16, 5353:9, 5353:17, 5353:20, 5353:22, 5354:7, 5354:12, 5355:25, 5357:17, 5358:19, 5361:3, 5361:5, 5361:8, 5362:3, 5363:9, 5363:12, 5363:14, 5363:16, 5364:2, 5364:10, 5366:17, 5367:17, 5368:25, 5369:9, 5369:13, 5369:21, 5369:25, 5370:3, 5370:19, 5371:4, 5371:9, 5371:25, 5375:15, 5375:23, 5378:23, 5379:4, 5379:18, 5384:20, 5386:4, 5386:11, 5388:2, 5388:14, 5392:3, 5393:10, 5394:4, 5394:9, 5395:3, 5395:14, 5396:3, 5396:18, 5397:11, 5398:5, 5398:8, 5398:12, 5398:17, 5399:1, 5399:9
**Court** [11] - 5273:12, 5378:18, 5379:21, 5381:13, 5394:7, 5394:14, 5394:23, 5394:24, 5397:1, 5397:3, 5397:10
**court** [6] - 5275:2, 5307:24, 5328:24, 5368:10, 5370:8, 5375:9
**Court's** [1] - 5370:7
**courthouse** [2] - 5393:22, 5393:25
**courtyard** [5] - 5280:16, 5280:18, 5280:19, 5282:3
**cover** [4] - 5307:3, 5309:18, 5371:6,

5372:24
**covered** [2] - 5297:1, 5370:24
**covers** [1] - 5372:25
**create** [2] - 5284:1, 5381:3
**created** [4] - 5292:5, 5292:10, 5294:9, 5313:11
**creation** [2] - 5291:4, 5381:3
**credit** [4] - 5310:12, 5379:13, 5379:14
**cross** [1] - 5328:14
**CROSS** [1] - 5301:4
**Cross** [1] - 5274:3
**cross-examination** [1] - 5328:14
**CROSS-EXAMINATION** [1] - 5301:4
**Cross-Examination..** ........... [1] - 5274:3
**CRR** [1] - 5273:12
**curiosity** [1] - 5386:5
**curious** [2] - 5327:15, 5328:6
**current** [8] - 5348:7, 5348:8, 5375:1, 5375:2, 5375:5, 5375:6, 5394:11, 5396:4
**customer** [8] - 5278:25, 5293:24, 5314:11, 5367:25, 5368:1, 5368:6, 5372:21, 5373:18
**customers** [26] - 5275:10, 5275:11, 5275:15, 5275:16, 5275:17, 5276:9, 5279:7, 5279:10, 5279:19, 5310:16, 5313:21, 5314:7, 5314:9, 5314:10, 5314:11, 5314:14, 5314:21, 5314:22, 5315:3, 5315:6, 5315:12, 5316:13, 5365:2, 5367:8, 5367:10, 5367:13

**D**

**D.C** [6] - 5272:5, 5272:14, 5272:17, 5273:3, 5273:9, 5273:13
**data** [5] - 5290:21, 5378:6, 5389:12,

5389:15, 5389:24
**DATE** [1] - 5399:9
**date** [1] - 5363:14
**dated** [2] - 5331:11, 5359:22
**David** [2] - 5339:2, 5360:1
**DAY** [1] - 5272:9
**days** [5] - 5278:18, 5283:19, 5317:6, 5332:5, 5397:19
**dead** [2] - 5278:19, 5297:11
**deal** [2] - 5329:16, 5387:20
**dealership** [1] - 5386:20
**dealings** [3] - 5292:2, 5292:4, 5330:19
**deals** [1] - 5289:21
**decades** [1] - 5378:4
**December** [2] - 5352:16, 5359:22
**decide** [1] - 5287:17
**decided** [1] - 5278:1
**decides** [3] - 5280:21, 5287:14, 5363:19
**decisions** [2] - 5341:2, 5396:11
**deck** [6] - 5291:22, 5370:9, 5370:12, 5370:17, 5370:18, 5371:6
**declaration** [3] - 5290:5, 5290:8, 5294:21
**declared** [5] - 5390:6, 5390:13, 5390:15, 5390:16, 5391:20
**decline** [2] - 5362:15, 5363:1
**declining** [1] - 5331:2
**decrease** [4] - 5299:22, 5300:6, 5300:13, 5300:16
**deep** [2] - 5277:2, 5305:16
**deeply** [1] - 5368:19
**default** [13] - 5276:6, 5283:12, 5283:17, 5283:19, 5283:21, 5283:22, 5321:24, 5322:3, 5329:6, 5329:22, 5329:24, 5330:23
**defaults** [1] - 5330:5
**Defendant** [2] - 5272:7, 5273:2
**define** [1] - 5379:4
**defining** [1] - 5378:24

**definition** [3] - 5314:11, 5392:6, 5392:7
**degree** [2] - 5371:18, 5371:23
**Dell** [2] - 5379:6, 5379:10
**delve** [1] - 5295:6
**demand** [1] - 5282:12
**demographics** [1] - 5389:17
**demolished** [1] - 5388:6
**demonstrative** [7] - 5319:7, 5319:14, 5319:19, 5333:24, 5334:4, 5356:17, 5358:3
**demonstratives** [1] - 5320:7
**Denver** [1] - 5272:22
**Department** [3] - 5272:13, 5272:16, 5272:20
**dependence** [1] - 5284:1
**dependency** [2] - 5331:13, 5331:15
**dependent** [2] - 5293:24, 5316:13
**depict** [2] - 5383:19, 5383:20
**depo** [1] - 5362:20
**deposition** [10] - 5316:18, 5317:2, 5317:4, 5318:9, 5318:24, 5325:14, 5327:22, 5355:7, 5355:8, 5362:1
**Depot** [1] - 5387:21
**describe** [9] - 5282:16, 5293:19, 5318:17, 5355:6, 5376:3, 5377:22, 5378:15, 5378:20, 5379:22
**described** [11] - 5285:11, 5302:9, 5313:2, 5315:3, 5315:5, 5315:11, 5333:10, 5333:12, 5337:16, 5354:13, 5354:17
**describes** [3] - 5304:7, 5337:7, 5379:23
**describing** [2] - 5281:4, 5337:19
**description** [1] - 5302:5

**design** [1] - 5299:21
**designate** [1] - 5302:20
**designed** [1] - 5334:7
**desire** [5] - 5382:6, 5382:10, 5382:11, 5382:16
**desirous** [1] - 5383:1
**desktop** [6] - 5278:15, 5282:14, 5294:5, 5319:20, 5321:9, 5378:17
**desktops** [1] - 5297:4
**details** [2] - 5275:14, 5371:6
**determination** [1] - 5363:23
**determine** [1] - 5296:1
**determines** [1] - 5340:23
**developed** [1] - 5372:18
**developments** [1] - 5293:22
**device** [1] - 5305:6
**devices** [1] - 5282:22
**dialogue** [1] - 5325:1
**dictated** [1] - 5288:16
**dictatorship** [1] - 5288:23
**difference** [5] - 5302:12, 5302:13, 5334:12, 5353:12, 5387:13
**different** [29] - 5277:19, 5279:25, 5280:11, 5290:13, 5291:10, 5291:22, 5302:14, 5311:22, 5330:17, 5336:14, 5352:13, 5356:8, 5363:7, 5363:8, 5364:8, 5366:4, 5373:3, 5374:24, 5383:14, 5383:15, 5383:16, 5383:19, 5383:25, 5390:23, 5390:25, 5391:1
**differentiate** [1] - 5287:11
**differently** [4] - 5285:10, 5285:13, 5299:8, 5299:10
**difficult** [15] - 5275:23, 5279:6, 5280:3, 5280:5, 5281:11, 5281:16, 5282:9, 5286:20, 5287:11, 5297:6, 5304:15, 5324:22, 5368:1,

5368:6, 5386:13
**digital** [23] - 5353:3, 5372:12, 5372:16, 5372:17, 5372:24, 5372:25, 5373:16, 5374:25, 5375:1, 5375:10, 5375:13, 5375:16, 5376:3, 5377:18, 5377:21, 5378:7, 5378:11, 5381:8, 5381:10, 5384:23, 5384:25, 5385:2
**DIJK** [2] - 5274:3, 5275:3
**Dijk** [13] - 5275:9, 5292:24, 5295:1, 5301:6, 5308:14, 5320:11, 5325:6, 5327:20, 5328:25, 5364:14, 5365:17, 5369:7, 5369:14
**Dijk's** [1] - 5365:10
**DINTZER** [7] - 5272:13, 5394:3, 5394:5, 5394:10, 5396:19, 5398:7, 5398:9
**Dintzer** [1] - 5396:18
**direct** [52] - 5276:24, 5277:4, 5297:13, 5304:5, 5304:7, 5304:9, 5304:16, 5304:17, 5304:19, 5304:22, 5305:8, 5305:10, 5305:12, 5305:18, 5305:23, 5306:1, 5308:16, 5308:22, 5309:11, 5309:12, 5309:23, 5310:2, 5310:6, 5310:13, 5310:15, 5313:6, 5313:19, 5313:21, 5314:6, 5314:8, 5314:13, 5315:15, 5316:12, 5330:25, 5335:7, 5337:16, 5345:10, 5354:14, 5354:17, 5367:1, 5367:4, 5367:5, 5367:7, 5367:12, 5367:15, 5367:23, 5367:24, 5380:23, 5395:22, 5397:1
**Direct** [2] - 5274:3, 5274:5
**DIRECT** [2] - 5275:7, 5371:10
**directionally** [1] -

5355:20
**directly** [9] - 5276:12, 5276:16, 5277:24, 5278:24, 5280:20, 5315:13, 5346:9, 5349:21, 5379:11
**director** [1] - 5331:8
**disclose** [2] - 5395:17, 5396:9
**disclosed** [2] - 5396:6
**disclosures** [1] - 5396:2
**discovery** [1] - 5396:21
**discuss** [3] - 5387:3, 5393:14
**discussed** [9] - 5278:3, 5291:22, 5294:11, 5316:4, 5329:5, 5390:25, 5391:10, 5391:21, 5398:16
**discussing** [1] - 5301:20
**discussion** [3] - 5275:10, 5288:25, 5378:19
**displacing** [1] - 5295:14
**display** [10] - 5373:3, 5373:18, 5378:11, 5378:15, 5378:16, 5380:20, 5391:14, 5391:24, 5392:14, 5393:2
**dispute** [2] - 5350:5, 5364:11
**dissertation** [2] - 5371:24, 5372:1
**distance** [1] - 5390:3
**distant** [2] - 5354:4, 5390:1
**distinct** [2] - 5376:25, 5377:3
**distribute** [3] - 5285:9, 5285:13, 5338:25
**DISTRICT** [3] - 5272:1, 5272:1, 5272:10
**dive** [1] - 5377:11
**diversification** [1] - 5285:16
**divide** [1] - 5284:25
**division** [1] - 5372:11
**document** [28] - 5289:13, 5289:16, 5289:20, 5290:13, 5291:4, 5292:9, 5292:19, 5293:1, 5293:3, 5293:9, 5293:11, 5293:12,

5293:15, 5293:19, 5293:20, 5294:1, 5294:9, 5294:10, 5294:14, 5298:24, 5317:8, 5318:6, 5318:15, 5344:18, 5346:15, 5347:13, 5365:8, 5369:8
**documents** [5] - 5318:10, 5318:13, 5324:23, 5376:15, 5383:17
**dog** [2] - 5278:9, 5278:10
**dog-friendly** [2] - 5278:9, 5278:10
**DOJ** [3] - 5272:13, 5394:12, 5398:9
**dollar** [1] - 5296:3
**dollars** [3] - 5341:3, 5391:3
**dominance** [1] - 5339:24
**dominant** [5] - 5293:13, 5316:25, 5318:5, 5318:16, 5348:23
**done** [19] - 5277:22, 5291:15, 5306:7, 5318:14, 5336:16, 5360:19, 5361:5, 5374:21, 5385:2, 5385:16, 5387:3, 5387:17, 5387:19, 5394:13, 5395:11, 5395:25, 5396:13, 5397:17, 5398:3
**door** [12] - 5280:15, 5280:19, 5280:21, 5282:4, 5319:6, 5319:9, 5319:10, 5320:13, 5320:17, 5320:18, 5320:19
**doors** [3] - 5280:19, 5281:1, 5318:21
**double** [1] - 5281:3
**Douyon** [1] - 5307:22
**down** [30] - 5278:15, 5286:17, 5287:4, 5287:6, 5287:7, 5287:22, 5293:3, 5294:6, 5297:7, 5297:8, 5298:14, 5306:14, 5313:18, 5317:23, 5338:15, 5343:5, 5343:11, 5345:18, 5349:7, 5349:18, 5360:1, 5378:11, 5383:9, 5393:19, 5394:12

**downgrade** [1] - 5395:1
**downwards** [1] - 5377:23
**Dr** [1] - 5398:13
**draw** [4] - 5280:17, 5296:16, 5357:9, 5359:25
**drew** [1] - 5376:13
**drive** [2] - 5279:8, 5279:17
**driven** [3] - 5314:22, 5323:12, 5340:23
**driving** [1] - 5386:17
**drop** [2] - 5356:22, 5358:10
**dropped** [2] - 5350:1, 5397:23
**dropping** [1] - 5396:12
**DuckDuckGo** [1] - 5323:7
**during** [5] - 5305:19, 5316:12, 5330:25, 5361:12, 5361:20
**DX** [1] - 5359:21
**DX31** [1] - 5336:16
**DX3114** [2] - 5344:11, 5344:16
**DX3114......................
.............................** [1]
- 5274:10
**DX3131** [3] - 5274:9, 5307:19, 5308:8
**DX3133** [1] - 5358:4
**DX3136** [1] - 5314:15
**DX3140** [1] - 5309:19
**DX3145** [1] - 5308:25
**DX3148** [2] - 5307:13, 5307:16
**DX3148......................
.............................** [1]
- 5274:8
**DX3156** [2] - 5355:4, 5355:22
**DX3160** [1] - 5340:11
**DX3167** [1] - 5331:10
**DX3169** [3] - 5359:19, 5365:7, 5365:17
**DX3186** [1] - 5338:16
**DXD13.00** [1] - 5357:12
**DXD13.0024** [1] - 5334:5
**DXD13.0043** [1] - 5357:19
**DXD13.0043...............
.............................** [1] - 5274:10
**DXD13.09044** [2] -

5358:17, 5358:20
**DXD13.09044............
.............................** [1] - 5274:11
**dynamics** [2] - 5284:1, 5297:2

## E

**e-commercial** [1] - 5281:18
**e-mail** [5] - 5317:8, 5359:22, 5360:1, 5381:2, 5381:3
**earnings** [14] - 5306:4, 5306:16, 5307:2, 5307:11, 5307:18, 5308:20, 5308:25, 5309:19, 5314:16, 5316:2, 5316:3, 5331:11, 5336:17, 5339:21
**easier** [1] - 5287:11
**Economics** [1] - 5374:10
**ecosystem** [2] - 5283:16
**Edge** [4] - 5319:20, 5320:15, 5321:8, 5321:19
**editorial** [2] - 5374:6
**effective** [7] - 5280:8, 5389:2, 5391:2, 5391:9, 5391:16, 5391:22, 5392:2
**effectively** [1] - 5377:4
**efficiently** [1] - 5395:2
**effort** [4] - 5276:11, 5280:10, 5338:4, 5389:6
**efforts** [1] - 5291:17
**eight** [3] - 5334:22, 5335:21, 5335:22
**either** [8] - 5276:12, 5294:17, 5320:19, 5324:13, 5345:22, 5345:23, 5369:1, 5369:2
**elements** [2] - 5278:9, 5302:1
**elicit** [2] - 5322:25, 5369:3
**elsewhere** [1] - 5293:6
**eMarketer** [3] - 5378:6, 5378:7, 5378:10
**emphasis** [1] - 5305:23
**empirical** [1] - 5382:23

**employee** [2] - 5336:9, 5395:7
**employees** [4] - 5394:17, 5394:18, 5394:19, 5396:24
**employer** [1] - 5327:21
**end** [1] - 5370:20
**End** [1] - 5292:21
**endlessly** [1] - 5286:18
**endowed** [1] - 5372:8
**engaged** [1] - 5373:8
**engagements** [2] - 5374:17, 5374:20
**engaging** [1] - 5373:9
**engine** [26] - 5284:24, 5285:4, 5285:7, 5285:23, 5286:1, 5286:3, 5287:7, 5288:13, 5295:22, 5300:14, 5312:24, 5321:24, 5323:12, 5323:13, 5323:18, 5329:6, 5329:22, 5329:25, 5330:23, 5362:25, 5380:24, 5380:25, 5390:10, 5390:11, 5392:17
**engineering** [1] - 5371:19
**engines** [2] - 5311:25, 5330:16
**English** [1] - 5330:8
**enjoy** [2] - 5392:22, 5392:23
**enormous** [2] - 5276:20, 5282:18
**ensure** [1] - 5380:25
**enter** [1] - 5370:12
**entire** [1] - 5370:8
**entirely** [1] - 5292:8
**entitled** [4] - 5327:3, 5327:8, 5328:3, 5399:5
**entries** [1] - 5312:18
**environment** [1] - 5384:19
**epidemic** [1] - 5356:5
**equal** [2] - 5343:10, 5343:12
**especially** [3] - 5281:17, 5349:23
**ESQ** [8] - 5272:13, 5272:15, 5272:16, 5272:19, 5272:19, 5273:2, 5273:4, 5273:7
**essentially** [1] - 5353:13

**establish** [2] - 5290:4, 5290:6
**estate** [1] - 5295:14
**estimate** [2] - 5296:10, 5296:14
**et** [4] - 5272:3, 5312:1, 5356:7
**EU** [5] - 5289:14, 5289:16, 5290:22, 5292:12, 5330:9
**Europe** [4] - 5330:15, 5330:19, 5341:8, 5354:4
**European** [4] - 5289:20, 5289:24, 5291:8, 5330:12
**Euros** [1] - 5289:15
**evaluate** [1] - 5398:3
**evening** [1] - 5395:16
**event** [2] - 5357:5, 5371:7
**evidence** [15] - 5294:24, 5307:13, 5307:16, 5307:18, 5308:9, 5344:11, 5344:16, 5357:19, 5358:17, 5358:20, 5369:2, 5369:8, 5369:9, 5370:13, 5370:16
**evolving** [1] - 5348:6
**exact** [3] - 5286:23, 5321:19, 5397:1
**exactly** [4] - 5320:25, 5326:5, 5354:9, 5359:6
**exaggeration** [1] - 5316:16
**EXAMINATION** [4] - 5275:7, 5301:4, 5364:12, 5371:10
**examination** [4] - 5326:20, 5328:14, 5331:1, 5370:12
**Examination............** [1] - 5274:4
**Examination............
.** - 5274:3, 5274:5
**Examination............
.. ** [1] - 5274:3
**example** [25] - 5277:12, 5278:9, 5281:9, 5287:16, 5290:9, 5291:17, 5292:11, 5304:15, 5304:22, 5312:13, 5312:14, 5313:19, 5330:9, 5343:14, 5348:21, 5350:17, 5351:14, 5366:6,

5408

5379:12, 5383:16,
5386:15, 5388:3,
5388:11, 5390:14,
5393:8
**examples** [3] -
5349:12, 5380:9,
5380:12
**Exchange** [1] - 5344:3
**exchange** [1] -
5327:16
**excuse** [2] - 5337:1,
5347:17
**executive** [5] -
5295:10, 5295:25,
5296:5, 5331:7,
5339:4
**executives** [1] -
5344:5
**Exhibit** [6] - 5292:24,
5294:24, 5307:16,
5344:16, 5357:19,
5358:20
**exhibit** [3] - 5295:1,
5310:18, 5331:1
**exhibits** [3] - 5289:5,
5306:24, 5370:15
**Exhibits** [1] - 5308:8
**EXHIBITS** [1] - 5274:7
**exist** [1] - 5383:15
**existing** [5] - 5275:16,
5275:18, 5276:8,
5314:11, 5378:4
**expectation** [1] -
5398:13
**expected** [2] -
5389:16, 5397:20
**Expedia** [3] - 5312:1,
5350:17, 5380:14
**expenses** [2] -
5289:21, 5289:22
**expensive** [2] -
5277:15, 5282:8
**experience** [6] -
5341:1, 5384:13,
5386:23, 5393:1,
5393:3, 5393:4
**experimented** [1] -
5333:20
**expert** [3] - 5375:9,
5375:13, 5375:16
**experts** [5] - 5370:11,
5376:8, 5379:7,
5395:6, 5396:11
**explain** [13] - 5286:6,
5295:16, 5296:12,
5297:2, 5297:17,
5298:2, 5299:19,
5322:22, 5349:20,
5365:23, 5381:21,
5381:23, 5390:8

**explained** [9] -
5275:21, 5295:17,
5305:14, 5314:8,
5320:13, 5322:10,
5349:15, 5365:4,
5387:13
**exposed** [1] - 5386:16
**expressing** [1] -
5333:5
**extensive** [1] -
5376:14
**extent** [7] - 5283:8,
5324:1, 5369:1,
5370:15, 5370:25,
5391:17, 5391:23
**extra** [1] - 5393:25
**eyes** [1] - 5348:15

---

## F

**Facebook** [6] -
5280:1, 5311:23,
5351:14, 5392:19,
5393:7
**faces** [1] - 5350:7
**fact** [14] - 5290:2,
5292:14, 5316:20,
5316:24, 5317:4,
5324:15, 5341:6,
5357:8, 5388:11,
5392:11, 5394:11,
5394:18, 5396:23,
5398:14
**factor** [2] - 5357:8,
5390:22
**factors** [2] - 5287:6,
5343:7
**factual** [1] - 5320:14
**factually** [2] - 5321:6,
5361:14
**faculty** [1] - 5372:19
**fair** [14] - 5293:4,
5299:11, 5302:5,
5302:9, 5310:11,
5310:13, 5313:4,
5320:18, 5325:12,
5352:18, 5352:23,
5354:19, 5362:24
**fairness** [1] - 5397:22
**fall** [5] - 5315:25,
5329:16, 5351:15,
5378:1, 5391:11
**falls** [1] - 5291:8
**familiar** [4] - 5279:10,
5291:3, 5293:1,
5321:14
**far** [8] - 5282:1,
5282:11, 5293:13,
5293:14, 5294:4,
5316:23, 5317:20,

5326:9
**fascinating** [1] -
5289:2
**fast** [3] - 5298:16,
5365:22, 5365:24
**faster** [3] - 5308:17,
5309:11, 5366:23
**favored** [1] - 5295:18
**favorite** [1] - 5281:15
**feature** [1] - 5302:8
**features** [1] - 5339:11
**ferry** [8] - 5318:25,
5319:5, 5319:6,
5319:10, 5320:23,
5321:2, 5321:17,
5322:9
**few** [12] - 5284:9,
5304:4, 5310:24,
5335:8, 5365:13,
5370:5, 5370:8,
5377:6, 5385:3,
5387:13, 5390:9,
5391:10
**fewer** [1] - 5362:16
**field** [1] - 5350:4
**Fifth** [1] - 5272:17
**fight** [1] - 5327:22
**figure** [6] - 5342:8,
5387:16, 5387:23,
5388:9, 5389:13,
5391:6
**files** [1] - 5344:2
**filing** [3] - 5292:1,
5339:22, 5356:1
**final** [6] - 5354:21,
5361:10, 5396:14,
5396:17, 5397:20,
5397:21
**finally** [1] - 5396:12
**financial** [3] -
5281:18, 5339:4,
5368:3
**fine** [4] - 5276:17,
5290:8, 5299:13,
5394:16
**finish** [1] - 5398:13
**finished** [1] - 5371:22
**finishing** [1] - 5395:4
**Firefox** [1] - 5321:13
**firm** [1] - 5381:3
**firms** [4] - 5281:21,
5284:22, 5380:18,
5380:22
**first** [22] - 5290:18,
5295:11, 5300:9,
5310:7, 5321:1,
5333:13, 5335:4,
5335:15, 5335:22,
5337:25, 5340:14,
5346:24, 5350:14,

5351:23, 5360:8,
5365:13, 5371:15,
5376:24, 5382:4,
5385:2, 5394:5
**five** [11] - 5278:14,
5286:16, 5286:25,
5331:13, 5333:14,
5334:21, 5335:14,
5335:20, 5336:6,
5372:6, 5396:25
**flagship** [2] - 5372:17,
5374:8
**flexibility** [1] - 5370:1
**flight** [1] - 5348:24
**flights** [1] - 5356:7
**flip** [1] - 5289:14
**Floor** [2] - 5272:22,
5273:6
**focus** [2] - 5317:24,
5330:19
**focused** [2] - 5285:17,
5350:24
**focusing** [1] - 5317:20
**Fogel** [11] - 5314:17,
5314:20, 5315:5,
5315:11, 5315:5,
5331:21, 5331:24,
5333:5, 5337:6,
5337:19, 5339:20
**follow** [8] - 5294:17,
5301:22, 5304:4,
5326:6, 5326:18,
5329:3, 5349:16,
5371:8
**follow-up** [3] -
5294:17, 5329:3,
5371:8
**following** [5] - 5337:7,
5389:14, 5395:17
**FOR** [3] - 5272:1,
5275:3, 5369:24
**foregoing** [1] - 5399:3
**forget** [2] - 5315:4,
5383:8
**forgive** [1] - 5363:9
**former** [2] - 5327:21,
5394:18
**formulate** [2] - 5299:8,
5299:10
**forth** [3] - 5375:8,
5384:10, 5386:3
**Forum** [1] - 5341:8
**forward** [9] - 5293:16,
5309:18, 5316:3,
5329:1, 5334:20,
5335:20, 5335:25,
5338:7, 5393:15
**Foundation** [1] -
5374:15
**foundation** [4] -

5283:6, 5290:6,
5291:7, 5292:19
**foundational** [2] -
5372:22, 5381:7
**four** [18] - 5278:14,
5282:3, 5286:16,
5293:21, 5297:8,
5305:21, 5305:22,
5333:14, 5333:18,
5333:21, 5334:21,
5336:1, 5336:10,
5361:1, 5361:10,
5376:23, 5386:11,
5395:12
**fourth** [3] - 5296:6,
5377:8, 5395:11
**fraction** [1] - 5296:19
**framed** [1] - 5292:1
**framework** [1] -
5386:1
**Francisco** [3] -
5281:10, 5281:13,
5281:14
**FRE** [2] - 5357:13,
5358:17
**free** [6] - 5286:8,
5295:23, 5296:19,
5299:23, 5324:3,
5364:20
**FREEBORN** [3] -
5272:15, 5301:2,
5319:13
**frequent** [2] - 5275:21,
5279:3
**Friday** [1] - 5393:24
**friendly** [3] - 5278:9,
5278:10, 5288:20
**friends** [2] - 5368:16,
5392:22
**front** [3] - 5280:25,
5292:25, 5362:1
**fuel** [1] - 5383:1
**full** [2] - 5325:18,
5372:8
**fully** [4] - 5320:20,
5325:3, 5360:18,
5396:11
**function** [1] - 5367:12
**functionality** [1] -
5348:23
**fundamental** [1] -
5383:20
**funnel** [56] - 5373:1,
5381:11, 5381:12,
5381:14, 5381:15,
5381:19, 5381:24,
5382:2, 5382:9,
5382:11, 5382:12,
5382:20, 5383:3,
5383:4, 5383:10,

5383:12, 5383:14, 5383:17, 5383:19, 5383:23, 5383:24, 5383:25, 5384:6, 5384:9, 5384:14, 5384:16, 5384:18, 5385:1, 5385:4, 5385:6, 5385:10, 5385:14, 5385:17, 5385:21, 5386:8, 5386:14, 5386:22, 5387:1, 5387:7, 5387:9, 5387:10, 5387:14, 5387:17, 5387:24, 5389:1, 5390:24, 5391:1, 5391:16, 5391:17, 5391:22, 5391:23, 5391:25, 5392:1, 5392:2

**furthermore** [1] - 5351:18

**future** [2] - 5308:7, 5353:7

## G

**gained** [1] - 5309:23
**game** [1] - 5321:9
**gaming** [1] - 5380:1
**gates** [1] - 5282:4
**gathering** [1] - 5290:21
**gears** [2] - 5284:9, 5339:19
**general** [22] - 5275:11, 5275:16, 5279:23, 5281:21, 5282:13, 5284:22, 5286:1, 5286:3, 5286:21, 5287:3, 5288:2, 5298:11, 5312:25, 5322:7, 5323:13, 5323:17, 5324:19, 5352:15, 5364:11, 5367:23, 5373:19, 5376:24
**generalization** [1] - 5382:23
**generally** [6] - 5282:7, 5282:17, 5284:2, 5377:12, 5380:14, 5389:18
**generate** [2] - 5276:18, 5325:11
**generating** [3] - 5305:23, 5306:1, 5342:15
**generation** [7] - 5378:13, 5378:24,

5379:4, 5379:5, 5379:12, 5379:16, 5392:14
**Genius** [2] - 5367:15, 5367:18
**GHA** [3] - 5297:15, 5297:17, 5297:20
**given** [2] - 5291:19, 5349:12
**gladly** [4] - 5282:11, 5288:14, 5321:7, 5322:21
**Glenn** [3] - 5314:16, 5331:5, 5331:21
**globally** [1] - 5348:3
**Gmail** [1] - 5318:10
**goal** [5] - 5389:1, 5391:7, 5391:8, 5391:17, 5391:18
**goals** [14] - 5344:24, 5345:2, 5384:1, 5384:4, 5384:8, 5386:2, 5387:4, 5389:1, 5391:5, 5391:16, 5391:22, 5391:23, 5392:2
**Goodrich** [1] - 5273:5
**Google** [212] - 5275:12, 5275:15, 5275:18, 5275:25, 5276:3, 5276:5, 5276:6, 5276:9, 5277:1, 5277:5, 5277:6, 5277:13, 5277:18, 5278:1, 5278:13, 5278:18, 5279:7, 5279:16, 5279:20, 5279:21, 5280:10, 5280:15, 5280:20, 5280:21, 5280:23, 5281:2, 5281:4, 5281:5, 5281:8, 5281:19, 5281:22, 5282:4, 5282:8, 5282:23, 5283:9, 5283:13, 5283:15, 5283:17, 5283:19, 5284:2, 5284:6, 5285:1, 5285:7, 5285:21, 5285:24, 5286:2, 5286:8, 5286:9, 5286:15, 5287:10, 5287:14, 5287:17, 5288:6, 5288:8, 5288:12, 5288:19, 5288:24, 5291:17, 5291:23, 5291:24, 5292:2, 5292:4, 5292:13, 5293:12,

5293:23, 5293:25, 5295:11, 5295:13, 5295:18, 5295:24, 5296:17, 5297:11, 5297:15, 5297:18, 5297:19, 5297:20, 5297:24, 5298:13, 5298:20, 5299:7, 5299:15, 5302:18, 5303:20, 5305:15, 5312:5, 5314:9, 5315:5, 5315:12, 5316:13, 5318:17, 5318:20, 5318:25, 5319:9, 5319:11, 5320:18, 5320:20, 5320:23, 5321:3, 5321:17, 5321:21, 5321:25, 5322:3, 5322:6, 5322:9, 5322:18, 5323:8, 5323:11, 5323:12, 5323:14, 5323:18, 5323:23, 5324:2, 5324:3, 5324:5, 5324:7, 5324:10, 5324:12, 5324:14, 5327:16, 5329:9, 5329:12, 5329:18, 5329:21, 5329:25, 5330:5, 5330:7, 5330:11, 5330:21, 5331:15, 5332:18, 5332:20, 5332:21, 5332:25, 5333:6, 5333:13, 5333:17, 5333:18, 5333:21, 5336:1, 5336:6, 5336:10, 5336:15, 5337:8, 5337:9, 5337:13, 5337:16, 5337:24, 5339:9, 5339:10, 5339:12, 5339:23, 5343:17, 5343:18, 5344:21, 5345:2, 5346:3, 5346:4, 5346:5, 5346:6, 5346:8, 5346:9, 5346:11, 5346:12, 5346:13, 5347:1, 5347:9, 5348:9, 5348:16, 5348:17, 5349:1, 5349:12, 5349:20, 5349:22, 5350:5, 5351:14, 5353:6, 5354:19, 5356:14, 5359:1, 5359:16, 5360:14, 5360:19, 5361:2, 5361:11, 5361:19, 5365:20,

5365:21, 5365:23, 5365:25, 5368:7, 5368:9, 5368:11, 5368:13, 5368:15, 5369:11, 5377:7, 5377:8, 5383:16, 5394:15, 5394:17, 5394:19, 5395:7, 5396:24, 5397:13
**GOOGLE** [1] - 5272:6
**Google's** [11] - 5283:1, 5296:1, 5320:12, 5327:21, 5329:5, 5330:22, 5337:20, 5348:21, 5349:13, 5363:19, 5376:8
**Google-controlled** [1] - 5320:18
**Goulden** [3] - 5339:2, 5339:21, 5360:1
**gradual** [1] - 5382:3
**graphic** [1] - 5381:25
**great** [2] - 5339:11, 5388:5
**green** [2] - 5313:9, 5335:4
**grew** [2] - 5309:11, 5365:25
**gross** [3] - 5358:5, 5358:6, 5358:9
**ground** [3] - 5350:2, 5364:5, 5370:24
**grounded** [1] - 5356:7
**grouped** [1] - 5382:11
**grow** [5] - 5300:21, 5310:13, 5367:5, 5367:7, 5368:6
**growing** [10] - 5288:7, 5298:16, 5300:17, 5308:17, 5308:23, 5310:2, 5365:22, 5365:24, 5366:3
**grown** [4] - 5348:22, 5360:14, 5365:20, 5366:23
**growth** [11] - 5278:25, 5279:9, 5298:14, 5300:13, 5300:17, 5314:22, 5330:3, 5359:12, 5359:15, 5367:23, 5367:24
**guess** [4] - 5355:22, 5396:3, 5396:5, 5398:12
**guest** [1] - 5303:13
**guide** [1] - 5346:18
**guy** [2] - 5386:20, 5386:24
**guys** [2] - 5301:1,

5304:7

## H

**half** [4] - 5305:20, 5305:21, 5305:22, 5361:1
**halfway** [1] - 5360:1
**hand** [1] - 5344:1
**handed** [2] - 5320:8, 5364:4
**handing** [2] - 5317:16, 5370:9
**hang** [2] - 5326:22, 5345:12
**happy** [8] - 5275:13, 5286:23, 5316:21, 5318:19, 5324:24, 5328:18, 5370:3, 5398:2
**hard** [4] - 5275:20, 5280:7, 5295:3, 5295:20
**harder** [2] - 5324:23, 5324:25
**harms** [1] - 5377:8
**heads** [2] - 5393:20, 5394:7
**heads-up** [2] - 5393:20, 5394:7
**headwinds** [1] - 5332:2
**hear** [2] - 5292:16, 5343:17
**heard** [16] - 5278:17, 5284:15, 5289:8, 5290:24, 5304:4, 5311:22, 5320:19, 5320:21, 5342:2, 5343:16, 5378:18, 5379:21, 5379:24, 5380:15, 5381:13, 5384:5
**hearing** [1] - 5393:12, 5393:23
**hearsay** [1] - 5289:17
**held** [2] - 5372:3, 5372:9
**help** [2] - 5325:7, 5347:21
**helped** [2] - 5376:17, 5385:16
**helpful** [4] - 5308:15, 5370:25, 5383:23, 5384:21
**helps** [3] - 5383:24, 5385:22, 5386:1
**high** [9] - 5279:8, 5280:13, 5302:17, 5303:12, 5315:19,

5368:17, 5376:22, 5376:23, 5386:23

**high-experience** [1] - 5386:23

**high-intensity** [1] - 5315:19

**high-intent** [3] - 5279:8, 5280:13, 5302:17

**high-level** [1] - 5376:22

**higher** [8] - 5301:19, 5302:4, 5302:8, 5302:21, 5303:21, 5313:15, 5325:7, 5371:7

**highlight** [2] - 5351:17, 5392:11

**highlighted** [4] - 5295:3, 5298:4, 5300:10, 5339:9

**highway** [1] - 5386:18

**hip** [1] - 5281:15

**hip-hop** [1] - 5281:15

**historically** [1] - 5337:23

**hold** [4] - 5335:18, 5336:16, 5338:18, 5356:18

**Holdings** [17] - 5306:19, 5307:4, 5314:19, 5332:5, 5332:6, 5332:10, 5332:19, 5332:20, 5339:5, 5344:2, 5348:14, 5349:23, 5354:24, 5355:10, 5357:25, 5359:11, 5366:11

**Home** [1] - 5387:21

**home** [3] - 5278:8, 5354:6, 5378:2

**homes** [2] - 5353:23, 5353:25

**honest** [2] - 5284:23, 5294:13

**honor** [1] - 5308:5

**Honor** [52] - 5275:6, 5283:5, 5284:13, 5289:5, 5289:7, 5289:9, 5289:12, 5289:15, 5289:19, 5290:18, 5290:24, 5291:21, 5292:5, 5300:23, 5307:13, 5307:17, 5310:22, 5317:13, 5317:15, 5326:8, 5326:10, 5336:22, 5341:15, 5344:10, 5355:21,

5357:12, 5357:14, 5358:16, 5363:6, 5364:4, 5368:24, 5369:6, 5369:18, 5369:22, 5370:5, 5370:21, 5371:8, 5375:12, 5375:21, 5376:9, 5379:23, 5385:17, 5388:5, 5388:18, 5394:3, 5395:15, 5396:19, 5398:7, 5398:9, 5398:10, 5398:11, 5398:15

**HONORABLE** [1] - 5272:10

**hop** [1] - 5281:15

**hope** [3] - 5303:4, 5365:4, 5388:1

**hopefully** [4] - 5285:2, 5319:8, 5382:7, 5395:25

**Hotel** [9] - 5281:4, 5295:13, 5297:20, 5312:5, 5339:10, 5346:6, 5346:12, 5348:17, 5349:20

**hotel** [11] - 5278:9, 5278:10, 5281:7, 5302:15, 5303:24, 5334:17, 5348:24, 5348:25, 5354:14, 5367:20, 5380:13

**Hotels** [1] - 5312:1

**hotels** [6] - 5302:3, 5302:11, 5312:25, 5335:13, 5336:1, 5353:24

**hour** [2] - 5305:16, 5328:8

**housekeeping** [1] - 5393:20

**huge** [1] - 5342:18

**human** [1] - 5325:25

**hypothesis** [2] - 5296:17, 5296:21

**hypothetical** [1] - 5343:14

## I

**Ian** [1] - 5339:2

**idea** [15] - 5289:1, 5381:11, 5382:1, 5382:13, 5382:14, 5382:15, 5382:19, 5385:4, 5385:5, 5385:17, 5385:18, 5385:23, 5385:24, 5385:25, 5388:8

**ideally** [1] - 5276:19

**ideas** [5] - 5383:19, 5383:20, 5383:21, 5384:14

**identified** [4] - 5297:14, 5352:3, 5355:9, 5383:5

**identify** [5] - 5291:25, 5317:7, 5318:16, 5355:14, 5355:15

**image** [2] - 5319:23, 5321:1

**imagine** [3] - 5356:6, 5364:24, 5396:14

**immediately** [1] - 5382:2

**impact** [2] - 5331:2, 5343:7

**impacted** [3] - 5354:23, 5362:17, 5363:2

**impeaching** [1] - 5363:7

**importance** [5] - 5283:18, 5316:4, 5329:22, 5329:24, 5330:22

**important** [9] - 5282:21, 5316:8, 5372:15, 5372:25, 5387:14

**imposed** [4] - 5288:16, 5289:1, 5300:1, 5354:19

**impossible** [3] - 5283:2, 5286:14, 5286:18

**imprecise** [1] - 5330:20

**improve** [1] - 5366:22

**improved** [1] - 5296:9

**Inc** [1] - 5307:4

**include** [2] - 5392:3, 5392:6

**includes** [5] - 5305:5, 5377:1, 5378:1, 5380:21, 5380:22

**including** [2] - 5351:10, 5392:10

**incorrect** [1] - 5336:7

**increase** [4] - 5299:2, 5314:13, 5367:12, 5382:5

**increased** [9] - 5296:20, 5298:20, 5299:6, 5309:12, 5313:5, 5314:6, 5315:16, 5343:20, 5357:10

**increases** [3] -

5296:10, 5296:14, 5310:6

**increasing** [5] - 5314:3, 5315:15, 5316:4, 5345:11, 5345:19

**increasingly** [1] - 5366:4

**incredibly** [1] - 5279:5

**indeed** [2] - 5304:16, 5323:16

**Indian** [1] - 5371:19

**indicating** [1] - 5311:16

**industries** [5] - 5280:24, 5281:5, 5281:8, 5281:17, 5374:24

**industry** [21] - 5277:16, 5277:17, 5280:14, 5281:18, 5283:8, 5284:2, 5284:4, 5287:2, 5314:4, 5352:25, 5353:1, 5353:4, 5374:11, 5375:8, 5376:14, 5377:12, 5377:14, 5377:17, 5377:18, 5378:10

**industry-leading** [1] - 5314:4

**infer** [1] - 5390:19

**inferences** [1] - 5390:4

**inferred** [4] - 5389:9, 5389:11, 5391:15

**influence** [3] - 5358:10, 5373:4, 5381:16

**inform** [2] - 5293:15, 5389:21

**information** [16] - 5291:18, 5292:14, 5295:5, 5328:20, 5349:1, 5364:8, 5369:4, 5369:6, 5371:23, 5377:9, 5381:22, 5387:5, 5389:25, 5390:12, 5397:6, 5397:18

**informed** [1] - 5396:25

**infrequent** [1] - 5279:11

**innovative** [1] - 5280:12

**inquiries** [6] - 5289:13, 5290:17, 5290:20, 5290:21, 5292:6, 5294:15

**inquiring** [1] - 5292:3

**inquiry** [2] - 5289:16, 5292:12

**insert** [1] - 5380:19

**Instagram** [1] - 5392:20

**Institute** [3] - 5371:19, 5373:23, 5374:12

**institute** [2] - 5373:23, 5373:24

**integrating** [1] - 5348:25

**intense** [1] - 5350:4

**intensely** [3] - 5348:5, 5352:25, 5353:4

**intensity** [1] - 5315:19

**intent** [15] - 5279:8, 5280:2, 5280:13, 5302:17, 5389:10, 5389:11, 5390:7, 5390:13, 5390:15, 5390:16, 5390:18, 5391:15, 5391:20

**intention** [5] - 5370:7, 5370:22, 5370:23, 5371:2, 5396:5

**interact** [1] - 5392:22

**interactions** [1] - 5376:14

**interco** [1] - 5311:10

**intercompany** [1] - 5311:20

**interest** [4] - 5373:19, 5382:10, 5382:11, 5391:18

**interested** [12] - 5281:2, 5306:9, 5315:24, 5382:5, 5382:17, 5382:18, 5382:25, 5387:6, 5387:7, 5389:14, 5389:18, 5390:2

**interesting** [4] - 5285:6, 5337:13, 5343:12, 5361:23

**internal** [8] - 5289:20, 5290:12, 5290:13, 5291:9, 5291:20, 5329:12, 5329:18, 5383:17

**Internet** [7] - 5358:23, 5385:15, 5385:16, 5386:6, 5386:7, 5387:14, 5389:24

**interrupt** [2] - 5353:9, 5378:23

**interview** [3] - 5340:14, 5340:19, 5341:6

**interviewed** [1] - 5340:6

5411

interviews [1] - 5340:8
intimating [1] - 5361:7
introduced [2] -
5295:12, 5367:14
introducing [1] -
5341:15
inverted [1] - 5383:2
invest [3] - 5285:19,
5341:3, 5367:24
investigation [3] -
5289:24, 5291:8,
5292:14
investment [10] -
5285:15, 5340:4,
5341:3, 5366:8,
5366:10, 5366:14,
5366:21, 5367:6,
5373:5
invited [1] - 5374:19
involve [4] - 5280:10,
5321:2, 5322:2,
5380:23
involved [3] - 5374:4,
5374:11, 5374:13
involves [1] - 5381:2
iPhone [2] - 5283:3,
5283:14
irrelevant [4] -
5278:13, 5320:15,
5321:21, 5342:19
irritated [1] - 5326:2
island [1] - 5318:25
issue [3] - 5288:17,
5291:10, 5346:3
issues [9] - 5279:24,
5291:2, 5291:21,
5355:22, 5368:19,
5375:1, 5376:17,
5395:20, 5396:10
issuing [1] - 5339:21
Italy [1] - 5354:6
itself [1] - 5353:15

**J**

J-e-r-a-t-h [1] -
5371:16
James [1] - 5395:12
January [2] - 5347:14,
5358:25
Japan [1] - 5285:6
JERATH [2] - 5274:5,
5369:24
Jerath [17] - 5369:23,
5369:25, 5370:22,
5371:12, 5371:15,
5371:16, 5375:13,
5375:15, 5375:18,
5375:22, 5376:1,
5376:12, 5379:3,

5388:20, 5393:13,
5393:18, 5398:13
Jerath's [4] - 5370:8,
5370:12, 5371:1,
5371:5
job [1] - 5342:7
JOHN [1] - 5273:2
joined [2] - 5372:4,
5372:6
joke [4] - 5278:17,
5278:19, 5281:16,
5297:10
JONATHAN [1] -
5272:19
Journal [1] - 5374:7
journal [2] - 5374:8,
5384:17
journals [4] - 5373:13,
5374:4, 5374:5,
5374:7
JUDGE [1] - 5272:10
judge [3] - 5300:25,
5332:8, 5336:5
Judge [3] - 5301:3,
5361:4, 5363:25
judgments [1] -
5396:15
jump [2] - 5344:18,
5378:24
June [2] - 5340:7,
5341:9
Justice [2] - 5272:13,
5272:16

**K**

K-i-n-s-h-u-k [1] -
5371:15
Kaufmann [3] -
5275:5, 5283:18,
5364:3
KAUFMANN [37] -
5272:19, 5275:6,
5275:8, 5281:20,
5283:25, 5284:19,
5289:19, 5290:1,
5290:4, 5290:11,
5290:24, 5291:5,
5291:21, 5292:23,
5293:8, 5294:19,
5294:25, 5300:22,
5307:14, 5308:2,
5320:7, 5326:8,
5341:15, 5344:14,
5355:24, 5357:14,
5358:18, 5363:6,
5364:7, 5364:13,
5365:6, 5365:10,
5365:16, 5366:19,
5367:21, 5368:23,

5369:5
Kayak [7] - 5311:13,
5311:15, 5348:15,
5349:24, 5353:12,
5353:13, 5356:6
keep [3] - 5328:25,
5334:21, 5334:22
keeping [1] - 5343:10
KENNETH [1] -
5272:13
KERRIE [1] - 5272:15
key [8] - 5280:6,
5283:19, 5286:13,
5340:24, 5341:4,
5342:7, 5367:8,
5391:2
keyword [1] - 5286:7
keywords [5] -
5282:10, 5286:10,
5287:15, 5287:19,
5288:11
kind [31] - 5278:1,
5278:20, 5278:22,
5279:8, 5280:4,
5280:19, 5281:25,
5282:5, 5283:23,
5286:11, 5286:13,
5286:14, 5288:9,
5288:17, 5288:25,
5294:2, 5295:23,
5305:18, 5320:15,
5321:10, 5325:25,
5342:19, 5365:2,
5366:2, 5366:24,
5373:19, 5386:21,
5387:2, 5389:5,
5390:14
kinds [3] - 5373:3,
5374:24, 5377:2
Kinshuk [2] - 5369:23,
5371:15
KINSHUK [2] - 5274:5,
5369:24
knowledge [2] -
5283:8, 5376:13
known [1] - 5336:9
Korea [1] - 5285:4
Krueger [1] - 5395:8

**L**

labeled [1] - 5377:20
language [1] - 5384:9
laptop [2] - 5379:6,
5379:7
laptops [1] - 5380:1
large [1] - 5351:10,
5368:9, 5374:23
largely [2] - 5298:2,
5298:18

largest [1] - 5353:7
last [17] - 5312:7,
5331:13, 5331:17,
5344:19, 5354:17,
5361:10, 5363:18,
5370:2, 5371:25,
5372:18, 5373:9,
5373:12, 5374:19,
5384:16, 5385:12,
5385:18
late [1] - 5397:25
launch [2] - 5348:7,
5352:8
launches [1] - 5379:6
Law [1] - 5272:20
lawyer [1] - 5327:22
lay [1] - 5381:6
lead [7] - 5378:13,
5378:24, 5379:4,
5379:5, 5379:10,
5379:12, 5379:16
leading [2] - 5292:18,
5314:4
learning [2] - 5352:4,
5352:15
least [6] - 5285:11,
5297:23, 5302:14,
5313:23, 5333:5,
5359:7
leave [3] - 5369:16,
5392:18, 5392:21
left [7] - 5328:10,
5368:17, 5380:13,
5381:25, 5388:25,
5390:19, 5396:22
less [13] - 5282:8,
5286:8, 5287:10,
5288:16, 5293:12,
5296:13, 5297:11,
5298:15, 5299:9,
5300:20, 5324:16,
5365:1, 5392:24
level [4] - 5345:23,
5371:7, 5376:22,
5376:23
leveling [1] - 5366:2
levels [2] - 5314:22,
5357:21
lever [1] - 5287:10
life [2] - 5368:16
likely [1] - 5316:9
limited [2] - 5284:23,
5390:4
line [6] - 5319:25,
5326:13, 5327:1,
5332:23, 5351:23,
5355:9, 5355:17,
5357:9, 5362:5
linear [2] - 5383:4,
5383:9

lines [9] - 5298:8,
5316:19, 5317:19,
5317:21, 5317:24,
5317:25, 5325:24,
5362:21, 5363:13
link [5] - 5278:4,
5304:16, 5322:17,
5379:8, 5379:10
linked [1] - 5277:2
linking [2] - 5305:16,
5348:22
links [2] - 5278:3,
5353:14
list [3] - 5394:15,
5394:25, 5396:7
listen [1] - 5324:9
listening [1] - 5306:9
listing [1] - 5380:7
listings [1] - 5380:3
literally [1] - 5390:10
LLC [1] - 5272:6
LLP [2] - 5273:2,
5273:8
local [2] - 5284:24,
5386:20
look [53] - 5281:21,
5285:15, 5288:5,
5290:18, 5292:24,
5296:13, 5308:11,
5308:14, 5310:5,
5314:15, 5315:8,
5318:2, 5318:19,
5319:19, 5326:13,
5329:15, 5330:4,
5330:10, 5330:18,
5333:1, 5335:12,
5335:18, 5339:7,
5343:19, 5346:12,
5346:24, 5348:15,
5350:11, 5350:12,
5351:17, 5351:18,
5352:16, 5354:6,
5356:8, 5356:11,
5358:1, 5361:21,
5361:22, 5361:23,
5362:7, 5364:10,
5365:6, 5365:11,
5373:4, 5381:25,
5382:15, 5382:24,
5387:4, 5389:12,
5390:21, 5391:13,
5393:15
looked [9] - 5324:15,
5335:14, 5338:22,
5346:15, 5350:2,
5356:2, 5356:8,
5359:10, 5366:20
looking [7] - 5278:9,
5280:13, 5315:24,
5342:7, 5353:7,

5394:20, 5395:10
**looks** [1] - 5357:9
**loss** [1] - 5370:4
**loud** [1] - 5326:18
**low** [7] - 5275:21,
5279:3, 5280:2,
5286:23, 5321:20,
5348:8, 5389:25
**low-frequent** [2] -
5275:21, 5279:3
**low-intent** [1] - 5280:2
**lower** [3] - 5283:1,
5303:6, 5387:14
**loyal** [3] - 5367:9,
5368:1, 5368:6
**loyalty** [2] - 5367:18,
5367:20
**lunch** [1] - 5278:3,
5301:9

## M

**m-e-t-a** [1] - 5311:21
**machine** [4] - 5352:4,
5352:15, 5387:19,
5387:22
**machines** [2] -
5321:8, 5387:22
**Macy's** [1] - 5387:20
**MADDOX** [19] -
5272:16, 5369:18,
5369:22, 5370:5,
5370:21, 5371:5,
5371:11, 5372:2,
5375:12, 5375:17,
5375:21, 5375:24,
5375:25, 5376:9,
5376:11, 5379:1,
5379:20, 5388:17,
5388:19
**Maddox** [1] - 5369:19
**magazines** [1] -
5378:1
**magnitude** [1] -
5282:16
**mail** [5] - 5317:8,
5359:22, 5360:1,
5381:2, 5381:3
**main** [2] - 5276:9,
5373:16
**Maine** [1] - 5273:3
**maintained** [2] -
5292:10, 5306:15
**majority** [3] - 5279:7,
5332:10, 5392:13
**manage** [4] - 5341:13,
5341:21, 5366:13,
5373:6
**Management** [1] -
5374:9

**management** [6] -
5294:11, 5371:23,
5372:21, 5373:19,
5374:7, 5384:17
**managers** [1] -
5288:22
**manner** [2] - 5304:6,
5340:10
**map** [1] - 5385:21
**Maps** [1] - 5349:2
**March** [11] - 5314:20,
5316:23, 5317:15,
5317:16, 5317:18,
5326:7, 5336:17,
5355:7, 5361:25,
5362:1, 5363:15
**marked** [2] - 5310:18,
5312:17, 5340:11,
5359:19, 5373:19,
5376:10
**market** [4] - 5280:18,
5284:1, 5320:16,
5388:7
**marketer** [1] - 5342:8
**marketers** [2] -
5341:2, 5381:16
**marketing** [48] -
5280:7, 5280:11,
5280:12, 5281:22,
5284:25, 5285:9,
5285:13, 5288:3,
5330:3, 5331:16,
5332:13, 5341:14,
5342:4, 5371:24,
5372:1, 5372:4,
5372:8, 5372:11,
5372:12, 5372:16,
5372:17, 5372:22,
5372:24, 5372:25,
5373:4, 5373:13,
5373:16, 5373:19,
5374:7, 5374:8,
5374:25, 5375:1,
5375:10, 5375:13,
5375:16, 5379:17,
5380:15, 5380:21,
5380:24, 5381:5,
5381:8, 5381:10,
5384:23, 5385:1,
5386:6, 5387:12,
5387:14
**Marketing** [6] -
5340:7, 5373:23,
5374:8, 5374:9,
5374:10, 5374:12
**marketplace** [1] -
5351:11
**markets** [9] - 5284:10,
5284:11, 5284:16,
5284:20, 5285:10,

5285:14, 5348:5
**Marriott** [1] - 5367:19
**mass** [1] - 5285:18
**materially** [1] -
5362:17
**math** [1] - 5305:22
**matter** [5] - 5282:11,
5290:22, 5340:15,
5373:16, 5399:5
**matters** [1] - 5373:14
**mature** [1] - 5367:13
**maturing** [1] - 5367:11
**MBA** [2] - 5372:23,
5375:4
**mean** [19] - 5281:3,
5287:23, 5292:9,
5293:4, 5313:11,
5342:19, 5342:24,
5343:1, 5361:16,
5375:5, 5377:23,
5385:6, 5385:10,
5385:13, 5389:3,
5389:9, 5390:6,
5395:3, 5397:5
**means** [37] - 5276:8,
5278:14, 5279:5,
5279:6, 5279:15,
5280:3, 5280:21,
5281:1, 5285:18,
5286:17, 5286:19,
5287:9, 5287:21,
5288:4, 5288:8,
5288:23, 5294:4,
5295:17, 5295:19,
5300:3, 5303:9,
5303:11, 5304:9,
5304:10, 5313:14,
5321:22, 5323:11,
5342:14, 5343:21,
5343:22, 5345:22,
5361:14, 5364:23,
5365:1, 5389:12
**meant** [1] - 5386:22
**measure** [2] -
5361:13, 5373:5
**measures** [2] -
5358:6, 5359:10
**media** [16] - 5366:4,
5366:6, 5372:13,
5373:4, 5377:17,
5378:3, 5380:19,
5381:3, 5385:7,
5391:14, 5392:3,
5392:10, 5392:12,
5392:13
**medium** [1] - 5280:2
**medium-intent** [1] -
5280:2
**meet** [4] - 5301:7,
5301:8, 5384:2,

5384:4
**meeting** [1] - 5391:7
**MEHTA** [1] - 5272:10
**Mellon** [1] - 5372:5
**member** [1] - 5306:8
**memory** [3] - 5318:5,
5318:7, 5359:2
**mention** [1] - 5393:18
**mentioned** [12] -
5284:11, 5287:5,
5301:14, 5305:16,
5315:17, 5335:7,
5335:8, 5352:9,
5352:11, 5368:9,
5379:21, 5385:17
**messages** [1] -
5380:19
**met** [1] - 5345:2
**meta** [5] - 5311:21,
5311:25, 5312:4,
5348:24, 5348:25
**meta-search** [2] -
5348:24, 5348:25
**meteoric** [1] - 5359:15
**metric** [2] - 5364:16,
5364:19
**metrics** [2] - 5364:18,
5373:5
**Miami** [1] - 5278:10
**mic** [2] - 5386:20,
5386:25
**Michael** [1] - 5301:6
**MICHAEL** [1] - 5273:4
**Microsoft** [6] -
5285:20, 5285:21,
5319:20, 5320:15,
5320:17, 5321:19
**mid** [4] - 5382:12,
5391:17, 5391:23,
5397:23
**mid-funnel** [3] -
5382:12, 5391:17,
5391:23
**mid-trial** [1] - 5397:23
**middle** [4] - 5311:10,
5351:18, 5356:5,
5387:9
**might** [7] - 5278:19,
5297:10, 5341:7,
5342:18, 5364:16,
5364:18, 5365:1
**migrated** [1] - 5282:13
**mind** [5] - 5279:5,
5301:1, 5326:19,
5362:14, 5389:5
**minimal** [1] - 5301:11
**minimize** [1] - 5371:2
**minute** [2] - 5331:23,
5394:3
**minutes** [2] - 5387:13,

5390:9
**mishear** [2] - 5343:17,
5343:18
**misspell** [1] - 5322:5
**mix** [3] - 5279:13,
5331:16, 5332:2
**mobile** [19] - 5277:3,
5278:16, 5278:24,
5282:14, 5282:19,
5282:20, 5282:22,
5283:1, 5294:5,
5297:3, 5297:7,
5297:12, 5299:23,
5305:15, 5309:21,
5321:10, 5321:11,
5321:24, 5378:17
**mock** [1] - 5330:17
**mode** [1] - 5392:23
**model** [6] - 5303:23,
5343:20, 5343:21,
5381:19, 5384:6,
5385:10
**moderately** [1] -
5306:3
**modern** [2] - 5384:18,
5384:19
**moment** [22] - 5285:1,
5303:25, 5304:3,
5324:15, 5332:3,
5332:14, 5332:18,
5334:14, 5337:15,
5338:8, 5338:15,
5338:16, 5338:22,
5340:1, 5346:16,
5347:4, 5353:10,
5360:7, 5363:25,
5367:25, 5378:24,
5389:21
**moments** [1] -
5391:10
**Monday** [3] - 5393:23,
5394:6, 5398:6
**monetize** [3] - 5281:9,
5281:17, 5281:19
**monetized** [1] -
5287:20
**monetizing** [1] -
5288:9
**money** [10] - 5276:20,
5277:17, 5280:24,
5302:3, 5302:7,
5302:21, 5325:6,
5333:25, 5368:12
**monitor** [2] - 5300:4,
5308:14
**months** [2] - 5275:22
**morning** [7] - 5329:4,
5336:5, 5337:17,
5343:16, 5371:12,
5394:1, 5398:20

**most** [15] - 5276:1, 5330:11, 5345:5, 5347:25, 5368:18, 5372:15, 5384:14, 5389:2, 5389:6, 5391:2, 5391:8, 5391:16, 5391:22, 5392:2
**mostly** [1] - 5374:24
**move** [10] - 5291:17, 5292:13, 5294:19, 5322:11, 5322:14, 5323:1, 5327:24, 5334:20, 5346:2, 5370:12
**moving** [4] - 5298:8, 5309:18, 5329:1, 5397:5
**Mozilla** [1] - 5321:13
**MR** [127] - 5275:6, 5275:8, 5281:20, 5283:5, 5283:25, 5284:13, 5284:19, 5289:7, 5289:12, 5289:19, 5290:1, 5290:4, 5290:11, 5290:15, 5290:24, 5291:5, 5291:11, 5291:21, 5292:3, 5292:17, 5292:18, 5292:23, 5293:3, 5293:8, 5293:17, 5294:19, 5294:25, 5300:22, 5300:25, 5301:3, 5301:5, 5304:2, 5307:13, 5307:14, 5307:17, 5308:2, 5308:5, 5308:10, 5311:3, 5311:5, 5317:12, 5317:15, 5317:17, 5319:15, 5319:16, 5320:7, 5320:8, 5320:10, 5323:5, 5325:5, 5326:8, 5326:10, 5326:12, 5327:1, 5327:2, 5327:25, 5328:8, 5329:2, 5336:22, 5336:25, 5338:21, 5338:24, 5339:1, 5340:13, 5341:15, 5341:19, 5341:20, 5344:10, 5344:14, 5344:17, 5345:15, 5345:17, 5347:7, 5347:8, 5354:16, 5355:21, 5355:24, 5356:2, 5356:10, 5357:12, 5357:14,

5357:16, 5357:20, 5358:16, 5358:18, 5358:21, 5360:11, 5360:12, 5361:4, 5361:9, 5362:4, 5363:6, 5363:11, 5363:13, 5363:15, 5363:17, 5363:25, 5364:4, 5364:7, 5364:13, 5365:6, 5365:8, 5365:10, 5365:16, 5366:16, 5366:19, 5367:21, 5368:23, 5369:5, 5369:11, 5370:18, 5375:14, 5394:3, 5394:5, 5394:10, 5395:6, 5395:9, 5395:10, 5395:15, 5396:8, 5396:19, 5397:22, 5398:7, 5398:9, 5398:10, 5398:11, 5398:15
**MS** [24] - 5301:2, 5319:13, 5328:12, 5347:6, 5360:10, 5365:15, 5369:18, 5369:22, 5370:5, 5370:21, 5371:5, 5371:11, 5372:2, 5375:12, 5375:17, 5375:21, 5375:24, 5375:25, 5376:9, 5376:11, 5379:1, 5379:20, 5388:17, 5388:19
**MSI** [3] - 5373:23, 5374:1, 5374:12
**multiple** [2] - 5278:15, 5374:7

## N

**name** [11] - 5277:12, 5277:17, 5277:18, 5301:6, 5321:9, 5327:18, 5334:17, 5371:14, 5371:15, 5371:16
**namely** [1] - 5275:25
**narrowing** [2] - 5382:22, 5383:22
**natural** [10] - 5278:11, 5278:12, 5278:21, 5287:12, 5294:7, 5295:20, 5295:23, 5297:6, 5297:9, 5324:4
**Naver** [1] - 5285:4
**navigated** [1] -

5342:20
**navigating** [1] - 5278:24
**navigational** [6] - 5277:22, 5279:20, 5304:24, 5322:4, 5323:15, 5323:17
**necessarily** [3] - 5346:5, 5366:7, 5383:6
**necessary** [1] - 5325:4
**need** [14] - 5279:7, 5282:2, 5285:19, 5325:3, 5325:25, 5326:1, 5343:25, 5369:2, 5369:11, 5384:2, 5385:10, 5393:25, 5397:12
**needed** [2] - 5331:16, 5370:25
**needs** [2] - 5306:15, 5395:24
**negate** [1] - 5292:15
**neglected** [1] - 5364:5
**negotiating** [1] - 5329:10
**nerdwallet.com** [1] - 5379:15
**networking** [1] - 5351:11
**never** [9] - 5286:19, 5301:1, 5303:12, 5328:1, 5329:21, 5333:18, 5333:21, 5352:20, 5362:14
**New** [3] - 5273:6, 5287:16
**new** [21] - 5275:11, 5275:15, 5275:18, 5279:7, 5293:24, 5314:8, 5314:10, 5316:13, 5324:1, 5337:25, 5348:7, 5350:10, 5352:21, 5367:8, 5367:25, 5379:6, 5379:14, 5385:7, 5385:10, 5385:19
**newspaper** [2] - 5378:1
**next** [35] - 5294:8, 5296:8, 5309:23, 5311:21, 5319:23, 5320:3, 5321:12, 5322:1, 5325:20, 5331:14, 5334:17, 5336:2, 5338:8, 5338:9, 5338:25, 5346:2, 5350:23, 5351:9, 5352:21,

5358:3, 5358:22, 5373:2, 5377:15, 5378:9, 5378:21, 5380:11, 5388:23, 5391:12, 5393:23, 5394:6, 5395:19, 5395:22, 5396:14, 5397:14, 5398:6
**nice** [1] - 5386:17
**nicely** [1] - 5386:13
**niche** [1] - 5321:23
**nights** [1] - 5310:7
**nine** [2] - 5334:22, 5335:5
**nominated** [2] - 5373:25, 5374:2
**nonbrand** [4] - 5312:18, 5312:25, 5313:1, 5313:25
**nonbranded** [1] - 5298:10
**noncommercial** [1] - 5281:10
**none** [2] - 5349:6, 5349:16
**nonexistent** [2] - 5321:10, 5388:13
**nonleading** [1] - 5292:20
**nonpaid** [1] - 5334:13
**nonpreferred** [1] - 5334:2
**normal** [1] - 5292:6
**normally** [2] - 5364:20, 5364:22
**Northwest** [4] - 5272:14, 5272:17, 5273:8, 5273:12
**note** [2] - 5361:2, 5364:4
**nothing** [4] - 5300:22, 5343:12, 5364:1, 5390:19
**notice** [1] - 5300:13
**notification** [2] - 5300:2, 5397:25
**noting** [1] - 5350:4
**notion** [2] - 5343:22, 5352:16
**November** [1] - 5331:11
**number** [20] - 5288:6, 5295:1, 5296:11, 5299:5, 5300:10, 5311:2, 5324:19, 5328:13, 5328:14, 5328:18, 5336:18, 5347:21, 5366:1, 5366:2, 5372:15, 5375:4, 5383:21,

5396:5, 5397:1
**Number** [1] - 5272:3
**numbered** [1] - 5317:23
**numbers** [17] - 5297:16, 5297:22, 5307:23, 5310:24, 5312:17, 5313:5, 5314:4, 5332:9, 5355:3, 5355:25, 5356:2, 5356:5, 5356:6, 5356:8, 5356:11, 5356:17, 5356:19
**numerical** [1] - 5306:24

## O

**oath** [1] - 5362:10
**object** [2] - 5347:5, 5360:8
**objection** [19] - 5283:5, 5284:13, 5289:7, 5289:12, 5292:3, 5292:4, 5293:17, 5307:14, 5308:1, 5308:4, 5326:8, 5344:13, 5344:14, 5347:6, 5355:24, 5360:10, 5363:6, 5366:16, 5375:14
**objections** [1] - 5308:7
**objective** [1] - 5363:23
**observe** [1] - 5299:25
**observed** [3] - 5299:20, 5345:10, 5345:19
**obsessed** [2] - 5341:25, 5342:2
**obsession** [1] - 5342:3
**obtaining** [1] - 5372:3
**obvious** [1] - 5322:21
**obviously** [1] - 5392:15
**occasions** [1] - 5353:19
**occur** [1] - 5299:24
**October** [4] - 5272:6, 5293:20, 5297:23, 5399:8
**OF** [5] - 5272:1, 5272:3, 5272:9, 5399:1, 5399:9
**offer** [10] - 5307:13, 5307:21, 5344:10, 5348:5, 5355:22,

5357:12, 5358:17,
5364:5, 5364:6,
5375:13
**offering** [5] - 5307:18,
5376:18, 5376:23,
5377:4, 5388:6
**offerings** [1] - 5348:22
**offers** [3] - 5295:24,
5339:12, 5353:23
**officer** [3] - 5280:7,
5331:7, 5339:4
**OFFICIAL** [1] - 5399:1
**Official** [1] - 5273:12
**officially** [2] - 5395:23,
5396:1
**offline** [1] - 5284:5
**often** [4] - 5279:14,
5279:19, 5382:9,
5382:10
**olden** [1] - 5278:18
**once** [12] - 5279:4,
5294:9, 5314:7,
5322:23, 5333:21,
5355:6, 5395:17,
5396:1, 5396:12,
5397:16, 5397:17
**one** [90] - 5278:13,
5280:6, 5280:25,
5286:16, 5287:12,
5288:15, 5288:17,
5288:20, 5289:4,
5289:15, 5291:8,
5297:7, 5299:24,
5300:25, 5302:19,
5304:18, 5305:16,
5306:16, 5308:13,
5311:21, 5312:7,
5314:2, 5316:7,
5316:25, 5318:6,
5318:17, 5318:24,
5319:2, 5320:22,
5321:23, 5325:4,
5325:6, 5325:10,
5330:20, 5330:25,
5331:18, 5333:13,
5335:4, 5335:19,
5336:2, 5338:18,
5338:22, 5339:24,
5341:7, 5341:8,
5341:10, 5341:12,
5342:20, 5343:25,
5345:6, 5347:15,
5348:16, 5349:11,
5350:14, 5350:20,
5350:23, 5351:9,
5352:3, 5353:6,
5353:11, 5355:7,
5357:13, 5358:5,
5358:22, 5359:23,
5362:1, 5362:14,

5363:16, 5363:25,
5364:21, 5368:21,
5374:9, 5374:14,
5376:24, 5379:12,
5380:3, 5383:12,
5386:4, 5387:2,
5388:2, 5392:21,
5393:17, 5393:20,
5394:11, 5395:7,
5396:22, 5398:12
**one-sided** [6] -
5288:15, 5288:20,
5316:25, 5318:6,
5318:17, 5368:21
**one-sidedness** [1] -
5339:24
**ones** [1] - 5303:16
**online** [13] - 5284:2,
5284:4, 5284:5,
5348:3, 5348:21,
5350:15, 5350:23,
5351:10, 5375:10,
5385:21, 5389:19,
5389:20
**open** [11] - 5276:4,
5276:5, 5277:20,
5280:15, 5280:21,
5283:11, 5306:23,
5330:16, 5370:8,
5370:14, 5388:9
**opening** [1] - 5373:25
**opens** [1] - 5320:14
**operate** [1] - 5284:11
**operating** [1] -
5321:17
**operations** [1] -
5371:23
**opinion** [2] - 5377:4,
5377:8
**opinions** [3] -
5376:18, 5376:23,
5377:11
**opportunity** [2] -
5322:24, 5357:14
**opposed** [1] - 5322:8
**opt** [1] - 5283:23
**optimization** [6] -
5295:22, 5296:1,
5300:14, 5339:11,
5362:25, 5380:24
**optimize** [6] -
5339:14, 5342:24,
5343:1, 5343:2,
5373:7
**optimized** [1] -
5342:21
**optimizing** [1] -
5296:17
**option** [1] - 5285:5
**order** [12] - 5275:2,

5306:24, 5325:11,
5328:3, 5328:24,
5353:13, 5355:21,
5367:7, 5369:3,
5396:6, 5396:9,
5397:14
**organic** [31] - 5278:3,
5278:4, 5286:5,
5286:6, 5286:7,
5286:15, 5286:22,
5287:1, 5287:6,
5287:7, 5288:2,
5295:14, 5296:9,
5298:13, 5298:15,
5300:7, 5300:14,
5302:9, 5302:10,
5313:2, 5331:15,
5334:24, 5334:25,
5335:2, 5335:11,
5335:15, 5335:22,
5336:2, 5336:6,
5362:16, 5380:3
**orient** [1] - 5378:19
**original** [3] - 5298:23,
5353:14, 5370:22
**originally** [1] - 5396:8
**originate** [1] - 5275:18
**OTAs** [1] - 5302:15
**otherwise** [4] -
5307:23, 5368:5,
5388:7, 5394:21
**ourselves** [2] -
5299:25, 5354:23
**out-of-home** [1] -
5378:2
**outdated** [2] - 5384:6,
5384:11
**outline** [1] - 5294:1
**outlines** [2] - 5293:12,
5397:8
**outside** [5] - 5277:16,
5284:10, 5284:11,
5284:13, 5284:20
**overall** [3] - 5313:16,
5329:15, 5331:16
**overlap** [1] - 5371:2
**overlapping** [1] -
5394:22
**overnight** [1] -
5393:15
**overruled** [3] - 5283:7,
5326:11, 5366:17
**overview** [3] -
5376:20, 5377:12,
5381:6
**overwhelming** [1] -
5332:10
**own** [7] - 5277:12,
5277:17, 5277:18,
5279:16, 5291:9,

5363:23, 5386:5
**owners** [1] - 5380:18
**owns** [1] - 5311:23

---

## P

**p.m** [4] - 5272:6,
5328:23, 5398:21
**page** [93] - 5276:12,
5278:8, 5278:18,
5279:16, 5287:7,
5288:13, 5290:18,
5295:9, 5295:10,
5295:12, 5295:19,
5296:2, 5296:15,
5296:18, 5296:24,
5296:25, 5297:7,
5297:11, 5297:13,
5297:14, 5298:1,
5298:3, 5298:17,
5298:18, 5299:10,
5299:13, 5299:14,
5300:11, 5301:19,
5302:5, 5308:12,
5309:1, 5309:6,
5309:7, 5309:8,
5309:20, 5310:5,
5311:6, 5311:10,
5314:16, 5314:20,
5317:18, 5317:19,
5317:22, 5320:3,
5322:6, 5324:7,
5324:9, 5324:14,
5326:6, 5326:13,
5326:14, 5326:23,
5326:24, 5331:12,
5331:14, 5331:19,
5334:1, 5336:18,
5336:19, 5337:1,
5337:6, 5338:18,
5345:9, 5345:13,
5345:18, 5346:1,
5346:24, 5347:17,
5347:18, 5347:19,
5347:20, 5350:11,
5350:13, 5351:9,
5351:17, 5355:7,
5355:8, 5355:14,
5360:1, 5362:5,
5362:20, 5363:10,
5363:12
**pages** [2] - 5297:8,
5310:24
**Pages** [8] - 5388:3,
5388:4, 5388:5,
5388:7, 5388:9,
5388:11, 5388:15
**paid** [19] - 5287:12,
5293:13, 5294:3,
5295:12, 5296:2,
5299:6, 5302:20,

5305:18, 5312:22,
5313:8, 5313:18,
5313:24, 5314:3,
5324:16, 5332:15,
5334:8, 5334:13,
5379:11
**pains** [1] - 5280:8
**pandemic** [3] -
5356:25, 5357:8,
5358:10
**paper** [5] - 5345:6,
5370:10, 5374:3,
5384:17, 5385:19
**papers** [2] - 5374:2,
5374:18
**paragraph** [11] -
5308:12, 5309:20,
5310:6, 5338:8,
5338:9, 5339:7,
5345:18, 5348:21,
5351:18, 5351:25,
5352:20
**pared** [1] - 5396:4
**part** [13] - 5278:21,
5292:2, 5295:25,
5303:8, 5305:15,
5306:6, 5306:18,
5312:5, 5329:15,
5341:13, 5352:15,
5354:21, 5371:25
**partially** [3] - 5276:3,
5280:20, 5320:20
**particular** [5] - 5316:7,
5342:25, 5376:2,
5384:22, 5391:7
**particularly** [1] -
5287:21
**partner** [9] - 5302:15,
5303:21, 5303:24,
5312:14, 5334:2,
5334:8, 5334:15,
5335:5
**partners** [18] -
5301:15, 5301:18,
5301:21, 5301:23,
5302:11, 5302:14,
5303:15, 5311:13,
5311:17, 5311:18,
5312:10, 5312:12,
5312:13, 5325:7,
5333:25, 5334:11,
5334:21, 5335:5
**parts** [3] - 5366:5,
5391:25, 5392:1
**party** [2] - 5328:20,
5395:16
**pass** [1] - 5300:23
**past** [6] - 5288:18,
5360:14, 5362:11,
5365:20, 5365:25,

5389:19
**path** [1] - 5383:4
**pay** [44] - 5276:20,
5277:8, 5277:10,
5277:11, 5277:17,
5277:21, 5277:25,
5278:5, 5279:14,
5279:18, 5288:4,
5288:14, 5293:13,
5293:23, 5297:18,
5300:19, 5301:18,
5302:11, 5302:24,
5303:5, 5303:6,
5303:10, 5303:12,
5303:14, 5303:15,
5303:24, 5304:11,
5304:20, 5305:2,
5305:6, 5305:13,
5308:17, 5309:11,
5309:15, 5309:16,
5312:24, 5324:8,
5332:13, 5343:5,
5353:19, 5364:20,
5364:21, 5380:25
**pay-for-performance**
[1] - 5332:13
**paying** [9] - 5276:17,
5277:13, 5288:12,
5297:19, 5303:16,
5310:15, 5313:15,
5313:16, 5380:18
**payment** [3] -
5303:20, 5303:21,
5380:23
**pays** [4] - 5303:8,
5334:10, 5334:12,
5335:3
**peer** [4] - 5373:11,
5373:13, 5373:14,
5374:20
**peer-reviewed** [4] -
5373:11, 5373:13,
5373:14, 5374:20
**pencil** [1] - 5397:4
**Pennsylvania** [1] -
5371:22
**people** [51] - 5275:20,
5276:19, 5277:1,
5278:8, 5281:1,
5282:5, 5282:18,
5283:13, 5283:16,
5283:22, 5283:23,
5293:9, 5298:12,
5302:20, 5302:24,
5303:5, 5303:6,
5303:10, 5304:10,
5304:19, 5315:5,
5315:11, 5315:12,
5315:23, 5342:4,
5343:21, 5356:7,

5357:2, 5366:1,
5366:4, 5366:6,
5367:15, 5368:18,
5379:7, 5381:4,
5382:24, 5384:7,
5386:25, 5389:5,
5389:6, 5389:7,
5392:4, 5392:19,
5392:20, 5396:21,
5397:8, 5397:23
**people's** [2] - 5353:23,
5353:24
**per** [13] - 5277:10,
5297:18, 5361:11,
5361:13, 5361:19,
5361:24, 5362:10,
5364:14, 5364:15,
5364:19, 5364:25,
5366:3, 5378:10
**percent** [8] - 5276:25,
5282:20, 5283:22,
5283:23, 5289:18,
5314:21, 5320:16,
5321:22
**percentage** [11] -
5275:11, 5275:17,
5286:23, 5288:7,
5310:6, 5313:10,
5313:24, 5314:13,
5355:9, 5355:15,
5392:12
**percentages** [2] -
5313:14, 5313:18
**performance** [3] -
5332:13, 5354:22,
5358:6
**perhaps** [1] - 5386:5
**period** [3] - 5299:24,
5306:12, 5307:19
**periods** [2] - 5345:10,
5345:19
**person** [5] - 5321:6,
5387:6, 5387:23,
5389:13, 5397:15
**personal** [1] - 5368:17
**personalized** [1] -
5387:25
**perspective** [5] -
5291:1, 5315:25,
5353:6, 5369:5
**perspectives** [1] -
5376:16
**persuade** [1] -
5381:17
**Ph.D** [3] - 5371:21,
5371:22, 5372:3
**phenomenon** [1] -
5393:9
**phone** [11] - 5276:4,
5276:6, 5276:13,

5276:23, 5278:16,
5282:19, 5294:5,
5297:7, 5299:23,
5316:9, 5321:24
**phones** [2] - 5282:14,
5378:17
**photos** [1] - 5392:23
**phrase** [1] - 5391:2
**pick** [3] - 5280:23,
5280:24, 5281:8
**picked** [1] - 5340:15
**picking** [1] - 5342:11
**picture** [1] - 5280:17
**piece** [1] - 5328:20
**ping** [1] - 5281:18
**place** [4] - 5275:24,
5392:18, 5395:15
**placed** [1] - 5310:25
**placement** [1] -
5339:14
**placements** [4] -
5293:13, 5294:3,
5295:13, 5296:2
**plaintiff** [1] - 5369:5
**Plaintiff** [1] - 5272:18
**PLAINTIFFS** [2] -
5275:3, 5369:24
**Plaintiffs** [2] - 5272:4,
5272:13
**plaintiffs** [2] -
5394:12, 5398:9
**plaintiffs'** [3] -
5322:23, 5395:4,
5395:13
**plan** [3] - 5329:15,
5394:7, 5395:2
**PLAs** [1] - 5380:6
**platform** [3] - 5275:20,
5276:21, 5303:9
**platforms** [2] -
5279:25, 5350:7
**play** [2] - 5340:10,
5344:8
**played** [2] - 5329:9,
5340:12
**pleased** [1] - 5308:14
**plot** [1] - 5377:16
**point** [24] - 5286:24,
5290:19, 5295:11,
5296:6, 5296:8,
5302:17, 5318:6,
5319:10, 5319:12,
5319:17, 5320:14,
5323:25, 5334:10,
5345:5, 5351:10,
5352:20, 5375:12,
5376:5, 5382:21,
5382:22, 5390:4,
5395:18, 5396:24
**points** [2] - 5288:8,

5350:14
**portion** [1] - 5350:13
**portions** [1] - 5295:1
**position** [6] - 5284:25,
5295:18, 5396:15,
5397:18, 5397:20,
5398:3
**positioned** [1] -
5281:19
**positions** [2] - 5372:3,
5374:6
**positive** [1] - 5358:13
**possible** [2] -
5359:16, 5392:18
**posted** [1] - 5306:11
**potential** [3] -
5330:19, 5348:8,
5351:22
**potentially** [2] -
5290:19, 5330:15
**power** [1] - 5330:4
**powered** [2] - 5285:7,
5323:11
**powerful** [1] - 5286:10
**PPC** [16] - 5277:10,
5277:13, 5279:15,
5295:13, 5297:15,
5297:17, 5297:18,
5298:10, 5298:12,
5312:18, 5312:19,
5312:23, 5312:25,
5313:25
**practice** [2] - 5370:10,
5378:10
**practitioners** [4] -
5373:24, 5374:16,
5375:7, 5383:15
**pre** [2] - 5386:6,
5387:14
**pre-Internet** [2] -
5386:6, 5387:14
**precipitous** [1] -
5356:22
**prefer** [2] - 5289:8,
5326:19
**preferred** [13] -
5301:23, 5303:15,
5325:7, 5330:6,
5330:7, 5330:8,
5333:25, 5334:8,
5334:11, 5334:15,
5334:20, 5335:5
**preinstalled** [1] -
5283:16
**prepandemic** [1] -
5357:21
**preparation** [1] -
5294:15
**prepare** [3] - 5291:12,
5394:21, 5395:2

**prepared** [11] -
5289:13, 5289:23,
5290:3, 5290:9,
5290:16, 5291:5,
5291:7, 5291:9,
5293:9, 5375:18,
5397:24
**preparing** [2] -
5344:8, 5397:8
**preprinted** [1] -
5347:21
**presence** [2] -
5282:22, 5282:25
**present** [3] - 5359:13,
5375:21, 5398:17
**presentation** [4] -
5370:8, 5375:18,
5375:22, 5376:10
**presented** [1] -
5374:17
**president** [5] -
5314:18, 5331:7,
5332:6, 5332:19,
5339:5
**pressures** [2] -
5351:23, 5352:3
**presumably** [2] -
5396:6, 5397:13
**pretty** [5] - 5295:20,
5357:9, 5358:1,
5358:13, 5394:13
**previous** [3] -
5314:23, 5370:11,
5371:3
**previously** [1] -
5285:11
**price** [10] - 5279:18,
5288:10, 5297:21,
5312:4, 5343:11,
5353:13, 5358:22,
5359:3, 5359:8,
5359:11
**Priceline** [2] -
5311:13, 5311:15
**prices** [3] - 5343:17,
5343:18, 5343:22
**primarily** [3] -
5350:24, 5372:16,
5376:5
**primary** [3] - 5309:11,
5378:12, 5388:24
**principal** [2] -
5382:13, 5382:14
**print** [2] - 5378:1,
5378:2
**private** [2] - 5353:23,
5353:25
**problem** [4] - 5286:13,
5288:12, 5288:14,
5288:15

**problems** [2] - 5291:24, 5291:25
**proceed** [2] - 5326:20, 5369:20
**Proceedings** [2] - 5273:15, 5398:21
**proceedings** [1] - 5399:4
**process** [4] - 5381:18, 5382:3, 5383:25
**produced** [2] - 5273:16, 5376:15
**produces** [1] - 5389:4
**product** [13] - 5376:25, 5377:3, 5380:6, 5380:7, 5380:13, 5382:4, 5382:5, 5382:6, 5383:1, 5383:8, 5387:18, 5389:4, 5389:5
**products** [12] - 5339:12, 5339:13, 5346:9, 5348:25, 5349:1, 5376:4, 5376:5, 5381:17, 5383:10, 5383:11, 5392:5
**professional** [1] - 5368:16
**professor** [2] - 5372:4, 5372:8
**Professor** [24] - 5369:23, 5369:25, 5370:7, 5370:11, 5370:22, 5371:1, 5371:5, 5371:12, 5375:13, 5375:15, 5375:18, 5375:21, 5376:1, 5376:12, 5379:3, 5388:20, 5393:13, 5393:18, 5394:6, 5394:10, 5396:13, 5396:22, 5397:17, 5398:2
**profiles** [1] - 5389:19
**profit** [6] - 5325:8, 5325:11, 5325:25, 5327:4, 5327:10, 5328:4
**program** [5] - 5367:16, 5367:17, 5367:18, 5367:19, 5372:13
**programs** [2] - 5367:14, 5367:20
**project** [1] - 5291:20
**proliferation** [1] - 5287:5
**prominence** [1] - 5295:14

**prominent** [4] - 5287:10, 5294:4, 5299:22, 5374:9
**prompted** [1] - 5294:15
**pronounced** [1] - 5366:5
**property** [2] - 5303:13, 5311:20
**proportion** [1] - 5286:21
**proposed** [1] - 5385:2
**proposition** [1] - 5364:11
**Protection** [1] - 5272:20
**proud** [3] - 5358:15, 5360:21, 5367:11
**proven** [1] - 5294:12
**provide** [2] - 5397:18, 5398:3
**provided** [1] - 5344:25
**provider** [1] - 5354:3
**providers** [2] - 5312:6, 5351:6
**providing** [1] - 5377:5
**provisionally** [1] - 5370:17
**PS** [1] - 5346:19
**PSX0097** [1] - 5292:24
**PSX94** [3] - 5311:3, 5346:16, 5346:20
**PSX94A** [2] - 5310:20, 5311:3
**PSX97** [3] - 5294:19, 5294:23, 5294:24
**PSX97.......................**
**.......................................** [1]
- 5274:8
**public** [5] - 5306:8, 5328:19, 5356:1, 5356:17, 5356:19
**publication** [1] - 5340:6
**publications** [1] - 5340:16
**publicly** [1] - 5339:22
**published** [4] - 5373:11, 5373:12, 5373:18, 5384:17
**publishing** [1] - 5374:5
**pull** [1] - 5394:25
**pulled** [1] - 5350:1
**punched** [2] - 5336:23, 5338:22
**purchase** [18] - 5275:21, 5279:3, 5303:22, 5373:1, 5381:11, 5381:12,

5381:15, 5381:17, 5381:18, 5381:19, 5381:23, 5382:2, 5382:7, 5382:16, 5383:1, 5383:25, 5384:5, 5384:19
**purchases** [3] - 5282:7, 5373:2, 5381:20
**purchasing** [1] - 5385:11
**purpose** [3] - 5289:24, 5291:7, 5292:9
**purposes** [5] - 5290:3, 5291:10, 5295:2, 5319:6, 5368:14
**pursuant** [2] - 5357:13, 5395:19
**pursue** [1] - 5380:22
**pushed** [3] - 5287:6, 5395:7, 5395:21
**pushing** [1] - 5287:5
**put** [20] - 5280:25, 5282:5, 5287:15, 5287:16, 5293:6, 5319:7, 5325:1, 5331:12, 5334:4, 5346:17, 5347:18, 5354:18, 5355:5, 5356:16, 5361:17, 5369:1, 5380:4, 5395:15, 5395:22, 5396:24
**puts** [2] - 5281:6, 5336:6
**putting** [2] - 5359:25, 5390:17

## Q

**Q1** [5] - 5307:2, 5307:11, 5308:22, 5309:19, 5314:15
**Q4** [1] - 5308:25
**qualify** [2] - 5346:13, 5357:18
**quality** [4] - 5287:13, 5287:21, 5364:24, 5365:1
**quantitative** [1] - 5320:25
**Quantitative** [1] - 5398:3
**quantity** [1] - 5285:19
**quarter** [4] - 5306:7, 5309:10, 5310:7
**quarterly** [1] - 5306:4
**queries** [7] - 5287:20, 5287:22, 5288:6, 5288:10, 5364:21,

5364:22, 5364:24
**query** [10] - 5281:10, 5281:12, 5287:18, 5287:23, 5379:25, 5390:9, 5390:10, 5390:18, 5391:21, 5392:8
**questions** [13] - 5284:10, 5292:19, 5292:20, 5294:17, 5301:2, 5322:21, 5323:1, 5327:7, 5329:3, 5344:19, 5361:10, 5363:18, 5364:14, 5367:2, 5368:24, 5370:16, 5371:8, 5387:16
**quibble** [4] - 5319:2, 5320:22, 5334:23, 5334:25
**quibbling** [1] - 5334:8
**quick** [2] - 5379:24, 5393:20
**quickly** [2] - 5314:15, 5365:25
**quite** [6] - 5301:11, 5361:12, 5361:20, 5362:10, 5379:1, 5388:17
**quote** [1] - 5396:19

## R

**radio** [1] - 5378:2
**raise** [1] - 5291:24
**raised** [1] - 5291:23
**raising** [3] - 5343:17, 5343:18, 5343:22
**ranking** [1] - 5296:10
**rapid** [1] - 5348:6
**rapidly** [1] - 5348:22
**rate** [2] - 5300:13, 5367:9
**rather** [2] - 5341:12, 5384:11
**RAZI** [5] - 5273:7, 5328:12, 5347:6, 5360:10, 5365:15
**Razi** [1] - 5328:12
**re** [1] - 5398:3
**re-evaluate** [1] - 5398:3
**reach** [4] - 5281:6, 5385:8, 5391:24, 5392:1
**react** [1] - 5300:3
**read** [23] - 5297:5, 5317:5, 5317:19, 5317:25, 5318:3, 5325:18, 5326:5,

5326:16, 5326:17, 5326:19, 5338:16, 5341:13, 5349:12, 5350:10, 5360:8, 5360:13, 5362:7, 5365:9, 5365:12, 5365:13, 5379:9
**reading** [4] - 5332:12, 5351:25, 5375:8, 5394:7
**ready** [5] - 5275:5, 5337:4, 5340:17, 5388:8, 5397:24
**real** [2] - 5288:25, 5295:14
**reality** [11] - 5275:20, 5276:7, 5278:12, 5278:20, 5280:1, 5282:6, 5288:22, 5300:19, 5384:21, 5385:8, 5385:9
**realization** [1] - 5283:23
**realize** [3] - 5276:2, 5283:13, 5325:3
**really** [55] - 5275:19, 5275:23, 5276:18, 5278:7, 5280:4, 5280:13, 5280:21, 5282:1, 5282:2, 5282:11, 5283:2, 5283:13, 5283:19, 5284:25, 5285:5, 5286:9, 5286:12, 5286:15, 5287:3, 5287:11, 5293:12, 5294:1, 5294:11, 5296:14, 5297:6, 5297:19, 5298:12, 5299:25, 5317:20, 5330:5, 5330:10, 5330:17, 5332:13, 5343:12, 5352:16, 5352:17, 5352:20, 5354:2, 5361:23, 5365:25, 5366:3, 5367:15, 5373:1, 5375:2, 5382:19, 5384:21, 5385:19, 5385:22, 5387:3, 5390:2, 5391:6, 5393:8
**realm** [1] - 5304:18
**realtime** [3] - 5390:7, 5390:13, 5390:15
**reason** [4] - 5326:1, 5392:15, 5392:16, 5397:24
**reasons** [2] - 5325:6, 5398:15

**received** [9] - 5294:24, 5307:16, 5308:9, 5344:16, 5357:19, 5358:20, 5373:21, 5373:22, 5374:2
**RECEIVED** [1] - 5274:7
**recent** [7] - 5282:14, 5345:6, 5345:10, 5345:19, 5345:23, 5348:1, 5389:19
**Recess** [1] - 5328:23
**recognition** [1] - 5373:21
**recognize** [1] - 5375:15
**recognized** [1] - 5375:9
**recollection** [2] - 5340:10, 5362:9
**recommend** [1] - 5354:6
**record** [15] - 5290:5, 5290:7, 5290:10, 5291:13, 5292:15, 5294:22, 5310:20, 5321:1, 5324:22, 5328:19, 5369:1, 5369:10, 5371:14, 5376:9, 5399:4
**recorded** [1] - 5273:15
**records** [1] - 5294:21
**rectangle** [2] - 5379:25, 5380:2
**red** [8] - 5298:23, 5299:2, 5313:8, 5334:6, 5334:14, 5370:10, 5379:25, 5380:2
**redacted** [7] - 5295:2, 5295:4, 5295:5, 5298:2, 5298:18, 5324:18, 5328:14
**redactions** [1] - 5370:9
**redirect** [1] - 5364:3
**Redirect** [1] - 5274:4
**REDIRECT** [1] - 5364:12
**reduce** [3] - 5279:21, 5280:10, 5385:25
**reduced** [2] - 5288:2, 5313:8
**refer** [4] - 5301:14, 5304:6, 5334:18, 5384:5
**reference** [4] - 5347:1, 5365:23, 5370:7, 5371:7
**referenced** [1] -

5370:22
**referred** [2] - 5352:13, 5380:6
**referring** [7] - 5311:12, 5311:25, 5331:24, 5332:4, 5332:5, 5352:7, 5380:18
**refers** [2] - 5312:10, 5389:6
**reflected** [1] - 5355:25
**refresh** [3] - 5318:7, 5340:10, 5362:9
**refreshes** [1] - 5318:4
**refused** [3] - 5325:14, 5325:20, 5394:24
**regard** [1] - 5346:8
**regarding** [1] - 5381:13
**regards** [1] - 5376:2
**regular** [2] - 5292:2, 5306:18
**regularly** [2] - 5291:11, 5375:8
**regulator** [4] - 5290:9, 5290:12, 5290:14, 5290:16
**regulators** [2] - 5290:17, 5292:6
**regulatory** [2] - 5294:15, 5339:22
**rejumbled** [1] - 5396:9
**related** [4] - 5302:3, 5311:12, 5348:4, 5394:5
**relationship** [26] - 5288:15, 5288:20, 5288:21, 5318:17, 5329:5, 5329:19, 5330:22, 5332:25, 5333:6, 5336:15, 5337:7, 5337:8, 5337:9, 5338:7, 5338:10, 5339:23, 5346:2, 5356:13, 5359:1, 5368:7, 5368:12, 5368:15, 5368:18, 5368:20, 5368:21, 5368:22
**relative** [4] - 5310:7, 5313:10, 5313:14, 5313:18
**relatively** [2] - 5296:9, 5348:8
**release** [1] - 5352:8
**relevance** [2] - 5288:2, 5341:16
**relevant** [8] - 5278:8, 5284:14, 5284:17, 5286:11, 5364:18,

5386:5, 5389:7
**reliable** [1] - 5397:7
**reliance** [2] - 5279:21, 5280:10
**reliant** [2] - 5280:15, 5360:19
**rely** [3] - 5278:23, 5279:6, 5314:9
**relying** [1] - 5288:17
**remained** [3] - 5361:12, 5361:20, 5362:10
**remaining** [1] - 5395:12
**remarkable** [1] - 5359:12
**remember** [30] - 5275:22, 5278:19, 5286:9, 5301:12, 5301:20, 5316:14, 5316:18, 5316:22, 5317:1, 5317:9, 5318:11, 5318:22, 5318:24, 5325:23, 5327:6, 5327:16, 5327:18, 5329:7, 5330:2, 5331:3, 5333:15, 5340:14, 5340:19, 5341:8, 5341:10, 5341:12, 5342:22, 5362:22, 5363:4, 5367:1
**remind** [1] - 5393:24
**remove** [1] - 5328:18
**rental** [4] - 5303:24, 5351:7, 5354:3, 5354:5
**rentals** [1] - 5354:15
**repeat** [2] - 5307:23, 5359:21
**rephrase** [6] - 5285:25, 5315:9, 5315:22, 5341:19, 5363:11
**replaced** [1] - 5388:12
**report** [1] - 5308:12
**reported** [1] - 5366:9
**reporter** [1] - 5307:24
**REPORTER** [2] - 5399:1, 5399:9
**Reporter** [1] - 5273:12
**reports** [3] - 5354:25, 5375:8, 5376:7
**represent** [1] - 5334:7
**represented** [2] - 5308:3, 5397:16
**represents** [1] - 5332:9
**request** [1] - 5370:17
**require** [2] - 5364:8,

5383:4
**requirements** [1] - 5330:15
**requires** [1] - 5377:5
**research** [10] - 5373:8, 5373:9, 5375:3, 5375:5, 5375:6, 5376:13, 5384:15, 5384:17, 5387:18, 5387:19
**Research** [2] - 5374:8, 5374:15
**resembles** [1] - 5397:5
**reservation** [6] - 5348:4, 5349:1, 5350:15, 5350:24, 5353:18, 5358:18
**reservations** [1] - 5353:24
**resonate** [1] - 5389:6
**resources** [1] - 5377:6
**respect** [4] - 5355:3, 5368:19, 5384:22, 5396:5
**respond** [2] - 5290:21, 5376:8
**responded** [1] - 5326:4
**response** [9] - 5289:13, 5289:16, 5291:9, 5292:5, 5301:12, 5337:19, 5380:1, 5392:8, 5392:9
**responsive** [1] - 5392:25
**restaurant** [2] - 5348:4, 5349:1
**restaurants** [1] - 5357:3
**result** [9] - 5290:17, 5296:18, 5302:9, 5302:11, 5335:15, 5335:23, 5336:2, 5380:25, 5397:8
**results** [30] - 5277:11, 5278:11, 5278:12, 5286:15, 5287:7, 5287:12, 5288:3, 5288:13, 5294:7, 5295:12, 5295:20, 5296:2, 5297:6, 5297:9, 5298:14, 5298:15, 5299:14, 5300:14, 5300:20, 5301:19, 5313:2, 5335:11, 5336:7, 5336:8, 5337:25, 5344:6, 5362:16,

5380:1, 5380:4
**resume** [1] - 5328:10
**RESUMED** [1] - 5275:3
**retailing** [2] - 5372:20, 5373:18
**retain** [1] - 5367:14
**retention** [2] - 5314:4, 5314:11
**retread** [1] - 5370:24
**return** [11] - 5285:15, 5340:4, 5341:3, 5366:8, 5366:10, 5366:13, 5366:14, 5366:21, 5368:7, 5373:5
**returning** [5] - 5279:10, 5279:19, 5314:22, 5315:6, 5315:11
**reveal** [1] - 5312:16
**revealed** [1] - 5328:13
**revealing** [1] - 5332:9
**revenue** [8] - 5288:7, 5325:11, 5354:25, 5355:10, 5355:16, 5357:10, 5357:21, 5359:11
**review** [7] - 5357:15, 5357:16, 5357:17, 5376:7, 5379:7, 5379:9
**reviewed** [6] - 5308:2, 5317:4, 5373:11, 5373:13, 5373:14, 5374:20
**reviewer** [1] - 5379:11
**reviews** [1] - 5379:8
**revolution** [1] - 5386:6
**road** [1] - 5394:12
**ROI** [20] - 5340:1, 5340:24, 5342:3, 5342:7, 5342:15, 5342:18, 5342:21, 5342:25, 5343:5, 5343:11, 5344:19, 5344:20, 5344:24, 5345:2, 5345:11, 5361:13, 5361:24, 5363:23, 5364:17, 5373:5
**ROIs** [8] - 5338:11, 5339:14, 5341:14, 5341:22, 5345:19, 5345:22, 5345:23, 5366:25
**role** [2] - 5329:9, 5344:8
**roles** [1] - 5372:9
**room** [2] - 5276:1,

5310:7
**Room** [1] - 5273:13
**Rosati** [1] - 5273:5
**route** [1] - 5276:3
**row** [2] - 5391:13,
5391:19
**RPR** [1] - 5273:12
**ruled** [1] - 5289:15
**rules** [1] - 5364:6
**run** [2] - 5330:3,
5338:10
**Russia** [3] - 5284:23,
5285:2, 5285:11

**S**

**safari** [1] - 5322:2
**Safari** [9] - 5276:4,
5283:4, 5283:11,
5321:24, 5322:2,
5322:6, 5323:20,
5324:13, 5329:8
**salespeople** [1] -
5387:15
**salesperson** [2] -
5387:16, 5390:14
**SALLET** [5] - 5272:19,
5395:6, 5395:10,
5398:10, 5398:15
**San** [3] - 5281:10,
5281:13, 5281:14
**SARA** [2] - 5273:7,
5273:12
**Sara** [3] - 5328:12,
5399:3, 5399:8
**save** [1] - 5307:17
**saw** [9] - 5299:22,
5324:15, 5331:1,
5332:1, 5340:1,
5352:25, 5385:19,
5386:19, 5390:1
**scale** [2] - 5281:25,
5282:2
**scaled** [1] - 5285:17
**scaring** [1] - 5306:22
**scenarios** [1] -
5330:17
**scenic** [1] - 5386:17
**scheduling** [3] -
5393:21, 5393:22,
5395:20
**Schmidtlein** [2] -
5396:20, 5397:16
**SCHMIDTLEIN** [7] -
5273:2, 5292:18,
5395:9, 5395:15,
5396:8, 5397:22,
5398:11
**Scholar** [1] - 5374:1
**scholar** [1] - 5373:25

**scholars** [1] - 5374:1
**School** [6] - 5371:21,
5372:5, 5372:7,
5372:10, 5372:14,
5375:4
**school** [1] - 5372:12
**science** [1] - 5371:19
**Science** [4] - 5373:23,
5374:9, 5374:10,
5374:12
**scientists** [1] - 5330:4
**scout's** [1] - 5308:5
**screen** [15] - 5293:7,
5294:6, 5295:4,
5295:14, 5297:7,
5309:4, 5319:8,
5331:12, 5338:24,
5345:13, 5345:18,
5346:17, 5347:18,
5356:16, 5359:25
**scroll** [7] - 5278:15,
5286:17, 5294:6,
5297:7, 5297:8,
5335:20
**seal** [1] - 5355:23
**SEALED** [1] - 5272:9
**search** [124] - 5276:5,
5276:6, 5276:23,
5277:22, 5278:11,
5278:12, 5278:21,
5279:16, 5279:20,
5281:10, 5281:21,
5283:12, 5283:17,
5284:22, 5284:24,
5285:4, 5285:23,
5286:1, 5286:3,
5286:5, 5287:1,
5287:7, 5287:19,
5288:6, 5288:10,
5288:12, 5294:7,
5295:12, 5295:19,
5295:20, 5295:22,
5295:23, 5295:24,
5296:2, 5296:18,
5297:6, 5297:9,
5300:14, 5304:24,
5311:25, 5312:22,
5312:24, 5313:8,
5313:18, 5313:19,
5313:24, 5314:3,
5318:10, 5318:14,
5321:24, 5322:4,
5322:7, 5322:16,
5323:6, 5323:12,
5323:13, 5323:15,
5323:17, 5324:4,
5324:7, 5324:9,
5324:14, 5324:17,
5329:6, 5329:22,
5329:25, 5330:16,

5330:23, 5331:15,
5332:15, 5335:13,
5335:18, 5335:25,
5336:8, 5348:23,
5348:24, 5348:25,
5350:23, 5351:11,
5354:7, 5362:25,
5364:21, 5364:24,
5373:4, 5373:17,
5376:24, 5377:1,
5377:2, 5377:5,
5378:11, 5378:13,
5378:19, 5379:15,
5379:22, 5380:5,
5380:9, 5380:20,
5380:24, 5380:25,
5387:3, 5388:6,
5388:12, 5390:8,
5390:10, 5391:19,
5391:20, 5391:22,
5392:4, 5392:6,
5392:7, 5392:9,
5392:10, 5392:11,
5392:14, 5392:17,
5392:25, 5393:7
**Search** [13] - 5279:20,
5298:13, 5305:15,
5322:6, 5324:7,
5346:6, 5346:12,
5348:17, 5349:20,
5360:14, 5365:20,
5365:21, 5365:24
**searched** [1] - 5387:8
**searches** [5] - 5277:7,
5282:10, 5287:6,
5287:7, 5366:2
**searching** [2] -
5366:1, 5366:7
**seated** [1] - 5275:4
**second** [24] - 5278:18,
5290:19, 5295:9,
5295:10, 5300:25,
5308:12, 5308:16,
5309:22, 5319:24,
5326:7, 5335:19,
5338:18, 5339:8,
5345:6, 5345:18,
5356:12, 5371:16,
5376:19, 5376:25,
5377:20, 5390:22,
5391:19, 5394:10,
5397:13
**secret** [1] - 5332:17
**Section** [1] - 5272:20
**section** [3] - 5347:20,
5347:25, 5350:3
**securing** [1] - 5367:23
**Securities** [1] - 5344:3
**see** [96] - 5282:19,
5285:5, 5287:19,

5289:14, 5294:3,
5294:5, 5294:12,
5297:5, 5298:4,
5298:8, 5298:25,
5299:17, 5306:15,
5307:4, 5308:16,
5308:17, 5309:4,
5309:10, 5309:12,
5309:22, 5309:25,
5310:9, 5310:23,
5310:24, 5311:10,
5312:8, 5312:16,
5312:20, 5314:20,
5314:24, 5317:12,
5319:19, 5319:21,
5319:25, 5320:1,
5328:21, 5331:18,
5332:21, 5333:3,
5334:17, 5335:14,
5335:15, 5336:1,
5336:3, 5337:11,
5337:21, 5337:25,
5338:2, 5338:12,
5338:13, 5339:15,
5340:2, 5345:9,
5345:20, 5347:1,
5347:14, 5347:20,
5347:25, 5348:9,
5348:10, 5349:3,
5349:16, 5350:3,
5350:14, 5351:6,
5351:12, 5351:23,
5351:24, 5352:5,
5354:10, 5354:22,
5355:9, 5355:10,
5355:17, 5356:3,
5356:22, 5358:4,
5358:10, 5358:23,
5360:2, 5360:4,
5365:2, 5365:25,
5366:3, 5370:18,
5377:18, 5377:20,
5378:6, 5378:11,
5380:2, 5389:8,
5396:10, 5397:13,
5398:19
**seeing** [4] - 5297:22,
5298:14, 5304:16,
5393:16
**sell** [1] - 5301:10
**send** [3] - 5363:12,
5381:4, 5387:10
**sends** [1] - 5324:3
**senior** [2] - 5368:18,
5374:6
**sense** [5] - 5287:4,
5355:23, 5377:13,
5377:16, 5387:25
**sensitive** [1] - 5356:3
**sent** [2] - 5359:16,

5361:1
**sentence** [11] -
5308:16, 5309:22,
5309:23, 5339:8,
5360:4, 5360:9,
5360:18, 5365:12,
5365:19, 5381:21,
5381:23
**SEO** [10] - 5295:14,
5295:21, 5295:22,
5313:1, 5331:2,
5331:15, 5331:24,
5333:9, 5362:15
**separate** [1] - 5357:25
**September** [4] -
5338:17, 5359:7,
5394:16, 5396:8
**sequentially** [1] -
5309:24
**serious** [2] - 5347:9,
5348:16
**SERP** [1] - 5296:18
**serves** [1] - 5297:21
**service** [3] - 5351:6,
5368:3, 5372:9
**services** [11] -
5281:18, 5303:25,
5348:5, 5348:7,
5348:23, 5350:10,
5350:15, 5350:24,
5383:11, 5392:5
**session** [6] - 5275:14,
5324:24, 5325:3,
5369:3, 5369:12,
5370:14
**SESSION** [1] - 5272:9
**set** [1] - 5370:25
**sets** [1] - 5317:16
**setting** [2] - 5276:6,
5283:12
**settings** [1] - 5283:19
**seven** [2] - 5334:21,
5335:21
**Seventh** [1] - 5272:22
**several** [3] - 5280:18,
5374:22, 5397:23
**shall** [1] - 5280:21
**shape** [1] - 5383:2
**share** [5] - 5275:13,
5309:12, 5309:23,
5320:16, 5321:21
**shareholders** [1] -
5306:8
**sharp** [1] - 5375:4
**sharpen** [1] - 5397:4
**shift** [1] - 5339:19
**shopping** [3] -
5286:14, 5380:4,
5380:6
**short** [2] - 5340:9,

5376:25
**shorthand** [1] -
5273:15
**shortly** [1] - 5328:21
**shouting** [2] -
5386:20, 5386:25
**show** [21] - 5277:11,
5277:15, 5277:18,
5278:11, 5286:8,
5286:11, 5286:20,
5287:14, 5295:4,
5298:9, 5303:10,
5310:18, 5316:20,
5319:7, 5321:7,
5330:11, 5333:24,
5334:1, 5361:13,
5361:14, 5386:17
**showing** [2] - 5280:3,
5357:24
**shown** [7] - 5296:5,
5300:9, 5310:20,
5321:2, 5364:24,
5364:25, 5392:9
**shows** [5] - 5294:1,
5298:10, 5303:12,
5358:9, 5381:11
**side** [13] - 5283:14,
5283:15, 5291:8,
5294:18, 5317:23,
5333:18, 5333:22,
5335:10, 5336:10,
5369:1, 5384:15,
5390:21, 5395:5
**sidebar** [1] - 5289:8
**sided** [6] - 5288:15,
5288:20, 5316:25,
5318:6, 5318:17,
5368:21
**sidedness** [1] -
5339:24
**signal** [3] - 5335:19,
5389:20, 5390:20
**signals** [12] - 5389:10,
5389:11, 5389:12,
5389:15, 5389:22,
5389:23, 5389:24,
5390:4, 5390:16,
5390:17, 5391:15
**SIGNATURE** [1] -
5399:9
**signed** [1] - 5311:18
**significant** [9] -
5275:13, 5275:15,
5275:19, 5278:21,
5287:3, 5299:9,
5305:14, 5354:10,
5377:5
**significantly** [5] -
5276:9, 5279:18,
5287:20, 5288:11,

5296:14
**similar** [3] - 5297:2,
5318:24, 5350:3
**similarly** [1] - 5371:5
**simple** [3] - 5385:23,
5385:25, 5386:1
**Simpson** [1] - 5273:8
**single** [2] - 5317:7,
5318:15
**sister** [2] - 5311:19,
5348:16
**sit** [1] - 5318:15
**site** [3] - 5303:6,
5353:14, 5353:20
**situation** [2] -
5277:19, 5370:2
**six** [4] - 5275:22,
5334:21, 5335:21,
5396:25
**size** [3] - 5295:18,
5377:13, 5377:16
**skewed** [1] - 5356:6
**Skift** [1] - 5341:8
**skip** [3] - 5296:25,
5338:8, 5383:6
**Skyscanner** [1] -
5312:1
**sleeve** [1] - 5336:21
**slide** [24] - 5319:23,
5321:12, 5322:1,
5370:9, 5371:5,
5375:18, 5375:22,
5376:9, 5376:19,
5376:20, 5377:15,
5378:7, 5378:21,
5379:23, 5380:11,
5381:11, 5382:1,
5382:21, 5383:12,
5388:23, 5389:10,
5390:7, 5390:21,
5391:12
**slides** [2] - 5371:6,
5382:1
**slightly** [3] - 5277:19,
5356:6, 5383:16
**small** [13] - 5281:25,
5320:17, 5320:18,
5322:10, 5323:7,
5331:22, 5332:1,
5332:2, 5333:9,
5342:18, 5374:23,
5392:12, 5393:8
**smaller** [2] - 5286:19,
5296:19
**smoothly** [1] - 5323:2
**social** [9] - 5351:11,
5373:4, 5391:14,
5391:24, 5392:3,
5392:10, 5392:12,
5392:13

**solely** [1] - 5278:23
**solid** [1] - 5385:18
**solutions** [1] -
5294:12
**someone** [11] -
5304:11, 5304:20,
5305:1, 5305:13,
5306:16, 5310:15,
5320:11, 5324:5,
5324:10, 5364:9,
5389:17
**sometimes** [7] -
5320:13, 5379:16,
5380:6, 5381:2,
5382:11, 5389:25,
5393:4
**somewhere** [1] -
5392:24
**Sommer** [12] - 5301:6,
5301:8, 5308:3,
5328:6, 5328:13,
5328:25, 5345:12,
5353:9, 5364:2,
5365:12, 5365:19,
5367:1
**SOMMER** [76] -
5273:4, 5283:5,
5284:13, 5289:7,
5289:12, 5290:15,
5291:11, 5292:3,
5292:17, 5293:3,
5293:17, 5300:25,
5301:3, 5301:5,
5304:2, 5307:13,
5307:17, 5308:5,
5308:10, 5311:3,
5311:5, 5317:12,
5317:15, 5317:17,
5319:15, 5319:16,
5320:8, 5320:10,
5323:5, 5325:5,
5326:10, 5326:12,
5327:1, 5327:2,
5327:25, 5328:8,
5329:2, 5336:22,
5336:25, 5338:21,
5338:24, 5339:1,
5340:13, 5341:19,
5341:20, 5344:10,
5344:17, 5345:15,
5345:17, 5347:7,
5347:8, 5354:16,
5355:21, 5356:2,
5356:10, 5357:12,
5357:16, 5357:20,
5358:16, 5358:21,
5360:11, 5360:12,
5361:4, 5361:9,
5362:4, 5363:11,
5363:13, 5363:15,

5363:17, 5363:25,
5364:4, 5365:8,
5366:16, 5369:11,
5370:18, 5375:14
**Sommer's** [1] - 5323:1
**song** [1] - 5333:2
**Sonsini** [1] - 5273:5
**soon** [2] - 5392:18,
5398:2
**sophisticated** [1] -
5339:13
**sorry** [28] - 5281:12,
5287:24, 5296:24,
5299:12, 5301:1,
5303:19, 5307:9,
5309:1, 5311:1,
5320:8, 5326:16,
5327:7, 5330:14,
5337:1, 5345:6,
5345:15, 5349:8,
5352:10, 5361:4,
5362:21, 5363:14,
5363:16, 5365:4,
5367:17, 5370:4,
5371:25, 5378:23,
5388:16
**sort** [14] - 5319:3,
5372:17, 5384:2,
5386:1, 5386:23,
5387:1, 5387:9,
5388:12, 5392:11,
5393:3, 5395:3,
5395:21, 5395:23,
5396:12
**sought** [1] - 5296:21
**sounds** [1] - 5398:5
**source** [4] - 5276:10,
5287:1, 5339:23,
5378:6
**sources** [3] - 5302:4,
5358:23, 5364:8
**South** [1] - 5285:4
**Southwest** [1] -
5273:3
**SP** [1] - 5312:7
**space** [3] - 5280:2,
5343:13, 5354:5
**speaking** [4] - 5296:9,
5374:17, 5374:20,
5386:12
**specific** [7] - 5278:9,
5281:5, 5299:14,
5299:15, 5324:19,
5328:18, 5354:5
**specifically** [3] -
5329:8, 5352:7,
5378:13
**specification** [1] -
5390:18
**spectrum** [1] -

5356:11
**speculation** [2] -
5283:5, 5366:16
**speedboat** [1] -
5368:5
**speedboating** [1] -
5368:4
**spell** [1] - 5371:14
**spend** [18] - 5282:11,
5285:9, 5285:13,
5285:21, 5288:18,
5289:2, 5296:20,
5297:15, 5297:23,
5299:9, 5340:23,
5342:8, 5344:24,
5366:21, 5368:12,
5377:17, 5378:8,
5378:11
**spending** [3] - 5366:6,
5377:19, 5391:3
**spends** [1] - 5368:8
**spent** [1] - 5297:23
**sponsored** [1] -
5380:12
**stability** [1] - 5364:15
**stable** [5] - 5345:11,
5345:19, 5361:12,
5361:20, 5362:10
**stage** [5] - 5370:25,
5382:3, 5383:7,
5383:17
**stage-wise** [1] -
5382:3
**stages** [16] - 5382:8,
5382:9, 5382:13,
5382:14, 5382:19,
5382:22, 5383:4,
5383:6, 5383:22,
5383:25, 5384:8,
5384:21, 5385:22,
5390:23, 5391:1
**stall** [1] - 5280:25
**stalls** [1] - 5280:18
**stamped** [3] - 5311:6,
5338:18, 5350:11
**STAND** [1] - 5275:3
**stand** [1] - 5325:18
**standard** [1] - 5378:10
**standing** [1] - 5368:17
**starred** [1] - 5390:4
**start** [15] - 5276:7,
5277:1, 5280:13,
5281:2, 5315:4,
5356:20, 5368:4,
5373:1, 5374:23,
5381:9, 5381:10,
5381:12, 5381:14,
5386:24, 5395:23
**start-ups** [1] - 5374:23
**started** [7] - 5278:7,

5278:13, 5286:15, 5309:2, 5359:1, 5371:21, 5396:23

**starting** [7] - 5326:13, 5339:8, 5358:25, 5360:9, 5361:6, 5374:22, 5376:16

**starts** [1] - 5360:4

**state** [2] - 5371:14, 5381:14

**State** [1] - 5272:18

**statement** [6] - 5320:14, 5339:17, 5339:21, 5348:14, 5349:19, 5390:18

**statements** [4] - 5340:2, 5340:21, 5341:16, 5344:6

**STATES** [3] - 5272:1, 5272:3, 5272:10

**states** [1] - 5397:19

**States** [12] - 5272:13, 5272:16, 5284:10, 5284:14, 5284:20, 5344:3, 5351:4, 5369:19, 5369:22, 5376:1, 5376:4, 5398:10

**states'** [1] - 5369:5

**stay** [7] - 5295:5, 5295:7, 5303:13, 5375:1, 5375:2, 5375:5, 5375:6

**stayed** [2] - 5345:23, 5385:24

**stays** [1] - 5343:12

**steady** [1] - 5357:6

**stenotype** [1] - 5273:15

**step** [4] - 5373:2, 5377:11, 5378:9, 5393:19

**steps** [1] - 5328:3

**STEVEN** [1] - 5272:19

**stick** [2] - 5283:22, 5319:5

**still** [7] - 5332:6, 5355:12, 5355:19, 5395:3, 5395:10, 5397:12, 5397:19

**stock** [6] - 5358:22, 5359:2, 5359:8, 5359:11, 5364:5, 5364:7

**stop** [8] - 5284:6, 5331:22, 5332:3, 5332:14, 5332:18, 5335:21, 5337:15, 5367:25

**store** [1] - 5303:9

**story** [1] - 5321:19

**straight** [1] - 5277:20

**strategic** [2] - 5312:10, 5312:12

**strategies** [4] - 5288:3, 5292:12, 5293:16, 5388:21

**strategy** [1] - 5291:18

**Street** [3] - 5272:14, 5272:17, 5273:8

**strict** [2] - 5341:14, 5341:22

**string** [1] - 5385:20

**strong** [2] - 5284:24, 5314:22

**stronger** [2] - 5285:20, 5297:12

**students** [4] - 5372:23, 5375:4, 5381:8, 5388:14

**studies** [1] - 5330:10

**study** [2] - 5376:14, 5376:17

**studying** [3] - 5384:18, 5385:19, 5392:16

**stuff** [2] - 5300:3, 5392:23

**stupid** [4] - 5325:15, 5325:21, 5327:5, 5327:7

**subject** [7] - 5290:22, 5308:6, 5348:6, 5357:16, 5357:17, 5373:14, 5373:16

**submission** [1] - 5289:19

**submitted** [4] - 5290:12, 5290:13, 5290:16, 5376:8

**succeeded** [3] - 5306:1, 5314:2, 5315:15

**success** [1] - 5359:12

**successful** [1] - 5360:21

**successive** [2] - 5382:22, 5383:22

**suddenly** [1] - 5281:1

**suggesting** [1] - 5364:16

**suggestion** [1] - 5384:20

**suggests** [1] - 5291:19

**suited** [6] - 5389:2, 5391:2, 5391:8, 5391:16, 5391:22, 5392:2

**sum** [1] - 5368:9

**summarize** [1] - 5376:22

**summary** [4] - 5295:10, 5295:25, 5296:5, 5394:8

**suppose** [2] - 5379:6, 5379:9

**surpassed** [1] - 5357:21

**sustain** [1] - 5284:7

**switch** [1] - 5284:9

**SWORN** [1] - 5369:24

**synonym** [1] - 5295:23

## T

**table** [1] - 5397:6

**talks** [1] - 5391:13

**target** [2] - 5344:20, 5386:13

**targeting** [10] - 5389:1, 5389:3, 5389:4, 5389:6, 5389:8, 5389:9, 5389:11, 5390:6, 5391:14, 5391:20

**tasks** [1] - 5280:6

**taught** [4] - 5372:14, 5372:15, 5372:20, 5372:23

**tautological** [1] - 5382:15

**teach** [6] - 5372:16, 5372:19, 5375:4, 5381:8, 5381:10, 5381:22

**teaching** [5] - 5372:18, 5375:3, 5376:13, 5382:1

**team** [14] - 5280:9, 5291:5, 5294:11, 5296:21, 5298:5, 5298:19, 5299:3, 5329:12, 5329:13, 5329:15, 5329:18, 5330:3, 5330:17, 5335:19

**technical** [1] - 5287:24

**technology** [3] - 5352:21, 5371:18, 5372:13

**Technology** [1] - 5371:19

**teeing** [1] - 5341:12

**television** [2] - 5280:1, 5280:4

**temporal** [1] - 5390:3

**temporally** [1] -

5389:25

**ten** [7] - 5282:18, 5286:25, 5334:22, 5373:12, 5374:19, 5394:17, 5396:24

**tendency** [1] - 5287:3

**tens** [1] - 5391:3

**tenure** [3] - 5305:19, 5361:12, 5361:20

**tenured** [1] - 5372:7

**Tepper** [1] - 5372:5

**term** [9] - 5277:14, 5283:12, 5301:23, 5304:4, 5304:5, 5304:7, 5380:15, 5380:16, 5382:20

**terminology** [3] - 5311:9, 5334:6, 5334:9

**terms** [20] - 5279:23, 5282:16, 5286:21, 5287:1, 5288:2, 5292:1, 5312:25, 5313:10, 5316:10, 5320:25, 5332:2, 5334:20, 5358:6, 5367:23, 5368:11, 5380:17, 5391:14, 5391:15, 5393:21

**terrific** [2] - 5307:25, 5369:13

**test** [1] - 5385:24

**tested** [1] - 5337:25

**testified** [1] - 5291:16

**testifies** [1] - 5292:11

**testify** [4] - 5290:25, 5291:15, 5369:7, 5396:11

**TESTIMONY** [1] - 5274:2

**testimony** [22] - 5284:15, 5301:9, 5304:5, 5316:12, 5329:3, 5335:7, 5336:5, 5337:17, 5341:16, 5349:6, 5354:18, 5369:15, 5370:13, 5371:1, 5375:19, 5376:20, 5378:18, 5379:21, 5379:24, 5381:13, 5393:15, 5397:19

**text** [14] - 5282:7, 5284:6, 5297:18, 5297:19, 5376:24, 5377:1, 5377:5, 5378:18, 5379:25, 5380:2, 5380:3, 5380:10, 5391:19

**Thacher** [1] - 5273:8

**THE** [135] - 5272:1, 5272:1, 5272:10, 5275:3, 5275:4, 5281:12, 5281:13, 5281:14, 5281:15, 5283:7, 5283:11, 5284:15, 5289:6, 5289:10, 5289:23, 5290:2, 5290:7, 5291:3, 5291:6, 5291:14, 5292:8, 5292:22, 5293:4, 5293:18, 5293:20, 5294:8, 5294:10, 5294:14, 5294:16, 5294:17, 5294:20, 5300:24, 5303:19, 5303:23, 5304:1, 5307:15, 5307:22, 5308:6, 5311:1, 5311:4, 5317:14, 5322:23, 5323:4, 5325:1, 5326:11, 5326:22, 5326:25, 5327:24, 5328:6, 5328:9, 5328:16, 5328:25, 5336:21, 5336:24, 5338:20, 5338:23, 5341:18, 5344:13, 5344:15, 5345:12, 5345:16, 5353:9, 5353:16, 5353:17, 5353:19, 5353:20, 5353:21, 5353:22, 5354:2, 5354:7, 5354:9, 5354:12, 5355:25, 5356:4, 5357:17, 5358:19, 5361:3, 5361:5, 5361:6, 5361:8, 5362:3, 5363:9, 5363:12, 5363:14, 5363:16, 5364:2, 5364:10, 5366:17, 5366:18, 5367:17, 5367:18, 5368:25, 5369:9, 5369:13, 5369:17, 5369:21, 5369:24, 5369:25, 5370:1, 5370:3, 5370:19, 5371:4, 5371:9, 5371:25, 5372:1, 5375:15, 5375:23, 5378:23, 5379:4, 5379:5, 5379:18, 5379:19, 5384:20, 5384:25, 5386:4, 5386:9, 5386:11, 5386:12, 5388:2, 5388:4, 5388:14,

5392:3, 5392:7, 5393:10, 5394:4, 5394:9, 5395:3, 5395:14, 5396:3, 5396:18, 5397:11, 5398:5, 5398:8, 5398:12, 5398:17

**therefore** [3] - 5299:22, 5390:19, 5392:24

**they've** [3] - 5319:11, 5394:24, 5396:20

**thinking** [6] - 5276:1, 5386:1, 5386:2, 5388:25, 5396:4, 5398:18

**third** [4] - 5328:20, 5354:4, 5360:4, 5377:4

**third-party** [1] - 5328:20

**threat** [2] - 5352:21, 5352:22

**three** [9] - 5278:13, 5285:10, 5286:16, 5297:8, 5305:20, 5333:14, 5334:21, 5383:17, 5396:20

**three-stage** [1] - 5383:17

**thumb** [1] - 5334:18

**thumb-up** [1] - 5334:18

**thumbs** [4] - 5302:22, 5302:24, 5303:7, 5303:16

**TikTok** [2] - 5280:1, 5392:20

**timeless** [4] - 5384:12, 5385:5, 5385:18

**timing** [1] - 5328:7

**title** [3] - 5291:19, 5331:7, 5374:1

**today** [10] - 5317:5, 5318:15, 5318:20, 5346:11, 5355:12, 5355:19, 5359:7, 5376:20, 5386:21, 5397:12

**together** [12] - 5313:25, 5326:17, 5330:3, 5330:16, 5332:25, 5334:4, 5334:5, 5337:24, 5349:13, 5373:24, 5374:16, 5382:12

**tomorrow** [3] - 5393:14, 5393:16, 5398:13

**took** [2] - 5358:23,

5362:15

**top** [26] - 5279:5, 5280:23, 5295:9, 5296:17, 5319:25, 5331:19, 5333:18, 5333:22, 5335:10, 5336:6, 5336:10, 5337:6, 5344:5, 5351:10, 5359:22, 5373:13, 5380:4, 5382:9, 5382:21, 5384:17, 5387:8, 5391:13, 5391:17, 5392:2

**top-side** [4] - 5333:18, 5333:22, 5335:10, 5336:10

**topic** [1] - 5354:17

**topics** [2] - 5372:25, 5373:20

**total** [4] - 5286:21, 5297:15, 5297:22, 5377:17

**totally** [1] - 5388:6

**touched** [1] - 5336:15

**tough** [1] - 5294:13

**toward** [1] - 5346:16

**towards** [2] - 5296:2, 5343:21

**track** [2] - 5366:2, 5395:4

**trackability** [1] - 5385:16

**tracking** [1] - 5385:5

**trademark** [2] - 5279:17, 5312:24

**traditional** [6] - 5348:4, 5377:25, 5378:3, 5378:4, 5391:13, 5391:24

**traffic** [31] - 5276:10, 5276:24, 5277:4, 5277:6, 5279:8, 5286:5, 5286:6, 5286:7, 5286:22, 5293:14, 5302:17, 5305:15, 5305:18, 5305:24, 5306:2, 5311:16, 5311:25, 5313:24, 5314:3, 5315:16, 5316:4, 5324:3, 5324:16, 5359:16, 5367:1, 5367:4, 5367:5, 5367:7, 5367:23

**training** [1] - 5371:17

**trajectory** [2] - 5357:6, 5358:13

**transact** [1] - 5276:21

**transcribed** [1] -

5306:11

**Transcript** [1] - 5273:16

**transcript** [9] - 5316:21, 5325:19, 5326:7, 5328:15, 5338:17, 5361:25, 5362:1, 5362:20, 5399:4

**TRANSCRIPT** [1] - 5272:9

**transcription** [1] - 5273:16

**travel** [18] - 5277:16, 5277:17, 5280:14, 5280:25, 5281:2, 5281:17, 5284:2, 5284:4, 5286:14, 5287:2, 5302:3, 5348:4, 5348:21, 5348:22, 5350:15, 5351:6, 5366:2, 5380:14

**Travel** [1] - 5346:13

**travel-related** [1] - 5302:3

**traveling** [1] - 5357:2

**traversed** [1] - 5387:8

**treated** [1] - 5287:22

**tremendously** [1] - 5333:1

**trend** [2] - 5298:8, 5357:9

**Trends** [1] - 5340:7

**trial** [1] - 5397:23

**TRIAL** [1] - 5272:9

**triangle** [1] - 5383:2

**tried** [3] - 5279:21, 5279:24, 5280:6

**tries** [2] - 5325:10, 5325:11

**triggered** [1] - 5292:14

**trip** [2] - 5279:4, 5315:24

**Trip** [1] - 5312:6

**Trivago** [1] - 5312:6

**true** [10] - 5277:1, 5289:18, 5315:1, 5323:6, 5333:22, 5339:17, 5340:21, 5353:3, 5355:12, 5360:17

**truly** [1] - 5386:12

**Trump** [1] - 5393:24

**truthful** [1] - 5349:19

**try** [16] - 5276:11, 5279:25, 5280:11, 5292:19, 5295:4, 5302:19, 5304:18, 5307:10, 5322:14,

5324:23, 5324:25, 5327:4, 5327:10, 5345:9, 5349:11, 5357:8

**trying** [7] - 5299:12, 5300:4, 5342:24, 5343:2, 5349:16, 5356:3, 5366:22

**Tuesday** [1] - 5398:6

**turn** [23] - 5296:24, 5297:13, 5298:1, 5298:17, 5299:13, 5306:24, 5308:12, 5308:25, 5309:20, 5310:23, 5310:24, 5311:6, 5317:18, 5336:14, 5343:24, 5347:17, 5354:21, 5359:19, 5362:5, 5362:20, 5365:17, 5367:9, 5376:19

**TV** [6] - 5377:23, 5378:1, 5380:19, 5385:12, 5385:14, 5386:15

**twice** [1] - 5279:4, 5316:20, 5336:5

**two** [17] - 5278:13, 5286:16, 5317:15, 5317:16, 5333:14, 5356:2, 5356:14, 5363:18, 5370:2, 5381:21, 5381:23, 5382:9, 5388:24, 5391:11, 5394:5, 5395:6, 5396:21

**type** [12] - 5277:20, 5279:15, 5283:12, 5286:7, 5298:13, 5312:23, 5321:16, 5322:16, 5323:13, 5323:20, 5359:15, 5386:7

**typed** [1] - 5286:10

**types** [12] - 5279:24, 5291:1, 5305:1, 5324:5, 5324:11, 5366:20, 5373:17, 5378:19, 5378:20, 5379:21, 5379:22, 5390:9

**typically** [2] - 5381:2, 5382:3

**typing** [4] - 5304:23, 5319:25, 5322:2, 5323:6

## U

**U.S** [7] - 5316:11,

5323:12, 5354:3, 5355:16, 5377:17, 5378:14, 5393:23

**under** [9] - 5307:3, 5311:21, 5355:23, 5358:16, 5358:17, 5362:10, 5364:5, 5377:21, 5380:5

**underlying** [1] - 5370:15

**understood** [5] - 5283:20, 5292:17, 5318:3, 5346:7, 5354:12

**undo** [1] - 5385:4

**unfortunate** [1] - 5357:5

**unique** [3] - 5284:3, 5286:12, 5314:20

**unit** [1] - 5297:20

**Unit** [4] - 5272:21

**UNITED** [3] - 5272:1, 5272:3, 5272:10

**United** [12] - 5272:13, 5272:16, 5284:10, 5284:14, 5284:20, 5312:14, 5344:2, 5351:3, 5369:19, 5369:22, 5376:1, 5376:4

**units** [2] - 5299:21, 5300:2

**University** [2] - 5371:22, 5372:5

**unless** [3] - 5382:16, 5382:17, 5382:18

**unlikely** [1] - 5395:1, 5397:3

**up** [85] - 5277:11, 5277:15, 5277:18, 5278:11, 5279:18, 5286:8, 5286:11, 5286:20, 5287:20, 5288:6, 5288:10, 5288:11, 5289:10, 5291:14, 5291:16, 5294:17, 5298:8, 5298:11, 5298:12, 5301:19, 5301:22, 5302:8, 5302:21, 5302:22, 5302:24, 5303:7, 5303:10, 5303:12, 5303:16, 5304:4, 5306:23, 5311:18, 5315:8, 5317:16, 5318:2, 5318:11, 5318:19, 5319:7, 5319:24, 5321:8, 5322:23, 5326:13, 5329:3,

5422

5330:11, 5330:16, 5330:17, 5331:12, 5334:1, 5334:18, 5335:12, 5340:15, 5341:12, 5343:11, 5343:19, 5345:13, 5345:23, 5346:17, 5347:18, 5349:16, 5350:1, 5350:12, 5351:18, 5352:17, 5355:5, 5356:16, 5357:6, 5358:4, 5361:21, 5361:22, 5362:7, 5370:9, 5371:8, 5383:8, 5385:7, 5388:5, 5388:9, 5393:11, 5393:13, 5393:20, 5394:7, 5395:4, 5396:1

**update** [3] - 5299:21, 5394:15, 5394:24

**updates** [1] - 5398:4

**upper** [1] - 5387:24

**ups** [1] - 5374:23

**UPXD103** [2] - 5376:10, 5383:13

**URL** [9] - 5304:23, 5305:1, 5319:25, 5321:17, 5322:2, 5322:8, 5323:20, 5324:6, 5324:10

**usage** [1] - 5279:11

**useful** [3] - 5385:6, 5385:23, 5389:24

**user** [2] - 5303:22, 5320:6

**users** [6] - 5278:23, 5304:6, 5314:5, 5316:8, 5324:1, 5376:5

**uses** [1] - 5321:23

**utterly** [1] - 5316:13

## V

**vacation** [4] - 5303:24, 5354:3, 5354:5, 5354:14

**variations** [2] - 5383:18, 5383:19

**varies** [1] - 5393:5

**Variety** [1] - 5340:15

**various** [4] - 5349:13, 5358:23, 5373:22, 5374:3

**vary** [1] - 5383:12

**vast** [1] - 5392:13

**verify** [1] - 5364:9

**version** [1] - 5298:4

**versions** [3] - 5291:23, 5383:14, 5383:16

**versus** [1] - 5387:20

**vertical** [1] - 5346:14

**via** [3] - 5275:12, 5275:15, 5276:2

**viable** [4] - 5281:22, 5285:5, 5285:23, 5286:1

**vice** [1] - 5339:4

**video** [3] - 5340:9, 5378:16, 5393:3

**Video** [1] - 5340:12

**videos** [1] - 5392:23

**view** [6] - 5333:5, 5341:21, 5342:5, 5349:16, 5349:18, 5376:6

**viewed** [1] - 5354:13

**views** [1] - 5376:17

**virtual** [2] - 5385:8, 5385:9

**visibility** [1] - 5296:9

**visually** [1] - 5295:13

**volume** [6] - 5288:10, 5298:21, 5321:20, 5323:7, 5342:16, 5344:25

**volumes** [1] - 5317:15

**Vrbo** [1] - 5351:1

**vs** [1] - 5272:5

## W

**Waikiki** [2] - 5335:13, 5336:1

**wait** [3] - 5336:16, 5370:19, 5393:17

**walk** [1] - 5387:20

**wants** [2] - 5369:1, 5389:13

**warrants** [1] - 5294:22

**washing** [2] - 5387:19, 5387:22

**Washington** [6] - 5272:5, 5272:14, 5272:17, 5273:3, 5273:9, 5273:13

**waste** [1] - 5345:8

**ways** [2] - 5292:13, 5314:2

**web** [7] - 5276:2, 5276:12, 5276:23, 5278:7, 5295:24, 5321:13, 5324:12

**website** [13] - 5277:21, 5277:25, 5278:24, 5286:11, 5306:11, 5306:14,

5353:13, 5379:10, 5380:14, 5390:1, 5392:21, 5392:22, 5393:5

**websites** [2] - 5378:17, 5392:21

**Wednesday** [4] - 5395:16, 5395:19, 5395:22, 5396:2

**week** [11] - 5384:16, 5385:18, 5390:1, 5395:6, 5395:8, 5395:11, 5395:13, 5395:17, 5396:14, 5397:14, 5398:6

**weeks** [3] - 5370:2, 5386:11, 5397:12

**welcome** [2] - 5369:25, 5393:18

**whammy** [1] - 5281:3

**Wharton** [1] - 5371:21

**whereas** [1] - 5353:17

**Whinston** [6] - 5394:6, 5394:11, 5396:13, 5396:22, 5397:17, 5398:2

**whole** [2] - 5323:11, 5353:4

**WICK** [1] - 5273:12

**Wick** [2] - 5399:3, 5399:8

**Williams** [1] - 5273:2

**willing** [1] - 5290:6

**Wilson** [1] - 5273:5

**Windows** [1] - 5321:8

**wise** [1] - 5382:3

**wish** [2] - 5359:4, 5359:5

**withdrawn** [2] - 5309:22, 5350:10

**withholding** [1] - 5377:9

**WITNESS** [32] - 5275:3, 5281:13, 5281:15, 5283:11, 5293:20, 5294:10, 5294:16, 5303:23, 5311:4, 5323:4, 5326:25, 5336:24, 5353:16, 5353:19, 5353:21, 5354:2, 5354:9, 5356:4, 5361:6, 5366:18, 5367:18, 5369:17, 5369:24, 5370:1, 5372:1, 5379:5, 5379:19, 5384:25, 5386:9, 5386:12, 5388:4, 5392:7

**witness** [19] -

5290:25, 5292:19, 5293:5, 5300:23, 5301:2, 5342:3, 5362:2, 5394:11, 5394:12, 5394:15, 5395:11, 5395:19, 5395:21, 5395:24, 5396:6, 5396:14, 5396:23, 5397:13, 5398:14

**witness's** [1] - 5294:20

**witnesses** [13] - 5370:23, 5371:3, 5394:19, 5395:12, 5395:17, 5396:12, 5396:16, 5396:22, 5397:2, 5397:9, 5397:23, 5397:25

**wonderful** [2] - 5288:21, 5337:8

**wondering** [1] - 5364:17

**word** [7] - 5287:9, 5301:21, 5319:1, 5334:23, 5335:2, 5342:2, 5342:21, 5347:5, 5368:21, 5390:17, 5390:20

**words** [12] - 5291:17, 5316:18, 5316:25, 5317:8, 5318:5, 5318:16, 5321:7, 5331:13, 5333:13, 5360:5, 5360:8, 5365:13

**works** [1] - 5303:23

**world** [6] - 5277:13, 5277:23, 5280:14, 5316:11, 5355:15, 5366:5

**worldwide** [3] - 5288:5, 5289:22, 5321:22

**worries** [1] - 5295:8

**worry** [1] - 5370:3

**wrap** [2] - 5393:11, 5393:13

**write** [2] - 5360:1, 5379:8

**writing** [1] - 5318:5

**written** [6] - 5316:25, 5317:8, 5347:9, 5347:11, 5349:7, 5349:18

**wrote** [2] - 5360:13, 5360:15

## Y

**Yahoo** [6] - 5285:6, 5323:6, 5323:11, 5323:13, 5323:16, 5323:17

**Yandex** [2] - 5284:24, 5285:1

**year** [13] - 5279:4, 5288:7, 5309:12, 5309:24, 5314:23, 5340:7, 5344:3, 5347:13, 5356:14, 5366:3, 5391:4

**years** [32] - 5282:14, 5282:18, 5283:20, 5286:10, 5286:16, 5286:25, 5288:19, 5293:21, 5305:20, 5305:21, 5305:22, 5331:17, 5333:17, 5337:10, 5345:10, 5345:19, 5345:24, 5360:14, 5360:25, 5361:1, 5362:11, 5365:20, 5366:1, 5368:15, 5372:6, 5372:19, 5373:10, 5373:12, 5374:19, 5385:2, 5385:12, 5396:20

**Yellow** [8] - 5388:3, 5388:4, 5388:5, 5388:7, 5388:9, 5388:11, 5388:15

**yellow** [3] - 5302:21, 5302:24, 5334:18

**yesterday** [3] - 5316:22, 5327:6, 5342:3

**York** [2] - 5273:6, 5287:17

**younger** [1] - 5316:8

**yourself** [1] - 5317:19

## Z

**zero** [2] - 5282:24