```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
        United States of America,    )
 3      et al.,                      )
                                     )  DAY 21
 4                    Plaintiffs,    )
                                     )  CV No. 20-3010
 5                    vs.   )  Washington, D.C.
                                     )  October 12, 2023
 6      Google LLC,                  )  1:35 p.m.
                                     )
 7                    Defendant.    )
        _____)
 8

 9                    TRANSCRIPT OF BENCH TRIAL
                BEFORE THE HONORABLE AMIT P. MEHTA
10                 UNITED STATES DISTRICT JUDGE

11      APPEARANCES:
        For DoJ Plaintiffs:        Kenneth M. Dintzer
12                                  U.S. Department of Justice
                                    1100 L Street, NW
13                                  Washington, D.C.
                                    (202) 307-0340
14                                  Email: Kenneth.dintzer2@usdoj.gov
                                    David E. Dahlquist
15                                  U.S. Department of Justice
                                    209 South LaSalle Street
16                                  Suite 600
                                    Chicago, IL  60604
17                                  (202) 805-8563
                                    Email:  David.dahlquist@usdoj.gov
18                                  Claire Maddox
                                    Richard Cameron Gower
19                                  U.S. Department of Justice
                                    450 Fifth Street, NW, Suite 7100
20                                  Washington, DC  20530
                                    202-549-7155
21                                  Email:  Claire.maddox@usdoj.gov
                                    Email:  Richard.gower@usdoj.gov
22      For Plaintiff
        State of Colorado:          William J. Cavanaugh, Jr.
23                                  Patterson Belknap Webb & Tyler LLP
                                    1133 Avenue of the Americas
24                                  Suite 2200
                                    New York, NY 10036
25                                  (212) 335-2793
                                    Email:  Wfcavanaugh@pbwt.com
```

```
 1
 2     For Defendant Google:      John E. Schmidtlein
                                  Enjamin M. Greenblum
 3                                Williams & Connolly LLP
                                  680 Main Avenue, SW
 4                                Washington, D.C. 20005
                                  (202) 434-5000
 5                                Email:  Jschmidtlein@wc.com
                                  Email:  Bgreenblum@wc.com
 6                                Michael Sommer
                                  Wilson Sonsini Goodrich & Rosati
 7                                1301 Avenue of the Americas
                                  40th Floor
 8                                New York, NY  10019
                                  (212) 497-7728
 9                                Email:  Msommer@wsgr.com

10     Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
                                  Official Court Reporter
11                                United States Courthouse, Room 6523
                                  333 Constitution Avenue, NW
12                                Washington, DC  20001
                                  202-354-3267
13                                     *   *   *
14
15
16
17
18
19
20
21
22
23
24
25
```

1      * * * * * * *P R O C E E D I N G S* * * * * * *

2              THE COURT:  Mr. Sommer?

3              MR. SOMMER:  Judge, I conferred with government

4      counsel over the lunch break.  There were four exhibits I meant

5      to offer that I did not:  DX3062, -63, and -64, which are the

6      three lists of materials relied upon by Dr. Jerath, and DX3080,

7      which is the Google Help page, which we offer as a business

8      record.

9              THE COURT:  Okay.

10             MS. MADDOX:  No objection, Your Honor.

11             THE COURT:  Terrific.  Thank you, Counsel.

12                         KINSHUK JERATH,

13                 CROSS-EXAMINATION (Cont.)

14     BY MR. SOMMER:

15     Q.  Good afternoon, Dr. Jerath.  Welcome back.

16             Just before we broke we had just discussed that the

17     first step in the effort to do your mapping is to evaluate at

18     what level of the funnel a particular ad format is most suited,

19     correct?

20     A.  Yes.

21     Q.  And I know you mentioned in your direct testimony that

22     you've seen various -- differing presentations of the funnel,

23     correct?

24     A.  Yes.

25     Q.  Okay.  Well, let's just look at a couple -- a few together.

```
 1              Let's put up on the screen DXD10.002.

 2              Have you seen this formulation of the funnel before?

 3    A.  I have.

 4    Q.  Okay.  This is the one from the DoJ complaint, correct?

 5    A.  That's correct.

 6    Q.  Let's go to DXD14.007.

 7              This is the funnel that Mr. Lowcock described.  Do you

 8    recognize this one?

 9    A.  I'm seeing it for the first time, but --

10    Q.  Okay.  You read his testimony, correct?

11    A.  I did, yes.

12    Q.  So you know he described awareness, intent, consideration,

13    decision, and purchase, right?

14    A.  Yeah.

15    Q.  Let's go to the next one, 14.008.

16              MS. MADDOX:  Just -- objection.  For clarification,

17    Counsel, on the preceding slide, DXD14.007, Lowcock, can you

18    please clarify?  Is this an actual document that was produced

19    by IPG, or is this a depiction that defense counsel has created?

20              MR. SOMMER:  It's a demonstrative we put together

21    during his testimony.

22              MS. MADDOX:  Okay.  Thank you.

23              MR. SOMMER:  14.008.

24    BY MR. SOMMER:

25    Q.  Okay.  You recognize this one, right?
```

```
 1    A.  Yep.

 2    Q.  This one is yours, correct?

 3    A.  Yes.

 4    Q.  This has four levels; awareness, interest, desire, action,

 5    correct?

 6    A.  Yes.

 7    Q.  Let's go to DX10.003.

 8         Do you recognize this one?

 9    A.  Yes.

10    Q.  What's this one?

11    A.  It think says at the bottom, so I have a vague

12    recollection.  I think this was in one of Bucklin's reports,

13    Professor Bucklin's reports.

14    Q.  I will share with you, this was from the state plaintiffs'

15    opening statement in this case.  And this shows three levels to

16    the funnel, correct?

17    A.  Yes, it does.

18    Q.  Now, I'll stop there for a moment.

19         So now we just looked at funnels with seven, five, four,

20    three levels, correct?

21    A.  Yep.

22    Q.  But in fairness, the point is that the construct of the

23    consumer thinking is not terribly different among all of them.

24    It's all about awareness, consideration, ultimately conversion;

25    is that a fair characterization?
```

1    A.  That would be one characterization, yes.

2    Q.  Okay.  So, the mapping that I keep coming back to is taking

3    each of these ad formats and figuring out at which level of the

4    funnel, whether it's three levels or seven levels, that format

5    is most suited to, correct?

6    A.  Say that again.  I'm not sure I understood the question.

7    Q.  Sure.  I'll repeat it -- or, I'll restate it because I

8    don't remember what I said.

9         The first step of the mapping process that you described

10   is to take each ad format, and then however many levels of the

11   funnel there may be, try to slot that in at the level it's most

12   suited for from an advertiser's perspective, correct?

13   A.  I would do it differently.  I would say that let's start

14   with the funnel, whatever.  Like, you know, we shouldn't be --

15   we shouldn't be distracted by the number of stages, really.

16   That's sort of more cosmetic.  But I would think of it as top

17   funnel, bottom funnel, and some mid-funnel, and so I would --

18   mainly the -- the main distinction is top funnel and bottom

19   funnel.

20        So in any of these funnels you can take, sort of, the

21   top few up to consideration, let's say, as top funnel stages.

22   Below that, bottom funnel stages.  And a little bit of overlap

23   of these two in the middle, and that would be mid-funnel.

24   Q.  Now, in your report, sir, in discussing search ads, you

25   opine that those are most suited for mid- and bottom-funnel

```
 1    purposes, correct?
 2    A.  That's right.
 3    Q.  Now, let's just make a clear record on what you view as
 4    search ads because I don't want there to be any confusion.
 5         So, text ads on general search engines, those are search
 6    ads, correct?
 7    A.  Yes.
 8    Q.  And PLAs, or shopping ads, on general search engines, those
 9    are search ads, right?
10    A.  Yes.
11    Q.  And ads on Amazon, for example, that are shown in response
12    to a user typing in a search request, those are search ads,
13    correct?
14    A.  Yes, they are.
15         So, I want to offer one qualification.  But I can
16    wait on that, if you like.
17         THE COURT:  That's okay.  You'll have the opportunity
18    to -- plaintiffs' counsel will get up and give you the
19    opportunity to clarify things.
20         THE WITNESS:  Sure.  Thank you.
21    BY MR. SOMMER:
22    Q.  And ads -- you know what SVPs are?
23    A.  If you could expand that for me.  Vertical -- V is for
24    vertical, I would imagine.
25    Q.  It's not a guessing game here.  Just tell me if you
```

1    don't -- I mean, it's not a big deal.  I'm going to move on if

2    you don't know what that is.

3    A.  I don't remember right now what that expands to exactly.

4    Q.  Ads on social -- withdrawn.

5        Ads on other specialized retail sites where someone

6    types in a search and gets fed an ad, those are search ads,

7    correct?

8    A.  Yes.  I call them as other search ads.

9    Q.  And ads on social media that are in response to search

10   queries are search ads, correct?

11   A.  Yes, they would be search ads.

12   Q.  So, for example, on Facebook or Instagram or TikTok or

13   Pinterest, and there's probably others, a user has the ability

14   to type and search for something, and they would then get fed

15   an ad; correct?

16   A.  In many of these, yes.  About --

17   Q.  I'm sorry.  Go ahead.

18   A.  So about ten years ago, Facebook actually stopped showing

19   search ads on Facebook because it was just not a big enough

20   business.  And then about five years ago, they restarted it to

21   hopefully monetize that.  But it's a very small phenomenon.

22   Searching on social media is -- I think we talked about it

23   yesterday also.

24   Q.  But the only point I'm trying to make is you viewed those

25   all as search ads, right?

 1    A.  Yes.

 2    Q.  Now, one of the things that is not on your list of

 3    materials relied upon are the reports of the other plaintiffs'

 4    experts in this case.  You're aware of that, right?

 5    A.  Yes.

 6              THE COURT:  What was your question?  I'm sorry.

 7              MR. SOMMER:  Yes.  One of the things that is not on

 8    his list of materials relied upon are the other reports of

 9    plaintiffs' experts in this case.

10              THE COURT:  Okay.

11    BY MR. SOMMER:

12    Q.  Are you aware as you sit here today, Dr. Jerath, that

13    Dr. Amaldoss, one of plaintiffs' experts, opines that consumers

14    doing searches on general search engines are at the research

15    phase.  Are you aware that?

16    A.  No.  I haven't read Dr. Amaldoss' report.

17    Q.  From your perspective, sir, we can agree that the research

18    phase is mid-funnel, correct?

19    A.  Yes, generally it's mid-funnel.

20    Q.  It's not bottom funnel?

21    A.  Yeah.  It's somewhere in between.  But, yes, it's more

22    mid-funnel.

23    Q.  And similarly, you're not aware that Dr. Baker, another of

24    plaintiffs' experts, opines that general search ads are used to

25    reach consumers in the middle of the funnel.  You're not aware

1    of that either?

2    A.  No.

3    Q.  Let me ask you -- let me go back to social advertising for

4    a minute -- social platforms.

5         Now, in your report at paragraph -- opening report at

6    paragraph 76, you define social ads as:  Ads on social

7    networks.

8         Correct?

9    A.  I would have to check, but --

10   Q.  Okay.  It's not a memory test.

11        What was the number of the opening report?

12             UNIDENTIFIED SPEAKER:  3209.

13   BY MR. SOMMER:

14   Q.  3209 in your binder, paragraph 76.

15   A.  Yes, I'm there.

16   Q.  I'll just repeat my question.

17        In your report, you noted that ads on -- ads on social

18   platforms is how you define social ads, correct?

19   A.  Let me just -- so that's -- doesn't seem to be in the

20   highlighted portion.  I don't see it in the highlighted portion

21   as such.

22   Q.  All right.  Let me move on.

23        Now, what you did in your report was you included social

24   ads in your category of display ads, correct?

25   A.  With I'm saying is that social ads are basically display

1    ads.

2    Q.  Okay.  That's what I thought I was asking.

3    A.  Largely, yeah.

4    Q.  And you say in your report that:  Social media ads belong

5    at the top or middle of the funnel.

6         Is that fair?

7    A.  Yes.

8    Q.  Now, if you will look at paragraph 137 of your report --

9    your opening report.  I'll give you a second to get there.

10        You express the opinion that:  Other digital advertising

11   options, other than search ads, are less effective at targeting

12   mid- and bottom-funnel consumers.

13        Do you see that?

14   A.  Let me just read that.

15   Q.  At the very bottom.  See the words:  They are less

16   effective than search ads at actively and accurately targeting

17   mid- and bottle-funnel consumers.

18        Do you see that?

19   A.  Yes.

20   Q.  That was the opinion you expressed in your opening report,

21   correct?

22   A.  Let me just read that, just to get the context of the --

23   Q.  Sure.

24   A.  Yes.

25   Q.  Now, my question to you, sir, is:  Did you do any empirical

1    work to test your assertion that other digital advertising

2    options are less effective than search ads at targeting mid-

3    and bottom-funnel consumers?  Any empirical analysis?

4    A.  No.

5    Q.  Okay.  Have you seen, in connection with this case, any

6    empirical analysis done by anyone else that concludes that

7    other digital advertising options are less effective than

8    search ads at targeting mid- and bottom-funnel consumers?

9    A.  No.

10   Q.  Can we agree, sir, that your opinion that other digital

11   advertising options are less effective than search ads at

12   targeting mid- and bottom-funnel consumers, as presented in

13   your three different reports, is not supported by any empirical

14   evidence?  Can we agree on that?

15            MS. MADDOX:  Objection, Your Honor.  Argumentative.

16            THE COURT:  It's overruled.

17   A.  I mean, I haven't cited empirical analysis in the reports.

18   BY MR. SOMMER:

19   Q.  Thank you.

20   A.  But I want to add --

21   Q.  I'm sorry, sir.  Give me a second.

22        I want to move on and talk a little bit about display

23   ads, which encompasses social ads.  We're together?

24        When I say "display ads," we're not encompassing social

25   ads because that was the approach you took, correct?

1    A.  Yes.

2    Q.  Now, you told the Court in your direct examination that

3    display ads are most suited for awareness, correct?

4    A.  Awareness and also interest building.

5    Q.  Okay.  And I think I heard you say that you thought that

6    display ads were most suited for top- and mid-level funnel,

7    correct?

8    A.  Yes.

9    Q.  Now, can we agree that a display ad can also serve the

10   purpose of conversion?

11   A.  In some cases.

12   Q.  Okay.  And do you think, sir, based on all your experience,

13   that advertisers appreciate that display ads can sometimes lead

14   to conversion?

15   A.  Sometimes.

16   Q.  In fact, wouldn't you agree with me that the ultimate goal

17   of the advertiser in sending out a display ad is that it will

18   lead a consumer to purchase a product, either directly or

19   indirectly?

20   A.  As I'd said earlier, that is the ultimate goal of a

21   company.

22   Q.  Now, the Court has heard me use an example a couple times.

23   You haven't heard it, so get ready for something very exciting.

24       I like to go on Instagram, and I scroll, and I pause on

25   certain feeds -- usually golf videos -- and the next day I go

1    on there, and I'm fed an ad for golf shorts.

2          Do you have my hypothetical in mind?

3    A.  Golf shorts?

4    Q.  Golf shorts.

5    A.  Are they a kind of shorts?

6    Q.  I'm sorry?

7    A.  Are they a particular kind of shorts?

8    Q.  Any particular kind?

9    A.  No.  I said:  Are they a particular kind of shorts?

10    Q.  They're golfing shorts.

11    A.  Okay.

12    Q.  Now, would you agree with me -- would you agree with me,

13    Dr. Jerath, that I receive that ad on my Instagram feed because

14    by watching one or more videos, I sent out an intense signal

15    that under some algorithm caused that ad to be sent to me?

16    Would you agree with that?

17    A.  Yes.

18    Q.  Let's talk about intense signals for a second.

19          Are you aware, sir, of any recent studies -- I know

20    they're not listed in your materials considered, but are you

21    aware of any that have concluded that particular younger

22    demographics are spending more time on social media these days

23    than watching television?  Are you aware of those studies?

24    A.  Generally, yes.

25    Q.  And even older people, like me, will -- are spending

5593

1    increasing amounts of time on social media sites?  Are you

2    aware of that?

3    A.  Generally, yes.

4    Q.  Now, let's talk about intent signals for a moment.

5         Can we agree that when you -- when a person is on a

6    social media site, what they are looking at is being tracked?

7    Can we agree on that?

8    A.  Generally, yes.

9    Q.  So if you pause to look at something, that's tracked,

10   right?

11   A.  Yep.

12   Q.  And if you stop and watch some particular content, that's

13   tracked, correct?

14   A.  Yeah.

15   Q.  And it's not only what I'm looking at that's tracked, but

16   on some sites, my friends, what they're looking at is tracked

17   and connected to me because they're my friends, right?

18   A.  Yes.

19   Q.  And what I may "like" -- that's in quotation marks -- or

20   click on a heart, that's tracked, right?

21   A.  Yes.

22   Q.  And the same of my friends.  Everything they're doing in

23   that regard is tracked and associated with me, correct?

24   A.  Yes.

25   Q.  And as a result of this and the enormous amount of time

 1  people are increasingly spending on these social sites,

 2  advertisers are getting intense intent signals about users;

 3  correct?

 4  A.  They're getting signals that this person is generally

 5  interested in this category.

 6  Q.  And that type of -- I think I already asked this, but I

 7  don't remember.

 8       Those type of intent signals are what led to me getting

 9  fed the ad I described a moment ago, correct?

10  A.  That would generally be the case, yeah.

11  Q.  Have you ever purchased a product from a display ad on

12  Instagram or some other social platform?

13  A.  I'm not sure.

14  Q.  Well, since you've had so much experience in this field,

15  would you agree with me that literally in a matter of three

16  clicks -- having never looked at that brand of golf shorts or

17  even thought that I wanted golf shorts, in three clicks, less

18  than a minute, I was able to purchase those?  Would you dispute

19  that?

20  A.  I mean, you're telling me that you did, so --

21  Q.  I did.

22  A.  Yeah.  I mean, I wouldn't dispute that, but --

23            THE COURT:  Would you like to enter those shorts into

24  the record?

25            MR. SOMMER:  You know, I will tell you, Judge, one of

 1    my team suggested I do that, but I'm not going to.

 2            THE COURT:  If it doesn't have a DX number, I won't

 3    consider it.

 4    BY MR. SOMMER:

 5    Q.  Okay.  Are you aware, Dr. Jerath -- one last thing on

 6    intent signals.

 7            Are you aware that if you have Facebook on your phone,

 8    that it is not only tracking what you like or watch on

 9    Facebook, but its actually tracking everywhere else you go on

10    your phone?  Are you aware of that?

11    A.  I mean, that depends on the permissions you give to

12    Facebook.

13    Q.  It has that ability; correct?

14    A.  If you give it, it has that ability, if you give it that

15    ability.

16    Q.  And the only way to shut that down, it's not just by

17    closing the app.  You actually have to log out.  Are you aware

18    of that?

19    A.  So when you install a new app on your phone, at least on

20    Apple phones, you're asked at that time:  Do you want to be

21    tracked by other apps while on this app?

22            So that's the ATT policy of Apple and, I mean, it

23    depends on your answer to that.

24    Q.  In the example I just described to you, the display ad

25    served each of the purposes of awareness, interest, and

1    conversion, correct?

2    A.  I mean, it's kind of a magical display ad which serves all

3    of these purposes.

4              THE WITNESS:  If I can just expand on that a little

5    bit --

6    BY MR. SOMMER:

7    Q.  Before you do, sir --

8              THE WITNESS:  -- Your Honor.

9    BY MR. SOMMER:

10   Q.  Before you do, I'm go to ask you a follow-up question

11   because you used the word "magical."

12             By "magical," were you suggesting that what I described

13   is some unique and unusual experience in the marketplace?

14   A.  100 percent, and that's why I wanted to expand on that.

15   Q.  Let me ask my next question.

16             It is your view that it is extremely unusual for

17   somebody to be fed a display ad on a social network and

18   actually click through and buy something?  That's your opinion,

19   that's very unusual?

20   A.  It is.  And may I expand?

21             THE COURT:  You'll have the opportunity on redirect

22   examination, if you're asked the question.

23   BY MR. SOMMER:

24   Q.  Now, getting back to this group of display ads which

25   incorporates social ads.  You told me just a moment ago that

1    your opinion is that they are best placed at mid or upper

2    funnel, correct?

3    A.  Would you repeat that again?

4    Q.  Yes.  Display ads, including social ads, your opinion is

5    that they are best slotted in, mapped into mid- or upper-

6    funnel, correct?

7    A.  That's right.

8    Q.  Okay.  And I think we can agree, you undertook no analysis

9    or did any empirical work in connection with that opinion to

10   see if your opinion was correct.  Can we agree on that?

11   A.  In the context of this case, I did not conduct an empirical

12   analysis.

13   Q.  Now, sir, are you aware that documents were collected in

14   this case from numerous companies that buy digital advertising?

15   Are you aware of that?

16   A.  Yes, I am.

17   Q.  Thank you.

18        I'm going to hand out a binder now.  Here's a binder for

19   you.

20   A.  Yes.

21   Q.  Now, Dr. Jerath, I want to give you some instructions about

22   this binder because it contains materials from third parties.

23   Okay?

24        So, what you have in the binder has nothing marked --

25   you know, taken off of it, so you'll be able to see the

1    company.  Please do not say the company name.

2              MR. SOMMER:  On the screen, Your Honor, we will be

3    showing completely anonymized versions of the exhibit.  Your

4    Honor has the unredacted version as well.

5    BY MR. SOMMER:

6    Q.  So, please, no names.  Okay?

7         Are you with me?

8    A.  Yes.

9    Q.  Okay.  I would like you to turn in your binder, sir, to

10   DX3057.

11   A.  I'm there.

12   Q.  Okay.  Now, you can see the company, correct?

13   A.  I can.

14   Q.  Don't say it.

15        All right.  Now, turn to page -- at the very bottom, in

16   the middle, you see those printed numbers, DX3057, and then it

17   has a dot.  So I want you to turn to .067.

18        And let's put the redacted version up on the screen.

19             MR. SOMMER:  Judge, I should have pointed out that in

20   the front of your binder, there's a Rosetta Stone.

21             THE COURT:  Okay.

22   A.  Is it 67?

23   BY MR. SOMMER:

24   Q.  Yeah, 067.  It's up on the screen.  You should be able to

25   see that's what we're talking about.

```
 1              Just tell me when you're there.  Are you ready?

 2   A.  Yeah.

 3   Q.  Okay.  Now, you see an iteration of the funnel there,

 4   correct?

 5   A.  Yes.

 6   Q.  And at the top of the funnel, we're going to focus on

 7   Display.  Do you see that Display is at the top of the funnel?

 8   A.  Yes.

 9   Q.  Okay.  Do you see that Display is in the middle of the

10   funnel?

11   A.  Yes.

12   Q.  And do you see that Display is at lower funnel?

13   A.  Yes.

14   Q.  How about Social?  Do you see that Social is at the top of

15   the funnel?

16   A.  Yes.

17   Q.  Do you see Social is also mid-funnel?

18   A.  Yes.

19   Q.  And Social is also lower funnel?

20   A.  Yes.

21   Q.  Would it be fair to say, Dr. Jerath, that Company A has a

22   view of social and display ads that is different than yours?

23              MS. MADDOX:  Objection, Your Honor.  I would note for

24   the record that this particular exhibit appears to be 95 pages

25   long, and counsel is asking about 1 page out of 95 and asking
```

1    the witness to make a rather sweeping conclusion from that.  So

2    I would object to the extent.

3              THE COURT:  I guess what I would say is:  I think it

4    is a problematic question in the sense that you're asking for

5    the organization's view about something, as opposed to what's

6    on the page.

7              MR. SOMMER:  Fair enough.  Point taken.

8    BY MR. SOMMER:

9    Q.  Let me rephrase my question, Dr. Jerath.

10             Based on this one page alone -- and if there's something

11   else counsel wants to show you, I'm sure she will.

12             Based on the page you're looking at, does it at least

13   appear to you that what's written there is not consistent with

14   your view of where these ad formats are most suited?

15   A.  For display on social, yes.  They're putting it in a

16   conversion.  I would put it in awareness and consideration.  I

17   think conversion rates would be quite low on these ads.

18   Q.  And can we agree, at least from this one page, that this

19   particular company, to the extent all three of these ad formats

20   are on -- excuse me -- each of these two ad formats are on the

21   same level, that it would be fair to infer that this company

22   views those ad formats as interchangeable?

23             MS. MADDOX:  Objection, Your Honor.  Same basis as I

24   stated previously.

25             THE COURT:  You can ask him about what this means,

1    but I don't know how we can draw a larger inference to what the

2    company as a whole thinks.

3              MR. SOMMER:  Okay.  Okay.  I'll move on.

4              THE WITNESS:  So --

5              THE COURT:  Hang on.  There's no question pending.

6    BY MR. SOMMER:

7    Q.  Now, you have in mind the company here, and I don't want

8    you to say it.

9         Did you -- and I noticed this was not on your list of

10   materials relied upon.

11        Did you review documents from this company in connection

12   with your work?

13   A.  I'm not sure.

14   Q.  I will represent -- I mean, does the fact that it's not on

15   any of your materials relied upon, would that -- if it's not,

16   would that mean you did not look at it?

17   A.  I did not rely on it.

18   Q.  Not relying.  Okay.

19        Do you have a list of what your -- what was made

20   available to you to look at?

21              MS. MADDOX:  Objection, Your Honor.  I believe this

22   falls within the scope of material under the case management

23   order that is not open to -- not subject to discovery.

24              THE COURT:  I don't have the case management order in

25   front of me, but I'm not sure it's improper cross-examination

1  as to what the, sort of, universe of records he started from.

2  So I'll overrule the objection.

3  BY MR. SOMMER:

4  Q.  I'm not asking you to give me a list.  I'm just asking, did

5  you compile a list of everything you've looked at, as opposed

6  what you relied on?  Is there some other list?

7  A.  No, I did not.

8  Q.  You don't know?

9  A.  I did not compile such a list.

10  Q.  Would you consider the document that you're looking at on

11  the screen relevant to the work you did in this case?

12  A.  Yes.

13  Q.  And if it had been provided to you and you looked at it and

14  you saw what you're looking at now, would you have listed it on

15  your materials relied upon?

16  A.  If I relied upon it, I would have listed it.

17  Q.  I'm not sure you answered my question.  Let me try one more

18  time.

19      If you had been provided with the document that we're

20  looking at and you saw the page that's on the screen, would you

21  have relied upon it in forming your opinions in this case?

22          THE COURT:  That's a slightly different question than

23  what you were getting at.

24          MR. SOMMER:  Well, you have the screen.  I don't

25  have --

1          THE COURT:  Are you asking him whether, if he would

2     have received it, he would have put it on his relied-upon

3     documents?

4          MR. SOMMER:  I'll try one more time.

5          THE COURT:  Okay.

6     BY MR. SOMMER:

7     Q.  If you had received it and looked at it, would this have

8     been a document that you would have then listed as something

9     you relied on?

10    A.  Kind of a confusing question.  Say that again, one more

11    time.

12    Q.  Last try.  Then I'm going to throw in the towel.

13         I know you -- back up.

14         You don't remember whether you saw this or not, correct?

15    A.  Yes.

16    Q.  I'm trying to go a little beyond that and see if we can

17    reach common ground.

18         If you had seen this page that we're looking at that has

19    this funnel and has these ad formats at places different than

20    your opinion, would you have relied on this document in

21    rethinking your opinions?

22    A.  I would potentially have relied on it.  And I don't think

23    it necessarily would have changed my opinion.

24    Q.  That's fine.  I didn't ask if it would have changed it.

25    A.  So, I just want to say that in my report, I already cite

1    that certain kinds of display ads, like retargeted display ads,

2    which includes retargeted social ads, they can work at the

3    bottom of the funnel.  So I would have tried to dig deeper into

4    this to see what kind of display ads are they talking about.

5    So maybe at this time they're only talking about for the bottom

6    of the funnel, retargeted display and retargeted social, but

7    just listing it as display and social, which would be

8    consistent with what's in my report already.

9         So looking at this wouldn't necessarily make me

10   rethink my opinion.  And, in fact, I would just dig deeper,

11   that:  Okay, what kind of display ads are you using?

12        And I think, once again here, maybe I can offer some

13   statistics.

14   Q.  Sir, I'm going to interrupt you.  And I hate to do it, but

15   I really want to get us out of here at a reasonable time.  So

16   they'll have an opportunity to ask you more questions.

17        Let me ask you one last question, because you said this

18   is not inconsistent with your opinions.

19        Your opinion is that display and social is best suited

20   for awareness, correct?  Yes or no.

21   A.  It is.  But that is not my complete opinion about display

22   ads.

23   Q.  I think we have the record on that.

24        One aside, quickly.

25        In connection with your work in this case, one thing I

1    also noticed on your materials relied upon is that you did not

2    have discussions, any telephone calls or meetings with any

3    advertisers; isn't that true?

4    A.  For my relied-upon?

5    Q.  Yes.

6    A.  Yes, that's true.

7    Q.  Let's turn next to DX700.  This is Company B in the Rosetta

8    Stone.  And, again, please don't say the name, and just look up

9    when you're at DX700.

10   A.  Is it in the first binder?  No.  It's in current binder?

11            MR. SOMMER:  May I?

12            THE COURT:  Should be in the same binder.

13   A.  Okay.  Yeah, I see it.

14   BY MR. SOMMER:

15   Q.  All right.  Are you there, sir?

16   A.  I'm there.

17   Q.  And you see the name of the company?

18   A.  I do.

19   Q.  Okay.  Can you turn to page .013?

20        Now, let's put that up on the screen.

21        Now, for this type of company, the conversion is

22   represented as a quote.  Do you see that?

23   A.  Yes.

24   Q.  Okay.  And what this shows, if you agree with me, is the

25   various paths that a consumer can take to get to the

1    conversion, or the quote, correct?

2    A.  Let me just take a look.

3    Q.  I can't hear you.

4    A.  Let me just take a look, I said.

5    Q.  Of course.

6    A.  Yes.

7    Q.  Now, look at the bottom consumer on the left, the little

8    image all the way at the bottom.  That guy that I just

9    highlighted on the screen.

10        Do you see that his journey is on social, directly to

11   quote?  Do you see that?

12   A.  Yes.

13   Q.  So, that would be social being used as a lower funnel,

14   correct?

15   A.  Not necessarily.

16   Q.  Okay.  Let's take a look at the top person.  That person

17   got to quote stage through search.  Do you see that?

18   A.  Yeah.

19   Q.  And is that lower funnel?

20   A.  Potentially.

21   Q.  Potentially.  Okay.

22        And to the extent the bottom person, through social,

23   results in a conversion, that is lower-funnel activity,

24   correct?

25   A.  So, it does not -- so, if I clicked on something and I

1    bought, that doesn't mean that that necessarily acted in a

2    lower-funnel manner.  It might have, it might not have.  It

3    depends on how you got there, right?  So if you got there, you

4    were already in the mid-funnel, and then the ad worked.  Then

5    it's -- so it is the person, right?  The user is in some stage

6    of the funnel, and then you show the ad.  So the social could

7    have been in lower funnel, yes.  Or it could have done the

8    awareness job and then, you know, I found out about golf shorts

9    and then I talked to my golfing friends and they said, Oh,

10   yeah, these are great golf shorts.

11           That's how you went to lower tunnel, and then you

12   purchased.

13   Q.  Okay.  I think I understand.

14           Let's go to DX3058 in the same binder.  There is another

15   company that produced documents in this case.

16           Are you with me?

17   A.  Yeah.

18   Q.  Please turn to page 003.

19   A.  I'm there.

20   Q.  Okay.  Now, here, in this company's perspective, it has

21   social listed as -- at the top left, first time, as middle

22   consideration.  Do you see that?

23   A.  I do.

24   Q.  And you understand that consideration, in your terminology,

25   that's mid-funnel, correct?

```
 1    A.  Yes.
 2    Q.  Okay.  And then do you see, lower down, social is, again,
 3    listed by this company as lower, which is conversion.  That's
 4    low funnel, correct?
 5    A.  Yes.
 6    Q.  So at least from the page we're looking at, from this
 7    particular company's production, from this page, social is
 8    listed as both mid- and lower-funnel, correct?
 9    A.  On this page, yes.
10    Q.  Okay.  And your opinion was that social was mid- and upper-
11    funnel, correct?
12    A.  Yes.
13    Q.  Now, do you see -- by the way --
14            THE COURT:  Sorry.
15    BY MR. SOMMER:
16    Q.  -- do you recognize this one?  Were you shown this
17    document?
18    A.  I'm not sure.
19    Q.  Okay.  I'll represent to you it's not listed on your list
20    of materials relied upon.  Had you seen this document and seen
21    that it expresses a view, at least in part, different from
22    yours, would you have considered it?
23    A.  I'm not sure this view is very different from mine.  If
24    it's retargeted social they're talking about, I already
25    mentioned that in my report.  Retargeted display works in the
```

1    lower funnel.  Retargeted social would be retargeted display.

2    So, no, it would not change my opinion.  And I would list it,

3    if I had seen it and relied on it.

4    Q.  Let me draw your attention to something called display RT.

5    Do you see that.  Display RT.  Do you know that "RT" refers to

6    retargeting?  That's not a big stretch, is it?

7    A.  Probably does.

8    Q.  Okay.  And so there actually is an entry here for

9    retargeting as opposed to social, correct?

10   A.  Yeah.

11   Q.  Okay.  Do you see, also toward the top, we have at

12   middle -- for consideration, middle funnel is nonbrand search,

13   and brand search shopping?  Do you see that?

14   A.  Yes.

15   Q.  Those are listed as mid-funnel, correct?

16   A.  Yes.

17   Q.  Okay.  In fairness, we also see brand search text as lower.

18   Do you see that?

19   A.  Yes.

20   Q.  Okay.  So, at least this document makes a distinction

21   between nonbrand search, which is mid-funnel, and brand search,

22   which is low funnel, correct?

23   A.  Say that again.

24   Q.  This document, at least, makes a distinction between

25   nonbrand search, which is mid-funnel, and brand search, which,

```
1      I guess, is both mid- and lower-funnel, right?

2   A.  Yeah.

3   Q.  Okay.  Let's go to the next one, DX710 in your binder.

4      It's Company E, page 6 -- 006.  Now, let me orient you to this

5      document.

6          If you look at the very top, it says:  Upper funnel

7      phases.  Then to the right of that:  Lower funnel phases.

8          Do you see that?

9   A.  Yes.

10  Q.  So do you see under upper funnel, we have display next to

11     paid media channels?

12  A.  Yes.

13  Q.  Okay.  And do you see we also have social in upper funnel?

14  A.  Yes.

15  Q.  If you look to the right, we see that both display and

16     social are lower funnel as well, right?

17  A.  Yes.

18  Q.  Now, your opinion was that display and social are most

19     suited for upper funnel, correct?

20  A.  Yes.

21  Q.  Okay.  Now, do you remember whether you saw this document?

22  A.  No, I don't.

23  Q.  Let's go to Company F, which is DX3059.

24          Oh, my colleague just reminded me of one thing I forgot

25     to ask you.  I hate to do this.
```

1           Can you just go back to DX710 for a moment?

2    A.  Yep.

3    Q.  I'm really sorry.

4           If you go to page 12 of that document, you see it has an

5    image on the left of upper funnel?

6    A.  Just one second.

7    Q.  Page 012.  You can see it on the screen.

8    A.  Okay.  I'll just follow the screen, I guess.  I'm there.

9    Q.  Take your time.  I don't want to rush you.

10   A.  I'm there and I can see it on the screen.

11   Q.  On the document we looked at just a moment ago, it had two

12   columns, upper funnel and lower funnel, correct?

13   A.  Yes.

14   Q.  But now we're seeing, on page 12, an actual funnel-shaped

15   thing, right?

16   A.  Yes.

17   Q.  And you see there's upper funnel listed here.  And then, if

18   we go to page 022, we see the bottom is the lower funnel.  Do

19   you see that?

20   A.  Yes.

21   Q.  So this is actually a two-level funnel that we're now

22   seeing for the first time, correct?

23   A.  Yeah.  Upper and lower, yeah.

24   Q.  Okay.  Great.  All right.  Now let's move on to Company F,

25   which is DX3059.

```
 1    A.  I'm there.

 2    Q.  Are you there?

 3    A.  Yep.

 4    Q.  You saw what company it was, right?

 5    A.  Yeah, I did.

 6    Q.  Please take a look at page 019.  And this company on this

 7    page also identifies levels of the funnel on the left side,

 8    correct?

 9    A.  Yes.

10    Q.  Okay.  And under top of funnel, do you see they list

11    social?

12    A.  Yes.

13    Q.  Do you see under middle of funnel, they list social?

14    A.  Yes.

15    Q.  Do you see at bottom of funnel, they list social?

16    A.  Yes.

17    Q.  By the way, do you see that in the middle of the funnel,

18    they list display?

19    A.  Yes.

20    Q.  Okay.  Okay.  That's a good spot for it.  I was actually

21    looking on the left.

22         Let's stay on the left side of -- on middle funnel,

23    programming, mobile display.  Okay.

24         And do you see bottom funnel they list display?

25    A.  Yes.
```

1    Q.  So at least according to this page, this particular company

2    viewed social as suited for all three levels of the funnel that

3    they have depicted, correct?

4    A.  They've depicted that.

5    Q.  And they had display listed as suited for mid- and low-

6    funnel, correct?

7    A.  Yes.  It might be retargeting display.  Programmatic often

8    means that, actually.

9    Q.  Okay.  Thank you.

10        Let me show you next what's in evidence as DX660.

11   A.  Is that in the front of the binder?

12   Q.  No.  This is going to come up on the screen.  I think it is

13   in your binder, but it's going to come up on the screen.  Okay.

14   Everybody here, except for you, has seen this before.

15        Do we have that or do I need -- okay.  Good.  It's

16   coming.

17        Can we go to page --

18            MR. SOMMER:  This is -- just for the record, this is

19   a JPMorgan Chase document.

20            Can we go to page 14?

21   BY MR. SOMMER:

22   Q.  Do you see, on -- under media channels, that display is

23   depicted as upper?

24        Excuse me.  That's a bad question.

25        Do you see, it's in the -- of the three stacked boxes,

1    it's at the top box?

2    A.  Yes.

3    Q.  And do you see display in the middle box?

4    A.  Yes.

5    Q.  And do you see display in the bottom box?

6    A.  Yes.

7    Q.  And do you see social in all three of the same boxes?

8    A.  Yes.

9    Q.  By the way, do you remember looking at this document from

10   JPMorgan Chase when you were doing your work?

11   A.  No.

12   Q.  Had you looked at it, would you have considered it, at

13   least?

14   A.  Yes.

15   Q.  Let's go to Company G.  That's a DX3207.  Tell me when

16   you're there.

17   A.  I'm there.

18   Q.  Okay.  Turn, please, to page .026.  We see an iteration of

19   the funnel, correct?

20   A.  Yeah.

21   Q.  Okay.  And this document, you see at the top:  Digital

22   Strategic Approach, Primary Focus on Acquisition Prospects.

23        Do you see that?

24   A.  Yes.

25   Q.  And toward the top of the funnel we have social -- well,

 1    let me back up further.

 2         Look at the first bullet point:  Online video and

 3    mid-funnel tactics raise awareness and extend media reach

 4    beyond broadcast, establish benchmarks for new media platforms,

 5    social, custom content.

 6         Do you see that?

 7    A.  Yes.

 8    Q.  And then bottom funnel tactics is display banners, right?

 9    A.  Yes.

10    Q.  Now, display banners, you told us, was upper funnel,

11    correct?

12    A.  Yes.

13    Q.  But at least this company, in this particular document, has

14    display banners as lower funnel, at conversion, correct?

15         MS. MADDOX:  Objection, Your Honor.  Again, speaking

16    to the document as a whole, when it's an over 50-, 60-page

17    document for a company.  Just request that the question be

18    limited to this particular page.

19         MR. SOMMER:  I thought I specifically said, "This

20    document."  But I'll rephrase the question to make sure I did.

21    BY MR. SOMMER:

22    Q.  The document you're looking at from this particular

23    company, they, according to this document, the screen you're

24    looking at, they have display banners at conversion, not at

25    awareness, correct?

 1   A.  They don't have "awareness" written anywhere -- oh, yeah,

 2   they do have display banners at conversion.

 3   Q.  I'll rephrase my question.

 4        They have display banner at lower funnel, not upper

 5   funnel, correct?

 6   A.  Yes.

 7   Q.  And that is at odds with your opinion, correct?

 8   A.  This particular example, yes, it is.

 9   Q.  Do you recall whether you saw this document?

10   A.  No.  Also, my opinion is about most suited and effective.

11   I do say in my report that companies use and can use different

12   kinds of ads at different levels of the funnel.  But where is

13   it most used and where is it most suited and effective as a

14   matter of an offer you look at?  Again, sort of in the

15   industry, I'm talking about most suited and effective.

16   Q.  Just so the record is clear, sir, on this particular

17   document, the only place display appears -- banner display, is

18   bottom funnel, correct?

19   A.  Looks like that, yes.

20   Q.  Okay.  Thank you.

21        I don't remember if I asked this question.  Do you

22   remember whether you reviewed this one?

23   A.  I don't remember.

24   Q.  Had you reviewed it, would you have considered it in

25   forming your opinions in this case?

1    A.  Yes.

2    Q.  Take that down, please.

3         Can we agree, sir, that when it comes to display ads,

4    including social ads, that actual advertisers believe that such

5    ads can be used for each of awareness, consideration, and

6    conversion?  Can we agree on that?

7    A.  I already say that in my report, that they can be used at

8    different levels of the funnel, but they're most suited and

9    effective and -- for display ads.  They would be most suited

10   and effective for brand awareness and brand positioning types

11   of upper-funnel activities.

12   Q.  Okay.  And we just looked at some documents that had social

13   and display depicted as lower funnel; correct?

14   A.  Yes.

15   Q.  Therefore, to the extent advertisers perceive of display

16   and social as being lower funnel, they then have to make

17   decisions about how to allocate their advertising budget among

18   the various ad formats that are lower funnel, correct?

19   A.  They would do that, yeah.

20   Q.  Thank you.

21        All right.  Let's turn next to search ads.  We're moving

22   past social and display.  We're moving to search.

23        In your slide deck, sir, you had a couple of slides that

24   referred to a Google employee by the name of Hal Varian.  Do

25   you remember that?

```
 1    A.  Yes.

 2    Q.  Do you remember the date of the quote or the document that

 3    you were referring to in those slides?

 4    A.  I don't remember all the dates.

 5    Q.  Do you remember it was, like, 2008 time period?

 6    A.  Yes, I do remember.

 7    Q.  And I take it we can agree that the digital marketing

 8    industry has changed materially since 2008, correct?

 9            MS. MADDOX:  Objection, Your Honor.  Just to the

10    extent, as he stated, there were multiple documents with

11    Mr. Varian on them that were cited in Dr. Jerath's slide deck,

12    so I just want some clarity of which specific document you're

13    referring to.

14            MR. SOMMER:  The witness remembers a 2008 document

15    relating to Hal Varian.

16    BY MR. SOMMER:

17    Q.  Right?

18    A.  Yeah, I do remember.

19    Q.  With that one in mind, would you agree with me, sir, that

20    the digital advertising industry has changed dramatically since

21    2008 to today?

22    A.  So, there have been more channels that have come up, but I

23    don't think the fundamentals have changed.

24    Q.  Okay.  All right.

25            Now, would you agree, Dr. Jerath, that search ads can
```

1    perform the purpose of awareness, upper funnel?

2    A.  In some cases, they can.

3    Q.  But your position is that search ads are best suited for

4    lower- and mid-funnel, correct?

5    A.  Yes, most suited and effective.

6    Q.  Okay.  Let's take a look at DX3077.

7        Do you remember being shown this article at your

8    deposition?  You might recognize, if you turn to page 007,

9    there's a funnel.  Do you remember this one?

10   A.  Yes, I do remember.

11   Q.  Okay.

12        MS. MADDOX:  Mr. Sommer, just one moment.  We had to

13   pull out a separate binder.

14        MR. SOMMER:  Sorry.  We'll wait.

15        (Pause.)

16        THE COURT:  This is in a non-company binder?  This is

17   in your original binder?

18        MR. SOMMER:  Yeah, this is the original binder.  This

19   is not confidential.  Thank you.

20        Sorry for the --

21        MS. MADDOX:  Keeping us on our toes.

22        MR. SOMMER:  Okay.  Everyone good?

23        MS. MADDOX:  Um-hum.

24   BY MR. SOMMER:

25   Q.  By the way, this is an article written by an author named

1    Brooks, and you do identify this in your report as something

2    you relied upon, right?

3    A.  I do recall that, yes.

4    Q.  And this shows --

5        If we go to page 007, can we blow up the funnel a little

6    bit?

7        This shows search as upper funnel, very -- all the way

8    at the top on the right side.  Okay.  It's also on the right,

9    organic and paid.  That's where I'm really focusing.

10       This shows paid search upper funnel, correct?

11   A.  So, they have -- seem to have conflated two levels,

12   exposure and discovery.  But this person has dropped them into

13   upper funnel and has put it there.  Discovery, I would think of

14   it as maybe a little below exposure --

15   Q.  Sir, can you move the microphone a little closer?  I'm

16   having trouble hearing.

17   A.  Yeah, I'm saying that in here, the top title

18   Exposure/Discovery.  And so exposure, I would think of

19   definitely as something like awareness.  Discovery is a little

20   bit more than that.  Like, you're trying to find out more about

21   the product, potentially.  So they have conflated that and put

22   it there.  So it looks like it might be upper funnel.  It could

23   also be kind of mid-funnel.

24   Q.  Sir, do you remember -- I'm sorry.  Were you done?

25   A.  I'm saying that if they are saying that search is more for

1    discovery, then I would put it a little bit below the top.

2    Q.  Do you remember being shown this at your deposition and

3    agreeing with us that paid search was depicted at top of

4    funnel?  Do you remember that?

5    A.  It is in the top stage here.

6    Q.  Okay.  Thank you.

7         And do you also recall telling us that this author did

8    not agree with how you placed paid search in lower funnel?  Do

9    you remember that?

10   A.  At a general level, yes.

11   Q.  Let me show you what's in evidence as DXD10.012.

12        Let's put that up on the screen, please.

13        Just for orientation, you remember this from

14   Mr. Lowcock's testimony, right?

15   A.  I do not.

16   Q.  You do not.

17        Were you listening to Mr. Lowcock's testimony on the day

18   it was given?

19   A.  No.  I read a transcript.

20   Q.  Okay.  That's fine.

21        And I guess the exhibits aren't in the transcript, so in

22   fairness to you, you wouldn't have seen this.  But I will

23   represent to you this was an exhibit that was introduced in

24   evidence at Mr. Lowcock's examination.  And for Google Search,

25   Bing search, YouTube search, Amazon search -- let me stop there

1    for a moment -- according to you, those would all be search

2    ads, correct?  Because they're search, right?

3              MS. MADDOX:  Your Honor, at this time, just want to

4    make it clear for the record that the particular item that

5    we're looking at, 410.007, says:  Modified after.

6              I believe this is the version that Counsel created in

7    realtime during that testimony.  So I just wanted to make sure

8    that was clear, that it wasn't something strictly --

9              THE COURT:  Fine.

10             MS. MADDOX:  Okay.

11             MR. SOMMER:  Says "modified" in the lower left, and

12   that was the document I offered in evidence.  Let me rewind the

13   tape.

14   BY MR. SOMMER:

15   Q.  Do you see the platforms listed with search?

16   A.  I do.

17   Q.  Okay.  So those would all be -- ads that came in response

18   to that would all be search ads, correct?

19   A.  Yeah.

20   Q.  Do you see, according to this exhibit, that for all those

21   search platforms, they play the roles -- each of the roles of

22   awareness, consideration, and purchase?  Do you see that?

23   A.  I see that.

24   Q.  Take that down.

25             All right.  We're going to now go back to the advertiser

```
 1    binder because we're going to look at what some advertisers
 2    think about search.
 3           So in the advertiser binder, if you could find DX3057.
 4    A.  I'm there.
 5    Q.  And turn please to page 020.
 6           Okay.  This is Company A, again, that we already looked
 7    at once.  And, again, please don't mention the name.
 8    A.  Yeah.
 9    Q.  You see at the top it says:  TV and search are the primary
10    channels to drive awareness and consideration.
11           Do you see that?
12    A.  Yes.
13    Q.  And just to make sure we're clear on the terminology,
14    awareness is upper funnel, correct?
15    A.  Yes.
16    Q.  And consideration is mid-funnel, correct?
17    A.  Yes.
18    Q.  So according to this page, this particular company, as
19    reflected on this page, is identifying search as mid- and upper
20    funnel, correct?
21    A.  Based on this page, it's putting them in both of those.
22    Q.  And, in fact, if you look at the column called Awareness
23    Channel Performance, the second highest one is search, right?
24    A.  Yes.
25    Q.  And if you look at the -- to the right, consideration
```

 1    channel performance -- that would be midlevel -- the highest

 2    one is search, correct?

 3    A.  Yes.

 4    Q.  And do you remember whether you looked at this document?

 5    A.  I don't remember.

 6    Q.  Okay.  I will represent to you it's not listed on your

 7    materials relied upon.

 8         Let's go to Company H, which is at DX412.

 9    A.  Is it in this binder?

10    Q.  Same binder, yep.  That's the one, DX412.  They really

11    should be in numerical order, so probably closer to the front,

12    I would guess.

13              MR. SOMMER:  Your Honor, may I assist the witness?

14              THE COURT:  It's the first tab.

15              THE WITNESS:  It's the first one?

16              MR. SOMMER:  Thank you, Judge.

17    A.  Okay.  Yeah, I'm there.  Thank you.

18    BY MR. SOMMER:

19    Q.  What I would ask you to do, sir, is turn to page 015.

20         And for brand -- do you see the word "brand" at the very

21    top?

22    A.  Yes.

23    Q.  Okay.  And it's talking about driving awareness and

24    excitement.  Do you see that?

25    A.  Yes.

1    Q.  And do you see, under Priority Channels, it lists search,

2    in addition to display and social, for driving awareness.  Do

3    you see that?

4    A.  Yes.

5    Q.  Do you recall whether you saw this document in doing your

6    work on this case?

7    A.  No.

8    Q.  I'll represent to you it's not on your list of materials

9    relied upon.  Do you accept that?

10   A.  I do.

11   Q.  Thank you.

12         And by the way, just so we have a complete record,

13   driving awareness is upper funnel, according to you, right?

14   A.  Yes.

15   Q.  Let's look, again, at Company F, which is DX3060, at

16   page 003.

17         And do you see, at the top, it's discussing:  Value of

18   nonbrand search.

19         Do you see that?

20   A.  I do.

21   Q.  And then below that:  Performance versus other awareness

22   channels.

23         Do you see that?

24   A.  Yes.

25   Q.  And then it has a list of awareness channels.  Do you see

1    that?

2    A.  Yes.

3    Q.  And one of them is NB search, which is nonbrand search,

4    correct?

5    A.  It is.

6    Q.  So that, according to this page from this company, has

7    nonbranded search as upper funnel, correct?

8    A.  Yes.

9    Q.  Do you recall whether you reviewed this document?

10   A.  I don't.

11   Q.  I will represent to you it's not on your materials relied

12   upon.

13        Let's go to company I, DX3054.  3054.  And we're looking

14   at page 2.

15        Okay.  Now, at the top of the document there's a

16   definition of paid search.  Do you see that?

17        I'm not going to take you through it.  I'm just trying

18   to orient you on the document.  Do you see that?

19   A.  Yes.

20   Q.  And then next, under Why to Participate, it says:  Search

21   is the number one way consumers find information while

22   shopping, and it facilitates consumers' buying process

23   throughout the funnel, driving awareness, consideration, and

24   close.

25        Do you see that?

```
 1    A.   Yes.

 2    Q.   And "close," in this context, would be conversion, correct?

 3    A.   Looks like that.

 4    Q.   Okay.  And, so, this particular company, at least from this

 5    page that we're looking at, identifies search as driving

 6    awareness, correct?

 7    A.   That's one of the things it's doing, yeah.

 8    Q.   Okay.  Okay.  By the way, do you recall reviewing this

 9    document?

10    A.   No.

11    Q.   I will represent to you it's not on your materials relied

12    upon lists.

13         Let's go to DX3055, at page 016.  Let me know when

14    you're there.

15         Are you there?

16    A.   I'm there.

17    Q.   I'm going to put it up on the screen because this one is a

18    little hard to read.  The first -- I mean, we -- no?  It's not

19    working?  Okay.

20         Since we can't read it, we'll keep going.  I think

21    that's enough, anyway.

22         Sir, if my memory is right, during your direct

23    examination you identified one advertiser that agreed with your

24    mapping of where each of these ad formats go; is my memory

25    correct?
```

1   A.  I think it was an ad agency, maybe.  I don't remember

2   exactly.

3   Q.  Ad agency.

4   A.  And also Google itself.

5   Q.  Can you -- you have not identified a single actual

6   advertiser that agrees with your mapping, have you?

7   A.  I'm not sure that I would say that.

8   Q.  Okay.  Can we agree, sir, from the documents that we just

9   looked at, that when it comes to search ads, that there are

10  advertisers who believe that search ads can be used for each of

11  awareness, consideration, and conversion?

12  A.  We agree.  And I say as much in my report, and I

13  followed-up with my full opinion of where is it most suited and

14  effective.

15  Q.  And can we agree that from the documents we just looked at,

16  some advertisers are of the view that search ads are most

17  effective at awareness?  Can we agree on that?

18          MS. MADDOX:  Objection, Your Honor.  The very similar

19  point.  We looked at discrete pages within longer

20  presentations, and now it's being attributed to those

21  companies' entire view of advertising.

22          MR. SOMMER:  Okay.  Point taken.

23  BY MR. SOMMER:

24  Q.  Dr. Jerath, to the extent advertisers perceive search ads

25  as being at the same level of the funnel as social and display,

1    would you agree with me that those advertisers need to make

2    decisions about how to allocate their spending budget among

3    those various formats at each level?

4    A.  It would depend on how effective they think each of these

5    is.  Something that is more effective they would put more money

6    on, and something that's less effective they would put less

7    money on for the same goal.

8    Q.  So, in other words, they would allocate their money based

9    on the format in a particular level of the funnel that they

10   thought would give them the best bang for their buck, true?

11   A.  Generally speaking, yes.

12   Q.  Thank you.

13   A.  And just what I was saying was that --

14   Q.  Sir, there's no question pending right now.  Just hold the

15   thought.

16        Before I finish on the purchase funnel, I want to go off

17   on a quick tangent, because you just brought me there.

18        Would you agree, Dr. Jerath, that advertisers seek to

19   optimize their advertising spend?

20   A.  Yes.

21   Q.  And by "optimization," that means trying to get the best

22   possible metrics for your investment, correct?

23   A.  Best possible, yes.  I mean, it depends on the objective

24   function, so if the metric is aligned with that, yes.

25   Q.  And another way of describing optimization is to get the

1    best possible outcome with the least possible investment.

2            Do you remember giving us that definition at your

3    deposition?

4    A.  Yes, that's one way of looking at it.

5    Q.  Okay.  Now, can we agree that advertisers seek to optimize

6    their ad budgets across all ad formats?  Can we agree on that?

7    A.  Depending on the goal.

8    Q.  Generally.  Can we agree on that?

9    A.  As I said, they have goals.  They want to figure out, okay,

10   this campaign has this particular goal, which ad formats will

11   help me achieve that goal in general?

12           And then it will optimize within those as formats.

13   Q.  Can we agree, Dr. Jerath, that the principle factors that

14   advertisers look at to asses their ad spend across those

15   various channels is ROI, return on investments?

16   A.  I think the principle factor would be the goals.  And then

17   within the channels that meet those goals ROI is an important

18   contributor.  But, one of the contributors.

19   Q.  Well, can you think -- in your opinion, sir, is there

20   anything more important than ROI to an advertiser?

21   A.  So in my direct testimony, I had shown an example of an

22   apparel manufacturer that had, actually, different ROI that was

23   targeting different ROI numbers for different channels and for

24   different goals.  So, I think the goal take precedence, and

25   then the ROI is a useful metric that they use.

1    Q.  Do you remember saying in your direct testimony that:  It's

2    very, very hard for advertisers to calculate their ROI?

3          Do you remember that testimony?

4    A.  Yes.

5    Q.  Let me --

6    A.  I'm not sure I used two "verys," but I did say it's hard.

7    Q.  Very.  Very good point.

8          Let's take a look at DX187.  It's not in the -- it's --

9    you know what, you can --

10          MR. SOMMER:  May I approach?  I'm going to take the

11    third-party binder away from Dr. Jerath because we're done with

12    that one.

13    A.  Is it in this one?

14    BY MR. SOMMER:

15    Q.  It is.  DX187.

16    A.  187?

17    Q.  187.

18    A.  Could it be towards the front?

19    Q.  I'm sorry, sir.  I didn't hear you.

20    A.  I said, would it be towards the front?

21          THE COURT:  I think it's the first tab.

22          THE WITNESS:  Okay.  Thank you.

23    BY MR. SOMMER:

24    Q.  All right.  Now, I will tell you that you didn't list this

25    one either, this exhibit either.  But let me tell you what it

1    is -- oops.

2    A.  Sorry about that.

3    Q.  Quite all right.  I'll take this one away because you're

4    not going to need this one either anymore.

5        Let me tell you what it is.  This is a Google study done

6    in 2020.  I take it you have no recollection of seeing this

7    document, correct?

8    A.  No.  I'm not sure.

9    Q.  Let's turn to page .013.

10   A.  Just give me one second, please.

11           (Pause.)

12   Q.  Okay.  Do you see, on page -- let's put up --

13           MR. SOMMER:  By the way, I offer 187 into evidence,

14   Your Honor.

15           MS. MADDOX:  Your Honor, I think we'll need just one

16   moment.  I believe this contains a survey information in it,

17   which would be considered hearsay, but -- well, embedded

18   hearsay.  But we'll take just a moment, if that's all right.

19           MR. SOMMER:  This is -- okay.  If you look at it,

20   Your Honor, it's clearly a business record of Google.

21           MS. MADDOX:  The survey -- to the extent it contains

22   survey results, that would be --

23           MR. SOMMER:  I don't think I'm going to be going into

24   what someone else said.

25           THE COURT:  I'm not sure survey results are hearsay.

1    So, I'll admit it, and let's see what examination comes up.

2    BY MR. SOMMER:

3    Q.  Please turn to page 013.

4    A.  I'm there.

5    Q.  Do you see where it says:  Almost three-quarters of

6    participants say they evaluate ROI for search when assessing

7    performance?

8         Do you see that?

9    A.  I do.

10         MR. SOMMER:  I'm told this is already in evidence.

11   Thank you.

12   BY MR. SOMMER:

13   Q.  Okay.  And I want to ask you to turn to page .067 of the

14   same document.

15         Do you see in the upper left --

16         Let's blow that up.

17         -- do you see where it says:  Return on investment on

18   search advertising is the top factor affecting short-term

19   spend?

20   A.  I do.

21   Q.  And can we go to page 070.  Blow that one up.

22         Do you see where it says:  Return on investment is the

23   most prominent factor affecting long-term search spend?

24         Do you see that?

25   A.  I do.

1    Q.  And finally, let's go to page .054.

2         Do you see where it says:  ROI is evaluated by

3    participants, mostly on a weekly and monthly basis; however,

4    some evaluate as often as once a day or more?

5         Do you see that?

6    A.  Yes.

7    Q.  Okay.  Now, sir, this was from 2020, in terms of that --

8    those conclusions by Google.

9         Just give me one second.

10        And I take it, sir, in connection with your testimony,

11   that it's very difficult for advertisers to calculate their

12   ROI.

13        Can we agree that there is not a single advertiser that

14   you have spoken to in connection with this case that has told

15   you that?

16   A.  In connection with this case?  No.

17   Q.  And we can also agree that you conducted no analysis or

18   study of your own to see if your hypothesis of how difficult

19   calculating ROI is, or is not?  Can we agree on that also?

20   A.  Not in the context of this case.

21   Q.  Thank you.

22        Now, I know you told me that you were listening to

23   Tracy-Ann Lim's testimony, but there may have been some parts

24   you didn't hear.

25        Did you hear this part?  This is at page 4875 of the

1    transcript.

2        Question:  "Now, your job as an ad buyer, do you ever

3    talk about the return on investment that you receive from

4    search text ads?"

5        Answer:  "We obsess about return on investment."

6            Did you hear that testimony?

7    A.  I believe so.  Not 100 percent sure, but I believe.

8    Q.  Were you here yesterday, when Mr. Dijk from booking.com

9    testified?  Were you here in court, by any chance?

10   A.  Only for a short part of it.

11   Q.  Okay.  Do you remember hearing the following from Mr. Dijk:

12       Question:  "The way" -- I'm sorry.  This is at page

13   5340.

14       "The way booking determines its ad spend is driven by

15   the key thing, which is ROI, correct?"

16       Answer:  "Yes."

17       Question:  "And would you agree, in your experience,

18   even beyond booking.com, for marketers making decisions about

19   where to invest their advertising dollars, return on investment

20   is the key thing?  Do you agree with that?"

21       Answer:  "Yes."

22       And then skipping down to line 21.

23       "In 2020, was it your view that booking would manage its

24   budget to very strict ROIs?"

25       Answer:  "Yes."

1          Question:  "And would you agree that that was something

2     Booking was obsessed about?"

3          Answer:  "I probably would have said that, yeah."

4          Did you hear that testimony yesterday when you were

5     here?

6     A.  No.

7          THE COURT:  Mr. Sommer, how much longer do you think

8     you have?

9          MR. SOMMER:  Probably ten minutes.

10         THE COURT:  Okay.

11         MR. SOMMER:  I'll try to speed along.

12         Let's put up on the screen what's in evidence as

13    DX411.  And let's go to 494 and highlight Key Principles.

14    BY MR. SOMMER:

15    Q.  And, sir, just to orient you, this was a document produced

16    by IPG.  I believe that's the agency you noted in your direct

17    examination, correct?

18    A.  That's right.

19    Q.  Okay.  And does this document look familiar to you?  You

20    can flip through it.  Take a moment.

21    A.  I'm not sure.  I saw a lot of documents.

22    Q.  Okay.  Do you recall whether you listed this one on your

23    materials relied upon?

24    A.  Are you asking me a question?  Sorry.

25    Q.  Do you know if this is on your materials relied upon?

1    A.  I don't know.

2    Q.  Okay.  Do you see where it says Key Principles, the first

3    sentence says:  The key to effective and performance-driven

4    optimization is ensuring that all campaigns are delivering the

5    highest volume of traffic, sales, leads within the agreed KPIs,

6    CPC, CPA, ROI?

7        Do you see that?

8    A.  I do.

9    Q.  And let's go to the second paragraph.  Let's highlight that

10   whole paragraph:

11       "If the performance measured is across multiple channels

12   and the client has a fluid approach to budget allocation, we

13   may recommend reallocating the budget to the channel that has

14   higher headroom within the agreed KPIs.  For example, if paid

15   social is performing well within the target ROI, but paid

16   search is not achieving the ROI, we may recommend moving the

17   budget to ensure we spend in the next most efficient channel."

18       Let me stop reading there.

19       Do you see that?

20   A.  I do.

21   Q.  And nothing about that surprises you, does it?

22   A.  In fact, my example to the Judge earlier today aligns with

23   that.

24   Q.  Okay.

25   A.  So it is about interpreting that shift in spend also.  And

 1     I give an example of how that might actually mean the channels

 2     are complimentary, not necessarily interchangeable.

 3     Q.  I'm not going to quibble with you on that.

 4          But the example here is moving spend from paid search to

 5     paid social based on ROI, correct?

 6     A.  This is a statement, not an example.  But, yeah.  Okay.

 7     Yeah, you can call it an example.  It says, "For example."

 8     Q.  It does say, "For example."

 9          Okay.  Let's take that down.

10          I take it, Dr. Jerath, that you are familiar with the

11     fact that all major ad agencies have created or purchased ad

12     spend optimization engines, correct?

13     A.  Our general level, from what I understand from your

14     statement, yes, they have optimization software that they use.

15     Q.  Okay.  And can we agree, to the extent you know -- and if

16     you don't know, just tell us -- that these software

17     optimization devices, algorithms will shift ad spend between

18     different ad formats in order to optimize performance?  Can we

19     agree on that?

20     A.  They would.

21     Q.  Okay.  And let me show you DX3004, which is in evidence.

22     This is another IPG document, sir.  And let's go to page 451.

23     And let's go down to the bottom:  Optimization engine.  What is

24     it?

25     A.  Which page?  Sorry.

1    Q.  Yes.  Page 008.  I think I forgot to say that.  Let's look

2    at the first bullet point under Optimization Engine, which

3    says:  Optimization engine is a realtime budget and performance

4    optimizer for the brands's in-flight campaigns.

5         Do you see that?

6    A.  I do.

7    Q.  By "in flight," that means the campaign is ongoing, right?

8    A.  That's right.

9    Q.  And so -- oops.  Just lost our image.  There we go.  Thank

10   you.

11        And this describes -- I'm not going to read the whole

12   thing to you.  This describes how the optimization engine

13   works; fair to say?

14   A.  This part that's highlighted here?

15   Q.  Yeah.

16   A.  I'm sorry.  I can't --

17             MR. SOMMER:  Must be time for me to wrap up.

18             THE COURT:  It's a good signal.

19   A.  Can we have it bigger, please, for me to read?

20   BY MR. SOMMER:

21   Q.  Let me draw your attention to the portion on the right, on

22   the bottom, the second bullet point.  Do you see where it says:

23   Recommends budget shifts away from underperforming tactics and

24   channels to outperforming channels and tactics to increase

25   white paper downloads?

5640

1         Do you see that?

2    A.  Yes.

3    Q.  That's the same thing we were talking about before, the

4    example of shifting ad spend from paid search to paid social,

5    correct?

6    A.  Something similar.

7    Q.  Okay.  Now, are you familiar -- I take it you're aware that

8    there are companies that offer this software for optimization

9    of ad spend, correct?

10   A.  There are companies, yes.

11   Q.  Let me just show you a few of them.  DX3199.

12        That's a company called Grid.  Do you see that?

13   A.  On the top left?

14   Q.  Grid Dynamics?

15   A.  Yes, I see it.

16   Q.  Let's go to the next page of the exhibit.

17        Do you see there on page 006, there's a section on

18   marketing spend optimization?

19   A.  I see that title.

20   Q.  And it says:  Use advanced statistical models to optimally

21   allocate budgets across marketing channels and measure the true

22   contribution of each channel or campaign.

23        Do you see that?

24   A.  Yes.

25   Q.  And, again, this is the same thing, about shifting ad spend

1    from one format to another to try to optimize results, correct?

2    A.  Well, it's talking about marketing channels.  Doesn't have

3    to be different formats, necessarily.  It could be display ads

4    on Facebook and Google, for example.

5    Q.  Or it could be ad formats?

6    A.  It is possible, yeah.

7    Q.  Let's look at the next one, DX3197, from a company called

8    Nexoya.

9          Have you heard of Nexoya?

10   A.  No.

11   Q.  Let me just show you what they offer.

12         Can we go to the appropriate page?

13         They have -- on page 006, sir, do you see where it says:

14   Automated portfolio management.  Unlock efficiency with

15   AI-driven portfolio management, optimizing your cross-channel

16   budget allocation effortlessly.

17         Do you see that?

18   A.  Yes, I see that.

19   Q.  Let's do the last one, DX3198.

20         Have you heard of a company called ChannelMix?

21   A.  ChannelMix, no.

22   Q.  Okay.  Is that the first page?  Yeah.  Page 006.  Can we

23   blow that up?  Because I can't read it.

24         Maximize your ROI and take the guesswork out of media

25   planning with ChannelMix's revolutionary AI-powered marketing

1    recommendation engine.

2         Do you see that?

3    A.  I see that.  But what I see right before that, "Attribution

4    is the wrong path," doesn't lend a lot of confidence for me for

5    this company.

6    Q.  Okay.  Let's go below that.

7         What is ChannelMix AI?  The first-of-its-kind modeling

8    engine, ChannelMix AI provides automated, channel-specific,

9    realtime recommendations about how and where to spend marketing

10   dollars.

11        Do you see that?

12   A.  Yes.  It's talking in a really general, saying, this much

13   to spend on this channel.  Channel specific.

14   Q.  Okay.  Let's just make clear we know what channels are

15   here.  Go to the next paragraph.

16        Maximize ROI with specific scenarios that detail how to

17   allocate budget to a combination of marketing channels, such as

18   display, paid search, social media, radio, TV, and print, with

19   a predicted level of accuracy.

20        Do you see that?

21   A.  I see that.

22   Q.  So "channels" is referring to add formats, right?

23   A.  It is referring to different ad formats.

24   Q.  Thank you.

25        Last topic, sir.

1        You testified about the difference between text ads and

2    shopping ads.  Both are search ads, but you were distinguishing

3    between within search ads, text ads are different -- have

4    differences, right?

5    A.  Yes.

6    Q.  Okay.  And, for example, you said they have different

7    appearances, there's different information, there are different

8    auctions, correct?

9    A.  I didn't mention the auctions part.  I did mention --

10   Q.  There are different auctions.  You know --

11   A.  There are different auctions.  That's another difference,

12   yes.

13   Q.  And did you do any empirical study or analysis of your own

14   on substitution or interchangeability between these two ad

15   formats?

16   A.  No.

17   Q.  Did you review any study of anyone else in the course of

18   your work on this case on substitution between these particular

19   ad formats?

20   A.  No.

21   Q.  Did you read any academic articles that discuss that issue?

22   A.  I don't believe so.

23   Q.  Okay.  And no scholarly books either, right?

24   A.  No.

25   Q.  What you did, instead, if I understand your work in this

 1    area, is you reviewed depositions of Jerry Dischler, Ryan

 2    Booth, Josh Lowcock, Adam Juda, who all testified in this case;

 3    correct?

 4    A.  I did.  And I also group on my own experience in this.

 5    Q.  Okay.  Thank you.

 6         But we can agree you looked at no empirical data, right?

 7    A.  That's right.

 8    Q.  I'm going to show you a little empirical data quickly.

 9    Let's put up, first, what I've marked as DXD14.039.

10         Now, Company M -- since we're not identifying

11    companies -- this shows over time spent at Google on text and

12    shopping ads.

13         Are you oriented?  Do you follow?

14    A.  Yes, I do.

15    Q.  Okay.  And if we look in 2017, what we can see is a shift

16    of 11 percent to 2023 --

17              MS. MADDOX:  If I may interrupt for a moment.  Can we

18    just have a little bit of background about what this is?  Our

19    copy doesn't even identify the company or the source of any of

20    this data.

21              MR. SOMMER:  You don't have the unredacted version?

22              MS. MADDOX:  No, I do not.

23              MR. SOMMER:  Okay.  I'll show you for now and I'll

24    get you one.

25              MS. MADDOX:  Also, can you identify the source of

1      this data?

2              MR. SOMMER:  Yes.  The data comes from Google.  It's

3      Google ad spend.  It comes from Google.

4              THE COURT:  I guess the question is:  Is this

5      something that was created for litigation or is this an actual

6      business record for Google --

7              MR. SOMMER:  Created for litigation from underlying

8      business records.

9              THE COURT:  Okay.  So it's a summary exhibit, is your

10     point.

11             MR. SOMMER:  Yeah.  And by the way, the companies are

12     all identified in the Rosetta Stone in the front of your

13     binder.

14             MS. MADDOX:  All right.  And was the underlying data

15     produced during discovery?

16             MR. SOMMER:  There were requests for text and ad

17     spent, which were produced, and there were no requests for any

18     specific customer data.

19             MS. MADDOX:  We're not sure what that means.

20             Also, some of this data is from 2022 and '23, which

21     would have been after the cutoff as well.  So, just have some

22     significant concerns about the basis for this particular

23     demonstrative.

24             THE COURT:  I think the question is -- well, let me

25     put it this way:  I don't know that this witness can,

```
 1   obviously, attest to --
 2             MR. SOMMER:  I can address this with a different
 3   witness, Your Honor.
 4             THE COURT:  Let's do that, especially if there's a
 5   witness that can attest to how this was created, the data the
 6   witness used and relied upon.
 7             MR. SOMMER:  We have a witness coming with whom I can
 8   do that.
 9             All right.  Last thing, then.
10             THE COURT:  We're now 15 minutes into your 10, so I
11   do need you to wrap up.
12             MR. SOMMER:  Let me see if I can skip the rest, then.
13   Oh, yes.  Last thing.
14   BY MR. SOMMER:
15   Q.  Remember when we were going through your articles and
16   books, there were none that -- in the last five years that
17   addressed these ad formats in connection with the funnel?  And
18   I said there was one, the Kagan book?  Do you remember that
19   happened?
20             Let's put up on the screen DXD14.019.
21             THE COURT:  Can you tell me, again, what year this
22   book is from?
23             MR. SOMMER:  Well, in his materials considered it's
24   called Second Addition 2021, but, actually, the Second Edition
25   is 2022.
```

1          THE COURT:  Okay.

2          MR. SOMMER:  Let's put up DXD14.019.

3    BY MR. SOMMER:

4    Q.  And on page 134 of this book, there is a paragraph followed

5    by a funnel.  And the paragraph preceding Figure 7.3 says:  For

6    marketers this means regardless of the specific choice of

7    social media or channel, more and more potential customers are

8    sharing information and joining communities of like-minded

9    interests.  This presents an unprecedented opportunity to find

10   and reach potential customers.  Social media, in a sense, has

11   changed the traditional marketing funnel.

12          Do you see that?

13   A.  I read that.

14   Q.  Okay.  So according to Jeremy Kagan, the author of the

15   book, the funnel isn't as timeless as you seem to think,

16   correct?

17   A.  He seems to think that.

18   Q.  Do you see how he also has search at the top, by awareness?

19   Do you see that?

20   A.  Yes, I see that.

21   Q.  Last thing I'm going to show you, sir.

22          Are you familiar with a company by the name a Tinuiti?

23   A.  Yes, I am.

24   Q.  You know that they're the largest independent performance

25   marketing firm in the United States?  Is that consistent with

```
1    your understanding?

2    A.  I mean, I know that they do performance marketing, which is

3    lower-funnel marketing.

4    Q.  Let me show you a slide of their home page on the internet,

5    DX3073.

6             THE COURT:  Spell the name of the company.

7             MR. SOMMER:  T-I-N-U-I-T-I.

8             Can we blow up what it says under Rethink

9    Performance?

10   BY MR. SOMMER:

11   Q.  It says:  The funnel has collapsed.  Brand and performance

12   have become one.  All of it digital, all of it measurable, all

13   of it performance.

14             Do you see that?

15   A.  I see that.

16   Q.  Now, when you made your list of materials relied upon, you

17   also had some online articles and blogs that you listed, correct?

18   A.  Yes.

19   Q.  And how did you go about finding those?  Just doing a

20   Google Search?

21   A.  Partly.

22   Q.  Okay.  And I want to show you --

23             MR. SOMMER:  Last thing, Judge, I promise.

24   BY MR. SOMMER:

25   Q.  -- headlines of some of the articles that we found when we
```

```
 1    did that search.
 2          Let's just put that last slide up.
 3    A.  Sorry.  What search did you do?
 4    Q.  I'll tell you exactly what we did.  We searched:  Is the
 5    purchase funnel still relevant in today's digital advertising?
 6          These are some of the headlines and articles we got:
 7    The marketing funnel is dead.  Game over.  The marketing funnel
 8    is dead.  The marketing funnel is obsolete.  In today's digital
 9    world, the sales funnel is dead.
10          Let me stop there.
11          Did you run across any of these when you did your search
12    for relevant articles on this topic?
13    A.  Sometimes I see them.  I don't believe most of it.
14    Q.  You didn't list any of these in your materials relied upon
15    or cite any of these in any of your three reports, did you?
16    A.  No, I don't think I did cite any of these particular ones.
17              MR. SOMMER:  Thank you, Judge, for your patience.
18              THE COURT:  Okay.  Let us take our afternoon break.
19    It's 3:15.  We'll resume -- we'll resume just about 3:30.  See
20    everyone shortly.  Thank you.
21          (Recess at 3:16 to 3:31.)
22              THE COURT:  All right.
23              MR. SOMMER:  Judge, just very briefly.  I conferred
24    with government counsel.  The following exhibits are being
25    offered, subject to the government reviewing them tonight to
```

 1    make sure there are no issues.  Just quickly read them on the

 2    record.

 3               412, 660, 700, 710, 3054, 3057, 3058, 3059, 3060,

 4    3073, 3077, 3197, 3198, 3199.

 5               I will add, Your Honor, that the third-party

 6    documents that I'm offering are subject to us getting

 7    certifications, but I'll certainly discuss any issues with

 8    government counsel.

 9               MS. MADDOX:  Yes, Your Honor.

10               And for the record of those, as Counsel mentioned, we

11    will review.  And I think some related issues may be addressed

12    in the argument that's about to happen after this -- after

13    Professor Jerath is done.

14               I will note that four of those documents that were

15    offered, DX3073, DX3197, DX3198, and DX3199, those were the

16    printouts from third-party websites.  We would -- I can say

17    now, we would challenge those on authentication grounds.  But,

18    again, we can take that up as part of the larger issue.

19               THE COURT:  Okay.

20                         REDIRECT EXAMINATION

21    BY MS. MADDOX:

22    Q.  Professor Jerath, I would like to go back and ask you

23    questions about several things that was discussed during

24    questioning by Mr. Sommer.

25               First, do you recall being asked about seeing --

1    if you'd seen any search query reports?

2    A.  Yes.

3    Q.  And I know you mentioned you reviewed a number of documents

4    in this case.  Do you recall whether any of those documents

5    discussed search query reports?

6    A.  Yes.

7    Q.  Okay.

8            MS. MADDOX:  Your Honor, I would like to hand the

9    witness an exhibit -- I have copies for the Court -- of a

10   document that was cited in Professor Jerath's slide deck.  May

11   I approach?

12           Gave away my own copy.

13           THE COURTROOM DEPUTY:  Do you have one more?

14           MS. MADDOX:  Do we have one more copy?  You know

15   what, you can use this.  I can do it from memory.  Sorry about

16   that.

17   BY MS. MADDOX:

18   Q.  Professor Jerath, I've just handed you a copy of UPX526,

19   which was cited in your presentation at UPXD103, and I would

20   like for you to turn to in UPX526, the page ending in 534, that

21   Bates number at the bottom.

22           And actually, I'll say one thing before you do that --

23   well, go ahead to 534.

24           And I'll note that, for the record, there's certain

25   pieces of this document that are redacted, so I'll ask you not

1    to read from the page ending in 534.

2        But can you tell us whether this document relates to

3    search query reports?

4    A.  Yes, it relates to search query reports.

5    Q.  And can you please turn to the page ending in 538 in

6    UPX526?

7    A.  Yes, I'm there.

8    Q.  And there's a -- looks like a graphic depiction at the

9    bottom of that slide.  Does that reflect a search query report?

10   A.  Yes, it does.

11   Q.  Thank you.  You can set that aside.

12        MS. MADDOX:  And, Your Honor, UPX526 is already in

13   evidence.

14        THE COURT:  Okay.

15   BY MS. MADDOX:

16   Q.  Professor Jareth, do you recall being asked about the

17   testimony of Ms. Lim earlier this week?

18   A.  Yes.

19   Q.  Do you recall being asked questions about whether, when she

20   discussed the 20 percent loss in the search query reports, if

21   that was 20 percent of keywords or 20 percent of spend?

22   A.  I remember that 20 percent of spend.

23   Q.  All right.  Regardless of whether it was 20 percent of

24   keywords or 20 percent of spend, does your opinion change one

25   way or the other?

```
 1    A.  No, it doesn't.

 2    Q.  I would like to turn to a document that defendants gave

 3    you, DXD3078.  And this is one of your articles.

 4    A.  Should I open it here?

 5    Q.  Yes, please.

 6              THE COURT:  Can I get the number again, please?

 7              MS. MADDOX:  Yes.  DX3078.  And I apologize.  I think

 8    I said "DXD."  I meant DX.

 9    BY MS. MADDOX:

10    Q.  Professor Jerath, can you please turn to page 51?

11    A.  Yes, I am there.

12    Q.  Now, actually, before we get further into this document, I

13    want to back up and ask you a question.

14         Do you recall being -- in response to some questions,

15    you referred to cookies?

16    A.  Yes.

17    Q.  Can you explain briefly what cookies are?

18    A.  Cookies are -- you can think of it as a marker or a piece

19    of software -- a little piece of software that is put on a

20    consumer's computer or -- yeah, basically computer, to -- and

21    then, you know, that helps track the consumer as they are

22    browsing the internet.

23    Q.  And how are cookies used in the advertising context?

24    A.  Cookies are used to track consumers and build profiles

25    of -- build a history of their activity.  And based on the
```

1    history of activity, you can build profiles of consumers.  And

2    based on that, you can know what the consumer -- that's a

3    signal, like we've been talking about.  So that's how cookies

4    are used.

5    Q.  Are you familiar with the term cookie deprecation?

6    A.  Yes.

7    Q.  And very briefly, what does cookie deprecation refer to?

8    A.  So cookie deprecation refers to the fact that already it

9    has started, and going forward, the whole system, the internet

10   and advertisers and everything, they want to and they will be

11   relying less and less on cookies because consumers don't like,

12   generally, to be tracked like that and their profiles being

13   built.  There's a lot of regulation around this cookie

14   deprecation.

15   Q.  And last point on this:  To what extent, in your opinion,

16   do you expect cookie deprecation to have an impact on search

17   advertising?

18   A.  Very little, especially in contrast with other kinds of

19   advertising, because, as I said, the cookie builds a history.

20   History leads to the signal.  The signal is used in display

21   advertising to infer your interest and so forth.  And search

22   advertising, what am I interested in?  I just tell the search

23   engine using my query.  So, the relative value of any

24   historical data is much less in search, and it is much more in

25   display.

1    Q.  Now, turning back to DX3078, which was one of your -- one

2    of your papers, correct?

3    A.  Yes.

4    Q.  And page 51, Section 8.1, the title there:  What can be

5    expected with weaker ad targeting and measurement.

6        Is that right?

7    A.  Yes, that's the section.

8    Q.  Then, if we turn to the next page, page 52, can you read

9    the sentence that's in the middle of the paragraph?  It starts

10   with the world "Third."

11   A.  Yeah.

12       Third, the share of ad spend on ad formats that do

13   not necessarily require user profiling, for example, contextual

14   advertising and paid search advertising, can be expected to

15   increase.

16   Q.  And what does that sentence mean?

17   A.  So what that sentence means is that -- and I'm just

18   pointing out -- that certain channels, which includes paid

19   search advertising, they do not require user profiling to be

20   effective, something that I just mentioned.  And to the extent

21   that we expect that display ads will become less effective

22   because the signal you're getting from consumers' data is

23   worse, advertisers, you know, at least in relative terms, will

24   rely more on channels where the signal is not affected, which

25   would be paid search.

```
 1    Q.  Professor Jerath, turning to another point.

 2         Can search ads on a general search engine reach

 3    consumers in the lowest part of the funnel?

 4    A.  Search ads that are a general search engine?

 5    Q.  Yes.

 6    A.  Yes.

 7    Q.  And you were asked several questions about whether your

 8    opinions were supported by any empirical analysis.  Do you

 9    recall that?

10    A.  Yes.

11    Q.  And you also said at the time, that you had wanted to add

12    to that, but you didn't have a chance to at that time.  I would

13    like to give you a chance to do that now.

14         Is there something you would add to your previous

15    testimony about whether your opinions are supported by any

16    empirical analysis?

17    A.  In my opinions -- and I've been doing work and research and

18    teaching and work in this industry -- as an academic, of

19    course -- for a long time and I've come across scores of

20    empirical analysis.  I did not do analysis in the context of

21    this particular case, but my experience informs me.

22    Q.  You were also asked -- Mr. Sommer gave you an example of

23    his golf shorts purchase after being on Instagram.  Do you

24    recall that?

25    A.  I do.
```

1    Q.  And I believe you described that as a "magical display ad."

2         And in your answer you said you wanted to expand on

3    that, but you didn't have an opportunity to.  Would you like to

4    do so now?

5    A.  Yep.  Sure.  I think I have a few points in mind.  So call

6    it a magical display ad because the way Mr. Sommer was talking

7    about it, as if he just saw the ad and immediately went to

8    purchase, that could happen in the very rare and magical case,

9    as I said, but that's certainly not how things happen.

10        In fact, in my testimony -- direct testimony, I said

11   that display ads of that nature, the click-through rates on

12   those range from 1 in 1,000 to 1 in 10,000.  So even if you

13   take the upper end of that, that's 1,000 display ads, and one

14   of them gets clicked.  And that doesn't even mean that somebody

15   actually buys after clicking.  It's, like, multiplied by

16   10 percent more.

17        So that's why I said that, you know, this is not a

18   very representative example.  So I think that is one of the

19   main points that one must keep in mind, to not read too much

20   into that example.

21        And the other thing is that purchasing off social

22   media platforms, that comes under the umbrella of social

23   commerce.  And I also teach a course on retailing, and in that

24   we discuss social commerce at this time.  So when I'm saying

25   "at this time," in 2022, social commerce -- sales through

1    social commerce were about less than 100 million, about 90

2    billion -- sorry.  Not million.  Excuse me -- 90 billion in the

3    U.S. last year, and the total sales in the U.S. are about

4    5 trillion.

5            So this is less than 2 percent of the whole retail

6    market, so we should not inform our thinking using such a, sort

7    of, misrepresentative example, I would say.

8    Q.  I would like to switch gears a little bit, again, and jump

9    to -- if you could take a look at DX187.

10           THE COURT:  I'm sorry.  Do you have a number, whether

11   a revenue or percentage number, for U.S. sales through search

12   ads?

13           THE WITNESS:  Sales through search ads?  I don't have

14   a number off the top of my head, but I know that search ads are

15   about 40 percent of digital ads -- digital ad spend.

16           THE COURT:  Digital ad spend, as opposed to --

17   because I thought the numbers you were giving was a spend by

18   consumers, not spend by advertising.

19           THE WITNESS:  Yes.  So I remember the social

20   advertising number.  I don't remember exactly the search ad --

21   spend through search ads.  But, one can think of the

22   click-through rate.  The click-through rate on search ads is

23   about 2 percent to 4 percent.  So as I said in the morning, two

24   orders of magnitude higher than click-through display ads.  One

25   could do some back-of-the-envelope calculation to impute

```
 1    something, but I don't have the number off the top of my head
 2    right now.
 3              THE COURT:  The 2 percent number you're talking
 4    about, that is the amount of actual commerce that has been
 5    estimated to move through social media sites?
 6              THE WITNESS:  Yes.  That's called social commerce.
 7    BY MS. MADDOX:
 8    Q.  Professor Jerath, can you please take out -- or, open the
 9    binder to DX187?
10    A.  That being the beginning of this binder?
11    Q.  I think so.  I think it's the first one.
12    A.  Okay.  All right.  Yeah.
13    Q.  Can you please turn to page 46 of DX187?
14              And if I may, for defense counsel with the trial
15    director, if I could -- if you would be able to assist, please,
16    in putting up DX187, page 46.
17              And, Professor Jerath, do you recall being asked various
18    questions about advertisers' use of ROI?
19    A.  Yes.
20    Q.  And you had noted in your direct testimony, as I recall,
21    that advertise -- measuring ROI can be challenging, right?
22    A.  Yes.
23    Q.  Can you please read for us -- since I see it's not on the
24    screens, can you please read for us the text to the left of the
25    chart on page 46 of DX187?
```

```
 1    A.  It says:  Difficulties with tracking data for ROI, as well
 2    as being able to attribute performance to a sale, is the top
 3    reason participants do not evaluate ROI.
 4    Q.  And is that consistent with your opinions in this case?
 5    A.  Yes.  And I'll just add that I do think advertisers should
 6    calculate ROI.  I've written a teaching case on ROI.  I'm not
 7    anti-ROI in any way.  I'm very pro-ROI.  But the challenges are
 8    the challenges, and that is -- it is a real difficulty that
 9    advertisers face, especially when they want to calculate
10    incremental ROI.
11    Q.  And finally, Professor Jerath, Mr. Sommer showed you a
12    number of documents from third parties discussing the
13    advertising funnel.  Do you recall?
14    A.  Yes.
15    Q.  And all of those companies in those -- all those third
16    parties, they use the funnel in some way for digital
17    advertising.  Am I understanding the documents correctly?
18    A.  Yes, all those documents had the funnel in there.
19    Q.  Does that support your opinion that the consumer purchase
20    funnel is still relevant today?
21    A.  Yes, absolutely it supports it.  And in the morning, also I
22    had said some people call it outdated, but even those people
23    talk in the language of the funnel.  And certainly from an
24    academic point of view, there's a lot of research around the
25    funnel.  Like, I think I might have mentioned this yesterday.
```

```
 1    I forget if it was yesterday or today.  But even last week I
 2    came across a publication in a top academic journal which was
 3    looking at the congruence between funnel concepts and modern
 4    purchasing by consumers.
 5    Q.  And did any of the exhibits that defense counsel showed
 6    you, did they change your opinion at all?
 7    A.  No, they did not.
 8              MS. MADDOX:  One moment, Your Honor.
 9              No further questions.  Thank you very much for your
10    time Professor Jerath.
11              THE WITNESS:  Thank you.
12              THE COURT:  Could I request that Professor Jerath
13    identify the article that he was just referring to, the one
14    that he saw recently?
15              MS. MADDOX:  Yes.
16              THE COURT:  So that we all know what he's talking
17    about and can take a look at it.
18              MS. MADDOX:  Yes, certainly.
19              THE COURT:  Thank you.
20              All right.  Professor Jerath, thank you very much for
21    your time and your testimony, and safe travels home.  Thank
22    you, sir.
23              THE WITNESS:  Thank you very much, Your Honor.
24              THE COURT:  All right, everyone.  Okay.  So what is
25    it that we need to discuss in our remaining time this
```

```
 1    afternoon.
 2             MR. SCHMIDTLEIN:  Your Honor, before we get to the
 3    exciting -- the really exciting part, just two quick issues.
 4    One, I think, as you know, Professor Whinston is coming to
 5    testify on Monday.  I had mentioned to you previously that we
 6    had a Daubert motion directed at a portion of his testimony
 7    from the first half.  They actually did offer opinions relating
 8    to those aspects, so those are off the table.
 9             There are other aspects of our Daubert motion that
10    are directed to what I anticipate is going to be testimony
11    they're going to try to elicit from him next week relating to
12    scale.  He offers opinions about scale, about privacy, about
13    latency, which we say he is not qualified for.  So, I just
14    wanted to give you a heads-up on that.
15             The second issue is one that -- if I heard correctly
16    from Professor Jerath, I thought I heard him make reference to
17    the fact that he was watching testimony, if I got that right.
18    He was viewing testimony from the trial by video.
19             Just a clarification from Your Honor.  I'd understood
20    that the video feed was only supposed to go to counsel, and not
21    other people.  But, if -- I guess I just want some
22    clarification on that, because that was contrary -- you know,
23    we were limiting the feed, I think, appropriately, and I just
24    wanted to get some clarification on that.
25             MR. DAHLQUIST:  Your Honor, David Dahlquist on behalf
```

5663

1      of the United States.  I can clarify.

2              Professor Jerath was at our office.  Counsel was

3      viewing video in a conference room that Professor Jareth was

4      in.  He viewed it with counsel.  He was simply prepping with us

5      yesterday, Your Honor.

6              THE COURT:  You mean he was watching the testimony

7      while he was with counsel?

8              MR. DAHLQUIST:  Correct, Your Honor.  There was

9      counsel in the room at all times.  Counsel had his appearance

10     on file in this case.

11             THE COURT:  Well, I will say that, you know, when we

12     contemplated this, I didn't -- look, I mean, when it comes to

13     experts, I don't think specifically we talked about it, and

14     what I cannot recall is whether we talked about experts being

15     present for the testimony of other experts and other witnesses,

16     for example.

17             MR. SCHMIDTLEIN:  If he was in the courtroom, I would

18     have no problem with it.  This just really goes to the feed

19     security issue.  And as long as the feed is not going out to

20     his -- you know, his office at his university, I have less

21     concerns about that.

22             THE COURT:  Okay.  It sounds like he was at the

23     Department of Justice, and so that ought to --

24             MR. DAHLQUIST:  The feed never left the Department of

25     Justice, Your Honor.

 1                    MR. SCHMIDTLEIN:  Okay.  That's fine.  Thank you,

 2      Your Honor.

 3                    THE COURT:  All right.  Terrific.

 4                    MR. DAHLQUIST:  Your Honor, with respect to Professor

 5      Jerath, we forgot to do one housekeeping matter.

 6                    MS. MADDOX:  Yes.  Apologies, Your Honor.

 7                    I mentioned at the beginning we would like to move to

 8      admit Professor Jerath's slide deck, UPXD103, to complete his

 9      testimony.

10                    MR. SMITH:  No objection, Your Honor.

11                    THE COURT:  So we'll admit the slide deck.

12                    MR. SCHMIDTLEIN:  To be clear, it's a demonstrative.

13      It's not for the truth.  Obviously, his opinions are what they

14      are.

15                    THE COURT:  I understand.  I understand the limited

16      focus for which it's being admitted, which is it reflects his

17      opinions.  And to the extent that there are underlying

18      documents in there and are referenced in there, it ensures that

19      they are in evidence.

20                    MR. SOMMER:  Two quick things from me, Your Honor.

21                    First, we corrected some of the demonstratives from

22      Mr. Dijk's testimony yesterday which we provided Counsel.  I

23      don't know how many of these you're keeping, but I'll hand it

24      to JC and you have it.

25                    The final thing is, that last exhibit that created

1    some furor that I used, I apparently misunderstood some

2    protocol, so I think that's on me.  But, I think right now we

3    do not -- I said I would try to do it with another witness.  No

4    longer the plan.  And if it's going to be -- if I even

5    contemplate using it, I'll certainly confer with plaintiffs'

6    counsel in advance.

7          THE COURT:  My only point is that if it is a summary

8    exhibit, and it's one that hasn't been stipulated to and one

9    the witness can't testify to, you know, there's a better way to

10   get it.

11         MR. SOMMER:  I think the concern was more about what

12   had been produced and not been produced and what the date was.

13   So, I now have a better understanding of that.

14         MR. DAHLQUIST:  Your Honor, just so that it's in

15   proximity in time on the record, we just received the -- I'll

16   call it a corrected version of Mr. Dijk's slide deck.  They

17   changed it.  And so I don't think it should supplement -- or,

18   it should not replace what's already in there.  It could be

19   submitted as a changed, or modified.  We'll discuss it and

20   resolve it, but --

21         THE COURT:  Okay.  Well, I guess -- I don't know what

22   the changes are, and you all can decide whether that's -- any

23   changes are material or not and just let me know.

24         MR. DAHLQUIST:  We believe they may be.  So, thank

25   you.

```
 1              THE COURT:  Okay.  All right.  Okay.  What's next?
 2              MR. GOWER:  Hello, Your Honor.  Cameron Gower for the
 3    United States.  We have two matters that I raised on Tuesday
 4    about deposition designations for witnesses in the
 5    United State's case-in-chief, and exhibits, and I have updates
 6    for that -- for you on that, if now is a good time.
 7              THE COURT:  As good a time as any.
 8              MR. GOWER:  All right.  So with regard to deposition
 9    designations, we have 21 transcripts with the -- highlighting
10    three colors.  We have --
11              THE COURT:  I'm sorry.  Highlighting -- you say three
12    colors or --
13              MR. GOWER:  Three colors, one for each side.
14              THE COURT:  I see.  Okay.
15              MR. GOWER:  U.S. plaintiffs, Colorado plaintiffs,
16    Google.  That's on the transcripts.  We have objections as well
17    for those.  There are two of those transcripts that are
18    provisional because it's possible those witnesses will testify.
19    If they do, we withdraw those two provisional transcripts.
20              And, on Tuesday, I had mentioned that we would be
21    able to give you video, which we will, but we were unable to do
22    that by today.  So we'll have to follow-up with that later, if
23    that's okay with Your Honor.
24              THE COURT:  That's fine.  I can leave the record open
25    if it's simply to add video to the transcript.
```

 1          MR. GOWER:  Yes.  So, here, I have a flash drive

 2   transcript with the transcripts and the objections.

 3          THE COURT:  When you say "the objections," do you

 4   mean -- help me understand what you mean.  Are there global

 5   objections in the case of particular witnesses, or are we

 6   talking about just the way -- you know, everything from that to

 7   the way a question -- format of a question in a deposition?

 8          MR. GOWER:  I think it's about the way the questions

 9   were asked in the depositions, and it's the back and forth

10   between the parties over whether the questions are acceptable.

11          THE COURT:  Okay.  So in other words, to the extent

12   there's a designation, the objection is reflected in the

13   designation, and these aren't -- the objections are not

14   independent of what you're handing me?

15          MR. GOWER:  Correct.  They're part of the transcript.

16   And to the extent you find --

17          THE COURT:  I just wanted to make sure I understood

18   that.  Okay.

19          MR. GOWER:  Okay.  Exhibits.  So, we have been

20   working on getting a group of exhibits that we could move into

21   evidence.  And you asked us to work with Google about this, and

22   we have.  And I'm happy to report to you that we've made some

23   progress.  We took about 100 documents off the exhibits that we

24   were trying to move in.  These are things like AFAs and ACCs

25   and third-party regulatory filings that we've removed.

1          On the other hand, Google has agreed to accept some

2     of the documents that we would like to move in.  There are 42

3     where Google does not oppose our motion to admit these

4     documents, and an additional 15 where Google has an embedded

5     hearsay objection that we've agreed the document could come in

6     subject to that embedded hearsay objection.

7          So I have a list of those 42, plus 15 exhibits that I

8     could hand to Your Honor, if --

9          THE COURT:  Counsel?

10          MR. GREENBLUM:  Ben Greenblum from Williams &

11     Connolly for Google.  My apologies.

12          We have had an exchange with the other side about

13     these -- them withdrawing some and us withdrawing our

14     objections to some.  We asked for an updated list of, sort of,

15     what they saw as now being moved in, and we didn't -- we

16     weren't -- we didn't receive that before now.  So, I'm sure

17     that Counsel's representations on the numbers are accurate.  We

18     would just ask for a chance to review what's going to be

19     submitted to the Court.  We can do that after it's submitted to

20     the Court.

21          THE COURT:  Okay.

22          MR. GREENBLUM:  And then let you know if there's a

23     problem.

24          THE COURT:  Go ahead.

25          MR. GOWER:  I have copies of the exhibit numbers.  I

1    have copies I can give to you and Google, and they can let us

2    know if we have made any mistakes.  They should be all agreed

3    upon.  And it's separated out, the 42 where there's no

4    objection, and the 15 where there is.

5                THE COURT:  Why don't we just make sure Mr. Douyon

6    has it, so it's reflected in the final exhibit list.

7                MR. GOWER:  Yes, Your Honor.

8                One moment.

9                I believe that takes care of the agreed-upon matters.

10               And then now we have several disagreed-upon matters.

11   And we've done our best to put them into categories that we

12   think Your Honor could process today, with a little bit of

13   time.  And we'd appreciate the opportunity to be able to go

14   through those, if you will.

15               THE COURT:  Okay.  Go ahead.

16               MR. GOWER:  So the first is that we would like -- the

17   first are Google documents where foundation is the only

18   objection, and we believe that this is an improper basis to

19   keep a document outside of the record.  There are 68 of these

20   documents.  Your Honor has admitted many exhibits from both

21   sides without a sponsoring witness.  And to the extent Google's

22   foundation objection is based on personal knowledge, that does

23   not apply to documents.  It applies to testimony.

24               So for those, we would ask Your Honor to overrule

25   Google's objections and admit the 68 documents where foundation

1       is the only objection.  And these are Google documents.

2                MR. GREENBLUM:  Your Honor, this goes to the issue I

3       mentioned earlier.  We asked for a list of which they were

4       going to be presenting to the Court, and so I don't know which

5       68 documents Mr. Gower is referring to.  That's the first

6       problem.

7                As a general matter, and I -- I think the problem is

8       going to be that we would need to get into specifics, so I

9       don't know that, as a general matter, it is going to be

10      satisfying to you.  But we do have concerns that these are, in

11      large part, documents that were either never used with a

12      witness in any one of more than 100 depositions or at trial, or

13      where they were used with a witness, perhaps in a manner that

14      is not consistent in the manner in which they're now going to

15      be used.

16               So, we had conferral about this.  We offered further

17      conferral.  We asked to know exactly which documents that they

18      are representing are in this category.  And I don't have that

19      list as I stand here.  So, those are our concerns.

20               THE COURT:  Okay.

21               Go ahead, Counsel.

22               MR. GOWER:  The 68 are all outstanding exhibits where

23      foundation is the only objection.  It's not a particular

24      subset.  It's just all where foundation is the only -- all

25      Google documents where foundation is the only objection.

1          THE COURT:  Okay.  So without, obviously, ruling on

2     any specific documents, I think what I can tell you is my

3     view -- that you all should be aware of by now -- which is that

4     it does not, A, sound like there's any authenticity objection

5     since it's coming from Google; B, assuming they are subject to

6     a business record certification, it would be admissible.  And

7     to the extent that there's a concern that a speaker within the

8     business record doesn't have the appropriate foundation or

9     knowledge, that does not make it a business record.  It still

10    can come in as a business record, and ultimately just goes to

11    the weight of the document and the evidence itself.

12          And, so, that's my general view.  Otherwise, I'm not

13    quite sure what else falls into the foundation objection

14    category.  And maybe I'm misunderstanding the nature of the

15    documents.

16          MR. GOWER:  Google has been raising hearsay

17    objections separate.  This is just a foundation objection,

18    which we don't really believe is a proper objection at all, and

19    it's separate from their hearsay objections.  So these are

20    documents that are just a hearsay objection.

21          THE COURT:  No.  I got that.  And, so, I'm just

22    trying to understand what else the foundation could be, if not

23    authenticity or hearsay.

24          MR. GREENBLUM:  It's not authenticity and it's not

25    hearsay, Your Honor.  It's that they're taking snippets from

1    documents that we don't believe the purpose of those documents

2    was the purpose for which they're now representing.  They

3    haven't asked a witness about them, or they did and the witness

4    did not agree to the manner in which they're using them.

5           So, I understood Your Honor's comments about if they

6    didn't use them at trial, they would have only so much

7    significance, in any event.  But those are our concerns, simply

8    that.

9           MR. GOWER:  And we understand that Your Honor also

10   wants to see the documents that we find most persuasive, and

11   we're doing our best to get those documents in front of you,

12   but we believe the other documents that supplement -- go ahead.

13          THE COURT:  So I ask two things:  One is, if the

14   government wishes -- the government -- the plaintiffs wish to

15   admit a document that, at least, you know, within the bounds of

16   the Rules of Evidence is admissible, as it sounds like these

17   are, if there is testimony accompanying those documents that

18   Google or the plaintiffs wish to put into evidence, fine, have

19   at it.  I would rather have the document with some testimony

20   explaining the document, at the end of the day, than just the

21   document itself.  That's one.

22          Two, if Google, for example, believes that an exhibit

23   is incomplete, out of context, whatever the case may be, you

24   know, you do have an opportunity under the rule of

25   completeness -- although that's usually reserved for testimony,

1    but I think it's equally equitable to documents, at least in

2    this context, at least, I would apply it that way -- you have

3    the opportunity to include whatever else part of an exhibit --

4    part of a document or some other document that you think might

5    put that document in a different light.

6          MR. GOWER:  And, Your Honor, I believe they also have

7    incompleteness objections.  And at this point, I was just

8    focusing on the 68 where there is no -- where foundation is the

9    only objection.

10         THE COURT:  Understood.  So I think I've -- unless

11   there's something more than what we've just talked about in

12   terms of the shortcomings -- or, the perceived shortcomings of

13   these records, then it seems like they can either be -- they've

14   been addressed or can be supplemented in a way to resolve any

15   concerns that Google may have.

16         MR. GREENBLUM:  Understood.  If we could review the

17   list of 68 and let you know if there is anything that falls

18   outside of those categories.  But we understand the Court's

19   guidance.

20         THE COURT:  All right.  So I can defer on formally

21   admitting them, have a look, and we'll make sure that every I

22   is dotted and every T is crossed in terms of those records.

23         MR. GOWER:  Thank you, Your Honor.

24         So the next group are third-party documents where

25   foundation is the only objection.  And we believe this is the

1    same.  Wanted to keep them separate so there would be no

2    confusion about what we're talking about.  But, we think the

3    same rules should apply here.

4        And for context, Your Honor, we're now only talking

5    about eight documents.

6        THE COURT:  Okay.

7        MR. GREENBLUM:  The first I know of these.  I don't

8    know which eight documents Mr. Gower is referring to, so I'll

9    have to go and crosscheck.

10        MR. GOWER:  These are -- the substance of the

11    documents we don't really believe is all that important,

12    because what matters is that Google's only objection to the

13    document is foundation, which we believe is an improper

14    objection, and that's why we would ask for these documents to

15    be admitted.

16        THE COURT:  Well, take a look at them.  You know,

17    it's not clear to me that when you -- well, anyway, I don't

18    know what the back and forth has been here in terms of when

19    these objections have been made and whether these are sort of

20    residual, you know, objections from some time ago or they're

21    more contemporaneous to today.  And as we've seen, oftentimes

22    the objection that was made months ago has been withdrawn

23    during the course of trial, and maybe the same will happen with

24    these documents.

25        MR. GOWER:  Your Honor, these are the longstanding

1    objections.  I realize they have been withdrawing lots of

2    objections along the way.  I'm talking about these eight are

3    ones that they've had for a long time.  So perhaps they'd

4    withdraw them and we can just let them in.  Or, otherwise, we

5    would ask for the objections to be overruled.

6         THE COURT:  Given them the Bates numbers for the

7    eight and you can tell me on Monday whether there's continued

8    objections about them.  Otherwise, your case is still open, so

9    waiting until Monday to confirm that they have an opportunity

10   to review that is not going to be an issue.

11        MR. GOWER:  Understood.  Thank you, Your Honor.

12        So the next group -- and I don't think we need to

13   spend too long on this -- they are another group of documents

14   where foundation is one of several objections, and so I guess

15   this probably is covered already.  But, just to be clear, we

16   would ask that those objections on foundation where there are

17   other objections, the foundation objection be overruled so we

18   can negotiate on what remains and not continue to dispute

19   foundation.

20        THE COURT:  All right.  This is foundation plus?

21        MR. GOWER:  This is foundation plus.

22        THE COURT:  Okay.  So this is a combination of Google

23   and third party or only third party or only Google?

24        MR. GOWER:  This is a combination.  So this would be

25   any document in our outstanding exhibit list where Google has

5676

1    stated foundation plus another objection, we would like -- to

2    facilitate our negotiations, we believe if you overruled the

3    foundation objections, we could then focus on the remaining

4    objections and proceed more effectively.

5            THE COURT:  Okay.  I think what I've said ought to

6    resolve or address the concern of any foundation objection.

7    Now, if there's some specific document that you want to

8    identify that has a true foundation objection, although I'm not

9    quite sure what that would look like in this case, you can let

10   me know.  But otherwise, the foundation is just -- given what

11   I've said, I'm not sure it's a real concern with respect to

12   anything that might be introduced.

13           MR. GOWER:  Thank you, Your Honor.

14           Another group.  These are documents where Google's

15   only objection is relevance.  There are 69 documents fitting

16   into this category.  We believe relevance is not a well-suited

17   objection for this bench trial.  Google has withdrawn the large

18   majority of relevance objections as we've introduced these

19   documents at trial.  The few that they've maintained were

20   overruled.  The relevance objection just doesn't have a good

21   track record in this case, and so we believe that the relevance

22   objections should be overruled.

23           And we also think that this makes sense because if

24   Your Honor finds that the document is not relevant, Your Honor

25   presumably wouldn't be citing it in the final opinion.  So, we

 1   would ask to move in the, I believe, 69 documents where

 2   relevance is the only objection.

 3          MR. GREENBLUM:  I'll pass on the track record.

 4          But, there are specific relevance issues that we have

 5   raised by meet and confer, and in a letter we asked for

 6   follow-up from the government and we didn't get it.  So, I

 7   don't know what the specific 69 are.  Maybe it's been narrowed.

 8   I can't tell.

 9          Some of these are agreements with parties that we

10   don't think are at issue in the case.  Some of these are really

11   old documents that we don't see a specific relevance to the

12   case now.

13          Those are some examples for the Court.  But we did

14   narrow.  We've taken the Court's guidance very much to heart.

15   So --

16          THE COURT:  Okay.

17          MR. SCHMIDTLEIN:  Your Honor, once the documents come

18   in, you know, then we're going to have -- potentially, down the

19   road, there's going to be a question of, well, who gets access

20   to them, you know, from the outside world.  So if they're not

21   relevant, our records shouldn't be part of the case record in

22   this case.  So we don't think this:  Oh, relevance really

23   doesn't matter because it's a bench trial -- you've obviously

24   granted numerous motions in limine that we made.  And if, you

25   know, we were going to apply the standard they're suggesting,

1   just deny all the motions in limine while we're at it.

2            THE COURT:  So what I was going to say before

3   Mr. Schmidtlein's comment is as follows, which is:  While

4   foundation is an objection I think I can address and did

5   address in a global manner, I don't think I can do that with

6   relevance.  I mean, if there really are relevance objections to

7   69 documents, I've got to look at them.  I just can't sort of

8   say, Yeah it's all relevant, put it in.

9            And, so, if there continues to be issues, then you're

10  just going to have to get me those records.  And, you know, we

11  don't necessarily need to resolve that within the confines of

12  the temporal aspect of your case.  We can always leave it open,

13  and if there needs to be a day that we come back between now

14  and, you know, when we have the final closing and argument in

15  this case, we can come in and do that and have that discussion.

16           MR. GOWER:  Thank you, Your Honor.

17           So there are some -- a subset of documents where we

18  are prepared to address the relevance.  And these are, again,

19  groups that we believe are manageable for a setting like this.

20  And so I would like to -- if you'll allow, I would like to

21  proceed to discuss contracts, which, I believe, is one of the

22  groups that Mr. Greenblum just addressed.

23           THE COURT:  Yeah, so I don't really want to do that

24  right now.  I expected a little bit more time to get things

25  done this afternoon.  But that's fine.  So I don't -- it's not

 1    that I don't want to do this, I just don't know that we need to

 2    do it right now.

 3              MR. GOWER:  Understood, Your Honor.

 4              So if you don't want to go through any relevance

 5    objections, that's all we have.

 6              THE COURT:  Well, like I said, if there continues to

 7    be an issue, I'm going to have to look at them.  I will look at

 8    them.  I don't think there's any urgency in terms of getting

 9    those objections resolved in the sense that I am certainly not

10    going to foreclose a discussion about an outstanding exhibit

11    just because the plaintiffs have rested with respect to

12    testimony.  So if that's what's driving this concern, rest

13    assured, you don't need to worry about it.

14              MR. GOWER:  Okay.  Thank you, Your Honor.

15              THE COURT:  And we're not going to end up delivering

16    these documents to a jury, so we have some flexibility.

17              MR. GOWER:  Understood.

18              THE COURT:  Okay.  All right.  Is there anything else

19    we need to talk about?

20              MR. DINTZER:  Nothing else from the DoJ plaintiffs,

21    Your Honor.

22              MR. CAVANAUGH:  Nothing.

23              MR. SCHMIDTLEIN:  Nothing.

24              THE COURT:  All right.  So we've got Whinston on

25    Monday.  I take it he will likely be the day, if not more.

1                  MR. DINTZER:  (Nods head.)

2                  THE COURT:  Okay.  All right.  So we'll have him for

3       a few days next week, and we'll keep going from there.

4                  All right.  Please don't wait for me.  Thank you,

5       everyone.

6                  THE COURTROOM DEPUTY:  This court stands in recess.

7                                    *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4      foregoing constitutes a true and accurate transcript of my

5      stenographic notes and is a full, true and complete transcript

6      of the proceedings to the best of my ability.

7                          Dated this 12th day of October, 2023

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

    WITNESS:
3

        Kinshuk Jerath
4           Cross-Examination By Mr. Sommer...................5581
            Redirect Examination By Ms. Maddox...............5650
5

6   EXHIBITS:

7       Admitted:
            DX3062, DX3063, DX3064, DX3080...................5581
8
            UPDX103.........................................5664
9

10      Offered:
            DX412, DX660, DX700, DX710, DX3054, DX3057,
11          DX3058, DX3059, DX3060, DX3073, DX3077, DX3197,
            DX3198, DX3199..................................5650
12
                                *   *   *
13

14

15

16

17

18

19

20

21

22

23

24

25

5683

## '

**'23** [1] - 5645:20

## 0

**003** [2] - 5607:18, 5625:16
**006** [4] - 5610:4, 5640:17, 5641:13, 5641:22
**007** [2] - 5619:8, 5620:5
**008** [1] - 5639:1
**012** [1] - 5611:7
**013** [3] - 5605:19, 5632:9, 5633:3
**015** [1] - 5624:19
**016** [1] - 5627:13
**019** [1] - 5612:6
**020** [1] - 5623:5
**022** [1] - 5611:18
**026** [1] - 5614:18
**054** [1] - 5634:1
**067** [3] - 5598:17, 5598:24, 5633:13
**070** [1] - 5633:21

## 1

**1** [3] - 5599:25, 5657:12
**1,000** [2] - 5657:12, 5657:13
**10** [2] - 5646:10, 5657:16
**10,000** [1] - 5657:12
**100** [5] - 5596:14, 5635:7, 5658:1, 5667:23, 5670:12
**10019** [1] - 5580:7
**10036** [1] - 5579:24
**11** [1] - 5644:16
**1100** [1] - 5579:12
**1133** [1] - 5579:23
**12** [3] - 5579:5, 5611:4, 5611:14
**12th** [1] - 5681:7
**1301** [1] - 5580:6
**134** [1] - 5647:4
**137** [1] - 5589:8
**14** [1] - 5613:20
**14.008** [2] - 5582:15, 5582:23
**15** [4] - 5646:10, 5668:4, 5668:7, 5669:4
**187** [3] - 5631:16, 5631:17, 5632:13
**1:35** [1] - 5579:6

## 2

**2** [4] - 5626:14, 5658:5, 5658:23, 5659:3
**20** [6] - 5652:20, 5652:21, 5652:22, 5652:23, 5652:24
**20-3010** [1] - 5579:4
**20001** [2] - 5580:12, 5681:13
**20005** [1] - 5580:3
**2008** [4] - 5618:5, 5618:8, 5618:14, 5618:21
**2017** [1] - 5644:15
**202** [3] - 5579:13, 5579:17, 5580:4
**202-354-3267** [1] - 5580:12
**202-549-7155** [1] - 5579:20
**2020** [3] - 5632:6, 5634:7, 5635:23
**2021** [1] - 5646:24
**2022** [3] - 5645:20, 5646:25, 5657:25
**2023** [3] - 5579:5, 5644:16, 5681:7
**20530** [1] - 5579:20
**209** [1] - 5579:15
**21** [3] - 5579:3, 5635:22, 5666:9
**212** [2] - 5579:25, 5580:8
**2200** [1] - 5579:24

## 3

**3054** [2] - 5626:13, 5650:3
**3057** [1] - 5650:3
**3058** [1] - 5650:3
**3059** [1] - 5650:3
**3060** [1] - 5650:3
**307-0340** [1] - 5579:13
**3073** [1] - 5650:4
**3077** [1] - 5650:4
**3197** [1] - 5650:4
**3198** [1] - 5650:4
**3199** [1] - 5650:4
**3209** [2] - 5588:12, 5588:14
**333** [2] - 5580:11, 5681:12
**335-2793** [1] - 5579:25
**3:15** [1] - 5649:19
**3:16** [1] - 5649:19
**3:30** [1] - 5649:19
**3:31** [1] - 5649:21

## 4

**4** [1] - 5658:23
**40** [1] - 5658:15
**40th** [1] - 5580:7
**410.007** [1] - 5622:5
**412** [1] - 5650:3
**42** [3] - 5668:2, 5668:7, 5669:3
**434-5000** [1] - 5580:4
**450** [1] - 5579:19
**451** [1] - 5638:22
**46** [3] - 5659:13, 5659:16, 5659:25
**4875** [1] - 5634:25
**494** [1] - 5636:13
**497-7728** [1] - 5580:8

## 5

**5** [1] - 5658:4
**50** [1] - 5615:16
**51** [2] - 5653:10, 5655:4
**52** [1] - 5655:8
**534** [3] - 5651:20, 5651:23, 5652:1
**5340** [1] - 5635:13
**538** [1] - 5652:5

## 6

**6** [1] - 5610:4
**60-page** [1] - 5615:16
**600** [1] - 5579:16
**60604** [1] - 5579:16
**63** [1] - 5581:5
**64** [1] - 5581:5
**6523** [2] - 5580:11, 5681:12
**660** [1] - 5650:3
**67** [1] - 5598:22
**68** [6] - 5669:19, 5669:25, 5670:5, 5670:22, 5673:8, 5673:17
**680** [1] - 5580:3
**69** [4] - 5676:15, 5677:1, 5677:7, 5678:7

## 7

**7.3** [1] - 5647:5
**700** [1] - 5650:3
**710** [1] - 5650:3
**7100** [1] - 5579:19
**76** [2] - 5588:6, 5588:14

## 8

**8.1** [1] - 5655:4
**805-8563** [1] - 5579:17

## 9

**90** [2] - 5658:1, 5658:2
**95** [2] - 5599:24, 5599:25

## A

**ability** [5] - 5586:13, 5595:13, 5595:14, 5595:15, 5681:6
**able** [7] - 5594:18, 5597:25, 5598:24, 5659:15, 5660:2, 5666:21, 5669:13
**absolutely** [1] - 5660:21
**academic** [4] - 5643:21, 5656:18, 5660:24, 5661:2
**accept** [2] - 5625:9, 5668:1
**acceptable** [1] - 5667:10
**access** [1] - 5677:19
**accompanying** [1] - 5672:17
**according** [8] - 5613:1, 5615:23, 5622:1, 5622:20, 5623:18, 5625:13, 5626:6, 5647:14
**ACCs** [1] - 5667:24
**accuracy** [1] - 5642:19
**accurate** [2] - 5668:17, 5681:4
**accurately** [1] - 5589:16
**achieve** [1] - 5630:11
**achieving** [1] - 5637:16
**Acquisition** [1] - 5614:22
**acted** [1] - 5607:1
**action** [1] - 5583:4
**actively** [1] - 5589:16
**activities** [1] - 5617:11
**activity** [3] - 5606:23, 5653:25, 5654:1
**actual** [6] - 5582:18, 5611:14, 5617:4, 5628:5, 5645:5, 5659:4
**ad** [55] - 5581:18, 5584:3, 5584:10, 5586:6, 5586:15,

5591:9, 5591:17, 5592:1, 5592:13, 5592:15, 5594:9, 5594:11, 5595:24, 5596:2, 5596:17, 5600:14, 5600:19, 5600:20, 5600:22, 5603:19, 5607:4, 5607:6, 5617:18, 5627:24, 5628:1, 5628:3, 5630:6, 5630:10, 5630:14, 5635:2, 5635:14, 5638:11, 5638:17, 5638:18, 5640:4, 5640:9, 5640:25, 5641:5, 5642:23, 5643:14, 5643:19, 5645:3, 5645:16, 5646:17, 5655:5, 5655:12, 5657:1, 5657:6, 5657:7, 5658:15, 5658:16, 5658:20

**Adam** [1] - 5644:2
**add** [7] - 5590:20, 5642:22, 5650:5, 5656:11, 5656:14, 5660:5, 5666:25
**addition** [1] - 5625:2
**Addition** [1] - 5646:24
**additional** [1] - 5668:4
**address** [5] - 5646:2, 5676:6, 5678:4, 5678:5, 5678:18
**addressed** [4] - 5646:17, 5650:11, 5673:14, 5678:22
**admissible** [2] - 5671:6, 5672:16
**admit** [6] - 5633:1, 5664:8, 5664:11, 5668:3, 5669:25, 5672:15
**admitted** [4] - 5664:16, 5669:20, 5674:15, 5682:7
**admitting** [1] - 5673:21
**ads** [88] - 5584:24, 5585:4, 5585:5, 5585:6, 5585:8, 5585:9, 5585:11, 5585:12, 5585:22, 5586:4, 5586:5, 5586:6, 5586:8, 5586:9, 5586:10, 5586:11, 5586:19, 5586:25, 5587:24, 5588:6, 5588:17,

5588:18, 5588:24, 5588:25, 5589:1, 5589:4, 5589:11, 5589:16, 5590:2, 5590:8, 5590:11, 5590:23, 5590:24, 5590:25, 5591:3, 5591:6, 5591:13, 5596:24, 5596:25, 5597:4, 5599:22, 5600:17, 5604:1, 5604:2, 5604:4, 5604:11, 5604:22, 5616:12, 5617:3, 5617:4, 5617:5, 5617:9, 5617:21, 5618:25, 5619:3, 5622:2, 5622:17, 5622:18, 5628:9, 5628:10, 5628:16, 5628:24, 5635:4, 5641:3, 5643:1, 5643:2, 5643:3, 5644:12, 5655:21, 5656:2, 5656:4, 5657:11, 5657:13, 5658:12, 5658:13, 5658:14, 5658:15, 5658:21, 5658:22, 5658:24
**advance** [1] - 5665:6
**advanced** [1] - 5640:20
**advertise** [1] - 5659:21
**advertiser** [7] - 5591:17, 5622:25, 5623:3, 5627:23, 5628:6, 5630:20, 5634:13
**advertiser's** [1] - 5584:12
**advertisers** [19] - 5591:13, 5594:2, 5605:3, 5617:4, 5617:15, 5623:1, 5628:10, 5628:16, 5628:24, 5629:1, 5629:18, 5630:5, 5630:14, 5631:2, 5634:11, 5654:10, 5655:23, 5660:5, 5660:9
**advertisers'** [1] - 5659:18
**advertising** [25] - 5588:3, 5589:10, 5590:1, 5590:7, 5590:11, 5597:14, 5617:17, 5618:20, 5628:21, 5629:19,

5633:18, 5635:19, 5649:5, 5653:23, 5654:17, 5654:19, 5654:21, 5654:22, 5655:14, 5655:19, 5658:18, 5658:20, 5660:13, 5660:17
**AFAs** [1] - 5667:24
**affected** [1] - 5655:24
**affecting** [2] - 5633:18, 5633:23
**afternoon** [4] - 5581:15, 5649:18, 5662:1, 5678:25
**agencies** [1] - 5638:11
**agency** [3] - 5628:1, 5628:3, 5636:16
**ago** [7] - 5586:18, 5586:20, 5594:9, 5596:25, 5611:11, 5674:20, 5674:22
**agree** [41] - 5587:17, 5590:10, 5590:14, 5591:9, 5591:16, 5592:12, 5592:16, 5593:5, 5593:7, 5594:15, 5597:8, 5597:10, 5600:18, 5605:24, 5617:3, 5617:6, 5618:7, 5618:19, 5618:25, 5621:8, 5628:8, 5628:12, 5628:15, 5628:17, 5629:1, 5629:18, 5630:5, 5630:6, 5630:8, 5630:13, 5634:13, 5634:17, 5634:19, 5635:17, 5635:20, 5636:1, 5638:15, 5638:19, 5644:6, 5672:4
**agreed** [7] - 5627:23, 5637:5, 5637:14, 5668:1, 5668:5, 5669:2, 5669:9
**agreed-upon** [1] - 5669:9
**agreeing** [1] - 5621:3
**agreements** [1] - 5677:9
**agrees** [1] - 5628:6
**ahead** [6] - 5586:17, 5651:23, 5668:24, 5669:15, 5670:21, 5672:12
**AI** [4] - 5641:15, 5641:25, 5642:7, 5642:8
**AI-driven** [1] - 5641:15

**AI-powered** [1] - 5641:25
**al** [1] - 5579:3
**algorithm** [1] - 5592:15
**algorithms** [1] - 5638:17
**aligned** [1] - 5629:24
**aligns** [1] - 5637:22
**allocate** [5] - 5617:17, 5629:2, 5629:8, 5640:21, 5642:17
**allocation** [2] - 5637:12, 5641:16
**allow** [1] - 5678:20
**almost** [1] - 5633:5
**alone** [1] - 5600:10
**Amaldoss** [1] - 5587:13
**Amaldoss'** [1] - 5587:16
**Amazon** [2] - 5585:11, 5621:25
**America** [1] - 5579:2
**Americas** [2] - 5579:23, 5580:6
**AMIT** [1] - 5579:9
**amount** [2] - 5593:25, 5659:4
**amounts** [1] - 5593:1
**analysis** [11] - 5590:3, 5590:6, 5590:17, 5597:8, 5597:12, 5634:17, 5643:13, 5656:8, 5656:16, 5656:20
**Ann** [1] - 5634:23
**anonymized** [1] - 5598:3
**answer** [7] - 5595:23, 5635:5, 5635:16, 5635:21, 5635:25, 5636:3, 5657:2
**answered** [1] - 5602:17
**anti** [1] - 5660:7
**anti-ROI** [1] - 5660:7
**anticipate** [1] - 5662:10
**anyway** [2] - 5627:21, 5674:17
**apologies** [2] - 5664:6, 5668:11
**apologize** [1] - 5653:7
**app** [3] - 5595:17, 5595:19, 5595:21
**apparel** [1] - 5630:22
**appear** [1] - 5600:13
**appearance** [1] - 5663:9

5685

**appearances** [1] - 5643:7
**APPEARANCES** [1] - 5579:11
**Apple** [2] - 5595:20, 5595:22
**applies** [1] - 5669:23
**apply** [4] - 5669:23, 5673:2, 5674:3, 5677:25
**appreciate** [2] - 5591:13, 5669:13
**Approach** [1] - 5614:22
**approach** [4] - 5590:25, 5631:10, 5637:12, 5651:11
**appropriate** [2] - 5641:12, 5671:8
**appropriately** [1] - 5662:23
**apps** [1] - 5595:21
**area** [1] - 5644:1
**argument** [2] - 5650:12, 5678:14
**argumentative** [1] - 5590:15
**article** [3] - 5619:7, 5619:25, 5661:13
**articles** [7] - 5643:21, 5646:15, 5648:17, 5648:25, 5649:6, 5649:12, 5653:3
**aside** [2] - 5604:24, 5652:11
**aspect** [1] - 5678:12
**aspects** [2] - 5662:8, 5662:9
**assertion** [1] - 5590:1
**asses** [1] - 5630:14
**assessing** [1] - 5633:6
**assist** [2] - 5624:13, 5659:15
**associated** [1] - 5593:23
**assuming** [1] - 5671:5
**assured** [1] - 5679:13
**ATT** [1] - 5595:22
**attention** [2] - 5609:4, 5639:21
**attest** [1] - 5646:1, 5646:5
**attribute** [1] - 5660:2
**attributed** [1] - 5628:20
**Attribution** [1] - 5642:3
**auctions** [4] - 5643:8, 5643:9, 5643:10, 5643:11

**authentication** [1] - 5650:17
**authenticity** [3] - 5671:4, 5671:23, 5671:24
**author** [3] - 5619:25, 5621:7, 5647:14
**automated** [2] - 5641:14, 5642:8
**available** [1] - 5601:20
**Avenue** [5] - 5579:23, 5580:3, 5580:6, 5580:11, 5681:12
**aware** [17] - 5587:4, 5587:12, 5587:15, 5587:23, 5587:25, 5592:19, 5592:21, 5592:23, 5593:2, 5595:5, 5595:7, 5595:10, 5595:17, 5597:13, 5597:15, 5640:7, 5671:3
**awareness** [29] - 5582:12, 5583:4, 5583:24, 5591:3, 5591:4, 5595:25, 5600:16, 5604:20, 5607:8, 5615:3, 5615:25, 5616:1, 5617:5, 5617:10, 5619:1, 5620:19, 5622:22, 5623:10, 5623:14, 5624:23, 5625:2, 5625:13, 5625:21, 5625:25, 5626:23, 5627:6, 5628:11, 5628:17, 5647:18
**Awareness** [1] - 5623:22

## B

**back-of-the-envelope** [1] - 5658:25
**background** [1] - 5644:18
**bad** [1] - 5613:24
**baker** [1] - 5587:23
**bang** [1] - 5629:10
**banner** [2] - 5616:4, 5616:17
**banners** [5] - 5615:8, 5615:10, 5615:14, 5615:24, 5616:2
**based** [9] - 5591:12, 5600:10, 5600:12, 5623:21, 5629:8, 5638:5, 5653:25, 5654:2, 5669:22

**basis** [4] - 5600:23, 5634:3, 5645:22, 5669:18
**Bates** [2] - 5651:21, 5675:6
**become** [2] - 5648:12, 5655:21
**BEFORE** [1] - 5579:9
**beginning** [2] - 5659:10, 5664:7
**behalf** [1] - 5662:25
**believes** [1] - 5672:22
**Belknap** [1] - 5579:23
**belong** [1] - 5589:4
**below** [5] - 5584:22, 5620:14, 5621:1, 5625:21, 5642:6
**Ben** [1] - 5668:10
**BENCH** [1] - 5579:9
**bench** [2] - 5676:17, 5677:23
**benchmarks** [1] - 5615:4
**best** [11] - 5597:1, 5597:5, 5604:19, 5619:3, 5629:10, 5629:21, 5629:23, 5630:1, 5669:11, 5672:11, 5681:6
**better** [2] - 5665:9, 5665:13
**between** [11] - 5587:21, 5609:21, 5609:24, 5638:17, 5643:1, 5643:3, 5643:14, 5643:18, 5661:3, 5667:10, 5678:13
**beyond** [3] - 5603:16, 5615:4, 5635:18
**bgreenblum@wc.com** [1] - 5580:5
**big** [3] - 5586:1, 5586:19, 5609:6
**bigger** [1] - 5639:19
**billion** [2] - 5658:2
**binder** [26] - 5588:14, 5597:18, 5597:22, 5597:24, 5598:9, 5598:20, 5605:10, 5605:12, 5607:14, 5610:3, 5613:11, 5613:13, 5619:13, 5619:16, 5619:17, 5619:18, 5623:1, 5623:3, 5624:9, 5624:10, 5631:11, 5645:13, 5659:9, 5659:10
**Bing** [1] - 5621:25

**bit** [10] - 5584:22, 5590:22, 5596:5, 5620:6, 5620:20, 5621:1, 5644:18, 5658:8, 5669:12, 5678:24
**blogs** [1] - 5648:17
**blow** [5] - 5620:5, 5633:16, 5633:21, 5641:23, 5648:8
**book** [4] - 5646:18, 5646:22, 5647:4, 5647:15
**booking** [2] - 5635:14, 5635:23
**Booking** [1] - 5636:2
**booking.com** [2] - 5635:8, 5635:18
**books** [2] - 5643:23, 5646:16
**Booth** [1] - 5644:2
**bottle** [1] - 5589:17
**bottle-funnel** [1] - 5589:17
**bottom** [27] - 5583:11, 5584:17, 5584:18, 5584:22, 5584:25, 5587:20, 5589:12, 5589:15, 5590:3, 5590:8, 5590:12, 5598:15, 5604:3, 5604:5, 5606:7, 5606:8, 5606:22, 5611:18, 5612:15, 5612:24, 5614:5, 5615:8, 5616:18, 5638:23, 5639:22, 5651:21, 5652:9
**bottom-funnel** [5] - 5584:25, 5589:12, 5590:3, 5590:8, 5590:12
**bought** [1] - 5607:1
**bounds** [1] - 5672:15
**box** [3] - 5614:1, 5614:3, 5614:5
**boxes** [2] - 5613:25, 5614:7
**brand** [10] - 5594:16, 5609:13, 5609:17, 5609:21, 5609:25, 5617:10, 5624:20, 5648:11
**brands's** [1] - 5639:4
**break** [2] - 5581:4, 5649:18
**briefly** [3] - 5649:23, 5653:17, 5654:7
**broadcast** [1] - 5615:4
**broke** [1] - 5581:16

5686

**Brooks** [1] - 5620:1
**brought** [1] - 5629:17
**browsing** [1] - 5653:22
**buck** [1] - 5629:10
**Bucklin's** [2] - 5583:12, 5583:13
**budget** [10] - 5617:17, 5629:2, 5635:24, 5637:12, 5637:13, 5637:17, 5639:3, 5639:23, 5641:16, 5642:17
**budgets** [2] - 5630:6, 5640:21
**build** [3] - 5653:24, 5653:25, 5654:1
**building** [1] - 5591:4
**builds** [1] - 5654:19
**built** [1] - 5654:13
**bullet** [3] - 5615:2, 5639:2, 5639:22
**business** [9] - 5581:7, 5586:20, 5632:20, 5645:6, 5645:8, 5671:6, 5671:8, 5671:9, 5671:10
**buy** [2] - 5596:18, 5597:14
**buyer** [1] - 5635:2
**buying** [1] - 5626:22
**buys** [1] - 5657:15
**BY** [40] - 5581:14, 5582:24, 5585:21, 5587:11, 5588:13, 5590:18, 5595:4, 5596:6, 5596:9, 5596:23, 5598:5, 5598:23, 5600:8, 5601:6, 5602:3, 5603:6, 5605:14, 5608:15, 5613:21, 5615:21, 5618:16, 5619:24, 5622:14, 5624:18, 5628:23, 5631:14, 5631:23, 5633:2, 5633:12, 5636:14, 5639:20, 5646:14, 5647:3, 5648:10, 5648:24, 5650:21, 5651:17, 5652:15, 5653:9, 5659:7

**C**

**calculate** [4] - 5631:2, 5634:11, 5660:6, 5660:9
**calculating** [1] -

5634:19
**calculation** [1] - 5658:25
**Cameron** [2] - 5579:18, 5666:2
**campaign** [3] - 5630:10, 5639:7, 5640:22
**campaigns** [2] - 5637:4, 5639:4
**cannot** [1] - 5663:14
**care** [1] - 5669:9
**case** [38] - 5583:15, 5587:4, 5587:9, 5590:5, 5594:10, 5597:11, 5597:14, 5601:22, 5601:24, 5602:11, 5602:21, 5604:25, 5607:15, 5616:25, 5625:6, 5634:14, 5634:16, 5634:20, 5643:18, 5644:2, 5651:4, 5656:21, 5657:8, 5660:4, 5660:6, 5663:10, 5666:5, 5667:5, 5672:23, 5675:8, 5676:9, 5676:21, 5677:10, 5677:12, 5677:21, 5677:22, 5678:12, 5678:15
**case-in-chief** [1] - 5666:5
**cases** [2] - 5591:11, 5619:2
**categories** [2] - 5669:11, 5673:18
**category** [5] - 5588:24, 5594:5, 5670:18, 5671:14, 5676:16
**caused** [1] - 5592:15
**Cavanaugh** [1] - 5579:22
**CAVANAUGH** [1] - 5679:22
**CCR** [1] - 5681:11
**certain** [4] - 5591:25, 5604:1, 5651:24, 5655:18
**certainly** [6] - 5650:7, 5657:9, 5660:23, 5661:18, 5665:5, 5679:9
**CERTIFICATE** [1] - 5681:1
**certification** [1] - 5671:6
**certifications** [1] -

5650:7
**certify** [1] - 5681:3
**challenge** [1] - 5650:17
**challenges** [2] - 5660:7, 5660:8
**challenging** [1] - 5659:21
**chance** [4] - 5635:9, 5656:12, 5656:13, 5668:18
**change** [3] - 5609:2, 5652:24, 5661:6
**changed** [8] - 5603:23, 5603:24, 5618:8, 5618:20, 5618:23, 5647:11, 5665:17, 5665:19
**changes** [2] - 5665:22, 5665:23
**Channel** [1] - 5623:23
**channel** [9] - 5624:1, 5637:13, 5637:17, 5640:22, 5641:15, 5642:8, 5642:13, 5647:7
**channel-specific** [1] - 5642:8
**ChannelMix** [3] - 5641:20, 5642:7, 5642:8
**channelMix** [1] - 5641:21
**ChannelMix's** [1] - 5641:25
**Channels** [1] - 5625:1
**channels** [20] - 5610:11, 5613:22, 5618:22, 5623:10, 5625:22, 5625:25, 5630:15, 5630:17, 5630:23, 5637:11, 5638:1, 5639:24, 5640:21, 5641:2, 5642:14, 5642:17, 5642:22, 5655:18, 5655:24
**characterization** [2] - 5583:25, 5584:1
**chart** [1] - 5659:25
**Chase** [2] - 5613:19, 5614:10
**check** [1] - 5588:9
**Chicago** [1] - 5579:16
**chief** [1] - 5666:5
**choice** [1] - 5647:6
**cite** [3] - 5603:25, 5649:15, 5649:16
**cited** [4] - 5590:17, 5618:11, 5651:10,

5651:19
**citing** [1] - 5676:25
**Claire** [1] - 5579:18
**claire.maddox@ usdoj.gov** [1] - 5579:21
**clarification** [4] - 5582:16, 5662:19, 5662:22, 5662:24
**clarify** [3] - 5582:18, 5585:19, 5663:1
**clarity** [1] - 5618:12
**clear** [9] - 5585:3, 5616:16, 5622:4, 5622:8, 5623:13, 5642:14, 5664:12, 5674:17, 5675:15
**clearly** [1] - 5632:20
**click** [6] - 5593:20, 5596:18, 5657:11, 5658:22, 5658:24
**click-through** [4] - 5657:11, 5658:22, 5658:24
**clicked** [2] - 5606:25, 5657:14
**clicking** [1] - 5657:15
**clicks** [2] - 5594:16, 5594:17
**client** [1] - 5637:12
**close** [2] - 5626:24, 5627:2
**closer** [2] - 5620:15, 5624:11
**closing** [2] - 5595:17, 5678:14
**CMR** [1] - 5681:11
**collapsed** [1] - 5648:11
**colleague** [1] - 5610:24
**collected** [1] - 5597:13
**Colorado** [2] - 5579:22, 5666:15
**colors** [3] - 5666:10, 5666:12, 5666:13
**COLUMBIA** [1] - 5579:1
**column** [1] - 5623:22
**columns** [1] - 5611:12
**combination** [3] - 5642:17, 5675:22, 5675:24
**coming** [5] - 5584:2, 5613:16, 5646:7, 5662:4, 5671:5
**comment** [1] - 5678:3
**comments** [1] - 5672:5
**commerce** [6] - 5657:23, 5657:24,

5687

5657:25, 5658:1, 5659:4, 5659:6

**common** [1] - 5603:17

**communities** [1] - 5647:8

**companies** [7] - 5597:14, 5616:11, 5640:8, 5640:10, 5644:11, 5645:11, 5660:15

**companies'** [1] - 5628:21

**company** [31] - 5591:21, 5598:1, 5598:12, 5600:19, 5600:21, 5601:2, 5601:7, 5601:11, 5605:17, 5605:21, 5607:15, 5608:3, 5612:4, 5612:6, 5613:1, 5615:13, 5615:17, 5615:23, 5619:16, 5623:18, 5626:6, 5626:13, 5627:4, 5640:12, 5641:7, 5641:20, 5642:5, 5644:19, 5647:22, 5648:6

**Company** [10] - 5599:21, 5605:7, 5610:4, 5610:23, 5611:24, 5614:15, 5623:6, 5624:8, 5625:15, 5644:10

**company's** [2] - 5607:20, 5608:7

**compile** [2] - 5602:5, 5602:9

**complaint** [1] - 5582:4

**complete** [4] - 5604:21, 5625:12, 5664:8, 5681:5

**completely** [1] - 5598:3

**completeness** [1] - 5672:25

**complimentary** [1] - 5638:2

**computer** [2] - 5653:20

**concepts** [1] - 5661:3

**concern** [5] - 5665:11, 5671:7, 5676:6, 5676:11, 5679:12

**concerns** [6] - 5645:22, 5663:21, 5670:10, 5670:19, 5672:7, 5673:15

**concluded** [1] - 5592:21

**concludes** [1] - 5590:6

**conclusion** [1] - 5600:1

**conclusions** [1] - 5634:8

**conduct** [1] - 5597:11

**conducted** [1] - 5634:17

**confer** [2] - 5665:5, 5677:5

**conference** [1] - 5663:3

**conferral** [2] - 5670:16, 5670:17

**conferred** [2] - 5581:3, 5649:23

**confidence** [1] - 5642:4

**confidential** [1] - 5619:19

**confines** [1] - 5678:11

**confirm** [1] - 5675:9

**conflated** [2] - 5620:11, 5620:21

**confusing** [1] - 5603:10

**confusion** [2] - 5585:4, 5674:2

**congruence** [1] - 5661:3

**connected** [1] - 5593:17

**connection** [8] - 5590:5, 5597:9, 5601:11, 5604:25, 5634:10, 5634:14, 5634:16, 5646:17

**Connolly** [2] - 5580:2, 5668:11

**consider** [2] - 5595:3, 5602:10

**consideration** [14] - 5582:12, 5583:24, 5584:21, 5600:16, 5607:22, 5607:24, 5609:12, 5617:5, 5622:22, 5623:10, 5623:16, 5623:25, 5626:23, 5628:11

**considered** [6] - 5592:20, 5608:22, 5614:12, 5616:24, 5632:17, 5646:23

**consistent** [5] - 5600:13, 5604:8, 5647:25, 5660:4, 5670:14

**constitutes** [1] - 5681:4

**Constitution** [2] - 5580:11, 5681:12

**construct** [1] - 5583:22

**consumer** [7] - 5583:23, 5591:18, 5605:25, 5606:7, 5653:21, 5654:2, 5660:19

**consumer's** [1] - 5653:20

**consumers** [14] - 5587:13, 5587:25, 5589:12, 5589:17, 5590:3, 5590:8, 5590:12, 5626:21, 5653:24, 5654:1, 5654:11, 5656:3, 5658:18, 5661:4

**consumers'** [2] - 5626:22, 5655:22

**Cont** [1] - 5581:13

**contains** [3] - 5597:22, 5632:16, 5632:21

**contemplate** [1] - 5665:5

**contemplated** [1] - 5663:12

**contemporaneous** [1] - 5674:21

**content** [2] - 5593:12, 5615:5

**context** [9] - 5589:22, 5597:11, 5627:2, 5634:20, 5653:23, 5656:20, 5672:23, 5673:2, 5674:4

**contextual** [1] - 5655:13

**continue** [1] - 5675:18

**continued** [1] - 5675:7

**continues** [2] - 5678:9, 5679:6

**contracts** [1] - 5678:21

**contrary** [1] - 5662:22

**contrast** [1] - 5654:18

**contribution** [1] - 5640:22

**contributor** [1] - 5630:18

**contributors** [1] - 5630:18

**conversion** [16] - 5583:24, 5591:10, 5591:14, 5596:1, 5600:16, 5600:17, 5605:21, 5606:1, 5606:23, 5608:3,

5615:14, 5615:24, 5616:2, 5617:6, 5627:2, 5628:11

**cookie** [6] - 5654:5, 5654:7, 5654:8, 5654:13, 5654:16, 5654:19

**cookies** [7] - 5653:15, 5653:17, 5653:18, 5653:23, 5653:24, 5654:3, 5654:11

**copies** [3] - 5651:9, 5668:25, 5669:1

**copy** [4] - 5644:19, 5651:12, 5651:14, 5651:18

**correct** [93] - 5581:19, 5581:23, 5582:4, 5582:5, 5582:10, 5583:2, 5583:5, 5583:16, 5583:20, 5584:5, 5584:12, 5585:1, 5585:6, 5585:13, 5586:7, 5586:10, 5586:15, 5587:18, 5588:8, 5588:18, 5588:24, 5589:21, 5590:25, 5591:3, 5591:7, 5593:13, 5593:23, 5594:3, 5594:9, 5595:13, 5596:1, 5597:2, 5597:6, 5597:10, 5598:12, 5599:4, 5603:14, 5604:20, 5606:1, 5606:14, 5606:24, 5607:25, 5608:4, 5608:8, 5608:11, 5609:9, 5609:15, 5609:22, 5610:19, 5611:12, 5611:22, 5612:8, 5613:3, 5613:6, 5614:19, 5615:11, 5615:14, 5615:25, 5616:5, 5616:7, 5616:18, 5617:13, 5617:18, 5618:8, 5619:4, 5620:10, 5622:2, 5622:18, 5623:14, 5623:16, 5623:20, 5624:2, 5626:4, 5626:7, 5627:2, 5627:6, 5627:25, 5629:22, 5632:7, 5635:15, 5636:17, 5638:5, 5638:12, 5640:5, 5640:9, 5641:1, 5643:8,

5688

5644:3, 5647:16,
5648:17, 5655:2,
5663:8, 5667:15
  **corrected** [2] -
5664:21, 5665:16
  **correctly** [2] -
5660:17, 5662:15
  **cosmetic** [1] - 5584:16
  **counsel** [17] - 5581:4,
5582:19, 5585:18,
5599:25, 5600:11,
5649:24, 5650:8,
5659:14, 5661:5,
5662:20, 5663:2,
5663:4, 5663:7,
5663:9, 5665:6, 5668:9
  **Counsel** [6] - 5581:11,
5582:17, 5622:6,
5650:10, 5664:22,
5670:21
  **Counsel's** [1] -
5668:17
  **couple** [3] - 5581:25,
5591:22, 5617:23
  **course** [5] - 5606:5,
5643:17, 5656:19,
5657:23, 5674:23
  **COURT** [91] - 5579:1,
5581:2, 5581:9,
5581:11, 5585:17,
5587:6, 5587:10,
5590:16, 5594:23,
5595:2, 5596:21,
5598:21, 5600:3,
5600:25, 5601:5,
5601:24, 5602:22,
5603:1, 5603:5,
5605:12, 5608:14,
5619:16, 5622:9,
5624:14, 5631:21,
5632:25, 5636:7,
5636:10, 5639:18,
5645:4, 5645:9,
5645:24, 5646:4,
5646:10, 5646:21,
5647:1, 5648:6,
5649:18, 5649:22,
5650:19, 5652:14,
5653:6, 5658:10,
5658:16, 5659:3,
5661:12, 5661:16,
5661:19, 5661:24,
5663:6, 5663:11,
5663:22, 5664:3,
5664:11, 5664:15,
5665:7, 5665:21,
5666:1, 5666:7,
5666:11, 5666:14,
5666:24, 5667:3,
5667:11, 5667:17,

5668:9, 5668:21,
5668:24, 5669:5,
5669:15, 5670:20,
5671:1, 5671:21,
5672:13, 5673:10,
5673:20, 5674:6,
5674:16, 5675:6,
5675:20, 5675:22,
5676:5, 5677:16,
5678:2, 5678:23,
5679:6, 5679:15,
5679:18, 5679:24,
5680:2, 5681:1
  **court** [2] - 5635:9,
5680:6
  **Court** [10] - 5580:10,
5580:10, 5591:2,
5591:22, 5651:9,
5668:19, 5668:20,
5670:4, 5677:13,
5681:11
  **Court's** [2] - 5673:18,
5677:14
  **Courthouse** [1] -
5580:11
  **COURTROOM** [2] -
5651:13, 5680:6
  **courtroom** [1] -
5663:17
  **covered** [1] - 5675:15
  **CPA** [1] - 5637:6
  **CPC** [1] - 5637:6
  **CRC** [1] - 5580:10
  **created** [7] - 5582:19,
5622:6, 5638:11,
5645:5, 5645:7,
5646:5, 5664:25
  **CROSS** [1] - 5581:13
  **Cross** [1] - 5682:4
  **cross** [2] - 5601:25,
5641:15
  **cross-channel** [1] -
5641:15
  **cross-examination**
- 5601:25
  **CROSS-**
**EXAMINATION** [1] -
5581:13
  **Cross-Examination**
[1] - 5682:4
  **crosscheck** [1] -
5674:9
  **crossed** [1] - 5673:22
  **CRR** [2] - 5580:10,
5681:11
  **current** [1] - 5605:10
  **custom** [1] - 5615:5
  **customer** [1] -
5645:18
  **customers** [2] -

5647:7, 5647:10
  **cutoff** [1] - 5645:21
  **CV** [1] - 5579:4

## D

  **D.C** [4] - 5579:5,
5579:13, 5580:3,
5681:13
  **DAHLQUIST** [6] -
5662:25, 5663:8,
5663:24, 5664:4,
5665:14, 5665:24
  **Dahlquist** [2] -
5579:14, 5662:25
  **data** [12] - 5644:6,
5644:8, 5644:20,
5645:1, 5645:2,
5645:14, 5645:18,
5645:20, 5646:5,
5654:24, 5655:22,
5660:1
  **date** [2] - 5618:2,
5665:12
  **Dated** [1] - 5681:7
  **dates** [1] - 5618:4
  **Daubert** [2] - 5662:6,
5662:9
  **David** [2] - 5579:14,
5662:25
  **David.dahlquist@**
**usdoj.gov** [1] - 5579:17
  **DAY** [1] - 5579:3
  **days** [2] - 5592:22,
5680:3
  **DC** [2] - 5579:20,
5580:12
  **dead** [3] - 5649:7,
5649:8, 5649:9
  **deal** [1] - 5586:1
  **decide** [1] - 5665:22
  **decision** [1] - 5582:13
  **decisions** [3] -
5617:17, 5629:2,
5635:18
  **deck** [6] - 5617:23,
5618:11, 5651:10,
5664:8, 5664:11,
5665:16
  **deeper** [2] - 5604:3,
5604:10
  **Defendant** [2] -
5579:7, 5580:1
  **defendants** [1] -
5653:2
  **defense** [3] - 5582:19,
5659:14, 5661:5
  **defer** [1] - 5673:20
  **define** [2] - 5588:6,
5588:18

  **definitely** [1] - 5620:19
  **definition** [2] -
5626:16, 5630:2
  **delivering** [2] -
5637:4, 5679:15
  **demographics** [1] -
5592:22
  **demonstrative** [3] -
5582:20, 5645:23,
5664:12
  **demonstratives** [1] -
5664:21
  **deny** [1] - 5678:1
  **Department** [5] -
5579:12, 5579:15,
5579:19, 5663:23,
5663:24
  **depicted** [5] - 5613:3,
5613:4, 5613:23,
5617:13, 5621:3
  **depiction** [2] -
5582:19, 5652:8
  **deposition** [6] -
5619:8, 5621:2,
5630:3, 5666:4,
5666:8, 5667:7
  **depositions** [3] -
5644:1, 5667:9,
5670:12
  **deprecation** [5] -
5654:5, 5654:7,
5654:8, 5654:14,
5654:16
  **DEPUTY** [2] - 5651:13,
5680:6
  **described** [7] -
5582:7, 5582:12,
5584:9, 5594:9,
5595:24, 5596:12,
5657:1
  **describes** [2] -
5639:11, 5639:12
  **describing** [1] -
5629:25
  **designation** [2] -
5667:12, 5667:13
  **designations** [2] -
5666:4, 5666:9
  **desire** [1] - 5583:4
  **detail** [1] - 5642:16
  **determines** [1] -
5635:14
  **devices** [1] - 5638:17
  **Dickman** [2] -
5580:10, 5681:11
  **DICKMAN** [1] - 5681:3
  **difference** [2] -
5643:1, 5643:11
  **differences** [1] -
5643:4

**different** [25] - 5583:23, 5590:13, 5599:22, 5602:22, 5603:19, 5608:21, 5608:23, 5616:11, 5616:12, 5617:8, 5630:22, 5630:23, 5630:24, 5638:18, 5641:3, 5642:23, 5643:3, 5643:6, 5643:7, 5643:10, 5643:11, 5646:2, 5673:5

**differently** [1] - 5584:13

**differing** [1] - 5581:22

**difficult** [2] - 5634:11, 5634:18

**difficulties** [1] - 5660:1

**difficulty** [1] - 5660:8

**dig** [2] - 5604:3, 5604:10

**digital** [15] - 5589:10, 5590:1, 5590:7, 5590:10, 5597:14, 5614:21, 5618:7, 5618:20, 5648:12, 5649:5, 5649:8, 5658:15, 5658:16, 5660:16

**Dijk** [2] - 5635:8, 5635:11

**Dijk's** [2] - 5664:22, 5665:16

**Dintzer** [1] - 5579:11

**DINTZER** [2] - 5679:20, 5680:1

**direct** [8] - 5581:21, 5591:2, 5627:22, 5630:21, 5631:1, 5636:16, 5657:10, 5659:20

**directed** [2] - 5662:6, 5662:10

**directly** [2] - 5591:18, 5606:10

**director** [1] - 5659:15

**disagreed** [1] - 5669:10

**disagreed-upon** [1] - 5669:10

**Dischler** [1] - 5644:1

**discovery** [6] - 5601:23, 5620:12, 5620:13, 5620:19, 5621:1, 5645:15

**discrete** [1] - 5628:19

**discuss** [6] - 5643:21, 5650:7, 5657:24,

5661:25, 5665:19, 5678:21

**discussed** [4] - 5581:16, 5650:23, 5651:5, 5652:20

**discussing** [3] - 5584:24, 5625:17, 5660:12

**discussion** [2] - 5678:15, 5679:10

**discussions** [1] - 5605:2

**Display** [4] - 5599:7, 5599:9, 5599:12

**display** [65] - 5588:24, 5588:25, 5590:22, 5590:24, 5591:3, 5591:6, 5591:9, 5591:13, 5591:17, 5594:11, 5595:24, 5596:2, 5596:17, 5596:24, 5597:4, 5599:22, 5600:15, 5604:1, 5604:4, 5604:6, 5604:7, 5604:11, 5604:19, 5604:21, 5608:25, 5609:1, 5609:4, 5609:5, 5610:10, 5610:15, 5610:18, 5612:18, 5612:23, 5612:24, 5613:5, 5613:7, 5613:22, 5614:3, 5614:5, 5615:8, 5615:10, 5615:14, 5615:24, 5616:2, 5616:4, 5616:17, 5617:3, 5617:9, 5617:13, 5617:15, 5617:22, 5625:2, 5628:25, 5641:3, 5642:18, 5654:20, 5654:25, 5655:21, 5657:1, 5657:6, 5657:11, 5657:13, 5658:24

**dispute** [3] - 5594:18, 5594:22, 5675:18

**distinction** [3] - 5584:18, 5609:20, 5609:24

**distinguishing** [1] - 5643:2

**distracted** [1] - 5584:15

**DISTRICT** [3] - 5579:1, 5579:1, 5579:10

**document** [58] - 5582:18, 5602:10, 5602:19, 5603:8,

5603:20, 5608:17, 5608:20, 5609:20, 5609:24, 5610:5, 5610:21, 5611:4, 5611:11, 5613:19, 5614:9, 5614:21, 5615:13, 5615:16, 5615:17, 5615:20, 5615:22, 5615:23, 5616:9, 5616:17, 5618:2, 5618:12, 5618:14, 5622:12, 5624:4, 5625:5, 5626:9, 5626:15, 5626:18, 5627:9, 5632:7, 5633:14, 5636:15, 5636:19, 5638:22, 5651:10, 5651:25, 5652:2, 5653:2, 5653:12, 5668:5, 5669:19, 5671:11, 5672:15, 5672:19, 5672:20, 5672:21, 5673:4, 5673:5, 5674:13, 5675:25, 5676:7, 5676:24

**documents** [55] - 5597:13, 5601:11, 5603:3, 5607:15, 5617:12, 5618:10, 5628:8, 5628:15, 5636:21, 5650:6, 5650:14, 5651:3, 5651:4, 5660:12, 5660:17, 5660:18, 5664:18, 5667:23, 5668:2, 5668:4, 5669:17, 5669:20, 5669:23, 5669:25, 5670:1, 5670:5, 5670:11, 5670:17, 5670:25, 5671:2, 5671:15, 5671:20, 5672:1, 5672:10, 5672:11, 5672:12, 5672:17, 5673:1, 5673:24, 5674:5, 5674:8, 5674:11, 5674:14, 5674:24, 5675:13, 5676:14, 5676:15, 5676:19, 5677:1, 5677:11, 5677:17, 5678:7, 5678:17, 5679:16

**DoJ** [3] - 5579:11, 5582:4, 5679:20

**dollars** [2] - 5635:19, 5642:10

**done** [8] - 5590:6, 5607:7, 5620:24,

5631:11, 5632:5, 5650:13, 5669:11, 5678:25

**dot** [1] - 5598:17

**dotted** [1] - 5673:22

**Douyon** [1] - 5669:5

**down** [8] - 5595:16, 5608:2, 5617:2, 5622:24, 5635:22, 5638:9, 5638:23, 5677:18

**downloads** [1] - 5639:25

**Dr** [18] - 5581:6, 5581:15, 5587:12, 5587:13, 5587:16, 5587:23, 5592:13, 5595:5, 5597:21, 5599:21, 5600:9, 5618:11, 5618:25, 5628:24, 5629:18, 5630:13, 5631:11, 5638:10

**dramatically** [1] - 5618:20

**draw** [3] - 5601:1, 5609:4, 5639:21

**drive** [2] - 5623:10, 5667:1

**driven** [3] - 5635:14, 5637:3, 5641:15

**driving** [6] - 5624:23, 5625:2, 5625:13, 5626:23, 5627:5, 5679:12

**dropped** [1] - 5620:12

**during** [6] - 5582:21, 5622:7, 5627:22, 5645:15, 5650:23, 5674:23

**DX** [2] - 5595:2, 5653:8

**DX10.003** [1] - 5583:7

**DX187** [7] - 5631:8, 5631:15, 5658:9, 5659:9, 5659:13, 5659:16, 5659:25

**DX3004** [1] - 5638:21

**DX3054** [2] - 5626:13, 5682:10

**DX3055** [1] - 5627:13

**DX3057** [4] - 5598:10, 5598:16, 5623:3, 5682:10

**DX3058** [2] - 5607:14, 5682:11

**DX3059** [3] - 5610:23, 5611:25, 5682:11

**DX3060** [2] - 5625:15, 5682:11

**DX3062** [2] - 5581:5, 5682:7
**DX3063** [1] - 5682:7
**DX3064** [1] - 5682:7
**DX3073** [3] - 5648:5, 5650:15, 5682:11
**DX3077** [2] - 5619:6, 5682:11
**DX3078** [2] - 5653:7, 5655:1
**DX3080** [1] - 5581:6
**DX3080.................. 5581** [1] - 5682:7
**DX3197** [3] - 5641:7, 5650:15, 5682:11
**DX3198** [3] - 5641:19, 5650:15, 5682:11
**DX3199** [2] - 5640:11, 5650:15
**DX3199..................... ...............5650** [1] - 5682:11
**DX3207** [1] - 5614:15
**DX411** [1] - 5636:13
**DX412** [3] - 5624:8, 5624:10, 5682:10
**DX660** [2] - 5613:10, 5682:10
**DX700** [3] - 5605:7, 5605:9, 5682:10
**DX710** [3] - 5610:3, 5611:1, 5682:10
**DXD** [1] - 5653:8
**DXD10.002** [1] - 5582:1
**DXD10.012** [1] - 5621:11
**DXD14.007** [2] - 5582:6, 5582:17
**DXD14.019** [2] - 5646:20, 5647:2
**DXD14.039** [1] - 5644:9
**DXD3078** [1] - 5653:3
**Dynamics** [1] - 5640:14

## E

**Edition** [1] - 5646:24
**effective** [19] - 5589:11, 5589:16, 5590:2, 5590:7, 5590:11, 5616:10, 5616:13, 5616:15, 5617:9, 5617:10, 5619:5, 5628:14, 5628:17, 5629:4, 5629:5, 5629:6, 5637:3, 5655:20,

5655:21
**effectively** [1] - 5676:4
**efficiency** [1] - 5641:14
**efficient** [1] - 5637:17
**effort** [1] - 5581:17
**effortlessly** [1] - 5641:16
**eight** [4] - 5674:5, 5674:8, 5675:2, 5675:7
**either** [8] - 5588:1, 5591:18, 5631:25, 5632:4, 5643:23, 5670:11, 5673:13
**elicit** [1] - 5662:11
**email** [1] - 5579:25
**Email** [7] - 5579:14, 5579:17, 5579:21, 5579:21, 5580:4, 5580:5, 5580:8
**embedded** [3] - 5632:17, 5668:4, 5668:6
**empirical** [13] - 5589:25, 5590:3, 5590:6, 5590:13, 5590:17, 5597:9, 5597:11, 5643:13, 5644:6, 5644:8, 5656:8, 5656:16, 5656:20
**employee** [1] - 5617:24
**encompasses** [1] - 5590:23
**encompassing** [1] - 5590:24
**end** [3] - 5657:13, 5672:20, 5679:15
**ending** [3] - 5651:20, 5652:1, 5652:5
**engine** [8] - 5638:23, 5639:3, 5639:12, 5642:1, 5642:8, 5654:23, 5656:2, 5656:4
**Engine** [1] - 5639:2
**engines** [4] - 5585:5, 5585:8, 5587:14, 5638:12
**enjamin** [1] - 5580:2
**enormous** [1] - 5593:25
**ensure** [1] - 5637:17
**ensures** [1] - 5664:18
**ensuring** [1] - 5637:4
**enter** [1] - 5594:23
**entire** [1] - 5628:21
**entry** [1] - 5609:8
**envelope** [1] - 5658:25

**equally** [1] - 5673:1
**equitable** [1] - 5673:1
**especially** [3] - 5646:4, 5654:18, 5660:9
**establish** [1] - 5615:4
**estimated** [1] - 5659:5
**et** [1] - 5579:3
**evaluate** [3] - 5581:17, 5633:6, 5634:4, 5660:3
**evaluated** [1] - 5634:2
**event** [1] - 5672:7
**everywhere** [1] - 5595:9
**Evidence** [1] - 5672:16
**evidence** [14] - 5590:14, 5613:10, 5621:11, 5621:24, 5622:12, 5632:13, 5633:10, 5636:12, 5638:21, 5652:13, 5664:19, 5667:21, 5671:11, 5672:18
**exactly** [5] - 5586:3, 5628:2, 5649:4, 5658:20, 5670:17
**Examination** [2] - 5682:4, 5682:4
**EXAMINATION** [2] - 5581:13, 5650:20
**examination** [7] - 5591:2, 5596:22, 5601:25, 5621:24, 5627:23, 5633:1, 5636:17
**example** [24] - 5585:11, 5586:12, 5591:22, 5595:24, 5616:8, 5630:21, 5637:14, 5637:22, 5638:1, 5638:4, 5638:6, 5638:7, 5638:8, 5640:4, 5641:4, 5643:6, 5655:13, 5656:22, 5657:18, 5657:20, 5658:7, 5663:16, 5672:22
**examples** [1] - 5677:13
**except** [1] - 5613:14
**exchange** [1] - 5668:12
**excitement** [1] - 5624:24
**exciting** [3] - 5591:23, 5662:3
**excuse** [3] - 5600:20, 5613:24, 5658:2
**exhibit** [16] - 5598:3,

5599:24, 5621:23, 5622:20, 5631:25, 5640:16, 5645:9, 5651:9, 5664:25, 5665:8, 5668:25, 5669:6, 5672:22, 5673:3, 5675:25, 5679:10
**exhibits** [11] - 5581:4, 5621:21, 5649:24, 5661:5, 5666:5, 5667:19, 5667:20, 5667:23, 5668:7, 5669:20, 5670:22
**EXHIBITS** [1] - 5682:6
**expand** [5] - 5585:23, 5596:4, 5596:14, 5596:20, 5657:2
**expands** [1] - 5586:3
**expect** [2] - 5654:16, 5655:21
**expected** [3] - 5655:5, 5655:14, 5678:24
**experience** [6] - 5591:12, 5594:14, 5596:13, 5635:17, 5644:4, 5656:21
**experts** [7] - 5587:4, 5587:9, 5587:13, 5587:24, 5663:13, 5663:14, 5663:15
**explain** [1] - 5653:17
**explaining** [1] - 5672:20
**exposure** [3] - 5620:12, 5620:14, 5620:18
**Exposure/Discovery** [1] - 5620:18
**express** [1] - 5589:10
**expressed** [1] - 5589:20
**expresses** [1] - 5608:21
**extend** [1] - 5615:3
**extent** [15] - 5600:2, 5600:19, 5606:22, 5617:15, 5618:10, 5628:24, 5632:21, 5638:15, 5654:15, 5655:20, 5664:17, 5667:11, 5667:16, 5669:21, 5671:7
**extremely** [1] - 5596:16

## F

**face** [1] - 5660:9
**Facebook** [7] -

5691

5586:12, 5586:18, 5586:19, 5595:7, 5595:9, 5595:12, 5641:4

**facilitate** [1] - 5676:2

**facilitates** [1] - 5626:22

**fact** [9] - 5591:16, 5601:14, 5604:10, 5623:22, 5637:22, 5638:11, 5654:8, 5657:10, 5662:17

**factor** [3] - 5630:16, 5633:18, 5633:23

**factors** [1] - 5630:13

**fair** [6] - 5583:25, 5589:6, 5599:21, 5600:7, 5600:21, 5639:13

**fairness** [3] - 5583:22, 5609:17, 5621:22

**falls** [3] - 5601:22, 5671:13, 5673:17

**familiar** [5] - 5636:19, 5638:10, 5640:7, 5647:22, 5654:5

**fed** [5] - 5586:6, 5586:14, 5592:1, 5594:9, 5596:17

**feed** [6] - 5592:13, 5662:20, 5662:23, 5663:18, 5663:19, 5663:24

**feeds** [1] - 5591:25

**few** [6] - 5581:25, 5584:21, 5640:11, 5657:5, 5676:19, 5680:3

**field** [1] - 5594:14

**Fifth** [1] - 5579:19

**Figure** [1] - 5647:5

**figure** [1] - 5630:9

**figuring** [1] - 5584:3

**file** [1] - 5663:10

**filings** [1] - 5667:25

**final** [4] - 5664:25, 5669:6, 5676:25, 5678:14

**finally** [2] - 5634:1, 5660:11

**fine** [7] - 5603:24, 5621:20, 5622:9, 5664:1, 5666:24, 5672:18, 5678:25

**finish** [1] - 5629:16

**firm** [1] - 5647:25

**first** [24] - 5581:17, 5582:9, 5584:9, 5605:10, 5607:21, 5611:22, 5615:2,

5624:14, 5624:15, 5627:18, 5631:21, 5637:2, 5639:2, 5641:22, 5642:7, 5644:9, 5650:25, 5659:11, 5662:7, 5664:21, 5669:16, 5669:17, 5670:5, 5674:7

**first-of-its-kind** [1] - 5642:7

**fitting** [1] - 5676:15

**five** [3] - 5583:19, 5586:20, 5646:16

**flash** [1] - 5667:1

**flexibility** [1] - 5679:16

**flight** [2] - 5639:4, 5639:7

**flip** [1] - 5636:20

**Floor** [1] - 5580:7

**fluid** [1] - 5637:12

**focus** [3] - 5599:6, 5664:16, 5676:3

**Focus** [1] - 5614:22

**focusing** [2] - 5620:9, 5673:8

**follow** [5] - 5596:10, 5611:8, 5644:13, 5666:22, 5677:6

**follow-up** [3] - 5596:10, 5666:22, 5677:6

**followed** [2] - 5628:13, 5647:4

**followed-up** [1] - 5628:13

**following** [2] - 5635:11, 5649:24

**follows** [1] - 5678:3

**FOR** [1] - 5579:1

**foreclose** [1] - 5679:10

**foregoing** [1] - 5681:4

**forget** [1] - 5661:1

**forgot** [3] - 5610:24, 5639:1, 5664:5

**formally** [1] - 5673:20

**format** [6] - 5581:18, 5584:4, 5584:10, 5629:9, 5641:1, 5667:7

**formats** [21] - 5584:3, 5600:14, 5600:19, 5600:20, 5600:22, 5603:19, 5617:18, 5627:24, 5629:3, 5630:6, 5630:10, 5630:12, 5638:18, 5641:3, 5641:5, 5642:22, 5642:23, 5643:15, 5643:19,

5646:17, 5655:12

**forming** [2] - 5602:21, 5616:25

**formulation** [1] - 5582:2

**forth** [3] - 5654:21, 5667:9, 5674:18

**forward** [1] - 5654:9

**foundation** [25] - 5669:17, 5669:22, 5669:25, 5670:23, 5670:24, 5670:25, 5671:8, 5671:13, 5671:17, 5671:22, 5673:8, 5673:25, 5674:13, 5675:14, 5675:16, 5675:17, 5675:19, 5675:20, 5675:21, 5676:1, 5676:3, 5676:6, 5676:8, 5676:10, 5678:4

**four** [4] - 5581:4, 5583:4, 5583:19, 5650:14

**friends** [4] - 5593:16, 5593:17, 5593:22, 5607:9

**front** [8] - 5598:20, 5601:25, 5613:11, 5624:11, 5631:18, 5631:20, 5645:12, 5672:11

**full** [2] - 5628:13, 5681:5

**function** [1] - 5629:24

**fundamentals** [1] - 5618:23

**funnel** [136] - 5581:18, 5581:22, 5582:2, 5582:7, 5583:16, 5584:4, 5584:11, 5584:14, 5584:17, 5584:18, 5584:19, 5584:21, 5584:22, 5584:23, 5584:25, 5587:18, 5587:19, 5587:20, 5587:22, 5587:25, 5589:5, 5589:12, 5589:17, 5590:3, 5590:8, 5590:12, 5591:6, 5597:2, 5597:6, 5599:3, 5599:6, 5599:7, 5599:10, 5599:12, 5599:15, 5599:17, 5599:19, 5603:19, 5604:3, 5604:6, 5606:13, 5606:19, 5606:23,

5607:2, 5607:4, 5607:6, 5607:7, 5607:25, 5608:4, 5608:8, 5608:11, 5609:1, 5609:12, 5609:15, 5609:21, 5609:22, 5609:25, 5610:1, 5610:6, 5610:7, 5610:10, 5610:13, 5610:16, 5610:19, 5611:5, 5611:12, 5611:14, 5611:17, 5611:18, 5611:21, 5612:7, 5612:10, 5612:13, 5612:15, 5612:17, 5612:22, 5612:24, 5613:2, 5613:6, 5614:19, 5614:25, 5615:3, 5615:8, 5615:10, 5615:14, 5616:4, 5616:5, 5616:12, 5616:18, 5617:8, 5617:11, 5617:13, 5617:16, 5617:18, 5619:1, 5619:4, 5619:9, 5620:5, 5620:7, 5620:10, 5620:13, 5620:22, 5620:23, 5621:4, 5621:8, 5623:14, 5623:16, 5623:20, 5625:13, 5626:7, 5626:23, 5628:25, 5629:9, 5629:16, 5646:17, 5647:5, 5647:11, 5647:15, 5648:3, 5648:11, 5649:5, 5649:7, 5649:8, 5649:9, 5656:3, 5660:13, 5660:16, 5660:18, 5660:20, 5660:23, 5660:25, 5661:3

**funnel-shaped** [1] - 5611:14

**funnels** [2] - 5583:19, 5584:20

**furor** [1] - 5665:1

### G

**game** [2] - 5585:25, 5649:7

**gears** [1] - 5658:8

**general** [13] - 5585:5, 5585:8, 5587:14, 5587:24, 5621:10, 5630:11, 5638:13, 5642:12, 5656:2,

5692

5656:4, 5670:7, 5670:9, 5671:12
**generally** [9] - 5587:19, 5592:24, 5593:3, 5593:8, 5594:4, 5594:10, 5629:11, 5630:8, 5654:12
**given** [3] - 5621:18, 5675:6, 5676:10
**global** [2] - 5667:4, 5678:5
**goal** [7] - 5591:16, 5591:20, 5629:7, 5630:7, 5630:10, 5630:11, 5630:24
**goals** [4] - 5630:9, 5630:16, 5630:17, 5630:24
**golf** [9] - 5591:25, 5592:1, 5592:3, 5592:4, 5594:16, 5594:17, 5607:8, 5607:10, 5656:23
**golfing** [2] - 5592:10, 5607:9
**Goodrich** [1] - 5580:6
**google** [1] - 5579:6
**Google** [34] - 5580:1, 5581:7, 5617:24, 5621:24, 5628:4, 5632:5, 5632:20, 5634:8, 5641:4, 5644:11, 5645:2, 5645:3, 5645:6, 5648:20, 5666:16, 5667:21, 5668:1, 5668:3, 5668:4, 5668:11, 5669:1, 5669:17, 5670:1, 5670:25, 5671:5, 5671:16, 5672:18, 5672:22, 5673:15, 5675:22, 5675:23, 5675:25, 5676:17
**Google's** [4] - 5669:21, 5669:25, 5674:12, 5676:14
**government** [7] - 5581:3, 5649:24, 5649:25, 5650:8, 5672:14, 5677:6
**GOWER** [26] - 5666:2, 5666:8, 5666:13, 5666:15, 5667:1, 5667:8, 5667:15, 5667:19, 5668:25, 5669:7, 5669:16, 5670:22, 5671:16, 5672:9, 5673:6,

5673:23, 5674:10, 5674:25, 5675:11, 5675:21, 5675:24, 5676:13, 5678:16, 5679:3, 5679:14, 5679:17
**Gower** [2] - 5579:18, 5666:2
**gower** [2] - 5670:5, 5674:8
**granted** [1] - 5677:24
**graphic** [1] - 5652:8
**great** [2] - 5607:10, 5611:24
**GREENBLUM** [7] - 5668:10, 5668:22, 5670:2, 5671:24, 5673:16, 5674:7, 5677:3
**Greenblum** [2] - 5580:2, 5668:10
**greenblum** [1] - 5678:22
**Grid** [2] - 5640:12, 5640:14
**ground** [1] - 5603:17
**grounds** [1] - 5650:17
**group** [7] - 5596:24, 5644:4, 5667:20, 5673:24, 5675:12, 5675:13, 5676:14
**groups** [2] - 5678:19, 5678:22
**guess** [9] - 5600:3, 5610:1, 5611:8, 5621:21, 5624:12, 5645:4, 5662:21, 5665:21, 5675:14
**guessing** [1] - 5585:25
**guesswork** [1] - 5641:24
**guidance** [2] - 5673:19, 5677:14
**guy** [1] - 5606:8

## H

**Hal** [2] - 5617:24, 5618:15
**half** [1] - 5662:7
**hand** [5] - 5597:18, 5651:8, 5664:23, 5668:1, 5668:8
**handed** [1] - 5651:18
**handing** [1] - 5667:14
**hang** [1] - 5601:5
**happy** [1] - 5667:22
**hard** [3] - 5627:18, 5631:2, 5631:6

**hate** [2] - 5604:14, 5610:25
**head** [3] - 5658:14, 5659:1, 5680:1
**headlines** [2] - 5648:25, 5649:6
**headroom** [1] - 5637:14
**heads** [1] - 5662:14
**heads-up** [1] - 5662:14
**hear** [6] - 5606:3, 5631:19, 5634:24, 5634:25, 5635:6, 5636:4
**heard** [7] - 5591:5, 5591:22, 5591:23, 5641:9, 5641:20, 5662:15, 5662:16
**hearing** [2] - 5620:16, 5635:11
**hearsay** [10] - 5632:17, 5632:18, 5632:25, 5668:5, 5668:6, 5671:16, 5671:19, 5671:20, 5671:23, 5671:25
**heart** [2] - 5593:20, 5677:14
**hello** [1] - 5666:2
**Help** [1] - 5581:7
**help** [2] - 5630:11, 5667:4
**helps** [1] - 5653:21
**hereby** [1] - 5681:3
**higher** [2] - 5637:14, 5658:24
**highest** [3] - 5623:23, 5624:1, 5637:5
**highlight** [2] - 5636:13, 5637:9
**highlighted** [4] - 5588:20, 5606:9, 5639:14
**highlighting** [2] - 5666:9, 5666:11
**historical** [1] - 5654:24
**history** [4] - 5653:25, 5654:1, 5654:19, 5654:20
**hold** [1] - 5629:14
**home** [2] - 5648:4, 5661:21
**Honor** [58] - 5581:10, 5590:15, 5596:8, 5598:2, 5598:4, 5599:23, 5600:23, 5601:21, 5615:15, 5618:9, 5622:3,

5624:13, 5628:18, 5632:14, 5632:15, 5632:20, 5646:3, 5650:5, 5650:9, 5651:8, 5652:12, 5661:8, 5661:23, 5662:2, 5662:19, 5662:25, 5663:5, 5663:8, 5663:25, 5664:2, 5664:4, 5664:6, 5664:10, 5664:20, 5665:14, 5666:2, 5666:23, 5668:8, 5669:7, 5669:12, 5669:20, 5669:24, 5670:2, 5671:25, 5672:9, 5673:6, 5673:23, 5674:4, 5674:25, 5675:11, 5676:13, 5676:24, 5677:17, 5678:16, 5679:3, 5679:14, 5679:21
**Honor's** [1] - 5672:5
**HONORABLE** [1] - 5579:9
**hopefully** [1] - 5586:21
**housekeeping** [1] - 5664:5
**hum** [1] - 5619:23
**hypothesis** [1] - 5634:18
**hypothetical** [1] - 5592:2

## I

**identified** [3] - 5627:3, 5628:5, 5645:12
**identifies** [2] - 5612:7, 5627:5
**identify** [5] - 5620:1, 5644:19, 5644:25, 5661:13, 5676:8
**identifying** [2] - 5623:19, 5644:10
**IL** [1] - 5579:16
**image** [3] - 5606:8, 5611:5, 5639:9
**imagine** [1] - 5585:24
**immediately** [1] - 5657:7
**impact** [1] - 5654:16
**important** [3] - 5630:17, 5630:20, 5674:11
**improper** [3] - 5601:25, 5669:18,

5674:13
  **impute** [1] - 5658:25
  **IN** [1] - 5579:1
  **in-flight** [1] - 5639:4
  **include** [1] - 5673:3
  **included** [1] - 5588:23
  **includes** [2] - 5604:2,
  5655:18
  **including** [2] - 5597:4,
  5617:4
  **incomplete** [1] -
  5672:23
  **incompleteness** [1] -
  5673:7
  **inconsistent** [1] -
  5604:18
  **incorporates** [1] -
  5596:25
  **increase** [1] - 5639:24,
  5655:15
  **increasing** [1] -
  5593:1
  **increasingly** [1] -
  5594:1
  **incremental** [1] -
  5660:10
  **independent** [2] -
  5647:24, 5667:14
  **INDEX** [1] - 5682:1
  **indirectly** [1] -
  5591:19
  **industry** [4] - 5616:15,
  5618:8, 5618:20,
  5656:18
  **infer** [2] - 5600:21,
  5654:21
  **inference** [1] - 5601:1
  **inform** [1] - 5658:6
  **information** [4] -
  5626:21, 5632:16,
  5643:7, 5647:8
  **informs** [1] - 5656:21
  **Instagram** [5] -
  5586:12, 5591:24,
  5592:13, 5594:12,
  5656:23
  **install** [1] - 5595:19
  **instead** [1] - 5643:25
  **instructions** [1] -
  5597:21
  **intense** [3] - 5592:14,
  5592:18, 5594:2
  **intent** [5] - 5582:12,
  5593:4, 5594:2,
  5594:8, 5595:6
  **interchangeability** [1]
  - 5643:14
  **interchangeable** [2] -
  5600:22, 5638:2
  **interest** [4] - 5583:4,

5591:4, 5595:25,
5654:21
  **interested** [2] -
  5594:5, 5654:22
  **interests** [1] - 5647:9
  **internet** [3] - 5648:4,
  5653:22, 5654:9
  **interpreting** [1] -
  5637:25
  **interrupt** [2] -
  5604:14, 5644:17
  **introduced** [3] -
  5621:23, 5676:12,
  5676:18
  **invest** [1] - 5635:19
  **investment** [7] -
  5629:22, 5630:1,
  5633:17, 5633:22,
  5635:3, 5635:5,
  5635:19
  **investments** [1] -
  5630:15
  **IPG** [3] - 5582:19,
  5636:16, 5638:22
  **issue** [8] - 5643:21,
  5650:18, 5662:15,
  5663:19, 5670:2,
  5675:10, 5677:10,
  5679:7
  **issues** [6] - 5650:1,
  5650:7, 5650:11,
  5662:3, 5677:4, 5678:9
  **item** [1] - 5622:4
  **iteration** [2] - 5599:3,
  5614:18
  **itself** [3] - 5628:4,
  5671:11, 5672:21

## J

  **JANICE** [1] - 5681:3
  **Janice** [2] - 5580:10,
  5681:11
  **Jareth** [2] - 5652:16,
  5663:3
  **JC** [1] - 5664:24
  **Jerath** [29] - 5581:6,
  5581:15, 5587:12,
  5592:13, 5595:5,
  5597:21, 5599:21,
  5600:9, 5618:25,
  5628:24, 5629:18,
  5630:13, 5631:11,
  5638:10, 5650:13,
  5650:22, 5651:18,
  5653:10, 5656:1,
  5659:8, 5659:17,
  5660:11, 5661:10,
  5661:12, 5661:20,
  5662:16, 5663:2,

5664:5, 5682:3
  **JERATH** [1] - 5581:12
  **Jerath's** [3] - 5618:11,
  5651:10, 5664:8
  **Jeremy** [1] - 5647:14
  **Jerry** [1] - 5644:1
  **job** [2] - 5607:8,
  5635:2
  **John** [1] - 5580:1
  **joining** [1] - 5647:8
  **Josh** [1] - 5644:2
  **journal** [1] - 5661:2
  **journey** [1] - 5606:10
  **JPMorgan** [2] -
  5613:19, 5614:10
  **Jr** [1] - 5579:22
  **jschmidtlein@wc.
  com** [1] - 5580:4
  **Juda** [1] - 5644:2
  **Judge** [5] - 5594:25,
  5624:16, 5637:22,
  5648:23, 5649:17
  **JUDGE** [1] - 5579:10
  **judge** [3] - 5581:3,
  5598:19, 5649:23
  **jump** [1] - 5658:8
  **jury** [1] - 5679:16
  **Justice** [5] - 5579:12,
  5579:15, 5579:19,
  5663:23, 5663:25

## K

  **Kagan** [2] - 5646:18,
  5647:14
  **keep** [6] - 5584:2,
  5627:20, 5657:19,
  5669:19, 5674:1,
  5680:3
  **keeping** [2] - 5619:21,
  5664:23
  **Kenneth** [1] - 5579:11
  **kenneth.dintzer2@
  usdoj.gov** [1] - 5579:14
  **key** [3] - 5635:15,
  5635:20, 5637:3
  **Key** [2] - 5636:13,
  5637:2
  **keywords** [2] -
  5652:21, 5652:24
  **kind** [10] - 5592:5,
  5592:7, 5592:8,
  5592:9, 5596:2,
  5603:10, 5604:4,
  5604:11, 5620:23,
  5642:7
  **kinds** [3] - 5604:1,
  5616:12, 5654:18
  **Kinshuk** [1] - 5682:3
  **KINSHUK** [1] -

5581:12
  **knowledge** [2] -
  5669:22, 5671:9
  **KPIs** [2] - 5637:5,
  5637:14

## L

  **language** [1] -
  5660:23
  **large** [2] - 5670:11,
  5676:17
  **largely** [1] - 5589:3
  **larger** [2] - 5601:1,
  5650:18
  **largest** [1] - 5647:24
  **LaSalle** [1] - 5579:15
  **last** [15] - 5595:5,
  5603:12, 5604:17,
  5641:19, 5642:25,
  5646:9, 5646:13,
  5646:16, 5647:21,
  5648:23, 5649:2,
  5654:15, 5658:3,
  5661:1, 5664:25
  **latency** [1] - 5662:13
  **lead** [2] - 5591:13,
  5591:18
  **leads** [2] - 5637:5,
  5654:20
  **least** [16] - 5595:19,
  5600:12, 5600:18,
  5608:6, 5608:21,
  5609:20, 5609:24,
  5613:1, 5614:13,
  5615:13, 5627:4,
  5630:1, 5655:23,
  5672:15, 5673:1,
  5673:2
  **leave** [2] - 5666:24,
  5678:12
  **led** [1] - 5594:8
  **left** [11] - 5606:7,
  5607:21, 5611:5,
  5612:7, 5612:21,
  5612:22, 5622:11,
  5633:15, 5640:13,
  5659:24, 5663:24
  **lend** [1] - 5642:4
  **less** [15] - 5589:11,
  5589:15, 5590:2,
  5590:7, 5590:11,
  5594:17, 5629:6,
  5654:11, 5654:24,
  5655:21, 5658:1,
  5658:5, 5663:20
  **letter** [1] - 5677:5
  **level** [12] - 5581:18,
  5584:3, 5584:11,
  5591:6, 5600:21,

5611:21, 5621:10, 5628:25, 5629:3, 5629:9, 5638:13, 5642:19
**levels** [11] - 5583:4, 5583:15, 5583:20, 5584:4, 5584:10, 5612:7, 5613:2, 5616:12, 5617:8, 5620:11
**light** [1] - 5673:5
**like-minded** [1] - 5647:8
**likely** [1] - 5679:25
**Lim** [1] - 5652:17
**Lim's** [1] - 5634:23
**limine** [2] - 5677:24, 5678:1
**limited** [2] - 5615:18, 5664:15
**limiting** [1] - 5662:23
**line** [1] - 5635:22
**list** [27] - 5587:2, 5587:8, 5601:9, 5601:19, 5602:4, 5602:5, 5602:6, 5602:9, 5608:19, 5609:2, 5612:10, 5612:13, 5612:15, 5612:18, 5612:24, 5625:8, 5625:25, 5631:24, 5648:16, 5649:14, 5668:7, 5668:14, 5669:6, 5670:3, 5670:19, 5673:17, 5675:25
**listed** [15] - 5592:20, 5602:14, 5602:16, 5603:8, 5607:21, 5608:3, 5608:8, 5608:19, 5609:15, 5611:17, 5613:5, 5622:15, 5624:6, 5636:22, 5648:17
**listening** [2] - 5621:17, 5634:22
**listing** [1] - 5604:7
**lists** [3] - 5581:6, 5625:1, 5627:12
**literally** [1] - 5594:15
**litigation** [2] - 5645:5, 5645:7
**LLC** [1] - 5579:6
**LLP** [2] - 5579:23, 5580:2
**log** [1] - 5595:17
**long-term** [1] - 5633:23
**longstanding** [1] - 5674:25

**look** [36] - 5581:25, 5589:8, 5593:9, 5601:16, 5601:20, 5605:8, 5606:2, 5606:4, 5606:7, 5606:16, 5610:6, 5610:15, 5612:6, 5615:2, 5616:14, 5619:6, 5623:1, 5623:22, 5623:25, 5625:15, 5630:14, 5631:8, 5632:19, 5636:19, 5639:1, 5641:7, 5644:15, 5658:9, 5661:17, 5663:12, 5673:21, 5674:16, 5676:9, 5678:7, 5679:7
**looked** [14] - 5583:19, 5594:16, 5602:5, 5602:13, 5603:7, 5611:11, 5614:12, 5617:12, 5623:6, 5624:4, 5628:9, 5628:15, 5628:19, 5644:6
**looking** [19] - 5593:6, 5593:15, 5593:16, 5600:12, 5602:10, 5602:14, 5602:20, 5603:18, 5604:9, 5608:6, 5612:21, 5614:9, 5615:22, 5615:24, 5622:5, 5626:13, 5627:5, 5630:4, 5661:3
**looks** [4] - 5616:19, 5620:22, 5627:3, 5652:8
**loss** [1] - 5652:20
**lost** [1] - 5639:9
**low** [4] - 5600:17, 5608:4, 5609:22, 5613:5
**Lowcock** [3] - 5582:7, 5582:17, 5644:2
**lowcock's** [1] - 5621:14
**Lowcock's** [2] - 5621:17, 5621:24
**lower** [28] - 5599:12, 5599:19, 5606:13, 5606:19, 5606:23, 5607:2, 5607:7, 5607:11, 5608:2, 5608:3, 5608:8, 5609:1, 5609:17, 5610:1, 5610:7, 5610:16, 5611:12, 5611:18, 5611:23,

5615:14, 5616:4, 5617:13, 5617:16, 5617:18, 5619:4, 5621:8, 5622:11, 5648:3
**lower-funnel** [5] - 5606:23, 5607:2, 5608:8, 5610:1, 5648:3
**lowest** [1] - 5656:3
**lunch** [1] - 5581:4

**M**

**Maddox** [1] - 5579:18
**MADDOX** [36] - 5581:10, 5582:16, 5582:22, 5590:15, 5599:23, 5600:23, 5601:21, 5615:15, 5618:9, 5619:12, 5619:21, 5619:23, 5622:3, 5622:10, 5628:18, 5632:15, 5632:21, 5644:17, 5644:22, 5644:25, 5645:14, 5645:19, 5650:9, 5650:21, 5651:8, 5651:14, 5651:17, 5652:12, 5652:15, 5653:7, 5653:9, 5659:7, 5661:8, 5661:15, 5661:18, 5664:6
**Maddox................ 5650** [1] - 5682:4
**magical** [6] - 5596:2, 5596:11, 5596:12, 5657:1, 5657:6, 5657:8
**magnitude** [1] - 5658:24
**main** [2] - 5584:18, 5657:19
**Main** [1] - 5580:3
**maintained** [1] - 5676:19
**major** [1] - 5638:11
**majority** [1] - 5676:18
**manage** [1] - 5635:23
**manageable** [1] - 5678:19
**management** [4] - 5601:22, 5601:24, 5641:14, 5641:15
**manner** [5] - 5607:2, 5670:13, 5670:14, 5672:4, 5678:5
**manufacturer** [1] - 5630:22
**mapped** [1] - 5597:5
**mapping** [5] -

5581:17, 5584:2, 5584:9, 5627:24, 5628:6
**marked** [2] - 5597:24, 5644:9
**marker** [1] - 5653:18
**market** [1] - 5658:6
**marketers** [2] - 5635:18, 5647:6
**marketing** [14] - 5618:7, 5640:18, 5640:21, 5641:2, 5641:25, 5642:9, 5642:17, 5647:11, 5647:25, 5648:2, 5648:3, 5649:7, 5649:8
**marketplace** [1] - 5596:13
**marks** [1] - 5593:19
**material** [2] - 5601:22, 5665:23
**materially** [1] - 5618:8
**materials** [19] - 5581:6, 5587:3, 5587:8, 5592:20, 5597:22, 5601:10, 5601:15, 5602:15, 5605:1, 5608:20, 5624:7, 5625:8, 5626:11, 5627:11, 5636:23, 5636:25, 5646:23, 5648:16, 5649:14
**matter** [6] - 5594:15, 5616:14, 5664:5, 5670:7, 5670:9, 5677:23
**matters** [4] - 5666:3, 5669:9, 5669:10, 5674:12
**maximize** [2] - 5641:24, 5642:16
**mean** [21] - 5586:1, 5590:17, 5594:20, 5594:22, 5595:11, 5595:22, 5596:2, 5601:14, 5601:16, 5607:1, 5627:18, 5629:23, 5638:1, 5648:2, 5655:16, 5657:14, 5663:6, 5663:12, 5667:4, 5678:6
**means** [7] - 5600:25, 5613:8, 5629:21, 5639:7, 5645:19, 5647:6, 5655:17
**meant** [2] - 5581:4, 5653:8
**measurable** [1] -

5648:12
**measure** [1] - 5640:21
**measured** [1] -
5637:11
**measurement** [1] -
5655:5
**measuring** [1] -
5659:21
**media** [16] - 5586:9,
5586:22, 5589:4,
5592:22, 5593:1,
5593:6, 5610:11,
5613:22, 5615:3,
5615:4, 5641:24,
5642:18, 5647:7,
5647:10, 5657:22,
5659:5
**meet** [2] - 5630:17,
5677:5
**meetings** [1] - 5605:2
**MEHTA** [1] - 5579:9
**memory** [4] - 5588:10,
5627:22, 5627:24,
5651:15
**mention** [3] - 5623:7,
5643:9
**mentioned** [10] -
5581:21, 5608:25,
5650:10, 5651:3,
5655:20, 5660:25,
5662:5, 5664:7,
5666:20, 5670:3
**metric** [2] - 5629:24,
5630:25
**metrics** [1] - 5629:22
**Michael** [1] - 5580:5
**microphone** [1] -
5620:15
**mid** [29] - 5584:17,
5584:23, 5584:25,
5587:18, 5587:19,
5587:22, 5589:12,
5589:17, 5590:2,
5590:8, 5590:12,
5591:6, 5597:1,
5597:5, 5599:17,
5607:4, 5607:25,
5608:8, 5608:10,
5609:15, 5609:21,
5609:25, 5610:1,
5613:5, 5615:3,
5619:4, 5620:23,
5623:16, 5623:19
**mid-funnel** [15] -
5584:17, 5584:23,
5587:18, 5587:19,
5587:22, 5599:17,
5607:4, 5607:25,
5609:15, 5609:21,
5609:25, 5615:3,

5619:4, 5620:23,
5623:16
**mid-level** [1] - 5591:6
**middle** [13] - 5584:23,
5587:25, 5589:5,
5598:16, 5599:9,
5607:21, 5609:12,
5612:13, 5612:17,
5612:22, 5614:3,
5655:9
**midlevel** [1] - 5624:1
**might** [9] - 5607:2,
5613:7, 5619:8,
5620:22, 5638:1,
5660:25, 5673:4,
5676:12
**million** [2] - 5658:1,
5658:2
**mind** [5] - 5592:2,
5601:7, 5618:19,
5657:5, 5657:19
**minded** [1] - 5647:8
**mine** [1] - 5608:23
**minute** [2] - 5588:4,
5594:18
**minutes** [2] - 5636:9,
5646:10
**misrepresentative** [1]
- 5658:7
**mistakes** [1] - 5669:2
**misunderstanding** [1]
- 5671:14
**misunderstood** [1] -
5665:1
**mobile** [1] - 5612:23
**modeling** [1] - 5642:7
**models** [1] - 5640:20
**modern** [1] - 5661:3
**modified** [3] - 5622:5,
5622:11, 5665:19
**moment** [14] -
5583:18, 5593:4,
5594:9, 5596:25,
5611:1, 5611:11,
5619:12, 5622:1,
5632:16, 5632:18,
5636:20, 5644:17,
5661:8, 5669:8
**Monday** [4] - 5662:5,
5675:7, 5675:9,
5679:25
**monetize** [1] - 5586:21
**money** [3] - 5629:5,
5629:7, 5629:8
**monthly** [1] - 5634:3
**months** [1] - 5674:22
**morning** [2] - 5658:23,
5660:21
**most** [21] - 5581:18,
5584:5, 5584:11,

5584:25, 5591:3,
5591:6, 5600:14,
5610:18, 5616:10,
5616:13, 5616:15,
5617:8, 5617:9,
5619:5, 5628:13,
5628:16, 5633:23,
5637:17, 5649:13,
5672:10
**mostly** [1] - 5634:3
**motion** [3] - 5662:6,
5662:9, 5668:3
**motions** [2] - 5677:24,
5678:1
**move** [12] - 5586:1,
5588:22, 5590:22,
5601:3, 5611:24,
5620:15, 5659:5,
5664:7, 5667:20,
5667:24, 5668:2,
5677:1
**moved** [1] - 5668:15
**moving** [4] - 5617:21,
5617:22, 5637:16,
5638:4
**MR** [131] - 5581:3,
5581:14, 5582:20,
5582:23, 5582:24,
5585:21, 5587:7,
5587:11, 5588:13,
5590:18, 5594:25,
5595:4, 5596:6,
5596:9, 5596:23,
5598:2, 5598:5,
5598:19, 5598:23,
5600:7, 5600:8,
5601:3, 5601:6,
5602:3, 5602:24,
5603:4, 5603:6,
5605:11, 5605:14,
5608:15, 5613:18,
5613:21, 5615:19,
5615:21, 5618:14,
5618:16, 5619:14,
5619:18, 5619:22,
5619:24, 5622:11,
5622:14, 5624:13,
5624:16, 5624:18,
5628:22, 5628:23,
5631:10, 5631:14,
5631:23, 5632:13,
5632:19, 5632:23,
5633:2, 5633:10,
5633:12, 5636:9,
5636:11, 5636:14,
5639:17, 5639:20,
5644:21, 5644:23,
5645:2, 5645:7,
5645:11, 5645:16,
5646:2, 5646:7,

5646:12, 5646:14,
5646:23, 5647:2,
5647:3, 5648:7,
5648:10, 5648:23,
5648:24, 5649:17,
5649:23, 5662:2,
5662:25, 5663:8,
5663:17, 5663:24,
5664:1, 5664:4,
5664:10, 5664:12,
5664:20, 5665:11,
5665:14, 5665:24,
5666:2, 5666:8,
5666:13, 5666:15,
5667:1, 5667:8,
5667:15, 5667:19,
5668:10, 5668:22,
5668:25, 5669:7,
5669:16, 5670:2,
5670:22, 5671:16,
5671:24, 5672:9,
5673:6, 5673:16,
5673:23, 5674:7,
5674:10, 5674:25,
5675:11, 5675:21,
5675:24, 5676:13,
5677:3, 5677:17,
5678:16, 5679:3,
5679:14, 5679:17,
5679:20, 5679:22,
5679:23, 5680:1
**MS** [36] - 5581:10,
5582:16, 5582:22,
5590:15, 5599:23,
5600:23, 5601:21,
5615:15, 5618:9,
5619:12, 5619:21,
5619:23, 5622:3,
5622:10, 5628:18,
5632:15, 5632:21,
5644:17, 5644:22,
5644:25, 5645:14,
5645:19, 5650:9,
5650:21, 5651:8,
5651:14, 5651:17,
5652:12, 5652:15,
5653:7, 5653:9,
5659:7, 5661:8,
5661:15, 5661:18,
5664:6
**msommer@wsgr.
com** [1] - 5580:8
**multiple** [2] - 5618:10,
5637:11
**multiplied** [1] -
5657:15
**must** [2] - 5639:17,
5657:19

5696

## N

**N.W** [1] - 5681:12
**name** [7] - 5598:1, 5605:8, 5605:17, 5617:24, 5623:7, 5647:22, 5648:6
**named** [1] - 5619:25
**names** [1] - 5598:6
**narrow** [1] - 5677:14
**narrowed** [1] - 5677:7
**nature** [2] - 5657:11, 5671:14
**NB** [1] - 5626:3
**necessarily** [8] - 5603:23, 5604:9, 5606:15, 5607:1, 5638:2, 5641:3, 5655:13, 5678:11
**need** [12] - 5613:15, 5629:1, 5632:4, 5632:15, 5646:11, 5661:25, 5670:8, 5675:12, 5678:11, 5679:1, 5679:13, 5679:19
**needs** [1] - 5678:13
**negotiate** [1] - 5675:18
**negotiations** [1] - 5676:2
**network** [1] - 5596:17
**networks** [1] - 5588:7
**never** [3] - 5594:16, 5663:24, 5670:11
**New** [2] - 5579:24, 5580:7
**new** [2] - 5595:19, 5615:4
**Nexoya** [2] - 5641:8, 5641:9
**next** [19] - 5582:15, 5591:25, 5596:15, 5605:7, 5610:3, 5610:10, 5613:10, 5617:21, 5626:20, 5637:17, 5640:16, 5641:7, 5642:15, 5655:8, 5662:11, 5666:1, 5673:24, 5675:12, 5680:3
**non** [1] - 5619:16
**non-company** [1] - 5619:16
**nonbrand** [5] - 5609:12, 5609:21, 5609:25, 5625:18, 5626:3
**nonbranded** [1] - 5626:7

**none** [1] - 5646:16
**note** [3] - 5599:23, 5650:14, 5651:24
**noted** [3] - 5588:17, 5636:16, 5659:20
**notes** [1] - 5681:5
**nothing** [5] - 5597:24, 5637:21, 5679:20, 5679:22, 5679:23
**noticed** [2] - 5601:9, 5605:1
**number** [14] - 5584:15, 5588:11, 5595:2, 5626:21, 5651:3, 5651:21, 5653:6, 5658:10, 5658:11, 5658:14, 5658:20, 5659:1, 5659:3, 5660:12
**numbers** [6] - 5598:16, 5630:23, 5658:17, 5668:17, 5668:25, 5675:6
**numerical** [1] - 5624:11
**numerous** [2] - 5597:14, 5677:24
**NW** [3] - 5579:12, 5579:19, 5580:11
**NY** [2] - 5579:24, 5580:7

## O

**object** [1] - 5600:2
**objection** [39] - 5581:10, 5582:16, 5590:15, 5599:23, 5600:23, 5601:21, 5602:2, 5615:15, 5618:9, 5628:18, 5664:10, 5667:12, 5668:5, 5668:6, 5669:4, 5669:18, 5669:22, 5670:1, 5670:23, 5670:25, 5671:4, 5671:13, 5671:17, 5671:18, 5671:20, 5673:9, 5673:25, 5674:12, 5674:14, 5674:22, 5675:17, 5676:1, 5676:6, 5676:8, 5676:15, 5676:17, 5676:20, 5677:2, 5678:4
**objections** [26] - 5666:16, 5667:2, 5667:3, 5667:5, 5667:13, 5668:14,

5669:25, 5671:17, 5671:19, 5673:7, 5674:19, 5674:20, 5675:1, 5675:2, 5675:5, 5675:8, 5675:14, 5675:16, 5675:17, 5676:3, 5676:4, 5676:18, 5676:22, 5678:6, 5679:5, 5679:9
**objective** [1] - 5629:23
**obsess** [1] - 5635:5
**obsessed** [1] - 5636:2
**obsolete** [1] - 5649:8
**obviously** [4] - 5646:1, 5664:13, 5671:1, 5677:23
**October** [2] - 5579:5, 5681:7
**odds** [1] - 5616:7
**OF** [3] - 5579:1, 5579:9, 5681:1
**offer** [9] - 5581:5, 5581:7, 5585:15, 5604:12, 5616:14, 5632:13, 5640:8, 5641:11, 5662:7
**offered** [4] - 5622:12, 5649:25, 5650:15, 5670:16
**Offered** [1] - 5682:10
**offering** [1] - 5650:6
**offers** [1] - 5662:12
**office** [2] - 5663:2, 5663:20
**OFFICIAL** [1] - 5681:1
**Official** [2] - 5580:10, 5681:11
**often** [2] - 5613:7, 5634:4
**oftentimes** [1] - 5674:21
**old** [1] - 5677:11
**older** [1] - 5592:25
**once** [4] - 5604:12, 5623:7, 5634:4, 5677:17
**one** [86] - 5582:4, 5582:8, 5582:15, 5582:25, 5583:2, 5583:8, 5583:10, 5583:12, 5584:1, 5585:15, 5587:2, 5587:7, 5587:13, 5592:14, 5594:25, 5595:5, 5600:10, 5600:18, 5602:17, 5603:4, 5603:10, 5604:17, 5604:24, 5604:25, 5608:16,

5610:3, 5610:24, 5611:6, 5616:22, 5618:19, 5619:9, 5619:12, 5623:23, 5624:2, 5624:10, 5624:15, 5626:3, 5626:21, 5627:7, 5627:17, 5627:23, 5630:4, 5630:18, 5631:12, 5631:13, 5631:25, 5632:3, 5632:4, 5632:10, 5632:15, 5633:21, 5634:9, 5636:22, 5641:1, 5641:7, 5641:19, 5644:24, 5646:18, 5648:12, 5651:13, 5651:14, 5651:22, 5652:24, 5653:3, 5655:1, 5657:13, 5657:18, 5657:19, 5658:21, 5658:24, 5659:11, 5661:8, 5661:13, 5662:4, 5662:15, 5664:5, 5665:8, 5666:13, 5669:8, 5670:12, 5672:13, 5672:21, 5675:14, 5678:21
**ones** [2] - 5649:16, 5675:3
**ongoing** [1] - 5639:7
**online** [2] - 5615:2, 5648:17
**oops** [1] - 5632:1, 5639:9
**open** [2] - 5601:23, 5653:4, 5659:8, 5666:24, 5675:8, 5678:12
**opening** [5] - 5583:15, 5588:5, 5588:11, 5589:9, 5589:20
**opine** [1] - 5584:25
**opines** [2] - 5587:13, 5587:24
**opinion** [25] - 5589:10, 5589:20, 5590:10, 5596:18, 5597:1, 5597:4, 5597:9, 5597:10, 5603:20, 5603:23, 5604:10, 5604:19, 5604:21, 5608:10, 5609:2, 5610:18, 5616:7, 5616:10, 5628:13, 5630:19, 5652:24, 5654:15, 5660:19, 5661:6, 5676:25

**opinions** [12] -
5602:21, 5603:21,
5604:18, 5616:25,
5656:8, 5656:15,
5656:17, 5660:4,
5662:7, 5662:12,
5664:13, 5664:17
**opportunity** [10] -
5585:17, 5585:19,
5596:21, 5604:16,
5647:9, 5657:3,
5669:13, 5672:24,
5673:3, 5675:9
**oppose** [1] - 5668:3
**opposed** [4] - 5600:5,
5602:5, 5609:9,
5658:16
**optimally** [1] - 5640:20
**optimization** [11] -
5629:21, 5629:25,
5637:4, 5638:12,
5638:14, 5638:17,
5638:23, 5639:3,
5639:12, 5640:8,
5640:18
**Optimization** [1] -
5639:2
**optimize** [5] - 5629:19,
5630:5, 5630:12,
5638:18, 5641:1
**optimizer** [1] - 5639:4
**optimizing** [1] -
5641:15
**options** [4] - 5589:11,
5590:2, 5590:7,
5590:11
**order** [4] - 5601:23,
5601:24, 5624:11,
5638:18
**orders** [1] - 5658:24
**organic** [1] - 5620:9
**organization's** [1] -
5600:5
**orient** [3] - 5610:4,
5626:18, 5636:15
**orientation** [1] -
5621:13
**oriented** [1] - 5644:13
**original** [2] - 5619:17,
5619:18
**otherwise** [4] -
5671:12, 5675:4,
5675:8, 5676:10
**ought** [2] - 5663:23,
5676:5
**outcome** [1] - 5630:1
**outdated** [1] - 5660:22
**outperforming** [1] -
5639:24
**outside** [3] - 5669:19,

5673:18, 5677:20
**outstanding** [3] -
5670:22, 5675:25,
5679:10
  **overlap** [1] - 5584:22
  **overrule** [2] - 5602:2,
5669:24
  **overruled** [6] -
5590:16, 5675:5,
5675:17, 5676:2,
5676:20, 5676:22
  **own** [4] - 5634:18,
5643:13, 5644:4,
5651:12

# P

  **p.m** [1] - 5579:6
  **page** [67] - 5581:7,
5598:15, 5599:25,
5600:6, 5600:10,
5600:12, 5600:18,
5602:20, 5603:18,
5605:19, 5607:18,
5608:6, 5608:7,
5608:9, 5610:4,
5611:4, 5611:7,
5611:14, 5611:18,
5612:6, 5612:7,
5613:1, 5613:17,
5613:20, 5614:18,
5615:18, 5619:8,
5620:5, 5623:5,
5623:18, 5623:19,
5623:21, 5624:19,
5625:16, 5626:6,
5626:14, 5627:5,
5627:13, 5632:9,
5632:12, 5633:3,
5633:13, 5633:21,
5634:1, 5634:25,
5635:12, 5638:22,
5638:25, 5639:1,
5640:16, 5640:17,
5641:12, 5641:13,
5641:22, 5647:4,
5648:4, 5651:20,
5652:1, 5652:5,
5653:10, 5655:4,
5655:8, 5659:13,
5659:16, 5659:25
  **pages** [2] - 5599:24,
5628:19
  **paid** [16] - 5610:11,
5620:9, 5620:10,
5621:3, 5621:8,
5626:16, 5637:14,
5637:15, 5638:4,
5638:5, 5640:4,
5642:18, 5655:14,

5655:18, 5655:25
  **paper** [1] - 5639:25
  **papers** [1] - 5655:2
  **paragraph** [10] -
5588:5, 5588:6,
5588:14, 5589:8,
5637:9, 5637:10,
5642:15, 5647:4,
5647:5, 5655:9
  **part** [13] - 5608:21,
5634:25, 5635:10,
5639:14, 5643:9,
5650:18, 5656:3,
5662:3, 5667:15,
5670:11, 5673:3,
5673:4, 5677:21
  **participants** [3] -
5633:6, 5634:3, 5660:3
  **Participate** [1] -
5626:20
  **particular** [26] -
5581:18, 5592:7,
5592:8, 5592:9,
5592:21, 5593:12,
5599:24, 5600:19,
5608:7, 5613:1,
5615:13, 5615:18,
5615:22, 5616:8,
5616:16, 5622:4,
5623:18, 5627:4,
5629:9, 5630:10,
5643:18, 5645:22,
5649:16, 5656:21,
5667:5, 5670:23
  **parties** [5] - 5597:22,
5660:12, 5660:16,
5667:10, 5677:9
  **partly** [1] - 5648:21
  **parts** [1] - 5634:23
  **party** [7] - 5631:11,
5650:5, 5650:16,
5667:25, 5673:24,
5675:23
  **pass** [1] - 5677:3
  **past** [1] - 5617:22
  **path** [1] - 5642:4
  **paths** [1] - 5605:25
  **patience** [1] - 5649:17
  **Patterson** [1] -
5579:23
  **pause** [4] - 5591:24,
5593:9, 5619:15,
5632:11
  **pending** [2] - 5601:5,
5629:14
  **people** [5] - 5592:25,
5594:1, 5660:22,
5662:21
  **perceive** [2] - 5617:15,
5628:24

**perceived** [1] -
5673:12
**percent** [15] - 5596:14,
5635:7, 5644:16,
5652:20, 5652:21,
5652:22, 5652:23,
5652:24, 5657:16,
5658:5, 5658:15,
5658:23, 5659:3
**percentage** [1] -
5658:11
**perform** [1] - 5619:1
**Performance** [2] -
5623:23, 5648:9
**performance** [12] -
5624:1, 5625:21,
5633:7, 5637:3,
5637:11, 5638:18,
5639:3, 5647:24,
5648:2, 5648:11,
5648:13, 5660:2
**performance-driven**
[1] - 5637:3
**performing** [1] -
5637:15
**perhaps** [2] - 5670:13,
5675:3
**period** [1] - 5618:5
**permissions** [1] -
5595:11
**person** [7] - 5593:5,
5594:4, 5606:16,
5606:22, 5607:5,
5620:12
**personal** [1] - 5669:22
**perspective** [3] -
5584:12, 5587:17,
5607:20
**persuasive** [1] -
5672:10
**phase** [2] - 5587:15,
5587:18
**phases** [2] - 5610:7
**phenomenon** [1] -
5586:21
**phone** [3] - 5595:7,
5595:10, 5595:19
**phones** [1] - 5595:20
**piece** [2] - 5653:18,
5653:19
**pieces** [1] - 5651:25
**Pinterest** [1] - 5586:13
**place** [1] - 5616:17
**placed** [2] - 5597:1,
5621:8
**places** [1] - 5603:19
**Plaintiff** [1] - 5579:22
**Plaintiffs** [2] - 5579:4,
5579:11
  **plaintiffs** [6] -

5698

5666:15, 5672:14, 5672:18, 5679:11, 5679:20
**plaintiffs'** [7] - 5583:14, 5585:18, 5587:3, 5587:9, 5587:13, 5587:24, 5665:5
**plan** [1] - 5665:4
**planning** [1] - 5641:25
**PLAs** [1] - 5585:8
**platform** [1] - 5594:12
**platforms** [6] - 5588:4, 5588:18, 5615:4, 5622:15, 5622:21, 5657:22
**play** [1] - 5622:21
**plus** [4] - 5668:7, 5675:20, 5675:21, 5676:1
**point** [15] - 5583:22, 5586:24, 5600:7, 5615:2, 5628:19, 5628:22, 5631:7, 5639:2, 5639:22, 5645:10, 5654:15, 5656:1, 5660:24, 5665:7, 5673:7
**pointed** [1] - 5598:19
**pointing** [1] - 5655:18
**points** [2] - 5657:5, 5657:19
**policy** [1] - 5595:22
**portfolio** [2] - 5641:14, 5641:15
**portion** [4] - 5588:20, 5639:21, 5662:6
**position** [1] - 5619:3
**positioning** [1] - 5617:10
**possible** [6] - 5629:22, 5629:23, 5630:1, 5641:6, 5666:18
**potential** [2] - 5647:7, 5647:10
**potentially** [5] - 5603:22, 5606:20, 5606:21, 5620:21, 5677:18
**powered** [1] - 5641:25
**precedence** [1] - 5630:24
**preceding** [2] - 5582:17, 5647:5
**predicted** [1] - 5642:19
**prepared** [1] - 5678:18
**prepping** [1] - 5663:4
**present** [1] - 5663:15
**presentation** [1] -

5651:19
**presentations** [2] - 5581:22, 5628:20
**presented** [1] - 5590:12
**presenting** [1] - 5670:4
**presents** [1] - 5647:9
**presumably** [1] - 5676:25
**previous** [1] - 5656:14
**previously** [2] - 5600:24, 5662:5
**primary** [1] - 5623:9
**Primary** [1] - 5614:22
**principle** [2] - 5630:13, 5630:16
**Principles** [2] - 5636:13, 5637:2
**print** [1] - 5642:18
**printed** [1] - 5598:16
**printouts** [1] - 5650:16
**Priority** [1] - 5625:1
**privacy** [1] - 5662:12
**pro** [1] - 5660:7
**pro-ROI** [1] - 5660:7
**problem** [4] - 5663:18, 5668:23, 5670:6, 5670:7
**problematic** [1] - 5600:4
**proceed** [2] - 5676:4, 5678:21
**proceedings** [1] - 5681:6
**process** [3] - 5584:9, 5626:22, 5669:12
**produced** [7] - 5582:18, 5607:15, 5636:15, 5645:15, 5645:17, 5665:12
**product** [3] - 5591:18, 5594:11, 5620:21
**production** [1] - 5608:7
**professor** [2] - 5652:16, 5663:2
**Professor** [18] - 5583:13, 5650:13, 5650:22, 5651:10, 5651:18, 5653:10, 5656:1, 5659:8, 5659:17, 5660:11, 5661:10, 5661:12, 5661:20, 5662:4, 5662:16, 5663:3, 5664:4, 5664:8
**profiles** [3] - 5653:24, 5654:1, 5654:12
**profiling** [2] - 5655:13,

5655:19
**programmatic** [1] - 5613:7
**programming** [1] - 5612:23
**progress** [1] - 5667:23
**prominent** [1] - 5633:23
**promise** [1] - 5648:23
**proper** [1] - 5671:18
**Prospects** [1] - 5614:22
**protocol** [1] - 5665:2
**provided** [3] - 5602:13, 5602:19, 5664:22
**provides** [1] - 5642:8
**provisional** [2] - 5666:18, 5666:19
**proximity** [1] - 5665:15
**publication** [1] - 5661:2
**pull** [1] - 5619:13
**purchase** [9] - 5582:13, 5591:18, 5594:18, 5622:22, 5629:16, 5649:5, 5656:23, 5657:8, 5660:19
**purchased** [3] - 5594:11, 5607:12, 5638:11
**purchasing** [2] - 5657:21, 5661:4
**purpose** [4] - 5591:10, 5619:1, 5672:1, 5672:2
**purposes** [3] - 5585:1, 5595:25, 5596:3
**put** [25] - 5582:1, 5582:20, 5598:18, 5600:16, 5603:2, 5605:20, 5620:13, 5620:21, 5621:1, 5621:12, 5627:17, 5629:5, 5629:6, 5632:12, 5636:12, 5644:9, 5645:25, 5646:20, 5647:2, 5649:2, 5653:19, 5669:11, 5672:18, 5673:5, 5678:8
**putting** [3] - 5600:15, 5623:21, 5659:16

**Q**

**qualification** [1] - 5585:15
**qualified** [1] - 5662:13

5655:19 (quarters)
**quarters** [1] - 5633:5
**queries** [1] - 5586:10
**query** [7] - 5651:1, 5651:5, 5652:3, 5652:4, 5652:9, 5652:20, 5654:23
**questioning** [1] - 5650:24
**questions** [9] - 5604:16, 5650:23, 5652:19, 5653:14, 5656:7, 5659:18, 5661:9, 5667:8, 5667:10
**quibble** [1] - 5638:3
**quick** [3] - 5629:17, 5662:3, 5664:20
**quickly** [3] - 5604:24, 5644:8, 5650:1
**quite** [4] - 5600:17, 5632:3, 5671:13, 5676:9
**quotation** [1] - 5593:19
**quote** [5] - 5605:22, 5606:1, 5606:11, 5606:17, 5618:2

**R**

**radio** [1] - 5642:18
**raise** [1] - 5615:3
**raised** [2] - 5666:3, 5677:5
**raising** [1] - 5671:16
**range** [1] - 5657:12
**rare** [1] - 5657:8
**rate** [2] - 5658:22
**rates** [2] - 5600:17, 5657:11
**rather** [2] - 5600:1, 5672:19
**reach** [5] - 5587:25, 5603:17, 5615:3, 5647:10, 5656:2
**read** [18] - 5582:10, 5587:16, 5589:14, 5589:22, 5621:19, 5627:18, 5627:20, 5639:11, 5639:19, 5641:23, 5643:21, 5647:13, 5650:1, 5652:1, 5655:8, 5657:19, 5659:23, 5659:24
**reading** [1] - 5637:18
**ready** [2] - 5591:23, 5599:1
**real** [2] - 5660:8, 5676:11

5699

realize [1] - 5675:1
reallocating [1] -
5637:13
really [14] - 5584:15,
5604:15, 5611:3,
5620:9, 5624:10,
5642:12, 5662:3,
5663:18, 5671:18,
5674:11, 5677:10,
5677:22, 5678:6,
5678:23
realtime [3] - 5622:7,
5639:3, 5642:9
reason [1] - 5660:3
reasonable [1] -
5604:15
receive [3] - 5592:13,
5635:3, 5668:16
received [3] - 5603:2,
5603:7, 5665:15
recent [1] - 5592:19
recently [1] - 5661:14
recess [2] - 5649:21,
5680:6
recognize [5] -
5582:8, 5582:25,
5583:8, 5608:16,
5619:8
recollection [2] -
5583:12, 5632:6
recommend [2] -
5637:13, 5637:16
recommendation [1] -
5642:1
recommendations [1]
- 5642:9
recommends [1] -
5639:23
record [24] - 5581:8,
5585:3, 5594:24,
5599:24, 5604:23,
5613:18, 5616:16,
5622:4, 5625:12,
5632:20, 5645:6,
5650:2, 5650:10,
5651:24, 5665:15,
5666:24, 5669:19,
5671:6, 5671:8,
5671:9, 5671:10,
5676:21, 5677:3,
5677:21
records [6] - 5602:1,
5645:8, 5673:13,
5673:22, 5677:21,
5678:10
redacted [2] -
5598:18, 5651:25
Redirect [1] - 5682:4
REDIRECT [1] -
5650:20

redirect [1] - 5596:21
refer [1] - 5654:7
reference [1] -
5662:16
referenced [1] -
5664:18
referred [2] - 5617:24,
5653:15
referring [7] - 5618:3,
5618:13, 5642:22,
5642:23, 5661:13,
5670:5, 5674:8
refers [2] - 5609:5,
5654:8
reflect [1] - 5652:9
reflected [3] -
5623:19, 5667:12,
5669:6
reflects [1] - 5664:16
regard [2] - 5593:23,
5666:8
regardless [2] -
5647:6, 5652:23
regulation [1] -
5654:13
regulatory [1] -
5667:25
related [1] - 5650:11
relates [2] - 5652:2,
5652:4
relating [3] - 5618:15,
5662:7, 5662:11
relative [2] - 5654:23,
5655:23
relevance [13] -
5676:15, 5676:16,
5676:18, 5676:20,
5676:21, 5677:2,
5677:4, 5677:11,
5677:22, 5678:6,
5678:18, 5679:4
relevant [7] - 5602:11,
5649:5, 5649:12,
5660:20, 5676:24,
5677:21, 5678:8
relied [27] - 5581:6,
5587:3, 5587:8,
5601:10, 5601:15,
5602:6, 5602:15,
5602:16, 5602:21,
5603:2, 5603:9,
5603:20, 5603:22,
5605:1, 5605:4,
5608:20, 5609:3,
5620:2, 5624:7,
5625:9, 5626:11,
5627:11, 5636:23,
5636:25, 5646:6,
5648:16, 5649:14
relied-upon [2] -

5603:2, 5605:4
rely [2] - 5601:17,
5655:24
relying [2] - 5601:18,
5654:11
remaining [2] -
5661:25, 5676:3
remains [1] - 5675:18
remember [35] -
5584:8, 5586:3,
5594:7, 5603:14,
5610:21, 5614:9,
5616:21, 5616:22,
5616:23, 5617:25,
5618:2, 5618:4,
5618:5, 5618:6,
5618:18, 5619:7,
5619:9, 5619:10,
5620:24, 5621:2,
5621:4, 5621:9,
5621:13, 5624:4,
5624:5, 5628:1,
5630:2, 5631:1,
5631:3, 5635:11,
5646:15, 5646:18,
5652:22, 5658:19,
5658:20
remembers [1] -
5618:14
reminded [1] -
5610:24
removed [1] - 5667:25
repeat [3] - 5584:7,
5588:16, 5597:3
rephrase [3] - 5600:9,
5615:20, 5616:3
replace [1] - 5665:18
report [20] - 5584:24,
5587:16, 5588:5,
5588:11, 5588:17,
5588:23, 5589:4,
5589:8, 5589:9,
5589:20, 5603:25,
5604:8, 5608:25,
5616:11, 5617:7,
5620:1, 5628:12,
5652:9, 5667:22
Reporter [3] -
5580:10, 5580:10,
5681:11
REPORTER [1] -
5681:1
reports [12] - 5583:12,
5583:13, 5587:3,
5587:8, 5590:13,
5590:17, 5649:15,
5651:1, 5651:5,
5652:3, 5652:4,
5652:20
represent [7] -

5601:14, 5608:19,
5621:23, 5624:6,
5625:8, 5626:11,
5627:11
representations [1] -
5668:17
representative [1] -
5657:18
represented [1] -
5605:22
representing [2] -
5670:18, 5672:2
request [3] - 5585:12,
5615:17, 5661:12
requests [2] -
5645:16, 5645:17
require [2] - 5655:13,
5655:19
research [4] -
5587:14, 5587:17,
5656:17, 5660:24
reserved [1] - 5672:25
residual [1] - 5674:20
resolve [4] - 5665:20,
5673:14, 5676:6,
5678:11
resolved [1] - 5679:9
respect [3] - 5664:4,
5676:11, 5679:11
response [4] -
5585:11, 5586:9,
5622:17, 5653:14
rest [2] - 5646:12,
5679:12
restarted [1] - 5586:20
restate [1] - 5584:7
rested [1] - 5679:11
result [1] - 5593:25
results [4] - 5606:23,
5632:22, 5632:25,
5641:1
resume [2] - 5649:19
retail [2] - 5586:5,
5658:5
retailing [1] - 5657:23
retargeted [8] -
5604:1, 5604:2,
5604:6, 5608:24,
5608:25, 5609:1
retargeting [3] -
5609:6, 5609:9, 5613:7
Rethink [1] - 5648:8
rethink [1] - 5604:10
rethinking [1] -
5603:21
return [6] - 5630:15,
5633:17, 5633:22,
5635:3, 5635:5,
5635:19
revenue [1] - 5658:11

**review** [6] - 5601:11, 5643:17, 5650:11, 5668:18, 5673:16, 5675:10
**reviewed** [5] - 5616:22, 5616:24, 5626:9, 5644:1, 5651:3
**reviewing** [2] - 5627:8, 5649:25
**revolutionary** [1] - 5641:25
**rewind** [1] - 5622:12
**Richard** [1] - 5579:18
**richard.gower@ usdoj.gov** [1] - 5579:21
**RMR** [1] - 5580:10
**road** [1] - 5677:19
**ROI** [27] - 5630:15, 5630:17, 5630:20, 5630:22, 5630:23, 5630:25, 5631:2, 5633:6, 5634:2, 5634:12, 5634:19, 5635:15, 5637:6, 5637:15, 5637:16, 5638:5, 5641:24, 5642:16, 5659:18, 5659:21, 5660:1, 5660:3, 5660:6, 5660:7, 5660:10
**ROIs** [1] - 5635:24
**roles** [2] - 5622:21
**room** [2] - 5663:3, 5663:9
**Room** [2] - 5580:11, 5681:12
**Rosati** [1] - 5580:6
**Rosetta** [3] - 5598:20, 5605:7, 5645:12
**RT** [3] - 5609:4, 5609:5
**rule** [1] - 5672:24
**Rules** [1] - 5672:16
**rules** [1] - 5674:3
**ruling** [1] - 5671:1
**run** [1] - 5649:11
**rush** [1] - 5611:9
**Ryan** [1] - 5644:1

## S

**safe** [1] - 5661:21
**sale** [1] - 5660:2
**sales** [6] - 5637:5, 5649:9, 5657:25, 5658:3, 5658:11, 5658:13
**satisfying** [1] - 5670:10
**saw** [11] - 5602:14, 5602:20, 5603:14,

5610:21, 5612:4, 5616:9, 5625:5, 5636:21, 5657:7, 5661:14, 5668:15
**scale** [2] - 5662:12
**scenarios** [1] - 5642:16
**Schmidtlein** [1] - 5580:1
**SCHMIDTLEIN** [6] - 5662:2, 5663:17, 5664:1, 5664:12, 5677:17, 5679:23
**Schmidtlein's** [1] - 5678:3
**scholarly** [1] - 5643:23
**scope** [1] - 5601:22
**scores** [1] - 5656:19
**screen** [19] - 5582:1, 5598:2, 5598:18, 5598:24, 5602:11, 5602:20, 5602:24, 5605:20, 5606:9, 5611:7, 5611:8, 5611:10, 5613:12, 5613:13, 5615:23, 5621:12, 5627:17, 5636:12, 5646:20
**screens** [1] - 5659:24
**scroll** [1] - 5591:24
**Search** [2] - 5621:24, 5648:20
**search** [103] - 5584:24, 5585:4, 5585:5, 5585:8, 5585:9, 5585:12, 5586:6, 5586:8, 5586:9, 5586:10, 5586:11, 5586:14, 5586:19, 5586:25, 5587:14, 5587:24, 5589:11, 5589:16, 5590:2, 5590:8, 5590:11, 5606:17, 5609:12, 5609:13, 5609:17, 5609:21, 5609:25, 5617:21, 5617:22, 5618:25, 5619:3, 5620:7, 5620:10, 5620:25, 5621:3, 5621:8, 5621:25, 5622:1, 5622:2, 5622:15, 5622:18, 5622:21, 5623:2, 5623:9, 5623:19, 5623:23, 5624:2, 5625:1, 5625:18, 5626:3, 5626:7, 5626:16, 5626:20, 5627:5, 5628:9,

5628:10, 5628:16, 5628:24, 5633:6, 5633:18, 5633:23, 5635:4, 5637:16, 5638:4, 5640:4, 5642:18, 5643:2, 5643:3, 5647:18, 5649:1, 5649:3, 5649:11, 5651:1, 5651:5, 5652:3, 5652:4, 5652:9, 5652:20, 5654:16, 5654:21, 5654:22, 5654:24, 5655:14, 5655:19, 5655:25, 5656:2, 5656:4, 5658:11, 5658:13, 5658:14, 5658:20, 5658:21, 5658:22
**searched** [1] - 5649:4
**searches** [1] - 5587:14
**searching** [1] - 5586:22
**second** [10] - 5589:9, 5590:21, 5592:18, 5611:6, 5623:23, 5632:10, 5634:9, 5637:9, 5639:22, 5662:15
**Second** [2] - 5646:24
**section** [2] - 5640:17, 5655:7
**Section** [1] - 5655:4
**security** [1] - 5663:19
**see** [117] - 5588:20, 5589:13, 5589:15, 5589:18, 5597:10, 5597:25, 5598:12, 5598:16, 5598:25, 5599:3, 5599:7, 5599:9, 5599:12, 5599:14, 5599:17, 5603:16, 5604:4, 5605:13, 5605:17, 5605:22, 5606:10, 5606:11, 5606:17, 5607:22, 5608:2, 5608:13, 5609:5, 5609:11, 5609:13, 5609:17, 5609:18, 5610:8, 5610:10, 5610:13, 5610:15, 5611:4, 5611:7, 5611:10, 5611:17, 5611:18, 5611:19, 5612:10, 5612:13, 5612:15, 5612:17, 5612:24, 5613:22, 5613:25, 5614:3, 5614:5, 5614:7,

5614:18, 5614:21, 5614:23, 5615:6, 5622:15, 5622:20, 5622:22, 5622:23, 5623:9, 5623:11, 5624:20, 5624:24, 5625:1, 5625:3, 5625:17, 5625:19, 5625:23, 5625:25, 5626:16, 5626:18, 5626:25, 5632:12, 5633:1, 5633:5, 5633:8, 5633:15, 5633:17, 5633:22, 5633:24, 5634:2, 5634:5, 5634:18, 5637:2, 5637:7, 5637:19, 5639:5, 5639:22, 5640:1, 5640:12, 5640:15, 5640:17, 5640:19, 5640:23, 5641:13, 5641:17, 5641:18, 5642:2, 5642:3, 5642:11, 5642:20, 5642:21, 5644:15, 5646:12, 5647:12, 5647:18, 5647:19, 5647:20, 5648:14, 5648:15, 5649:13, 5649:19, 5659:23, 5666:14, 5672:10, 5677:11
**seeing** [5] - 5582:9, 5611:14, 5611:22, 5632:6, 5650:25
**seek** [2] - 5629:18, 5630:5
**seem** [3] - 5588:19, 5620:11, 5647:15
**sending** [1] - 5591:17
**sense** [4] - 5600:4, 5647:10, 5676:23, 5679:9
**sent** [2] - 5592:14, 5592:15
**sentence** [4] - 5637:3, 5655:9, 5655:16, 5655:17
**separate** [4] - 5619:13, 5671:17, 5671:19, 5674:1
**separated** [1] - 5669:3
**serve** [1] - 5591:9
**served** [1] - 5595:25
**serves** [1] - 5596:2
**set** [1] - 5652:11
**setting** [1] - 5678:19
**seven** [2] - 5583:19, 5584:4

5701

**several** [4] - 5650:23, 5656:7, 5669:10, 5675:14
**shaped** [1] - 5611:14
**share** [2] - 5583:14, 5655:12
**sharing** [1] - 5647:8
**shift** [3] - 5637:25, 5638:17, 5644:15
**shifting** [2] - 5640:4, 5640:25
**shifts** [1] - 5639:23
**shopping** [5] - 5585:8, 5609:13, 5626:22, 5643:2, 5644:12
**short** [2] - 5633:18, 5635:10
**short-term** [1] - 5633:18
**shortcomings** [2] - 5673:12
**shortly** [1] - 5649:20
**shorts** [13] - 5592:1, 5592:3, 5592:4, 5592:5, 5592:7, 5592:9, 5592:10, 5594:16, 5594:17, 5594:23, 5607:8, 5607:10, 5656:23
**show** [12] - 5600:11, 5607:6, 5613:10, 5621:11, 5638:21, 5640:11, 5641:11, 5644:8, 5644:23, 5647:21, 5648:4, 5648:22
**showed** [2] - 5660:11, 5661:5
**showing** [2] - 5586:18, 5598:3
**shown** [5] - 5585:11, 5608:16, 5619:7, 5621:2, 5630:21
**shows** [6] - 5583:15, 5605:24, 5620:4, 5620:7, 5620:10, 5644:11
**shut** [1] - 5595:16
**side** [5] - 5612:7, 5612:22, 5620:8, 5666:13, 5668:12
**sides** [1] - 5669:21
**signal** [7] - 5592:14, 5639:18, 5654:3, 5654:20, 5655:22, 5655:24
**signals** [6] - 5592:18, 5593:4, 5594:2, 5594:4, 5594:8, 5595:6
**significance** [1] -

5672:7
**significant** [1] - 5645:22
**similar** [2] - 5628:18, 5640:6
**similarly** [1] - 5587:23
**simply** [3] - 5663:4, 5666:25, 5672:7
**single** [2] - 5628:5, 5634:13
**sit** [1] - 5587:12
**site** [1] - 5593:6
**sites** [5] - 5586:5, 5593:1, 5593:16, 5594:1, 5659:5
**skip** [1] - 5646:12
**skipping** [1] - 5635:22
**slide** [10] - 5582:17, 5617:23, 5618:11, 5648:4, 5649:2, 5651:10, 5652:9, 5664:8, 5664:11, 5665:16
**slides** [2] - 5617:23, 5618:3
**slightly** [1] - 5602:22
**slot** [1] - 5584:11
**slotted** [1] - 5597:5
**small** [1] - 5586:21
**SMITH** [1] - 5664:10
**snippets** [1] - 5671:25
**social** [69] - 5586:4, 5586:9, 5586:22, 5588:3, 5588:4, 5588:6, 5588:17, 5588:18, 5588:23, 5588:25, 5589:4, 5590:23, 5590:24, 5592:22, 5593:1, 5593:6, 5594:1, 5594:12, 5596:17, 5596:25, 5597:4, 5599:22, 5600:15, 5604:2, 5604:6, 5604:7, 5604:19, 5606:10, 5606:13, 5606:22, 5607:6, 5607:21, 5608:2, 5608:7, 5608:10, 5608:24, 5609:1, 5609:9, 5610:13, 5610:16, 5610:18, 5612:11, 5612:13, 5612:15, 5613:2, 5614:7, 5614:25, 5615:5, 5617:4, 5617:12, 5617:16, 5617:22, 5625:2, 5628:25, 5637:15, 5638:5, 5640:4,

5642:18, 5647:7, 5647:10, 5657:21, 5657:22, 5657:24, 5657:25, 5658:1, 5658:19, 5659:5, 5659:6
**Social** [4] - 5599:14, 5599:17, 5599:19
**software** [5] - 5638:14, 5638:16, 5640:8, 5653:19
**someone** [2] - 5586:5, 5632:24
**sometimes** [3] - 5591:13, 5591:15, 5649:13
**somewhere** [1] - 5587:21
**SOMMER** [82] - 5581:3, 5581:14, 5582:20, 5582:23, 5582:24, 5585:21, 5587:7, 5587:11, 5588:13, 5590:18, 5594:25, 5595:4, 5596:6, 5596:9, 5596:23, 5598:2, 5598:5, 5598:19, 5598:23, 5600:7, 5600:8, 5601:3, 5601:6, 5602:3, 5602:24, 5603:4, 5603:6, 5605:11, 5605:14, 5608:15, 5613:18, 5613:21, 5615:19, 5615:21, 5618:14, 5618:16, 5619:14, 5619:18, 5619:22, 5619:24, 5622:11, 5622:14, 5624:13, 5624:16, 5624:18, 5628:22, 5628:23, 5631:10, 5631:14, 5631:23, 5632:13, 5632:19, 5632:23, 5633:2, 5633:10, 5633:12, 5636:9, 5636:11, 5636:14, 5639:17, 5639:20, 5644:21, 5644:23, 5645:2, 5645:7, 5645:11, 5645:16, 5646:2, 5646:7, 5646:12, 5646:14, 5646:23, 5647:2, 5647:3, 5648:7, 5648:10, 5648:23, 5648:24, 5649:17, 5649:23, 5664:20, 5665:11

**sommer** [2] - 5636:7, 5650:24
**Sommer** [6] - 5580:5, 5581:2, 5619:12, 5656:22, 5657:6, 5660:11
**Sommer.................. 5581** [1] - 5682:4
**Sonsini** [1] - 5580:6
**sorry** [20] - 5586:17, 5587:6, 5590:21, 5592:6, 5608:14, 5611:3, 5619:14, 5619:20, 5620:24, 5631:19, 5632:2, 5635:12, 5636:24, 5638:25, 5639:16, 5649:3, 5651:15, 5658:2, 5658:10, 5666:11
**sort** [8] - 5584:16, 5584:20, 5602:1, 5616:14, 5658:6, 5668:14, 5674:19, 5678:7
**sound** [1] - 5671:4
**sounds** [2] - 5663:22, 5672:16
**source** [2] - 5644:19, 5644:25
**South** [1] - 5579:15
**speaker** [1] - 5671:7
**SPEAKER** [1] - 5588:12
**speaking** [2] - 5615:15, 5629:11
**specialized** [1] - 5586:5
**specific** [11] - 5618:12, 5642:8, 5642:13, 5642:16, 5645:18, 5647:6, 5671:2, 5676:7, 5677:4, 5677:7, 5677:11
**specifically** [2] - 5615:19, 5663:13
**specifics** [1] - 5670:8
**speed** [1] - 5636:11
**spell** [1] - 5648:6
**spend** [27] - 5629:19, 5630:14, 5633:19, 5633:23, 5635:14, 5637:17, 5637:25, 5638:4, 5638:12, 5638:17, 5640:4, 5640:9, 5640:18, 5640:25, 5642:9, 5642:13, 5645:3, 5652:21, 5652:22,

5702

5652:24, 5655:12, 5658:15, 5658:16, 5658:17, 5658:18, 5658:21, 5675:13
**spending** [4] - 5592:22, 5592:25, 5594:1, 5629:2
**spent** [2] - 5644:11, 5645:17
**spoken** [1] - 5634:14
**sponsoring** [1] - 5669:21
**spot** [1] - 5612:20
**stacked** [1] - 5613:25
**stage** [3] - 5606:17, 5607:5, 5621:5
**stages** [3] - 5584:15, 5584:21, 5584:22
**stand** [1] - 5670:19
**standard** [1] - 5677:25
**stands** [1] - 5680:6
**start** [1] - 5584:13
**started** [2] - 5602:1, 5654:9
**starts** [1] - 5655:9
**State** [1] - 5579:22
**state** [1] - 5583:14
**State's** [1] - 5666:5
**statement** [3] - 5583:15, 5638:6, 5638:14
**STATES** [2] - 5579:1, 5579:10
**States** [5] - 5579:2, 5580:11, 5647:25, 5663:1, 5666:3
**statistical** [1] - 5640:20
**statistics** [1] - 5604:13
**stay** [1] - 5612:22
**stenographic** [1] - 5681:5
**step** [2] - 5581:17, 5584:9
**still** [4] - 5649:5, 5660:20, 5671:9, 5675:8
**stipulated** [1] - 5665:8
**Stone** [3] - 5598:20, 5605:8, 5645:12
**stop** [5] - 5583:18, 5593:12, 5621:25, 5637:18, 5649:10
**stopped** [1] - 5586:18
**Strategic** [1] - 5614:22
**Street** [3] - 5579:12, 5579:15, 5579:19
**stretch** [1] - 5609:6
**strict** [1] - 5635:24
**strictly** [1] - 5622:8

**studies** [2] - 5592:19, 5592:23
**study** [4] - 5632:5, 5634:18, 5643:13, 5643:17
**subject** [5] - 5601:23, 5649:25, 5650:6, 5668:6, 5671:5
**submitted** [3] - 5665:19, 5668:19
**subset** [2] - 5670:24, 5678:17
**substance** [1] - 5674:10
**substitution** [2] - 5643:14, 5643:18
**suggested** [1] - 5595:1
**suggesting** [2] - 5596:12, 5677:25
**Suite** [3] - 5579:16, 5579:19, 5579:24
**suited** [20] - 5581:18, 5584:5, 5584:12, 5584:25, 5591:3, 5591:6, 5600:14, 5604:19, 5610:19, 5613:2, 5613:5, 5616:10, 5616:13, 5616:15, 5617:8, 5617:9, 5619:3, 5619:5, 5628:13, 5676:16
**summary** [2] - 5645:9, 5665:7
**supplement** [2] - 5665:17, 5672:12
**supplemented** [1] - 5673:14
**support** [1] - 5660:19
**supported** [3] - 5590:13, 5656:8, 5656:15
**supports** [1] - 5660:21
**supposed** [1] - 5662:20
**surprises** [1] - 5637:21
**survey** [4] - 5632:16, 5632:21, 5632:22, 5632:25
**SVPs** [1] - 5585:22
**SW** [1] - 5580:3
**sweeping** [1] - 5600:1
**switch** [1] - 5658:8
**system** [1] - 5654:9

**T**

**T-I-N-U-I-T-I** [1] -

5648:7
**tab** [2] - 5624:14, 5631:21
**table** [1] - 5662:8
**tactics** [4] - 5615:3, 5615:8, 5639:23, 5639:24
**tangent** [1] - 5629:17
**tape** [1] - 5622:13
**target** [1] - 5637:15
**targeting** [7] - 5589:11, 5589:16, 5590:2, 5590:8, 5590:12, 5630:23, 5655:5
**teach** [1] - 5657:23
**teaching** [2] - 5656:18, 5660:6
**team** [1] - 5595:1
**telephone** [1] - 5605:2
**television** [1] - 5592:23
**temporal** [1] - 5678:12
**ten** [2] - 5586:18, 5636:9
**term** [3] - 5633:18, 5633:23, 5654:5
**terminology** [2] - 5607:24, 5623:13
**terms** [6] - 5634:7, 5655:23, 5673:12, 5673:22, 5674:18, 5679:8
**terribly** [1] - 5583:23
**terrific** [2] - 5581:11, 5664:3
**test** [2] - 5588:10, 5590:1
**testified** [3] - 5635:9, 5643:1, 5644:2
**testify** [3] - 5662:5, 5665:9, 5666:18
**testimony** [32] - 5581:21, 5582:10, 5582:21, 5621:14, 5621:17, 5622:7, 5630:21, 5631:1, 5631:3, 5634:10, 5634:23, 5635:6, 5636:4, 5652:17, 5656:15, 5657:10, 5659:20, 5661:21, 5662:6, 5662:10, 5662:17, 5662:18, 5663:6, 5663:15, 5664:9, 5664:22, 5669:23, 5672:17, 5672:19, 5672:25, 5679:12
**text** [8] - 5585:5,

5609:17, 5635:4, 5643:1, 5643:3, 5644:11, 5645:16, 5659:24
**THE** [105] - 5579:1, 5579:1, 5579:9, 5581:2, 5581:9, 5581:11, 5585:17, 5585:20, 5587:6, 5587:10, 5590:16, 5594:23, 5595:2, 5596:4, 5596:8, 5596:21, 5598:21, 5600:3, 5600:25, 5601:4, 5601:5, 5601:24, 5602:22, 5603:1, 5603:5, 5605:12, 5608:14, 5619:16, 5622:9, 5624:14, 5624:15, 5631:21, 5631:22, 5632:25, 5636:7, 5636:10, 5639:18, 5645:4, 5645:9, 5645:24, 5646:4, 5646:10, 5646:21, 5647:1, 5648:6, 5649:18, 5649:22, 5650:19, 5651:13, 5652:14, 5653:6, 5658:10, 5658:13, 5658:16, 5658:19, 5659:3, 5659:6, 5661:11, 5661:12, 5661:16, 5661:19, 5661:23, 5661:24, 5663:6, 5663:11, 5663:22, 5664:3, 5664:11, 5664:15, 5665:7, 5665:21, 5666:1, 5666:7, 5666:11, 5666:14, 5666:24, 5667:3, 5667:11, 5667:17, 5668:9, 5668:21, 5668:24, 5669:5, 5669:15, 5670:20, 5671:1, 5671:21, 5672:13, 5673:10, 5673:20, 5674:6, 5674:16, 5675:6, 5675:20, 5675:22, 5676:5, 5677:16, 5678:2, 5678:23, 5679:6, 5679:15, 5679:18, 5679:24, 5680:2, 5680:6
**therefore** [1] - 5617:15
**they've** [4] - 5613:4, 5673:13, 5675:3, 5676:19

5703

**thinking** [2] - 5583:23, 5658:6
**thinks** [1] - 5601:2
**third** [11] - 5597:22, 5631:11, 5650:5, 5650:16, 5655:12, 5660:12, 5660:15, 5667:25, 5673:24, 5675:23
**Third** [1] - 5655:10
**third-party** [5] - 5631:11, 5650:5, 5650:16, 5667:25, 5673:24
**three** [16] - 5581:6, 5583:15, 5583:20, 5584:4, 5590:13, 5594:15, 5594:17, 5600:19, 5613:2, 5613:25, 5614:7, 5633:5, 5649:15, 5666:10, 5666:11, 5666:13
**three-quarters** [1] - 5633:5
**throughout** [1] - 5626:23
**throw** [1] - 5603:12
**TikTok** [1] - 5586:12
**timeless** [1] - 5647:15
**Tinuiti** [1] - 5647:22
**title** [3] - 5620:17, 5640:19, 5655:4
**today** [8] - 5587:12, 5618:21, 5637:22, 5660:20, 5661:1, 5666:22, 5669:12, 5674:21
**today's** [2] - 5649:5, 5649:8
**toes** [1] - 5619:21
**together** [3] - 5581:25, 5582:20, 5590:23
**tonight** [1] - 5649:25
**took** [2] - 5590:25, 5667:23
**top** [33] - 5584:16, 5584:18, 5584:21, 5589:5, 5591:6, 5599:6, 5599:7, 5599:14, 5606:16, 5607:21, 5609:11, 5610:6, 5612:10, 5614:1, 5614:21, 5614:25, 5620:8, 5620:17, 5621:1, 5621:3, 5621:5, 5623:9, 5624:21, 5625:17, 5626:15, 5633:18, 5640:13,

5647:18, 5658:14, 5659:1, 5660:2, 5661:2
**topic** [2] - 5642:25, 5649:12
**total** [1] - 5658:3
**toward** [2] - 5609:11, 5614:25
**towards** [2] - 5631:18, 5631:20
**towel** [1] - 5603:12
**track** [4] - 5653:21, 5653:24, 5676:21, 5677:3
**tracked** [9] - 5593:6, 5593:9, 5593:13, 5593:15, 5593:16, 5593:20, 5593:23, 5595:21, 5654:12
**tracking** [3] - 5595:8, 5595:9, 5660:1
**Tracy** [1] - 5634:23
**Tracy-Ann** [1] - 5634:23
**traditional** [1] - 5647:11
**traffic** [1] - 5637:5
**TRANSCRIPT** [1] - 5579:9
**transcript** [8] - 5621:19, 5621:21, 5635:1, 5666:25, 5667:2, 5667:15, 5681:4, 5681:5
**transcripts** [5] - 5666:9, 5666:16, 5666:17, 5666:19, 5667:2
**travels** [1] - 5661:21
**TRIAL** [1] - 5579:9
**trial** [8] - 5659:14, 5662:18, 5670:12, 5672:6, 5674:23, 5676:17, 5676:19, 5677:23
**tried** [1] - 5604:3
**trillion** [1] - 5658:4
**trouble** [1] - 5620:16
**true** [7] - 5605:3, 5605:6, 5629:10, 5640:21, 5676:8, 5681:4, 5681:5
**truth** [1] - 5664:13
**try** [8] - 5584:11, 5602:17, 5603:4, 5603:12, 5636:11, 5641:1, 5662:11, 5665:3
**trying** [7] - 5586:24, 5603:16, 5620:20, 5626:17, 5629:21,

5667:24, 5671:22
**Tuesday** [2] - 5666:3, 5666:20
**tunnel** [1] - 5607:11
**turn** [20] - 5598:9, 5598:15, 5598:17, 5605:7, 5605:19, 5607:18, 5614:18, 5617:21, 5619:8, 5623:5, 5624:19, 5632:9, 5633:3, 5633:13, 5651:20, 5652:5, 5653:2, 5653:10, 5655:8, 5659:13
**turning** [2] - 5655:1, 5656:1
**TV** [2] - 5623:9, 5642:18
**two** [15] - 5584:23, 5600:20, 5611:11, 5611:21, 5620:11, 5631:6, 5643:14, 5658:23, 5662:3, 5664:20, 5666:3, 5666:17, 5666:19, 5672:13, 5672:22
**two-level** [1] - 5611:21
**Tyler** [1] - 5579:23
**type** [4] - 5586:14, 5594:6, 5594:8, 5605:21
**types** [2] - 5586:6, 5617:10
**typing** [1] - 5585:12

## U

**U.S** [7] - 5579:12, 5579:15, 5579:19, 5658:3, 5658:11, 5666:15
**ultimate** [2] - 5591:16, 5591:20
**ultimately** [2] - 5583:24, 5671:10
**um-hum** [1] - 5619:23
**umbrella** [1] - 5657:22
**unable** [1] - 5666:21
**under** [12] - 5592:15, 5601:22, 5610:10, 5612:10, 5612:13, 5613:22, 5625:1, 5626:20, 5639:2, 5648:8, 5657:22, 5672:24
**underlying** [3] - 5645:7, 5645:14, 5664:17
**underperforming** [1] -

5639:23
**understood** [9] - 5584:6, 5662:19, 5667:17, 5672:5, 5673:10, 5673:16, 5675:11, 5679:3, 5679:17
**undertook** [1] - 5597:8
**UNIDENTIFIED** [1] - 5588:12
**unique** [1] - 5596:13
**UNITED** [2] - 5579:1, 5579:10
**United** [5] - 5580:11, 5647:25, 5663:1, 5666:3, 5666:5
**united** [1] - 5579:2
**universe** [1] - 5602:1
**university** [1] - 5663:20
**unless** [1] - 5673:10
**unlock** [1] - 5641:14
**unprecedented** [1] - 5647:9
**unredacted** [2] - 5598:4, 5644:21
**unusual** [3] - 5596:13, 5596:16, 5596:19
**up** [37] - 5582:1, 5584:21, 5585:18, 5596:10, 5598:18, 5598:24, 5603:13, 5605:8, 5605:20, 5613:12, 5613:13, 5615:1, 5618:22, 5620:5, 5621:12, 5627:17, 5628:13, 5632:12, 5633:1, 5633:16, 5633:21, 5636:12, 5639:17, 5641:23, 5644:9, 5646:11, 5646:20, 5647:2, 5648:8, 5649:2, 5650:18, 5653:13, 5659:16, 5662:14, 5666:22, 5677:6, 5679:15
**updated** [1] - 5668:14
**updates** [1] - 5666:5
**UPDX103...................
.......................5664** [1]
- 5682:8
**upper** [26] - 5597:1, 5597:5, 5608:10, 5610:6, 5610:10, 5610:13, 5610:19, 5611:5, 5611:12, 5611:17, 5611:23, 5613:23, 5615:10, 5616:4, 5617:11,

5619:1, 5620:7, 5620:10, 5620:13, 5620:22, 5623:14, 5623:19, 5625:13, 5626:7, 5633:15, 5657:13

**upper-funnel** [1] - 5617:11

**UPX526** [4] - 5651:18, 5651:20, 5652:6, 5652:12

**UPXD103** [2] - 5651:19, 5664:8

**urgency** [1] - 5679:8

**useful** [1] - 5630:25

**user** [5] - 5585:12, 5586:13, 5607:5, 5655:13, 5655:19

**users** [1] - 5594:2

## V

**vague** [1] - 5583:11

**value** [2] - 5625:17, 5654:23

**Varian** [2] - 5617:24, 5618:15

**varian** [1] - 5618:11

**various** [6] - 5581:22, 5605:25, 5617:18, 5629:3, 5630:15, 5659:17

**version** [5] - 5598:4, 5598:18, 5622:6, 5644:21, 5665:16

**versions** [1] - 5598:3

**versus** [1] - 5625:21

**vertical** [2] - 5585:23, 5585:24

**verys** [1] - 5631:6

**video** [6] - 5615:2, 5662:18, 5662:20, 5663:3, 5666:21, 5666:25

**videos** [2] - 5591:25, 5592:14

**view** [13] - 5585:3, 5596:16, 5599:22, 5600:5, 5600:14, 5608:21, 5608:23, 5628:16, 5628:21, 5635:23, 5660:24, 5671:3, 5671:12

**viewed** [3] - 5586:24, 5613:2, 5663:4

**viewing** [2] - 5662:18, 5663:3

**views** [1] - 5600:22

**volume** [1] - 5637:5

**vs** [1] - 5579:5

## W

**wait** [3] - 5585:16, 5619:14, 5680:4

**waiting** [1] - 5675:9

**wants** [2] - 5600:11, 5672:10

**Washington** [6] - 5579:5, 5579:13, 5579:20, 5580:3, 5580:12, 5681:13

**watch** [2] - 5593:12, 5595:8

**watching** [4] - 5592:14, 5592:23, 5662:17, 5663:6

**weaker** [1] - 5655:5

**Webb** [1] - 5579:23

**websites** [1] - 5650:16

**week** [4] - 5652:17, 5661:1, 5662:11, 5680:3

**weekly** [1] - 5634:3

**weight** [1] - 5671:11

**welcome** [1] - 5581:15

**well-suited** [1] - 5676:16

**Wfcavanaugh@pbwt .com** [1] - 5579:25

**Whinston** [2] - 5662:4, 5679:24

**white** [1] - 5639:25

**whole** [6] - 5601:2, 5615:16, 5637:10, 5639:11, 5654:9, 5658:5

**William** [1] - 5579:22

**Williams** [2] - 5580:2, 5668:10

**Wilson** [1] - 5580:6

**wish** [2] - 5672:14, 5672:18

**wishes** [1] - 5672:14

**withdraw** [2] - 5666:19, 5675:4

**withdrawing** [3] - 5668:13, 5675:1

**withdrawn** [3] - 5586:4, 5674:22, 5676:17

**witness** [16] - 5600:1, 5618:14, 5624:13, 5645:25, 5646:3, 5646:5, 5646:6, 5646:7, 5651:9, 5665:3, 5665:9, 5669:21, 5670:12, 5670:13, 5672:3

**WITNESS** [12] - 5585:20, 5596:4,

5596:8, 5601:4, 5624:15, 5631:22, 5658:13, 5658:19, 5659:6, 5661:11, 5661:23, 5682:2

**witnesses** [4] - 5663:15, 5666:4, 5666:18, 5667:5

**word** [2] - 5596:11, 5624:20

**words** [3] - 5589:15, 5629:8, 5667:11

**works** [2] - 5608:25, 5639:13

**world** [3] - 5649:9, 5655:10, 5677:20

**worry** [1] - 5679:13

**worse** [1] - 5655:23

**wrap** [2] - 5639:17, 5646:11

**written** [4] - 5600:13, 5616:1, 5619:25, 5660:6

## Y

**year** [2] - 5646:21, 5658:3

**years** [3] - 5586:18, 5586:20, 5646:16

**yesterday** [7] - 5586:23, 5635:8, 5636:4, 5660:25, 5661:1, 5663:5, 5664:22

**York** [2] - 5579:24, 5580:7

**younger** [1] - 5592:21

**YouTube** [1] - 5621:25