```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
         United States of America,    )
 3       et al.,                      )
                                      ) DAY 22
 4                      Plaintiffs, )
                                      ) CV No. 20-3010
 5                        vs. ) Washington, D.C.
                                      ) October 16, 2023
 6       Google LLC,                  ) 1:30 p.m.
                                      )
 7                      Defendant. )
         _____)
 8

 9                      TRANSCRIPT OF BENCH TRIAL
                    BEFORE THE HONORABLE AMIT P. MEHTA
10                    UNITED STATES DISTRICT JUDGE

11       APPEARANCES:
         For DoJ Plaintiffs:      Kenneth M. Dintzer
12                                U.S. Department of Justice
                                  1100 L Street, NW
13                                Washington, D.C.
                                  (202) 307-0340
14                                Email: Kenneth.dintzer2@usdoj.gov
                                  David E. Dahlquist
15                                U.S. Department of Justice
                                  209 South LaSalle Street
16                                Suite 600
                                  Chicago, IL  60604
17                                (202) 805-8563
                                  Email: David.dahlquist@usdoj.gov
18                                Adam T. Severt
                                  U.S. Department of Justice
19                                450 Fifth Street, NW, Suite 7100
                                  Washington, DC  20530
20                                202-307-6158
                                  Email: Adam.severt@usdoj.gov
21       For Plaintiff
          States:                 William J. Cavanaugh, Jr.
22                                Patterson Belknap Webb & Tyler LLP
                                  1133 Avenue of the Americas
23                                Suite 2200
                                  New York, NY 10036
24                                (212) 335-2793
                                  Email: Wfcavanaugh@pbwt.com
25
```

```
 1    For Plaintiff
        States:                Jonathan Bruce Sallet
 2                             COLORADO DEPARTMENT OF LAW
                               Consumer Protection Section,
 3                             Antitrust Unit
                               Ralph L. Carr
 4                             Colorado Judicial Center
                               1300 Broadway
 5                             Seventh Floor
                               Denver, CO 80203
 6                             (720) 508-6000
                               Email:  Jon.sallet@coag.gov
 7
      For Defendant Google:    John E. Schmidtlein
 8                             Graham Safty
                               Williams & Connolly LLP
 9                             680 Main Avenue, SW
                               Washington, D.C. 20005
10                             (202) 434-5000
                               Email:  Jschmidtlein@wc.com
11                             Email:  Gsafty@wc.com
                               Michael Sommer
12                             Wilson Sonsini Goodrich & Rosati
                               1301 Avenue of the Americas
13                             40th Floor
                               New York, NY  10019
14                             (212) 497-7728
                               Email:  Msommer@wsgr.com
15

16    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
17                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
18                             Washington, DC  20001
                               202-354-3267
19                                 *   *   *

20

21

22

23

24

25
```

```
 1       *  *  *  *  *  *  * P R O C E E D I N G S *  *  *  *  *  *
 2              THE COURT:  All right.  Before we get started, I
 3       would ask the parties to review the filing that New York Times
 4       made this morning and just get the position on whether you
 5       would like to file a response before we consider the request?
 6              Mr. Dahlquist?
 7              MR. DAHLQUIST:  Thank you, Your Honor.  David
 8       Dahlquist on behalf of the United States.
 9              We're happy to answer questions from Your Honor.
10       We're happy to address it -- any issues you might have, but we
11       do not feel the need to respond in writing.
12              THE COURT:  Okay.  Mr. Cavanaugh?
13              MR. CAVANAUGH:  We're in the same position,
14       Your Honor.
15              THE COURT:  Mr. Schmidtlein.
16              MR. SCHMIDTLEIN:  We'll be prepared to address it
17       this afternoon at the end of the day without the need to file
18       anything.
19              THE COURT:  Okay.  So what I'll do is we'll reach out
20       to counsel for the Times and check on their availability at
21       5 o'clock so we can consider the request then.
22              Just give me one second.
23              (Pause.)
24              THE COURT:  All right.  Ready when you are,
25       Counsel.
```

```
 1                    PROFESSOR MICHAEL WHINSTON,

 2                    DIRECT EXAMINATION (Continued)

 3   BY MR. SEVERT:

 4   Q.  Professor Whinston, before lunch I think I asked you if

 5   you've seen evidence of significant business decisions

 6   predicated on scale?

 7   A.  I have.

 8   Q.  And what have you seen?

 9   A.  So, if you turn to slide 54.

10           Your Honor, this is testimony from Mr. Nadella and

11   Mr. Tinter, as well as a readdicted Microsoft document from

12   2016.  And on the left, Mr. Nadella is discussing the

13   Microsoft/Yahoo! deal.

14           I think previously you've seen discussion about how

15   that deal was predicated on scale.  And, certainly at the time,

16   there were statements to that effect by the CEOs.  And here you

17   have Mr. Nadella, who wasn't CEO at the time, but obviously is

18   now, was at Microsoft, I believe, at the time describing the

19   impact that the deal had and the importance of its boost to --

20   to Microsoft scale.

21           And, on the right, Mr. Tinter, as well, statement

22   about the importance in negotiating deals of scale and then a

23   redacted document from when Microsoft was, in 2016, trying to

24   get the Safari default and what they were saying to Apple about

25   what Apple's scale would do for them.
```

 1    Q.  And so, we've talked about scale effects on the user side.

 2    I now want to transition to talk about scale on the advertiser

 3    side.

 4         How does scale affect competitive effects, or harm in

 5    the -- in the advertiser side?

 6    A.  So in the advertiser side, there, you know, are I think two

 7    distinct aspects of scale, if you bring down -- bring up,

 8    sorry, slide 55.

 9         So, first, you know, scale drives advertiser

10    participation on the -- on a general search engine platform

11    and that's going to be important for monetization.  Later, it's

12    also going to have effects on -- on competitive -- how

13    competitive and their substitution and how much substitution

14    there is in the ad markets between ad products.

15         But here, just discussing sale scale and its effect

16    on a search engine.  And then second, scale improves a general

17    search engine's ability to show relevant ads and increase ad

18    click-through rates and this is -- you know, kind of the

19    counterpart to the search services side.  We're going to try to

20    predict what's a good response to a query.

21    Q.  Well, let's start with your first bullet.  How does scale

22    impact advertiser participation?

23    A.  So, Your Honor, scale is important for advertiser

24    participation because there are costs involved in participating

25    on an ad platform.  You know, you need to monitor it, you need

1    to come up with your ad campaigns, you need to have staff to do

2    that, and those involve costs and how, you know, much you're

3    amortizing those costs over query -- over ads matters.

4            So, you know, in the extreme, if a platform has one

5    ad opportunity, it's not going to be a very desirable platform

6    to spend all the money to monitor and all the rest.  If it

7    starts having scale, then now it starts making sense to do it.

8    Q.  And why is advertiser participation important for

9    competition in the ad markets?

10   A.  So it's what I started to allude to before.  Your Honor,

11   when you have more participation of advertisers on the

12   platform, from the standpoint of the search engine it means

13   there's more competition for ads.  And of course with more

14   competition, prices can go up.  You'll earn more -- your RPM

15   will get higher -- will be higher.  Sorry, revenue per

16   thousands queries.

17           THE COURT:  I got you.

18   BY MR. SEVERT:

19   Q.  And is there empirical evidence of the scale effect on

20   advertiser participation?

21   A.  I'm sorry.  One more time.

22   Q.  Sure.

23           Is there empirical evidence you used in your analysis --

24   A.  Yes.

25   Q.  -- of scale effects on advertiser participation?

1    A.   I did.  So if you bring up slide 56.

2             Your Honor, this is just a pretty simple graph

3    showing over time in -- the blue bars are showing -- sorry.

4             The dash line is showing the number of queries Google

5    is getting in each year and the dash line -- the bars are

6    showing you how many advertisers are participating on their

7    platform.  And you can see they're basically both just moving

8    up together.  As Google gets more queries, more advertisers are

9    going on the platform.

10             And a thing you'll read, you know, with some

11   frequency is that advertisers follow users.  So if the users

12   are all on the platform, the advertisers want to be there.

13   Q.   And I think you mentioned the implications of scale for ad

14   relevance.  Have you seen evidence -- Google documents relating

15   to the scale effects of ad relevance --

16   A.   I have.

17   Q.   -- ad relevance?

18   A.   Sorry.  Didn't mean to talk over you.

19             So if you bring up slide 57.

20             Your Honor, this is an extract from an article --

21   scholarly article published by 16 Google employees that was

22   titled, "Ad Click Prediction, a View From the Trenches,"

23   published in 2013 and it's just talking about, you know, how

24   difficult it is to predict what ad is a good, relevant ad for

25   a -- for a query.  And, you know, in bold you see here training

1    data sets are enormous.

2    Q.  And I think you alluded to this earlier, but did you do any

3    empirical analysis looking at the scale and ad relevance?

4    A.  I did.

5         So, Your Honor, just like there's a click split for

6    search services, i.e., the click split time on -- for organic

7    results that you can also -- there's also a click split measure

8    for ads.  And so, I did the same kind of analysis that I did

9    that I described to you earlier on -- for organic results.  I

10   did the same thing for -- for the ads -- for ad click split,

11   and the results are really the same.  It's the same picture.

12        Head queries have better click splits than torso

13   queries, torso queries have better click splits than tail

14   queries.

15   Q.  Did you do any other empirical analysis looking at scale

16   and ad relevance?

17   A.  I did.  If you bring up slide 58.  This is redacted, so I

18   won't, you know, say anything about the numbers in it, but...

19        So this is -- instead of looking at click split,

20   Your Honor, it's looking at the click-through rate, CTR, you

21   know, for short.  The click-through rate on the top positioned,

22   you know, ad, the number -- you know, the number, you know, in

23   the top slot, the best position.  You know, this is the

24   advertiser in some sense who won the auction, you know, in the

25   sense of getting the best -- the best possible outcome.

1          And, let me walk you through this.  It's a little bit

2    walking through it, but I really like -- I think this is a

3    really interesting and informative figure.

4          So on the left are -- I'm looking just at PCs, at

5    queries on PCs.  And on the right, I'm looking at just queries

6    in mobile phones.

7          So let's first just look on the left.  Okay.  What am

8    I doing here?  What I did is I took query phrases and I put

9    them in bins.  So depending on how often Google saw the query

10   with that -- in that one-week query data that I have.

11         So, all the way to the left where it says 1 to 4,

12   those are queries Google saw in that week one to four times.

13   They're the tail of the tail.

14         Then we go 5 to 9, 10 to 49, and as you move to the

15   right, when you get all the way to the right, those are the

16   head of the head queries.  They are queries Google saw

17   1,000,000 times or more.

18         Then, for each of those bins what I -- what I did is

19   I calculated the click-through rate on that top ad, how

20   frequent is that top ad clicked, which is a measure of how

21   relevant it is.  You know, it's not the only -- you know, as I

22   said, these measures are all not 100 percent perfect, but it's

23   a measure that Google and others use for measuring relevance.

24         And so in red you'll see a little dot above each, so

25   it's really the dots that are the data -- the data and the

1    lines is just drawing lines between them.

2         So each dot -- like at 1 to 4, you'll see a red dot

3    and blue dot.  The red dot is the click-through rate for

4    Google, the blue dot is the click-through rate for Bing, and so

5    forth.  As we move -- you know, as move we to the right, we're

6    looking at click-through rates for higher and higher frequency

7    phrases.

8         So there are two things to take from this as we look

9    at this PC one.  The first thing to take from it is for both

10   Google and Bing, the click-through rates are increasing as we

11   move to the right.

12        What does that mean?  It means that the more we

13   see -- we, sorry.  The more Google or Bing -- the more frequent

14   the query is, the higher the click-through rate on the ad -- on

15   the top positioned ad.  And so it's telling you it's exactly

16   this idea that, you know, as we see things more often, we do a

17   better job at predicting what's a relevant ad.

18        The second thing, which I think is quite striking, is

19   Bing is better than Google for every one of these.  And, so,

20   you know, in PCs, Microsoft has at least a decent scale.  I

21   mean, you've heard Mr. Nadella talk about that, they wouldn't

22   exist, you know, but for the Microsoft/Yahoo! deal with getting

23   them scale in PCs.  And so Bing has a decent scale there.  It

24   actually does better in click-through rates for this top ad.

25        Okay.  That's the left panel.

 1              In the right panel, we're doing exactly the same
 2     thing but for mobile.  And what you can see is two things.
 3     One, again, as you move left to right for each of these firms,
 4     the more frequent the -- the query phrase, the higher the
 5     click-through rate on that top positioned ad.  So, again, we're
 6     seeing that more frequent phrases, these firms are doing better
 7     at predicting what's the most relevant ad.
 8              The second thing is the positions have switched and
 9     for every bin now Bing is much worse.  And this is in mobile,
10     where Bing has no scale at all.
11              And, so, you know, I think it's -- sometimes can be,
12     you know, tempting, or you hear people say, oh, Microsoft is
13     just incompetent, like they're just bad, whatever.  What you
14     can see here is, like, no, you look on the left, they're
15     actually better than Google.  You look on the right where they
16     don't have scale, they're much worse.
17     Q.  And then going back to the Microsoft/Yahoo! deal we talked
18     about earlier, did you see any evidence as to whether that deal
19     affected Microsoft's ability to monetize?
20     A.  I did.  So, if you bring up slide 59.
21              So, Your Honor, this slide is a picture that was from
22     2015 where Microsoft, again, it was thinking about the
23     effects -- you know, what should -- what should we do about the
24     Apple/Safari deal, what's going to be the value scale from
25     that?  And it's looking back at what the Microsoft/Yahoo! deal

1    did for its monetization.  And there's a lot of information in

2    this figure and many bullet points below, but I think I can

3    describe the basic idea fairly simply.

4             So what this figure is doing is it's conceptualizing

5    what the benefits were for monetization for Microsoft.  And,

6    the lower red curve, you can think about basically they were

7    thinking about, well, with our current algorithms -- sorry.

8    Let me back up one step.  I didn't say one thing I should have

9    said.

10            The horizontal axis is measuring scale of queries --

11   I know it's very small.  It's measuring scale of queries and

12   the vertical axis is measuring RPM, our average revenue per

13   thousand queries.  "Our" being Microsoft's.

14            Okay.  So the red curve is basically their -- what --

15   how they thought about the relationship given the algorithms

16   that they had in -- at the time of the deal and how increasing

17   scale would increase their revenue per query.

18            So you can think of that and if you look at the

19   bullet points below, these points are being made here.  As

20   we -- you know, with our current algorithms, if we get more

21   scale, we're going to get more advertisers and they're going to

22   start bidding, more -- there's going to be more competition on

23   our platform and our revenue per thousand queries will go up.

24   That's what the red is.

25            And then, what you can see is they're plotting in

 1    each year what the RPM and their scale was.  So you see the

 2    first point is all the way to the left with a dashed vertical

 3    line, and it's where they were at the time of the deal.  And

 4    then you can see them plotting -- oh, we're moving up along

 5    this red curve.  And there's a little box -- I know it's hard

 6    to read in the figure sometimes, but there's a little box to

 7    the lower right.  And that's actually just summarizing in each

 8    year what their average RPM was.

 9         And so they're first moving along the red curve.

10    Okay, then there's this jump, and they jump up to a purple

11    curve over the course of a year or a couple years.  The way

12    they thought about the purple curve was we're going to improve

13    our algorithms.  We have more scale.  We're going to figure out

14    how to do -- basically do this better, and we're going to get

15    onto an entirely new higher curve for RPM.

16         And they're plotting out here exactly how that

17    happened so that between -- I'm going to have to take off my

18    glasses, too.  You know, between 2013 and 2015, it suddenly

19    shot up where, okay, we've had this data, we've improved our

20    algorithms, and now RPM is really rising quickly.  If you look

21    in this time period, you know, they, in fact -- you know, well,

22    you can see here how their RPM increased, and Google's, in the

23    same period, did not increase like this.

24    Q.  Professor, let's now turn on slide 60 to the second

25    mechanism that you listed and focus on "Reduce Incentives to

1    Compete on Quality and Price."

2        Are you there?

3    A.  I am.

4    Q.  How are market participants' incentives for investment

5    affected by Google's contracts?

6    A.  So, Your Honor, this brings us back to things we were

7    talking about before lunch.  And the way in which -- first,

8    foreclosure, because of these contracts tying up demand or

9    queries, ends up meaning that rivals and potential entrants

10   don't have access, if they do improve their quality, to the --

11   as much traffic as they would absent the contract.

12        And so -- sorry, let me just say that again.  So

13   what we -- you know, this morning we were about how much is

14   tied up.  And with the -- what I meant to say is with the

15   contracts in place, we talked about how much -- what a

16   DuckDuckGo who became Super Duck could possibly get.  And that

17   affects their investment incentives because they're thinking,

18   like, oh, if I invest, what's the benefit?  And, of course,

19   they're -- when they think about that, they're comparing it to

20   the cost, the difficulty of investing.

21        And what these contracts are doing are two things.

22   One, because of the tying up of queries, the contracts are

23   reducing the benefits of investing.  You're going to get less

24   traffic if you become Super Duck.  They're also, for the reason

25   that we just talked about a couple of minutes ago, making it

1    more costly for you to increase your quality, more difficult

2    because now it's harder for you to experiment, it's harder for

3    you to figure out how to get quality to be higher.

4        So we may have -- you know, we don't have the data.

5    Maybe we're going to have to hire more engineers.  Maybe we're

6    going to have to do something else -- sorry -- something else

7    to get our quality to become Super Duck.  So it's both benefits

8    getting smaller and costs getting higher of improving quality,

9    and that -- that's the -- you know, basic kind of benefit

10   versus cost analysis, like, investment -- you know, that's the

11   basic model of what determines investment in economics.  It's

12   benefits and costs.

13   Q.  Professor, have you seen evidence that Google thinks about

14   investments using the benefit-cost framework you described?

15   A.  I have.  So, if you bring up slide 61.

16        Your Honor, Google is a company that kind of prides

17   itself, you know, from what I can tell in looking at documents,

18   at employing exactly this kind of benefit-cost reasoning.  And

19   so here, this is a document where, you know, basically about an

20   engineer proposing some improvement to search and part of the

21   pitch to get the funds to do it is what's the benefit going to

22   be?  And, you know, what do they do?  They say, well, the

23   key -- you know, the callout here is highlighting exactly how

24   they're using things that I've talked about here to figure that

25   out.

1          So they're saying, well, what we're going to do, you

2     know, the key proxy metric to highlight is IS score.  So, you

3     know, and then describes, you know, how much a .1 IS score

4     increase gives you in terms of extra revenue, gives Google in

5     terms of extra revenue.  And so the way they -- which we talked

6     about nine days ago.  And the way they -- what they're doing is

7     they're saying, okay, in this proposal, we want you to tell

8     us -- you're asking us for money, how much is it going to

9     improve IS score?  And with the analysis that we've done in the

10    past, what does that mean for revenue?  So that's exactly this

11    benefit-cost reasoning.

12    Q.  And have you seen evidence that rivals, Google's rivals

13    think about investments using this benefit-cost analysis?

14    A.  I have.  So if you bring up slide 62, Your Honor.

15         This is testimony by Mr. Parakhin talking about, you

16    know, how does Microsoft think about these things?  And

17    fundamentally it boils down to what kind of long-term revenue

18    we can achieve for making an investment.

19    Q.  Have you reviewed testimony from the trial relating to how

20    Google's contracts have affected current rivals' incentives to

21    invest in quality improvements?

22    A.  I have.  If you bring up slide 63.

23         Your Honor, this is trial testimony by Mr. Parakhin

24    and also deposition testimony by Mr. Stein of Ask.  And what

25    did Mr. Parakhin say?  Well, when asked, you know, whether, you

1    know, basically asked this question about what would the

2    investments be, what did you say to Apple about what your

3    investments would be if you got scale, and why aren't you doing

4    it now? the answer was it's uneconomical for Microsoft right

5    now to invest more in mobile because even any -- like, it's our

6    belief that no amount of investment without securing some way

7    to do distribution in mobile will result in any share gain.

8              So this is exactly this logic that I've been talking

9    about.  And Ask is asking the same thing, like, why did it stop

10    crawling and indexing the web?

11             So, you know, it's -- you can see these firms and,

12    you know, from an economist's standpoint, not surprising,

13    looking at the market.  They're asking themselves, like, should

14    I plop down all this money to -- you know, it's billions to

15    index the web.  It's, you know, billions to invest and go

16    improve your quality.  Should I do that?

17             Well, you're going to think about what could you get

18    if you do it.  And if the answer is not much because these

19    contracts are in place, the answer is you won't do it.

20    Q.  What is the effect on competition of these reduced

21    incentives from rivals?

22    A.  Well, it adds to the direct effect that I talked about

23    before.  So denying rival scale directly worsens their quality.

24    Disincentive effect, you know, is no less important, maybe more

25    important that if rival -- if firms don't have an incentive to

5841

1    invest to improve their quality, it's going to lower their

2    quality and they're going to be weaker, less effective

3    competitors.

4    Q.  Is there an impact on Google's incentives as well?

5    A.  There is.

6    Q.  What is that?

7    A.  So, Your Honor, at the risk of repeating myself, this just

8    comes back to what I've talked about here about competitive

9    pressure and how when Google -- if Google feels more

10   competitive pressure, if it's more at risk of losing business,

11   whether consumer queries or advertisers, if it doesn't improve

12   quality or if raises price to advertiser in the case of

13   advertisers, it's going to not -- it's going to refrain -- you

14   know, invest more, it will run faster, and in the case of price

15   increases, it will be more hesitant about raising prices.

16   Q.  And you said that Google's incentives to invest would be

17   greater if not for the contracts.  What evidence have you seen

18   to support that conclusion?

19   A.  So, Your Honor, this next piece -- you know, there aren't

20   many times that Google has really felt threatened by

21   competition.  But, there are two times where it has, where it's

22   been -- felt some risk.  And if you look at them -- and this

23   is, I think -- you know, I think this is just super important.

24   What you see is the responding.

25              And so if you bring up the next slide, two cases that

1    I looked at, Your Honor, one was the introduction of Bing, and

2    the other was the European Commission introducing the choice

3    screen.

4    Q.  Starting with the introduction of Bing, what -- did you see

5    any Google documents relating to that?

6    A.  I have.  So, if you bring up slide 65.

7         Your Honor, this -- when Bing was introduced, Google

8    sat up and took notice.  It started -- you know, you could see

9    that already when -- in those discussions with, you know,

10   Mr. Manber and Ms. Mayer, that it took notice, and it started

11   to track what Bing's quality was.  So, here, what you're seeing

12   is a measure in red of Google's quality, starting in September

13   2009 and going until -- really hard to read -- April of 2010.

14   In red is Google.  In blue is Bing.

15        And so let me just -- to make sure I'm saying this,

16   we've talked about -- sorry, too loud.  We've talked about IS

17   scores.  This is something called a precision score, and it was

18   the predecessor of IS scores.  So this is from a document in

19   2012, and they started tracking this.  And it won't surprise

20   you, looking at this, if you were Google, you would start

21   worrying because Bing, you know, you're flat, you, being

22   Google, and Bing is starting to catch up.

23   Q.  And did you see any evidence that Google reacted to this

24   threat from Bing?

25   A.  I did.  So, if you turn to slide 66.

1          This is a document from 2010, written by Amit

2    Singhal, the former head of Google's search ranking team.  What

3    does it say?

4          "As you know, we have a serious competitive threat

5    from Bing in ranking.  We need to act fast and decisively.  I

6    would like you to drop everything you are doing starting today

7    and debug the next 20,000 set for losses to Bing."

8          So they saw what was happening.  And, you know, what

9    was their reaction?  We have to get better.  We have to

10   improve -- we -- that flat line, pretty flat improvement in

11   precision can't continue.

12   Q.  And did you see any evidence that Google's response to Bing

13   was successful?

14   A.  So, I did.  So if you bring up slide 67, you'll see

15   comments of Eric Schmidt in deposition testimony in 2012.  And

16   there are two things actually about this.  So what did he say?

17          He said, "I believe in the subsequent three years we

18   have responded to their competitiveness with a number of

19   products.  Although our pride would be hurt, you can argue that

20   we" -- I'm jumping now to the bold -- "we were responding to

21   competition that was initiated by Microsoft.  We responded

22   successfully to the competitive threat from Microsoft."

23          So there are two things from this, Your Honor.  The

24   first thing is they responded, and, you know, this is

25   immediately also confirming it was the Microsoft threat that

 1    made them start doing it.  To the extent that what does it

 2    mean, our pride would be hurt?  Well, it -- our pride would be

 3    hurt because our precision was pretty flat until we started

 4    really working and, yes, they were successful.

 5    Q.  Professor, let's turn now to slide 68 and look at the

 6    second incident.  The 2018 European Commission ruling requiring

 7    the choice screen.

 8         How did Google respond to the European choice screen?

 9    A.  If you bring up slide 69.  Your Honor, following the --

10    what was going to be the launch of this choice screen, Google

11    came up with a plan called "Go Big in Europe."  And what the Go

12    Big in Europe plan led to was efforts, investments to improve

13    quality in Europe.  And on the right you can see the things

14    that they did in the callout.  You know, they -- you know,

15    improved their features.  They added more local content, sports

16    for example, and the like.

17         And I guess -- so, you know, this was in this

18    document.  In my reports I document, like, what they ended

19    up -- how they ended up actually doing these things.  And so

20    there's -- from this, I think there is a couple of things that

21    are really worth noting.

22         The first thing is -- maybe more than a couple.

23    Maybe three.  One, there was -- again, you see them -- there's

24    a threat.  Now the market is going to be more open.  We're not

25    going to have things tied up as much in Europe.  They respond.

1    They do something in response.

2            Second -- and, you know, actually, if I can just jump

3    ahead to confirm that before I, you know, tell you the second

4    and third thing.

5            If you look at the next slide, slide 70, you can see

6    deposition testimony by Ben Gomes, who is senior vice president

7    of search and assistant, about this episode.  You know, he's

8    asked about the impetus for these changes.  And what he says,

9    in bold, "Well, you know, they sat up and said, well, is there

10   some way, some other things we could be doing that maybe we're

11   missing doing?"

12           So, again, this idea that, like, they weren't doing

13   stuff.  Now they are recognizing maybe we should be.

14           And if you turn to the next slide, slide 71.  This is

15   another document.  You know, What is Go Big in Europe?  And

16   going down to the second -- you know, the last paragraph, where

17   there's bold.  "Go Big in Europe is product investments above

18   and beyond business as usual."  Okay?

19           So they're responding, but -- if we can just go back

20   to slide 69 for a second.

21           So, you know, the -- a second thing about this that

22   is really striking is none of these things are, you know,

23   inventing the new way of doing search.  They all are kind of

24   pretty mundane and they're all things they could have done

25   before.  There was no big discovery they needed, there was no,

1   you know -- there was no magic moment in the -- in the science

2   room.  It was just they had to spend more money getting local

3   content.  They had to do things that, you know, they could have

4   done before but they didn't and now they have the threat and

5   they do.

6          And, you know, it reminds me to some extent of the --

7   you know, at one point during the -- while working on these

8   reports I -- there was this *New York Times* article and *The New*

9   *York Times* article started talking about that there was

10  reporting that there was pantry mode at Google.

11         What do they mean by pantry mode?  And, you know,

12  what they meant by pantry mode was -- and it was described as

13  like we come -- there are these things and we keep them on the

14  shelf until maybe we need to bring them out.  And the

15  article -- it was a newspaper article, I'm not relying on it.

16  It's -- I don't even know if it was about search, but this has

17  that flavor to it.  That's, you know -- it has exactly this

18  flavor to it.  And so that's a second thing I think that's

19  really striking about this.

20         Oh, sorry.  I said there were three.  Sorry,

21  Mr. Severt.

22  Q.  What's number three?

23  A.  The third thing is just to recognize that when we look at

24  the choice screen results, this was going on at the same time.

25  And, so, the choice screen -- you know, first of all -- all

 1    right.  Actually, there are four.

 2            The choice screen didn't move shares all that -- a

 3    whole lot.  Like it moved them some, but it didn't move -- like

 4    as we talked about earlier, but it still made this happen.  It

 5    still made this -- these changes that improved things for

 6    consumers happen.

 7            And, moreover, when you think about the, well, I only

 8    saw X amount of change in -- of choices, well, that's given

 9    that Google is making these efforts.  And so, that's also worth

10    remembering.

11    Q.  Professor, any more recent examples of Google responding by

12    increasing its investments when facing competitive threat?

13    A.  So, Your Honor, these are the only two cases that I

14    really -- you know, during the time of the record that I was

15    looking at, you know, could look at and document of Google

16    responding, but, you know, this past April -- or maybe it

17    was -- I forget which month it was this spring when Chat -- you

18    know, OpenAI and ChatGPT was announced, I was just tremendously

19    struck by that because right in the paper you saw Google

20    immediately, the next day, declare a code red, saying it was

21    throwing engineers on, announce a press conference the next

22    week.  So, you know, it's -- it's not part of my analysis, but

23    I think we've all seen it.

24    Q.  And, Professor, just to -- to go back to your comments

25    about the -- about the improvements in Europe.

1          So, in the -- the -- so can consumers benefit from

2     competition even if market shares are not changing, like in

3     response to the U-choice screen?

4     A.   Right.  So, that was -- I don't remember whether it was

5     number three or number four that I ended up getting to.

6          But, you know, the -- this point that, like, the

7     choice screen didn't -- I mean, it had what I describe as a

8     modest but, you know, significant economically change in

9     shares, you know, the shares doubled or tripled.  Choice share

10    was relative to their previous share, but it was modest.

11         But, nonetheless, the response by Google was good for

12    consumers.  Consumers were getting content that they weren't

13    getting before.  Why?  Because it cost Google money to get that

14    content and why do it if you're not threatened?

15    Q.   So, Professor, we've talked about incentives for rivals,

16    incentives for Google.  Are there other market participants

17    whose incentives are affected by Google's contracts?

18    A.   Yes.

19    Q.   And who are those?

20    A.   So, another group would be entrants.  Potential entrants.

21    So, you know, most potential entrants, their calculus is

22    exactly the kind of thing that I just talked about.  They're --

23    if they're thinking about coming in, they're thinking about the

24    benefits.  They're thinking about the costs.  And to the extent

25    that Google's exclusionary contracts have raised -- have

1    lowered the benefits and raised the costs, it's less likely

2    they're going to enter.  And, I mean, you see this sometimes in

3    references like, oh, search is a place that venture capital

4    does not go.  Things like that.

5    Q.  And how about distributors?

6    A.  Well, so, there is another entrant who I haven't mentioned.

7    It's an important entrant, potential entrant, Apple.  So, I

8    don't know, do you want to...

9    Q.  Yeah.  Well, can you give me an example of how Google's

10   contracts have affected potential entrants?

11   A.  Sure.  So if you bring up slide 72, you'll see -- this is a

12   document where Google is thinking about Apple's incentives to

13   enter and they're talking about two different things.  One is

14   it would be -- there would be a lot of direct costs to Apple

15   entering, and those we talked about last time when we talked

16   about barriers to entry.  But as well, you see here that

17   they're talking about the cost of foregone payments from Google

18   and so, you know, the -- you know, rough order -- you know,

19   here they're talking about, you know, what are incremental

20   costs, the direct costs?  Well, okay, 200 billion.  What's the

21   incremental cost to Apple of --

22           MR. SCHMIDTLEIN:  Professor, I'd ask you not to

23   disclose this stuff.

24           THE WITNESS:  Oh, I'm really sorry.  I apologize.

25           THE COURT:  Counsel, just -- Mr. Schmidtlein, please

1    make the objection to me and not to the witness.

2              Thank you.

3              THE WITNESS:  I apologize.

4              So, yes.  It's redacted.  I'm not going to read it.

5    I said the one thing and I do apologize for that.

6              So -- and thank you for interrupting to stop me from

7    saying more, so...

8              So here they're talking about -- explicitly about the

9    forgone payments and how that would keep -- help, you know,

10   dissuade Apple from wanting to come in.

11   BY MR. SEVERT:

12   Q.  And beyond the payments, is there other ways in which

13   Google's contracts with Apple restrict Apple's ability to

14   enter?

15   A.  Yes.

16   Q.  How that?

17   A.  So, if you bring up slide 73.  This is a document from 2018

18   from Ms. Braddi, who I understand testified.  And so, here

19   explicitly what's being discussed is how -- is the concerns

20   over Safari suggestions and how Safari suggestions could start

21   taking away from Google's -- the queries that Google was

22   getting, and that posed, you know, a risk to Google.

23             So Safari -- you know, suggestions are not a general

24   search engine but, nonetheless, you know, it's -- I don't know,

25   I think of it as kind of Apple's nose -- camel's nose in the

1    tent and it's a threat.  And so, what do they do?  They put in

2    this language in the -- in 2016 when they saw that threat, they

3    put language into the agreement that Apple was restricted to

4    not go further.

5    Q.  And then, Professor, turning to distributors now.  How did

6    Google's contracts affect the incentives of distributors?

7    A.  So, for distributors -- if you bring up slide 74 -- you

8    know, they -- they are subject to -- you know, have agreed, you

9    know, to these contracts and these contracts have, you know, as

10   we've been saying, stipulations that alternative search

11   services aren't allowed.  And, you know, there's been

12   testimony, Your Honor, I know and I've seen, about Branch

13   metrics.  So you've heard about Branch.

14          This is a document that Ms. Kartasheva, who

15   testified, authored, and -- specifically talking about Samsung

16   and the concern with -- that Branch -- that Samsung was

17   interested in a partnership with Branch.

18          So the way I think about Branch is, again, it's not a

19   general search engine, but what Branch was doing was

20   potentially making apps a little more like a general search

21   engine because it basically would -- basically was something

22   that would provide kind of a measure of one-stop shopping over

23   apps that would be more like a general search engine.

24          And, you know, in a way, it kind of reminds me some

25   of, you know, back to the Microsoft case of -- with Netscape

 1    that, you know, why was Netscape a threat?  It was a threat to

 2    Windows.  It wasn't in the operating system, but it could

 3    facilitate entry and that would threaten the operating system.

 4            And here, Branch was kind of not in the market but

 5    could potentially facilitate things that would be a threat.

 6    Q.  And, Professor, did you see any evidence relating to

 7    Samsung's consideration of Branch?

 8    A.  I did.  So if you bring up slide 75.

 9            You'll see an email from Mr. Kang, a project manager

10    at Samsung, where he's saying:  I realize that it's a much

11    better experience, but the gating factor here is the

12    Google/Samsung contract terms and anything that Google can

13    claim is web search we have to avoid.

14    Q.  And did you see evidence from the carriers relating to

15    Branch?

16    A.  I did.  You know, there's also evidence about -- from

17    carriers.  And if you bring up slide 76, you'll see deposition

18    testimony by Mr. Ezell -- I'm not sure I'm pronouncing it

19    correctly -- about AT&T.  So AT&T was interested in Branch, as

20    well, and approached Google to ask about it and Google

21    indicated they felt it was inconsistent with the RSA.  And you

22    see in bold at the bottom:  We just decided it wasn't worth the

23    uncertainty.

24    Q.  Okay.  Professor, we've talked about the two mechanisms by

25    which Google's contracts reduce competition, now I want to talk

1        about the effects of that on consumers and advertisers.  Let's

2        start with consumers.

3               Harms to competition are most --

4               THE COURT:  Counsel, sorry to interrupt you.  Can I

5        interject a question that may be looking ahead into the future,

6        but I welcome your reaction.

7               It's been posited that there are actually, quote,

8        competitive benefits to these revenue-share payments and the --

9        and the contracts and one of them, with respect to the

10       distributors, is encouraging competition among mobile phone

11       carriers and mobile phone manufacturers, and improving those

12       products through the use of the revenue-share payments that are

13       received from Google.

14              What is your general view of that position?

15              THE WITNESS:  So -- so they are -- you know, they're

16       getting revenue share payments.  It's kind of -- I would say

17       two things.  One, just in terms of evidence, I have not seen

18       evidence that is at all convincing and reliable of such

19       effects.  Second, it's kind of a mixed picture of the -- of the

20       impact that it has.  So, for example, you know, you might say,

21       well, getting a revenue share payment by a distributor might

22       incent the distributor to do something to try to get more

23       business.

24              But if you think about some of the other things it

25       does, for example, Apple is getting money -- I'm sorry, let me

1    say that again.

2              Google's revenue share deal with Apple is giving it

3    money from Apple sales and so it's reducing Google's incentive,

4    actually, to push Android because every sale of an Android

5    phone is one less, potentially -- you know, it's a reduction in

6    sales of Apple.  So there's kind of a mixed picture of what the

7    effects are.

8              THE COURT:  I expect we'll get more into that, but go

9    ahead.

10   BY MR. SEVERT:

11   Q.  Professor, I just want to go back to -- so thinking about

12   consumer harm and thinking about consumers.  And the harms to

13   competition are most often realized through -- through higher

14   prices, and in general search services there's no price.

15             Google and its rivals are giving consumer general search

16   services for free, how can there be harm in that case?

17   A.  Well, there's harm because quality is super important for

18   consumers and if competition or lack of competition reduces the

19   quality and the options that consumers have, consumers are

20   going to be highly likely to be worse off.

21   Q.  And can you give an example where Google decided to provide

22   less quality because of its insulation from competition?

23   A.  I can.  So, if you bring up slide 77.

24             You know, one place, Your Honor, where, you know,

25   consumers certainly care about a lot is privacy and, you know,

1    there's lots of evidence and survey evidence about that and

2    consumers do vary in how much they care about privacy, but they

3    certainly -- there's certainly many consumers who do and in

4    some sense all consumers benefit if it's easy to choose what

5    privacy you want.

6          And so at one point, this is a document of --

7    actually, deposition testimony from 2021 by Mr. Raghavan, who

8    is senior vice president of search and ads, and he's asked, you

9    know:

10         When you consider to sign off on a privacy -- you

11   know, privacy enhancement for search, would you consider

12   whether Google is losing queries to a rival?

13         Answer:  Correct.

14         Is that correct?

15         Yes, that's correct."

16         So it's exactly this kind of issue of, you know, what

17   is your risk of losing business?  And that risk, that threat,

18   is what drives you to do things if you're a competitor.

19   Q.  And did you see any documentary evidence along these lines?

20   A.  I did.  So, if you bring up slide 78, you'll see something

21   else that he wrote.

22         You know, at one point they were having this, you

23   know very intense -- well, it seemed intense when I read it --

24   discussion about privacy and people in Google were pushing to

25   offer more privacy.  They were pointing toward DuckDuckGo and

1    saying DuckDuckGo offers so many better things than we do for

2    privacy and he comes back saying, you know, no, working teams

3    have to be much more careful before wasting our team -- our

4    time on private search.  I want to see evidence that there's a

5    real impact on Google users attributable to this.

6              So what is -- you know, at least my reading of this

7    is back to what he said in deposition, like it's -- you know,

8    we're looking at how the threat of losing users -- we need to

9    see that we're really going to lose users before we start doing

10   things, and why is -- I should say, Your Honor, why is it --

11   why are they reluctant to do it?  Because privacy cuts into

12   their revenue.  Because with privacy options, you know,

13   targeting is -- you're less able to target and so they make

14   money -- less money on ads.

15   Q.  And you mentioned privacy, are there other -- sort of other

16   axes of competition?

17   A.  I'm sorry.  Let me say one other thing.

18   Q.  Sure.

19   A.  Of course, it's also costly to do these things.

20   Q.  Are there other ways, besides privacy, where consumers

21   could be harmed through less competition in general search

22   services?

23   A.  Sure, I mean, there are, you know, unending numbers of ways

24   in which consumers care about quality dimensions of search

25   services, whether it's latency, how quickly they get their

1    results, whether there are sports -- you know, local sports

2    scores that are provided, et cetera.  So, you know, many

3    different dimensions on which quality can be enhanced or

4    worsened for consumers.

5    Q.  Have you looked at evidence regarding Google's research and

6    development investment?

7    A.  I have.

8    Q.  What did you find?

9    A.  So, Your Honor, Google likes to, you know, say how much in

10   absolute dollars they spend on R&D as a way of saying, like,

11   how exceptional they are in terms of how R&D -- how much R&D

12   they do.

13          Economists have a standard metric of R&D intensity,

14   which is R&D sales ratio.  So, the dollar spent on R&D divided

15   by the sales revenue of the firm.  So that's a way of kind of

16   correcting for how big firms are.

17          And what I'm showing you, if you bring up slide 79 --

18   and this is all redacted, and so I won't say anything about the

19   numbers or anything.  But this is showing something about where

20   Google and -- stands in its R&D intensity relative to other

21   firms.

22          So the specific comparison, Your Honor, this is from

23   something called the EU Industrial R&D Investment Scoreboard.

24   Overall, I think that scoreboard has over 3,000 firms.  And

25   what this is, is just narrowing it to the firms in software and

1    computer services category.  And I should say, you know, there

2    are a few firms in that that don't have their sales revenue in

3    the data.  So it's a very small number.  So this is showing 311

4    of the firms and what their R&D intensity was.

5            So, you know, on the left is the least R&D intensive.

6    On the right is the most, and it's plotting what that R&D --

7    you know, vertical height of these bars, what the -- for each

8    of these 311 firms that are ordered from left to right, it

9    shows exactly what their R&D intensity is.

10           What you can see here is Google, which -- you know,

11   for the far left here.  You know, out of all of these firms,

12   it's a number -- blank -- that you can see.

13           THE COURT:  The numbers on the bottom, these are just

14   anonymized numbers that relate to particular software and

15   computer services firms?

16           THE WITNESS:  Correct.  But ordered where to the left

17   it's the least R&D intensive and to the right it's the most.

18   And then if you look at all of alphabet, which of course is

19   including, you know, the Bets Division that's doing

20   self-driving cars and all the rest, it's still where you see

21   it, which is below the median.

22   BY MR. SEVERT:

23   Q.  Professor, is it your opinion that consumers likely would

24   have had significantly better and more varied search services

25   but for Google's contracts?

1    A.  Yes.

2    Q.  And does your opinion about harm to competition in general

3    search services depend upon their being harm to competition in

4    the ad markets?

5    A.  It doesn't.  And so, Your Honor, I think this is also an

6    important point that, you know, if one -- one -- you, in

7    particular, decide in the end, you know, were to decide and

8    say, well, I think the ad market is competitive, it's like the

9    No. 2 wheat market.  That would not change anything.  We're

10   talking about for the search services side.  All of the things

11   about competition would still be there.  It's just that, you

12   know, at one point I talked about the revenue you get from

13   selling ads as being, like, a cost.  That would just be a fixed

14   thing that Google couldn't -- you know, wasn't affecting, but

15   all of the things about quality and the search services market

16   would still be true, just as much as I've said.

17   Q.  And let's turn to those advertising markets.  Do you have

18   an opinion that Google's contracts harm advertisers?

19   A.  I do.

20   Q.  And what would you expect to happen if there were an

21   increase in competition in the ads markets?

22   A.  So I think Google would have increased -- well, I think

23   rivals would invest more.  All these things we talked about.

24   Rivals would invest more.  They would have bigger incentives to

25   invest.  Google would feel more competitive pressure and have

1    bigger incentives to invest and would have incentives as well,

2    you know, would see diminished incentives to do price increases

3    and the like.

4    Q.  Have you seen evidence that greater competition benefits

5    advertisers?

6    A.  I have.  So, if you bring up slide 80.

7            This is just -- you know, I have less information

8    about the ad side here, Your Honor, but this is something

9    about -- that Google did in Japan called JIP search, which

10   basically was a discount program for advertisers in Japan.  And

11   in Japan, Google -- actually, Yahoo! was a strong competitor in

12   Japan, and because of that, Google introduced this discount

13   program called JIP search and that's -- you see up at the top,

14   you know, JIP search started more than ten years ago to help

15   our competitive position against Yahoo!.

16           The next bullet says, "Google surpassed Yahoo!'s

17   search revenue in 2014.  Our revenue is now" -- redacted -- "of

18   Yahoo!'s.  So we have less reason to have JIP search from the

19   competition perspective."

20           And so what did they do?  Down at the bottom in bold,

21   "In 2020, we scaled down the investment in this program towards

22   sunsetting it in the not too far in the future."

23   Q.  And was expanding the JIP program to the United States, was

24   that ever raised?

25   A.  It was.  And so there was a discussion -- I don't have a

1    slide here for it, Your Honor, but a discussion at one point

2    that came up, hey, should we do JI -- something like JIP search

3    in the U.S.?  And the immediate response was, like, why?  We

4    don't have -- we're not facing competition here, and the

5    discussion was tabled and things, you know, moved on to other

6    topics.

7    Q.  And, Professor, have you seen evidence that Google decided

8    to provide less quality to advertisers because of its

9    insulation from competition?

10   A.  I have.  And bring up slide 81.

11        So, Your Honor, this is entirely redacted.  This was

12   a memo that was written at Google in 2013.  And I think it's

13   kind of an interesting memo in that we talked last time about

14   ad launches that Google did, where they were increasing prices.

15   Before that, here, they're talking about not things they

16   launched and actually not price changes to the auction, but,

17   rather, quality things that they could do.

18        And what you're seeing here is in this memo, this

19   recognition that there's this problem that if we increase

20   our -- if we increase the measure of relevance, our ability to

21   predict relevance, it actually can thin out the auction, we'll

22   have less competition in our auction.

23        And the reason is, you know, imagine in the extreme

24   that they get so good at predicting relevance, they know

25   exactly the one advertiser that a consumer will click on.  And

 1   now you've heard how they use predictive click-through rates.

 2   So what that's going to mean is there's really only one

 3   advertiser who is bidding, and what they've -- you know, this

 4   document -- you know, in the document they're recognizing,

 5   like, oh, these increased relevance things, these good quality

 6   things that we could do -- and I should say, this is a member

 7   of the quality team.  So, they want to increase quality.

 8           But what they're saying here is, you know, how many

 9   times -- and I can't read it -- I'm not -- anyway, you can read

10   it.  That things that increase quality would get blocked

11   because of the concern that it reduced revenue.

12           And so, I think it's very compelling in that it's not

13   just things they do; it's things they don't do.  And we kind of

14   saw things they don't do before when we saw the response.  You

15   know, without Bing, they wouldn't have put in the effort.

16   Without the choice screen, they wouldn't have done Go Big in

17   Europe, and you see that here, too.

18   Q.  And, Professor, more broadly, if Google and rivals are

19   making decisions about how much to invest based on what you

20   describe as the cost-benefit analysis, aren't those just

21   rational business decisions?

22   A.  Right.  So I think this really kind of gets to the heart of

23   things, this question.  And -- and it's tempting to say

24   benefits and costs, that's just rational.  So what does

25   competition have to do with it?  But the thing, Your Honor, is

1    competition changes what are benefits and costs.  So, you know,

2    when Google doesn't face any competition, it sees itself losing

3    revenue by doing these quality improvements for advertisers, so

4    it doesn't do them.

5         If Google faces competition and it doesn't do the

6    quality improvements, it will lose advertisers to rivals.  The

7    whole calculus changes, and now the rational business decision

8    when it faces competition is to do the ad launch, even though,

9    you know, they wish they wouldn't have the competition.  They

10   wish they didn't have to do the quality improvement, but that's

11   what competitive markets do.  They force firms, they push firms

12   that their rational business decisions are to do things that

13   are good for consumers; in this case, advertisers.

14        MR. SEVERT:  I have no additional questions at this

15   time.  I would move to admit UPXD104 to complete

16   Professor Whinston's testimony.

17        THE COURT:  104 will be admitted.

18        All right.  Does the state have a direct examination?

19        MR. CAVANAUGH:  No, Your Honor.

20        THE COURT:  Okay.  Mr. Schmidtlein, we're ready

21   whenever Google is ready to begin its examination.

22        MR. SCHMIDTLEIN:  Thank you, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. SCHMIDTLEIN:

25   Q.  Good afternoon, Professor.

1    A.  Good afternoon.

2    Q.  I'm going to go back in time to market definition.

3    A.  Okay.

4    Q.  If that's okay with you.

5         Do you agree that although Google tries to provide high

6    quality search results for all queries, only a small fraction

7    of those queries are monetizable?

8    A.  Yes.

9    Q.  And have you conducted any analysis of the record in this

10   case to get a sense of, a rough estimate of the number of

11   queries -- or the percentage of queries where Google shows at

12   least one ad?

13   A.  I've seen evidence about that.

14   Q.  Okay.  And what have you seen?

15   A.  I -- I think I've seen various things, but the one thing

16   that stands out in my mind is how Varian -- I think he gave

17   many talks where he talked about 6 percent or something like

18   that.

19   Q.  It's a small percentage, correct?

20   A.  Yes.

21   Q.  And do you understand that Google operates on the principle

22   that if it does a bad job providing search results for that

23   large majority of queries that don't monetize, that users won't

24   come back and search with Google for queries that do monetize?

25   A.  Yes.

1    Q.  And based on that principle, would you agree that Google

2    has invested significant sums of money to provide high quality

3    search results for both non-monetizable and monetizable search

4    queries?

5    A.  Yes.  I haven't looked at the dollars for, you know, each

6    of them, but yes.

7    Q.  Right.  I mean, you haven't seen any evidence in the case

8    that Google is somehow engaging in different investment

9    decisions for monetizable versus non-monetizable queries?

10   A.  No.

11   Q.  And you certainly have offered no opinions in this case

12   that Google has intentionally served poor search results for

13   non-monetizable queries and focused only on the monetized ones,

14   right?

15   A.  No.

16        Sorry.  I haven't seen that, no.

17   Q.  Okay.  And would you agree:  Users have different places

18   where they can search for information about purchasing running

19   shoes, which would be a monetizable query, than they do if

20   they're looking for information about the weather, which is a

21   non-monetizable query?

22   A.  Yes.

23   Q.  And that's true as to -- as to many categories of queries,

24   right?  Users have different options for searching for

25   information depending on what exactly it is they're looking

1    for?

2    A.  Yes.

3    Q.  Okay.  Now, some of the options that users have are

4    something that I think the Court has heard referred to as

5    specialized vertical providers.  Have you -- are you familiar

6    with those?

7    A.  Yeah.  I call them specialized search engines, but same --

8    I think we're talking about the same thing.

9    Q.  Okay?  If I -- if I break into the acronym of SVP,

10   specialized vertical provider, will you understand that to be

11   the same thing as an SSE, I guess in your jargon?

12   A.  I will.

13   Q.  Okay.  Great.

14       Now, I want to talk about your opinion about general

15   search engines providing users the ability to one-stop shop.

16       Do you recall giving testimony about that?

17   A.  I do.

18       MR. SCHMIDTLEIN:  Okay.  And can we pull up slide 7

19   of his deck from -- no, 7 from the first one.

20   BY MR. SCHMIDTLEIN:

21   Q.  Do you still have that binder?

22   A.  No.

23   Q.  Okay.

24       MR. SCHMIDTLEIN:  Sorry, Your Honor.

25       THE COURT:  That's okay.  Looks like it's on the

1    screen, too.

2    BY MR. SCHMIDTLEIN:

3    Q.  It's the same as you had before, just a different color

4    binder.

5    A.  Okay.  Thank you.

6    Q.  And this is the slide you put together on one-stop

7    shopping?

8    A.  Yeah, I think this is what I showed.

9    Q.  Okay.  And the first two bullets there, "Single location

10   for all queries," and "Avoids the time and energy needed to

11   recall or identify the right specialized site."

12           The point there is that, in your view, consumers use a

13   search engine for queries with lots of vertical search options

14   because they can't be bothered with remembering all the various

15   options that they have for those queries; is that right?

16   A.  I think it's a factor.  Yes.

17   Q.  Okay.  And have you done any independent empirical analysis

18   or any consumer surveys that estimate the time or energy that

19   consumers expend or would have to expend to recall or identify

20   a particular SVP that competes with Google for search queries?

21   A.  No, I haven't.

22   Q.  Now, SVPs have their own mobile applications that users can

23   download on their mobile devices, right?

24   A.  Yes.

25   Q.  And the point of having those mobile apps is to make it

1    easy and convenient for users to start searching on the SVP

2    rather than Google, correct?

3    A.  Certainly, yes.

4    Q.  And, in fact, you've seen evidence in this case that users

5    frequently start searching on particular SVP sites without

6    going to a search engine first, right?

7    A.  Well, it depends what you mean by frequently.  The

8    empirical evidence that I described said that 77 percent of the

9    time consumers start on a general search engine.

10   Q.  Okay.  That's the -- that was the comScore study you looked

11   at; is that right.

12   A.  Not comScore study, but my analysis using comScore data.

13   Q.  Fair enough.

14       It actually wasn't something comScore put together, it

15   was a slice of comScore data that you looked at for purposes of

16   this case?

17   A.  Again, yeah.  I don't know what you mean by "slice," but...

18   Q.  Well, you looked at a set of comScore data for a certain

19   period of time?

20   A.  Yes.

21   Q.  Okay.  The cost in time needed to open an SVP app or

22   navigate directly to an SVP website is -- is almost zero,

23   right?

24   A.  You know, the time, if you know where you want to go, can

25   be zero.

1    Q.  Okay.  Now, the next -- the next bullet you have there is

2    "Provides results with greater depth and breadth than an SVP."

3         Do you see that?

4    A.  Yes.

5    Q.  And have you offered an opinion in your expert reports in

6    this case that any difference in depth and breadth of search

7    results means that for a particular commercial query or

8    category of queries, Google does not face competition from an

9    SVP?

10   A.  I'm sorry.  Could you repeat the question?  Just -- there's

11   a lot in it.

12   Q.  Sure.  Sure.

13        Would you agree that for those most highly monetizable

14   categories of queries, that SVPs offer a depth and breadth of

15   information that allows them to compete with Google?

16   A.  So, I think it's not that SVPs, you know, have -- are --

17   are zero competitors to general search engines.  As I said when

18   I talked about market definition, we're always leaving out some

19   substitutes, and that's even particularly true when you -- you

20   know, there are some things that are not in the relevant market

21   but, nonetheless, compete to some degree, and it's particularly

22   true if you're looking at a firm with market power for the

23   cellophane reasons and the like.

24        So, yeah.  They -- they do compete, but they don't

25   offer the same one-stop shop feature for consumers.

 1    Q.  Understood.

 2         But -- but you -- you have not undertaken, for purposes

 3    of your opinions in this case, to analyze, for example, whether

 4    Google has substantial market power for any particular vertical

 5    category of search queries, right?

 6    A.  I haven't looked at individual categories.

 7    Q.  Okay.

 8    A.  I've looked at the whole.

 9    Q.  You've looked -- you've looked across the broader general

10    search engine market that you've defined, right?

11    A.  Right.

12    Q.  Your next bullet or star there is, "Caters to habit

13    formation."

14         Do you see that?

15    A.  Yes.

16    Q.  And have you done any empirical or other analysis in this

17    case to assess whether consumers are any more likely to form

18    habits of starting their searches on SVPs rather than on

19    general search engines?

20    A.  No, I haven't.

21    Q.  Would you agree that SVPs certainly are trying to train

22    users to form the habit of coming and searching on their sites

23    instead of Google?

24    A.  They would love to.  I mean, that's part of why they are --

25    you know, they can't get certain consumers.  They're

1    advertising on general search engines to try to attract them to

2    their website and maybe, hopefully, get them to start liking

3    going there.

4    Q.  Have you examined for particular search categories whether

5    particular SVPs have had success in getting consumers to start

6    searching on their websites rather than on search engines?

7    A.  So, I have to the extent that I've -- you know, I looked at

8    the extent of different -- I think I talked about this.  The

9    extent that different SVPs are relying on referral traffic from

10   general search engines versus traffic that's going to them

11   directly.

12   Q.  Okay.

13            THE COURT:  Sorry.  Sorry to interrupt,

14   Mr. Schmidtlein.

15            The 77 percent number that we talked about, was that

16   a percentage with respect to all search or just commercial

17   search queries?

18            THE WITNESS:  All.

19            THE COURT:  Thank you.

20            MR. SCHMIDTLEIN:  We're going to get there.

21   BY MR. SCHMIDTLEIN:

22   Q.  Would you agree that Amazon has been successful in

23   providing a high quality online shopping experience that

24   customers look to first without going to a general search

25   engine?

1    A.  Yes.  I think Amazon has been, out of various SVPs, you

2    know, the one that kind of stands out in terms of its success

3    in that way.

4    Q.  The last bullet you have on slide 7 is, "Convenient search

5    bars on browsers and devices."

6        Do you see that?

7    A.  I do.

8    Q.  And can you explain again what the significance of that

9    fact is to your opinion?

10    A.  Well, convenience obviously matters -- it's kind of

11    twofold.  Convenience matters and it's also recognizing that

12    there's a reason that browsers are making general search

13    engines their -- you know, considering them for their defaults

14    and not considering, SVPs as you call them, for their defaults.

15    And, you know, there's plenty of evidence about that.

16    Q.  And those convenient search bars, whether they are

17    incorporated into a browser or whether it's like a search

18    widget on the Android devices, those convenient search

19    locations cause consumers to search more, correct?

20    A.  I haven't measured that.  I'm sure that the answer is yes.

21    Q.  Okay.  And consumers can use those convenient search points

22    that you -- search bars that you identify here, whether it's a

23    widget or a browser search box, they can use those to navigate

24    directly to an SVP, right?

25    A.  Correct.

1    Q.  Or they can navigate directly to some other source of

2    information.

3         So I know you've made reference to sports scores this

4    morning.  If you want to go look for sports scores on ESPN, you

5    can go right into that browser box and you can type in ESPN and

6    it sends you right to ESPN, right?

7    A.  You can do that.  But probably if that was like just as

8    wonderful for consumers, it wouldn't have been part of Go Big

9    in Europe.

10   Q.  You recognize that users, whether they're in Europe or the

11   United States, or anywhere else, they oftentimes have mobile

12   applications that they can tap on that can get them sports

13   scores, right?

14   A.  I do recognize that.

15   Q.  Okay.  And you're aware that Amazon has consistently been

16   one of the most popular keywords typed into Google for many

17   years?

18   A.  I haven't seen a statistic on that, but it doesn't surprise

19   me.

20   Q.  You haven't done any analysis in this case as to how

21   popular particular SVPs are in terms of being navigational

22   queries on Google, have you?

23   A.  No.  I mean, I haven't done that, no.

24        THE COURT:  Mr. Schmidtlein, I'm sorry to interrupt

25   again, but just for my own clarity and recollection purposes:

 1    When you say navigational query, so if someone were just to

 2    type "Amazon" into the search bar, that's not a navigational

 3    query, but if it's in Amazon.com it would be a navigational --

 4         MR. SCHMIDTLEIN:  I think people use that

 5    interchangeably.

 6         THE COURT:  All right.

 7         MR. SCHMIDTLEIN:  Because either way you're going to

 8    get sent to -- people are either going to get a link to Amazon

 9    or they're going to get sent directly to the page, or to the

10    Amazon.com home page.

11         THE COURT:  Okay.  Thank you.  Sorry for the

12    interruption.

13         MR. SCHMIDTLEIN:  Nope.

14    BY MR. SCHMIDTLEIN:

15    Q.  Now, I promise you, we're going to come back to your

16    comScore data analysis.

17         And am I right, the comScore data you looked at involved

18    consumers on Window PCs?

19    A.  Correct.

20    Q.  And you looked at where consumers started a search session;

21    is that right?

22    A.  Correct.

23    Q.  And explain -- if you can remind the Court again what a

24    search session was in your -- for purposes of your analysis.

25    A.  So, I think I talked about this nine days ago, or whatever

1    number of days ago it was, Your Honor, that the comScore data

2    records searches, this particular data set records all the

3    searches a consumer is doing.

4         So a session is when there's a gap of -- in the main

5    analysis I did, I think I used 30 minutes.  That was partly

6    motivated by, if I recall, similar kinds of analysis Google has

7    done using that kind of gap.

8         And so it would be -- you know, that 77 percent is

9    talking about the first search query that's entered by a

10    consumer in any site after a 30-minute gap where there's been

11    no search.  And I think I -- if I recall, I also did -- I'm

12    pretty sure, but I -- I did a -- I know I did other windows.  I

13    think it was 60 and 120 minutes, or something like that.

14         THE COURT:  So just to be clear, you're defining new

15    session as starting if there was a period of dormancy for

16    30 minutes?

17         THE WITNESS:  Correct.

18    BY MR. SCHMIDTLEIN:

19    Q.  The 77 percent figure that you reported was in relation to

20    where the user first actually started the session.  In other

21    words, according to you, 77 percent of the time the user

22    started their session on the Windows PC by going to a general

23    search engine; is that right?

24    A.  If by what you mean by going to" is put in -- you know,

25    their first search, yes.

1   Q.  Okay.  Now, the comScore analysis you described, it didn't

2   involve mobile device, where consumers can directly access

3   various websites, including SVPs, through mobile applications

4   right?

5   A.  Correct.

6              THE COURT:  Did not?

7              THE WITNESS:  Did not.

8              MR. SCHMIDTLEIN:  Did not.

9              THE WITNESS:  The comScore data, Your Honor, is PCs.

10  BY MR. SCHMIDTLEIN:

11  Q.  The comScore analysis you cited -- and I think this

12  pertains to the question the judge was getting at before --

13  that 77 percent figure was based on looking at all types of

14  search queries, including noncommercial queries, correct?

15  A.  That's correct.  And just to be clear, there really, to my

16  knowledge, isn't any way to separate those things out, you

17  know.  So Google separates out commercial and noncommercial

18  queries and navigational queries itself in its data.  In

19  comScore you see the query and now question what do you -- you

20  know, that's what I see.

21  Q.  Have you seen data in that case that indicates that roughly

22  20 percent of Google search queries are commercial queries that

23  trigger ads?  At least one ad?

24  A.  Yeah.  So previously you asked me a question, and I think

25  what I can't remember is in your question, did you ask me about

1    ads or clicks?  I think the 6 percent number is an ad click,

2    maybe, and the 20 percent is whether it showed an ad.  I may be

3    remembering this --

4    Q.  You're not sure what the 6 percent pertains to, are you?

5    A.  I think I'm pretty sure, but that's what I'm trying to

6    remember from this.

7    Q.  Okay.  So, again, just trying to get ourselves situated on

8    this comScore analysis, if you would just assume with me for

9    the moment, as we get our data set here, 80 percent of queries

10   on Google are noncommercial, right, no ads?

11   A.  Okay.

12   Q.  And you found that 77 percent of the time people started on

13   a search engine, irrespective of what type of query they

14   were searching --

15   A.  I'm sorry, I lost -- I'm going to have to ask you to repeat

16   it because I'm still thinking about the 6 percent number.  I

17   think it's 6 percent of clicks, or ad clicks, but go ahead.

18   Q.  It's a lot of data.

19   A.  There's an enormous amount of data in this case.  If you

20   could just repeat your question, so that I'm focused on it.

21   Q.  No, we've got a world where 80 percent of the queries are

22   noncommercial queries, so queries where it's unlikely that

23   somebody is navigating, let's say, directly to something like

24   Amazon, right?

25   A.  I don't -- I mean -- I'm not part of Google's decision

 1    about serving ads, but I think in general I would agree with

 2    you.

 3    Q.  But, again, when you went down and did your 77 percent, you

 4    looked at all queries.  You weren't looking at commercial

 5    queries or any particular category of query.  You were looking

 6    across everything?

 7    A.  Correct.  It was all queries.

 8    Q.  Okay.  Your comScore analysis did not account for

 9    navigational queries, correct?

10    A.  Correct.  It was all queries.

11    Q.  So if a user sat down as part of your comScore analysis and

12    typed in Expedia.com or Booking.com or Amazon.com, you treated

13    that as the user -- you attributed that to the user starting

14    their search on a general search engine, right?

15    A.  Correct.  Because they did.

16    Q.  Have you done any analysis in this case to assess how often

17    users first start -- for a shopping query, how often they start

18    on Amazon versus Google?

19    A.  No.

20    Q.  Have you looked at any documents or seen any data that

21    address that question?

22    A.  I've seen documents that are survey documents that talk

23    about those.  I think I cite some in my reports.

24    Q.  What do you recall the documents and the data that you

25    recall seeing say about this question for product queries where

1    users start online searching for?

2    A.  I think there's various surveys that have been done.  I

3    think they show a significant number of people starting on

4    Google and a significant number starting on Amazon, and the

5    results vary across the different surveys.

6    Q.  Do you recall -- just in terms of, like, an order of

7    magnitude, do you recall whether a majority of users start on

8    Amazon or whether a majority of users start on Google?

9    A.  Again, I think the surveys show different things.  I can

10   remember one survey that showed, maybe, a number a little over

11   50 percent reporting that they started on Amazon.

12   Q.  You recall that one of the documents you relied on in this

13   case for some other point, you recall that document reflected

14   that 58 percent of users began their online shopping queries on

15   Amazon as compared to 25 percent for Google, right?

16   A.  Yes.  I mean, I think that's why I'm more likely to have

17   remembered that document.

18   Q.  Okay.

19          THE COURT:  Mr. Schmidtlein, are you moving on to a

20   different topic?

21          MR. SCHMIDTLEIN:  This is as good a time as any.

22          THE COURT:  Terrific.  It's a little bit before 3:00.

23   We will see you at 3:15.

24          (Recess from 2:59 p.m. to 3:17 p.m.)

25          THE COURT:  I don't know why my computer shut off.

1    Go ahead, Mr. Schmidtlein.

2                  MR. SCHMIDTLEIN:  Okay.  Thank you, Your Honor.

3                  Your Honor, may I approach?

4                  THE WITNESS:  Thank you.

5    BY MR. SCHMIDTLEIN:

6    Q.  Professor Whinston, before the break, we were talking about

7    some data.  If you would turn to the binder I just handed you,

8    the first slide in that binder is DXD15.002 and -- pull that up

9    on the screen.  It will be on the screen or it will be in your

10   binder, whichever is easiest.

11   A.  I have both.

12   Q.  We were talking about a chart involving Amazon and where

13   people go to shop online.  Is this the slide you were thinking

14   of?

15   A.  I think it is.

16   Q.  Okay.  And this slide comes from a Bank of America report

17   that you cited in one of your expert reports, correct?

18   A.  I believe so.

19   Q.  All right.  You can close that for a moment.

20                 MR. SCHMIDTLEIN:  If we could go back and look at the

21   Professor's slides from before, from a couple weeks ago, slide

22   8.

23   BY MR. SCHMIDTLEIN:

24   Q.  And this is some testimony that -- from Dr. Varian that I

25   think you cited to.  Do you recall that?

```
 1    A.  Yes.
 2    Q.  And you cited this as, again, in support of your opinions
 3    about one-stop shopping, right?
 4    A.  I did.
 5    Q.  And can you explain again what the significance of this
 6    slide or this testimony was to your opinion?
 7    A.  The significance is that if there wasn't an important link
 8    between noncommercial and commercial, putting in noncommercial
 9    and commercial queries for consumers, Google would not have an
10    incentive to do this.
11    Q.  Okay.  And you -- is it your testimony that this Q and A
12    supports the notion that consumers engage in one-stop shopping?
13    A.  I think it is supportive, yes.
14    Q.  Okay.  So the question that was asked Mr. Varian here was
15    "Google answers noncommercial queries because it hopes, at some
16    point, the user will also type in a commercial query and Google
17    can make money off of it."
18         Do you see that question?
19    A.  I do.
20    Q.  Mr. Varian was not asked the question about whether users
21    engage in one-stop shopping all at one point in time, was he?
22    A.  No, he wasn't.
23    Q.  Okay.  You can put that --
24    A.  I mean, I think that is the fourth point, arrow point that
25    you brought up earlier.  You know, it's kind of a habit
```

1    formation point.

2    Q.  Now, you've testified that results pages on specialized

3    search engines are often very different from results pages on

4    general search engines for the same query, right?

5    A.  Yes.

6    Q.  And you claim that's another reason for not including

7    specialized search engines in any assessment of a competitive

8    market or relevant market that involves Google search, right?

9    A.  No.

10    Q.  Well, that was one of the points that you cite to in

11    support of your notion that specialized search engines are not

12    part of general search services market, correct?

13    A.  That's correct.  It was just your use of, you know, "any

14    assessment."  I did assess it.  I looked at all the evidence

15    about substitution from many products, not just specialized

16    search, SVPs, as you call them.

17    Q.  You used the example, I believe, a couple weeks ago of

18    Valentine's Day.  Do you remember that?

19    A.  Sorry.  Go ahead.  Say it again.

20    Q.  The example you used a couple weeks ago was a search query

21    "Valentine's Day"?

22    A.  I showed that query, yes.

23    Q.  You also made reference to, I think, Halloween.  Do you

24    remember that?

25    A.  I did.  I think, if I recall correctly, I said that I had

1    looked at Halloween, either the day before or that morning or

2    something like that.

3    Q.  If you'll take a look in your binder there that I handed

4    you again, slide 004, would you agree -- there is a comparison

5    of search results pages for Valentine's Day gifts.

6         Do you see that?

7    A.  I do.

8    Q.  And this compares search results pages for Google and

9    Amazon, right?

10   A.  Let me look at it just for a moment, if you would.

11        Sorry, it's -- yeah, that's what it appears to be.

12   Q.  And if you look at the next slide in your binder, this is

13   comparing such results for Halloween decorations.

14        Do you see that?

15   A.  I do.

16   Q.  And you don't disagree that for these particular types of

17   search queries, Google faces competition from a specialized

18   search engine like Amazon, correct?

19   A.  I think it does face some competition from specialized

20   search engines.  I just don't think it's enough to change my

21   opinion that general search engines are -- general search

22   services are a relevant market.

23   Q.  Professor Whinston, I am not expecting you, during the

24   hours of my examination here, to cop to that.  I'm asking you a

25   very, very specific question.

1    A.  Sure.

2    Q.  We are going to let this gentleman up here decide

3    ultimately what matters and what doesn't, okay?

4    A.  Of course we are.

5    Q.  All right.  For these types of queries, you would agree

6    that these types of search results for Google and for Amazon

7    are similar, correct?

8    A.  I mean, I haven't analyzed them and I'm not seeing the full

9    results, so, you know, I don't want to -- I would need to look

10   at it, and sitting here now, quickly -- but, you know, quickly,

11   a glance at it, seems to suggest that, but I want to look at it

12   more carefully.

13          MR. SEVERT:  Objection.  Your Honor, there's a

14   scroll -- looks like there's more material here.  I'm just

15   going to request the full pages.

16          MR. SCHMIDTLEIN:  There's always more, Adam.

17          MR. SEVERT:  If you're showing the witness full

18   pages --

19          THE COURT:  Hang on.  If there's a demonstrative, he

20   said he's not sure without the opportunity to look at the whole

21   document.  So I think that's where we are with this.

22   BY MR. SCHMIDTLEIN:

23   Q.  Would you agree that there are many popular SVPs and other

24   websites that answer consumers' informational needs that do not

25   get the majority of their search traffic from Google?

1    A.  Sorry, let me just think back to your -- could you repeat

2    the question so I am sure I'm --

3    Q.  Sure.  Would you agree that there are many popular SVPs and

4    other websites where people can go to get their informational

5    needs online that do not get the majority of their search

6    traffic from Google?

7    A.  Without saying -- I don't want to -- I'm not trying to be

8    picky what "many" is, but I had a display -- a figure in my

9    report that showed referral traffic and, you know, there

10   certainly were SVPs in there that did not get the majority from

11   Google.

12   Q.  If you'll look at the -- actually, the second slide in your

13   binder, it's DXD15.003.  This is from that same Bank of America

14   study that you had cited previously.

15       And can you describe what this chart depicts?

16   A.  Can I describe what this chart predicts?

17   Q.  Depicts.

18   A.  Oh, depicts.  I'm sorry.

19       Well, looking at this slide it says it's the percent

20   of traffic coming from Google.  It has five bar charts on it,

21   listing what seem to be different SVPs, and the legend is

22   saying that it's Google's source traffic, which seems to be

23   referral traffic.  I don't know whether it's navigational or

24   all referral traffic.  It doesn't say.  And then it's showing

25   the percentages, so that's what this depicts.

1    Q.   Okay.  And you would -- you would -- you would agree that

2    these are a good representative sample of very popular places

3    where people go to do online shopping?

4    A.   These are certainly online places that are popular for

5    online shopping.

6    Q.   And online shopping represents a very substantial percent

7    of commercial queries that Google gets, correct?

8    A.   It is a significant part of -- of what Google gets.

9    Q.   Now, in your prior testimony --

10             MR. SCHMIDTLEIN:  You can take that down.

11   BY MR. SCHMIDTLEIN:

12   Q.   In your prior testimony you cited to some internal Google

13   documents that analyzed market shares of general search engines

14   as proof of a general search engine market.

15        Do you remember that?

16   A.   I'm sorry.  Just repeat it one more time.

17   Q.   In your prior testimony, you cited to some internal Google

18   documents that analyzed market shares for general search

19   engines as evidence that you claim supports your assessment

20   that there's a general search services market.

21        Do you remember that?

22   A.   By prior testimony, do you mean nine days ago?

23   Q.   Correct.

24   A.   Yes.

25   Q.   From your work on this case, are you aware of other

1    internal Google documents where Google analyzes competition

2    that Google faces from specialized search engines?

3    A.  I've seen documents where they're talking about Amazon, for

4    example.

5    Q.  You're aware that there are many internal Google documents

6    that discuss Google's competition with Amazon for shopping

7    queries, right?

8    A.  So I'm aware of that.  For example, Dr. Israel, I think,

9    talked about -- maybe the -- let me take that back.  I'm not --

10   I would have to remember whether he was talking about ads or

11   talking about queries.  But, yes.

12   Q.  And you've seen many other documents, internal Google

13   documents discussing Google's competition with vertical search

14   providers in other significant commercial categories, like

15   travel and local search, just as examples?

16   A.  Yes.  I mean, one of the things that always comes up when

17   you're looking at these documents is are they talking about

18   Google.com or are they talking about their specialized search

19   engine, you know, in that -- their own SVP.  And so that -- you

20   know, that is one thing one has to be careful of in looking at

21   those documents.

22   Q.  But you have seen -- you have seen plenty of internal

23   Google documents where Google expresses concern about if it

24   doesn't deliver high quality search results for particular

25   vertical search queries, commercial queries, that people will

```
1    begin searching elsewhere first?

2    A.  I've seen documents where they're concerned about that.

3    You know, as I said, it's, with some frequency, not clear

4    whether they're talking about their SVP or not.  But I've seen

5    documents like that.

6    Q.  And are you aware of internal Google documents that analyze

7    competition that Google faces from social media sites for

8    online search?

9    A.  Much less.  I wouldn't say I haven't -- you know, I've seen

10   none, but certainly less.

11   Q.  And the documents you've seen involving social media sites

12   are from a more recent time period; is that fair?

13   A.  A document about TikTok stands out, so that certainly was

14   more recent.

15   Q.  As part of your work in this case, did you evaluate the

16   extent to which Google has worked to innovate in ways that

17   improve Google's ability to compete with social media sites in

18   search?

19   A.  Can you just repeat the beginning of the question, or maybe

20   the whole thing?

21   Q.  Did you evaluate, as part of your work in this case, the

22   extent to which Google has worked to innovate in ways to

23   improve its ability to compete with social media sites?

24   A.  I looked at the whole record.  That was certainly part of

25   what I was looking at.
```

1  Q.  And have you done any analysis in this case to -- to assess

2  the extent to which consumers today are searching for

3  information, products, news, and many other things on social

4  media sites like Facebook or Instagram or TikTok?

5  A.  No, I haven't.

6  Q.  Do you have an understanding of whether users can search

7  for and buy directly products on social media sites?

8  A.  Just to ask you about your question, as distinguished from

9  clicking on an ad on a social media site that brings me

10  someplace where I can buy?

11  Q.  Correct.  Correct.

12  A.  No, I don't know about that.

13  Q.  Why don't you take a look in your binder at DXD15.006, and

14  I'll represent to you this is a screen shot from a search for

15  running shoes on Facebook.

16  A.  Okay.

17  Q.  As part of your work in this case, did you investigate

18  searches like this on social media sites to see the types of

19  search results that they would produce?

20  A.  So, I haven't done that.  I guess you're suggesting that

21  these are, like, kind of, selling product listing ads?  Is that

22  what you're suggesting?

23  Q.  Sir, I'm -- I'm just -- I've just asked you a question as

24  to whether you've -- whether you've done this, whether you've

25  looked at this?

1    A.  So, I'm sorry, let me --

2    Q.  Go ahead.  I think I know -- I think you've answered the

3    question.

4    A.  I would say no, I haven't.  But, for example, it doesn't

5    affect my -- you know, for example, the market shares in the

6    search ads market that I would calculate.

7    Q.  Would you agree that the search results page here on

8    Facebook for running shoes looks similar to the types of search

9    results that you get on Google?

10   A.  It does, but it's different.  For example, there are no

11   prices.  You know, when I see product listing ads on Google

12   there are prices.  And, you know, I think I -- there's -- you

13   know, without seeing them side by side -- you haven't put them

14   side by side.  I can't really fully compare.  And even so, I

15   would probably need to go look more carefully.  But at least

16   that's one difference I notice.

17   Q.  I'm going to -- I'm here to help you learn about social

18   media, Professor.

19        Why don't you look at the next slide?

20   A.  Okay.

21   Q.  I'll represent to you this is -- these are search results

22   on Facebook.  If you scroll over and you click on the shop --

23   shopping tab that exists on -- on Facebook's mobile

24   application, do you see prices for running shoes on this

25   results page?

1    A.  This one I do.

2    Q.  Okay.  And would you agree that these types of search

3    results are similar in nature and character to the types of

4    results you would get on a Google search results page?

5    A.  Again, it's not side by side.  But generally, yes.

6    Q.  Have you seen studies -- you can put that away.

7         Have you seen studies regarding the amount of time users

8    spend on social media sites on average in a day versus the

9    amount of time they spend on Google?

10   A.  I have.

11   Q.  And what did those studies -- what did you learn from those

12   studies?

13   A.  People spend a lot of time on social media.  I didn't need

14   the studies to tell me that.

15   Q.  People spend a lot more time on social media sites looking

16   at various different aspects of things on those sites than they

17   do on a search engine, right?

18   A.  Correct.

19   Q.  And you've seen analyses demonstrating that users are

20   increasingly staying within social media sites to accomplish

21   many different use cases, correct?

22   A.  No.  I don't think I've seen that.

23   Q.  You haven't seen studies demonstrating that people are

24   spending time in social media sites looking for entertainment,

25   shopping, connecting with friends, lots of different things in

1    the very same session where they're on that social media site?

2    A.  So there was a document -- a document related to TikTok

3    that I had in my report.  I think it was talking about use

4    cases.  And, you know, I would have to go back to see if it

5    fits exactly what you're asking about.

6    Q.  You've seen documents describing the fact that users,

7    particularly young users, are increasingly using TikTok to

8    search, right?

9    A.  I don't know if I've seen that as part of the record, but

10    I've certainly seen some statements like that somewhere.

11    Q.  Okay.  I want to talk a little bit about the search ads

12    now.

13        One of the things you testified about a couple weeks ago

14    was the role of an ad in a consumer purchase journey.

15        Do you recall that?

16    A.  Yes.

17    Q.  Okay.  And the Court has heard probably more testimony than

18    it ever dreamed it would ever get in a case about consumer

19    purchase journeys.

20        But would you agree that user purchase journeys are not

21    a set and formulaic journey?

22    A.  If what you mean is -- you could mean two things by that.

23    I'm not -- maybe you can say what you mean by "set and

24    formulaic."  Maybe you could -- maybe there's more than two

25    things that you could mean.

1    Q.  User journeys go in lots of different directions up and

2    down the marketing funnel, correct?

3    A.  I see.  So if what you're saying is:  Do users, consumers,

4    always start at the top of the funnel and progress to the

5    extent that they continue always be going down the funnel?  No,

6    they -- you know, there's some -- some consumers may do that

7    sometimes, but other consumers at other times they will circle

8    back and, you know, go back to a point earlier, et cetera.

9    Q.  And display ads over time have increasingly become

10   effective at sort of being able to pull people into different

11   parts of the funnel, depending on what the ad campaign is

12   and -- and what the -- what the product is, right?

13   A.  So I think the evidence is that, you know, as the ability

14   to follow people around using cookies has increased, that

15   display ads, with that increase, have improved their ability

16   to -- to target and to be down funnel.  I think it's -- as I

17   said, I think it's still -- there are relative advantages, up

18   funnel is more in-brand awareness.

19        But increase -- your question was about increasingly

20   over time, so I would agree with that, with the caveat that

21   looking forward, as I said, you know, it's not clear that that

22   will continue to be true.  Cookie deprecation, which Google has

23   said, for example, it's going to do in Chrome, would

24   substantially change that.

25   Q.  And have you looked at ways in which big display

1   advertisers are looking for new ways to be able to understand

2   and get conversion data to be able to continue to effectively

3   target users?

4   A.   Certainly advertisers want to be able to target users and

5   they also want to be able to measure conversion to know whether

6   when they reach a consumer, it's ending up in a sale.  That's

7   certainly things they're very interested in.

8   Q.   So we've just talked about display ads.  Social media ads

9   also can be used to communicate with users wherever they are on

10  their purchase journey, correct?

11  A.   Again, like I said nine days ago, I think their relative

12  advantage is brand awareness, but they do some things

13  throughout.  And I think we talked -- I also talked about their

14  ability over time to target by tracking consumers, and that was

15  the -- in that case, it actually has already happened that it's

16  gotten harder because, you know, I talked about the Apple

17  transparency, privacy changes.

18  Q.   But you're -- you're aware that increasingly advertisers

19  are turning to social media to place ads for performance

20  purposes, correct?

21  A.   I think that probably got much worse after -- you know, I

22  don't know if I would say increasingly post-Apple, the Apple

23  change --

24  Q.   You've not --

25  A.   Sorry.  Go ahead.

1    Q.  I'm sorry.  Finish your answer.

2    A.  It's all right.  Go ahead.

3    Q.  You've not performed any sort of empirical analysis of what

4    percentage of display ads by dollar volume are targeted at any

5    particular part of the marketing funnel, have you?

6    A.  No.

7    Q.  And the same is true for social media.  You haven't done

8    any analysis in this case that tries to estimate what percent

9    of social media ads are targeted at any particular part of a

10    marketing funnel, right?

11    A.  Correct.

12    Q.  Now, another factor you testified about is the

13    characteristics of the ad audience and the degree to which

14    those audiences overlap.

15         Did I get that right?

16    A.  I don't know what you were -- I don't know how to say

17    whether it was right because I don't know what you were trying

18    to do, but I did say something like that.

19    Q.  I'm trying to quote from one of your -- from one of your

20    slides.

21    A.  Yes.

22    Q.  Have you done any analysis in this case to assess the

23    degree to which Google search users overlap with Bing search

24    users?

25    A.  I have looked at that some.

1    Q.  Okay.  And what did you find?

2    A.  I think it's small.

3    Q.  So --

4    A.  Not zero.  I mean, there is some, but it's not a large

5    number.

6    Q.  So, the people who are Bing users are not using Google

7    simultaneously on some sort of regular basis.

8         Is that your testimony?

9    A.  I think they -- there is some of that.  I may have seen

10   some of that.  You know, I think -- you know, simple example

11   would be, you know, what -- something I've heard you say

12   maybe -- what's the most frequent query on Bing?  It's Google.

13         So those people are -- you know, there's some degree

14   to which there is what economists, Your Honor, would call

15   multi-homing, using both.  But, you know, the real question, I

16   guess, Your Honor, for thinking about advertising, is for a

17   consumer who has a given intent, when they have that intent --

18   this is thinking about search advertising -- to what extent are

19   they on both, because an advertiser wants to reach them when

20   they have that intent, and can they?  So...

21   Q.  So, coming back to this point about advertisers, if I'm an

22   advertiser and I am looking at the various different possible

23   advertising platforms that I could go to to reach people who

24   are searching on Google -- are you following me?

25   A.  Yes.

1    Q.   Okay.  Would -- would I be more likely to find people who

2    are searching on Google also on Amazon or Facebook or Bing?

3    A.   So, you mean right now, with the current quality of Bing?

4    Q.   I'm talking about during the entire time period from 2014

5    to the time that you conducted your analysis in this case.

6    A.   Right.  So, I don't think I've conducted it going back like

7    that.  But, you know, I think, to answer the substance of your

8    question, I think right now, with the current state of Bing,

9    you wouldn't be likely to find them on Bing.

10   Q.   So if I'm an advertiser, again, and I'm looking for

11   alternatives to reach the people who are on Google, my next

12   best alternative would be to advertise on Facebook or Amazon,

13   not Bing, correct?

14   A.   In the current state, that's correct.

15             And, Your Honor, this is when we -- I started talking

16   to you about what kind of evidence about substitution, this

17   point that you need to remember -- you know, an important thing

18   to consider is given the effect that the behavior has had, it

19   changes the substitution patterns that you see.

20             So if Bing is very, very weak, you won't see many

21   people using it, as well.

22   Q.   If we went back in time to 2005 and we were looking at --

23   strike that.

24             In 2005, do you believe there was more or less overlap

25   between Google and Bing than there is today?

1    A.  There is zero in 2005 because Bing didn't exist.

2    Q.  Do you understand that Bing is not -- Bing wasn't a new

3    search engine.  It was a new brand of the Microsoft search

4    engine.

5    A.  Sorry.  I wasn't --

6    Q.  Did you know that?

7    A.  -- trying to be anything.  I'm just saying -- so it was MSN

8    before.

9    Q.  Right.

10    A.  So if that's what you meant, I misinterpreted.  So, you

11    know, I think if you generally meant Microsoft search, whatever

12    it's called or whatever they were doing --

13    Q.  That's what I meant.

14    A.  Okay.  Fine.  So I don't know.  It's 2005 and I don't have

15    data and I just don't know.

16    Q.  Do you have a reason to believe that in 2010 the overlap in

17    users between Google and Bing is different than today?

18    A.  I just -- I don't know.  The one thing I would say is, you

19    know, to the extent that on the search services side you have,

20    you know, products that are doing very similar things and

21    there's no real reason to go to the other, then, you know, it's

22    because on the search services side, they're close.  They're

23    undifferentiated.

24            So not seeing someone -- actually, I think Dr. Israel

25    even said something like this.  Oh, it's common sense that you

1    wouldn't want to use, you know, both -- go to Bing, you know,

2    and Google.  That common sense is precisely because they're

3    close substitutes, compared to going to Amazon or Facebook, and

4    that's exactly my point.

5    Q.  But if you're an advertiser and you're trying to figure out

6    what are my competitive alternatives to reach that same

7    audience, you're more likely to pick Facebook or Amazon than

8    you are Bing, correct?

9    A.  I wouldn't say that.  So if you focus -- if you recall, I

10   talked about various ways in which ad products are

11   differentiated, and you're focusing on just one, the overlap.

12   If overlap was the only thing --

13   Q.  That's what I'm focused on right now.  I'm asking about the

14   question of overlap.

15   A.  But you're -- I'm sorry, but you're -- repeat your question

16   because your question didn't sound like it was limited to

17   overlap, so --

18   Q.  When we started this conversation, I read to you the factor

19   from your report that talked about the characteristics of the

20   ad audiences and the decree to which those audiences overlap.

21   A.  You did.  You absolutely did.  Just repeat your last

22   question, and I'm happy to answer it.

23   Q.  You would agree, from an advertiser's perspective, the

24   audience overlap between Google and Amazon or Google and

25   Facebook is much more significant than the overlap between

1    Google and Bing?

2    A.  Yes.  I've already said yes.  Right now that's absolutely

3    correct.

4    Q.  Now, another factor that you testified about a couple weeks

5    ago was the degree to which display ads can be targeted.  And I

6    think you've talked a little bit here today now that display

7    ads can be targeted, correct?

8    A.  We talked about re-marketing ads, for example, yes.

9    Q.  And those display ads, those retargeted ads can be used to

10   drive consumer purchase, correct?

11   A.  Yes.  I mean, you see -- in advertiser budgets you'll see

12   display ads -- some share of display ads allocated to kind of

13   conversion, down funnel, whatever they're calling it.  And

14   sometimes -- they're sometimes specifically called re-marketing

15   or retargeting.  But, yeah, that's my understanding.

16   Q.  Have you done any analysis in this case at all to try to

17   gather information about all of the intense signals that a

18   social media site like a Facebook or an Instagram or TikTok can

19   gather about a user for purposes of advertising to that user?

20   A.  Just repeat the question so I get the beginning of it

21   again.

22   Q.  Sure.  Have you done an analysis in this case -- have you

23   tried to study and analyze all of the intense signals that a

24   social media site like Facebook or Instagram or TikTok gather

25   about a user that they can then use to advertise to that user?

1    A.  So I've certainly tried, and both thought about it and

2    looked to see what information I -- is available to me.

3    Certainly, you know, a lot of what these platforms are doing is

4    proprietary and I don't know exactly what they're doing, but to

5    the extent I could, I did.

6    Q.  And you would agree that, based upon all of the intent

7    signals that those social media sites have about users, they

8    are able to effectively target users for advertising?

9    A.  So could you just say what you mean by "effectively"?

10   Q.  They're able to make billions and billions and billions of

11   dollars of ad sales on their advertising platforms every year.

12   A.  They are making billions, and they are targeting.  You

13   know, in terms of effectiveness, I think I spoke -- you know,

14   when first -- when I last testified, I spoke about a document

15   where Facebook executives were talking about not having the

16   same signal of intent as Google does.

17        So I think there is a difference.  I think there is

18   definitely a difference, especially post-Apple privacy

19   initiatives.  But they certainly are targeting, you know, to a

20   significant degree and selling a lot of ads.

21   Q.  Are you aware of whether Instagram users search for and

22   purchase products that are listed for sale on Instagram?

23   A.  I'm not, no.

24   Q.  Do you know whether TikTok makes products available for

25   advertisement and sale on their platform?

1    A.  I don't, no.

2              THE COURT:  Mr. Schmidtlein, I know these are your

3    questions, but just to be clear, when you say "advertising

4    sale," are you meaning completing the sale within the platform,

5    or do you mean taking current user out?

6              MR. SCHMIDTLEIN:  Correct.

7              THE COURT:  Completing the sale within the --

8              MR. SCHMIDTLEIN:  On the platform.

9              THE COURT:  -- platform.  Okay.

10    BY MR. SCHMIDTLEIN:

11    Q.  Can you take a look at DXD15.008 in your binder?  It will

12    also come up on the screen.  And I'll represent to you, this is

13    a page from, sort of, the TikTok ads website where they are

14    providing statistics and metrics to advertisers about their ads

15    platform.

16              In your work in this case, did you do any investigation

17    to assess the extent to which TikTok is a popular place for

18    users to go to purchase products?

19    A.  No, I have not.

20    Q.  You were not aware that 70 percent of TikTok users discover

21    new brands and products on TikTok, right?

22    A.  Well, I'm looking at that number.  I mean, discovery --

23    discovering new brands and products is definitely up funnel,

24    but I wasn't aware.

25    Q.  We're going to get to the down funnel, Professor.

1    A.  Okay.

2    Q.  The next one, three in four TikTok users are likely to buy

3    something while using TikTok.  Were you aware of that

4    statistic?

5    A.  I wasn't.  And, I'm sorry, don't know if I can even read

6    this.  Like over what period of time?  How frequently are they

7    actually doing it?  I don't know what it means.  But I wasn't

8    aware of -- whatever that statistic is, I wasn't aware of it.

9    Q.  And then the last statistic on the far right, 83 percent of

10   TikTok users say that TikTok plays a role in purchase

11   decisions.  Does that sound like down funnel to you?

12   A.  No.  It sounds like a role in purchase decisions is

13   anywhere in the funnel.

14   Q.  I see.  So based on looking at this, you don't know whether

15   TikTok is an effective place for advertisers to sell and

16   convert on sales for their products?

17   A.  You know, I'm -- they're obviously making -- doing things

18   that do result -- you know, buy something while using TikTok.

19   I don't know exactly what that means or how frequently or

20   anything else from what I'm looking at.

21   Q.  Would you agree that TikTok is able to gather significant

22   user intent signals based on the information that they learn

23   about their users based on their behavior on TikTok?

24   A.  I don't know exactly what TikTok is doing and, you know,

25   how it, for example, compares to what Facebook had -- you know,

1    sorry, yeah, what Facebook was doing and how it was affected,

2    say, by Apple's initiative in privacy.  So I don't know.

3    Q.  Are you aware of another social media site that drives a

4    lot of sales called Pinterest?

5    A.  I am aware of Pinterest.

6    Q.  Did you do any investigation in this case to evaluate the

7    extent to which Pinterest is able to gather significant user

8    intense signals to allow them to market and sell products?

9    A.  Sorry.  In the question before did you refer to them as

10   social media or specialized search, SVP --

11   Q.  I'm not -- I don't know where to put them.  I'm just asking

12   whether you're familiar with them.

13   A.  I am familiar with them, and I have not looked at the

14   extent to which they are selling products.

15   Q.  Do you know whether Pinterest is able to provide

16   advertisers with the opportunity to engage in advertisements

17   that are directed at the entire funnel?

18   A.  No.

19   Q.  In terms of media spend, do advertisers today spend more on

20   display ads than are search ads?

21   A.  Sorry, and just -- if I could just pause for a second.

22            I'm trying to think back to the many advertiser

23   budget documents I've seen and the extent to which I've seen

24   Pinterest listed.  I think the -- nothing is coming to mind as

25   something they said, but I'm sure that -- you know, people are

1    advertising on Pinterest and -- but I don't remember seeing

2    them listed where, like, I would have seen whether they were

3    listed as conversion or up funnel.  I just didn't see them

4    really listed.  And maybe because they were just talking about

5    broader categories of ads and Pinterest was --

6    Q.  Are you familiar with the website, Pinterest?

7    A.  Oh, yes.

8    Q.  You've gone to the website?

9    A.  I've used it, yes.  My wife has used it more than me.  But,

10   yes.

11   Q.  And would you agree that the Pinterest website is a popular

12   place for people to offer products for sale?

13   A.  Yes.

14   Q.  And Pinterest is a -- for certain categories of products,

15   is a very, very popular place for people to go and shop?

16   A.  It seems that way.  I haven't seen statistics, but it does

17   seem that way.

18   Q.  Based on -- I think we've had a similar experience in this

19   regard.  You understand that for home purchases, Pinterest is

20   one of the leading places where people will go to discover,

21   search for, and ultimately purchase products online?

22   A.  Yes.  I mean, it seems that way.  Like -- sorry, I can't

23   testify as to whether you and I have had the same experience,

24   but it seems that way.

25   Q.  Okay.  Let me go back to the question I asked before,

1    before you paused.

2         In terms of media spend, do advertisers today spend more

3    on display ads than search ads?

4    A.  I don't remember the statistics off the top of my head.  I

5    would have to go look at my report.

6         THE COURT:  And, I'm sorry, when you say "search

7    ads," do you mean search ads appearing on search engines or do

8    you mean search ads more broadly defined to include --

9         MR. SCHMIDTLEIN:  Search engines.  I think that's how

10   they are normally -- by the broader, sort of, industry folks

11   who track these things, search ads are considered general

12   search engines.

13        THE WITNESS:  Wait, wait.  I'm sorry --

14        THE COURT:  I just want to be clear because in his

15   earlier testimony he testified that the search ads market

16   includes not only searches on Google and Bing, for example, but

17   also searches on SVPs.

18        MR. SCHMIDTLEIN:  For his market, yes.

19        THE COURT:  For his market.

20        MR. SCHMIDTLEIN:  Correct.

21        THE COURT:  I want to make sure we're all using the

22   same lexicon to compare apples to apples here.

23        THE WITNESS:  So, Your Honor, if I could just like --

24        THE COURT:  Sure.

25        THE WITNESS:  When you look at industry recognition,

1    which I talked about, and they're talking about search ads,

2    they're talking not just about general search engines, but

3    they're talking about SVPs and the like.

4            And the only other thing I just want to add is all

5    these questions about, you know, have I considered TikTok --

6    you know, that you can search on TikTok and people are placing

7    ads on that, what I told you back then is that ultimately when,

8    quote, the rubber hit the road, I think that was the expression

9    I used, what I rely on for the size of that market are industry

10   estimates, including Google's estimates of the size of the

11   market.

12           And I don't -- you know, we were having a discussion

13   at the time of like, well, what's in a search ad and what's

14   not, and these are all discussions about what's in and what's

15   not.  But at the end of the day, what I'm using is these

16   industry observers' characterizations.  And I don't -- did they

17   count the Instagram ads in that because they responded to a

18   search?  I don't know.  But I'm relying on their knowledge of

19   the industry when I use that as the denominator.

20   BY MR. SCHMIDTLEIN:

21   Q.  Are you -- are you done?

22   A.  Yes.

23   Q.  Are social media ads a larger channel of digital

24   advertising today than search ads?

25   A.  Again, you know, the split -- I know have this in my

1    report, and they're all big numbers.  And I would have to --
2    I'd have to go back and look at my report to just make sure I
3    tell you the right answer.
4    Q.  In your prior testimony you presented a comparison of
5    display ad prices versus text ad prices.
6        Do you recall that?
7    A.  I do.
8    Q.  Now, in connection with that analysis, you didn't perform
9    any empirical study that compares return on investment for
10   display ads versus return on investment for search ads, did
11   you?
12   A.  An empirical study myself?
13   Q.  Yeah.
14   A.  No.  I mean, I've seen documents where advertisers are
15   talking about return on investment.
16   Q.  Right.  But you -- you didn't conduct any independent
17   analysis yourself in this case?
18   A.  No.  Although, I talked about return on investment for ads
19   and what it tells you.  I talked about that quite a bit in my
20   reports.
21   Q.  You have not performed any empirical analysis in this case
22   that compares return on investment of display ads used for
23   performance advertising versus return on investment for search
24   ads, correct?
25   A.  Correct.

1    Q.  And you would agree that you've seen internal Google

2    documents that track ads competition between Google search ads

3    and Facebook, Amazon, TikTok, and other firms that are not

4    general search engines, correct?

5    A.  I have seen documents that look at that.

6    Q.  You've seen internal Google documents that track and

7    analyze competition between Google search ads and the ads shown

8    on Amazon and various social media sites, correct?

9    A.  Sorry.  Could you repeat that question, just so I'm sure I

10   got the beginning of it.

11   Q.  You've seen, as part of your work in this case, numerous

12   Google internal documents that track competition between Google

13   search ads and the ads shown on Amazon and various social media

14   sites, correct?

15   A.  So that time you said "numerous."  I'm not sure you did

16   before.  But I don't know what -- I'm not sure what numerous

17   means.  I've seen documents that do that.

18          Your question also talked about search ads and, you

19   know, Google sells PLAs, as well as text ads, so I just -- you

20   know, to the extent that the documents are doing comparisons,

21   they're off -- frequently looking at PLAs.

22   Q.  Would you agree that Google views Facebook, Instagram,

23   TikTok, and Amazon as competitors with Google search ads?

24   A.  You know, I think they think that they're competitors to

25   some degree.  I don't think that -- it's -- again, you know,

1    not everything that is a competitor is something that is going

2    to be a significant enough constraint to prevent a hypothetical

3    monopolist from exercising considerable market power.

4    Q.  Have you done any empirical analysis in this case that

5    compares the ROI for search ads versus the ads shown on SVP

6    sites?

7    A.  I haven't.  And -- sorry.  Let me make sure I answer the

8    question.  If you could repeat it.  I'm sorry about that.

9    Q.  Have you done any empirical analysis in this case that

10   compares the ROI for search ads versus the ROI for SVP ads?

11   A.  I haven't.  I mean, measure --

12   Q.  Sir, these are yes or no questions.

13   A.  Fine.

14        I have not, no.

15   Q.  Thank you.

16        Have you done any empirical analysis in this case to

17   show that your proposed advertising markets satisfy the

18   hypothetical monopolist test?

19   A.  So, as I said at the -- sorry.  You asked me about

20   empirical analysis?

21   Q.  Correct.

22   A.  Okay.  So, I, myself, haven't, but I cited empirical

23   analysis that Google did about responsiveness of advertisers,

24   so I talked quite a bit about that.

25   Q.  You've not -- you've not done an analysis of Google's ad

1    prices yourself to assess whether your relevant markets satisfy

2    the proposed -- excuse me -- the hypothetical monopolist test?

3    Yes or no?

4    A.  So, I -- sorry.  No.  I could say quite a bit about that,

5    but no.

6    Q.  You've not conducted any empirical analysis to assess

7    whether any particular advertising launch by Google search ads

8    has resulted in advertisers switching away to another ad

9    platform, correct?

10    A.  And just so I understand your question, when I see launch

11    documents that show changes in ad clicks and changes in -- that

12    result from a change, that's not in the category that you're

13    asking me about?

14    Q.  Correct.

15    A.  Okay.  No, I haven't.

16    Q.  Now, in connection with your opinions with respect to

17    monopoly power, the first factor you consider is Google's

18    market share in a general search services market, correct?

19    A.  Yes.

20    Q.  And you have included in that market only general search

21    engines, right?

22    A.  Correct.

23    Q.  And if you were wrong about the relevant market, including

24    only general search engines, then the market share figures

25    you've cited there don't hold, correct?

5912

1   A.  That's correct.  Of course not.

2   Q.  Now, as part of the testimony you've given, you've also

3   provided some market share statistics for general search

4   engines for mobile search queries; is that right?

5   A.  Yes.

6   Q.  You've not offered an opinion in any of your expert reports

7   in this case that there exists a relevant antitrust market that

8   consists only of mobile general search services, correct?

9   A.  That's correct.  And my point in doing that was really just

10  the point I made earlier today, that mobile is where the market

11  is growing, so wherever -- whatever the share is in mobile is,

12  if trends continue, what the overall share will become.  So...

13  Q.  If you'll -- if you'll look at slide 49 from your prior

14  binder, which we gave you another copy of.

15  A.  Okay.

16          MR. SCHMIDTLEIN:  And you can pull that up.

17  BY MR. SCHMIDTLEIN:

18  Q.  This is the -- this is what we were just talking about,

19  right, your -- your mobile market shares?

20  A.  Yes.

21  Q.  Okay.  And again, just level set, you're not saying this is

22  a relevant antitrust market, right?

23  A.  I expressed no opinion about that.

24  Q.  You see here that Yahoo! and DuckDuckGo both have a higher

25  market share in mobile search than Bing does.

```
1              Do you see that?
2     A.  I do.
3     Q.  And do you know why that is?
4     A.  I guess because people are putting more queries in them on
5     mobile than on Bing.
6     Q.  Have you done anything to assess or analyze why Yahoo! and
7     DuckDuckGo have a higher market share than Bing on mobile?
8     A.  I have not.  No.
9     Q.  The stats you looked at for the overall general search
10    services market, Bing had a higher market share than Yahoo! and
11    DuckDuckGo, right?
12    A.  Do you want to -- I don't -- the answer surely is yes.
13    Q.  Well, go back to slide 47.
14    A.  Yep.  So, yes.
15    Q.  Did you do any analysis in this case to try to understand
16    or assess why there was a difference in relative market share
17    between the overall search services market and the mobile
18    search services market when it came to Bing versus Yahoo! and
19    DuckDuckGo?
20    A.  Did I do any specific analysis?
21    Q.  Correct.
22    A.  Not -- no, not specific analysis.  No.
23              THE COURT:  Sorry to interrupt.  I may have asked
24    this previously, but clarification:  In terms of market share,
25    what is the metric you're using?  Is it number of queries?
```

5914

```
 1    Revenue?
 2            What's the variable upon which you're basing the
 3    share percentage?
 4            THE WITNESS:  Sure.  When I'm looking at general
 5    search services, I'm always using queries.  And when I'm
 6    looking at ads, I'm always using revenue.
 7    BY MR. SCHMIDTLEIN:
 8    Q.  Going back to the slide on mobile phones with the market
 9    shares there.  Do Yahoo! or DuckDuckGo have any mobile search
10    distribution agreements in the United States?
11    A.  I believe that they pay something to be, for example, in
12    bookmarks, if that's what you're referring to, so...  Like on
13    the iPhone, for example.
14    Q.  The same as Bing though, correct?
15    A.  Yeah.
16    Q.  Do they have any exclusive distribution agreements on
17    mobile devices in the United States?
18    A.  No.  Not to my knowledge, no.
19    Q.  Does Bing?
20    A.  No.
21    Q.  You're not aware of Bing having --
22    A.  Oh, sorry -- well, go ahead.  Go ahead.  I didn't mean to
23    talk over you.
24    Q.  Are you -- I'll try it again.
25    A.  Sure.
```

1    Q.  Are you aware of any instance where Microsoft has an

2    exclusive mobile distribution agreement in the United States?

3    A.  I don't think they do.  Like, I'm sitting here wondering,

4    like, is a Windows phone still sold somewhere somehow?  I don't

5    think it is.  And on the Surface Duo, they don't have an

6    exclusive because Google is also on it, so...

7    Q.  Are you familiar with Fire tablets?

8    A.  Oh, I'm sorry.  Amazon.  They do have some -- an

9    arrangement on Amazon.

10   Q.  Okay.  But even though Bing has an arrangement with Amazon

11   and Yahoo! and DuckDuckGo don't, Yahoo! and DuckDuckGo have a

12   higher query share than Bing does on mobile devices, right?

13   A.  Well, this picture we're looking at is mobile phones and

14   the Fire tablet that you're referring to is not a phone, so

15   it's a little different.

16   Q.  Do you -- do you know whether historically Bing was on the

17   Fire phone?

18   A.  Whether Bing was -- yeah.  So, there was -- Amazon did, at

19   one point, I think, try to make a phone.  Your Honor, they

20   tried to make a phone and it failed because they were trying to

21   do Android open source, it seems, without the Play Store and

22   they didn't get anywhere, so...

23   Q.  They tried to do a forked version of Android, right?

24   A.  Correct.

25   Q.  Are the barriers to entry today that exist to launch its

1    search engine larger, the same, or lower than they were five

2    years ago?

3    A.  To launch what kind of search engine?

4    Q.  General search engine.

5    A.  I don't know.  You know, I'm not sure of how it has

6    changed.  It's a very big number, but I'm not sure how it's

7    changed.

8    Q.  You consider DuckDuckGo to be a competitor in the general

9    search engine market?

10   A.  You know, I do.  Although, to be honest, like, when I --

11   Your Honor, when I include DuckDuckGo and Yahoo!, for example,

12   in those market share statistics, I'm really being very

13   conservative because these are general search engines that are

14   actually syndicating the results from either Google or Bing.

15   So it's not quite clear that they're really independent

16   competitors fully.  And so I'm counting them when I do my

17   market shares as if they are, but, you know, you could make an

18   argument that they're not, in which case Google's market share

19   would be even higher.

20   Q.  What happened to Super Duck?

21   A.  I'm not sure what your question is.

22   Q.  I spent all morning listening to Super Duck.  You've now

23   told me DuckDuckGo is not in the -- it's not really in the

24   general search services market?

25   A.  Super Duck was really just trying to --

1          THE COURT:  Why don't we move on.  I know what Super

2    Duck is.

3    BY MR. SCHMIDTLEIN:

4    Q.  Do you have a sense of how much DuckDuckGo has spent on

5    fixed and sunk capital costs over the years?

6    A.  I don't think I've seen that number.

7    Q.  Do you know how much money they've spent on an annual basis

8    to operate the DuckDuckGo search engine?

9    A.  I don't know, no.

10   Q.  Now, you're aware that the Court has heard testimony from

11   the founder of the Neeva search engine, correct?

12   A.  Yes.

13   Q.  Are you aware of how much money Neeva spent in capital

14   costs to have a competing search engine?

15   A.  I don't remember the testimony on that and I haven't seen

16   numbers -- I don't think I had seen numbers on it before.

17   Q.  If you'll turn to slide 52 in your binder.  This is from

18   your old slides.

19          These are redacted.  Are you there?

20   A.  Oh, sorry, I should -- now I realize why I have to look at

21   the binder, because it's all redacted.  And...

22   Q.  Just a couple of things I want to clarify here.  You've got

23   a figure here for the annual coast to Google for search

24   services.  That is not a number that pertains to the

25   United States, correct, just the United States?

1    A.  I don't think it is.  And, you know, I think the way I was

2    discussing this was around Apple coming in -- in my reports,

3    these numbers were -- came in in terms of Google's estimate of

4    what Apple's costs would be of entering as a general search

5    engine, and I think it was considering that worldwide.

6    Q.  And additionally, the annual costs for Google for search

7    advertising, that's a worldwide number, correct?

8    A.  Yeah.  I take it they're coming out of their P&Ls.

9    Q.  Have you done any analysis in this case to determine

10   whether advances in large language models and machine learning

11   have made it less costly to build a general search engine?

12   A.  I haven't done any analysis.

13        Your Honor, I think you asked me a question about

14   that last time.

15   Q.  And so, therefore, you're not in a position to offer an

16   opinion as to whether those advances have reduced the barriers

17   to entry in general search services?

18   A.  Going forward?  I mean, my -- Dr. Lehman testified about

19   this, I think.  You know, even he is not -- sounded like even

20   he is not very sure about exactly what role these models will

21   play relative to user data.

22        I'm certainly -- you still need to have a web index.

23   That's not going to be changed.  That's very expensive.  And,

24   so -- but I haven't done any analysis myself.

25   Q.  And how about artificial intelligence, have you offered any

1    opinions in this case about whether or not artificial

2    intelligence advances have lowered the barriers to entry and

3    search?

4    A.  No.

5    Q.  Would you agree that the advent of cloud computing has made

6    it significantly less costly to develop a search engine today

7    than, say, five years ago?

8    A.  I haven't looked at that.  So my -- you know, my -- I'm

9    just really thinking about that for the first time.  I'm not

10   sure exactly why it would.  You know, typically cloud computing

11   I think of as helping small firms because they can share

12   servers, you know, in essence, with other firms.  For a company

13   like Google that's doing search, you know, it's using massive

14   numbers of servers, and so I'm not -- I'm not sure.  I haven't

15   studied it, though.

16   Q.  You haven't seen any testimony or record evidence on the

17   question of the impact of the evolution of cloud computing on

18   the cost to operating a general search engine?

19   A.  So at this point I've read some of the testimony, but not

20   all of it.  So, you know, that may be somewhere in the

21   testimony I haven't seen at this point.

22   Q.  You, yourself, have not offered an opinion in this case as

23   to how much a firm would need to expend to enter the general

24   search services market; correct?

25   A.  Could you just repeat the question one more time?

1    Q.  You have not offered an opinion in this case as to exactly

2    how much a firm would need to expend to enter the general

3    search services market?

4    A.  To enter it successfully, you mean?  I guess, I'm not sure

5    exactly.

6    Q.  To compete.

7    A.  I don't mean to be flippant here.  I can enter and compete,

8    but very badly.  So I guess I'm just trying to get a sense

9    like -- Neeva entered, but it's failed.  So I don't know what

10   exactly -- I'm not sure how to answer.

11   Q.  Did you hear any testimony in this case as to how much

12   market share Neeva estimated it needed to capture in order to

13   compete effectively in the market?

14   A.  I did see that.  That was -- if I remember correctly, 2.5

15   percent market share.  You know, I guess they haven't

16   successfully competed, since they closed shop.

17   Q.  How does that 2.5 percent market share compare to the

18   market share that Bing has in the general search services

19   market today?

20   A.  Well, we had the number up.  I think it was half, roughly,

21   maybe a little less than half.  I remember the number was 5.8

22   or something.  5.5, sorry.  So a little less than half.

23   Q.  Well, in terms of scale, Bing gets all of DuckDuckGo's and

24   all of Yahoo!'s queries, too, doesn't it?

25   A.  It does.  You know --

1    Q.   So Bing's scale is closer to 10 percent, right?

2    A.   Adding these up, yes.

3    Q.   Four times what Mr. Ramaswamy calculated, correct?

4    A.   Correct.  But I'm not certain what to take from

5    Mr. Ramaswamy because what he thought he had to do to come into

6    this market was obviously not what you needed to do to come

7    into this market because he failed.

8    Q.   I see.  So you've disregarded his testimony?

9    A.   No, I'm just saying the fact that he closed doors, you

10   know, that affects how I interpret his statement.

11   Q.   Have you assessed the profitability of Bing in this case?

12   A.   I haven't assessed it, but, you know, I know that they -- I

13   think, roughly, in 2015 became profitable.  But on the other

14   hand, they lost many, many billions of dollars before that.

15   Q.   They've been profitable every year since 2015 to the

16   present, correct?

17   A.   That's my understanding.

18   Q.   And Yahoo! is profitable today, too, correct?

19   A.   I haven't seen it and looked at Yahoo!, so I'm not sure.

20   Q.   And DuckDuckGo is profitable today, too, correct?

21   A.   Same answer.

22   Q.   Another factor that you cited in your expert reports was

23   Google's strong brand recognition and loyalty.

24        Do you recall that?

25   A.   I do.

1    Q.  And did Google build a strong brand recognition and loyalty

2    by offering a high quality search engine?

3    A.  It did.  I mean, I think Google, you know, revolutionized

4    search back in, you know, the late 1990s into the beginning of

5    the century.

6    Q.  Is an incumbent firm having a particularly popular product

7    something that economists typically characterize as a barrier

8    to entry?

9    A.  Yeah, it can be when you have lots of advantages over

10   rivals, yes.

11   Q.  Now, you're not an expert in search engine scale, correct?

12   A.  In terms of the technical aspects of search engine scale?

13   Is that what you're asking me?

14   Q.  You're not an expert in evaluating and analyzing search

15   engine scale, correct?

16   A.  I guess I'm not sure exactly the question you're asking me,

17   so --

18   Q.  You're not qualified to offer an opinion that tries to

19   correlate search engine scale with search quality?

20   A.  I think I am in a position where I can correlate search

21   engine scale with quality, and that's -- those are the

22   regressions -- the analysis that I did.

23   Q.  Have you formed an opinion in this case as to how much of

24   any particular search engine's overall search quality, whether

25   measured by an IS score or anything else, is attributable to

1    scale versus non-scale factors?

2    A.  So the -- you know, what the regressions did is they looked

3    at one measure of quality.  In that case, for example, what I'm

4    doing, looking at click split, and it's analyzing what the

5    effect is of scale on different queries where I'm trying to

6    control for the differences -- other differences, potentially

7    confounding differences among the queries.

8    Q.  But your regression analysis didn't purport to take into

9    consideration all of the non-scale factors that go into search

10   quality, correct?

11   A.  I mean, the confounding -- the variables that are

12   controlling for confounding effects are taking account of

13   non-scale factors.

14   Q.  You've not looked at Google's search algorithms to try to

15   assess what factors are scale related and what factors are not

16   scale related that produce search quality?

17   A.  I have not looked at their algorithms, no.

18   Q.  You haven't looked at any general search engine's

19   algorithms, correct?

20   A.  That's correct.

21   Q.  And even if you did, you wouldn't know what to do with

22   them, right?  You're not qualified?

23   A.  I would not put myself as an expert in the engineering

24   aspects of search engine algorithms.

25   Q.  You're not an expert -- you're not qualified to make an

 1   assessment about how much user action data a search engine

 2   needs to build a competitive search engine, correct?

 3   A.  So, I -- you know, I am in a position to look at

 4   competition and how effective firms are.  So, you know, I have

 5   thought -- that is something that I think about as part of

 6   competitive analysis.

 7   Q.  That's not the question I asked you.

 8   A.  Okay.

 9   Q.  You're not qualified to assess how much user interaction

10   data a general search engine needs to build a competitive

11   search engine, correct?

12   A.  There are just so many pieces of that to unpack.  Like what

13   competitive -- being a competitive search engine exactly means

14   and exactly what you mean by user interaction.  What I look at

15   is -- and have testified to, is how does scale relate to

16   measures of quality?  So, I do feel qualified to do that kind

17   of analysis.  The engineering parts of it, no.

18   Q.  You haven't offered an opinion in this case that a general

19   search engine needs to achieve some specific degree of scale in

20   order to compete effectively in a market?

21   A.  So, no, I haven't.  And, you know, that's the other piece

22   of this, is compete effectively, Your Honor, is this 01 term.

23   How effective -- you know, how effective you are as a

24   competitor isn't 01.  So, you know, the more a search engine

25   has scale, the higher it's probably going to be, the better it

1    is going to be able to compete.  But I don't have a

2    quantitative measure of that, if you're asking me that.

3    Q.  You haven't offered an opinion in this case about how much

4    scale a search engine needs in order to build a competitive

5    search advertising business, correct?

6    A.  My answer, I think, would be the same.

7    Q.  The only evidence you've seen in this case on that point is

8    Mr. Ramaswamy's testimony about 2.5 percent, correct?

9    A.  No, that's not correct.

10   Q.  Do you think you are more qualified than Mr. Ramaswamy to

11   testify about the minimum scale needed to compete for a search

12   engine?

13   A.  I don't want to say anything about -- I don't -- I have not

14   -- I don't know Mr. Ramaswamy.

15         THE COURT:  That seems more argument than question.

16   So next question, please.

17   BY MR. SCHMIDTLEIN:

18   Q.  You've not offered any opinions in your expert reports in

19   this case that Google has engaged in any anti-competitive

20   conduct with regards to the Chrome browser setting Google

21   search as the default, have you?

22   A.  No.

23   Q.  And you've not offered any opinions in this case that

24   Google has substantial market power in any market by virtue of

25   its ownership of the Chrome browser, correct?

1    A.   Sorry.  Could you repeat the question one more time?

2    Q.   You've not offered any opinion in this case that Google has

3    substantial market power in any market by virtue of its

4    ownership of the Chrome browser?

5    A.   Just give me a moment to just think about the question.

6         So I'm not sure how to -- I'm not exactly sure how to

7    answer that in terms of opinion.  You know, I did, today,

8    Your Honor, when we talked about this, talk about how the share

9    of Chrome affects what you think is available to rivals if they

10   improve their quality and that that affects incentives.  And by

11   affecting incentives, it affects the quality of rivals and what

12   their investment is, which does effect, ultimately, Google's

13   market power.

14        So in that sense, I have talked about things in that,

15   but it wasn't part of my assignment to talk about Chrome

16   specifically.  So in that sense it's not -- you know, my

17   opinions are about the contracts.

18   Q.   And users can change the default search engine on Chrome,

19   correct?

20   A.   They can.

21   Q.   And Google, in fact, has made changing default search

22   engine on Chrome much easier than Microsoft has made changing

23   the default search engine in its various browsers over the

24   years, correct?

25   A.   I haven't studied that, but I've seen statements to that

1    effect in various -- in various places.

2    Q.  Do you know the code base upon which the Chrome browser was

3    built?

4    A.  The Chrome browser, Chromium.

5    Q.  And Chromium is an open source web project?

6    A.  Yes, that's my understanding.

7    Q.  And Google has been the primary steward of the Chromium web

8    browser project, correct?

9    A.  I don't know enough about the Chromium project to know who

10   has contributed what to the open source.

11   Q.  The Chromium browser is licensed royalty free and open

12   source, right?

13   A.  Again, I don't know the details of how it's licensed.

14   Q.  Any third-party can license the Chromium code base and

15   develop its own browser?

16   A.  I mean, it's open source, which typically means that.  But

17   I don't know the details of the open source license.

18   Q.  And are you aware of all the various browsers that have

19   been developed based on the Chromium code base?

20   A.  Of all of them?  No, but...

21   Q.  Can you name some?

22   A.  I think Edge has been.

23   Q.  Microsoft Edge is based on Chromium?

24   A.  Correct.

25   Q.  And the Samsung internet browser is based on Chromium?

1    A.   You mean S.Browser?

2    Q.   Correct.

3    A.   That I didn't know, but I'll take your word for it.

4    Q.   And the Brave browser is based on Chromium, right?

5    A.   I know -- I have -- I know about Edge.  I don't know about

6    the other browsers.

7    Q.   Now, Chrome was initially released in 2008 as a browser on

8    Windows, right?

9    A.   I believe that's correct.

10   Q.   And Chrome has never been preloaded on Windows, correct?

11   A.   Not to my knowledge, no.

12   Q.   Chrome has, for years, been the most popular browser used

13   on Windows, right?

14   A.   For years, yes.  At some point it overtook Internet

15   Explorer.  I don't remember exactly what year.  Microsoft's

16   Internet Explorer.

17   Q.   And Chrome overcame Microsoft's Internet Explorer, even

18   though Internet Explorer was preloaded on every Windows PC,

19   correct?

20   A.   It overcame it in that its usage share passed it.  And it

21   is also correct that it -- you know, Internet Explorer was

22   preloaded on each PC -- Windows PC.

23   Q.   And Chrome's usage share today on Windows PCs is greater

24   than Microsoft Edge, correct?

25   A.   Yes.

1    Q.  And this is another example of where Google has succeeded

2    winning users on a platform where it is not preloaded for the

3    default, correct?

4    A.  That's correct.  You know, there are various factors that

5    were behind that, you know, which we could talk about, if you

6    want to.  But, correct.

7    Q.  Now, you've offered an opinion here that Google search

8    distribution contracts act as a barrier to entry to a new

9    entrant; is that right?

10    A.  Yes.

11    Q.  You've not offered an opinion in your expert reports that

12    Google search distribution contracts have prevented a

13    particular search engine from being able to enter the market?

14        In other words, a search engine was going to enter and

15    then they decided not to?

16    A.  Going to enter and decided not to?

17    Q.  Correct.

18    A.  So that -- you used -- you said, "In other words" to

19    describe what it means to stop someone from entering, but

20    someone could not enter and never have been previously planning

21    to because they just knew that, like, there was no way they

22    were going to make a profit.

23    Q.  You've not heard any testimony or any discovery in this

24    case of someone who believed they had the idea for a better

25    search engine but decided against it because of Google's search

1    distribution agreements?

2    A.  No, but I've read testimony -- I shouldn't say testimony.

3    Documents -- I don't know whether it was deposition or

4    documents.

5           My recollection is, from Mr. Giannandrea -- I think I

6    may refer to this in my reports -- actually, maybe it's not

7    Giannandrea, it could have been Ramaswamy.  I apologize, I

8    don't remember who -- about, you know, search is just not VC

9    fundable.

10   Q.  Do Microsoft's contracts on Windows that make Bing the

11   exclusive default search engine and Edge the exclusive and

12   default browser create significant barriers to entry for a new

13   search engine?

14   A.  I mean, I think they're a factor that can make it harder on

15   just -- that could make it harder on a third-party search

16   engine that, you know, non-Microsoft, non -- obviously,

17   non-Google because Google is in, but some other search engine

18   that was thinking about entering, they also would be dealing

19   with defaults that Microsoft has.

20   Q.  Another factor you testified to a couple weeks ago were

21   Google's advantages over rivals as a basis for Google's

22   monopoly power.

23          Do you recall that?

24   A.  Yes.  Sorry, yes.

25   Q.  And one of those was search quality, right?

1    A.  Yes.

2    Q.  How long has Google held a search quality advantage over a

3    rival general search engine?

4    A.  So in terms of seeing, you know, exact -- you know, IS

5    score or a precession score information, I think the earliest

6    thing I've seen is the document I showed today, Your Honor,

7    the -- where Bing was starting to catch up, which is back from

8    2010.

9           But, you know, Google clearly, as I said a few

10   minutes ago, like in 2000 or, you know, when it -- when Google

11   first figured out how to use -- originally it was web links

12   that they were using, but they first figured out, you know, how

13   to do a search engine that used information from the web.

14          So at first, Your Honor -- my understanding is that

15   at first what they figured out is that you could use the -- the

16   way in which websites link to other websites to decide what was

17   important.  And then when you got to 2005, that Singhal

18   document that I quoted about Nav Boost.  At some point they

19   figured out that users' clicks -- well, user information was

20   incredibly valuable for that, and the reason it was so -- the

21   reason for the statement, we've -- you know, that Nav Boost has

22   frozen out small players is that before that anyone could use

23   the web links.  You didn't have to be big to use web link, to

24   use that -- to get that information, you just had to know how

25   to do it, which Google brilliantly figured out.

1          Once it started -- they figured out that user clicks

2     are actually even more valuable or beneficial than using these

3     web links, hyperlinks, then suddenly scale really started to

4     matter.

5     Q.  Did other rivals have scale advantages over Google when

6     Google entered the market in 1998?

7     A.  There were other search engines that existed and that, you

8     know, were doing other kinds of things, like doing a curated

9     list of websites, for example.  They didn't -- and, you know,

10    what Page and Brin figured out was a whole new way of doing it.

11    Q.  Other search engines had search quality advantages over

12    Google when Google entered, right?

13    A.  I don't think I would say that.

14    Q.  From day one, they had better search quality, no scale?

15    A.  I don't have the measurement.  But, you know, from day one,

16    you know, this web -- you know, you can -- forgetting the --

17    was it Into the Google Plex?  There's a great book about the

18    early days of Google and, you know, it describes how they

19    were -- had some small office and they were trying -- you know,

20    cobbling together computers to be able to do this, to, you

21    know, do their algorithm that used these -- the hyperlinks.

22          So I don't know whether on day 1, you know, or it was

23    day 2 or day 5, but it was revolutionary.

24    Q.  Why don't you go to slide DXD15.011 in your binder.

25          This is an article from *Fortune* magazine in March 1998.

1          Do you recall, 1998 is the year that Google launched its

2   search engine?  Correct?

3   A.  I believe that's correct.

4   Q.  And this article proclaims:  This much is clear, Yahoo! has

5   won the search engine wars and is poised for much bigger

6   things.  More people go to Yahoo! than to Netscape or AOL.

7   More people search at Yahoo! than watch MTV, Nickelodeon, or

8   Showtime in any given week.  More people check out Yahoo! than

9   read the typical issue of *Time*, *Newsweek*, or *Life*.

10          Would you agree that in 1998 Yahoo! had a substantial

11   advantage in many of the factors that you've identified in your

12   report over Google?

13   A.  You know, the first thing I would say about this is, like,

14   boy, did they get it wrong.  You know, so, yeah -- I don't

15   know, the day -- was this the day before Google came in they

16   had a big advantage?  They obviously had a big share.

17          But there were some things that were really

18   noticeably different than -- than now.  So, Your Honor, one

19   thing that was really different, and I've already described

20   this, is they weren't using things where scale of -- you know,

21   the scale of queries mattered.

22          So Yahoo! was doing a, you know, search engine at the

23   time.  I think Yahoo! was actually -- this was their thing,

24   were, like, do a curated list; like, here are good websites for

25   the following topics, and that's how search worked.

1          And then Google came along with its innovation.  Now,

2     its innovation, as I just described, was this way of using

3     hyperlinks to figure out what were important websites for a

4     given topic.

5          Only in 2005, or, you know, 2006, you know, the time

6     of Nav Boost did things suddenly change, where scale started to

7     matter.  So that's one thing that was really, really different

8     here in -- when Google was able to take over.

9          The second thing that was really, really different

10    was there weren't exclusive default contracts.  So, I described

11    to you, I think, earlier today, about when Michael Dell

12    explained to Sergey Brin how to think about a default

13    agreement, that was the start of them using default agreements.

14         If you look in the record, you'll see that around

15    2005 suddenly everyone starts realizing that the distributors

16    are controlling a lot of traffic and that if you write these

17    contracts, you can lock up a lot of traffic.

18    Q.  And in 2005 and 2006, Yahoo! had lots of those contracts,

19    didn't they?

20    A.  I'm not sure that they did.  I think Yahoo! had some and

21    Google set out -- what Google set out to do was sign those

22    contracts.

23    Q.  And Microsoft had a lot of those contracts too, didn't

24    they?

25    A.  You know, I think this was early days and I'm not -- I

1    haven't seen you know, documents about -- I know that they all

2    were trying to get these contracts.  They all figured out,

3    like, this was the time to start doing it.  And by 2005 and '6,

4    I mean, everyone knew that Google had something that nobody

5    else had.

6    Q.  And as part of your work in this case, you weren't asked to

7    look at any contracts that predated 2014, correct?

8    A.  So I didn't -- you know, I obviously have looked at the

9    history of this market.  I've looked at things about the

10   market.  I've looked at documents that are about the market,

11   but I was asked to express an opinion about -- from 2014 to

12   2000 -- to the present, and that's what I did.

13   Q.  And you know that for many, many, many years Microsoft has

14   had the exclusive contracts on Windows PCs during periods where

15   that's where all the searching was done, basically, in the

16   United States, correct?

17   A.  That is correct.

18   Q.  And Microsoft had the defaults on all those Windows PCs,

19   correct?

20   A.  So, it's kind of a complicated story on Windows because of

21   Chrome.  You know, Chrome as, you said, came in.  It was a much

22   better browser than Internet Explorer, and it managed -- and

23   because of that, people started putting Chrome onto their

24   Windows PCs and Chrome had a Google default.  And that was a

25   very powerful thing for getting Google distributed and Google

1    usage on Windows PCs.

2    Q.  I think, as we talked about, Google didn't get any preloads

3    or defaults for Chrome on Windows PCs, correct?

4    A.  No.  It was user downloaded.

5    Q.  Now, among the opinions you expressed a couple weeks ago

6    were that general search engine -- the general search engine

7    market is characterized as one where there is no -- where there

8    is low consumer responsiveness to quality, to reductions; is

9    that right?

10   A.  Sorry.  Just repeat the question.

11   Q.  The general search engine market is characterized as one

12   where there are low consumer responsiveness to quality

13   reductions; is that right?

14   A.  I think what I -- I just -- yes, I described experiments

15   that Google has done about that and what those experiments

16   showed.

17   Q.  You haven't identified in any of your expert reports a

18   particular, specific search innovation that Google

19   intentionally decided not to introduce?

20   A.  Are you -- when you say "search innovation," do you mean

21   general search services?

22   Q.  Correct.  You haven't identified in your expert reports any

23   particular Google search engine innovation that it would have

24   introduced but for any of the distribution agreements?

25   A.  I think I testified today about privacy, and so if that --

1     you know, that is an innovation?  I don't know whether you want

2     to call it innovation or a product improvement for consumers

3     who want to have choices over privacy.

4     Q.  Have you evaluated in this case the trade-offs that exist

5     between taking steps to increase user privacy and the

6     reduction -- and reductions in search engine or search ads

7     quality?

8     A.  So, I haven't evaluated them.  There are certainly

9     trade-offs involved, but on the other hand, you can give

10    consumers choice and then they can choose.

11    Q.  You yourself are not in a position to evaluate whether

12    Google has intentionally decided to degrade its product, from a

13    privacy standpoint or any other, as a result of any search

14    distribution agreement?

15    A.  So, you're talking about degrading as if you're taking away

16    something that was there.  But another form of degrading is not

17    offering something that could have been there.  So the privacy

18    example is one of them.

19    Q.  You haven't evaluated in this case whether -- for any

20    particular privacy feature, what the consumer demand for that

21    particular feature is, correct?

22    A.  No.  I mean, not myself.  I've -- you know, saw the

23    documents and internal Google discussion.

24    Q.  But the internal Google discussion you referenced, you

25    haven't testified to or identified any particular feature of

 1    privacy.

 2    A.  I did not testify about that today.  I -- sitting here, I

 3    don't remember exactly the details of what I talked about in my

 4    reports.  You know, whether that included some of the specifics

 5    that they were considering.

 6         I do know that they certainly were considering

 7    specifics in the sense that they -- you know, I remember, you

 8    know, a document -- I think it was in my report -- you know,

 9    comparing Google to DuckDuckGo on a number of dimensions of

10    privacy.  So they certainly were talking about different --

11    these various dimensions.

12    Q.  And you're not offering any particular opinion in this case

13    that any particular feature of DuckDuckGo is demanded by a

14    particular percentage of consumers in the United States?

15    A.  No.

16    Q.  And you haven't conducted any analysis that would assess

17    what the reduction in search quality would be for adopting some

18    feature that DuckDuckGo has adopted, correct?

19    A.  Adopting it as a mandatory thing, so everybody had to have

20    it?

21    Q.  Mandatory or otherwise.

22    A.  So I haven't evaluated that.  But, again, you can give

23    people a choice if they prefer privacy or whatever the effect

24    is on search quality.

25    Q.  Have you conducted any analysis in this case comparing

1    DuckDuckGo search quality with Google search quality?

2    A.  Analysis myself, no, but I've seen documents where Google

3    has compared itself to rivals, and I believe that included

4    DuckDuckGo.

5    Q.  And Google search quality is substantially higher than

6    DuckDuckGo search quality, correct?

7    A.  Correct.

8    Q.  And -- I'm about to turn to a new --

9            THE COURT:  Why don't we pause for the day.  I want

10   to give our court reporter a couple minutes, too, since we're

11   going to have a more extended discussion in a few minutes.

12           Professor Whinston, thank you very much.  I'll ask

13   you to come back tomorrow so we can get started at 9:30.  And

14   I'll ask you not to discuss your testimony with anybody

15   overnight.  You can step down and step out of the courtroom.

16   Thank you.

17           All right.  Mr. Schmidtlein, just quickly, what's

18   your anticipated length of continued cross tomorrow?

19           MR. SCHMIDTLEIN:  We're certain to go all morning.

20           THE COURT:  Okay.  So let's just take a couple

21   minutes.  I don't know whether counsel for *The New York Times*

22   is here or not.  All right.  I see him in the back of the room.

23   I want to give our court reporter just a few minutes.  So why

24   don't we just plan to get back -- we'll start around 5 after 5

25   and have that discussion, and then we'll conclude for the day.

1          (Recess from 4:59 p.m. to 5:07 p.m.)

2          THE COURT:  All right.  Why don't we start with

3     just -- I want to get the parties' reactions to the motion that

4     was filed by *The New York Times*, and we can figure out a path

5     forward.  Mr. Dahlquist?

6          MR. DAHLQUIST:  Certainly.  Thank you, Your Honor.

7     Your Honor, three quick points on behalf of the United States.

8     First, the United States fully supports public access and has

9     advocated for public access at repeated times throughout this

10    proceeding.  We believe the most important point of public

11    access is in this courtroom, which Your Honor has done.  We

12    appreciate the Court's ongoing efforts to continuously apply

13    the Hubbard factors to the documents and testimony that have

14    been presented.

15          Second, we believe that Google and some third parties

16    have over-designated a lot of the information that's being

17    presented here.  And we've pushed back, where appropriate, as

18    the Court has asked, where appropriate and necessary.  And we

19    intend to continue to do that consistent with your process that

20    you put in place.

21          With respect to *New York Times*' requests, we're happy

22    to go through them and answer questions, but we stand on our

23    position that we really have no position on them in total.  We

24    agree with some, but perhaps not all.

25          THE COURT:  Why don't we start with what you don't

1    agree with.

2              MR. DAHLQUIST:  Okay.  Understood.  Maybe we can do

3    it in reverse order, Your Honor.  *The New York Times* has asked

4    for a complete un-redaction of UPX137 and 552.  We would

5    support an un-redaction of both of those documents.  We have no

6    objection to an un-redaction of those specific documents.

7              THE COURT:  What are they?

8              MR. DAHLQUIST:  They both are Google documents and

9    correspondence that relate to the Apple agreement.  They're

10   from 2007.  I have copies, if you would like them, Your Honor.

11   But we do believe, due to the passage of time, that they could

12   be fully un-redacted.

13             THE COURT:  If you could hand those up, that would be

14   helpful.

15             MR. DAHLQUIST:  Certainly.  Do you guys have copies?

16             MR. SAFTY:  We do.

17             MR. DAHLQUIST:  I've got two of each.

18             That's 137 and 552.

19             THE COURT:  Okay.

20             MR. DAHLQUIST:  Would you like me to continue the

21   other categories?

22             THE COURT:  Sure.

23             MR. DAHLQUIST:  Your Honor, *New York Times* has also

24   asked for the complete un-redaction of testimony by Mr. Cue and

25   Mr. Dischler.  We believe we've already resolved that process.

1    We submitted our proposed redactions and pushed back on many,

2    which I believe the Court adopted some of those narrow

3    redactions and released those.  So we do not feel a need to

4    revisit the Cue and Dischler testimony.

5            Would you like me to proceed?

6            THE COURT:  I'm listening.

7            MR. DAHLQUIST:  The next category was sealed

8    briefing.  We believe, on behalf of the United States, we have

9    filed redacted versions of all -- either fully public or

10    redacted versions of everything that we submitted.  So I think

11    this is a request purely to Google.  And in that case, we would

12    agree that redacted versions of what they filed under seal

13    should be made.

14            THE COURT:  I think typically that's been done.  If

15    memory serves, there's -- I suppose we can modify the rule a

16    little bit since we're in trial, but my recollection is within

17    seven days -- am I right about that -- there would be a

18    redacted public version posted.

19            MR. DAHLQUIST:  I believe that's the rule.

20            MR. SCHMIDTLEIN:  That's the rule I think we've tried

21    to adhere to pretrial.

22            THE COURT:  Right, right.  That has been the rule

23    pretrial, and we haven't -- because it hasn't been brought

24    up -- modified that rule for purposes of any -- with any trial

25    filing.  And I'm hoping to hear, you know, that we can modify

 1    that, sure.

 2          MR. DAHLQUIST:  I do know *The New York Times* has

 3    asked for one specific declaration from, I believe, a lawyer

 4    that was at Google.  With respect to that declaration, we have

 5    no objection to that being filed publicly.  I don't believe it

 6    self-contains any confidential information.  It merely

 7    references the documents and an argument as to why it should be

 8    maintained as confidential.  So with respect to that specific

 9    request, we do not believe that should maintain as

10    confidential.

11          THE COURT:  Okay.

12          MR. DAHLQUIST:  The last category, I think, is the

13    most difficult category, which is the requested modifications

14    of the September 28th order, which I believe -- I think it's

15    docket 731.  I might have that wrong.  725.  Sorry.  Docket

16    725.  I think with respect to that, we appreciate *The New York*

17    *Times* appearing here.  We welcome their brief.  We welcome

18    their thoughts into it.  However, I do not think inviting them

19    to have the opportunity to object when and if this Court

20    decides it needs to close the courtroom is a workable and a

21    manageable situation.

22          I think if they have thoughts related to how the

23    process can or should be changed or what type of information

24    they believe should or shouldn't be deemed confidential, I

25    think their opportunity to present that is today and now, and

1    in their briefing I think they already have.  And we can look

2    at modifying -- the Court can evaluate modifying the proposal

3    based on that insight.  But I will go back to my first point,

4    which is we believe the public-accessed information is here in

5    this courtroom.  And we appreciate and will continue to

6    advocate to have this courtroom open as much as possible,

7    working within the guideposts that have been put in place by

8    the Court.

9              THE COURT:  Okay.

10             MR. DAHLQUIST:  And we can -- I think I hit the -- at

11   least the landscape.  I may have missed a few things, but happy

12   to readdress more specific questions.

13             THE COURT:  Okay.  Not right now.

14             Why don't we hear from Mr. Cavanaugh?

15             MR. CAVANAUGH:  Your Honor, briefly.  We agree with

16   the United States.  We fully support public access.  We think

17   the Court has worked mightily to attempt to achieve that.

18             In terms of the unredacted documents, they weren't by

19   the United States.  We're -- it's certainly fine with us,

20   unredacting them.

21             I think Cue and Dischler testimony has been dealt

22   with.  I do think access -- debating access ahead of time,

23   before a closed session, isn't particularly workable,

24   Your Honor.

25             In terms of -- we did make a filing within the past

1    couple of weeks in connection with an offer of proof.  That was

2    filed under seal.  I don't think we filed an un-redacted

3    version of it, but we certainly can take care of that,

4    Your Honor.  It was only a couple of pages.  Thank you,

5    Your Honor.

6              THE COURT:  Thank you, Mr. Cavanaugh.

7              All right.  Mr. Schmidtlein or --

8              MR. SAFTY:  Safty.

9              THE COURT:  Safty.

10             MR. SAFTY:  Thank you very much.  It's Graham Safty,

11   S-A-F-T-Y, from Williams & Connolly, on behalf of Google.

12             Thank you, Your Honor.  I'll start by saying that I

13   think we sort of share the same objectives here of maximizing

14   the openness of the proceedings, and I'm glad that we're all

15   aligned and moving further in that direction.  We also agree

16   with both groups of plaintiffs that there's no need to revisit

17   the redacted version of Mr. Dischler and Mr. Cue's transcripts

18   because the parties have been heard on that and that's been

19   dealt with.

20             We did file a short position statement under seal

21   addressing redactions to Mr. Cue's transcripts.  We'll prepare

22   a redacted version of that.  That was under seal because we

23   addressed the provisions and other substantive matters that we

24   sought to seal, so we'll certainly address that.

25             With respect to the declarations -- and I will confer

 1    with my colleagues from the plaintiff's side about this --

 2    there was a hearing on August 11th about confidentiality

 3    matters and in advance of that there was a very large JSR

 4    submitted involving multiple confidentiality disputes.

 5    Google's brief is not confidential, we're happy to file that.

 6    We made extensive argument in Court about that.  I'm not sure,

 7    though, if all of those material -- all those briefs that went

 8    into the JSR were ever filed publicly.  That's a filing that

 9    plaintiffs handled, so we're happy to work with them to make

10    sure that those are filed publicly.

11           As to the declarations, we delivered those to

12    Your Honor, obviously, in hyperlinked form, as with prior

13    filing; hence, the reference to the August 10th delivery.

14    There is material in those that discusses sealed documents and

15    so we will have redactions to those.  But we're certainly happy

16    to file redacted versions of those declarations.

17           I think this was all kind of bound up in that

18    August 10th filing in advance of the August 11th hearing.  So

19    we'll make sure that, you know, the party's house is in order

20    in that respect.

21           Let me address what I think are a couple of points of

22    disagreement that are -- that are very important from Google's

23    perspective.

24           First, there is a request in -- in *The New York*

25    *Time's* filing that the public and reporters be given access to,

 1    sort of, the full exhibit, rather than the version of the

 2    exhibit that is prepared for use in open court.  And since

 3    August what the parties and third parties have all been doing

 4    in order to make sure that the proceedings are kept open as

 5    much as possible and proceed as efficiently as possible, is

 6    identifying pages -- or ranges of documents, when they're

 7    voluminous -- that might be used with a witness.  So if it's a

 8    100-slide deck, plaintiffs might write to us on Friday and say

 9    please let us know by Sunday -- because we're always on a

10    48-hour clock now during trial -- what your position is on

11    pages 1 to 10.  Then we'll hash out any disagreements before we

12    show up here in court on Monday morning.

13           So what the public has been receiving is the very

14    same version that is presented to the witness in court.  Every

15    single page that potentially is available for use with the

16    witness in court is exactly what goes on the DoJ's website and

17    is exactly what Google, for its own documents, to the extent

18    that they're introduced into evidence, is happy to provide upon

19    request.

20           We don't think that it's appropriate to go back and

21    review for confidentiality in the first instance the 90 pages

22    of this deck that no one thought were worth questioning a

23    witness about and no one sought confidentiality review of in

24    the first instance.

25           So, for example, Your Honor, if you look at the two

1    exhibits that were just handed up, focus on 137 as an example.

2    The entire first page is redacted.  And the reason for that is

3    DoJ didn't ask for our review of that page, or the first half

4    of the second page, because it relates to a deal with something

5    called Nifty.  It has nothing to do with Apple.  And so DoJ, to

6    its credit, said, Hey, you've only got 48 hours to do this and

7    we want to make sure that we can reach resolution on our

8    disagreement redactions, so please just focus on the part about

9    Apple because that's what's relevant in the case and that's

10   what we're going to ask the witness about.

11          So we are not planning to and have not gone back and

12   re-reviewed for confidentiality every other portion of every

13   other document because none of the parties have contended that

14   those are -- matters are relevant or the subject of

15   examination.

16          So our plan is to continue to push out, in response

17   to plaintiff's request, the versions that are prepared for

18   examination of the witness.  And that's really the only way to

19   do it, given the constraints we're under with the 48-hour

20   turnaround, and the way to make sure that relevant material is

21   in the hands of the public very promptly.

22          One other note about that, because I think that there

23   has potentially been some divergence of interpretation of --

24   of, perhaps, Your Honor's September 26th order.

25          Some third parties have taken the view that they are

1    not required to accede to disclosure of their exhibits.  So we

2    have, in some instances, told reporters, I believe including

3    from *The New York Times*, we cannot provide those exhibits to

4    them that were introduced in court because the third-party has

5    not consented.

6         We have, in other instances, been told that the

7    third-party's interpretation is that only the page that is

8    shown on the screen in court should be disclosed.  So that's

9    why *The New York Times*, I believe, in its papers is referencing

10   sometimes only receiving a single page of the document.

11        Google's view is the same exhibit that we prepare for

12   potential public disclosure can go to the public after it's

13   introduced into evidence, even if plaintiffs only use one of

14   the ten pages that we redacted.  You know, I don't know what

15   those third-parties' positions are based on, but that's why, in

16   some instances with third-party documents, I think the

17   reporters might not have all of the documents that have been

18   introduced into evidence.

19        On that point, I would sort of respectfully disagree

20   with the, sort of, allocation of burden that I think *The New*

21   *York Times* is contemplating.  We have chosen not to haul those

22   third parties back before the Court and have a big dispute

23   about confidentiality because we want to proceed as efficiently

24   as possible and we want to get the witnesses on and off the

25   stand and not have them waiting around.

1         So we don't think it's necessarily in the public

2    interest or the interest of the parties and the Court to have

3    an obligation to haul every third party before the Court

4    immediately.  To the extent those third parties'

5    interpretations are inaccurate, perhaps some guidance on that

6    would clarify matters.

7         THE COURT:  I'm sorry to interrupt you.  I want to

8    try and move this along a little bit.

9         Do you have anything else you want to say

10   specifically with respect to the proposals that have been made?

11        MR. SAFTY:  One more proposal, Your Honor, that I

12   think is slightly more nuanced, is that I understand that *The*

13   *New York Times* proposes to obtain copies of exhibits from

14   previously sealed sessions.  And to the extent that those were

15   prepared in advance in redacted form and the witness was

16   questioned about sealed portions of them, just like any other

17   exhibit, we're happy to provide those in the version which they

18   were prepared in advance of the testimony.

19        The nuance is that in some instances we have shown

20   documents to witnesses without putting them on the screen and

21   without removing the confidentiality designation to facilitate

22   open examination.  And in that instance I don't think there's a

23   waiver of the confidentiality so much as there is the use of a

24   document in a confidential form in order to facilitate an open

25   courtroom, and that, to me, is the primary goal.

1          So, thank you, Your Honor, for your indulgence as I

2  went through those issues.  Unless you have any questions,

3  those would be Google's positions on what I understand to be

4  the primary proposals.

5          THE COURT:  Okay.  Thank you, Counsel.

6          Mr. Sumar, you want to come forward and share with me

7  your redactions -- redactions, that was a Freudian slip -- your

8  reactions.

9          MR. SUMAR:  No redactions from me, Your Honor.

10          And just for the record, Al-Amyn Sumar, that's A-L,

11  dash, A-M-Y-N, S-U-M-A-R, with The New York Times Company.  And

12  I want to thank Your Honor for hearing us so promptly on this.

13          I want to make sure I cover everything.  I'm going to

14  go through, in a sort of random order.  But I'm not sure what

15  Google's position was on Exhibits UPX137 and 552, on whether

16  they should be unsealed.

17          THE COURT:  Maybe a better way for me to do this

18  is -- and I'm sorry.  I've read your papers, and I hope you can

19  appreciate the hour.

20          A couple things.  *The New York Times* is certainly

21  right and we have been proceeding from the principles that are

22  articulated in your memo:  Whenever a piece of evidence is

23  introduced at trial, it becomes a public record.  It is a court

24  record, importantly.  But, nevertheless, is presumptively

25  public.

1          And, so, the request that was made essentially --

2     well, you've actually accurately characterized the history of

3     how this all came about.  This was never something that was

4     contemplated pretrial.  But, nevertheless, we've now got a

5     process in place.  That's one.

6          Two, it is the case that we cannot just make an

7     exhibit available.  And the reason for that, I hope you will

8     appreciate, is twofold.  One is, to the extent that there is a

9     right of private -- right of public access, it's to what is

10    introduced during the trial and is relevant to the disputes at

11    issue.

12         So, for example, we've had and seen lots of slide

13    decks in this case that are sometimes in excess of 100 pages,

14    in which a couple of pages are shown.  The remaining 98 or

15    99 percent of the slide deck is not relevant to other -- to

16    issues at this trial.

17         At the opposite end of the spectrum, that's also been

18    true with emails.  And I think what I tried to do is guide the

19    parties in that way in terms of what should be publicly

20    available.  That is the -- what should be publicly available is

21    what's being presented to me in open court for consideration

22    with respect to the disputed issues.

23         And -- and I think it's fairly well established that,

24    again, what -- and sort of the hierarchy of what becomes

25    public, it is what's presented to the Court in terms of an

1    exhibit for consideration.  If we had, sort of, started from

2    square one and I had advised the parties that anything you

3    present to me could be made public in its entirety, I think

4    they would have not presented full documents for purposes of,

5    you know, examining witnesses.  So that's one.

6          Two is that in terms of the process by which we have

7    been making these available -- again, nobody has asked that the

8    Court do this.  And it's not, in my experience, typically the

9    Court that is -- is responsible for actually making the

10   exhibits public.  Typically it's one or more of the parties

11   that do that, and that's how we've done it here.

12         And so to the extent that there are issues with

13   respect to what you are receiving from them, we can talk about

14   that and that process and the way that's being done.

15         Thirdly, with respect to the closing of the

16   courtrooms.  Look, I'll be the first to -- I'm happy to admit

17   that, upon reflection, some amount of the testimony that was

18   done outside of the public should have been done in the public

19   session.  It was something that I was still trying to feel my,

20   you know, way around, trying to figure out what the parties

21   understood to be something that needed to be done in public

22   versus private session.  And I think what I've tried to do

23   since, and we've tried to get the transcripts out to reflect

24   what I think truly should have been private.  That's one.

25         And then, two, we haven't had a public -- a closed

 1    session, I think, in the last three-plus weeks.  I think the

 2    last one was at the end of the second week of trial, and we

 3    haven't had one since, certainly starting with, I think --

 4    certainly with Mr. -- anyway, it's been at least three weeks.

 5              And so I am not inclined -- and I do agree with the

 6    parties, that it is a little unworkable to have a third party

 7    come forward to essentially contest whether a portion of the

 8    proceedings should be sealed or not.

 9              I mean, you can let me know today what factors you

10    think I ought to be considering, but the same factors that have

11    been governing my determinations with respect to the exhibits

12    that have been unsealed -- or, excuse me, transcripts that have

13    been unsealed is what I've been trying to communicate to the

14    parties as to what the parameters are when it comes to any

15    further and future closed session.  And I think that is

16    probably the reason we haven't had any over the last three

17    weeks.

18              So, anyway, those are my thoughts and I'm happy to

19    hear from you, given those thoughts.

20              MR. SUMAR:  Yeah.  Thank you, Your Honor.  I'll try

21    not to waste any time here.  But let me take these in reverse

22    order.

23              I mean, the fact that Your Honor is so attentive to

24    this issue now, which we recognize, and has not closed the

25    courtroom in three weeks actually militates in favor of what we

1    are proposing here because it's going to happen rarely.  It's

2    not going to be every day that I am going to need to get on the

3    Red Line and come down here.  I don't necessarily want to be

4    doing that.

5            I will come on the days when the Court has signaled

6    that there will be closure.  And the reason that's important,

7    as we've laid out, is that there is an irreparable harm done

8    when the public is excluded wrongfully, right? that cannot be

9    remedied after the fact.  So I have faith in Your Honor that

10   you'll apply the principles correctly.

11           I would not characterize the *Times* as a third-party

12   here.  We stand in the shoes of the public.  We're here to

13   advocate for the public's right of access.  So it's not we're,

14   you know, just Apple or Verizon, or some other company.

15           And I don't think this needs to be burdensome,

16   Your Honor.  I mean, this is not something novel that I'm

17   proposing here.  It happens in criminal trials all the time

18   where the First Amendment -- the First Amendment clearly

19   says -- commands that if you're going to exclude the public,

20   you have to give them notice and opportunity to be heard.

21           If that's not happening -- I mean, it should be.  But

22   I don't think what I'm asking for here is novel.  I don't think

23   it's unworkable.  I think it's a matter of having the public

24   come forward and raise objections before the Court makes a

25   decision.  So I'll just leave it at that.

1          In terms of the process for exhibits, what you're

2     saying, Your Honor, is exactly what we have suggested.  We're

3     putting the onus here on the parties, and what we're asking the

4     Court to do is make amendments to the order that would force

5     the parties to do what they're supposed to do.  I mean, I

6     appreciate that a lot of -- I'm not sure how much, but maybe a

7     lot of what's been withheld here is information that they

8     consider confidential.  But we have no way of knowing that.

9          I mean, there's 68 DoJ exhibits that we do not have

10    access to.  We have not been told that those are confidential.

11    A number of state exhibits, maybe 18, we have not been

12    provided.  We have not been told that they are confidential.  I

13    think there are -- I'm not sure how many from Google, but there

14    are a number of them.  And so the objective here is to get as

15    much information as we are entitled to, to understand what has

16    been withheld on the grounds of confidentiality and, where

17    necessary, to challenge that.  So our frustrations are, I

18    think, directed to that problem, and we think the Court can

19    easily fix that.

20         As to this question about the whole exhibit versus a

21    portion, I think the focus really here is on what is admitted

22    because that's what Your Honor said.  Once an exhibit is

23    admitted into evidence, it's a public record.  And so if Google

24    is proposing to admit into evidence one slide from a 100-page

25    slide deck, that's what we are entitled to.  But if its seeking

1    to admit the entirety of it, in my view, that's a judicial

2    record.

3            And Your Honor may feel differently about certain

4    portions, whether some are confidential and some are not, but

5    if the issue here is practicality and burden, I think we can

6    work something out.  As a legal matter, I think if the exhibit

7    is admitted into evidence, it's presumptively public.

8            THE COURT:  Well, I would agree with only part of

9    that in a sense that, again, the sands are shifting a little

10   bit.  And what I mean by that is because this was not an issue

11   that was raised pretrial, the parties, as far as I can tell

12   have been proceeding from a posture of presenting the entire

13   exhibit.  In other words, the exhibit is being presented in its

14   entirety.  It's not being presented only for a single -- and

15   that's, frankly, just more because I think they're doing it

16   with the expectation that it's only the particular page that is

17   really what's relevant to the examination.

18           And, so, I continue to adhere to that belief, and I

19   think that's consistent with the law, that it is what's

20   presented in court that is what's a public record.  Now, you

21   know, the fact that, for example, there's been a 100-page slide

22   deck presented to me doesn't make all of that record a public

23   record.  If it's only one or two pages that are relevant to the

24   issues at hand -- and if I need to, I can, I suppose, make

25   clear that what's being admitted are the portions of the record

 1    that the parties are pointing me to, as opposed to the entirety

 2    of an exhibit.

 3            MR. SUMAR:  Well, I guess I just disagree,

 4    Your Honor.  If the exhibit is being offered to you in its

 5    whole, it's being offered to influence you in your

 6    decision-making, and that's the entirety because, I mean, maybe

 7    there's one page they think is relevant, but, of course,

 8    there's context in there --

 9            THE COURT:  Look, we'll just have to agree to

10    disagree because I think what would happen is if we had stood

11    and had this conversation at the start of trial, what we would

12    be seeing, instead of a 100-page slide deck, is the cover of

13    the slide deck and the one page that matters.

14            And so, the only reason it's being done this way is

15    because there was no request at the start of the trial of the

16    kind that you're making here today.  And I understand why

17    you're taking the position you are, but I just think it's a

18    little bit unfair to the parties to start shifting the sands,

19    not only the parties here, but the third parties as well.

20            MR. SUMAR:  Well, I'm certainly not saying that

21    everything needs to be released, Your Honor.  All we're saying

22    is that it's presumptively public.  And if, Your Honor, the

23    parties, third parties want to make a showing that what's in

24    that slide deck is going to cause some harm to their business

25    interest or otherwise invade their privacies, they're free to

1    do that.  I don't think there's any issue about subtle

2    expectations here, given that power -- reliance interest,

3    rather.

4         THE COURT:  Well, here's where I am on this, which is

5    that to the extent *The New York Times* or the press and the

6    public are seeking copies of exhibits that have been introduced

7    and presented to witnesses, that is fair game.  I do not think

8    the fact that a single page or two pages of a much larger

9    exhibit as shown to a witness means the entirety of the exhibit

10   is a public record that needs to be released, because if we had

11   proceeded in that way, this would look very different.

12        And so I think, certainly consistent with the Hubbard

13   factors, what really matters is what's being presented to the

14   Court for its determination in determining the disputed issues,

15   and it's those portions of those documents that the public has

16   the greatest interest in seeing and having access to and not

17   the rest of the material.

18        So that's where I am on that.

19        MR. SUMAR:  Okay.  Anything else, Your Honor?

20        THE COURT:  No.  I'm looking to you to tell me if

21   there's more you want to raise with me today.

22        MR. SUMAR:  I don't think so.  Let me go just through

23   this quickly.  You know, on the UPX137 and 552, again, what I

24   was hearing from the DoJ was that this should be made public.

25   I wasn't necessarily hearing from Google that there's a basis

1    under the Hubbard factors to keep that under seal.  But maybe I

2    misunderstood.

3              THE COURT:  Right.  I did hear counsel say, at least

4    with respect to 137, for example, that the first two pages are

5    not relevant in the sense they pertain to a completely

6    different issue that's not relevant to this trial.

7              MR. SUMAR:  And I just don't know of any authority

8    that says that if that's in a document -- again, it's been

9    presented to the Court, presented to a witness -- but the fact

10   that Google doesn't think it's relevant is enough to override

11   public access.

12             THE COURT:  Yeah, I think this is the same

13   conversation that you and I just had, which is what's relevant

14   is what's being presented to me for my consideration.  The

15   alternative would have been to have completely blacked

16   everything out and only presented the unsealed portion, and

17   effectively that's what's happening.  And the public doesn't

18   have a right to have access to the irrelevant parts of the

19   record.

20             MR. SUMAR:  I mean, I just don't think that's the

21   law, Your Honor.  Under Hubbard, I mean, if it's being

22   tendered, again, to influence a judicial decision, it's a

23   public record.  And what matters under Hubbard factors 4 and

24   5 --

25             THE COURT:  My point, what's being presented to me

 1   for my consideration is not the entirety of the document.  It's

 2   the portions of the document that the parties want me to

 3   consider.

 4           MR. SUMAR:  And I just don't know of any case that

 5   says you can pick and choose, that you can just decide to black

 6   out, not show something to the witness and, therefore, avoid

 7   putting it on the public record.

 8           THE COURT:  I'm not -- well, I welcome any case that

 9   stands for the proposition that all parts of an exhibit,

10   regardless of their relevancy, entitle -- requires the exhibit

11   to be publicly released.

12           MR. SUMAR:  Sure.  And we can follow up with that.

13           THE COURT:  I'm happy to take a look, but I'm not

14   aware of any case that requires that either.

15           To be clear, you know, to the extent we're talking

16   about how this is working in my mind, which is all of this is

17   being done by the Hubbard factors, and what I mean by that is

18   specifically, to the extent the parties have redacted things

19   from the record and from exhibits, it's because -- or withheld

20   things that are not being public, it's because the relevancy

21   element of the Hubbard factors, and the public interest is

22   something that I am considering.

23           And to the extent that there are, for example, you

24   know, UPX137 -- and I haven't made any decisions about this --

25   but to the extent, for example, the first page relates to

1    nothing that is relevant to this case, the Hubbard factors, in

2    my view, the balancing of them would warrant not making them

3    public.

4            MR. SUMAR:  Yeah, I think we'll just have to agree to

5    disagree.  But we're certainly happy to follow up with

6    authority on that.

7            In the Cue and Dischler transcripts, what we're

8    really looking for here is unsealing, absent some showing by

9    the parties and some explanation by the Court for why those

10   redactions are proper, and we just don't have that.  I mean, I

11   haven't seen anything in the public record.  Your Honor hasn't

12   had a chance to explain it, so...

13           THE COURT:  So in fairness to you -- and this is

14   probably -- this is on me.  When the first set of exhibits were

15   released, I -- excuse me -- the transcripts were released, I

16   did -- and you've cited it in the record here.  My mistake was

17   not then restating all of those reasons when we released

18   Mr. Cue's and Mr. Giannandrea's transcripts.  But I can make

19   clear now, as I made clear earlier today, that the same

20   principles I applied with the first release were the same

21   principles I applied, including the line-by-line review.

22           I received competing requests for redactions.  Google

23   made requests.  Apple made requests, for example, and the

24   plaintiffs then took a position on their request.  I considered

25   those, literally line by line, subject matter by subject

1     matter, applying the Hubbard factors and -- obviously, in my

2     own review.  And then those factors, as I described them at the

3     very first time we released the first set of transcripts -- I

4     can't remember exactly who it was -- that has been the thinking

5     in the subsequent releases.

6              MR. SUMAR:  Fair enough.  And, you know, it's just

7     because it's not a process that's played out in public, I'm not

8     really in a position to argue about specific redactions.  But I

9     think once the Court does take steps to sort of make public its

10    basis for the redactions and release of anything the parties

11    have filed on the subject, subject to any sealing that's

12    necessary, we would be in a position to make sort of a more

13    full-throated argument on that.

14             THE COURT:  I would say the following, which is:

15    Your suggestion to post it on the docket to let the public know

16    what transcripts are released, we certainly can adopt that.  I

17    do make an announcement in open court when those transcripts

18    are available.  So I can put it on the docket.

19             I'm not inviting you to do this, but once the

20    transcript is out there and if you think there are things from

21    context that are inappropriately redacted, you can file

22    something and draw it to my attention as, you know, an

23    intervenor on behalf of the media and the public.  You know, at

24    some point I've got to make a call.  You all want the

25    transcripts and that's -- and so they're being produced as

1  quickly as we get them in and have the time to review them.

2  MR. SUMAR:  That's fair enough, Your Honor.  And,

3  really, what we're not trying to do is impose more burdens on

4  the Court.  If the Court were to release a transcript and say:

5  I'll follow up on this day with the basis of my ruling, that

6  would be helpful to us because we, you know, would understand

7  why the Court has redacted these passages and then decide

8  whether we want to challenge any of the sealing.  But it's just

9  very hard to do that when we have only the transcript and not

10  even, sort of, anything the parties have submitted.

11  THE COURT:  Okay.  Look, if what -- okay, as I said,

12  what you're asking of me is to sit there with the transcript

13  when it's released and go page by page and explain what I've

14  redacted and I haven't.  I'm not sure that's terribly practical

15  either.

16  MR. SUMAR:  Well, I haven't asked for that.

17  THE COURT:  I just want to make sure.

18  MR. SUMAR:  All we said was sort of what the Court

19  did for the other transcripts, it hasn't done here, and it

20  would be helpful.

21  THE COURT:  Okay.  Well, as I said, that's on me.  I

22  should have made it explicit on the record.  But it's the same

23  exact process and factors we considered the first time.

24  MR. SUMAR:  Fair enough.

25  Just a couple other things:  You know, counsel for

1    Google briefly addressed the exhibits that are sort of treated

2    as confidential, but that perhaps Google and maybe the DoJ has

3    quoted from in open court or discussed the substance of, and I

4    just don't understand why there would be a basis to keep those

5    portions under seal.  And so I think the Court can sort of make

6    amendments to its September 28th order to reflect that.

7         THE COURT:  Well, look, I don't disagree with the

8    general proposition.  I don't have -- I'll confess, I don't

9    remember precisely what it is that you're referring to, but --

10        MR. SUMAR:  It's exhibit JX33 that counsel for Google

11   is quoting from -- this is, I think, the 2069, saying --

12   quoting from provisions, you know, verbatim.

13        THE COURT:  Right.  So, I mean, I think -- I don't

14   know that I'm going to get any pushback from this, but if a

15   party reads into the record a portion of an exhibit, it is then

16   that portion of the exhibit is a public record at that point.

17   I mean, I'm not sure why that would not be the case.  So I

18   wouldn't -- I don't disagree with that proposition.

19        MR. SUMAR:  And then, I mean, I think all the other

20   changes to the September 28th order that we haven't discussed,

21   I take it, are reasonable.  You know, the fact that there have

22   been exhibits that have been kept from the public just because

23   a third-party has objected --

24        THE COURT:  I don't think that's the case.  I mean,

25   let me --

```
1              MR. SUMAR:  That's what I --

2              THE COURT:  Let me back up.  If that's true, that

3       shouldn't be what's happening.  Okay.  The process, as you

4       know, is simply one in which either Google -- Google or a

5       third-party gets 24 -- or, gets an opportunity before the

6       document is introduced to identify what they would like to

7       be -- have it deemed confidential or not.  I rely on the

8       plaintiffs, because they do represent the public's interests

9       here, to either accede to the request or push back.

10             Once the document is presented, it is then in

11      evidence and the party that is requesting the redactions has at

12      least a few extra hours that evening to consider whether the

13      full exhibit is properly redacted or not.

14             Nobody has a veto over this.  And so if there is a

15      document that you're being told is not being released that's

16      been introduced into evidence because a third-party or somebody

17      else is refusing to do it, then I need to know that because

18      that's not what the order says and nobody has a veto over the

19      release or non-release of any document in full or in part.

20      That's my decision.

21             MR. SUMAR:  Well, and this is all spelled out in our

22      brief, but I think the problem that we're -- the main problem

23      we're seeking to fix here is that the order is discretionary,

24      that the parties can follow this process if they want to make

25      exhibits publicly available, but they don't have to.
```

1              And so, again --

2              THE COURT:  Okay.  Go ahead.

3              MR. SUMAR:  From *The Times* perspective, we don't know

4    which exhibits have been withheld on the basis of

5    confidentiality, whether it's a third-party or Google that's

6    making that claim, versus exhibits that just -- I mean, DoJ has

7    conveyed to a reporter that this is a resource issue for them,

8    that what they've been doing is making one to two exhibits a

9    day public on their website and not posting others -- based on

10   which they think are the most important for that day, and not

11   making others available because they just don't have the

12   resources.

13             So, again, we don't know which exhibits are being

14   withheld on the basis of confidentiality and which the DoJ just

15   didn't consider important enough that day.  Our reporters are

16   sending multiple emails to representatives of Google trying to

17   get exhibits and they're just not being responded to.  They're

18   not being told that I can't release this because of

19   confidentiality, they're just not being responded to.

20             So I think what we're looking for mainly in this

21   process, Your Honor, is some clarity, a better understanding of

22   what's being withheld, and why, so that we can make challenges

23   where appropriate.

24             THE COURT:  And we can talk about what to do here,

25   but nothing -- put it this way:  Any exhibit that has been

 1    admitted and that there is agreement on portions of exhibits --

 2    or, what portion of the exhibit can be released is eligible to

 3    be released.

 4            And again, I'm not -- I have not tasked, because it

 5    wasn't requested by anyone, that every single exhibit that is

 6    admitted be put up on a website.  That has never been requested

 7    and that's not what I've tasked the parties to do.  That

 8    happens in certain cases, but that hasn't been requested of me

 9    and I have not ordered it in this case.

10            Now, if that's a modification that is being sought,

11    then I need to talk with the parties about how to execute that,

12    because they also do need to prepare for trial the next day.

13    So I need to understand if that's what is genuinely being

14    requested or something else?

15            MR. SUMAR:  This is all spelled out in our brief,

16    Your Honor.  We're very specific about what we would like to

17    see changed in the order.  If Your Honor wants to see a

18    proposed order from us, we're happy to prepare that.  But I

19    think we're being very clear about how the order should be

20    modified to make the process better.

21            And I -- I want to be clear, this is to effectuate

22    what we think was the Court's intent, not to do something else;

23    to give effect to what the Court has said early in the case,

24    that once these exhibits are admitted, they're public records

25    and should be released, absent some, you know, confidentiality

1    or redactions for personal information.

2              THE COURT:  Okay.  All right.  Well, if you want to,

3    we can -- you can do this just as well as we can -- but if you

4    want to mark up something and red line it and file it and -- so

5    I can take a look at it and the parties can take a look at it,

6    we're happy to consider it.

7              MR. SUMAR:  We will do that, Your Honor.

8              THE COURT:  Okay.  Anything else, Counsel?

9              MR. SUMAR:  No.

10             THE COURT:  All right.  Thank you.  Appreciate it.

11             All right.  Anybody want to be heard about any of

12   that?

13             Look, I think the question up here is -- it's the

14   point I just made, which is that until today there has not been

15   a request by the Department of Justice or of plaintiff states,

16   or anyone, to post every single exhibit that is been posted --

17   that is admitted into evidence.  It's just not been a request

18   that's been made and so, therefore, it's not something I have

19   ordered.

20             If this is what's being requested for the first time,

21   I'm happy to consider it, but I do need to hear from the

22   parties about what that would take because, as anybody that's

23   been here knows, you know, there are, you know, upwards of

24   dozens -- dozens of exhibits that are admitted on any given

25   day, and going through the process that we've already put in

 1   place can be very resource intensive.  And so I want to be --

 2   you know, manage that in a way that doesn't impact the parties

 3   and their ability to actually do job one, which is present the

 4   trial and present their defenses and move the case forward in

 5   an expeditious manner.  So I think we'll just leave it at that.

 6          So, we'll welcome your markup, Counsel, and then we

 7   can talk about it and if there are any modifications that are

 8   warranted, we can do that.

 9          Okay.  Anything else we need to discuss before we

10   adjourn for the evening?

11          MR. DINTZER:  Your Honor, just briefly.

12          So, the DoJ plaintiffs plan to close their case

13   tomorrow.  Professor Whinston is our last witness.  We've

14   tendered him to the other side for cross-examination.

15          Google opens their case Wednesday morning by calling

16   Pandu Nayak.  We believe that tonight would be a very good time

17   for us -- to give us the revised witness list.  We've got

18   nothing left to hide here, so there's no reason they shouldn't

19   be able to tell who they're going to call and when so we can --

20   I mean, as the Court has recognized there's a lot to do.  If

21   they're going to pull people off, there's no reason why they

22   shouldn't know that now and they can let us know so we don't

23   prepare cross-examinations for witnesses who aren't going to be

24   called.

25          THE COURT:  Okay.  So last week we were together,

1    there was going to be another fact witness.  Is that no longer

2    the case?

3           MR. DINTZER:  She will be designated, Your Honor, by

4    agreement of the parties.

5           THE COURT:  Okay.

6           MR. SCHMIDTLEIN:  They just pulled a witness off

7    their witness list.

8           MR. DINTZER:  Right.  Yes, Your Honor.  And so, I

9    mean, that should make life easier for Google to give us this

10    list.  Presumably they have it for themselves because they know

11    who they're preparing.

12           As I said, they open their case on Wednesday.  And

13    so, in all fairness, if we get that list, that means that every

14    person that they don't call is nights and work that doesn't

15    have to be done that's a pure waste.

16           THE COURT:  It is true they are opening their case on

17    Wednesday, but that's because a witness is being taken out of

18    order.  So let's just make sure that's understood.

19           MR. DINTZER:  Yes, Your Honor.  Yes.

20           MR. SCHMIDTLEIN:  Your Honor, I believe you have an

21    order in place that says on every Wednesday evening we're

22    supposed to tell -- now, I think the States are still going to

23    have their case going next week, obviously.

24           MR. CAVANAUGH:  Yeah.  Next week, Your Honor, we have

25    one fact witness on Tuesday morning and then our two experts.

5972

```
1    We'll be done on Wednesday.
2              THE COURT:  Okay.
3              MR. SCHMIDTLEIN:  And, you know, consistent with
4    that, I know we still got some other witness issues that are
5    floating around right now, which you know about.
6              But, Wednesday evening we're going to disclose --
7    once we kind of confirm how much time is left for us next week,
8    we will disclose who we're going to call next week.
9              MR. DINTZER:  Your Honor, we're asking for more than
10   that.  On September -- the last we heard from the defense was
11   September --
12             THE COURT:  Here's what I'm going to ask you both to
13   do:  On Wednesday I'll ask you to disclose who you're going to
14   call or who you think you're calling next week and the week
15   after.  Okay?  So that will give you at least seven days' worth
16   of an idea of who Google is intending to call at this point.
17   Then I can ask them to sort of supplement that as time moves
18   forward.
19             MR. DINTZER:  We appreciate that, Your Honor.  And
20   respectfully, we haven't heard from them since September 5th.
21   If they know there are people they're not calling, it --
22             THE COURT:  Well, I guess, let me just ask
23   Mr. Schmidtlein:  Are there folks on your original witness list
24   that you now know you are not going to be calling?
25             MR. SCHMIDTLEIN:  There are still some that are being
```

1    debated with my client.

2            MR. DINTZER:  And that's not an answer to the

3    question, Your Honor.

4            MR. SCHMIDTLEIN:  No.  I have not made a final

5    decision as to culling witnesses.

6            THE COURT:  As to anyone?

7            MR. SCHMIDTLEIN:  We have not.  We've told them a

8    couple of experts who we provisionally said we do not expect to

9    call, and that remains to be the case, in light of

10   developments.  But we have not made a final decision to not

11   call people on our list.

12           THE COURT:  How many were on that list?

13           MR. DINTZER:  I want to say there were 14.

14           MR. CAVANAUGH:  Fourteen.  I remember 14.

15           MR. DINTZER:  There are 14 fact witnesses.  I believe

16   they're all Google employees.  And so if they genuinely intend

17   to call 14 of their employees, a lot of whom are overlapping --

18   I mean, these are decisions -- as I said, all we had was an

19   expert this week.

20           In fairness, there was one other witness, but I don't

21   think that that really -- a fact witness that was designated.

22   I don't think that controls the -- the general push for them.

23   If they don't know whether they're going to call 14 fact

24   witnesses or some subset thereof and they've made no decisions

25   about that, then they really should and they should provide us

```
 1      with a list.
 2              So if they're going to cut six people, that's six of
 3      my attorneys who don't have to work at night and over the
 4      weekend writing exams for witnesses that they're -- you know,
 5      want to keep in the air.
 6              We did it for them and we made a list -- and,
 7      granted, it did change and I --
 8              THE COURT:  Mr. Dintzer, I am sensitive to this.  You
 9      know, I understand folks are working and I would rather them,
10      you know, go see the Taylor Swift movie instead.
11              MR. DINTZER:  I don't want to punish them,
12      Your Honor.
13              THE COURT:  It would be a good three hours well
14      spent.
15              But, look, I'm going to ask Mr. Schmidtlein, by
16      Wednesday, to give you at least a week and a half worth of
17      their witnesses.  And that's going to give you a head start
18      into what their insight is.
19              And I'll ask you, Mr. Schmidtlein, to at least
20      start -- let's refine this down to what the brass tacks is
21      going to be, so we'll be in a position, certainly no later than
22      early next week, to know exactly who Google is going to call
23      and how long it is going to take because that, frankly, is an
24      important factor for me to know how long the rest of this trial
25      is going to be.
```

1          MR. DINTZER:  We appreciate that.

2          And, also, so we know the schedule of the rebuttal

3    portion, because if it shrinks, it shrinks.

4          THE COURT:  There is that.  Okay.  One open-ended

5    issue -- anything else?

6          MR. DINTZER:  No.  Thank you, Your Honor.

7          THE COURT:  I do need Google's final position on the

8    declaration and the two exhibits that *The New York Times* has

9    requested to be unsealed.

10         So I don't need it now.  Take a look at it tomorrow.

11   And what I would ask you to do is if there are portions --

12   essentially do what has been done with the transcripts.  If

13   there are portions you would like to have redacted, submit

14   those to me.  I can hear you out on why you think it ought to

15   be redacted.

16         If, for example, there are existing redactions, as

17   there are on UPX137 and 552 that you would like to maintain,

18   just -- you know, I think with a PDF you can stick a note or

19   flag it in some way that notifies me that this is something

20   that you want to have continued sealing of or redaction of.

21   Okay?

22         Terrific.

23         All right.  Anything else?

24         MR. DINTZER:  Not from the DoJ plaintiffs,

25   Your Honor.

1          MR. CAVANAUGH:  No, Your Honor.

2          THE COURT:  All right.  Thank you all.  We'll see you

3     in the morning.

4          And thanks for staying late everybody.

5                              *   *   *

6

7

8              CERTIFICATE OF OFFICIAL COURT REPORTER

9

10      I, JANICE DICKMAN, do hereby certify that the above and

11    foregoing constitutes a true and accurate transcript of my

12    stenographic notes and is a full, true and complete transcript

13    of the proceedings to the best of my ability.

14                    Dated this 17th day of October, 2023

15

16

17              _____

18                    Janice E. Dickman, CRR, CMR, CCR
                       Official Court Reporter
19                    Room 6523
                       333 Constitution Avenue, N.W.
20                    Washington, D.C.  20001

21

22

23

24

25

1                              INDEX

2

3       WITNESS:

4           Michael Whinston

5               Direct Examination (Cont.) By Mr. Severt.........5827
                Cross-Examination By Mr. Schmitlein..............5863
6

7       EXHIBIT

8           Exhibit UPXD104 Admitted...............................5863

9                              *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5978

## 0

**004** [1] - 5883:4
**01** [2] - 5924:22, 5924:24

## 1

**1** [5] - 5832:11, 5833:2, 5839:3, 5932:22, 5947:11
**1,000,000** [1] - 5832:17
**10** [3] - 5832:14, 5921:1, 5947:11
**100** [2] - 5832:22, 5952:13
**100-page** [3] - 5956:24, 5957:21, 5958:12
**100-slide** [1] - 5947:8
**10019** [1] - 5825:13
**10036** [1] - 5824:23
**104** [1] - 5863:17
**10th** [2] - 5946:13, 5946:18
**1100** [1] - 5824:12
**1133** [1] - 5824:22
**11th** [2] - 5946:2, 5946:18
**120** [1] - 5875:13
**1300** [1] - 5825:4
**1301** [1] - 5825:12
**137** [3] - 5941:18, 5948:1, 5960:4
**14** [5] - 5973:13, 5973:14, 5973:15, 5973:17, 5973:23
**16** [2] - 5824:5, 5830:21
**17th** [1] - 5976:14
**18** [1] - 5956:11
**1990s** [1] - 5922:4
**1998** [4] - 5932:6, 5932:25, 5933:1, 5933:10
**1:30** [1] - 5824:6

## 2

**2** [2] - 5859:9, 5932:23
**2.5** [3] - 5920:14, 5920:17, 5925:8
**20** [2] - 5876:22, 5877:2
**20,000** [1] - 5843:7
**20-3010** [1] - 5824:4
**200** [1] - 5849:20
**2000** [2] - 5931:10, 5935:12

**20001** [2] - 5825:18, 5976:20
**20005** [1] - 5825:9
**2005** [9] - 5897:22, 5897:24, 5898:1, 5898:14, 5931:17, 5934:5, 5934:15, 5934:18, 5935:3
**2006** [2] - 5934:5, 5934:18
**2007** [1] - 5941:10
**2008** [1] - 5928:7
**2009** [1] - 5842:13
**2010** [4] - 5842:13, 5843:1, 5898:16, 5931:8
**2012** [2] - 5842:19, 5843:15
**2013** [3] - 5830:23, 5836:18, 5861:12
**2014** [4] - 5860:17, 5897:4, 5935:7, 5935:11
**2015** [4] - 5834:22, 5836:18, 5921:13, 5921:15
**2016** [3] - 5827:12, 5827:23, 5851:2
**2018** [2] - 5844:6, 5850:17
**202** [3] - 5824:13, 5824:17, 5825:10
**202-307-6158** [1] - 5824:20
**202-354-3267** [1] - 5825:18
**2020** [1] - 5860:21
**2021** [1] - 5855:7
**2023** [2] - 5824:5, 5976:14
**20530** [1] - 5824:19
**2069** [1] - 5965:11
**209** [1] - 5824:15
**212** [2] - 5824:24, 5825:14
**22** [1] - 5824:3
**2200** [1] - 5824:23
**24** [1] - 5966:5
**25** [1] - 5879:15
**26th** [1] - 5948:24
**28th** [3] - 5943:14, 5965:6, 5965:20
**2:59** [1] - 5879:24

## 3

**3,000** [1] - 5857:24
**30** [2] - 5875:5, 5875:16
**30-minute** [1] -

5875:10
**307-0340** [1] - 5824:13
**311** [2] - 5858:3, 5858:8
**333** [2] - 5825:17, 5976:19
**335-2793** [1] - 5824:24
**3:00** [1] - 5879:22
**3:15** [1] - 5879:23
**3:17** [1] - 5879:24

## 4

**4** [3] - 5832:11, 5833:2, 5960:23
**40th** [1] - 5825:13
**434-5000** [1] - 5825:10
**450** [1] - 5824:19
**47** [1] - 5913:13
**48** [1] - 5948:6
**48-hour** [2] - 5947:10, 5948:19
**49** [2] - 5832:14, 5912:13
**497-7728** [1] - 5825:14
**4:59** [1] - 5940:1

## 5

**5** [6] - 5826:21, 5832:14, 5932:23, 5939:24, 5960:24
**5.5** [1] - 5920:22
**5.8** [1] - 5920:21
**50** [1] - 5879:11
**508-6000** [1] - 5825:6
**52** [1] - 5917:17
**54** [1] - 5827:9
**55** [1] - 5828:8
**552** [5] - 5941:4, 5941:18, 5951:15, 5959:23, 5975:17
**56** [1] - 5830:1
**57** [1] - 5830:19
**58** [2] - 5831:17, 5879:14
**59** [1] - 5834:20
**5:07** [1] - 5940:1
**5th** [1] - 5972:20

## 6

**6** [6] - 5864:17, 5877:1, 5877:4, 5877:16, 5877:17, 5935:3
**60** [2] - 5836:24, 5875:13
**600** [1] - 5824:16
**60604** [1] - 5824:16

**61** [1] - 5838:15
**62** [1] - 5839:14
**63** [1] - 5839:22
**65** [1] - 5842:6
**6523** [2] - 5825:17, 5976:19
**66** [1] - 5842:25
**67** [1] - 5843:14
**68** [2] - 5844:5, 5956:9
**680** [1] - 5825:9
**69** [2] - 5844:9, 5845:20

## 7

**7** [3] - 5866:18, 5866:19, 5872:4
**70** [2] - 5845:5, 5902:20
**71** [1] - 5845:14
**7100** [1] - 5824:19
**72** [1] - 5849:11
**720** [1] - 5825:6
**725** [2] - 5943:15, 5943:16
**73** [1] - 5850:17
**731** [1] - 5943:15
**74** [1] - 5851:7
**75** [1] - 5852:8
**76** [1] - 5852:17
**77** [9] - 5854:23, 5868:8, 5871:15, 5875:8, 5875:19, 5875:21, 5876:13, 5877:12, 5878:3
**78** [1] - 5855:20
**79** [1] - 5857:17

## 8

**8** [1] - 5880:22
**80** [3] - 5860:6, 5877:9, 5877:21
**80203** [1] - 5825:5
**805-8563** [1] - 5824:17
**81** [1] - 5861:10
**83** [1] - 5903:9

## 9

**9** [1] - 5832:14
**90** [1] - 5947:21
**98** [1] - 5952:14
**99** [1] - 5952:15
**9:30** [1] - 5939:13

## A

**ability** [12] - 5828:17, 5834:19, 5850:13,

5861:20, 5866:15,
5888:17, 5888:23,
5893:13, 5893:15,
5894:14, 5970:3,
5976:13
**able** [16] - 5856:13,
5893:10, 5894:1,
5894:2, 5894:4,
5894:5, 5901:8,
5901:10, 5903:21,
5904:7, 5904:15,
5925:1, 5929:13,
5932:20, 5934:8,
5970:19
**absent** [3] - 5837:11,
5962:8, 5968:25
**absolute** [1] - 5857:10
**absolutely** [2] -
5899:21, 5900:2
**accede** [2] - 5949:1,
5966:9
**access** [15] - 5837:10,
5876:2, 5940:8,
5940:9, 5940:11,
5944:16, 5944:22,
5946:25, 5952:9,
5955:13, 5956:10,
5959:16, 5960:11,
5960:18
**accessed** [1] - 5944:4
**accomplish** [1] -
5891:20
**according** [1] -
5875:21
**account** [2] - 5878:8,
5923:12
**accurate** [1] - 5976:11
**accurately** [1] - 5952:2
**achieve** [3] - 5839:18,
5924:19, 5944:17
**acronym** [1] - 5866:9
**act** [2] - 5843:5,
5929:8
**action** [1] - 5924:1
**Ad** [1] - 5830:22
**ad** [47] - 5828:14,
5828:17, 5828:25,
5829:1, 5829:5,
5829:9, 5830:13,
5830:15, 5830:17,
5830:24, 5831:3,
5831:10, 5831:16,
5831:22, 5832:19,
5832:20, 5833:14,
5833:15, 5833:17,
5833:24, 5834:5,
5834:7, 5859:4,
5859:8, 5860:8,
5861:14, 5863:8,
5864:12, 5876:23,

5877:1, 5877:2,
5877:17, 5889:9,
5892:14, 5893:11,
5895:13, 5899:10,
5899:20, 5901:11,
5907:13, 5908:5,
5910:25, 5911:8,
5911:11
**Adam** [2] - 5824:18,
5884:16
**Adam.severt@usdoj.**
**gov** [1] - 5824:20
**add** [1] - 5907:4
**added** [1] - 5844:15
**adding** [1] - 5921:2
**additional** [1] -
5863:14
**additionally** [1] -
5918:6
**address** [5] - 5826:10,
5826:16, 5878:21,
5945:24, 5946:21
**addressed** [2] -
5945:23, 5965:1
**addressing** [1] -
5945:21
**adds** [1] - 5840:22
**adhere** [2] - 5942:21,
5957:18
**adjourn** [1] - 5970:10
**admit** [4] - 5863:15,
5953:16, 5956:24,
5957:1
**admitted** [10] -
5863:17, 5956:21,
5956:23, 5957:7,
5957:25, 5968:1,
5968:6, 5968:24,
5969:17, 5969:24
**Admitted...................**
**...........5863** [1] - 5977:8
**adopt** [1] - 5963:16
**adopted** [2] - 5938:18,
5942:2
**adopting** [2] -
5938:17, 5938:19
**ads** [71] - 5828:17,
5829:3, 5829:13,
5831:8, 5831:10,
5855:8, 5856:14,
5859:13, 5859:21,
5876:23, 5877:1,
5877:10, 5878:1,
5887:10, 5889:21,
5890:6, 5890:11,
5892:11, 5893:9,
5893:15, 5894:8,
5894:19, 5895:4,
5895:9, 5900:5,
5900:7, 5900:8,

5900:9, 5900:12,
5901:20, 5902:13,
5902:14, 5904:20,
5905:5, 5906:3,
5906:7, 5906:8,
5906:11, 5906:15,
5907:1, 5907:7,
5907:17, 5907:23,
5907:24, 5908:10,
5908:18, 5908:22,
5908:24, 5909:2,
5909:7, 5909:13,
5909:18, 5909:19,
5909:23, 5910:5,
5910:10, 5911:7,
5914:6, 5937:6
**advance** [4] - 5946:3,
5946:18, 5950:15,
5950:18
**advances** [3] -
5918:10, 5918:16,
5919:2
**advantage** [4] -
5894:12, 5931:2,
5933:11, 5933:16
**advantages** [5] -
5893:17, 5922:9,
5930:21, 5932:5,
5932:11
**advent** [1] - 5919:5
**advertise** [2] -
5897:12, 5900:25
**advertisement** [1] -
5901:25
**advertisements** [1] -
5904:16
**advertiser** [19] -
5828:2, 5828:5,
5828:6, 5828:9,
5828:22, 5828:23,
5829:8, 5829:20,
5829:25, 5831:24,
5841:12, 5861:25,
5862:3, 5896:19,
5896:22, 5897:10,
5899:5, 5900:11,
5904:22
**advertiser's** [1] -
5899:23
**advertisers** [28] -
5829:11, 5830:6,
5830:8, 5830:11,
5830:12, 5835:21,
5841:11, 5841:13,
5853:1, 5859:18,
5860:5, 5860:10,
5861:8, 5863:3,
5863:6, 5863:13,
5894:1, 5894:4,
5894:18, 5896:21,

5902:14, 5903:15,
5904:16, 5904:19,
5906:2, 5908:14,
5910:23, 5911:8
**advertising** [16] -
5859:17, 5871:1,
5896:16, 5896:18,
5896:23, 5900:19,
5901:8, 5901:11,
5902:3, 5905:1,
5907:24, 5908:23,
5910:17, 5911:7,
5918:7, 5925:5
**advised** [1] - 5953:2
**advocate** [2] - 5944:6,
5955:13
**advocated** [1] - 5940:9
**affect** [3] - 5828:4,
5851:6, 5890:5
**affected** [6] - 5834:19,
5837:5, 5839:20,
5848:17, 5849:10,
5904:1
**affecting** [2] -
5859:14, 5926:11
**affects** [5] - 5837:17,
5921:10, 5926:9,
5926:10, 5926:11
**afternoon** [3] -
5826:17, 5863:25,
5864:1
**ago** [17] - 5837:25,
5839:6, 5860:14,
5874:25, 5875:1,
5880:21, 5882:17,
5882:20, 5886:22,
5892:13, 5894:11,
5900:5, 5916:2,
5919:7, 5930:20,
5931:10, 5936:5
**agree** [33] - 5864:5,
5865:1, 5865:17,
5869:13, 5870:21,
5871:22, 5878:1,
5883:4, 5884:5,
5884:23, 5885:3,
5886:1, 5890:7,
5891:2, 5892:20,
5893:20, 5899:23,
5901:6, 5903:21,
5905:11, 5909:1,
5909:22, 5919:5,
5933:10, 5940:24,
5941:1, 5942:12,
5944:15, 5945:15,
5954:5, 5957:8,
5958:9, 5962:4
**agreed** [1] - 5851:8
**agreement** [7] -
5851:3, 5915:2,

5934:13, 5937:14, 5941:9, 5968:1, 5971:4
**agreements** [5] - 5914:10, 5914:16, 5930:1, 5934:13, 5936:24
**ahead** [13] - 5845:3, 5853:5, 5854:9, 5877:17, 5880:1, 5882:19, 5890:2, 5894:25, 5895:2, 5914:22, 5944:22, 5967:2
**air** [1] - 5974:5
**al** [1] - 5824:3
**AI** [1] - 5951:10
**AL** [1] - 5951:10
**Al-Amyn** [1] - 5951:10
**algorithm** [1] - 5932:21
**algorithms** [9] - 5835:7, 5835:15, 5835:20, 5836:13, 5836:20, 5923:14, 5923:17, 5923:19, 5923:24
**aligned** [1] - 5945:15
**allocated** [1] - 5900:12
**allocation** [1] - 5949:20
**allow** [1] - 5904:8
**allowed** [1] - 5851:11
**allows** [1] - 5869:15
**allude** [1] - 5829:10
**alluded** [1] - 5831:2
**almost** [1] - 5868:22
**alphabet** [1] - 5858:18
**alternative** [3] - 5851:10, 5897:12, 5960:15
**alternatives** [2] - 5897:11, 5899:6
**Amazon** [30] - 5871:22, 5872:1, 5873:15, 5874:2, 5874:8, 5877:24, 5878:18, 5879:4, 5879:8, 5879:11, 5879:15, 5880:12, 5883:9, 5883:18, 5884:6, 5887:3, 5887:6, 5897:2, 5897:12, 5899:3, 5899:7, 5899:24, 5909:3, 5909:8, 5909:13, 5909:23, 5915:8, 5915:9, 5915:10, 5915:18
**Amazon.com** [3] - 5874:3, 5874:10,

**5878:12**
**Amendment** [2] - 5955:18
**amendments** [2] - 5956:4, 5965:6
**America** [3] - 5824:2, 5880:16, 5885:13
**Americas** [2] - 5824:22, 5825:12
**Amit** [1] - 5843:1
**AMIT** [1] - 5824:9
**amortizing** [1] - 5829:3
**amount** [6] - 5840:6, 5847:8, 5877:19, 5891:7, 5891:9, 5953:17
**Amyn** [1] - 5951:10
**AMYN** [1] - 5951:11
**analyses** [1] - 5891:19
**analysis** [54] - 5829:23, 5831:3, 5831:8, 5831:15, 5838:10, 5839:9, 5839:13, 5847:22, 5862:20, 5864:9, 5867:17, 5868:12, 5870:16, 5873:20, 5874:16, 5874:24, 5875:5, 5875:6, 5876:1, 5876:11, 5877:8, 5878:8, 5878:11, 5878:16, 5889:1, 5895:3, 5895:8, 5895:22, 5897:5, 5900:16, 5900:22, 5908:8, 5908:17, 5908:21, 5910:4, 5910:9, 5910:16, 5910:20, 5910:23, 5910:25, 5911:6, 5913:15, 5913:20, 5913:22, 5918:9, 5918:12, 5918:24, 5922:22, 5923:8, 5924:6, 5924:17, 5938:16, 5938:25, 5939:2
**analyze** [5] - 5870:3, 5888:6, 5900:23, 5909:7, 5913:6
**analyzed** [3] - 5884:8, 5886:13, 5886:18
**analyzes** [1] - 5887:1
**analyzing** [2] - 5922:14, 5923:4
**and..** [1] - 5917:21
**Android** [5] - 5854:4, 5872:18, 5915:21, 5915:23

**announce** [1] - 5847:21
**announced** [1] - 5847:18
**announcement** [1] - 5963:17
**annual** [3] - 5917:7, 5917:23, 5918:6
**anonymized** [1] - 5858:14
**answer** [19] - 5826:9, 5840:4, 5840:18, 5840:19, 5855:13, 5872:20, 5884:24, 5895:1, 5897:7, 5899:22, 5908:3, 5910:7, 5913:12, 5920:10, 5921:21, 5925:6, 5926:7, 5940:22, 5973:2
**answered** [1] - 5890:2
**answers** [1] - 5881:15
**anti** [1] - 5925:19
**anti-competitive** [1] - 5925:19
**anticipated** [1] - 5939:18
**antitrust** [2] - 5912:7, 5912:22
**Antitrust** [1] - 5825:3
**anyway** [3] - 5862:9, 5954:4, 5954:18
**AOL** [1] - 5933:6
**apologize** [4] - 5849:24, 5850:3, 5850:5, 5930:7
**app** [1] - 5868:21
**APPEARANCES** [1] - 5824:11
**appearing** [2] - 5906:7, 5943:17
**Apple** [22] - 5827:24, 5840:2, 5849:7, 5849:14, 5849:21, 5850:10, 5850:13, 5851:3, 5853:25, 5854:2, 5854:3, 5854:6, 5894:16, 5894:22, 5901:18, 5918:2, 5941:9, 5948:5, 5948:9, 5955:14, 5962:23
**Apple's** [6] - 5827:25, 5849:12, 5850:13, 5850:25, 5904:2, 5918:4
**Apple/Safari** [1] - 5834:24
**apples** [2] - 5906:22
**application** [1] -

**5890:24**
**applications** [3] - 5867:22, 5873:12, 5876:3
**applied** [2] - 5962:20, 5962:21
**apply** [2] - 5940:12, 5955:10
**applying** [1] - 5963:1
**appreciate** [9] - 5940:12, 5943:16, 5944:5, 5951:19, 5952:8, 5956:6, 5969:10, 5972:19, 5975:1
**approach** [1] - 5880:3
**approached** [1] - 5852:20
**appropriate** [4] - 5940:17, 5940:18, 5947:20, 5967:23
**apps** [3] - 5851:20, 5851:23, 5867:25
**April** [2] - 5842:13, 5847:16
**argue** [2] - 5843:19, 5963:8
**argument** [5] - 5916:18, 5925:15, 5943:7, 5946:6, 5963:13
**arrangement** [2] - 5915:9, 5915:10
**arrow** [1] - 5881:24
**article** [8] - 5830:20, 5830:21, 5846:8, 5846:9, 5846:15, 5932:25, 5933:4
**articulated** [1] - 5951:22
**artificial** [2] - 5918:25, 5919:1
**aspects** [4] - 5828:7, 5891:16, 5922:12, 5923:24
**assess** [13] - 5870:17, 5878:16, 5882:14, 5889:1, 5895:22, 5902:17, 5911:1, 5911:6, 5913:6, 5913:16, 5923:15, 5924:9, 5938:16
**assessed** [2] - 5921:11, 5921:12
**assessment** [4] - 5882:7, 5882:14, 5886:19, 5924:1
**assignment** [1] - 5926:15
**assistant** [1] - 5845:7

5981

**assume** [1] - 5877:8
**AT&T** [2] - 5852:19
**attempt** [1] - 5944:17
**attention** [1] - 5963:22
**attentive** [1] - 5954:23
**attorneys** [1] - 5974:3
**attract** [1] - 5871:1
**attributable** [2] - 5856:5, 5922:25
**attributed** [1] - 5878:13
**auction** [4] - 5831:24, 5861:16, 5861:21, 5861:22
**audience** [3] - 5895:13, 5899:7, 5899:24
**audiences** [3] - 5895:14, 5899:20
**August** [5] - 5946:2, 5946:13, 5946:18, 5947:3
**authored** [1] - 5851:15
**authority** [2] - 5960:7, 5962:6
**availability** [1] - 5826:20
**available** [11] - 5901:2, 5901:24, 5926:9, 5947:15, 5952:7, 5952:20, 5953:7, 5963:18, 5966:25, 5967:11
**Avenue** [5] - 5824:22, 5825:9, 5825:12, 5825:17, 5976:19
**average** [3] - 5835:12, 5836:8, 5891:8
**avoid** [2] - 5852:13, 5961:6
**Avoids** [1] - 5867:10
**aware** [20] - 5873:15, 5886:25, 5887:5, 5887:8, 5888:6, 5894:18, 5901:21, 5902:20, 5902:24, 5903:3, 5903:8, 5904:3, 5904:5, 5914:21, 5915:1, 5917:10, 5917:13, 5927:18, 5961:14
**awareness** [2] - 5893:18, 5894:12
**axes** [1] - 5856:16
**axis** [2] - 5835:10, 5835:12

**B**

**bad** [2] - 5834:13,

5864:22
**badly** [1] - 5920:8
**balancing** [1] - 5962:2
**Bank** [2] - 5880:16, 5885:13
**bar** [2] - 5874:2, 5885:20
**barrier** [2] - 5922:7, 5929:8
**barriers** [3] - 5849:16, 5915:25, 5918:16, 5919:2, 5930:12
**bars** [6] - 5830:3, 5830:5, 5858:7, 5872:5, 5872:16, 5872:22
**base** [3] - 5927:2, 5927:14, 5927:19
**based** [15] - 5862:19, 5865:1, 5876:13, 5901:6, 5903:14, 5903:22, 5903:23, 5905:18, 5927:19, 5927:23, 5927:25, 5928:4, 5944:3, 5949:15, 5967:9
**basic** [3] - 5835:3, 5838:9, 5838:11
**basing** [1] - 5914:2
**basis** [9] - 5896:7, 5917:7, 5930:21, 5959:25, 5963:10, 5964:5, 5965:4, 5967:4, 5967:14
**became** [2] - 5837:16, 5921:13
**become** [4] - 5837:24, 5838:7, 5893:9, 5912:12
**becomes** [2] - 5951:23, 5952:24
**BEFORE** [1] - 5824:9
**began** [1] - 5879:14
**begin** [2] - 5863:21, 5888:1
**beginning** [4] - 5888:19, 5900:20, 5909:10, 5922:4
**behalf** [5] - 5826:8, 5940:7, 5942:8, 5945:11, 5963:23
**behavior** [2] - 5897:18, 5903:23
**behind** [1] - 5929:5
**belief** [2] - 5840:6, 5957:18
**Belknap** [1] - 5824:22
**below** [3] - 5835:2, 5835:19, 5858:21
**Ben** [1] - 5845:6

**BENCH** [1] - 5824:9
**beneficial** [1] - 5932:2
**benefit** [10] - 5837:18, 5838:9, 5838:14, 5838:18, 5838:21, 5839:11, 5839:13, 5848:1, 5855:4, 5862:20
**benefit-cost** [4] - 5838:14, 5838:18, 5839:11, 5839:13
**benefits** [10] - 5835:5, 5837:23, 5838:7, 5838:12, 5848:24, 5849:1, 5853:8, 5860:4, 5862:24, 5863:1
**best** [5] - 5831:23, 5831:25, 5897:12, 5976:13
**Bets** [1] - 5858:19
**better** [19] - 5831:12, 5831:13, 5833:17, 5833:19, 5833:24, 5834:6, 5834:15, 5836:14, 5843:9, 5852:11, 5856:1, 5858:24, 5924:25, 5929:24, 5932:14, 5935:22, 5951:17, 5967:21, 5968:20
**between** [14] - 5828:14, 5833:1, 5836:17, 5836:18, 5881:8, 5897:25, 5898:17, 5899:24, 5899:25, 5909:2, 5909:7, 5909:12, 5913:17, 5937:5
**beyond** [2] - 5845:18, 5850:12
**bidding** [2] - 5835:22, 5862:3
**Big** [6] - 5844:11, 5844:12, 5845:15, 5845:17, 5862:16, 5873:8
**big** [9] - 5845:25, 5857:16, 5893:25, 5908:1, 5916:6, 5931:23, 5933:16, 5949:22
**bigger** [3] - 5859:24, 5860:1, 5933:5
**billion** [1] - 5849:20
**billions** [7] - 5840:14, 5840:15, 5901:10, 5901:12, 5921:14, 5921:14
**bin** [1] - 5834:9
**binder** [14] - 5866:21,

5867:4, 5880:7, 5880:8, 5880:10, 5883:3, 5883:12, 5885:13, 5889:13, 5902:11, 5912:14, 5917:17, 5917:21, 5932:24
**Bing** [54] - 5833:4, 5833:10, 5833:13, 5833:19, 5833:23, 5834:9, 5834:10, 5842:1, 5842:4, 5842:7, 5842:14, 5842:21, 5842:22, 5842:24, 5843:5, 5843:7, 5843:12, 5862:15, 5895:23, 5896:6, 5896:12, 5897:2, 5897:3, 5897:8, 5897:9, 5897:13, 5897:20, 5897:25, 5898:1, 5898:2, 5898:17, 5899:1, 5899:8, 5900:1, 5906:16, 5912:25, 5913:5, 5913:7, 5913:10, 5913:18, 5914:14, 5914:19, 5914:21, 5915:10, 5915:12, 5915:16, 5915:18, 5916:14, 5920:18, 5920:23, 5921:11, 5930:10, 5931:7
**Bing's** [2] - 5842:11, 5921:1
**bins** [2] - 5832:9, 5832:18
**bit** [11] - 5832:1, 5879:22, 5892:11, 5900:6, 5908:19, 5910:24, 5911:4, 5942:16, 5950:8, 5957:10, 5958:18
**black** [1] - 5961:5
**blacked** [1] - 5960:15
**blank** [1] - 5858:12
**blocked** [1] - 5862:10
**blue** [4] - 5830:3, 5833:3, 5833:4, 5842:14
**boils** [1] - 5839:17
**bold** [6] - 5830:25, 5843:20, 5845:9, 5845:17, 5852:22, 5860:20
**book** [1] - 5932:17
**Booking.com** [1] - 5878:12
**bookmarks** [1] -

5914:12
**Boost** [3] - 5931:18, 5931:21, 5934:6
**boost** [1] - 5827:19
**bothered** [1] - 5867:14
**bottom** [3] - 5852:22, 5858:13, 5860:20
**bound** [4] - 5946:17
**box** [4] - 5836:5, 5836:6, 5872:23, 5873:5
**boy** [1] - 5933:14
**Braddi** [1] - 5850:18
**Branch** [10] - 5851:12, 5851:13, 5851:16, 5851:17, 5851:18, 5851:19, 5852:4, 5852:7, 5852:15, 5852:19
**brand** [5] - 5893:18, 5894:12, 5898:3, 5921:23, 5922:1
**brands** [2] - 5902:21, 5902:23
**brass** [1] - 5974:20
**Brave** [1] - 5928:4
**breadth** [3] - 5869:2, 5869:6, 5869:14
**break** [2] - 5866:9, 5880:6
**brief** [4] - 5943:17, 5946:5, 5966:22, 5968:15
**briefing** [2] - 5942:8, 5944:1
**briefly** [3] - 5944:15, 5965:1, 5970:11
**briefs** [1] - 5946:7
**brilliantly** [1] - 5931:25
**Brin** [2] - 5932:10, 5934:12
**bring** [24] - 5828:7, 5830:1, 5830:19, 5831:17, 5834:20, 5838:15, 5839:14, 5839:22, 5841:25, 5842:6, 5843:14, 5844:9, 5846:14, 5849:11, 5850:17, 5851:7, 5852:8, 5852:17, 5854:23, 5855:20, 5857:17, 5860:6, 5861:10
**brings** [2] - 5837:6, 5889:9
**broader** [3] - 5870:9, 5905:5, 5906:10
**broadly** [2] - 5862:18, 5906:8

**Broadway** [1] - 5825:4
**brought** [2] - 5881:25, 5942:23
**browser** [17] - 5872:17, 5872:23, 5873:5, 5925:20, 5925:25, 5926:4, 5927:2, 5927:4, 5927:8, 5927:11, 5927:15, 5927:25, 5928:4, 5928:7, 5928:12, 5930:12, 5935:22
**browsers** [5] - 5872:5, 5872:12, 5926:23, 5927:18, 5928:6
**Bruce** [1] - 5825:1
**budget** [1] - 5904:23
**budgets** [1] - 5900:11
**build** [5] - 5918:11, 5922:1, 5924:2, 5924:10, 5925:4
**built** [1] - 5927:3
**bullet** [7] - 5828:21, 5835:2, 5835:19, 5860:16, 5869:1, 5870:12, 5872:4
**bullets** [1] - 5867:9
**burden** [2] - 5949:20, 5957:5
**burdens** [1] - 5964:3
**burdensome** [1] - 5955:15
**business** [10] - 5827:5, 5841:10, 5845:18, 5853:23, 5855:17, 5862:21, 5863:7, 5863:12, 5925:5, 5958:24
**but..** [3] - 5831:18, 5868:17, 5927:20
**buy** [4] - 5889:7, 5889:10, 5903:2, 5903:18
**BY** [22] - 5827:3, 5829:18, 5850:11, 5854:10, 5858:22, 5863:24, 5866:20, 5867:2, 5871:21, 5874:14, 5875:18, 5876:10, 5880:5, 5880:23, 5884:22, 5886:11, 5902:10, 5907:20, 5912:17, 5914:7, 5917:3, 5925:17

**C**

**calculate** [1] - 5890:6

**calculated** [2] - 5832:19, 5921:3
**calculus** [2] - 5848:21, 5863:7
**callout** [2] - 5838:23, 5844:14
**camel's** [1] - 5850:25
**campaign** [1] - 5893:11
**campaigns** [1] - 5829:1
**cannot** [3] - 5949:3, 5952:6, 5955:8
**capital** [3] - 5849:3, 5917:5, 5917:13
**capture** [1] - 5920:12
**care** [4] - 5854:25, 5855:2, 5856:24, 5945:3
**careful** [2] - 5856:3, 5887:20
**carefully** [2] - 5884:12, 5890:15
**Carr** [1] - 5825:3
**carriers** [3] - 5852:14, 5852:17, 5853:11
**cars** [1] - 5858:20
**case** [81] - 5841:12, 5841:14, 5851:25, 5854:16, 5863:13, 5864:10, 5865:7, 5865:11, 5868:4, 5868:16, 5869:6, 5870:3, 5870:17, 5873:20, 5876:21, 5877:19, 5878:16, 5879:13, 5886:25, 5888:15, 5888:21, 5889:1, 5889:17, 5892:18, 5894:15, 5895:8, 5895:22, 5897:5, 5900:16, 5900:22, 5902:16, 5904:6, 5908:17, 5908:21, 5909:11, 5910:4, 5910:9, 5910:16, 5912:7, 5913:15, 5916:18, 5918:9, 5919:1, 5919:22, 5920:1, 5920:11, 5921:11, 5922:23, 5923:3, 5924:18, 5925:3, 5925:7, 5925:19, 5925:23, 5926:2, 5929:24, 5935:6, 5937:4, 5937:19, 5938:12, 5938:25, 5942:11, 5948:9, 5952:6, 5952:13,

5961:4, 5961:8, 5961:14, 5962:1, 5965:17, 5965:24, 5968:9, 5968:23, 5970:4, 5970:12, 5970:15, 5971:2, 5971:12, 5971:16, 5971:23, 5973:9
**cases** [5] - 5841:25, 5847:13, 5891:21, 5892:4, 5968:8
**catch** [2] - 5842:22, 5931:7
**categories** [8] - 5865:23, 5869:14, 5870:6, 5871:4, 5887:14, 5905:5, 5905:14, 5941:21
**category** [8] - 5858:1, 5869:8, 5870:5, 5878:5, 5911:12, 5942:7, 5943:12, 5943:13
**Caters** [1] - 5870:12
**Cavanaugh** [4] - 5824:21, 5826:12, 5944:14, 5945:6
**CAVANAUGH** [6] - 5826:13, 5863:19, 5944:15, 5971:24, 5973:14, 5976:1
**caveat** [1] - 5893:20
**CCR** [1] - 5976:18
**cellophane** [1] - 5869:23
**Center** [1] - 5825:4
**century** [1] - 5922:5
**CEO** [1] - 5827:17
**CEOs** [1] - 5827:16
**certain** [7] - 5868:18, 5870:25, 5905:14, 5921:4, 5939:19, 5957:3, 5968:8
**certainly** [36] - 5827:15, 5854:25, 5855:3, 5865:11, 5868:3, 5870:21, 5885:10, 5886:4, 5888:10, 5888:13, 5888:24, 5892:10, 5894:4, 5894:7, 5901:1, 5901:3, 5901:19, 5918:22, 5937:8, 5938:6, 5938:10, 5940:6, 5941:15, 5944:19, 5945:3, 5945:24, 5946:15, 5951:20, 5954:3, 5954:4, 5958:20, 5959:12,

5983

5962:5, 5963:16,
5974:21
  **CERTIFICATE** [1] -
5976:8
  **certify** [1] - 5976:10
  **cetera** [2] - 5857:2,
5893:8
  **challenge** [2] -
5956:17, 5964:8
  **challenges** [1] -
5967:22
  **chance** [1] - 5962:12
  **change** [10] - 5847:8,
5848:8, 5859:9,
5883:20, 5893:24,
5894:23, 5911:12,
5926:18, 5934:6,
5974:7
  **changed** [5] - 5916:6,
5916:7, 5918:23,
5943:23, 5968:17
  **changes** [10] - 5845:8,
5847:5, 5861:16,
5863:1, 5863:7,
5894:17, 5897:19,
5911:11, 5965:20
  **changing** [3] - 5848:2,
5926:21, 5926:22
  **channel** [1] - 5907:23
  **character** [1] - 5891:3
  **characteristics** [2] -
5895:13, 5899:19
  **characterizations** [1] -
5907:16
  **characterize** [2] -
5922:7, 5955:11
  **characterized** [3] -
5936:7, 5936:11,
5952:2
  **chart** [3] - 5880:12,
5885:15, 5885:16
  **charts** [1] - 5885:20
  **Chat** [1] - 5847:17
  **ChatGPT** [1] - 5847:18
  **check** [2] - 5826:20,
5933:8
  **Chicago** [1] - 5824:16
  **choice** [13] - 5842:2,
5844:7, 5844:8,
5844:10, 5846:24,
5846:25, 5847:2,
5848:3, 5848:7,
5848:9, 5862:16,
5937:10, 5938:23
  **choices** [2] - 5847:8,
5937:3
  **choose** [3] - 5855:4,
5937:10, 5961:5
  **chosen** [1] - 5949:21
  **Chrome** [19] -

5893:23, 5925:20,
5925:25, 5926:4,
5926:9, 5926:15,
5926:18, 5926:22,
5927:2, 5927:4,
5928:7, 5928:10,
5928:12, 5928:17,
5935:21, 5935:23,
5935:24, 5936:3
  **Chrome's** [1] -
5928:23
  **Chromium** [10] -
5927:4, 5927:5,
5927:7, 5927:9,
5927:11, 5927:14,
5927:19, 5927:23,
5927:25, 5928:4
  **circle** [1] - 5893:7
  **cite** [2] - 5878:23,
5882:10
  **cited** [11] - 5876:11,
5880:17, 5880:25,
5881:2, 5885:14,
5886:12, 5886:17,
5910:22, 5911:25,
5921:22, 5962:16
  **claim** [4] - 5852:13,
5882:6, 5886:19,
5967:6
  **clarification** [1] -
5913:24
  **clarify** [2] - 5917:22,
5950:6
  **clarity** [2] - 5873:25,
5967:21
  **clear** [14] - 5875:14,
5876:15, 5888:3,
5893:21, 5902:3,
5906:14, 5916:15,
5933:4, 5957:25,
5961:15, 5962:19,
5968:19, 5968:21
  **clearly** [2] - 5931:9,
5955:18
  **click** [23] - 5828:18,
5831:5, 5831:6,
5831:7, 5831:10,
5831:12, 5831:13,
5831:19, 5831:20,
5831:21, 5832:19,
5833:3, 5833:4,
5833:6, 5833:10,
5833:14, 5833:24,
5834:5, 5861:25,
5862:1, 5877:1,
5890:22, 5923:4
  **Click** [1] - 5830:22
  **click-through** [2] -
5828:18, 5831:20,
5831:21, 5832:19,

5833:3, 5833:4,
5833:6, 5833:10,
5833:14, 5833:24,
5834:5, 5862:1
  **clicked** [1] - 5832:20
  **clicking** [1] - 5889:9
  **clicks** [6] - 5877:1,
5877:17, 5911:11,
5931:19, 5932:1
  **client** [1] - 5973:1
  **clock** [1] - 5947:10
  **close** [5] - 5880:19,
5898:22, 5899:3,
5943:20, 5970:12
  **closed** [6] - 5920:16,
5921:9, 5944:23,
5953:25, 5954:15,
5954:24
  **closer** [1] - 5921:1
  **closing** [1] - 5953:15
  **closure** [1] - 5955:6
  **cloud** [3] - 5919:5,
5919:10, 5919:17
  **CMR** [1] - 5976:18
  **CO** [1] - 5825:5
  **coast** [1] - 5917:23
  **cobbling** [1] - 5932:20
  **code** [4] - 5847:20,
5927:2, 5927:14,
5927:19
  **colleagues** [1] -
5946:1
  **color** [1] - 5867:3
  **COLORADO** [1] -
5825:2
  **Colorado** [1] - 5825:4
  **COLUMBIA** [1] -
5824:1
  **coming** [7] - 5848:23,
5870:22, 5885:20,
5896:21, 5904:24,
5918:2, 5918:8
  **commands** [1] -
5955:19
  **comments** [2] -
5843:15, 5847:24
  **commercial** [11] -
5869:7, 5871:16,
5876:17, 5876:22,
5878:4, 5881:8,
5881:9, 5881:16,
5886:7, 5887:14,
5887:25
  **Commission** [2] -
5842:2, 5844:6
  **common** [2] -
5898:25, 5899:2
  **communicate** [2] -
5894:9, 5954:13
  **Company** [1] -

5951:11
  **company** [3] -
5838:16, 5919:12,
5955:14
  **compare** [3] -
5890:14, 5906:22,
5920:17
  **compared** [3] -
5879:15, 5899:3,
5939:3
  **compares** [6] -
5883:8, 5903:25,
5908:9, 5908:22,
5910:5, 5910:10
  **comparing** [4] -
5837:19, 5883:13,
5938:9, 5938:25
  **comparison** [3] -
5857:22, 5883:4,
5908:4
  **comparisons** [1] -
5909:20
  **compelling** [1] -
5862:12
  **compete** [12] -
5869:15, 5869:21,
5869:24, 5888:17,
5888:23, 5920:6,
5920:7, 5920:13,
5924:20, 5924:22,
5925:1, 5925:11
  **Compete** [1] - 5837:1
  **competed** [1] -
5920:16
  **competes** [1] -
5867:20
  **competing** [2] -
5917:14, 5962:22
  **competition** [43] -
5829:9, 5829:13,
5829:14, 5835:22,
5840:20, 5841:21,
5843:21, 5848:2,
5852:25, 5853:3,
5853:10, 5854:13,
5854:18, 5854:22,
5856:16, 5856:21,
5859:2, 5859:3,
5859:11, 5859:21,
5860:4, 5860:19,
5861:4, 5861:9,
5861:22, 5862:25,
5863:1, 5863:2,
5863:5, 5863:8,
5863:9, 5869:8,
5883:17, 5883:19,
5887:1, 5887:6,
5887:13, 5888:7,
5909:2, 5909:7,
5909:12, 5924:4

**competitive** [22] - 5828:4, 5828:12, 5828:13, 5841:8, 5841:10, 5843:4, 5843:22, 5847:12, 5853:8, 5859:8, 5859:25, 5860:15, 5863:11, 5882:7, 5899:6, 5924:2, 5924:6, 5924:10, 5924:13, 5925:4, 5925:19

**competitiveness** [1] - 5843:18

**competitor** [5] - 5855:18, 5860:11, 5910:1, 5916:8, 5924:24

**competitors** [5] - 5841:3, 5869:17, 5909:23, 5909:24, 5916:16

**complete** [4] - 5863:15, 5941:4, 5941:24, 5976:12

**completely** [2] - 5960:5, 5960:15

**completing** [2] - 5902:4, 5902:7

**complicated** [1] - 5935:20

**computer** [3] - 5858:1, 5858:15, 5879:25

**computers** [1] - 5932:20

**computing** [3] - 5919:5, 5919:10, 5919:17

**comScore** [16] - 5868:10, 5868:12, 5868:14, 5868:15, 5868:18, 5874:16, 5874:17, 5875:1, 5876:1, 5876:9, 5876:11, 5876:19, 5877:8, 5878:8, 5878:11

**conceptualizing** [1] - 5835:4

**concern** [3] - 5851:16, 5862:11, 5887:23

**concerned** [1] - 5888:2

**concerns** [1] - 5850:19

**conclude** [1] - 5939:25

**conclusion** [1] - 5841:18

**conduct** [2] - 5908:16,

5925:20

**conducted** [6] - 5864:9, 5897:5, 5897:6, 5911:6, 5938:16, 5938:25

**confer** [1] - 5945:25

**conference** [1] - 5847:21

**confess** [1] - 5965:8

**confidential** [12] - 5943:6, 5943:8, 5943:10, 5943:24, 5946:5, 5950:24, 5956:8, 5956:10, 5956:12, 5957:4, 5965:2, 5966:7

**confidentiality** [13] - 5946:2, 5946:4, 5947:21, 5947:23, 5948:12, 5949:23, 5950:21, 5950:23, 5956:16, 5967:5, 5967:14, 5967:19, 5968:25

**confirm** [2] - 5845:3, 5972:7

**confirming** [1] - 5843:25

**confounding** [3] - 5923:7, 5923:11, 5923:12

**connecting** [1] - 5891:25

**connection** [3] - 5908:8, 5911:16, 5945:1

**Connolly** [2] - 5825:8, 5945:11

**consented** [1] - 5949:5

**conservative** [1] - 5916:13

**consider** [13] - 5826:5, 5826:21, 5855:10, 5855:11, 5897:18, 5911:17, 5916:8, 5956:8, 5961:3, 5966:12, 5967:15, 5969:6, 5969:21

**considerable** [1] - 5910:3

**consideration** [6] - 5852:7, 5923:9, 5952:21, 5953:1, 5960:14, 5961:1

**considered** [4] - 5906:11, 5907:5, 5962:24, 5964:23

**considering** [7] - 5872:13, 5872:14,

5918:5, 5938:5, 5938:6, 5954:10, 5961:22

**consistent** [4] - 5940:19, 5957:19, 5959:12, 5972:3

**consistently** [1] - 5873:15

**consists** [1] - 5912:8

**constitutes** [1] - 5976:11

**Constitution** [2] - 5825:17, 5976:19

**constraint** [1] - 5910:2

**constraints** [1] - 5948:19

**Consumer** [1] - 5825:2

**consumer** [15] - 5841:11, 5854:12, 5854:15, 5861:25, 5867:18, 5875:3, 5875:10, 5892:14, 5892:18, 5894:6, 5896:17, 5900:10, 5936:8, 5936:12, 5937:20

**consumers** [42] - 5847:6, 5848:1, 5848:12, 5853:1, 5853:2, 5854:12, 5854:18, 5854:19, 5854:25, 5855:2, 5855:3, 5855:4, 5856:20, 5856:24, 5857:4, 5858:23, 5863:13, 5867:12, 5867:19, 5868:9, 5869:25, 5870:17, 5870:25, 5871:5, 5872:19, 5872:21, 5873:8, 5874:18, 5874:20, 5876:2, 5881:9, 5881:12, 5889:2, 5893:3, 5893:6, 5893:7, 5894:14, 5937:2, 5937:10, 5938:14

**consumers'** [1] - 5884:24

**Cont** [1] - 5977:5

**contains** [1] - 5943:6

**contemplated** [1] - 5952:4

**contemplating** [1] - 5949:21

**contended** [1] - 5948:13

**content** [4] - 5844:15, 5846:3, 5848:12,

5848:14

**contest** [1] - 5954:7

**context** [2] - 5958:8, 5963:21

**continue** [10] - 5843:11, 5893:5, 5893:22, 5894:2, 5912:12, 5940:19, 5941:20, 5944:5, 5948:16, 5957:18

**continued** [2] - 5939:18, 5975:20

**Continued** [1] - 5827:2

**continuously** [1] - 5940:12

**contract** [2] - 5837:11, 5852:12

**contracts** [31] - 5837:5, 5837:8, 5837:15, 5837:21, 5837:22, 5839:20, 5840:19, 5841:17, 5848:17, 5848:25, 5849:10, 5850:13, 5851:6, 5851:9, 5852:25, 5853:9, 5858:25, 5859:18, 5926:17, 5929:8, 5929:12, 5930:10, 5934:10, 5934:17, 5934:18, 5934:22, 5934:23, 5935:2, 5935:7, 5935:14

**contributed** [1] - 5927:10

**control** [1] - 5923:6

**controlling** [2] - 5923:12, 5934:16

**controls** [1] - 5973:22

**convenience** [2] - 5872:10, 5872:11

**convenient** [4] - 5868:1, 5872:16, 5872:18, 5872:21

**Convenient** [1] - 5872:4

**conversation** [3] - 5899:18, 5958:11, 5960:13

**conversion** [4] - 5894:2, 5894:5, 5900:13, 5905:3

**convert** [1] - 5903:16

**conveyed** [1] - 5967:7

**convincing** [1] - 5853:18

**cookie** [1] - 5893:22

**cookies** [1] - 5893:14

**cop** [1] - 5883:24

5985

**copies** [4] - 5941:10, 5941:15, 5950:13, 5959:6
**copy** [1] - 5912:14
**correct** [104] - 5855:13, 5855:14, 5855:15, 5858:16, 5864:19, 5868:2, 5872:19, 5872:25, 5874:19, 5874:22, 5875:17, 5876:5, 5876:14, 5876:15, 5878:7, 5878:9, 5878:10, 5878:15, 5880:17, 5882:12, 5882:13, 5883:18, 5884:7, 5886:7, 5886:23, 5889:11, 5891:18, 5891:21, 5893:2, 5894:10, 5894:20, 5895:11, 5897:13, 5897:14, 5899:8, 5900:3, 5900:7, 5900:10, 5902:6, 5906:20, 5908:24, 5908:25, 5909:4, 5909:8, 5909:14, 5910:21, 5911:9, 5911:14, 5911:18, 5911:22, 5911:25, 5912:1, 5912:8, 5912:9, 5913:21, 5914:14, 5915:24, 5917:11, 5917:25, 5918:7, 5919:24, 5921:3, 5921:4, 5921:16, 5921:18, 5921:20, 5922:11, 5922:15, 5923:10, 5923:19, 5923:20, 5924:2, 5924:11, 5925:5, 5925:8, 5925:9, 5925:25, 5926:19, 5926:24, 5927:8, 5927:24, 5928:2, 5928:9, 5928:10, 5928:19, 5928:21, 5928:24, 5929:3, 5929:4, 5929:6, 5929:17, 5933:2, 5933:3, 5935:7, 5935:16, 5935:17, 5935:19, 5936:3, 5936:22, 5937:21, 5938:18, 5939:6, 5939:7
**correcting** [1] - 5857:16
**correctly** [4] -

5852:19, 5882:25, 5920:14, 5955:10
**correlate** [2] - 5922:19, 5922:20
**correspondence** [1] - 5941:9
**cost** [13] - 5837:20, 5838:10, 5838:14, 5838:18, 5839:11, 5839:13, 5848:13, 5849:17, 5849:21, 5859:13, 5862:20, 5868:21, 5919:18
**cost-benefit** [1] - 5862:20
**costly** [4] - 5838:1, 5856:19, 5918:11, 5919:6
**costs** [16] - 5828:24, 5829:2, 5829:3, 5838:8, 5838:12, 5848:24, 5849:1, 5849:14, 5849:20, 5862:24, 5863:1, 5917:5, 5917:14, 5918:4, 5918:6
**Counsel** [5] - 5826:25, 5849:25, 5951:5, 5969:8, 5970:6
**counsel** [6] - 5826:20, 5853:4, 5939:21, 5960:3, 5964:25, 5965:10
**count** [1] - 5907:17
**counterpart** [1] - 5828:19
**counting** [1] - 5916:16
**couple** [21] - 5836:11, 5837:25, 5844:20, 5844:22, 5880:21, 5882:17, 5882:20, 5892:13, 5900:4, 5917:22, 5930:20, 5936:5, 5939:10, 5939:20, 5945:1, 5945:4, 5946:21, 5951:20, 5952:14, 5964:25, 5973:8
**course** [8] - 5829:13, 5836:11, 5837:18, 5856:19, 5858:18, 5884:4, 5912:1, 5958:7
**court** [13] - 5939:10, 5939:23, 5947:2, 5947:12, 5947:14, 5947:16, 5949:4, 5949:8, 5951:23, 5952:21, 5957:20, 5963:17, 5965:3
**Court** [35] - 5825:16,

5825:16, 5866:4, 5874:23, 5892:17, 5917:10, 5940:18, 5942:2, 5943:19, 5944:2, 5944:8, 5944:17, 5946:6, 5949:22, 5950:2, 5950:3, 5952:25, 5953:8, 5953:9, 5955:5, 5955:24, 5956:4, 5956:18, 5959:14, 5960:9, 5962:9, 5963:9, 5964:4, 5964:7, 5964:18, 5965:5, 5968:23, 5970:20, 5976:18
**COURT** [92] - 5824:1, 5826:2, 5826:12, 5826:15, 5826:19, 5826:24, 5829:17, 5849:25, 5853:4, 5854:8, 5858:13, 5863:17, 5863:20, 5866:25, 5871:13, 5871:19, 5873:24, 5874:6, 5874:11, 5875:14, 5876:6, 5879:19, 5879:22, 5879:25, 5884:19, 5902:2, 5902:7, 5902:9, 5906:6, 5906:14, 5906:19, 5906:21, 5906:24, 5913:23, 5917:1, 5925:15, 5939:9, 5939:20, 5940:2, 5940:25, 5941:7, 5941:13, 5941:19, 5941:22, 5942:6, 5942:14, 5942:22, 5943:11, 5944:9, 5944:13, 5945:6, 5945:9, 5950:7, 5951:5, 5951:17, 5957:8, 5958:9, 5959:4, 5959:20, 5960:3, 5960:12, 5960:25, 5961:8, 5961:13, 5962:13, 5963:14, 5964:11, 5964:17, 5964:21, 5965:7, 5965:13, 5965:24, 5966:2, 5967:2, 5967:24, 5969:2, 5969:8, 5969:10, 5970:25, 5971:5, 5971:16, 5972:2, 5972:12, 5972:22, 5973:6, 5973:12, 5974:8,

5974:13, 5975:4, 5975:7, 5976:2, 5976:8
**Court's** [2] - 5940:12, 5968:22
**Courthouse** [1] - 5825:17
**courtroom** [7] - 5939:15, 5940:11, 5943:20, 5944:5, 5944:6, 5950:25, 5954:25
**courtrooms** [1] - 5953:16
**cover** [2] - 5951:13, 5958:12
**crawling** [1] - 5840:10
**CRC** [1] - 5825:16
**create** [1] - 5930:12
**credit** [1] - 5948:6
**criminal** [1] - 5955:17
**CROSS** [1] - 5863:23
**cross** [3] - 5939:18, 5970:14, 5970:23
**Cross** [1] - 5977:5
**cross-examination** [1] - 5970:14
**CROSS-EXAMINATION** [1] - 5863:23
**Cross-Examination** [1] - 5977:5
**cross-examinations** [1] - 5970:23
**CRR** [2] - 5825:16, 5976:18
**CTR** [1] - 5831:20
**Cue** [4] - 5941:24, 5942:4, 5944:21, 5962:7
**Cue's** [3] - 5945:17, 5945:21, 5962:18
**culling** [1] - 5973:5
**curated** [2] - 5932:8, 5933:24
**current** [7] - 5835:7, 5835:20, 5839:20, 5897:3, 5897:8, 5897:14, 5902:5
**curve** [7] - 5835:6, 5835:14, 5836:5, 5836:9, 5836:11, 5836:12, 5836:15
**customers** [1] - 5871:24
**cut** [1] - 5974:2
**cuts** [1] - 5856:11
**CV** [1] - 5824:4

5986

# D

**D.C** [4] - 5824:5, 5824:13, 5825:9, 5976:20

**DAHLQUIST** [13] - 5826:7, 5940:6, 5941:2, 5941:8, 5941:15, 5941:17, 5941:20, 5941:23, 5942:7, 5942:19, 5943:2, 5943:12, 5944:10

**Dahlquist** [4] - 5824:14, 5826:6, 5826:8, 5940:5

**dash** [3] - 5830:4, 5830:5, 5951:11

**dashed** [1] - 5836:2

**data** [28] - 5831:1, 5832:10, 5832:25, 5836:19, 5838:4, 5858:3, 5868:12, 5868:15, 5868:18, 5874:16, 5874:17, 5875:1, 5875:2, 5876:9, 5876:18, 5876:21, 5877:9, 5877:18, 5877:19, 5878:20, 5878:24, 5880:7, 5894:2, 5898:15, 5918:21, 5924:1, 5924:10

**Dated** [1] - 5976:14

**David** [2] - 5824:14, 5826:7

**David.dahlquist@ usdoj.gov** [1] - 5824:17

**DAY** [1] - 5824:3

**days** [9] - 5839:6, 5874:25, 5875:1, 5886:22, 5894:11, 5932:18, 5934:25, 5942:17, 5955:5

**days'** [1] - 5972:15

**DC** [2] - 5824:19, 5825:18

**deal** [12] - 5827:13, 5827:15, 5827:19, 5833:22, 5834:17, 5834:18, 5834:24, 5834:25, 5835:16, 5836:3, 5854:2, 5948:4

**dealing** [1] - 5930:18

**deals** [1] - 5827:22

**dealt** [2] - 5944:21, 5945:19

**debated** [1] - 5973:1

**debating** [1] - 5944:22

**debug** [1] - 5843:7

**decent** [2] - 5833:20, 5833:23

**decide** [6] - 5859:7, 5884:2, 5931:16, 5961:5, 5964:7

**decided** [8] - 5852:22, 5854:21, 5861:7, 5929:15, 5929:16, 5929:25, 5936:19, 5937:12

**decides** [1] - 5943:20

**decision** [8] - 5863:7, 5877:25, 5955:25, 5958:6, 5960:22, 5966:20, 5973:5, 5973:10

**decision-making** [1] - 5958:6

**decisions** [10] - 5827:5, 5862:19, 5862:21, 5863:12, 5865:9, 5903:11, 5903:12, 5961:24, 5973:18, 5973:24

**decisively** [1] - 5843:5

**deck** [9] - 5866:19, 5947:8, 5947:22, 5952:15, 5956:25, 5957:22, 5958:12, 5958:13, 5958:24

**decks** [1] - 5952:13

**declaration** [3] - 5943:3, 5943:4, 5975:8

**declarations** [3] - 5945:25, 5946:11, 5946:16

**declare** [1] - 5847:20

**decorations** [1] - 5883:13

**decree** [1] - 5899:20

**deemed** [2] - 5943:24, 5966:7

**default** [12] - 5827:24, 5925:21, 5926:18, 5926:21, 5926:23, 5929:3, 5930:11, 5930:12, 5934:10, 5934:12, 5934:13, 5935:24

**defaults** [5] - 5872:13, 5872:14, 5930:19, 5935:18, 5936:3

**Defendant** [2] - 5824:7, 5825:7

**defense** [1] - 5972:10

**defenses** [1] - 5970:4

**defined** [2] - 5870:10, 5906:8

**defining** [1] - 5875:14

**definitely** [2] -

5901:18, 5902:23

**definition** [2] - 5864:2, 5869:18

**degrade** [1] - 5937:12

**degrading** [2] - 5937:15, 5937:16

**degree** [8] - 5869:21, 5895:13, 5895:23, 5896:13, 5900:5, 5901:20, 5909:25, 5924:19

**deliver** [1] - 5887:24

**delivered** [1] - 5946:11

**delivery** [1] - 5946:13

**Dell** [1] - 5934:11

**demand** [2] - 5837:8, 5937:20

**demanded** [1] - 5938:13

**demonstrating** [2] - 5891:19, 5891:23

**demonstrative** [1] - 5884:19

**denominator** [1] - 5907:19

**Denver** [1] - 5825:5

**denying** [1] - 5840:23

**Department** [4] - 5824:12, 5824:15, 5824:18, 5969:15

**DEPARTMENT** [1] - 5825:2

**depicts** [4] - 5885:15, 5885:17, 5885:18, 5885:25

**deposition** [7] - 5839:24, 5843:15, 5845:6, 5852:17, 5855:7, 5856:7, 5930:3

**deprecation** [1] - 5893:22

**depth** [3] - 5869:2, 5869:6, 5869:14

**describe** [6] - 5835:3, 5848:7, 5862:20, 5885:15, 5885:16, 5929:19

**described** [10] - 5831:9, 5838:14, 5846:12, 5868:8, 5876:1, 5933:19, 5934:2, 5934:10, 5936:14, 5963:2

**describes** [2] - 5839:3, 5932:18

**describing** [2] - 5827:18, 5892:6

**designated** [3] - 5940:16, 5971:3, 5973:21

**designation** [1] - 5950:21

**desirable** [1] - 5829:5

**details** [3] - 5927:13, 5927:17, 5938:3

**determination** [1] - 5959:14

**determinations** [1] - 5954:11

**determine** [1] - 5918:9

**determines** [1] - 5838:11

**determining** [1] - 5959:14

**develop** [2] - 5919:6, 5927:15

**developed** [1] - 5927:19

**development** [1] - 5857:6

**developments** [1] - 5973:10

**device** [1] - 5876:2

**devices** [5] - 5867:23, 5872:5, 5872:18, 5914:17, 5915:12

**DICKMAN** [1] - 5976:10

**Dickman** [2] - 5825:16, 5976:18

**difference** [5] - 5869:6, 5890:16, 5901:17, 5901:18, 5913:16

**differences** [3] - 5923:6, 5923:7

**different** [30] - 5849:13, 5857:3, 5865:8, 5865:17, 5865:24, 5867:3, 5871:8, 5871:9, 5879:5, 5879:9, 5879:20, 5882:3, 5885:21, 5890:10, 5891:16, 5891:21, 5891:25, 5893:1, 5893:10, 5896:22, 5898:17, 5915:15, 5923:5, 5933:18, 5933:19, 5934:7, 5934:9, 5938:10, 5959:11, 5960:6

**differentiated** [1] - 5899:11

**differently** [1] - 5957:3

**difficult** [3] - 5830:24, 5838:1, 5943:13

**difficulty** [1] - 5837:20

**digital** [1] - 5907:23

**dimensions** [4] -

5987

5856:24, 5857:3, 5938:9, 5938:11

**diminished** [1] - 5860:2

**DINTZER** [13] - 5970:11, 5971:3, 5971:8, 5971:19, 5972:9, 5972:19, 5973:2, 5973:13, 5973:15, 5974:11, 5975:1, 5975:6, 5975:24

**Dintzer** [2] - 5824:11, 5974:8

**direct** [4] - 5840:22, 5849:14, 5849:20, 5863:18

**Direct** [1] - 5977:5

**DIRECT** [1] - 5827:2

**directed** [2] - 5904:17, 5956:18

**direction** [1] - 5945:15

**directions** [1] - 5893:1

**directly** [9] - 5840:23, 5868:22, 5871:11, 5872:24, 5873:1, 5874:9, 5876:2, 5877:23, 5889:7

**disagree** [7] - 5883:16, 5949:19, 5958:3, 5958:10, 5962:5, 5965:7, 5965:18

**disagreement** [2] - 5946:22, 5948:8

**disagreements** [1] - 5947:11

**Dischler** [5] - 5941:25, 5942:4, 5944:21, 5945:17, 5962:7

**disclose** [4] - 5849:23, 5972:6, 5972:8, 5972:13

**disclosed** [1] - 5949:8

**disclosure** [2] - 5949:1, 5949:12

**discount** [2] - 5860:10, 5860:12

**discover** [2] - 5902:20, 5905:20

**discovering** [1] - 5902:23

**discovery** [3] - 5845:25, 5902:22, 5929:23

**discretionary** [1] - 5966:23

**discuss** [3] - 5887:6, 5939:14, 5970:9

**discussed** [3] -

5850:19, 5965:3, 5965:20

**discusses** [1] - 5946:14

**discussing** [4] - 5827:12, 5828:15, 5887:13, 5918:2

**discussion** [10] - 5827:14, 5855:24, 5860:25, 5861:1, 5861:5, 5907:12, 5937:23, 5937:24, 5939:11, 5939:25

**discussions** [2] - 5842:9, 5907:14

**disincentive** [1] - 5840:24

**display** [16] - 5885:8, 5893:9, 5893:15, 5893:25, 5894:8, 5895:4, 5900:5, 5900:6, 5900:9, 5900:12, 5904:20, 5906:3, 5908:5, 5908:10, 5908:22

**dispute** [1] - 5949:22

**disputed** [2] - 5952:22, 5959:14

**disputes** [2] - 5946:4, 5952:10

**disregarded** [1] - 5921:8

**dissuade** [1] - 5850:10

**distinct** [1] - 5828:7

**distinguished** [1] - 5889:8

**distributed** [1] - 5935:25

**distribution** [9] - 5840:7, 5914:10, 5914:16, 5915:2, 5929:8, 5929:12, 5930:1, 5936:24, 5937:14

**distributor** [2] - 5853:21, 5853:22

**distributors** [6] - 5849:5, 5851:5, 5851:6, 5851:7, 5853:10, 5934:15

**DISTRICT** [3] - 5824:1, 5824:1, 5824:10

**divergence** [1] - 5948:23

**divided** [1] - 5857:14

**Division** [1] - 5858:19

**docket** [4] - 5943:15, 5963:15, 5963:18

**document** [35] - 5827:11, 5827:23,

5838:19, 5842:18, 5843:1, 5844:18, 5845:15, 5847:15, 5849:12, 5850:17, 5851:14, 5855:6, 5862:4, 5879:13, 5879:17, 5884:21, 5888:13, 5892:2, 5901:14, 5931:6, 5931:18, 5938:8, 5948:13, 5949:10, 5950:24, 5960:8, 5961:1, 5961:2, 5966:6, 5966:10, 5966:15, 5966:19

**documentary** [1] - 5855:19

**documents** [52] - 5830:14, 5838:17, 5842:5, 5878:20, 5878:22, 5878:24, 5879:12, 5886:13, 5886:18, 5887:1, 5887:3, 5887:5, 5887:12, 5887:13, 5887:17, 5887:21, 5887:23, 5888:2, 5888:5, 5888:6, 5888:11, 5892:6, 5904:23, 5908:14, 5909:2, 5909:5, 5909:6, 5909:12, 5909:17, 5909:20, 5911:11, 5930:3, 5930:4, 5935:1, 5935:10, 5937:23, 5939:2, 5940:13, 5941:5, 5941:6, 5941:8, 5943:7, 5944:18, 5946:14, 5947:6, 5947:17, 5949:16, 5949:17, 5950:20, 5953:4, 5959:15

**DoJ** [10] - 5824:11, 5948:3, 5948:5, 5956:9, 5959:24, 5965:2, 5967:6, 5967:14, 5970:12, 5975:24

**DoJ's** [1] - 5947:16

**dollar** [2] - 5857:14, 5895:4

**dollars** [4] - 5857:10, 5865:5, 5901:11, 5921:14

**done** [43] - 5839:9, 5845:24, 5846:4, 5862:16, 5867:17, 5870:16, 5873:20,

5873:23, 5875:7, 5878:16, 5879:2, 5889:1, 5889:20, 5889:24, 5895:7, 5895:22, 5900:16, 5900:22, 5907:21, 5910:4, 5910:9, 5910:16, 5910:25, 5913:6, 5918:9, 5918:12, 5918:24, 5935:15, 5936:15, 5940:11, 5942:14, 5953:11, 5953:14, 5953:18, 5953:21, 5955:7, 5958:14, 5961:17, 5964:19, 5971:15, 5972:1, 5975:12

**doors** [1] - 5921:9

**dormancy** [1] - 5875:15

**dot** [6] - 5832:24, 5833:2, 5833:3, 5833:4

**dots** [1] - 5832:25

**doubled** [1] - 5848:9

**down** [18] - 5828:7, 5839:17, 5840:14, 5845:16, 5860:20, 5860:21, 5878:3, 5878:11, 5886:10, 5893:2, 5893:5, 5893:16, 5900:13, 5902:25, 5903:11, 5939:15, 5955:3, 5974:20

**download** [1] - 5867:23

**downloaded** [1] - 5936:4

**dozens** [2] - 5969:24

**Dr** [4] - 5880:24, 5887:8, 5898:24, 5918:18

**draw** [1] - 5963:22

**drawing** [1] - 5833:1

**dreamed** [1] - 5892:18

**drive** [1] - 5900:10

**drives** [3] - 5828:9, 5855:18, 5904:3

**driving** [1] - 5858:20

**drop** [1] - 5843:6

**Duck** [7] - 5837:16, 5837:24, 5838:7, 5916:20, 5916:22, 5916:25, 5917:2

**DuckDuckGo** [22] - 5837:16, 5855:25, 5856:1, 5912:24, 5913:7, 5913:11, 5913:19, 5914:9,

5988

5915:11, 5916:8,
5916:11, 5916:23,
5917:4, 5917:8,
5921:20, 5938:9,
5938:13, 5938:18,
5939:1, 5939:4, 5939:6
**DuckDuckGo's** [1] -
5920:23
**due** [1] - 5941:11
**Duo** [1] - 5915:5
**during** [7] - 5846:7,
5847:14, 5883:23,
5897:4, 5935:14,
5947:10, 5952:10
**DXD15.002** [1] -
5880:8
**DXD15.003** [1] -
5885:13
**DXD15.006** [1] -
5889:13
**DXD15.008** [1] -
5902:11
**DXD15.011** [1] -
5932:24

# E

**earliest** [1] - 5931:5
**early** [4] - 5932:18,
5934:25, 5968:23,
5974:22
**earn** [1] - 5829:14
**easier** [2] - 5926:22,
5971:9
**easiest** [1] - 5880:10
**easily** [1] - 5956:19
**easy** [2] - 5855:4,
5868:1
**economically** [1] -
5848:8
**economics** [1] -
5838:11
**economist's** [1] -
5840:12
**economists** [3] -
5857:13, 5896:14,
5922:7
**Edge** [5] - 5927:22,
5927:23, 5928:5,
5928:24, 5930:11
**effect** [12] - 5827:16,
5828:15, 5829:19,
5840:20, 5840:22,
5840:24, 5897:18,
5923:5, 5926:12,
5927:1, 5938:23,
5968:23
**effective** [6] - 5841:2,
5893:10, 5903:15,
5924:4, 5924:23

**effectively** [7] -
5894:2, 5901:8,
5901:9, 5920:13,
5924:20, 5924:22,
5960:17
**effectiveness** [1] -
5901:13
**effects** [10] - 5828:1,
5828:4, 5828:12,
5829:25, 5830:15,
5834:23, 5853:1,
5853:19, 5854:7,
5923:12
**effectuate** [1] -
5968:21
**efficiently** [2] - 5947:5,
5949:23
**effort** [1] - 5862:15
**efforts** [3] - 5844:12,
5847:9, 5940:12
**either** [9] - 5874:7,
5874:8, 5883:1,
5916:14, 5942:9,
5961:14, 5964:15,
5966:4, 5966:9
**element** [1] - 5961:21
**eligible** [1] - 5968:2
**elsewhere** [1] - 5888:1
**email** [2] - 5824:24,
5852:9
**Email** [7] - 5824:14,
5824:17, 5824:20,
5825:6, 5825:10,
5825:11, 5825:14
**emails** [2] - 5952:18,
5967:16
**empirical** [17] -
5829:19, 5829:23,
5831:3, 5831:15,
5867:17, 5868:8,
5870:16, 5895:3,
5908:9, 5908:12,
5908:21, 5910:4,
5910:9, 5910:16,
5910:20, 5910:22,
5911:6
**employees** [3] -
5830:21, 5973:16,
5973:17
**employing** [1] -
5838:18
**encouraging** [1] -
5853:10
**end** [5] - 5826:17,
5859:7, 5907:15,
5952:17, 5954:2
**ended** [4] - 5844:18,
5844:19, 5848:5,
5975:4
**ending** [1] - 5894:6

**ends** [1] - 5837:9
**energy** [2] - 5867:10,
5867:18
**engage** [3] - 5881:12,
5881:21, 5904:16
**engaged** [1] - 5925:19
**engaging** [1] - 5865:8
**engine** [68] - 5828:10,
5828:16, 5829:12,
5850:24, 5851:19,
5851:21, 5851:23,
5867:13, 5868:6,
5868:9, 5870:10,
5871:25, 5875:23,
5877:13, 5878:14,
5883:18, 5886:14,
5887:19, 5891:17,
5898:3, 5898:4,
5916:1, 5916:3,
5916:4, 5916:9,
5917:8, 5917:11,
5917:14, 5918:5,
5918:11, 5919:6,
5919:18, 5922:2,
5922:11, 5922:12,
5922:15, 5922:19,
5922:21, 5923:24,
5924:1, 5924:2,
5924:10, 5924:11,
5924:13, 5924:19,
5924:24, 5925:4,
5925:12, 5926:18,
5926:22, 5926:23,
5929:13, 5929:14,
5929:25, 5930:11,
5930:13, 5930:16,
5930:17, 5931:3,
5931:13, 5933:2,
5933:5, 5933:22,
5936:6, 5936:11,
5936:23, 5937:6
**engine's** [3] - 5828:17,
5922:24, 5923:18
**engineer** [1] - 5838:20
**engineering** [2] -
5923:23, 5924:17
**engineers** [2] -
5838:5, 5847:21
**engines** [28] - 5866:7,
5866:15, 5869:17,
5870:19, 5871:1,
5871:6, 5871:10,
5872:13, 5882:3,
5882:4, 5882:7,
5882:11, 5883:20,
5883:21, 5886:13,
5886:19, 5887:2,
5906:7, 5906:9,
5906:12, 5907:2,
5909:4, 5911:21,

5911:24, 5912:4,
5916:13, 5932:7,
5932:11
**enhanced** [1] - 5857:3
**enhancement** [1] -
5855:11
**enormous** [2] -
5831:1, 5877:19
**enter** [11] - 5849:2,
5849:13, 5850:14,
5919:23, 5920:2,
5920:4, 5920:7,
5929:13, 5929:14,
5929:16, 5929:20
**entered** [4] - 5875:9,
5920:9, 5932:6,
5932:12
**entering** [4] - 5849:15,
5918:4, 5929:19,
5930:18
**entertainment** [1] -
5891:24
**entire** [4] - 5897:4,
5904:17, 5948:2,
5957:12
**entirely** [2] - 5836:15,
5861:11
**entirety** [7] - 5953:3,
5957:1, 5957:14,
5958:1, 5958:6,
5959:9, 5961:1
**entitle** [1] - 5961:10
**entitled** [2] - 5956:15,
5956:25
**entrant** [4] - 5849:6,
5849:7, 5929:9
**entrants** [5] - 5837:9,
5848:20, 5848:21,
5849:10
**entry** [8] - 5849:16,
5852:3, 5915:25,
5918:17, 5919:2,
5922:8, 5929:8,
5930:12
**episode** [1] - 5845:7
**Eric** [1] - 5843:15
**especially** [1] -
5901:18
**ESPN** [3] - 5873:4,
5873:5, 5873:6
**essence** [1] - 5919:12
**essentially** [3] -
5952:1, 5954:7,
5975:12
**established** [1] -
5952:23
**estimate** [4] - 5864:10,
5867:18, 5895:8,
5918:3
**estimated** [1] -

5989

5920:12

**estimates** [2] - 5907:10

**et** [3] - 5824:3, 5857:2, 5893:8

**EU** [1] - 5857:23

**Europe** [10] - 5844:11, 5844:12, 5844:13, 5844:25, 5845:15, 5845:17, 5847:25, 5862:17, 5873:9, 5873:10

**European** [3] - 5842:2, 5844:6, 5844:8

**evaluate** [5] - 5888:15, 5888:21, 5904:6, 5937:11, 5944:2

**evaluated** [4] - 5937:4, 5937:8, 5937:19, 5938:22

**evaluating** [1] - 5922:14

**evening** [4] - 5966:12, 5970:10, 5971:21, 5972:6

**evidence** [43] - 5827:5, 5829:19, 5829:23, 5830:14, 5834:18, 5838:13, 5839:12, 5841:17, 5842:23, 5843:12, 5852:6, 5852:14, 5852:16, 5853:17, 5853:18, 5855:1, 5855:19, 5856:4, 5857:5, 5860:4, 5861:7, 5864:13, 5865:7, 5868:4, 5868:8, 5872:15, 5882:14, 5886:19, 5893:13, 5897:16, 5919:16, 5925:7, 5947:18, 5949:13, 5949:18, 5951:22, 5956:23, 5956:24, 5957:7, 5966:11, 5966:16, 5969:17

**evolution** [1] - 5919:17

**exact** [2] - 5931:4, 5964:23

**exactly** [34] - 5833:15, 5834:1, 5836:16, 5838:18, 5838:23, 5839:10, 5840:8, 5846:17, 5848:22, 5855:16, 5858:9, 5861:25, 5865:25, 5892:5, 5899:4, 5901:4, 5903:19,

5903:24, 5918:20, 5919:10, 5920:1, 5920:5, 5920:10, 5922:16, 5924:13, 5924:14, 5926:6, 5928:15, 5938:3, 5947:16, 5947:17, 5956:2, 5963:4, 5974:22

**examination** [8] - 5863:18, 5863:21, 5883:24, 5948:15, 5948:18, 5950:22, 5957:17, 5970:14

**EXAMINATION** [2] - 5827:2, 5863:23

**Examination** [2] - 5977:5, 5977:5

**examinations** [1] - 5970:23

**examined** [1] - 5871:4

**examining** [1] - 5953:5

**example** [34] - 5844:16, 5849:9, 5853:20, 5853:25, 5854:21, 5870:3, 5882:17, 5882:20, 5887:4, 5887:8, 5890:4, 5890:5, 5890:10, 5893:23, 5896:10, 5900:8, 5903:25, 5906:16, 5914:11, 5914:13, 5916:11, 5923:3, 5929:1, 5932:9, 5937:18, 5947:25, 5948:1, 5952:12, 5957:21, 5960:4, 5961:23, 5961:25, 5962:23, 5975:16

**examples** [2] - 5847:11, 5887:15

**exams** [1] - 5974:4

**exceptional** [1] - 5857:11

**excess** [1] - 5952:13

**exclude** [1] - 5955:19

**excluded** [1] - 5955:8

**exclusionary** [1] - 5848:25

**exclusive** [7] - 5914:16, 5915:2, 5915:6, 5930:11, 5934:10, 5935:14

**excuse** [3] - 5911:2, 5954:12, 5962:15

**execute** [1] - 5968:11

**executives** [1] - 5901:15

**exercising** [1] - 5910:3

**exhibit** [25] - 5947:1, 5947:2, 5949:11, 5950:17, 5952:7, 5953:1, 5956:20, 5956:22, 5957:6, 5957:13, 5958:2, 5958:4, 5959:9, 5961:9, 5961:10, 5965:10, 5965:15, 5965:16, 5966:13, 5967:25, 5968:2, 5968:5, 5969:16

**EXHIBIT** [1] - 5977:7

**Exhibit** [1] - 5977:8

**Exhibits** [1] - 5951:15

**exhibits** [24] - 5948:1, 5949:1, 5949:3, 5950:13, 5953:10, 5954:11, 5956:1, 5956:9, 5956:11, 5959:6, 5961:19, 5962:14, 5965:1, 5965:22, 5966:25, 5967:4, 5967:6, 5967:8, 5967:13, 5967:17, 5968:1, 5968:24, 5969:24, 5975:8

**exist** [4] - 5833:22, 5898:1, 5915:25, 5937:4

**existed** [1] - 5932:7

**existing** [1] - 5975:16

**exists** [2] - 5890:23, 5912:7

**expanding** [1] - 5860:23

**expect** [3] - 5854:8, 5859:20, 5973:8

**expectation** [1] - 5957:16

**expectations** [1] - 5959:2

**expecting** [1] - 5883:23

**Expedia.com** [1] - 5878:12

**expeditious** [1] - 5970:5

**expend** [4] - 5867:19, 5919:23, 5920:2

**expensive** [1] - 5918:23

**experience** [5] - 5852:11, 5871:23, 5905:18, 5905:23, 5953:8

**experiment** [1] -

5838:2

**experiments** [2] - 5936:14, 5936:15

**expert** [13] - 5869:5, 5880:17, 5912:6, 5921:22, 5922:11, 5922:14, 5923:23, 5923:25, 5925:18, 5929:11, 5936:17, 5936:22, 5973:19

**experts** [2] - 5971:25, 5973:8

**explain** [5] - 5872:8, 5874:23, 5881:5, 5962:12, 5964:13

**explained** [1] - 5934:12

**explanation** [1] - 5962:9

**explicit** [1] - 5964:22

**explicitly** [2] - 5850:8, 5850:19

**Explorer** [6] - 5928:15, 5928:16, 5928:17, 5928:18, 5928:21, 5935:22

**express** [1] - 5935:11

**expressed** [2] - 5912:23, 5936:5

**expresses** [1] - 5887:23

**expression** [1] - 5907:8

**extended** [1] - 5939:11

**extensive** [1] - 5946:6

**extent** [28] - 5844:1, 5846:6, 5848:24, 5871:7, 5871:8, 5871:9, 5888:16, 5888:22, 5889:2, 5893:5, 5896:18, 5898:19, 5901:5, 5902:17, 5904:7, 5904:14, 5904:23, 5909:20, 5947:17, 5950:4, 5950:14, 5952:8, 5953:12, 5959:5, 5961:15, 5961:18, 5961:23, 5961:25

**extra** [3] - 5839:4, 5839:5, 5966:12

**extract** [1] - 5830:20

**extreme** [2] - 5829:4, 5861:23

**Ezell** [1] - 5852:18

5990

# F

**face** [3] - 5863:2, 5869:8, 5883:19
**Facebook** [16] - 5889:4, 5889:15, 5890:8, 5890:22, 5897:2, 5897:12, 5899:3, 5899:7, 5899:25, 5900:18, 5900:24, 5901:15, 5903:25, 5904:1, 5909:3, 5909:22
**Facebook's** [1] - 5890:23
**faces** [5] - 5863:5, 5863:8, 5883:17, 5887:2, 5888:7
**facilitate** [4] - 5852:3, 5852:5, 5950:21, 5950:24
**facing** [2] - 5847:12, 5861:4
**fact** [17] - 5836:21, 5868:4, 5872:9, 5892:6, 5921:9, 5926:21, 5954:23, 5955:9, 5957:21, 5959:8, 5960:9, 5965:21, 5971:1, 5971:25, 5973:15, 5973:21, 5973:23
**factor** [10] - 5852:11, 5867:16, 5895:12, 5899:18, 5900:4, 5911:17, 5921:22, 5930:14, 5930:20, 5974:24
**factors** [19] - 5923:1, 5923:9, 5923:13, 5923:15, 5929:4, 5933:11, 5940:13, 5954:9, 5954:10, 5959:13, 5960:1, 5960:23, 5961:17, 5961:21, 5962:1, 5963:1, 5963:2, 5964:23
**failed** [3] - 5915:20, 5920:9, 5921:7
**fair** [5] - 5868:13, 5888:12, 5959:7, 5963:6, 5964:2
**Fair** [1] - 5964:24
**fairly** [2] - 5835:3, 5952:23
**fairness** [3] - 5962:13, 5971:13, 5973:20
**faith** [1] - 5955:9
**familiar** [5] - 5866:5,

5904:12, 5904:13, 5905:6, 5915:7
**far** [4] - 5858:11, 5860:22, 5903:9, 5957:11
**fast** [1] - 5843:5
**faster** [1] - 5841:14
**favor** [1] - 5954:25
**feature** [6] - 5869:25, 5937:20, 5937:21, 5937:25, 5938:13, 5938:18
**features** [1] - 5844:15
**felt** [3] - 5841:20, 5841:22, 5852:21
**few** [6] - 5858:2, 5931:9, 5939:11, 5939:23, 5944:11, 5966:12
**Fifth** [1] - 5824:19
**figure** [15] - 5832:3, 5835:2, 5835:4, 5836:6, 5836:13, 5838:3, 5838:24, 5875:19, 5876:13, 5885:8, 5899:5, 5917:23, 5934:3, 5940:4, 5953:20
**figured** [8] - 5931:11, 5931:12, 5931:15, 5931:19, 5931:25, 5932:1, 5932:10, 5935:2
**figures** [1] - 5911:24
**file** [7] - 5826:5, 5826:17, 5945:20, 5946:5, 5946:16, 5963:21, 5969:4
**filed** [9] - 5940:4, 5942:9, 5942:12, 5943:5, 5945:2, 5946:8, 5946:10, 5963:11
**filing** [7] - 5826:3, 5942:25, 5944:25, 5946:8, 5946:13, 5946:18, 5946:25
**final** [3] - 5973:4, 5973:10, 5975:7
**fine** [3] - 5898:14, 5910:13, 5944:19
**finish** [1] - 5895:1
**Fire** [3] - 5915:7, 5915:14, 5915:17
**firm** [5] - 5857:15, 5869:22, 5919:23, 5920:2, 5922:6
**firms** [19] - 5834:3, 5834:6, 5840:11, 5840:25, 5857:16,

5857:21, 5857:24, 5857:25, 5858:2, 5858:4, 5858:8, 5858:11, 5858:15, 5863:11, 5909:3, 5919:11, 5919:12, 5924:4
**first** [44] - 5828:9, 5828:21, 5832:7, 5833:9, 5836:2, 5836:9, 5837:7, 5843:24, 5844:22, 5846:25, 5866:19, 5867:9, 5868:6, 5871:24, 5875:9, 5875:20, 5875:25, 5878:17, 5880:8, 5888:1, 5901:14, 5911:17, 5919:9, 5931:11, 5931:12, 5931:14, 5931:15, 5933:13, 5940:8, 5944:3, 5946:24, 5947:21, 5947:24, 5948:2, 5948:3, 5953:16, 5960:4, 5961:25, 5962:14, 5962:20, 5963:3, 5964:23, 5969:20
**First** [2] - 5955:18
**fits** [1] - 5892:5
**five** [3] - 5885:20, 5916:1, 5919:7
**fix** [2] - 5956:19, 5966:23
**fixed** [2] - 5859:13, 5917:5
**flag** [1] - 5975:19
**flat** [4] - 5842:21, 5843:10, 5844:3
**flavor** [2] - 5846:17, 5846:18
**flippant** [1] - 5920:7
**floating** [1] - 5972:5
**Floor** [2] - 5825:5, 5825:13
**focus** [5] - 5836:25, 5899:9, 5948:1, 5948:8, 5956:21
**focused** [3] - 5865:13, 5877:20, 5899:13
**focusing** [1] - 5899:11
**folks** [3] - 5906:10, 5972:23, 5974:9
**follow** [6] - 5830:11, 5893:14, 5961:12, 5962:5, 5964:5, 5966:24
**following** [4] - 5844:9, 5896:24, 5933:25,

5963:14
**FOR** [1] - 5824:1
**force** [2] - 5863:11, 5956:4
**foreclosure** [1] - 5837:8
**foregoing** [1] - 5976:11
**foregone** [1] - 5849:17
**forget** [1] - 5847:17
**forgetting** [1] - 5932:16
**forgone** [1] - 5850:9
**forked** [1] - 5915:23
**form** [6] - 5870:17, 5870:22, 5937:16, 5946:12, 5950:15, 5950:24
**formation** [2] - 5870:13, 5882:1
**formed** [1] - 5922:23
**former** [1] - 5843:2
**formulaic** [2] - 5892:21, 5892:24
**forth** [1] - 5833:5
**Fortune** [1] - 5932:25
**forward** [8] - 5893:21, 5918:18, 5940:5, 5951:6, 5954:7, 5955:24, 5970:4, 5972:18
**founder** [1] - 5917:11
**four** [5] - 5832:12, 5847:1, 5848:5, 5903:2, 5921:3
**fourteen** [1] - 5973:14
**fourth** [1] - 5881:24
**fraction** [1] - 5864:6
**framework** [1] - 5838:14
**frankly** [2] - 5957:15, 5974:23
**free** [3] - 5854:16, 5927:11, 5958:25
**frequency** [3] - 5830:11, 5833:6, 5888:3
**frequent** [5] - 5832:20, 5833:13, 5834:4, 5834:6, 5896:12
**frequently** [5] - 5868:5, 5868:7, 5903:6, 5903:19, 5909:21
**Freudian** [1] - 5951:7
**Friday** [1] - 5947:8
**friends** [1] - 5891:25
**frozen** [1] - 5931:22
**frustrations** [1] - 5956:17

5991

**full** [9] - 5884:8, 5884:15, 5884:17, 5947:1, 5953:4, 5963:13, 5966:13, 5966:19, 5976:12
**full-throated** [1] - 5963:13
**fully** [6] - 5890:14, 5916:16, 5940:8, 5941:12, 5942:9, 5944:16
**fundable** [1] - 5930:9
**fundamentally** [1] - 5839:17
**funds** [1] - 5838:21
**funnel** [15] - 5893:2, 5893:4, 5893:5, 5893:11, 5893:16, 5893:18, 5895:5, 5895:10, 5900:13, 5902:23, 5902:25, 5903:11, 5903:13, 5904:17, 5905:3
**future** [3] - 5853:5, 5860:22, 5954:15

## G

**gain** [1] - 5840:7
**game** [1] - 5959:7
**gap** [3] - 5875:4, 5875:7, 5875:10
**gather** [5] - 5900:17, 5900:19, 5900:24, 5903:21, 5904:7
**gating** [1] - 5852:11
**general** [62] - 5828:10, 5828:16, 5850:23, 5851:19, 5851:20, 5851:23, 5853:14, 5854:14, 5854:15, 5856:21, 5859:2, 5866:14, 5868:9, 5869:17, 5870:9, 5870:19, 5871:1, 5871:10, 5871:24, 5872:12, 5875:22, 5878:1, 5878:14, 5882:4, 5882:12, 5883:21, 5886:13, 5886:14, 5886:18, 5886:20, 5906:11, 5907:2, 5909:4, 5911:18, 5911:20, 5911:24, 5912:3, 5912:8, 5913:9, 5914:4, 5916:4, 5916:8, 5916:13, 5916:24, 5918:4, 5918:11, 5918:17,

5919:18, 5919:23, 5920:2, 5920:18, 5923:18, 5924:10, 5924:18, 5931:3, 5936:6, 5936:11, 5936:21, 5965:8, 5973:22
**generally** [2] - 5891:5, 5898:11
**gentleman** [1] - 5884:2
**genuinely** [2] - 5968:13, 5973:16
**Giannandrea** [2] - 5930:5, 5930:7
**Giannandrea's** [1] - 5962:18
**gifts** [1] - 5883:5
**given** [12] - 5835:15, 5847:8, 5896:17, 5897:18, 5912:2, 5933:8, 5934:4, 5946:25, 5948:19, 5954:19, 5959:2, 5969:24
**glad** [1] - 5945:14
**glance** [1] - 5884:11
**glasses** [1] - 5836:18
**goal** [1] - 5950:25
**Gomes** [1] - 5845:6
**Goodrich** [1] - 5825:12
**google** [1] - 5824:6
**Google** [218] - 5825:7, 5830:4, 5830:8, 5830:14, 5830:21, 5832:9, 5832:12, 5832:16, 5832:23, 5833:4, 5833:10, 5833:13, 5833:19, 5834:15, 5838:13, 5838:16, 5839:4, 5841:9, 5841:20, 5842:5, 5842:7, 5842:14, 5842:20, 5842:22, 5842:23, 5844:8, 5844:10, 5846:10, 5847:9, 5847:11, 5847:15, 5847:19, 5848:11, 5848:13, 5848:16, 5849:12, 5849:17, 5850:21, 5850:22, 5852:12, 5852:20, 5853:13, 5854:15, 5854:21, 5855:12, 5855:24, 5856:5, 5857:9, 5857:20, 5858:10, 5859:14, 5859:22, 5859:25,

5860:9, 5860:11, 5860:12, 5860:16, 5861:7, 5861:12, 5861:14, 5862:18, 5863:2, 5863:5, 5863:21, 5864:5, 5864:11, 5864:21, 5864:24, 5865:1, 5865:8, 5865:12, 5867:20, 5868:2, 5869:8, 5869:15, 5870:4, 5870:23, 5873:16, 5873:22, 5875:6, 5876:17, 5876:22, 5877:10, 5878:18, 5879:4, 5879:8, 5879:15, 5881:9, 5881:15, 5881:16, 5882:8, 5883:8, 5883:17, 5884:6, 5884:25, 5885:6, 5885:11, 5885:20, 5886:7, 5886:8, 5886:12, 5886:17, 5887:1, 5887:2, 5887:5, 5887:12, 5887:23, 5888:6, 5888:7, 5888:16, 5888:22, 5890:9, 5890:11, 5891:4, 5891:9, 5893:22, 5895:23, 5896:6, 5896:12, 5896:24, 5897:2, 5897:11, 5897:25, 5898:17, 5899:2, 5899:24, 5900:1, 5901:16, 5906:16, 5909:1, 5909:2, 5909:6, 5909:7, 5909:12, 5909:19, 5909:22, 5909:23, 5910:23, 5911:7, 5915:6, 5916:14, 5917:23, 5918:6, 5919:13, 5922:1, 5922:3, 5925:19, 5925:20, 5925:24, 5926:2, 5926:21, 5927:7, 5929:1, 5929:7, 5929:12, 5930:17, 5931:2, 5931:9, 5931:10, 5931:25, 5932:5, 5932:6, 5932:12, 5932:17, 5932:18, 5933:1, 5933:12, 5933:15, 5934:1, 5934:8, 5934:21, 5935:4, 5935:24, 5935:25, 5936:2,

5936:15, 5936:18, 5936:23, 5937:12, 5937:23, 5937:24, 5938:9, 5939:1, 5939:2, 5939:5, 5940:15, 5941:8, 5942:11, 5943:4, 5945:11, 5947:17, 5956:13, 5956:23, 5959:25, 5960:10, 5962:22, 5965:1, 5965:2, 5965:10, 5966:4, 5967:5, 5967:16, 5970:15, 5971:9, 5972:16, 5973:16, 5974:22
**Google's** [43] - 5836:22, 5837:5, 5839:12, 5839:20, 5841:4, 5841:16, 5842:12, 5843:2, 5843:12, 5848:17, 5848:25, 5849:9, 5850:13, 5850:21, 5851:6, 5852:25, 5854:2, 5854:3, 5857:5, 5858:25, 5859:18, 5877:25, 5885:22, 5887:6, 5887:13, 5888:17, 5907:10, 5910:25, 5911:17, 5916:18, 5918:3, 5921:23, 5923:14, 5926:12, 5929:25, 5930:21, 5946:5, 5946:22, 5949:11, 5951:3, 5951:15, 5975:7
**Google.com** [1] - 5887:18
**Google/Samsung** [1] - 5852:12
**governing** [1] - 5954:11
**Graham** [2] - 5825:8, 5945:10
**granted** [1] - 5974:7
**graph** [1] - 5830:2
**great** [2] - 5866:13, 5932:17
**greater** [4] - 5841:17, 5860:4, 5869:2, 5928:23
**greatest** [1] - 5959:16
**grounds** [1] - 5956:16
**group** [1] - 5848:20
**groups** [1] - 5945:16
**growing** [1] - 5912:11
**Gsafty@wc.com** [1] - 5825:11

5992

**guess** [1] - 5844:17, 5866:11, 5889:20, 5896:16, 5913:4, 5920:4, 5920:8, 5920:15, 5922:16, 5958:3, 5972:22
**guidance** [1] - 5950:5
**guide** [1] - 5952:18
**guideposts** [1] - 5944:7
**guys** [1] - 5941:15

# H

**habit** [3] - 5870:12, 5870:22, 5881:25
**habits** [1] - 5870:18
**half** [5] - 5920:20, 5920:21, 5920:22, 5948:3, 5974:16
**Halloween** [3] - 5882:23, 5883:1, 5883:13
**hand** [4] - 5921:14, 5937:9, 5941:13, 5957:24
**handed** [3] - 5880:7, 5883:3, 5948:1
**handled** [1] - 5946:9
**hands** [1] - 5948:21
**hang** [1] - 5884:19
**happy** [17] - 5826:9, 5826:10, 5899:22, 5940:21, 5944:11, 5946:5, 5946:9, 5946:15, 5947:18, 5950:17, 5953:16, 5954:18, 5961:13, 5962:5, 5968:18, 5969:6, 5969:21
**hard** [3] - 5836:5, 5842:13, 5964:9
**harder** [5] - 5838:2, 5894:16, 5930:14, 5930:15
**harm** [9] - 5828:4, 5854:12, 5854:16, 5854:17, 5859:2, 5859:3, 5859:18, 5955:7, 5958:24
**harmed** [1] - 5856:21
**harms** [2] - 5853:3, 5854:12
**hash** [1] - 5947:11
**haul** [2] - 5949:21, 5950:3
**head** [6] - 5831:12, 5832:16, 5843:2, 5906:4, 5974:17
**hear** [8] - 5834:12,

5920:11, 5942:25, 5944:14, 5954:19, 5960:3, 5969:21, 5975:14
**heard** [13] - 5833:21, 5851:13, 5862:1, 5866:4, 5892:17, 5896:11, 5917:10, 5929:23, 5945:18, 5955:20, 5969:11, 5972:10, 5972:20
**hearing** [5] - 5946:2, 5946:18, 5951:12, 5959:24, 5959:25
**heart** [1] - 5862:22
**height** [1] - 5858:7
**held** [1] - 5931:2
**help** [3] - 5850:9, 5860:14, 5890:17
**helpful** [3] - 5941:14, 5964:6, 5964:20
**helping** [1] - 5919:11
**hence** [1] - 5946:13
**hereby** [1] - 5976:10
**hesitant** [1] - 5841:15
**hide** [1] - 5970:18
**hierarchy** [1] - 5952:24
**high** [5] - 5864:5, 5865:2, 5871:23, 5887:24, 5922:2
**higher** [17] - 5829:15, 5833:6, 5833:14, 5834:4, 5836:15, 5838:3, 5838:8, 5854:13, 5912:24, 5913:7, 5913:10, 5915:12, 5916:19, 5924:25, 5939:5
**highlight** [1] - 5839:2
**highlighting** [1] - 5838:23
**highly** [2] - 5854:20, 5869:13
**hire** [1] - 5838:5
**historically** [1] - 5915:16
**history** [2] - 5935:9, 5952:2
**hit** [2] - 5907:8, 5944:10
**hold** [1] - 5911:25
**home** [2] - 5874:10, 5905:19
**homing** [1] - 5896:15
**honest** [1] - 5916:10
**Honor** [100] - 5826:7, 5826:9, 5826:14, 5827:10, 5828:23, 5829:10, 5830:2,

5830:20, 5831:5, 5831:20, 5834:21, 5837:6, 5838:16, 5839:14, 5839:23, 5841:7, 5841:19, 5842:1, 5842:7, 5843:23, 5844:9, 5847:13, 5851:12, 5854:24, 5856:10, 5857:9, 5857:22, 5859:5, 5860:8, 5861:1, 5861:11, 5862:25, 5863:19, 5863:22, 5866:24, 5875:1, 5876:9, 5880:2, 5880:3, 5884:13, 5896:14, 5896:16, 5897:15, 5906:23, 5915:19, 5916:11, 5918:13, 5924:22, 5926:8, 5931:6, 5931:14, 5933:18, 5940:6, 5940:7, 5940:11, 5941:3, 5941:10, 5941:23, 5944:15, 5944:24, 5945:4, 5945:5, 5945:12, 5946:12, 5947:25, 5950:11, 5951:1, 5951:9, 5951:12, 5954:20, 5954:23, 5955:9, 5955:16, 5956:2, 5956:22, 5957:3, 5958:4, 5958:21, 5958:22, 5959:19, 5960:21, 5962:11, 5964:2, 5967:21, 5968:16, 5968:17, 5969:7, 5970:11, 5971:3, 5971:8, 5971:19, 5971:20, 5971:24, 5972:9, 5972:19, 5973:3, 5974:12, 5975:6, 5975:25, 5976:1
**Honor's** [1] - 5948:24
**HONORABLE** [1] - 5824:9
**hope** [2] - 5951:18, 5952:7
**hopefully** [1] - 5871:2
**hopes** [1] - 5881:15
**hoping** [1] - 5942:25
**horizontal** [1] - 5835:10
**hour** [1] - 5951:19
**hours** [4] - 5883:24, 5948:6, 5966:12,

5974:13
**house** [1] - 5946:19
**Hubbard** [9] - 5940:13, 5959:12, 5960:1, 5960:21, 5960:23, 5961:17, 5961:21, 5962:1, 5963:1
**hurt** [3] - 5843:19, 5844:2, 5844:3
**hyperlinked** [1] - 5946:12
**hyperlinks** [3] - 5932:3, 5932:21, 5934:3
**hypothetical** [3] - 5910:2, 5910:18, 5911:2

# I

**i.e** [1] - 5831:6
**idea** [5] - 5833:16, 5835:3, 5845:12, 5929:24, 5972:16
**identified** [4] - 5933:11, 5936:17, 5936:22, 5937:25
**identify** [4] - 5867:11, 5867:19, 5872:22, 5966:6
**identifying** [1] - 5947:6
**IL** [1] - 5824:16
**imagine** [1] - 5861:23
**immediate** [1] - 5861:3
**immediately** [3] - 5843:25, 5847:20, 5950:4
**impact** [7] - 5827:19, 5828:22, 5841:4, 5853:20, 5856:5, 5919:17, 5970:2
**impetus** [1] - 5845:8
**implications** [1] - 5830:13
**importance** [2] - 5827:19, 5827:22
**important** [19] - 5828:11, 5828:23, 5829:8, 5840:24, 5840:25, 5841:23, 5849:7, 5854:17, 5859:6, 5881:7, 5897:17, 5931:17, 5934:3, 5940:10, 5946:22, 5955:6, 5967:10, 5967:15, 5974:24

5993

**importantly** [1] - 5951:24
**impose** [1] - 5964:3
**improve** [11] - 5836:12, 5837:10, 5839:9, 5840:16, 5841:1, 5841:11, 5843:10, 5844:12, 5888:17, 5888:23, 5926:10
**improved** [4] - 5836:19, 5844:15, 5847:5, 5893:15
**improvement** [4] - 5838:20, 5843:10, 5863:10, 5937:2
**improvements** [4] - 5839:21, 5847:25, 5863:3, 5863:6
**improves** [1] - 5828:16
**improving** [2] - 5838:8, 5853:11
**IN** [1] - 5824:1
**in-brand** [1] - 5893:18
**inaccurate** [1] - 5950:5
**inappropriately** [1] - 5963:21
**incent** [1] - 5853:22
**incentive** [3] - 5840:25, 5854:3, 5881:10
**Incentives** [1] - 5836:25
**incentives** [17] - 5837:4, 5837:17, 5839:20, 5840:21, 5841:4, 5841:16, 5848:15, 5848:16, 5848:17, 5849:12, 5851:6, 5859:24, 5860:1, 5860:2, 5926:10, 5926:11
**incident** [1] - 5844:6
**inclined** [1] - 5954:5
**include** [2] - 5906:8, 5916:11
**included** [3] - 5911:20, 5938:4, 5939:3
**includes** [1] - 5906:16
**including** [8] - 5858:19, 5876:3, 5876:14, 5882:6, 5907:10, 5911:23, 5949:2, 5962:21
**incompetent** [1] - 5834:13
**inconsistent** [1] -

5852:21
**incorporated** [1] - 5872:17
**increase** [13] - 5828:17, 5835:17, 5836:23, 5838:1, 5839:4, 5859:21, 5861:19, 5861:20, 5862:7, 5862:10, 5893:15, 5893:19, 5937:5
**increased** [4] - 5836:22, 5859:22, 5862:5, 5893:14
**increases** [2] - 5841:15, 5860:2
**increasing** [4] - 5833:10, 5835:16, 5847:12, 5861:14
**increasingly** [6] - 5891:20, 5892:7, 5893:9, 5893:19, 5894:18, 5894:22
**incredibly** [1] - 5931:20
**incremental** [2] - 5849:19, 5849:21
**incumbent** [1] - 5922:6
**independent** [3] - 5867:17, 5908:16, 5916:15
**INDEX** [1] - 5977:1
**index** [2] - 5840:15, 5918:22
**indexing** [1] - 5840:10
**indicated** [1] - 5852:21
**indicates** [1] - 5876:21
**individual** [1] - 5870:6
**indulgence** [1] - 5951:1
**Industrial** [1] - 5857:23
**industry** [5] - 5906:10, 5906:25, 5907:9, 5907:16, 5907:19
**influence** [2] - 5958:5, 5960:22
**information** [22] - 5835:1, 5860:7, 5865:18, 5865:20, 5865:25, 5869:15, 5873:2, 5889:3, 5900:17, 5901:2, 5903:22, 5931:5, 5931:13, 5931:19, 5931:24, 5940:16, 5943:6, 5943:23, 5944:4, 5956:7,

5956:15, 5969:1
**informational** [2] - 5884:24, 5885:4
**informative** [1] - 5832:3
**initiated** [1] - 5843:21
**initiative** [1] - 5904:2
**initiatives** [1] - 5901:19
**innovate** [2] - 5888:16, 5888:22
**innovation** [7] - 5934:1, 5934:2, 5936:18, 5936:20, 5936:23, 5937:1, 5937:2
**insight** [2] - 5944:3, 5974:18
**Instagram** [7] - 5889:4, 5900:18, 5900:24, 5901:21, 5901:22, 5907:17, 5909:22
**instance** [4] - 5915:1, 5947:21, 5947:24, 5950:22
**instances** [4] - 5949:2, 5949:6, 5949:16, 5950:19
**instead** [4] - 5831:19, 5870:23, 5958:12, 5974:10
**insulation** [2] - 5854:22, 5861:9
**intelligence** [2] - 5918:25, 5919:2
**intend** [2] - 5940:19, 5973:16
**intending** [1] - 5972:16
**intense** [5] - 5855:23, 5900:17, 5900:23, 5904:8
**intensity** [4] - 5857:13, 5857:20, 5858:4, 5858:9
**intensive** [3] - 5858:5, 5858:17, 5970:1
**intent** [7] - 5896:17, 5896:20, 5901:6, 5901:16, 5903:22, 5968:22
**intentionally** [3] - 5865:12, 5936:19, 5937:12
**interaction** [2] - 5924:9, 5924:14
**interchangeably** [1] - 5874:5
**interest** [6] - 5950:2,

5958:25, 5959:2, 5959:16, 5961:21
**interested** [3] - 5851:17, 5852:19, 5894:7
**interesting** [2] - 5832:3, 5861:13
**interests** [1] - 5966:8
**interject** [1] - 5853:5
**internal** [12] - 5886:12, 5886:17, 5887:1, 5887:5, 5887:12, 5887:22, 5888:6, 5909:1, 5909:6, 5909:12, 5937:23, 5937:24
**internet** [1] - 5927:25
**Internet** [6] - 5928:14, 5928:16, 5928:17, 5928:18, 5928:21, 5935:22
**interpret** [1] - 5921:10
**interpretation** [2] - 5948:23, 5949:7
**interpretations** [1] - 5950:5
**interrupt** [5] - 5853:4, 5871:13, 5873:24, 5913:23, 5950:7
**interrupting** [1] - 5850:6
**interruption** [1] - 5874:12
**intervenor** [1] - 5963:23
**introduce** [1] - 5936:19
**introduced** [12] - 5842:7, 5860:12, 5936:24, 5947:18, 5949:4, 5949:13, 5949:18, 5951:23, 5952:10, 5959:6, 5966:6, 5966:16
**introducing** [1] - 5842:2
**introduction** [2] - 5842:1, 5842:4
**invade** [1] - 5958:25
**inventing** [1] - 5845:23
**invest** [12] - 5837:18, 5839:21, 5840:5, 5840:15, 5841:1, 5841:14, 5841:16, 5859:23, 5859:24, 5859:25, 5860:1, 5862:19
**invested** [1] - 5865:2
**investigate** [1] -

5994

5889:17
**investigation** [2] - 5902:16, 5904:6
**investing** [2] - 5837:20, 5837:23
**Investment** [1] - 5857:23
**investment** [16] - 5837:4, 5837:17, 5838:10, 5838:11, 5839:18, 5840:6, 5857:6, 5860:21, 5865:8, 5908:9, 5908:10, 5908:15, 5908:18, 5908:22, 5908:23, 5926:12
**investments** [7] - 5838:14, 5839:13, 5840:2, 5840:3, 5844:12, 5845:17, 5847:12
**inviting** [2] - 5943:18, 5963:19
**involve** [2] - 5829:2, 5876:2
**involved** [3] - 5828:24, 5874:17, 5937:9
**involves** [1] - 5882:8
**involving** [3] - 5880:12, 5888:11, 5946:4
**iPhone** [1] - 5914:13
**irrelevant** [1] - 5960:18
**irreparable** [1] - 5955:7
**irrespective** [1] - 5877:13
**IS** [7] - 5839:2, 5839:3, 5839:9, 5842:16, 5842:18, 5922:25, 5931:4
**Israel** [2] - 5887:8, 5898:24
**issue** [10] - 5855:16, 5933:9, 5952:11, 5954:24, 5957:5, 5957:10, 5959:1, 5960:6, 5967:7, 5975:5
**issues** [8] - 5826:10, 5951:2, 5952:16, 5952:22, 5953:12, 5957:24, 5959:14, 5972:4
**itself** [4] - 5838:17, 5863:2, 5876:18, 5939:3

## J

**Janice** [2] - 5825:16, 5976:18
**JANICE** [1] - 5976:10
**Japan** [4] - 5860:9, 5860:10, 5860:11, 5860:12
**jargon** [1] - 5866:11
**JI** [1] - 5861:2
**JIP** [6] - 5860:9, 5860:13, 5860:14, 5860:18, 5860:23, 5861:2
**job** [3] - 5833:17, 5864:22, 5970:3
**John** [1] - 5825:7
**jon.sallet@coag.gov** [1] - 5825:6
**Jonathan** [1] - 5825:1
**journey** [3] - 5892:14, 5892:21, 5894:10
**journeys** [3] - 5892:19, 5892:20, 5893:1
**Jr** [1] - 5824:21
**jschmidtlein@wc.com** [1] - 5825:10
**JSR** [2] - 5946:3, 5946:8
**judge** [1] - 5876:12
**JUDGE** [1] - 5824:10
**judicial** [2] - 5957:1, 5960:22
**Judicial** [1] - 5825:4
**jump** [3] - 5836:10, 5845:2
**jumping** [1] - 5843:20
**Justice** [4] - 5824:12, 5824:15, 5824:18, 5969:15
**JX33** [1] - 5965:10

## K

**Kang** [1] - 5852:9
**Kartasheva** [1] - 5851:14
**keep** [5] - 5846:13, 5850:9, 5960:1, 5965:4, 5974:5
**Kenneth** [1] - 5824:11
**kenneth.dintzer2@usdoj.gov** [1] - 5824:14
**kept** [2] - 5947:4, 5965:22
**key** [2] - 5838:23, 5839:2
**keywords** [1] - 5873:16

**kind** [33] - 5828:18, 5831:8, 5838:9, 5838:16, 5838:18, 5839:17, 5845:23, 5848:22, 5850:25, 5851:22, 5851:24, 5852:4, 5853:16, 5853:19, 5854:6, 5855:16, 5857:15, 5861:13, 5862:13, 5862:22, 5872:2, 5872:10, 5875:7, 5881:25, 5889:21, 5897:16, 5900:12, 5916:3, 5924:16, 5935:20, 5946:17, 5958:16, 5972:7
**kinds** [2] - 5875:6, 5932:8
**knowing** [1] - 5956:8
**knowledge** [4] - 5876:16, 5907:18, 5914:18, 5928:11
**knows** [1] - 5969:23

## L

**lack** [1] - 5854:18
**laid** [1] - 5955:7
**landscape** [1] - 5944:11
**language** [3] - 5851:2, 5851:3, 5918:10
**large** [4] - 5864:23, 5896:4, 5918:10, 5946:3
**larger** [3] - 5907:23, 5916:1, 5959:8
**LaSalle** [1] - 5824:15
**last** [15] - 5845:16, 5849:15, 5861:13, 5872:4, 5899:21, 5901:14, 5903:9, 5918:14, 5943:12, 5954:1, 5954:2, 5954:16, 5970:13, 5970:25, 5972:10
**late** [2] - 5922:4, 5976:4
**latency** [1] - 5856:25
**launch** [6] - 5844:10, 5863:8, 5911:7, 5911:10, 5915:25, 5916:3
**launched** [2] - 5861:16, 5933:1
**launches** [1] - 5861:14
**law** [2] - 5957:19, 5960:21
**LAW** [1] - 5825:2

**lawyer** [1] - 5943:3
**leading** [1] - 5905:20
**learn** [3] - 5890:17, 5891:11, 5903:22
**learning** [1] - 5918:10
**least** [14] - 5833:20, 5856:6, 5858:5, 5858:17, 5864:12, 5876:23, 5890:15, 5944:11, 5954:4, 5960:3, 5966:12, 5972:15, 5974:16, 5974:19
**leave** [2] - 5955:25, 5970:5
**leaving** [1] - 5869:18
**led** [1] - 5844:12
**left** [14] - 5827:12, 5832:4, 5832:7, 5832:11, 5833:25, 5834:3, 5834:14, 5836:2, 5858:5, 5858:8, 5858:11, 5858:16, 5970:18, 5972:7
**legal** [1] - 5957:6
**legend** [1] - 5885:21
**Lehman** [1] - 5918:18
**length** [1] - 5939:18
**less** [20] - 5837:23, 5840:24, 5841:2, 5849:1, 5854:5, 5854:22, 5856:13, 5856:14, 5856:21, 5860:7, 5860:18, 5861:8, 5861:22, 5888:9, 5888:10, 5897:24, 5918:11, 5919:6, 5920:21, 5920:22
**level** [1] - 5912:21
**lexicon** [1] - 5906:22
**license** [2] - 5927:14, 5927:17
**licensed** [2] - 5927:11, 5927:13
**Life** [1] - 5933:9
**life** [1] - 5971:9
**light** [1] - 5973:9
**likely** [9] - 5849:1, 5854:20, 5858:23, 5870:17, 5879:16, 5897:1, 5897:9, 5899:7, 5903:2
**limited** [1] - 5899:16
**Line** [1] - 5955:3
**line** [9] - 5830:4, 5830:5, 5836:3, 5843:10, 5962:21, 5962:25, 5969:4

**line-by-line** [1] - 5962:21

**lines** [3] - 5833:1, 5855:19

**link** [4] - 5874:8, 5881:7, 5931:16, 5931:23

**links** [3] - 5931:11, 5931:23, 5932:3

**list** [11] - 5932:9, 5933:24, 5970:17, 5971:7, 5971:10, 5971:13, 5972:23, 5973:11, 5973:12, 5974:1, 5974:6

**listed** [6] - 5836:25, 5901:22, 5904:24, 5905:2, 5905:3, 5905:4

**listening** [2] - 5916:22, 5942:6

**listing** [3] - 5885:21, 5889:21, 5890:11

**literally** [1] - 5962:25

**LLC** [1] - 5824:6

**LLP** [2] - 5824:22, 5825:8

**local** [4] - 5844:15, 5846:2, 5857:1, 5887:15

**location** [1] - 5867:9

**locations** [1] - 5872:19

**lock** [1] - 5934:17

**logic** [1] - 5840:8

**long-term** [1] - 5839:17

**look** [49] - 5832:7, 5833:8, 5834:14, 5834:15, 5835:18, 5836:20, 5841:22, 5844:5, 5845:5, 5846:23, 5847:15, 5858:18, 5871:24, 5873:4, 5880:20, 5883:3, 5883:10, 5883:12, 5884:9, 5884:11, 5884:20, 5885:12, 5889:13, 5890:15, 5890:19, 5902:11, 5906:5, 5906:25, 5908:2, 5909:5, 5912:13, 5917:20, 5924:3, 5924:14, 5934:14, 5935:7, 5944:1, 5947:25, 5953:16, 5958:9, 5959:11, 5961:13, 5964:11, 5965:7, 5969:5, 5969:13, 5974:15,

**5975**:10

**looked** [33] - 5842:1, 5857:5, 5865:5, 5868:10, 5868:15, 5868:18, 5870:6, 5870:8, 5870:9, 5871:7, 5874:17, 5874:20, 5878:4, 5878:20, 5882:14, 5883:1, 5888:24, 5889:25, 5893:25, 5895:25, 5901:2, 5904:13, 5913:9, 5919:8, 5921:19, 5923:2, 5923:14, 5923:17, 5923:18, 5935:8, 5935:9, 5935:10

**looking** [42] - 5831:3, 5831:15, 5831:19, 5831:20, 5832:4, 5832:5, 5833:6, 5834:25, 5838:17, 5840:13, 5842:20, 5847:15, 5853:5, 5856:8, 5865:20, 5865:25, 5869:22, 5876:13, 5878:4, 5878:5, 5885:19, 5887:17, 5887:20, 5888:25, 5891:15, 5891:24, 5893:21, 5894:1, 5896:22, 5897:10, 5897:22, 5902:22, 5903:14, 5903:20, 5909:21, 5914:4, 5914:6, 5915:13, 5923:4, 5959:20, 5962:8, 5967:20

**looks** [3] - 5866:25, 5884:14, 5890:8

**lose** [2] - 5856:9, 5863:6

**losing** [5] - 5841:10, 5855:12, 5855:17, 5856:8, 5863:2

**losses** [1] - 5843:7

**lost** [2] - 5877:15, 5921:14

**loud** [1] - 5842:16

**love** [1] - 5870:24

**low** [2] - 5936:8, 5936:12

**lower** [4] - 5835:6, 5836:7, 5841:1, 5916:1

**lowered** [1] - 5849:1, 5919:2

**loyalty** [2] - 5921:23, 5922:1

**lunch** [2] - 5827:4, 5837:7

**M**

**machine** [1] - 5918:10

**magazine** [1] - 5932:25

**magic** [1] - 5846:1

**magnitude** [1] - 5879:7

**Main** [1] - 5825:9

**main** [2] - 5875:4, 5966:22

**maintain** [2] - 5943:9, 5975:17

**maintained** [1] - 5943:8

**majority** [6] - 5864:23, 5879:7, 5879:8, 5884:25, 5885:5, 5885:10

**manage** [1] - 5970:2

**manageable** [1] - 5943:21

**managed** [1] - 5935:22

**manager** [1] - 5852:9

**Manber** [1] - 5842:10

**mandatory** [2] - 5938:19, 5938:21

**manner** [1] - 5970:5

**manufacturers** [1] - 5853:11

**March** [1] - 5932:25

**mark** [1] - 5969:4

**market** [79] - 5837:4, 5840:13, 5844:24, 5848:2, 5848:16, 5852:4, 5859:8, 5859:9, 5859:15, 5864:2, 5869:18, 5869:20, 5869:22, 5870:4, 5870:10, 5882:8, 5882:12, 5883:22, 5886:13, 5886:14, 5886:18, 5886:20, 5890:5, 5890:6, 5904:8, 5906:15, 5906:18, 5906:19, 5907:9, 5907:11, 5910:3, 5911:18, 5911:20, 5911:23, 5911:24, 5912:3, 5912:7, 5912:10, 5912:19, 5912:22, 5912:25, 5913:7, 5913:10, 5913:16, 5913:17, 5913:18, 5913:24,

**5914**:8, 5916:9, 5916:12, 5916:17, 5916:18, 5916:24, 5919:24, 5920:3, 5920:12, 5920:13, 5920:15, 5920:17, 5920:18, 5920:19, 5921:6, 5921:7, 5924:20, 5925:24, 5926:3, 5926:13, 5929:13, 5932:6, 5935:9, 5935:10, 5936:7, 5936:11

**marketing** [5] - 5893:2, 5895:5, 5895:10, 5900:8, 5900:14

**markets** [8] - 5828:14, 5829:9, 5859:4, 5859:17, 5859:21, 5863:11, 5910:17, 5911:1

**markup** [1] - 5970:6

**massive** [1] - 5919:13

**material** [5] - 5884:14, 5946:7, 5946:14, 5948:20, 5959:17

**matter** [6] - 5932:4, 5934:7, 5955:23, 5957:6, 5962:25, 5963:1

**mattered** [1] - 5933:21

**matters** [11] - 5829:3, 5872:10, 5872:11, 5884:3, 5945:23, 5946:3, 5948:14, 5950:6, 5958:13, 5959:13, 5960:23

**maximizing** [1] - 5945:13

**Mayer** [1] - 5842:10

**mean** [70] - 5830:18, 5833:12, 5833:21, 5839:10, 5844:2, 5846:11, 5848:7, 5849:2, 5856:23, 5862:2, 5865:7, 5868:7, 5868:17, 5870:24, 5873:23, 5875:24, 5877:25, 5879:16, 5881:24, 5884:8, 5886:22, 5887:16, 5892:22, 5892:23, 5892:25, 5896:4, 5897:3, 5900:11, 5901:9, 5902:5, 5902:22, 5905:22, 5906:7, 5906:8, 5908:14, 5910:11, 5914:22,

5996

5918:18, 5920:4, 5920:7, 5922:3, 5923:11, 5924:14, 5927:16, 5928:1, 5930:14, 5935:4, 5936:20, 5937:22, 5954:9, 5954:23, 5955:16, 5955:21, 5956:5, 5956:9, 5957:10, 5958:6, 5960:20, 5960:21, 5961:17, 5962:10, 5965:13, 5965:17, 5965:19, 5965:24, 5967:6, 5970:20, 5971:9, 5973:18
**meaning** [2] - 5837:9, 5902:4
**means** [11] - 5829:12, 5833:12, 5869:7, 5903:7, 5903:19, 5909:17, 5924:13, 5927:16, 5929:19, 5959:9, 5971:13
**meant** [5] - 5837:14, 5846:12, 5898:10, 5898:11, 5898:13
**measure** [10] - 5831:7, 5832:20, 5832:23, 5842:12, 5851:22, 5861:20, 5894:5, 5910:11, 5923:3, 5925:2
**measured** [2] - 5872:20, 5922:25
**measurement** [1] - 5932:15
**measures** [2] - 5832:22, 5924:16
**measuring** [4] - 5832:23, 5835:10, 5835:11, 5835:12
**mechanism** [1] - 5836:25
**mechanisms** [1] - 5852:24
**media** [30] - 5888:7, 5888:11, 5888:17, 5888:23, 5889:4, 5889:7, 5889:9, 5889:18, 5890:18, 5891:8, 5891:13, 5891:15, 5891:20, 5891:24, 5892:1, 5894:8, 5894:19, 5895:7, 5895:9, 5900:18, 5900:24, 5901:7, 5904:3, 5904:10, 5904:19, 5906:2, 5907:23,

5909:8, 5909:13, 5963:23
**median** [1] - 5858:21
**MEHTA** [1] - 5824:9
**member** [1] - 5862:6
**memo** [4] - 5861:12, 5861:13, 5861:18, 5951:22
**memory** [1] - 5942:15
**mentioned** [3] - 5830:13, 5849:6, 5856:15
**merely** [1] - 5943:6
**metric** [3] - 5839:2, 5857:13, 5913:25
**metrics** [2] - 5851:13, 5902:14
**MICHAEL** [1] - 5827:1
**Michael** [3] - 5825:11, 5934:11, 5977:4
**Microsoft** [25] - 5827:11, 5827:18, 5827:20, 5827:23, 5833:20, 5834:12, 5834:22, 5835:5, 5839:16, 5840:4, 5843:21, 5843:22, 5843:25, 5851:25, 5898:3, 5898:11, 5915:1, 5926:22, 5927:23, 5928:24, 5930:16, 5930:19, 5934:23, 5935:13, 5935:18
**Microsoft's** [5] - 5834:19, 5835:13, 5928:15, 5928:17, 5930:10
**Microsoft/Yahoo** [4] - 5827:13, 5833:22, 5834:17, 5834:25
**might** [7] - 5826:10, 5853:20, 5853:21, 5943:15, 5947:7, 5947:8, 5949:17
**mightily** [1] - 5944:17
**militates** [1] - 5954:25
**mind** [3] - 5864:16, 5904:24, 5961:16
**minimum** [1] - 5925:11
**minutes** [9] - 5837:25, 5875:5, 5875:13, 5875:16, 5931:10, 5939:10, 5939:11, 5939:21, 5939:23
**misinterpreted** [1] - 5898:10
**missed** [1] - 5944:11
**missing** [1] - 5845:11

**mistake** [1] - 5962:16
**misunderstood** [1] - 5960:2
**mixed** [2] - 5853:19, 5854:6
**mobile** [29] - 5832:6, 5834:2, 5834:9, 5840:5, 5840:7, 5853:10, 5853:11, 5867:22, 5867:23, 5867:25, 5873:11, 5876:2, 5876:3, 5890:23, 5912:4, 5912:8, 5912:10, 5912:11, 5912:19, 5912:25, 5913:5, 5913:7, 5913:17, 5914:8, 5914:9, 5914:17, 5915:2, 5915:12, 5915:13
**mode** [3] - 5846:10, 5846:11, 5846:12
**model** [1] - 5838:11
**models** [2] - 5918:10, 5918:20
**modest** [2] - 5848:8, 5848:10
**modification** [1] - 5968:10
**modifications** [2] - 5943:13, 5970:7
**modified** [2] - 5942:24, 5968:20
**modify** [2] - 5942:15, 5942:25
**modifying** [2] - 5944:2
**moment** [5] - 5846:1, 5877:9, 5880:19, 5883:10, 5926:5
**Monday** [1] - 5947:12
**monetizable** [9] - 5864:7, 5865:3, 5865:9, 5865:13, 5865:19, 5865:21, 5869:13
**monetization** [3] - 5828:11, 5835:1, 5835:5
**monetize** [3] - 5834:19, 5864:23, 5864:24
**monetized** [1] - 5865:13
**money** [13] - 5829:6, 5839:8, 5840:14, 5846:2, 5848:13, 5853:25, 5854:3, 5856:14, 5865:2, 5881:17, 5917:7, 5917:13

**monitor** [2] - 5828:25, 5829:6
**monopolist** [3] - 5910:3, 5910:18, 5911:2
**monopoly** [2] - 5911:17, 5930:22
**month** [1] - 5847:17
**moreover** [1] - 5847:7
**morning** [10] - 5826:4, 5837:13, 5873:4, 5883:1, 5916:22, 5939:19, 5947:12, 5970:15, 5971:25, 5976:3
**most** [13] - 5834:7, 5848:21, 5853:3, 5854:13, 5858:6, 5858:17, 5869:13, 5873:16, 5896:12, 5928:12, 5940:10, 5943:13, 5967:10
**motion** [1] - 5940:3
**motivated** [1] - 5875:6
**move** [11] - 5832:14, 5833:5, 5833:11, 5834:3, 5847:2, 5847:3, 5863:15, 5917:1, 5950:8, 5970:4
**moved** [2] - 5847:3, 5861:5
**moves** [1] - 5972:17
**movie** [1] - 5974:10
**moving** [5] - 5830:7, 5836:4, 5836:9, 5879:19, 5945:15
**MR** [114] - 5826:7, 5826:13, 5826:16, 5827:3, 5829:18, 5849:22, 5850:11, 5854:10, 5858:22, 5863:14, 5863:19, 5863:22, 5863:24, 5866:18, 5866:20, 5866:24, 5867:2, 5871:20, 5871:21, 5874:4, 5874:7, 5874:13, 5874:14, 5875:18, 5876:8, 5876:10, 5879:21, 5880:2, 5880:5, 5880:20, 5880:23, 5884:13, 5884:16, 5884:17, 5884:22, 5886:10, 5886:11, 5902:6, 5902:8, 5902:10, 5906:9, 5906:18, 5906:20, 5907:20, 5912:16, 5912:17, 5914:7,

5917:3, 5925:17,
5939:19, 5940:6,
5941:2, 5941:8,
5941:15, 5941:16,
5941:17, 5941:20,
5941:23, 5942:7,
5942:19, 5942:20,
5943:2, 5943:12,
5944:10, 5944:15,
5945:8, 5945:10,
5950:11, 5951:9,
5954:20, 5958:3,
5958:20, 5959:19,
5959:22, 5960:7,
5960:20, 5961:4,
5961:12, 5962:4,
5963:6, 5964:2,
5964:16, 5964:18,
5964:24, 5965:10,
5965:19, 5966:1,
5966:21, 5967:3,
5968:15, 5969:7,
5969:9, 5970:11,
5971:3, 5971:6,
5971:8, 5971:19,
5971:20, 5971:24,
5972:3, 5972:9,
5972:19, 5972:25,
5973:2, 5973:4,
5973:7, 5973:13,
5973:14, 5973:15,
5974:11, 5975:1,
5975:6, 5975:24,
5976:1
   **MSN** [1] - 5898:7
   **msommer@wsgr.**
**com** [1] - 5825:14
   **MTV** [1] - 5933:7
   **multi** [1] - 5896:15
   **multi-homing** [1] -
5896:15
   **multiple** [2] - 5946:4,
5967:16
   **mundane** [1] -
5845:24

# N

   **N.W** [1] - 5976:19
   **Nadella** [4] - 5827:10,
5827:12, 5827:17,
5833:21
   **name** [1] - 5927:21
   **narrow** [1] - 5942:2
   **narrowing** [1] -
5857:25
   **nature** [1] - 5891:3
   **Nav** [3] - 5931:18,
5931:21, 5934:6
   **navigate** [3] - 5868:22,

5872:23, 5873:1
   **navigating** [1] -
5877:23
   **navigational** [7] -
5873:21, 5874:1,
5874:2, 5874:3,
5876:18, 5878:9,
5885:23
   **Nayak** [1] - 5970:16
   **necessarily** [3] -
5950:1, 5955:3,
5959:25
   **necessary** [3] -
5940:18, 5956:17,
5963:12
   **need** [27] - 5826:11,
5826:17, 5828:25,
5829:1, 5843:5,
5846:14, 5856:8,
5884:9, 5890:15,
5891:13, 5897:17,
5918:22, 5919:23,
5920:2, 5942:3,
5945:16, 5955:2,
5957:24, 5966:17,
5968:11, 5968:12,
5968:13, 5969:21,
5970:9, 5975:7,
5975:10
   **needed** [7] - 5845:25,
5867:10, 5868:21,
5920:12, 5921:6,
5925:11, 5953:21
   **needs** [10] - 5884:24,
5885:5, 5924:2,
5924:10, 5924:19,
5925:4, 5943:20,
5955:15, 5958:21,
5959:10
   **Neeva** [4] - 5917:11,
5917:13, 5920:9,
5920:12
   **negotiating** [1] -
5827:22
   **Netscape** [3] -
5851:25, 5852:1,
5933:6
   **never** [4] - 5928:10,
5929:20, 5952:3,
5968:6
   **nevertheless** [2] -
5951:24, 5952:4
   **New** [21] - 5824:23,
5825:13, 5826:3,
5846:8, 5939:21,
5940:4, 5940:21,
5941:3, 5941:23,
5943:2, 5943:16,
5946:24, 5949:3,
5949:9, 5949:20,

5950:13, 5951:11,
5951:20, 5959:5,
5975:8
   **new** [12] - 5836:15,
5845:23, 5875:14,
5894:1, 5898:2,
5898:3, 5902:21,
5902:23, 5929:8,
5930:12, 5932:10,
5939:8
   **news** [1] - 5889:3
   **newspaper** [1] -
5846:15
   **Newsweek** [1] -
5933:9
   **next** [24] - 5841:19,
5841:25, 5843:7,
5845:5, 5845:14,
5847:20, 5847:21,
5860:16, 5869:1,
5870:12, 5883:12,
5890:19, 5897:11,
5903:2, 5925:16,
5942:7, 5968:12,
5971:23, 5971:24,
5972:7, 5972:8,
5972:14, 5974:22
   **Nickelodeon** [1] -
5933:7
   **Nifty** [1] - 5948:5
   **night** [1] - 5974:3
   **nights** [1] - 5971:14
   **nine** [4] - 5839:6,
5874:25, 5886:22,
5894:11
   **nobody** [4] - 5935:4,
5953:7, 5966:14,
5966:18
   **non** [11] - 5865:3,
5865:9, 5865:13,
5865:21, 5923:1,
5923:9, 5923:13,
5930:16, 5930:17,
5966:19
   **non-Google** [1] -
5930:17
   **non-Microsoft** [1] -
5930:16
   **non-monetizable** [4] -
5865:3, 5865:9,
5865:13, 5865:21
   **non-release** [1] -
5966:19
   **non-scale** [3] -
5923:1, 5923:9,
5923:13
   **noncommercial** [7] -
5876:14, 5876:17,
5877:10, 5877:22,
5881:8, 5881:15

   **none** [3] - 5845:22,
5888:10, 5948:13
   **nonetheless** [3] -
5848:11, 5850:24,
5869:21
   **normally** [1] - 5906:10
   **nose** [2] - 5850:25
   **note** [2] - 5948:22,
5975:18
   **notes** [1] - 5976:12
   **nothing** [5] - 5904:24,
5948:5, 5962:1,
5967:25, 5970:18
   **notice** [4] - 5842:8,
5842:10, 5890:16,
5955:20
   **noticeably** [1] -
5933:18
   **notifies** [1] - 5975:19
   **noting** [1] - 5844:21
   **notion** [2] - 5881:12,
5882:11
   **novel** [2] - 5955:16,
5955:22
   **nuance** [1] - 5950:19
   **nuanced** [1] - 5950:12
   **number** [29] - 5830:4,
5831:22, 5843:18,
5846:22, 5848:5,
5858:3, 5858:12,
5864:10, 5871:15,
5875:1, 5877:1,
5877:16, 5879:3,
5879:4, 5879:10,
5896:5, 5902:22,
5913:25, 5916:6,
5917:6, 5917:24,
5918:7, 5920:20,
5920:21, 5938:9,
5956:11, 5956:14
   **numbers** [10] -
5831:18, 5856:23,
5857:19, 5858:13,
5858:14, 5908:1,
5917:16, 5918:3,
5919:14
   **numerous** [3] -
5909:11, 5909:15,
5909:16
   **NW** [3] - 5824:12,
5824:19, 5825:17
   **NY** [2] - 5824:23,
5825:13

# O

   **o'clock** [1] - 5826:21
   **object** [1] - 5943:19
   **objected** [1] - 5965:23
   **objection** [4] - 5850:1,

5998

5884:13, 5941:6,
5943:5
**objections** [1] -
5955:24
**objective** [1] - 5956:14
**objectives** [1] -
5945:13
**obligation** [1] - 5950:3
**observers'** [1] -
5907:16
**obtain** [1] - 5950:13
**obviously** [10] -
5827:17, 5872:10,
5903:17, 5921:6,
5930:16, 5933:16,
5935:8, 5946:12,
5963:1, 5971:23
**October** [2] - 5824:5,
5976:14
**OF** [4] - 5824:1,
5824:9, 5825:2, 5976:8
**offer** [7] - 5855:25,
5869:14, 5869:25,
5905:12, 5918:15,
5922:18, 5945:1
**offered** [15] - 5865:11,
5869:5, 5912:6,
5918:25, 5919:22,
5920:1, 5924:18,
5925:3, 5925:18,
5925:23, 5926:2,
5929:7, 5929:11,
5958:4, 5958:5
**offering** [3] - 5922:2,
5937:17, 5938:12
**offers** [1] - 5856:1
**office** [1] - 5932:19
**Official** [2] - 5825:16,
5976:18
**OFFICIAL** [1] - 5976:8
**offs** [2] - 5937:4,
5937:9
**often** [6] - 5832:9,
5833:16, 5854:13,
5878:16, 5878:17,
5882:3
**oftentimes** [1] -
5873:11
**old** [1] - 5917:18
**once** [7] - 5932:1,
5956:22, 5963:9,
5963:19, 5966:10,
5968:24, 5972:7
**one** [96] - 5826:22,
5829:4, 5829:21,
5832:10, 5832:12,
5833:9, 5833:19,
5834:3, 5835:8,
5837:22, 5842:1,
5844:23, 5846:7,

5849:13, 5850:5,
5851:22, 5853:9,
5853:17, 5854:5,
5854:24, 5855:6,
5855:22, 5856:17,
5859:6, 5859:12,
5861:1, 5861:25,
5862:2, 5864:12,
5864:15, 5866:15,
5866:19, 5867:6,
5869:25, 5872:2,
5873:16, 5876:23,
5879:10, 5879:12,
5880:17, 5881:3,
5881:12, 5881:21,
5882:10, 5886:16,
5887:16, 5887:20,
5890:16, 5891:1,
5892:13, 5895:19,
5898:18, 5899:11,
5903:2, 5905:20,
5915:19, 5919:25,
5923:3, 5926:1,
5930:25, 5932:14,
5932:15, 5933:18,
5934:7, 5936:7,
5936:11, 5937:18,
5943:3, 5947:22,
5947:23, 5948:22,
5949:13, 5950:11,
5952:5, 5952:8,
5953:2, 5953:5,
5953:10, 5953:24,
5954:2, 5954:3,
5956:24, 5957:23,
5958:7, 5958:13,
5966:4, 5967:8,
5970:3, 5971:25,
5973:20, 5975:4
**one-stop** [7] -
5851:22, 5866:15,
5867:6, 5869:25,
5881:3, 5881:12,
5881:21
**one-week** [1] -
5832:10
**ones** [1] - 5865:13
**ongoing** [1] - 5940:12
**online** [11] - 5871:23,
5879:1, 5879:14,
5880:13, 5885:5,
5886:3, 5886:4,
5886:5, 5886:6,
5888:8, 5905:21
**onus** [1] - 5956:3
**open** [18] - 5844:24,
5868:21, 5915:21,
5927:5, 5927:10,
5927:11, 5927:16,
5927:17, 5944:6,

5947:2, 5947:4,
5950:22, 5950:24,
5952:21, 5963:17,
5965:3, 5971:12,
5975:4
**open-ended** [1] -
5975:4
**OpenAI** [1] - 5847:18
**opening** [1] - 5971:16
**openness** [1] -
5945:14
**opens** [1] - 5970:15
**operate** [1] - 5917:8
**operates** [1] - 5864:21
**operating** [3] - 5852:2,
5852:3, 5919:18
**opinion** [23] - 5858:23,
5859:2, 5859:18,
5866:14, 5869:5,
5872:9, 5881:6,
5883:21, 5912:6,
5912:23, 5918:16,
5919:22, 5920:1,
5922:18, 5922:23,
5924:18, 5925:3,
5926:2, 5926:7,
5929:7, 5929:11,
5935:11, 5938:12
**opinions** [9] -
5865:11, 5870:3,
5881:2, 5911:16,
5919:1, 5925:18,
5925:23, 5926:17,
5936:5
**opportunity** [7] -
5829:5, 5884:20,
5904:16, 5943:19,
5943:25, 5955:20,
5966:5
**opposed** [1] - 5958:1
**opposite** [1] - 5952:17
**options** [6] - 5854:19,
5856:12, 5865:24,
5866:3, 5867:13,
5867:15
**order** [23] - 5849:18,
5879:6, 5920:12,
5924:20, 5925:4,
5941:3, 5943:14,
5946:19, 5947:4,
5948:24, 5950:24,
5951:14, 5954:22,
5956:4, 5965:6,
5965:20, 5966:18,
5966:23, 5968:17,
5968:18, 5968:19,
5971:18, 5971:21
**ordered** [4] - 5858:8,
5858:16, 5968:9,
5969:19

**organic** [2] - 5831:6,
5831:9
**original** [1] - 5972:23
**originally** [1] -
5931:11
**otherwise** [2] -
5938:21, 5958:25
**ought** [2] - 5954:10,
5975:14
**ourselves** [1] - 5877:7
**outcome** [1] - 5831:25
**outside** [1] - 5953:18
**over-designated** [1] -
5940:16
**overall** [4] - 5912:12,
5913:9, 5913:17,
5922:24
**Overall** [1] - 5857:24
**overcame** [2] -
5928:17, 5928:20
**overlap** [11] - 5895:14,
5895:23, 5897:24,
5898:16, 5899:11,
5899:12, 5899:14,
5899:17, 5899:20,
5899:24, 5899:25
**overlapping** [1] -
5973:17
**overnight** [1] -
5939:15
**override** [1] - 5960:10
**overtook** [1] - 5928:14
**own** [6] - 5867:22,
5873:25, 5887:19,
5927:15, 5947:17,
5963:2
**ownership** [2] -
5925:25, 5926:4

**P**

**P&Ls** [1] - 5918:8
**p.m** [5] - 5824:6,
5879:24, 5940:1
**page** [19] - 5874:9,
5874:10, 5890:7,
5890:25, 5891:4,
5902:13, 5947:15,
5948:2, 5948:3,
5948:4, 5949:7,
5949:10, 5957:16,
5958:7, 5958:13,
5959:8, 5961:25,
5964:13
**Page** [1] - 5932:10
**pages** [16] - 5882:2,
5882:3, 5883:5,
5883:8, 5884:15,
5884:18, 5945:4,
5947:6, 5947:11,

5999

5947:21, 5949:14,
5952:13, 5952:14,
5957:23, 5959:8,
5960:4
  **Pandu** [1] - 5970:16
  **panel** [2] - 5833:25,
5834:1
  **pantry** [3] - 5846:10,
5846:11, 5846:12
  **paper** [1] - 5847:19
  **papers** [2] - 5949:9,
5951:18
  **paragraph** [1] -
5845:16
  **Parakhin** [3] -
5839:15, 5839:23,
5839:25
  **parameters** [1] -
5954:14
  **part** [23] - 5838:20,
5847:22, 5870:24,
5873:8, 5877:25,
5878:11, 5882:12,
5886:8, 5888:15,
5888:21, 5888:24,
5889:17, 5892:9,
5895:5, 5895:9,
5909:11, 5912:2,
5924:5, 5926:15,
5935:6, 5948:8,
5957:8, 5966:19
  **participants** [1] -
5848:16
  **participants'** [1] -
5837:4
  **participating** [2] -
5828:24, 5830:6
  **participation** [7] -
5828:10, 5828:22,
5828:24, 5829:8,
5829:11, 5829:20,
5829:25
  **particular** [27] -
5858:14, 5859:7,
5867:20, 5868:5,
5869:7, 5870:4,
5871:4, 5871:5,
5873:21, 5875:2,
5878:5, 5883:16,
5887:24, 5895:5,
5895:9, 5911:7,
5922:24, 5929:13,
5936:18, 5936:23,
5937:20, 5937:21,
5937:25, 5938:12,
5938:13, 5938:14,
5957:16
  **particularly** [5] -
5869:19, 5869:21,
5892:7, 5922:6,

5944:23
  **parties** [36] - 5826:3,
5940:15, 5945:18,
5947:3, 5948:13,
5948:25, 5949:22,
5950:2, 5952:19,
5953:2, 5953:10,
5953:20, 5954:6,
5954:14, 5956:3,
5956:5, 5957:11,
5958:1, 5958:18,
5958:19, 5958:23,
5961:2, 5961:18,
5962:9, 5963:10,
5964:10, 5966:24,
5968:7, 5968:11,
5969:5, 5969:22,
5970:2, 5971:4
  **parties'** [3] - 5940:3,
5949:15, 5950:4
  **partly** [1] - 5875:5
  **partnership** [1] -
5851:17
  **parts** [4] - 5893:11,
5924:17, 5960:18,
5961:9
  **party** [13] - 5927:14,
5930:15, 5949:4,
5949:16, 5950:3,
5954:6, 5955:11,
5965:15, 5965:23,
5966:5, 5966:11,
5966:16, 5967:5
  **party's** [2] - 5946:19,
5949:7
  **passage** [1] - 5941:11
  **passages** [1] - 5964:7
  **passed** [1] - 5928:20
  **past** [3] - 5839:10,
5847:16, 5944:23
  **path** [1] - 5940:4
  **patterns** [1] - 5897:19
  **Patterson** [1] -
5824:22
  **pause** [3] - 5826:23,
5904:21, 5939:9
  **paused** [1] - 5906:1
  **pay** [1] - 5914:11
  **payment** [1] - 5853:21
  **payments** [6] -
5849:17, 5850:9,
5850:12, 5853:8,
5853:12, 5853:16
  **PC** [5] - 5833:9,
5875:22, 5928:18,
5928:22
  **PCs** [12] - 5832:4,
5832:5, 5833:20,
5833:23, 5874:18,
5876:9, 5928:23,

5935:14, 5935:18,
5935:24, 5936:1,
5936:3
  **PDF** [1] - 5975:18
  **people** [36] - 5834:12,
5855:24, 5874:4,
5874:8, 5877:12,
5879:3, 5880:13,
5885:4, 5886:3,
5887:25, 5891:13,
5891:15, 5891:23,
5893:10, 5893:14,
5896:6, 5896:13,
5896:23, 5897:1,
5897:11, 5897:21,
5904:25, 5905:12,
5905:15, 5905:20,
5907:6, 5913:4,
5933:6, 5933:7,
5933:8, 5935:23,
5938:23, 5970:21,
5972:21, 5973:11,
5974:2
  **per** [4] - 5829:15,
5835:12, 5835:17,
5835:23
  **percent** [31] - 5832:22,
5864:17, 5868:8,
5871:15, 5875:8,
5875:19, 5875:21,
5876:13, 5876:22,
5877:1, 5877:2,
5877:4, 5877:9,
5877:12, 5877:16,
5877:17, 5877:21,
5878:3, 5879:11,
5879:14, 5879:15,
5885:19, 5886:6,
5895:8, 5902:20,
5903:9, 5920:15,
5920:17, 5921:1,
5925:8, 5952:15
  **percentage** [6] -
5864:11, 5864:19,
5871:16, 5895:4,
5914:3, 5938:14
  **percentages** [1] -
5885:25
  **perfect** [1] - 5832:22
  **perform** [1] - 5908:8
  **performance** [2] -
5894:19, 5908:23
  **performed** [2] -
5895:3, 5908:21
  **perhaps** [4] - 5940:24,
5948:24, 5950:5,
5965:2
  **period** [7] - 5836:21,
5836:23, 5868:19,
5875:15, 5888:12,

5897:4, 5903:6
  **periods** [1] - 5935:14
  **person** [1] - 5971:14
  **personal** [1] - 5969:1
  **perspective** [4] -
5860:19, 5899:23,
5946:23, 5967:3
  **pertain** [3] - 5876:12,
5877:4, 5917:24
  **pertains** [3] - 5876:12,
5877:4, 5917:24
  **phone** [8] - 5853:10,
5853:11, 5854:5,
5915:4, 5915:14,
5915:17, 5915:19,
5915:20
  **phones** [3] - 5832:6,
5914:8, 5915:13
  **phrase** [1] - 5834:4
  **phrases** [3] - 5832:8,
5833:7, 5834:6
  **pick** [2] - 5899:7,
5961:5
  **picky** [1] - 5885:8
  **picture** [5] - 5831:11,
5834:21, 5853:19,
5854:6, 5915:13
  **piece** [3] - 5841:19,
5924:21, 5951:22
  **pieces** [1] - 5924:12
  **Pinterest** [11] -
5904:4, 5904:5,
5904:7, 5904:15,
5904:24, 5905:1,
5905:5, 5905:6,
5905:11, 5905:14,
5905:19
  **pitch** [1] - 5838:21
  **place** [14] - 5837:15,
5840:19, 5849:3,
5854:24, 5894:19,
5902:17, 5903:15,
5905:12, 5905:15,
5940:20, 5944:7,
5952:5, 5970:1,
5971:21
  **places** [5] - 5865:17,
5886:2, 5886:4,
5905:20, 5927:1
  **placing** [1] - 5907:6
  **plaintiff** [1] - 5969:15
  **Plaintiff** [2] - 5824:21,
5825:1
  **plaintiff's** [2] - 5946:1,
5948:17
  **Plaintiffs** [2] - 5824:4,
5824:11
  **plaintiffs** [8] -
5945:16, 5946:9,
5947:8, 5949:13,
5962:24, 5966:8,

6000

5970:12, 5975:24
**plan** [5] - 5844:11, 5844:12, 5939:24, 5948:16, 5970:12
**planning** [2] - 5929:20, 5948:11
**PLAs** [2] - 5909:19, 5909:21
**platform** [16] - 5828:10, 5828:25, 5829:4, 5829:5, 5829:12, 5830:7, 5830:9, 5830:12, 5835:23, 5901:25, 5902:4, 5902:8, 5902:9, 5902:15, 5911:9, 5929:2
**platforms** [3] - 5896:23, 5901:3, 5901:11
**Play** [1] - 5915:21
**play** [1] - 5918:21
**played** [1] - 5963:7
**players** [1] - 5931:22
**plays** [1] - 5903:10
**plenty** [2] - 5872:15, 5887:22
**Plex** [1] - 5932:17
**plop** [1] - 5840:14
**plotting** [4] - 5835:25, 5836:4, 5836:16, 5858:6
**plus** [1] - 5954:1
**point** [36] - 5836:2, 5846:7, 5848:6, 5855:6, 5855:22, 5859:6, 5859:12, 5861:1, 5867:12, 5867:25, 5879:13, 5881:16, 5881:21, 5881:24, 5882:1, 5893:8, 5896:21, 5897:17, 5899:4, 5912:9, 5912:10, 5915:19, 5919:19, 5919:21, 5925:7, 5928:14, 5931:18, 5940:10, 5944:3, 5949:19, 5960:25, 5963:24, 5965:16, 5969:14, 5972:16
**pointing** [2] - 5855:25, 5958:1
**points** [7] - 5835:2, 5835:19, 5872:21, 5882:10, 5940:7, 5946:21
**poised** [1] - 5933:5
**poor** [1] - 5865:12
**popular** [11] - 5873:16,

5873:21, 5884:23, 5885:3, 5886:2, 5886:4, 5902:17, 5905:11, 5905:15, 5922:6, 5928:12
**portion** [8] - 5948:12, 5954:7, 5956:21, 5960:16, 5965:15, 5965:16, 5968:2, 5975:3
**portions** [9] - 5950:16, 5957:4, 5957:25, 5959:15, 5961:2, 5965:5, 5968:1, 5975:11, 5975:13
**posed** [1] - 5850:22
**posited** [1] - 5853:7
**position** [20] - 5826:4, 5826:13, 5831:23, 5853:14, 5860:15, 5918:15, 5922:20, 5924:3, 5937:11, 5940:23, 5945:20, 5947:10, 5951:15, 5958:17, 5962:24, 5963:8, 5963:12, 5974:21, 5975:7
**positioned** [3] - 5831:21, 5833:15, 5834:5
**positions** [3] - 5834:8, 5949:15, 5951:3
**possible** [6] - 5831:25, 5896:22, 5944:6, 5947:5, 5949:24
**possibly** [1] - 5837:16
**post** [4] - 5894:22, 5901:18, 5963:15, 5969:16
**post-Apple** [2] - 5894:22, 5901:18
**posted** [2] - 5942:18, 5969:16
**posting** [1] - 5967:9
**posture** [1] - 5957:12
**potential** [6] - 5837:9, 5848:20, 5848:21, 5849:7, 5849:10, 5949:12
**potentially** [6] - 5851:20, 5852:5, 5854:5, 5923:6, 5947:15, 5948:23
**power** [9] - 5869:22, 5870:4, 5910:3, 5911:17, 5925:24, 5926:3, 5926:13, 5930:22, 5959:2
**powerful** [1] - 5935:25
**practical** [1] - 5964:14

**practicality** [1] - 5957:5
**precession** [1] - 5931:5
**precisely** [2] - 5899:2, 5965:9
**precision** [3] - 5842:17, 5843:11, 5844:3
**predated** [1] - 5935:7
**predecessor** [1] - 5842:18
**predicated** [2] - 5827:6, 5827:15
**predict** [3] - 5828:20, 5830:24, 5861:21
**predicting** [3] - 5833:17, 5834:7, 5861:24
**Prediction** [1] - 5830:22
**predictive** [1] - 5862:1
**predicts** [1] - 5885:16
**prefer** [1] - 5938:23
**preloaded** [4] - 5928:10, 5928:18, 5928:22, 5929:2
**preloads** [1] - 5936:2
**prepare** [5] - 5945:21, 5949:11, 5968:12, 5968:18, 5970:23
**prepared** [5] - 5826:16, 5947:2, 5948:17, 5950:15, 5950:18
**preparing** [1] - 5971:11
**present** [6] - 5921:16, 5935:12, 5943:25, 5953:3, 5970:3, 5970:4
**presented** [19] - 5908:4, 5940:14, 5940:17, 5947:14, 5952:21, 5952:25, 5953:4, 5957:13, 5957:14, 5957:20, 5957:22, 5959:7, 5959:13, 5960:9, 5960:14, 5960:16, 5960:25, 5966:10
**presenting** [1] - 5957:12
**president** [2] - 5845:6, 5855:8
**press** [2] - 5847:21, 5959:5
**pressure** [3] - 5841:9, 5841:10, 5859:25
**presumably** [1] - 5971:10

**presumptively** [3] - 5951:24, 5957:7, 5958:22
**pretrial** [4] - 5942:21, 5942:23, 5952:4, 5957:11
**pretty** [6] - 5830:2, 5843:10, 5844:3, 5845:24, 5875:12, 5877:5
**prevent** [1] - 5910:2
**prevented** [1] - 5929:12
**previous** [1] - 5848:10
**previously** [6] - 5827:14, 5876:24, 5885:14, 5913:24, 5929:20, 5950:14
**Price** [1] - 5837:1
**price** [5] - 5841:12, 5841:14, 5854:14, 5860:2, 5861:16
**prices** [5] - 5829:14, 5841:15, 5854:14, 5861:14, 5890:11, 5890:12, 5890:24, 5908:5, 5911:1
**pride** [3] - 5843:19, 5844:2
**prides** [1] - 5838:16
**primary** [3] - 5927:7, 5950:25, 5951:4
**principle** [2] - 5864:21, 5865:1
**principles** [4] - 5951:21, 5955:10, 5962:20, 5962:21
**privacies** [1] - 5958:25
**privacy** [24] - 5854:25, 5855:2, 5855:5, 5855:10, 5855:11, 5855:24, 5855:25, 5856:2, 5856:11, 5856:12, 5856:15, 5856:20, 5894:17, 5901:18, 5904:2, 5936:25, 5937:3, 5937:5, 5937:13, 5937:17, 5937:20, 5938:1, 5938:10, 5938:23
**private** [4] - 5856:4, 5952:9, 5953:22, 5953:24
**problem** [4] - 5861:19, 5956:18, 5966:22
**proceed** [3] - 5942:5, 5947:5, 5949:23
**proceeded** [1] - 5959:11

6001

proceeding [3] - 5940:10, 5951:21, 5957:12

proceedings [4] - 5945:14, 5947:4, 5954:8, 5976:13

process [14] - 5940:19, 5941:25, 5943:23, 5952:5, 5953:6, 5953:14, 5956:1, 5963:7, 5964:23, 5966:3, 5966:24, 5967:21, 5968:20, 5969:25

proclaims [1] - 5933:4

produce [2] - 5889:19, 5923:16

produced [1] - 5963:25

product [8] - 5845:17, 5878:25, 5889:21, 5890:11, 5893:12, 5922:6, 5937:2, 5937:12

products [19] - 5828:14, 5843:19, 5853:12, 5882:15, 5889:3, 5889:7, 5898:20, 5899:10, 5901:22, 5901:24, 5902:18, 5902:21, 5902:23, 5903:16, 5904:8, 5904:14, 5905:12, 5905:14, 5905:21

PROFESSOR [1] - 5827:1

Professor [23] - 5827:4, 5836:24, 5838:13, 5844:5, 5847:11, 5847:24, 5848:15, 5849:22, 5851:5, 5852:6, 5852:24, 5854:11, 5858:23, 5861:7, 5862:18, 5863:16, 5863:25, 5880:6, 5883:23, 5890:18, 5902:25, 5939:12, 5970:13

Professor's [1] - 5880:21

profit [1] - 5929:22

profitability [1] - 5921:11

profitable [4] - 5921:13, 5921:15, 5921:18, 5921:20

program [4] - 5860:10, 5860:13, 5860:21,

5860:23

progress [1] - 5893:4

project [4] - 5852:9, 5927:5, 5927:8, 5927:9

promise [1] - 5874:15

promptly [2] - 5948:21, 5951:12

pronouncing [1] - 5852:18

proof [2] - 5886:14, 5945:1

proper [1] - 5962:10

properly [1] - 5966:13

proposal [3] - 5839:7, 5944:2, 5950:11

proposals [2] - 5950:10, 5951:4

proposed [4] - 5910:17, 5911:2, 5942:1, 5968:18

proposes [1] - 5950:13

proposing [4] - 5838:20, 5955:1, 5955:17, 5956:24

proposition [3] - 5961:9, 5965:8, 5965:18

proprietary [1] - 5901:4

Protection [1] - 5825:2

provide [10] - 5851:22, 5854:21, 5861:8, 5864:5, 5865:2, 5904:15, 5947:18, 5949:3, 5950:17, 5973:25

provided [3] - 5857:2, 5912:3, 5956:12

provider [1] - 5866:10

providers [2] - 5866:5, 5887:14

Provides [1] - 5869:2

providing [4] - 5864:22, 5866:15, 5871:23, 5902:14

provisionally [1] - 5973:8

provisions [2] - 5945:23, 5965:12

proxy [1] - 5839:2

public [52] - 5940:8, 5940:9, 5940:10, 5942:9, 5942:18, 5944:4, 5944:16, 5946:25, 5947:13, 5948:21, 5949:12, 5950:1, 5951:23, 5951:25, 5952:9,

5952:25, 5953:3, 5953:10, 5953:18, 5953:21, 5953:25, 5955:8, 5955:12, 5955:19, 5955:23, 5956:23, 5957:7, 5957:20, 5957:22, 5958:22, 5959:6, 5959:10, 5959:15, 5959:24, 5960:11, 5960:17, 5960:23, 5961:7, 5961:20, 5961:21, 5962:3, 5962:11, 5963:7, 5963:9, 5963:15, 5963:23, 5965:16, 5965:22, 5967:9, 5968:24

public's [2] - 5955:13, 5966:8

public-accessed [1] - 5944:4

publicly [7] - 5943:5, 5946:8, 5946:10, 5952:19, 5952:20, 5961:11, 5966:25

published [2] - 5830:21, 5830:23

pull [5] - 5866:18, 5880:8, 5893:10, 5912:16, 5970:21

pulled [1] - 5971:6

punish [1] - 5974:11

purchase [10] - 5892:14, 5892:19, 5892:20, 5894:10, 5900:10, 5901:22, 5902:18, 5903:10, 5903:12, 5905:21

purchases [1] - 5905:19

purchasing [1] - 5865:18

pure [1] - 5971:15

purely [1] - 5942:11

purple [2] - 5836:10, 5836:12

purport [1] - 5923:8

purposes [8] - 5868:15, 5870:2, 5873:25, 5874:24, 5894:20, 5900:19, 5942:24, 5953:4

push [5] - 5854:4, 5863:11, 5948:16, 5966:9, 5973:22

pushback [1] - 5965:14

pushed [2] - 5940:17, 5942:1

pushing [1] - 5855:24

put [18] - 5832:8, 5851:1, 5851:3, 5862:15, 5867:6, 5868:14, 5875:24, 5881:23, 5890:13, 5891:6, 5904:11, 5923:23, 5940:20, 5944:7, 5963:18, 5967:25, 5968:6, 5969:25

putting [6] - 5881:8, 5913:4, 5935:23, 5950:20, 5956:3, 5961:7

## Q

qualified [6] - 5922:18, 5923:22, 5923:25, 5924:9, 5924:16, 5925:10

Quality [1] - 5837:1

quality [57] - 5837:10, 5838:1, 5838:3, 5838:7, 5838:8, 5839:21, 5840:16, 5840:23, 5841:1, 5841:2, 5841:12, 5842:11, 5842:12, 5844:13, 5854:17, 5854:19, 5854:22, 5856:24, 5857:3, 5859:15, 5861:8, 5861:17, 5862:5, 5862:7, 5862:10, 5863:3, 5863:6, 5863:10, 5864:6, 5865:2, 5871:23, 5887:24, 5897:3, 5922:2, 5922:19, 5922:21, 5922:24, 5923:3, 5923:10, 5923:16, 5924:16, 5926:10, 5926:11, 5930:25, 5931:2, 5932:11, 5932:14, 5936:8, 5936:12, 5937:7, 5938:17, 5938:24, 5939:1, 5939:5, 5939:6

quantitative [1] - 5925:2

queries [74] - 5829:16, 5830:4, 5830:8, 5831:12, 5831:13, 5831:14, 5832:5, 5832:12, 5832:16, 5835:10, 5835:11, 5835:13, 5835:23, 5837:9, 5837:22,

6002

5841:11, 5850:21, 5855:12, 5864:6, 5864:7, 5864:11, 5864:23, 5864:24, 5865:4, 5865:9, 5865:13, 5865:23, 5867:10, 5867:13, 5867:15, 5867:20, 5869:8, 5869:14, 5870:5, 5871:17, 5873:22, 5876:14, 5876:18, 5876:22, 5877:9, 5877:21, 5877:22, 5878:4, 5878:5, 5878:7, 5878:9, 5878:10, 5878:25, 5879:14, 5881:9, 5881:15, 5883:17, 5884:5, 5886:7, 5887:7, 5887:11, 5887:25, 5912:4, 5913:4, 5913:25, 5914:5, 5920:24, 5923:5, 5923:7, 5933:21

**query** [25] - 5828:20, 5829:3, 5830:25, 5832:8, 5832:9, 5832:10, 5833:14, 5834:4, 5835:17, 5865:19, 5865:21, 5869:7, 5874:1, 5874:3, 5875:9, 5876:19, 5877:13, 5878:5, 5878:17, 5881:16, 5882:4, 5882:20, 5882:22, 5896:12, 5915:12

**questioned** [1] - 5950:16

**questioning** [1] - 5947:22

**questions** [8] - 5826:9, 5863:14, 5902:3, 5907:5, 5910:12, 5940:22, 5944:12, 5951:2

**quick** [1] - 5940:7

**quickly** [7] - 5836:20, 5856:25, 5884:10, 5939:17, 5959:23, 5964:1

**quite** [5] - 5833:18, 5908:19, 5910:24, 5911:4, 5916:15

**quote** [3] - 5853:7, 5895:19, 5907:8

**quoted** [2] - 5931:18, 5965:3

**quoting** [2] - 5965:11,

5965:12

# R

**R&D** [13] - 5857:10, 5857:11, 5857:13, 5857:14, 5857:20, 5857:23, 5858:4, 5858:5, 5858:6, 5858:9, 5858:17

**Raghavan** [1] - 5855:7

**raise** [2] - 5955:24, 5959:21

**raised** [4] - 5848:25, 5849:1, 5860:24, 5957:11

**raises** [1] - 5841:12

**raising** [1] - 5841:15

**Ralph** [1] - 5825:3

**Ramaswamy** [5] - 5921:3, 5921:5, 5925:10, 5925:14, 5930:7

**Ramaswamy's** [1] - 5925:8

**random** [1] - 5951:14

**ranges** [1] - 5947:6

**ranking** [2] - 5843:2, 5843:5

**rarely** [1] - 5955:1

**rate** [7] - 5831:20, 5831:21, 5832:19, 5833:3, 5833:4, 5833:14, 5834:5

**rates** [5] - 5828:18, 5833:6, 5833:10, 5833:24, 5862:1

**rather** [7] - 5861:17, 5868:2, 5870:18, 5871:6, 5947:1, 5959:3, 5974:9

**ratio** [1] - 5857:14

**rational** [4] - 5862:21, 5862:24, 5863:7, 5863:12

**re** [3] - 5900:8, 5900:14, 5948:12

**re-marketing** [2] - 5900:8, 5900:14

**re-reviewed** [1] - 5948:12

**reach** [7] - 5826:19, 5894:6, 5896:19, 5896:23, 5897:11, 5899:6, 5948:7

**reacted** [1] - 5842:23

**reaction** [1] - 5843:9, 5853:6

**reactions** [2] - 5940:3, 5951:8

**read** [13] - 5830:10, 5836:6, 5842:13, 5850:4, 5855:23, 5862:9, 5899:18, 5903:5, 5919:19, 5930:2, 5933:9, 5951:18

**readdicted** [1] - 5827:11

**readdress** [1] - 5944:12

**reading** [1] - 5856:6

**reads** [1] - 5965:15

**ready** [3] - 5826:24, 5863:20, 5863:21

**real** [3] - 5856:5, 5896:15, 5898:21

**realize** [2] - 5852:10, 5917:20

**realized** [1] - 5854:13

**realizing** [1] - 5934:15

**really** [42] - 5831:11, 5832:2, 5832:3, 5832:25, 5836:20, 5841:20, 5842:13, 5844:4, 5844:21, 5845:22, 5846:19, 5847:14, 5849:24, 5856:9, 5862:2, 5862:22, 5876:15, 5890:14, 5905:4, 5912:9, 5916:12, 5916:15, 5916:23, 5916:25, 5919:9, 5932:3, 5933:17, 5933:19, 5934:7, 5934:9, 5940:23, 5948:18, 5956:21, 5957:17, 5959:13, 5962:8, 5963:8, 5964:3, 5973:21, 5973:25

**reason** [16] - 5837:24, 5860:18, 5861:23, 5872:12, 5882:6, 5898:16, 5898:21, 5931:20, 5931:21, 5948:2, 5952:7, 5954:16, 5955:6, 5958:14, 5970:18, 5970:21

**reasonable** [1] - 5965:21

**reasoning** [2] - 5838:18, 5839:11

**reasons** [2] - 5869:23, 5962:17

**rebuttal** [1] - 5975:2

**received** [2] - 5853:13, 5962:22

**receiving** [3] - 5947:13, 5949:10, 5953:13

**recent** [3] - 5847:11, 5888:12, 5888:14

**recess** [2] - 5879:24, 5940:1

**recognition** [4] - 5861:19, 5906:25, 5921:23, 5922:1

**recognize** [4] - 5846:23, 5873:10, 5873:14, 5954:24

**recognized** [1] - 5970:20

**recognizing** [3] - 5845:13, 5862:4, 5872:11

**recollection** [3] - 5873:25, 5930:5, 5942:16

**record** [25] - 5847:14, 5864:9, 5888:24, 5892:9, 5919:16, 5934:14, 5951:10, 5951:23, 5951:24, 5956:23, 5957:2, 5957:20, 5957:22, 5957:23, 5957:25, 5959:10, 5960:19, 5960:23, 5961:7, 5961:19, 5962:11, 5962:16, 5964:22, 5965:15, 5965:16

**records** [3] - 5875:2, 5968:24

**Red** [1] - 5955:3

**red** [12] - 5832:24, 5833:2, 5833:3, 5835:6, 5835:14, 5835:24, 5836:5, 5836:9, 5842:12, 5842:14, 5847:20, 5969:4

**redacted** [27] - 5827:23, 5831:17, 5850:4, 5857:18, 5860:17, 5861:11, 5917:19, 5917:21, 5941:12, 5942:9, 5942:10, 5942:12, 5942:18, 5945:2, 5945:17, 5945:22, 5946:16, 5948:2, 5949:14, 5950:15, 5961:18, 5963:21, 5964:7, 5964:14, 5966:13, 5975:13, 5975:15

**redaction** [5] - 5941:4,

6003

5941:5, 5941:6,
5941:24, 5975:20
**redactions** [15] -
5942:1, 5942:3,
5945:21, 5946:15,
5948:8, 5951:7,
5951:9, 5962:10,
5962:22, 5963:8,
5963:10, 5966:11,
5969:1, 5975:16
**Reduce** [1] - 5836:25
**reduce** [1] - 5852:25
**reduced** [3] - 5840:20,
5862:11, 5918:16
**reduces** [1] - 5854:18
**reducing** [2] -
5837:23, 5854:3
**reduction** [3] - 5854:5,
5937:6, 5938:17
**reductions** [3] -
5936:8, 5936:13,
5937:6
**refer** [2] - 5904:9,
5930:6
**reference** [3] - 5873:3,
5882:23, 5946:13
**referenced** [1] -
5937:24
**references** [2] -
5849:3, 5943:7
**referencing** [1] -
5949:9
**referral** [4] - 5871:9,
5885:9, 5885:23,
5885:24
**referred** [1] - 5866:4
**referring** [3] - 5914:12,
5915:14, 5965:9
**refine** [1] - 5974:20
**reflect** [2] - 5953:23,
5965:6
**reflected** [1] - 5879:13
**reflection** [1] -
5953:17
**refrain** [1] - 5841:13
**refusing** [1] - 5966:17
**regard** [1] - 5905:19
**regarding** [2] - 5857:5,
5891:7
**regardless** [1] -
5961:10
**regards** [1] - 5925:20
**regression** [1] -
5923:8
**regressions** [2] -
5922:22, 5923:2
**regular** [1] - 5896:7
**relate** [3] - 5858:14,
5924:15, 5941:9
**related** [4] - 5892:2,

5923:15, 5923:16,
5943:22
**relates** [2] - 5948:4,
5961:25
**relating** [5] - 5830:14,
5839:19, 5842:5,
5852:6, 5852:14
**relation** [1] - 5875:19
**relationship** [1] -
5835:15
**relative** [6] - 5848:10,
5857:20, 5893:17,
5894:11, 5913:16,
5918:21
**release** [6] - 5962:20,
5963:10, 5964:4,
5966:19, 5967:18
**released** [15] - 5928:7,
5942:3, 5958:21,
5959:10, 5961:11,
5962:15, 5962:17,
5963:3, 5963:16,
5964:13, 5966:15,
5968:2, 5968:3,
5968:25
**releases** [1] - 5963:5
**relevance** [10] -
5830:14, 5830:15,
5830:17, 5831:3,
5831:16, 5832:23,
5861:20, 5861:21,
5861:24, 5862:5
**relevancy** [2] -
5961:10, 5961:20
**relevant** [25] -
5828:17, 5830:24,
5832:21, 5833:17,
5834:7, 5869:20,
5882:8, 5883:22,
5911:1, 5911:23,
5912:7, 5912:22,
5948:9, 5948:14,
5948:20, 5952:10,
5952:15, 5957:17,
5957:23, 5958:7,
5960:5, 5960:6,
5960:10, 5960:13,
5962:1
**reliable** [1] - 5853:18
**reliance** [1] - 5959:2
**relied** [1] - 5879:12
**reluctant** [1] - 5856:11
**rely** [2] - 5907:9,
5966:7
**relying** [3] - 5846:15,
5871:9, 5907:18
**remaining** [1] -
5952:14
**remains** [1] - 5973:9
**remedied** [1] - 5955:9

**remember** [22] -
5848:4, 5876:25,
5877:6, 5879:10,
5882:18, 5882:24,
5886:15, 5886:21,
5887:10, 5897:17,
5905:1, 5906:4,
5917:15, 5920:14,
5920:21, 5928:15,
5930:8, 5938:3,
5938:7, 5963:4,
5965:9, 5973:14
**remembered** [1] -
5879:17
**remembering** [3] -
5847:10, 5867:14,
5877:3
**remind** [1] - 5874:23
**reminds** [2] - 5846:6,
5851:24
**removing** [1] -
5950:21
**repeat** [14] - 5869:10,
5877:15, 5877:20,
5885:1, 5886:16,
5888:19, 5899:15,
5899:21, 5900:20,
5909:9, 5910:8,
5919:25, 5926:1,
5936:10
**repeated** [1] - 5940:9
**repeating** [1] - 5841:7
**report** [9] - 5880:16,
5885:9, 5892:3,
5899:19, 5906:5,
5908:1, 5908:2,
5933:12, 5938:8
**reported** [1] - 5875:19
**Reporter** [3] -
5825:16, 5825:16,
5976:18
**reporter** [3] - 5939:10,
5939:23, 5967:7
**REPORTER** [1] -
5976:8
**reporters** [4] -
5946:25, 5949:2,
5949:17, 5967:15
**reporting** [2] -
5846:10, 5879:11
**reports** [15] - 5844:18,
5846:8, 5869:5,
5878:23, 5880:17,
5908:20, 5912:6,
5918:2, 5921:22,
5925:18, 5929:11,
5930:6, 5936:17,
5936:22, 5938:4
**represent** [4] -
5889:14, 5890:21,

5902:12, 5966:8
**representative** [1] -
5886:2
**representatives** [1] -
5967:16
**represents** [1] -
5886:6
**request** [14] - 5826:5,
5826:21, 5884:15,
5942:11, 5943:9,
5946:24, 5947:19,
5948:17, 5952:1,
5958:15, 5962:24,
5966:9, 5969:15,
5969:17
**requested** [7] -
5943:13, 5968:5,
5968:6, 5968:8,
5968:14, 5969:20,
5975:9
**requesting** [1] -
5966:11
**requests** [4] -
5940:21, 5962:22,
5962:23
**required** [1] - 5949:1
**requires** [2] - 5961:10,
5961:14
**requiring** [1] - 5844:6
**research** [1] - 5857:5
**resolution** [1] - 5948:7
**resolved** [1] - 5941:25
**resource** [2] - 5967:7,
5970:1
**resources** [1] -
5967:12
**respect** [15] - 5853:9,
5871:16, 5911:16,
5940:21, 5943:4,
5943:8, 5943:16,
5945:25, 5946:20,
5950:10, 5952:22,
5953:13, 5953:15,
5954:11, 5960:4
**respectfully** [2] -
5949:19, 5972:20
**respond** [3] - 5826:11,
5844:8, 5844:25
**responded** [6] -
5843:18, 5843:21,
5843:24, 5907:17,
5967:17, 5967:19
**responding** [5] -
5841:24, 5843:20,
5845:19, 5847:11,
5847:16
**response** [9] - 5826:5,
5828:20, 5843:12,
5845:1, 5848:3,
5848:11, 5861:3,

6004

5862:14, 5948:16
**responsible** [1] -
5953:9
**responsiveness** [3] -
5910:23, 5936:8,
5936:12
**rest** [4] - 5829:6,
5858:20, 5959:17,
5974:24
**restating** [1] - 5962:17
**restrict** [1] - 5850:13
**restricted** [1] - 5851:3
**result** [4] - 5840:7,
5903:18, 5911:12,
5937:13
**resulted** [1] - 5911:8
**results** [29] - 5831:7,
5831:9, 5831:11,
5846:24, 5857:1,
5864:6, 5864:22,
5865:3, 5865:12,
5869:2, 5869:7,
5879:5, 5882:2,
5882:3, 5883:5,
5883:8, 5883:13,
5884:6, 5884:9,
5887:24, 5889:19,
5890:7, 5890:9,
5890:21, 5890:25,
5891:3, 5891:4,
5916:14
**retargeted** [1] - 5900:9
**retargeting** [1] -
5900:15
**return** [6] - 5908:9,
5908:10, 5908:15,
5908:18, 5908:22,
5908:23
**revenue** [23] -
5829:15, 5835:12,
5835:17, 5835:23,
5839:4, 5839:5,
5839:10, 5839:17,
5853:8, 5853:12,
5853:16, 5853:21,
5854:2, 5856:12,
5857:15, 5858:2,
5859:12, 5860:17,
5862:11, 5863:3,
5914:1, 5914:6
**revenue-share** [2] -
5853:8, 5853:12
**reverse** [2] - 5941:3,
5954:21
**review** [7] - 5826:3,
5947:21, 5947:23,
5948:3, 5962:21,
5963:2, 5964:1
**reviewed** [2] -
5839:19, 5948:12

**revised** [1] - 5970:17
**revisit** [2] - 5942:4,
5945:16
**revolutionary** [1] -
5932:23
**revolutionized** [1] -
5922:3
**rising** [1] - 5836:20
**risk** [6] - 5841:7,
5841:10, 5841:22,
5850:22, 5855:17
**rival** [4] - 5840:23,
5840:25, 5855:12,
5931:3
**rivals** [16] - 5837:9,
5839:12, 5840:21,
5848:15, 5854:15,
5859:23, 5859:24,
5862:18, 5863:6,
5922:10, 5926:9,
5926:11, 5930:21,
5932:5, 5939:3
**rivals'** [1] - 5839:20
**RMR** [1] - 5825:16
**road** [1] - 5907:8
**ROI** [3] - 5910:5,
5910:10
**role** [4] - 5892:14,
5903:10, 5903:12,
5918:20
**room** [2] - 5846:2,
5939:22
**Room** [2] - 5825:17,
5976:19
**Rosati** [1] - 5825:12
**rough** [2] - 5849:18,
5864:10
**roughly** [3] - 5876:21,
5920:20, 5921:13
**royalty** [1] - 5927:11
**RPM** [7] - 5829:14,
5835:12, 5836:1,
5836:8, 5836:15,
5836:20, 5836:22
**RSA** [1] - 5852:21
**rubber** [1] - 5907:8
**rule** [5] - 5942:15,
5942:19, 5942:20,
5942:22, 5942:24
**ruling** [2] - 5844:6,
5964:5
**run** [1] - 5841:14
**running** [4] - 5865:18,
5889:15, 5890:8,
5890:24

# S

**S.Browser** [1] -
5928:1

**Safari** [4] - 5827:24,
5850:20, 5850:23
**SAFTY** [5] - 5941:16,
5945:8, 5945:10,
5945:11, 5950:11
**Safty** [3] - 5825:8,
5945:9, 5945:10
**safty** [1] - 5945:8
**sale** [9] - 5828:15,
5854:4, 5894:6,
5901:22, 5901:25,
5902:4, 5902:7,
5905:12
**sales** [8] - 5854:3,
5854:6, 5857:14,
5857:15, 5858:2,
5901:11, 5903:16,
5904:4
**Sallet** [1] - 5825:1
**sample** [1] - 5886:2
**Samsung** [4] -
5851:15, 5851:16,
5852:10, 5927:25
**Samsung's** [1] -
5852:7
**sands** [2] - 5957:9,
5958:18
**sat** [3] - 5842:8,
5845:9, 5878:11
**satisfy** [2] - 5910:17,
5911:1
**saw** [10] - 5832:9,
5832:12, 5832:16,
5843:8, 5847:8,
5847:19, 5851:2,
5862:14, 5937:22
**scale** [60] - 5827:6,
5827:15, 5827:20,
5827:22, 5827:25,
5828:1, 5828:2,
5828:4, 5828:7,
5828:9, 5828:15,
5828:16, 5828:21,
5828:23, 5829:7,
5829:19, 5829:25,
5830:13, 5830:15,
5831:3, 5831:15,
5833:20, 5833:23,
5834:10, 5834:16,
5834:24, 5835:10,
5835:11, 5835:17,
5835:21, 5836:1,
5836:13, 5840:3,
5840:23, 5920:23,
5921:1, 5922:11,
5922:12, 5922:15,
5922:19, 5922:21,
5923:1, 5923:5,
5923:9, 5923:13,
5923:15, 5923:16,

5924:15, 5924:19,
5924:25, 5925:4,
5925:11, 5932:3,
5932:5, 5932:14,
5933:20, 5933:21,
5934:6
**scaled** [1] - 5860:21
**schedule** [1] - 5975:2
**Schmidt** [1] - 5843:15
**Schmidtlein** [14] -
5825:7, 5826:16,
5849:25, 5863:20,
5871:14, 5873:24,
5879:19, 5880:1,
5902:2, 5939:17,
5945:7, 5972:23,
5974:15, 5974:19
**SCHMIDTLEIN** [46] -
5826:16, 5849:22,
5863:22, 5863:24,
5866:18, 5866:20,
5866:24, 5867:2,
5871:20, 5871:21,
5874:4, 5874:7,
5874:13, 5874:14,
5875:18, 5876:8,
5876:10, 5879:21,
5880:2, 5880:5,
5880:20, 5880:23,
5884:16, 5884:22,
5886:10, 5886:11,
5902:6, 5902:8,
5902:10, 5906:9,
5906:18, 5906:20,
5907:20, 5912:16,
5912:17, 5914:7,
5917:3, 5925:17,
5939:19, 5942:20,
5971:6, 5971:20,
5972:3, 5972:25,
5973:4, 5973:7
**Schmitlein..............
5863** [1] - 5977:5
**scholarly** [1] - 5830:21
**science** [1] - 5846:1
**score** [7] - 5839:2,
5839:3, 5839:9,
5842:17, 5922:25,
5931:5
**Scoreboard** [1] -
5857:23
**scoreboard** [1] -
5857:24
**scores** [6] - 5842:17,
5842:18, 5857:2,
5873:3, 5873:4,
5873:13
**screen** [17] - 5842:3,
5844:7, 5844:8,
5844:10, 5846:24,

6005

5846:25, 5847:2, 5848:3, 5848:7, 5862:16, 5867:1, 5880:9, 5889:14, 5902:12, 5949:8, 5950:20

**scroll** [2] - 5884:14, 5890:22

**seal** [7] - 5942:12, 5945:2, 5945:20, 5945:22, 5945:24, 5960:1, 5965:5

**sealed** [5] - 5942:7, 5946:14, 5950:14, 5950:16, 5954:8

**sealing** [3] - 5963:11, 5964:8, 5975:20

**search** [264] - 5828:10, 5828:16, 5828:17, 5828:19, 5829:12, 5831:6, 5838:20, 5843:2, 5845:7, 5845:23, 5846:16, 5849:3, 5850:24, 5851:10, 5851:19, 5851:20, 5851:23, 5852:13, 5854:14, 5854:15, 5855:8, 5855:11, 5856:4, 5856:21, 5856:24, 5858:24, 5859:3, 5859:10, 5859:15, 5860:9, 5860:13, 5860:14, 5860:17, 5860:18, 5861:2, 5864:6, 5864:22, 5864:24, 5865:3, 5865:12, 5865:18, 5866:7, 5866:15, 5867:13, 5867:20, 5868:6, 5868:9, 5869:6, 5869:17, 5870:5, 5870:10, 5870:19, 5871:1, 5871:4, 5871:6, 5871:10, 5871:16, 5871:17, 5871:24, 5872:4, 5872:12, 5872:16, 5872:17, 5872:18, 5872:19, 5872:21, 5872:22, 5872:23, 5874:2, 5874:20, 5874:24, 5875:9, 5875:11, 5875:23, 5875:25, 5876:14, 5876:22, 5877:13, 5878:14, 5882:3, 5882:4, 5882:7, 5882:8, 5882:11, 5882:12,

5882:16, 5882:20, 5883:5, 5883:8, 5883:17, 5883:18, 5883:20, 5883:21, 5884:6, 5884:25, 5885:5, 5886:13, 5886:14, 5886:18, 5886:20, 5887:2, 5887:13, 5887:15, 5887:18, 5887:24, 5887:25, 5888:8, 5888:18, 5889:6, 5889:14, 5889:19, 5890:6, 5890:7, 5890:8, 5890:21, 5891:2, 5891:4, 5891:17, 5892:8, 5892:11, 5895:23, 5896:18, 5898:3, 5898:11, 5898:19, 5898:22, 5901:21, 5904:10, 5904:20, 5905:21, 5906:3, 5906:6, 5906:7, 5906:8, 5906:9, 5906:11, 5906:12, 5906:15, 5907:1, 5907:2, 5907:6, 5907:13, 5907:18, 5907:24, 5908:10, 5908:23, 5909:2, 5909:4, 5909:7, 5909:13, 5909:18, 5909:23, 5910:5, 5910:10, 5911:7, 5911:18, 5911:20, 5911:24, 5912:3, 5912:4, 5912:8, 5912:25, 5913:9, 5913:17, 5913:18, 5914:5, 5914:9, 5916:1, 5916:3, 5916:4, 5916:9, 5916:13, 5916:24, 5917:8, 5917:11, 5917:14, 5917:23, 5918:4, 5918:6, 5918:11, 5918:17, 5919:3, 5919:6, 5919:13, 5919:18, 5919:24, 5920:3, 5920:18, 5922:2, 5922:4, 5922:11, 5922:12, 5922:14, 5922:19, 5922:20, 5922:24, 5923:9, 5923:14, 5923:16, 5923:18, 5923:24, 5924:1, 5924:2, 5924:10, 5924:11, 5924:13, 5924:19,

5924:24, 5925:4, 5925:5, 5925:11, 5925:21, 5926:18, 5926:21, 5926:23, 5929:7, 5929:12, 5929:13, 5929:14, 5929:25, 5930:8, 5930:11, 5930:13, 5930:15, 5930:17, 5930:25, 5931:2, 5931:3, 5931:13, 5932:7, 5932:11, 5932:14, 5933:2, 5933:5, 5933:7, 5933:22, 5933:25, 5936:6, 5936:11, 5936:18, 5936:20, 5936:21, 5936:23, 5937:6, 5937:13, 5938:17, 5938:24, 5939:1, 5939:5, 5939:6

**searches** [6] - 5870:18, 5875:2, 5875:3, 5889:18, 5906:16, 5906:17

**searching** [12] - 5865:24, 5868:1, 5868:5, 5870:22, 5871:6, 5877:14, 5879:1, 5888:1, 5889:2, 5896:24, 5897:2, 5935:15

**second** [19] - 5826:22, 5828:16, 5833:18, 5834:8, 5836:24, 5844:6, 5845:2, 5845:3, 5845:16, 5845:20, 5845:21, 5846:18, 5853:19, 5885:12, 5904:21, 5934:9, 5940:15, 5948:4, 5954:2

**Section** [1] - 5825:2

**securing** [1] - 5840:6

**see** [73] - 5830:7, 5830:25, 5832:24, 5833:2, 5833:13, 5833:16, 5834:2, 5834:14, 5834:18, 5835:25, 5836:1, 5836:4, 5836:22, 5840:11, 5841:24, 5842:4, 5842:8, 5842:23, 5843:12, 5843:14, 5844:13, 5844:23, 5845:5, 5849:2, 5849:11, 5849:16, 5852:6, 5852:9, 5852:14, 5852:17, 5852:22,

5855:19, 5855:20, 5856:4, 5856:9, 5858:10, 5858:12, 5858:20, 5860:2, 5860:13, 5862:17, 5869:3, 5870:14, 5872:6, 5876:19, 5876:20, 5879:23, 5881:18, 5883:6, 5883:14, 5889:18, 5890:11, 5890:24, 5892:4, 5893:3, 5897:19, 5897:20, 5900:11, 5901:2, 5903:14, 5905:3, 5911:10, 5912:24, 5913:1, 5920:14, 5921:8, 5934:14, 5939:22, 5968:17, 5974:10, 5976:2

**seeing** [11] - 5834:6, 5842:11, 5861:18, 5878:25, 5884:8, 5890:13, 5898:24, 5905:1, 5931:4, 5958:12, 5959:16

**seeking** [3] - 5956:25, 5959:6, 5966:23

**seem** [2] - 5885:21, 5905:17

**sees** [1] - 5863:2

**self** [2] - 5858:20, 5943:6

**self-contains** [1] - 5943:6

**self-driving** [1] - 5858:20

**sell** [2] - 5903:15, 5904:8

**selling** [4] - 5859:13, 5889:21, 5901:20, 5904:14

**sells** [1] - 5909:19

**sending** [1] - 5967:16

**sends** [1] - 5873:6

**senior** [2] - 5845:6, 5855:8

**sense** [14] - 5829:7, 5831:24, 5831:25, 5855:4, 5864:10, 5898:25, 5899:2, 5917:4, 5920:8, 5926:14, 5926:16, 5938:7, 5957:9, 5960:5

**sensitive** [1] - 5974:8

**sent** [2] - 5874:8, 5874:9

**separate** [1] - 5876:16

**separates** [1] - 5876:17

6006

**September** [8] - 5842:12, 5943:14, 5948:24, 5965:6, 5965:20, 5972:10, 5972:11, 5972:20

**Sergey** [1] - 5934:12

**serious** [1] - 5843:4

**served** [2] - 5865:12

**servers** [2] - 5919:12, 5919:14

**serves** [1] - 5942:15

**services** [31] - 5828:19, 5831:6, 5851:11, 5854:14, 5854:16, 5856:22, 5856:25, 5858:1, 5858:15, 5858:24, 5859:3, 5859:10, 5859:15, 5882:12, 5883:22, 5886:20, 5898:19, 5898:22, 5911:18, 5912:8, 5913:10, 5913:17, 5913:18, 5914:5, 5916:24, 5917:24, 5918:17, 5919:24, 5920:3, 5920:18, 5936:21

**serving** [1] - 5878:1

**session** [12] - 5874:20, 5874:24, 5875:4, 5875:15, 5875:20, 5875:22, 5892:1, 5944:23, 5953:19, 5953:22, 5954:1, 5954:15

**sessions** [1] - 5950:14

**set** [11] - 5843:7, 5868:18, 5875:2, 5877:9, 5892:21, 5892:23, 5912:21, 5934:21, 5962:14, 5963:3

**sets** [1] - 5831:1

**setting** [1] - 5925:20

**seven** [2] - 5942:17, 5972:15

**Seventh** [1] - 5825:5

**SEVERT** [8] - 5827:3, 5829:18, 5850:11, 5854:10, 5858:22, 5863:14, 5884:13, 5884:17

**Severt** [2] - 5824:18, 5846:21

**Severt.........5827** [1] - 5977:5

**share** [34] - 5840:7, 5848:9, 5848:10, 5853:8, 5853:12,

5853:16, 5853:21, 5854:2, 5900:12, 5911:18, 5911:24, 5912:3, 5912:11, 5912:12, 5912:25, 5913:7, 5913:10, 5913:16, 5913:24, 5914:3, 5915:12, 5916:12, 5916:18, 5919:11, 5920:12, 5920:15, 5920:17, 5920:18, 5926:8, 5928:20, 5928:23, 5933:16, 5945:13, 5951:6

**shares** [10] - 5847:2, 5848:2, 5848:9, 5886:13, 5886:18, 5890:5, 5912:19, 5914:9, 5916:17

**shelf** [1] - 5846:14

**shifting** [2] - 5957:9, 5958:18

**shoes** [5] - 5865:19, 5889:15, 5890:8, 5890:24, 5955:12

**shop** [6] - 5866:15, 5869:25, 5880:13, 5890:22, 5905:15, 5920:16

**shopping** [14] - 5851:22, 5867:7, 5871:23, 5878:17, 5879:14, 5881:3, 5881:12, 5881:21, 5886:3, 5886:5, 5886:6, 5887:6, 5890:23, 5891:25

**short** [2] - 5831:21, 5945:20

**shot** [2] - 5836:19, 5889:14

**show** [7] - 5828:17, 5879:3, 5879:9, 5910:17, 5911:11, 5947:12, 5961:6

**showed** [7] - 5867:8, 5877:2, 5879:10, 5882:22, 5885:9, 5931:6, 5936:16

**showing** [11] - 5830:3, 5830:4, 5830:6, 5857:17, 5857:19, 5858:3, 5884:17, 5885:24, 5958:23, 5962:8

**shown** [7] - 5909:7, 5909:13, 5910:5, 5949:8, 5950:19, 5952:14, 5959:9

**shows** [2] - 5858:9, 5864:11

**Showtime** [1] - 5933:8

**shrinks** [2] - 5975:3

**shut** [1] - 5879:25

**side** [17] - 5828:1, 5828:3, 5828:5, 5828:6, 5828:19, 5859:10, 5860:8, 5890:13, 5890:14, 5891:5, 5898:19, 5898:22, 5946:1, 5970:14

**sign** [2] - 5855:10, 5934:21

**signal** [1] - 5901:16

**signaled** [1] - 5955:5

**signals** [5] - 5900:17, 5900:23, 5901:7, 5903:22, 5904:8

**significance** [3] - 5872:8, 5881:5, 5881:7

**significant** [13] - 5827:5, 5848:8, 5865:2, 5879:3, 5879:4, 5886:8, 5887:14, 5899:25, 5901:20, 5903:21, 5904:7, 5910:2, 5930:12

**significantly** [2] - 5858:24, 5919:6

**similar** [6] - 5875:6, 5884:7, 5890:8, 5891:3, 5898:20, 5905:18

**simple** [2] - 5830:2, 5896:10

**simply** [2] - 5835:3, 5966:4

**simultaneously** [1] - 5896:7

**Singhal** [2] - 5843:2, 5931:17

**single** [6] - 5947:15, 5949:10, 5957:14, 5959:8, 5968:5, 5969:16

**Single** [1] - 5867:9

**sit** [1] - 5964:12

**site** [7] - 5867:11, 5875:10, 5889:9, 5892:1, 5900:18, 5900:24, 5904:3

**sites** [18] - 5868:5, 5870:22, 5888:7, 5888:11, 5888:17, 5888:23, 5889:4, 5889:7, 5889:18, 5891:8, 5891:15,

5891:16, 5891:20, 5891:24, 5901:7, 5909:8, 5909:14, 5910:6

**sitting** [3] - 5884:10, 5915:3, 5938:2

**situated** [1] - 5877:7

**situation** [1] - 5943:21

**six** [2] - 5974:2

**size** [2] - 5907:9, 5907:10

**slice** [2] - 5868:15, 5868:17

**slide** [59] - 5827:9, 5828:8, 5830:1, 5830:19, 5831:17, 5834:20, 5834:21, 5836:24, 5838:15, 5839:14, 5839:22, 5841:25, 5842:6, 5842:25, 5843:14, 5844:5, 5844:9, 5845:5, 5845:14, 5845:20, 5849:11, 5850:17, 5851:7, 5852:8, 5852:17, 5854:23, 5855:20, 5857:17, 5860:6, 5861:1, 5861:10, 5866:18, 5867:6, 5872:4, 5880:8, 5880:13, 5880:16, 5880:21, 5881:6, 5883:4, 5883:12, 5885:12, 5885:19, 5890:19, 5912:13, 5913:13, 5914:8, 5917:17, 5932:24, 5952:12, 5952:15, 5956:24, 5956:25, 5957:21, 5958:12, 5958:13, 5958:24

**slides** [3] - 5880:21, 5895:20, 5917:18

**slightly** [1] - 5950:12

**slip** [1] - 5951:7

**slot** [1] - 5831:23

**small** [8] - 5835:11, 5858:3, 5864:6, 5864:19, 5896:2, 5919:11, 5931:22, 5932:19

**smaller** [1] - 5838:8

**so..** [7] - 5850:7, 5896:20, 5912:12, 5914:12, 5915:6, 5915:22, 5962:12

**social** [27] - 5888:7, 5888:11, 5888:17, 5888:23, 5889:3,

6007

5889:7, 5889:9, 5889:18, 5890:17, 5891:8, 5891:13, 5891:15, 5891:20, 5891:24, 5892:1, 5894:8, 5894:19, 5895:7, 5895:9, 5900:18, 5900:24, 5901:7, 5904:3, 5904:10, 5907:23, 5909:8, 5909:13

**software** [2] - 5857:25, 5858:14

**sold** [1] - 5915:4

**someone** [5] - 5874:1, 5898:24, 5929:19, 5929:20, 5929:24

**someplace** [1] - 5889:10

**sometimes** [8] - 5834:11, 5836:6, 5849:2, 5893:7, 5900:14, 5949:10, 5952:13

**somewhere** [3] - 5892:10, 5915:4, 5919:20

**Sommer** [1] - 5825:11

**Sonsini** [1] - 5825:12

**Sorry** [2] - 5882:19, 5894:25

**sorry** [55] - 5828:8, 5829:15, 5829:21, 5830:3, 5830:18, 5833:13, 5835:7, 5837:12, 5838:6, 5842:16, 5846:20, 5849:24, 5853:4, 5853:25, 5856:17, 5865:16, 5866:24, 5869:10, 5871:13, 5873:24, 5874:11, 5877:15, 5883:11, 5885:1, 5885:18, 5886:16, 5890:1, 5895:1, 5898:5, 5899:15, 5903:5, 5904:1, 5904:9, 5904:21, 5905:22, 5906:6, 5906:13, 5909:9, 5910:7, 5910:8, 5910:19, 5911:4, 5913:23, 5914:22, 5915:8, 5917:20, 5920:22, 5926:1, 5930:24, 5936:10, 5943:15, 5950:7, 5951:18

**sort** [20] - 5856:15, 5893:10, 5895:3,

5896:7, 5902:13, 5906:10, 5945:13, 5947:1, 5949:19, 5949:20, 5951:14, 5952:24, 5953:1, 5963:9, 5963:12, 5964:10, 5964:18, 5965:1, 5965:5, 5972:17

**sought** [3] - 5945:24, 5947:23, 5968:10

**sound** [2] - 5899:16, 5903:11

**sounded** [1] - 5918:19

**sounds** [1] - 5903:12

**source** [8] - 5873:1, 5885:22, 5915:21, 5927:5, 5927:10, 5927:12, 5927:16, 5927:17

**South** [1] - 5824:15

**specialized** [13] - 5866:5, 5866:7, 5866:10, 5867:11, 5882:2, 5882:7, 5882:11, 5882:15, 5883:17, 5883:19, 5887:2, 5887:18, 5904:10

**specific** [12] - 5857:22, 5883:25, 5913:20, 5913:22, 5924:19, 5936:18, 5941:6, 5943:3, 5943:8, 5944:12, 5963:8, 5968:16

**specifically** [5] - 5851:15, 5900:14, 5926:16, 5950:10, 5961:18

**specifics** [2] - 5938:4, 5938:7

**spectrum** [1] - 5952:17

**spelled** [2] - 5966:21, 5968:15

**spend** [11] - 5829:6, 5846:2, 5857:10, 5891:8, 5891:9, 5891:13, 5891:15, 5904:19, 5906:2

**spending** [1] - 5891:24

**spent** [6] - 5857:14, 5916:22, 5917:4, 5917:7, 5917:13, 5974:14

**split** [7] - 5831:5, 5831:6, 5831:7, 5831:10, 5831:19,

5907:25, 5923:4

**splits** [2] - 5831:12, 5831:13

**sports** [6] - 5844:15, 5857:1, 5873:3, 5873:4, 5873:12

**spring** [1] - 5847:17

**square** [1] - 5953:2

**SSE** [1] - 5866:11

**staff** [1] - 5829:1

**stand** [3] - 5940:22, 5949:25, 5955:12

**standard** [1] - 5857:13

**standpoint** [3] - 5829:12, 5840:12, 5937:13

**stands** [5] - 5857:20, 5864:16, 5872:2, 5888:13, 5961:9

**star** [1] - 5870:12

**start** [29] - 5828:21, 5835:22, 5842:20, 5844:1, 5850:20, 5853:2, 5856:9, 5868:1, 5868:5, 5868:9, 5871:2, 5871:5, 5878:17, 5879:1, 5879:7, 5879:8, 5893:4, 5934:13, 5935:3, 5939:24, 5940:2, 5940:25, 5945:12, 5958:11, 5958:15, 5958:18, 5974:17, 5974:20

**started** [21] - 5826:2, 5829:10, 5842:8, 5842:10, 5842:19, 5844:3, 5846:9, 5864:14, 5874:20, 5875:20, 5875:22, 5877:12, 5879:11, 5897:15, 5899:18, 5932:1, 5932:3, 5934:6, 5935:23, 5939:13, 5953:1

**starting** [11] - 5842:4, 5842:12, 5842:22, 5843:6, 5870:18, 5875:15, 5878:13, 5879:3, 5879:4, 5931:7, 5954:3

**starts** [3] - 5829:7, 5934:15

**state** [4] - 5863:18, 5897:8, 5897:14, 5956:11

**statement** [4] - 5827:21, 5921:10, 5931:21, 5945:20

**statements** [3] - 5827:16, 5892:10, 5926:25

**STATES** [2] - 5824:1, 5824:10

**states** [2] - 5825:1, 5969:15

**States** [19] - 5824:2, 5824:21, 5825:17, 5826:8, 5860:23, 5873:11, 5914:10, 5914:17, 5915:2, 5917:25, 5935:16, 5938:14, 5940:7, 5940:8, 5942:8, 5944:16, 5944:19, 5971:22

**statistic** [4] - 5873:18, 5903:4, 5903:8, 5903:9

**statistics** [5] - 5902:14, 5905:16, 5906:4, 5912:3, 5916:12

**stats** [1] - 5913:9

**staying** [2] - 5891:20, 5976:4

**Stein** [1] - 5839:24

**stenographic** [1] - 5976:12

**step** [3] - 5835:8, 5939:15

**steps** [2] - 5937:5, 5963:9

**steward** [1] - 5927:7

**stick** [1] - 5975:18

**still** [14] - 5847:4, 5847:5, 5858:20, 5859:11, 5859:16, 5866:21, 5877:16, 5893:17, 5915:4, 5918:22, 5953:19, 5971:22, 5972:4, 5972:25

**stipulations** [1] - 5851:10

**stood** [1] - 5958:10

**stop** [10] - 5840:9, 5850:6, 5851:22, 5866:15, 5867:6, 5869:25, 5881:3, 5881:12, 5881:21, 5929:19

**Store** [1] - 5915:21

**story** [1] - 5935:20

**Street** [3] - 5824:12, 5824:15, 5824:19

**strike** [1] - 5897:23

**striking** [3] - 5833:18, 5845:22, 5846:19

**strong** [3] - 5860:11,

6008

5921:23, 5922:1
**struck** [1] - 5847:19
**studied** [2] - 5919:15, 5926:25
**studies** [6] - 5891:6, 5891:7, 5891:11, 5891:12, 5891:14, 5891:23
**study** [6] - 5868:10, 5868:12, 5885:14, 5900:23, 5908:9, 5908:12
**stuff** [2] - 5845:13, 5849:23
**subject** [6] - 5851:8, 5948:14, 5962:25, 5963:11
**submit** [1] - 5975:13
**submitted** [4] - 5942:1, 5942:10, 5946:4, 5964:10
**subsequent** [2] - 5843:17, 5963:5
**subset** [1] - 5973:24
**substance** [2] - 5897:7, 5965:3
**substantial** [5] - 5870:4, 5886:6, 5925:24, 5926:3, 5933:10
**substantially** [2] - 5893:24, 5939:5
**substantive** [1] - 5945:23
**substitutes** [2] - 5869:19, 5899:3
**substitution** [5] - 5828:13, 5882:15, 5897:16, 5897:19
**subtle** [1] - 5959:1
**succeeded** [1] - 5929:1
**success** [2] - 5871:5, 5872:2
**successful** [3] - 5843:13, 5844:4, 5871:22
**successfully** [3] - 5843:22, 5920:4, 5920:16
**suddenly** [4] - 5836:18, 5932:3, 5934:6, 5934:15
**suggest** [1] - 5884:11
**suggested** [1] - 5956:2
**suggesting** [2] - 5889:20, 5889:22
**suggestion** [1] - 5963:15

**suggestions** [3] - 5850:20, 5850:23
**Suite** [3] - 5824:16, 5824:19, 5824:23
**Sumar** [2] - 5951:6, 5951:10
**SUMAR** [25] - 5951:9, 5951:11, 5954:20, 5958:3, 5958:20, 5959:19, 5959:22, 5960:7, 5960:20, 5961:4, 5961:12, 5962:4, 5963:6, 5964:2, 5964:16, 5964:18, 5964:24, 5965:10, 5965:19, 5966:1, 5966:21, 5967:3, 5968:15, 5969:7, 5969:9
**summarizing** [1] - 5836:7
**sums** [1] - 5865:2
**Sunday** [1] - 5947:9
**sunk** [1] - 5917:5
**sunsetting** [1] - 5860:22
**super** [2] - 5841:23, 5854:17
**Super** [7] - 5837:16, 5837:24, 5838:7, 5916:20, 5916:22, 5916:25, 5917:1
**supplement** [1] - 5972:17
**support** [5] - 5841:18, 5881:2, 5882:11, 5941:5, 5944:16
**supportive** [1] - 5881:13
**supports** [3] - 5881:12, 5886:19, 5940:8
**suppose** [2] - 5942:15, 5957:24
**supposed** [2] - 5956:5, 5971:22
**surely** [1] - 5913:12
**Surface** [1] - 5915:5
**surpassed** [1] - 5860:16
**surprise** [2] - 5842:19, 5873:18
**surprising** [1] - 5840:12
**survey** [3] - 5855:1, 5878:22, 5879:10
**surveys** [4] - 5867:18, 5879:2, 5879:5, 5879:9
**SVP** [14] - 5866:9, 5867:20, 5868:1,

5868:5, 5868:21, 5868:22, 5869:2, 5869:9, 5872:24, 5887:19, 5888:4, 5904:10, 5910:5, 5910:10
**SVPs** [18] - 5867:22, 5869:14, 5869:16, 5870:18, 5870:21, 5871:5, 5871:9, 5872:1, 5872:14, 5873:21, 5876:3, 5882:16, 5884:23, 5885:3, 5885:10, 5885:21, 5906:17, 5907:3
**SW** [1] - 5825:9
**Swift** [1] - 5974:10
**switched** [1] - 5834:8
**switching** [1] - 5911:8
**syndicating** [1] - 5916:14
**system** [2] - 5852:2, 5852:3

**T**

**tab** [1] - 5890:23
**tabled** [1] - 5861:5
**tablet** [1] - 5915:14
**tablets** [1] - 5915:7
**tacks** [1] - 5974:20
**tail** [3] - 5831:13, 5832:13
**talks** [1] - 5864:17
**tap** [1] - 5873:12
**target** [6] - 5856:13, 5893:16, 5894:3, 5894:4, 5894:14, 5901:8
**targeted** [4] - 5895:4, 5895:9, 5900:5, 5900:7
**targeting** [3] - 5856:13, 5901:12, 5901:19
**tasked** [2] - 5968:4, 5968:7
**Taylor** [1] - 5974:10
**team** [3] - 5843:2, 5856:3, 5862:7
**teams** [1] - 5856:2
**technical** [1] - 5922:12
**tempting** [2] - 5834:12, 5862:23
**ten** [2] - 5860:14, 5949:14
**tendered** [2] - 5960:22, 5970:14
**tent** [1] - 5851:1
**term** [2] - 5839:17,

5924:22
**terms** [23] - 5839:4, 5839:5, 5852:12, 5853:17, 5857:11, 5872:2, 5873:21, 5879:6, 5901:13, 5904:19, 5906:2, 5913:24, 5918:3, 5920:23, 5922:12, 5926:7, 5931:4, 5944:18, 5944:25, 5952:19, 5952:25, 5953:6, 5956:1
**terribly** [1] - 5964:14
**terrific** [2] - 5879:22, 5975:22
**test** [2] - 5910:18, 5911:2
**testified** [13] - 5850:18, 5851:15, 5882:2, 5892:13, 5895:12, 5900:4, 5901:14, 5906:15, 5918:18, 5924:15, 5930:20, 5936:25, 5937:25
**testify** [3] - 5905:23, 5925:11, 5938:2
**testimony** [42] - 5827:10, 5839:15, 5839:19, 5839:23, 5839:24, 5843:15, 5845:6, 5851:12, 5852:18, 5855:7, 5863:16, 5866:16, 5880:24, 5881:6, 5881:11, 5886:9, 5886:12, 5886:17, 5886:22, 5892:17, 5896:8, 5906:15, 5908:4, 5912:2, 5917:10, 5917:15, 5919:16, 5919:19, 5919:21, 5920:11, 5921:8, 5925:8, 5929:23, 5930:2, 5939:14, 5940:13, 5941:24, 5942:4, 5944:21, 5950:18, 5953:17
**text** [2] - 5908:5, 5909:19
**THE** [106] - 5824:1, 5824:1, 5824:9, 5826:2, 5826:12, 5826:15, 5826:19, 5826:24, 5829:17, 5849:24, 5849:25, 5850:3, 5853:4, 5853:15, 5854:8,

5858:13, 5858:16,
5863:17, 5863:20,
5866:25, 5871:13,
5871:18, 5871:19,
5873:24, 5874:6,
5874:11, 5875:14,
5875:17, 5876:6,
5876:7, 5876:9,
5879:19, 5879:22,
5879:25, 5880:4,
5884:19, 5902:2,
5902:7, 5902:9,
5906:6, 5906:13,
5906:14, 5906:19,
5906:21, 5906:23,
5906:24, 5906:25,
5913:23, 5914:4,
5917:1, 5925:15,
5939:9, 5939:20,
5940:2, 5940:25,
5941:7, 5941:13,
5941:19, 5941:22,
5942:6, 5942:14,
5942:22, 5943:11,
5944:9, 5944:13,
5945:6, 5945:9,
5950:7, 5951:5,
5951:17, 5957:8,
5958:9, 5959:4,
5959:20, 5960:3,
5960:12, 5960:25,
5961:8, 5961:13,
5962:13, 5963:14,
5964:11, 5964:17,
5964:21, 5965:7,
5965:13, 5965:24,
5966:2, 5967:2,
5967:24, 5969:2,
5969:8, 5969:10,
5970:25, 5971:5,
5971:16, 5972:2,
5972:12, 5972:22,
5973:6, 5973:12,
5974:8, 5974:13,
5975:4, 5975:7, 5976:2
**themselves** [2] -
5840:13, 5971:10
**therefore** [3] -
5918:15, 5961:6,
5969:18
**thereof** [1] - 5973:24
**they've** [5] - 5862:3,
5917:7, 5921:15,
5967:8, 5973:24
**thin** [1] - 5861:21
**thinking** [16] -
5834:22, 5835:7,
5837:17, 5848:23,
5848:24, 5849:12,
5854:11, 5854:12,

5877:16, 5880:13,
5896:16, 5896:18,
5919:9, 5930:18,
5963:4
**thinks** [1] - 5838:13
**third** [22] - 5845:4,
5846:23, 5927:14,
5930:15, 5940:15,
5947:3, 5948:25,
5949:4, 5949:7,
5949:15, 5949:16,
5949:22, 5950:3,
5950:4, 5954:6,
5955:11, 5958:19,
5958:23, 5965:23,
5966:5, 5966:16,
5967:5
**third-parties'** [1] -
5949:15
**third-party** [9] -
5927:14, 5930:15,
5949:4, 5949:16,
5955:11, 5965:23,
5966:5, 5966:16,
5967:5
**third-party's** [1] -
5949:7
**thirdly** [1] - 5953:15
**thoughts** [4] -
5943:18, 5943:22,
5954:18, 5954:19
**thousand** [2] -
5835:13, 5835:23
**thousands** [1] -
5829:16
**threat** [14] - 5842:24,
5843:4, 5843:22,
5843:25, 5844:24,
5846:4, 5847:12,
5851:1, 5851:2,
5852:1, 5852:5,
5855:17, 5856:8
**threaten** [1] - 5852:3
**threatened** [2] -
5841:20, 5848:14
**three** [12] - 5843:17,
5844:23, 5846:20,
5846:22, 5848:5,
5903:2, 5940:7,
5954:1, 5954:4,
5954:16, 5954:25,
5974:13
**three-plus** [1] - 5954:1
**throated** [1] - 5963:13
**throughout** [2] -
5894:13, 5940:9
**throwing** [1] - 5847:21
**tied** [2] - 5837:14,
5844:25
**TikTok** [24] - 5888:13,

5889:4, 5892:2,
5892:7, 5900:18,
5900:24, 5901:24,
5902:13, 5902:17,
5902:20, 5902:21,
5903:2, 5903:3,
5903:10, 5903:15,
5903:18, 5903:21,
5903:23, 5903:24,
5907:5, 5907:6,
5909:3, 5909:23
**Time's** [1] - 5946:25
**Times'** [1] - 5940:21
**Tinter** [2] - 5827:11,
5827:21
**titled** [1] - 5830:22
**to..** [1] - 5849:8
**today** [26] - 5843:6,
5889:2, 5897:25,
5898:17, 5900:6,
5904:19, 5906:2,
5907:24, 5912:10,
5915:25, 5919:6,
5920:19, 5921:18,
5921:20, 5926:7,
5928:23, 5931:6,
5934:11, 5936:25,
5938:2, 5943:25,
5954:9, 5958:16,
5959:21, 5962:19,
5969:14
**together** [5] - 5830:8,
5867:6, 5868:14,
5932:20, 5970:25
**tomorrow** [4] -
5939:13, 5939:18,
5970:13, 5975:10
**tonight** [1] - 5970:16
**took** [4] - 5832:8,
5842:8, 5842:10,
5962:24
**top** [10] - 5831:21,
5831:23, 5832:19,
5832:20, 5833:15,
5833:24, 5834:5,
5860:13, 5893:4,
5906:4
**topic** [2] - 5879:20,
5934:4
**topics** [2] - 5861:6,
5933:25
**torso** [2] - 5831:12,
5831:13
**total** [1] - 5940:23
**toward** [1] - 5855:25
**towards** [1] - 5860:21
**track** [5] - 5842:11,
5906:11, 5909:2,
5909:6, 5909:12
**tracking** [2] - 5842:19,

5894:14
**trade** [2] - 5937:4,
5937:9
**trade-offs** [2] - 5937:4,
5937:9
**traffic** [13] - 5837:11,
5837:24, 5871:9,
5871:10, 5884:25,
5885:6, 5885:9,
5885:20, 5885:22,
5885:23, 5885:24,
5934:16, 5934:17
**train** [1] - 5870:21
**training** [1] - 5830:25
**transcript** [6] -
5963:20, 5964:4,
5964:9, 5964:12,
5976:11, 5976:12
**TRANSCRIPT** [1] -
5824:9
**transcripts** [13] -
5945:17, 5945:21,
5953:23, 5954:12,
5962:7, 5962:15,
5962:18, 5963:3,
5963:16, 5963:17,
5963:25, 5964:19,
5975:12
**transition** [1] - 5828:2
**transparency** [1] -
5894:17
**travel** [1] - 5887:15
**treated** [2] - 5878:12,
5965:1
**tremendously** [1] -
5847:18
**Trenches** [1] -
5830:22
**trends** [1] - 5912:12
**TRIAL** [1] - 5824:9
**trial** [15] - 5839:19,
5839:23, 5942:16,
5942:24, 5947:10,
5951:23, 5952:10,
5952:16, 5954:2,
5958:11, 5958:15,
5960:6, 5968:12,
5970:4, 5974:24
**trials** [1] - 5955:17
**tried** [8] - 5900:23,
5901:1, 5915:20,
5915:23, 5942:20,
5952:18, 5953:22,
5953:23
**tries** [3] - 5864:5,
5895:8, 5922:18
**trigger** [1] - 5876:23
**tripled** [1] - 5848:9
**true** [11] - 5859:16,
5865:23, 5869:19,

6010

5869:22, 5893:22, 5895:7, 5952:18, 5966:2, 5971:16, 5976:11, 5976:12
**truly** [1] - 5953:24
**try** [10] - 5828:19, 5853:22, 5871:1, 5900:16, 5913:15, 5914:24, 5915:19, 5923:14, 5950:8, 5954:20
**trying** [21] - 5827:23, 5870:21, 5877:5, 5877:7, 5885:7, 5895:17, 5895:19, 5898:7, 5899:5, 5904:22, 5915:20, 5916:25, 5920:8, 5923:5, 5932:19, 5935:2, 5953:19, 5953:20, 5954:13, 5964:3, 5967:16
**Tuesday** [1] - 5971:25
**turn** [9] - 5827:9, 5836:24, 5842:25, 5844:5, 5845:14, 5859:17, 5880:7, 5917:17, 5939:8
**turnaround** [1] - 5948:20
**turning** [2] - 5851:5, 5894:19
**two** [26] - 5828:6, 5833:8, 5834:2, 5837:21, 5841:21, 5841:25, 5843:16, 5843:23, 5847:13, 5849:13, 5852:24, 5853:17, 5867:9, 5892:22, 5892:24, 5941:17, 5947:25, 5952:6, 5953:6, 5953:25, 5957:23, 5959:8, 5960:4, 5967:8, 5971:25, 5975:8
**twofold** [2] - 5872:11, 5952:8
**tying** [1] - 5837:8, 5837:22
**Tyler** [1] - 5824:22
**type** [5] - 5873:5, 5874:2, 5877:13, 5881:16, 5943:23
**typed** [2] - 5873:16, 5878:12
**types** [8] - 5876:13, 5883:16, 5884:5, 5884:6, 5889:18, 5890:8, 5891:2, 5891:3

**typical** [1] - 5933:9
**typically** [6] - 5919:10, 5922:7, 5927:16, 5942:14, 5953:8, 5953:10

## U

**U-choice** [1] - 5848:3
**U.S** [4] - 5824:12, 5824:15, 5824:18, 5861:3
**ultimately** [4] - 5884:3, 5905:21, 5907:7, 5926:12
**un-redacted** [2] - 5941:12, 5945:2
**un-redaction** [4] - 5941:4, 5941:5, 5941:6, 5941:24
**uncertainty** [1] - 5852:23
**under** [10] - 5942:12, 5945:2, 5945:20, 5945:22, 5948:19, 5960:1, 5960:21, 5960:23, 5965:5
**understood** [4] - 5870:1, 5941:2, 5953:21, 5971:18
**undertaken** [1] - 5870:2
**undifferentiated** [1] - 5898:23
**uneconomical** [1] - 5840:4
**unending** [1] - 5856:23
**unfair** [1] - 5958:18
**Unit** [1] - 5825:3
**United** [16] - 5825:17, 5826:8, 5860:23, 5873:11, 5914:10, 5914:17, 5915:2, 5917:25, 5935:16, 5938:14, 5940:7, 5940:8, 5942:8, 5944:16, 5944:19
**UNITED** [2] - 5824:1, 5824:10
**united** [1] - 5824:2
**unless** [1] - 5951:2
**unlikely** [1] - 5877:22
**unpack** [1] - 5924:12
**unredacted** [1] - 5944:18
**unredacting** [1] - 5944:20
**unsealed** [5] - 5951:16, 5954:12,

5954:13, 5960:16, 5975:9
**unsealing** [1] - 5962:8
**unworkable** [2] - 5954:6, 5955:23
**up** [72] - 5828:7, 5829:1, 5829:14, 5830:1, 5830:8, 5830:19, 5831:17, 5834:20, 5835:8, 5835:23, 5836:4, 5836:10, 5836:19, 5837:8, 5837:9, 5837:14, 5837:22, 5838:15, 5839:14, 5839:22, 5841:25, 5842:6, 5842:8, 5842:22, 5843:14, 5844:9, 5844:11, 5844:19, 5844:25, 5845:9, 5848:5, 5849:11, 5850:17, 5851:7, 5852:8, 5852:17, 5854:23, 5855:20, 5857:17, 5860:6, 5860:13, 5861:2, 5861:10, 5866:18, 5880:8, 5881:25, 5884:2, 5887:16, 5893:1, 5893:17, 5894:6, 5902:12, 5902:23, 5905:3, 5912:16, 5920:20, 5921:2, 5931:7, 5934:17, 5941:13, 5942:24, 5946:17, 5947:12, 5948:1, 5961:12, 5962:5, 5964:5, 5966:2, 5968:6, 5969:4, 5969:13
**upwards** [1] - 5969:23
**UPX137** [5] - 5941:4, 5951:15, 5959:23, 5961:24, 5975:17
**UPXD104** [2] - 5863:15, 5977:8
**usage** [3] - 5928:20, 5928:23, 5936:1
**user** [24] - 5828:1, 5875:20, 5875:21, 5878:11, 5878:13, 5881:16, 5892:20, 5893:1, 5900:19, 5900:25, 5902:5, 5903:22, 5904:7, 5918:21, 5924:1, 5924:9, 5924:14, 5931:19, 5932:1, 5936:4, 5937:5

**users** [44] - 5830:11, 5856:5, 5856:8, 5856:9, 5864:23, 5865:17, 5865:24, 5866:3, 5866:15, 5867:22, 5868:1, 5868:4, 5870:22, 5873:10, 5878:17, 5879:1, 5879:7, 5879:8, 5879:14, 5881:20, 5889:6, 5891:7, 5891:19, 5892:6, 5892:7, 5893:3, 5894:3, 5894:4, 5894:9, 5895:23, 5895:24, 5896:6, 5898:17, 5901:7, 5901:8, 5901:21, 5902:18, 5902:20, 5903:2, 5903:10, 5903:23, 5926:18, 5929:2
**users'** [1] - 5931:19
**usual** [1] - 5845:18

## V

**Valentine's** [3] - 5882:18, 5882:21, 5883:5
**valuable** [2] - 5931:20, 5932:2
**value** [1] - 5834:24
**variable** [1] - 5914:2
**variables** [1] - 5923:11
**Varian** [4] - 5864:16, 5880:24, 5881:14, 5881:20
**varied** [1] - 5858:24
**various** [16] - 5864:15, 5867:14, 5872:1, 5876:3, 5879:2, 5891:16, 5896:22, 5899:10, 5909:8, 5909:13, 5926:23, 5927:1, 5927:18, 5929:4, 5938:11
**vary** [2] - 5855:2, 5879:5
**VC** [1] - 5930:8
**venture** [1] - 5849:3
**verbatim** [1] - 5965:12
**Verizon** [1] - 5955:14
**version** [8] - 5915:23, 5942:18, 5945:3, 5945:17, 5945:22, 5947:1, 5947:14, 5950:17
**versions** [5] - 5942:9, 5942:10, 5942:12,

5946:16, 5948:17

**versus** [15] - 5838:10, 5865:9, 5871:10, 5878:18, 5891:8, 5908:5, 5908:10, 5908:23, 5910:5, 5910:10, 5913:18, 5923:1, 5953:22, 5956:20, 5967:6

**vertical** [9] - 5835:12, 5836:2, 5858:7, 5866:5, 5866:10, 5867:13, 5870:4, 5887:13, 5887:25

**veto** [2] - 5966:14, 5966:18

**vice** [2] - 5845:6, 5855:8

**view** [6] - 5853:14, 5867:12, 5948:25, 5949:11, 5957:1, 5962:2

**View** [1] - 5830:22

**views** [1] - 5909:22

**virtue** [2] - 5925:24, 5926:3

**volume** [1] - 5895:4

**voluminous** [1] - 5947:7

**vs** [1] - 5824:5

## W

**wait** [2] - 5906:13

**waiting** [1] - 5949:25

**waiver** [1] - 5950:23

**walk** [1] - 5832:1

**walking** [1] - 5832:2

**wants** [2] - 5896:19, 5968:17

**warrant** [1] - 5962:2

**warranted** [1] - 5970:8

**wars** [1] - 5933:5

**Washington** [6] - 5824:5, 5824:13, 5824:19, 5825:9, 5825:18, 5976:20

**waste** [2] - 5954:21, 5971:15

**wasting** [1] - 5856:3

**watch** [1] - 5933:7

**ways** [8] - 5850:12, 5856:20, 5856:23, 5888:16, 5888:22, 5893:25, 5894:1, 5899:10

**weak** [1] - 5897:20

**weaker** [1] - 5841:2

**weather** [1] - 5865:20

**web** [12] - 5840:10,

5840:15, 5852:13, 5918:22, 5927:5, 5927:7, 5931:11, 5931:13, 5931:23, 5932:3, 5932:16

**Webb** [1] - 5824:22

**website** [9] - 5868:22, 5871:2, 5902:13, 5905:6, 5905:8, 5905:11, 5947:16, 5967:9, 5968:6

**websites** [9] - 5871:6, 5876:3, 5884:24, 5885:4, 5931:16, 5932:9, 5933:24, 5934:3

**Wednesday** [8] - 5970:15, 5971:12, 5971:17, 5971:21, 5972:1, 5972:6, 5972:13, 5974:16

**week** [15] - 5832:10, 5832:12, 5847:22, 5933:8, 5954:2, 5970:25, 5971:23, 5971:24, 5972:7, 5972:8, 5972:14, 5973:19, 5974:16, 5974:22

**weekend** [1] - 5974:4

**weeks** [12] - 5880:21, 5882:17, 5882:20, 5892:13, 5900:4, 5930:20, 5936:5, 5945:1, 5954:1, 5954:4, 5954:17, 5954:25

**welcome** [5] - 5853:6, 5943:17, 5961:8, 5970:6

**Wfcavanaugh@pbwt .com** [1] - 5824:24

**wheat** [1] - 5859:9

**whichever** [1] - 5880:10

**WHINSTON** [1] - 5827:1

**Whinston** [6] - 5827:4, 5880:6, 5883:23, 5939:12, 5970:13, 5977:4

**Whinston's** [1] - 5863:16

**whole** [9] - 5847:3, 5863:7, 5870:8, 5884:20, 5888:20, 5888:24, 5932:10, 5956:20, 5958:5

**widget** [2] - 5872:18, 5872:23

**wife** [1] - 5905:9

**William** [1] - 5824:21

**Williams** [2] - 5825:8, 5945:11

**Wilson** [1] - 5825:12

**Window** [1] - 5874:18

**Windows** [16] - 5852:2, 5875:22, 5915:4, 5928:8, 5928:10, 5928:13, 5928:18, 5928:22, 5928:23, 5930:10, 5935:14, 5935:18, 5935:20, 5935:24, 5936:1, 5936:3

**windows** [1] - 5875:12

**winning** [1] - 5929:2

**wish** [2] - 5863:9, 5863:10

**withheld** [6] - 5956:7, 5956:16, 5961:19, 5967:4, 5967:14, 5967:22

**WITNESS** [13] - 5849:24, 5850:3, 5853:15, 5858:16, 5871:18, 5875:17, 5876:7, 5876:9, 5880:4, 5906:13, 5906:23, 5906:25, 5914:4

**witness** [24] - 5850:1, 5884:17, 5947:7, 5947:14, 5947:16, 5947:23, 5948:10, 5948:18, 5950:15, 5959:9, 5960:9, 5961:6, 5970:13, 5970:17, 5971:1, 5971:6, 5971:7, 5971:17, 5971:25, 5972:4, 5972:23, 5973:20, 5973:21, 5977:3

**witnesses** [10] - 5949:24, 5950:20, 5953:5, 5959:7, 5970:23, 5973:5, 5973:15, 5973:24, 5974:4, 5974:17

**won** [2] - 5831:24, 5933:5

**wonderful** [1] - 5873:8

**wondering** [1] - 5915:3

**word** [1] - 5928:3

**words** [4] - 5875:21, 5929:14, 5929:18, 5957:13

**workable** [2] -

5943:20, 5944:23

**world** [1] - 5877:21

**worldwide** [2] - 5918:5, 5918:7

**worrying** [1] - 5842:21

**worse** [4] - 5834:9, 5834:16, 5854:20, 5894:21

**worsened** [1] - 5857:4

**worsens** [1] - 5840:23

**worth** [6] - 5844:21, 5847:9, 5852:22, 5947:22, 5972:15, 5974:16

**write** [2] - 5934:16, 5947:8

**writing** [2] - 5826:11, 5974:4

**written** [2] - 5843:1, 5861:12

**wrongfully** [1] - 5955:8

**wrote** [1] - 5855:21

## Y

**Yahoo** [20] - 5860:11, 5912:24, 5913:6, 5913:10, 5913:18, 5914:9, 5915:11, 5916:11, 5921:18, 5921:19, 5933:4, 5933:6, 5933:7, 5933:8, 5933:10, 5933:22, 5933:23, 5934:18, 5934:20

**Yahoo!** [1] - 5860:15

**Yahoo!'s** [3] - 5860:16, 5860:18, 5920:24

**year** [8] - 5830:5, 5836:1, 5836:8, 5836:11, 5901:11, 5921:15, 5928:15, 5933:1

**years** [11] - 5836:11, 5843:17, 5860:14, 5873:17, 5916:2, 5917:5, 5919:7, 5926:24, 5928:12, 5928:14, 5935:13

**York** [21] - 5824:23, 5825:13, 5826:3, 5846:8, 5846:9, 5939:21, 5940:4, 5940:21, 5941:3, 5941:23, 5943:2, 5943:16, 5946:24, 5949:3, 5949:9, 5949:21, 5950:13,

6012

5951:11, 5951:20,
5959:5, 5975:8
**young** [1] - 5892:7
**yourself** [4] - 5908:17,
5911:1, 5919:22,
5937:11

## Z

**zero** [5] - 5868:22,
5868:25, 5869:17,
5896:4, 5898:1