```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3       UNITED STATES OF AMERICA, et al., .
                                           .  Case Number 20-cv-3010
 4                Plaintiffs,              .
                                           .
 5           vs.                           .
                                           .  Washington, D.C.
 6       GOOGLE LLC,                       .  October 17, 2023
                                           .  1:31 p.m.
 7                Defendant.               .
         - - - - - - - - - - - - - - - - - .

 8

 9                   PUBLIC TRANSCRIPT OF BENCH TRIAL, DAY 23
                             (AFTERNOON SESSION)
10                   BEFORE THE HONORABLE AMIT P. MEHTA
                         UNITED STATES DISTRICT JUDGE
11

12       APPEARANCES:

13       For DOJ Plaintiffs:          KENNETH DINTZER, ESQ.
                                       United States Department of Justice
14                                     1100 L Street Northwest
                                       Washington, D.C. 20005
15
                                       DAVID DAHLQUIST, ESQ.
16                                     United States Department of Justice
                                       209 South LaSalle Street
17                                     Suite 600
                                       Chicago, Illinois 60604
18
                                       ADAM SEVERT, ESQ.
19                                     CAMERON GOWER, ESQ.
                                       MEAGAN BELLSHAW, ESQ.
20                                     United States Department of Justice
                                       450 Fifth Street Northwest
21                                     Washington, D.C. 20001

22

23                         -- continued --

24

25
```

```
1    APPEARANCES (CONTINUED):

2    For Plaintiff State of
     Colorado:                  JONATHAN SALLET, ESQ.
3                               STEVEN KAUFMANN, ESQ.
                                Colorado Department of Law
4                               Consumer Protection Section
                                Antitrust Unit
5                               1300 Broadway
                                Seventh Floor
6                               Denver, Colorado 80203

7    For the Defendant:         JOHN SCHMIDTLEIN, ESQ.
                                AARON MAURER, ESQ.
8                               BENJAMIN GREENBLUM, ESQ.
                                Williams & Connolly LLP
9                               680 Maine Avenue Southwest
                                Washington, D.C. 20024
10
                                MICHAEL SOMMER, ESQ.
11                              Wilson Sonsini Goodrich & Rosati
                                1301 Avenue of the Americas
12                              40th Floor
                                New York, New York 10019
13
     For Microsoft Corporation: JULIA CHAPMAN, ESQ.
14                              Dechert LLP
                                2929 Arch Street
15                              Philadelphia, Pennsylvania 19104

16

17

18   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
19                              Room 4704-B
                                Washington, D.C. 20001
20                              202-354-3284

21

     Proceedings recorded by stenotype shorthand.
22   Transcript produced by computer-aided transcription.

23

24

25
```

C O N T E N T S

TESTIMONY

MICHAEL D. WHINSTON    Cross-Examination (Cont'd)...... 6132
                       Redirect Examination............ 6148

NEIL BARRETT-BOWEN     Direct Examination.............. 6168
                       Cross-Examination............... 6207
                       Redirect Examination............ 6212
                       Cross-Examination............... 6212
                       Redirect Examination............ 6238


EXHIBITS RECEIVED

PSXD04.............................................. 6181
PSX780.............................................. 6195
PSX1201............................................. 6201
DX292A.............................................. 6218

```
1                   P R O C E E D I N G S
2           (Call to order of the court.)
3               THE COURT:  Thank you, everyone.  Please be seated.
4           All right.  Mr. Schmidtlein?
5               MR. SCHMIDTLEIN:  Thank you, Your Honor.
6       MICHAEL D. WHINSTON, WITNESS FOR THE PLAINTIFFS, RESUMED STAND
7                   CROSS-EXAMINATION (Continued)
8               BY MR. SCHMIDTLEIN:
9       Q.   Professor Whinston, you've not evaluated, as a part of your
10      work in this case, the cost to OEMs or browsers or wireless
11      carriers of implementing a choice screen; correct?
12      A.   Correct.
13      Q.   And you also did not set forth in any of your reports any
14      analysis or opinions about what revenue share payments any
15      search engine would offer to participate in a choice screen;
16      correct?
17      A.   That's correct.  It would probably depend on the design of
18      the choice screen.
19      Q.   Now, you've offered some opinions in this case about the
20      impact of the agreement that Bing and Yahoo! entered into in
21      2009; correct?
22      A.   Sorry.  Repeat the question.
23      Q.   You -- you have made reference to and offered some opinions
24      in this case about the impact of the Bing/Yahoo! deal in 2009 on
25      Bing's scale.
```

1          Do you recall that?

2     A.   Yes.

3     Q.   And if we can -- if you will look in your binder at

4     DXD16.013.  And this is a -- I've taken your -- one of your

5     slides from your binder, and I've just sort of kind of blown it

6     up to focus on the time period of the Yahoo!/Bing deal.

7          Do you see that?

8     A.   I mean, I see this, but I don't know what you did.  So can

9     you maybe just explain a little more?

10    Q.   You had a chart that -- of this that went all the way from

11    2009 all the way up to the present.  And I just cropped it and

12    blew it up so we could get a better look at this time period,

13    2009 and right afterwards.

14    A.   And what's being measured?  What's the vertical axis?

15    Q.   I believe it's market share.  This is from one of your

16    figures, Professor.

17    A.   I mean, I thought so, but I want to make sure.  So this is

18    overall U.S. market share?

19    Q.   That's correct.

20    A.   Okay.

21    Q.   And as of the time of the Yahoo!/Microsoft deal in 2009,

22    Yahoo! had larger market share than Bing; correct?

23    A.   Yes.

24    Q.   And as a result of that arrangement, Bing acquired --

25    doubled, more than doubled its scale of search queries; correct?

A.    Correct.

Q.    And after that time period, what we see in terms of market share here is Yahoo! losing market share to Bing; correct?

A.    Yahoo! does lose market share in this period, and Bing increases its market share.

Q.    There's no material impact on Google's market share; correct?

A.    So, you know, it slightly is going up in aggregate market share, but -- well, you can go ahead.  I mean, I think the -- the aggregate is a little -- missing some of the picture, I guess.  It depends what you're going to focus on.  So go ahead.

Q.    Well, the -- the point here is that after Yahoo! and Bing combined their search query scale, we don't see any increase in Bing's scale at the expense of Google; correct?

A.    So what's -- the reason I was saying what I said a moment ago is that in looking at aggregate share, you're kind of missing some of -- of the picture, which is that if you looked separately at mobile and you looked separately at PCs, the total share of Yahoo! and Bing actually in both of them goes up, and the Google share goes down.

        But it's hidden in this picture by the fact that the composition of the market during this period is moving towards mobile, where Google has a higher share.

        It's almost like -- when I started describing to you why you do a CPI index to deal with composition effects, it's kind

1    of the same idea, is like --

2    Q.   What percentage of the market, sir, in 2009 of search

3    queries were on mobile versus desktop?

4    A.   I don't remember that number, but --

5    Q.   It was overwhelmingly desktop; correct, sir?

6    A.   It may be, but I'm telling you that this picture is because

7    of composition.

8    Q.   It was overwhelmingly desktop in 2009 and 2010; correct?

9    A.   But mobile was -- was growing during this time, and that is

10   the composition change that I'm telling you about.

11   Q.   Do you know what percentage of mobile queries Microsoft had

12   in 2009 based on default agreements Microsoft had?

13   A.   I'm sorry.  Repeat the question.

14   Q.   Do you know what percentage of mobile queries Microsoft was

15   getting in 2009/2010 based on default mobile agreements

16   Microsoft had?

17   A.   I don't know that number.

18   Q.   You haven't done an analysis in this case of the gap in IS

19   score between Bing in 2009/2010 and Google in 2009/2010, have

20   you?

21   A.   So IS score didn't -- as of -- what they call IS score

22   didn't exist.  If you remember, I showed a picture to Your Honor

23   yesterday.  We looked at that graph -- towards the end, when I

24   was testifying, we looked at the precision score graph.  So that

25   had -- that showed a measure of the gap.

1    Q.    But you haven't -- you haven't analyzed in this case, you

2    haven't tried to calculate a quality score for Google versus a

3    quality score for Bing during the period 2009 to 2012?

4    A.    Google did that for me.  I showed it yesterday.

5    Q.    You showed it in one snippet of -- in 2009 --

6    A.    Over a year, I think, or a little more than a year.

7    That -- that's what I knew.

8    Q.    But you haven't tried to track the IS gap over 2009 to,

9    let's say, '12 or '15 or any other later period?

10   A.    The gap, no.  In my either rebuttal or reply report, I

11   don't remember which one, I also showed how Bing's -- its own

12   measure -- well, sorry.  I'm not sure if it was its measure or

13   Google's measure of Bing's quality following the -- the deal,

14   what happened to that and how it went up.

15         But you -- you asked about a gap.

16   Q.    Correct.

17   A.    I don't -- the only gap I know about is what I showed

18   yesterday.

19   Q.    Okay.  If you will turn to slide 29 from your binder from

20   yesterday, the white binder.

21   A.    Are there going to be redacted things on it?

22   Q.    Yes, just a little.

23   A.    Okay.  Got it.

24   Q.    And this is a slide that depicts search engine share based

25   on different browsers; right?

1    A.    Correct.

2    Q.    And you made reference to in your testimony the share --

3    the increased share of Bing search traffic coming from IE and

4    Edge; correct?

5    A.    By "increased," you mean what the share is on Edge and IE

6    compared to the other four?

7    Q.    Correct.

8    A.    Yeah, it's in this figure.

9    Q.    And did you do any analysis in this case to evaluate how

10    many people were trying to avoid or switch search engines on IE

11    and Edge by switching to a different browser that defaulted to

12    Google?

13    A.    I don't know that, no.

14    Q.    You're aware that IE and Edge have been preloaded almost

15    exclusively on Windows PCs; right?

16    A.    Yes.

17    Q.    And you know that the overall search engine share on

18    Windows PCs is predominantly Google; correct?

19    A.    Yes.

20    Q.    And so you know just by doing the math that a significant

21    percentage of the people who were on Windows PCs and having IE

22    and Edge available to them decided not to search on these

23    browsers with Bing as the default; correct?

24    A.    Yeah, a lot of them searched on Chrome.

25    Q.    If you will turn to slide 44 in your binder.  And I just

1    want to get a clarification on this slide.  Again, this one also

2    has the red box around it.  So I don't think we need to get into

3    specific numbers here.

4    A.    Okay.  Good to have the reminder.  Thank you.

5    Q.    But just in terms of trying to level set on what's being

6    calculated here and the magnitudes, you're looking here at

7    unique search phrases; correct?

8    A.    Yes.

9    Q.    So in other words, every unique search phrase is given sort

10   of -- is counted once; right?

11   A.    Correct.

12   Q.    So this is weighted for actual search volume; correct?

13   A.    Right.  That was exactly the point that I made yesterday

14   when -- Your Honor, when we were talking, and the second bullet

15   is telling you the weighted amount.

16   Q.    So, for example, "head" and "torso" queries we would

17   actually expect to be in the green bar, wouldn't we?

18   A.    We would.

19   Q.    Sorry?

20   A.    Yes.

21   Q.    If you will turn to slide 50, this is another red box, I'm

22   afraid, but this is again a chart you put together that is

23   looking at average IS score for particular categories of

24   queries.  And the ones you've got here, you've labeled "popular"

25   and "tail"; correct?

A.    Correct.

Q.    And this analysis here, or your chart here does not consider the myriad nonscale factors that impact IS score or quality score; correct?

A.    Yeah, that's correct.  So this, just to be clear what this is, this is coming from Google.  Google -- you said I listed them as popular and tail.  It's Google that listed them as "popular" and "tail," and this is data that Google provided.

      Here, I'm not able to do the kind of corrections, you know, confounding factor controls that I did when I looked at click split.  So it is what it is.

Q.    Okay.  If you will turn to slide 63, and here, your slide reads, "Google's contracts reduce rivals' incentives to invest"; right?

A.    Correct.

Q.    And you quote some testimony from Mr. Parakhin at Microsoft; correct?

A.    Yes, at the top half.

Q.    And the testimony Mr. Parakhin was giving there was around his thinking around Microsoft investments in connection with negotiations Microsoft was having with Apple; correct?

A.    So I read -- you know, I read this testimony, and I'm not remembering the context of the -- this negotiation point that you're mentioning.  But -- so I'm not sure.

Q.    Well, the question that was asked here --

```
1   A.   I'm sorry.  I didn't mean to interrupt.  Why don't you go
2   ahead, but I now see what you're referring to.
3   Q.   The predicate question here has to do with conversations
4   Microsoft was having with Apple; correct?
5   A.   Yes.
6   Q.   And those conversations were around Microsoft trying to
7   persuade Apple to make it the default search engine on Safari;
8   correct?
9   A.   Correct.
10  Q.   And the essence of what Mr. Parakhin testified to that I
11  think is reflected here is that Microsoft wasn't prepared to
12  make the investments to improve its search quality unless and
13  until Apple committed to giving it the default search agreement
14  on Safari; correct?
15  A.   Well, I think it was a more general statement about if we
16  can't get access to consumers, there's not much point in
17  investing, you know, in terms of profitability.
18  Q.   You recall that in the back and forth between Microsoft and
19  Apple, Apple asked Microsoft to make a guarantee; correct?
20  A.   I do remember that, yes.
21  Q.   And Microsoft refused; correct?
22  A.   I remember -- I spent some time on those documents, and
23  that's how it seemed to me.  It was from the outside a little
24  hard to parse fully what was going on, but that was my sense.
25  Q.   And Microsoft's position was if you give us the contract,
```

1    we'll make the investment; right?

2    A.    Well, that was certainly one of the, you know -- yes.

3    Q.    And Microsoft was making the claim that if you give us the

4    contract, we'll make the investment, and we'll improve our

5    search quality; correct?

6    A.    That's what they were arguing, yes.

7    Q.    And Apple didn't believe them; correct?

8    A.    I can't say what they believed or they didn't believe, but

9    I can say that they didn't go with Microsoft.

10   Q.    Now, if you will look at the next slide, slide 64, and this

11   is your slide where you discuss identifying what you refer to as

12   rare competitive threats that Google faced; is that right?

13   A.    Yes.

14   Q.    And did you -- by the way, between 2009 up until when you

15   issued your reports, did you do sort of a comprehensive review

16   of all of the search innovations that Google Search brought to

17   market?

18   A.    No, I did not do a comprehensive review of all their

19   innovations.  You know, they do thousands of things a year of

20   various kinds.

21   Q.    And are you suggesting that -- well, let me strike that.

22         You're -- you're not suggesting that Google hasn't brought

23   new innovations to market in response to competition other than

24   just these two events here; correct?

25   A.    I mean, they may have brought -- competition may have led

them to do things.  You know, these seem to me the most

significant competitive threats as -- to them in the market on

search services.

Q.   Is it your testimony that the innovations that you have

flagged here in your slides in 2009 and 2018 were the most

significant innovations that Google brought to market between

2009 and 2018?

A.   No, I'm not saying that.  I'm saying that based on the

evidence that I showed yesterday, they brought things to market

that they wouldn't have done otherwise.

Q.   But again, you -- you haven't tried to catalogue all of the

various competitive responses that Google has made between 2009

and 2018?

A.   No, I have not.

Q.   And you haven't tried to compare the -- the innovative

significance of the two episodes you describe here in 2009 and

2018 versus the myriad of other innovations Google has brought

to market; correct?

A.   I have not made that -- done a comparison, no.

Q.   Now, in --

A.   I will say, just as an aside, we did look -- when I was

talking about Bing, you know, I looked at the IS score, you

know, that graph of the gap.  We saw what Google's progression

on IS -- I guess it was precision then -- was.  And in my

reports, I documented what happened to Google after it responded

1    in these ways.

2        Certainly, there may have been other innovations they may

3    have done on user interface and other things that don't --

4    aren't ranking.  But IS score, definitely -- after they start --

5    said they were going to have its competitive response and throw

6    engineers on it, their IS score after -- what I describe in my

7    report is, you know, starting in 2012, after they did this,

8    their -- I keep saying IS score, but at that time it was

9    precision.  They ended up responding -- just as I described,

10   they responded successfully, and they started to accelerate

11   their precision.

12   Q.   Did -- did you try to compare the increase in precision

13   score that happened in -- after these two episodes you've

14   identified here with increases in precision score with respect

15   to other innovations that occurred in other time periods?

16   A.   No.  And, you know, there may well be other things that

17   they're trying to do that increase precision and ranking

18   otherwise, you know.  I think firms with market power, even an

19   outright monopolist would have an incentive to make investments.

20   So I'm not saying otherwise.

21   Q.   And again, you haven't modeled a but-for world of

22   innovations with substantial market power versus innovations

23   without one; correct?

24   A.   It depends what you mean by "modeled."  Sorry.  Ask your

25   question one more time, just so I'm sure I'm answering it.

```
1    Q.    You haven't identified innovations that Google would have
2    brought to market in a but-for world versus ones that they
3    didn't bring to market?
4    A.    Specific innovations?
5    Q.    Yeah.
6    A.    I think you asked me that yesterday as well, and I was
7    talking about, you know, the last document that I referred to,
8    and -- but there wasn't anything specific, no.
9    Q.    Right.  That's it, the last document on -- in your slides.
10   A.    In terms of things they did -- they could have done and did
11   not do?  I guess privacy things as well I also talked about
12   yesterday.
13   Q.    If you will go to slide 72 in your binder.  In this slide,
14   you make a point about Google recognizing the ISA deterring
15   Apple from developing its own search engine; is that right?
16   A.    Correct.
17   Q.    Again, this is boxed in red here, but part of what you
18   quote from in this document is estimates of the value of the ISA
19   to Apple; correct?
20   A.    In terms of payments, yes.
21   Q.    And if Apple had switched the default from Google to
22   Microsoft in 2016, would that agreement have deterred Apple from
23   developing its own search engine?
24   A.    So, I mean, it depends what the agreement would have been,
25   but if -- if they had signed the same agreement -- if you're
```

asking if they had signed the same agreement with Bing as they
did with Google, that agreement would have had the same effect.

    That's different than asking, well, what if, say, Google
was offering them revenue share that didn't have an exclusivity
provision.  In that case, it would have been different.

Q.   Microsoft -- you're not aware of Microsoft -- strike that.

    The agreement that Microsoft was proposing to Apple was of
the same structure as the Google agreement; correct?

A.   I think it was, but -- you know, I think in some sense an
important point to realize is that if Google is offering just an
exclusive, there's nothing for Microsoft to do but compete for
an exclusive.  Like, it can't -- there's no split that's going
to happen, because it's all or nothing.  So --

Q.   Are you aware of Microsoft ever offering a nonexclusive
agreement to anyone for search?

A.   Well, they tried to convince Apple to break off the U.S.

Q.   Sir, I'm asking you, are you aware of any evidence of
Microsoft offering a nonexclusive agreement to Apple?

A.   Sorry.  I thought I was answering that in terms of
nonexclusive for U.S. versus, you know, just exclusive for U.S.
versus the world.  But if you mean was it -- if it's exclusive
for the U.S. --

Q.   Yes.

A.   -- then no, I'm not.

Q.   So go to slide 75.  I believe you've testified this slide

1    has to do with Branch Metrics; correct?

2    A.    Yes.

3    Q.    And you've testified Branch Metrics is not a general search

4    engine; correct?

5    A.    Correct.

6    Q.    You tried to draw an analogy yesterday between Branch

7    Metrics and Netscape; correct?

8    A.    Yes, there was an analogy that I talked about.

9    Q.    And Netscape -- Microsoft's agreements to harm Netscape

10   reduced the application's barrier to entry for rival general

11   search engines; correct?

12   A.    Sorry.  I didn't -- you said something about general search

13   engines, but it didn't have anything to do with that.  So --

14   Q.    Let me start again.  In the *U.S. v. Microsoft* case,

15   Microsoft's contracts that excluded Netscape Navigator, the

16   reason why that was deemed harm to competition was because

17   Netscape Navigator offered the prospect of reducing the

18   application's barrier to entry that other competing operating

19   systems faced when trying to compete with Windows; correct?

20   A.    Correct.  So --

21   Q.    Sir, I just asked you --

22   A.    Sorry.

23   Q.    It's a yes or no question.

24   A.    Yes.

25   Q.    Now, there's no applications barrier to entry with search

1  engines; correct?

2  A.   No.  That wasn't the analogy that I was using.

3  Q.   And Branch Metrics has never done a deal with any search

4  engine; correct?

5  A.   No.  They wouldn't be doing that.

6  Q.   Branch Metrics has never done anything to enhance general

7  search engine competition?

8  A.   No, not general search engine competition, but the analogy

9  wasn't that.  The analogy was about something outside the market

10 potentially creating a threat for things in the market.

11 Q.   But it would have to create a threat that enabled somebody

12 in the market to be the threat; correct?

13 A.   No, no, it wouldn't.  So in this case --

14 Q.   That's what the *Microsoft* case was about; correct?

15            THE COURT:  Let's move on.  I think I can interpret

16 what *Microsoft* was about.

17            BY MR. SCHMIDTLEIN:

18 Q.   Sir, have you seen evidence in this case around why Samsung

19 did not enter into an agreement with Branch?

20 A.   I've seen testimony that it was because of the Google

21 contract.

22 Q.   Have you seen testimony in this case that it was due to

23 product decisions by the people who are in charge of the

24 S Finder product?

25 A.   Well, I'm looking at a document here that is saying

1    otherwise, but I haven't -- I'm not sure what you're referring

2    to.

3    Q.    You didn't follow the testimony of Mr. Chang in this case?

4    A.    I don't think I have seen -- I looked at a bunch of the

5    testimony.  Sitting here right now, I don't think I've seen

6    Mr. Chang's.

7    Q.    Have you reviewed all the evidence in this case as to why

8    AT&T didn't enter into an agreement with Branch Metrics?

9    A.    I think the next slide is talking about AT&T.

10    Q.    Are you aware that AT&T did not enter into an agreement

11    with Branch Metrics based on privacy concerns?

12    A.    So, the next slide I showed was saying something different

13    than that, but -- so --

14    Q.    You haven't looked at all the AT&T evidence in this case,

15    have you?

16    A.    No, I haven't.

17            MR. SCHMIDTLEIN:  Okay.  No further questions, Your

18    Honor.

19            THE COURT:  Okay.  Thank you, Mr. Schmidtlein.

20        All right.  Redirect?

21            MR. SEVERT:  Yes, Your Honor.

22                    REDIRECT EXAMINATION

23            BY MR. SEVERT:

24    Q.    Okay, Professor Whinston.  I'm going to start with

25    counsel's questions from yesterday.

1          Do you recall yesterday -- first, let's go back to the
2     direct.
3          You were shown -- you presented some Amazon and Google
4     results pages for the query "Valentine's Day."
5          Do you remember that?
6     A.    Yes.
7     Q.    And why did you look at the query "Valentine's Day" in
8     particular?
9     A.    It was one of the ones that Dr. Israel had pointed to as a
10    top query.
11    Q.    Okay.  And then do you recall yesterday counsel showed you
12    two results pages for the query "Valentine's Day gifts," one
13    from Amazon, one from Google?  Do you recall that?
14    A.    I do.
15    Q.    Let's take another look at that.  Do you still have your
16    binder from yesterday?  It should be DXD15.004.
17    A.    I'm sorry.  Which binder are you referring to?
18    Q.    It should be --
19    A.    One of Google's binders?
20    Q.    Yes.  The one from yesterday with the blue cover.
21    A.    All right.  There's many binders.
22              THE COURT:  It's the binder -- if you look in the
23    lower left, it has DX.001.
24              THE WITNESS:  Okay.
25              BY MR. SEVERT:

```
1    Q.   Let's take a look at page 004.

2    A.   Okay.  It's very -- I'm taking off my glasses.  It's very

3    small.

4    Q.   It's small.  So I want to direct your attention to -- on

5    the Google page, on the right-hand side, there's a Wikipedia

6    link.

7         Do you see that?

8    A.   Yes, I do, on the right.

9    Q.   Do you see a similar result on the Amazon page?

10   A.   Give me a moment to look it over.

11        No, I do not.

12   Q.   And then also, there's a -- on the Google page, second from

13   the bottom, there's a link to "57 best Valentine's Day gift

14   ideas for 2023."

15        Do you see that?

16   A.   Yes, I do.

17   Q.   Do you see a similar result on the Amazon page?

18   A.   No.  I guess on the Amazon page, it seems to all be, you

19   know, basically organic and sponsored essentially, you know,

20   link to products for sale.

21   Q.   Okay.  And generally, on the Amazon page, if you were to

22   click on any of these products, where -- where would the link

23   take you?

24   A.   It would take me to someplace on Amazon.

25   Q.   And the Google page on the right, if I were to -- if a user
```

1    were to click on one of the PLAs at the top, where would the

2    user be taken?

3    A.    The PLAs on the top?  So the -- that's a good question.  So

4    what I'm not sure is whether it would take me to Google's -- the

5    PLAs, whether it would take me to Google's shopping page or

6    whether it would take me to the website of the seller.

7    Q.    Okay.

8    A.    Certainly, many, as I testified, you know, I think a big

9    aspect of general search engine ads is that they bring you to

10    the website of the seller, which sell -- confers value for the

11    reasons I testified to.

12    Q.    Let's turn in the same binder to DXD15.006.  This is the --

13    the Facebook "running shoes" query.

14    A.    Yes.

15    Q.    Okay.  And at the very top, we see some shoes.

16         Do you see the shoes?

17    A.    You mean the two shoes and a half?  Is that what you're

18    referring to?

19    Q.    Yes.  And can you tell if those are organic results, or are

20    those ads?

21    A.    You know, it doesn't -- oh, sorry.  I'm not sure, because

22    the thing above it, "NOBULL," says "sponsored," but I'm not

23    quite sure whether that means all of these things are sponsored

24    or they're organic.  I'm just not sure.

25    Q.    And does it appear that the -- all -- the shoes listed are

```
 1    all from the same -- are all NOBULL shoes?

 2    A.    They're all what?  I'm sorry.

 3    Q.    Are all the shoes --

 4    A.    Oh, NOBULL shoes?  It seems that way.

 5    Q.    And -- and just to be very clear, are ads like this that

 6    appear in response to a query, a user query on Facebook, are

 7    those in your search advertising market?

 8    A.    So this is something we talked about, and Your Honor, we

 9    talked about it, I think, a couple of times.  So if it's a

10    response to the search, they're in -- conceptually, they're in

11    the market.

12         And then the question is, okay, when I get to doing market

13    shares, how are they getting counted?  And this was the rubber

14    on the road comment, that ultimately, you know, what I'm

15    counting on is that if these are search ads, the various market

16    participants that are coming up with estimates of the search ads

17    market are counting them.

18         And so -- and Google is relying, you know -- so I don't

19    know if I made this completely clear when we -- when I was

20    testifying, but when I'm doing that estimate, Google has

21    something it calls "industry metrics "for this.  And what it

22    does is it looks at -- looks at three different -- I had

23    eMarketer is one entity that comes up with an estimate of the

24    market.  Google looks to three other entities, one of which is

25    Forrester Research, I forget what the other two are, and comes
```

1    up with what it calls its final number for the size of the

2    search ad market.

3         And then what I did was I combined those in a way that kind

4    of was always conservative.  So on every -- on both kinds of

5    device in every year, I always took the bigger number.

6         I'm relying on that those firms that are estimating the

7    size of the search ad market are estimating it in a way that is

8    at least close to this conceptual idea.

9    Q.   Okay.  And then, Professor, if we take a look -- if you

10   would compare DXD15.006 to DXD15.016 --

11   A.   Yes.

12   Q.   -- we see .016 is a Google results page for the same

13   query, "running shoes."

14        Do you see that?

15   A.   Yes.

16   Q.   Do the Facebook results page and Google results page appear

17   the same?

18   A.   No, they don't.

19   Q.   Okay.  You were asked about a number of different websites

20   yesterday, including Facebook, Pinterest, TikTok.

21        Do you recall that?

22   A.   I do.

23   Q.   And are the ads -- I think you touched on this, but the ads

24   served in response to a query on those websites, those are also

25   all in your search advertising market; correct?

A.    You know, conceptually, as long as it's ad served in
response to a search, it's in the market.  And again, just like
I just said, you know, I'm counting on the fact that these
entities whose business is estimating the size of the search ad
market are going to efforts to be -- have an accurate number for
that.

Q.    Switching topics a little bit, you were asked whether you
offered an opinion in this case that Google has engaged in
anticompetitive conduct with regards to Chrome browser setting
in Google Search as the default.

      Do you recall that?

A.    Yes.

Q.    And when you were providing an answer to that, were you
talking about user-downloaded Chrome?

A.    Yes.

Q.    Did you have an opinion about whether pre-installed Chrome
on Android, whether Google had engaged in anticompetitive
conduct with respect to pre-installed Chrome on Android?

      MR. SCHMIDTLEIN:  Objection; leading.

      THE COURT:  Overruled.

    Go ahead.  You can answer.

      THE WITNESS:  So on Android, Chrome is a part of the
agreement.  So it's -- you know, it's part of the exclusionary
RSAs.  And also, the MADA also does things with Chrome.

    So I was -- it's user-downloaded Chrome, and that's why I

1    leave user-downloaded Chrome out of the coverage numbers.

2              BY MR. SEVERT:

3    Q.   Okay.  And yesterday, you were asked if you did any

4    empirical analysis in this case to show that your proposed

5    advertising markets satisfy the hypothetical monopolist test.

6         Do you recall that testimony?

7    A.   I do.

8    Q.   Okay.  And did you reach a conclusion that the ad markets

9    you analyzed passed hypothetical monopolist tests?

10   A.   I did.

11   Q.   And how did you reach that conclusion?

12   A.   I reached that conclusion by looking at various kinds of

13   evidence.  I looked at ordinary business documents.  I looked at

14   evidence from Google looking at advertiser responsiveness.  I

15   looked at, you know, empirical analysis of ad prices and both

16   their levels and how they moved over time.  And I looked at

17   evidence of market power as well, which informs the market

18   definition exercise.

19   Q.   Okay.  Professor, I'm going to move to today's questioning.

20   A.   Sure.

21   Q.   Okay.  Earlier today, you were shown your slide with the

22   Google price index.

23        Do you recall that?

24   A.   Yes.

25   Q.   And what conclusions did you draw from the increase in

Google's price -- ads price index?

A.    So the bottom line of my looking at that entire piece of evidence was that I -- Google's behavior that led to those price increases, you know, revealed its market power.

So, Your Honor, I think -- actually, I think earlier I said how -- I think I tried to offer, you know, to say more about what happened there.  So let me just describe the whole story.

So actually, that last slide, you know, which I talked about yesterday, was saying -- this was back in 2013.  These innovations, they thin the market.  Sometimes, we don't -- we don't do them because it lowers revenue.

And the conclusion of that was well, one way that we can make sure, you know, that we will have an incentive to do this is to raise prices when we do this.

So this process where they were looking at price increases was, you know, aimed at making sure that when Google did something that was better for advertisers, Google got all the benefits.  And they actually started -- it's actually quite an interesting story.

So they actually started tracking something called -- excess CPC is what they called it.  It was some measure that they had that was designed to capture, as we do these innovations, how much better off were advertisers.  And their goal in this process at first was to make sure that whatever improvements there were for advertisers, Google got all of it.

1       So that was the aim, and that was the aim up until around

2    2018, 2019.  And you could -- what it was that convinced them

3    they could do this, well, they did these experiments, as I

4    described to you.

5       So at that time, they called it holistic pricing.  That --

6    that was what they called this project.  And then around 2018,

7    2019, you see them saying hey, we -- in essence, we have a lot

8    of market power.  We don't have to just stop at capturing the

9    quality, you know, improvement values; we can go further.

10      And they started calling it value-based pricing.  And

11   pricing based on value is, you know, a real marker of market

12   power.

13      And, you know, when I -- we had that slide from the Momiji

14   meeting minutes, and I described to you -- you know, we saw,

15   well, they want a price a penny below the breaking point, that

16   that was the goal.

17      And that's what value-based pricing is about.  It's can we

18   manage the price.  You know, we don't have to stop at just what

19   our quality improvements were; we want to try to get all of the

20   value, if we can, from advertisers.

21      So the first thing is, I -- I think Mr. Schmidtlein's

22   questions about do you know that they raised quality during this

23   time, answer yes, and, you know, I described that at length in

24   my report.  And yet, despite the fact that they raised quality

25   during this time, the evidence from this whole episode is really

very strong about their market power.

So first, at some point, they didn't have to just stop at capturing the improvements; they could go further.  Second, the thing that convinced them they could go further was low responsiveness, and so low responsiveness is exactly about market power.

And third, there was other evidence in here that I didn't talk about.  Again, I had to choose what I was going to say in my testimony, given the time.

MR. SCHMIDTLEIN:  Your Honor, to the extent he's going to start offering things for the first time on redirect, we're going to object.

THE COURT:  All right.  Let's stay within the scope of the examination.  If the response is within the scope of the examination, I will allow it.  If there's something he says that isn't in his direct examination, you can cross him on that portion.

THE WITNESS:  Okay.  So I mean, the other stuff -- it's in my direct report, my first report.  So I don't have to say more.  But the conclusion of this whole thing for me was strong evidence of market power.

And I think one thing to me, when I look at this whole episode, is I think okay, is the way to get innovation -- them to do innovations, that they should be able to extract all the value, you know?  There's another way to get innovations into

1    the market, which is competition.  And with competition,

2    customers benefit.

3               BY MR. SEVERT:

4    Q.   Okay.  And then, Professor, you answered counsel's question

5    that you don't have an empirical prediction of what would happen

6    to advertising prices without the -- Google's contracts.

7         Do you recall that?

8    A.   Yes.

9    Q.   Okay.  But did you offer an opinion generally about what

10   would happen to advertising prices if not for Google's

11   contracts?

12   A.   Yes.  I mean, in general, you know, the point is with

13   competitive pressure, Google would have, you know, stronger

14   incentives to do things that are good for advertisers, and that

15   could be quality improvements, and it could be price reductions,

16   price reductions or not increasing price as much.

17   Q.   And the Court asked you a question about an exercise you

18   did where all the defaults covered by the Android agreements

19   were switched to a rival.

20        Do you recall that line of questioning?

21   A.   Yes.

22   Q.   And I think he asked if your conclusion would be that that

23   would be a less than 1 percent overall shift in traffic?

24   A.   I'm sorry.  Can you just repeat the question?

25   Q.   Sure, sure.  So this is the Court's question about if all

1   of the Android agreements were switched to a rival.  And I think

2   he asked if it was your conclusion that that would represent a

3   less than 1 percent overall shift in traffic.

4       Do you recall that?

5   A.   Overall, like in --

6   Q.   In the marketplace.

7   A.   I'm trying to remember.  I think so.  That's a number that

8   Google's experts have put forth, not a number that I put forth.

9   But --

10   Q.   Is the 1 percent associated with a shift to a rival or

11   associated with the choice screen?

12   A.   Oh, I'm sorry.  So what the -- yes, now I'm understanding.

13   What the Google experts have put forth is a statement about that

14   1 percent relative to the EU choice screen.

15   Q.   Is there a connection between the 1 percent and the shift

16   to a rival?

17   A.   Well, the shift to the rival would be much bigger.

18   Q.   Okay.  And you were asked about users shifting away from

19   Mozilla due to the default switching to Yahoo!.

20       Do you remember that?

21   A.   Users switching away from Mozilla to other browsers, you

22   mean?

23   Q.   Yes.

24   A.   Yes, I do.

25   Q.   Counsel suggested that your assessment ignored the

1    possibility that people would shift to a different browser.

2         Do you recall that?

3    A.    Yeah, in general.  I don't remember the specific wording.

4    Q.    And I think yesterday you testified about that you relied

5    upon Google's analysis of this event; is that right?

6    A.    Yes.

7    Q.    And what's your understanding of whether Google

8    incorporated browser changes into its analysis?

9    A.    You know, Google, when it did those -- my understanding is

10   when Google did its recovery estimates and when it was

11   considering the bottom-line question of if we lose a default,

12   how much is going to follow us, and that would include all ways.

13   And just as I testified yesterday, you know, my share shift

14   analysis, my foreclosure measure all consider those

15   possibilities.

16   Q.    Okay.  And then one clarification.  I think you were asked

17   what share of the market would shift to a rival on Android if

18   rivals took Google's default.

19        Do you recall that?

20   A.    Yes.

21   Q.    And counsel told you that the number from your reports was

22   6.4 to 8.5 percent.

23        Do you remember that?

24   A.    I remember him saying it, and I said I don't remember the

25   specific number.

```
 1    Q.   Would it help to see the part of your reports where you
 2    wrote those numbers down?
 3    A.   I think that might help.
 4              MR. SCHMIDTLEIN:  Okay.  May I approach, Your Honor?
 5              THE WITNESS:  It's good to have another binder.  This
 6    one might break the desk, though.
 7              BY MR. SCHMIDTLEIN:
 8    Q.   Professor Whinston, I'd just direct your attention
 9    to figure 160 on page 362 --
10    A.   Initial report?
11    Q.   Yes.
12    A.   Which page?
13    Q.   It should be page 362, I believe.
14    A.   Figure 160?
15    Q.   Yes.  Is figure 160 where the -- your Android share shift
16    estimates were reported?
17    A.   Yes.
18    Q.   And what did you report?
19    A.   So for all devices, so I had -- in each of these estimates,
20    I had a low-end and a high-end estimate and then the average.
21    The average here is 12.6 percent of U.S. queries.
22    Q.   And what were the low-end and high-end estimates?
23    A.   Low-end estimate, 11.6 percent, and high-end estimate,
24    13.5.
25              THE COURT:  I'm sorry.  What do these numbers
```

 1    represent?

 2              THE WITNESS:  Sorry.  So the way I built up -- Your

 3    Honor, sorry.  I'm putting glasses on and off, on and off.

 4         The way I built up these numbers is I separate -- because

 5    the effects were different for different distributors and

 6    different device types, I kind of did -- I built up getting that

 7    share shift estimate from basically looking first -- for each

 8    kind of partner for each kind of device.

 9         So this is looking just at Android partners, and it's --

10    the first two rows are breaking out the -- the first row is

11    phones; second row is tablet; the third row is combining them

12    all.  So if we look at that third row, the number on the left --

13    can I say these numbers?

14              THE COURT:  Sure.

15              THE WITNESS:  The 19.4 percent, that's the existing

16    Google share that are going through the agreement.

17              THE COURT:  Of all U.S. searches?

18              THE WITNESS:  Right.  And then you will see there's

19    a -- three -- there's six columns but broken down into three

20    groups:  Low end, average, and high.  And so you will see three

21    numbers in that last row.

22              MR. SCHMIDTLEIN:  Your Honor, these are numbers that

23    are confidential.

24              THE COURT:  Okay.  He's just mentioned the one number.

25    Let's just keep going.

1           THE WITNESS:  I will just say -- I don't have to say

2      the number here.  So what it represents, take that middle

3      average estimate, what you see in bold at the bottom, that's the

4      share -- my estimate of, you know, kind of again in this range,

5      the average estimate of the share of U.S. queries, all U.S.

6      queries that would shift if all of Google's exclusive Android

7      defaults were to shift to a rival.  And, of course, that is

8      taking account of rivals' current strength or weakness, whatever

9      way you want to put it.

10          So that's what that number is.  Is that helpful?

11          THE COURT:  Yes.  Thank you.

12          BY MR. SEVERT:

13     Q.   And then, Professor, you were asked about whether Microsoft

14     has entered into any nonexclusive search distribution contracts.

15          Do you recall that?

16     A.   Yes.  Well, sorry.  Do I remember?  There's so many

17     questions.  Any nonexclusive --

18     Q.   Search distribution contracts.

19     A.   I don't remember exactly being asked that question, but go

20     ahead.

21     Q.   Would the bookmark deal that Microsoft entered into with

22     Apple, would that be an example of a nonexclusive search

23     agreement, distribution agreement in the U.S.?

24     A.   I was almost going to volunteer that, and I thought I

25     should let you ask the question.  But yes.

```
 1              MR. SEVERT:  All right.  No further questions, Your
 2      Honor.
 3              THE COURT:  All right.  Just to close the loop, the
 4      bookmark deal with whom?
 5              THE WITNESS:  Oh, Apple.  So Microsoft and -- the
 6      firms that are in the bookmarks, which are other search engines
 7      other than -- Google is in there, but others are, they pay for
 8      that.
 9              THE COURT:  Right.  I see.  Okay.  And that --
10              THE WITNESS:  And they pay -- yeah.  So --
11              THE COURT:  Okay.  All right.  Professor Whinston, you
12      are done, at least for now.  We may see you again.  Thank you
13      very much for your time and your testimony and all your work.
14              THE WITNESS:  I appreciate the time to be here talking
15      to you.
16              THE COURT:  I want everybody to be ready for
17      Mr. Dintzer's big announcement.
18              MR. DINTZER:  I don't want to get in anybody's way.
19              THE COURT:  Sir, you can have a seat.  We will be with
20      you in one second.
21          Mr. Dintzer?
22              MR. DINTZER:  Thank you, Your Honor.  At this time,
23      the DOJ plaintiffs have no further witnesses to call.
24          We do have two housekeeping matters that we want to put on
25      the Court's radar.  The first is that we've moved -- we've taken
```

1    care of most of the designations.  We have four outstanding

2    witnesses.  The designations are being prepared for the Court.

3    And I understand from the Court's prior testimony we won't be

4    prejudiced in our ability to take care of that at a later date

5    when that's ready.

6        With respect to confidentiality, my understanding is that

7    the parties have agreed on the outstanding confidentiality

8    issues, and as we stand right now, we have no confidentiality

9    issues to address.

10            THE COURT:  Okay.  I'm not sure what you mean by that.

11            MR. DINTZER:  Just --

12            MR. DAHLQUIST:  It's a nonissue.

13            MR. DINTZER:  Okay.  I should have stayed silent about

14   it.

15        And finally, with exhibits, we have one push now that we

16   would like to make that's not opposed.  We have one push now.

17   We have one category of push documents that is opposed that we

18   would like to do.  And then we have, again as the Court has

19   discussed, a later push as we continue to work through those and

20   get those ready.

21        So we don't know if it would be the Court's pleasure to

22   hear those exhibit things now or at the end of the day.

23            THE COURT:  Let's do it at the end of the day.  We

24   have our witness here, and let's not take any more of his time

25   than we already are.  Why don't we move to the witness

testimony, and we can deal with the exhibit issue at the end of the day.

          MR. DINTZER:  Thank you, Your Honor.

          THE COURT:  Thank you.

          MR. SALLET:  Could I just do one housekeeping issue first?  Excuse me, Your Honor.  I apologize.

     Your Honor, I would just like to inform the Court, we will do an open questioning.  We have a small number of questions, a short closed session that we will seek to do at the end of the open questioning.  The testimony to be elicited during that portion has to do with the kind of information that Your Honor has kept redacted under the *Hubbard* factors, looking to strategic issues and negotiating tactics.  We will be discussing some specific companies, specific deal terms and structures, the manner in which deals are made or perhaps not made, and sometimes the reference to other companies, third companies that do not currently have knowledge of the arrangements between Microsoft and a different company.

     As such, we believe they meet the standard Your Honor has applied, for example, in the redaction of recent testimony.

     Microsoft counsel is present to address that if Your Honor would like.

          THE COURT:  Give me a sense of timing, Mr. Sallet.  How long will the open portion be, and then how long are you contemplating for a closed session?

```
 1              MR. SALLET:  I am notoriously bad at this, but my
 2     guess is the open session would take roughly 45 minutes, and the
 3     closed session is 30 minutes maybe.  I could be close on both of
 4     them.  It could be shorter; it could be shorter, Your Honor.
 5              THE COURT:  Let's get started.  We can talk about
 6     length and timing of all that, but let's get moving.  Let's get
 7     started.
 8          NEIL BARRETT-BOWEN, WITNESS FOR THE PLAINTIFFS, SWORN
 9              THE COURT:  Welcome.
10                         DIRECT EXAMINATION
11          BY MR. SALLET:
12     Q.   I am Jonathan Sallet.  I'm counsel for the plaintiff states
13     in this action.
14     A.   Nice to meet you.
15     Q.   Mr. Barrett-Bowen, just for the record, could you state
16     your name and spelling.
17     A.   Neil Barrett-Bowen.  And the spelling?
18     Q.   Please.
19     A.   Neil, N-e-i-l.  Barrett is B-a-r-r-e-t-t.  And there's a
20     hyphen.  Bowen, B-o-w-e-n.
21              THE COURT:  Mr. Barrett-Bowen, sorry to interrupt.
22     Could I just ask you to keep your voice up.  That's a microphone
23     in there to help amplify your voice so we can all hear you.
24              THE WITNESS:  Yes, of course.
25              BY MR. SALLET:
```

1    Q.    Thank you.  Mr. Barrett-Bowen, where do you work?

2    A.    I work for Microsoft.

3    Q.    When did you first join Microsoft?

4    A.    2010.

5    Q.    What is your current title at Microsoft?

6    A.    I'm a director of business development.

7    Q.    With any particular specialization?

8    A.    So, I work on Bing.  I'm working on content acquisition.

9    Q.    Content acquisition.  How long have you been in your

10   current role?

11   A.    Two years as a director.

12   Q.    And what role did you have prior to the current one?

13          THE COURT:  I'm sorry.  Did you say content

14   acquisition for Bing?

15          THE WITNESS:  For Bing.

16          THE COURT:  Again, if you would just keep your voice

17   up.

18          BY MR. SALLET:

19   Q.    I'm sorry.  Before -- before you took your current job at

20   Microsoft, what position did you hold?

21   A.    I was a senior manager.

22   Q.    And prior to those two positions, did you hold other

23   positions in Microsoft?

24   A.    I did.  Sorry.  I worked on distribution with OEMs.  So I

25   worked with the likes of Samsung and Lenovo.

1    Q.    Thank you.  Can you describe what the business development

2    function at Microsoft does?

3    A.    So, the business development function is really to acquire

4    content in places where we don't have content and working with

5    partners in a way to get -- to acquire the data that is

6    beneficiary not just to us but also to our partners as well.

7    Q.    Just for clarity, could you just give us an example of a

8    partner with whom Microsoft works?

9    A.    Yeah, so Trip Advisor is a good example of a partner.

10   Q.    If I characterize such partners as content partners, would

11   that be understandable to you?

12   A.    It is, yes.

13   Q.    By the way, Mr. Barrett-Bowen, does your role at Bing

14   involve any responsibility for advertising?

15   A.    No, it doesn't.

16   Q.    And you said that content is acquired for Bing.  Is this to

17   be shown on the Bing search results page?

18   A.    Correct, on Bing, yes.

19   Q.    And if I use the acronym SERP, will that be understandable

20   to you?

21   A.    It is, yes.

22   Q.    So in your current role, do you negotiate content

23   partnership agreements between Microsoft and other companies?

24   A.    I do.

25   Q.    And once they are made, do you also have responsibility for

1    managing the ongoing relationships with those content partners?

2    A.    I do.

3    Q.    And at a high level, what does managing those relationships

4    involve?

5    A.    So it's really important to maintain a good relationship

6    with these partners, and so making sure the things that we say

7    we deliver we deliver against, and the things for the partner,

8    so that they deliver.  We work with them to ensure that they're

9    delivering on their end, yeah.

10   Q.    And can you tell us, why does Microsoft want to show Bing

11   users content from such content partners on the Bing SERP?

12   A.    So by working with these partners, it brings -- it brings

13   to us content that's trusted, and it's also relevant content

14   that's timely.  So it gives us a dimension that provides this

15   trusted, relevant, timely, and fresh content for Bing.

16   Q.    And can I ask, are there particular kinds of content, say

17   vertical segments, in which you spend most of your time?

18   A.    So my area is travel, local, and more recently maps.

19   Q.    Travel, local, and maps?

20   A.    Yeah.

21   Q.    So you've just described why Microsoft wants to show Bing

22   users content.  Does the answer you gave apply to both travel

23   and local forms of information?

24   A.    It does.

25   Q.    And by the way, travel and local, is it possible for

    1    something that's considered to be travel content to also be

    2    considered local content?

    3    A.    Yeah, it is.  Yeah, so it's a good question.  So local and

    4    travel do have overlaps.

    5          The way to think about local is something that is kind of

    6    geographically constrained, I guess, something that's nearby.

    7    Whereas, travel is where you go to a destination that's away

    8    from where you live.

    9          But the overlap can happen in terms of restaurants.  So a

   10    traveler can go to a restaurant as can a local person.

   11    Q.    And in the content partnerships with which you work, can

   12    the brand name of the content provider be displayed on the Bing

   13    SERP?

   14    A.    Yes, it can.

   15    Q.    Could you give us an example of that?

   16    A.    Sure.  So Trip Advisor -- maybe to go back to that, Trip

   17    Advisor provides swift content.  Part of the agreement that we

   18    negotiated was to what we call provide attribution, and

   19    attribution is essentially a form of acknowledging that the

   20    brand, the information comes from another source, and the

   21    attribution often will click through to that brand or that

   22    partner.

   23    Q.    Are there -- excuse me.  I didn't mean to interrupt.

   24    A.    And to the partner, correct.

   25    Q.    Are there reasons Microsoft likes to have the brand name of

1    the content partner appear on the Bing SERP?

2    A.    Again, it brings credibility to the answer.

3    Q.    Great.  And when you talk about the nature of credibility,

4    you mentioned trust as one ingredient; correct?

5    A.    Correct.

6    Q.    Why is it important for Bing to have content that users

7    trust?

8    A.    So, search is also about trust.  If you don't have

9    something that the user trusts, they're not going to come back.

10   Q.    And you also mentioned as an attribute freshness or

11   relevance, or what I think you meant, sort of the timeliness of

12   information, if I understood it.

13   A.    Correct.

14   Q.    Why is it important to show Bing users that kind of

15   information?

16   A.    So a good example is, you don't want to send somebody to a

17   pharmacy that's closed.  So we need to ensure that the data

18   we're providing is timely, it's fresh, and it's up-to-date.

19   Q.    And why does Microsoft seek this content from content

20   providers instead of getting it itself?

21   A.    So, we don't have the depth or the expertise or the

22   resources to be able to get access to the depth of information

23   that goes across the local and travel categories and also

24   mapping as well.  We just don't have -- it's not a specialty

25   either for Microsoft or for Bing.  So we want to leverage

```
 1   partners to pull that in.
 2             THE COURT:  Could you restate that last part again.
 3             THE WITNESS:  Yeah.  So it's not an area of expertise
 4   for us.  And so by using partners who have that expertise, it
 5   provides us with the ability to leverage those partners and
 6   provide an answer which is -- which is of use.
 7             BY MR. SALLET:
 8   Q.   Could Microsoft just crawl the open web and collect this
 9   information?
10   A.   Yeah, absolutely.  So there is the ability to crawl and
11   just -- that is a way in which we do source information.  The
12   challenge with it is, it's expensive, but also, we can't get
13   access to a lot of the data, and a lot of the data has
14   constraints written in with it.  So it is a form of getting
15   access to data.
16       But typically, the data that's probably the most important
17   to a user are things that are what we call rich types of data,
18   which are not just the name, the telephone number, and maybe the
19   address, but things like the opening hours, which I mentioned
20   before, you know, photos or reviews.
21       So that's very difficult to get through crawling, and there
22   are -- there is the ability for companies to opt out of Bing
23   crawl.  So there are certain restrictions sometimes in terms of
24   getting a complete picture in terms of the answer that we're
25   providing.
```

1    Q.   Would it be typical for this form of rich data to be

2    created and owned by a content partner that controls its usage

3    and availability?

4    A.   Can you say that again?  Sorry.

5    Q.   Sure.  Would it be typical for such rich data to be created

6    and owned by a content partner that has the ability to restrict

7    its availability?

8    A.   Absolutely, yeah, yeah.  That's -- yeah.

9    Q.   In your experience, Mr. Barrett-Bowen, can these content

10   partnerships play any role in helping Bing compete against

11   Google?

12   A.   So my role is to acquire content so that the quality of the

13   answer is such that we're hopefully at a level of quality that

14   is similar to our competitors.  And so what we're trying to

15   achieve is providing an answer to a user that will satisfy them

16   in terms of the question they've asked, but equally provide the

17   trust and give them the layer of trust so they will come back

18   and use us again.

19   Q.   Great.  Thank you.

20        And so, are content partnerships designed to make Bing's

21   SERP page more attractive to users?

22   A.   Yes.

23   Q.   Now, you've talked about travel content, Mr. Barrett-Bowen.

24   Has the presence of travel content on the Bing SERP enabled Bing

25   to consider or take other steps to allow users to plan their

1    travel?

2    A.    Yes.  So we provide a number of different entries into

3    the -- into the travel process, whether it's flights through to

4    booking a hotel to booking a rental car.  So we provide a

5    solution that is kind of -- that is end to end.

6    Q.    Thank you.  And in your experience, does Bing have fewer

7    search queries than Google?

8    A.    So it's not an area that I focus in on.

9    Q.    Sure.  Of course.

10   A.    But my understanding, obviously, yes, that's something that

11   we have list sessions on, yeah.

12   Q.    And does that apply as well to mobile queries?

13   A.    That's correct.

14   Q.    In terms of going back to travel content, if we might, in

15   your experience, is having mobile data important to respond to

16   certain kinds of travel queries?

17   A.    So mobile data is pretty critical for the categories of

18   local and also travel and mapping as well.  I mean, the whole

19   three rely on mobile.  And the rationale for that is that if you

20   have your mobile, you're much more likely to capture data by --

21   you know, if you're in the restaurant, you write the review or

22   you take a photo.  If you're -- and so having the mobile signal,

23   having a mobile device provides us -- would provide us with

24   data.

25         So by not having access to the mobile device and that

1    platform, it makes it more challenging for us to source the

2    data.

3    Q.   Could you take a moment and explain what you mean when you

4    say not have access to the mobile device?

5    A.   So in terms of as a user using our service on mobile.

6    Q.   And so I assume, Mr. Barrett-Bowen, you must make pitches,

7    if that's the word that you use, proposals to content partners;

8    is that fair?

9    A.   Yeah, we don't pitch.  I really just -- we work in

10   partnership.  So really, it's really important for me to

11   understand what is a partner looking for, and vice versa.

12        But I never pitch --

13   Q.   So if I use the word "proposal," would that be more

14   acceptable?

15   A.   Yeah.

16   Q.   When you make proposals to potential partners, how do you

17   deal with mobile?

18   A.   So I think we're very upfront about it.  I think it's well

19   understood and it's acknowledged that it's not an area of

20   strength for us.  So I'm very upfront about acknowledging that

21   that is the case.

22   Q.   Okay.  So you've talked about how content is displayed on

23   the SERP.  I would like to hand you a document, if I may

24   approach, which is a search engine results page.

25        Mr. Barrett-Bowen, I'm not suggesting you've seen this

1    document before, but can you identify what it is?

2    A.    So this is what is called a SERP result for a query.    So

3    someone in this case has searched for "hotels in London."

4              MR. SALLET:    Your Honor, we have marked this PSXD04.

5    It is not currently in evidence.

6              BY MR. SALLET:

7    Q.    Mr. Barrett-Bowen, looking at this page, there's a legend

8    that says "hotels, London, United Kingdom," and then there's a

9    map under it.    And then below that, there are some pictures, a

10   rectangle of pictures and information about hotels, and a line

11   that says "see more hotels."

12             What do you describe this -- what term do you use to

13   describe this area of the SERP?

14   A.    So we call this an answer.

15   Q.    An answer?

16   A.    An answer, yeah.

17   Q.    And let me ask you about this.    If you go down to the

18   photograph, the one on the top right is for the Thistle

19   Trafalgar Square, the Royal Trafalgar.

20             Do you see that, Mr. Barrett-Bowen?

21   A.    Yes.

22   Q.    How do you describe that information about that hotel?

23   Does it also have a name?

24   A.    It's a listing as a part of the answer.    So this is the

25   listing of a property.    It's a part of the answer.

1    Q.   So this is a listing?

2    A.   Yes.

3    Q.   If you look underneath the photograph, there are a set of

4    circles.  You can see all but one filled in and then the

5    words "Trip Advisor" next to it.

6         Do you see that?

7    A.   I do.

8    Q.   What is that?

9    A.   So that's the -- that's essentially the rating that Trip

10   Advisor has given the hotel.

11   Q.   And is this made available to Bing through a content

12   partnership?

13   A.   It is.

14   Q.   Then if you go to the left of that same top row, you will

15   see the citizenM Tower of London Hotel.

16   A.   Uh-huh.

17   Q.   Which one wants to say is the kind of hotel that one can

18   never leave.  But I assume this is not the actual Tower of

19   London.

20        If you look under the name of the hotel, there's a set of

21   stars, and then Booking.com appears.

22        Is that also ratings?

23   A.   Correct.  That's the booking rating for the hotel.

24   Q.   And does that also appear as a result of a content

25   partnership?

1    A.    It does, yes.

2    Q.    And when you were talking before about content that users

3    will trust, is this -- are these examples of that kind of

4    content?

5    A.    Yeah, yeah, reviews are really important when it comes to

6    ratings, as we all know.  So it's a really important part of the

7    overall bit of pieces of information that we present.

8    Q.    And here, the brand names of the two content providers

9    appear, correct, Trip Advisor and Booking?

10   A.    Correct.

11   Q.    Thank you.  You can put that document away.

12           THE COURT:  The hotels listings sort of on the bottom

13   half of the page, are these advertisements that, if clicked,

14   would result in revenue, or are they nonadvertising information

15   for the user?

16           THE WITNESS:  Yes, good question.

17      So if it's an advertisement, we would actually place an

18   advertising icon on there, and sometimes, if there's two slots,

19   can have -- can be an ad.

20      This particular one doesn't have any ads on it that I can

21   see.  So they're actually displayed in accordance to how the

22   product team builds the algorithm to display them.  And so we

23   take into consideration the time, the availability.  And so it's

24   really up to the product team as to how to display them.

25           THE COURT:  Thank you.

1          MR. SALLET:  Your Honor, I would like to move PSXD04

2     into evidence.

3          MR. MAURER:  No objection.

4          THE COURT:  It will be admitted.

5          (Exhibit PSXD04 received into evidence.)

6          BY MR. SALLET:

7     Q.   Mr. Barrett-Bowen, we've been talking about content

8     partnerships.  What are the primary constructs of the deals that

9     you seek to engage in with content partners?

10    A.   So there's three types of deals that you should classify.

11    The first one is a data for traffic where we get information and

12    we provide signal or traffic back to the partner.

13         The second one is really a revenue share, where we actually

14    share -- we would refer revenue -- sorry, we would refer

15    customers or users, and there's some revenue that comes out of

16    that, and so we share in that revenue.

17         And then there's a third one, which is paid.  So we

18    actually pay a provider for that data.

19    Q.   Just to go through them one at a time, at a high level, how

20    does the data-for-traffic deals work?

21    A.   So data for traffic is really about using Bing to drive --

22    to display content in some abbreviated form which we've

23    negotiated but with the ability of providing an answer on Bing.

24    But if the user wants more information, then they would go to

25    the partner to source that information.

1          So we have attributions or links on the answer that can

2     then go through to the partner's site, and that's the traffic

3     that we provide in exchange for the data that they've provided

4     to us.

5     Q.   And in your experience, Mr. Barrett-Bowen, do Bing's

6     partners ever express concerns that a data-for-traffic

7     partnership might not work because there isn't enough traffic

8     coming from Bing?

9     A.   So it's something that is a constant discussion for us.  We

10    always -- partners always want to have more data, and, you know,

11    from our point of view, we try and find ways, creative ways, to

12    try and do that.  But yeah, I think it's a core part of a deal

13    in terms of the gives and gets.

14    Q.   In your experience, if Bing had more traffic to deliver,

15    would that impact its ability to enter into data for --

16    data-for-content deals?

17    A.   So, it's difficult.  I don't want to hypothesize.  I don't

18    want to make anything up here.  But I think, given the

19    experience I have in doing deals, the more you bring, the more

20    you have to make a better deal.

21         So conceptually, I think the answer is yes.

22    Q.   The second category you mentioned were revenue share deals.

23         Can you explain how they work?

24    A.   Yeah.  So that's a situation where we would refer -- we

25    monetize, so we actually -- the differentiator here is that we

1    know if someone has bought a room, in this case a hotel room,

2    and so we would actually share in the revenue based on that

3    transaction.

4    Q.   So do I have it right that if, for example, in one of these

5    listings somebody came from the Bing SERP, ended up at a content

6    partner, booked a room that yielded revenue, some portion of

7    that revenue would be shared with Bing?  Is that correct?

8    A.   Correct, yeah.

9    Q.   And so is that also -- excuse me.

10        It sounds like that revenue-sharing deal also then depends

11   on traffic ending in transactions; is that correct?

12   A.   It does.

13   Q.   And then the third you mentioned was a paid deal.

14        Is that an exchange of money for content?

15   A.   Correct.

16   Q.   And looking at the three types, do you have a generalized

17   preference for one of these kinds of deals over the others?

18   A.   So data for traffic I love, because really, it doesn't cost

19   us money.  It provides us with the ability to also meet what the

20   partner is looking for, which is traffic, and the deal

21   construct's simpler.

22        But yeah, I prefer those types of contracts, and revenue

23   shares are fine as well.

24   Q.   I understand.

25             MR. SALLET:  So, Your Honor, I know we're five minutes

```
 1    short of a break, but I, in the misability to estimate, have

 2    reached the end of what would be the planned open session.

 3              THE COURT:  Okay.  Again, how long do you think this

 4    will last realistically, and is there any way we can do some of

 5    this in an open courtroom?

 6              MR. SALLET:  Your Honor, it would be, I think -- first

 7    of all, you've asked me two questions, Your Honor.  So let me,

 8    if pages --

 9              THE COURT:  You can object on compound grounds.

10              MR. SALLET:  Your Honor, I don't often object to a

11    judge's questions.

12              THE COURT:  We've been at this long enough.

13              MR. SALLET:  If the number of pages is any guide,

14    where we come would be 50 percent of the time I've just used.

15              THE COURT:  50 percent of the time?

16              MR. SALLET:  If I've gone a half an hour, I would go

17    15 minutes.

18              THE COURT:  Okay.  I wasn't sure if it was 50 percent

19    of the time used or an additional 50 percent.

20         Okay.  So about 15 minutes.  That's fine.

21         And the second question was whether -- let's do this:  We

22    will take a break.  Take a look at your examination.  If there's

23    some of what we can do when we come back in open session, let's

24    do that.  If not, then we will proceed to a closed session for

25    about 15 minutes, and then we will move to the cross-
```

```
 1   examination, which I presume will be less than that, at least
 2   the closed session cross.
 3             MR. MAURER:  We hope so.
 4             THE COURT:  Well --
 5             MR. SALLET:  Thank you, Your Honor.
 6             THE COURT:  Thank you, all.
 7        Mr. Barrett-Bowen, we will ask you not to discuss your
 8   testimony with anyone during the break, please.
 9        (Recess taken from 2:57 p.m. to 3:16 p.m.)
10        (Call to order of the court.)
11             THE COURT:  Mr. Sallet, I understand you have some
12   representations you would like to make.
13             MR. SALLET:  Yes, Your Honor.  We have gone through
14   the material.  We believe the remaining material is
15   appropriately considered in closed session.  We have in the open
16   portion tried to establish the basic themes that we will
17   discuss, but what we're moving into now is a set of discussions
18   of dealings with specific companies, the terms, the structures
19   of the deal, in some instances, the potential ramifications for
20   other companies, and we believe under Your Honor's application
21   of the Hubbard factors this constitutes the kind of strategic
22   and negotiating tactics that are appropriately considered in a
23   closed session.
24             THE COURT:  Okay.  Counsel for Microsoft, if you would
25   like to be heard on this.
```

1          MS. CHAPMAN:  Julia Chapman from Dechert for

2    Microsoft.

3          Mr. Sallet has accurately identified the issues.  Our

4    understanding is this portion of the questioning is going to

5    address specific deal structures with specific partners, and

6    that's material that Microsoft maintains strict confidentiality

7    around because it would be disadvantaged if any of that

8    information were to be disclosed publicly.

9          I can answer further questions, Your Honor, but I do think

10   that counsel for the States has identified the issue.

11         THE COURT:  Okay.  No, that's fine.  Thank you,

12   Counsel.  I appreciate that.

13         Again, Mr. Sallet, we're talking about just 15 minutes or

14   so?

15         MR. SALLET:  I believe that's right.  I mean, I have

16   half the number of pages I just did.

17         THE COURT:  Okay.

18         MR. SALLET:  I think 15, 20 minutes.  I can't see it

19   would go longer than that.

20         MS. CHAPMAN:  Thank you.

21         THE COURT:  Thank you, Counsel.

22         There has been an objection lodged through -- one of the

23   reporters here from Bloomberg has objected.  I've taken that

24   objection into account, and I thank her for making it.  But I

25   think on balance, the *Hubbard* factors that I do need to consider

1    weigh in favor of a brief closed session here, although the

2    public interest here certainly favors an open courtroom.

3        Given that the representations are that these are

4    essentially confidential, this is confidential information about

5    deal structures that could disadvantage a third party

6    importantly here, as the representations have been made by

7    counsel, I think the balancing of those factors weighs in favor

8    of a brief closed session.

9        Of course, if I am ultimately misaligned with or if the

10   parties are misaligned with my understanding of what ought to be

11   considered confidential, then certainly, we will move quickly to

12   review the transcripts and release what may fall outside the

13   boundaries of what I think should be confidential.

14       So at this point, we will briefly ask folks to exit, and we

15   will have you back in here as soon as we can.

16       Thank you, everyone.

17       (The following occurred under seal.)

18   ███████████████████████████████████

19   ████████████

20   █ ██████████████████████████████████████

21   ███████████████████████████████████████

22   ████████████████████████████████████████

23   ██████████████████████████

24   █ ██████

25   █ █████████████████











6193















6200





6202















6209



6210







18          (End of sealed session.)

19              MR. MAURER:  While we're doing that, Your Honor, if I

20     may.

21                  CROSS-EXAMINATION (Continued)

22              BY MR. MAURER:

23     Q.  Mr. Barrett-Bowen, let's start with some discussion of the

24     partnerships that Microsoft has, these content partnerships.

25          You have a partnership with Booking.com; correct?

1   A.   Correct.

2   Q.   It's one of the largest online travel agencies; correct?

3   A.   It is.

4   Q.   That's a key relationship for Microsoft; right?

5   A.   It is.

6   Q.   And Booking.com provides information such as hotel booking

7   information and reviews and accessibility and amenities

8   information; correct?

9   A.   Correct.

10  Q.   And Microsoft has a partnership with Trip Advisor; correct?

11  A.   Correct.

12  Q.   It's another very large player in the travel and local

13  space?

14  A.   That's correct.

15  Q.   That's another key relationship for Bing for travel and

16  local; right?

17  A.   Correct.

18  Q.   And Bing gets information from Trip Advisor along the same

19  lines, reviews and photos and things of that nature; correct?

20  A.   That's correct.

21  Q.   And it uses all that information to serve these answers

22  that you were talking about?

23  A.   Correct.

24  Q.   Bing also has partnership with OpenTable; right?

25  A.   Correct.

1    Q.   And Expedia?

2    A.   Correct.

3    Q.   Priceline?

4    A.   Correct.

5    Q.   Fandango?

6    A.   Not that I'm aware of.

7    Q.   Dun & Bradstreet?

8    A.   Correct.

9    Q.   Foursquare?

10   A.   No, we don't have an agreement with Foursquare.

11   Q.   Did you ever have one?

12   A.   We did.

13   Q.   Yext?

14   A.   We do.

15   Q.   Y-e-x-t.  Who is Yext?

16   A.   Yext is an aggregator of local content.  So they provide --

17   they're essentially a marketing agency.  So they aggregate

18   information from small businesses, and then they provide that to

19   search engines and companies that promote those small

20   businesses.

21   Q.   Nextdoor?

22   A.   Correct.

23   Q.   The big airlines, like Delta and Alaska and others?

24   A.   We have -- we do work with them, yeah.

25   Q.   I could go on, but you have over 70 partners in travel and

1    local; correct?

2    A.   Correct.

3    Q.   Including some of the biggest players on the web in travel

4    and local?

5    A.   We have -- I mean, yeah, we have good relationships, great

6    partnerships with these partners, yeah.

7    Q.   It's fair to say that Bing has entered into lots of

8    partnerships for lots of different content with lots of

9    different companies?

10   A.   Correct.

11   Q.   If we look at in your binder in front of you Exhibit 10 --

12   DX1305.  We're not going to put it on the screen because it's

13   from Microsoft, and they've marked it confidential.  But I'm

14   going to ask you to turn to page DX1305.018.

15   A.   I'm sorry.  Could you clarify which?

16   Q.   If you look at the tabs, they're numbered, and they're in

17   order.  There's a tab DX1305, and if you flip to that.

18        Let me know when you're there.

19   A.   Yeah, got it.

20   Q.   And then if you turn -- do you see there's page numbers in

21   the bottom at the center?  If you would turn to page 18, .018.

22   Are you there?

23   A.   Just give me one minute.  Which one?  18?

24   Q.   Yeah.

25   A.   Okay.

1          MR. MAURER:  For the record, Your Honor, this is a

2     written response from Microsoft -- it is in evidence; they've

3     marked it as confidential -- that they provided in lieu of

4     30(b)(6) testimony on certain topics, including content partners

5     that Microsoft has.

6          THE COURT:  Sir, just to help you out here, the tab

7     should be 1305.

8          Counsel, if you could help him out.

9          BY MR. MAURER:

10    Q.  What we have here is an 11-page list of partners who

11    Microsoft has these content agreements with.

12         My question for you is, you recognize these as names of

13    partners that Microsoft has had or has?

14    A.  Correct.

15         THE COURT:  To be clear, are these all current or

16    current and former?

17         THE WITNESS:  I have to have a look.  I think it's

18    probably safe to say that they're both, because we renew

19    contracts a lot.  So it's quite likely that there will be some

20    companies here we've had deals with but potentially don't have

21    anymore.

22         MR. MAURER:  And Microsoft describes what this is,

23    Your Honor, on page 4.  They say it is partners with whom

24    Microsoft has had Bing-related content agreements since 2005.

25    So I think that is current and former.

```
 1              THE COURT:  Okay.  I appreciate it.
 2              BY MR. MAURER:
 3    Q.   All right.  These content agreements that Microsoft has
 4    with its partners, they're negotiated; correct?
 5    A.   Correct.
 6    Q.   And you agree that Microsoft's partners that we've been
 7    discussing, these are sophisticated business entities?
 8    A.   I do.
 9    Q.   And when you or your team negotiates with them, you're
10    negotiating with their counterpart business development team?
11    A.   Correct.
12    Q.   And lawyers get involved at some point as well?
13    A.   Correct.
14    Q.   And you talked about how the structure of these falls into
15    three different types of buckets.  You've got the data for
16    traffic, the rev share, and the paid.
17         Do you recall that testimony?
18    A.   Correct.
19    Q.   And you agree that these sophisticated partners wouldn't
20    enter into these data-for-traffic deals or rev share deals if
21    they didn't think it made sense; right?
22    A.   Correct.
23    Q.   Let's, if we can, look at a SERP.  Let's look at in your
24    binder DX292 -- 292A, and I can help you if you can't find it.
25    It's also on the screen.
```

```
 1    A.    Let's look at the screen.

 2              MR. MAURER:  Your Honor, this is an exhibit that we

 3    have blown up, Exhibit 292, and we've made it 292A.  I would

 4    like to move this into evidence.  I don't understand there's any

 5    objection anymore.

 6              MR. SALLET:  No objection.

 7              THE COURT:  It will be admitted, 292A.

 8         (Exhibit DX292A received into evidence.)

 9              BY MR. MAURER:

10    Q.    This is a result of search for "hotel Seattle" on Bing.

11          Do you see that?

12    A.    Yes.

13    Q.    This is an example of a hotel's vertical SERP on Bing?

14    A.    Yeah, it looks in line.

15    Q.    And we will start from the top, and we will go through it.

16    But this is the top of the page, and what we have at the top are

17    some text ads; correct?

18    A.    Correct.

19    Q.    And we know that they're text ads because they say

20    here "ad" next to them; right?

21    A.    Correct.

22    Q.    And these text ads, it looks like it's with Booking and

23    with Expedia and with Trip Advisor, among others.

24          Do you see that?

25    A.    Yeah, I do.
```

```
 1   Q.   And those are all content partners, but the fact that
 2   they're content partners has nothing to do with the fact that
 3   their ads are on this page; is that right?
 4   A.   They're two separate things.
 5   Q.   And on the right, we have like a display ad for
 6   Booking.com.
 7        Do you see that?
 8   A.   Yeah.
 9   Q.   And do you know -- if the user clicks on this Booking.com
10   display ad, do they go to the same place as if they clicked on
11   that first text ad for Booking.com?
12   A.   I'm not aware.  This is not an area that I'm specialized
13   in.
14   Q.   You're not an ads guy?
15   A.   I'm not an ad guy, yeah.
16   Q.   Let's go to the next page, then.  And this is as we scroll
17   down the SERP.  And I think you testified this is called the
18   answer?
19   A.   Correct.
20   Q.   Is that a capital A answer, or is it just answer of like
21   question and answer?
22   A.   We refer to it as the answer.
23   Q.   And you don't capitalize it, I guess, in your own stuff?
24            THE COURT:  I'm not sure it matters.  Why don't we
25   move on.
```

1          MR. MAURER:  I appreciate that, Your Honor.

2          BY MR. MAURER:

3     Q.   And this answer has a -- a map, and it has these tiles.

4          Is that okay to call them that, tiles, where these hotels

5     are?

6     A.   Sure.

7     Q.   And underneath this, if we keep scrolling down the SERP, we

8     have more links, and these don't have the notation "ad" next to

9     them, and that means these aren't ads; correct?

10    A.   Correct.

11    Q.   These are organic or algorithmic links?

12    A.   Correct.

13    Q.   And is it fair that the arrangement that we see here where

14    you've got some ads followed by an answer followed by organic

15    links, that's the general structure you'd see in a Bing vertical

16    SERP?

17    A.   Again, it's not my role to figure out what the page looks

18    like, but generally, this is something that looks typical.

19    Q.   And the -- the inclusion of the answer, Bing's answer on

20    the SERP means that the organic results are pushed down the

21    results page; right?

22    A.   So in the states, yeah, that's right.

23    Q.   And I think you said Microsoft designs its answers on Bing

24    to be useful for a user searching for a result; right?

25    A.   Again, yeah.

Q.   And you believe the answers Bing provides are useful to the users?

A.   Again, the product team put a lot of time in making sure that the answers that we were delivering is what --

Q.   Right.  I'm sorry.  I didn't mean to interrupt.

A.   What the user is looking for.

Q.   Something you focus on.

     Let's put the answer back up, please, Al.

     And Bing competes with vertical search sites for the user queries that result in the Bing answer; right?

A.   So let me just, if I can, just dig into that a little bit.  So we do have the same users, that's correct.  But I think it's important to kind of -- to recognize that when we go into partnerships, we're adding value to getting access to users that our partner wouldn't have access to.

     And so it's important to just point that out.

Q.   You agree there is an overlap between the users who are searching for a hotel on Bing and users who are searching for a hotel on Trip Advisor?

A.   There's certainly an overlap.

Q.   And Bing is trying to obtain users searching for the same things that the companies are offering the vertical search sites for; right?

A.   Again, just to be clear, I mean, what we're doing here is providing the -- our users, users using Bing, the opportunity to

1    look for hotels.  In this case, they've chosen -- that user is

2    not on one of our partner sites.  So yeah, in this case, we're

3    offering that opportunity for a user who isn't on one of our

4    partner sites to look for hotels.

5    Q.   Bing is competing for those users?

6    A.   I just want to be really clear.  When we talk about

7    competing, so firstly, it's really important from a business

8    development point of view, I don't see our partners as

9    competitors.  That's not the intention.  And it's really

10   important to also point out that when we partner with our

11   partners, you know, those partners are -- see value in what

12   we're doing in terms of getting to users that they don't get to.

13        I think it's really important just to clarify that.  So

14   this competing can be a little loaded as a word, but I think

15   it's really important just to distinguish what is actually

16   happening here and why we're offering values to our partners.

17   Q.   I understand you're the deal guy, and it's hard to say bad

18   things about competing with your partners.  But I want to make

19   sure I get an answer to this question.  So let me try it one

20   more time.

21        Bing is trying to obtain users searching for the same

22   things that companies are offering the vertical search sites

23   for; do you agree with that?

24   A.   So we're offering an answer to our users for hotels.  In

25   some cases, we compete for users, but I think it's important to

1    just be very clear about the user.  A user is not always the

2    same user.

3    Q.   Your team benchmarks the Bing answers against the vertical

4    search units that appear on the Google SERP; correct?

5    A.   We do.

6    Q.   And one way you do that is by something called a

7    side-by-side; right?

8    A.   Correct.

9    Q.   And a side-by-side is a comparison where you have testers

10   who are actual human users look at one and look at the other and

11   then compare the user experience between them; correct?

12   A.   So, again, I don't look after that process.  It's not my

13   area of expertise.  But we do have that process.

14   Q.   You're familiar with the process I described?

15   A.   I'm familiar with the side-by-side process, yeah.

16   Q.   And Bing believes it's competitive with Google in the

17   travel and local verticals; right?

18   A.   So I think the answer to that is by this process of

19   side-by-side, it allows us to look at one point of reference and

20   say how we're comparing against Google for those answers and

21   making sure that we're providing an answer that is -- allows us

22   to provide a good quality answer.

23        So yeah, I think the answer is yes.

24   Q.   Just to be clear, the answer to the question whether Bing

25   believes it's competitive with Google in the local and travel

```
 1    space in terms of the vertical search results from Google versus
 2    the Bing answer is yes, you believe they're competitive?
 3    A.   I think it's really important.  Are we competitive?  I
 4    think from a business development point of view, what I'm trying
 5    to do is partner to get content so that we can provide our user
 6    with the ability to look for that particular answer and get a
 7    great answer.  That's what I'm trying to do.
 8         The partnership, the ability to -- I think it's important
 9    we split this out, because what I'm not doing is looking for
10    distribution.  All right?  So the content partnership that I'm
11    negotiating is to get comparable content --
12    Q.   I think maybe you misunderstood my question.  I wasn't
13    asking about your partners now.  I was asking about Google.  So
14    let me try it again.  Maybe I will change the language to help
15    you out a little bit.
16    A.   Uh-huh.
17    Q.   Bing believes its vertical offerings are on par with the
18    Google vertical offerings in travel and local; correct?
19    A.   So that is something that I -- it's probably not fair of a
20    business development guy to ask the question, because we have a
21    team of people who go and figure out what that looks like.  So
22    my opinion on that is probably not something you'd want to ask.
23    I can give you an opinion, but I don't think that it's probably
24    right to ask a business development person that question.
25    Q.   But you've seen these side-by-side results comparing the
```

1  two; right?

2  A.  Side-by-side is one element that we use to compare.  And

3  again, I'm not an expert on the side-by-side comparison, but it

4  is just one element.

5  Q.  And the side-by-sides that you have seen recently show that

6  Bing is on par with Google in terms of their vertical offerings;

7  is that right?

8  A.  So I just want to be super clear about this.  The

9  side-by-side comparison is a very subjective way in which we

10  actually do comparisons.  It's really important to be clear that

11  that is not a determinant of whether we are competitive with

12  Google or not.  It's not designed to be a way to answer that

13  particular question.

14  Q.  So you can't answer whether or not you believe Bing's

15  vertical search results are --

16          MR. SALLET:  Your Honor, objection.  This is beyond

17  the scope of anything in the direct.

18          THE COURT:  Well, I think he's answered the question

19  that was asked.  So why don't we move on.

20          MR. MAURER:  I will move on, Your Honor.

21          BY MR. MAURER:

22  Q.  There is a case, though, isn't it right, Mr. Barrett-Bowen,

23  where Bing's testing showed it was behind in the flights

24  vertical?

25  A.  Correct.

1  Q.   And then Google --

2              THE COURT:  Hang on, Counsel.  There's an objection

3  here.

4              MR. MAURER:  Oh, sorry.

5              MR. SALLET:  Perhaps I should state my objection.

6      There was no question in the direct about side-by-sides or

7  how Bing views itself in any segment vis-a-vis Google.  This is

8  beyond the scope of his direct.  It is not appropriate for

9  cross-examination.

10             THE COURT:  Counsel?

11             MR. MAURER:  His entire examination was about traffic

12 and how they are drowning for traffic, and I think that this

13 shows -- helps to show that that's not the case.

14             MR. SALLET:  It doesn't have any relevance.

15             MR. MAURER:  If I --

16             THE COURT:  Hang on.  I'm not sure I see how the

17 side-by-side issue relates to traffic.

18             MR. MAURER:  If you give me three questions, Your

19 Honor, I can link it up, or I can make a proffer.

20             THE COURT:  Do your three questions.  Go ahead.

21             BY MR. MAURER:

22 Q.   Question number 1:  At one point, Bing's testing showed it

23 was behind in the flights vertical compared to Google's flight

24 vertical; correct?

25 A.   That is correct.

1   Q.   And Bing invested and made improvements to its flights

2   vertical; correct?

3   A.   We did.

4   Q.   And as a result of that, Bing improved its flights vertical

5   and ended up getting more traffic to it; correct?

6   A.   So let me be very clear about that last statement.   We

7   improved the flights answer because we recognized that that part

8   of the travel solution was not competitive.

9        So we did that.  It doesn't necessarily mean that we

10  somehow, by improving the answer, improved traffic.   What we did

11  is we improved the answer to the traffic who came to us.

12       And I just want to be really careful to parse this apart,

13  because I don't negotiate -- by negotiating partnerships for

14  content, what I'm doing is -- what I'm not doing is driving

15  traffic.  It really a subtlety that's quite different.  It's a

16  little bit -- just be careful.  I don't want to say that we

17  improved the answer for flights, which is one part of our

18  overall travel proposition, and by doing that we generated more

19  traffic, because they're two different things.

20  Q.   There's not necessarily a link between the partnerships you

21  have and the improvements that those make to an answer and the

22  traffic that Bing has?

23  A.   Correct.  So again, just to be super clear, what I'm trying

24  to do with content is I'm trying to provide the users that we

25  have with an answer that provides them with the answers they're

1    looking for.

2         I just want to make sure we do disconnect the distribution

3    piece, because it's not about driving traffic.

4    Q.   Let's look at the SERP deck that you looked at with

5    Mr. Sallet, which is PSXD04.  If we look at the answer here on

6    PSXD04, you were pointed to a couple of these that were called

7    out.

8         The Trip Advisor one, can we call that one out?  All right.

9    There we go.

10        Now, Bing collects the information that it provides in

11   these tiles from many different sources; right?

12   A.   Correct.

13   Q.   Not all of the information on this tile is from Trip

14   Advisor; correct?

15   A.   Correct.

16             THE COURT:  I'm sorry.  On the individual tile or all

17   the tiles collectively?

18             THE WITNESS:  So these tiles are a collection of

19   signals that we get from partners that we put together --

20             THE COURT:  I see.  So this is more than one signal

21   from a partner?

22             THE WITNESS:  Yeah.

23             BY MR. MAURER:

24   Q.   So, for instance, on this tile, you have information from

25   Trip Advisor, but you can also have information in it that comes

6229

1    from crawling the web or from the Bing places program or the

2    hotel pricing option, things of that nature?  That's all put

3    together in these different tiles?

4    A.    Correct.

5    Q.    Okay.  And even though these tiles -- this tile that we're

6    looking at here says "Trip Advisor" on it -- well, let me

7    withdraw that question and try another one.

8          The fact that this tile says "Trip Advisor" on it, that is

9    directly related to the four-star rating we're seeing; right?

10   A.    So I want to be super careful about answering that

11   question, because the elements that go on this page, it's up to

12   the product team how they build those.  And each one of these is

13   governed, obviously, by the agreements that we have.

14         So I just want to make sure that you --

15   Q.    You've read my mind.  My next question was going to be, the

16   reason Trip Advisor is named here is because they negotiated for

17   that in the content partnership agreement that they have with

18   Microsoft; right?

19   A.    This was a -- yeah, I mean, we've got the right to use

20   their content.

21   Q.    That's what they wanted, and that was a part of the back

22   and forth in this negotiation between Microsoft and Trip

23   Advisor?

24   A.    Correct.

25   Q.    And you don't know, for instance, whether that photo on

1    this tile comes from Trip Advisor; it could come from them or

2    from any number of sources?

3    A.   Correct.

4    Q.   Now, the results that are shown on this answer, each of

5    these tiles, those are all hotel properties at which a consumer

6    can stay; right?

7    A.   Correct.

8    Q.   Bing will not return as a result in its answer a link to

9    Kayak or Trip Advisor instead of a hotel property; correct?

10    A.   In this quadrant?  I mean, no.  The format of this is it

11    remains as it's laid out here in this three-by-three.

12       Just to be clear, though, there can be two ads -- well, can

13    be ad placements in here, and so the first and the second tile

14    could be an ad in the form of this.

15    Q.   So for --

16       THE COURT:  So if one were to click a tile, where does

17    it go?

18       THE WITNESS:  So this goes off to the hotel, to the

19    actual hotel itself, the details page about the hotel.

20       THE COURT:  Is that true in all cases unless it's an

21    ad sponsor?

22       THE WITNESS:  That's a good question.  I'm not quite

23    sure what happens with ads.  I think the ads -- I'm not sure is

24    the answer.  But certainly from the content piece, it goes to

25    the page, the hotel itself, yeah.

        BY MR. MAURER:

1

2   Q.   And just to be clear -- I'm sorry for interrupting, Your

3   Honor.

4        When you click on one of these tiles, it goes to a results

5   page for that hotel that's hosted by Bing; is that right?

6   A.   Correct.

7   Q.   And that results page has more information about the hotel,

8   more pictures, maybe more reviews, a list of the amenities and

9   policies, and also booking links out to various -- maybe direct

10  to the hotel, but also to the Trip Advisors and the Pricelines

11  of the world; right?

12  A.   Correct.

13  Q.   So to go back to my question, the reason that -- at least

14  for the algorithmic or organic -- I'm not sure what to call the

15  non-ad tiles.  Do you have a term for those?

16  A.   I understand what you're saying, yes.

17  Q.   For those ones, the non-ad ones, you don't have a link in

18  there to the Kayaks or the Trip Advisors, because the purpose of

19  this answer is to answer the consumer's query, and what the

20  consumer is looking for is a hotel; right?

21  A.   Correct.

22  Q.   And this is a hotels vertical, but let me talk to you about

23  the local vertical for a second -- the local Bing answer, I

24  should say.

25       To show up in Bing's local results, the business or service

1    needs to have a local address; right?

2    A.   I mean, I'm not quite sure what the question is.  I mean,

3    yeah, it has to be local.

4    Q.   It has to be a place in the locale where you're looking for

5    it?

6    A.   Yes.  I mean, generally, I think that's the case, yes,

7    yeah.

8    Q.   And that's because Bing -- when a user types in a query for

9    like "plumbers near me" or "tacos near me," Bing understands

10   that they're looking for a plumber or a taco restaurant; right?

11   A.   That's right.  And just to clarify that, the plumber may

12   not live in the region -- the address might not be there, but

13   they service the region.  So there's that nuance.

14   Q.   A plumber comes to you.  So you're saying the area of

15   interest for the plumber --

16   A.   Yes.

17   Q.   -- would have to be the local area?

18   A.   Correct.

19   Q.   All right.  Do you agree that the disparity in the number

20   of users between Bing and Google does not impact Microsoft's

21   ability to enter into travel and local partnerships generally?

22   A.   Sorry.  Can you say that again?

23   Q.   Sure.  Do you agree that the disparity in the number of

24   users between Bing and Google does not impact Microsoft's

25   ability to enter into travel and local partnerships?

A.   So I just want to be clear.  We can enter into

negotiations.  I think what's important is that the -- what we

bring to the negotiation table is dependent on the amount of

users that we have.

     And so there is a disparity -- I can only surmise that

there is an imbalance there.

Q.   Let me ask it one more time, because I want to make sure we

get this straight.  I'm talking about in the U.S. now, just to

be clear, which is where this case is about.

A.   Uh-huh.

Q.   Do you agree that the disparity in the number of users

between Bing and Google does not impact Microsoft's ability to

enter into travel and local partnerships?

A.   So I think the answer to that is we can -- when we

negotiate, we come up with an agreement based on the leverages

that we have in terms of traffic.

     And I think that not -- yeah, I think based on the users

that we have, we can negotiate agreements, yeah.

Q.   Microsoft, you would agree, has good penetration in the

U.S. that allows Microsoft to enter into these travel and local

partnerships for the U.S. market?

A.   So just to be clear, local, for example, is really

important.  We have users, but what we negotiate is, you know --

we don't have a lot of local signal.  So we do negotiate

agreements with partners based on the data that we have.

1      If I was Google, I would have more data points by the fact

2   that they're in -- you have mobile signal.  And so yeah, sure,

3   we're negotiating, but I think -- I just want to be very clear

4   that we're negotiating with less users.  And so there is an

5   imbalance in terms of the negotiations in terms of what I

6   suspect, you know, we could get, given the limited amount of

7   users that we have.

8   Q.   All right.  Let me --

9           MR. MAURER:  Excuse me, Your Honor, one minute.  If I

10  may approach.

11          BY MR. MAURER:

12  Q.   All right.  Mr. Barrett-Bowen, I've handed you a copy of

13  the deposition transcripts from your depositions in this case.

14      Do you recall being deposed in April of 2022?

15  A.   I do, yes.

16  Q.   And before you gave a deposition, you were given an oath

17  similar to the one that you gave here; right?

18  A.   Uh-huh.

19  Q.   Yes?

20  A.   Correct.

21  Q.   All right.  And you did your best to tell the truth at this

22  time?

23  A.   Correct.

24  Q.   All right.  If you would please turn in your deposition,

25  let's look at page 43.  It's the first deposition.  I'm going to

1    direct you to line 8.

2        Are you there?

3    A.   Correct.

4    Q.   Read along with me.

5        "Question:  And aside from exclusive partnerships, does the

6    disparity in the number of users between Bing and Google impact

7    Microsoft's ability to enter into travel and local partnerships

8    generally?

9        "Answer:  I think if you look, it doesn't -- it doesn't

10   impact us getting into -- getting access to data, because I

11   think we have good penetration inside the U.S., so that's

12   important."  Then you go on to talk about other markets.

13       Did I read that correctly?

14   A.   That's right.  Can I just clarify, though?  I'm not saying

15   that we can't enter into agreements.  The point of clarification

16   is that -- what I'm trying to clarify here is that we don't have

17   as much leverage because we don't have as many users.

18   Q.   Now, you mentioned one of the reasons that Microsoft enters

19   into these content partnerships is to get information from the

20   partners that Microsoft doesn't collect itself; correct?

21   A.   Correct.

22   Q.   And you mentioned, I think, reviews and pictures, things of

23   that nature?

24   A.   Correct.

25   Q.   And you said you don't have that because you don't have

1    access to the mobile device, which makes it challenging to get

2    those signals; right?

3    A.   Correct.

4    Q.   But the partners that Microsoft gets this content from, the

5    Trip Advisors and the Bookings of this world, they don't have a

6    mobile device either, do they?

7    A.   They have good mobile penetration.  A lot of these

8    companies access wide mobile devices.

9    Q.   They have apps. that they have put out there for users to

10    download, and then they have invested in getting users to

11    download those apps. and use them to do the reviews and the

12    pictures and those things; right?

13    A.   So with respect, I think we're going into -- we're kind of

14    moving away from the content discussion.  I think you're

15    starting to think more about the distribution, which is, again,

16    not an area that I focus in on.

17        So I just want to be clear that it's probably not a fair

18    question, but --

19    Q.   My question for you is, the information that you're

20    getting, this rich content, the reviews and such that you say

21    Bing lacks the signal for because you don't have any mobile

22    devices, you would agree Trip Advisor and Booking don't have

23    mobile devices either; right?

24    A.   That's correct, but I think your point is -- just to be

25    clear, are you asking do they have access to mobile?  They have

1    access to mobile signal because they're a popular application on

2    these mobile devices, yeah.

3    Q.    And, by the way, Google doesn't have Trip Advisor and

4    Booking reviews on its vertical search results; right?

5    A.    Again, I don't believe they do.  I'm not sure, but --

6    Q.    Do you know where Google gets its reviews and its pictures

7    and its rich data from?

8    A.    Again, I have no idea.  I mean, I can tell from the reviews

9    that the reviews come from your sources, but I don't know.

10   Q.    When you say our sources, you mean Google has invested in

11   getting -- in building a platform and developing the resources

12   where users can go out there and do their own reviews of the

13   restaurants that then Google has and take pictures of the

14   restaurants and the hotels that Google has.

15          And Bing hasn't done that; right?

16   A.    So I just want to be careful again.  I'm trying to give my

17   testimony based on negotiations, partners I have content

18   agreements.  I think this is kind of venturing into discussions

19   around distribution and how you're doing so --

20   Q.    You don't know the answer; is that right?

21   A.    I don't think this is my wheelhouse.  I don't think this is

22   something that's kind of relevant to my --

23          THE COURT:  Why don't we move forward.  How much

24   longer do we have?

25          MR. MAURER:  We have no much longer.

1          THE COURT:  Excellent.  Thank you.

2       Mr. Sallet, any redirect?

3          MR. SALLET:  Very short, Your Honor.

4                    REDIRECT EXAMINATION

5       BY MR. SALLET:

6  Q.   Mr. Barrett-Bowen, the SERP that I showed you that was

7  marked PSXD04, "hotels London," could you just look at that for

8  a second.

9          THE COURT:  It's up on the screen, if that's helpful.

10          THE WITNESS:  Yeah.

11       BY MR. SALLET:

12  Q.   I think the screen is probably easier to look at,

13  Mr. Barrett-Bowen.

14  A.   Okay.

15  Q.   The query that's entered is "hotel London"; correct?

16  A.   Correct.

17  Q.   Now, looking at the SERP, the second entry above the map

18  is "hotels in London, up to half price on hotels," and then

19  there's a URL that goes to a page at Booking.com; is that

20  correct?

21  A.   Correct.

22  Q.   And then this SERP goes on, as we've displayed it, for

23  three more pages.  So if you scroll down past the answer, as

24  you've described it, the page continues, and then there's

25  another link for Booking.com; is that correct?

1    A.    Correct.

2    Q.    And the page continues down after that.  And there's a link

3    for Trip Advisor, correct, and then Expedia?  And there's still

4    more content, some of it from Bing.

5         Now, we don't have to go through it all.  Let me just ask

6    you a question.  All of this content is served by Bing in

7    response to a single query, which is "hotels London"; is that

8    right?

9    A.    Correct.

10              MR. SALLET:  No other questions.

11              THE COURT:  All right.  Mr. Barrett-Bowen, thank you

12   very much for your time and testimony.

13              THE WITNESS:  Thank you.

14              THE COURT:  Safe travels home, sir.

15        Counsel, actually, could I ask you to submit what you

16   believe ought to remain redacted for Mr. Barrett-Bowen's

17   unsealed testimony by the end of the week?

18              MS. CHAPMAN:  Absolutely.

19              THE COURT:  If you could just highlight what you think

20   should be redacted, that would be appreciated.

21              MS. CHAPMAN:  Your Honor, we want to make sure we can

22   access the transcript.

23              THE COURT:  Sure.  If I can -- I'll ask the court

24   reporter -- the court reporter has permission to provide you

25   with that portion of the testimony.  Make sure she has your

```
 1    contact information.

 2              MS. CHAPMAN:  Thank you, Your Honor.

 3              THE COURT:  I appreciate it.  Thank you very much.

 4              MR. KAUFMANN:  Your Honor, there are no additional

 5    witnesses today.

 6              THE COURT:  All right.  So what does that look like

 7    for tomorrow?

 8              MR. SCHMIDTLEIN:  Tomorrow, Your Honor, Google will

 9    call Pandu Nayak as sort of the agreed-upon scheduling issue

10    that we have.  He's being called slightly out of order.  And

11    then I think the States have, I think, a couple more witnesses

12    for Thursday, I believe.

13              MR. KAUFMANN:  On Thursday, there's two witnesses.

14              THE COURT:  So is there just Ms. Nayak tomorrow?

15              MR. SCHMIDTLEIN:  Mr. Nayak is going to come tomorrow.

16              THE COURT:  I'm sorry.  Mr. Nayak.

17              MR. SCHMIDTLEIN:  He will testify for more than a

18    couple of hours, but we probably won't take up the full day

19    tomorrow, I don't believe, depending on the cross.

20              MR. DINTZER:  It's really hard for me to estimate at

21    this point, Your Honor.  If he's going to testify for a couple

22    of hours, and we'll have concerns, perhaps, about what he's

23    testifying about, but I really can't estimate at this point.

24              THE COURT:  Okay.  All right.

25              MR. KAUFMANN:  Then on Thursday, there's two fact
```

```
 1    witnesses, Your Honor.
 2              THE COURT:  All right.  So that's what we've got for
 3    the rest of the week?
 4              MR. KAUFMANN:  Yes.
 5              THE COURT:  Just a couple of housekeeping issues.  I
 6    know we have on my to-do list to still get out a few
 7    transcripts, but I would like to get from the parties your
 8    proposed redactions to, I think, the last two of that first two
 9    weeks, Ms. Kartesheva and Mr. Tinter.  And I know Mr. Tinter may
10    take a little bit of time.  But if we could get those by -- is
11    Friday realistic?  If we can get those by Friday, that would be
12    terrific.  That way, I can get those out early next week.
13              MS. BELLSHAW:  Yes, Your Honor.  Google has already
14    sent an email to Microsoft's counsel with their position on the
15    transcripts, and we've asked Microsoft to send their response by
16    Friday so that we can get it to the Court by Friday.  And that's
17    both for Mr. Tinter and Mr. Parakhin.
18              THE COURT:  Terrific.  Thank you.
19         Okay.  Did we do any of Mr. Parakhin under seal?  I don't
20    remember that we did.
21              MS. BELLSHAW:  I believe there was a small portion
22    during Google's questioning.
23              THE COURT:  Okay.  Terrific.  So we will look forward
24    to receiving the proposed redactions to those transcripts by the
25    end of the week.
```

1          All right.  We've got a few minutes here in the afternoon.

2     So Mr. Dintzer, you had raised some issues about exhibits.

3               MR. GOWER:  Yes, Your Honor.  Good afternoon.  Cameron

4     Gower.

5          I don't think this should take too long.  We have a few

6     matters of exhibits.  We're still working through them, and we

7     made some additional progress, and I just wanted to give you a

8     few updates.

9               THE COURT:  Okay.

10              MR. GOWER:  So the first thing is that I have

11     corrected copies of the documents I handed to you on Thursday.

12     Google identified for us that we had had a mix-up in a few of

13     our numbers.  So I have corrected copies of that.

14              THE COURT:  Okay.

15              MR. GOWER:  And I apologize for that double

16     submission.

17              THE COURT:  That's all right.

18              MR. GOWER:  And the second matter is a new round of

19     the same idea.  We have more documents that we have agreed

20     with -- or that Google has withdrawn any objection moving to

21     admit, with some having the same embedded hearsay reservation.

22     So we have identified those in a single document this time.

23          So we would move to admit these, with the understanding

24     that some of them which are identified in the document Google

25     has reserved an embedded hearsay objection.

1          THE COURT:  Okay.  Has counsel seen the list and

2     signed off on it, I take it?

3          MR. GREENBLUM:  We've had an e-mail exchange, and I'm

4     sure it's the same.  I'll confirm.  If we have any issues, I

5     will raise them with Mr. Gower, but I'm sure it's fine.

6          THE COURT:  Hand that up to Mr. Douyon, and he'll make

7     sure it's on our exhibit list.

8          MR. GOWER:  Great.  And then the last matter is, we

9     still have outstanding documents where there's dispute.  We have

10     one dispute that we think is ripe for today, and it regards

11     MADAs and RSAs with partners who you haven't heard a lot about

12     but are out there who Google has agreements with.

13     There are 14 partners who Google has MADAs and RSAs with

14     where queries occur in the United States.  These are smaller

15     players.  They're carriers like Metro PCS, and they're browsers

16     such as Opera, and OEMs such as Sony.  These don't make up a

17     large part of Professor Whinston's numbers that he presented to

18     you, but they are a small piece of that.  And we identified

19     these through Google's RSA data that identifies these as

20     payments that they make in the United States.

21     And for that reason, we believe they are relevant and

22     worthy of admission.

23          THE COURT:  Okay.

24          MR. GREENBLUM:  Ben Greenblum for Google.

25     Just briefly.  This is 258 contracts that haven't been

presented to the Court at all in its case-in-chief.

Mr. Whinston didn't say anything that I heard about them in any

of his examinations to date.  These include OEMs that

predominantly are producing devices or selling devices outside

the United States.  They include OEMs whose devices are banned

from the United States.

So we've heard everything the Court has obviously directed

us on with respect to foundation and hearsay and so forth.  We

do think there's a pretty important relevance issue here.

With respect to the agreements the Court has heard lots of

percipient fact witness and expert testimony on, those are --

none of those are in this bucket, like the Verizons and the

AT&Ts and the Samsungs.  We think this is a huge mass of

material that has not been put at issue in the case.

THE COURT:  Okay.  Look, you know, I don't know if I

would agree that it's not at issue in the case.  Just one

example:  We've talked about Opera a little bit at the outset.

It's a small browser, I recognize, but nonetheless, it is a

channel of distribution.

And so to the extent that those channels of distribution

have MADAs and RSAs associated with them, there's relevance to

the evidence, it seems to me.

Now, it's fair to say that they may not be subject to

Professor Whinston's analysis since they're so small, but I

don't think at the end of the day there's no relevance to them

1    at all.

2           MR. GREENBLUM:  Understood on Opera, Your Honor.  I do

3    think it's in a different category than the Huaweis and the

4    Xiaomis and a bunch of others that I don't believe you've been

5    presented even with the names of.  I don't want to go through

6    them now.

7           THE COURT:  I guess the question is, for present

8    purposes -- I shouldn't say present purposes.  If there are

9    carriers, for example, and OEMs as to which once upon a time

10   Google did have MADAs and RSAs but they've expired because, for

11   one reason or another, the product is no longer sold in the

12   United States, it's no longer -- in other words, these are

13   historic numbers, I don't know how essential it is that I have

14   them, to have some documentation about a small distribution

15   partner, but I don't know how many we're talking about.

16          MR. GOWER:  First, we're talking about 14 companies.

17   These are all companies where Google has made payments for

18   queries in the United States.  So it confuses me that they're

19   saying some of these devices are not even allowed in the United

20   States.  They're making payments on them.  These companies do

21   involve relevant big companies that you've heard about before,

22   like Opera.  Others, we haven't occupied a lot of your time with

23   them.  Charter, for example, has -- they're a carrier in the

24   same way that Verizon is.  We haven't occupied a lot of your

25   time with that because we didn't think it was as important as

1    Verizon and the others.

2         And yes, these are all queries that fit into the coverage

3    numbers that you heard from Professor Whinston.  They are a

4    piece of it, and we think that honestly the fact that Google

5    goes all the way down to even the smallest carriers to sign

6    agreements with them, that that shows the extent to which Google

7    is tying up the market.

8         And all these payments were made in 2020, which is the year

9    for which we got the data from Google.

10              MR. GREENBLUM:  Your Honor, we don't have any

11   objection to Professor Whinston relying on the data or even

12   relying on the fact of the agreements.  I don't think there's

13   been any record made of the particular nature of any of these

14   contracts or relationships.  But we don't have a problem with

15   him relying on it.

16        It's a question of whether 258 contracts come into the

17   record as evidence that just gets cited for other purposes.  We

18   don't have a problem with him relying on the fact.

19              THE COURT:  Look, I will overrule the objection.

20   We'll admit them.  Microsoft did speak -- did talk about the

21   effects of alleged anticompetitive conduct, even in small

22   channels of distribution, as relevant to the overall

23   consideration of whether the conduct overall was anticompetitive

24   or not.

25        So I'll accept them into evidence with the understanding

1    that it's a very small distribution channel, and we'll just

2    leave it at that.

3           MR. GOWER:  Thank you, Your Honor.

4           MR. GREENBLUM:  Thank you, Your Honor.

5           THE COURT:  All right.  Anything else?

6           MR. KAUFMANN:  One small matter, Your Honor.  Last

7    Thursday at the conclusion of Mr. Dijk's -- the day after

8    Mr. Dijk's testimony, Google handed up corrected demonstratives

9    that were used with him, and we reserved our right to take a

10   look at what they were.

11       Your Honor, we object to that process.  I could hand up

12   what the two corrections were, and we're going to ask that they

13   not be accepted into -- and testimony relating to it be struck.

14          THE COURT:  Can you walk me through again what the

15   chronology is here and what I've got in front of me?

16          MR. KAUFMANN:  Sure.  What I've handed up, Your Honor,

17   are the one that was -- the two demonstratives that were

18   originally used and then Google's proposed corrected

19   demonstrative.

20       The one -- Mr. Dijk was shown a Bing search that had eight

21   ads, and now they're changing it to well, it was only five.  But

22   he was asked -- he was shown it, and Mr. Sommer said, "Let's

23   scroll it forward.  It's not five, six, seven, eight.  Okay,

24   stop it there."

25       The other one, Your Honor, is they corrected for Google.

Originally, they had four ads, and now they say it's one ad and the other results are organic.

Your Honor, I'm not suggesting there was anything deliberate done here, but I don't think it's appropriate to start swapping out demonstratives. These aren't correcting typos. These are material changes, and witnesses were questioned about a demonstrative that they're now seeking to change the demonstrative. We don't think that's appropriate.

THE COURT: Okay.

MR. SOMMER: So, Judge, let me start with the testimony, because Your Honor may recall that when I took Mr. Dijk to the Bing demonstrative, I first said there are five ads, and he agreed with me. And then I misconstrued the next three and characterized them as ads.

So the record says, "Let's look at Bing. Do you see there are five ads before you get to the first organic result? Do you see that?" Answer, "yes."

I don't think that testimony is being challenged. I think what's being challenged is I then said, "Okay. Let's scroll forward," and it gets to eight. And I said, do you see eight? The witness agreed. I'm sure he took my word for it that I had counted them accurately.

So I have no problem with the eight being stricken, because I miscounted them. The fact that the witness went along with me, it's not particularly substantive. Five makes the exact

```
 1    point I was trying to make.

 2                THE COURT:  It's the power of your cross-examination.

 3                MR. SOMMER:  Yes, very powerful.

 4         On the Google one, I mean, there was some very -- I don't

 5    think there's any testimony they're seeking to strike on that,

 6    because Mr. Dijk, you may recall, testified a few times on

 7    direct that Google uses five top-side ads, and he conceded in

 8    cross that that was wrong and he knew that was wrong.

 9         So the fact that on this demonstrative I miscounted against

10    my client's interest and said it was four when in fact it was

11    one doesn't change the point that I made at all with Mr. Dijk

12    that he knew his testimony about five was erroneous when he gave

13    it.

14         So the one thing -- I'm perfectly content to have the one

15    portion stricken, the reference to eight on Bing, because five

16    was the point I was trying to make.

17         And in terms of the demonstratives themselves, I should

18    probably count better, but I really don't care.  I don't want

19    Your Honor to have an erroneous set of demonstratives and make

20    the same error Mr. Dijk made.

21         But whatever the States feel strongly about, I'm fine with.

22    If the originals have a miscount, they do.

23                THE COURT:  Can I just make a quick observation about

24    at least these two demonstratives and at least what the

25    propositions they were being introduced for?
```

1          I sort of take all of this with a little bit of grain of

2     salt, and I say that for the following reason.  I suspect if you

3     punched in the same search a second, third, fourth, fifth time,

4     you would have a different SERP.  And you would have a different

5     number of ads, perhaps not more than four, fair enough.

6          But I think, unless somebody is going to come in here, for

7     example, and tell me that every time you look for hotels in any

8     location the Google SERP is only going to produce one ad --

9               MR. SOMMER:  No, I would not make that representation.

10              THE COURT:  And I'm not suggesting that was the nature

11     of the representation either.  But all of this with a grain of

12     salt, I think it's important to correct the fact that Bing

13     doesn't have eight ads but five.  That's a material difference.

14          But the fact that Google on this particular page is one ad

15     versus four, I'm not sure really is all that --

16              MR. SOMMER:  I don't think any of it impacts the point

17     I was trying to make with the witness.  But as I said, if it

18     gives the States any angst, I'm happy to have the reference to

19     eight stricken.

20              THE COURT:  Okay.  Mr. Sallet, anything you want to

21     add?

22              MR. SALLET:  No, Your Honor.  It wasn't a miscounting.

23     He showed the witness eight ads.  So I just don't think that's

24     appropriate.  So I think that should be stricken.

25              THE COURT:  Look, I think it's fair.  I mean, it's --

1    I think it's fair to strike the testimony, and then when the

2    witness is shown something that's not accurate, it causes one to

3    question the accuracy of the responses.  Ultimately, I'm not

4    sure how critically important all of this is, in any event.

5        We'll -- to the extent that these were requested to be

6    admitted, and I don't recall whether they were --

7        MR. SOMMER:  They were not.

8        THE COURT:  If they were, we will withdraw them from

9    the evidence, and then we will strike the testimony that related

10   to these two particular demonstratives.

11       MR. SOMMER:  Just to be clear, Your Honor, it's

12   limited to the number eight.  Certainly, the count of four on

13   Google is not a detriment to the States at all.  But the

14   testimony about five ads on Bing is accurate testimony and

15   consistent with the exhibit.  So there would be no reason to

16   strike that.

17       Certainly, there would be no reason to strike Mr. Dijk's

18   acknowledgment that his statement about five top-side Google Ads

19   was knowingly incorrect.

20       THE COURT:  Yeah, I don't think I'm striking that one.

21       I think the bottom line here, as you yourself have admitted

22   or conceded, and Mr. Dijk I'm not sure was a real expert in

23   determining what was a paid ad and a nonpaid ad and was clearly

24   sort of green with your very authoritative inquiry of him, so

25   again, I'm not sure how terribly helpful it is for me to take

1    that testimony at face value, in light of the inaccuracies of

2    the exhibits.

3        We will strike those portions from the record, or at least

4    withdraw those portions from the record for the Court's

5    consideration.

6                THE COURT:  MR. SOMMER:  I had one other thing.

7                THE COURT:  Uh-huh.

8                MR. SOMMER:  During Mr. Jerath's testimony, Your Honor

9    inquired about the article that he said he saw in the last

10   couple of weeks.

11               THE COURT:  Right.

12               MR. SOMMER:  Government counsel gave me a copy of the

13   article yesterday, which is from a week or two ago.

14       Your Honor may recall the context in which that came up, at

15   least my memory of it, I was making the record that in the last

16   five years he really hasn't looked at anything that was

17   addressing the relationship between ad formats insofar as it may

18   relate to the purchase funnel.

19               THE COURT:  Right.  That's my recollection, too.

20               MR. SOMMER:  The article that was given to me does

21   address the purchase funnel.  It's in the context of product

22   recommendations, and it's talking about awareness and

23   conversion.  But there is nothing in that article about ad

24   formats and how they interface with the purchase funnel.

25       I have no objection to Your Honor looking at the articles.

1    It was obviously not on his list of materials considered because

2    it didn't exist yet.  But I just wanted to give you at least

3    Google's perspective on the relevance or nonrelevance of that

4    article.

5            THE COURT:  Look, I don't recall specifically what he

6    was citing it for other than I know it had to do with the

7    funnel.  And I don't remember whether there was more to it than

8    just that there was this article that he had seen recently that

9    referred to the purchase funnel.

10           MR. SOMMER:  And it does.

11           THE COURT:  And in the context of digital ads.

12           MR. DAHLQUIST:  Your Honor, David Dahlquist.

13       Again, I appreciate Mr. Sommer's raising this.  Again, this

14   was a question Your Honor asked specifically, and this was in

15   response directly to cross-examination.  He was asked, Had you

16   ever seen an article?  And he had.  And it's a peer-reviewed

17   article.  There's a long title, longer words than I need to

18   speak here, but it's a marketing funnel perspective.

19       So with that, we do believe and we do offer it to Your

20   Honor per your request.  It is, for the record, UPX2006.

21       I guess at this time, Your Honor, because he was asked

22   about it, properly stated and properly disclosed, we would move

23   it into evidence, Your Honor.

24           MR. SOMMER:  A couple of points, Your Honor.  First of

25   all, I would object.  I didn't ask him about it.  He volunteered

1   that he had seen an article within the past couple of weeks.

2       Second, as I said already, it has nothing to do with the

3   focus of my examination, which was whether it discusses ad

4   formats and how they relate to the funnel.  As I've

5   acknowledged, it does mention the purchase funnel, but not in

6   the context of ad formats, which is really what Dr. Jerath

7   testified about.

8       So it's not -- I don't want to add form over substance

9   here.  It's a nonevent.

10          THE COURT:  The bottom line is, I asked for it, and

11  I'll take a look at it.  I'm not going to -- it's not something

12  the substance of which at least has been put at issue.  It was

13  essentially to essentially corroborate what his recollection was

14  of having some recency with a subject matter that was at issue.

15      That's the reason I wanted to take a look at it.  Frankly,

16  if you look at pages --

17          MR. SOMMER:  A lot of mathematical equations.

18          THE COURT:  I will ask Mr. Sommer to translate that

19  for me at some point.

20          MR. DAHLQUIST:  It makes the LTV formula look easy,

21  Your Honor.

22      Thank you, your Honor, for your consideration.

23          THE COURT:  Is there anything else, Counsel?

24          MR. DINTZER:  Nothing for the DOJ plaintiffs, Your

25  Honor.

1           MR. SALLET:  Not for the States, Your Honor.

2           MR. SCHMIDTLEIN:  Not for Google, Your Honor.

3           THE COURT:  Thank you all very much.  We will see you

4      in the morning.

5          (Proceedings adjourned at 4:56 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

         I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.


/s/ Sara A. Wick_____          October 17, 2023____
SIGNATURE OF COURT REPORTER            DATE

**'**

**'12** [1] - 6136:9
**'15** [1] - 6136:9

**/**

**/s** [1] - 6256:8

**0**

**004** [1] - 6150:1
**016** [1] - 6153:12
**018** [1] - 6215:21

**1**

**1** [6] - 6159:23,
6160:3, 6160:10,
6160:14, 6160:15,
6226:22
**10** [1] - 6215:11
**10019** [1] - 6130:12
**11-page** [1] - 6216:10
**11.6** [1] - 6162:23
**1100** [1] - 6129:14
**12.6** [1] - 6162:21
**13.5** [1] - 6162:24
**1300** [1] - 6130:5
**1301** [1] - 6130:11
**1305** [1] - 6216:7
**14** [2] - 6243:13,
6245:16
**15** [5] - 6184:17,
6184:20, 6184:25,
6186:13, 6186:18
**160** [3] - 6162:9,
6162:14, 6162:15
**17** [2] - 6129:6, 6256:8
**18** [2] - 6215:21,
6215:23
**19.4** [1] - 6163:15
**19104** [1] - 6130:15
**1:31** [1] - 6129:6

**2**

**20** [1] - 6186:18
**20-cv-3010** [1] -
6129:3
**20001** [2] - 6129:21,
6130:19
**20005** [1] - 6129:14
**20024** [1] - 6130:9
**2005** [1] - 6216:24
**2009** [16] - 6132:21,
6132:24, 6133:11,
6133:13, 6133:21,
6135:2, 6135:8,
6135:12, 6136:3,

6136:5, 6136:8,
6141:14, 6142:5,
6142:7, 6142:12,
6142:16
**2009/2010** [3] -
6135:15, 6135:19
**2010** [2] - 6135:8,
6169:4
**2012** [2] - 6136:3,
6143:7
**2013** [1] - 6156:9
**2016** [1] - 6144:22
**2018** [6] - 6142:5,
6142:7, 6142:13,
6142:17, 6157:2,
6157:6
**2019** [2] - 6157:2,
6157:7
**202-354-3284** [1] -
6130:20
**2020** [1] - 6246:8
**2022** [1] - 6234:14
**2023** [3] - 6129:6,
6150:14, 6256:8
**209** [1] - 6129:16
**23** [1] - 6129:9
**258** [2] - 6243:25,
6246:16
**29** [1] - 6136:19
**292** [1] - 6218:3
**2929** [1] - 6130:14
**292A** [3] - 6217:24,
6218:3, 6218:7
**2:57** [1] - 6185:9

**3**

**30** [1] - 6168:3
**30(b)(6** [1] - 6216:4
**333** [1] - 6130:18
**362** [2] - 6162:9,
6162:13
**3:16** [1] - 6185:9

**4**

**4** [1] - 6216:23
**40th** [1] - 6130:12
**43** [1] - 6234:25
**44** [1] - 6137:25
**45** [1] - 6168:2
**450** [1] - 6129:20
**4704-B** [1] - 6130:19
**4:56** [1] - 6255:5

**5**

**50** [5] - 6138:21,
6184:14, 6184:15,
6184:18, 6184:19

**57** [1] - 6150:13

**6**

**6.4** [1] - 6161:22
**600** [1] - 6129:17
**60604** [1] - 6129:17
**6132** [1] - 6131:3
**6148** [1] - 6131:3
**6168** [1] - 6131:4
**6181** [1] - 6131:9
**6195** [1] - 6131:9
**6201** [1] - 6131:10
**6207** [1] - 6131:5
**6212** [2] - 6131:5,
6131:6
**6218** [1] - 6131:10
**6238** [1] - 6131:6
**63** [1] - 6139:12
**64** [1] - 6141:10
**680** [1] - 6130:9

**7**

**70** [1] - 6214:25
**72** [1] - 6144:13
**75** [1] - 6145:25

**8**

**8** [1] - 6235:1
**8.5** [1] - 6161:22
**80203** [1] - 6130:6

**A**

**AARON** [1] - 6130:7
**abbreviated** [1] -
6181:22
**ability** [14] - 6166:4,
6174:5, 6174:10,
6174:22, 6175:6,
6181:23, 6182:15,
6183:19, 6224:6,
6224:8, 6232:21,
6232:25, 6233:12,
6235:7
**able** [3] - 6139:9,
6158:24, 6173:22
**above-entitled** [1] -
6256:5
**absolutely** [3] -
6174:10, 6175:8,
6239:18
**accelerate** [1] -
6143:10
**accept** [1] - 6246:25
**acceptable** [1] -
6177:14
**accepted** [1] - 6247:13

**access** [14] - 6140:16,
6173:22, 6174:13,
6174:15, 6176:25,
6177:4, 6221:14,
6221:15, 6235:10,
6236:1, 6236:8,
6236:25, 6237:1,
6239:22
**accessibility** [1] -
6213:7
**accordance** [1] -
6180:21
**account** [2] - 6164:8,
6186:24
**accuracy** [1] - 6251:3
**accurate** [3] - 6154:5,
6251:2, 6251:14
**accurately** [2] -
6186:3, 6248:22
**achieve** [1] - 6175:15
**acknowledged** [2] -
6177:19, 6254:5
**acknowledging** [2] -
6172:19, 6177:20
**acknowledgment** [1] -
6251:18
**acquire** [3] - 6170:3,
6170:5, 6175:12
**acquired** [2] -
6133:24, 6170:16
**acquisition** [3] -
6169:8, 6169:9,
6169:14
**acronym** [1] - 6170:19
**action** [1] - 6168:13
**actual** [4] - 6138:12,
6179:18, 6223:10,
6230:19
**ad** [27] - 6153:2,
6153:7, 6154:1,
6154:4, 6155:8,
6155:15, 6180:19,
6218:20, 6219:5,
6219:10, 6219:11,
6219:15, 6220:8,
6230:13, 6230:14,
6230:21, 6231:15,
6231:17, 6248:1,
6250:8, 6250:14,
6251:23, 6252:17,
6252:23, 6254:3,
6254:6
**ADAM** [1] - 6129:18
**add** [2] - 6250:21,
6254:8
**adding** [1] - 6221:14
**additional** [3] -
6184:19, 6240:4,
6242:7
**address** [7] - 6166:9,

6167:21, 6174:19,
6186:5, 6232:1,
6232:12, 6252:21
**addressing** [1] -
6252:17
**adjourned** [1] - 6255:5
**admission** [1] -
6243:22
**admit** [3] - 6242:21,
6242:23, 6246:20
**admitted** [4] - 6181:4,
6218:7, 6251:6,
6251:21
**ads** [30] - 6151:9,
6151:20, 6152:5,
6152:15, 6152:16,
6153:23, 6156:1,
6180:20, 6218:17,
6218:19, 6218:22,
6219:3, 6219:14,
6220:9, 6220:14,
6230:12, 6230:23,
6247:21, 6248:1,
6248:13, 6248:14,
6248:16, 6249:7,
6250:5, 6250:13,
6250:23, 6251:14,
6253:11
**Ads** [1] - 6251:18
**advertisement** [1] -
6180:17
**advertisements** [1] -
6180:13
**advertiser** [1] -
6155:14
**advertisers** [5] -
6156:17, 6156:23,
6156:25, 6157:20,
6159:14
**advertising** [5] -
6152:7, 6153:25,
6155:5, 6159:6,
6159:10, 6170:14,
6180:18
**Advisor** [22] - 6170:9,
6172:16, 6172:17,
6179:5, 6179:10,
6180:9, 6213:10,
6213:18, 6218:23,
6221:19, 6228:8,
6228:14, 6228:25,
6229:6, 6229:8,
6229:16, 6229:23,
6230:1, 6230:9,
6236:22, 6237:3,
6239:3
**Advisors** [3] -
6231:10, 6231:18,
6236:5
**afraid** [1] - 6138:22

**AFTERNOON** [1] - 6129:9
**afternoon** [2] - 6242:1, 6242:3
**afterwards** [1] - 6133:13
**agencies** [1] - 6213:2
**agency** [1] - 6214:17
**aggregate** [4] - 6134:8, 6134:10, 6134:16, 6214:17
**aggregator** [1] - 6214:16
**ago** [2] - 6134:16, 6252:13
**agree** [10] - 6217:6, 6217:19, 6221:17, 6222:23, 6232:19, 6232:23, 6233:11, 6233:19, 6236:22, 6244:16
**agreed** [5] - 6166:7, 6240:9, 6242:19, 6248:13, 6248:21
**agreed-upon** [1] - 6240:9
**agreement** [2] - 6132:20, 6140:13, 6144:22, 6144:24, 6144:25, 6145:1, 6145:2, 6145:7, 6145:8, 6145:15, 6145:18, 6147:19, 6148:8, 6148:10, 6154:23, 6163:16, 6164:23, 6172:17, 6214:10, 6229:17, 6233:15
**agreements** [18] - 6135:12, 6135:15, 6146:9, 6159:18, 6160:1, 6170:23, 6216:11, 6216:24, 6217:3, 6229:13, 6233:18, 6233:25, 6235:15, 6237:18, 6243:12, 6244:10, 6246:6, 6246:12
**ahead** [6] - 6134:9, 6134:11, 6140:2, 6154:21, 6164:20, 6226:20
**aided** [1] - 6130:22
**aim** [2] - 6157:1
**aimed** [1] - 6156:16
**airlines** [1] - 6214:23
**al** [1] - 6129:3
**Al** [1] - 6221:8
**Alaska** [1] - 6214:23
**algorithm** [1] -

6180:22
**algorithmic** [2] - 6220:11, 6231:14
**alleged** [1] - 6246:21
**allow** [2] - 6158:15, 6175:25
**allowed** [1] - 6245:19
**allows** [3] - 6223:19, 6223:21, 6233:20
**almost** [3] - 6134:24, 6137:14, 6164:24
**Amazon** [7] - 6149:3, 6149:13, 6150:9, 6150:17, 6150:18, 6150:21, 6150:24
**amenities** [2] - 6213:7, 6231:8
**AMERICA** [1] - 6129:3
**Americas** [1] - 6130:11
**AMIT** [1] - 6129:10
**amount** [3] - 6138:15, 6233:3, 6234:6
**amplify** [1] - 6168:23
**analogy** [5] - 6146:6, 6146:8, 6147:2, 6147:8, 6147:9
**analysis** [10] - 6132:14, 6135:18, 6137:9, 6139:2, 6155:4, 6155:15, 6161:5, 6161:8, 6161:14, 6244:24
**analyzed** [2] - 6136:1, 6155:9
**Android** [9] - 6154:17, 6154:18, 6154:22, 6159:18, 6160:1, 6161:17, 6162:15, 6163:9, 6164:6
**angst** [1] - 6250:18
**announcement** [1] - 6165:17
**answer** [58] - 6154:13, 6154:21, 6157:23, 6171:22, 6173:2, 6174:6, 6174:24, 6175:13, 6175:15, 6178:14, 6178:15, 6178:16, 6178:24, 6178:25, 6181:23, 6182:1, 6182:21, 6186:9, 6219:18, 6219:20, 6219:21, 6219:22, 6220:3, 6220:14, 6220:19, 6221:8, 6221:10, 6222:19, 6222:24, 6223:18, 6223:21, 6223:22, 6223:23,

6223:24, 6224:2, 6224:6, 6224:7, 6225:12, 6225:14, 6227:7, 6227:10, 6227:11, 6227:17, 6227:21, 6227:25, 6228:5, 6230:4, 6230:8, 6230:24, 6231:19, 6231:23, 6233:14, 6237:20, 6238:23, 6248:17
**Answer** [1] - 6235:9
**answered** [2] - 6159:4, 6225:18
**answering** [3] - 6143:25, 6145:19, 6229:10
**answers** [7] - 6213:21, 6220:23, 6221:1, 6221:4, 6223:3, 6223:20, 6227:25
**anticompetitive** [4] - 6154:9, 6154:17, 6246:21, 6246:23
**Antitrust** [1] - 6130:4
**apart** [1] - 6227:12
**apologize** [2] - 6167:6, 6242:15
**appear** [7] - 6151:25, 6152:6, 6153:16, 6173:1, 6179:24, 6180:9, 6223:4
**APPEARANCES** [2] - 6129:12, 6130:1
**Apple** [16] - 6139:21, 6140:4, 6140:7, 6140:13, 6140:19, 6141:7, 6144:15, 6144:19, 6144:21, 6144:22, 6145:7, 6145:16, 6145:18, 6164:22, 6165:5
**application** [2] - 6185:20, 6237:1
**application's** [2] - 6146:10, 6146:18
**applications** [1] - 6146:25
**applied** [1] - 6167:20
**apply** [2] - 6171:22, 6176:12
**appreciate** [6] - 6165:14, 6186:12, 6217:1, 6220:1, 6240:3, 6253:13
**appreciated** [1] - 6239:20
**approach** [3] - 6162:4, 6177:24, 6234:10
**appropriate** [4] -

6226:8, 6248:4, 6248:8, 6250:24
**appropriately** [2] - 6185:15, 6185:22
**apps** [2] - 6236:9, 6236:11
**April** [1] - 6234:14
**Arch** [1] - 6130:14
**area** [10] - 6171:18, 6174:3, 6176:8, 6177:19, 6178:13, 6219:12, 6223:13, 6232:14, 6232:17, 6236:16
**arguing** [1] - 6141:6
**arrangement** [2] - 6133:24, 6220:13
**arrangements** [1] - 6167:17
**article** [9] - 6252:9, 6252:13, 6252:20, 6252:23, 6253:4, 6253:8, 6253:16, 6253:17, 6254:1
**articles** [1] - 6252:25
**aside** [2] - 6142:21, 6235:5
**aspect** [1] - 6151:9
**assessment** [1] - 6160:25
**associated** [3] - 6160:10, 6160:11, 6244:21
**assume** [4] - 6177:6, 6179:18
**AT&T** [4] - 6148:8, 6148:9, 6148:10, 6148:14
**AT&Ts** [1] - 6244:13
**attention** [2] - 6150:4, 6162:8
**attractive** [1] - 6175:21
**attribute** [1] - 6173:10
**attribution** [3] - 6172:18, 6172:19, 6172:21
**attributions** [1] - 6182:1
**authoritative** [1] - 6251:24
**availability** [3] - 6175:3, 6175:7, 6180:23
**available** [2] - 6137:22, 6179:11
**Avenue** [3] - 6130:9, 6130:11, 6130:18
**average** [6] - 6138:23, 6162:20, 6162:21,

6163:20, 6164:3, 6164:5
**avoid** [1] - 6137:10
**aware** [7] - 6137:14, 6145:6, 6145:14, 6145:17, 6148:10, 6214:6, 6219:12
**awareness** [1] - 6252:22
**axis** [1] - 6133:14

## B

**B-a-r-r-e-t-t** [1] - 6168:19
**B-o-w-e-n** [1] - 6168:20
**bad** [2] - 6168:1, 6222:17
**balance** [1] - 6186:25
**balancing** [1] - 6187:7
**banned** [1] - 6244:5
**bar** [1] - 6138:17
**BARRETT** [2] - 6131:4, 6168:8
**Barrett** [22] - 6168:15, 6168:17, 6168:19, 6168:21, 6169:1, 6170:13, 6175:9, 6175:23, 6177:6, 6177:25, 6178:7, 6178:20, 6181:7, 6182:5, 6185:7, 6212:23, 6225:22, 6234:12, 6238:6, 6238:13, 6239:11, 6239:16
**BARRETT-BOWEN** [2] - 6131:4, 6168:8
**Barrett-Bowen** [20] - 6168:15, 6168:17, 6168:21, 6169:1, 6170:13, 6175:9, 6175:23, 6177:6, 6177:25, 6178:7, 6178:20, 6181:7, 6182:5, 6185:7, 6212:23, 6225:22, 6234:12, 6238:6, 6238:13, 6239:11
**Barrett-Bowen's** [1] - 6239:16
**barrier** [3] - 6146:10, 6146:18, 6146:25
**based** [3] - 6135:12, 6135:15, 6136:24, 6142:8, 6148:11, 6157:10, 6157:11, 6157:17, 6183:2, 6233:15, 6233:17,

6233:25, 6237:17
**basic** [1] - 6185:16
**BEFORE** [2] - 6129:1, 6129:10
**behavior** [1] - 6156:3
**behind** [2] - 6225:23, 6226:23
**believes** [3] - 6223:16, 6223:25, 6224:17
**BELLSHAW** [3] - 6129:19, 6241:13, 6241:21
**below** [2] - 6157:15, 6178:9
**Ben** [1] - 6243:24
**BENCH** [1] - 6129:9
**benchmarks** [1] - 6223:3
**beneficiary** [1] - 6170:6
**benefit** [1] - 6159:2
**benefits** [1] - 6156:18
**BENJAMIN** [1] - 6130:8
**best** [2] - 6150:13, 6234:21
**better** [5] - 6133:12, 6156:17, 6156:23, 6182:20, 6249:18
**between** [18] - 6135:19, 6140:18, 6141:14, 6142:6, 6142:12, 6146:6, 6160:15, 6167:17, 6223:11, 6227:20, 6229:22, 6232:20, 6232:24, 6233:12, 6235:6, 6252:17
**beyond** [2] - 6225:16, 6226:8
**big** [4] - 6151:8, 6165:17, 6214:23, 6245:21
**bigger** [2] - 6153:5, 6160:17
**biggest** [1] - 6215:3
**binder** [13] - 6133:3, 6133:5, 6136:19, 6136:20, 6137:25, 6144:13, 6149:16, 6149:17, 6149:22, 6151:12, 6162:5, 6215:11, 6217:24
**binders** [2] - 6149:19, 6149:21
**Bing** [89] - 6132:20, 6133:22, 6133:24, 6134:3, 6134:4, 6134:12, 6134:19,

6135:19, 6136:3, 6137:3, 6137:23, 6142:22, 6145:1, 6169:8, 6169:14, 6169:15, 6170:13, 6170:16, 6170:17, 6170:18, 6171:10, 6171:11, 6171:15, 6171:21, 6172:12, 6173:1, 6173:6, 6173:14, 6173:25, 6174:22, 6175:10, 6175:24, 6176:6, 6179:11, 6181:21, 6181:23, 6182:8, 6182:14, 6183:5, 6183:7, 6213:15, 6213:18, 6213:24, 6215:7, 6216:24, 6218:10, 6218:13, 6220:15, 6220:23, 6221:1, 6221:9, 6221:10, 6221:18, 6221:21, 6221:25, 6222:5, 6222:21, 6223:3, 6223:16, 6223:24, 6224:2, 6224:17, 6225:6, 6226:7, 6227:1, 6227:4, 6227:22, 6228:10, 6229:1, 6230:8, 6231:5, 6231:23, 6232:8, 6232:9, 6232:20, 6232:24, 6233:12, 6235:6, 6236:21, 6237:15, 6239:4, 6239:6, 6247:20, 6248:12, 6248:15, 6249:15, 6250:12, 6251:14
**Bing's** [11] - 6132:25, 6134:14, 6136:11, 6136:13, 6175:20, 6182:5, 6220:19, 6225:14, 6225:23, 6226:22, 6231:25
**Bing-related** [1] - 6216:24
**Bing/Yahoo** [1] - 6132:24
**bit** [8] - 6154:7, 6180:7, 6221:11, 6224:15, 6227:16, 6241:10, 6244:17, 6250:1
**blew** [1] - 6133:12
**Bloomberg** [1] - 6186:23
**blown** [2] - 6133:5,

6218:3
**blue** [1] - 6149:20
**bold** [1] - 6164:3
**booked** [1] - 6183:6
**booking** [9] - 6176:4, 6179:23, 6180:9, 6213:6, 6218:22, 6231:9, 6236:22, 6237:4
**Booking.com** [8] - 6179:21, 6212:25, 6213:6, 6219:6, 6219:9, 6219:11, 6238:19, 6238:25
**Bookings** [1] - 6236:5
**bookmark** [2] - 6164:21, 6165:4
**bookmarks** [1] - 6165:6
**bottom** [8] - 6150:13, 6156:2, 6161:11, 6164:3, 6180:12, 6215:21, 6251:21, 6254:10
**bottom-line** [1] - 6161:11
**bought** [1] - 6183:1
**boundaries** [1] - 6187:13
**BOWEN** [2] - 6131:4, 6168:8
**Bowen** [21] - 6168:15, 6168:17, 6168:20, 6168:21, 6169:1, 6170:13, 6175:9, 6175:23, 6177:6, 6177:25, 6178:7, 6178:20, 6181:7, 6182:5, 6185:7, 6212:23, 6225:22, 6234:12, 6238:6, 6238:13, 6239:11
**Bowen's** [1] - 6239:16
**box** [2] - 6138:2, 6138:21
**boxed** [1] - 6144:17
**Bradstreet** [1] - 6214:7
**Branch** [7] - 6146:1, 6146:3, 6146:6, 6147:3, 6147:6, 6148:8, 6148:11
**branch** [1] - 6147:19
**brand** [5] - 6172:12, 6172:20, 6172:21, 6172:25, 6180:8
**break** [5] - 6145:16, 6162:6, 6184:1, 6184:22, 6185:8
**breaking** [2] -

6157:15, 6163:10
**brief** [2] - 6187:1, 6187:8
**briefly** [2] - 6187:14, 6243:25
**bring** [4] - 6144:3, 6151:9, 6182:19, 6233:3
**brings** [3] - 6171:12, 6173:2
**Broadway** [1] - 6130:5
**broken** [1] - 6163:19
**brought** [7] - 6141:16, 6141:22, 6141:25, 6142:6, 6142:9, 6142:17, 6144:2
**browser** [5] - 6137:11, 6154:9, 6161:1, 6161:8, 6244:18
**browsers** [5] - 6132:10, 6136:25, 6137:23, 6160:21, 6243:15
**bucket** [1] - 6244:12
**buckets** [1] - 6217:15
**build** [1] - 6229:12
**building** [1] - 6237:11
**builds** [1] - 6180:22
**built** [3] - 6163:2, 6163:4, 6163:6
**bullet** [1] - 6138:14
**bunch** [2] - 6148:4, 6245:4
**business** [12] - 6154:4, 6155:13, 6169:6, 6170:1, 6170:3, 6217:7, 6217:10, 6222:7, 6224:4, 6224:20, 6224:24, 6231:25
**businesses** [2] - 6214:18, 6214:20
**but-for** [2] - 6143:21, 6144:2
**BY** [26] - 6132:8, 6147:17, 6148:23, 6149:25, 6155:2, 6159:3, 6162:7, 6164:12, 6168:11, 6168:25, 6169:18, 6174:7, 6178:6, 6181:6, 6212:22, 6216:9, 6217:2, 6218:9, 6220:2, 6225:21, 6226:21, 6228:23, 6231:1, 6234:11, 6238:5, 6238:11

**C**

**calculate** [1] - 6136:2
**calculated** [1] - 6138:6
**cameron** [1] - 6242:3
**CAMERON** [1] - 6129:19
**capital** [1] - 6219:20
**capitalize** [1] - 6219:23
**capture** [2] - 6156:22, 6176:20
**capturing** [2] - 6157:8, 6158:3
**car** [1] - 6176:4
**care** [3] - 6166:1, 6166:4, 6249:18
**careful** [4] - 6227:12, 6227:16, 6229:10, 6237:16
**carrier** [1] - 6245:23
**carriers** [4] - 6132:11, 6243:15, 6245:9, 6246:5
**Case** [1] - 6129:3
**case** [30] - 6132:10, 6132:19, 6132:24, 6135:18, 6136:1, 6137:9, 6145:5, 6146:14, 6147:13, 6147:14, 6147:18, 6147:22, 6148:3, 6148:7, 6148:14, 6154:8, 6155:4, 6177:21, 6178:3, 6183:1, 6222:1, 6222:2, 6225:22, 6226:13, 6232:6, 6233:9, 6234:13, 6244:1, 6244:14, 6244:16
**case-in-chief** [1] - 6244:1
**cases** [2] - 6222:25, 6230:20
**catalogue** [1] - 6142:11
**categories** [3] - 6138:23, 6173:23, 6176:17
**category** [3] - 6166:17, 6182:22, 6245:3
**causes** [1] - 6251:2
**center** [1] - 6215:21
**certain** [3] - 6174:23, 6176:16, 6216:4
**certainly** [9] - 6141:2, 6143:2, 6151:8,

6187:2, 6187:11,
6221:20, 6230:24,
6251:12, 6251:17
**CERTIFICATE** [1] -
6256:1
**certify** [1] - 6256:3
**challenge** [1] -
6174:12
**challenged** [2] -
6248:18, 6248:19
**challenging** [2] -
6177:1, 6236:1
**Chang** [1] - 6148:3
**Chang's** [1] - 6148:6
**change** [4] - 6135:10,
6224:14, 6248:8,
6249:11
**changes** [2] - 6161:8,
6248:6
**changing** [1] -
6247:21
**channel** [2] - 6244:19,
6247:1
**channels** [2] -
6244:20, 6246:22
**CHAPMAN** [6] -
6130:13, 6186:1,
6186:20, 6239:18,
6239:21, 6240:2
**Chapman** [1] - 6186:1
**characterize** [1] -
6170:10
**characterized** [1] -
6248:14
**charge** [1] - 6147:23
**chart** [3] - 6133:10,
6138:22, 6139:2
**charter** [1] - 6245:23
**Chicago** [1] - 6129:17
**chief** [1] - 6244:1
**choice** [5] - 6132:11,
6132:15, 6132:18,
6160:11, 6160:14
**choose** [1] - 6158:8
**chosen** [1] - 6222:1
**Chrome** [9] - 6137:24,
6154:9, 6154:14,
6154:16, 6154:18,
6154:22, 6154:24,
6154:25, 6155:1
**chronology** [1] -
6247:15
**circles** [1] - 6179:4
**cited** [1] - 6246:17
**citing** [1] - 6253:6
**citizenM** [1] - 6179:15
**claim** [1] - 6141:3
**clarification** [3] -
6138:1, 6161:16,
6235:15

**clarify** [5] - 6215:15,
6222:13, 6232:11,
6235:14, 6235:16
**clarity** [1] - 6170:7
**classify** [1] - 6181:10
**clear** [21] - 6139:5,
6152:5, 6152:19,
6216:15, 6221:24,
6222:6, 6223:1,
6223:24, 6225:8,
6225:10, 6227:6,
6227:23, 6230:12,
6231:2, 6233:1,
6233:9, 6233:22,
6234:3, 6236:17,
6236:25, 6251:11
**clearly** [1] - 6251:23
**click** [6] - 6139:10,
6150:22, 6151:1,
6172:21, 6230:16,
6231:4
**clicked** [2] - 6180:13,
6219:10
**clicks** [1] - 6219:9
**client's** [1] - 6249:10
**close** [3] - 6153:8,
6165:3, 6168:3
**closed** [10] - 6167:9,
6167:25, 6168:3,
6173:17, 6184:24,
6185:2, 6185:15,
6185:23, 6187:1,
6187:8
**collect** [2] - 6174:8,
6235:20
**collection** [1] -
6228:18
**collectively** [1] -
6228:17
**collects** [1] - 6228:10
**Colorado** [3] - 6130:2,
6130:3, 6130:6
**COLUMBIA** [1] -
6129:1
**columns** [1] - 6163:19
**combined** [2] -
6134:13, 6153:3
**combining** [1] -
6163:11
**coming** [4] - 6137:3,
6139:6, 6152:16,
6182:8
**comment** [1] -
6152:14
**committed** [1] -
6140:13
**companies** [17] -
6167:14, 6167:16,
6170:23, 6174:22,
6185:18, 6185:20,

6214:19, 6215:9,
6216:20, 6221:22,
6222:22, 6236:8,
6245:16, 6245:17,
6245:20, 6245:21
**company** [1] -
6167:18
**comparable** [1] -
6224:11
**compare** [5] -
6142:15, 6143:12,
6153:10, 6223:11,
6225:2
**compared** [2] -
6137:6, 6226:23
**comparing** [2] -
6223:20, 6224:25
**comparison** [4] -
6142:19, 6223:9,
6225:3, 6225:9
**comparisons** [1] -
6225:10
**compete** [4] -
6145:11, 6146:19,
6175:10, 6222:25
**competes** [1] - 6221:9
**competing** [5] -
6146:18, 6222:5,
6222:7, 6222:14,
6222:18
**competition** [7] -
6141:23, 6141:25,
6146:16, 6147:7,
6147:8, 6159:1
**competitive** [11] -
6141:12, 6142:2,
6142:12, 6143:5,
6159:13, 6223:16,
6223:25, 6224:2,
6224:3, 6225:11,
6227:8
**competitors** [2] -
6175:14, 6222:9
**complete** [1] -
6174:24
**completely** [1] -
6152:19
**composition** [4] -
6134:22, 6134:25,
6135:7, 6135:10
**compound** [1] -
6184:9
**comprehensive** [2] -
6141:15, 6141:18
**computer** [1] -
6130:22
**computer-aided** [1] -
6130:22
**conceded** [2] -
6249:7, 6251:22

**conceptual** [1] -
6153:8
**conceptually** [3] -
6152:10, 6154:1,
6182:21
**concerns** [3] -
6148:11, 6182:6,
6240:22
**conclusion** [8] -
6155:8, 6155:11,
6155:12, 6156:12,
6158:20, 6159:22,
6160:2, 6247:7
**conclusions** [1] -
6155:25
**conduct** [4] - 6154:9,
6154:18, 6246:21,
6246:23
**confers** [1] - 6151:10
**confidential** [7] -
6163:23, 6187:4,
6187:11, 6187:13,
6215:13, 6216:3
**confidentiality** [4] -
6166:6, 6166:7,
6166:8, 6186:6
**confirm** [1] - 6243:4
**confounding** [1] -
6139:10
**confuses** [1] -
6245:18
**connection** [2] -
6139:20, 6160:15
**Connolly** [1] - 6130:8
**conservative** [1] -
6153:4
**consider** [4] - 6139:3,
6161:14, 6175:25,
6186:25
**consideration** [4] -
6180:23, 6246:23,
6252:5, 6254:22
**considered** [6] -
6172:1, 6172:2,
6185:15, 6185:22,
6187:11, 6253:1
**considering** [1] -
6161:11
**consistent** [1] -
6251:15
**constant** [1] - 6182:9
**constitutes** [1] -
6185:21
**Constitution** [1] -
6130:18
**constrained** [1] -
6172:6
**constraints** [1] -
6174:14
**construct's** [1] -

6183:21
**constructs** [1] -
6181:8
**consumer** [2] -
6230:5, 6231:20
**Consumer** [1] -
6130:4
**consumer's** [1] -
6231:19
**consumers** [1] -
6140:16
**Cont'd).....** [1] - 6131:3
**contact** [1] - 6240:1
**contemplating** [1] -
6167:25
**content** [71] - 6169:8,
6169:9, 6169:13,
6170:4, 6170:10,
6170:16, 6170:22,
6171:1, 6171:11,
6171:13, 6171:15,
6171:16, 6171:22,
6172:1, 6172:2,
6172:11, 6172:12,
6172:17, 6173:1,
6173:6, 6173:19,
6175:2, 6175:6,
6175:9, 6175:12,
6175:20, 6175:23,
6175:24, 6176:14,
6177:7, 6177:22,
6179:11, 6179:24,
6180:2, 6180:4,
6180:8, 6181:7,
6181:9, 6181:22,
6182:16, 6183:5,
6183:14, 6212:24,
6214:16, 6215:8,
6216:4, 6216:11,
6216:24, 6217:3,
6219:1, 6219:2,
6224:5, 6224:10,
6224:11, 6227:14,
6227:24, 6229:17,
6229:20, 6230:24,
6235:19, 6236:4,
6236:14, 6236:20,
6237:17, 6239:4,
6239:6, 6249:14
**context** [5] - 6139:23,
6252:14, 6252:21,
6253:11, 6254:6
**continue** [1] - 6166:19
**continued** [1] -
6129:23
**Continued** [2] -
6132:7, 6212:21
**CONTINUED** [1] -
6130:1
**continues** [2] -

6238:24, 6239:2
**contract** [3] - 6140:25,
6141:4, 6147:21
**contracts** [11] -
6139:13, 6146:15,
6159:6, 6159:11,
6164:14, 6164:18,
6183:22, 6216:19,
6243:25, 6246:14,
6246:16
**controls** [2] - 6139:10,
6175:2
**conversations** [2] -
6140:3, 6140:6
**conversion** [1] -
6252:23
**convince** [1] - 6145:16
**convinced** [2] -
6157:2, 6158:4
**copies** [2] - 6242:11,
6242:13
**copy** [2] - 6234:12,
6252:12
**core** [1] - 6182:12
**Corporation** [1] -
6130:13
**correct** [144] -
6132:11, 6132:12,
6132:16, 6132:17,
6132:21, 6133:19,
6133:22, 6133:25,
6134:1, 6134:3,
6134:7, 6134:14,
6135:5, 6135:8,
6136:16, 6137:1,
6137:4, 6137:7,
6137:18, 6137:23,
6138:7, 6138:11,
6138:12, 6138:25,
6139:1, 6139:4,
6139:5, 6139:15,
6139:17, 6139:21,
6140:4, 6140:8,
6140:9, 6140:14,
6140:19, 6140:21,
6141:5, 6141:7,
6141:24, 6142:18,
6143:23, 6144:16,
6144:19, 6145:8,
6146:1, 6146:4,
6146:5, 6146:7,
6146:11, 6146:19,
6146:20, 6147:1,
6147:4, 6147:12,
6147:14, 6153:25,
6170:18, 6172:24,
6173:4, 6173:5,
6173:13, 6176:13,
6179:23, 6180:9,
6180:10, 6183:7,

6183:8, 6183:11,
6183:15, 6212:25,
6213:1, 6213:2,
6213:8, 6213:9,
6213:10, 6213:11,
6213:14, 6213:17,
6213:19, 6213:20,
6213:23, 6213:25,
6214:2, 6214:4,
6214:8, 6214:22,
6215:1, 6215:2,
6215:10, 6216:14,
6217:4, 6217:5,
6217:11, 6217:13,
6217:18, 6217:22,
6218:17, 6218:18,
6218:21, 6219:19,
6220:9, 6220:10,
6220:12, 6221:12,
6223:4, 6223:8,
6223:11, 6224:18,
6225:25, 6226:24,
6226:25, 6227:2,
6227:5, 6227:23,
6228:12, 6228:14,
6228:15, 6229:4,
6229:24, 6230:3,
6230:7, 6230:9,
6231:6, 6231:12,
6231:21, 6232:18,
6234:20, 6234:23,
6235:3, 6235:20,
6235:21, 6235:24,
6236:3, 6236:24,
6238:15, 6238:16,
6238:20, 6238:21,
6238:25, 6239:1,
6239:3, 6239:9,
6250:12, 6256:4
**corrected** [5] -
6242:11, 6242:13,
6247:8, 6247:18,
6247:25
**correcting** [1] - 6248:5
**corrections** [2] -
6139:9, 6247:12
**correctly** [1] - 6235:13
**corroborate** [1] -
6254:13
**cost** [2] - 6132:10,
6183:18
**counsel** [13] -
6149:11, 6160:25,
6161:21, 6167:21,
6168:12, 6186:10,
6187:7, 6216:8,
6226:10, 6239:15,
6241:14, 6243:1,
6252:12
**Counsel** [5] - 6185:24,

6186:12, 6186:21,
6226:2, 6254:23
**counsel's** [2] -
6148:25, 6159:4
**count** [2] - 6249:18,
6251:12
**counted** [3] - 6138:10,
6152:13, 6248:22
**counterpart** [1] -
6217:10
**counting** [3] -
6152:15, 6152:17,
6154:3
**couple** [9] - 6152:9,
6228:6, 6240:11,
6240:18, 6240:21,
6241:5, 6252:10,
6253:24, 6254:1
**course** [4] - 6164:7,
6168:24, 6176:9,
6187:9
**COURT** [102] - 6129:1,
6132:3, 6147:15,
6148:19, 6149:22,
6154:20, 6158:13,
6162:25, 6163:14,
6163:17, 6163:24,
6164:11, 6165:3,
6165:9, 6165:11,
6165:16, 6165:19,
6166:10, 6166:23,
6167:4, 6167:23,
6168:5, 6168:9,
6168:21, 6169:13,
6169:16, 6174:2,
6180:12, 6180:25,
6181:4, 6184:3,
6184:9, 6184:12,
6184:15, 6184:18,
6185:4, 6185:6,
6185:11, 6185:24,
6186:11, 6186:17,
6186:21, 6216:6,
6216:15, 6217:1,
6218:7, 6219:24,
6225:18, 6226:2,
6226:10, 6226:16,
6226:20, 6228:16,
6228:20, 6230:16,
6230:20, 6237:23,
6238:1, 6238:9,
6239:11, 6239:14,
6239:19, 6239:23,
6240:3, 6240:6,
6240:14, 6240:16,
6240:24, 6241:2,
6241:5, 6241:18,
6241:23, 6242:9,
6242:14, 6242:17,
6243:1, 6243:6,

6243:23, 6244:15,
6245:7, 6246:19,
6247:5, 6247:14,
6248:9, 6249:2,
6249:23, 6250:10,
6250:20, 6250:25,
6251:8, 6251:20,
6252:7, 6252:11,
6252:19, 6253:5,
6253:11, 6254:10,
6254:18, 6254:23,
6255:3, 6256:1,
6256:9
**Court** [9] - 6130:18,
6159:17, 6166:2,
6166:18, 6167:7,
6241:16, 6244:1,
6244:7, 6244:10
**court** [4] - 6132:2,
6185:10, 6239:23,
6239:24
**Court's** [5] - 6159:25,
6165:25, 6166:3,
6166:21, 6252:4
**courtroom** [2] -
6184:5, 6187:2
**cover** [1] - 6149:20
**coverage** [2] - 6155:1,
6246:2
**covered** [1] - 6159:18
**CPC** [1] - 6156:21
**CPI** [1] - 6134:25
**crawl** [3] - 6174:8,
6174:10, 6174:23
**crawling** [2] -
6174:21, 6229:1
**create** [1] - 6147:11
**created** [2] - 6175:2,
6175:5
**creating** [1] - 6147:10
**creative** [1] - 6182:11
**credibility** [2] -
6173:2, 6173:3
**critical** [1] - 6176:17
**critically** [1] - 6251:4
**cropped** [1] - 6133:11
**cross** [8] - 6158:16,
6184:25, 6185:2,
6226:9, 6240:19,
6249:2, 6249:8,
6253:15
**Cross** [3] - 6131:3,
6131:5, 6131:6
**CROSS** [2] - 6132:7,
6212:21
**cross-examination** [3]
- 6226:9, 6249:2,
6253:15
**CROSS-**
**EXAMINATION** [2] -

6132:7, 6212:21
**Cross-Examination**
[1] - 6131:3
**Cross-Examination..**
............ [2] - 6131:5,
6131:6
**CRR** [1] - 6130:18
**current** [9] - 6164:8,
6169:5, 6169:10,
6169:12, 6169:19,
6170:22, 6216:15,
6216:16, 6216:25
**customers** [2] -
6159:2, 6181:15

**D**

**D.C** [5] - 6129:5,
6129:14, 6129:21,
6130:9, 6130:19
**Dahlquist** [1] -
6253:12
**DAHLQUIST** [4] -
6129:15, 6166:12,
6253:12, 6254:20
**data** [34] - 6139:8,
6170:5, 6173:17,
6174:13, 6174:15,
6174:16, 6174:17,
6175:1, 6175:5,
6176:15, 6176:17,
6176:20, 6176:24,
6177:2, 6181:11,
6181:18, 6181:20,
6181:21, 6182:3,
6182:6, 6182:10,
6182:15, 6182:16,
6183:18, 6217:15,
6217:20, 6233:25,
6234:1, 6235:10,
6237:7, 6243:19,
6246:9, 6246:11
**data-for-content** [1] -
6182:16
**data-for-traffic** [3] -
6181:20, 6182:6,
6217:20
**DATE** [1] - 6256:9
**date** [3] - 6166:4,
6173:18, 6244:3
**DAVID** [1] - 6129:15
**David** [1] - 6253:12
**DAY** [1] - 6129:9
**deal** [20] - 6132:24,
6133:6, 6133:21,
6134:25, 6136:13,
6147:3, 6164:21,
6165:4, 6167:1,
6167:14, 6177:17,
6182:12, 6182:20,

6183:10, 6183:13,
6183:20, 6185:19,
6186:5, 6187:5,
6222:17
**dealings** [1] - 6185:18
**deals** [11] - 6167:15,
6181:8, 6181:10,
6181:20, 6182:16,
6182:19, 6182:22,
6183:17, 6216:20,
6217:20
**Dechert** [2] - 6130:14,
6186:1
**decided** [1] - 6137:22
**decisions** [1] -
6147:23
**deck** [1] - 6228:4
**deemed** [2] - 6146:16
**default** [10] - 6135:12,
6135:15, 6137:23,
6140:7, 6140:13,
6144:21, 6154:10,
6160:19, 6161:11,
6161:18
**defaulted** [1] -
6137:11
**defaults** [2] - 6159:18,
6164:7
**Defendant** [2] -
6129:7, 6130:7
**definitely** [1] - 6143:4
**definition** [1] -
6155:18
**deliberate** [1] - 6248:4
**deliver** [4] - 6171:7,
6171:8, 6182:14
**delivering** [2] -
6171:9, 6221:4
**Delta** [1] - 6214:23
**demonstrative** [5] -
6247:19, 6248:7,
6248:8, 6248:12,
6249:9
**demonstratives** [7] -
6247:8, 6247:17,
6248:5, 6249:17,
6249:19, 6249:24,
6251:10
**Denver** [1] - 6130:6
**Department** [4] -
6129:13, 6129:16,
6129:20, 6130:3
**dependent** [1] -
6233:3
**depicts** [1] - 6136:24
**deposed** [1] - 6234:14
**deposition** [4] -
6234:13, 6234:16,
6234:24, 6234:25
**depositions** [1] -

6234:13
**depth** [2] - 6173:21,
6173:22
**describe** [7] -
6142:16, 6143:6,
6156:7, 6170:1,
6178:12, 6178:13,
6178:22
**described** [7] -
6143:9, 6157:4,
6157:14, 6157:23,
6171:21, 6223:14,
6238:24
**describes** [1] -
6216:22
**describing** [1] -
6134:24
**design** [1] - 6132:17
**designations** [2] -
6166:1, 6166:2
**designed** [3] -
6156:22, 6175:20,
6225:12
**designs** [1] - 6220:23
**desk** [1] - 6162:6
**desktop** [3] - 6135:3,
6135:5, 6135:8
**despite** [1] - 6157:24
**destination** [1] -
6172:7
**details** [1] - 6230:19
**determinant** [1] -
6225:11
**determining** [1] -
6251:23
**deterred** [1] - 6144:22
**deterring** [1] - 6144:14
**detriment** [1] -
6251:13
**developing** [3] -
6144:15, 6144:23,
6237:11
**development** [7] -
6169:6, 6170:1,
6170:3, 6217:10,
6222:8, 6224:4,
6224:20, 6224:24
**device** [8] - 6153:5,
6163:6, 6163:8,
6176:23, 6176:25,
6177:4, 6236:1,
6236:6
**devices** [9] - 6162:19,
6236:8, 6236:22,
6236:23, 6237:2,
6244:4, 6244:5,
6245:19
**difference** [1] -
6250:13
**different** [23] -

6136:25, 6137:11,
6145:3, 6145:5,
6148:12, 6152:22,
6153:19, 6161:1,
6163:5, 6163:6,
6167:18, 6176:2,
6215:8, 6215:9,
6217:15, 6227:15,
6227:19, 6228:11,
6229:3, 6245:3,
6250:4
**differentiator** [1] -
6182:25
**difficult** [2] - 6174:21,
6182:17
**dig** [1] - 6221:11
**digital** [1] - 6253:11
**Dijk** [6] - 6247:20,
6248:12, 6249:6,
6249:11, 6249:20,
6251:22
**Dijk's** [3] - 6247:7,
6247:8, 6251:17
**dimension** [1] -
6171:14
**DINTZER** [8] -
6129:13, 6165:18,
6165:22, 6166:11,
6166:13, 6167:3,
6240:20, 6254:24
**Dintzer** [2] - 6165:21,
6242:2
**Dintzer's** [1] - 6165:17
**direct** [11] - 6149:2,
6150:4, 6158:16,
6158:19, 6162:8,
6225:17, 6226:6,
6226:8, 6231:9,
6235:1, 6249:7
**DIRECT** [1] - 6168:10
**Direct** [1] - 6131:4
**directed** [1] - 6244:7
**directly** [2] - 6229:9,
6253:15
**director** [2] - 6169:6,
6169:11
**disadvantage** [1] -
6187:5
**disadvantaged** [1] -
6186:7
**disclosed** [2] -
6186:8, 6253:22
**disconnect** [1] -
6228:2
**discuss** [3] - 6141:11,
6185:7, 6185:17
**discussed** [1] -
6166:19
**discusses** [1] - 6254:3
**discussing** [2] -

6167:13, 6217:7
**discussion** [3] -
6182:9, 6212:23,
6236:14
**discussions** [2] -
6185:17, 6237:18
**disparity** [5] -
6232:19, 6232:23,
6233:5, 6233:11,
6235:6
**display** [5] - 6180:22,
6180:24, 6181:22,
6219:5, 6219:10
**displayed** [4] -
6172:12, 6177:22,
6180:21, 6238:22
**dispute** [2] - 6243:9,
6243:10
**distinguish** [1] -
6222:15
**distribution** [13] -
6164:14, 6164:18,
6164:23, 6169:24,
6224:10, 6228:2,
6236:15, 6237:19,
6244:19, 6244:20,
6245:14, 6246:22,
6247:1
**distributors** [1] -
6163:5
**DISTRICT** [3] - 6129:1,
6129:1, 6129:10
**document** [9] -
6144:7, 6144:9,
6144:18, 6147:25,
6177:23, 6178:1,
6180:11, 6242:22,
6242:24
**documentation** [1] -
6245:14
**documented** [1] -
6142:25
**documents** [6] -
6140:22, 6155:13,
6166:17, 6242:11,
6242:19, 6243:9
**DOJ** [3] - 6129:13,
6165:23, 6254:24
**done** [10] - 6135:18,
6142:10, 6142:19,
6143:3, 6144:10,
6147:3, 6147:6,
6165:12, 6237:15,
6248:4
**double** [1] - 6242:15
**doubled** [2] - 6133:25
**Douyon** [1] - 6243:6
**down** [10] - 6134:20,
6162:2, 6163:19,
6178:17, 6219:17,

6220:7, 6220:20,
6238:23, 6239:2,
6246:5
**download** [2] -
6236:10, 6236:11
**downloaded** [3] -
6154:14, 6154:25,
6155:1
**Dr** [2] - 6149:9, 6254:6
**draw** [2] - 6146:6,
6155:25
**drive** [1] - 6181:21
**driving** [2] - 6227:14,
6228:3
**drowning** [1] -
6226:12
**due** [2] - 6147:22,
6160:19
**Dun** [1] - 6214:7
**during** [9] - 6134:22,
6135:9, 6136:3,
6157:22, 6157:25,
6167:10, 6185:8,
6241:22, 6252:8
**DX.001** [1] - 6149:23
**DX1305** [2] - 6215:12,
6215:17
**DX1305.018** [1] -
6215:14
**DX292** [1] - 6217:24
**DX292A** [1] - 6218:8
**DX292A....................
.........................** [1]
- 6131:10
**DXD15.004** [1] -
6149:16
**DXD15.006** [2] -
6151:12, 6153:10
**DXD15.016** [1] -
6153:10
**DXD16.013** [1] -
6133:4

**E**

**e-mail** [1] - 6243:3
**early** [1] - 6241:12
**easier** [1] - 6238:12
**easy** [1] - 6254:20
**Edge** [5] - 6137:4,
6137:5, 6137:11,
6137:14, 6137:22
**effect** [1] - 6145:2
**effects** [3] - 6134:25,
6163:5, 6246:21
**efforts** [1] - 6154:5
**eight** [10] - 6247:20,
6247:23, 6248:20,
6248:23, 6249:15,
6250:13, 6250:19,

6250:23, 6251:12
**either** [5] - 6136:10,
6173:25, 6236:6,
6236:23, 6250:11
**element** [2] - 6225:2,
6225:4
**elements** [1] - 6229:11
**elicited** [1] - 6167:10
**email** [1] - 6241:14
**eMarketer** [1] -
6152:23
**embedded** [2] -
6242:21, 6242:25
**empirical** [3] - 6155:4,
6155:15, 6159:5
**enabled** [2] - 6147:11,
6175:24
**end** [20] - 6135:23,
6162:20, 6162:22,
6162:23, 6163:20,
6166:22, 6166:23,
6167:1, 6167:9,
6171:9, 6176:5,
6184:2, 6212:18,
6239:17, 6241:25,
6244:25
**ended** [3] - 6143:9,
6183:5, 6227:5
**ending** [1] - 6183:11
**engage** [1] - 6181:9
**engaged** [2] - 6154:8,
6154:17
**engine** [12] - 6132:15,
6136:24, 6137:17,
6140:7, 6144:15,
6144:23, 6146:4,
6147:4, 6147:7,
6147:8, 6151:9,
6177:24
**engineers** [1] - 6143:6
**engines** [6] - 6137:10,
6146:11, 6146:13,
6147:1, 6165:6,
6214:19
**enhance** [1] - 6147:6
**ensure** [2] - 6171:8,
6173:17
**enter** [12] - 6147:19,
6148:8, 6148:10,
6182:15, 6217:20,
6232:21, 6232:25,
6233:1, 6233:13,
6233:20, 6235:7,
6235:15
**entered** [5] - 6132:20,
6164:14, 6164:21,
6215:7, 6238:15
**enters** [1] - 6235:18
**entire** [2] - 6156:2,
6226:11

**entities** [3] - 6152:24,
6154:4, 6217:7
**entitled** [1] - 6256:5
**entity** [1] - 6152:23
**entries** [1] - 6176:2
**entry** [4] - 6146:10,
6146:18, 6146:25,
6238:17
**episode** [2] - 6157:25,
6158:23
**episodes** [2] -
6142:16, 6143:13
**equally** [1] - 6175:16
**equations** [1] -
6254:17
**erroneous** [2] -
6249:12, 6249:19
**error** [1] - 6249:20
**ESQ** [12] - 6129:13,
6129:15, 6129:18,
6129:19, 6129:19,
6130:2, 6130:3,
6130:7, 6130:7,
6130:8, 6130:10,
6130:13
**essence** [2] - 6140:10,
6157:7
**essential** [1] - 6245:13
**essentially** [7] -
6150:19, 6172:19,
6179:9, 6187:4,
6214:17, 6254:13
**establish** [1] -
6185:16
**estimate** [12] -
6152:20, 6152:23,
6162:20, 6162:23,
6163:7, 6164:3,
6164:4, 6164:5,
6184:1, 6240:20,
6240:23
**estimates** [6] -
6144:18, 6152:16,
6161:10, 6162:16,
6162:19, 6162:22
**estimating** [3] -
6153:6, 6153:7,
6154:4
**et** [1] - 6129:3
**EU** [1] - 6160:14
**evaluate** [1] - 6137:9
**evaluated** [1] - 6132:9
**event** [2] - 6161:5,
6251:4
**events** [1] - 6141:24
**evidence** [23] -
6142:9, 6145:17,
6147:18, 6148:7,
6148:14, 6155:13,
6155:14, 6155:17,

6156:3, 6157:25,
6158:7, 6158:21,
6178:5, 6181:2,
6181:5, 6216:2,
6218:4, 6218:8,
6244:22, 6246:17,
6246:25, 6251:9,
6253:23
**exact** [1] - 6248:25
**exactly** [3] - 6138:13,
6158:5, 6164:19
**Examination** [1] -
6131:3
**examination** [10] -
6158:14, 6158:15,
6158:16, 6184:22,
6185:1, 6226:9,
6226:11, 6249:2,
6253:15, 6254:3
**EXAMINATION** [5] -
6132:7, 6148:22,
6168:10, 6212:21,
6238:4
**Examination...........**
[3] - 6131:3, 6131:5,
6131:6
**Examination.............**
[1] - 6131:4
**Examination.............**
. [2] - 6131:5, 6131:6
**examinations** [1] -
6244:3
**example** [14] -
6138:16, 6164:22,
6167:20, 6170:7,
6170:9, 6172:15,
6173:16, 6183:4,
6218:13, 6233:22,
6244:17, 6245:9,
6245:23, 6250:7
**examples** [1] - 6180:3
**excellent** [1] - 6238:1
**excess** [1] - 6156:21
**exchange** [3] -
6182:3, 6183:14,
6243:3
**excluded** [1] -
6146:15
**exclusionary** [1] -
6154:23
**exclusive** [6] -
6145:11, 6145:12,
6145:20, 6145:21,
6164:6, 6235:5
**exclusively** [1] -
6137:15
**exclusivity** [1] -
6145:4
**excuse** [4] - 6167:6,
6172:23, 6183:9,

6234:9
**exercise** [2] - 6155:18,
6159:17
**Exhibit** [4] - 6181:5,
6215:11, 6218:3,
6218:8
**exhibit** [5] - 6166:22,
6167:1, 6218:2,
6243:7, 6251:15
**EXHIBITS** [1] - 6131:8
**exhibits** [4] - 6166:15,
6242:2, 6242:6,
6252:2
**exist** [2] - 6135:22,
6253:2
**existing** [1] - 6163:15
**exit** [1] - 6187:14
**expect** [1] - 6138:17
**Expedia** [3] - 6214:1,
6218:23, 6239:3
**expense** [1] - 6134:14
**expensive** [1] -
6174:12
**experience** [7] -
6175:9, 6176:6,
6176:15, 6182:5,
6182:14, 6182:19,
6223:11
**experiments** [1] -
6157:3
**expert** [3] - 6225:3,
6244:11, 6251:22
**expertise** [4] -
6173:21, 6174:3,
6174:4, 6223:13
**experts** [2] - 6160:8,
6160:13
**expired** [1] - 6245:10
**explain** [3] - 6133:9,
6177:3, 6182:23
**express** [1] - 6182:6
**extent** [4] - 6158:10,
6244:20, 6246:6,
6251:5
**extract** [1] - 6158:24

---

## F

**face** [1] - 6252:1
**Facebook** [4] -
6151:13, 6152:6,
6153:16, 6153:20
**faced** [2] - 6141:12,
6146:19
**fact** [17] - 6134:21,
6154:3, 6157:24,
6219:1, 6219:2,
6229:8, 6234:1,
6240:25, 6244:11,
6246:4, 6246:12,

6246:18, 6248:24,
6249:9, 6249:10,
6250:12, 6250:14
**factor** [1] - 6139:10
**factors** [5] - 6139:3,
6167:12, 6185:21,
6186:25, 6187:7
**fair** [6] - 6177:8,
6215:7, 6220:13,
6224:19, 6236:17,
6244:23, 6250:5,
6250:25, 6251:1
**fall** [1] - 6187:12
**falls** [1] - 6217:14
**familiar** [2] - 6223:14,
6223:15
**Fandango** [1] - 6214:5
**favor** [2] - 6187:1,
6187:7
**favors** [1] - 6187:2
**few** [6] - 6241:6,
6242:1, 6242:5,
6242:8, 6242:12,
6249:6
**fewer** [1] - 6176:6
**fifth** [1] - 6250:3
**Fifth** [1] - 6129:20
**figure** [6] - 6137:8,
6162:9, 6162:14,
6162:15, 6220:17,
6224:21
**figures** [1] - 6133:16
**filled** [1] - 6179:4
**final** [1] - 6153:1
**finally** [1] - 6166:15
**Finder** [1] - 6147:24
**fine** [5] - 6183:23,
6184:20, 6186:11,
6243:5, 6249:21
**firms** [3] - 6143:18,
6153:6, 6165:6
**first** [23] - 6149:1,
6156:24, 6157:21,
6158:2, 6158:11,
6158:19, 6163:7,
6163:10, 6165:25,
6167:6, 6169:3,
6181:11, 6184:6,
6219:11, 6230:13,
6234:25, 6241:8,
6242:10, 6245:16,
6248:12, 6248:16,
6253:24
**firstly** [1] - 6222:7
**fit** [1] - 6246:2
**five** [13] - 6183:25,
6247:21, 6247:23,
6248:12, 6248:16,
6248:25, 6249:7,
6249:12, 6249:15,

6250:13, 6251:14, 6251:18, 6252:16
**flagged** [1] - 6142:5
**flight** [1] - 6226:23
**flights** [7] - 6176:3, 6225:23, 6226:23, 6227:1, 6227:4, 6227:7, 6227:17
**flip** [1] - 6215:17
**Floor** [2] - 6130:5, 6130:12
**focus** [6] - 6133:6, 6134:11, 6176:8, 6221:7, 6236:16, 6254:3
**folks** [1] - 6187:14
**follow** [2] - 6148:3, 6161:12
**followed** [2] - 6220:14
**following** [3] - 6136:13, 6187:17, 6250:2
**FOR** [3] - 6129:1, 6132:6, 6168:8
**foreclosure** [1] - 6161:14
**foregoing** [1] - 6256:3
**forget** [1] - 6152:25
**form** [6] - 6172:19, 6174:14, 6175:1, 6181:22, 6230:14, 6254:8
**format** [1] - 6230:10
**formats** [4] - 6252:17, 6252:24, 6254:4, 6254:6
**former** [2] - 6216:16, 6216:25
**forms** [1] - 6171:23
**formula** [1] - 6254:20
**Forrester** [1] - 6152:25
**forth** [7] - 6132:13, 6140:18, 6160:8, 6160:13, 6229:22, 6244:8
**forward** [4] - 6237:23, 6241:23, 6247:23, 6248:20
**foundation** [1] - 6244:8
**four** [8] - 6137:6, 6166:1, 6229:9, 6248:1, 6249:10, 6250:5, 6250:15, 6251:12
**four-star** [1] - 6229:9
**Foursquare** [2] - 6214:9, 6214:10
**fourth** [1] - 6250:3

**frankly** [1] - 6254:15
**fresh** [2] - 6171:15, 6173:18
**freshness** [1] - 6173:10
**Friday** [4] - 6241:11, 6241:16
**front** [2] - 6215:11, 6247:15
**full** [1] - 6240:18
**fully** [1] - 6140:24
**function** [2] - 6170:2, 6170:3
**funnel** [8] - 6252:18, 6252:21, 6252:24, 6253:7, 6253:9, 6253:18, 6254:4, 6254:5

## G

**gap** [7] - 6135:18, 6135:25, 6136:8, 6136:10, 6136:15, 6136:17, 6142:23
**general** [10] - 6140:15, 6146:3, 6146:10, 6146:12, 6147:6, 6147:8, 6151:9, 6159:12, 6161:3, 6220:15
**generalized** [1] - 6183:16
**generally** [6] - 6150:21, 6159:9, 6220:18, 6232:6, 6232:21, 6235:8
**generated** [1] - 6227:18
**geographically** [1] - 6172:6
**gift** [1] - 6150:13
**gifts** [1] - 6149:12
**given** [8] - 6138:9, 6158:9, 6179:10, 6182:18, 6187:3, 6234:6, 6234:16, 6252:20
**glasses** [2] - 6150:2, 6163:3
**goal** [2] - 6156:24, 6157:16
**Goodrich** [1] - 6130:11
**GOOGLE** [1] - 6129:6
**Google** [97] - 6134:14, 6134:20, 6134:23, 6135:19, 6136:2, 6136:4, 6137:12, 6137:18, 6139:6,

6139:7, 6139:8, 6141:12, 6141:16, 6141:22, 6142:6, 6142:12, 6142:17, 6142:25, 6144:1, 6144:14, 6144:21, 6145:2, 6145:3, 6145:8, 6145:10, 6147:20, 6149:3, 6149:13, 6150:5, 6150:12, 6150:25, 6152:18, 6152:20, 6152:24, 6153:12, 6153:16, 6154:8, 6154:10, 6154:17, 6155:14, 6155:22, 6156:16, 6156:17, 6156:25, 6159:13, 6160:13, 6161:7, 6161:9, 6161:10, 6163:16, 6165:7, 6175:11, 6176:7, 6223:4, 6223:16, 6223:20, 6223:25, 6224:1, 6224:13, 6224:18, 6225:6, 6225:12, 6226:1, 6226:7, 6232:20, 6232:24, 6233:12, 6234:1, 6235:6, 6237:3, 6237:6, 6237:10, 6237:13, 6237:14, 6240:8, 6241:13, 6242:12, 6242:20, 6242:24, 6243:12, 6243:13, 6243:24, 6245:10, 6245:17, 6246:4, 6246:6, 6246:9, 6247:8, 6247:25, 6249:4, 6249:7, 6250:8, 6250:14, 6251:13, 6251:18, 6255:2
**Google's** [20] - 6134:6, 6136:13, 6139:13, 6142:23, 6149:19, 6151:4, 6151:5, 6156:1, 6156:3, 6159:6, 6159:10, 6160:8, 6161:5, 6161:18, 6164:6, 6226:23, 6241:22, 6243:19, 6247:18, 6253:3
**governed** [1] - 6229:13
**government** [1] - 6252:12
**GOWER** [8] - 6129:19, 6242:3, 6242:10,

6242:15, 6242:18, 6243:8, 6245:16, 6247:3
**Gower** [2] - 6242:4, 6243:5
**grain** [2] - 6250:1, 6250:11
**graph** [3] - 6135:23, 6135:24, 6142:23
**great** [5] - 6173:3, 6175:19, 6215:5, 6224:7, 6243:8
**green** [2] - 6138:17, 6251:24
**Greenblum** [1] - 6243:24
**GREENBLUM** [6] - 6130:8, 6243:3, 6243:24, 6245:2, 6246:10, 6247:4
**grounds** [1] - 6184:9
**groups** [1] - 6163:20
**growing** [1] - 6135:9
**guarantee** [1] - 6140:19
**guess** [9] - 6134:11, 6142:24, 6144:11, 6150:18, 6168:2, 6172:6, 6219:23, 6245:7, 6253:21
**guide** [1] - 6184:13
**guy** [4] - 6219:14, 6219:15, 6222:17, 6224:20

## H

**half** [6] - 6139:18, 6151:17, 6180:13, 6184:16, 6186:16, 6238:18
**hand** [4] - 6150:5, 6177:23, 6243:6, 6247:11
**handed** [4] - 6234:12, 6242:11, 6247:8, 6247:16
**hang** [2] - 6226:2, 6226:16
**happy** [1] - 6250:18
**hard** [3] - 6140:24, 6222:17, 6240:20
**harm** [2] - 6146:9, 6146:16
**head** [1] - 6138:16
**hear** [2] - 6166:22, 6168:23
**heard** [7] - 6185:25, 6243:11, 6244:2, 6244:7, 6244:10,

6245:21, 6246:3
**hearsay** [3] - 6242:21, 6242:25, 6244:8
**help** [7] - 6162:1, 6162:3, 6168:23, 6216:6, 6216:8, 6217:24, 6224:14
**helpful** [3] - 6164:10, 6238:9, 6251:25
**helping** [1] - 6175:10
**helps** [1] - 6226:13
**hidden** [1] - 6134:21
**high** [6] - 6162:20, 6162:22, 6162:23, 6163:20, 6171:3, 6181:19
**high-end** [3] - 6162:20, 6162:22, 6162:23
**higher** [1] - 6134:23
**highlight** [1] - 6239:19
**historic** [1] - 6245:13
**hold** [2] - 6169:20, 6169:22
**holistic** [1] - 6157:5
**home** [1] - 6239:14
**honestly** [1] - 6246:4
**Honor** [75] - 6132:5, 6135:22, 6138:14, 6148:18, 6148:21, 6152:8, 6156:5, 6158:10, 6162:4, 6163:3, 6163:22, 6165:2, 6165:22, 6167:3, 6167:6, 6167:7, 6167:11, 6167:19, 6167:21, 6168:4, 6178:4, 6181:1, 6183:25, 6184:6, 6184:7, 6184:10, 6185:5, 6185:13, 6186:9, 6212:19, 6216:1, 6216:23, 6218:2, 6220:1, 6225:16, 6225:20, 6226:19, 6231:3, 6234:9, 6238:3, 6239:21, 6240:2, 6240:4, 6240:8, 6240:21, 6241:1, 6241:13, 6242:3, 6245:2, 6246:10, 6247:3, 6247:4, 6247:6, 6247:11, 6247:16, 6247:25, 6248:3, 6248:11, 6249:19, 6250:22, 6251:11, 6252:8, 6252:14, 6252:25, 6253:12,

6253:14, 6253:20, 6253:21, 6253:23, 6253:24, 6254:21, 6254:22, 6254:25, 6255:1, 6255:2
**Honor's** [1] - 6185:20
**HONORABLE** [1] - 6129:10
**hope** [1] - 6185:3
**hopefully** [1] - 6175:13
**hosted** [1] - 6231:5
**hotel** [23] - 6176:4, 6178:22, 6179:10, 6179:17, 6179:20, 6179:23, 6183:1, 6213:6, 6218:10, 6221:18, 6221:19, 6229:2, 6230:5, 6230:9, 6230:18, 6230:19, 6230:25, 6231:5, 6231:7, 6231:10, 6231:20, 6238:15
**Hotel** [1] - 6179:15
**hotel's** [1] - 6218:13
**hotels** [16] - 6178:3, 6178:8, 6178:10, 6178:11, 6180:12, 6220:4, 6222:1, 6222:4, 6222:24, 6231:22, 6237:14, 6238:7, 6238:18, 6239:7, 6250:7
**hour** [1] - 6184:16
**hours** [3] - 6174:19, 6240:18, 6240:22
**housekeeping** [2] - 6165:24, 6167:5, 6241:5
**Huaweis** [1] - 6245:3
**Hubbard** [3] - 6167:12, 6185:21, 6186:25
**huge** [1] - 6244:13
**human** [1] - 6223:10
**hyphen** [1] - 6168:20
**hypothesize** [1] - 6182:17
**hypothetical** [2] - 6155:5, 6155:9

**I**

**icon** [1] - 6180:18
**idea** [4] - 6135:1, 6153:8, 6237:8, 6242:19
**ideas** [1] - 6150:14
**identified** [8] -

6143:14, 6144:1, 6186:3, 6186:10, 6242:12, 6242:22, 6242:24, 6243:18
**identifies** [1] - 6243:19
**identify** [1] - 6178:1
**identifying** [1] - 6141:11
**IE** [5] - 6137:3, 6137:5, 6137:10, 6137:14, 6137:21
**ignored** [1] - 6160:25
**Illinois** [1] - 6129:17
**imbalance** [2] - 6233:6, 6234:5
**impact** [10] - 6132:20, 6132:24, 6134:6, 6139:3, 6182:15, 6232:20, 6232:24, 6233:12, 6235:6, 6235:10
**impacts** [1] - 6250:16
**implementing** [1] - 6132:11
**important** [26] - 6145:10, 6171:5, 6173:6, 6173:14, 6174:16, 6176:15, 6177:10, 6180:5, 6180:6, 6221:13, 6221:16, 6222:7, 6222:10, 6222:13, 6222:15, 6222:25, 6224:3, 6224:8, 6225:10, 6233:2, 6233:23, 6235:12, 6244:9, 6245:25, 6250:12, 6251:4
**importantly** [1] - 6187:6
**improve** [2] - 6140:12, 6141:4
**improved** [5] - 6227:4, 6227:7, 6227:10, 6227:11, 6227:17
**improvement** [1] - 6157:9
**improvements** [6] - 6156:25, 6157:19, 6158:3, 6159:15, 6227:1, 6227:21
**improving** [1] - 6227:10
**inaccuracies** [1] - 6252:1
**incentive** [2] - 6143:19, 6156:13
**incentives** [2] - 6139:13, 6159:14

**include** [3] - 6161:12, 6244:3, 6244:5
**including** [3] - 6153:20, 6215:3, 6216:4
**inclusion** [1] - 6220:19
**incorporated** [1] - 6161:8
**incorrect** [1] - 6251:19
**increase** [4] - 6134:13, 6143:12, 6143:17, 6155:25
**increased** [2] - 6137:3, 6137:5
**increases** [4] - 6134:5, 6143:14, 6156:4, 6156:15
**increasing** [1] - 6159:16
**index** [3] - 6134:25, 6155:22, 6156:1
**individual** [1] - 6228:16
**industry** [1] - 6152:21
**inform** [1] - 6167:7
**information** [31] - 6167:11, 6171:23, 6172:20, 6173:12, 6173:15, 6173:22, 6174:9, 6174:11, 6178:10, 6178:22, 6180:7, 6180:14, 6181:11, 6181:24, 6181:25, 6186:8, 6187:4, 6213:6, 6213:7, 6213:8, 6213:18, 6213:21, 6214:18, 6228:10, 6228:13, 6228:24, 6228:25, 6231:7, 6235:19, 6236:19, 6240:1
**informs** [1] - 6155:17
**ingredient** [1] - 6173:4
**initial** [1] - 6162:10
**innovation** [1] - 6158:23
**innovations** [16] - 6141:16, 6141:19, 6141:23, 6142:4, 6142:6, 6142:17, 6143:2, 6143:15, 6143:22, 6144:1, 6144:4, 6156:10, 6156:23, 6158:24, 6158:25
**innovative** [1] - 6142:15
**inquired** [1] - 6252:9

**inquiry** [1] - 6251:24
**inside** [1] - 6235:11
**insofar** [1] - 6252:17
**installed** [2] - 6154:16, 6154:18
**instance** [2] - 6228:24, 6229:25
**instances** [1] - 6185:19
**instead** [2] - 6173:20, 6230:9
**intention** [1] - 6222:9
**interest** [3] - 6187:2, 6232:15, 6249:10
**interesting** [1] - 6156:19
**interface** [2] - 6143:3, 6252:24
**interpret** [1] - 6147:15
**interrupt** [4] - 6140:1, 6168:21, 6172:23, 6221:5
**interrupting** [1] - 6231:2
**introduced** [1] - 6249:25
**invest** [1] - 6139:13
**invested** [3] - 6227:1, 6236:10, 6237:10
**investing** [1] - 6140:17
**investment** [2] - 6141:1, 6141:4
**investments** [3] - 6139:20, 6140:12, 6143:19
**involve** [3] - 6170:14, 6171:4, 6245:21
**involved** [1] - 6217:12
**IS** [11] - 6135:18, 6135:21, 6136:8, 6138:23, 6139:3, 6142:22, 6142:24, 6143:4, 6143:6, 6143:8
**ISA** [2] - 6144:14, 6144:18
**Israel** [1] - 6149:9
**issue** [10] - 6167:1, 6167:5, 6186:10, 6226:17, 6240:9, 6244:9, 6244:14, 6244:16, 6254:12, 6254:14
**issued** [1] - 6141:15
**issues** [7] - 6166:8, 6166:9, 6167:13, 6186:3, 6241:5, 6242:2, 6243:4
**itself** [5] - 6173:20,

**J**

**Jerath** [1] - 6254:6
**Jerath's** [1] - 6252:8
**job** [1] - 6169:19
**JOHN** [1] - 6130:7
**join** [1] - 6169:3
**JONATHAN** [1] - 6130:2
**Jonathan** [1] - 6168:12
**JUDGE** [1] - 6129:10
**Judge** [1] - 6248:10
**judge's** [1] - 6184:11
**JULIA** [1] - 6130:13
**Julia** [1] - 6186:1
**Justice** [3] - 6129:13, 6129:16, 6129:20

**K**

**Kartesheva** [1] - 6241:9
**KAUFMANN** [7] - 6130:3, 6240:4, 6240:13, 6240:25, 6241:4, 6247:6, 6247:16
**Kayak** [1] - 6230:9
**Kayaks** [1] - 6231:18
**keep** [5] - 6143:8, 6163:25, 6168:22, 6169:16, 6220:7
**KENNETH** [1] - 6129:13
**kept** [1] - 6167:12
**key** [2] - 6213:4, 6213:15
**kind** [20] - 6133:5, 6134:16, 6134:25, 6139:9, 6153:3, 6163:6, 6163:8, 6164:4, 6167:11, 6172:5, 6173:14, 6176:5, 6179:17, 6180:3, 6185:21, 6221:13, 6236:13, 6237:18, 6237:22
**kinds** [6] - 6141:20, 6153:4, 6155:12, 6171:16, 6176:16, 6183:17
**Kingdom** [1] - 6178:8
**knowingly** [1] - 6251:19
**knowledge** [1] - 6167:17

**inquiry** [1] -

**6226:7, 6230:19, 6230:25, 6235:20

# L

**labeled** [1] - 6138:24
**lacks** [1] - 6236:21
**laid** [1] - 6230:11
**language** [1] - 6224:14
**large** [2] - 6213:12, 6243:17
**larger** [1] - 6133:22
**largest** [1] - 6213:2
**LaSalle** [1] - 6129:16
**last** [12] - 6144:7, 6144:9, 6156:8, 6163:21, 6174:2, 6184:4, 6227:6, 6241:8, 6243:8, 6247:6, 6252:9, 6252:15
**Law** [1] - 6130:3
**lawyers** [1] - 6217:12
**layer** [1] - 6175:17
**leading** [1] - 6154:19
**least** [10] - 6153:8, 6165:12, 6185:1, 6231:13, 6249:24, 6252:3, 6252:15, 6253:2, 6254:12
**leave** [3] - 6155:1, 6179:18, 6247:2
**led** [2] - 6141:25, 6156:3
**left** [3] - 6149:23, 6163:12, 6179:14
**legend** [1] - 6178:7
**length** [2] - 6157:23, 6168:6
**Lenovo** [1] - 6169:25
**less** [4] - 6159:23, 6160:3, 6185:1, 6234:4
**level** [4] - 6138:5, 6171:3, 6175:13, 6181:19
**levels** [1] - 6155:16
**leverage** [3] - 6173:25, 6174:5, 6235:17
**leverages** [1] - 6233:15
**lieu** [1] - 6216:3
**light** [1] - 6252:1
**likely** [2] - 6176:20, 6216:19
**limited** [2] - 6234:6, 6251:12
**line** [8] - 6156:2, 6159:20, 6161:11, 6178:10, 6218:14, 6235:1, 6251:21, 6254:10

**lines** [1] - 6213:19
**link** [10] - 6150:6, 6150:13, 6150:20, 6150:22, 6226:19, 6227:20, 6230:8, 6231:17, 6238:25, 6239:2
**links** [5] - 6182:1, 6220:8, 6220:11, 6220:15, 6231:9
**list** [7] - 6176:11, 6216:10, 6231:8, 6241:6, 6243:1, 6243:7, 6253:1
**listed** [3] - 6139:6, 6139:7, 6151:25
**listing** [3] - 6178:24, 6178:25, 6179:1
**listings** [2] - 6180:12, 6183:5
**live** [2] - 6172:8, 6232:12
**LLC** [1] - 6129:6
**LLP** [2] - 6130:8, 6130:14
**loaded** [1] - 6222:14
**local** [31] - 6171:18, 6171:19, 6171:23, 6171:25, 6172:2, 6172:3, 6172:5, 6172:10, 6173:23, 6176:18, 6213:12, 6213:16, 6214:16, 6215:1, 6215:4, 6223:17, 6223:25, 6224:18, 6231:23, 6231:25, 6232:1, 6232:3, 6232:17, 6232:25, 6233:13, 6233:20, 6233:22, 6233:24, 6235:7
**locale** [1] - 6232:4
**location** [1] - 6250:8
**lodged** [1] - 6186:22
**London** [8] - 6178:3, 6178:8, 6179:15, 6179:19, 6238:7, 6238:15, 6238:18, 6239:7
**look** [47] - 6133:3, 6133:12, 6141:10, 6142:21, 6149:7, 6149:15, 6149:22, 6150:1, 6150:10, 6153:9, 6158:22, 6163:12, 6179:3, 6179:20, 6184:22, 6215:11, 6215:16, 6216:17, 6217:23,

6218:1, 6222:1, 6222:4, 6223:10, 6223:12, 6223:19, 6224:6, 6228:4, 6228:5, 6234:25, 6235:9, 6238:7, 6238:12, 6240:6, 6241:23, 6244:15, 6246:19, 6247:10, 6248:15, 6250:7, 6250:25, 6253:5, 6254:11, 6254:15, 6254:16, 6254:20
**looked** [14] - 6134:17, 6134:18, 6135:23, 6135:24, 6139:10, 6142:22, 6148:4, 6148:14, 6155:13, 6155:15, 6155:16, 6228:4, 6252:16
**looking** [24] - 6134:16, 6138:6, 6138:23, 6147:25, 6155:12, 6155:14, 6156:2, 6156:15, 6163:7, 6163:9, 6167:12, 6177:11, 6178:7, 6183:16, 6183:20, 6221:6, 6224:9, 6228:1, 6229:6, 6231:20, 6232:4, 6232:10, 6238:17, 6252:25
**looks** [8] - 6152:22, 6152:24, 6218:14, 6218:22, 6220:17, 6220:18, 6224:21
**loop** [1] - 6165:3
**lose** [2] - 6134:4, 6161:11
**losing** [1] - 6134:3
**love** [1] - 6183:18
**low** [6] - 6158:4, 6158:5, 6162:20, 6162:22, 6162:23, 6163:20
**low-end** [3] - 6162:20, 6162:22, 6162:23
**lower** [1] - 6149:23
**lowers** [1] - 6156:11
**LTV** [1] - 6254:20

# M

**MADA** [1] - 6154:24
**MADAs** [4] - 6243:11, 6243:13, 6244:21, 6245:10
**magnitudes** [1] - 6138:6

**mail** [1] - 6243:3
**Maine** [1] - 6130:9
**maintain** [1] - 6171:5
**maintains** [1] - 6186:6
**manage** [1] - 6157:18
**manager** [1] - 6169:21
**managing** [2] - 6171:1, 6171:3
**manner** [1] - 6167:15
**map** [3] - 6178:9, 6220:3, 6238:17
**mapping** [2] - 6173:24, 6176:18
**maps** [2] - 6171:18, 6171:19
**marked** [4] - 6178:4, 6215:13, 6216:3, 6238:7
**marker** [1] - 6157:11
**market** [48] - 6133:15, 6133:18, 6133:22, 6134:2, 6134:3, 6134:4, 6134:5, 6134:6, 6134:8, 6134:22, 6135:2, 6141:17, 6141:23, 6142:2, 6142:6, 6142:9, 6142:18, 6143:18, 6143:22, 6144:2, 6144:3, 6147:9, 6147:10, 6147:12, 6152:7, 6152:11, 6152:12, 6152:15, 6152:17, 6152:24, 6153:2, 6153:7, 6153:25, 6154:2, 6154:5, 6155:17, 6156:4, 6156:10, 6157:8, 6157:11, 6158:1, 6158:6, 6158:21, 6159:1, 6161:17, 6233:21, 6246:7
**marketing** [2] - 6214:17, 6253:18
**marketplace** [1] - 6160:6
**markets** [3] - 6155:5, 6155:8, 6235:12
**mass** [1] - 6244:13
**material** [5] - 6134:6, 6185:14, 6186:6, 6244:14, 6248:6, 6250:13
**materials** [1] - 6253:1
**math** [1] - 6137:20
**mathematical** [1] - 6254:17
**matter** [5] - 6242:18, 6243:8, 6247:6,

6254:14, 6256:5
**matters** [3] - 6165:24, 6219:24, 6242:6
**MAURER** [25] - 6130:7, 6181:3, 6185:3, 6212:19, 6212:22, 6216:1, 6216:9, 6216:22, 6217:2, 6218:2, 6218:9, 6220:1, 6220:2, 6225:20, 6225:21, 6226:4, 6226:11, 6226:15, 6226:18, 6226:21, 6228:23, 6231:1, 6234:9, 6234:11, 6237:25
**MEAGAN** [1] - 6129:19
**mean** [31] - 6133:8, 6133:17, 6134:9, 6137:5, 6140:1, 6141:25, 6143:24, 6144:24, 6145:21, 6151:17, 6158:18, 6159:12, 6160:22, 6166:10, 6172:23, 6176:18, 6177:3, 6186:15, 6215:5, 6221:5, 6221:24, 6227:9, 6229:19, 6230:10, 6232:2, 6232:6, 6237:8, 6237:10, 6249:4, 6250:25
**means** [3] - 6151:23, 6220:9, 6220:20
**meant** [1] - 6173:11
**measure** [6] - 6135:25, 6136:12, 6136:13, 6156:21, 6161:14
**measured** [1] - 6133:14
**meet** [3] - 6167:19, 6168:14, 6183:19
**meeting** [1] - 6157:14
**MEHTA** [1] - 6129:10
**memory** [1] - 6252:15
**mention** [1] - 6254:5
**mentioned** [8] - 6163:24, 6173:4, 6173:10, 6174:19, 6182:22, 6183:13, 6235:18, 6235:22
**mentioning** [1] - 6139:24
**metrics** [1] - 6152:21
**Metrics** [7] - 6146:1, 6146:3, 6146:7,

6147:3, 6147:6, 6148:8, 6148:11
**Metro** [1] - 6243:15
**MICHAEL** [3] - 6130:10, 6131:3, 6132:6
**microphone** [1] - 6168:22
**Microsoft** [69] - 6130:13, 6135:11, 6135:12, 6135:14, 6135:16, 6139:17, 6139:20, 6139:21, 6140:4, 6140:6, 6140:11, 6140:18, 6140:19, 6140:21, 6141:3, 6141:9, 6144:22, 6145:6, 6145:7, 6145:11, 6145:14, 6145:18, 6146:14, 6147:14, 6147:16, 6164:13, 6164:21, 6165:5, 6167:18, 6167:21, 6169:2, 6169:3, 6169:5, 6169:20, 6169:23, 6170:2, 6170:8, 6170:23, 6171:10, 6171:21, 6172:25, 6173:19, 6173:25, 6174:8, 6185:24, 6186:2, 6186:6, 6212:24, 6213:4, 6213:10, 6215:13, 6216:2, 6216:5, 6216:11, 6216:13, 6216:22, 6216:24, 6217:3, 6220:23, 6229:18, 6229:22, 6233:19, 6233:20, 6235:18, 6235:20, 6236:4, 6241:15, 6246:20
**Microsoft's** [9] - 6140:25, 6146:9, 6146:15, 6217:6, 6232:20, 6232:24, 6233:12, 6235:7, 6241:14
**middle** [1] - 6164:2
**might** [5] - 6162:3, 6162:6, 6176:14, 6182:7, 6232:12
**mind** [1] - 6229:15
**minute** [2] - 6215:23, 6234:9
**minutes** [10] - 6157:14, 6168:2, 6168:3, 6183:25, 6184:17, 6184:20,

6184:25, 6186:13, 6186:18, 6242:1
**misability** [1] - 6184:1
**misaligned** [2] - 6187:9, 6187:10
**misconstrued** [1] - 6248:13
**miscount** [1] - 6249:22
**miscounted** [2] - 6248:24, 6249:9
**miscounting** [1] - 6250:22
**missing** [2] - 6134:10, 6134:17
**misunderstood** [1] - 6224:12
**mix** [1] - 6242:12
**mix-up** [1] - 6242:12
**mobile** [28] - 6134:18, 6134:23, 6135:3, 6135:9, 6135:11, 6135:14, 6135:15, 6176:12, 6176:15, 6176:17, 6176:19, 6176:20, 6176:22, 6176:23, 6176:25, 6177:4, 6177:5, 6177:17, 6234:2, 6236:1, 6236:6, 6236:7, 6236:8, 6236:21, 6236:23, 6236:25, 6237:1, 6237:2
**modeled** [2] - 6143:21, 6143:24
**moment** [3] - 6134:15, 6150:10, 6177:3
**Momiji** [1] - 6157:13
**monetize** [1] - 6182:25
**money** [2] - 6183:14, 6183:19
**monopolist** [3] - 6143:19, 6155:5, 6155:9
**morning** [1] - 6255:4
**most** [5] - 6142:1, 6142:5, 6166:1, 6171:17, 6174:16
**move** [13] - 6147:15, 6155:19, 6166:25, 6181:1, 6184:25, 6187:11, 6218:4, 6219:25, 6225:19, 6225:20, 6237:23, 6242:23, 6253:22
**moved** [2] - 6155:16, 6165:25
**moving** [5] - 6134:22,

6168:6, 6185:17, 6236:14, 6242:20
**Mozilla** [2] - 6160:19, 6160:21
**MR** [114] - 6132:5, 6132:8, 6147:17, 6148:17, 6148:21, 6148:23, 6149:25, 6154:19, 6155:2, 6158:10, 6159:3, 6162:4, 6162:7, 6163:22, 6164:12, 6165:1, 6165:18, 6165:22, 6166:11, 6166:12, 6166:13, 6167:3, 6167:5, 6168:1, 6168:11, 6168:25, 6169:18, 6174:7, 6178:4, 6178:6, 6181:1, 6181:3, 6181:6, 6183:25, 6184:6, 6184:10, 6184:13, 6184:16, 6185:3, 6185:5, 6185:13, 6186:15, 6186:18, 6212:19, 6212:22, 6216:1, 6216:9, 6216:22, 6217:2, 6218:2, 6218:6, 6218:9, 6220:1, 6220:2, 6225:16, 6225:20, 6225:21, 6226:4, 6226:5, 6226:11, 6226:14, 6226:15, 6226:18, 6226:21, 6228:23, 6231:1, 6234:9, 6234:11, 6237:25, 6238:3, 6238:5, 6238:11, 6239:10, 6240:4, 6240:8, 6240:13, 6240:15, 6240:17, 6240:20, 6240:25, 6241:4, 6242:3, 6242:10, 6242:15, 6242:18, 6243:3, 6243:8, 6243:24, 6245:2, 6245:16, 6246:10, 6247:3, 6247:4, 6247:6, 6247:16, 6248:10, 6249:3, 6250:9, 6250:16, 6250:22, 6251:7, 6251:11, 6252:6, 6252:8, 6252:12, 6252:20, 6253:10, 6253:12, 6253:24, 6254:17, 6254:20, 6254:24, 6255:1,

6255:2
**MS** [7] - 6186:1, 6186:20, 6239:18, 6239:21, 6240:2, 6241:13, 6241:21
**must** [1] - 6177:6
**myriad** [2] - 6139:3, 6142:17

## N

**N-e-i-l** [1] - 6168:19
**name** [6] - 6168:16, 6172:12, 6172:25, 6174:18, 6178:23, 6179:20
**named** [1] - 6229:16
**names** [3] - 6180:8, 6216:12, 6245:5
**nature** [6] - 6173:3, 6213:19, 6229:2, 6235:23, 6246:13, 6250:10
**Navigator** [2] - 6146:15, 6146:17
**Nayak** [4] - 6240:9, 6240:14, 6240:15, 6240:16
**near** [2] - 6232:9
**nearby** [1] - 6172:6
**necessarily** [2] - 6227:9, 6227:20
**need** [4] - 6138:2, 6173:17, 6186:25, 6253:17
**needs** [1] - 6232:1
**negotiate** [6] - 6170:22, 6227:13, 6233:15, 6233:18, 6233:23, 6233:24
**negotiated** [4] - 6172:18, 6181:23, 6217:4, 6229:16
**negotiates** [1] - 6217:9
**negotiating** [7] - 6167:13, 6185:22, 6217:10, 6224:11, 6227:13, 6234:3, 6234:4
**negotiation** [3] - 6139:23, 6229:22, 6233:3
**negotiations** [4] - 6139:21, 6233:2, 6234:5, 6237:17
**NEIL** [2] - 6131:4, 6168:8
**Neil** [2] - 6168:17, 6168:19

**Netscape** [5] - 6146:7, 6146:9, 6146:15, 6146:17
**never** [4] - 6147:3, 6147:6, 6177:12, 6179:18
**New** [2] - 6130:12
**new** [2] - 6141:23, 6242:18
**next** [10] - 6141:10, 6148:9, 6148:12, 6179:5, 6218:20, 6219:16, 6220:8, 6229:15, 6241:12, 6248:13
**Nextdoor** [1] - 6214:21
**nice** [1] - 6168:14
**NOBULL** [3] - 6151:22, 6152:1, 6152:4
**non** [2] - 6231:15, 6231:17
**non-ad** [2] - 6231:15, 6231:17
**nonadvertising** [1] - 6180:14
**none** [1] - 6244:12
**nonetheless** [1] - 6244:18
**nonevent** [1] - 6254:9
**nonexclusive** [6] - 6145:14, 6145:18, 6145:20, 6164:14, 6164:17, 6164:22
**nonissue** [1] - 6166:12
**nonpaid** [1] - 6251:23
**nonrelevance** [1] - 6253:3
**nonscale** [1] - 6139:3
**Northwest** [3] - 6129:14, 6129:20, 6130:18
**notation** [1] - 6220:8
**nothing** [6] - 6145:11, 6145:13, 6219:2, 6252:23, 6254:2, 6254:24
**notoriously** [1] - 6168:1
**nuance** [1] - 6232:13
**Number** [1] - 6129:3
**number** [27] - 6135:4, 6135:17, 6153:1, 6153:5, 6153:19, 6154:5, 6160:7, 6160:8, 6161:21, 6161:25, 6163:12, 6163:24, 6164:2,

6164:10, 6167:8,
6174:18, 6176:2,
6184:13, 6186:16,
6226:22, 6230:2,
6232:19, 6232:23,
6233:11, 6235:6,
6250:5, 6251:12
**numbered** [1] -
6215:16
**numbers** [13] -
6138:3, 6155:1,
6162:2, 6162:25,
6163:4, 6163:13,
6163:21, 6163:22,
6215:20, 6242:13,
6243:17, 6245:13,
6246:3

## O

**oath** [1] - 6234:16
**object** [5] - 6158:12,
6184:9, 6184:10,
6247:11, 6253:25
**objected** [1] - 6186:23
**objection** [14] -
6154:19, 6181:3,
6186:22, 6186:24,
6218:5, 6218:6,
6225:16, 6226:2,
6226:5, 6242:20,
6242:25, 6246:11,
6246:19, 6252:25
**observation** [1] -
6249:23
**obtain** [2] - 6221:21,
6222:21
**obviously** [4] -
6176:10, 6229:13,
6244:7, 6253:1
**occupied** [2] -
6245:22, 6245:24
**occur** [1] - 6243:14
**occurred** [2] -
6143:15, 6187:17
**October** [2] - 6129:6,
6256:8
**OEMs** [6] - 6132:10,
6169:24, 6243:16,
6244:3, 6244:5,
6245:9
**OF** [5] - 6129:1,
6129:3, 6129:9,
6256:1, 6256:9
**offer** [4] - 6132:15,
6156:6, 6159:9,
6253:19
**offered** [4] - 6132:19,
6132:23, 6146:17,
6154:8

**offering** [10] - 6145:4,
6145:10, 6145:14,
6145:18, 6158:11,
6221:22, 6222:3,
6222:16, 6222:22,
6222:24
**offerings** [3] -
6224:17, 6224:18,
6225:6
**OFFICIAL** [1] - 6256:1
**Official** [1] - 6130:18
**often** [2] - 6172:21,
6184:10
**once** [3] - 6138:10,
6170:25, 6245:9
**one** [82] - 6133:4,
6133:15, 6136:5,
6136:11, 6138:1,
6141:2, 6143:23,
6143:25, 6149:9,
6149:12, 6149:13,
6149:19, 6149:20,
6151:1, 6152:23,
6152:24, 6156:12,
6158:22, 6161:16,
6162:6, 6163:24,
6165:20, 6166:15,
6166:16, 6166:17,
6167:5, 6169:12,
6173:4, 6178:18,
6179:4, 6179:17,
6180:20, 6181:11,
6181:13, 6181:17,
6181:19, 6183:4,
6183:17, 6186:22,
6213:2, 6214:11,
6215:23, 6222:2,
6222:3, 6222:19,
6223:6, 6223:10,
6223:19, 6225:2,
6225:4, 6226:22,
6227:17, 6228:8,
6228:20, 6229:7,
6229:12, 6230:16,
6231:4, 6233:7,
6234:9, 6234:17,
6235:18, 6243:10,
6244:16, 6245:11,
6247:6, 6247:17,
6247:20, 6247:25,
6248:1, 6249:4,
6249:11, 6249:14,
6250:8, 6250:14,
6251:2, 6251:20,
6252:6
**ones** [5] - 6138:24,
6144:2, 6149:9,
6231:17
**ongoing** [1] - 6171:1
**online** [1] - 6213:2

**open** [10] - 6167:8,
6167:10, 6167:24,
6168:2, 6174:8,
6184:2, 6184:5,
6184:23, 6185:15,
6187:2
**opening** [1] - 6174:19
**OpenTable** [1] -
6213:24
**Opera** [4] - 6243:16,
6244:17, 6245:2,
6245:22
**operating** [1] -
6146:18
**opinion** [5] - 6154:8,
6154:16, 6159:9,
6224:22, 6224:23
**opinions** [3] -
6132:14, 6132:19,
6132:23
**opportunity** [2] -
6221:25, 6222:3
**opposed** [2] -
6166:16, 6166:17
**opt** [1] - 6174:22
**option** [1] - 6229:2
**order** [4] - 6132:2,
6185:10, 6215:17,
6240:10
**ordinary** [1] - 6155:13
**organic** [9] - 6150:19,
6151:19, 6151:24,
6220:11, 6220:14,
6220:20, 6231:14,
6248:2, 6248:16
**originally** [2] -
6247:18, 6248:1
**originals** [1] - 6249:22
**otherwise** [4] -
6142:10, 6143:18,
6143:20, 6148:1
**ought** [2] - 6187:10,
6239:16
**outright** [1] - 6143:19
**outset** [1] - 6244:17
**outside** [4] - 6140:23,
6147:9, 6187:12,
6244:4
**outstanding** [3] -
6166:1, 6166:7,
6243:9
**overall** [9] - 6133:18,
6137:17, 6159:23,
6160:3, 6160:5,
6180:7, 6227:18,
6246:22, 6246:23
**overlap** [3] - 6172:9,
6221:17, 6221:20
**overlaps** [1] - 6172:4
**overrule** [1] - 6246:19

**overruled** [1] -
6154:20
**overwhelmingly** [2] -
6135:5, 6135:8
**own** [5] - 6136:11,
6144:15, 6144:23,
6219:23, 6237:12
**owned** [2] - 6175:2,
6175:6

## P

**p.m** [4] - 6129:6,
6185:9, 6255:5
**page** [39] - 6150:1,
6150:5, 6150:9,
6150:12, 6150:17,
6150:18, 6150:21,
6150:25, 6151:5,
6153:12, 6153:16,
6162:9, 6162:12,
6162:13, 6170:17,
6175:21, 6177:24,
6178:7, 6180:13,
6215:14, 6215:20,
6215:21, 6216:23,
6218:16, 6219:3,
6219:16, 6220:17,
6220:21, 6229:11,
6230:19, 6230:25,
6231:5, 6231:7,
6234:25, 6238:19,
6238:24, 6239:2,
6250:14
**pages** [7] - 6149:4,
6149:12, 6184:8,
6184:13, 6186:16,
6238:23, 6254:16
**paid** [4] - 6181:17,
6183:13, 6217:16,
6251:23
**Pandu** [1] - 6240:9
**par** [2] - 6224:17,
6225:6
**Parakhin** [5] -
6139:16, 6139:19,
6140:10, 6241:17,
6241:19
**parse** [2] - 6140:24,
6227:12
**part** [15] - 6132:9,
6144:17, 6154:22,
6154:23, 6162:1,
6172:17, 6174:2,
6178:24, 6178:25,
6180:6, 6182:12,
6227:7, 6227:17,
6229:21, 6243:17
**participants** [1] -
6152:16

**participate** [1] -
6132:15
**particular** [10] -
6138:23, 6149:8,
6169:7, 6171:16,
6180:20, 6224:6,
6225:13, 6246:13,
6250:14, 6251:10
**particularly** [1] -
6248:25
**parties** [3] - 6166:7,
6187:10, 6241:7
**partner** [21] - 6163:8,
6170:8, 6170:9,
6171:7, 6172:22,
6172:24, 6173:1,
6175:2, 6175:6,
6177:11, 6181:12,
6181:25, 6183:6,
6183:20, 6221:15,
6222:2, 6222:4,
6222:10, 6224:5,
6228:21, 6245:15
**partner's** [1] - 6182:2
**partners** [42] - 6163:9,
6170:5, 6170:6,
6170:10, 6171:1,
6171:6, 6171:11,
6171:12, 6174:1,
6174:4, 6174:5,
6177:7, 6177:16,
6181:9, 6182:6,
6182:10, 6186:5,
6214:25, 6215:6,
6216:4, 6216:10,
6216:13, 6216:23,
6217:4, 6217:6,
6217:19, 6219:1,
6219:2, 6222:8,
6222:11, 6222:16,
6222:18, 6224:13,
6228:19, 6233:25,
6235:20, 6236:4,
6237:17, 6243:11,
6243:13
**partnership** [11] -
6170:23, 6177:10,
6179:12, 6179:25,
6182:7, 6212:25,
6213:10, 6213:24,
6224:8, 6224:10,
6229:17
**partnerships** [18] -
6172:11, 6175:10,
6175:20, 6181:8,
6212:24, 6215:6,
6215:8, 6221:14,
6227:13, 6227:20,
6232:21, 6232:25,
6233:13, 6233:21,

6235:5, 6235:7, 6235:19

**party** [1] - 6187:5

**passed** [1] - 6155:9

**past** [2] - 6238:23, 6254:1

**pay** [3] - 6165:7, 6165:10, 6181:18

**payments** [6] - 6132:14, 6144:20, 6243:20, 6245:17, 6245:20, 6246:8

**PCS** [1] - 6243:15

**PCs** [4] - 6134:18, 6137:15, 6137:18, 6137:21

**peer** [1] - 6253:16

**peer-reviewed** [1] - 6253:16

**penetration** [3] - 6233:19, 6235:11, 6236:7

**Pennsylvania** [1] - 6130:15

**penny** [1] - 6157:15

**people** [5] - 6137:10, 6137:21, 6147:23, 6161:1, 6224:21

**per** [1] - 6253:20

**percent** [13] - 6159:23, 6160:3, 6160:10, 6160:14, 6160:15, 6161:22, 6162:21, 6162:23, 6163:15, 6184:14, 6184:15, 6184:18, 6184:19

**percentage** [4] - 6135:2, 6135:11, 6135:14, 6137:21

**percipient** [1] - 6244:11

**perfectly** [1] - 6249:14

**perhaps** [4] - 6167:15, 6226:5, 6240:22, 6250:5

**period** [7] - 6133:6, 6133:12, 6134:2, 6134:4, 6134:22, 6136:3, 6136:9

**periods** [1] - 6143:15

**permission** [1] - 6239:24

**person** [2] - 6172:10, 6224:24

**perspective** [2] - 6253:3, 6253:18

**persuade** [1] - 6140:7

**pharmacy** [1] - 6173:17

**Philadelphia** [1] -

6130:15

**phones** [1] - 6163:11

**photo** [2] - 6176:22, 6229:25

**photograph** [2] - 6178:18, 6179:3

**photos** [2] - 6174:20, 6213:19

**phrase** [1] - 6138:9

**phrases** [1] - 6138:7

**picture** [6] - 6134:10, 6134:17, 6134:21, 6135:6, 6135:22, 6174:24

**pictures** [7] - 6178:9, 6178:10, 6231:8, 6235:22, 6236:12, 6237:6, 6237:13

**piece** [5] - 6156:2, 6228:3, 6230:24, 6243:18, 6246:4

**pieces** [1] - 6180:7

**Pinterest** [1] - 6153:20

**pitch** [2] - 6177:9, 6177:12

**pitches** [1] - 6177:6

**place** [3] - 6180:17, 6219:10, 6232:4

**placements** [1] - 6230:13

**places** [2] - 6170:4, 6229:1

**plaintiff** [1] - 6168:12

**Plaintiff** [1] - 6130:2

**PLAINTIFFS** [2] - 6132:6, 6168:8

**plaintiffs** [2] - 6165:23, 6254:24

**Plaintiffs** [2] - 6129:4, 6129:13

**plan** [1] - 6175:25

**planned** [1] - 6184:2

**PLAs** [3] - 6151:1, 6151:3, 6151:5

**platform** [2] - 6177:1, 6237:11

**play** [1] - 6175:10

**player** [1] - 6213:12

**players** [2] - 6215:3, 6243:15

**pleasure** [1] - 6166:21

**plumber** [4] - 6232:10, 6232:11, 6232:14, 6232:15

**plumbers** [1] - 6232:9

**point** [27] - 6134:12, 6138:13, 6139:23, 6140:16, 6144:14, 6145:10, 6157:15, 6158:2, 6159:12,

6182:11, 6187:14, 6217:12, 6221:16, 6222:8, 6222:10, 6223:19, 6224:4, 6226:22, 6235:15, 6236:24, 6240:21, 6240:23, 6249:1, 6249:11, 6249:16, 6250:16, 6254:19

**pointed** [2] - 6149:9, 6228:6

**points** [2] - 6234:1, 6253:24

**policies** [1] - 6231:9

**popular** [4] - 6138:24, 6139:7, 6139:8, 6237:1

**portion** [9] - 6158:17, 6167:11, 6167:24, 6183:6, 6185:16, 6186:4, 6239:25, 6241:21, 6249:15

**portions** [2] - 6252:3, 6252:4

**position** [3] - 6140:25, 6169:20, 6241:14

**positions** [2] - 6169:22, 6169:23

**possibilities** [1] - 6161:15

**possibility** [1] - 6161:1

**possible** [1] - 6171:25

**potential** [2] - 6177:16, 6185:19

**potentially** [2] - 6147:10, 6216:20

**power** [10] - 6143:18, 6143:22, 6155:17, 6156:4, 6157:8, 6157:12, 6158:1, 6158:6, 6158:21, 6249:2

**powerful** [1] - 6249:3

**pre** [2] - 6154:16, 6154:18

**pre-installed** [2] - 6154:16, 6154:18

**precision** [7] - 6135:24, 6142:24, 6143:9, 6143:11, 6143:12, 6143:14, 6143:17

**predicate** [1] - 6140:3

**prediction** [1] - 6159:5

**predominantly** [2] - 6137:18, 6244:4

**prefer** [1] - 6183:22

**preference** [1] - 6183:17

**prejudiced** [1] - 6166:4

**preloaded** [1] - 6137:14

**prepared** [2] - 6140:11, 6166:2

**presence** [1] - 6175:24

**present** [5] - 6133:11, 6167:21, 6180:7, 6245:7, 6245:8

**presented** [4] - 6149:3, 6243:17, 6244:1, 6245:5

**pressure** [1] - 6159:13

**presume** [1] - 6185:1

**pretty** [2] - 6176:17, 6244:9

**price** [9] - 6155:22, 6156:1, 6156:3, 6156:15, 6157:15, 6157:18, 6159:15, 6159:16, 6238:18

**Priceline** [1] - 6214:3

**Pricelines** [1] - 6231:10

**prices** [4] - 6155:15, 6156:14, 6159:6, 6159:10

**pricing** [5] - 6157:5, 6157:10, 6157:11, 6157:17, 6229:2

**primary** [1] - 6181:8

**privacy** [2] - 6144:11, 6148:11

**problem** [3] - 6246:14, 6246:18, 6248:23

**proceed** [1] - 6184:24

**proceedings** [1] - 6256:4

**Proceedings** [2] - 6130:21, 6255:5

**process** [7] - 6156:15, 6156:24, 6176:3, 6223:12, 6223:13, 6223:14, 6223:15, 6223:18, 6247:11

**produce** [1] - 6250:8

**produced** [1] - 6130:22

**producing** [1] - 6244:4

**product** [8] - 6147:23, 6147:24, 6180:22, 6180:24, 6221:3, 6229:12, 6245:11, 6252:21

**products** [2] - 6150:20, 6150:22

**professor** [1] -

6155:19

**Professor** [12] - 6132:9, 6133:16, 6148:24, 6153:9, 6159:4, 6162:8, 6164:13, 6165:11, 6243:17, 6244:24, 6246:3, 6246:11

**proffer** [1] - 6226:19

**profitability** [1] - 6140:17

**program** [1] - 6229:1

**progress** [1] - 6242:7

**progression** [1] - 6142:23

**project** [1] - 6157:6

**promote** [1] - 6214:19

**properly** [2] - 6253:22

**properties** [1] - 6230:5

**property** [2] - 6178:25, 6230:9

**proposal** [1] - 6177:13

**proposals** [2] - 6177:7, 6177:16

**proposed** [4] - 6155:4, 6241:8, 6241:24, 6247:18

**proposing** [1] - 6145:7

**proposition** [1] - 6227:18

**propositions** [1] - 6249:25

**prospect** [1] - 6146:17

**Protection** [1] - 6130:4

**provide** [14] - 6172:18, 6174:6, 6175:16, 6176:2, 6176:4, 6176:23, 6181:12, 6182:3, 6214:16, 6214:18, 6223:22, 6224:5, 6227:24, 6239:24

**provided** [3] - 6139:8, 6182:3, 6216:3

**provider** [2] - 6172:12, 6181:18

**providers** [1] - 6173:20, 6180:8

**provides** [9] - 6171:14, 6172:17, 6174:5, 6176:23, 6183:19, 6213:6, 6221:1, 6227:25, 6228:10

**providing** [7] - 6154:13, 6173:18, 6174:25, 6175:15, 6181:23, 6221:25,

6223:21
**provision** [1] - 6145:5
**PSX1201**...................
........................... [1]
- 6131:10
**PSX780**....................
........................... [1]
- 6131:9
**PSXD04** [6] - 6178:4,
6181:1, 6181:5,
6228:5, 6228:6,
6238:7
**PSXD04**....................
........................... [1]
- 6131:9
**public** [1] - 6187:2
**PUBLIC** [1] - 6129:9
**publicly** [1] - 6186:8
**pull** [1] - 6174:1
**punched** [1] - 6250:3
**purchase** [5] -
6252:18, 6252:21,
6252:24, 6253:9,
6254:5
**purpose** [1] - 6231:18
**purposes** [2] - 6245:8,
6246:17
**push** [4] - 6166:15,
6166:16, 6166:17,
6166:19
**pushed** [1] - 6220:20
**put** [15] - 6138:22,
6160:8, 6160:13,
6164:9, 6165:24,
6180:11, 6215:12,
6221:3, 6221:8,
6228:19, 6229:2,
6236:9, 6244:14,
6254:12
**putting** [1] - 6163:3

## Q

**quadrant** [1] - 6230:10
**quality** [14] - 6136:2,
6136:3, 6136:13,
6139:4, 6140:12,
6141:5, 6157:9,
6157:19, 6157:22,
6157:24, 6159:15,
6175:12, 6175:13,
6223:22
**queries** [16] - 6133:25,
6135:3, 6135:11,
6135:14, 6138:16,
6138:24, 6162:21,
6164:5, 6164:6,
6176:7, 6176:12,
6176:16, 6221:10,
6243:14, 6245:18,

6246:2
**query** [15] - 6134:13,
6149:4, 6149:7,
6149:10, 6149:12,
6151:13, 6152:6,
6153:13, 6153:24,
6178:2, 6231:19,
6232:8, 6238:15,
6239:7
**questioned** [1] -
6248:7
**questioning** [6] -
6155:19, 6159:20,
6167:8, 6167:10,
6186:4, 6241:22
**questions** [12] -
6148:17, 6148:25,
6157:22, 6164:17,
6165:1, 6167:8,
6184:7, 6184:11,
6186:9, 6226:18,
6226:20, 6239:10
**quick** [1] - 6249:23
**quickly** [1] - 6187:11
**quite** [6] - 6151:23,
6156:18, 6216:19,
6227:15, 6230:22,
6232:2
**quote** [2] - 6139:16,
6144:18

## R

**radar** [1] - 6165:25
**raise** [2] - 6156:14,
6243:5
**raised** [3] - 6157:22,
6157:24, 6242:2
**raising** [1] - 6253:13
**ramifications** [1] -
6185:19
**range** [1] - 6164:4
**ranking** [2] - 6143:4,
6143:17
**rare** [1] - 6141:12
**rating** [5] - 6179:9,
6179:23, 6229:9
**ratings** [2] - 6179:22,
6180:6
**rationale** [1] - 6176:19
**reach** [2] - 6155:8,
6155:11
**reached** [2] - 6155:12,
6184:2
**read** [5] - 6139:22,
6229:15, 6235:4,
6235:13
**reads** [1] - 6139:13
**ready** [3] - 6165:16,
6166:5, 6166:20

**real** [2] - 6157:11,
6251:22
**realistic** [1] - 6241:11
**realistically** [1] -
6184:4
**realize** [1] - 6145:10
**really** [28] - 6157:25,
6170:3, 6171:5,
6177:9, 6177:10,
6180:5, 6180:6,
6180:24, 6181:13,
6181:21, 6183:18,
6222:6, 6222:7,
6222:9, 6222:13,
6222:15, 6224:3,
6225:10, 6227:12,
6227:15, 6233:22,
6240:20, 6240:23,
6249:18, 6250:15,
6252:16, 6254:6
**reason** [10] - 6134:15,
6146:16, 6229:16,
6231:13, 6243:21,
6245:11, 6250:2,
6251:15, 6251:17,
6254:15
**reasons** [3] - 6151:11,
6172:25, 6235:18
**rebuttal** [1] - 6136:10
**RECEIVED** [1] -
6131:8
**received** [2] - 6181:5,
6218:8
**receiving** [1] -
6241:24
**recency** [1] - 6254:14
**recent** [1] - 6167:20
**recently** [3] - 6171:18,
6225:5, 6253:8
**Recess** [1] - 6185:9
**recognize** [3] -
6216:12, 6221:13,
6244:18
**recognized** [1] -
6227:7
**recognizing** [1] -
6144:14
**recollection** [2] -
6252:19, 6254:13
**recommendations** [1]
- 6252:22
**record** [10] - 6168:15,
6216:1, 6246:13,
6246:17, 6248:15,
6252:3, 6252:4,
6252:15, 6253:20,
6256:4
**recorded** [1] - 6130:21
**recovery** [1] - 6161:10
**rectangle** [1] -

6178:10
**red** [3] - 6138:2,
6138:21, 6144:17
**redacted** [4] -
6136:21, 6167:12,
6239:16, 6239:20
**redaction** [1] -
6167:20
**redactions** [2] -
6241:8, 6241:24
**Redirect** [3] - 6131:3,
6131:5, 6131:6
**redirect** [3] - 6148:20,
6158:11, 6238:2
**REDIRECT** [2] -
6148:22, 6238:4
**reduce** [1] - 6139:13
**reduced** [1] - 6146:10
**reducing** [1] - 6146:17
**reductions** [2] -
6159:15, 6159:16
**refer** [5] - 6141:11,
6181:14, 6182:24,
6219:22
**reference** [6] -
6132:23, 6137:2,
6167:16, 6223:19,
6249:15, 6250:18
**referred** [2] - 6144:7,
6253:9
**referring** [4] - 6140:2,
6148:1, 6149:17,
6151:18
**reflected** [1] - 6140:11
**refused** [1] - 6140:21
**regards** [2] - 6154:9,
6243:10
**region** [2] - 6232:12,
6232:13
**relate** [2] - 6252:18,
6254:4
**related** [3] - 6216:24,
6229:9, 6251:9
**relates** [1] - 6226:17
**relating** [1] - 6247:13
**relationship** [4] -
6171:5, 6213:4,
6213:15, 6252:17
**relationships** [4] -
6171:1, 6171:3,
6215:5, 6246:14
**relative** [1] - 6160:14
**release** [1] - 6187:12
**relevance** [6] -
6173:11, 6226:14,
6244:9, 6244:21,
6244:25, 6253:3
**relevant** [6] - 6171:13,
6171:15, 6237:22,
6243:21, 6245:21,

6246:22
**relied** [1] - 6161:4
**rely** [1] - 6176:19
**relying** [6] - 6152:18,
6153:6, 6246:11,
6246:12, 6246:15,
6246:18
**remain** [1] - 6239:16
**remaining** [1] -
6185:14
**remains** [1] - 6230:11
**remember** [16] -
6135:4, 6135:22,
6136:11, 6140:20,
6140:22, 6149:5,
6160:7, 6160:20,
6161:3, 6161:23,
6161:24, 6164:16,
6164:19, 6241:20,
6253:7
**remembering** [1] -
6139:23
**reminder** [1] - 6138:4
**renew** [1] - 6216:18
**rental** [1] - 6176:4
**repeat** [3] - 6132:22,
6135:13, 6159:24
**reply** [1] - 6136:10
**report** [7] - 6136:10,
6143:7, 6157:24,
6158:19, 6162:10,
6162:18
**reported** [1] - 6162:16
**Reporter** [1] - 6130:18
**REPORTER** [2] -
6256:1, 6256:9
**reporter** [2] - 6239:24
**reporters** [1] -
6186:23
**reports** [5] - 6132:13,
6141:15, 6142:25,
6161:21, 6162:1
**represent** [2] - 6160:2,
6163:1
**representation** [2] -
6250:9, 6250:11
**representations** [3] -
6185:12, 6187:3,
6187:6
**represents** [1] -
6164:2
**request** [1] - 6253:20
**requested** [1] - 6251:5
**Research** [1] -
6152:25
**reservation** [1] -
6242:21
**reserved** [2] -
6242:25, 6247:9
**resources** [2] -

6173:22, 6237:11
**respect** [6] - 6143:14,
6154:18, 6166:6,
6236:13, 6244:8,
6244:10
**respond** [1] - 6176:15
**responded** [2] -
6142:25, 6143:10
**responding** [1] -
6143:9
**response** [11] -
6141:23, 6143:5,
6152:6, 6152:10,
6153:24, 6154:2,
6158:14, 6216:2,
6239:7, 6241:15,
6253:15
**responses** [2] -
6142:12, 6251:3
**responsibility** [2] -
6170:14, 6170:25
**responsiveness** [3] -
6155:14, 6158:3
**rest** [1] - 6241:3
**restate** [1] - 6174:2
**restaurant** [3] -
6172:10, 6176:21,
6232:10
**restaurants** [3] -
6172:9, 6237:13,
6237:14
**restrict** [1] - 6175:6
**restrictions** [1] -
6174:23
**result** [12] - 6133:24,
6150:9, 6150:17,
6178:2, 6179:24,
6180:14, 6218:10,
6220:24, 6221:10,
6227:4, 6230:8,
6248:16
**results** [19] - 6149:4,
6149:12, 6151:19,
6153:12, 6153:16,
6170:17, 6177:24,
6220:20, 6220:21,
6224:1, 6224:25,
6225:15, 6230:4,
6231:4, 6231:7,
6231:25, 6237:4,
6248:2
**RESUMED** [1] -
6132:6
**return** [1] - 6230:8
**rev** [2] - 6217:16,
6217:20
**revealed** [1] - 6156:4
**revenue** [14] -
6132:14, 6145:4,
6156:11, 6180:14,

6181:13, 6181:14,
6181:15, 6181:16,
6182:22, 6183:2,
6183:6, 6183:7,
6183:10, 6183:22
**revenue-sharing** [1] -
6183:10
**review** [4] - 6141:15,
6141:18, 6176:21,
6187:12
**reviewed** [2] - 6148:7,
6253:16
**reviews** [13] -
6174:20, 6180:5,
6213:7, 6213:19,
6231:8, 6235:22,
6236:11, 6236:20,
6237:4, 6237:6,
6237:8, 6237:9,
6237:12
**rich** [5] - 6174:17,
6175:1, 6175:5,
6236:20, 6237:7
**right-hand** [1] -
6150:5
**ripe** [1] - 6243:10
**rival** [8] - 6146:10,
6159:19, 6160:1,
6160:10, 6160:16,
6160:17, 6161:17,
6164:7
**rivals** [1] - 6161:18
**rivals'** [2] - 6139:13,
6164:8
**road** [1] - 6152:14
**role** [7] - 6169:10,
6169:12, 6170:13,
6170:22, 6175:10,
6175:12, 6220:17
**Room** [1] - 6130:19
**room** [2] - 6183:1,
6183:6
**Rosati** [1] - 6130:11
**roughly** [1] - 6168:2
**round** [1] - 6242:18
**row** [6] - 6163:10,
6163:11, 6163:12,
6163:21, 6179:14
**rows** [1] - 6163:10
**Royal** [1] - 6178:19
**RPR** [1] - 6130:18
**RSA** [1] - 6243:19
**RSAs** [5] - 6154:24,
6243:11, 6243:13,
6244:21, 6245:10
**rubber** [1] - 6152:13
**running** [2] - 6151:13,
6153:13

**S**

**Safari** [2] - 6140:7,
6140:14
**safe** [2] - 6216:18,
6239:14
**sale** [1] - 6150:20
**SALLET** [30] - 6130:2,
6167:5, 6168:1,
6168:11, 6168:25,
6169:18, 6174:7,
6178:4, 6178:6,
6181:1, 6181:6,
6183:25, 6184:6,
6184:10, 6184:13,
6184:16, 6185:5,
6185:13, 6186:15,
6186:18, 6218:6,
6225:16, 6226:5,
6226:14, 6238:3,
6238:5, 6238:11,
6239:10, 6250:22,
6255:1
**Sallet** [8] - 6167:23,
6168:12, 6185:11,
6186:3, 6186:13,
6228:5, 6238:2,
6250:20
**salt** [2] - 6250:2,
6250:12
**Samsung** [2] -
6147:18, 6169:25
**Samsungs** [1] -
6244:13
**SARA** [1] - 6130:18
**Sara** [2] - 6256:3,
6256:8
**satisfy** [2] - 6155:5,
6175:15
**saw** [3] - 6142:23,
6157:14, 6252:9
**scale** [4] - 6132:25,
6133:25, 6134:13,
6134:14
**scheduling** [1] -
6240:9
**SCHMIDTLEIN** [14] -
6130:7, 6132:5,
6132:8, 6147:17,
6148:17, 6154:19,
6158:10, 6162:4,
6162:7, 6163:22,
6240:8, 6240:15,
6240:17, 6255:2
**Schmidtlein** [2] -
6132:4, 6148:19
**Schmidtlein's** [1] -
6157:21
**scope** [4] - 6158:13,
6158:14, 6225:17,

6226:8
**score** [15] - 6135:19,
6135:21, 6135:24,
6136:2, 6136:3,
6138:23, 6139:3,
6139:4, 6142:22,
6143:4, 6143:6,
6143:8, 6143:13,
6143:14
**screen** [10] - 6132:11,
6132:15, 6132:18,
6160:11, 6160:14,
6215:12, 6217:25,
6218:1, 6238:9,
6238:12
**scroll** [4] - 6219:16,
6238:23, 6247:23,
6248:19
**scrolling** [1] - 6220:7
**seal** [2] - 6187:17,
6241:19
**sealed** [1] - 6212:18
**search** [57] - 6132:15,
6133:25, 6134:13,
6135:2, 6136:24,
6137:3, 6137:10,
6137:17, 6137:22,
6138:7, 6138:9,
6138:12, 6140:7,
6140:12, 6140:13,
6141:5, 6141:16,
6142:3, 6144:15,
6144:23, 6145:15,
6146:3, 6146:11,
6146:12, 6146:25,
6147:3, 6147:7,
6147:8, 6151:9,
6152:7, 6152:10,
6152:15, 6152:16,
6153:2, 6153:7,
6153:25, 6154:2,
6154:4, 6164:14,
6164:18, 6164:22,
6165:6, 6170:17,
6173:8, 6176:7,
6177:24, 6214:19,
6218:10, 6221:9,
6221:22, 6222:22,
6223:4, 6224:1,
6225:15, 6237:4,
6247:20, 6250:3
**Search** [2] - 6141:16,
6154:10
**searched** [2] -
6137:24, 6178:3
**searches** [1] - 6163:17
**searching** [5] -
6220:24, 6221:18,
6221:21, 6222:21
**seat** [1] - 6165:19

**seated** [1] - 6132:3
**Seattle** [1] - 6218:10
**second** [15] - 6138:14,
6150:12, 6158:3,
6163:11, 6165:20,
6181:13, 6182:22,
6184:21, 6230:13,
6231:23, 6238:8,
6238:17, 6242:18,
6250:3, 6254:2
**Section** [1] - 6130:4
**see** [41] - 6133:7,
6133:8, 6134:2,
6134:13, 6140:2,
6150:7, 6150:9,
6150:15, 6150:17,
6151:15, 6151:16,
6153:12, 6153:14,
6157:7, 6162:1,
6163:18, 6163:20,
6164:3, 6165:9,
6165:12, 6178:11,
6178:20, 6179:4,
6179:6, 6179:15,
6180:21, 6186:18,
6215:20, 6218:11,
6218:24, 6219:7,
6220:13, 6220:15,
6222:8, 6222:11,
6226:16, 6228:20,
6248:15, 6248:17,
6248:20, 6255:3
**seeing** [1] - 6229:9
**seek** [3] - 6167:9,
6173:19, 6181:9
**seeking** [2] - 6248:7,
6249:5
**seem** [1] - 6142:1
**segment** [1] - 6226:7
**segments** [1] -
6171:17
**sell** [1] - 6151:10
**seller** [2] - 6151:6,
6151:10
**selling** [1] - 6244:4
**send** [2] - 6173:16,
6241:15
**senior** [1] - 6169:21
**sense** [4] - 6140:24,
6145:9, 6167:23,
6217:21
**sent** [1] - 6241:14
**separate** [2] - 6163:4,
6219:4
**separately** [2] -
6134:18
**SERP** [23] - 6170:19,
6171:11, 6172:13,
6173:1, 6175:21,
6175:24, 6177:23,

6178:2, 6178:13,
6183:5, 6217:23,
6218:13, 6219:17,
6220:7, 6220:16,
6220:20, 6223:4,
6228:4, 6238:6,
6238:17, 6238:22,
6250:4, 6250:8
**serve** [1] - 6213:21
**served** [3] - 6153:24,
6154:1, 6239:6
**service** [3] - 6177:5,
6231:25, 6232:13
**services** [1] - 6142:3
**SESSION** [1] - 6129:9
**session** [13] - 6167:9,
6167:25, 6168:2,
6168:3, 6184:2,
6184:23, 6184:24,
6185:2, 6185:15,
6185:23, 6187:1,
6187:8, 6212:18
**sessions** [1] - 6176:11
**set** [6] - 6132:13,
6138:5, 6179:3,
6179:20, 6185:17,
6249:19
**setting** [1] - 6154:9
**seven** [1] - 6247:23
**Seventh** [1] - 6130:5
**SEVERT** [8] - 6129:18,
6148:21, 6148:23,
6149:25, 6155:2,
6159:3, 6164:12,
6165:1
**share** [34] - 6132:14,
6133:15, 6133:18,
6133:22, 6134:3,
6134:4, 6134:5,
6134:6, 6134:9,
6134:16, 6134:19,
6134:20, 6134:23,
6136:24, 6137:2,
6137:3, 6137:5,
6137:17, 6145:4,
6161:13, 6161:17,
6162:15, 6163:7,
6163:16, 6164:4,
6164:5, 6181:13,
6181:14, 6181:16,
6182:22, 6183:2,
6217:16, 6217:20
**shared** [1] - 6183:7
**shares** [2] - 6152:13,
6183:23
**sharing** [1] - 6183:10
**shift** [12] - 6159:23,
6160:3, 6160:10,
6160:15, 6160:17,
6161:1, 6161:13,

6161:17, 6162:15,
6163:7, 6164:6,
6164:7
**shifting** [1] - 6160:18
**shoes** [9] - 6151:13,
6151:15, 6151:16,
6151:17, 6151:25,
6152:1, 6152:3,
6152:4, 6153:13
**shopping** [1] - 6151:5
**short** [3] - 6167:9,
6184:1, 6238:3
**shorter** [2] - 6168:4
**shorthand** [1] -
6130:21
**show** [7] - 6155:4,
6171:10, 6171:21,
6173:14, 6225:5,
6226:13, 6231:25
**showed** [13] -
6135:22, 6135:25,
6136:4, 6136:5,
6136:11, 6136:17,
6142:9, 6148:12,
6149:11, 6225:23,
6226:22, 6238:6,
6250:23
**shown** [7] - 6149:3,
6155:21, 6170:17,
6230:4, 6247:20,
6247:22, 6251:2
**shows** [2] - 6226:13,
6246:6
**side** [23] - 6150:5,
6223:7, 6223:9,
6223:15, 6223:19,
6224:25, 6225:2,
6225:3, 6225:5,
6225:9, 6226:6,
6226:17, 6249:7,
6251:18
**side-by-side** [9] -
6223:7, 6223:9,
6223:15, 6223:19,
6224:25, 6225:2,
6225:3, 6225:9,
6226:17
**side-by-sides** [2] -
6225:5, 6226:6
**sides** [2] - 6225:5,
6226:6
**sign** [1] - 6246:5
**signal** [7] - 6176:22,
6181:12, 6228:20,
6233:24, 6234:2,
6236:21, 6237:1
**signals** [2] - 6228:19,
6236:2
**SIGNATURE** [1] -
6256:9

**signed** [3] - 6144:25,
6145:1, 6243:2
**significance** [1] -
6142:16
**significant** [3] -
6137:20, 6142:2,
6142:6
**silent** [1] - 6166:13
**similar** [4] - 6150:9,
6150:17, 6175:14,
6234:17
**simpler** [1] - 6183:21
**single** [2] - 6239:7,
6242:22
**site** [1] - 6182:2
**sites** [5] - 6221:9,
6221:22, 6222:2,
6222:4, 6222:22
**sitting** [1] - 6148:5
**situation** [1] - 6182:24
**six** [2] - 6163:19,
6247:23
**size** [3] - 6153:1,
6153:7, 6154:4
**slide** [19] - 6136:19,
6136:24, 6137:25,
6138:1, 6138:21,
6139:12, 6141:10,
6141:11, 6144:13,
6145:25, 6148:9,
6148:12, 6155:21,
6156:8, 6157:13
**slides** [3] - 6133:5,
6142:5, 6144:9
**slightly** [2] - 6134:8,
6240:10
**slots** [1] - 6180:18
**small** [13] - 6150:3,
6150:4, 6167:8,
6214:18, 6214:19,
6241:21, 6243:18,
6244:18, 6244:24,
6245:14, 6246:21,
6247:1, 6247:6
**smaller** [1] - 6243:14
**smallest** [1] - 6246:5
**snippet** [1] - 6136:5
**sold** [1] - 6245:11
**solution** [2] - 6176:5,
6227:8
**someone** [2] - 6178:3,
6183:1
**someplace** [1] -
6150:24
**sometimes** [4] -
6156:10, 6167:16,
6174:23, 6180:18
**Sommer** [2] - 6247:22,
6254:18
**SOMMER** [14] -

6130:10, 6248:10,
6249:3, 6250:9,
6250:16, 6251:7,
6251:11, 6252:6,
6252:8, 6252:12,
6252:20, 6253:10,
6253:24, 6254:17
**Sommer's** [1] -
6253:13
**Sonsini** [1] - 6130:11
**Sony** [1] - 6243:16
**soon** [1] - 6187:15
**sophisticated** [2] -
6217:7, 6217:19
**sorry** [31] - 6132:22,
6135:13, 6136:12,
6138:19, 6140:1,
6143:24, 6145:19,
6146:12, 6146:22,
6149:17, 6151:21,
6152:2, 6159:24,
6160:12, 6162:25,
6163:2, 6163:3,
6164:16, 6168:21,
6169:13, 6169:19,
6169:24, 6175:4,
6181:14, 6215:15,
6221:5, 6226:4,
6228:16, 6231:2,
6232:22, 6240:16
**sort** [8] - 6133:5,
6138:9, 6141:15,
6173:11, 6180:12,
6240:9, 6250:1,
6251:24
**sounds** [1] - 6183:10
**source** [4] - 6172:20,
6174:11, 6177:1,
6181:25
**sources** [4] - 6228:11,
6230:2, 6237:9,
6237:10
**South** [1] - 6129:16
**Southwest** [1] -
6130:9
**space** [2] - 6213:13,
6224:1
**specialization** [1] -
6169:7
**specialized** [1] -
6219:12
**specialty** [2] - 6173:24
**specific** [10] - 6138:3,
6144:4, 6144:8,
6161:3, 6161:25,
6167:14, 6185:18,
6186:5
**specifically** [2] -
6253:5, 6253:14
**spelling** [2] - 6168:16,

6168:17
**spend** [1] - 6171:17
**spent** [1] - 6140:22
**split** [3] - 6139:11,
6145:12, 6224:9
**sponsor** [1] - 6230:21
**sponsored** [3] -
6150:19, 6151:22,
6151:23
**Square** [1] - 6178:19
**stand** [1] - 6166:8
**STAND** [1] - 6132:6
**standard** [1] - 6167:19
**star** [1] - 6229:9
**stars** [1] - 6179:21
**start** [8] - 6143:4,
6146:14, 6148:24,
6158:11, 6212:23,
6218:15, 6248:5,
6248:10
**started** [7] - 6134:24,
6143:10, 6156:18,
6156:20, 6157:10,
6168:5, 6168:7
**starting** [2] - 6143:7,
6236:15
**state** [2] - 6168:15,
6226:5
**State** [1] - 6130:2
**statement** [4] -
6140:15, 6160:13,
6227:6, 6251:18
**STATES** [3] - 6129:1,
6129:3, 6129:10
**states** [3] - 6168:12,
6186:10, 6220:22
**States** [15] - 6129:13,
6129:16, 6129:20,
6240:11, 6243:14,
6243:20, 6244:5,
6244:6, 6245:12,
6245:18, 6245:20,
6249:21, 6250:18,
6251:13, 6255:1
**stay** [2] - 6158:13,
6230:6
**stayed** [1] - 6166:13
**stenotype** [1] -
6130:21
**steps** [1] - 6175:25
**STEVEN** [1] - 6130:3
**still** [5] - 6149:15,
6239:3, 6241:6,
6242:6, 6243:9
**stop** [4] - 6157:8,
6157:18, 6158:2,
6247:24
**story** [2] - 6156:7,
6156:19
**straight** [1] - 6233:8

**strategic** [2] - 6167:13, 6185:21
**Street** [4] - 6129:14, 6129:16, 6129:20, 6130:14
**strength** [2] - 6164:8, 6177:20
**stricken** [4] - 6248:23, 6249:15, 6250:19, 6250:24
**strict** [1] - 6186:6
**strike** [8] - 6141:21, 6145:6, 6249:5, 6251:1, 6251:9, 6251:16, 6251:17, 6252:3
**striking** [1] - 6251:20
**strong** [2] - 6158:1, 6158:21
**stronger** [1] - 6159:13
**strongly** [1] - 6249:21
**struck** [1] - 6247:13
**structure** [3] - 6145:8, 6217:14, 6220:15
**structures** [4] - 6167:14, 6185:18, 6186:5, 6187:5
**stuff** [2] - 6158:18, 6219:23
**subject** [2] - 6244:23, 6254:14
**subjective** [1] - 6225:9
**submission** [1] - 6242:16
**submit** [1] - 6239:15
**substance** [2] - 6254:8, 6254:12
**substantial** [1] - 6143:22
**substantive** [1] - 6248:25
**subtlety** [1] - 6227:15
**successfully** [1] - 6143:10
**suggested** [1] - 6160:25
**suggesting** [5] - 6141:21, 6141:22, 6177:25, 6248:3, 6250:10
**Suite** [1] - 6129:17
**super** [3] - 6225:8, 6227:23, 6229:10
**surmise** [1] - 6233:5
**suspect** [2] - 6234:6, 6250:2
**swapping** [1] - 6248:5
**swift** [1] - 6172:17
**switch** [1] - 6137:10
**switched** [3] -

6144:21, 6159:19, 6160:1
**switching** [4] - 6137:11, 6154:7, 6160:19, 6160:21
**SWORN** [1] - 6168:8
**systems** [1] - 6146:19

**T**

**tab** [2] - 6215:17, 6216:6
**table** [1] - 6233:3
**tablet** [1] - 6163:11
**tabs** [1] - 6215:16
**taco** [1] - 6232:10
**tacos** [1] - 6232:9
**tactics** [2] - 6167:13, 6185:22
**tail** [3] - 6138:25, 6139:7, 6139:8
**team** [8] - 6180:22, 6180:24, 6217:9, 6217:10, 6221:3, 6223:3, 6224:21, 6229:12
**telephone** [1] - 6174:18
**term** [2] - 6178:12, 6231:15
**terms** [22] - 6134:2, 6138:5, 6140:17, 6144:10, 6144:20, 6145:19, 6167:14, 6172:9, 6174:23, 6174:24, 6175:16, 6176:14, 6177:5, 6182:13, 6185:18, 6222:12, 6224:1, 6225:6, 6233:16, 6234:5, 6249:17
**terribly** [1] - 6251:25
**terrific** [3] - 6241:12, 6241:18, 6241:23
**test** [1] - 6155:5
**testers** [1] - 6223:9
**testified** [10] - 6140:10, 6145:25, 6146:3, 6151:8, 6151:11, 6161:4, 6161:13, 6219:17, 6249:6, 6254:7
**testify** [2] - 6240:17, 6240:21
**testifying** [3] - 6135:24, 6152:20, 6240:23
**TESTIMONY** [1] - 6131:2
**testimony** [36] -

6137:2, 6139:16, 6139:19, 6139:22, 6142:4, 6147:20, 6147:22, 6148:3, 6148:5, 6155:6, 6158:9, 6165:13, 6166:3, 6167:1, 6167:10, 6167:20, 6185:8, 6216:4, 6217:17, 6237:17, 6239:12, 6239:17, 6239:25, 6244:11, 6247:8, 6247:13, 6248:11, 6248:18, 6249:5, 6249:12, 6251:1, 6251:9, 6251:14, 6252:1, 6252:8
**testing** [2] - 6225:23, 6226:22
**tests** [1] - 6155:9
**text** [4] - 6218:17, 6218:19, 6218:22, 6219:11
**THE** [126] - 6129:1, 6129:1, 6129:10, 6132:3, 6132:6, 6147:15, 6148:19, 6149:22, 6149:24, 6154:20, 6154:22, 6158:13, 6158:18, 6162:5, 6162:25, 6163:2, 6163:14, 6163:15, 6163:17, 6163:18, 6163:24, 6164:1, 6164:11, 6165:3, 6165:5, 6165:9, 6165:10, 6165:11, 6165:14, 6165:16, 6165:19, 6166:10, 6166:23, 6167:4, 6167:23, 6168:5, 6168:8, 6168:9, 6168:21, 6168:24, 6169:13, 6169:15, 6169:16, 6174:2, 6174:3, 6180:12, 6180:16, 6180:25, 6181:4, 6184:3, 6184:9, 6184:12, 6184:15, 6184:18, 6185:4, 6185:6, 6185:11, 6185:24, 6186:11, 6186:17, 6186:21, 6216:6, 6216:15, 6216:17, 6217:1, 6218:7, 6219:24, 6225:18, 6226:2, 6226:10, 6226:16, 6226:20, 6228:16,

6228:18, 6228:20, 6228:22, 6230:16, 6230:18, 6230:20, 6230:22, 6237:23, 6238:1, 6238:9, 6238:10, 6239:11, 6239:13, 6239:14, 6239:19, 6239:23, 6240:3, 6240:6, 6240:14, 6240:16, 6240:24, 6241:2, 6241:5, 6241:18, 6241:23, 6242:9, 6242:14, 6242:17, 6243:1, 6243:6, 6243:23, 6244:15, 6245:7, 6246:19, 6247:5, 6247:14, 6248:9, 6249:2, 6249:23, 6250:10, 6250:20, 6250:25, 6251:8, 6251:20, 6252:7, 6252:11, 6252:19, 6253:5, 6253:11, 6254:10, 6254:18, 6254:23, 6255:3
**themes** [1] - 6185:16
**themselves** [1] - 6249:17
**they've** [6] - 6175:16, 6182:3, 6215:13, 6216:2, 6222:1, 6245:10
**thin** [1] - 6156:10
**thinking** [1] - 6139:20
**third** [8] - 6158:7, 6163:11, 6163:12, 6167:16, 6181:17, 6183:13, 6187:5, 6250:3
**Thistle** [1] - 6178:18
**thousands** [1] - 6141:19
**threat** [3] - 6147:10, 6147:11, 6147:12
**threats** [2] - 6141:12, 6142:2
**three** [15] - 6152:22, 6152:24, 6163:19, 6163:20, 6176:19, 6181:10, 6183:16, 6217:15, 6226:18, 6226:20, 6230:11, 6238:23, 6248:14
**three-by-three** [1] - 6230:11
**throw** [1] - 6143:5
**Thursday** [5] - 6240:12, 6240:13,

6240:25, 6242:11, 6247:7
**TikTok** [1] - 6153:20
**tile** [8] - 6228:13, 6228:16, 6228:24, 6229:5, 6229:8, 6230:1, 6230:13, 6230:16
**tiles** [10] - 6220:3, 6220:4, 6228:11, 6228:17, 6228:18, 6229:3, 6229:5, 6230:5, 6231:4, 6231:15
**timeliness** [1] - 6173:11
**timely** [3] - 6171:14, 6171:15, 6173:18
**timing** [2] - 6167:23, 6168:6
**tinter** [3] - 6241:9, 6241:17
**title** [2] - 6169:5, 6253:17
**to-do** [1] - 6241:6
**today** [3] - 6155:21, 6240:5, 6243:10
**today's** [1] - 6155:19
**together** [5] - 6138:22, 6228:19, 6229:3
**tomorrow** [5] - 6240:7, 6240:8, 6240:14, 6240:15, 6240:19
**took** [5] - 6153:5, 6161:18, 6169:19, 6248:11, 6248:21
**top** [12] - 6139:18, 6149:10, 6151:1, 6151:3, 6151:15, 6178:18, 6179:14, 6218:15, 6218:16, 6249:7, 6251:18
**top-side** [2] - 6249:7, 6251:18
**topics** [2] - 6154:7, 6216:4
**torso** [1] - 6138:16
**total** [1] - 6134:18
**touched** [1] - 6153:23
**towards** [2] - 6134:22, 6135:23
**Tower** [2] - 6179:15, 6179:18
**track** [1] - 6136:8
**tracking** [1] - 6156:20
**Trafalgar** [2] - 6178:19
**traffic** [27] - 6137:3, 6159:23, 6160:3, 6181:11, 6181:12,

6181:20, 6181:21,
6182:2, 6182:6,
6182:7, 6182:14,
6183:11, 6183:18,
6183:20, 6217:16,
6217:20, 6226:11,
6226:12, 6226:17,
6227:5, 6227:10,
6227:11, 6227:15,
6227:19, 6227:22,
6228:3, 6233:16
**transaction** [1] -
6183:3
**transactions** [1] -
6183:11
**Transcript** [1] -
6130:22
**TRANSCRIPT** [1] -
6129:9
**transcript** [2] -
6239:22, 6256:4
**transcription** [1] -
6130:22
**transcripts** [5] -
6187:12, 6234:13,
6241:7, 6241:15,
6241:24
**translate** [1] - 6254:18
**travel** [30] - 6171:18,
6171:19, 6171:22,
6171:25, 6172:1,
6172:4, 6172:7,
6173:23, 6175:23,
6175:24, 6176:1,
6176:3, 6176:14,
6176:16, 6176:18,
6213:2, 6213:12,
6213:15, 6214:25,
6215:3, 6223:17,
6223:25, 6224:18,
6227:8, 6227:18,
6232:21, 6232:25,
6233:13, 6233:20,
6235:7
**traveler** [1] - 6172:10
**travels** [1] - 6239:14
**TRIAL** [1] - 6129:9
**tried** [8] - 6136:2,
6136:8, 6142:11,
6142:15, 6145:16,
6146:6, 6156:6,
6185:16
**Trip** [25] - 6170:9,
6172:16, 6179:5,
6179:9, 6180:9,
6213:10, 6213:18,
6218:23, 6221:19,
6228:8, 6228:13,
6228:25, 6229:6,
6229:8, 6229:16,

6229:22, 6230:1,
6230:9, 6231:10,
6231:18, 6236:5,
6236:22, 6237:3,
6239:3
**true** [1] - 6230:20
**trust** [6] - 6173:4,
6173:7, 6173:8,
6175:17, 6180:3
**trusted** [2] - 6171:13,
6171:15
**trusts** [1] - 6173:9
**truth** [1] - 6234:21
**try** [7] - 6143:12,
6157:19, 6182:11,
6182:12, 6222:19,
6224:14, 6229:7
**trying** [18] - 6137:10,
6138:5, 6140:6,
6143:17, 6146:19,
6160:7, 6175:14,
6221:21, 6222:21,
6224:4, 6224:7,
6227:23, 6227:24,
6235:16, 6237:16,
6249:1, 6249:16,
6250:17
**turn** [9] - 6136:19,
6137:25, 6138:21,
6139:12, 6151:12,
6215:14, 6215:20,
6215:21, 6234:24
**two** [26] - 6141:24,
6142:16, 6143:13,
6149:12, 6151:17,
6152:25, 6163:10,
6165:24, 6169:11,
6169:22, 6180:8,
6180:18, 6184:7,
6219:4, 6225:1,
6227:19, 6230:12,
6240:13, 6240:25,
6241:8, 6247:12,
6247:17, 6249:24,
6251:10, 6252:13
**tying** [1] - 6246:7
**types** [7] - 6163:6,
6174:17, 6181:10,
6183:16, 6183:22,
6217:15, 6232:8
**typical** [3] - 6175:1,
6175:5, 6220:18
**typically** [1] - 6174:16
**typos** [1] - 6248:6

## U

**U.S** [15] - 6133:18,
6145:16, 6145:20,
6145:22, 6146:14,

6162:21, 6163:17,
6164:5, 6164:23,
6233:8, 6233:20,
6233:21, 6235:11
**ultimately** [3] -
6152:14, 6187:9,
6251:3
**under** [6] - 6167:12,
6178:9, 6179:20,
6185:20, 6187:17,
6241:19
**underneath** [2] -
6179:3, 6220:7
**understandable** [2] -
6170:11, 6170:19
**understood** [3] -
6173:12, 6177:19,
6245:2
**unique** [2] - 6138:7,
6138:9
**Unit** [1] - 6130:4
**UNITED** [3] - 6129:1,
6129:3, 6129:10
**United** [11] - 6129:13,
6129:16, 6129:20,
6178:8, 6243:14,
6243:20, 6244:5,
6244:6, 6245:12,
6245:18, 6245:19
**units** [1] - 6223:4
**unless** [3] - 6140:12,
6230:20, 6250:6
**unsealed** [1] -
6239:17
**up** [39] - 6133:6,
6133:11, 6133:12,
6134:8, 6134:19,
6136:14, 6141:14,
6143:9, 6152:16,
6152:23, 6153:1,
6157:1, 6163:2,
6163:4, 6163:6,
6168:22, 6169:17,
6173:18, 6180:24,
6182:18, 6183:5,
6218:3, 6221:8,
6226:19, 6227:5,
6229:11, 6231:25,
6233:15, 6238:9,
6238:18, 6240:18,
6242:12, 6243:6,
6243:16, 6246:7,
6247:8, 6247:11,
6247:16, 6252:14
**up-to-date** [1] -
6173:18
**updates** [1] - 6242:8
**upfront** [2] - 6177:18,
6177:20
**UPX2006** [1] - 6253:20

**URL** [1] - 6238:19
**usage** [1] - 6175:2
**useful** [2] - 6220:24,
6221:1
**user** [25] - 6143:3,
6150:25, 6151:2,
6152:6, 6154:14,
6154:25, 6155:1,
6173:9, 6174:17,
6175:15, 6177:5,
6180:15, 6181:24,
6219:9, 6220:24,
6221:6, 6221:9,
6222:1, 6222:3,
6223:1, 6223:2,
6223:11, 6224:5,
6232:8
**user-downloaded** [3]
- 6154:14, 6154:25,
6155:1
**users** [38] - 6160:18,
6160:21, 6171:11,
6171:22, 6173:6,
6173:14, 6175:21,
6175:25, 6180:2,
6181:15, 6221:2,
6221:12, 6221:14,
6221:17, 6221:18,
6221:21, 6221:25,
6222:5, 6222:12,
6222:21, 6222:24,
6222:25, 6223:10,
6227:24, 6232:20,
6232:24, 6233:4,
6233:11, 6233:17,
6233:23, 6234:4,
6234:7, 6235:6,
6235:17, 6236:9,
6236:10, 6237:12
**uses** [2] - 6213:21,
6249:7

## V

**Valentine's** [4] -
6149:4, 6149:7,
6149:12, 6150:13
**value** [10] - 6144:18,
6151:10, 6157:10,
6157:11, 6157:17,
6157:20, 6158:25,
6221:14, 6222:11,
6252:1
**value-based** [2] -
6157:10, 6157:17
**values** [2] - 6157:9,
6222:16
**various** [5] - 6141:20,
6142:12, 6152:15,
6155:12, 6231:9

**venturing** [1] -
6237:18
**Verizon** [2] - 6245:24,
6246:1
**Verizons** [1] - 6244:12
**versa** [1] - 6177:11
**versus** [9] - 6135:3,
6136:2, 6142:17,
6143:22, 6144:2,
6145:20, 6145:21,
6224:1, 6250:15
**vertical** [21] - 6133:14,
6171:17, 6218:13,
6220:15, 6221:9,
6221:22, 6222:22,
6223:3, 6224:1,
6224:17, 6224:18,
6225:6, 6225:15,
6225:24, 6226:23,
6226:24, 6227:2,
6227:4, 6231:22,
6231:23, 6237:4
**verticals** [1] - 6223:17
**vice** [1] - 6177:11
**view** [3] - 6182:11,
6222:8, 6224:4
**views** [1] - 6226:7
**vis** [2] - 6226:7
**vis-a-vis** [1] - 6226:7
**voice** [3] - 6168:22,
6168:23, 6169:16
**volume** [1] - 6138:12
**volunteer** [1] -
6164:24
**volunteered** [1] -
6253:25
**vs** [1] - 6129:5

## W

**walk** [1] - 6247:14
**wants** [3] - 6171:21,
6179:17, 6181:24
**Washington** [5] -
6129:5, 6129:14,
6129:21, 6130:9,
6130:19
**ways** [4] - 6143:1,
6161:12, 6182:11
**weakness** [1] - 6164:8
**web** [3] - 6174:8,
6215:3, 6229:1
**website** [2] - 6151:6,
6151:10
**websites** [2] -
6153:19, 6153:24
**week** [5] - 6239:17,
6241:3, 6241:12,
6241:25, 6252:13
**weeks** [3] - 6241:9,

6252:10, 6254:1
**weigh** [1] - 6187:1
**weighs** [1] - 6187:7
**weighted** [2] - 6138:12, 6138:15
**welcome** [1] - 6168:9
**wheelhouse** [1] - 6237:21
**whereas** [1] - 6172:7
**WHINSTON** [2] - 6131:3, 6132:6
**Whinston** [7] - 6132:9, 6148:24, 6162:8, 6165:11, 6244:2, 6246:3, 6246:11
**Whinston's** [2] - 6243:17, 6244:24
**white** [1] - 6136:20
**whole** [5] - 6156:7, 6157:25, 6158:20, 6158:22, 6176:18
**Wick** [2] - 6256:3, 6256:8
**WICK** [1] - 6130:18
**wide** [1] - 6236:8
**Wikipedia** [1] - 6150:5
**Williams** [1] - 6130:8
**Wilson** [1] - 6130:11
**Windows** [4] - 6137:15, 6137:18, 6137:21, 6146:19
**wireless** [1] - 6132:10
**withdraw** [3] - 6229:7, 6251:8, 6252:4
**withdrawn** [1] - 6242:20
**witness** [8] - 6166:24, 6166:25, 6244:11, 6248:21, 6248:24, 6250:17, 6250:23, 6251:2
**WITNESS** [24] - 6132:6, 6149:24, 6154:22, 6158:18, 6162:5, 6163:2, 6163:15, 6163:18, 6164:1, 6165:5, 6165:10, 6165:14, 6168:8, 6168:24, 6169:15, 6174:3, 6180:16, 6216:17, 6228:18, 6228:22, 6230:18, 6230:22, 6238:10, 6239:13
**witnesses** [7] - 6165:23, 6166:2, 6240:5, 6240:11, 6240:13, 6241:1, 6248:6
**word** [4] - 6177:7,

6177:13, 6222:14, 6248:21
**wording** [1] - 6161:3
**words** [4] - 6138:9, 6179:5, 6245:12, 6253:17
**works** [1] - 6170:8
**world** [5] - 6143:21, 6144:2, 6145:21, 6231:11, 6236:5
**worthy** [1] - 6243:22
**write** [1] - 6176:21
**written** [2] - 6174:14, 6216:2
**wrote** [1] - 6162:2

## X

**Xiaomis** [1] - 6245:4

## Y

**Y-e-x-t** [1] - 6214:15
**Yahoo** [6] - 6132:20, 6133:22, 6134:3, 6134:4, 6134:12, 6134:19
**Yahoo!** [1] - 6160:19
**Yahoo!/Bing** [1] - 6133:6
**Yahoo!/Microsoft** [1] - 6133:21
**year** [5] - 6136:6, 6141:19, 6153:5, 6246:8
**years** [2] - 6169:11, 6252:16
**yesterday** [20] - 6135:23, 6136:4, 6136:18, 6136:20, 6138:13, 6142:9, 6144:6, 6144:12, 6146:6, 6148:25, 6149:1, 6149:11, 6149:16, 6149:20, 6153:20, 6155:3, 6156:9, 6161:4, 6161:13, 6252:13
**Yext** [3] - 6214:13, 6214:15, 6214:16
**yielded** [1] - 6183:6
**York** [2] - 6130:12
**yourself** [1] - 6251:21