```
1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2
        United States of America,    )
3       et al.,                      )
                                     ) Day 25
4                       Plaintiffs,  )
                                     ) CV No. 20-3010
5                   vs. ) Washington, D.C.
                                     ) October 19, 2023
6       Google LLC,                  ) 1:35 p.m.
                                     )
7                       Defendant. )
        _____)
8

9                   TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE AMIT P. MEHTA
10                  UNITED STATES DISTRICT JUDGE

11      APPEARANCES:
        For DoJ Plaintiffs:         Kenneth M. Dintzer
12                                  U.S. DEPARTMENT OF JUSTICE
                                    1100 L Street, NW
13                                  Washington, D.C.
                                    (202) 307-0340
14                                  Email:  Kenneth.dintzer2@usdoj.gov

15                                  David E. Dahlquist
                                    U.S. Department of Justice
16                                  209 South LaSalle Street, Suite 600
                                    Chicago, IL  60604
17                                  (202) 805-8563
                                    Email:  David.dahlquist@usdoj.gov
18
                                    Richard Cameron Gower
19                                  U.S. Department of Justice
                                    450 Fifth Street, NW, Suite 7100
20                                  Washington, DC  20530
                                    202-549-7155
21                                  Email:  Richard.gower@usdoj.gov
        For Plaintiff
22        States:                   Michael Schwartz
                                    Office of the Attorney General
23                                  28 Liberty Street
                                    New York, NY  10005
24                                  (212) 416-8096
                                    Email:  Michael.schwartz@ag.ny.gov
25
```

```
 1    For Plaintiff
        States (cont.):        Jonathan Bruce Sallet
 2                             COLORADO DEPARTMENT OF LAW
                               Consumer Protection Section,
 3                             Antitrust Unit
                               Colorado Judicial Center
 4                             1300 Broadway, Seventh Floor
                               Denver, CO 80203
 5                             (720) 508-6000
                               Email:  Jon.sallet@coag.gov
 6
                               William J. Cavanaugh, Jr.
 7                             Patterson Belknap Webb & Tyler LLP
                               1133 Avenue of the Americas
 8                             Suite 2200
                               New York, NY 10036
 9                             (212) 335-2793
                               Email:  Wfcavanaugh@pbwt.com
10
      For Defendant Google:    John E. Schmidtlein
11                             Benjamin M. Greenblum
                               WILLIAMS & CONNOLLY LLP
12                             725 12th St., NW
                               Washington, D.C. 20005
13                             (202) 434-5000
                               Email:  Jschmidtlein@wc.com
14                             Email:  Bgreenblum@wc.com
                               Wendy Huang Waszmer
15                             Wilson Sonsini Goodrich & Rosati
                               1301 Avenue of the Americas
16                             40th Floor
                               New York, NY  10019
17                             (212) 999-5800
                               Email:  Wwaszmer@wsgr.com
18
19    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
20                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
21                             Washington, DC  20001
                               202-354-3267
22
                                    *   *   *
23

24

25
```

```
 1          *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

 2               THE COURT:  Mr. Schwartz, ready when you are.

 3                    DIRECT EXAMINATION (Cont.)

 4                         PAUL VALLEZ

 5     BY MR. SCHWARTZ:

 6     Q.  Mr. Vallez, I want to just clarify one question I asked you

 7     this morning.

 8          Do you know the relative ad spend on Skai in the U.S. as

 9     between Google and Bing?

10     A.  Yes.

11     Q.  And what is that?

12     A.  It's about 80 percent for Google in the U.S., and I would

13     say it's in the high 90s for Microsoft.

14     Q.  What do you mean by the "high 90s"?

15     A.  In terms of the percent of spend that we manage for

16     Microsoft Bing, the majority of it occurs in the U.S.

17     Q.  I'm sorry.  Let me clarify the question.

18          Of ad money that is spent in the U.S. in the search

19     channel, how much of that money is spent advertising on Google

20     versus advertising on Bing?

21     A.  Got it.  Got it.  Okay.  Okay.  So I would say that about

22     half of Microsoft's (sic) ad spend exists in the U.S.  For

23     Microsoft, it's a very different number.  I would say it's more

24     than 90 percent is in the U.S. versus rest of the world.

25     Q.  Okay.  Before the break --
```

1          THE COURT:  Sorry.  Just -- just to be clear, I think

2     you -- I think what he's being asked is of the overall spend

3     between the two search engines on your platform, what's the

4     percent spent that's spent on Google -- and it can be a global

5     number -- versus Microsoft -- Google or Bing.

6          THE WITNESS:  Got it, got it.  We're somewhat unique

7     in that the ratio of spend is about -- I think Microsoft is

8     anywhere between 12 to 14 percent of our cert. spends.  It's

9     different than the industry metric.  We tend to over index on

10    having a higher percentage of our ratio of Microsoft spend than

11    the industry.

12    BY MR. SCHWARTZ:

13    Q.  If it's 12 to 14 percent on Microsoft, what would the

14    percentage be for Google?

15    A.  I would say it's about 80 -- 84, 85 percent, yep.  Because

16    that 1 percent remaining is the other category, which is the

17    smaller search engines that we support, like Yandex and Baidee.

18    Q.  Thank you.

19          THE COURT:  Can you explain why you think your

20    platform's percentage is greater than the industry's?

21          THE WITNESS:  A lot of the value that we bring to the

22    table for our shared customers, Your Honor, is around reducing

23    some of the friction that they experience when they are trying

24    to spend between both platforms.  So we end up trying to think

25    about a day in the life of an advertiser, what their

 1    day-in-day-out looks like, and we try to simplify and give them

 2    efficiencies.

 3            And so we talked earlier about mirroring as one

 4    specific feature that we rolled out.  Mirroring is an example

 5    of where we work with Microsoft advertisers to help them

 6    automate the process for bringing over all their Google

 7    activity and make it very simple for them to manage across.  So

 8    I think because we reduce a lot of that friction, it ends up --

 9    and Microsoft performs fairly well for them, it ends up leading

10    to higher spend ratios on Microsoft than probably the industry

11    standard.

12    BY MR. SCHWARTZ:

13    Q.  Thank you.  I think this may lead into my next topic.

14            Are there certain features on the Microsoft native tool,

15    the Google native tool that are available within those native

16    tools?

17    A.  Can you clarify the question?

18    Q.  Sure.  Let me ask it in a different way.

19            Does Skai work with the native tools to integrate some

20    of the features from the native tools to make them available

21    with customers using the Skai tool?

22    A.  Yes.

23    Q.  And that applies to both Google features as well as

24    Microsoft features?

25    A.  Yes.

1    Q.  What is the process by which features from the native tools

2    to are integrated into the Skai tool?

3    A.  A lot of what my team specifically does is we work with the

4    publishers directly, whether it be Google or Microsoft, and we

5    try to understand, of all the hundreds of things they could be

6    working on, what are the things that really are driving impact,

7    getting traction, getting more adoption and usage within their

8    marketplace?

9           We don't have the resources of a Google or Microsoft,

10   and so we try to focus on the things that have the biggest

11   impact.  And so we take that signal from our publishers.  We

12   work with Microsoft and Google to get those signals, and then

13   we also evaluate those with advertisers.  So we understand from

14   both sides what's going to have the biggest impact and value

15   for our advertisers.

16   Q.  Does this process of integrating features generally require

17   some amount of collaboration with Google or with Microsoft?

18   A.  It's not required but, we end up doing a lot of

19   collaboration, yes.

20   Q.  Can you explain, generally, the collaboration that Skai

21   does with Google or with Microsoft with respect to the feature

22   support?

23   A.  They're very different as far as how we collaborate with

24   the two.  With Google, for example, we try to understand the

25   narrative.  Why should we be providing this value or support to

1    an advertiser?  How should we be thinking about why this --

2    well, why did you build this feature?  What value, what problem

3    are you trying to solve for the advertiser?  So we understand

4    the narrative.

5         We also give them feedback because we've been doing a

6    lot of building of features with their API for years, and so

7    we'll give them feedback and guidance on how to make it more

8    easily accessible, easier for us to build against, what are the

9    best practices.  So we will give them a lot of feedback on what

10   we think the market will accept versus what we think the market

11   may push back on.  So we arrive at solutions that we know are

12   going to be embraced by the marketplace.

13        Well, as with Microsoft, they tend to be very open,

14   probably more open than most publishers we work with.  We work

15   with them in terms of understanding what's coming, what are

16   they working on.  And sometimes we'll co-build things together,

17   to collaborate, because sometimes, if we want the solution to

18   operate a certain way, we need more functionality from the

19   publisher.  We need them to open up APIs, or just give them

20   guidance on what's going to -- how to simplify the whole

21   process for us.

22   Q.  In your experience, do advertiser generally want comparable

23   feature support on Skai when it comes to advertising on Google

24   versus advertising on Bing?

25   A.  Yes.

1    Q.  And why is that?

2    A.  Because when they actually -- again, if you think about a

3    day in the life of an advertiser, they want to get home for

4    time and dinner, which means the way they operate in one

5    marketplace needs to be very similar, otherwise they're having

6    to reinvent the wheel.

7            So we create workflows that allow them to do a task

8    and bring parity to how that task is done in Microsoft,

9    sometimes in one workflow.  But, again, if we want to get them

10   home in time for dinner, then we have to simplify the whole

11   proces, and that process includes both Google and Microsoft,

12   whatever it is they're trying to get done.

13   Q.  Does SA360 also integrate support for features from the

14   Google native tool?

15   A.  Yes.

16   Q.  And how does the extent of support for Google features on

17   Skai compare to the extent of support for Google features on

18   SA360?

19   A.  In terms of support for Google features?

20   Q.  Correct.

21   A.  Are you asking, do we do more features?  I'm not sure

22   exactly --

23   Q.  Basically, yes.  Do you have a sense of the breadth or the

24   scope of Google features that are supported on SA360 versus on

25   Skai?

1    A.  I mean, all I can say there -- I guess what I can say is

2    that we have limited budgets and funding in terms of what we

3    can afford to build, and so we try to focus on the most

4    impactful things.  We can't afford to do everything that SA360

5    does, and so I would say oftentimes they're probably able to do

6    a little bit more than we are because we don't have the funding

7    to be able to do everything.

8    Q.  And can this greater support for Google features on SA360,

9    does that make it more difficult to persuade advertisers to

10   switch to Skai from SA360?

11   A.  Yes.  Oftentimes advertisers will -- even if the advertiser

12   is not planning to use a full set of features, they oftentimes

13   look at the depth of feature support to understand how

14   committed are you to a given publisher, yes.

15   Q.  We spoke -- so that's about Google features.  Do you have a

16   sense of the extent to which Microsoft features are supported

17   on Skai as compared to on SA360?

18   A.  I'm pretty confident that Skai supports more.  And we use

19   it as a way to compete, to be quite honest.  We use it as a way

20   to demonstrate that we're investing in publishers where maybe

21   our peers or others -- not just SA360, but whomever, we try to

22   focus on using that as a competitive advantage because we know

23   that we're more invested.

24   Q.  And is that greater support for Microsoft feature, as

25   compared to SA360, one contributing factor in that relatively

1    greater spend on Bing?

2    A.  It doesn't hurt.

3    Q.  Have you heard a feature called realtime auto bidding?

4    A.  Yes.

5    Q.  And have you heard that feature also sometimes called

6    auction time bidding?

7    A.  Yes.

8    Q.  And what is realtime auto bidding?

9    A.  It's the ability to determine what advertisers will

10   participate in a given auction at the moment the consumer is

11   conducting that search.

12   Q.  So is it fair to say that the different signals and other

13   conversion inputs are updated in realtime with each ad auction?

14   A.  In realtime, mostly, yes, yes.  It's something that third

15   parties cannot do.  It's only the publishers that really have

16   all the data to make those realtime decisions.

17   Q.  In your experience, is realtime auto bidding a valuable

18   feature for use in the search ad campaigns?

19   A.  Absolutely.

20   Q.  Can you explain why?

21   A.  Search a very complex.  The marketplaces for Google and

22   Microsoft, they've been around for decades now, so you've got

23   20 years of feature after feature being layered on because

24   search marketers, we like to think of them as control freaks,

25   if you will; they want more controls to be able to manipulate

 1     and get the best performance they can.

 2              But at some point, there's too many controls for a

 3     human to manage, and so auto bidding definitely provides the

 4     automation, taking in all the different signals to make those

 5     decisions on behalf of the advertiser.

 6              So, yes, given the complexity, auto bidding has

 7     become foundational for most campaigns that we work with.

 8     Q.  And have you heard of something called intraday auto

 9     bidding?

10     A.  Yes.

11     Q.  What is that?

12     A.  It's something that's more along the lines of what third

13     parties, like Skai, could provide.  That means that we're

14     making hourly decisions on how advertisers should be bidding.

15     So that means that we'll actually make -- we'll take in data

16     every hour and then make decisions on bids, versus doing it

17     realtime, at the moment the search is happening, or maybe

18     delayed by maybe an hour.

19     Q.  And in your experience does the realtime, or auction auto

20     bidding, lead to better outcomes than the intraday bidding?

21     A.  Yes.

22     Q.  Is realtime auto bidding available on Microsoft native

23     tool?

24     A.  Yes.

25     Q.  Is realtime auto bidding available on the Google native

1    tool?

2    A.  Yes.

3    Q.  In your experience, is realtime auto bidding a feature that

4    is commonly requested by advertisers?

5    A.  Yes.

6    Q.  And does that apply to both the Microsoft auto bidding as

7    well as the Google auto bidding?

8    A.  Yes.

9    Q.  Does Skai currently support realtime auto bidding for

10   advertising on Google?

11   A.  Yes.

12   Q.  And does Skai support realtime auto bidding for advertising

13   on Bing?

14   A.  Yes.

15   Q.  When did Skai first introduce the support for the Google

16   realtime auto bidding?

17   A.  I can only provide an estimation based on my memory, but I

18   believe it was around 2017, I believe.

19   Q.  And how long did it take Skai to integrate that support for

20   the Google realtime auto bidding?

21   A.  From begin to end, it took a couple years, but not the

22   building component necessarily.  We spent a lot of time

23   engaging with Google engineers to figure out how we might be

24   able to approach it because at that point in time, a lot of

25   third parties, like Skai, had their own bidding technologies.

1    And, so, it was fairly new and groundbreaking when Skai decided

2    to support Microsoft -- I'm sorry, Google's Smart Bidding.

3            So it took us some time to figure out how we want to

4    integrate, how we would bring this to life, how we would

5    prioritize it, and so it took a lot of cycles.  There is a lot

6    of good collaboration between the two companies.  So I guess

7    that whole process took at least two years.

8    Q.  And when does Skai first introduce support for the

9    Microsoft realtime auto bidding?

10   A.  It came later.  I would say at least a year later.

11   Q.  And how long did that process take to integrate the

12   Microsoft realtime auto bidding?

13   A.  On the Microsoft piece, we spent less time collaborating on

14   how we would do it, since we had already gone through a lot of

15   that process with Google.  With Google, we knew what to do.  So

16   I would say the building, it came in stages.  It wasn't like a

17   process where we started and finished.  We would work in

18   six-month cycles.

19           We would identify what are the different objectives,

20   because with auto bidding there's maybe six or seven different

21   objectives that you can optimize towards.  Do you want to

22   optimize towards revenue versus clicks? whatever the objective

23   is.  So we started supporting them one at a time based on the

24   priorities, and so it was probably a year or so, maybe a little

25   bit longer.  But like I said, less than Google because all of

1    the back and forth wasn't necessary.

2    Q.   And so is it fair to say that having already integrated the

3    Google realtime auto bidding, that simplified the process of

4    integrating the Microsoft realtime auto bidding?

5    A.   Yes.

6    Q.   Why did Skai decide to integrate the Microsoft realtime

7    auto bidding?

8    A.   Our clients -- it wasn't that we made the decision on our

9    own.  Our clients were asking for it.  So, what we talked

10   earlier about, clients being our strongest signal, and so we

11   were starting -- a lot of them -- a lot of the advertisers try

12   things on their own.  They may test it on their own, and so

13   they have a perspective, a point of view.  And so at some point

14   we got enough signals and feedback that it was performing for

15   them, and so we went all in to support Microsoft.

16   Q.   I think you testified earlier that Skai prioritizes the

17   most impactful features; is that correct?

18   A.   Yes.

19   Q.   Was realtime auto bidding one of these most impactful

20   features?

21   A.   Yes.  Anything surrounding performance usually receives a

22   lot of priority for advertisers.

23   Q.   Have you heard of a feature called fractional conversions?

24   A.   Yes.

25   Q.   What is fractional conversions?

1    A.  Again, I'll go back to a consumer.  If you think about a

2    consumer, in their day to day they can go from Google to

3    Microsoft to Pinterest.  They can go to any number of channels

4    as they're spending their time and day before they make a

5    purchase or a transaction.  If, in fact, that consumer does, in

6    fact, convert, make a purchase, there's many touch points that

7    that consumer engaged throughout the process.

8            And so oftentimes we can see a lot of that data, and

9    so when we take a conversion and we import it back into Google

10    or Microsoft, we have the ability to give partial credit or

11    full credit.

12    Q.  And then have you heard a feature called last click

13    attribution?

14    A.  Yes.

15    Q.  What is that?

16    A.  Again, if you take a purchase or a conversion event, you

17    have to make a decision on:  In all the different touch points

18    that consumer had along that journey, which one do we give

19    credit to?  For last click, whatever the last touch point was,

20    that touch point becomes -- they get credit for that

21    conversion.

22    Q.  So is it accurate to say if an advertiser uses last click

23    attribution, it would only attribute the conversion to where

24    the last -- the last view, and contrast -- fractional

25    conversions might assign fractional versions to prior clicks?

1    A.  To clicks, yes.

2    Q.  In your view, is realtime auto bidding useful for

3    advertisers whether they use fractional conversions or last

4    click attribution?

5    A.  I would say its foundational.

6    Q.  Just a moment.

7         Just to clarify one point.  And I -- do you recall when

8    the realtime auto bidding feature was first introduced on Skai

9    for Microsoft?

10   A.  Do I recall the date?

11   Q.  Correct, or the year.

12   A.  I believe it was 2020.

13   Q.  Okay.  Thank you.

14              MR. SCHWARTZ:  I have no further questions.

15              THE COURT:  All right.  Ms. Waszmer?

16              MS. WASZMER:  Thank you, Your Honor.  I just have a

17   minute to set up.

18              And, Your Honor, before I get started, I'm just going

19   to hand up transcripts.  And I believe Skai's counsel is here

20   today, Mr. Guryan and Ms. Baxley.  And I think what we've

21   determined is to the extent I need to use the transcript, I

22   believe the great majority is not confidential, but I'll pause,

23   as we've been doing before, I'll give the numbers, and if they

24   have an objection, they can stand up.

25              THE COURT:  Okay.  Let's -- I assume the transcript

1    is only if you need to refresh his memory on something.

2                            CROSS-EXAMINATION

3    BY MS. WASZMER:

4    Q.  Mr. Vallez, good afternoon.  Wendy Waszmer on behalf of

5    Google.  It's nice to see you.  I know we met in your virtual

6    deposition.

7    A.  Good to see you again.

8    Q.  Nice to see you in person.

9         So, I have some questions that will follow up on

10   Mr. Schwartz, as well as some related topics.

11        So, I think during your testimony prior to lunch,

12   Mr. Schwartz asked you if paid search is better than all other

13   channels at capturing the intent of users.  Do you recall that?

14   A.  Yes.

15   Q.  And you responded, in sum and substance, that when

16   consumers are exploring, or looking at products or exploring a

17   purchase, it is more often than not that that this is the last

18   step.  Do you recall that?

19   A.  Yes.

20   Q.  Okay.  I think you testified that paid social -- I think

21   you were making a contrast -- is more upper funnel and not

22   necessarily in the context of purchasing; is that right?

23   A.  More often than not, yes.

24   Q.  Okay.  So if that is true -- and let me just pause for a

25   second.

```
1              At Skai, I think you testified earlier today that you
2     oversee search and social and apps and display advertising,
3     correct?
4     A.  From a partnership and business development standpoint,
5     yes.
6     Q.  Okay.  So you have some interaction oversight for social?
7     A.  Yes.
8     Q.  Okay.  If what you testified to prior lunch is accurate,
9     why is Skai advertising that social is where consumers turn to
10    make purchasing decisions?
11    A.  What we do, at least at Skai, we started working with
12    Facebook early on because we saw a connection between the two.
13    Think of it as a conversation.  When you're engaging -- when a
14    consumer is engaging with your brand, we know those consumers
15    are also going to, let's say, a Meta, or a Facebook.  And so we
16    developed a solution with Meta where we were able to continue
17    that conversation.  We call it cookie matching.
18              So, we tried to -- part of our value is to be able to
19    create a link in performance between the two, because we were
20    able to continue that conversation.  If someone goes to search
21    and searching for blue running shoes, we're able to find that
22    user and we retarget them on social, and so we've helped turn
23    into more of a performance engine, if you will.
24    Q.  Okay.  So, social media is, in fact, a place where
25    consumers go to make purchases, correct?
```

1    A.    Purchases can happen on Facebook.

2    Q.    And, Mr. Vallez, I'm going to show you exhibit that we've

3    marked for identification DX3226.

4            MS. WASZMER:  Your Honor, may I approach?

5            THE COURT:  Can I just ask a clarifying question?

6    The example you just posited about running shoes, where is the

7    original search being input for running shoes?

8            THE WITNESS:  On a search engine like Google.

9            THE COURT:  Okay.  So, what I hear you saying is that

10    the user looks for running shoes, they go to some pages, and

11    then the cookies that are associated with those pages, you're

12    able to somehow, in coordination with Facebook, supplying them

13    to Facebook as a way for Facebook to then place ads for running

14    shoes?

15            THE WITNESS:  Correct.  Correct.  I can give you more

16    clarity, if you would like.

17            THE COURT:  If you would, please, because that's just

18    my layman's way of trying to describe it.

19            THE WITNESS:  Of course, of course.  So, Google tends

20    to work in the form of queries and searches.  Microsoft, we

21    like to think of them, they operate in terms of audiences,

22    audience segments.  So what we are able to do is when a search

23    happens on Google, we're able to cookie that user, and then we

24    can actually match it with audience segments that went with

25    cookies on Facebook's side, so we can figure out, what audience

1    does the searcher belong into?  Because then you know there's

2    an affinity between that audience and a specific keyword.  And

3    so we can tell the advertiser, hey, men within 30 to 40 are

4    very much interested in blue running shoes.  If you see them on

5    Facebook, you can retarget them because we know there's a high

6    affinity of interest.

7              Does that make sense?

8              THE COURT:  It does, yes.  Thank you.

9              MS. WASZMER:  Thank you, Your Honor.

10   BY MS. WASZMER:

11   Q.  So let me have you have a look at DX3226, which I will

12   represent that we printed from Skai's website.

13   A.  What's in front of my screen here?

14   Q.  Yeah.  And the paper copy in front of you, too.  The title

15   of this is Insights to Fuel Success on Paid Social.

16        Do you see that?

17   A.  I have it.

18   Q.  Okay.  And at the top of the page, there's some icons

19   there.  Do you see those six icons?

20   A.  Um-hum.

21   Q.  Am I right that those icons represent Facebook, Instagram,

22   Snapchat, Pinterest, LinkedIn, and TikTok?

23   A.  Yes.

24   Q.  And are those social media platforms partners of Skai?

25   A.  Yes.

1    Q.  And currently, isn't it true that Skai allows advertisers

2    to purchase social media ads on those platforms?

3    A.  Yes.

4    Q.  Okay.  The line I was going to refer you to is right below

5    the, "Get your messaging and targeting right with Skai's unique

6    capabilities," right below that it says, "Customers turn to

7    social media to make purchasing decisions."

8         Do you see that?

9    A.  Yes.

10   Q.  This page is accurate, as far as you know, correct?

11   A.  It's general.  But, as I mentioned before, purchases do

12   happen on Facebook.

13   Q.  Okay.

14   A.  Or social media.

15             MS. WASZMER:  Your Honor.  Move to admit DX3226.

16             MR. SCHWARTZ:  No objection.

17             THE COURT:  It will be admitted.

18   BY MS. WASZMER:

19   Q.  Now, Mr. Vallez, I think when we met before, I did ask you

20   some questions about the consumer's journey.  Is it fair, in

21   your experience, that the consumer's journey is not linear?

22   A.  I mean, every journey is unique, but I would say more often

23   than not, it's no longer linear.

24   Q.  Okay.  And a user may start on a search engine or a user

25   may start on Facebook or a user may start on Amazon; is that

1    fair?

2    A.  Yes.

3    Q.  Okay.  Now, I think, just to go back to what Skai does,

4    Mr. Schwartz asked you about SEM tools, and I think we had a

5    conversation about that term, "SEM tool."

6         Isn't it fair that you described Skai as something

7    broader than a SEM tool, as an activation platform?

8    A.  We started as a SEM tool when we started the company, but

9    evolved into something much broader than that, yes.

10   Q.  And I think, when you first testified before lunch, did you

11   say omnichannel?  Was that the term you used?

12   A.  Omnichannel is the most recent positioning that we put for

13   the company, probably in the last year.

14   Q.  Upon Mr. Schwartz's questions, I think you described SEM

15   tools, and you said SA360 was the primary SEM tool, correct?

16   A.  Correct.

17   Q.  But when you testified in your deposition in this case last

18   year, you named Marin, Adobe, SA360, and also a company called

19   Smartly.  Do you recall that?

20   A.  Smartly is not a SEM tool.

21   Q.  Do you recall saying it was?  You basically identified it

22   as a competitor to you?

23   A.  They're a competitor, but on the social side, not the

24   search side.

25   Q.  And that term activation platform, I believe that you used

1    that term because you were saying that Skai activates media

2    across many channels, correct?

3    A.  I mean, this was, again, with the -- the deposition was

4    after we had repositioned the company, so the way we talk about

5    it today is different than what we talked about it maybe 18

6    months ago.  But, yes, at that time, activation was some of the

7    language that we used to define our value.

8    Q.  Okay.  And as of that time -- and you can just tell me if

9    it's changed -- activation platforms, when I asked you, you

10   said there were hundreds that advertisers could use, correct?

11   A.  I don't recall if I said hundreds or not.

12   Q.  Okay.  Let me have you take a look at the transcript.  I

13   gave you and copy of your transcript.  And I'm going to have

14   you take a look at page 104.  And there's a page number, and

15   then I'm going to give you lines.  So get to page 104, and then

16   I'll have you take a look at the text.  And the lines are 9

17   through 25.

18        I'll pause for counsel, if they have any questions or

19   confidentiality.

20        No?  Okay.

21   A.  You said lines 9 through 25?

22   Q.  Lines 9 through 25, page 104.

23        I asked you:  Any other platforms you can think of that

24   you consider activation platforms?

25        Answer:  I mean, there's hundreds of activation

1    platforms out there.

2         And then you described the ones that you compete with

3    that you had just mentioned, correct?

4    A.   Correct.  I believe when I said "hundreds of," I was

5    speaking very generally, based on the language here.  I wasn't

6    talking about hundreds of search activation platforms.  There

7    are many, many activation platforms out there because there's

8    many, many channels, but I -- so there's a difference between

9    generally versus search activation.

10   Q.   Okay.  Got it.  Okay.

11        Let me go to another topic that I think Mr. Schwartz

12   asked you about.  Do you recall, he showed you an exhibit -- I

13   believe it was 1119 -- and asked you about independence and

14   being a neutral third party.  Do you recall that?

15   A.   Yes.

16   Q.   Okay.  And I think that you testified, in sum and

17   substance, that Skai looks to be -- and I put this in quotes:

18   A neutral third party who is giving advice that is not biased;

19   right?

20   A.   Correct.

21   Q.   When he asked you that, you also said that there's a lot of

22   advertisers that view you that way, correct?

23   A.   Yes.

24   Q.   Okay.  Didn't you testify in your deposition on this issue

25   of independence that some advertisers care and some don't?

1    A.  Yes.

2    Q.  Okay.  So, you market yourself -- you market Skai as a

3    platform that does not have a search engine, correct?

4    A.  Sorry.  Can you repeat that?

5    Q.  You market Skai as a platform that does not have a search

6    engine, correct?

7    A.  Yes.

8    Q.  And that makes you, in your words, independent?

9    A.  We're independent.  How we define it is up for debate.

10   Q.  Okay.  And some advertisers care and some advertisers

11   don't, and if they care, they can choose you, correct?

12   A.  We have a lot of advertisers and some of them care a lot

13   about our independence.  That's part of the value that they get

14   from our service.  Some of them don't care as much about it.

15   So there's both camps.

16   Q.  Okay.  Moving on.

17       I believe you were also asked about Search Ads 360, and

18   in the context of Search Ads 360, let me just pause for some

19   kind of basic questions.

20       Skai competes with Search Ads 360, correct?

21   A.  Correct.

22   Q.  Okay.  And I believe that you testified that you had

23   concerns about Google or SA360.  And I just want to clarify

24   what you were concerned about.  And I believe you testified

25   that you felt disadvantaged.  Do you recall that?

```
 1    A.  In what context?

 2    Q.  I think you testified that you were disadvantaged because

 3    of a product called Google Ad Manager.  Do you recall that?

 4    A.  Right.

 5    Q.  Okay.  And I believe your concerns about that was that

 6    Google offers Google Ad Manager potentially free or at lower

 7    cost than Skai, right?

 8    A.  That's part of it.

 9    Q.  Okay.  Google Ad Manager is not related to Search Ads 360,

10    correct?  It's a separate product?

11    A.  It's a product that's deeply integrated because when Google

12    acquired DoubleClick, they were actually part of the same

13    platform.

14    Q.  But it's a product offered separately at Google from Search

15    Ads 360, correct?

16    A.  Yes.

17    Q.  Okay.  So your concern is that Google can offer this other

18    product -- I think you said free or at lower cost; is that

19    fair?

20    A.  Yes.

21    Q.  Okay.  So your concern is that Skai charges advertisers

22    more for your competing product, correct?

23    A.  No, it's that Google charges them more.  So, we don't

24    charge customers to use Google Ad Manager.  Google offers that

25    product as a complimentary tool to Search Ads 360, and so they
```

1    charge them -- an advertiser using Search Ads 360, it's

2    generally low cost to free, but the advertiser will be charged

3    a higher fee if they're use a third party for Google Ad

4    Manager.  We don't charge.  It's not our product.

5    Q.  Okay.  I understood.  But you were saying that you are

6    disadvantaged because Skai would have to charge more, correct?

7    A.  Charge more for what?

8    Q.  For Google Ad Manager.

9    A.  It's not our product.  We don't sell it or license it or --

10   Q.  Okay.  So let me -- Mr. Vallez, let me ask you to go back.

11       What is the issue you believe you are disadvantaged on?

12   A.  The advertise -- it's all on the advertiser side.  So,

13   imagine I'm an advertiser, I want to use -- I'm on, let's say,

14   Search Ads 360 and I'm using Google Ad Manager and I get it

15   mostly for free, or very little cost, but then I decide I want

16   to use Skai.  Google will come to them and say:  Okay.  Well,

17   now your fees are going to be three to fourfold higher by using

18   Skai plus Google Ad Manager.

19       That's the challenge.

20   Q.  So your issue is that that advertiser would pay for Skai,

21   and then pay Google for a product, correct?

22   A.  They would have to pay a fee for using the Google product,

23   Google Ad Manager, which is significantly higher than the Skai

24   costs.

25   Q.  So what would you ask Google to do?  That is not an SA360

```
 1    issue.  How would you like to be not disadvantaged by Google
 2    there?
 3    A.  We would expect parity in pricing.  If they're going to use
 4    a tool like Google Ad Manager and they're being charged a fee,
 5    they shouldn't necessarily charge a different fee because
 6    they're using a third party.
 7    Q.  Parity in pricing between Google and Skai?  That's what
 8    you're asking for?
 9    A.  I'm sorry?
10    Q.  Parity between Google and Skai?
11    A.  Parity between Google and the industry in terms of what
12    they -- whether they charge for that product, for using a
13    complimentary product versus what they charge the industry.
14    Q.  Okay.  Mr. Vallez, are you aware -- I'm not going to ask
15    you to be a lawyer -- that, actually, price coordination is an
16    issue in the area that we're in, in antitrust?  Are you aware
17    of that?
18    A.  I'm not aware of that.
19    Q.  Okay.  Let's move on.
20         Okay.  I think the Judge asked you about Verizon.  I
21    think he asked you about a checkmark.  Okay.  That was Verizon.
22    And I think you were asked questions about switching.  Do you
23    recall that?
24    A.  Can you be more specific?
25    Q.  Yeah.  Customer switching.  Sorry.
```

1    Verizon is a customer of SA360's that switched some

2    business to Skai, correct?

3    A.  Correct.

4    Q.  And that was because perhaps you offered features that the

5    advertiser wanted more, correct?

6    A.  No, no.  It was based on the performance that we were able

7    to deliver for them, and results, yes.

8    Q.  So, the advertiser viewed you as better, for whatever

9    reason, and was able to switch, correct?

10    A.  Correct.

11    Q.  Okay.  Mr. Vallez, let's now go to Skai's development cycle

12    for features.  I think Mr. Schwartz asked you about development

13    for Google and Microsoft, and let me just ask you some general

14    questions.

15    Mr. Vallez, it's true that Kenshoo, now Skai, has a

16    pretty aggressive development model, right?

17    A.  Can you be more specific?

18    Q.  Fast-paced, aggressive development model for features.

19    A.  I don't know what the development cycle looks like for

20    competing businesses, so I can't state if we're aggressive

21    relative to our competitors, if that's what you're asking.

22    Q.  Okay.  So let me have you go back to your transcript.  Go

23    to page 229, starting at line 4.

24    And for your counsel, it will be lines 4 through 24,

25    page 229.

```
 1    A.  Okay.

 2    Q.  I'm just going to pause for your counsel to review.

 3    A.  Okay.

 4    Q.  Okay.  Let's put that up.  Okay.  So, I think you were

 5    asked a question, at line 4:  Is your experience at Kenshoo

 6    that Kenshoo is faster than Search Ads 360?

 7              There were some objections.

 8              And then you stated:  Yeah.  I can't speak to how fast

 9    they are.  What we're talking about is how rapidly we deploy

10    codes.  It's just our model.  We work in two-week sprints.

11    It's a pretty aggressive model.

12              Do you see that?

13    A.  Yes.

14    Q.  Is that accurate?

15    A.  It was at the time.  We've changed it since then.

16    Q.  What's been the change?

17    A.  We do it monthly now.

18    Q.  Okay.  So let me just ask you:  Back then, I believe you

19    testified that a goal of Skai was to make sure that you had a

20    minimum viable product into the customer's hands as soon as

21    possible.  Do you recall that?

22    A.  Yes.

23    Q.  Okay.  Is that still Skai's approach?

24    A.  It depends on the solution, but we try to put value in the

25    hands of a customer as soon as we can, yes.
```

1    Q.  Okay.  I believe you analogized -- you have a great analogy

2    to Skai being like building a car with wheels and a steering

3    wheel, but it may not heated seats or air conditioning.  Do you

4    recall that?

5    A.  Yes.

6    Q.  But the value proposition is that you're in a bit of a

7    race, and if you can be the first to build a feature, that's a

8    value proposition, correct?

9    A.  It's not about how fast we can launch it.  It's about how

10   soon we can get it into a customer's hand so they can validate

11   that it's providing value for them.  In other words, we don't

12   want to overbuild it and then find out it doesn't meet their

13   needs.  We need to do it in stages, and so we try to focus on

14   the MVP, if you will, minimal viable product, so we can figure

15   out really fast, is it successful, or do we need to start over,

16   yeah.

17   Q.  And that means, Mr. Vallez, sometimes Skai builds features

18   before the data is there; is that fair?

19   A.  Before the data in terms of --

20   Q.  Is there to prove performance.  Sometimes you have the data

21   that proves how it's performing, sometimes you'll build in

22   advance of having the data, correct?

23   A.  Everything we build, there's no data until we build it,

24   and, so, there's no feature that we build that has data behind

25   it because it's not built yet.

1    Q.  Okay.  Now, I think in response to Mr. Schwartz's questions

2    about Microsoft -- I'm going to use the term automated bidding

3    or auto bidding; is that fair?

4    A.  Sure.

5    Q.  And to make sure that I use the right terminology, when I

6    use "auto bidding" or "automated bidding," I'm talking about

7    the solution that has seven or eight different objectives; is

8    that accurate?  Or will you understand if I do that?

9    A.  Yes.  It's just confusing because Google calls their

10   product Smart Bidding, whereas Microsoft calls it Auto Bidding.

11   So, when you use the term generally, it's actually the same

12   name that Microsoft uses for their product.

13   Q.  Okay.  So, I will use -- if you use auto bidding, right,

14   for Microsoft, I will use that.

15   A.  Okay.

16   Q.  And is it fair to say, when you describe Microsoft auto

17   bidding, this is the solution that may have multiple objectives

18   and features, correct?

19   A.  Correct.

20   Q.  Believe upon Mr. Schwartz asking you about the development

21   timeframe, you said it was about a year.  Do you recall that?

22   A.  For Microsoft.

23   Q.  Okay.  In your deposition, you said it took two years of

24   full investment.  Which was right?  Was it one year or two

25   years?

1    A.   Probably somewhere in between.

2    Q.   Okay.  I think you said in your deposition, there was

3    full-time team of engineers working on it, correct?

4    A.   No.  I said we work in stages, and so we would build --

5    build, then we would sync with Microsoft to figure out what we

6    should be focusing on next, in collaboration.  And, so, we just

7    worked in stages to be able to launch those pieces.

8    Q.   Okay.  Now, let me ask you about working in stages.  Is it

9    fair that some of the features and objectives in Microsoft auto

10   bidding launched over time?

11   A.   Yes.

12   Q.   So Skai supported features as they were launched; is that

13   fair?

14   A.   No, but by the time we started dealing with Microsoft, I

15   would they were about halfway through launching the objectives.

16   And so some of the objectives were already out there, but over

17   time they started launching more, and we supported them as they

18   came live, yes.

19   Q.   Okay.  To set this in time, let me know if this is correct,

20   that Skai started rolling out automated bidding or auto bidding

21   from Microsoft in late 2019, correct?

22   A.   I don't recall the exact date.

23   Q.   Let me have you take a look at your deposition again, see

24   if it refreshes you.  Let's go to 193, 6 through 12, and just

25   have a look at that to see if it refreshes your recollection.

1    A.   Okay.

2    Q.   Does that refresh your recollection as to the time that

3    Skai started rolling out that feature set for Microsoft?

4    A.   Sure.   Sure.

5    Q.   So was it late -- second half of 2019?

6    A.   Keep in mind, we roll out features every month, so

7    remembering the exact date of a very specific feature, that's

8    why I'm a little bit -- not 100 percent sure.   But this looks

9    about right.

10   Q.   Okay.   And I just want to hone in on a time because I have

11   some questions about customer demand around a particular time.

12   So why don't we focus on the second half of 2019.

13        At that time, client demand was light because Skai

14   already had its own strong optimization, correct?

15   A.   Sorry.   Can you repeat the question?

16   Q.   Yes.   Around the time, second half of 2019, customer demand

17   was light for this feature because Skai already had its own

18   strong optimization?

19   A.   I probably couldn't say what was driving the demand, but

20   what I will say is that we had already -- you have to keep in

21   mind that over 90 percent of our advertisers use Google and

22   Bing, and so we have over 80 percent -- it's close to 80

23   percent of all of our clients using Smart Bidding, so they

24   already know what to expect.   They expect, I'm using Smart

25   Bidding on Google, and so they want parity.   And, so, a lot of

1    the demand could have come from them saying, hey, we have it

2    for Google Smart Bidding, we need it for Bing as well.

3            But, that would be understanding of where demand come

4    from.  Yes, we had a competing solution, but we had a competing

5    solution even before Smart Bidding was out there, and that was

6    part of our value proposition to the market.

7    Q.  Okay.  Mr. Vallez, I'm going to have you look back at your

8    transcript, same page -- same pages, and look at page 193, line

9    23, and then onto 194, to line 9.  Just have a look at that.

10   And I'll make sure your counsel has a chance to look at it.

11   A.  23 to what?

12   Q.  193, line 23, to page 194, line 9.

13   A.  Okay.

14   Q.  Mr. Vallez, I'm just going to read -- I think this was my

15   question -- no, it wasn't my question.  It was Mr. Cavanaugh's,

16   colleague's:

17           And how would you describe the level of client demand or

18   input that Skai was receiving regarding auto bidding for

19   Microsoft?

20           And then you answered:  I would say it started out light

21   because we -- if you recall, we had, at Skai, we had a very

22   strong optimization platform, and we were, in many ways, the

23   undisputed leader in optimization.

24           Was that accurate?

25   A.  We definitely were very strong in optimization.  It was a

1    big part of our value proposition, yes.

2    Q.  At that time, you described Microsoft's feature as

3    "nascent," correct?

4    A.  Yes.  Yes.

5    Q.  All right.  You can put that aside.

6         Okay.  Mr. Vallez, I'm going to actually give you an

7    exhibit and -- for you and for the Court.  There's aspects to

8    this document that have confidentiality -- confidential

9    aspects, so what I'm going to do is I'm going to give you a

10   copy of this document.  I don't need to put it up on the

11   screen.  And I'm going to ask you questions about it, but I'm

12   not going to read the language, and I would ask you to do the

13   same.

14        MS. WASZMER:  So, let me just cite for the record the

15   exhibit I'm going to show you -- it's already in evidence, Your

16   Honor -- PSX956.

17   BY MS. WASZMER:

18   Q.  Okay.  Mr. Vallez, why don't you just take a moment to

19   familiarize yourself with the exhibit, and then I'll you ask

20   questions about it.  And let me tell you the page I will focus

21   on.  I'm going to focus on primarily the fourth page of the

22   agreement, page 4.  So just have a look at that, and then I'll

23   ask you some questions.

24   A.  Okay.

25   Q.  Okay.  So this is PSX956.  Mr. Vallez, just the title of

1    this, this is a Microsoft Advertising Feature Development and

2    Collaboration Agreement, correct?

3    A.  I believe that's what Microsoft called it.

4    Q.  Okay.  And do you have knowledge of this agreement?

5    A.  Yes.

6    Q.  I believe you had helped author parts of it, correct?

7    A.  Correct.

8    Q.  And the date of this is August 19th, 2019.

9         Now, just off of the agreement for a second.

10        Skai is a very strong partner of Microsoft advertising,

11    correct?

12    A.  Correct.

13    Q.  And Skai has won Microsoft technology awards multiple years

14    in a row; is that fair?

15    A.  Yes.

16    Q.  Okay.  Now, I'm not going to get into any specific monetary

17    amounts or describe the monetary aspects to this, but just at a

18    very high level, is it accurate that under this agreement there

19    is funding to Skai from Microsoft?

20    A.  Yes.

21    Q.  Okay.  And, again, at a very high level, not getting into

22    any specific provisions, this agreement -- Skai does not have a

23    pay-per-feature relationship with Microsoft, correct?

24    A.  Correct.

25    Q.  Skai retains -- in its relationship with Microsoft, Skai

1    retains its ability to determine which features are best for

2    the platform and which features advertisers would be best

3    served by, correct?

4    A.  Correct.

5    Q.  Okay.  So let me now have you turn to page 4.

6         MS. WASZMER:  And, Your Honor, there's some

7    definitions.  The provision that I'm going to talk about but

8    not read is 2.2(b), and then there's three paragraphs under.

9    So, 2.2(b)(1), (2), and (3), but I'm not going to read them.

10   BY MS. WASZMER:

11   Q.  So, Mr. Vallez, have a look at those.

12   A.  I'm familiar with them.  I wrote them.

13   Q.  I know them.  Okay.  Great.  This is perfect.  Then I won't

14   have to read them.

15        So, looking at 2.2(b)(1), I'm not going to read that,

16   but just at a very high level, does Skai ever view itself as

17   having a requirement to meet feature parity between Microsoft

18   and Google features?

19   A.  Who would be the requirer?

20   Q.  Either party, Google, Microsoft -- or, just does Skai have

21   a requirement to meet feature parity?

22   A.  No, no.  It's not with any publisher.

23   Q.  And is it your experience that Skai can decide -- even if a

24   search engine, whether it's Google or Microsoft or, let's say,

25   another publisher, wants Skai to build something, Skai can make

1    it's own determination about whether to build a particular

2    feature for a search engine or another publisher, correct?

3    A.  Correct.  We get asked a lot by publishers to build very

4    specific features, and we have to pick and choose where we're

5    going to invest.

6    Q.  And how do you pick and choose?

7    A.  If you may recall, we talked about this earlier, around

8    clients are our biggest signal.  They will usually define for

9    us what are their top priorities.  So we hold regular council

10   meetings.  I, for example, am the executive sponsor for a

11   number of our big brands and so I'm able to engage with them

12   and understand what's working and what's not.  So, again, these

13   are just signals that we get.  But, usually the advertiser, our

14   clients, are our largest signal.

15   Q.  And, Mr. Vallez, let me now have you look at 2.2(b)(2) and

16   that provision there.

17   A.  Yep.

18   Q.  Now, I think in response to Mr. Schwartz's questions, you

19   started to talk about when Kenshoo may improve upon a search

20   engine's features.  Do you recall that?

21   A.  You may what upon?

22   Q.  When Skai or Kenshoo may improve upon another engine's

23   features.

24   A.  Yes.

25   Q.  So in the course of your work at Skai, does Skai build its

1    own features or innovate in its own way in terms of features?

2    A.  We aspire to.  We don't always have the opportunity to, but

3    our goal is to add value on top.  Otherwise, if all we're doing

4    is providing support for features, our customers don't want to

5    pay us.

6    Q.  Does Skai -- in your experience, does Skai have a roadmap

7    of features it builds every year or every six months?

8    A.  Yes.

9    Q.  Okay.  And on Skai's roadmap, are their features that are

10   really specific to Skai and not a particular search engine?

11   A.  Yes.

12   Q.  Okay.  Now, just a final segment of this agreement,

13   2.2(b)(3), I want you to have a look at that.

14   A.  Yes.

15   Q.  Okay.  So, in the course of your work with Microsoft, has

16   Skai ever determined to take a bet on a feature and build it,

17   even if there's not data yet on how it would perform?

18   A.  Yes.

19   Q.  Okay.  And can you describe the thinking behind taking a

20   bet with Microsoft on a feature where there isn't data yet?

21   A.  So, we often find that with Microsoft, they are looking at

22   trying new things.  They're trying to not be a carbon copy of

23   Google in terms of the features and functions they offer, and

24   so they'll make strategic investments.  They're trying to bring

25   net new solutions that don't exist in the market.  And

 1    oftentimes our -- probably more on the agency side, all of our

 2    agency partners, they are looking for new opportunities that

 3    aren't sort of, like, part of the broader set of features that

 4    everyone else uses.  They're looking for net new opportunities

 5    that really haven't hit the ground or taken traction yet.

 6            And, so, agency partners oftentimes come to us for

 7    these big bets.  What are the cool thing you're doing that

 8    nobody else is doing?  So, Microsoft tends often to have

 9    features like this, and so that's why we classified this as

10    strategic features.

11    Q.  And one of those features was MSAN, or Microsoft Audience

12    Network, correct?

13    A.  Correct.

14    Q.  And that is something where Skai took a bet on Microsoft to

15    do.

16    A.  Yes.

17    Q.  Is that right?

18            But in this instance, that feature really didn't

19    materialize into anything, did it?

20    A.  We still run it.  We still manage it.  We still improve on

21    it.  It's not one of our top features, no.  It hasn't really

22    taken off the way other features have.

23    Q.  Okay.

24            MS. WASZMER:  Your Honor, just a minute.

25            (Pause.)

 1              MS. WASZMER:  Thank you, Mr. Vallez.  I have nothing

 2      further at this time.

 3              THE COURT:  Mr. Schwartz, did you have any redirect?

 4              MR. SCHWARTZ:  Briefly.

 5                      REDIRECT EXAMINATION

 6      BY MR. SCHWARTZ:

 7      Q.  Mr. Vallez, you were asked by counsel for Google questions

 8      about the demand for realtime auto bidding at the time when it

 9      was a nascent feature.  Do you recall that?

10      A.  Yes.

11      Q.  And did the demand for Microsoft realtime auto bidding

12      increase thereafter?

13      A.  Thereafter what?

14      Q.  After it was initially integrated into the Skai tool.

15      A.  Yes.  Yes, it increased.

16      Q.  And I just want to -- so you were asked about this

17      Microsoft agreement a moment ago.

18      A.  Yes.

19      Q.  If you could turn to that, please.

20      A.  Yep.

21      Q.  If you go to the page that ends in 4309.  So I'm going to

22      ask you about this generally, but if you look at clause

23      2.2(b)(1).  Do you see that?

24      A.  Yes.

25      Q.  And I'll just -- so that clause refers to a period of time

1    by which Kenshoo would use best efforts to develop this

2    category of features.  Do you see that?

3    A.  Yes.

4    Q.  And generally speaking, did you consider that to be a

5    reasonable period of time to develop this category of features?

6    A.  I'm just looking at the requirements here on this.

7         Okay.  It's reasonable.  So long as there is an API

8    that's available, then 90 days to develop a feature is

9    reasonable.

10        MR. SCHWARTZ:  Thank you.  No further questions.

11        THE COURT:  Mr. Vallez, thank you very much for your

12   time and your testimony.  Safe travels home.

13        THE WITNESS:  All right.  Thank you, Your Honor.

14        THE COURT:  Okay.  So we've come to the end of the

15   day in terms of evidence, correct?

16        MR. CAVANAUGH:  Correct, Your Honor.

17        THE COURT:  Okay.  All right.  So we had asked

18   counsel for *The Times* at 3, so we were half an hour early.  I

19   don't know if there's anything we can resolve or discuss in the

20   next 30 minutes?

21        MR. GOWER:  Good afternoon, Your Honor.  Cameron

22   Gower for the United States.  We have some more exhibit matters

23   that we could cover now, if it's okay with you.

24        THE COURT:  Sure.

25        MR. GOWER:  Okay.  So, we have some agreed-upon

1    documents -- or, exhibits to admit.  Those we're still getting

2    the finalized paper to hand up, so I don't have that for you

3    right now.  But, more will be coming where there's no

4    objection, or where the only objection is the standing embedded

5    hearsay objection.

6          The second matter that we have is a group of

7    documents where there is a live dispute.  There are, I believe,

8    about 21 of these documents, and we are -- they all pertain to

9    the matter -- to matters of spoliation or communicating with

10   care.  I think of them as fitting into, basically, about three

11   buckets.  One where employees are avoiding creating evidence

12   that's unfavorable for Google in the first place; where they're

13   manipulating evidence that otherwise would have been

14   unfavorable for Google; or altering what, I guess, is put in

15   writing; or just ensuring that it's deleted.

16         So, we -- we believe all of these go towards the

17   spoliation motion that we raised.  And we believe they also can

18   be used substantively to interpret the other evidence in the

19   case.  We believe it would affect the way that you should view

20   documents that you see.  You may want to translate words that

21   are written on the page because guidance that Google employees

22   received say:  Don't use this word.  Use another word.

23         And we believe it could also inform any absence of

24   evidence because there could be a fair inference that that

25   evidence doesn't exist because employees were told and were

1    policing each other to keep from creating that evidence.  So

2    we're happy to go through some of those one by one, but I

3    think, categorically, you could admit them.  And we're talking

4    about 21 documents, roughly.

5              THE COURT:  Okay.

6              Hear from counsel, first.

7              MR. GREENBLUM:  Good afternoon, Your Honor.  Ben

8    Greenblum for Google.

9              In conferral, these were put into two buckets, which

10   I think correspond to the docket.  The communicate-with-care

11   motion that Your Honor addressed and denied in the spring of

12   2022, and the -- let's call it the Chats motion that Your Honor

13   addressed pretrial and gave leave for them to examine witnesses

14   live, in court.

15             Most of these documents, or certainly many of them,

16   are only in the former bucket, the, sort of, communicate with

17   care -- the category of documents in which they sought

18   sanctions and which sanctions were denied.  There's a record on

19   that motion.  Obviously, there's been instances where witnesses

20   on the stand have been asked about references to those sorts of

21   things in emails, and they've answered those questions.

22             But, we don't think there's any basis for them to

23   just push in more documents to supplement a record on a motion

24   that was denied.  I'm not aware from conferral of any

25   particular interpretation of a document that is before the

1    Court that these documents supplement.

2          With respect to Chats, we understand your Honor's

3    ruling from the pretrial conference, that they could ask

4    witnesses questions about that, and they've obviously availed

5    themselves of that opportunity.  But, Your Honor didn't grant,

6    as we understood it, leave for them to just push in more

7    documents on top of the 50-some-odd that are already in the

8    record on the Chats motion that Your Honor addressed.

9          THE COURT:  Okay.

10         MR. GOWER:  So the communicate with care motion was a

11   discovery motion that we brought in April of 2022, asking for a

12   motion to compel, or in the alternative, for discovery

13   sanctions.  Google has recast that event as a motion in limine

14   that they won and that they filed, and that's simply not what

15   it was.  So, we believe the -- these documents were not ruled

16   inadmissible or not relevant.  We just didn't fully succeed on

17   our motion.

18         I'll note, we did partially succeed.  Google was

19   directed to go back and re-review a lot of documents, and we

20   got more documents because of that motion that we filed, some

21   of which, I believe, are even included in the documents that

22   we're trying to produce today.  I'm not certain about that

23   part.  But, we did get more documents that we found relevant.

24         I think that covers most of the points that were

25   raised.  I may have missed one.  If I have, I'm happy to

1    address it.

2         MR. GREENBLUM:  Just one response, Your Honor.

3         We don't see the relevance of these materials where

4    they weren't used with a witness.  If they were used with a

5    witness in court, obviously Your Honor has heard that

6    testimony.  I think there may be some in the depo designations

7    that the government is moving in.  But we do not understand the

8    relevance of these materials outside of in front of testimony

9    that Your Honor's heard.

10        MR. GOWER:  And in response to that, Your Honor,

11   we're happy to show you the relevance right now.  I have a

12   folder with about 11 documents that I would be happy to walk

13   you through.  We could go through one or two, stop whenever you

14   would like.

15        THE COURT:  So let me just make two observations at

16   the start.  One is, I agree with counsel for the DoJ that the

17   prior motion concerning communicate with care was a discovery

18   motion, and really the outcome of that was more about

19   sanctions; and, ultimately, Google was able to satisfy me about

20   a number of things and, ultimately, were able to produce the

21   things that otherwise weren't -- that were originally withheld,

22   and so I didn't think sanctions were appropriate in that

23   circumstance, given the good faith that counsel exhibited in

24   attempting to cure a deficiency.

25        Obviously, did not then preclude the introduction of

 1    that evidence, if it's relevant here at trial.  So, that's one.

 2         Two, with respect to the Chat material, I obviously

 3    have invited the plaintiffs to present evidence about that.  I

 4    will say, the one concern I have about it -- and it touches a

 5    little bit about the first, although maybe a little less so --

 6    is I just -- if a document hasn't been presented to a witness,

 7    I just want to make sure that it's not something that's taken

 8    out of context, and that's my concern.

 9         You know, inferences, adverse or otherwise, can be

10    drawn from documents, and certainly given the kind of inference

11    you want me to draw, I have -- I want to be sure that what I'm

12    reading is, in fact, conveying the intent or the purpose that

13    you are wanting it to.  And, so, I suppose what I want to do is

14    actually look at the documents and see whether they actually

15    meet that threshold before I -- I think they ought to be

16    admitted into evidence.

17         MR. GOWER:  Certainly, Your Honor.  And we believe

18    these documents speak for themselves, and I would be happy to

19    show you a few right now.

20         THE COURT:  No, you don't have to show them to me.

21    Why don't you just get them to me and I'll take a look at all

22    of them and then I'll get back to you all.  If I have got

23    questions about it, I can raise them with you.

24         MR. GREENBLUM:  Thank you, Your Honor.

25         THE COURT:  All right.  Are any of the records --

 1   well, I'll see myself.  I mean, presumably the names of the

 2   folks will be on there, and, so, I'll be able to discern

 3   whether they've been called as witnesses or will be called as

 4   witnesses.

 5            MR. GOWER:  Yes, you will see that some of the names

 6   will be familiar names that you've heard before.  Some of them

 7   are, you know, the boss of an employee who has testified

 8   already whose name you may not be directly familiar with.  So,

 9   I would be happy to, you know, find a way to demonstrate that

10   relevance to you, if we can't do it right now.  I don't know

11   what form you would like that, though.

12            THE COURT:  Let me -- I don't want to flip pages here

13   one by one.  We can do that if I've got questions after I have

14   had an opportunity to review them in chambers.

15            MR. GOWER:  Understood.  Thank you, Your Honor.

16            MR. SCHMIDTLEIN:  Just to be clear, Your Honor, they

17   filed a motion on this.  If they had evidence to support their

18   motion, they attached exhibits to the motion.

19            THE COURT:  Which one are you referring to?

20            MR. SCHMIDTLEIN:  The Chats motion.

21            THE COURT:  Right.

22            MR. SCHMIDTLEIN:  The sanctions motion.  They filed a

23   full motion.  We fully briefed it.  They had a full opportunity

24   to put whatever exhibits in front of you they wanted to.  And

25   then they asked for a hearing when they wanted to call some

 1    number of witnesses.  You deferred that to the trial and you

 2    gave them leave to examine a number of witnesses.  And we

 3    haven't objected to any of those questions or any documents

 4    used with those witnesses to date, and I don't think we're

 5    going to.

 6           But the idea that they get to show up now and it's,

 7    Oh, guess what?  We've got a whole bunch of more exhibits that

 8    we apparently are not going to use with any witness, and we

 9    want to push all of those in, we think is inappropriate.

10    That's our position.

11           THE COURT:  Understood.

12           MR. GOWER:  Your Honor, if I may, briefly.

13           These are 12 documents, not -- or, it's 12 to 22.  I

14    think the binder you have is about 12, and we do plan to use

15    some of these with witnesses.  And just a moment ago, these

16    were being construed, or at least in negotiations --

17           THE COURT:  Hang on, hang on.  Let me ask you to

18    pause there.

19           If you intend to use them with witnesses, why in the

20    binder right now?

21           MR. GOWER:  It's a minority of the documents that are

22    in the binder we intend to use with a witness, but not zero.  I

23    don't know the exact number.  We're still planning, you know,

24    cross-examinations.  And, of course, witnesses that come to

25    testify next are Google's choice, so if they withdraw a

 1    witness, we wouldn't be able to use it.  So, all these things

 2    were calculations that went in.  But, some of them were written

 3    by employees that won't be testifying here.

 4            MR. GREENBLUM:  I want to point out briefly, Your

 5    Honor, I haven't seen how the set dwindled from 22 to 12, so

 6    I'm not sure the percentage that this comment applies to.  But,

 7    some of these are for witnesses that have come in the DoJ's

 8    case and they didn't ask about those Chats.

 9            THE COURT:  So, let me just ask counsel, I wrote down

10    21 -- and maybe I miswrote it down -- but, help me understand

11    what the final number is and what they consist of.

12            MR. GOWER:  Yes.  Allow me to clarify.

13            That 21 was the amount that I was moving for orally

14    here.  12 were the number that I was -- about 11, the number

15    that's in your binder, was the amount that I was planning to go

16    through --

17            THE COURT:  Oh, I see.

18            MR. GOWER:  -- one by one, if you were prepared.  So,

19    you know, we are happy to start with just these 11 and look at

20    the other 10, but they're not in that binder.

21            THE COURT:  I got you.  Okay.  Why don't you give me

22    the other ten and I'll take a look at all of them, and then, if

23    I need to, we can have a more fulsome discussion about it.

24            MR. GOWER:  Yes, Your Honor.

25            THE COURT:  Anything else?

1              MR. DINTZER:  Just briefly, Your Honor.

2              Your Honor, we want to call the Court's attention to

3    the fact that we -- the defense has said that they're going to

4    call their expert, Professor Fox, next week, and we have an

5    outstanding *Daubert*, and we just wanted to put that on the

6    Court's radar.

7              THE COURT:  Thank you.  I'll make sure I review that

8    before next week.

9              MR. DINTZER:  We appreciate that, Your Honor.

10             MR. CAVANAUGH:  Your Honor, I've been reminded that

11    during Mr. Hurst's questioning, I didn't move in the two

12    demonstratives, PX7 and 8.

13             THE COURT:  Okay.

14             Did you get those numbers, J.C.?

15             THE COURTROOM DEPUTY:  Yep.

16             MR. CAVANAUGH:  Thank you.

17             THE COURT:  Let me just ask, is there an objection to

18    those?

19             MS. MAIER:  No objection to them being admitted as

20    demonstratives.

21             And I was going to do the same thing and move to

22    admit in evidence as a demonstrative Defendant's Demonstrative

23    DXD18.

24             MR. CAVANAUGH:  No objection.

25             THE COURT:  Okay.  Just that number, Ms. Maier?

```
 1                MS. MAIER:  Yes.  It's multiple pages, DXD18, pages 1
 2       through 13.  And for the record, we showed him every page
 3       except for DXD18.011.
 4                THE COURT:  Okay.  Terrific.  Okay.
 5                So why don't we take 15 minutes.  Presumably counsel
 6       for The Times will be here at 3 o'clock.  We can wrap up that
 7       discussion and then be done for the day.
 8                See you all shortly.  Thank you.
 9                (Recess from 2:45 p.m. to 3:05 p.m.)
10                THE COURT:  Okay.  I guess the place to just begin is
11       just to open things up.  Since we were last on this topic, the
12       counsel for the intervenor from the New York Times did file a
13       motion -- not a motion, but a supplemental memo, and then also
14       attached proposed redlines to the order, which I had -- at my
15       invitation, and then Google did file something last evening.
16       So, we had a little bit of a conversation about this yesterday,
17       but let me just start with the parties and see if they would
18       like to add anything.
19                Why don't we begin with the government.
20       Mr. Dahlquist?
21                MR. DAHLQUIST:  Your Honor, we appreciate the
22       opportunity.  We have nothing else to add beyond our statements
23       that have already been made on the record, and -- I'll leave it
24       at that, Your Honor.
25                THE COURT:  Okay.
```

1              Mr. Cavanaugh, did you want to add anything?

2              MR. CAVANAUGH:  Same position as DoJ, Your Honor.

3              THE COURT:  Mr. Schmidtlein?

4              MR. SCHMIDTLEIN:  No, Your Honor.

5              THE COURT:  All right.  Counsel for *The Times* --

6    there he is, hiding back there.  You're supposed to be out in

7    the open.

8              MR. SUMAR:  Thank you, Your Honor.

9              Just, again, for the record, A-L dash A-M-Y-N, last

10   name S-U-M-A-R, for The New York Times Company.

11             And if I could just start with kind of an opening

12   spiel to convey, sort of, our current thinking about the path

13   forward here.

14             And, I actually want to start by just thanking the

15   Court for hearing this motion so promptly, for granting our

16   request that the public be provided with a notice and

17   opportunity to be heard in advance of courtroom closure.  We

18   think that goes a long way to protecting public access in this

19   case.

20             THE COURT:  Counsel, you weren't here yesterday.

21             Look, I appreciate you bringing it to my attention.

22   This isn't something that happens often, so I was happy to be

23   educated.

24             MR. SUMAR:  We really can appreciate, we see that the

25   Court considers public access to be important here.  And it

1    seems to us like the main issue on the Court's mind is one of

2    burden and workability at this stage of the case, about halfway

3    through the trial.  We're sensitive to those concerns, and what

4    I'm going to lay out now I think responds to them.

5         So, here's what we propose:  That we bracket this

6    question for now, of whether a trial exhibit as admitted into

7    evidence is a judicial record subject to a right of public

8    access.  I conveyed to you on Monday, and as we conveyed in our

9    papers, we believe that it is.  But, to sort of minimize the

10   burden on the Court and parties at this stage in the

11   litigation, we're happy to defer that question until after the

12   trial is over.

13        So, you know, if Your Honor wants to sort of deny

14   that aspect of the motion without prejudice to renewing later,

15   we would be comfortable with that.  And the only thing that we

16   would ask for from the parties is that when we do request an

17   exhibit and a page is provided or a portion of it is provided,

18   that there be a cover sheet or some other indication that shows

19   the date of the exhibit, because that has been something that

20   has proved difficult for our reporters to just -- you know,

21   when they get a page, they don't know necessarily when the

22   exhibit was dated, it's not obvious.

23        THE COURT:  I'm sorry.  You're requesting the date of

24   the exhibit or the date it was admitted?

25        MR. SUMAR:  The date of the exhibit itself.  So, it

1    could be on a coverage page, it could be somewhere else.

2         THE COURT:  I see what you're saying.  I understood.

3    Okay.  Got you.

4         MR. SUMAR:  And so that leaves us with main requests,

5    and I want to lay those out without going through the proposed

6    order.  But it captures, I think, what is there.

7         The most basic thing that we need and that we are

8    entitled to under the law is to have prompt public access to

9    the portions of exhibits that are publicly displayed at trial

10   and that both parties agree do not raise confidentiality

11   concerns.  This is the part that's most frustrating to us.  And

12   notwithstanding what Google said in its response, I just really

13   don't understand why that's not workable.

14        And I don't understand why that's not legally

15   required.  They said:  We don't think we have an obligation.  I

16   think that's ignoring the relevant case law.  As of this

17   morning, Your Honor, the DoJ website has 51 exhibits on it.

18   There are another 78 that have not been posted and that we have

19   not been told are confidential.  So about 60 percent --

20        THE COURT:  Where does that number come from?

21        MR. SUMAR:  That comes from what a reporter conveyed

22   to me.  I believe there's a spreadsheet that's been maintained

23   on this.  And we're happy to provide the Court with that.

24        THE COURT:  Okay.  It's not a number that seems to me

25   to be tethered to anything.  And I only said that because there

 1    have been a lot more exhibits than 78 that have been admitted.

 2              MR. SUMAR:  I'm talking about exhibits used by the

 3    DoJ.

 4              THE COURT:  Even if you add those two numbers up,

 5    they've admitted far more than that.

 6              MR. SUMAR:  Well, those are the ones that we have

 7    requested.

 8              THE COURT:  That's a different issue.

 9              MR. SUMAR:  So, actually, there are many more,

10    potentially, that haven't been provided to the public.  And I

11    actually think that reinforces the point I'm making.  We

12    focused on 78 exhibits we have asked the DoJ for.  You know, if

13    you take that to be the total universe, that's 60 percent of

14    exhibits the DoJ has used that the public doesn't have.  If

15    they have actually admitted more, then there are many more that

16    the public doesn't have access to.

17              Google has said this process, in its recent

18    submission, would be burdensome, and I just don't understand

19    that.  I mean, the Court has already laid this out, that if the

20    parties go through this process, they've already sort of

21    conferred about what is supposed to be confidential.  As Your

22    Honor said -- I can't remember the exact date, but it would be

23    very rare for the parties to come to court and say that there

24    are objections.  That -- you know, that just isn't going to

25    happen very often.  So I just don't understand what the

1    concerns are here about burden.

2         And then there's a second request, Your Honor, and

3    that is that there be a mechanism in some form for the press

4    and the public to dispute the sealing of trial exhibits in a

5    timely fashion.  It just can't be that the parties get to

6    decide for themselves what the public is entitled to see for

7    the duration of the trial, and that the public has to wait

8    until the end of the trial to raise those disputes, or that

9    third parties essentially get a veto over what gets conveyed to

10   the public.  And that's essentially what Google has said, that

11   in some cases, third parties have raised a concern and so they

12   just haven't proceeded with providing the public with that

13   exhibit.

14         I don't think that's acceptable, Your Honor.  And let

15   me just provide one example to show why this is problematic.

16   And this has been conveyed to me by folks who were in the

17   courtroom.  And if I mischaracterize anything, that's on me.

18         But on Monday afternoon, during Mr. Whinston's

19   testimony, there was a slide of his presentation that contained

20   data from the EU Industrial R&D Investment Scoreboard -- this

21   is mentioned at page 5857 of the transcript -- and the entirety

22   of the slide was redacted.  Our reporters found -- and I can

23   provide this to you, if necessary -- a publicly available copy

24   of that document or of the information in that document online,

25   with no redactions.  So what was being redacted in court was

1    available to the public.

2            And I -- I don't -- I'm not saying that there's been

3    bad faith by the parties.  I'm not saying that there's a

4    deliberate effort to obscure information that's publicly

5    available, but there are going to be instances like that, where

6    information is being presented here that really should not be

7    sealed.

8            And, so, you know, we really are not going to try to

9    make this process difficult for the Court.  We're not going to

10   bury the Court or the parties with requests to unseal.  So far

11   we've only asked for the unsealing of two exhibits and a

12   declaration.  And I'm happy to get to those later, if the Court

13   wants me to, or I'd be happy to provide something in writing.

14           But, I just want to underline one more thing, and

15   that's that, you know, I do, again, see that the Court is --

16   who cares very much about public access, but the impediments in

17   this case to timely public access to information that, you

18   know, is genuinely not going to cause competitive harm has a

19   real cost, and that is to the public's faith in the justice

20   system.  It's hard for them to understand why they're being

21   denied access to so much information in a case that really has

22   huge consequences for them for, you know, products that they

23   use on a daily basis.

24           So, I'm happy to leave it there and take any

25   questions from Your Honor.

1           THE COURT:  No.  No, not just yet.  Let me just share

2      with you my thoughts, and then we can figure out a path

3      forward.  And, Counsel, you can have a seat.  This might take a

4      few minute.

5           So, I said some of this yesterday, and -- Counsel,

6      you don't need to walk all the way back there.  Feel free to

7      stay within the well.  I don't -- I didn't even know there were

8      cushions until I walked in here the other day.

9           Look, I want to just start at the beginning, and I

10     said some of this yesterday, but I want to -- I think it's

11     important to say it again with counsel present from *The Times*

12     to make sure that there is an accurate record of how things

13     have unfolded here since the start of the trial, and really

14     since the start of the case.

15          You know, we go all the way back to -- I guess it was

16     December of 2021 -- or, December -- I guess I entered this on

17     December 21st of 2021.  This was the original stipulated

18     protective order, which is ECF -- looks like 58.  I can't read

19     my own handwriting.  Maybe it's 98 -- in which the parties and

20     I contemplated this very issue would come up, that we knew

21     there was going to be a lot of confidential information that

22     was exchanged, not only from Google, but from third parties,

23     and we needed to think about how to handle that, not only

24     during the course of the pretrial phase of the case, but also,

25     ultimately, at trial.

1          And the decision then was made that the parties would

2    stipulate to things being either confidential or highly

3    confidential, and treat them as such during the discovery

4    phase.  Then, what was left open was how we would deal with

5    this at trial.  And the original sealed protective order made

6    clear that the parties and me, we would have this conversation

7    before the trial began and put in place a process.  And that

8    happened.

9          And, so, if you -- you know, we had monthly hearings

10   throughout the duration of this trial -- excuse me -- this

11   case, and in the months leading up to the trial -- I can't tell

12   you exactly precisely when -- this issue of confidentiality

13   started to bubble up because everyone knew it would be an issue

14   heading towards trial in terms of exhibits and how to present

15   them.

16         So, I shared my views with counsel about how the best

17   way forward was to try and do this, and asked everybody to go

18   back and think about a process by which to do it.  And we

19   entered an order -- I entered an order, I should say, on August

20   the 15th of 2023, it's at ECF 647, titled Stipulated Order on

21   the Use of Confidential Information At Trial.  And it's an

22   order that lays out, over the course of four-plus pages,

23   exactly how to handle these matters.

24         And they can really be distilled into two.  One --

25   or, really, three.  One was, I asked the parties in advance of

1    trial to not only list their exhibits for one another, but as

2    we got closer to trial, to identify specific portions of

3    exhibits that they were going to use with witnesses, and to

4    then share those specific portions largely with Google, or with

5    a third party with which the document was going to be used.

6         And the reason I did that is so that we could ensure

7    that what was really going to be used was something that was

8    truly confidential -- or, at least the parties believed it was

9    confidential, and that we could then keep the courtroom open as

10   much as possible, and so that we could present these documents

11   in a way that we could both -- you know, for those documents

12   that didn't have confidentiality concerns, we could proceed

13   without any concerns.  For those that did have some, you know,

14   the parties could examine witnesses in a way that at least

15   would make the confidential portions available to me, but yet

16   the public would still, you know, be able to watch the

17   examination.  And so we did that, and so that's exactly what

18   transpired.  So that was one part of it.

19        The second part of it was that the parties agreed

20   that, you know, we were working in good faith towards ensuring

21   maximal (sic) closure of the courtroom.  That was two.

22        The third thing is that in paragraph 6 of this

23   protective order -- or, I should say, shouldn't call it a

24   protective order, but a stipulated order.  It states:  Two

25   weeks prior to the filing of post trial briefs, the parties

1    shall submit to the Court a proposed process for handling the

2    sealing of the information, exhibits introduced at trial; two,

3    transcripts reflecting trial testimony offered during closed

4    sessions; three, exhibits admitted into evidence but not used

5    with a witness, if any; and four, deposition designations

6    introduced into evidence but not played during trial.

7          So, the agreement was and the order that I signed did

8    not contemplate the mid release of trial exhibits or sealed

9    transcripts.  And there is really two reasons for that.  One

10   is, nobody asked for it.  And, two, I recognized at the time

11   that it would put some burden on the parties.  Okay?

12         So this order was entered a month prior to the start

13   of trial.  Nobody said a word about it.  I didn't hear anything

14   from any -- I'm not being critical.  These are the facts.  None

15   of the media came forward and said:  Judge, this is

16   unacceptable.  We need you to come up with a different process.

17         So we went into the trial with this process in place,

18   and part of that meant that the parties were going to start

19   introducing exhibits that weren't fully redacted; in other

20   words, they would be presenting large exhibits, say 100-page

21   slide deck, of only which two or three pages might be relevant,

22   because we all understood that's how the trial would unfold,

23   and that it would be left until after trial to sort all of this

24   out.  So that's how we began.

25         And I'll tell you the same thing I said yesterday,

1    which is:  The first two weeks, the courtroom was closed more

2    than I wanted it to be, and I think the trial transcripts

3    reflect that.  And I will put it on myself that it was closed

4    more than it should be.  And I should have been a little bit

5    more probing of the parties as to how much of it really needed

6    to be under seal.  So, I'll fess up to that.

7            But, what we've done since then, and I think you know

8    this now, is that, you know, since that first two weeks -- I

9    think we're now four weeks after the first two weeks.  We're

10   through week six of this case -- I think we've been closed for

11   a total of half an hour since then, and that was the other day.

12   So, you know, the concerns that were being raised were heard

13   and we adjusted to them, at least in this respect.

14           The other thing that I did, as you know, is we -- I

15   asked the parties -- and, again, this is not what was

16   contemplated by the original order -- was to propose redactions

17   to the sealed portions of the hearings that occurred, the

18   testimony that occurred during the first two weeks.  And, so,

19   the parties and third parties started doing that.  I started

20   reviewing them.  This was nothing -- none of this was

21   contemplated beforehand, but we did it.  And, so, now I think

22   all but two of the transcripts of witnesses that testified

23   under seal, a portion of their testimonies under seal have now

24   been released and are available to the press and to the public.

25           So, where we are now, then, is the question of

1    documents.  And just, again, historical context is important

2    here.  Again, remember what the parties thought was going to

3    happen.  And the only reason this came up -- the only reason it

4    came up was because there was a dispute about a particular

5    exhibit and whether I should, you know, consider it

6    confidential or not.

7         Google's counsel, at that point, said, you know, the

8    reason they want to leave this under seal -- not sealed is so

9    they can post it on a website.  Okay?  That was the first I had

10   been told of any posting of any exhibits on a website; first

11   time.  And my reaction was, and -- was, okay, been good to have

12   known about it.  I don't have any problem with it, but we do

13   need a process.  It needs to be a process in place.

14        And it took, I don't know, maybe a week or so to work

15   that process out.  When the parties presented the process to

16   me, I approved it.  And it, obviously, included third parties.

17   And so that process was worked out.  And contrary to

18   anybody's -- how anybody may have construed it, nobody has a

19   veto over that.  I get to make the final call on all of it.

20        So when things were being released, it was with some

21   coordination, but we were trying to get things out that the

22   Department of Justice, at least at the time, thought it wanted

23   to put on a public website.  Nobody, nobody, even at that

24   point, had asked for every single exhibit to be posted.  Nobody

25   had come forward with that request until *The New York Times*

1    intervened and made that request.

2            So, that is really the history of how we've come to

3    where we are today.  There's been this ever increasing need, if

4    you will, for greater access to both testimony and exhibits,

5    and at each stage we've tried to respond to that.  So that's

6    where we are.

7            So, this is why, for example -- and I said this

8    earlier -- one, I'm grateful that you notified me and educated

9    me about making sure that there's public notice before we close

10    a session, and so we've got a process in place now; two, to the

11    extent there was a request -- and I haven't made this clear --

12    that for those exhibits that were introduced in sealed sessions

13    that I did not approve as being redacted in full -- and I don't

14    think there is anything like that.  In other words, I don't

15    think -- there may be some document that was redacted in full,

16    but I think not very many -- those exhibits can be released.

17    They are now public records.  Okay?

18            So, to the extent that The Times is concerned that

19    those records that were presented in the under-seal proceedings

20    are being withheld, that is not the intention, and I'll make

21    that clear.

22            So, to the request, then, of what -- and I appreciate

23    The New York Times recognizing that there is a burden on the

24    Court and on the parties, and you can see all the work that's

25    been put into this case, and this demands more.  And that's

1    okay, that's what we're supposed to do.  But I want the press

2    to be able to get what it thinks is most important and not

3    overburden the parties.

4            And you have -- there is a mechanism in place for the

5    Department of Justice to post things.  And I am happy to create

6    a mechanism for individual requests of exhibits, and to do

7    that.  And it sounds like it's happening a little informally,

8    which is fine.  But we can formalize that in which, if there

9    are specific requests made -- and when I say "specific

10   requests," I mean for individual exhibits, not We want

11   everything that's been admitted so far -- to make an ask of the

12   parties, whether it's Google or either of the plaintiffs, for

13   specific exhibits, and that's okay.

14           And then we can go through, essentially, an

15   equivalent process of what's already been in place for what the

16   Department of Justice has been doing in posting exhibits it

17   thinks are beneficial or wants to put on its website.

18           You know, in terms of timing of that process, I

19   think -- well, two things.  In terms of timing and process,

20   given the sort of on-demand quality of it, I'm not going to ask

21   the parties to turn something around within 24 hours, or within

22   three hours, I guess, is really what is currently contemplated.

23   But, I do think there is some time period -- and we can take

24   about what's reasonable -- by which a demand made by the press

25   should be responded to.  And if there haven't been responses

1    from counsel, you know, that's on me.  So, let's talk about

2    what is a reasonable amount of time, and, so, we can work

3    through that.

4            The second thing, in terms of your request about

5    being able to raise disputes about sealing, look, I -- let me

6    put it this way:  I don't think it's something I'm required to

7    do, because I think there's case law in the circuit that says I

8    don't have to do that.  And that doesn't mean I don't want to

9    help figure out a way to do that.

10           So, I think the question is how to best do it.  And I

11   don't know that a, sort of, a daily, every morning,

12   come-in-at-9:30 session about exhibits is in the best interest

13   of moving this trial forward.  I've got witnesses coming in

14   from, you know, largely all out of town.  I don't know if

15   there's been a local witness yet.  And, so, you know, every

16   minute in court, starting at 9:30, is really a precious minute.

17   And for anybody that's been here, you know we start at 9:30 and

18   we typically finish at 5, and sometimes even after, for that

19   very reason.

20           But, you know, if there are objections to the

21   confidentiality designations that have been made and documents

22   that are requested and then made public, again, we can think

23   about a process, but I just cannot -- in the interest of my own

24   judicial interest in moving the case forward and the parties'

25   interest in not being -- having to do any more than they

1    already have, to do that on the daily basis that's being

2    requested, I just -- I can't do that.

3            So those are my thoughts.  And I welcome your

4    response to that in terms of what you think is a reasonable

5    accommodation to what you're asking for, given all the other

6    things I need to think about.

7            Mr. Schmidtlein?

8            MR. SCHMIDTLEIN:  Can I be heard on that, Your Honor?

9            THE COURT:  Sure.

10           MR. SCHMIDTLEIN:  I mean, I think you went through,

11   yesterday, some of the case law, Judge Scalia's opinion --

12           THE COURT:  Right.

13           MR. SCHMIDTLEIN:  -- and I think the case law is --

14   you know, I think gives you a fair degree of discretion in

15   terms of this issue of timing, and sort of when we -- you know,

16   when we have to navigate these things.  And, obviously, the

17   importance of particular documents, I think, ultimately will be

18   judged by you and evaluated by you in terms of, you know, final

19   opinions, decisions.  I think there will be, obviously, a point

20   in time when we submit our posttrial briefs, when I think some

21   of that stuff will probably come into even more clearer focus.

22           But, I will say this:  The parties are working

23   extraordinarily hard so that what you see and what the press

24   sees -- and I'm speaking on behalf of both sides here -- what

25   you all see during when the lights are on here is the product

1    of extraordinary work that is going on by both sides, and both

2    sides are engaged in extraordinary amounts of behind the scenes

3    back and forth, and conferring over confidentiality and

4    exhibits and admissibility and everything else.

5          Justice Scalia -- or, Judge Scalia had it absolutely

6    right when he talks about the complexity of an antitrust trial

7    of this magnitude, and with the number of witnesses that are

8    being coordinated and everything else.

9          The notion that we should be able to, on top of

10   everything else that we have to produce what we hope is useful

11   to you, that we are going to be fighting with the press or

12   having to sort of go back and forth with them on a daily basis

13   or a weekly basis or on any other basis between now and what I

14   hope is going to be the end of this trial, the week before

15   Thanksgiving, is completely unworkable, in my view.

16         I think you have complete discretion to, sort of,

17   resolve and address these.  They're not going to be in any

18   position to, sort of, evaluate and kind of contest these

19   things.  They're going to get these documents that have been

20   redacted, as Your Honor has suggested, that, you know, when the

21   department comes to us with the 100-page slide deck and they

22   say they want, you know, three pages -- or, Mr. Cavanaugh wants

23   us to look at three pages, you know, candidly, like, it's

24   entirely reasonable for my team to say:  Well, great.  We're

25   not even going to look at the other 97.  I don't know whether

 1    they are confidential or not, but we don't have time.

 2           We're dealing with hundreds and hundreds, you know,

 3    large volumes of exhibits.  They're going to get that exhibit

 4    and say:  We want the whole 97.  What's the big deal?  This

 5    deck has got a date -- now he wants me to put a date on the

 6    deck of -- because now I'm going to presumptively say:  No, the

 7    whole thing is challengeable.  It is, in my judgment, not

 8    workable.

 9           THE COURT:  Let me -- if I can at least modify one

10    thing you've said there, which is:  I'm not contemplating that,

11    for example, in that circumstance, if there's a request that

12    the whole deck would need to be produced redacted, it would be

13    the pages that were introduced at trial.

14           MR. SCHMIDTLEIN:  You mean the redactions within the

15    three pages?

16           THE COURT:  Correct.

17           MR. SCHMIDTLEIN:  And, again, like --

18           THE COURT:  I recognize that's going to require a

19    little bit of extra work.

20           MR. SCHMIDTLEIN:  But, again, I think when we are

21    dealing with -- and you saw it the other day -- we are trying

22    to, as we speak, come up with processes for Google's witnesses

23    and how we're going to deal with exhibits that we want to use

24    with our witnesses and how we're going to get those to them and

25    confidentiality reviews and everything else.

1           At the end of the day, when, you know, this trial is

2     over and, you know, we've done our posttrial findings and all

3     these things are in clearer focus and they've had a chance to

4     look at the documents, if they then want to sort of talk about,

5     Gee, we think this line or this paragraph, we don't understand

6     it, you know, that is the time to deal with this.  But, to put

7     more burdens on parties who are already extraordinarily

8     burdened right now, I don't think the law requires it, and I

9     don't think it's warranted or necessary, given the burdens of

10    this case.

11          THE COURT:  Let me ask you this:  What about the

12    first part of this, which is the, sort of, disclosure of

13    individual exhibits, once requested?

14          MR. SCHMIDTLEIN:  You know, again, it's going to

15    depend on the volume and it's going to depend on the timing.

16    But the -- again, I'm operating under four -- we've been

17    operating under three-hour time reviews.  I mean, we've got so

18    many different reviews going on of so many different things

19    with so many different people, and the number of press that are

20    following this case on a daily basis, we can get bombarded with

21    requests for any number of parties that could overwhelm all of

22    my team.

23          I just don't want to have to set aside scarce

24    resources to just deal with emails from the press on this.

25    Again, I think we've been trying to respond to them and trying

1    to evaluate them.  But to put us under a three-hour or 24-hour

2    or some other thing, it's extraordinarily burdensome.  We'll do

3    our level best to be responsive.

4         But, to your point, we don't want blanket, Give us

5    everythings.  And, again, the number of press that, you know,

6    this sort of implicates -- and I don't think we're obligated to

7    set up a website to sort of throw everything up.  I just don't

8    think that's appropriate or legal or required as well.

9         THE COURT:  I don't think you are either, so --

10   okay.

11        Mr.  Dahlquist, do you want to respond?

12        MR. DAHLQUIST:  Thank you, Your Honor.  A couple

13   quick points.  In fact, I'll just say, two quick points.

14        One, I'll reiterate for the record, since we're being

15   a little repetitive, but to have it all on one record, the

16   United States is committed to public access and continues to

17   advocate for public access throughout this trial.

18        THE COURT:  I wish you would stop saying that.  Tell

19   me what really matters.  This is what got me in trouble in the

20   first place.

21        MR. DAHLQUIST:  Understood, Your Honor.

22        The parties have implemented at least a six-step

23   process that we believe has been workable, and I would like to

24   work through that very quickly for Your Honor's information, as

25   well as the press information.  And this is -- this is a

1    process that balances, we believe, the importance of public

2    access, together with all of the important interests that have

3    to happen in this courtroom, as well as the need for us to

4    prepare and present trial.

5          First, as Your Honor ordered, the lawyers identify

6    their examinations the specific pieces of documents that they

7    intend to present in court.  That's the first thing.  And

8    that's been happening sometimes a week or two weeks in advance

9    of the actual examination.

10          Second, we are providing at least 48-hour notice to

11    the other side as to which specific items of documents we plan

12    to use.  That's rare, Your Honor.  In my 25 years, that's very

13    rare that we're doing.

14          Third, we have a meet and confer process that within

15    24 hours the parties must engage with each other in order to

16    negotiate confidentiality as to what can be presented in court.

17    And both sides have teams that are solely dedicated to that

18    process.  We have insulated them from the actual examination

19    teams so that that process can happen in and of itself.

20          Fourth, any issues and disputes that we have we bring

21    to Your Honor.  And you've seen it.  We've done that.  I've

22    done that, Your Honor, of in advance of a witness going on the

23    stand, we have argued and addressed what we believe should be

24    open public and what should be confidential.

25          Fifth, where we have been unable to resolve those,

1    we've done it on the fly at times, in an examination, where

2    Your Honor has addressed that as well.

3            That's before we even get to step six, which is Your

4    Honor's September 28th order, which is Docket 725, which, in

5    and of itself, has multiple additional steps.

6            The update I have for Your Honor is that we've

7    conferred in the hallway, and our goal is to have the open

8    courtroom as much as possible for the rest of the trial.  As a

9    result, we've agreed -- and we'll work out language to get to

10    Your Honor -- to make sure that this process, this six-step

11    process continues.  Because we've been on the offense.  They're

12    now going on the offense.  We're going on defense.  So that

13    process will continue.

14            Google will continue to send us their documents that

15    they plan to use in exam, and we will reciprocate.  Now, that

16    doesn't prevent any of us from using additional documents, but

17    it helps to keep the courtroom open as much as possible.

18            So, I wanted to update Your Honor on that.  We hope

19    to get some additional language of just agreed or -- we're

20    happy to share it with Your Honor as well, but we intend that

21    process to continue throughout the duration of this trial.

22            Thank you, Your Honor, for your help.

23            THE COURT:  I appreciate that, Mr. Dahlquist.  That's

24    helpful to spell out.

25            MR. DAHLQUIST:  I'm sorry I began with the unhelpful

```
1    part, before I got to the helpful.
2              MR. SCHMIDTLEIN:  And, Your Honor, just one more
3    point because I failed to mention before, because I wanted to
4    make sure it was addressed.
5              The exhibits used with Professor Whinston that
6    counsel claims they found on a public website, that exhibit,
7    you may recall, did have information from a survey, but it also
8    had superimposed into its exhibit confidential Google
9    information that they extracted from confidential Google
10   documents that was Google specific, and they added that into
11   the document.
12             And that is why the parties understood and agreed
13   that that had to be maintained.  This was not the parties
14   together taking a document from a public website and claiming
15   it was confidential to Your Honor.
16             THE COURT:  Okay.  Counsel?
17             MR. SUMAR:  Yeah, I have a lot to say, Your Honor.
18   Let me start at the top of what you said.
19             In an ideal world, the public representative of the
20   public would have been in that room, at those conferences,
21   raising concerns about the process.  That's not how it happened
22   in this case.  Obviously, that does not prejudice the relief
23   we're seeking here.
24             THE COURT:  No, it doesn't prejudice.  But, I will
25   tell you this:  It makes it harder, and this case -- and I
```

1    don't -- I don't want to sound defensive, but I know I will,

2    which is that the case was filed in December of 2020 -- no,

3    October of 2020.  That was the original DoJ case.  Since then

4    we have had monthly, monthly status conferences that have been

5    open to the public, open to the press.  And there is a docket

6    entry, the docket that is -- I don't know how many thousands of

7    entries long.  And so, you know, the idea that *The New York*

8    *Times* or any other press organization did not know what the

9    rules of the road of this trial were going to be with respect

10   to confidential information is just not something I can accept.

11          MR. SUMAR:  Well, if I can push back on that, Your

12   Honor.  With respect, I don't think any of us in the press

13   anticipated the level of sealing that would happen in this

14   case.  And I'm not just talking about closure of the courtroom.

15   I'm talking about access to exhibits.  What's happening in this

16   case --

17          THE COURT:  Nobody asked for access to exhibits,

18   Counsel.

19          MR. SUMAR:  I think we assumed that it would be

20   easier to get.  I mean, I'm an access lawyer.  I do this a lot.

21          THE COURT:  Where were you on September 10th?  I

22   mean, I don't want to be difficult here, but, you know, you've

23   shown up in week six of this trial and demanded the sky.  So,

24   if these were the things that *The New York Times* thought it

25   needed to cover this case, it should have asked for them before

1    the trial began.

2            MR. SUMAR:  Your Honor, I disagree with you.  And the

3    reason is --

4            THE COURT:  That's fine.

5            MR. SUMAR:  -- that we did not anticipate the kind of

6    resistance that we are now getting to basic requests for

7    exhibits -- again, not confidential information -- to what's

8    being presented in court.  We did not anticipate the kind of

9    sealing of the courtroom that Your Honor undertook, and that

10   you're now acknowledged was probably, in some cases, excessive.

11           THE COURT:  And now we've fixed.

12           MR. SUMAR:  Okay.  Fair enough.  But, I'm talking

13   about why we were not there.  And, you know, to be very clear,

14   Your Honor, we just have been, you know, at every turn -- not

15   at every turn, but in many cases -- I mean, this has been

16   happening behind the scenes for weeks.  It's not that one

17   request for exhibits was not responded to and we showed up here

18   and started making arguments.  I mean, this has been building

19   over weeks, and Your Honor hasn't necessarily seen all of that.

20           THE COURT:  I haven't seen any of it.

21           MR. SUMAR:  Okay.  And that's why we brought the

22   motion, because he were growing frustrated that emails,

23   requests for exhibits were not being responded to, that we were

24   not being told why certain exhibits were being posted to the

25   website and certain weren't.  I mean, in a lot of jury cases

1    where you're dealing with paper exhibits, things just get

2    handed out to the press and they make copies of them and share

3    them.  There's no issue.

4          And, so, I just -- I really am emphasizing that it

5    would have been better for us to be there early, but what's

6    happened in this trial is not what we were expecting, and we

7    brought this motion over growing frustration.  It wasn't just

8    that we woke up one day and decided now would be a good time.

9    It was that we were seeing barriers, and the only relief, we

10   thought, would be through the Court.

11         Now, you know, what Google's counsel was talking

12   about, about the 97 pages of the slide deck, I mean, I came up

13   here and the first thing I said we're bracketing this question

14   of the whole exhibit admitted into evidence and what's shown to

15   the witness.  So we can just set that aside.

16         And, again, I just don't understand what the concern

17   is about burden here with the -- especially with the first

18   request I made, which is that the press be promptly provided --

19   I didn't even say 24 hours, but be promptly provided with

20   copies of the exhibits that do not contain information that the

21   parties think is confidential.  That sort of thing is just

22   necessary to cover a trial.

23         When you don't have paper copies, when things go up

24   on the screen very quickly, you don't have a chance to absorb

25   it; you need access.  And so what the Court, I think, is

1    outlining helps to some extent.  But to the extent it does not

2    give us full access on a prompt basis to exhibits, again, that

3    do not contain confidential information, I think that that's

4    wrong on the law.

5         And let me just talk about the law for a second

6    because I think Your Honor is referring to the *Reporters*

7    *Committee* case from 1985 which you talked about yesterday,

8    which held that the press has no First Amendment entitlement to

9    a document-by-document determination of the need for

10   confidentiality prior to the dates of judgment.

11        And I want to be clear on a legal matter, that

12   there's three reasons why that case has no application here.

13   The first is that the Court limited its holding to purely

14   private civil cases, it did not extend the holding to civil

15   cases where the government is a party.  This is most clear in

16   footnote 8, on page 1336, where Judge Scalia sales the former

17   category of case, where the government agency was a party,

18   appears always to have been outside the prejudgment, nonaccess

19   rule.  And as you'll see in references, page 1326, page 1336,

20   Judge Scalia refers consistently to private civil actions, as

21   private matters until trial or judgment.

22        Cases where the government agency is a party have

23   always been treated differently.  So just right out of the gate

24   it doesn't apply here.

25        Second, the Court grounded its holding under the

1    First Amendment, as you know, not the common law.  And the case

2    has actually been distinguished on that basis.  And you can

3    look, for example, to the Third Circuit's decision in *Republic*

4    *Philippines versus Westinghouse Electrical Corporation*, 949

5    F.2d 653, where the Court says:  *Reporters Committee* did not

6    involve the common law right of access but, instead, was

7    limited to the reporter's claim of a constitutional right

8    grounded in the First Amendment.

9         It also points out that what was at issue in *RCFP*

10   were the documents of a third party.  And when you're talking

11   about the documents of a party, the stakes are higher.  And, of

12   course, you can look at the 1985 decision itself where the

13   Court says:  Common law may go further.  We're not going to go

14   there.  Maybe it expresses a view in dicta, but it really does

15   not implicate the common law, in our view.

16        And third, you know, apart from these two exhibits,

17   we have not actually asked the Court to make document-by-

18   document determinations on the specific timeframe.  That's not

19   even in the proposed order that we submitted.

20        Again, the main goal here is to have the parties

21   release to the public the exhibits they have used in open

22   court.  Yes, we also want the ability to challenge sealing of

23   exhibits in this case that we do not think are properly

24   confidential.  But at this point we are not asking for a

25   document-by-document determination and it's okay if, you know,

1    we don't get that.

2            All of this can be done in a way that minimizes the

3    burden.  That's really what the Court is concerned about in

4    *RCFP*.  And so let me just reiterate, the first part of what

5    we're asking, I envision that as just providing to the public

6    what has been presented in court and not getting into issues of

7    whether the sealing is appropriate.  I don't understand why --

8    I just don't understand why that's burdensome, Your Honor.

9            The second part is that, yes, this there has to be a

10   mechanism for seeking unsealing of exhibits that, you know, are

11   not properly sealed.  And I'm not asking for 24 hours or 48

12   hours.  We can work out a schedule that makes sense.  But,

13   trial exhibits are judicial records, there's a right of

14   contemporaneous access.  I think that has to include the

15   ability of the press to come forward and in a way that

16   recognizes the practicalities of this case -- which is very

17   complex, which involves a lot of documents -- for the Court to

18   adjudicate those disputes and release to the public what it's

19   entitled to.

20           So -- and again, I am happy to address the two

21   specific exhibits that we're seeking the unsealing of, but I

22   can also do that by written submission.

23           THE COURT:  Okay.  Let me start with the second issue

24   first, and that is the, sort of, document-by-document

25   objections to sealings -- or, confidentiality designations.  I

1    do not hear *The New York Times* demanding that that be done in

2    any particular time period.  And I'm not even prepared to say

3    the time period would be within the confines of the trial.

4           In terms of exhibits and the release of exhibits,

5    particularly those that contain nonconfidential information, I

6    think we can, certainly with nonconfidential information,

7    figure out -- exhibits that do not contain confidential

8    information, figure out a way to make those available, and do

9    so promptly.  That's not -- that shouldn't be that difficult.

10           In terms of the exhibits that do contain confidential

11    information, if the press is prepared to appoint a point person

12    that would make requests on behalf of the press for individual

13    exhibits that contain confidential information, we'll figure

14    out a way to get that -- those exhibits out with the

15    confidentiality designations that the parties have reached in a

16    reasonably timely manner, so that the parties are not receiving

17    emails at all hours from, you know, multiple sources.  And

18    whether it's *The Times* or a reporter from *Bloomberg*, whoever it

19    may be, if there is a single designee, that would help.

20           So I think that's what we will try to do.  So let me

21    turn to counsel with respect to those two categories; that is,

22    exhibits that do not contain confidential information for which

23    there are no confidential designations, what is a, one, a

24    reasonable time period to get those out and, two, what is the

25    best way of getting it out?  And I'm not asking anybody to put

 1    up a website.

 2             MR. DAHLQUIST:  Your Honor, on behalf of the

 3    United States, I would just state that even a document without

 4    any confidential information still has to go through the PII

 5    process that's set out in your September 28th order, and that

 6    alone takes some time.  There's emails --

 7             THE COURT:  Sorry to interrupt.

 8             MR. DAHLQUIST:  No, please.

 9             THE COURT:  To be 100 percent clear what I'm talking

10    about, I'm talking, in both categories, only portions of

11    documents that have been actually presented in court.  Now, for

12    the ones that have no confidentiality, it's probably not an

13    issue, I would think.  You could probably, you know, release

14    the whole thing, and that would be easier on you.  But again, I

15    want to be clear, this is only as to portions of documents,

16    particularly those with confidential designations, that have

17    been presented to a witness.

18             MR. DAHLQUIST:  Understood, Your Honor.  And I guess

19    I would respectfully ask the opportunity to go consult with our

20    teams.  As you might expect, the press office is separate from

21    the litigation team.  And while we understand we talk -- not

22    every day, not every night -- and I would need to Chat with my

23    team on the press side to actually figure out what is feasible.

24             THE COURT:  Okay.  What about the -- okay, go ahead,

25    Mr. Schmidtlein.

1          MR. SCHMIDTLEIN:  On the Google's side, for those --

2     and I agree, even documents that have no confidential

3     information, i.e., sort of trade secret or other types of

4     information, we've do have the PII thing that would have to be

5     done.  And I guess I would ask for 48 hours to be able to make

6     sure that gets processed and run through the right -- the right

7     channels on my side.

8          THE COURT:  Okay.

9          MR. CAVANAUGH:  Your Honor, speaking for the states,

10    I think, as the Court has observed, most of the exhibits that

11    have been introduced in this case have not come from us.  You

12    know, we're -- we have set up a website that we put some

13    documents on.  You know, to the extent we're agreeable to

14    participating in this process, we would ask that it involve the

15    exhibits that we offer.

16         THE COURT:  Okay.

17         MR. SCHMIDTLEIN:  I guess, one footnote to that, one

18    of the issues that is a complication here is when we do get a

19    request for a document that is a third-party document, because

20    that requires us to sort of go to them.  Even documents that

21    have -- third-party documents that are -- have not had portions

22    redacted, there's PII considerations.  And we really are -- I

23    don't want to say hostage, but we are sort of dependent upon

24    them to do this.

25         And so, again, we will do our best for 48 hours, but

```
 1    if it involves third-party documents, I can't -- I don't have a
 2    way to compel them to sort of get back to me with any period --
 3    within some period of time.
 4         THE COURT:  When you say 48 hours, you're talking
 5    about even those that have no confidential information in them?
 6         MR. SCHMIDTLEIN:  Yeah.  I mean, if it's literally a
 7    website screenshot, as have been presented to you, obviously
 8    that's not an issue.  If it is an email or it is another
 9    document that hasn't been redacted per se for purposes of the
10    trial, I typically -- we typically do want to give them notice
11    and get confirmation that, you know, we're going to provide
12    this.  And when that has happened to date in response to press
13    requests, we have not always gotten, sort of, really timely
14    responses from them, and I can understand why.  They've got
15    other, probably, more important things to do than respond to
16    these types of things.  So that's the only potential hiccup
17    that might come within the 48 hours.
18         THE COURT:  Okay.  Well, what I can do is ask -- or,
19    put in an order that the third party have some designee who
20    is -- who is -- who is the point person to accept those
21    requests and then turn them around within the timeframe that
22    we'll ask them to.
23         Okay.  I guess what I will -- where we'll leave this
24    is as follows:  I'll just ask counsel again to confer.  We're
25    not going to be back together until Tuesday, at least in court.
```

1    Can I just ask you all to confer overnight, proposed time

2    frames that you think are reasonable, and then we can put

3    something together.  Mr. Dahlquist, if you want to wrap it into

4    the six-step order that you have outlined, that's fine, and we

5    can go from there.

6              Okay?  If you just get me the draft tomorrow, at the

7    end of the day, that would be fine.  Okay?

8              MR. DAHLQUIST:  Thank you, Your Honor.

9              THE COURT:  All right.  Is there anything else?

10             Yes, Counsel?

11             Oh, hang on for a second.

12             MR. SUMAR:  Thank you, Your Honor.  And just to

13   confirm, we will follow up with a written submission on those

14   two specific exhibits.  I think that only leaves briefs on

15   matters of sealing, and I don't know where we stand on those.

16   But, we would appreciate the opportunity, as well, to weigh in

17   on whatever the parties propose, if that's okay with Your

18   Honor.

19             THE COURT:  In terms of weighing in on sealing, what

20   I can tell you is this:  Obviously, there will be a time when I

21   think the public and press can make those objections.  I'm not

22   sure what you have in mind in terms of resolving them and the

23   timing of the resolution of those.

24             MR. SUMAR:  Well, just say whatever the parties do

25   end up coming up with, that we have a chance to at least

1    provide our view.  Whether the Court wants to take that into

2    account or not is up to you, but at least a chance to weigh in.

3            THE COURT:  I don't know that the parties are going

4    to be terribly interested in -- you know, I'm asking them to

5    make the exhibits available, and come up with a process for

6    making those exhibits available.  In terms of the next step

7    that you're asking for, which would be an opportunity mid-trial

8    to contest the confidentiality designations, I'm not asking

9    them to come up with a process for that.

10           MR. SUMAR:  Sorry, no.  I'm just commenting on what

11   you've asked the parties to file and an opportunity to comment

12   on that.

13           THE COURT:  Okay.  I mean, sure, you can look at what

14   they have and if you want to file something, by all means, I'm

15   happy to take a look.

16           MR. SUMAR:  Thank you.

17           THE COURT:  All right.  Anything else?

18           MR. GOWER:  Good evening -- or, sorry.  Just briefly,

19   Your Honor, we have decided to limit our motion only to the 11

20   that we passed up to you in the binder.  For the remaining

21   related exhibits that we would like to move into the record, we

22   plan to do so through a witness.

23           THE COURT:  Okay.  Great.  That narrows the universe

24   that I need to take a look at.

25           MR. GOWER:  Thank you, Your Honor.

```
1                THE COURT:  Anything else?

2                MR. DINTZER:  Nothing from the DoJ plaintiffs, Your

3      Honor.

4                MR. CAVANAUGH:  Nothing further.

5                THE COURT:  So Tuesday we are expecting experts from

6      the state.

7                MR. CAVANAUGH:  We start with a Google witness,

8      Mr. Krueger, the brother.

9                THE COURT:  And that's a state witness or an

10     out-of-turn Google witness?

11               MR. CAVANAUGH:  It's a state witness.  It's Jason

12     Krueger.  His brother, Ryan, had testified previously in the

13     trial.  And then Professor Amaldoss, marketing expert, and then

14     Dr. Baker, our economist.

15               THE COURT:  Okay.  And in terms of expectation on

16     needing to seal the courtroom for, at least, starting

17     with Mr. Kreuger?

18               MR. CAVANAUGH:  I don't anticipate any closing for

19     those three witnesses.

20               MR. SCHMIDTLEIN:  I don't think so, Your Honor.  I'm

21     fairly certain that my colleagues would be able to cross some

22     of those folks.  But I think that's right, I think we should be

23     able to, as we have in the past, navigate around any

24     confidentiality issues with documents and screens and things

25     like that.
```

1          THE COURT:  Okay.  All right.  Well, again, if -- as

2    you know, we've got a few days.  If you're thinking changes,

3    please let us know by Monday so we can post something Monday

4    evening.  But as of now, the expectation is we'll be open on

5    Tuesday.

6          MR. CAVANAUGH:  Tuesday and Wednesday, Your Honor.

7          THE COURT:  And Wednesday, right.

8          MR. SCHMIDTLEIN:  We did file a *Daubert* motion

9    directed to Professor Baker, but he is substantially similar on

10   issues in terms of the *Daubert* motion directed at Professor

11   Whinston on scale and other similar issues.  I think I'm fairly

12   certain what the resolution of that would be, but you've asked

13   us to let you know, so I have let you know.

14         THE COURT:  I appreciate it.  But I will -- I've

15   reviewed all these some weeks ago, but I will take a look at it

16   again and make sure I get you a final decision on that.

17         MR. CAVANAUGH:  Thank you, Your Honor.

18         THE COURT:  Thank you, everyone.  Have a nice

19   weekend.  Look forward to seeing you on Tuesday.

20                          *   *   *

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 19th day of October, 2023

_____

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001

```
 1                              INDEX

 2
    WITNESS:
 3
        PAUL VALLEZ
 4          Direct Examination (Cont.) By Mr. Schwartz.......6630
            Cross-Examination By Ms. Waszmer.................6644
 5          Redirect Examination By Mr. Schwartz.............6669

 6
    EXHIBITS ADMITTED:
 7
        Defendant's Exhibit DX3226...........................6648
 8
        State's Demonstrative Exhibits PX7 and PX8............6679
 9
        Defendant's Demonstrative Exhibit DXD18..............6679
10
                              *   *   *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# 1

**1** [2] - 6631:16, 6680:1
**10** [1] - 6678:20
**100** [2] - 6661:8, 6711:9
**100-page** [2] - 6690:20, 6697:21
**10005** [1] - 6628:23
**10019** [1] - 6629:16
**10036** [1] - 6629:8
**104** [3] - 6650:14, 6650:15, 6650:22
**10th** [1] - 6704:21
**11** [4] - 6674:12, 6678:14, 6678:19, 6715:19
**1100** [1] - 6628:12
**1119** [1] - 6651:13
**1133** [1] - 6629:7
**12** [8] - 6631:8, 6631:13, 6660:24, 6677:13, 6677:14, 6678:5, 6678:14
**12th** [1] - 6629:12
**13** [1] - 6680:2
**1300** [1] - 6629:4
**1301** [1] - 6629:15
**1326** [1] - 6707:19
**1336** [2] - 6707:16, 6707:19
**14** [2] - 6631:8, 6631:13
**15** [2] - 6628:5, 6680:5
**15th** [1] - 6688:20
**18** [1] - 6650:5
**193** [3] - 6660:24, 6662:8, 6662:12
**194** [2] - 6662:9, 6662:12
**1985** [2] - 6707:7, 6708:12
**19th** [2] - 6664:8, 6718:7
**1:35** [1] - 6628:6

# 2

**2** [1] - 6665:9
**2.2(b** [1] - 6665:8
**2.2(b)(1** [2] - 6665:9, 6665:15
**2.2(b)(1)** [1] - 6669:23
**2.2(b)(2** [1] - 6666:15
**2.2(b)(3** [1] - 6667:13
**20** [1] - 6637:23
**20-3010** [1] - 6628:4
**20001** [2] - 6629:21, 6718:13
**20005** [1] - 6629:12

**2017** [1] - 6639:18
**2019** [5] - 6660:21, 6661:5, 6661:12, 6661:16, 6664:8
**202** [3] - 6628:13, 6628:17, 6629:13
**202-354-3267** [1] - 6629:21
**202-549-7155** [1] - 6628:20
**2020** [3] - 6643:12, 6704:2, 6704:3
**2021** [2] - 6687:16, 6687:17
**2022** [2] - 6672:12, 6673:11
**2023** [3] - 6628:5, 6688:20, 6718:7
**20530** [1] - 6628:20
**209** [1] - 6628:16
**21** [4] - 6671:8, 6672:4, 6678:10, 6678:13
**212** [3] - 6628:24, 6629:9, 6629:17
**21st** [1] - 6687:17
**22** [2] - 6677:13, 6678:5
**2200** [1] - 6629:8
**229** [2] - 6656:23, 6656:25
**23** [3] - 6662:9, 6662:11, 6662:12
**24** [5] - 6656:24, 6694:21, 6701:15, 6706:19, 6709:11
**24-hour** [1] - 6700:1
**25** [5] - 6628:3, 6650:17, 6650:21, 6650:22, 6701:12
**28** [1] - 6628:23
**28th** [2] - 6702:4, 6711:5
**2:45** [1] - 6680:9

# 3

**3** [3] - 6665:9, 6670:18, 6680:6
**30** [2] - 6647:3, 6670:20
**307-0340** [1] - 6628:13
**333** [2] - 6629:20, 6718:12
**335-2793** [1] - 6629:9
**360** [9] - 6652:17, 6652:18, 6652:20, 6653:9, 6653:15, 6653:25, 6654:1, 6654:14, 6657:6

**3:05** [1] - 6680:9

# 4

**4** [5] - 6656:23, 6656:24, 6657:5, 6663:22, 6665:5
**40** [1] - 6647:3
**40th** [1] - 6629:16
**416-8096** [1] - 6628:24
**4309** [1] - 6669:21
**434-5000** [1] - 6629:13
**450** [1] - 6628:19
**48** [5] - 6709:11, 6712:5, 6712:25, 6713:4, 6713:17
**48-hour** [1] - 6701:10

# 5

**5** [1] - 6695:18
**50-some-odd** [1] - 6673:7
**508-6000** [1] - 6629:5
**51** [1] - 6683:17
**58** [1] - 6687:18
**5857** [1] - 6685:21

# 6

**6** [2] - 6660:24, 6689:22
**60** [2] - 6683:19, 6684:13
**600** [1] - 6628:16
**60604** [1] - 6628:16
**647** [1] - 6688:20
**6523** [2] - 6629:20, 6718:12
**653** [1] - 6708:5

# 7

**7100** [1] - 6628:19
**720** [1] - 6629:5
**725** [2] - 6629:12, 6702:4
**78** [3] - 6683:18, 6684:1, 6684:12

# 8

**8** [2] - 6679:12, 6707:16
**80** [4] - 6630:12, 6631:15, 6661:22
**80203** [1] - 6629:4
**805-8563** [1] - 6628:17
**84** [1] - 6631:15
**85** [1] - 6631:15

# 9

**9** [5] - 6650:16, 6650:21, 6650:22, 6662:9, 6662:12
**90** [3] - 6630:24, 6661:21, 6670:8
**90s** [2] - 6630:13, 6630:14
**949** [1] - 6708:4
**97** [3] - 6697:25, 6698:4, 6706:12
**98** [1] - 6687:19
**999-5800** [1] - 6629:17
**9:30** [2] - 6695:16, 6695:17

# A

**ability** [6] - 6637:9, 6642:10, 6665:1, 6708:22, 6709:15, 6718:6
**able** [26] - 6636:5, 6636:7, 6637:25, 6639:24, 6645:16, 6645:18, 6645:20, 6645:21, 6646:12, 6646:22, 6646:23, 6656:6, 6656:9, 6660:7, 6666:11, 6674:19, 6674:20, 6676:2, 6678:1, 6689:16, 6694:2, 6695:5, 6697:9, 6712:5, 6716:21, 6716:23
**absence** [1] - 6671:23
**absolutely** [2] - 6637:19, 6697:5
**absorb** [1] - 6706:24
**accept** [3] - 6634:10, 6704:10, 6713:20
**acceptable** [1] - 6685:14
**access** [19] - 6681:18, 6681:25, 6682:8, 6683:8, 6684:16, 6686:16, 6686:17, 6686:21, 6693:4, 6700:16, 6700:17, 6701:2, 6704:15, 6704:17, 6704:20, 6706:25, 6707:2, 6708:6, 6709:14
**accessible** [1] - 6634:8
**accommodation** [1] - 6696:5
**account** [1] - 6715:2

6721

**accurate** [9] - 6642:22, 6645:8, 6648:10, 6657:14, 6659:8, 6662:24, 6664:18, 6687:12, 6718:4
**acknowledged** [1] - 6705:10
**acquired** [1] - 6653:12
**actions** [1] - 6707:20
**activates** [1] - 6650:1
**activation** [9] - 6649:7, 6649:25, 6650:6, 6650:9, 6650:24, 6650:25, 6651:6, 6651:7, 6651:9
**activity** [1] - 6632:7
**actual** [2] - 6701:9, 6701:18
**ad** [5] - 6630:8, 6630:18, 6630:22, 6637:13, 6637:18
**Ad** [10] - 6653:3, 6653:6, 6653:9, 6653:24, 6654:3, 6654:8, 6654:14, 6654:18, 6654:23, 6655:4
**add** [5] - 6667:3, 6680:18, 6680:22, 6681:1, 6684:4
**added** [1] - 6703:10
**additional** [3] - 6702:5, 6702:16, 6702:19
**address** [3] - 6674:1, 6697:17, 6709:20
**addressed** [6] - 6672:11, 6672:13, 6673:8, 6701:23, 6702:2, 6703:4
**adjudicate** [1] - 6709:18
**adjusted** [1] - 6691:13
**admissibility** [1] - 6697:4
**admit** [4] - 6648:15, 6671:1, 6672:3, 6679:22
**ADMITTED** [1] - 6719:6
**admitted** [11] - 6648:17, 6675:16, 6679:19, 6682:6, 6682:24, 6684:1, 6684:5, 6684:15, 6690:4, 6694:11, 6706:14
**Adobe** [1] - 6649:18
**adoption** [1] - 6633:7
**ads** [2] - 6646:13,

6648:2
**Ads** [9] - 6652:17, 6652:18, 6652:20, 6653:9, 6653:15, 6653:25, 6654:1, 6654:14, 6657:6
**advance** [5] - 6658:22, 6681:17, 6688:25, 6701:8, 6701:22
**advantage** [1] - 6636:22
**adverse** [1] - 6675:9
**advertise** [1] - 6654:12
**advertiser** [17] - 6631:25, 6634:1, 6634:3, 6634:22, 6635:3, 6636:11, 6638:5, 6642:22, 6647:3, 6654:1, 6654:2, 6654:12, 6654:13, 6654:20, 6656:5, 6656:8, 6666:13
**advertisers** [21] - 6632:5, 6633:13, 6633:15, 6636:9, 6636:11, 6637:9, 6638:14, 6639:4, 6641:11, 6641:22, 6643:3, 6648:1, 6650:10, 6651:22, 6651:25, 6652:10, 6652:12, 6653:21, 6661:21, 6665:2
**advertising** [9] - 6630:19, 6630:20, 6634:23, 6634:24, 6639:10, 6639:12, 6645:2, 6645:9, 6664:10
**Advertising** [1] - 6664:1
**advice** [1] - 6651:18
**advocate** [1] - 6700:17
**affect** [1] - 6671:19
**affinity** [2] - 6647:2, 6647:6
**afford** [2] - 6636:3, 6636:4
**afternoon** [4] - 6644:4, 6670:21, 6672:7, 6685:18
**agency** [5] - 6668:1, 6668:2, 6668:6, 6707:17, 6707:22
**aggressive** [4] - 6656:16, 6656:18, 6656:20, 6657:11
**ago** [4] - 6650:6, 6669:17, 6677:15,

6717:15
**agree** [3] - 6674:16, 6683:10, 6712:2
**agreeable** [1] - 6712:13
**agreed** [5] - 6670:25, 6689:19, 6702:9, 6702:19, 6703:12
**agreed-upon** [1] - 6670:25
**agreement** [8] - 6663:22, 6664:4, 6664:9, 6664:18, 6664:22, 6667:12, 6669:17, 6690:7
**Agreement** [1] - 6664:2
**ahead** [1] - 6711:24
**air** [1] - 6658:3
**AL** [1] - 6681:9
**al** [1] - 6628:3
**allow** [2] - 6635:7, 6678:12
**allows** [1] - 6648:1
**alone** [1] - 6711:6
**altering** [1] - 6671:14
**alternative** [1] - 6673:12
**Amaldoss** [1] - 6716:13
**Amazon** [1] - 6648:25
**Amendment** [3] - 6707:8, 6708:1, 6708:8
**America** [1] - 6628:2
**Americas** [2] - 6629:7, 6629:15
**AMIT** [1] - 6628:9
**amount** [4] - 6633:17, 6678:13, 6678:15, 6695:2
**amounts** [2] - 6664:17, 6697:2
**AMYN** [1] - 6681:9
**analogized** [1] - 6658:1
**analogy** [1] - 6658:1
**answer** [1] - 6650:25
**answered** [2] - 6662:20, 6672:21
**anticipate** [3] - 6705:5, 6705:8, 6716:18
**anticipated** [1] - 6704:13
**antitrust** [2] - 6655:16, 6697:6
**Antitrust** [1] - 6629:3
**apart** [1] - 6708:16
**API** [2] - 6634:6, 6670:7

**APIs** [1] - 6634:19
**APPEARANCES** [1] - 6628:11
**application** [1] - 6707:12
**applies** [2] - 6632:23, 6678:6
**apply** [2] - 6639:6, 6707:24
**appoint** [1] - 6710:11
**appreciate** [8] - 6679:9, 6680:21, 6681:21, 6681:24, 6693:22, 6702:23, 6714:16, 6717:14
**approach** [3] - 6639:24, 6646:4, 6657:23
**appropriate** [3] - 6674:22, 6700:8, 6709:7
**approve** [1] - 6693:13
**approved** [1] - 6692:16
**apps** [1] - 6645:2
**April** [1] - 6673:11
**area** [1] - 6655:16
**argued** [1] - 6701:23
**arguments** [1] - 6705:18
**arrive** [1] - 6634:11
**aside** [3] - 6663:5, 6699:23, 6706:15
**aspect** [1] - 6682:14
**aspects** [3] - 6663:7, 6663:9, 6664:17
**aspire** [1] - 6667:2
**assign** [1] - 6642:25
**associated** [1] - 6646:11
**assume** [1] - 6643:25
**assumed** [1] - 6704:19
**attached** [2] - 6676:18, 6680:14
**attempting** [1] - 6674:24
**attention** [2] - 6679:2, 6681:21
**Attorney** [1] - 6628:22
**attribute** [1] - 6642:23
**attribution** [3] - 6642:13, 6642:23, 6643:4
**auction** [4] - 6637:6, 6637:10, 6637:13, 6638:19
**Audience** [1] - 6668:11
**audience** [4] - 6646:22, 6646:24,

6646:25, 6647:2
**audiences** [1] -
6646:21
**August** [2] - 6664:8,
6688:19
**author** [1] - 6664:6
**auto** [34] - 6637:3,
6637:8, 6637:17,
6638:3, 6638:6,
6638:8, 6638:19,
6638:22, 6638:25,
6639:3, 6639:6,
6639:7, 6639:9,
6639:12, 6639:16,
6639:20, 6640:9,
6640:12, 6640:20,
6641:3, 6641:4,
6641:7, 6641:19,
6643:2, 6643:8,
6659:3, 6659:6,
6659:13, 6659:16,
6660:9, 6660:20,
6662:18, 6669:8,
6669:11
**Auto** [1] - 6659:10
**automate** [1] - 6632:6
**automated** [3] -
6659:2, 6659:6,
6660:20
**automation** [1] -
6638:4
**available** [13] -
6632:15, 6632:20,
6638:22, 6638:25,
6670:8, 6685:23,
6686:1, 6686:5,
6689:15, 6691:24,
6710:8, 6715:5, 6715:6
**availed** [1] - 6673:4
**Avenue** [4] - 6629:7,
6629:15, 6629:20,
6718:12
**avoiding** [1] - 6671:11
**awards** [1] - 6664:13
**aware** [4] - 6655:14,
6655:16, 6655:18,
6672:24

# B

**bad** [1] - 6686:3
**Baidee** [1] - 6631:17
**baker** [1] - 6716:14
**Baker** [1] - 6717:9
**balances** [1] - 6701:1
**barriers** [1] - 6706:9
**based** [4] - 6639:17,
6640:23, 6651:5,
6656:6
**basic** [3] - 6652:19,

6683:7, 6705:6
**basis** [9] - 6672:22,
6686:23, 6696:1,
6697:12, 6697:13,
6699:20, 6707:2,
6708:2
**Baxley** [1] - 6643:20
**become** [1] - 6638:7
**becomes** [1] - 6642:20
**BEFORE** [1] - 6628:9
**beforehand** [1] -
6691:21
**began** [4] - 6688:7,
6690:24, 6702:25,
6705:1
**begin** [3] - 6639:21,
6680:10, 6680:19
**beginning** [1] - 6687:9
**behalf** [5] - 6638:5,
6644:4, 6696:24,
6710:12, 6711:2
**behind** [4] - 6658:24,
6667:19, 6697:2,
6705:16
**Belknap** [1] - 6629:7
**belong** [1] - 6647:1
**below** [2] - 6648:4,
6648:6
**Ben** [1] - 6672:7
**BENCH** [1] - 6628:9
**beneficial** [1] -
6694:17
**Benjamin** [1] -
6629:11
**best** [12] - 6634:9,
6638:1, 6665:1,
6665:2, 6670:1,
6688:16, 6695:10,
6695:12, 6700:3,
6710:25, 6712:25,
6718:6
**bet** [3] - 6667:16,
6667:20, 6668:14
**bets** [1] - 6668:7
**better** [4] - 6638:20,
6644:12, 6656:8,
6706:5
**between** [15] - 6630:9,
6631:3, 6631:8,
6631:24, 6640:6,
6645:12, 6645:19,
6647:2, 6651:8,
6655:7, 6655:10,
6655:11, 6660:1,
6665:17, 6697:13
**beyond** [1] - 6680:22
**bgreenblum@wc.**
**com** [1] - 6629:14
**biased** [1] - 6651:18
**bidding** [41] - 6637:3,

6637:6, 6637:8,
6637:17, 6638:3,
6638:6, 6638:9,
6638:14, 6638:20,
6638:22, 6638:25,
6639:3, 6639:6,
6639:7, 6639:9,
6639:12, 6639:16,
6639:20, 6639:25,
6640:9, 6640:12,
6640:20, 6641:3,
6641:4, 6641:7,
6641:19, 6643:2,
6643:8, 6659:2,
6659:3, 6659:6,
6659:13, 6659:17,
6660:10, 6660:20,
6662:18, 6669:8,
6669:11
**Bidding** [7] - 6640:2,
6659:10, 6661:23,
6661:25, 6662:2,
6662:5
**bids** [1] - 6638:16
**big** [4] - 6663:1,
6666:11, 6668:7,
6698:4
**biggest** [3] - 6633:10,
6633:14, 6666:8
**binder** [6] - 6677:14,
6677:20, 6677:22,
6678:15, 6678:20,
6715:20
**Bing** [9] - 6630:9,
6630:16, 6630:20,
6631:5, 6634:24,
6637:1, 6639:13,
6661:22, 6662:2
**bit** [8] - 6636:6,
6640:25, 6658:6,
6661:8, 6675:5,
6680:16, 6691:4,
6698:19
**blanket** [1] - 6700:4
**Bloomberg** [1] -
6710:18
**blue** [2] - 6645:21,
6647:4
**bombarded** [1] -
6699:20
**boss** [1] - 6676:7
**bracket** [1] - 6682:5
**bracketing** [1] -
6706:13
**brand** [1] - 6645:14
**brands** [1] - 6666:11
**breadth** [1] - 6635:23
**break** [1] - 6630:25
**briefed** [1] - 6676:23
**briefly** [5] - 6669:4,

6677:12, 6678:4,
6679:1, 6715:18
**briefs** [3] - 6689:25,
6696:20, 6714:14
**bring** [5] - 6631:21,
6635:8, 6640:4,
6667:24, 6701:20
**bringing** [2] - 6632:6,
6681:21
**broader** [3] - 6649:7,
6649:9, 6668:3
**Broadway** [1] - 6629:4
**brother** [2] - 6716:8,
6716:12
**brought** [5] - 6673:11,
6705:21, 6706:7
**Bruce** [1] - 6629:1
**bubble** [1] - 6688:13
**bucket** [1] - 6672:16
**buckets** [2] - 6671:11,
6672:9
**budgets** [1] - 6636:2
**build** [16] - 6634:2,
6634:8, 6634:16,
6636:3, 6658:7,
6658:21, 6658:23,
6658:24, 6660:4,
6660:5, 6665:25,
6666:1, 6666:3,
6666:25, 6667:16
**building** [5] - 6634:6,
6639:22, 6640:16,
6658:2, 6705:18
**builds** [2] - 6658:17,
6667:7
**built** [1] - 6658:25
**bunch** [1] - 6677:7
**burden** [7] - 6682:2,
6682:10, 6685:1,
6690:11, 6693:23,
6706:17, 6709:3
**burdened** [1] - 6699:8
**burdens** [2] - 6699:7,
6699:9
**burdensome** [3] -
6684:18, 6700:2,
6709:8
**bury** [1] - 6686:10
**business** [2] - 6645:4,
6656:2
**businesses** [1] -
6656:20
**BY** [9] - 6630:5,
6631:12, 6632:12,
6644:3, 6647:10,
6648:18, 6663:17,
6665:10, 6669:6

# C

**calculations** [1] - 6678:2
**Cameron** [2] - 6628:18, 6670:21
**campaigns** [2] - 6637:18, 6638:7
**camps** [1] - 6652:15
**candidly** [1] - 6697:23
**cannot** [2] - 6637:15, 6695:23
**capabilities** [1] - 6648:6
**captures** [1] - 6683:6
**capturing** [1] - 6644:13
**car** [1] - 6658:2
**carbon** [1] - 6667:22
**care** [10] - 6651:25, 6652:10, 6652:11, 6652:12, 6652:14, 6671:10, 6672:10, 6672:17, 6673:10, 6674:17
**cares** [1] - 6686:16
**case** [33] - 6649:17, 6671:19, 6678:8, 6681:19, 6682:2, 6683:16, 6686:17, 6686:21, 6687:14, 6687:24, 6688:11, 6691:10, 6693:25, 6695:7, 6695:24, 6696:11, 6696:13, 6699:10, 6699:20, 6703:22, 6703:25, 6704:2, 6704:3, 6704:14, 6704:16, 6704:25, 6707:7, 6707:12, 6707:17, 6708:1, 6708:23, 6709:16, 6712:11
**cases** [7] - 6685:11, 6705:10, 6705:15, 6705:25, 6707:14, 6707:15, 6707:22
**categorically** [1] - 6672:3
**categories** [2] - 6710:21, 6711:10
**category** [5] - 6631:16, 6670:2, 6670:5, 6672:17, 6707:17
**Cavanaugh** [3] - 6629:6, 6681:1, 6697:22
**CAVANAUGH** [12] - 6670:16, 6679:10,

6679:16, 6679:24, 6681:2, 6712:9, 6716:4, 6716:7, 6716:11, 6716:18, 6717:6, 6717:17
**Cavanaugh's** [1] - 6662:15
**CCR** [1] - 6718:11
**Center** [1] - 6629:3
**cert** [1] - 6631:8
**certain** [7] - 6632:14, 6634:18, 6673:22, 6705:24, 6705:25, 6716:21, 6717:12
**certainly** [4] - 6672:15, 6675:10, 6675:17, 6710:6
**CERTIFICATE** [1] - 6718:1
**certify** [1] - 6718:3
**challenge** [1] - 6654:19, 6708:22
**challengeable** [1] - 6698:7
**chambers** [1] - 6676:14
**chance** [5] - 6662:10, 6699:3, 6706:24, 6714:25, 6715:2
**change** [1] - 6657:16
**changed** [2] - 6650:9, 6657:15
**changes** [1] - 6717:2
**channel** [1] - 6630:19
**channels** [5] - 6642:3, 6644:13, 6650:2, 6651:8, 6712:7
**charge** [8] - 6653:24, 6654:1, 6654:4, 6654:6, 6654:7, 6655:5, 6655:12, 6655:13
**charged** [2] - 6654:2, 6655:4
**charges** [2] - 6653:21, 6653:23
**Chat** [2] - 6675:2, 6711:22
**Chats** [5] - 6672:12, 6673:2, 6673:8, 6676:20, 6678:8
**checkmark** [1] - 6655:21
**Chicago** [1] - 6628:16
**choice** [1] - 6677:25
**choose** [3] - 6652:11, 6666:4, 6666:6
**circuit** [1] - 6695:7
**Circuit's** [1] - 6708:3
**circumstance** [2] -

6674:23, 6698:11
**cite** [1] - 6663:14
**civil** [3] - 6707:14, 6707:20
**claim** [1] - 6708:7
**claiming** [1] - 6703:14
**claims** [1] - 6703:6
**clarify** [6] - 6630:6, 6630:17, 6632:17, 6643:7, 6652:23, 6678:12
**clarifying** [1] - 6646:5
**clarity** [1] - 6646:16
**classified** [1] - 6668:9
**clause** [2] - 6669:22, 6669:25
**clear** [10] - 6631:1, 6676:16, 6688:6, 6693:11, 6693:21, 6705:13, 6707:11, 6707:15, 6711:9, 6711:15
**clearer** [2] - 6696:21, 6699:3
**click** [4] - 6642:12, 6642:19, 6642:22, 6643:4
**clicks** [3] - 6640:22, 6642:25, 6643:1
**client** [2] - 6661:13, 6662:17
**clients** [6] - 6641:8, 6641:9, 6641:10, 6661:23, 6666:8, 6666:14
**close** [2] - 6661:22, 6693:9
**closed** [4] - 6690:3, 6691:1, 6691:3, 6691:10
**closer** [1] - 6689:2
**closing** [1] - 6716:18
**closure** [3] - 6681:17, 6689:21, 6704:14
**CMR** [1] - 6718:11
**co** [1] - 6634:16
**CO** [1] - 6629:4
**co-build** [1] - 6634:16
**codes** [1] - 6657:10
**collaborate** [2] - 6633:23, 6634:17
**collaborating** [1] - 6640:13
**Collaboration** [1] - 6664:2
**collaboration** [5] - 6633:17, 6633:19, 6633:20, 6640:6, 6660:6
**colleague's** [1] -

6662:16
**colleagues** [1] - 6716:21
**COLORADO** [1] - 6629:2
**Colorado** [1] - 6629:3
**COLUMBIA** [1] - 6628:1
**come-in-at-9:30** [1] - 6695:12
**comfortable** [1] - 6682:15
**coming** [4] - 6634:15, 6671:3, 6695:13, 6714:25
**comment** [2] - 6678:6, 6715:11
**commenting** [1] - 6715:10
**committed** [2] - 6636:14, 6700:16
**Committee** [2] - 6707:7, 6708:5
**common** [4] - 6708:1, 6708:6, 6708:13, 6708:15
**commonly** [1] - 6639:4
**communicate** [4] - 6672:10, 6672:16, 6673:10, 6674:17
**communicate-with-care** [1] - 6672:10
**communicating** [1] - 6671:9
**companies** [1] - 6640:6
**company** [4] - 6649:8, 6649:13, 6649:18, 6650:4
**Company** [1] - 6681:10
**comparable** [1] - 6634:22
**compare** [1] - 6635:17
**compared** [2] - 6636:17, 6636:25
**compel** [2] - 6673:12, 6713:2
**compete** [2] - 6636:19, 6651:2
**competes** [1] - 6652:20
**competing** [4] - 6653:22, 6656:20, 6662:4
**competitive** [2] - 6636:22, 6686:18
**competitor** [2] - 6649:22, 6649:23

6724

**competitors** [1] - 6656:21
**complete** [2] - 6697:16, 6718:5
**completely** [1] - 6697:15
**complex** [2] - 6637:21, 6709:17
**complexity** [2] - 6638:6, 6697:6
**complication** [1] - 6712:18
**complimentary** [2] - 6653:25, 6655:13
**component** [1] - 6639:22
**concern** [6] - 6653:17, 6653:21, 6675:4, 6675:8, 6685:11, 6706:16
**concerned** [3] - 6652:24, 6693:18, 6709:3
**concerning** [1] - 6674:17
**concerns** [9] - 6652:23, 6653:5, 6682:3, 6683:11, 6685:1, 6689:12, 6689:13, 6691:12, 6703:21
**conditioning** [1] - 6658:3
**conducting** [1] - 6637:11
**confer** [3] - 6701:14, 6713:24, 6714:1
**conference** [1] - 6673:3
**conferences** [2] - 6703:20, 6704:4
**conferral** [2] - 6672:9, 6672:24
**conferred** [2] - 6684:21, 6702:7
**conferring** [1] - 6697:3
**confident** [1] - 6636:18
**confidential** [30] - 6643:22, 6663:8, 6683:19, 6684:21, 6687:21, 6688:2, 6688:3, 6689:8, 6689:9, 6689:15, 6692:6, 6698:1, 6701:24, 6703:8, 6703:9, 6703:15, 6704:10, 6705:7, 6706:21, 6707:3,

6708:24, 6710:7, 6710:10, 6710:13, 6710:22, 6710:23, 6711:4, 6711:16, 6712:2, 6713:5
**Confidential** [1] - 6688:21
**confidentiality** [15] - 6650:19, 6663:8, 6683:10, 6688:12, 6689:12, 6695:21, 6697:3, 6698:25, 6701:16, 6707:10, 6709:25, 6710:15, 6711:12, 6715:8, 6716:24
**confines** [1] - 6710:3
**confirm** [1] - 6714:13
**confirmation** [1] - 6713:11
**confusing** [1] - 6659:9
**connection** [1] - 6645:12
**CONNOLLY** [1] - 6629:11
**consequences** [1] - 6686:22
**consider** [3] - 6650:24, 6670:4, 6692:5
**considerations** [1] - 6712:22
**considers** [1] - 6681:25
**consist** [1] - 6678:11
**consistently** [1] - 6707:20
**constitutes** [1] - 6718:4
**Constitution** [2] - 6629:20, 6718:12
**constitutional** [1] - 6708:7
**construed** [2] - 6677:16, 6692:18
**consult** [1] - 6711:19
**Consumer** [1] - 6629:2
**consumer** [7] - 6637:10, 6642:1, 6642:2, 6642:5, 6642:7, 6642:18, 6645:14
**consumer's** [2] - 6648:20, 6648:21
**consumers** [4] - 6644:16, 6645:9, 6645:14, 6645:25
**Cont** [2] - 6630:3, 6719:4

**cont** [1] - 6629:1
**contain** [7] - 6706:20, 6707:3, 6710:5, 6710:7, 6710:10, 6710:13, 6710:22
**contained** [1] - 6685:19
**contemplate** [1] - 6690:8
**contemplated** [4] - 6687:20, 6691:16, 6691:21, 6694:22
**contemplating** [1] - 6698:10
**contemporaneous** [1] - 6709:14
**contest** [2] - 6697:18, 6715:8
**context** [5] - 6644:22, 6652:18, 6653:1, 6675:8, 6692:1
**continue** [5] - 6645:16, 6645:20, 6702:13, 6702:14, 6702:21
**continues** [2] - 6700:16, 6702:11
**contrary** [1] - 6692:17
**contrast** [2] - 6642:24, 6644:21
**contributing** [1] - 6636:25
**control** [1] - 6637:24
**controls** [2] - 6637:25, 6638:2
**conversation** [6] - 6645:13, 6645:17, 6645:20, 6649:5, 6680:16, 6688:6
**conversion** [5] - 6637:13, 6642:9, 6642:16, 6642:21, 6642:23
**conversions** [4] - 6641:23, 6641:25, 6642:25, 6643:3
**convert** [1] - 6642:6
**convey** [1] - 6681:12
**conveyed** [5] - 6682:8, 6683:21, 6685:9, 6685:16
**conveying** [1] - 6675:12
**cookie** [2] - 6645:17, 6646:23
**cookies** [2] - 6646:11, 6646:25
**cool** [1] - 6668:7
**coordinated** [1] - 6697:8

**coordination** [3] - 6646:12, 6655:15, 6692:21
**copies** [3] - 6706:2, 6706:20, 6706:23
**copy** [5] - 6647:14, 6650:13, 6663:10, 6667:22, 6685:23
**Corporation** [1] - 6708:4
**correct** [56] - 6635:20, 6641:17, 6643:11, 6645:3, 6645:25, 6646:15, 6648:10, 6649:15, 6649:16, 6650:2, 6650:10, 6651:3, 6651:4, 6651:20, 6651:22, 6652:3, 6652:6, 6652:11, 6652:20, 6652:21, 6653:10, 6653:15, 6653:22, 6654:6, 6654:21, 6656:2, 6656:3, 6656:5, 6656:9, 6656:10, 6658:8, 6658:22, 6659:18, 6659:19, 6660:3, 6660:19, 6660:21, 6661:14, 6663:3, 6664:2, 6664:6, 6664:7, 6664:11, 6664:12, 6664:23, 6664:24, 6665:3, 6665:4, 6666:2, 6666:3, 6668:12, 6668:13, 6670:15, 6670:16, 6698:16
**correspond** [1] - 6672:10
**cost** [5] - 6653:7, 6653:18, 6654:2, 6654:15, 6686:19
**costs** [1] - 6654:24
**council** [1] - 6666:9
**counsel** [24] - 6643:19, 6650:18, 6656:24, 6657:2, 6662:10, 6669:7, 6670:18, 6672:6, 6674:16, 6674:23, 6678:9, 6680:5, 6680:12, 6681:5, 6681:20, 6687:11, 6688:16, 6692:7, 6695:1, 6703:6, 6703:16, 6706:11, 6710:21, 6713:24
**Counsel** [4] - 6687:3, 6687:5, 6704:18,

6714:10
**couple** [2] - 6639:21, 6700:12
**course** [8] - 6646:19, 6666:25, 6667:15, 6677:24, 6687:24, 6688:22, 6708:12
**court** [12] - 6672:14, 6674:5, 6684:23, 6685:25, 6695:16, 6701:7, 6701:16, 6705:8, 6708:22, 6709:6, 6711:11, 6713:25
**COURT** [86] - 6628:1, 6630:2, 6631:1, 6631:19, 6643:15, 6643:25, 6646:5, 6646:9, 6646:17, 6647:8, 6648:17, 6669:3, 6670:11, 6670:14, 6670:17, 6670:24, 6672:5, 6673:9, 6674:15, 6675:20, 6675:25, 6676:12, 6676:19, 6676:21, 6677:11, 6677:17, 6678:9, 6678:17, 6678:21, 6678:25, 6679:7, 6679:13, 6679:17, 6679:25, 6680:4, 6680:10, 6680:25, 6681:3, 6681:5, 6681:20, 6682:23, 6683:2, 6683:20, 6683:24, 6684:4, 6684:8, 6687:1, 6696:9, 6696:12, 6698:9, 6698:16, 6698:18, 6699:11, 6700:9, 6700:18, 6702:23, 6703:16, 6703:24, 6704:17, 6704:21, 6705:4, 6705:11, 6705:20, 6709:23, 6711:7, 6711:9, 6711:24, 6712:8, 6712:16, 6713:4, 6713:18, 6714:9, 6714:19, 6715:3, 6715:13, 6715:17, 6715:23, 6716:1, 6716:5, 6716:9, 6716:15, 6717:1, 6717:7, 6717:14, 6717:18, 6718:1
**Court** [27] - 6629:19, 6629:19, 6663:7,

6673:1, 6681:15, 6681:25, 6682:10, 6683:23, 6684:19, 6686:9, 6686:10, 6686:12, 6686:15, 6690:1, 6693:24, 6706:10, 6706:25, 6707:13, 6707:25, 6708:5, 6708:13, 6708:17, 6709:3, 6709:17, 6712:10, 6715:1, 6718:11
**Court's** [3] - 6679:2, 6679:6, 6682:1
**Courthouse** [1] - 6629:20
**courtroom** [11] - 6681:17, 6685:17, 6689:9, 6689:21, 6691:1, 6701:3, 6702:8, 6702:17, 6704:14, 6705:9, 6716:16
**COURTROOM** [1] - 6679:15
**cover** [4] - 6670:23, 6682:18, 6704:25, 6706:22
**coverage** [1] - 6683:1
**covers** [1] - 6673:24
**CRC** [1] - 6629:19
**create** [3] - 6635:7, 6645:19, 6694:5
**creating** [2] - 6671:11, 6672:1
**credit** [4] - 6642:10, 6642:11, 6642:19, 6642:20
**critical** [1] - 6690:14
**Cross** [1] - 6719:4
**cross** [2] - 6677:24, 6716:21
**CROSS** [1] - 6644:2
**Cross-Examination** [1] - 6719:4
**CROSS-EXAMINATION** [1] - 6644:2
**cross-examinations** [1] - 6677:24
**CRR** [2] - 6629:19, 6718:11
**cure** [1] - 6674:24
**current** [1] - 6681:12
**cushions** [1] - 6687:8
**customer** [5] - 6655:25, 6656:1, 6657:25, 6661:11, 6661:16
**customer's** [2] -

6657:20, 6658:10
**customers** [4] - 6631:22, 6632:21, 6653:24, 6667:4
**Customers** [1] - 6648:6
**CV** [1] - 6628:4
**cycle** [2] - 6656:11, 6656:19
**cycles** [2] - 6640:5, 6640:18

# D

**D.C** [4] - 6628:5, 6628:13, 6629:12, 6718:13
**DAHLQUIST** [8] - 6680:21, 6700:12, 6700:21, 6702:25, 6711:2, 6711:8, 6711:18, 6714:8
**Dahlquist** [5] - 6628:15, 6680:20, 6700:11, 6702:23, 6714:3
**daily** [5] - 6686:23, 6695:11, 6696:1, 6697:12, 6699:20
**dash** [1] - 6681:9
**data** [12] - 6637:16, 6638:15, 6642:8, 6658:18, 6658:19, 6658:20, 6658:22, 6658:23, 6658:24, 6667:17, 6667:20, 6685:20
**date** [13] - 6643:10, 6660:22, 6661:7, 6664:8, 6677:4, 6682:19, 6682:23, 6682:24, 6682:25, 6684:22, 6698:5, 6713:12
**Dated** [1] - 6718:7
**dated** [1] - 6682:22
**dates** [1] - 6707:10
**Daubert** [3] - 6679:5, 6717:8, 6717:10
**David** [1] - 6628:15
**David.dahlquist@usdoj.gov** [1] - 6628:17
**day-in-day-out** [1] - 6632:1
**days** [2] - 6670:8, 6717:2
**DC** [2] - 6628:20, 6629:21
**deal** [5] - 6688:4, 6698:4, 6698:23,

6699:6, 6699:24
**dealing** [4] - 6660:14, 6698:2, 6698:21, 6706:1
**debate** [1] - 6652:9
**decades** [1] - 6637:22
**December** [4] - 6687:16, 6687:17, 6704:2
**decide** [4] - 6641:6, 6654:15, 6665:23, 6685:6
**decided** [3] - 6640:1, 6706:8, 6715:19
**decision** [6] - 6641:8, 6642:17, 6688:1, 6708:3, 6708:12, 6717:16
**decisions** [7] - 6637:16, 6638:5, 6638:14, 6638:16, 6645:10, 6648:7, 6696:19
**deck** [6] - 6690:21, 6697:21, 6698:5, 6698:6, 6698:12, 6706:12
**declaration** [1] - 6686:12
**dedicated** [1] - 6701:17
**deeply** [1] - 6653:11
**Defendant** [2] - 6628:7, 6629:10
**defendant's** [1] - 6719:7
**Defendant's** [2] - 6679:2, 6719:9
**defense** [2] - 6679:3, 6702:12
**defensive** [1] - 6704:1
**defer** [1] - 6682:11
**deferred** [1] - 6677:1
**deficiency** [1] - 6674:24
**define** [3] - 6650:7, 6652:9, 6666:8
**definitely** [2] - 6638:3, 6662:25
**definitions** [1] - 6665:7
**degree** [1] - 6696:14
**delayed** [1] - 6638:18
**deleted** [1] - 6671:15
**deliberate** [1] - 6686:4
**deliver** [1] - 6656:7
**demand** [11] - 6661:11, 6661:13, 6661:16, 6661:19, 6662:1, 6662:3,

6726

6662:17, 6669:8,
6669:11, 6694:20,
6694:24
  **demanded** [1] -
6704:23
  **demanding** [1] -
6710:1
  **demands** [1] -
6693:25
  **demonstrate** [2] -
6636:20, 6676:9
  **demonstrative** [1] -
6679:22
  **Demonstrative** [3] -
6679:22, 6719:8,
6719:9
  **demonstratives** [2] -
6679:12, 6679:20
  **denied** [4] - 6672:11,
6672:18, 6672:24,
6686:21
  **Denver** [1] - 6629:4
  **deny** [1] - 6682:13
  **DEPARTMENT** [2] -
6628:12, 6629:2
  **department** [1] -
6697:21
  **Department** [5] -
6628:15, 6628:19,
6692:22, 6694:5,
6694:16
  **dependent** [1] -
6712:23
  **deploy** [1] - 6657:9
  **depo** [1] - 6674:6
  **deposition** [8] -
6644:6, 6649:17,
6650:3, 6651:24,
6659:23, 6660:2,
6660:23, 6690:5
  **depth** [1] - 6636:13
  **DEPUTY** [1] - 6679:15
  **describe** [1] -
6646:18, 6659:16,
6662:17, 6664:17,
6667:19
  **described** [4] -
6649:6, 6649:14,
6651:2, 6663:2
  **designations** [8] -
6674:6, 6690:5,
6695:21, 6709:25,
6710:15, 6710:23,
6711:16, 6715:8
  **designee** [2] -
6710:19, 6713:19
  **determination** [3] -
6666:1, 6707:9,
6708:25
  **determinations** [1] -

6708:18
  **determine** [2] -
6637:9, 6665:1
  **determined** [2] -
6643:21, 6667:16
  **develop** [3] - 6670:1,
6670:5, 6670:8
  **developed** [1] -
6645:16
  **Development** [1] -
6664:1
  **development** [7] -
6645:4, 6656:11,
6656:12, 6656:16,
6656:18, 6656:19,
6659:20
  **Dickman** [2] -
6629:19, 6718:11
  **DICKMAN** [1] - 6718:3
  **dicta** [1] - 6708:14
  **difference** [1] - 6651:8
  **different** [17] -
6630:23, 6631:9,
6632:18, 6633:23,
6637:12, 6638:4,
6640:19, 6640:20,
6642:17, 6650:5,
6655:5, 6659:7,
6684:8, 6690:16,
6699:18, 6699:19
  **differently** [1] -
6707:23
  **difficult** [5] - 6636:9,
6682:20, 6686:9,
6704:22, 6710:9
  **dinner** [2] - 6635:4,
6635:10
  **DINTZER** [3] - 6679:1,
6679:9, 6716:2
  **Dintzer** [1] - 6628:11
  **DIRECT** [1] - 6630:3
  **Direct** [1] - 6719:4
  **directed** [3] - 6673:9,
6717:9, 6717:10
  **directly** [2] - 6633:4,
6676:8
  **disadvantaged** [5] -
6652:25, 6653:2,
6654:6, 6654:11,
6655:1
  **disagree** [1] - 6705:2
  **discern** [1] - 6676:2
  **disclosure** [1] -
6699:12
  **discovery** [4] -
6673:11, 6673:12,
6674:17, 6688:3
  **discretion** [2] -
6696:14, 6697:16
  **discuss** [1] - 6670:19

**discussion** [2] -
6678:23, 6680:7
  **display** [1] - 6645:2
  **displayed** [1] - 6683:9
  **dispute** [3] - 6671:7,
6685:4, 6692:4
  **disputes** [4] - 6685:8,
6695:5, 6701:20,
6709:18
  **distilled** [1] - 6688:24
  **distinguished** [1] -
6708:2
  **DISTRICT** [3] - 6628:1,
6628:1, 6628:10
  **Docket** [1] - 6702:4
  **docket** [3] - 6672:10,
6704:5, 6704:6
  **document** [22] -
6663:8, 6663:10,
6672:25, 6675:6,
6685:24, 6689:5,
6693:15, 6703:11,
6703:14, 6707:9,
6708:17, 6708:18,
6708:25, 6709:24,
6711:3, 6712:19,
6713:9
  **document-by** [1] -
6708:17
  **document-by-**
**document** [3] - 6707:9,
6708:25, 6709:24
  **documents** [45] -
6671:1, 6671:7,
6671:8, 6671:20,
6672:4, 6672:15,
6672:17, 6672:23,
6673:1, 6673:7,
6673:15, 6673:19,
6673:20, 6673:21,
6673:23, 6674:12,
6675:10, 6675:14,
6675:18, 6677:3,
6677:13, 6677:21,
6689:10, 6689:11,
6692:1, 6695:21,
6696:17, 6697:19,
6699:4, 6701:6,
6701:11, 6702:14,
6702:16, 6703:10,
6708:10, 6708:11,
6709:17, 6711:11,
6711:15, 6712:2,
6712:13, 6712:20,
6712:21, 6713:1,
6716:24
  **DoJ** [9] - 6628:11,
6674:16, 6681:2,
6683:17, 6684:3,
6684:12, 6684:14,

6704:3, 6716:2
  **DoJ's** [1] - 6678:7
  **done** [9] - 6635:8,
6635:12, 6680:7,
6691:7, 6699:2,
6701:21, 6701:22,
6702:1, 6709:2,
6710:1, 6712:5
  **DoubleClick** [1] -
6653:12
  **down** [2] - 6678:9,
6678:10
  **Dr** [1] - 6716:14
  **draft** [1] - 6714:6
  **draw** [1] - 6675:11
  **drawn** [1] - 6675:10
  **driving** [2] - 6633:6,
6661:19
  **duration** [3] - 6685:7,
6688:10, 6702:21
  **during** [9] - 6644:11,
6679:11, 6685:18,
6687:24, 6688:3,
6690:3, 6690:6,
6691:18, 6696:25
  **dwindled** [1] - 6678:5
  **DX3226** [3] - 6646:3,
6647:11, 6648:15
  **DX3226.....................
......6648** [1] - 6719:7
  **DXD18** [2] - 6679:23,
6680:1
  **DXD18..............6679**
[1] - 6719:9
  **DXD18.011** [1] -
6680:3

**E**

  **early** [3] - 6645:12,
6670:18, 6706:5
  **easier** [3] - 6634:8,
6704:20, 6711:14
  **easily** [1] - 6634:8
  **ECF** [2] - 6687:18,
6688:20
  **economist** [1] -
6716:14
  **educated** [2] -
6681:23, 6693:8
  **efficiencies** [1] -
6632:2
  **effort** [1] - 6686:4
  **efforts** [1] - 6670:1
  **eight** [1] - 6659:7
  **either** [4] - 6665:20,
6688:2, 6694:12,
6700:9
  **Electrical** [1] - 6708:4
  **Email** [8] - 6628:14,

6628:17, 6628:21, 6628:24, 6629:5, 6629:13, 6629:14, 6629:17

**email** [2] - 6629:9, 6713:8

**emails** [5] - 6672:21, 6699:24, 6705:22, 6710:17, 6711:6

**embedded** [1] - 6671:4

**embraced** [1] - 6634:12

**emphasizing** [1] - 6706:4

**employee** [1] - 6676:7

**employees** [4] - 6671:11, 6671:21, 6671:25, 6678:3

**end** [9] - 6631:24, 6633:18, 6639:21, 6670:14, 6685:8, 6697:14, 6699:1, 6714:7, 6714:25

**ends** [3] - 6632:8, 6632:9, 6669:21

**engage** [2] - 6666:11, 6701:15

**engaged** [2] - 6642:7, 6697:2

**engaging** [3] - 6639:23, 6645:13, 6645:14

**engine** [8] - 6645:23, 6646:8, 6648:24, 6652:3, 6652:6, 6665:24, 6666:2, 6667:10

**engine's** [2] - 6666:20, 6666:22

**engineers** [2] - 6639:23, 6660:3

**engines** [2] - 6631:3, 6631:17

**ensure** [1] - 6689:6

**ensuring** [2] - 6671:15, 6689:20

**entered** [4] - 6687:16, 6688:19, 6690:12

**entirely** [1] - 6697:24

**entirety** [1] - 6685:21

**entitled** [3] - 6683:8, 6685:6, 6709:19

**entitlement** [1] - 6707:8

**entries** [1] - 6704:7

**entry** [1] - 6704:6

**envision** [1] - 6709:5

**equivalent** [1] - 6694:15

**especially** [1] - 6706:17

**essentially** [3] - 6685:9, 6685:10, 6694:14

**estimation** [1] - 6639:17

**et** [1] - 6628:3

**EU** [1] - 6685:20

**evaluate** [3] - 6633:13, 6697:18, 6700:1

**evaluated** [1] - 6696:18

**evening** [3] - 6680:15, 6715:18, 6717:4

**event** [2] - 6642:16, 6673:13

**everythings** [1] - 6700:5

**evidence** [17] - 6663:15, 6670:15, 6671:11, 6671:13, 6671:18, 6671:24, 6671:25, 6672:1, 6675:1, 6675:3, 6675:16, 6676:17, 6679:22, 6682:7, 6690:4, 6690:6, 6706:14

**evolved** [1] - 6649:9

**exact** [4] - 6660:22, 6661:7, 6677:23, 6684:22

**exactly** [4] - 6635:22, 6688:12, 6688:23, 6689:17

**exam** [1] - 6702:15

**EXAMINATION** [3] - 6630:3, 6644:2, 6669:5

**Examination** [3] - 6719:4, 6719:4, 6719:5

**examination** [4] - 6689:17, 6701:9, 6701:18, 6702:1

**examinations** [2] - 6677:24, 6701:6

**examine** [3] - 6672:13, 6677:2, 6689:14

**example** [8] - 6632:4, 6633:24, 6646:6, 6666:10, 6685:15, 6693:7, 6698:11, 6708:3

**except** [1] - 6680:3

**excessive** [1] - 6705:10

**exchanged** [1] - 6687:22

**excuse** [1] - 6688:10

**executive** [1] -

6666:10

**exhibit** [19] - 6646:2, 6651:12, 6663:7, 6663:15, 6663:19, 6670:22, 6682:6, 6682:17, 6682:19, 6682:22, 6682:24, 6682:25, 6685:13, 6692:5, 6692:24, 6698:3, 6703:6, 6703:8, 6706:14

**Exhibit** [2] - 6719:7, 6719:9

**exhibited** [1] - 6674:23

**exhibits** [62] - 6671:1, 6676:18, 6676:24, 6677:7, 6683:9, 6683:17, 6684:1, 6684:2, 6684:12, 6684:14, 6685:4, 6686:11, 6688:14, 6689:1, 6689:3, 6690:2, 6690:4, 6690:8, 6690:19, 6690:20, 6692:10, 6693:4, 6693:12, 6693:16, 6694:6, 6694:10, 6694:13, 6694:16, 6695:12, 6697:4, 6698:3, 6698:23, 6699:13, 6703:5, 6704:15, 6704:17, 6705:7, 6705:17, 6705:23, 6705:24, 6706:1, 6706:20, 6707:2, 6708:16, 6708:21, 6708:23, 6709:10, 6709:13, 6709:21, 6710:4, 6710:7, 6710:10, 6710:13, 6710:14, 6710:22, 6712:10, 6712:15, 6714:14, 6715:5, 6715:6, 6715:21

**EXHIBITS** [1] - 6719:6

**Exhibits** [1] - 6719:8

**exist** [2] - 6667:25, 6671:25

**exists** [1] - 6630:22

**expect** [4] - 6655:3, 6661:24, 6711:20

**expectation** [2] - 6716:15, 6717:4

**expecting** [2] - 6706:6, 6716:5

**experience** [9] - 6631:23, 6634:22, 6637:17, 6638:19,

6639:3, 6648:21, 6657:5, 6665:23, 6667:6

**expert** [2] - 6679:4, 6716:13

**experts** [1] - 6716:5

**explain** [3] - 6631:19, 6633:20, 6637:20

**exploring** [1] - 6644:16

**expresses** [1] - 6708:14

**extend** [1] - 6707:14

**extent** [9] - 6635:16, 6635:17, 6636:16, 6643:21, 6693:11, 6693:18, 6707:1, 6712:13

**extra** [1] - 6698:19

**extracted** [1] - 6703:9

**extraordinarily** [3] - 6696:23, 6699:7, 6700:2

**extraordinary** [2] - 6697:1, 6697:2

## F

**F.2d** [1] - 6708:5

**Facebook** [10] - 6645:12, 6645:15, 6646:1, 6646:12, 6646:13, 6647:5, 6647:21, 6648:12, 6648:25

**Facebook's** [1] - 6646:25

**fact** [6] - 6642:5, 6642:6, 6645:24, 6675:12, 6679:3, 6700:13

**factor** [1] - 6636:25

**facts** [1] - 6690:14

**failed** [1] - 6703:3

**fair** [15] - 6637:12, 6641:2, 6648:20, 6649:1, 6649:6, 6653:19, 6658:18, 6659:3, 6659:16, 6660:9, 6660:13, 6664:14, 6671:24, 6696:14, 6705:12

**fairly** [4] - 6632:9, 6640:1, 6716:21, 6717:11

**faith** [4] - 6674:23, 6686:3, 6686:19, 6689:20

**familiar** [3] - 6665:12, 6676:6, 6676:8

familiarize [1] - 6663:19
far [5] - 6633:23, 6648:10, 6684:5, 6686:10, 6694:11
fashion [1] - 6685:5
fast [4] - 6656:18, 6657:8, 6658:9, 6658:15
fast-paced [1] - 6656:18
faster [1] - 6657:6
feasible [1] - 6711:23
feature [30] - 6632:4, 6633:21, 6634:2, 6634:23, 6636:13, 6636:24, 6637:3, 6637:5, 6637:18, 6637:23, 6639:3, 6641:23, 6642:12, 6643:8, 6658:7, 6658:24, 6661:3, 6661:7, 6661:17, 6663:2, 6664:23, 6665:17, 6665:21, 6666:2, 6667:16, 6667:20, 6668:18, 6669:9, 6670:8
Feature [1] - 6664:1
features [47] - 6632:14, 6632:20, 6632:23, 6632:24, 6633:1, 6633:16, 6634:6, 6635:13, 6635:16, 6635:17, 6635:19, 6635:21, 6635:24, 6636:8, 6636:12, 6636:15, 6636:16, 6641:17, 6641:20, 6656:4, 6656:12, 6656:18, 6658:17, 6659:18, 6660:9, 6660:12, 6661:6, 6665:1, 6665:2, 6665:18, 6666:4, 6666:20, 6666:23, 6667:1, 6667:4, 6667:7, 6667:9, 6667:23, 6668:3, 6668:9, 6668:10, 6668:11, 6668:21, 6668:22, 6670:2, 6670:5
fee [4] - 6654:3, 6654:22, 6655:4, 6655:5
feedback [4] - 6634:5, 6634:7, 6634:9, 6641:14
fees [1] - 6654:17

felt [1] - 6652:25
fess [1] - 6691:6
few [3] - 6675:19, 6687:4, 6717:2
Fifth [1] - 6628:19
fifth [1] - 6701:25
fighting [1] - 6697:11
figure [11] - 6639:23, 6640:3, 6646:25, 6658:14, 6660:5, 6687:2, 6695:9, 6710:7, 6710:8, 6710:13, 6711:23
file [5] - 6680:12, 6680:15, 6715:11, 6715:14, 6717:8
filed [5] - 6673:14, 6673:20, 6676:17, 6676:22, 6704:2
filing [1] - 6689:25
final [5] - 6667:12, 6678:11, 6692:19, 6696:18, 6717:16
finalized [1] - 6671:2
findings [1] - 6699:2
fine [4] - 6694:8, 6705:4, 6714:4, 6714:7
finish [1] - 6695:18
finished [1] - 6640:17
first [23] - 6639:15, 6640:8, 6643:8, 6649:10, 6658:7, 6671:12, 6672:6, 6675:5, 6691:1, 6691:8, 6691:9, 6691:18, 6692:9, 6692:10, 6699:12, 6700:20, 6701:5, 6701:7, 6706:13, 6706:17, 6707:13, 6709:4, 6709:24
First [3] - 6707:8, 6708:1, 6708:8
fitting [1] - 6671:10
fixed [1] - 6705:11
flip [1] - 6676:12
Floor [2] - 6629:4, 6629:16
fly [1] - 6702:1
focus [9] - 6633:10, 6636:3, 6636:22, 6658:13, 6661:12, 6663:20, 6663:21, 6696:21, 6699:3
focused [1] - 6684:12
focusing [1] - 6660:6
folder [1] - 6674:12
folks [1] - 6676:2, 6685:16, 6716:22
follow [2] - 6644:9,

6714:13
following [1] - 6699:20
follows [1] - 6713:24
footnote [2] - 6707:16, 6712:17
FOR [1] - 6628:1
foregoing [1] - 6718:4
form [3] - 6646:20, 6676:11, 6685:3
formalize [1] - 6694:8
former [2] - 6672:16, 6707:16
forth [3] - 6641:1, 6697:3, 6697:12
forward [9] - 6681:13, 6687:3, 6688:17, 6690:15, 6692:25, 6695:13, 6695:24, 6709:15, 6717:19
foundational [2] - 6638:7, 6643:5
four [4] - 6688:22, 6690:5, 6691:9, 6699:16
four-plus [1] - 6688:22
fourfold [1] - 6654:17
fourth [2] - 6663:21, 6701:20
Fox [1] - 6679:4
fractional [5] - 6641:23, 6641:25, 6642:24, 6642:25, 6643:3
frames [1] - 6714:2
freaks [1] - 6637:24
free [5] - 6653:6, 6653:18, 6654:2, 6654:15, 6687:6
friction [2] - 6631:23, 6632:8
front [4] - 6647:13, 6647:14, 6674:8, 6676:24
frustrated [1] - 6705:22
frustrating [1] - 6683:11
frustration [1] - 6706:7
Fuel [1] - 6647:15
full [10] - 6636:12, 6642:11, 6659:24, 6660:3, 6676:23, 6693:13, 6693:15, 6707:2, 6718:5
full-time [1] - 6660:3
fully [3] - 6673:16, 6676:23, 6690:19
fulsome [1] - 6678:23

functionality [1] - 6634:18
functions [1] - 6667:23
funding [3] - 6636:2, 6636:6, 6664:19
funnel [1] - 6644:21

## G

gate [1] - 6707:23
Gee [1] - 6699:5
general [2] - 6648:11, 6656:13
General [1] - 6628:22
generally [9] - 6633:16, 6633:20, 6634:22, 6651:5, 6651:9, 6654:2, 6659:11, 6669:22, 6670:4
genuinely [1] - 6686:18
given [8] - 6636:14, 6637:10, 6638:6, 6674:23, 6675:10, 6694:20, 6696:5, 6699:9
global [1] - 6631:4
goal [4] - 6657:19, 6667:3, 6702:7, 6708:20
Goodrich [1] - 6629:15
Google [98] - 6628:6, 6629:10, 6630:9, 6630:12, 6630:19, 6631:4, 6631:5, 6631:14, 6632:6, 6632:15, 6632:23, 6633:4, 6633:9, 6633:12, 6633:17, 6633:21, 6633:24, 6634:23, 6635:11, 6635:14, 6635:16, 6635:17, 6635:19, 6635:24, 6636:8, 6636:15, 6637:21, 6638:25, 6639:7, 6639:10, 6639:15, 6639:20, 6639:23, 6640:15, 6640:25, 6641:3, 6642:2, 6642:9, 6644:5, 6646:8, 6646:19, 6646:23, 6652:23, 6653:3, 6653:6, 6653:9, 6653:11, 6653:14, 6653:17, 6653:23, 6653:24,

6729

6654:3, 6654:8, 6654:14, 6654:16, 6654:18, 6654:21, 6654:22, 6654:23, 6654:25, 6655:1, 6655:4, 6655:7, 6655:10, 6655:11, 6656:13, 6659:9, 6661:21, 6661:25, 6662:2, 6665:18, 6665:20, 6665:24, 6667:23, 6669:7, 6671:12, 6671:14, 6671:21, 6672:8, 6673:13, 6673:18, 6674:19, 6680:15, 6683:12, 6684:17, 6685:10, 6687:22, 6689:4, 6694:12, 6702:14, 6703:8, 6703:9, 6703:10, 6716:7, 6716:10

**Google's** [6] - 6640:2, 6677:25, 6692:7, 6698:22, 6706:11, 6712:1

**government** [5] - 6674:7, 6680:19, 6707:15, 6707:17, 6707:22

**Gower** [2] - 6628:18, 6670:22

**GOWER** [14] - 6670:21, 6670:25, 6673:10, 6674:10, 6675:17, 6676:5, 6676:15, 6677:12, 6677:21, 6678:12, 6678:18, 6678:24, 6715:18, 6715:25

**grant** [1] - 6673:5

**granting** [1] - 6681:15

**grateful** [1] - 6693:8

**great** [5] - 6643:22, 6658:1, 6665:13, 6697:24, 6715:23

**greater** [5] - 6631:20, 6636:8, 6636:24, 6637:1, 6693:4

**Greenblum** [2] - 6629:11, 6672:8

**GREENBLUM** [4] - 6672:7, 6674:2, 6675:24, 6678:4

**ground** [1] - 6668:5

**groundbreaking** [1] - 6640:1

**grounded** [2] - 6707:25, 6708:8

**group** [1] - 6671:6

**growing** [2] - 6705:22, 6706:7

**guess** [12] - 6636:1, 6640:6, 6671:14, 6677:7, 6680:10, 6687:15, 6687:16, 6694:22, 6711:18, 6712:5, 6712:17, 6713:23

**guidance** [3] - 6634:7, 6634:20, 6671:21

**guryan** [1] - 6643:20

## H

**half** [6] - 6630:22, 6661:5, 6661:12, 6661:16, 6670:18, 6691:11

**halfway** [2] - 6660:15, 6682:2

**hallway** [1] - 6702:7

**hand** [3] - 6643:19, 6658:10, 6671:2

**handed** [1] - 6706:2

**handle** [2] - 6687:23, 6688:23

**handling** [1] - 6690:1

**hands** [2] - 6657:20, 6657:25

**handwriting** [1] - 6687:19

**hang** [1] - 6677:17, 6714:11

**happy** [17] - 6672:2, 6673:25, 6674:11, 6674:12, 6675:18, 6676:9, 6678:19, 6681:22, 6682:11, 6683:23, 6686:12, 6686:13, 6686:24, 6694:5, 6702:20, 6709:20, 6715:15

**hard** [2] - 6686:20, 6696:23

**harder** [1] - 6703:25

**harm** [1] - 6686:18

**heading** [1] - 6688:14

**hear** [4] - 6646:9, 6672:6, 6690:13, 6710:1

**heard** [11] - 6637:3, 6637:5, 6638:8, 6641:23, 6642:12, 6674:5, 6674:9, 6676:6, 6681:17, 6691:12, 6696:8

**hearing** [2] - 6676:25, 6681:15

**hearings** [2] - 6688:9,

6691:17

**hearsay** [1] - 6671:5

**heated** [1] - 6658:3

**held** [1] - 6707:8

**help** [5] - 6632:5, 6678:10, 6695:9, 6702:22, 6710:19

**helped** [2] - 6645:22, 6664:6

**helpful** [2] - 6702:24, 6703:1

**helps** [2] - 6702:17, 6707:1

**hereby** [1] - 6718:3

**hiccup** [1] - 6713:16

**hiding** [1] - 6681:6

**high** [6] - 6630:13, 6630:14, 6647:5, 6664:18, 6664:21, 6665:16

**higher** [6] - 6631:10, 6632:10, 6654:3, 6654:17, 6654:23, 6708:11

**highly** [1] - 6688:2

**historical** [1] - 6692:1

**history** [1] - 6693:2

**hit** [1] - 6668:5

**hold** [1] - 6666:9

**holding** [3] - 6707:13, 6707:14, 6707:25

**home** [3] - 6635:3, 6635:10, 6670:12

**hone** [1] - 6661:10

**honest** [1] - 6636:19

**Honor** [78] - 6631:22, 6643:16, 6643:18, 6646:4, 6647:9, 6648:15, 6663:16, 6665:6, 6668:24, 6670:13, 6670:16, 6670:21, 6672:7, 6672:11, 6672:12, 6673:5, 6673:8, 6674:2, 6674:5, 6674:10, 6675:17, 6675:24, 6676:15, 6676:16, 6677:12, 6678:5, 6678:24, 6679:1, 6679:2, 6679:9, 6679:10, 6680:21, 6680:24, 6681:2, 6681:4, 6681:8, 6682:13, 6683:17, 6684:22, 6685:2, 6685:14, 6686:25, 6696:8, 6697:20, 6700:12, 6700:21, 6701:5, 6701:12, 6701:21,

6701:22, 6702:2, 6702:6, 6702:10, 6702:18, 6702:20, 6702:22, 6703:2, 6703:15, 6703:17, 6704:12, 6705:2, 6705:9, 6705:14, 6705:19, 6707:6, 6709:8, 6711:2, 6711:18, 6712:9, 6714:8, 6714:12, 6714:18, 6715:19, 6715:25, 6716:3, 6716:20, 6717:6, 6717:17

**Honor's** [4] - 6673:2, 6674:9, 6700:24, 6702:4

**HONORABLE** [1] - 6628:9

**hope** [3] - 6697:10, 6697:14, 6702:18

**hostage** [1] - 6712:23

**hour** [6] - 6638:16, 6638:18, 6670:18, 6691:11, 6699:17, 6700:1

**hourly** [1] - 6638:14

**hours** [11] - 6694:21, 6694:22, 6701:15, 6706:19, 6709:11, 6709:12, 6710:17, 6712:5, 6712:25, 6713:4, 6713:17

**Huang** [1] - 6629:14

**huge** [1] - 6686:22

**hum** [1] - 6647:20

**human** [1] - 6638:3

**hundreds** [8] - 6633:5, 6650:10, 6650:11, 6650:25, 6651:4, 6651:6, 6698:2

**hurst's** [1] - 6679:11

**hurt** [1] - 6637:2

## I

**i.e** [1] - 6712:3

**icons** [3] - 6647:18, 6647:19, 6647:21

**idea** [2] - 6677:6, 6704:7

**ideal** [1] - 6703:19

**identification** [1] - 6646:3

**identified** [1] - 6649:21

**identify** [3] - 6640:19, 6689:2, 6701:5

**ignoring** [1] - 6683:16

6730

**IL** [1] - 6628:16
**imagine** [1] - 6654:13
**impact** [3] - 6633:6,
6633:11, 6633:14
**impactful** [3] - 6636:4,
6641:17, 6641:19
**impediments** [1] -
6686:16
**implemented** [1] -
6700:22
**implicate** [1] - 6708:15
**implicates** [1] - 6700:6
**import** [1] - 6642:9
**importance** [2] -
6696:17, 6701:1
**important** [6] -
6681:25, 6687:11,
6692:1, 6694:2,
6701:2, 6713:15
**improve** [3] - 6666:19,
6666:22, 6668:20
**IN** [1] - 6628:1
**inadmissible** [1] -
6673:16
**inappropriate** [1] -
6677:9
**include** [1] - 6709:14
**included** [2] -
6673:21, 6692:16
**includes** [1] - 6635:11
**increase** [1] - 6669:12
**increased** [1] -
6669:15
**increasing** [1] -
6693:3
**independence** [3] -
6651:13, 6651:25,
6652:13
**independent** [2] -
6652:8, 6652:9
**INDEX** [1] - 6719:1
**index** [1] - 6631:9
**indication** [1] -
6682:18
**individual** [4] -
6694:6, 6694:10,
6699:13, 6710:12
**Industrial** [1] -
6685:20
**industry** [5] - 6631:9,
6631:11, 6632:10,
6655:11, 6655:13
**industry's** [1] -
6631:20
**inference** [2] -
6671:24, 6675:10
**inferences** [1] -
6675:9
**inform** [1] - 6671:23
**informally** [1] - 6694:7

**information** [25] -
6685:24, 6686:4,
6686:6, 6686:17,
6686:21, 6687:21,
6690:2, 6700:24,
6700:25, 6703:7,
6703:9, 6704:10,
6705:7, 6706:20,
6707:3, 6710:5,
6710:6, 6710:8,
6710:11, 6710:13,
6710:22, 6711:4,
6712:3, 6712:4, 6713:5
**Information** [1] -
6688:21
**innovate** [1] - 6667:1
**input** [2] - 6646:7,
6662:18
**inputs** [1] - 6637:13
**Insights** [1] - 6647:15
**Instagram** [1] -
6647:21
**instance** [1] - 6668:18
**instances** [2] -
6672:19, 6686:5
**instead** [1] - 6708:6
**insulated** [1] -
6701:18
**integrate** [6] -
6632:19, 6635:13,
6639:19, 6640:4,
6640:11, 6641:6
**integrated** [4] -
6633:2, 6641:2,
6653:11, 6669:14
**integrating** [2] -
6633:16, 6641:4
**intend** [4] - 6677:19,
6677:22, 6701:7,
6702:20
**intent** [2] - 6644:13,
6675:12
**intention** [1] - 6693:20
**interaction** [1] -
6645:6
**interest** [5] - 6647:6,
6695:12, 6695:23,
6695:24, 6695:25
**interested** [2] -
6647:4, 6715:4
**interests** [1] - 6701:2
**interpret** [1] - 6671:18
**interpretation** [1] -
6672:25
**interrupt** [1] - 6711:7
**intervened** [1] -
6693:1
**intervenor** [1] -
6680:12
**intraday** [2] - 6638:8,

6638:20
**introduce** [2] -
6639:15, 6640:8
**introduced** [6] -
6643:8, 6690:2,
6690:6, 6693:12,
6698:13, 6712:11
**introducing** [1] -
6690:19
**introduction** [1] -
6674:25
**invest** [1] - 6666:5
**invested** [1] - 6636:23
**investing** [1] -
6636:20
**investment** [1] -
6659:24
**Investment** [1] -
6685:20
**investments** [1] -
6667:24
**invitation** [1] -
6680:15
**invited** [1] - 6675:3
**involve** [2] - 6708:6,
6712:14
**involves** [2] - 6709:17,
6713:1
**issue** [16] - 6651:24,
6654:11, 6654:20,
6655:1, 6655:16,
6682:1, 6684:8,
6687:20, 6688:12,
6688:13, 6696:15,
6706:3, 6708:9,
6709:23, 6711:13,
6713:8
**issues** [6] - 6701:20,
6709:6, 6712:18,
6716:24, 6717:10,
6717:11
**items** [1] - 6701:11
**itself** [5] - 6665:16,
6682:25, 6701:19,
6702:5, 6708:12

## J

**J.C** [1] - 6679:14
**Janice** [2] - 6629:19,
6718:11
**JANICE** [1] - 6718:3
**Jason** [1] - 6716:11
**John** [1] - 6629:10
**jon.sallet@coag.gov**
[1] - 6629:5
**Jonathan** [1] - 6629:1
**journey** [4] - 6642:18,
6648:20, 6648:21,
6648:22

**Jr** [1] - 6629:6
**jschmidtlein@wc.
com** [1] - 6629:13
**JUDGE** [1] - 6628:10
**Judge** [6] - 6655:20,
6690:15, 6696:11,
6697:5, 6707:16,
6707:20
**judged** [1] - 6696:18
**judgment** [3] - 6698:7,
6707:10, 6707:21
**judicial** [3] - 6682:7,
6695:24, 6709:13
**Judicial** [1] - 6629:3
**jury** [1] - 6705:25
**justice** [2] - 6686:19,
6697:5
**JUSTICE** [1] - 6628:12
**Justice** [5] - 6628:15,
6628:19, 6692:22,
6694:5, 6694:16

## K

**keep** [5] - 6661:6,
6661:20, 6672:1,
6689:9, 6702:17
**Kenneth** [1] - 6628:11
**kenneth.dintzer2@
usdoj.gov** [1] - 6628:14
**Kenshoo** [6] -
6656:15, 6657:5,
6657:6, 6666:19,
6666:22, 6670:1
**keyword** [1] - 6647:2
**kind** [6] - 6652:19,
6675:10, 6681:11,
6697:18, 6705:5,
6705:8
**knowledge** [1] -
6664:4
**known** [1] - 6692:12
**Kreuger** [1] - 6716:17
**Krueger** [2] - 6716:8,
6716:12

## L

**laid** [1] - 6684:19
**language** [5] - 6650:7,
6651:5, 6663:12,
6702:9, 6702:19
**large** [2] - 6690:20,
6698:3
**largely** [2] - 6689:4,
6695:14
**largest** [1] - 6666:14
**LaSalle** [1] - 6628:16
**last** [13] - 6642:12,
6642:19, 6642:22,

6731

6642:24, 6643:3, 6644:17, 6649:13, 6649:17, 6680:11, 6680:15, 6681:9
**late** [2] - 6660:21, 6661:5
**launch** [2] - 6658:9, 6660:7
**launched** [2] - 6660:10, 6660:12
**launching** [2] - 6660:15, 6660:17
**LAW** [1] - 6629:2
**law** [12] - 6683:8, 6683:16, 6695:7, 6696:11, 6696:13, 6699:8, 6707:4, 6707:5, 6708:1, 6708:6, 6708:13, 6708:15
**lawyer** [2] - 6655:15, 6704:20
**lawyers** [1] - 6701:5
**lay** [2] - 6682:4, 6683:5
**layered** [1] - 6637:23
**layman's** [1] - 6646:18
**lays** [1] - 6688:22
**lead** [2] - 6632:13, 6638:20
**leader** [1] - 6662:23
**leading** [2] - 6632:9, 6688:11
**least** [15] - 6640:7, 6640:10, 6645:11, 6677:16, 6689:8, 6689:14, 6691:13, 6692:22, 6698:9, 6700:22, 6701:10, 6713:25, 6714:25, 6715:2, 6716:16
**leave** [7] - 6672:13, 6673:6, 6677:2, 6680:23, 6686:24, 6692:8, 6713:23
**leaves** [2] - 6683:4, 6714:14
**left** [2] - 6688:4, 6690:23
**legal** [2] - 6700:8, 6707:11
**legally** [1] - 6683:14
**less** [3] - 6640:13, 6640:25, 6675:5
**level** [6] - 6662:17, 6664:18, 6664:21, 6665:16, 6700:3, 6704:13
**Liberty** [1] - 6628:23
**license** [1] - 6654:9

**life** [3] - 6631:25, 6635:3, 6640:4
**light** [3] - 6661:13, 6661:17, 6662:20
**lights** [1] - 6696:25
**limine** [1] - 6673:13
**limit** [1] - 6715:19
**limited** [3] - 6636:2, 6707:13, 6708:7
**line** [8] - 6648:4, 6656:23, 6657:5, 6662:8, 6662:9, 6662:12, 6699:5
**linear** [2] - 6648:21, 6648:23
**lines** [6] - 6638:12, 6650:15, 6650:16, 6650:21, 6650:22, 6656:24
**link** [1] - 6645:19
**LinkedIn** [1] - 6647:22
**list** [1] - 6689:1
**literally** [1] - 6713:6
**litigation** [2] - 6682:11, 6711:21
**live** [3] - 6660:18, 6671:7, 6672:14
**LLC** [1] - 6628:6
**LLP** [2] - 6629:7, 6629:11
**local** [1] - 6695:15
**look** [33] - 6636:13, 6647:11, 6650:12, 6650:14, 6650:16, 6660:23, 6660:25, 6662:7, 6662:8, 6662:9, 6662:10, 6663:22, 6665:11, 6666:15, 6667:13, 6669:22, 6675:14, 6675:21, 6678:19, 6678:22, 6681:21, 6687:9, 6695:5, 6697:23, 6697:25, 6699:4, 6708:3, 6708:12, 6715:13, 6715:15, 6715:24, 6717:15, 6717:19
**looking** [6] - 6644:16, 6665:15, 6667:21, 6668:2, 6668:4, 6670:6
**looks** [6] - 6632:1, 6646:10, 6651:17, 6656:19, 6661:8, 6687:18
**low** [1] - 6654:2
**lower** [2] - 6653:6, 6653:18
**lunch** [3] - 6644:11, 6645:8, 6649:10

**M**

**magnitude** [1] - 6697:7
**MAIER** [2] - 6679:19, 6680:1
**Maier** [1] - 6679:25
**main** [3] - 6682:1, 6683:4, 6708:20
**maintained** [2] - 6683:22, 6703:13
**majority** [2] - 6630:16, 6643:22
**manage** [4] - 6630:15, 6632:7, 6638:3, 6668:20
**Manager** [10] - 6653:3, 6653:6, 6653:9, 6653:24, 6654:4, 6654:8, 6654:14, 6654:18, 6654:23, 6655:4
**manipulate** [1] - 6637:25
**manipulating** [1] - 6671:13
**manner** [1] - 6710:16
**Marin** [1] - 6649:18
**marked** [1] - 6646:3
**market** [7] - 6634:10, 6652:2, 6652:5, 6662:6, 6667:25
**marketers** [1] - 6637:24
**marketing** [1] - 6716:13
**marketplace** [3] - 6633:8, 6634:12, 6635:5
**marketplaces** [1] - 6637:21
**match** [1] - 6646:24
**matching** [1] - 6645:17
**material** [1] - 6675:2
**materialize** [1] - 6668:19
**materials** [2] - 6674:3, 6674:8
**matter** [3] - 6671:6, 6671:9, 6707:11
**matters** [5] - 6670:22, 6671:9, 6688:23, 6700:19, 6707:21, 6714:15
**maximal** [1] - 6689:21
**mean** [20] - 6630:14, 6636:1, 6648:22, 6650:3, 6650:25, 6676:1, 6684:19,

6694:10, 6695:8, 6696:10, 6698:14, 6699:17, 6704:20, 6704:22, 6705:15, 6705:18, 6705:25, 6706:12, 6713:6, 6715:13
**means** [5] - 6635:4, 6638:13, 6638:15, 6658:17, 6715:14
**meant** [1] - 6690:18
**mechanism** [4] - 6685:3, 6694:4, 6694:6, 6709:10
**media** [7] - 6645:24, 6647:24, 6648:2, 6648:7, 6648:14, 6650:1, 6690:15
**meet** [5] - 6658:12, 6665:17, 6665:21, 6675:15, 6701:14
**meetings** [1] - 6666:10
**MEHTA** [1] - 6628:9
**memo** [1] - 6680:13
**memory** [2] - 6639:17, 6644:1
**men** [1] - 6647:3
**mention** [1] - 6703:3
**mentioned** [3] - 6648:11, 6651:3, 6685:21
**messaging** [1] - 6648:5
**met** [2] - 6644:5, 6648:19
**Meta** [2] - 6645:15, 6645:16
**metric** [1] - 6631:9
**Michael** [1] - 6628:22
**michael.schwartz@ ag.ny.gov** [1] - 6628:24
**Microsoft** [67] - 6630:13, 6630:16, 6630:23, 6631:5, 6631:7, 6631:10, 6631:13, 6632:5, 6632:9, 6632:10, 6632:14, 6632:24, 6633:4, 6633:9, 6633:12, 6633:17, 6633:21, 6634:13, 6635:8, 6635:11, 6636:16, 6636:24, 6637:22, 6638:22, 6639:6, 6640:2, 6640:9, 6640:12, 6640:13, 6641:4, 6641:6, 6641:15, 6642:3, 6642:10,

6732

6643:9, 6646:20,
6656:13, 6659:2,
6659:10, 6659:12,
6659:14, 6659:16,
6659:22, 6660:5,
6660:9, 6660:14,
6660:21, 6661:3,
6662:19, 6664:1,
6664:3, 6664:10,
6664:13, 6664:19,
6664:23, 6664:25,
6665:17, 6665:20,
6665:24, 6667:15,
6667:20, 6667:21,
6668:8, 6668:11,
6668:14, 6669:11,
6669:17
  **Microsoft's** [2] -
6630:22, 6663:2
  **mid** [2] - 6690:8,
6715:7
  **mid-trial** [1] - 6715:7
  **might** [6] - 6639:23,
6642:25, 6687:3,
6690:21, 6711:20,
6713:17
  **mind** [4] - 6661:6,
6661:21, 6682:1,
6714:22
  **minimal** [1] - 6658:14
  **minimize** [1] - 6682:9
  **minimizes** [1] - 6709:2
  **minimum** [1] -
6657:20
  **minority** [1] - 6677:21
  **minute** [5] - 6643:17,
6668:24, 6687:4,
6695:16
  **minutes** [2] - 6670:20,
6680:5
  **mirroring** [2] - 6632:3,
6632:4
  **mischaracterize** [1] -
6685:17
  **missed** [1] - 6673:25
  **miswrote** [1] -
6678:10
  **model** [4] - 6656:16,
6656:18, 6657:10,
6657:11
  **modify** [1] - 6698:9
  **moment** [6] - 6637:10,
6638:17, 6643:6,
6663:18, 6669:17,
6677:15
  **Monday** [4] - 6682:8,
6685:18, 6717:3
  **monetary** [2] -
6664:16, 6664:17
  **money** [2] - 6630:18,

6630:19
  **month** [3] - 6640:18,
6661:6, 6690:12
  **monthly** [4] - 6657:17,
6688:9, 6704:4
  **months** [3] - 6650:6,
6667:7, 6688:11
  **morning** [3] - 6630:7,
6683:17, 6695:11
  **most** [13] - 6634:14,
6636:3, 6638:7,
6641:17, 6641:19,
6649:12, 6672:15,
6673:24, 6683:7,
6683:11, 6694:2,
6707:15, 6712:10
  **mostly** [2] - 6637:14,
6654:15
  **motion** [29] - 6671:17,
6672:11, 6672:12,
6672:19, 6672:23,
6673:8, 6673:10,
6673:11, 6673:12,
6673:13, 6673:17,
6673:20, 6674:17,
6674:18, 6676:17,
6676:18, 6676:20,
6676:22, 6676:23,
6680:13, 6681:15,
6682:14, 6705:22,
6706:7, 6715:19,
6717:8, 6717:10
  **move** [5] - 6648:15,
6655:19, 6679:11,
6679:21, 6715:21
  **moving** [5] - 6652:16,
6674:7, 6678:13,
6695:13, 6695:24
  **MR** [85] - 6630:5,
6631:12, 6632:12,
6643:14, 6648:16,
6669:4, 6669:6,
6670:10, 6670:16,
6670:21, 6670:25,
6672:7, 6673:10,
6674:2, 6674:10,
6675:17, 6675:24,
6676:5, 6676:15,
6676:16, 6676:20,
6676:22, 6677:12,
6677:21, 6678:4,
6678:12, 6678:18,
6678:24, 6679:1,
6679:9, 6679:10,
6679:16, 6679:24,
6680:21, 6681:2,
6681:4, 6681:8,
6681:24, 6682:25,
6683:4, 6683:21,
6684:2, 6684:6,

6684:9, 6696:8,
6696:10, 6696:13,
6696:14, 6698:17,
6698:20, 6699:14,
6700:12, 6700:21,
6702:25, 6703:2,
6703:17, 6704:11,
6704:19, 6705:2,
6705:5, 6705:12,
6705:21, 6711:2,
6711:8, 6711:18,
6712:1, 6712:9,
6712:17, 6713:6,
6714:8, 6714:12,
6714:24, 6715:10,
6715:16, 6715:18,
6715:25, 6716:2,
6716:4, 6716:7,
6716:11, 6716:18,
6716:20, 6717:6,
6717:8, 6717:17
  **MS** [15] - 6643:16,
6644:3, 6646:4,
6647:9, 6647:10,
6648:15, 6648:18,
6663:14, 6663:17,
6665:6, 6665:10,
6668:24, 6669:1,
6679:19, 6680:1
  **MSAN** [1] - 6668:11
  **multiple** [5] - 6659:17,
6664:13, 6680:1,
6702:5, 6710:17
  **must** [1] - 6701:15
  **MVP** [1] - 6658:14

## N

  **N.W** [1] - 6718:12
  **name** [3] - 6659:12,
6676:8, 6681:10
  **named** [1] - 6649:18
  **names** [3] - 6676:1,
6676:5, 6676:6
  **narrative** [2] -
6633:25, 6634:4
  **narrows** [1] - 6715:23
  **nascent** [2] - 6663:3,
6669:9
  **native** [9] - 6632:14,
6632:15, 6632:19,
6632:20, 6633:1,
6635:14, 6638:22,
6638:25
  **navigate** [2] - 6696:16,
6716:23
  **necessarily** [5] -
6639:22, 6644:22,
6655:5, 6682:21,
6705:19

  **necessary** [4] -
6641:1, 6685:23,
6699:9, 6706:22
  **need** [21] - 6634:18,
6634:19, 6643:21,
6644:1, 6658:13,
6658:15, 6662:2,
6663:10, 6678:23,
6683:7, 6687:6,
6690:16, 6692:13,
6693:3, 6696:6,
6698:12, 6701:3,
6706:25, 6707:9,
6711:22, 6715:24
  **needed** [3] - 6687:23,
6691:5, 6704:25
  **needing** [1] - 6716:16
  **needs** [3] - 6635:5,
6658:13, 6692:13
  **negotiate** [1] -
6701:16
  **negotiations** [1] -
6677:16
  **net** [2] - 6667:25,
6668:4
  **Network** [1] - 6668:12
  **neutral** [2] - 6651:14,
6651:18
  **New** [10] - 6628:23,
6629:8, 6629:16,
6680:12, 6681:10,
6692:25, 6693:23,
6704:7, 6704:24,
6710:1
  **new** [5] - 6640:1,
6667:22, 6667:25,
6668:2, 6668:4
  **next** [7] - 6632:13,
6660:6, 6670:20,
6677:25, 6679:4,
6679:8, 6715:6
  **nice** [3] - 6644:5,
6644:8, 6717:18
  **night** [1] - 6711:22
  **nobody** [8] - 6668:8,
6690:10, 6690:13,
6692:18, 6692:23,
6692:24, 6704:17
  **nonaccess** [1] -
6707:18
  **nonconfidential** [2] -
6710:5, 6710:6
  **none** [2] - 6690:14,
6691:20
  **note** [1] - 6673:18
  **notes** [1] - 6718:5
  **nothing** [5] - 6669:1,
6680:22, 6691:20,
6716:2, 6716:4
  **notice** [4] - 6681:16,

6733

6693:9, 6701:10, 6713:10
**notified** [1] - 6693:8
**notion** [1] - 6697:9
**notwithstanding** [1] - 6683:12
**number** [19] - 6630:23, 6631:5, 6642:3, 6650:14, 6666:11, 6674:20, 6677:1, 6677:2, 6677:23, 6678:11, 6678:14, 6679:25, 6683:20, 6683:24, 6697:7, 6699:19, 6699:21, 6700:5
**numbers** [3] - 6643:23, 6679:14, 6684:4
**NW** [4] - 6628:12, 6628:19, 6629:12, 6629:20
**NY** [3] - 6628:23, 6629:8, 6629:16

## O

**o'clock** [1] - 6680:6
**objected** [1] - 6677:3
**objection** [8] - 6643:24, 6648:16, 6671:4, 6671:5, 6679:17, 6679:19, 6679:24
**objections** [5] - 6657:7, 6684:24, 6695:20, 6709:25, 6714:21
**objective** [1] - 6640:22
**objectives** [7] - 6640:19, 6640:21, 6659:7, 6659:17, 6660:9, 6660:15, 6660:16
**obligated** [1] - 6700:6
**obligation** [1] - 6683:15
**obscure** [1] - 6686:4
**observations** [1] - 6674:15
**observed** [1] - 6712:10
**obvious** [1] - 6682:22
**obviously** [11] - 6672:19, 6673:4, 6674:5, 6674:25, 6675:2, 6692:16, 6696:16, 6696:19, 6703:22, 6713:7, 6714:20

**occurred** [2] - 6691:17, 6691:18
**occurs** [1] - 6630:16
**October** [3] - 6628:5, 6704:3, 6718:7
**OF** [5] - 6628:1, 6628:9, 6628:12, 6629:2, 6718:1
**offense** [2] - 6702:11, 6702:12
**offer** [3] - 6653:17, 6667:23, 6712:15
**offered** [3] - 6653:14, 6656:4, 6690:3
**offers** [2] - 6653:6, 6653:24
**Office** [1] - 6628:22
**office** [1] - 6711:20
**OFFICIAL** [1] - 6718:1
**Official** [2] - 6629:19, 6718:11
**often** [7] - 6644:17, 6644:23, 6648:22, 6667:21, 6668:8, 6681:22, 6684:25
**oftentimes** [6] - 6636:5, 6636:11, 6636:12, 6642:8, 6668:1, 6668:6
**omnichannel** [2] - 6649:11, 6649:12
**on-demand** [1] - 6694:20
**once** [1] - 6699:13
**one** [44] - 6630:6, 6632:3, 6635:4, 6635:9, 6636:25, 6640:23, 6641:19, 6642:18, 6643:7, 6659:24, 6668:11, 6668:21, 6671:11, 6672:2, 6673:25, 6674:2, 6674:13, 6674:16, 6675:1, 6675:4, 6676:13, 6676:19, 6678:18, 6682:1, 6685:15, 6686:14, 6688:24, 6688:25, 6689:1, 6689:18, 6690:9, 6693:8, 6698:9, 6700:14, 6700:15, 6703:2, 6705:16, 6706:8, 6710:23, 6712:17
**ones** [3] - 6651:2, 6684:6, 6711:12
**online** [1] - 6685:24
**open** [14] - 6634:13, 6634:14, 6634:19,

6680:11, 6681:7, 6688:4, 6689:9, 6701:24, 6702:7, 6702:17, 6704:5, 6708:21, 6717:4
**opening** [1] - 6681:11
**operate** [3] - 6634:18, 6635:4, 6646:21
**operating** [2] - 6699:16, 6699:17
**opinion** [1] - 6696:11
**opinions** [1] - 6696:19
**opportunities** [2] - 6668:2, 6668:4
**opportunity** [10] - 6667:2, 6673:5, 6676:14, 6676:23, 6680:22, 6681:17, 6711:19, 6714:16, 6715:7, 6715:11
**optimization** [5] - 6661:14, 6661:18, 6662:22, 6662:23, 6662:25
**optimize** [2] - 6640:21, 6640:22
**orally** [1] - 6678:13
**order** [19] - 6680:14, 6683:6, 6687:18, 6688:5, 6688:19, 6688:22, 6689:23, 6689:24, 6690:7, 6690:12, 6691:16, 6701:15, 6702:4, 6708:19, 6711:5, 6713:19, 6714:4
**Order** [1] - 6688:20
**ordered** [1] - 6701:5
**organization** [1] - 6704:8
**original** [5] - 6646:7, 6687:17, 6688:5, 6691:16, 6704:3
**originally** [1] - 6674:21
**otherwise** [5] - 6635:5, 6667:3, 6671:13, 6674:21, 6675:9
**ought** [1] - 6675:15
**out-of-turn** [1] - 6716:10
**outcome** [1] - 6674:18
**outcomes** [1] - 6638:20
**outlined** [1] - 6714:4
**outlining** [1] - 6707:1
**outside** [2] - 6674:8, 6707:18
**outstanding** [1] -

6679:5
**overall** [1] - 6631:2
**overbuild** [1] - 6658:12
**overburden** [1] - 6694:3
**overnight** [1] - 6714:1
**oversee** [1] - 6645:2
**oversight** [1] - 6645:6
**overwhelm** [1] - 6699:21
**own** [11] - 6639:25, 6641:9, 6641:12, 6661:14, 6661:17, 6666:1, 6667:1, 6687:19, 6695:23

## P

**p.m** [3] - 6628:6, 6680:9
**paced** [1] - 6656:18
**page** [25] - 6647:18, 6648:10, 6650:14, 6650:15, 6650:22, 6656:23, 6656:25, 6662:8, 6662:12, 6663:20, 6663:21, 6663:22, 6665:5, 6669:21, 6671:21, 6680:2, 6682:17, 6682:21, 6683:1, 6685:21, 6707:16, 6707:19
**pages** [13] - 6646:10, 6646:11, 6662:8, 6676:12, 6680:1, 6688:22, 6690:21, 6697:22, 6697:23, 6698:13, 6698:15, 6706:12
**paid** [2] - 6644:12, 6644:20
**Paid** [1] - 6647:15
**paper** [4] - 6647:14, 6671:2, 6706:1, 6706:23
**papers** [1] - 6682:9
**paragraph** [2] - 6689:22, 6699:5
**paragraphs** [1] - 6665:8
**parity** [8] - 6635:8, 6655:3, 6655:7, 6655:10, 6655:11, 6661:25, 6665:17, 6665:21
**part** [16] - 6645:18, 6652:13, 6653:8, 6653:12, 6662:6,

6734

6663:1, 6668:3,
6673:23, 6683:11,
6689:18, 6689:19,
6690:18, 6699:12,
6703:1, 6709:4, 6709:9
**partial** [1] - 6642:10
**partially** [1] - 6673:18
**participate** [1] -
6637:10
**participating** [1] -
6712:14
**particular** [7] -
6661:11, 6666:1,
6667:10, 6672:25,
6692:4, 6696:17,
6710:2
**particularly** [2] -
6710:5, 6711:16
**parties** [51] - 6637:15,
6638:13, 6639:25,
6680:17, 6682:10,
6682:16, 6683:10,
6684:20, 6684:23,
6685:5, 6685:9,
6685:11, 6686:3,
6686:10, 6687:19,
6687:22, 6688:1,
6688:6, 6688:25,
6689:8, 6689:14,
6689:19, 6689:25,
6690:11, 6690:18,
6691:5, 6691:15,
6691:19, 6692:2,
6692:15, 6692:16,
6693:24, 6694:3,
6694:12, 6694:21,
6696:22, 6699:7,
6699:21, 6700:22,
6701:15, 6703:12,
6703:13, 6706:21,
6708:20, 6710:15,
6710:16, 6714:17,
6714:24, 6715:3,
6715:11
**parties'** [1] - 6695:24
**partner** [1] - 6664:10
**partners** [3] - 6647:24,
6668:2, 6668:6
**partnership** [1] -
6645:4
**parts** [1] - 6664:6
**party** [15] - 6651:14,
6651:18, 6654:3,
6655:6, 6665:20,
6689:5, 6707:15,
6707:17, 6707:22,
6708:10, 6708:11,
6712:19, 6712:21,
6713:1, 6713:19
**passed** [1] - 6715:20

**past** [1] - 6716:23
**path** [2] - 6681:12,
6687:2
**Patterson** [1] - 6629:7
**PAUL** [2] - 6630:4,
6719:3
**pause** [7] - 6643:22,
6644:24, 6650:18,
6652:18, 6657:2,
6668:25, 6677:18
**pay** [5] - 6654:20,
6654:21, 6654:22,
6664:23, 6667:5
**pay-per-feature** [1] -
6664:23
**peers** [1] - 6636:21
**people** [1] - 6699:19
**per** [2] - 6664:23,
6713:9
**percent** [15] - 6630:12,
6630:15, 6630:24,
6631:4, 6631:8,
6631:13, 6631:15,
6631:16, 6661:8,
6661:21, 6661:22,
6661:23, 6683:19,
6684:13, 6711:9
**percentage** [4] -
6631:10, 6631:14,
6631:20, 6678:6
**perfect** [1] - 6665:13
**perform** [1] - 6667:17
**performance** [6] -
6638:1, 6641:21,
6645:19, 6645:23,
6656:6, 6658:20
**performing** [2] -
6641:14, 6658:21
**performs** [1] - 6632:9
**perhaps** [1] - 6656:4
**period** [8] - 6669:25,
6670:5, 6694:23,
6710:2, 6710:3,
6710:24, 6713:2,
6713:3
**person** [3] - 6644:8,
6710:11, 6713:20
**perspective** [1] -
6641:13
**persuade** [1] - 6636:9
**pertain** [1] - 6671:8
**phase** [2] - 6687:24,
6688:4
**Philippines** [1] -
6708:4
**pick** [2] - 6666:4,
6666:6
**piece** [1] - 6640:13
**pieces** [2] - 6660:7,
6701:6

**PII** [3] - 6711:4,
6712:4, 6712:22
**Pinterest** [2] - 6642:3,
6647:22
**place** [11] - 6645:24,
6646:13, 6671:12,
6680:10, 6688:7,
6690:17, 6692:13,
6693:10, 6694:4,
6694:15, 6700:20
**Plaintiff** [2] - 6628:21,
6629:1
**Plaintiffs** [2] - 6628:4,
6628:11
**plaintiffs** [3] - 6675:3,
6694:12, 6716:2
**plan** [4] - 6677:14,
6701:11, 6702:15,
6715:22
**planning** [3] -
6636:12, 6677:23,
6678:15
**platform** [8] - 6631:3,
6649:7, 6649:25,
6652:3, 6652:5,
6653:13, 6662:22,
6665:2
**platform's** [1] -
6631:20
**platforms** [9] -
6631:24, 6647:24,
6648:2, 6650:9,
6650:23, 6650:24,
6651:1, 6651:6, 6651:7
**played** [1] - 6690:6
**plus** [2] - 6654:18,
6688:22
**point** [17] - 6638:2,
6639:24, 6641:13,
6642:19, 6642:20,
6643:7, 6678:4,
6684:11, 6692:7,
6692:24, 6696:19,
6700:4, 6703:3,
6708:24, 6710:11,
6713:20
**points** [6] - 6642:6,
6642:17, 6673:24,
6700:13, 6708:9
**policing** [1] - 6672:1
**portion** [2] - 6682:17,
6691:23
**portions** [8] - 6683:9,
6689:2, 6689:4,
6689:15, 6691:17,
6711:10, 6711:15,
6712:21
**posited** [1] - 6646:6
**position** [3] - 6677:10,
6681:2, 6697:18

**positioning** [1] -
6649:12
**possible** [4] - 6657:21,
6689:10, 6702:8,
6702:17
**post** [4] - 6689:25,
6692:9, 6694:5, 6717:3
**posted** [3] - 6683:18,
6692:24, 6705:24
**posting** [2] - 6692:10,
6694:16
**posttrial** [2] - 6696:20,
6699:2
**potential** [1] - 6713:16
**potentially** [2] -
6653:6, 6684:10
**practicalities** [1] -
6709:16
**practices** [1] - 6634:9
**precious** [1] - 6695:16
**precisely** [1] - 6688:12
**preclude** [1] - 6674:25
**prejudgment** [1] -
6707:18
**prejudice** [3] -
6682:14, 6703:22,
6703:24
**prepare** [1] - 6701:4
**prepared** [3] -
6678:18, 6710:2,
6710:11
**present** [6] - 6675:3,
6687:11, 6688:14,
6689:10, 6701:4,
6701:7
**presentation** [1] -
6685:19
**presented** [10] -
6675:6, 6686:6,
6692:15, 6693:19,
6701:16, 6705:8,
6709:6, 6711:11,
6711:17, 6713:7
**presenting** [1] -
6690:20
**press** [23] - 6685:3,
6691:24, 6694:1,
6694:24, 6696:23,
6697:11, 6699:19,
6699:24, 6700:5,
6700:25, 6704:5,
6704:8, 6704:12,
6706:2, 6706:18,
6707:8, 6709:15,
6710:11, 6710:12,
6711:20, 6711:23,
6713:12, 6714:21
**presumably** [2] -
6676:1, 6680:5
**presumptively** [1] -

6735

6698:6
  **pretrial** [3] - 6672:13, 6673:3, 6687:24
  **pretty** [3] - 6636:18, 6656:16, 6657:11
  **prevent** [1] - 6702:16
  **previously** [1] - 6716:12
  **price** [1] - 6655:15
  **pricing** [2] - 6655:3, 6655:7
  **primarily** [1] - 6663:21
  **primary** [1] - 6649:15
  **printed** [1] - 6647:12
  **priorities** [2] - 6640:24, 6666:9
  **prioritize** [1] - 6640:5
  **prioritizes** [1] - 6641:16
  **priority** [1] - 6641:22
  **private** [3] - 6707:14, 6707:20, 6707:21
  **probing** [1] - 6691:5
  **problem** [2] - 6634:2, 6692:12
  **problematic** [1] - 6685:15
  **proceed** [1] - 6689:12
  **proceeded** [1] - 6685:12
  **proceedings** [2] - 6693:19, 6718:6
  **proces** [1] - 6635:11
  **process** [43] - 6632:6, 6633:1, 6633:16, 6634:21, 6635:11, 6640:7, 6640:11, 6640:15, 6640:17, 6641:3, 6642:7, 6684:17, 6684:20, 6686:9, 6688:7, 6688:18, 6690:1, 6690:16, 6690:17, 6692:13, 6692:15, 6692:17, 6693:10, 6694:15, 6694:18, 6694:19, 6695:23, 6700:23, 6701:1, 6701:14, 6701:18, 6701:19, 6702:10, 6702:11, 6702:13, 6702:21, 6703:21, 6711:5, 6712:14, 6715:5, 6715:9
  **processed** [1] - 6712:6
  **processes** [1] - 6698:22
  **produce** [3] - 6673:22, 6674:20, 6697:10

  **produced** [1] - 6698:12
  **product** [18] - 6653:3, 6653:10, 6653:11, 6653:14, 6653:18, 6653:22, 6653:25, 6654:4, 6654:9, 6654:21, 6654:22, 6655:12, 6655:13, 6657:20, 6658:14, 6659:10, 6659:12, 6696:25
  **products** [2] - 6644:16, 6686:22
  **Professor** [5] - 6679:4, 6703:5, 6716:13, 6717:9, 6717:10
  **prompt** [2] - 6683:8, 6707:2
  **promptly** [4] - 6681:15, 6706:18, 6706:19, 6710:9
  **properly** [2] - 6708:23, 6709:11
  **propose** [3] - 6682:5, 6691:16, 6714:17
  **proposed** [5] - 6680:14, 6683:5, 6690:1, 6708:19, 6714:1
  **proposition** [4] - 6658:6, 6658:8, 6662:6, 6663:1
  **protecting** [1] - 6681:18
  **Protection** [1] - 6629:2
  **protective** [4] - 6687:18, 6688:5, 6689:23, 6689:24
  **prove** [1] - 6658:20
  **proved** [1] - 6682:20
  **proves** [1] - 6658:21
  **provide** [8] - 6638:13, 6639:17, 6683:23, 6685:15, 6685:23, 6686:13, 6713:11, 6715:1
  **provided** [6] - 6681:16, 6682:17, 6684:10, 6706:18, 6706:19
  **provides** [1] - 6638:3
  **providing** [6] - 6633:25, 6658:11, 6667:4, 6685:12, 6701:10, 6709:5
  **provision** [2] - 6665:7, 6666:16
  **provisions** [1] -

6664:22
  **PSX956** [2] - 6663:16, 6663:25
  **public** [35] - 6681:16, 6681:18, 6681:25, 6682:7, 6683:8, 6684:10, 6684:14, 6684:16, 6685:4, 6685:6, 6685:7, 6685:10, 6685:12, 6686:1, 6686:16, 6686:17, 6689:16, 6691:24, 6692:23, 6693:9, 6693:17, 6695:22, 6700:16, 6700:17, 6701:1, 6701:24, 6703:6, 6703:14, 6703:19, 6703:20, 6704:5, 6708:21, 6709:5, 6709:18, 6714:21
  **public's** [1] - 6686:19
  **publicly** [3] - 6683:9, 6685:23, 6686:4
  **publisher** [5] - 6634:19, 6636:14, 6665:22, 6665:25, 6666:2
  **publishers** [6] - 6633:4, 6633:11, 6634:14, 6636:20, 6637:15, 6666:3
  **purchase** [5] - 6642:5, 6642:6, 6642:16, 6644:17, 6648:2
  **purchases** [3] - 6645:25, 6646:1, 6648:11
  **purchasing** [3] - 6644:22, 6645:10, 6648:7
  **purely** [1] - 6707:13
  **purpose** [1] - 6675:12
  **purposes** [1] - 6713:9
  **push** [5] - 6634:11, 6672:23, 6673:6, 6677:9, 6704:11
  **put** [24] - 6649:12, 6651:17, 6657:4, 6657:24, 6663:5, 6663:10, 6671:14, 6672:9, 6676:24, 6679:5, 6688:7, 6690:11, 6691:3, 6692:23, 6693:25, 6694:17, 6695:6, 6698:5, 6699:6, 6700:1, 6710:25, 6712:12, 6713:19, 6714:2

  **PX7** [2] - 6679:12, 6719:8
  **PX8............6679** [1] - 6719:8

**Q**

  **quality** [1] - 6694:20
  **queries** [1] - 6646:20
  **questioning** [1] - 6679:11
  **questions** [22] - 6643:14, 6644:9, 6648:20, 6649:14, 6650:18, 6652:19, 6655:22, 6656:14, 6659:1, 6661:11, 6663:11, 6663:20, 6663:23, 6666:18, 6669:7, 6670:10, 6672:21, 6673:4, 6675:23, 6676:13, 6677:3, 6686:25
  **quick** [2] - 6700:13
  **quickly** [2] - 6700:24, 6706:24
  **quite** [1] - 6636:19
  **quotes** [1] - 6651:17

**R**

  **R&D** [1] - 6685:20
  **race** [1] - 6658:7
  **radar** [1] - 6679:6
  **raise** [4] - 6675:23, 6683:10, 6685:8, 6695:5
  **raised** [4] - 6671:17, 6673:25, 6685:11, 6691:12
  **raising** [1] - 6703:21
  **rapidly** [1] - 6657:9
  **rare** [3] - 6684:23, 6701:12, 6701:13
  **ratio** [2] - 6631:7, 6631:10
  **ratios** [1] - 6632:10
  **RCFP** [2] - 6708:9, 6709:4
  **re** [1] - 6673:19
  **re-review** [1] - 6673:19
  **reached** [1] - 6710:15
  **reaction** [1] - 6692:11
  **read** [7] - 6662:14, 6663:12, 6665:8, 6665:9, 6665:14, 6665:15, 6687:18
  **reading** [1] - 6675:12
  **ready** [1] - 6630:2
  **real** [1] - 6686:19

6736

**really** [28] - 6633:6, 6637:15, 6658:15, 6667:10, 6668:5, 6668:18, 6668:21, 6674:18, 6681:24, 6683:12, 6686:6, 6686:8, 6686:21, 6687:13, 6688:24, 6688:25, 6689:7, 6690:9, 6691:5, 6693:2, 6694:22, 6695:16, 6700:19, 6706:4, 6708:14, 6709:3, 6712:22, 6713:13

**realtime** [25] - 6637:3, 6637:8, 6637:13, 6637:14, 6637:16, 6637:17, 6638:17, 6638:19, 6638:22, 6638:25, 6639:3, 6639:9, 6639:12, 6639:16, 6639:20, 6640:9, 6640:12, 6641:3, 6641:4, 6641:6, 6641:19, 6643:2, 6643:8, 6669:8, 6669:11

**reason** [7] - 6656:9, 6689:6, 6692:3, 6692:8, 6695:19, 6705:3

**reasonable** [9] - 6670:5, 6670:7, 6670:9, 6694:24, 6695:2, 6696:4, 6697:24, 6710:24, 6714:2

**reasonably** [1] - 6710:16

**reasons** [2] - 6690:9, 6707:12

**recast** [1] - 6673:13

**received** [1] - 6671:22

**receives** [1] - 6641:21

**receiving** [2] - 6662:18, 6710:16

**recent** [2] - 6649:12, 6684:17

**recess** [1] - 6680:9

**reciprocate** [1] - 6702:15

**recognize** [1] - 6698:18

**recognized** [1] - 6690:10

**recognizes** [1] - 6709:16

**recognizing** [1] - 6693:23

**recollection** [2] - 6660:25, 6661:2

**record** [12] - 6663:14, 6672:18, 6672:23, 6673:8, 6680:2, 6680:23, 6681:9, 6682:7, 6687:12, 6700:14, 6700:15, 6715:21

**records** [4] - 6675:25, 6693:17, 6693:19, 6709:13

**redacted** [9] - 6685:22, 6685:25, 6690:19, 6693:13, 6693:15, 6697:20, 6698:12, 6712:22, 6713:9

**redactions** [3] - 6685:25, 6691:16, 6698:14

**Redirect** [1] - 6719:5

**redirect** [1] - 6669:3

**REDIRECT** [1] - 6669:5

**redlines** [1] - 6680:14

**reduce** [1] - 6632:8

**reducing** [1] - 6631:22

**refer** [1] - 6648:4

**references** [2] - 6672:20, 6707:19

**referring** [2] - 6676:19, 6707:6

**refers** [2] - 6669:25, 6707:20

**reflect** [1] - 6691:3

**reflecting** [1] - 6690:3

**refresh** [2] - 6644:1, 6661:2

**refreshes** [2] - 6660:24, 6660:25

**regarding** [1] - 6662:18

**regular** [1] - 6666:9

**reinforces** [1] - 6684:11

**reinvent** [1] - 6635:6

**reiterate** [2] - 6700:14, 6709:4

**related** [3] - 6644:10, 6653:9, 6715:21

**relationship** [2] - 6664:23, 6664:25

**relative** [2] - 6630:8, 6656:21

**relatively** [1] - 6636:25

**release** [5] - 6690:8, 6708:21, 6709:18, 6710:4, 6711:13

**released** [3] - 6691:24,

6692:20, 6693:16

**relevance** [4] - 6674:3, 6674:8, 6674:11, 6676:10

**relevant** [5] - 6673:16, 6673:23, 6675:1, 6683:16, 6690:21

**relief** [2] - 6703:22, 6706:9

**remaining** [2] - 6631:16, 6715:20

**remember** [2] - 6684:22, 6692:2

**remembering** [1] - 6661:7

**reminded** [1] - 6679:10

**renewing** [1] - 6682:14

**repeat** [2] - 6652:4, 6661:15

**repetitive** [1] - 6700:15

**REPORTER** [1] - 6718:1

**Reporter** [3] - 6629:19, 6629:19, 6718:11

**reporter** [2] - 6683:21, 6710:18

**reporter's** [1] - 6708:7

**Reporters** [1] - 6707:6

**reporters** [3] - 6682:20, 6685:22, 6708:5

**repositioned** [1] - 6650:4

**represent** [2] - 6647:12, 6647:21

**representative** [1] - 6703:19

**Republic** [1] - 6708:3

**request** [12] - 6681:16, 6682:16, 6685:2, 6692:25, 6693:1, 6693:11, 6693:22, 6695:4, 6698:11, 6705:17, 6706:18, 6712:19

**requested** [5] - 6639:4, 6684:7, 6695:22, 6696:2, 6699:13

**requesting** [1] - 6682:23

**requests** [11] - 6683:4, 6686:10, 6694:6, 6694:9, 6694:10, 6699:21, 6705:6, 6705:23, 6710:12,

6713:13, 6713:21

**require** [2] - 6633:16, 6698:18

**required** [4] - 6633:18, 6683:15, 6695:6, 6700:8

**requirement** [2] - 6665:17, 6665:21

**requirements** [1] - 6670:6

**requirer** [1] - 6665:19

**requires** [2] - 6699:8, 6712:20

**resistance** [1] - 6705:6

**resolution** [2] - 6714:23, 6717:12

**resolve** [3] - 6670:19, 6697:17, 6701:25

**resolving** [1] - 6714:22

**resources** [2] - 6633:9, 6699:24

**respect** [7] - 6633:21, 6673:2, 6675:2, 6691:13, 6704:9, 6704:12, 6710:21

**respectfully** [1] - 6711:19

**respond** [4] - 6693:5, 6699:25, 6700:11, 6713:15

**responded** [4] - 6644:15, 6694:25, 6705:17, 6705:23

**responds** [1] - 6682:4

**response** [7] - 6659:1, 6666:18, 6674:2, 6674:10, 6683:12, 6696:4, 6713:12

**responses** [2] - 6694:25, 6713:14

**responsive** [1] - 6700:3

**rest** [2] - 6630:24, 6702:8

**result** [1] - 6702:9

**results** [1] - 6656:7

**retains** [2] - 6664:25, 6665:1

**retarget** [2] - 6645:22, 6647:5

**revenue** [1] - 6640:22

**review** [4] - 6657:2, 6673:19, 6676:14, 6679:7

**reviewed** [1] - 6717:15

**reviewing** [1] - 6691:20

**reviews** [3] - 6698:25, 6699:17, 6699:18

6737

**Richard** [1] - 6628:18
**richard.gower@
usdoj.gov** [1] - 6628:21
**RMR** [1] - 6629:19
**road** [1] - 6704:9
**roadmap** [2] - 6667:6,
6667:9
**roll** [1] - 6661:6
**rolled** [1] - 6632:4
**rolling** [2] - 6660:20,
6661:3
**room** [1] - 6703:20
**Room** [2] - 6629:20,
6718:12
**Rosati** [1] - 6629:15
**roughly** [1] - 6672:4
**row** [1] - 6664:14
**rule** [1] - 6707:19
**ruled** [1] - 6673:15
**rules** [1] - 6704:9
**ruling** [1] - 6673:3
**run** [2] - 6668:20,
6712:6
**running** [6] - 6645:21,
6646:6, 6646:7,
6646:10, 6646:13,
6647:4
**Ryan** [1] - 6716:12

## S

**SA360** [13] - 6635:13,
6635:18, 6635:24,
6636:4, 6636:8,
6636:10, 6636:17,
6636:21, 6636:25,
6649:15, 6649:18,
6652:23, 6654:25
**SA360's** [1] - 6656:1
**safe** [1] - 6670:12
**sales** [1] - 6707:16
**Sallet** [1] - 6629:1
**sanctions** [6] -
6672:18, 6673:13,
6674:19, 6674:22,
6676:22
**satisfy** [1] - 6674:19
**saw** [2] - 6645:12,
6698:21
**scale** [1] - 6717:11
**Scalia** [4] - 6697:5,
6707:16, 6707:20
**Scalia's** [1] - 6696:11
**scarce** [1] - 6699:23
**scenes** [2] - 6697:2,
6705:16
**schedule** [1] - 6709:12
**Schmidtlein** [4] -
6629:10, 6681:3,
6696:7, 6711:25

**SCHMIDTLEIN** [17] -
6676:16, 6676:20,
6676:22, 6681:4,
6696:8, 6696:10,
6696:13, 6698:14,
6698:17, 6698:20,
6699:14, 6703:2,
6712:1, 6712:17,
6713:6, 6716:20,
6717:8
**schwartz** [1] - 6649:4
**SCHWARTZ** [8] -
6630:5, 6631:12,
6632:12, 6643:14,
6648:16, 6669:4,
6669:6, 6670:10
**Schwartz** [8] -
6628:22, 6630:2,
6644:10, 6644:12,
6651:11, 6656:12,
6659:20, 6669:3
**schwartz's** [1] -
6649:14
**Schwartz's** [2] -
6659:1, 6666:18
**Schwartz.............
6669** [1] - 6719:5
**schwartz.......6630** [1]
- 6719:4
**scope** [1] - 6635:24
**Scoreboard** [1] -
6685:20
**screen** [3] - 6647:13,
6663:11, 6706:24
**screens** [1] - 6716:24
**screenshot** [1] -
6713:7
**se** [1] - 6713:9
**seal** [6] - 6691:6,
6691:23, 6692:8,
6693:19, 6716:16
**sealed** [7] - 6686:7,
6688:5, 6690:8,
6691:17, 6692:8,
6693:12, 6709:11
**sealing** [9] - 6685:4,
6690:2, 6695:5,
6704:13, 6705:9,
6708:22, 6709:7,
6714:15, 6714:19
**sealings** [1] - 6709:25
**Search** [9] - 6652:17,
6652:18, 6652:20,
6653:9, 6653:14,
6653:25, 6654:1,
6654:14, 6657:6
**search** [24] - 6630:18,
6631:3, 6631:17,
6637:11, 6637:18,
6637:21, 6637:24,

6638:17, 6644:12,
6645:2, 6645:20,
6646:7, 6646:8,
6646:22, 6648:24,
6649:24, 6651:6,
6651:9, 6652:3,
6652:5, 6665:24,
6666:2, 6666:19,
6667:10
**searcher** [1] - 6647:1
**searches** [1] - 6646:20
**searching** [1] -
6645:21
**seat** [1] - 6687:3
**seats** [1] - 6658:3
**second** [15] - 6644:25,
6661:5, 6661:12,
6661:16, 6664:9,
6671:6, 6685:2,
6689:19, 6695:4,
6701:10, 6707:5,
6707:25, 6709:9,
6709:23, 6714:11
**secret** [1] - 6712:3
**Section** [1] - 6629:2
**see** [29] - 6642:8,
6644:5, 6644:7,
6644:8, 6647:4,
6647:16, 6647:19,
6648:8, 6657:12,
6660:23, 6660:25,
6669:23, 6670:2,
6671:20, 6674:3,
6675:14, 6676:1,
6676:5, 6678:17,
6680:8, 6680:17,
6681:24, 6683:2,
6685:6, 6686:15,
6693:24, 6696:23,
6696:25, 6707:19
**seeing** [2] - 6706:9,
6717:19
**seeking** [3] - 6703:23,
6709:10, 6709:21
**sees** [1] - 6696:24
**segment** [1] - 6667:12
**segments** [2] -
6646:22, 6646:24
**sell** [1] - 6654:9
**SEM** [7] - 6649:4,
6649:5, 6649:7,
6649:8, 6649:14,
6649:15, 6649:20
**send** [1] - 6702:14
**sense** [4] - 6635:23,
6636:16, 6647:7,
6709:12
**sensitive** [1] - 6682:3
**separate** [2] - 6653:10,
6711:20

**separately** [1] -
6653:14
**September** [3] -
6702:4, 6704:21,
6711:5
**served** [1] - 6665:3
**service** [1] - 6652:14
**session** [2] - 6693:10,
6695:12
**sessions** [2] - 6690:4,
6693:12
**set** [11] - 6636:12,
6643:17, 6660:19,
6661:3, 6668:3,
6678:5, 6699:23,
6700:7, 6706:15,
6711:5, 6712:12
**seven** [2] - 6640:20,
6659:7
**Seventh** [1] - 6629:4
**shall** [1] - 6690:1
**share** [4] - 6687:1,
6689:4, 6702:20,
6706:2
**shared** [2] - 6631:22,
6688:16
**sheet** [1] - 6682:18
**shoes** [5] - 6645:21,
6646:6, 6646:7,
6646:10, 6646:14,
6647:4
**shortly** [1] - 6680:8
**show** [7] - 6646:2,
6663:15, 6674:11,
6675:19, 6675:20,
6677:6, 6685:15
**showed** [3] - 6651:12,
6680:2, 6705:17
**shown** [2] - 6704:23,
6706:14
**shows** [1] - 6682:18
**sic** [2] - 6630:22,
6689:21
**side** [9] - 6646:25,
6649:23, 6649:24,
6654:12, 6668:1,
6701:11, 6711:23,
6712:1, 6712:7
**sides** [5] - 6633:14,
6696:24, 6697:1,
6697:2, 6701:17
**signal** [4] - 6633:11,
6641:10, 6666:8,
6666:14
**signals** [5] - 6633:12,
6637:12, 6638:4,
6641:14, 6666:13
**signed** [1] - 6690:7
**significantly** [1] -
6654:23

**similar** [3] - 6635:5, 6717:9, 6717:11
**simple** [1] - 6632:7
**simplified** [1] - 6641:3
**simplify** [3] - 6632:1, 6634:20, 6635:10
**simply** [1] - 6673:14
**single** [2] - 6692:24, 6710:19
**six** [10] - 6640:18, 6640:20, 6647:19, 6667:7, 6691:10, 6700:22, 6702:3, 6702:10, 6704:23, 6714:4
**six-month** [1] - 6640:18
**six-step** [3] - 6700:22, 6702:10, 6714:4
**Skai** [75] - 6630:8, 6632:19, 6632:21, 6633:2, 6633:20, 6634:23, 6635:17, 6635:25, 6636:10, 6636:17, 6636:18, 6638:13, 6639:9, 6639:12, 6639:15, 6639:19, 6639:25, 6640:1, 6640:8, 6641:6, 6641:16, 6643:8, 6645:1, 6645:9, 6645:11, 6647:24, 6648:1, 6649:3, 6649:6, 6650:1, 6651:17, 6652:2, 6652:5, 6652:20, 6653:7, 6653:21, 6654:6, 6654:16, 6654:18, 6654:20, 6654:23, 6655:7, 6655:10, 6656:2, 6656:15, 6657:19, 6658:2, 6658:17, 6660:12, 6660:20, 6661:3, 6661:13, 6661:17, 6662:18, 6662:21, 6664:10, 6664:13, 6664:19, 6664:22, 6664:25, 6665:16, 6665:20, 6665:23, 6665:25, 6666:22, 6666:25, 6667:6, 6667:10, 6667:16, 6668:14, 6669:14
**Skai's** [6] - 6643:19, 6647:12, 6648:5, 6656:11, 6657:23, 6667:9
**sky** [1] - 6704:23

**slide** [5] - 6685:19, 6685:22, 6690:21, 6697:21, 6706:12
**smaller** [1] - 6631:17
**Smart** [6] - 6640:2, 6659:10, 6661:23, 6661:24, 6662:2, 6662:5
**Smartly** [1] - 6649:19
**smartly** [1] - 6649:20
**Snapchat** [1] - 6647:22
**social** [11] - 6644:20, 6645:2, 6645:6, 6645:9, 6645:22, 6645:24, 6647:24, 6648:2, 6648:7, 6648:14, 6649:23
**Social** [1] - 6647:15
**solely** [1] - 6701:17
**solution** [7] - 6634:17, 6645:16, 6657:24, 6659:7, 6659:17, 6662:4, 6662:5
**solutions** [2] - 6634:11, 6667:25
**solve** [1] - 6634:3
**someone** [1] - 6645:20
**sometimes** [9] - 6634:16, 6634:17, 6635:9, 6637:5, 6658:17, 6658:20, 6658:21, 6695:18, 6701:8
**somewhat** [1] - 6631:6
**somewhere** [2] - 6660:1, 6683:1
**Sonsini** [1] - 6629:15
**soon** [3] - 6657:20, 6657:25, 6658:10
**Sorry** [1] - 6715:10
**sorry** [11] - 6630:17, 6631:1, 6640:2, 6652:4, 6655:9, 6655:25, 6661:15, 6682:23, 6702:25, 6711:7, 6715:18
**sort** [24] - 6668:3, 6672:16, 6681:12, 6682:9, 6682:13, 6684:20, 6690:23, 6694:20, 6695:11, 6696:15, 6697:12, 6697:16, 6697:18, 6699:4, 6699:12, 6700:6, 6700:7, 6706:21, 6709:24, 6712:3, 6712:20, 6712:23, 6713:2,

6713:13
**sorts** [1] - 6672:20
**sought** [1] - 6672:17
**sound** [1] - 6704:1
**sounds** [1] - 6694:7
**sources** [1] - 6710:17
**South** [1] - 6628:16
**speaking** [4] - 6651:5, 6670:4, 6696:24, 6712:9
**specific** [20] - 6632:4, 6647:2, 6655:24, 6656:17, 6661:7, 6664:16, 6664:22, 6666:4, 6667:10, 6689:2, 6689:4, 6694:9, 6694:13, 6701:6, 6701:11, 6703:10, 6708:18, 6709:21, 6714:14
**specifically** [1] - 6633:3
**spell** [1] - 6702:24
**spend** [9] - 6630:8, 6630:15, 6630:22, 6631:2, 6631:7, 6631:10, 6631:24, 6632:10, 6637:1
**spending** [1] - 6642:4
**spends** [1] - 6631:8
**spent** [6] - 6630:18, 6630:19, 6631:4, 6639:22, 6640:13
**spiel** [1] - 6681:12
**spoliation** [2] - 6671:9, 6671:17
**sponsor** [1] - 6666:10
**spreadsheet** [1] - 6683:22
**spring** [1] - 6672:11
**sprints** [1] - 6657:10
**St** [1] - 6629:12
**stage** [3] - 6682:2, 6682:10, 6693:5
**stages** [5] - 6640:16, 6658:13, 6660:4, 6660:7, 6660:8
**stakes** [1] - 6708:11
**stand** [4] - 6643:24, 6672:20, 6701:23, 6714:15
**standard** [1] - 6632:11
**standing** [1] - 6671:4
**standpoint** [1] - 6645:4
**start** [18] - 6648:24, 6648:25, 6658:15, 6674:16, 6678:19, 6680:17, 6681:11, 6681:14, 6687:9,

6687:13, 6687:14, 6690:12, 6690:18, 6695:17, 6703:18, 6709:23, 6716:7
**started** [16] - 6640:17, 6640:23, 6643:18, 6645:11, 6649:8, 6660:14, 6660:17, 6660:20, 6661:3, 6662:20, 6666:19, 6688:13, 6691:19, 6705:18
**starting** [4] - 6641:11, 6656:23, 6695:16, 6716:16
**state** [5] - 6656:20, 6711:3, 6716:6, 6716:9, 6716:11
**State's** [1] - 6719:8
**statements** [1] - 6680:22
**states** [2] - 6689:24, 6712:9
**STATES** [2] - 6628:1, 6628:10
**States** [7] - 6628:2, 6628:22, 6629:1, 6629:20, 6670:22, 6700:16, 6711:3
**status** [1] - 6704:4
**stay** [1] - 6687:7
**steering** [1] - 6658:2
**stenographic** [1] - 6718:5
**step** [6] - 6644:18, 6700:22, 6702:3, 6702:10, 6714:4, 6715:6
**steps** [1] - 6702:5
**still** [8] - 6657:23, 6668:20, 6671:1, 6677:23, 6689:16, 6711:4
**stipulate** [1] - 6688:2
**Stipulated** [1] - 6688:20
**stipulated** [2] - 6687:17, 6689:24
**stop** [2] - 6674:13, 6700:18
**strategic** [2] - 6667:24, 6668:10
**Street** [4] - 6628:12, 6628:16, 6628:19, 6628:23
**strong** [5] - 6661:14, 6661:18, 6662:22, 6662:25, 6664:10
**strongest** [1] - 6641:10

**stuff** [1] - 6696:21
**subject** [1] - 6682:7
**submission** [3] -
6684:18, 6709:22,
6714:13
**submit** [2] - 6690:1,
6696:20
**submitted** [1] -
6708:19
**substance** [2] -
6644:15, 6651:17
**substantially** [1] -
6717:9
**substantively** [1] -
6671:18
**succeed** [2] - 6673:6,
6673:18
**Success** [1] - 6647:15
**successful** [1] -
6658:15
**suggested** [1] -
6697:20
**Suite** [3] - 6628:16,
6628:19, 6629:8
**sum** [2] - 6644:15,
6651:16
**SUMAR** [20] - 6681:8,
6681:10, 6681:24,
6682:25, 6683:4,
6683:21, 6684:2,
6684:6, 6684:9,
6703:17, 6704:11,
6704:19, 6705:2,
6705:5, 6705:12,
6705:21, 6714:12,
6714:24, 6715:10,
6715:16
**superimposed** [1] -
6703:8
**supplement** [2] -
6672:23, 6673:1
**supplemental** [1] -
6680:13
**supplying** [1] -
6646:12
**support** [20] -
6631:17, 6633:22,
6633:25, 6634:23,
6635:13, 6635:16,
6635:17, 6635:19,
6636:8, 6636:13,
6636:24, 6639:9,
6639:12, 6639:15,
6639:19, 6640:2,
6640:8, 6641:15,
6667:4, 6676:17
**supported** [4] -
6635:24, 6636:16,
6660:12, 6660:17
**supporting** [1] -

6640:23
**supports** [1] - 6636:18
**suppose** [1] - 6675:13
**supposed** [3] -
6681:6, 6684:21,
6694:1
**surrounding** [1] -
6641:21
**survey** [1] - 6703:7
**switch** [2] - 6636:10,
6656:9
**switched** [1] - 6656:1
**switching** [2] -
6655:22, 6655:25
**sync** [1] - 6660:5
**system** [1] - 6686:20

## T

**table** [1] - 6631:22
**talks** [1] - 6697:6
**targeting** [1] - 6648:5
**task** [2] - 6635:7,
6635:8
**team** [6] - 6633:3,
6660:3, 6697:24,
6699:22, 6711:21,
6711:23
**teams** [3] - 6701:17,
6701:19, 6711:20
**technologies** [1] -
6639:25
**technology** [1] -
6664:13
**ten** [1] - 6678:22
**tend** [2] - 6631:9,
6634:13
**tends** [2] - 6646:19,
6668:8
**term** [6] - 6649:5,
6649:11, 6649:25,
6650:1, 6659:2,
6659:11
**terminology** [1] -
6659:5
**terms** [24] - 6630:15,
6634:15, 6635:19,
6636:2, 6646:21,
6655:11, 6658:19,
6667:1, 6667:23,
6670:15, 6688:14,
6694:18, 6694:19,
6695:4, 6696:4,
6696:15, 6696:18,
6710:4, 6710:10,
6714:19, 6714:22,
6715:6, 6716:15,
6717:10
**terribly** [1] - 6715:4
**terrific** [1] - 6680:4

**test** [1] - 6641:12
**testified** [14] -
6641:16, 6644:20,
6645:1, 6645:8,
6649:10, 6649:17,
6651:16, 6652:22,
6652:24, 6653:2,
6657:19, 6676:7,
6691:22, 6716:12
**testify** [2] - 6651:24,
6677:25
**testifying** [1] - 6678:3
**testimonies** [1] -
6691:23
**testimony** [8] -
6644:11, 6670:12,
6674:6, 6674:8,
6685:19, 6690:3,
6691:18, 6693:4
**tethered** [1] - 6683:25
**text** [1] - 6650:16
**thanking** [1] - 6681:14
**Thanksgiving** [1] -
6697:15
**THE** [94] - 6628:1,
6628:1, 6628:9,
6630:2, 6631:1,
6631:6, 6631:19,
6631:21, 6643:15,
6643:25, 6646:5,
6646:8, 6646:9,
6646:15, 6646:17,
6646:19, 6647:8,
6648:17, 6669:3,
6670:11, 6670:13,
6670:14, 6670:17,
6670:24, 6672:5,
6673:9, 6674:15,
6675:20, 6675:25,
6676:12, 6676:19,
6676:21, 6677:11,
6677:17, 6678:9,
6678:17, 6678:21,
6678:25, 6679:7,
6679:13, 6679:15,
6679:17, 6679:25,
6680:4, 6680:10,
6680:25, 6681:3,
6681:5, 6681:20,
6682:23, 6683:2,
6683:20, 6683:24,
6684:4, 6684:8,
6687:1, 6696:9,
6696:12, 6698:9,
6698:16, 6698:18,
6699:11, 6700:9,
6700:18, 6702:23,
6703:16, 6703:24,
6704:17, 6704:21,
6705:4, 6705:11,

6705:20, 6709:23,
6711:7, 6711:9,
6711:24, 6712:8,
6712:16, 6713:4,
6713:18, 6714:9,
6714:19, 6715:3,
6715:13, 6715:17,
6715:23, 6716:1,
6716:5, 6716:9,
6716:15, 6717:1,
6717:7, 6717:14,
6717:18
**themselves** [3] -
6673:5, 6675:18,
6685:6
**thereafter** [2] -
6669:12, 6669:13
**they've** [8] - 6637:22,
6672:21, 6673:4,
6676:3, 6684:5,
6684:20, 6699:3,
6713:14
**thinking** [4] - 6634:1,
6667:19, 6681:12,
6717:2
**thinks** [2] - 6694:2,
6694:17
**Third** [1] - 6708:3
**third** [21] - 6637:14,
6638:12, 6639:25,
6651:14, 6651:18,
6654:3, 6655:6,
6685:9, 6685:11,
6687:22, 6689:5,
6689:22, 6691:19,
6692:16, 6701:14,
6708:10, 6708:16,
6712:19, 6712:21,
6713:1, 6713:19
**third-party** [3] -
6712:19, 6712:21,
6713:1
**thoughts** [2] - 6687:2,
6696:3
**thousands** [1] -
6704:6
**three** [14] - 6654:17,
6665:8, 6671:10,
6688:25, 6690:4,
6690:21, 6694:22,
6697:22, 6697:23,
6698:15, 6699:17,
6700:1, 6707:12,
6716:19
**three-hour** [2] -
6699:17, 6700:1
**threshold** [1] -
6675:15
**throughout** [4] -
6642:7, 6688:10,

6740

6700:17, 6702:21
**throw** [1] - 6700:7
**TikTok** [1] - 6647:22
**timeframe** [3] -
6659:21, 6708:18,
6713:21
**timely** [4] - 6685:5,
6686:17, 6710:16,
6713:13
**timing** [5] - 6694:18,
6694:19, 6696:15,
6699:15, 6714:23
**title** [2] - 6647:14,
6663:25
**titled** [1] - 6688:20
**today** [5] - 6643:20,
6645:1, 6650:5,
6673:22, 6693:3
**together** [5] - 6634:16,
6701:2, 6703:14,
6713:25, 6714:3
**tomorrow** [1] - 6714:6
**took** [7] - 6639:21,
6640:3, 6640:5,
6640:7, 6659:23,
6668:14, 6692:14
**tool** [15] - 6632:14,
6632:15, 6632:21,
6633:2, 6635:14,
6638:23, 6639:1,
6649:5, 6649:7,
6649:8, 6649:15,
6649:20, 6653:25,
6655:4, 6669:14
**tools** [6] - 6632:16,
6632:19, 6632:20,
6633:1, 6649:4,
6649:15
**top** [7] - 6647:18,
6666:9, 6667:3,
6668:21, 6673:7,
6697:9, 6703:18
**topic** [3] - 6632:13,
6651:11, 6680:11
**topics** [1] - 6644:10
**total** [2] - 6684:13,
6691:11
**touch** [4] - 6642:6,
6642:17, 6642:19,
6642:20
**touches** [1] - 6675:4
**towards** [5] - 6640:21,
6640:22, 6671:16,
6688:14, 6689:20
**town** [1] - 6695:14
**traction** [2] - 6633:7,
6668:5
**trade** [1] - 6712:3
**transaction** [1] -
6642:5

**TRANSCRIPT** [1] -
6628:9
**transcript** [9] -
6643:21, 6643:25,
6650:12, 6650:13,
6656:22, 6662:8,
6685:21, 6718:4,
6718:5
**transcripts** [5] -
6643:19, 6690:3,
6690:9, 6691:2,
6691:22
**translate** [1] - 6671:20
**transpired** [1] -
6689:18
**travels** [1] - 6670:12
**treat** [1] - 6688:3
**treated** [1] - 6707:23
**trial** [48] - 6675:1,
6677:1, 6682:3,
6682:6, 6682:12,
6683:9, 6685:4,
6685:7, 6685:8,
6687:13, 6687:25,
6688:5, 6688:7,
6688:10, 6688:11,
6688:14, 6689:1,
6689:2, 6689:25,
6690:2, 6690:3,
6690:6, 6690:8,
6690:13, 6690:17,
6690:22, 6690:23,
6691:2, 6695:13,
6697:6, 6697:14,
6698:13, 6699:1,
6700:17, 6701:4,
6702:8, 6702:21,
6704:9, 6704:23,
6705:1, 6706:6,
6706:22, 6707:21,
6709:13, 6710:3,
6713:10, 6715:7,
6716:13
**TRIAL** [1] - 6628:9
**Trial** [1] - 6688:21
**tried** [2] - 6645:18,
6693:5
**trouble** [1] - 6700:19
**true** [5] - 6644:24,
6648:1, 6656:15,
6718:4, 6718:5
**truly** [1] - 6689:8
**try** [12] - 6632:1,
6633:5, 6633:10,
6633:24, 6636:3,
6636:21, 6641:11,
6657:24, 6658:13,
6686:8, 6688:17,
6710:20
**trying** [13] - 6631:23,

6631:24, 6634:3,
6635:12, 6646:18,
6667:22, 6667:24,
6673:22, 6692:21,
6698:21, 6699:25
**Tuesday** [5] - 6713:25,
6716:5, 6717:5,
6717:6, 6717:19
**turn** [11] - 6645:9,
6645:22, 6648:6,
6665:5, 6669:19,
6694:21, 6705:14,
6705:15, 6710:21,
6713:21, 6716:10
**two** [37] - 6631:3,
6633:24, 6640:6,
6640:7, 6645:12,
6645:19, 6657:10,
6659:23, 6659:24,
6672:9, 6674:13,
6674:15, 6675:2,
6679:11, 6684:4,
6686:11, 6688:24,
6689:21, 6689:24,
6690:2, 6690:9,
6690:10, 6690:21,
6691:1, 6691:8,
6691:9, 6691:18,
6691:22, 6693:10,
6694:19, 6700:13,
6701:8, 6708:16,
6709:20, 6710:21,
6710:24, 6714:14
**two-week** [1] -
6657:10
**Tyler** [1] - 6629:7
**types** [2] - 6712:3,
6713:16
**typically** [3] - 6695:18,
6713:10

**U**

**U.S** [9] - 6628:12,
6628:15, 6628:19,
6630:8, 6630:12,
6630:16, 6630:18,
6630:22, 6630:24
**ultimately** [4] -
6674:19, 6674:20,
6687:25, 6696:17
**um-hum** [1] - 6647:20
**unable** [1] - 6701:25
**unacceptable** [1] -
6690:16
**under** [12] - 6664:18,
6665:8, 6683:8,
6691:6, 6691:23,
6692:8, 6693:19,
6699:16, 6699:17,

6700:1, 6707:25
**under-seal** [1] -
6693:19
**underline** [1] -
6686:14
**understood** [9] -
6654:5, 6673:6,
6676:15, 6677:11,
6683:2, 6690:22,
6700:21, 6703:12,
6711:18
**undertook** [1] - 6705:9
**undisputed** [1] -
6662:23
**unfavorable** [2] -
6671:12, 6671:14
**unfold** [1] - 6690:22
**unfolded** [1] - 6687:13
**unhelpful** [1] -
6702:25
**unique** [3] - 6631:6,
6648:5, 6648:22
**Unit** [1] - 6629:3
**United** [4] - 6629:20,
6670:22, 6700:16,
6711:3
**UNITED** [2] - 6628:1,
6628:10
**united** [1] - 6628:2
**universe** [2] - 6684:13,
6715:23
**unseal** [1] - 6686:10
**unsealing** [3] -
6686:11, 6709:10,
6709:21
**unworkable** [1] -
6697:15
**up** [41] - 6631:24,
6632:8, 6632:9,
6633:18, 6634:19,
6643:17, 6643:19,
6643:24, 6644:9,
6652:9, 6657:4,
6663:10, 6671:2,
6677:6, 6680:6,
6680:11, 6684:4,
6687:20, 6688:11,
6688:13, 6690:16,
6691:6, 6692:3,
6692:4, 6698:22,
6700:7, 6704:23,
6705:17, 6706:8,
6706:12, 6706:23,
6711:1, 6712:12,
6714:13, 6714:25,
6715:2, 6715:5,
6715:9, 6715:20
**update** [2] - 6702:6,
6702:18
**updated** [1] - 6637:13

6741

**upper** [1] - 6644:21
**usage** [1] - 6633:7
**useful** [2] - 6643:2, 6697:10
**user** [6] - 6645:22, 6646:10, 6646:23, 6648:24, 6648:25
**users** [1] - 6644:13
**uses** [3] - 6642:22, 6659:12, 6668:4

## V

**validate** [1] - 6658:10
**vallez** [5] - 6644:4, 6648:19, 6654:10, 6655:14, 6658:17
**VALLEZ** [2] - 6630:4, 6719:3
**Vallez** [14] - 6630:6, 6646:2, 6656:11, 6656:15, 6662:7, 6662:14, 6663:6, 6663:18, 6663:25, 6665:11, 6666:15, 6669:1, 6669:7, 6670:11
**valuable** [1] - 6637:17
**value** [14] - 6631:21, 6633:14, 6633:25, 6634:2, 6645:18, 6650:7, 6652:13, 6657:24, 6658:6, 6658:8, 6658:11, 6662:6, 6663:1, 6667:3
**Verizon** [3] - 6655:20, 6655:21, 6656:1
**versions** [1] - 6642:25
**versus** [11] - 6630:20, 6630:24, 6631:5, 6634:10, 6634:24, 6635:24, 6638:16, 6640:22, 6651:9, 6655:13, 6708:4
**veto** [2] - 6685:9, 6692:19
**viable** [1] - 6657:20, 6658:14
**view** [10] - 6641:13, 6642:24, 6643:2, 6651:22, 6665:16, 6671:19, 6697:15, 6708:14, 6708:15, 6715:1
**viewed** [1] - 6656:8
**views** [1] - 6688:16
**virtual** [1] - 6644:5
**volume** [1] - 6699:15
**volumes** [1] - 6698:3
**vs** [1] - 6628:5

## W

**wait** [1] - 6685:7
**walk** [2] - 6674:12, 6687:6
**walked** [1] - 6687:8
**wants** [7] - 6665:25, 6682:13, 6686:13, 6694:17, 6697:22, 6698:5, 6715:1
**warranted** [1] - 6699:9
**Washington** [6] - 6628:5, 6628:13, 6628:20, 6629:12, 6629:21, 6718:13
**Waszmer** [3] - 6629:14, 6643:15, 6644:4
**WASZMER** [13] - 6643:16, 6644:3, 6646:4, 6647:9, 6647:10, 6648:15, 6648:18, 6663:14, 6663:17, 6665:6, 6665:10, 6668:24, 6669:1
**Waszmer.................6644** [1] - 6719:4
**watch** [1] - 6689:16
**ways** [1] - 6662:22
**Webb** [1] - 6629:7
**website** [13] - 6647:12, 6683:17, 6692:9, 6692:10, 6692:23, 6694:17, 6700:7, 6703:6, 6703:14, 6705:25, 6711:1, 6712:12, 6713:7
**Wednesday** [2] - 6717:6, 6717:7
**week** [8] - 6657:10, 6679:4, 6679:8, 6691:10, 6692:14, 6697:14, 6701:8, 6704:23
**weekend** [1] - 6717:19
**weekly** [1] - 6697:13
**weeks** [10] - 6689:25, 6691:1, 6691:8, 6691:9, 6691:18, 6701:8, 6705:16, 6705:19, 6717:15
**weigh** [2] - 6714:16, 6715:2
**weighing** [1] - 6714:19
**welcome** [1] - 6696:3
**wendy** [1] - 6644:4
**Wendy** [1] - 6629:14
**Westinghouse** [1] - 6708:4

**Wfcavanaugh@pbwt.com** [1] - 6629:9
**wheel** [2] - 6635:6, 6658:3
**wheels** [1] - 6658:2
**whereas** [1] - 6659:10
**Whinston** [2] - 6703:5, 6717:11
**whinston's** [1] - 6685:18
**whole** [9] - 6634:20, 6635:10, 6640:7, 6677:7, 6698:4, 6698:7, 6698:12, 6706:14, 6711:14
**William** [1] - 6629:6
**WILLIAMS** [1] - 6629:11
**Wilson** [1] - 6629:15
**wish** [1] - 6700:18
**withdraw** [1] - 6677:25
**withheld** [2] - 6674:21, 6693:20
**WITNESS** [6] - 6631:6, 6631:21, 6646:8, 6646:15, 6646:19, 6670:13
**witness** [17] - 6674:4, 6674:5, 6675:6, 6677:8, 6677:22, 6678:1, 6690:5, 6695:15, 6701:22, 6706:15, 6711:17, 6715:22, 6716:7, 6716:9, 6716:10, 6716:11, 6719:2
**witnesses** [20] - 6672:13, 6672:19, 6673:4, 6676:3, 6676:4, 6677:1, 6677:2, 6677:4, 6677:15, 6677:19, 6677:24, 6678:7, 6689:3, 6689:14, 6691:22, 6695:13, 6697:7, 6698:22, 6698:24, 6716:19
**woke** [1] - 6706:8
**won** [2] - 6664:13, 6673:14
**word** [3] - 6671:22, 6690:13
**words** [5] - 6652:8, 6658:11, 6671:20, 6690:20, 6693:14
**workability** [1] - 6682:2
**workable** [3] - 6683:13, 6698:8, 6700:23

**workflow** [1] - 6635:9
**workflows** [1] - 6635:7
**world** [2] - 6630:24, 6703:19
**wrap** [2] - 6680:6, 6714:3
**writing** [2] - 6671:15, 6686:13
**written** [4] - 6671:21, 6678:2, 6709:22, 6714:13
**wrote** [2] - 6665:12, 6678:9
**wwaszmer@wsgr.com** [1] - 6629:17

## Y

**Yandex** [1] - 6631:17
**year** [8] - 6640:10, 6640:24, 6643:11, 6649:13, 6649:18, 6659:21, 6659:24, 6667:7
**years** [8] - 6634:6, 6637:23, 6639:21, 6640:7, 6659:23, 6659:25, 6664:13, 6701:12
**yesterday** [7] - 6680:16, 6681:20, 6687:5, 6687:10, 6690:25, 6696:11, 6707:7
**York** [10] - 6628:23, 6629:8, 6629:16, 6680:12, 6681:10, 6692:25, 6693:23, 6704:7, 6704:24, 6710:1
**yourself** [2] - 6652:2, 6663:19

## Z

**zero** [1] - 6677:22