```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
           United States of America,    )
 3         et al.,                      )
                                        ) DAY 26
 4                        Plaintiffs,   )
                                        ) CV No. 20-3010
 5                   vs. ) Washington, D.C.
                                        ) October 24, 2023
 6         Google LLC,                  ) 1:35 p.m.
                                        )
 7                        Defendant.    )
           _____ )
 8
 9                     TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE AMIT P. MEHTA
10                  UNITED STATES DISTRICT JUDGE
11         APPEARANCES:
           For DoJ Plaintiffs:       Kenneth M. Dintzer
12                                   U.S. DEPARTMENT OF JUSTICE
                                     1100 L Street, NW
13                                   Washington, D.C.
                                     (202) 307-0340
14                                   Email: Kenneth.dintzer2@usdoj.gov
                                     David E. Dahlquist
15                                   U.S. Department of Justice
                                     209 South LaSalle Street
16                                   Suite 600
                                     Chicago, IL  60604
17                                   (202) 805-8563
                                     Email: David.dahlquist@usdoj.gov
18                                   Veronica Onyema
                                     Richard Cameron Gower
19                                   U.S. Department of Justice
                                     450 Fifth Street, NW, Suite 7100
20                                   Washington, DC  20530
                                     202-549-7155
21                                   Email: Veronica.onyema@usdoj.gov
                                     Email: Richard.gower@usdoj.gov
22
           For Plaintiff
23         State of Colorado:        Jonathan Bruce Sallet
                                     COLORADO DEPARTMENT OF LAW
24                                   Consumer Protection Section,
                                     Antitrust Unit
25                                   Ralph L. Carr
                                     Colorado Judicial Center
```

```
 1                                1300 Broadway
                                  Seventh Floor
 2                                Denver, CO 80203
                                  (720) 508-6000
 3                                Email:  Jon.sallet@coag.gov
                                  William J. Cavanaugh, Jr.
 4                                Patterson Belknap Webb & Tyler LLP
                                  1133 Avenue of the Americas
 5                                Suite 2200
                                  New York, NY 10036
 6                                (212) 335-2793
                                  Email:  Wfcavanaugh@pbwt.com
 7
         For Defendant Google:   John E. Schmidtlein
 8                                Aaron P. Maurer
                                  WILLIAMS & CONNOLLY LLP
 9                                725 12th St., NW
                                  Washington, D.C. 20005
10                                (202) 434-5000
                                  Email:  Jschmidtlein@wc.com
11                                Email:  Amaurer@wc.com
                                  Wendy Huang Waszmer
12                                Wilson Sonsini Goodrich & Rosati
                                  1301 Avenue of the Americas
13                                40th Floor
                                  New York, NY  10019
14                                (212) 999-5800
                                  Email:  Wwaszmer@wsgr.com
15

16       Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                                  Official Court Reporter
17                                United States Courthouse, Room 6523
                                  333 Constitution Avenue, NW
18                                Washington, DC  20001
                                  202-354-3267
19
                                      *   *   *
20

21

22

23

24

25
```

1    * * * * * * *P R O C E E D I N G S* * * * * * *

2              THE COURT:  All right.  Welcome back, everybody.

3              Ms. Waszmer, we are ready when you are.

4              MS. WASZMER:  Thank you, Your Honor.

5                        JASON KRUEGER,

6              CROSS-EXAMINATION (Cont.)

7    BY MS. WASZMER:

8    Q.  Welcome back, Mr. Krueger.

9         Just to recap, when we last left for lunch, I think I

10   was asking you some questions about Project Myx and Project

11   Byx.  Just to set a moment in time, let me have you turn to the

12   binder I gave you that has exhibits in it.  Let's have you turn

13   to PSX563.

14             MS. WASZMER:  And, Your Honor, PSX563 is already in

15   evidence.

16             THE COURT:  Okay.  Thank you.

17   BY MS. WASZMER:

18   Q.  Mr. Krueger, I just want you to look at the document for

19   the date, and just briefly for the content.

20   A.  Okay.

21   Q.  Do you recall, prior to the lunch break, Mr. Cavanaugh

22   asked you and you testified about a one-pager?  Do you recall

23   that?

24   A.  Yes.

25   Q.  Relating to Project Byx?

1    A.  Yes.

2    Q.  I think you testified there may have been two versions of

3    the one pager; is that right?

4    A.  Yes.

5    Q.  Mr. Cavanaugh showed you a version which, I believe, was

6    PSX446.  Let me just have you look at the date of this

7    document, which is January 23rd, 2020.  Is this the prior

8    version of the one-pager that you were referencing?

9    A.  That's correct.

10    Q.  Okay.  I think you can put that aside.

11        So just keeping that timeframe in mind, January of 2020,

12    I'm going to have you take a look at another document that's

13    already in evidence in your binder, PSX457.  And let's just

14    stay on the first page.  Just have a flip through to

15    familiarize yourself with the document, and I'll just put some

16    information on the record.

17        This is a deck that is titled SA360, 2020H2 Product

18    Prioritization Sales and G-Tech, and the first page says:  Last

19    updated May 8th, 2020.

20        Just have a look at that, and let me know when you're

21    ready.

22    A.  I'm familiar with this document, I believe.  I've read

23    through it.

24    Q.  So, now we're in May 2020, several months after the

25    document I just showed you, which was PSX563.  Mr. Krueger, let

1    me ask you, during your work on Project Byx from the period of

2    2020 to 2021, did you ever become aware of any particular

3    advertisers that were interested in Microsoft's version of

4    auction-time bidding or automated bidding?

5    A.  Customer feedback?  I don't believe I heard notable

6    customer feedback until -- I want to say it was December of

7    2020, but it might have been December 2021.  I'm just

8    remembering the timeframes, but it was not earlier.

9    Q.  Okay.  So --

10   A.  It was 2021.

11   Q.  Okay.  So as far as you recall, was it after this moment in

12   time in May 2020?

13   A.  Yes.

14   Q.  And before the lunch, I think I was asking you about the

15   number of advertisers who had expressed interest in Project

16   Myx, which was Google's auction-time bidding testing.  If you

17   recall, as compared to the response for Project Myx, what was

18   the interest you were aware of with regard to Project Byx or

19   with regard to Microsoft feature?

20   A.  So, "feedback" I would define as either an explicit mention

21   from an advertiser that they wanted the feature, or even more

22   importantly, cited claims from the advertiser that they had

23   utilized either Google 's or Microsoft's auction-time bidding.

24   My recollection is, it was several orders of magnitude larger

25   for Google; many hundreds, I had heard, some directly and some

1    indirectly, for Google's.

2           And I have only recollection of a small handful,

3    maybe two or three advertisers that had mentioned testing

4    Microsoft's auction-time bidding.

5    Q.  So let me now have you take a look at this exhibit, at the

6    exhibit in front of you.  And I want to just have you take a

7    look at the second page of this, and I'm just going to have you

8    have a look at No. 3, which is AMER Customer Survey.

9           Do you see that?

10   A.  Yes.

11   Q.  I will come back to that, but I just wanted to highlight

12   that.

13          Let's go to the next page.  Okay.  Great.

14          And then let's go to -- there's a page -- I think

15   there's a page where there's numbers, and you see 5 through 8.

16   Let me just identify the page for you.

17   A.  I see it.

18          MS. WASZMER:  For the record, this page ends in 740.

19   BY MS. WASZMER:

20   Q.  Do you see that at the bottom?  Okay.  Great.

21          So, Mr. Krueger, do you understand what's being shown

22   here with Nos. 5 through 8 on the page ending 740?

23   A.  I believe what is represented are an aggregated stack rank

24   list of feature asks.  I think this was from our America's

25   customer survey, meaning America's customers and our sales

1    teams asking for specific features from those customers.

2    Q.  Okay.  And, Mr. Krueger, I think the Court has seen this in

3    the context of prior testimony, but let me just ask you about

4    some of the language next to No. 8 on the same page.

5         It says:  Auction-time bidding for other engines.

6         On the right-hand side, there's a note that says:  JP

7    Rakuten.

8         Do you know what "JP" means here?

9    A.  I believe JP refers to Japan, as a region.

10   Q.  And then let me have you look below the charge, and there's

11   some language that's been marked confidential, but I don't need

12   you to look at that.  There's a paragraph below the

13   confidential segment that says:  Auction-time bidding for other

14   engines.

15        Do you see that?

16   A.  Yes.

17   Q.  And just have a look at that language for a second.

18        Do you see a reference to Rakuten in Japan?

19   A.  Yes.

20   Q.  Is there any reference here to Microsoft auction-time

21   bidding or automated bidding or any customers seeking Microsoft

22   auction-time bidding in these notes?

23   A.  In the notes, I do not see any mention of Microsoft

24   advertising.

25   Q.  Let's put that aside.  The next exhibit I'm going to have

1    you look at is also in your binder.

2              MS. WASZMER:  And, Your Honor, this exhibit is not in

3    evidence yet.  It's marked DX3233 for identification.

4    BY MS. WASZMER:

5    Q.  And, Mr. Krueger, let me just have you have a look at that

6    before I ask you questions.  Just page through it, and let me

7    know when you're ready.

8              The title, for the record, on the front page is Customer

9    Survey Responses Feature Prio H2 2020, and then there's a note:

10   Completed April 6, '20.

11             THE COURT:  This is a long deck.

12             MS. WASZMER:  Yeah.

13   BY MS. WASZMER:

14   Q.  Have you had a chance to look at it?

15   A.  I flipped through most of it.

16   Q.  Mr. Krueger, are you familiar with the content of this

17   document?

18   A.  I believe I've seen versions of this feedback and these

19   themes periodically and am somewhat familiar, yes.

20   Q.  Okay.  Can you explain to the Court, to the extent you

21   know, what is this document?

22   A.  So there would be surveys to our Search Ads 360 customers

23   at some periodic basis, led by either our research teams or

24   sales teams or both.  They would collect top areas of

25   opportunity.  Usually, that would be problems to solve,

1   features to improve, or features to add.  A lot of times they

2   would cite specific instances of issues or lack of insights

3   with summaries of how it impacted their business.

4   Q.  And both the deck that you're looking at right now and the

5   exhibit that I just showed you, Exhibit 457, have the date --

6   or, have a reference to H2 2020.

7         In your work at SA360, when you see H1 or H2, can you

8   tell the Court what that means or what that meant?

9   A.  H1 would refer to the first half of the year, and H2 would

10  be the second half of the year.

11  Q.  Let's now turn to the second page of this particular

12  exhibit which ends in 927.  And you see there's a slide that

13  says:  Background.

14        MS. WASZMER:  And, Your Honor, we move to admit this

15  exhibit.

16        THE COURT:  DX3233?

17        MS. WASZMER:  Yeah, 3233.

18        MR. CAVANAUGH:  No objection.

19        THE COURT:  It will be admitted.

20        MS. WASZMER:  Thank you, Your Honor.

21        THE COURT:  I'm sorry.  You're on page 927, you say?

22        MS. WASZMER:  927, which is the second page of the

23  deck.

24  BY MS. WASZMER:

25  Q.  And now we've put that up, Mr. Krueger, now that it's

1    admitted.  And just having you have a look at this, does this

2    describe the customer survey that you were just discussing?

3    A.  Yes.

4    Q.  Okay.  And having had a look at this particular customer

5    survey, does it appear to be the same timeframe as the deck

6    that I showed you previously, PSX457?

7    A.  I believe so, yes.

8    Q.  Okay.  Having had a look at this particular exhibit -- and

9    by "this" I mean the exhibit just admitted, DX3233 -- were you

10   able to see any reference to specific customer demand or

11   requests from Microsoft's auction-time bidding or automated

12   bidding?

13   A.  No.

14        MS. WASZMER:  Thank you, Your Honor, no further

15   questions.

16        THE COURT:  Mr. Cavanaugh?

17        MR. CAVANAUGH:  Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. CAVANAUGH:

20   Q.  Mr. Krueger, can you go back to Exhibit 457, which Counsel

21   just questioned you about?

22   A.  457.

23   Q.  And if you go to page 740.  If we could highlight the

24   eighth item that counsel questioned you about.

25        Do you see there's two distinct things.  There's a 1,

1    for Microsoft advertising, and then 2, for Yahoo! Japan,

2    correct?

3    A.  That's correct.  That's what's written.

4    Q.  All right.  And in the upper right-hand corner, you see

5    there's a little yellow flag?

6    A.  Yes.

7    Q.  Thank you.  And if you could turn to page 740.

8        Do you see the flag is noted as:  Raised in America

9    Customer Survey?

10   A.  Sorry.  We're on 740?

11   Q.  I'm sorry, I've gone from 740 to 737.

12   A.  Yes.

13   Q.  The right-hand side --

14   A.  I see that.

15   Q.  -- the flag signifies that it was raised in the American

16   survey, correct?

17   A.  That's what that flag seems to say, yes.

18   Q.  And that flag appears in item 8 on page 740, correct?

19   A.  I do see a flag.  I don't know what those flags indicate.

20   My assumption was that was a comment on a particular slide.

21   Q.  And it's described -- and that comment relates to

22   auction-time bidding for other engines where Microsoft

23   advertising is identified, correct?

24   A.  I'm not sure how comments were captured and printed on this

25   page.  My assumption -- I'm trying to see if there's another

1    example -- is that each of those flags represents an

2    independent comment from an independent slide.  I could be, of

3    course, wrong.  Maybe the evidence can be -- was captured,

4    discussed.  But my assumption was that that flag was for a

5    particular slide, and I wouldn't necessarily assume that it

6    relates to all the flags across all the slides.

7    Q.  Can you turn to Exhibit 462 in the binder I gave you?  It's

8    the January 8th email from Mr. La Force, which your brother,

9    Ryan Krueger, forwarded to you and Mr. Varia.  It's the e-mail

10   in which Mr. La Force said he was about to initiate the

11   recruitment of customers for the Floodlight auction-time

12   bidding testing, correct?

13   A.  Let me take a second to read this, please.

14   Q.  All you need to do is read the first sentence.

15   A.  Sorry.  What is the question again, please?

16   Q.  So you understood from this that Microsoft was about to

17   recruit customers for the test, correct?

18   A.  First, I don't know if I was on this direct email at the

19   time.  It seems that Mr. La Force, from Microsoft, was stating

20   that Microsoft is ready to begin recruitment of customers for

21   the auction-time bidding test between Search Ads 360 and

22   Microsoft ads.

23   Q.  Can we go to the second page?

24   A.  Okay.

25   Q.  And your brother forwards that to you, correct?

```
1    A.  Yes.

2    Q.  All right.  And he says:  For now, I'll reply back and let

3    them know to hold off on outreach to customers.

4         Do you see that?

5    A.  I see that.

6    Q.  Would you agree with me that one way to get customer

7    feedback on interest in Microsoft auction-time bidding and this

8    testing would be to actually contact the customers?

9    A.  I would say that contacting customers is a way to get

10   customer feedback.

11   Q.  But Google instructed Microsoft not to do that?

12   A.  Well, I think the specific claim from Mr. La Force was that

13   there was a recruitment of customers for the testing of an

14   integration between Search Ads 360 and Microsoft ads.  In other

15   words, customers that would be ready to begin that type of

16   testing.  I do see that as distinct of getting customer

17   feedback on a feature from an engine.

18   Q.  Well, if customers were interested in participating in that

19   testing, you would know that they had some interest in the

20   subject matter, right?

21   A.  So, just reading through Mr. La Force's email, he states:

22   We have a list of approximately 50 customers that would

23   qualify.

24         My understanding of that is that those customers

25   would be eligible, based on some definition, perhaps
```

1    Microsoft's, for testing.  That is, at least from this

2    statement, not any reflection of those customers' interest.

3    Q.  Yes.  And if they had reached out to them, you would have

4    known their level of interest, correct?

5    A.  Perhaps.  Again, I think the framing of this was for the

6    testing of the feature of the integration.  I think that is

7    separate from if customers are interested in using Microsoft's

8    auction-time bidding.

9    Q.  Would you agree with me that the best way to identify bugs

10   and challenges and issues that would come up in utilizing

11   Floodlight data for use in Microsoft ads through SA360 would be

12   to do the actual testing?

13   A.  I would agree, if the objective is to assess performance

14   and potential issues, which could include bugs of Floodlight

15   conversions exported to Microsoft for the use -- for

16   Microsoft's auction-time bidding.  Testing would be helpful to

17   identify those.

18   Q.  And the best way to do that is to actually start the

19   testing, right?

20   A.  The best way to identify the bugs and issues, potentially,

21   as I described, would be to have tests running.

22   Q.  Thank you.

23         MR. CAVANAUGH:  Nothing further, Your Honor.

24         THE COURT:  Okay.  Mr. Krueger, thank you very much

25   for your time and testimony.

```
 1                 THE WITNESS:  You're very welcome.

 2                 THE COURT:  Safe travels home.

 3                 THE WITNESS:  Thank you, sir.

 4                 THE COURT:  Mr. Cavanaugh, ready for your next

 5      witness.

 6                 MR. CAVANAUGH:  Thank you, Your Honor.  Plaintiffs

 7      call Professor Wilfred Amaldoss.

 8                          WILFRED AMALDOSS,

 9      was called as a witness and, having been first duly sworn, was

10      examined and testified as follows:

11                 THE COURT:  Welcome.

12                 THE WITNESS:  Thank you.  Good afternoon.

13                 THE COURT:  Afternoon.

14                 Mr. Cavanaugh?

15                 MR. CAVANAUGH:  Your Honor, may I approach?

16                         DIRECT EXAMINATION

17      BY MR. CAVANAUGH:

18      Q.  Good afternoon, Professor.  Would you provide your name for

19      the record?

20      A.  My name is Wilfred Amaldoss.

21      Q.  Where are you currently employed?

22      A.  I'm currently employed at Duke University.  I am a Thomas

23      A. Finch Professor.

24                 THE COURT:  Professor Amaldoss, I'm just going to

25      just ask you to just keep your voice up so we can hear you.
```

1    Thank you, sir.

2              I'm sorry.  You said you were at Duke, and I didn't

3    hear the rest of it.

4              THE WITNESS:  I'm a Thomas A. Finch professor of

5    business administration and professor of marketing.

6              THE COURT:  Gotcha.

7    BY MR. CAVANAUGH:

8    Q.  Could you briefly describe for the Court your educational

9    background?

10   A.  I did my MBA at the Indian Institute of Management in

11   India, and then I worked for seven years in a top advertising

12   agency in India.  And then I came to the U.S. to do my Ph.D. in

13   marketing.  I completed it at the Wharton business school.  And

14   then I worked for four years at Purdue, and now close to 21

15   years at Duke.

16   Q.  What did you do at Purdue?

17   A.  I was an assistant professor of marketing.

18   Q.  And I think you've indicated you were at Duke for 21 years.

19   Can you describe the types of things you've been doing at Duke

20   over that period?

21   A.  I have -- over there at Duke, I have taught -- initially, I

22   taught the marketing core class for MBA students and executive

23   MBA students, and thereafterwards, I started teaching both the

24   marketing core class and the pricing class.  Now I teach mostly

25   the pricing class, both for executive MBA students and the

1    daytime MBA students, and also we have one-year masters.  I

2    teach all of them the pricing course.

3    Q.  Are there any particular areas of marketing where you have

4    focused?

5    A.  Most of my work is about understanding the strategic

6    behavior of consumers and firms, especially in context like

7    advertising.  And more recently I've done lots of work on

8    digital marketing, which includes search advertising, online

9    platforms, eCommerce marketplaces, and so forth.

10   Q.  Have you received any honors or awards to recognize your

11   achievements and contributions in marketing research?

12   A.  Yes.  I have received the Best Paper award in Marketing

13   Science and Management Science.  I've also received the Best

14   Doctoral Dissertation award, and which translate into a paper.

15   I've also -- my work has been recognized for long-term

16   contribution.  I'm also the associate editor of two of the

17   leading marketing journals, *Management Science* and *Journal of*

18   *Marketing Research*.

19   Q.  Have you authored many papers?

20   A.  Come again?

21   Q.  Have you authored many papers?

22   A.  I've authored several papers.  In our profession, if a

23   person can publish one paper in a top-tier journal every year,

24   it's brilliant, and I have done that for 25 years.

25   Q.  Have you done any academic publications that concern

1    digital advertising?

2    A.  Yes.  I have a few papers, and I also have a very

3    interesting working paper also.  One is about -- I have already

4    published this paper about broad match.  Broad match, on the

5    surface, helps advertisers to bring their keyword management

6    costs, and it looks like a good thing; it is, indeed, will work

7    out that way.

8           But if you look closely, if you layer on top of that

9    the direct benefit, there's an indirect benefit, and the

10   indirect benefit could be negative because of competition, or

11   they could end up paying more and, therefore, under some

12   circumstances, it can hurt the advertisers.

13   Q.  Have you ever testified in court before?

14   A.  No, I have never done that.  This is the first time.

15          You're the first judge I'm seeing in the U.S., and

16   this is also the first courthouse I've stepped in.

17          THE COURT:  Well, welcome.

18   BY MR. CAVANAUGH:

19   Q.  Before you were retained by the states in this case, have

20   you ever been retained as a testifying expert before?

21   A.  No.

22          MR. CAVANAUGH:  Your Honor, plaintiff states move for

23   the admission of Professor Amaldoss as an expert in digital

24   marketing.

25          MR. MAURER:  That's fine, Your Honor.

1              THE COURT:  All right.  So the Court will recognize

2     Professor Amaldoss as an expert in digital marketing.

3     BY MR. CAVANAUGH:

4     Q.  Before we get into the substance of your opinions, have you

5     prepared a slide deck to assist you in presenting your

6     testimony?

7     A.  Yeah.

8     Q.  You have to speak audibly.

9     A.  Yeah.

10    Q.  Have you prepared a slide deck?

11    A.  Yes, I have.

12    Q.  Thank you.

13    A.  Yes.

14    Q.  What was your assignment in this case?

15    A.  My assignment was threefold.  First, I was asked to address

16    the issue of how advertisers decide which online ad to buy.

17    The second task was to examine how advertisers have been

18    affected by Google's changes to its search engines results

19    page.  The third question I was asked to look at was how

20    advertisers have been impacted by Google's operation of SA360.

21    Q.  At a high level, what opinions have you reached on these

22    three topics?

23    A.  Yeah.  If you can move to the next slide, I can lay my

24    three opinions.

25              First, general search ads serve a very distinct

1    purpose because they help advertisers reach consumers with a

2    higher probability of purchase.

3              With reference to your second question, my opinion is

4    Google has reduced the visibility of certain SVP advertisers on

5    SERP.  This conduct has increased the costs of maintaining

6    prominence on the Google SERP for those SVPs.

7              And the third opinion is Google's failure to support

8    auction-time bidding and other Microsoft ad tools has decreased

9    the efficiency of advertisers' spend.

10   Q.  Let's start with your first opinion.  When you use the term

11   "general search ads," what are you referring to?

12   A.  When I use the term general search ads, what I'm referring

13   to is when a consumer enters a query in the search box, a page

14   is -- a search engine results page is served, and along with

15   that some ads are also presented.  I'm speaking of general

16   search ads, all ads which are displayed on the search engine's

17   results page -- which are featured in the search engine results

18   page.

19   Q.  What type of search engines?

20   A.  General search engine.

21   Q.  Again, at a high level, do general search ads serve a

22   distinct purpose for advertisers, in your view?

23   A.  Yes.

24   Q.  What is that?

25   A.  General search ads help to reach consumers with a higher

1    purchase probability, and general search ads also help those

2    advertisers to be very visible on the search engine's results

3    page because these consumers are looking for some information,

4    and they want to be very visible so that they can do business

5    with them.

6    Q.  Have you been reading the trial testimony in this case?

7    A.  Yes.

8    Q.  Have you seen evidence in this case that illustrates the

9    distinctive nature of general search ads?

10   A.  General search ads, as I mentioned, the search engine

11   results page is a small real estate.  And general search ads

12   help advertisers to be very visible because the real estate is

13   very small.

14   Q.  You're looking at testimony from Mr. Booth.

15   A.  Yes.

16   Q.  What relevance does that have to your views?

17   A.  This one is particularly important because there, what he's

18   speaking of is they could introduce both PLA and search ads,

19   and the question was how good it is?  And he says:  If I use

20   both, it doubles the impact.

21        That's what he's stating.

22   Q.  Can we go to slide 5, please.

23        Is this the point you were just making?

24   A.  Yes.  To illustrate the point, take a look at the next

25   slide.  And there you can see, here is Home Depot getting both

1    the search ad -- I mean, two types of general search ads.  One

2    is a general search text ad and, also, a product listing add.

3    Together, it raises the visibility of Home Depot, and hopefully

4    they would click one of those links and they may have some

5    transaction with them.

6    Q.  Have you seen any indication from Google's own documents

7    that it views general search ads this way?

8    A.  Yes.  Google is well aware of this point.  And if you look

9    in this slide, what they are speaking of is text plus PLA is --

10   works wonderfully.  In particular, it helps the advertise on

11   the search engine's results page.  It is the whole point of

12   improving visibility and being effective in the SERP.

13   Q.  Are you familiar with ads on what we refer to as SVPs?

14   A.  Yes.

15   Q.  All right.  Can you give the Court an example?  When you've

16   used -- when we use the term "SVPs," what are we referring to?

17   A.  When I'm speaking of SVPs, I'm referring to specialized

18   vertical providers.  These are firms which are trying to

19   connect consumers to a service provider.  An example of that

20   would be Expedia, Travelocity, and Amazon, and so forth.  And

21   on those -- that's SVP.  And there could also be ads on those

22   sites.  Those are called SVP ads.

23   Q.  In your view, do you distinguish between ads that are on

24   special vertical providers and on general search ads -- on

25   general search?

1    A.  Yes.

2    Q.  How so?

3    A.  In some product categories we have SVPs, but not in all

4    product categories.  Where the option of an SVP exists, we see

5    in those SVPs consumers with a higher purchase of probability,

6    people go to Amazon thinking they are going to buy something or

7    when they are almost close to the time of purchase.  That's why

8    the purchase probability is much higher.

9         General search ads for categories where an SVP

10   exists, it also can happen to consumers with a higher purchase

11   probability compared to display advertising, but it could be a

12   little lower than an ad in a SVP.

13        THE COURT:  Sorry.  What could be a little lower?

14        THE WITNESS:  The probability of purchase of a

15   consumer in a general search engine would be a little lower

16   compared to in an SVP site where an SVP exists.  But in many

17   product categories, SVPs don't exist.  In those categories,

18   consumers with highest purchase intent can be tapped at the

19   general search engine.

20   BY MR. CAVANAUGH:

21   Q.  In response to my question, when you refer to "ads on

22   SVPs," are those ads in response to a search query?

23   A.  Yes.  That's the focus.

24   Q.  If we could turn to slide 8, please.

25        How does Mr. Lowcock's testimony relate to the point you

1    were just making?

2    A.  The point I just made is what he's also speaking.  So if a

3    user goes to a retailer website, they got a higher probability

4    and intent to buy.  On a general search engine you could be

5    doing research into the products, so you are trying to learn.

6    I think this is the point which I just made.  In cases where an

7    SVP exists, when they're very close to the purchase position,

8    they're more likely to be at the SVP rather than in the general

9    search engine, but SVPs don't exist in all product categories.

10   Q.  What is it about the difference in -- in this difference of

11   intent?  Why is that meaningful?

12   A.  Because if you look at the next slide -- you go further on

13   slide 10.  Okay.  All right.  You can go show that slide.  I'll

14   explain it.

15   Q.  Okay.

16   A.  So you can see both, one, a search for refrigerator in a

17   general search engine and a search for a refrigerator in a SVP.

18   In a general search engine, we see even a firm which is -- for

19   example, any consumer can possibly learn about the product in

20   the text ad and they can use the PLA and go to Home Depot and

21   buy it.

22          Whereas if you go to an SVP, everybody cannot

23   advertise there.  Only those who are selling a product can

24   advertise there.  And if a customer clicks it, the transaction

25   will happen in that website itself.  Therefore, this is a click

1     in, and whereas in the general search engine, it's a click out.

2          Those are some structural differences, but there are

3     some qualifications.  Only a vendor who is selling products in

4     a SVP can advertise, which is not true for general search

5     engine; anybody can.  In a general search engine for general

6     search text ads, anybody can buy an ad.

7     Q.  And can a consumer make a purchase on a general search

8     engine?

9     A.  In a general search engine, they have to click out, go to

10    the advertiser's website, and close the transaction.  But as in

11    a SVP, like Amazon, you click in and the transaction and

12    everything is closed at the SVP itself.

13    Q.  How is that relevant to indicating a consumer's likely

14    intent?

15    A.  Yeah, the fact that they're going to the website and

16    closing the transaction says that they are very, very close to

17    the moment of purchase; therefore, those consumers' eyeballs

18    are very valuable.

19          THE COURT:  I'm curious.  What you say has an

20    intuitive quality to it.  The question I have is:  Have there

21    been any efforts to actually measure this?  I mean, to test the

22    hypothesis that searchs done on SVPs attract consumers who are

23    closer to the purchase decision versus someone who goes to a

24    search engine or who goes to social, is there any sort of hard

25    statistics, data experiments that would actually back this up?

1          THE WITNESS:  Yeah.  I think it would be based on the

2     conversion probability, what it would be; one is that.  The

3     other is:  How much are people willing to bid for their

4     eyeballs.  Those would be the two matrix, but I have not done

5     any survey to present that information.

6          THE COURT:  Is there anything in the academic

7     literature, to your knowledge?

8          THE WITNESS:  People have explored this issue, but we

9     do not have hard facts about -- from the firm to quantify

10    precisely.

11    BY MR. CAVANAUGH:

12    Q.  Does Google acknowledge in its documents distinction

13    between the mindset of consumers on an SVP, like Amazon,

14    compared to consumers on Google Search?

15    A.  Yeah.  I think this also addresses the point which you

16    raised, Your Honor.  You can see in the next slide, Google is

17    where people research.  69 percent of people start with Google

18    when going to retail.  And then --

19          THE COURT:  I'm sorry.  What was the number?

20          THE WITNESS:  Sorry, sorry.  I skipped a slide.

21    BY MR. CAVANAUGH:

22    Q.  You skipped one.

23    A.  Because I was going by my charts and I flipped two of them.

24    Sorry.

25          So Google, in -- in its own documents it's presented,

1    Amazon owns the lower purchase funnel and is often the last

2    point before buying, with ROI that is immediate.  And then

3    Google says Google is focused on building a strong shopping

4    ecosystem by helping advertisers reach users across the

5    purchase funnel.

6                And what is across the purchase funnel?  If you go to

7    the next slide --

8                THE COURT:  Just to be clear -- I'm sorry -- this

9    slide that you just showed, is that -- that's an excerpt from

10   an actual Google document?

11               MR. CAVANAUGH:  It's from PSX302, Your Honor, which

12   is in evidence.

13               THE COURT:  All right.  Thank you.

14   A.  Which one could see in the footnote.

15               And the next one is:  So is it across the purchase

16   funnel?

17               I later explain the purchase funnel concept also.

18               Google is where people research.  69 percent of

19   people start with Google.  So in its eyes, it's where people

20   research.

21               And then the next point is -- it further clarifies:

22   Category searches are a massive opportunity to reach consumers

23   before they have settled on a brand or product.

24               So that's how they, themselves, perceive the general

25   search engine.

```
 1    BY MR. CAVANAUGH:

 2    Q.  In your view, do advertisers view SVP search ads as

 3    substitutes for Google Search ads?

 4    A.  They're not perfect or almost perfect substitutes.  They're

 5    different.  Because when an SVP exists, you can go further

 6    down -- follow the consumer further down the purchase funnel

 7    and when they're about to -- when they're in a SVP, you can

 8    further lease an ad and try to close the sale.

 9    Q.  Are you familiar with the term "full-funnel strategy"?

10    A.  Yes.

11    Q.  What is that?

12    A.  Well, full-funnel strategy, broadly, consumers are in

13    different mindsets; some people are aware of the product, some

14    are considering the product, and some are predisposed towards

15    buying my product.  If you think of if I am a firm and I'm

16    trying to sell a product, I would target audience, in my mind,

17    to whom I want to sell the product.

18           Now, I want to know, How am I doing in the

19    marketplace?  So I want to know what fraction of my target

20    audience are aware of my product, what fraction of my target

21    audience are considering my product, what fraction of my target

22    audience are inclined to buy my product.  That tells me how I

23    am doing with the different mindsets of the consumers.

24           Sometimes the problem could be in their awareness

25    phase.  Sometimes the problem could be in the consideration
```

1    phase.  Sometimes the problem could be in the purchase phase.

2    So being able to define the source of the problem gives a clear

3    idea about what sort of media channel I should use to help move

4    the consumer onto the funnel down, so that they can buy.

5            You can think of another, simpler analogy, which I

6    would give is, if I'm a farmer, I need to sow seeds and I need

7    to nurture it and I need to harvest it.  The idea that I can

8    continuously keep harvesting without sowing the seed, I will

9    run out of business.  And farmers know this very well.

10   Business people also know this very well.

11           So, we need to know, if we want to keep our estate,

12   we need to sow seeds.  If I put all my money in harvesting,

13   this is a wonderful year, but tomorrow may be very bad for me.

14   And people understand.  And these investments are playing

15   complimentary role.  They're helping each other.  One is not a

16   perfect substitute or replacement for others.  I will further

17   elaborate this idea.

18   Q.  So if we could turn to slide 12.

19   A.  If we go to slide 12.

20   Q.  Professor, let me just ask you to hold for a moment.

21           MR. CAVANAUGH:  Your Honor, this is a demonstrative

22   drawn from PX970, which I understand is not in evidence, and we

23   would offer it.

24           MR. MAURER:  Do we have a business records exception

25   or anything on that?

```
1                 MR. CAVANAUGH:  Yes.  Your Honor, we have a business
2       record declaration.
3                 MR. MAURER:  I don't see a Bates number.  I'm not
4       sure if this was produced in the case or where it comes from,
5       Your Honor.  We've lodged a foundation objection for that
6       reason.
7                 MR. CAVANAUGH:  We'll replace it with Bates.  They
8       have Bates numbers.
9                 MR. MAURER:  Who produced it?
10                MR. CAVANAUGH:  Tinuiti.
11                THE COURT:  Sorry.  Who produced it?
12                MR. CAVANAUGH:  The company Tinuiti.  It's where
13      these slides are from.
14                THE COURT:  I see.  Okay.  Okay.
15      BY MR. CAVANAUGH:
16      Q.  Go ahead, Professor.
17      A.  Okay.
18                THE WITNESS:  Can I proceed?
19                THE COURT:  Yes, you may.
20                THE WITNESS:  Okay.  If you look at this slide, this
21      is part of a presentation given by one firm to its client --
22      I'm not mentioning the client's name for confidentiality
23      reasons -- and where they are showing them how their
24      investments across the purchase funnel were allocated in 2020
25      and what recommendation they are making for 2021.  As you can
```

1    see, in 2020 this firm -- this advertising agency has

2    recommended that they spend 55 percent of their budget on

3    purchase in that phase -- last phase of the purchase funnel,

4    and 23 percent for the awareness phase, and 22 percent for

5    consideration phase.

6            Now, the recommendation for 2021, they are saying:

7    Let's invest less in purchase and invest more in awareness and

8    consideration.

9            This is the whole idea, that you have to balance your

10   investments over time across the purchase funnel so that your

11   continuous flow of consumers, from awareness to consideration

12   to purchase. And that's why I present the marketing funnel as

13   a diagnostic tool, to recognize where the problem is and

14   systematically use it, depending on where the source is.

15           Another point which I want to emphasize is, if you

16   look at the bottom of the funnel, which is the purchase stage,

17   you would see there the investments have been made -- are

18   recommended to be made in CVS, Target, Walmart, and Amazon.

19   These are all places where the consumer could actually buy the

20   product. Whereas Google and Bing, in this instance they are

21   not at the bottom of the funnel because consumers can buy these

22   products. There's already a place where they can go and buy.

23           They're wanting to use them more to increase their

24   disposition to buy these products, rather than actually buy.

25   That's why they've aligned Google and Bing in the consideration

 1    phase.  If you see that, the little "g" and "b."  In further

 2    support of fact, if we go to the next slide --

 3              THE COURT:  Before you go to the next slide, there's

 4    a little orange carrot --

 5              THE WITNESS:  Yeah.  That's Instacart.

 6              THE COURT:  Instacart.  Okay.

 7              THE WITNESS:  Yeah, yeah.  So these are the places

 8    how people can actually buy the product from.  So -- because

 9    these consumers have a very high purchase probability, and they

10    want to close the sale.  So this is the last place, and they

11    want to invest here.

12    BY MR. CAVANAUGH:

13    Q.  How does this full-funnel strategy apply when an advertiser

14    is introducing a new product?

15    A.  When a firm is introducing a new product, as I said, the

16    biggest challenge in front of them is increasing the awareness

17    of the product more than -- yes, they would like to ultimately

18    sell, but it's more in increasing awareness of the product.

19    And of those, maybe a little later down, creating a favorable

20    disposition so that this particular product is in the

21    consideration set of consumers.

22              Therefore, for a new product, one would spend -- cast

23    a wide net, which is using display advertising and so forth, so

24    that it reach the maximum number of people I can within my

25    budget so that I build the awareness, and hopefully, down the

1   line, my product will deliver the promise what I made.

2   Q.  What type of factors would lead an advertiser to move spend

3   from one category to another?

4   A.  Yes.  As I said, much like a farmer, they are sowing seeds

5   here so that they can harvest something.  So, therefore, they

6   would spend a lot of money in building awareness at that phase,

7   in the early phase.

8   Q.  As a product reaches adoption, how might that change spend

9   within these categories?

10   A.  If a product is very well known, then they could sustain

11   with reminder advertising.  Advertising -- awareness

12   advertising, they will decrease, and they can just reinforce

13   them with display ad a little bit, billboards, all these

14   things; therefore, the investment in building awareness need

15   not be very high.

16          For example, I would give a product like Gatorade --

17   or, for example, Nike.  Most people know about Nike.  So is the

18   task now to make people aware of Nike, or is it to go to

19   convince them that their shoe is better and make them buy the

20   product?  Therefore, over time, once the awareness is very

21   high, they shift their budget.

22          But, again, they have to recognize the fact they

23   cannot completely forego awareness because a new generation of

24   consumers are coming.  Okay?  Otherwise, it will be my

25   grandfather's generation loved it.  I won't love it because my

1    grandfather's awareness is not my awareness.  Therefore, they

2    have to continuously invest and bring people down the funnel.

3            MR. CAVANAUGH:  Your Honor, the Bates page for this

4    Tinuiti document is 1665.

5            THE COURT:  Can I ask you a question?  Do you have a

6    view on whether -- well, let me back up.

7            This is a depiction of a purchase funnel that's

8    associating particular channels of advertising for a particular

9    product, and it's one that, you know, we're all familiar with.

10   In your view, might the funnel look differently, and the

11   associated channels at each stage, in a different industry?

12           THE WITNESS:  There could be small changes, but this

13   funnel is a very, very basic concept.  And what it essentially,

14   fundamentally captures is, people need to know a product, and

15   then after that, they may consider some product of the subset

16   of what they're aware of, and then they may buy.  Therefore,

17   across product categories there could be some changes, but at

18   the general level, this is what it is.

19           For any product which involves certain amount of

20   involvement -- and this is high involvement -- this would apply

21   for, let's say, if somebody's buying a house or they're buying

22   a car and so forth.  But, if somebody is buying -- like, for

23   example, I'm stopping every morning in a convenience store and

24   I want to buy Starburst candy -- just I want to keep myself

25   awake, so I'm getting a Starburst candy.  So I go there, and I

1    see a Mango Tango flavor.  I know mango, I know what's tango,

2    but I never put them together.  Okay?  And here, I see this

3    flavor.  So what would I do?

4             I saw this, and it doesn't cost much.  I give a buck

5    and I get that, I try that.  What is the cost for me?  If it

6    doesn't taste good, I'm going to spit it out.  If it tastes

7    good, maybe some other time, when I feel like this, I may buy

8    it.

9             So in those cases, they become aware of the product,

10   buy the product, and then they form an attitude.  This is true

11   only for low involvement, low-value products.

12            The bulk of the products they are not doing like that

13   because for most of us we cannot buy a house in a heartbeat and

14   then figure out what happens.  Therefore, for most products,

15   these three stages exist.  But some of them may refine a

16   particular stage and subdivide it in two or three parts.

17            But what I would like to emphasize is this notion of

18   funnel is about the mindset of the consumer.  It's what happens

19   within the cranial cavity of people.  It's not what's happening

20   over there.  Time may change, but the way people think has not

21   fundamentally changed, and there's no reason to believe -- at

22   least I don't believe it's going to change 10 years from now,

23   20 years from now, how people think.

24            So, this is very simple concept.  Even 30 years ago,

25   when I was working in advertising full-time, we used these

1    concepts, and nothing much has fundamentally changed.

2              MR. CAVANAUGH:  Can we go to slide 14, please?

3    BY MR. CAVANAUGH:

4    Q.  What does this slide illustrate, Professor?

5    A.  This is rate of territory slide.  Earlier, I have shown

6    that Walmart, Amazon, Target, and CVS are used more -- lower

7    down in the funnel in the purchase phase.  Then, I also

8    mentioned that Google and Bing are a little higher, as far as

9    this product category goes.  Yet, it's clarified that they're

10   leveraging brand searches via Google and Bing as a way to

11   circulate purchase intent to the eCommerce partnerships.  So

12   they are playing slightly different role, as exemplified in

13   this example.

14             MR. CAVANAUGH:  Your Honor, we would move 970 into

15   evidence.

16             MR. MAURER:  I thought we already did that.  No

17   objection.

18             THE COURT:  I don't know if we formally did.  But if

19   there's no objection, we'll certainly admit it.

20             Thank you, Counsel.

21   BY MR. CAVANAUGH:

22   Q.  Now, there's been testimony from a Google executive that

23   the funnel is, quote, "obsolete."

24             Do you agree with that?

25   A.  I think people may -- would like to say it's obsolete, but

1    this concept has survived 120 years, and at the fundamental

2    level, it's about how people make decisions.  There is an

3    awareness phase, there's a research phase, there's a decision

4    phase, and that's what this is capturing, and it follows very

5    logically, and it's very, very basic psychology.  I don't think

6    what's happening inside people --

7    Q.  Can we go to slide 15?

8    A.  Yeah, go ahead.  Is that --

9    Q.  Slide 15, that's on the screen.

10   A.  Yeah.

11   Q.  Okay.

12   A.  So what's happening inside people's head has not

13   fundamentally changed, although what's happening outside

14   people's head can change.  But what's happening inside the mind

15   has not changed; therefore, these phases are about, as I

16   mentioned, about the mindsets of consumers.  That's what this

17   is capturing.  It's not capturing the actions of consumers or

18   what they are doing out in the world.  It's what's happening

19   inside the head.

20          What's happening out has changed with time, but

21   what's happening inside the head, fundamental psychology, has

22   not changed, and I do not think it's going to radically change,

23   at least in my lifetime.

24   Q.  I believe Mr. Dischler also said that all advertising is a,

25   quote, "singular pool."

1          Do you agree with that?

2     A.   Yes.  I've heard of that.  I would like to clarify.  As I

3     mentioned before, I give this analogy for farmer.  If any

4     farmer who thinks that they can keep harvesting all the time

5     and just move the investments around and nothing will happen,

6     they will do at their own peril.

7          And same is true in business.  If any firm thinks

8     that they will invest all their money only in the purchase

9     phase and condone the other phases, they will hurt themselves.

10    And that's the idea behind the full-funnel strategy, you have

11    to continuously balance them.

12         And the objective which the firm has with reference

13    to each of these phases are not one and the same.  They are

14    different.  One is to build awareness, and there are ways to

15    measure it.  The direct way to know whether somebody is aware

16    is:  What is the quality of every ad?  Which other sports drink

17    which comes to your mind?  What comes to the top, it stayed

18    there, so it is top of mind.  What they're able to list other

19    than the top is slightly lower quality, but still it's unaided.

20         Then, I can ask them -- if I don't do well on these

21    two, then I can ask them:  Do you know about Gatorade?  And

22    then they give that example.  Then I understand, okay, it's not

23    as good.  And that says, hey, my quality awareness is very poor

24    and I have to do action.  I don't have to wait all the way from

25    my return on investment, then wake up and say, Well, I totally

1    did not know what's happening in the marketplace, I want more

2    money to realize what I could have done more efficiently.  Most

3    business people are savvy, and they recognize that.

4    Q.  So, to go to a question which the Judge was just asking

5    you:  Have you seen evidence in this case of advertising

6    industry participants continuing to use the funnel concept in

7    making advertising decisions?

8    A.  Yes.

9    Q.  If we could turn to slide 16.

10   A.  Here is -- if the question is, is people are still thinking

11   in terms of the funnel, you can see all the various ways people

12   are thinking.  They refined it more.  Some people collapse

13   some, some extend, but the notion of funnel is live and well

14   and many people are using it customized to their product

15   category, and based on their knowledge and sophistication.

16          Therefore, the idea is there, and it's still used,

17   but people have partitioned it into more levels, fewer levels,

18   and so forth.  And some are mixed up, mindset with actions,

19   also, but the idea is there and people are still using it.

20          MR. CAVANAUGH:  Your Honor, the DX references

21   are two -- these are the documents Google used in the

22   cross-examination of Dr. Jerath.

23   BY MR. CAVANAUGH:

24   Q.  Have you done any analysis about how advertisers categorize

25   social display and search ads relative to one another in the

1    funnel?

2    A.  Yeah.  The way I will explain it is, I have tried to -- in

3    the documents which I have cited in my opening report, and

4    those which were cited in the rebuttal report of Professor

5    Bucklin, I pulled them all together and tried to figure out,

6    how are they electively positioning display ads search?  Let's

7    step back and ask ourselves this question.

8              If a human being comes from an outer planet, they're

9    all coming there, obviously they have no idea about what

10   advertising we are doing here and whether they should place it

11   higher or below.  So, my expectation would be --

12             THE COURT:  I'm laughing.  You don't have to come

13   from another planet to have that approach.

14             THE WITNESS:  There are some also here, also, in any

15   dataset, too.

16             They are equally likely to place them -- some may

17   place above, some may place low.  On average, my product would

18   be same.

19             THE COURT:  Okay.

20             THE WITNESS:  I'll present you, this is based on the

21   documents and depositions which we have in our -- which were

22   cited -- documents which were cited in my opening report, as

23   well as in the rebuttal report of Professor Bucklin.  We looked

24   at that set and picked among them, which were by advertisers

25   and advertising agencies, but did not include firms which are

1    selling advertising, which is who are in the online general

2    search engine information.

3            And what you can see here is, out of the small

4    sample, most of them tend to place display above search

5    advertising.  The key point which I want to emphasize is, none

6    of them place it below.  Okay?  As I said, an uninformed buyer

7    would be equally likely, but what this is saying is, it's not

8    necessarily equally likely; it's queued, which means it's

9    queued.

10           Most people tend to think display is higher than

11   search.  As you said, I don't need to go to outer planet to

12   find people who may think they're equally likely.  Yes, they

13   are in this dataset.  There will be a few.  Okay?  And, here,

14   I'm not asking what their motivation.  I'm just saying they're

15   not equally likely.

16   BY MR. CAVANAUGH:

17   Q.  And just so our record is complete here, what percent of

18   display ads were noted to be higher than search in the funnel?

19   A.  64 percent.  And you can see, it's not even -- it's very

20   large number of them think they're higher than search.

21   Q.  And what percent were lower than search?

22   A.  Lower than search?  As I mentioned, none.  So I think

23   it's -- that part will emphasize they're not equally even

24   likely.

25   Q.  Why did you exclude firms that sell ads?

1    A.  Because I don't want -- there may be some conflict of

2    interest; therefore, I did not use those documents.

3    Q.  Now, if we turn to slide 18.  This is analysis of evidence

4    from the case with the relative position of social and search

5    in the marketing funnel.  Can you explain what you mean by

6    "social" here?

7    A.  Here, I am referring to -- when I refer to social here, I'm

8    referring to social display ad, not social search.  And we were

9    trying to find out, how do they look at social display compared

10   to general search.  And, again, as you can see, they're not

11   equally likely, and most people tend to use social display

12   above -- place it above search ads.

13   Q.  What percent is that?

14   A.  That's pretty comparable to the earlier one.  It's around

15   62 percent.  And, again, the key point what I would emphasize,

16   no one is thinking they should display their product -- place a

17   display advertising below search.

18           THE COURT:  I'm sorry.  The denominator here is what,

19   again?  This is a collection of evidence representing what

20   sources?

21           THE WITNESS:  Yeah, this is based on the documents

22   which I have cited in my opening report, that body of documents

23   I cited, and the body of documents which was cited in Professor

24   Bucklin's rebuttal to my report, pulled them together, and then

25   from that, I have constructed this to get an opinion.

1           And this also says another point.  All these

2     advertisers are not only using marketing funnel; they also have

3     idea about relative position, which one they should use for

4     volume and which one is less; therefore, people are conversant

5     in this funnel and it's part of their everyday parlance and

6     they use it.

7           THE COURT:  And in putting this together, you were

8     able to -- let me ask you:  Were you able to distinguish

9     between search on social versus display ads on social?

10          THE WITNESS:  This is -- this analysis does not

11    address that question.  This is about display advertising.

12    That was the focus.  I later address that question.

13    BY MR. CAVANAUGH:

14    Q.  Now, have you done any analysis comparing conversion rates

15    for display ads and search ads?

16    A.  Yes.

17    Q.  Could we go to the next slide, please?

18    A.  See, as I mentioned, search advertising is very effective

19    lower in the funnel.  And I mentioned that before, and here we

20    can see the conversion rate is 4.4 percent, according to one

21    study, and -- whereas for display advertising, the conversion

22    probability is low.  Why?  Because they are higher up on the

23    funnel.  The probability of purchase is much lower and,

24    therefore, they are converting a far lower probability.  And

25    it's not, like, a little smaller.  You know, it's at least one,

1    two, seven -- eight times less effective compared to search

2    ads.

3            THE COURT:  This data comes from where?

4            THE WITNESS:  This is based on the source which is

5    cited below.  But, most -- this is -- I have given one

6    indication, but qualitatively, they are similar.  I think, by

7    several orders of magnitude, display ads are less effective

8    compared to search ads.

9            THE COURT:  And what's "conversion" defined as here.

10           THE WITNESS:  Conversion is an action which the

11   consumer has taken.  It could be buying a product.  What was

12   the -- for advertiser wanted, that's what they do.  That's what

13   it is.

14   BY MR. CAVANAUGH:

15   Q.  Will you also see references to the funnel in academic

16   literature?

17   A.  Yes.  There, I would like to clarify one thing.  The

18   marketing funnel has been around for a very, very long time,

19   and it's very, very basic psychology.  So, people are in the --

20   in the current literature, people are not doing:  Does the

21   funnel exist?  What is the three stages of force?  That's not

22   the pursuit now.  I think some people use that idea to inform

23   some research which they're doing related to other issues in

24   the online space, often not directly related to the issues in

25   front of the Court.

1          But, here is one paper which has used the marketing

2     funnel, and it speaks about when should -- when is retargeted

3     advertising more effective, and sort of says that it's more

4     effective in the lower stage of the funnel.  I'll later

5     elaborate what retarget advertising is and how it looks.

6     Q.  Let me ask you to turn to slide 21.  This was a

7     demonstrative shown on cross-examination of Professor Jerath.

8     Would you comment on this?

9     A.  Yeah.  As you can see, these are, like, headlines, which

10    the primary purpose of these headlines is to draw attention,

11    and there's nothing more powerful than saying somebody is dead.

12    Okay?  Everybody will wake up.  And that's what -- these are

13    all dramatic headlines.

14         But, as you've seen, what I've discussed before, the

15    funnel is live and kicking, and it's being used by advertisers.

16    And we also teach that for undergraduate -- I mean, when I

17    was -- undergraduates and grad students, we discuss it.  And

18    I'm not surprised that still it is used.

19    Q.  With the funnel concept in mind, turning back to the

20    question of how advertisers make purchasing decisions about

21    online ads, what, again, distinguishes general search ads from

22    ads appearing in SVPs?

23    A.  This is what is referenced to as Google Meta.  It is a

24    specialized provider within the Google website itself.  There

25    is a distinction between them -- the people who are looking at

1   Google's Meta product -- and I mean their specialized vertical

2   units -- they are at a slightly higher purchase intent than

3   those who are in those search text ads.

4   Q.  Are there practical and functional differences between ads

5   in SVPs and ads in general search?

6   A.  Yes.  As I mentioned -- elaborated before, the mindset of a

7   consumer who is in the evaluation phase is very different from

8   the mindset of a consumer who is in the purchase stage.  The

9   consumer who is in the evaluation phase, they're looking for

10  information which will guide their choice.

11       The consumer who is in the purchase stage wants to

12  refine it and figure out, can I get a blue-colored shirt or a

13  green-colored shirt?  Can I get the right green?  The right

14  blue?

15       Whereas in the evaluation phase, what brand should I

16  buy, whether I should -- those sorts of issues are there.

17       So this is the mindset of the consumer, and the

18  advertisers recognize this.  And, therefore, the ads which are

19  used as general search ads the way they are, and compared to

20  the SVP ads, there are some functional and practical

21  differences.  Now, let me elaborate them.

22       To be in an SVP, the advertiser should sell their

23  product there, whereas anyone can advertise in the general

24  search, particularly general search text ads.  There are some

25  restrictions, but as of general search text ads, anyone can

1    avail that opportunity.

2              Then, in terms of functional differences, even in

3    terms of the revenue they generate, the source of revenue is

4    slightly different for a SVP, like Amazon.  Amazon has two

5    sources of revenue.  One, they can get advertising revenue.

6    They can also make money by selling the product.  They can get

7    a commission of that.  Of course, they also make more than

8    this -- I'm not going into it -- which is referral fees and so

9    forth.  At least these two direct sources are there.

10             Whereas for a firm which is using a general search

11   text ad, there they're only getting from the advertising.

12   They're not getting any other source of income from the

13   consumer directly.  So the ad revenue is the only source of

14   income for them because they're not getting a commission off

15   the product sales in the general search.

16             These are some differences, but these differences are

17   aligned with what is the mindset of the consumer.

18   Q.  Are you familiar with the concept of pull and push

19   advertising?

20   A.  Yes.

21   Q.  Can you explain that to the Court, and in the context of

22   this case?

23   A.  Yes.  In the context of this case, a search text ad is a

24   pull ad.  Why is a search text ad called a pull ad?  Because

25   the consumer is going to the general search engine, typing a

1    query, and in response to the query, the ad is SERPed so that

2    they can do business and they can -- and the advertiser can

3    make some money.  So the ad is pulled in response to the search

4    inquiry; that's why it's called a pull ad.  And it is acting on

5    a very high-quality signal, the express intention of the

6    consumer.  It's not something which is inferred.  It's

7    explicitly, the person has gone and typed.

8              Whereas, a display ad is slightly different from

9    this.  It is a push ad.  So, somebody is reading *New York*

10   *Times*, I'm interested in what's happening in the Middle East

11   now, so I'm reading about it, and then an ad would get served

12   to me.  That is based on their inference of what I may be

13   interested.  There is some chance I may not pay attention to it

14   at all because I am looking at something that's immediate and I

15   don't really know what's happening there and I want to know.

16   So peripherally I may process that information, it's not the

17   focus of my attention.

18             Whereas, when I am on a general search engine, I am

19   the one who is seeking this information.  And this ad is coming

20   along, and if it's directly addressing the question, I would

21   look at it.

22             So, therefore, one is a pull ad, because it's a

23   response to the query.  A push ad is, based on my profile,

24   they're serving an ad, not based on my express intent.  That's

25   the distinction.

1    Q.  Would display ads in social media constitute a push

2    advertising?

3    A.  I would put it as display.  Social is push.

4    Q.  We're looking at slide 24.  This is Mr. Vallez's testimony

5    at trial.  Is this consistent with the point you were just

6    making?

7    A.  Yes.  This is testimony.  Paul Vallez has mentioned the

8    same point, what I just said, between the distinction between

9    push and pull.

10   Q.  So if we could turn to slide 25.

11       We've had an example of the now-infamous Sommer's golf

12   shorts.  Without any commentary on --

13            THE COURT:  I don't think he's here to defend

14   himself.

15            MR. CAVANAUGH:  No.  Unfortunately.

16   BY MR. CAVANAUGH:

17   Q.  Could you provide context for the consumer watching a golf

18   video and how that might differ from someone doing a search for

19   golf shorts on Google?

20   A.  To help understand the background what may be happening in

21   this context, let's consider two consumers.  One is Consumer 1.

22   Another is Consumer 2.  Consumer 1 -- let's assume Consumer 1

23   has watched a golf video on Instagram.  What can I infer about

24   that?  That consumer may be interested in things related to

25   golf, but I do not know what.  It could be golf lessons, it

1    could be golf clubs, shirts, hats, shorts, tee times,

2    vacations, and so goes on the long list.  So based on this, the

3    fact that I know this person is interested in golf, I can

4    follow that person wherever they go and what some of the sites,

5    then I can display an ad to them.

6            But, one has to recognize how -- what is the

7    probability this person is really interested in shorts?  This

8    one, a very large ad -- very large denominator, 1.  Okay.

9    Therefore, my probability of converting this customer for one

10   given product is relatively low, because I really do not know

11   what this person is really interested in.  Yes, this person is

12   interested in golf, but is it shorts?  Is it T-shirt?  I'm not

13   100 percent sure.

14   Q.  Is there any indication that they even want to make a

15   purchase?

16   A.  I have no idea.  Okay?  But, now let me contrast with

17   Customer 2.  Customer 2 has gone to Google and typed golf

18   shorts.  This person -- and they're putting some PLAs in

19   response to that query.  Now, one thing we can know for sure,

20   this customer is interested in golf shorts.  At least that much

21   I know.  And this customer may be -- soon may be buying a

22   product, maybe this month, maybe this day, maybe two days from

23   now.  They're interested.

24            So, if I were to -- the conversion for this ad is

25   more likely than the first one, okay, because here, this is an

1    expressed, explicit intent -- clearly expressed intent.  The

2    first one is I'm inferring, I'm speculating and, therefore, the

3    probability of conversion is much lower compared to the second

4    one.

5            That's the point which I want to emphasize.  And I

6    also want to use this to draw a distinction between pull ad and

7    push ad.  The second one is a pull ad.  It's in response to the

8    query.  And pull ads are more likely to be with a higher

9    conversion probability.

10           The first one is a push ad, and the conversion

11   probability is going to be lower.  So that's what this helps

12   clarify, the push and pull concept, also.

13   Q.  Can we go to slide 26.

14           How does Ms. Lim's testimony bear on the point you were

15   just making?

16   A.  I think that here, she is making the same point.  I think

17   pull is consumer initiated, whereas the first one, which is an

18   add in *New York Times* and so forth, we are intercepting the

19   consumer while they are trying to consume the content.  That's

20   what she was trying to draw a distinction.

21           The key point here is, in a pull ad, it's consumer

22   initiated, and it's a very powerful signal to act on.

23   Q.  We've had some testimony in the case regarding a certain

24   species of display, social ads, retargeted ads.  Are retargeted

25   display ads, in your view, similar to general search ads?

1    A.  I think there are a distinction between them.  I had

2    earlier explained to you the contrast between display ad.

3    Maybe buying an audience with a weak signal compared to search

4    ads, we're buying an audience with a higher conversion

5    probability.

6         Retargeting ads are better than display ads because

7    now they have a little more.  I went to a place, I picked a

8    product at Amazon, put it in the cart.  And then I was fickle-

9    minded.  I left.  I didn't buy.  So now they can chase me at

10   another place and present a display ad to me.

11        It is better than display ad -- retarget display ad

12   is better, but it is nowhere near search ads.  Because why?

13   Because the signal is getting weaker and weaker as more time

14   lapse back from the time they left the Amazon shopping cart and

15   went somewhere else.

16        The first two days itself, the value of the signal,

17   it drops by 50 percent.  After one week, it's very, very

18   negligible value.

19   Q.  Did you do any analysis regarding retargeted ads in terms

20   of conversions compared with general search ads?

21        Go to the next slide.

22   A.  See, if you can see the next slide, the point which I just

23   made about a display ad is far weaker than general search ads.

24   Retargeted ads are slightly better than display ads, but still

25   several magnitudes lower than general search ads.  Okay?  This

1    is .5 percent and, in general, many people have reported

2    retargeted bumps up the quality of the display ad by 70 percent

3    because the signals are slightly better.  But, still, it's a

4    huge difference between them.

5    Q.  And just so the record is clear, your retargeted number is

6    .97?

7    A.  Correct.

8    Q.  And then what is it for search ads on Google ads?

9    A.  4.4.  That's the number I have.  But this can vary

10   according to product categories and firms and so forth.  But

11   qualitatively, the rank --  I would be very surprised if

12   somebody places evidence that the rank order of this has

13   changed.

14   Q.  Given this, in your view, can advertisers use retargeted

15   display ads instead of general search ads?

16   A.  They are serving different functions, so advertising may

17   use both of them, but they're not substitutes.

18   Q.  Turn to slide 28.

19       Referring to trial testimony from Mr. Booth at Home

20   Depot.  What's the point he's making here regarding

21   retargeting?

22   A.  He's saying that search ads are unique.  And then in the

23   highlighted portion:  Whereas retargeting is, they could be

24   anywhere throughout the web, and then Home Depot would push a

25   message to them, saying, hey, remember us?  Why don't you come

 1    back to our website?

 2          So retargeting advertising remind the consumer about

 3    the product which they expressed some sort of interest and so

 4    forth.  So, it's better than display advertising, but it's

 5    nowhere compatible to when they are in an SVP, about to buy a

 6    product.

 7    Q.  Going back to a question the Judge asked you at the outset.

 8    We've heard a bit about social search in this case.  What's

 9    your understanding of those types of ads?

10    A.  Social search is -- I think Facebook had it in 2012, around

11    that time, and then, again, there was a drop, then they came

12    back, I think, around 2019.

13          Social search, even today, is a very small

14    phenomenon.  And it's useful to understand that people are in

15    most of the social websites to be connected with the social

16    network, be entertained, and so forth.  Whereas with the

17    general search engine, it's very different case.  There, they

18    are seeking information.  So -- and because they are seeking

19    information, the general search ads are meeting their immediate

20    need, their focal need.

21          Whereas in social, they want to know what's happening

22    among their family members, college friends, and so forth.

23    There, they are not focused on consuming.  They're more focused

24    on consuming the content and less about the ads and the

25    information it gives; therefore, they are literally far weaker.

1    And it is still in the early stages of development, and it's

2    nowhere near general search text ads.

3    Q.  Could we turn to slide 29.

4        Referring to testimony from Mr. Vallez, is that

5    consistent with the point you were just making?

6    A.  Yes.

7    Q.  How does he refer to social search?

8    A.  He refers it to still in its infancy and fairly nascent.

9    And that's my view, too.

10   Q.  Turn to slide 30.

11       What are we looking at here?

12   A.  Here, we are looking at highlighting the point that it is a

13   very, very small fraction of their business, because the names

14   are -- I'm not mentioning the names and I'm not mentioning how

15   small it is.  The last line says how small it is.

16   Q.  So, Professor Amaldoss, I believe you said you reviewed

17   trial testimony in this case.  Did you review the trial

18   testimony of Professor Jerath?

19   A.  Yes.

20   Q.  Let me put up slide 31.

21       This is a demonstrative Professor Jerath used discussing

22   contrasting text ads with other general search ads.

23           MR. MAURER:  Objection.  This is another expert that

24   Dr. -- Professor Amaldoss didn't rely on in his report.  He's

25   in another case.  I'm not sure what the purpose of these

1    questions are or what the basis is to ask Professor Amaldoss

2    about this.

3            MR. CAVANAUGH:  Your Honor, I was simply trying to

4    save time.  He has opinions regarding distinctions between

5    texts and other search ads.  I was just trying to avoid

6    duplication.

7            MR. MAURER:  It's not disclosed.

8            THE COURT:  I think the question is:  Are you going

9    to be asking him about Professor Jerath's opinions or just

10   using this --

11           MR. CAVANAUGH:  I'm using this to go through this

12   very quickly, to just -- I mean, I don't have to have him say

13   does he agree with what --

14           THE COURT:  Well, I don't think it's appropriate to

15   have him -- well, I suppose it actually would be appropriate.

16   But, let's let this play out and we'll see what weight I give

17   to it.

18           Go ahead.

19   BY MR. CAVANAUGH:

20   Q.  Professor Amaldoss, have you looked at whether there are

21   distinctions to be made between text ads and PLA search ads?

22   A.  I think there are some important differences between

23   general search text ads and PLAs.  Any firm can advertise on

24   text ads, and it's more detailed.  Whereas PLAs don't have that

25   much detailed information because they're serving a slightly

1    different purpose.  They're trying to cater to consumers who

2    are a little more advanced in the purchase funnel compared to a

3    text ad.  But PLAs are only available for firms selling their

4    products.  PLAs cannot be used by service firms that are

5    offering services and so forth.  There are some differences.

6    The person who is on the PLA may be a little lower down the

7    funnel.

8    Q.  When looking at demonstrative slide 31.

9        On the text ads, can they advertise virtually anything?

10   A.  On text ads?  Yes.

11   Q.  How so?

12   A.  Because anybody can buy those text ads, and they can sell

13   products, messages.  Whatever message they want, they can buy

14   and -- unless they conform to sort of the norms Google has with

15   reference to what is considered unacceptable.  But, generally,

16   it's available for everybody.

17   Q.  Are there certain advantages to text ads in terms of how an

18   advertiser can -- what they can do with text ad?

19   A.  Yes.

20   Q.  What else?

21   A.  They can customize their information.  They can customize

22   the headline to reflect recognizing the keywords.  They can

23   also choose the landing pages appropriately.  There's lots of

24   customization which is possible within the text ads.

25   Q.  Let me ask you to turn to slide 32.

1          THE COURT:  Mr. Cavanaugh, before we do that and

2     discuss the next slide, it's past 3 o'clock, so why don't we

3     take our afternoon break.

4          MR. CAVANAUGH:  That's fine.

5          THE COURT:  It's a little bit after -- I guess almost

6     3:05.  Why don't we resume at 3:20.

7          And, Professor Amaldoss, I would ask you not to

8     discuss your testimony with anyone during the break.

9          THE WITNESS:  Yes, sir.

10         (Recess from 3:04 p.m. to 3:22 p.m.)

11         THE COURT:  All right.  Mr. Cavanaugh, whenever

12    you're ready.

13         MR. CAVANAUGH:  Thank you, Your Honor.

14    BY MR. CAVANAUGH:

15    Q.  Professor, have you looked at the importance of general

16    search text ads to advertisers?

17    A.  Yes.  I have an exhibit which can help present some

18    evidence for that.

19    Q.  Why don't we move to slide 33.

20    A.  33?

21    Q.  32.

22    A.  32.

23    Q.  Let's go to 33.

24    A.  What this says is that there is one firm, which is

25    Booking.com, saying:  Can they stop buying text ads?  And the

1    answer is no, because they're heavily dependent on traffic from

2    a Google search engine.

3    Q.  Go to slide 34.

4    A.  This is another testimony from one of the people who came

5    here, Tracy-Ann, who came here and mentioned about the

6    challenges they face.  And the question was:  Do you typically

7    shift spend between search and digital?  The answer is no.

8              And, basically, there are buckets created for each

9    stage, and they don't move them around that much because the

10   objective is to search with the term and they have something to

11   achieve and they don't move around that frequently.  They may

12   move from one little bit on the margin, but they don't meet

13   radically, at least in this case.  And she explicitly says:

14   It's not transferable between progammatic buy and web pages and

15   paid search.  Therefore, they recognize how important paid

16   search is, and they're stretching as much as they can to fully

17   take advantage of the power of paid search.

18   Q.  If we go to slide 35.

19   A.  Here is another firm, and they're using both paid search

20   text ad and PLA.  The reason why they're using paid text ad,

21   because it gives some special advantage.  If you see, the

22   messages can be customized, like, Labor Day Saving 20 Percent

23   Off and all these things.  It's much easier to bring them in in

24   the text ad.

25   Q.  So he refers to the 20 percent off.  But does he provide a

1    second example with respect to the nature of the query?

2    A.  I think that he makes a difference, because what he says in

3    the second point, if you see there, again, text ads for

4    queries, like Home Depot, is kind of a very general query for

5    which no particular product can be assigned.  And, again, a

6    text ad can be sold to the consumer and hopefully catch them.

7    So, that's how text ad is very helpful.

8    Q.  Let's turn to a different topic.

9          You said earlier part of your assignment was to look

10   at SVP visibility on the Google SERP.  Did you form an opinion

11   as to that?

12   A.  Yes.

13   Q.  What is your opinion?

14   A.  Google has reduced the visibility of certain SVP

15   advertisers on the SERP, and this conduct has increased the

16   cost of being prominent on the Google SERP for those SVPs.

17   Q.  Have you reviewed any testimony in this trial that

18   illustrates this point?

19   A.  Yes.  This is from Hurst, who is from Expedia brands:

20   Could Expedia brands forego advertising on Google?  The answer

21   is no.  And they do not ever say it's possible for them to grow

22   without Google.

23   Q.  And if we could turn to slide 38.

24          Referencing Mr. Dijk's testimony at trial.

25   A.  This is another SVP who is, again, from the travel

1    industry.  And, again, this SVP is completely reliant on Google

2    to open the door to the courtyard.  And he uses the courtyard

3    metaphor to explain there are many entrances to the courtyard,

4    and we need Google, is at all the entrances, and we need them

5    to open the door.

6    Q.  How has SVP's ability to acquire customers through the

7    Google SERP changed over time?

8    A.  Over time, as -- just give me a minute.

9    Q.  Sure.

10   A.  In 1998, when Google introduced the product, they had a set

11   of links -- blue links, so when consumers made a query, the

12   blue links were featured.  Later, around 2000, they introduced

13   search text ads, and like this, over a period of time, they've

14   introduced multiple units.

15         One important consequence from the point of SVPs is

16   their visibility has got decreased because SVPs could gain

17   visibility on the SERP through text ads or search ads, broadly,

18   and also through the blue links or the organic links.  But

19   because of these additional units which have come along, the

20   organic links have got pushed further down.  So that, as a

21   source of traffic, has become less significant for them.  But,

22   they need traffic from Google.  The way how they solve their

23   predicament is, they invest more on search advertising so that

24   they can draw traffic.

25   Q.  Are certain SVPs prohibited from showing up in some of

1    these unpaid units on this search engine results page?

2    A.  Yeah.  There's some instances of them.  In the next slide,

3    I can give an example of local services ad.  I'm just using

4    this as an illustration.  For local services ad, depending on

5    the keyword, here it is something, like, "Electrician near me,"

6    then one could see a set of local services ads displayed in

7    response to that keyword search.  Now, if somebody clicks on

8    that ad, they are taken to Google-hosted page, not to the page

9    of the service provider.  It's taken to the Google-hosted page.

10         Now, in this, one can also ask, consider somebody

11    like Angie's, who is an SVP, and that service provider has a

12    lot of -- Angie's, as an SVP, has several service providers,

13    plumbers, electricians, and others providing services to

14    Angie's.  Angie's can place the ad on behalf of a particular

15    service provider.  But if anybody clicks the ad, it takes to

16    Google-hosted page.  It does not take them to Angie's.

17         So, for Angie's, Angie's is not selling one service.

18    They are selling a bundle of services.  They would like to

19    build a relationship with the customer and hopefully, over

20    time, sell them more.  And in some cases, it may also be

21    efficient for the consumer to know what are the other services

22    that Angie's is offering, but they do not get that opportunity.

23         So, there is a lot of restrictions like this that has

24    reduced their visibility.

25    Q.  Are there also restrictions in the hotel unit and flight

1    unit?

2    A.  Yes, similar restrictions exist on the hotels and flights

3    unit.  On the search engine's results page, those SVPs cannot

4    feature.  But they can feature on other pages, but not on the

5    surface of the SERP.

6    Q.  How have SVPs responded to these changes on the SERP?

7    A.  It has had some consequences on them.  You can see on the

8    next slide.  So the point which I want to emphasize, they need

9    the traffic, and they recognize that.  But once there's -- a

10   traffic flow is decreasing, they are increasing their spend on

11   advertising and that raises the cost of doing business.

12   Q.  This is Mr. Hurst's testimony --

13   A.  I think there's one more point.

14   Q.  Sure.

15   A.  Can you go to the previous slide?  There's one more point

16   which is worthwhile emphasizing in the second paragraph.

17          Yes, they increase the cost.  And I don't think we

18   actually ended up getting anything incremental in return

19   because they have to spend more to remain where they are.

20   Q.  Can we go to slide 41?

21          What is Mr. Hurst responding here in response to the

22   Court's question?

23   A.  He's giving the rationale for why this is.  In a sense,

24   what he's saying is, real estate is limited and they need to be

25   the top.  And also, earlier, they could take advantage of the

1    blue links or searching and optimization.  Now they got pushed

2    down.  Therefore, they are becoming more dependent on search

3    text ads or general search ads, and that's what they're using.

4    Q.  If we could turn to slide 42.

5         Referring to Mr. Dijk's trial testimony.

6    A.  This is another point of evidence from another SVP,

7    Booking.com, here again, "And did you notice a decrease in your

8    growth rate from organic results or search engine optimization?

9              "Yes.

10             "And what we are talking about here is actually a

11   decrease in growth for Booking.com?

12             "Yes, but also the reality that we have a pay more,

13   more, and more to get more or less to the same results."

14             In a sense, they have to pay more and get less or

15   same.  So, the cost of doing business for them has increased as

16   a consequence of this for the SVPs.

17   Q.  Let me turn to slide 43.

18             Now, this is from -- you use an example from local

19   services.  Is this someone in the local services -- local

20   services SVP.  And what's the point the witness was making

21   here?

22   A.  They're reflecting a similar sentiment what I had earlier

23   expressed, that these units -- additional vertically focused

24   units have decreased their visibility on the SERP.

25             But they're also emphasizing another interesting

1    point.  The effect of this lower visibility is not just

2    affecting the consumer traffic.  That's one part of the

3    equation.  There's another part of the equation.  The other

4    part is, the flow of suppliers joining the network is also

5    decreasing because they're saying fewer consumers are coming,

6    are less visible, then, you know, should I really be there?

7    That's the other point which he's mentioned.

8             The introduction of the OneBox would have reduced our

9    service pro traffic and service pro signups as well.  That's

10   the point which he's saying.

11   Q.  So if the cost of acquiring customers on the Google SERP

12   has increased costs for SVPs, why don't they simply advertise

13   somewhere else?

14   A.  That's a good thought.  Let me go to the next slide and

15   that will -- that's something which they have probably

16   considered, but they didn't think it's worthwhile and,

17   therefore, they have stayed put.  Why bother with such a ad

18   partnership?  We compromise a lot because it's Google, because

19   it is the principal source of traffic for them.  And

20   whatever -- how else search advertising grows and grows, we

21   want to grow with them.  That's the reason.

22             MR. CAVANAUGH:  Your Honor, this comes from PSX965,

23   which I understand is not in evidence.

24             MR. MAURER:  Your Honor, I need a moment to look at

25   this, if I may.

1          And do we have a business records declaration,

2    Mr. Cavanaugh?

3          MR. CAVANAUGH:  Yes, you do.

4          MR. MAURER:  No objection.

5          THE COURT:  PSX965 will be admitted.

6    BY MR. CAVANAUGH:

7    Q.  Have any SVPs considered Microsoft's Bing as an alternative

8    to Google?

9    A.  Yes.  We have another testimony from Expedia.  Could

10   Expedia brands reasonably shift ad spend from Google to Bing?

11   We could at a 10 to 1 ratio.  Let's assume maybe we don't have

12   a similar share of each.  I don't think there's a way to shift

13   enough spend to Bing.  The reason is, the relative sizes are

14   too asymmetric.

15   Q.  Let's turn to the third opinion you've given in this case

16   with respect to SA360.  What is your opinion?

17   A.  My opinion is, from the advertisers' perspective Google's

18   failure to support auction-time bidding and other Microsoft ad

19   tools, features on SA360 has decreased the efficiency of

20   advertisers' spend.

21   Q.  Were you familiar with SA360 before you were engaged in

22   this matter?

23   A.  Yes.

24   Q.  How so?

25   A.  I have -- based on my awareness of digital marketing and

1    also my work on marketing channels, I sort of understand what

2    role an intermediary plays in helping consumers get what they

3    want.  A channel is a nice way for consumers to efficiently get

4    a product without having multiple interactions.

5           So that problem is at the core of this as well, and

6    that is the promise they are offering.  They want to offer

7    earlier consumer -- I mean, advertisers who buy Google ads --

8    if you go to the next slides, I can explain.

9           They could go to Google ads and get Google ads on

10   Google SERP.  They can procure advertisement and manage their

11   advertisement on Bing through Microsoft Advertising.  The

12   fundamental premise of SA360 is you do not have to deal with

13   native tools; deal with one.  The advantage of dealing with one

14   is there is one integrated interface to purchase and evaluate

15   them comparatively.

16          The reason for SA360 to exist, from an advertiser's

17   point of view, is it helps them to manage campaigns across

18   multiple native tools, that's the reason.  That's the reason

19   why advertisers want to avail an intermediary, so that it's

20   very efficient for them.

21   Q.  Has Google made these points in promoting SA360 to

22   advertisers?

23   A.  You can see the next slide.  I've told you why somebody

24   would want to go to an intermediary, for better efficiency.

25   Q.  Let me just interrupt you.

1     MR. CAVANAUGH:  This is from PSX460, which I

2   understand is in evidence, Your Honor.

3   A.  Can I go ahead?

4   BY MR. CAVANAUGH:

5   Q.  Go ahead.

6   A.  It speaks about deep integrations.  "We aim to ensure that

7   we build deep integrations across various search engines that

8   we support today."  The key point here is across various search

9   engines.  So that's where they're going.  So it's not for one;

10   they can avail the service across multiple search engines.  If

11   they want only one, they could have gone directly to Google ads

12   or they can go to Microsoft ads, either one they can go.  But

13   if you want multiple and you want to be efficient, you use one

14   tool which can manage both of them.

15   Q.  Does Google continue to promote SA360 along those lines?

16   A.  We can go to the next slide.

17         Here's another one on the website that said,

18   "Realtime data, unified insights."  Efficiently manage your

19   search campaign across multiple search engines and media

20   channels for faster, valuable insights that lead to better

21   business decisions.

22         MR. CAVANAUGH:  Your Honor, this is reference

23   PSX1210, which is in evidence.

24   BY MR. CAVANAUGH:

25   Q.  Let me ask you, what is your understanding of auction-time

```
1    bidding?

2    A.  What auction-time bidding is, they can generate a bid at

3    the time of each individual auction.  Why that is good, there

4    are a couple of reasons.  One reason is it is based on a larger

5    set of segments.

6           Secondly, the frequency of optimization.  Instead of

7    optimizing once in four hours or six hours, here they can

8    optimize for every auction in principle, at least that's the

9    very word "auction-time bidding" means, that they can do it for

10   every auction, that's what they're trying to do it.  And it may

11   take their managing millions and millions and millions of

12   auctions, and they can generate a bid in a second or even a

13   fraction of a second.

14          And that is very good from the advertisers' point of

15   view because now the bid is based on a richer set of

16   information set and also very fresh data.  Both.

17   Q.  Turn to slide 50.  Were you here for the testimony of

18   Mr. Krueger this morning?

19   A.  Yes, I was here.

20   Q.  Briefly can you describe --

21   A.  This just reinforces the set of signals which, as

22   mentioned, I think you also heard, for the intraday bidding,

23   it's based on a smaller set of signals, the deep blue color.

24   Okay?  It's a smaller set of signals.  Whereas the green has a

25   larger set of signals.  So, one, the signals set is different.
```

1    And second, the frequency at which the optimization happens is

2    also different.  And that's the reason why advertisers would

3    love to avail auction time and use it.

4    Q.  Are you familiar with the concept of conversion data?

5    A.  Yes.

6    Q.  If we could turn to slide 51.

7        Can you walk the Court through?

8    A.  How this works:  Imagine a consumer goes to a website and

9    clicks on an ad on a SERP.  After they click, the consumer

10   lands on the advertiser's website.  Once they land on the

11   advertiser's website, they may take some action which is

12   desired by the advertiser; as in, for example, the consumer is

13   buying a product.  And after the consumer buys a product, the

14   tag which Google has leveraged, SA360 is there, recognizes a

15   transaction happened and it's transmitted to SA360.  SA360, in

16   turn, relays it back to Google ads.

17       Now, that realtime data which Google ads collects, it

18   can be used to generate the bid at the very next second; they

19   can use that information to use in principle, whether they use

20   it within five seconds, ten seconds, I think they would say.

21   But that information is available, the richer dataset is

22   available and they can optimize it.

23   Q.  What are the advantages of auction-time bidding for

24   advertisers?

25   A.  The principle advantage is it's based on fresh data and a

1    richer set of signals.  Hopefully the bids are yielding better

2    results and better conversion and that they can track because

3    of this.

4    Q.  Has Google provided any indication internally of how

5    important auction-time bidding is to SA360 and to Google?

6    A.  There's another slide.  It's -- from this slide, it would

7    be quite evident that auction-time bidding is doing very well

8    and their aspiration for this is sky high and the reason is

9    very simple, because it's very effective in improving

10   conversion.  There's an increase of around, according to their

11   own information, 15 to 30 percent improvement in conversion.

12   So they're convinced that it will do wonders and it will be

13   well received by advertisers.

14            MR. CAVANAUGH:  Your Honor, this is -- from PSX458,

15   at page 467, which is already in evidence.

16   BY MR. CAVANAUGH:

17   Q.  And you were here for Mr. Krueger's testimony this morning.

18   Did he provide some estimate of what he thought the revenue

19   that the integration of auction-time bidding into SA360 would

20   produce FOR Google?

21   A.  I don't recall precisely, but in the documents the number,

22   what I've seen, is 15 to 30 percent, that's the improvement

23   they expect.  And in this -- should I go on talking about G

24   Company as well?

25   Q.  Let me first ask you, now -- that's fine.  Did you see

1    evidence in this case as to what advantages there would be for

2    advertisers utilizing Microsoft's ads, auction-time bidding

3    through SA360?

4    A.  Advertisers cannot avail -- at the time when my opening

5    report was written, advertisers could not avail auction-time

6    bidding through SA360 for ads based on Microsoft, but they

7    could avail intraday bidding.

8            Intraday bidding, as I elaborate on one of the

9    earlier slides, it's based on a smaller set of signals and it's

10   optimized less frequently.  It's optimized 4- to 6,000, that

11   range.

12           Therefore, if the comparison is holding -- if you

13   were to -- holding the firm constant, holding the firm

14   constant, and if I were to compare intraday bidding with

15   auction-time bidding, even if you rule off Microsoft

16   advertising and look only within Google, if they were to do

17   these two, it's evident to them that if you optimize on a

18   larger set of signals and more frequently, it's going to do

19   very well.

20           So, in general, it should not be surprising if

21   somebody uses Microsoft and then the result, they should see --

22   they should see an increase in cost, if they can only avail

23   intraday bidding.  And there is a company, G Company, which

24   tried, on its own initiative, tried to move campaign from SA360

25   to Microsoft Ads.  It ran the campaign and it found its cost of

1    customer acquisition dropped significantly.

2    Q.  We can go to the next slide, slide 54.

3    A.  Yes.

4    Q.  This is referring to a second advertising.

5    A.  This is another company, U Company.  They also did the same

6    thing.  They also found substantial benefit in availing

7    Microsoft Ads.  That's what they found.  In these two instances

8    we have some hard evidence doing that produces better results.

9    Q.  How would this benefit Microsoft?

10    A.  Two things are possible:  If somebody finds a product

11    better, whatever the product may be, it can do two things:

12    One, they can buy more of that product or more consumers will

13    buy their product.  More people could buy, or they could buy

14    more of it.  These are two benefits.  And I think that general

15    principle would also apply in this case; advertisers could

16    definitely buy multiple more, and many more advertisers may be

17    inclined to use them, given their size is so asymmetric.

18    Q.  Has Google also withheld or delayed advertisers' access to

19    other Microsoft advertising features through SA360?

20         Can we go to the next slide.  Well, sorry.

21    A.  There's one more.

22    Q.  I jumped ahead.

23         Was the information from Company G and U provided to

24    Google?

25    A.  The information was provided, and you could see, in slide

1    55, that -- this is what Ryan Krueger says:  I'm not terribly

2    surprised Microsoft ATB is performing better than intraday.  I

3    would be surprised if he was surprised because conceptually

4    this cannot happen unless there's some technical problem,

5    because one is using a larger set of signals and it's optimized

6    more frequently, and that's why.

7    Q.  Has Google also withheld or delayed advertisers' access to

8    other Microsoft advertising features through SA360?

9    A.  Could you repeat that question for me, please?

10   Q.  Sure.  Oh, I see what happened.  Go to slide 63, please.

11        Were you here for Mr. Krueger's testimony this morning?

12   A.  Yes.

13   Q.  Did he provide some estimate of what he thought the

14   additional revenue would be to Google with the integration of

15   auction-time bidding?

16   A.  They have an idea about what sort of benefit they can

17   possibly get.

18        MR. CAVANAUGH:  Your Honor, this is from PSX419 at

19   Bates 238.

20   BY MR. CAVANAUGH:

21   Q.  Now let's go to additional features.

22        Can you explain what we're seeing on slide 57?

23   A.  At the time of the states filing the case, Google ads

24   offered auction-time bidding, dynamic search ads, and

25   responsive search ads.

1    Q.  You have to slow down.

2    A.  Sorry, sorry.  Thank you.  Thanks for stopping me.

3           At the time when the states filed the case,

4    advertisers could avail through SA360 all the features which

5    Google Ads offers.  Some of the most important one is

6    auction-time bidding, dynamic search ads, responsive search

7    ads, and local inventory ads.  Whereas, for those who wanted to

8    avail Microsoft ad features through SA360 they could not avail

9    at that point in time auction-time bidding.  They could not

10   avail dynamic search ads, responsive search ads, and local

11   inventory ads.  I'm speaking of December 17, 2020.

12   Q.  Since the time this case was filed by the states, what's

13   happened with these three features?

14   A.  Responsive search ads were delayed by two years and then

15   made available.  Local inventory ads also in the neighborhood

16   of two years and made available.  Dynamic search ads,

17   approximately four years, I think, and then they were made

18   available.  So with some delay, they were subsequently made

19   available.  And they're still having some challenges with

20   auction-time bidding.  My belief is the new one may incorporate

21   it, but I don't have perfect knowledge on it.

22   Q.  Why can't advertisers who have been unhappy with SA360's

23   lack of features or Microsoft ads just switch to another SEM

24   tool which might provide those?

25   A.  I think the next slide will help address this from a

1    testimony's point.

2          An advertiser is using SA360 for a very good reason,

3    because they are using Google ads as their primary platform.

4    And here, if they want to switch, there is a cost of having two

5    tools -- to use two tools.  Okay.  And then there is also a lot

6    of time cost and effort cost.

7          I would like to reiterate:  The principle reason why

8    people want to use SA360 is instead of going to two windows, I

9    can go to one window.  Now, if they have to switch, there is a

10   switching cost to them if they want to switch.  And switching

11   is not very easy because it's sticky, because this is the

12   principal platform through which I place my ads.

13   Q.  Can we return to slide 59.

14          Is Mr. Lowcock making the same point?

15   A.  Yeah.

16   Q.  How so?

17   A.  This is another SEM tool provider.  This is Lowcock, he was

18   speaking about is it easy for them to switch from one SEM tool

19   to another?  And he's saying there are cost barriers.  There's

20   a cost of time, people, and they also, broadly, beyond Lowcock,

21   they have to transfer the data and train the new system on

22   their data.  So all these costs are involved in this.

23   Q.  If you turn to slide 60.  This is from Mr. Vallez at Skai.

24   What point was he making in his testimony?

25   A.  I think here he emphasizes the point of stickiness very

1    sharply.  If you look at the highlighted area, oftentimes

2    advertisers will -- even if the advertiser is not planning to

3    use a full set of features, they oftentimes look at the depth

4    of feature support to understand how committed are you to a

5    given publisher?  Therefore, the -- because of the stickiness,

6    even though they may have some costs, they choose not to

7    switch.

8    Q.  When you use the term "stickiness," what do you mean by

9    that?

10    A.  Because the bulk of their advertising, search advertising

11    expenditure is on Google, and SA360 is well integrated with

12    Google.

13    Q.  We've heard testimony that there may be workarounds so the

14    advertiser can still obtain the data it needs from SA360 to use

15    Microsoft's auction-time bidding.  In your view, is that an

16    efficient process?

17    A.  From an advertiser's point of view, it's inconvenient.

18    Q.  How so?

19    A.  Could be more convenient.  Because I have bought an

20    intermediary who will help me do the job across channels.  And

21    if somebody can do it, why can't they make my life easier?  If

22    they can tell me to make my life easier some other way, why

23    can't they do it?  As a buyer, that would be the extent of it.

24    That's the reason, if I only wanted -- if somebody wanted only

25    Google Ads, they could have gone to Google Ads and not SA360.

1    They say SA360 central promises we can help you manage purchase

2    and manage your campaign across search engines.

3         MR. CAVANAUGH:  Thank you, Professor.

4         No further questions, Your Honor.

5         We would move in demonstrative deck of Amaldoss

6    PSXD10.

7         MR. MAURER:  So long as it's subject to the same

8    limitations; so long as it's not substantive evidence, but to

9    explain his testimony.

10        THE COURT:  It will be so admitted for that purpose.

11        MR. MAURER:  Good afternoon, Your Honor.  Aaron

12   Maurer for Google.

13                        CROSS-EXAMINATION

14   BY MR. MAURER:

15   Q.  Good afternoon, Professor.

16        Let's start with the special vertical providers.  You

17   would agree that the Google hotels unit is beneficial to

18   consumers, right?

19   A.  Yes.

20   Q.  And the users find the Google flights unit helpful?

21   A.  Yes.

22   Q.  And that local search unit, local services unit they

23   provide benefits to user?

24   A.  Yes.

25   Q.  And you have not offered any opinion that the introduction

1   of those units on the SERP is harmful to consumers or users in

2   any way, correct?

3   A.  I have not discussed that.

4   Q.  And you haven't offered any opinions about Google's

5   immersive pages or the detail pages that are linked from the

6   SERP?  Your opinions are all based on the SERP itself, correct?

7   A.  Could you repeat the question for me?

8   Q.  Sure.  You haven't offered any opinions about how SVPs are

9   treated or what's available to them on the immersive pages or

10  the detail pages that are linked from the units on the SERP,

11  your opinions are all focused on the SERP itself, correct?

12  A.  Correct.

13  Q.  You said you reviewed some trial testimony of the

14  proceedings here, correct?

15  A.  Come again?

16  Q.  You reviewed the trial testimony from the proceedings so

17  far?

18  A.  Some of them; not all of them.

19  Q.  Did you review the trial testimony of Mr. Barrett-Bowen

20  from Microsoft?

21  A.  No.

22  Q.  Do you know he testified about the design of the Bing

23  search engine result page?  Did anyone tell you that?

24  A.  No, I didn't review that testimony.

25  Q.  Are you familiar with the design of Bing's search engine

1    results page?

2    A.  I've not reviewed any documents from Microsoft, documents

3    on that issue.

4    Q.  So you don't know that Bing includes units that are very

5    similar to Google's units that also push down the organic

6    links?  You don't know that?

7    A.  I have not focused on the Microsoft part.

8    Q.  You didn't consider Microsoft for purposes of your opinion;

9    is that correct?

10   A.  I did consider Microsoft.  But I didn't for this part, it

11   was only with reference to Google.  My opinion is with

12   reference to Google, it's not about Microsoft.

13   Q.  Fair enough.  That was a broad question.

14       You didn't consider the design of Microsoft SERP in how

15   it has affected organic links?

16   A.  I have not considered that issue in detail.

17   Q.  You know that back to the Google units that you talked

18   about, you understand that these SVPs can participate in the

19   local services ads, correct?

20   A.  Yes.

21   Q.  And, in fact, some of the SVPs that you addressed in your

22   testimony did enter into agreements with Google and appear in

23   those ads?

24   A.  I would like to clarify one.  The local services ad all --

25   there are some restrictions.  They can appear, but there are

1    some restrictions there.

2    Q.  You've not offered any opinion on how often a user's query

3    will trigger the display of the Google vertical units, right?

4    A.  I have not done any analysis to that extent, how frequently

5    it is generated.

6    Q.  You haven't tried to quantify how often the display of the

7    vertical units on the SERP, on Google SERP, moves the organic

8    links down?

9    A.  I have not done any frequency analysis.

10   Q.  You haven't offered any opinion about whether or to what

11   extent the vertical units on Google SERP have harmed any SVP?

12   A.  That was not the focus of my analysis.

13   Q.  And you're not offering any opinions about competitive harm

14   from Google's practices with respect to SVPs, correct?

15   A.  That is not the focus of my analysis.

16   Q.  The SVPs that you talked about in your testimony today

17   those are all multi-billion-dollar companies, right?

18   A.  Yeah.

19   Q.  They're sophisticated, large entities?

20   A.  They're large entities.

21   Q.  And you agree that these companies would not buy

22   advertisements on Google unless they believe it made sense to

23   do so, correct?

24   A.  I believe they've bought advertisements.

25   Q.  But they wouldn't have bought those advertisements if they

```
 1   believed it made financial sense to do so, correct?

 2   A.  I don't want to vouch for how they made that decision.

 3   Q.  I see.  You can't testify here today that the

 4   sophisticated, large, multi-billion-dollar entities are buying

 5   ads on Google because they believe it makes business sense?

 6   You don't have an opinion on that?

 7   A.  I would say it seems reasonable.

 8   Q.  You agree that for these SEPs we talked about, the

 9   Tripadvisors and the Expedias and the Bookings, consumers can

10   go to them and do searches, right?

11   A.  Yes.

12   Q.  Let's, if we could, put up DXD20.004.

13            MR. MAURER:  May I approach, Your Honor --

14            THE COURT:  You may.

15            THE WITNESS:  Thank you.

16   BY MR. MAURER:

17   Q.  All right.  Professor, I've handed you what's marked as

18   DFD20.  I'm going to ask you to turn to the page marked

19   DXD20.004, titled Google Hotels Unit search for Seattle,

20   Washington.

21   A.  Just give me a little time.

22   Q.  It's on the screen.

23   A.  It's very tiny.  It's my vision problem, not the exhibit.

24   Q.  Can we magnify the left-hand portion of this, please?

25            Thanks.
```

```
 1    A.  Yeah.  Now I can read it.

 2    Q.  You recognize this as the Google Hotels Unit, correct?

 3    A.  (Nods head.)

 4    Q.  Is that a yes?

 5    A.  Yes.

 6    Q.  And you see that this, in particular, is we ran a search

 7    for Seattle, Washington hotels.  Do you see that?

 8    A.  Yeah.

 9    Q.  There are some ads that show up on this page, correct?

10    A.  Yes, I'm seeing now.

11    Q.  Where it says "Sponsor," that's an ad?

12    A.  Yes.

13    Q.  And let's compare this now to the next page, which is

14    DXD20.005.  This is a search on Expedia for hotels in Seattle,

15    Washington.  Do you see that?

16    A.  Yes.

17    Q.  And there are ads here.  You can see, like, that first one

18    that says "Ad" in the lower left-hand corner of the box?

19    A.  Which one are you referring to?  Yes, I see an ad, I see

20    that.

21    Q.  And these ads on both the Hotels Unit for Google as well as

22    Expedia, they are being served to consumers that have a high

23    purchase probability.  Would you agree with that?

24    A.  Yes.  In a SVP, in general, the purchase probability is

25    high.
```

1    Q.  And also on the Google Hotels Unit, where they've searched
2    for hotels, Seattle, right?
3    A.  Yes.
4    Q.  Okay.  And advertisers would view these ads as equivalent
5    or substitutes, right?
6    A.  I wouldn't say that they view them as substitutes.  But I
7    think they serve important functions and some of -- related to
8    some extent.  But I wouldn't use the word "substitute."
9    Q.  But what they do is both of these ads target consumers who
10    are searching for hotels in Seattle and have a high purchase
11    intent for those?
12    A.  I agree with that.
13    Q.  Okay.  You mentioned -- we can take that down.  Thank you.
14        You referred in your direct to some testimony by
15    Mr. Lowcock.  Do you recall that?
16    A.  Vaguely.  Go ahead.  If you remind me, I can look at that
17    exhibit.
18    Q.  He was talking about various product searches.  You can
19    search for product, specific products on Google, correct?
20    A.  You can search for specific product?  What specific
21    product?
22    Q.  You can search for -- a user, consumer, can search for a
23    specific product on Google?
24    A.  You can type in any keyword you want.
25    Q.  And so let's look at DXD20, which is the same thing you

1  have in front of you.  At page 11.  And we can blow up the

2  search box so Professor can see what we searched for.  We

3  searched for LaCroix lemon sparkling water.

4  A.  Yes.

5  Q.  What we have on the page are the Google Search results for

6  that specific product, right?

7  A.  Yes.

8  Q.  And that's -- this SERP has ads and organic results that

9  are specific to that product, correct?

10  A.  Yep.

11  Q.  And it also has -- if we can flip to the next page.  We

12  have sort of split this up so we can see it.  It's over three

13  pages.  There are some on the second page, some product listing

14  ads, right?

15  A.  I see this one set of ads, is that what you're referring

16  to?

17  Q.  Yeah, those sponsored ads there, and then on the third page

18  there's some more ads specific to those products, correct?

19  A.  Yeah.

20  Q.  And they show the price and where these products can be

21  bought?

22  A.  Yeah.

23  Q.  Would you agree that the user running a specific product

24  search on Google has a high probability and intent to buy?

25  A.  Would you please repeat the question?

```
 1    Q.  Would you agree that a user, a consumer running a search on
 2    Google for a specific product has a high probability and intent
 3    to buy?
 4    A.  Yes, they have a high probability and intent to buy.
 5    Q.  Let's look at, if we can, DXD20, starting on page 14.
 6    A.  Page 14?
 7    Q.  14.  This is an Amazon results page.
 8    A.  Yeah.
 9    Q.  And this is -- we searched for the same thing.  You see
10    LaCroix sparkling water?
11    A.  Yes.
12    Q.  And this Amazon results page, just like the Google page has
13    organic results and ads specific to this product, correct?
14    A.  Yes, they have sponsored part and then they have the rest
15    of the results.
16    Q.  And the sponsored ad here is interesting, right?  Because
17    it's not to the actual LaCroix product, it's to Polar, which is
18    a different product, correct?  Do you see that?
19    A.  Yes, I see that.
20    Q.  And in this case, Amazon -- that indicates to you -- these
21    are called conquest ads; is that right?
22    A.  Yes.
23    Q.  That indicates to you that Amazon, at least, thinks that
24    this consumer has not made up their mind to purchase, correct?
25    A.  Shall I clarify on that?
```

1   Q.  You can answer the question.  Do you think that that means

2   that Amazon believes the customer has not made up their mind to

3   purchase the specific product that they searched for?

4   A.  It is not that Amazon doesn't believe.  It's the hope of

5   Polar that it can conquest that consumer's mind.

6   Q.  So even though Amazon is serving the results directed to

7   the specific product that they searched for, the LaCroix

8   sparkling water, it has also served additional ads to a

9   different product, out of the hope that the consumer would

10  click and buy on those?

11  A.  It is not Amazon's hope.  It is the hope of the Polar, it

12  thinks that let me try and get some of the people who were

13  planning to buy LaCroix, whether I can switch their mind or

14  jump into their consideration.  It's the hope of Polar

15  conquesting.  Conquesting ads are less effective than the other

16  ad because I want to buy LaCroix.  I may think about Polar now,

17  maybe next time I will consider.  Conquesting is trying to jump

18  into the consideration set.  And that's the hope of the

19  advertiser and not of the platform.

20  Q.  I'm sorry.  So the advertiser here, Polar, even though

21  there is a customer that has searched for this and has high

22  intent and probability to buy, that advertiser still thinks

23  they can get the switch?

24  A.  Hope springs eternally.

25  Q.  Okay.  We can take that down.

1           We talked some about the traffic sources to SVPs in your
2      testimony.  Did you review the testimony of -- the trial
3      testimony of Mr. Hurst from Expedia?
4      A.  I scanned it, but I don't remember specifics.  You can
5      mention it.
6      Q.  Do you recall that Mr. Hurst from Expedia testified that
7      almost two-thirds of their traffic came -- I'm sorry,
8      two-thirds of their bookings came by way of direct traffic to
9      them?
10     A.  I remember they had a fair amount of traffic directly.
11     That's what Expedia has said.  But that's not far -- what I
12     gathered from Travelocity and Booking.  There's some
13     differences between them and I am not fully aware of what's the
14     difference between them which is causing some of these changes.
15     I'm not aware of it.
16     Q.  But you are aware, you are familiar that there's been trial
17     testimony from one of these giant, multi-billion-dollar travel
18     SVPs that they aren't reliant on the search text ads for the
19     majority of their traffic; they get it directly, right?
20     A.  But even -- I agree not for the majority.  But even for
21     them, I think they get a very significant share of their
22     traffic from Google.  It's not like 1 or 2 percent of the
23     people are going from Google, it's probably 30 percent,
24     somewhere of that.  I would never put that number as a trivial
25     amount of traffic.

1    Q.  So what his testimony was, I got two-thirds of the bookings

2    by direct traffic and then of that remaining third Google was

3    some fraction, right?

4    A.  Fraction, as long as that fraction extends from 0 to

5    .99999.  It's a fraction, but it's not a trivial fraction.

6    That's what I want to say.  I don't want to say it's a trivial

7    percentage.  It's a significant percent.

8    Q.  Professor, do you know what percentage it is?

9    A.  What percent it is?  I do not know for a fact.

10   Q.  Okay.  You were put up a slide with testimony where the

11   individual's name and their company were redacted.  So I'm

12   going to try to do this to preserve that for some reason.

13        Let's look at -- this is a new exhibit, it's DX20.32,

14   which is an excerpt of the deposition testimony --

15   A.  Can you refer to the corresponding deposition testimony?

16   Q.  Yeah, I'm going to give you a copy of this.

17             MR. MAURER:  May I approach, Your Honor?

18   BY MR. MAURER:

19   Q.  All right.  Now, doing my best here, and I'm going to ask

20   you to do your best not to divulge the information.

21        Let's turn, if we could -- you see that this is the same

22   deposition that you quoted from in your testimony, correct?

23   A.  Can you refer to the corresponding slide in my deck?  That

24   will make things easier for me.

25   Q.  Give me one second.  I'm sure I can.

```
 1                    (Pause.)
 2                    THE COURT:  I think it's 43.
 3       A.  43.  Okay.
 4                    MR. MAURER:  43.  Thank you.
 5       BY MR. MAURER:
 6       Q.  So my question was:  This is the same person in the same
 7       deposition, right?
 8       A.  Yeah.
 9       Q.  Okay.  And if we turn in this deposition to page 123.
10       A.  123.  Yeah.
11       Q.  You see there, starting at line 18, he discusses what
12       percent of traffic to his site is from Google Search ads?
13       A.  Line -- which line you mentioned?
14       Q.  Line -- starting at line 18 in that answer.
15       A.  18, okay.
16       Q.  We're not going to say the percent out loud.  But you see
17       that, correct?
18       A.  I haven't seen the percent.  I need to read it.
19       Q.  Are you on page 123?
20       A.  Oh, sorry.  I was looking at 122.
21       Q.  Line 18.
22       A.  18.
23       Q.  Are you there?
24       A.  Yes.
25       Q.  I don't think it's going to violate the confidentiality,
```

1    there's nowhere near the majority of the traffic that they get,

2    correct?

3    A.  I agree with you.

4    Q.  And if we turn a couple of pages further on in the exhibit,

5    but it's page 158 of the deposition.

6    A.  150.

7    Q.  158.

8    A.  Okay.

9    Q.  Do you see that this witness testified that his company has

10   taken steps to reduce reliance on Google, correct?

11   A.  Which line are you in in 158?

12   Q.  Line 8.

13   A.  8.

14          THE COURT:  Is there any reason -- I understand the

15   percent of ad spend, but is there any reason we shouldn't --

16          MR. CAVANAUGH:  Your Honor, the transcript had been

17   designated as confidential.

18          THE COURT:  I suspect every transcript has been

19   designated confidential.

20          MR. CAVANAUGH:  It was.

21          THE COURT:  Why don't we identify the company.  I'll

22   ask you not to say the percent of the ad spend.  I do think

23   that is probably a confidential piece of information.  The rest

24   of it is not.

25          MR. CAVANAUGH:  That's fine.

```
 1              THE COURT:  Don't feel bound by the confidentiality.
 2    BY MR. MAURER:
 3    Q.  The company here they're talking about is Thumbtack?
 4    A.  Yeah.
 5    Q.  That's one of those local service aggregators you talked
 6    about in your direct?
 7    A.  Yes.
 8    Q.  And the witness here is Sander Daniels, Mr. Daniels?
 9    A.  Yeah.
10    Q.  And one of the things that Mr. Daniel said is that
11    Thumbtack has taken steps to reduce reliance on Google,
12    correct?
13    A.  Yeah.
14    Q.  And they've done that through several ways.  One of the
15    ways is through Facebook advertising.  You see that?  Line 21
16    of page 158.  Do you see that?
17    A.  Yeah.  I'm just trying to complete off that entire
18    paragraph.
19    Q.  And I'm going to ask you to turn to page 159, at line 20.
20    Another way that they try to diversifies is with their mobile
21    application, correct?
22    A.  159.  Which part are you in now?
23    Q.  Page 20 -- I mean line 20, page 159.
24    A.  Yeah, I read.
25    Q.  And what he says there is that another way that they're
```

1    trying to diversify away from reliance on Google Search ads is

2    to use their mobile application, correct?

3    A.  Yeah.

4    Q.  I'm going to hand you another exhibit.  This is Exhibit

5    251, which is already in evidence.

6         We've put it partially on the screen, but the numbers

7    themselves come from data that's been marked as confidential.

8         This is an exhibit from Professor Elzinga on sources of

9    traffic for SVPs.  You've seen this before, correct?

10   A.  I have not seen this particular chart.

11   Q.  This was in Professor Elzinga's opening report which you

12   reviewed and responded to in your opening report.

13   A.  I don't remember it precisely.

14   Q.  Okay.  Needless to say, you didn't respond to this chart,

15   if it was in his report, correct?

16   A.  Again, what is it?

17   Q.  You didn't respond to this chart, I take it?

18   A.  No, I don't remember it now, that's what I'm saying.

19   Q.  You didn't offer any opinions saying that Professor

20   Elzinga's analysis of the traffic sources for SVPs was

21   incorrect, right?  You haven't offered any opinions on that?

22   A.  I don't think I offered in my reply much comment on

23   Professor Elzinga at all, because he said what I was

24   recommending would be good for SVPs.

25   Q.  Let's take that one down.  Let's talk about the marketing

1    funnel, everybody's favorite topic.

2          The market final is a conceptual framework, right?

3    A.  It's a framework, yes.

4    Q.  And there is different levels in the funnel that relate to

5    a consumer's mindset, as I understand it?

6    A.  Yes.

7    Q.  And you're aware that there are other funnels, and we

8    looked at some of them during your direct, that have more or

9    different stages than this three-stage funnel that you've

10   discussed, right.

11   A.  Yes.

12   Q.  And advertisers can and do differ as to which media

13   channels fall into which stage of the funnel, right?

14   A.  Depending on their product and the competition and so

15   forth, yes, there would be differences across how they

16   effectively utilize, how sophisticated they are and their

17   market and so forth.  There would be some variation how they're

18   using the ad channels across the funnel.

19   Q.  How they understand which channels to fall within which

20   stage of the funnel, correct?

21   A.  What I can say is there would be differences across

22   advertisers.  Even in the chart which I presented, I did show

23   advertisers' perceptions on relative importance could change.

24   Q.  Let's look at your chart.  Let's put up slide 17 from his

25   presentation, if we can.

1          And I want to make clear what it is that you did here.

2     So, to generate these tables, you took the advertisers that you

3     had identified in your initial report, or at least the

4     materials from advertisers you identified in your initial

5     report about the funnel, and you took the materials that

6     Professor Bucklin had identified in his report about the funnel

7     and you went through those materials.  Am I right so far?

8     A.  Yes.

9     Q.  Am I right so far?

10    A.  Yes.

11    Q.  You went through the materials and you looked at the

12    documents and you looked at the deposition testimony and you

13    used your interpretation of what media channel fell within what

14    stage of your funnel?

15    A.  Yes.

16    Q.  And there were a number of these documents, you would

17    agree, that although they had funnels, didn't have your funnel,

18    so you had to do a mapping interpretive exercise?

19    A.  It was not about I was trying to map my funnel with their

20    funnel.  What I was trying to figure out what was the relative

21    position, whatever file they have, what is the relative

22    position of the media channel.  It was not mapping my funnel

23    with their funnel.  I was trying to infer what is the relative

24    position of the media channel, and that was my focus.

25    Q.  You were interpreting from their document whether they

1    believed a certain media channel was higher or lower or in the

2    middle?

3    A.  Based on the graphics which they used and statements of

4    those documents.

5    Q.  Some of them didn't even have a, funnel some of them were

6    just words, right?

7    A.  Yep.

8    Q.  This was your interpretation of where they would fall?

9    A.  It is my characterization of what I observed in the

10   documents.

11   Q.  You would agree a lot of these documents would use language

12   that was less than precise?  Like, some would say things like

13   social tends to be higher, or that search ads usually are this

14   or that, right?

15   A.  That's why you'll see them in all levels there.  It's not

16   like they're all in one bucket.  I tried to be as conservative

17   as I could be.

18   Q.  I'm not sure that's true.  You interpreted retargeted

19   display ads, which are shown in lower funnel as something

20   different from display ads, right?  That's not a

21   conservative --

22   A.  No.  What here my focus was on display ad.  I didn't look

23   at retargeted display ad at all.  I didn't miss classify them.

24   I did not use them.

25   Q.  The number of advertisers that you ultimately ended up

1    pulling from these reports, it looks like in this first slide,

2    slide 17, is 28.  And in the -- let's go to the slide 18, as

3    well.  And slide 18 is 21 right?

4    A.  Yeah.

5    Q.  Some of those overlap.  It's not 49 total, right?

6    A.  Yep.

7    Q.  Yes?

8    A.  Yes.

9    Q.  That's not a -- you didn't make any effort to make sure

10   that that was a representative sample of advertisers, right?

11   A.  As I clearly stated, it was based on those documents which

12   I relied on and which Professor Bucklin relied on.

13          And on the representativeness, I won't say it's a

14   random sample, but these are some of the largest advertisers in

15   the country and some of the largest advertising agencies in the

16   country.  So, I put some weight on their opinion, that's all I

17   would say.  If you ask me whether it's a random sample, it's

18   not a random sample.

19   Q.  And it's not even all the documents in these companies,

20   right?  You just selected certain documents, right?  We don't

21   even know that these documents are representative of what the

22   companies think, do we?

23   A.  These are the documents -- yes, it's a convenient sample,

24   one can use it.  This is the word in statistics, this is a

25   "convenient sample," not a random sample.  But the documents

1    which I included in my opening report was not conditioned on

2    that there would be a need for me to do something like this.

3    Neither did Bucklin think that I would use his document for

4    this purpose.  So you can think this set was not conditioned on

5    how it's going to be used.  That's all I would say.

6            Whether it's representative, I won't say it's

7    representative of the entire universe.  But the facts are based

8    on large sum of the largest advertisers in the country, largest

9    advertising agencies in the world, and some of the very large

10   advertisers in the country.  So in that sense, these are --

11   earlier I used the word "sophisticated advertisers."  I would

12   place these people, many of them as sophisticated advertisers.

13   Q.  You didn't undertake to do a survey of a random sample or

14   representative sample?

15   A.  I did not do that.

16   Q.  These are just far from random; these are the ones that --

17   or, at least included in these slides are documents that you

18   affirmatively chose to make your points about the funnel in

19   your opening report, correct?

20   A.  I chose a set of documents and Bucklin chose another set of

21   documents.  And they were the ones which were presented to the

22   Court and I put them in and analyzed this.  As I said, it's not

23   that I picked the entire documents and picked a random sample

24   of that and did this analysis.

25   Q.  Even by your interpretation, you would agree that the

1    advertisers did not universally accept the premise that display

2    advertising is directed to a higher funnel stage than search

3    advertising?

4    A.  The picture disappeared from my screen.

5    Q.  Can we put that back up, please?

6          And let's go to 17.  I'll ask my question again.  Even

7    under your interpretation of these documents, do you agree that

8    advertisers did not universally accept your conclusion that

9    display advertising is directed to a higher stage of the

10   financial than search advertising, correct?

11   A.  That's the inference, weak inference which I'm making.

12   Q.  I'm sorry?

13   A.  That's the weakest form of inference I can make with this

14   data.  I am not making any strong inference on this data.

15   Q.  Okay.  And there were a advertisers that concluded that

16   display advertising was at the same level, or at least at the

17   same level or higher than search advertising?

18   A.  Yes.

19   Q.  Likewise, there were significant number of advertisers that

20   concluded that social advertising was at the same level or at

21   least the same level as search advertising?

22   A.  That's another exhibit, I think.

23   Q.  That's slide 18?

24   A.  Yeah.  I'm seeing 17.

25   Q.  Am I correct?

```
 1    A.  Yeah.

 2            THE COURT:  Sorry.  Could you just -- what's your

 3    distinction between weak and strong inferences?  If you would

 4    just explain what you meant by that.

 5            THE WITNESS:  What I meant was I'm making the most

 6    conservative statement here.  I'm not saying this is the best

 7    channel or that is, I'm not saying that.  I'm just saying from

 8    the date, the distribution is skewed.  It's not uniform.  And

 9    the tilt is towards display being higher.  That's the weakest.

10    I'm not saying how many percentile and all that stuff, I'm not

11    saying.

12            So my inference from this, this is the weakest

13    inference which I can infer from this.  Is all of them equally

14    likely?  I think -- this seems -- within this, it's probably

15    not equally likely.  That's what I had say.

16    BY MR. MAURER:

17    Q.  And when you said data in your --

18            MR. MAURER:  I'm sorry.  Were you done?

19            THE COURT:  No, go ahead.

20    BY MR. MAURER:

21    Q.  When you said "data" in response to the Court, you were

22    talking -- when you said "data" in response to the Court's

23    question, you were talking about the hand-picked exhibits from

24    your opening report, as well as the exhibits from Mr. --

25    Professor Bucklin's report?
```

1    A.  It is based on the documents included in my opening report

2    and Professor Bucklin's report.

3    Q.  Let's look at slide 25 while we're in your slides.

4    Mr. Sommer's golf shorts.  The premise of your slide is a user

5    watched this consumer No. 1 watch a golf video on Instagram,

6    right?

7    A.  Correct.

8    Q.  And the golf video is some guy who is talking about his

9    swing, his golf swing, right?

10   A.  Yeah.

11   Q.  All right.  And then on the other side you're comparing

12   that to a search that somebody did on Google for golf shorts,

13   right?

14   A.  Right.

15   Q.  I'm going to ask you a hypothetical.  What if, instead of

16   watching some random golfer swing his club, what if, instead,

17   consumer No. 1 watched a video that was a review of a pair of

18   golf shorts?  Do you understand my hypothetical?

19   A.  Correct.

20   Q.  Do you agree that that would be a powerful signal of that

21   user's interest in purchase golf shorts?

22   A.  If that consumer has watched a review of golf shorts in

23   Instagram?

24   Q.  That's the question, right.

25   A.  In principle, if the customer is highly involved.  But the

1    point here is, here they are -- a person is watching the

2    review, but which product are they going to click there

3    afterwards in this Instagram?  Because they're watching the

4    video, I'm watching the video.  That person's purchase

5    probability will be higher than this person's purchase

6    probability.  That much I can say.

7         But I would be hesitant to say a customer watching

8    Instagram and a customer searching on Google have relatively

9    similar mindset.  And most of the time, most people will not be

10   doing that sort of activity in social media, compared to what

11   they do on a search engine.  So --

12   Q.  Have you done any research or survey or quantification --

13   A.  No, this is a hypothetical example.  So I'm just

14   speculating on this hypothetical example.

15   Q.  Right.  So you don't know how often it is that people using

16   TikTok on Pinterest or Instagram are looking at products versus

17   other media?

18   A.  I don't have an empirical study contrasting with lots of

19   people over quite some time.  I can say people go to social

20   media for entertainment and Twitter for entertainment.  They're

21   not going there to collect information.  That's why even --

22   this is research outside of this purview -- and those headlines

23   and so forth when they are sensational, they draw a lot of

24   traffic.  And that's where the distortion also happens in this

25   media.  That's besides the point.  I just want to say that the

1  mindset itself is different, when people are in that place

2  versus this.  The mindset is different and the behavior is

3  different.

4  Q.  My questions was a simple one.  You haven't offered any

5  opinion or quantification as to how much people are using

6  social media for looking at products, or not?

7  A.  No.

8  Q.  We can take that one down.

9       Let's look at slide 19 before we leave your slides.

10 Now, this slide I want to make sure we understand.  You went to

11 this website in the footnote and you took the conversion rates

12 and you put that on the slide; is that right?

13 A.  Right.  Correct.

14 Q.  Do you know what the average conversion rate this slide --

15 I'm sorry, this website reports for Facebook, Facebook ads?

16 A.  I have not.

17 Q.  Do you know whether it's greater or lesser than Google

18 Search ads?

19 A.  I have not done any comparison.

20 Q.  It's 9.2 percent.  More than twice the Google Search ads

21 result.  Does that surprise you?

22 A.  For Google Search ads?  That surprises me.

23 Q.  Let's look at slide 27, which is, I think, a modification

24 of this one.  All right.  So this one you've now added the

25 middle column.  And the middle column here is the retargeted

1    display, correct?  And what you did there is the website that

2    you went to that reported the conversions, that doesn't have

3    anything for retargeted display, correct?

4    A.  Correct.

5    Q.  Right?

6    A.  Correct.

7    Q.  And so what you did is you went out there and you found

8    something else that said, okay, this compares display with

9    retargeted display and you sort of did a transit of property

10   and put that on the middle column?

11   A.  Yeah.

12   Q.  All right.  The source that you found is from 2012, right?

13   A.  Yes.

14   Q.  Okay.  The data you're using from the conversion website is

15   relatively recent, it's 2000 -- I guess you visited it in 2022.

16   So this is -- the retargeting data that you're using is from

17   ten years before, right?

18   A.  Yes.

19   Q.  All right.  And that retargeting data that you used there,

20   that's not overall, that's very specific to one brand and one

21   industry, correct?

22   A.  Yes.

23   Q.  Okay.  Let's take that one down.

24   A.  But my goal there --

25   Q.  I haven't asked you a question.

1    A.   Okay.   Thank you.

2    Q.   Do you agree that an advertiser is not required to spend

3    their ad dollars by channel according to the funnel?

4    A.   Come again?

5    Q.   All right.   Do you agree that an advertiser is not required

6    to allocate where they spend their ad dollars on their various

7    media channels according to the funnel?

8    A.   Could you rephrase that question one more time?

9    Q.   The funnel is not a rule, it's not a mandate?   Advertisers

10   can spend it as they want?

11   A.   It's their money.

12   Q.   You said the funnel concept has been around a long time.

13   Well before digital advertising?

14   A.   Correct.

15   Q.   You agree that digital advertising has allowed collection

16   of data about user intent that was not available to the same

17   extent prior to digital advertising?

18   A.   I agree with you, not to the same extent.

19   Q.   Do you agree that advertisers have more information --

20           THE COURT:   Counsel, could you repeat the question

21   and could I hear the answer one more time?   Sorry about that:

22           MR. MAURER:   I asked him:   Do you agree that digital

23   advertising has allowed the collection of data about user

24   intent that was not available prior to digital advertising?

25           THE COURT:   Got you.   Okay.

1    BY MR. MAURER:

2    Q.  Do you agree that advertisers today have more information

3    about how their ads are performing than was available before

4    the advent of digital advertising?

5    A.  They have a lot of information.

6    Q.  My question was a little different.  My question was:  Do

7    you agree they have more information as a result of digital

8    advertising and the ability of computers to track what people

9    do than existed prior to digital advertising?

10   A.  Yes, there's a lot more information.  Tracking is much

11   easier now.

12   Q.  Yeah.  In fact, the ability of an advertiser to understand

13   a user's actions in response to that advertiser's marketing has

14   never been greater than it is now, right?

15   A.  I have to say more information is available, but people at

16   each window of time try to do the best which they can, and they

17   have been successful in each window of time.

18   Q.  What I heard you say is the answer is yes, right?

19   Advertisers' ability to track how a user has responded to their

20   marketing is better today than it ever was in the past?

21   A.  Better is a complicated word.  Because there is the privacy

22   issue and so forth.  Lots of things are there.  I wouldn't use

23   the word "better," but I would say there is more information

24   because consumers are more closely tracked now than ever

25   before.

1    Q.  Okay.  And you agree that there are metrics that

2    advertisers use to track their ad campaigns on various media

3    channels, right?

4    A.  Yes.

5    Q.  And one of -- an important one of those is return on ad

6    spend?

7    A.  One of them is return on ad spend.

8    Q.  And that's an important one, correct?

9    A.  It is one of them.

10   Q.  You -- are you disagreeing -- are you quibbling that it is

11   important?

12   A.  No.  I don't want to come to the conclusion that it is the

13   measure for everything.  I'm not saying that.  I'm saying it's

14   one of them.

15   Q.  I'm not say it's "the" one either, I'm just saying it's an

16   important one.

17   A.  Yeah.

18   Q.  This return on ad spend metric tells advertisers how well

19   the money they are spending on the various media channels is

20   working?

21   A.  See, again, what they know for sure is how much money they

22   spent.  The return is a function of how they are giving credit,

23   whether it's the last click, should I give all the credit for

24   the search ad which I saw last, or should I give some credit

25   for the display ad I should give.  So that is a fuzzy area.

1    So, therefore, yes, they know a cost site.  The return side is

2    something which is attributed to.  So, therefore, one has to be

3    very careful about the accuracy of that measure because there's

4    a lot of question mark goes in how the attribution is made.

5    Q.  There are very complicated models involving fractional

6    conversions that are out there that marketers and advertisers

7    use and that they get from the platforms and the publishers of

8    these advertising, and then they use that to calculate a return

9    on ad spend?

10   A.  My humble opinion, if you ask my humble opinion, I would

11   say more complicated are things, the less people understand it

12   and end up using not so very well.  So in general, over the

13   years, this is what I found in business.  I even tell my

14   students, keep it simple.  If you want it to succeed, keep it

15   simple.

16         So these complicated stuff just confuses people and

17   they may have challenge in using that measure efficiently.  If

18   it's last attribution, it's clean.  If it's for the last

19   attribution, it's clean.  But the moment we are trying to

20   parcel out, it depends on what the model output is.  And

21   different firms may have different calculations for them and

22   different agencies -- that's where it becomes a little fuzzy.

23   I don't want to make it out that ROS is the measure and that is

24   highly scientific and that is the metric which people should

25   use.

1    Q.  Let me try it this way, ask a simple question:  It's

2    correct that advertisers look at a return on their

3    advertisements as one of the metrics to judge how well they're

4    performing?

5    A.  Yes.  Yes.

6    Q.  And they can and do reallocate their ad spend based on

7    that, right?

8    A.  I want to clarify that.  They have to evaluate how well

9    they're doing with reference to their objective.  Always money

10   is not the only objective.  There are other objectives.  There

11   are goals for the awareness stage and so forth.  They have to

12   align with their objective.

13            MR. MAURER:  May I approach, Your Honor?

14   BY MR. MAURER:

15   Q.  All right, Professor.  If you could -- I've handed you a

16   copy of your deposition in this case.  Do you recall being

17   deposed in this case?

18   A.  Yeah.

19   Q.  And you were given an oath before that deposition, right?

20   A.  Yeah.

21   Q.  Okay.  I'm going to ask you, if you could, to turn to page

22   373 of your deposition.  This is on November 8th.

23   A.  Yeah.

24   Q.  I'm going to direct you to line 5.  Are you there?

25   A.  Yeah.

1    Q.  All right.  Read along we me.

2         "But it's correct that advertisers do look at the return

3    on their advertisements --

4         And you answered, "Yes."

5         " -- as one of the metrics?"

6    A.  Tell me, which page are you in?

7    Q.  Page 373.

8    A.  Sorry.  I was looking at the wrong page.

9    Q.  Line 5.  Are you there?  I asked you about, "It's correct

10   that advertisers do look at the return on their advertisements

11   as one of the metrics?"

12        You answered, "Yes"?

13   A.  Yes.

14   Q.  And I asked, "And they can and do reallocate their ad spend

15   based on that, right?"

16   A.  Yes.

17   Q.  And you answered, "Yes, it is an important input for them"?

18   A.  Yes.

19   Q.  Did I read that correctly?

20   A.  Yeah.

21   Q.  Okay.  You can put that to the side.

22        Do you agree that consumers may pass through the

23   sequence of funnel stages in varied and nonlinear ways?

24   A.  Yes.

25   Q.  Do you agree that a consumer can, for instance, move

1    directly from awareness to purchase?

2    A.  Yes.

3    Q.  Do you agree that there are users who use a general search

4    in order to explore new topics or discover new things?

5    A.  Yes.

6    Q.  And for those users, do you agree that the text

7    advertisements that would appear in response to that query

8    would help drive that consumer's awareness of the thing that's

9    being advertised?

10   A.  It is possible.

11   Q.  Do you agree that text ads served on a general search

12   engine can influence consumers at any level of the funnel?

13   A.  Could you please repeat for me?

14   Q.  Do you agree that text ads can influence consumers at any

15   level of the funnel?

16   A.  It is possible.

17   Q.  Do you agree that text advertising on Google serves to

18   increase an advertiser's brand recognition with consumers?

19   A.  It is possible.

20   Q.  You say it is possible.  Do you mean yes?

21   A.  I'm just saying it's possible.

22   Q.  Okay.  Are you distinguishing that from an affirmative

23   response?  I want to make sure the record is clear.

24   A.  I'm just saying it's possible.

25   Q.  So it can?  You're agreeing with me?

```
 1       A.  It can.

 2              THE COURT:  I'm sorry to interrupt you.  What's your

 3       timing look like?

 4              MR. MAURER:  (Pause.)

 5              THE COURT:  I think that tells me all I need to know.

 6              MR. MAURER:  I'm not sure I'll be done by 5, but I

 7       might be able to be done by 5:15.

 8              THE COURT:  I'm going to call it for today in terms

 9       of the testimony because I need to leave a little bit of time

10       to discuss what we need to about the exhibits issue, and then

11       I've got another hearing at 5 o'clock.

12              So Professor Amaldoss, we're going to have to

13       continue your testimony tomorrow.  So you'll have a second day

14       of live testimony in court.

15              Overnight, I'll ask you not to discuss your testimony

16       with anyone.  And we'll look forward to seeing you tomorrow.

17       We'll start at 9:30.

18              You can step on out.  I just need to continue to talk

19       to the parties.  You can step down.

20              THE WITNESS:  Oh, I can step down.

21              THE COURT:  Yes.  Thank you.

22              MR. MAURER:  You can just leave those there.

23              THE COURT:  Okay.  Everyone, because of my schedule,

24       I thought it made sense to just call things a little bit

25       earlier today than we usually do, so we can get through what we
```

 1      need to get through.

 2              Why don't we just start with -- I had asked you all,

 3      and you did very kindly and promptly propose an order for the

 4      release of exhibits.  And then *The New York Times* counsel had

 5      asked for an opportunity to comment.  I did give that to him

 6      and he provided a comments and red line proposed -- proposed

 7      red lines to the order you put together.  I'm happy to hear

 8      your thoughts about those red lines and responses, and then

 9      I'll just figure out what we're going to do.

10              Yes, Counsel.

11              MS. ONYEMA:  Hi.  Thank you, Your Honor.  Veronica

12      Onyema for the United States.

13              THE COURT:  Say your name again.

14              MS. ONYEMA:  Veronica Onyema.

15              THE COURT:  Ms. Onyema.

16              MS. ONYEMA:  Thank you.  In terms of the proposed red

17      lines, we believe that what we've provided to the Court over

18      the weekend adequately facilitates the posting the trial

19      exhibits and public access.  We thought diligently about how

20      best to craft that order in terms of the time that we proposed,

21      the -- and we've had the goal of making sure that we're

22      providing a flexible framework while also making something

23      that's manageable as we're going through trial.

24              We're happy to discuss, if you have specific granular

25      questions about the proposed additions that *The New York Times*

```
 1    has proposed.  But we do believe that the current order -- our
 2    proposed order as stands is sufficient.  And there are a few
 3    buckets that we would have some concerns about, Your Honor.
 4         THE COURT:  Why don't you tell me what your primary
 5    concerns are.  That would be helpful.
 6         MS. ONYEMA:  Certainly, Your Honor.  I would say
 7    there's probably three buckets.  One in terms of timing.  We've
 8    proposed two days in terms of documents where there is no party
 9    or third-party confidentiality, and then four days for
10    documents where is that such confidentiality.  That provides us
11    time to go through, make sure we're removing Privacy Act
12    information, performing our own quality control, while also
13    doing that against the backdrop of trial.
14         Another concern would be the addition of the pending
15    requests.  I understand that there have been a number of
16    pending requests made to our public affairs office.  The
17    proposed edits don't necessarily lay out what those requests
18    look like, but they do want those to be fulfilled within a
19    week, which, again, may prove somewhat unmanageable for us,
20    given our trial preparation.
21         THE COURT:  Sure.  Let me ask you, what do you think
22    is realistic in terms of getting caught up?
23         MS. ONYEMA:  I think it depends on how many requests
24    we get.  My understanding is that there has been at least one
25    request for all of the exhibits.  And so certainly that volume
```

1    is going to take a while.  If it's something that's a smaller

2    number --

3              THE COURT:  I'm sorry, maybe -- I should be more

4    specific.  As I said last time, I am not entertaining, nor

5    should the parties entertain any request for all exhibits.  I

6    mean, it's just not, at this point, feasible, given what we

7    need to get accomplished.  And that's why we will have a

8    process that I think counsel for *The Times* agreed was

9    reasonable, and he didn't really dispute it, which is to

10   identify specific exhibits.  He suggested some numerical

11   limits.  We can talk about that.

12             But at this point we are now in week seven of trial.

13   It would be unduly burdensome, in my view, to ask the parties

14   to go back and produce everything that's been admitted,

15   particularly within the timeframe that's been suggested.

16             So that's one.  Two, my understanding, at least from

17   how this, frankly, all started, is that there have been some

18   number of pending requests that are -- that haven't been

19   responded to.  And so that's why I'm trying to figure out, is

20   sort of what the backlog is about specific requests and how

21   long you might think it would take to address that backlog.

22   Because I suspect -- well, I shouldn't guess.  Maybe more of

23   those are your exhibits than Google's, but that may not be the

24   case.

25             MS. ONYEMA:  I'm not sure how many -- obviously, how

1    many requests they've gotten.  I know that we've gotten a mixed

2    bag in terms of different outlets requesting directly from our

3    front office and public affairs office.  But we don't know the

4    full volume of the past requests.  I know that we had requested

5    a, sort of, daily limit moving forward of five, just thinking

6    that that would be feasible, given confidentiality team's

7    obligations as well.

8            But certainly, to the extent that we had a concrete

9    number, we would be better suited to be able to come back and

10    provide more details on how long it would take to fill that

11    backlog.  But we don't have that information as the current

12    draft red lines from the *New York Times* contain.

13            THE COURT:  Okay.  Because I would like to get this

14    done.  So if you all can get that information and give me a

15    realistic assessment of what it will take in terms of time to

16    get through the backlog, in addition, obviously, needing to

17    respond to requests moving forward, then I would like to know

18    that.

19            MS. ONYEMA:  Okay.  That sounds good, Your Honor.

20            One moment.

21            (Off-the-record discussion between counsel.)

22            MS. ONYEMA:  Oh, yes.  Thank you.  And I don't know

23    if the Court saw, but last night we did file an additional

24    motion that was uncontested regarding Google's case-in-chief,

25    in terms of getting 48 hours notice for any documents that

1    Google intends to use that are confidential, so that we have

2    time to work through that.

3            So, again, we are committed to public access, and

4    that is certainly another step to show that we are making

5    strides to make sure that we can do our part to get information

6    out.

7            THE COURT:  Okay.  Before you take a seat, let me

8    just make sure there's -- I guess the last question I have:

9    What are your thoughts on the limits?  You all have proposed

10   five.  *New York Times* has pushed back on that, asking for

11   either no cap or if there is to be a cap, there be a higher

12   cap.

13           MS. ONYEMA:  Yes, Your Honor.  Five is something that

14   we feel that we can commit to and meet that deadline.  Could we

15   do more?  Potentially.  But again, that just -- 15, I know that

16   they had mentioned that has an alternative.  That seems like

17   that might not be workable.  But again, our goal is to move

18   things out as quickly as we can.  Five we feel confident with.

19   Could we do a few more than that?  Potentially.

20           THE COURT:  In terms of -- let me make sure I have

21   this straight in my head.  In terms of -- I'm thinking of these

22   in two categories:  One are records that have no

23   confidentiality concerns, there are no markings.  The only

24   thing we need to worry about is PII.

25           You've suggested 48 hours.  What's your

1    recommendation for -- or, two business days.  I should be

2    clear.  What's your recommendation for the turnaround for

3    records that do have confidentiality designations?

4             MS. ONYEMA:  We've listed four days, Your Honor.

5             THE COURT:  Four business days?

6             MS. ONYEMA:  Four business days, correct.

7             THE COURT:  Okay.  All right.  Anything else?

8             MS. ONYEMA:  No, nothing.

9             THE COURT:  Okay.  Mr. Schmidtlein -- or, I'll turn

10   to the states first.

11            MR. CAVANAUGH:  Nothing further for us, Your Honor.

12            THE COURT:  Okay.  All right.  Mr. Schmidtlein, or

13   someone from the Google side wish to be heard?

14            MR. SCHMIDTLEIN:  I think we're all in agreement on

15   our positions on this.  We spent some time huddling on this and

16   trying to work with our respective clients about what was

17   reasonable.  And I think we did take into consideration -- I

18   know Your Honor's real push to try to make these things more

19   open and try to be more responsive.  And this is, I think,

20   reasonable, given the other volumes of confidentiality that's

21   going on, really, daily.  Multiple times the parties are going

22   back and forth on documents.  The third-party issues I think

23   are real here and I think, like counsel for the DoJ, I don't

24   have a good volume of the catch-up that has come to us.  And so

25   trying to evaluate a different timeframe for that really would

1    require us to potentially go and get them to tell us what they

2    think is in that volume of things that haven't been responded

3    to.

4              THE COURT:  Mr. Schmidtlein, before you have a seat,

5    it would be helpful if you could just at least get me a rough

6    estimate of what you think, just in the same way I've asked the

7    plaintiffs.  Just give me a rough estimate, because I would

8    like to get something out.  If you all could just get something

9    to us.  Again, I don't need anything -- just give me a rough

10   estimate by 7 p.m. this evening, so that we can get this

11   finalized and out shortly --

12             MR. SCHMIDTLEIN:  Will do.

13             THE COURT:  -- certainly by tomorrow.

14             Anything else you want to comment on,

15   Mr. Schmidtlein?

16             MR. SCHMIDTLEIN:  No.  Thank you.

17             THE COURT:  All right.  And then the other thing, I

18   wanted to give Google an opportunity to be heard about the

19   objections to the two documents that's -- can't remember what

20   the numbers are, but you know what I'm referring to -- UPX552

21   and UPX137.  I think the declaration you've all agreed can be

22   released.  But are there any -- anything else you would like to

23   add in response to what *The Times* has said about those two

24   documents?

25             MR. SCHMIDTLEIN:  No, Your Honor.  We've, obviously,

1    made our written submission.  I think we've made our position

2    on those, so we'll stand on that.

3             THE COURT:  We'll take a look at all of that this

4    evening.  I'll do the *Hubbard* factor weighing and then we will

5    get that taken care of in short order.

6             Okay.  All right.  Am I missing anything from -- sort

7    of outstanding items to address?  Oh, yes.  I've got the 11

8    documents that I need to look at and I haven't done that yet.

9             MR. GOWER:  Hello, Your Honor.  Cameron Gower for the

10   United States.

11            During our discussion about the 11 documents I

12   previewed that we had more documents where there's no

13   opposition to moving them into evidence, or where the only

14   opposition is the standard embedded hearsay objection.  And

15   we've passed this list by Google and we're all in agreement.

16   So I can pass this up to Your Honor now, if that's okay.

17            THE COURT:  Just -- I don't need to sign it, right?

18   He can hand that list to Mr. Douyon.

19            So unless there's anything else, I have one seed to

20   plant for you all to start thinking about.

21            MR. GOWER:  That's all for me.

22            THE COURT:  So I take it the likelihood is we'll wrap

23   up the state's case tomorrow?

24            MR. CAVANAUGH:  Yes.

25            THE COURT:  Is there an expectation of moving to

1    Google's case tomorrow?  Or is Professor Baker likely to take

2    the full day?

3            MR. SALLET:  My guess -- and I was very bad on this

4    last week -- is that Professor Baker will take the remainder of

5    the day, given the fact that we have some of Amaldoss's

6    testimony in the morning.

7            THE COURT:  Okay.  Fine.  Let me formally rule on the

8    *Daubert* motion with respect to Baker.  Professor Baker, for the

9    same reasons that I denied the motion to Professor Whinston

10   again, I can just consider the limitations of his expertise in

11   the overall consideration of his testimony and the weight to

12   give it and the context in which he raises the issue of scale.

13   And so I'm not going to exclude him from testifying about

14   scale, I'll obviously take into account the context in which he

15   testifies about scale and who he's relying on and the context

16   in which he's actually making those -- providing testimony that

17   involves the issue of scale.

18           Raises a question in my mind, and that is

19   Professor -- I'm forgetting his name.  Professor from Virginia

20   Tech.

21           MR. SALLET:  Fox.

22           THE COURT:  Professor Fox.  Now, one of the issues

23   that was raised about Professor Baker is that he, in his

24   rebuttal report, had some commentary about Professor Fox's, you

25   know, data reduction study.  Are you expecting to elicit that

1    testimony from him tomorrow, or are you intending to wait until

2    rebuttal to do so?

3            MR. SALLET:  We're not intending to raise it

4    tomorrow.  We -- just for context, Professor -- our response to

5    the motion, Professor Baker was responding to Professor

6    Murphy's --

7            THE COURT:  Right.  I understand that.  I understand

8    what your position is.  I just am curious whether we're going

9    to --

10           MR. SALLET:  For that reason, we're not intending to

11   use it tomorrow.

12           THE COURT:  All right.  Fine.  To the extent it

13   becomes an issue, it may become one if you call him in your

14   rebuttal case.

15           MR. SALLET:  Yes, Your Honor.

16           THE COURT:  Okay.  Very good.  Final seed I want to

17   plant for the evening is with the plaintiffs' case about to

18   rest, I want you to look over the horizon and just start

19   thinking a little bit about the submission of proposed findings

20   of fact and conclusions of law.  Two primary questions:  One is

21   timing and, two, importantly, page limits.  And I want to put

22   that out there now, because the last time I did this I asked

23   the question too late in the day.  And I suspect those

24   documents are being drafted as we speak.

25           I recognize that we're talking about a very large

1    number of pages.  I get it.  This trial will probably be in the

2    books at around eight to ten weeks, and there's a lot of

3    evidence, including that which has been submitted outside the

4    formal trial, you know, testimonial part of the trial.  So just

5    begin those conversations amongst yourselves in terms of what

6    you think is a reasonable number and in terms of timing,

7    because I, too, as I'm sure you all do, need to look across the

8    horizon to my trial schedule.  Sometime early next year.

9                    (Off-the-record discussion between counsel.)

10                   MR. SCHMIDTLEIN:  I think -- I think you actually --

11    one of the earlier CMOs set out -- I thought it was 70 days.

12                   MR. SALLET:  I thought it was ten weeks.

13                   THE COURT:  Okay.  Fine.  I had forgotten.

14                   MR. SCHMIDTLEIN:  I'm not -- we'll talk about it, if

15    we want something different than that.  But I think --

16                   THE COURT:  That's fine, if it's already been

17    addressed in the CMO.  I didn't just didn't recall that.

18                   MR. SCHMIDTLEIN:  Pages is something we should all

19    think about.

20                   THE COURT:  We should think about pages.  Okay.

21                   All right.  Anything else from the parties this

22    evening?

23                   MR. DINTZER:  Not from the DoJ plaintiffs, Your

24    Honor.

25                   MR. CAVANAUGH:  No, Your Honor.

1              MR. SCHMIDTLEIN:  No, Your Honor.

2              THE COURT:  Thank you.  We'll see you all in the

3      morning.  Please do not wait for me.

4                              *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, JANICE DICKMAN, do hereby certify that the above

4      and foregoing constitutes a true and accurate transcript of my

5      stenographic notes and is a full, true and complete transcript

6      of the proceedings to the best of my ability.

7                          Dated this 25th day of October, 2023

8

9

10                      _____

11                      Janice E. Dickman, CRR, CMR, CCR
                        Official Court Reporter
12                      Room 6523
                        333 Constitution Avenue, N.W.
13                      Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                  INDEX

 2

 3      WITNESSES:

 4          JASON KRUEGER
                Cross-Examination (Cont.) By Ms. Waszmer.........6844
                Redirect Examination By Mr. Cavanaugh............6851
 5
            WILFRED AMALDOSS
 6              Direct Examination By Mr. Cavanaugh..............6856
                Cross-Examination By Mr. Maurer..................6919
 7

 8

 9      EXHIBITS ADMITTED:

            PX970............................................6870
10          PSX965...........................................6907
            PSXD10...........................................6919
11          DX3233...........................................6850

12                              *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6968

| ' | 2 | 3 | 54 [1] - 6914:2 |
|---|---|---|---|

**'20** [1] - 6849:10

## 0

**0** [1] - 6930:4

## 1

**1** [9] - 6851:25, 6890:21, 6890:22, 6891:8, 6907:11, 6929:22, 6942:5, 6942:17
**10** [3] - 6865:13, 6876:22, 6907:11
**100** [1] - 6891:13
**10019** [1] - 6843:13
**10036** [1] - 6843:5
**11** [3] - 6926:1, 6961:7, 6961:11
**1100** [1] - 6842:12
**1133** [1] - 6843:4
**12** [2] - 6870:18, 6870:19
**120** [1] - 6878:1
**122** [1] - 6931:20
**123** [3] - 6931:9, 6931:10, 6931:19
**12th** [1] - 6843:9
**1300** [1] - 6843:1
**1301** [1] - 6843:12
**14** [4] - 6877:2, 6927:5, 6927:6, 6927:7
**15** [5] - 6878:7, 6878:9, 6912:11, 6912:22, 6958:15
**150** [1] - 6932:6
**158** [4] - 6932:5, 6932:7, 6932:11, 6933:16
**159** [3] - 6933:19, 6933:22, 6933:23
**16** [1] - 6880:9
**1665** [1] - 6875:4
**17** [5] - 6916:11, 6935:24, 6938:2, 6940:6, 6940:24
**18** [9] - 6883:3, 6931:11, 6931:14, 6931:15, 6931:21, 6931:22, 6938:2, 6938:3, 6940:23
**19** [1] - 6944:9
**1998** [1] - 6902:10
**1:35** [1] - 6842:6

**2** [5] - 6852:1, 6890:22, 6891:17, 6929:22
**20** [6] - 6876:23, 6900:22, 6900:25, 6933:19, 6933:23
**20-3010** [1] - 6842:4
**2000** [2] - 6902:12, 6945:15
**20001** [2] - 6843:18, 6966:13
**20005** [1] - 6843:9
**2012** [2] - 6895:10, 6945:12
**2019** [1] - 6895:12
**202** [3] - 6842:13, 6842:17, 6843:10
**202-354-3267** [1] - 6843:18
**202-549-7155** [1] - 6842:20
**2020** [12] - 6845:7, 6845:11, 6845:19, 6845:24, 6846:2, 6846:7, 6846:12, 6849:9, 6850:6, 6871:24, 6872:1, 6916:11
**2020H2** [1] - 6845:17
**2021** [5] - 6846:2, 6846:7, 6846:10, 6871:25, 6872:6
**2022** [1] - 6945:15
**2023** [2] - 6842:5, 6966:7
**20530** [1] - 6842:20
**209** [1] - 6842:15
**21** [5] - 6857:14, 6857:18, 6886:6, 6933:15, 6938:3
**212** [2] - 6843:6, 6843:14
**22** [1] - 6872:4
**2200** [1] - 6843:5
**23** [1] - 6872:4
**238** [1] - 6915:19
**23rd** [1] - 6845:7
**24** [2] - 6842:5, 6890:4
**25** [3] - 6858:24, 6890:10, 6942:3
**251** [1] - 6934:5
**25th** [1] - 6966:7
**26** [2] - 6842:3, 6892:13
**27** [1] - 6944:23
**28** [2] - 6894:18, 6938:2
**29** [1] - 6896:3

**3** [2] - 6847:8, 6899:2
**30** [5] - 6876:24, 6896:10, 6912:11, 6912:22, 6929:23
**307-0340** [1] - 6842:13
**31** [2] - 6896:20, 6898:8
**32** [3] - 6898:25, 6899:21, 6899:22
**3233** [1] - 6850:17
**33** [3] - 6899:19, 6899:20, 6899:23
**333** [2] - 6843:17, 6966:12
**335-2793** [1] - 6843:6
**34** [1] - 6900:3
**35** [1] - 6900:18
**360** [3] - 6849:22, 6853:21, 6854:14
**373** [2] - 6950:22, 6951:7
**38** [1] - 6901:23
**3:04** [1] - 6899:10
**3:05** [1] - 6899:6
**3:20** [1] - 6899:6
**3:22** [1] - 6899:10

## 4

**4** [1] - 6913:10
**4.4** [2] - 6884:20, 6894:9
**40th** [1] - 6843:13
**41** [1] - 6904:20
**42** [1] - 6905:4
**43** [4] - 6905:17, 6931:2, 6931:3, 6931:4
**434-5000** [1] - 6843:10
**450** [1] - 6842:19
**457** [3] - 6850:5, 6851:20, 6851:22
**462** [1] - 6853:7
**467** [1] - 6912:15
**48** [2] - 6957:25, 6958:25
**49** [1] - 6938:5

## 5

**5** [8] - 6847:15, 6847:22, 6862:22, 6894:1, 6950:24, 6951:9, 6953:6, 6953:11
**50** [1] - 6854:22, 6893:17, 6910:17
**508-6000** [1] - 6843:2
**51** [1] - 6911:6

**55** [2] - 6872:2, 6915:1
**57** [1] - 6915:22
**59** [1] - 6917:13
**5:15** [1] - 6953:7

## 6

**6** [1] - 6849:10
**6,000** [1] - 6913:10
**60** [1] - 6917:23
**600** [1] - 6842:16
**60604** [1] - 6842:16
**62** [1] - 6883:15
**63** [1] - 6915:10
**64** [1] - 6882:19
**6523** [2] - 6843:17, 6966:12
**69** [2] - 6867:17, 6868:18

## 7

**7** [1] - 6960:10
**70** [2] - 6894:2, 6964:11
**7100** [1] - 6842:19
**720** [1] - 6843:2
**725** [1] - 6843:9
**737** [1] - 6852:11
**740** [7] - 6847:18, 6847:22, 6851:23, 6852:7, 6852:10, 6852:11, 6852:18

## 8

**8** [7] - 6847:15, 6847:22, 6848:4, 6852:18, 6864:24, 6932:12, 6932:13
**80203** [1] - 6843:2
**805-8563** [1] - 6842:17
**8th** [3] - 6845:19, 6853:8, 6950:22

## 9

**9.2** [1] - 6944:20
**927** [3] - 6850:12, 6850:21, 6850:22
**97** [1] - 6894:6
**970** [1] - 6877:14
**999-5800** [1] - 6843:14
**99999** [1] - 6930:5
**9:30** [1] - 6953:17

## A

**Aaron** [2] - 6843:8,

6969

6919:11
  **ability** [5] - 6902:6,
6947:8, 6947:12,
6947:19, 6966:6
  **able** [7] - 6851:10,
6870:2, 6879:18,
6884:8, 6953:7, 6957:9
  **academic** [3] -
6858:25, 6867:6,
6885:15
  **accept** [2] - 6940:1,
6940:8
  **access** [4] - 6914:18,
6915:7, 6954:19,
6958:3
  **accomplished** [1] -
6956:7
  **according** [5] -
6884:20, 6894:10,
6912:10, 6946:3,
6946:7
  **account** [1] - 6962:14
  **accuracy** [1] - 6949:3
  **accurate** [1] - 6966:4
  **achieve** [1] - 6900:11
  **achievements** [1] -
6858:11
  **acknowledge** [1] -
6867:12
  **acquire** [1] - 6902:6
  **acquiring** [1] -
6906:11
  **acquisition** [1] -
6914:1
  **Act** [1] - 6955:11
  **act** [1] - 6892:22
  **acting** [1] - 6889:4
  **action** [3] - 6879:24,
6885:10, 6911:11
  **actions** [3] - 6878:17,
6880:18, 6947:13
  **activity** [1] - 6943:10
  **actual** [3] - 6855:12,
6868:10, 6927:17
  **ad** [79] - 6860:16,
6861:8, 6863:1,
6863:2, 6864:12,
6865:20, 6866:6,
6869:8, 6874:13,
6879:16, 6883:8,
6888:11, 6888:13,
6888:23, 6888:24,
6889:1, 6889:3,
6889:4, 6889:8,
6889:9, 6889:11,
6889:19, 6889:22,
6889:23, 6889:24,
6891:5, 6891:8,
6891:24, 6892:6,
6892:7, 6892:10,

6892:21, 6893:2,
6893:10, 6893:11,
6893:23, 6894:2,
6898:3, 6898:18,
6900:20, 6900:24,
6901:6, 6901:7,
6903:3, 6903:4,
6903:8, 6903:14,
6903:15, 6906:17,
6907:10, 6907:18,
6911:9, 6916:8,
6921:24, 6924:11,
6924:19, 6927:16,
6928:16, 6932:15,
6932:22, 6935:18,
6937:22, 6937:23,
6946:3, 6946:6,
6948:2, 6948:5,
6948:7, 6948:18,
6948:24, 6948:25,
6949:9, 6950:6,
6951:14
  **Ad** [1] - 6924:18
  **add** [4] - 6850:1,
6863:2, 6892:18,
6960:23
  **added** [1] - 6944:24
  **addition** [2] - 6955:14,
6957:16
  **additional** [6] -
6902:19, 6905:23,
6915:14, 6915:21,
6928:8, 6957:23
  **additions** [1] -
6954:25
  **address** [6] - 6860:15,
6884:11, 6884:12,
6916:25, 6956:21,
6961:7
  **addressed** [2] -
6921:21, 6964:17
  **addresses** [1] -
6867:15
  **addressing** [1] -
6889:20
  **adequately** [1] -
6954:18
  **administration** [1] -
6857:5
  **admission** [1] -
6859:23
  **admit** [2] - 6850:14,
6877:19
  **ADMITTED** [1] -
6967:8
  **admitted** [6] -
6850:19, 6851:1,
6851:9, 6907:5,
6919:10, 6956:14
    **adoption** [1] - 6874:8

  **Ads** [8] - 6849:22,
6853:21, 6854:14,
6913:25, 6914:7,
6916:5, 6918:25
  **ads** [151] - 6853:22,
6854:14, 6855:11,
6860:25, 6861:11,
6861:12, 6861:15,
6861:16, 6861:21,
6861:25, 6862:1,
6862:9, 6862:10,
6862:11, 6862:18,
6863:1, 6863:7,
6863:13, 6863:21,
6863:22, 6863:23,
6863:24, 6864:9,
6864:21, 6864:22,
6866:6, 6869:2,
6869:3, 6880:25,
6881:6, 6882:18,
6882:25, 6883:12,
6884:9, 6884:15,
6885:2, 6885:7,
6885:8, 6886:21,
6886:22, 6887:3,
6887:4, 6887:5,
6887:18, 6887:19,
6887:20, 6887:24,
6887:25, 6890:1,
6892:8, 6892:24,
6892:25, 6893:4,
6893:6, 6893:12,
6893:19, 6893:20,
6893:23, 6893:24,
6893:25, 6894:8,
6894:15, 6894:22,
6895:9, 6895:19,
6895:24, 6896:2,
6896:22, 6897:5,
6897:21, 6897:23,
6897:24, 6898:9,
6898:10, 6898:12,
6898:17, 6898:24,
6899:16, 6899:25,
6901:3, 6902:13,
6902:17, 6903:6,
6905:3, 6908:7,
6908:9, 6909:11,
6909:12, 6911:16,
6911:17, 6913:2,
6913:6, 6915:23,
6915:24, 6915:25,
6916:6, 6916:7,
6916:10, 6916:11,
6916:14, 6916:15,
6916:16, 6916:23,
6917:3, 6917:12,
6921:19, 6921:23,
6923:5, 6924:9,
6924:17, 6924:21,
6925:4, 6925:9,

6926:8, 6926:14,
6926:15, 6926:17,
6926:18, 6927:13,
6927:21, 6928:8,
6928:15, 6929:18,
6931:12, 6934:1,
6937:13, 6937:19,
6937:20, 6944:15,
6944:18, 6944:20,
6944:22, 6947:3,
6952:11, 6952:14
  **advanced** [1] - 6898:2
  **advantage** [5] -
6900:17, 6900:21,
6904:25, 6908:13,
6911:25
  **advantages** [3] -
6898:17, 6911:23,
6913:1
  **advent** [1] - 6947:4
  **advertise** [8] -
6863:10, 6865:23,
6865:24, 6866:4,
6887:23, 6897:23,
6898:9, 6906:12
  **advertised** [1] -
6952:9
  **advertisement** [2] -
6908:10, 6908:11
  **advertisements** [7] -
6922:22, 6922:24,
6922:25, 6950:3,
6951:3, 6951:10,
6952:7
  **advertiser** [18] -
6846:21, 6846:22,
6873:13, 6874:2,
6885:12, 6887:22,
6889:2, 6898:18,
6911:12, 6917:2,
6918:2, 6918:14,
6928:19, 6928:20,
6928:22, 6946:2,
6946:5, 6947:12
  **advertiser's** [7] -
6866:10, 6908:16,
6911:10, 6911:11,
6918:17, 6947:13,
6952:18
  **advertisers** [63] -
6846:3, 6846:15,
6847:3, 6859:5,
6859:12, 6860:16,
6860:17, 6860:20,
6861:1, 6861:4,
6861:22, 6862:2,
6862:12, 6868:4,
6869:2, 6880:24,
6881:24, 6884:2,
6886:15, 6886:20,

6887:18, 6894:14,
6899:16, 6901:15,
6908:7, 6908:19,
6908:22, 6911:2,
6911:24, 6912:13,
6913:2, 6913:4,
6913:5, 6914:15,
6914:16, 6916:4,
6916:22, 6918:2,
6925:4, 6935:12,
6935:22, 6936:2,
6936:4, 6937:25,
6938:10, 6938:14,
6939:8, 6939:10,
6939:11, 6939:12,
6940:1, 6940:8,
6940:15, 6940:19,
6946:9, 6946:19,
6947:2, 6948:2,
6948:18, 6949:6,
6950:2, 6951:2,
6951:10

**advertisers'** [8] -
6861:9, 6907:17,
6907:20, 6910:14,
6914:18, 6915:7,
6935:23, 6947:19

**Advertising** [1] -
6908:11

**advertising** [66] -
6848:24, 6852:1,
6852:23, 6857:11,
6858:7, 6858:8,
6859:1, 6864:11,
6872:1, 6873:23,
6874:11, 6874:12,
6875:8, 6876:25,
6878:24, 6880:5,
6880:7, 6881:10,
6881:25, 6882:1,
6882:5, 6883:17,
6884:11, 6884:18,
6884:21, 6886:3,
6886:5, 6888:5,
6888:11, 6888:19,
6890:2, 6894:16,
6895:2, 6895:4,
6901:20, 6902:23,
6904:11, 6906:20,
6913:16, 6914:4,
6914:19, 6915:8,
6918:10, 6933:15,
6938:15, 6939:9,
6940:2, 6940:3,
6940:9, 6940:10,
6940:16, 6940:17,
6940:20, 6940:21,
6946:13, 6946:15,
6946:17, 6946:23,
6946:24, 6947:4,
6947:8, 6947:9,

6949:8, 6952:17

**affairs** [2] - 6955:16,
6957:3

**affected** [2] - 6860:18,
6921:15

**affecting** [1] - 6906:2

**affirmatively** [1] -
6939:18

**afternoon** [6] -
6856:12, 6856:13,
6856:18, 6899:3,
6919:11, 6919:15

**afterwards** [1] -
6943:3

**agencies** [4] -
6881:25, 6938:15,
6939:9, 6949:22

**agency** [2] - 6857:12,
6872:1

**aggregated** [1] -
6847:23

**aggregators** [1] -
6933:5

**ago** [1] - 6876:24

**agree** [36] - 6854:6,
6855:9, 6855:13,
6877:24, 6879:1,
6897:13, 6919:17,
6922:21, 6923:8,
6924:23, 6925:12,
6926:23, 6927:1,
6929:20, 6932:3,
6936:17, 6937:11,
6939:25, 6940:7,
6942:20, 6946:2,
6946:5, 6946:15,
6946:18, 6946:19,
6946:22, 6947:2,
6947:7, 6948:1,
6951:22, 6951:25,
6952:3, 6952:6,
6952:11, 6952:14,
6952:17

**agreed** [2] - 6956:8,
6960:21

**agreeing** [1] - 6952:25

**agreement** [2] -
6959:14, 6961:15

**agreements** [1] -
6921:22

**ahead** [8] - 6871:16,
6878:8, 6897:18,
6909:3, 6909:5,
6914:22, 6925:16,
6941:19

**aim** [1] - 6909:6

**al** [1] - 6842:3

**align** [1] - 6950:12

**aligned** [2] - 6872:25,
6888:17

**allocate** [1] - 6946:6

**allocated** [1] - 6871:24

**allowed** [2] - 6946:15,
6946:23

**almost** [4] - 6864:7,
6869:4, 6899:5, 6929:7

**alternative** [2] -
6907:7, 6958:16

**Amaldoss** [12] -
6856:7, 6856:20,
6856:24, 6859:23,
6860:2, 6896:16,
6896:24, 6897:1,
6897:20, 6899:7,
6919:5, 6953:12

**AMALDOSS** [2] -
6856:8, 6967:5

**Amaldoss's** [1] -
6962:5

**amaurer@wc.com** [1]
- 6843:11

**Amazon** [18] -
6863:20, 6864:6,
6866:11, 6867:13,
6868:1, 6872:18,
6877:6, 6888:4,
6893:8, 6893:14,
6927:7, 6927:12,
6927:20, 6927:23,
6928:2, 6928:4, 6928:6

**Amazon's** [1] -
6928:11

**AMER** [1] - 6847:8

**America** [2] - 6842:2,
6852:8

**America's** [2] -
6847:24, 6847:25

**American** [1] -
6852:15

**Americas** [2] - 6843:4,
6843:12

**AMIT** [1] - 6842:9

**amount** [3] - 6875:19,
6929:10, 6929:25

**analogy** [2] - 6870:5,
6879:3

**analysis** [11] -
6880:24, 6883:3,
6884:10, 6884:14,
6893:19, 6922:4,
6922:9, 6922:12,
6922:15, 6934:20,
6939:24

**analyzed** [1] - 6939:22

**Angie's** [8] - 6903:11,
6903:12, 6903:14,
6903:16, 6903:17,
6903:22

**Ann** [1] - 6900:5

**answer** [7] - 6900:1,

6900:7, 6901:20,
6928:1, 6931:14,
6946:21, 6947:18

**answered** [3] - 6951:4,
6951:12, 6951:17

**Antitrust** [1] - 6842:24

**appear** [4] - 6851:5,
6921:22, 6921:25,
6952:7

**APPEARANCES** [1] -
6842:11

**appearing** [1] -
6886:22

**application** [2] -
6933:21, 6934:2

**apply** [3] - 6873:13,
6875:20, 6914:15

**approach** [5] -
6856:15, 6881:13,
6923:13, 6930:17,
6950:13

**appropriate** [2] -
6897:14, 6897:15

**appropriately** [1] -
6898:23

**April** [1] - 6849:10

**area** [2] - 6918:1,
6948:25

**areas** [2] - 6849:24,
6858:3

**aside** [2] - 6845:10,
6848:25

**aspiration** [1] - 6912:8

**assess** [1] - 6855:13

**assessment** [1] -
6957:15

**assigned** [1] - 6901:5

**assignment** [3] -
6860:14, 6860:15,
6901:9

**assist** [1] - 6860:5

**assistant** [1] - 6857:17

**associate** [1] -
6858:16

**associated** [1] -
6875:11

**associating** [1] -
6875:8

**assume** [3] - 6853:5,
6890:22, 6907:11

**assumption** [3] -
6852:20, 6852:25,
6853:4

**asymmetric** [2] -
6907:14, 6914:17

**ATB** [1] - 6915:2

**attention** [3] -
6886:10, 6889:13,
6889:17

**attitude** [1] - 6876:10

6971

**attract** [1] - 6866:22
**attributed** [1] - 6949:2
**attribution** [3] - 6949:4, 6949:18, 6949:19
**auction** [37] - 6846:4, 6846:16, 6846:23, 6847:4, 6848:5, 6848:13, 6848:20, 6848:22, 6851:11, 6852:22, 6853:11, 6853:21, 6854:7, 6855:8, 6855:16, 6861:8, 6907:18, 6909:25, 6910:2, 6910:3, 6910:8, 6910:9, 6910:10, 6911:3, 6911:23, 6912:5, 6912:7, 6912:19, 6913:2, 6913:5, 6913:15, 6915:15, 6915:24, 6916:6, 6916:9, 6916:20, 6918:15
**auction-time** [33] - 6846:4, 6846:16, 6846:23, 6847:4, 6848:5, 6848:13, 6848:20, 6848:22, 6851:11, 6852:22, 6853:11, 6853:21, 6854:7, 6855:8, 6855:16, 6861:8, 6907:18, 6909:25, 6910:2, 6910:9, 6911:23, 6912:5, 6912:7, 6912:19, 6913:2, 6913:5, 6913:15, 6915:15, 6915:24, 6916:6, 6916:9, 6916:20, 6918:15
**auctions** [1] - 6910:12
**audibly** [1] - 6860:8
**audience** [6] - 6869:16, 6869:20, 6869:21, 6869:22, 6893:3, 6893:4
**authored** [3] - 6858:19, 6858:21, 6858:22
**automated** [3] - 6846:4, 6848:21, 6851:11
**avail** [12] - 6888:1, 6908:19, 6909:10, 6911:3, 6913:4, 6913:5, 6913:7, 6913:22, 6916:4, 6916:8, 6916:10

**available** [13] - 6898:3, 6898:16, 6911:21, 6911:22, 6916:15, 6916:16, 6916:18, 6916:19, 6920:9, 6946:16, 6946:24, 6947:3, 6947:15
**availing** [1] - 6914:6
**Avenue** [4] - 6843:4, 6843:12, 6843:17, 6966:12
**average** [2] - 6881:17, 6944:14
**avoid** [1] - 6897:5
**awake** [1] - 6875:25
**award** [2] - 6858:12, 6858:14
**awards** [1] - 6858:10
**aware** [13] - 6846:2, 6846:18, 6863:8, 6869:13, 6869:20, 6874:18, 6875:16, 6876:9, 6879:15, 6929:13, 6929:15, 6929:16, 6935:7
**awareness** [21] - 6869:24, 6872:4, 6872:7, 6872:11, 6873:16, 6873:18, 6873:25, 6874:6, 6874:11, 6874:14, 6874:20, 6874:23, 6875:1, 6878:3, 6879:14, 6879:23, 6907:25, 6950:11, 6952:1, 6952:8

## B

**backdrop** [1] - 6955:13
**background** [3] - 6850:13, 6857:9, 6890:20
**backlog** [4] - 6956:20, 6956:21, 6957:11, 6957:16
**bad** [2] - 6870:13, 6962:3
**bag** [1] - 6957:2
**Baker** [6] - 6962:1, 6962:4, 6962:8, 6962:23, 6963:5
**balance** [2] - 6872:9, 6879:11
**Barrett** [1] - 6920:19
**Barrett-Bowen** [1] - 6920:19
**barriers** [1] - 6917:19
**based** [24] - 6854:25,

6867:1, 6880:15, 6881:20, 6883:21, 6885:4, 6889:12, 6889:23, 6889:24, 6891:2, 6907:25, 6910:4, 6910:15, 6910:23, 6911:25, 6913:6, 6913:9, 6920:6, 6937:3, 6938:11, 6939:7, 6942:1, 6950:6, 6951:15
**basic** [3] - 6875:13, 6878:5, 6885:19
**basis** [2] - 6849:23, 6897:1
**Bates** [5] - 6871:3, 6871:7, 6871:8, 6875:3, 6915:19
**bear** [1] - 6892:14
**become** [4] - 6846:2, 6876:9, 6902:21, 6963:13
**becomes** [2] - 6949:22, 6963:13
**becoming** [1] - 6905:2
**BEFORE** [1] - 6842:9
**begin** [3] - 6853:20, 6854:15, 6964:5
**behalf** [1] - 6903:14
**behavior** [2] - 6858:6, 6944:2
**behind** [1] - 6879:10
**belief** [1] - 6916:20
**believes** [1] - 6928:2
**Belknap** [1] - 6843:4
**below** [6] - 6848:10, 6848:12, 6881:11, 6882:6, 6883:17, 6885:5
**BENCH** [1] - 6842:9
**beneficial** [1] - 6919:17
**benefit** [6] - 6859:9, 6859:10, 6914:6, 6914:9, 6915:16
**benefits** [2] - 6914:14, 6919:23
**best** [9] - 6855:9, 6855:18, 6855:20, 6930:19, 6930:20, 6941:6, 6947:16, 6954:20, 6966:6
**Best** [2] - 6858:12, 6858:13
**better** [18] - 6874:19, 6893:6, 6893:11, 6893:12, 6893:24, 6894:3, 6895:4, 6908:24, 6909:20,

6912:1, 6912:2, 6914:8, 6914:11, 6915:2, 6947:20, 6947:21, 6947:23, 6957:9
**between** [23] - 6853:21, 6854:14, 6863:23, 6867:13, 6884:9, 6886:25, 6887:4, 6890:8, 6892:6, 6893:1, 6893:2, 6894:4, 6897:4, 6897:21, 6897:22, 6900:7, 6900:14, 6929:13, 6929:14, 6941:3, 6957:21, 6964:9
**beyond** [1] - 6917:20
**bid** [5] - 6867:3, 6910:2, 6910:12, 6910:15, 6911:18
**bidding** [41] - 6846:4, 6846:16, 6846:23, 6847:4, 6848:5, 6848:13, 6848:21, 6848:22, 6851:11, 6851:12, 6852:22, 6853:12, 6853:21, 6854:7, 6855:8, 6855:16, 6861:8, 6907:18, 6910:1, 6910:2, 6910:9, 6910:22, 6911:23, 6912:5, 6912:7, 6912:19, 6913:2, 6913:6, 6913:7, 6913:8, 6913:14, 6913:15, 6913:23, 6915:15, 6915:24, 6916:6, 6916:9, 6916:20, 6918:15
**bids** [1] - 6912:1
**biggest** [1] - 6873:16
**billboards** [1] - 6874:13
**billion** [3] - 6922:17, 6923:4, 6929:17
**binder** [4] - 6844:12, 6845:13, 6849:1, 6853:7
**Bing** [10] - 6872:20, 6872:25, 6877:8, 6877:10, 6907:7, 6907:10, 6907:13, 6908:11, 6920:22, 6921:4
**Bing's** [1] - 6920:25
**bit** [7] - 6874:13, 6895:8, 6899:5, 6900:12, 6953:9,

6972

6953:24, 6963:19
**blow** [1] - 6926:1
**blue** [7] - 6887:12, 6887:14, 6902:11, 6902:12, 6902:18, 6905:1, 6910:23
**blue-colored** [1] - 6887:12
**body** [2] - 6883:22, 6883:23
**Booking** [1] - 6929:12
**Booking.com** [3] - 6899:25, 6905:7, 6905:11
**Bookings** [1] - 6923:9
**bookings** [2] - 6929:8, 6930:1
**books** [1] - 6964:2
**Booth** [1] - 6894:19
**booth** [1] - 6862:14
**bother** [1] - 6906:17
**bottom** [3] - 6847:20, 6872:16, 6872:21
**bought** [4] - 6918:19, 6922:24, 6922:25, 6926:21
**bound** [1] - 6933:1
**Bowen** [1] - 6920:19
**box** [3] - 6861:13, 6924:18, 6926:2
**brand** [5] - 6868:23, 6877:10, 6887:15, 6945:20, 6952:18
**brands** [3] - 6901:19, 6901:20, 6907:10
**break** [3] - 6844:21, 6899:3, 6899:8
**briefly** [3] - 6844:19, 6857:8, 6910:20
**brilliant** [1] - 6858:24
**bring** [3] - 6859:5, 6875:2, 6900:23
**broad** [3] - 6859:4, 6921:13
**broadly** [3] - 6869:12, 6902:17, 6917:20
**Broadway** [1] - 6843:1
**brother** [2] - 6853:8, 6853:25
**Bruce** [1] - 6842:23
**buck** [1] - 6876:4
**bucket** [1] - 6937:16
**buckets** [3] - 6900:8, 6955:3, 6955:7
**Bucklin** [6] - 6881:5, 6881:23, 6936:6, 6938:12, 6939:3, 6939:20
**Bucklin's** [3] - 6883:24, 6941:25,

6942:2
**budget** [3] - 6872:2, 6873:25, 6874:21
**bugs** [3] - 6855:9, 6855:14, 6855:20
**build** [4] - 6873:25, 6879:14, 6903:19, 6909:7
**building** [3] - 6868:3, 6874:6, 6874:14
**bulk** [2] - 6876:12, 6918:10
**bumps** [1] - 6894:2
**bundle** [1] - 6903:18
**burdensome** [1] - 6956:13
**business** [21] - 6850:3, 6857:5, 6857:13, 6862:4, 6870:9, 6870:10, 6870:24, 6871:1, 6879:7, 6880:3, 6889:2, 6896:13, 6904:11, 6905:15, 6907:1, 6909:21, 6923:5, 6949:13, 6959:1, 6959:5, 6959:6
**buy** [39] - 6860:16, 6864:6, 6865:4, 6865:21, 6866:6, 6869:22, 6870:4, 6872:19, 6872:21, 6872:22, 6872:24, 6873:8, 6874:19, 6875:16, 6875:24, 6876:7, 6876:10, 6876:13, 6887:16, 6893:9, 6895:5, 6898:12, 6898:13, 6900:14, 6908:7, 6914:12, 6914:13, 6914:16, 6922:21, 6926:24, 6927:3, 6927:4, 6928:10, 6928:13, 6928:16, 6928:22
**buyer** [2] - 6882:6, 6918:23
**buying** [12] - 6868:2, 6869:15, 6875:21, 6875:22, 6885:11, 6891:21, 6893:3, 6893:4, 6899:25, 6911:13, 6923:4
**buys** [1] - 6911:13
**BY** [35] - 6844:7, 6844:17, 6847:19, 6849:4, 6849:13, 6850:24, 6851:19, 6856:17, 6857:7,

6859:18, 6860:3, 6864:20, 6867:11, 6867:21, 6869:1, 6871:15, 6873:12, 6877:3, 6877:21, 6880:23, 6882:16, 6884:13, 6885:14, 6890:16, 6897:19, 6899:14, 6907:6, 6909:4, 6919:14, 6923:16, 6931:5, 6933:2, 6941:16, 6941:20, 6947:1
**Byx** [4] - 6844:11, 6844:25, 6846:1, 6846:18

# C

**calculate** [1] - 6949:8
**calculations** [1] - 6949:21
**Cameron** [2] - 6842:18, 6961:9
**campaign** [4] - 6909:19, 6913:24, 6913:25, 6919:2
**campaigns** [2] - 6908:17, 6948:2
**candy** [2] - 6875:24, 6875:25
**cannot** [7] - 6865:22, 6874:23, 6876:13, 6898:4, 6904:3, 6913:4, 6915:4
**cap** [3] - 6958:11, 6958:12
**captured** [2] - 6852:24, 6853:3
**captures** [1] - 6875:14
**capturing** [3] - 6878:4, 6878:17
**car** [1] - 6875:22
**care** [1] - 6961:5
**careful** [1] - 6949:3
**Carr** [1] - 6842:25
**carrot** [1] - 6873:4
**cart** [2] - 6893:8, 6893:14
**case** [30] - 6859:19, 6860:14, 6862:6, 6862:8, 6871:4, 6880:5, 6883:4, 6888:22, 6888:23, 6892:23, 6895:8, 6895:17, 6896:17, 6896:25, 6900:13, 6907:15, 6913:1, 6914:15, 6915:23, 6916:3, 6916:12,

6927:20, 6950:16, 6950:17, 6956:24, 6957:24, 6961:23, 6962:1, 6963:14, 6963:17
**case-in-chief** [1] - 6957:24
**cases** [3] - 6865:6, 6876:9, 6903:20
**cast** [1] - 6873:22
**catch** [2] - 6901:6, 6959:24
**catch-up** [1] - 6959:24
**categories** [10] - 6864:3, 6864:4, 6864:9, 6864:17, 6865:9, 6874:9, 6875:17, 6894:10, 6958:22
**categorize** [1] - 6880:24
**category** [4] - 6868:22, 6874:3, 6877:9, 6880:15
**cater** [1] - 6898:1
**caught** [1] - 6955:22
**causing** [1] - 6929:14
**CAVANAUGH** [59] - 6850:18, 6851:17, 6851:19, 6855:23, 6856:6, 6856:15, 6856:17, 6857:7, 6859:18, 6859:22, 6860:3, 6864:20, 6867:11, 6867:21, 6868:11, 6869:1, 6870:21, 6871:1, 6871:7, 6871:10, 6871:12, 6871:15, 6873:12, 6875:3, 6877:2, 6877:3, 6877:14, 6877:21, 6880:20, 6880:23, 6882:16, 6884:13, 6885:14, 6890:15, 6890:16, 6897:3, 6897:11, 6897:19, 6899:4, 6899:13, 6899:14, 6906:22, 6907:3, 6907:6, 6909:1, 6909:4, 6909:22, 6909:24, 6912:14, 6912:16, 6915:18, 6915:20, 6919:3, 6932:16, 6932:20, 6932:25, 6959:11, 6961:24, 6964:25
**cavanaugh** [1] - 6899:1

6973

**Cavanaugh** [8] - 6843:3, 6844:21, 6845:5, 6851:16, 6856:4, 6856:14, 6899:11, 6907:2
**Cavanaugh...............** **6856** [1] - 6967:6
**Cavanaugh...........** **6851** [1] - 6967:4
**cavity** [1] - 6876:19
**CCR** [1] - 6966:11
**Center** [1] - 6842:25
**central** [1] - 6919:1
**certain** [8] - 6861:4, 6875:19, 6892:23, 6898:17, 6901:14, 6902:25, 6937:1, 6938:20
**certainly** [6] - 6877:19, 6955:6, 6955:25, 6957:8, 6958:4, 6960:13
**CERTIFICATE** [1] - 6966:1
**certify** [1] - 6966:3
**challenge** [2] - 6873:16, 6949:17
**challenges** [3] - 6855:10, 6900:6, 6916:19
**chance** [2] - 6849:14, 6889:13
**change** [6] - 6874:8, 6876:20, 6876:22, 6878:14, 6878:22, 6935:23
**changed** [8] - 6876:21, 6877:1, 6878:13, 6878:15, 6878:20, 6878:22, 6894:13, 6902:7
**changes** [5] - 6860:18, 6875:12, 6875:17, 6904:6, 6929:14
**channel** [8] - 6870:3, 6908:3, 6936:13, 6936:22, 6936:24, 6937:1, 6941:7, 6946:3
**channels** [11] - 6875:8, 6875:11, 6908:1, 6909:20, 6918:20, 6935:13, 6935:18, 6935:19, 6946:7, 6948:3, 6948:19
**characterization** [1] - 6937:9
**charge** [1] - 6848:10
**chart** [5] - 6934:10, 6934:14, 6934:17,

6935:22, 6935:24
**charts** [1] - 6867:23
**chase** [1] - 6893:9
**Chicago** [1] - 6842:16
**chief** [1] - 6957:24
**choice** [1] - 6887:10
**choose** [2] - 6898:23, 6918:6
**chose** [3] - 6939:18, 6939:20
**circulate** [1] - 6877:11
**circumstances** [1] - 6859:12
**cite** [1] - 6850:2
**cited** [9] - 6846:22, 6881:3, 6881:4, 6881:22, 6883:22, 6883:23, 6885:5
**claim** [1] - 6854:12
**claims** [1] - 6846:22
**clarified** [1] - 6877:9
**clarifies** [1] - 6868:21
**clarify** [6] - 6879:2, 6885:17, 6892:12, 6921:24, 6927:25, 6950:8
**class** [4] - 6857:22, 6857:24, 6857:25
**classify** [1] - 6937:23
**clean** [2] - 6949:18, 6949:19
**clear** [6] - 6868:8, 6870:2, 6894:5, 6936:1, 6952:23, 6959:2
**clearly** [2] - 6892:1, 6938:11
**click** [9] - 6863:4, 6865:25, 6866:1, 6866:9, 6866:11, 6911:9, 6928:10, 6943:2, 6948:23
**clicks** [4] - 6865:24, 6903:7, 6903:15, 6911:9
**client** [1] - 6871:21
**client's** [1] - 6871:22
**clients** [1] - 6959:16
**close** [7] - 6857:14, 6864:7, 6865:7, 6866:10, 6866:16, 6869:8, 6873:10
**closed** [1] - 6866:12
**closely** [2] - 6859:8, 6947:24
**closer** [1] - 6866:23
**closing** [1] - 6866:16
**club** [1] - 6942:16
**clubs** [1] - 6891:1
**CMO** [1] - 6964:17

**CMOs** [1] - 6964:11
**CMR** [1] - 6966:11
**CO** [1] - 6843:2
**collapse** [1] - 6880:12
**collect** [2] - 6849:24, 6943:21
**collection** [3] - 6883:19, 6946:15, 6946:23
**collects** [1] - 6911:17
**college** [1] - 6895:22
**color** [1] - 6910:23
**Colorado** [2] - 6842:23, 6842:25
**COLORADO** [1] - 6842:23
**colored** [2] - 6887:12, 6887:13
**COLUMBIA** [1] - 6842:1
**column** [3] - 6944:25, 6945:10
**coming** [4] - 6874:24, 6881:9, 6889:19, 6906:5
**comment** [7] - 6852:20, 6852:21, 6853:2, 6886:8, 6934:22, 6954:5, 6960:14
**commentary** [2] - 6890:12, 6962:24
**comments** [2] - 6852:24, 6954:6
**commission** [2] - 6888:7, 6888:14
**commit** [1] - 6958:14
**committed** [2] - 6918:4, 6958:3
**companies** [4] - 6922:17, 6922:21, 6938:19, 6938:22
**company** [7] - 6871:12, 6913:23, 6914:5, 6930:11, 6932:9, 6932:21, 6933:3
**Company** [4] - 6912:24, 6913:23, 6914:5, 6914:23
**comparable** [1] - 6883:14
**comparatively** [1] - 6908:15
**compare** [2] - 6913:14, 6924:13
**compared** [13] - 6846:17, 6864:11, 6864:16, 6867:14, 6883:9, 6885:1,

6885:8, 6887:19, 6892:3, 6893:3, 6893:20, 6898:2, 6943:10
**compares** [1] - 6945:8
**comparing** [2] - 6884:14, 6942:11
**comparison** [2] - 6913:12, 6944:19
**compatible** [1] - 6895:5
**competition** [2] - 6859:10, 6935:14
**competitive** [1] - 6922:13
**complete** [3] - 6882:17, 6933:17, 6966:5
**completed** [2] - 6849:10, 6857:13
**completely** [2] - 6874:23, 6902:1
**complicated** [4] - 6947:21, 6949:5, 6949:11, 6949:16
**complimentary** [1] - 6870:15
**compromise** [1] - 6906:18
**computers** [1] - 6947:8
**concept** [10] - 6868:17, 6875:13, 6876:24, 6878:1, 6880:6, 6886:19, 6888:18, 6892:12, 6911:4, 6946:12
**concepts** [1] - 6877:1
**conceptual** [1] - 6935:2
**conceptually** [1] - 6915:3
**concern** [2] - 6858:25, 6955:14
**concerns** [3] - 6955:3, 6955:5, 6958:23
**concluded** [2] - 6940:15, 6940:20
**conclusion** [2] - 6940:8, 6948:12
**conclusions** [1] - 6963:20
**concrete** [1] - 6957:8
**conditioned** [2] - 6939:1, 6939:4
**condone** [1] - 6879:9
**conduct** [2] - 6861:5, 6901:15
**confident** [1] - 6958:18

6974

confidential [7] -
6848:11, 6848:13,
6932:17, 6932:19,
6932:23, 6934:7,
6958:1
confidentiality [9] -
6871:22, 6931:25,
6933:1, 6955:9,
6955:10, 6957:6,
6958:23, 6959:3,
6959:20
conflict [1] - 6883:1
conform [1] - 6898:14
confuses [1] -
6949:16
connect [1] - 6863:19
connected [1] -
6895:15
CONNOLLY [1] -
6843:8
conquest [2] -
6927:21, 6928:5
conquesting [2] -
6928:15, 6928:17
consequence [2] -
6902:15, 6905:16
consequences [1] -
6904:7
conservative [3] -
6937:16, 6937:21,
6941:6
consider [8] -
6875:15, 6890:21,
6903:10, 6921:8,
6921:10, 6921:14,
6928:17, 6962:10
consideration [10] -
6869:25, 6872:5,
6872:8, 6872:11,
6872:25, 6873:21,
6928:14, 6928:18,
6959:17, 6962:11
considered [4] -
6898:15, 6906:16,
6907:7, 6921:16
considering [2] -
6869:14, 6869:21
consistent [2] -
6890:5, 6896:5
constant [2] -
6913:13, 6913:14
constitute [1] - 6890:1
constitutes [1] -
6966:4
Constitution [2] -
6843:17, 6966:12
constructed [1] -
6883:25
consume [1] -
6892:19

consumer [41] -
6861:13, 6864:15,
6865:19, 6866:7,
6869:6, 6870:4,
6872:19, 6876:18,
6885:11, 6887:7,
6887:8, 6887:9,
6887:11, 6887:17,
6888:13, 6888:17,
6888:25, 6889:6,
6890:17, 6890:22,
6890:24, 6892:17,
6892:19, 6892:21,
6895:2, 6901:6,
6903:21, 6906:2,
6908:7, 6911:8,
6911:9, 6911:12,
6911:13, 6925:22,
6927:1, 6927:24,
6928:9, 6942:5,
6942:17, 6942:22,
6951:25
Consumer [4] -
6842:24, 6890:21,
6890:22
consumer's [4] -
6866:13, 6928:5,
6935:5, 6952:8
consumers [38] -
6858:6, 6861:1,
6861:25, 6862:3,
6863:19, 6864:5,
6864:10, 6864:18,
6866:22, 6867:13,
6867:14, 6868:22,
6869:12, 6869:23,
6872:11, 6872:21,
6873:9, 6873:21,
6874:24, 6878:16,
6878:17, 6890:21,
6898:1, 6902:11,
6906:5, 6908:2,
6908:3, 6914:12,
6919:18, 6920:1,
6923:9, 6924:22,
6925:9, 6947:24,
6951:22, 6952:12,
6952:14, 6952:18
consumers' [1] -
6866:17
consuming [2] -
6895:23, 6895:24
Cont [2] - 6844:6,
6967:4
contact [1] - 6854:8
contacting [1] -
6854:9
contain [1] - 6957:12
content [4] - 6844:19,
6849:16, 6892:19,

6895:24
context [10] - 6848:3,
6858:6, 6888:21,
6888:23, 6890:17,
6890:21, 6962:12,
6962:14, 6962:15,
6963:4
continue [3] -
6909:15, 6953:13,
6953:18
continuing [1] -
6880:6
continuous [1] -
6872:11
continuously [3] -
6870:8, 6875:2,
6879:11
contrast [2] - 6891:16,
6893:2
contrasting [2] -
6896:22, 6943:18
contribution [1] -
6858:16
contributions [1] -
6858:11
control [1] - 6955:12
convenience [1] -
6875:23
convenient [3] -
6918:19, 6938:23,
6938:25
conversant [1] -
6884:4
conversations [1] -
6964:5
conversion [18] -
6867:2, 6884:14,
6884:20, 6884:21,
6885:9, 6885:10,
6891:24, 6892:3,
6892:9, 6892:10,
6893:4, 6911:4,
6912:2, 6912:10,
6912:11, 6944:11,
6944:14, 6945:14
conversions [4] -
6855:15, 6893:20,
6945:2, 6949:6
converting [2] -
6884:24, 6891:9
convince [1] - 6874:19
convinced [1] -
6912:12
copy [2] - 6930:16,
6950:16
core [3] - 6857:22,
6857:24, 6908:5
corner [2] - 6852:4,
6924:18
correct [55] - 6845:9,

6852:2, 6852:3,
6852:16, 6852:18,
6852:23, 6853:12,
6853:17, 6853:25,
6855:4, 6894:7,
6920:2, 6920:6,
6920:11, 6920:12,
6920:14, 6921:9,
6921:19, 6922:14,
6922:23, 6923:1,
6924:2, 6924:9,
6925:19, 6926:9,
6926:18, 6927:13,
6927:18, 6927:24,
6930:22, 6931:17,
6932:2, 6932:10,
6933:12, 6933:21,
6934:2, 6934:9,
6934:15, 6935:20,
6939:19, 6940:10,
6940:25, 6942:7,
6942:19, 6944:13,
6945:1, 6945:3,
6945:4, 6945:21,
6946:14, 6948:8,
6950:2, 6951:2,
6951:9, 6959:6
Correct [1] - 6945:6
correctly [1] - 6951:19
corresponding [2] -
6930:15, 6930:23
cost [16] - 6876:4,
6876:5, 6901:16,
6904:11, 6904:17,
6905:15, 6906:11,
6913:22, 6913:25,
6917:4, 6917:6,
6917:10, 6917:19,
6917:20, 6949:1
costs [5] - 6859:6,
6861:5, 6906:12,
6917:22, 6918:6
Counsel [3] - 6851:20,
6877:20, 6954:10
counsel [7] - 6851:24,
6946:20, 6954:4,
6956:8, 6957:21,
6959:23, 6964:9
country [4] - 6938:15,
6938:16, 6939:8,
6939:10
couple [2] - 6910:4,
6932:4
course [3] - 6853:3,
6858:2, 6888:7
Court [16] - 6843:16,
6843:16, 6848:2,
6849:20, 6850:8,
6857:8, 6860:1,
6863:15, 6885:25,

6975

6888:21, 6911:7,
6939:22, 6941:21,
6954:17, 6957:23,
6966:11
 **court** [2] - 6859:13,
6953:14
 **COURT** [88] - 6842:1,
6844:2, 6844:16,
6849:11, 6850:16,
6850:19, 6850:21,
6851:16, 6855:24,
6856:2, 6856:4,
6856:11, 6856:13,
6856:24, 6857:6,
6859:17, 6860:1,
6864:13, 6866:19,
6867:6, 6867:19,
6868:8, 6868:13,
6871:11, 6871:14,
6871:19, 6873:3,
6873:6, 6875:5,
6877:18, 6881:12,
6881:19, 6883:18,
6884:7, 6885:3,
6885:9, 6890:13,
6897:8, 6897:14,
6899:1, 6899:5,
6899:11, 6907:5,
6919:10, 6923:14,
6931:2, 6932:14,
6932:18, 6932:21,
6933:1, 6941:2,
6941:19, 6946:20,
6946:25, 6953:2,
6953:5, 6953:8,
6953:21, 6953:23,
6954:13, 6954:15,
6955:4, 6955:21,
6956:3, 6957:13,
6958:7, 6958:20,
6959:5, 6959:7,
6959:9, 6959:12,
6960:4, 6960:13,
6960:17, 6961:3,
6961:17, 6961:22,
6961:25, 6962:7,
6962:22, 6963:7,
6963:12, 6963:16,
6964:13, 6964:16,
6964:20, 6965:2,
6966:1
 **Court's** [2] - 6904:22,
6941:22
 **Courthouse** [1] -
6843:17
 **courthouse** [1] -
6859:16
 **courtyard** [3] - 6902:2,
6902:3
 **craft** [1] - 6954:20

**cranial** [1] - 6876:19
**CRC** [1] - 6843:16
**created** [1] - 6900:8
**creating** [1] - 6873:19
**credit** [3] - 6948:22,
6948:23, 6948:24
**Cross** [2] - 6967:4,
6967:6
 **CROSS** [2] - 6844:6,
6919:13
 **cross** [2] - 6880:22,
6886:7
 **Cross-Examination**
[2] - 6967:4, 6967:6
 **cross-examination** [2]
- 6880:22, 6886:7
 **CROSS-**
**EXAMINATION** [2] -
6844:6, 6919:13
 **CRR** [2] - 6843:16,
6966:11
 **curious** [1] - 6866:19,
6963:8
 **current** [3] - 6885:20,
6955:1, 6957:11
 **customer** [21] -
6846:5, 6846:6,
6847:25, 6851:2,
6851:4, 6851:10,
6854:6, 6854:10,
6854:16, 6865:24,
6891:9, 6891:17,
6891:20, 6891:21,
6903:19, 6914:1,
6928:2, 6928:21,
6942:25, 6943:7,
6943:8
 **Customer** [4] -
6847:8, 6849:8,
6852:9, 6891:17
 **customers** [18] -
6847:25, 6848:1,
6848:21, 6849:22,
6853:11, 6853:17,
6853:20, 6854:3,
6854:8, 6854:9,
6854:13, 6854:15,
6854:18, 6854:22,
6854:24, 6855:7,
6902:6, 6906:11
 **customers'** [1] -
6855:2
 **customization** [1] -
6898:24
 **customize** [2] -
6898:21
 **customized** [2] -
6880:14, 6900:22
 **CV** [1] - 6842:4
 **CVS** [2] - 6872:18,

6877:6

# D

 **D.C** [4] - 6842:5,
6842:13, 6843:9,
6966:13
 **Dahlquist** [1] -
6842:14
 **daily** [2] - 6957:5,
6959:21
 **Daniel** [1] - 6933:10
 **Daniels** [2] - 6933:8
 **data** [23] - 6855:11,
6866:25, 6885:3,
6909:18, 6910:16,
6911:4, 6911:17,
6911:25, 6917:21,
6917:22, 6918:14,
6934:7, 6940:14,
6941:17, 6941:21,
6941:22, 6945:14,
6945:16, 6945:19,
6946:16, 6946:23,
6962:25
 **dataset** [3] - 6881:15,
6882:13, 6911:21
 **date** [4] - 6844:19,
6845:6, 6850:5, 6941:8
 **Dated** [1] - 6966:7
 **Daubert** [1] - 6962:8
 **David** [1] - 6842:14
 **David.dahlquist@**
**usdoj.gov** [1] - 6842:17
 **DAY** [1] - 6842:3
 **days** [9] - 6891:22,
6893:16, 6955:8,
6955:9, 6959:1,
6959:4, 6959:5,
6959:6, 6964:11
 **daytime** [1] - 6858:1
 **DC** [2] - 6842:20,
6843:18
 **dead** [1] - 6886:11
 **deadline** [1] - 6958:14
 **deal** [2] - 6908:12,
6908:13
 **dealing** [1] - 6908:13
 **December** [3] -
6846:6, 6846:7,
6916:11
 **decide** [1] - 6860:16
 **decision** [3] - 6866:23,
6878:3, 6923:2
 **decisions** [4] - 6878:2,
6880:7, 6886:20,
6909:21
 **deck** [9] - 6845:17,
6849:11, 6850:4,
6850:23, 6851:5,

6860:5, 6860:10,
6919:5, 6930:23
 **declaration** [3] -
6871:2, 6907:1,
6960:21
 **decrease** [3] -
6874:12, 6905:7,
6905:11
 **decreased** [4] -
6861:8, 6902:16,
6905:24, 6907:19
 **decreasing** [2] -
6904:10, 6906:5
 **deep** [3] - 6909:6,
6909:7, 6910:23
 **defend** [1] - 6890:13
 **Defendant** [2] -
6842:7, 6843:7
 **define** [2] - 6846:20,
6870:2
 **defined** [1] - 6885:9
 **definitely** [1] - 6914:16
 **definition** [1] -
6854:25
 **delay** [1] - 6916:18
 **delayed** [3] - 6914:18,
6915:7, 6916:14
 **deliver** [1] - 6874:1
 **demand** [1] - 6851:10
 **demonstrative** [5] -
6870:21, 6886:7,
6896:21, 6898:8,
6919:5
 **denied** [1] - 6962:9
 **denominator** [2] -
6883:18, 6891:8
 **Denver** [1] - 6843:2
 **DEPARTMENT** [2] -
6842:12, 6842:23
 **Department** [2] -
6842:15, 6842:19
 **dependent** [2] -
6900:1, 6905:2
 **depiction** [1] - 6875:7
 **deposed** [1] - 6950:17
 **deposition** [10] -
6930:14, 6930:15,
6930:22, 6931:7,
6931:9, 6932:5,
6936:12, 6950:16,
6950:19, 6950:22
 **depositions** [1] -
6881:21
 **Depot** [6] - 6862:25,
6863:3, 6865:20,
6894:20, 6894:24,
6901:4
 **depth** [1] - 6918:3
 **describe** [4] - 6851:2,
6857:8, 6857:19,

6910:20
  **described** [2] - 6852:21, 6855:21
  **design** [3] - 6920:22, 6920:25, 6921:14
  **designated** [2] - 6932:17, 6932:19
  **designations** [1] - 6959:3
  **desired** [1] - 6911:12
  **detail** [3] - 6920:5, 6920:10, 6921:16
  **detailed** [2] - 6897:24, 6897:25
  **details** [1] - 6957:10
  **development** [1] - 6896:1
  **DFD20** [1] - 6923:18
  **diagnostic** [1] - 6872:13
  **Dickman** [2] - 6843:16, 6966:11
  **DICKMAN** [1] - 6966:3
  **differ** [2] - 6890:18, 6935:12
  **difference** [5] - 6865:10, 6894:4, 6901:2, 6929:14
  **differences** [11] - 6866:2, 6887:4, 6887:21, 6888:2, 6888:16, 6897:22, 6898:5, 6929:13, 6935:15, 6935:21
  **different** [30] - 6869:5, 6869:13, 6869:23, 6875:11, 6877:12, 6879:14, 6887:7, 6888:4, 6889:8, 6894:16, 6895:17, 6898:1, 6901:8, 6910:25, 6911:2, 6927:18, 6928:9, 6935:4, 6935:9, 6937:20, 6944:1, 6944:2, 6944:3, 6947:6, 6949:21, 6949:22, 6957:2, 6959:25, 6964:15
  **differently** [1] - 6875:10
  **digital** [14] - 6858:8, 6859:1, 6859:23, 6860:2, 6900:7, 6907:25, 6946:13, 6946:15, 6946:17, 6946:22, 6946:24, 6947:4, 6947:7, 6947:9
  **Dijk's** [2] - 6901:24, 6905:5

  **diligently** [1] - 6954:19
  **DINTZER** [1] - 6964:23
  **Dintzer** [1] - 6842:11
  **direct** [10] - 6853:18, 6859:9, 6879:15, 6888:9, 6925:14, 6929:8, 6930:2, 6933:6, 6935:8, 6950:24
  **DIRECT** [1] - 6856:16
  **Direct** [1] - 6967:6
  **directed** [3] - 6928:6, 6940:2, 6940:9
  **directly** [9] - 6846:25, 6885:24, 6888:13, 6889:20, 6909:11, 6929:10, 6929:19, 6952:1, 6957:2
  **disagreeing** [1] - 6948:10
  **disappeared** [1] - 6940:4
  **Dischler** [1] - 6878:24
  **disclosed** [1] - 6897:7
  **discover** [1] - 6952:4
  **discuss** [6] - 6886:17, 6899:2, 6899:8, 6953:10, 6953:15, 6954:24
  **discussed** [4] - 6853:4, 6886:14, 6920:3, 6935:10
  **discusses** [1] - 6931:11
  **discussing** [2] - 6851:2, 6896:21
  **discussion** [3] - 6957:21, 6961:11, 6964:9
  **display** [49] - 6864:11, 6873:23, 6874:13, 6880:25, 6881:6, 6882:4, 6882:10, 6882:18, 6883:8, 6883:9, 6883:11, 6883:16, 6883:17, 6884:9, 6884:11, 6884:15, 6884:21, 6885:7, 6889:8, 6890:1, 6890:3, 6891:5, 6892:24, 6892:25, 6893:2, 6893:6, 6893:10, 6893:11, 6893:23, 6893:24, 6894:2, 6894:15, 6895:4, 6922:3, 6922:6, 6937:19, 6937:20, 6937:22, 6937:23,

6940:1, 6940:9, 6940:16, 6941:9, 6945:1, 6945:3, 6945:8, 6945:9, 6948:25
  **displayed** [2] - 6861:16, 6903:6
  **disposition** [2] - 6872:24, 6873:20
  **dispute** [1] - 6956:9
  **Dissertation** [1] - 6858:14
  **distinct** [4] - 6851:25, 6854:16, 6860:25, 6861:22
  **distinction** [8] - 6867:12, 6886:25, 6889:25, 6890:8, 6892:6, 6892:20, 6893:1, 6941:3
  **distinctions** [2] - 6897:4, 6897:21
  **distinctive** [1] - 6862:9
  **distinguish** [2] - 6863:23, 6884:8
  **distinguishes** [1] - 6886:21
  **distinguishing** [1] - 6952:22
  **distortion** [1] - 6943:24
  **distribution** [1] - 6941:8
  **DISTRICT** [3] - 6842:1, 6842:1, 6842:10
  **diversifies** [1] - 6933:20
  **diversify** [1] - 6934:1
  **divulge** [1] - 6930:20
  **Doctoral** [1] - 6858:14
  **document** [12] - 6844:18, 6845:7, 6845:12, 6845:15, 6845:22, 6845:25, 6849:17, 6849:21, 6868:10, 6875:4, 6936:25, 6939:3
  **documents** [41] - 6863:6, 6867:12, 6867:25, 6880:21, 6881:3, 6881:21, 6881:22, 6883:2, 6883:21, 6883:22, 6883:23, 6912:21, 6921:2, 6936:12, 6936:16, 6937:4, 6937:10, 6937:11, 6938:11, 6938:19, 6938:20, 6938:21,

6938:23, 6938:25, 6939:17, 6939:20, 6939:21, 6939:23, 6940:7, 6942:1, 6955:8, 6955:10, 6957:25, 6959:22, 6960:19, 6960:24, 6961:8, 6961:11, 6961:12, 6963:24
  **DoJ** [3] - 6842:11, 6959:23, 6964:23
  **dollar** [3] - 6922:17, 6923:4, 6929:17
  **dollars** [2] - 6946:3, 6946:6
  **done** [19] - 6858:7, 6858:24, 6858:25, 6859:14, 6866:22, 6867:4, 6880:2, 6880:24, 6884:14, 6922:4, 6922:9, 6933:14, 6941:18, 6943:12, 6944:19, 6953:6, 6953:7, 6957:14, 6961:8
  **door** [2] - 6902:2, 6902:5
  **doubles** [1] - 6862:20
  **Douyon** [1] - 6961:18
  **down** [20] - 6869:6, 6870:4, 6873:19, 6873:25, 6875:2, 6877:7, 6898:6, 6902:20, 6905:2, 6916:1, 6921:5, 6922:8, 6925:13, 6928:25, 6934:25, 6944:8, 6945:23, 6953:19, 6953:20
  **Dr** [2] - 6880:22, 6896:24
  **draft** [1] - 6957:12
  **drafted** [1] - 6963:24
  **dramatic** [1] - 6886:13
  **draw** [5] - 6886:10, 6892:6, 6892:20, 6902:24, 6943:23
  **drawn** [1] - 6870:22
  **drink** [1] - 6879:16
  **drive** [1] - 6952:8
  **drop** [1] - 6895:11
  **dropped** [1] - 6914:1
  **drops** [1] - 6893:17
  **Duke** [6] - 6856:22, 6857:2, 6857:15, 6857:18, 6857:19, 6857:21
  **duly** [1] - 6856:9
  **duplication** [1] - 6897:6

**during** [4] - 6846:1, 6899:8, 6935:8, 6961:11
**DX** [1] - 6880:20
**DX20.32** [1] - 6930:13
**DX3233** [3] - 6849:3, 6850:16, 6851:9
   **DX3233.....................
   .........................6850**
[1] - 6967:11
**DXD20** [2] - 6925:25, 6927:5
**DXD20.004** [2] - 6923:12, 6923:19
**DXD20.005** [1] - 6924:14
**dynamic** [4] - 6915:24, 6916:6, 6916:10, 6916:16

# E

**e-mail** [1] - 6853:9
**early** [3] - 6874:7, 6896:1, 6964:8
**easier** [5] - 6900:23, 6918:21, 6918:22, 6930:24, 6947:11
**East** [1] - 6889:10
**easy** [2] - 6917:11, 6917:18
**eCommerce** [2] - 6858:9, 6877:11
**ecosystem** [1] - 6868:4
**editor** [1] - 6858:16
**edits** [1] - 6955:17
**educational** [1] - 6857:8
**effect** [1] - 6906:1
**effective** [8] - 6863:12, 6884:18, 6885:1, 6885:7, 6886:3, 6886:4, 6912:9, 6928:15
**effectively** [1] - 6935:16
**efficiency** [3] - 6861:9, 6907:19, 6908:24
**efficient** [4] - 6903:21, 6908:20, 6909:13, 6918:16
**efficiently** [4] - 6880:2, 6908:3, 6909:18, 6949:17
**effort** [2] - 6917:6, 6938:9
**efforts** [1] - 6866:21
**eight** [2] - 6885:1, 6964:2

**eighth** [1] - 6851:24
**either** [6] - 6846:20, 6846:23, 6849:23, 6909:12, 6948:15, 6958:11
**elaborate** [4] - 6870:17, 6886:5, 6887:21, 6913:8
**elaborated** [1] - 6887:6
**electively** [1] - 6881:6
**Electrician** [1] - 6903:5
**electricians** [1] - 6903:13
**elicit** [1] - 6962:25
**eligible** [1] - 6854:25
**Elzinga** [2] - 6934:8, 6934:23
**Elzinga's** [2] - 6934:11, 6934:20
**Email** [8] - 6842:14, 6842:17, 6842:21, 6842:21, 6843:3, 6843:10, 6843:11, 6843:14
   **email** [4] - 6843:6, 6853:8, 6853:18, 6854:21
**embedded** [1] - 6961:14
**emphasize** [7] - 6872:15, 6876:17, 6882:5, 6882:23, 6883:15, 6892:5, 6904:8
**emphasizes** [1] - 6917:25
**emphasizing** [2] - 6904:16, 6905:25
**empirical** [1] - 6943:18
**employed** [2] - 6856:21, 6856:22
**end** [2] - 6859:11, 6949:12
**ended** [2] - 6904:18, 6937:25
**ending** [1] - 6847:22
**ends** [2] - 6847:18, 6850:12
**engaged** [1] - 6907:21
**engine** [29] - 6854:17, 6861:14, 6861:17, 6861:20, 6862:10, 6864:15, 6864:19, 6865:4, 6865:9, 6865:17, 6865:18, 6866:1, 6866:5, 6866:8, 6866:9,

6866:24, 6868:25, 6882:2, 6888:25, 6889:18, 6895:17, 6900:2, 6903:1, 6905:8, 6920:23, 6920:25, 6943:11, 6952:12
   **engine's** [4] - 6861:16, 6862:2, 6863:11, 6904:3
**engines** [10] - 6848:5, 6848:14, 6852:22, 6860:18, 6861:19, 6909:7, 6909:9, 6909:10, 6909:19, 6919:2
**ensure** [1] - 6909:6
**enter** [1] - 6921:22
**enters** [1] - 6861:13
**entertain** [1] - 6956:5
**entertained** [1] - 6895:16
**entertaining** [1] - 6956:4
**entertainment** [2] - 6943:20
**entire** [3] - 6933:17, 6939:7, 6939:23
**entities** [3] - 6922:19, 6922:20, 6923:4
**entrances** [2] - 6902:3, 6902:4
**equally** [9] - 6881:16, 6882:7, 6882:8, 6882:12, 6882:15, 6882:23, 6883:11, 6941:13, 6941:15
**equation** [2] - 6906:3
**equivalent** [1] - 6925:4
**especially** [1] - 6858:6
**essentially** [1] - 6875:13
**estate** [4] - 6862:11, 6862:12, 6870:11, 6904:24
**estimate** [5] - 6912:18, 6915:13, 6960:6, 6960:7, 6960:10
**et** [1] - 6842:3
**eternally** [1] - 6928:24
**evaluate** [3] - 6908:14, 6950:8, 6959:25
**evaluation** [3] - 6887:7, 6887:9, 6887:15
**evening** [4] - 6960:10, 6961:4, 6963:17, 6964:22
**everyday** [1] - 6884:5

**evidence** [24] - 6844:15, 6845:13, 6849:3, 6853:3, 6862:8, 6868:12, 6870:22, 6877:15, 6880:5, 6883:3, 6883:19, 6894:12, 6899:18, 6905:6, 6906:23, 6909:2, 6909:23, 6912:15, 6913:1, 6914:8, 6919:8, 6934:5, 6961:13, 6964:3
**evident** [2] - 6912:7, 6913:17
**Examination** [4] - 6967:4, 6967:4, 6967:6, 6967:6
**examination** [2] - 6880:22, 6886:7
**EXAMINATION** [4] - 6844:6, 6851:18, 6856:16, 6919:13
**examine** [1] - 6860:17
**examined** [1] - 6856:10
**example** [16] - 6853:1, 6863:15, 6863:19, 6865:19, 6874:16, 6874:17, 6875:23, 6877:13, 6879:22, 6890:11, 6901:1, 6903:3, 6905:18, 6911:12, 6943:13, 6943:14
**exception** [1] - 6870:24
**excerpt** [2] - 6868:9, 6930:14
**exclude** [2] - 6882:25, 6962:13
**executive** [3] - 6857:22, 6857:25, 6877:22
**exemplified** [1] - 6877:12
**exercise** [1] - 6936:18
**Exhibit** [4] - 6850:5, 6851:20, 6853:7, 6934:4
**exhibit** [17] - 6847:5, 6847:6, 6848:25, 6849:2, 6850:5, 6850:12, 6850:15, 6851:8, 6851:9, 6899:17, 6923:23, 6925:17, 6930:13, 6932:4, 6934:4, 6934:8, 6940:22
   **EXHIBITS** [1] - 6967:8

6978

**exhibits** [10] - 6844:12, 6941:23, 6941:24, 6953:10, 6954:4, 6954:19, 6955:25, 6956:5, 6956:10, 6956:23

**exist** [6] - 6864:17, 6865:9, 6876:15, 6885:21, 6904:2, 6908:16

**existed** [1] - 6947:9

**exists** [5] - 6864:4, 6864:10, 6864:16, 6865:7, 6869:5

**expect** [1] - 6912:23

**expectation** [2] - 6881:11, 6961:25

**expecting** [1] - 6962:25

**Expedia** [10] - 6863:20, 6901:19, 6901:20, 6907:9, 6907:10, 6924:14, 6924:22, 6929:3, 6929:6, 6929:11

**Expedias** [1] - 6923:9

**expenditure** [1] - 6918:11

**experiments** [1] - 6866:25

**expert** [4] - 6859:20, 6859:23, 6860:2, 6896:23

**expertise** [1] - 6962:10

**explain** [11] - 6849:20, 6865:14, 6868:17, 6881:2, 6883:5, 6888:21, 6902:3, 6908:8, 6915:22, 6919:9, 6941:4

**explained** [1] - 6893:2

**explicit** [2] - 6846:20, 6892:1

**explicitly** [2] - 6889:7, 6900:13

**explore** [1] - 6952:4

**explored** [1] - 6867:8

**exported** [1] - 6855:15

**express** [2] - 6889:5, 6889:24

**expressed** [5] - 6846:15, 6892:1, 6895:3, 6905:23

**extend** [1] - 6880:13

**extends** [1] - 6930:4

**extent** [9] - 6849:20, 6918:23, 6922:4, 6922:11, 6925:8, 6946:17, 6946:18, 6957:8, 6963:12

**eyeballs** [2] - 6866:17, 6867:4

**eyes** [1] - 6868:19

## F

**face** [1] - 6900:6

**Facebook** [4] - 6895:10, 6933:15, 6944:15

**facilitates** [1] - 6954:18

**fact** [9] - 6866:15, 6873:2, 6874:22, 6891:3, 6921:21, 6930:9, 6947:12, 6962:5, 6963:20

**factor** [1] - 6961:4

**factors** [1] - 6874:2

**facts** [2] - 6867:9, 6939:7

**failure** [2] - 6861:7, 6907:18

**fair** [2] - 6921:13, 6929:10

**fairly** [1] - 6896:8

**fall** [3] - 6935:13, 6935:19, 6937:8

**familiar** [11] - 6845:22, 6849:16, 6849:19, 6863:13, 6869:9, 6875:9, 6888:18, 6907:21, 6911:4, 6920:25, 6929:16

**familiarize** [1] - 6845:15

**family** [1] - 6895:22

**far** [10] - 6846:11, 6877:8, 6884:24, 6893:23, 6895:25, 6920:17, 6929:11, 6936:7, 6936:9, 6939:16

**farmer** [4] - 6870:6, 6874:4, 6879:3, 6879:4

**farmers** [1] - 6870:9

**faster** [1] - 6909:20

**favorable** [1] - 6873:19

**favorite** [1] - 6935:1

**feasible** [2] - 6956:6, 6957:6

**feature** [8] - 6846:19, 6846:21, 6847:24, 6854:17, 6855:6, 6904:4, 6918:4

**Feature** [1] - 6849:9

**featured** [2] - 6861:17, 6902:12

**features** [12] - 6848:1,

6850:1, 6907:19, 6914:19, 6915:8, 6915:21, 6916:4, 6916:8, 6916:13, 6916:23, 6918:3

**feedback** [7] - 6846:5, 6846:6, 6846:20, 6849:18, 6854:7, 6854:10, 6854:17

**fees** [1] - 6888:8

**fell** [1] - 6936:13

**few** [4] - 6859:2, 6882:13, 6955:2, 6958:19

**fewer** [2] - 6880:17, 6906:5

**fickle** [1] - 6893:8

**Fifth** [1] - 6842:19

**figure** [6] - 6876:14, 6881:5, 6887:12, 6936:20, 6954:9, 6956:19

**file** [2] - 6936:21, 6957:23

**filed** [2] - 6916:3, 6916:12

**filing** [1] - 6915:23

**fill** [1] - 6957:10

**final** [2] - 6935:2, 6963:16

**finalized** [1] - 6960:11

**financial** [2] - 6923:1, 6940:10

**Finch** [2] - 6856:23, 6857:4

**findings** [1] - 6963:19

**fine** [8] - 6859:25, 6899:4, 6912:25, 6932:25, 6962:7, 6963:12, 6964:13, 6964:16

**firm** [14] - 6865:18, 6867:9, 6869:15, 6871:21, 6872:1, 6873:15, 6879:7, 6879:12, 6888:10, 6897:23, 6899:24, 6900:19, 6913:13

**firms** [8] - 6858:6, 6863:18, 6881:25, 6882:25, 6894:10, 6898:3, 6898:4, 6949:21

**first** [21] - 6845:14, 6845:18, 6850:9, 6853:14, 6853:18, 6856:9, 6859:14, 6859:15, 6859:16, 6860:15, 6860:25, 6861:10, 6891:25,

6892:2, 6892:10, 6892:17, 6893:16, 6912:25, 6924:17, 6938:1, 6959:10

**five** [5] - 6911:20, 6957:5, 6958:10, 6958:13, 6958:18

**flag** [7] - 6852:5, 6852:8, 6852:15, 6852:17, 6852:18, 6852:19, 6853:4

**flags** [3] - 6852:19, 6853:1, 6853:6

**flavor** [2] - 6876:1, 6876:3

**flexible** [1] - 6954:22

**flight** [1] - 6903:25

**flights** [2] - 6904:2, 6919:20

**flip** [2] - 6845:14, 6926:11

**flipped** [2] - 6849:15, 6867:23

**Floodlight** [3] - 6853:11, 6855:11, 6855:14

**Floor** [2] - 6843:1, 6843:13

**flow** [3] - 6872:11, 6904:10, 6906:4

**focal** [1] - 6895:20

**focus** [7] - 6864:23, 6884:12, 6889:17, 6922:12, 6922:15, 6936:24, 6937:22

**focused** [7] - 6858:4, 6868:3, 6895:23, 6905:23, 6920:11, 6921:7

**follow** [2] - 6869:6, 6891:4

**follows** [2] - 6856:10, 6878:4

**footnote** [2] - 6868:14, 6944:11

**FOR** [2] - 6842:1, 6912:20

**Force** [4] - 6853:8, 6853:10, 6853:19, 6854:12

**force** [1] - 6885:21

**Force's** [1] - 6854:21

**forego** [2] - 6874:23, 6901:20

**foregoing** [1] - 6966:4

**forgetting** [1] - 6962:19

**forgotten** [1] - 6964:13

**form** [3] - 6876:10,

6979

6901:10, 6940:13
**formal** [1] - 6964:4
**formally** [2] - 6877:18, 6962:7
**forth** [18] - 6858:9, 6863:20, 6873:23, 6875:22, 6880:18, 6888:9, 6892:18, 6894:10, 6895:4, 6895:16, 6895:22, 6898:5, 6935:15, 6935:17, 6943:23, 6947:22, 6950:11, 6959:22
**forward** [3] - 6953:16, 6957:5, 6957:17
**forwarded** [1] - 6853:9
**forwards** [1] - 6853:25
**foundation** [1] - 6871:5
**four** [7] - 6857:14, 6910:7, 6916:17, 6955:9, 6959:4, 6959:5, 6959:6
**fox** [1] - 6962:21
**Fox** [1] - 6962:22
**Fox's** [1] - 6962:24
**fraction** [10] - 6869:19, 6869:20, 6869:21, 6896:13, 6910:13, 6930:3, 6930:4, 6930:5
**fractional** [1] - 6949:5
**framework** [3] - 6935:2, 6935:3, 6954:22
**framing** [1] - 6855:5
**frankly** [1] - 6956:17
**frequency** [3] - 6910:6, 6911:1, 6922:9
**frequently** [5] - 6900:11, 6913:10, 6913:18, 6915:6, 6922:4
**fresh** [2] - 6910:16, 6911:25
**friends** [1] - 6895:22
**front** [6] - 6847:6, 6849:8, 6873:16, 6885:25, 6926:1, 6957:3
**fulfilled** [1] - 6955:18
**full** [9] - 6869:9, 6869:12, 6873:13, 6876:25, 6879:10, 6918:3, 6957:4, 6962:2, 6966:5
**full-funnel** [4] - 6869:9, 6869:12, 6873:13, 6879:10
**full-time** [1] - 6876:25

**fully** [2] - 6900:16, 6929:13
**function** [1] - 6948:22
**functional** [3] - 6887:4, 6887:20, 6888:2
**functions** [2] - 6894:16, 6925:7
**fundamental** [3] - 6878:1, 6878:21, 6908:12
**fundamentally** [4] - 6875:14, 6876:21, 6877:1, 6878:13
**funnel** [68] - 6868:1, 6868:5, 6868:6, 6868:16, 6868:17, 6869:6, 6869:9, 6869:12, 6870:4, 6871:24, 6872:3, 6872:10, 6872:12, 6872:16, 6872:21, 6873:13, 6875:2, 6875:7, 6875:10, 6875:13, 6876:18, 6877:7, 6877:23, 6879:10, 6880:6, 6880:11, 6880:13, 6881:1, 6882:18, 6883:5, 6884:2, 6884:5, 6884:19, 6884:23, 6885:15, 6885:18, 6885:21, 6886:2, 6886:4, 6886:15, 6886:19, 6898:2, 6898:7, 6935:1, 6935:4, 6935:9, 6935:13, 6935:18, 6935:20, 6936:5, 6936:6, 6936:14, 6936:17, 6936:19, 6936:20, 6936:22, 6936:23, 6937:5, 6937:19, 6939:18, 6940:2, 6946:3, 6946:7, 6946:9, 6946:12, 6951:23, 6952:12, 6952:15
**funnels** [2] - 6935:7, 6936:17
**fuzzy** [2] - 6948:25, 6949:22

# G

**G-Tech** [1] - 6845:18
**gain** [1] - 6902:16
**gathered** [1] - 6929:12
**Gatorade** [2] -

6874:16, 6879:21
**general** [63] - 6860:25, 6861:11, 6861:12, 6861:15, 6861:20, 6861:21, 6861:25, 6862:1, 6862:9, 6862:10, 6862:11, 6863:1, 6863:2, 6863:7, 6863:24, 6863:25, 6864:9, 6864:15, 6864:19, 6865:4, 6865:8, 6865:17, 6865:18, 6866:1, 6866:4, 6866:5, 6866:7, 6866:9, 6868:24, 6875:18, 6882:1, 6883:10, 6886:21, 6887:5, 6887:19, 6887:23, 6887:24, 6887:25, 6888:10, 6888:15, 6888:25, 6889:18, 6892:25, 6893:20, 6893:23, 6893:25, 6894:1, 6894:15, 6895:17, 6895:19, 6896:2, 6896:22, 6897:23, 6899:15, 6901:4, 6905:3, 6913:20, 6914:14, 6924:24, 6949:12, 6952:3, 6952:11
**generally** [1] - 6898:15
**generate** [5] - 6888:3, 6910:2, 6910:12, 6911:18, 6936:2
**generated** [1] - 6922:5
**generation** [2] - 6874:23, 6874:25
**giant** [1] - 6929:17
**given** [13] - 6871:21, 6885:5, 6891:10, 6894:14, 6907:15, 6914:17, 6918:5, 6950:19, 6955:20, 6956:6, 6957:6, 6959:20, 6962:5
**goal** [3] - 6945:24, 6954:21, 6958:17
**goals** [1] - 6950:11
**golf** [19] - 6890:11, 6890:17, 6890:19, 6890:23, 6890:25, 6891:1, 6891:3, 6891:12, 6891:17, 6891:20, 6942:4, 6942:5, 6942:8, 6942:9, 6942:12, 6942:18, 6942:21,

6942:22
**golfer** [1] - 6942:16
**Goodrich** [1] - 6843:12
**Google** [113] - 6842:6, 6843:7, 6846:23, 6846:25, 6854:11, 6861:4, 6861:6, 6863:8, 6867:12, 6867:14, 6867:16, 6867:17, 6867:25, 6868:3, 6868:10, 6868:18, 6868:19, 6869:3, 6872:20, 6872:25, 6877:8, 6877:10, 6877:22, 6880:21, 6886:23, 6886:24, 6890:19, 6891:17, 6894:8, 6898:14, 6900:2, 6901:10, 6901:14, 6901:16, 6901:20, 6901:22, 6902:1, 6902:4, 6902:7, 6902:10, 6902:22, 6903:8, 6903:9, 6903:16, 6906:11, 6906:18, 6907:8, 6907:10, 6908:7, 6908:9, 6908:10, 6908:21, 6909:11, 6909:15, 6911:14, 6911:16, 6911:17, 6912:4, 6912:5, 6912:20, 6913:16, 6914:18, 6914:24, 6915:7, 6915:14, 6915:23, 6916:5, 6917:3, 6918:11, 6918:12, 6918:25, 6919:12, 6919:17, 6919:20, 6921:11, 6921:12, 6921:17, 6921:22, 6922:3, 6922:7, 6922:11, 6922:22, 6923:5, 6923:19, 6924:2, 6924:21, 6925:1, 6925:19, 6925:23, 6926:5, 6926:24, 6927:2, 6927:12, 6929:22, 6929:23, 6930:2, 6931:12, 6932:10, 6933:11, 6934:1, 6942:12, 6943:8, 6944:17, 6944:20, 6944:22, 6952:17, 6958:1, 6959:13, 6960:18, 6961:15
**Google's** [14] -

6980

6846:16, 6847:1, 6860:18, 6860:20, 6861:7, 6863:6, 6887:1, 6907:17, 6920:4, 6921:5, 6922:14, 6956:23, 6957:24, 6962:1

**Google-hosted** [3] - 6903:8, 6903:9, 6903:16

**gotcha** [1] - 6857:6

**Gower** [2] - 6842:18, 6961:9

**GOWER** [2] - 6961:9, 6961:21

**grad** [1] - 6886:17

**grandfather's** [2] - 6874:25, 6875:1

**granular** [1] - 6954:24

**graphics** [1] - 6937:3

**great** [2] - 6847:13, 6847:20

**greater** [2] - 6944:17, 6947:14

**green** [3] - 6887:13, 6910:24

**green-colored** [1] - 6887:13

**grow** [2] - 6901:21, 6906:21

**grows** [2] - 6906:20

**growth** [2] - 6905:8, 6905:11

**guess** [5] - 6899:5, 6945:15, 6956:22, 6958:8, 6962:3

**guide** [1] - 6887:10

**guy** [1] - 6942:8

---

## H

**H1** [2] - 6850:7, 6850:9

**H2** [4] - 6849:9, 6850:6, 6850:7, 6850:9

**half** [2] - 6850:9, 6850:10

**hand** [8] - 6848:6, 6852:4, 6852:13, 6923:24, 6924:18, 6934:4, 6941:23, 6961:18

**hand-picked** [1] - 6941:23

**handed** [2] - 6923:17, 6950:15

**handful** [1] - 6847:2

**happy** [2] - 6954:7, 6954:24

**hard** [3] - 6866:24, 6867:9, 6914:8

---

**harm** [1] - 6922:13

**harmed** [1] - 6922:11

**harmful** [1] - 6920:1

**harvest** [2] - 6870:7, 6874:5

**harvesting** [3] - 6870:8, 6870:12, 6879:4

**hats** [1] - 6891:1

**head** [6] - 6878:12, 6878:14, 6878:19, 6878:21, 6924:3, 6958:21

**headline** [1] - 6898:22

**headlines** [4] - 6886:9, 6886:10, 6886:13, 6943:22

**hear** [4] - 6856:25, 6857:3, 6946:21, 6954:7

**heard** [9] - 6846:5, 6846:25, 6879:2, 6895:8, 6910:22, 6918:13, 6947:18, 6959:13, 6960:18

**hearing** [1] - 6953:11

**hearsay** [1] - 6961:14

**heartbeat** [1] - 6876:13

**heavily** [1] - 6900:1

**Hello** [1] - 6961:9

**help** [11] - 6861:1, 6861:25, 6862:1, 6862:12, 6870:3, 6890:20, 6899:17, 6916:25, 6918:20, 6919:1, 6952:8

**helpful** [5] - 6855:16, 6901:7, 6919:20, 6955:5, 6960:5

**helping** [3] - 6868:4, 6870:15, 6908:2

**helps** [4] - 6859:5, 6863:10, 6892:11, 6908:17

**hereby** [1] - 6966:3

**hesitant** [1] - 6943:7

**Hi** [1] - 6954:11

**high** [15] - 6860:21, 6861:21, 6873:9, 6874:15, 6874:21, 6875:20, 6889:5, 6912:8, 6924:22, 6924:25, 6925:10, 6926:24, 6927:2, 6927:4, 6928:21

**high-quality** [1] - 6889:5

**higher** [23] - 6861:2, 6861:25, 6864:5,

---

6864:8, 6864:10, 6865:3, 6877:8, 6881:11, 6882:10, 6882:18, 6882:20, 6884:22, 6887:2, 6892:8, 6893:4, 6937:1, 6937:13, 6940:2, 6940:9, 6940:17, 6941:9, 6943:5, 6958:11

**highest** [1] - 6864:18

**highlight** [2] - 6847:11, 6851:23

**highlighted** [2] - 6894:23, 6918:1

**highlighting** [1] - 6896:12

**highly** [2] - 6942:25, 6949:24

**himself** [1] - 6890:14

**hold** [2] - 6854:3, 6870:20

**holding** [3] - 6913:12, 6913:13

**home** [1] - 6856:2

**Home** [6] - 6862:25, 6863:3, 6865:20, 6894:19, 6894:24, 6901:4

**Honor** [48] - 6844:4, 6844:14, 6849:2, 6850:14, 6850:20, 6851:14, 6851:17, 6855:23, 6856:6, 6856:15, 6859:22, 6859:25, 6867:16, 6868:11, 6870:21, 6871:1, 6871:5, 6875:3, 6877:14, 6880:20, 6897:3, 6899:13, 6906:22, 6906:24, 6909:2, 6909:22, 6912:14, 6915:18, 6919:4, 6919:11, 6923:13, 6930:17, 6932:16, 6950:13, 6954:11, 6955:3, 6955:6, 6957:19, 6958:13, 6959:4, 6959:11, 6960:25, 6961:9, 6961:16, 6963:15, 6964:24, 6964:25, 6965:1

**Honor's** [1] - 6959:18

**HONORABLE** [1] - 6842:9

**honors** [1] - 6858:10

**hope** [7] - 6928:4, 6928:9, 6928:11,

---

6928:14, 6928:18, 6928:24

**hopefully** [5] - 6863:3, 6873:25, 6901:6, 6903:19, 6912:1

**horizon** [2] - 6963:18, 6964:8

**hosted** [3] - 6903:8, 6903:9, 6903:16

**hotel** [1] - 6903:25

**Hotels** [4] - 6923:19, 6924:2, 6924:21, 6925:1

**hotels** [6] - 6904:2, 6919:17, 6924:7, 6924:14, 6925:2, 6925:10

**hours** [4] - 6910:7, 6957:25, 6958:25

**house** [2] - 6875:21, 6876:13

**Huang** [1] - 6843:11

**Hubbard** [1] - 6961:4

**huddling** [1] - 6959:15

**huge** [1] - 6894:4

**human** [1] - 6881:8

**humble** [2] - 6949:10

**hundreds** [1] - 6846:25

**Hurst** [4] - 6901:19, 6904:21, 6929:3, 6929:6

**Hurst's** [1] - 6904:12

**hurt** [2] - 6859:12, 6879:9

**hypothesis** [1] - 6866:22

**hypothetical** [4] - 6942:15, 6942:18, 6943:13, 6943:14

---

## I

**idea** [12] - 6870:3, 6870:7, 6870:17, 6872:9, 6879:10, 6880:16, 6880:19, 6881:9, 6884:3, 6885:22, 6891:16, 6915:16

**identification** [1] - 6849:3

**identified** [4] - 6852:23, 6936:3, 6936:4, 6936:6

**identify** [6] - 6847:16, 6855:9, 6855:17, 6855:20, 6932:21, 6956:10

**IL** [1] - 6842:16

**illustrate** [2] - 6862:24, 6877:4
**illustrates** [2] - 6862:8, 6901:18
**illustration** [1] - 6903:4
**imagine** [1] - 6911:8
**immediate** [3] - 6868:2, 6889:14, 6895:19
**immersive** [2] - 6920:5, 6920:9
**impact** [1] - 6862:20
**impacted** [2] - 6850:3, 6860:20
**importance** [2] - 6899:15, 6935:23
**important** [12] - 6862:17, 6897:22, 6900:15, 6902:15, 6912:5, 6916:5, 6925:7, 6948:5, 6948:8, 6948:11, 6948:16, 6951:17
**importantly** [2] - 6846:22, 6963:21
**improve** [1] - 6850:1
**improvement** [2] - 6912:11, 6912:22
**improving** [2] - 6863:12, 6912:9
**IN** [1] - 6842:1
**inclined** [2] - 6869:22, 6914:17
**include** [2] - 6855:14, 6881:25
**included** [3] - 6939:1, 6939:17, 6942:1
**includes** [2] - 6858:8, 6921:4
**including** [1] - 6964:3
**income** [2] - 6888:12, 6888:14
**inconvenient** [1] - 6918:17
**incorporate** [1] - 6916:20
**incorrect** [1] - 6934:21
**increase** [5] - 6872:23, 6904:17, 6912:10, 6913:22, 6952:18
**increased** [4] - 6861:5, 6901:15, 6905:15, 6906:12
**increasing** [3] - 6873:16, 6873:18, 6904:10
**incremental** [1] - 6904:18
**indeed** [1] - 6859:6

**independent** [2] - 6853:2
**INDEX** [1] - 6967:1
**India** [2] - 6857:11, 6857:12
**Indian** [1] - 6857:10
**indicate** [1] - 6852:19
**indicated** [1] - 6857:18
**indicates** [2] - 6927:20, 6927:23
**indicating** [1] - 6866:13
**indication** [4] - 6863:6, 6885:6, 6891:14, 6912:4
**indirect** [1] - 6859:9, 6859:10
**indirectly** [1] - 6847:1
**individual** [1] - 6910:3
**individual's** [1] - 6930:11
**industry** [4] - 6875:11, 6880:6, 6902:1, 6945:21
**infamous** [1] - 6890:11
**infancy** [1] - 6896:8
**infer** [3] - 6890:23, 6936:23, 6941:13
**inference** [7] - 6889:12, 6940:11, 6940:13, 6940:14, 6941:12, 6941:13
**inferences** [1] - 6941:3
**inferred** [1] - 6889:6
**inferring** [1] - 6892:2
**influence** [2] - 6952:12, 6952:14
**inform** [1] - 6885:22
**information** [32] - 6845:16, 6862:3, 6867:5, 6882:2, 6887:10, 6889:16, 6889:19, 6895:18, 6895:19, 6895:25, 6897:25, 6898:21, 6910:16, 6911:19, 6911:21, 6912:11, 6914:23, 6914:25, 6930:20, 6932:23, 6943:21, 6946:19, 6947:2, 6947:5, 6947:7, 6947:10, 6947:15, 6947:23, 6955:12, 6957:11, 6957:14, 6958:5
**initial** [2] - 6936:3, 6936:4

**initiate** [1] - 6853:10
**initiated** [2] - 6892:17, 6892:22
**initiative** [1] - 6913:24
**input** [1] - 6951:17
**inquiry** [1] - 6889:4
**inside** [5] - 6878:6, 6878:12, 6878:14, 6878:19, 6878:21
**insights** [3] - 6850:2, 6909:18, 6909:20
**Instacart** [1] - 6873:5
**instacart** [1] - 6873:6
**Instagram** [6] - 6890:23, 6942:5, 6942:23, 6943:3, 6943:8, 6943:16
**instance** [2] - 6872:20, 6951:25
**instances** [3] - 6850:2, 6903:2, 6914:7
**instead** [6] - 6894:15, 6910:6, 6917:8, 6942:15, 6942:16
**Institute** [1] - 6857:10
**instructed** [1] - 6854:11
**integrated** [2] - 6908:14, 6918:11
**integration** [4] - 6854:14, 6855:6, 6912:19, 6915:14
**integrations** [2] - 6909:6, 6909:7
**intending** [3] - 6963:1, 6963:3, 6963:10
**intends** [1] - 6958:1
**intent** [16] - 6864:18, 6865:4, 6865:11, 6866:14, 6877:11, 6887:2, 6889:24, 6892:1, 6925:11, 6926:24, 6927:2, 6927:4, 6928:22, 6946:16, 6946:24
**intention** [1] - 6889:5
**interactions** [1] - 6908:4
**intercepting** [1] - 6892:18
**interest** [9] - 6846:15, 6846:18, 6854:7, 6854:19, 6855:2, 6855:4, 6883:2, 6895:3, 6942:21
**interested** [12] - 6846:3, 6854:18, 6855:7, 6889:10, 6889:13, 6890:24, 6891:3, 6891:7,

6891:11, 6891:12, 6891:20, 6891:23
**interesting** [3] - 6859:3, 6905:25, 6927:16
**interface** [1] - 6908:14
**intermediary** [4] - 6908:2, 6908:19, 6908:24, 6918:20
**internally** [1] - 6912:4
**interpretation** [4] - 6936:13, 6937:8, 6939:25, 6940:7
**interpreted** [1] - 6937:18
**interpreting** [1] - 6936:25
**interpretive** [1] - 6936:18
**interrupt** [2] - 6908:25, 6953:2
**intraday** [6] - 6910:22, 6913:7, 6913:8, 6913:14, 6913:23, 6915:2
**introduce** [1] - 6862:18
**introduced** [3] - 6902:10, 6902:12, 6902:14
**introducing** [2] - 6873:14, 6873:15
**introduction** [2] - 6906:8, 6919:25
**intuitive** [1] - 6866:20
**inventory** [3] - 6916:7, 6916:11, 6916:15
**invest** [6] - 6872:7, 6873:11, 6875:2, 6879:8, 6902:23
**investment** [2] - 6874:14, 6879:25
**investments** [5] - 6870:14, 6871:24, 6872:10, 6872:17, 6879:5
**involved** [2] - 6917:22, 6942:25
**involvement** [3] - 6875:20, 6876:11
**involves** [2] - 6875:19, 6962:17
**involving** [1] - 6949:5
**issue** [9] - 6860:16, 6867:8, 6921:3, 6921:16, 6947:22, 6953:10, 6962:12, 6962:17, 6963:13
**issues** [9] - 6850:2, 6855:10, 6855:14,

6982

6855:20, 6885:23, 6885:24, 6887:16, 6959:22, 6962:22
**item** [2] - 6851:24, 6852:18
**items** [1] - 6961:7
**itself** [7] - 6865:25, 6866:12, 6886:24, 6893:16, 6920:6, 6920:11, 6944:1

## J

**Janice** [2] - 6843:16, 6966:11
**JANICE** [1] - 6966:3
**January** [3] - 6845:7, 6845:11, 6853:8
**Japan** [3] - 6848:9, 6848:18, 6852:1
**jASON** [1] - 6967:3
**JASON** [1] - 6844:5
**Jerath** [4] - 6880:22, 6886:7, 6896:18, 6896:21
**Jerath's** [1] - 6897:9
**job** [1] - 6918:20
**John** [1] - 6843:7
**joining** [1] - 6906:4
**jon.sallet@coag.gov** [1] - 6843:3
**Jonathan** [1] - 6842:23
**Journal** [1] - 6858:17
**journal** [1] - 6858:23
**journals** [1] - 6858:17
**JP** [3] - 6848:6, 6848:8, 6848:9
**Jr** [1] - 6843:3
**jschmidtlein@wc.com** [1] - 6843:10
**Judge** [2] - 6880:4, 6895:7
**JUDGE** [1] - 6842:10
**judge** [2] - 6859:15, 6950:3
**Judicial** [1] - 6842:25
**jump** [2] - 6928:14, 6928:17
**jumped** [1] - 6914:22
**JUSTICE** [1] - 6842:12
**Justice** [2] - 6842:15, 6842:19

## K

**keep** [7] - 6856:25, 6870:8, 6870:11, 6875:24, 6879:4, 6949:14

**keeping** [1] - 6845:11
**Kenneth** [1] - 6842:11
**kenneth.dintzer2@usdoj.gov** [1] - 6842:14
**key** [4] - 6882:5, 6883:15, 6892:21, 6909:8
**keyword** [4] - 6859:5, 6903:5, 6903:7, 6925:24
**keywords** [1] - 6898:22
**kicking** [1] - 6886:15
**kind** [1] - 6901:4
**kindly** [1] - 6954:3
**knowledge** [3] - 6867:7, 6880:15, 6916:21
**known** [2] - 6855:4, 6874:10
**KRUEGER** [2] - 6844:5, 6967:3
**Krueger** [13] - 6844:8, 6844:18, 6845:25, 6847:21, 6848:2, 6849:5, 6849:16, 6850:25, 6851:20, 6853:9, 6855:24, 6910:18, 6915:1
**Krueger's** [2] - 6912:17, 6915:11

## L

**Labor** [1] - 6900:22
**lack** [2] - 6850:2, 6916:23
**LaCroix** [6] - 6926:3, 6927:10, 6927:17, 6928:7, 6928:13, 6928:16
**land** [1] - 6911:10
**landing** [1] - 6898:23
**lands** [1] - 6911:10
**language** [4] - 6848:4, 6848:11, 6848:17, 6937:11
**lapse** [1] - 6893:14
**large** [9] - 6882:20, 6891:8, 6922:19, 6922:20, 6923:4, 6939:8, 6939:9, 6963:25
**larger** [5] - 6846:24, 6910:4, 6910:25, 6913:18, 6915:5
**largest** [4] - 6938:14, 6938:15, 6939:8
**LaSalle** [1] - 6842:15
**last** [15] - 6844:9,

6845:18, 6868:1, 6872:3, 6873:10, 6896:15, 6948:23, 6948:24, 6949:18, 6956:4, 6957:23, 6958:8, 6962:4, 6963:22
**late** [1] - 6963:23
**laughing** [1] - 6881:12
**LAW** [1] - 6842:23
**law** [1] - 6963:20
**lay** [2] - 6860:23, 6955:17
**layer** [1] - 6859:8
**lead** [2] - 6874:2, 6909:20
**leading** [1] - 6858:17
**learn** [2] - 6865:5, 6865:19
**lease** [1] - 6869:8
**least** [16] - 6855:1, 6876:22, 6878:23, 6884:25, 6888:9, 6891:20, 6900:13, 6910:8, 6927:23, 6936:3, 6939:17, 6940:16, 6940:21, 6955:24, 6956:16, 6960:5
**leave** [3] - 6944:9, 6953:9, 6953:22
**led** [1] - 6849:23
**left** [5] - 6844:9, 6893:9, 6893:14, 6923:24, 6924:18
**left-hand** [2] - 6923:24, 6924:18
**lemon** [1] - 6926:3
**less** [13] - 6872:7, 6884:4, 6885:1, 6885:7, 6895:24, 6902:21, 6905:13, 6905:14, 6906:6, 6913:10, 6928:15, 6937:12, 6949:11
**lesser** [1] - 6944:17
**lessons** [1] - 6890:25
**level** [11] - 6855:4, 6860:21, 6861:21, 6875:18, 6878:2, 6940:16, 6940:17, 6940:20, 6940:21, 6952:12, 6952:15
**levels** [4] - 6880:17, 6935:4, 6937:15
**leveraged** [1] - 6911:14
**leveraging** [1] - 6877:10
**life** [2] - 6918:21,

6918:22
**lifetime** [1] - 6878:23
**likelihood** [1] - 6961:22
**likely** [14] - 6865:8, 6866:13, 6881:16, 6882:7, 6882:8, 6882:12, 6882:15, 6882:24, 6883:11, 6891:25, 6892:8, 6941:14, 6941:15, 6962:1
**likewise** [1] - 6940:19
**Lim's** [1] - 6892:14
**limit** [1] - 6957:5
**limitations** [2] - 6919:8, 6962:10
**limited** [1] - 6904:24
**limits** [3] - 6956:11, 6958:9, 6963:21
**line** [16] - 6874:1, 6896:15, 6931:11, 6931:13, 6931:14, 6931:21, 6932:11, 6932:12, 6933:15, 6933:19, 6933:23, 6950:24, 6951:9, 6954:6
**lines** [5] - 6909:15, 6954:7, 6954:8, 6954:17, 6957:12
**linked** [2] - 6920:5, 6920:10
**links** [11] - 6863:4, 6902:11, 6902:12, 6902:18, 6902:20, 6905:1, 6921:6, 6921:15, 6922:8
**list** [6] - 6847:24, 6854:22, 6879:18, 6891:2, 6961:15, 6961:18
**listed** [1] - 6959:4
**listing** [2] - 6863:2, 6926:13
**literally** [1] - 6895:25
**literature** [3] - 6867:7, 6885:16, 6885:20
**live** [3] - 6880:13, 6886:15, 6953:14
**LLC** [1] - 6842:6
**LLP** [2] - 6843:4, 6843:8
**local** [14] - 6903:3, 6903:4, 6903:6, 6905:18, 6905:19, 6916:7, 6916:10, 6916:15, 6919:22, 6921:19, 6921:24, 6933:5

6983

**lodged** [1] - 6871:5
**logically** [1] - 6878:5
**long-term** [1] -
6858:15
**look** [50] - 6844:18,
6845:6, 6845:12,
6845:20, 6847:5,
6847:7, 6847:8,
6848:10, 6848:12,
6848:17, 6849:1,
6849:5, 6849:14,
6851:1, 6851:4,
6851:8, 6859:8,
6860:19, 6862:24,
6863:8, 6865:12,
6871:20, 6872:16,
6875:10, 6883:9,
6889:21, 6901:9,
6906:24, 6913:16,
6918:1, 6918:3,
6925:16, 6925:25,
6927:5, 6930:13,
6935:24, 6937:22,
6942:3, 6944:9,
6944:23, 6950:2,
6951:2, 6951:10,
6953:3, 6953:16,
6955:18, 6961:3,
6961:8, 6963:18,
6964:7
**looked** [6] - 6881:23,
6897:20, 6899:15,
6935:8, 6936:11,
6936:12
**looking** [14] - 6850:4,
6862:3, 6862:14,
6886:25, 6887:9,
6889:14, 6890:4,
6896:11, 6896:12,
6898:8, 6931:20,
6943:16, 6944:6,
6951:8
**looks** [3] - 6859:6,
6886:5, 6938:1
**loud** [1] - 6931:16
**love** [2] - 6874:25,
6911:3
**loved** [1] - 6874:25
**low** [5] - 6876:11,
6881:17, 6884:22,
6891:10
**low-value** [1] -
6876:11
**Lowcock** [4] -
6917:14, 6917:17,
6917:20, 6925:15
**Lowcock's** [1] -
6864:25
**lower** [20] - 6864:12,
6864:13, 6864:15,

6868:1, 6877:6,
6879:19, 6882:21,
6882:22, 6884:19,
6884:23, 6884:24,
6886:4, 6892:3,
6892:11, 6893:25,
6898:6, 6906:1,
6924:18, 6937:1,
6937:19
**lunch** [3] - 6844:9,
6844:21, 6846:14

# M

**magnify** [1] - 6923:24
**magnitude** [2] -
6846:24, 6885:7
**magnitudes** [1] -
6893:25
**mail** [1] - 6853:9
**maintaining** [1] -
6861:5
**majority** [3] - 6929:19,
6929:20, 6932:1
**manage** [6] - 6908:10,
6908:17, 6909:14,
6909:18, 6919:1,
6919:2
**manageable** [1] -
6954:23
**Management** [3] -
6857:10, 6858:13,
6858:17
**management** [1] -
6859:5
**managing** [1] -
6910:11
**mandate** [1] - 6946:9
**Mango** [1] - 6876:1
**mango** [1] - 6876:1
**map** [1] - 6936:19
**mapping** [2] -
6936:18, 6936:22
**margin** [1] - 6900:12
**mark** [1] - 6949:4
**marked** [5] - 6848:11,
6849:3, 6923:17,
6923:18, 6934:7
**market** [2] - 6935:2,
6935:17
**marketers** [1] - 6949:6
**marketing** [21] -
6857:5, 6857:13,
6857:17, 6857:22,
6857:24, 6858:3,
6858:8, 6858:11,
6858:17, 6859:24,
6860:2, 6872:12,
6883:5, 6884:2,
6885:18, 6886:1,

6907:25, 6908:1,
6934:25, 6947:13,
6947:20
**Marketing** [2] -
6858:12, 6858:18
**marketplace** [2] -
6869:19, 6880:1
**marketplaces** [1] -
6858:9
**markings** [1] -
6958:23
**massive** [1] - 6868:22
**masters** [1] - 6858:1
**match** [2] - 6859:4
**materials** [4] - 6936:4,
6936:5, 6936:7,
6936:11
**matrix** [1] - 6867:4
**matter** [2] - 6854:20,
6907:22
**MAURER** [29] -
6859:25, 6870:24,
6871:3, 6871:9,
6877:16, 6896:23,
6897:7, 6906:24,
6907:4, 6919:7,
6919:11, 6919:14,
6923:13, 6923:16,
6930:17, 6930:18,
6931:4, 6931:5,
6933:2, 6941:16,
6941:18, 6941:20,
6946:22, 6947:1,
6950:13, 6950:14,
6953:4, 6953:6,
6953:22
**Maurer** [2] - 6843:8,
6919:12
**Maurer..................**
**6919** [1] - 6967:6
**maximum** [1] -
6873:24
**MBA** [5] - 6857:10,
6857:22, 6857:23,
6857:25, 6858:1
**mean** [12] - 6851:9,
6863:1, 6866:21,
6883:5, 6886:16,
6887:1, 6897:12,
6908:7, 6918:8,
6933:23, 6952:20,
6956:6
**meaning** [1] - 6847:25
**meaningful** [1] -
6865:11
**means** [5] - 6848:8,
6850:8, 6882:8,
6910:9, 6928:1
**meant** [3] - 6850:8,
6941:4, 6941:5

**measure** [6] - 6866:21,
6879:15, 6948:13,
6949:3, 6949:17,
6949:23
**media** [16] - 6870:3,
6890:1, 6909:19,
6935:12, 6936:13,
6936:22, 6936:24,
6937:1, 6943:10,
6943:17, 6943:20,
6943:25, 6944:6,
6946:7, 6948:2,
6948:19
**meet** [2] - 6900:12,
6958:14
**meeting** [1] - 6895:19
**MEHTA** [1] - 6842:9
**members** [1] -
6895:22
**mention** [3] - 6846:20,
6848:23, 6929:5
**mentioned** [16] -
6847:3, 6862:10,
6877:8, 6878:16,
6879:3, 6882:22,
6884:18, 6884:19,
6887:6, 6890:7,
6900:5, 6906:7,
6910:22, 6925:13,
6931:13, 6958:16
**mentioning** [3] -
6871:22, 6896:14
**message** [2] -
6894:25, 6898:13
**messages** [2] -
6898:13, 6900:22
**Meta** [2] - 6886:23,
6887:1
**metaphor** [1] - 6902:3
**metric** [2] - 6948:18,
6949:24
**metrics** [4] - 6948:1,
6950:3, 6951:5,
6951:11
**Microsoft** [37] -
6846:19, 6848:20,
6848:21, 6848:23,
6852:1, 6852:22,
6853:16, 6853:19,
6853:20, 6853:22,
6854:7, 6854:11,
6854:14, 6855:11,
6855:15, 6861:8,
6907:18, 6908:11,
6909:12, 6913:6,
6913:15, 6913:21,
6913:25, 6914:7,
6914:9, 6914:19,
6915:2, 6915:8,
6916:8, 6916:23,

6984

6920:20, 6921:2, 6921:7, 6921:8, 6921:10, 6921:12, 6921:14

**Microsoft's** [10] - 6846:3, 6846:23, 6847:4, 6851:11, 6855:1, 6855:7, 6855:16, 6907:7, 6913:2, 6918:15

**middle** [4] - 6937:2, 6944:25, 6945:10

**Middle** [1] - 6889:10

**might** [8] - 6846:7, 6874:8, 6875:10, 6890:18, 6916:24, 6953:7, 6956:21, 6958:17

**millions** [3] - 6910:11

**mind** [11] - 6845:11, 6869:16, 6878:14, 6879:17, 6879:18, 6886:19, 6927:24, 6928:2, 6928:5, 6928:13, 6962:18

**minded** [1] - 6893:9

**mindset** [11] - 6867:13, 6876:18, 6880:18, 6887:6, 6887:8, 6887:17, 6888:17, 6935:5, 6943:9, 6944:1, 6944:2

**mindsets** [3] - 6869:13, 6869:23, 6878:16

**minute** [1] - 6902:8

**miss** [1] - 6937:23

**missing** [1] - 6961:6

**mixed** [2] - 6880:18, 6957:1

**mobile** [2] - 6933:20, 6934:2

**model** [1] - 6949:20

**models** [1] - 6949:5

**modification** [1] - 6944:23

**moment** [7] - 6844:11, 6846:11, 6866:17, 6870:20, 6906:24, 6949:19, 6957:20

**money** [10] - 6870:12, 6874:6, 6879:8, 6880:2, 6888:6, 6889:3, 6946:11, 6948:19, 6948:21, 6950:9

**month** [1] - 6891:22

**months** [1] - 6845:24

**morning** [6] - 6875:23, 6910:18, 6912:17,

6915:11, 6962:6, 6965:3

**most** [15] - 6849:15, 6858:5, 6874:17, 6876:13, 6876:14, 6880:2, 6882:4, 6882:10, 6883:11, 6885:5, 6895:15, 6916:5, 6941:5, 6943:9

**mostly** [1] - 6857:24

**motion** [4] - 6957:24, 6962:8, 6962:9, 6963:5

**motivation** [1] - 6882:14

**move** [15] - 6850:14, 6859:22, 6860:23, 6870:3, 6874:2, 6877:14, 6879:5, 6899:19, 6900:9, 6900:11, 6900:12, 6913:24, 6919:5, 6951:25, 6958:17

**moves** [1] - 6922:7

**moving** [4] - 6957:5, 6957:17, 6961:13, 6961:25

**MR** [103] - 6850:18, 6851:17, 6851:19, 6855:23, 6856:6, 6856:15, 6856:17, 6857:7, 6859:18, 6859:22, 6859:25, 6860:3, 6864:20, 6867:11, 6867:21, 6868:11, 6869:1, 6870:21, 6870:24, 6871:1, 6871:3, 6871:7, 6871:9, 6871:10, 6871:12, 6871:15, 6873:12, 6875:3, 6877:2, 6877:3, 6877:14, 6877:16, 6877:21, 6880:20, 6880:23, 6882:16, 6884:13, 6885:14, 6890:15, 6890:16, 6896:23, 6897:3, 6897:7, 6897:11, 6897:19, 6899:4, 6899:13, 6899:14, 6906:22, 6906:24, 6907:3, 6907:4, 6907:6, 6909:4, 6909:22, 6909:24, 6912:14, 6912:16, 6915:18, 6915:20, 6919:3, 6919:7, 6919:11, 6919:14, 6923:13, 6923:16, 6930:17,

6930:18, 6931:4, 6931:5, 6932:16, 6932:20, 6932:25, 6933:2, 6941:16, 6941:18, 6941:20, 6946:22, 6947:1, 6950:13, 6950:14, 6953:4, 6953:6, 6953:22, 6959:11, 6959:14, 6960:12, 6960:16, 6960:25, 6961:9, 6961:21, 6962:3, 6962:21, 6963:3, 6963:10, 6963:15, 6964:10, 6964:12, 6964:14, 6964:18, 6964:23, 6964:25, 6965:1

**MS** [28] - 6844:4, 6844:7, 6844:14, 6844:17, 6847:18, 6847:19, 6849:2, 6849:4, 6849:12, 6849:13, 6850:14, 6850:17, 6850:20, 6850:22, 6850:24, 6851:14, 6954:11, 6954:14, 6954:16, 6955:6, 6955:23, 6956:25, 6957:19, 6957:22, 6958:13, 6959:4, 6959:6, 6959:8

**multi** [3] - 6922:17, 6923:4, 6929:17

**multi-billion-dollar** [3] - 6922:17, 6923:4, 6929:17

**multiple** [8] - 6902:14, 6908:4, 6908:18, 6909:10, 6909:13, 6909:19, 6914:16, 6959:21

**Murphy's** [1] - 6963:6

**Myx** [3] - 6844:10, 6846:16, 6846:17

# N

**N.W** [1] - 6966:12

**name** [6] - 6856:18, 6856:20, 6871:22, 6930:11, 6954:13, 6962:19

**names** [2] - 6896:13, 6896:14

**nascent** [1] - 6896:8

**native** [2] - 6908:13, 6908:18

**nature** [2] - 6862:9, 6901:1

**near** [4] - 6893:12, 6896:2, 6903:5, 6932:1

**necessarily** [3] - 6853:5, 6882:8, 6955:17

**need** [31] - 6848:11, 6853:14, 6870:6, 6870:7, 6870:11, 6870:12, 6874:14, 6875:14, 6882:11, 6895:20, 6902:4, 6902:22, 6904:8, 6904:24, 6906:24, 6931:18, 6939:2, 6953:5, 6953:9, 6953:10, 6953:18, 6954:1, 6956:7, 6958:24, 6960:9, 6961:8, 6961:17, 6964:7

**needing** [1] - 6957:16

**Needless** [1] - 6934:14

**needs** [1] - 6918:14

**negative** [1] - 6859:10

**negligible** [1] - 6893:18

**neighborhood** [1] - 6916:15

**net** [1] - 6873:23

**network** [2] - 6895:16, 6906:4

**never** [4] - 6859:14, 6876:2, 6929:24, 6947:14

**New** [8] - 6843:5, 6843:13, 6889:9, 6892:18, 6954:4, 6954:25, 6957:12, 6958:10

**new** [9] - 6873:14, 6873:15, 6873:22, 6874:23, 6916:20, 6917:21, 6930:13, 6952:4

**next** [31] - 6847:13, 6848:4, 6848:25, 6856:4, 6860:23, 6862:24, 6865:12, 6867:16, 6868:7, 6868:15, 6868:21, 6873:2, 6873:3, 6884:17, 6893:21, 6893:22, 6899:2, 6903:2, 6904:8, 6906:14, 6908:8, 6908:23, 6909:16, 6911:18, 6914:2, 6914:20, 6916:25, 6924:13, 6926:11, 6928:17, 6964:8

6985

**nice** [1] - 6908:3
**night** [1] - 6957:23
**Nike** [3] - 6874:17, 6874:18
**none** [2] - 6882:5, 6882:22
**nonlinear** [1] - 6951:23
**norms** [1] - 6898:14
**Nos** [1] - 6847:22
**notable** [1] - 6846:5
**note** [2] - 6848:6, 6849:9
**noted** [2] - 6852:8, 6882:18
**notes** [3] - 6848:22, 6848:23, 6966:5
**nothing** [6] - 6855:23, 6877:1, 6879:5, 6886:11, 6959:8, 6959:11
**notice** [2] - 6905:7, 6957:25
**notion** [2] - 6876:17, 6880:13
**November** [1] - 6950:22
**now-infamous** [1] - 6890:11
**nowhere** [4] - 6893:12, 6895:5, 6896:2, 6932:1
**number** [18] - 6846:15, 6867:19, 6871:3, 6873:24, 6882:20, 6894:5, 6894:9, 6912:21, 6929:24, 6936:16, 6937:25, 6940:19, 6955:15, 6956:2, 6956:18, 6957:9, 6964:1, 6964:6
**numbers** [4] - 6847:15, 6871:8, 6934:6, 6960:20
**numerical** [1] - 6956:10
**nurture** [1] - 6870:7
**NW** [4] - 6842:12, 6842:19, 6843:9, 6843:17
**NY** [2] - 6843:5, 6843:13

## O

**o'clock** [2] - 6899:2, 6953:11
**oath** [1] - 6950:19
**objection** [7] - 6850:18, 6871:5,
6877:17, 6877:19, 6896:23, 6907:4, 6961:14
**objections** [1] - 6960:19
**objective** [6] - 6855:13, 6879:12, 6900:10, 6950:9, 6950:10, 6950:12
**objectives** [1] - 6950:10
**obligations** [1] - 6957:7
**observed** [1] - 6937:9
**obsolete** [2] - 6877:23, 6877:25
**obtain** [1] - 6918:14
**obviously** [5] - 6881:9, 6956:25, 6957:16, 6960:25, 6962:14
**October** [2] - 6842:5, 6966:7
**OF** [5] - 6842:1, 6842:9, 6842:12, 6842:23, 6966:1
**Off-the-record** [1] - 6957:21
**off-the-record** [1] - 6964:9
**offer** [3] - 6870:23, 6908:6, 6934:19
**offered** [9] - 6915:24, 6919:25, 6920:4, 6920:8, 6922:2, 6922:10, 6934:21, 6934:22, 6944:4
**offering** [4] - 6898:5, 6903:22, 6908:6, 6922:13
**offers** [1] - 6916:5
**office** [3] - 6955:16, 6957:3
**OFFICIAL** [1] - 6966:1
**Official** [2] - 6843:16, 6966:11
**often** [5] - 6868:1, 6885:24, 6922:2, 6922:6, 6943:15
**oftentimes** [2] - 6918:1, 6918:3
**once** [4] - 6874:20, 6904:9, 6910:7, 6911:10
**one** [118] - 6844:22, 6845:3, 6845:8, 6854:6, 6858:1, 6858:23, 6859:3, 6862:17, 6863:1, 6863:4, 6865:16, 6867:2, 6867:22,

6868:14, 6868:15, 6870:15, 6871:21, 6873:22, 6874:3, 6875:9, 6879:13, 6879:14, 6880:25, 6883:14, 6883:16, 6884:3, 6884:4, 6884:20, 6884:25, 6885:5, 6885:17, 6886:1, 6888:5, 6889:19, 6889:22, 6890:21, 6891:6, 6891:8, 6891:9, 6891:19, 6891:25, 6892:2, 6892:4, 6892:7, 6892:10, 6892:17, 6893:17, 6899:24, 6900:4, 6900:12, 6902:15, 6903:6, 6903:10, 6903:17, 6904:13, 6904:15, 6906:2, 6908:13, 6908:14, 6909:9, 6909:11, 6909:12, 6909:13, 6909:17, 6910:4, 6910:25, 6913:8, 6914:12, 6914:21, 6915:5, 6916:5, 6916:20, 6917:9, 6917:18, 6921:24, 6924:17, 6924:19, 6926:15, 6929:17, 6930:25, 6933:5, 6933:10, 6933:14, 6934:25, 6937:16, 6938:24, 6944:4, 6944:8, 6944:24, 6945:20, 6945:23, 6946:8, 6946:21, 6948:5, 6948:7, 6948:8, 6948:9, 6948:14, 6948:15, 6948:16, 6949:2, 6950:3, 6951:5, 6951:11, 6955:7, 6955:24, 6956:16, 6957:20, 6958:22, 6961:19, 6962:22, 6963:13, 6963:20, 6964:11
**one-pager** [2] - 6844:22, 6845:8
**one-year** [1] - 6858:1
**OneBox** [1] - 6906:8
**ones** [2] - 6939:16, 6939:21
**online** [5] - 6858:8, 6860:16, 6882:1, 6885:24, 6886:21

**Onyema** [4] - 6842:18, 6954:12, 6954:14, 6954:15
**ONYEMA** [12] - 6954:11, 6954:14, 6954:16, 6955:6, 6955:23, 6956:25, 6957:19, 6957:22, 6958:13, 6959:4, 6959:6, 6959:8
**open** [3] - 6902:2, 6902:5, 6959:19
**opening** [10] - 6881:3, 6881:22, 6883:22, 6913:4, 6934:11, 6934:12, 6939:1, 6939:19, 6941:24, 6942:1
**operation** [1] - 6860:20
**opinion** [19] - 6861:3, 6861:7, 6861:10, 6883:25, 6901:10, 6901:13, 6907:15, 6907:16, 6907:17, 6919:25, 6921:8, 6921:11, 6922:2, 6922:10, 6923:6, 6938:16, 6944:5, 6949:10
**opinions** [12] - 6860:4, 6860:21, 6860:24, 6897:4, 6897:9, 6920:4, 6920:6, 6920:8, 6920:11, 6922:13, 6934:19, 6934:21
**opportunity** [6] - 6849:25, 6868:22, 6888:1, 6903:22, 6954:5, 6960:18
**opposition** [2] - 6961:13, 6961:14
**optimization** [4] - 6905:1, 6905:8, 6910:6, 6911:1
**optimize** [3] - 6910:8, 6911:22, 6913:17
**optimized** [3] - 6913:10, 6915:5
**optimizing** [1] - 6910:7
**option** [1] - 6864:4
**orange** [1] - 6873:4
**order** [8] - 6894:12, 6952:4, 6954:3, 6954:7, 6954:20, 6955:1, 6955:2, 6961:5
**orders** [2] - 6846:24, 6885:7

**organic** [8] - 6902:18, 6902:20, 6905:8, 6921:5, 6921:15, 6922:7, 6926:8, 6927:13
**otherwise** [1] - 6874:24
**ourselves** [1] - 6881:7
**outer** [2] - 6881:8, 6882:11
**outlets** [1] - 6957:2
**output** [1] - 6949:20
**outreach** [1] - 6854:3
**outset** [1] - 6895:7
**outside** [3] - 6878:13, 6943:22, 6964:3
**outstanding** [1] - 6961:7
**overall** [2] - 6945:20, 6962:11
**overlap** [1] - 6938:5
**overnight** [1] - 6953:15
**own** [6] - 6863:6, 6867:25, 6879:6, 6912:11, 6913:24, 6955:12
**owns** [1] - 6868:1

## P

**p.m** [4] - 6842:6, 6899:10, 6960:10
**Page** [1] - 6933:23
**page** [62] - 6845:14, 6845:18, 6847:7, 6847:13, 6847:14, 6847:15, 6847:16, 6847:18, 6847:22, 6848:4, 6849:6, 6849:8, 6850:11, 6850:21, 6850:22, 6851:23, 6852:7, 6852:18, 6852:25, 6853:23, 6860:19, 6861:13, 6861:14, 6861:17, 6861:18, 6862:3, 6862:11, 6863:11, 6875:3, 6903:1, 6903:8, 6903:9, 6903:16, 6904:3, 6912:15, 6920:23, 6921:1, 6923:18, 6924:9, 6924:13, 6926:1, 6926:5, 6926:11, 6926:13, 6926:17, 6927:5, 6927:6, 6927:7, 6927:12, 6931:9, 6931:19,

6932:5, 6933:16, 6933:19, 6933:23, 6950:21, 6951:6, 6951:7, 6951:8, 6963:21
**pager** [3] - 6844:22, 6845:3, 6845:8
**pages** [12] - 6898:23, 6900:14, 6904:4, 6920:5, 6920:9, 6920:10, 6926:13, 6932:4, 6964:1, 6964:18, 6964:20
**paid** [5] - 6900:15, 6900:17, 6900:19, 6900:20
**pair** [1] - 6942:17
**Paper** [1] - 6858:12
**paper** [5] - 6858:14, 6858:23, 6859:3, 6859:4, 6886:1
**papers** [4] - 6858:19, 6858:21, 6858:22, 6859:2
**paragraph** [3] - 6848:12, 6904:16, 6933:18
**parcel** [1] - 6949:20
**parlance** [1] - 6884:5
**part** [13] - 6871:21, 6882:23, 6884:5, 6901:9, 6906:2, 6906:3, 6906:4, 6921:7, 6921:10, 6927:14, 6933:22, 6958:5, 6964:4
**partially** [1] - 6934:6
**participants** [1] - 6880:6
**participate** [1] - 6921:18
**participating** [1] - 6854:18
**particular** [16] - 6846:2, 6850:11, 6851:4, 6851:8, 6852:20, 6853:5, 6858:3, 6863:10, 6873:20, 6875:8, 6876:16, 6901:5, 6903:14, 6924:6, 6934:10
**particularly** [3] - 6862:17, 6887:24, 6956:15
**parties** [5] - 6953:19, 6956:5, 6956:13, 6959:21, 6964:21
**partitioned** [1] - 6880:17

**partnership** [1] - 6906:18
**partnerships** [1] - 6877:11
**parts** [1] - 6876:16
**party** [3] - 6955:8, 6955:9, 6959:22
**pass** [2] - 6951:22, 6961:16
**passed** [1] - 6961:15
**past** [3] - 6899:2, 6947:20, 6957:4
**Patterson** [1] - 6843:4
**Paul** [1] - 6890:7
**pause** [2] - 6931:1, 6953:4
**pay** [3] - 6889:13, 6905:12, 6905:14
**paying** [1] - 6859:11
**pending** [3] - 6955:14, 6955:16, 6956:18
**people** [58] - 6864:6, 6867:3, 6867:8, 6867:17, 6868:18, 6868:19, 6869:13, 6870:10, 6870:14, 6873:8, 6873:24, 6874:17, 6874:18, 6875:2, 6875:14, 6876:19, 6876:20, 6876:23, 6877:25, 6878:2, 6878:6, 6880:3, 6880:10, 6880:11, 6880:12, 6880:14, 6880:17, 6880:19, 6882:10, 6882:12, 6883:11, 6884:4, 6885:19, 6885:20, 6885:22, 6886:25, 6894:1, 6895:14, 6900:4, 6914:13, 6917:8, 6917:20, 6928:12, 6929:23, 6939:12, 6943:9, 6943:15, 6943:19, 6944:1, 6944:5, 6947:8, 6947:15, 6949:11, 6949:16, 6949:24
**people's** [2] - 6878:12, 6878:14
**perceive** [1] - 6868:24
**Percent** [1] - 6900:22
**percent** [28] - 6867:17, 6868:18, 6872:2, 6872:4, 6882:17, 6882:19, 6882:21, 6883:13, 6883:15, 6884:20, 6891:13, 6893:17, 6894:1,

6894:2, 6900:25, 6912:11, 6912:22, 6929:22, 6929:23, 6930:7, 6930:9, 6931:12, 6931:16, 6931:18, 6932:15, 6932:22, 6944:20
**percentage** [2] - 6930:7, 6930:8
**percentile** [1] - 6941:10
**perceptions** [1] - 6935:23
**perfect** [4] - 6869:4, 6870:16, 6916:21
**performance** [1] - 6855:13
**performing** [4] - 6915:2, 6947:3, 6950:4, 6955:12
**perhaps** [2] - 6854:25, 6855:5
**peril** [1] - 6879:6
**period** [3] - 6846:1, 6857:20, 6902:13
**periodic** [1] - 6849:23
**periodically** [1] - 6849:19
**peripherally** [1] - 6889:16
**person** [11] - 6858:23, 6889:7, 6891:3, 6891:4, 6891:7, 6891:11, 6891:18, 6898:6, 6931:6, 6943:1
**person's** [2] - 6943:4, 6943:5
**perspective** [1] - 6907:17
**Ph.D** [1] - 6857:12
**phase** [18] - 6869:25, 6870:1, 6872:3, 6872:4, 6872:5, 6873:1, 6874:6, 6874:7, 6877:7, 6878:3, 6878:4, 6879:9, 6887:7, 6887:9, 6887:15
**phases** [3] - 6878:15, 6879:9, 6879:13
**phenomenon** [1] - 6895:14
**picked** [5] - 6881:24, 6893:7, 6939:23, 6941:23
**picture** [1] - 6940:4
**piece** [1] - 6932:23
**PII** [1] - 6958:24
**Pinterest** [1] - 6943:16
**PLA** [6] - 6862:18,

6987

6863:9, 6865:20, 6897:21, 6898:6, 6900:20

**place** [16] - 6872:22, 6873:10, 6881:10, 6881:16, 6881:17, 6882:4, 6882:6, 6883:12, 6883:16, 6893:7, 6893:10, 6903:14, 6917:12, 6939:12, 6944:1

**places** [3] - 6872:19, 6873:7, 6894:12

**Plaintiff** [1] - 6842:22

**plaintiff** [1] - 6859:22

**plaintiffs** [3] - 6856:6, 6960:7, 6964:23

**Plaintiffs** [2] - 6842:4, 6842:11

**plaintiffs'** [1] - 6963:17

**planet** [3] - 6881:8, 6881:13, 6882:11

**planning** [2] - 6918:2, 6928:13

**plant** [2] - 6961:20, 6963:17

**PLAs** [5] - 6891:18, 6897:23, 6897:24, 6898:3, 6898:4

**platform** [3] - 6917:3, 6917:12, 6928:19

**platforms** [2] - 6858:9, 6949:7

**play** [1] - 6897:16

**playing** [2] - 6870:14, 6877:12

**plays** [1] - 6908:2

**plumbers** [1] - 6903:13

**plus** [1] - 6863:9

**point** [48] - 6862:23, 6862:24, 6863:8, 6863:11, 6864:25, 6865:2, 6865:6, 6867:15, 6868:2, 6868:21, 6872:15, 6882:5, 6883:15, 6884:1, 6890:5, 6890:8, 6892:5, 6892:14, 6892:16, 6892:21, 6893:22, 6894:20, 6896:5, 6896:12, 6901:3, 6901:18, 6902:15, 6904:8, 6904:13, 6904:15, 6905:6, 6905:20, 6906:1, 6906:7, 6906:10, 6908:17, 6909:8,

6910:14, 6916:9, 6917:1, 6917:14, 6917:24, 6917:25, 6918:17, 6943:1, 6943:25, 6956:6, 6956:12

**points** [2] - 6908:21, 6939:18

**Polar** [6] - 6927:17, 6928:5, 6928:11, 6928:14, 6928:16, 6928:20

**pool** [1] - 6878:25

**poor** [1] - 6879:23

**portion** [2] - 6894:23, 6923:24

**position** [8] - 6865:7, 6883:4, 6884:3, 6936:21, 6936:22, 6936:24, 6961:1, 6963:8

**positioning** [1] - 6881:6

**positions** [1] - 6959:15

**possible** [9] - 6898:24, 6901:21, 6914:10, 6952:10, 6952:16, 6952:19, 6952:20, 6952:21, 6952:24

**possibly** [2] - 6865:19, 6915:17

**posting** [1] - 6954:18

**potential** [1] - 6855:14

**potentially** [4] - 6855:20, 6958:15, 6958:19, 6960:1

**power** [1] - 6900:17

**powerful** [3] - 6886:11, 6892:22, 6942:20

**practical** [2] - 6887:4, 6887:20

**practices** [1] - 6922:14

**precise** [1] - 6937:12

**precisely** [3] - 6867:10, 6912:21, 6934:13

**predicament** [1] - 6902:23

**predisposed** [1] - 6869:14

**premise** [3] - 6908:12, 6940:1, 6942:4

**preparation** [1] - 6955:20

**prepared** [2] - 6860:5, 6860:10

**present** [5] - 6867:5, 6872:12, 6881:20,

6893:10, 6899:17

**presentation** [2] - 6871:21, 6935:25

**presented** [4] - 6861:15, 6867:25, 6935:22, 6939:21

**presenting** [1] - 6860:5

**preserve** [1] - 6930:12

**pretty** [1] - 6883:14

**previewed** [1] - 6961:12

**previous** [1] - 6904:15

**previously** [1] - 6851:6

**price** [1] - 6926:20

**pricing** [3] - 6857:24, 6857:25, 6858:2

**primary** [4] - 6886:10, 6917:3, 6955:4, 6963:20

**principal** [2] - 6906:19, 6917:12

**principle** [6] - 6910:8, 6911:19, 6911:25, 6914:15, 6917:7, 6942:25

**printed** [1] - 6852:24

**Prio** [1] - 6849:9

**Prioritization** [1] - 6845:18

**Privacy** [1] - 6955:11

**privacy** [1] - 6947:21

**pro** [2] - 6906:9

**probability** [26] - 6861:2, 6862:1, 6864:5, 6864:8, 6864:11, 6864:14, 6865:3, 6867:2, 6873:9, 6884:22, 6884:23, 6884:24, 6891:7, 6891:9, 6892:3, 6892:9, 6892:11, 6893:5, 6924:23, 6924:24, 6926:24, 6927:2, 6927:4, 6928:22, 6943:5, 6943:6

**problem** [8] - 6869:24, 6869:25, 6870:1, 6870:2, 6872:13, 6908:5, 6915:4, 6923:23

**problems** [1] - 6849:25

**proceed** [1] - 6871:18

**proceedings** [3] - 6920:14, 6920:16, 6966:6

**process** [3] - 6889:16,

6918:16, 6956:8

**procure** [1] - 6908:10

**produce** [2] - 6912:20, 6956:14

**produced** [3] - 6871:4, 6871:9, 6871:11

**produces** [1] - 6914:8

**product** [78] - 6863:2, 6864:3, 6864:4, 6864:17, 6865:9, 6865:19, 6865:23, 6868:23, 6869:13, 6869:14, 6869:15, 6869:16, 6869:17, 6869:20, 6869:21, 6869:22, 6872:20, 6873:8, 6873:14, 6873:15, 6873:17, 6873:18, 6873:20, 6873:22, 6874:1, 6874:8, 6874:10, 6874:16, 6874:20, 6875:9, 6875:14, 6875:15, 6875:17, 6875:19, 6876:9, 6876:10, 6877:9, 6880:14, 6881:17, 6883:16, 6885:11, 6887:1, 6887:23, 6888:6, 6888:15, 6891:10, 6891:22, 6893:8, 6894:10, 6895:3, 6895:6, 6901:5, 6902:10, 6908:4, 6911:13, 6914:10, 6914:11, 6914:12, 6914:13, 6925:18, 6925:19, 6925:20, 6925:21, 6925:23, 6926:6, 6926:9, 6926:13, 6926:23, 6927:2, 6927:13, 6927:17, 6927:18, 6928:3, 6928:7, 6928:9, 6935:14, 6943:2

**Product** [1] - 6845:17

**products** [14] - 6865:5, 6866:3, 6872:22, 6872:24, 6876:11, 6876:12, 6876:14, 6898:4, 6898:13, 6925:19, 6926:18, 6926:20, 6943:16, 6944:6

**profession** [1] - 6858:22

**Professor** [49] - 6856:7, 6856:18, 6856:23, 6856:24,

6988

6859:23, 6860:2,
6870:20, 6871:16,
6877:4, 6881:4,
6881:23, 6883:23,
6886:7, 6896:16,
6896:18, 6896:21,
6896:24, 6897:1,
6897:9, 6897:20,
6899:7, 6899:15,
6919:3, 6919:15,
6923:17, 6926:2,
6930:8, 6934:8,
6934:11, 6934:19,
6934:23, 6936:6,
6938:12, 6941:25,
6942:2, 6950:15,
6953:12, 6962:1,
6962:4, 6962:8,
6962:9, 6962:19,
6962:22, 6962:23,
6962:24, 6963:4,
6963:5
  **professor** [3] - 6857:4,
6857:5, 6857:17
  **profile** [1] - 6889:23
  **progammatic** [1] -
6900:14
  **prohibited** [1] -
6902:25
  **Project** [7] - 6844:10,
6844:25, 6846:1,
6846:15, 6846:17,
6846:18
  **prominence** [1] -
6861:6
  **prominent** [1] -
6901:16
  **promise** [2] - 6874:1,
6908:6
  **promises** [1] - 6919:1
  **promote** [1] - 6909:15
  **promoting** [1] -
6908:21
  **promptly** [1] - 6954:3
  **property** [1] - 6945:9
  **propose** [1] - 6954:3
  **proposed** [11] -
6954:6, 6954:16,
6954:20, 6954:25,
6955:1, 6955:2,
6955:8, 6955:17,
6958:9, 6963:19
  **Protection** [1] -
6842:24
  **prove** [1] - 6955:19
  **provide** [8] - 6856:18,
6890:17, 6900:25,
6912:18, 6915:13,
6916:24, 6919:23,
6957:10

  **provided** [5] - 6912:4,
6914:23, 6914:25,
6954:6, 6954:17
  **provider** [6] - 6863:19,
6886:24, 6903:9,
6903:11, 6903:15,
6917:17
  **providers** [4] -
6863:18, 6863:24,
6903:12, 6919:16
  **provides** [1] - 6955:10
  **providing** [3] -
6903:13, 6954:22,
6962:16
  **PSX1210** [1] - 6909:23
  **PSX302** [1] - 6868:11
  **PSX419** [1] - 6915:18
  **PSX446** [1] - 6845:6
  **PSX457** [2] - 6845:13,
6851:6
  **PSX458** [1] - 6912:14
  **PSX460** [1] - 6909:1
  **PSX563** [3] - 6844:13,
6844:14, 6845:25
  **PSX965** [2] - 6906:22,
6907:5
  **PSX965**........................
..........................**6907**
[1] - 6967:10
  **PSXD10** [1] - 6919:6
  **pSXD10**.....................
..........................**6919**
[1] - 6967:10
  **psychology** [3] -
6878:5, 6878:21,
6885:19
  **public** [4] - 6954:19,
6955:16, 6957:3,
6958:3
  **publications** [1] -
6858:25
  **publish** [1] - 6858:23
  **published** [1] - 6859:4
  **publisher** [1] - 6918:5
  **publishers** [1] -
6949:7
  **pull** [12] - 6888:18,
6888:24, 6889:4,
6889:22, 6890:9,
6892:6, 6892:7,
6892:8, 6892:12,
6892:17, 6892:21
  **pulled** [3] - 6881:5,
6883:24, 6889:3
  **pulling** [1] - 6938:1
  **purchase** [48] -
6861:2, 6862:1,
6864:5, 6864:7,
6864:8, 6864:10,
6864:14, 6864:18,

6865:7, 6866:7,
6866:17, 6866:23,
6868:1, 6868:5,
6868:6, 6868:15,
6868:17, 6869:6,
6870:1, 6871:24,
6872:3, 6872:7,
6872:10, 6872:12,
6872:16, 6873:9,
6875:7, 6877:7,
6877:11, 6879:8,
6884:23, 6887:2,
6887:8, 6887:11,
6891:15, 6898:2,
6908:14, 6919:1,
6924:23, 6924:24,
6925:10, 6927:24,
6928:3, 6942:21,
6943:4, 6943:5, 6952:1
  **purchasing** [1] -
6886:20
  **Purdue** [2] - 6857:14,
6857:16
  **purpose** [7] - 6861:1,
6861:22, 6886:10,
6896:25, 6898:1,
6919:10, 6939:4
  **purposes** [1] - 6921:8
  **pursuit** [1] - 6885:22
  **purview** [1] - 6943:22
  **push** [12] - 6888:18,
6889:9, 6889:23,
6890:1, 6890:3,
6890:9, 6892:7,
6892:10, 6892:12,
6894:24, 6921:5,
6959:18
  **pushed** [3] - 6902:20,
6905:1, 6958:10
  **put** [23] - 6845:10,
6845:15, 6848:25,
6850:25, 6870:12,
6876:2, 6890:3,
6893:8, 6896:20,
6906:17, 6923:12,
6929:24, 6930:10,
6934:6, 6935:24,
6938:16, 6939:22,
6940:5, 6944:12,
6945:10, 6951:21,
6954:7, 6963:21
  **putting** [2] - 6884:7,
6891:18
  **PX970** [1] - 6870:22
  **pX970**.........................
..........................**6870** [1]
- 6967:9

## Q

  **qualifications** [1] -
6866:3
  **qualify** [1] - 6854:23
  **qualitatively** [2] -
6885:6, 6894:11
  **quality** [7] - 6866:20,
6879:16, 6879:19,
6879:23, 6889:5,
6894:2, 6955:12
  **quantification** [2] -
6943:12, 6944:5
  **quantify** [2] - 6867:9,
6922:6
  **queries** [1] - 6901:4
  **query** [12] - 6861:13,
6864:22, 6889:1,
6889:23, 6891:19,
6892:8, 6901:1,
6901:4, 6902:11,
6922:2, 6952:7
  **questioned** [2] -
6851:21, 6851:24
  **questions** [8] -
6844:10, 6849:6,
6851:15, 6897:1,
6919:4, 6944:4,
6954:25, 6963:20
  **queued** [2] - 6882:8,
6882:9
  **quibbling** [1] -
6948:10
  **quickly** [2] - 6897:12,
6958:18
  **quite** [2] - 6912:7,
6943:19
  **quote** [2] - 6877:23,
6878:25
  **quoted** [1] - 6930:22

## R

  **radically** [2] - 6878:22,
6900:13
  **raise** [1] - 6963:3
  **raised** [4] - 6852:8,
6852:15, 6867:16,
6962:23
  **raises** [4] - 6863:3,
6904:11, 6962:12,
6962:18
  **Rakuten** [2] - 6848:7,
6848:18
  **Ralph** [1] - 6842:25
  **ran** [2] - 6913:25,
6924:6
  **random** [8] - 6938:14,
6938:17, 6938:18,
6938:25, 6939:13,

6939:16, 6939:23, 6942:16

**range** [1] - 6913:11
**rank** [3] - 6847:23, 6894:11, 6894:12
**rate** [4] - 6877:5, 6884:20, 6905:8, 6944:14
**rates** [2] - 6884:14, 6944:11
**rather** [2] - 6865:8, 6872:24
**ratio** [1] - 6907:11
**rationale** [1] - 6904:23
**reach** [5] - 6861:1, 6861:25, 6868:4, 6868:22, 6873:24
**reached** [2] - 6855:3, 6860:21
**reaches** [1] - 6874:8
**read** [8] - 6845:22, 6853:13, 6853:14, 6924:1, 6931:18, 6933:24, 6951:1, 6951:19
**reading** [4] - 6854:21, 6862:6, 6889:9, 6889:11
**ready** [7] - 6844:3, 6845:21, 6849:7, 6853:20, 6854:15, 6856:4, 6899:12
**real** [5] - 6862:11, 6862:12, 6904:24, 6959:18, 6959:23
**realistic** [2] - 6955:22, 6957:15
**reality** [1] - 6905:12
**realize** [1] - 6880:2
**reallocate** [2] - 6950:6, 6951:14
**really** [8] - 6889:15, 6891:7, 6891:10, 6891:11, 6906:6, 6956:9, 6959:21, 6959:25
**Realtime** [1] - 6909:18
**realtime** [1] - 6911:17
**reason** [18] - 6871:6, 6876:21, 6900:20, 6906:21, 6907:13, 6908:16, 6908:18, 6910:4, 6911:2, 6912:8, 6917:2, 6917:7, 6918:24, 6930:12, 6932:14, 6932:15, 6963:10
**reasonable** [5] - 6923:7, 6956:9, 6959:17, 6959:20,

6964:6
**reasonably** [1] - 6907:10
**reasons** [3] - 6871:23, 6910:4, 6962:9
**rebuttal** [6] - 6881:4, 6881:23, 6883:24, 6962:24, 6963:2, 6963:14
**recap** [1] - 6844:9
**received** [4] - 6858:10, 6858:12, 6858:13, 6912:13
**recent** [1] - 6945:15
**recently** [1] - 6858:7
**Recess** [1] - 6899:10
**recognition** [1] - 6952:18
**recognize** [11] - 6858:10, 6860:1, 6872:13, 6874:22, 6880:3, 6887:18, 6891:6, 6900:15, 6904:9, 6924:2, 6963:25
**recognized** [1] - 6858:15
**recognizes** [1] - 6911:14
**recognizing** [1] - 6898:22
**recollection** [2] - 6846:24, 6847:2
**recommendation** [4] - 6871:25, 6872:6, 6959:1, 6959:2
**recommended** [2] - 6872:2, 6872:18
**recommending** [1] - 6934:24
**record** [10] - 6845:16, 6847:18, 6849:8, 6856:19, 6871:2, 6882:17, 6894:5, 6952:23, 6957:21, 6964:9
**records** [4] - 6870:24, 6907:1, 6958:22, 6959:3
**recruit** [1] - 6853:17
**recruitment** [3] - 6853:11, 6853:20, 6854:13
**red** [5] - 6954:6, 6954:7, 6954:8, 6954:16, 6957:12
**redacted** [1] - 6930:11
**REDIRECT** [1] - 6851:18
**Redirect** [1] - 6967:4

**reduce** [2] - 6932:10, 6933:11
**reduced** [4] - 6861:4, 6901:14, 6903:24, 6906:8
**reduction** [1] - 6962:25
**refer** [7] - 6850:9, 6863:13, 6864:21, 6883:7, 6896:7, 6930:15, 6930:23
**reference** [11] - 6848:18, 6848:20, 6850:6, 6851:10, 6861:3, 6879:12, 6898:15, 6909:22, 6921:11, 6921:12, 6950:9
**referenced** [1] - 6886:23
**references** [2] - 6880:20, 6885:15
**referencing** [2] - 6845:8, 6901:24
**referral** [1] - 6888:8
**referred** [1] - 6925:14
**referring** [13] - 6861:11, 6861:12, 6863:16, 6863:17, 6883:7, 6883:8, 6894:19, 6896:4, 6905:5, 6914:4, 6924:19, 6926:15, 6960:20
**refers** [3] - 6848:9, 6896:8, 6900:25
**refine** [2] - 6876:15, 6887:12
**refined** [1] - 6880:12
**reflect** [1] - 6898:22
**reflecting** [1] - 6905:22
**reflection** [1] - 6855:2
**refrigerator** [2] - 6865:16, 6865:17
**regard** [2] - 6846:18, 6846:19
**regarding** [5] - 6892:23, 6893:19, 6894:20, 6897:4, 6957:24
**region** [1] - 6848:9
**reinforce** [1] - 6874:12
**reinforces** [1] - 6910:21
**reiterate** [1] - 6917:7
**relate** [2] - 6864:25, 6935:4
**related** [4] - 6885:23, 6885:24, 6890:24,

6925:7
**relates** [2] - 6852:21, 6853:6
**relating** [1] - 6844:25
**relationship** [1] - 6903:19
**relative** [8] - 6880:25, 6883:4, 6884:3, 6907:13, 6935:23, 6936:20, 6936:21, 6936:23
**relatively** [3] - 6891:10, 6943:8, 6945:15
**relays** [1] - 6911:16
**release** [1] - 6954:4
**released** [1] - 6960:22
**relevance** [1] - 6862:16
**relevant** [1] - 6866:13
**reliance** [3] - 6932:10, 6933:11, 6934:1
**reliant** [2] - 6902:1, 6929:18
**relied** [2] - 6938:12
**rely** [1] - 6896:24
**relying** [1] - 6962:15
**remain** [1] - 6904:19
**remainder** [1] - 6962:4
**remaining** [1] - 6930:2
**remember** [6] - 6894:25, 6929:4, 6929:10, 6934:13, 6934:18, 6960:19
**remembering** [1] - 6846:8
**remind** [2] - 6895:2, 6925:16
**reminder** [1] - 6874:11
**removing** [1] - 6955:11
**repeat** [5] - 6915:9, 6920:7, 6926:25, 6946:20, 6952:13
**rephrase** [1] - 6946:8
**replace** [1] - 6871:7
**replacement** [1] - 6870:16
**reply** [2] - 6854:2, 6934:22
**report** [21] - 6881:3, 6881:4, 6881:22, 6881:23, 6883:22, 6883:24, 6896:24, 6913:5, 6934:11, 6934:12, 6934:15, 6936:3, 6936:5, 6936:6, 6939:1, 6939:19, 6941:24, 6941:25, 6942:1,

6990

6942:2, 6962:24
  **reported** [2] - 6894:1, 6945:2
  **REPORTER** [1] - 6966:1
  **Reporter** [3] - 6843:16, 6843:16, 6966:11
  **reports** [2] - 6938:1, 6944:15
  **representative** [5] - 6938:10, 6938:21, 6939:6, 6939:7, 6939:14
  **representativeness** [1] - 6938:13
  **represented** [1] - 6847:23
  **representing** [1] - 6883:19
  **represents** [1] - 6853:1
  **request** [2] - 6955:25, 6956:5
  **requested** [1] - 6957:4
  **requesting** [1] - 6957:2
  **requests** [10] - 6851:11, 6955:15, 6955:16, 6955:17, 6955:23, 6956:18, 6956:20, 6957:1, 6957:4, 6957:17
  **require** [1] - 6960:1
  **required** [2] - 6946:2, 6946:5
  **research** [10] - 6849:23, 6858:11, 6865:5, 6867:17, 6868:18, 6868:20, 6878:3, 6885:23, 6943:12, 6943:22
  **Research** [1] - 6858:18
  **respect** [4] - 6901:1, 6907:16, 6922:14, 6962:8
  **respective** [1] - 6959:16
  **respond** [3] - 6934:14, 6934:17, 6957:17
  **responded** [5] - 6904:6, 6934:12, 6947:19, 6956:19, 6960:2
  **responding** [2] - 6904:21, 6963:5
  **response** [17] - 6846:17, 6864:21, 6864:22, 6889:1,

6889:3, 6889:23, 6891:19, 6892:7, 6903:7, 6904:21, 6941:21, 6941:22, 6947:13, 6952:7, 6952:23, 6960:23, 6963:4
  **Responses** [1] - 6849:9
  **responses** [1] - 6954:8
  **responsive** [5] - 6915:25, 6916:6, 6916:10, 6916:14, 6959:19
  **rest** [4] - 6857:3, 6927:14, 6932:23, 6963:18
  **restrictions** [6] - 6887:25, 6903:23, 6903:25, 6904:2, 6921:25, 6922:1
  **result** [4] - 6913:21, 6920:23, 6944:21, 6947:7
  **results** [21] - 6860:18, 6861:14, 6861:17, 6862:2, 6862:11, 6863:11, 6903:1, 6904:3, 6905:8, 6905:13, 6912:2, 6914:8, 6921:1, 6926:5, 6926:8, 6927:7, 6927:12, 6927:13, 6927:15, 6928:6
  **resume** [1] - 6899:6
  **retail** [1] - 6867:18
  **retailer** [1] - 6865:3
  **retained** [2] - 6859:19, 6859:20
  **retarget** [2] - 6886:5, 6893:11
  **retargeted** [13] - 6886:2, 6892:24, 6893:19, 6893:24, 6894:2, 6894:5, 6894:14, 6937:18, 6937:23, 6944:25, 6945:3, 6945:9
  **retargeting** [6] - 6893:6, 6894:21, 6894:23, 6895:2, 6945:16, 6945:19
  **return** [12] - 6879:25, 6904:18, 6917:13, 6948:5, 6948:7, 6948:18, 6948:22, 6949:1, 6949:8, 6950:2, 6951:2,

6951:10
  **revenue** [7] - 6888:3, 6888:5, 6888:13, 6912:18, 6915:14
  **review** [7] - 6896:17, 6920:19, 6920:24, 6929:2, 6942:17, 6942:22, 6943:2
  **reviewed** [6] - 6896:16, 6901:17, 6920:13, 6920:16, 6921:2, 6934:12
  **Richard** [1] - 6842:18
  **richard.gower@ usdoj.gov** [1] - 6842:21
  **richer** [3] - 6910:15, 6911:21, 6912:1
  **right-hand** [3] - 6848:6, 6852:4, 6852:13
  **RMR** [1] - 6843:16
  **ROI** [1] - 6868:2
  **role** [3] - 6870:15, 6877:12, 6908:2
  **Room** [2] - 6843:17, 6966:12
  **ROS** [1] - 6949:23
  **Rosati** [1] - 6843:12
  **rough** [3] - 6960:5, 6960:7, 6960:9
  **rule** [3] - 6913:15, 6946:9, 6962:7
  **run** [1] - 6870:9
  **running** [3] - 6855:21, 6926:23, 6927:1
  **Ryan** [2] - 6853:9, 6915:1

## S

  **SA360** [29] - 6845:17, 6850:7, 6855:11, 6860:20, 6907:16, 6907:19, 6907:21, 6908:12, 6908:16, 6908:21, 6909:15, 6911:14, 6911:15, 6912:5, 6912:19, 6913:3, 6913:6, 6913:24, 6914:19, 6915:8, 6916:4, 6916:8, 6917:2, 6917:8, 6918:11, 6918:14, 6918:25, 6919:1
  **SA360's** [1] - 6916:22
  **safe** [1] - 6856:2
  **sale** [2] - 6869:8, 6873:10
  **sales** [3] - 6847:25,

6849:24, 6888:15
  **Sales** [1] - 6845:18
  **Sallet** [1] - 6842:23
  **SALLET** [6] - 6962:3, 6962:21, 6963:3, 6963:10, 6963:15, 6964:12
  **sample** [11] - 6882:4, 6938:10, 6938:14, 6938:17, 6938:18, 6938:23, 6938:25, 6939:13, 6939:14, 6939:23
  **Sander** [1] - 6933:8
  **save** [1] - 6897:4
  **Saving** [1] - 6900:22
  **savvy** [1] - 6880:3
  **saw** [3] - 6876:4, 6948:24, 6957:23
  **scale** [4] - 6962:12, 6962:14, 6962:15, 6962:17
  **scanned** [1] - 6929:4
  **schedule** [2] - 6953:23, 6964:8
  **Schmidtlein** [5] - 6843:7, 6959:9, 6959:12, 6960:4, 6960:15
  **SCHMIDTLEIN** [8] - 6959:14, 6960:12, 6960:16, 6960:25, 6964:10, 6964:14, 6964:18, 6965:1
  **school** [1] - 6857:13
  **Science** [3] - 6858:13, 6858:17
  **scientific** [1] - 6949:24
  **screen** [4] - 6878:9, 6923:22, 6934:6, 6940:4
  **search** [158] - 6858:8, 6860:18, 6860:25, 6861:11, 6861:12, 6861:13, 6861:14, 6861:16, 6861:17, 6861:19, 6861:20, 6861:21, 6861:25, 6862:1, 6862:2, 6862:9, 6862:10, 6862:11, 6862:18, 6863:1, 6863:2, 6863:7, 6863:11, 6863:24, 6863:25, 6864:9, 6864:15, 6864:19, 6864:22, 6865:4, 6865:9, 6865:16, 6865:17, 6865:18, 6866:1, 6866:4, 6866:5,

6991

6866:6, 6866:7,
6866:9, 6866:24,
6868:25, 6869:2,
6880:25, 6881:6,
6882:2, 6882:4,
6882:11, 6882:18,
6882:20, 6882:21,
6882:22, 6883:4,
6883:8, 6883:10,
6883:12, 6883:17,
6884:9, 6884:15,
6884:18, 6885:1,
6885:8, 6886:21,
6887:3, 6887:5,
6887:19, 6887:24,
6887:25, 6888:10,
6888:15, 6888:23,
6888:24, 6888:25,
6889:3, 6889:18,
6890:18, 6892:25,
6893:3, 6893:12,
6893:20, 6893:23,
6893:25, 6894:8,
6894:15, 6894:22,
6895:8, 6895:10,
6895:13, 6895:17,
6895:19, 6896:2,
6896:7, 6896:22,
6897:5, 6897:21,
6897:23, 6899:16,
6900:2, 6900:7,
6900:10, 6900:15,
6900:16, 6900:17,
6900:19, 6902:13,
6902:17, 6902:23,
6903:1, 6903:7,
6904:3, 6905:2,
6905:3, 6905:8,
6906:20, 6909:7,
6909:8, 6909:10,
6909:19, 6915:24,
6915:25, 6916:6,
6916:10, 6916:14,
6916:16, 6918:10,
6919:2, 6919:22,
6920:23, 6920:25,
6923:19, 6924:6,
6924:14, 6925:19,
6925:20, 6925:22,
6926:2, 6926:24,
6927:1, 6929:18,
6937:13, 6940:2,
6940:10, 6940:17,
6940:21, 6942:12,
6943:11, 6948:24,
6952:3, 6952:11
  **Search** [11] - 6849:22,
6853:21, 6854:14,
6867:14, 6869:3,
6926:5, 6931:12,
6934:1, 6944:18,

6944:20, 6944:22
  **searched** [7] - 6925:1,
6926:2, 6926:3,
6927:9, 6928:3,
6928:7, 6928:21
  **searches** [4] -
6868:22, 6877:10,
6923:10, 6925:18
  **searching** [3] -
6905:1, 6925:10,
6943:8
  **searchs** [1] - 6866:22
  **seat** [2] - 6958:7,
6960:4
  **Seattle** [5] - 6923:19,
6924:7, 6924:14,
6925:2, 6925:10
  **second** [22] - 6847:7,
6848:17, 6850:10,
6850:11, 6850:22,
6853:13, 6853:23,
6860:17, 6861:3,
6892:3, 6892:7,
6901:1, 6901:3,
6904:16, 6910:12,
6910:13, 6911:1,
6911:18, 6914:4,
6926:13, 6930:25,
6953:13
  **secondly** [1] - 6910:6
  **seconds** [2] - 6911:20
  **Section** [1] - 6842:24
  **see** [75] - 6847:9,
6847:15, 6847:17,
6847:20, 6848:15,
6848:18, 6848:23,
6850:7, 6850:12,
6851:10, 6851:25,
6852:4, 6852:8,
6852:14, 6852:19,
6852:25, 6854:4,
6854:5, 6854:16,
6862:25, 6864:4,
6865:16, 6865:18,
6867:16, 6868:14,
6871:3, 6871:14,
6872:1, 6872:17,
6873:1, 6876:1,
6876:2, 6880:11,
6882:3, 6882:19,
6883:10, 6884:18,
6884:20, 6885:15,
6886:9, 6893:22,
6897:16, 6900:21,
6901:3, 6903:6,
6904:7, 6908:23,
6912:25, 6913:21,
6913:22, 6914:25,
6915:10, 6923:3,
6924:6, 6924:7,

6924:15, 6924:17,
6924:19, 6926:2,
6926:12, 6926:15,
6927:9, 6927:18,
6927:19, 6930:21,
6931:11, 6931:16,
6932:9, 6933:15,
6933:16, 6937:15,
6948:21, 6965:2
  **seed** [3] - 6870:8,
6961:19, 6963:16
  **seeds** [3] - 6870:6,
6870:12, 6874:4
  **seeing** [5] - 6859:15,
6915:22, 6924:10,
6940:24, 6953:16
  **seeking** [4] - 6848:21,
6889:19, 6895:18
  **segment** [1] - 6848:13
  **segments** [1] - 6910:5
  **selected** [1] - 6938:20
  **sell** [7] - 6869:16,
6869:17, 6873:18,
6882:25, 6887:22,
6898:12, 6903:20
  **selling** [7] - 6865:23,
6866:3, 6882:1,
6888:6, 6898:3,
6903:17, 6903:18
  **SEM** [3] - 6916:23,
6917:17, 6917:18
  **sensational** [1] -
6943:23
  **sense** [7] - 6904:23,
6905:14, 6922:22,
6923:1, 6923:5,
6939:10, 6953:24
  **sentence** [1] - 6853:14
  **sentiment** [1] -
6905:22
  **separate** [1] - 6855:7
  **SEPs** [1] - 6923:8
  **sequence** [1] -
6951:23
  **SERP** [24] - 6861:5,
6861:6, 6863:12,
6901:10, 6901:15,
6901:16, 6902:7,
6902:17, 6904:5,
6904:6, 6905:24,
6906:11, 6908:10,
6911:9, 6920:1,
6920:6, 6920:10,
6920:11, 6921:14,
6922:7, 6922:11,
6926:8
  **SERPed** [1] - 6889:1
  **serve** [3] - 6860:25,
6861:21, 6925:7
  **served** [5] - 6861:14,

6889:11, 6924:22,
6928:8, 6952:11
  **serves** [1] - 6952:17
  **service** [11] - 6863:19,
6898:4, 6903:9,
6903:11, 6903:12,
6903:15, 6903:17,
6906:9, 6909:10,
6933:5
  **services** [13] - 6898:5,
6903:3, 6903:4,
6903:6, 6903:13,
6903:18, 6903:21,
6905:19, 6905:20,
6919:22, 6921:19,
6921:24
  **serving** [4] - 6889:24,
6894:16, 6897:25,
6928:6
  **set** [24] - 6844:11,
6873:21, 6881:24,
6902:10, 6903:6,
6910:5, 6910:15,
6910:16, 6910:21,
6910:23, 6910:24,
6910:25, 6912:1,
6913:9, 6913:18,
6915:5, 6918:3,
6926:15, 6928:18,
6939:4, 6939:20,
6964:11
  **settled** [1] - 6868:23
  **seven** [3] - 6857:11,
6885:1, 6956:12
  **Seventh** [1] - 6843:1
  **several** [7] - 6845:24,
6846:24, 6858:22,
6885:7, 6893:25,
6903:12, 6933:14
  **shall** [1] - 6927:25
  **share** [2] - 6907:12,
6929:21
  **sharply** [1] - 6918:1
  **shift** [4] - 6874:21,
6900:7, 6907:10,
6907:12
  **shirt** [3] - 6887:12,
6887:13, 6891:12
  **shirts** [1] - 6891:1
  **shoe** [1] - 6874:19
  **shopping** [2] - 6868:3,
6893:14
  **short** [1] - 6961:5
  **shortly** [1] - 6960:11
  **shorts** [12] - 6890:12,
6890:19, 6891:1,
6891:7, 6891:12,
6891:18, 6891:20,
6942:4, 6942:12,
6942:18, 6942:21,

6992

**show** [5] - 6865:13, 6924:9, 6926:20, 6935:22, 6958:4
**showed** [5] - 6845:5, 6845:25, 6850:5, 6851:6, 6868:9
**showing** [2] - 6871:23, 6902:25
**shown** [4] - 6847:21, 6877:5, 6886:7, 6937:19
**side** [6] - 6848:6, 6852:13, 6942:11, 6949:1, 6951:21, 6959:13
**sign** [1] - 6961:17
**signal** [6] - 6889:5, 6892:22, 6893:3, 6893:13, 6893:16, 6942:20
**signals** [10] - 6894:3, 6910:21, 6910:23, 6910:24, 6910:25, 6912:1, 6913:9, 6913:18, 6915:5
**significant** [4] - 6902:21, 6929:21, 6930:7, 6940:19
**significantly** [1] - 6914:1
**signifies** [1] - 6852:15
**signups** [1] - 6906:9
**similar** [7] - 6885:6, 6892:25, 6904:2, 6905:22, 6907:12, 6921:5, 6943:9
**simple** [6] - 6876:24, 6912:9, 6944:4, 6949:14, 6949:15, 6950:1
**simpler** [1] - 6870:5
**simply** [2] - 6897:3, 6906:12
**singular** [1] - 6878:25
**site** [3] - 6864:16, 6931:12, 6949:1
**sites** [2] - 6863:22, 6891:4
**six** [1] - 6910:7
**size** [1] - 6914:17
**sizes** [1] - 6907:13
**Skai** [1] - 6917:23
**skewed** [1] - 6941:8
**skipped** [2] - 6867:20, 6867:22
**sky** [1] - 6912:8
**slide** [85] - 6850:12, 6852:20, 6853:2, 6853:5, 6860:5,

6860:10, 6860:23, 6862:22, 6862:25, 6863:9, 6864:24, 6865:12, 6865:13, 6867:16, 6867:20, 6868:7, 6868:9, 6870:18, 6870:19, 6871:20, 6873:2, 6873:3, 6877:2, 6877:4, 6877:5, 6878:7, 6878:9, 6880:9, 6883:3, 6884:17, 6886:6, 6890:4, 6890:10, 6892:13, 6893:21, 6893:22, 6894:18, 6896:3, 6896:10, 6896:20, 6898:8, 6898:25, 6899:2, 6899:19, 6900:3, 6900:18, 6901:23, 6903:2, 6904:8, 6904:15, 6904:20, 6905:4, 6905:17, 6906:14, 6908:23, 6909:16, 6910:17, 6911:6, 6912:6, 6914:2, 6914:20, 6914:25, 6915:10, 6915:22, 6916:25, 6917:13, 6917:23, 6930:10, 6930:23, 6935:24, 6938:1, 6938:2, 6938:3, 6940:23, 6942:3, 6942:4, 6944:9, 6944:10, 6944:12, 6944:14, 6944:23
**slides** [7] - 6853:6, 6871:13, 6908:8, 6913:9, 6939:17, 6942:3, 6944:9
**slightly** [8] - 6877:12, 6879:19, 6887:2, 6888:4, 6889:8, 6893:24, 6894:3, 6897:25
**slow** [1] - 6916:1
**small** [9] - 6847:2, 6862:11, 6862:13, 6875:12, 6882:3, 6895:13, 6896:13, 6896:15
**smaller** [5] - 6884:25, 6910:23, 6910:24, 6913:9, 6956:1
**social** [26] - 6866:24, 6880:25, 6883:4, 6883:6, 6883:7, 6883:8, 6883:9,

6883:11, 6884:9, 6890:1, 6890:3, 6892:24, 6895:8, 6895:10, 6895:13, 6895:15, 6895:21, 6896:7, 6937:13, 6940:20, 6943:10, 6943:19, 6944:6
**sold** [1] - 6901:6
**solve** [2] - 6849:25, 6902:22
**someone** [4] - 6866:23, 6890:18, 6905:19, 6959:13
**sometime** [1] - 6964:8
**sometimes** [3] - 6869:24, 6869:25, 6870:1
**somewhat** [2] - 6849:19, 6955:19
**somewhere** [3] - 6893:15, 6906:13, 6929:24
**Sommer's** [2] - 6890:11, 6942:4
**Sonsini** [1] - 6843:12
**soon** [1] - 6891:21
**sophisticated** [5] - 6922:19, 6923:4, 6935:16, 6939:11, 6939:12
**sophistication** [1] - 6880:15
**Sorry** [1] - 6916:2
**sorry** [26] - 6850:21, 6852:10, 6852:11, 6853:15, 6857:2, 6864:13, 6867:19, 6867:20, 6867:24, 6868:8, 6871:11, 6883:18, 6914:20, 6916:2, 6928:20, 6929:7, 6931:20, 6940:12, 6941:2, 6941:18, 6944:15, 6946:21, 6951:8, 6953:2, 6956:3
**sort** [13] - 6866:24, 6870:3, 6886:3, 6895:3, 6898:14, 6908:1, 6915:16, 6926:12, 6943:10, 6945:9, 6956:20, 6957:5, 6961:6
**sorts** [1] - 6887:16
**sounds** [1] - 6957:19
**source** [9] - 6870:2, 6872:14, 6885:4, 6888:3, 6888:12, 6888:13, 6902:21,

6906:19, 6945:12
**sources** [6] - 6883:20, 6888:5, 6888:9, 6929:1, 6934:8, 6934:20
**South** [1] - 6842:15
**sow** [2] - 6870:6, 6870:12
**sowing** [2] - 6870:8, 6874:4
**space** [1] - 6885:24
**sparkling** [3] - 6926:3, 6927:10, 6928:8
**speaking** [7] - 6861:15, 6862:18, 6863:9, 6863:17, 6865:2, 6916:11, 6917:18
**speaks** [2] - 6886:2, 6909:6
**special** [3] - 6863:24, 6900:21, 6919:16
**specialized** [3] - 6863:17, 6886:24, 6887:1
**species** [1] - 6892:24
**specific** [21] - 6848:1, 6850:2, 6851:10, 6854:12, 6925:19, 6925:20, 6925:23, 6926:6, 6926:9, 6926:18, 6926:23, 6927:2, 6927:13, 6928:3, 6928:7, 6945:20, 6954:24, 6956:4, 6956:10, 6956:20
**specifics** [1] - 6929:4
**speculating** [2] - 6892:2, 6943:14
**spend** [23] - 6861:9, 6872:2, 6873:22, 6874:2, 6874:6, 6874:8, 6900:7, 6904:10, 6904:16, 6907:10, 6907:13, 6907:20, 6932:15, 6932:22, 6946:2, 6946:6, 6946:10, 6948:6, 6948:7, 6948:18, 6949:9, 6950:6, 6951:14
**spending** [1] - 6948:19
**spent** [2] - 6948:22, 6959:15
**spit** [1] - 6876:6
**split** [1] - 6926:12
**Sponsor** [1] - 6924:11
**sponsored** [3] -

6993

6926:17, 6927:14, 6927:16

**sports** [1] - 6879:16
**springs** [1] - 6928:24
**St** [1] - 6843:9
**stack** [1] - 6847:23
**stage** [14] - 6872:16, 6875:11, 6876:16, 6886:4, 6887:8, 6887:11, 6900:9, 6935:9, 6935:13, 6935:20, 6936:14, 6940:2, 6940:9, 6950:11
**stages** [5] - 6876:15, 6885:21, 6896:1, 6935:9, 6951:23
**stand** [1] - 6961:2
**standard** [1] - 6961:14
**stands** [1] - 6955:2
**Starburst** [2] - 6875:24, 6875:25
**start** [9] - 6855:18, 6861:10, 6867:17, 6868:19, 6919:16, 6953:17, 6954:2, 6961:20, 6963:18
**started** [2] - 6857:23, 6956:17
**starting** [3] - 6927:5, 6931:11, 6931:14
**State** [1] - 6842:23
**state's** [1] - 6961:23
**statement** [2] - 6855:2, 6941:6
**statements** [1] - 6937:3
**STATES** [2] - 6842:1, 6842:10
**states** [7] - 6854:21, 6859:19, 6859:22, 6915:23, 6916:3, 6916:12, 6959:10
**States** [4] - 6842:2, 6843:17, 6954:12, 6961:10
**stating** [2] - 6853:19, 6862:21
**statistics** [2] - 6866:25, 6938:24
**stay** [1] - 6845:14
**stayed** [2] - 6879:17, 6906:17
**stenographic** [1] - 6966:5
**step** [5] - 6881:7, 6953:18, 6953:19, 6953:20, 6958:4
**stepped** [1] - 6859:16
**steps** [2] - 6932:10,

6933:11
**stickiness** [3] - 6917:25, 6918:5, 6918:8
**sticky** [1] - 6917:11
**still** [12] - 6879:19, 6880:10, 6880:16, 6880:19, 6886:18, 6893:24, 6894:3, 6896:1, 6896:8, 6916:19, 6918:14, 6928:22
**stop** [1] - 6899:25
**stopping** [2] - 6875:23, 6916:2
**store** [1] - 6875:23
**straight** [1] - 6958:21
**strategic** [1] - 6858:5
**strategy** [4] - 6869:9, 6869:12, 6873:13, 6879:10
**Street** [3] - 6842:12, 6842:15, 6842:19
**stretching** [1] - 6900:16
**strides** [1] - 6958:5
**strong** [3] - 6868:3, 6940:14, 6941:3
**structural** [1] - 6866:2
**students** [6] - 6857:22, 6857:23, 6857:25, 6858:1, 6886:17, 6949:14
**study** [3] - 6884:21, 6943:18, 6962:25
**stuff** [2] - 6941:10, 6949:16
**subdivide** [1] - 6876:16
**subject** [2] - 6854:20, 6919:7
**submission** [2] - 6961:1, 6963:19
**submitted** [1] - 6964:3
**subsequently** [1] - 6916:18
**subset** [1] - 6875:15
**substance** [1] - 6860:4
**substantial** [1] - 6914:6
**substantive** [1] - 6919:8
**substitute** [2] - 6870:16, 6925:8
**substitutes** [1] - 6869:3, 6869:4, 6894:17, 6925:5, 6925:6
**succeed** [1] - 6949:14

**successful** [1] - 6947:17
**sufficient** [1] - 6955:2
**suggested** [3] - 6956:10, 6956:15, 6958:25
**Suite** [3] - 6842:16, 6842:19, 6843:5
**suited** [1] - 6957:9
**sum** [1] - 6939:8
**summaries** [1] - 6850:3
**suppliers** [1] - 6906:4
**support** [5] - 6861:7, 6873:2, 6907:18, 6909:8, 6918:4
**suppose** [1] - 6897:15
**surface** [2] - 6859:5, 6904:5
**surprise** [1] - 6944:21
**surprised** [5] - 6886:18, 6894:11, 6915:2, 6915:3
**surprises** [1] - 6944:22
**surprising** [1] - 6913:20
**Survey** [3] - 6847:8, 6849:9, 6852:9
**survey** [7] - 6847:25, 6851:2, 6851:5, 6852:16, 6867:5, 6939:13, 6943:12
**surveys** [1] - 6849:22
**survived** [1] - 6878:1
**suspect** [3] - 6932:18, 6956:22, 6963:23
**sustain** [1] - 6874:10
**SVP** [33] - 6861:4, 6863:21, 6863:22, 6864:4, 6864:9, 6864:12, 6864:16, 6865:7, 6865:8, 6865:17, 6865:22, 6866:4, 6866:11, 6866:12, 6867:13, 6869:2, 6869:5, 6869:7, 6887:20, 6887:22, 6888:4, 6895:5, 6901:10, 6901:14, 6901:25, 6902:1, 6903:11, 6903:12, 6905:6, 6905:20, 6922:11, 6924:24
**SVP's** [1] - 6902:6
**SVPs** [31] - 6861:6, 6863:13, 6863:16, 6863:17, 6864:3, 6864:5, 6864:17,

6864:22, 6865:9, 6866:22, 6886:22, 6887:5, 6901:16, 6902:15, 6902:16, 6902:25, 6904:3, 6904:6, 6905:16, 6906:12, 6907:7, 6920:8, 6921:18, 6921:21, 6922:14, 6922:16, 6929:1, 6929:18, 6934:9, 6934:20, 6934:24
**swing** [3] - 6942:9, 6942:16
**switch** [8] - 6916:23, 6917:4, 6917:9, 6917:10, 6917:18, 6918:7, 6928:13, 6928:23
**switching** [2] - 6917:10
**sworn** [1] - 6856:9
**system** [1] - 6917:21
**systematically** [1] - 6872:14

## T

**T-shirt** [1] - 6891:12
**tables** [1] - 6936:2
**tag** [1] - 6911:14
**Tango** [1] - 6876:1
**tango** [1] - 6876:1
**tapped** [1] - 6864:18
**target** [5] - 6869:16, 6869:19, 6869:20, 6869:21, 6925:9
**Target** [2] - 6872:18, 6877:6
**task** [2] - 6860:17, 6874:18
**taste** [1] - 6876:6
**tastes** [1] - 6876:6
**taught** [2] - 6857:21, 6857:22
**teach** [3] - 6857:24, 6858:2, 6886:16
**teaching** [1] - 6857:23
**team's** [1] - 6957:6
**teams** [3] - 6848:1, 6849:23, 6849:24
**Tech** [2] - 6845:18, 6962:20
**technical** [1] - 6915:4
**tee** [1] - 6891:1
**ten** [4] - 6911:20, 6945:17, 6964:2, 6964:12
**tend** [3] - 6882:4, 6882:10, 6883:11

6994

**tends** [1] - 6937:13
**term** [7] - 6858:15, 6861:10, 6861:12, 6863:16, 6869:9, 6900:10, 6918:8
**terms** [18] - 6880:11, 6888:2, 6888:3, 6893:19, 6898:17, 6953:8, 6954:16, 6954:20, 6955:7, 6955:8, 6955:22, 6957:2, 6957:15, 6957:25, 6958:20, 6958:21, 6964:5, 6964:6
**terribly** [1] - 6915:1
**territory** [1] - 6877:5
**test** [3] - 6853:17, 6853:21, 6866:21
**testified** [7] - 6844:22, 6845:2, 6856:10, 6859:13, 6920:22, 6929:6, 6932:9
**testifies** [1] - 6962:15
**testify** [1] - 6923:3
**testifying** [2] - 6859:20, 6962:13
**testimonial** [1] - 6964:4
**testimony** [53] - 6848:3, 6855:25, 6860:6, 6862:6, 6862:14, 6864:25, 6877:22, 6890:4, 6890:7, 6892:14, 6892:23, 6894:19, 6896:4, 6896:17, 6896:18, 6899:8, 6900:4, 6901:17, 6901:24, 6904:12, 6905:5, 6907:9, 6910:17, 6912:17, 6915:11, 6917:24, 6918:13, 6919:9, 6920:13, 6920:16, 6920:19, 6920:24, 6921:22, 6922:16, 6925:14, 6929:2, 6929:3, 6929:17, 6930:1, 6930:10, 6930:14, 6930:15, 6930:22, 6936:12, 6953:9, 6953:13, 6953:14, 6953:15, 6962:6, 6962:11, 6962:16, 6963:1
**testimony's** [1] - 6917:1
**testing** [12] - 6846:16, 6847:3, 6853:12,

6854:8, 6854:13, 6854:16, 6854:19, 6855:1, 6855:6, 6855:12, 6855:16, 6855:19
**tests** [1] - 6855:21
**text** [38] - 6863:2, 6863:9, 6865:20, 6866:6, 6887:3, 6887:24, 6887:25, 6888:11, 6888:23, 6888:24, 6896:2, 6896:22, 6897:21, 6897:23, 6897:24, 6898:3, 6898:9, 6898:10, 6898:12, 6898:17, 6898:18, 6898:24, 6899:16, 6899:25, 6900:20, 6900:24, 6901:3, 6901:6, 6901:7, 6902:13, 6902:17, 6905:3, 6929:18, 6952:6, 6952:11, 6952:14, 6952:17
**texts** [1] - 6897:5
**THE** [112] - 6842:1, 6842:1, 6842:9, 6844:2, 6844:16, 6849:11, 6850:16, 6850:19, 6850:21, 6851:16, 6855:24, 6856:1, 6856:2, 6856:3, 6856:4, 6856:11, 6856:12, 6856:13, 6856:24, 6857:4, 6857:6, 6859:17, 6860:1, 6864:13, 6864:14, 6866:19, 6867:1, 6867:6, 6867:8, 6867:19, 6867:20, 6868:8, 6868:13, 6871:11, 6871:14, 6871:18, 6871:19, 6871:20, 6873:3, 6873:5, 6873:6, 6873:7, 6875:5, 6875:12, 6877:18, 6881:12, 6881:14, 6881:19, 6881:20, 6883:18, 6883:21, 6884:7, 6884:10, 6885:3, 6885:4, 6885:9, 6885:10, 6890:13, 6897:8, 6897:14, 6899:1, 6899:5, 6899:9, 6899:11, 6907:5, 6919:10, 6923:14, 6923:15, 6931:2,

6932:14, 6932:18, 6932:21, 6933:1, 6941:2, 6941:5, 6941:19, 6946:20, 6946:25, 6953:2, 6953:5, 6953:8, 6953:20, 6953:21, 6953:23, 6954:13, 6954:15, 6955:4, 6955:21, 6956:3, 6957:13, 6958:7, 6958:20, 6959:5, 6959:7, 6959:9, 6959:12, 6960:4, 6960:13, 6960:17, 6961:3, 6961:17, 6961:22, 6961:25, 6962:7, 6962:22, 6963:7, 6963:12, 6963:16, 6964:13, 6964:16, 6964:20, 6965:2
**themes** [1] - 6849:19
**themselves** [3] - 6868:24, 6879:9, 6934:7
**thereafterwards** [1] - 6857:23
**therefore** [27] - 6859:11, 6865:25, 6866:17, 6873:22, 6874:5, 6874:14, 6874:20, 6875:1, 6875:16, 6876:14, 6878:15, 6880:16, 6883:2, 6884:4, 6884:24, 6887:18, 6889:22, 6891:9, 6892:2, 6895:25, 6900:15, 6905:2, 6906:17, 6913:12, 6918:5, 6949:1, 6949:2
**they've** [6] - 6872:25, 6902:13, 6922:24, 6925:1, 6933:14, 6957:1
**thinking** [8] - 6864:6, 6880:10, 6880:12, 6883:16, 6957:5, 6958:21, 6961:20, 6963:19
**thinks** [5] - 6879:4, 6879:7, 6927:23, 6928:12, 6928:22
**third** [7] - 6860:19, 6861:7, 6907:15, 6926:17, 6930:2, 6955:9, 6959:22
**third-party** [2] - 6955:9, 6959:22

**thirds** [3] - 6929:7, 6929:8, 6930:1
**Thomas** [2] - 6856:22, 6857:4
**thoughts** [2] - 6954:8, 6958:9
**three** [10] - 6847:3, 6860:22, 6860:24, 6876:15, 6876:16, 6885:21, 6916:13, 6926:12, 6935:9, 6955:7
**three-stage** [1] - 6935:9
**threefold** [1] - 6860:15
**throughout** [1] - 6894:24
**Thumbtack** [2] - 6933:3, 6933:11
**tier** [1] - 6858:23
**TikTok** [1] - 6943:16
**tilt** [1] - 6941:9
**timeframe** [4] - 6845:11, 6851:5, 6956:15, 6959:25
**timeframes** [1] - 6846:8
**timing** [4] - 6953:3, 6955:7, 6963:21, 6964:6
**Tinuiti** [3] - 6871:10, 6871:12, 6875:4
**tiny** [1] - 6923:23
**title** [1] - 6849:8
**titled** [2] - 6845:17, 6923:19
**today** [8] - 6895:13, 6909:8, 6922:16, 6923:3, 6947:2, 6947:20, 6953:8, 6953:25
**together** [6] - 6863:3, 6876:2, 6881:5, 6883:24, 6884:7, 6954:7
**tomorrow** [9] - 6870:13, 6953:13, 6953:16, 6960:13, 6961:23, 6962:1, 6963:1, 6963:4, 6963:11
**took** [3] - 6936:2, 6936:5, 6944:11
**tool** [5] - 6872:13, 6909:14, 6916:24, 6917:17, 6917:18
**tools** [6] - 6861:8, 6907:19, 6908:13, 6908:18, 6917:5
**top** [8] - 6849:24,

6995

6857:11, 6858:23, 6859:8, 6879:17, 6879:18, 6879:19, 6904:25
**top-tier** [1] - 6858:23
**topic** [2] - 6901:8, 6935:1
**topics** [2] - 6860:22, 6952:4
**total** [1] - 6938:5
**totally** [1] - 6879:25
**towards** [2] - 6869:14, 6941:9
**track** [4] - 6912:2, 6947:8, 6947:19, 6948:2
**tracked** [1] - 6947:24
**tracking** [1] - 6947:10
**Tracy** [1] - 6900:5
**Tracy-Ann** [1] - 6900:5
**traffic** [22] - 6900:1, 6902:21, 6902:22, 6902:24, 6904:9, 6904:10, 6906:2, 6906:9, 6906:19, 6929:1, 6929:7, 6929:8, 6929:10, 6929:19, 6929:22, 6929:25, 6930:2, 6931:12, 6932:1, 6934:9, 6934:20, 6943:24
**train** [1] - 6917:21
**transaction** [6] - 6863:5, 6865:24, 6866:10, 6866:11, 6866:16, 6911:15
**TRANSCRIPT** [1] - 6842:9
**transcript** [4] - 6932:16, 6932:18, 6966:4, 6966:5
**transfer** [2] - 6917:21
**transferable** [1] - 6900:14
**transit** [1] - 6945:9
**translate** [1] - 6858:14
**transmitted** [1] - 6911:15
**travel** [2] - 6901:25, 6929:17
**Travelocity** [2] - 6863:20, 6929:12
**travels** [1] - 6856:2
**treated** [1] - 6920:9
**TRIAL** [1] - 6842:9
**trial** [22] - 6862:6, 6890:5, 6894:19, 6896:17, 6901:17, 6901:24, 6905:5,

6920:13, 6920:16, 6920:19, 6929:2, 6929:16, 6954:18, 6954:23, 6955:13, 6955:20, 6956:12, 6964:1, 6964:4, 6964:8
**tried** [6] - 6881:2, 6881:5, 6913:24, 6922:6, 6937:16
**trigger** [1] - 6922:3
**Tripadvisors** [1] - 6923:9
**trivial** [3] - 6929:24, 6930:5, 6930:6
**true** [6] - 6866:4, 6876:10, 6879:7, 6937:18, 6966:4, 6966:5
**try** [9] - 6869:8, 6876:5, 6928:12, 6930:12, 6933:20, 6947:16, 6950:1, 6959:18, 6959:19
**trying** [21] - 6852:25, 6863:18, 6865:5, 6869:16, 6883:9, 6892:19, 6892:20, 6897:3, 6897:5, 6898:1, 6910:10, 6928:17, 6933:17, 6934:1, 6936:19, 6936:20, 6936:23, 6949:19, 6956:19, 6959:16, 6959:25
**turn** [31] - 6844:11, 6844:12, 6850:11, 6852:7, 6853:7, 6864:24, 6870:18, 6880:9, 6883:3, 6886:6, 6890:10, 6894:18, 6896:3, 6896:10, 6898:25, 6901:8, 6901:23, 6905:4, 6905:17, 6907:15, 6910:17, 6911:6, 6911:16, 6917:23, 6923:18, 6930:21, 6931:9, 6932:4, 6933:19, 6950:21, 6959:9
**turnaround** [1] - 6959:2
**turning** [1] - 6886:19
**twice** [1] - 6944:20
**Twitter** [1] - 6943:20
**two** [37] - 6845:2, 6847:3, 6851:25, 6858:16, 6863:1, 6867:4, 6867:23, 6876:16, 6879:21,

6880:21, 6885:1, 6888:4, 6888:9, 6890:21, 6891:22, 6893:16, 6913:17, 6914:7, 6914:10, 6914:11, 6914:14, 6916:14, 6916:16, 6917:4, 6917:5, 6917:8, 6929:7, 6929:8, 6930:1, 6955:8, 6956:16, 6958:22, 6959:1, 6960:19, 6960:23, 6963:20, 6963:21
**two-thirds** [3] - 6929:7, 6929:8, 6930:1
**Tyler** [1] - 6843:4
**type** [4] - 6854:15, 6861:19, 6874:2, 6925:24
**typed** [2] - 6889:7, 6891:17
**types** [3] - 6857:19, 6863:1, 6895:9
**typically** [1] - 6900:6
**typing** [1] - 6888:25

# U

**U.S** [5] - 6842:12, 6842:15, 6842:19, 6857:12, 6859:15
**ultimately** [2] - 6873:17, 6937:25
**unacceptable** [1] - 6898:15
**unaided** [1] - 6879:19
**uncontested** [1] - 6957:24
**under** [2] - 6859:11, 6940:7
**undergraduate** [1] - 6886:16
**undergraduates** [1] - 6886:17
**understood** [1] - 6853:16
**undertake** [1] - 6939:13
**unduly** [1] - 6956:13
**unfortunately** [1] - 6890:15
**unhappy** [1] - 6916:22
**unified** [1] - 6909:18
**uniform** [1] - 6941:8
**uninformed** [1] - 6882:6
**unique** [1] - 6894:22
**unit** [7] - 6903:25, 6904:1, 6904:3,

6919:17, 6919:20, 6919:22
**Unit** [5] - 6842:24, 6923:19, 6924:2, 6924:21, 6925:1
**United** [3] - 6843:17, 6954:12, 6961:10
**UNITED** [2] - 6842:1, 6842:10
**united** [1] - 6842:2
**units** [14] - 6887:2, 6902:14, 6902:19, 6903:1, 6905:23, 6905:24, 6920:1, 6920:10, 6921:4, 6921:5, 6921:17, 6922:3, 6922:7, 6922:11
**universally** [2] - 6940:1, 6940:8
**universe** [1] - 6939:7
**University** [1] - 6856:22
**unless** [4] - 6898:14, 6915:4, 6922:22, 6961:19
**unmanageable** [1] - 6955:19
**unpaid** [1] - 6903:1
**up** [29] - 6850:25, 6855:10, 6856:25, 6859:11, 6866:25, 6875:6, 6879:25, 6880:18, 6884:22, 6886:12, 6894:2, 6896:20, 6902:25, 6904:18, 6923:12, 6924:9, 6926:1, 6926:12, 6927:24, 6928:2, 6930:10, 6935:24, 6937:25, 6940:5, 6949:12, 6955:22, 6959:24, 6961:16, 6961:23
**updated** [1] - 6845:19
**upper** [1] - 6852:4
**UPX137** [1] - 6960:21
**UPX552** [1] - 6960:20
**useful** [1] - 6895:14
**user** [9] - 6865:3, 6919:23, 6925:22, 6926:23, 6927:1, 6942:4, 6946:16, 6946:23, 6947:19
**user's** [3] - 6922:2, 6942:21, 6947:13
**users** [5] - 6868:4, 6919:20, 6920:1, 6952:3, 6952:6
**uses** [2] - 6902:2,

6996

6913:21
**utilize** [1] - 6935:16
**utilized** [1] - 6846:23
**utilizing** [2] - 6855:10, 6913:2

## V

**vacations** [1] - 6891:2
**vaguely** [1] - 6925:16
**Vallez** [3] - 6890:7, 6896:4, 6917:23
**Vallez's** [1] - 6890:4
**valuable** [2] - 6866:18, 6909:20
**value** [3] - 6876:11, 6893:16, 6893:18
**Varia** [1] - 6853:9
**variation** [1] - 6935:17
**varied** [1] - 6951:23
**various** [7] - 6880:11, 6909:7, 6909:8, 6925:18, 6946:6, 6948:2, 6948:19
**vary** [1] - 6894:9
**vendor** [1] - 6866:3
**Veronica** [3] - 6842:18, 6954:11, 6954:14
**Veronica.onyema@ usdoj.gov** [1] - 6842:21
**version** [3] - 6845:5, 6845:8, 6846:3
**versions** [2] - 6845:2, 6849:18
**versus** [4] - 6866:23, 6884:9, 6943:16, 6944:2
**vertical** [7] - 6863:18, 6863:24, 6887:1, 6919:16, 6922:3, 6922:7, 6922:11
**vertically** [1] - 6905:23
**via** [1] - 6877:10
**video** [7] - 6890:18, 6890:23, 6942:5, 6942:8, 6942:17, 6943:4
**view** [16] - 6861:22, 6863:23, 6869:2, 6875:6, 6875:10, 6892:25, 6894:14, 6896:9, 6908:17, 6910:15, 6918:15, 6918:17, 6925:4, 6925:6, 6956:13
**views** [2] - 6862:16, 6863:7
**violate** [1] - 6931:25
**Virginia** [1] - 6962:19

**virtually** [1] - 6898:9
**visibility** [10] - 6861:4, 6863:3, 6863:12, 6901:10, 6901:14, 6902:16, 6902:17, 6903:24, 6905:24, 6906:1
**visible** [4] - 6862:2, 6862:4, 6862:12, 6906:6
**vision** [1] - 6923:23
**visited** [1] - 6945:15
**voice** [1] - 6856:25
**volume** [5] - 6884:4, 6955:25, 6957:4, 6959:24, 6960:2
**volumes** [1] - 6959:20
**vouch** [1] - 6923:2
**vs** [1] - 6842:5

## W

**wait** [3] - 6879:24, 6963:1, 6965:3
**wake** [2] - 6879:25, 6886:12
**walk** [1] - 6911:7
**Walmart** [2] - 6872:18, 6877:6
**wants** [1] - 6887:11
**Washington** [9] - 6842:5, 6842:13, 6842:20, 6843:9, 6843:18, 6923:20, 6924:7, 6924:15, 6966:13
**Waszmer** [2] - 6843:11, 6844:3
**WASZMER** [16] - 6844:4, 6844:7, 6844:14, 6844:17, 6847:18, 6847:19, 6849:2, 6849:4, 6849:12, 6849:13, 6850:14, 6850:17, 6850:20, 6850:22, 6850:24, 6851:14
**Waszmer.........6844** [1] - 6967:4
**watch** [1] - 6942:5
**watched** [4] - 6890:23, 6942:5, 6942:17, 6942:22
**watching** [6] - 6890:17, 6942:16, 6943:1, 6943:3, 6943:4, 6943:7
**water** [1] - 6926:3, 6927:10, 6928:8
**ways** [5] - 6879:14,

6880:11, 6933:14, 6933:15, 6951:23
**weak** [3] - 6893:3, 6940:11, 6941:3
**weaker** [4] - 6893:13, 6893:23, 6895:25
**weakest** [3] - 6940:13, 6941:9, 6941:12
**web** [2] - 6894:24, 6900:14
**Webb** [1] - 6843:4
**website** [14] - 6865:3, 6865:25, 6866:10, 6866:15, 6886:24, 6895:1, 6909:17, 6911:8, 6911:10, 6911:11, 6944:11, 6944:15, 6945:1, 6945:14
**websites** [1] - 6895:15
**week** [4] - 6893:17, 6955:19, 6956:12, 6962:4
**weekend** [1] - 6954:18
**weeks** [2] - 6964:2, 6964:12
**weighing** [1] - 6961:4
**weight** [3] - 6897:16, 6938:16, 6962:11
**welcome** [5] - 6844:2, 6844:8, 6856:1, 6856:11, 6859:17
**Wendy** [1] - 6843:11
**Wfcavanaugh@pbwt .com** [1] - 6843:6
**Wharton** [1] - 6857:13
**whereas** [15] - 6865:22, 6866:1, 6872:20, 6884:21, 6887:15, 6887:23, 6888:10, 6889:8, 6889:18, 6892:17, 6894:23, 6895:16, 6895:21, 6897:24, 6910:24
**Whereas** [1] - 6916:7
**Whinston** [1] - 6962:9
**whole** [2] - 6863:11, 6872:9
**wide** [1] - 6873:23
**Wilfred** [2] - 6856:7, 6856:20
**wILFRED** [1] - 6967:5
**WILFRED** [1] - 6856:8
**William** [1] - 6843:3
**WILLIAMS** [1] - 6843:8
**willing** [1] - 6867:3
**Wilson** [1] - 6843:12
**window** [3] - 6917:9, 6947:16, 6947:17

**windows** [1] - 6917:8
**wish** [1] - 6959:13
**withheld** [2] - 6914:18, 6915:7
**WITNESS** [23] - 6856:1, 6856:3, 6856:12, 6857:4, 6864:14, 6867:1, 6867:8, 6867:20, 6871:18, 6871:20, 6873:5, 6873:7, 6875:12, 6881:14, 6881:20, 6883:21, 6884:10, 6885:4, 6885:10, 6899:9, 6923:15, 6941:5, 6953:20
**witness** [5] - 6856:5, 6856:9, 6905:20, 6932:9, 6933:8
**WITNESSES** [1] - 6967:2
**wonderful** [1] - 6870:13
**wonderfully** [1] - 6863:10
**wonders** [1] - 6912:12
**word** [6] - 6910:9, 6925:8, 6938:24, 6939:11, 6947:21, 6947:23
**words** [2] - 6854:15, 6937:6
**workable** [1] - 6958:17
**workarounds** [1] - 6918:13
**works** [2] - 6863:10, 6911:8
**world** [2] - 6878:18, 6939:9
**worry** [1] - 6958:24
**worthwhile** [2] - 6904:16, 6906:16
**wrap** [1] - 6961:22
**written** [3] - 6852:3, 6913:5, 6961:1
**wwaszmer@wsgr. com** [1] - 6843:14

## Y

**Yahoo** [1] - 6852:1
**year** [6] - 6850:9, 6850:10, 6858:1, 6858:23, 6870:13, 6964:8
**years** [14] - 6857:11, 6857:14, 6857:15, 6857:18, 6858:24, 6876:22, 6876:23,

6876:24, 6878:1,
6916:14, 6916:16,
6916:17, 6945:17,
6949:13

**yellow** [1] - 6852:5
**yielding** [1] - 6912:1
**York** [8] - 6843:5,
6843:13, 6889:9,
6892:18, 6954:4,
6954:25, 6957:12,
6958:10
**yourself** [1] - 6845:15
**yourselves** [1] -
6964:5