<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
       United States of America,    )
 3     et al.,                      )   DAY 28
                                    )
 4                      Plaintiffs, )
                                    )   CV No. 20-3010
 5                         vs. )   Washington, D.C.
                                    )   October 26, 2023
 6     Google LLC,                  )   9:30 a.m.
                                    )
 7                      Defendant. )
       _____)
 8

 9                     TRANSCRIPT OF BENCH TRIAL
                   BEFORE THE HONORABLE AMIT P. MEHTA
10                   UNITED STATES DISTRICT JUDGE

11     APPEARANCES:
       For DOJ Plaintiffs:        Kenneth M. Dintzer
12                                U.S. DEPARTMENT OF JUSTICE
                                  1100 L Street, NW
13                                Washington, D.C.
                                  (202) 307-0340
14                                Email:  Kenneth.dintzer2@usdoj.gov

15                                David E. Dahlquist
                                  U.S. Department of Justice
16                                209 South LaSalle Street
                                  Suite 600
17                                Chicago, IL  60604
                                  (202) 805-8563
18                                Email:  David.dahlquist@usdoj.gov

19                                Joshua Hafenbrack
                                  U.S. DEPARTMENT OF JUSTICE
20                                455 5th Street NW
                                  Washington, DC  20530
21                                (202) 603-0857
                                  Email:  Joshua.hafenbrack@usdoj.gov

22     For Plaintiff
         States:                  William J. Cavanaugh, Jr.
23                                Patterson Belknap Webb & Tyler LLP
                                  1133 Avenue of the Americas
24                                Suite 2200
                                  New York, NY 10036
25                                (212) 335-2793
                                  Email:  Wfcavanaugh@pbwt.com
</pre>

For Plaintiff
  States (Cont.):          **Jonathan Bruce Sallet**
                           **Steven M. Kaufmann**
                           COLORADO DEPARTMENT OF LAW
                           Consumer Protection Section
                           Ralph L. Carr Colorado Judicial Center
                           1300 Broadway
                           Seventh Floor
                           Denver, CO 80203
                           (720) 508-6000
                           Email:  Jon.sallet@coag.gov

For Defendant Google:      **John E. Schmidtlein**
                           WILLIAMS & CONNOLLY LLP
                           680 Maine Avenue SW
                           Washington, D.C. 20024
                           (202) 434-5000
                           Email:  Jschmidtlein@wc.com

                           **Michael Sommer**
                           Wilson Sonsini Goodrich & Rosati
                           1301 Avenue of the Americas
                           40th Floor
                           New York, NY  10019
                           (212) 497-7728
                           Email:  Msommer@wsgr.com

                           **Wendy Huang Waszmer**
                           Wilson Sonsini Goodrich & Rosati
                           1301 Avenue of the Americas
                           40th Floor
                           New York, NY  10019
                           (212) 999-5800
                           Email:  Wwaszmer@wsgr.com

Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
                           Official Court Reporter
                           United States Courthouse, Room 6523
                           333 Constitution Avenue, NW
                           Washington, DC  20001
                           202-354-3267
                                 *   *   *

```
1      *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2           THE COURT:  Good morning, Counsel.

3           THE COURTROOM DEPUTY:  Good morning, Your Honor.

4      This is civil action 20-3010, *United States of America, et al.*

5      *versus Google LLC*.  Kenneth Dintzer for the DoJ.  Jonathan

6      Sallet and William Cavanaugh for plaintiff states.  John

7      Schmidtlein on behalf of Google.

8           THE COURT:  Good morning, everyone.  All right.

9      Before we get started, I wanted to just raise one issue, and

10     that concerns Professor Fox and whether we hear from him today

11     or not.  I've had a chance to look through the *Daubert* motion

12     and here's how I would like to proceed, which is I would like

13     to treat Professor Fox's testimony both as a hearing on the

14     *Daubert* motion and substantive testimony.

15          Now, if that means the parties need additional time

16     to prepare, let me know.  This is on me, in terms of the late

17     notice.  But I do want to consider the *Daubert* motion and some

18     of the issues raised in there in the context of his testimony

19     because I think I would need a hearing on the *Daubert* motion,

20     in any event; just couldn't simply rule on the papers.  Okay.

21          MR. DINTZER:  And, Your Honor, just so that I

22     understand what it would look like, would you actually have an

23     argument on the *Daubert* -- just so we know what to prepare for,

24     would you have a hearing on the *Daubert* right before Professor

25     Fox is seated?  Or what is the Court thinking?
```

1              THE COURT:  No, what I would propose is simply to put

2      him on the stand, and you should direct your examination both

3      to the issues that are raised in the *Daubert* motion and

4      anything substantively about the results of the experiment.

5      And so, ultimately we'll take that up in the context of the

6      ultimate findings of fact and conclusions of law, leaving the

7      ultimate issue of the admissibility of his testimony open.

8              MR. DINTZER:  Will do.  Thank you, Your Honor.

9              THE COURT:  Okay.  All right.  Any question about

10     that?

11             (No response.)

12             THE COURT:  All right.  Mr. Schmidtlein, do you want

13     to continue?

14             Mr. Baker, good morning.

15             THE WITNESS:  Good morning.

16             MR. SCHMIDTLEIN:  Thank you, Your Honor.

17                          JONATHAN BAKER,

18                     CROSS-EXAMINATION (Cont.)

19     Q.  Good morning, Professor.

20     A.  Good morning.

21     Q.  I want to turn to some of the opinions you've offered

22     regarding the distribution contracts that are at issue in this

23     case.  For purposes of your opinions in this case regarding

24     competitive impact of Google search distribution agreements,

25     what time period did you examine?

1    A.  Well, I concluded that the -- the exclusive default

2    agreements, have harmed competition since at least 2016,

3    possibly earlier.  But at least 2016.

4    Q.  And is it your opinion that as of 2016, Google had

5    substantial market power?

6    A.  Yes.

7    Q.  And do you know when Google first gained substantial market

8    power in the alleged general search services and the search

9    advertising markets that you've opined about?

10   A.  No, I did not evaluate that.

11   Q.  You've not offered an opinion in this case that Google

12   achieved substantial market power based on any exclusionary

13   conduct, correct?

14   A.  That's correct.

15   Q.  And just so we're clear, you're not -- you haven't offered

16   an opinion as to when Google first achieved substantial market

17   power?

18   A.  That's also correct.  My opinion is about Google's conduct,

19   preventing its market power from erosion, not about its -- how

20   it -- how and when it obtained market power.

21   Q.  Okay.  So during this time period that you've looked at,

22   2016 until you issued your reports in 2022, was Google's search

23   quality higher than any other general search engine in the

24   United States?

25   A.  My understanding is that many industry participants think

1    so, and that there is a bit of an argument about whether the

2    quality of Bing search results on the desktop is close.  But,

3    that aside from that, many -- that's the general view, I

4    understand, from industry participants.

5    Q.  For purposes of your opinions in this case, did you -- did

6    you assume that Google search quality was in fact superior to

7    all other rival search engines in the United States?

8    A.  I accepted the -- what I just said as what many -- what

9    industry participants believed.

10   Q.  And do you know how far back in time it has been sort of

11   the industry consensus that Google search quality is superior

12   to other rival search engines in the United States?

13   A.  No, I did not look at that.

14   Q.  And you've not done any comparison or analysis over time

15   looking at the gap in search quality between Google and any

16   search rivals in the United States?

17   A.  No, only in -- only insofar as I've looked at the gap in

18   scale and that affects search quality.  But I've not evaluated

19   differences in search quality over time.

20   Q.  Okay.  And you've certainly not offered any opinions in

21   this case that but for the alleged exclusionary agreements,

22   another rival would have developed a search engine that was

23   higher quality than Google's?

24   A.  I don't know what would have happened -- whether another

25   rival would have.  It could have, but I've not offered the

1    opinion that it would have.

2    Q.  And you've not offered any opinion in this case that but

3    for the alleged exclusionary agreements, that whatever gap

4    exists in search quality between Google and rival search

5    engines would have changed, correct?

6    A.  I'll give you the same answer:  It could have changed in a

7    more competitive world, it's likely that there would be

8    differences and that it would be easier for Google's rivals to

9    achieve higher quality.  But I don't -- I didn't reach a

10    conclusion as to whether that would have occurred or did not

11    assume it would have occurred necessarily.

12    Q.  You've not identified in your expert reports any investment

13    in improving U.S. search quality that a rival search engine

14    declined to make because of Google's search distribution

15    agreements, correct?

16    A.  I explained reasons why rivals would be discouraged from

17    investing by virtue of those agreements, but I did not identify

18    any specific investment that a rival would have otherwise made,

19    didn't, and -- that is to say, I did not determine in the

20    but-for world, without the challenged conduct, what firms --

21    what firms would make what investments.  And that's a very

22    different world and competitive conditions would be very

23    different, and I did not identify specific investments that

24    would have been made in that world relative to what was made in

25    the actual world.

1    Q.  And just to be clear, you didn't see, in your review of the

2    record, any instance where Microsoft, Yahoo!, DuckDuckGo, any

3    rival was evaluating an investment, an innovation, something

4    that would improve their search engine and they decided no, we

5    can't do that because of Google's agreements?

6    A.  Well, I did explain why Google's exclusive default

7    agreement was, in part, a reason for the DuckDuckGo's

8    conversations with Apple about becoming a default for privacy

9    searches not to have resulted in an agreement.

10   Q.  We'll get to that.  I'm asking about investments or things

11   that they would do internally to improve the quality of their

12   search engine that they declined to do because Google had a

13   particular search distribution agreement.

14   A.  I guess that Samsung branch metrics conversation was not --

15   did you ask about any industry?

16   Q.  Rival search engine.

17   A.  Rival search engine.  I guess that was not a rival search

18   engine.  So I don't recall anything else right now.

19   Q.  Okay.  Now, as to the question of search engine scale,

20   you're not an expert in how search engine algorithms operate,

21   correct?

22   A.  I'm not a technical expert, that's correct.

23   Q.  You're not qualified to offer an opinion as to the relative

24   importance of scale versus non-scale factors in determining the

25   quality of any search engine's search results, correct?

1    A.  Well, I'm -- not in any technical way, which was, I think,

2    the sense of the question.

3    Q.  You haven't offered any opinion in this case as to the

4    relative importance of scale versus non-scale factors in

5    improving or developing the quality of a search engine?

6    A.  Only insofar as I offered an opinion that scale matters.

7    Q.  Right.  But you haven't an opinion as to whether scale

8    matters more, less, or the same as non-scale factors in

9    determining the quality of a search engine?

10   A.  No.  I've seen reasons to think that both scale and other

11   investments matter.

12   Q.  You've not offered any opinion in this case about the point

13   at which diminishing returns kick in for search engine scale,

14   correct?

15   A.  I've seen testimony to the effect that when the relative --

16   from Mr. Parakhin, to the effect that when the relative scale

17   of a large general search firm is very high, 65, 70 percent, I

18   have forgotten the number, that it has substantially

19   diminishing returns for investments for -- to quality from

20   increasing scale further.

21   Q.  You haven't seen -- or, you haven't offered an opinion --

22   you, yourself have not offered an expert opinion as to what

23   share of queries or what volume of queries are necessary to get

24   to that point of diminishing returns of scale?

25   A.  No.  I relied on the testimony that I just --

1    Q.  And you believe --

2    A.  -- I didn't independently analyze the question.

3    Q.  I see.  And the testimony you've relied on for that is one

4    question and answer from Mr. Parakhin?

5    A.  It was Mr. Parakhin's testimony, both what we heard and

6    what I saw in the testimony in court and in my interview with

7    him.

8    Q.  In your 30-minute interview with him?

9    A.  I don't recall how long it was.  But, in my interview.

10   Q.  You can't say how much additional market share Bing would

11   need to acquire before it would improve its search quality in

12   the United States, correct?

13   A.  Well, I can say that any additional market share would work

14   in the direction of improving search quality, but I can't say

15   how much any particular increase -- how much quality increase

16   would come from any specific increase in scale.

17   Q.  You've not offered any opinion in this case as to what the

18   minimum scale is needed to be able to develop and operate a

19   competitive search engine in the United States, correct?

20   A.  Correct.

21   Q.  Have you heard any testimony in this trial to that effect?

22   A.  Well, it sort of depends on what you mean -- it depends on

23   what you mean by compete.  For example, I think there was

24   testimony by Mr. Ramaswamy -- is that how it's pronounced --

25   that with his business model, which is not advertising

1    supported, it was a subscription-based business model, I think

2    he gave testimony as to the share he would need using that

3    business model to be successful and then -- but he

4    ultimately -- but his firm ultimately decided to exit.  That's

5    one thing I remember.

6    Q.  Did Mr. Ramaswamy's testimony impact any of your views or

7    opinions in this case?

8    A.  You mean his testimony on this point?

9    Q.  Correct.  The fact that he testified that he believed

10   2.5 percent market share was sufficient for him to be able to

11   compete in the United States.  Did you take that into

12   consideration in any of your opinions in this case?

13   A.  Well, I recognize it, but, remember, he had a different

14   business model.  He's not -- his firm is not ad supported, it's

15   subscription supported, and the -- that would affect the scale

16   that would be required to make it profitable to compete.

17   Q.  Now, you've opined that Google's conduct has reduced

18   competitors' incentives and ability to compete, correct?

19   A.  Yes.

20   Q.  And with regard to incentives to compete, you've seen

21   plenty of evidence of rival search engines competing to try to

22   win default search engine agreements, correct?

23   A.  I've seen examples in which rivals have had conversations

24   with firms that control the search access points about

25   whether -- about trying to obtain exclusive default agreements.

1    Q.  Yahoo! had the ability and the incentive to win the Mozilla

2    Firefox default in 2014, correct?

3    A.  I recall that it did at one time, but that was before the

4    period where I was focusing on the competitive harm.  So I

5    think you're right, but I'm not 100 percent sure.

6    Q.  Well, they held that default until 2017, and that includes

7    the period you looked at, right?

8    A.  Yes.

9    Q.  And in 2017 did Mozilla again evaluate whether or not to

10   switch default search providers?

11   A.  Yes.

12   Q.  And how many search engines competed to try to win the

13   Firefox default in 2017?

14   A.  I don't recall.

15   Q.  Did you investigate how many firms had the incentive and

16   the ability to compete for the Firefox default in 2017?

17   A.  I remember learning about the outcome of those negotiations

18   but I don't recall the details.  I know that Google had the

19   incentive and ability to compete because it secured that

20   default.

21   Q.  Are you aware of whether other rival search engines

22   competed to win the Firefox default in 2017?

23   A.  I'm not remembering one way or the other.  I think I knew

24   that at one time.

25   Q.  Now, even though the Firefox browser in 2017 had a

1    relatively small share of search queries, of all queries in the

2    United States, numerous search engines competed for that

3    default, correct?

4    A.  Well, I said I didn't recall, But I -- nothing I know is

5    inconsistent with that claim.

6    Q.  And Google competed and won the Firefox default search

7    engine with Moxilla in 2017 because it had the best quality

8    search engine, correct?

9    A.  Well, it also paid for the default.

10   Q.  Did you look at the record and evaluate the evidence as to

11   why Mozilla chose Google?

12   A.  I don't remember now.

13   Q.  Since 2017, Mozilla has continued to consider various rival

14   search engines to be the default search, correct?

15   A.  I don't remember one way or the other.

16   Q.  Has -- Mozilla's run tests with Google and Bing as the

17   default search engine in Firefox, correct?

18   A.  I don't remember.

19   Q.  You just don't have any recollection as to what the

20   competitive dynamic with Mozilla has been?

21   A.  I don't remember that, no.  I think I understood it at one

22   time, but I think I've paid more attention to the Apple --

23   Q.  Okay.  Let's talk about Apple.  Over the years Apple has

24   held competitions to be the default search engine for Safari,

25   correct?

1    A.  It has talked to multiple search firms, yes.

2    Q.  Many search engines in the United States have had both

3    the -- have had the incentive to compete for the Safari

4    default, correct?

5    A.  Incentive, yes.

6    Q.  And Microsoft has -- strike that.

7         Apple has been approached by every search engine that

8    you've identified as being in your search engine relevant

9    market to try to be the default over the years, correct?

10   A.  Well, I don't know -- recall every search engine, you know,

11   before 2016 who talked to whom at Apple, but I know that Bing

12   certainly approached Apple.

13   Q.  Well, you made reference to DuckDuckGo, too, correct?

14   A.  Well, that was not to get the exclusive default as a whole,

15   that was to get an exclusive -- a relative for certain privacy

16   related searching.

17   Q.  Apple has repeatedly selected Google because it has the

18   highest search quality, correct?

19   A.  That was a factor in Apple's consideration, but Apple also

20   was paid by Google to -- you know, for that position.  So it's

21   not just the -- the quality.  If -- if all that mattered to

22   Apple was the quality, you know, it could have chosen Google

23   without an agreement.

24   Q.  I see.  So you think that -- strike that.

25        Without getting into specific numbers, have you examined

 1    the record in this case to evaluate whether the revenue shares

 2    that Google offered to Apple were higher, lower, or the same as

 3    the revenue shares offered by rivals?

 4    A.  I've known that.  And I've had the impression that -- well,

 5    since I'm not certain, I guess I shouldn't say.  But I have

 6    examined -- I know I have examined that, and I've also examined

 7    the -- something related, the price per query that Apple

 8    received in its Google default and how that changed over time.

 9            I guess it's not really -- where I'm going is not

10    really an answer to your question, so maybe I should stop.

11    Q.  The fact that Google has won the Safari default agreement

12    repeatedly over the years has not deterred competitors from

13    trying to win that default, correct?

14    A.  That's -- at least it hasn't deterred Microsoft from

15    trying.  But, of course, Apple continues to stay with Google.

16    Q.  Let's turn to slide 62 of your slide deck.  And this slide,

17    the heading of this slide is:  Defaults Increase User Switching

18    Costs.  I want to talk about some of the bullets on this slide.

19         The first bullet is:  General tendency of consumers to

20    retain defaults set by others.  Have you seen evidence in this

21    case that users retain the default when it's set to Google in

22    much larger percentages than when it's set to another search

23    engine?

24            THE COURT:  Could you repeat the question?

25            MR. SCHMIDTLEIN:  Sure.

1    MR. SCHMIDTLEIN:

2    Q.  Have you seen evidence in this case that users retain the

3    default when it is set to Google in much larger percentages

4    than when the default is set to another search engine?

5    A.  I've seen evidence consistent with that possibility, but

6    not a -- that's the most I could say.

7    Q.  Have you seen evidence in this case that users have

8    switched the default upwards of 60, 70, 80, 90 percent of the

9    time when the default is set to a search engine other than

10   Google?

11   A.  Well, I don't know about your specific numbers, but I've

12   seen -- I've seen evidence that Microsoft users who -- you

13   know, Bing -- where there's a Bing default would download

14   Chrome browser, and that Chrome browser has a Google default

15   and then they would be using the Google default after that, on

16   their browser.

17   Q.  Can we pull up demonstrative DXD-25.009.  And it's in the

18   binder we gave you because some of it is redacted, Professor.

19        In forming your opinions in this case around the

20   tendency of consumers to retain the default, did you examine

21   the instances reflected in this demonstrative demonstrating

22   that substantial majorities of consumers switched the default

23   away from a rival search engine and searched on Google?

24   A.  I think I've seen this -- was it in Professor Murphy's

25   report, something like this?

 1              Let's see.  The first bar, the one that's redacted on

 2      the left, is highly consistent with a figure that was in my

 3      testimony yesterday.  So I --

 4      Q.  We're going to get to that.

 5      A.  You know, I looked at that.

 6      Q.  Yep.

 7      A.  The second bar appears to have something to do with events

 8      in 2010.  And I don't know about the competitive situation then

 9      enough to comment on that.  The third bar about Firefox and

10      Yahoo! defaults, my recollection is that what happened with the

11      events surrounding Firefox choosing various defaults at

12      different times, that you discussed a moment ago, was one of

13      the bases for Google's projections of substantial revenue

14      losses were it to lose its exclusive defaults to someone else,

15      to another firm that I talked about yesterday.  So to that

16      extent I've thought about this bar.  And then the fourth one is

17      2010 as well and I don't really know anything about it.

18      Q.  You don't disagree that in every instance that's in the

19      record in this case that a rival has chosen a default search

20      engine other than Google, a substantial majority of users have

21      switched back to Google?

22      A.  Well, in my Windows 9 Chrome example -- I don't recall

23      whether the number was public or not in that.  But I wouldn't

24      describe it as a substantial majority there.  With emphasis on

25      "substantial."

1    Q.  You understand that for many, many years on Windows PCs a

2    Microsoft browser defaulted to a Microsoft search engine and a

3    Microsoft search engine had been exclusively preloaded on those

4    Windows PCs, correct?

5    A.  That's generally right, yes.

6    Q.  And you were also aware that for many, many, many years

7    Google has been overwhelmingly the most popular search engine

8    used on Windows, correct?

9    A.  That seems consistent with the numbers that I found in --

10   that I reported yesterday.

11   Q.  Let's go back to slide 62.

12       Your second bullet is Google's home page study, is that

13   right?

14   A.  Yes.

15   Q.  And what year was the home page study?

16   A.  I don't remember now.

17   Q.  Long time ago, wasn't it?

18   A.  I wanted to say 2010, but is that right?

19   Q.  More than ten years ago, correct?

20   A.  I don't remember.

21   Q.  That's an example of when you did decide to reach back

22   before 2016 and look at something, right?

23   A.  Yes, I came across that, and that was why I didn't describe

24   it as a -- discussing -- as about the switching costs for these

25   defaults.  It was a -- it was like the first bullet, it's about

1   that the general tendency of consumers to retain defaults set

2   by others doesn't just apply in their 401(K) plans and, you

3   know, what the behaviorial economics literature talks about, it

4   also applies to online searching.  I was using it for that

5   purpose, not to anything else.

6   Q.  Do you think users today are more educated about how to

7   change defaults than when the default home page study was

8   conducted many years ago?

9   A.  I really don't know.

10  Q.  Did you study the mechanisms for whether -- or even whether

11  you could change a default on a home page many, many years ago

12  versus the mechanisms for changing a default today?

13  A.  No.

14  Q.  The third bullet on your chart there is Bing's higher share

15  on Windows desktops where Google defaults cover fewer queries.

16      Can we go to slide 68.

17      Now, part of this is redacted.  The top figure there,

18  desktop Windows non-Chrome.  You understand that that figure is

19  impacted by the number of users who have decided not to use

20  Bing by downloading Chrome instead, correct?

21  A.  Yes.

22  Q.  I mean, you're not -- you're not offering the opinion in

23  this court that that percentage that's been redacted reflects

24  the true number of users on Windows who are affirmatively

25  deciding to stick with a default, correct?

1    A.  No.  I'm just saying this is a situation in which there're

2    relatively fewer users that have -- subject to the default to

3    Google than in most of the other categories.

4    Q.  Right.  But you recognize that a significant way that users

5    of Windows PCs avoid having to use Bing is by downloading

6    Chrome, correct?

7    A.  Well, I'm aware that when users of Windows PCs download

8    Chrome, they have a default to Google.  But if you're

9    suggesting that they downloaded Chrome in order to change the

10   default, rather than in order to use Chrome, I don't have any

11   reason to think that was the general --

12   Q.  You haven't looked at that question at all, have you?

13   A.  Well, no, except so far as I read testimony about users

14   switching to -- users who switch to Chrome, then subject to the

15   Google default and then choosing Google.

16   Q.  Have you analyzed the question of whether Bing being set as

17   the default search engine on Windows PCs has harmed consumer

18   welfare?

19   A.  No.  My testimony is about Google's conduct and the

20   competitive harms from that.

21   Q.  Have you done any analysis in this case as to how many

22   incremental queries Bing has gained as a result of its

23   exclusive agreements on Windows PCs?

24   A.  Incremental relative to had it not had a default and

25   someone else had the default?

```
1    Q.  Correct.

2    A.  No, I've not analyzed that.

3    Q.  I want to take a look at a slide that was handed up and

4    marked separately yesterday, if you still have it, it's

5    PSXD-12.  Do you have that?

6    A.  Yes, sir.

7    Q.  We can pull that up, if you've got it.  Oh, you don't have

8    it.  Okay.

9         This is the share of Google, Bing, and Yahoo! U.S.

10   mobile and desktop general search queries eligible for payments

11   under Google distribution agreements, correct?

12            THE COURT:  Sorry.  Can you put this up on the

13   screen?  Do we have a digital version of this?

14            MR. SCHMIDTLEIN:  Sorry, I'm trying to get them to --

15   I don't know if we got it last night or not.

16            MR. SALLET:  Is it --

17            MR. SCHMIDTLEIN:  This is --

18            MR. SALLET:  Let us check and we'll see.

19            MR. SCHMIDTLEIN:  Parts of it are redacted, but I'm

20   happy to have --

21            THE COURTROOM DEPUTY:  Put it on the Elmo.

22            THE COURT:  Is the Elmo even there?

23            THE COURTROOM DEPUTY:  Yep.

24            THE COURT:  We could use the Elmo, too.

25            THE WITNESS:  Well, it has on it --
```

```
 1              THE COURT:  Hang on for a second, please.
 2              MR. SALLET:  The only question, this has redactions.
 3              MR. SCHMIDTLEIN:  I think the versions we all have
 4     are unredacted, Your Honor.
 5              MR. SALLET:  We have it.  We have it.
 6              MR. SCHMIDTLEIN:  Okay.  Great.
 7              Great.  Thank you very much.
 8              THE COURT:  Thank you.
 9     BY MR. SCHMIDTLEIN:
10     Q.  The blue bars here represent the percentage of search
11     queries over the years that, in the U.S., are covered by the
12     Google agreements that are the subject of your opinions in this
13     case, is that right?
14     A.  Yes, percentage of -- on Google, Bing, and Yahoo!, and --
15     but, yes.
16     Q.  Okay.  And what is the purpose of this analysis to your
17     opinions?  Or what's the relevance of this analysis to your
18     opinions?
19     A.  It shows the fraction of the general search business,
20     search for services business that is covered by the exclusive
21     defaults and because of the defaults create higher user
22     switching costs.  This is a fraction of business that's harder
23     to get, for rivals to get as a result.
24     Q.  Okay.  This reflects all of the agreements that Google won
25     in competition with other rival search engines and you've
```

1    aggregated them all together, correct?

2    A.  That's correct.

3    Q.  Now, you've not offered any opinion in this case about what

4    a but-for world would look like in the absence of the

5    agreements that are reflected in the blue bars here, correct?

6    A.  So, my -- the but-for world would not include the -- would

7    not have started -- we would go back in time, not have these

8    agreements and the SA360-related conduct and the -- let the

9    market evolve in -- after that, and it would be a more

10   competitive -- it would -- the rivals and Google would have

11   greater incentives to invest and compete and then we would end

12   up with today.  And so, it's --

13   Q.  You haven't offered an opinion in this case as to what any

14   browser, Android OEM or Android wireless carrier, would have

15   done if they did not enter into an agreement with Google,

16   correct?

17   A.  That's correct.  I did not identify what -- whether there

18   would be exclusive defaults in that but-for world, and if there

19   were, who would have them and anything like that.

20   Q.  You've basically just assumed that Google is not allowed to

21   enter into an agreement with all of these companies in your

22   but-for world?

23   A.  That's not quite right.  Because in the more competitive

24   but-for world, it is possible that it wouldn't have -- you

25   know, over time it's possible that the competitive situation

1    would be different and that it wouldn't be harmful to

2    competition for Google to do that.

3    Q.  I see.  So you're imagining a world where over some period

4    of time rivals win a lot of market share, Google's market share

5    goes down, and then at some unbeknownst, undefined time period

6    Google could come back in and compete for an exclusive

7    agreement, is that what you're saying?

8    A.  That's one possibility.  I'm not saying -- I'm not saying

9    that would be what would happen.  I'm saying that --

10   Q.  At what point --

11   A.  -- I'm saying that the world without this conduct could

12   evolve in different ways, with different firms having different

13   shares and different -- and different ability to compete and

14   making different investments and, you know, different --

15   Q.  Sir, let me just ask you this:  So is it your testimony

16   that in the but-for world here, when Apple goes out and holds a

17   competition for the default search engine for the Safari

18   browser, at least during the time period you examined, Google's

19   response to that request should be:  I'm sorry, I'm not allowed

20   to be the default search engine?

21   A.  I didn't say that.  I just said that it was possible that

22   at some time -- that the but-for world could be very different

23   from the current world.

24   Q.  You've only looked at 2016 to the present, right?

25   A.  That's what I said.  I said Google harm began at least

1    2016.

2    Q.  Right.  And there was an Apple agreement that was

3    negotiated and entered into and up for competition in 2016,

4    right?

5    A.  That's correct.

6    Q.  And are you testifying that as in your view, when Apple put

7    that contract out for bid for competition in 2016, Google's

8    response had to be:  I'm sorry, we can't bid or compete to be

9    the default search engine for this agreement?

10   A.  That's not what I said.

11   Q.  So what -- what could Google have done in 2016 during that

12   competition?

13   A.  The -- my view is -- I'm describing what a -- what the

14   but-for world would have looked like without the conduct that

15   harmed competition in the actual world.  I'm using that and

16   explaining that in that world, we would have more competitive

17   outcomes and, as a result, we would have, you know, higher

18   searches of quality and lower ad prices, or at least more

19   likely to have them, than in the current world.  I'm not --

20   Q.  But you haven't said --

21   A.  May I finish please?  I didn't take a view as to what

22   Google should have done when.  I'm just setting that world up

23   as the way of under -- of the conceptual experiment to

24   understand the competitive effects of Google's conduct.

25   Q.  And if I asked you what Google should have done in 2017

1    when Mozilla came to Google after suffering significant

2    economic harm after it switched to Yahoo!, and came to Google

3    and said:  We want you to be the default search engine,

4    Google's response should be:  No, I'm sorry, you're stuck with

5    Yahoo!?

6    A.  I didn't take a view on that.  It's not -- it's not -- I'm

7    explaining the consequences of the conduct that Google engaged

8    in, not reaching an opinion on what Google should have done

9    instead.  I'm explaining that the conduct that Google engaged

10   in helped protect its market power from erosion and, as a

11   result, harmed competition.  That's a different question from

12   the question you're asking.

13   Q.  You've not offered any opinion in this case that any of

14   Google's Android partners or browser partners would have chosen

15   a rival search engine to be the default during the period 2016

16   through the present, correct?

17   A.  Could you please repeat that?

18   Q.  Sure.  You've not offered any opinion in this case that

19   during the time period you examined, in the absence of Google's

20   alleged exclusionary contracts, a browser, Apple, Mozilla, an

21   Android OEM, Samsung, Motorola, Android wireless carrier,

22   Verizon, AT&T, T-Mo, you haven't offered an opinion that any of

23   them would have chosen a rival search engine to be the default,

24   correct?

25   A.  That's correct.  I have not offered an opinion about what

1    defaults would have been reached in the but-for world absent

2    the conduct that was at issue in this case.

3    Q.  If you'll look at the -- back at PSXD-12.  The red line

4    that is tracking above the blue bars there, what is that

5    reflect?

6    A.  That's the total number of queries on -- in the general

7    search queries, all devices for each year and the scale

8    redacted.

9    Q.  The scale is redacted, but the Court can see the magnitude

10   of the increase during that time period.

11        The red bar there reflects that during the time period

12   where Google allegedly had exclusionary agreements in effect,

13   total search output is significantly expanding, correct?

14   A.  Yes.  Over that time period, that's correct.

15   Q.  And based on the data you've reviewed --

16   A.  Well, search output measured by number of queries.  But,

17   yes.

18   Q.  That's a pretty good way to measure search output, fair?

19   A.  Yes, there's advertising, there's -- but, yes.

20   Q.  Based on -- let's just step back.  When search queries are

21   going up, search advertising revenue typically goes up, too,

22   correct?

23   A.  Correct.

24   Q.  You don't have any reason to believe that during this time

25   period search advertising revenue was not also significantly

1    increasing?

2    A.  No.  I expect it was.  I wasn't questioning that.

3    Q.  Based on the data you've reviewed, are you aware that

4    mobile search makes up a higher percentage of search usage

5    increases during this time period than desktop search?

6    A.  That is to say, mobile search was growing faster than

7    desktop search?

8    Q.  Correct.

9    A.  That's correct, yes.

10   Q.  And the Google distribution agreements that you've captured

11   in these blue bars here overwhelmingly involve mobile

12   agreements, right?

13   A.  Yes.  Mobile agreements are very important, yes.

14   Q.  And Google -- the desktop, if we were to look at a universe

15   of the percentage of exclusive distribution agreements

16   involving desktop, the overwhelming number of those would be to

17   Bing, correct?

18   A.  So -- agreements with browser firms, OEMs, and the like, or

19   do you mean defaults?

20   Q.  The percentage of queries that are coming off of desktop

21   devices during this time period involve devices where Bing is

22   the exclusive default search engine, correct?

23   A.  That was different from what you said.  You used the word

24   "agreements" before and now you're asking about just defaults,

25   which include, for example, the Chrome default, correct?

1    Q.  Right.

2    A.  So, yes, there's a lot of Bing desktop defaults.  I take

3    your point.

4    Q.  Okay.  Let's just recap where we are.  During this time

5    period where the exclusive agreements are in effect, we see

6    substantial increase in overall search usage, right?

7    A.  Yes.

8    Q.  And that search usage increase is weighted more heavily in

9    mobile devices, correct?

10   A.  That's likely.

11   Q.  And the exclusive distribution agreements that are in place

12   during this period weight predominantly with Google as the

13   default, right?

14   A.  The agreements, yes.

15   Q.  And the lower -- the lower output increase is on desktop

16   where Bing has the overwhelming majority of the default, right?

17   A.  Yes.  Mobile search is growing more rapidly than desktop,

18   but not -- you know, for all sorts of reasons, like smart phone

19   penetration.  But you're correct as to, I believe, as to what

20   you just said.

21   Q.  Let's look at slide 99 of your deck.

22        Now, this says greater competition would tend to improve

23   the quality of general search services, right?

24   A.  This one is not redacted.  Yes.  That's correct.

25   Q.  And the first bullet that you have there is:  Google

1    analysis indicates that with greater competition, Google would

2    have an incentive to invest more in general search services,

3    right?

4    A.  Yes.

5    Q.  And just to be clear, you've not offered any opinion that

6    Google has failed to adopt some innovation or otherwise failed

7    to make some particular investment to improve search quality in

8    the U.S. due to a lack of competition, correct?

9    A.  I haven't offered an opinion about any specific investment.

10   My opinion is about the incentive.

11   Q.  And let's go to slide 101.

12        Now, slide 101 cites a Google document from 2009,

13   correct?

14   A.  Correct.

15   Q.  And in this document Google discusses competition it faces

16   in several foreign countries, right?

17   A.  Correct.

18   Q.  And the document discusses actions Google could take to

19   improve its competitive position in those four countries,

20   right?

21   A.  Correct.

22   Q.  Did you investigate whether Google search quality in the

23   U.S., at the time this document was drafted, was greater than

24   or equal to the search quality in the foreign markets listed in

25   this document?

1    A.  No, I did not.

2    Q.  In 2009 did Google face greater competition in the U.S.

3    than it did in the foreign markets identified in the document?

4    A.  Let me try and think.  I recall the -- I've seen market

5    share figures that go before -- earlier than the ones I

6    computed from other sources, I believe, and have the impression

7    that Google -- I think I've known something about Google's

8    relative position and think it was -- well, since I'm not sure,

9    I won't say.  But I think I've known something about that.

10   Q.  And -- well, your recollection is that in 2009, Google's

11   competitive position in the United States was stronger, much

12   stronger than the four markets that are referenced in this

13   document, correct?

14   A.  That's what I think.

15   Q.  Okay.  But, you haven't looked and evaluated search metrics

16   that measure the quality of Google search in the U.S. in 2009

17   versus any of these markets?

18   A.  That's correct.

19   Q.  You're not offering the opinion, are you, sir, that Google

20   search quality in 2009 in Russia was higher than its search

21   quality in the United States?

22   A.  No.  I wasn't using this document for that purpose.

23   Q.  And you don't know whether the various competitive actions

24   that are referenced in this document from 2009 having to do

25   with foreign markets, whether Google had already engaged in or

1    undertaken these developments to improve U.S. search quality,

2    correct?

3    A.   No.  But I did notice that in -- I think it was this

4    document, where Google referred to -- the document referred to

5    the need to invest more than the standard level.

6    Q.   But you don't know what that standard level refers to?

7    A.   I don't know that that refers to the United States for

8    sure.

9    Q.   Right.  That could refer to the standard level in any of

10   these foreign countries up until that time, correct?

11   A.   I guess that's correct, yes.

12   Q.   Let's take a look at slide 105.  This slide references

13   testimony about Microsoft analyses indicating Google Search

14   results quality is greater in countries where Google faces

15   competition, is that right?

16   A.   More competition, yes.

17   Q.   And you're referring here to Mr. Parakhin's testimony,

18   right?

19   A.   That's correct.

20   Q.   And have you seen any written analysis from Microsoft

21   relating to this purported proposition about Google search

22   quality?

23   A.   No.

24   Q.   Did you look through all of the --

25   A.   I don't think so.  But --

1    Q.  Well, if you did, you would have looked at it, right?

2    A.  I'm sure I would have, if I -- yeah.

3    Q.  Your colleagues here have helped you try to comb through

4    the voluminous record in this case to find documents that are

5    relevant to your testimony, right?

6    A.  Yes, that's correct.

7    Q.  And you also talked to Mr. Parakhin during your interview

8    with him about this issue, correct?

9    A.  Yes.

10   Q.  And did Mr. Parakhin provide you, as part of that interview

11   process, with any documentation to support this notion that

12   Google's search result quality is greater in countries where

13   Google faces more competition?

14   A.  No, he didn't.  What I'm not remembering is the date of

15   my -- oh, I do have the -- let's see.

16           No, I don't have the -- cited below, the date of my

17   conversation with Mr. Parakhin.

18   Q.  September 2022, right on the eve of your submitting one of

19   your various expert reports, right?

20   A.  Was that after the close of discovery in this case?

21   Q.  Did you ask Mr. Parakhin to provide you with any

22   documentation?

23   A.  No, I did not.  But I'm not sure whether -- you know, it's

24   possible this was after the close of discovery, in which case I

25   wouldn't have asked.

1    Q.  You --

2    A.  I wouldn't have asked because I would have said, thought to

3    myself, he wouldn't be able to submit it.

4    Q.  What foreign countries was Mr. Parakhin referencing?

5    Because he didn't reference any -- he didn't identify a single

6    country by name in his testimony when he sat in that chair.

7    A.  He was talking -- let's see.  I remember him saying

8    something about -- I believe he said -- well, he's talking

9    about Russia, I believe, and I believe -- I think he knew that

10   well from his past experience.  But he -- I think he talked

11   about Russia.  I have a -- I'm not completely sure, but I think

12   he might have said Spain as a -- you know, maybe a country that

13   was -- where Google had lower quality.  I believe he talked

14   about three or four countries, but I don't remember what they

15   all were now.

16   Q.  All right.  Russia you think was one?

17   A.  Possibly the Czech Republic, but I'm not sure.

18   Q.  South Korea?

19   A.  Possibly.

20   Q.  You don't remember?

21   A.  I don't remember now.  I don't recall whether it was in my

22   review notes.

23   Q.  Whatever countries he identified for you, did you go and

24   check whether Google search quality in those countries was

25   higher or lower than the search quality in the United States?

1    A.  No, not at the time -- you know, I didn't know what precise

2    years his analysis covered, so I wouldn't have known how to --

3    you know, what precisely to look for.

4    Q.  Your bullet here says -- I want to get this language

5    precise -- Microsoft analyses indicating that Google's search

6    result quality is greater in countries where Google faces more

7    competition.

8         Okay.  Greater in countries where Google faces more

9    competition.

10        Does Google face, in your judgment, more or less

11   competition in the United States than it does in Russia or

12   South Korea?

13   A.  I did not evaluate that.  That was how Mr. Parakhin viewed

14   it and I was -- I said it a little more precisely, perhaps, on

15   the next slide in the -- in my deck, a similar thing.

16   Q.  You haven't done any analysis in this case to evaluate

17   Google's competitive conduct in Russia, South Korea, or any

18   foreign country as compared to the United States, correct?

19   A.  That's correct.  Only insofar as I talked about this kind

20   of evidence and the evidence from Google about how it -- what

21   happened in Japan and the like.

22   Q.  Now, you also have claimed that general search firms would

23   have used more SVP partnerships to improve search quality with

24   more competition, is that right?

25   A.  Google's general search rivals.

1    Q.  I think you said Google would too?

2    A.  Well, if it -- it would have more -- greater incentive to,

3    yes, if it faced more competition, that's correct.

4    Q.  Let's talk about Google first.  You've not identified a

5    single SVP partnership that Google failed to enter into in the

6    United States due to a supposed lack of competition, correct?

7    A.  That's correct.

8    Q.  Now, you've cited a document in your slides about Google

9    considering partnerships to improve its search quality in

10   Japan, correct?

11   A.  Correct.

12   Q.  Did you evaluate whether Google has more significant

13   partnerships in the U.S. than it has in Japan?

14   A.  No.

15   Q.  And you've not evaluated the competitive landscape in Japan

16   versus the competitive landscape that Google faces in the U.S.?

17   A.  That's correct.  Except insofar as I saw that slide about

18   where Google is doing the evaluation, the collecting

19   advertising comparison.

20   Q.  We'll come back to that.  Do you have an understanding of

21   whether Google search quality in the U.S. is greater then its

22   search quality in Japan?

23   A.  That's correct.  I don't know.

24   Q.  Now let's now next talk about SVP's with rival search

25   engines.  You've not offered any opinion in your expert reports

1    in this case identifying a single SVP general search engine

2    partnership that would have been formed or become more

3    effective for any rival search engine in the absence of the

4    alleged anticompetitive conduct, correct?

5    A.  Well, so you're saying -- that sounds like a reference to

6    the but-for world and I don't know which partnerships would

7    have --

8    Q.  No, I'm talking about in the actual world.  During the

9    course of the -- these supposed alleged anticompetitive

10   agreements, did you see examples of Bing trying to get a deal

11   done or Yahoo! or DuckDuckGo and it failing because of a lack

12   of distribution?

13   A.  Well, I talked -- nothing other than what I talked about

14   yesterday from the --

15   Q.  Yeah, we're going to get to those.  But those weren't in

16   your report, correct?

17   A.  That's correct.  Well, I think in one of my reports,

18   though, I discussed the Bing-Yelp partnership to some extent.

19   Q.  Okay.  Well, let's get to your -- let's get to your slide

20   116.

21         And here you say:  Bing small scale limits the value it

22   can bring to partnerships because it offers partners limited

23   traffic, is that right?

24   A.  Yes.

25   Q.  And you cite to -- in the middle and the right there you

1    cite to testimony from Expedia and Booking, correct?

2    A.  Yes.

3    Q.  And why did you include testimony from those executives on

4    this slide?

5    A.  Because they were talking about their -- the problem -- I

6    guess it's most clear in that right on the right from Booking

7    that the -- their lack of interest or -- well, I'm sorry, lack

8    of interest isn't quite the right word there.  It wouldn't work

9    for Booking because they wouldn't get the scale they need.

10   That's consistent with the title of the slide, The Bing Small

11   Scale Limits the Value It Can Bring to the Partnerships,

12   because it offers limited traffic.

13   Q.  What is the "it" there?  It would really not work for us.

14   What's the "it"?

15   A.  Well, let's see.  If you look at the full testimony:  Is

16   Booking.com able to look to other general search firms, such as

17   Bing, as viable marketing alternatives to Google?  I would say

18   no.  And why is that?  Because the scale is kind of too small,

19   so it wouldn't work with them.  It is -- it has to do with

20   viable marketing alternatives.

21   Q.  Does this have to do with a partnership between Bing and

22   Expedia or Booking?

23   A.  Well, marketing alternatives are -- partnerships are a part

24   of a way of marketing from the point of view from the SVP.  But

25   it doesn't directly say partnership, correct.

1    Q.  Bing has a partnership with Expedia, doesn't it?

2    A.  Yes.

3    Q.  And Bing has a partnership with Booking.com right?

4    A.  I think you're right about both, but I'm not 100 percent

5    sure.

6    Q.  Nothing about this testimony pertains to the question of

7    whether Bing has been unable to enter into partnerships with

8    Booking.com or Expedia to improve Bing's search results, right?

9    A.  No, this goes to the importance of scale and traffic to the

10   SVPs in working out arrangements with general search firms.

11   Not specific partnerships, no.

12   Q.  Those SVPs have arrangements with Bing, right?

13   A.  I guess I think so, but -- or at least they had that.  I

14   don't remember for sure.

15   Q.  Bing has arrangements with dozens and dozens and dozens of

16   SVPs, correct?

17   A.  Bing has arrangements with a number of SVPs, correct.

18   Q.  Let's look at your next slide, 117.

19           MR. SCHMIDTLEIN:  Now, Your Honor, there are portions

20   of this that are redacted.  I, candidly, don't understand why

21   Microsoft should be redacting the information on here.  And I

22   will -- I will respect the redactions if you -- if you instruct

23   me to.  But, I don't see --

24           THE COURT:  These are redactions requested by

25   Microsoft?

 1          MR. SALLET:  Your Honor, I believe what happened is

 2   you asked Microsoft to submit the Barret-Bowen testimony that

 3   was in closed session with suggestions of what should be

 4   redacted and not redacted.  This slide, at the bottom, has

 5   transcript citations to support each of the bullets.  I

 6   believe, Your Honor, that what is being cited to are portions

 7   that Microsoft, in response to your request, designated as

 8   confidential.

 9          THE COURT:  Okay.  Let's --

10          MR. SCHMIDTLEIN:  I'll work around it, if you want me

11   to, but these don't seem consistent with the direction we've

12   been going.

13          THE COURT:  I don't think they are either.  I'll

14   confess, I haven't looked at the Barret-Bowen redactions, so I

15   can't say one way or another.  It doesn't seem the type.

16          MR. SALLET:  And, Your Honor, we would be happy to

17   comment on those, if it would be helpful to the Court.  The one

18   thing I will note is that the second bullet describes a form of

19   arrangement that identified very particular entities by

20   reference, as Mr. Bowen's testimony suggested.  He talked about

21   a particular kind of arrangement, which he has only one, and he

22   would like to have more than one.  And that, I think -- I'm not

23   here to speak on behalf of Microsoft -- Microsoft asked to be

24   confidential because it felt that would identify to the

25   incumbent provider that Microsoft might be looking to as

1    additional providers.

2            As to the other two, the redactions, I think, the

3    trial transcripts would inform Your Honor whether or not you

4    believe those redactions are appropriate.  They deal with terms

5    of agreements that are reached --

6            MR. SCHMIDTLEIN:  Your Honor, I'll work around it.  I

7    don't want to delay any more on this.  If Your Honor -- if Your

8    Honor looked at these and was -- the third one is -- I think we

9    can ignore because the very next slide makes reference to that

10   company.

11           MR. SALLET:  The next slide is partially unredacted,

12   partially redacted.

13           THE COURT:  Can I see the next slide, please?

14           MR. SALLET:  Am I right?

15           MR. SCHMIDTLEIN:  Yeah, but the top of it makes

16   reference to Yelp.

17           MR. SALLET:  It's partially redacted and partially

18   unredacted.

19           MR. SCHMIDTLEIN:  Yeah.

20           MR. SALLET:  That's right.

21           THE COURT:  Yeah, I don't see why the first and third

22   bullets -- I'm not sure I understand the reason why those need

23   to be redacted.  I can understand the strategic concerns about

24   the second one.  And certainly since the last bullet, that

25   partnership is referenced in the next slide.  So,

1    Mr. Schmidtlein, you can go ahead and refer to whatever is

2    underneath the first and third bullets, that's fine.

3              Let's avoid the nature of the business under the

4    second bullet because I think that has more competitive

5    sensitivities.  Go ahead.

6              MR. SCHMIDTLEIN:  That's fine.

7              MR. SALLET:  Thank you, Your Honor.

8    BY MR. SCHMIDTLEIN:

9    Q.  So, your slide 117 identifies three bullets, correct?

10   A.  Correct.

11   Q.  The first one makes reference to Microsoft attempting to

12   reach a partnership with a company called Hopper, correct?

13   A.  Excuse me a second.

14   Q.  Sure.

15   A.  Yes, that's correct.

16   Q.  And what is Hopper?

17   A.  I actually looked it up and now I don't remember.

18   Q.  You did not make any reference to Hopper in your expert

19   reports, correct?

20   A.  That's correct.

21   Q.  The first time you heard about Hopper was the testimony

22   that was given by Mr. Barret-Bowen about a week ago?

23   A.  Correct.

24   Q.  And I will represent to you that Hopper is an online travel

25   agency.  Is that -- is that consistent with your looking them

7262

1    up?

2    A.  That sounds plausible to me.

3    Q.  Does Microsoft have other partnerships with online travel

4    agencies in the United States?

5    A.  I believe so.

6    Q.  They have many partnerships with online travel agencies in

7    the United States, right?

8    A.  I wouldn't be surprised.

9    Q.  Expedia, Priceline, Booking.com, Tripadvisor are just a

10   few?

11   A.  So, I don't remember precisely which firms, but if you

12   would like to represent to that, I wouldn't disagree.

13   Q.  Who are the largest online travel agencies in the U.S.

14   today?

15   A.  I don't recall.  I think the ones that you're describing

16   are among them.

17   Q.  Yep.  And they're all much bigger than Hopper, right?

18   A.  Likely.

19   Q.  Does Google have a partnership with Hopper?

20   A.  I don't know.

21   Q.  You've not performed any analysis to assess whether a lack

22   of a partnership with Hopper has impacted Bing's search

23   quality, correct?

24   A.  I did not analyze it, that's correct.

25   Q.  Or its ability to compete with Google?

1    A.  That's correct.

2    Q.  Now, the second bullet refers to reaching a partnership.

3    Now, this one also is nowhere referenced in your report, right?

4    A.  That's not referenced in my report.

5    Q.  And you've not analyzed the adequacy of Bing's partnerships

6    in this vertical area, correct?

7    A.  Correct.

8    Q.  Bing does have partnerships with other entities that

9    address this vertical area, correct?

10    A.  I don't -- well, I don't know.

11    Q.  Does Bing offer a particular vertical that addresses this

12    commercial area?

13    A.  Unless it's -- I don't know, actually.

14    Q.  May I approach, Your Honor?

15              MR. SALLET:  Your Honor, we --

16              MR. SCHMIDTLEIN:  I'm not going to put that on the

17    screen.

18              MR. SALLET:  And I'm not suggesting that

19    Mr. Schmidtlein would.  But if we were to read the language of

20    this slide --

21              MR. SCHMIDTLEIN:  I'm not going to read the language.

22    I'm showing it to the witness and to the judge.

23              MR. SALLET:  Thank you.

24    BY MR. SCHMIDTLEIN:

25    Q.  Sir, I've handed to you what's been marked as DXD25.012.

1      And this is a search results page and a Bing immersive that

2      addresses the vertical area in your second bullet.

3      A.   Okay.

4      Q.   Have you done any analysis in this case as to whether the

5      failure to reach an additional partnership in this area has had

6      any impact on Bing's ability to offer quality search results in

7      the vertical area that is reflected in the demonstrative I just

8      handed you?

9      A.   No, I have not.

10     Q.   And then the third one that you've identified is Yelp,

11     correct?

12     A.   Correct.

13     Q.   And Yelp had an agreement with Microsoft from 2012 to 2019

14     correct?

15     A.   Yes.

16     Q.   And that agreement was not renewed because of a dispute

17     between Yelp and Microsoft, correct?

18     A.   Yes.

19     Q.   And Yelp wanted to change the structure of its agreement

20     with Microsoft, correct?

21     A.   Yes.

22     Q.   And Microsoft did not agree to the restructuring, correct?

23     A.   They did not reach an agreement, the two of them.

24     Q.   And one of the issues that Yelp had with Microsoft was Yelp

25     felt that Microsoft was misusing its data in Bing search

 1    results, correct?

 2    A.  I've seen some reference to that, yes.

 3    Q.  And in light of that, Yelp wanted additional compensation

 4    in the form of a restructured agreement, right?

 5    A.  I've seen references to both of those things.  But I don't

 6    know about the "in light of."  You know, the connection that

 7    you posit.  But the pieces of it were correct.

 8    Q.  You've not offered any opinion in this case that Microsoft

 9    has lost market share in the United States since 2019 due to

10    the fact that the Yelp partnership ended, correct?

11    A.  That's correct.

12    Q.  Let's look at slide 120.

13    A.  120?

14    Q.  Yes.  Now, this slide says Apple and DuckDuckGo fail to

15    reach agreement in part because of Apple's exclusive default

16    with Google.  What did you mean by "in part"?

17    A.  That there were other issues that came up in -- you know,

18    that concerned one of the other parties.

19    Q.  You've seen evidence in this case that Apple believed that

20    DuckDuckGo search quality was far behind Google's, correct?

21    A.  Behind.  What I don't recall is the word "far."  Yes,

22    behind.

23    Q.  You've also seen evidence in this case that the senior

24    executives in charge of deciding the Safari default never

25    wanted to make DuckDuckGo the default search engine in any

 1    capacity on the Safari browser due to its quality, correct?

 2    A.  I recall that the quality of DuckDuckGo's search results

 3    were an issue for Apple.

 4    Q.  That was the issue that Mr. Cue identified in his testimony

 5    in this courtroom, correct?

 6    A.  I don't recall which executive.  It may well have been

 7    Mr. Cue who talked about that.

 8    Q.  Did Apple ever propose to Google, at any time, carving out

 9    private browsing mode from the Safari default agreement?

10    A.  Did Apple propose to Google?

11    Q.  Yes.

12    A.  I think -- I think the answer is no, but that -- that --

13    but -- so I don't believe so, but I guess I'm not 100 percent

14    sure.

15    Q.  Now, you claim in this slide that Apple -- that the Apple

16    agreement limits choices available to users interested in

17    privacy, is that right?

18    A.  Yes.

19    Q.  Now, DuckDuckGo is available in the drop-down menus on

20    Safari so users can switch the default, whether in private

21    browsing mode now under the now IOS, or under, sort of,

22    non-private browsing mode, correct?

23    A.  It's in a drop-down menu, yes.

24    Q.  So users can easily access DuckDuckGo by switching the

25    default, correct?

```
 1    A.  The word "easily" is what's in dispute.  But they can
 2    access it that way, yes.
 3    Q.  The agreement doesn't limit their choices, correct?
 4    A.  Ah, I see.  You're focusing on the word "choices."  The
 5    agreement -- I guess, in the sense of what you're using the
 6    term, you're correct.  That's not my choice of verb.
 7    Q.  Let's look at slide 122.  Now, this is under a section
 8    where you talk about or you claim greater competition would
 9    tend to lower advertising prices, right?
10    A.  Yes.
11    Q.  And you make reference to the regulatory environment in
12    Japan, right?
13    A.  Correct.
14    Q.  Yahoo! Japan is a competitor to Google there, right?
15    A.  Yes.
16    Q.  And Google actually provides search results for Yahoo!
17    Japan, right?
18    A.  Yes.
19    Q.  And search ads, right?
20    A.  Yes, they --
21    Q.  And you think that that's a more competitive environment
22    than what exists in the U.S. today, is that right?
23    A.  That it -- it -- what I said, to be clear, was that it
24    simulates what a -- what would happen if there was more
25    competition for general search services and -- because of the
```

1    regulation.  That wasn't quite what you asked.

2    Q.  And let's look at -- the point you're trying to make there

3    is that there is a more -- there's closer market shares in

4    Japan than there are in the U.S., correct?

5    A.  No, it's that -- the result quality.

6    Q.  Right.  And the reason the result quality is closer is

7    because Google is supplying the results to the rival, right?

8    A.  Correct.

9    Q.  And Google attempted to enter into a similar agreement with

10    Yahoo! back in the 2000s and the antitrust division blocked it,

11    right?

12    A.  I don't know.

13    Q.  Let's look at slide 125.

14    A.  I remember there was some sort of Google-Yahoo! agreement

15    that had an antitrust issue, but I don't remember the details.

16    Q.  Let's look at slide 125, because this is the document you

17    claim supports the notion that greater competition would lead

18    to lower ad prices, is that right?

19    A.  Yes, that's the implication.

20    Q.  In this email exchange there's a discussion going on

21    because the RPMs in Japan are being observed as being lower

22    than in the U.S., right?

23    A.  Correct.

24    Q.  And you have plucked out a couple of lines in here

25    referring to or making reference to auction pressure, is that

1    right?

2    A.  Yes.

3    Q.  And the supposition, or your interpretation is somebody is

4    raising that there may be fewer advertisers in Google's auction

5    because of competition with Yahoo!, right?

6    A.  Yes, which led advertisers to split search budgets.

7    Q.  And what's going on in this email is that various --

8    internally within Google, people are debating what is the cause

9    of the lower RPMs in Japan, right?

10   A.  That's correct.

11   Q.  And one of the things they hypothesized was auction

12   pressure, right?

13   A.  Yes.

14   Q.  But they also hypothesized various other factors too,

15   right?

16   A.  Yes.

17   Q.  And let's take a look at some of those other factors that

18   are identified in this email.

19       So if we look at the bottom one, that's that -- that you

20   have flagged.  And it says:  We have some theories around

21   Yahoo! Japan reducing auction -- around Yahoo! Japan reducing

22   auction pressure, higher mobile share in Japan and relative

23   size of eCommerce market, but welcome thoughts.

24       So, in that email they're offering a whole variety of

25   possible explanations for lower RPMs in Japan, right?

1  A.  So I think this was a somewhat -- I think the question was

2  coming from someone who was -- my recollection, someone who is

3  in a different -- maybe in the U.S. or something like that and

4  wanted the -- wanted to ask the -- are the -- ask for an

5  explanation from people who were closer to what was going on in

6  Japan to try and understand the reasons for the differences in

7  advertising prices.  And so this is a question.  You know, this

8  is the person asking the question, I think --

9  Q.  Right.

10  A.  -- at the bottom.

11  Q.  And one of the things that's identified in the response is

12  advertisers splitting their search budget, right?

13  A.  Yes, that's one of the -- yes.

14  Q.  But if you go down in the responsive email that is above,

15  if you go down to another possible factor behind why the

16  absolute mobile RPMs are lower than in other countries is that

17  Japan advertisers may value online less compared to those in

18  U.K.  Online share of wallet in the ads market is 23 percent in

19  Japan, while it's 35 percent in U.S. and 56 percent in U.K.,

20  correct?

21      So that's another example of somebody hypothesizing

22  another factor that might explain the differences in RPMs

23  between Japan and the United States, right?

24  A.  Yes.  That's another possibility.

25  Q.  And you, yourself, have not done any sort of analysis of

1    RPMs in Japan versus RPMs in the United States for Google

2    search ads?

3    A.  That's correct.

4    Q.  You aren't in a position to evaluate or offer explanations

5    for any such difference in RPMs between those countries?

6    A.  That's correct.

7              MR. SCHMIDTLEIN:  Right on time, Your Honor.  No

8    further questions.

9              THE COURT:  Okay.  All right.  Let's take our morning

10   break.  It's a little bit before 11.  We will resume at 11:15.

11   Thank you all very much.

12            (Recess.)

13            MR. SCHMIDTLEIN:  Just one housekeeping on the

14   demonstratives.  Because we did not use all of the

15   demonstratives in the binder, we would ask that the Court, you

16   know, accept into evidence, as we've been doing with

17   demonstratives, DXD25.002, 25.009, 25.012, and 25.013.

18            THE COURT:  Okay.  We'll accept those into evidence.

19            MR. SALLET:  No objection.

20            THE COURT:  All right.  Mr. Sallet, redirect.

21                    REDIRECT EXAMINATION

22   BY MR. SALLET:

23   Q.  Professor Baker, I would like to show you slide 41 from

24   your demonstratives.  If you might look at that and if we might

25   post that.

1          Do you recall, yesterday I asked you about the trend of

2     the Google market share in the time 2012 to 2021.

3          I should give you a second, Professor Baker.  I'm sorry.

4     A.  I'm fine.

5     Q.  Do you recall, yesterday I asked you to describe the

6     Google -- the trend in Google share from 2012 to 2021 as shown

7     on this chart?

8     A.  Yes.

9     Q.  Just for the record, this is -- shows shares of U.S.

10    general search ad revenue by general search ad firm from 2012

11    to 2021, correct?

12    A.  Yes.

13    Q.  And can you just tell us the trend lines that apply to

14    Google rivals as a whole during the same time period?

15          MR. SCHMIDTLEIN:  Your Honor, this is outside the

16    scope of my examination.  I didn't ask him about this slide.

17          MR. SALLET:  I'm going to tie it up to a question in

18    my next question.

19          THE COURT:  Okay.  It's overruled.  Go ahead.

20    A.  So when Google's share is increasing, the aggregate share

21    of its rivals would be decreasing by the same amount.

22    BY MR. SALLET:

23    Q.  So I want you to look at 2021.  Mr. Schmidtlein asked you

24    if you could identify specific advertisers and the manner in

25    which they allocated their spending between Google and Bing.

1    For 2021, what, if anything, did the Google and Bing shares on

2    this slide show you about how advertisers as a group actually

3    allocated their spending?

4    A.  It shows --

5            THE COURT:  I'm sorry, the objection?

6            MR. SCHMIDTLEIN:  This data doesn't tell them

7    anything about this.  There's no foundation as to what this

8    data means in terms of the growth of the overall market,

9    doesn't say anything about allocation.

10           MR. SALLET:  I haven't asked that.

11           MR. SCHMIDTLEIN:  You said --

12           THE COURT:  Hang on.

13           MR. SALLET:  Not in the pending question, Your Honor.

14    In the pending question I directed him to the year 2021.  I

15    reminded him that Mr. Schmidtlein had asked him about whether

16    he could identify specific advertisers and the manner in which

17    they allocated spending between Google and Bing, and I asked

18    whether this chart would show how, as a group, advertisers

19    actually allocated their spending between Google and Bing,

20    which is a fair response to the question about individual

21    identification.

22           THE COURT:  Okay.

23    A.  So this shows that in 2021 the overwhelming majority of

24    advertising dollars that were spent on general search ads were

25    allocated to Google, rather than to any of its rivals.

BY MR. SALLET:

Q. Could you look at, now, slide 73 in your demonstratives. And this is the heavily redacted slide, so I just remind you, Professor Baker, we're not using particular numbers on this.

So, you were asked about switching between SEM tool providers in connection with this slide. Do you recall that?

A. I don't recall whether it was in connection with this slide. But that was probably yesterday. That was a long time ago.

Q. Yes, yesterday. Have you seen, in this record of the case, any evidence of significant switching away from SA360 by advertisers to another SEM tool provider?

A. I've not seen indication of significant switching, no. I've seen an example or two.

Q. Now, you were asked yesterday about the change in shares as demonstrated on this slide. So, if you look at the trend lines of -- let's start with SA360. I think you addressed this yesterday. What is the trend line, up or down, in share for SA360 between 2016 and 2020?

A. The SA360 share that's reported here increased substantially.

Q. Now, Skai is, as of 2020, the next leading provider. What happens to its share during this period?

A. Its share decreased.

Q. And, in fact, if one looked at 2018 to 2020, the same trend

1    line holds, correct?

2    A.  Yes.

3    Q.  And am I right, because we can't use specific figures, that

4    as of 2020 SA360 share is something on the order of five times

5    that of Skai, its nearest rival?

6    A.  I think more than that perhaps.

7           (Off-the-record discussion between Mr. Cavanaugh and

8    Mr. Sallet.)

9           MR. SALLET:  I thought -- Mr. Cavanaugh thinks I

10   misstated the question.  And as always, I will defer to his

11   understanding.

12   BY MR. SALLET:

13   Q.  I don't want you to refer to specific shares.  We'll see if

14   Mr. Cavanaugh helps me on this one.

15          But, the SA360 share for 2020, would it be correct to

16   say that its roughly five times the share of Skai?

17   A.  So, the highlighted -- the number for SA360 that's in the

18   little box that's highlighted is more than -- I think, more

19   than five times the number for Skai that's directly below it.

20   Q.  And as to the other SEM tool providers shown on this graph,

21   what is the trend lines of their share between 2016 and 2020?

22   A.  It's decreasing.

23          THE COURT:  I should ask, is there a reason we can't

24   show market shares?  Because that's all this shows.  I don't

25   know who is making the request.

```
 1              MR. SALLET:  This is from Google data, I believe,
 2    Mr. Schmidtlein.
 3              THE COURT:  These are just market shares.  And I
 4    don't know where the information is sourced from, but I'm not
 5    sure why market shares need to be redacted.
 6              MR. SCHMIDTLEIN:  It's a combination of a variety of
 7    sources, including Microsoft --
 8              THE COURT REPORTER:  I'm sorry, I can't hear.
 9              MR. SALLET:  That's true.  That is true, Your Honor.
10              MR. SCHMIDTLEIN:  In other words, this is not
11    public -- these shares are not public because it is a
12    combination of a variety of private data that is being amassed
13    together.
14              THE COURT:  I understand, but at the end of the day
15    it's market share.  It's not anything that seems to me would be
16    competitively disadvantaged if the market shares were revealed.
17              MR. SCHMIDTLEIN:  Well, I think that depends on who
18    you talk to within the various companies.
19              THE COURT:  You know, market share is always a pretty
20    strong indicia, or is an indicia of market power, and so --
21              MR. SCHMIDTLEIN:  He's testified he has no opinion on
22    that.
23              MR. SALLET:  Well, that's --
24              THE COURT:  Wait, I'm not worried about an opinion,
25    I'm just -- why these numbers are redacted.  So, why don't we
```

1    just go ahead and you can use the numbers, refer to them, and

2    then I have a follow-up question.  So why don't you go ahead

3    and just state what the numbers are and the trend is over time,

4    and then I have a question.

5              MR. SALLET:  Should I just put that into the record,

6    Your Honor, or should I ask him to do it again?

7              THE COURT:  It's going to be in the record anyways,

8    so why don't you summarize it so it's on the public record.

9    BY MR. SALLET:

10   Q.  As I see this -- and please correct me if I'm wrong,

11   Professor Baker -- in the years 2016 to 2020, SA360's share

12   goes from 40.7 percent to 76.0 percent.  Skai, for those years,

13   goes from 26.4 percent to 13.7 percent.  And Adobe's goes, for

14   the same years, 7.7 percent to 5.8 percent.  And Marin goes,

15   for the same years, 25.2 percent to 4.6 percent.  Have I read

16   those correctly?

17   A.  Yes, you have.

18   Q.  Mr. Schmidtlein asked you about switching yesterday.  I

19   want to ask you to look at the second row in this chart,

20   general search ad revenue through major SEM tools in millions.

21   Do you see that?

22   A.  Yes.

23   Q.  What is the trend line for that revenue between 2016 and

24   2020?

25   A.  It rose substantially.

1    Q.  Can you tell by looking at this chart the extent to which

2    growth in SA360 over this time period could be from new

3    business -- that is to say, the growth in revenue to which you

4    just referred -- rather than switching between SEM tool

5    providers?

6    A.  Not just from looking at these numbers.  I suppose if I did

7    some multiplication, I could think about it, what the

8    implications of that were.  But it's not obvious on the face of

9    this chart.

10            MR. SALLET:  Well, the general search ad revenue,

11   Your Honor, is this something I can read?

12            MR. SCHMIDTLEIN:  These are not public numbers.

13            MR. SALLET:  I will do it by percentage, if I can do

14   the math.

15            THE COURT:  What numbers do you want to read?

16            MR. SALLET:  I want to ask him to estimate the growth

17   in general search ad revenue -- and he can do it as a

18   percentage -- between 2016 and 2020.

19            THE COURT:  Again, these are aggregate numbers across

20   four different companies.  That's the numbers I want to --

21            MR. SALLET:  That's correct.

22            THE COURT:  I'm not sure why that's a problem.

23            MR. SCHMIDTLEIN:  Well, if we're going to read the

24   market shares in connection with those, now you can reverse

25   engineer what each individual company's total dollars are.

1          THE COURT:  Okay.  And then I'm not sure why the

2     total dollars any particular company is earning is a state

3     secret.  So, why don't you just go ahead and say what the

4     totals are.  If you need to ask your question with the totals,

5     that's fine; if not, then it's not necessary.  But, go ahead.

6          MR. SALLET:  I can ask without.  And let's see if I

7     can do this.

8     BY MR. SALLET:

9     Q.  Professor Baker, look at the revenue -- general search ad

10    revenue for major SEM tools in 2016 and then look at the number

11    for 2020.  Am I correct that that's growing by something like

12    50 percent?

13    A.  That's roughly the percent increase.  That is to say, the

14    number in 2020 is roughly 150 percent of the number in 2016.

15    Q.  And would you have a view as to whether it would be fair to

16    believe that some portion of SA360's share of 76 percent in

17    2020 came from the growth in general search ad revenue over

18    those years?

19    A.  That could well be the case.

20    Q.  I would like to ask you --

21          THE COURT:  Let me interrupt for a moment.  My follow

22    up question is:  What is your -- do you have an opinion as to

23    why the market share rose so dramatically for SA360 over a

24    four-year period and decreased so dramatically for the others?

25          THE WITNESS:  No, I don't.  I did not analyze this

 1    market and don't have an opinion.

 2            THE COURT:  And so am I right in understanding

 3    that -- I suppose it's one of two possibilities, either, one,

 4    there was actually switching or, two, that the increase in ad

 5    revenue over the course of that period was disproportionally

 6    for SA360?  That's the other possibility that explains the

 7    market share increase?

 8            THE WITNESS:  Yes, that is what this conversation has

 9    been about.

10            THE COURT:  Okay.

11    BY MR. SALLET:

12    Q.  Professor Baker, this morning Mr. Schmidtlein asked you

13    whether you could identify any instances where Microsoft was

14    evaluating an investment or innovation, something that would

15    improve their search engine, and decided no, we can't do that

16    because of Google's agreements, the exclusive default

17    agreements.  Do you recall that?

18    A.  Yes, I recall we discussed that.

19    Q.  And I would like to just read you testimony that -- I may

20    be mispronouncing -- Mr. Parakhin gave to this Court.

21            MR. SCHMIDTLEIN:  Objection, Your Honor.  This is an

22    improper question.  I asked him the question whether he had

23    identified anything and he gave the answer.  He's not allowed

24    to read into the record summation --

25            THE COURT:  Hang on.  Hang on.  What are you

```
 1      intending to do, Mr. Sallet?

 2              MR. SALLET:  I'm intending to read a response given

 3      by Mr. Parakhin and ask whether this is an example that would

 4      or would not be relevant to Mr. Schmidtlein's question.

 5              MR. SCHMIDTLEIN:  That has nothing to do with his

 6      expert opinion, if he didn't consider it.

 7              MR. SALLET:  Well, he asked --

 8              THE COURT:  Can we not argue amongst each other.

 9              MR. SALLET:  I apologize.

10              THE COURT:  That's okay.  It is relevant to the

11      expert opinion; that I disagree with.  I do agree, however,

12      it's not an appropriate form of redirect examination.  If he

13      remembers it and can testify about it, great.  If you want to

14      show it to him and it refreshes his recollection, that may be a

15      different issue.  He's read Mr. Parakhin's testimony and, you

16      know, he's a witness who's been on for a while.  He can't

17      possibly remember every single thing in the record.  So if you

18      want to refresh his recollection, see if it makes a difference,

19      that's fine.

20              MR. SALLET:  Yes.

21              THE COURT:  But simply asking him about it and then

22      saying, hey, you know, is this consistent with your opinion, I

23      don't think that's appropriate.

24              MR. SALLET:  Would it be okay to refresh his

25      recollection by reading the question and asking --
```

```
 1            THE COURT:  Why don't you give it to him then,
 2    instead of reading the question and answer, because then you're
 3    essentially doing what --
 4            MR. SALLET:  No, I was only going to have him read
 5    the question.
 6            THE COURT:  Why don't you have him take a look at the
 7    testimony.
 8    A.  Where would you like me to start reading?
 9    BY MR. SALLET:
10    Q.  There's a question that begins on line 25 of the first of
11    the two pages you have.  And you give -- and there's an answer
12    Mr. Parakhin gives to that.
13    A.  I'm sorry, now what is the question?
14    Q.  My question is:  Does this refresh your recollection as to
15    any instance where Microsoft was evaluating an investment in
16    innovation or something like that that would improve the search
17    engine and decided not to do that in light of Google exclusive
18    default agreements?
19    A.  Well, I think I recall reading this.  I think I read it
20    to -- not to talk at any specific particular investment, but a
21    general -- about investments in general in an area.
22    Q.  And how do you understand that?
23    A.  Because he's talking about --
24            THE COURT:  Let's move on.  I don't need him to
25    interpret somebody else's testimony.
```

1            MR. SALLET:  Thank you.  Thank you.

2    BY MR. SALLET:

3    Q.  You talked about an interview with Mr. Parakhin.  Putting

4    that interview and the associated testimony to one side, have

5    you seen any evidence that bears on a potential relationship

6    between scale and advertising quality?

7    A.  Yes.  I've seen -- so, yes, is the answer.  Would you like

8    to know what?

9    Q.  Yes, please.

10   A.  Let's see.  I've seen evidence that when -- well, first,

11   that greater scale helps improve ad targeting.  Ad targeting is

12   a lot like search that way.  And I've seen evidence that

13   advertisers want to advertise on search firms that have larger

14   scale.  I think I talked about that in my direct examination.

15   And that -- I've seen evidence that small advertisers are, at

16   times, reluctant to spend the fixed costs of trying to work

17   with more than one general search firm when they place their

18   advertising, and so for that reason would only pick the one

19   with the large scale.

20            THE COURT REPORTER:  Sorry?

21            THE COURT:  Sorry.  That's my fault.

22            MR. SALLET:  Is it okay to proceed?

23   BY MR. SALLET:

24   Q.  Professor Baker, the Judge asked you a moment ago about the

25   changes in share for SA360 from the 2016 to 2020.  Do you

1    recall that?

2    A.  Yes.

3    Q.  Do you have a view as to whether advertisers are more

4    likely to stay with SA360 than they otherwise might because of

5    the relationship between SA360 and Google Ads?

6    A.  I've seen testimony to the effect that advertise -- that

7    that relationship between SA360 and Google Ads makes it --

8    makes it easier for the advertiser to use the features of

9    Google Ads.  And I think I referenced something like that in my

10   direct testimony.  So that would be a reason why they would

11   want to stay with Google Ads.  I think that was your -- with

12   SA360.

13   Q.  That is my question, yes.

14             MR. SALLET:  Your Honor, no further questions.

15             Your Honor, may I -- we can excuse the witness.  I

16   want to take up an evidentiary question.

17             THE COURT:  Sure.  Okay.

18             Professor Baker, thank you very much for your time

19   and testimony, sir.

20             THE WITNESS:  Thank you.  It was a pleasure to be in

21   your courtroom.

22             THE COURT:  It's good to have you.  And thank you for

23   all your work.

24             Mr. Sallet?

25             MR. SALLET:  Your Honor, I neglected yesterday to

 1   move into evidence as a demonstrative two slides that were

 2   marked as PXSD-12.  Mr. Schmidtlein used them this morning.

 3          MR. SCHMIDTLEIN:  No objection in that -- treating

 4   that in that fashion.

 5          MR. SALLET:  Your Honor, yesterday I raised the

 6   question of moving into evidence what I called original

 7   analysis -- well, actually, analysis like the kind on this

 8   demonstrative that we've seen from Mr. Baker.  Last night we --

 9   well, I sent a list to Google and asked for its views as to the

10   admissibility of the evidence.  Unless Google has a response it

11   wishes to give, I would like to go forward and address that

12   question now.

13          THE COURT:  Maybe I'm not following you.  What are

14   you referring to specifically?

15          MR. SALLET:  So let me -- could I pass up a list of

16   the exhibits?

17          MR. SCHMIDTLEIN:  Your Honor, if I may.

18          I know these are issues, I guess, relating to their

19   case in chief.  Last night they sent us a list of these --

20   basically the same slides -- or, a variety of the same slides

21   and said, we would like to treat them as 1006 exhibits and have

22   them admitted for the truth.

23          We haven't had an opportunity to evaluate, you know,

24   everything that goes into these to be able -- so we're

25   objecting to that right now.  But we have a witness who is

 1    waiting to get on the stand and testify today, and I think --
 2    we're not going to agree to the admission of these as 1006
 3    exhibits, given that they were shown to us last night.  We will
 4    take them under advisement, and we will be able to come back
 5    with a position on this.  But I think we don't need to resolve
 6    this before they close their case, I think is my point.
 7              MR. SALLET:  Could I just speak to this 30 seconds?
 8              THE COURT:  Sure.
 9              MR. SALLET:  With the understanding of the witness's
10    time.
11              Just so the Court has the context of this, Google has
12    moved into evidence, without objection from us, roughly 22, I
13    think, exhibits -- as exhibits, tables and figures calculations
14    from an expert report.  We are prepared to demonstrate that
15    what we wish to move in from Professor Baker is of the same
16    quality, equally eligible under 1006 as the ones that Google
17    asked to move into evidence and to which we did not object.  We
18    can provide that as a basis to the Court, as the Court would
19    like.
20              THE COURT:  I don't know that we need to resolve this
21    now.  But can you just help me understand, these are what?
22    These are --
23              MR. SALLET:  Yes.
24              THE COURT:  I take it these are depictions or charts
25    of data collections that Professor Baker put together for

1    purposes of his report; is that what this is?

2          MR. SALLET:  Yes.  Very importantly, it's what I'm

3    calling independent analysis.  In other words, imagine -- we've

4    seen this:  Imagine a date database --

5          THE COURT:  Well, no.  I think we've seen some

6    examples --

7          MR. SALLET:  Yes, exactly.

8          THE COURT:  -- in which he's, for lack of a better

9    term, crunched numbers.

10         MR. SALLET:  Yes, sir.

11         THE COURT:  Fine.  So, look, what I'll do is we'll

12   defer on this, let Google have an opportunity to assess whether

13   they come in under 1006.  If they don't, then we'll -- you

14   know, I'll have to just figure out the question of whether

15   they're otherwise admissible or not.

16         MR. SALLET:  Well, Your Honor --

17         MR. SCHMIDTLEIN:  They're all, I think, coming from

18   demonstrative exhibits.  And if they were pushing them in as

19   demonstratives, as we've been treating those, we would have no

20   objection.

21         THE COURT:  Okay.

22         MR. SCHMIDTLEIN:  The exhibits he's referring to were

23   listed months ago, when we first exchanged exhibits, and they

24   hadn't had a chance to evaluate them.  Maybe they will do that.

25         MR. SALLET:  Your Honor, we did evaluate them.  I

1    mistakenly thought perhaps Google was not yet taking a position

2    on these.  But we did evaluate them and we believed that it

3    would be important for the Court to have the opportunity to

4    rest its ultimate findings on facts and analysis used by

5    experts and presented to the Court.

6         So we are simply following up at the appropriate time

7    to say we have analysis of the same kind.  Indeed, I can pass

8    up binders to the Court now that demonstrates that some of the

9    examples that Google moved into evidence are its expert

10   directly saying he's relying on Professor Baker's methodology

11   and providing a contrasting view.  It's entirely, we believe,

12   helpful to move these in.

13        THE COURT:  Look, I think the bottom line is --

14   let's -- I hear Mr. Schmidtlein saying that they haven't formed

15   a final position -- and maybe I'm mishearing him -- give them

16   an opportunity to take a look at these, see if they qualify

17   under 1006.  If he's going to object to some or all of them, I

18   can then take it up on an exhibit-by-exhibit basis.

19        MR. SALLET:  Thank you, Your Honor.

20        THE COURT:  And, again, the record is still kept

21   open, even though you're about to rest your case.

22        MR. SALLET:  And -- I am.  And if I could just note

23   for the record that it is open on this issue, it is open on

24   some additional exhibits, and some designations with which

25   we're working.  So, with those issues remaining open, the

```
 1    plaintiff states rest their case.

 2              THE COURT:  Perfect.  Thank you.

 3              All right.  So with that, let's go ahead and shift to

 4    Google.

 5              And ready to call your first witness, Mr. Sommers --

 6    or, I suppose, your second witness.

 7              MR. SOMMERS:  Yes, Your Honor.  Google calls

 8    Dr. Prabhakar Raghavan to the stand.

 9                        PRABHAKAR RAGHAVAN,

10    was called as a witness and, having been first duly sworn, was

11    examined and testified as follows:

12              THE COURT:  Dr. Raghavan.

13              THE WITNESS:  Good morning.

14              THE COURT:  Good morning, and welcome.

15              MR. SOMMERS:  Judge, we're going to hand out a couple

16    of binders so we don't have to interrupt.

17              Your Honor, we're going to be handing up a binder of

18    demonstratives and a binder of exhibits.

19              May I approach, Your Honor?

20                        DIRECT EXAMINATION

21    BY MR. SOMMER:

22    Q.  Okay.  Good morning.

23    A.  Good morning.

24    Q.  Can you please state your name for the record?

25    A.  My name is Prabhakar Raghavan.
```

```
 1    Q.  Who is your employer, sir?

 2              THE COURT:  Before you do that, could I just ask you

 3    to spell it for our court reporter?

 4              THE WITNESS:  Absolutely.  It's P Peter, R Robert,

 5    A apple, B Boston, H hotel, A apple, K Kansas, A Apple, R

 6    Robert.  That's the first name.

 7              Second name is Raghavan.  R Robert, A apple, G

 8    George, H hotel, A apple, V Victor, A apple, N Nancy.

 9              You can tell I've done this before.

10    BY MR. SOMMERS:

11    Q.  By the way, just -- the microphone will pick up your voice.

12    If we can't hear, I'll tell you to lean closer, but you don't

13    need to strain yourself leaning into it.

14              Who is your employer?

15    A.  My employer is Google.

16    Q.  And what is your current position at Google?

17    A.  I'm senior vice president for knowledge and information

18    products.

19    Q.  Can you briefly describe for the Court your educational

20    background?

21    A.  I hold a Ph.D. in computer science from U.S. Berkeley.

22    Prior to that I have a bachelor of technology from the Indian

23    Institute of Technology at Madras.

24    Q.  What was the subject of your Ph.D. dissertation?

25    A.  Randomized algorithms.
```

1    Q.  Have you authored any other publications?

2    A.  Yes.  I've authored some scientific papers and a couple of

3    textbooks.

4    Q.  When you say you've authored scientific papers, would that

5    be over 100 scientific papers?

6    A.  Certainly over 100.

7    Q.  Do you hold any patents?

8    A.  I hold a number of patents.  Last I checked, was over 20 of

9    them.

10   Q.  Can you briefly describe to the Court your professional

11   experience prior to joining Google?

12   A.  Yeah.  Following graduate school I joined IBM at the Thomas

13   Watson Research Center in New York, then moved to the West

14   Coast arm.  Then, I went to enterprise search software vendor

15   Verity.

16   Q.  Verity?

17   A.  Verity.

18   Q.  Okay.

19   A.  Following that I joined Yahoo!  And then most really, in

20   the year 2012, I joined Google.

21   Q.  And how long were you at Yahoo!?

22   A.  For eight years, approximately.

23   Q.  The mid-2000s to 2012?

24   A.  Yeah.  2005 to 2012.

25   Q.  Have you also taught?

1    A.  Yes, I have.  When I was at IBM on the East Coast, I would

2    teach at Yale.  And then when I moved to the West Coast, I took

3    up an adjunct position at Stanford that I filled from 1995 up

4    until 2014, and stopped.

5    Q.  Generally, what were the subject matters that you taught

6    out at Stanford?

7    A.  Initially, it was databases.  But at the urging of the

8    department chair, I started the first course on search at

9    Stanford, which continues to this day and -- yep.

10   Q.  Did you teach both undergrad and graduate students?

11   A.  The course material was aimed at graduate students, but a

12   fair number of adventurous undergrads did show up.

13   Q.  Thank you.

14            THE COURT:  I'm sure, at Stanford, there was no

15   shortage of them.

16   BY MR. SOMMERS:

17   Q.  Dr. Raghavan, when did you first hear about something

18   called Google?

19   A.  It was somewhere in the range of late 1997 or early 1998.

20   Q.  And how did you hear about Google?

21   A.  Well, in the computer science department at Stanford, I

22   would frequently run into these two graduate students who had

23   an idea for a search engine --

24   Q.  What were their names?

25   A.  Larry Page and Sergey Brin.  And we would discuss link

1    analysis for search engine ranking at that time.

2    Q.  Okay.  And what was your reaction to their idea at that

3    time?

4    A.  I told them they would never make money with this thing.

5    Q.  And as a result of that, you decided to go work for IBM and

6    not join forces with them; is that right?

7    A.  So, I remained at IBM at that point, and then went to

8    Verity, which is a search company that did make money.

9    Q.  I take it at some point you changed your view about Google;

10   is that right?

11   A.  The perception changed over time.  And after a few attempts

12   at courtship, eventually I ended up at Google in 2012.

13   Q.  Thank you.

14        What was your first role at Google when you joined the

15   company?

16   A.  I was appointed a vice president of strategic technologies,

17   where I did research in various aspects of search, advertising,

18   and maps.

19   Q.  And how about after that?  Did your position change at some

20   time?

21   A.  In the year 2014, I assumed responsibility for what is now

22   referred to as Google Workspace, but at that time it was called

23   Google Apps.  And it encompassed a productivity suite,

24   including Gmail, Google Docs and Drive, Calendar, and so on.

25   Q.  When did your position change again, after that?

1    A.   In October of 2018, I assumed responsibility for Google's

2    advertising and commerce products.

3    Q.   And how about your current role?  When did you assume that

4    position?

5              THE COURT:  I'm sorry.  You said advertising and what

6    products?

7              THE WITNESS:  Commerce.

8              THE COURT:  Commerce.  Okay.  That's what I thought

9    you said.

10             Go ahead.

11   BY MR. SOMMER:

12   Q.   My question -- do you have my question in mind?

13   A.   I think so.

14   Q.   Go ahead.

15   A.   In October of -- sorry.  That was the last change.

16             In June of 2020, I added responsibility for Google

17   Search, Assistant, Maps -- yeah, that's sounds right.

18   Q.   Who do you currently report to?

19   A.   Mr. Sundar Pichai, the CEO of the company.

20   Q.   And just to give a little context, the Court heard earlier

21   in the trial from a gentleman by the name of Jerry Dischler.

22   Does he report to you?

23   A.   Yes, he does.

24   Q.   All right.  Great.  Done with the background.

25             I want to turn first to our first topic, which is:  What

1    is Google's core mission?

2    A.  Our mission is to make all the world's information

3    universally accessible and useful.

4    Q.  Okay.  And how does Google use innovation to try to carry

5    out that mission?

6    A.  So, in my experience, I've seen two parallel tracks.  One

7    is users' expectations and needs constantly evolve.  The other

8    track is technology evolves, and what Google has to do is

9    constantly expand the available technology to meet -- rise to

10    meet those needs.

11    Q.  The Court heard about search quality innovation from one of

12    your colleagues, Pandu Nayak.  So I don't want to repeat

13    everything that the Court heard there.  I really want to,

14    instead, turn to what it takes to keep Google's search product

15    the industry leader.

16         Are you familiar generally with the amount of R&D that

17    Google has invested in its search products since 2018,

18    approximately?

19    A.  I have a good ballpark sense.

20    Q.  Okay.  So, I'm going to put up on the screen our first

21    demonstrative, DXD -- well, I'm not going to put it on the

22    screen because it's redacted.

23         But in the demonstrative binder it's slide 2, DXD21.002.

24    And if you can find that.  Do you have that?

25         Again, just because we're not reading numbers out loud,

1    does this demonstrative slide fairly show what you understand

2    to be the range of R&D expenditure by Google from 2018 to 2021?

3    A.  Yes, it does.

4         MR. SOMMER:  And, Your Honor, we will offer this

5    slide in evidence just so those numbers can be in the record.

6         MR. HAFENBRACK:  Are you offering it for the truth,

7    the demonstrative?

8         MR. SOMMERS:  The numbers, yes, because I don't want

9    to read them.

10        MR. HAFENBRACK:  To the extent you're offering this

11   for the truth, we would object because it's a demonstrative.  I

12   don't know what rule you're offering it under.

13        THE COURT:  Are these numbers in dispute?

14        MR. HAFENBRACK:  Your Honor, I haven't -- I'm just

15   getting this for the first time.  I haven't looked at the

16   underlying document that it appears to be based on.

17        THE COURT:  I'm sorry?

18        MR. HAFENBRACK:  The document from which this comes

19   is not referenced here.  It is not validated, for us to be able

20   to validate.

21        MR. SOMMERS:  I'll confer with plaintiffs' counsel,

22   and we'll mark that --

23        THE COURT:  Let me ask the witness if these are --

24   based on his understanding, whether these numbers are accurate.

25   And if the answer is he's not sure, then we can figure out what

1    the source material is to support the numbers.

2    BY MR. SOMMERS:

3    Q.  Dr. Raghavan, do these numbers, based on your knowledge,

4    appear to be accurate to you?

5    A.  They do.

6                MR. SOMMER:  Then I offer --

7                MR. HAFENBRACK:  No objection.

8                THE COURT:  Okay.  Great.  Glad we could resolve

9    that.

10               MR. SOMMERS:  Okay.  Great.

11   BY MR. SOMMERS:

12   Q.  Now, we can obviously see an upward trend in these

13   expenditures, correct?

14   A.  Correct.

15   Q.  And since the chart ends in 2021, has -- based on your

16   knowledge, has that upward trajectory of R&D spend continued?

17   A.  Yes, it has.

18   Q.  Why does Google spend so much on R&D?

19   A.  It's the best way of keeping up with the very best

20   technology we can bring to our users so we can run the best

21   product that we can put in front of users.

22   Q.  Okay.  And would you be concerned, if Google was not

23   devoting such substantial resources to R&D, about what would

24   happen to the business?

25   A.  Oh, yes.

1    Q.   What's the concern -- what would be the concern?

2    A.   I think the space of information in the media is exploding

3    with so many players, each of whom brings a special secret

4    sauce, that it would be foolish of us to not put our best foot

5    forward in terms of investment and technology.

6    Q.   How many employees are currently assigned to work on search

7    and search quality at Google?

8    A.   So the search team in its entirety, including search

9    quality, is roughly 8,000 engineers -- engineers and product

10   managers.  A subset of that is what we would call search

11   quality.  That is headed by Dr. Punda Nayak, who you mentioned

12   earlier, and that's 1,000-odd people.

13   Q.   A thousand or so, you said.

14        Now, the Court has already met, I think, a few Ph.D.s

15   from Google.  How many Ph.D.s does Google actually employ?

16   A.   When I last checked, two or three years ago, it was a

17   little over 15,000.

18   Q.   I'm going to go off on a tangent here for a moment.

19        Yesterday and, again, today, the Court heard from one of

20   plaintiffs' experts about relative market share in certain

21   other countries, such as Japan.  And then a Google document was

22   excerpted in a slide that noted the possibility of increasing

23   investment in those countries.  Now, I showed you that slide

24   this morning, correct?

25   A.   Correct.

1    Q.  And as I understand the point -- I'm just going to set this

2    up so you understand my question.

3         As I understand the point the witness may have been

4    trying to make, is if -- is that if there was a general search

5    engine in this country that had bigger market share, Google

6    might be investing more in its search product in this country.

7         So I want to ask you this question:  First of all, is

8    the Google product in this country in any way inferior to the

9    Google product offered in any other country?

10        MR. HAFENBRACK:  I'll object on leading grounds.  The

11   whole preamble was very leading.

12        THE COURT:  Preamble may have been, but the question

13   was not.

14        Go ahead.  You can answer, sir.

15   A.  I believe the Google product in this country is at or equal

16   to the best in any other country.

17   BY MR. SOMMERS:

18   Q.  And we're going to be discussing various innovations during

19   the course of your testimony, but let me ask you one question

20   here.

21        On the point on the slide that I showed you, are there

22   situations where Google does elect to spend additional funds in

23   foreign markets?

24   A.  Yes, there are.

25   Q.  And what would be the circumstances that would give rise to

1    such an expenditure?

2    A.  Companies like us tend to build a product and then

3    replicate it in as many places as possible, as much as

4    possible, with minor variations.  So, for instance, you might,

5    in taking the U.S. search engine and putting it in the U.K.,

6    swap out baseball scores and put in premium league soccer.  But

7    that's a relatively lightweight change.

8        I think what you're asking, anything that might seem

9    outsize.  And my observation has been that the products we

10   build for North America and Western Europe tend to be

11   relatively homogenous.  But there are many cultures where the

12   behavior is quite distinct.  And one of the things I've

13   directed my team to do is spend much more effort in studying

14   those countries.  I'll give you a couple of examples -- maybe

15   one.

16       We found that lens queries -- these are queries where

17   the user points the camera on their phone at something and

18   that's the query -- spiked in Indonesia during exam time.  What

19   it was, was high school kids getting answers to math problems.

20       So, what is clear to me is we had to do a better job

21   of understanding certain distinctive cultures, like -- and the

22   ones that are under special focus at this point are Indonesia,

23   Japan, India, and Brazil.

24   Q.  Thank you.  All right.  Switching topics.

25       Are you familiar with the concept of latency?

1    A.  I am.

2    Q.  Can you tell the Judge what latency is?

3    A.  So in the context of a search engine, it is the time

4    between when a user issues a query and they get an actionable

5    results page on their screen, whether mobile or desktop.

6    Q.  Is that a important consideration at Google?

7    A.  Extremely.  Because the founders enshrined it as one of the

8    principles for building successful products.

9    Q.  Does it correlate in any way to the financial results of

10   the company?

11   A.  It correlates positively to the financial results in the

12   sense that if they provided a poor latency experience, it's

13   been our observation that users engage less with us and tend to

14   go away.

15   Q.  Has Google invested heavily in improving latency?

16   A.  We have invested a fair bit in latency.

17   Q.  How have those investments improved latency for the Google

18   product?

19   A.  Let me give you a couple of data points.  Over the last

20   three years our median, 90 percentile latencies, both on mobile

21   and desktop, have come down by roughly 500 milliseconds.  And

22   recently I was extremely thrilled with my team when they told

23   me that for the first time in history, the mobile median

24   latency was subsecond.  That was an astonishing number to me,

25   that they could have actually achieved that.

1    Q.  Less than one second?

2    A.  Less than one second.

3    Q.  I'm going to turn now to the topic of Google's competition

4    for users.  Okay?

5         Does Google Search face competition?

6    A.  Yes.

7    Q.  Okay.  And can you generally describe that competition?

8    A.  So, as users pursue information today, what we see is

9    roughly three buckets of competition.  First, the obvious ones,

10   which are other providers who provide an interface much like

11   our own who creates results and present them.

12        The second --

13   Q.  A couple of examples in this bucket?

14   A.  Bing.  DuckDuckGo.

15   Q.  Okay.

16   A.  The second bucket would be a range of vertical providers,

17   particularly in the retail and travel segments.  So, Amazon is

18   an example.  Booking and Expedia are examples.  Hotels.com is

19   an example.

20        The third bucket is actually circular.  One of the

21   things we're learning is when you go to a search engine, you go

22   with what I'll call patent intent, explicit intent that you go

23   and express.

24   Q.  Patent?

25   A.  Patent.

```
1   Q.  Okay.

2   A.  But, what we're learning through a series of demographic

3   shifts in the last few years, is users have a latent intent,

4   and that latent intent is captured by a number of players who

5   have far more opportunity to observe the behavior of a user

6   over the course of a day.  And these include the likes of

7   Instagram, TikTok, to some extent Facebook.

8           Curiously, some of our user research even showed that

9   with some demographics, a messaging platform like WhatsApp is a

10  point that draws query intent, because there are users who say

11  you know what? it's too difficult for me at this moment to

12  formulate a Google query or a search query in the traditional

13  sense; I'm just going to ask my undergraduate class and get the

14  answer.

15          So, that's another way messaging platforms also

16  function as information intermediaries.

17  Q.  Let me show you the next slide in the deck.  It's

18  DXD-15.011.

19          Do you recognize this article -- this headline -- some

20  of these excerpts from a 1998 Fortune magazine?

21  A.  I see it.  Yeah, I do.

22  Q.  Okay.  And is anything reflected in this slide still true

23  today?

24  A.  Unfortunately, yes.  As a former Yahoo! employee, not, but

25  as a friend of the two gentlemen shown here.
```

1    Q.  You know the two people in the photo?

2    A.  I do.

3    Q.  But other than -- I'm sure it's a younger version of them,

4    but other than that, this is no longer accurate, correct, these

5    statements?

6    A.  I think it may still be the case that more people go to

7    Yahoo! than Netscape or AOL.  But other than that, I wouldn't

8    agree with the -- you know, Yahoo! has won the search engine

9    wars.

10   Q.  Dr. Raghavan, was there a time when Yahoo! had a seemingly

11   insurmountable lead in the race for capturing the search

12   market?

13   A.  Oh, yes.

14   Q.  Then Google came along; is that right?

15   A.  Then Google came along, indeed.

16   Q.  How did Google disrupt the industry?

17   A.  At the very beginning, it was through a completely

18   different way of looking at search ranking, which is the

19   favored page rank algorithm, just part of what I would discuss

20   with the founders, but it doesn't stop there.  And as you may

21   have learned from my colleague, Dr. Nayak, the ranking

22   improvements kept building up.

23          But we learned soon -- Google learned soon.  I

24   shouldn't take credit.  I was not in this position -- that it

25   wasn't just about better ranking.  It was being able to answer

1  questions directly.  For instance, like, what's the height of

2  the Eiffel Tower, to be able to answer directly.

3           To be able to do voice queries better.  In certain

4  demographics, voice queries are a very large fraction of

5  queries that come, so speech recognition became important.

6           And then I mentioned earlier the lens example.  The

7  fastest growing segment of queries is people, especially young

8  people, using their cameras to point to things.  But my wife

9  uses it to point to a client that seems to have a disease and

10 say, How do I fix this?

11          And these are all examples that required not just

12 some product launch that required fundamental research in

13 computer science, speech recognition.  We have some of the best

14 teams for those products.

15 Q.  So, I take it from these new and innovative technologies

16 that Google developed, it was able to surpass Yahoo!, correct?

17 A.  It was.

18 Q.  And is there a lesson from that event that you are keenly

19 aware of?

20 A.  I think, drawing on my own experience, I feel a keen sense

21 not to become the next roadkill.

22 Q.  Roadkill.  Okay.

23 A.  If I may say so, yeah.

24 Q.  And is that why Google is so committed to new innovation?

25 A.  Absolutely.

1    Q.  The Court has heard earlier in this trial from the CEO of

2    Microsoft, who testified that, quote, "On search, I think the

3    competition is pretty intense," close quote.

4         Do you agree with that?

5    A.  Oh, yes.

6    Q.  Now, you've mentioned some of the other platforms that

7    Google competes with for users.  Has that list changed over

8    time?

9    A.  It has changed and grown over time.

10   Q.  Let me show you the next slide in the deck, which is

11   DXD-21.003.  What is represented in this slide, sir?

12   A.  It's a sampling of companies where people go to fulfil

13   their information online -- information needs online.

14   Q.  Let's go to DXD-21.004.  And this is paragraph 90 of the

15   DoJ complaint in this case.  And the one thing I highlighted

16   here is this phrase "one-stop shops."

17        Do you see that?

18   A.  I do.

19   Q.  And do you understand that the plaintiffs here -- or at

20   least the DoJ plaintiffs are claiming that these other

21   platforms you described are not competitors of Google because

22   they can't answer all informational queries.  Do you understand

23   that claim?

24   A.  I understand that.

25   Q.  Do you have a view as to that claim?

1    A.  I really struggle with that view because, as I constantly

2    remind my team, nobody wakes up every morning and says, you

3    know, I have to run a Google query.  They go wherever their

4    instinct takes them to address their need.  Sometimes it's a

5    faucet.  I would think of going to Home Depot first.  It could

6    be a hotel in Washington, D.C.  I might go to Hotels.com.  So,

7    whatever seems most appropriate for the task at hand is where I

8    would take my information need, and that is going to remain a

9    fact of life forever.

10   Q.  Let me just pick up on your example.  If someone needs a

11   hotel in Washington, D.C. and goes to Hotels.com, from your

12   perspective, sir, will that user care whether or not Hotels.com

13   can tell them the height of the Eiffel Tower?

14   A.  No.  But they will care that they get the best deal.

15   Q.  On a hotel?

16   A.  On a hotel.  Sorry.

17   Q.  You also mentioned social media platforms.  Has that become

18   a competitor to Google of relatively recent vintage in some

19   respects?

20   A.  No.  I would say it's been growing since perhaps 15 years

21   ago, when Facebook first appeared on the scene.  And at that

22   point, it felt different.  But, over time, it became clearer

23   that they were eliciting the latent intent in people.

24          It's also become the case that for a number of user

25   needs, some platforms, like TikTok, fill the need extremely

1  well, especially for younger demographics.  And one of the

2  things user research consistently shows is where young people

3  go, older people follow, and that's been in motion.  So, one

4  thing we've tried really hard to understand is where are young

5  people going? because that's where everybody else is going to

6  follow.

7  Q.  Not to jump too far ahead, but in your experience, do

8  advertisers also focus on where young people go because older

9  people follow?

10  A.  Advertisers are very aware of these phenomena, and they're

11  quite sophisticated about forecasting these trends.  And one of

12  the things we've seen is with the erosion of certain kinds of

13  intent to platforms like TikTok and Instagram, advertisers are

14  focusing more of their attention, and we hear that from them.

15  Q.  Have you heard the expression "Grandpa Google"?

16  A.  Unfortunately, yes, I have.

17  Q.  What do you understand that to refer to?

18  A.  Unfortunately, many younger demographics refer to us, I'm

19  told, as Grandpa Google.  And Grandpa Google knows the answers

20  and will help you with homework, but when it comes to doing

21  interesting things, they like to start elsewhere.

22  Q.  Have you seen studies, Dr. Raghavan, that address the

23  amount of time users spend on the web or on Google Search

24  compared to these social platforms?

25  A.  I have.  And if I may give a little bit of context.  It was

1    approximately 10 or 11 years ago that Chris Anderson, then the

2    chief -- editor in chief of *WIRED* magazine, published a very

3    provocative issue with blaring headlines on the front page that

4    said, "The web is dead.  Long live the internet."

5                   And at that time, I was kind of dismissive of his

6    point, that the web would erode relevance because apps would

7    take over.  But, the data that I've seen in studies over the

8    years -- and I'll give you a couple of sample data points.

9    Between 2018 and last year, 2022, the average U.S. user's time

10   spent on the web -- when I say "the web," I include all web,

11   not just Google -- is constant at about 23 minutes a day.

12   Q.  23?

13   A.  Roughly 23 minutes a day.  The time they spend on apps has

14   grown from just under three hours to almost four hours a day.

15   Q.  Are you familiar with the term "user journey"?

16   A.  Yes, I am.

17   Q.  What do you understand that to refer to?

18   A.  We recognize that users don't make point use of services.

19   Sometimes the same intent is satisfied by a user through a

20   number of steps.  It could be as simple as they're going to

21   Amazon, search for a 60-watt bulb, and come out at the other

22   end with a cart where they transact.

23                   There are other journeys, like purchasing a house,

24   deciding on which college to go to, that can take many weeks

25   and months and entail many, many touch points across many

1    services.

2    Q.  We're going to come back, when we talk about ads, to intent

3    signals that are captured from the length of time people are on

4    social platforms.

5         So, let me turn to another group of platforms that you

6    mentioned, and that's the verticals.  Okay?  As with social

7    platforms, plaintiffs claim in this case that the verticals

8    also don't compete with Google.  Do you agree with that?

9    A.  We feel ourselves competing with them every day.

10   Q.  Every day?

11   A.  Well, for the verticals I mentioned, at least.

12   Q.  One of them you mentioned was some of the travel verticals,

13   correct?

14   A.  Yes, I think I mentioned some travel.

15   Q.  Does Google compete with some of the travel verticals?

16   A.  Yes.

17   Q.  And just briefly describe how Google competes with travel

18   verticals.

19   A.  So, to build on the earlier example where I was looking for

20   a hotel in Washington, the user journey looks more like they

21   want to book flights, they want to book a place to stay -- it

22   could be hotel or Airbnb -- it could be a transportation, and

23   users use apps with which to fulfil those intents and piece

24   together that whole journey so that they can get their ideal

25   vacation.

1           The alternative is to try and do everything from

2    Google.  But we don't see users carrying through these journeys

3    entirely through Google.  They go in and out and spend a lot of

4    times on these other apps and platforms.

5    Q.  Let me show you the next demonstrative, which is

6    DXD-21.005.

7           What do we see in this demonstrative, Dr. Raghavan?

8    A.  I'm seeing a number of travel sites, as well as a Google

9    page.

10   Q.  And what is the point that you're trying to set out in this

11   slide?

12   A.  What I'm seeing in front of me is the user appears to be

13   looking for -- in a number of these cases, at least, a hotel,

14   for instance, in the Google example, and certainly the Booking

15   and Hotels.com example.  And you have essentially the same

16   interface and experience.

17   Q.  And why does the image in this slide -- if this is an

18   example, why does this confirm to you that Google is competing

19   with each of these verticals in this particular space?

20   A.  Because these are all viable alternatives to Google when

21   the user is looking to complete their travel journey.

22   Q.  And is that true even though these travel verticals, you

23   know, might not give you a recipe for cheese cake?

24   A.  Oh, yes.  Speaking from personal experience, I use some of

25   these.

1    Q.  Let me show you another vertical.  Another group of

2    verticals are shopping verticals, correct?

3    A.  Yes.

4    Q.  Okay.  And up on the screen right now is DXD-21.006.

5         Is this really the same point that you just made with

6    respect to travel that we're now seeing on shopping?

7    A.  It's substantively the same point, except the interface

8    will vary in these cases.

9    Q.  I'm sorry?

10   A.  The user interface will be different from that for travel

11   journeys.

12   Q.  And, so, is the conclusion the same in terms of whether

13   Google competes with these verticals?

14   A.  I see myself as competing with them every day.

15   Q.  All right.  Just give me one moment.

16        The Court heard from another expert from plaintiffs, a

17   gentleman named Dr. Whinston, who testified that there is a

18   cost associated with users trying to remember these other

19   platforms.  For example, trying to remember that there's

20   something out there called Amazon.  Do you think, for example,

21   that users are having trouble remembering that Amazon is pretty

22   good at responding to shopping queries?

23        MR. HAFENBRACK:  I'll object, Your Honor, because the

24   lead-up to the question, sort of embedded in the question,

25   mischaracterizes what our expert said on the stand.

```
 1              MR. SOMMERS:  I'll rephrase.

 2              THE COURT:  Rephrase it.  And I would just ask you

 3    not to ask him to comment on somebody else's testimony.

 4              MR. SOMMERS:  I'm sorry?

 5              THE COURT:  Ask him not to comment on somebody else's

 6    testimony.  You can elicit the information but --

 7              MR. SOMMERS:  I understand.

 8    BY MR. SOMMER:

 9    Q.  Dr. Raghavan, in your experience, do you view there to be a

10    time cost or mental cost to users to remember apps that they're

11    frequently using?

12    A.  That's not the observation that we have, for a couple of

13    reasons.  One, earlier I gave you the data on how much time

14    users are spending on apps versus the web and the trend

15    therein.

16              The second reason is mobile phones.  You have an

17    iPhone, for instance, provide functionality to readily access

18    your apps.  So, there's a feature in iPhone called Spotlight,

19    for example, that lets you quickly find an app.  So if you're

20    not quite sure, you start typing something and it immediately

21    takes you to the relevant apps.

22    Q.  And just sticking with shopping for a moment.  Generally,

23    can you describe to the Court what you have seen over the past

24    five to ten years with respect to users turning specifically to

25    Amazon?
```

1    A.   The general sense I have is -- and I've read many external

2    reports of this -- that users are increasingly beginning their

3    shopping journeys on Amazon.

4    Q.   How about concluding their shopping journeys?

5    A.   That's actually one of the prime advantages -- sorry.  I

6    didn't mean to make a pun -- but one of the advantages of

7    Amazon, because that's a place where you can begin your

8    shopping journey and conclude it, and the platform, in this

9    case Amazon, has full visibility of that.  And they can then go

10   to merchandisers and advertisers and say not only did I have a

11   user who started, that finished successfully, and their basket

12   size, which is the volume of the transactions, was $63 or

13   whatever.

14   Q.   When we first met, you mentioned there was a company that

15   kept you up at night.  What company is that?

16   A.   There's a bunch of them, but perhaps Amazon is one of the

17   two most keep-awake companies.

18   Q.   Why is that one of the companies that's front of mind for

19   you?

20   A.   To me, for Google to be a successful company, we should be

21   good at answering any kind of query, including commercial

22   queries.  Commercial queries is one of our biggest verticals.

23   And I believe that if we become second class, we get relegated

24   when it comes to commercial intent, we will become irrelevant

25   over time.

1    Q.  And just to complete this -- and we'll come back to this on

2    the ad side -- but what is your view as to the claim in this

3    case that Google does not compete with Amazon for users?

4    A.  I believe it compete.  I feel the competition.  So,

5    hopefully I can speak directly for Google, that we compete

6    every single day.

7    Q.  All right.  Let's take that down.

8         We mentioned apps a little bit.  Are you generally

9    familiar with the pace -- the increasing pace of app downloads

10   over the past several years?

11   A.  The trend has been, as they say, up and to the right.

12   Q.  Up and to the right.  Okay.

13        MR. SOMMERS:  Judge, I know we're five minutes early.

14   I can keep going, but I'm about to switch topics entirely.

15        THE COURT:  We can take an extra five minutes.  So,

16   we'll take lunch now, and we will resume at 1:30.

17        Dr. Raghavan, I will just ask if you would please not

18   discuss your testimony with anyone during the lunch break.

19        And we will see everybody at 1:30.  Thank you,

20   everyone.

21                        *    *    *

22

23

24

25

1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                         Dated this 26th day of October, 2023

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX
      WITNESSES:
 2
          JONATHAN BAKER
 3            Cross-Examination (Cont.) By Mr. Schmidtlein.....7223
              Redirect Examination By Mr. Sallet...............7271
 4
          PRABHAKAR RAGHAVAN
 5            Direct Examination By Mr. Sommer.................7289

 6

 7    STATES REST...........................................7289

 8

 9    EXHIBITS ADMITTED:

10        PXSD-12...........................................7285

11        DXD25.002, 25.009, 25.012, and 25.013.............7271

12                            *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$63** [1] - 7314:12

## 1

**1,000-odd** [1] - 7298:12
**10** [1] - 7309:1
**100** [5] - 7231:5, 7258:4, 7266:13, 7291:5, 7291:6
**10019** [2] - 7221:12, 7221:16
**10036** [1] - 7220:24
**1006** [5] - 7285:21, 7286:2, 7286:16, 7287:13, 7288:17
**101** [2] - 7249:11, 7249:12
**105** [1] - 7251:12
**11** [2] - 7271:10, 7309:1
**1100** [1] - 7220:12
**1133** [1] - 7220:23
**116** [1] - 7256:20
**117** [2] - 7258:18, 7261:9
**11:15** [1] - 7271:10
**120** [2] - 7265:12, 7265:13
**122** [1] - 7267:7
**125** [2] - 7268:13, 7268:16
**13.7** [1] - 7277:13
**1300** [1] - 7221:4
**1301** [2] - 7221:11, 7221:15
**15** [1] - 7307:20
**15,000** [1] - 7298:17
**150** [1] - 7279:14
**1995** [1] - 7292:3
**1997** [1] - 7292:19
**1998** [2] - 7292:19, 7303:20
**1:30** [2] - 7315:16, 7315:19

## 2

**2** [1] - 7295:23
**2.5** [1] - 7230:10
**20** [1] - 7291:8
**20-3010** [2] - 7220:4, 7222:4
**20001** [2] - 7221:20, 7316:13
**2000s** [1] - 7268:10
**20024** [1] - 7221:8
**2005** [1] - 7291:24

**2009** [6] - 7249:12, 7250:2, 7250:10, 7250:16, 7250:20, 7250:24
**2010** [3] - 7236:8, 7236:17, 7237:18
**2012** [8] - 7264:13, 7272:2, 7272:6, 7272:10, 7291:20, 7291:23, 7291:24, 7293:12
**2014** [3] - 7231:2, 7292:4, 7293:21
**2016** [20] - 7224:2, 7224:3, 7224:4, 7224:22, 7233:11, 7237:22, 7243:24, 7244:1, 7244:3, 7244:7, 7244:11, 7245:15, 7274:19, 7275:21, 7277:11, 7277:23, 7278:18, 7279:10, 7279:14, 7283:25
**2017** [9] - 7231:6, 7231:9, 7231:13, 7231:16, 7231:22, 7231:25, 7232:7, 7232:13, 7244:25
**2018** [5] - 7274:25, 7294:1, 7295:17, 7296:2, 7309:9
**2019** [2] - 7264:13, 7265:9
**202** [4] - 7220:13, 7220:17, 7220:21, 7221:9
**202-354-3267** [1] - 7221:21
**2020** [14] - 7274:19, 7274:22, 7274:25, 7275:4, 7275:15, 7275:21, 7277:11, 7277:24, 7278:18, 7279:11, 7279:14, 7279:17, 7283:25, 7294:16
**2021** [9] - 7272:2, 7272:6, 7272:11, 7272:23, 7273:1, 7273:14, 7273:23, 7296:2, 7297:15
**2022** [3] - 7224:22, 7252:18, 7309:9
**2023** [2] - 7220:5, 7316:7
**20530** [1] - 7220:20
**209** [1] - 7220:16
**212** [3] - 7220:25, 7221:13, 7221:17

**22** [1] - 7286:12
**2200** [1] - 7220:24
**23** [4] - 7270:18, 7309:11, 7309:12, 7309:13
**25** [1] - 7282:10
**25.009** [2] - 7271:17, 7317:10
**25.012** [2] - 7271:17, 7317:10
**25.013** [1] - 7271:17
**25.013**.................
**7271** - 7317:10
**25.2** [1] - 7277:15
**26** [1] - 7220:5
**26.4** [1] - 7277:13
**26th** [1] - 7316:7
**28** [1] - 7220:3

## 3

**30** [1] - 7286:7
**30-minute** [1] - 7229:8
**307-0340** [1] - 7220:13
**333** [2] - 7221:20, 7316:12
**335-2793** [1] - 7220:25
**35** [1] - 7270:19

## 4

**4.6** [1] - 7277:15
**40.7** [1] - 7277:12
**401(K** [1] - 7238:2
**40th** [2] - 7221:12, 7221:16
**41** [1] - 7271:23
**434-5000** [1] - 7221:9
**455** [1] - 7220:20
**497-7728** [1] - 7221:13

## 5

**5.8** [1] - 7277:14
**50** [1] - 7279:12
**500** [1] - 7301:21
**508-6000** [1] - 7221:5
**56** [1] - 7270:19
**5th** [1] - 7220:20

## 6

**60** [1] - 7235:8
**60-watt** [1] - 7309:21
**600** [1] - 7220:16
**603-0857** [1] - 7220:21
**60604** [1] - 7220:17
**62** [2] - 7234:16, 7237:11
**65** [1] - 7228:17

**6523** [2] - 7221:19, 7316:12
**68** [1] - 7238:16
**680** [1] - 7221:8

## 7

**7.7** [1] - 7277:14
**70** [2] - 7228:17, 7235:8
**720** [1] - 7221:5
**73** [1] - 7274:2
**76** [1] - 7279:16
**76.0** [1] - 7277:12

## 8

**8,000** [1] - 7298:9
**80** [1] - 7235:8
**80203** [1] - 7221:5
**805-8563** [1] - 7220:17

## 9

**9** [1] - 7236:22
**90** [3] - 7235:8, 7301:20, 7306:14
**99** [1] - 7248:21
**999-5800** [1] - 7221:17
**9:30** [1] - 7220:6

## A

**a.m** [1] - 7220:6
**ability** [8] - 7230:18, 7231:1, 7231:16, 7231:19, 7243:13, 7262:25, 7264:6, 7316:6
**able** [11] - 7229:18, 7230:10, 7253:3, 7257:16, 7285:24, 7286:4, 7296:19, 7304:25, 7305:2, 7305:3, 7305:16
**absence** [3] - 7242:4, 7245:19, 7256:3
**absent** [1] - 7246:1
**absolute** [1] - 7270:16
**absolutely** [2] - 7290:4, 7305:25
**accept** [2] - 7271:16, 7271:18
**accepted** [1] - 7225:8
**access** [4] - 7230:24, 7266:24, 7267:2, 7313:17
**accessible** [1] - 7295:3
**accurate** [4] - 7296:24,

7297:4, 7304:4, 7316:4
**achieve** [1] - 7226:9
**achieved** [3] -
7224:12, 7224:16,
7301:25
**acquire** [1] - 7229:11
**action** [1] - 7222:4
**actionable** [1] -
7301:4
**actions** [2] - 7249:18,
7250:23
**actual** [3] - 7226:25,
7244:15, 7256:8
**ad** [14] - 7230:14,
7244:18, 7268:18,
7272:10, 7277:20,
7278:10, 7278:17,
7279:9, 7279:17,
7280:4, 7283:11,
7315:2
**added** [1] - 7294:16
**additional** [8] -
7222:15, 7229:10,
7229:13, 7260:1,
7264:5, 7265:3,
7288:24, 7299:22
**address** [4] - 7263:9,
7285:11, 7307:4,
7308:22
**addressed** [1] -
7274:17
**addresses** [2] -
7263:11, 7264:2
**adequacy** [1] - 7263:5
**adjunct** [1] - 7292:3
**admissibility** [2] -
7223:7, 7285:10
**admissible** [1] -
7287:15
**admission** [1] -
7286:2
**ADMITTED** [1] -
7317:8
**admitted** [1] - 7285:22
**Adobe's** [1] - 7277:13
**adopt** [1] - 7249:6
**ads** [5] - 7267:19,
7270:18, 7271:2,
7273:24, 7310:2
**Ads** [4] - 7284:5,
7284:7, 7284:9,
7284:11
**advantages** [2] -
7314:5, 7314:6
**adventurous** [1] -
7292:12
**advertise** [2] -
7283:13, 7284:6
**advertiser** [1] - 7284:8
**advertisers** [16] -

7269:4, 7269:6,
7270:12, 7270:17,
7272:24, 7273:2,
7273:16, 7273:18,
7274:12, 7283:13,
7283:15, 7284:3,
7308:8, 7308:10,
7308:13, 7314:10
**advertising** [14] -
7224:9, 7229:25,
7246:19, 7246:21,
7246:25, 7255:19,
7267:9, 7270:7,
7273:24, 7283:6,
7283:18, 7293:17,
7294:2, 7294:5
**advisement** [1] -
7286:4
**affect** [1] - 7230:15
**affects** [1] - 7225:18
**affirmatively** [1] -
7238:24
**agencies** [3] - 7262:4,
7262:6, 7262:13
**agency** [1] - 7261:25
**aggregate** [2] -
7272:20, 7278:19
**aggregated** [1] -
7242:1
**ago** [12] - 7236:12,
7237:17, 7237:19,
7238:8, 7238:11,
7261:22, 7274:9,
7283:24, 7287:23,
7298:16, 7307:21,
7309:1
**agree** [6] - 7264:22,
7281:11, 7286:2,
7304:8, 7306:4, 7310:8
**agreement** [22] -
7227:7, 7227:9,
7227:13, 7233:23,
7234:11, 7242:15,
7242:21, 7243:7,
7244:2, 7244:9,
7264:13, 7264:16,
7264:19, 7264:23,
7265:4, 7265:15,
7266:9, 7266:16,
7267:3, 7267:5,
7268:9, 7268:14
**agreements** [30] -
7223:24, 7224:2,
7225:21, 7226:3,
7226:15, 7226:17,
7227:5, 7230:22,
7230:25, 7239:23,
7240:11, 7241:12,
7241:24, 7242:5,
7242:8, 7246:12,

7247:10, 7247:12,
7247:13, 7247:15,
7247:18, 7247:24,
7248:5, 7248:11,
7248:14, 7256:10,
7260:5, 7280:16,
7280:17, 7282:18
**ahead** [12] - 7261:1,
7261:5, 7272:19,
7277:1, 7277:2,
7279:3, 7279:5,
7289:3, 7294:10,
7294:14, 7299:14,
7308:7
**aimed** [1] - 7292:11
**Airbnb** [1] - 7310:22
**al** [2] - 7220:3, 7222:4
**algorithm** [1] -
7304:19
**algorithms** [2] -
7227:20, 7290:25
**alleged** [6] - 7224:8,
7225:21, 7226:3,
7245:20, 7256:4,
7256:9
**allegedly** [1] - 7246:12
**allocated** [5] -
7272:25, 7273:3,
7273:17, 7273:19,
7273:25
**allocation** [1] - 7273:9
**allowed** [3] - 7242:20,
7243:19, 7280:23
**almost** [1] - 7309:14
**alternative** [1] -
7311:1
**alternatives** [4] -
7257:17, 7257:20,
7257:23, 7311:20
**amassed** [1] - 7276:12
**Amazon** [10] -
7302:17, 7309:21,
7312:20, 7312:21,
7313:25, 7314:3,
7314:7, 7314:9,
7314:16, 7315:3
**America** [3] - 7220:2,
7222:4, 7300:10
**Americas** [3] -
7220:23, 7221:11,
7221:15
**AMIT** [1] - 7220:9
**amount** [3] - 7272:21,
7295:16, 7308:23
**analyses** [2] -
7251:13, 7254:5
**analysis** [17] -
7225:14, 7239:21,
7241:16, 7241:17,
7249:1, 7251:20,

7254:2, 7254:16,
7262:21, 7264:4,
7270:25, 7285:7,
7287:3, 7288:4,
7288:7, 7293:1
**analyze** [3] - 7229:2,
7262:24, 7279:25
**analyzed** [3] -
7239:16, 7240:2,
7263:5
**Anderson** [1] - 7309:1
**Android** [5] - 7242:14,
7245:14, 7245:21
**answer** [14] - 7226:6,
7229:4, 7234:10,
7266:12, 7280:23,
7282:2, 7282:11,
7283:7, 7296:25,
7299:14, 7303:14,
7304:25, 7305:2,
7306:22
**answering** [1] -
7314:21
**answers** [2] - 7300:19,
7308:19
**anticompetitive** [2] -
7256:4, 7256:9
**antitrust** [2] - 7268:10,
7268:15
**anyways** [1] - 7277:7
**AOL** [1] - 7304:7
**apologize** [1] - 7281:9
**app** [2] - 7313:19,
7315:9
**appear** [1] - 7297:4
**APPEARANCES** [1] -
7220:11
**appeared** [1] -
7307:21
**Apple** [24] - 7227:8,
7232:22, 7232:23,
7233:7, 7233:11,
7233:12, 7233:19,
7233:22, 7234:2,
7234:7, 7234:15,
7243:16, 7244:2,
7244:6, 7245:20,
7265:14, 7265:19,
7266:3, 7266:8,
7266:10, 7266:15,
7290:5
**apple** [6] - 7233:17,
7290:5, 7290:7, 7290:8
**Apple's** [2] - 7233:19,
7265:15
**applies** [1] - 7238:4
**apply** [2] - 7238:2,
7272:13
**appointed** [1] -
7293:16

approach [2] - 7263:14, 7289:19
approached [2] - 7233:7, 7233:12
appropriate [5] - 7260:4, 7281:12, 7281:23, 7288:6, 7307:7
apps [9] - 7309:6, 7309:13, 7310:23, 7311:4, 7313:10, 7313:14, 7313:18, 7313:21, 7315:8
Apps [1] - 7293:23
area [7] - 7263:6, 7263:9, 7263:12, 7264:2, 7264:5, 7264:7, 7282:21
argue [1] - 7281:8
argument [2] - 7222:23, 7225:1
arm [1] - 7291:14
arrangement [2] - 7259:19, 7259:21
arrangements [4] - 7258:10, 7258:12, 7258:15, 7258:17
article [1] - 7303:19
aside [1] - 7225:3
aspects [1] - 7293:17
assess [2] - 7262:21, 7287:12
assigned [1] - 7298:6
Assistant [1] - 7294:17
associated [2] - 7283:4, 7312:18
assume [2] - 7225:6, 7226:11, 7294:3
assumed [3] - 7242:20, 7293:21, 7294:1
astonishing [1] - 7301:24
AT&T [1] - 7245:22
attempted [1] - 7268:9
attempting [1] - 7261:11
attempts [1] - 7293:11
attention [2] - 7232:22, 7308:14
auction [5] - 7268:25, 7269:4, 7269:11, 7269:21, 7269:22
authored [3] - 7291:1, 7291:2, 7291:4
available [3] - 7266:16, 7266:19, 7295:9
Avenue [6] - 7220:23,

7221:8, 7221:11, 7221:15, 7221:20, 7316:12
average [1] - 7309:9
avoid [2] - 7239:5, 7261:3
awake [1] - 7314:17
aware [6] - 7231:21, 7237:6, 7239:7, 7247:3, 7305:19, 7308:10

## B

bachelor [1] - 7290:22
background [2] - 7290:20, 7294:24
Baker [12] - 7223:14, 7271:23, 7272:3, 7274:4, 7277:11, 7279:9, 7280:12, 7283:24, 7284:18, 7285:8, 7286:15, 7286:25
BAKER [2] - 7223:17, 7317:2
Baker's [1] - 7288:10
ballpark [1] - 7295:19
bar [5] - 7236:1, 7236:7, 7236:9, 7236:16, 7246:11
baseball [1] - 7300:6
based [9] - 7224:12, 7230:1, 7246:15, 7246:20, 7247:3, 7296:16, 7296:24, 7297:3, 7297:15
bases [1] - 7236:13
basis [2] - 7286:18, 7288:18
basket [1] - 7314:11
bears [1] - 7283:5
became [2] - 7305:5, 7307:22
become [6] - 7256:2, 7305:21, 7307:17, 7307:24, 7314:23, 7314:24
becoming [1] - 7227:8
BEFORE [1] - 7220:9
began [1] - 7243:25
begin [1] - 7314:7

beginning [2] - 7304:17, 7314:2
begins [1] - 7282:10
behalf [2] - 7222:7, 7259:23
behavior [2] - 7300:12, 7303:5
behavorial [1] - 7238:3
behind [4] - 7265:20, 7265:21, 7265:22, 7270:15
Belknap [1] - 7220:23
below [2] - 7252:16, 7275:19
BENCH [1] - 7220:9
Berkeley [1] - 7290:21
best [9] - 7232:7, 7297:19, 7297:20, 7298:4, 7299:16, 7305:13, 7307:14, 7316:6
better [4] - 7287:8, 7300:20, 7304:25, 7305:3
between [21] - 7225:15, 7226:4, 7257:21, 7264:17, 7270:23, 7271:5, 7272:25, 7273:17, 7273:19, 7274:5, 7274:19, 7275:7, 7275:21, 7277:23, 7278:4, 7278:18, 7283:6, 7284:5, 7284:7, 7301:4, 7309:9
bid [2] - 7244:7, 7244:8
bigger [2] - 7262:17, 7299:5
biggest [1] - 7314:22
binder [5] - 7235:18, 7271:15, 7289:17, 7289:18, 7295:23
binders [2] - 7288:8, 7289:16
Bing [37] - 7225:2, 7229:10, 7232:16, 7233:11, 7235:13, 7238:20, 7239:5, 7239:16, 7239:22, 7240:9, 7241:14, 7247:17, 7247:21, 7248:2, 7248:16, 7256:10, 7256:18, 7256:21, 7257:10, 7257:17, 7257:21, 7258:1, 7258:3, 7258:7, 7258:12, 7258:15, 7258:17,

7263:8, 7263:11, 7264:1, 7264:25, 7272:25, 7273:1, 7273:17, 7273:19, 7302:14
Bing's [5] - 7238:14, 7258:8, 7262:22, 7263:5, 7264:6
Bing-Yelp [1] - 7256:18
bit [5] - 7225:1, 7271:10, 7301:16, 7308:25, 7315:8
blaring [1] - 7309:3
blocked [1] - 7268:10
blue [4] - 7241:10, 7242:5, 7246:4, 7247:11
book [2] - 7310:21
Booking [5] - 7257:1, 7257:6, 7257:9, 7257:22, 7311:14
booking [1] - 7302:18
Booking.com [4] - 7257:16, 7258:3, 7258:8, 7262:9
Boston [1] - 7290:5
bottom [5] - 7259:4, 7269:19, 7270:10, 7288:13
Bowen [3] - 7259:2, 7259:14, 7261:22
Bowen's [1] - 7259:20
box [1] - 7275:18
branch [1] - 7227:14
Brazil [1] - 7300:23
break [2] - 7271:10, 7315:18
briefly [3] - 7290:19, 7291:10, 7310:17
Brin [1] - 7292:25
bring [2] - 7256:22, 7297:20
Bring [1] - 7257:11
brings [1] - 7298:3
Broadway [1] - 7221:4
browser [11] - 7231:25, 7235:14, 7235:16, 7237:2, 7242:14, 7243:18, 7245:14, 7245:20, 7247:18, 7266:1
browsing [3] - 7266:9, 7266:21, 7266:22
Bruce [1] - 7221:1
bucket [3] - 7302:13, 7302:16, 7302:20
buckets [1] - 7302:9
budget [1] - 7270:12
budgets [1] - 7269:6

**build** [3] - 7300:2, 7300:10, 7310:19
**building** [2] - 7301:8, 7304:22
**bulb** [1] - 7309:21
**bullet** [11] - 7234:19, 7237:12, 7237:25, 7238:14, 7248:25, 7254:4, 7259:18, 7260:24, 7261:4, 7263:2, 7264:2
**bullets** [5] - 7234:18, 7259:5, 7260:22, 7261:2, 7261:9
**bunch** [1] - 7314:16
**business** [10] - 7229:25, 7230:1, 7230:3, 7230:14, 7241:19, 7241:20, 7241:22, 7261:3, 7278:3, 7297:24
**but-for** [11] - 7226:20, 7242:4, 7242:6, 7242:18, 7242:22, 7242:24, 7243:16, 7243:22, 7244:14, 7246:1, 7256:6
**BY** [21] - 7241:9, 7261:8, 7263:24, 7271:22, 7272:22, 7274:1, 7275:12, 7277:9, 7279:8, 7280:11, 7282:9, 7283:2, 7283:23, 7289:21, 7290:10, 7292:16, 7294:11, 7297:2, 7297:11, 7299:17, 7313:8

## C

**cake** [1] - 7311:23
**calculations** [1] - 7286:13
**Calendar** [1] - 7293:24
**camera** [1] - 7300:17
**cameras** [1] - 7305:8
**candidly** [1] - 7258:20
**capacity** [1] - 7266:1
**captured** [3] - 7247:10, 7303:4, 7310:3
**capturing** [1] - 7304:11
**care** [2] - 7307:12, 7307:14
**Carr** [1] - 7221:3
**carrier** [2] - 7242:14, 7245:21
**carry** [1] - 7295:4

**carrying** [1] - 7311:2
**cart** [1] - 7309:22
**carving** [1] - 7266:8
**case** [45] - 7223:23, 7224:11, 7225:5, 7225:21, 7226:2, 7228:3, 7228:12, 7229:17, 7230:7, 7230:12, 7234:1, 7234:21, 7235:2, 7235:7, 7235:19, 7236:19, 7239:21, 7241:13, 7242:3, 7242:13, 7245:13, 7245:18, 7246:2, 7252:4, 7252:20, 7252:24, 7254:16, 7256:1, 7264:4, 7265:8, 7265:19, 7265:23, 7274:10, 7279:19, 7285:19, 7286:6, 7288:21, 7289:1, 7304:6, 7306:15, 7307:24, 7310:7, 7314:9, 7315:3
**cases** [2] - 7311:13, 7312:8
**categories** [1] - 7239:3
**Cavanaugh** [5] - 7220:22, 7222:6, 7275:7, 7275:9, 7275:14
**CCR** [1] - 7316:11
**Center** [2] - 7221:3, 7291:13
**CEO** [2] - 7294:19, 7306:1
**certain** [6] - 7233:15, 7234:5, 7298:20, 7300:21, 7305:3, 7308:12
**certainly** [5] - 7225:20, 7233:12, 7260:24, 7291:6, 7311:14
**CERTIFICATE** [1] - 7316:1
**certify** [1] - 7316:3
**chair** [2] - 7253:6, 7292:8
**challenged** [1] - 7226:20
**chance** [2] - 7222:11, 7287:24
**change** [9] - 7238:7, 7238:11, 7239:9, 7264:19, 7274:15, 7293:19, 7293:25, 7294:15, 7300:7
**changed** [7] - 7226:5,

7226:6, 7234:8, 7293:9, 7293:11, 7306:7, 7306:9
**changes** [1] - 7283:25
**changing** [1] - 7238:12
**charge** [1] - 7265:24
**chart** [7] - 7238:14, 7272:7, 7273:18, 7277:19, 7278:1, 7278:9, 7297:15
**charts** [1] - 7286:24
**check** [2] - 7240:18, 7253:24
**checked** [2] - 7291:8, 7298:16
**cheese** [1] - 7311:23
**Chicago** [1] - 7220:17
**chief** [3] - 7285:19, 7309:2
**choice** [1] - 7267:6
**choices** [3] - 7266:16, 7267:3, 7267:4
**choosing** [2] - 7236:11, 7239:15
**chose** [1] - 7232:11
**chosen** [4] - 7233:22, 7236:19, 7245:14, 7245:23
**Chris** [1] - 7309:1
**Chrome** [11] - 7235:14, 7236:22, 7238:18, 7238:20, 7239:6, 7239:8, 7239:9, 7239:10, 7239:14, 7247:25
**circular** [1] - 7302:20
**circumstances** [1] - 7299:25
**citations** [1] - 7259:5
**cite** [2] - 7256:25, 7257:1
**cited** [3] - 7252:16, 7255:8, 7259:6
**cites** [1] - 7249:12
**civil** [1] - 7222:4
**claim** [8] - 7232:5, 7266:15, 7267:8, 7268:17, 7306:23, 7306:25, 7310:7, 7315:2
**claimed** [1] - 7254:22
**claiming** [1] - 7306:20
**class** [2] - 7303:13, 7314:23
**clear** [6] - 7224:15, 7227:1, 7249:5, 7257:6, 7267:23, 7300:20
**clearer** [1] - 7307:22

**client** [1] - 7305:9
**close** [5] - 7225:2, 7252:20, 7252:24, 7286:6, 7306:3
**closed** [1] - 7259:3
**closer** [4] - 7268:3, 7268:6, 7270:5, 7290:12
**CMR** [1] - 7316:11
**CO** [1] - 7221:5
**Coast** [3] - 7291:14, 7292:1, 7292:2
**colleague** [1] - 7304:21
**colleagues** [2] - 7252:3, 7295:12
**collecting** [1] - 7255:18
**collections** [1] - 7286:25
**college** [1] - 7309:24
**COLORADO** [1] - 7221:2
**Colorado** [1] - 7221:3
**COLUMBIA** [1] - 7220:1
**comb** [1] - 7252:3
**combination** [2] - 7276:6, 7276:12
**coming** [3] - 7247:20, 7270:2, 7287:17
**comment** [4] - 7236:9, 7259:17, 7313:3, 7313:5
**commerce** [3] - 7294:2, 7294:7, 7294:8
**commercial** [4] - 7263:12, 7314:21, 7314:22, 7314:24
**committed** [1] - 7305:24
**companies** [7] - 7242:21, 7276:18, 7278:20, 7300:2, 7306:12, 7314:17, 7314:18
**company** [10] - 7260:10, 7261:12, 7279:2, 7293:8, 7293:15, 7294:19, 7301:10, 7314:14, 7314:15, 7314:20
**company's** [1] - 7278:25
**compared** [3] - 7254:18, 7270:17, 7308:24
**comparison** [2] - 7225:14, 7255:19
**compensation** [1] -

7322

**7265:3**
  **compete** [18] -
7229:23, 7230:11,
7230:16, 7230:18,
7230:20, 7231:16,
7231:19, 7233:3,
7242:11, 7243:6,
7243:13, 7244:8,
7262:25, 7310:8,
7310:15, 7315:3,
7315:4, 7315:5
  **competed** [4] -
7231:12, 7231:22,
7232:2, 7232:6
  **competes** [3] -
7306:7, 7310:17,
7312:13
  **competing** [4] -
7230:21, 7310:9,
7311:18, 7312:14
  **competition** [33] -
7224:2, 7241:25,
7243:2, 7243:17,
7244:3, 7244:7,
7244:12, 7244:15,
7245:11, 7248:22,
7249:1, 7249:8,
7249:15, 7250:2,
7251:15, 7251:16,
7252:13, 7254:7,
7254:9, 7254:11,
7254:24, 7255:3,
7255:6, 7267:8,
7267:25, 7268:17,
7269:5, 7302:3,
7302:5, 7302:7,
7302:9, 7306:3, 7315:4
  **competitions** [1] -
7232:24
  **competitive** [21] -
7223:24, 7226:7,
7226:22, 7229:19,
7231:4, 7232:20,
7236:8, 7239:20,
7242:10, 7242:23,
7242:25, 7244:16,
7244:24, 7249:19,
7250:11, 7250:23,
7254:17, 7255:15,
7255:16, 7261:4,
7267:21
  **competitively** [1] -
7276:16
  **competitor** [2] -
7267:14, 7307:18
  **competitors** [2] -
7234:12, 7306:21
  **competitors'** [1] -
7230:18
  **complaint** [1] -

**7306:15**
  **complete** [3] -
7311:21, 7315:1,
7316:5
  **completely** [2] -
7253:11, 7304:17
  **computed** [1] - 7250:6
  **computer** [3] -
7290:21, 7292:21,
7305:13
  **concept** [1] - 7300:25
  **conceptual** [1] -
7244:23
  **concern** [2] - 7298:1
  **concerned** [2] -
7265:18, 7297:22
  **concerns** [2] -
7222:10, 7260:23
  **conclude** [1] - 7314:8
  **concluded** [1] -
7224:1
  **concluding** [1] -
7314:4
  **conclusion** [2] -
7226:10, 7312:12
  **conclusions** [1] -
7223:6
  **conditions** [1] -
7226:22
  **conduct** [14] -
7224:13, 7224:18,
7226:20, 7230:17,
7239:19, 7242:8,
7243:11, 7244:14,
7244:24, 7245:7,
7245:9, 7246:2,
7254:17, 7256:4
  **conducted** [1] -
7238:8
  **confer** [1] - 7296:21
  **confess** [1] - 7259:14
  **confidential** [2] -
7259:8, 7259:24
  **confirm** [1] - 7311:18
  **connection** [4] -
7265:6, 7274:6,
7274:7, 7278:24
  **CONNOLLY** [1] -
7221:7
  **consensus** [1] -
7225:11
  **consequences** [1] -
7245:7
  **consider** [3] -
7222:17, 7232:13,
7281:6
  **consideration** [3] -
7230:12, 7233:19,
7301:6
  **considering** [1] -

**7255:9**
  **consistent** [7] -
7235:5, 7236:2,
7237:9, 7257:10,
7259:11, 7261:25,
7281:22
  **consistently** [1] -
7308:2
  **constant** [1] - 7309:11
  **constantly** [3] -
7295:7, 7295:9, 7307:1
  **constitutes** [1] -
7316:4
  **Constitution** [2] -
7221:20, 7316:12
  **consumer** [1] -
7239:17
  **Consumer** [1] -
7221:3
  **consumers** [4] -
7234:19, 7235:20,
7235:22, 7238:1
  **Cont** [3] - 7221:1,
7223:18, 7317:3
  **context** [6] - 7222:18,
7223:5, 7286:11,
7294:20, 7301:3,
7308:25
  **continue** [1] - 7223:13
  **continued** [2] -
7232:13, 7297:16
  **continues** [2] -
7234:15, 7292:9
  **contract** [1] - 7244:7
  **contracts** [2] -
7223:22, 7245:20
  **contrasting** [1] -
7288:11
  **control** [1] - 7230:24
  **conversation** [3] -
7227:14, 7252:17,
7280:8
  **conversations** [2] -
7227:8, 7230:23
  **core** [1] - 7295:1
  **correct** [136] -
7224:13, 7224:14,
7224:18, 7226:5,
7226:15, 7227:21,
7227:22, 7227:25,
7228:14, 7229:12,
7229:19, 7229:20,
7230:9, 7230:18,
7230:22, 7231:2,
7232:3, 7232:8,
7232:14, 7232:17,
7232:25, 7233:4,
7233:9, 7233:13,
7233:18, 7234:13,
7237:4, 7237:8,

**7237:19, 7238:20,**
7238:25, 7239:6,
7240:1, 7240:11,
7242:1, 7242:2,
7242:5, 7242:16,
7242:17, 7244:5,
7245:16, 7245:24,
7245:25, 7246:13,
7246:14, 7246:22,
7246:23, 7247:8,
7247:9, 7247:17,
7247:22, 7247:25,
7248:9, 7248:19,
7248:24, 7249:8,
7249:13, 7249:14,
7249:17, 7249:21,
7250:13, 7250:18,
7251:2, 7251:10,
7251:11, 7251:19,
7252:6, 7252:8,
7254:18, 7254:19,
7255:3, 7255:6,
7255:7, 7255:10,
7255:11, 7255:17,
7255:23, 7256:4,
7256:16, 7256:17,
7257:1, 7257:25,
7258:16, 7258:17,
7261:9, 7261:10,
7261:12, 7261:15,
7261:19, 7261:20,
7261:23, 7262:23,
7262:24, 7263:1,
7263:6, 7263:7,
7263:9, 7264:11,
7264:12, 7264:14,
7264:17, 7264:20,
7264:22, 7265:1,
7265:7, 7265:10,
7265:11, 7265:20,
7266:1, 7266:5,
7266:22, 7266:25,
7267:3, 7267:6,
7267:13, 7268:4,
7268:8, 7268:23,
7269:10, 7270:20,
7271:3, 7271:6,
7272:11, 7275:1,
7275:15, 7277:10,
7278:21, 7279:11,
7297:13, 7297:14,
7298:24, 7298:25,
7304:4, 7305:16,
7310:13, 7312:2
  **correctly** [1] - 7277:16
  **correlate** [1] - 7301:9
  **correlates** [1] -
7301:11
  **cost** [3] - 7312:18,
7313:10

7323

**Costs** [1] - 7234:18
**costs** [3] - 7237:24,
7241:22, 7283:16
**counsel** [1] - 7296:21
**Counsel** [1] - 7222:2
**countries** [16] -
7249:16, 7249:19,
7251:10, 7251:14,
7252:12, 7253:4,
7253:14, 7253:23,
7253:24, 7254:6,
7254:8, 7270:16,
7271:5, 7298:21,
7298:23, 7300:14
**country** [9] - 7253:6,
7253:12, 7254:18,
7299:5, 7299:6,
7299:8, 7299:9,
7299:15, 7299:16
**couple** [8] - 7268:24,
7289:15, 7291:2,
7300:14, 7301:19,
7302:13, 7309:8,
7313:12
**course** [7] - 7234:15,
7256:9, 7280:5,
7292:8, 7292:11,
7299:19, 7303:6
**court** [3] - 7229:6,
7238:23, 7290:3
**COURT** [75] - 7220:1,
7222:2, 7222:8,
7223:1, 7223:9,
7223:12, 7234:24,
7240:12, 7240:22,
7240:24, 7241:1,
7241:8, 7258:24,
7259:9, 7259:13,
7260:13, 7260:21,
7271:9, 7271:18,
7271:20, 7272:19,
7273:5, 7273:12,
7273:22, 7275:23,
7276:3, 7276:8,
7276:14, 7276:19,
7276:24, 7277:7,
7278:15, 7278:19,
7278:22, 7279:1,
7279:21, 7280:2,
7280:10, 7280:25,
7281:8, 7281:10,
7281:21, 7282:1,
7282:6, 7282:24,
7283:20, 7283:21,
7284:17, 7284:22,
7285:13, 7286:8,
7286:20, 7286:24,
7287:5, 7287:8,
7287:11, 7287:21,
7288:13, 7288:20,

7289:2, 7289:12,
7289:14, 7290:2,
7292:14, 7294:5,
7294:8, 7296:13,
7296:17, 7296:23,
7297:8, 7299:12,
7313:2, 7313:5,
7315:15, 7316:1
**Court** [24] - 7221:18,
7221:19, 7222:25,
7246:9, 7259:17,
7271:15, 7280:20,
7286:11, 7286:18,
7288:3, 7288:5,
7288:8, 7290:19,
7291:10, 7294:20,
7295:11, 7295:13,
7298:14, 7298:19,
7306:1, 7312:16,
7313:23, 7316:11
**Courthouse** [1] -
7221:19
**courtroom** [2] -
7266:5, 7284:21
**COURTROOM** [3] -
7222:3, 7240:21,
7240:23
**courtship** [1] -
7293:12
**cover** [1] - 7238:15
**covered** [3] - 7241:11,
7241:20, 7254:2
**CRC** [1] - 7221:18
**create** [1] - 7241:21
**creates** [1] - 7302:11
**credit** [1] - 7304:24
**Cross** [1] - 7317:3
**CROSS** [1] - 7223:18
**Cross-Examination**
[1] - 7317:3
**CROSS-
EXAMINATION** [1] -
7223:18
**CRR** [2] - 7221:18,
7316:11
**crunched** [1] - 7287:9
**Cue** [2] - 7266:4,
7266:7
**cultures** [2] - 7300:11,
7300:21
**curiously** [1] - 7303:8
**current** [4] - 7243:23,
7244:19, 7290:16,
7294:3
**CV** [1] - 7220:4
**Czech** [1] - 7253:17

---

# D

**D.C** [6] - 7220:5,

7220:13, 7221:8,
7307:6, 7307:11,
7316:13
**Dahlquist** [1] -
7220:15
**data** [12] - 7246:15,
7247:3, 7264:25,
7273:6, 7273:8,
7276:1, 7276:12,
7286:25, 7301:19,
7309:7, 7309:8,
7313:13
**database** [1] - 7287:4
**databases** [1] - 7292:7
**date** [3] - 7252:14,
7252:16, 7287:4
**Dated** [1] - 7316:7
**Daubert** [7] - 7222:11,
7222:14, 7222:17,
7222:19, 7222:23,
7222:24, 7223:3
**David** [1] - 7220:15
**David.dahlquist@
usdoj.gov** [1] - 7220:18
**DAY** [1] - 7220:3
**DC** [2] - 7220:20,
7221:20
**dead** [1] - 7309:4
**deal** [2] - 7256:10,
7260:4, 7307:14
**debating** [1] - 7269:8
**decide** [1] - 7237:21
**decided** [6] - 7227:4,
7230:4, 7238:19,
7280:15, 7282:17,
7293:5
**deciding** [3] -
7238:25, 7265:24,
7309:24
**deck** [5] - 7234:16,
7248:21, 7254:15,
7303:17, 7306:10
**declined** [2] - 7226:14,
7227:12
**decreased** [2] -
7274:24, 7279:24
**decreasing** [2] -
7272:21, 7275:22
**default** [64] - 7224:1,
7227:6, 7227:8,
7230:22, 7230:25,
7231:2, 7231:6,
7231:10, 7231:13,
7231:16, 7231:20,
7231:22, 7232:3,
7232:6, 7232:9,
7232:14, 7232:17,
7232:24, 7233:4,
7233:9, 7233:14,
7234:8, 7234:11,

7234:13, 7234:21,
7235:3, 7235:4,
7235:8, 7235:9,
7235:13, 7235:14,
7235:15, 7235:20,
7235:22, 7236:19,
7238:7, 7238:11,
7238:12, 7238:25,
7239:2, 7239:8,
7239:10, 7239:15,
7239:17, 7239:24,
7239:25, 7243:17,
7243:20, 7244:9,
7245:3, 7245:15,
7245:23, 7247:22,
7247:25, 7248:13,
7248:16, 7265:15,
7265:24, 7265:25,
7266:9, 7266:20,
7266:25, 7280:16,
7282:18
**defaulted** [1] - 7237:2
**defaults** [16] -
7234:17, 7234:20,
7236:10, 7236:11,
7236:14, 7237:25,
7238:1, 7238:7,
7238:15, 7241:21,
7242:18, 7246:1,
7247:19, 7247:24,
7248:2
**Defendant** [2] -
7220:7, 7221:7
**defer** [2] - 7275:10,
7287:12
**delay** [1] - 7260:7
**demographic** [1] -
7303:2
**demographics** [4] -
7303:9, 7305:4,
7308:1, 7308:18
**demonstrate** [1] -
7286:14
**demonstrated** [1] -
7274:16
**demonstrates** [1] -
7288:8
**demonstrating** [1] -
7235:21
**demonstrative** [13] -
7235:17, 7235:21,
7264:7, 7285:1,
7285:8, 7287:18,
7295:21, 7295:23,
7296:1, 7296:7,
7296:11, 7311:5,
7311:7
**demonstratives** [7] -
7271:14, 7271:15,
7271:17, 7271:24,

7274:2, 7287:19,
7289:18
**Denver** [1] - 7221:5
**department** [2] -
7292:8, 7292:21
**DEPARTMENT** [3] -
7220:12, 7220:19,
7221:2
**Department** [1] -
7220:15
**depictions** [1] -
7286:24
**Depot** [1] - 7307:5
**DEPUTY** [3] - 7222:3,
7240:21, 7240:23
**describe** [8] -
7236:24, 7237:23,
7272:5, 7290:19,
7291:10, 7302:7,
7310:17, 7313:23
**described** [1] -
7306:21
**describes** [1] -
7259:18
**describing** [2] -
7244:13, 7262:15
**designated** [1] -
7259:7
**designations** [1] -
7288:24
**desktop** [13] - 7225:2,
7238:18, 7240:10,
7247:5, 7247:7,
7247:14, 7247:16,
7247:20, 7248:2,
7248:15, 7248:17,
7301:5, 7301:21
**desktops** [1] -
7238:15
**details** [2] - 7231:18,
7268:15
**determine** [1] -
7226:19
**determining** [2] -
7227:24, 7228:9
**deterred** [2] - 7234:12,
7234:14
**develop** [1] - 7229:18
**developed** [2] -
7225:22, 7305:16
**developing** [1] -
7228:5
**developments** [1] -
7251:1
**devices** [4] - 7246:7,
7247:21, 7248:9
**devoting** [1] - 7297:23
**Dickman** [2] -
7221:18, 7316:11
**DICKMAN** [1] - 7316:3

**difference** [2] -
7271:5, 7281:18
**differences** [4] -
7225:19, 7226:8,
7270:6, 7270:22
**different** [21] -
7226:22, 7226:23,
7230:13, 7236:12,
7243:1, 7243:12,
7243:13, 7243:14,
7243:22, 7245:11,
7247:23, 7270:3,
7278:20, 7281:15,
7304:18, 7307:22,
7312:10
**difficult** [1] - 7303:11
**digital** [1] - 7240:13
**diminishing** [1] -
7228:13, 7228:19,
7228:24
**Dintzer** [2] - 7220:11,
7222:5
**DINTZER** [2] -
7222:21, 7223:8
**DIRECT** [1] - 7289:20
**direct** [4] - 7223:2,
7283:14, 7284:10,
7317:5
**directed** [2] - 7273:14,
7300:13
**direction** [2] -
7229:14, 7259:11
**directly** [6] - 7257:25,
7275:19, 7288:10,
7305:1, 7305:2, 7315:5
**disadvantaged** [1] -
7276:16
**disagree** [3] -
7236:18, 7262:12,
7281:11
**Dischler** [1] - 7294:21
**discouraged** [1] -
7226:16
**discovery** [2] -
7252:20, 7252:24
**discuss** [3] - 7292:25,
7304:19, 7315:18
**discussed** [3] -
7236:12, 7256:18,
7280:18
**discusses** [2] -
7249:15, 7249:18
**discussing** [2] -
7237:24, 7299:18
**discussion** [2] -
7268:20, 7275:7
**disease** [1] - 7305:9
**dismissive** [1] -
7309:5
**disproportionally** [1] -

7280:5
**dispute** [3] - 7264:16,
7267:1, 7296:13
**disrupt** [1] - 7304:16
**dissertation** [1] -
7290:24
**distinct** [1] - 7300:12
**distinctive** [1] -
7300:21
**distribution** [9] -
7223:22, 7223:24,
7226:14, 7227:13,
7240:11, 7247:10,
7247:15, 7248:11,
7256:12
**DISTRICT** [3] - 7220:1,
7220:1, 7220:10
**division** [1] - 7268:10
**Docs** [1] - 7293:24
**document** [16] -
7249:12, 7249:15,
7249:18, 7249:23,
7249:25, 7250:3,
7250:13, 7250:22,
7250:24, 7251:4,
7255:8, 7268:16,
7296:16, 7296:18,
7298:21
**documentation** [2] -
7252:11, 7252:22
**documents** [1] -
7252:4
**DoJ** [3] - 7222:5,
7306:15, 7306:20
**DOJ** [1] - 7220:11
**dollars** [3] - 7273:24,
7278:25, 7279:2
**done** [13] - 7225:14,
7239:21, 7242:15,
7244:11, 7244:22,
7244:25, 7245:8,
7254:16, 7256:11,
7264:4, 7270:25,
7290:9, 7294:24
**down** [8] - 7243:5,
7266:19, 7266:23,
7270:14, 7270:15,
7274:18, 7301:21,
7315:7
**download** [2] -
7235:13, 7239:7
**downloaded** [1] -
7239:9
**downloading** [2] -
7238:20, 7239:5
**downloads** [1] -
7315:9
**dozens** [3] - 7258:15
**Dr** [12] - 7289:8,
7289:12, 7292:17,

7297:3, 7298:11,
7304:10, 7304:21,
7308:22, 7311:7,
7312:17, 7313:9,
7315:17
**drafted** [1] - 7249:23
**dramatically** [2] -
7279:23, 7279:24
**drawing** [1] - 7305:20
**draws** [1] - 7303:10
**Drive** [1] - 7293:24
**drop** [2] - 7266:19,
7266:23
**drop-down** [2] -
7266:19, 7266:23
**DuckDuckGo** [9] -
7227:2, 7233:13,
7256:11, 7265:14,
7265:20, 7265:25,
7266:19, 7266:24,
7302:14
**DuckDuckGo's** [2] -
7227:7, 7266:2
**due** [4] - 7249:8,
7255:6, 7265:9, 7266:1
**duly** [1] - 7289:10
**during** [19] - 7224:21,
7243:18, 7244:11,
7245:15, 7245:19,
7246:10, 7246:11,
7246:24, 7247:5,
7247:21, 7248:4,
7248:12, 7252:7,
7256:8, 7272:14,
7274:23, 7299:18,
7300:18, 7315:18
**DXD** [1] - 7295:21
**DXD-15.011** [1] -
7303:18
**DXD-21.003** [1] -
7306:11
**DXD-21.004** [1] -
7306:14
**DXD-21.005** [1] -
7311:6
**DXD-21.006** [1] -
7312:4
**DXD-25.009** [1] -
7235:17
**DXD21.002** [1] -
7295:23
**DXD25.002** [2] -
7271:17, 7317:10
**DXD25.012** [1] -
7263:25
**dynamic** [1] - 7232:20

---

**E**

---

**early** [2] - 7292:19,

7315:13
**earning** [1] - 7279:2
**easier** [2] - 7226:8, 7284:8
**easily** [2] - 7266:24, 7267:1
**East** [1] - 7292:1
**eCommerce** [1] - 7269:23
**economic** [1] - 7245:2
**economics** [1] - 7238:3
**editor** [1] - 7309:2
**educated** [1] - 7238:6
**educational** [1] - 7290:19
**effect** [6] - 7228:15, 7228:16, 7229:21, 7246:12, 7248:5, 7284:6
**effective** [1] - 7256:3
**effects** [1] - 7244:24
**effort** [1] - 7300:13
**Eiffel** [2] - 7305:2, 7307:13
**eight** [1] - 7291:22
**either** [2] - 7259:13, 7280:3
**elect** [1] - 7299:22
**elicit** [1] - 7313:6
**eliciting** [1] - 7307:23
**eligible** [2] - 7240:10, 7286:16
**Elmo** [3] - 7240:21, 7240:22, 7240:24
**elsewhere** [1] - 7308:21
**Email** [7] - 7220:14, 7220:18, 7220:21, 7221:6, 7221:9, 7221:13, 7221:17
**email** [6] - 7220:25, 7268:20, 7269:7, 7269:18, 7269:24, 7270:14
**embedded** [1] - 7312:24
**emphasis** [1] - 7236:24
**employ** [1] - 7298:15
**employee** [1] - 7303:24
**employees** [1] - 7298:6
**employer** [3] - 7290:1, 7290:14, 7290:15
**encompassed** [1] - 7293:23
**end** [3] - 7242:11, 7276:14, 7309:22

**ended** [2] - 7265:10, 7293:12
**ends** [1] - 7297:15
**engage** [1] - 7301:13
**engaged** [3] - 7245:7, 7245:9, 7250:25
**engine** [50] - 7224:23, 7225:22, 7226:13, 7227:4, 7227:12, 7227:16, 7227:17, 7227:18, 7227:19, 7227:20, 7228:5, 7228:9, 7228:13, 7229:19, 7230:22, 7232:7, 7232:8, 7232:17, 7232:24, 7233:7, 7233:8, 7233:10, 7234:23, 7235:4, 7235:9, 7235:23, 7236:20, 7237:2, 7237:3, 7237:7, 7239:17, 7243:17, 7243:20, 7244:9, 7245:3, 7245:15, 7245:23, 7247:22, 7256:1, 7256:3, 7265:25, 7280:15, 7282:17, 7292:23, 7293:1, 7299:5, 7300:5, 7301:3, 7302:21, 7304:8
**engine's** [1] - 7227:25
**engineer** [1] - 7278:25
**engineers** [2] - 7298:9
**engines** [11] - 7225:7, 7225:12, 7226:5, 7230:21, 7231:12, 7231:21, 7232:2, 7232:14, 7233:2, 7241:25, 7255:25
**enshrined** [1] - 7301:7
**entail** [1] - 7309:25
**enter** [5] - 7242:15, 7242:21, 7255:5, 7258:7, 7268:9
**entered** [1] - 7244:3
**enterprise** [1] - 7291:14
**entirely** [3] - 7288:11, 7311:3, 7315:14
**entirety** [1] - 7298:8
**entities** [2] - 7259:19, 7263:8
**environment** [2] - 7267:11, 7267:21
**equal** [2] - 7249:24, 7299:15
**equally** [1] - 7286:16
**erode** [1] - 7309:6

**erosion** [3] - 7224:19, 7245:10, 7308:12
**especially** [2] - 7305:7, 7308:1
**essentially** [2] - 7282:3, 7311:15
**estimate** [1] - 7278:16
**et** [2] - 7220:3, 7222:4
**Europe** [1] - 7300:10
**evaluate** [12] - 7224:10, 7231:9, 7232:10, 7234:1, 7254:13, 7254:16, 7255:12, 7271:4, 7285:23, 7287:24, 7287:25, 7288:2
**evaluated** [3] - 7225:18, 7250:15, 7255:15
**evaluating** [3] - 7227:3, 7280:14, 7282:15
**evaluation** [1] - 7255:18
**eve** [1] - 7252:18
**event** [2] - 7222:20, 7305:18
**events** [2] - 7236:7, 7236:11
**eventually** [1] - 7293:12
**evidence** [25] - 7230:21, 7232:10, 7234:20, 7235:2, 7235:5, 7235:7, 7235:12, 7254:20, 7265:19, 7265:23, 7271:16, 7271:18, 7274:11, 7283:5, 7283:10, 7283:12, 7283:15, 7285:1, 7285:6, 7285:10, 7286:12, 7286:17, 7288:9, 7296:5
**evidentiary** [1] - 7284:16
**evolve** [3] - 7242:9, 7243:12, 7295:7
**evolves** [1] - 7295:8
**exactly** [1] - 7287:7
**exam** [1] - 7300:18
**Examination** [3] - 7317:3, 7317:3, 7317:5
**examination** [4] - 7223:2, 7272:16, 7281:12, 7283:14
**EXAMINATION** [3] - 7223:18, 7271:21, 7289:20
**examine** [2] - 7223:25,

7235:20
**examined** [7] - 7233:25, 7234:6, 7243:18, 7245:19, 7289:11
**example** [18] - 7229:23, 7236:22, 7237:21, 7247:25, 7270:21, 7274:14, 7281:3, 7302:18, 7302:19, 7305:6, 7307:10, 7310:19, 7311:14, 7311:15, 7311:18, 7312:19, 7312:20, 7313:19
**examples** [8] - 7230:23, 7256:10, 7287:6, 7288:9, 7300:14, 7302:13, 7302:18, 7305:11
**except** [3] - 7239:13, 7255:17, 7312:7
**excerpted** [1] - 7298:22
**excerpts** [1] - 7303:20
**exchange** [1] - 7268:20
**exchanged** [1] - 7287:23
**exclusionary** [5] - 7224:12, 7225:21, 7226:3, 7245:20, 7246:12
**exclusive** [17] - 7224:1, 7227:6, 7230:25, 7233:14, 7233:15, 7236:14, 7239:23, 7241:20, 7242:18, 7243:6, 7247:15, 7247:22, 7248:5, 7248:11, 7265:15, 7280:16, 7282:17
**exclusively** [1] - 7237:3
**excuse** [2] - 7261:13, 7284:15
**executive** [1] - 7266:6
**executives** [2] - 7257:3, 7265:24
**exhibit** [2] - 7288:18
**exhibit-by-exhibit** [1] - 7288:18
**EXHIBITS** [1] - 7317:8
**exhibits** [10] - 7285:16, 7285:21, 7286:3, 7286:13, 7287:18, 7287:22, 7287:23, 7288:24, 7289:18

7326

**exists** [2] - 7226:4, 7267:22
**exit** [1] - 7230:4
**expand** [1] - 7295:9
**expanding** [1] - 7246:13
**expect** [1] - 7247:2
**expectations** [1] - 7295:7
**Expedia** [6] - 7257:1, 7257:22, 7258:1, 7258:8, 7262:9, 7302:18
**expenditure** [2] - 7296:2, 7300:1
**expenditures** [1] - 7297:13
**experience** [9] - 7253:10, 7291:11, 7295:6, 7301:12, 7305:20, 7308:7, 7311:16, 7311:24, 7313:9
**experiment** [2] - 7223:4, 7244:23
**expert** [13] - 7226:12, 7227:20, 7227:22, 7228:22, 7252:19, 7255:25, 7261:18, 7281:6, 7281:11, 7286:14, 7288:9, 7312:16, 7312:25
**experts** [2] - 7288:5, 7298:20
**explain** [2] - 7227:6, 7270:22
**explained** [1] - 7226:16
**explaining** [3] - 7244:16, 7245:7, 7245:9
**explains** [1] - 7280:6
**explanation** [1] - 7270:5
**explanations** [2] - 7269:25, 7271:4
**explicit** [1] - 7302:22
**exploding** [1] - 7298:2
**express** [1] - 7302:23
**expression** [1] - 7308:15
**extent** [5] - 7236:16, 7256:18, 7278:1, 7296:10, 7303:7
**external** [1] - 7314:1
**extra** [1] - 7315:15
**extremely** [3] - 7301:7, 7301:22, 7307:25

# F

**face** [4] - 7250:2, 7254:10, 7278:8, 7302:5
**Facebook** [2] - 7303:7, 7307:21
**faced** [1] - 7255:3
**faces** [6] - 7249:15, 7251:14, 7252:13, 7254:6, 7254:8, 7255:16
**fact** [7] - 7223:6, 7225:6, 7230:9, 7234:11, 7265:10, 7274:25, 7307:9
**factor** [3] - 7233:19, 7270:15, 7270:22
**factors** [5] - 7227:24, 7228:4, 7228:8, 7269:14, 7269:17
**facts** [1] - 7288:4
**fail** [1] - 7265:14
**failed** [3] - 7249:6, 7255:5
**failing** [1] - 7256:11
**failure** [1] - 7264:5
**fair** [5] - 7246:18, 7273:20, 7279:15, 7292:12, 7301:16
**fairly** [1] - 7296:1
**familiar** [4] - 7295:16, 7300:25, 7309:15, 7315:9
**far** [6] - 7225:10, 7239:13, 7265:20, 7265:21, 7303:5, 7308:7
**fashion** [1] - 7285:4
**faster** [1] - 7247:6
**fastest** [1] - 7305:7
**faucet** [1] - 7307:5
**fault** [1] - 7283:21
**favored** [1] - 7304:19
**feature** [1] - 7313:18
**features** [1] - 7284:8
**felt** [3] - 7259:24, 7264:25, 7307:22
**few** [4] - 7262:10, 7293:11, 7298:14, 7303:3
**fewer** [3] - 7238:15, 7239:2, 7269:4
**figure** [5] - 7236:2, 7238:17, 7238:18, 7287:14, 7296:25
**figures** [3] - 7250:5, 7275:3, 7286:13
**fill** [1] - 7307:25
**filled** [1] - 7292:3

**final** [1] - 7288:15
**financial** [2] - 7301:9, 7301:11
**findings** [2] - 7223:6, 7288:4
**fine** [6] - 7261:2, 7261:6, 7272:4, 7279:5, 7281:19, 7287:11
**finish** [1] - 7244:21
**finished** [1] - 7314:11
**Firefox** [9] - 7231:2, 7231:13, 7231:16, 7231:22, 7231:25, 7232:6, 7232:17, 7236:9, 7236:11
**firm** [6] - 7228:17, 7230:4, 7230:14, 7236:15, 7272:10, 7283:17
**firms** [12] - 7226:20, 7226:21, 7230:24, 7231:15, 7233:1, 7243:12, 7247:18, 7254:22, 7257:16, 7258:10, 7262:11, 7283:13
**first** [30] - 7224:7, 7224:16, 7234:19, 7236:1, 7237:25, 7248:25, 7255:4, 7260:21, 7261:2, 7261:11, 7261:21, 7282:10, 7283:10, 7287:23, 7289:5, 7289:10, 7290:6, 7292:8, 7292:17, 7293:14, 7294:25, 7295:20, 7296:15, 7299:7, 7301:23, 7302:9, 7307:5, 7307:21, 7314:14
**five** [6] - 7275:4, 7275:16, 7275:19, 7313:24, 7315:13, 7315:15
**fix** [1] - 7305:10
**fixed** [1] - 7283:16
**flagged** [1] - 7269:20
**flights** [1] - 7310:21
**Floor** [3] - 7221:4, 7221:12, 7221:16
**focus** [2] - 7300:22, 7308:8
**focusing** [3] - 7231:4, 7267:4, 7308:14
**follow** [5] - 7277:2, 7279:21, 7308:3, 7308:6, 7308:9
**follow-up** [1] - 7277:2

**following** [4] - 7285:13, 7288:6, 7291:12, 7291:19
**follows** [1] - 7289:11
**foolish** [1] - 7298:4
**foot** [1] - 7298:4
**FOR** [1] - 7220:1
**forces** [1] - 7293:6
**forecasting** [1] - 7308:11
**foregoing** [1] - 7316:4
**foreign** [8] - 7249:16, 7249:24, 7250:3, 7250:25, 7251:10, 7253:4, 7254:18, 7299:23
**forever** [1] - 7307:9
**forgotten** [1] - 7228:18
**form** [3] - 7259:18, 7265:4, 7281:12
**formed** [2] - 7256:2, 7288:14
**former** [1] - 7303:24
**forming** [1] - 7235:19
**formulate** [1] - 7303:12
**Fortune** [1] - 7303:20
**forward** [2] - 7285:11, 7298:5
**foundation** [1] - 7273:7
**founders** [2] - 7301:7, 7304:20
**four** [6] - 7249:19, 7250:12, 7253:14, 7278:20, 7279:24, 7309:14
**four-year** [1] - 7279:24
**fourth** [1] - 7236:16
**Fox** [2] - 7222:10, 7222:25
**Fox's** [1] - 7222:13
**fraction** [3] - 7241:19, 7241:22, 7305:4
**frequently** [2] - 7292:22, 7313:11
**friend** [1] - 7303:25
**front** [4] - 7297:21, 7309:3, 7311:12, 7314:18
**fulfil** [2] - 7306:12, 7310:23
**full** [3] - 7257:15, 7314:9, 7316:5
**function** [1] - 7303:16
**functionality** [1] - 7313:17
**fundamental** [1] - 7305:12

**funds** [1] - 7299:22

## G

**gained** [2] - 7224:7, 7239:22
**gap** [3] - 7225:15, 7225:17, 7226:3
**general** [31] - 7224:8, 7224:23, 7225:3, 7228:17, 7234:19, 7238:1, 7239:11, 7240:10, 7241:19, 7246:6, 7248:23, 7249:2, 7254:22, 7254:25, 7256:1, 7257:16, 7258:10, 7267:25, 7272:10, 7273:24, 7277:20, 7278:10, 7278:17, 7279:9, 7279:17, 7282:21, 7283:17, 7299:4, 7314:1
**generally** [6] - 7237:5, 7292:5, 7295:16, 7302:7, 7313:22, 7315:8
**gentleman** [2] - 7294:21, 7312:17
**gentlemen** [1] - 7303:25
**George** [1] - 7290:8
**given** [3] - 7261:22, 7281:2, 7286:3
**glad** [1] - 7297:8
**Gmail** [1] - 7293:24
**Goodrich** [2] - 7221:11, 7221:15
**Google** [190] - 7221:7, 7222:5, 7222:7, 7223:24, 7224:4, 7224:7, 7224:11, 7224:16, 7225:6, 7225:11, 7225:15, 7226:4, 7227:12, 7231:18, 7232:6, 7232:11, 7232:16, 7233:17, 7233:20, 7233:22, 7234:2, 7234:8, 7234:11, 7234:15, 7234:21, 7235:3, 7235:10, 7235:14, 7235:15, 7235:23, 7236:20, 7236:21, 7237:7, 7238:15, 7239:3, 7239:8, 7239:15, 7240:9, 7240:11, 7241:12, 7241:14, 7241:24, 7242:10,

7242:15, 7242:20, 7243:2, 7243:6, 7243:25, 7244:11, 7244:22, 7244:25, 7245:1, 7245:2, 7245:7, 7245:8, 7245:9, 7246:12, 7247:10, 7247:14, 7248:12, 7248:25, 7249:1, 7249:6, 7249:12, 7249:15, 7249:18, 7249:22, 7250:2, 7250:7, 7250:16, 7250:19, 7250:25, 7251:4, 7251:13, 7251:14, 7251:21, 7252:13, 7253:13, 7253:24, 7254:6, 7254:8, 7254:10, 7254:20, 7255:1, 7255:4, 7255:5, 7255:8, 7255:12, 7255:16, 7255:18, 7255:21, 7257:17, 7262:19, 7262:25, 7265:16, 7266:8, 7266:10, 7267:14, 7267:16, 7268:7, 7268:9, 7268:14, 7269:8, 7271:1, 7272:2, 7272:6, 7272:14, 7272:25, 7273:1, 7273:17, 7273:19, 7273:25, 7276:1, 7282:17, 7284:5, 7284:7, 7284:9, 7284:11, 7285:9, 7285:10, 7286:11, 7286:16, 7287:12, 7288:1, 7288:9, 7289:4, 7289:7, 7290:15, 7290:16, 7291:11, 7291:20, 7292:18, 7292:20, 7293:9, 7293:12, 7293:14, 7293:22, 7293:23, 7293:24, 7294:16, 7295:4, 7295:8, 7295:17, 7296:2, 7297:18, 7297:22, 7298:7, 7298:15, 7298:21, 7299:5, 7299:8, 7299:9, 7299:15, 7299:22, 7301:6, 7301:15, 7301:17, 7302:5, 7303:12, 7304:14, 7304:15, 7304:16, 7304:23, 7305:16, 7305:24,

7306:7, 7306:21, 7307:3, 7307:18, 7308:15, 7308:19, 7308:23, 7309:11, 7310:8, 7310:15, 7310:17, 7311:2, 7311:3, 7311:8, 7311:14, 7311:18, 7311:20, 7312:13, 7314:20, 7315:3, 7315:5
**google** [1] - 7220:6
**Google's** [32] - 7224:18, 7224:22, 7225:23, 7226:8, 7226:14, 7227:5, 7227:6, 7230:17, 7236:13, 7237:12, 7239:19, 7243:4, 7243:18, 7244:7, 7244:24, 7245:4, 7245:14, 7245:19, 7250:7, 7250:10, 7252:12, 7254:5, 7254:17, 7254:25, 7265:20, 7269:4, 7272:20, 7280:16, 7294:1, 7295:1, 7295:14, 7302:3
**Google-Yahoo** [1] - 7268:14
**graduate** [4] - 7291:12, 7292:10, 7292:11, 7292:22
**Grandpa** [3] - 7308:15, 7308:19
**graph** [1] - 7275:20
**great** [6] - 7241:6, 7241:7, 7281:13, 7294:24, 7297:8, 7297:10
**greater** [14] - 7242:11, 7248:22, 7249:1, 7249:23, 7250:2, 7251:14, 7252:12, 7254:6, 7254:8, 7255:2, 7255:21, 7267:8, 7268:17, 7283:11
**grounds** [1] - 7299:10
**group** [4] - 7273:2, 7273:18, 7310:5, 7312:1
**growing** [5] - 7247:6, 7248:17, 7279:11, 7305:7, 7307:20
**grown** [2] - 7306:9, 7309:14
**growth** [5] - 7273:8, 7278:2, 7278:3,

7278:16, 7279:17
**guess** [10] - 7227:14, 7227:17, 7234:5, 7234:9, 7251:11, 7257:6, 7258:13, 7266:13, 7267:5, 7285:18

## H

**Hafenbrack** [1] - 7220:19
**HAFENBRACK** [7] - 7296:6, 7296:10, 7296:14, 7296:18, 7297:7, 7299:10, 7312:23
**hand** [2] - 7289:15, 7307:7
**handed** [3] - 7240:3, 7263:25, 7264:8
**handing** [1] - 7289:17
**Hang** [1] - 7280:25
**hang** [3] - 7241:1, 7273:12, 7280:25
**happy** [2] - 7240:20, 7259:16
**hard** [1] - 7308:4
**harder** [1] - 7241:22
**harm** [3] - 7231:4, 7243:25, 7245:2
**harmed** [4] - 7224:2, 7239:17, 7244:15, 7245:11
**harmful** [1] - 7243:1
**harms** [1] - 7239:20
**headed** [1] - 7298:11
**heading** [1] - 7234:17
**headline** [1] - 7303:19
**headlines** [1] - 7309:3
**hear** [7] - 7222:10, 7276:8, 7288:14, 7290:12, 7292:17, 7292:20, 7308:14
**heard** [10] - 7229:5, 7229:21, 7261:21, 7294:20, 7295:11, 7295:13, 7298:19, 7306:1, 7308:15, 7312:16
**hearing** [3] - 7222:13, 7222:19, 7222:24
**heavily** [3] - 7248:8, 7274:3, 7301:15
**height** [2] - 7305:1, 7307:13
**held** [2] - 7231:6, 7232:24
**help** [2] - 7286:21, 7308:20

7328

**helped** [2] - 7245:10, 7252:3
**helpful** [2] - 7259:17, 7288:12
**helps** [2] - 7275:14, 7283:11
**hereby** [1] - 7316:3
**high** [2] - 7228:17, 7300:19
**higher** [11] - 7224:23, 7225:23, 7226:9, 7234:2, 7238:14, 7241:21, 7244:17, 7247:4, 7250:20, 7253:25, 7269:22
**highest** [1] - 7233:18
**highlighted** [3] - 7275:17, 7275:18, 7306:15
**highly** [1] - 7236:2
**history** [1] - 7301:23
**hold** [3] - 7290:21, 7291:7, 7291:8
**holds** [2] - 7243:16, 7275:1
**home** [4] - 7237:12, 7237:15, 7238:7, 7238:11
**Home** [1] - 7307:5
**homework** [1] - 7308:20
**homogenous** [1] - 7300:11
**Honor** [37] - 7222:3, 7222:21, 7223:8, 7223:16, 7241:4, 7258:19, 7259:1, 7259:6, 7259:16, 7260:3, 7260:6, 7260:7, 7260:8, 7261:7, 7263:14, 7263:15, 7271:7, 7272:15, 7273:13, 7276:9, 7277:6, 7278:11, 7280:21, 7284:14, 7284:15, 7284:25, 7285:5, 7285:17, 7287:16, 7287:25, 7288:19, 7289:7, 7289:17, 7289:19, 7296:4, 7296:14, 7312:23
**HONORABLE** [1] - 7220:9
**hopefully** [1] - 7315:5
**Hopper** [8] - 7261:12, 7261:16, 7261:18, 7261:21, 7261:24, 7262:17, 7262:19, 7262:22

**hotel** [9] - 7290:5, 7290:8, 7307:6, 7307:11, 7307:15, 7307:16, 7310:20, 7310:22, 7311:13
**hotels.com** [1] - 7302:18
**Hotels.com** [4] - 7307:6, 7307:11, 7307:12, 7311:15
**hours** [2] - 7309:14
**house** [1] - 7309:23
**housekeeping** [1] - 7271:13
**Huang** [1] - 7221:14
**hypothesized** [2] - 7269:11, 7269:14
**hypothesizing** [1] - 7270:21

## I

**IBM** [4] - 7291:12, 7292:1, 7293:5, 7293:7
**idea** [2] - 7292:23, 7293:2
**ideal** [1] - 7310:24
**identification** [1] - 7273:21
**identified** [11] - 7226:12, 7233:8, 7250:3, 7253:23, 7255:4, 7259:19, 7264:10, 7266:4, 7269:18, 7270:11, 7280:23
**identifies** [1] - 7261:9
**identify** [8] - 7226:17, 7226:23, 7242:17, 7253:5, 7259:24, 7272:24, 7273:16, 7280:13
**identifying** [1] - 7256:1
**ignore** [1] - 7260:9
**IL** [1] - 7220:17
**image** [1] - 7311:17
**imagine** [2] - 7287:3, 7287:4
**imagining** [1] - 7243:3
**immediately** [1] - 7313:20
**immersive** [1] - 7264:1
**impact** [3] - 7223:24, 7230:6, 7264:6
**impacted** [2] - 7238:19, 7262:22
**implication** [1] - 7268:19
**implications** [1] -

7278:8
**importance** [3] - 7227:24, 7228:4, 7258:9
**important** [4] - 7247:13, 7288:3, 7301:6, 7305:5
**importantly** [1] - 7287:2
**impression** [2] - 7234:4, 7250:6
**improper** [1] - 7280:22
**improve** [13] - 7227:4, 7227:11, 7229:11, 7248:22, 7249:7, 7249:19, 7251:1, 7254:23, 7255:9, 7258:8, 7280:15, 7282:16, 7283:11
**improved** [1] - 7301:17
**improvements** [1] - 7304:22
**improving** [4] - 7226:13, 7228:5, 7229:14, 7301:15
**IN** [1] - 7220:1
**incentive** [8] - 7231:1, 7231:15, 7231:19, 7233:3, 7233:5, 7249:2, 7249:10, 7255:2
**incentives** [3] - 7230:18, 7230:20, 7242:11
**include** [5] - 7242:6, 7247:25, 7257:3, 7303:6, 7309:10
**includes** [1] - 7231:6
**including** [4] - 7276:7, 7293:24, 7298:8, 7314:21
**inconsistent** [1] - 7232:5
**increase** [10] - 7229:15, 7229:16, 7246:10, 7248:6, 7248:8, 7248:15, 7279:13, 7280:4, 7280:7
**Increase** [1] - 7234:17
**increased** [1] - 7274:20
**increases** [1] - 7247:5
**increasing** [5] - 7228:20, 7247:1, 7272:20, 7298:22, 7315:9
**increasingly** [1] - 7314:2

**incremental** [2] - 7239:22, 7239:24
**incumbent** [1] - 7259:25
**indeed** [2] - 7288:7, 7304:15
**independent** [1] - 7287:3
**independently** [1] - 7229:2
**INDEX** [1] - 7317:1
**India** [1] - 7300:23
**Indian** [1] - 7290:22
**indicates** [1] - 7249:1
**indicating** [2] - 7251:13, 7254:5
**indication** [1] - 7274:13
**indicia** [1] - 7276:20
**individual** [2] - 7273:20, 7278:25
**Indonesia** [2] - 7300:18, 7300:22
**industry** [7] - 7224:25, 7225:4, 7225:9, 7225:11, 7227:15, 7295:15, 7304:16
**inferior** [1] - 7299:8
**inform** [1] - 7260:3
**information** [11] - 7258:21, 7276:4, 7290:17, 7295:2, 7298:2, 7302:8, 7303:16, 7306:13, 7307:8, 7313:6
**informational** [1] - 7306:22
**innovation** [7] - 7227:3, 7249:6, 7280:14, 7282:16, 7295:4, 7295:11, 7305:24
**innovations** [1] - 7299:18
**innovative** [1] - 7305:15
**insofar** [4] - 7225:17, 7228:6, 7254:19, 7255:17
**Instagram** [2] - 7303:7, 7308:13
**instance** [7] - 7227:2, 7236:18, 7282:15, 7300:4, 7305:1, 7311:14, 7313:17
**instances** [2] - 7235:21, 7280:13
**instead** [4] - 7238:20, 7245:9, 7282:2, 7295:14

**instinct** [1] - 7307:4
**Institute** [1] - 7290:23
**instruct** [1] - 7258:22
**insurmountable** [1] - 7304:11
**intending** [2] - 7281:1, 7281:2
**intense** [1] - 7306:3
**intent** [10] - 7302:22, 7303:3, 7303:4, 7303:10, 7307:23, 7308:13, 7309:19, 7310:2, 7314:24
**intents** [1] - 7310:23
**interest** [2] - 7257:7, 7257:8
**interested** [1] - 7266:16
**interesting** [1] - 7308:21
**interface** [4] - 7302:10, 7311:16, 7312:7, 7312:10
**intermediaries** [1] - 7303:16
**internally** [2] - 7227:11, 7269:8
**internet** [1] - 7309:4
**interpret** [1] - 7282:25
**interpretation** [1] - 7269:3
**interrupt** [2] - 7279:21, 7289:16
**interview** [7] - 7229:6, 7229:8, 7229:9, 7252:7, 7252:10, 7283:3, 7283:4
**invest** [3] - 7242:11, 7249:2, 7251:5
**invested** [3] - 7295:17, 7301:15, 7301:16
**investigate** [2] - 7231:15, 7249:22
**investing** [2] - 7226:17, 7299:6
**investment** [10] - 7226:12, 7226:18, 7227:3, 7249:7, 7249:9, 7280:14, 7282:15, 7282:20, 7298:5, 7298:23
**investments** [8] - 7226:21, 7226:23, 7227:10, 7228:11, 7228:19, 7243:14, 7282:21, 7301:17
**involve** [2] - 7247:11, 7247:21
**involving** [1] - 7247:16

**IOS** [1] - 7266:21
**iPhone** [2] - 7313:17, 7313:18
**irrelevant** [1] - 7314:24
**issue** [11] - 7222:9, 7223:7, 7223:22, 7246:2, 7252:8, 7266:3, 7266:4, 7268:15, 7281:15, 7288:23, 7309:3
**issued** [1] - 7224:22
**issues** [7] - 7222:18, 7223:3, 7264:24, 7265:17, 7285:18, 7288:25, 7301:4

### J

**Janice** [2] - 7221:18, 7316:11
**JANICE** [1] - 7316:3
**Japan** [22] - 7254:21, 7255:10, 7255:13, 7255:15, 7255:22, 7267:12, 7267:14, 7267:17, 7268:4, 7268:21, 7269:9, 7269:21, 7269:22, 7269:25, 7270:6, 7270:17, 7270:19, 7270:23, 7271:1, 7298:21, 7300:23
**Jerry** [1] - 7294:21
**job** [1] - 7300:20
**John** [2] - 7221:7, 7222:6
**join** [1] - 7293:6
**joined** [4] - 7291:12, 7291:19, 7291:20, 7293:14
**joining** [1] - 7291:11
**jon.sallet@coag.gov** [1] - 7221:6
**JONATHAN** [1] - 7223:17
**jONATHAN** [1] - 7317:2
**Jonathan** [2] - 7221:1, 7222:5
**Joshua** [1] - 7220:19
**joshua.hafenbrack@usdoj.gov** [1] - 7220:21
**journey** [5] - 7309:15, 7310:20, 7310:24, 7311:21, 7314:8
**journeys** [5] - 7309:23, 7311:2, 7312:11, 7314:3, 7314:4

**Jr** [1] - 7220:22
**jschmidtlein@wc.com** [1] - 7221:9
**judge** [3] - 7263:22, 7289:15, 7315:13
**Judge** [2] - 7283:24, 7301:2
**JUDGE** [1] - 7220:10
**judgment** [1] - 7254:10
**Judicial** [1] - 7221:3
**jump** [1] - 7308:7
**June** [1] - 7294:16
**JUSTICE** [2] - 7220:12, 7220:19
**Justice** [1] - 7220:15

### K

**Kansas** [1] - 7290:5
**Kaufmann** [1] - 7221:2
**keen** [1] - 7305:20
**keenly** [1] - 7305:18
**keep** [3] - 7295:14, 7314:17, 7315:14
**keep-awake** [1] - 7314:17
**keeping** [1] - 7297:19
**Kenneth** [2] - 7220:11, 7222:5
**kenneth.dintzer2@usdoj.gov** [1] - 7220:14
**kept** [3] - 7288:20, 7304:22, 7314:15
**kick** [1] - 7228:13
**kids** [1] - 7300:19
**kind** [7] - 7254:19, 7257:18, 7259:21, 7285:7, 7288:7, 7309:5, 7314:21
**kinds** [1] - 7308:12
**knowledge** [3] - 7290:17, 7297:3, 7297:16
**known** [4] - 7234:4, 7250:7, 7250:9, 7254:2
**knows** [1] - 7308:19
**Korea** [3] - 7253:18, 7254:12, 7254:17

### L

**lack** [7] - 7249:8, 7255:6, 7256:11, 7257:7, 7262:21, 7287:8
**landscape** [2] - 7255:15, 7255:16
**language** [3] - 7254:4, 7263:19, 7263:21

**large** [3] - 7228:17, 7283:19, 7305:4
**larger** [3] - 7234:22, 7235:3, 7283:13
**largest** [1] - 7262:13
**Larry** [1] - 7292:25
**LaSalle** [1] - 7220:16
**last** [11] - 7240:15, 7260:24, 7285:8, 7285:19, 7286:3, 7291:8, 7294:15, 7298:16, 7301:19, 7303:3, 7309:9
**late** [2] - 7222:16, 7292:19
**latencies** [1] - 7301:20
**latency** [7] - 7300:25, 7301:2, 7301:12, 7301:15, 7301:16, 7301:17, 7301:24
**latent** [3] - 7303:3, 7303:4, 7307:23
**launch** [1] - 7305:12
**LAW** [1] - 7221:2
**law** [1] - 7223:6
**lead** [3] - 7268:17, 7304:11, 7312:24
**lead-up** [1] - 7312:24
**leader** [1] - 7295:15
**leading** [3] - 7274:22, 7299:10, 7299:11
**league** [1] - 7300:6
**lean** [1] - 7290:12
**leaning** [1] - 7290:13
**learned** [3] - 7304:21, 7304:23
**learning** [3] - 7231:17, 7302:21, 7303:2
**least** [10] - 7224:2, 7224:3, 7234:14, 7243:18, 7243:25, 7244:18, 7258:13, 7306:20, 7310:11, 7311:13
**leaving** [1] - 7223:6
**led** [1] - 7269:6
**left** [1] - 7236:2
**length** [1] - 7310:3
**lens** [2] - 7300:16, 7305:6
**less** [6] - 7228:8, 7254:10, 7270:17, 7301:13, 7302:1, 7302:2
**lesson** [1] - 7305:18
**level** [3] - 7251:5, 7251:6, 7251:9
**life** [1] - 7307:9
**light** [3] - 7265:3, 7265:6, 7282:17

lightweight [1] - 7300:7
likely [5] - 7226:7, 7244:19, 7248:10, 7262:18, 7284:4
limit [1] - 7267:3
limited [2] - 7256:22, 7257:12
limits [2] - 7256:21, 7266:16
Limits [1] - 7257:11
line [6] - 7246:3, 7274:18, 7275:1, 7277:23, 7282:10, 7288:13
lines [4] - 7268:24, 7272:13, 7274:16, 7275:21
link [1] - 7292:25
list [4] - 7285:9, 7285:15, 7285:19, 7306:7
listed [2] - 7249:24, 7287:23
literature [1] - 7238:3
live [1] - 7309:4
LLC [2] - 7220:6, 7222:5
LLP [2] - 7220:23, 7221:7
look [34] - 7222:11, 7222:22, 7225:13, 7232:10, 7237:22, 7240:3, 7242:4, 7246:3, 7247:14, 7248:21, 7251:12, 7251:24, 7254:3, 7257:15, 7257:16, 7258:18, 7265:12, 7267:7, 7268:2, 7268:13, 7268:16, 7269:17, 7269:19, 7271:24, 7272:23, 7274:2, 7274:16, 7277:19, 7279:9, 7279:10, 7282:6, 7287:11, 7288:13, 7288:16
looked [14] - 7224:21, 7225:17, 7231:7, 7236:5, 7239:12, 7243:24, 7244:14, 7250:15, 7252:1, 7259:14, 7260:8, 7261:17, 7274:25, 7296:15
looking [9] - 7225:15, 7259:25, 7261:25, 7278:1, 7278:6, 7304:18, 7310:19,

7311:13, 7311:21
looks [1] - 7310:20
lose [1] - 7236:14
losses [1] - 7236:14
lost [1] - 7265:9
loud [1] - 7295:25
lower [12] - 7234:2, 7244:18, 7248:15, 7253:13, 7253:25, 7267:9, 7268:18, 7268:21, 7269:9, 7269:25, 7270:16
lunch [2] - 7315:16, 7315:18

# M

Madras [1] - 7290:23
magazine [2] - 7303:20, 7309:2
magnitude [1] - 7246:9
Maine [1] - 7221:8
major [2] - 7277:20, 7279:10
majorities [1] - 7235:22
majority [4] - 7236:20, 7236:24, 7248:16, 7273:23
managers [1] - 7298:10
manner [2] - 7272:24, 7273:16
maps [1] - 7293:18
Maps [1] - 7294:17
Marin [1] - 7277:14
mark [1] - 7296:22
marked [3] - 7240:4, 7263:25, 7285:2
market [35] - 7224:5, 7224:7, 7224:12, 7224:16, 7224:19, 7224:20, 7229:10, 7229:13, 7230:10, 7233:9, 7242:9, 7243:4, 7245:10, 7250:4, 7265:9, 7268:3, 7269:23, 7270:18, 7272:2, 7273:8, 7275:24, 7276:3, 7276:5, 7276:15, 7276:16, 7276:19, 7276:20, 7278:24, 7279:23, 7280:1, 7280:7, 7298:20, 7299:5, 7304:12
marketing [4] - 7257:17, 7257:20,

7257:23, 7257:24
markets [7] - 7224:9, 7249:24, 7250:3, 7250:12, 7250:17, 7250:25, 7299:23
material [2] - 7292:11, 7297:1
math [2] - 7278:14, 7300:19
matter [1] - 7228:11
mattered [1] - 7233:21
matters [3] - 7228:6, 7228:8, 7292:5
mean [7] - 7229:22, 7229:23, 7230:8, 7238:22, 7247:19, 7265:16, 7314:6
means [2] - 7222:15, 7273:8
measure [2] - 7246:18, 7250:16
measured [1] - 7246:16
mechanisms [2] - 7238:10, 7238:12
media [2] - 7298:2, 7307:17
median [2] - 7301:20, 7301:23
meet [2] - 7295:9, 7295:10
MEHTA [1] - 7220:9
mental [1] - 7313:10
mentioned [10] - 7298:11, 7305:6, 7306:6, 7307:17, 7310:6, 7310:11, 7310:12, 7310:14, 7314:14, 7315:8
menu [1] - 7266:23
menus [1] - 7266:19
merchandisers [1] - 7314:10
messaging [2] - 7303:9, 7303:15
met [2] - 7298:14, 7314:14
methodology [1] - 7288:10
metrics [2] - 7227:14, 7250:15
Michael [1] - 7221:10
microphone [1] - 7290:11
Microsoft [30] - 7227:2, 7233:6, 7234:14, 7235:12, 7237:2, 7237:3, 7251:13, 7251:20, 7254:5, 7258:21,

7258:25, 7259:2, 7259:7, 7259:23, 7259:25, 7261:11, 7262:3, 7264:13, 7264:17, 7264:20, 7264:22, 7264:24, 7264:25, 7265:8, 7276:7, 7280:13, 7282:15, 7306:2
mid-2000s [1] - 7291:23
middle [1] - 7256:25
might [1] - 7253:12, 7259:25, 7270:22, 7271:24, 7284:4, 7299:6, 7300:4, 7300:8, 7307:6, 7311:23
millions [1] - 7277:20
milliseconds [1] - 7301:21
mind [2] - 7294:12, 7314:18
minimum [1] - 7229:18
minor [1] - 7300:4
minutes [4] - 7309:11, 7309:13, 7315:13, 7315:15
mischaracterizes [1] - 7312:25
mishearing [1] - 7288:15
mispronouncing [1] - 7280:20
mission [3] - 7295:1, 7295:2, 7295:5
misstated [1] - 7275:10
mistakenly [1] - 7288:1
misusing [1] - 7264:25
Mo [1] - 7245:22
mobile [13] - 7240:10, 7247:4, 7247:6, 7247:11, 7247:13, 7248:9, 7248:17, 7269:22, 7270:16, 7301:5, 7301:20, 7301:23, 7313:16
mode [3] - 7266:9, 7266:21, 7266:22
model [4] - 7229:25, 7230:1, 7230:3, 7230:14
moment [7] - 7236:12, 7279:21, 7283:24, 7298:18, 7303:11, 7312:15, 7313:22

7331

**money** [2] - 7293:4, 7293:8
**months** [2] - 7287:23, 7309:25
**morning** [16] - 7222:2, 7222:3, 7222:8, 7223:14, 7223:15, 7223:19, 7223:20, 7271:9, 7280:12, 7285:2, 7289:13, 7289:14, 7289:22, 7289:23, 7298:24, 7307:2
**most** [7] - 7235:6, 7237:7, 7239:3, 7257:6, 7291:19, 7307:7, 7314:17
**motion** [6] - 7222:11, 7222:14, 7222:17, 7222:19, 7223:3, 7308:3
**Motorola** [1] - 7245:21
**move** [5] - 7282:24, 7285:1, 7286:15, 7286:17, 7288:12
**moved** [4] - 7286:12, 7288:9, 7291:13, 7292:2
**moving** [1] - 7285:6
**Moxilla** [1] - 7232:7
**Mozilla** [7] - 7231:1, 7231:9, 7232:11, 7232:13, 7232:20, 7245:1, 7245:20
**Mozilla's** [1] - 7232:16
**MR** [123] - 7222:21, 7223:8, 7223:16, 7234:25, 7235:1, 7240:14, 7240:16, 7240:17, 7240:18, 7240:19, 7241:2, 7241:3, 7241:5, 7241:6, 7241:9, 7258:19, 7259:1, 7259:10, 7259:16, 7260:6, 7260:11, 7260:14, 7260:15, 7260:17, 7260:19, 7260:20, 7261:6, 7261:7, 7261:8, 7263:15, 7263:16, 7263:18, 7263:21, 7263:23, 7263:24, 7271:7, 7271:13, 7271:19, 7271:22, 7272:15, 7272:17, 7272:22, 7273:6, 7273:10, 7273:11, 7273:13, 7274:1, 7275:9, 7275:12,

7276:1, 7276:6, 7276:10, 7276:17, 7276:21, 7276:23, 7277:5, 7277:9, 7278:10, 7278:12, 7278:13, 7278:16, 7278:21, 7278:23, 7279:6, 7279:8, 7280:11, 7280:21, 7281:2, 7281:5, 7281:7, 7281:9, 7281:20, 7281:24, 7282:4, 7282:9, 7283:1, 7283:2, 7283:22, 7283:23, 7284:14, 7284:25, 7285:3, 7285:5, 7285:15, 7285:17, 7286:7, 7286:9, 7286:23, 7287:2, 7287:7, 7287:10, 7287:16, 7287:17, 7287:22, 7287:25, 7288:19, 7288:22, 7289:7, 7289:15, 7289:21, 7290:10, 7292:16, 7294:11, 7296:4, 7296:6, 7296:8, 7296:10, 7296:14, 7296:18, 7296:21, 7297:2, 7297:6, 7297:7, 7297:10, 7297:11, 7299:10, 7299:17, 7312:23, 7313:1, 7313:4, 7313:7, 7313:8, 7315:13
**msommer@wsgr. com** [1] - 7221:13
**multiple** [1] - 7233:1
**multiplication** [1] - 7278:7
**Murphy's** [1] - 7235:24

## N

**N.W** [1] - 7316:12
**name** [6] - 7253:6, 7289:24, 7289:25, 7290:6, 7290:7, 7294:21
**named** [1] - 7312:17
**names** [1] - 7292:24
**Nancy** [1] - 7290:8
**nature** [1] - 7261:3
**Nayak** [3] - 7295:12, 7298:11, 7304:21
**nearest** [1] - 7275:5
**necessarily** [1] - 7226:11

**necessary** [2] - 7228:23, 7279:5
**need** [16] - 7222:15, 7222:19, 7229:11, 7230:2, 7251:5, 7257:9, 7260:22, 7276:5, 7279:4, 7282:24, 7286:5, 7286:20, 7290:13, 7307:4, 7307:8, 7307:25
**needed** [1] - 7229:18
**needs** [5] - 7295:7, 7295:10, 7306:13, 7307:10, 7307:25
**neglected** [1] - 7284:25
**negotiated** [1] - 7244:3
**negotiations** [1] - 7231:17
**Netscape** [1] - 7304:7
**never** [2] - 7265:24, 7293:4
**new** [3] - 7278:2, 7305:15, 7305:24
**New** [4] - 7220:24, 7221:12, 7221:16, 7291:13
**next** [13] - 7254:15, 7255:24, 7258:18, 7260:9, 7260:11, 7260:13, 7260:25, 7272:18, 7274:22, 7303:17, 7305:21, 7306:10, 7311:5
**night** [5] - 7240:15, 7285:8, 7285:19, 7286:3, 7314:15
**nobody** [1] - 7307:2
**non** [5] - 7227:24, 7228:4, 7228:8, 7238:18, 7266:22
**non-Chrome** [1] - 7238:18
**non-private** [1] - 7266:22
**non-scale** [3] - 7227:24, 7228:4, 7228:8
**North** [1] - 7300:10
**note** [2] - 7259:18, 7288:22
**noted** [1] - 7298:22
**notes** [2] - 7253:22, 7316:5
**nothing** [4] - 7232:4, 7256:13, 7258:6, 7281:5
**notice** [2] - 7222:17,

7251:3
**notion** [2] - 7252:11, 7268:17
**nowhere** [1] - 7263:3
**number** [21] - 7228:18, 7236:23, 7238:19, 7238:24, 7246:6, 7246:16, 7247:16, 7258:17, 7275:17, 7275:19, 7279:10, 7279:14, 7291:8, 7292:12, 7301:24, 7303:4, 7307:24, 7309:20, 7311:8, 7311:13
**numbers** [20] - 7233:25, 7235:11, 7237:9, 7274:4, 7276:25, 7277:1, 7277:3, 7278:6, 7278:12, 7278:15, 7278:19, 7278:20, 7287:9, 7295:25, 7296:5, 7296:8, 7296:13, 7296:24, 7297:1, 7297:3
**numerous** [1] - 7232:2
**NW** [3] - 7220:12, 7220:20, 7221:20
**NY** [3] - 7220:24, 7221:12, 7221:16

## O

**object** [5] - 7286:17, 7288:17, 7296:11, 7299:10, 7312:23
**objecting** [1] - 7285:25
**objection** [7] - 7271:19, 7273:5, 7280:21, 7285:3, 7286:12, 7287:20, 7297:7
**observation** [3] - 7300:9, 7301:13, 7313:12
**observe** [1] - 7303:5
**observed** [1] - 7268:21
**obtain** [1] - 7230:25
**obtained** [1] - 7224:20
**obvious** [2] - 7278:8, 7302:9
**obviously** [1] - 7297:12
**occurred** [2] - 7226:10, 7226:11
**October** [4] - 7220:5, 7294:1, 7294:15,

7316:7
**OEM** [2] - 7242:14, 7245:21
**OEMs** [1] - 7247:18
**OF** [6] - 7220:1, 7220:9, 7220:12, 7220:19, 7221:2, 7316:1
**Off-the-record** [1] - 7275:7
**offer** [6] - 7227:23, 7263:11, 7264:6, 7271:4, 7296:4, 7297:6
**offered** [25] - 7223:21, 7224:11, 7224:15, 7225:20, 7225:25, 7226:2, 7228:3, 7228:6, 7228:12, 7228:21, 7228:22, 7229:17, 7234:2, 7234:3, 7242:3, 7242:13, 7245:13, 7245:18, 7245:22, 7245:25, 7249:5, 7249:9, 7255:25, 7265:8, 7299:9
**offering** [6] - 7238:22, 7250:19, 7269:24, 7296:6, 7296:10, 7296:12
**offers** [2] - 7256:22, 7257:12
**OFFICIAL** [1] - 7316:1
**Official** [2] - 7221:19, 7316:11
**older** [2] - 7308:3, 7308:8
**one** [62] - 7222:9, 7229:3, 7230:5, 7231:3, 7231:23, 7231:24, 7232:15, 7232:21, 7236:1, 7236:12, 7236:16, 7243:8, 7248:24, 7252:18, 7253:16, 7256:17, 7259:15, 7259:17, 7259:21, 7259:22, 7260:8, 7260:24, 7261:11, 7263:3, 7264:10, 7264:24, 7265:18, 7269:11, 7269:19, 7270:11, 7270:13, 7271:13, 7274:25, 7275:14, 7280:3, 7283:4, 7283:17, 7283:18, 7295:6, 7295:11, 7298:19, 7299:19, 7300:12, 7300:15, 7301:7,

7302:1, 7302:2, 7302:20, 7306:15, 7306:16, 7308:1, 7308:3, 7308:11, 7310:12, 7312:15, 7313:13, 7314:5, 7314:6, 7314:16, 7314:18, 7314:22
**one-stop** [1] - 7306:16
**ones** [5] - 7250:5, 7262:15, 7286:16, 7300:22, 7302:9
**online** [8] - 7238:4, 7261:24, 7262:3, 7262:6, 7262:13, 7270:17, 7306:13
**Online** [1] - 7270:18
**open** [5] - 7223:7, 7288:21, 7288:23, 7288:25
**operate** [2] - 7227:20, 7229:18
**opined** [2] - 7224:9, 7230:17
**opinion** [35] - 7224:4, 7224:11, 7224:16, 7224:18, 7226:1, 7226:2, 7227:23, 7228:3, 7228:6, 7228:7, 7228:12, 7228:21, 7228:22, 7229:17, 7238:22, 7242:3, 7242:13, 7245:8, 7245:13, 7245:18, 7245:22, 7245:25, 7249:5, 7249:9, 7249:10, 7250:19, 7255:25, 7265:8, 7276:21, 7276:24, 7279:22, 7280:1, 7281:6, 7281:11, 7281:22
**opinions** [10] - 7223:21, 7223:23, 7225:5, 7225:20, 7230:7, 7230:12, 7235:19, 7241:12, 7241:17, 7241:18
**opportunity** [5] - 7285:23, 7287:12, 7288:3, 7288:16, 7303:5
**order** [3] - 7239:9, 7239:10, 7275:4
**original** [1] - 7285:6
**otherwise** [4] - 7226:18, 7249:6, 7284:4, 7287:15
**ourselves** [1] - 7310:9
**outcome** [1] - 7231:17

**outcomes** [1] - 7244:17
**output** [4] - 7246:13, 7246:16, 7246:18, 7248:15
**outside** [1] - 7272:15
**outsize** [1] - 7300:9
**overall** [2] - 7248:6, 7273:8
**overruled** [1] - 7272:19
**overwhelming** [3] - 7247:16, 7248:16, 7273:23
**overwhelmingly** [2] - 7237:7, 7247:11
**own** [2] - 7302:11, 7305:20

### P

**pace** [2] - 7315:9
**Page** [1] - 7292:25
**page** [9] - 7237:12, 7237:15, 7238:7, 7238:11, 7264:1, 7301:5, 7304:19, 7309:3, 7311:9
**pages** [1] - 7282:11
**paid** [3] - 7232:9, 7232:22, 7233:20
**Pandu** [1] - 7295:12
**papers** [4] - 7222:20, 7291:2, 7291:4, 7291:5
**paragraph** [1] - 7306:14
**Parakhin** [12] - 7228:16, 7229:4, 7252:7, 7252:10, 7252:17, 7252:21, 7253:4, 7254:13, 7280:20, 7281:3, 7282:12, 7283:3
**Parakhin's** [3] - 7229:5, 7251:17, 7281:15
**parallel** [1] - 7295:6
**part** [7] - 7227:7, 7238:17, 7252:10, 7257:23, 7265:15, 7265:16, 7304:19
**partially** [4] - 7260:11, 7260:12, 7260:17
**participants** [3] - 7224:25, 7225:4, 7225:9
**particular** [10] - 7227:13, 7229:15, 7249:7, 7259:19, 7259:21, 7263:11,

7274:4, 7279:2, 7282:20, 7311:19
**particularly** [1] - 7302:17
**parties** [2] - 7222:15, 7265:18
**partners** [3] - 7245:14, 7256:22
**partnership** [14] - 7255:5, 7256:2, 7256:18, 7257:21, 7257:25, 7258:1, 7258:3, 7260:25, 7261:12, 7262:19, 7262:22, 7263:2, 7264:5, 7265:10
**Partnerships** [1] - 7257:11
**partnerships** [12] - 7254:23, 7255:9, 7255:13, 7256:6, 7256:22, 7257:23, 7258:7, 7258:11, 7262:3, 7262:6, 7263:5, 7263:8
**parts** [1] - 7240:19
**pass** [2] - 7285:15, 7288:7
**past** [3] - 7253:10, 7313:23, 7315:10
**patent** [3] - 7302:22, 7302:24, 7302:25
**patents** [2] - 7291:7, 7291:8
**Patterson** [1] - 7220:23
**payments** [1] - 7240:10
**PCs** [6] - 7237:1, 7237:4, 7239:5, 7239:7, 7239:17, 7239:23
**pending** [2] - 7273:13, 7273:14
**penetration** [1] - 7248:19
**people** [15] - 7269:8, 7270:5, 7298:12, 7304:1, 7304:6, 7305:7, 7305:8, 7306:12, 7307:23, 7308:2, 7308:3, 7308:5, 7308:8, 7308:9, 7310:3
**per** [1] - 7234:7
**percent** [21] - 7228:17, 7230:10, 7231:5, 7235:8, 7258:4, 7266:13, 7270:18, 7270:19, 7277:12,

7277:13, 7277:14, 7277:15, 7279:12, 7279:13, 7279:14, 7279:16

**percentage** [8] - 7238:23, 7241:10, 7241:14, 7247:4, 7247:15, 7247:20, 7278:13, 7278:18

**percentages** [2] - 7234:22, 7235:3

**percentile** [1] - 7301:20

**perception** [1] - 7293:11

**perfect** [1] - 7289:2

**performed** [1] - 7262:21

**perhaps** [5] - 7254:14, 7275:6, 7288:1, 7307:20, 7314:16

**period** [22] - 7223:25, 7224:21, 7231:4, 7231:7, 7243:3, 7243:5, 7243:18, 7245:15, 7245:19, 7246:10, 7246:11, 7246:14, 7246:25, 7247:5, 7247:21, 7248:5, 7248:12, 7272:14, 7274:23, 7278:2, 7279:24, 7280:5

**person** [1] - 7270:8

**personal** [1] - 7311:24

**perspective** [1] - 7307:12

**pertains** [1] - 7258:6

**Peter** [1] - 7290:4

**Ph.D** [2] - 7290:21, 7290:24

**Ph.D.s** [2] - 7298:14, 7298:15

**phenomena** [1] - 7308:10

**phone** [2] - 7248:18, 7300:17

**phones** [1] - 7313:16

**photo** [1] - 7304:1

**phrase** [1] - 7306:16

**Pichai** [1] - 7294:19

**pick** [3] - 7283:18, 7290:11, 7307:10

**piece** [1] - 7310:23

**pieces** [4] - 7265:7

**place** [4] - 7248:11, 7283:17, 7310:21, 7314:7

**places** [1] - 7300:3

**plaintiff** [2] - 7222:6,

7289:1

**Plaintiff** [2] - 7220:22, 7221:1

**Plaintiffs** [2] - 7220:4, 7220:11

**plaintiffs** [4] - 7306:19, 7306:20, 7310:7, 7312:16

**plaintiffs'** [2] - 7296:21, 7298:20

**plans** [1] - 7238:2

**platform** [2] - 7303:9, 7314:8

**platforms** [12] - 7303:15, 7306:6, 7306:21, 7307:17, 7307:25, 7308:13, 7308:24, 7310:4, 7310:5, 7310:7, 7311:4, 7312:19

**plausible** [1] - 7262:2

**players** [2] - 7298:3, 7303:4

**pleasure** [1] - 7284:20

**plenty** [1] - 7230:21

**plucked** [1] - 7268:24

**point** [23] - 7228:12, 7228:24, 7230:8, 7243:10, 7248:3, 7257:24, 7268:2, 7286:6, 7293:7, 7293:9, 7299:1, 7299:3, 7299:21, 7300:22, 7303:10, 7305:8, 7305:9, 7307:22, 7309:6, 7309:18, 7311:10, 7312:5, 7312:7

**points** [5] - 7230:24, 7300:17, 7301:19, 7309:8, 7309:25

**poor** [1] - 7301:12

**popular** [1] - 7237:7

**portion** [1] - 7279:16

**portions** [2] - 7258:19, 7259:6

**posit** [1] - 7265:7

**position** [14] - 7233:20, 7249:19, 7250:8, 7250:11, 7271:4, 7286:5, 7288:1, 7288:15, 7290:16, 7292:3, 7293:19, 7293:25, 7294:4, 7304:24

**positively** [1] - 7301:11

**possibilities** [1] - 7280:3

**possibility** [5] -

7235:5, 7243:8, 7270:24, 7280:6, 7298:22

**possible** [8] - 7242:24, 7242:25, 7243:21, 7252:24, 7269:25, 7270:15, 7300:3, 7300:4

**possibly** [4] - 7224:3, 7253:17, 7253:19, 7281:17

**post** [1] - 7271:25

**potential** [1] - 7283:5

**power** [8] - 7224:5, 7224:8, 7224:12, 7224:17, 7224:19, 7224:20, 7245:10, 7276:20

**pRABHAKAR** [1] - 7317:4

**Prabhakar** [2] - 7289:8, 7289:25

**PRABHAKAR** [1] - 7289:9

**preamble** [2] - 7299:11, 7299:12

**precise** [2] - 7254:1, 7254:5

**precisely** [3] - 7254:3, 7254:14, 7262:11

**predominantly** [1] - 7248:12

**preloaded** [1] - 7237:3

**premium** [1] - 7300:6

**prepare** [2] - 7222:16, 7222:23

**prepared** [1] - 7286:14

**present** [3] - 7243:24, 7245:16, 7302:11

**presented** [1] - 7288:5

**president** [2] - 7290:17, 7293:16

**pressure** [3] - 7268:25, 7269:12, 7269:22

**pretty** [4] - 7246:18, 7276:19, 7306:3, 7312:21

**preventing** [1] - 7224:19

**price** [1] - 7234:7

**Priceline** [1] - 7262:9

**prices** [4] - 7244:18, 7267:9, 7268:18, 7270:7

**prime** [1] - 7314:5

**principles** [1] - 7301:8

**privacy** [3] - 7227:8, 7233:15, 7266:17

**private** [4] - 7266:9,

7266:20, 7266:22, 7276:12

**problem** [2] - 7257:5, 7278:22

**problems** [1] - 7300:19

**proceed** [2] - 7222:12, 7283:22

**proceedings** [1] - 7316:6

**process** [1] - 7252:11

**product** [10] - 7295:14, 7297:21, 7298:9, 7299:6, 7299:8, 7299:9, 7299:15, 7300:2, 7301:18, 7305:12

**productivity** [1] - 7293:23

**products** [7] - 7290:18, 7294:2, 7294:6, 7295:17, 7300:9, 7301:8, 7305:14

**professional** [1] - 7291:10

**Professor** [17] - 7222:10, 7222:13, 7222:24, 7223:19, 7235:18, 7235:24, 7271:23, 7272:3, 7274:4, 7277:11, 7279:9, 7280:12, 7283:24, 7284:18, 7286:15, 7286:25, 7288:10

**profitable** [1] - 7230:16

**projections** [1] - 7236:13

**pronounced** [1] - 7229:24

**propose** [3] - 7223:1, 7266:8, 7266:10

**proposition** [1] - 7251:21

**protect** [1] - 7245:10

**Protection** [1] - 7221:3

**provide** [5] - 7252:10, 7252:21, 7286:18, 7302:10, 7313:17

**provided** [1] - 7301:12

**provider** [3] - 7259:25, 7274:12, 7274:22

**providers** [7] - 7231:10, 7260:1, 7274:6, 7275:20, 7278:5, 7302:10, 7302:16

7334

**provides** [1] - 7267:16
**providing** [1] -
7288:11
**provocative** [1] -
7309:3
**PSXD-12** [2] - 7240:5,
7246:3
**public** [5] - 7236:23,
7276:11, 7277:8,
7278:12
**publications** [1] -
7291:1
**published** [1] - 7309:2
**pull** [2] - 7235:17,
7240:7
**pun** [1] - 7314:6
**Punda** [1] - 7298:11
**purchasing** [1] -
7309:23
**purported** [1] -
7251:21
**purpose** [3] - 7238:5,
7241:16, 7250:22
**purposes** [3] -
7223:23, 7225:5,
7287:1
**pursue** [1] - 7302:8
**pushing** [1] - 7287:18
**put** [12] - 7223:1,
7240:12, 7240:21,
7244:6, 7263:16,
7277:5, 7286:25,
7295:20, 7295:21,
7297:21, 7298:4,
7300:6
**putting** [2] - 7283:3,
7300:5
**PXSD-12** [1] - 7285:2
**PXSD-12**.....................
.............................7285
[1] - 7317:9

## Q

**qualified** [1] - 7227:23
**qualify** [1] - 7288:16
**quality** [56] - 7224:23,
7225:2, 7225:6,
7225:11, 7225:15,
7225:18, 7225:19,
7225:23, 7226:4,
7226:9, 7226:13,
7227:11, 7227:25,
7228:5, 7228:9,
7228:19, 7229:11,
7229:14, 7229:15,
7232:7, 7233:18,
7233:21, 7233:22,
7244:18, 7248:23,
7249:7, 7249:22,

7249:24, 7250:16,
7250:20, 7250:21,
7251:1, 7251:14,
7251:22, 7252:12,
7253:13, 7253:24,
7253:25, 7254:6,
7254:23, 7255:9,
7255:21, 7255:22,
7262:23, 7264:6,
7265:20, 7266:1,
7266:2, 7268:5,
7268:6, 7283:6,
7286:16, 7295:11,
7298:7, 7298:9,
7298:11
**queries** [23] - 7228:23,
7232:1, 7238:15,
7239:22, 7240:10,
7241:11, 7246:6,
7246:7, 7246:16,
7246:20, 7247:20,
7300:16, 7305:3,
7305:4, 7305:5,
7305:7, 7306:22,
7312:22, 7314:22
**query** [8] - 7234:7,
7300:18, 7301:4,
7303:10, 7303:12,
7307:3, 7314:21
**questioning** [1] -
7247:2
**questions** [3] -
7271:8, 7284:14,
7305:1
**quickly** [1] - 7313:19
**quite** [6] - 7242:23,
7257:8, 7268:1,
7300:12, 7308:11,
7313:20
**quote** [2] - 7306:2,
7306:3

## R

**R&D** [5] - 7295:16,
7296:2, 7297:16,
7297:18, 7297:23
**race** [1] - 7304:11
**Raghavan** [11] -
7289:8, 7289:12,
7289:25, 7290:7,
7292:17, 7297:3,
7304:10, 7308:22,
7311:7, 7313:9,
7315:17
**RAGHAVAN** [2] -
7289:9, 7317:4
**raise** [1] - 7222:9
**raised** [3] - 7222:18,
7223:3, 7285:5

**raising** [1] - 7269:4
**Ralph** [1] - 7221:3
**Ramaswamy** [1] -
7229:24
**Ramaswamy's** [1] -
7230:6
**randomized** [1] -
7290:25
**range** [3] - 7292:19,
7296:2, 7302:16
**rank** [1] - 7304:19
**ranking** [4] - 7293:1,
7304:18, 7304:21,
7304:25
**rapidly** [1] - 7248:17
**rather** [3] - 7239:10,
7273:25, 7278:4
**reach** [6] - 7226:9,
7237:21, 7261:12,
7264:5, 7264:23,
7265:15
**reached** [2] - 7246:1,
7260:5
**reaching** [2] - 7245:8,
7263:2
**reaction** [1] - 7293:2
**read** [15] - 7239:13,
7263:19, 7263:21,
7277:15, 7278:11,
7278:15, 7278:23,
7280:19, 7280:24,
7281:2, 7281:15,
7282:4, 7282:19,
7296:9, 7314:1
**readily** [1] - 7313:17
**reading** [5] - 7281:25,
7282:2, 7282:8,
7282:19, 7295:25
**ready** [1] - 7289:5
**really** [10] - 7234:9,
7234:10, 7236:17,
7238:9, 7257:13,
7291:19, 7295:13,
7307:1, 7308:4, 7312:5
**reason** [9] - 7227:7,
7239:11, 7246:24,
7260:22, 7268:6,
7275:23, 7283:18,
7284:10, 7313:16
**reasons** [5] - 7226:16,
7228:10, 7248:18,
7270:6, 7313:13
**recap** [1] - 7248:4
**received** [1] - 7234:8
**recent** [1] - 7307:18
**recently** [1] - 7301:22
**recess** [1] - 7271:12
**recipe** [1] - 7311:23
**recognition** [2] -
7305:5, 7305:13

**recognize** [4] -
7230:13, 7239:4,
7303:19, 7309:18
**recollection** [8] -
7232:19, 7236:10,
7250:10, 7270:2,
7281:14, 7281:18,
7281:25, 7282:14
**record** [17] - 7227:2,
7232:10, 7234:1,
7236:19, 7252:4,
7272:9, 7274:10,
7275:7, 7277:5,
7277:7, 7277:8,
7280:24, 7281:17,
7288:20, 7288:23,
7289:24, 7296:5
**red** [2] - 7246:3,
7246:11
**redacted** [18] -
7235:18, 7236:1,
7238:17, 7238:23,
7240:19, 7246:8,
7246:9, 7248:24,
7258:20, 7259:4,
7260:12, 7260:17,
7260:23, 7274:3,
7276:5, 7276:25,
7295:22
**redacting** [1] -
7258:21
**redactions** [6] -
7241:2, 7258:22,
7258:24, 7259:14,
7260:2, 7260:4
**redirect** [2] - 7271:20,
7281:12
**Redirect** [1] - 7317:3
**REDIRECT** [1] -
7271:21
**reduced** [1] - 7230:17
**reducing** [2] - 7269:21
**refer** [7] - 7251:9,
7261:1, 7275:13,
7277:1, 7308:17,
7308:18, 7309:17
**reference** [11] -
7233:13, 7253:5,
7256:5, 7259:20,
7260:9, 7260:16,
7261:11, 7261:18,
7265:2, 7267:11,
7268:25
**referenced** [7] -
7250:12, 7250:24,
7260:25, 7263:3,
7263:4, 7284:9,
7296:19
**references** [2] -
7251:12, 7265:5

**referencing** [1] - 7253:4
**referred** [4] - 7251:4, 7278:4, 7293:22
**referring** [4] - 7251:17, 7268:25, 7285:14, 7287:22
**refers** [3] - 7251:6, 7251:7, 7263:2
**reflect** [1] - 7246:5
**reflected** [4] - 7235:21, 7242:5, 7264:7, 7303:22
**reflects** [3] - 7238:23, 7241:24, 7246:11
**refresh** [3] - 7281:18, 7281:24, 7282:14
**refreshes** [1] - 7281:14
**regard** [1] - 7230:20
**regarding** [2] - 7223:22, 7223:23
**regulation** [1] - 7268:1
**regulatory** [1] - 7267:11
**related** [2] - 7233:16, 7234:7
**relating** [2] - 7251:21, 7285:18
**relationship** [3] - 7283:5, 7284:5, 7284:7
**relative** [10] - 7226:24, 7227:23, 7228:4, 7228:15, 7228:16, 7233:15, 7239:24, 7250:8, 7269:22, 7298:20
**relatively** [5] - 7232:1, 7239:2, 7300:7, 7300:11, 7307:18
**relegated** [1] - 7314:23
**relevance** [2] - 7241:17, 7309:6
**relevant** [5] - 7233:8, 7252:5, 7281:4, 7281:10, 7313:21
**relied** [2] - 7228:25, 7229:3
**reluctant** [1] - 7283:16
**relying** [1] - 7288:10
**remain** [1] - 7307:8
**remained** [1] - 7293:7
**remaining** [1] - 7288:25
**remember** [22] - 7230:5, 7230:13, 7231:17, 7232:12, 7232:15, 7232:18, 7232:21, 7237:16,

7237:20, 7253:7, 7253:14, 7253:20, 7253:21, 7258:14, 7261:17, 7262:11, 7268:14, 7268:15, 7281:17, 7312:18, 7312:19, 7313:10
**remembering** [3] - 7231:23, 7252:14, 7312:21
**remembers** [1] - 7281:13
**remind** [2] - 7274:3, 7307:2
**reminded** [1] - 7273:15
**renewed** [1] - 7264:16
**repeat** [3] - 7234:24, 7245:17, 7295:12
**repeatedly** [2] - 7233:17, 7234:12
**rephrase** [2] - 7313:1, 7313:2
**replicate** [1] - 7300:3
**report** [8] - 7235:25, 7256:16, 7263:3, 7263:4, 7286:14, 7287:1, 7294:18, 7294:22
**reported** [2] - 7237:10, 7274:20
**Reporter** [3] - 7221:18, 7221:19, 7316:11
**reporter** [1] - 7290:3
**REPORTER** [3] - 7276:8, 7283:20, 7316:1
**reports** [7] - 7224:22, 7226:12, 7252:19, 7255:25, 7256:17, 7261:19, 7314:2
**represent** [3] - 7241:10, 7261:24, 7262:12
**represented** [1] - 7306:11
**Republic** [1] - 7253:17
**request** [3] - 7243:19, 7259:7, 7275:25
**requested** [1] - 7258:24
**required** [3] - 7230:16, 7305:11, 7305:12
**Research** [1] - 7291:13
**research** [4] - 7293:17, 7303:8, 7305:12, 7308:2
**resolve** [3] - 7286:5,

7286:20, 7297:8
**resources** [1] - 7297:23
**respect** [3] - 7258:22, 7312:6, 7313:24
**respects** [1] - 7307:19
**responding** [1] - 7312:22
**response** [9] - 7223:11, 7243:19, 7244:8, 7245:4, 7259:7, 7270:11, 7273:20, 7281:2, 7285:10
**responsibility** [3] - 7293:21, 7294:1, 7294:16
**responsive** [1] - 7270:14
**rest** [3] - 7288:4, 7288:21, 7289:1
**REST** ........................
.....................7289 [1] -
7317:7
**restructured** [1] - 7265:4
**restructuring** [1] - 7264:22
**result** [9] - 7239:22, 7241:23, 7244:17, 7245:11, 7252:12, 7254:6, 7268:5, 7268:6, 7293:5
**resulted** [1] - 7227:9
**results** [15] - 7223:4, 7225:2, 7227:25, 7251:14, 7258:8, 7264:1, 7264:6, 7265:1, 7266:2, 7267:16, 7268:7, 7301:5, 7301:9, 7301:11, 7302:11
**resume** [2] - 7271:10, 7315:16
**retail** [1] - 7302:17
**retain** [5] - 7234:20, 7234:21, 7235:2, 7235:20, 7238:1
**returns** [3] - 7228:13, 7228:19, 7228:24
**revealed** [1] - 7276:16
**revenue** [15] - 7234:1, 7234:3, 7236:13, 7246:21, 7246:25, 7272:10, 7277:20, 7277:23, 7278:3, 7278:10, 7278:17, 7279:9, 7279:10, 7279:17, 7280:5
**reverse** [1] - 7278:24

**review** [2] - 7227:1, 7253:22
**reviewed** [2] - 7246:15, 7247:3
**rise** [2] - 7295:9, 7299:25
**Rival** [1] - 7227:17
**rival** [22] - 7225:7, 7225:12, 7225:22, 7225:25, 7226:4, 7226:13, 7226:18, 7227:3, 7227:16, 7227:17, 7230:21, 7231:21, 7232:13, 7235:23, 7236:19, 7241:25, 7245:15, 7245:23, 7255:24, 7256:3, 7268:7, 7275:5
**rivals** [12] - 7225:16, 7226:8, 7226:16, 7230:23, 7234:3, 7241:23, 7242:10, 7243:4, 7254:25, 7272:14, 7272:21, 7273:25
**RMR** [1] - 7221:18
**roadkill** [2] - 7305:21, 7305:22
**Robert** [3] - 7290:4, 7290:6, 7290:7
**role** [2] - 7293:14, 7294:3
**Room** [2] - 7221:19, 7316:12
**Rosati** [2] - 7221:11, 7221:15
**rose** [2] - 7277:25, 7279:23
**roughly** [8] - 7275:16, 7279:13, 7279:14, 7286:12, 7298:9, 7301:21, 7302:9, 7309:13
**row** [1] - 7277:19
**RPMs** [8] - 7268:21, 7269:9, 7269:25, 7270:16, 7270:22, 7271:1, 7271:5
**rule** [2] - 7222:20, 7296:12
**run** [4] - 7232:16, 7292:22, 7297:20, 7307:3
**Russia** [6] - 7250:20, 7253:9, 7253:11, 7253:16, 7254:11, 7254:17

# S

**SA360** [15] - 7274:11, 7274:17, 7274:19, 7274:20, 7275:4, 7275:15, 7275:17, 7278:2, 7279:23, 7280:6, 7283:25, 7284:4, 7284:5, 7284:7, 7284:12

**SA360's** [2] - 7277:11, 7279:16

**SA360-related** [1] - 7242:8

**Safari** [8] - 7232:24, 7233:3, 7234:11, 7243:17, 7265:24, 7266:1, 7266:9, 7266:20

**Sallet** [6] - 7221:1, 7222:6, 7271:20, 7275:8, 7281:1, 7284:24

**SALLET** [60] - 7240:16, 7240:18, 7241:2, 7241:5, 7259:1, 7259:16, 7260:11, 7260:14, 7260:17, 7260:20, 7261:7, 7263:15, 7263:18, 7263:23, 7271:19, 7271:22, 7272:17, 7272:22, 7273:10, 7273:13, 7274:1, 7275:9, 7275:12, 7276:1, 7276:9, 7276:23, 7277:5, 7277:9, 7278:10, 7278:13, 7278:16, 7278:21, 7279:6, 7279:8, 7280:11, 7281:2, 7281:7, 7281:9, 7281:20, 7281:24, 7282:4, 7282:9, 7283:1, 7283:2, 7283:22, 7283:23, 7284:14, 7284:25, 7285:5, 7285:15, 7286:7, 7286:9, 7286:23, 7287:2, 7287:7, 7287:10, 7287:16, 7287:25, 7288:19, 7288:22

**Sallet...............7271** [1] - 7317:3

**sample** [1] - 7309:8

**sampling** [1] - 7306:12

**Samsung** [2] -

7227:14, 7245:21

**sat** [1] - 7253:6

**satisfied** [1] - 7309:19

**sauce** [1] - 7298:4

**saw** [2] - 7229:6, 7255:17

**scale** [27] - 7225:18, 7227:19, 7227:24, 7228:4, 7228:6, 7228:7, 7228:8, 7228:10, 7228:13, 7228:16, 7228:20, 7228:24, 7229:16, 7229:18, 7230:15, 7246:7, 7246:9, 7256:21, 7257:9, 7257:18, 7258:9, 7283:6, 7283:11, 7283:14, 7283:19

**Scale** [1] - 7257:11

**scene** [1] - 7307:21

**Schmidtlein** [12] - 7221:7, 7222:7, 7223:12, 7261:1, 7263:19, 7272:23, 7273:15, 7276:2, 7277:18, 7280:12, 7285:2, 7288:14

**SCHMIDTLEIN** [36] - 7223:16, 7234:25, 7235:1, 7240:14, 7240:17, 7240:19, 7241:3, 7241:6, 7241:9, 7258:19, 7259:10, 7260:6, 7260:15, 7260:19, 7261:6, 7261:8, 7263:16, 7263:21, 7263:24, 7271:7, 7271:13, 7272:15, 7273:6, 7273:11, 7276:6, 7276:10, 7276:17, 7276:21, 7278:12, 7278:23, 7280:21, 7281:5, 7285:3, 7285:17, 7287:17, 7287:22

**Schmidtlein's** [1] - 7281:4

**Schmidtlein.....7223** [1] - 7317:3

**school** [2] - 7291:12, 7300:19

**science** [3] - 7290:21, 7292:21, 7305:13

**scientific** [3] - 7291:2, 7291:4, 7291:5

**scope** [1] - 7272:16

**scores** [1] - 7300:6

**screen** [6] - 7240:13,

7263:17, 7295:20, 7295:22, 7301:5, 7312:4

**search** [171] - 7223:24, 7224:8, 7224:22, 7224:23, 7225:2, 7225:6, 7225:7, 7225:11, 7225:12, 7225:15, 7225:16, 7225:18, 7225:19, 7225:22, 7226:4, 7226:13, 7226:14, 7227:4, 7227:12, 7227:13, 7227:16, 7227:17, 7227:19, 7227:20, 7227:25, 7228:5, 7228:9, 7228:13, 7228:17, 7229:11, 7229:14, 7229:19, 7230:21, 7230:22, 7230:24, 7231:10, 7231:12, 7231:21, 7232:1, 7232:2, 7232:6, 7232:8, 7232:14, 7232:17, 7232:24, 7233:1, 7233:2, 7233:7, 7233:8, 7233:10, 7233:18, 7234:22, 7235:4, 7235:9, 7235:23, 7236:19, 7237:2, 7237:3, 7237:7, 7239:17, 7240:10, 7241:10, 7241:19, 7241:20, 7241:25, 7243:17, 7243:20, 7244:9, 7245:3, 7245:15, 7245:23, 7246:7, 7246:13, 7246:16, 7246:18, 7246:20, 7246:21, 7246:25, 7247:4, 7247:5, 7247:6, 7247:7, 7247:22, 7248:6, 7248:8, 7248:17, 7248:23, 7249:2, 7249:7, 7249:22, 7249:24, 7250:15, 7250:16, 7250:20, 7251:1, 7251:21, 7252:12, 7253:24, 7253:25, 7254:5, 7254:22, 7254:23, 7254:25, 7255:9, 7255:21, 7255:22, 7255:24, 7256:1, 7256:3, 7257:16, 7258:8, 7258:10, 7262:22, 7264:1, 7264:6,

7264:25, 7265:20, 7265:25, 7266:2, 7267:16, 7267:19, 7267:25, 7269:6, 7270:12, 7271:2, 7272:10, 7273:24, 7277:20, 7278:10, 7278:17, 7279:9, 7279:17, 7280:15, 7282:16, 7283:12, 7283:13, 7283:17, 7291:14, 7292:8, 7292:23, 7293:1, 7293:8, 7293:17, 7295:11, 7295:14, 7295:17, 7298:6, 7298:7, 7298:8, 7298:10, 7299:4, 7299:6, 7300:5, 7301:3, 7302:21, 7303:12, 7304:8, 7304:11, 7304:18, 7306:2, 7309:21

**Search** [4] - 7251:13, 7294:17, 7302:5, 7308:23

**searched** [1] - 7235:23

**searches** [2] - 7227:9, 7244:18

**searching** [2] - 7233:16, 7238:4

**seated** [1] - 7222:25

**second** [19] - 7236:7, 7237:12, 7241:1, 7259:18, 7260:24, 7261:4, 7261:13, 7263:2, 7264:2, 7272:3, 7277:19, 7289:6, 7290:7, 7302:1, 7302:2, 7302:12, 7302:16, 7313:16, 7314:23

**seconds** [1] - 7286:7

**secret** [2] - 7279:3, 7298:3

**Section** [1] - 7221:3

**section** [1] - 7267:7

**secured** [1] - 7231:19

**see** [31] - 7227:1, 7229:3, 7233:24, 7236:1, 7240:18, 7243:3, 7246:9, 7248:5, 7252:15, 7253:7, 7256:10, 7257:15, 7258:23, 7260:13, 7260:21, 7267:4, 7275:13, 7277:10, 7277:21, 7279:6, 7281:18, 7283:10, 7288:16,

7337

7297:12, 7302:8, 7303:21, 7306:17, 7311:2, 7311:7, 7312:14, 7315:19
**seeing** [3] - 7311:8, 7311:12, 7312:6
**seem** [3] - 7259:11, 7259:15, 7300:8
**seemingly** [1] - 7304:10
**segment** [1] - 7305:7
**segments** [1] - 7302:17
**selected** [1] - 7233:17
**SEM** [6] - 7274:5, 7274:12, 7275:20, 7277:20, 7278:4, 7279:10
**senior** [2] - 7265:23, 7290:17
**sense** [7] - 7228:2, 7267:5, 7295:19, 7301:12, 7303:13, 7305:20, 7314:1
**sensitivities** [1] - 7261:5
**sent** [2] - 7285:9, 7285:19
**separately** [1] - 7240:4
**September** [1] - 7252:18
**Sergey** [1] - 7292:25
**series** [1] - 7303:2
**services** [7] - 7224:8, 7241:20, 7248:23, 7249:2, 7267:25, 7309:18, 7310:1
**session** [1] - 7259:3
**set** [10] - 7234:20, 7234:21, 7234:22, 7235:3, 7235:4, 7235:9, 7238:1, 7239:16, 7299:1, 7311:10
**setting** [1] - 7244:22
**Seventh** [1] - 7221:4
**several** [2] - 7249:16, 7315:10
**share** [35] - 7228:23, 7229:10, 7229:13, 7230:2, 7230:10, 7232:1, 7238:14, 7240:9, 7243:4, 7250:5, 7265:9, 7269:22, 7270:18, 7272:2, 7272:6, 7272:20, 7274:18, 7274:20, 7274:23, 7274:24, 7275:4, 7275:15, 7275:16,

7275:21, 7276:15, 7276:19, 7277:11, 7279:16, 7279:23, 7280:7, 7283:25, 7298:20, 7299:5
**shares** [14] - 7234:1, 7234:3, 7243:13, 7268:3, 7272:9, 7273:1, 7274:15, 7275:13, 7275:24, 7276:3, 7276:5, 7276:11, 7276:16, 7278:24
**shift** [1] - 7289:3
**shifts** [1] - 7303:3
**shopping** [7] - 7312:2, 7312:6, 7312:22, 7313:22, 7314:3, 7314:4, 7314:8
**shops** [1] - 7306:16
**shortage** [1] - 7292:15
**show** [11] - 7271:23, 7273:2, 7273:18, 7275:24, 7281:14, 7292:12, 7296:1, 7303:17, 7306:10, 7311:5, 7312:1
**showed** [3] - 7298:23, 7299:21, 7303:8
**showing** [1] - 7263:22
**shown** [4] - 7272:6, 7275:20, 7286:3, 7303:25
**shows** [6] - 7241:19, 7272:9, 7273:4, 7273:23, 7275:24, 7308:2
**side** [2] - 7283:4, 7315:2
**signals** [1] - 7310:3
**significant** [5] - 7239:4, 7245:1, 7255:12, 7274:11, 7274:13
**significantly** [2] - 7246:13, 7246:25
**similar** [2] - 7254:15, 7268:9
**simple** [1] - 7309:20
**simply** [4] - 7222:20, 7223:1, 7281:21, 7288:6
**simulates** [1] - 7267:24
**single** [5] - 7253:5, 7255:5, 7256:1, 7281:17, 7315:6
**sites** [1] - 7311:8
**situation** [3] - 7236:8, 7239:1, 7242:25

**situations** [1] - 7299:22
**size** [2] - 7269:23, 7314:12
**Skai** [5] - 7274:22, 7275:5, 7275:16, 7275:19, 7277:12
**slide** [52] - 7234:16, 7234:17, 7234:18, 7237:11, 7238:16, 7240:3, 7248:21, 7249:11, 7249:12, 7251:12, 7254:15, 7255:17, 7256:19, 7257:4, 7257:10, 7258:18, 7259:4, 7260:9, 7260:11, 7260:13, 7260:25, 7261:9, 7263:20, 7265:12, 7265:14, 7266:15, 7267:7, 7268:13, 7268:16, 7271:23, 7272:16, 7273:2, 7274:2, 7274:3, 7274:6, 7274:8, 7274:16, 7295:23, 7296:1, 7296:5, 7298:22, 7298:23, 7299:21, 7303:17, 7303:22, 7306:10, 7306:11, 7311:11, 7311:17
**slides** [4] - 7255:8, 7285:1, 7285:20
**small** [4] - 7232:1, 7256:21, 7257:18, 7283:15
**Small** [1] - 7257:10
**smart** [1] - 7248:18
**soccer** [1] - 7300:6
**social** [4] - 7307:17, 7308:24, 7310:4, 7310:6
**software** [1] - 7291:14
**someone** [5] - 7236:14, 7239:25, 7270:2, 7307:10
**sometimes** [2] - 7307:4, 7309:19
**somewhat** [1] - 7270:1
**somewhere** [1] - 7292:19
**Sommer** [1] - 7221:10
**SOMMER** [5] - 7289:21, 7294:11, 7296:4, 7297:6, 7313:8
**Sommer.................7289** [1] - 7317:5
**Sommers** [1] - 7289:5
**SOMMERS** [14] -

**Sonsini** [2] - 7221:11, 7221:15
**soon** [2] - 7304:23
**sophisticated** [1] - 7308:11
**Sorry** [1] - 7283:20
**sorry** [18] - 7240:12, 7240:14, 7243:19, 7244:8, 7245:4, 7257:7, 7272:3, 7273:5, 7276:8, 7282:13, 7283:21, 7294:5, 7294:15, 7296:17, 7307:16, 7312:9, 7313:4, 7314:5
**sort** [6] - 7225:10, 7229:22, 7266:21, 7268:14, 7270:25, 7312:24
**sorts** [1] - 7248:18
**sounds** [3] - 7256:5, 7262:2, 7294:17
**source** [1] - 7297:1
**sourced** [1] - 7276:4
**sources** [2] - 7250:6, 7276:7
**South** [3] - 7220:16, 7254:12, 7254:17
**south** [1] - 7253:18
**space** [2] - 7298:2, 7311:19
**Spain** [1] - 7253:12
**speaking** [1] - 7311:24
**special** [2] - 7298:3, 7300:22
**specific** [12] - 7226:18, 7226:23, 7229:16, 7233:25, 7235:11, 7249:9, 7258:11, 7272:24, 7273:16, 7275:3, 7275:13, 7282:20
**specifically** [2] - 7285:14, 7313:24
**speech** [2] - 7305:5, 7305:13
**spell** [1] - 7290:3
**spend** [8] - 7283:16, 7297:16, 7297:18, 7299:22, 7300:13, 7308:23, 7309:13, 7311:3
**spending** [5] -

7272:25, 7273:3,
7273:17, 7273:19,
7313:14
  **spent** [2] - 7273:24,
7309:10
  **spiked** [1] - 7300:18
  **split** [1] - 7269:6
  **splitting** [1] - 7270:12
  **Spotlight** [1] - 7313:18
  **stand** [4] - 7223:2,
7286:1, 7289:8,
7312:25
  **standard** [3] - 7251:5,
7251:6, 7251:9
  **Stanford** [5] - 7292:3,
7292:6, 7292:9,
7292:14, 7292:21
  **start** [4] - 7274:17,
7282:8, 7308:21,
7313:20
  **started** [4] - 7222:9,
7242:7, 7292:8,
7314:11
  **state** [3] - 7277:3,
7279:2, 7289:24
  **statements** [1] -
7304:5
  **states** [2] - 7222:6,
7289:1
  **STATES** [3] - 7220:1,
7220:10, 7317:7
  **States** [26] - 7220:2,
7220:22, 7221:1,
7221:19, 7222:4,
7224:24, 7225:7,
7225:12, 7225:16,
7229:12, 7229:19,
7230:11, 7232:2,
7233:2, 7250:11,
7250:21, 7251:7,
7253:25, 7254:11,
7254:18, 7255:6,
7262:4, 7262:7,
7265:9, 7270:23,
7271:1
  **stay** [4] - 7234:15,
7284:4, 7284:11,
7310:21
  **stenographic** [1] -
7316:5
  **step** [1] - 7246:20
  **steps** [1] - 7309:20
  **Steven** [1] - 7221:2
  **stick** [1] - 7238:25
  **sticking** [1] - 7313:22
  **still** [4] - 7240:4,
7288:20, 7303:22,
7304:6
  **stop** [3] - 7234:10,
7304:20, 7306:16

  **stopped** [1] - 7292:4
  **strain** [1] - 7290:13
  **strategic** [2] -
7260:23, 7293:16
  **Street** [3] - 7220:12,
7220:16, 7220:20
  **strike** [2] - 7233:6,
7233:24
  **strong** [1] - 7276:20
  **stronger** [2] - 7250:11,
7250:12
  **structure** [1] - 7264:19
  **struggle** [1] - 7307:1
  **stuck** [1] - 7245:4
  **students** [3] -
7292:10, 7292:11,
7292:22
  **studies** [2] - 7308:22,
7309:7
  **study** [4] - 7237:12,
7237:15, 7238:7,
7238:10
  **studying** [1] - 7300:13
  **subject** [5] - 7239:2,
7239:14, 7241:12,
7290:24, 7292:5
  **submit** [2] - 7253:3,
7259:2
  **submitting** [1] -
7252:18
  **subscription** [2] -
7230:1, 7230:15
  **subscription-based**
[1] - 7230:1
  **subsecond** [1] -
7301:24
  **subset** [1] - 7298:10
  **substantial** [11] -
7224:5, 7224:7,
7224:12, 7224:16,
7235:22, 7236:13,
7236:20, 7236:24,
7236:25, 7248:6,
7297:23
  **substantially** [3] -
7228:18, 7274:21,
7277:25
  **substantive** [1] -
7222:14
  **substantively** [2] -
7223:4, 7312:7
  **successful** [3] -
7230:3, 7301:8,
7314:20
  **successfully** [1] -
7314:11
  **suffering** [1] - 7245:1
  **sufficient** [1] -
7230:10
  **suggested** [1] -

7259:20
  **suggesting** [2] -
7239:9, 7263:18
  **suggestions** [1] -
7259:3
  **suite** [1] - 7293:23
  **Suite** [2] - 7220:16,
7220:24
  **summarize** [1] -
7277:8
  **summation** [1] -
7280:24
  **Sundar** [1] - 7294:19
  **superior** [2] - 7225:6,
7225:11
  **supplying** [1] - 7268:7
  **support** [3] - 7252:11,
7259:5, 7297:1
  **supported** [3] -
7230:1, 7230:14,
7230:15
  **supports** [1] - 7268:17
  **suppose** [3] - 7278:6,
7280:3, 7289:6
  **supposed** [2] -
7255:6, 7256:9
  **supposition** [1] -
7269:3
  **surpass** [1] - 7305:16
  **surprised** [1] - 7262:8
  **surrounding** [1] -
7236:11
  **SVP** [4] - 7254:23,
7255:5, 7256:1,
7257:24
  **SVP's** [1] - 7255:24
  **SVPs** [4] - 7258:10,
7258:12, 7258:16,
7258:17
  **SW** [1] - 7221:8
  **swap** [1] - 7300:6
  **switch** [4] - 7231:10,
7239:14, 7266:20,
7315:14
  **switched** [4] - 7235:8,
7235:22, 7236:21,
7245:2
  **Switching** [1] -
7234:17
  **switching** [11] -
7237:24, 7239:14,
7241:22, 7266:24,
7274:5, 7274:11,
7274:13, 7277:18,
7278:4, 7280:4,
7300:24
  **sworn** [1] - 7289:10

**T**

  **T-Mo** [1] - 7245:22
  **tables** [1] - 7286:13
  **talks** [1] - 7238:3
  **tangent** [1] - 7298:18
  **targeting** [2] - 7283:11
  **task** [1] - 7307:7
  **taught** [2] - 7291:25,
7292:5
  **teach** [2] - 7292:2,
7292:10
  **team** [4] - 7298:8,
7300:13, 7301:22,
7307:2
  **teams** [1] - 7305:14
  **technical** [2] -
7227:22, 7228:1
  **technologies** [2] -
7293:16, 7305:15
  **technology** [5] -
7290:22, 7295:8,
7295:9, 7297:20,
7298:5
  **Technology** [1] -
7290:23
  **ten** [2] - 7237:19,
7313:24
  **tend** [5] - 7248:22,
7267:9, 7300:2,
7300:10, 7301:13
  **tendency** [3] -
7234:19, 7235:20,
7238:1
  **term** [3] - 7267:6,
7287:9, 7309:15
  **terms** [5] - 7222:16,
7260:4, 7273:8,
7298:5, 7312:12
  **testified** [5] - 7230:9,
7276:21, 7289:11,
7306:2, 7312:17
  **testify** [2] - 7281:13,
7286:1
  **testifying** [1] - 7244:6
  **testimony** [42] -
7222:13, 7222:14,
7222:18, 7223:7,
7228:15, 7228:25,
7229:3, 7229:5,
7229:6, 7229:21,
7229:24, 7230:2,
7230:6, 7230:8,
7236:3, 7239:13,
7239:19, 7243:15,
7251:13, 7251:17,
7252:5, 7253:6,
7257:1, 7257:3,
7257:15, 7258:6,
7259:2, 7259:20,

7261:21, 7266:4, 7280:19, 7281:15, 7282:7, 7282:25, 7283:4, 7284:6, 7284:10, 7284:19, 7299:19, 7313:3, 7313:6, 7315:18
**tests** [1] - 7232:16
**textbooks** [1] - 7291:3
**THE** [87] - 7220:1, 7220:1, 7220:9, 7222:2, 7222:3, 7222:8, 7223:1, 7223:9, 7223:12, 7223:15, 7234:24, 7240:12, 7240:21, 7240:22, 7240:23, 7240:24, 7240:25, 7241:1, 7241:8, 7258:24, 7259:9, 7259:13, 7260:13, 7260:21, 7271:9, 7271:18, 7271:20, 7272:19, 7273:5, 7273:12, 7273:22, 7275:23, 7276:3, 7276:8, 7276:14, 7276:19, 7276:24, 7277:7, 7278:15, 7278:19, 7278:22, 7279:1, 7279:21, 7279:25, 7280:2, 7280:8, 7280:10, 7280:25, 7281:8, 7281:10, 7281:21, 7282:1, 7282:6, 7282:24, 7283:20, 7283:21, 7284:17, 7284:20, 7284:22, 7285:13, 7286:8, 7286:20, 7286:24, 7287:5, 7287:8, 7287:11, 7287:21, 7288:13, 7288:20, 7289:2, 7289:12, 7289:13, 7289:14, 7290:2, 7290:4, 7292:14, 7294:5, 7294:7, 7294:8, 7296:13, 7296:17, 7296:23, 7297:8, 7299:12, 7313:2, 7313:5, 7315:15
**theories** [1] - 7269:20
**there're** [1] - 7239:1
**therein** [1] - 7313:15
**thinking** [1] - 7222:25
**thinks** [1] - 7275:9
**third** [7] - 7236:9, 7238:14, 7260:8,

7260:21, 7261:2, 7264:10, 7302:20
**Thomas** [1] - 7291:12
**thoughts** [1] - 7269:23
**thousand** [1] - 7298:13
**three** [6] - 7253:14, 7261:9, 7298:16, 7301:20, 7302:9, 7309:14
**thrilled** [1] - 7301:22
**tie** [1] - 7272:17
**TikTok** [3] - 7303:7, 7307:25, 7308:13
**title** [1] - 7257:10
**today** [10] - 7222:10, 7238:6, 7238:12, 7242:12, 7262:14, 7267:22, 7286:1, 7298:19, 7302:8, 7303:23
**together** [4] - 7242:1, 7276:13, 7286:25, 7310:24
**took** [1] - 7292:2
**tool** [4] - 7274:5, 7274:12, 7275:20, 7278:4
**tools** [2] - 7277:20, 7279:10
**top** [2] - 7238:17, 7260:15
**topic** [2] - 7294:25, 7302:3
**topics** [2] - 7300:24, 7315:14
**total** [4] - 7246:6, 7246:13, 7278:25, 7279:2
**totals** [2] - 7279:4
**touch** [1] - 7309:25
**Tower** [2] - 7305:2, 7307:13
**track** [1] - 7295:8
**tracking** [1] - 7246:4
**tracks** [1] - 7295:6
**traditional** [1] - 7303:12
**traffic** [3] - 7256:23, 7257:12, 7258:9
**trajectory** [1] - 7297:16
**transact** [1] - 7309:22
**transactions** [1] - 7314:12
**TRANSCRIPT** [1] - 7220:9
**transcript** [3] - 7259:5, 7316:4, 7316:5
**transcripts** [1] -

7260:3
**transportation** [1] - 7310:22
**travel** [14] - 7261:24, 7262:3, 7262:6, 7262:13, 7302:17, 7310:12, 7310:14, 7310:15, 7310:17, 7311:8, 7311:21, 7311:22, 7312:6, 7312:10
**treat** [2] - 7222:13, 7285:21
**treating** [2] - 7285:3, 7287:19
**trend** [12] - 7272:1, 7272:6, 7272:13, 7274:16, 7274:18, 7274:25, 7275:21, 7277:3, 7277:23, 7297:12, 7313:14, 7315:11
**trends** [1] - 7308:11
**TRIAL** [1] - 7220:9
**trial** [4] - 7229:21, 7260:3, 7294:21, 7306:1
**tried** [1] - 7308:4
**Tripadvisor** [1] - 7262:9
**trouble** [1] - 7312:21
**true** [7] - 7238:24, 7276:9, 7303:22, 7311:22, 7316:4, 7316:5
**truth** [3] - 7285:22, 7296:6, 7296:11
**try** [8] - 7230:21, 7231:12, 7233:9, 7250:4, 7252:3, 7270:6, 7295:4, 7311:1
**trying** [11] - 7230:25, 7234:13, 7234:15, 7240:14, 7256:10, 7268:2, 7283:16, 7299:4, 7311:10, 7312:18, 7312:19
**turn** [6] - 7223:21, 7234:16, 7294:25, 7295:14, 7302:3, 7310:5
**turning** [1] - 7313:24
**two** [13] - 7260:2, 7264:23, 7274:14, 7280:3, 7280:4, 7282:11, 7285:1, 7292:22, 7295:6, 7298:16, 7303:25, 7304:1, 7314:17
**Tyler** [1] - 7220:23

**type** [1] - 7259:15
**typically** [1] - 7246:21
**typing** [1] - 7313:20

## U

**U.K** [3] - 7270:18, 7270:19, 7300:5
**U.S** [24] - 7220:12, 7220:15, 7220:19, 7236:13, 7240:9, 7241:11, 7249:8, 7249:23, 7250:2, 7250:16, 7251:1, 7255:13, 7255:16, 7255:21, 7262:13, 7267:22, 7268:4, 7268:22, 7270:3, 7270:19, 7272:9, 7290:21, 7300:5, 7309:9
**ultimate** [3] - 7223:6, 7223:7, 7288:4
**ultimately** [3] - 7223:5, 7230:4
**unable** [1] - 7258:7
**unbeknownst** [1] - 7243:5
**undefined** [1] - 7243:5
**under** [13] - 7240:11, 7244:23, 7261:3, 7266:21, 7267:7, 7286:4, 7286:16, 7287:13, 7288:17, 7296:12, 7300:22, 7309:14
**undergrad** [1] - 7292:10
**undergrads** [1] - 7292:12
**undergraduate** [1] - 7303:13
**underlying** [1] - 7296:16
**underneath** [1] - 7261:2
**understood** [1] - 7232:21
**undertaken** [1] - 7251:1
**unfortunately** [3] - 7303:24, 7308:16, 7308:18
**United** [23] - 7221:19, 7222:4, 7224:24, 7225:7, 7225:12, 7225:16, 7229:12, 7229:19, 7230:11, 7232:2, 7233:2, 7250:11, 7250:21,

7340

7251:7, 7253:25,
7254:11, 7254:18,
7255:6, 7262:4,
7262:7, 7265:9,
7270:23, 7271:1
**UNITED** [2] - 7220:1,
7220:10
**united** [1] - 7220:2
**universally** [1] -
7295:3
**universe** [1] - 7247:14
**unless** [2] - 7263:13,
7285:10
**unredacted** [3] -
7241:4, 7260:11,
7260:18
**up** [41] - 7223:5,
7235:17, 7240:3,
7240:7, 7240:12,
7242:12, 7244:3,
7244:22, 7246:21,
7247:4, 7251:10,
7261:17, 7262:1,
7265:17, 7272:17,
7274:18, 7277:2,
7279:22, 7284:16,
7285:15, 7288:6,
7288:8, 7288:18,
7289:17, 7290:11,
7292:3, 7292:12,
7293:12, 7295:20,
7297:19, 7299:2,
7304:22, 7307:2,
7307:10, 7312:4,
7312:24, 7314:15,
7315:11, 7315:12
**upward** [2] - 7297:12,
7297:16
**upwards** [1] - 7235:8
**urging** [1] - 7292:7
**usage** [3] - 7247:4,
7248:6, 7248:8
**useful** [1] - 7295:3
**User** [1] - 7234:17
**user** [15] - 7241:21,
7300:17, 7301:4,
7303:5, 7303:8,
7307:12, 7307:24,
7308:2, 7309:15,
7309:19, 7310:20,
7311:12, 7311:21,
7312:10, 7314:11
**user's** [1] - 7309:9
**users** [35] - 7234:21,
7235:2, 7235:7,
7235:12, 7236:20,
7238:6, 7238:19,
7238:24, 7239:2,
7239:4, 7239:7,
7239:13, 7239:14,

7266:16, 7266:20,
7266:24, 7297:20,
7297:21, 7301:13,
7302:4, 7302:8,
7303:3, 7303:10,
7306:7, 7308:23,
7309:18, 7310:23,
7311:2, 7312:18,
7312:21, 7313:10,
7313:14, 7313:24,
7314:2, 7315:3
**users'** [1] - 7295:7
**uses** [1] - 7305:9

---

## V

**vacation** [1] - 7310:25
**validate** [1] - 7296:20
**validated** [1] - 7296:19
**value** [2] - 7256:21,
7270:17
**Value** [1] - 7257:11
**variations** [1] - 7300:4
**variety** [4] - 7269:24,
7276:6, 7276:12,
7285:20
**various** [9] - 7232:13,
7236:11, 7250:23,
7252:19, 7269:7,
7269:14, 7276:18,
7293:17, 7299:18
**vary** [1] - 7312:8
**vendor** [1] - 7291:14
**verb** [1] - 7267:6
**Verity** [3] - 7291:15,
7291:16, 7293:8
**verity** [1] - 7291:17
**Verizon** [1] - 7245:22
**version** [2] - 7240:13,
7304:3
**versions** [1] - 7241:3
**versus** [8] - 7222:5,
7227:24, 7228:4,
7238:12, 7250:17,
7255:16, 7271:1,
7313:14
**vertical** [7] - 7263:6,
7263:9, 7263:11,
7264:2, 7264:7,
7302:16, 7312:1
**verticals** [12] - 7310:6,
7310:7, 7310:11,
7310:12, 7310:15,
7310:18, 7311:19,
7311:22, 7312:2,
7312:13, 7314:22
**viable** [3] - 7257:17,
7257:20, 7311:20
**vice** [2] - 7290:17,
7293:16

**Victor** [1] - 7290:8
**view** [14] - 7225:3,
7244:6, 7244:13,
7244:21, 7245:6,
7257:24, 7279:15,
7284:3, 7288:11,
7293:9, 7306:25,
7307:1, 7313:9, 7315:2
**viewed** [1] - 7254:13
**views** [2] - 7230:6,
7285:9
**vintage** [1] - 7307:18
**virtue** [1] - 7226:17
**visibility** [1] - 7314:9
**voice** [3] - 7290:11,
7305:3, 7305:4
**volume** [2] - 7228:23,
7314:12
**voluminous** [1] -
7252:4
**vs** [1] - 7220:5

---

## W

**wait** [1] - 7276:24
**waiting** [1] - 7286:1
**wakes** [1] - 7307:2
**wallet** [1] - 7270:18
**wars** [1] - 7304:9
**Washington** [9] -
7220:5, 7220:13,
7220:20, 7221:8,
7221:20, 7307:6,
7307:11, 7310:20,
7316:13
**Waszmer** [1] - 7221:14
**Watson** [1] - 7291:13
**ways** [1] - 7243:12
**web** [7] - 7308:23,
7309:4, 7309:6,
7309:10, 7313:14
**Webb** [1] - 7220:23
**week** [1] - 7261:22
**weeks** [1] - 7309:24
**weight** [1] - 7248:12
**weighted** [1] - 7248:8
**welcome** [2] -
7269:23, 7289:14
**welfare** [1] - 7239:18
**Wendy** [1] - 7221:14
**West** [2] - 7291:13,
7292:2
**Western** [1] - 7300:10
**Wfcavanaugh@pbwt
.com** [1] - 7220:25
**WhatsApp** [1] - 7303:9
**Whinston** [1] -
7312:17
**whole** [5] - 7233:14,
7269:24, 7272:14,

7299:11, 7310:24
**wife** [1] - 7305:8
**William** [2] - 7220:22,
7222:6
**WILLIAMS** [1] - 7221:7
**Wilson** [2] - 7221:11,
7221:15
**win** [6] - 7230:22,
7231:1, 7231:12,
7231:22, 7234:13,
7243:4
**Windows** [11] -
7236:22, 7237:1,
7237:4, 7237:8,
7238:15, 7238:18,
7238:24, 7239:5,
7239:7, 7239:17,
7239:23
**WIRED** [1] - 7309:2
**wireless** [2] - 7242:14,
7245:21
**wish** [1] - 7286:15
**wishes** [1] - 7285:11
**witness** [9] - 7263:22,
7281:16, 7284:15,
7285:25, 7289:5,
7289:6, 7289:10,
7296:23, 7299:3
**WITNESS** [8] -
7223:15, 7240:25,
7279:25, 7280:8,
7284:20, 7289:13,
7290:4, 7294:7
**witness's** [1] - 7286:9
**wITNESSES** [1] -
7317:1
**won** [4] - 7232:6,
7234:11, 7241:24,
7304:8
**word** [5] - 7247:23,
7257:8, 7265:21,
7267:1, 7267:4
**words** [2] - 7276:10,
7287:3
**Workspace** [1] -
7293:22
**world** [23] - 7226:7,
7226:20, 7226:22,
7226:24, 7226:25,
7242:4, 7242:6,
7242:18, 7242:22,
7242:24, 7243:3,
7243:11, 7243:16,
7243:22, 7243:23,
7244:14, 7244:15,
7244:16, 7244:19,
7244:22, 7246:1,
7256:6, 7256:8
**world's** [1] - 7295:2
**worried** [1] - 7276:24

**written** [1] - 7251:20
**wwaszmer@wsgr. com** [1] - 7221:17

## Y

**Yahoo** [22] - 7227:2, 7231:1, 7236:10, 7240:9, 7241:14, 7245:2, 7245:5, 7256:11, 7267:14, 7267:16, 7268:10, 7268:14, 7269:5, 7269:21, 7291:19, 7291:21, 7303:24, 7304:7, 7304:8, 7304:10, 7305:16
**Yale** [1] - 7292:2
**year** [7] - 7237:15, 7246:7, 7273:14, 7279:24, 7291:20, 7293:21, 7309:9
**years** [24] - 7232:23, 7233:9, 7234:12, 7237:1, 7237:6, 7237:19, 7238:8, 7238:11, 7241:11, 7254:2, 7277:11, 7277:12, 7277:14, 7277:15, 7279:18, 7291:22, 7298:16, 7301:20, 7303:3, 7307:20, 7309:1, 7309:8, 7313:24, 7315:10
**Yelp** [10] - 7256:18, 7260:16, 7264:10, 7264:13, 7264:17, 7264:19, 7264:24, 7265:3, 7265:10
**yesterday** [15] - 7236:3, 7236:15, 7237:10, 7240:4, 7256:14, 7272:1, 7272:5, 7274:8, 7274:10, 7274:15, 7274:18, 7277:18, 7284:25, 7285:5, 7298:19
**York** [4] - 7220:24, 7221:12, 7221:16, 7291:13
**young** [4] - 7305:7, 7308:2, 7308:4, 7308:8
**younger** [3] - 7304:3, 7308:1, 7308:18
**yourself** [3] - 7228:22, 7270:25, 7290:13