```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      United States of America,     )
 3    et al.,                       ) DAY 33
                                    )
 4                    Plaintiffs,   )
                                    ) CV No. 20-3010
 5                       vs. ) Washington, D.C.
                                    ) November 2, 2023
 6    Google LLC,                   ) 9:30 a.m.
                                    )
 7                    Defendant.    )
      _____)
 8

 9                   TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE AMIT P. MEHTA
10                  UNITED STATES DISTRICT JUDGE

11    APPEARANCES:
      For DoJ Plaintiffs:        Kenneth M. Dintzer
12                               U.S. DEPARTMENT OF JUSTICE
                                 1100 L Street, NW
13                               Washington, D.C.
                                 (202) 307-0340
14                               Email: Kenneth.dintzer2@usdoj.gov
                                 David E. Dahlquist
15                               U.S. Department of Justice
                                 209 South LaSalle Street
16                               Suite 600
                                 Chicago, IL 60604
17                               (202) 805-8563
                                 Email: David.dahlquist@usdoj.gov
18
      For Plaintiff
19    State of Colorado:         Jonathan Bruce Sallet
                                 COLORADO DEPARTMENT OF LAW
20                               Consumer Protection Section,
                                 Antitrust Unit
21                               Ralph L. Carr
                                 Colorado Judicial Center
22                               1300 Broadway
                                 Seventh Floor
23                               Denver, CO 80203
                                 (720) 508-6000
24                               Email: Jon.sallet@coag.gov

25
```

8368

```
 1     For Plaintiff
          States (cont.):
 2                              William J. Cavanaugh, Jr.
                                Patterson Belknap Webb & Tyler LLP
 3                              1133 Avenue of the Americas
                                Suite 2200
 4                              New York, NY 10036
                                (212) 335-2793
 5                              Email:  Wfcavanaugh@pbwt.com

 6     For Defendant Google:    John E. Schmidtlein
                                WILLIAMS & CONNOLLY LLP
 7                              680 Maine Avenue SW
                                Washington, D.C. 20024
 8                              (202) 434-5000
                                Email: Jschmidtlein@wc.com
 9                              Michael Sommer
                                Wilson Sonsini Goodrich & Rosati
10                              1301 Avenue of the Americas
                                40th Floor
11                              New York, NY  10019
                                (212) 497-7728
12                              Email:  Msommer@wsgr.com
                                Wendy Huang Waszmer
13                              Wilson Sonsini Goodrich & Rosati
                                1301 Avenue of the Americas
14                              40th Floor
                                New York, NY  10019
15                              (212) 999-5800
                                Email:  Wwaszmer@wsgr.com
16
       Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
17                              Official Court Reporter
                                United States Courthouse, Room 6523
18                              333 Constitution Avenue, NW
                                Washington, DC  20001
19                              202-354-3267
                                      *    *    *
20

21

22

23

24

25
```

```
 1      *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
 2              THE COURT:  Good morning, everyone.  Please be
 3      seated.
 4              THE COURTROOM DEPUTY:  Your Honor, we are on the
 5      record for civil action 20-3010, United States of America
 6      versus Google LLC.  Kenneth Dintzer for the DoJ, Jonathan
 7      Sallet and William Cavanaugh for the plaintiffs.
 8              THE COURT:  Good morning, everyone.  Hope everybody
 9      is well.  All right.  So we're ready to get started this
10      morning.
11              MR. SOMMER:  Yes, Your Honor.  Good morning.  Michael
12      Sommer for Google.
13              Judge, before we get started with Dr. Israel, I'm
14      pleased to report that we're down to just three documents,
15      third-party documents that are at issue.  If I may hand them
16      up, Your Honor.
17              THE COURT:  Sure.
18              MR. SOMMER:  This is two copies of the three
19      documents.
20              Your Honor, the first -- and I should alert Your
21      Honor that counsel -- counsel for Microsoft, Allen Davis, is
22      here, and counsel for Amazon, Josh Lipton, is also here.
23              The first document, Your Honor, which is DXD29.062,
24      redactions as reflected in the red boxes are requested by
25      Amazon, Microsoft, and Google.  This chart reflects competitive
```

1    pricing information.  In fact, the other two companies just

2    have redacted versions themselves, so they don't see each

3    others numbers.  I don't -- I don't think there's objection

4    from the government on this one.  So, on that one document, we

5    request that the redactions be permitted as reflected by the

6    red boxes.

7                THE COURT:  I'm sorry.  This is DXD29.062, you say?

8                MR. SOMMER:  Yes, Your Honor.

9                THE COURT:  Okay.  Okay.

10               MR. SOMMER:  The next one, Your Honor, is DXD29.147.

11   Microsoft has requested that the box -- that the material on

12   the right, the charts, be redacted.  The way the chart is set

13   up, Your Honor, is there's some Google data on the left,

14   there's some Bing data on the right.  Google is not requesting

15   confidential treatment of its data, but Microsoft is.  So, as I

16   said, Mr. Davis is here to address that.  That's one we don't

17   take a position on.

18               THE COURT:  Okay.

19               MR. SOMMER:  And then the third -- just to tee it up,

20   and then I'll be done -- is DXD29.071.  It is a document from

21   Sketchers.  We agreed -- we worked out an agreement with them

22   to redact only some of the numbers in the upper left-hand side.

23   You can see them in the red box.  They really have no bearing

24   on the point Dr. Israel is going to make with this.  I don't

25   know if their counsel is here or not, but we reached agreement

```
 1    and told them we would advise Your Honor of that agreement.
 2              THE COURT:  Okay.
 3              MR. SOMMER:  And I'm not sure if there's any contrary
 4    position from the plaintiffs on that one.  Those are the three.
 5              THE COURT:  Okay.  Plaintiffs wish to be heard about
 6    any of the requests?
 7              MR. DINTZER:  No objection, Your Honor.
 8              THE COURT:  Okay.  Do any of the counsel who are
 9    present wish to be heard?
10              MR. DAVIS:  Good morning, Your Honor.  Allen Davis
11    for Microsoft Corporation.  So, just on the chart that
12    Mr. Sommers just mentioned, the one that shows the breakdowns,
13    those aren't market shares, necessarily.  They're revenue
14    allocations.  So, it looks at Microsoft's advertising revenue
15    and the SEM tools from which that revenue stems.  Obviously,
16    Your Honor has heard testimony of the importance of those
17    relationships between Microsoft and these providers, and this
18    would kind of give them more perfect information.
19              THE COURT:  Sorry.  Can you say the last part?
20              MR. DAVIS:  It would give them more perfect
21    information in those discussions, have an idea how decision
22    they're making could impact Microsoft's potential revenue.
23    These aren't publicly reported, they aren't externally reported
24    in any fashion.  We think it would be appropriate in this venue
25    to keep this redacted.  What we've said is we have no objection
```

 1    to, kind of, relative statements.

 2              So, this grouping, you know, that green line is lower

 3    than that red line, or that number at the bottom is, you know,

 4    lower than some percent.  But just kind of the specifics of the

 5    information is what we would like to keep redacted.

 6              THE COURT:  Okay.  Thank you, Mr. Davis.

 7              MR. LIPTON:  Thank you, Your Honor.  Joshua Lipton

 8    with Gibson, Dunn, representing Amazon.  I'd like to speak very

 9    briefly to the document with the confidential pricing

10    information.  This is pricing information that -- at least

11    Amazon bars, is confidential to Amazon.  My understanding, the

12    pricing on other companies is confidential to those companies.

13    It's not shown publicly, it's not shown to those other

14    companies.  And this is information if it was provided, if the

15    Amazon data were provided to Google, for example, could be used

16    by Google to competitively harm Amazon.

17              And then the last --

18              THE COURT:  I'm sorry, these are average CPC search

19    services, that's what they are, or CPM?

20              MR. LIPMAN:  Correct.  That's our understanding.  Our

21    understanding is Google's expert has spun up a lot of

22    confidential detailed information and produced these summary

23    charts.  Our understanding is these are designed to show

24    Google's positioning favorably relative to the others and that

25    could be used to harm Amazon in the competitive marketplace.

1            The last point I would like to make, it relates to

2     that which is we don't have access to the methodologies they've

3     used, any intermediate charts.  So if they were to get out in

4     the marketplace, Amazon does not have any basis to respond or

5     rebut or show another spin of this data.  So it's an unequal

6     treatment that could be used to harm Amazon.

7            THE COURT:  Okay.

8            MR. LIPTON:  Thank you, Your Honor.

9            THE COURT:  Thank you, Counsel.

10           All right.  Anyone else wish to be heard about this?

11    Okay.  All right.  Just, I think, moving backwards is probably

12    easiest.  DXD29.071, I think the information from Skechers will

13    certainly, I think -- is appropriate to redact it.  It is

14    confidential business information about its ad spend and

15    revenue resulting from that ad spend.  Presumably that

16    information is not public.  And because it is the information

17    of a third-party, I do think that that has a higher degree of

18    proprietary interest.  And representations have been made that

19    that information is not public and could harm Skechers to some

20    degree if it is made public, or at least would reveal its

21    internal strategies that are not otherwise public in terms of

22    how it spends its ad dollars.

23           In terms of the Microsoft request, or DXD29.147, I'll

24    allow that as well to be redacted.  Microsoft has made

25    representations -- Microsoft, again, is a third-party -- it's

8374

```
 1    made representations that this information is not publicly
 2    available and could harm it if it was revealed in the
 3    marketplace.
 4         We'll just note, Microsoft has been extremely
 5    accommodating in terms of the information that it's been
 6    prepared to make public throughout the course of this trial.
 7    So the fact that they've come forward and made representations
 8    that this particular information is particularly sensitive, has
 9    some weight.  And I will note that we can substitute, as
10    counsel represented, the numbers here with, at least, just
11    relative figures without the precise numbers themselves.
12         And then, finally, with respect to DXD29.062, which
13    depicts various ad pricing for various companies, including
14    Instagram, Amazon, Bing, and Google, there are multiple
15    parties, including Google and third parties, that are requested
16    that they be -- that this receive confidential treatment.  I
17    think it's appropriate.  This is sensitive pricing information
18    that is not otherwise public and, for obvious reasons, a
19    disclosure of pricing information could have prejudicial
20    impacts on these third parties and parties, in terms of the
21    pricing of their advertisements and the amounts that parties
22    bid for them, if this information were to become public.  The
23    information can be conveyed through relative terms, so the
24    public understands what's being conveyed in the particular
25    slides.
```

```
 1                        Okay.
 2                   MR. SOMMER:  Thank you, Your Honor.  So at that time
 3     Google calls Dr. Mark Israel.
 4                   THE COURTROOM DEPUTY:  Mr. Israel, please raise your
 5     right hand.
 6                              MARK ISRAEL,
 7     was called as a witness and, having been first duly sworn, was
 8     examined and testified as follows:
 9                   THE COURT:  Dr. Israel, good morning.  Nice to see
10     you again.
11                   THE WITNESS:  Good to see you.
12                   MR. SOMMER:  Your Honor, may I approach the witness?
13                   THE COURT:  You may.
14                         DIRECT EXAMINATION
15     BY MR. SOMMER:
16     Q.  Good morning, Dr. Israel.  Can you please state your name
17     and spell it for the record?
18     A.  Sure.  My name is Mark A. Israel.  Last name is
19     I-S-R-A-E-L.  It's Mark with a K.
20     Q.  Okay.  Ready?
21     A.  Sure.
22     Q.  Good.  Dr. Israel, can you please describe to the Court
23     both your current employment and your educational background?
24     A.  Sure.  I'm an economist by training.  I have a Ph.D. in
25     economics from Stanford University in 2001.  I taught at
```

1    Northwestern University for several years.  I left there to

2    move into full-time competition consulting and expert work.  I

3    now work for a firm called Compass Lexecon, where I'm -- my

4    title is senior managing director.  I'm one of four people who

5    runs the firm, but almost all my time is spent doing various

6    competition-related case work.

7    Q.  Dr. Israel, roughly how many times have you been engaged as

8    an expert in the area of economics?

9    A.  Counting all cases I work on across a variety of types of

10   cases, hundreds.

11   Q.  And have you been qualified as an expert in economics and

12   industrial organization in prior matters?

13   A.  Yes.

14   Q.  And have judges accepted your opinions in various matters?

15   A.  Yes.

16   Q.  Have there been times when a judge disagreed with your

17   opinion in matters?

18   A.  Yes.  I give my opinion in many cases, and, you know, of

19   course, sometimes people disagree.  So, I think I can think of

20   two cases where there's been clear disagreement.

21   Q.  Before you were retained in this matter, had you ever been

22   engaged by and provided your expert services for a government

23   agency?

24   A.  Yes.  Several times.  Most notably, multiple times for the

25   Federal Trade Commission, once in this courtroom.  But, several

1    times for the government.

2    Q.  And before you were retained in this matter, had you ever

3    been engaged by and provided your expert services on behalf of

4    Google?

5    A.  No.

6    Q.  Is there a current matter, other than this case, in which

7    you have been engaged by Google?

8    A.  Yes.

9    Q.  Before you were retained in this matter, had you ever been

10   engaged by and provided your expert services on a matter that

11   was adverse to Google?

12   A.  Yes.

13   Q.  And in the matter that brings you to court today, have you

14   written reports, provided deposition testimony, and prepared

15   testimony to provide to the Court in the area of economics and

16   industrial organization as those topics relate to the claims

17   brought by plaintiffs?

18   A.  Yes.

19          MR. SOMMER:  Your Honor, I move to qualify Dr. Israel

20   as an expert in economics and industrial organization.

21          MR. DINTZER:  No objection, Your Honor.

22          MR. CAVANAUGH:  No objection.

23          THE COURT:  All right.  So the Court recognizes

24   Dr. Israel as an expert in economics and industrial

25   organization.

```
1     BY MR. SOMMER:
2     Q.  Dr. Israel, do you have a slide deck that you'll be using
3     in connection with your testimony today?
4     A.  Yes.
5             MR. SOMMER:  And, Your Honor, for the record, that
6     deck -- the entirety of the deck has been marked as DXD29, and
7     that's been distributed.
8             And let's put that up.  I don't have any picture on
9     my screen.
10            MR. CAVANAUGH:  Probably need to turn it on.
11            MR. SOMMER:  That would help.  There we go.
12            Okay.  Organized.
13    BY MR. SOMMER:
14    Q.  Dr. Israel, can you provide the Court with a summary of
15    your opinions that you will discuss today?
16    A.  Sure.  I'll try to do it briefly.  I have opinions in six
17    basic areas.  The first four relate to market definition and
18    monopoly power.  So, the first two are on the user side of the
19    market.
20            So, my first opinion is that plaintiffs improperly
21    defined a market that improperly combines what are really
22    distinct products with different competitive conditions that
23    really belong in separate markets in order to analyze them
24    correctly.  And that by so doing, they define away strong
25    competition that Google faces.  They effectively adopt a
```

1    standard of, you don't compete for everything, you compete for

2    nothing; therefore, define away competition.

3              My second opinion is, therefore -- and, you know,

4    because of that and then looking at the evidence directly,

5    Google does not have monopoly power on the user side of the

6    market.

7              My third opinion then pivots to the advertising side

8    of the market.  And, again, I find that plaintiffs define away

9    what is actually the strongest and very strong competition that

10   Google faces.

11             And then my fourth opinion is because of that, and,

12   again, looking at the evidence directly, Google does not, in

13   fact, have monopoly power on the advertising side of the

14   market.

15             I then pivot on the advertising side to the question

16   of competitive effects.  To be clear here, I'm not weighing in

17   on the distribution agreements or defaults or anything like

18   that.  My opinion is really whether if Bing or another GSE were

19   larger, would that materially improve competition?  Or said

20   differently, you know, does the small size have any effect on

21   Bing, harms competition.  And I find that Google has not harmed

22   competition or advertisers in that way.

23             And then finally, again, a pivot to a somewhat

24   different topic that I know you've heard some about, and that

25   is Google's conduct with regard to what features it had rolled

1    out and at what times on SA360.  And I find that Google's

2    conduct with SA360 has not harmed competition.

3    Q.  Dr. Israel, before we get into the substance of each of

4    your opinions, I take it that those opinions are founded in

5    certain economic concepts; is that right?

6    A.  Yes, of course.

7    Q.  Can you describe those to the Court, starting with the

8    basic framework of where we're going to go today?

9    A.  Yeah.  I think here we can be quick, but I do think its

10   helpful and makes things much clearer for me if you separately

11   talk about the user side and the advertiser side.

12        So, Google runs what is really a two-sided market in

13   the sense that it serves a query of answers and queries of

14   questions for users, and, also, sells the attention of users to

15   advertisers.

16        So, it's -- the first, sort of, concept is being

17   clear about what the products are on each side of the market.

18   And so the product on the user side is really answering

19   questions, answering queries, and so the competition we're

20   studying is who is competing to answer those questions, those

21   queries.

22        The advertising side is quite different, right?  The

23   advertising side is different.  Firms have different

24   technologies, I would say, that generates user attention for

25   targeted users.  So, different firms are competing to attract

1    the attention of users who can be targeted with advertisements,

2    and to sell that targeted attention to advertisers.

3    Q.  I take it, sir, you're familiar with the term market

4    definition?

5    A.  Yes.

6    Q.  And is that an important consideration in your analysis?

7    A.  Yes, of course.

8    Q.  Okay.  Why don't you just describe some of the basic

9    principles of market definition from your perspective.

10   A.  Sure.  So market definition, the purpose of market

11   definition is to identify the closest competitive constraints

12   on a firm -- really, the closest constraints on a firm's

13   product.  So, what constrains a firm's competitive strategy,

14   its pricing, its quality?  And the way we go about it as

15   economists is to focus on the closest demand side substitutes.

16   Meaning, if I'm a firm and I don't perform as well in some way,

17   higher prices or lower quality, where would my customers go?

18   And, so, that constrains my behavior.

19          And with those constraints -- those constraints --

20   the Court would really need to identify those constraints in

21   order to draw on and assess whether or not the firm has

22   monopoly power in the face of those constraints.

23          Second key concept that's on the slide is clustering,

24   I'll talk a lot about.  That is, in order to properly assess

25   the constraints, you can group together products that face

1    similar constraints, similar competitors.  But you shouldn't

2    group together products that don't face similar competitors or

3    you'll run into this issue of defining away competition because

4    it doesn't exist in different segments.

5            And then the third principle or principles that I'll

6    talk some about are what I call the circle and small of market

7    principles.  The circle principle just says when you're

8    deciding what competitors to include, you shouldn't skip over

9    any.  So you should work your way out, define closer

10   competitors and don't skip over a close competitor for a more

11   distant one.

12           And small of the market principle just says basically

13   define as many as you need to determine what principally

14   constrains the firm.  You don't need to define every last

15   competitor.  Together, these mean you start with the product at

16   issue.  Here, you think of that as Google, you know, answering

17   queries -- particular query, and you work your way out to

18   figure out who are the closest competitors for that.

19   Q.  Dr. Israel, the Court has heard about something called the

20   cellophane fallacy.  Is that a principle you're familiar with?

21   A.  Yes.

22   Q.  Is that an economic concept that bears on your analysis in

23   this case?

24   A.  Yes.  It's really a concept that comes out of court cases,

25   but economists certainly think about it, too.

1    Q.   Okay.

2    A.   To discuss it, I would like to take one step back first and

3    talk about substitution, first bullet here.  So, to me, the

4    heart and soul of market definition is actual substitution.

5    Look in the data, see who's substituting to what.  Trust the

6    data as much as you can.

7         I know Professor Whinston has raised the issue, and

8    it's been raised in other cases, that the substitution -- the

9    second bullet, if you want to go down -- so, substitution in

10   this case is due to the cellophane fallacy, which would mean

11   that you're only seeing substitution between -- later I'll talk

12   about substitution between Google and Amazon for answering

13   queries, or Google and Amazon for selling advertisements.

14        You would say you're only seeing substitution of that

15   sort because -- normally the idea is Google has monopolized the

16   market, so Google is so high priced.  On the user side here we

17   don't have a price, so the argument would be Google is so low

18   quality.  But the argument would be, you're only seeing that

19   substitution because Google is so poor.

20        And I guess I would make two points about that.  The

21   first one is, to me, that's speculation without support.  I

22   think the standard should be -- at least this is consistent

23   with economics -- trust actual substitution, trust what you see

24   with your eyes, who is substituting where, unless someone has

25   proven that it's only due to cellophane.  And this case in

1    particular, though, affirmatively I would say the cellophane

2    claim is rejected, and I'll talk about that as I go through.

3            But, I think there's two ways I'll talk about.  One

4    is the competitors we're talking about -- and cellophane, the

5    argument was, the price of cellophane is so high you might wrap

6    your sandwich in newspaper, right?  Some commonsense has to be

7    applied.  My conclusion is that just doesn't apply at all to

8    substitutions with Amazon for shopping queries or Expedia for

9    travel queries or Facebook for advertisements.

10           These are not distant things.  These are active

11   competitors that are providing very much the same sort of

12   services.  So, I think part of it is just the strength of these

13   competitors is based on their strength, not based on Google

14   being poor.  Google actually is also high quality, and they

15   compete head to head.

16           And secondly, there are tests that say if you go

17   through, you can look at the data and say, let's think about

18   what the cellophane claim would imply, and does the data

19   support it, and I will present those as I go through.

20   Q.  Have you identified a few other considerations that relate

21   to substitution?

22   A.  Yes.  So another point that I heard Professor Whinston make

23   when talking about cellophane was that, you know, in a

24   situation like this, to think about substitution, you should

25   ask how differentiated are the products, and that should be the

1    focus of the inquiry.  And I would -- I just disagree with

2    that.  Again, to me, the focus of the inquiry should be what do

3    we see in the data about who is competing.

4          But, the other point I would make is the idea that

5    differentiated products can't be close substitutes.  The first

6    bullet here is, you know, unless the market is monopolized,

7    it's just inconsistent with economics.  There's a ton of

8    economic research studying close substitution between

9    differentiated products.  Doesn't require monopolization for

10   differentiated products to be very close substitution with each

11   other.  In fact, the degree of differentiation doesn't allow

12   you to rank the amount of substitution.  Products can be

13   differentiated but both be very good at what they do and be

14   very close substitutes.

15         So, that's my first part.  You need to be able to

16   look at who is competing with whom in the data and see what you

17   see on the demand and supply side, not try to rank things by

18   differentiation.

19         My second big point on substitution, and I think this

20   is really important to keep in mind in this case, is that

21   partial substitution is competition.  The question is not can

22   someone take 100 percent of Google's business, or there's 100

23   percent of search advertising move to social media advertising.

24   The question is, are they competing for dollars or for users?

25         So users make -- and I'll talk about this a lot.

1    Users make a choice at each query, who am I going to have

2    answer this question?  Am I going to Google or am I going to go

3    to Expedia, right?  All of that is competition, and if Google

4    loses a significant number of queries -- not all of them, but a

5    significant number to someone else, that's competition and that

6    constraints what Google can do.

7            Similarly, advertisers -- of course, most advertisers

8    advertise in multiple ways.  They use various channels.  But

9    when they're figuring out their budgets, they're moving money

10    back and forth based on the performance of the flow channels.

11    Not all of it, but they're moving money, and that's

12    competition.

13            Substitution is -- we call it -- diversion sometimes

14    in economics.  Diversion doesn't have to be 100 percent.  If

15    it's there and you're losing material amounts of revenue or

16    profits or customers, that's competition.

17    Q.  Dr. Israel, is monopoly power another issue you will be

18    addressing in the course of your testimony?

19    A.  Yes.

20    Q.  And can you describe to the Court your view on monopoly

21    power and how it relates to this -- to the work you've done

22    here?

23            THE COURT:  Can I interrupt before you answer that

24    question?

25            What is the -- undoubtedly you'll be getting to this,

1    but what is a hypothetical monopolist test, at least on the

2    user side?  If it's not price-driven on this case, how are

3    you -- I guess, one is, how are you applying it to this test?

4    Two, are you doing it?

5            THE WITNESS:  I won't explicitly be talking about the

6    hypothetical monopolist test today, so I won't be doing, sort

7    of, a quantitative version of it on the user side.  A lot of

8    what I'll be doing is just looking at who the closest

9    competitors are and looking at them relative to other

10   competitors to see what factors of the market could make sense.

11           So, I agree, on the user side, you know, when price

12   is zero, there's not an easy quantitative way do it.  Frankly,

13   I think if you look across economist reports or presentations

14   in cases, more normal than not that someone doesn't do a full

15   quantitative hypothetical monopolist test.  That's a concept to

16   say, who out there is constraining me?  Who would I have to own

17   to get rid of that constraint?

18           So, I'll try to talk about it conceptually, but I

19   won't be trying to do a quantitative version on either side of

20   the market.

21   BY MR. SOMMER:

22   Q.  So, we're about to get into monopoly power.

23   A.  Yeah.  So, monopoly power is -- I think a critical thing is

24   that monopoly power, to me, as an economist, is more than just

25   market power.  We know this is an issue that people debate, and

1    the definition -- you know, you might hear different

2    definitions, but monopoly power -- market power is the ability

3    to raise price above marginal cost.  And frankly, market power

4    exists.  Almost every firm has some degree of market power.

5    So, if you look for prices above marginal cost or some control

6    over prices, you would find that almost everywhere.  Monopoly

7    power needs to be more.

8            The way I think about monopoly power as an economist

9    is, the word monopoly, it doesn't have to be a truly only one

10   firm, but it has to be a firm that has the ability to do what

11   we associate with monopolization, which is to restrict output.

12   So, the fundamental characteristic in economics of what

13   monopolists do is they make money by creating scarcity, they

14   make money by restricting.  So monopoly power, to me, as an

15   economist, requires the ability to raise price or decrease

16   quality without the reduction associated with it and without

17   competitors stepping in to fill that void.

18           I don't see monopoly power where firms are competing

19   and one of them is winning the race with higher quality or

20   lower prices.  To me, a monopoly power is a firm that is in a

21   dominant enough position that they are able to and they

22   restrict output as their method of making profits.

23   Q.  You just mentioned both price and output.  I take it those

24   are additional economic concepts that you'll be focusing on

25   today; is that right?

1    A.  Yes.

2    Q.  And let's just go through these last three economic concept

3    points, and then we'll jump into the user side.

4    A.  So, just a way to put together price, quality, and output

5    is what I would say is the quality-adjusted price.  So when you

6    have products that have multiple characteristics, like we have

7    here, then even where there is a price charge, like, to

8    advertisers, price is not the only thing that matters, or even

9    the most important thing that matters.  It's one of the things.

10         Then, economists talk about quality-adjusted prices,

11    which a lot of the economic work on these sorts of industries

12    is trying to put value on product characteristics so you can

13    determine what's the value that a customer gets.  So you should

14    think about the quality-adjusted price as the value minus the

15    price.  That's the thing that matters.  So even if nominal

16    prices -- meaning, just the price itself goes up --

17    quality-adjusted prices can go down, and that's good for

18    customers.

19         THE COURT:  You'll equate that to sort of return on

20    investment?  Or is that a different concept?

21         THE WITNESS:  I think it's related, yeah.  I think

22    return on investment is quite quantitative.  So I think from an

23    advertiser point of view, you would say part of the quality of

24    what they're getting is how well the advertisement converts

25    into sales.  The ROI gets a lot of attention because it's math,

1    right?  You can compute it and they're all numbers.

2          Quality-adjusted price also applies, though, when

3    things aren't measured perfectly because, you know, even if ROI

4    isn't measured perfectly, or on the user side, if it's harder

5    to put a number on quality, we still want to get at the idea

6    that's what people care about, right?  They care about the

7    quality-adjusted price.

8          And the last bullet is one way we'll try to do that.

9    One reason that I and economists focus so much on output is it

10   can be a useful summary statistic for what's happened to

11   quality-adjusted prices.  If prices go up, the quality goes up

12   more, and you'll see output go up because it's beneficial.

13   When looking at output, you think about econ 1 demand curve;

14   when price goes up, you know, quantity goes down.  Really,

15   that's a quality-adjusted price that matters.  When the

16   quality-adjusted price goes down, people buy more.

17   BY MR. SOMMER:

18   Q.  All right.  With these economic concepts in mind, let's

19   turn first to the user side.

20         Can you describe to the Court what is represented in

21   your slide 11?

22   A.  Yes.  So this is just an image of a query.  So, as I said,

23   the user side, the product we're talking about is a query -- or

24   really a response to a query.  Query, or a question, the user

25   has something they want to get information about.  They got to

1    decide where to go get that information.  So here is an

2    example.  A user is interested in men's shoes.  One way they

3    can get information about men's shoes is to type it into

4    Google.  Another way they could get information about men's

5    shoes is to go to their Zappos app on their phone and query

6    men's shoes there.  So, those are two alternative competing

7    ways to get information about men's shoes.

8    Q.  Do you have another example?

9    A.  So, here, if it was a flight you want to take, you want to

10   travel somewhere, you -- same idea.  I want to good to London,

11   I can go into Google and I can look up flights into London.

12   Alternatively, I could go to my Expedia app and I could ask it

13   about flights to London.  Interesting, Expedia in the app now

14   actually uses ChatGPT AI inside the app.  But both of them are

15   ways to help you, you know, get information about how to get to

16   London.

17          So the user has a question, the product is answers to

18   that question, the competitors are the firms that can provide

19   those answers.

20   Q.  Dr. Israel, have you reached opinions regarding the users'

21   side of markets?

22   A.  Yes.  We went through these before.  So, as I said

23   before -- I'll go through these more.  I -- plaintiffs -- I

24   disagree with the plaintiffs' market definition, and I think

25   that leads them to a wrong conclusion, that there's monopoly

1    power.

2    Q.  So, let's go into the first one.  Why don't you describe to

3    the Court what you've set out in slide 15?

4    A.  I'll spend a little time here.  Even though this is basic

5    stuff because, to me, this is kind of the heart of a lot of

6    what I have to say on the user side, at least conceptually.

7           So each query made by a user is a meaningfully

8    distinct choice about where to go get information.  So when I'm

9    thinking about where to get shoes, and later I'm thinking about

10   where to take a flight, those are distinct choices about who is

11   going to answer that question for me.  All right?  And my

12   fundamental problem with the plaintiffs' market definition is

13   they cluster all of those queries together into one big, what

14   they call, one-stop shop market.

15          And I'll come back here and talk more about, you

16   know, their arguments for that and why I disagree, but I just

17   want to make a couple points here.

18          One is, at a high level -- and I'll come back to

19   this -- but, this idea of a one-stop shop market doesn't

20   describe in the evidence or my experience or in what I've seen

21   in the industry, how search works.  There's a one-stop shop

22   market, some people call it a bundle market, right?  What that

23   generally means is, I'm going to buy 30 things.  I need to get

24   30 food items and I'm going to decide whether to go to Giant or

25   Safeway to get them.  But, I'm going to make a decision about

1    where to get the next 30 things that I need, right?

2         That doesn't describe, in the evidence I've seen of

3    the industry, how people search.  People don't make a decision

4    about I need to decide where I'm going to search for the next

5    30 things and need to decide that at one time, right?  People

6    decide, as they need to search, who can fulfil that query.  So

7    it's not a bundle of products.  And I'll come back to this.

8         And it's -- and user -- and users don't substitute --

9    go back up in bolding -- users don't substitute between -- you

10   know, shopping for shoes is not a substitute for shopping for

11   travel.  Those are really distinct things, right?  And,

12   therefore, because they're distinct things, they're not one

13   bundle, it is not appropriate to cluster together different

14   types of queries unless the competitive conditions are similar.

15   This is a concept, cluster market concept in economics.  These

16   are separate products.  It's not appropriate to put them in one

17   giant market.  Instead, you should be grouping them by sets of

18   queries that have similar competitive conditions, similar

19   options.

20   Q.  Dr. Israel, did you have an opportunity to see the DoJ

21   plaintiff's opening statement and their characterization of

22   your opinion?

23   A.  I didn't see it, but I have read it.

24   Q.  And was your opinion accurately presented to the Court?

25   A.  No.

1    Q.  Can you describe where that divergence is?

2    A.  Right.  So as I read it, the argument was that I want

3    you -- I want the Court to look at every query that's ever made

4    and figure out who could answer every query on a query-by-query

5    basis.  And there's billions of them, and I'm not remotely

6    saying you have to look at billions of them to decide, right?

7    You absolutely should aggregate in order to make that exercise

8    doable.  You should aggregate -- basically, you should cluster

9    things together as far as you can to get an accurate picture of

10   competition, but not farther, right?

11            So, if you -- you know, you can go down a couple more

12   bullets here.

13            You should cluster things together.  Don't look at

14   every query.  Try to put things together in buckets that make

15   sense.  I think that naturally leads to verticals, as they're

16   called in the industry, as natural groupings.  I'm not saying

17   it has to be that, but I think that's sensible.

18            If you look at verticals, you're going to have things

19   like shopping or travel or local or, you know, education.

20   Those are going to lead you to similar sets of firms that can

21   answer those queries, right?  And honestly, what matters in

22   reaching the right conclusions here is not -- as usual with

23   market definition, it's not the metes and bounds of every last

24   decision about how you classify every query.

25            It's aggregating enough so that you can see Amazon

1    competes for shopping queries, Expedia competes for travel

2    queries, and Yelp competes for local queries.  Seeing those as

3    competitors rather than aggregating all the way up and saying

4    because those firms don't do everything, they don't count,

5    right?  If you just group them in sensible ways that could be

6    various ones, you'll see that they count.  There's competition

7    that can't be defined away.  And if you aggregate too far, you

8    sort of round that competition to zero, you act like it's not

9    there, even though it is.

10   Q.  Did you create a chart that showed some of these different

11   types of competitions?

12   A.  Yes.

13   Q.  Can you describe to the Court what slide 17 depicts?

14   A.  So this is a picture of the verticals that you -- you know,

15   you see in the ordinary course that Google uses.  So, you can

16   see shopping, travel, jobs and education, local, right?  What

17   jumps out at you is these are sensible.  As consumers,

18   economists, we can think about what these things mean, we can

19   think about searching for things in these areas, and they lead

20   us to what, I think, is fairly straightforward, obvious

21   competition for Google, as far as who can answer questions.

22   You need to find shoes, Amazon, Walmart, eBay could answer

23   those questions, right?  Again, generally these providers are

24   giving you answers to shopping queries.

25            I need to take a trip, I could go to Google or I

1    could go to Expedia or Travelocity.  I'm interested in job

2    postings, I could search on Google or I could search on Indeed.

3    You know, I want to find a dentist in my area, I could search

4    on Google or I could search on Yelp.  These lead you to who is

5    competing for queries in these useful buckets.

6    Q.  Dr. Israel, is the use of general search engines in all of

7    these different verticals the same?

8    A.  It's not identical, but, it's the -- you know, general

9    search engines in each case are providing answers to queries

10    for each of these.  General search engines have the ability to

11    provide them, but the extent to which they're general search

12    engines are being used or other options are being used varies.

13    Q.  And can you, in the set, set forth in slide 18?

14    A.  So, slide 18 I'll take a minute to explain.  There's a fair

15    bit of data summarized on slide 18.

16              THE COURT:  Before you do that, can I ask a question

17    or two?

18              So, how do you account for the fact that unlike all

19    the competitors you've identified, Google has the ability to

20    answer noncommercial queries, and in that respect, is

21    differentiated from, I think, almost every single one of the

22    competitors that you've identified?

23              THE WITNESS:  Yeah, that's a good question.  I mean,

24    I would say, noncommercial queries, or maybe buckets of them,

25    are in their own vertical.  They are separate here, so you

1    would look at that separately.  For some of them maybe, you

2    know, you would say there is some competition, Wikipedia or

3    things.  But for others in the slide I have later, but I'll

4    take it now, for others of them, I think it's a good question

5    for you to ask, you know, if you decide that in some of those

6    other buckets these other competitors aren't strong, sort of

7    what you do with that.  You know, here's how I think about

8    those other buckets.

9          An important distinction -- and I think it was

10   implicit in your question -- is those other buckets are

11   basically things Google doesn't monetize, they don't sell ads

12   on either.  They sell ads on about 20 percent of their queries.

13   And basically, on -- on almost all of those, the vast majority

14   of those -- and we can talk more about cases -- Google faces

15   this sort of competition from other providers.

16         So, then what's going on on the rest of them where

17   Google, you know, doesn't monetize them?  How should I think

18   about that in Google's business?  The way I think about that

19   is -- or another question would be, what's Google even getting

20   out of that, right?  The way I think about that is, that's

21   effectively, like, advertising for Google, right?  Google is

22   building a brand reputation by how well it provides searches.

23   And this has been in testimony, too.  Every time Google

24   provides an answer, it's like it's giving you a free sample of

25   its service.

1          And, so, the way I think about that is Google needs

2     to -- for that sort of business -- business model to work, for

3     that kind of sampling model to work, have so many queries that

4     they don't make any money on, they need to do well on those

5     queries, because if they don't do well on these queries, their

6     advertising doesn't work and people aren't going to go for them

7     where they can make money.

8          So I think it's fine to think about those as separate

9     queries, like I said, separate verticals.  Some of them face

10    competition.  If you want to know who was the seventh

11    president, go on Google or you can go on Wikipedia.  But if you

12    decide others of them have less competition, Google is not

13    making money there.  Those are really brand-building,

14    advertising-type functions where, like any brand-building,

15    advertising-type function, the constraint is, it better work or

16    I'm not going to make money on the stuff that I actually do

17    sell.

18          THE COURT:  So one more question, Mr. Sommer.

19          So to draw an analogy that's sort of near and dear to

20    our hearts, some time ago we talked about broadline

21    distribution.  And like broadline distribution, which was

22    intended to provide a variety of different types of foods and

23    services to particular vendors of all different shapes and

24    sizes, the advantage was that you could one-stop shop, get

25    everything you needed through the broadline.

1    There's some analogy here, and I query -- "query," no

2    pun intended -- where in your mind, if you will, does the

3    analogy break down?

4    THE WITNESS:  First, I have to say, can you believe

5    that was eight and a half years ago?

6    THE COURT:  I can.

7    THE WITNESS:  The -- it's the example I gave earlier

8    about whether you're buying a bundle or not.  I mean, there was

9    a lot of debate in that case.  You know, the other side was

10   saying you can chop it up, right?  But, the people were

11   meaningfully -- and had to show a lot of evidence there that

12   people were meaningfully saying, I'm going to get my basic food

13   stuff, and I'm going to get them from one provider so they can

14   come on one truck so I can have some, you know, volume

15   discounts and I get all of that sort of unified service.

16   That's a bundle, and people -- the decision that the

17   customers are making is, from whom should I buy that bundle?

18   Users are not saying, from whom shall I buy all my search

19   services, because they're using Amazon for some and Google for

20   others.  And I really think, if you think about how you do

21   this, you sit down -- the person at Marriott, when they're

22   buying broadline food service, sits down and says, from whom am

23   I going to buy at least my staples, my core products?  And

24   there's 500 of them.

25   The user usually sits down and wants to get shoes or

1     wants to get travel, they say, who can answer my query now?

2     And the fact that I used Google five minutes ago to look up

3     shoes or who the seventh president was doesn't mean that I'm

4     not going to go to Expedia for my travel services.  They're

5     just not linked in that way.

6          And a lot of what I'll talk about will be more on how

7     the plaintiffs argue that.  But I -- sorry to go on here for a

8     sec.  There's two separate concepts in economics.  One is a

9     bundle market, which is what you're describing, which is, I'm

10    going to buy a bundle.  I'm going to decide where I'm going to

11    get 50 things, and I'm going to make that decision at one time.

12    That applied in *Sysco*.  I don't see that as applying here.

13         The other concept is a cluster market, which is, they

14    really are different things.  I can group some of them together

15    for analytical convenience because I can group travel together,

16    even though there's lots of queries, because if I group it

17    together, I see basically the same component.  Different travel

18    queries are still distinct, but I can look at them as a group

19    because it gives me a good answer of who the competitors are.

20         But I that that absence of a bundle, I don't see any

21    evidence that a user sits down and says, where am I going to do

22    my next 50 searches?  I think there's lots of evidence

23    presented in *Sysco* that that was the decision being made.

24         THE COURT:  Thank you, sir.

25    BY MR. SOMMER:

1    Q.  All right.  You were about -- you said you were going to

2    need a little time to describe slide 18.  Why don't you take

3    your best shot.

4    A.  Okay.  So, slide 18 is -- this comes from Google, what they

5    call panels data.  So, Google has panels where some people have

6    opted in.  10,000 people in the U.S. over the age of 13 in the

7    time period that's on the slide agreed to, basically, let

8    Google track their online activity.  So they were tracked where

9    they were going on their computer, where they were going with

10    their phones -- with Android phones.

11        And, so -- well, and, therefore, you could look over

12    time and see, when they were on a general search engine, what

13    were they searching for.  Or when they navigated to these SVPs,

14    these special vertical providers -- specialized vertical

15    providers, where did they go, right?  So, what we've done here

16    is take the data for the year and look at three different

17    verticals:  Autos, flights, and shopping.

18        And let me take auto first for the example here,

19    right?  So, if you look at people over the course of the year,

20    each person, and you see how often did they search for stuff

21    about autos on a GSE, or how often did they navigate and go to

22    a specialized vertical provider in the auto area.  So the

23    orange slices of pie here are people who the majority of their

24    time in the auto vertical was on a GSE.  So the big, dark

25    orange one said about 20 percent of the people or so, 90 to 100

1    percent of the time they were thinking about automobiles.  It

2    was on a GSE, not an SVP.

3              As you move over towards the blue, that's people who

4    when they were doing something in the auto vertical, more of it

5    was on a SVP.  The slices of pies are the percentages of the

6    population in the sample.  The orange ones are people who were

7    mostly doing their automobile analysis on GSEs, and the blue

8    ones are people who were spending more time on SVPs.

9              What you see across the three is that for autos, a

10   lot of the interaction for autos is searching on GSE, queries

11   for automobile-related stuff.  There's some SVP activity, which

12   would be, like, going to cars.com, which is clearly a

13   competitor.  So there are SVP competitors that are specific to

14   auto, but auto searching is mostly geared towards people on

15   GSE.

16             For flights, that's a fair bit different.  There's

17   some searching on GSEs for flights.  You can go on Google and

18   look up flights to get to Chicago or whatever, but people are

19   spending much more of their time on an SVP.  Here, SVP in this

20   case could include an airline's own site or Expedia or

21   Travelocity.  I've done versions where you take out the

22   airlines and just looked at Expedia or Travelocity or those.

23   But, on flights, people are doing some on GSEs, but a lot more

24   of their time is on the specialized vertical providers.

25             THE COURT:  I'm not sure I understand how this is

1    being depicted.  So the pie segment is the percentage of the

2    whole that devotes that percent of their search time in that

3    particular vertical to a GSE versus something else?

4           THE WITNESS:  Right.  So if you take the dark orange

5    slice in auto, it's, like, 20 percent of the people are -- 90

6    to 100 percent of their time is searching on a GSE as opposed

7    to going to a SVP.

8           For flights, it's, you know, whatever that is, 10 --

9    less.  And a lot more of it is the dark blue, which is they're

10   on SVPs much more than GSEs.

11          For shopping, even more so.  You know, I think these

12   are intuitive.  Auto, you think maybe you'd mostly search on

13   Google, but there's competition from cars.com; flights, you

14   have Expedia, Travelocity, Orbitz; shopping, you have Amazon

15   and so on where we know the SVPs are quite strong.

16          THE COURT:  Does this reflect where searches

17   originate, or to what extent does it capture people bouncing

18   between the two?

19          THE WITNESS:  This is not where searches originate.

20   This is just where they -- they're searching on GSE.  And to be

21   clear, on the SVPs, I can just tell they're on the SVP.  I

22   can't see what query they're tying in on an SVP.  I can see

23   that they're on the SVP.  But, so this is just capturing

24   bouncing back -- this is just totals over the year.

25          There was a version in my report that looked at where

1    they start, which the pies weren't all the same.  The patterns

2    tended to be, in shopping, more than half the people started on

3    an SVP.  You know, on flights, that was high, but a little

4    lower.  On autos, it was more towards GSEs.  So, I did that

5    version, but this is just where they go over time.

6              THE COURT:  Does this capture desktop, mobile, and

7    app data usage or --

8              THE WITNESS:  This captures all of it because they're

9    tracking them over time, so it's wherever they are.  The one

10   thing about the data is it's -- the app is only installed on

11   Android phones, so it's people that have an Android phone.

12   Didn't have people who had an iPhone.  It's not in the sample.

13             THE COURT:  This is only Android mobile users?

14             THE WITNESS:  For an Android mobile user, it's all

15   their usage, including PC.

16             THE COURT:  Okay.

17   BY MR. SOMMER:

18   Q.  Dr. Israel, you mentioned earlier your view that the

19   plaintiffs are defining away the competition.  I know you

20   prepared a slide in that, and I think you've covered some of

21   it, but let's just go quickly go through these points.  If we

22   need to skip quickly, let me know.

23   A.  I think we've mostly covered this.  Users choose where to

24   search.  We've talked about questions.  For most commercial

25   queries, Google faces competition, and the product can't just

1    define that competition away.  You have to grapple with it.

2    So, Google competes in those separate verticals.

3         I mean, the one thing I'll do quickly here is, you

4    know, plaintiffs have used this analogy of Google like a Swiss

5    Army Knife.  This is maybe another contrast like we did with

6    Sysco.  So, if you think about a Swiss Army Knife, I understand

7    if you go to the store to buy a Swiss Army Knife you compare

8    just Swiss Army Knives or things like it, but here, the

9    situation is really, I have a Swiss Army Knife on my computer,

10   but I also have on my computer, you know, scissors and tweezers

11   and magnifying glass and whatever else.

12        So, for each individual query, I'm deciding should I

13   use Swiss Army Knife version -- that's Google.  Sometimes maybe

14   that's what I grab.  But, on each case, I have a decision about

15   using something else.  So, again, a key distinction here is I'm

16   not going to a store and buying this one time.  Each query I'm

17   deciding, which tool do I use?

18   Q.  Dr. Israel, the Court has heard various iterations of

19   testimony that there are differences between SVPs and general

20   search engines, and, therefore, they don't compete, or they

21   can't be substitutes for one another.  Do you agree with that?

22   A.  No.

23   Q.  And did you perform any analysis to test the extent to

24   which SVPs and general search engines can be close substitutes

25   for particular types of queries?

1    A.  I provide analysis to see to what extent they're answering

2    overlapping queries.  Are they really answering the same query

3    phrase?

4    Q.  What do we see on slide 20?

5    A.  Some more data.  These are query data.  So, early in the

6    case there were subpoenas in there from a few providers.  There

7    was collected query data for a week, that's what was asked for.

8    So it's literally every query these guys got for a week in

9    2020.  That was what was subpoenaed and is in the record in the

10   case.

11        So, what this chart depicts is shopping queries.  So,

12   they're shopping queries were someone has gone into Google.

13   And for this one, basically the way shopping queries are

14   defined is a shopping query is the sort of query that tends to

15   bring up PLAs, tends to bring up the picture ads.  So that's

16   the sort of query that's defined here.  That's the way to think

17   about the vertical.

18        So, this takes Google's top 25 shopping queries, and

19   it says for those top 25 queries, how many -- those top 25

20   terms, queries is being used in two different ways here.  But,

21   for those top 25 terms, how many requests did they get in that

22   week?  And Google got -- you'll see Google got 5.1 million hits

23   for those top 25 queries.  So the biggest shopping terms, think

24   air pods and air fryers and things people are buying, Google

25   got 5.1 million.

1          In its own query data for Amazon, Amazon got 3.7

2     million.  So Amazon is getting a lot of queries in its own

3     query data for the same thing.

4          Bing got 400,000 of them.

5          This varies some from term to term.  Another way I've

6     done it is go to Amazon and figure out what Amazon's top 20 is.

7     That's a nice way to define shopping queries, just what are the

8     top 25 Amazon's getting.  If you do it that way, you'll see

9     Amazon is actually getting a lot more than Google.  For terms

10    like air pods and air fryers, Amazon tends to get more than

11    Google.  But, here, you see Amazon clearly as a strong

12    competitor for those shopping queries.

13    Q.  Did you look at any verticals other than shopping?

14    A.  Yeah.  The next one I did was local.

15          THE COURT:  Can I ask another question?  Sorry.  This

16    is coming to mind.  This will happen -- just to move back to

17    the Swiss Army Knife bundling question.  One of the points the

18    plaintiffs have made is that -- I don't think they're disputing

19    that in these verticals, there's competition.  But what they

20    are saying is that general search engines are unique, and

21    they're unique in a technological sense, not only because of

22    what they produce, but the way in which they're used.

23    Specifically what I mean by that is, there is a search bar in

24    every browser, and it is a general search browser.  It's not a

25    search bar for Amazon or some vertical.  In fact, most of

1    the -- most search distribution sites only offer general search

2    as the way to search.

3              So why -- what's your response to that being a

4    feature that, essentially, makes it a product market onto

5    itself?

6              THE WITNESS:  You don't -- you ask big questions.

7              THE COURT:  That's why they pay me the big bucks.

8              THE WITNESS:  The -- so a couple things, and tell me

9    if there's more.

10             I mean, one is -- part of what you said is it's the

11   technology that they use to provide the service, right?  That's

12   why I started the -- you know, yes, it's a technology that the

13   GSEs use, and part of that technology is that they compete by

14   being broad and sort of have having there sampling-type

15   function.  You can learn about it from a lot of ways.  I think

16   about it with a picture like this (indicating).  Amazon

17   competes by maybe being more deep in shopping and providing

18   more services.  They overlap straight up in providing responses

19   to shopping queries.  So, probably focus on demand side

20   substitution, right?

21             Even though they're doing it in two different ways,

22   an analogy might be Amazon -- a different Amazon use as an

23   online book seller.  Barnes & Noble is bricks and mortar.

24   They're different.  They compete straight up to sell you books.

25   And I think you see them overlapping on queries here, and

1    that's competition.  Every one of those 3.7 million queries

2    here, by definition, could have gone to Google and didn't, and

3    Google can't sell ads against them.

4         So, I think the technology is, really, they're

5    competing, and you see that competition playing out vertical by

6    vertical.

7         The other part of your question was sort of, like,

8    what's on a browser bar?  I would say two things about that --

9    and you're doing a good job anticipating slides.

10        THE COURT:  Shorten the testimony.

11        MR. SOMMER:  You won't.

12        THE WITNESS:  We'll skip over some.

13        Two things.  One is, it certainly is true that, you

14   know, GSE -- as far as on the user side, GSEs have a position

15   on the screen that they may have, and that's a way in which

16   they can try to compete.  That can be an advantage that they

17   have for some users.  I don't see that as defining markets

18   because SVPs have ways they can compete.  Amazon has its app.

19   It's not, like, hard to get to Amazon.  People know Amazon.

20        So, that -- I can see that as a dimension of

21   competition, but the data tell me how often that Amazon is

22   winning an awful lot of queries.  And you can put, shortcuts.

23   You can use apps.  You know, they is different ways of trying

24   to attract these queries, right?

25        Amazon -- one thing that is an advantage that SVPs

 1    tend to have, is when you get there, you -- a lot of those

 2    queries on Google are for the purpose of going somewhere else.

 3    Those are the navigational queries.  When you get to Amazon you

 4    tend to hang out a little longer, and so that's a way they try

 5    to compete.  But, they're all just competing to attract those

 6    queries.

 7           And then the last part that I'll answer -- and this

 8    is really several slides.  There's really a separate

 9    decision -- and it's not so much my topic -- about what a

10    browser decides to do, right?  And there the Swiss Army Knife

11    analogy, I think, is helpful, right, because the browser -- the

12    way I think about it, they want to backstop.  They don't know

13    that you're going to search for shoes or travel.

14           They put a Swiss Army Knife on the phone so that

15    there's something there that can handle all of it out of the

16    box.  You, as the user, decides every time whether to use that

17    Swiss Army Knife or not.  So, browser really has a different

18    decision to make because there, you know, they need to kind of

19    give you kind of the one-size-fits-all because they don't know

20    what you're going to do.  But you still get to make that

21    choice.

22           Especially in mobile, I think about most clearly.

23    Sometimes I might be searching in Google, but all the time I'm

24    searching in various apps and using them right on the screen.

25    BY MR. SOMMER:

1    Q.  All right.  We were moving away to shopping just to one

2    other example that you present.

3    A.  So I have -- the one other vertical where I had data, where

4    the data were subpoenaed, was to have data from Yelp so you can

5    look in local.  Local queries are -- they are things like

6    dentists near me.  They're things that you tend to be looking

7    for something near your house or near where you are.

8            Here, you'll see, even if you take Google's top 25

9    local queries, Yelp gets more.  Google gets 11.4 million of

10   those.  Yelp actually gets 12.5 million.  Bing only gets

11   200,000.  So, Yelp and Amazon, obviously, are applying very

12   strong competition.  You know, much stronger competition than

13   Bing, as things stand.

14   Q.  I want to ask you about something Professor Baker testified

15   to, and that was that a query overlap could just show that the

16   search engines are complements, such as if a user goes to

17   Google, enters a query, clicks through to Amazon and enters the

18   same query there.  Do you agree with that?

19   A.  I don't understand that to be complements in the sense I

20   would use it as an economist.  It means you're using both, but

21   that's why my partial substitution matters.  I agree that you

22   could enter some queries in Google for a while and then go over

23   to Amazon and enter some more; but it remains true that every

24   query that you get over at Amazon is a query that didn't go to

25   Google, and they can't monetize.

1          And really, I think you can think of a lot of the

2    competition here as Amazon trying to get more and more of the

3    queries from the start, and Google trying to get more and more

4    of the queries that go to Amazon.  But they're still fighting

5    over which of those queries go where and where that division

6    is.  So, using both, to me, doesn't mean complements.  It means

7    they're fighting over the extent to which they use either.

8    Q.  Let me ask you about one thing Professor Whinston testified

9    about, and that was that SVPs only appear to be strong

10   competitors because Google's conduct has weakened other general

11   search engines.

12          Do you agree with that critique?

13   A.  This is the cellophane one we talked about earlier, and,

14   no, I don't.  I have a slide here, if we want to go to it.

15          So, this is the question about is the substitution

16   we're seeing or the query answering we're seeing on Amazon or

17   Yelp, is that fully a substitution?  Or are we only seeing that

18   because of Google's conduct?  And I say no to that, for several

19   reasons.  And, again, for cellophane, I think a lot of this you

20   have to go to the basic evidence and commonsense, frankly.

21          You know, Amazon is very, very good at shopping,

22   Expedia is very, very good at travel, and they're strong

23   competitors that Google is actively reacting to in its

24   documents.  So I just don't see that as in any which analogous

25   to the cellophane cases.  These really are extreme cases in

1    economics where somebody has been pushed to doing something

2    that otherwise wouldn't have been a substitute.  Wrapping a

3    sandwich in newspaper, to me, is not a good analogy for using

4    Amazon.  And I haven't seen any basis from plaintiffs to say

5    that, you know, that Amazon is only there because somehow

6    Google is weak.

7         I would say contrary to what Professor Whinston --

8    this goes back to my comment about differentiated products.

9    The fact that -- and to your last question.  The fact that

10   Amazon is differentiated from Google, Amazon is choosing to do

11   everything it can to be very good at shopping.  That makes it a

12   strong competitor in shopping.  Google holds on to a lot of

13   those queries.  Again, Google sort of does it by being broad

14   and attracting people.  Amazon does it by being deeper in

15   shopping.  That makes Amazon a very good competitor in

16   shopping.

17        THE COURT:  Is it -- is it appropriate to define the

18   product as a "query," period, full stop, and, therefore,

19   these -- Google competes with SVPs?  Or is it more appropriate

20   and, frankly, more complete to think of what happens on SVPs as

21   different.  It's not a straight query.  It's also a query and a

22   completion of the query.  You can do on Amazon and on Expedia

23   what you can't do it on Google.  You can complete the purchase.

24        And, so, in that sense, is the product market not --

25   it's -- to define a product market as just queries, is that, in

8414

```
 1    your view, appropriate in light of that important
 2    differentiation?
 3               THE WITNESS:  I mean, I think so.  Because that's
 4    the -- I mean, Google is fundamentally competing for queries,
 5    or trying to answer queries, right?  And the question is -- the
 6    question is -- so from the -- you define the market around, you
 7    know, the monopolization conduct we're thinking about.  So,
 8    what's the competition Google faces?
 9               Google is trying to answer queries.  Amazon is also
10    trying to answer queries.  Amazon is trying to do more, I
11    agree.  That relates to some of my opinions.  People will stay
12    on Amazon longer.  They'll also buy on Amazon.
13               But, I think that goes to your earlier question about
14    two different technologies to try to compete for this, right?
15    You know, it's sort of like you could have a store that sells
16    more than one thing, but that's sort of how you compete to sell
17    shoes.  Whereas, someone else might specialize in shoes, but
18    they still very much compete for the sale of that.
19               So, I think, yes.  I think -- again, especially
20    because the question here is what constrains Google, what stops
21    Google from not being very good at answering queries?  And an
22    answer is, Amazon can answer those queries, right?  You're
23    right, Amazon can go on and do more than that, which is the
24    technology Amazon is using to compete, which, I think, will be
25    quite important on the advertising side.
```

1          But, I think that's really their scope of services

2     that they each provide; again, Google by being broad, Amazon by

3     being deep.  That's how they each choose to fight it out to see

4     who gets to win those queries.

5     BY MR. SOMMER:

6     Q.  Is there one -- I think there's one more bullet point on

7     cellophane.

8     A.  Yes, on cellophane.  So, I pointed out that the one thing

9     you see in the results is that Yelp is a lot strong -- and

10    Amazon are a lot stronger than Bing.  I want to point out that

11    these overall results, the strength they're seeing is not just

12    driven by the weakness of Bing.  It's not just because Bing is

13    weak, these other guys step in.

14         And one way we can see that -- if we can go back up

15    to the slide that was before this -- is that, you know, Yelp is

16    actually getting more local queries than Google.  So, nothing

17    about the weakness of Bing can explain why Yelp is so strong

18    that it actually gets more local queries than Google does.

19    Q.  Okay.  Now, the DoJ plaintiff's complaint and certain of

20    its experts have mentioned this one-stop shop concept.

21         Let's go to slide 23.

22         And can you describe to the Court what we're looking at

23    on slide 23?

24    A.  Yeah, so, what's on the left here on slide 23 is Professor

25    Whinston's slide.  You'll see the Swiss Army Knife analogy.

1    He made five arguments in favor of this one-stop shopping.  I

2    think they're in various forms.  Not all of them are really

3    classic one-stop shopping.  But, to be fair, there are five

4    arguments he made that he argued, you know, point towards GSEs

5    as a separate market.

6    Q.  Are you going to take us through each of those five

7    arguments?

8    A.  Yes.

9    Q.  Before we drill down into each of the five, have you made

10   some general observations about this one-stop shop here?

11   A.  Yes.  Although, I think we've covered a lot of these in the

12   back and forth, so I'll be quick.

13        The first one is really what I've already said, that,

14   to me, is how I would look at this.  They are clearly competing

15   for queries.  Queries clearly are separate decisions, not a

16   bundle.  So I think these arguments define ways that Google

17   tries to compete.  Google goes to market with certain

18   strengths, Amazon and Expedia go to market with other

19   strengths, and that's how they compete.

20        And it's clear to me that -- if you can scroll down a

21   little more -- again, this competition happens on most

22   commercial queries.  Google clearly views these as -- and

23   Google clearly views Amazon and Expedia as real competition all

24   over its documents.  Maybe that's the clearest evidence, that

25   they recognize that these strengths these guys have let them

1    compete for queries.

2    Q.  All right.  I want to go to the five arguments in favor of

3    a one-stop shop that Professor Whinston set forth, and the

4    first one, the one we saw at the top, was this single location

5    for all queries.

6         I take it you disagree with that by the word "fails" at

7    the top of your slide?

8    A.  I do.  Again, I think a lot of the dialogue with Your Honor

9    has addressed this.  I think you basically asked this question.

10   Google -- the GSE is a single, one location, one bar for all

11   queries.  My basic response was what I gave before, that is

12   true.  But, they compete with SVPs.  Each time there's still a

13   decision to make, and the SVPs are obviously winning a lot of

14   queries.  Every one of those queries the SVP wins doesn't go to

15   Google.

16        And as I said before, searches are discreet events.

17   They really are not a group -- this group decision.  And maybe

18   it's useful to go to the next slide to sort of get into a

19   little bit of data on that.

20        So this is yet another dataset.

21   Q.  Just to caution you, there are a few numbers on this chart

22   that have red boxes around them, so if you could be sensitive

23   not to say those numbers.  But, otherwise, describe.

24   A.  They just say "redacted" on my screen, so I'll look at

25   that.

1          So this is -- Your Honor, this is Google's sessions

2     data.  So over a couple points in time, the record has data

3     from Google on what are called sessions -- sessions data, which

4     basically is you -- you're tracking everything the user is

5     doing on Google.  So it's not like panels, where you see

6     everything they're doing everywhere on the web.  This is

7     everything they're doing interacting with Google in any of the

8     forms; mobile, web, whatever.  So this is a way to get at how

9     are they interacting with Google.

10          Does it look like a one-stop shop, or does it look

11    like these discreet events?  So, to get at this question, in

12    the ordinary course of business, Google has a concept they call

13    a visit.  And what they mean by a "visit" is, think about

14    you're interacting with your phone or your computer for a

15    while, and then, if there's a five-minute break, Google says,

16    now, you've -- there's been a break, something else happened

17    for at least five minutes.  And then you come back and you do

18    something later.  The break could be longer, but as long as the

19    break is at least five minutes, they say those are distinct

20    visits.

21          What we see in the data is when you break things up

22    that way, first of all, the median -- so the typical length of

23    a visit -- is roughly 20 seconds.  So, people interact with

24    Google for roughly 20 seconds before they stop interacting for

25    at least 5 minutes.  The median number of queries per visit is

1    one.  So, the typical behavior when you're interacting with

2    Google is hang out there for about 20 seconds, ask it one

3    question, and then go do something else.

4         What's redacted here gives -- the question that's

5    asked in the bars is:  In those visits, looking across all

6    visits, how many different verticals are people interacting

7    with?

8         Obviously, the typical number in the median is one.

9    What the bars tell you is that even for longer visits, the

10   overwhelming majority of visits are one vertical or one or two

11   verticals.  So, in these data, people are really interacting

12   with the device for short periods of time, mostly one vertical

13   at a time, then there's a break and then they come back and

14   they interact with it in a different way, typically for another

15   20 seconds.

16        THE COURT:  So your columns here represent not number

17   of queries per visit, but, rather, number of verticals visited

18   per visit?

19        THE WITNESS:  Right.  Yeah.  So, again, the median

20   would be 50 percent.  So, obviously, given that I told you the

21   median number of queries is one, median number of verticals

22   would be one, because you can only do one vertical with one

23   query.  But, the columns give you the full distribution.  So

24   most of the time it's also -- even for longer visits, it's

25   still just one vertical.  Almost all the time it's one or two

1    verticals, not more.

2    BY MR. SOMMER:

3    Q.  Professor Whinston argued that your analysis was not

4    persuasive because you included visits with just a single

5    query.  Do you agree with that critique?

6    A.  No.  I mean, that's -- the point I'm trying to make is that

7    most visits are one query.  That's the most important point

8    because, to me, that's the opposite of one-stop shopping.

9    That's one stop -- you know, one event per stop.

10   Q.  Did another of plaintiffs' experts weigh in on this issue?

11             THE COURT:  Sorry to interrupt.  Did you consider

12   noncommercial as a vertical in this analysis?

13             THE WITNESS:  This would have noncommercial all

14   grouped together.  I have a variety of verticals that are

15   noncommercial.  It would have things, like -- I don't know if

16   I'll get them all right, but informational queries or geography

17   queries.  So, it would have a set of noncommercial.

18             THE COURT:  So this includes commercial and

19   noncommercial queries?

20             THE WITNESS:  Yes.

21             THE COURT:  Thank you.

22   BY MR. SOMMER:

23   Q.  I was asking you about another of plaintiffs' experts who

24   touched on this issue.  Was there another?

25   A.  Professor Baker.

8421

1    Q.  Let's go to the next slide.

2         And, again, there's some redactions here.  But, you can

3    describe it to the Court.

4    A.  Sure.  What Professor Baker presented or had in his slide

5    deck is on the right-hand side.  It's the pie chart on the

6    right-hand side.

7    Q.  Just to be clear, this was in his deck for testimony in the

8    courtroom.  And was it presented?

9    A.  I don't believe he presented it, but it was in the deck.

10   Q.  Okay.

11   A.  So this is a -- purports to show that more of the -- most

12   of the sessions -- here, the word is "sessions" -- involve

13   looking in more than one vertical -- more than one segment, he

14   calls it.  The reason for that -- and I'll show that on the

15   left-hand side in a minute -- is that a session in the data is

16   defined as a 24-hour period.

17        So, what he's showing is over the course of a full

18   day, you know, still not everybody, but many more people go to

19   more than one vertical over the course of a day, right?  I

20   agree with that.  Those are what I'm calling distinct events.

21   Something I did at breakfast isn't the same as something I did

22   at dinner.  Those are distinct decisions, as I see it.

23        If you look at the bar chart on the left --

24   Q.  Where does that come from?

25   A.  That comes from Professor Baker's report.  I think it's his

1    reply report cited at the bottom.  That has -- you'll see the

2    data, the red bars are what's presented on the -- in the pie

3    chart where you see -- those are sessions data, so you see more

4    with lots and lots of verticals when you look across the full

5    24-hour period.

6         The gray bars there are exactly what I just showed

7    you.  Those are visits.  So in his report, he had the visit --

8    when you look in his five-minute breaks, if you look at visits,

9    he had those results.  He also showed exactly that number that

10   I had where the vast majority of them are one.  But, what he

11   showed in his slide deck was the 24-hour window, which I just

12   don't think speaks to this question, given the number of

13   different queries, number of different visits somebody can do

14   in 24 hours.

15   Q.  Just to be clear, in his slide presented in the deck to the

16   Court, he did not include the visit data; is that right?

17   A.  That's correct.

18         THE COURT:  Just to be clear, his analysis is the

19   24-hour session, and you would say that over the course of 24

20   hours, there is a higher percentage of people that visit

21   multiple verticals, and do so if one uses it only -- measures

22   it by visit, or by visit as you --

23         THE WITNESS:  That's correct.  You know, I think we

24   have an agreement that if you look over 24 hours, people are

25   doing more different things.  My critique of this is that if

1   people are generally going at 20-second increments and then a

2   5-minute break at least, those are distinct events.  In a

3   one-stop shop you would make one decision for what you're going

4   to do all day.  If people sat down in the morning and said,

5   what search engine am I going to use all day?  That would be a

6   one-stop shop.  If you decide each event, these are discrete

7   decisions.

8   BY MR. SOMMER:

9   Q.  Professor Whinston also used a term in his testimony that

10  Google was a gateway to the internet.  Did you see that in

11  reviewing his testimony?

12  A.  I did.

13  Q.  Can you please explain your understanding of Professor

14  Whinston's gateway argument and whether you agree with it?

15  A.  This is also similar to something that Your Honor asked

16  earlier.  You briefly asked about where people start.  So,

17  Professor Whinston presented a statistic that said 77 percent

18  of first searches are on GSEs.  But his statistic was --

19  overall, he said that three-fourths -- more than three-fourths

20  of people start on GSEs.  But I -- his conclusion was that

21  makes GSEs special in some way or deserving of their own

22  market, but I disagree.

23  Q.  Can you explain why?

24  A.  There's several reasons over the next couple slides.  These

25  data include all queries.  They include what are called

8424

 1    navigational queries, which are queries where you enter

 2    something in Google for the purposes of going to another site.

 3    So, it's true that people do, you know, sometimes go to Google

 4    and enter a navigational query.  This is where you could enter

 5    the whole name in the bar or you enter it in Google.

 6              But, in that case you are using Google explicitly for

 7    the purposes of taking you somewhere else.  So, to me, that's

 8    like Google as the vehicle, the car that drives you to

 9    another -- to an SVP.  I acknowledge those exist, but the point

10    is that every single query after that goes to the SVP, or may,

11    and that's competition.

12              So, there's navigational queries.  Google can be the

13    car that takes you somewhere else, but I don't see how that's a

14    gateway, given that everything -- you're free to use the other

15    site for everything else you wanted to use it for.

16    Q.  Using your car analogy for a moment, if I get in my car to

17    go to the store, I'm not shopping in my car, right?

18    A.  Correct.  You're using Google, in that case, to go to the

19    store.  Now, Google takes you there navigationally.  Really,

20    you know, navigational queries, the real competition is I could

21    type the name at the top, or I could have a bookmarker on my

22    phone.  I could use an app.  You think of navigational as kind

23    of its own vertical.  The competition is other ways I can get

24    there.  But, once I'm there, I can enter the queries that are

25    there.  So it's really taking me to that other site, right?

1          So I say that in the next bullet.  Even if users

2     start in GSEs, if they're going to do ten queries today for

3     shopping -- in a row for shopping, if they do one on GSE and

4     then the next nine on the SVP, that's competition for those

5     nine queries.

6          The other point I would make about Professor

7     Whinston's number is -- I think you said this, but it's from

8     ComScore data.  Those data are only Windows PCs.  They don't

9     include any mobile.  And a lot of this case is about mobile,

10    and the story is quite different on mobile.  This idea that for

11    those of us who use laptops a lot, that I type it in Google to

12    Go, it's not how you interact -- or a least not how I interact

13    with my phone.  You have apps.  You jump to the apps.  At a

14    minimum, this would only speak to Windows PCs.

15    Q.  The next slide sticks with this gateway theory.  Can you

16    describe what you see here?

17    A.  So, Professor Whinston, in his report, I think in his

18    testimony, referred to a Bank of America study where he said

19    his number from Bank of America, the only number he showed in

20    his report, was that 25 percent of shopping visits start on

21    Google.

22          For starters, that's only 25 percent that start on

23    Google.  But, what the Bank of America study actually said is

24    that 58 percent -- fully 58 percent of users start their

25    shopping searches on Amazon.  So they actually don't even go to

1    Google at all.  They go straight to Amazon.  This little text

2    callout was in the Bank of America report.  Says 58 percent of

3    users search Amazon first when shopping online, while 25

4    percent search Google first.

5            So, again, for shopping, this is shopping alone, but

6    it's, you know, a very large vertical, and an important one.

7    This gateway idea doesn't even hold at all because more people

8    are starting on Amazon.

9    Q.  Just to follow-up on a couple things.

10           The pie chart, and both the black and red words, those

11   are actually in the Bank of America study?

12   A.  Yes.

13   Q.  And that study was cited by Professor Whinston?

14   A.  Yes.

15   Q.  Did his testimony before this Court identify that 58

16   percent starting point at Amazon?

17   A.  No.

18   Q.  One final slide on the first of the one-stop shops.

19           Let's go to the next slide, 29.

20   A.  I think we fully covered this, honestly, in a back and

21   forth.  Professor Varian at one point had made this comment

22   about -- or, been asked questions about noncommercial queries,

23   like you asked me.  And, so, we're going to run through the

24   logic about using them as advertising or sampling to encourage

25   people that Google is good at queries.  But, you and I had that

1    discussion, so...

2            MR. SOMMER:  Your Honor, before I move to the second

3    one-stop shop argument, this might be a good stop for the

4    break.

5            THE COURT:  Okay.  Come back at 11:15.

6            And, Dr. Israel, I'll ask you not to please discuss

7    your testimony during the break with anyone.  Thank you, sir.

8            (Recess from 10:58 a.m. to 11:14 a.m.)

9            THE COURT:  Mr. Sommer, whenever you're ready.

10            MR. SOMMER:  Thank you, Judge.  One sec.

11    BY MR. SOMMER:

12    Q.  All right.  Welcome back, Dr. Israel.

13    A.  Thank you.

14    Q.  I want to turn to the second of Professor Whinston's

15    one-stop shop arguments, and that was that general search

16    engines avoid the time and energy needed to recall or identify

17    the right SVP.

18            Do you have views on the time and energy argument from

19    Professor Whinston?

20    A.  Yes.  And they're reflected on the slide.  I don't think

21    this really distinguishes GSE.  You know, many SVPs are

22    extremely well known.  So, people can easily go to Amazon or

23    Expedia or Yelp.  So that's one.  I mean, there's lots of these

24    competitors I've been naming who are well known.  It seems

25    particularly inept to me in an increasingly mobile world, as I

1    mentioned, because you have apps, even on a desktop you have

2    bookmarks, and so there's no role for a GSE, if you have an

3    app.

4         So, there might be a need to learn of an SVP the

5    first time, but then once you do you know of it and it's

6    competition forevermore.  We see new apps can quickly achieve

7    popularity, like with TikTok and so on.  So, in general, there

8    could be competition to be known in services, but I don't see

9    how this distinguishes GSEs or, certainly, defines a market.

10   Q.  By the way, did Professor Whinston come forward with any

11   data or any empirical evidence supporting his view that there

12   is some type of burden of time and energy imposed on users to

13   recall apps?

14   A.  None that I've seen.

15   Q.  And what do we see in slide 31?

16   A.  This was just what was I referring to.  You can -- you

17   know, many of our phones look like this.  You have apps that

18   are largely your favorite SVPs.  You can add shortcuts to a

19   browser for SVPs.  So, again, there's active competition to be

20   known, to be used.  But I consider that an area of competition,

21   not a reason there's a separate market.

22   Q.  Let's turn to the third of Professor Whinston's arguments

23   in support of his one-stop shop, and that is that general

24   search engines provide unmatched depth and breadth.  Do you

25   have a view on that one?

1      A.  I think we've talked about this in response to some

2      questions.  So, I mean, I, you know, kept using my hands like

3      this (indicating).  I agree that there are, you know, different

4      ways that different players compete for queries.  But, these

5      are sources of strength that create strong competition and

6      needs to innovate.

7              My first point here is just the vertical-specific

8      depth provided by SVPs, which you asked about, are a source of

9      competitive strength.  So, when competing for a travel query,

10     Expedia's depth in travel actually seems like a strength for

11     them, to me.

12             The fact that the GSEs and SVPs use different

13     competitive strengths, much like Your Honor's question about

14     them using somewhat different technologies, they are fighting

15     for queries, especially now.  And we're going to talk about

16     later that SVPs are selling advertising on queries, just like

17     GSEs, they're fighting to get those queries using their

18     strengths to do so.

19             In fact, I would say -- and I have a couple sides for

20     this -- the customized information that SVPs provide can be a

21     source of competitive advantage, a way they can compete

22     strongly.  An issue that GSEs have had for a long time can be

23     while the search query has, you know, information about user

24     intent, it can be limited information in some cases, which is

25     what I try to show in my next couple examples.

1    Q.   Okay.  What's the example we see on slide 33?

2    A.   This is one example -- I think this was asked of me in my

3    deposition.  It's similar to what's been asked.  If you type in

4    "Patagonia" to Google, you're going to get results here for the

5    clothing retailer Patagonia, but, also, for the region

6    Patagonia.  It's true that Google provides all of that, right?

7         But when you have the focus, as you should, for

8    competition on the user, on the demand side, and you've got a

9    user choosing where to go for a query, thinking about

10   competition, the user is going to know what they want to know,

11   right?  So, if a user wants to know about travel to Patagonia,

12   then the user can go to Kayak or a travel site and get just

13   that information and more of it.

14        Google can still compete for that, but the fact that

15   the -- that Google also provided clothing information is of no

16   benefit to that user, right?  So, again, for that query, Kayak

17   actually has a strength in providing travel specific

18   information.

19   Q.   Did you have another example, as well?

20   A.   Right.  Whereas, if you know you want Patagonia clothes,

21   the user would know that's what they want, then Amazon has a

22   source of strength.  So, yes, information that's returned is

23   different.  But, this is an SVP competitive advantage that

24   helps them to fight with Google for that query.  For any user

25   who wants Patagonia clothes, typing "Patagonia" into Amazon is

1   clearly a good option -- could be a superior option.

2   Q.  We're on to the fourth of Professor Whinston's arguments,

3   and that one is that general search engines cater to habit

4   formation.  You want to give us your views on that one?

5   A.  I don't really understand this one at all as a market

6   definition argument because, you know, it wouldn't seem to me

7   that someone would have a habit of using GSEs just generically,

8   so that would be a market.  I mean, people could have habits, I

9   don't quarrel with that.  I might have a habit to go to Amazon.

10  I might have a habit to go to Google.  I might have a habit to

11  go to Expedia.  But, habits apply to what product I tend to

12  use, so habits -- competing to be somebody's habit can be a

13  form of competition, but I don't see any way in which habits

14  apply to a class of GSEs and some way they would define a

15  market.

16          I'd also say, you know, bottom line here, this is

17  competition.  If SVPs return me better results and I,

18  personally, have a habit of going to Expedia, I like their

19  travel services, that becomes competition.  That's what this

20  fight is for.  So, who are you going to use for that type of

21  query or for queries in general?

22          And, again, I haven't seen any empirical evidence

23  from Professor Whinston at all that would establish that

24  somehow there's a GSE habit that would in any way support a

25  separate market.

8432

1    Q.  Finally, we're at the fifth of Professor Whinston's

2    arguments in support of his one-stop shop, and this one is that

3    general search engines hold convenient search bars of browsers

4    and devices.

5    A.  I think we talked about this one, too, so I'll be quick.

6    As I said before, it can be one way to compete.  Doesn't define

7    a market to me.  It's a way in which a GSE might try to

8    compete.  SVPs compete by using apps.  Talked a fair bit in my

9    reports about the efforts that Yelp, for example, has put into

10   getting people to use their app.  That's competition, as far as

11   being convenient to use.

12         Again, a lot of this case has been about mobile, and

13   in the mobile world, I really see it as competition for who has

14   got a convenient position.

15         The final point I'll make on all of these, again, is

16   that even if there were some users out there who did find GSEs

17   on the search bar as a useful initial useful place to go, if

18   lot of them use that GSE to go to Amazon and then they type

19   their queries for what clothes they're looking for or what

20   toothpaste they're looking for into Amazon, all of those

21   queries that go to Amazon, whatever queries go to Amazon don't

22   go to Google.

23         That's the competition.  It's not all or nothing.

24   It's competition for whatever queries each side can get.

25   Q.  By the way, would it be appropriate, just in terms of

1    process, would one define a market from the user perspective or

2    the browser perspective?

3    A.   The user perspective.  Here, we're talking about user side

4    monopoly power as the ultimate question, so that the question

5    is:  What are the users' demand side choices?  What competition

6    does Google have to respond to in order to attract queries from

7    users?

8    Q.   Dr. Israel, did you glean some additional arguments from

9    Professor Whinston's reports and testimony on this subject

10   matter, as well?

11   A.   Yes.

12   Q.   What do we see in slide 37?

13   A.   The slide that's up now was a summary slide from Professor

14   Whinston's deck.  He went through some more slides on these,

15   but, generally, he made arguments that I see in two categories.

16   One was that internal Google documents look at GSEs, and that

17   would support a GSE market definition.

18        I would just make two comments on there -- two

19   responses on that.  The first one is, you know, firms -- in

20   everything I do, in hundreds of cases, firms have documents

21   where they look at all sorts of cuts of competition.  And I

22   find once they do it a certain way, they do it forever.  It's

23   in documents for years.

24        I universally find that, sort of, market share

25   definitions or things like that at firms don't define antitrust

1    markets.  You know, in other cases, I used earlier the example

2    of a bricks and motor bookstore and an online bookstore.

3    You'll see firms do shares separately.  Clearly, they compete

4    with each other and, so, I think we need to analyze markets as

5    antitrust practitioners, not based on the cuts that firms do.

6              Maybe equally, at least as importantly, there are

7    lots and lots and lots of documents that Google is focusing on

8    Amazon and Expedia and how many queries Amazon is getting and

9    what needs to happen in travel to deal with Expedia.  So, I

10   think we are seeing a firm that is facing competition from a

11   variety of places and documents accordingly.

12   Q.  Okay.  The second group?

13   A.  This one we really did talk about.  The second bucket is

14   browser defaults.  Really, all of them go to browser defaults.

15   So, I really mentioned this before, right?  That's not the user

16   decision.  That's a browser decision.  Those decisions are

17   really just different, right?  Browsers need a backstop, that's

18   what they need.  Users make a decision on each query.

19   Q.  One other issue that came out is that some of these SVPs

20   actually advertise on Google.  Does that persuade you that

21   they're not competing because of that?

22   A.  No.  I mean, simple sentence says that:  SVPs can be a

23   customer of Google's and, also, a competition.

24             You see that all over the economy, where a firm may

25   buy some products from a manufacturer, but also competes with

1    it, its retail outlets.  We see firms as customers and

2    competitors very often.

3              And, really, I think what you're seeing here, I mean,

4    this, to me, seems like, if anything, evidence of competition,

5    right?  SVPs find -- seems they find GSEs an attractive place

6    to advertise because they're both serving queries for hotels or

7    travel or so on, right?  And, so, if an SVP can advertise on

8    Google, they may be able to steal away some of those queries.

9              It's kind of like if I had a network TV show, I would

10    love to advertise on the other network because that attracts

11    away their users.  So, in no way does advertising on a GSE

12    suggest they're not competing.

13    Q.  Back to a screen we saw a moment ago.  Have you concluded

14    your market definition discussion on the user side?

15    A.  Yes.

16    Q.  Okay.  Let's move, then, on to monopoly power.

17              Now, I see in slide 40 that word "indirect" is

18    italicized.  Can you just describe to the Court the difference

19    between direct and indirect?  And then we'll get into indirect.

20    A.  Right.  So I'm going to go through the plaintiffs'

21    arguments I've heard for why Google has monopoly power on the

22    user side, and I'm going to give my views that are all very

23    much based on what we've been saying about who is in the

24    market.

25              So, there's two classes of evidence.  We could think

1    about indirect evidence from monopoly power says:  I'm going to

2    look at the market.  I'm going to talk about the market

3    structure.  What are the market shares?  Are there barriers to

4    entry?

5            I'm going to look at that indirect market structure

6    evidence and see if that supports monopoly power.

7    Q.  Does this slide identify the factors Professor Whinston

8    identified as indirect evidence of monopoly power?

9    A.  Professor Whinston went through a variety of factors

10   supporting monopoly power.  I've broken them out.  So the ones

11   that are classically indirect are market shares and barriers to

12   entry.  So those are -- you look at the market.  Again, as he's

13   defined it, just GSEs, and he says in that market he finds that

14   its structure supports monopoly power.

15   Q.  Your conclusion is at the bottom of this slide?

16   A.  Yeah.  My conclusion is that those factors can't support a

17   conclusion of monopoly power.  In particular because, you know,

18   we've just been talking about the disagreement over the market.

19   My conclusion is, there's many more players in the market that

20   he has defined away and, therefore, the market definition he's

21   using can't support a definition of monopoly power because he's

22   defining away competition.

23   Q.  Let's just spend one more moment on his first argument, the

24   market share.

25   A.  Right.  So, this is -- I mean, this is -- should fall out

1    from what I'm saying about market definition.  My view is,

2    Google faces substantially competition from SVPs, which means

3    GSE-only market shares don't tell you anything.  Remind you of

4    the pie charts where there's lots of usage of SVPs in some of

5    these verticals.

6         I would quickly like to just say one more thing,

7    because you asked me a good question earlier.  Just to go back

8    there, the question was the -- you asked what about

9    noncommercial verticals and so on?  And I'll make a comment

10   about that on each of the next couple slides, right?

11        Here, I would say some of them have SVP competition

12   from Wikipedia or others.  But even if you conclude some of

13   them have higher shares, those are generally not monetized

14   verticals.

15        So, Google is -- and it says this -- really using

16   them to build a brand reputation.  It only works to use them to

17   build a brand reputation if you do a good job.  So, the

18   question we ask about monopoly power is:  What's constraining

19   this firm's ability to make profits, right?  That's what

20   constrains firms.  So, the answer for the noncommercial

21   queries, in large part, is that's how Google tries to show

22   people it's good at search, and, so, it has to do a good job

23   there or that will fail.

24   Q.  Professor Whinston also addressed barriers to entry and

25   expansion.  Have you expressed your own view on that?

1    A.  It's the same point.  Again, that's specific, and his

2    arguments are specific to a GSE market.  So, once you

3    acknowledge or if you accept that SVPs are in the market, then

4    even Professor Whinston agrees the cost of entry are much

5    lower.

6          If you go to the next slide.  Professor Whinston, in

7    his report, had a discussion of this, where he said what's

8    highlighted.  These factors he's mentioning above, he says:

9    These make the costs of developing services and responding to

10   queries lower than the cost of launching a general search

11   engine.

12         So, it's a lower cost thing for an SVP.  We've

13   certainly seen lots of SVP -- entry SVPs popping up in travel

14   and shopping and so on quite frequently.

15         One other comment I would make on this point is going

16   back, again, to your question about, what about noncommercial,

17   right?

18         To me, what the lesson of commercial verticals has

19   told us is that where there's money to be made, SVPs pop up and

20   they compete for advertising.  So, if there were some potential

21   to make money, to actually monetize any of the noncommercial

22   verticals, I think the lesson tells us SVPs would compete for

23   that.  So, I think that's another reason why entry barrier --

24   why SVPs matter, because the fact that they exist, and they

25   could, if Google tried to make money directly on any other

1    noncommercial query, they could pop up there, is a source of

2    entry that we've seen work everywhere there's money to be made.

3    Q.  All right.  So you've addressed Professor Whinston's views

4    on indirect evidence.  Let's turn to direct evidence.  Can you

5    share with the Court your opinions in that regard?

6    A.  Yes.  So, I earlier discussed my view on how you would

7    define monopoly power.  And, ultimately, monopoly power is an

8    action.  A firm has monopoly power if it can act like a

9    monopolous, which means reduce market-wide output.  So to

10   establish market power directly, you would need to show that

11   the firm has reduced output relative to some but-for world,

12   right?  And this is the case where I really think you need to

13   define a but-for world, because if you're going to go after

14   monopoly power, because it's really an output question and, you

15   know, you don't want to say just, you know, if we see output

16   expanding, you need to say:  How do I see this firm has reduced

17   output, relative to some alternative?

18          THE COURT:  "Output" here, you're talking about total

19   query volume?  Or what's your definition of "output"?

20          THE WITNESS:  That's probably the one that I would

21   look at, something like queries, queries.  Like in most cases,

22   there's -- you know, there's never a perfect measure of output

23   because -- and I can talk about this.  I'm going to show a

24   chart.  You know, not all queries are the same, and

25   occasionally you might misspell or whatever.  But, on the

1    whole, if people are doing a good job providing answers to

2    searches, then people are going to query more.  So, I think

3    that's the bottom line measure of output.

4            My conclusion here is really the next bullet, which

5    is:  I don't see any evidence from plaintiffs that could

6    support a direct finding of monopoly power.  Because to have a

7    direct finding of monopoly power, you would have to define a

8    but-for world, support it, and say that output in that but-for

9    world, in which there is less Google power in some sense, would

10   be higher than output that we actually see, right?

11           And I have not seen them even attempt to do that,

12   which means they have not taken the task to monopoly power

13   directly.

14           MR. SOMMER:  Judge, can I just confer with

15   plaintiffs' counsel for one second?

16           (Pause.)

17   BY MR. SOMMER:

18   Q.  All right.  Sticking --

19           THE COURT:  Can I just ask a question?

20           Spin a hypothetical for me, if you would, of what

21   would, in your view, a monopolist in an SVP -- in a search --

22   in a market firm for search queries, what would that look like

23   and how would they restrict output?  And what does that look

24   like in that world?

25           THE WITNESS:  So, it's different from the world as I

1    see it, so give me one second.  I mean, I would imagine it

2    would be something like they had, you know, some technology or

3    something that, you know, enabled search to happen that nobody

4    else could do.  And that, therefore, they were -- you know,

5    they truly were a monopolist, they were safe as the provider of

6    search and, therefore, they could, you know, relax.  And you

7    wouldn't see a lot of improvements.  You wouldn't see a lot of

8    innovation.

9         You would see output relatively flat or -- and you

10   would try to show -- I mean, if it was an SVP, in your sense,

11   if somebody wanted to prove that, they would look for a

12   different type of search in which there wasn't that

13   technological gap and they would show, look how much faster

14   output is going out there.

15        But, it would be truly something where if there were

16   SVPs in the world here, we don't see it.  But, if there really

17   was only one search engine and it wasn't chased by your Bing

18   and the SVPs and everyone else, then it would be the one and

19   only, I think you would see relatively less innovation.  I

20   think you would see relatively less output.

21        As far as how to -- what does "relatively less" mean?

22   Again, I think what plaintiffs would have to do would be to

23   come forward with some benchmark, be it another market, another

24   country, another time period, and show you that when you

25   introduce more competition, you truly see output results that

1    look different.  I don't -- I have not seen anything that does

2    that here.

3    BY MR. SOMMER:

4    Q.  We've now addressed output for a couple of minutes, and you

5    mentioned you had a chart on output.

6          Let's go to the next slide, which is slide 45.

7          MR. SOMMER:  Your Honor, on the -- there's a redacted

8    line on the left which no longer needs to be redacted, but the

9    one we have loaded says "redacted."  So, I'm just going to

10    identify what that is, and then we can supplement it in the

11    binder.

12          So at the very bottom, it's zero.  And -- oh, look at

13    that.  They're better than I thought.

14          Thank you, Allen.  Never mind.

15          THE COURT:  Pretty impressive.

16    BY MR. SOMMER:

17    Q.  Okay.  Dr. Israel, can you describe to the Court what your

18    chart shows?

19    A.  Yes.  So, this is responsive to your question.  The way I'm

20    measuring output here is total query volume.  And here I'm

21    showing it on GSEs, what it would be under plaintiffs' market

22    definition.  I mean, clearly, you see output is exploding in

23    this industry.  That's no surprise.  I mean, broadly speaking,

24    the industry is a success story.  It's being used more and

25    more.  Output is more than double over this ten-year time

1    period.  But, it has the hallmarks of an industry that's doing

2    well.

3                Now, I want to be clear.  I don't want to overstate

4    it.  I'm not saying this chart proves the case or that you're

5    done, but, my point is, when you see output going up like that,

6    and you see an industry that has the hallmarks of succeeding,

7    then to show monopoly power, someone would need to show

8    evidence that -- actual evidence that it should have been even

9    better.  And that's what I haven't seen.

10   Q.  No such evidence?

11   A.  None that I've seen.

12   Q.  In your response to the Court, I think you made reference

13   to quality.  Does Google's commitment to research and

14   development factor into your assessment in this regard?

15   A.  Yes.  I mean, in response I said:  If they were a

16   monopolous, what would you see?  I think you would see them

17   investing relatively less.

18               And, again, numbers on investment can't give you an

19   answer on its own -- on their own, but you can look at what you

20   see in the data on investment and R&D and see what it tells

21   you.  It's another data point.

22               So the next slide has -- I want to make a point, it

23   has R&D numbers.  I'll make a couple points about them.  One

24   is, these are -- to be clear, these are total Google -- or,

25   total Google and Alphabet R&D numbers.  These include the

1    corporate entity.  You do that on purpose, because one thing I

2    see clearly in the evidence in the record is that although

3    Google broadly makes a lot of investments that don't directly

4    seem like search investments, like Android or like Chrome, you

5    know, if you dig into those, Google is quite clear that those

6    are -- the motivation for those is to support search, right?

7         Android was to make more mobile phone options and

8    mobile phone competition to support use of the internet; Chrome

9    was to support use of the internet.  So, I looked at --

10   intentionally looked at all of the investments that Google and

11   Alphabet are making, right?  And what I see on the left-hand

12   chart is they've been exponentially increasing over time, so

13   they're investing heavily.

14        What I see on the right-hand chart is an attempt by

15   me to do something like I described to you in the last answer,

16   which is, compare them relative to something.  So here I looked

17   at their R&D expenditures as a percentage of revenue -- it is a

18   way people often look at it -- and I looked at it over time.  I

19   don't think we have an exact time that's been given of when the

20   conduct did or did not start, but I know the complaint says

21   back to 2010.

22        Professor Whinston, in his report, made a comment

23   about the markets being more competitive when Bing had first

24   entered, around 2009.  So, the question I asked is:  Has R&D,

25   as a percentage of sales, gone down since those earlier time

 1    periods?  And the answer is no.  It's gone up since those

 2    earlier time periods.

 3              So, at least of the amount of R&D that Google is

 4    reinvesting in -- you know, the amount of sales that Google is

 5    investing into R&D, that's gone up over time, even relative to

 6    times that have been said to be more competitive.

 7    Q.  Dr. Israel, did you review the testimony given at this

 8    trial by Mr. Nadella of Microsoft?

 9    A.  I did.

10    Q.  Did you find some relevance in portions of his testimony?

11    A.  I did.  And that's on the next slide.  And I don't want to

12    spend a long time just repeating testimony to you.  But I did

13    think -- just particularly this highlighted stuff here.  And I

14    would particularly focus on the last Q&A.  I put it in because

15    it really does go directly to the question that you asked me,

16    which is:  What would you see if there was a monopoly?

17              And I think -- the thing I would look for as an

18    economist is, does the monopolous seemed to be acting like it's

19    safe?  Like, it doesn't even respond to competitive threats.

20              Mr. Nadella says when Microsoft rolled out, or

21    announced, Bing Chat, the ChatGPT we've all witnessed, was

22    there a competitive response to Google?  He says, pretty much

23    immediately, they've been competing every day to improve search

24    in Google in all dimensions.  And his summary of that is:  Yes,

25    on Search, I think the competition is pretty intense.

1          So, again, you know, he's saying what he's saying,

2    but, to me, that's a hallmark I would definitely look for, is

3    it a monopolous?  You know, it is not an immediate, intense

4    competitive response.

5          THE COURT:  Let me ask you another question about

6    output.

7          One of the indicia on which the plaintiffs have put

8    forward is that Google has not advanced -- "not advanced" is,

9    perhaps, to put it in a more competitive environment --

10   privacy and features that would promote privacy for users.  Is

11   that factored into your opinion at all?

12         THE WITNESS:  I have not offered a direct opinion

13   about privacy.  I mean, I guess, the most that --

14         THE COURT:  I'm sorry.  Would you agree it's a form

15   of output, another way to measure output in some sense?

16         THE WITNESS:  Well, I might call it, potentially, a

17   form of quality.  I don't disagree with that.  The reason I

18   like output as sort of an all-in measure is because, like, this

19   quality-adjusted price idea.  If the quality all-in is not very

20   good, then you might expect to see people consuming the product

21   less.

22         The way to roll everything into output is to say if

23   people were unhappy with the product, they wouldn't query with

24   it as much.  They query with it quite a bit.  And, so, again,

25   the argument, I think, to be complete with that, to say there

1    should have been more privacy, and we can show that if there

2    had been, there would be even more queries.

3    BY MR. SOMMER:

4    Q.  On the next slide, we are on the direct monopoly argument

5    from Professor Whinston.  And what are you --

6    A.  So -- yes.  So, I presented, sort of, my view with output

7    and R&D.  Professor Whinston cited the three factors that I'm

8    grouping as direct evidence of monopoly power, according to

9    him.  One is, just Google's advantages over its search, which

10   by he means GSE rivals, just its quality advantages; the second

11   one is what he calls low consumer responsiveness to quality

12   reduction; and the third one is earning substantial profits

13   from the distribution contracts.

14          My conclusion with regard to all of those is, they

15   cannot support a finding of monopoly power.

16   Q.  Let's go through each of those three.  Let's start with the

17   advantages over other GSEs point.

18          Do you have a view on that one?

19   A.  An advantage of quality product is not evidence of monopoly

20   power.  In fact, to me, it's the reverse.  It's evidence -- you

21   know, on its face, it's evidence of a reduced quality-adjusted

22   price and of competition spurring you to innovate.  What I said

23   in my opening on monopoly power, an ongoing competitive race

24   that a firm is winning is not monopoly power.  To me, if

25   anything, it's more supportive of strong competition.

1    And, again, in some sense, my response to here -- to

2    Professor Whinston is like my responses to his indirect

3    evidence.  He seems to be saying that because Google, in his

4    view, is far ahead of Bing, it has a monopoly power.  But, you

5    need to compare it to what it's doing versus Amazon and

6    Expedia, and everyone else, too, and that he's not doing.

7    I actually see this argument, frankly, in a fair bit

8    of tension with his cellophane argument, right?  Because here,

9    he's arguing that Google has monopoly power because its quality

10    is so far above the quality of the GSEs.  Effectively, it's

11    such a good quality that it has monopoly power.

12    His cellophane claims are that it's such poor

13    quality, that's the only reason we see substitution to the

14    SVPs.  I think those things come together by saying, yes,

15    Google has a very high-quality product that's good for

16    customers.  And as I say in the next bullet, so do the powerful

17    SVP competitors, and that's active competition.

18    Finally, I would just note that Google's relative

19    success to quality it does have doesn't insulate it from

20    competition.  We saw Mr. Nadella's quote about needing to

21    react.  We see all over the record Google reacting to SVPs with

22    new verticals and so on.  You see Google reacting to social

23    media sites, and we'll talk more about those in advertising.

24    Google, you know, even if you -- to whatever extent

25    one concludes it has a quality advantage today, it's clearly

1    reacting to competition to maintain its quality.

2    Q.  All right.  Let's turn to the second point Professor

3    Whinston was making, and that was that Google is, essentially,

4    insulated from making quality improvements.

5        Can you share with the Court your views in that regard?

6    A.  So, Professor Whinston presented these quality ablation

7    experiments he talked about.  And, you know, his interpretation

8    of them was that Google ran an experiment, looked to see what

9    would happened if it increased its quality by one point on that

10   scale.  He said that would only lead to something, like, less

11   than a 1 percent change in usage.

12       And, so, he concluded that means Google is safe from

13   competition because there's a relative lack of sensitivity to

14   quality, so it doesn't need to invest to preserve its lead, in

15   his view, right?  That's his interpretation of the document

16   that I think, on its face, says the opposite.

17       The document itself is written as a part of a

18   presentation to promote more investment in search quality,

19   right?  It's part a series of experiments that Google does to

20   support R&D.

21       Google is not saying -- there's nothing in the

22   document that says, because of this result, let's not invest.

23   It's the opposite.  It says, if we invest a lot -- if we

24   invest, we can get a 1 point increase in quality, and that will

25   give us, you know, 1 percent more usage, or less than

1    1 percent.

2              Google is actually saying, even that little bit of

3    increased use is worth it, right?  Let's invest to get that

4    increase usage.  To me, that's a hallmark of competition.

5    Google is facing enough competition that it finds it worth it

6    to invest, even for a relatively small increment.  That's what

7    you see when firms face competitive pressure.

8              I would also note that the document --

9              Maybe just flip to the next slide, so we can look at

10   the document.

11             The document also is quite clear -- I think Your

12   Honor asked Professor Whinston a question about this.  It's

13   quite clear that it's looking at relatively small changes.  If

14   the change were bigger, then there might be nonlinear, there

15   might be inflection points, right?

16             So, I mean, it just doesn't really speak to what --

17   the question, to me, would be:  If Google stopped investing

18   such as its quality slipped back by a few points over time and

19   it got closer to Bing on these same metrics, what would happen?

20   That, by its caveat, is not responsive to that question.

21   Q.  Finally, the third point Professor Whinston was expressing

22   was his view that Google possesses monopoly power because it

23   receives benefits from search default agreements, like the one

24   with Apple.

25             Do you have a view on that, distribution agreements?

 1    A.  I mean, mostly, it's just that I don't think that the terms

 2    between Google and Apple speak to the user-focused market.

 3    There could be -- they speak to negotiations on the browser

 4    side, which I already talked about were different.  Browsers

 5    need what they need, there's negotiation.  Our phones need what

 6    they need, there's negotiations with Apple and Google.  I don't

 7    see that as answering the question about what choices users

 8    have.  In particular because, as I indicated, browsers really

 9    need something different.  They potentially need a backstop to

10    put on the device.

11         But, I would also say that even if you want to look

12    at those terms for evidence of monopoly power, so if you -- you

13    know, I think they're not informative because they're not

14    speaking to what users can do.  But, if we want to look at them

15    and see what they tell me as an economist, I would say they

16    tell me two things.

17         One is that the deal between Google and Apple

18    obviously creates substantial joint benefits.  I think

19    Professor Murphy will talk more about these.  But there's

20    substantial joint benefits to be shared when Google and Apple

21    are negotiating over those benefits.  And Google pays Apple a

22    substantial portion of the total ad revenues under the deal,

23    right?

24         So, I think Professor Whinston has said it should pay

25    even more.  That's sort of a case he's been advocating for.

1    But if the question is monopoly power, does Google have a

2    monopolous?  If you ask me what I would look for, it wouldn't

3    be Google paying a large share of the revenues to Apple.  A

4    monopolist would say to Apple, we're the only search engine in

5    town, we're going to keep the money, or you pay us.

6         You know, Professor Whinston might have some

7    periphery competition ideal in mind, but when I see Google

8    paying Apple a large share of the revenues that comes from its

9    advertising, that's not what I would expect to see a monopolist

10   do.  I think the monopolist would say, we're the only game in

11   town; use us or don't.

12        THE COURT:  What's your response to the point that

13   occupying the default -- take an IOS.  Google is in a position

14   to receive far more query traffic than anyone else, and that

15   would include SVPs, because Apple, for example, doesn't load

16   third-party apps out of the box?

17        THE WITNESS:  This has been more of other people's

18   topic about the effect of the default.  So, I don't want to say

19   more than is in my reports, obviously.  You know, so I have not

20   been the one to try to measure the effect of the defaults.  I

21   would say, maybe I'll comment more for SVPs, because that's

22   been more my focus.

23        You know, this I commented on earlier.  The default

24   position, there's been testimony about what it does, to whether

25   you go get another GSE, right?  And even under Professor

1    Whinston's argument -- or, people arguing it say, you know,

2    defaults make you sticky on GSEs, and I'm not getting into

3    that.  But, clearly, we see lots of SVP usage.  We see people

4    adding apps for SVP.  So this isn't a situation where you need

5    to download them out of the box.  Apple does make and advertise

6    the App Store where people actively get those apps.

7            So I'm not getting into the GSE issue, but I think

8    the SVP numbers, in terms of how many queries they get, how

9    active they are, Yelp testimony was in my report about how

10   successful it's been moving people to app, say that SVPs are

11   able to compete.  Not competing to overcome a default, and they

12   are available there in the App Store.

13   BY MR. SOMMER:

14   Q.  So, Dr. Israel, that brings us to the end of your monopoly

15   power discussion on the user side and the conclusion of the

16   user side discussion.  So we're now -- and we can see on slide

17   53 that we've already discussed this.  I'm not going to ask you

18   to describe it again.  That just sets forth your opinions on

19   the user side, correct?

20   A.  Yes.

21   Q.  All right.  Let's go to the advertiser side.

22           What is the relevant product to consider on the

23   advertiser side?

24   A.  So, this would have been a great time, if everything was

25   timed perfectly, to take a break so we could breathe and think

1    about advertiser side differently, because I really think it

2    is.

3        The advertiser side is platforms, firms competing to

4    sell advertisers targeted, information-loaded, attention of

5    users, right?  So, different firms have different technologies

6    that they use to attract user attention, and particularly user

7    attention that it can be targeted to particular users about

8    whom they know things.  And, so, I would define the relevant

9    advertiser side product as access to the attention of potential

10   customers.

11       I'll say, before I get into this slide, I mean, that,

12   to me, I think about the advertising industry a lot.  Really,

13   the evolution of digital advertising over the last few years,

14   right, is that different firms, innovations by Meta about how

15   they do it and TikTok about how they do and Amazon, who has

16   gotten much more into advertising, but, how they do it, to have

17   found ways to get the attention of a user who is an individual

18   about whom they know a lot, who has indicated a lot about their

19   preferences.

20       So I see this as competition between these

21   technologies, these ways of attracting user attention.

22   Q.  What's set forth on slide 55?

23   A.  So, this is -- so, this is now -- and, again, a market

24   definition should always be from the point of view of the

25   buyer, demander.  So now we need to turn our attention around

1    and say the buyer is an advertiser.

2           So if someone wants to advertise kitchen knives, the

3    ones set forth on the slide are different ways that different

4    people could, you know, generate attention to sell to somebody

5    who wants to advertise kitchen knives.  So, we saw, first,

6    search.  Somebody searches for kitchen knives.  And you can see

7    on the -- I can't even -- I forget the name of the -- Made In.

8    The brand is Made In.  So it's Made In kitchen knives.  They

9    search for that on Google and they get results and they get ads

10   that are sold to advertisers.

11          Another version of it would be social, and I'll talk

12   a lot more about this.  But, I think it's something I use a

13   lot, and I think it's important to think about somebody like

14   Instagram in this context.  Instagram has users who are

15   clicking "Like" on kitchen supplies and on knives, right?  And

16   they are, you know, watching videos about cooking and so on.

17   TikTok would have people watching videos about cooking and so

18   on, and they sell them advertising based on that signal.

19          So, on Instagram, one can see often, if someone

20   clicks "Like" on a certain type of product, and they get fed an

21   ad about the product.  That's another way of selling intention

22   of a user who has indicated -- recently, in many cases,

23   indicated an interest in this product.

24          Display is another way to do it.  The example I have

25   for display here is what's really a retargeting example.  I

1    think we've talked about that in here.  Somebody has previously

2    looked at knives or searched for knives on a site and now that

3    information follows them and they get fed an ad for knives on

4    ESPN.  It's targeted.  People know they looked for knives.

5            Amazon is another version.  This is what Amazon has

6    done much more aggressively in the last several years.  If you

7    go to Amazon and you search for Made In knives, you will get

8    results and you will get ads.  Those are all ways of selling to

9    advertisers the attention of someone who has indicated an

10   interest in knives.

11   Q.  Have you put together a slide summarizing your opinions on

12   the search advertising side?

13   A.  Yes.

14   Q.  Can you describe those opinions to the Court, please?

15   A.  So, I described them earlier, so I can be quick.

16           These are 3 through 5 on my overall list.  So,

17   plaintiffs proposed search advertising market excludes key

18   competitors because it's focused just on search, and it

19   excludes these other ways to sell the attention of a targeted

20   set of customers to advertisers.

21           Second, therefore, in large part, plaintiffs fail to

22   demonstrate monopoly power because there's all this

23   competition.  It's really very active, aggressive, everyday

24   competition here in advertising leading to lots of output

25   expansion.  And then, finally, building off of those and

1    considering the conduct here, in particular, plaintiffs fail to

2    show harm to competition.

3    Q.  So, you described for the Court user side market

4    definition.  Let's go through the same process with the market

5    side on advertiser definition.

6    A.  I think we can do this quickly because I have covered a

7    fair bit of it before.

8         The product being sold here, as I said, is the

9    attention of a targeted audience, so we're no longer focused at

10   all about competition for queries.  It's not the question.  The

11   question is:  What digital -- so, if we think about Google,

12   and, you know, what digital options are providing substitutable

13   ways to access targeted attention.

14        So, the demand side question is:  What are the

15   substitutes for somebody who might buy an advertisement, or

16   more than one, off Google Search?  Where else can they go to

17   get attention of users who are interested in a product?  And in

18   particular, what are the closest substitutes, as -- you know,

19   as we can measure them.  And I'll talk about that.

20   Q.  Do plaintiffs' proposed markets account for all the ways

21   advertisers actually reach their target audiences?

22   A.  No, not at all.

23   Q.  Is there a chart in your deck that tries to describe that?

24   A.  Yeah.

25   Q.  What do we see on slide 59?

1    A.  So on the left-hand side, I have a list of -- it's not

2    exhaustive, but a list of various ways, various technologies,

3    platforms that are being used to generate this attention and

4    sell it to advertisers.  So, you see Search, Amazon, Facebook,

5    social media, right?  Across the columns are what is and what

6    is not in plaintiffs' market or markets, right?

7              So, I would just make a few points on this slide.

8    Maybe give a couple examples that help me think about it.  So,

9    all three of plaintiffs' markets that have been alleged include

10    general; so, search, text ads on general search engines.

11             So, in the next bucket down, we get into PLAs,

12    shopping ads.  So, various of plaintiffs' markets do not

13    include some or all of the PLAs, right?  So, states only

14    include -- only include PLAs on general sites.  One of the DoJ

15    definitions includes them on Amazon.  All I'll say there is,

16    those are search ads, right, that return advertisements in

17    response to queries.  And I'll present evidence later about how

18    close that substitution is.

19             But, those are various -- those are search ads

20    responding to search queries.  They're excluded here, even

21    though that's a very close substitute for the attention of

22    someone who is searching.

23             Let me go down and make one more point, and then

24    maybe give an example that helps me think about these.  I want

25    to flag the next two, the fourth and fifth ones, which are

1    Amazon ads on the product page and the Amazon display ads.

2            I think it's important to understand -- this hasn't

3    come through -- Amazon actually sells ads in three different

4    ways.  So, one form of ads on Amazon would be just like on

5    Google.  You type a query and you get ads on the search result

6    page.  Those are in this first column, plaintiffs' market,

7    right?

8            A second form of advertising on Amazon would be you

9    click on the product and you get to a product page.  Okay.  So,

10   you search.  You decide there's a coffee maker you want.  You

11   click on it.  You get to a product page.  That product page has

12   advertisements, too, for other coffee makers.  If people are

13   buying ads there, they have a lot of information that that

14   person wants a coffee maker.  People are buying ads there.

15   Those are explicitly excluded from all of plaintiffs' market.

16           So about a third of Amazon advertising is not on the

17   search page, it's on the product page.  But even though the

18   user has now given a very strong signal that they want a coffee

19   maker, those ads are explicitly removed from the market.

20   They're not in the market.  Professor Whinston explicitly takes

21   them out from all his calculations.

22           Similarly, Amazon has some display ads where you've

23   searched for a coffee maker and it will show you a coffee maker

24   as a display ad.  Those are also out.

25           So one thing is, I don't see a justification for

1    saying some Amazon ads are in and some are out, when they all

2    have this ability from Amazon to target users based on what

3    Amazon knows.

4            So, I can pause there.

5    Q.  Okay.  The Court has heard testimony that some of these

6    different ad formats are priced differently and, therefore,

7    advertisers can't figure out how to substitute, let's say, a

8    CPM-based price for a CPC-based price advertisement.

9            Do you have a view on that?

10   A.  Yeah.  I mean, I think it's important to spend a few

11   minutes on how these things are priced and what we can learn

12   from that.

13           So, the next slide here, I mean, the most fundamental

14   point is that, you know, some ads are quoted in CPMs, some are

15   quoted in CPCs, but you can convert between them, and

16   advertisers do all the time as one step towards getting towards

17   competing in ROI.  And, so, the formula that's shown here just

18   says it's a straightforward math.

19           A CPM is cost for 1,000 impressions.  So, if you look

20   at the far right-hand part of this math, it says, CPM over

21   1,000, all that stuff.  Let me just simplify that for you.  It

22   says if you take -- CPM is the cost for 1,000 impressions.  If

23   you divide that by 1,000 times the click-through rate, you're

24   taking the cost for 1,000 impressions, you're dividing by the

25   number of clicks, you would expect to get 1,000 impressions.

1          It's just converts that into a cost per click, right?

2     So, advertisers will -- when they look at a CPM, will -- or

3     they look at a CPC, they're naturally doing this conversion.  A

4     big reason -- and I'll show you this in a minute -- you'll see

5     CPMs look different is because different ads have different

6     click-through rates and the CPMs are really adjusting for that,

7     to account for the different click-through rates.

8          But, advertisers can make this conversion all the

9     time.  There actually are services for advertisers, in some

10    cases, that will let them bid, if they want to bid on a

11    CPC-basis for everything, they can do that, and the services

12    will pay the advertiser, the publishers in the CPM form.

13    There's lots of ability to convert.

14         But, the fact that some are quoted in CPM and some

15    are quoted in CPC is, really, a distinction largely without a

16    difference, because ultimately, people are taking the step to

17    think about how many clicks am I going to get and that's what

18    they're going to compare.

19    Q.  Dr. Israel, do you ever have any real-world examples of

20    this comparison of CPMs and CPCs?

21    A.  Yeah.  That's a subsequent slide, which appears to be

22    redacted.

23    Q.  Slide 62, which is redacted pursuant to the Court's order

24    this morning.  But, can you generally describe, without going

25    into specific numbers, what we see here?

1    A.   Yes.   So the left-hand side chart here is from Professor

2    Whinston's -- I think he presented it.   This may be from his

3    report, I think -- but, this was in Professor Whinston's

4    report.   And it shows CPMs comparing across five different

5    types of advertisements here.   So, social -- I'll just name the

6    categories here.   Social -- Instagram ads, two types of Amazon

7    ads, the Bing Search ads, and Google Search ads.

8         You see in that chart on the left, it appears that

9    there are very large CPM differences.   There are very large CPM

10   differences between these types of ads.   But, again, as I said

11   earlier, that's just because the CPMs are actually accounting

12   for the fact that different ads return you different numbers of

13   clicks, right?

14        And so the differences in the prices doesn't make

15   them less comparable.   It actually makes them more comparable,

16   right?   Because otherwise, you might say, how do I balance

17   between an ad that gives me more clicks and an ad that gives me

18   less clicks?   How do I balance that?   Because ultimately, I

19   want clicks, right?

20        So, the fact that the CPMs are different, that

21   translates to what's on the right-hand side in terms of cost

22   per click.   So, in the right-hand side, you'll see the costs

23   per clicks are much closer together.   The reason that those --

24   that certain of the ad types had much higher CPMs is because

25   they have higher click-through rates, but the lower prices of

1    the other ads are compensating for that.  They're saying, yes,

2    you're going to get fewer clicks, but we'll just charge you

3    less.

4            So, that way, it determines the price you're going to

5    get for a click.  It's much more balanced on the right-hand

6    side.  So, yes, some of these ads get less clicks, but the

7    lowers price compensates you for it.  So you're paying close to

8    the same amount per click.

9            And then there's one last step here, which is on the

10    bottom, which is -- and you asked me this earlier -- you've

11    heard a lot about ROI.  All right.  So cost per click

12    doesn't quite get you all the way there, right?  Cost per click

13    tells you, how much am I paying per click?

14            But, the other thing that matter here is -- you've

15    probably heard testimony about conversions.  It's how much am I

16    going -- how much profit am I going to make per click?  So,

17    some type of ads are somebody clicks, right, if I have a really

18    good TikTok ad -- earlier, I heard your statement about your

19    daughter -- if I have a really good TikTok ad on makeup,

20    probably if your daughter is like mine, she clicks, she's

21    pretty likely to buy the makeup, right?

22            THE COURT:  With your credit card.

23            THE WITNESS:  Yes.

24            High conversion, higher profits.

25            Other types of ads, even when people click, the

1    conversions are lower, and there's not as good information.

2    So, basically, if you took the last step and you translated

3    these costs per click and you accounted for the profits per

4    click, you would get return on investment.  That's basically

5    just profits per click divided by costs per click.  All right?

6    Profits per click divided by costs per click gives you profits

7    divided by cost of the ad.

8            So all this -- this can easily just be saying there's

9    slight differences in the cost per click because some of these

10   have higher conversion rates.  So when you boil down to an ROI,

11   the different prices are actually adjusting for all that,

12   leading you to ROIs that can be quite similar.

13           THE COURT:  A question, maybe just to clarify the

14   chart on the right -- let me back up.

15           Do these numbers reflect ad pricing on a

16   cost-per-click basis through auctions, or, rather, this is the

17   conversion of -- to a cost-per-click valuation when ads are

18   purchased on a CPM basis?

19           THE WITNESS:  There's a little of both because of

20   what was in Professor Whinston's original chart.  So --

21           THE COURT:  At least as I understood it, display ads,

22   for example, are charged on a --

23           THE WITNESS:  CPM.

24           THE COURT:  -- on a CPM basis, whereas the auction

25   price is strict cost per click, and there is a difference in

 1    that pricing.

 2              THE WITNESS:  So -- yeah.  So Professor Whinston

 3    reported them all on CPM, even though the search ads on the

 4    right are probably sold on a cost per -- or, would be sold on a

 5    cost-per-click basis.  I think you're right, that display ads

 6    tend to be sold on a CPM basis.  That also comes out of an

 7    auction, by the way.  It's just a different auction.

 8              THE COURT:  My question is -- maybe I'm not being

 9    clear -- the chart on the left -- the chart on the right, is

10    that simply a conversion --

11              THE WITNESS:  Yes.

12              THE COURT:  -- of what's on the left?

13              I don't understand the chart on the left to be

14    capturing pricing based on auction pricing.

15              THE WITNESS:  These are still prices --

16              THE COURT:  Auction pricing vortexed ads.  Maybe I

17    should be more precise.

18              THE WITNESS:  The chart on the right, this was what I

19    was trying to say, probably poorly, the two text ads on the

20    chart on the right, those would have to be converted.  The

21    price that came out of the action would have been cost per

22    click.  That would be converted into a cost per impression

23    here.  So, basically this is all coming from the revenue data

24    that these firms provide.  So in both cases you're just taking

25    revenue and dividing by impressions or dividing by clicks.  So

1     none of this is really pulling something out of an auction.

2     It's giving you what's in the data.

3             So, Professor Whinston had presented it all on CPM by

4     dividing revenue -- dividing, you know, by the 1,000 of

5     impressions.  What I did on the right was convert and compute

6     it all as cost per click.  Which one came out of the auction

7     would vary across the different types of ads.

8             The point I made earlier, just by the way, though --

9     although that's true, there are services like Google Ads, which

10    is the place advertisers go to buy search ads, you can also buy

11    display ads through Google Ads.  And Google's ads will let

12    advertisers by all of that on a cost-per-click basis.  And they

13    handle the conversion to pay publishers.  So there are services

14    that help with that equation.

15            But, yes, what you're seeing here is revenue data on

16    the cost basis.  And the underlying auction prices, in some

17    cases, would be CPC and in some cases would be CPM.

18            THE COURT:  One other question.  We talked about this

19    earlier.

20            On the user side, there wasn't a way to measure

21    price.  Now, on the advertiser side, they do have a way to

22    measure price, and do have pricing information.  And, so, I'm

23    curious -- and maybe you'll get to this -- whether you have --

24    and I don't recall if Professor Whinston did -- whether you

25    have done some sort of sensitivity experimentation about

1    whether advertisers would substitute away, and to whom they

2    would substitute away, if Google's ad prices increased by a

3    certain percent?

4            THE WITNESS:  I'm going to try to show you all the

5    evidence that I could come up with.  There's not -- I mean, two

6    answers to that question.  First is, first thing I'm going to

7    say, which, I think, is implied here, is that the right metric

8    for price is really ROI as well as we can measure it.  These

9    are all quantitative things.  And the bottom line question is:

10   What does it cost me to make a sale?

11           Now, ROI, like many economic variables, is hard to

12   get perfectly.  But, it's getting better and better, much

13   better than it used to be.  It's quite good these days.  But

14   the key metric is going to be ROI.  So I'm going to go through

15   some slides just emphasizing the point that the key metric is

16   ROI, and then I'm going to try to show you evidence that I can

17   about people substituting on that basis.

18           The problem that we have in the case, the economist

19   have, is, you know, there's only so much data that we have from

20   advertisers on ROI or advertisers substituting.  So, a fair bit

21   of the evidence is going to be qualitative in different forms.

22   But I'll go through what I've been able to put together.

23           The punch line will be, advertisers look at ROI as

24   their metric, and they substitute a lot based on ROI.

25   BY MR. SOMMER:

1    Q.  All right.  Since we've gotten to ROI, you just mentioned

2    evidence you are going to present.  Let's present.

3          The next slide is what?  Who do we see here?

4    A.  So this is Mr. Booth in a back-and-forth with Your Honor.

5    So I won't spend a ton of time, as I said.  But, you asked him

6    the same question you just asked me.  And, you know, his

7    response was:  It's not so much the price of a click, it's

8    really ROI.

9          Which, again, is a price.  I mean, ROI is just --

10   it's the return on what you spend, which is basically how much

11   do you have to pay to get those returns?  And I think -- so,

12   the important things about this statement are, one, it's all

13   about ROI; and, two -- this will come up a lot -- you talk --

14   advertisers talk about where they're putting their budgets.

15   That's the way advertisers talk, right?  So, the point you're

16   going to see repeatedly is, it's all about ROI, and we're going

17   to look across different types of advertising and we're going

18   to move money towards the -- we're going to shift our budget

19   towards where we get a higher ROI.

20         And I'll tell you, my experience in talking to

21   advertisers or working in the advertising, you know, industry

22   as an economist, I mean, that's universal, what you see here,

23   is this, you know, attempt to look at ROI, or attempt to look

24   at performance of the ad, and moving money towards what's

25   performing better.

1    Q.  Did you also hear the testimony of Dr. Raghavan from

2    Google?

3    A.  Right.  And, so, you've heard this, but he said manically

4    so, that they respond to ROI, right?  So people are very

5    focused on ROI.

6    Q.  Google is also focused on advertisers looking at ROI.  Did

7    you see surveys within Google that were assessing that?

8    A.  Right.  So, Google has an internal group, the CX Lab that

9    has run a survey called the CX Insights Survey, basically.  So,

10   the following several slides -- and one of their questions

11   they're asking is, to what extent are advertisers focusing on

12   ROI?  To what extent are they tracking ROI and using it to make

13   decisions?  So, that's -- the next several slides will

14   summarize those results.

15   Q.  Before we go on to the next one, we see at the bottom of

16   this slide a reference to a 73 percent of participants say they

17   monitor ROI.

18   A.  Right.  So, the main question here, the first point to get

19   to is that the question they ask is:  Do you evaluate ROI?  Do

20   you monitor ROI when assessing the performance of search?  And

21   73 percent of them said they monitor it.  The slide also notes

22   that that's more than said the same thing in 2018.  So people

23   are monitoring ROI, and increasingly doing so.

24   Q.  Okay.  Part of this same deck is the next slide, 66.

25        What do we see there?

1    A.  So, that's just another question which the survey asked.

2    And I should say, the survey was 176 advertisers.  It's

3    something that Google has done in the ordinary course to study

4    these questions.  But, when they asked those advertisers what

5    are your factors that affect your short-term spending

6    decisions -- which I think of as moving your budgets around in

7    the short-term -- the top single factor named was ROI.

8    Q.  And was there also response with respect to long-term

9    spend?

10   A.  So that's, you know, bigger movements over time.  The

11   single biggest factor named was ROI.

12              THE COURT:  I'm sorry.  Can we back up?  I just --

13   could you just go back to 66 and 67 and explain what I'm

14   looking at here?

15              THE WITNESS:  Yep.  I think my book -- oh, there's 66

16   and 67.

17              So is that starting with the short-term spend?

18              THE COURT:  Yes.

19              THE WITNESS:  They asked people for what factors

20   affect your spending -- your search ad spending in the

21   short-term, and they listed a set of factors, many of which are

22   hard to read here, and I don't have it memorized.  But, this

23   top one is the return on the investment.  And then what's to

24   the right is the number -- like, a count of the number of

25   people who said that.  So, the most commonly named factor was

8471

```
 1      the return on investment.
 2                Does that make sense?
 3                THE COURT:  Yes.
 4      BY MR. SOMMER:
 5      Q.  Then long-term, which was slide 67?
 6      A.  Yeah.  So, again, they have asked people to list what
 7      effects your long-term spending decisions, and the most
 8      commonly listed factor was return on investment.
 9      Q.  Dr. Israel, you're aware that various advertisers were
10      subpoenaed for records in this case, correct?
11      A.  Yes.
12      Q.  And you reviewed many?
13      A.  Yes.
14      Q.  Okay.  What have you set forth in slide 68 by way of
15      example?
16      A.  So, I'm going to give several examples, just to bolster
17      these two points.  Again, this is, in my view, highly
18      consistent with the record, and becoming more true, you know,
19      every time I look at what advertisers say.  And that is that
20      they say they think about where to put their budgets, they
21      think about ad budgets, and they mix across channels to
22      maximize ROI.
23                They refer to these MMM models.  That's a media --
24      basically, a media mix -- marketing media mix.  I might have
25      the Ms wrong.  But it's a model that advertisers use to think
```

8472

1    about where to put dollars.  And to be clear, what those models

2    tend to tell you is diversify your dollars in a variety of

3    buckets.  But then, when you think about how to allocate

4    budgets, where to put 20 percent, where to put 30 percent, base

5    that on ROI.  Move money towards the buckets that have higher

6    ROI.

7          So, here, Kohl's is saying it continues to use such a

8    model, which is a cross-channel optimization channel by its

9    nature, and move money around to maximize ROI.

10   Q.  And then you also included some testimony from a Kohl's

11   witness on the next slide?

12   A.  Yes.  She was asked -- Ms. Raymond was asked about a

13   particular spend shift recently into Pinterest and Snapchat as

14   one channel to go in, and she said, you know, we moved money

15   there because it had a high ROI.

16   Q.  You also include an example from Estee Lauder?

17   A.  It's really the same point.  They use a MMM model, which

18   puts money in various buckets, but allocates budgets based on

19   performance.  And they basically said, move the money around

20   based on highest driving traffic and ROAS drivers.  ROAS is

21   return on advertising spend, which is another way to say ROI.

22   Q.  There's also an example in your deck from Skechers?

23   A.  So Skechers, slide 71, is quite explicit.  They go through

24   a very similar analysis, but they say, let's pull black spend

25   on the lower ROAS.  And, again, a lot of these, if you look in

8473

1    the record, they have channels, like social and search and

2    display, and the consistent theme really is, there's a budget

3    for advertising and we move money around that budget set based

4    on our ROI.

5    Q.  And then you have some conclusions, or takeaways, from this

6    type of evidence you've looked at in slide 72.  I think you've

7    probably hit on most of these, but can you just --

8    A.  So, slide 72 is actually where I'm going next.  So, my

9    takeaway from the slides thus far would just be we have a

10   quantitative measure in ROI, and the statement that people are

11   maniacally focused on it is true, as far as I can tell in the

12   record.

13         Again, it's not the only thing.  I don't want to

14   overstate.  People are not the only thing that matters.  People

15   put money in various buckets.  It's not going to be 100 percent

16   to any one channel.

17         But, partial substitution is what matters, as I said

18   earlier, and the consistent theme is when you're deciding where

19   to move your budgeted money around, you move it towards the

20   channel that gets you a better ROI.

21         MR. SOMMER:  And, Your Honor, the next topic is going

22   to be a little more in depth on substitution.  If you want me

23   to start now, fine.  Or, otherwise, a lunch break is welcome.

24         THE COURT:  Let us do that.  We will move to our

25   lunch break.  It's -- we'll resume at 1:30.  And we'll see

8474

1    everybody then.

2            And same direction as previously.  Thank you,

3    Dr. Israel.  We'll see you all shortly.

4                            *   *   *

5

6

7

8                            INDEX

9

10   Witness:

11       Mark Israel........................................8375

12                            *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                            Dated this 2nd day of November, 2023

9

10

11                    _____

12                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue, N.W.
14                    Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25

8476

## 1

**1** [5] - 8390:13, 8449:11, 8449:24, 8449:25, 8450:1
**1,000** [7] - 8460:19, 8460:21, 8460:22, 8460:23, 8460:24, 8460:25, 8466:4
**10** [1] - 8403:8
**10,000** [1] - 8401:6
**100** [6] - 8385:22, 8386:14, 8401:25, 8403:6, 8473:15
**10019** [2] - 8368:11, 8368:14
**10036** [1] - 8368:4
**10:58** [1] - 8427:8
**11** [1] - 8390:21
**11.4** [1] - 8411:9
**1100** [1] - 8367:12
**1133** [1] - 8368:3
**11:14** [1] - 8427:8
**11:15** [1] - 8427:5
**12.5** [1] - 8411:10
**13** [1] - 8401:6
**1300** [1] - 8367:22
**1301** [2] - 8368:10, 8368:13
**15** [1] - 8392:3
**17** [1] - 8395:13
**176** [1] - 8470:2
**18** [5] - 8396:13, 8396:14, 8396:15, 8401:2, 8401:4
**1:30** [1] - 8473:25

## 2

**2** [1] - 8367:5
**20** [10] - 8397:12, 8401:25, 8403:5, 8406:4, 8407:6, 8418:23, 8418:24, 8419:2, 8419:15, 8472:4
**20-3010** [2] - 8367:4, 8369:5
**20-second** [1] - 8423:1
**200,000** [1] - 8411:11
**20001** [2] - 8368:18, 8475:14
**2001** [1] - 8375:25
**20024** [1] - 8368:7
**2009** [1] - 8444:24
**2010** [1] - 8444:21
**2018** [1] - 8469:22
**202** [3] - 8367:13, 8367:17, 8368:8

## 202-354-3267 [1] - 8368:19

**2020** [1] - 8406:9
**2023** [2] - 8367:5, 8475:8
**209** [1] - 8367:15
**212** [3] - 8368:4, 8368:11, 8368:15
**2200** [1] - 8368:3
**23** [3] - 8415:21, 8415:23, 8415:24
**24** [3] - 8422:14, 8422:19, 8422:24
**24-hour** [4] - 8421:16, 8422:5, 8422:11, 8422:19
**25** [10] - 8406:18, 8406:19, 8406:21, 8406:23, 8407:8, 8411:8, 8425:20, 8425:22, 8426:3
**29** [1] - 8426:19
**2nd** [1] - 8475:8

## 3

**3** [1] - 8456:16
**3.7** [2] - 8407:1, 8409:1
**30** [5] - 8392:23, 8392:24, 8393:1, 8393:5, 8472:4
**307-0340** [1] - 8367:13
**31** [1] - 8428:15
**33** [2] - 8367:3, 8430:1
**333** [2] - 8368:18, 8475:13
**335-2793** [1] - 8368:4
**37** [1] - 8433:12

## 4

**40** [1] - 8435:17
**400,000** [1] - 8407:4
**40th** [2] - 8368:10, 8368:14
**434-5000** [1] - 8368:8
**45** [1] - 8442:6
**497-7728** [1] - 8368:11

## 5

**5** [2] - 8418:25, 8456:16
**5-minute** [1] - 8423:2
**5.1** [2] - 8406:22, 8406:25
**50** [3] - 8400:11, 8400:22, 8419:20
**500** [1] - 8399:24

## 508-6000 [1] - 8367:23

**53** [1] - 8453:17
**55** [1] - 8454:22
**58** [4] - 8425:24, 8426:2, 8426:15
**59** [1] - 8457:25

## 6

**600** [1] - 8367:16
**60604** [1] - 8367:16
**62** [1] - 8461:23
**6523** [2] - 8368:17, 8475:13
**66** [3] - 8469:24, 8470:13, 8470:15
**67** [3] - 8470:13, 8470:16, 8471:5
**68** [1] - 8471:14
**680** [1] - 8368:7

## 7

**71** [1] - 8472:23
**72** [2] - 8473:6, 8473:8
**720** [1] - 8367:23
**73** [2] - 8469:16, 8469:21
**77** [1] - 8423:17

## 8

**80203** [1] - 8367:23
**805-8563** [1] - 8367:17

## 9

**90** [2] - 8401:25, 8403:5
**999-5800** [1] - 8368:15
**9:30** [1] - 8367:6

## A

**a.m** [3] - 8367:6, 8427:8
**ability** [9] - 8388:2, 8388:10, 8388:15, 8396:10, 8396:19, 8437:19, 8460:2, 8461:13, 8475:7
**ablation** [1] - 8449:6
**able** [5] - 8385:15, 8388:21, 8435:8, 8453:11, 8467:22
**absence** [1] - 8400:20
**absolutely** [1] - 8394:7
**accept** [1] - 8438:3
**accepted** [1] - 8376:14
**access** [3] - 8373:2,

8454:9, 8457:13
**accommodating** [1] - 8374:5
**according** [1] - 8447:8
**accordingly** [1] - 8434:11
**account** [3] - 8396:18, 8457:20, 8461:7
**accounted** [1] - 8464:3
**accounting** [1] - 8462:11
**accurate** [2] - 8394:9, 8475:5
**accurately** [1] - 8393:24
**achieve** [1] - 8428:6
**acknowledge** [2] - 8424:9, 8438:3
**act** [2] - 8395:8, 8439:8
**acting** [1] - 8445:18
**action** [5] - 8369:5, 8439:8, 8465:21
**active** [5] - 8384:10, 8428:19, 8448:17, 8453:9, 8456:23
**actively** [2] - 8412:23, 8453:6
**activity** [2] - 8401:8, 8402:11
**actual** [3] - 8383:4, 8383:23, 8443:8
**ad** [20] - 8373:14, 8373:15, 8373:22, 8374:13, 8451:22, 8455:21, 8456:3, 8459:24, 8460:6, 8462:17, 8462:24, 8463:18, 8463:19, 8464:7, 8464:15, 8467:2, 8468:24, 8470:20, 8471:21
**add** [1] - 8428:18
**adding** [1] - 8453:4
**additional** [2] - 8388:24, 8433:8
**address** [1] - 8370:16
**addressed** [4] - 8417:9, 8437:24, 8439:3, 8442:4
**addressing** [1] - 8386:18
**adjusted** [11] - 8389:5, 8389:10, 8389:14, 8389:17, 8390:2, 8390:7, 8390:11, 8390:15, 8390:16, 8446:19, 8447:21
**adjusting** [2] - 8461:6,

8477

8464:11
**adopt** [1] - 8378:25
**ads** [42] - 8397:11,
8397:12, 8406:15,
8409:3, 8455:9,
8456:8, 8458:10,
8458:12, 8458:16,
8458:19, 8459:1,
8459:3, 8459:4,
8459:5, 8459:13,
8459:14, 8459:19,
8459:22, 8460:1,
8460:14, 8461:5,
8462:6, 8462:7,
8462:10, 8462:12,
8463:1, 8463:6,
8463:17, 8463:25,
8464:17, 8464:21,
8465:3, 8465:5,
8465:16, 8465:19,
8466:7, 8466:10,
8466:11
**Ads** [2] - 8466:9,
8466:11
**advanced** [2] - 8446:8
**advantage** [7] -
8398:24, 8409:16,
8409:25, 8429:21,
8430:23, 8447:19,
8448:25
**advantages** [3] -
8447:9, 8447:10,
8447:17
**adverse** [1] - 8377:11
**advertise** [8] - 8386:8,
8434:20, 8435:6,
8435:7, 8435:10,
8453:5, 8455:2, 8455:5
**advertisement** [3] -
8389:24, 8457:15,
8460:8
**advertisements** [7] -
8374:21, 8381:1,
8383:13, 8384:9,
8458:16, 8459:12,
8462:5
**advertiser** [11] -
8380:11, 8389:23,
8453:21, 8453:23,
8454:1, 8454:3,
8454:9, 8455:1,
8457:5, 8461:12,
8466:21
**advertisers** [33] -
8379:22, 8380:15,
8381:2, 8386:7,
8389:8, 8454:4,
8455:10, 8456:9,
8456:20, 8457:21,
8458:4, 8460:7,

8460:16, 8461:2,
8461:8, 8461:9,
8466:10, 8466:12,
8467:1, 8467:20,
8467:23, 8468:14,
8468:15, 8468:21,
8469:6, 8469:11,
8470:2, 8470:4,
8471:9, 8471:19,
8471:25
**advertising** [32] -
8371:14, 8379:7,
8379:13, 8379:15,
8380:22, 8380:23,
8385:23, 8397:21,
8398:6, 8398:14,
8398:15, 8414:25,
8426:24, 8429:16,
8435:11, 8438:20,
8448:23, 8452:9,
8454:12, 8454:13,
8454:16, 8455:18,
8456:12, 8456:17,
8456:24, 8459:8,
8459:16, 8468:17,
8468:21, 8472:21,
8473:3
**advertising-type** [2] -
8398:14, 8398:15
**advise** [1] - 8371:1
**advocating** [1] -
8451:25
**affect** [2] - 8470:5,
8470:20
**affirmatively** [1] -
8384:1
**age** [1] - 8401:6
**agency** [1] - 8376:23
**aggregate** [3] -
8394:7, 8394:8, 8395:7
**aggregating** [2] -
8394:25, 8395:3
**aggressive** [1] -
8456:23
**aggressively** [1] -
8456:6
**ago** [4] - 8398:20,
8399:5, 8400:2,
8435:13
**agree** [11] - 8387:11,
8405:21, 8411:18,
8411:21, 8412:12,
8414:11, 8420:5,
8421:20, 8423:14,
8429:3, 8446:14
**agreed** [2] - 8370:21,
8401:7
**agreement** [4] -
8370:21, 8370:25,
8371:1, 8422:24

**agreements** [3] -
8379:17, 8450:23,
8450:25
**agrees** [1] - 8438:4
**ahead** [1] - 8448:4
**AI** [1] - 8391:14
**air** [4] - 8406:24,
8407:10
**airline's** [1] - 8402:20
**airlines** [1] - 8402:22
**al** [1] - 8367:3
**alert** [1] - 8369:20
**all-in** [2] - 8446:18,
8446:19
**alleged** [1] - 8458:9
**Allen** [3] - 8369:21,
8371:10, 8442:14
**allocate** [1] - 8472:3
**allocates** [1] - 8472:18
**allocations** [1] -
8371:14
**allow** [2] - 8373:24,
8385:11
**almost** [6] - 8376:5,
8388:4, 8388:6,
8396:21, 8397:13,
8419:25
**alone** [1] - 8426:5
**Alphabet** [2] -
8443:25, 8444:11
**alternative** [2] -
8391:6, 8439:17
**alternatively** [1] -
8391:12
**Amazon** [94] -
8369:22, 8369:25,
8372:8, 8372:11,
8372:15, 8372:16,
8372:25, 8373:4,
8373:6, 8374:14,
8383:12, 8383:13,
8384:8, 8394:25,
8395:22, 8399:19,
8403:14, 8407:1,
8407:2, 8407:6,
8407:9, 8407:10,
8407:11, 8407:25,
8408:16, 8408:22,
8409:18, 8409:19,
8409:21, 8409:25,
8410:3, 8411:11,
8411:17, 8411:23,
8411:24, 8412:2,
8412:4, 8412:16,
8412:21, 8413:4,
8413:5, 8413:10,
8413:14, 8413:15,
8413:22, 8414:9,
8414:10, 8414:12,
8414:22, 8414:23,

8414:24, 8415:2,
8415:10, 8416:18,
8416:23, 8425:25,
8426:1, 8426:3,
8426:8, 8426:16,
8427:22, 8430:21,
8430:25, 8431:9,
8432:18, 8432:20,
8432:21, 8434:8,
8448:5, 8454:15,
8456:5, 8456:7,
8458:4, 8458:15,
8459:1, 8459:3,
8459:4, 8459:8,
8459:16, 8459:22,
8460:1, 8460:2,
8460:3, 8462:6
**Amazon's** [2] -
8407:6, 8407:8
**America** [7] - 8367:2,
8369:5, 8425:18,
8425:19, 8425:23,
8426:2, 8426:11
**Americas** [3] - 8368:3,
8368:10, 8368:13
**AMIT** [1] - 8367:9
**amount** [4] - 8385:12,
8445:3, 8445:4, 8463:8
**amounts** [2] -
8374:21, 8386:15
**analogous** [1] -
8412:24
**analogy** [9] - 8398:19,
8399:1, 8399:3,
8405:4, 8408:22,
8410:11, 8413:3,
8415:25, 8424:16
**analysis** [9] - 8381:6,
8382:22, 8402:7,
8405:23, 8406:1,
8420:3, 8420:12,
8422:18, 8472:24
**analytical** [1] -
8400:15
**analyze** [2] - 8378:23,
8434:4
**Android** [7] - 8401:10,
8404:11, 8404:13,
8404:14, 8444:4,
8444:7
**announced** [1] -
8445:21
**answer** [22] - 8380:20,
8386:2, 8386:23,
8392:11, 8394:4,
8394:21, 8395:21,
8395:22, 8396:20,
8397:24, 8400:1,
8400:19, 8410:7,
8414:5, 8414:9,

8478

8414:10, 8414:22, 8437:20, 8443:19, 8444:15, 8445:1

**answering** [9] - 8380:18, 8380:19, 8382:16, 8383:12, 8406:1, 8406:2, 8412:16, 8414:21, 8451:7

**answers** [7] - 8380:13, 8391:17, 8391:19, 8395:24, 8396:9, 8440:1, 8467:6

**anticipating** [1] - 8409:9

**antitrust** [2] - 8433:25, 8434:5

**Antitrust** [1] - 8367:20

**App** [2] - 8453:6, 8453:12

**app** [11] - 8391:5, 8391:12, 8391:13, 8391:14, 8404:7, 8404:10, 8409:18, 8424:22, 8428:3, 8432:10, 8453:10

**appear** [1] - 8412:9

**APPEARANCES** [1] - 8367:11

**Apple** [11] - 8450:24, 8451:2, 8451:6, 8451:17, 8451:20, 8451:21, 8452:3, 8452:4, 8452:8, 8452:15, 8453:5

**applied** [2] - 8384:7, 8400:12

**applies** [1] - 8390:2

**apply** [3] - 8384:7, 8431:11, 8431:14

**applying** [3] - 8387:3, 8400:12, 8411:11

**approach** [1] - 8375:12

**appropriate** [9] - 8371:24, 8373:13, 8374:17, 8393:13, 8393:16, 8413:17, 8413:19, 8414:1, 8432:25

**apps** [12] - 8409:23, 8410:24, 8425:13, 8428:1, 8428:6, 8428:13, 8428:17, 8432:8, 8452:16, 8453:4, 8453:6

**area** [5] - 8376:8, 8377:15, 8396:3, 8401:22, 8428:20

**areas** [2] - 8378:17,

8395:19

**argue** [1] - 8400:7

**argued** [2] - 8416:4, 8420:3

**arguing** [2] - 8448:9, 8453:1

**argument** [14] - 8383:17, 8383:18, 8384:5, 8394:2, 8423:14, 8427:3, 8427:18, 8431:6, 8436:23, 8446:25, 8447:4, 8448:7, 8448:8, 8453:1

**arguments** [14] - 8392:16, 8416:1, 8416:4, 8416:7, 8416:16, 8417:2, 8427:15, 8428:22, 8431:2, 8432:2, 8433:8, 8433:15, 8435:21, 8438:2

**Army** [11] - 8405:5, 8405:6, 8405:7, 8405:8, 8405:9, 8405:13, 8407:17, 8410:10, 8410:14, 8410:17, 8415:25

**assess** [2] - 8381:21, 8381:24

**assessing** [2] - 8469:7, 8469:20

**assessment** [1] - 8443:14

**associate** [1] - 8388:11

**associated** [1] - 8388:16

**attempt** [4] - 8440:11, 8444:14, 8468:23

**attention** [20] - 8380:14, 8380:24, 8381:1, 8381:2, 8389:25, 8454:4, 8454:6, 8454:7, 8454:9, 8454:17, 8454:21, 8454:25, 8455:4, 8456:9, 8456:19, 8457:9, 8457:13, 8457:17, 8458:3, 8458:21

**attract** [5] - 8380:25, 8409:24, 8410:5, 8433:6, 8454:6

**attracting** [2] - 8413:14, 8454:21

**attractive** [1] - 8435:5

**attracts** [1] - 8435:10

**auction** [8] - 8464:24, 8465:7, 8465:14,

8465:16, 8466:1, 8466:6, 8466:16

**auctions** [1] - 8464:16

**audience** [1] - 8457:9

**audiences** [1] - 8457:21

**auto** [8] - 8401:18, 8401:22, 8401:24, 8402:4, 8402:14, 8403:5, 8403:12

**automobile** [2] - 8402:7, 8402:11

**automobile-related** [1] - 8402:11

**automobiles** [1] - 8402:1

**autos** [5] - 8401:17, 8401:21, 8402:9, 8402:10, 8404:4

**available** [2] - 8374:2, 8453:12

**Avenue** [6] - 8368:3, 8368:7, 8368:10, 8368:13, 8368:18, 8475:13

**average** [1] - 8372:18

**avoid** [1] - 8427:16

**aware** [1] - 8471:9

**awful** [1] - 8409:22

## B

**back-and-forth** [1] - 8468:4

**background** [1] - 8375:23

**backstop** [3] - 8410:12, 8434:17, 8451:9

**backwards** [1] - 8373:11

**Baker** [3] - 8411:14, 8420:25, 8421:4

**Baker's** [1] - 8421:25

**balance** [2] - 8462:16, 8462:18

**balanced** [1] - 8463:5

**Bank** [5] - 8425:18, 8425:19, 8425:23, 8426:2, 8426:11

**bar** [7] - 8407:23, 8407:25, 8409:8, 8417:10, 8421:23, 8424:5, 8432:17

**barnes** [1] - 8408:23

**barrier** [1] - 8438:23

**barriers** [3] - 8436:3, 8436:11, 8437:24

**bars** [6] - 8372:11, 8419:5, 8419:9,

8422:2, 8422:6, 8432:3

**base** [1] - 8472:4

**based** [4] - 8384:13, 8386:10, 8434:5, 8435:23, 8455:18, 8460:2, 8460:8, 8465:14, 8467:24, 8472:18, 8472:20, 8473:3

**basic** [7] - 8378:17, 8380:8, 8381:8, 8392:4, 8399:12, 8412:20, 8417:11

**basis** [12] - 8373:4, 8394:5, 8413:4, 8461:11, 8464:16, 8464:18, 8464:24, 8465:5, 8465:6, 8466:12, 8466:16, 8467:17

**bearing** [1] - 8370:23

**bears** [1] - 8382:22

**become** [1] - 8374:22

**becomes** [1] - 8431:19

**becoming** [1] - 8471:18

**BEFORE** [1] - 8367:9

**behalf** [1] - 8377:3

**behavior** [2] - 8381:18, 8419:1

**Belknap** [1] - 8368:2

**belong** [1] - 8378:23

**BENCH** [1] - 8367:9

**benchmark** [1] - 8441:23

**beneficial** [1] - 8390:12

**benefit** [1] - 8430:16

**benefits** [4] - 8450:23, 8451:18, 8451:20, 8451:21

**best** [2] - 8401:3, 8475:7

**better** [9] - 8398:15, 8431:17, 8442:13, 8443:9, 8467:12, 8467:13, 8468:25, 8473:20

**between** [14] - 8371:17, 8383:11, 8383:12, 8385:8, 8393:9, 8403:18, 8405:19, 8435:19, 8451:2, 8451:17, 8454:20, 8460:15, 8462:10, 8462:17

**bid** [3] - 8374:22,

**big** [6] - 8385:19, 8392:13, 8401:24,

8408:6, 8408:7, 8461:4
**bigger** [2] - 8450:14, 8470:10
**biggest** [2] - 8406:23, 8470:11
**billions** [2] - 8394:5, 8394:6
**binder** [1] - 8442:11
**Bing** [17] - 8370:14, 8374:14, 8379:18, 8379:21, 8407:4, 8411:10, 8411:13, 8415:10, 8415:12, 8415:17, 8441:17, 8444:23, 8445:21, 8448:4, 8450:19, 8462:7
**bit** [9] - 8396:15, 8402:16, 8417:19, 8432:8, 8446:24, 8448:7, 8450:2, 8457:7, 8467:20
**black** [2] - 8426:10, 8472:24
**blue** [3] - 8402:3, 8402:7, 8403:9
**boil** [1] - 8464:10
**bolding** [1] - 8393:9
**bolster** [1] - 8471:16
**book** [2] - 8408:23, 8470:15
**bookmarker** [1] - 8424:21
**bookmarks** [1] - 8428:2
**books** [1] - 8408:24
**bookstore** [2] - 8434:2
**booth** [1] - 8468:4
**bottom** [9] - 8372:3, 8422:1, 8431:16, 8436:15, 8440:3, 8442:12, 8463:10, 8467:9, 8469:15
**bouncing** [2] - 8403:17, 8403:24
**bounds** [1] - 8394:23
**box** [5] - 8370:11, 8370:23, 8410:16, 8452:16, 8453:5
**boxes** [3] - 8369:24, 8370:6, 8417:22
**brand** [6] - 8397:22, 8398:13, 8398:14, 8437:16, 8437:17, 8455:8
**brand-building** [2] - 8398:13, 8398:14
**breadth** [1] - 8428:24
**break** [13] - 8399:3, 8418:15, 8418:16,

8418:18, 8418:19, 8418:21, 8419:13, 8423:2, 8427:4, 8427:7, 8453:25, 8473:23, 8473:25
**breakdowns** [1] - 8371:12
**breakfast** [1] - 8421:21
**breaks** [1] - 8422:8
**breathe** [1] - 8453:25
**bricks** [2] - 8408:23, 8434:2
**briefly** [3] - 8372:9, 8378:16, 8423:16
**bring** [2] - 8406:15
**brings** [2] - 8377:13, 8453:14
**broad** [3] - 8408:14, 8413:13, 8415:2
**broadline** [4] - 8398:20, 8398:21, 8398:25, 8399:22
**broadly** [2] - 8442:23, 8444:3
**Broadway** [1] - 8367:22
**broken** [1] - 8436:10
**brought** [1] - 8377:17
**browser** [12] - 8407:24, 8409:8, 8410:10, 8410:11, 8410:17, 8428:19, 8433:2, 8434:14, 8434:16, 8451:3
**browsers** [4] - 8432:3, 8434:17, 8451:4, 8451:8
**Bruce** [1] - 8367:19
**bucket** [2] - 8434:13, 8458:11
**buckets** [10] - 8394:14, 8396:5, 8396:24, 8397:6, 8397:8, 8397:10, 8472:3, 8472:5, 8472:18, 8473:15
**bucks** [1] - 8408:7
**budget** [3] - 8468:18, 8473:2, 8473:3
**budgeted** [1] - 8473:19
**budgets** [7] - 8386:9, 8468:14, 8470:6, 8471:20, 8471:21, 8472:4, 8472:18
**build** [2] - 8437:16, 8437:17
**building** [4] - 8397:22, 8398:13, 8398:14,

8456:25
**bullet** [8] - 8383:3, 8383:9, 8385:6, 8390:8, 8415:6, 8425:1, 8440:4, 8448:16
**bullets** [1] - 8394:12
**bundle** [10] - 8392:22, 8393:7, 8393:13, 8399:8, 8399:16, 8399:17, 8400:9, 8400:10, 8400:20, 8416:16
**bundling** [1] - 8407:17
**burden** [1] - 8428:12
**business** [6] - 8373:14, 8385:22, 8397:18, 8398:2, 8418:12
**but-for** [4] - 8439:11, 8439:13, 8440:8
**buy** [13] - 8390:16, 8392:23, 8399:17, 8399:18, 8399:23, 8400:10, 8405:7, 8414:12, 8434:25, 8457:15, 8463:21, 8466:10
**buyer** [2] - 8454:25, 8455:1
**buying** [6] - 8399:8, 8399:22, 8405:16, 8406:24, 8459:13, 8459:14
**BY** [20] - 8375:15, 8378:1, 8378:13, 8387:21, 8390:17, 8400:25, 8404:17, 8410:25, 8415:5, 8420:2, 8420:22, 8423:8, 8427:11, 8440:17, 8442:3, 8442:16, 8447:3, 8453:13, 8467:25, 8471:4

---

# C

**calculations** [1] - 8459:21
**callout** [1] - 8426:2
**cannot** [1] - 8447:15
**capture** [2] - 8403:17, 8404:6
**captures** [1] - 8404:8
**capturing** [2] - 8403:23, 8465:14
**car** [5] - 8424:8, 8424:13, 8424:16, 8424:17

**card** [1] - 8463:22
**care** [2] - 8390:6
**Carr** [1] - 8367:21
**cars.com** [2] - 8402:12, 8403:13
**case** [22] - 8376:6, 8377:6, 8382:23, 8383:10, 8383:25, 8385:20, 8387:2, 8396:9, 8399:9, 8402:20, 8405:14, 8406:6, 8406:10, 8424:6, 8424:18, 8425:9, 8432:12, 8439:12, 8443:4, 8451:25, 8467:18, 8471:10
**cases** [19] - 8376:9, 8376:10, 8376:18, 8376:20, 8382:24, 8383:8, 8387:14, 8397:14, 8412:25, 8429:24, 8433:20, 8434:1, 8439:21, 8455:22, 8461:10, 8465:24, 8466:17
**categories** [2] - 8433:15, 8462:6
**cater** [1] - 8431:3
**caution** [1] - 8417:21
**CAVANAUGH** [2] - 8377:22, 8378:10
**Cavanaugh** [2] - 8368:2, 8369:7
**caveat** [1] - 8450:20
**CCR** [1] - 8475:12
**cellophane** [15] - 8382:20, 8383:10, 8383:25, 8384:1, 8384:4, 8384:5, 8384:18, 8384:23, 8412:13, 8412:19, 8412:25, 8415:7, 8415:8, 8448:8, 8448:12
**Center** [1] - 8367:21
**certain** [7] - 8380:5, 8415:19, 8416:17, 8433:22, 8455:20, 8462:24, 8467:3
**certainly** [5] - 8373:13, 8382:25, 8409:13, 8428:9, 8438:13
**CERTIFICATE** [1] - 8475:2
**certify** [1] - 8475:4
**change** [2] - 8449:11, 8450:14
**changes** [1] - 8450:13
**channel** [5] - 8472:8,

8480

8472:14, 8473:16, 8473:20

**channels** [4] - 8386:8, 8386:10, 8471:21, 8473:1

**characteristic** [1] - 8388:12

**characteristics** [2] - 8389:6, 8389:12

**characterization** [1] - 8393:21

**charge** [2] - 8389:7, 8463:2

**charged** [1] - 8464:22

**chart** [26] - 8369:25, 8370:12, 8371:11, 8395:10, 8406:11, 8417:21, 8421:5, 8421:23, 8422:3, 8426:10, 8439:24, 8442:5, 8442:18, 8443:4, 8444:12, 8444:14, 8457:23, 8462:1, 8462:8, 8464:14, 8464:20, 8465:9, 8465:13, 8465:18, 8465:20

**charts** [4] - 8370:12, 8372:23, 8373:3, 8437:4

**chased** [1] - 8441:17

**Chat** [1] - 8445:21

**ChatGPT** [2] - 8391:14, 8445:21

**Chicago** [2] - 8367:16, 8402:18

**choice** [3] - 8386:1, 8392:8, 8410:21

**choices** [3] - 8392:10, 8433:5, 8451:7

**choose** [2] - 8404:23, 8415:3

**choosing** [2] - 8413:10, 8430:9

**chop** [1] - 8399:10

**Chrome** [2] - 8444:4, 8444:8

**circle** [2] - 8382:6, 8382:7

**cited** [3] - 8422:1, 8426:13, 8447:7

**civil** [1] - 8369:5

**claim** [2] - 8384:2, 8384:18

**claims** [2] - 8377:16, 8448:12

**clarify** [1] - 8464:13

**class** [1] - 8431:14

**classes** [1] - 8435:25

**classic** [1] - 8416:3

**classically** [1] - 8436:11

**classify** [1] - 8394:24

**clear** [15] - 8376:20, 8379:16, 8380:17, 8403:21, 8416:20, 8421:7, 8422:15, 8422:18, 8443:3, 8443:24, 8444:5, 8450:11, 8450:13, 8465:9, 8472:1

**clearer** [1] - 8380:19

**clearest** [1] - 8416:24

**clearly** [13] - 8402:12, 8407:11, 8410:22, 8416:14, 8416:15, 8416:22, 8416:23, 8431:1, 8434:3, 8442:22, 8444:2, 8448:25, 8453:3

**click** [30] - 8459:9, 8459:11, 8460:23, 8461:1, 8461:6, 8461:7, 8462:22, 8462:25, 8463:5, 8463:8, 8463:11, 8463:12, 8463:13, 8463:16, 8463:25, 8464:3, 8464:4, 8464:5, 8464:6, 8464:9, 8464:16, 8464:17, 8464:25, 8465:5, 8465:22, 8466:6, 8466:12, 8468:7

**click-through** [4] - 8460:23, 8461:6, 8461:7, 8462:25

**clicking** [1] - 8455:15

**clicks** [14] - 8411:17, 8455:20, 8460:25, 8461:17, 8462:13, 8462:17, 8462:18, 8462:19, 8462:23, 8463:2, 8463:6, 8463:17, 8463:20, 8465:25

**close** [9] - 8382:10, 8385:5, 8385:8, 8385:10, 8385:14, 8405:24, 8458:18, 8458:21, 8463:7

**closer** [3] - 8382:9, 8450:19, 8462:23

**closest** [6] - 8381:11, 8381:12, 8381:15, 8382:18, 8387:8, 8457:18

**clothes** [3] - 8430:20, 8430:25, 8432:19

**clothing** [2] - 8430:5, 8430:15

**cluster** [6] - 8392:13, 8393:13, 8393:15, 8394:8, 8394:13, 8400:13

**clustering** [1] - 8381:23

**CMR** [1] - 8475:12

**CO** [1] - 8367:23

**coffee** [6] - 8459:10, 8459:12, 8459:14, 8459:18, 8459:23

**collected** [1] - 8406:7

**Colorado** [2] - 8367:19, 8367:21

**COLORADO** [1] - 8367:19

**COLUMBIA** [1] - 8367:1

**column** [1] - 8459:6

**columns** [3] - 8419:16, 8419:23, 8458:5

**combines** [1] - 8378:21

**coming** [2] - 8407:16, 8465:23

**comment** [6] - 8413:8, 8426:21, 8437:9, 8438:15, 8444:22, 8452:21

**commented** [1] - 8452:23

**comments** [1] - 8433:18

**commercial** [4] - 8404:24, 8416:22, 8420:18, 8438:18

**Commission** [1] - 8376:25

**commitment** [1] - 8443:13

**commonly** [2] - 8470:25, 8471:8

**commonsense** [2] - 8384:6, 8412:20

**companies** [5] - 8370:1, 8372:12, 8372:14, 8374:13

**comparable** [2] - 8462:15

**compare** [4] - 8405:7, 8444:16, 8448:5, 8461:18

**comparing** [1] - 8462:4

**comparison** [1] - 8461:20

**Compass** [1] - 8376:3

**compensates** [1] - 8463:7

**compensating** [1] - 8463:1

**compete** [27] - 8379:1, 8384:15, 8405:20, 8408:13, 8408:24, 8409:16, 8409:18, 8410:5, 8414:14, 8414:16, 8414:18, 8414:24, 8416:17, 8416:19, 8417:1, 8417:12, 8429:4, 8429:21, 8430:14, 8432:6, 8432:8, 8434:3, 8438:20, 8438:22, 8453:11

**competes** [7] - 8395:1, 8395:2, 8405:2, 8408:17, 8413:19, 8434:25

**competing** [20] - 8380:20, 8380:25, 8385:3, 8385:16, 8385:24, 8388:18, 8391:6, 8396:5, 8409:5, 8410:5, 8414:4, 8416:14, 8429:9, 8431:12, 8434:21, 8435:12, 8445:23, 8453:11, 8454:3, 8460:17

**competition** [81] - 8376:2, 8376:6, 8378:25, 8379:2, 8379:9, 8379:19, 8379:21, 8379:22, 8380:2, 8380:19, 8382:3, 8385:21, 8386:3, 8386:5, 8386:12, 8386:16, 8394:10, 8395:6, 8395:8, 8395:21, 8397:2, 8397:15, 8398:10, 8398:12, 8403:13, 8404:19, 8404:25, 8405:1, 8407:19, 8409:1, 8409:5, 8409:21, 8411:12, 8412:2, 8414:8, 8416:21, 8416:23, 8424:11, 8424:20, 8424:23, 8425:4, 8428:6, 8428:8, 8428:19, 8428:20, 8429:5, 8430:8, 8430:10, 8431:13, 8431:17, 8431:19, 8432:10, 8432:13, 8432:23,

8481

8432:24, 8433:5,
8433:21, 8434:10,
8434:23, 8435:4,
8436:22, 8437:2,
8437:11, 8441:25,
8444:8, 8445:25,
8447:22, 8447:25,
8448:17, 8448:20,
8449:1, 8449:13,
8450:4, 8450:5,
8452:7, 8454:20,
8456:23, 8456:24,
8457:2, 8457:10
    **competition-related**
[1] - 8376:6
    **competitions** [1] -
8395:11
    **competitive** [20] -
8369:25, 8372:25,
8378:22, 8379:16,
8381:11, 8381:13,
8393:14, 8393:18,
8429:9, 8429:13,
8429:21, 8430:23,
8444:23, 8445:6,
8445:19, 8445:22,
8446:4, 8446:9,
8447:23, 8450:7
    **competitively** [1] -
8372:16
    **competitor** [6] -
8382:10, 8382:15,
8402:13, 8407:12,
8413:12, 8413:15
    **competitors** [24] -
8382:1, 8382:2,
8382:8, 8382:10,
8382:18, 8384:4,
8384:11, 8384:13,
8387:9, 8387:10,
8388:17, 8391:18,
8395:3, 8396:19,
8396:22, 8397:6,
8400:19, 8402:13,
8412:10, 8412:23,
8427:24, 8435:2,
8448:17, 8456:18
    **complaint** [2] -
8415:19, 8444:20
    **complements** [3] -
8411:16, 8411:19,
8412:6
    **complete** [4] -
8413:20, 8413:23,
8446:25, 8475:6
    **completion** [1] -
8413:22
    **component** [1] -
8400:17
    **compute** [2] - 8390:1,

8466:5
    **computer** [4] - 8401:9,
8405:9, 8405:10,
8418:14
    **ComScore** [1] -
8425:8
    **concept** [12] -
8380:16, 8381:23,
8382:22, 8382:24,
8387:15, 8389:2,
8389:20, 8393:15,
8400:13, 8415:20,
8418:12
    **concepts** [4] - 8380:5,
8388:24, 8390:18,
8400:8
    **conceptually** [2] -
8387:18, 8392:6
    **conclude** [1] -
8437:12
    **concluded** [2] -
8435:13, 8449:12
    **concludes** [1] -
8448:25
    **conclusion** [10] -
8384:7, 8391:25,
8423:20, 8436:15,
8436:16, 8436:17,
8436:19, 8440:4,
8447:14, 8453:15
    **conclusions** [2] -
8394:22, 8473:5
    **conditions** [3] -
8378:22, 8393:14,
8393:18
    **conduct** [7] - 8379:25,
8380:2, 8412:10,
8412:18, 8414:7,
8444:20, 8457:1
    **confer** [1] - 8440:14
    **confidential** [7] -
8370:15, 8372:9,
8372:11, 8372:12,
8372:22, 8373:14,
8374:16
    **connection** [1] -
8378:3
    **CONNOLLY** [1] -
8368:6
    **consider** [3] -
8420:11, 8428:20,
8453:22
    **consideration** [1] -
8381:6
    **considerations** [1] -
8384:20
    **considering** [1] -
8457:1
    **consistent** [4] -
8383:22, 8471:18,

8473:2, 8473:18
    **constitutes** [1] -
8475:5
    **Constitution** [2] -
8368:18, 8475:13
    **constraining** [2] -
8387:16, 8437:18
    **constrains** [5] -
8381:13, 8381:18,
8382:14, 8414:20,
8437:20
    **constraint** [2] -
8387:17, 8398:15
    **constraints** [9] -
8381:11, 8381:12,
8381:19, 8381:20,
8381:22, 8381:25,
8382:1, 8386:6
    **consulting** [1] -
8376:2
    **Consumer** [1] -
8367:20
    **consumer** [1] -
8447:11
    **consumers** [1] -
8395:17
    **consuming** [1] -
8446:20
    **cont** [1] - 8368:1
    **context** [1] - 8455:14
    **continues** [1] - 8472:7
    **contracts** [1] -
8447:13
    **contrary** [2] - 8371:3,
8413:7
    **contrast** [1] - 8405:5
    **control** [1] - 8388:5
    **convenience** [1] -
8400:15
    **convenient** [3] -
8432:3, 8432:11,
8432:14
    **conversion** [7] -
8461:3, 8461:8,
8463:24, 8464:10,
8464:17, 8465:10,
8466:13
    **conversions** [2] -
8463:15, 8464:1
    **convert** [3] - 8460:15,
8461:13, 8466:5
    **converted** [2] -
8465:20, 8465:22
    **converts** [2] -
8389:24, 8461:1
    **conveyed** [2] -
8374:23, 8374:24
    **cooking** [2] - 8455:16,
8455:17
    **copies** [1] - 8369:18

    **core** [1] - 8399:23
    **corporate** [1] - 8444:1
    **Corporation** [1] -
8371:11
    **correct** [6] - 8372:20,
8422:17, 8422:23,
8424:18, 8453:19,
8471:10
    **correctly** [1] - 8378:24
    **cost** [25] - 8388:3,
8388:5, 8438:4,
8438:10, 8438:12,
8460:19, 8460:22,
8460:24, 8461:1,
8462:21, 8463:11,
8463:12, 8464:7,
8464:9, 8464:16,
8464:17, 8464:25,
8465:4, 8465:5,
8465:21, 8465:22,
8466:6, 8466:12,
8466:16, 8467:10
    **cost-per-click** [4] -
8464:16, 8464:17,
8465:5, 8466:12
    **costs** [5] - 8438:9,
8462:22, 8464:3,
8464:5, 8464:6
    **Counsel** [1] - 8373:9
    **counsel** [7] - 8369:21,
8369:22, 8370:25,
8371:8, 8374:10,
8440:15
    **count** [3] - 8395:4,
8395:6, 8470:24
    **counting** [1] - 8376:9
    **country** [1] - 8441:24
    **couple** [12] - 8392:17,
8394:11, 8408:8,
8418:2, 8423:24,
8426:9, 8429:19,
8429:25, 8437:10,
8442:4, 8443:23,
8458:8
    **course** [13] - 8374:6,
8376:19, 8380:6,
8381:7, 8386:7,
8386:18, 8395:15,
8401:19, 8418:12,
8421:17, 8421:19,
8422:19, 8470:3
    **Court** [29] - 8368:16,
8368:17, 8375:22,
8377:15, 8377:23,
8378:14, 8380:7,
8381:20, 8382:19,
8386:20, 8390:20,
8392:3, 8393:24,
8394:3, 8395:13,
8405:18, 8415:22,

8482

8421:3, 8422:16,
8426:15, 8435:18,
8439:5, 8442:17,
8443:12, 8449:5,
8456:14, 8457:3,
8460:5, 8475:12
**COURT** [59] - 8367:1,
8369:2, 8369:8,
8369:17, 8370:7,
8370:9, 8370:18,
8371:2, 8371:5,
8371:8, 8371:19,
8372:6, 8372:18,
8373:7, 8373:9,
8375:9, 8375:13,
8377:23, 8386:23,
8389:19, 8396:16,
8398:18, 8399:6,
8400:24, 8402:25,
8403:16, 8404:6,
8404:13, 8404:16,
8407:15, 8408:7,
8409:10, 8413:17,
8419:16, 8420:11,
8420:18, 8420:21,
8422:18, 8427:5,
8427:9, 8439:18,
8440:19, 8442:15,
8446:5, 8446:14,
8452:12, 8463:22,
8464:13, 8464:21,
8464:24, 8465:8,
8465:12, 8465:16,
8466:18, 8470:12,
8470:18, 8471:3,
8473:24, 8475:2
**court** [2] - 8377:13,
8382:24
**Court's** [1] - 8461:23
**Courthouse** [1] -
8368:17
**courtroom** [2] -
8376:25, 8421:8
**COURTROOM** [2] -
8369:4, 8375:4
**covered** [5] - 8404:20,
8404:23, 8416:11,
8426:20, 8457:6
**CPC** [6] - 8372:18,
8460:8, 8461:3,
8461:11, 8461:15,
8466:17
**CPC-based** [1] -
8460:8
**CPC-basis** [1] -
8461:11
**CPCs** [2] - 8460:15,
8461:20
**CPM** [17] - 8372:19,
8460:8, 8460:19,

8460:20, 8460:22,
8461:2, 8461:12,
8461:14, 8462:9,
8464:18, 8464:23,
8464:24, 8465:3,
8465:6, 8466:3,
8466:17
**CPM-based** [1] -
8460:8
**CPMs** [8] - 8460:14,
8461:5, 8461:6,
8461:20, 8462:4,
8462:11, 8462:20,
8462:24
**CRC** [1] - 8368:16
**create** [2] - 8395:10,
8429:5
**creates** [1] - 8451:18
**creating** [1] - 8388:13
**credit** [1] - 8463:22
**critical** [1] - 8387:23
**critique** [3] - 8412:12,
8420:5, 8422:25
**cross** [1] - 8472:8
**cross-channel** [1] -
8472:8
**CRR** [2] - 8368:16,
8475:12
**curious** [1] - 8466:23
**current** [2] - 8375:23,
8377:6
**curve** [1] - 8390:13
**customer** [2] -
8389:13, 8434:23
**customers** [8] -
8381:17, 8386:16,
8389:18, 8399:17,
8435:1, 8448:16,
8454:10, 8456:20
**customized** [1] -
8429:20
**cuts** [2] - 8433:21,
8434:5
**CV** [1] - 8367:4
**CX** [2] - 8469:8,
8469:9

## D

**D.C** [4] - 8367:5,
8367:13, 8368:7,
8475:14
**Dahlquist** [1] -
8367:14
**dark** [3] - 8401:24,
8403:4, 8403:9
**data** [45] - 8370:13,
8370:14, 8370:15,
8372:15, 8373:5,
8383:5, 8383:6,

8384:17, 8384:18,
8385:3, 8385:16,
8396:15, 8401:5,
8401:16, 8404:7,
8404:10, 8406:5,
8406:7, 8407:1,
8407:3, 8409:21,
8411:3, 8411:4,
8417:19, 8418:2,
8418:3, 8418:21,
8419:11, 8421:15,
8422:2, 8422:3,
8422:16, 8423:25,
8425:8, 8428:11,
8443:20, 8443:21,
8465:23, 8466:2,
8466:15, 8467:19
**dataset** [1] - 8417:20
**Dated** [1] - 8475:8
**daughter** [2] -
8463:19, 8463:20
**David** [1] - 8367:14
**David.dahlquist@**
**usdoj.gov** [1] - 8367:17
**DAVIS** [2] - 8371:10,
8371:20
**Davis** [4] - 8369:21,
8370:16, 8371:10,
8372:6
**DAY** [1] - 8367:3
**days** [1] - 8467:13
**DC** [1] - 8368:18
**deal** [3] - 8434:9,
8451:17, 8451:22
**dear** [1] - 8398:19
**debate** [2] - 8387:25,
8399:9
**decide** [11] - 8391:1,
8392:24, 8393:4,
8393:5, 8393:6,
8394:6, 8397:5,
8398:12, 8400:10,
8423:6, 8459:10
**decides** [2] - 8410:10,
8410:16
**deciding** [4] - 8382:8,
8405:12, 8405:17,
8473:18
**decision** [16] -
8371:21, 8392:25,
8393:3, 8394:24,
8399:16, 8400:11,
8400:23, 8405:14,
8410:9, 8410:18,
8417:13, 8417:17,
8423:3, 8434:16,
8434:18
**decisions** [7] -
8416:15, 8421:22,
8423:7, 8434:16,

8469:13, 8470:6,
8471:7
**deck** [12] - 8378:2,
8378:6, 8421:5,
8421:7, 8421:9,
8422:11, 8422:15,
8433:14, 8457:23,
8469:24, 8472:22
**decrease** [1] - 8388:15
**deep** [2] - 8408:17,
8415:3
**deeper** [1] - 8413:14
**default** [5] - 8450:23,
8452:13, 8452:18,
8452:23, 8453:11
**defaults** [5] - 8379:17,
8434:14, 8452:20,
8453:2
**Defendant** [2] -
8367:7, 8368:6
**define** [20] - 8378:24,
8379:2, 8379:8,
8382:9, 8382:13,
8382:14, 8405:1,
8407:7, 8413:17,
8413:25, 8414:6,
8416:16, 8431:14,
8432:6, 8433:1,
8433:25, 8439:7,
8439:13, 8440:7,
8454:8
**defined** [7] - 8378:21,
8395:7, 8406:14,
8406:16, 8421:16,
8436:13, 8436:20
**defines** [1] - 8428:9
**defining** [4] - 8382:3,
8404:19, 8409:17,
8436:22
**definitely** [1] - 8446:2
**definition** [22] -
8378:17, 8381:4,
8381:9, 8381:10,
8381:11, 8383:4,
8388:1, 8391:24,
8392:12, 8394:23,
8409:2, 8431:6,
8433:17, 8435:14,
8436:20, 8436:21,
8437:1, 8439:19,
8442:22, 8454:24,
8457:4, 8457:5
**definitions** [3] -
8388:2, 8433:25,
8458:15
**degree** [4] - 8373:17,
8373:20, 8385:11,
8388:4
**demand** [7] - 8381:15,
8385:17, 8390:13,

8483

8408:19, 8430:8,
8433:5, 8457:14
**demander** [1] -
8454:25
**demonstrate** [1] -
8456:22
**dentist** [1] - 8396:3
**dentists** [1] - 8411:6
**Denver** [1] - 8367:23
**DEPARTMENT** [2] -
8367:12, 8367:19
**Department** [1] -
8367:15
**depicted** [1] - 8403:1
**depicts** [3] - 8374:13,
8395:13, 8406:11
**deposition** [2] -
8377:14, 8430:3
**depth** [4] - 8428:24,
8429:8, 8429:10,
8473:22
**DEPUTY** [2] - 8369:4,
8375:4
**describe** [21] -
8375:22, 8380:7,
8381:8, 8386:20,
8390:20, 8392:2,
8392:20, 8393:2,
8394:1, 8395:13,
8401:2, 8415:22,
8417:23, 8421:3,
8425:16, 8435:18,
8442:17, 8453:18,
8456:14, 8457:23,
8461:24
**described** [3] -
8444:15, 8456:15,
8457:3
**describing** [1] -
8400:9
**deserving** [1] -
8423:21
**designed** [1] -
8372:23
**desktop** [2] - 8404:6,
8428:1
**detailed** [1] - 8372:22
**determine** [2] -
8382:13, 8389:13
**determines** [1] -
8463:4
**developing** [1] -
8438:9
**development** [1] -
8443:14
**device** [2] - 8419:12,
8451:10
**devices** [1] - 8432:4
**devotes** [1] - 8403:2
**dialogue** [1] - 8417:8

**DICKMAN** [1] - 8475:4
**Dickman** [2] -
8368:16, 8475:12
**difference** [3] -
8435:18, 8461:16,
8464:25
**differences** [5] -
8405:19, 8462:9,
8462:10, 8462:14,
8464:9
**different** [63] -
8378:22, 8379:24,
8380:22, 8380:23,
8380:25, 8382:4,
8388:1, 8389:20,
8393:13, 8395:10,
8396:7, 8398:22,
8398:23, 8400:14,
8400:17, 8401:16,
8402:16, 8406:20,
8408:21, 8408:22,
8408:24, 8409:23,
8410:17, 8413:21,
8414:14, 8419:6,
8419:14, 8422:13,
8422:25, 8425:10,
8429:3, 8429:4,
8429:12, 8429:14,
8430:23, 8434:17,
8440:25, 8441:12,
8442:1, 8451:4,
8451:9, 8454:5,
8454:14, 8455:3,
8459:3, 8460:6,
8461:5, 8461:7,
8462:4, 8462:12,
8462:20, 8464:11,
8465:7, 8466:7,
8467:21, 8468:17
**differentiated** [8] -
8384:25, 8385:5,
8385:9, 8385:10,
8385:13, 8396:21,
8413:8, 8413:10
**differentiation** [3] -
8385:11, 8385:18,
8414:2
**differently** [3] -
8379:20, 8454:1,
8460:6
**dig** [1] - 8444:5
**digital** [3] - 8454:13,
8457:11, 8457:12
**dimension** [1] -
8409:20
**dimensions** [1] -
8445:24
**dinner** [1] - 8421:22
**DINTZER** [2] - 8371:7,
8377:21

**Dintzer** [2] - 8367:11,
8369:6
**direct** [7] - 8435:19,
8439:4, 8440:6,
8440:7, 8446:12,
8447:4, 8447:8
**DIRECT** [1] - 8375:14
**direction** [1] - 8474:2
**directly** [7] - 8379:4,
8379:12, 8438:25,
8439:10, 8440:13,
8444:3, 8445:15
**director** [1] - 8376:4
**disagree** [7] -
8376:19, 8385:1,
8391:24, 8392:16,
8417:6, 8423:22,
8446:17
**disagreed** [1] -
8376:16
**disagreement** [2] -
8376:20, 8436:18
**disclosure** [1] -
8374:19
**discounts** [1] -
8399:15
**discreet** [2] - 8417:16,
8418:11
**discrete** [1] - 8423:6
**discuss** [3] - 8378:15,
8383:2, 8427:6
**discussed** [2] -
8439:6, 8453:17
**discussion** [5] -
8427:1, 8435:14,
8438:7, 8453:15,
8453:16
**discussions** [1] -
8371:21
**display** [9] - 8455:24,
8455:25, 8459:1,
8459:22, 8459:24,
8464:21, 8465:5,
8466:11, 8473:2
**disputing** [1] -
8407:18
**distant** [2] - 8382:11,
8384:10
**distinct** [10] - 8378:22,
8392:8, 8392:10,
8393:11, 8393:12,
8400:18, 8418:19,
8421:20, 8421:22,
8423:2
**distinction** [3] -
8397:9, 8405:15,
8461:15
**distinguishes** [2] -
8427:21, 8428:9
**distributed** [1] -

8378:7
**distribution** [7] -
8379:17, 8398:21,
8408:1, 8419:23,
8447:13, 8450:25
**DISTRICT** [3] - 8367:1,
8367:1, 8367:10
**divergence** [1] -
8394:1
**diversify** [1] - 8472:2
**diversion** [2] -
8386:13, 8386:14
**divide** [1] - 8460:23
**divided** [3] - 8464:5,
8464:6, 8464:7
**dividing** [5] - 8460:24,
8465:25, 8466:4
**division** [1] - 8412:5
**doable** [1] - 8394:8
**document** [10] -
8369:23, 8370:4,
8370:20, 8372:9,
8449:15, 8449:17,
8449:22, 8450:8,
8450:10, 8450:11
**documents** [10] -
8369:14, 8369:15,
8369:19, 8412:24,
8416:24, 8433:16,
8433:20, 8433:23,
8434:7, 8434:11
**DoJ** [5] - 8367:11,
8369:6, 8393:20,
8415:19, 8458:14
**dollars** [4] - 8373:22,
8385:24, 8472:1,
8472:2
**dominant** [1] -
8388:21
**done** [9] - 8370:20,
8386:21, 8401:15,
8402:21, 8407:6,
8443:5, 8456:6,
8466:25, 8470:3
**double** [1] - 8442:25
**down** [18] - 8369:14,
8383:9, 8389:17,
8390:14, 8390:16,
8394:11, 8399:3,
8399:21, 8399:22,
8399:25, 8400:21,
8416:9, 8416:20,
8423:4, 8444:25,
8458:11, 8458:23,
8464:10
**download** [1] - 8453:5
**dr** [1] - 8378:2
**Dr** [28] - 8369:13,
8370:24, 8375:3,
8375:9, 8375:16,

8484

8375:22, 8376:7,
8377:19, 8377:24,
8378:14, 8380:3,
8382:19, 8386:17,
8391:20, 8393:20,
8396:6, 8404:18,
8405:18, 8427:6,
8427:12, 8433:8,
8442:17, 8445:7,
8453:14, 8461:19,
8469:1, 8471:9, 8474:3
**draw** [2] - 8381:21,
8398:19
**drill** [1] - 8416:9
**driven** [2] - 8387:2,
8415:12
**drivers** [1] - 8472:20
**drives** [1] - 8424:8
**driving** [1] - 8472:20
**due** [2] - 8383:10,
8383:25
**duly** [1] - 8375:7
**Dunn** [1] - 8372:8
**during** [1] - 8427:7
**DXD29** [1] - 8378:6
**DXD29.062** [1] -
8369:23, 8370:7,
8374:12
**DXD29.071** [2] -
8370:20, 8373:12
**DXD29.147** [2] -
8370:10, 8373:23

## E

**early** [1] - 8406:5
**earning** [1] - 8447:12
**easiest** [1] - 8373:12
**easily** [2] - 8427:22,
8464:8
**easy** [1] - 8387:12
**eBay** [1] - 8395:22
**econ** [1] - 8390:13
**economic** [8] -
8380:5, 8382:22,
8385:8, 8388:24,
8389:2, 8389:11,
8390:18, 8467:11
**economics** [13] -
8375:25, 8376:8,
8376:11, 8377:15,
8377:20, 8377:24,
8383:23, 8385:7,
8386:14, 8388:12,
8393:15, 8400:8,
8413:1
**economist** [10] -
8375:24, 8387:13,
8387:24, 8388:8,
8388:15, 8411:20,

8445:18, 8451:15,
8467:18, 8468:22
**economists** [5] -
8381:15, 8382:25,
8389:10, 8390:9,
8395:18
**economy** [1] - 8434:24
**education** [2] -
8394:19, 8395:16
**educational** [1] -
8375:23
**effect** [3] - 8379:20,
8452:18, 8452:20
**effectively** [3] -
8378:25, 8397:21,
8448:10
**effects** [2] - 8379:16,
8471:7
**efforts** [1] - 8432:9
**eight** [1] - 8399:5
**either** [3] - 8387:19,
8397:12, 8412:7
**Email** [6] - 8367:14,
8367:17, 8367:24,
8368:8, 8368:12,
8368:15
**email** [1] - 8368:5
**emphasizing** [1] -
8467:15
**empirical** [2] -
8428:11, 8431:22
**employment** [1] -
8375:23
**enabled** [1] - 8441:3
**encourage** [1] -
8426:24
**end** [1] - 8453:14
**energy** [3] - 8427:16,
8427:18, 8428:12
**engaged** [5] - 8376:7,
8376:22, 8377:3,
8377:7, 8377:10
**engine** [5] - 8401:12,
8423:5, 8438:11,
8441:17, 8452:4
**engines** [14] - 8396:6,
8396:9, 8396:10,
8396:12, 8405:20,
8405:24, 8407:20,
8411:16, 8412:11,
8427:16, 8428:24,
8431:3, 8432:3,
8458:10
**enter** [7] - 8411:22,
8411:23, 8424:1,
8424:4, 8424:5,
8424:24
**entered** [1] - 8444:24
**enters** [2] - 8411:17
**entirety** [1] - 8378:6

**entity** [1] - 8444:1
**entry** [7] - 8436:4,
8436:12, 8437:24,
8438:4, 8438:13,
8438:23, 8439:2
**environment** [1] -
8446:9
**equally** [1] - 8434:6
**equate** [1] - 8389:19
**equation** [1] - 8466:14
**especially** [3] -
8410:22, 8414:19,
8429:15
**ESPN** [1] - 8456:4
**essentially** [2] -
8408:4, 8449:3
**establish** [2] -
8431:23, 8439:10
**Estee** [1] - 8472:16
**et** [1] - 8367:3
**evaluate** [1] - 8469:19
**event** [1] - 8420:9,
8423:6
**events** [4] - 8417:16,
8418:11, 8421:20,
8423:2
**everyday** [1] - 8456:23
**everywhere** [3] -
8388:6, 8418:6, 8439:2
**evidence** [35] -
8379:4, 8379:12,
8392:20, 8393:2,
8399:11, 8400:21,
8400:22, 8412:20,
8416:24, 8428:11,
8431:22, 8435:4,
8435:25, 8436:1,
8436:6, 8436:8,
8439:4, 8440:5,
8443:8, 8443:10,
8444:2, 8447:8,
8447:19, 8447:20,
8447:21, 8448:3,
8451:12, 8458:17,
8467:5, 8467:16,
8467:21, 8468:2,
8473:6
**evolution** [1] -
8454:13
**exact** [1] - 8444:19
**exactly** [2] - 8422:6,
8422:9
**EXAMINATION** [1] -
8375:14
**examined** [1] - 8375:8
**example** [19] -
8372:15, 8391:2,
8391:8, 8399:7,
8401:18, 8411:2,
8430:1, 8430:2,

8430:19, 8432:9,
8434:1, 8452:15,
8455:24, 8455:25,
8458:24, 8464:22,
8471:15, 8472:16,
8472:22
**examples** [4] -
8429:25, 8458:8,
8461:19, 8471:16
**excluded** [2] -
8458:20, 8459:15
**excludes** [2] -
8456:17, 8456:19
**exercise** [1] - 8394:7
**exhaustive** [1] -
8458:2
**exist** [3] - 8382:4,
8424:9, 8438:24
**exists** [1] - 8388:4
**expanding** [1] -
8439:16
**expansion** [2] -
8437:25, 8456:25
**expect** [3] - 8446:20,
8452:9, 8460:25
**Expedia** [20] - 8384:8,
8386:3, 8391:12,
8391:13, 8395:1,
8396:1, 8400:4,
8402:20, 8402:22,
8403:14, 8412:22,
8413:22, 8416:18,
8416:23, 8427:23,
8431:11, 8431:18,
8434:8, 8434:9, 8448:6
**Expedia's** [1] -
8429:10
**expenditures** [1] -
8444:17
**experience** [2] -
8392:20, 8468:20
**experiment** [1] -
8449:8
**experimentation** [1] -
8466:25
**experiments** [2] -
8449:7, 8449:19
**expert** [9] - 8372:21,
8376:2, 8376:8,
8376:11, 8376:22,
8377:3, 8377:10,
8377:20, 8377:24
**experts** [3] - 8415:20,
8420:10, 8420:23
**explain** [5] - 8396:14,
8415:17, 8423:13,
8423:23, 8470:13
**explicit** [1] - 8472:23
**explicitly** [5] - 8387:5,
8424:6, 8459:15,

8485

8459:19, 8459:20
**exploding** [1] -
8442:22
**exponentially** [1] -
8444:12
**expressed** [1] -
8437:25
**expressing** [1] -
8450:21
**extent** [8] - 8396:11,
8403:17, 8405:23,
8406:1, 8412:7,
8448:24, 8469:11,
8469:12
**externally** [1] -
8371:23
**extreme** [1] - 8412:25
**extremely** [2] - 8374:4,
8427:22
**eyes** [1] - 8383:24

---

## F

**face** [7] - 8381:22,
8381:25, 8382:2,
8398:9, 8447:21,
8449:16, 8450:7
**Facebook** [2] -
8384:9, 8458:4
**faces** [6] - 8378:25,
8379:10, 8397:14,
8404:25, 8414:8,
8437:2
**facing** [2] - 8434:10,
8450:5
**fact** [17] - 8370:1,
8374:7, 8379:13,
8385:11, 8396:18,
8400:2, 8407:25,
8413:9, 8429:12,
8429:19, 8430:14,
8438:24, 8447:20,
8461:14, 8462:12,
8462:20
**factor** [5] - 8443:14,
8470:7, 8470:11,
8470:25, 8471:8
**factored** [1] - 8446:11
**factors** [9] - 8387:10,
8436:7, 8436:9,
8436:16, 8438:8,
8447:7, 8470:5,
8470:19, 8470:21
**fail** [3] - 8437:23,
8456:21, 8457:1
**fails** [1] - 8417:6
**fair** [7] - 8396:14,
8402:16, 8416:3,
8432:8, 8448:7,
8457:7, 8467:20

**fairly** [1] - 8395:20
**fall** [1] - 8436:25
**fallacy** [2] - 8382:20,
8383:10
**familiar** [2] - 8381:3,
8382:20
**far** [12] - 8394:9,
8395:7, 8395:21,
8409:14, 8432:10,
8441:21, 8448:4,
8448:10, 8452:14,
8460:20, 8473:9,
8473:11
**fashion** [1] - 8371:24
**faster** [1] - 8441:13
**favor** [2] - 8416:1,
8417:2
**favorably** [1] -
8372:24
**favorite** [1] - 8428:18
**feature** [1] - 8408:4
**features** [2] - 8379:25,
8446:10
**fed** [2] - 8455:20,
8456:3
**Federal** [1] - 8376:25
**few** [7] - 8384:20,
8406:6, 8417:21,
8450:18, 8454:13,
8458:7, 8460:10
**fewer** [1] - 8463:2
**fifth** [2] - 8432:1,
8458:25
**fight** [3] - 8415:3,
8430:24, 8431:20
**fighting** [4] - 8412:4,
8412:7, 8429:14,
8429:17
**figure** [4] - 8382:18,
8394:4, 8407:6, 8460:7
**figures** [1] - 8374:11
**figuring** [1] - 8386:9
**fill** [1] - 8388:17
**final** [2] - 8426:18,
8432:15
**finally** [6] - 8374:12,
8379:23, 8432:1,
8448:18, 8450:21,
8456:25
**fine** [2] - 8398:8,
8473:23
**firm** [17] - 8376:3,
8376:5, 8381:12,
8381:16, 8381:21,
8382:14, 8388:4,
8388:10, 8388:20,
8434:10, 8434:24,
8439:8, 8439:11,
8439:16, 8440:22,
8447:24

**firm's** [3] - 8381:12,
8381:13, 8437:19
**firms** [18] - 8380:23,
8380:25, 8388:18,
8391:18, 8394:20,
8395:4, 8433:19,
8433:20, 8433:25,
8434:3, 8434:5,
8435:1, 8437:20,
8450:7, 8454:3,
8454:5, 8454:14,
8465:24
**first** [33] - 8369:20,
8369:23, 8375:7,
8378:17, 8378:18,
8378:20, 8380:16,
8383:2, 8383:3,
8383:21, 8385:5,
8385:15, 8390:19,
8392:2, 8399:4,
8401:18, 8416:13,
8417:4, 8418:22,
8423:18, 8426:3,
8426:4, 8426:18,
8428:5, 8429:7,
8433:19, 8436:23,
8444:23, 8455:5,
8459:6, 8467:6,
8469:18
**fits** [1] - 8410:19
**five** [11] - 8400:2,
8416:1, 8416:3,
8416:6, 8416:9,
8417:2, 8418:15,
8418:17, 8418:19,
8422:8, 8462:4
**five-minute** [2] -
8418:15, 8422:8
**flag** [1] - 8458:25
**flat** [1] - 8441:9
**flight** [2] - 8391:9,
8392:10
**flights** [10] - 8391:11,
8391:13, 8401:17,
8402:16, 8402:17,
8402:18, 8402:23,
8403:8, 8403:13,
8404:3
**flip** [1] - 8450:9
**Floor** [3] - 8367:22,
8368:10, 8368:14
**flow** [1] - 8386:10
**focus** [8] - 8381:15,
8385:1, 8385:2,
8390:9, 8408:19,
8430:7, 8445:14,
8452:22
**focused** [6] - 8451:2,
8456:18, 8457:9,
8469:5, 8469:6,

8473:11
**focusing** [3] -
8388:24, 8434:7,
8469:11
**follow** [1] - 8426:9
**follow-up** [1] - 8426:9
**following** [1] -
8469:10
**follows** [2] - 8375:8,
8456:3
**food** [2] - 8392:24,
8399:12, 8399:22
**foods** [1] - 8398:22
**FOR** [1] - 8367:1
**foregoing** [1] - 8475:5
**forever** [1] - 8433:22
**forevermore** [1] -
8428:6
**forget** [1] - 8455:7
**form** [6] - 8431:13,
8446:14, 8446:17,
8459:4, 8459:8,
8461:12
**formation** [1] - 8431:4
**formats** [1] - 8460:6
**forms** [3] - 8416:2,
8418:8, 8467:21
**formula** [1] - 8460:17
**forth** [10] - 8386:10,
8396:13, 8416:12,
8417:3, 8426:21,
8453:18, 8454:22,
8455:3, 8468:4,
8471:14
**forward** [4] - 8374:7,
8428:10, 8441:23,
8446:8
**founded** [1] - 8380:4
**four** [2] - 8376:4,
8378:17
**fourth** [3] - 8379:11,
8431:2, 8458:25
**fourths** [2] - 8423:19
**framework** [1] -
8380:8
**frankly** [5] - 8387:12,
8388:3, 8412:20,
8413:20, 8448:7
**free** [2] - 8397:24,
8424:14
**frequently** [1] -
8438:14
**fryers** [2] - 8406:24,
8407:10
**fulfil** [1] - 8393:6
**full** [7] - 8376:2,
8387:14, 8413:18,
8419:23, 8421:17,
8422:4, 8475:6
**full-time** [1] - 8376:2

**fully** [3] - 8412:17, 8425:24, 8426:20
**function** [2] - 8398:15, 8408:15
**functions** [1] - 8398:14
**fundamental** [3] - 8388:12, 8392:12, 8460:13
**fundamentally** [1] - 8414:4

# G

**game** [1] - 8452:10
**gap** [1] - 8441:13
**gateway** [5] - 8423:10, 8423:14, 8424:14, 8425:15, 8426:7
**geared** [1] - 8402:14
**general** [22] - 8396:6, 8396:8, 8396:10, 8396:11, 8401:12, 8405:19, 8405:24, 8407:20, 8407:24, 8408:1, 8412:10, 8416:10, 8427:15, 8428:7, 8428:23, 8431:3, 8431:21, 8432:3, 8438:10, 8458:10, 8458:14
**generally** [6] - 8392:23, 8395:23, 8423:1, 8433:15, 8437:13, 8461:24
**generate** [2] - 8455:4, 8458:3
**generates** [1] - 8380:24
**generically** [1] - 8431:7
**geography** [1] - 8420:16
**Giant** [1] - 8392:24
**giant** [1] - 8393:17
**Gibson** [1] - 8372:8
**given** [6] - 8419:20, 8422:12, 8424:14, 8444:19, 8445:7, 8459:18
**glass** [1] - 8405:11
**glean** [1] - 8433:8
**Goodrich** [2] - 8368:9, 8368:13
**Google** [185] - 8367:6, 8368:6, 8369:6, 8369:12, 8369:25, 8370:13, 8370:14, 8372:15, 8372:16, 8374:14, 8374:15,

8375:3, 8377:4, 8377:7, 8377:11, 8378:25, 8379:5, 8379:10, 8379:12, 8379:21, 8380:12, 8382:16, 8383:12, 8383:13, 8383:15, 8383:16, 8383:17, 8383:19, 8384:13, 8384:14, 8386:2, 8386:3, 8386:6, 8391:4, 8391:11, 8395:15, 8395:21, 8395:25, 8396:2, 8396:4, 8396:19, 8397:11, 8397:14, 8397:17, 8397:19, 8397:21, 8397:23, 8398:1, 8398:11, 8398:12, 8399:19, 8400:2, 8401:4, 8401:5, 8401:8, 8402:17, 8403:13, 8404:25, 8405:2, 8405:4, 8405:13, 8406:12, 8406:22, 8406:24, 8407:9, 8407:11, 8409:2, 8409:3, 8410:2, 8410:23, 8411:9, 8411:17, 8411:22, 8411:25, 8412:3, 8412:23, 8413:6, 8413:10, 8413:12, 8413:13, 8413:19, 8413:23, 8414:4, 8414:8, 8414:9, 8414:20, 8414:21, 8415:2, 8415:16, 8415:18, 8416:16, 8416:17, 8416:22, 8416:23, 8417:10, 8417:15, 8418:3, 8418:5, 8418:7, 8418:9, 8418:12, 8418:15, 8418:24, 8419:2, 8423:10, 8424:2, 8424:3, 8424:5, 8424:6, 8424:8, 8424:12, 8424:18, 8424:19, 8425:11, 8425:21, 8425:23, 8426:1, 8426:4, 8426:25, 8430:4, 8430:6, 8430:14, 8430:15, 8430:24, 8431:10, 8432:22, 8433:6, 8433:16, 8434:7, 8434:20, 8435:8, 8435:21, 8437:2,

8437:15, 8437:21, 8438:25, 8440:9, 8443:24, 8443:25, 8444:3, 8444:5, 8444:10, 8445:3, 8445:4, 8445:22, 8445:24, 8446:8, 8448:3, 8448:9, 8448:15, 8448:21, 8448:22, 8448:24, 8449:3, 8449:8, 8449:12, 8449:19, 8449:21, 8450:2, 8450:5, 8450:17, 8450:22, 8451:2, 8451:6, 8451:17, 8451:20, 8451:21, 8452:1, 8452:3, 8452:7, 8452:13, 8455:9, 8457:11, 8457:16, 8459:5, 8462:7, 8466:9, 8466:11, 8469:2, 8469:6, 8469:7, 8469:8, 8470:3
**Google's** [17] - 8372:21, 8372:24, 8379:25, 8380:1, 8385:22, 8397:18, 8406:18, 8411:8, 8412:10, 8412:18, 8418:1, 8434:23, 8443:13, 8447:9, 8448:18, 8466:11, 8467:2
**government** [3] - 8370:4, 8376:22, 8377:1
**grab** [1] - 8405:14
**grapple** [1] - 8405:1
**gray** [1] - 8422:6
**great** [1] - 8453:24
**green** [1] - 8372:2
**group** [11] - 8381:25, 8382:2, 8395:5, 8400:14, 8400:15, 8400:16, 8400:18, 8417:17, 8434:12, 8469:8
**grouped** [1] - 8420:14
**grouping** [3] - 8372:2, 8393:17, 8447:8
**groupings** [1] - 8394:16
**GSE** [24] - 8379:18, 8401:21, 8401:24, 8402:2, 8402:10, 8402:15, 8403:3, 8403:6, 8403:20, 8409:14, 8417:10,

8425:3, 8427:21, 8428:2, 8431:24, 8432:7, 8432:18, 8433:17, 8435:11, 8437:3, 8438:2, 8447:10, 8452:25, 8453:7
**GSE-only** [1] - 8437:3
**GSEs** [26] - 8402:7, 8402:17, 8402:23, 8403:10, 8404:4, 8408:13, 8409:14, 8416:4, 8423:18, 8423:20, 8423:21, 8425:2, 8428:9, 8429:12, 8429:17, 8429:22, 8431:7, 8431:14, 8432:16, 8433:16, 8435:5, 8436:13, 8442:21, 8447:17, 8448:10, 8453:2
**guess** [3] - 8383:20, 8387:3, 8446:13
**guys** [3] - 8406:8, 8415:13, 8416:25

# H

**habit** [8] - 8431:3, 8431:7, 8431:9, 8431:10, 8431:12, 8431:18, 8431:24
**habits** [4] - 8431:8, 8431:11, 8431:12, 8431:13
**half** [2] - 8399:5, 8404:2
**hallmark** [2] - 8446:2, 8450:4
**hallmarks** [2] - 8443:1, 8443:6
**hand** [14] - 8369:15, 8370:22, 8375:5, 8421:5, 8421:6, 8421:15, 8444:11, 8444:14, 8458:1, 8460:20, 8462:1, 8462:21, 8462:22, 8463:5
**handle** [2] - 8410:15, 8466:13
**hands** [1] - 8429:2
**hang** [2] - 8410:4, 8419:2
**hard** [3] - 8409:19, 8467:11, 8470:22
**harder** [1] - 8390:4
**harm** [6] - 8372:16, 8372:25, 8373:6,

8373:19, 8374:2,
8457:2
**harmed** [2] - 8379:21,
8380:2
**harms** [1] - 8379:21
**head** [2] - 8384:15
**hear** [2] - 8388:1,
8469:1
**heard** [14] - 8371:5,
8371:9, 8371:16,
8373:10, 8379:24,
8382:19, 8384:22,
8405:18, 8435:21,
8460:5, 8463:11,
8463:15, 8463:18,
8469:3
**heart** [2] - 8383:4,
8392:5
**hearts** [1] - 8398:20
**heavily** [1] - 8444:13
**help** [4] - 8378:11,
8391:15, 8458:8,
8466:14
**helpful** [2] - 8380:10,
8410:11
**helps** [2] - 8430:24,
8458:24
**hereby** [1] - 8475:4
**high** [8] - 8383:16,
8384:5, 8384:14,
8392:18, 8404:3,
8448:15, 8463:24,
8472:15
**high-quality** [1] -
8448:15
**higher** [12] - 8373:17,
8381:17, 8388:19,
8422:20, 8437:13,
8440:10, 8462:24,
8462:25, 8463:24,
8464:10, 8468:19,
8472:5
**highest** [1] - 8472:20
**highlighted** [2] -
8438:8, 8445:13
**highly** [1] - 8471:17
**hit** [1] - 8473:7
**hits** [1] - 8406:22
**hold** [2] - 8426:7,
8432:3
**holds** [1] - 8413:12
**honestly** [2] - 8394:21,
8426:20
**Honor** [28] - 8369:4,
8369:11, 8369:16,
8369:20, 8369:21,
8369:23, 8370:8,
8370:10, 8370:13,
8371:1, 8371:7,
8371:10, 8371:16,

8372:7, 8373:8,
8375:2, 8375:12,
8377:19, 8377:21,
8378:5, 8417:8,
8418:1, 8423:15,
8427:2, 8442:7,
8450:12, 8468:4,
8473:21
**Honor's** [1] - 8429:13
**HONORABLE** [1] -
8367:9
**hope** [1] - 8369:8
**hotels** [1] - 8435:6
**hours** [3] - 8422:14,
8422:20, 8422:24
**house** [1] - 8411:7
**Huang** [1] - 8368:12
**hundreds** [2] -
8376:10, 8433:20
**hypothetical** [4] -
8387:1, 8387:6,
8387:15, 8440:20

---

# I

**I-S-R-A-E-L** [1] -
8375:19
**idea** [9] - 8371:21,
8383:15, 8385:4,
8390:5, 8391:10,
8392:19, 8425:10,
8426:7, 8446:19
**ideal** [1] - 8452:7
**identical** [1] - 8396:8
**identified** [4] -
8384:20, 8396:19,
8396:22, 8436:8
**identify** [6] - 8381:11,
8381:20, 8426:15,
8427:16, 8436:7,
8442:10
**IL** [1] - 8367:16
**image** [1] - 8390:22
**imagine** [1] - 8441:1
**immediate** [1] -
8446:3
**immediately** [1] -
8445:23
**impact** [1] - 8371:22
**impacts** [1] - 8374:20
**implicit** [1] - 8397:10
**implied** [1] - 8467:7
**imply** [1] - 8384:18
**importance** [1] -
8371:16
**important** [12] -
8381:6, 8385:20,
8389:9, 8397:9,
8414:1, 8414:25,
8420:7, 8426:6,

8455:13, 8459:2,
8460:10, 8468:12
**importantly** [1] -
8434:6
**imposed** [1] - 8428:12
**impression** [1] -
8465:22
**impressions** [6] -
8460:19, 8460:22,
8460:24, 8460:25,
8465:25, 8466:5
**impressive** [1] -
8442:15
**improperly** [2] -
8378:20, 8378:21
**improve** [2] - 8379:19,
8445:23
**improvements** [2] -
8441:7, 8449:4
**IN** [1] - 8367:1
**include** [13] - 8382:8,
8402:20, 8422:16,
8423:25, 8425:9,
8443:25, 8452:15,
8458:9, 8458:13,
8458:14, 8472:16
**included** [2] - 8420:4,
8472:10
**includes** [2] - 8420:18,
8458:15
**including** [3] -
8374:13, 8374:15,
8404:15
**inconsistent** [1] -
8385:7
**increase** [2] - 8449:24,
8450:4
**increased** [3] -
8449:9, 8450:3, 8467:2
**increasing** [1] -
8444:12
**increasingly** [2] -
8427:25, 8469:23
**increment** [1] - 8450:6
**increments** [1] -
8423:1
**Indeed** [1] - 8396:2
**INDEX** [1] - 8474:8
**indicated** [5] - 8451:8,
8454:18, 8455:22,
8455:23, 8456:9
**indicating)** [2] -
8408:16, 8429:3
**indicia** [1] - 8446:7
**indirect** [9] - 8435:17,
8435:19, 8436:1,
8436:5, 8436:8,
8436:11, 8439:4,
8448:2
**individual** [2] -

8405:12, 8454:17
**industrial** [4] -
8376:12, 8377:16,
8377:20, 8377:24
**industries** [1] -
8389:11
**industry** [9] - 8392:21,
8393:3, 8394:16,
8442:23, 8442:24,
8443:1, 8443:6,
8454:12, 8468:21
**inept** [1] - 8427:25
**inflection** [1] -
8450:15
**information** [39] -
8370:1, 8371:18,
8371:21, 8372:5,
8372:10, 8372:14,
8372:22, 8373:12,
8373:14, 8373:16,
8373:19, 8374:1,
8374:5, 8374:8,
8374:17, 8374:19,
8374:22, 8374:23,
8390:25, 8391:1,
8391:3, 8391:4,
8391:7, 8391:15,
8392:8, 8429:20,
8429:23, 8429:24,
8430:13, 8430:15,
8430:18, 8430:22,
8454:4, 8456:3,
8459:13, 8464:1,
8466:22
**information-loaded**
[1] - 8454:4
**informational** [1] -
8420:16
**informative** [1] -
8451:13
**initial** [1] - 8432:17
**innovate** [2] - 8429:6,
8447:22
**innovation** [2] -
8441:8, 8441:19
**innovations** [1] -
8454:14
**inquiry** [2] - 8385:1,
8385:2
**inside** [1] - 8391:14
**Insights** [1] - 8469:9
**Instagram** [5] -
8374:14, 8455:14,
8455:19, 8462:6
**installed** [1] - 8404:10
**instead** [1] - 8393:17
**insulate** [1] - 8448:19
**insulated** [1] - 8449:4
**intended** [2] -
8398:22, 8399:2

8488

**intense** [2] - 8445:25, 8446:3
**intent** [1] - 8429:24
**intention** [1] - 8455:21
**intentionally** [1] - 8444:10
**interact** [4] - 8418:23, 8419:14, 8425:12
**interacting** [7] - 8418:7, 8418:9, 8418:14, 8418:24, 8419:1, 8419:6, 8419:11
**interaction** [1] - 8402:10
**interest** [3] - 8373:18, 8455:23, 8456:10
**interested** [3] - 8391:2, 8396:1, 8457:17
**interesting** [1] - 8391:13
**intermediate** [1] - 8373:3
**internal** [3] - 8373:21, 8433:16, 8469:8
**internet** [3] - 8423:10, 8444:8, 8444:9
**interpretation** [2] - 8449:7, 8449:15
**interrupt** [2] - 8386:23, 8420:11
**introduce** [1] - 8441:25
**intuitive** [1] - 8403:12
**invest** [6] - 8449:14, 8449:22, 8449:23, 8449:24, 8450:3, 8450:6
**investing** [4] - 8443:17, 8444:13, 8445:5, 8450:17
**investment** [9] - 8389:20, 8389:22, 8443:18, 8443:20, 8449:18, 8464:4, 8470:23, 8471:1, 8471:8
**investments** [3] - 8444:3, 8444:4, 8444:10
**involve** [1] - 8421:12
**IOS** [1] - 8452:13
**iPhone** [1] - 8404:12
**Israel** [19] - 8370:24, 8375:3, 8375:4, 8375:9, 8375:16, 8375:18, 8375:22, 8376:7, 8377:19, 8377:24, 8378:2,

8378:14, 8380:3, 8382:19, 8386:17, 8391:20, 8393:20, 8396:6, 8404:18, 8405:18, 8427:6, 8427:12, 8433:8, 8442:17, 8445:7, 8453:14, 8461:19, 8471:9, 8474:3
**ISRAEL** [1] - 8375:6
**israel** [1] - 8369:13
**Israel.........................
.................8375** [1] - 8474:11
**issue** [11] - 8369:15, 8382:3, 8382:16, 8383:7, 8386:17, 8387:25, 8420:10, 8420:24, 8429:22, 8434:19, 8453:7
**italicized** [1] - 8435:18
**items** [1] - 8392:24
**iterations** [1] - 8405:18
**itself** [3] - 8389:16, 8408:5, 8449:17

## J

**JANICE** [1] - 8475:4
**Janice** [2] - 8368:16, 8475:12
**job** [5] - 8396:1, 8409:9, 8437:17, 8437:22, 8440:1
**jobs** [1] - 8395:16
**John** [1] - 8368:6
**joint** [2] - 8451:18, 8451:20
**jon.sallet@coag.gov** [1] - 8367:24
**Jonathan** [2] - 8367:19, 8369:6
**Josh** [1] - 8369:22
**joshua** [1] - 8372:7
**Jr** [1] - 8368:2
**jschmidtlein@wc.
com** [1] - 8368:8
**Judge** [1] - 8427:10
**JUDGE** [1] - 8367:10
**judge** [3] - 8369:13, 8376:16, 8440:14
**judges** [1] - 8376:14
**Judicial** [1] - 8367:21
**jump** [2] - 8389:3, 8425:13
**jumps** [1] - 8395:17
**JUSTICE** [1] - 8367:15
**Justice** [1] - 8367:15
**justification** [1] -

8459:25

## K

**Kayak** [2] - 8430:12, 8430:16
**keep** [4] - 8371:25, 8372:5, 8385:20, 8452:5
**Kenneth** [2] - 8367:11, 8369:6
**kenneth.dintzer2@
usdoj.gov** [1] - 8367:14
**kept** [1] - 8429:2
**key** [5] - 8381:23, 8405:15, 8456:17, 8467:14, 8467:15
**kind** [9] - 8371:18, 8372:1, 8372:4, 8392:5, 8398:3, 8410:18, 8410:19, 8424:22, 8435:9
**kitchen** [5] - 8455:2, 8455:5, 8455:6, 8455:8, 8455:15
**Knife** [10] - 8405:5, 8405:6, 8405:7, 8405:9, 8405:13, 8407:17, 8410:10, 8410:14, 8410:17, 8415:25
**knives** [11] - 8455:2, 8455:5, 8455:6, 8455:8, 8455:15, 8456:2, 8456:3, 8456:4, 8456:7, 8456:10
**Knives** [1] - 8405:8
**known** [4] - 8427:22, 8427:24, 8428:8, 8428:20
**knows** [1] - 8460:3
**Kohl's** [2] - 8472:7, 8472:10

## L

**Lab** [1] - 8469:8
**lack** [1] - 8449:13
**laptops** [1] - 8425:11
**large** [7] - 8426:6, 8437:21, 8452:3, 8452:8, 8456:21, 8462:9
**largely** [2] - 8428:18, 8461:15
**larger** [1] - 8379:19
**LaSalle** [1] - 8367:15
**last** [16] - 8371:19, 8372:17, 8373:1,

8375:18, 8382:14, 8389:2, 8390:8, 8394:23, 8410:7, 8413:9, 8444:15, 8445:14, 8454:13, 8456:6, 8463:9, 8464:2
**Lauder** [1] - 8472:16
**launching** [1] - 8438:10
**LAW** [1] - 8367:19
**lead** [5] - 8394:20, 8395:19, 8396:4, 8449:10, 8449:14
**leading** [2] - 8456:24, 8464:12
**leads** [2] - 8391:25, 8394:15
**learn** [3] - 8408:15, 8428:4, 8460:11
**least** [15] - 8372:10, 8373:20, 8374:10, 8383:22, 8387:1, 8392:6, 8399:23, 8418:17, 8418:19, 8418:25, 8423:2, 8425:12, 8434:6, 8445:3, 8464:21
**left** [14] - 8370:13, 8370:22, 8376:1, 8415:24, 8421:15, 8421:23, 8442:8, 8444:11, 8458:1, 8462:1, 8462:8, 8465:9, 8465:12, 8465:13
**left-hand** [5] - 8370:22, 8421:15, 8444:11, 8458:1, 8462:1
**length** [1] - 8418:22
**less** [14] - 8398:12, 8403:9, 8440:9, 8441:19, 8441:20, 8441:21, 8443:17, 8446:21, 8449:10, 8449:25, 8462:15, 8462:18, 8463:3, 8463:6
**lesson** [2] - 8438:18, 8438:22
**level** [1] - 8392:18
**Lexecon** [1] - 8376:3
**light** [1] - 8414:1
**likely** [1] - 8463:21
**limited** [1] - 8429:24
**line** [7] - 8372:2, 8372:3, 8431:16, 8440:3, 8442:8, 8467:9, 8467:23
**linked** [1] - 8400:5

8489

**LIPMAN** [1] - 8372:20
**Lipton** [2] - 8369:22, 8372:7
**LIPTON** [2] - 8372:7, 8373:8
**list** [4] - 8456:16, 8458:1, 8458:2, 8471:6
**listed** [2] - 8470:21, 8471:8
**literally** [1] - 8406:8
**LLC** [2] - 8367:6, 8369:6
**LLP** [2] - 8368:2, 8368:6
**load** [1] - 8452:15
**loaded** [2] - 8442:9, 8454:4
**local** [9] - 8394:19, 8395:2, 8395:16, 8407:14, 8411:5, 8411:9, 8415:16, 8415:18
**location** [2] - 8417:4, 8417:10
**logic** [1] - 8426:24
**London** [4] - 8391:10, 8391:11, 8391:13, 8391:16
**long-term** [3] - 8470:8, 8471:5, 8471:7
**look** [59] - 8383:5, 8384:17, 8385:16, 8387:13, 8388:5, 8391:11, 8394:3, 8394:6, 8394:13, 8394:18, 8397:1, 8400:2, 8400:18, 8401:11, 8401:16, 8401:19, 8402:18, 8407:13, 8411:5, 8416:14, 8417:24, 8418:10, 8421:23, 8422:4, 8422:8, 8422:24, 8428:17, 8433:16, 8433:21, 8436:2, 8436:5, 8436:12, 8439:21, 8440:22, 8440:23, 8441:11, 8441:13, 8442:1, 8442:12, 8443:19, 8444:18, 8445:17, 8446:2, 8450:9, 8451:11, 8451:14, 8452:2, 8460:19, 8461:2, 8461:3, 8461:5, 8467:23, 8468:17, 8468:23, 8471:19, 8472:25
**looked** [10] - 8402:22,

8403:25, 8444:9, 8444:10, 8444:16, 8444:18, 8449:8, 8456:2, 8456:4, 8473:6
**looking** [14] - 8379:4, 8379:12, 8387:8, 8387:9, 8390:13, 8411:6, 8415:22, 8419:5, 8421:13, 8432:19, 8432:20, 8450:13, 8469:6, 8470:14
**looks** [1] - 8371:14
**loses** [1] - 8386:4
**losing** [1] - 8386:15
**love** [1] - 8435:10
**low** [2] - 8383:17, 8447:11
**lower** [11] - 8372:2, 8372:4, 8381:17, 8388:20, 8404:4, 8438:5, 8438:10, 8438:12, 8462:25, 8464:1, 8472:25
**lowers** [1] - 8463:7
**lunch** [2] - 8473:23, 8473:25

## M

**magnifying** [1] - 8405:11
**main** [1] - 8469:18
**Maine** [1] - 8368:7
**maintain** [1] - 8449:1
**majority** [4] - 8397:13, 8401:23, 8419:10, 8422:10
**maker** [5] - 8459:10, 8459:14, 8459:19, 8459:23
**makers** [1] - 8459:12
**makeup** [2] - 8463:19, 8463:21
**managing** [1] - 8376:4
**maniacally** [1] - 8473:11
**manically** [1] - 8469:3
**manufacturer** [1] - 8434:25
**marginal** [2] - 8388:3, 8388:5
**Mark** [4] - 8375:3, 8375:18, 8375:19, 8474:11
**MARK** [1] - 8375:6
**marked** [1] - 8378:6
**market** [85] - 8371:13, 8378:17, 8378:19, 8378:21, 8379:6,

8379:8, 8379:14, 8380:12, 8380:17, 8381:3, 8381:9, 8381:10, 8382:6, 8382:12, 8383:4, 8383:16, 8385:6, 8387:10, 8387:20, 8387:25, 8388:2, 8388:3, 8388:4, 8391:24, 8392:12, 8392:14, 8392:19, 8392:22, 8393:15, 8393:17, 8394:23, 8400:9, 8400:13, 8408:4, 8413:24, 8413:25, 8414:6, 8416:5, 8416:17, 8416:18, 8423:22, 8428:9, 8428:21, 8431:5, 8431:8, 8431:15, 8431:25, 8432:7, 8433:1, 8433:17, 8433:24, 8435:14, 8435:24, 8436:2, 8436:3, 8436:5, 8436:11, 8436:12, 8436:13, 8436:18, 8436:19, 8436:20, 8436:24, 8437:1, 8437:3, 8438:2, 8438:3, 8439:9, 8439:10, 8440:22, 8441:23, 8442:21, 8451:2, 8454:23, 8456:17, 8457:3, 8457:4, 8458:6, 8459:6, 8459:15, 8459:19, 8459:20
**market-wide** [1] - 8439:9
**marketing** [1] - 8471:24
**marketplace** [3] - 8372:25, 8373:4, 8374:3
**markets** [10] - 8378:23, 8391:21, 8409:17, 8434:1, 8434:4, 8444:23, 8457:20, 8458:6, 8458:9, 8458:12
**Marriott** [1] - 8399:21
**material** [2] - 8370:11, 8386:15
**materially** [1] - 8379:19
**math** [3] - 8389:25, 8460:18, 8460:20
**matter** [9] - 8376:21,

8377:2, 8377:6, 8377:9, 8377:10, 8377:13, 8433:10, 8438:24, 8463:14
**matters** [11] - 8376:12, 8376:14, 8376:17, 8389:8, 8389:9, 8389:15, 8390:15, 8394:21, 8411:21, 8473:14, 8473:17
**maximize** [2] - 8471:22, 8472:9
**mean** [35] - 8382:15, 8383:10, 8395:18, 8396:23, 8399:8, 8400:3, 8405:3, 8407:23, 8408:10, 8412:6, 8414:3, 8414:4, 8418:13, 8420:6, 8427:23, 8429:2, 8431:8, 8434:22, 8435:3, 8436:25, 8441:1, 8441:10, 8441:21, 8442:22, 8442:23, 8443:15, 8446:13, 8450:16, 8451:1, 8454:11, 8460:10, 8460:13, 8467:5, 8468:9, 8468:22
**meaning** [2] - 8381:16, 8389:16
**meaningfully** [3] - 8392:7, 8399:11, 8399:12
**means** [8] - 8392:23, 8411:20, 8412:6, 8437:2, 8439:9, 8440:12, 8447:10, 8449:12
**measure** [10] - 8439:22, 8440:3, 8446:15, 8446:18, 8452:20, 8457:19, 8466:20, 8466:22, 8467:8, 8473:10
**measured** [2] - 8390:3, 8390:4
**measures** [1] - 8422:21
**measuring** [1] - 8442:20
**media** [6] - 8385:23, 8448:23, 8458:5, 8471:23, 8471:24
**median** [6] - 8418:22, 8418:25, 8419:8, 8419:19, 8419:21
**MEHTA** [1] - 8367:9
**memorized** [1] -

8490

8470:22
**men's** [5] - 8391:2, 8391:3, 8391:4, 8391:6, 8391:7
**mentioned** [8] - 8371:12, 8388:23, 8404:18, 8415:20, 8428:1, 8434:15, 8442:5, 8468:1
**mentioning** [1] - 8438:8
**Meta** [1] - 8454:14
**metes** [1] - 8394:23
**method** [1] - 8388:22
**methodologies** [1] - 8373:2
**metric** [4] - 8467:7, 8467:14, 8467:15, 8467:24
**metrics** [1] - 8450:19
**Michael** [2] - 8368:9, 8369:11
**Microsoft** [12] - 8369:21, 8369:25, 8370:11, 8370:15, 8371:11, 8371:17, 8373:23, 8373:24, 8373:25, 8374:4, 8445:8, 8445:20
**Microsoft's** [2] - 8371:14, 8371:22
**might** [20] - 8384:5, 8388:1, 8408:22, 8410:23, 8414:17, 8427:3, 8428:4, 8431:9, 8431:10, 8432:7, 8439:25, 8446:16, 8446:20, 8450:14, 8450:15, 8452:6, 8457:15, 8462:16, 8471:24
**million** [6] - 8406:22, 8406:25, 8407:2, 8409:1, 8411:9, 8411:10
**mind** [6] - 8385:20, 8390:18, 8399:2, 8407:16, 8442:14, 8452:7
**mine** [1] - 8463:20
**minimum** [1] - 8425:14
**minus** [1] - 8389:14
**minute** [5] - 8396:14, 8418:15, 8421:15, 8422:8, 8461:4
**minutes** [6] - 8400:2, 8418:17, 8418:19, 8418:25, 8442:4, 8460:11

**misspell** [1] - 8439:25
**mix** [3] - 8471:21, 8471:24
**MMM** [2] - 8471:23, 8472:17
**mobile** [13] - 8404:6, 8404:13, 8404:14, 8410:22, 8418:8, 8425:9, 8425:10, 8427:25, 8432:12, 8432:13, 8444:7, 8444:8
**model** [5] - 8398:2, 8398:3, 8471:25, 8472:8, 8472:17
**models** [2] - 8471:23, 8472:1
**moment** [3] - 8424:16, 8435:13, 8436:23
**monetize** [4] - 8397:11, 8397:17, 8411:25, 8438:21
**monetized** [1] - 8437:13
**money** [23] - 8386:9, 8386:11, 8388:13, 8388:14, 8398:4, 8398:7, 8398:13, 8398:16, 8438:19, 8438:21, 8438:25, 8439:2, 8452:5, 8468:18, 8468:24, 8472:5, 8472:9, 8472:14, 8472:18, 8472:19, 8473:3, 8473:15, 8473:19
**monitor** [3] - 8469:17, 8469:20, 8469:21
**monitoring** [1] - 8469:23
**monopolist** [8] - 8387:1, 8387:6, 8387:15, 8440:21, 8441:5, 8452:4, 8452:9, 8452:10
**monopolists** [1] - 8388:13
**monopolization** [3] - 8385:9, 8388:11, 8414:7
**monopolized** [2] - 8383:15, 8385:6
**monopolous** [5] - 8439:9, 8443:16, 8445:18, 8446:3, 8452:2
**monopoly** [51] - 8378:18, 8379:5, 8379:13, 8381:22, 8386:17, 8386:20,

8387:22, 8387:23, 8387:24, 8388:2, 8388:6, 8388:8, 8388:9, 8388:14, 8388:18, 8388:20, 8391:25, 8433:4, 8435:16, 8435:21, 8436:1, 8436:6, 8436:8, 8436:10, 8436:14, 8436:17, 8436:21, 8437:18, 8439:7, 8439:8, 8439:14, 8440:6, 8440:7, 8440:12, 8443:7, 8445:16, 8447:4, 8447:8, 8447:15, 8447:19, 8447:23, 8447:24, 8448:4, 8448:9, 8448:11, 8450:22, 8451:12, 8452:1, 8453:14, 8456:22
**morning** [9] - 8369:2, 8369:8, 8369:10, 8369:11, 8371:10, 8375:9, 8375:16, 8423:4, 8461:24
**mortar** [1] - 8408:23
**most** [18] - 8376:24, 8386:7, 8389:9, 8404:24, 8407:25, 8408:1, 8410:22, 8416:21, 8419:24, 8420:7, 8421:11, 8439:21, 8446:13, 8460:13, 8470:25, 8471:7, 8473:7
**mostly** [6] - 8402:7, 8402:14, 8403:12, 8404:23, 8419:12, 8451:1
**motivation** [1] - 8444:6
**motor** [1] - 8434:2
**move** [15] - 8376:2, 8377:19, 8385:23, 8402:3, 8407:16, 8427:2, 8435:16, 8468:18, 8472:5, 8472:9, 8472:19, 8473:3, 8473:19, 8473:24
**moved** [1] - 8472:14
**movements** [1] - 8470:10
**moving** [7] - 8373:11, 8386:9, 8386:11, 8411:1, 8453:10, 8468:24, 8470:6
**MR** [46] - 8369:11,

8369:18, 8370:8, 8370:10, 8370:19, 8371:3, 8371:7, 8371:10, 8371:20, 8372:7, 8372:20, 8373:8, 8375:2, 8375:12, 8375:15, 8377:19, 8377:21, 8377:22, 8378:1, 8378:5, 8378:10, 8378:11, 8378:13, 8387:21, 8390:17, 8400:25, 8404:17, 8409:11, 8410:25, 8415:5, 8420:2, 8420:22, 8423:8, 8427:2, 8427:10, 8427:11, 8440:14, 8440:17, 8442:3, 8442:7, 8442:16, 8447:3, 8453:13, 8467:25, 8471:4, 8473:21
**msommer@wsgr.com** [1] - 8368:12
**multiple** [5] - 8374:14, 8376:24, 8386:8, 8389:6, 8422:21
**Murphy** [1] - 8451:19

## N

**N.W** [1] - 8475:13
**nadella** [1] - 8445:8
**Nadella** [1] - 8445:20
**nadella's** [1] - 8448:20
**name** [7] - 8375:16, 8375:18, 8424:5, 8424:21, 8455:7, 8462:5
**named** [3] - 8470:7, 8470:11, 8470:25
**naming** [1] - 8427:24
**natural** [1] - 8394:16
**naturally** [2] - 8394:15, 8461:3
**nature** [1] - 8472:9
**navigate** [1] - 8401:21
**navigated** [1] - 8401:13
**navigational** [6] - 8410:3, 8424:1, 8424:4, 8424:12, 8424:20, 8424:22
**navigationally** [1] - 8424:19
**near** [4] - 8398:19, 8411:6, 8411:7
**necessarily** [1] - 8371:13

8491

**need** [34] - 8378:10, 8381:20, 8382:13, 8382:14, 8385:15, 8392:23, 8393:1, 8393:4, 8393:5, 8393:6, 8395:22, 8395:25, 8398:4, 8401:2, 8404:22, 8410:18, 8428:4, 8434:4, 8434:17, 8434:18, 8439:10, 8439:12, 8439:16, 8443:7, 8448:5, 8449:14, 8451:5, 8451:6, 8451:9, 8453:4, 8454:25
**needed** [2] - 8398:25, 8427:16
**needing** [1] - 8448:20
**needs** [5] - 8388:7, 8398:1, 8429:6, 8434:9, 8442:8
**negotiating** [1] - 8451:21
**negotiation** [1] - 8451:5
**negotiations** [2] - 8451:3, 8451:6
**network** [2] - 8435:9, 8435:10
**never** [2] - 8439:22, 8442:14
**New** [3] - 8368:4, 8368:11, 8368:14
**new** [2] - 8428:6, 8448:22
**newspaper** [2] - 8384:6, 8413:3
**next** [32] - 8370:10, 8393:1, 8393:4, 8400:22, 8407:14, 8417:18, 8421:1, 8423:24, 8425:1, 8425:4, 8425:15, 8426:19, 8429:25, 8437:10, 8438:6, 8440:4, 8442:6, 8443:22, 8445:11, 8447:4, 8448:16, 8450:9, 8458:11, 8458:25, 8460:13, 8468:3, 8469:13, 8469:15, 8469:24, 8472:11, 8473:8, 8473:21
**nice** [2] - 8375:9, 8407:7
**nine** [2] - 8425:4, 8425:5
**Noble** [1] - 8408:23

**nobody** [1] - 8441:3
**nominal** [1] - 8389:15
**noncommercial** [13] - 8396:20, 8396:24, 8420:12, 8420:13, 8420:15, 8420:17, 8420:19, 8426:22, 8437:9, 8437:20, 8438:16, 8438:21, 8439:1
**none** [3] - 8428:14, 8443:11, 8466:1
**nonlinear** [1] - 8450:14
**normal** [1] - 8387:14
**normally** [1] - 8383:15
**Northwestern** [1] - 8376:1
**notably** [1] - 8376:24
**note** [4] - 8374:4, 8374:9, 8448:18, 8450:8
**notes** [2] - 8469:21, 8475:6
**nothing** [4] - 8379:2, 8415:16, 8432:23, 8449:21
**november** [1] - 8367:5
**November** [1] - 8475:8
**number** [19] - 8372:3, 8386:4, 8386:5, 8390:5, 8418:25, 8419:8, 8419:16, 8419:17, 8419:21, 8422:9, 8422:12, 8422:13, 8425:7, 8425:19, 8460:25, 8470:24
**numbers** [14] - 8370:3, 8370:22, 8374:10, 8374:11, 8390:1, 8417:21, 8417:23, 8443:18, 8443:23, 8443:25, 8453:8, 8461:25, 8462:12, 8464:15
**NW** [2] - 8367:12, 8368:18
**NY** [3] - 8368:4, 8368:11, 8368:14

## O

**objection** [5] - 8370:3, 8371:7, 8371:25, 8377:21, 8377:22
**observations** [1] - 8416:10
**obvious** [2] - 8374:18, 8395:20

**obviously** [7] - 8371:15, 8411:11, 8417:13, 8419:8, 8419:20, 8451:18, 8452:19
**occasionally** [1] - 8439:25
**occupying** [1] - 8452:13
**OF** [5] - 8367:1, 8367:9, 8367:12, 8367:19, 8475:2
**offer** [1] - 8408:1
**offered** [1] - 8446:12
**Official** [2] - 8368:17, 8475:12
**OFFICIAL** [1] - 8475:2
**often** [6] - 8401:20, 8401:21, 8409:21, 8435:2, 8444:18, 8455:19
**once** [5] - 8376:25, 8424:24, 8428:5, 8433:22, 8438:2
**one** [153] - 8370:4, 8370:10, 8370:16, 8371:4, 8371:12, 8376:4, 8382:11, 8383:2, 8383:21, 8384:3, 8387:3, 8388:9, 8388:19, 8389:9, 8390:8, 8390:9, 8391:2, 8392:2, 8392:13, 8392:14, 8392:18, 8392:19, 8392:21, 8393:5, 8393:12, 8396:13, 8396:21, 8398:18, 8398:24, 8399:13, 8399:14, 8400:8, 8400:11, 8401:25, 8404:9, 8405:3, 8405:16, 8405:21, 8406:13, 8407:14, 8407:17, 8408:10, 8409:1, 8409:13, 8409:25, 8410:19, 8411:1, 8411:3, 8412:8, 8412:13, 8414:16, 8415:6, 8415:8, 8415:14, 8415:20, 8416:1, 8416:3, 8416:10, 8416:13, 8417:3, 8417:4, 8417:10, 8417:14, 8418:10, 8419:1, 8419:2, 8419:8, 8419:10, 8419:12, 8419:21, 8419:22,

8419:25, 8420:7, 8420:8, 8420:9, 8421:13, 8421:19, 8422:10, 8422:21, 8423:3, 8423:6, 8425:3, 8426:6, 8426:18, 8426:21, 8427:3, 8427:10, 8427:15, 8427:23, 8428:23, 8428:25, 8430:2, 8431:3, 8431:4, 8431:5, 8432:2, 8432:5, 8432:6, 8433:1, 8433:16, 8433:19, 8434:13, 8434:19, 8436:23, 8437:6, 8438:15, 8439:20, 8440:15, 8441:1, 8441:17, 8441:18, 8442:9, 8443:23, 8444:1, 8446:7, 8447:9, 8447:11, 8447:12, 8447:18, 8448:25, 8449:9, 8450:23, 8451:17, 8452:20, 8455:19, 8457:16, 8458:14, 8458:23, 8459:4, 8459:25, 8460:16, 8463:9, 8466:6, 8466:18, 8468:12, 8469:10, 8469:15, 8470:23, 8472:14, 8473:16
**one-size-fits-all** [1] - 8410:19
**one-stop** [18] - 8392:14, 8392:19, 8392:21, 8398:24, 8415:20, 8416:1, 8416:3, 8416:10, 8417:3, 8418:10, 8420:8, 8423:3, 8423:6, 8426:18, 8427:3, 8427:15, 8428:23, 8432:2
**ones** [6] - 8395:6, 8402:6, 8402:8, 8436:10, 8455:3, 8458:25
**ongoing** [1] - 8447:23
**online** [4] - 8401:8, 8408:23, 8426:3, 8434:2
**opening** [2] - 8393:21, 8447:23
**opinion** [11] - 8376:17, 8376:18, 8378:20, 8379:3, 8379:7,

8492

8379:11, 8379:18, 8393:22, 8393:24, 8446:11, 8446:12
**opinions** [11] - 8376:14, 8378:15, 8378:16, 8380:4, 8391:20, 8414:11, 8439:5, 8453:18, 8456:11, 8456:14
**opportunity** [1] - 8393:20
**opposed** [1] - 8403:6
**opposite** [3] - 8420:8, 8449:16, 8449:23
**opted** [1] - 8401:6
**optimization** [1] - 8472:8
**option** [2] - 8431:1
**options** [4] - 8393:19, 8396:12, 8444:7, 8457:12
**orange** [4] - 8401:23, 8401:25, 8402:6, 8403:4
**Orbitz** [1] - 8403:14
**order** [6] - 8378:23, 8381:21, 8381:24, 8394:7, 8433:6, 8461:23
**ordinary** [3] - 8395:15, 8418:12, 8470:3
**organization** [4] - 8376:12, 8377:16, 8377:20, 8377:25
**organized** [1] - 8378:12
**original** [1] - 8464:20
**originate** [2] - 8403:17, 8403:19
**otherwise** [6] - 8373:21, 8374:18, 8413:2, 8417:23, 8462:16, 8473:23
**outlets** [1] - 8435:1
**output** [36] - 8388:11, 8388:22, 8388:23, 8389:4, 8390:9, 8390:12, 8390:13, 8439:9, 8439:11, 8439:14, 8439:15, 8439:17, 8439:18, 8439:19, 8439:22, 8440:3, 8440:8, 8440:10, 8440:23, 8441:9, 8441:14, 8441:20, 8441:25, 8442:4, 8442:5, 8442:20, 8442:22, 8442:25, 8443:5, 8446:6, 8446:15,

8446:18, 8446:22, 8447:6, 8456:24
**overall** [3] - 8415:11, 8423:19, 8456:16
**overcome** [1] - 8453:11
**overlap** [2] - 8408:18, 8411:15
**overlapping** [2] - 8406:2, 8408:25
**overstate** [2] - 8443:3, 8473:14
**overwhelming** [1] - 8419:10
**own** [10] - 8387:16, 8396:25, 8402:20, 8407:1, 8407:2, 8423:21, 8424:23, 8437:25, 8443:19

# P

**page** [7] - 8459:1, 8459:6, 8459:9, 8459:11, 8459:17
**panels** [3] - 8401:5, 8418:5
**part** [14] - 8371:19, 8384:12, 8385:15, 8389:23, 8408:10, 8408:13, 8409:7, 8410:7, 8437:21, 8449:17, 8449:19, 8456:21, 8460:20, 8469:24
**partial** [3] - 8385:21, 8411:21, 8473:17
**participants** [1] - 8469:16
**particular** [13] - 8374:8, 8374:24, 8382:17, 8384:1, 8398:23, 8403:3, 8405:25, 8436:17, 8451:8, 8454:7, 8457:1, 8457:18, 8472:13
**particularly** [5] - 8374:8, 8427:25, 8445:13, 8445:14, 8454:6
**parties** [5] - 8374:15, 8374:20, 8374:21
**party** [4] - 8369:15, 8373:17, 8373:25, 8452:16
**Patagonia** [7] - 8430:4, 8430:5, 8430:6, 8430:11, 8430:20, 8430:25

**patterns** [1] - 8404:1
**Patterson** [1] - 8368:2
**pause** [2] - 8440:16, 8460:4
**pay** [6] - 8408:7, 8451:24, 8452:5, 8461:12, 8466:13, 8468:11
**paying** [4] - 8452:3, 8452:8, 8463:7, 8463:13
**pays** [1] - 8451:21
**PC** [1] - 8404:15
**PCs** [2] - 8425:8, 8425:14
**people** [75] - 8376:4, 8376:19, 8387:25, 8390:6, 8390:16, 8392:22, 8393:3, 8393:5, 8398:6, 8399:10, 8399:12, 8399:16, 8401:5, 8401:6, 8401:19, 8401:23, 8401:25, 8402:3, 8402:6, 8402:8, 8402:14, 8402:18, 8402:23, 8403:5, 8403:17, 8404:2, 8404:11, 8404:12, 8406:24, 8409:19, 8413:14, 8414:11, 8418:23, 8419:6, 8419:11, 8421:18, 8422:20, 8422:24, 8423:1, 8423:4, 8423:16, 8423:20, 8424:3, 8426:7, 8426:25, 8427:22, 8431:8, 8432:10, 8437:22, 8440:1, 8440:2, 8444:18, 8446:20, 8446:23, 8453:1, 8453:3, 8453:6, 8453:10, 8455:4, 8455:17, 8456:4, 8459:12, 8459:14, 8461:16, 8463:25, 8467:17, 8469:4, 8469:22, 8470:19, 8470:25, 8471:6, 8473:10, 8473:14
**people's** [1] - 8452:17
**per** [28] - 8418:25, 8419:17, 8419:18, 8420:9, 8461:1, 8462:22, 8462:23, 8463:8, 8463:11, 8463:12, 8463:13, 8463:16, 8464:3,

8464:5, 8464:6, 8464:9, 8464:16, 8464:17, 8464:25, 8465:4, 8465:5, 8465:21, 8465:22, 8466:6, 8466:12
**percent** [28] - 8372:4, 8385:22, 8385:23, 8386:14, 8397:12, 8401:25, 8402:1, 8402:3, 8403:5, 8403:6, 8419:20, 8423:17, 8425:20, 8425:22, 8425:24, 8426:2, 8426:4, 8426:16, 8449:11, 8449:25, 8450:1, 8467:3, 8469:16, 8469:21, 8472:4, 8473:15
**percentage** [4] - 8403:1, 8422:20, 8444:17, 8444:25
**percentages** [1] - 8402:5
**perfect** [3] - 8371:18, 8371:20, 8439:22
**perfectly** [4] - 8390:3, 8390:4, 8453:25, 8467:12
**perform** [2] - 8381:16, 8405:23
**performance** [4] - 8386:10, 8468:24, 8469:20, 8472:19
**performing** [1] - 8468:25
**perhaps** [1] - 8446:9
**period** [6] - 8401:7, 8413:18, 8421:16, 8422:5, 8441:24, 8443:1
**periods** [3] - 8419:12, 8445:1, 8445:2
**periphery** [1] - 8452:7
**permitted** [1] - 8370:5
**person** [3] - 8399:21, 8401:20, 8459:14
**personally** [1] - 8431:18
**perspective** [4] - 8381:9, 8433:1, 8433:2, 8433:3
**persuade** [1] - 8434:20
**persuasive** [1] - 8420:4
**Ph.D** [1] - 8375:24
**phone** [8] - 8391:5, 8404:11, 8410:14,

8493

8418:14, 8424:22, 8425:13, 8444:7, 8444:8

**phones** [5] - 8401:10, 8404:11, 8428:17, 8451:5

**phrase** [1] - 8406:3

**picture** [5] - 8378:8, 8394:9, 8395:14, 8406:15, 8408:16

**pie** [6] - 8401:23, 8403:1, 8421:5, 8422:2, 8426:10, 8437:4

**pies** [2] - 8402:5, 8404:1

**Pinterest** [1] - 8472:13

**pivot** [2] - 8379:15, 8379:23

**pivots** [1] - 8379:7

**place** [3] - 8432:17, 8435:5, 8466:10

**places** [1] - 8434:11

**Plaintiff** [2] - 8367:18, 8368:1

**plaintiff's** [2] - 8393:21, 8415:19

**plaintiffs** [18] - 8369:7, 8371:4, 8371:5, 8377:17, 8378:20, 8379:8, 8391:23, 8400:7, 8404:19, 8405:4, 8407:18, 8413:4, 8440:5, 8441:22, 8446:7, 8456:17, 8456:21, 8457:1

**Plaintiffs** [2] - 8367:4, 8367:11

**plaintiffs'** [13] - 8391:24, 8392:12, 8420:10, 8420:23, 8435:20, 8440:15, 8442:21, 8457:20, 8458:6, 8458:9, 8458:12, 8459:6, 8459:15

**PLAs** [4] - 8406:15, 8458:11, 8458:13, 8458:14

**platforms** [2] - 8454:3, 8458:3

**players** [2] - 8429:4, 8436:19

**playing** [1] - 8409:5

**pleased** [1] - 8369:14

**pods** [2] - 8406:24, 8407:10

**point** [36] - 8370:24, 8373:1, 8384:22,

8385:4, 8385:19, 8389:23, 8415:6, 8415:10, 8416:4, 8420:6, 8420:7, 8424:9, 8425:6, 8426:16, 8426:21, 8429:7, 8432:15, 8438:1, 8438:15, 8443:5, 8443:21, 8443:22, 8447:17, 8449:2, 8449:9, 8449:24, 8450:21, 8452:12, 8454:24, 8458:23, 8460:14, 8466:8, 8467:15, 8468:15, 8469:18, 8472:17

**pointed** [1] - 8415:8

**points** [11] - 8383:20, 8389:3, 8392:17, 8404:21, 8407:17, 8418:2, 8443:23, 8450:15, 8450:18, 8458:7, 8471:17

**poor** [3] - 8383:19, 8384:14, 8448:12

**poorly** [1] - 8465:19

**pop** [2] - 8438:19, 8439:1

**popping** [1] - 8438:13

**popularity** [1] - 8428:7

**population** [1] - 8402:6

**portion** [1] - 8451:22

**portions** [1] - 8445:10

**position** [7] - 8370:17, 8371:4, 8388:21, 8409:14, 8432:14, 8452:13, 8452:24

**positioning** [1] - 8372:24

**possesses** [1] - 8450:22

**postings** [1] - 8396:2

**potential** [3] - 8371:22, 8438:20, 8454:9

**potentially** [2] - 8446:16, 8451:9

**power** [54] - 8378:18, 8379:5, 8379:13, 8381:22, 8386:17, 8386:21, 8387:22, 8387:23, 8387:24, 8387:25, 8388:2, 8388:3, 8388:4, 8388:7, 8388:8, 8388:14, 8388:18, 8388:20, 8392:1, 8433:4, 8435:16,

8435:21, 8436:1, 8436:6, 8436:8, 8436:10, 8436:14, 8436:17, 8436:21, 8437:18, 8439:7, 8439:8, 8439:10, 8439:14, 8440:6, 8440:7, 8440:9, 8440:12, 8443:7, 8447:8, 8447:15, 8447:20, 8447:23, 8447:24, 8448:4, 8448:9, 8448:11, 8450:22, 8451:12, 8452:1, 8453:15, 8456:22

**powerful** [1] - 8448:16

**practitioners** [1] - 8434:5

**precise** [2] - 8374:11, 8465:17

**preferences** [1] - 8454:19

**prejudicial** [1] - 8374:19

**prepared** [3] - 8374:6, 8377:14, 8404:20

**present** [6] - 8371:9, 8384:19, 8411:2, 8458:17, 8468:2

**presentation** [1] - 8449:18

**presentations** [1] - 8387:13

**presented** [12] - 8393:24, 8400:23, 8421:4, 8421:8, 8421:9, 8422:2, 8422:15, 8423:17, 8447:6, 8449:6, 8462:2, 8466:3

**preserve** [1] - 8449:14

**president** [2] - 8398:11, 8400:3

**pressure** [1] - 8450:7

**presumably** [1] - 8373:15

**pretty** [4] - 8442:15, 8445:22, 8445:25, 8463:21

**previously** [2] - 8456:1, 8474:2

**price** [32] - 8383:17, 8384:5, 8387:2, 8387:11, 8388:3, 8388:15, 8388:23, 8389:4, 8389:5, 8389:7, 8389:8, 8389:14, 8389:15, 8389:16, 8390:2,

8390:7, 8390:14, 8390:15, 8390:16, 8446:19, 8447:22, 8460:8, 8463:4, 8463:7, 8464:25, 8465:21, 8466:21, 8466:22, 8467:8, 8468:7, 8468:9

**price-driven** [1] - 8387:2

**priced** [3] - 8383:16, 8460:6, 8460:11

**prices** [15] - 8381:17, 8388:5, 8388:6, 8388:20, 8389:10, 8389:16, 8389:17, 8390:11, 8462:14, 8462:25, 8464:11, 8465:15, 8466:16, 8467:2

**pricing** [15] - 8370:1, 8372:9, 8372:10, 8372:12, 8374:13, 8374:17, 8374:19, 8374:21, 8381:14, 8464:15, 8465:1, 8465:14, 8465:16, 8466:22

**principally** [1] - 8382:13

**principle** [4] - 8382:5, 8382:7, 8382:12, 8382:20

**principles** [3] - 8381:9, 8382:5, 8382:7

**privacy** [4] - 8446:10, 8446:13, 8447:1

**problem** [2] - 8392:12, 8467:18

**proceedings** [1] - 8475:7

**process** [2] - 8433:1, 8457:4

**produce** [1] - 8407:22

**produced** [1] - 8372:22

**product** [29] - 8380:18, 8381:13, 8382:15, 8389:12, 8390:23, 8391:17, 8404:25, 8408:4, 8413:18, 8413:24, 8413:25, 8431:11, 8446:20, 8446:23, 8447:19, 8448:15, 8453:22, 8454:9, 8455:20, 8455:21, 8455:23, 8457:8, 8457:17, 8459:1, 8459:9, 8459:11,

8494

8459:17
**products** [15] -
8378:22, 8380:17,
8381:25, 8382:2,
8384:25, 8385:5,
8385:9, 8385:10,
8385:12, 8389:6,
8393:7, 8393:16,
8399:23, 8413:8,
8434:25
**Professor** [52] -
8383:7, 8384:22,
8411:14, 8412:8,
8413:7, 8415:24,
8417:3, 8420:3,
8420:25, 8421:4,
8421:25, 8423:9,
8423:13, 8423:17,
8425:6, 8425:17,
8426:13, 8426:21,
8427:14, 8427:19,
8428:10, 8428:22,
8431:2, 8431:23,
8432:1, 8433:9,
8433:13, 8436:7,
8436:9, 8437:24,
8438:4, 8438:6,
8439:3, 8444:22,
8447:5, 8447:7,
8448:2, 8449:2,
8449:6, 8450:12,
8450:21, 8451:19,
8451:24, 8452:6,
8452:25, 8459:20,
8462:1, 8462:3,
8464:20, 8465:2,
8466:3, 8466:24
**profit** [1] - 8463:16
**profits** [8] - 8386:16,
8388:22, 8437:19,
8447:12, 8463:24,
8464:3, 8464:5, 8464:6
**Profits** [1] - 8464:6
**promote** [2] - 8446:10,
8449:18
**properly** [1] - 8381:24
**proposed** [2] -
8456:17, 8457:20
**proprietary** [1] -
8373:18
**Protection** [1] -
8367:20
**prove** [1] - 8441:11
**proven** [1] - 8383:25
**proves** [1] - 8443:4
**provide** [11] - 8377:15,
8378:14, 8391:18,
8396:11, 8398:22,
8406:1, 8408:11,
8415:2, 8428:24,

8429:20, 8465:24
**provided** [8] -
8372:14, 8372:15,
8376:22, 8377:3,
8377:10, 8377:14,
8429:8, 8430:15
**provider** [3] - 8399:13,
8401:22, 8441:5
**providers** [7] -
8371:17, 8395:23,
8397:15, 8401:14,
8401:15, 8402:24,
8406:6
**provides** [3] -
8397:22, 8397:24,
8430:6
**providing** [7] -
8384:11, 8396:9,
8408:17, 8408:18,
8430:17, 8440:1,
8457:12
**public** [8] - 8373:16,
8373:19, 8373:20,
8373:21, 8374:6,
8374:18, 8374:22,
8374:24
**publicly** [3] - 8371:23,
8372:13, 8374:1
**publishers** [2] -
8461:12, 8466:13
**pull** [1] - 8472:24
**pulling** [1] - 8466:1
**pun** [1] - 8399:2
**punch** [1] - 8467:23
**purchase** [1] -
8413:23
**purchased** [1] -
8464:18
**purports** [1] - 8421:11
**purpose** [3] - 8381:10,
8410:2, 8444:1
**purposes** [2] - 8424:2,
8424:7
**pursuant** [1] - 8461:23
**pushed** [1] - 8413:1
**put** [20] - 8378:8,
8389:4, 8389:12,
8390:5, 8393:16,
8394:14, 8409:22,
8410:14, 8432:9,
8445:14, 8446:7,
8446:9, 8451:10,
8456:11, 8467:22,
8471:20, 8472:1,
8472:4, 8473:15
**puts** [1] - 8472:18
**putting** [1] - 8468:14

# Q

**Q&A** [1] - 8445:14
**qualified** [1] - 8376:11
**qualify** [1] - 8377:19
**qualitative** [1] -
8467:21
**quality** [42] - 8381:14,
8381:17, 8383:18,
8384:14, 8388:16,
8388:19, 8389:4,
8389:5, 8389:10,
8389:14, 8389:17,
8389:23, 8390:2,
8390:5, 8390:7,
8390:11, 8390:15,
8390:16, 8443:13,
8446:17, 8446:19,
8447:10, 8447:11,
8447:19, 8447:21,
8448:9, 8448:10,
8448:11, 8448:13,
8448:15, 8448:19,
8448:25, 8449:1,
8449:4, 8449:6,
8449:9, 8449:14,
8449:18, 8449:24,
8450:18
**quality-adjusted** [11] -
8389:5, 8389:10,
8389:14, 8389:17,
8390:2, 8390:7,
8390:11, 8390:15,
8390:16, 8446:19,
8447:21
**quantitative** [7] -
8387:7, 8387:12,
8387:15, 8387:19,
8389:22, 8467:9,
8473:10
**quantity** [1] - 8390:14
**quarrel** [1] - 8431:9
**queries** [115] -
8380:13, 8380:19,
8380:21, 8382:17,
8383:13, 8384:8,
8384:9, 8386:4,
8392:13, 8393:14,
8393:18, 8394:21,
8395:1, 8395:2,
8395:24, 8396:5,
8396:9, 8396:20,
8396:24, 8397:12,
8398:3, 8398:5,
8398:9, 8400:16,
8400:18, 8402:10,
8404:25, 8405:25,
8406:2, 8406:11,
8406:12, 8406:13,
8406:18, 8406:19,

8406:20, 8406:23,
8407:2, 8407:7,
8407:12, 8408:19,
8408:25, 8409:1,
8409:22, 8409:24,
8410:2, 8410:3,
8410:6, 8411:5,
8411:9, 8411:22,
8412:3, 8412:4,
8412:5, 8413:13,
8413:25, 8414:4,
8414:5, 8414:9,
8414:10, 8414:21,
8414:22, 8415:4,
8415:16, 8415:18,
8416:15, 8416:22,
8417:1, 8417:5,
8417:11, 8417:14,
8418:25, 8419:17,
8419:21, 8420:16,
8420:17, 8420:19,
8422:13, 8423:25,
8424:1, 8424:12,
8424:20, 8424:24,
8425:2, 8425:5,
8426:22, 8426:25,
8429:4, 8429:15,
8429:16, 8429:17,
8431:21, 8432:19,
8432:21, 8432:24,
8433:6, 8434:8,
8435:6, 8435:8,
8437:21, 8438:10,
8439:21, 8439:24,
8440:22, 8447:2,
8453:8, 8457:10,
8458:17, 8458:20
**query** [61] - 8380:13,
8382:17, 8386:1,
8390:22, 8390:23,
8390:24, 8391:5,
8392:7, 8393:6,
8394:3, 8394:4,
8394:14, 8394:24,
8399:1, 8400:1,
8403:22, 8405:12,
8405:16, 8406:2,
8406:5, 8406:7,
8406:8, 8406:14,
8406:16, 8407:1,
8407:3, 8411:15,
8411:17, 8411:18,
8411:24, 8412:16,
8413:18, 8413:21,
8413:22, 8419:23,
8420:5, 8420:7,
8424:4, 8424:10,
8429:9, 8429:23,
8430:9, 8430:16,
8430:24, 8431:21,
8434:18, 8439:1,

8439:19, 8440:2,
8442:20, 8446:23,
8446:24, 8452:14,
8459:5
  **query-by-query** [1] -
8394:4
  **questions** [11] -
8380:14, 8380:19,
8380:20, 8395:21,
8395:23, 8404:24,
8408:6, 8426:22,
8429:2, 8469:10,
8470:4
  **quick** [4] - 8380:9,
8416:12, 8432:5,
8456:15
  **quickly** [6] - 8404:21,
8404:22, 8405:3,
8428:6, 8437:6, 8457:6
  **quite** [14] - 8380:22,
8389:22, 8403:15,
8414:25, 8425:10,
8438:14, 8444:5,
8446:24, 8450:11,
8450:13, 8463:12,
8464:12, 8467:13,
8472:23
  **quote** [1] - 8448:20
  **quoted** [4] - 8460:14,
8460:15, 8461:14,
8461:15

# R

  **R&D** [9] - 8443:20,
8443:23, 8443:25,
8444:17, 8444:24,
8445:3, 8445:5,
8447:7, 8449:20
  **race** [2] - 8388:19,
8447:23
  **Raghavan** [1] - 8469:1
  **raise** [3] - 8375:4,
8388:3, 8388:15
  **raised** [2] - 8383:7,
8383:8
  **Ralph** [1] - 8367:21
  **ran** [1] - 8449:8
  **rank** [2] - 8385:12,
8385:17
  **rate** [1] - 8460:23
  **rates** [4] - 8461:6,
8461:7, 8462:25,
8464:10
  **rather** [3] - 8395:3,
8419:17, 8464:16
  **Raymond** [1] -
8472:12
  **reach** [1] - 8457:21
  **reached** [2] - 8370:25,

8391:20
  **reaching** [1] - 8394:22
  **react** [1] - 8448:21
  **reacting** [4] - 8412:23,
8448:21, 8448:22,
8449:1
  **read** [3] - 8393:23,
8394:2, 8470:22
  **ready** [3] - 8369:9,
8375:20, 8427:9
  **real** [3] - 8416:23,
8424:20, 8461:19
  **real-world** [1] -
8461:19
  **really** [60] - 8370:23,
8378:21, 8378:23,
8379:18, 8380:12,
8380:18, 8381:12,
8381:20, 8382:24,
8385:20, 8390:14,
8390:24, 8393:11,
8398:13, 8399:20,
8400:14, 8405:9,
8406:2, 8409:4,
8410:8, 8410:17,
8412:1, 8412:25,
8415:1, 8416:2,
8416:13, 8417:17,
8419:11, 8424:19,
8424:25, 8427:21,
8431:5, 8432:13,
8434:13, 8434:14,
8434:15, 8434:17,
8435:3, 8437:15,
8439:12, 8439:14,
8440:4, 8441:16,
8445:15, 8450:16,
8451:8, 8454:1,
8454:12, 8455:25,
8456:23, 8461:6,
8461:15, 8463:17,
8463:19, 8466:1,
8467:8, 8468:8,
8472:17, 8473:2
  **reason** [8] - 8390:9,
8421:14, 8428:21,
8438:23, 8446:17,
8448:13, 8461:4,
8462:23
  **reasons** [3] - 8374:18,
8412:19, 8423:24
  **rebut** [1] - 8373:5
  **receive** [2] - 8374:16,
8452:14
  **receives** [1] - 8450:23
  **recently** [2] - 8455:22,
8472:13
  **recess** [1] - 8427:8
  **recognize** [1] -
8416:25

  **recognizes** [1] -
8377:23
  **record** [10] - 8369:5,
8375:17, 8378:5,
8406:9, 8418:2,
8444:2, 8448:21,
8471:18, 8473:1,
8473:12
  **records** [1] - 8471:10
  **red** [7] - 8369:24,
8370:6, 8370:23,
8372:3, 8417:22,
8422:2, 8426:10
  **redact** [2] - 8370:22,
8373:13
  **redacted** [12] - 8370:2,
8370:12, 8371:25,
8372:5, 8373:24,
8417:24, 8419:4,
8442:7, 8442:8,
8442:9, 8461:22,
8461:23
  **redactions** [3] -
8369:24, 8370:5,
8421:2
  **reduce** [1] - 8439:9
  **reduced** [3] - 8439:11,
8439:16, 8447:21
  **reduction** [2] -
8388:16, 8447:12
  **refer** [1] - 8471:23
  **reference** [2] -
8443:12, 8469:16
  **referred** [1] - 8425:18
  **referring** [1] - 8428:16
  **reflect** [2] - 8403:16,
8464:15
  **reflected** [3] -
8369:24, 8370:5,
8427:20
  **reflects** [1] - 8369:25
  **regard** [5] - 8379:25,
8439:5, 8443:14,
8447:14, 8449:5
  **regarding** [1] -
8391:20
  **region** [1] - 8430:5
  **reinvesting** [1] -
8445:4
  **rejected** [1] - 8384:2
  **relate** [3] - 8377:16,
8378:17, 8384:20
  **related** [3] - 8376:6,
8389:21, 8402:11
  **relates** [3] - 8373:1,
8386:21, 8414:11
  **relationships** [1] -
8371:17
  **relative** [11] - 8372:1,
8372:24, 8374:11,

8374:23, 8387:9,
8439:11, 8439:17,
8444:16, 8445:5,
8448:18, 8449:13
  **relatively** [7] - 8441:9,
8441:19, 8441:20,
8441:21, 8443:17,
8450:6, 8450:13
  **relax** [1] - 8441:6
  **relevance** [1] -
8445:10
  **relevant** [2] - 8453:22,
8454:8
  **remains** [1] - 8411:23
  **remind** [1] - 8437:3
  **remotely** [1] - 8394:5
  **removed** [1] - 8459:19
  **repeatedly** [1] -
8468:16
  **repeating** [1] -
8445:12
  **reply** [1] - 8422:1
  **report** [13] - 8369:14,
8403:25, 8421:25,
8422:1, 8422:7,
8425:17, 8425:20,
8426:2, 8438:7,
8444:22, 8453:9,
8462:3, 8462:4
  **reported** [3] - 8371:23,
8465:3
  **REPORTER** [1] -
8475:2
  **Reporter** [3] -
8368:16, 8368:17,
8475:12
  **reports** [5] - 8377:14,
8387:13, 8432:9,
8433:9, 8452:19
  **represent** [1] -
8419:16
  **representations** [4] -
8373:18, 8373:25,
8374:1, 8374:7
  **represented** [2] -
8374:10, 8390:20
  **representing** [1] -
8372:8
  **reputation** [3] -
8397:22, 8437:16,
8437:17
  **request** [2] - 8370:5,
8373:23
  **requested** [3] -
8369:24, 8370:11,
8374:15
  **requesting** [1] -
8370:14
  **requests** [2] - 8371:6,
8406:21

8496

**require** [1] - 8385:9
**requires** [1] - 8388:15
**research** [2] - 8385:8, 8443:13
**respect** [3] - 8374:12, 8396:20, 8470:8
**respond** [4] - 8373:4, 8433:6, 8445:19, 8469:4
**responding** [2] - 8438:9, 8458:20
**response** [13] - 8390:24, 8408:3, 8417:11, 8429:1, 8443:12, 8443:15, 8445:22, 8446:4, 8448:1, 8452:12, 8458:17, 8468:7, 8470:8
**responses** [3] - 8408:18, 8433:19, 8448:2
**responsive** [2] - 8442:19, 8450:20
**responsiveness** [1] - 8447:11
**rest** [1] - 8397:16
**restrict** [3] - 8388:11, 8388:22, 8440:23
**restricting** [1] - 8388:14
**result** [2] - 8449:22, 8459:5
**resulting** [1] - 8373:15
**results** [9] - 8415:9, 8415:11, 8422:9, 8430:4, 8431:17, 8441:25, 8455:9, 8456:8, 8469:14
**resume** [1] - 8473:25
**retail** [1] - 8435:1
**retailer** [1] - 8430:5
**retained** [3] - 8376:21, 8377:2, 8377:9
**retargeting** [1] - 8455:25
**return** [11] - 8389:19, 8389:22, 8431:17, 8458:16, 8462:12, 8464:4, 8468:10, 8470:23, 8471:1, 8471:8, 8472:21
**returned** [1] - 8430:22
**returns** [1] - 8468:11
**reveal** [1] - 8373:20
**revealed** [1] - 8374:2
**revenue** [11] - 8371:13, 8371:14, 8371:15, 8371:22, 8373:15, 8386:15,

8444:17, 8465:23, 8465:25, 8466:4, 8466:15
**revenues** [3] - 8451:22, 8452:3, 8452:8
**reverse** [1] - 8447:20
**review** [1] - 8445:7
**reviewed** [1] - 8471:12
**reviewing** [1] - 8423:11
**rid** [1] - 8387:17
**right-hand** [7] - 8421:5, 8421:6, 8444:14, 8460:20, 8462:21, 8462:22, 8463:5
**rivals** [1] - 8447:10
**RMR** [1] - 8368:16
**ROAS** [3] - 8472:20, 8472:25
**ROI** [39] - 8389:25, 8390:3, 8460:17, 8463:11, 8464:10, 8467:8, 8467:11, 8467:14, 8467:16, 8467:20, 8467:23, 8467:24, 8468:1, 8468:8, 8468:9, 8468:13, 8468:16, 8468:19, 8468:23, 8469:4, 8469:5, 8469:6, 8469:12, 8469:17, 8469:19, 8469:20, 8469:23, 8470:7, 8470:11, 8471:22, 8472:5, 8472:6, 8472:9, 8472:15, 8472:21, 8473:4, 8473:10, 8473:20
**ROIs** [1] - 8464:12
**role** [1] - 8428:2
**roll** [1] - 8446:22
**rolled** [2] - 8379:25, 8445:20
**Room** [2] - 8368:17, 8475:13
**Rosati** [2] - 8368:9, 8368:13
**roughly** [3] - 8376:7, 8418:23, 8418:24
**round** [1] - 8395:8
**row** [1] - 8425:3
**run** [3] - 8382:3, 8426:23, 8469:9
**runs** [2] - 8376:5, 8380:12

## S

**SA360** [2] - 8380:1, 8380:2
**safe** [3] - 8441:5, 8445:19, 8449:12
**Safeway** [1] - 8392:25
**sale** [2] - 8414:18, 8467:10
**sales** [3] - 8389:25, 8444:25, 8445:4
**Sallet** [2] - 8367:19, 8369:7
**sample** [3] - 8397:24, 8402:6, 8404:12
**sampling** [3] - 8398:3, 8408:14, 8426:24
**sampling-type** [1] - 8408:14
**sandwich** [2] - 8384:6, 8413:3
**sat** [1] - 8423:4
**saw** [4] - 8417:4, 8435:13, 8448:20, 8455:5
**scale** [1] - 8449:10
**scarcity** [1] - 8388:13
**Schmidtlein** [1] - 8368:6
**scissors** [1] - 8405:10
**scope** [1] - 8415:1
**screen** [5] - 8378:9, 8409:15, 8410:24, 8417:24, 8435:13
**scroll** [1] - 8416:20
**search** [76] - 8372:18, 8385:23, 8392:21, 8393:3, 8393:4, 8393:6, 8396:2, 8396:3, 8396:4, 8396:6, 8396:9, 8396:10, 8396:11, 8399:18, 8401:12, 8401:20, 8403:2, 8403:12, 8404:24, 8405:20, 8405:24, 8407:20, 8407:23, 8407:24, 8407:25, 8408:1, 8408:2, 8410:13, 8411:16, 8412:11, 8423:5, 8426:3, 8426:4, 8427:15, 8428:24, 8429:23, 8431:3, 8432:3, 8432:17, 8437:22, 8438:10, 8440:21, 8440:22, 8441:3, 8441:6, 8441:12, 8441:17, 8444:4, 8444:6,

8445:23, 8447:9, 8449:18, 8450:23, 8452:4, 8455:6, 8455:9, 8456:7, 8456:12, 8456:17, 8456:18, 8458:10, 8458:16, 8458:19, 8458:20, 8459:5, 8459:10, 8459:17, 8465:3, 8466:10, 8469:20, 8470:20, 8473:1
**Search** [5] - 8445:25, 8457:16, 8458:4, 8462:7
**searched** [2] - 8456:2, 8459:23
**searches** [9] - 8397:22, 8400:22, 8403:16, 8403:19, 8417:16, 8423:18, 8425:25, 8440:2, 8455:6
**searching** [10] - 8395:19, 8401:13, 8402:10, 8402:14, 8402:17, 8403:6, 8403:20, 8410:23, 8410:24, 8458:22
**seated** [1] - 8369:3
**sec** [2] - 8400:8, 8427:10
**second** [14] - 8379:3, 8381:23, 8383:9, 8385:19, 8427:2, 8427:14, 8434:12, 8434:13, 8440:15, 8441:1, 8447:10, 8449:2, 8456:21, 8459:8
**secondly** [1] - 8384:16
**seconds** [4] - 8418:23, 8418:24, 8419:2, 8419:15
**Section** [1] - 8367:20
**see** [118] - 8370:2, 8370:23, 8375:9, 8375:11, 8383:5, 8383:23, 8385:3, 8385:16, 8385:17, 8387:10, 8388:18, 8390:12, 8393:20, 8393:23, 8394:25, 8395:6, 8395:15, 8395:16, 8400:12, 8400:17, 8400:20, 8401:12, 8401:20, 8402:9, 8403:22, 8406:1, 8406:4, 8406:22, 8407:8,

8497

8407:11, 8408:25, 8409:5, 8409:17, 8409:20, 8411:8, 8412:24, 8415:3, 8415:9, 8415:14, 8415:25, 8418:5, 8418:21, 8421:22, 8422:1, 8422:3, 8423:10, 8424:13, 8425:16, 8428:6, 8428:8, 8428:15, 8430:1, 8431:13, 8432:13, 8433:12, 8433:15, 8434:3, 8434:24, 8435:1, 8435:17, 8436:6, 8439:15, 8439:16, 8440:5, 8440:10, 8441:1, 8441:7, 8441:9, 8441:16, 8441:19, 8441:20, 8441:25, 8442:22, 8443:5, 8443:6, 8443:16, 8443:20, 8444:2, 8444:11, 8444:14, 8445:16, 8446:20, 8448:7, 8448:13, 8448:21, 8448:22, 8449:8, 8450:7, 8451:7, 8451:15, 8452:7, 8452:9, 8453:3, 8453:16, 8454:20, 8455:6, 8455:19, 8457:25, 8458:4, 8459:25, 8461:4, 8461:25, 8462:8, 8462:22, 8468:3, 8468:16, 8468:22, 8469:7, 8469:15, 8469:25, 8473:25, 8474:3

**seeing** [11] - 8383:11, 8383:14, 8383:18, 8395:2, 8412:16, 8412:17, 8415:11, 8434:10, 8435:3, 8466:15

**seem** [2] - 8431:6, 8444:4

**segment** [2] - 8403:1, 8421:13

**segments** [1] - 8382:4

**sell** [12] - 8381:2, 8397:11, 8397:12, 8398:17, 8408:24, 8409:3, 8414:16, 8454:4, 8455:4, 8455:18, 8456:19, 8458:4

**seller** [1] - 8408:23
**selling** [4] - 8383:13, 8429:16, 8455:21, 8456:8
**sells** [3] - 8380:14, 8414:15, 8459:3
**SEM** [1] - 8371:15
**senior** [1] - 8376:4
**sense** [11] - 8380:13, 8387:10, 8394:15, 8407:21, 8411:19, 8413:24, 8440:9, 8441:10, 8446:15, 8448:1, 8471:2
**sensible** [3] - 8394:17, 8395:5, 8395:17
**sensitive** [3] - 8374:8, 8374:17, 8417:22
**sensitivity** [2] - 8449:13, 8466:25
**sentence** [1] - 8434:22
**separate** [12] - 8378:23, 8393:16, 8396:25, 8398:8, 8398:9, 8400:8, 8405:2, 8410:8, 8416:5, 8416:15, 8428:21, 8431:25
**separately** [3] - 8380:10, 8397:1, 8434:3
**series** [1] - 8449:19
**serves** [1] - 8380:13
**service** [4] - 8397:25, 8399:15, 8399:22, 8408:11
**services** [17] - 8372:19, 8376:22, 8377:3, 8377:10, 8384:12, 8398:23, 8399:19, 8400:4, 8408:18, 8415:1, 8428:8, 8431:19, 8438:9, 8461:9, 8461:11, 8466:9, 8466:13
**serving** [1] - 8435:6
**session** [2] - 8421:15, 8422:19
**sessions** [6] - 8418:1, 8418:3, 8421:12, 8422:3
**set** [12] - 8370:12, 8392:3, 8396:13, 8417:3, 8420:17, 8454:22, 8455:3, 8456:20, 8470:21, 8471:14, 8473:3
**sets** [3] - 8393:17, 8394:20, 8453:18

**Seventh** [1] - 8367:22
**seventh** [2] - 8398:10, 8400:3
**several** [10] - 8376:1, 8376:24, 8376:25, 8410:8, 8412:18, 8423:24, 8456:6, 8469:10, 8469:13, 8471:16
**shall** [1] - 8399:18
**shapes** [1] - 8398:23
**share** [6] - 8433:24, 8436:24, 8439:5, 8449:5, 8452:3, 8452:8
**shared** [1] - 8451:20
**shares** [6] - 8371:13, 8434:3, 8436:3, 8436:11, 8437:3, 8437:13
**shift** [2] - 8468:18, 8472:13
**shoes** [13] - 8391:2, 8391:3, 8391:5, 8391:6, 8391:7, 8392:9, 8393:10, 8395:22, 8399:25, 8400:3, 8410:13, 8414:17
**shop** [14] - 8392:14, 8392:19, 8392:21, 8398:24, 8415:20, 8416:10, 8417:3, 8418:10, 8423:3, 8423:6, 8427:3, 8427:15, 8428:23, 8432:2
**shopping** [41] - 8384:8, 8393:10, 8394:19, 8395:1, 8395:16, 8395:24, 8401:17, 8403:11, 8403:14, 8404:2, 8406:11, 8406:12, 8406:13, 8406:14, 8406:18, 8406:23, 8407:7, 8407:12, 8407:13, 8408:17, 8408:19, 8411:1, 8412:21, 8413:11, 8413:12, 8413:15, 8413:16, 8416:1, 8416:3, 8420:8, 8424:17, 8425:3, 8425:20, 8425:25, 8426:3, 8426:5, 8438:14, 8458:12
**shops** [1] - 8426:18
**short** [5] - 8419:12, 8470:5, 8470:7, 8470:17, 8470:21

**short-term** [4] - 8470:5, 8470:7, 8470:17, 8470:21
**shortcuts** [2] - 8409:22, 8428:18
**shorten** [1] - 8409:10
**shortly** [1] - 8474:3
**shot** [1] - 8401:3
**show** [22] - 8372:23, 8373:5, 8399:11, 8411:15, 8421:11, 8421:14, 8429:25, 8435:9, 8437:21, 8439:10, 8439:23, 8441:10, 8441:13, 8441:24, 8443:7, 8447:1, 8457:2, 8459:23, 8461:4, 8467:4, 8467:16
**showed** [5] - 8395:10, 8422:6, 8422:9, 8422:11, 8425:19
**showing** [2] - 8421:17, 8442:21
**shown** [3] - 8372:13, 8460:17
**shows** [3] - 8371:12, 8442:18, 8462:4
**side** [58] - 8370:22, 8378:18, 8379:5, 8379:7, 8379:13, 8379:15, 8380:11, 8380:17, 8380:18, 8380:22, 8380:23, 8381:15, 8383:16, 8385:17, 8387:2, 8387:7, 8387:11, 8387:19, 8389:3, 8390:4, 8390:19, 8390:23, 8391:21, 8392:6, 8399:9, 8408:19, 8409:14, 8414:25, 8421:5, 8421:6, 8421:15, 8430:8, 8432:24, 8433:3, 8433:5, 8435:14, 8435:22, 8451:4, 8453:15, 8453:16, 8453:19, 8453:21, 8453:23, 8454:1, 8454:3, 8454:9, 8456:12, 8457:3, 8457:5, 8457:14, 8458:1, 8462:1, 8462:21, 8462:22, 8463:6, 8466:20, 8466:21
**sided** [1] - 8380:12
**sides** [1] - 8429:19
**signal** [2] - 8455:18,

8498

8459:18
**significant** [2] -
8386:4, 8386:5
**similar** [11] - 8382:1,
8382:2, 8393:14,
8393:18, 8394:20,
8423:15, 8430:3,
8464:12, 8472:24
**similarly** [2] - 8386:7,
8459:22
**simple** [1] - 8434:22
**simplify** [1] - 8460:21
**simply** [1] - 8465:10
**single** [7] - 8396:21,
8417:4, 8417:10,
8420:4, 8424:10,
8470:7, 8470:11
**sit** [1] - 8399:21
**site** [6] - 8402:20,
8424:2, 8424:15,
8424:25, 8430:12,
8456:2
**sites** [3] - 8408:1,
8448:23, 8458:14
**sits** [3] - 8399:22,
8399:25, 8400:21
**situation** [3] -
8384:24, 8405:9,
8453:4
**six** [1] - 8378:16
**size** [2] - 8379:20,
8410:19
**sizes** [1] - 8398:24
**Skechers** [4] -
8373:12, 8373:19,
8472:22, 8472:23
**Sketchers** [1] -
8370:21
**skip** [4] - 8382:8,
8382:10, 8404:22,
8409:12
**slice** [1] - 8403:5
**slices** [2] - 8401:23,
8402:5
**slide** [65] - 8378:2,
8381:23, 8390:21,
8392:3, 8395:13,
8396:13, 8396:14,
8396:15, 8397:3,
8401:2, 8401:4,
8401:7, 8404:20,
8406:4, 8412:14,
8415:15, 8415:21,
8415:23, 8415:24,
8415:25, 8417:7,
8417:18, 8421:1,
8421:4, 8422:11,
8422:15, 8425:15,
8426:18, 8426:19,
8427:20, 8428:15,

8430:1, 8433:12,
8433:13, 8435:17,
8436:7, 8436:15,
8438:6, 8442:6,
8443:22, 8445:11,
8447:4, 8450:9,
8453:16, 8454:11,
8454:22, 8455:3,
8456:11, 8457:25,
8458:7, 8460:13,
8461:21, 8461:23,
8468:3, 8469:16,
8469:21, 8469:24,
8471:5, 8471:14,
8472:11, 8472:23,
8473:6, 8473:8
**slides** [10] - 8374:25,
8409:9, 8410:8,
8423:24, 8433:14,
8437:10, 8467:15,
8469:10, 8469:13,
8473:9
**slight** [1] - 8464:9
**slipped** [1] - 8450:18
**small** [5] - 8379:20,
8382:6, 8382:12,
8450:6, 8450:13
**Snapchat** [1] -
8472:13
**so..** [1] - 8427:1
**social** [7] - 8385:23,
8448:22, 8455:11,
8458:5, 8462:5,
8462:6, 8473:1
**sold** [5] - 8455:10,
8457:8, 8465:4, 8465:6
**someone** [12] -
8383:24, 8385:22,
8386:5, 8387:14,
8406:12, 8414:17,
8431:7, 8443:7,
8455:2, 8455:19,
8456:9, 8458:22
**sometimes** [4] -
8376:19, 8386:13,
8405:13, 8410:23,
8424:3
**somewhat** [2] -
8379:23, 8429:14
**somewhere** [4] -
8391:10, 8410:2,
8424:7, 8424:13
**SOMMER** [37] -
8369:11, 8369:18,
8370:8, 8370:10,
8370:19, 8371:3,
8375:2, 8375:12,
8375:15, 8377:19,
8378:1, 8378:5,
8378:11, 8378:13,

8387:21, 8390:17,
8400:25, 8404:17,
8409:11, 8410:25,
8415:5, 8420:2,
8420:22, 8423:8,
8427:2, 8427:10,
8427:11, 8440:14,
8440:17, 8442:3,
8442:7, 8442:16,
8447:3, 8453:13,
8467:25, 8471:4,
8473:21
**Sommer** [4] - 8368:9,
8369:12, 8398:18,
8427:9
**Sommers** [1] -
8371:12
**Sonsini** [2] - 8368:9,
8368:13
**sorry** [8] - 8370:7,
8371:19, 8372:18,
8400:7, 8407:15,
8420:11, 8446:14,
8470:12
**sort** [24] - 8380:16,
8383:15, 8384:11,
8387:6, 8389:19,
8395:8, 8397:6,
8397:15, 8398:2,
8398:19, 8399:15,
8406:14, 8406:16,
8408:14, 8409:7,
8413:13, 8414:15,
8414:16, 8417:18,
8433:24, 8446:18,
8447:6, 8451:25,
8466:25
**sorts** [2] - 8389:11,
8433:21
**soul** [1] - 8383:4
**source** [4] - 8429:8,
8429:21, 8430:22,
8439:1
**sources** [1] - 8429:5
**South** [1] - 8367:15
**speaking** [2] -
8442:23, 8451:14
**speaks** [1] - 8422:12
**special** [2] - 8401:14,
8423:21
**specialize** [1] -
8414:17
**specialized** [3] -
8401:14, 8401:22,
8402:24
**specific** [6] - 8402:13,
8429:7, 8430:17,
8438:1, 8438:2,
8461:25
**specifically** [1] -

8407:23
**specifics** [1] - 8372:4
**speculation** [1] -
8383:21
**spell** [1] - 8375:17
**spend** [13] - 8373:14,
8373:15, 8392:4,
8436:23, 8445:12,
8460:10, 8468:5,
8468:10, 8470:9,
8470:17, 8472:13,
8472:21, 8472:24
**spending** [6] - 8402:8,
8402:19, 8470:5,
8470:20, 8471:7
**spends** [1] - 8373:22
**spent** [1] - 8376:5
**spin** [2] - 8373:5,
8440:20
**spun** [1] - 8372:21
**spurring** [1] - 8447:22
**stand** [1] - 8411:13
**standard** [2] - 8379:1,
8383:22
**Stanford** [1] - 8375:25
**staples** [1] - 8399:23
**start** [12] - 8382:15,
8404:1, 8412:3,
8423:16, 8423:20,
8425:2, 8425:20,
8425:22, 8425:24,
8444:20, 8447:16,
8473:23
**started** [4] - 8369:9,
8369:13, 8404:2,
8408:12
**starters** [1] - 8425:22
**starting** [4] - 8380:7,
8426:8, 8426:16,
8470:17
**State** [1] - 8367:19
**state** [1] - 8375:16
**statement** [4] -
8393:21, 8463:18,
8468:12, 8473:10
**statements** [1] -
8372:1
**states** [1] - 8458:13
**STATES** [2] - 8367:1,
8367:10
**States** [4] - 8367:2,
8368:1, 8368:17,
8369:5
**statistic** [3] - 8390:10,
8423:17, 8423:18
**stay** [1] - 8414:11
**steal** [1] - 8435:8
**stems** [1] - 8371:15
**stenographic** [1] -
8475:6

8499

**step** [6] - 8383:2, 8415:13, 8460:16, 8461:16, 8463:9, 8464:2
**stepping** [1] - 8388:17
**sticking** [1] - 8440:18
**sticks** [1] - 8425:15
**sticky** [1] - 8453:2
**still** [10] - 8390:5, 8400:18, 8410:20, 8412:4, 8414:18, 8417:12, 8419:25, 8421:18, 8430:14, 8465:15
**stop** [23] - 8392:14, 8392:19, 8392:21, 8398:24, 8413:18, 8415:20, 8416:1, 8416:3, 8416:10, 8417:3, 8418:10, 8418:24, 8420:8, 8420:9, 8423:3, 8423:6, 8426:18, 8427:3, 8427:15, 8428:23, 8432:2
**stopped** [1] - 8450:17
**stops** [1] - 8414:20
**store** [5] - 8405:7, 8405:16, 8414:15, 8424:17, 8424:19
**Store** [2] - 8453:6, 8453:12
**story** [2] - 8425:10, 8442:24
**straight** [4] - 8408:18, 8408:24, 8413:21, 8426:1
**straightforward** [2] - 8395:20, 8460:18
**strategies** [1] - 8373:21
**strategy** [1] - 8381:13
**Street** [2] - 8367:12, 8367:15
**strength** [8] - 8384:12, 8384:13, 8415:11, 8429:5, 8429:9, 8429:10, 8430:17, 8430:22
**strengths** [5] - 8416:18, 8416:19, 8416:25, 8429:13, 8429:18
**strict** [1] - 8464:25
**strong** [14] - 8378:24, 8379:9, 8397:6, 8403:15, 8407:11, 8411:12, 8412:9, 8412:22, 8413:12, 8415:9, 8415:17,

8429:5, 8447:25, 8459:18
**stronger** [2] - 8411:12, 8415:10
**strongest** [1] - 8379:9
**strongly** [1] - 8429:22
**structure** [3] - 8436:3, 8436:5, 8436:14
**study** [5] - 8425:18, 8425:23, 8426:11, 8426:13, 8470:3
**studying** [2] - 8380:20, 8385:8
**stuff** [7] - 8392:5, 8398:16, 8399:13, 8401:20, 8402:11, 8445:13, 8460:21
**subject** [1] - 8433:9
**subpoenaed** [3] - 8406:9, 8411:4, 8471:10
**subpoenas** [1] - 8406:6
**subsequent** [1] - 8461:21
**substance** [1] - 8380:3
**substantial** [4] - 8447:12, 8451:18, 8451:20, 8451:22
**substantially** [1] - 8437:2
**substitutable** [1] - 8457:12
**substitute** [10] - 8374:9, 8393:8, 8393:9, 8393:10, 8413:2, 8458:21, 8460:7, 8467:1, 8467:2, 8467:24
**substitutes** [7] - 8381:15, 8385:5, 8385:14, 8405:21, 8405:24, 8457:15, 8457:18
**substituting** [4] - 8383:5, 8383:24, 8467:17, 8467:20
**substitution** [25] - 8383:3, 8383:4, 8383:8, 8383:9, 8383:11, 8383:12, 8383:14, 8383:19, 8383:23, 8384:21, 8384:24, 8385:8, 8385:10, 8385:12, 8385:19, 8385:21, 8386:13, 8408:20, 8411:21, 8412:15, 8412:17, 8448:13,

8458:18, 8473:17, 8473:22
**substitutions** [1] - 8384:8
**succeeding** [1] - 8443:6
**success** [2] - 8442:24, 8448:19
**successful** [1] - 8453:10
**suggest** [1] - 8435:12
**Suite** [2] - 8367:16, 8368:3
**summarize** [1] - 8469:14
**summarized** [1] - 8396:15
**summarizing** [1] - 8456:11
**summary** [5] - 8372:22, 8378:14, 8390:10, 8433:13, 8445:24
**superior** [1] - 8431:1
**supplement** [1] - 8442:10
**supplies** [1] - 8455:15
**supply** [1] - 8385:17
**support** [15] - 8383:21, 8384:19, 8428:23, 8431:24, 8432:2, 8433:17, 8436:16, 8436:21, 8440:6, 8440:8, 8444:6, 8444:8, 8444:9, 8447:15, 8449:20
**supporting** [2] - 8428:11, 8436:10
**supportive** [1] - 8447:25
**supports** [2] - 8436:6, 8436:14
**surprise** [1] - 8442:23
**survey** [3] - 8469:9, 8470:1, 8470:2
**Survey** [1] - 8469:9
**surveys** [1] - 8469:7
**SVP** [28] - 8402:2, 8402:5, 8402:11, 8402:13, 8402:19, 8403:7, 8403:21, 8403:22, 8403:23, 8404:3, 8417:14, 8424:9, 8424:10, 8425:4, 8427:17, 8428:4, 8430:23, 8435:7, 8437:11, 8438:12, 8438:13, 8440:21, 8441:10,

8448:17, 8453:3, 8453:4, 8453:8
**SVPs** [40] - 8401:13, 8402:8, 8403:10, 8403:15, 8403:21, 8405:19, 8405:24, 8409:18, 8409:25, 8412:9, 8413:19, 8413:20, 8417:12, 8417:13, 8427:21, 8428:18, 8428:19, 8429:8, 8429:12, 8429:16, 8429:20, 8431:17, 8432:8, 8434:19, 8434:22, 8435:5, 8437:2, 8437:4, 8438:3, 8438:13, 8438:19, 8438:22, 8438:24, 8441:16, 8441:18, 8448:14, 8448:21, 8452:15, 8452:21, 8453:10
**SW** [1] - 8368:7
**Swiss** [11] - 8405:4, 8405:6, 8405:7, 8405:8, 8405:9, 8405:13, 8407:17, 8410:10, 8410:14, 8410:17, 8415:25
**sworn** [1] - 8375:7
**Sysco** [3] - 8400:12, 8400:23, 8405:6

**T**

**takeaway** [1] - 8473:9
**takeaways** [1] - 8473:5
**target** [2] - 8457:21, 8460:2
**targeted** [9] - 8380:25, 8381:1, 8381:2, 8454:4, 8454:7, 8456:4, 8456:19, 8457:9, 8457:13
**task** [1] - 8440:12
**taught** [1] - 8375:25
**technological** [2] - 8407:21, 8441:13
**technologies** [6] - 8380:24, 8414:14, 8429:14, 8454:5, 8454:21, 8458:2
**technology** [6] - 8408:11, 8408:12, 8408:13, 8409:4, 8414:24, 8441:2
**tee** [1] - 8370:19
**ten** [2] - 8425:2,

8500

8442:25
  **ten-year** [1] - 8442:25
  **tend** [6] - 8410:1,
8410:4, 8411:6,
8431:11, 8465:6,
8472:2
  **tended** [1] - 8404:2
  **tends** [3] - 8406:14,
8406:15, 8407:10
  **tension** [1] - 8448:8
  **term** [11] - 8381:3,
8407:5, 8423:9,
8470:5, 8470:7,
8470:8, 8470:17,
8470:21, 8471:5,
8471:7
  **terms** [14] - 8373:21,
8373:23, 8374:5,
8374:20, 8374:23,
8406:20, 8406:21,
8406:23, 8407:9,
8432:25, 8451:1,
8451:12, 8453:8,
8462:21
  **test** [5] - 8387:1,
8387:3, 8387:6,
8387:15, 8405:23
  **testified** [3] - 8375:8,
8411:14, 8412:8
  **testimony** [24] -
8371:16, 8377:14,
8377:15, 8378:3,
8386:18, 8397:23,
8405:19, 8409:10,
8421:7, 8423:9,
8423:11, 8425:18,
8426:15, 8427:7,
8433:9, 8445:7,
8445:10, 8445:12,
8452:24, 8453:9,
8460:5, 8463:15,
8469:1, 8472:10
  **tests** [1] - 8384:16
  **text** [3] - 8426:1,
8458:10, 8465:19
  **THE** [95] - 8367:1,
8367:1, 8367:9,
8369:2, 8369:4,
8369:8, 8369:17,
8370:7, 8370:9,
8370:18, 8371:2,
8371:5, 8371:8,
8371:19, 8372:6,
8372:18, 8373:7,
8373:9, 8375:4,
8375:9, 8375:11,
8375:13, 8377:23,
8386:23, 8387:5,
8389:19, 8389:21,
8396:16, 8396:23,

8398:18, 8399:4,
8399:6, 8399:7,
8400:24, 8402:25,
8403:4, 8403:16,
8403:19, 8404:6,
8404:8, 8404:13,
8404:14, 8404:16,
8407:15, 8408:6,
8408:7, 8408:8,
8409:10, 8409:12,
8413:17, 8414:3,
8419:16, 8419:19,
8420:11, 8420:13,
8420:18, 8420:20,
8420:21, 8422:18,
8422:23, 8427:5,
8427:9, 8439:18,
8439:20, 8440:19,
8440:25, 8442:15,
8446:5, 8446:12,
8446:14, 8446:16,
8452:12, 8452:17,
8463:22, 8463:23,
8464:13, 8464:19,
8464:21, 8464:23,
8464:24, 8465:2,
8465:8, 8465:11,
8465:12, 8465:15,
8465:16, 8465:18,
8466:18, 8467:4,
8470:12, 8470:15,
8470:18, 8470:19,
8471:3, 8473:24
  **theme** [2] - 8473:2,
8473:18
  **themselves** [2] -
8370:2, 8374:11
  **theory** [1] - 8425:15
  **therefore** [11] -
8379:2, 8379:3,
8393:12, 8401:11,
8405:20, 8413:18,
8436:20, 8441:4,
8441:6, 8456:21,
8460:6
  **they've** [4] - 8373:2,
8374:7, 8444:12,
8445:23
  **thinking** [5] - 8392:9,
8402:1, 8414:7, 8430:9
  **third** [13] - 8369:15,
8370:19, 8373:17,
8373:25, 8374:15,
8374:20, 8379:7,
8382:5, 8428:22,
8447:12, 8450:21,
8452:16, 8459:16
  **third-party** [4] -
8369:15, 8373:17,
8373:25, 8452:16

  **threats** [1] - 8445:19
  **three** [12] - 8369:14,
8369:18, 8371:4,
8389:2, 8401:16,
8402:9, 8423:19,
8447:7, 8447:16,
8458:9, 8459:3
  **three-fourths** [2] -
8423:19
  **throughout** [1] -
8374:6
  **TikTok** [5] - 8428:7,
8454:15, 8455:17,
8463:18, 8463:19
  **timed** [1] - 8453:25
  **title** [1] - 8376:4
  **today** [8] - 8377:13,
8378:3, 8378:15,
8380:8, 8387:6,
8388:25, 8425:2,
8448:25
  **together** [17] -
8381:25, 8382:2,
8382:15, 8389:4,
8392:13, 8393:13,
8394:9, 8394:13,
8394:14, 8400:14,
8400:15, 8400:17,
8420:14, 8448:14,
8456:11, 8462:23,
8467:22
  **ton** [2] - 8385:7,
8468:5
  **took** [1] - 8464:2
  **tool** [1] - 8405:17
  **tools** [1] - 8371:15
  **toothpaste** [1] -
8432:20
  **top** [13] - 8406:18,
8406:19, 8406:21,
8406:23, 8407:6,
8407:8, 8411:8,
8417:4, 8417:7,
8424:21, 8470:7,
8470:23
  **topic** [4] - 8379:24,
8410:9, 8452:18,
8473:21
  **topics** [1] - 8377:16
  **total** [5] - 8439:18,
8442:20, 8443:24,
8443:25, 8451:22
  **totals** [1] - 8403:24
  **touched** [1] - 8420:24
  **towards** [11] - 8402:3,
8402:14, 8404:4,
8416:4, 8460:16,
8468:18, 8468:19,
8468:24, 8472:5,
8473:19

  **town** [2] - 8452:5,
8452:11
  **track** [1] - 8401:8
  **tracked** [1] - 8401:8
  **tracking** [3] - 8404:9,
8418:4, 8469:12
  **Trade** [1] - 8376:25
  **traffic** [2] - 8452:14,
8472:20
  **training** [1] - 8375:24
  **TRANSCRIPT** [1] -
8367:9
  **transcript** [2] - 8475:5,
8475:6
  **translated** [1] - 8464:2
  **translates** [1] -
8462:21
  **travel** [21] - 8384:9,
8391:10, 8393:11,
8394:19, 8395:1,
8395:16, 8400:1,
8400:4, 8400:15,
8400:17, 8410:13,
8412:22, 8429:9,
8429:10, 8430:11,
8430:12, 8430:17,
8431:19, 8434:9,
8435:7, 8438:13
  **Travelocity** [4] -
8396:1, 8402:21,
8402:22, 8403:14
  **treatment** [3] -
8370:15, 8373:6,
8374:16
  **trial** [2] - 8374:6,
8445:8
  **TRIAL** [1] - 8367:9
  **tried** [1] - 8438:25
  **tries** [3] - 8416:17,
8437:21, 8457:23
  **trip** [1] - 8395:25
  **truck** [1] - 8399:14
  **true** [10] - 8409:13,
8411:23, 8417:12,
8424:3, 8430:6,
8466:9, 8471:18,
8473:11, 8475:5,
8475:6
  **truly** [4] - 8388:9,
8441:5, 8441:15,
8441:25
  **trust** [3] - 8383:5,
8383:23
  **try** [14] - 8378:16,
8385:17, 8387:18,
8390:8, 8394:14,
8409:16, 8410:4,
8414:14, 8429:25,
8432:7, 8441:10,
8452:20, 8467:4,

8467:16
**trying** [11] - 8387:19, 8389:12, 8409:23, 8412:2, 8412:3, 8414:5, 8414:9, 8414:10, 8420:6, 8465:19
**turn** [7] - 8378:10, 8390:19, 8427:14, 8428:22, 8439:4, 8449:2, 8454:25
**TV** [1] - 8435:9
**tweezers** [1] - 8405:10
**two** [30] - 8369:18, 8370:1, 8376:20, 8378:18, 8380:12, 8383:20, 8384:3, 8387:4, 8391:6, 8396:17, 8400:8, 8403:18, 8406:20, 8408:21, 8409:8, 8409:13, 8414:14, 8419:10, 8419:25, 8433:15, 8433:18, 8435:25, 8451:16, 8458:25, 8462:6, 8465:19, 8467:5, 8468:13, 8471:17
**two-sided** [1] - 8380:12
**tying** [1] - 8403:22
**Tyler** [1] - 8368:2
**type** [15] - 8391:3, 8398:14, 8398:15, 8408:14, 8424:21, 8425:11, 8428:12, 8430:3, 8431:20, 8432:18, 8441:12, 8455:20, 8459:5, 8463:17, 8473:6
**types** [12] - 8376:9, 8393:14, 8395:11, 8398:22, 8405:25, 8462:5, 8462:6, 8462:10, 8462:24, 8463:25, 8466:7, 8468:17
**typical** [3] - 8418:22, 8419:1, 8419:8
**typically** [1] - 8419:14
**typing** [1] - 8430:25

## U

**U.S** [3] - 8367:12, 8367:15, 8401:6
**ultimate** [1] - 8433:4
**ultimately** [3] - 8439:7, 8461:16, 8462:18
**under** [3] - 8442:21,

8451:22, 8452:25
**underlying** [1] - 8466:16
**understood** [1] - 8464:21
**undoubtedly** [1] - 8386:25
**unequal** [1] - 8373:5
**unhappy** [1] - 8446:23
**unified** [1] - 8399:15
**unique** [2] - 8407:20, 8407:21
**Unit** [1] - 8367:20
**United** [2] - 8368:17, 8369:5
**UNITED** [2] - 8367:1, 8367:10
**united** [1] - 8367:2
**universal** [1] - 8468:22
**universally** [1] - 8433:24
**University** [2] - 8375:25, 8376:1
**unless** [3] - 8383:24, 8385:6, 8393:14
**unlike** [1] - 8396:18
**unmatched** [1] - 8428:24
**up** [34] - 8369:16, 8370:13, 8370:19, 8372:21, 8378:8, 8389:16, 8390:11, 8390:12, 8390:14, 8391:11, 8393:9, 8395:3, 8399:10, 8400:2, 8402:18, 8406:15, 8408:18, 8408:24, 8415:14, 8418:21, 8426:9, 8433:13, 8438:13, 8438:19, 8439:1, 8443:5, 8445:1, 8445:5, 8464:14, 8467:5, 8468:13, 8470:12
**upper** [1] - 8370:22
**usage** [7] - 8404:7, 8404:15, 8437:4, 8449:11, 8449:25, 8450:4, 8453:3
**useful** [5] - 8390:10, 8396:5, 8417:18, 8432:17
**user** [53] - 8378:18, 8379:5, 8380:11, 8380:18, 8380:24, 8383:16, 8387:2, 8387:7, 8387:11, 8389:3, 8390:4, 8390:19, 8390:23,

8390:24, 8391:2, 8391:17, 8392:6, 8392:7, 8393:8, 8399:25, 8400:21, 8404:14, 8409:14, 8410:16, 8411:16, 8418:4, 8429:23, 8430:8, 8430:9, 8430:10, 8430:11, 8430:12, 8430:16, 8430:21, 8430:24, 8433:1, 8433:3, 8434:15, 8435:14, 8435:22, 8451:2, 8453:15, 8453:16, 8453:19, 8454:6, 8454:17, 8454:21, 8455:22, 8457:3, 8459:18, 8466:20
**user-focused** [1] - 8451:2
**users** [29] - 8380:14, 8380:25, 8381:1, 8385:24, 8385:25, 8386:1, 8393:8, 8393:9, 8399:18, 8404:13, 8404:23, 8409:17, 8425:1, 8425:24, 8426:3, 8428:12, 8432:16, 8433:7, 8434:18, 8435:11, 8446:10, 8451:7, 8451:14, 8454:5, 8454:7, 8455:14, 8457:17, 8460:2
**users'** [2] - 8391:20, 8433:5
**uses** [3] - 8391:14, 8395:15, 8422:21
**usual** [1] - 8394:22

## V

**valuation** [1] - 8464:17
**value** [3] - 8389:12, 8389:13, 8389:14
**variables** [1] - 8467:11
**Varian** [1] - 8426:21
**varies** [2] - 8396:12, 8407:5
**variety** [6] - 8376:9, 8398:22, 8420:14, 8434:11, 8436:9, 8472:2
**various** [16] - 8374:13, 8376:5, 8376:14, 8386:8, 8395:6, 8405:18, 8410:24,

8416:2, 8458:2, 8458:12, 8458:19, 8471:9, 8472:18, 8473:15
**vary** [1] - 8466:7
**vast** [2] - 8397:13, 8422:10
**vehicle** [1] - 8424:8
**vendors** [1] - 8398:23
**venue** [1] - 8371:24
**version** [7] - 8387:7, 8387:19, 8403:25, 8404:5, 8405:13, 8455:11, 8456:5
**versions** [2] - 8370:2, 8402:21
**versus** [3] - 8369:6, 8403:3, 8448:5
**vertical** [23] - 8396:25, 8401:14, 8401:22, 8401:24, 8402:4, 8402:24, 8403:3, 8406:17, 8407:25, 8409:5, 8409:6, 8411:3, 8419:10, 8419:12, 8419:22, 8419:25, 8420:12, 8421:13, 8421:19, 8424:23, 8426:6, 8429:7
**vertical-specific** [1] - 8429:7
**verticals** [23] - 8394:15, 8394:18, 8395:14, 8396:7, 8398:9, 8401:17, 8405:2, 8407:13, 8407:19, 8419:6, 8419:11, 8419:17, 8419:21, 8420:1, 8420:14, 8422:4, 8422:21, 8437:5, 8437:9, 8437:14, 8438:18, 8438:22, 8448:22
**videos** [2] - 8455:16, 8455:17
**view** [19] - 8386:20, 8389:23, 8404:18, 8414:1, 8428:11, 8428:25, 8437:1, 8437:25, 8439:6, 8440:21, 8447:6, 8447:18, 8448:4, 8449:15, 8450:22, 8450:25, 8454:24, 8460:9, 8471:17
**views** [7] - 8416:22, 8416:23, 8427:18, 8431:4, 8435:22,

8502

8439:3, 8449:5
**visit** [11] - 8418:13, 8418:23, 8418:25, 8419:17, 8419:18, 8422:7, 8422:16, 8422:20, 8422:22
**visited** [1] - 8419:17
**visits** [12] - 8418:20, 8419:5, 8419:6, 8419:9, 8419:10, 8419:24, 8420:4, 8420:7, 8422:7, 8422:8, 8422:13, 8425:20
**void** [1] - 8388:17
**volume** [3] - 8399:14, 8439:19, 8442:20
**vortexed** [1] - 8465:16
**vs** [1] - 8367:5

## W

**Walmart** [1] - 8395:22
**wants** [7] - 8399:25, 8400:1, 8430:11, 8430:25, 8455:2, 8455:5, 8459:14
**Washington** [5] - 8367:5, 8367:13, 8368:7, 8368:18, 8475:14
**Waszmer** [1] - 8368:12
**watching** [2] - 8455:16, 8455:17
**ways** [22] - 8384:3, 8386:8, 8391:7, 8391:15, 8395:5, 8406:20, 8408:15, 8408:21, 8409:18, 8409:23, 8416:16, 8424:23, 8429:4, 8454:17, 8454:21, 8455:3, 8456:8, 8456:19, 8457:13, 8457:20, 8458:2, 8459:4
**weak** [2] - 8413:6, 8415:13
**weakened** [1] - 8412:10
**weakness** [2] - 8415:12, 8415:17
**web** [2] - 8418:6, 8418:8
**Webb** [1] - 8368:2
**week** [3] - 8406:7, 8406:8, 8406:22
**weigh** [1] - 8420:10
**weighing** [1] - 8379:16
**weight** [1] - 8374:9

**welcome** [2] - 8427:12, 8473:23
**Wendy** [1] - 8368:12
**Wfcavanaugh@pbwt .com** [1] - 8368:5
**whereas** [3] - 8414:17, 8430:20, 8464:24
**Whinston** [32] - 8383:7, 8384:22, 8412:8, 8413:7, 8417:3, 8420:3, 8423:9, 8423:17, 8425:17, 8426:13, 8427:19, 8428:10, 8431:23, 8436:7, 8436:9, 8437:24, 8438:4, 8438:6, 8444:22, 8447:5, 8447:7, 8448:2, 8449:3, 8449:6, 8450:12, 8450:21, 8451:24, 8452:6, 8459:20, 8465:2, 8466:3, 8466:24
**Whinston's** [14] - 8415:25, 8423:14, 8425:7, 8427:14, 8428:22, 8431:2, 8432:1, 8433:9, 8433:14, 8439:3, 8453:1, 8462:2, 8462:3, 8464:20
**whole** [3] - 8403:2, 8424:5, 8440:1
**wide** [1] - 8439:9
**Wikipedia** [3] - 8397:2, 8398:11, 8437:12
**William** [2] - 8368:2, 8369:7
**WILLIAMS** [1] - 8368:6
**Wilson** [2] - 8368:9, 8368:13
**win** [1] - 8415:4
**window** [1] - 8422:11
**Windows** [2] - 8425:8, 8425:14
**winning** [4] - 8388:19, 8409:22, 8417:13, 8447:24
**wins** [1] - 8417:14
**wish** [3] - 8371:5, 8371:9, 8373:10
**witness** [4] - 8375:7, 8375:12, 8472:11, 8474:10
**WITNESS** [33] - 8375:11, 8387:5, 8389:21, 8396:23, 8399:4, 8399:7,

8403:4, 8403:19, 8404:8, 8404:14, 8408:6, 8408:8, 8409:12, 8414:3, 8419:19, 8420:13, 8420:20, 8422:23, 8439:20, 8440:25, 8446:12, 8446:16, 8452:17, 8463:23, 8464:19, 8464:23, 8465:2, 8465:11, 8465:15, 8465:18, 8467:4, 8470:15, 8470:19
**witnessed** [1] - 8445:21
**word** [4] - 8388:9, 8417:6, 8421:12, 8435:17
**words** [1] - 8426:10
**works** [2] - 8392:21, 8437:16
**world** [10] - 8427:25, 8432:13, 8439:11, 8439:13, 8440:8, 8440:9, 8440:24, 8440:25, 8441:16, 8461:19
**worth** [2] - 8450:3, 8450:5
**wrap** [1] - 8384:5
**wrapping** [1] - 8413:2
**written** [2] - 8377:14, 8449:17
**wwaszmer@wsgr. com** [1] - 8368:15

## Y

**year** [4] - 8401:16, 8401:19, 8403:24, 8442:25
**years** [5] - 8376:1, 8399:5, 8433:23, 8454:13, 8456:6
**Yelp** [13] - 8395:2, 8396:4, 8411:4, 8411:9, 8411:10, 8411:11, 8412:17, 8415:9, 8415:15, 8415:17, 8427:23, 8432:9, 8453:9
**York** [3] - 8368:4, 8368:11, 8368:14

## Z

**Zappos** [1] - 8391:5
**zero** [3] - 8387:12, 8395:8, 8442:12