IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
et al.,                                      Civil Action
                        Plaintiffs,          No. 1:20-cv-3010

          vs.                                Washington, DC
                                             November 7, 2023
GOOGLE, LLC,                                 1:37 p.m.

                        Defendant.           Day 36
_____/           Afternoon Session


                    TRANSCRIPT OF BENCH TRIAL
             BEFORE THE HONORABLE AMIT P. MEHTA
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For DOJ Plaintiffs:      KENNETH DINTZER
                            U.S. Department of Justice
                            1100 L Street, NW
                            Washington, DC 20005

                         MEAGAN BELLSHAW
                         VERONICA ONYEMA
                         MATTHEW JONES
                            U.S. Department of Justice
                            450 Fifth Street, NW
                            Washington, DC 20001

                         JEREMY GOLDSTEIN
                            U.S. Department of Justice
                            450 Golden Gate Ave, Room 10-101
                            San Francisco, CA 94102

                         DAVID DAHLQUIST
                            U.S Department of Justice
                            209 South LaSalle Street, Suite 600
                            Chicago, IL 60604

1    **APPEARANCES CONT:**

2    **For Plaintiffs**
     **State of Colorado &**
3    **State of Nebraska:**        **WILLIAM CAVANAUGH, JR.**
                                    Patterson, Belknap, Webb & Tyler, LLP
4                                    1133 Avenue of the Americas #2200
                                    Suite 2200
5                                    New York, NY 10036

6    **For Plaintiff**
     **State of Colorado:**        **JONATHAN SALLET**
7                                    Colorado Department of Law
                                    CPS/Antitrust Section
8                                    1300 Broadway, 7th Floor
                                    Denver, CO 80203

9

10   **For Defendant Google:**    **JOHN SCHMIDTLEIN**
                                   **GLORIA MAIER**
11                                   Williams & Connolly, LLP
                                    680 Maine Avenue, SW
12                                   Washington, DC 20024

13                                 **MICHAEL SOMMER**
                                    Wilson, Sonsini, Goodrich & Rosati
14                                   1301 Avenue of the Americas, 40th Fl.
                                    New York, NY 10019

15

16

17

18

19

20

21

22

23   **Court Reporter:**          **JEFF HOOK**
                                    Official Court Reporter
24                                   U.S. District & Bankruptcy Courts
                                    333 Constitution Avenue, NW
25                                   Washington, DC 20001

1
**I N D E X**

2
**WITNESS**                                                           **PAGE**

3
RICHARD HOLDEN

4
  Continued Cross-Examination by Mr. Sallet                 9281

5
  Cross-Examination by Mr. Jones                            9302

6
  Redirect Examination by Ms. Maier                         9304

7

8
ADRIENNE MCCALLISTER

9
  Direct Examination by Mr. Schmidtlein                     9311

10
  Continued Direct Examination by Mr. Schmidtlein           9351

11
  Cross-Examination by Mr. Goldstein                        9352

12
  Redirect Examination by Mr. Schmidtlein                   9380

13

14

15
**E X H I B I T S**

16
**EXHIBIT**                                                          **PAGE**

17
Exhibit PSX907        .....Admitted into evidence.....        9285

18
Exhibit PSX343        .....Admitted into evidence.....        9288

19
Exhibit PSX608        .....Admitted into evidence.....        9294

20
Exhibit PSX510        .....Admitted into evidence.....        9296

21
Exhibit PSX902        .....Admitted into evidence.....        9302

22
Exhibit UPX2093       .....Admitted into evidence.....        9358

23
Exhibit UPX2097       .....Admitted into evidence.....        9374

24

25

1    P R O C E E D I N G S

2        **THE COURT:**  Welcome back, everybody.

3        Mr. Sallet, we're ready when you are.

4        **CONTINUED CROSS-EXAMINATION OF RICHARD HOLDEN**

5    **BY MR. SALLET:**

6        **Q.**  Mr. Holden, I'd like to go back to the question of

7    intent that we were discussing before the lunch break.  I

8    want to ask you yes or no, Mr. Holden:  Do you believe that

9    text ads and hotel ads can be viewed as complementary, yes or

10   no?

11       **A.**  I view them as collectively bought by advertisers.

12       **Q.**  I'd like to show you a deposition transcript that you

13   gave -- do we have copies to give?  Okay.

14       May I approach, Your Honor?

15       **THE COURT:**  You may.

16   **BY MR. SALLET:**

17       **Q.**  Mr. Holden, do you recall being deposed on

18   December 1st, 2020?

19       **A.**  I do.

20       **Q.**  And do you recall taking an oath to tell the truth at

21   that deposition?

22       **A.**  I did.

23       **Q.**  I'd like you to turn to page 134, if you would.

24       **MR. SALLET:**  Ah, I made a mistake.  I withdraw this.  I

25   gave him the wrong deposition transcript; it's my fault.

1      Can I have the 2021?  Thank you.

2      I'm going to ask to approach to do the same thing, I'm

3  sorry.

4      **Q.**  Mr. Holden, I believe you've been deposed three times

5  in connection with this case, so I think my odds of getting

6  to the right one are improving as we go along.

7      **A.**  Okay.

8      **Q.**  Let's just make sure.  Mr. Holden, I'd like you to

9  turn to page 134 -- well, first of all, you recall giving

10  this deposition, correct, do you not?

11      **A.**  Yes.

12      **Q.**  And you swore to tell the truth, correct?

13      **A.**  I did.

14      **Q.**  Could you turn to page 134 of this transcript, and

15  I'd like to -- I'd like you to turn your attention to

16  line four:

17      "Question:  In the conversations you've had, have you

18  compared the benefits of hotel ads with AdWords for travel

19  queries?"

20      "Answer:  We see them as complementary, I would say.

21  They look at it, and we look at it, as if it's just a

22  different stage.  There's a user that's earlier in the

23  process, often with a search ad.  And with a hotel ad, it's

24  usually a user that's much closer to making a decision.

25  Generally speaking, that's usually of much higher value to

1     the partner.  They're closer to making that decision.

2     They're more likely to convert."

3          Was that the question that was asked?

4     **A.**  Sorry, which was the question?

5     **Q.**  The question that I read, was that question asked?

6     **A.**  I believe so.

7     **Q.**  And was the answer I read given?

8     **A.**  That was the answer given.

9     **Q.**  Thank you.

10    **MS. MAIER:**  One objection.  You didn't read the complete

11    answer to that question, it went on.  Can you, for the

12    record, complete his answer?

13    **MR. SALLET:**  Your Honor, I read the portion of the

14    question that I believe impeaches the statement that was made

15    by Mr. Holden.

16    **MS. MAIER:**  For the rule of completeness, it should be

17    included.

18    **THE COURT:**  That's fine.  Why don't you just go ahead and

19    read the rest of it.  It's either going to come in now or on

20    redirect.

21    **BY MR. SALLET:**

22    **Q.**  Sure.  Let me just make sure I start in the right

23    place.  Line 15:

24         "They're probably willing to probably bid more for that

25    customer at that stage.  We're not talking about usually a

1    trade-off.  We're usually talking about that they want to

2    reach users at various stages, and so they probably want to

3    buy advertising in both segments."

4        Have I now read the complete answer to the question?

5        **A.**  Yes, that clarifies it.

6        **Q.**  I'd like to ask you yes or no, Mr. Holden:  Do you

7    agree that Search is the ultimate intent signal?

8        **A.**  I agree that Search is a powerful intent signal that

9    can be utilized on many different sites.

10       **Q.**  Now, this time, I'm hoping I get it right.  I'd like

11   you to look at the December 2020 transcript I gave you.  And

12   if you put that aside, we can get you another copy.  I've

13   already asked you about your appearance here, so I won't ask

14   that again.  Could you turn to page 160 of this transcript,

15   please.  Question -- I'm sorry, I should say this,

16   Mr. Holden, I'm looking at line 13:

17       "Question:  Okay.  Just breaking it down further, what

18   does that intent signal refer to?"

19       That's the question, correct?

20       **A.**  That's what the question is, yes.

21       **Q.**  "Answer:  Intent.  Search is the ultimate sort of

22   intent signal.  When somebody is searching for -- is showing

23   you what their interests are, what their desires are, and

24   then looking and working with the user as they refine that

25   query as well over time, gives you an even more precise look

1    at that.  And that's what -- you know, so useful to our

2    advertisers is that they are getting insight into what a user

3    wants, and able to deliver the right product offering to them

4    at the right moment."

5        Is that the answer that you gave?

6        **A.**   Yes.  I meant small search, meaning you can search

7    anywhere.  It doesn't have to be Google Search.

8        **Q.**   But I've read the answer correctly?

9        **A.**   Correct.

10       **Q.**   Thank you.

11       **MR. SALLET:**  Your Honor, before the break, I was showing

12   an exhibit we marked, 907, a SERP of hotels in New York.  I

13   neglected to move that in, and I'd like to move that into

14   evidence.

15       **MS. MAIER:**  No objection.

16       **THE COURT:**  Okay, it will be admitted.

17       (Exhibit PSX907 admitted into evidence)

18   **BY MR. SALLET:**

19       **Q.**   Mr. Holden, would you now look at the exhibit marked

20   PSX902.  I want to just briefly ask you about this.  Please

21   let me know when you've had a chance to take a look at it.

22       (Witness reviews document)

23       **Q.**   Mr. Holden, I will represent to you that this is an

24   immersive that we found by linking from the SERP that was

25   hotels in New York.  I want to just ask you a question about

1    it.

2         The top two listings on this page, Hilton Garden and

3    Embassy Suites, are ads, correct?

4         A.   Yes, they're labeled as ads.

5         Q.   Can an SVP buy an ad that appears here?

6         A.   I believe so, with promoted hotels, that they can.   I

7    don't recall exactly.  There was a time when maybe they

8    didn't, but I believe they can.

9         Q.   And if they did, they could only purchase an ad in

10   the name of a single hotel, correct?

11        A.   These are the promoted hotel ads, and it's about a

12   particular property, so they're buying it to drive traffic

13   related to that hotel.

14        Q.   They wouldn't be able to buy an ad that says that

15   they have the ability to offer choices from among different

16   hotels in New York, correct?

17        A.   They're trying to advertise related to queries

18   related to -- or interests related to this hotel.  They're

19   not trying to market the other things they're doing, they're

20   trying to market to this hotel -- which is what hotel ads do.

21   It's attached to a particular property.

22        Q.   I'm not asking you, Mr. Holden, with respect, the

23   motivation of the advertiser.  I'm asking you:  Am I correct

24   that the ad they purchased would be in the name of a single

25   hotel, and would not be a kind of ad in which they can tell

1    users they have a number of choices to present?  Am I correct

2    about the kind of ad that would appear here?

3        **A.**   When they buy hotel ads, they have the ability often

4    to have a tagline with an Expedia booking.  Others often try

5    to promote the features that they have on their sites as well

6    as part of that advertisement.

7        **Q.**   And is that permitted for this kind of ad, this

8    specific kind of ad on this page?

9        **A.**   This ad, a promoted ad -- promoted hotel ad, is about

10   that property in particular.  If you went into that ad, they

11   have other attributes that they can share within there.  If

12   they click within that, the unit expands, I believe.  And

13   then there's opportunity for the advertiser there, the SVP or

14   others, to share other information about what you can get on

15   their site.

16       **Q.**   So my take on that is they can only show the kind of

17   content that appears here for a single ad; is that correct,

18   yes or no?

19       **A.**   Say the question again.  I'm not sure I understand

20   the question.

21       **Q.**   Yes or no --

22       **A.**   No, no, the question.

23       **Q.**   This kind of ad that appears in an immersive, if

24   purchased by an SVP, would only refer to a single hotel?

25       **A.**   Yes, they're buying an ad related to a hotel.

1      Q.  I'd like to now ask you to turn to 323 in your

2   binder.  Wait a second, hold on.  I think I have the wrong

3   number.  Ah, it's 343.

4      Your Honor, Mr. Cavanaugh said yesterday in court that I

5   did the math on something.  I think I've proven the falsity

6   of that statement several times today.

7      Mr. Holden, this is a Google document that came from your

8   files.  I just want to direct your attention to the bolded

9   language near the bottom of the page that begins with the

10  word "Expedia."

11     Do you see that?

12     A.  I do.

13     Q.  And the statement is:  "Expedia feels that there is

14  great imbalance in the commercial value they receive in

15  return for" -- I should just say, Your Honor, this is not in

16  evidence.  This is a new exhibit; it's a Google document.

17  We'd move it into evidence.

18     **MS. MAIER:**  No objection.

19     **THE COURT:**  It will be admitted.

20     (Exhibit PSX343 admitted into evidence)

21  **BY MR. SALLET:**

22     Q.  Thank you.  I'm going to start again, Mr. Holden:

23  "Expedia feels that there is great imbalance in the

24  commercial value they receive in return for the large amount

25  of itinerary data they are required to provide us to

1    participate on HA.  Would we consider providing them some

2    type of incentives (e.g. credits, payment, et cetera) for

3    providing the data they feel is not providing commercial

4    value in return?"

5         Do you see that?

6         **A.**  I do.

7         **Q.**  In that paragraph, "HA" stands for hotel ads,

8    correct?

9         **A.**  It does.

10        **Q.**  Now, this is a two-page document.  I invite you to

11   look at the second page, which I believe there's additional

12   content explaining Google's views.

13        Do you see that?

14        **A.**  Yeah, let me just look at it for a minute.

15        **Q.**  Sure, of course.

16        Mr. Holden, please take all the time you need, but I'd

17   direct your attention to the bottom of that page.  There's --

18        **A.**  Sorry, the second page?

19        **Q.**  The first page, I apologize, bottom of the first

20   page:  "Look at it like this, hotel search and ads provide

21   value to partners in the form of leads, needs content to work

22   for users.  Partners who get the leads need to provide that

23   content (in proportion to the value they get.)"

24        Do you see that?

25        **A.**  I do.

1      Q.   Is there any analysis in this document that purports

2   to measure the value given by Expedia to Google or the value

3   given by Google to Expedia in exchange?

4      A.   There's no analysis in this document.  This document

5   is about interpretation of interaction we've had with the

6   partners through the years, and how the products performed

7   for them to which they choose to participate because there's

8   value returned to them.  They need to share data to be able

9   to participate in the ads product or the organic offering in

10   the structured data.  And this is what we're discussing

11   internally about how we've discussed with them the value that

12   they get.

13      Q.   The language I read to you from the boldfaced

14   paragraph ends with the sentence:  "Would we consider

15   providing them some type of incentives (e.g. credits,

16   payment, et cetera)".

17      Do you see that?

18      A.   Yes, I do.

19      Q.   You never paid Expedia money for the data they

20   provided you, what's described in here as a large amount of

21   itinerary data; is that correct?

22      A.   We never paid them for it.  This is coming -- in

23   context, this is coming from our sales team expressing the

24   interest that they had in asking questions about this.  We

25   never paid them for it, because the return that we give them

1   is the value that they get in leads from advertisement, as

2   well as the organic results.  That's the exchange that's

3   occurring here.

4       Q.  Could you go to PSX608 in your binder.

5       THE COURT:  I'm sorry, can I ask a question?

6       MR. SALLET:  Of course.

7       THE COURT:  Is it the case that for any advertiser in the

8   hotels vertical and immersive, that they need to agree to

9   provide data in order to advertise?

10      THE WITNESS:  Well, we need the data, the pricing and

11  availability of hotels to be able to have something that's

12  structured data to present to the users.  So we need that

13  data to be able to do that.  A partner could choose not to

14  share that data.  There's no way for them to participate,

15  because we need the data to be able to show that to the

16  consumer at the end of the day.  If they don't want to share

17  the data, we'll work with other providers to get that.  We

18  might not have comprehensive pricing at the end of the day.

19  But they need to provide the data to have something for us to

20  show the user at the end of the day.

21      The value exchanged there is that they share the data,

22  they get leads as a result.  We build a more effective

23  product that helps generates leads for them over time.

24      THE COURT:  And so are -- is the treatment of SVPs

25  different?  In other words, are SVPs required to provide data

1    in order to advertise?

2        **THE WITNESS:**  It's no different than the supplier, the

3    hotel.  They need to provide data also to be able to

4    participate in it.  So they're not treated any differently

5    than anybody else who would want to buy advertisement with

6    us, for structured ad units like this where you need data

7    that's not web data to be able to present something useful to

8    the consumers.

9        **THE COURT:**  Okay.

10   **BY MR. SALLET:**

11       **Q.**  There's a large amount of itinerary data that's

12   provided.  That's used by Google for purposes other than

13   populating the content of the hotel ad that's -- that is

14   purchased, correct?

15       **A.**  The pricing information may appear in other places

16   outside the ad itself.  Again, that's of interest to present

17   to the consumer, information that makes the consumer engage

18   with it, ultimately, and then drives leads to the partners.

19   So they're aware that they're sharing data with us to build

20   the product, the product that helps generate leads for them.

21       **Q.**  And an example of that is the pricing data we talked

22   about before that can appear on the hotel unit without

23   disclosure of the source of the prices, correct?

24       **A.**  Again, that's an aggregation or a representative

25   price that could be coming from any partner in particular.

1     **Q.**  This document says:  "Expedia feels that there's a

2 great imbalance in the commercial value" --

3     **A.**  I'm sorry, which document?  We're back to -- which

4 one was that?

5     **Q.**  I'm sorry, that's correct, 343:

6 "Google understood that Expedia feels there is great

7 imbalance in the commercial value they receive in return for

8 the large amount of itinerary data that they are required to

9 provide to participate in the hotel ads," correct?

10     **A.**  So the context in that is that we, as building our

11 product --

12     **Q.**  Mr. Holden --

13     **A.**  -- try to get --

14     **Q.**  -- did Google understand --

15     **THE COURT:**  Let's not talk over one another, please.

16 **BY MR. SALLET:**

17     **Q.**  Did Google understand that Expedia was expressing the

18 view -- I'm asking you, did Google have an understanding that

19 Expedia felt there was a great imbalance in the commercial

20 value as expressed in this sentence?

21     **A.**  This is an expression of -- from a salesperson

22 representing what the partner felt.  We did not feel that

23 there was a grave imbalance.  We understood that we were

24 having an exchange of value -- the same as I've said before,

25 that it's a long-term commercial relationship where it's in

1    their interest to say that they don't feel like there's

2    value.  That's part of the negotiation that goes on in these

3    deals.

4        Q.  Could you turn, please, to PSX608.

5        Before we go into this, I just want to say there are

6    redactions in here, Mr. Holden.  I'll try to point them out

7    to you, again, so neither of us err.

8        Your Honor, this is not in evidence.  There's a relevance

9    objection from Google.  We move its admission.  We believe

10   it's clearly relevant in light of the discussions on direct

11   about the nature of relationships between SVPs and Google.

12       **MS. MAIER:**  No objection.

13       **THE COURT:**  So it will be admitted.

14       (Exhibit PSX608 admitted into evidence)

15   **BY MR. SALLET:**

16       Q.  Thank you, Your Honor.

17       So this document was also produced from your files,

18   Mr. Holden.  I would like you to turn, if you would, to this

19   fifth slide.  But you might find it most easily by looking at

20   the Bates number which ends in 938.  Again, there are

21   redactions here.

22       Mr. Holden, do you see that?

23       **A.**  Yes, I do.

24       **Q.**  And this -- the title of this reads:  Priority

25   Partners Increasingly Voice Concerns; is that correct?

1      **A.**   That's what it says, yes.

2      **Q.**   And then there's a column that's concern number two,

3      correct?  And under that is the language:  "Costs are rising

4      and traffic is falling."

5           Do you see that?

6      **A.**   I do.

7      **Q.**   And concerns were being voiced by companies other

8      than a single company, right?  Priority partners increasingly

9      voice concerns, correct?

10     **A.**   Yes.

11     **Q.**   And in fact, there are two quotations -- I'm not

12     referencing the companies, those are redacted, but two

13     quotations in concern two underneath "Costs are falling" --

14     "Costs are rising and traffic is falling."

15          Do you see that?

16     **A.**   Yes.

17     **Q.**   And the first one is:  "Google is deliberately making

18     it impossible to compare hotel ads and SEM to squeeze maximum

19     revenue from us."

20          Do you see that?

21     **A.**   I do.  I don't agree with it, but I see it.

22     **Q.**   And despite these kinds of concerns -- which were

23     written out by Google here, written up in the prior exhibit,

24     travel SVPs, OTAs kept buying Google Ads and continue to do

25     so today, correct?

1      **A.** They do so because it's higher ROI to them.

2      **Q.** Mr. Holden, I would like you to go to PSX510.

3      Your Honor, this an exhibit that's a new exhibit that we

4      have not moved into evidence. It is a Google document.

5      **THE COURT:** Is there any objection, Counsel?

6      **MS. MAIER:** No objection.

7      **THE COURT:** PSX510 will be admitted.

8      (Exhibit PSX510 admitted into evidence)

9   **BY MR. SALLET:**

10     **Q.** Mr. Holden, earlier today you referred to studies

11     that Google has done, correct?

12     **A.** I'm not sure what particular studies they were

13     referring to.

14     **Q.** I wasn't either, but during the direct, you

15     referenced the fact that sometimes Google does studies. Do

16     you remember that?

17     **A.** We do lots of experiments, and we do user-based

18     studies as well.

19     **Q.** And this document I'm showing you is such an

20     experiment. Can you take a look at it for a minute?

21     **A.** Sure, just give me a minute.

22     **Q.** I can help you, Mr. Holden, if you would -- although

23     take all the time you want. I'm going to ask you about only

24     a couple of pages in this, including the first one, the third

25     one and the fifth one. But, of course, take whatever time

1    you need.

2        **THE COURT:** Mr. Sallet, is there a particular portion of

3    this you want to direct him to?

4    **BY MR. SALLET:**

5        **Q.** I do, yes. Mr. Holden, could you look at the top of

6    the first page.

7        **A.** Okay.

8        **Q.** This document is called: Enforcing Booking Link

9    Diversity.

10       Do you see that?

11       **A.** I do.

12       **Q.** And in the second paragraph, you see: "For purpose

13   of this document, we define link diversity as, quote, showing

14   a mix of carrier and OTA links by default, where both links

15   exist and when users land on the booking page."

16       Do you see that?

17       **A.** I do.

18       **Q.** So with that in mind, the first sentence of the

19   context paragraph starts with the language: "With the

20   addition of numerous OTAs in multiple markets who are willing

21   to compete on price by offering small discounts."

22       Do you see that phrase?

23       **A.** I do.

24       **Q.** And that is Google's view, that OTAs are competing on

25   price against airlines, correct?

1    **A.** Yes, that's what it says.

2    **Q.** And then if you could turn to page 3, there is a

3    paragraph that's called:  Pitfalls.  Now, this is a study

4    that's being done, and the first sentence here reads:  "A

5    potential pitfall of this approach is that it breaks the

6    apparent price sorting of the booking links in the eyes of

7    the user."  And then it goes on to say:  "The user might miss

8    cheaper options than the airline link that are only visible

9    when the links are expanded."

10   Do you see that?

11   **A.** I do.

12   **Q.** And that refers to the manner in which options are

13   offered that can provide cheaper options than what the

14   airline itself would be providing, correct?

15   **A.** I think this is indicating that in case -- in some

16   cases, there might be cheaper options lower down in the list

17   of options.

18   **Q.** And then the next paragraph is:  "Another pitfall is

19   that such a condition will only solve this problem for

20   desktop, not for mobile."

21   Do you see that?  And can I just say, Mr. Holden, the

22   rest of that sentence is redacted.  That's why I'm not

23   reading it.

24   **A.** Let me look at the sentence.

25   **Q.** Please.

1    **A.**  Okay.  And, sorry, your question was, though?

2    **Q.**  I just want to see if you understood that the

3    distinction was being made here between desktop and mobile?

4    **A.**  Yes, there's a distinction being made.

5    **Q.**  And then could you go to the next page --

6    **THE COURT:**  Before we do that, I'm sorry, maybe I just

7    lost the thread here.  So the pitfalls -- a potential pitfall

8    of this approach, what approach are we referring to here?

9    **BY MR. SALLET:**

10   **Q.**  Could we go to the second page.  There's a section

11   called:  Experiment.

12   Do you see that, Mr. Holden?

13   **A.**  I do.

14   **Q.**  And this, I will say, is complicated.  But the second

15   paragraph says:  "In the short term, the proposal is to add a

16   basic diversity criterion in the ranking algorithm."  And

17   then it goes on and shows the kinds of conditions that could

18   appear through the experiment.

19   Do you see that?

20   **A.**  I do.

21   **Q.**  And so, for example, there's a bullet that says:  "If

22   an airline link is not one of the three cheapest ranked

23   solutions, then show the best airline link at position

24   three."

25   That's one way the test was being run, correct?

1    **A.**   I believe so.

2    **Q.**   And then it says:  "For symmetry, if an OTA link is

3    not one of the three cheapest ranked solutions, then show the

4    best OTA link at position three," correct?

5    **A.**   Yes, that's what it says.

6    **Q.**   And the purpose of this was to test the proposition

7    as to whether -- and this is on the bottom of page two --

8    inserting the airline link at rank three increases

9    click-through rates and conversion rates.

10    Do you see that?

11    **A.**   Yes.

12    **Q.**   So is that -- I've tried to give you a summary, Your

13    Honor, of the experiment that's being run testing the

14    presence of airlines and OTA.

15    **A.**   I think the summarization of this experiment could

16    best be said that research suggested to us that users want to

17    see the airline link -- or the airline price there in order

18    to trust the results better -- or don't trust the results if

19    they don't see them as well.  And part of what we were

20    experimenting with here is understanding -- showing that

21    airline price first, even if it wasn't the lowest price, may

22    be the right thing to do from a consumer perspective, and

23    being able to have a consumer have a full view of the

24    options.

25

1    **Q.**  In fact, there are two segments of users that are

2    discussed on page five, aren't there, Mr. Holden, under the

3    heading:  Additional Conclusions?  And the first is:  "Users

4    who want the cheapest flight, regardless of whether it is

5    from an airline or OTA."

6    That's one segment, correct?

7    **A.**  Yes.

8    **Q.**  And those users click on the top two links, the OTAs,

9    in both the control and the experiment.  That's one segment,

10   correct?

11   **A.**  Yep.

12   **Q.**  And then there's a second segment.  As you said:

13   "Users who prefer to book with airlines, probably due to a

14   lack of trust in OTAs, regardless of small differences in

15   price.  These users only click when we promote the airline

16   link, and they seem to be a minority."  And then there's some

17   redacted statistics.

18   That's the second segment, correct?

19   **A.**  Yeah, we're trying to strike a balance to serve both

20   sets of users.

21   **Q.**  The best way to strike the balance was to provide

22   both OTAs and airlines among the results, correct?

23   **A.**  Which is exactly what we were doing.

24   **Q.**  And that best serves competition?

25   **A.**  That best serves the user at the end of the day.  It

1  may serve competition, too, but it's about the user interest.

2      **Q.**  And so -- that's okay, competition is referenced

3  here.  I don't need to ask about that any more.

4      **MR. SALLET:**  Let me just ask, could I have one moment,

5  Your Honor?

6      Ah, I neglected to move in PSX902, which was the

7  immersive -- I think it was, wasn't it?  It was the immersive

8  to the hotels in New York.

9      **MS. MAIER:**  No objection to Exhibit 902.

10      **THE COURT:**  Okay.  902 will be admitted, if it hasn't

11  been already.

12      (Exhibit PSX902 admitted into evidence)

13      **MR. SALLET:**  We have no further questions.  Thank you.

14      **THE COURT:**  Thank you, Mr. Sallet.

15      Anything on behalf of the DOJ plaintiffs?

16      **MR. JONES:**  Very briefly, Your Honor.  Matthew Jones from

17  the United States.

18      <u>**CROSS-EXAMINATION OF RICHARD HOLDEN**</u>

19  **BY MR. JONES:**

20      **Q.**  Good afternoon, Mr. Holden.

21      **A.**  Good afternoon.

22      **Q.**  I believe you testified that just prior to the recent

23  role change you had, your position was VP of product

24  management for travel; is that right?

25      **A.**  I was -- that's my title.  I was general manager for

1    travel, which covered product and engineering.

2        Q.   Okay.  And your focus was on Google's travel

3    vertical; is that right?

4        A.   Correct.

5        Q.   And that's been true for the last 10 years?

6        A.   That's correct.

7        Q.   You didn't work on Google Finance?

8        A.   No.

9        Q.   You didn't work on Google Shopping, correct?

10       A.   No.

11       Q.   You didn't work broadly on general search queries

12   that are unrelated to travel?

13       A.   No, I did not.

14       Q.   I think you said before you came to Google you worked

15   for a company called @Home; is that right?

16       A.   It's called @Home Network, yes.

17       Q.   @Home Network.  And they provide cable modem service?

18       A.   They were one of the first broadband cable modem

19   service providers.

20       Q.   You haven't worked for an ad agency?

21       A.   No, I never worked for an ad agency.

22       Q.   And you haven't worked for an SVP, like an Expedia or

23   a Booking?

24       A.   I have not.

25       **MR. JONES:**  No further questions, Your Honor.

1      **THE COURT:**  Any redirect?

2      <u>**REDIRECT EXAMINATION OF RICHARD HOLDEN**</u>

3   BY MS. MAIER:

4      **Q.**  Mr. Holden, one of the exhibits that counsel showed

5   you was Exhibit 907 in the binder in front of you, and that

6   was an image of the SERP.  He asked you about that price

7   information that may appear on the SERP in the hotels unit.

8      I believe you noted in your testimony that multiple

9   channels may provide the same price for a given hotel; is

10  that correct?

11     **A.**  That is correct.

12     **Q.**  And then if a user proceeds and clicks on that hotel

13  entity in the unit and travels to the booking module, at that

14  point are prices attributed to the different -- the channels

15  that provided those prices?

16     **A.**  Yeah, there's direct attribution to every channel and

17  every price that's provided on that page.

18     **Q.**  And earlier in your testimony today we looked at an

19  example of the expanded booking module with all of the

20  options.  Do you recall that?

21     **A.**  Yes.

22     **Q.**  Is it fair to say that for a given hotel, there may

23  be many, many options available; is that correct?

24     **A.**  Yeah, there could be dozens of options.

25     **Q.**  Are there any design issues that would arise if

1    Google sought to, as was suggested, include attribution for a

2    particular -- for the prices in the hotels unit that appears

3    on the search results page?

4        A.  Yeah, our goal is to make the page able for the user

5    to digest information.  If we were trying to provide

6    attribution for dozens and dozens of channels with which that

7    room could be booked, you wouldn't be able to see the rest of

8    the page.

9        Q.  And you were also shown PSX524.  Do you recall that?

10       A.  Yes.

11       Q.  It's in your binder.  The date on the presentation

12   here is April 5th, 2019.  Do you see that on the front?

13       A.  I do.

14       Q.  Is that the time that -- was it about this time when

15   this analysis was conducted?

16       A.  I believe so.

17       Q.  And is this before or after Google had introduced the

18   unpaid booking links possibility?

19       A.  This is before we had introduced UBL, or the unpaid

20   booking links.  So nothing in here would represent the

21   traffic we might be generating for users -- for partners

22   unpaid through the booking module.

23       Q.  And in the booking module, I believe you were asked

24   some questions by counsel about page 241 --

25       A.  241, you said?

1    Q.  Yes, which was mostly redacted.  But the title was:

2    OTAs on Search.

3    Do you see that?

4    A.  Yes.

5    Q.  On the next page -- which I don't want to show on the

6    screen because it hasn't been reviewed for confidentiality

7    and would also be redacted.  But do you see that that one's

8    titled:  Suppliers on Search?

9    A.  Yes.

10   Q.  And earlier, just to clarify, again, a hotel -- can

11   you tell us again what a hotel supplier is?

12   A.  A hotel supplier you can think about as the brand of

13   the hotel.  It's who operates the hotel at the end of the

14   day.

15   Q.  That is a type of third-party -- potentially an

16   advertiser that also obtains traffic through either paid or

17   unpaid clicks; is that fair to say?

18   A.  Correct.  They are competing for traffic to their

19   sites, just like the OTAs and the meta search providers are.

20   Q.  And does this slide reflect -- and I don't want to

21   use numbers, but -- specific numbers, but could you sort of

22   in general terms characterize whether suppliers derived an

23   insignificant or a substantial amount of traffic from the

24   hotels unit in immersive?

25   A.  They are -- not using numbers as well.  They are

getting a range of traffic from us, paid and unpaid, from the
search results page, as well as from the dedicated hotels
unit, and are getting a mix like the OTAs of paid and unpaid.

Q.   And do the OTAs have to compete with suppliers for
visibility within the hotels immersive?

A.   Yes.  Within that booking module that we spoke about
before, they are competing in the ad portion of that booking
module for presence versus the online travel agents.  They,
too, can insert descriptions of what's unique about their
property.  The OTAs can insert descriptions there as well to
differentiate their product from another person's product.

Q.   And then when it comes to the competition that an OTA
faces for visibility vis-a-vis the suppliers, how does it
compare within the unit versus on the SERP?

A.   Well, in the booking module, they're competing for --
if they're choosing to bid higher or not, they're competing
with each other within the booking module as well.  And then
on the SERP itself, they're also maybe competing in text ads,
and they also have presence in the organic results as a
whole.  The supplier might have presence on the knowledge
panel, but the OTAs will show up in that knowledge panel
also.

Q.   I guess, would it depend somewhat, for a categorical
query, the level of competition with hotel suppliers as
opposed to a hotel navigational query?

1    **A.**  Yeah.  For a categorical query, the suppliers and

2    OTAs are both competing for that traffic over time.  And then

3    a navigational query, this supplier is shown more prominently

4    because we think that's what the user's question is about.

5    OTAs are competing for that traffic also.  In fact, the

6    creation of hotel ads in many ways was an opportunity to give

7    more traffic to the OTAs who didn't generally garner as much

8    traffic on navigational queries.  In fact, the suppliers

9    themselves were often upset that we created hotel ads,

10    because the OTAs benefit from them quite a bit.

11    **Q.**  And you were asked --

12    **THE COURT:**  Sorry, the document that's in front of you,

13    page 242 there at the bottom, the reference to hotel units

14    here, does that refer to the entirety of the hotel unit,

15    which would include both the SERP and the immersive pages, or

16    is this referring just to the portion of the hotels unit that

17    appears on the SERP?

18    **THE WITNESS:**  So the box that says "hotel unit organic"

19    is referring to the unit on the search results page that we

20    were talking about with the three or four hotels listed in

21    it.  But it's also referring, I believe, to all the traffic

22    that's going through the immersive experience as well.  Once

23    you're in the hotel unit, everything is organic about that.

24    **THE COURT:**  In other words, so hotel units, as used here,

25    is the entirety of the product --

1        **THE WITNESS:**  The organic experience of it, yeah.

2        **THE COURT:**  Right, but it's the entirety of the product,

3    both the SERP and the immersive and not just the SERP?

4        **THE WITNESS:**  Yeah.

5        **THE COURT:**  Okay.

6    **BY MS. MAIER:**

7        **Q.**  Just to clarify that point more, is that because the

8    classic hotels unit that we've been looking at that appears

9    on the SERP that identifies the entity, is it right that

10   no -- clicks neither go to hotel suppliers nor OTAs from that

11   box on the SERP?

12       **A.**  That's right.  I mean, that's generally -- that is --

13   goes into the immersive once you engage with that.

14   There's -- I probably can't say percentages.  There's lots of

15   organic traffic going out from that page, both through the

16   booking module organic section, and then there's some paid

17   traffic coming out of that as well in the booking module.

18       **Q.**  And then you were asked some questions about the

19   requirement that data be provided in order to show booking

20   module links and hotel ads.  Do you recall that testimony?

21       **A.**  Yes.

22       **Q.**  And I just want to be clear that is it right, those

23   forms of ads -- is it right that they sort of inherently

24   require data?  Can you explain that?

25       **A.**  Yeah, that's what I was trying to say.  Without the

1   data there is no ad, and so it is part of the creative itself

2   or the ad creative.  And the incentive for the partner to

3   provide that data is they want to represent an ad to the

4   consumer so the consumer will come to them ultimately, and it

5   will generate leads for them.

6       **Q.**  So those ads are shown about a specific hotel and a

7   specific price for that hotel on a specific day; is that

8   right?

9       **A.**  Yes.  There's date association with that particular

10  property.  That price is only relevant for that combination.

11      **Q.**  And Google cannot show the linkage between those

12  prices and those dates and those hotels without having data

13  to put that information together, right?

14      **A.**  Correct.  This is, again, the whole point about

15  bringing structured dated together.  We need to go gather

16  structured data to be able to generate leads for the

17  partners.  So it's in their interest to give us the data so

18  that we can generate qualified traffic to them.

19      **Q.**  But are there other ads -- for example, the text ads,

20  that don't require that type of structured data?

21      **A.**  Correct.  You can buy text ads where you're bidding

22  on keywords that are keywords that a user might be searching

23  on, and you don't need to provide any structured data to

24  participate in those.  In some cases, we're enhancing those

25  ads over time and allowing partners to give us data if they

1    want to make that ad richer and more engaging to the user.

2    But you do not have to provide any structured data for that.

3         **MS. MAIER:**  Thank you.  I have no further questions.

4         **THE COURT:**  Mr. Holden, thank you very much for your time

5    and your testimony.  Safe travels home.

6         **THE WITNESS:**  Thank you.

7         **MR. SCHMIDTLEIN:**  Your Honor, Google calls as its next

8    witness Adrienne McCallister.

9         **DEPUTY CLERK:**  Please raise your right hand.  Do you

10   solemnly swear or affirm that the testimony you'll provide to

11   the Court will be the truth, the whole truth, and nothing but

12   the truth?

13        **THE WITNESS:**  I do.

14        **DEPUTY CLERK:**  Thank you.

15        **THE COURT:**  Ms. McCallister, welcome.

16        **THE WITNESS:**  Hello, thank you.

17        **THE COURT:**  Mr. Schmidtlein, whenever you're ready.

18        **MR. SCHMIDTLEIN:**  Thank you, Your Honor.

19        **DIRECT EXAMINATION OF ADRIENNE MCCALLISTER**

20   BY MR. SCHMIDTLEIN:

21        **Q.**  Good afternoon, Ms. McCallister.  Can you state and

22   spell your name for the record, please.

23        **A.**  Sure.  Adrienne McCallister, A-D-R-I-E-N-N-E,

24   M-C-C-A-L-L-I-S-T-E-R.

25        **Q.**  And who are you employed by?

1       **A.**   Google.

2       **Q.**   How long have you worked at Google?

3       **A.**   About 12 and a half years.

4       **Q.**   Can you briefly describe for the Court your

5  educational background?

6       **A.**   Sure.  I attended the University of Virginia from

7  1993 to 1997, and then I got a graduate degree at the

8  University of California, Berkeley.  I received my MBA and

9  was there from about 2001 to 2003.

10      **Q.**   Now, prior to working at Google, where did you work?

11      **A.**   I held several different jobs before Google.

12  Immediately after college, I worked in investment banking at

13  Paine Webber, and then Credit Suisse, doing M&A and some

14  business development.  After graduate school, I went to go

15  work for AOL.  I was there from about 2003 to 2007.  I then

16  left to work for a company called Clearleap, which was a

17  video technology infrastructure provider.  About a year and a

18  half later, I then worked for a company called Associated

19  Content, which was a crowdsource content creation company

20  that was eventually acquired by Yahoo!.  I left in 2010, and

21  then was hired in 2011 by Google to work and run strategic

22  content partnerships for Google TV.  And I've held a variety

23  of roles at Google since then.

24      **Q.**   What is your current job position?

25      **A.**   I am VP of global partnerships and, I look after a

1   number of different product areas and run partnerships for

2   those.

3       Q.  How long have you held that position?

4       A.  Since about June of 2021.

5       Q.  Now, prior to that position, what was your job title?

6       A.  I was managing director of global partnerships.

7       Q.  And for how long did you hold that position?

8       A.  Approximately two years.

9       Q.  Okay.  Between 2019 and 2021, when you held that

10  position, were you involved in negotiating Android revenue

11  share agreements with mobile carriers in the United States?

12      A.  Yes, I was.

13      Q.  And if I refer to an RSA, will you understand that I

14  mean an Android revenue share agreement?

15      A.  Yes.

16      Q.  Now, during this time period, this 2019 to 2021 time

17  period, did you have other responsibilities in your role at

18  Google?

19      A.  I did.  In addition to those negotiations, I also

20  looked after partnerships for our messaging product area.  We

21  have a client called Android Messages or Google Messages.  I

22  was responsible for those partnerships with folks around the

23  world.

24      Q.  Okay.  Who are the major U.S. carriers?

25      A.  Verizon, AT&T and T-Mobile.

1    **Q.** Do the major U.S. carriers manufacture Android

2    smartphones?

3    **A.** They do not.

4    **Q.** What role do those carriers have with respect to the

5    sale of Android devices in the United States?

6    **A.** They have a very significant role. They acquire and

7    buy cellphones, mobile phones, from OEMs or hardware

8    manufacturers, and they are responsible for distributing the

9    vast majority of cellphones in the United States.

10   **Q.** And when you say distributing cellphones in the

11   United States, are you talking about the retail sale of

12   phones to consumers?

13   **A.** That's right.

14   **Q.** And how do they sell those phones to consumers?

15   **A.** Primarily in their stores and online, but that

16   channel.

17   **Q.** Now, does Google license software applications to be

18   pre-loaded on Android smartphones?

19   **A.** Yes.

20   **Q.** And have you heard of something called the Android

21   Mobile Application Distribution Agreement or MADA?

22   **A.** Yes, I've heard of that.

23   **Q.** And have you ever been involved in negotiating a

24   MADA?

25   **A.** No, I have not.

1      **Q.**  And who does Google negotiate MADAs with?

2      **A.**  We negotiate MADAs with the Android OEMs, the

3  hardware manufacturers.

4      **Q.**  Okay.  Does Google enter into MADAs with the U.S.

5  carriers?

6      **A.**  No, we do not.

7      **Q.**  Now, do carriers negotiate with OEMs to build

8  wireless devices that the carriers will then purchase and

9  sell in their stores?

10      **A.**  Yes, they do.  Of course, I haven't been privy to

11  those contracts, but our understanding is that they have

12  significant negotiations with the OEMs.  They oftentimes have

13  technical requirements of the OEMs.  For example, they may

14  require that the OEMs support a certain 5G specification or

15  eSIM implementation.  They also oftentimes require those OEMs

16  to pre-load certain apps.  So, for example, Verizon may

17  require an Android OEM to pre-load the My Verizon app on the

18  device.

19      **Q.**  In the United States, do the carriers ultimately have

20  the final say as to how mobile devices are configured that

21  they sell directly to consumers?

22      **A.**  Yes, they do.

23      **Q.**  I'd like to turn to the topic of the search revenue

24  share agreements, or the RSAs.  Can U.S. carriers purchase

25  Android devices from an OEM for retail to consumers without

1   any agreement with Google?

2     **A.** Yes, they can.

3     **Q.** And can you explain how that -- how they can do that?

4     **A.** They have no need to have a relationship with Google,

5   they simply negotiate with the Android OEMs. The Android

6   OEMs have a license to Google products and services, but that

7   relationship is between the carrier and the OEM itself and

8   Google need not be involved.

9     **Q.** Now, do mobile carriers like Verizon, AT&T and

10   T-Mobile have to enter into RSAs with Google in order to sell

11   Android-based smartphones to consumers?

12     **A.** No, they do not.

13     **Q.** Do mobile carriers have to enter into RSAs with

14   Google in order to sell Android devices that are pre-loaded

15   with Google search on an Android device?

16     **A.** No, they do not.

17     **Q.** Now, at the time you became involved in negotiating

18   RSAs with the major U.S. carriers, were those carriers

19   already operating under preexisting or prior RSAs?

20     **A.** Yes, they were.

21     **Q.** And did those RSAs that were in effect with Verizon,

22   AT&T and T-Mobile in 2019, when you came into this role, did

23   they provide for Google search revenue share to be provided

24   to those carriers?

25     **A.** Yes, they did.

1    Q.  When were the RSA agreements with Verizon, AT&T and
2    T-Mobile that you negotiated, when were they actually entered
3    into?
4    A.  In and around June of 2021.
5    Q.  And are those search RSA agreements still in effect
6    today, to the best of your knowledge?
7    A.  Yes.  They -- well, they're all in effect, either
8    because the deal is -- term is still there or it's been
9    extended.
10   THE COURT:  I'm sorry, what was the last part?
11   THE WITNESS:  Or the deal has been extended, the deal
12   term.
13   BY MR. SCHMIDTLEIN:
14   Q.  And can you describe at a high level whether or not
15   the structure and approach to the 2021 RSAs with the major
16   U.S. carriers differed from the structure and approach from
17   the prior RSAs that were operating when you came into the
18   role?
19   A.  They did differ, yes.
20   Q.  Do you have an understanding of why Google changed
21   the structure?
22   A.  Yes.  We had been seeing for several years that our
23   revenue share payments to the carriers had continued to
24   increase, and at the same time our Android share was either
25   stagnant or declining with those carriers.  And so we sought

1    to restructure those deals.

2        Q.  And when you say that the revenue share payments were

3    increasing, are you referring to the actual dollars that were

4    paid out as opposed to the revenue share percentage?

5        A.  That's correct.  So the absolute dollars were

6    increasing.

7        Q.  And at the same time Android share was decreasing; is

8    that right?

9        A.  That's right, correct.

10       THE COURT:  I'm sorry, when you say Android share was

11   decreasing, relative to what?

12       THE WITNESS:  Relative to the entire smartphone market,

13   which is essentially iPhone versus Android.

14       MR. SCHMIDTLEIN:  Your Honor, at this time, I want to get

15   into some very specific questions about the negotiations that

16   Ms. McCallister engaged in in connection with each of the

17   three major carriers.  And for this section, I think, as we

18   discussed, we would request to go into closed session.

19       THE COURT:  Let me just ask you, Mr. Schmidtlein, you

20   described this as about 15 minutes?

21       MR. SCHMIDTLEIN:  I hope it's going to be no longer than

22   15, 20 minutes.

23       THE COURT:  Do you intend to then continue to question

24   her in open session or will that be the end of your

25   examination?

1    **MR. SCHMIDTLEIN:**  No.  I am hopeful to get this all

2    wrapped up before -- certainly before our 3:00 o'clock break

3    and concluded in closed session.

4        **THE COURT:**  Okay.  So consistent with the Court's earlier

5    ruling, then, I'm going to -- we're going to move into a

6    closed session.  Plaintiffs' counsel -- who's doing the

7    cross?

8        **MR. GOLDSTEIN:**  Good afternoon.  Jeremy Goldstein for the

9    United States.

10       **THE COURT:**  Mr. Goldstein, do you have a sense of how

11   long your cross will be with respect to the closed portion?

12   I know you haven't heard what the examination is.

13       **MR. GOLDSTEIN:**  I mean, it obviously depends on the

14   answers, but our expectation at the moment is we can do

15   everything in open session.

16       **THE COURT:**  Okay, terrific.  Will the states have any?

17       **MR. CAVANAUGH:**  I don't believe so, Your Honor.

18       **THE COURT:**  So it sounds like we're going to be closed

19   for about 15 or 20 or so.  So if you're not associated with

20   either of the parties, I'll please ask you to excuse yourself

21   for that brief period of time.  We'll then reopen the

22   courtroom for the continuation of open session questioning.

23   Thank you, everyone.

24       (Closed session transcript, pages 9320 - 9350, placed

25        under separate cover)

1    (Recess was taken at 3:18 p.m.)

2    (Back on the record at 3:36 p.m.)

3    **THE COURT:**  So we are back in open session.  Thank you,

4    everybody, for your patience.

5    Mr. Schmidtlein.

6    **CONTINUED DIRECT EXAMINATION OF ADRIENNE MCCALLISTER**

7    **BY MR. SCHMIDTLEIN:**

8    **Q.**  Just one -- hopefully one last question for you,

9    Ms. McCallister.  In your view, do the 2021 RSAs help make

10   Android devices more competitive with Apple devices?

11   **A.**  Yes, absolutely, I think across several dimensions.

12   First, we believe that Google Search is an excellent product,

13   and we want to make sure that when we partner with carriers

14   and we share out revenue at the highest tier, that they are

15   giving us promotional exclusivity.  And that's a

16   differentiation vis-a-vis Apple iPhones, because they do not

17   have the search widget there.  And we want to make sure that

18   the experience that we believe in is easily accessible to

19   Android users.  And we believe they've come to expect it.

20   We also believe that the enhanced placement that we get

21   from the RSAs of the Chrome browser is incredibly important

22   in differentiating.  Chrome browser is a world class browser

23   that's fast, secure, reliable and it's available across

24   operating systems, which is in stark differentiation to the

25   Safari browser, which is only available on Apple devices.

1    And we talked about earlier, it's incredibly important that

2    we work with the carriers to be able to push out security and

3    letter upgrades for our Android users.

4        So all of those combined, you know, we think are

5    incredibly important to help differentiate Android devices

6    vis-a-vis iPhone, and make them competitive at the same time.

7        **THE COURT:**  Just one follow-up.  I suppose I should know

8    this by now, given where we are in this trial, but the Safari

9    browser is not available on an Android platform?

10       **THE WITNESS:**  Not that I'm aware of.

11       **MR. SCHMIDTLEIN:**  No further questions, Your Honor.

12   Thank you.

13       **THE COURT:**  So we'll hear from DOJ.

14       <u>**CROSS-EXAMINATION OF ADRIENNE MCCALLISTER**</u>

15   **BY MR. GOLDSTEIN:**

16       **Q.**  Good afternoon again, Ms. McCallister.

17       **A.**  Hello.

18       **Q.**  I want to start with just a couple of additional

19   background questions.

20       **A.**  Sure.

21       **Q.**  I'm going to try not to tread the same ground that

22   your counsel covered.  The first is just about terminology.

23   So when you were negotiating carrier RSAs between June of

24   2019 and June of 2021, you were on a team called the North

25   America Carrier Partnerships Team; is that right?

1      **A.**  Yes.

2      **Q.**  And is that sort of colloquially called just the

3  carrier team?

4      **A.**  Maybe, but primarily we call it the Android Carrier

5  Partnership Team.

6      **Q.**  If I refer to it as the carrier team, will you know

7  what I'm talking about?

8      **A.**  Sure.

9      **THE COURT:**  Counsel, I'm sorry, can I ask you to just

10  move that mic a little closer and keep your voice up.

11      **MR. GOLDSTEIN:**  Yes.

12      **THE COURT:**  Thank you.

13  **BY MR. GOLDSTEIN:**

14      **Q.**  And so you led the carrier team for approximately

15  two years; is that right?

16      **A.**  The North America Carrier Partnership Team, yes.

17      **Q.**  And as you said earlier on your direct, you were

18  responsible for negotiating search revenue share agreements,

19  or RSAs, while you led that team?

20      **A.**  I led a team that negotiated with the three major

21  U.S. carriers, yes.

22      **Q.**  Just so I'm clear, and by way of background, you

23  negotiated RSAs with carriers.  You were not responsible for

24  negotiating RSAs with OEMs; is that right?

25      **A.**  Correct.

1      **Q.**  You were also not involved in negotiating carrier

2      RSAs before you joined the carrier team in June of 2019?

3          **A.**  That's correct.

4          **Q.**  And after you left the carrier team, you were not

5      involved in negotiating carrier RSAs?

6          **A.**  That's correct.

7          **Q.**  You mentioned that the RSAs you negotiated were

8      signed in June of 2021, right?

9          **A.**  Correct.

10          **Q.**  The lawsuit -- or the complaint in this case was

11      filed in October of 2020, right?

12          **A.**  That sounds about right.

13          **Q.**  So all the RSAs that you negotiated were signed after

14      this lawsuit was initiated?

15          **A.**  Yes.

16          **Q.**  When you joined the carrier team, you received copies

17      of the carrier's prior agreements?

18          **A.**  Yes.

19          **Q.**  And while I understand from your testimony that you

20      are not deeply knowledgeable having not negotiated those, you

21      have some sort of familiarity with the terms of those

22      agreements?

23          **A.**  Some, but it's been quite some time since I read

24      through those very lengthy documents.

25          **Q.**  Fair.  In your direct examination, you were asked a

1    couple of questions about device-by-device agreements.  Do

2    you recall that?

3        **A.**  Not precisely, but I trust that I did.

4        **Q.**  Sure.  I just mean the concept was raised in the

5    direct examination.

6        **A.**  Sure.

7        **Q.**  And one more time, a device-by-device agreement is

8    one in which the carriers essentially get to choose which

9    devices to opt in to a revenue share tier?

10       **A.**  Correct.

11       **Q.**  Are you familiar with the concept of a platform deal,

12   or a platform RSA?

13       **A.**  Yes.

14       **Q.**  A platform RSA is one in which the carrier agrees to

15   conform all of their Android devices to the terms of the RSA?

16       **A.**  Yes.

17       **Q.**  Prior to 2021, three of the four major carriers were

18   on platform deals, correct?

19       **MR. SCHMIDTLEIN:**  Objection to the form.  There's no

20   foundation for that.

21       **THE COURT:**  Well, I guess the question is whether she was

22   in a position to answer it.  And given that we've been

23   talking about three, I'm not sure where we end up with three

24   out of four.  So maybe you can --

25       **MR. GOLDSTEIN:**  Yeah, let me rephrase.

1      **THE COURT:**  -- tease that out a little bit more.

2  BY MR. GOLDSTEIN:

3      **Q.**  Sure.  So on the direct examination, you mentioned

4  that there was a time in which Sprint and T-Mobile merged,

5  correct?

6      **A.**  Correct.

7      **Q.**  That was during the period of time that you were in

8  charge of the carrier team, correct?

9      **A.**  I believe it started -- the merger was announced

10  probably before, but it closed during that time, yes.

11      **Q.**  Got it.  When you joined the carrier team in

12  June 2019, there were RSAs with four different carriers:

13  T-Mobile, Sprint, Verizon and AT&T, correct?

14      **A.**  That sounds right.

15      **Q.**  Okay.  And to the extent you know, based on reviewing

16  those earlier agreements, three of the four of those

17  companies were on platform RSA deals, correct?

18      **MR. SCHMIDTLEIN:**  Same objection.

19      **THE COURT:**  It's overruled.  To the extent she has

20  knowledge of it.

21      **THE WITNESS:**  I can't actually answer with any degree of

22  certitude.

23  BY MR. GOLDSTEIN:

24      **Q.**  When you joined the carrier team, Google was already

25  in the midst of negotiating a new RSA with Verizon, right?

1      **A.**   Correct.

2      **Q.**   And at the time, Verizon's RSA that was in existence

3      did not include a prohibition on pre-installing alternative

4      search services for devices that qualified for search

5      revenue -- I'm sorry, for revenue share?

6      **A.**   When I took over responsibility for those deals, I

7      was made aware that in a previous iteration, an amendment to

8      the original Verizon RSA, that the exclusivity provision had

9      been struck.  I think it was inadvertent, at least from

10     Google's point of view.  And once we were made aware that it

11     was not there, I think that precipitated the renegotiations

12     of the RSA.

13     **Q.**   I'm going to hand up a binder with a couple of

14     documents.

15     **A.**   Sure.

16     **MR. GOLDSTEIN:**   Your Honor, may I approach?

17     **THE COURT:**   You may.

18     **BY MR. GOLDSTEIN:**

19     **Q.**   Ms. McCallister, I'd like to direct your attention to

20     the document that's behind the tab that says UPX2093.

21     **A.**   Okay.

22     **Q.**   And I'm going to ask Mr. Barkey to pull that up in a

23     minute, but for now let me ask you a couple of questions

24     before it appears on the screen.

25     UPX2093 is a June 2019 e-mail chain, correct?

1      A.   Yes.

2      Q.   And you sent and received e-mails on this chain while

3   you were employed by Google?

4      A.   Yes.

5      MR. GOLDSTEIN:   Your Honor, I move to admit UPX2093 into

6   evidence.

7      THE COURT:   Any objection, Mr. Schmidtlein?

8      MR. SCHMIDTLEIN:   No objection, Your Honor.

9      THE COURT:   Okay, it will be admitted.

10      (Exhibit UPX2093 admitted into evidence)

11   BY MR. GOLDSTEIN:

12      Q.   Ms. McCallister, there are some redactions on this

13   document, some for confidentiality, some for privacy.  I'm

14   going to sort of navigate around those, and ask that you

15   don't sort of read anything that's in a red box out loud.

16      A.   Understood.

17      Q.   So the e-mail chain -- actually, sorry, let me

18   scratch that.

19      Let me direct your attention to the e-mail sent by Matt

20   Klainer on the bottom of the first page and going onto the

21   second page.

22      A.   Yes.

23      Q.   Essentially, what's happening in this e-mail is that

24   Mr. Klainer is taking a leave of absence, correct?

25      A.   Correct.

1      **Q.** He's essentially giving some instructions or telling

2   you about what's sort of on his plate and immediately needs

3   to be taken care of while he's gone?

4      **A.** I don't know that he was telling me. He was telling

5   his manager at the time, and I was on that chain.

6      **Q.** Understood. And so there's -- one of the recipients

7   here is Donald Harrison?

8      **A.** Correct.

9      **Q.** He was Mr. Klainer's boss at the time?

10     **A.** Yes.

11     **Q.** And he was the vice president of global partnerships;

12   is that right?

13     **A.** I believe he was the president of global

14   partnerships.

15     **Q.** Got it. So his e-mail was to his boss, again, sort

16   of leaving instructions and letting him know about what's on

17   his plate when he's out of the office?

18     **A.** Yes.

19     **Q.** I want to direct your attention to the sort of large

20   paragraph at the top of the second page, the one that starts

21   with: "The only major pressing thing."

22   Do you see that?

23     **A.** Yes.

24     **Q.** And I'm going to read a sentence in the middle --

25   again, not reading out loud a number that's redacted: "Also,

1    in previous amendments, per Jamie/Zahavah, the exclusivity

2    provision was removed!!  So we are paying Verizon," a

3    percentage, "for basically nothing right now."

4        Do you see that?

5        **A.**  I do.

6        **Q.**  And that's referring to the search exclusivity

7    provision that was not in Verizon's RSA because of that

8    amendment that you mentioned?

9        **A.**  Yes.

10       **Q.**  And the percentage that's redacted in the sentence,

11   that's the revenue share percentage that Google was paying

12   Verizon under the prior RSA?

13       **A.**  I believe so.

14       **Q.**  And so Google was paying Verizon but getting

15   basically nothing, correct?

16       **A.**  I don't necessarily agree with that, I think there

17   was value.  But we clearly felt that if we are going to pay a

18   carrier out at the highest revenue share, in order to be a

19   good partner, we would expect them to not promote a rival

20   search engine.  So it was important for us to make sure that

21   in the new set of negotiations, we were able to put that

22   provision back in.

23       **Q.**  Got it.  But in this e-mail -- which, again,

24   Mr. Klainer wrote to his boss, he wrote that Google was

25   paying Verizon but getting basically nothing, correct?

1    A.   I think he was being a bit overly dramatic and hasty

2    in his exit.  We didn't even have a proper handoff, to give

3    you a sense.

4    Q.   Sure.  But he wrote that in his e-mail, correct?

5    A.   I see what he wrote, but I don't think that was

6    necessarily everyone's point of view.

7    Q.   I understand, Ms. McCallister.  But again, just the

8    question is just:  That's what he wrote in this e-mail to his

9    boss?

10   A.   That is what is in the e-mail.

11   Q.   Let me direct your attention to the next sentence:

12   "So while I want to reopen the negotiation, even if it's at

13   the last minute after 18 months of negotiation, to add the

14   marketing support for Android, the highest priority is

15   resecuring exclusivity."

16   Do you see that?

17   A.   I do.

18   Q.   So the highest priority, according to Mr. Klainer,

19   was resecuring exclusivity for Google Search in the new RSA?

20   A.   That is what he wrote here, but that is not how the

21   course of the negotiations actually occurred.  We actually

22   found it was very important to have marketing provisions in

23   there, as we talked about earlier.

24   Q.   Got it.  And you might have been anticipating my

25   question.  The reference to marketing support, that's -- I

1    know this is a couple months -- couple years before the

2    agreements were actually signed, but that's a reference to

3    the concept that carriers would use some amount of the money

4    they received from Google for marketing purposes?

5        A.   That was right.  I think the concept had been

6    starting to be discussed, but it actually got much more fully

7    developed over the ensuing months.

8        Q.   Understood.  And you can set that document aside.

9    Let me direct your attention to DX0158, and this should be

10   the very first document in your binder.

11       Your Honor, this exhibit was previously admitted and is

12   in evidence.

13       So DX158 is a briefing document for a meeting between

14   Hiroshi Lockheimer and Ronan Dunne at Verizon, correct?

15       A.   Yes.

16       Q.   And Mr. Lockheimer leads Google's platform and

17   ecosystems team; is that correct?

18       A.   Correct.

19       Q.   He reports directly to the CEO?

20       A.   Yes.

21       Q.   Mr. Dunne was the head of Verizon Mobile; is that

22   right?

23       A.   My understanding was that he was the CEO of Verizon

24   Mobile, the consumer group.

25       Q.   Got it.  So this is a briefing document for two high

1    level executives at Google and Verizon?

2        **A.**   Yes.

3        **Q.**   You and your team contributed to the preparation of

4    these materials?

5        **A.**   Most likely.  I don't see my name on it, but it looks

6    and would be fair to say that we would probably have

7    contributed to that.

8        **THE COURT:**   I'm sorry to interrupt again.  Can you just

9    say again who the relevant players are and what this is in

10    preparation for?

11        **THE WITNESS:**   Sure.  So Hiroshi Lockheimer is the SVP of

12    platforms and ecosystems group at Google.  That's Android,

13    Play and Chrome; so all the major consumer platforms.  He

14    runs that team, and he reports to Sundar.  And then Ronan

15    Dunne at the time was the CEO of the Verizon Mobile group,

16    the consumer group.

17        **THE COURT:**   Great, thank you.

18    **BY MR. GOLDSTEIN:**

19        **Q.**   And if it's helpful, Mr. Lockheimer and Mr. Dunne

20    were people sort of other high level executives periodically

21    met and discussed sort of priorities of the two companies,

22    right?

23        **A.**   Yes.

24        **Q.**   I guess what I'm saying is meetings like this aren't

25    unusual, they happen with some regularity?

1    **A.**  That's correct.

2    **Q.**  Let me draw your attention to the top of the second

3    page.  Do you see a section that says:  "Sensitive topic"?

4    **A.**  Yes.

5    **Q.**  Now, this I think references an item that you

6    discussed in your direct examination, which is that Verizon

7    wanted to pre-install the Yahoo! mobile app on Android

8    phones, correct?

9    **A.**  Correct, yes.

10   **Q.**  And as you said in your direct examination, the

11   Yahoo! mobile application wasn't itself a search application,

12   but it did include access to Yahoo! Search?

13   **A.**  Yes.

14   **Q.**  And Verizon wanted devices with the Yahoo! mobile app

15   to still be eligible for the highest revenue share

16   percentage, even though Yahoo! Search was essentially loaded

17   on the device?

18   **A.**  That was their position, yes.

19   **Q.**  If you'd look at the section below that that says

20   "talking points" in all bold.

21   **A.**  Yes.

22   **Q.**  So these are proposed responses from Mr. Lockheimer

23   should Mr. Dunne raise the topic of the Yahoo! home app?

24   **A.**  Yes.

25   **Q.**  Let me draw your attention to the first bullet

1    point -- and again, there's some redactions.  I'm going to

2    refer to a higher number and a lower number, but not actually

3    say them out loud.

4        **A.**  Excellent.

5        **Q.**  "We are not stopping Verizon from pre-loading the

6    Yahoo! mobile application in any way.  However, if they want

7    to pre-load it with an alternative search, such as Yahoo!

8    Search, then they will need to select the lower option, as

9    the higher option is reserved only for Google Search

10   exclusive devices.  We only share that high percentage of

11   revenue because the value exclusivity brings to Google."

12       Do you see that?

13       **A.**  I do.

14       **Q.**  What -- so these, again, were prepared talking points

15   for Mr. Lockheimer, correct?

16       **A.**  Correct.

17       **Q.**  And if Google pre-loaded -- I'm sorry, let me

18   restart.

19       If Verizon pre-loaded the Yahoo! app, it would have to

20   accept the lower revenue share option, that was Google's

21   position?

22       **A.**  That was our position at the time.

23       **Q.**  And that's because Google reserves the higher revenue

24   share for devices with search exclusivity?

25       **A.**  Yeah, I mean, the concept is if we're going to pay

1    out the highest revenue share, we want the carriers to be

2    party of pushing, kind of on our experience, the best Android

3    device.  And we don't think that them placing a rival search

4    engine next to that accomplishes that.  So that was our

5    position.

6        **Q.**  Would you agree that search exclusivity brings value

7    to Google?

8        **A.**  Yes.

9        **Q.**  And the difference between the higher option and the

10   lower option in this document is the value that exclusivity

11   brings to Google?

12       **A.**  There are other values that we get from paying out at

13   the highest revenue share.  The search -- promotional search

14   exclusivity certainly is one of them.  We also talked about

15   placement of the Chrome browser, like, in the hotseat and set

16   it as default, and the security and letter upgrades, as well

17   as some other preferred device configurations.  But yes, we

18   do think that having promotional exclusivity for Google

19   search is important and valuable.

20       **Q.**  And these talking points say that the value between,

21   again, the higher and the lower option is because of the

22   value that search exclusivity brings to Google; that's what

23   the talking points say?

24       **A.**  I see what it says, yes.  It's the shorthand of a

25   brief.  We have tried to be very concise in our briefing for

1    executives.

2        **Q.**  You can put that document aside.

3        Ms. McCallister, if you could turn to UPX293.  It should

4    just be the next document in your binder.

5        And Your Honor, UPX293 was previously admitted and is

6    already in evidence.

7        So Ms. McCallister, UPX293 is an e-mail dated March 17th,

8    2020 to members of the business council; is that right?

9        **A.**  Yes.

10        **Q.**  And business council sometimes goes by BC for short?

11        **A.**  Yes.

12        **Q.**  And the business counsel is a decision-making body at

13    Google?

14        **A.**  It is an approval body, yes.

15        **Q.**  And so things like structures for revenue share

16    agreements, before they're negotiated, would be approved by

17    the business council?

18        **A.**  Depending on the size, yes.  There are different

19    guardrails for when you need to go to BC, whether it's a

20    dollar amount or a particular deal structure, first-of-a-kind

21    types of deals.

22        **Q.**  And I understand that the makeup of BC changes over

23    time; is that right?

24        **A.**  I think that's probably right.  But in general, it's

25    an executive cross-functional review; so finance, product,

1    legal, et cetera, representatives.

2        **Q.**  It includes Google's CFO?

3        **A.**  Either the Google CFO or a designee.

4        **Q.**  And also Google's chief business officer?

5        **A.**  Yes, or a designee.

6        **Q.**  So you're copied on this e-mail.  And if you look on

7    the second page, you're listed as deal representative?

8        **A.**  That's correct.

9        **Q.**  On the first page, do you see the section that says:

10   U.S. Carrier RSA Structure?

11       **A.**  Yes.

12       **Q.**  And then below that is a section called:  Asks for

13   BC?

14       **A.**  Yes.

15       **Q.**  And so essentially, what is being asked of BC is to

16   sign off on an updated carrier RSA structure?

17       **A.**  That's correct.

18       **Q.**  And I think you referenced this in your direct, but

19   the structure of the RSAs that you negotiated changed over

20   time?

21       **A.**  That's right.

22       **Q.**  So this is a structure that wasn't the final one, but

23   was one that was approved in the course of negotiations?

24       **A.**  That's right.  It was an iteration amongst many.

25       **Q.**  An iteration, all right.  Let me draw your attention

1    to the third bullet point, the one that starts with:  "Allow

2    exception."

3         Do you see that?

4         A.  Yes.

5         Q.  So in this -- so this bullet point talks about the

6    exception that Verizon had asked about about loading Yahoo!

7    home on devices, correct?

8         A.  Yes.

9         Q.  And there's a reference in that sentence to DHS.

10   That's default home screen?

11        A.  Correct.

12        Q.  That's essentially the first screen on a device when

13   you pick it up?

14        A.  That's right.

15        Q.  There's also a plus-one screen.  Do you see that?

16        A.  Yes.

17        Q.  And that's a screen on the device if you swipe to the

18   left?

19        A.  I believe that's correct, yes.

20        Q.  So the new RSA structure that's being proposed here

21   allowed Verizon to pre-load the Yahoo! home app and still

22   qualify for the highest tier, correct?

23        A.  Yes.

24        Q.  And if Verizon wanted to do that, to load the app and

25   still qualify for the higher tier, it had to make sure that

1      the Yahoo! home app was not on the default home page?

2          A.   The exception that we said was that they could have

3      the Yahoo! home mobile app on that plus-one screen, not on

4      the default home screen.

5          Q.   Okay.  Turn to the second page of this document.

6          A.   Yes.

7          Q.   And the bottom half of the page has a section called:

8      Rationale in support of the deal.

9          A.   Yes.

10         Q.   So this is a summary of the rationale of the deal

11     that was provided to BC?

12         A.   Yes.

13         Q.   Do you see the third sentence there, the one that

14     starts with:  "Search usage"?

15         A.   I do.

16         Q.   And so this bullet point is discussing the Yahoo!

17     mobile application exception?

18         A.   Correct -- well, yes and no.

19         Q.   Well, let me maybe just ask the question.  Allowing

20     Verizon to pre-load the Yahoo! home application was not

21     expected to materially impact Google Search usage, correct?

22         A.   That was correct, yes.

23         Q.   And that's the reference here to "not expected to be

24     materially impacted"?

25         A.   In the first sentence, yes.

1    **Q.**  In the first sentence.  And that -- let me scratch

2    that.

3        So search usage was not expected to be materially

4    impacted as long as Yahoo! loaded the Yahoo! -- I'm sorry,

5    let me try that one more time.  I'm getting confused with my

6    names here.

7        The search usage was not expected to be materially

8    impacted as long as Verizon loaded the Yahoo! home app on the

9    plus-one screen and not the default home screen?

10   **A.**  For Verizon, that's correct.

11   **Q.**  For Verizon phones?

12   **A.**  Yes, in the first sentence.

13   **Q.**  Okay.  Let me draw your attention to the next bullet

14   point, the one that starts with:  "Relaxing configuration."

15   And that reads:  "Relaxing configuration requirements to

16   allow pre-loads of alternative search apps helps ease

17   regulatory risk, and reinforces Google's principle to provide

18   options to users."

19       Do you see that?

20   **A.**  I do.

21   **Q.**  So one reason for permitting the exception that

22   Verizon asked for was to reduce regulatory risk?

23   **A.**  The primary reason really was to provide this option

24   to users, and what we talked about just previously, that

25   ultimately, once we talked to Verizon and understood that

1    Yahoo! was meant to be a content and utility app and not a

2    search forward app, we were able to get comfortable with the

3    exception.

4      **Q.**  But when these materials were being sent to BC, one

5    rationale that was provided for allowing Verizon to pre-load

6    the Yahoo! home app on devices was that it would reduce

7    regulatory risk?

8      **A.**  I don't recall specifically talking about that.  Keep

9    in mind, these notes are written by somebody else that

10   doesn't necessarily have full context of the device.  It's

11   somebody who works in compliance.

12     **Q.**  Just one more time, and I hate to belabor it.  But

13   what it says on this document that was sent to BC is that one

14   rationale for permitting an exception to Verizon's search

15   exclusivity provision was that it would reduce regulatory

16   risk?

17     **A.**  I see what that says, but sometimes they're written

18   somewhat confusingly.  So yes, I see that.

19     **Q.**  You can put that document aside.

20     **THE COURT:**  Before you turn to the next document, can I

21   ask you a question on a prior bullet point --

22     **THE WITNESS:**  Sure.

23     **THE COURT:**  -- that speaks of estimated loss across U.S.

24   carriers.  That I think I understand, but then it talks about

25   savings.  I'm not quite sure I understand what the "savings"

1    is a reference to.

2        **THE WITNESS:**  I can't answer that with a great degree --

3    decision, that's sort of what I'm saying.  Like, these notes

4    are taken by somebody without full context, and I don't have

5    reference to that.

6        **THE COURT:**  If you know, great.  If not, that's all

7    right.  I was just curious, I didn't quite understand what

8    that means.

9        **THE WITNESS:**  Sure.

10   **BY MR. GOLDSTEIN:**

11       **Q.**  Actually, let's leave that up and go up to the first

12   page.  And this may or may not help answer that question.

13       But under "asks for BC," do you see the second bullet

14   point that says:  Reduced U.S. carrier rev share?

15       **A.**  Yes.

16       **Q.**  Does the savings referenced in that bullet point on

17   the second page refer to savings that Google would have

18   because of reducing the revenue share from 20 to 10 percent?

19       **A.**  It may.  Although, of course, we were trying to

20   re-purpose those funds.  But that's what I'm saying.  I think

21   they were talking about apples and oranges in those two

22   figures in that sentence on the second page, and so it's a

23   bit confusing.

24       **Q.**  Now, you can put that document aside.

25       **MR. SCHMIDTLEIN:**  Mr. Goldstein, I would just caution you

1  with respect to the percentages, reading them out loud.

2  BY MR. GOLDSTEIN:

3       Q.  I apologize.

4       Ms. McCallister, you can put that document aside.

5       A.  Sure.

6       Q.  Let me draw your attention to UPX2097.

7       A.  Yes.

8       Q.  UPX2097 is another e-mail sent to BC?

9       A.  Okay.

10      Q.  Is that right?

11      A.  Yes, it appears that way.

12      Q.  And this e-mail was sent in November of 2020, so a

13  couple months after the last one we looked at?

14      A.  Yes.

15      Q.  Again, you're copied on the e-mail.  And if you look

16  at the bottom of the first page, you're listed as a deal

17  representative?

18      A.  Yes.

19      MR. GOLDSTEIN:  Your Honor, I'd move to admit UPX2097

20  into evidence.

21      MR. SCHMIDTLEIN:  No objection.

22      THE COURT:  It will be admitted.

23      (Exhibit UPX2097 admitted into evidence)

24  BY MR. GOLDSTEIN:

25      Q.  Okay.  So I'm going to ask you a couple of questions,

1    and this is, again, just if helpful for the questions.

2         But earlier today, you talked about a separate

3    go-to-market agreement.  Do you recall that?

4         A.   Yes.

5         Q.   And so around this period of time, was a decision

6    made to sort of break the RSA into two deals?

7         A.   Yes.

8         Q.   Referenced here is a deal one and deal two.  Do you

9    see that?

10        A.   Correct.

11        Q.   Do those sort of refer to that decision to break the

12   RSA in two?

13        A.   Yes.  In general, deal one was the RSA, and deal two

14   was this go-to-market agreement.

15        Q.   When signed, was deal two called a mobile services

16   incentive agreement, or MSIA?

17        A.   Oh, gosh, it could have been.

18        Q.   Does that sound right?

19        A.   That sounds like it could be right, yes.

20        Q.   So under the -- let me actually just ask, would you

21   prefer me to refer to it as a go-to-market agreement?

22        A.   Sure.  That's helpful, thank you.

23        Q.   Under the go-to-market agreement, Google paid

24   carriers a monthly incentive, correct?

25        A.   There were a number of provisions under the

go-to-market deal that, in return for them doing these
marketing activities that we referenced earlier, we would pay
them a monthly percentage, yes.

**Q.** I'm sorry, did I cut you off?

**A.** No.

**Q.** And the monthly percentage was tied to the number of
active Android devices that they had in the market?

**A.** The general concept was that we took where they were
at the beginning of the term of the deal, and to the extent
that they were able to drive Android actives, we would pay
them incrementally. So we wanted to incentivize them to
continue to drive Android actives. So in actuality, with a
two-deal structure, it was possible for them to make even
more money under the two-deal construct than the previous
deal construct.

**Q.** Got it. Just so I'm clear, essentially there were
tiers such that for every some amount of additional active
Android devices, they would get more money as a way to
incentivize them to sell more Android devices?

**A.** That's correct, that's the general concept.

**Q.** So turn the page and look at the top of the second
page of this document. So in your direct examination, you
mentioned that the go-to-market deal and the RSA for Verizon
were not contingent on each other?

**A.** That's correct.

1    Q.   And by that you mean that Verizon was allowed to sign

2    an RSA but not an MSIA?

3    A.   That's correct.

4    Q.   Or vice versa?

5    A.   Uh-huh.

6    Q.   And just so I'm clear, that was the same deal for all

7    the carriers?

8    A.   I believe so, generally.

9    Q.   And so signing one of these go-to-market agreements

10    didn't require carriers to install applications on any of

11    their Android devices, correct?

12    A.   In general, no.  There may have been one application

13    that was required as part of the go-to-market, but in

14    general, no.

15    Q.   Let me ask a better and more precise question.  The

16    go-to-market agreements did not require carriers to

17    pre-install Google Search --

18    A.   No, it did not.

19    Q.   -- on devices?  It also didn't require Google Search

20    to be set as the default search engine on the Android devices

21    that qualified?

22    A.   The go-to-market deal did not, that was in the RSA

23    agreement.

24    Q.   Got it.  And the go-to-market agreement did not

25    require that the devices that qualified had Google Search

1  exclusivity?

2      **A.**  No.

3      **Q.**  And so the MSIAs were designed to promote and support

4  the Android ecosystem?

5      **A.**  The way we think about it philosophically is that the

6  RSAs were really meant to make the Android device an

7  excellent experience, and the most competitive and

8  differentiated vis-a-vis iPhones.  And so we had those search

9  exclusivity promotional provisions and the other things that

10  we've discussed, whereas the go-to-market deal was really

11  about the things that the carriers could uniquely do to drive

12  Android -- incremental Android sales.

13      **Q.**  But the go-to-market deal or the MSIAs were also

14  about promoting the sale of Android devices, correct?

15      **A.**  Well, again, the RSAs were about the carriers

16  partnering with us to make the device experience excellent,

17  which sure, yes, in order to -- hopefully it would also help

18  drive Android sales.  But the activities described under the

19  go-to-market deal were marketing, promotional, training type

20  activities and obligations that the carriers would take on

21  that they could uniquely do in their retail store

22  environment.

23      **Q.**  And again, I don't mean to belabor the point, but the

24  purpose of supporting those marketing activities was to

25  support the sale of Android devices, correct?

1    **A.**  Sure, yes.

2    **Q.**  And the --

3    **THE COURT:**  I'm sorry to interrupt, but can I -- so I

4    understand.  The deal two, as it's described here on the

5    first page, speaks of fixed payments up to a remaining

6    percentage net to incentivize Android.  So what is that a

7    percentage of?

8    **THE WITNESS:**  I mean, I think the notion is that we set

9    it to be roughly equivalent of what they would have earned

10   under the other deal construct.  So that's that cap, that

11   ceiling.  So that's what it was meant to do.  So now instead

12   of one RSA deal that encompasses everything, that ultimately

13   wasn't having the impact that we wanted -- because we talked

14   about us paying them an absolute dollar amount, more money,

15   and Android sales declining.

16       So we were trying to make sure that in the go-to-market

17   deal, the dollars were more impactful and effective.  But

18   they could still earn up to the same equivalent as under the

19   previous deal construct.

20   **THE COURT:**  I see.  So this is sort of an accretive

21   percentage?

22   **THE WITNESS:**  That's right, that's right.  And they could

23   have gone above that, of course, as well which would have

24   been a win-win for everybody.

25   **MR. GOLDSTEIN:**  And with that, Your Honor, I don't have

1  any further questions.

2  **THE COURT:**  Sorry, when you say go above that, I'm not

3  sure I understand.

4  **THE WITNESS:**  Meaning that they could have gone above

5  that percentage if they drove more Android active equivalents

6  beyond where they were.  So if they had increased their

7  Android actives a hundred percent, it's quite possible they

8  could have gone above that 20 percent.  Sorry, apologies.

9  **THE COURT:**  All right.  Thank you.

10  Mr. Cavanaugh?

11  **MR. CAVANAUGH:**  Nothing, Your Honor.

12  **MR. SCHMIDTLEIN:**  Just very quickly, Your Honor.

13  <u>**REDIRECT EXAMINATION OF ADRIENNE MCCALLISTER**</u>

14  **BY MR. SCHMIDTLEIN:**

15  **Q.**  Ms. McCallister, you were asked some questions by

16  counsel about the fact that the 2021 RSAs were signed after

17  the litigation that we're here today was filed.

18  Do you recall that?

19  **A.**  Yes.

20  **Q.**  I will represent to you that the Department of

21  Justice's lawsuit was filed in October of 2020, okay.

22  Is it fair to say that the negotiations and the

23  discussions with all of the major carriers regarding the

24  agreements that became executed in the summer of 2021, that

25  those preceded, by some time period, October of 2020?

1          **MR. GOLDSTEIN:**  Objection, Your Honor, leading.

2          **THE COURT:**  I think we know the answer.  It's okay, go

3     ahead.

4          **THE WITNESS:**  I apologize, can you repeat the question?

5     BY MR. SCHMIDTLEIN:

6          **Q.**  Is it fair to say that the negotiations that you

7     became involved in, beginning in the summer when you took

8     over in 2019, long preceded October of 2020?

9          **A.**  Yes.

10         **Q.**  You were asked a question about the e-mail exchange

11    you had with Mr. Klainer --

12         **A.**  Correct.

13         **Q.**  -- when he handed off the job responsibilities to you

14    in the summer of 2019.  Do you recall that?

15         **A.**  Correct.

16         **Q.**  And he was -- you were asked some questions about the

17    fact that the Verizon agreement that was in place at that

18    time had no exclusivity provision, correct?

19         **A.**  That was what I came to understand, yes.

20         **Q.**  Did you ever have -- gain an understanding as to

21    whether Verizon -- even though it didn't have the

22    exclusivity, whether Verizon ever pre-loaded a rival search

23    engine on any Verizon Android device?

24         **A.**  No.  I mean, one, we came to understand that Verizon

25    was very well aware that that provision was not in the

1    agreement.  But they never pre-loaded any rival search

2    engine, Yahoo! Search or otherwise, during the previous RSA.

3        **MR. SCHMIDTLEIN:**  I have no further questions, Your

4    Honor.

5        **THE COURT:**  Thank you, Mr. Schmidtlein.

6        And Ms. McCallister, thank you very much for your time

7    and your testimony.  Safe travels home.

8        **THE WITNESS:**  Thank you.

9        **THE COURT:**  So Mr. Schmidtlein, thoughts on where we go

10   from here today?

11       **MR. SCHMIDTLEIN:**  I have a couple of options for Your

12   Honor.  We have several deposition videos.  The next one that

13   we would propose to play is from Jeff Giard, who is the

14   representative from T-Mobile, who you will hear had

15   involvement in negotiations involving Android revenue share

16   agreements.  The videotape that we have for Mr. Giard runs, I

17   am told, about one hour and three minutes or one hour and

18   four minutes.  We can tee that up and play that right now or

19   we can play that at another time during the week, given the

20   hour.  It's at the Court's discretion.

21       **THE COURT:**  Well, give me a preview of what you want to

22   do tomorrow, what you intend to do tomorrow, and that may

23   help inform my thinking.

24       **MR. SCHMIDTLEIN:**  Sure.  We will -- we have one live

25   witness on deck tomorrow, Jamie Rosenberg.  I anticipate that

1    Mr. Rosenberg's testimony will certainly go through -- with

2    cross-examination, I assume it's going to take us through the

3    lunch hour, to be sure.  And so we will have time in the --

4    we do have time in the afternoon sort of set aside for video

5    deposition, and so we could certainly play it tomorrow.  We

6    have some other video that we also would like to play at some

7    point this week, but we could certainly play Mr. Giard

8    tomorrow as well.

9        **THE COURT:**  And Mr. Rosenberg or Ms. Rosenberg?

10       **MR. SCHMIDTLEIN:**  Mr. Rosenberg.

11       **THE COURT:**  Mr. Rosenberg is a Google employee?

12       **MR. SCHMIDTLEIN:**  That is a Google employee.

13       **THE COURT:**  Okay.  And expectation on any closed?

14       **MR. SCHMIDTLEIN:**  Right now, I anticipate that the direct

15   examination of Mr. Rosenberg we will -- with workarounds,

16   we're going to do in open court.

17       **THE COURT:**  Great, okay.

18       **MR. SCHMIDTLEIN:**  And I should say, Mr. Giard, I believe

19   the videotape of that, is also fully open court.  We may --

20   depending on our timing tomorrow, if you want to kick that

21   tomorrow.  The next videos that would be potential candidates

22   could involve, as we had before, a couple of excerpts that we

23   would ask be muted based on confidentiality issues that we

24   have been in conversations with with other -- because these

25   are third parties.  And as we -- we will certainly be in a

1  position tomorrow morning to hand up to Your Honor clips of

2  those, if you'd like to review those in advance.

3      **THE COURT:**  Okay, terrific.  Look, if we end now, I can

4  actually get to the judges' meeting that I have at 4:30,

5  which I've missed for the last many months.  They'll be

6  surprised to see me.

7      Well, terrific.  So I think we'll close for the day.  I

8  will ask -- what's today?  Tuesday.  I'll just ask Google by

9  the end of the week, by Thursday, if we could get proposed

10  redactions to the under-seal testimony that we just had

11  today.

12      Is that enough time to get through it?

13      **MR. SCHMIDTLEIN:**  By the end of Thursday?

14      **THE COURT:**  By the end of Thursday.

15      **MR. SCHMIDTLEIN:**  Absolutely.

16      **THE COURT:**  Okay, great.  And then we can review that and

17  get that taken care of.

18      I think that's it.  Anything else?  I guess -- I have one

19  other thing, but if anybody else has anything else?

20      **MR. DINTZER:**  I just have a list of demonstratives we

21  want to move in from Dr. Israel.  We don't want to keep the

22  Judge from your meeting.  We can do that tomorrow at the

23  Court's convenience.

24      **THE COURT:**  Okay.  I mean, you can read it into the

25  record or just give Mr. Douyon a list, that's fine too.

1       **MR. DINTZER:**  We'll provide a list, and then we'll ask

2   for it and move it.  We appreciate that, Your Honor.  Thank

3   you.

4       **THE COURT:**  Okay.  I guess it is now ripe, the motion

5   concerning the rebuttal testimony of Mr. Davies.  I'll tell

6   you, I haven't read Google's reply yet.  I don't know whether

7   the DOJ believes it's in a position to say whether, in fact,

8   you're going to seek to call him or not based upon what

9   you've heard so far or are we going to wait until Professor

10   Murphy?

11       **MS. ONYEMA:**  Good afternoon, Your Honor.  Veronica

12   Onyema.  At this point in time, we are still listing

13   Mr. Davies as a may call.  It really just depends on the

14   testimony that Professor Murphy provides as to whether or not

15   we need to call him.

16       **THE COURT:**  Then we don't need to address that tomorrow.

17   We're not expecting Professor Murphy until next Monday; is

18   that correct?

19       **MR. SCHMIDTLEIN:**  That's correct, Your Honor.

20       **THE COURT:**  Okay.  Anything else?

21       **MR. DINTZER:**  Not from the DOJ plaintiffs, Your Honor.

22       **MR. CAVANAUGH:**  No, Your Honor.

23       **MR. SCHMIDTLEIN:**  No, Your Honor.

24       **THE COURT:**  Thank you, everyone.  Have a good evening.

25       (Proceedings adjourned at 4:22 p.m.)

1               **C E R T I F I C A T E**

2

3                    I, **Jeff M. Hook, Official Court Reporter,**

4      certify that the foregoing is a true and correct transcript

5      of the record of proceedings in the above-entitled matter.

6

7

8

9      November 7, 2023          _____

10              DATE                      Jeff M. Hook

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. GOLDSTEIN:
[10]    9352/14
9353/12 9356/1
9356/22 9357/17
9358/10 9363/17
9373/9 9374/1
9374/23
BY MR. JONES: [1]
9302/18
BY MR. SALLET:
[11]    9281/4
9281/15 9283/20
9285/17 9288/20
9292/9 9293/15
9294/14 9296/8
9297/3 9299/8
BY MR.
SCHMIDTLEIN: [5]
9311/19 9317/12
9351/6 9380/13
9381/4
BY MS. MAIER: [2]
9304/2 9309/5
DEPUTY CLERK: [2]
9311/8 9311/13
MR. CAVANAUGH:
[3]    9319/16
9380/10 9385/21
MR. DINTZER: [3]
9384/19 9384/25
9385/20
MR. GOLDSTEIN:
[9]    9319/7
9319/12 9353/10
9355/24 9357/15
9358/4 9374/18
9379/24 9380/25
MR. JONES: [2]
9302/15 9303/24
MR. SALLET: [6]
9281/23 9283/12
9285/10 9291/5
9302/3 9302/12
MR. SCHMIDTLEIN:
[23]    9311/6
9311/17 9318/13
9318/20 9318/25
9352/10 9355/18
9356/17 9358/7
9373/24 9374/20
9380/11 9382/2
9382/10 9382/23
9383/9 9383/11
9383/13 9383/17
9384/12 9384/14
9385/18 9385/22
MS. MAIER: [8]
9283/9 9283/15
9285/14 9288/17
9294/11 9296/5
9302/8 9311/2
MS. ONYEMA: [1]
9385/10
THE COURT: [70]
9281/1 9281/14
9283/17 9285/15

9288/18 9291/4
9291/6 9291/23
9292/8 9293/14
9294/12 9296/4
9296/6 9297/1
9299/5 9302/9
9302/13 9303/25
9308/11 9308/23
9309/1 9309/4
9311/3 9311/14
9311/16 9317/9
9318/9 9318/18
9318/22 9319/3
9319/9 9319/15
9319/17 9351/2
9352/6 9352/12
9353/8 9353/11
9355/20 9355/25
9356/18 9357/16
9358/6 9358/8
9363/7 9363/16
9372/19 9372/22
9373/5 9374/21
9379/2 9379/19
9380/1 9380/8
9381/1 9382/4
9382/8 9382/20
9383/8 9383/10
9383/12 9383/15
9384/2 9384/13
9384/15 9384/23
9385/3 9385/15
9385/19 9385/23
THE WITNESS: [21]
9291/9 9292/1
9308/17 9308/25
9309/3 9311/5
9311/12 9311/15
9317/10 9318/11
9352/9 9356/20
9363/10 9372/21
9373/1 9373/8
9379/7 9379/21
9380/3 9381/3
9382/7

.

.....Admitted [7]
9280/17 9280/18
9280/19 9280/20
9280/21 9280/22
9280/23

1

10 percent [1]
9373/18
10 years [1]
9303/5
10-101 [1]
9278/20
10019 [1]    9279/14
10036 [1]    9279/5
101 [1]    9278/20
1100 [1]    9278/14
1133 [1]    9279/24
12 [1]    9312/3
13 [1]    9284/16
1300 [1]    9279/8

1301 [1]    9279/14
134 [3]    9281/23
9282/9 9282/14
15 [3]    9283/23
9318/22 9319/19
15 minutes [1]
9318/20
160 [1]    9284/14
17th [1]    9367/7
18 months [1]
9361/13
1993 [1]    9312/7
1997 [1]    9312/7
1:20-cv-3010 [1]
9278/4
1:37 [1]    9278/6
1st [1]    9281/18

2

20 [2]    9319/19
9373/18
20 minutes [1]
9318/22
20 percent [1]
9380/8
20001 [2]    9278/18
9279/25
20005 [1]    9278/15
2001 [1]    9312/9
20024 [1]    9279/12
2003 [2]    9312/9
9312/15
2007 [1]    9312/15
2010 [1]    9312/20
2011 [1]    9312/21
2019 [10]    9305/1
9313/9 9313/16
9316/22 9352/24
9354/2 9356/12
9357/25 9381/8
9381/14
2020 [8]    9281/18
9284/11 9354/11
9367/8 9374/12
9380/21 9380/25
9381/8
2021 [12]    9282/1
9313/4 9313/9
9313/16 9317/4
9317/15 9351/9
9352/24 9354/8
9355/17 9380/16
9380/24
2023 [1]    9278/5
209 [1]    9278/23
2200 [2]    9279/4
9279/4
241 [2]    9305/24
9305/25
242 [1]    9308/13

3

3010 [1]    9278/4
323 [1]    9288/1
333 [1]    9279/24
343 [2]    9288/3
9293/5
36 [1]    9278/7

3:00 o'clock [1]
9319/2
3:18 [1]    9351/1
3:36 [1]    9351/2

4

40th [1]    9279/14
450 [2]    9278/18
9278/20
4:22 p.m [1]
9385/25
4:30 [1]    9384/4

5

5G [1]    9315/14
5th [1]    9305/12

6

600 [1]    9278/23
60604 [1]    9278/23
680 [1]    9279/11

7

7th [1]    9279/8

8

80203 [1]    9279/8

9

902 [2]    9302/9
9302/10
907 [2]    9285/12
9304/5
9281 [1]    9280/4
9285 [1]    9280/17
9288 [1]    9280/18
9294 [1]    9280/19
9296 [1]    9280/20
9302 [2]    9280/5
9280/21
9304 [1]    9280/6
9311 [1]    9280/9
9320 [1]    9319/24
9350 [1]    9319/24
9351 [1]    9280/10
9352 [1]    9280/11
9358 [1]    9280/22
9374 [1]    9280/23
938 [1]    9294/20
9380 [1]    9280/12
94102 [1]    9278/21

A

A-D-R-I-E-N-N-E
[1]    9311/23
ability [2]
9286/15 9287/3
able [16]    9285/3
9286/14 9290/8
9291/11 9291/13
9291/15 9292/3
9292/7 9300/23
9305/4 9305/7
9310/16 9352/2
9360/21 9372/2
9376/10
above [5]    9379/23
9380/2 9380/4

9380/8 9386/5
above-entitled [1]
9386/5
absence [1]
9358/24
absolute [2]
9318/5 9379/14
absolutely [2]
9351/11 9384/15
accept [1]
9365/20
access [1]
9364/12
accessible [1]
9351/18
accomplishes [1]
9366/4
according [1]
9361/18
accretive [1]
9379/20
acquire [1]
9314/6
acquired [1]
9312/20
across [3]
9351/11 9351/23
9372/23
Action [1]    9278/3
active [3]    9376/7
9376/17 9380/5
actives [3]
9376/10 9376/12
9380/7
activities [4]
9376/2 9378/18
9378/20 9378/24
actual [1]    9318/3
actuality [1]
9376/12
actually [11]
9317/2 9356/21
9358/17 9361/21
9361/21 9362/2
9362/6 9365/2
9373/11 9375/20
9384/4
ad [27]    9282/23
9282/23 9286/5
9286/9 9286/14
9286/24 9286/25
9287/2 9287/7
9287/8 9287/9
9287/9 9287/9
9287/10 9287/17
9287/23 9287/25
9292/6 9292/13
9292/16 9303/20
9303/21 9307/7
9310/1 9310/2
9310/3 9311/1
add [2]    9299/15
9361/13
addition [2]
9297/20 9313/19
additional [4]
9289/11 9301/3

**A**

additional... [2]
  9352/18 9376/17
address [1]
  9385/16
adjourned [1]
  9385/25
admission [1]
  9294/9
admit [2]    9358/5
  9374/19
admitted [16]
  9285/16 9285/17
  9288/19 9288/20
  9294/13 9294/14
  9296/7 9296/8
  9302/10 9302/12
  9358/9 9358/10
  9362/11 9367/5
  9374/22 9374/23
ADRIENNE [7]
  9280/8 9311/8
  9311/19 9311/23
  9351/6 9352/14
  9380/13
ads [24]    9281/9
  9281/9 9282/18
  9286/3 9286/4
  9286/11 9286/20
  9287/3 9289/7
  9289/20 9290/9
  9293/9 9295/18
  9295/24 9307/18
  9308/6 9308/9
  9309/20 9309/23
  9310/6 9310/19
  9310/19 9310/21
  9310/25
advance [1]
  9384/2
advertise [3]
  9286/17 9291/9
  9292/1
advertisement [3]
  9287/6 9291/1
  9292/5
advertiser [4]
  9286/23 9287/13
  9291/7 9306/16
advertisers [2]
  9281/11 9285/2
advertising [1]
  9284/3
AdWords [1]
  9282/18
affirm [1]
  9311/10
afternoon [8]
  9278/7 9302/20
  9302/21 9311/21
  9319/8 9352/16
  9383/4 9385/11
again [24]
  9284/14 9287/19
  9288/22 9292/16
  9292/24 9294/7
  9294/20 9306/10

9306/11 9310/14
9352/16 9359/1
9359/25 9360/23
9361/7 9363/8
9363/9 9365/1
9365/14 9366/21
9374/15 9375/1
9378/15 9378/23
against [1]
  9297/25
agency [2]
  9303/20 9303/21
agents [1]    9307/8
aggregation [1]
  9292/24
agree [6]    9284/7
  9284/8 9291/8
  9295/21 9360/16
  9366/6
agreement [13]
  9313/14 9314/21
  9316/1 9355/7
  9375/3 9375/14
  9375/16 9375/21
  9375/23 9377/23
  9377/24 9381/17
  9382/1
agreements [15]
  9313/11 9315/24
  9317/1 9317/5
  9353/18 9354/17
  9354/22 9355/1
  9356/16 9362/2
  9367/16 9377/9
  9377/16 9380/24
  9382/16
agrees [1]
  9355/14
Ah [3]    9281/24
  9288/3 9302/6
ahead [2]    9283/18
  9381/3
airline [10]
  9298/8 9298/14
  9299/22 9299/23
  9300/8 9300/17
  9300/17 9300/21
  9301/5 9301/15
airlines [4]
  9297/25 9300/14
  9301/13 9301/22
al [1]    9278/3
algorithm [1]
  9299/16
allow [2]    9369/1
  9371/16
allowed [2]
  9369/1 9377/1
allowing [3]
  9310/25 9370/19
  9372/5
along [1]    9282/6
alternative [3]
  9357/3 9365/7
  9371/16
although [2]
  9296/22 9373/19

amendment [2]
  9357/7 9360/8
amendments [1]
  9360/1
AMERICA [3]
  9278/3 9352/25
  9353/16
Americas [2]
  9279/4 9279/14
AMIT [1]    9278/10
among [2]    9286/15
  9301/22
amongst [1]
  9368/24
amount [9]
  9288/24 9290/20
  9292/11 9293/8
  9306/23 9362/3
  9367/20 9376/17
  9379/14
analysis [3]
  9290/1 9290/4
  9305/15
Android [50]
  9313/10 9313/14
  9313/21 9314/1
  9314/5 9314/18
  9314/20 9315/2
  9315/17 9315/25
  9316/5 9316/5
  9316/11 9316/14
  9316/15 9317/24
  9318/7 9318/10
  9318/13 9351/10
  9351/19 9352/3
  9352/5 9352/9
  9353/4 9355/15
  9361/14 9363/12
  9364/7 9366/2
  9376/7 9376/10
  9376/12 9376/18
  9376/19 9377/11
  9377/20 9378/4
  9378/6 9378/12
  9378/12 9378/14
  9378/18 9378/25
  9379/6 9379/15
  9380/5 9380/7
  9381/23 9382/15
Android-based [1]
  9316/11
announced [1]
  9356/9
anticipate [2]
  9382/25 9383/14
anticipating [1]
  9361/24
Antitrust [1]
  9279/7
AOL [1]    9312/15
apologies [1]
  9380/8
apologize [3]
  9289/19 9374/3
  9381/4
app [13]    9315/17
  9364/7 9364/14

9364/23 9365/19
9369/21 9369/24
9370/1 9370/3
9371/8 9372/1
9372/2 9372/6
apparent [1]
  9298/6
appear [5]    9287/2
  9292/15 9292/22
  9299/18 9304/7
appearance [1]
  9284/13
APPEARANCES [2]
  9278/12 9279/1
appears [8]
  9286/5 9287/17
  9287/23 9305/2
  9308/17 9309/8
  9372/24 9374/11
Apple [3]    9351/10
  9351/16 9351/25
apples [1]
  9373/21
application [7]
  9314/21 9364/11
  9364/11 9365/6
  9370/17 9370/20
  9377/12
applications [2]
  9314/17 9377/10
appreciate [1]
  9385/2
approach [8]
  9281/14 9282/2
  9298/5 9299/8
  9299/8 9317/15
  9317/16 9357/16
approval [1]
  9367/14
approved [2]
  9367/16 9368/23
approximately [2]
  9313/8 9353/14
apps [2]    9315/16
  9371/16
April [1]    9305/12
April 5th [1]
  9305/12
area [1]    9313/20
areas [1]    9313/1
arise [1]    9304/25
around [4]
  9313/22 9317/4
  9358/14 9375/5
aside [1]    9284/12
  9362/8 9367/2
  9372/19 9373/24
  9374/4 9383/4
associated [2]
  9312/18 9319/19
association [1]
  9310/9
assume [1]    9383/2
attached [1]
  9286/21
attended [1]
  9312/6

attention [13]
  9282/15 9288/8
  9289/17 9357/19
  9358/19 9359/19
  9361/11 9362/9
  9364/2 9364/25
  9368/25 9371/13
  9374/6
attributed [1]
  9304/14
attributes [1]
  9287/11
attribution [3]
  9304/16 9305/1
  9305/6
availability [1]
  9291/11
available [4]
  9304/23 9351/23
  9351/25 9352/9
Ave [1]    9278/20
Avenue [4]    9279/4
  9279/11 9279/14
  9279/24
aware [5]    9292/19
  9352/10 9357/7
  9357/10 9381/25

**B**

back [6]    9281/2
  9281/6 9293/3
  9351/2 9351/3
  9360/22
back to [1]
  9293/3
background [3]
  9312/5 9352/19
  9353/22
balance [2]
  9301/19 9301/21
banking [1]
  9312/12
Bankruptcy [1]
  9279/24
Barkey [1]
  9357/22
based [5]    9296/17
  9316/1 9356/15
  9383/23 9385/8
basic [1]    9299/16
basically [3]
  9360/3 9360/15
  9360/25
Bates [1]    9294/20
BC [10]    9367/10
  9367/19 9367/22
  9368/13 9368/15
  9370/11 9372/4
  9372/13 9373/13
  9374/8
became [3]
  9316/17 9380/24
  9381/7
beginning [2]
  9376/9 9381/7
begins [1]    9288/9
behalf [1]
  9302/15

**B**

behind [1] 9357/20

belabor [2] 9372/12 9378/23

believes [1] 9385/7

Belknap [1] 9279/3

BELLSHAW [1] 9278/16

below [2] 9364/19 9368/12

BENCH [1] 9278/10

benefit [1] 9308/10

benefits [1] 9282/18

Berkeley [1] 9312/8

best [8] 9299/23 9300/4 9300/16 9301/21 9301/24 9301/25 9317/6 9366/2

better [2] 9300/18 9377/15

beyond [1] 9380/6

bid [2] 9283/24 9307/16

bidding [1] 9310/21

binder [7] 9288/2 9291/4 9304/5 9305/11 9357/13 9362/10 9367/4

bit [4] 9308/10 9356/1 9361/1 9373/23

body [2] 9367/12 9367/14

bold [1] 9364/20

bolded [1] 9288/8

boldfaced [1] 9290/13

book [1] 9301/13

booked [1] 9305/7

booking [18] 9287/4 9297/8 9297/15 9298/6 9303/23 9304/13 9304/19 9305/18 9305/20 9305/22 9305/23 9307/6 9307/7 9307/15 9307/17 9309/16 9309/17 9309/19

boss [4] 9359/9 9359/15 9360/24 9361/9

both [9] 9284/3 9297/14 9301/9 9301/19 9301/22 9308/2 9308/15 9309/3 9309/15

bottom [8] 9288/9 9289/17 9289/19

9300/7 9308/13 9358/20 9370/7 9374/16

bought [1] 9281/11

box [3] 9308/18 9309/11 9358/15

brand [1] 9306/12

break [5] 9281/7 9285/11 9319/2 9375/6 9375/11

breaking [1] 9284/17

breaks [1] 9298/5

brief [2] 9319/21 9366/25

briefing [3] 9362/13 9362/25 9366/25

briefly [3] 9285/20 9302/16 9312/4

bringing [1] 9310/15

brings [4] 9365/11 9366/6 9366/11 9366/22

broadband [1] 9303/18

broadly [1] 9303/11

Broadway [1] 9279/8

browser [6] 9351/21 9351/22 9351/22 9351/25 9352/9 9366/15

build [3] 9291/22 9292/19 9315/7

building [1] 9293/10

bullet [9] 9299/21 9364/25 9369/1 9369/5 9370/16 9371/13 9372/21 9373/13 9373/16

business [6] 9312/14 9367/8 9367/10 9367/12 9367/17 9368/4

buy [7] 9284/3 9286/5 9286/14 9287/3 9292/5 9310/21 9314/7

buying [3] 9286/12 9287/25 9295/24

**C**

CA [1] 9278/21

cable [2] 9303/17 9303/18

California [1] 9312/8

call [4] 9353/4 9385/8 9385/13 9385/15

called [14] 9297/8 9298/3 9299/11 9303/15 9303/16 9312/16 9312/18 9313/21 9314/20 9352/24 9353/2 9368/12 9370/7 9375/15

calls [1] 9311/7

came [6] 9288/7 9303/14 9316/22 9317/17 9381/19 9381/24

can [51] 9281/9 9282/1 9283/11 9284/9 9284/12 9285/6 9286/5 9286/6 9286/8 9286/25 9287/11 9287/14 9287/16 9291/5 9292/22 9296/20 9296/22 9298/13 9298/21 9306/10 9306/12 9307/9 9307/10 9309/24 9310/18 9310/21 9311/21 9312/4 9315/24 9316/2 9316/3 9316/3 9317/14 9319/14 9353/9 9355/24 9362/8 9363/8 9367/2 9372/19 9372/20 9373/24 9374/4 9379/3 9381/4 9382/18 9382/19 9384/3 9384/16 9384/22 9384/24

candidates [1] 9383/21

cap [1] 9379/10

care [2] 9359/3 9384/17

carrier [22] 9297/14 9316/7 9352/23 9352/25 9353/3 9353/4 9353/6 9353/14 9353/16 9354/1 9354/2 9354/4 9354/5 9354/16 9355/14 9356/8 9356/11 9356/24 9360/18 9368/10 9368/16 9373/14

carrier's [1] 9354/17

carriers [36] 9313/11 9313/24 9314/1 9314/4 9315/5 9315/7 9315/8 9315/19 9315/24 9316/9 9316/13 9316/18 9316/18 9316/24 9317/16 9317/23

9317/25 9318/17 9351/13 9352/2 9353/21 9353/23 9355/8 9355/17 9356/12 9362/3 9366/1 9372/24 9375/24 9377/7 9377/10 9377/16 9378/11 9378/15 9378/20 9380/23

case [4] 9282/5 9291/7 9298/15 9354/10

cases [2] 9298/16 9310/24

categorical [2] 9307/23 9308/1

caution [1] 9373/25

CAVANAUGH [3] 9279/3 9288/4 9380/10

ceiling [1] 9379/11

cellphones [3] 9314/7 9314/9 9314/10

CEO [3] 9362/19 9362/23 9363/15

certain [2] 9315/14 9315/16

certainly [6] 9319/2 9366/14 9383/1 9383/5 9383/7 9383/25

certify [1] 9386/4

certitude [1] 9356/22

cetera [3] 9289/2 9290/16 9368/1

CFO [2] 9368/2 9368/3

chain [4] 9357/25 9358/2 9358/17 9359/5

chance [1] 9285/21

change [1] 9302/23

changed [2] 9317/20 9368/19

changes [1] 9367/22

channel [2] 9304/16 9314/16

channels [3] 9304/9 9304/14 9305/6

characterize [1] 9306/22

charge [1] 9356/8

cheaper [3] 9298/8 9298/13 9298/16

cheapest [3] 9299/22 9300/3

9301/4

Chicago [1] 9278/23

chief [1] 9368/4

choices [2] 9286/15 9287/1

choose [3] 9290/7 9291/13 9355/8

choosing [1] 9307/16

Chrome [4] 9351/21 9351/22 9363/13 9366/15

Civil [1] 9278/3

clarifies [1] 9284/5

clarify [2] 9306/10 9309/7

class [1] 9351/22

classic [1] 9309/8

clear [4] 9309/22 9353/22 9376/16 9377/6

Clearleap [1] 9312/16

clearly [2] 9294/10 9360/17

click [4] 9287/12 9300/9 9301/8 9301/15

click-through [1] 9300/9

clicks [3] 9304/12 9306/17 9309/10

client [1] 9313/21

clips [1] 9384/1

close [1] 9384/7

closed [8] 9318/18 9319/3 9319/6 9319/11 9319/18 9319/24 9356/10 9383/13

closer [3] 9282/24 9283/1 9353/10

CO [1] 9279/8

collectively [1] 9281/11

college [1] 9312/12

colloquially [1] 9353/2

Colorado [3] 9279/2 9279/6 9279/7

COLUMBIA [1] 9278/1

column [1] 9295/2

combination [1] 9310/10

combined [1] 9352/4

comfortable [1] 9372/2

**C**

coming [4]
9290/22 9290/23
9292/25 9309/17
commercial [7]
9288/14 9288/24
9289/3 9293/2
9293/7 9293/19
9293/25
companies [4]
9295/7 9295/12
9356/17 9363/21
company [5]
9295/8 9303/15
9312/16 9312/18
9312/19
compare [2]
9295/18 9307/14
compared [1]
9282/18
compete [2]
9297/21 9307/4
competing [8]
9297/24 9306/18
9307/7 9307/15
9307/16 9307/18
9308/2 9308/5
competition [5]
9301/24 9302/1
9302/2 9307/12
9307/24
competitive [3]
9351/10 9352/6
9378/7
complaint [1]
9354/10
complementary [2]
9281/9 9282/20
complete [3]
9283/10 9283/12
9284/4
completeness [1]
9283/16
compliance [1]
9372/11
complicated [1]
9299/14
comprehensive [1]
9291/18
concept [7]
9355/4 9355/11
9362/3 9362/5
9365/25 9376/8
9376/20
concern [2]
9295/2 9295/13
concerning [1]
9385/5
concerns [4]
9294/25 9295/7
9295/9 9295/22
concise [1]
9366/25
concluded [1]
9319/3
Conclusions [1]
9301/3

condition [1]
9298/19
conditions [1]
9299/17
conducted [1]
9305/15
confidentiality
[3] 9306/6
9358/13 9383/23
configuration [2]
9371/14 9371/15
configurations [1]
9366/17
configured [1]
9315/20
conform [1]
9355/15
confused [1]
9371/5
confusing [1]
9373/23
confusingly [1]
9372/18
connection [2]
9282/5 9318/16
Connolly [1]
9279/11
consider [2]
9289/1 9290/14
consistent [1]
9319/4
Constitution [1]
9279/24
construct [4]
9376/14 9376/15
9379/10 9379/19
consumer [10]
9291/16 9292/17
9292/19 9300/22
9300/23 9310/4
9310/4 9362/24
9363/13 9363/16
consumers [6]
9292/8 9314/12
9314/14 9315/21
9315/25 9316/11
CONT [1] 9279/1
content [9]
9287/17 9289/12
9289/21 9289/23
9292/13 9312/19
9312/19 9312/22
9372/1
context [5]
9290/23 9293/10
9297/19 9372/10
9373/4
contingent [1]
9376/24
continuation [1]
9319/22
continue [3]
9295/24 9318/23
9376/12
continued [5]
9280/4 9280/10
9281/4 9317/23

9351/6
contracts [1]
9315/11
contributed [2]
9363/3 9363/7
control [1]
9301/9
convenience [1]
9384/23
conversations [2]
9282/17 9383/24
conversion [1]
9300/9
convert [1]
9283/2
copied [2] 9368/6
9374/15
copies [2]
9281/13 9354/16
copy [1] 9284/12
correctly [1]
9285/8
Costs [3] 9295/3
9295/13 9295/14
council [3]
9367/8 9367/10
9367/17
counsel [8]
9296/5 9304/4
9305/24 9319/6
9352/22 9353/9
9367/12 9380/16
couple [11]
9296/24 9352/18
9355/1 9357/13
9357/23 9362/1
9362/1 9374/13
9374/25 9382/11
9383/22
course [8]
9289/15 9291/6
9296/25 9315/10
9361/21 9368/23
9373/19 9379/23
court [9] 9278/1
9279/23 9279/23
9288/4 9311/11
9312/4 9383/16
9383/19 9386/3
Court's [3]
9319/4 9382/20
9384/23
courtroom [1]
9319/22
Courts [1]
9279/24
cover [1] 9319/25
covered [2]
9303/1 9352/22
CPS [1] 9278/7
CPS/Antitrust [1]
9279/7
created [1]
9308/9
creation [2]
9308/6 9312/19
creative [2]

9310/1 9310/2
Credit [1]
9312/13
credits [2]
9289/2 9290/15
criterion [1]
9299/16
cross [10] 9280/4
9280/5 9280/11
9281/4 9302/18
9319/7 9319/11
9352/14 9367/25
9383/2
cross-examination
[7] 9280/4
9280/5 9280/11
9281/4 9302/18
9352/14 9383/2
cross-functional
[1] 9367/25
crowdsource [1]
9312/19
curious [1]
9373/7
current [1]
9312/24
customer [1]
9283/25
cut [1] 9376/4
cv [1] 9278/4

**D**

DAHLQUIST [1]
9278/22
data [34] 9288/25
9289/3 9290/8
9290/10 9290/19
9290/21 9291/9
9291/10 9291/12
9291/13 9291/14
9291/15 9291/17
9291/19 9291/21
9291/25 9292/3
9292/6 9292/7
9292/11 9292/19
9292/21 9293/8
9309/19 9309/24
9310/1 9310/3
9310/12 9310/16
9310/17 9310/20
9310/23 9310/25
9311/2
date [3] 9305/11
9310/9 9386/10
dated [2] 9310/15
9367/7
dates [1] 9310/12
DAVID [1] 9278/22
Davies [2] 9385/5
9385/13
day [8] 9278/7
9291/16 9291/18
9291/20 9301/25
9306/14 9310/7
9384/7
DC [5] 9278/5
9278/15 9278/18
9279/12 9279/25

deal [30] 9317/8
9317/11 9317/11
9355/11 9367/20
9368/7 9370/8
9370/10 9374/16
9375/8 9375/8
9375/13 9375/13
9375/15 9376/1
9376/9 9376/13
9376/14 9376/15
9376/23 9377/6
9377/22 9378/10
9378/13 9378/19
9379/4 9379/10
9379/12 9379/17
9379/19
deals [7] 9294/3
9318/1 9355/18
9356/17 9357/6
9367/21 9375/6
December [2]
9281/18 9284/11
December 1st [1]
9281/18
December 2020 [1]
9284/11
decision [6]
9282/24 9283/1
9367/12 9373/3
9375/5 9375/11
decision-making
[1] 9367/12
deck [1] 9382/25
declining [2]
9317/25 9379/15
decreasing [2]
9318/7 9318/11
dedicated [1]
9307/2
deeply [1]
9354/20
default [7]
9297/14 9366/16
9369/10 9370/1
9370/4 9371/9
9377/20
Defendant [2]
9278/7 9279/10
define [1]
9297/13
degree [3] 9312/7
9356/21 9373/2
deliberately [1]
9295/17
deliver [1]
9285/3
demonstratives [1]
9384/20
Denver [1] 9279/8
Department [6]
9278/14 9278/17
9278/20 9278/22
9279/7 9380/20
depend [1]
9307/23
depending [2]
9367/18 9383/20

**D**

depends [2]
9319/13 9385/13
deposed [2]
9281/17 9282/4
deposition [6]
9281/12 9281/21
9281/25 9282/10
9382/12 9383/5
derived [1]
9306/22
describe [2]
9312/4 9317/14
described [4]
9290/20 9318/20
9378/18 9379/4
descriptions [2]
9307/9 9307/10
design [1]
9304/25
designed [1]
9378/3
designee [2]
9368/3 9368/5
desires [1]
9284/23
desktop [2]
9298/20 9299/3
despite [1]
9295/22
developed [1]
9362/7
development [1]
9312/14
device [15]
9315/18 9316/15
9355/1 9355/1
9355/7 9355/7
9364/17 9366/3
9366/17 9369/12
9369/17 9372/10
9378/6 9378/16
9381/23
device-by-device
[2]   9355/1
9355/7
devices [26]
9314/5 9315/8
9315/20 9315/25
9316/14 9351/10
9351/10 9351/25
9352/5 9355/9
9355/15 9357/4
9364/14 9365/10
9365/24 9369/7
9372/6 9376/7
9376/18 9376/19
9377/11 9377/19
9377/20 9377/25
9378/14 9378/25
DHS [1]   9369/9
differ [1]
9317/19
differed [1]
9317/16
difference [1]
9366/9

differences [1]
9301/14
different [10]
9282/22 9284/9
9286/15 9291/25
9292/2 9304/14
9312/11 9313/1
9356/12 9367/18
differentiate [2]
9307/1 9352/5
differentiated [1]
9378/8
differentiating
[1]   9351/22
differentiation
[2]   9351/16
9351/24
differently [1]
9292/4
digest [1]   9305/5
dimensions [1]
9351/11
DINTZER [1]
9278/13
direct [24]
9280/9 9280/10
9288/8 9289/17
9294/10 9296/14
9297/3 9304/16
9311/19 9351/6
9353/17 9354/25
9355/5 9356/3
9357/19 9358/19
9359/19 9361/11
9362/9 9364/6
9364/10 9368/18
9376/22 9383/14
directly [2]
9315/21 9362/19
director [1]
9313/6
disclosure [1]
9292/23
discounts [1]
9297/21
discretion [1]
9382/20
discussed [7]
9290/11 9301/2
9318/18 9362/6
9363/21 9364/6
9378/10
discussing [3]
9281/7 9290/10
9370/16
discussions [2]
9294/10 9380/23
distinction [2]
9299/3 9299/4
distributing [2]
9314/8 9314/10
Distribution [1]
9314/21
DISTRICT [4]
9278/1 9278/1
9278/11 9279/24
diversity [3]

9297/9 9297/13
9299/16
document [31]
9285/22 9288/7
9288/16 9289/10
9290/1 9290/4
9290/4 9293/1
9293/3 9294/17
9296/4 9296/19
9297/8 9297/13
9308/12 9357/20
9358/13 9362/8
9362/10 9362/13
9362/25 9366/10
9367/2 9367/4
9370/5 9372/13
9372/19 9372/20
9373/24 9374/4
9376/22
documents [2]
9354/24 9357/14
DOJ [5]   9278/13
9302/15 9352/13
9385/7 9385/21
dollar [2]
9367/20 9379/14
dollars [3]
9318/3 9318/5
9379/17
Donald [1]   9359/7
done [2]   9296/11
9298/4
Douyon [1]
9384/25
down [2]   9284/17
9298/16
dozens [3]
9304/24 9305/6
9305/6
Dr. [1]   9384/21
Dr. Israel [1]
9384/21
dramatic [1]
9361/1
draw [5]   9364/2
9364/25 9368/25
9371/19 9374/6
drive [5]   9286/12
9376/10 9376/12
9378/11 9378/18
drives [1]
9292/18
drove [1]   9380/5
due [1]   9301/13
Dunne [5]   9362/14
9362/21 9363/15
9363/19 9364/23
during [6]
9296/14 9313/16
9356/7 9356/10
9382/2 9382/19
DX0158 [1]   9362/9
DX158 [1]   9362/13

**E**

e-mail [15]
9357/25 9358/17
9358/19 9358/23

9359/15 9360/23
9361/4 9361/8
9361/10 9367/7
9368/6 9374/8
9374/12 9374/15
9381/10
e-mails [1]
9358/2
e.g [2]   9289/2
9290/15
earlier [11]
9282/22 9296/10
9304/18 9306/10
9319/4 9352/1
9353/17 9356/16
9361/23 9375/2
9376/2
earn [1]   9379/18
earned [1]   9379/9
ease [1]   9371/16
easily [2]
9294/19 9351/18
ecosystem [1]
9378/4
ecosystems [2]
9362/17 9363/12
educational [1]
9312/5
effect [3]
9316/21 9317/5
9317/7
effective [2]
9291/22 9379/17
either [7]
9283/19 9296/14
9306/16 9317/7
9317/24 9319/20
9368/3
eligible [1]
9364/15
else [6]   9292/5
9372/9 9384/18
9384/19 9384/19
9385/20
Embassy [1]
9286/3
employed [2]
9311/25 9358/3
employee [2]
9383/11 9383/12
encompasses [1]
9379/12
end [11]   9291/16
9291/18 9291/20
9301/25 9306/13
9318/24 9355/23
9384/3 9384/9
9384/13 9384/14
ends [2]   9290/14
9294/20
Enforcing [1]
9297/8
engage [1]
9292/17 9309/13
engaged [1]
9318/16
engaging [1]

9311/1
engine [5]
9360/20 9366/4
9377/20 9381/23
9382/2
engineering [1]
9303/1
enhanced [1]
9351/20
enhancing [1]
9310/24
enough [1]
9384/12
ensuing [1]
9362/7
enter [3]   9315/4
9316/10 9316/13
entered [1]
9317/2
entire [1]
9318/12
entirety [3]
9308/14 9308/25
9309/2
entitled [1]
9386/5
entity [2]
9304/13 9309/9
environment [1]
9378/22
equivalent [2]
9379/9 9379/18
equivalents [1]
9380/5
err [1]   9294/7
eSIM [1]   9315/15
essentially [8]
9318/13 9355/8
9358/23 9359/1
9364/16 9368/15
9369/12 9376/16
estimated [1]
9372/23
et [4]   9278/3
9289/2 9290/16
9368/1
even [7]   9284/25
9300/21 9361/2
9361/12 9364/16
9376/13 9381/21
evening [1]
9385/24
eventually [1]
9312/20
everybody [3]
9281/2 9351/4
9379/24
everyone [2]
9319/23 9385/24
everyone's [1]
9361/6
evidence [23]
9280/17 9280/18
9280/19 9280/20
9280/21 9280/22
9280/23 9281/24
9285/17 9288/16

**E**

evidence... [13]
9288/17 9288/20
9294/8 9294/14
9296/4 9296/8
9302/12 9358/6
9358/10 9362/12
9367/6 9374/20
9374/23

exactly [2]
9286/7 9301/23

examination [24]
9280/4 9280/5
9280/6 9280/9
9280/10 9280/11
9280/12 9281/4
9302/18 9304/2
9311/19 9318/25
9319/12 9351/6
9352/14 9354/25
9355/5 9356/3
9364/6 9364/10
9376/22 9380/13
9383/2 9383/15

example [6]
9292/21 9299/21
9304/19 9310/19
9315/13 9315/16

excellent [4]
9351/12 9365/4
9378/7 9378/16

exception [7]
9369/2 9369/6
9370/2 9370/17
9371/21 9372/3
9372/14

excerpts [1]
9383/22

exchange [4]
9290/3 9291/2
9293/24 9381/10

exchanged [1]
9291/21

exclusive [1]
9365/10

exclusivity [18]
9351/15 9357/8
9360/1 9360/6
9361/15 9361/19
9365/11 9365/24
9366/6 9366/10
9366/14 9366/18
9366/22 9372/15
9378/1 9378/9
9381/18 9381/22

excuse [1]
9319/20

executed [1]
9380/24

executive [1]
9367/25

executives [3]
9363/1 9363/20
9367/1

exhibit [24]
9280/16 9280/17
9280/18 9280/19
9280/20 9280/21
9280/22 9280/23
9285/12 9285/17
9285/19 9288/16
9288/20 9294/14
9295/23 9296/3
9296/3 9296/8
9302/9 9302/12
9304/5 9358/10
9362/11 9374/23

Exhibit 902 [1]
9302/9

Exhibit 907 [1]
9304/5

exhibits [1]
9304/4

exist [1]   9297/15

existence [1]
9357/2

exit [1]   9361/2

expanded [2]
9298/9 9304/19

expands [1]
9287/12

expect [2]
9351/19 9360/19

expectation [2]
9319/14 9383/13

expected [4]
9370/2 9370/23
9371/3 9371/7

expecting [1]
9385/17

Expedia [12]
9287/4 9288/10
9288/13 9288/23
9290/2 9290/3
9290/19 9293/1
9293/6 9293/17
9293/19 9303/22

experience [6]
9308/22 9309/1
9351/18 9366/2
9378/7 9378/16

experiment [6]
9296/20 9299/11
9299/18 9300/13
9300/15 9300/15

experimenting [1]
9300/20

experiments [1]
9296/17

explain [2]
9309/24 9316/3

explaining [1]
9289/12

expressed [1]
9293/20

expressing [2]
9290/23 9293/17

expression [1]
9293/21

extended [2]
9317/9 9317/11

extent [3]
9356/15 9356/19
9376/9

9280/20 9280/21
9280/22 9280/23
9285/12 9285/17
9285/19 9288/16
9288/20 9294/14
9295/23 9296/3
9296/3 9296/8
9302/9 9302/12
9304/5 9358/10
9362/11 9374/23

Exhibit 902 [1]
9302/9

Exhibit 907 [1]
9304/5

exhibits [1]
9304/4

exist [1]   9297/15

existence [1]
9357/2

exit [1]   9361/2

expanded [2]
9298/9 9304/19

expands [1]
9287/12

expect [2]
9351/19 9360/19

expectation [2]
9319/14 9383/13

expected [4]
9370/2 9370/23
9371/3 9371/7

expecting [1]
9385/17

Expedia [12]
9287/4 9288/10
9288/13 9288/23
9290/2 9290/3
9290/19 9293/1
9293/6 9293/17
9293/19 9303/22

experience [6]
9308/22 9309/1
9351/18 9366/2
9378/7 9378/16

experiment [6]
9296/20 9299/11
9299/18 9300/13
9300/15 9300/15

experimenting [1]
9300/20

experiments [1]
9296/17

explain [2]
9309/24 9316/3

explaining [1]
9289/12

expressed [1]
9293/20

expressing [2]
9290/23 9293/17

expression [1]
9293/21

extended [2]
9317/9 9317/11

extent [3]
9356/15 9356/19
9376/9

**F**

faces [1]   9307/13

fact [8]   9295/11
9296/15 9301/1
9308/5 9308/8
9380/16 9381/17
9385/7

fair [6]   9304/22
9306/17 9354/25
9363/6 9380/22
9381/6

falling [3]
9295/4 9295/13
9295/14

falsity [1]
9288/5

familiar [1]
9355/11

familiarity [1]
9354/21

far [1]   9385/9

fast [1]   9351/23

fault [1]   9281/25

features [1]
9287/5

feel [3]   9289/3
9293/22 9294/1

feels [4]   9288/13
9288/23 9293/1
9293/6

felt [3]   9293/19
9293/22 9360/17

fifth [3]   9278/18
9294/19 9296/25

figures [1]
9373/22

filed [3]   9354/11
9380/17 9380/21

files [2]   9288/8
9294/17

final [2]   9315/20
9368/22

finance [2]
9303/7 9367/25

find [1]   9294/19

fine [2]   9283/18
9384/25

first [25]   9282/9
9289/19 9289/19
9295/17 9296/24
9297/6 9297/18
9298/4 9300/21
9301/3 9303/18
9351/12 9352/22
9358/20 9362/10
9364/25 9367/22
9368/9 9369/12
9370/25 9371/1
9371/12 9373/11
9374/16 9379/5

first-of-a-kind
[1]   9367/20

five [1]   9279/14

fixed [1]   9379/5

Fl [1]   9279/14

flight [1]   9301/4

eyes [1]   9298/6

**F**

faces [1]   9307/13

fact [8]   9295/11
9296/15 9301/1
9308/5 9308/8
9380/16 9381/17
9385/7

fair [6]   9304/22
9306/17 9354/25
9363/6 9380/22
9381/6

falling [3]
9295/4 9295/13
9295/14

falsity [1]
9288/5

familiar [1]
9355/11

familiarity [1]
9354/21

far [1]   9385/9

fast [1]   9351/23

fault [1]   9281/25

features [1]
9287/5

feel [3]   9289/3
9293/22 9294/1

feels [4]   9288/13
9288/23 9293/1
9293/6

felt [3]   9293/19
9293/22 9360/17

fifth [3]   9278/18
9294/19 9296/25

figures [1]
9373/22

filed [3]   9354/11
9380/17 9380/21

files [2]   9288/8
9294/17

final [2]   9315/20
9368/22

finance [2]
9303/7 9367/25

find [1]   9294/19

fine [2]   9283/18
9384/25

first [25]   9282/9
9289/19 9289/19
9295/17 9296/24
9297/6 9297/18
9298/4 9300/21
9301/3 9303/18
9351/12 9352/22
9358/20 9362/10
9364/25 9367/22
9368/9 9369/12
9370/25 9371/1
9371/12 9373/11
9374/16 9379/5

first-of-a-kind
[1]   9367/20

five [1]   9279/14

fixed [1]   9379/5

Fl [1]   9279/14

flight [1]   9301/4

Floor [1]   9279/8

focus [1]   9303/2

folks [1]   9313/22

follow [1]   9352/7

follow-up [1]
9352/7

For Plaintiffs [1]
9279/2

foregoing [1]
9386/4

form [2]   9289/21
9355/19

forms [1]   9309/23

forward [1]
9372/2

found [2]   9285/24
9361/22

foundation [1]
9355/20

four [7]   9282/16
9308/20 9355/17
9355/24 9356/12
9356/16 9382/18

four minutes [1]
9382/18

Francisco [1]
9278/21

front [3]   9304/5
9305/12 9308/12

full [3]   9300/23
9372/10 9373/4

fully [2]   9362/6
9383/19

functional [1]
9367/25

funds [1]   9373/20

further [7]
9284/17 9302/13
9303/25 9311/3
9352/11 9380/1
9382/3

**G**

gain [1]   9381/20

Garden [1]   9286/2

garner [1]   9308/7

Gate [1]   9278/20

gather [1]
9310/15

gave [4]   9281/13
9281/25 9284/11
9285/5

general [9]
9302/25 9303/11
9306/22 9367/24
9375/13 9376/8
9376/20 9377/12
9377/14

generally [4]
9282/25 9308/7
9309/12 9377/8

generate [4]
9292/20 9310/5
9310/16 9310/18

generates [1]
9291/23

generating [1]
9305/21

Giard [4]   9382/13
9382/16 9383/7
9383/18

given [9]   9283/7
9283/8 9290/2
9290/3 9304/9
9304/22 9352/8
9355/22 9382/19

gives [1]   9284/25

giving [3]   9282/9
9351/15 9359/1

global [4]
9312/25 9313/6
9359/11 9359/13

GLORIA [1]
9279/10

go-to-market [15]
9375/3 9375/14
9375/21 9375/23
9376/1 9376/23
9377/9 9377/13
9377/16 9377/22
9377/24 9378/10
9378/13 9378/19
9379/16

goal [1]   9305/4

goes [5]   9294/2
9298/7 9299/17
9309/13 9367/10

Golden [1]
9278/20

GOLDSTEIN [5]
9278/19 9280/11
9319/8 9319/10
9373/25

good [8]   9302/20
9302/21 9311/21
9319/8 9352/16
9360/19 9385/11
9385/24

Goodrich [1]
9279/13

GOOGLE [77]
9278/6 9279/10
9285/7 9288/7
9288/16 9290/2
9290/3 9292/12
9293/6 9293/14
9293/17 9293/18
9294/9 9294/11
9295/17 9295/23
9295/24 9296/4
9296/11 9296/15
9303/7 9303/9
9303/14 9305/1
9305/17 9310/11
9311/7 9312/1
9312/2 9312/10
9312/11 9312/21
9312/22 9312/23
9313/18 9313/21
9314/17 9315/1
9315/4 9316/1
9316/4 9316/6
9316/8 9316/10
9316/14 9316/15
9316/23 9317/20

# G

GOOGLE... [29]
9351/12 9356/24
9358/3 9360/11
9360/14 9360/24
9361/19 9362/4
9363/1 9363/12
9365/9 9365/11
9365/17 9365/23
9366/7 9366/11
9366/18 9366/22
9367/13 9368/3
9370/21 9373/17
9375/23 9377/17
9377/19 9377/25
9383/11 9383/12
9384/8
Google's [10]
9289/12 9297/24
9303/2 9357/10
9362/16 9365/20
9368/2 9368/4
9371/17 9385/6
gosh [1]   9375/17
graduate [2]
9312/7 9312/14
grave [1]   9293/23
great [10]
9288/14 9288/23
9293/2 9293/6
9293/19 9363/17
9373/2 9373/6
9383/17 9384/16
ground [1]
9352/21
group [4]   9362/24
9363/12 9363/15
9363/16
guardrails [1]
9367/19
guess [5]   9307/23
9355/21 9363/24
9384/18 9385/4

# H

HA [2]   9289/1
9289/7
half [3]   9312/3
9312/18 9370/7
hand [3]   9311/9
9357/13 9384/1
handed [1]
9381/13
handoff [1]
9361/2
happen [1]
9363/25
happening [1]
9358/23
hardware [2]
9314/7 9315/3
Harrison [1]
9359/7
hasty [1]   9361/1
hate [1]   9372/12
head [1]   9362/21
heading [1]

9301/3
hear [2]   9352/13
9382/14
heard [4]   9314/20
9314/22 9319/12
9385/9
held [4]   9312/11
9312/22 9313/3
9313/9
Hello [2]   9311/16
9352/17
help [6]   9296/22
9351/9 9352/5
9373/12 9378/17
9382/23
helpful [3]
9363/19 9375/1
9375/22
helps [3]   9291/23
9292/20 9371/16
high [4]   9317/14
9362/25 9363/20
9365/10
higher [9]
9282/25 9296/1
9307/16 9365/2
9365/9 9365/23
9366/9 9366/21
9369/25
highest [8]
9351/14 9360/18
9361/14 9361/18
9364/15 9366/1
9366/13 9369/22
Hilton [1]   9286/2
hired [1]   9312/21
Hiroshi [2]
9362/14 9363/11
hold [2]   9288/2
9313/7
HOLDEN [32]
9280/3 9281/4
9281/6 9281/8
9281/17 9282/4
9282/8 9283/15
9284/6 9284/16
9285/19 9285/23
9286/22 9288/7
9288/22 9289/16
9293/12 9294/6
9294/18 9294/22
9296/2 9296/10
9296/22 9297/5
9298/21 9299/12
9301/2 9302/18
9302/20 9304/2
9304/4 9311/4
home [17]   9303/15
9303/16 9303/17
9311/5 9364/23
9369/7 9369/10
9369/21 9370/1
9370/1 9370/3
9370/4 9370/20
9371/8 9371/9
9372/6 9382/7
Honor [36]

9281/14 9283/13
9285/11 9288/4
9288/15 9294/8
9294/16 9296/3
9300/13 9302/5
9302/16 9303/25
9311/7 9311/18
9318/14 9319/17
9352/11 9357/16
9358/5 9358/8
9362/11 9367/5
9374/19 9379/25
9380/11 9380/12
9381/1 9382/4
9382/12 9384/1
9385/2 9385/11
9385/19 9385/21
9385/22 9385/23
HONORABLE [1]
9278/10
HOOK [3]   9279/23
9386/3 9386/10
hope [1]   9318/21
hopeful [1]
9319/1
hopefully [2]
9351/8 9378/17
hoping [1]
9284/10
hotel [42]   9281/9
9282/18 9282/23
9286/10 9286/11
9286/13 9286/18
9286/20 9286/20
9286/25 9287/3
9287/9 9287/24
9287/25 9289/7
9289/20 9292/3
9292/13 9292/22
9293/9 9295/18
9304/9 9304/12
9304/22 9306/10
9306/11 9306/12
9306/13 9306/13
9307/24 9307/25
9308/6 9308/9
9308/13 9308/14
9308/18 9308/23
9308/24 9309/10
9309/20 9310/6
9310/7
hotels [16]
9285/12 9285/25
9286/6 9286/16
9291/8 9291/11
9302/8 9304/7
9305/2 9306/24
9307/2 9307/5
9308/16 9308/20
9309/8 9310/12
hotseat [1]
9366/15
hour [4]   9382/17
9382/17 9382/20
9383/3
huh [1]   9377/5
hundred [1]

9380/7

# I

identifies [1]
9309/9
IL [1]   9278/23
image [1]   9304/6
imbalance [6]
9288/14 9288/23
9293/2 9293/7
9293/19 9293/23
immediately [4]
9312/12 9359/2
9302/7 9306/24
9307/5 9308/15
9308/22 9309/3
9309/13
impact [2]
9370/21 9379/13
impacted [3]
9370/24 9371/4
9371/8
impactful [1]
9379/17
impeaches [1]
9283/14
implementation [1]
9315/15
important [6]
9351/21 9352/1
9352/5 9360/20
9361/22 9366/19
impossible [1]
9295/18
improving [1]
9282/6
inadvertent [1]
9357/9
incentive [3]
9310/2 9375/16
9375/24
incentives [2]
9289/2 9290/15
incentivize [3]
9376/11 9376/19
9379/6
include [4]
9305/1 9308/15
9357/3 9364/12
included [1]
9283/17
includes [1]
9368/2
including [1]
9296/24
increase [1]
9317/24
increased [1]
9380/6
increases [1]
9300/8
increasing [2]
9318/3 9318/6
increasingly [2]
9294/25 9295/8

incredibly [3]
9351/21 9352/1
9352/5
incremental [1]
9378/12
incrementally [1]
9376/11
indicating [1]
9298/15
inform [1]
9382/23
information [6]
9287/14 9292/15
9292/17 9304/7
9305/5 9310/13
infrastructure [1]
9312/17
inherently [1]
9309/23
initiated [1]
9354/14
insert [2]   9307/9
9307/10
inserting [1]
9300/8
insight [1]
9285/2
insignificant [1]
9306/23
install [3]
9364/7 9377/10
9377/17
installing [1]
9357/3
instead [1]
9379/11
instructions [2]
9359/1 9359/16
intend [2]
9318/23 9382/22
intent [6]   9281/7
9284/7 9284/8
9284/18 9284/21
9284/22
interaction [1]
9290/5
interest [5]
9290/24 9292/16
9294/1 9302/1
9310/17
interests [2]
9284/23 9286/18
internally [1]
9290/11
interpretation [1]
9290/5
interrupt [2]
9363/8 9379/3
into [34]   9280/17
9280/18 9280/19
9280/20 9280/21
9280/22 9280/23
9285/2 9285/13
9285/17 9287/10
9288/17 9288/24
9294/5 9294/14
9296/4 9296/8

**I**

into... [17] 9302/12 9309/13 9315/4 9316/10 9316/13 9316/22 9317/3 9317/17 9318/15 9318/18 9319/5 9358/5 9358/10 9374/20 9374/23 9375/6 9384/24
introduced [2] 9305/17 9305/19
investment [1] 9312/12
invite [1] 9289/10
involve [1] 9383/22
involved [7] 9313/10 9314/23 9316/8 9316/17 9354/1 9354/5 9381/7
involvement [1] 9382/15
involving [1] 9382/15
iPhone [2] 9318/13 9352/6
iPhones [2] 9351/16 9378/8
Israel [1] 9384/21
issues [2] 9304/25 9383/23
item [1] 9364/5
iteration [3] 9357/7 9368/24 9368/25
itinerary [4] 9288/5 9290/21 9292/11 9293/8

**J**

Jamie [2] 9360/1 9382/25
Jamie/Zahavah [1] 9360/1
JEFF [4] 9279/23 9382/13 9386/3 9386/10
JEREMY [2] 9278/19 9319/8
job [3] 9312/24 9313/5 9381/13
jobs [1] 9312/11
JOHN [1] 9279/10
joined [4] 9354/2 9354/16 9356/11 9356/24
JONATHAN [1] 9279/6
JONES [3] 9278/17 9280/5 9302/16
JR [1] 9279/3
JUDGE [2] 9278/11

9384/22
judges' [1] 9384/4
June [8] 9313/4 9317/4 9352/23 9352/24 9354/2 9354/8 9356/12 9357/25
June 2019 [2] 9356/12 9357/25
Justice [4] 9278/14 9278/17 9278/20 9278/22
Justice's [1] 9380/21

**K**

keep [3] 9353/10 9372/8 9384/21
KENNETH [1] 9278/13
kept [1] 9295/24
keywords [2] 9310/22 9310/22
kick [1] 9383/20
kind [8] 9286/25 9287/2 9287/7 9287/8 9287/16 9287/23 9366/2 9367/20
kinds [2] 9295/22 9299/17
Klainer [5] 9358/20 9358/24 9360/24 9361/18 9381/11
Klainer's [1] 9359/9
knowledge [4] 9307/20 9307/21 9317/6 9356/20
knowledgeable [1] 9354/20

**L**

labeled [1] 9286/4
lack [1] 9301/14
land [1] 9297/15
language [4] 9288/9 9290/13 9295/3 9297/19
large [5] 9288/24 9290/20 9292/11 9293/8 9359/19
LaSalle [1] 9278/23
last [6] 9303/5 9317/10 9351/8 9361/13 9374/13 9384/5
later [1] 9312/18
Law [1] 9279/7
lawsuit [3] 9354/10 9354/14 9380/21
leading [1] 9381/1

leads [10] 9289/21 9289/22 9291/1 9291/22 9291/23 9292/18 9292/20 9310/5 9310/16 9362/16
least [1] 9357/9
leave [2] 9358/24 9373/11
leaving [1] 9359/16
led [3] 9353/14 9353/19 9353/20
left [4] 9312/16 9312/20 9354/4 9369/18
legal [1] 9368/1
lengthy [1] 9354/24
letter [2] 9352/3 9366/16
letting [1] 9359/16
level [4] 9307/24 9317/14 9363/1 9363/20
license [2] 9314/17 9316/6
light [1] 9294/10
likely [2] 9283/2 9363/5
line [3] 9282/16 9283/23 9284/16
line 13 [1] 9284/16
line four [1] 9282/16
link [10] 9297/8 9297/13 9298/8 9299/22 9299/23 9300/2 9300/4 9300/8 9300/17 9301/16
linkage [1] 9310/11
linking [1] 9285/24
links [8] 9297/14 9297/14 9298/6 9298/9 9301/8 9305/18 9305/20 9309/20
list [4] 9298/16 9384/20 9384/25 9385/1
listed [3] 9308/20 9368/7 9374/16
listing [1] 9385/12
listings [1] 9286/2
litigation [1] 9380/17
little [2] 9353/10 9356/11
live [1] 9382/24

LLC [1] 9278/6
LLP [2] 9279/3 9279/11
load [7] 9315/16 9315/17 9365/7 9369/21 9369/24 9370/20 9372/5
loaded [9] 9314/18 9316/14 9364/16 9365/17 9365/19 9371/4 9371/8 9381/22 9382/1
loading [2] 9365/5 9369/6
loads [1] 9371/16
Lockheimer [6] 9362/14 9362/16 9363/11 9363/19 9364/22 9365/15
long [8] 9293/25 9312/2 9313/3 9313/7 9319/11 9371/4 9371/8 9381/8
long-term [1] 9293/25
longer [1] 9318/21
look [18] 9282/21 9282/21 9284/11 9284/21 9285/19 9285/21 9289/11 9289/14 9289/20 9296/20 9297/5 9298/24 9312/25 9364/19 9368/6 9374/15 9376/21 9384/3
looked [3] 9304/18 9313/20 9374/13
looking [4] 9284/16 9284/21 9294/19 9309/8
looks [1] 9363/5
loss [1] 9372/23
lost [1] 9299/7
lots [2] 9296/17 9309/14
loud [4] 9358/15 9359/25 9365/3 9374/1
lower [6] 9298/16 9365/2 9365/8 9365/20 9366/10 9366/21
lowest [1] 9300/21
lunch [2] 9281/7 9383/3

**M**

M-C-C-A-L-L-I-S-T-E-R [1] 9311/24
MADA [2] 9314/21 9314/24
MADAs [3] 9315/1

9315/2 9315/4
MAIER [2] 9279/10 9280/6
mail [15] 9357/25 9358/17 9358/19 9358/23 9359/15 9360/23 9361/4 9361/8 9361/10 9367/7 9368/6 9374/8 9374/12 9374/15 9381/10
mails [1] 9358/2
Maine [1] 9279/11
major [10] 9313/24 9314/1 9316/18 9317/15 9318/17 9353/20 9355/17 9359/21 9363/13 9380/23
majority [1] 9314/9
makes [1] 9292/17
makeup [1] 9367/22
making [4] 9282/24 9283/1 9295/17 9367/12
management [1] 9302/24
manager [2] 9302/25 9359/5
managing [1] 9313/6
manner [1] 9298/12
manufacture [1] 9314/1
manufacturers [2] 9314/9 9315/3
many [6] 9284/9 9304/23 9304/23 9308/6 9368/24 9384/5
March [1] 9367/7
March 17th [1] 9367/7
marked [2] 9285/12 9285/19
market [19] 9286/9 9286/20 9318/12 9375/3 9375/14 9375/21 9375/23 9376/1 9376/7 9376/23 9377/9 9377/13 9377/16 9377/22 9377/24 9378/10 9378/13 9378/19 9379/16
marketing [7] 9361/14 9361/22 9361/25 9362/4 9376/2 9378/19 9378/24
markets [1] 9297/20
materially [4]

# M

**materially... [4]** 9370/21 9370/24 9371/3 9371/7

**materials [2]** 9363/4 9372/4

**math [1]** 9288/5

**Matt [1]** 9358/19

**matter [1]** 9386/5

**MATTHEW [2]** 9278/17 9302/16

**maximum [1]** 9295/18

**may [19]** 9281/14 9281/15 9292/15 9300/21 9302/1 9304/7 9304/9 9304/22 9315/13 9315/16 9357/16 9357/17 9373/12 9373/12 9373/19 9377/12 9382/22 9383/19 9385/13

**maybe [6]** 9286/7 9299/6 9307/18 9353/4 9355/24 9370/19

**MBA [1]** 9312/8

**MCCALLISTER [20]** 9280/8 9311/8 9311/15 9311/19 9311/21 9311/23 9318/16 9351/6 9351/9 9352/14 9352/16 9357/19 9358/12 9361/7 9367/3 9367/7 9374/4 9380/13 9380/15 9382/6

**MEAGAN [1]** 9278/16

**mean [10]** 9309/12 9313/14 9319/13 9355/4 9365/25 9377/1 9378/23 9379/8 9381/24 9384/24

**meaning [2]** 9285/6 9380/4

**means [1]** 9373/8

**meant [4]** 9285/6 9372/1 9378/6 9379/11

**measure [1]** 9290/2

**meeting [3]** 9362/13 9384/4 9384/22

**meetings [1]** 9363/24

**MEHTA [1]** 9278/10

**members [1]** 9367/8

**mentioned [4]** 9354/7 9356/3 9360/8 9376/23

**merged [1]** 9356/4

**merger [1]** 9356/9

**Messages [2]** 9313/21 9313/21

**messaging [1]** 9313/20

**met [1]** 9363/21

**meta [1]** 9306/19

**mic [1]** 9353/10

**MICHAEL [1]** 9279/13

**middle [1]** 9359/24

**midst [1]** 9356/25

**might [8]** 9291/18 9294/19 9298/7 9298/16 9305/21 9307/20 9310/22 9361/24

**mind [2]** 9297/18 9372/9

**minority [1]** 9301/16

**minute [5]** 9289/14 9296/20 9296/21 9357/23 9361/13

**minutes [4]** 9318/20 9318/22 9382/17 9382/18

**miss [1]** 9298/7

**missed [1]** 9384/5

**mistake [1]** 9281/24

**mix [2]** 9297/14 9307/3

**mobile [25]** 9298/20 9299/3 9313/11 9313/25 9314/7 9314/21 9315/20 9316/9 9316/10 9316/13 9316/22 9317/2 9356/4 9356/13 9362/21 9362/24 9363/15 9364/7 9364/11 9364/14 9365/6 9370/3 9370/17 9375/15 9382/14

**modem [2]** 9303/17 9303/18

**module [11]** 9304/13 9304/19 9305/22 9305/23 9307/6 9307/8 9307/15 9307/17 9309/16 9309/17 9309/20

**moment [3]** 9285/4 9302/4 9319/14

**Monday [1]** 9385/17

**money [5]** 9290/19 9362/3 9376/14 9376/18 9379/14

**monthly [3]** 9375/24 9376/3

9376/6

**months [5]** 9361/13 9362/1 9362/7 9374/13 9384/5

**more [22]** 9283/2 9283/24 9284/25 9291/22 9302/3 9308/3 9308/7 9309/7 9311/1 9351/10 9355/7 9356/1 9362/6 9371/5 9372/12 9376/14 9376/18 9376/19 9377/15 9379/14 9379/17 9380/5

**more Android [1]** 9376/19

**morning [1]** 9384/1

**most [3]** 9294/19 9363/5 9378/7

**mostly [1]** 9306/1

**motion [1]** 9385/4

**motivation [1]** 9286/23

**move [11]** 9285/13 9285/13 9288/17 9294/9 9302/6 9319/5 9353/10 9358/5 9374/19 9384/21 9385/2

**moved [1]** 9296/4

**Mr. [61]** 9281/3 9281/8 9281/17 9282/4 9282/8 9283/15 9284/6 9284/6 9285/19 9285/23 9286/22 9288/4 9288/7 9288/16 9289/16 9293/12 9294/9 9294/22 9296/2 9296/10 9296/22 9297/2 9297/5 9298/21 9299/12 9301/4 9302/14 9302/20 9304/4 9311/4 9318/19 9351/5 9357/22 9358/7 9359/9 9360/18 9361/18 9363/19 9364/22 9364/23 9365/15 9373/25 9380/10 9380/11 9382/5 9382/9 9382/16 9383/1 9383/7 9383/9 9383/10 9383/11 9383/15 9383/18 9385/5 9385/13

**Mr. Barkey [1]** 9357/22

**Mr. Cavanaugh [2]** 9288/4 9380/10

**Mr. Davies [2]** 9385/5 9385/13

**Mr. Dunne [3]** 9362/21 9363/19 9364/23

**Mr. Giard [3]** 9382/16 9383/7 9383/18

**Mr. Goldstein [1]** 9373/25

**Mr. Holden [27]** 9281/8 9281/17 9282/4 9282/8 9283/15 9284/6 9284/16 9285/19 9285/23 9286/22 9288/7 9288/22 9289/16 9293/12 9294/6 9294/18 9294/22 9296/2 9296/10 9296/22 9297/5 9298/21 9299/12 9301/2 9302/20 9304/4 9311/4

**Mr. Klainer [4]** 9358/24 9360/24 9361/18 9381/11

**Mr. Klainer's [1]** 9359/9

**Mr. Lockheimer [4]** 9362/16 9363/19 9364/22 9365/15

**Mr. Rosenberg [4]** 9383/9 9383/10 9383/11 9383/15

**Mr. Rosenberg's [1]** 9383/1

**Mr. Sallet [3]** 9281/3 9297/2 9302/14

**Mr. Schmidtlein [5]** 9318/19 9351/5 9358/7 9382/5 9382/9

**Ms. [14]** 9311/15 9311/21 9318/16 9351/9 9352/16 9357/19 9358/12 9361/7 9367/3 9367/7 9374/4 9380/15 9382/6 9383/9

**Ms. McCallister [13]** 9311/15 9311/21 9318/16 9351/9 9352/16 9357/19 9358/12 9361/7 9367/3 9367/7 9374/4 9380/15 9382/6

**Ms. Rosenberg [1]** 9383/9

**MSIA [2]** 9375/16 9377/2

**Mr. Cavanaugh [2]** 9288/4 9380/10

**MSIAs [2]** 9378/3 9378/13

**much [6]** 9282/24 9282/25 9308/7 9311/4 9362/6 9382/6

**multiple [2]** 9297/20 9304/8

**Murphy [3]** 9385/10 9385/14 9385/17

**muted [1]** 9383/23

# N

**name [4]** 9286/10 9286/24 9311/22 9363/5

**names [1]** 9371/6

**nature [1]** 9294/11

**navigate [1]** 9358/14

**navigational [3]** 9307/25 9308/3 9308/8

**near [1]** 9288/9

**Nebraska [1]** 9279/3

**necessarily [3]** 9360/16 9361/6 9372/10

**need [20]** 9289/16 9289/22 9290/8 9291/8 9291/10 9291/12 9291/15 9291/19 9292/3 9292/6 9297/1 9302/3 9310/15 9310/23 9316/4 9316/8 9365/8 9367/19 9385/15 9385/16

**needs [2]** 9289/21 9359/2

**neglected [2]** 9285/13 9302/6

**negotiate [4]** 9315/1 9315/2 9315/7 9316/5

**negotiated [8]** 9317/2 9353/20 9353/23 9354/7 9354/13 9354/20 9367/16 9368/19

**negotiating [9]** 9313/10 9314/23 9316/17 9352/23 9353/18 9353/24 9354/1 9354/5 9356/25

**negotiation [3]** 9294/2 9361/12 9361/13

**negotiations [9]** 9313/19 9315/12 9318/15 9360/21 9361/21 9368/23 9380/22 9381/6

**N**

negotiations...
[1]   9382/15
neither [2]
9294/7 9309/10
net [1]   9379/6
Network [2]
9303/16 9303/17
new [12]   9279/5
9279/14 9285/12
9285/25 9286/16
9288/16 9296/3
9302/8 9356/25
9360/21 9361/19
9369/20
next [12]   9298/18
9299/5 9306/5
9311/7 9361/11
9366/4 9367/4
9371/13 9372/20
9382/12 9383/21
9385/17
nor [1]   9309/10
North [2]   9352/24
9353/16
noted [1]   9304/4
notes [2]   9372/9
9373/3
notion [1]   9379/8
November [2]
9278/5 9374/12
number [10]
9287/1 9288/3
9294/20 9295/2
9313/1 9359/25
9365/2 9365/2
9375/25 9376/6
numbers [3]
9306/21 9306/21
9306/25
numerous [1]
9297/20
NW [3]   9278/14
9278/18 9279/24
NY [2]   9279/5
9279/14

**O**

o'clock [1]
9319/2
oath [1]   9281/20
objection [14]
9283/10 9285/15
9288/18 9294/9
9294/12 9296/5
9296/6 9302/9
9355/19 9356/18
9358/7 9358/8
9374/21 9381/1
obligations [1]
9378/20
obtains [1]
9306/16
obviously [1]
9319/13
occurred [1]
9361/21

occurring [1]
9291/3
October [4]
9354/11 9380/21
9380/25 9381/8
odds [1]   9282/5
OEM [3]   9315/17
9315/25 9316/7
OEMs [10]   9314/7
9315/2 9315/7
9315/12 9315/13
9315/14 9315/15
9316/5 9316/6
9353/24
off [4]   9284/1
9368/16 9376/4
9381/13
offer [1]   9286/15
offered [1]
9298/13
offering [3]
9285/3 9290/9
9297/21
office [1]
9359/17
officer [1]
9368/4
Official [2]
9279/23 9386/3
often [4]   9282/23
9287/3 9287/4
9308/9
oftentimes [2]
9315/12 9315/15
once [4]   9308/22
9309/13 9357/10
9371/25
one [50]   9282/6
9283/10 9293/4
9293/15 9295/17
9296/24 9296/25
9296/25 9299/22
9299/25 9300/3
9301/6 9301/9
9302/4 9303/18
9304/4 9351/8
9351/8 9352/7
9355/7 9355/8
9355/14 9359/6
9359/20 9366/14
9368/22 9368/23
9369/1 9369/15
9370/3 9370/13
9371/5 9371/9
9371/14 9371/21
9372/4 9372/12
9372/13 9374/13
9375/8 9375/13
9377/9 9377/12
9379/12 9381/24
9382/12 9382/17
9382/17 9382/24
9384/18
one's [1]   9306/7
online [2]   9307/8
9314/15
only [12]   9286/9

9287/16 9287/24
9296/23 9298/8
9298/19 9301/15
9310/10 9351/25
9359/21 9365/9
9365/10
onto [1]   9358/20
ONYEMA [2]
9278/16 9385/12
open [6]   9318/24
9319/15 9319/22
9351/3 9383/16
9383/19
operates [1]
9306/13
operating [3]
9316/19 9317/17
9351/24
opportunity [2]
9287/13 9308/6
opposed [2]
9307/25 9318/4
opt [1]   9355/9
option [7]   9365/8
9365/9 9365/20
9366/9 9366/10
9366/21 9371/23
options [11]
9298/8 9298/12
9298/13 9298/16
9298/17 9300/24
9304/20 9304/23
9304/24 9371/18
9382/11
oranges [1]
9373/21
order [8]   9291/9
9292/1 9300/17
9309/19 9316/10
9316/14 9360/18
9378/17
organic [8]
9290/9 9291/2
9307/19 9308/18
9308/23 9309/1
9309/15 9309/16
original [1]
9357/8
OTA [6]   9297/14
9300/2 9300/4
9300/14 9301/5
9307/12
OTAs [17]   9295/24
9297/20 9297/24
9301/8 9301/14
9301/22 9306/2
9306/19 9307/3
9307/4 9307/10
9307/21 9308/2
9308/5 9308/7
9308/10 9309/10
others [2]   9287/4
otherwise [1]
9382/2
out [17]   9294/6
9295/23 9309/15

9309/17 9318/4
9351/14 9352/2
9355/24 9356/1
9358/15 9359/17
9359/25 9360/18
9365/3 9366/1
9366/12 9374/1
outside [1]
9292/16
over [10]   9284/25
9291/23 9293/15
9308/2 9310/25
9357/6 9362/7
9367/22 9368/19
9381/8
overly [1]   9361/1
overruled [1]
9356/19

**P**

p.m [4]   9278/6
9351/1 9351/2
9385/25
page [48]   9280/2
9280/16 9281/23
9282/9 9282/14
9284/14 9286/2
9287/8 9288/9
9289/10 9289/11
9289/17 9289/18
9289/19 9289/20
9297/6 9297/15
9298/2 9299/5
9299/10 9300/7
9301/2 9304/17
9305/3 9305/4
9305/8 9305/24
9306/5 9307/2
9308/13 9308/19
9309/15 9358/20
9358/21 9359/20
9364/3 9368/7
9368/9 9370/1
9370/5 9370/7
9373/12 9373/17
9373/22 9374/16
9376/21 9376/22
9379/5
page 134 [3]
9281/23 9282/9
9282/14
page 160 [1]
9284/14
page 241 [1]
9305/24
page 242 [1]
9308/13
page 3 [1]   9298/2
page five [1]
9301/2
page two [1]
9300/7
pages [3]   9296/24
9308/15 9319/24
paid [9]   9290/19
9290/22 9290/25
9306/16 9307/1
9307/3 9309/16

9318/4 9375/23
Paine [1]   9312/13
panel [2]   9307/21
9307/21
paragraph [8]
9289/7 9290/14
9297/12 9297/19
9298/3 9298/18
9299/15 9359/20
part [6]   9287/6
9294/2 9300/19
9310/1 9317/10
9377/13
participate [7]
9289/1 9290/7
9290/9 9291/14
9292/4 9293/9
9310/24
particular [9]
9286/12 9286/21
9287/10 9292/25
9296/12 9297/2
9305/2 9310/9
9367/20
parties [2]
9319/20 9383/25
partner [7]
9283/1 9291/13
9292/25 9293/22
9310/2 9351/13
9360/19
partnering [1]
9378/16
partners [9]
9289/21 9289/22
9290/6 9292/18
9294/25 9295/8
9305/21 9310/17
9310/25
Partnership [2]
9353/5 9353/16
partnerships [9]
9312/22 9312/25
9313/1 9313/6
9313/20 9313/22
9352/25 9359/11
9359/14
party [1]   9306/15
9366/2
patience [1]
9351/4
Patterson [1]
9279/3
pay [4]   9360/17
9365/25 9376/2
9376/10
paying [6]   9360/2
9360/11 9360/14
9360/25 9366/12
9379/14
payment [2]
9289/2 9290/16
payments [3]
9317/23 9318/2
9379/5
people [1]
9363/20

**P**

per [1]    9360/1
percent [3]
  9373/18 9380/7
  9380/8
percentage [12]
  9318/4 9360/3
  9360/10 9360/11
  9364/16 9365/10
  9376/3 9376/6
  9379/6 9379/7
  9379/21 9380/5
percentages [2]
  9309/14 9374/1
performed [1]
  9290/6
period [6]
  9313/16 9313/17
  9319/21 9356/7
  9375/5 9380/25
periodically [1]
  9363/20
permitted [1]
  9287/7
permitting [2]
  9371/21 9372/14
person's [1]
  9307/11
perspective [1]
  9300/22
philosophically
  [1]   9378/5
phones [5]   9314/7
  9314/12 9314/14
  9364/8 9371/11
phrase [1]
  9297/22
pick [1]    9369/13
pitfall [3]
  9298/5 9298/18
  9299/7
pitfalls [2]
  9298/3 9299/7
place [2]    9283/23
  9381/17
placed [1]
  9319/24
placement [2]
  9351/20 9366/15
places [1]
  9292/15
placing [1]
  9366/3
Plaintiff [1]
  9279/6
plaintiffs [5]
  9278/4 9278/13
  9279/2 9302/15
  9385/21
Plaintiffs' [1]
  9319/6
plate [2]    9359/2
  9359/17
platform [7]
  9352/9 9355/11
  9355/12 9355/14
  9355/18 9356/17

9362/16
platforms [2]
  9363/12 9363/13
play [7]    9363/13
  9382/13 9382/18
  9382/19 9383/5
  9383/6 9383/7
players [1]
  9363/9
please [9]
  9284/15 9285/20
  9289/16 9293/15
  9294/4 9298/25
  9311/9 9311/22
  9319/20
plus [3]    9369/15
  9370/3 9371/9
plus-one [3]
  9369/15 9370/3
  9371/9
point [17]   9294/6
  9304/14 9309/7
  9310/14 9357/10
  9361/6 9365/1
  9369/1 9369/5
  9370/16 9371/14
  9372/21 9373/14
  9373/16 9378/23
  9383/7 9385/12
points [4]
  9364/20 9365/14
  9366/20 9366/23
populating [1]
  9292/13
portion [5]
  9283/13 9297/2
  9307/7 9308/16
  9319/11
position [15]
  9299/23 9300/4
  9302/23 9312/24
  9313/3 9313/5
  9313/7 9313/10
  9355/22 9364/18
  9365/21 9365/22
  9366/5 9384/1
  9385/7
possibility [1]
  9305/18
possible [2]
  9376/13 9380/7
potential [3]
  9298/5 9299/7
  9383/21
potentially [1]
  9306/15
powerful [1]
  9284/8
pre [17]    9314/18
  9315/16 9315/17
  9316/14 9357/3
  9364/7 9365/5
  9365/7 9365/17
  9365/19 9369/21
  9370/20 9371/16
  9372/5 9377/17
  9381/22 9382/1

pre-install [2]
  9364/7 9377/17
pre-installing [1]
  9357/3
pre-load [6]
  9315/16 9315/17
  9365/7 9369/21
  9370/20 9372/5
pre-loaded [6]
  9314/18 9316/14
  9365/17 9365/19
  9381/22 9382/1
pre-loading [1]
  9365/5
pre-loads [1]
  9371/16
preceded [2]
  9380/25 9381/8
precipitated [1]
  9357/11
precise [2]
  9284/25 9377/15
precisely [1]
  9355/3
preexisting [1]
  9316/19
prefer [2]
  9301/13 9375/21
preferred [1]
  9366/17
preparation [2]
  9363/3 9363/10
prepared [1]
  9365/14
presence [4]
  9300/14 9307/8
  9307/19 9307/20
present [4]
  9287/1 9291/12
  9292/7 9292/16
presentation [1]
  9305/11
president [2]
  9359/11 9359/13
pressing [1]
  9359/21
preview [1]
  9382/21
previous [5]
  9357/7 9360/1
  9376/14 9379/19
  9382/2
previously [5]
  9362/11 9367/5
  9371/24
price [13]
  9292/25 9297/21
  9297/25 9298/6
  9300/17 9300/21
  9300/21 9301/15
  9304/6 9304/9
  9304/17 9310/7
  9310/10
prices [5]
  9292/23 9304/14
  9304/15 9305/2
  9310/12

pricing [4]
  9291/10 9291/18
  9292/15 9292/21
primarily [2]
  9314/15 9353/4
primary [1]
  9371/23
principle [1]
  9371/17
prior [10]
  9295/23 9302/22
  9312/10 9313/5
  9316/19 9317/17
  9354/17 9355/17
  9360/12 9372/21
priorities [1]
  9363/21
priority [4]
  9294/24 9295/8
  9361/14 9361/18
privacy [1]
  9358/13
privy [1]   9315/10
probably [8]
  9283/24 9283/24
  9284/2 9301/13
  9309/14 9356/10
  9363/6 9367/24
problem [1]
  9298/19
proceedings [2]
  9385/25 9386/5
proceeds [1]
  9304/12
process [1]
  9282/23
produced [1]
  9294/17
product [16]
  9285/3 9290/9
  9291/23 9292/20
  9292/20 9293/11
  9302/23 9303/1
  9307/11 9307/11
  9308/25 9309/2
  9313/1 9313/20
  9351/12 9367/25
products [2]
  9290/6 9316/6
Professor [3]
  9385/9 9385/14
  9385/17
prohibition [1]
  9357/3
prominently [1]
  9308/3
promote [4]
  9287/5 9301/15
  9360/19 9378/3
promoted [4]
  9286/6 9286/11
  9287/9 9287/9
promoting [1]
  9378/14
promotional [5]
  9351/15 9366/13
  9366/18 9378/9

9378/19
proper [1]   9361/2
property [5]
  9286/12 9286/21
  9287/10 9307/10
  9310/10
proportion [1]
  9289/23
proposal [1]
  9299/15
propose [1]
  9382/13
proposed [3]
  9364/22 9369/20
  9384/9
proposition [1]
  9300/6
proven [1]   9288/5
provide [21]
  9288/25 9289/20
  9289/22 9291/9
  9291/19 9291/25
  9292/3 9293/9
  9298/13 9301/21
  9303/17 9304/9
  9305/5 9310/3
  9310/23 9311/2
  9311/10 9316/23
  9371/17 9371/23
  9385/1
provided [8]
  9290/20 9292/12
  9304/15 9304/17
  9309/19 9316/23
  9370/11 9372/5
provider [1]
  9312/17
providers [3]
  9291/17 9303/19
  9306/19
provides [1]
  9385/14
providing [5]
  9289/1 9289/3
  9289/3 9290/15
  9298/14
provision [7]
  9357/8 9360/2
  9360/7 9360/22
  9372/15 9381/18
  9381/25
provisions [3]
  9361/22 9375/25
  9378/9
PSX343 [2]
  9280/18 9288/20
PSX510 [4]
  9280/20 9296/2
  9296/7 9296/8
PSX524 [1]   9305/9
PSX608 [4]
  9280/19 9291/4
  9294/4 9294/14
PSX902 [4]
  9280/21 9285/20
  9302/6 9302/12
PSX907 [2]

**P**

PSX907... [2]
   9280/17 9285/17
pull [1]   9357/22
purchase [3]
   9286/9 9315/8
   9315/24
purchased [3]
   9286/24 9287/24
   9292/14
purports [1]
   9290/1
purpose [4]
   9297/12 9300/6
   9373/20 9378/24
purposes [2]
   9292/12 9362/4
push [1]   9352/2
pushing [1]
   9366/2
put [7]   9284/12
   9310/13 9360/21
   9367/2 9372/19
   9373/24 9374/4

**Q**

qualified [4]
   9310/18 9357/4
   9377/21 9377/25
qualify [2]
   9369/22 9369/25
queries [4]
   9282/19 9286/17
   9303/11 9308/8
query [5]   9284/25
   9307/24 9307/25
   9308/1 9308/3
quickly [1]
   9380/12
quite [5]   9308/10
   9354/23 9372/25
   9373/7 9380/7
quotations [2]
   9295/11 9295/13
quote [1]   9297/13

**R**

raise [2]   9311/9
   9364/23
raised [1]   9355/4
range [1]   9307/1
rank [1]   9300/8
ranked [2]
   9299/24 9300/3
ranking [1]
   9299/16
rates [2]   9300/9
   9300/9
rationale [4]
   9370/8 9370/10
   9372/5 9372/14
re [1]   9373/20
re-purpose [1]
   9373/20
reach [1]   9284/2
read [13]   9283/5
   9283/7 9283/10

9283/13 9283/19
9284/4 9285/8
9290/13 9354/23
9358/15 9359/24
9384/24 9385/6
reading [3]
   9298/23 9359/25
   9374/1
reads [3]   9294/24
   9298/4 9371/15
ready [2]   9281/3
   9311/17
really [4]
   9371/23 9378/6
   9378/10 9385/13
reason [2]
   9371/21 9371/23
rebuttal [1]
   9385/5
recall [12]
   9281/17 9281/20
   9282/9 9286/7
   9304/20 9305/9
   9309/20 9355/2
   9372/8 9375/3
   9380/18 9381/14
receive [3]
   9288/14 9288/24
   9293/7
received [4]
   9312/8 9354/16
   9358/2 9362/4
recent [1]
   9302/22
Recess [1]   9351/1
recipients [1]
   9359/6
record [3]
   9283/12 9311/22
   9351/2 9384/25
   9386/5
red [1]   9358/15
redacted [7]
   9295/12 9298/22
   9301/17 9306/1
   9306/7 9359/25
   9360/10
redactions [5]
   9294/6 9294/21
   9358/12 9365/1
   9384/10
redirect [6]
   9280/6 9280/12
   9283/20 9304/1
   9304/2 9380/13
reduce [3]
   9371/22 9372/6
   9372/15
Reduced [1]
   9373/14
reducing [1]
   9373/18
refer [9]   9284/18
   9287/24 9308/14
   9313/13 9353/6
   9365/2 9373/17
   9375/11 9375/21

reference [7]
   9308/13 9361/25
   9362/2 9369/9
   9370/23 9373/1
   9373/5
referenced [6]
   9296/15 9302/2
   9368/18 9373/16
   9375/8 9376/2
references [1]
   9364/5
referencing [1]
   9295/12
referred [1]
   9296/10
referring [7]
   9296/13 9299/8
   9308/16 9308/19
   9308/21 9318/3
   9360/6
refers [1]
   9298/12
refine [1]
   9284/24
reflect [2]
   9306/20
regarding [1]
   9380/23
regardless [2]
   9301/4 9301/14
regularity [1]
   9363/25
regulatory [4]
   9371/17 9371/22
   9372/7 9372/15
reinforces [1]
   9371/17
related [5]
   9286/13 9286/17
   9286/18 9286/18
   9287/25
relationship [3]
   9293/25 9316/4
   9316/7
relationships [1]
   9294/11
relative [2]
   9318/11 9318/12
Relaxing [1]
   9371/14 9371/15
relevance [1]
   9294/8
relevant [3]
   9294/10 9310/10
   9363/9
reliable [1]
   9351/23
remaining [1]
   9379/5
remember [1]
   9296/16
removed [1]
   9360/2
renegotiations [1]
   9357/11
reopen [2]
   9319/21 9361/12

repeat [1]   9381/4
rephrase [1]
   9355/25
reply [1]   9385/6
Reporter [3]
   9279/23 9279/23
   9386/3
reports [2]
   9362/19 9363/14
represent [4]
   9285/23 9305/20
   9310/3 9380/20
representative [4]
   9292/24 9368/7
   9374/17 9382/14
representatives
   [1]   9368/1
representing [1]
   9293/22
request [1]
   9318/18
require [9]
   9309/24 9310/20
   9315/14 9315/15
   9315/17 9377/10
   9377/16 9377/19
   9377/25
required [4]
   9288/25 9291/25
   9293/8 9377/13
requirement [1]
   9309/19
requirements [2]
   9315/13 9371/15
research [1]
   9300/16
resecuring [2]
   9361/15 9361/19
reserved [1]
   9365/9
reserves [1]
   9365/23
respect [4]
   9286/22 9314/4
   9319/11 9374/1
responses [1]
   9364/22
responsibilities
   [2]   9313/17
   9381/13
responsibility [1]
   9357/6
responsible [4]
   9313/22 9314/8
   9353/18 9353/23
rest [3]   9283/19
   9298/22 9305/7
restart [1]
   9365/18
restructure [1]
   9318/1
result [1]
   9291/22
results [8]
   9291/2 9300/18
   9300/18 9301/22
   9305/3 9307/2

9307/19 9308/19
retail [3]
   9314/11 9315/25
   9378/21
return [6]
   9288/15 9288/24
   9289/4 9292/25
   9293/7 9376/1
returned [1]
   9290/8
rev [1]   9373/14
revenue [24]
   9295/19 9313/10
   9313/14 9315/23
   9316/23 9317/23
   9318/2 9318/4
   9351/14 9353/18
   9355/9 9357/5
   9357/5 9360/11
   9360/18 9364/15
   9365/11 9365/20
   9365/23 9366/1
   9366/13 9367/15
   9373/18 9382/15
review [3]
   9367/25 9384/2
   9384/16
reviewed [1]
   9306/6
reviewing [1]
   9356/15
reviews [1]
   9285/22
RICHARD [4]
   9280/3 9281/4
   9302/18 9304/2
richer [1]   9311/1
right [50]   9282/6
   9283/22 9284/10
   9285/3 9285/4
   9295/8 9300/22
   9302/24 9303/3
   9303/15 9309/2
   9309/9 9309/12
   9309/22 9309/23
   9310/8 9310/13
   9311/9 9314/13
   9318/8 9318/9
   9352/25 9353/15
   9353/24 9354/8
   9354/11 9354/12
   9356/14 9356/25
   9359/12 9360/3
   9362/5 9362/22
   9363/22 9367/8
   9367/23 9367/24
   9368/21 9368/24
   9368/25 9369/14
   9373/7 9374/10
   9375/18 9375/19
   9379/22 9379/22
   9380/9 9382/18
   9383/14
ripe [1]   9385/4
rising [2]   9295/3
   9295/14
risk [4]   9371/17

**R**

risk... [3]    9371/22 9372/7
9372/16
rival [4]    9360/19
9366/3 9381/22
9382/1
ROI [1]    9296/1
role [6]    9302/23
9313/17 9314/4
9314/6 9316/22
9317/18
roles [1]    9312/23
Ronan [2]    9362/14
9363/14
room [2]    9278/20
9305/7
Rosati [1]
9279/13
Rosenberg [6]
9382/25 9383/9
9383/9 9383/10
9383/11 9383/15
Rosenberg's [1]
9383/1
roughly [1]
9379/9
RSA [25]    9313/13
9317/1 9317/5
9355/12 9355/14
9355/15 9356/17
9356/25 9357/2
9357/8 9357/12
9360/7 9360/12
9361/19 9368/10
9368/16 9369/20
9375/6 9375/12
9375/13 9376/23
9377/2 9377/22
9379/12 9382/2
RSAs [23]    9315/24
9316/10 9316/13
9316/18 9316/19
9316/21 9317/15
9317/17 9351/9
9351/21 9352/23
9353/19 9353/23
9353/24 9354/2
9354/5 9354/7
9354/13 9356/12
9368/19 9378/6
9378/15 9380/16
rule [1]    9283/16
ruling [1]    9319/5
run [4]    9299/25
9300/13 9312/21
9313/1
runs [2]    9363/14
9382/16

**S**

Safari [2]
9351/25 9352/8
Safe [2]    9311/5
9382/7
sale [4]    9314/5
9314/11 9378/14

9378/25
sales [4]    9290/23
9378/12 9378/18
9379/15
salesperson [1]
9293/21
SALLET [5]    9279/6
9280/4 9281/3
9297/2 9302/14
same [10]    9282/2
9293/24 9304/9
9317/24 9318/7
9352/6 9352/21
9356/18 9377/6
9379/18
San [1]    9278/21
savings [4]
9372/25 9372/25
9373/16 9373/17
saying [3]
9363/24 9373/3
9373/20
SCHMIDTLEIN [10]
9279/10 9280/9
9280/10 9280/12
9311/17 9318/19
9351/5 9358/7
9382/5 9382/9
school [1]
9312/14
scratch [2]
9358/18 9371/1
screen [10]
9306/6 9357/24
9369/10 9369/12
9369/15 9369/17
9370/3 9370/4
9371/9 9371/9
seal [1]    9384/10
search [55]
9282/23 9284/7
9284/8 9284/21
9285/6 9285/6
9285/7 9289/20
9303/11 9305/3
9306/2 9306/8
9306/19 9307/2
9308/19 9315/23
9316/15 9316/23
9317/5 9351/12
9351/17 9353/18
9357/4 9357/4
9360/6 9360/20
9361/19 9364/11
9364/12 9364/16
9365/7 9365/8
9365/9 9365/24
9366/3 9366/6
9366/13 9366/13
9366/19 9366/22
9370/14 9370/21
9371/3 9371/7
9371/16 9372/2
9372/14 9377/17
9377/19 9377/20
9377/25 9378/8
9381/22 9382/1

9382/2
searching [2]
9284/22 9310/22
second [17]
9288/2 9289/11
9289/18 9297/12
9299/10 9299/14
9301/12 9301/18
9358/21 9359/20
9364/2 9368/7
9370/5 9373/13
9373/17 9373/22
9376/21
section [9]
9279/7 9299/10
9309/16 9318/17
9364/3 9364/19
9368/9 9368/12
9370/7
secure [1]
9351/23
security [2]
9352/2 9366/16
seeing [1]
9317/22
seek [1]    9385/8
seem [1]    9301/16
segment [4]
9301/6 9301/9
9301/12 9301/18
segments [2]
9284/3 9301/1
select [1]    9365/8
sell [6]    9314/14
9315/9 9315/21
9316/10 9316/14
9376/19
SEM [1]    9291/8
sense [2]    9319/10
9361/3
Sensitive [1]
9364/3
sent [6]    9358/2
9358/19 9372/4
9372/13 9374/8
9374/12
sentence [15]
9290/14 9293/20
9297/18 9298/4
9298/22 9298/24
9359/24 9360/10
9361/11 9369/9
9370/13 9370/25
9371/1 9371/12
9373/22
separate [2]
9319/25 9375/2
SERP [12]    9285/12
9285/24 9304/6
9304/7 9307/14
9307/18 9308/15
9308/17 9309/3
9309/3 9309/9
9309/11
serve [2]    9301/19
9302/1
serves [2]

9301/24 9301/25
service [2]
9303/17 9303/19
services [3]
9316/6 9357/4
9375/15
session [9]
9278/7 9318/18
9318/24 9319/3
9319/6 9319/15
9319/22 9319/24
9351/3
set [6]    9360/21
9362/8 9366/15
9377/20 9379/8
9383/4
sets [1]    9301/20
several [5]
9288/6 9312/11
9317/22 9351/11
9382/12
share [32]
9287/11 9287/14
9290/8 9291/14
9291/16 9291/21
9313/11 9313/14
9315/24 9316/23
9317/23 9317/24
9318/2 9318/4
9318/7 9318/10
9351/14 9353/18
9355/9 9357/5
9360/11 9360/18
9364/15 9365/10
9365/20 9365/24
9366/1 9366/13
9367/15 9373/14
9373/18 9382/15
sharing [1]
9292/19
Shopping [1]
9303/9
short [2]    9299/15
9367/10
shorthand [1]
9366/24
show [10]    9281/12
9287/16 9291/15
9291/20 9299/23
9300/3 9306/5
9307/21 9309/19
9310/11
showed [1]    9304/4
showing [5]
9284/22 9285/11
9296/19 9297/13
9300/20
shown [3]    9305/9
9308/3 9310/6
shows [1]    9299/17
sign [2]    9368/16
9377/1
signal [4]    9284/7
9284/8 9284/18
9284/22
signed [5]    9354/8
9354/13 9362/2

9375/15 9380/16
significant [2]
9314/6 9315/12
signing [1]
9377/9
simply [1]    9316/5
single [5]
9286/10 9286/24
9287/17 9287/24
9295/8
site [1]    9287/15
sites [3]    9284/9
9287/5 9306/19
size [1]    9367/18
slide [2]    9294/19
9306/20
small [3]    9285/6
9297/21 9301/14
smartphone [1]
9318/12
smartphones [3]
9314/2 9314/18
9316/11
software [1]
9314/17
solemnly [1]
9311/10
solutions [2]
9299/23 9300/3
solve [1]    9298/19
somebody [4]
9284/22 9372/9
9372/11 9373/4
sometimes [3]
9296/15 9367/10
9372/17
somewhat [2]
9307/23 9372/18
SOMMER [1]
9279/13
Sonsini [1]
9279/13
sorry [22]    9282/3
9283/4 9284/15
9289/18 9291/5
9293/3 9293/5
9299/1 9299/6
9308/12 9317/10
9318/10 9353/9
9357/5 9358/17
9363/8 9365/17
9371/4 9376/4
9379/3 9380/2
9380/8
sort [17]    9284/21
9306/21 9309/23
9353/2 9354/21
9358/14 9358/15
9359/2 9359/15
9359/19 9363/20
9363/21 9373/3
9375/6 9375/11
9379/20 9383/4
sorting [1]
9298/6
sought [2]    9305/1
9317/25

**S**

sound [1]    9375/18
sounds [1]
  9319/18 9354/12
  9356/14 9375/19
source [1]
  9292/23
South [1]    9278/23
speaking [1]
  9282/25
speaks [2]
  9372/23 9379/5
specific [6]
  9287/8 9306/21
  9310/6 9310/7
  9310/7 9318/15
specifically [1]
  9372/8
specification [1]
  9315/14
spell [1]    9311/22
spoke [1]    9307/6
Sprint [2]    9356/4
  9356/13
squeeze [1]
  9295/18
stage [2]    9282/22
  9283/25
stages [1]    9284/2
stagnant [1]
  9317/25
stands [1]    9289/7
stark [1]    9351/24
start [3]    9283/22
  9288/22 9352/18
started [1]
  9356/9
starting [1]
  9362/6
starts [5]
  9297/19 9359/20
  9369/1 9370/14
  9371/14
state [4]    9279/2
  9279/3 9279/6
  9311/21
statement [3]
  9283/14 9288/6
  9288/13
states [11]
  9278/1 9278/3
  9278/11 9302/17
  9313/11 9314/5
  9314/9 9314/11
  9315/19 9319/9
  9319/16
statistics [1]
  9301/17
still [7]    9317/5
  9317/8 9364/15
  9369/21 9369/25
  9379/18 9385/12
stopping [1]
  9365/5
store [1]    9378/21
stores [2]
  9314/15 9315/9

strategic [1]
  9312/21
Street [3]
  9278/14 9278/18
  9278/23
strike [2]
  9301/19 9301/21
struck [1]    9357/9
structure [1]
  9317/15 9317/16
  9317/21 9367/20
  9368/10 9368/16
  9368/19 9368/22
  9369/20 9376/13
structured [8]
  9290/10 9291/12
  9292/6 9310/15
  9310/16 9310/20
  9310/23 9311/2
structures [1]
  9367/15
studies [4]
  9296/10 9296/12
  9296/15 9296/18
study [1]    9298/3
substantial [1]
  9306/23
suggested [2]
  9300/16 9305/1
Suisse [1]
  9312/13
Suite [2]    9278/23
  9279/4
Suites [1]    9286/3
summarization [1]
  9300/15
summary [2]
  9300/12 9370/10
summer [3]
  9380/24 9381/7
  9381/14
Sundar [1]
  9363/14
supplier [5]
  9292/2 9306/11
  9306/12 9307/20
  9308/3
suppliers [8]
  9306/8 9306/22
  9307/4 9307/13
  9307/24 9308/1
  9308/8 9309/10
support [6]
  9315/14 9361/14
  9361/25 9370/8
  9378/3 9378/25
supporting [1]
  9378/24
suppose [1]
  9352/7
sure [33]    9282/8
  9283/22 9283/22
  9287/19 9289/15
  9296/12 9296/21
  9311/23 9312/6
  9351/13 9351/17
  9352/20 9353/8

9355/4 9355/6
9355/23 9356/3
9357/15 9360/20
9361/4 9363/11
9369/25 9372/22
9372/25 9373/9
9374/5 9375/22
9378/17 9379/1
9379/16 9380/3
9382/24 9383/3
surprised [1]
  9384/6
SVP [5]    9286/5
  9287/13 9287/24
  9303/22 9363/11
SVPs [4]    9291/24
  9291/25 9294/11
  9295/24
SW [1]    9279/11
swear [1]    9311/10
swipe [1]    9369/17
swore [1]    9282/12
symmetry [1]
  9300/2
systems [1]
  9351/24

**T**

T-Mobile [7]
  9313/25 9316/10
  9316/22 9317/2
  9356/4 9356/13
  9382/14
tab [1]    9357/20
tagline [1]
  9287/4
talk [1]    9293/15
talked [8]
  9292/21 9352/1
  9361/23 9366/14
  9371/24 9371/25
  9375/2 9379/13
talking [12]
  9283/25 9284/1
  9308/20 9314/11
  9353/7 9355/23
  9364/20 9365/14
  9366/20 9366/23
  9372/8 9373/21
talks [2]    9369/5
  9372/24
team [19]    9290/23
  9352/24 9352/25
  9353/3 9353/5
  9353/6 9353/14
  9353/16 9353/19
  9353/20 9354/2
  9354/4 9354/16
  9356/8 9356/11
  9356/24 9362/17
  9363/3 9363/14
tease [1]    9356/1
technical [1]
  9315/13
technology [1]
  9312/17
tee [1]    9382/18
telling [3]

9359/1 9359/4
9359/4
term [5]    9293/25
  9299/15 9317/8
  9317/12 9376/9
terminology [1]
  9352/22
terms [3]    9306/22
  9354/21 9355/15
terrific [3]
  9319/16 9384/3
  9384/7
test [2]    9299/25
  9300/6
testified [1]
  9302/22
testimony [11]
  9304/8 9304/18
  9309/20 9311/5
  9311/10 9354/19
  9382/7 9383/1
  9384/10 9385/5
  9385/14
testing [1]
  9300/13
thinking [1]
  9382/23
third [5]    9296/24
  9306/15 9369/1
  9370/13 9383/25
third-party [1]
  9306/15
though [3]    9299/1
  9364/16 9381/21
thoughts [1]
  9382/9
thread [1]    9299/7
three [14]    9282/4
  9299/22 9299/24
  9300/3 9300/4
  9300/8 9308/20
  9318/17 9353/20
  9355/17 9355/23
  9355/23 9356/16
  9382/17
three minutes [1]
  9382/17
Thursday [3]
  9384/9 9384/13
  9384/14
tied [1]    9376/6
tier [4]    9351/14
  9355/9 9369/22
  9369/25
tiers [1]    9376/17
times [2]    9282/4
  9288/6
timing [1]
  9383/20
title [4]    9294/24
  9302/25 9306/1
  9313/5
titled [1]    9306/8
today [10]    9288/6
  9295/25 9296/10
  9304/18 9317/6
  9375/2 9380/17

9382/10 9384/8
9384/11
together [2]
  9310/13 9310/15
told [1]    9382/17
tomorrow [10]
  9382/22 9382/22
  9382/25 9383/5
  9383/8 9383/20
  9383/21 9384/1
  9384/22 9385/16
took [3]    9357/6
  9376/8 9381/7
top [6]    9286/2
  9297/5 9301/8
  9359/20 9364/2
  9376/21
topic [3]    9315/23
  9364/3 9364/23
trade [1]    9284/1
trade-off [1]
  9284/1
traffic [16]
  9286/12 9295/4
  9295/14 9305/21
  9306/16 9306/18
  9306/23 9307/1
  9308/2 9308/5
  9308/7 9308/8
  9308/21 9309/15
  9309/17 9310/18
training [1]
  9378/19
transcript [8]
  9278/10 9281/12
  9281/25 9282/14
  9284/11 9284/14
  9319/24 9386/4
travel [7]
  9282/18 9295/24
  9302/24 9303/1
  9303/2 9303/12
  9307/8
travels [3]
  9304/13 9311/5
  9382/7
tread [1]    9352/21
treated [1]
  9292/4
treatment [1]
  9291/24
trial [2]    9278/10
  9352/8
tried [2]    9300/12
  9366/25
true [2]    9303/5
  9386/4
trust [4]    9300/18
  9300/18 9301/14
  9355/3
truth [5]    9281/20
  9282/12 9311/11
  9311/11 9311/12
try [5]    9287/4
  9293/13 9294/6
  9352/21 9371/5
trying [8]

**T**

trying... [8]
9286/17 9286/19
9286/20 9301/19
9305/5 9309/25
9373/19 9379/16
Tuesday [1]
9384/8
turn [14]    9281/23
9282/9 9282/14
9282/15 9284/14
9288/1 9294/4
9294/18 9298/2
9315/23 9367/3
9370/5 9372/20
9376/21
TV [1]    9312/22
two [22]    9286/2
9289/10 9295/2
9295/11 9295/12
9295/13 9300/7
9301/1 9301/8
9313/8 9353/15
9362/25 9363/21
9373/21 9375/6
9375/8 9375/12
9375/13 9375/15
9376/13 9376/14
9379/4
two years [1]
9353/15
two-deal [2]
9376/13 9376/14
two-page [1]
9289/10
Tyler [1]    9279/3
type [5]    9289/2
9290/15 9306/15
9310/20 9378/19
types [1]    9367/21

**U**

U.S [15]    9278/14
9278/17 9278/20
9278/22 9279/24
9313/24 9314/1
9315/4 9315/24
9316/18 9317/16
9353/21 9368/10
9372/23 9373/14
UBL [1]    9305/19
Uh [1]    9377/5
ultimate [2]
9284/7 9284/21
ultimately [5]
9292/18 9310/4
9315/19 9371/25
9379/12
under [14]    9295/3
9301/2 9316/19
9319/25 9360/12
9373/13 9375/20
9375/23 9375/25
9376/14 9378/18
9379/10 9379/18
9384/10
under-seal [1]

underneath [1]
9295/13
understood [7]
9293/6 9293/23
9299/2 9358/16
9359/6 9362/8
9371/25
unique [1]    9307/9
uniquely [2]
9378/11 9378/21
unit [14]    9287/12
9292/22 9304/7
9304/13 9305/22
9306/24 9307/3
9307/14 9308/14
9308/16 9308/18
9308/19 9308/23
9309/8
UNITED [10]
9278/1 9278/3
9278/11 9302/17
9313/11 9314/5
9314/9 9314/11
9315/19 9319/9
units [3]    9292/6
9308/13 9308/24
University [2]
9312/6 9312/8
unpaid [6]
9305/18 9305/19
9305/22 9306/17
9307/1 9307/3
unrelated [1]
9303/12
unusual [1]
9363/25
up [15]    9295/23
9307/21 9319/2
9352/7 9353/10
9355/23 9357/13
9357/22 9369/13
9373/11 9373/11
9379/5 9379/18
9382/18 9384/1
updated [1]
9368/16
upgrades [2]
9352/3 9366/16
upon [1]    9385/8
upset [1]    9308/9
UPX2093 [5]
9280/22 9357/20
9357/25 9358/5
9358/10
UPX2097 [5]
9280/23 9374/6
9374/8 9374/19
9374/23
UPX293 [3]    9367/3
9367/5 9367/7
usage [4]    9370/14
9370/21 9371/3
9371/7
use [2]    9306/21
9362/3
used [2]    9292/12

9308/24
useful [2]    9285/1
9292/7
user [14]    9282/22
9282/24 9284/24
9285/2 9291/20
9296/17 9298/7
9298/7 9301/25
9302/1 9304/12
9305/4 9310/22
9311/1
user's [1]    9308/4
user-based [1]
9296/17
users [17]    9284/2
9287/1 9289/22
9291/12 9297/15
9300/16 9301/1
9301/3 9301/8
9301/20 9305/21
9351/19 9352/3
9371/18 9371/24
using [1]    9306/25
usually [4]
9282/24 9282/25
9283/25 9284/1
utility [1]
9372/1
utilized [1]
9284/9

**V**

valuable [1]
9366/19
value [23]
9282/25 9288/14
9288/24 9289/4
9289/21 9289/23
9290/2 9290/2
9290/8 9290/11
9291/1 9291/21
9293/2 9293/7
9293/20 9293/24
9294/2 9360/17
9365/11 9366/6
9366/10 9366/20
9366/22
values [1]
9366/12
variety [1]
9312/22
various [1]
9284/2
vast [1]    9314/9
Verizon [39]
9313/25 9315/16
9315/17 9316/9
9316/21 9317/1
9353/13 9356/25
9357/8 9360/2
9360/12 9360/14
9360/25 9362/14
9362/21 9362/23
9363/1 9363/15
9364/6 9364/14
9365/5 9365/19
9369/6 9369/21

9369/24 9370/20
9371/8 9371/10
9371/11 9371/22
9371/25 9372/5
9376/23 9377/1
9381/17 9381/21
9381/22 9381/23
9381/24
Verizon's [3]
9357/2 9360/7
9372/14
VERONICA [2]
9278/16 9385/11
versa [1]    9377/4
versus [3]    9307/8
9307/14 9318/13
vertical [2]
9291/8 9303/3
vice [2]    9359/11
9377/4
video [3]    9312/17
9383/4 9383/6
videos [2]
9382/12 9383/21
videotape [2]
9382/16 9383/19
view [7]    9281/11
9293/18 9297/24
9300/23 9351/9
9357/10 9361/6
viewed [1]    9281/9
views [1]    9289/12
Virginia [1]
9312/6
vis [8]    9307/13
9307/13 9351/16
9351/16 9352/6
9352/6 9378/8
9378/8
vis-a-vis [4]
9307/13 9351/16
9352/6 9378/8
visibility [2]
9307/5 9307/13
visible [1]
9298/8
voice [3]    9294/25
9295/9 9353/10
voiced [1]    9295/7
VP [2]    9302/23
9312/25

**W**

wait [2]    9288/2
9385/9
wants [1]    9285/3
Washington [5]
9278/5 9278/15
9278/18 9279/12
9279/25
way [8]    9291/14
9299/25 9301/21
9353/22 9365/6
9374/11 9376/18
9378/5
ways [1]    9308/6
web [1]    9292/7
Webb [1]    9279/3

Webber [1]
9312/13
week [3]    9382/19
9383/7 9384/9
welcome [2]
9281/2 9311/15
what's [6]
9290/20 9307/9
9358/23 9359/2
9359/16 9384/8
whenever [1]
9311/17
whereas [1]
9378/10
who's [1]    9319/6
whole [3]    9307/20
9310/14 9311/11
widget [1]
9351/17
WILLIAM [1]
9279/3
Williams [1]
9279/11
willing [2]
9283/24 9297/20
Wilson [1]
9279/13
win [2]    9379/24
9379/24
win-win [1]
9379/24
wireless [1]
9315/8
withdraw [1]
9281/24
within [6]
9287/11 9287/12
9307/5 9307/6
9307/14 9307/17
without [5]
9292/2 9309/25
9310/12 9315/25
9373/4
witness [4]
9280/2 9285/22
9311/8 9382/25
word [1]    9288/10
words [2]    9291/25
9308/24
work [10]    9289/21
9291/17 9303/7
9303/9 9303/11
9312/10 9312/15
9312/16 9312/21
9352/2
workarounds [1]
9383/15
worked [7]
9303/14 9303/20
9303/21 9303/22
9312/2 9312/12
9312/18
working [2]
9284/24 9312/10
works [1]    9372/11
world [3]    9313/23
9351/22

**W**

wrapped [1]
  9319/2
written [4]
  9295/23 9295/23
  9372/9 9372/17
wrong [2]   9281/25
  9288/2
wrote [6]   9360/24
  9360/24 9361/4
  9361/5 9361/8
  9361/20

**Y**

Yahoo [22]
  9312/20 9364/7
  9364/11 9364/12
  9364/14 9364/16
  9364/23 9365/6
  9365/7 9365/19
  9369/6 9369/21
  9370/1 9370/3
  9370/16 9370/20
  9371/4 9371/4
  9371/8 9372/1
  9372/6 9382/2
year [1]   9312/17
years [7]   9290/6
  9303/5 9312/3
  9313/8 9317/22
  9353/15 9362/1
Yep [1]   9301/11
yesterday [1]
  9288/4
York [6]   9279/5
  9279/14 9285/12
  9285/25 9286/16
  9302/8

**Z**

Zahavah [1]
  9360/1