```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,
     et al.,                              Civil Action
 4                    Plaintiffs,         No. 1:20-cv-3010

 5            vs.                         Washington, DC
                                          November 7, 2023
 6   GOOGLE, LLC,                         1:37 p.m.

 7                    Defendant.          Day 36
     _____/    Afternoon Session
 8

 9                   **█████ PROCEEDINGS**

10             TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE AMIT P. MEHTA
11             UNITED STATES DISTRICT JUDGE

12

     APPEARANCES:
13

14   For DOJ Plaintiffs:    KENNETH DINTZER
                               U.S. Department of Justice
15                             1100 L Street, NW
                               Washington, DC 20005
16
                             MEAGAN BELLSHAW
17                           VERONICA ONYEMA
                             MATTHEW JONES
18                             U.S. Department of Justice
                               450 Fifth Street, NW
19                             Washington, DC 20001

20                           JEREMY GOLDSTEIN
                               U.S. Department of Justice
21                             450 Golden Gate Ave, Room 10-101
                               San Francisco, CA 94102
22
                             DAVID DAHLQUIST
23                             U.S Department of Justice
                               209 South LaSalle Street, Suite 600
24                             Chicago, IL 60604

25
```

```
 1     APPEARANCES CONT:

 2     For Plaintiffs
       State of Colorado &
 3     State of Nebraska:      WILLIAM CAVANAUGH, JR.
                                Patterson, Belknap, Webb & Tyler, LLP
 4                              1133 Avenue of the Americas #2200
                                Suite 2200
 5                              New York, NY 10036

 6     For Plaintiff
       State of Colorado:      JONATHAN SALLET
 7                              Colorado Department of Law
                                CPS/Antitrust Section
 8                              1300 Broadway, 7th Floor
                                Denver, CO 80203

 9

10     For Defendant Google:   JOHN SCHMIDTLEIN
                               GLORIA MAIER
11                              Williams & Connolly, LLP
                                680 Maine Avenue, SW
12                              Washington, DC 20024

13                             MICHAEL SOMMER
                                Wilson, Sonsini, Goodrich & Rosati
14                              1301 Avenue of the Americas, 40th Fl.
                                New York, NY 10019

15

16

17

18

19

20

21

22

23     Court Reporter:         JEFF HOOK
                                Official Court Reporter
24                              U.S. District & Bankruptcy Courts
                                333 Constitution Avenue, NW
25                              Washington, DC 20001
```

1

**I N D E X**

2

**WITNESS**                                                      **PAGE**

3

ADRIENNE MCCALLISTER

4

  Direct Examination by Mr. Schmidtlein              9323

5

  Cross-Examination by Mr. Goldstein                 9344

6

  Redirect Examination by Mr. Schmidtlein            9348

7

8

9

**E X H I B I T S**

10

11

        NO EXHIBITS WERE MARKED IN CLOSED SESSION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 ██████ **PROCEEDINGS**

2      **THE COURT:**  Mr. Schmidtlein.

3      **DIRECT EXAMINATION OF ADRIENNE MCCALLISTER**

4 **BY MR. SCHMIDTLEIN:**

5      **Q.**  Ms. McCallister, I'd like to start with the

6 negotiations that led to the execution of the 2021 RSA with

7 Verizon.

8      What do you recall were notable issues that were

9 addressed or discussed during the negotiations with Verizon?

10     **A.**  There were a few.  I would say the first was there

11 was a lot of discussion about our structure with the revenue

12 share reduction and pivoting to a go-to-market agreement as

13 well.  So we had lots of back and forth with Verizon about

14 that.

15     **THE COURT:**  I'm sorry, could you say that again?  Rev

16 share reduction and a go-to?

17     **THE WITNESS:**  Go-to-market pivot.  So it was a separate

18 agreement where we negotiated some go-to-market activities,

19 marketing activities and obligations that Verizon would take

20 on.  So that was certainly one of them.  It took us a while

21 to kind of explain the rationale and work through that with

22 Verizon.  ████████████████████████████████████████████

23 ████████████████████████████████.  We were able to

24 resolve that.

25     And then Verizon also had a request to be able to

1    pre-load a Yahoo! mobile home app on their devices and still

2    be paid out at the highest revenue share tier.  And there

3    were a lot of discussions around that particular point as

4    well.

5    **BY MR. SCHMIDTLEIN:**

6        **Q.**  Okay.  I want to follow up on a couple of those.  You

7    said that there were --

8        **MR. SOMMER:**  Your Honor, I'm sorry to interrupt.  I just

9    got a message from my associate that the public line is still

10   open.  Sorry.

11       **THE COURT:**  No, I appreciate you letting us know that.

12   Thank you.

13       (Brief interruption)

14   **BY MR. SCHMIDTLEIN:**

15       **Q.**  Ms. McCallister, you made reference to the fact that

16   there were a lot of initial discussions with Verizon around

17   the reduction in the revenue share or a proposed reduction in

18   revenue share.

19       When you say discussions, can you be a little more

20   colorful, perhaps, in explaining that?

21       **A.**  Sure, sure.  Well, let's say there was some initial

22   displeasure on behalf of Verizon.  It's natural.  I would

23   expect that Verizon would initially react that way when we're

24   discussing reducing revenue share.  However, as I mentioned

25   before, the situation in the U.S. was such that our overall

1    absolute revenue share payments had been increasing to

2    Verizon, and yet our Android share was stagnant to declining.

3    So we started to kind of walk through the rationale with

4    Verizon and say, you know, we want to take those savings from

5    the revenue share and re-purpose them into this go-to-market

6    agreement.

7        So it was never our intention to pay out less money to

8    Verizon.  We just wanted the money that we spent to be more

9    impactful by moving some of this into this go-to-market deal

10   for a separate function.  And so, ultimately, we were able to

11   resolve that with Verizon.

12   **Q.**  And the go-to-market agreement, I'm not going to ask

13   you to recite from memory all the various components of the

14   go-to-market agreement, but can you give the Court some

15   examples of some of the things that Google was funding or was

16   prepared to fund as part of the go-to-market agreement?

17   **A.**  Sure, a few different examples.  One, we wanted to

18   make sure that Verizon in this instance was giving Android

19   equal share of voice in some of the advertising that they

20   did, whether it's above-the-line TV or radio ads or some

21   other direct marketing.  We also wanted to make sure that

22   they trained their retail store associates about Android.

23   And we kind of went through a whole list and back and forth

24   about some of these other marketing-type activities that

25   Verizon themselves were uniquely able to do in order to help

1    drive additional sales of Android devices.

2        Q.   And would you agree or disagree that even the

3    go-to-market sort of agreement concept was negotiated and

4    evolved as part of your discussions with Verizon?

5        A.   Absolutely.  We had never actually done those types

6    of go-to-market deals with carriers in the past.  So we had

7    an initial idea, but it was really a lot of back and forth

8    until we got to a place where both Google and Verizon were

9    comfortable with what was in that agreement.

10       Q.   And just so we're clear, was the go-to-market

11   agreement a separate, standalone agreement from the RSA?

12       A.   It was a separate agreement, yes.

13       Q.   So that if, for example -- let me strike that.

14   Were they signed and executed at or around the same time?

15       A.   They were signed and executed at or around the same

16   time, but they were not contingent on one another.

17       Q.   You also made reference to negotiations or to some

18   discussions with Verizon around a request by Verizon relating

19   to the Yahoo! mobile home application; is that right?

20       A.   Correct.

21       Q.   And what was the Yahoo! mobile home application, as

22   you understood it?

23       A.   So what we came to understand is that the Yahoo!

24   mobile home application was really a content and utility app

25   that had Yahoo! News, Yahoo! Sports, Yahoo! Finance, but it

1    also had an entree point into Yahoo! Search.

2        Q.   And why was the Yahoo! home application an issue in

3    connection with Yahoo! getting paid out at the highest level

4    of the proposed revenue share agreement?

5        A.   Sure.  So the notion that we believe is that in --

6    when we are partnering with a carrier and paying them out at

7    the highest revenue share tier, we really want them to be a

8    partner.  And as such, that they should be working with us on

9    promotional exclusivity; that they're not promoting a rival

10   search engine at the same time.  And so when they came to us

11   initially with a request, we were concerned that Yahoo! was

12   kind of a rival search engine in that instance.

13       But once we understood from Verizon that, on the one

14   hand, it really was meant to be a content and utility app, it

15   was not a search forward experience, through the course of

16   the negotiations we were able to come to alignment that they

17   could place the Yahoo! mobile home app on the minus-one

18   screen and still be paid out at the highest revenue share

19   tier.

20       Q.   Now, did Google initially agree to Verizon's ask

21   about being able to be paid out at the highest revenue share

22   tier?

23       A.   Not initially, no.  We thought under the constructs

24   of the deal we had with them at the time -- or we were

25   discussing with them at the time that they had the

1    optionality to go ahead and put that Yahoo! mobile home app

2    on the device, just not get paid out at the highest revenue

3    share tier.  And they did not agree with us, and so hence the

4    discussion.

5        Q.  Okay.  And I think you stated that eventually

6    Yahoo! -- I'm sorry, Verizon and Google were able to reach an

7    agreement; is that fair?

8        A.  That's right, yes.

9        Q.  I'll show you what we've marked as DXD36.  This is a

10   demonstrative exhibit that I'd like to review with

11   Ms. McCallister.  Can you put up slide 002.

12       Do you recognize this demonstrative exhibit,

13   Ms. McCallister?

14       A.  Yes, I do.

15       Q.  And did you work with my team to put this together?

16       A.  Yes, I did.

17       Q.  Okay.  Can you summarize what this slide depicts?

18       A.  Sure.  So essentially, we had several different

19   constructs for sharing revenue with Verizon under the 2021

20   agreement.  For a set of core devices, ██████████████████

21   ████████████████████████████████████████████ with Google

22   Search in the hotseat and set as default.  ████████████████

23   ████████████████████████████████, and they also were

24   required to push security and letter upgrades.  And in

25   return, they would get a █ percent net revenue share for new

1    devices.

2    Q.   And what was the █ percent paid on for the core

3    devices?

4    A.   That was paid off of Google -- the Google Search -- I

5    think it was the Google Search -- I can't remember exactly.

6    I don't want to misspeak.

7    █    ███████████████████████████████████████

8    █    ████████████████████

9    Q.   And you make reference there to █ percent net revenue

10   share, and then new devices?

11   A.   Yes.

12   Q.   What's the difference between a new device and a

13   legacy or an existing device that's referenced here?

14   A.   Sure.  So a new device are devices that are sold to a

15   consumer or user during the term of the deal.  We also had a

16   definition of qualifying devices.  We sometimes called it

17   installed base of devices.  And that was a recognition that

18   those were devices that were sold by Verizon under the

19   previous deal, and there were still ongoing obligations that

20   we ask Verizon to do.  Namely, we wanted them to ensure that

21   the devices remained in the prior configuration that we had

22   negotiated with them and approved, and that they continued to

23   push security and letter upgrades to those devices in the

24   field.  And in return, we would pay them a █ percent net

25   revenue share.

1    Q.  Can you just briefly describe for the Court what a

2    security upgrade is?

3    A.  Sure.  If the Android operating system needs to

4    push -- we find a security vulnerability, we need to kind of

5    push a security upgrade.  And similarly, letter upgrades.

6    Approximately once a year, Android pushes a new version of

7    the operating system to improve the user experience, add new

8    features and functionality.  And we need the carriers to

9    actually do the work to push those upgrades onto the devices

10   on their network.

11   Q.  And what is a letter upgrade, in Google vernacular?

12   A.  Sure.  So each version of the Android operating

13   system has a letter associated with it.  I think we

14   started -- I think we might have started with C and D, and

15   there's also a dessert designation.  I think we might be up

16   to U, Upside Down Pineapple Cake, right now.

17   Q.  And what was the relevance or the significance of

18   letter upgrades?

19   A.  They were huge.  I mean, you have to keep in mind a

20   lot of the RSA was about creating these devices -- Android

21   devices to be competitive versus Apple iPhones.  Apple is

22   able -- has been able to push their own operating system

23   updates on their own without the coordination of the

24   carriers.  And at some point in time, that ended up being

25   viewed as negative about Android phones.  And so we really

1    needed to ensure that the carriers helped push those letter

2    upgrades, as well as the security upgrades, so we could be

3    competitive with Apple's iPhone.

4        Q.  Now, under the preferred device tier or level,

5    there's a reference to device-by-device.  The Court has heard

6    about that, but can you explain what device-by-device means

7    in this context?

8        A.  Sure.  It just means that for every major device

9    model -- in this instance, Verizon could choose which tier

10   they wanted that device -- which configuration they wanted to

11   put on that device.  So it could be a core device or they

12   could choose to configure that device so it qualified for the

13   preferred tier revenue share.

14       Q.  And am I correct that it makes reference here under

15   the core device that a -- that Verizon could pre-load an

16   alternative search engine, like Bing or DuckDuckGo, on the

17   default home screen and still be paid out at the core device

18   level; is that right?

19       A.  That's correct.

20       Q.  During the course of the negotiations that you had

21   with Yahoo!, was there ever a discussion or was it ever

22   raised by Verizon, any notion that Yahoo! Search was a

23   superior search engine to Google?

24       A.  No.

25       Q.  You mentioned that they were interested in having or

1    raising this Yahoo! mobile home application carve-out.  It

2    was part of the final deal.

3        Why was Verizon -- if you ever understood, why was

4    Verizon interested in pursuing pre-loading the Yahoo! mobile

5    home application?

6        A.  So my understanding is that several years before,

7    Verizon had acquired a number of different assets under a

8    brand called Oath, including the Yahoo! assets.  And the way

9    it was positioned to us was, you know, we just need to help

10   out our sister company.  And we were trying to help the

11   Yahoo! home mobile app get some distribution.  But it was

12   never really meant to be a search forward experience, and so

13   that was the nature of their desire to get the Yahoo! home

14   mobile app on the phone.

15       Q.  And was it your understanding -- or did you have an

16   understanding as to sort of when during the course of the

17   negotiations the Yahoo! home mobile application ask was made?

18       A.  I became involved myself in about June 2019, and it

19   didn't become apparent to me that this was a request until

20   about August of 2019.  It may have been made before, but

21   that's when I became aware of that.

22       Q.  And who was the person who was your sort of

23   counterpart in negotiations for Verizon?

24       A.  Brian Higgins.

25       Q.  I next want to talk about AT&T and the RSA

1    negotiations that you had with them.  Were there particular

2    issues that took time to resolve with AT&T before you were

3    able to reach agreement with them on an RSA?

4        A.   Really, primarily the biggest issue was, similar to

5    Verizon, we had to explain the concept of the reduction in

6    revenue share in the RSA, and re-purposing and pivoting it

7    into this go-to-market agreement.

8        Q.   Now, did they raise anything about the Yahoo! mobile

9    home application?

10        A.   No, they did not, no.

11        Q.   And during the course of the negotiations with AT&T,

12    was there ever any discussion about pre-loading another

13    search engine, like Bing or Yahoo! or DuckDuckGo, on any

14    Android device?

15        A.   No, there was not.

16        Q.   Was there any pushback or opposition to the pre-load

17    promotion exclusivity or any of the other requirements of the

18    agreement that related to having Google Search on the device?

19        A.   No.

20        Q.   Now, you testified previously -- and we looked at the

21    last demonstrative that talked about a core tier and a

22    preferred device tier.  Did you -- as part of the

23    negotiations with AT&T, did you make multiple tiers available

24    to AT&T?

25        A.   We did give them that option, yes.

1     **Q.**  And did those two tiers -- or did multiple tiers end

2     up in the final RSA that Google signed with AT&T in

3     June 2021?

4     **A.**  No.

5     **Q.**  Why not?

6     **A.**  AT&T did not feel that they would make use of the

7     core tier.  So to simplify, they shared with us that their

8     intention was to enroll all of the devices at the preferred

9     tier.

10     **Q.**  And can we look at the next -- this is DXD36.003.

11     Does this demonstrative summarize sort of the key -- some of

12     the key provisions of the 2021 AT&T Android RSA?

13     **A.**  Yes.

14     **Q.**  And can you, again, just sort of briefly summarize

15     those?

16     **A.**  Sure.  So for the preferred device tier -- which,

17     again, was device-by-device, so AT&T could, for any device

18     model, choose to enroll it or not.  Their obligations was to

19     ██████████████████████████████████ and default with

20     Google Search.  We had promotional exclusivity vis-a-vis

21     other alternative search services, and they were also

22     required to push security and letter upgrades.

23     **Q.**  And then we also -- you talked previously about the

24     qualifying devices.  These were the installed base devices?

25     **A.**  Correct, yes.

1    **Q.** And were the provisions for the qualifying devices

2    roughly the same as with Verizon?

3    **THE COURT:** I'm sorry, installed base devices? I'm not

4    quite sure I understand what that means.

5    **BY MR. SCHMIDTLEIN:**

6    **Q.** Can you explain it to the Court?

7    **A.** Sure, yes, I'll explain it again. So qualifying

8    devices and installed base I use somewhat interchangeably.

9    They are devices that AT&T would have sold under the prior

10   agreement, and yet by signing this new agreement they were

11   continuing to take on obligations. So they were the

12   installed base, and so --

13   **THE COURT:** I see. So these are already devices --

14   **THE WITNESS:** Already in the market. But from our

15   perspective, it was still important for AT&T to push these

16   particular -- the security upgrades and the letter upgrades

17   for these devices, whether they were a year old, two,

18   three years old.

19   **THE COURT:** So the RSAs -- I guess I should have realized

20   this, but the RSAs, the revenue share payment for any -- that

21   comes off of any particular device is governed by the RSA at

22   the time of the search as opposed to the RSA at the time that

23   the device was pushed to market? Does that make sense?

24   **BY MR. SCHMIDTLEIN:**

25   **Q.** Let me formulate a question to see if I can get her

1    to address your question.

2        Each of these RSAs are for a term of years, correct?

3        **A.**   Correct.

4        **Q.**   So hypothetically, if Google had not been able to

5    enter into an RSA agreement with a carrier and the current

6    agreement lapsed, would Google continue to have an obligation

7    to make revenue share payments for devices that had been sold

8    during that prior time period when the agreement was in

9    effect?

10       **A.**   Generally not, conceptually not.  There may -- and I

11   don't know for certain, there could have been a wind-down

12   provision that said we paid for, I don't know, 36 months

13   after the term of the deal.  But in general, we would not pay

14   on those devices if there were not a subsequent deal.

15       **THE COURT:**  I see.

16       **MR. SCHMIDTLEIN:**  Does that --

17       **THE COURT:**  I think so.  I think I understand.

18       **MR. SCHMIDTLEIN:**  It's complicated, that's for sure.

19       **THE COURT:**  Well, I guess let me just make sure I

20   understand.  So say there's an agreement that ended in 2021,

21   went from '19 to '21.  A device that's purchased during that

22   period continues into 2022.  So the device that is being used

23   in 2022 that's from the prior period, that is subject to

24   which revenue share?  From the new deal, right?

25       **THE WITNESS:**  That's right.  That would be subject now to

1     the qualifying device revenue share.

2         THE COURT:  Understood.  Even though perhaps because it

3     was a new device and received a higher rev share in the prior

4     agreement, under the newer agreement, at least as it's

5     presently structured, it gets a lower rev share?

6         THE WITNESS:  That's right.  And the notion, again, was

7     like by taking those savings from the previous rev share now

8     down to ███ percent, we used those funds into the separate

9     go-to-market deal to be spent in a different way.

10        THE COURT:  Okay, thank you.

11    BY MR. SCHMIDTLEIN:

12        Q.  And are you aware of any devices that AT&T decided

13    not to enroll in the 2021 RSA agreement?

14        A.  No, I am not.

15        THE COURT:  I'm sorry, did I understand you to say that

16    even though the agreement is device-by-device -- in other

17    words, AT&T has a choice -- it ultimately chose to enroll all

18    of its devices at the highest tier?

19        THE WITNESS:  As far as I'm aware, yes.

20        THE COURT:  Thank you.

21    BY MR. SCHMIDTLEIN:

22        Q.  And as -- again, just to follow up on that.

23    Obviously during the course of the length of the agreement,

24    new device models can come out from a Samsung or a Motorola

25    or another Android manufacturer; is that fair?

1      A.   That's correct.

2      Q.   And each time one of those comes out, a carrier has a

3   decision about whether or not they're going to support and

4   sell those devices in their stores; is that right?

5      A.   That's right.

6      Q.   And so with each one of those new devices, does the

7   carrier have the option as to whether or not they want to opt

8   in or opt out a device from the RSA?

9      A.   Yes, they do.

10      THE COURT:   Can I just ask, the drop in rev share, did

11   that only apply to qualifying devices?

12      THE WITNESS:   There was a reduction in rev share, even

13   for the highest tier as well, as well as for the installed

14   base.

15      THE COURT:   Okay.   I was just trying to understand that.

16   BY MR. SCHMIDTLEIN:

17      Q.   And I was going to get that, I'll ask it right now.

18      What was the revenue share percentage that had existed

19   under the prior agreement?

20      A.   I believe with Verizon, it was ██ percent down to ██

21      Q.   And so --

22      THE COURT:   I'm sorry, we're talking about Verizon or

23   AT&T right now?

24      THE WITNESS:   Oh, I'm sorry, with Verizon.   But I believe

25   it was ██████ for AT&T.

1      **THE COURT:**  So with Verizon it was ▓ and ▓ with

2   AT&T?

3      **THE WITNESS:**  I believe so, yes.  I mean, I didn't

4   negotiate those deals, but yes, I believe so.

5   BY MR. SCHMIDTLEIN:

6      **Q.**  And so the revenue share on the new devices for those

7   deals was reduced from ▓ percent to ▓ percent?

8      **A.**  That's right.

9      **Q.**  And let's talk last about the T-Mobile RSA

10  negotiation.  Was Google's approach to the negotiations with

11  T-Mobile similar to with Verizon and AT&T?

12     **A.**  Yes, it was.

13     **Q.**  And how did T-Mobile react to Google's new RSA

14  approach?

15     **A.**  Shockingly similar.  They had a very similar

16  reaction, concern about the drop in revenue share.  But like

17  we did with the others, we walked them through the rationale.

18  They understood that none of the carriers wanted to live in a

19  world where Android's share continued to decline.  It's not

20  in their best interests to become an iPhone reseller solely.

21  And so they wanted to work with us ultimately on

22  restructuring those deals.

23     Our goal, intent was not to change or lower the overall

24  payments to any of the carriers, but, again, to reconfigure

25  them to be more effective and impactful in order to drive

1    Android device sales.

2        **Q.**   Now, were there any other notable differences in

3    terms of asks that T-Mobile had in response to Google's

4    initial proposal around revenue share and other requirements?

5        **A.**   So the most notable difference is that T-Mobile

6    actually asked us not to necessarily do a revenue share, but

7    to convert our relationship to a bounty.

8        **Q.**   And explain to the Court in this setting, what would

9    a bounty look like?

10       **A.**   Sure.  So for qualifying -- or preferred devices,

11   they wanted us to pay a per-device dollar amount per month.

12       **Q.**   And does Google have a preference between a revenue

13   share versus a bounty when it comes to these types of

14   agreements with carriers?

15       **A.**   In general, we prefer for our RSAs to be revenue

16   share.  If our revenue goes up, it's a win-win.  If our

17   revenues go down because there's a global pandemic, we share

18   the proportional amount with them.  So that's our general

19   preference.

20       **Q.**   And I'm sorry, do you know why they wanted a bounty

21   rather than a revenue share?

22       **A.**   You know, what they shared with us was that they

23   wanted to have more predictability on their incoming cash

24   flows, and they felt that they had more control over how many

25   Android devices they sold in a given month versus how much

1    revenue Google generated in a given month.  So they wanted

2    more predictable cash flows.

3        Q.  And were there things that were driving the need for

4    that more predictable cash flow?

5        A.  Our interpretation was that they had just -- they

6    were in the middle of, and I think prior to us closing, they

7    closed the acquisition of Sprint.  So that was a significant

8    outlay for T-Mobile, as well as they had -- like a lot of

9    carriers, they had significant capital expenditures trying to

10   upgrade their network to 5G, the latest iteration of

11   cellphone technology.

12       MR. SCHMIDTLEIN:  Your Honor, I'm mindful of the time,

13   but I think I can finish this if Mr. Court Reporter can hang

14   on for --

15       THE COURT:  And we're also probably about 25 minutes in,

16   so try to be mindful of the time we've told folks.

17   BY MR. SCHMIDTLEIN:

18       Q.  Can we put up on the screen the last slide here.

19       Ms. McCallister, does this summarize some of the key

20   terms of the 2021 T-Mobile agreement?

21       A.  Yes, it does.

22       Q.  And again, can you -- many of these look similar, so

23   I'm not going to ask you to run through them.  But can you

24   highlight the key difference from the other deals?

25       A.  Sure.  So the key difference is that you can see in

1    the preferred device tier, we agreed to pay a bounty to

2    T-Mobile of ██████ per new active device per month.  And

3    for qualifying devices, the installed tier, we agreed to pay

4    a bounty of ██████ per existing active device per month.

5         Q.  And I notice here that, similar to AT&T, there was

6    only a preferred device and a qualifying device.  There isn't

7    a core device.

8         Did Google make available to T-Mobile the core device

9    option?

10        A.  Yes, we did.

11        Q.  And did T-Mobile ask that that not be included in the

12   final agreement?

13        A.  They requested that it be taken out.

14        Q.  And did they indicate an intention about where they

15   wanted to enroll their devices or what they assumed they

16   would do?

17        A.  They were --

18        MR. GOLDSTEIN:  Objection, Your Honor.  To the extent

19   this relies on hearsay for statements that T-Mobile made, we

20   would object to that testimony.

21        THE COURT:  I think these are being offered for the

22   impact it had on the course of the negotiations.  I suppose

23   if she's -- I can't remember what the exact question was, but

24   it explains why things ended up where they did.  If the

25   question is designed to elicit a reason why T-Mobile wanted

1    something, I suppose there's some hearsay issue to it.  But

2    we're at a bench trial, so it's okay.  Go ahead.

3    **BY MR. SCHMIDTLEIN:**

4         **Q.**  During -- you can answer.

5         **A.**  Do you mind repeating the question?

6         **Q.**  Sure.  Do you have an understanding as to why we only

7    ended up with two tiers rather than the third tier that you

8    testified to previously?

9         **A.**  Sure.  We were told that T-Mobile did not believe

10   they would make use of the core tier, and their intention was

11   to enroll most of the devices into the preferred device tier.

12        **Q.**  And during the course of the negotiations with

13   T-Mobile, was there pushback or complaints made about any of

14   the search or exclusivity provisions that were set forth in

15   the agreement?

16        **A.**  No.

17        **Q.**  In your view, do the RSAs help make Android devices

18   more competitive versus Apple's devices?

19        **A.**  Yes, absolutely.  I think, first, having the --

20        **THE COURT:**  I'm sorry to interrupt, you'll forgive me.

21   But if that's the -- is that something we could ask in closed

22   session unless -- in open session, unless there's something

23   more specific to these agreements?

24        **MR. SCHMIDTLEIN:**  That's my last question.

25        **THE COURT:**  So why don't we ask that last question in

1    open session, and then we can move to the cross-examination.

2        But let me ask, in light of what you've heard, do you

3    still --

4        MR. GOLDSTEIN:  I think we'll have just a couple of

5    minutes in the closed session, probably under five minutes.

6        THE COURT:  Let's go ahead and do the closed session

7    cross, and then we'll move to open session.

8        I think he's done with his closed session examination, so

9    you're up.

10        <u>**CROSS-EXAMINATION OF ADRIENNE MCCALLISTER**</u>

11    BY MR. GOLDSTEIN:

12    Q.  Hi, Ms. McCallister.  My name is Jeremy Goldstein, I

13    represent the United States.

14    A.  Hello.

15    Q.  I have just a couple of questions for you in closed

16    session.  I'd like to refer to the demonstrative that you

17    received from counsel just to sort of speed things up a

18    little bit.

19    A.  Okay.

20    Q.  So the first thing is, for each of the major

21    carriers, there is a qualifying devices tier, correct?

22    A.  Correct.

23    Q.  And your testimony is, essentially, those were for

24    devices that had already been sold and were out in the field?

25    A.  That's right.

1    **Q.**  You mentioned that the revenue share for that tier

2    required the carriers to continue to make security updates;

3    is that right?

4    **A.**  Correct.

5    **Q.**  I see underneath that, that in the demonstrative, it

6    says devices remain in prior configuration?

7    **A.**  Correct.

8    **Q.**  And that meant that if the prior RSA required Google

9    Search to be a default, that would be a requirement to

10   qualify for that tier?

11   **A.**  Whatever the requirements were -- and I can't speak

12   to them with a great degree of certitude.  Whatever those

13   requirements were, they needed to keep those configurations

14   in place.

15   **Q.**  Got it.  So if there were terms relating to the

16   default status for search engines on the phone, that would

17   need to continue?

18   **A.**  Correct.

19   **Q.**  And if there were terms relating to prohibition on

20   alternative search services on the device, that would also

21   continue into the future?

22   **A.**  The terms that were in place, they needed to keep

23   those configurations in place.

24   **THE COURT:**  I'm sorry, can I ask what that means?  In

25   other words, these are existing devices that people are

1     using.  So say I'm a user that actually switched the default

2     of my browser to DuckDuckGo.  Does that mean Verizon would

3     need to switch back to the original default?

4         **THE WITNESS:**  No, it does not mean that.  But it means

5     that to qualify as a qualified device or installed tier, they

6     wouldn't prompt somebody, for example, that was using Google

7     Search to then move to DuckDuckGo.

8         **THE COURT:**  I see.

9         **THE WITNESS:**  So it's sort of the opposite.  You know, of

10    course they respect a user changing, but they couldn't -- the

11    carriers themselves couldn't do a push to change those

12    configurations.

13        **THE COURT:**  In other words, they couldn't engage in any

14    promotional activity to encourage users to switch to a

15    different --

16        **THE WITNESS:**  That's right.

17        **THE COURT:**  Thank you.

18    **BY MR. GOLDSTEIN:**

19        **Q.**  And then I believe you mentioned a wind-down period,

20    the concept of a wind-down period?

21        **A.**  Yes.  But I don't know if there was a wind-down

22    period or not, so I can't speak to that.  I was just -- that

23    was illustrative.

24        **Q.**  Got it.  But you're familiar with the concept of a

25    wind-down period?

1    A.  Sure.

2    Q.  And under -- if there was no wind-down period in the

3    RSA, essentially when the agreement expired all payments from

4    Google to the carriers would stop?

5    A.  Under the RSA, if there was no renewal or a new deal,

6    then yes.

7    Q.  Are you aware that prior to the signing of the --

8    well, apologies.  Let me scratch that and re-ask.

9    In the course of negotiating the June 2021 agreements,

10   did it come to your awareness that certain carriers did not

11   have wind-down periods, but asked for wind-down periods?

12   A.  I don't recall wind-down periods being a major area

13   of negotiation.

14   Q.  Are you aware that the carriers wanted wind-down

15   periods?

16   A.  It wasn't something that I was involved in discussing

17   with the carriers.

18   MR. GOLDSTEIN:  That's all I have for the closed session.

19   THE COURT:  Just so -- because I probably missed it, can

20   you just explain to me again what a wind-down period is, and

21   what its relevance is to these types of agreements?

22   THE WITNESS:  Sure.  I think -- and we do have wind-down

23   periods, at least in some of them, but again, like I wasn't

24   involved.  But the general concept is that if a carrier sold

25   a device during an active term and then the term closed and

1    there was no renewal, that for some period of time --

2    three months, six months, we would continue to pay out on

3    those devices for that period of time.

4    **THE COURT:**  I see.

5    **THE WITNESS:**  In recognition that they were -- oftentimes

6    they still have ongoing obligations, for example, during that

7    wind-down period as well.  So it's in recognition that

8    sometimes it takes devices a while to get through the

9    channels.

10    **THE COURT:**  Okay, thank you.

11    Mr. Schmidtlein, any redirect on those topics?

12    **REDIRECT EXAMINATION OF ADRIENNE MCCALLISTER**

13    **BY MR. SCHMIDTLEIN:**

14    **Q.**  Are you familiar with the term "OTA"?

15    **A.**  Yes.

16    **Q.**  Over-the-air?

17    **A.**  Yes.

18    **Q.**  Going back to the questions that you were asked -- or

19    I think the Judge asked you about the requirements of sort of

20    keeping the devices in the same sort of configuration in

21    order to get the qualifying device revenue share payment.

22    If there wasn't that provision in the agreement, would it

23    be possible for a carrier, for example, to be able to

24    reconfigure, push out to prior devices other applications

25    like a Bing or a DuckDuckGo?

1      **A.**   Yes.

2      **Q.**   So the purpose of the qualifying device provision was

3    so that in order to continue to get the rev share, the

4    carrier wasn't permitted to do that -- engage in that sort of

5    activity?

6      **A.**   That's right.  That, and making sure that they

7    continued to push the security and letter upgrades.

8      **MR. SCHMIDTLEIN:**   That's all I've got, Your Honor.

9      **THE COURT:**   Thank you, Mr. Schmidtlein.

10    So we'll take our afternoon break now.  It's a little bit

11    after 3:15.  So we'll resume at 3:35.  We'll begin with the

12    last question that you wanted to ask in open session.  I

13    recognize it's only one question or two questions, but

14    nevertheless.  And then we'll move to the cross-examination

15    in open session.  Thank you all very much.

16    (Closed session adjourned at 3:18 p.m.)

1              **C E R T I F I C A T E**

2

3                 I, **Jeff M. Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9        **November 7, 2023**              _____

10              **DATE**                        **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25