```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA, et al., .
                                       .  Case Number 20-cv-3010
 4            Plaintiffs,              .
                                       .
 5         vs.                         .
                                       .  Washington, D.C.
 6    GOOGLE LLC,                      .  November 8, 2023
                                       .  1:35 p.m.
 7            Defendant.               .
      - - - - - - - - - - - - - - - - -
 8

 9                  TRANSCRIPT OF BENCH TRIAL, DAY 37
                           (AFTERNOON SESSION)
10            BEFORE THE HONORABLE AMIT P. MEHTA
                    UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For DOJ Plaintiffs:        KENNETH DINTZER, ESQ.
                                 United States Department of Justice
14                               1100 L Street Northwest
                                 Washington, D.C. 20005
15
                                 MEAGAN BELLSHAW, ESQ.
16                               United States Department of Justice
                                 450 Fifth Street Northwest
17                               Washington, D.C. 20001

18    For Plaintiffs State of
      Colorado and State of
19    Nebraska:                  WILLIAM F. CAVANAUGH, JR., ESQ.
                                 Patterson Belknap Webb & Tyler LLP
20                               1133 Avenue of the Americas
                                 Suite 2200
21                               New York, New York 10036

22

23                       -- continued --

24

25
```

1    APPEARANCES (CONTINUED):

2    For the Defendant:            JOHN SCHMIDTLEIN, ESQ.
                                   Williams & Connolly LLP
3                                  680 Maine Avenue Southwest
                                   Washington, D.C. 20024
4
                                   MARK POPOFSKY, ESQ.
5                                  Ropes & Gray LLP
                                   2009 Pennsylvania Avenue Northwest
6                                  Washington, D.C. 20006

7

8

9

10   Official Court Reporter:      SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
11                                 Room 4704-B
                                   Washington, D.C. 20001
12                                 202-354-3284

13

14   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.

15

16

17

18

19

20

21

22

23

24

25

# C O N T E N T S

### TESTIMONY

JAMIE ROSENBERG          Cross-Examination................ 9544
                         Redirect Examination............ 9582

JEFFREY GIARD (via videotaped deposition)

### EXHIBITS RECEIVED

UPX2111 and UPX2118..................................... 9546
UPX296A................................................. 9571
UPX2091................................................. 9577
PSX016.................................................. 9594

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3              THE COURT:  All right.  Welcome back, everybody.
 4          Ms. Bellshaw, I am ready when you are.
 5              MS. BELLSHAW:  Thank you, Your Honor.
 6      JAMIE ROSENBERG, WITNESS FOR THE DEFENDANT, RESUMED STAND
 7                    CROSS-EXAMINATION (Continued)
 8              BY MS. BELLSHAW:
 9  Q.    Good afternoon, Mr. Rosenberg.
10  A.    Good afternoon.
11  Q.    Staying with the Google Play Store -- well, I guess sort
12  of.  The monetary, you -- touched on this in your direct, but
13  the monetary benefits that Google gets from Android is not
14  limited to Search; right?
15  A.    When you're -- if you're talking about the services that we
16  have on Android, that's correct.  There are other sources of
17  revenue.
18  Q.    And the other sources of revenue include apps. that Google
19  monetizes, like YouTube and Google Pay?
20  A.    Google Pay is not in MADA.
21  Q.    Okay.  But there are other apps. that Google monetizes that
22  are included in MADA, like YouTube?
23  A.    Yes.
24  Q.    And then also the Play Store; right?
25  A.    Yes.
```

1    Q.    And Google makes a lot of money from the Play Store?

2    A.    The Play Store is a significant source of revenue for us,

3    yes.

4    Q.    I would like to turn your attention to two documents.  The

5    first is UPX2118.  I'm not really going to ask you any questions

6    about it, except that it's the cover e-mail to UPX2111.

7          If you would just briefly look at UPX2118, do you see that

8    this is an e-mail from Nicholas Drake to you dated May 26, 2020,

9    with a subject line "for review, deck for tomorrow's Samsung

10   deal"?

11   A.    Yes, I see that.

12   Q.    And then if you would turn to the second page of UPX2118.

13         Do you see that you've sent to Mr. Lockheimer and

14   Mr. Harrison a presentation for a Samsung deal review?

15   A.    Yes, I see that.

16   Q.    So then if you would please turn to UPX2111, UPX2111 is the

17   presentation that was attached to -- or is a linked document in

18   your e-mail in UPX2118.

19         And UPX2111 is a slide presentation that was prepared for a

20   meeting with Mr. Pichai and his executive team; right?

21   A.    I don't know if Sundar would have been in the review if it

22   was the BC, but it says "BC review" here.

23   Q.    Does it say "exec/BC review"?

24   A.    Yes.

25   Q.    So it's possible that that would have been for more than

1    just the BC?

2    A.   It's possible.  I don't know who else would have been in

3    that review.

4            MS. BELLSHAW:  Your Honor, I would move to admit

5    UPX2118 and UPX2111.

6            MR. POPOFSKI:  No objection, Your Honor.

7            THE COURT:  All right.  They will be admitted.

8        (Exhibits UPX2111 and UPX2118 received into evidence.)

9            BY MS. BELLSHAW:

10   Q.   And if we could put -- thank you so much.

11       Looking at UPX2111, do you see that this is a slide deck

12   dated May 26, 2020, with a subject "Samsung Revenue Share

13   Renewal"?

14   A.   Yes.

15   Q.   So at this time in 2020, Google was in the process of

16   restructuring its revenue share agreement with Samsung?

17   A.   Yes.  I mean, eventually, that got done in

18   November of 2020, but this looked like it was at the beginning

19   of that process.

20   Q.   And that's the 2020 Samsung revenue share agreement that

21   you testified about on your direct?

22   A.   Yes.

23   Q.   And -- withdrawn.

24       If you would please turn to page 12 of UPX2111.  And again,

25   a number of the numbers and graphs here are redacted.  So we

1    will just do our best not to say any of the redacted information

2    aloud.

3         Looking at the slide on page 12 of UPX2111, do you see the

4    heading "Distribution Deals Designed With," and then there's a

5    dollar amount, "Incremental Margin to Google"?  Do you see that?

6              THE COURT:  So it's a document that ends with 097.

7              THE WITNESS:  Oh, I see.

8              MS. BELLSHAW:  Yes.  Apologies.

9              THE WITNESS:  I see that it says that in the header,

10   yes.

11             BY MS. BELLSHAW:

12   Q.   Okay.  So this slide breaks down the various sources of

13   revenue that Google projected it would earn from Samsung devices

14   during the time of the -- during the term of the 2020 RSA;

15   correct?

16   A.   Yes.  I just want to say, and I think you understand this,

17   that there was a lot of negotiation that happened between this

18   point and the deal that eventually got signed.  So this isn't

19   representative of the deal that got signed.

20   Q.   Understood.  So maybe just to clarify for the record a

21   little bit, this presentation in May of 2020 was when Google was

22   discussing the framework that it wanted to negotiate with

23   Samsung for the ultimate 2020 RSA; correct?

24   A.   Yes.

25   Q.   And then the -- so from this time in May 2020, the

1    framework would have been finalized within Google, negotiated

2    with Samsung, and then the parties would have reached a final

3    agreement in November of 2020?

4    A.   Yes, and there were some differences between the final

5    agreement and what was contemplated here.

6    Q.   Understood.  So just focusing on what Google was

7    contemplating in May of 2020, this slide 12 in UPX2111 breaks

8    down the various sources of revenue that Google projected it

9    would earn from Samsung devices over the course of a new Samsung

10   revenue share agreement; correct?

11   A.   Yes, I believe that's true.

12   Q.   And do you see there's sort of three buckets of revenue?

13   And I believe these correspond to the three deals that you

14   discussed earlier.

15       Does that look right to you?

16   A.   No.  I don't believe this -- I don't believe that the

17   go-to-market deal is reflected on this chart.

18   Q.   So do you see that there are three buckets, and the first

19   sort of blue heading is "Search Deal"?

20   A.   Yes.

21   Q.   And then the heading in the middle is "Services Deal"?

22   That's deal number 2; right?

23   A.   Yes.

24   Q.   And then the third heading is -- that would be deal

25   number 3, I guess what ultimately came to be known as the

1    "go-to-market deal"?

2    A.    No, that's not what this third column is.

3    Q.    Okay.

4    A.    I think this third column is some analysis of the

5    combination of the first two.  The third deal's not represented

6    here.

7    Q.    Okay.  That's helpful.

8         Looking at the chart on the right, the chart on the right

9    reflects -- there's a gray bar chart that has gray and then red

10   on top.

11        Do you see that?  I'm sorry.  All the way to the left.

12   A.    There's a couple charts that have gray and red.  You mean

13   the one that's on the far left?

14   Q.    Yes.

15   A.    Yes.

16   Q.    So that chart reflects the expected revenue from Search;

17   right?

18        Mr. Rosenberg, I will withdraw that question, and I will

19   direct your attention to the notes at the bottom.  That might be

20   a little bit easier to parse through.

21   A.    Okay.

22   Q.    Do you see the first note at the bottom -- and again, the

23   exact figures are redacted, but the first line, there's a number

24   and then the words in parens "Distribution Search"?

25   A.    Yes.

1    Q.   So that first number before "Distribution Search" refers to

2    the amount of expected revenue from Search on Samsung devices

3    during the term of a new Samsung RSA; correct?

4    A.   I think this is in reference to the expected revenue coming

5    through the access points where we had terms around promotion in

6    the RSA.   There are other aspects of Search that aren't covered

7    here in terms of how users access Search.

8    Q.   So this is the expected revenue through RSA search access

9    points for Search.   Is that your understanding?

10   A.   In the context of this deal, I'm assuming that's what this

11   means.

12   Q.   And then below that, do you see that there's a number and

13   then the word "Gray"?

14   A.   Yes.

15   Q.   And that's a breakdown of the sort of services revenue,

16   these other monetizeable Google apps. from -- on Samsung devices

17   during the term of a new Samsung RSA; correct?

18   A.   I think that's what this refers to, yes.

19   Q.   And then focusing your attention on that first number,

20   there's a number before the word "Play."

21        Do you see that?

22   A.   Yes.

23   Q.   So that number refers to the projected revenue from the

24   Play Store on Samsung devices during the proposed 2020 Samsung

25   RSA deal; correct?

1    A.    I believe that's what that refers to, yes.

2    Q.    Okay.  And then if you would please turn to page -- the

3    page ending in Bates number 1120, and we're not going to put

4    this on the screen.

5              THE COURT:  Can I ask a question?  I don't think we've

6    addressed this, but can you at a high level just explain to me

7    how Google generates revenue from the Play Store?

8              THE WITNESS:  Yes.  The primary way we generate

9    revenue from the Play Store is transaction fees on payments

10   either for apps. or, more commonly, in apps.

11         So if you download, for example, a game in the Play Store,

12   the way a lot of games work is then the user can usually play a

13   part of the game for free, but then if they want to buy access

14   to another level or a sword or whatever, then that's a paid

15   transaction.  We facilitate that transaction through Play and

16   then take a share of the consumer spend.

17         And there are also ads in the Play Store as well as another

18   source.

19              THE COURT:  Thank you.

20              BY MS. BELLSHAW:

21   Q.    If you would please turn to the slide where the Bates

22   number ends in 1120.  And this one is small, I realize, even

23   smaller than the other ones.

24         Do you see that this is a further breakdown of the

25   projected revenue from a new deal with Samsung that Google

1   projects would be generated on Samsung devices?

2   A.   The numbers are very blurry on this printout.  It's hard

3   for me to see it.  But it seems to be some sort of financial

4   analysis associated with the deal and the different components

5   of the deal.

6   Q.   So looking under "Revenue" in the far left column, do you

7   see there's a line, sort of the third named line, titled "Play"?

8   A.   Yes.

9   Q.   So looking all the way across -- I'm not going to ask you

10  the exact numbers, but these numbers, is it your understanding

11  these break down the expected revenue for the Play Store by year

12  of a future deal?

13  A.   Yes, that seems to be what this is doing.

14  Q.   And then if you look all the way on the right, there's a

15  total projected revenue on Samsung devices for the Play Store

16  for the deal term.

17       Do you see that?

18  A.   Yes.

19  Q.   And without saying the actual number, that's an even higher

20  number than the one that we were just looking at on slide 12;

21  correct?

22  A.   Yeah, I'm not sure why that's the case.  I see that 2019 is

23  included as a column here, but this was already in 2020.  So I'm

24  not sure why the difference between what's on here and the other

25  slide.

1    Q.    It's possible it just includes an extra year or so?

2    A.    Possibly.

3    Q.    Okay.  Google has a significant stake in Android's success,

4    even without Search; right?

5    A.    Well, I think Android's success is really the success at

6    advancing computing in a scaled way, which is -- which is meant

7    to serve our core businesses, the products and services that we

8    create.  So the motivation for doing Android is to continue to

9    be able to execute on those products and their business

10   components and reach as many users as possible and serve as many

11   users as possible.

12   Q.    So the Play Store is only available on Android devices;

13   correct?

14   A.    Yes.

15   Q.    It's not available on iPhones?

16   A.    Correct.

17   Q.    So the more users on Android devices, the more money Google

18   can make from the Play Store; right?

19   A.    Generally speaking, if we serve those users well.

20   Q.    So if a consumer switches from an Android phone to an

21   iPhone, Google loses all potential Play Store revenue from that

22   user; correct?

23   A.    Yes, correct.

24   Q.    But Google Search is set as the default on both Android and

25   Apple devices; right?

1    A.   Well, Google Search is promoted -- I can't speak to the

2    Apple deal, but Google Search is preloaded on Android devices,

3    as we've discussed.  And then in some scenarios where we have an

4    RSA, it's further promoted.

5    Q.   And do you understand that Google Search is set as the

6    default on the Safari browser on iPhones?

7    A.   I think that's the case, but again, I don't work on that

8    part of the business.

9    Q.   So if a user switches from an Android device to an iPhone,

10   Google still gets that Search revenue; correct?

11   A.   It wouldn't necessarily be the same revenue.  There's -- if

12   the user uses Search on an iPhone, then Google would have an

13   opportunity to get some revenue there.  I wouldn't be able to

14   say that it's one for one.

15   Q.   If you would please turn to slide 14 of UPX2111, looking

16   down in the notes, it says, "Let's directly translate Android's

17   projected share loss into economic impact to Google."

18            THE COURT:  Sorry, Ms. Bellshaw --

19            MS. BELLSHAW:  My apologies, Your Honor.  It's the

20   slide ending in 1099.

21            THE COURT:  So we're moving forward, okay.  Okay.

22            BY MS. BELLSHAW:

23   Q.   Are you there, Mr. Rosenberg?

24   A.   Yes.

25   Q.   Do you see in the notes on slide 14, page 1099 of UPX2111,

1    it says, "Let's directly translate Android's projected share

2    loss into economic impact to Google"?  Do you see that?

3    A.    Yes.

4    Q.    And then skipping a paragraph, beneath that, "if we lose

5    share, we lose Play revenue, and our Search TAC goes up to

6    whatever the Apple rate is.  We still get Search revenue; it's

7    just more expensive."

8         Do you see that?

9    A.    I see that.  That doesn't necessarily comment on how well

10   Search monetizes in that context on iOS for that user compared

11   to iPhone.  It just talks about the distribution cost.

12   Q.    But it does reflect another piece of what we were just

13   talking about, which is that when Google loses market share on

14   Android, it loses 100 percent of the potential revenue from the

15   Play Store that those users might have generated; correct?

16   A.    Yes, there are -- it's not possible to have an app. store

17   on Apple other than the Apple app. store.

18   Q.    And as we just saw, the Play Store is a significant source

19   of revenue on Android for Google; correct?

20   A.    Yes.

21   Q.    So even setting Search aside, Google has a significant

22   commercial interest in continuing to invest in and drive the

23   success of Android?

24   A.    I think all these things reinforce each other.  I think

25   that the -- what we do to create a compelling experience for

1    Android, including the way we do Search, including the way we

2    invest in the ecosystem with Search allows us to also invest in

3    building out the developer ecosystem with Play, getting

4    developers interested in bringing their apps. to Play, putting

5    that as a compelling offering in front of users.

6        So these things, I think they all go hand in hand, and the

7    two together comprise a really important part of both our

8    product strategy and our business strategy for our investment in

9    Android.

10   Q.   But again, setting Search aside, Google has a significant

11   commercial interest in continuing to invest in and drive the

12   success of Android; correct?

13       MR. POPOFSKI:  Objection; asked and answered, Your

14   Honor.

15       THE COURT:  It's overruled.

16       You can answer.

17       THE WITNESS:  I mean, we have -- we certainly have

18   commercial interest in seeing Android succeed because of Play.

19   What I'm saying is that the assumptions that we would see the

20   same success with Play if we weren't also doing a good job with

21   Search, with all of the things that that implies, I don't think

22   it's -- I don't think you can necessarily make that connection.

23   Q.   If I could have you flip forward in the slide deck two

24   pages to slide 12.  That's the one we were first looking at that

25   is Bates number 1097.

1          One of the -- I'm sorry.  I'll give you a minute to get

2     there.  It's two pages forward at 1097.

3     A.    I see it.

4     Q.    So in that middle set of charts, do you see there's a small

5     orange box labeled "Payment to Samsung"?

6     A.    Yes.

7     Q.    One of the elements of the payments to Samsung was revenue

8     share payments on the Play Store; correct?

9     A.    I think that was contemplated here.  I think, as you know,

10    we didn't end up incorporating this in the deal.

11    Q.    But it was contemplated, at least initially in May of 2020,

12    that Google would pay Samsung revenue share on the Play Store?

13    A.    It was contemplated in this framework here, yes.

14    Q.    As a Google employee, you used Google's internal chat

15    systems; correct?

16    A.    Yes.

17    Q.    And you would chat with other employees probably a few

18    times a day?

19    A.    Yes.

20    Q.    And one topic that you discussed on chat was Samsung's

21    request for revenue share on the Play Store; correct?

22    A.    I think I got an update on chat on that based on a call

23    that someone on the team was having, but I wouldn't call it a

24    discussion.

25    Q.    You received an update on chat from Mr. Kolotouros

1    regarding Samsung's request to receive revenue share on the Play

2    Store?

3    A.    I think I recall seeing an e-mail thread where I referenced

4    that.  I don't remember the exact update.

5    Q.    And you were aware that your chats defaulted to "history

6    off" and were deleted within -- in 24 hours; correct?

7    A.    That was the way chat worked by default.  I didn't change

8    that setting in the time that I was working on -- at Google

9    full-time.

10   Q.    You never changed your default setting to "history on"?

11   A.    No.

12   Q.    Including on the chat that you had with Mr. Kolotouros

13   regarding Samsung's request to include Play Store revenue share

14   in its agreement with Google; correct?

15   A.    Correct.

16   Q.    One last item in this deck to direct your attention to, and

17   that's slide 6.  So we're going forward in the deck to the slide

18   ending in 1091.

19        So does slide 6 reflect this three-deal structure that you

20   were testifying about in the Samsung 2020 agreement?

21   A.    It reflects broadly a three-deal structure.  There was a

22   lot of negotiation between this time and the deal that got

23   signed or the framework that got executed.  The framework that

24   got executed had three deals roughly along these lines, but the

25   specifics changed.

1  Q.   This on slide 6 of UPX2111 reflects the framework that

2  Google wanted from Samsung in the new deal before the

3  negotiations with Samsung started and the deal had to be sort of

4  revised over the course of those negotiations?

5  A.   This reflects the framework we were contemplating

6  internally at that time, yes.

7  Q.   Do you see the third deal, the sort of third box all the

8  way to the right, "device quality and market share"?

9  A.   Yes.

10 Q.   Is that the third deal that you referred to earlier as the

11 go-to-market deal?

12 A.   Yes.  That's the same bucket.  I don't know if the

13 specifics here are exactly the same as the way that it got

14 negotiated.

15 Q.   So at least as originally conceptualized, this third deal

16 would create an investment fund to target share growth in the

17 $400-plus device tier in top geographies; correct?

18 A.   Yes.

19 Q.   And that $400-plus device, is that the devices that Google

20 believed were most likely to compete with the iPhone?

21 A.   That is what we would often refer to as the premium

22 segment, and it was a segment that -- where Apple was most

23 focused.  As I talked about earlier, they were starting to focus

24 on other segments as well, but we were -- we and Samsung were

25 particularly focused on being more competitive in the premium

1    segment, and that's what this was about.

2    Q.    And then looking down at the notes, do you see that there's

3    sort of a description of each of the -- additional description

4    of each of the three deals?

5    A.    Yes.

6    Q.    So the first is the Search deal?

7    A.    Yes.

8    Q.    And then the second is the monetizing services deal?

9    A.    Yes.  That changed quite a bit between this time and what

10   was signed.

11   Q.    And then the third one is -- at least here in the notes,

12   deal 3 is referred to as "Share Force Investment."

13         Do you see that?

14   A.    I see that.

15   Q.    And so the description of deal 3 is, "Custom program

16   focused on driving share against iOS by improving key aspects of

17   user experience and deeper collaboration on go-to-market

18   activities."

19         Do you see that?

20   A.    Yes.

21   Q.    So looking at the description of the three deals in the

22   speaker notes, deal 3 is the only one that addresses competition

23   with iOS; correct?

24   A.    No, I don't agree with that.  I think all of these are

25   about making the devices more competitive with iOS.  I think

1    deal 3 is about getting the marketing teams to collaborate on

2    go-to-market activities and adding an additional incentive for

3    Samsung for growing its share relative to iOS.

4    Q.    But in terms of what's written here on the page in UPX2111

5    and being presented to the BC and Google executives, the only

6    one of the three deals that references competition with iOS is

7    deal number 3; correct?

8    A.    Well, actually, in the execution of this, deal 3, one of

9    the requirements for, I believe, a device to earn the economics

10    under deal 3 was that it met the product conditions of the first

11    two deals.  And so deal 3 was sort of saying if the device is

12    good, if it has all these great features, then we will work

13    together on go to market, and as we achieve results, there will

14    be an additional kicker available to Samsung for those results.

15    Q.    And Mr. Rosenberg, just to make sure that I get an answer

16    to my question --

17    A.    Yes.

18    Q.    -- in terms of what's written here --

19    A.    Yes.

20    Q.    -- and that was being presented in UPX2111 to the business

21    counsel and Google's executives --

22    A.    Yes.

23    Q.    -- the only one of the three deals that references

24    competition with iOS is deal number 3?

25    A.    I think -- I'm not trying to be difficult, but if you're --

1    Q.    Mr. Rosenberg, it is a yes or no question.

2    A.    If you are asking me about these notes and if that's the

3    only part of these notes that mentions iOS, the answer is yes.

4    Q.    Thank you.

5          So you referenced that in order to get the go-to-market

6    funding and other financial benefits of deal 3, Samsung also had

7    to have -- or that the devices also had to qualify for the

8    revenue share agreement; correct?

9    A.    I believe there were -- there were several qualifying

10   conditions for the devices to be eligible for those economics.

11   Some of those had to do with placement of Search.  Some of them

12   had to do with commitment to security and updates.

13         So basically, the thinking was for the best devices, we

14   wanted to put additional go-to-market support behind them.

15   Q.    So to qualify for the go-to-market and promotional support

16   in deal 3, the devices had to have Google Search loaded as the

17   exclusive default search out of the box on the device; correct?

18   A.    I believe that's true.  I'd have to go back and look

19   through the agreement to confirm.

20   Q.    And you're aware that the carrier deals that were signed in

21   2021 did not make the go to market funds contingent on the

22   carrier also signing an RSA; correct?

23   A.    I don't remember the specifics of those deals.

24   Q.    And there's no reason that Google needed to make

25   go-to-market and promotional payments contingent on Search

1    exclusivity; correct?

2    A.   Well, I think the idea was if we were going to put extra

3    dollars behind promotion and sell-through of these devices, then

4    we wanted to have the assurances that they were products that we

5    were excited about and that we thought would be successful

6    against Apple.  And having a good search experience was one of

7    those aspects that we felt was important.

8    Q.   And you've also referenced security upgrades.  There is no

9    requirement that security upgrades be tied in any way to Search

10   exclusivity; correct?

11   A.   Which agreement are you asking about?

12   Q.   You referenced that there's security upgrade requirements

13   in the revenue share agreements; is that correct?

14   A.   I believe in the Samsung agreement, there are security

15   requirements in deal 3.

16   Q.   And like with the marketing funds, there is no reason that

17   Google needs to make security upgrades contingent on Search

18   exclusivity; correct?

19   A.   Well, in that construct, the commitment to security updates

20   was separate from the deal that had the commitment to Search

21   exclusivity.

22   Q.   But as we just discussed, deal 3 was contingent on Samsung

23   also signing the first deal, which required Search exclusivity;

24   correct?

25   A.   It wasn't contingent on the first deal.  Some of the

1    funding there was contingent on meeting the product requirements
2    that were contemplated in the first deal.
3    Q.   So you would agree, then, that there's no need to sort of
4    tie Search and security upgrades together?
5    A.   There wasn't a technical requirement that those needed to
6    be together.  As I said before, when we had done that in our
7    prior agreements, it was sort of a reinforcement of the product
8    and strategic importance to us that if we were going to invest
9    significant dollars in the form of this revenue share agreement,
10   when we do our highest value commercial agreement with a
11   partner, a precondition for that is that the partner make a
12   strong security promise on the device.
13        So the spirit of it was to provide the strongest possible
14   motivation to the partner to make a responsible commitment to
15   security.
16   Q.   And I think you referred earlier to security as an
17   existential issue for Google.  Given the high importance of
18   security to Google, it could choose to offer Android partners
19   incentives to do regular security upgrades that have nothing to
20   do with Search; correct?
21   A.   Yes, but as I talked about with Mr. Popofski, that wasn't
22   the way we were thinking about it.  We weren't thinking about it
23   as this transactional work-for-hire thing.  And in fact, we
24   ultimately hoped that the partners would fully internalize the
25   importance to their own businesses of doing security updates.

1    Q.   So setting aside the go-to-market payments and promotional

2    payments, you have no understanding how OEMs use the Search

3    revenue share that Google pays them; right?

4    A.   We don't require them to tell us how they're using the

5    funds.

6    Q.   And you have no understanding how carriers use the search

7    revenue payments that Google pays; correct?

8    A.   With the exception of what's now in some of these

9    go-to-market agreements, we don't require them to share with us

10   how they're using the funds.

11   Q.   And you don't have any understanding as to how carriers or

12   OEMs use the revenue share payments that Google pays them?

13   A.   I don't.

14   Q.   And there are no requirements that carriers or OEMs use any

15   of the payments they receive to lower device prices for

16   consumers; correct?

17          THE COURT:   Sorry.   Could you repeat the question

18   again?

19          BY MS. BELLSHAW:

20   Q.   There's no requirement that carriers or OEMs use the

21   revenue share payments they receive from Google to lower the

22   price of Android devices to consumers?

23   A.   That's true.

24   Q.   And there's no requirement that carriers use the revenue

25   share payments from Google to make their wireless plans cheaper

1    for consumers?

2    A.    That's correct.

3    Q.    And you're not aware of any analysis at Google showing that

4    Android partners use the RSA payments to either make Android

5    devices cheaper for consumers or wireless plans cheaper for

6    consumers?

7    A.    I'm not aware.  What I would say is that particularly with

8    the device manufacturers, selling phones is a highly competitive

9    market.  They're competing with each other on price all the

10   time.  To the extent that our agreement provides them with a

11   significant benefit to their P&L, I think we can assume that

12   they're able to take that into account in the way that they set

13   their pricing.

14   Q.    But you don't know one way or the other?

15   A.    Correct.

16   Q.    I think you described the competition between Apple and

17   Android as intense as it gets.

18        Do you recall that?

19   A.    Yes.

20   Q.    Given the intensity of competition between Apple and

21   Android, have you ever told anyone that Google should not be

22   paying billions of dollars every year to Android's biggest

23   competitor?

24   A.    I don't think so.

25   Q.    Have you ever had discussions with anyone that Google

```
1    shouldn't be paying Apple revenue share?
2    A.   I don't think so.
3    Q.   Focusing on the MADA and the applications that are included
4    in the MADA, a guiding principle for including an app. as a part
5    of the MADA bundle is whether the app. generates revenue for
6    Google; correct?
7    A.   No, I wouldn't say that categorically.  I think there's a
8    lot that goes into thinking about what apps. go into the MADA.
9    Q.   If I could direct your attention to UPX706.
10             MS. BELLSHAW:  Your Honor, UPX706 is in evidence.
11             BY MS. BELLSHAW:
12   Q.   Are you there, Mr. Rosenberg?
13   A.   Yes.
14   Q.   UPX706 is an e-mail from you to a colleague at Google dated
15   August 2019.
16        Do you see that?
17   A.   I see that.
18   Q.   And 2019 was a renewal cycle for Google with respect to the
19   MADA; correct?
20   A.   I believe that's true.
21   Q.   And during renewal cycles, Google re-evaluates the MADA,
22   including which apps. it wants to include; correct?
23   A.   That's one of the things we evaluate in a renewal cycle,
24   yes.
25   Q.   Could you turn to the second page of UPX706.  There's an
```

1    e-mail from you at 4:04 p.m.

2        Do you see that?

3    A.    Yes.

4    Q.    So in this e-mail, it appears that you're commenting on a

5    slide deck that you reviewed with Mr. Lockheimer.

6        Do you see that?

7    A.    Yes.

8    Q.    And Mr. Lockheimer was the senior vice president of the

9    platforms in ecosystems?

10   A.    Yes.

11   Q.    So in the first bullet of your feedback on the slide deck

12   that you reviewed with Mr. Lockheimer, you direct your team

13   to "make sure to" -- I think you meant "mark each slide as

14   privileged and have Kate on the distribution for her review."

15       Do you see that?

16   A.    Yes.

17   Q.    And Kate refers to Kate Lee?

18   A.    Most likely, yes.

19   Q.    And Ms. Lee was in-house counsel at Google?

20   A.    Yes.

21   Q.    And if you will see above, you've also marked your e-mail

22   as "attorney-client privileged" and asked Ms. Lee to "please

23   advise"?

24   A.    Yes.

25   Q.    Looking at the third bullet of your feedback in UPX706, do

9569

1    you see that you ask to see the apps. in the MADA bundle

2    characterized by type of app.?

3    A.    Yes.

4    Q.    And by this, did you mean, you know, health app.,

5    communication app., that type of thing?

6    A.    Yeah, it looks like, reading the rest of the paragraph,

7    there were some thematic areas that I was suggesting organizing

8    the apps. into.

9    Q.    So you wrote that "the rationale is that a particular app.

10    might not yet be great or have broad usage, but the use case

11    could be super important/strategic to us."

12    A.    Yes.

13    Q.    And by "us," you meant Google?

14    A.    Presumably, yes.

15    Q.    So there might be apps. that Google wants to include in the

16    MADA that aren't very good yet; right?

17    A.    No, I wouldn't characterize it that way.  I think health is

18    a good example.  Though we didn't ultimately include a health

19    app., but it could be, if we have an important new initiative

20    like the work we were doing on smartwatches to try to counteract

21    what Apple was doing with Apple Watch, we knew that was coming,

22    we knew we were investing in it.  We wanted to make sure that

23    phones reliably had a good health app. to go with the product.

24    So it could have been an emerging product category that we

25    thought was going to be very important.

1    Q.   But it's possible that in including the app. in the MADA

2    bundle, that the app. might not yet be great?

3    A.   I see that the language says that here.  But the reasons

4    for it not to be great might be that the category is still

5    emerging, we're still working on it, but we want to have a plan

6    to have that app. there as we continue to invest.

7    Q.   And Google might also choose to include in the MADA an app.

8    that's not very popular with users?

9    A.   Yes; for example, for the same reason I just articulated.

10   Q.   Right.  Google might choose to include apps. in the MADA

11   bundle that aren't that great or might not be that popular,

12   because it serves a strategic purpose for Google?

13   A.   It could be that it serves an important purpose for the

14   experience on the device.  I mean, one example is Google Meet.

15   I think at that time it was Google Duo.  Apple has FaceTime on

16   iPhones.  We felt that Android needed to have a good, reliable

17   video communication experience on the device.  Apple doesn't

18   make FaceTime available for Android.  We were building Duo.  We

19   were evolving it into Meet.  We saw that the category was going

20   to be an important use case.  Even if the app. wasn't perfect,

21   we wanted to make sure that it was there.

22   Q.   One of the uses for the MADA bundle is to promote new apps.

23   to users; correct?

24   A.   I wouldn't agree with that positioning.

25   Q.   If you would please turn to UPX296A.  It's going to be the

1    first tab in your binder.

2         And UPX296A is the linked attachment to your e-mail in

3    UPX706.  And I think you saw a version of this presentation with

4    your counsel on direct.

5         Do you recall that?

6    A.   Yes.  I don't know if it's the same version.

7    Q.   It's slightly different.  I can represent that to you.

8    A.   Okay.

9    Q.   But it's a similar version to UPX129, which you saw with

10   your counsel.

11             MS. BELLSHAW:  Your Honor, we would move to admit

12   UPX296A into evidence.

13             MR. POPOFSKI:  Our understanding is this is

14   effectively in evidence already, Your Honor.

15             THE COURT:  Okay.  We will admit it, then.

16        (Exhibit UPX296A received into evidence.)

17             THE COURT:  Go ahead.

18             BY MS. BELLSHAW:

19   Q.   If you could please turn to slide 8, which is the page

20   ending in Bates number 500.

21        Do you see there's a slide "MADA version 2019 and beyond:

22   8 candidates for 3 slots, which we'll review with the following

23   principles"?

24        Do you see that?

25   A.   Yes.

1    Q.   And then there are suggested guiding principles for

2    determining which new apps. to include in the MADA bundle;

3    correct?

4    A.   Yes.

5    Q.   And the first guiding principle that Google identifies

6    is "generate revenue for Google"; right?

7    A.   I see that here, yes.

8    Q.   So generating revenue for Google is the first principle

9    that Google considered when deciding which applications to

10   include in the 2019 MADA?

11   A.   I don't know if this is a stack rank.  It's one of the

12   principles that was considered.

13   Q.   So at least in this list, money is first on the list above

14   user experience; right?

15   A.   Yes, but if you're suggesting this is a ranking, I'm not

16   necessarily agreeing with that.

17   Q.   You can set that one aside.  Thank you, Mr. Rosenberg.

18        THE COURT:  I'm sorry.  Could I just ask a quick

19   question?  So what does this mean, "8 candidates for 3 slots"?

20        THE WITNESS:  So what this meant -- sorry.  I'm paging

21   back to it.  What this meant is we were cognizant of not

22   creating -- not making the bundle more than 11 apps.  We wanted

23   to keep it at 11 apps.  We had reasonable certainty around eight

24   of the 11, and we were thinking about what are the right choices

25   for the last three.

```
1              THE COURT:  That's what I thought, but I just wanted

2     to make sure.  Thank you.

3              BY MS. BELLSHAW:

4     Q.   Just while we're on this slide, this slide has ten apps.,

5     and then the last app. in the MADA bundle is the Play Store?

6     A.   Yes.

7     Q.   Okay.  If you would please turn to UPX997.

8              THE COURT:  What was that number again?  997?

9              MS. BELLSHAW:  997.

10             BY MS. BELLSHAW:

11    Q.   UPX997 is an e-mail chain between you and others at Google,

12    including Ms. Kartasheva, about AT&T's 2020 RSA, among other

13    topics; correct?

14    A.   Sorry.  I just need a minute to read it.

15    Q.   Sure.  And if it helps, the RSA is explicitly referenced in

16    your e-mail on page 5065.

17    A.   Yes, I see that.

18    Q.   So turning back to the first page, do you see that there's

19    an e-mail from Kesh Patel?

20    A.   Yes.

21    Q.   Who is Mr. Patel?

22    A.   Mr. Patel at this time -- I don't know what role he's in

23    now, but he was a member of our partnerships team, and I believe

24    he worked on the relationship with AT&T.

25    Q.   So in his e-mail, Mr. Patel is recounting a conversation
```

```
1    that he had with AT&T; correct?

2    A.   Yes.

3    Q.   And do you see Mr. Patel reports that "Google and AT&T have

4    philosophical differences on the user experience on Android?

5         It's on the fourth line down.

6    A.   Yeah, I think he's recounting something that Jeff Howard

7    said.

8    Q.   And Mr. Patel goes on to report that "AT&T wants to

9    differentiate the experiences so not all Android devices look

10   the same."

11        Do you see that?

12   A.   Yes.

13   Q.   Android OEMs and carriers don't just compete with Apple;

14   correct?

15   A.   Android OEMs compete with each other.  Carriers compete

16   with each other as well.

17   Q.   So AT&T competes against Verizon to sell AT&T Android

18   devices, among other things; right?

19   A.   And iPhones, yes.

20   Q.   And Samsung competes against Motorola?

21   A.   Yes.

22   Q.   And Android partners compete against one another by

23   differentiating their devices and device experiences?

24   A.   That's one of the ways they compete, yes.

25   Q.   And differentiation between Android devices can lead to
```

1    innovation; correct?

2    A.    Yes, I mean, innovation is one of the ways they can

3    differentiate, like the foldable devices I showed or some of the

4    other innovations that we talked about earlier.

5    Q.    If you would turn back to your e-mail on page 7 of 506 --

6    Bates number 5065.  It's page 7 of UPX997.

7         This is your e-mail where you reference AT&T's RSA.

8         Do you see that?

9    A.    Yes.

10   Q.    And you start your e-mail with "attorney-client privileged"

11   in all caps.

12        Do you see that?

13   A.    Yes.

14   Q.    And then you write in parens "adding Tristan for legal

15   advice, since I'm about to use some trigger words."

16        Does Tristan refer to an in-house lawyer at Google?

17   A.    Yes.

18   Q.    What trigger words were you referring to?

19   A.    I don't know specifically, but it might have been terms

20   that had particular legal implications that I wanted to make

21   sure Tristan had a chance to weigh in on.

22   Q.    If you look at the first sentence in the body of your

23   e-mail under "trigger words," you wrote, "Sadly, I think this is

24   all about leverage and money."

25        The trigger word that you were concerned about

1    was "leverage"; right?

2    A.    I don't -- I don't remember specifically what word I was

3    concerned about.

4    Q.    Google offers guidelines on how employees should

5    communicate in writing; correct?

6    A.    There are some guidelines about communication, yes.

7    Q.    And those guidelines include instructions to employees to

8    avoid using certain words in writing; correct?

9    A.    I believe that's true.  I don't remember the specifics.

10   Q.    One of the words that employees are taught not to use

11   is "leverage"?

12   A.    That might be true in certain contexts.  In this context, I

13   think I'm referring to leverage in a negotiation, which I don't

14   think is what's implicated there.

15   Q.    So we can -- if you would please turn to UPX2091.  UPX2091

16   is a document entitled "five rules of thumb for written

17   communications."

18         Do you see that?

19   A.    I see that.

20   Q.    So these are Google's guidelines to employees about what

21   they should and should not put in writing; correct?

22   A.    I don't know if I've seen this document.  If you're

23   representing that this is a Google document, then I'll trust you

24   on that.

25   Q.    If you want to look at the bottom of the first page, you

1    can see the source of this document.  It comes

2    from "support.google.com/ethics."

3        Do you see that?

4    A.   I see that.

5    Q.   And that's an internal Google website available to

6    employees?

7    A.   I think so, yes.

8    Q.   And so you yourself would have had access to this document?

9    A.   Yes.

10            MS. BELLSHAW:  Your Honor, I move to admit UPX2091.

11            MR. POPOFSKI:  No objection, Your Honor.

12            THE COURT:  It will be admitted.

13        (Exhibit UPX2091 received into evidence.)

14            BY MS. BELLSHAW:

15    Q.   Looking up at the top of the "five rules of thumb for

16    written communications," do you see that the first paragraph

17    starts, "Words matter.  Especially in antitrust law"?

18    A.   I see that.

19    Q.   And then it lists out five rules of thumb that employees

20    should follow in their written communications?

21    A.   Yes.

22    Q.   And then looking at the fifth one, it reminds employees to

23    assume every document you write will be seen by regulators;

24    correct?

25    A.   I see that.

1    Q.   So these are the guidelines that Google employees should

2    keep in mind in case regulators see their e-mails and documents?

3    A.   I think these were general guidelines for communication,

4    written communication.

5    Q.   And below the summary list, it provides additional color on

6    each of these five rules of thumb; right?

7    A.   Yes, I see that.

8    Q.   So the first rule of thumb is, "We're out to help users"?

9    A.   Yes.

10   Q.   And it tells employees, "Don't focus on what impact we

11   might have on our competition.  We are not out to crush, kill,

12   hurt, block, or do anything else that might be perceived as evil

13   or unfair."

14        Do you see that?

15   A.   Yes.

16   Q.   And then it reminds employees about a famous statement that

17   came out during the Microsoft antitrust trial; right?

18   A.   Yes, I think that's what this refers to.

19   Q.   And then the second rule of thumb that Google employees

20   should keep in mind when writing their communications is, "Our

21   users should always be free to switch."

22        Do you see that?

23   A.   Yes.

24   Q.   And it instructs employees not to use words like "bundle"

25   or "tie"?

1    A.    I think it's in reference to the language, but I see that

2    those two words are highlighted there.

3    Q.    And then a little bit further down, maybe about two-thirds

4    of the way down, it says, "Likewise, we don't leverage markets,

5    products, or resources.  Using the word leverage may make you

6    sound like you went to business school, but it implies

7    exploitation and an absence of consumer choice."

8         So that's the lesson that you were referring to when you

9    said in your e-mail that you were about to use a trigger word

10   and then wrote the word "leverage"; correct?

11   A.    I wouldn't necessarily draw that connection, because it

12   wasn't in the context of any of these examples.  It was about a

13   negotiation.

14   Q.    So you wrote in UPX997, you wrote the word "leverage" and

15   then added in-house counsel to your e-mail; correct?

16   A.    Yes.

17   Q.    And you asked for legal advice because you were about to

18   use words you knew weren't supposed to be in writing?

19   A.    I think, you know -- I don't know about the term "trigger

20   words."  It's not a term I would use today, for a lot of reasons

21   that don't have anything to do with this case.  I think the

22   point here was that we were talking about a big partnership.  We

23   were talking about deal terms.  We were talking about big

24   things.  To the extent that there were legal implications of the

25   things we were talking about, I wanted to make sure that Tristan

1    had a chance to weigh in on those.

2    Q.    So looking at the third rule of thumb, it reminds employees

3    that Google has lots of competitors; right?

4    A.    Yes.

5    Q.    At least in written communication?

6    A.    Yes.

7    Q.    "Google competes with every company that lets users access

8    information and every company that sells advertising."

9          Do you see that?

10   A.    Yes.

11   Q.    And then it admonishes employees not to include lists of

12   competitors.  And down at the bottom, it says, "If you really

13   need to list a group of competitors in a particular area, list

14   as many as possible."

15         Do you see that?

16   A.    Yes.

17   Q.    And then helpfully at the top, there's a list that

18   employees can reference included in the guidelines for their

19   written communications; right?

20   A.    I mean, there's a list of companies.  Some of these

21   companies have different names or aren't around anymore.  But I

22   think at least at the time this was written, I see there's a

23   list of companies there.

24   Q.    And the list of companies that Google employees are

25   reminded they can use in their written communications include

1    names like Amazon, Facebook, Twitter, Kayak, and Apple?

2    A.    I see that it says that here.  It says "just to name a

3    few."  So there are others, but these are examples that were

4    pulled out for this document.

5    Q.    And then looking at the fourth rule of thumb, the fourth

6    rule of thumb is, "Don't define markets and estimate shares";

7    right?

8    A.    I see that it says that.

9    Q.    And it goes on to say, "There's no problem with referring

10    to a market segment, sector, business, et cetera, but just try

11    and avoid defining the market for what we offer.  Similarly,

12    estimating market share is complicated, and it implies a defined

13    market.  So guessing or approximating isn't very reliable."

14        Do you see that?

15    A.    I see that.

16    Q.    So employees shouldn't use "market share" or "market," but

17    "segment," "sector," "business," those are okay for written

18    communications?

19    A.    I see that the document says that.  I think the guidance is

20    probably applied differently to different products ultimately.

21    Q.    This was a -- five rules of thumbs for written

22    communications that was available to all employees; correct?

23    A.    Yes.

24        MS. BELLSHAW:    Okay.  Thank you, Mr. Rosenberg.

25        I have no further questions.

1              THE COURT:  All right.  Mr. Cavanaugh, any questions?

2              MR. CAVANAUGH:  No questions, Your Honor.

3              THE COURT:  Okay.  Mr. Popofski, redirect.

4              MR. POPOFSKI:  Thank you, Your Honor.  Please just

5    give me one moment.

6         May I proceed?

7              THE COURT:  You may.

8                        REDIRECT EXAMINATION

9         BY MR. POPOFSKI:

10   Q.   Good afternoon, Mr. Rosenberg.

11   A.   Good afternoon.

12   Q.   Ms. Bellshaw asked you about some services other than

13   Search that monetize that Google distributes through the MADA.

14        Do you recall that line of questions?

15   A.   Yes.

16   Q.   And one of those services is Play?

17   A.   Yes.

18   Q.   In Europe, was a license fee charged for the eMADA, which

19   includes Play, even though it doesn't include Search and Chrome?

20   A.   Yes.

21   Q.   Why was that, just to remind the Court?

22   A.   Because our business model for Android contemplates all of

23   the revenue from the services we distribute in MADA and the

24   ability for us to then take that, invest it in continuing to

25   grow the platform, competing with iOS in all the ways that we

1    need to compete, making those services better.

2          In Europe, when we couldn't count on Search and Chrome

3    being reliably available in MADA, we put a license fee on the

4    other part of MADA so that we could still achieve the same

5    economics per device as we would have had we had the full suite

6    of apps. available.

7    Q.   And, Mr. Rosenberg, if Google had no Search revenue at all,

8    would Google have as much incentive to continue to invest in

9    Android as it has today?

10   A.   No.

11   Q.   Do you recall that Ms. Bellshaw asked you about some

12   security requirements in the Samsung deal 3?  That's the

13   go-to-market agreement.

14   A.   Yes.

15   Q.   If there had been no go-to-market agreement with Samsung in

16   2020, would Google still have pushed to have had security

17   requirements in the search RSA?

18              MS. BELLSHAW:  Objection; calls for a hypothetical.

19              THE COURT:  You can answer.  Go ahead.

20              THE WITNESS:  I think we would have.  I think we would

21   have -- along the principle of if we're going to do a big deal

22   with a partner, a foundational commitment needs to be upholding

23   the security principles that we have.

24          So most likely, we would have found somewhere else to put

25   that.

1    Q.    Thank you.

2         I would like to show you a document, if I may approach,

3    Your Honor.  This is in evidence.  It is JX0075.

4         And I will represent to you, Mr. Rosenberg, it is the

5    go-to-market agreement with Samsung --

6    A.    Okay.

7    Q.    -- from 2020.

8         Now, I'm going to ask about this elliptically, Your Honor,

9    because a vast majority, if not all, of this document is fully

10   under seal, but I can do this, though, in open session.

11        Do you recall, Mr. Rosenberg, that Ms. Bellshaw asked you

12   about what devices were covered by this agreement?

13   A.    Yes.

14   Q.    And how that related to deal 1?

15   A.    Yes.

16   Q.    Again, I don't want you to say anything out loud.  Would

17   you please turn to page 5 in this document ending in 2368.  And

18   it's a section called "eligible device."

19   A.    Yes.

20   Q.    Section 3, do you see that?

21   A.    Yes.

22   Q.    Does Section 3.1.C provide information that was responsive

23   to Ms. Bellshaw's question to you about device prerequisites for

24   this agreement?

25   A.    Yes, I think Romanette -- if that's what it's called,

1    Romanette 3 here under C provides that information.

2    Q.    And whatever the requirements are for the provisions that

3    are cross-referenced in Romanette 3, they are what they are?

4    A.    Yes.

5    Q.    I don't want to discuss them in open court.

6          Thank you, Mr. Rosenberg.  Nothing further on that

7    document.

8          Ms. Bellshaw also asked you about use of RSA funds.  Do you

9    recall that?  She was asking you how partners use them.

10   A.    Yes.

11   Q.    Was one of the objectives, Mr. Rosenberg, of the Search RSA

12   to incentivize OEM and carrier partners to sell more Android

13   devices in competition with iOS?

14              MS. BELLSHAW:  Objection; leading.

15              THE COURT:  Rephrase the question, please.

16              MR. POPOFSKI:  Sure.

17              BY MR. POPOFSKI:

18   Q.    How, if at all, was the RSA incentive related to

19   iPhone/Android competition?

20              THE COURT:  That's not exactly a rephrase.  Why don't

21   we try something a little more open-ended.

22              MR. POPOFSKI:  Sure.

23              BY MR. POPOFSKI:

24   Q.    What's your view of one of the purposes of the incentives

25   that are provided in the RSA?

1    A.   Well, the RSA was an attempt to align the partner's

2    business with ours.  And so as we were able to make more money

3    for the partner on their Android devices and share that money

4    with them, then we hoped that would motivate them to either sell

5    more Android devices or ship more Android devices, depending on

6    the nature of the partner.

7    Q.   I would like to return to DXD35 and go to slide 9, if we

8    can.

9         Do you recall Ms. Bellshaw asked you about the Duo?

10   A.   Yes.

11   Q.   Do you see on the right side of that image, there is a

12   vertical row of icons?

13   A.   Yes.

14   Q.   What's the top icon, Mr. Rosenberg?

15   A.   I believe that's the Edge browser from Microsoft.

16   Q.   And what is the default search engine, if you know, in the

17   Edge browser?

18   A.   Typically, it's Bing.  I assume it's Bing.

19   Q.   Last question, Mr. Rosenberg.  If you would go to UPX129 in

20   the binder I handed you.  I believe it's the black binder.  And

21   we are going to go to page 905.

22        Do you see there's a second row entitled "Placement,

23   Services, and Integrations"?  It's also going to be up on the

24   screen for you.

25   A.   Yes.

1    Q.   And just for the record -- no, I said 905.

2         What does the first little caret-shaped or chevron-shaped

3    icon represent?

4    A.   That's the Android Auto icon.

5              THE COURT:  I'm sorry.  Android what?

6              THE WITNESS:  Auto.

7              BY MR. POPOFSKI:

8    Q.   What does Android Auto do?

9    A.   What Android Auto does is for compatible cars, when you get

10   in your car with your Android phone, then it allows basically

11   the -- you to have some applications and experience that project

12   to the screen in the car, similar to Car Play with iOS.

13   Q.   Why did Google add that service to MADA?

14   A.   We were working really hard with the auto industry to have

15   them evolve their in-car infotainment systems, if you will, to

16   be able to do this what we call projected mode from the phone to

17   the screen.  We wanted that to be reliably available on every

18   Android device that we worked with.  That was what Apple was

19   working toward with iPhone.  I think it was a great way of how a

20   phone has increasingly become useful to users in different

21   contexts as we've moved forward.

22   Q.   Is that a service that Google monetizes?

23   A.   No.

24   Q.   How, if at all, does it relate to the user experience?

25   A.   It just -- it makes the experience better.  It makes the

1    phone useful in more contexts.

2          MR. POPOFSKI:  No further questions, Your Honor.

3          THE COURT:  Could we go back to that slide for a

4    moment?  I want to make sure I'm reading this right.

5      Do I read this to say that at least in 2019, all of the

6    apps. on the top row were included in the MADA, all of the apps.

7    in the second row were included in the MADA but deleteable, and

8    then those three additional apps. were added?

9          THE WITNESS:  Those were what we call headless apps.

10   So they're not apps. with icons.  They're sort of underlying

11   functionality that's a part of the software package.

12     So one of them -- that's Android Auto.  One of them is

13   Family Link, which allows you to have parental controls across

14   your family.  I think it exists in device settings, not as an

15   icon necessarily.

16     And the other one is Digital Wellbeing, which helps you set

17   controls and limits for how much you're using your device.

18         THE COURT:  Okay.  I was just curious, because we had

19   talked about 11 apps., and I was counting more than that, but

20   now I understand why you're at 11 still.

21     Thank you.

22         MR. POPOFSKI:  Thank you, Your Honor.  No further

23   questions.

24         THE COURT:  All right.  Mr. Rosenberg, thank you very

25   much for your time and your testimony.  Safe travels home.

1          THE WITNESS:  Thank you.

2          THE COURT:  Mr. Schmidtlein?

3          MR. SCHMIDTLEIN:  Your Honor, the next witness that

4    we're prepared to call is Jeff Giard from T-Mobile.  We have a

5    video deposition that we have coordinated for him.  And the run

6    time on that is about one hour and three minutes, four minutes,

7    all in open court.

8      As we did with the videos last week, we've got designations

9    and counterdesignations from both sides, and we're just going to

10   play it all the way through, you know, all of them together,

11   just a continuous run-through.

12          THE COURT:  Right.

13          MR. SCHMIDTLEIN:  I leave to Your Honor whether you

14   want to take the break now and then just play them all the way

15   through.  That might be a better user experience.

16          THE COURT:  There's only one user.

17          MR. SCHMIDTLEIN:  We've watched them a lot.  So yes.

18          THE COURT:  All right.  So then I just want to

19   confirm, the Levy and the Ezell that you handed, is that

20   something you intend to run today?

21      I have to confess, I did not look at them over lunch in the

22   way that I had hoped.

23          MR. SCHMIDTLEIN:  Your Honor, again, it will be sort

24   of your preference sort of where we are at the end of the day.

25   I am conferring -- I'd like to confer with my client as to sort

1    of how they want to proceed in terms of whether we want to push

2    sort of these today or -- as I said, we will be guided by you.

3         The next one that we would have to play is Mr. Levy, who is

4    from Facebook.  My understanding is that I think all of the

5    parties have agreed upon the designations, the clips.  I don't

6    think there are any confidentiality disputes.  There are several

7    spots, I think as I indicated to Your Honor before, where there

8    are a handful of places where there are proposed places to --

9         THE COURT:  It looks like there's only two.  Maybe

10    there's more.

11         MR. SCHMIDTLEIN:  There is one more that I've been --

12    let me flag for you that has come up as a result of -- and it's

13    on the very, very last page of the material in your binder.  And

14    if you go to line 184 -- or page 184, line 19, there is a

15    number, percent revenue.

16         THE COURT:  Right.

17         MR. SCHMIDTLEIN:  And my understanding is that

18    Facebook's counsel, who is here today, has requested, and I

19    believe the parties have all agreed, that just that specific

20    number could be sort of edited out of the audio.

21         THE COURT:  Okay.  It looks like that same number is

22    on page 28, line 184:13.

23         Does this number relate to -- again, I haven't looked at

24    this, but does this relate in any way to the Apple change in

25    privacy settings and the impact it would have on Facebook's ad

1    revenue?

2                MR. SCHMIDTLEIN:  That is correct.

3                THE COURT:  Okay.  I mean, just from my own following

4    of the news, I know Facebook has made announcements about

5    revenue impacts.  I do not know whether they've assigned a

6    particular percentage to it.

7        So I would just ask, at least in terms of thinking of the

8    factors, whether this particular number has been revealed in an

9    investor call or something like that.

10               MR. SCHMIDTLEIN:  I would recommend -- let me confer

11   with their counsel over the break.

12               THE COURT:  Sure.

13               MR. SCHMIDTLEIN:  And then if they want to be heard on

14   this afterwards, then obviously, I think they can be.

15               THE COURT:  Great.  Terrific.

16       So let's take our break now.  It's a little bit before

17   2:55.  So why don't we just plan to resume at 3:10.

18       Thanks, everyone.

19       (Recess taken from 2:53 p.m. to 3:10 p.m.)

20               THE COURT:  Okay.  So are we ready to roll the tape?

21       (Videotaped deposition of Jeffrey Giard played.)

22               MR. SCHMIDTLEIN:  All right.  Your Honor, I want to

23   give you just a little bit of an update on where we are and

24   where we're going.

25               THE COURT:  Okay.  Before you do that, have these

1    exhibits -- are they already in evidence?

2            MR. SCHMIDTLEIN:  I believe they are.  We can confirm

3    that.

4            THE COURT:  Just make sure Mr. Douyon has those

5    numbers.

6            MR. SCHMIDTLEIN:  Absolutely.

7    Good news, I think, hopefully to deliver here.  Given the

8    progress we've made this week with the variety of the Google

9    witnesses who have testified, we had another witness who was a

10   potential call for tomorrow live that we are not going to call

11   live tomorrow.

12       And so at this point, we've got -- we have been in

13   discussions with three more deposition videos:  The Facebook

14   video that I referenced earlier, and I have conferred with

15   counsel for Facebook who can represent that the percentage

16   figure that we talked about before the last break, as best

17   they've been able to verify, has not been publicly revealed.

18           THE COURT:  Okay.

19           MR. SCHMIDTLEIN:  Obviously, you're welcome to talk to

20   them directly about that.  But that's the representation I've

21   been told that we can make on their behalf.

22       The video -- that video is 54 minutes, and then we have

23   Mr. Ezell from AT&T.  He holds a position similar to Mr. Giard,

24   who you just heard from, Mr. Higgins, who you heard from live.

25   He is the individual who has negotiated a number of the AT&T RSA

1    agreements.  So the run time on that video is an hour and 47

2    minutes, I think largely because he has actually been employed

3    in this position longer and has a greater breadth.

4         So we have those two videos that are queued up and ready to

5    go.

6         I will tell you, we have been in negotiations over another

7    video.  We have a variety of disagreements with some of my

8    colleagues, particularly the States, over the propriety of the

9    counters, which have grown in size and scope to a point, Your

10   Honor, that quite frankly, I don't want you to have to fight

11   over -- or deal with our fight over that, nor do I want you to

12   have to listen to the length of the video that would be

13   required, given all of the various parties, the battles back and

14   forth to that.

15        And so we have decided we're not going to offer to have

16   that played for you, because frankly it's nearly three hours and

17   you have better things to do than watch three hours of that

18   video.  We think there are, obviously, relevant portions of it.

19   It's a witness from Amazon.  There are also a variety of

20   confidentiality issues that are being -- that became, I think,

21   difficult for us to hash out.  And at this late date in the

22   trial, it's not worth the candle is my judgment.  We're

23   obviously going to submit the designations to you.  They will be

24   available for citation post-trial.

25        So we basically have tomorrow two videos of two hours and

1    45 or so minutes or so.  And then we're done for tomorrow.  As I

2    said, Professor Murphy will be coming first thing on Monday,

3    given scheduling issues that he has.

4            THE COURT:  Okay.  Terrific.

5            MR. SCHMIDTLEIN:  Great.  Mr. Cavanaugh?

6            MR. CAVANAUGH:  Just a few small things, Your Honor.

7        We have agreement on 49 additional exhibits that we'll

8    offer.  We also have our deposition designations for witnesses

9    that have not previously been submitted, where the United States

10   put in deponents and we had designations.  The United States put

11   those in.  These are -- I think only we had designations and

12   Google had designations.

13       There is one more deponent, Your Honor, where we're trying

14   to finalize the designations.  It's the individual who wasn't

15   able -- who we had anticipated coming live but as we discussed

16   couldn't.  We should have that by -- I think we owe them

17   counters to counters at this point.

18       Last thing, as I mentioned, I used a demonstrative, PSX016

19   with Dr. Israel.  It was a SERP.  And we would just offer that

20   as a demonstrative.

21           THE COURT:  Okay.  So that will be admitted.

22       (Exhibit PSX016 received into evidence.)

23           MS. JENSEN:  Elizabeth Jensen with the United States.

24       I have here some of the demonstratives that we used with

25   Professor Israel on cross.  We had mentioned that we'd be

1    offering these as we've offered demonstratives in the past in

2    this case.

3         So I have here 23 demonstratives.  I would be happy to read

4    them into the record or hand them up if you prefer.

5              THE COURT:  Just hand them up.  That's fine.  They're

6    already read into the record in terms of their numbers.  If

7    they're all admitted, then we just need to record them.

8              MS. JENSEN:  Thank you, Your Honor.  May I approach?

9              THE COURT:  Sure.  Of course.

10             MR. CAVANAUGH:  I forgot one thing.

11        We have a meet and confer with Google tonight about a

12   handful of exhibits that hopefully we can resolve or at least

13   cut it down to an even lesser number.  If not, if we could just

14   take a little time tomorrow to just deal with them and argue the

15   point and get it resolved.

16             THE COURT:  Sure.  No problem.

17             MR. CAVANAUGH:  Thank you.

18             THE COURT:  Okay.  Anyone else?

19             MR. DINTZER:  Nothing for DOJ plaintiffs, Your Honor.

20             MR. SCHMIDTLEIN:  And per your request, we will be

21   submitting, if it hasn't already been filed, we will be

22   submitting the confidentiality statement on the Apple documents

23   that you had asked us about yesterday.  That will be filed, as I

24   said, if it hasn't been filed already, it's going to be filed

25   this evening for you.

1          THE COURT:  Terrific.  Thank you.

2      All right.  Okay.  So I think just in terms of outstanding

3  things from my end, we did receive an e-mail last night about

4  the transcripts from the afternoon session in which some numbers

5  were stated on the record inadvertently, both by one of the

6  examiners and by the witness.  There's been a request to seal

7  those on the transcripts.  And I did ask the court reporter not

8  to send those out until we resolved the issue.

9      I guess the one thing I wanted to just raise before I

10  proceeded any further, and that is, notwithstanding the

11  inadvertence of it, it's a little unclear to me whether I can

12  sort of take something off the public record that's already been

13  on it, even if inadvertent.  I know everybody's been making

14  Herculean efforts to sort of be cognizant of that.  But I think

15  that's my concern, that I can't somehow unring the bell.

16      And if you all think I can and have some authority that

17  would allow me to do that, then I would be happy to consider it.

18          MR. SCHMIDTLEIN:  If I can ask for your indulgence,

19  let me confer with my client this evening on that point, and I

20  will report back to you first thing tomorrow on it.

21          THE COURT:  That's fine.

22          MR. DINTZER:  Our basic position, Your Honor, is --

23  and we have been making every effort, is that once they're said

24  in court, of course, reporters are here, and to some extent they

25  may have already reported these things, that the public record

 1    would not match what's already gone out.

 2          MR. SCHMIDTLEIN:  We will report back to you first

 3    thing in the morning, Your Honor.

 4          THE COURT:  Great.  We will resolve it in the morning.

 5    Okay.  So I also know I've got that set of documents that

 6    were provided to me.  I will make sure I get that taken care of.

 7          And then in terms of tomorrow's videos, I know we've got

 8    counsel for Facebook here.  Would you like to be heard just

 9    about -- I'll take a look at the transcripts tonight, but if you

10    would like to put anything on the record at this point, I'm

11    happy to consider it.

12          MR. LAZEROW:  I appreciate that, Your Honor.  Andrew

13    Lazerow, Covington & Burling, on behalf of Meta Platforms, Inc.

14    Thank you for hearing us.

15          The figure you referenced earlier I have now confirmed was

16    not made public.  You will see when you review that document

17    that was an internal discussion in February of 2020 about a

18    long-range plan.  The discussion is around Apple but also other

19    potential changes that might be coming.  And therefore, it does

20    not tie to the publicly available figure that at the time

21    Facebook reported in February of 2022.

22          THE COURT:  All right.  I will keep that in mind.  I

23    will take a look at the requested moments of silence in the

24    running video, and I can just rule on those tomorrow morning.

25          MR. LAZEROW:  Thank you.

1          THE COURT:  Is there anything else we need to take

2    care of before we adjourn?

3          MR. DINTZER:  Not for DOJ plaintiffs, Your Honor.

4          MR. CAVANAUGH:  No, Your Honor.

5          THE COURT:  I do have one question.  Just in terms of

6    scheduling, we have, I take it, Google's last witness on Monday

7    of next week, which I assume will bleed into the 14th,

8    likelihood of that being the case.

9       And then have the plaintiffs -- where are you in your

10   current thinking of your rebuttal cases?

11         MR. DINTZER:  Your Honor, we have three rebuttal

12   witnesses, two will call and one may call.  The will calls are

13   Professor Whinston, recalling him, and Professor Oard, and then

14   the may call is Professor Davies, as the Court has heard.

15      And the order of these is t/b/d, but -- so we assume that

16   no matter what we wouldn't start before Wednesday.  I assume

17   Professor Murphy's going to take at least a day and flop over.

18   And so we wouldn't start before Wednesday.

19         THE COURT:  Okay.  Mr. Cavanaugh, are you expecting a

20   rebuttal case?

21         MR. CAVANAUGH:  No, Your Honor, not at this point.

22         MR. SCHMIDTLEIN:  The t/b/d under the Court's order, I

23   believe, is 7:00 p.m. this evening on the order of witnesses for

24   next week.  So we've got two and a half hours to firm that up as

25   far as we can tell, Your Honor.

1          THE COURT:  Okay.  So you're on the clock.

2          MR. DINTZER:  We meet our deadlines, Your Honor.

3          THE COURT:  Okay.  Good.  Well, look, there's an

4    outside chance that we could finish next week.  Depending upon

5    the length of the experts and how many, we may bleed into the

6    following week, but we're certainly on course to finish up

7    before the Thanksgiving present that you all give one another.

8          All right.  Anything else before we conclude?  Thank you,

9    all, very much.  We will see you in the morning.

10          (Proceedings adjourned at 4:28 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick_____          November 8, 2023_____

SIGNATURE OF COURT REPORTER               DATE

## /

**/s** [1] - 9600:8

## 0

**097** [1] - 9547:6

## 1

**1** [1] - 9584:14
**100** [1] - 9555:14
**10036** [1] - 9541:21
**1091** [1] - 9558:18
**1097** [2] - 9556:25, 9557:2
**1099** [2] - 9554:20, 9554:25
**11** [5] - 9572:22, 9572:23, 9572:24, 9588:19, 9588:20
**1100** [1] - 9541:14
**1120** [2] - 9551:3, 9551:22
**1133** [1] - 9541:20
**12** [5] - 9546:24, 9547:3, 9548:7, 9552:20, 9556:24
**14** [2] - 9554:15, 9554:25
**14th** [1] - 9598:7
**184** [2] - 9590:14
**184:13** [1] - 9590:22
**19** [1] - 9590:14
**1:35** [1] - 9541:6

## 2

**2** [1] - 9548:22
**20-cv-3010** [1] - 9541:3
**20001** [2] - 9541:17, 9542:11
**20005** [1] - 9541:14
**20006** [1] - 9542:6
**20024** [1] - 9542:3
**2009** [1] - 9542:5
**2019** [6] - 9552:22, 9567:15, 9567:18, 9571:21, 9572:10, 9588:5
**202-354-3284** [1] - 9542:12
**2020** [19] - 9545:8, 9546:12, 9546:15, 9546:18, 9546:20, 9547:14, 9547:21, 9547:23, 9547:25, 9548:3, 9548:7, 9550:24, 9552:23,

9557:11, 9558:20, 9573:12, 9583:16, 9584:7, 9597:17
**2021** [1] - 9562:21
**2022** [1] - 9597:21
**2023** [2] - 9541:6, 9600:8
**2200** [1] - 9541:20
**23** [1] - 9595:3
**2368** [1] - 9584:17
**24** [1] - 9558:6
**26** [2] - 9545:8, 9546:12
**28** [1] - 9590:22
**2:53** [1] - 9591:19
**2:55** [1] - 9591:17

## 3

**3** [20] - 9548:25, 9560:12, 9560:15, 9560:22, 9561:1, 9561:7, 9561:8, 9561:10, 9561:11, 9561:24, 9562:6, 9562:16, 9563:15, 9563:22, 9571:22, 9572:19, 9583:12, 9584:20, 9585:1, 9585:3
**3.1.C** [1] - 9584:22
**333** [1] - 9542:10
**37** [1] - 9541:9
**3:10** [2] - 9591:17, 9591:19

## 4

**400-plus** [2] - 9559:17, 9559:19
**45** [1] - 9594:1
**450** [1] - 9541:16
**47** [1] - 9593:1
**4704-B** [1] - 9542:11
**49** [1] - 9594:7
**4:04** [1] - 9568:1
**4:28** [1] - 9599:10

## 5

**5** [1] - 9584:17
**500** [1] - 9571:20
**506** [1] - 9575:6
**5065** [2] - 9573:16, 9575:6
**54** [1] - 9592:22

## 6

**6** [3] - 9558:17,

9558:19, 9559:1
**680** [1] - 9542:3

## 7

**7** [2] - 9575:5, 9575:6
**7:00** [1] - 9598:23

## 8

**8** [5] - 9541:6, 9571:19, 9571:22, 9572:19, 9600:8

## 9

**9** [1] - 9586:7
**905** [2] - 9586:21, 9587:1
**9544** [1] - 9543:4
**9546** [1] - 9543:9
**9571** [1] - 9543:9
**9577** [1] - 9543:10
**9582** [1] - 9543:4
**9594** [1] - 9543:10
**997** [2] - 9573:8, 9573:9

## A

**ability** [1] - 9582:24
**able** [7] - 9553:9, 9554:13, 9566:12, 9586:2, 9587:16, 9592:17, 9594:15
**above-entitled** [1] - 9600:5
**absence** [1] - 9579:7
**absolutely** [1] - 9592:6
**access** [6] - 9550:5, 9550:7, 9550:8, 9551:13, 9577:8, 9580:7
**account** [1] - 9566:12
**achieve** [2] - 9561:13, 9583:4
**activities** [2] - 9560:18, 9561:2
**actual** [1] - 9552:19
**ad** [1] - 9590:25
**add** [1] - 9587:13
**added** [2] - 9579:15, 9588:8
**adding** [2] - 9561:2, 9575:14
**additional** [7] - 9560:3, 9561:2, 9561:14, 9562:14, 9578:5, 9588:8,

9594:7
**addressed** [1] - 9551:6
**addresses** [1] - 9560:22
**adjourn** [1] - 9598:2
**adjourned** [1] - 9599:10
**admit** [4] - 9546:4, 9571:11, 9571:15, 9577:10
**admitted** [4] - 9546:7, 9577:12, 9594:21, 9595:7
**admonishes** [1] - 9580:11
**ads** [1] - 9551:17
**advancing** [1] - 9553:6
**advertising** [1] - 9580:8
**advice** [2] - 9575:15, 9579:17
**advise** [1] - 9568:23
**afternoon** [5] - 9544:9, 9544:10, 9582:10, 9582:11, 9596:4
**AFTERNOON** [1] - 9541:9
**afterwards** [1] - 9591:14
**agree** [2] - 9560:24, 9564:3, 9570:24
**agreed** [2] - 9590:5, 9590:19
**agreeing** [1] - 9572:16
**agreement** [20] - 9546:16, 9546:20, 9548:3, 9548:5, 9548:10, 9558:14, 9558:20, 9562:8, 9562:19, 9563:11, 9563:14, 9564:9, 9564:10, 9566:10, 9583:13, 9583:15, 9584:5, 9584:12, 9584:24, 9594:7
**agreements** [4] - 9563:13, 9564:7, 9565:9, 9593:1
**ahead** [2] - 9571:17, 9583:19
**aided** [1] - 9542:14
**al** [1] - 9541:3
**align** [1] - 9586:1
**allow** [1] - 9596:17
**allows** [3] - 9556:2, 9587:10, 9588:13
**aloud** [1] - 9547:2

**Amazon** [2] - 9581:1, 9593:19
**AMERICA** [1] - 9541:3
**Americas** [1] - 9541:20
**AMIT** [1] - 9541:10
**amount** [2] - 9547:5, 9550:2
**analysis** [3] - 9549:4, 9552:4, 9566:3
**Andrew** [1] - 9597:12
**Android** [44] - 9544:13, 9544:16, 9553:8, 9553:12, 9553:17, 9553:20, 9553:24, 9554:2, 9554:9, 9555:14, 9555:19, 9555:23, 9556:1, 9556:9, 9556:12, 9556:18, 9564:18, 9565:22, 9566:4, 9566:17, 9566:21, 9570:16, 9570:18, 9574:4, 9574:9, 9574:13, 9574:15, 9574:17, 9574:22, 9574:25, 9582:22, 9583:9, 9585:12, 9586:3, 9586:5, 9587:4, 9587:5, 9587:8, 9587:9, 9587:10, 9587:18, 9588:12
**Android's** [5] - 9553:3, 9553:5, 9554:16, 9555:1, 9566:22
**announcements** [1] - 9591:4
**answer** [4] - 9556:16, 9561:15, 9562:3, 9583:19
**answered** [1] - 9556:13
**anticipated** [1] - 9594:15
**antitrust** [2] - 9577:17, 9578:17
**apologies** [2] - 9547:8, 9554:19
**app** [16] - 9555:16, 9555:17, 9567:4, 9567:5, 9569:2, 9569:4, 9569:5, 9569:9, 9569:19, 9569:23, 9570:1, 9570:2, 9570:6, 9570:7, 9570:20, 9573:5
**APPEARANCES** [2] -

9541:12, 9542:1
**Apple** [20] - 9553:25, 9554:2, 9555:6, 9555:17, 9559:22, 9563:6, 9566:16, 9566:20, 9567:1, 9569:21, 9570:15, 9570:17, 9574:13, 9581:1, 9587:18, 9590:24, 9595:22, 9597:18
**applications** [3] - 9567:3, 9572:9, 9587:11
**applied** [1] - 9581:20
**appreciate** [1] - 9597:12
**approach** [2] - 9584:2, 9595:8
**approximating** [1] - 9581:13
**apps** [24] - 9544:18, 9544:21, 9550:16, 9551:10, 9556:4, 9567:8, 9567:22, 9569:1, 9569:8, 9569:15, 9570:10, 9570:22, 9572:2, 9572:22, 9572:23, 9573:4, 9583:6, 9588:6, 9588:8, 9588:9, 9588:10, 9588:19
**area** [1] - 9580:13
**areas** [1] - 9569:7
**argue** [1] - 9595:14
**articulated** [1] - 9570:9
**aside** [4] - 9555:21, 9556:10, 9565:1, 9572:17
**aspects** [3] - 9550:6, 9560:16, 9563:7
**assigned** [1] - 9591:5
**associated** [1] - 9552:4
**assume** [6] - 9566:11, 9577:23, 9586:18, 9598:7, 9598:15, 9598:16
**assuming** [1] - 9550:10
**assumptions** [1] - 9556:19
**assurances** [1] - 9563:4
**AT&T** [8] - 9573:24, 9574:1, 9574:3, 9574:8, 9574:17, 9592:23, 9592:25
**AT&T's** [2] - 9573:12, 9575:7
**attached** [1] - 9545:17
**attachment** [1] - 9571:2
**attempt** [1] - 9586:1
**attention** [5] - 9545:4, 9549:19, 9550:19, 9558:16, 9567:9
**attorney** [2] - 9568:22, 9575:10
**attorney-client** [2] - 9568:22, 9575:10
**audio** [1] - 9590:20
**August** [1] - 9567:15
**authority** [1] - 9596:16
**Auto** [4] - 9587:4, 9587:8, 9587:9, 9588:12
**auto** [2] - 9587:6, 9587:14
**available** [11] - 9553:12, 9553:15, 9561:14, 9570:18, 9577:5, 9581:22, 9583:3, 9583:6, 9587:17, 9593:24, 9597:20
**Avenue** [4] - 9541:20, 9542:3, 9542:5, 9542:10
**avoid** [2] - 9576:8, 9581:11
**aware** [4] - 9558:5, 9562:20, 9566:3, 9566:7

## B

**bar** [1] - 9549:9
**based** [1] - 9557:22
**basic** [1] - 9596:22
**Bates** [5] - 9551:3, 9551:21, 9556:25, 9571:20, 9575:6
**battles** [1] - 9593:13
**BC** [4] - 9545:22, 9546:1, 9561:5
**became** [1] - 9593:20
**become** [1] - 9587:20
**BEFORE** [2] - 9541:1, 9541:10
**beginning** [1] - 9546:18
**behalf** [2] - 9592:21, 9597:13
**behind** [2] - 9562:14, 9563:3
**Belknap** [1] - 9541:19
**bell** [1] - 9596:15
**BELLSHAW** [23] - 9541:15, 9544:5, 9544:8, 9546:4, 9546:9, 9547:8, 9547:11, 9551:20, 9554:19, 9554:22, 9565:19, 9567:10, 9567:11, 9571:11, 9571:18, 9573:3, 9573:9, 9573:10, 9577:10, 9577:14, 9581:24, 9583:18, 9585:14
**Bellshaw** [7] - 9544:4, 9554:18, 9582:12, 9583:11, 9584:11, 9585:8, 9586:9
**Bellshaw's** [1] - 9584:23
**below** [2] - 9550:12, 9578:5
**BENCH** [1] - 9541:9
**beneath** [1] - 9555:4
**benefit** [1] - 9566:11
**benefits** [2] - 9544:13, 9562:6
**best** [3] - 9547:1, 9562:13, 9592:16
**better** [4] - 9583:1, 9587:25, 9589:15, 9593:17
**between** [9] - 9547:17, 9548:4, 9552:24, 9558:22, 9560:9, 9566:16, 9566:20, 9573:11, 9574:25
**beyond** [1] - 9571:21
**big** [3] - 9579:22, 9579:23, 9583:21
**biggest** [1] - 9566:22
**billions** [1] - 9566:22
**binder** [4] - 9571:1, 9586:20, 9590:13
**Bing** [2] - 9586:18
**bit** [6] - 9547:21, 9549:20, 9560:9, 9579:3, 9591:16, 9591:23
**black** [1] - 9586:20
**bleed** [2] - 9598:7, 9599:5
**block** [1] - 9578:12
**blue** [1] - 9548:19
**blurry** [1] - 9552:2
**body** [1] - 9575:22
**bottom** [4] - 9549:19, 9549:22, 9576:25, 9580:12
**box** [3] - 9557:5, 9559:7, 9562:17
**breadth** [1] - 9593:3
**break** [5] - 9552:11, 9589:14, 9591:11, 9591:16, 9592:16
**breakdown** [2] - 9550:15, 9551:24
**breaks** [2] - 9547:12, 9548:7
**briefly** [1] - 9545:7
**bringing** [1] - 9556:4
**broad** [1] - 9569:10
**broadly** [1] - 9558:21
**browser** [3] - 9554:6, 9586:15, 9586:17
**bucket** [1] - 9559:12
**buckets** [2] - 9548:12, 9548:18
**building** [2] - 9556:3, 9570:18
**bullet** [2] - 9568:11, 9568:25
**bundle** [9] - 9567:5, 9569:1, 9570:2, 9570:11, 9570:22, 9572:2, 9572:22, 9573:5, 9578:24
**Burling** [1] - 9597:13
**business** [9] - 9553:9, 9554:8, 9556:8, 9561:20, 9579:6, 9581:10, 9581:17, 9582:22, 9586:2
**businesses** [2] - 9553:7, 9564:25
**buy** [1] - 9551:13
**BY** [15] - 9544:8, 9546:9, 9547:11, 9551:20, 9554:22, 9565:19, 9567:11, 9571:18, 9573:3, 9573:10, 9577:14, 9582:9, 9585:17, 9585:23, 9587:7

## C

**candidates** [2] - 9571:22, 9572:19
**candle** [1] - 9593:22
**caps** [1] - 9575:11
**car** [3] - 9587:10, 9587:12, 9587:15
**Car** [1] - 9587:12
**care** [2] - 9597:6, 9598:2
**caret** [1] - 9587:2
**caret-shaped** [1] - 9587:2
**carrier** [3] - 9562:20, 9562:22, 9585:12
**carriers** [7] - 9565:6, 9565:11, 9565:14, 9565:20, 9565:24, 9574:13, 9574:15
**cars** [1] - 9587:9
**case** [9] - 9552:22, 9554:7, 9569:10, 9570:20, 9578:2, 9579:21, 9595:2, 9598:8, 9598:20
**Case** [1] - 9541:3
**cases** [1] - 9598:10
**categorically** [1] - 9567:7
**category** [3] - 9569:24, 9570:4, 9570:19
**Cavanaugh** [3] - 9582:1, 9594:5, 9598:19
**CAVANAUGH** [7] - 9541:19, 9582:2, 9594:6, 9595:10, 9595:17, 9598:4, 9598:21
**certain** [2] - 9576:8, 9576:12
**certainly** [2] - 9556:17, 9599:6
**certainty** [1] - 9572:23
**CERTIFICATE** [1] - 9600:1
**certify** [1] - 9600:3
**cetera** [1] - 9581:10
**chain** [1] - 9573:11
**chance** [3] - 9575:21, 9580:1, 9599:4
**change** [2] - 9558:7, 9590:24
**changed** [3] - 9558:10, 9558:25, 9560:9
**changes** [1] - 9597:19
**characterize** [1] - 9569:17
**characterized** [1] - 9569:2
**charged** [1] - 9582:18
**chart** [5] - 9548:17, 9549:8, 9549:9, 9549:16
**charts** [2] - 9549:12, 9557:4
**chat** [7] - 9557:14, 9557:17, 9557:20, 9557:22, 9557:25, 9558:7, 9558:12
**chats** [1] - 9558:5
**cheaper** [3] - 9565:25, 9566:5

**chevron** [1] - 9587:2
**chevron-shaped** [1] - 9587:2
**choice** [1] - 9579:7
**choices** [1] - 9572:24
**choose** [3] - 9564:18, 9570:7, 9570:10
**Chrome** [2] - 9582:19, 9583:2
**citation** [1] - 9593:24
**clarify** [1] - 9547:20
**client** [4] - 9568:22, 9575:10, 9589:25, 9596:19
**clips** [1] - 9590:5
**clock** [1] - 9599:1
**cognizant** [2] - 9572:21, 9596:14
**collaborate** [1] - 9561:1
**collaboration** [1] - 9560:17
**colleague** [1] - 9567:14
**colleagues** [1] - 9593:8
**color** [1] - 9578:5
**Colorado** [1] - 9541:18
**COLUMBIA** [1] - 9541:1
**column** [4] - 9549:2, 9549:4, 9552:6, 9552:23
**combination** [1] - 9549:5
**coming** [5] - 9550:4, 9569:21, 9594:2, 9594:15, 9597:19
**comment** [1] - 9555:9
**commenting** [1] - 9568:4
**commercial** [4] - 9555:22, 9556:11, 9556:18, 9564:10
**commitment** [5] - 9562:12, 9563:19, 9563:20, 9564:14, 9583:22
**commonly** [1] - 9551:10
**communicate** [1] - 9576:5
**communication** [6] - 9569:5, 9570:17, 9576:6, 9578:3, 9578:4, 9580:5
**communications** [8] - 9576:17, 9577:16, 9577:20, 9578:20,

9580:19, 9580:25, 9581:18, 9581:22
**companies** [4] - 9580:20, 9580:21, 9580:23, 9580:24
**company** [2] - 9580:7, 9580:8
**compared** [1] - 9555:10
**compatible** [1] - 9587:9
**compelling** [2] - 9555:25, 9556:5
**compete** [7] - 9559:20, 9574:13, 9574:15, 9574:22, 9574:24, 9583:1
**competes** [3] - 9574:17, 9574:20, 9580:7
**competing** [2] - 9566:9, 9582:25
**competition** [8] - 9560:22, 9561:6, 9561:24, 9566:16, 9566:20, 9578:11, 9585:13, 9585:19
**competitive** [3] - 9559:25, 9560:25, 9566:8
**competitor** [1] - 9566:23
**competitors** [3] - 9580:3, 9580:12, 9580:13
**complicated** [1] - 9581:12
**components** [2] - 9552:4, 9553:10
**comprise** [1] - 9556:7
**computer** [1] - 9542:14
**computer-aided** [1] - 9542:14
**computing** [1] - 9553:6
**conceptualized** [1] - 9559:15
**concern** [1] - 9596:15
**concerned** [2] - 9575:25, 9576:3
**conclude** [1] - 9599:8
**conditions** [2] - 9561:10, 9562:10
**confer** [4] - 9589:25, 9591:10, 9595:11, 9596:19
**conferred** [1] - 9592:14
**conferring** [1] -

9589:25
**confess** [1] - 9589:21
**confidentiality** [3] - 9590:6, 9593:20, 9595:22
**confirm** [3] - 9562:19, 9589:19, 9592:2
**confirmed** [1] - 9597:15
**connection** [2] - 9556:22, 9579:11
**Connolly** [1] - 9542:2
**consider** [2] - 9596:17, 9597:11
**considered** [2] - 9572:9, 9572:12
**Constitution** [1] - 9542:10
**construct** [1] - 9563:19
**consumer** [3] - 9551:16, 9553:20, 9579:7
**consumers** [5] - 9565:16, 9565:22, 9566:1, 9566:5, 9566:6
**contemplated** [5] - 9548:5, 9557:9, 9557:11, 9557:13, 9564:2
**contemplates** [1] - 9582:22
**contemplating** [2] - 9548:7, 9559:5
**context** [4] - 9550:10, 9555:10, 9576:12, 9579:12
**contexts** [3] - 9576:12, 9587:21, 9588:1
**contingent** [6] - 9562:21, 9562:25, 9563:17, 9563:22, 9563:25, 9564:1
**continue** [3] - 9553:8, 9570:6, 9583:8
**Continued** [1] - 9544:7
**continued** [1] - 9541:23
**CONTINUED** [1] - 9542:1
**continuing** [3] - 9555:22, 9556:11, 9582:24
**continuous** [1] - 9589:11
**controls** [2] - 9588:13, 9588:17

**conversation** [1] - 9573:25
**coordinated** [1] - 9589:5
**core** [1] - 9553:7
**correct** [56] - 9544:16, 9547:15, 9547:23, 9548:10, 9550:3, 9550:17, 9550:25, 9552:21, 9553:13, 9553:16, 9553:22, 9553:23, 9554:10, 9555:15, 9555:19, 9556:12, 9557:8, 9557:15, 9557:21, 9558:6, 9558:14, 9558:15, 9559:17, 9560:23, 9561:7, 9562:8, 9562:17, 9562:22, 9563:1, 9563:10, 9563:13, 9563:18, 9563:24, 9564:20, 9565:7, 9565:16, 9566:2, 9566:15, 9567:6, 9567:19, 9567:22, 9570:23, 9572:3, 9573:13, 9574:1, 9574:14, 9575:1, 9576:5, 9576:8, 9576:21, 9577:24, 9579:10, 9579:15, 9581:22, 9591:2, 9600:4
**correspond** [1] - 9548:13
**cost** [1] - 9555:11
**counsel** [9] - 9561:21, 9568:19, 9571:4, 9571:10, 9579:15, 9590:18, 9591:11, 9592:15, 9597:8
**count** [1] - 9583:2
**counteract** [1] - 9569:20
**counterdesignations** [1] - 9589:9
**counters** [3] - 9593:9, 9594:17
**counting** [1] - 9588:19
**couple** [1] - 9549:12
**course** [5] - 9548:9, 9559:4, 9595:9, 9596:24, 9599:6
**court** [5] - 9544:2, 9585:5, 9589:7, 9596:7, 9596:24
**Court** [3] - 9542:10, 9582:21, 9598:14
**COURT** [57] - 9541:1,

9544:3, 9546:7, 9547:6, 9551:5, 9551:19, 9554:18, 9554:21, 9556:15, 9565:17, 9571:15, 9571:17, 9572:18, 9573:1, 9573:8, 9577:12, 9582:1, 9582:3, 9582:7, 9583:19, 9585:15, 9585:20, 9587:5, 9588:3, 9588:18, 9588:24, 9589:2, 9589:12, 9589:16, 9589:18, 9590:9, 9590:16, 9590:21, 9591:3, 9591:12, 9591:15, 9591:20, 9591:25, 9592:4, 9592:18, 9594:4, 9594:21, 9595:5, 9595:9, 9595:16, 9595:18, 9596:1, 9596:21, 9597:4, 9597:22, 9598:1, 9598:5, 9598:19, 9599:1, 9599:3, 9600:1, 9600:9
**Court's** [1] - 9598:22
**cover** [1] - 9545:6
**covered** [2] - 9550:6, 9584:12
**Covington** [1] - 9597:13
**create** [3] - 9553:8, 9555:25, 9559:16
**creating** [1] - 9572:22
**CROSS** [1] - 9544:7
**Cross** [1] - 9543:4
**cross** [2] - 9585:3, 9594:25
**CROSS-EXAMINATION** [1] - 9544:7
**Cross-Examination..............** [1] - 9543:4
**cross-referenced** [1] - 9585:3
**CRR** [1] - 9542:10
**crush** [1] - 9578:11
**curious** [1] - 9588:18
**current** [1] - 9598:10
**Custom** [1] - 9560:15
**cut** [1] - 9595:13
**cycle** [2] - 9567:18, 9567:23
**cycles** [1] - 9567:21

**D**

**D.C** [6] - 9541:5,
9541:14, 9541:17,
9542:3, 9542:6,
9542:11
**date** [1] - 9593:21
**DATE** [1] - 9600:9
**dated** [3] - 9545:8,
9546:12, 9567:14
**Davies** [1] - 9598:14
**DAY** [1] - 9541:9
**deadlines** [1] - 9599:2
**deal** [51] - 9545:10,
9545:14, 9547:18,
9547:19, 9548:17,
9548:22, 9548:24,
9549:1, 9550:10,
9550:25, 9551:25,
9552:4, 9552:5,
9552:12, 9552:16,
9554:2, 9557:10,
9558:19, 9558:21,
9558:22, 9559:2,
9559:3, 9559:7,
9559:10, 9559:11,
9559:15, 9560:6,
9560:8, 9560:12,
9560:15, 9560:22,
9561:1, 9561:7,
9561:8, 9561:10,
9561:11, 9561:24,
9562:6, 9562:16,
9563:15, 9563:20,
9563:22, 9563:23,
9563:25, 9564:2,
9579:23, 9583:12,
9583:21, 9584:14,
9593:11, 9595:14
**Deal** [2] - 9548:19,
9548:21
**deal's** [1] - 9549:5
**Deals** [1] - 9547:4
**deals** [9] - 9548:13,
9558:24, 9560:4,
9560:21, 9561:6,
9561:11, 9561:23,
9562:20, 9562:23
**decided** [1] - 9593:15
**deciding** [1] - 9572:9
**deck** [7] - 9545:9,
9546:11, 9556:23,
9558:16, 9558:17,
9568:5, 9568:11
**deeper** [1] - 9560:17
**default** [6] - 9553:24,
9554:6, 9558:7,
9558:10, 9562:17,
9586:16
**defaulted** [1] - 9558:5

**Defendant** [2] -
9541:7, 9542:2
**DEFENDANT** [1] -
9544:6
**define** [1] - 9581:6
**defined** [1] - 9581:12
**defining** [1] - 9581:11
**deleteable** [1] -
9588:7
**deleted** [1] - 9558:6
**deliver** [1] - 9592:7
**demonstrative** [2] -
9594:18, 9594:20
**demonstratives** [3] -
9594:24, 9595:1,
9595:3
**Department** [2] -
9541:13, 9541:16
**deponent** [1] -
9594:13
**deponents** [1] -
9594:10
**deposition** [5] -
9543:5, 9589:5,
9591:21, 9592:13,
9594:8
**described** [1] -
9566:16
**description** [4] -
9560:3, 9560:15,
9560:21
**designations** [8] -
9589:8, 9590:5,
9593:23, 9594:8,
9594:10, 9594:11,
9594:12, 9594:14
**Designed** [1] - 9547:4
**determining** [1] -
9572:2
**developer** [1] - 9556:3
**developers** [1] -
9556:4
**device** [19] - 9554:9,
9559:8, 9559:17,
9559:19, 9561:9,
9561:11, 9562:17,
9564:12, 9565:15,
9566:8, 9570:14,
9570:17, 9574:23,
9583:5, 9584:18,
9584:23, 9587:18,
9588:14, 9588:17
**devices** [30] -
9547:13, 9548:9,
9550:2, 9550:16,
9550:24, 9552:1,
9552:15, 9553:12,
9553:17, 9553:25,
9554:2, 9559:19,
9560:25, 9562:7,

9562:10, 9562:13,
9562:16, 9563:3,
9565:22, 9566:5,
9574:9, 9574:18,
9574:23, 9574:25,
9575:3, 9584:12,
9585:13, 9586:3,
9586:5
**difference** [1] -
9552:24
**differences** [2] -
9548:4, 9574:4
**different** [5] - 9552:4,
9571:7, 9580:21,
9581:20, 9587:20
**differentiate** [2] -
9574:9, 9575:3
**differentiating** [1] -
9574:23
**differentiation** [1] -
9574:25
**differently** [1] -
9581:20
**difficult** [2] - 9561:25,
9593:21
**Digital** [1] - 9588:16
**DINTZER** [6] -
9541:13, 9595:19,
9596:22, 9598:3,
9598:11, 9599:2
**direct** [7] - 9544:12,
9546:21, 9549:19,
9558:16, 9567:9,
9568:12, 9571:4
**directly** [3] - 9554:16,
9555:1, 9592:20
**disagreements** [1] -
9593:7
**discuss** [1] - 9585:5
**discussed** [5] -
9548:14, 9554:3,
9557:20, 9563:22,
9594:15
**discussing** [1] -
9547:22
**discussion** [3] -
9557:24, 9597:17,
9597:18
**discussions** [2] -
9566:25, 9592:13
**disputes** [1] - 9590:6
**distribute** [1] -
9582:23
**distributes** [1] -
9582:13
**distribution** [2] -
9555:11, 9568:14
**Distribution** [1] -
9547:4, 9549:24,
9550:1

**DISTRICT** [3] - 9541:1,
9541:1, 9541:10
**document** [15] -
9545:17, 9547:6,
9576:16, 9576:22,
9576:23, 9577:1,
9577:8, 9577:23,
9581:4, 9581:19,
9584:2, 9584:9,
9584:17, 9585:7,
9597:16
**documents** [4] -
9545:4, 9578:2,
9595:22, 9597:5
**DOJ** [3] - 9541:13,
9595:19, 9598:3
**dollar** [2] - 9547:5
**dollars** [3] - 9563:3,
9564:9, 9566:22
**done** [3] - 9546:17,
9564:6, 9594:1
**Douyon** [1] - 9592:4
**down** [10] - 9547:12,
9548:8, 9552:11,
9554:16, 9560:2,
9574:5, 9579:3,
9579:4, 9580:12,
9595:13
**download** [1] -
9551:11
**Dr** [1] - 9594:19
**Drake** [1] - 9545:8
**draw** [1] - 9579:11
**drive** [2] - 9555:22,
9556:11
**driving** [1] - 9560:16
**Duo** [3] - 9570:15,
9570:18, 9586:9
**during** [7] - 9547:14,
9550:3, 9550:17,
9550:24, 9567:21,
9578:17
**DXD35** [1] - 9586:7

**E**

**e-mail** [20] - 9545:6,
9545:8, 9545:18,
9558:3, 9567:14,
9568:1, 9568:4,
9568:21, 9571:2,
9573:11, 9573:16,
9573:19, 9573:25,
9575:5, 9575:7,
9575:10, 9575:23,
9579:9, 9579:15,
9596:3
**e-mails** [1] - 9578:2
**earn** [3] - 9547:13,
9548:9, 9561:9

**easier** [1] - 9549:20
**economic** [2] -
9554:17, 9555:2
**economics** [3] -
9561:9, 9562:10,
9583:5
**ecosystem** [2] -
9556:2, 9556:3
**ecosystems** [1] -
9568:9
**Edge** [2] - 9586:15,
9586:17
**edited** [1] - 9590:20
**effectively** [1] -
9571:14
**effort** [1] - 9596:23
**efforts** [1] - 9596:14
**eight** [1] - 9572:23
**either** [3] - 9551:10,
9566:4, 9586:4
**elements** [1] - 9557:7
**eligible** [2] - 9562:10,
9584:18
**Elizabeth** [1] -
9594:23
**elliptically** [1] - 9584:8
**eMADA** [1] - 9582:18
**emerging** [2] -
9569:24, 9570:5
**employed** [1] - 9593:2
**employee** [1] -
9557:14
**employees** [19] -
9557:17, 9576:4,
9576:7, 9576:10,
9576:20, 9577:6,
9577:19, 9577:22,
9578:1, 9578:10,
9578:16, 9578:19,
9578:24, 9580:2,
9580:11, 9580:18,
9580:24, 9581:16,
9581:22
**end** [3] - 9557:10,
9589:24, 9596:3
**ended** [1] - 9585:21
**ending** [5] - 9551:3,
9554:20, 9558:18,
9571:20, 9584:17
**ends** [2] - 9547:6,
9551:22
**engine** [1] - 9586:16
**entitled** [3] - 9576:16,
9586:22, 9600:5
**especially** [1] -
9577:17
**ESQ** [5] - 9541:13,
9541:15, 9541:19,
9542:2, 9542:4
**estimate** [1] - 9581:6

**estimating** [1] - 9581:12
**et** [2] - 9541:3, 9581:10
**Europe** [2] - 9582:18, 9583:2
**evaluate** [1] - 9567:23
**evaluates** [1] - 9567:21
**evening** [3] - 9595:25, 9596:19, 9598:23
**eventually** [2] - 9546:17, 9547:18
**evidence** [9] - 9546:8, 9567:10, 9571:12, 9571:14, 9571:16, 9577:13, 9584:3, 9592:1, 9594:22
**evil** [1] - 9578:12
**evolve** [1] - 9587:15
**evolving** [1] - 9570:19
**exact** [3] - 9549:23, 9552:10, 9558:4
**exactly** [2] - 9559:13, 9585:20
**EXAMINATION** [2] - 9544:7, 9582:8
**Examination..........** [1] - 9543:4
**Examination..........** [1] - 9543:4
**examiners** [1] - 9596:6
**example** [4] - 9551:11, 9569:18, 9570:9, 9570:14
**examples** [2] - 9579:12, 9581:3
**except** [1] - 9545:6
**exception** [1] - 9565:8
**excited** [1] - 9563:5
**exclusive** [1] - 9562:17
**exclusivity** [5] - 9563:1, 9563:10, 9563:18, 9563:21, 9563:23
**exec/BC** [1] - 9545:23
**execute** [1] - 9553:9
**executed** [2] - 9558:23, 9558:24
**execution** [1] - 9561:8
**executive** [1] - 9545:20
**executives** [2] - 9561:5, 9561:21
**Exhibit** [3] - 9571:16, 9577:13, 9594:22
**EXHIBITS** [1] - 9543:8
**Exhibits** [1] - 9546:8

**exhibits** [3] - 9592:1, 9594:7, 9595:12
**existential** [1] - 9564:17
**exists** [1] - 9588:14
**expected** [5] - 9549:16, 9550:2, 9550:4, 9550:8, 9552:11
**expecting** [1] - 9598:19
**expensive** [1] - 9555:7
**experience** [1] - 9555:25, 9560:17, 9563:6, 9570:14, 9570:17, 9572:14, 9574:4, 9587:11, 9587:24, 9587:25, 9589:15
**experiences** [2] - 9574:9, 9574:23
**experts** [1] - 9599:5
**explain** [1] - 9551:6
**explicitly** [1] - 9573:15
**exploitation** [1] - 9579:7
**extent** [3] - 9566:10, 9579:24, 9596:24
**extra** [2] - 9553:1, 9563:2
**Ezell** [2] - 9589:19, 9592:23

## F

**Facebook** [7] - 9581:1, 9590:4, 9591:4, 9592:13, 9592:15, 9597:8, 9597:21
**Facebook's** [2] - 9590:18, 9590:25
**FaceTime** [2] - 9570:15, 9570:18
**facilitate** [1] - 9551:15
**fact** [1] - 9564:23
**factors** [1] - 9591:8
**Family** [1] - 9588:13
**family** [1] - 9588:14
**famous** [1] - 9578:16
**far** [3] - 9549:13, 9552:6, 9598:25
**features** [1] - 9561:12
**February** [2] - 9597:17, 9597:21
**fee** [2] - 9582:18, 9583:3
**feedback** [2] - 9568:11, 9568:25
**fees** [1] - 9551:9

**felt** [1] - 9563:7, 9570:16
**few** [3] - 9557:17, 9581:3, 9594:6
**Fifth** [1] - 9541:16
**fifth** [1] - 9577:22
**fight** [2] - 9593:10, 9593:11
**figure** [3] - 9592:16, 9597:15, 9597:20
**figures** [1] - 9549:23
**filed** [4] - 9595:21, 9595:23, 9595:24
**final** [2] - 9548:2, 9548:4
**finalize** [1] - 9594:14
**finalized** [1] - 9548:1
**financial** [2] - 9552:3, 9562:6
**fine** [2] - 9595:5, 9596:21
**finish** [2] - 9599:4, 9599:6
**firm** [1] - 9598:24
**first** [27] - 9545:5, 9548:18, 9549:5, 9549:22, 9549:23, 9550:1, 9550:19, 9556:24, 9560:6, 9561:10, 9563:23, 9563:25, 9564:2, 9568:11, 9571:1, 9572:5, 9572:8, 9572:13, 9573:18, 9575:22, 9576:25, 9577:16, 9578:8, 9587:2, 9594:2, 9596:20, 9597:2
**five** [5] - 9576:16, 9577:15, 9577:19, 9578:6, 9581:21
**flag** [1] - 9590:12
**flip** [1] - 9556:23
**flop** [1] - 9598:17
**focus** [2] - 9559:23, 9593:10
**focused** [3] - 9559:23, 9559:25, 9560:16
**focusing** [3] - 9548:6, 9550:19, 9567:3
**foldable** [1] - 9575:3
**follow** [1] - 9577:20
**following** [3] - 9571:22, 9591:3, 9599:6
**FOR** [2] - 9541:1, 9544:6
**Force** [1] - 9560:12
**foregoing** [1] - 9600:3
**forgot** [1] - 9595:10

**form** [1] - 9564:9
**forth** [1] - 9593:14
**forward** [2] - 9554:21, 9556:23, 9557:2, 9558:17, 9587:21
**foundational** [1] - 9583:22
**four** [1] - 9589:6
**fourth** [2] - 9574:5, 9581:5
**framework** [7] - 9547:22, 9548:1, 9557:13, 9558:23, 9559:1, 9559:5
**frankly** [2] - 9593:10, 9593:16
**free** [2] - 9551:13, 9578:21
**front** [1] - 9556:5
**full** [2] - 9558:9, 9583:5
**full-time** [1] - 9558:9
**fully** [2] - 9564:24, 9584:9
**functionality** [1] - 9588:11
**fund** [1] - 9559:16
**funding** [2] - 9562:6, 9564:1
**funds** [5] - 9562:21, 9563:16, 9565:5, 9565:10, 9585:8
**future** [1] - 9552:12

## G

**game** [2] - 9551:11, 9551:13
**games** [1] - 9551:12
**general** [1] - 9578:3
**generally** [1] - 9553:19
**generate** [2] - 9551:8, 9572:6
**generated** [2] - 9552:1, 9555:15
**generates** [2] - 9551:7, 9567:5
**generating** [1] - 9572:8
**geographies** [1] - 9559:17
**GIARD** [1] - 9543:5
**Giard** [3] - 9589:4, 9591:21, 9592:23
**given** [5] - 9564:17, 9566:20, 9592:7, 9593:13, 9594:3
**go-to-market** [14] - 9548:17, 9549:1,

9559:11, 9560:17, 9561:2, 9562:5, 9562:14, 9562:15, 9562:25, 9565:1, 9565:9, 9583:13, 9583:15, 9584:5
**GOOGLE** [1] - 9541:6
**Google** [88] - 9544:11, 9544:13, 9544:18, 9544:19, 9544:20, 9544:21, 9545:1, 9546:15, 9547:5, 9547:13, 9547:21, 9548:1, 9548:6, 9548:8, 9550:16, 9551:7, 9551:25, 9553:3, 9553:17, 9553:21, 9553:24, 9554:1, 9554:2, 9554:5, 9554:10, 9554:12, 9554:17, 9555:2, 9555:13, 9555:19, 9555:21, 9556:10, 9557:12, 9557:14, 9558:8, 9558:14, 9559:2, 9559:19, 9561:5, 9562:16, 9562:24, 9563:17, 9564:17, 9564:18, 9565:3, 9565:7, 9565:12, 9565:21, 9565:25, 9566:3, 9566:21, 9566:25, 9567:6, 9567:14, 9567:18, 9567:21, 9568:19, 9569:13, 9569:15, 9570:7, 9570:10, 9570:12, 9570:14, 9570:15, 9572:5, 9572:6, 9572:8, 9572:9, 9573:11, 9574:3, 9575:16, 9576:4, 9576:23, 9577:5, 9578:1, 9578:19, 9580:3, 9580:7, 9580:24, 9582:13, 9583:7, 9583:8, 9583:16, 9587:13, 9587:22, 9592:8, 9594:12, 9595:11
**Google's** [4] - 9557:14, 9561:21, 9576:20, 9598:6
**graphs** [1] - 9546:25
**Gray** [2] - 9542:5, 9550:13
**gray** [3] - 9549:9, 9549:12

**great** [9] - 9561:12, 9569:10, 9570:2, 9570:4, 9570:11, 9587:19, 9591:15, 9594:5, 9597:4
**greater** [1] - 9593:3
**group** [1] - 9580:13
**grow** [1] - 9582:25
**growing** [1] - 9561:3
**grown** [1] - 9593:9
**growth** [1] - 9559:16
**guess** [3] - 9544:11, 9548:25, 9596:9
**guessing** [1] - 9581:13
**guidance** [1] - 9581:19
**guided** [1] - 9590:2
**guidelines** [7] - 9576:4, 9576:6, 9576:7, 9576:20, 9578:1, 9578:3, 9580:18
**guiding** [3] - 9567:4, 9572:1, 9572:5

## H

**half** [1] - 9598:24
**hand** [4] - 9556:6, 9595:4, 9595:5
**handed** [2] - 9586:20, 9589:19
**handful** [2] - 9590:8, 9595:12
**happy** [3] - 9595:3, 9596:17, 9597:11
**hard** [2] - 9552:2, 9587:14
**Harrison** [1] - 9545:14
**hash** [1] - 9593:21
**header** [1] - 9547:9
**heading** [4] - 9547:4, 9548:19, 9548:21, 9548:24
**headless** [1] - 9588:9
**health** [4] - 9569:4, 9569:17, 9569:18, 9569:23
**heard** [5] - 9591:13, 9592:24, 9597:8, 9598:14
**hearing** [1] - 9597:14
**help** [1] - 9578:8
**helpful** [1] - 9549:7
**helpfully** [1] - 9580:17
**helps** [2] - 9573:15, 9588:16
**Herculean** [1] - 9596:14

**Higgins** [1] - 9592:24
**high** [2] - 9551:6, 9564:17
**higher** [1] - 9552:19
**highest** [1] - 9564:10
**highlighted** [1] - 9579:2
**highly** [1] - 9566:8
**hire** [1] - 9564:23
**history** [2] - 9558:5, 9558:10
**holds** [1] - 9592:23
**home** [1] - 9588:25
**Honor** [35] - 9544:5, 9546:4, 9546:6, 9554:19, 9556:14, 9567:10, 9571:11, 9571:14, 9577:10, 9577:11, 9582:2, 9582:4, 9584:3, 9584:8, 9588:2, 9588:22, 9589:3, 9589:13, 9589:23, 9590:7, 9591:22, 9593:10, 9594:6, 9594:13, 9595:8, 9595:19, 9596:22, 9597:3, 9597:12, 9598:3, 9598:4, 9598:11, 9598:21, 9598:25, 9599:2
**HONORABLE** [1] - 9541:10
**hoped** [3] - 9564:24, 9586:4, 9589:22
**hopefully** [2] - 9592:7, 9595:12
**hour** [2] - 9589:6, 9593:1
**hours** [5] - 9558:6, 9593:16, 9593:17, 9593:25, 9598:24
**house** [3] - 9568:19, 9575:16, 9579:15
**Howard** [1] - 9574:6
**hurt** [1] - 9578:12
**hypothetical** [1] - 9583:18

## I

**icon** [4] - 9586:14, 9587:3, 9587:4, 9588:15
**icons** [2] - 9586:12, 9588:10
**idea** [1] - 9563:2
**identifies** [1] - 9572:5
**image** [1] - 9586:11
**impact** [4] - 9554:17,

9555:2, 9578:10, 9590:25
**impacts** [1] - 9591:5
**implicated** [1] - 9576:14
**implications** [2] - 9575:20, 9579:24
**implies** [3] - 9556:21, 9579:6, 9581:12
**importance** [3] - 9564:8, 9564:17, 9564:25
**important** [6] - 9556:7, 9563:7, 9569:19, 9569:25, 9570:13, 9570:20
**important/strategic** [1] - 9569:11
**improving** [1] - 9560:16
**in-car** [1] - 9587:15
**in-house** [3] - 9568:19, 9575:16, 9579:15
**inadvertence** [1] - 9596:11
**inadvertent** [1] - 9596:13
**inadvertently** [1] - 9596:5
**Inc** [1] - 9597:13
**incentive** [3] - 9561:2, 9583:8, 9585:18
**incentives** [2] - 9564:19, 9585:24
**incentivize** [1] - 9585:12
**include** [13] - 9544:18, 9558:13, 9567:22, 9569:15, 9569:18, 9570:7, 9570:10, 9572:2, 9572:10, 9576:7, 9580:11, 9580:25, 9582:19
**included** [6] - 9544:22, 9552:23, 9567:3, 9580:18, 9588:6, 9588:7
**includes** [2] - 9553:1, 9582:19
**including** [7] - 9556:1, 9558:12, 9567:4, 9567:22, 9570:1, 9573:12
**incorporating** [1] - 9557:10
**increasingly** [1] - 9587:20
**Incremental** [1] - 9547:5

**indicated** [1] - 9590:7
**individual** [2] - 9592:25, 9594:14
**indulgence** [1] - 9596:18
**industry** [1] - 9587:14
**information** [4] - 9547:1, 9580:8, 9584:22, 9585:1
**infotainment** [1] - 9587:15
**initiative** [1] - 9569:19
**innovation** [2] - 9575:1, 9575:2
**innovations** [1] - 9575:4
**instructions** [1] - 9576:7
**instructs** [1] - 9578:24
**Integrations** [1] - 9586:23
**intend** [1] - 9589:20
**intense** [1] - 9566:17
**intensity** [1] - 9566:20
**interest** [3] - 9555:22, 9556:11, 9556:18
**interested** [1] - 9556:4
**internal** [3] - 9557:14, 9577:5, 9597:17
**internalize** [1] - 9564:24
**internally** [1] - 9559:6
**invest** [8] - 9555:22, 9556:2, 9556:11, 9564:8, 9570:6, 9582:24, 9583:8
**investing** [1] - 9569:22
**investment** [2] - 9556:8, 9559:16
**Investment** [1] - 9560:12
**investor** [1] - 9591:9
**iOS** [11] - 9555:10, 9560:16, 9560:23, 9560:25, 9561:3, 9561:6, 9561:24, 9562:3, 9582:25, 9585:13, 9587:12
**iPhone** [6] - 9553:21, 9554:9, 9554:12, 9555:11, 9559:20, 9587:19
**iPhone/Android** [1] - 9585:19
**iPhones** [4] - 9553:15, 9554:6, 9570:16, 9594:6
**Israel** [2] - 9594:19, 9594:25

**issue** [2] - 9564:17, 9596:8
**issues** [2] - 9593:20, 9594:3
**item** [1] - 9558:16

## J

**JAMIE** [1] - 9543:4, 9544:6
**Jeff** [2] - 9574:6, 9589:4
**JEFFREY** [1] - 9543:5
**Jeffrey** [1] - 9591:21
**JENSEN** [2] - 9594:23, 9595:8
**Jensen** [1] - 9594:23
**job** [1] - 9556:20
**JOHN** [1] - 9542:2
**JR** [1] - 9541:19
**JUDGE** [1] - 9541:10
**judgment** [1] - 9593:22
**Justice** [2] - 9541:13, 9541:16
**JX0075** [1] - 9584:3

## K

**Kartasheva** [1] - 9573:12
**Kate** [3] - 9568:14, 9568:17
**Kayak** [1] - 9581:1
**keep** [4] - 9572:23, 9578:2, 9578:20, 9597:22
**KENNETH** [1] - 9541:13
**Kesh** [1] - 9573:19
**key** [1] - 9560:16
**kicker** [1] - 9561:14
**kill** [1] - 9578:11
**known** [1] - 9548:25
**Kolotouros** [2] - 9557:25, 9558:12

## L

**labeled** [1] - 9557:5
**language** [2] - 9570:3, 9579:1
**largely** [1] - 9593:2
**last** [10] - 9558:16, 9572:25, 9573:5, 9586:19, 9589:8, 9590:13, 9592:16, 9594:18, 9596:3, 9598:6
**late** [1] - 9593:21

9607

**law** [1] - 9577:17
**lawyer** [1] - 9575:16
**LAZEROW** [2] - 9597:12, 9597:25
**Lazerow** [1] - 9597:13
**lead** [1] - 9574:25
**leading** [1] - 9585:14
**least** [10] - 9557:11, 9559:15, 9560:11, 9572:13, 9580:5, 9580:22, 9588:5, 9591:7, 9595:12, 9598:17
**leave** [1] - 9589:13
**Lee** [3] - 9568:17, 9568:19, 9568:22
**left** [3] - 9549:11, 9549:13, 9552:6
**legal** [4] - 9575:14, 9575:20, 9579:17, 9579:24
**length** [2] - 9593:12, 9599:5
**lesser** [1] - 9595:13
**lesson** [1] - 9579:8
**level** [2] - 9551:6, 9551:14
**leverage** [8] - 9575:24, 9576:1, 9576:11, 9576:13, 9579:4, 9579:5, 9579:10, 9579:14
**Levy** [2] - 9589:19, 9590:3
**license** [2] - 9582:18, 9583:3
**likelihood** [1] - 9598:8
**likely** [3] - 9559:20, 9568:18, 9583:24
**likewise** [1] - 9579:4
**limited** [1] - 9544:14
**limits** [1] - 9588:17
**line** [9] - 9545:9, 9549:23, 9552:7, 9574:5, 9582:14, 9590:14, 9590:22
**lines** [1] - 9558:24
**Link** [1] - 9588:13
**linked** [2] - 9545:17, 9571:2
**list** [9] - 9572:13, 9578:5, 9580:13, 9580:17, 9580:20, 9580:23, 9580:24
**listen** [1] - 9593:12
**lists** [2] - 9577:19, 9580:11
**live** [4] - 9592:10, 9592:11, 9592:24, 9594:15

**LLC** [1] - 9541:6
**LLP** [3] - 9541:19, 9542:2, 9542:5
**loaded** [1] - 9562:16
**Lockheimer** [4] - 9545:13, 9568:5, 9568:8, 9568:12
**long-range** [1] - 9597:18
**look** [11] - 9545:7, 9548:15, 9552:14, 9562:18, 9574:9, 9575:22, 9576:25, 9589:21, 9597:9, 9597:23, 9599:3
**looked** [2] - 9546:18, 9590:23
**looking** [15] - 9546:11, 9547:3, 9549:8, 9552:6, 9552:9, 9552:20, 9554:15, 9556:24, 9560:2, 9560:21, 9568:25, 9577:15, 9577:22, 9580:2, 9581:5
**looks** [3] - 9569:6, 9590:9, 9590:21
**lose** [2] - 9555:4, 9555:5
**loses** [3] - 9553:21, 9555:13, 9555:14
**loss** [2] - 9554:17, 9555:2
**loud** [1] - 9584:16
**lower** [2] - 9565:15, 9565:21
**lunch** [1] - 9589:21

**M**

**MADA** [25] - 9544:20, 9544:22, 9567:3, 9567:4, 9567:5, 9567:8, 9567:19, 9567:21, 9569:1, 9569:16, 9570:1, 9570:7, 9570:10, 9570:22, 9571:21, 9572:2, 9572:10, 9573:5, 9582:13, 9582:23, 9583:3, 9583:4, 9587:13, 9588:6, 9588:7
**mail** [20] - 9545:6, 9545:8, 9545:18, 9558:3, 9567:14, 9568:1, 9568:4, 9568:21, 9571:2, 9573:11, 9573:16, 9573:19, 9573:25,

9575:5, 9575:7, 9575:10, 9575:23, 9579:9, 9579:15, 9596:3
**mails** [1] - 9578:2
**Maine** [1] - 9542:3
**majority** [1] - 9584:9
**manufacturers** [1] - 9566:8
**Margin** [1] - 9547:5
**MARK** [1] - 9542:4
**mark** [1] - 9568:13
**marked** [1] - 9568:21
**market** [25] - 9548:17, 9549:1, 9555:13, 9559:8, 9559:11, 9560:17, 9561:2, 9561:13, 9562:5, 9562:14, 9562:15, 9562:21, 9562:25, 9565:1, 9565:9, 9566:9, 9581:10, 9581:11, 9581:12, 9581:13, 9581:16, 9583:13, 9583:15, 9584:5
**marketing** [2] - 9561:1, 9563:16
**markets** [2] - 9579:4, 9581:6
**match** [1] - 9597:1
**material** [1] - 9590:13
**matter** [3] - 9577:17, 9598:16, 9600:5
**MEAGAN** [1] - 9541:15
**mean** [9] - 9546:17, 9549:12, 9556:17, 9569:4, 9570:14, 9572:19, 9575:2, 9580:20, 9591:3
**means** [1] - 9550:11
**meant** [5] - 9553:6, 9568:13, 9569:13, 9572:20, 9572:21
**Meet** [1] - 9570:14
**meet** [3] - 9570:19, 9595:11, 9599:2
**meeting** [2] - 9545:20, 9564:1
**MEHTA** [1] - 9541:10
**member** [1] - 9573:23
**mentioned** [2] - 9594:18, 9594:25
**mentions** [1] - 9562:3
**met** [1] - 9561:10
**Meta** [1] - 9597:13
**Microsoft** [2] - 9578:17, 9586:15
**middle** [2] - 9548:21,

9557:4
**might** [15] - 9549:19, 9555:15, 9569:10, 9569:15, 9570:2, 9570:4, 9570:7, 9570:10, 9570:11, 9575:19, 9576:12, 9578:11, 9578:12, 9589:15, 9597:19
**mind** [3] - 9578:2, 9578:20, 9597:22
**minute** [2] - 9557:1, 9573:14
**minutes** [5] - 9589:6, 9592:22, 9593:2, 9594:1
**Mobile** [1] - 9589:4
**mode** [1] - 9587:16
**model** [1] - 9582:22
**moment** [2] - 9582:5, 9588:4
**moments** [1] - 9597:23
**Monday** [2] - 9594:2, 9598:6
**monetary** [2] - 9544:12, 9544:13
**monetize** [1] - 9582:13
**monetizeable** [1] - 9550:16
**monetizes** [4] - 9544:19, 9544:21, 9555:10, 9587:22
**monetizing** [1] - 9560:8
**money** [6] - 9545:1, 9553:17, 9572:13, 9575:24, 9586:2, 9586:3
**morning** [4] - 9597:3, 9597:4, 9597:24, 9599:9
**most** [4] - 9559:20, 9559:22, 9568:18, 9583:24
**motivate** [1] - 9586:4
**motivation** [2] - 9553:8, 9564:14
**Motorola** [1] - 9574:20
**move** [3] - 9546:4, 9571:11, 9577:10
**moved** [1] - 9587:21
**moving** [1] - 9554:21
**MR** [44] - 9546:6, 9556:13, 9571:13, 9577:11, 9582:2, 9582:4, 9582:9, 9585:16, 9585:17, 9585:22, 9585:23,

9587:7, 9588:2, 9588:22, 9589:3, 9589:13, 9589:17, 9589:23, 9590:11, 9590:17, 9591:2, 9591:10, 9591:13, 9591:22, 9592:2, 9592:6, 9592:19, 9594:5, 9594:6, 9595:10, 9595:17, 9595:19, 9595:20, 9596:18, 9596:22, 9597:2, 9597:12, 9597:25, 9598:3, 9598:4, 9598:11, 9598:21, 9598:22, 9599:2
**MS** [24] - 9544:5, 9544:8, 9546:4, 9546:9, 9547:8, 9547:11, 9551:20, 9554:19, 9554:22, 9565:19, 9567:10, 9567:11, 9571:11, 9571:18, 9573:3, 9573:9, 9573:10, 9577:10, 9577:14, 9581:24, 9583:18, 9585:14, 9594:23, 9595:8
**Murphy** [1] - 9594:2
**Murphy's** [1] - 9598:17

**N**

**name** [1] - 9581:2
**named** [1] - 9552:7
**names** [2] - 9580:21, 9581:1
**nature** [1] - 9586:6
**nearly** [1] - 9593:16
**Nebraska** [1] - 9541:19
**necessarily** [6] - 9554:11, 9555:9, 9556:22, 9572:16, 9579:11, 9588:15
**need** [6] - 9564:3, 9573:14, 9580:13, 9583:1, 9595:7, 9598:1
**needed** [3] - 9562:24, 9564:5, 9570:16
**needs** [2] - 9563:17, 9583:22
**negotiate** [1] - 9547:22
**negotiated** [3] - 9548:1, 9559:14,

9592:25
**negotiation** [4] - 9547:17, 9558:22, 9576:13, 9579:13
**negotiations** [3] - 9559:3, 9559:4, 9593:6
**never** [1] - 9558:10
**new** [8] - 9548:9, 9550:3, 9550:17, 9551:25, 9559:2, 9569:19, 9570:22, 9572:2
**New** [2] - 9541:21
**news** [2] - 9591:4, 9592:7
**next** [5] - 9589:3, 9590:3, 9598:7, 9598:24, 9599:4
**Nicholas** [1] - 9545:8
**night** [1] - 9596:3
**Northwest** [4] - 9541:14, 9541:16, 9542:5, 9542:10
**note** [1] - 9549:22
**notes** [8] - 9549:19, 9554:16, 9554:25, 9560:2, 9560:11, 9560:22, 9562:2, 9562:3
**nothing** [3] - 9564:19, 9585:6, 9595:19
**notwithstanding** [1] - 9596:10
**November** [4] - 9541:6, 9546:18, 9548:3, 9600:8
**number** [26] - 9546:25, 9548:22, 9548:25, 9549:23, 9550:1, 9550:12, 9550:19, 9550:20, 9550:23, 9551:3, 9551:22, 9552:19, 9552:20, 9556:25, 9561:7, 9561:24, 9571:20, 9573:8, 9575:6, 9590:15, 9590:20, 9590:21, 9590:23, 9591:8, 9592:25, 9595:13
**Number** [1] - 9541:3
**numbers** [7] - 9546:25, 9552:2, 9552:10, 9592:5, 9595:6, 9596:4

## O

**Oard** [1] - 9598:13

**objection** [5] - 9546:6, 9556:13, 9577:11, 9583:18, 9585:14
**objectives** [1] - 9585:11
**obviously** [4] - 9591:14, 9592:19, 9593:18, 9593:23
**OEM** [1] - 9585:12
**OEMs** [6] - 9565:2, 9565:12, 9565:14, 9565:20, 9574:13, 9574:15
**OF** [5] - 9541:1, 9541:3, 9541:9, 9600:1, 9600:9
**offer** [5] - 9564:18, 9581:11, 9593:15, 9594:8, 9594:19
**offered** [1] - 9595:1
**offering** [2] - 9556:5, 9595:1
**offers** [1] - 9576:4
**OFFICIAL** [1] - 9600:1
**Official** [1] - 9542:10
**often** [1] - 9559:21
**once** [1] - 9596:23
**one** [45] - 9549:13, 9551:22, 9552:20, 9554:14, 9556:24, 9557:1, 9557:7, 9557:20, 9558:16, 9560:11, 9560:22, 9561:6, 9561:8, 9561:23, 9563:6, 9566:14, 9567:23, 9570:14, 9570:22, 9572:11, 9572:17, 9574:22, 9574:24, 9575:2, 9576:10, 9577:22, 9582:5, 9582:16, 9585:11, 9585:24, 9588:12, 9588:16, 9589:6, 9589:16, 9590:3, 9590:11, 9594:13, 9595:10, 9596:5, 9596:9, 9598:5, 9598:12, 9599:7
**ones** [1] - 9551:23
**open** [4] - 9584:10, 9585:5, 9585:21, 9589:7
**open-ended** [1] - 9585:21
**opportunity** [1] - 9554:13
**orange** [1] - 9557:5
**order** [5] - 9544:2, 9562:5, 9598:15,

9598:22, 9598:23
**organizing** [1] - 9569:7
**originally** [1] - 9559:15
**outside** [1] - 9599:4
**outstanding** [1] - 9596:2
**overruled** [1] - 9556:15
**owe** [1] - 9594:16
**own** [2] - 9564:25, 9591:3

## P

**P&L** [1] - 9566:11
**p.m** [6] - 9541:6, 9568:1, 9591:19, 9598:23, 9599:10
**package** [1] - 9588:11
**page** [19] - 9545:12, 9546:24, 9547:3, 9551:2, 9551:3, 9554:25, 9561:4, 9567:25, 9571:19, 9573:16, 9573:18, 9575:5, 9575:6, 9576:25, 9584:17, 9586:21, 9590:13, 9590:14, 9590:22
**pages** [2] - 9556:24, 9557:2
**paging** [1] - 9572:20
**paid** [1] - 9551:14
**paragraph** [1] - 9555:4, 9569:6, 9577:16
**parens** [2] - 9549:24, 9575:14
**parental** [1] - 9588:13
**parse** [1] - 9549:20
**part** [7] - 9551:13, 9554:8, 9556:7, 9562:3, 9567:4, 9583:4, 9588:11
**particular** [5] - 9569:9, 9575:20, 9580:13, 9591:6, 9591:8
**particularly** [3] - 9559:25, 9566:7, 9593:8
**parties** [4] - 9548:2, 9590:5, 9590:19, 9593:13
**partner** [6] - 9564:11, 9564:14, 9583:22, 9586:16
**partner's** [1] - 9586:1
**partners** [6] - 9564:18,

9564:24, 9566:4, 9574:22, 9585:9, 9585:12
**partnership** [1] - 9579:22
**partnerships** [1] - 9573:23
**past** [1] - 9595:1
**Patel** [6] - 9573:19, 9573:21, 9573:22, 9573:25, 9574:3, 9574:8
**Patterson** [1] - 9541:19
**Pay** [2] - 9544:19, 9544:20
**pay** [1] - 9557:12
**paying** [2] - 9566:22, 9567:1
**Payment** [1] - 9557:5
**payments** [12] - 9551:9, 9557:7, 9557:8, 9562:25, 9565:1, 9565:2, 9565:7, 9565:12, 9565:15, 9565:21, 9565:25, 9566:4
**pays** [3] - 9565:3, 9565:7, 9565:12
**Pennsylvania** [1] - 9542:5
**per** [2] - 9583:5, 9595:20
**percent** [2] - 9555:14, 9590:15
**percentage** [2] - 9591:6, 9592:15
**perfect** [1] - 9570:20
**philosophical** [1] - 9574:4
**phone** [5] - 9553:20, 9587:10, 9587:16, 9587:20, 9588:1
**phones** [2] - 9566:8, 9569:23
**Pichai** [1] - 9545:20
**piece** [1] - 9555:12
**Placement** [1] - 9586:22
**placement** [1] - 9562:11
**places** [2] - 9590:8
**Plaintiffs** [3] - 9541:4, 9541:13, 9541:18
**plaintiffs** [3] - 9595:19, 9598:3, 9598:9
**plan** [3] - 9570:5,

9591:17, 9597:18
**plans** [2] - 9565:25, 9566:5
**platform** [1] - 9582:25
**Platforms** [1] - 9597:13
**platforms** [1] - 9568:9
**play** [6] - 9551:12, 9551:15, 9555:5, 9589:10, 9589:14, 9590:3
**Play** [31] - 9544:11, 9544:24, 9545:1, 9545:2, 9550:20, 9550:24, 9551:7, 9551:9, 9551:11, 9551:17, 9552:7, 9552:11, 9552:15, 9553:12, 9553:18, 9553:21, 9555:15, 9555:18, 9556:3, 9556:4, 9556:18, 9556:20, 9557:8, 9557:12, 9557:21, 9558:1, 9558:13, 9573:5, 9582:16, 9582:19, 9587:12
**played** [2] - 9591:21, 9593:16
**point** [9] - 9547:18, 9579:22, 9592:12, 9593:9, 9594:17, 9595:15, 9596:19, 9597:10, 9598:21
**points** [2] - 9550:5, 9550:9
**Popofski** [2] - 9564:21, 9582:3
**POPOFSKI** [13] - 9546:6, 9556:13, 9571:13, 9577:11, 9582:4, 9582:9, 9585:16, 9585:17, 9585:22, 9585:23, 9587:7, 9588:2, 9588:22
**POPOFSKY** [1] - 9542:4
**popular** [2] - 9570:8, 9570:11
**portions** [1] - 9593:18
**position** [3] - 9592:23, 9593:3, 9596:22
**positioning** [1] - 9570:24
**possible** [9] - 9545:25, 9546:2, 9553:1, 9553:10, 9553:11, 9555:16, 9564:13, 9570:1,

9580:14
**possibly** [1] - 9553:2
**post** [1] - 9593:24
**post-trial** [1] - 9593:24
**potential** [4] -
9553:21, 9555:14,
9592:10, 9597:19
**precondition** [1] -
9564:11
**prefer** [1] - 9595:4
**preference** [1] -
9589:24
**preloaded** [1] - 9554:2
**premium** [2] -
9559:21, 9559:25
**prepared** [2] -
9545:19, 9589:4
**prerequisites** [1] -
9584:23
**present** [1] - 9599:7
**presentation** [5] -
9545:14, 9545:17,
9545:19, 9547:21,
9571:3
**presented** [2] -
9561:5, 9561:20
**president** [1] - 9568:8
**presumably** [1] -
9569:14
**previously** [1] -
9594:9
**price** [2] - 9565:22,
9566:9
**prices** [1] - 9565:15
**pricing** [1] - 9566:13
**primary** [1] - 9551:8
**principle** [4] - 9567:4,
9572:5, 9572:8,
9583:21
**principles** [4] -
9571:23, 9572:1,
9572:12, 9583:23
**printout** [1] - 9552:2
**privacy** [1] - 9590:25
**privileged** [3] -
9568:14, 9568:22,
9575:10
**problem** [2] - 9581:9,
9595:16
**proceed** [2] - 9582:6,
9590:1
**proceeded** [1] -
9596:10
**proceedings** [1] -
9600:4
**Proceedings** [2] -
9542:13, 9599:10
**process** [2] - 9546:15,
9546:19
**produced** [1] -

9542:14
**product** [6] - 9556:8,
9561:10, 9564:1,
9564:7, 9569:23,
9569:24
**products** [5] - 9553:7,
9553:9, 9563:4,
9579:5, 9581:20
**Professor** [6] -
9594:2, 9594:25,
9598:13, 9598:14,
9598:17
**program** [1] - 9560:15
**progress** [1] - 9592:8
**project** [1] - 9587:11
**projected** [8] -
9547:13, 9548:8,
9550:23, 9551:25,
9552:15, 9554:17,
9555:1, 9587:16
**projects** [1] - 9552:1
**promise** [1] - 9564:12
**promote** [1] - 9570:22
**promoted** [2] -
9554:1, 9554:4
**promotion** [2] -
9550:5, 9563:3
**promotional** [3] -
9562:15, 9562:25,
9565:1
**proposed** [2] -
9550:24, 9590:8
**propriety** [1] - 9593:8
**provide** [2] - 9564:13,
9584:22
**provided** [2] -
9585:25, 9597:6
**provides** [3] -
9566:10, 9578:5,
9585:1
**provisions** [1] -
9585:2
**PSX016** [2] - 9594:18,
9594:22
**PSX016.....................
...........................** [1]
- 9543:10
**public** [3] - 9596:12,
9596:25, 9597:16
**publicly** [2] - 9592:17,
9597:20
**pulled** [1] - 9581:4
**purpose** [2] - 9570:12,
9570:13
**purposes** [1] -
9585:24
**push** [1] - 9590:1
**pushed** [1] - 9583:16
**put** [10] - 9546:10,
9551:3, 9562:14,

9563:2, 9576:21,
9583:3, 9583:24,
9594:10, 9597:10
**putting** [1] - 9556:4

### Q

**qualify** [2] - 9562:7,
9562:15
**qualifying** [1] - 9562:9
**quality** [1] - 9559:8
**questions** [7] -
9545:5, 9581:25,
9582:1, 9582:2,
9582:14, 9588:2,
9588:23
**queued** [1] - 9593:4
**quick** [1] - 9572:18
**quite** [2] - 9560:9,
9593:10

### R

**raise** [1] - 9596:9
**range** [1] - 9597:18
**rank** [1] - 9572:11
**ranking** [1] - 9572:15
**rate** [1] - 9555:6
**rationale** [1] - 9569:9
**re** [1] - 9567:21
**re-evaluates** [1] -
9567:21
**reach** [1] - 9553:10
**reached** [1] - 9548:2
**read** [4] - 9573:14,
9588:5, 9595:3,
9595:6
**reading** [2] - 9569:6,
9588:4
**ready** [3] - 9544:4,
9591:20, 9593:4
**realize** [1] - 9551:22
**really** [5] - 9545:5,
9553:5, 9556:7,
9580:12, 9587:14
**reason** [3] - 9562:24,
9563:16, 9570:9
**reasonable** [1] -
9572:23
**reasons** [2] - 9570:3,
9579:20
**rebuttal** [3] - 9598:10,
9598:11, 9598:20
**recalling** [1] - 9598:13
**receive** [4] - 9558:1,
9565:15, 9565:21,
9596:3
**received** [5] - 9546:8,
9557:25, 9571:16,
9577:13, 9594:22

**RECEIVED** [1] -
9543:8
**Recess** [1] - 9591:19
**recommend** [1] -
9591:10
**record** [9] - 9547:20,
9587:1, 9595:4,
9595:6, 9595:7,
9596:5, 9596:12,
9596:25, 9597:10,
9600:4
**recorded** [1] - 9542:13
**recounting** [2] -
9573:25, 9574:6
**red** [2] - 9549:9,
9549:12
**redacted** [3] -
9546:25, 9547:1,
9549:23
**redirect** [1] - 9582:3
**Redirect** [1] - 9543:4
**REDIRECT** [1] -
9582:8
**refer** [2] - 9559:21,
9575:16
**reference** [4] - 9550:4,
9575:7, 9579:1,
9580:18
**referenced** [8] -
9558:3, 9562:5,
9563:8, 9563:12,
9573:15, 9585:3,
9592:14, 9597:15
**references** [2] -
9561:6, 9561:23
**referred** [3] - 9559:10,
9560:12, 9564:16
**referring** [4] -
9575:18, 9576:13,
9579:8, 9581:9
**refers** [6] - 9550:1,
9550:18, 9550:23,
9551:1, 9568:17,
9578:18
**reflect** [2] - 9555:12,
9558:19
**reflected** [1] - 9548:17
**reflects** [5] - 9549:9,
9549:16, 9558:21,
9559:1, 9559:5
**regarding** [2] -
9558:1, 9558:13
**regular** [1] - 9564:19
**regulators** [2] -
9577:23, 9578:2
**reinforce** [1] - 9555:24
**reinforcement** [1] -
9564:7
**relate** [3] - 9587:24,
9590:23, 9590:24

**related** [2] - 9584:14,
9585:18
**relationship** [1] -
9573:24
**relative** [1] - 9561:3
**relevant** [1] - 9593:18
**reliable** [2] - 9570:16,
9581:13
**reliably** [3] - 9569:23,
9583:3, 9587:17
**remember** [4] -
9558:4, 9562:23,
9576:2, 9576:9
**remind** [1] - 9582:21
**reminded** [1] -
9580:25
**reminds** [3] - 9577:22,
9578:16, 9580:2
**Renewal** [1] - 9546:13
**renewal** [3] - 9567:18,
9567:21, 9567:23
**repeat** [1] - 9565:17
**rephrase** [2] -
9585:15, 9585:20
**report** [3] - 9574:8,
9596:20, 9597:2
**reported** [2] - 9596:25,
9597:21
**REPORTER** [2] -
9600:1, 9600:9
**reporter** [1] - 9596:7
**Reporter** [1] - 9542:10
**reporters** [1] -
9596:24
**reports** [1] - 9574:3
**represent** [4] - 9571:7,
9584:4, 9587:3,
9592:15
**representation** [1] -
9592:20
**representative** [1] -
9547:19
**represented** [1] -
9549:5
**representing** [1] -
9576:23
**request** [5] - 9557:21,
9558:1, 9558:13,
9595:20, 9596:6
**requested** [2] -
9590:18, 9597:23
**require** [2] - 9565:4,
9565:9
**required** [2] - 9563:23,
9593:13
**requirement** [4] -
9563:9, 9564:5,
9565:20, 9565:24
**requirements** [8] -
9561:9, 9563:12,

9563:15, 9564:1,
9565:14, 9583:12,
9583:17, 9585:2
**resolve** [2] - 9595:12,
9597:4
**resolved** [2] -
9595:15, 9596:8
**resources** [1] - 9579:5
**respect** [1] - 9567:18
**responsible** [1] -
9564:14
**responsive** [1] -
9584:22
**rest** [1] - 9569:6
**restructuring** [1] -
9546:16
**result** [1] - 9590:12
**results** [2] - 9561:13,
9561:14
**resume** [1] - 9591:17
**RESUMED** [1] -
9544:6
**return** [1] - 9586:7
**revealed** [2] - 9591:8,
9592:17
**revenue** [50] -
9544:17, 9544:18,
9545:2, 9546:16,
9546:20, 9547:13,
9548:8, 9548:10,
9548:12, 9549:16,
9550:2, 9550:4,
9550:8, 9550:15,
9550:23, 9551:7,
9551:9, 9551:25,
9552:11, 9552:15,
9553:21, 9554:10,
9554:11, 9554:13,
9555:5, 9555:6,
9555:14, 9555:19,
9557:7, 9557:12,
9557:21, 9558:1,
9558:13, 9562:8,
9563:13, 9564:9,
9565:3, 9565:7,
9565:12, 9565:21,
9565:24, 9567:1,
9567:5, 9572:6,
9572:8, 9582:23,
9583:7, 9590:15,
9591:1, 9591:5
**Revenue** [2] -
9546:12, 9552:6
**review** [9] - 9545:9,
9545:14, 9545:21,
9545:22, 9545:23,
9546:3, 9568:14,
9571:22, 9597:16
**reviewed** [2] - 9568:5,
9568:12

**revised** [1] - 9559:4
**role** [1] - 9573:22
**roll** [1] - 9591:20
**Romanette** [3] -
9584:25, 9585:1,
9585:3
**Room** [1] - 9542:11
**Ropes** [1] - 9542:5
**Rosenberg** [17] -
9544:9, 9549:18,
9554:23, 9561:15,
9562:1, 9567:12,
9572:17, 9581:24,
9582:10, 9583:7,
9584:4, 9584:11,
9585:6, 9585:11,
9586:14, 9586:19,
9588:24
**ROSENBERG** [2] -
9543:4, 9544:6
**roughly** [1] - 9558:24
**row** [4] - 9586:12,
9586:22, 9588:6,
9588:7
**RPR** [1] - 9542:10
**RSA** [20] - 9547:14,
9547:23, 9550:3,
9550:6, 9550:8,
9550:17, 9550:25,
9554:4, 9562:22,
9566:4, 9573:12,
9573:15, 9575:7,
9583:17, 9585:8,
9585:11, 9585:18,
9585:25, 9586:1,
9592:25
**rule** [6] - 9578:8,
9578:19, 9580:2,
9581:5, 9581:6,
9597:24
**rules** [5] - 9576:16,
9577:15, 9577:19,
9578:6, 9581:21
**run** [4] - 9589:5,
9589:11, 9589:20,
9593:1
**run-through** [1] -
9589:11
**running** [1] - 9597:24

## S

**sadly** [1] - 9575:23
**Safari** [1] - 9554:6
**safe** [1] - 9588:25
**Samsung** [35] -
9545:9, 9545:14,
9546:12, 9546:16,
9546:20, 9547:13,
9547:23, 9548:2,

9548:9, 9550:2,
9550:3, 9550:16,
9550:17, 9550:24,
9551:25, 9552:1,
9552:15, 9557:5,
9557:7, 9557:12,
9558:20, 9559:2,
9559:3, 9559:24,
9561:3, 9561:14,
9562:6, 9563:14,
9563:22, 9574:20,
9583:12, 9583:15,
9584:5
**Samsung's** [3] -
9557:20, 9558:1,
9558:13
**Sara** [2] - 9600:3,
9600:8
**SARA** [1] - 9542:10
**saw** [4] - 9555:18,
9570:19, 9571:3,
9571:9
**scaled** [1] - 9553:6
**scenarios** [1] - 9554:3
**scheduling** [2] -
9594:3, 9598:6
**SCHMIDTLEIN** [19] -
9542:2, 9589:3,
9589:13, 9589:17,
9589:23, 9590:11,
9590:17, 9591:2,
9591:10, 9591:13,
9591:22, 9592:2,
9592:6, 9592:19,
9594:5, 9595:20,
9596:18, 9597:2,
9598:22
**Schmidtlein** [1] -
9589:2
**school** [1] - 9579:6
**scope** [1] - 9593:9
**screen** [4] - 9551:4,
9586:24, 9587:12,
9587:17
**seal** [2] - 9584:10,
9596:6
**search** [11] - 9550:8,
9553:4, 9555:10,
9556:2, 9556:10,
9562:17, 9563:6,
9565:6, 9583:2,
9583:17, 9586:16
**Search** [35] - 9544:14,
9548:19, 9549:16,
9549:24, 9550:1,
9550:2, 9550:6,
9550:7, 9550:9,
9553:24, 9554:1,
9554:2, 9554:5,
9554:10, 9554:12,

9555:5, 9555:6,
9555:21, 9556:1,
9556:21, 9560:6,
9562:11, 9562:16,
9562:25, 9563:9,
9563:17, 9563:20,
9563:23, 9564:4,
9564:20, 9565:2,
9582:13, 9582:19,
9583:7, 9585:11
**second** [6] - 9545:12,
9560:8, 9567:25,
9578:19, 9586:22,
9588:7
**section** [2] - 9584:18,
9584:20
**Section** [1] - 9584:22
**sector** [2] - 9581:10,
9581:17
**security** [17] -
9562:12, 9563:8,
9563:9, 9563:12,
9563:14, 9563:17,
9563:19, 9564:4,
9564:12, 9564:15,
9564:16, 9564:18,
9564:19, 9564:25,
9583:12, 9583:16,
9583:23
**see** [76] - 9545:7,
9545:11, 9545:13,
9545:15, 9546:11,
9547:3, 9547:5,
9547:7, 9547:9,
9548:12, 9548:18,
9549:11, 9549:22,
9550:12, 9550:21,
9551:24, 9552:3,
9552:7, 9552:17,
9552:22, 9554:25,
9555:2, 9555:8,
9555:9, 9556:19,
9557:3, 9557:4,
9559:7, 9560:2,
9560:13, 9560:14,
9560:19, 9567:16,
9567:17, 9568:2,
9568:6, 9568:15,
9568:21, 9569:1,
9570:3, 9571:21,
9571:24, 9572:7,
9573:17, 9573:18,
9574:3, 9574:11,
9575:8, 9575:12,
9576:18, 9576:19,
9577:1, 9577:3,
9577:4, 9577:16,
9577:18, 9577:25,
9578:2, 9578:7,
9578:14, 9578:22,

9579:1, 9580:9,
9580:15, 9580:22,
9581:2, 9581:8,
9581:14, 9581:15,
9581:19, 9584:20,
9586:11, 9586:22,
9597:16, 9599:9
**seeing** [2] - 9556:18,
9558:3
**segment** [5] -
9559:22, 9560:1,
9581:10, 9581:17
**segments** [1] -
9559:24
**sell** [4] - 9563:3,
9574:17, 9585:12,
9586:4
**sell-through** [1] -
9563:3
**selling** [1] - 9566:8
**sells** [1] - 9580:8
**send** [1] - 9596:8
**senior** [1] - 9568:8
**sent** [1] - 9545:13
**sentence** [1] - 9575:22
**separate** [1] - 9563:20
**SERP** [1] - 9594:19
**serve** [3] - 9553:7,
9553:10, 9553:19
**serves** [2] - 9570:12,
9570:13
**service** [2] - 9587:13,
9587:22
**services** [8] - 9544:15,
9550:15, 9553:7,
9560:8, 9582:12,
9582:16, 9582:23,
9583:1
**Services** [2] -
9548:21, 9586:23
**SESSION** [1] - 9541:9
**session** [2] - 9584:10,
9596:4
**set** [7] - 9553:24,
9554:5, 9557:4,
9566:12, 9572:17,
9588:16, 9597:5
**setting** [5] - 9555:21,
9556:10, 9558:8,
9558:10, 9565:1
**settings** [2] - 9588:14,
9590:25
**several** [2] - 9562:9,
9590:6
**shaped** [2] - 9587:2
**Share** [2] - 9546:12,
9560:12
**share** [29] - 9546:16,
9546:20, 9548:10,
9551:16, 9554:17,

9555:1, 9555:5, 9555:13, 9557:8, 9557:12, 9557:21, 9558:1, 9558:13, 9559:8, 9559:16, 9560:16, 9561:3, 9562:8, 9563:13, 9564:9, 9565:3, 9565:9, 9565:12, 9565:21, 9565:25, 9567:1, 9581:12, 9581:16, 9586:3
**shares** [1] - 9581:6
**ship** [1] - 9586:5
**shorthand** [1] - 9542:13
**show** [1] - 9584:2
**showed** [1] - 9575:3
**showing** [1] - 9566:3
**side** [1] - 9586:11
**sides** [1] - 9589:9
**SIGNATURE** [1] - 9600:9
**signed** [5] - 9547:18, 9547:19, 9558:23, 9560:10, 9562:20
**significant** [7] - 9545:2, 9553:3, 9555:18, 9555:21, 9556:10, 9564:9, 9566:11
**signing** [2] - 9562:22, 9563:23
**silence** [1] - 9597:23
**similar** [3] - 9571:9, 9587:12, 9592:23
**similarly** [1] - 9581:11
**size** [1] - 9593:9
**skipping** [1] - 9555:4
**slide** [26] - 9545:19, 9546:11, 9547:3, 9547:12, 9548:7, 9551:21, 9552:20, 9552:25, 9554:15, 9554:20, 9554:25, 9556:23, 9556:24, 9558:17, 9558:19, 9559:1, 9568:5, 9568:11, 9568:13, 9571:19, 9571:21, 9573:4, 9586:7, 9588:3
**slightly** [1] - 9571:7
**slots** [2] - 9571:22, 9572:19
**small** [3] - 9551:22, 9557:4, 9594:6
**smaller** [1] - 9551:23
**smartwatches** [1] - 9569:20

**software** [1] - 9588:11
**someone** [1] - 9557:23
**somewhere** [1] - 9583:24
**sorry** [8] - 9549:11, 9554:18, 9557:1, 9565:17, 9572:18, 9572:20, 9573:14, 9587:5
**sort** [20] - 9544:11, 9548:12, 9548:19, 9550:15, 9552:3, 9552:7, 9559:3, 9559:7, 9560:3, 9561:11, 9564:3, 9564:7, 9588:10, 9589:23, 9589:24, 9589:25, 9590:2, 9590:20, 9596:12, 9596:14
**sound** [1] - 9579:6
**source** [4] - 9545:2, 9551:18, 9555:18, 9577:1
**sources** [4] - 9544:16, 9544:18, 9547:12, 9548:8
**Southwest** [1] - 9542:3
**speaker** [1] - 9560:22
**speaking** [1] - 9553:19
**specific** [1] - 9590:19
**specifically** [2] - 9575:19, 9576:2
**specifics** [4] - 9558:25, 9559:13, 9562:23, 9576:9
**spend** [1] - 9551:16
**spirit** [1] - 9564:13
**spots** [1] - 9590:7
**stack** [1] - 9572:11
**stake** [1] - 9553:3
**STAND** [1] - 9544:6
**start** [3] - 9575:10, 9598:16, 9598:18
**started** [1] - 9541:20
**starting** [1] - 9559:23
**starts** [1] - 9577:17
**State** [2] - 9541:18, 9541:18
**statement** [2] - 9578:16, 9595:22
**STATES** [3] - 9541:1, 9541:3, 9541:10
**States** [6] - 9541:13, 9541:16, 9593:8, 9594:9, 9594:10, 9594:23

**staying** [1] - 9544:11
**stenotype** [1] - 9542:13
**still** [7] - 9554:10, 9555:6, 9570:4, 9570:5, 9583:4, 9583:16, 9588:20
**Store** [22] - 9544:11, 9544:24, 9545:1, 9545:2, 9550:24, 9551:7, 9551:9, 9551:11, 9551:17, 9552:11, 9552:15, 9553:12, 9553:18, 9553:21, 9555:15, 9555:18, 9557:8, 9557:12, 9557:21, 9558:2, 9558:13, 9573:5
**store** [2] - 9555:16, 9555:17
**strategic** [2] - 9564:8, 9570:12
**strategy** [2] - 9556:8
**Street** [1] - 9541:14, 9541:16
**strong** [1] - 9564:12
**strongest** [1] - 9564:13
**structure** [2] - 9558:19, 9558:21
**subject** [2] - 9545:9, 9546:12
**submit** [1] - 9593:23
**submitted** [1] - 9594:9
**submitting** [2] - 9595:21, 9595:22
**succeed** [1] - 9556:18
**success** [6] - 9553:3, 9553:5, 9555:23, 9556:12, 9556:20
**successful** [1] - 9563:5
**suggested** [1] - 9572:1
**suggesting** [2] - 9569:7, 9572:15
**Suite** [1] - 9541:20
**suite** [1] - 9583:5
**summary** [1] - 9578:5
**Sundar** [1] - 9545:21
**super** [1] - 9569:11
**support** [2] - 9562:14, 9562:15
**support.google.com/ethics** [1] - 9577:2
**supposed** [1] - 9579:18
**switch** [1] - 9578:21
**switches** [2] -

9553:20, 9554:9
**sword** [1] - 9551:14
**systems** [2] - 9557:15, 9587:15

## T

**T-Mobile** [1] - 9589:4
**t/b/d** [2] - 9598:15, 9598:22
**tab** [1] - 9571:1
**TAC** [1] - 9555:5
**talks** [1] - 9591:20
**tape** [1] - 9591:20
**target** [1] - 9559:16
**taught** [1] - 9576:10
**team** [4] - 9545:20, 9557:23, 9568:12, 9573:23
**teams** [1] - 9561:1
**technical** [1] - 9564:5
**ten** [1] - 9573:4
**term** [6] - 9547:14, 9550:3, 9550:17, 9552:16, 9579:19, 9579:20
**terms** [12] - 9550:5, 9550:7, 9561:4, 9561:18, 9575:19, 9579:23, 9590:1, 9591:7, 9595:6, 9596:2, 9597:7, 9598:5
**terrific** [3] - 9591:15, 9594:4, 9596:1
**testified** [2] - 9546:21, 9592:9
**testifying** [1] - 9558:20
**TESTIMONY** [1] - 9543:3
**testimony** [1] - 9588:25
**Thanksgiving** [1] - 9599:7
**THE** [67] - 9541:1, 9541:1, 9541:10, 9544:3, 9544:6, 9546:7, 9547:6, 9547:7, 9547:9, 9551:5, 9551:8, 9551:19, 9554:18, 9554:21, 9556:15, 9556:17, 9565:17, 9571:15, 9571:17, 9572:18, 9572:20, 9573:1, 9573:8, 9577:12, 9582:1, 9582:3, 9582:7, 9583:19, 9583:20,

9585:15, 9585:20, 9587:5, 9587:6, 9588:3, 9588:9, 9588:18, 9588:24, 9589:1, 9589:2, 9589:12, 9589:16, 9589:18, 9590:9, 9590:16, 9590:21, 9591:3, 9591:12, 9591:15, 9591:20, 9591:25, 9592:4, 9592:18, 9594:4, 9594:21, 9595:5, 9595:9, 9595:16, 9595:18, 9596:1, 9596:21, 9597:4, 9597:22, 9598:1, 9598:5, 9598:19, 9599:1, 9599:3
**thematic** [1] - 9569:7
**therefore** [1] - 9597:19
**they've** [2] - 9591:5, 9592:17
**thinking** [7] - 9562:13, 9564:22, 9567:8, 9572:24, 9591:7, 9598:10
**third** [12] - 9548:24, 9549:2, 9549:4, 9549:5, 9552:7, 9559:7, 9559:10, 9559:15, 9560:11, 9568:25, 9580:2
**thirds** [1] - 9579:3
**thread** [1] - 9558:3
**three** [17] - 9548:12, 9548:13, 9548:18, 9558:19, 9558:21, 9558:24, 9560:4, 9560:21, 9561:6, 9561:23, 9572:25, 9588:8, 9589:6, 9592:13, 9593:16, 9593:17, 9598:11
**three-deal** [2] - 9558:19, 9558:21
**thumb** [9] - 9576:16, 9577:15, 9577:19, 9578:6, 9578:8, 9578:19, 9580:2, 9581:5, 9581:6
**thumbs** [1] - 9581:21
**tie** [3] - 9564:4, 9578:25, 9597:20
**tied** [1] - 9563:9
**tier** [1] - 9559:17
**titled** [1] - 9552:7
**today** [5] - 9579:20, 9583:9, 9589:20, 9590:2, 9590:18

**together** [5] - 9556:7, 9561:13, 9564:4, 9564:6, 9589:10
**tomorrow** [7] - 9592:10, 9592:11, 9593:25, 9594:1, 9595:14, 9596:20, 9597:24
**tomorrow's** [2] - 9545:9, 9597:7
**tonight** [2] - 9595:11, 9597:9
**top** [6] - 9549:10, 9559:17, 9577:15, 9580:17, 9586:14, 9588:6
**topic** [1] - 9557:20
**topics** [1] - 9573:13
**total** [1] - 9552:15
**touched** [1] - 9544:12
**toward** [1] - 9587:19
**transaction** [3] - 9551:9, 9551:15
**transactional** [1] - 9564:23
**transcript** [1] - 9600:4
**TRANSCRIPT** [1] - 9541:9
**Transcript** [1] - 9542:14
**transcription** [1] - 9542:14
**transcripts** [3] - 9596:4, 9596:7, 9597:9
**translate** [2] - 9554:16, 9555:1
**travels** [1] - 9588:25
**trial** [3] - 9578:17, 9593:22, 9593:24
**TRIAL** [1] - 9541:9
**trigger** [6] - 9575:15, 9575:18, 9575:23, 9575:25, 9579:9, 9579:19
**Tristan** [4] - 9575:14, 9575:16, 9575:21, 9579:25
**true** [6] - 9548:11, 9562:18, 9565:23, 9567:20, 9576:9, 9576:12
**trust** [1] - 9576:23
**try** [3] - 9569:20, 9581:10, 9585:21
**trying** [2] - 9561:25, 9594:13
**turn** [14] - 9545:4, 9545:12, 9545:16, 9546:24, 9551:2,

9551:21, 9554:15, 9567:25, 9570:25, 9571:19, 9573:7, 9575:5, 9576:15, 9584:17
**turning** [1] - 9573:18
**Twitter** [1] - 9581:1
**two** [14] - 9545:4, 9549:5, 9556:7, 9556:23, 9557:2, 9561:11, 9579:2, 9579:3, 9590:9, 9593:4, 9593:25, 9598:12, 9598:24
**two-thirds** [1] - 9579:3
**Tyler** [1] - 9541:19
**type** [2] - 9569:2, 9569:5
**typically** [1] - 9586:18

**U**

**ultimate** [1] - 9547:23
**ultimately** [4] - 9548:25, 9564:24, 9569:18, 9581:20
**unclear** [1] - 9596:11
**under** [6] - 9552:6, 9561:10, 9575:23, 9584:10, 9585:1, 9598:22
**underlying** [1] - 9588:10
**understood** [2] - 9547:20, 9548:6
**unfair** [1] - 9578:13
**UNITED** [3] - 9541:1, 9541:3, 9541:10
**United** [5] - 9541:13, 9541:16, 9594:9, 9594:10, 9594:23
**unring** [1] - 9596:15
**up** [10] - 9555:5, 9557:10, 9577:15, 9586:23, 9590:12, 9593:4, 9595:4, 9595:5, 9598:24, 9599:6
**update** [4] - 9557:22, 9557:25, 9558:4, 9591:23
**updates** [3] - 9562:12, 9563:19, 9564:25
**upgrade** [1] - 9563:12
**upgrades** [5] - 9563:8, 9563:9, 9563:17, 9564:4, 9564:19
**upholding** [1] - 9583:22
**UPX129** [2] - 9571:9,

9586:19
**UPX2091** [4] - 9576:15, 9577:10, 9577:13
**UPX2091**................... ......................................... [1] - 9543:10
**UPX2111** [16] - 9543:9, 9545:6, 9545:16, 9545:19, 9546:5, 9546:8, 9546:11, 9546:24, 9547:3, 9548:7, 9554:15, 9554:25, 9559:1, 9561:4, 9561:20
**UPX2118** [6] - 9545:5, 9545:7, 9545:12, 9545:18, 9546:5, 9546:8
**UPX2118**................... ................... [1] - 9543:9
**UPX296A** [4] - 9570:25, 9571:2, 9571:12, 9571:16
**UPX296A**................... ......................................... [1] - 9543:9
**UPX706** [6] - 9567:9, 9567:10, 9567:14, 9567:25, 9568:25, 9571:3
**UPX997** [4] - 9573:7, 9573:11, 9575:6, 9579:14
**usage** [1] - 9569:10
**useful** [2] - 9587:20, 9588:1
**user** [11] - 9551:12, 9553:22, 9554:9, 9554:12, 9555:10, 9560:17, 9572:14, 9574:4, 9587:24, 9589:15, 9589:16
**users** [13] - 9550:7, 9553:10, 9553:11, 9553:17, 9553:19, 9555:15, 9556:5, 9570:8, 9570:23, 9578:8, 9578:21, 9580:7, 9587:20
**uses** [2] - 9554:12, 9570:22

**V**

**value** [1] - 9564:10
**variety** [3] - 9592:8, 9593:7, 9593:19

**various** [3] - 9547:12, 9548:8, 9593:13
**vast** [1] - 9584:9
**verify** [1] - 9592:17
**Verizon** [1] - 9574:17
**version** [4] - 9571:3, 9571:6, 9571:9, 9571:21
**vertical** [1] - 9586:12
**via** [1] - 9543:5
**vice** [1] - 9568:8
**video** [10] - 9570:17, 9589:5, 9592:14, 9592:22, 9593:1, 9593:7, 9593:12, 9593:18, 9597:24
**videos** [5] - 9589:8, 9592:13, 9593:4, 9593:25, 9597:7
**videotaped** [2] - 9543:5, 9591:21
**view** [1] - 9585:24
**vs** [1] - 9541:5

**W**

**wants** [3] - 9567:22, 9569:15, 9574:8
**Washington** [6] - 9541:5, 9541:14, 9541:17, 9542:3, 9542:6, 9542:11
**watch** [1] - 9593:17
**Watch** [1] - 9569:21
**watched** [1] - 9589:17
**ways** [3] - 9574:24, 9575:2, 9582:25
**Webb** [1] - 9541:19
**website** [1] - 9577:5
**Wednesday** [2] - 9598:16, 9598:18
**week** [6] - 9589:8, 9592:8, 9598:7, 9598:24, 9599:4, 9599:6
**weigh** [2] - 9575:21, 9580:1
**welcome** [2] - 9544:3, 9592:19
**Wellbeing** [1] - 9588:16
**Whinston** [1] - 9598:13
**WICK** [1] - 9542:10
**Wick** [2] - 9600:3, 9600:8
**WILLIAM** [1] - 9541:19
**Williams** [1] - 9542:2
**wireless** [2] - 9565:25, 9566:5

**withdraw** [1] - 9549:18
**withdrawn** [1] - 9546:23
**witness** [5] - 9589:3, 9592:9, 9593:19, 9596:6, 9598:6
**WITNESS** [10] - 9544:6, 9547:7, 9547:9, 9551:8, 9556:17, 9572:20, 9583:20, 9587:6, 9588:9, 9589:1
**witnesses** [4] - 9592:9, 9594:8, 9598:12, 9598:23
**word** [8] - 9550:13, 9550:20, 9575:25, 9576:2, 9579:5, 9579:9, 9579:10, 9579:14
**words** [11] - 9549:24, 9575:15, 9575:18, 9575:23, 9576:8, 9576:10, 9577:17, 9578:24, 9579:2, 9579:18, 9579:20
**work-for-hire** [1] - 9564:23
**worth** [1] - 9593:22
**write** [2] - 9575:14, 9577:23
**writing** [5] - 9576:5, 9576:8, 9576:21, 9578:20, 9579:18
**written** [12] - 9561:4, 9561:18, 9576:16, 9577:16, 9577:20, 9578:4, 9580:5, 9580:19, 9580:22, 9580:25, 9581:17, 9581:21
**wrote** [5] - 9569:9, 9575:23, 9579:10, 9579:14

**Y**

**year** [3] - 9552:11, 9553:1, 9566:22
**yesterday** [1] - 9595:23
**York** [2] - 9541:21
**yourself** [1] - 9577:8
**YouTube** [2] - 9544:19, 9544:22