```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      United States of America,    )
 3    et al.,                      )
                                   ) DAY 39
 4                   Plaintiffs, )
                                   ) CV No. 20-3010
 5                         vs. ) Washington, D.C.
                                   ) November 13, 2023
 6    Google LLC,                  ) 1:35 p.m.
                                   )
 7                   Defendant. )
      _____)
 8

 9                    TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE AMIT P. MEHTA
10                  UNITED STATES DISTRICT JUDGE

11    APPEARANCES:
      For DoJ Plaintiffs:      Kenneth M. Dintzer
12                             U.S. DEPARTMENT OF JUSTICE
                               1100 L Street, NW
13                             Washington, D.C.
                               (202) 307-0340
14                             Email: Kenneth.dintzer2@usdoj.gov
                               David E. Dahlquist
15                             U.S. Department of Justice
                               209 South LaSalle Street
16                             Suite 600
                               Chicago, IL  60604
17                             (202) 805-8563
                               Email: David.dahlquist@usdoj.gov
18

19    For Plaintiff
      State of Colorado:       Jonathan Bruce Sallet
20                             COLORADO DEPARTMENT OF LAW
                               Consumer Protection Section,
21                             Antitrust Unit
                               Ralph L. Carr
22                             Colorado Judicial Center
                               1300 Broadway
23                             Seventh Floor
                               Denver, CO 80203
24                             (720) 508-6000
                               Email: Jon.sallet@coag.gov
25
```

```
 1   For Plaintiff States:    William J. Cavanaugh, Jr.
                              Patterson Belknap Webb & Tyler LLP
 2                            1133 Avenue of the Americas
                              Suite 2200
 3                            New York, NY 10036
                              (212) 335-2793
 4                            Email:  Wfcavanaugh@pbwt.com

 5   For Defendant Google:    John E. Schmidtlein
                              WILLIAMS & CONNOLLY LLP
 6                            680 Maine Avenue SW
                              Washington, D.C. 20024
 7                            (202) 434-5000
                              Email: Jschmidtlein@wc.com
 8                            Michael Sommer
                              Wilson Sonsini Goodrich & Rosati
 9                            1301 Avenue of the Americas
                              40th Floor
10                            New York, NY  10019
                              (212) 497-7728
11                            Email:  Msommer@wsgr.com
                              Wendy Huang Waszmer
12                            Wilson Sonsini Goodrich & Rosati
                              1301 Avenue of the Americas
13                            40th Floor
                              New York, NY  10019
14                            (212) 999-5800
                              Email:  Wwaszmer@wsgr.com
15
     Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
16                            Official Court Reporter
                              United States Courthouse, Room 6523
17                            333 Constitution Avenue, NW
                              Washington, DC  20001
18                            202-354-3267
                                   *   *   *
19

20

21

22

23

24

25
```

```
1       *  *  *  *  *  *  *PROCEEDINGS*  *  *  *  *  *  *

2              THE COURT:  Good afternoon.  Ready when you are,

3       Mr. Schmidtlein.

4                       KEVIN MURPHY,

5                  DIRECT EXAMINATION (Cont.)

6       BY MR. SCHMIDTLEIN:

7       Q.  All right.  Professor Murphy, let's turn to the next

8       subpoint in your slides here.  Rivals would not gain

9       substantially more share in a choice screen world.

10             Can you explain this subpart of your opinions for the

11      Court?

12      A.  Yeah.  So, I'm going to look to kind of measure the impact

13      of having defaults by comparing it to what you would get on a

14      choice screen.  The idea is, is if you had a choice screen, the

15      other parts of the marketplace would be kept the way they are,

16      but you would have something where it was sort of neutral in

17      terms of presentation.  So, if you think about limited access

18      at the start, when you get the device, a choice screen is a way

19      to kind of think about equalizing access in some ways.

20             I'm not saying choice screen is what would have

21      happened, but it is going to give you a benchmark for what

22      happens if you get rid of what the plaintiffs complain about,

23      which is some limitation on users' access to rivals.  So, the

24      choice screen is a way of doing that.  So, I'm going to look at

25      the European choice screen.
```

1          I'm also going to draw some on the Russian choice

2    screen, although things are so different in Russia it isn't

3    really great as a direct benchmark, but it can help us think

4    about the U.S. vis-à-vis Europe, and use the Russian choice

5    screen to do what Professor Whinston says you need to do, with

6    some correction for strength of rivals.  Say, what would those

7    two together tell us about what might happen in the U.S. under

8    a choice screen?

9    Q.  Can you --

10          Let's turn to slide 79.

11          Can you describe what is depicted on this slide?  And,

12   again, it's redacted.

13   A.  Yep.  Yes.  This is -- these are the choices that happened

14   in Europe on the implementation of the choice screen, and we're

15   looking -- I don't remember if you remember the history of the

16   choice screen.  It was various choice screens.  This is sort of

17   the end of that, the September to December 2001.  And these are

18   the selections by country as well as kind of the average across

19   Europe in selections, which is at the top.  So, Europe as a

20   whole, and these are selections.

21          So, these are the selections people made on the

22   choice screen during this period of time.  They're not usage,

23   right, because people could choose it.  And then that's a

24   separate question from what they actually end up using.  And

25   most of the analysis the plaintiff experts have done, they've

1    assumed that choices translate into uses, at least eventually,

2    right?  If you get more choices, you're going to get more

3    usage.  And I'm going to both look at the choices, but, also,

4    look at how usage evolved over time.

5    Q.  And just so we're clear here, because I want to make sure

6    the record is clear, the time period that you're looking at

7    here in Europe is September to December, 2021; is that right?

8    A.  That's the choice period we're going to look at.  We're

9    actually going to look at usage shares beyond that period.  So

10    we're going to say this is what happened to choices then, and

11    then we're going to look at usage shares afterward.  Okay?

12    Q.  All right.  Let's go to the next slide.

13         Did you examine actual usage when compared to choice

14    screen selections in Europe?

15    A.  Yes.  So, as you can see in this chart, and it's redacted,

16    so you can see the lines that say when various -- I don't know,

17    instances of the choice screen went in place.  The one that

18    we're focused on here is the final one that came in that

19    September 2021.  And then we had data on choices for, like, six

20    months, roughly, thereafter.

21         And you can see relative to usage, which is the blue

22    line in what you see.  And relative to what choices had been on

23    the previous choice screens, there was a substantial increase

24    in the choices of rivals that happened at that time.  And this

25    is what you've seen already from Professor Whinston and

1    Professor Baker.

2            But, if you look at what happened in usage after

3    that, you can see not nearly the change in usage you might

4    expect by some choices.  And I follow it out for roughly

5    another two years -- not quite two years because I don't yet

6    make it to September '23.  But, you know, if you think about

7    phones, you know, this is only happening now on new phones,

8    but, this is two years in.

9            So if there was going to be an affect, you would

10   expect to start seeing it.  And I can't talk too much about it,

11   but you see there's not a substantial affect over this period

12   of time.  Okay?

13   Q.  Now, Professor --

14   A.  Now, if you compare --

15   Q.  Go ahead.

16   A.  -- if you compare all the way back to before any of the

17   choice screens, you can see there's some increase.  I don't --

18   can I talk about the number or not?  Roughly?

19   Q.  Directional.

20   A.  Yeah, it's a small number over that, small percentage.

21   Okay?  There's a small increase over the long period, but

22   really nothing since the big jump in selections in September

23   '21.

24   Q.  Professor Murphy, is the Russian choice screen experience

25   something you found relevant to an analysis of the U.S. market?

1    A.  It's not directly relevant because it's so different from

2    the U.S.  Basically, Yandex, as an alternative, was so much

3    more successful than any of the rivals were in the U.S.  I

4    think Yandex had roughly a 30-something percent share even

5    before the choice screen went into place.  So, obviously,

6    that's way, way bigger than what we saw in the U.S.

7            The U.S. experience on Android is much closer to

8    Europe, and you can see on the chart, like, the green dot is

9    where the U.S. is, the red dot is where Europe is, and the blue

10   dot is Yandex.  So, you can see the U.S. is much, much closer

11   to Europe.  But, in keeping with what Professor Whinston talked

12   about, he says:  Well, you need to correct for strength of

13   rivals.

14           So all I did here was just say, look, we know where

15   Yandex is, we know where Europe is, and I just interpolated

16   between the two of them, said if you use that slope to measure

17   of the affect of strength of rival on impact, you get the U.S.

18   number.  And this isn't redacted, so I can say it's 1 1/2.  You

19   get an estimate of the impact in the U.S. about 1 1/2

20   percentage points.

21           Now, you might think that the Russian number is a

22   little bit inflated because there's a bunch of other stuff

23   going on in Russia at the time; that is, this was all part of

24   the Russian experience at the time and -- but, for this

25   purpose, I don't think that's the biggest deal.  Even if we

1    just use the number as it comes, you can see what kind of

2    numbers you get in the U.S.  So, the estimate that would come

3    out of this is about 1 1/2 percent.

4            THE COURT:  I'm sorry, maybe I'm not following what

5    this chart on the right is suggesting.  Can you just tell me

6    again what this is depicting?

7            THE WITNESS:  Yeah.  The horizontal access is the

8    pre-choice screen share that rivals had.  Okay?  So, in Europe,

9    pre-choice screen, the rivals had very little.  You can see

10   horizontally where that red dot is.  In the U.S., rivals had

11   more than that, but still relatively little.

12           In contrast, pre-choice screen in Russia, rivals had

13   a lot.  And, so, I say, if I use that slope, right, I'm using

14   Europe and Russia as I interpolate between the two.  So, you're

15   saying for every point you get, you get a bigger impact of the

16   choice screen.  Russia gives you the bigger impact over here,

17   much smaller impact in Europe.  Since U.S. is very close to

18   Europe, you get a number pretty close to Europe.  You get,

19   like, 1 1/2 percent.

20           The vertical axis is the change in share.  It's,

21   like, usage afterwards versus usage before.  Okay?  So this is

22   not based on selections.  Selections might be driving what's

23   going on, but we're actually looking at usage.  So, given that

24   we don't see usage following selections that closely, in Europe

25   this is what we use.  We use the change in usage.  Now, in

1    Russia, you get a big change in usage, but much, much stronger

2    rival.  Okay?  And other things going on at the same time.

3    BY MR. SCHMIDTLEIN:

4    Q.  What were some of the other things going on at the same

5    time?

6    A.  Well, Yandex was getting some distribution agreements.

7    There was broader antitrust scrutiny going on in Russia at that

8    point in time.  So, there were a number of things happening at

9    that point in time which would have been expected to affect

10   Yandex shares.  There's also some trends in other things.

11          But, you know, for purposes of making a correction

12   for strength of rivals, I think this is -- it doesn't really

13   matter that much if you move that Russian dot up or down a

14   little.  It's not going to move the green dot very much.  So,

15   given the methodology here, it's not that sensitive to that.

16   Q.  Based on your analyses of the choice screen data available

17   to you, did you reach any conclusions about what share shifts

18   could be expected in the U.S., if a choice screen were used?

19   A.  The analysis I just did gave you a number of 1 1/2.  For

20   conservative purposes I doubled that, and I used 3 percent.  If

21   you take that 3 percent number and if you apply it to the

22   covered volume in the U.S., okay, that -- because these

23   agreements don't cover all the volume, right, so it's 3 percent

24   times the covered volume, then you get .9 percent is the shift

25   in the total share of U.S. queries.  So, in keeping with the

1    choice screen having very modest effects, you would get a very

2    modest change in queries for rivals implementing a choice

3    screen.

4           THE COURT:  Because the 3 percent only applies to

5    Android devices?

6           THE WITNESS:  No.  This is Apple and independent

7    browsers.  I'm going to do Android in a bit.

8           THE COURT:  Oh, okay.

9           THE WITNESS:  So, we're using the choice screen

10   evidence from Android to say what would happen on Apple.

11          THE COURT:  I see.

12          THE WITNESS:  Okay?

13          THE COURT:  Okay.

14          THE WITNESS:  We're correcting for strength of rivals

15   by using the U.S. versus Europe.  Okay?

16          Now, rivals can do -- you have rivals on Apple, but

17   you don't want to take rival success on Apple as a pure

18   strength of rivals' affect because, remember, they're getting

19   promotion on Apple, so it's not apples to oranges -- no pun

20   intended -- it's not -- it's apples and oranges.  It's not

21   apples to apples.

22          THE COURT:  Got it.

23   BY MR. SCHMIDTLEIN:

24   Q.  All right.  Professor Murphy, let's turn to opinion 2:  The

25   Android agreements are procompetitive.

1    Can you give a quick summary here of your primary

2    opinions and how you're going to present those?

3    A.  Yes.  I'm going to look at the Android agreements.  The two

4    I'm going to focus on would be the MADA and the RSA.  I

5    understand those are the agreements at focus now in the case.

6    There's other agreements I'll talk briefly about and the role

7    they play, but focus is going to be on those two.

8    Given the questions we're asking in this case, I'm

9    going to be focused on how those agreements affect competition,

10   because that's what we're here to talk about, but, in

11   particular, how they affect competition and output in search.

12   You know, what affects do they have in search?  But, to study

13   what they're going to do in search you have to understand what

14   they do in platforms, because one of the big mechanisms that

15   drive search is through the platforms, right?  Complements,

16   again.

17   And then finally, my conclusion on the second one is

18   going to be that the Android agreements, like the browser

19   agreements we just looked at, do not substantially foreclose

20   rivals; that is, substantially impede their ability to compete.

21   Q.  All right.  With respect to your first point, did you

22   consider whether the Android agreements benefit competition,

23   including search competition?

24   A.  I did.  And I prepared a slide.  This is an overview of

25   what we're going to do.  First thing to recognize is, you know,

1    what is Android?  Android is a platform.  It's a platform for

2    mobile devices, largely.  You can use it on other devices, but

3    for our purpose, we're going to focus on a mobile device

4    platform.  And one of the things Android has done as a

5    platform, is it expanded as a platform for search.  Indeed, if

6    you think of why Google had an incentive to go into the

7    business in the first place, one of the biggest reasons was to

8    help drive search.  And, so, that was part of the reasons.

9         And just like when we talked about browsers in search

10   as complements, platforms in search can be complements as well,

11   particularly on a new area like mobile, where the growth of the

12   platform is a big part of the growth of usage on mobile.  That

13   is, more devices, better devices, more heavily use of those

14   platforms.

15        It's a little bit different than the desktop, where

16   we're -- a little more mature part of the history, right?  This

17   has been a big growth in the smartphone business, so the growth

18   of platforms is going to be a big part of the growth in search

19   on platforms.

20        On desktop, we're kind of much more mature.  So you

21   might get more search on desktops, but it's not really being

22   driven by growth of the platform.  So, here, platforms are

23   going to play a big role.

24        So, the Android agreements.  Well, there's two basic,

25   kind of, models you can use in a platform business.  You can

9842

1    have a, kind of, a more closed model, like Apple has.  You

2    control a lot of it yourself.  You build the hardware, you

3    build the software, you closely manage the way the platform

4    works.  You sell it yourself, so you decide what software goes

5    on it.

6         Or you can do a more open structure, like Android

7    tried to do.  Kind of like -- Windows versus Mac was kind of

8    the same story, more open versus closed.  And they both have

9    advantages.  The closed platform was nice because you're

10   driving the car, right?  You're in control.  The open platform

11   you get more folks involved.  Lot of great ideas, a lot of

12   things can happen, but a lot of other things can happen, right?

13   You kind of get the two sides of the equation.

14        So, the contracts you put in place are an important

15   part because, remember, you're doing it between firms more than

16   you are within the firm in contract, so the Android agreements

17   are going to play a role in helping shape and grow the

18   platform.  And since that's going to be shaping and growing

19   search, that's going to be part of our search story as well.

20   Q.  Can you explain how this next slide, slide 87, depicts some

21   of those challenges of the early Android platform?

22   A.  Yeah.  So, this is the universe we saw.  This is, like, you

23   know, we're back in '07, '08, and if you look at the mobile

24   world back in '07, '08, there were a number of platforms out

25   there.  And there was Symbian, Java Mobile, Linux, Blackberry

 1    RIM, Windows Mobile, PaLM.  I can remember some of those

 2    devices, you know, and I had a couple of them myself.

 3            Symbian was much bigger in Europe than it is in the

 4    U.S., but, you know, it was still a player.  But, it was a bit

 5    of a jungle, kind of.  There was a lot going on, and these

 6    platforms had significant issues, and one of the big issues

 7    that you had is being good platforms.  To be a platform, you

 8    really want to attract all the participants you need to make it

 9    work, and one of the big ones is compatibility within the

10    platform.

11            If software that runs on some of the platform doesn't

12    run on other parts of the platform, it's not really a good

13    platform, right?  The whole idea of a platform is some kind of

14    uniformity.  So when you manage a platform, you're trying to

15    combine some ability to expand and do new things, but at the

16    same time, maintain compatibility.  And the kind of agreements

17    we have are an effort to do that.

18            So, if you go to the next page.

19            So, the Android business model -- and this is -- this

20    is discussed in a lot of platform economics books -- is about

21    attracting four primary groups of participants.  You want to

22    get the OEMs on board.  Those are the guys that are going to

23    make the devices.

24            You want to get the wireless carriers on board

25    because they're the guys who are going to distribute the

1    devices.

2              You want to get the app developers on board because

3    the reason people want to have the device is so they can use

4    applications on it, including browsers and search and the like.

5              And, finally, if you get all those people together

6    you can attract the users, which is your ultimate goal, of

7    course, to get more use.  And if you were just in the platform

8    business, that would be your primary goal.

9              But, if you're also in the search business, you want

10   to grow search, too.  And one of the reasons Android -- Google

11   got involved in Android was to create a successful platform to

12   drive search.  And if the Android platform is successful --

13   think about the business model.  If your Android platform is

14   successful, that provides more usage, and particularly if it's

15   a good platform, it's going to get more search done, and that's

16   good, if I'm a search provider.

17             But, it's also going to compete with Apple, and

18   that's spurs Apple to move its platform forward, which gives

19   you even more search.  There's kind of a direct and indirect

20   benefit of moving the Android platform forward for what happens

21   in search.

22   Q.  How did the Android agreements address challenges that

23   Android faced in the marketplace?

24   A.  Okay.  So, Android open source.  There are really two

25   layers to what I, as a layman, would think of as the operating

 1    system part.  There's the open source part of Android.  And,

 2    so, Android was an open source, which means that other people

 3    can access the code.  That was important early on because you

 4    were trying to attract OEMs.  Who knew if Android was going to

 5    turn out to be successful?  If it split up and went its

 6    separate ways, they could take advantage of the open source

 7    nature, and they wouldn't be out of everything they had worked

 8    on in Android.

 9          The AFAs/ACCs, I know they've been discussed, but I

10    don't think they're as big a part of the case, but that's a

11    part of that compatibility story I talked about before,

12    building a platform that is easy for developers to write to and

13    has similar functionality, no matter who you get the device

14    from.

15          The MADA agreement, that's one I'm going to focus on,

16    and then I'm going to -- which, you know, is going to

17    facilitate a royalty-free license.  And given that it's going

18    to have this commonality to it, right, because everybody who

19    takes the MADA is going to put the same software on it, it's

20    going to facilitate users moving among Android devices.  And

21    that could be, oh, I used to have a Motorola phone, but

22    Motorola has kind of fallen by the wayside, I want to move to

23    Samsung.  Well, it's going to have the same Android operating

24    system with the same basic suite of apps.

25          Or maybe I had a low-end phone and want to move to a

 1    high-end phone.  Well, again, I'm moving within the Android

 2    system.  So it creates some competition within the platform.

 3        The RSA agreements are part of that complementarity I

 4    talked about, incentive to grow the platform.  And, if I'm

 5    successful growing the platform, that's going to grow search.

 6    And the promotional agreements provide some of the benefits of

 7    growing the Android platform.  And, also, the payments from the

 8    RSAs enhance carrier -- I mean, OEM's desire to build better

 9    devices, right, because better device means more search, more

10    search means more search dollars, and incentivizes distribution

11    partners, like carriers, to invest in promoting the Android

12    platform.

13    Q.  Did the Android platform enhance -- or, the Android

14    agreements enhance both intra- and inter-platform competition?

15    A.  Yeah.  I mentioned this already.

16        Whoa, we went the wrong way.  This way.

17        Yeah.  I mentioned this already.  So, when you think

18    about competition, think about competition within different

19    Android devices, Samsung competing against LG or whatever it

20    is, and that compatibility fosters competition by allowing

21    people to move.  It's not closed silos.  I'm not stuck with one

22    or the other.  I can switch back and forth.

23        And then when it comes to IOS, that's a separate

24    platform.  So, you know, there's a little -- you can move from

25    an Android to an iOS phone, but it's different.  And -- but if

1    you make the Android platform do better, it's going to compete

2    better with iOS and vice versa.  There's competition between

3    Android and iOS.  That's what we call inter-platform

4    competition.

5    Q.  Now, what have you observed with regards to the competition

6    over time between Android and Apple and the effect of that

7    competition on overall search usage?

8    A.  Yeah, I mean, you know, this is a scale of just what's

9    happened to mobile search over time.  And, obviously, there's

10   been enormous growth in mobile search.  And, you know, that

11   comes from many things, right?  You got more devices.  We got

12   more search per device.  The device quality has gone up.

13   There's more search things to search these days.  Search

14   engines and browsers are better than they used to be.  Lots of

15   things are driving it.

16        We can't say all that's being generated by

17   competition, but this is not a stagnant market, right?  This is

18   not, like, we're in a mature market, the only thing we can do

19   is work to buy a Ford versus a GM, or something.  That's not

20   the nature of this market, right?  This is a market where

21   mobile search is growing.  And it's not all manna from heaven

22   that, well, it's just going to happen on its own.  So that

23   competition for better devices and all that is going to feed

24   into growing that.

25        I can't tell you how much of that is due to that

1    competition, but it's clearly a part of that picture because

2    this tells me that that drawing stuff away from the rest of the

3    world is a big part of growing mobile search, right?  Google

4    getting more mobile search, for example.  How did Google grow

5    its mobile search?  By getting more total mobile search, not by

6    winning it away from other people.

7    Q.  Can you highlight some of the benefits that Android devices

8    have generated for members of the Android ecosystem?

9    A.  That's the next slide.  Remember, on that previous slide we

10   had those force groups?  And, so, I list some of the benefits

11   for each of them here.  So for users, one of the things we're

12   going to show -- and I'll show you some data on this.  We don't

13   spend too much time here -- variety of Android devices, many

14   low-price devices.  Lots of apps available.  That common

15   interface generates lots of apps.  Lots of uses of search.

16        Android devices tend to be what you might call

17   searchy.  You might have heard about that, they're kind of

18   search intensive.  It's not surprising, given Google's

19   motivation for bringing Android in the first place, which is,

20   they tend to be a little more searchy, less on device.

21        THE COURT:  What do you mean by "searchy"?  I'm

22   not --

23        THE WITNESS:  That is, for a given price point of

24   form, they tend to generate more searchs.

25        THE COURT:  I see.

1          THE WITNESS:  They're more off-device intensive as

2     opposed to on-device intensive.  So that's what I think people

3     call it, searchy.  Okay?

4          The development for benefit developers are,

5     obviously, broad access to users, least development costs

6     because of the common platform.  OEMs, we can talk about those,

7     and we will.  And, obviously, benefits carriers, one of them

8     being we now have Android with iOS.

9          So, in the early days, in that 2007, 2008, we had

10    this, like -- I called it a jungle of lots of different ones.

11    You dropped Android and iOS into that.  They competed very

12    successfully, mostly because they were really successful at

13    building a platform.  Most of those other guys have fallen by

14    the wayside.  Today's world is really -- Android and iOS is

15    really the mobile platforms to speak of today.

16    BY MR. SCHMIDTLEIN:

17    Q.  All right.  Let's talk a little bit about the MADA.  And in

18    your expert reports you refer to something called the MADA

19    barter.  Can you explain to the Court what you mean by that?

20    A.  Yeah.  One way to -- you know, one type of transaction you

21    can have in the world is a sale transaction.  I sell you a

22    widget, you give me money in return.

23          A barter agreement is -- in a pure barter agreement,

24    no money changes hands.  I give you something that you value,

25    you give me something that I value in return, and it's just --

1    it's a trade, it's a barter.  And it's just like you would find

2    in the dictionary.  This one really does match up with the

3    dictionary.  It's just an exchange of one item for another.

4        In this case, Google is giving a royalty-free license

5    to GMS.  That is, the Play Store and the APIs and other things

6    that go on top of -- that go on top of open source Android,

7    right?  This is what makes it into the platform that we're

8    talking about here today.  So that -- you know, that's

9    something that, obviously, an OEM values because he's got a

10   good OS with users that know how and want to use it, apps

11   developed for that platform, right?  So the things that the OEM

12   wants are there.

13       Google says:  No license fee for that at all.  You

14   can have that with no license fee.  In exchange, though, we're

15   going to ask for some promotion, and that promotion is

16   pre-installation of Google Search in the form of Google Search

17   app and Chrome in a folder on the default home screen, and,

18   also, the widget -- placement of the widget.  So you've heard

19   about that.

20       Now, the zero royalty was kind of new with the

21   Android operating -- I don't know if it was new, but it was a

22   feature of the Android operating system.  In previous operating

23   systems, Symbian and Windows Mobile charged positive license

24   fees that, at least some people say, made it more difficult for

25   those platforms to succeed.  They didn't have that free license

1    that would attract people to the system.

2    Q.  Have you studied how Android devices are priced in the

3    marketplace?  And, in particular, how they compare to Apple

4    devices?

5    A.  Yeah.  And what you can see is, there's Apple devices in

6    the -- I can -- yeah, this one is not redacted -- those are

7    Apple devices in the blue, mostly at high price points.  Okay?

8    Android has some high-price devices, too, that is, devices that

9    compete directly with Apple at the high end of the marketplace.

10   But, you can see there's a much wider variety of Android

11   devices.  In fact, like, more than 40 percent are below $200,

12   which is -- you know, which is -- and you think about what

13   that -- how do they do that?

14        Well, one is, they had a royalty-free OS.  So, if you

15   had a cheap device, you didn't have to pay for the OS.  But,

16   the barter did something else.  See, if you did -- those

17   devices, both across devices and over time -- maybe it's

18   easy -- actually, I'm sorry.  Maybe it's easier to think about

19   over time.

20        As the Android platform got bigger and better and all

21   that happened, the value of one-half of the barter, GMS, was

22   rising, so the -- what Google would have had to charge for --

23   what market prices would have been for the OS side was going

24   up, but the value of search that they were getting in return

25   was also going up as the platform.  So the barter was kind of a

1    natural way to kind of say if this platform is successful,

2    you're going to get more in terms of a more valuable GMS

3    package, including Play, and I'm going to get more as Google.

4         That also works across devices, right?  That is, if

5    this allows for low-end devices, which get less search revenue,

6    they're effectively getting the operating -- sorry -- the GMS

7    package for a lower dollar because it's a barter.  So I'm

8    getting less on one side, but, also, less on the other.  So the

9    same thing that kind of made it work over time also makes it

10    work across devices.  So that facilitates getting those low-end

11    devices that we see here.

12         And you can see just -- you know, now why is that

13    important?  Well, you can first say, well, isn't that in the

14    smartphone area?  Well, it is.  But, since people down there

15    would be switching from feature phones, what's going to happen

16    to search when they get those smartphones?  They're going to do

17    more search.  So, this feeds back into the search market, the

18    generation of more low-end devices.

19         THE COURT:  You use the term "feature phone."

20         What do you mean by that?

21         THE WITNESS:  Before we had smartphones, these are

22    kind of the previous phones, which was pretty hard to do any --

23    you remember, like, you hit multiple keys?  It was not a lot of

24    fun.

25         THE COURT:  Yes, I recall them.

1    BY MR. SCHMIDTLEIN:

2    Q.  Have the MADA placement requirements had an impact on

3    competition among Android devices?

4    A.  I have.  And I talked about this already.  I don't want to

5    spend too much time.  Basically, having the MADA, so everybody

6    has that same software, allows people to switch.  Which is also

7    an interesting thing for those low-end phones, because it's the

8    same operating system and the same apps available on those

9    low-end phones.  So, in some sense, even though those low-end

10   devices are implicitly paying a low price to get the GMS

11   package, they're getting the full package.  It's not a low-end

12   platform and a high-end platform.  Same platform.  That also

13   facilities people upgrading their devices because we're moving

14   within the same platform.

15   Q.  Does some consistency in the Android experience also help

16   in competing against Apple devices and how the experience is on

17   Apple devices?

18   A.  Well, the consistency draws in more app developers, causes

19   the platform to be more successful, which, as Android becomes

20   more successful as a platform, that allows it to compete more

21   effectively with Apple.

22           Now, Apple tries to do exactly what Google tries to

23   do, right, in terms of building a platform that attracts

24   developers, attracts users.  They don't have to attract OEMs

25   because they are the OEM, right?  And they have more control

1    about what goes on the device, so they don't depend so much on

2    other people in that regard.

3              But, the problem they're tackling, basically, is the

4    same.  They want to attract all those participants to their

5    system.  They just do it in a different way.  They don't do it

6    through contractual arrangements like the MADA that try to make

7    it all work together.  They just control it directly.  But

8    they're trying to solve the same economic problem.

9              And I've worked in tech for -- the economic side of

10   tech for a long time, and this competition between more closed

11   platforms and open platforms been around forever.  It was

12   Microsoft versus the Mac.  In that case, the open platform was

13   much more successful than the closed one.  Other cases, it goes

14   the other way around.  So, you never know what's going to work

15   out better because each has an advantage.  In this case, we

16   have the two styles competing with each other.

17   Q.  All right.  Let's talk about the RSAs.  And I'm going to

18   show you another slide that has some redactions to it and ask

19   you, at a high level, to describe the points that are reflected

20   in this slide.

21   A.  Yeah.  This is the U.S. picture on RSAs.  In the U.S.,

22   these are the revenue sharing agreements, right?  The OEMs are

23   the people.  The people make the phone sign the MADA.  The --

24   in the U.S., largely carriers sign the RSAs.  So, the carrier

25   RSAs are here in green, and the bluish colors are the RSAs that

1    Google has with OEMs.  You can see, of those, it's mostly

2    Samsung.  So, the other OEMs are quite small in terms of their

3    RSAs.  It's really -- if you're thinking of RSAs, it's

4    basically carriers, mostly accounted for by the big carriers,

5    not surprisingly, and Samsung.

6    Q.  From an economic perspective, would you expect the RSA

7    payments to have an impact on competition, including search

8    competition?

9    A.  Yeah.  I mean, for the reasons we've discussed.  Basically

10   you make a revshare payment.  That makes it -- that's revenue

11   you get every time somebody searchs.  So if you have a better

12   device where people do more searches, if you have more devices

13   where more people are doing searches, you have an incentive to

14   expand the sales of Android devices and use of Android devices;

15   it's what we call lowering marginal costs, urges you to expand.

16          Since you're going to pass some of that cost through,

17   one of the ways you do that is through lower prices, but, also,

18   higher quality.  Higher quality is another way to get more

19   users and, therefore, get more search and, therefore, more

20   search revenue.  So, this enhances search output, partly by

21   directly encouraging search, because that's where the payment

22   is coming from, but, indirectly, also, by pushing the people to

23   have -- push the platforms.

24          So, you can get more search dollars by getting more

25   phones or more searches per phone, either way.  Either one will

1    work.

2    Q.  Aside from the promotion of Google Search and Chrome, are

3    there other RSA provisions that impact competition, including

4    search competition?

5    A.  Yes, there are.  So, you have the security and letter

6    upgrades, updates.  And, again, this is one where Apple is

7    virtually integrated, so if they want to update their Apple

8    phones, they do it directly.  Since Google's system is more

9    decentralized, Google relies on the carriers to do the updates.

10   And carriers have incentive to do updates, but not totally.

11   Because if my Android phone doesn't work, some of that cost

12   will fall on the carrier, but some of it will fall on Android

13   platform generally.

14          It's, like, if I had a bad experience with Android,

15   maybe I'm going to go iOS next time.  So, Google has an

16   incentive to push the carriers to do this, and one of the

17   things they do is do that through requiring timely upgrades

18   through the RSA.

19          In more recent contracts, there're also other things,

20   other provisions that encourage higher-quality devices.  So,

21   they'll give carriers extra payments or OEMs extra -- I'm

22   sorry -- carriers and/or OEMs extra credit.  In this case, for

23   example, Samsung or something.

24   Q.  Does Google compete for incremental promotion of search

25   through the RSAs?

1    A.  Yes, they do.  So, remember, we talked about the MADA.  And

2    one of the features that Google -- one of the benefits Google

3    gets from the MADA is in that barter, they're giving access to

4    GMS.  In exchange, they're getting promotion of search, but

5    that's the widget and placement of Chrome and Search app in a

6    folder.

7           The RSA goes on top of the MADA, and it gives Google

8    additional promotion, which is, you know, Chrome goes in the

9    app doc or the hotseat, whatever you want to call it, and it's

10   going to be set as the default browser on the phone.  And,

11   also, typically what we have is a commitment not to install

12   alternative search services, what people have referred to as

13   pre-installation exclusivity.  Okay?

14           So, those are the two provisions that typically come

15   with the RSA.  Sometimes they're split up, but for most of the

16   time, they'll come together.

17   Q.  Do the RSA pre-installation exclusivity provisions generate

18   economic efficiencies?

19   A.  They do.  And this is -- so, let's assume you didn't have

20   the exclusivity provision and I paid a revshare in exchange for

21   getting that promotion, that is, putting these extra things on

22   the phone.  Now, I'm not paying again on the incremental,

23   right?  I'm paying revshare across the whole board.  I'm not

24   paying just for the added.

25           And so just like I gave you that example before, if

1    they promote something else and reduce what Google gets, their

2    promotional amount would fall more than proportionally than the

3    payments would.  So, you're sort of not getting the full

4    benefit on the margin, so there's additional value provided.

5            Really, an economist might say this prevents

6    opportunistic behavior, where you sort of say, I want

7    promotion.  It takes my sales from 100 to 140, but I'm going

8    pay for it across all 140, then the guy has an incentive to cut

9    back.  If you only get half the promotion and he still gets,

10   12, 14 -- 6-7ths of the dollars, but he is only giving you half

11   the promotion.  So that's why you might want to have a

12   requirement that assures you're getting that benefit of that

13   bargain.

14           THE COURT:  So the exclusivity, in your mind, has

15   procompetitive benefits because it algins interest to promote

16   search?

17           THE WITNESS:  Correct.  It's sort of -- you can think

18   about it as a way of enforcing the benefit of that bargain,

19   preventing opportunistic behavior.

20   BY MR. SCHMIDTLEIN:

21   Q.  Professor Murphy, I want to turn to your next Android

22   opinion about:  The agreements do not substantially foreclose

23   search rivals.

24           Can you explain -- or, did you analyze whether the

25   Android agreements foreclosed or impaired search rivals?

1    And, again, I'll caution you about some of the

2    redactions here.

3    A.   Yep.  I'm going to use this same methodology we used with

4    the Apple and independent browsers.  I'm going to start with

5    what volume is covered.  I'm not going to mention the number.

6    You can see it at the right, and it's also listed in text, you

7    know the amount of Android out of total search.  Okay?  So

8    that's sort of the base to which any impact will be applied.

9    Just like we applied it before to the Apple and

10   independent browsers, here we're going to apply it to the

11   Android piece.  I'm going to use exact same revenue share

12   comparison, and we're going to find that the impact here is --

13   I can say that one, right -- less than 1 percent.  It turns out

14   it's a .6 percent is what you get from the Android side of the

15   world.

16   So, now, you might say, well, gees, why is it only

17   that much smaller, given Android that?  But, the coverage of

18   Android in the agreements is broader than it is on Apple,

19   right?  So that accounts for that difference.

20   Q.   Let's talk about the degree or the extent to which the MADA

21   forecloses search rivals.

22   A.   Yeah.  So we sort of now established impact on rivals,

23   right, but we haven't really talked about whether there's any

24   foreclosure here or not.  So we're going to go back and look at

25   the two agreements, the MADA agreement and RSA agreement,

1    thinking about whether they foreclose competition, whether they

2    prevent rivals from competing.

3        So, there's some key facts about the MADA.  The MADA

4    is not -- it's no pre-installation exclusivity.  If somebody

5    signs the MADA, they're free to install another stuff.  They

6    can put another browser on there, they can put another search

7    widget on there.  They can put another search app on there,

8    they can put the browser with a different search app in the

9    hotseat.  There's a lot of promotion opportunities on top of

10   the MADA.

11       THE COURT:  Does it affect your opinion at all that,

12   by and large, there isn't much other pre-installation?  As a

13   business reality, that most of these Android OEMs and carriers

14   don't want to create bloat on their screens, and, so,

15   therefore, generally limit the apps to what's --

16       THE WITNESS:  Well, yeah.  I don't know if it's a

17   matter of bloat, because if they did not want to create

18   bloat -- they put the Google apps on top of these ones here, so

19   they're creating that same extra, pretty much.  They still got

20   Google in a folder, or Samsung puts a Samsung browser on there.

21   So, they do add things on top.

22       I think it's more that the rivals -- they don't have

23   a compelling case to replace the Google apps with the rival

24   apps, really.  If you had stronger rivals, I don't see any

25   reason why they wouldn't be installed on top of the MADA.  And,

```
1    in fact, we're going to talk in a moment about the Microsoft
2    Duo.  They have actually done that in Europe, and in the Duo
3    they actually signed the MADA agreement, but actually put their
4    own apps on there rather then the Google apps.  So we have one
5    example.
6              Would it be stronger evidence if people had done it?
7    Yes.  You know, if people had done it, then you don't have to
8    say, well, they could do it.  Here, we haven't seen them do it.
9    So, I tried to do the calculation to say would somebody who had
10   an attractive package be able to get somebody to drop the RSA
11   and put them on instead?
12             The math sort of seems to say they could, the
13   experience with Microsoft says they did.  But, that's the
14   evidence we got.  So, we really don't have enough -- we don't
15   have any more empirical evidence than that.
16             The best I can do is look at the data available, look
17   at the space available, look at how much volume they could get,
18   and could they compete if they could do even as close to as
19   well as Google?  I'm going to do that in a minute.  But, you
20   know, it would be much stronger evidence if you saw other
21   people already doing it.
22   BY MR. SCHMIDTLEIN:
23   Q.  What's depicted on this next slide?
24   A.  Now, this red is not a redaction, right?
25   Q.  Correct.
```

1    A.   Okay.  This is -- so this is the Duo phone I just talked

2    about.  So, you can tell the MADA is here because you can see

3    the Google Search widget there, but you see -- and you see the

4    Google folder there, it's actually below the Microsoft folder,

5    you know.  So Chrome and stuff that's required on the MADA will

6    be in there, but not on the desktop.

7         And then you can see there's a Microsoft folder, but

8    you can also see there's Edge down here on the bottom, in

9    the -- I don't know, call it the hotseat, app doc, whatever you

10   want to call it, bottom tray down there, Edge is there.  But,

11   also, there are numerous Bing search box here, right?  So you

12   have the Edge browser, which I have circled down here in the

13   lower left.  Bing is the default there.  Edge browser with Bing

14   as default is set as the default browser.

15        And on a device, there are two defaults that have to

16   do with search.  There's the search default and the browser

17   default.  In terms of traffic, the browser default is more

18   important than the search default because there are just more

19   instances where you get drawn there not for a search, per se,

20   but for a website.  You know, one of those you got an email and

21   it says:  Here's the website.  You click on that, that's going

22   to be the browser default.

23        In addition, there's several Bing search boxes --

24             THE COURT:  I'm sorry.  You said which of the two, in

25   your mind, is --

1    THE WITNESS:  Browser -- browsers.

2    THE COURT:  Default is the more --

3    THE WITNESS:  Browser default is the more active one.

4 Okay?

5    Now, that's my understanding.  I would think that's

6 what everybody else you've heard --

7    THE COURT:  I'm sorry.  When you say "more active,"

8 I'm not sure what you mean.

9    THE WITNESS:  Gets more traffic.  You get more stuff

10 flowing through the browser default than you do through the

11 search default because, you know, it's very common to want to

12 go browse something.  It's less common to have a search --

13 something you want to search.  That would happen if you had an

14 application that wanted to do a search.  It would use a

15 search -- my understanding is that would use the search

16 default.  But, wanting to browse a web page is such a very

17 common activity.

18    THE COURT:  Just to make sure we're on the same page,

19 the browser default, you include that to include the search bar

20 within the browser or --

21    THE WITNESS:  Well, if the browser comes up, it's

22 going to have a search bar, right?

23    THE COURT:  Right.

24    THE WITNESS:  So you're reading your email and your

25 wife said:  Oh, I found something cool.  Go look at this

1    website.

2              You click on that website, it's going to open a

3    browser and it will go right to that page, but then you'll be

4    on the browser that has -- then you say, oh, now that I'm here,

5    I want to go search for something, you're going to be using

6    whatever the search default is on that browser --

7              THE COURT:  Um-hum.

8              THE WITNESS:  -- whether or not that's the search

9    default for the device.  You're coming through the browser, so

10   you're going to use the search default for that browser.

11   That's why I'm saying, even for the search point of view, the

12   browser default -- if you're the default on the browser that's

13   a browser default, is probably the more important thing.  So in

14   this case you've got Edge as the Bing default search, but it's

15   the browser default for the device.  Okay?  Does that make

16   sense?

17             THE COURT:  Um-hum.

18             THE WITNESS:  Okay.  Then the Bing search app is in

19   the app folder, which is down on the bottom.  Okay?  So, the

20   search app is down in the -- I'm sorry -- in the app folder.

21   Sorry.  It's not in the app tray.  It's in the app folder.

22   There's a Bing search box on the minus 1 screen.  I always

23   forget which way you scroll, but it's the screen over here on

24   the left.  I guess you go like that to get to the minus 1

25   screen.  (Indicating.)

 1          There's also a Bing search box, which, if you touch
 2    in the middle of the screen and you swipe down, it'll give you
 3    another search box that defaults to Bing.  So, there's several
 4    ways to get to Bing search on this device.  That's kind of an
 5    example of a promotion that somebody can put on top of the
 6    MADA.
 7    BY MR. SCHMIDTLEIN:
 8    Q.  Does the fact that the Google Search widget is prominently
 9    placed on MADA devices render those devices de facto exclusive?
10    A.  Well, that's a good question.  And one of the things you
11    can look at is the amount of traffic that flows through
12    different search access points on Android devices.  So, if you
13    look --
14    Q.  Be careful about the percentage.
15    A.  Yeah.  And if you look, you see the search widget there in
16    blue, you see browsers in green, you see the search app, which
17    it's -- it's the application.  It actually uses -- it's kind of
18    like the widget, but it's not a search box.  It's just an icon
19    that you click on to use the search app.  They're kind of
20    really doing the same thing.  It's more how you get there.
21          One, you just type the search right away in the
22    widget.  The other one, you open the app and then you can type
23    your search.  Then there's some other traffic also that
24    happens.  But, you can see the widget accounts -- you know,
25    it's significant traffic, but not nearly all the traffic.

1    Let's just put it that way.  And you can see it more precisely

2    in terms of the graph.  Okay?

3    Q.  Professor, did you consider whether the MADA barter has

4    reduced competition in search?

5    A.  Yeah.  One complaint people have made is that because it's

6    a barter agreement and people really want Play, well, then

7    they're forced to take the other half of the agreement, which

8    is the promotion of Google Search through the search widget and

9    the folder with Chrome and the Google Search app.  Right?

10        So, that's -- you could think of that as bundle, and

11   in Europe, for litigation they were forced to unbundle -- they

12   unbundled.  So what they did is they separated the MADA into

13   two pieces.  So instead of having a royalty-free license in

14   exchange for placement, what Google did was have a license fee

15   for GMS and Play, so dollars were flowing from the OEM to

16   Google for GMS and Play.  And then, if the OEM decided to take

17   the MADA, dollars would flow the other way to kind of

18   replicate, roughly, what the bundle was.  Right?

19        But, you had a choice.  You could take one without

20   the other.  You could get GMS and Play, what people said was

21   must have, but not take the promotional half.  And one -- this

22   would address the issue, if the bundle was forcing people to

23   get -- to take the promotional base, like the widget, this

24   would help identify that, because then you could say, I don't

25   have to do that no more.  I can just take the GMS and Play and

 1     put somebody else on there.

 2              And what you found in Europe is nobody split the

 3     MADA.  Everybody just did what they were doing before and take

 4     the full bundle.  Okay?

 5              Now, interesting, even Microsoft did that, right?

 6     Microsoft in Europe had the access.  They could have done the

 7     E-MADA, but they didn't.  They took the MADA, the GMS and Play

 8     on the one hand, and also took the Google placement with the

 9     widget and then put their stuff on top.  So, they didn't take

10     the RSA.  They just took the MADA, but not the RSA.

11              So based on that, I would say it's not the bundle

12     that's driving things.  Beyond bundle, I don't see any evidence

13     that people would do something different.

14              THE COURT:  And the payment for the search in Chrome,

15     what's the -- what's --

16              THE WITNESS:  It's a bounty.

17              THE COURT:  I'm sorry?

18              THE WITNESS:  It's going to be a bounty.

19              THE COURT:  A bounty?

20              THE WITNESS:  Yeah.  That's my understanding, it was

21     generally done through a bounty.  So -- because you originally

22     had no dollars, and now it's going to be you pay me X for the

23     GMS and Play, and then I'll pay you a little more than X,

24     typically, for placement, but not much.  You know, one of the

25     things that happened with the unbundling is there's more

1    transaction costs, right, because you now have two agreements

2    and everything else.

3          So, one of the things that Google did was kind of

4    make it, on net, a little bit more positive.  Not a lot, but

5    enough to say, well, you know, for your headaches, here's a

6    change.

7    BY MR. SCHMIDTLEIN:

8    Q.  Did you evaluate whether the MADA provisions relating to

9    OEM's ability to facilitate switching search providers were

10   economically justified?

11   A.  Yeah.  I think they are because I think it facilitated

12   this -- you know, first, when it was part of the barter, it

13   facilitated the barter.  But, more generally, you know, one of

14   the things plaintiffs challenge is the limitation on having an

15   automatically launched launcher, right, or encouraging

16   customers to do a launcher.

17         The way I see that, though, and I think the right way

18   to think about it is this:  Well, look, you have a MADA

19   agreement and you agree to install some things on the device in

20   exchange for getting the zero license fee for GMS and Play.  If

21   you said:  Okay, but I'm going to do that barter, and then I'm

22   going to automatically run a launcher that undoes the

23   placement, you're sort of just undoing the agreement.

24         It's, like, I'll sign an agreement.  I agree to

25   install your software, but then I'll delete it.  And I'll say:

1    Well, where's my money? I installed it.

2          You know, but you're not going to do that, right?

3    It's contract enforcement. So, it's really ensuring that

4    Google got the benefit of the bargain.

5          Now, you can say, well, I don't like the MADA. Well,

6    if you don't like the MADA, then you don't like the MADA. But

7    if you say the MADA is okay, preventing people from unwinding

8    the MADA through a launcher is just a way to enforce that

9    agreement. Okay?

10          Now, importantly, the restriction on launchers

11   doesn't prevent users from running a launcher. And, indeed,

12   the OEM can install a launcher that the user chooses to execute

13   to change the configuration of the device. But, that's in

14   keeping with the idea that what you're really trying to do is

15   enforce your agreement with the OEM who signed the MADA, not to

16   undo it, while allowing the user to undo it.

17          And then you can say, well, what about the OEM

18   encouraging the user? Well, that's kind of somewhere in

19   between. But it seems to me in keeping with enforcing the

20   agreement with the OEM while still giving the user the

21   flexibility to run a launcher, if they want to do something

22   that wouldn't violate the MADA agreement.

23          And, remember, the restriction on launchers is

24   just -- you can have the launcher, you just can't do something

25   to violates the MADA. Which, again, if you view it as contract

1    enforcement, makes perfect sense.

2    Q.  Professor, let's now turn to whether the Android RSAs

3    substantially foreclose search rivals --

4                THE COURT:  I'm sorry to interrupt.

5                When you say "do something else," you understand the

6    MADA to allow inclusion of a launcher on whatever screen the

7    OEM may want to put it on.  So what is the something else that

8    the MADA prevents the OEM from doing with respect to the

9    launcher?

10               THE WITNESS:  It prevents them -- they can put it on

11   there, but they can't encourage the user to do it, which would

12   be, in some sense, the OEM going back on the MADA agreement.

13   They can encourage them to run a launcher, but it can't be a

14   launcher that violates the MADA, right?

15               THE COURT:  Oh, I see.

16               THE WITNESS:  They can say, oh, run this launcher.

17   It will make some cool --

18               THE COURT:  In other words, the placement aspects of

19   the MADA cannot be altered by a launcher?

20               THE WITNESS:  Yeah, you would have to get somebody to

21   read the agreement.  I think it just says whatever terms you

22   have in the MADA, you can't use a launcher to violate those

23   terms.

24               THE COURT:  Right.

25               THE WITNESS:  So that's why I think it fits very well

1    in a contract enforcement view -- or benefit-of-the-bargain

2    view is another way to think about it.

3    BY MR. SCHMIDTLEIN:

4    Q.  Let's turn to the RSAs.

5         Did you analyze whether search rivals can compete for

6    pre-installation on Android devices against the Google RSAs?

7    A.  Yeah.  So, again, the experiment here is a case where an

8    OEM has taken the MADA, and then the question:  Could an

9    alternative search provider compete to have an OEM or a carrier

10   not take the RSA and put their software on top, like Microsoft

11   did with the Duo?  Again, we have an example of them doing

12   that, which was the Duo.

13        The other way to think about it is, is there enough

14   traffic left that an efficient rival, a good -- a strong rival

15   could -- doesn't have to be stronger than Google or even as

16   strong as Google -- could they attract enough search traffic

17   that they could pay more to the OEM -- or the carrier, let's

18   say, than Google would pay under the RSA, right?  That they

19   would beat Google for the RSA and be able to install their

20   software.

21        It's, like, ability to compete story, right?  We're

22   focused on not do they win, but do they have the ability to

23   compete for it?  And I can't give you the numbers, but you can

24   see the amount of traffic -- and this is in revenue terms now,

25   this is not searches -- that goes through the browser, the

 1    amount that goes through the search app.  And, remember, both

 2    of those are going to be in a folder if you only assigned the

 3    MADA, right?  So they're going to take them off the desktop,

 4    take them out of the hotseat -- take the Chrome out of the

 5    hotseat, let's say, and you could put some other browser with

 6    an alternative search engine default.

 7           And Google's revshares are in that lower right-hand

 8    box there.  That's what they're paying in revshare.  A simple

 9    way to think about it is you got to capture more traffic

10    measured in revenue than you do revshare.  So, you can see how

11    much is out there to be had.  They wouldn't have to get nearly

12    all of it to be able to compete.

13           You see how that works?  I can't give you the

14    numbers --

15           THE COURT:  No.  I understand.

16           THE WITNESS:  -- but that's the logic.  Kind of the

17    same thing we talked about earlier in terms of our

18    hypothetical.

19           THE COURT:  Right.

20           THE WITNESS:  Okay?

21           Now, there's a separate question:  Is Google

22    overpaying for the RSA?

23           And, of course, Google gets the benefit of the

24    incremental traffic, which, at least as I see it here, is

25    certainly enough to justify it there, but they also are helping

1    to promote the Android platform.  And that's an important

2    feature of the RSA payments.  Let's say I had -- I'm -- I run

3    the platform, I'm running Google, and I got a -- I'm paying a

4    payment to people for placement or through promotion for the

5    RSA, and I just wrote them a check.  Okay?

6          Or more importantly, let's say I just -- so, when I

7    send them money for the -- it could be a check or it could be

8    the RSA share-pays payments -- that dollar kind of does double

9    duty.  It incentivizes them to do more search and to put that

10   search app on there, but it also incentivizes them to sell more

11   Android devices, right?  Because it sort of -- it does both at

12   the same time.  The RSA payments encourage search, but, also,

13   at the same time, help the Android OEMs compete for things.

14         Now, they would also -- if they got RSA payments from

15   somebody else, that would also help them compete.  So it's not

16   the only way they could help compete, but those payments kind

17   of do double duty.

18   BY MR. SCHMIDTLEIN:

19   Q.  The Court has heard about Google's payments on what's, I

20   think, been referred to as installed-base devices.  Does Google

21   paying a revenue share on installed-base devices prevent rivals

22   from competing against the RSA for pre-installation?

23   A.  All right.  I'll apologize for this.  This is, like, one of

24   them brain teasers.  Okay?  So this one takes a little bit

25   of -- it's a few moving parts.

1          So the whole idea of the tail payments is that --

2          THE COURT:  The what payments?

3          THE WITNESS:  Tail payments.  Have you heard about

4     tail payments?

5          THE COURT:  I've heard about tail searches.

6          THE WITNESS:  No, this is --

7          THE COURT:  Tail queries.

8          THE WITNESS:  So, let's assume I'm a carrier and I

9     have had a deal Google.  I have a bunch of phones out there in

10    people's hands that I'm getting RSA payments on.  If I stop

11    using Google, I'm no longer going to get those RSA payments.

12    I'm going to lose those RSA payments.  And the logic is, well,

13    gees, that's a disincentive to leaving Google.

14          But it doesn't quite work like that.  Because, think

15    about it.  So if Google wins the deal, they pay the tail

16    payments.  If Google loses the deal, they don't have to pay the

17    tail payments.  That lowers what Google is willing to pay to

18    win the deal, right?  Now, there's a cost of winning the deal;

19    I have to make those payments I wouldn't otherwise make by the

20    amount of the tail payments.

21          So Google is going to offer amount -- it's going to

22    offer what they would have offered without the tail payments by

23    the amount of the tail payments.  They're going to send that

24    offer over to the carrier.  He's going to say, well, gees, I

25    got to reduced offer, but I got the tail payments.

1      So he's going to add them back in.  So the value of

2   Google's offer is going to be the same from him, and either the

3   rival beats that or they don't.  It's effectively like a

4   refundable deposit.  It's, like, I put this money out there for

5   you, but if I don't buy the product, I get it back.  So it

6   basically doesn't affect who's going to win the contest.

7              THE COURT:  So these are the payments on --

8              THE WITNESS:  Legacy devices.

9              THE COURT:  Right.  Exiting devices that were covered

10  under a prior agreement.

11             THE WITNESS:  That would continue to get paid, if you

12  continue to go with Google, but wouldn't get paid now, if

13  you -- so that's what we call tail payments.  These are

14  payments that you would make if you stay, but Google won't make

15  if you leave.  And the logic people often say is, well, gees, I

16  don't want to leave Google because I'll lose the payments.

17             The trick is, Google also saves the payments.  So on

18  the two sides of the equation, it basically washes.  So, Google

19  reduced their offer by the amount of the tail payments, but it

20  will be valued up again by the amount of the tail payments back

21  to where it would have been otherwise.

22  BY MR. SCHMIDTLEIN:

23  Q.  Professor Murphy, would deploying a choice screen on

24  Android devices under Professor Whinston's analysis result in

25  significant shift of search queries from Google to rivals?

1   A.  No.  And using that same methodology -- we already went

2   through it -- we're just going to do exactly what we did on

3   Apple and independent browsers.  We're going to get 0.6.  So,

4   again, we use the 1 1/2, doubled it to 3, applied it to the

5   Android-covered devices, I get 0.6.

6   Q.  Professor Murphy, would -- in your view, would changing the

7   Google business model harm competition in a manner that impacts

8   search?

9   A.  I do believe it would.  So, for example, if you do the

10  E-MADA, like it was unbundling the MADA, like was done in

11  Europe, it raises costs.  It's -- you know, it could also lead

12  to people dropping one of the parts, which I think would harm

13  the platform.

14          But, more importantly, there's no real upside here.

15  Nobody seems to want to do that.  I don't think that would be

16  something that would add value, and it would probably, since it

17  has costs, would reduce value.  Eliminating the RSA payments,

18  requirements -- eliminating the RSA installation requirements

19  would most likely lower revshare, because we've already said

20  that others aren't willing to pay as much as Google is right

21  now because they're not as high quality.

22          So, probably, Google -- OEMs would get less, and if

23  they get less, that's less incentive to expand search and less

24  incentive to sell more Android devices.  Both would hinder

25  Android's ability to compete with Apple, which would both lead

1    to less growth in Android, but probably less growth in Apple,

2    as well -- or at least the combined two, I guess I would say.

3    Q.  And would that decrease in competition have a spillover

4    affect on search?

5    A.  It would.  And, if you remember, if we go back, how search

6    grew on mobile is a lot of it is growing the ecosystem; getting

7    more devices, more use of those devices.  So things that slow

8    down the growth of the mobile platforms is going to slow down

9    search.

10   Q.  Okay.  Let's talk about your third opinion:  No evidence

11   that the challenged agreements impair the ability or incentive

12   to compete.

13        Can you describe the high-level points you're going to

14   make in support of your third opinion?

15   A.  Yeah.  So, I'm going to address four things that Professor

16   Whinston raises as what he sees as adverse effects of the

17   challenged agreements.  And when I talk about the challenged

18   agreements here, I'm now talking about the browser agreements

19   and the Android agreements together.  So now we're lumping them

20   together in terms of our discussion here of adverse effects on

21   rivals.  Okay?

22        So the first one is:  The opinion is going to be the

23   challenged agreements do not impair rivals' ability to compete

24   by depriving them of scale.

25        Okay?  So, that's number one, because one of the big

1    theories that's been around in this case is these agreements

2    deny rival scale.  When they don't have scale, they can't get

3    better.  If they can't get better, they can't compete, right?

4    That's the story we've heard for a long time, so I want to

5    address that issue directly.  Okay?

6    Q.  Let's jump in there.

7        What market evidence did you find relevant to the

8    question of whether the challenged agreements deprived rivals

9    of scale such that search competition was harmed?

10   A.  Yeah.  So, the first thing I started with is to say the

11   impact of the challenged agreements relative to a choice

12   screen.  Again, I'm saying the alternative here is a choice

13   screen.  In my mind, that would reduce the competition we see.

14   But, let's assume we did it anyway.  That would reduce -- that

15   would increase rival share by, at most, 1 1/2 percent of total

16   search.  You know, based on my estimate I doubled it to 3, and

17   that gave me the 1 1/2 percent.  So you get 1 1/2 percent more

18   share for rivals.

19       Now, a major critique that Professor Whinston makes

20   is that those choice screen results don't really tell you the

21   story because those are current qualities, and in a but-for

22   world, rivals would be quite a bit stronger.  And the basic

23   argument would be, well, start at some point.  And, obviously,

24   at that point, they're recurring qualities.  Wherever you

25   start, that's the qualities they're at.

 1          But, then maybe they get a little bit of share and
 2    then that little bit of share would help them get more share
 3    and we're off to the races, right?  I think in his report he
 4    called it snowball.  You get the snowball rolling, and it will
 5    become a big snowball by the time it gets to the bottom of the
 6    hill.
 7          That's one theory.
 8          The other theory he has is that the challenged
 9    agreements directly impede rivals' incentives to invest and get
10    better.  So I'm going to try to address both of those theories.
11    I'll add some economics that will help us address those
12    theories, but, more importantly, I'm going to try to use some
13    market evidence to see if there's evidence for those theories
14    in the outcomes we see in the marketplace.
15  Q.  In your view, would small share shifts from Google to
16    rivals yield substantially stronger rival search engines?
17  A.  No.  Okay?  So, again, we're in this feedback theory, which
18    I already talked about.  So, this theory that -- let's take --
19    the initial impact is the 1 1/2 I just talked about, right?
20    Let's say we thought that that was the effect.  Reasons to
21    believe is might be even smaller as we go back, but -- because
22    in the past more of the volume was on desktop, less of it was
23    on mobile, these agreements are disproportionally mobile
24    agreements.  So, maybe that 1 1/2 would have been even smaller
25    further back in time.  But let's just use the 1 1/2.

1          So, the question is:  If at some point in time the

2    rivals got another 1 1/2 because we switched to a choice

3    screen, that's not going to probably change competition

4    dramatically, right?  They're only slightly larger than they

5    are today.  No evidence that that would make a significant

6    difference in competition.

7          Then, would that, though, through the snowball or

8    some other story, expand to be a bigger and bigger effect over

9    time?  Okay?  Well, having feedback effects or claiming there

10   are feedback effects isn't enough.  That is, feedback effects

11   are all over the place, right?  In just about any profession,

12   the more I work in that profession, the better I get.  The

13   better I get, the more I'm going to work.

14         So, that cycle is ubiquitous, really, in the economy,

15   right?  It's the classic learning-by-doing story.  And you

16   might say, well, gees, in this industry, maybe it's more

17   important?  So how big do those feedback effects turn out to

18   be?  Well, that's an empirical question.  We actually can look

19   at the data and see, is there evidence that when people get a

20   bump, that bump grows over time due to these feedback effects.

21   Okay?

22         So we're going to look for instances where people got

23   more share and ask, okay, they got more share.  Did that

24   translate to even bigger changes in share subsequent to that?

25   We're also going to look to see whether people, when they had

1  the conditions that Professor Whinston says would be conducive

2  to snowballing, took advantage of it.  Actually, they did.

3  They said, Wow, I got access, I got share.  I'm going to take

4  off.  Now is the time.

5         Because, remember, if getting 1 1/2 percent of share

6  could then lead me to getting more and more over time, that

7  would be a big return to doing that, right?  You would work

8  real hard to get that 1 1/2, so then you can just roll down the

9  hill the rest of the way.  And, so, we're going to see whether

10  we see evidence that when people had an opportunity to do that,

11  they took advantage of it.  Okay?  So look at market evidence

12  on both of these.

13  Q.  What market evidence did you review to inform your opinions

14  on this question of whether small share shifts would yield

15  substantially stronger rivals?

16  A.  Okay.  So, the first one I'm going to look at -- and I'm

17  sure you've heard a lot about this -- is the Yahoo! syndication

18  with Microsoft in 2010.  It provided Bing with a substantial

19  boost in share, right?  They more than doubled their share

20  bringing in Yahoo!'s data along with their own data, right?  So

21  that shock, which was 9.2 percentage points, is roughly 6 times

22  the 1 1/2 percent we're talking about here today, right?  So,

23  if we were going to see a snowball from the 1.5, we should see

24  something from the 9.  Okay?

25  Q.  Did you find evidence that Microsoft's gains in scale due

1    to the Yahoo! agreement led to a material impact or increase in

2    Bing's search quality relative to Google's search quality?

3    A.  No.  So, this next chart uses data from Professor

4    Whinston's backup.  I think there's other data produced in the

5    various reports.  It's all pretty much the same because

6    everybody got it from the same place.

7           This is the gap between Google's quality and Bing's

8    quality.  So, going down means Bing is getting better relative

9    to Google, right?  So this is the precision score gap, I

10   believe.  In -- back at the beginning the gap is about 3.

11   Okay?  See that?  That is Google's 3 points above Bing.

12          Between January 2010 and the end of 2010, it goes

13   down.  They close the gap quite a bit.  They close it from 3 to

14   1, but that's before the Yahoo! acquisition -- before the data

15   actually comes in.  The data comes in in December 2010.  That

16   is, that's when they actually added the scale.

17          What you see is rather than continuing down, or

18   accelerating in their convergence to Google, it actually

19   flattened.  I mean, like -- right?  The progress basically

20   stopped measured in quality.

21          Now, one thing with quality scores, you know, what

22   does quality mean?  It's always a tough thing to look at,

23   right?  But, at least measured by this measure, it doesn't seem

24   any evidence that the addition of the data caused further

25   improvements, right?  Kind of the trend stopped rather than

1    accelerated so --

2    Q.  Did you also examine, after the Microsoft Yahoo! agreement,

3    whether that additional scale for Microsoft resulted in gains

4    in search share from Microsoft or Yahoo!?

5    A.  Yeah.  That --

6         THE COURT:  I'm sorry.  Could I ask a clarifying

7    question about this chart?  Does this capture search quality

8    score for mobile or desktop or for both?

9         THE WITNESS:  At this time, it's desktop.  The world

10    is desktop back in 2010.  There's a little mobile at this

11    point, but we're -- this is the desktop universe at this point.

12        THE COURT:  I didn't appreciate that.

13        THE WITNESS:  Right, right.  So, we got the year

14    before and the year after, roughly.  So there's a little mobile

15    going on here, but this is really desktop.  Okay?  All right.

16    BY MR. SCHMIDTLEIN:

17    Q.  Did you also take a look at the question of whether the

18    Microsoft Yahoo! agreement resulted in gains in search share by

19    either Yahoo! or Microsoft?

20    A.  Right.  Rather than looking at effects on quality, we're

21    going to see kind of the snowball directly.  Did we see when

22    they got more scale, that allowed them to get even more scale?

23    Okay?  And what you see is I got lines on here for Bing in the

24    red, Yahoo! in the yellow.  And even though they weren't

25    combined before December 2010, I got a dash line that ads them

1    together.  That's what they would have had adding them

2    together.  And then the vertical line is when the scale comes

3    in.  So they get the added scale in December 2010.

4            What you'll notice is there was no subsequent up,

5    right?  There was no -- the snowball didn't roll.  I mean, they

6    didn't at all.  Remember, if we -- this is a big change, and if

7    we want 1 1/2 to turn into something substantially bigger, you

8    ought to see 9 get bigger, right? and it didn't.  It really

9    stayed about the same at that point in time.  Really, no

10   evidence that it led to any -- the improvement.

11           And this is two years afterward, right?  I'm looking

12   over a two-year period.  No evidence that, really, that a gain

13   in scale much bigger than the 1 1/2 percent we're talking about

14   here, no evidence that it led to further increases in scale

15   after that.  So the idea that you have to say, well, that's

16   only a current qualities, their subsequent qualities or

17   subsequent scale will be bigger, not really supported by this

18   data.

19   Q.  Did you look for other instances where Bing or Yahoo! got

20   increases in search usage to see how that impacted their

21   overall competitiveness in the market?

22   A.  Yes.  And this is Yahoo!'s share.  Okay?  And this is

23   looking over a much longer period here, right?  Because we're

24   going from February 2011 to February 2022.  So, this is an

25   11-year period.  And that big jump up in scale, that's when

9885

1     Firefox switched to Yahoo!, so they got additional scale.

2          The big jump down that happens a few years later is

3     when they switch back to Google.  But, if you look at the trend

4     during the period where they had Yahoo!, they're actually --

5     the gain is waning, not accelerating, right?  You don't really

6     see any evidence of a feedback here either.  Okay?

7          So, basic conclusion is, is when we look at the

8     empirical evidence here, we really don't see evidence of

9     subs -- any real improvement subsequent, gains in share after

10    an increase in scale.  And the first shock was quite big.  It

11    was, like, 9.  This shock is closer to the one we're talking

12    about.  This is about 2 percent.  So it's not tiny, but not

13    nearly as big as the syndication, but of the order of magnitude

14    we would be thinking about in choice screen shock.  Okay?  They

15    go from like, you know, 8 to 10.  So it's about a 2 point jump.

16          MR. SCHMIDTLEIN:  All right.  Your Honor, we are

17    almost there.  We have a short, I think, section left and -- to

18    finish up Opinion 3, and then we'll be done.  So now would be a

19    good time to break.

20          THE COURT:  Why don't we plan to resume at 3:20.  See

21    you all shortly.

22          (Recess from 3:04 p.m. to 3:21 p.m.)

23    BY MR. SCHMIDTLEIN:

24    Q.  All right.  Professor Murphy, I want to go to subpoint B

25    for your third opinion:  The challenged agreements do not

1    impair rivals' incentives to invest.

2        What is your response to Professor Whinston's claim that

3    the challenged agreements decreased rivals' incentives to

4    invest?

5    A.  First, I'm going to address it in two separate steps.  He

6    really posits two different theories, although he -- you know,

7    kind of both operate, according to his theory of the world,

8    that, one, that because they derive rivals of scale, they

9    increase rivals' investment costs.  That is, on a per-user

10   basis, any investment costs more the smaller you are, right?

11   So, it's basically not so much that it costs more to make any

12   improvement, it's just more per user that you have, the costs

13   rise.

14       The second is the agreements decrease rivals' access

15   to customers, and because they have less access to customers,

16   the benefits of investment go down.  That is, the gains from

17   investing go down.  Those would be the two pieces.

18       I'm going to look at empirical evidence, I'm going to

19   look at some of the underlying economics, and I think they both

20   lack, really, economic or empirical support.  And given that I

21   didn't find support for his prior theory about scale directly,

22   I don't find this theory -- evidence for this theory.  I don't

23   see evidence that this at-current-qualities critique, that,

24   boy, in the but-for world, things would be sufficiently

25   different, that we wouldn't get, like, the 1 1/2 percent, we

1    would get much bigger, I don't find evidence that that would be

2    the case.  Okay?

3    Q.  In your view, why did the challenged agreements not

4    increase rivals' costs of investment?

5    A.  Well, simply, I think the way he's measuring it is the

6    wrong measure.  That is, when you think about making an

7    investment to attract more users, what you care about is the

8    cost per incremental user.  You know, so you say, look, I'm

9    going to make an investment that can bring me 100 users.

10         The question is:  Is it worth -- is the dollars

11   you're spending paid for by the 100 users?  That would be true

12   whether I have 100 users today or 200 users or 1,000 users,

13   right?  It's always incremental users.  And if you have, like,

14   Google and Bing competing on quality and, let's say, increasing

15   both quality equally is kind of neutral, so it doesn't do

16   anything, then they're sort of competing for the same

17   incremental users, right?

18         Because if Bing improves their quality they get 400

19   users, if Google then increases theirs, the 400 users go back.

20   So, they are both competing for the same incremental, so you

21   don't have higher cost per incremental user.  So you want to

22   focus on the incremental users.

23         Another way to think about it is, like, if I'm a

24   small firm, a lot of small firms invest a lot.  They don't

25   invest a lot because they have a lot of users.  They invest a

1    lot because they want to get more users, and that's basically

2    the point.  So, I think the theory doesn't really hold in this

3    case.

4    Q.  Let's look at the other side and talk about the benefits

5    from investment.  Do the challenged agreements, in your view,

6    decrease rivals' benefits from investment?

7    A.  I don't believe so based on the economics, again.  And let

8    me kind of give you the idea.  Clearly, if you had no access to

9    users, then you would have no incentive to invest, right?

10    That's pretty straightforward.  Although, if I make it harder

11    for you to reach users, will you invest more or less?

12         Well, that's a well-known economic question.  Like,

13    you can say, well, it's too tough.  I give up.  On the other

14    hand you might say, boy, I got to work even harder to get more

15    users, right?  So the -- even in theory it's ambiguous which

16    way it goes.  That is, you might come to a hill and it's so

17    steep you say, I'm not going up.  I give up.  On the other

18    hand, you might say, boy, I got to work harder to get up the

19    hill.

20         So whether you invest more or less is really an

21    empirical question.  It could go either way, depending.  And

22    the evidence kind of also shows you that it can go the other

23    way.  For example, early on, Google didn't have a lot of

24    pre-installation, but they invested a lot because they said,

25    look, the only way to get a lot of volume is to be better than

1    the other guys.  We got to invest a lot to get better.

2            On the other hand, Microsoft had a lot of

3    pre-installation, yet they didn't find it in their interest to

4    invest nearly as heavily a Google did.  So, if we go back to,

5    like, the 2008 period, right around when Bing was launched, we

6    can see, even though they were both competing for those

7    incremental users, right, they're both competing, Google had

8    three times the head count, and that continued.

9            In fact, we had testimony in this case that not only

10   did Google have three times the head count, it got worse over

11   time.  So even though Bing had the access and they were

12   competing for incremental users against Google, they invested

13   far less.  And Bing had a lot of access, right?  Because they

14   have the defaults, they don't need to get users to even come to

15   them.  They just got to keep them from leaving, right?

16           So, in some sense, they had ready access to users.

17   If they improved their product, they would get people to stay

18   with them, right?  And that's the case at that point in time.

19   So, they definitely had the access.  And, you know, like I

20   said, they're competing for the same incremental users against

21   Google, and they failed to invest at that point in time.

22           I think we have another slide.  Yeah.  So -- okay.

23   Just a document.  Oh, no.  Yeah.

24   Q.  Now, does the market evidence support Professor Whinston's

25   claim that an increased scale in search distribution would

1    result in greater Bing market share?

2    A.  Yeah.  So I'm going to go back, again, to 2011, because if

3    you think about -- if you think about Professor Whinston's

4    theory, right -- we skipped a couple slides.  I think we're on

5    this slide here.

6            In 2011, remember, Professor Whinston's theory is,

7    look, when will rivals have an incentive to invest?  When they

8    have more scale and when they have more access and, therefore,

9    can compete for those incremental users.  If you think about

10   2011, number one, Windows made up a very large fraction of

11   search usage, right?  The number's here.  So, Windows was a big

12   chunk of search usage.

13           Bing was pre-installed on just about -- on a large

14   fraction of Windows PCs, so Windows had pre-installation

15   access.  Microsoft Internet Explorer itself accounted for a

16   substantial amount of usage.  So they didn't even have to get

17   people to change browsers, they just had to use a different

18   search engine on the same browser.  And they doubled their

19   scale in December 2011 with the Yahoo! syndication.

20           And you would say, well, boy, there's a time period

21   where you had much more than you would get in the but-for world

22   with a choice screen and 1 1/2 percent volume, right?  Because

23   in terms of access, you have -- you have virtually all the

24   defaults and they're on your platform on desktop, on your

25   browser.

1          So access-wise, you have way better access than you

2    would in a choice screen world because you actually had the

3    preferred position.  And in scale-wise, you just got a doubling

4    of your scale and 9 percent addition to your scale rather than

5    1 1/2.  The fact that Microsoft didn't take advantage of the

6    snowball or feedback effect at this point, didn't invest nearly

7    as much as Google did, really indicates that there's no

8    indication that they would have done more with the

9    1 1/2 percent or whatever they would have gotten from a choice

10   screen.  Okay?

11   Q.  Now, did you find more recent market evidence on the

12   question of whether increased search scale would result in

13   greater Microsoft investment in search?

14   A.  Yeah.  And this one you could say Microsoft said, look --

15   they sort of articulated a theory, right?  They said, if we get

16   more scale from Apple, we'll invest and we'll get better and

17   everything will work great.  Tim Cook and the other people at

18   Apple evaluated that and said --

19   Q.  I caution you that parts of this are redacted.

20   A.  I know.  I'm not going to quote anything.

21          It didn't happen.  Let's put it that way.  They went

22   to Apple with the pitch, and Apple said, no thanks.  I think

23   that's public information, right, that they were -- and, you

24   know, there's some other quotes.  Eddy Cue talked about various

25   things about what Apple was asking for in order to sort of see

1    whether they were willing to really put their money where their

2    mouth was, and it didn't work out.

3    Q.  Now, you've gone through some evidence here with the Court

4    with respect to Microsoft's behavior on this question of more

5    scale leading to greater investment.  Did you also consider

6    this question as it pertains too Yahoo!?

7    A.  I did.  Remember, we had the Firefox switched to Yahoo! and

8    what -- and, indeed, that -- much of that deal was -- I don't

9    want to say too much.

10           Investment incentives played a role in that deal.

11   What we actually saw happen was it didn't pan out for the

12   parties as well as they had hoped.  They eventually broke up

13   the deal -- it was a five-year deal.  They eventually broke it

14   up when -- transfer of control, I think, at Yahoo! three years

15   later.  And all that is public information, I would think.

16   Q.  Okay.  All right.  Let's move forward to your sub-bullet --

17   or, sub-letter C:  The challenged agreements do not impair

18   Google's incentive to invest.

19           Have you looked at the question of whether the

20   challenged agreements impacted Google and its investments?

21   A.  I have.  And first, I sort of thought back to what defaults

22   do.  So, I'm Google.  I'm competing for default.  So, when I'm

23   competing for that default, improving my quality benefits me in

24   several ways.  One, I'm more likely to win the default the

25   better I am.

1          Two, whether I win the default or lose the default,

2     I'm going to get more share than I would have otherwise,

3     because I can compete against the default if I don't have it.

4     I can compete against the guy competing against me if I do have

5     the default.  That's an important part of defaults, is they

6     don't eliminate the direct competition after the default is

7     granted.  There's both competition for the default and

8     competition against default.

9          One way to think about the other part is they

10    strengthen their positions with rival.  I got better search

11    engine, you're more likely to choose me.  And, probably, I

12    don't have to be quite as aggressive competing for your

13    business.  I am, I'm competing on quality rather than money, so

14    there's an incentive to invest, get a better deal.

15    Q.  Have you also looked at the question of whether total

16    searches have increased significantly over the years when all

17    these investments by Google occurred?

18    A.  Yeah.  And, again, I'm not saying Google investments

19    generated all this growth.  Okay?  That would be silly.  What

20    I'm saying, though, is how does Google grow?  They grow by

21    getting more search, not by more search share.  And a lot of

22    this is coming on mobile.  Lots of this is coming because

23    they're growing mobile, particularly in the later years.  And

24    the efforts they're making to invest and improve their quality

25    on mobile is driving that mobile platform faster forward than

1    it would otherwise.

2          So it's hard to tell how much of this growth, but the

3    key here is it's not all just about competing with the other

4    providers.  A lot of that is I want to grow by growing mobile

5    more.  And, you know, another way to think about it, again, on

6    this scale access comparison, if you think about desktop, okay,

7    Google faces competition from Microsoft on desktop.

8    Microsoft's much stronger.  In fact, they say, we're roughly

9    equal in quality on desktop.  Microsoft has the distribution on

10   desktop.  It's mostly Windows with their own distribution.

11         Under the -- under the access theory, Google should

12   be investing hard -- they should be investing hard on desktop

13   to kind of win because they face competition there from

14   Microsoft.  You can't argue they're shut out.  That doesn't

15   make any sense.  They got 80 percent on desktops, so they're

16   not shut out.  They're competing hard to keep that on desktop.

17         But the rival is weaker in mobile, but Google's --

18   most of the investment in this period is really focused on

19   mobile.  Why?  Because that's where the growth opportunity was.

20   So I guess what I'm saying, you -- is Google's investment

21   incentives, a lot of it is driven by growth.  It's growing the

22   pie, particularly in mobile.

23         THE COURT:  Let me ask you a question.  Leave Google

24   aside.  There's only a single search engine.  No other

25   competitors in the world.  You think that such a search engine

1    would have the incentive to restrict output as a reduced

2    search -- restrict search?

3              THE WITNESS:  Well, it would have, I mean, some

4    modest incentive.  But I think particularly Search, you're

5    competing so much against the outside world.  You're not just

6    competing against the other search engines.  So, I don't think

7    that would be the major -- particularly in mobile, I don't

8    think that's where it's at.  It's really most of the incentive

9    is to compete on a margin.

10             THE COURT:  I'm sorry.  And when you say the "outside

11   world," what do you mean?

12             THE WITNESS:  I mean, things that aren't currently

13   going through mobile.  That is, maybe other things people are

14   doing online.  But, if you think of how mobile grew, a lot of

15   it isn't even other online sources, right?  All the things you

16   do on your phone today using search, most of those you did

17   in -- I don't know, on a telephone, with your feet, with --

18   right?  I mean, they've been successful in attracting people

19   onto the mobile platform from lots of other uses.

20             They also compete against other, like, vertical

21   providers, right?  So there's a lot of things outside of

22   general search.  Because there's so much opportunity to grow

23   the market, that that's a very, very important investment

24   dimension.

25             Now, you might say if they had -- if they get

1    bigger -- its easier to think about bigger, not be the only

2    one.  Because as you get bigger, your investment incentives

3    change a little bit.  Because when you're small, what do you

4    think about?  I'm going to win stuff from the big guy.  When

5    you're big, you worry about the small guy, but you also worry

6    about growing the market because that's where you -- you can't

7    really -- that's where the growth potential is.

8              THE COURT:  To can't grow sharing, you need to grow

9    the size of the market.

10             THE WITNESS:  I need to grow the size, correct.  And

11   you'll do things when you're big.  Like, Google did Chromium,

12   and they made Chromium available not just for browsers where

13   Google was on, but other browsers.  Like, it's even used for

14   Edge, right?  And they do that because growing Search -- if

15   they grow Search, they're going to get a significant chunk of

16   it, right?  That's kind of the way to think about it.

17             So, when you compare a large producer in an industry

18   with a small one, they have different investment incentives.

19   One's more driven sort of by growing the pie, and one is more

20   driven by switching between providers.  This is what we call in

21   economics Marshall's law.  Marshall's law talks about how where

22   I get customers from varies depending on whether I'm big part

23   or a small part of the total.

24             And so in answer to your question, it's not all

25   one-way street.  As you get bigger, you focus more and more on

1    the market -- growing the market and less and less on the

2    people in the market. But, the -- you know, that does -- I'm

3    not saying monopoly is good or anything like that. I mean,

4    competition is always good. Artificially creating competition

5    isn't necessarily the right way to go, but if you have

6    competition, that's going to push you.

7            But, in this case, I wouldn't get -- I wouldn't be

8    solely thinking about competition between general search

9    because there's a lot of competition between general search and

10   other stuff, particularly on mobile. And not even limited to

11   just other search providers, because there's just a lot of

12   space, and there has been a lot of space to grow the market.

13           And, if I think about what's driving Google to do

14   what they do, you know, how can we get people to use more

15   search instead of paper, pencil, be on the phone, call people,

16   whatever, you know. And so you invest -- instead of calling

17   the store to get the hours, what do you do? You Google the --

18   you Google where the store is and you look on their website and

19   what their hours are, right? Or are you looking for -- so much

20   stuff.

21           To do that, though, you need to get the complements

22   there. You need to get the platforms better. You need to get

23   the browsers better. You need to do all that. And that's what

24   this whole business model, to me, is about.

25           So, in answer to your question, you know, competition

1    is great always, but I wouldn't be just, like, oh, that is the

2    only competition that matters, is within the search.  There's a

3    lot going on outside, and it's not only just within electronic

4    stuff.  There's a lot of ways.

5           If you look what we're going to be doing on a

6    computer, our phone five years from now, who knows where that's

7    going to come from?  It could come from lots of other places.

8    Who knew it was going to be our camera, right?  We used to have

9    things called cameras.  Now, my grandkids, camera is a phone.

10   There's no such thing -- they don't know what a camera is.

11   It's a phone, right?

12          And, so, I'm not saying that's a search part, but you

13   can see what I'm talking about.  There's a lot of -- there's a

14   big universe out there and if we grow the marketplace, there's

15   a lot to be drawn in.

16   BY MR. SCHMIDTLEIN:

17   Q.  Does Google have incentives to improve search quality even

18   though it has default agreements?

19   A.  Oh, yes.  For the reasons I talked about a bit ago.  That

20   even if you have the default, you're going to get more under

21   the default, if you're better.  You're going to pay less to get

22   the default, if you're better.  You're going to be more likely

23   to win the default, right?  There's all kinds of benefits even

24   once you have it.  And that's the key here, there's competition

25   even with the default or without the default.

1    Q.  And how did -- how did your assessment of that question

2    pertain to search on Android as reflected in slide 139 here?

3    A.   Okay.  So, in terms of 139 -- and we have no scales, but I

4    think the lines show, right?  If I look on here, that's what

5    they see, right?  So the lines are showing -- so this is --

6    this blue line is search queries over time.  The red line is

7    Android devices.  So you can see, early on, devices in queries

8    were kind of going up together with queries growing faster, so

9    queries per device was going up.

10              But since '18 or so, Android devices is pretty flat,

11   right?  There hasn't been a lot of growth in Android devices.

12   But queries, it continued to go up.  Why is that?  Well, you

13   know, the marketplace has been successful in generating more

14   queries per device, basically, is what we can infer.  That's

15   how we get continued -- so ones that we call the extensive

16   margin, how many?  The other is the intensive margin, how much

17   searches per device?  So the growth in recent years is coming

18   from more intensive search usage on a given number of devices.

19   Q.  Have you seen evidence in the record regarding Google's

20   investments to improve and expand search quality?

21   A.  I have.  This is a timeline that's taken from the Google

22   website search through time.  And it's a cool website,

23   actually.  If you go there and look, they have a whole list of

24   different kinds of activities that have happened over time that

25   have enhanced mostly the quality of search and user experience

1    in search, and I list a whole bunch of them here.  It's just to

2    give you an idea of, you know, how many innovations have been

3    happening over this period of time.  And there's more.  These

4    are just from two of the categories.  They had, like, six or

5    seven categories, and I put two of them up here so -- just to

6    give you a general picture.

7    Q.  I think the next slide you prepared, Professor Murphy,

8    dealt with Chromium, and I think --

9    A.  Yeah.  I've covered it.

10   Q.  -- you've highlighted that to His Honor --

11   A.  Right.

12   Q.  -- so I'm going to skip ahead here.

13        Professor Whinston has argued that Google has not

14   significantly invested in R&D when compared to other software

15   and computer companies.  Do you agree with his analysis?

16   A.  I don't.  One of the things we already talked about is when

17   they were competing back in 2011 with Bing on -- largely on

18   Windows at the time, they were out-investing Bing

19   significantly.  Remember, they're competing -- you know, users

20   lost by Bing or, basically, users gained by -- by Google, and

21   vice versa at that time, because there's not that much growth

22   in the platform, right?  This is not a period where desktops

23   were really growing like mobile does later.  So, if you just

24   did that comparison.

25        This is based on the data that Professor Whinston

1    used.  And it's redacted on here.  So I'm looking at R&D to

2    sales ratios versus the size measured in sales, right?  It's a

3    ratio of R&D to sales compared to size.  And Professor Whinston

4    compares Google Search and Alphabet, I think, to all these

5    firms together.

6           Well, one of the ways you get a really hard R&D to

7    sales ratio is not have much sales.  This kind of happens when

8    you take ratios.  Like, the way to get a really big number is

9    have a small number on the bottom.  And you can see in this

10    picture that the small ones, the small sales firms, which are

11    to the left, I did in blue, you can see that's where a lot of

12    the really high numbers come from.

13           Now, I made one other change, which is instead of

14    using just search and search ads, I added in the related areas,

15    which are, like, Chrome, Android, the Pixel phone, those areas,

16    because as we've been talking all day, these are kind of the

17    complementary things that Google is doing with Search.  They're

18    doing those, really, motivated, to a large extent, by Search

19    itself.

20           So, if you compare Google to the other large firms,

21    you can see that segment of Google is above the average for the

22    other large firms.  Okay?  So once you eliminate the really

23    small firms, Google is actually higher than the average.  Not a

24    lot higher, but higher.  So the claim that they're low in this

25    distribution really is because you have a lot of small firms in

 1    it as comparison.

 2            If you move that line -- because I did a cutoff at a

 3    certain level.  If I move the cutoff to the left by using half

 4    that level, or move that cutoff to the right by doubling that

 5    level, the average doesn't change much.  It moves by less than

 6    half a percent point.  So, you can see kind of that -- the

 7    claim that Google's investment is low doesn't really hold up

 8    once we include the complements and once we include a control

 9    or comparison to other large firms in terms of sales.

10    Q.  Professor Whinston has pointed to a Google initiative in

11    Europe as evidence that a choice screen or something else that

12    he claims represents more competition would lead Google to

13    invest more.  Do you agree with him?

14    A.  I don't think it really -- that's not the story I would

15    draw from Europe.  I think Europe does tell you something.

16    That is, when you went to a choice screen -- think about what a

17    choice screen does.  Choice screen kind of switches how you're

18    marketing your product in some sense, right?  One of the big

19    things I'm doing without the choice screen is marketing it to

20    the OEMs and other people who are going to install it on the

21    device.

22            With a choice screen I'm marketing to end users, but,

23    also, making -- marketing it to end users who are making kind

24    of a quick choice.  And as the documents sort of make clear,

25    that means they're sort of top of mind.  You're sort of

1    marketing.  And that's true in general, when you switch from

2    what you might think of wholesale marketing to retail.

3              Let's say I'm selling cereal to a restaurant.  What

4    am I going to do?  I'm going to produce a good cereal.  I'm

5    going to put it in a plastic bag.  I'm going to ship it to the

6    restaurant.  I'm not going to get -- you know, I'm not going to

7    spend a lot of money on a -- you know, what happens if I move

8    it in a grocery store, right?  I'm going to put in a box, and

9    I'll slap a bunny rabbit on the front, you know, because it's a

10   very different product.

11             So one of the things Google did was put a lot of

12   money into marketing, putting themselves top of mind.  But

13   that's not all they did.  It wasn't all marketing.  They also

14   switched in terms of they put more emphasis on things that were

15   visible to people; sports scores, things likes that, right?

16   Things, many of which they'd already done in the U.S., they

17   hurried to get out in Europe to make themselves top-of-mind

18   when that choice screen came around.

19             The big thinking, according to the documents -- and,

20   you know, documents are what they are -- but it seems to be

21   they were thinking other people would market, so we should

22   counter-market against that because you want to be top-of-mind

23   when that user goes to make that choice screen choice.

24             So, when I think about Google being in Europe, what

25   does it tell me?  It tells me you're going to do the kind of

1    things the choice screen drives you to do, but you might not do

2    as much of the other things you were doing when the goal was to

3    appeal to the guys that were going to pre-install you, right?

4    Because -- you know.

5            So in both cases you want to be higher quality, but

6    the dimensions on which you want to be higher quality might be

7    somewhat different.  It's not surprising that the focus in

8    Europe was really on those more top-of-mind items, because

9    that's what you would expect when you fix to retail marketing.

10           So it did affect Google's decisionmaking.  They did a

11   program.  It was relatively small, as Mr. Gomes said, about --

12   of the total amount they invest.  It did affect the kind of

13   things they did, I think, more than anything else.  I wouldn't

14   view it as reflecting an increase in competition, per se, but

15   an increase in the benefits of certain types of marketing.

16   Q.  Did you see value --

17   A.  And product design.  I should say, the kind of more visible

18   parts of product design.

19   Q.  Did you evaluate the evidence to assess whether Google's

20   decisions regarding search privacy have been impacted by the

21   challenged agreements?

22   A.  Yeah.  I did some work on privacy.  Let me tell you how

23   I -- to me, as an economist, I'm not a privacy expert.  But I

24   can tell you, as an economist, a perspective I think is

25   important when thinking about something of privacy.

1          Fundamentally, privacy, if we just focus on the users

2    side, involves a tradeoff.  As I use more user data, I can give

3    them better results.  On the other hand, that probably means

4    somewhat less privacy for them.  So what that means is you

5    don't want to think about more privacy is necessarily better,

6    right?  Because -- well, if I get better privacy, but now my

7    restaurant I get is 400 miles away, that's maybe not so good.

8    So it's a tradeoff.  So you can't just say more privacy is

9    better.  Privacy is good, but it comes at a tradeoff from

10   quality.

11          Now, if you look at the data -- if you look at the

12   world, let's go back to what we're talking about.  If privacy

13   investment was a way to really attract users, really please

14   users, who in the current world would be well positioned to try

15   to do that?  Microsoft, right?  They got access on the desktop.

16   Implementing privacy is not a huge dollar investment to bring

17   it to -- for it, right?  They could even partner with

18   DuckDuckGo or somebody to bring privacy to the desktop.

19          They have access to customers.  They got

20   pre-installation.  If they had a product and people say, Hey, I

21   don't want to switch to Google anymore, I'm going to use Bing,

22   they got all this new privacy stuff.  The fact that you don't

23   see Microsoft doing it -- I'm not surprised you don't see

24   Google doing it either, right?  Because if it was a great idea,

25   Microsoft would think it's a great idea, too, in my mind.

1          Now, DuckDuckGo is doing it, but they're suffering

2    the two sides of the tradeoff, right?  On the one hand, they

3    have users who are interested in them because they have

4    privacy.  On the other hand, their search results, according to

5    testimony I've heard at trial, suffer to some extent.  I'm

6    not -- I'm not a search guru, so I can just give you what I've

7    learned from the trial and the evidence I've seen.

8          I'm an economist.  Economist tells me there's a

9    tradeoff.  I would lose my license as an economist if I didn't

10   tell you there was a tradeoff, right?  That's part of being an

11   economist.

12         But, number two, I would look at the market evidence

13   and say, really, if privacy was something Google would do but

14   for competition, well, Bing clearly faces competition on

15   desktop, why aren't they doing it?

16   Q.  All right.  The last -- turning to your last sub-bullet

17   here for your third opinion.  Did you evaluate whether

18   plaintiffs' claims in this case pose threats to search

19   competition?

20   A.  I did.  I really tried to look at it.  And, again, I'll

21   tell you the key economic pieces I would put together is,

22   first, remember that vigorous competition can reduce rival

23   success, and even change their incentives to invest.

24         Most importantly, though, there's no empirical

25   evidence for attributing rivals' current scale or quality to

1    the challenged agreement.  If you move to something like a

2    choice screen, they would only be modestly bigger than they

3    are, and there's no evidence they would snowball or lead to

4    something else.

5            And the most important conclusion is the bottom.

6    Based on everything I've seen, these default agreements and the

7    Android agreements enhance competition.  The default agreements

8    create price competition in a search marketplace where it would

9    be harder to have free price competition absent those

10   agreements.

11           It preserves quality competition.  They're not

12   exclusive.  People can compete for them and against them.  They

13   create -- they preserve investment and create investment

14   incentives.  So, if you were to get rid of those agreements, I

15   think what we would do is give up competition today.  And as

16   long as you don't have the agreement in place on the

17   speculative hope that somehow this is going to strengthen

18   rivals and lead to more competition in the future, I would say

19   as a theory, you could make that theory, but the empirical

20   evidence doesn't seem to support that you would get that

21   follow-on effect.

22           Where, in my mind, the empirical evidence says the

23   reduced competition you would get from getting rid of the

24   agreements would happen.  That is, you would have less price

25   competition, less competition in the marketplace generally as a

 1    direct result of getting rid of the agreements.  And it would

 2    be speculative to claim there's further benefits down the road.

 3                MR. SCHMIDTLEIN:  Thank you, Professor Murphy.

 4                Your Honor, we move into evidence, as we have with

 5    other witnesses, DXD37, which are the demonstrative slides

 6    which we have used with Professor Murphy on his direct

 7    examination.

 8                THE COURT:  All right.  They'll be admitted.  Thank

 9    you.

10                Cross-examination?

11                MR. DINTZER:  Yes, Your Honor.  If we could have two

12    minutes to --

13                THE COURT:  Sure.

14                (Pause.)

15                MR. DINTZER:  We're ready, Your Honor.

16                          CROSS-EXAMINATION

17    BY MR. DINTZER:

18    Q.  Professor Murphy, so we also, obviously, have a fair amount

19    of ground to cover.  What I would like to do is start by

20    talking about some of the options we've heard about in the

21    search bar space that you've talked about.  And the first thing

22    I'd like to do is, I would like to hand up --

23                MR. DINTZER:  If I might approach, Your Honor --

24    BY MR. DINTZER:

25    Q.  -- UPX615.

1              Do you have those, sir?

2    A.  I do.

3    Q.  We're going to have them on the screen.

4              615 is an email from Apple to Google.  Do you see that?

5    A.  I do.

6    Q.  And it's a 2009 email --

7              This is in evidence, Your Honor.

8              -- among Google employees, including Mr. Shardell.  Do

9    you see that?

10   A.  I do.

11   Q.  He's forwarding a draft of an amendment from Apple.  You'll

12   see that at the bottom slide, where you see Leslie Fithian

13   forwarding up a draft of an agreement.  Do you see that?

14   A.  That's the other document you handed me, correct?

15   Q.  It is.  It's going to be the attachment.  And I'm not

16   hiding the ball here.  This is the email that's been forwarded,

17   and we're going to look at the attachment.  Do you see that,

18   sir?

19   A.  I do.

20   Q.  Okay.  So let's go to UPX675, and that's the attached

21   proposal.

22              Have you seen this document before, sir?

23   A.  Well, there's lots of versions.  I think I've seen this

24   one, but, you know, I -- I believe I have.

25   Q.  Okay.  And fair amount is redacted, but we're going to

1    focus you on page Bates number -- and it will all be on the

2    screen, to the extent we can -- Bates number 250.

3         And let me know when you are there.

4    A.  I am.

5    Q.  Okay.  And what it says is -- and I'm quoting here -- this

6    is a proposal coming from Apple to Google, quote, "Apple will

7    have the option but not the obligation to preset the services

8    as the default search service in the software."

9         Do you see that?

10   A.  I didn't see exactly --

11   Q.  I'm sorry.  I'm getting ahead of us.

12        So let's go ahead and highlight that for you.  It's the

13   fourth line down.

14        Do you see that?

15   A.  No.  It's -- somebody keeps switching the screen on me.

16   Q.  We've got it.  Apple will have the option but not the

17   obligation to preset the services as the default search service

18   in the software.

19        Do you see that?

20   A.  I'm just trying to read the whole paragraph to make sure I

21   understand the concept.

22   Q.  Please, of course.

23   A.  Beginning of the paragraph says:  Apple agrees to preset

24   the services as the default search service in the web search

25   box provided by Apple within Apple web browser software

1    designed for use on iPhones, iPods, or product X.

2    Q.  Sure.  Do you see that?

3    A.  I do.

4    Q.  Okay.

5    A.  And then that seems to be somewhat different than what's

6    coming next.

7    Q.  Okay.  Well, so one of the things that Apple is proposing

8    is that it has the option but not the obligation to preset

9    Google.  Do you see that?

10   A.  I do.

11   Q.  Okay.  And then, if we go to the bottom of that same

12   paragraph, it says:  If Apple provides a non-Google default

13   search service in the web search box of some units of the

14   software but not others, only in some locations, product lines,

15   or versions, the default revenue share will still apply to any

16   units in which it is preset as the default.

17        Do you see that?

18   A.  I do.

19   Q.  Okay.  So Apple was proposing that it had the option but

20   not the obligation to put -- make Google the default search.

21   Do you see that?

22   A.  I mean, I -- that's the best I can read it.  You know, I'm

23   trying to understand what it all says.  But it says they're

24   proposing something where they would have the option or -- but

25   not the obligation in some cases, yeah.

1   Q.  Okay.  And if Google had agreed to this, Apple could have

2   set different defaults, maybe in different locations or

3   different product lines or different versions.  You understand

4   that?

5   A.  That is what it appears.  I'm not the best at interpreting

6   contracts, but that's what it appears.

7   Q.  Okay.  Do you understand that Google said no to this

8   proposal?

9   A.  Yeah.  It was a proposal, and people often say no to

10  proposals.

11  Q.  And are you aware that Apple asked, again, to have the

12  option, but not obligation -- this is 2009 -- in -- three years

13  later?

14  A.  I don't recall -- you mean, 2012?

15  Q.  Yes.

16  A.  I don't remember the language.  They did some stuff in

17  2012, as well, and I think I've seen those documents, yes.

18          MR. DINTZER:  May I approach, Your Honor?

19          THE COURT:  You may.

20  BY MR. DINTZER:

21  Q.  Okay.  Sir you've been handed UPX050 (sic).  Do you see

22  that?

23  A.  I do.

24  Q.  And I'm going to take you to Bates number 724, which we're

25  going to put on the screen.  Do you see that?

1    A.  I do.

2    Q.  This is one of the proposals, and it's under the heading of

3    Search.  And for Default it says:  No obligation to use Google

4    Search services or to make Google the default.

5         Do you see that?

6    A.  I do see that language.

7    Q.  The next line, under Revenue Shares:  Apple's revenue share

8    would be -- and then that's redacted -- of Google's net revenue

9    from referral traffic.

10        So Apple still wanted revshare, but, again, no

11   obligation.  They had the option, but not the obligation.  Do

12   you see that?

13   A.  Yeah.  Although, what's not clear to me is to what traffic

14   that revshare would provide, right?  Because it's got the next

15   sentence that says about Apple integration, and it's not

16   defined what -- I don't think that's defined, what that means

17   here.  So it's not clear on what that would get paid.

18   Q.  Fair enough.  Fair enough.  But the ability for Apple to

19   choose, but not be obligated to put Google in the default spot,

20   that was something that Apple was, again, seeking in 2012?

21   A.  Well, this is -- this is part of that negotiations, yeah.

22   You can ask for things in negotiations.

23   Q.  Right.  And, so, if Google had said yes -- you talked a lot

24   about defaults early in your presentation, and about why

25   defaults are helpful and useful, et cetera, et cetera.  If

 1    Google had said yes to option but not obligation, Apple could

 2    have had the choice to put Google as the default and get all

 3    those benefits, and maybe put somebody else as a default and

 4    get some other benefits.  Those would all be there without

 5    Google having the exclusive right to be in that bar, right?

 6    A.  Well, I don't know.  Depends on what deal they struck and

 7    how it was forged.  But, in principle, they could have struck a

 8    deal that goes another way.  Now, typically, Google wouldn't

 9    value that deal as much, and so -- and that deal ends up

10    getting negotiated to its end point, maybe that's something

11    Apple doesn't want.

12    Q.  And have you done any economic analysis, financial

13    analysis, where you valued how much the search bar default

14    would be worth if someone had the option but not obligation to

15    put Google there?

16    A.  I'm an economist.  I'm not somebody engaged in that

17    business.  But I'll tell you what I would look at as an

18    economist.  I would look at -- you see these kinds of

19    agreements emerging typically in the marketplace.  If you don't

20    see those kind of agreements emerging in the marketplace,

21    typically you would say, boy, that doesn't necessarily look

22    like something that meets the market test.

23    Q.  Or maybe, just maybe, you have a monopolist who refuses to

24    participate in option but not obligation.  That could be one

25    reason it doesn't exist, right?

 1   A.  Well, what about the other people that are not the

 2   monopolist?  Wouldn't they be doing it, in your view of the

 3   world?

 4   Q.  We're going to go through those.  And I usually get to ask

 5   the questions, so -- and I know you're familiar with this

 6   process, so -- but we're going to get a chance to do a deep

 7   dive.

 8        Now, did you read John Giannandrea's testimony?

 9   A.  I did.  Not all of it, but I read parts of it.

10        MR. DINTZER:  And may I approach, Your Honor?

11        THE COURT:  Yeah.

12        MR. DINTZER:  Oh, actually, we're going to put it on

13   the screen.  I think we'll make it -- this will make life

14   easier.

15   BY MR. DINTZER:

16   Q.  And he was asked, Question:  And use the term "front."

17   Could you explain what the term means?

18        Well, what we've been discussing, which is intercept or

19   divert, or we see every query, first and foremost, in Safari

20   and Spotlight and then we make a decision and determination

21   about whether to send it to the default search engine.

22        Question:  Okay.  And hypothetically, if Apple wanted

23   to, it could send the query to a different source.  It could

24   send it to a different search engine.  It could choose between

25   search engines.

1          Answer:  We could, yes.

2          Did you see that?

3    A.   I do.  I don't see here the context in which it was

4    discussed, but I do see the words you read.

5    Q.   So another alternative to the present ISA, which requires

6    that queries be sent to Google, is a situation where Apple had

7    the ability to distribute searches to whoever it wanted to.

8    That could be an option that he says he's capable of?

9    A.   Well, no.  Under the current agreement it's my

10   understanding -- again, I'm not a legal expert, but my

11   understanding is Apple has the ability and rights to take user

12   input and do other things, like Safari Suggest and the like, if

13   it's something that they determine enhances the value provided

14   to the user.

15          So, I'm not -- are you saying they don't have that

16   right now?

17   Q.   Well, actually, again, I'm going to ask you the question.

18          My question to you is:  Is it your understanding that

19   Apple has the unlimited right to do whatever it wants to with

20   every query that comes through the search bar on Safari?  Is

21   that your understanding?

22   A.   No.

23   Q.   Okay.  And so --

24   A.   Nor would I expect that.

25   Q.   Fair enough.  One of the alternatives to the world we have

1    now is one where the browser distributes the queries to

2    whichever place it feels is the best place, right?  It can't do

3    that now, but that's one alternative, right?

4    A.  You can envision a world like that.  I've never seen one

5    emerge, so I'm not sure that's ever met the market test.  But

6    you could imagine whatever you want.

7    Q.  In fact, Google pays Apple so that it won't distribute

8    queries to whoever it wants, that they'll go to Google.  That's

9    part of the ISA, right?

10   A.  That's an incorrect inference from what -- statements you

11   just made.  You don't know that's why they pay Apple today.

12   That's something they can't do under the agreement, but you

13   have no reason to say that that's the reason they pay Apple

14   today.

15   Q.  Okay.  Safari has a privacy mode for private browsing; is

16   that right?

17   A.  I understand they do.

18   Q.  Do you understand that recently they've adopted a separate

19   default for the private browsing mode?  Are you aware of that?

20   A.  I'm not directly aware of that, no.

21   Q.  Okay.  Let me introduce you to it, sir.  We're going to go

22   ahead and put up -- do you have an iPhone?  Is that what you

23   use?

24   A.  I use an Android.

25   Q.  So that might be why, sir.

1          So let's go ahead and put up UPXD005.

2               MR. DINTZER:  May I approach, Your Honor?

3               THE COURT:  You may.

4     BY MR. DINTZER:

5     Q.  Okay.  Sir, do you see the picture?

6     A.  I do.

7     Q.  And I'll represent to you that there was testimony, sir,

8     about a recent upgrade of the Safari system that allowed a

9     separate default to a private search engine.  Do you see that?

10    A.  I do see it.  I'm not aware of it, so alls I can do is go

11    by what you're showing me.

12    Q.  Okay.  And -- and I guess -- and if you don't know the

13    answer to this, that's fine.

14          Are you aware that under the ISA, Apple is required to

15    set a search engine and its private search engine both to

16    Google as the default out of the box?

17    A.  I would have to go back and read the ISA.  I'm not aware of

18    what happened after this split was put in place.

19    Q.  Okay.  Are you aware, generally, that Apple does not have a

20    private browsing function set to anybody other than Google as

21    the default?

22    A.  Again, I don't use an Apple phone and I don't use the

23    private browsing function on my phone, so I can't give you a

24    comment on that.

25    Q.  Okay.  So let me put it as a hypothetical, sir.

1          If, if the ISA -- let me put it this way:

2          If Apple had a private search engine default set to a

3     company like DuckDuckGo, that would likely increase the

4     opportunity for DuckDuckGo to get search traffic, right?

5     A.  As a hypothetical, yes.  Although, my understanding is

6     someone -- somebody from Apple testified they wouldn't use

7     DuckDuckGo.

8     Q.  And when they said that were they talking about as these

9     general search engine default, or do you recall?

10    A.  I thought they were talking about as a private, but that's

11    just off the top of my head.

12    Q.  Okay.  But, still, that would be another way that we could

13    have defaults -- like you talked about how important they were

14    in the first part of your testimony -- but still have a second

15    default set to somebody else other than Google, as opposed to

16    all of the search traffic in a default going to Google, right?

17    A.  In principle, if that was something Apple wanted to do.  I

18    haven't seen evidence that's what they wanted to do for the

19    default, but --

20    Q.  Well, they allowed a separate default -- well --

21    A.  Well, that's different than saying I'll let the user change

22    it, right?  It's not clear they wanted a separate preset

23    default.

24    Q.  Now, you talked about choice screens.  And we can agree

25    that choice screens are where users see a screen to choose from

1   among alternatives.  Not to dumb down the question of a choice

2   screen, but it's a screen where you have alternatives and you

3   make a choice, right?

4   A.  I think that is the definition of a choice screen.

5   Q.  Okay.  I just want to make sure we're on the same page,

6   sir.

7          And let's put up UPXD009.

8          Apple and Android phones or tablets use choice screens

9   on their setup, right?

10  A.  Choice screens for browsers?

11  Q.  No.  Just choice screens just as part of the setup process,

12  right?

13  A.  Yeah.

14  Q.  Okay.  So -- and Apple and Android phones or tablets -- we

15  can just use this screen -- sometimes use choice screens when

16  apps are downloaded or opened, right?

17  A.  Yeah.  There are various prompts they give you, sometimes

18  to choose something, sometimes to allow something, things like

19  that.

20  Q.  And Apple routinely asks users to make choices that affect

21  the phone's functionality, right?

22  A.  What do you mean by that?

23  Q.  About whether to allow somebody to track or not.

24  A.  Oh, yeah.  Or, like, allow them to use location.  For

25  example, they'll ask you, should you allow this app to use

1    location, and they might give you an option:  Just this time,

2    every time, while it's open, things like that.

3    Q.  Right.  And the user has to take a second and then make a

4    choice, right?

5    A.  Sure.

6    Q.  So choice screen is another alternative to the present

7    method of allocating search, right?

8    A.  Again, not one that's met the market test.  But you

9    could -- in principle, if you wanted to, you could try a choice

10   screen.  The ones I've seen have all been due to requirements

11   imposed.  Haven't seen it emerge as a market choice.

12   Q.  And, so -- so in the -- you'll agree with me that the

13   existence of a choice screen doesn't harm users, doesn't come

14   as a -- that doesn't impose an unwelcome burden on users,

15   right?

16   A.  Depends on the choice of what.  I mean, it doesn't --

17   different choice screens can have different values.  If it's

18   something where different users really want to choose something

19   different, where there's not something that almost everybody

20   wants to do, then you might want to have a choice screen.  If

21   it's something that users don't have much information about, a

22   choice screen might be a very bad idea.  You might want to let

23   somebody else choose for you, like I talked about earlier.

24          So you can't just throw all choice screens in a

25   single bucket and say, well, if this choice screen is good,

1    wouldn't another choice screen be good?  Because it depends on

2    the options and what users can or can't or want to do with it.

3                MR. DINTZER:  May I approach, Your Honor?

4                Sir, you've been handed what's been marked as

5    UPX2143.

6                Your Honor, this is not in evidence yet.  It's an

7    email chain with Mr. Pichai, among other people, and we'll

8    offer it, Your Honor.  And the subject is:  Mozilla Blog on

9    Browser Choice Rollout of Choice Screen.

10               THE COURT:  Mr. Schmidtlein?

11               MR. SCHMIDTLEIN:  We got this.  I think we were asked

12   about this document late, late last night, and I just am

13   confirming whether there is a -- there are -- we will object to

14   this to the extent that there is a fair amount of embedded

15   hearsay in this document.  I don't know how he's planning to

16   use this document.

17               THE COURT:  Subject to the limitations we've been

18   talking about, we'll admit 2143.

19               MR. DINTZER:  Thank you, Your Honor.

20   BY MR. DINTZER:

21   Q.  Professor, we're going to go to page 309.  Basically, the

22   second page, and you'll see it's a blog post.  It's got a big

23   URL at the top of it.  Do you see?

24   A.  Yes.

25   Q.  And this is -- well, this is from the Mozilla website.  Do

1    you see that?

2    A.  I do.

3    Q.  Okay.  And -- and in the fifth paragraph -- well, it starts

4    off:  Our lives are all full of choices.

5            But, if you go down, in the fifth paragraph it says:

6    And so we're pleased to support -- this is in 2010 -- the

7    European Commission Microsoft, and, also, recognizing how

8    important choice is.

9            Do you see that?

10   A.  Yes.

11   Q.  And then it says:  In accordance with the landmark

12   settlement, if you're using a Windows PC in Europe and you're

13   still using the default web browser, in the coming weeks and

14   months you'll see a browser choice screen.

15           Do you see that?

16   A.  I do.

17   Q.  So this was a choice screen -- this was an opportunity for

18   Mozilla.  They were happy about this for browsers?

19   A.  I would think so because it's going to happen only on the

20   guys that were using the default.  So, I don't think they were

21   the default, so it's an opportunity for them that this legal

22   settlement is going to give them.  I would assume they thought

23   that was good for them.

24   Q.  Okay.  The choice screen was going to give them a chance to

25   grow their market share.

1    A.  Yeah.  I mean, they would think, well, gees, you want to

2    give me something, I didn't pay for it, I just -- somebody gave

3    it to me, sure, I'll take it.

4    Q.  Okay.  And so then we're going to go to the first page,

5    five emails up, and this is an email from Mr. Pichai.  And it's

6    dated March 1st, 2010.  Do you see that?

7    A.  Yes.

8    Q.  And he writes:  1M -- presumably million -- per week seems

9    about it.  We are over -- we overall expect to gain 3 to

10   5 million, so this seems a bit higher.  Let's keep fingers

11   crossed.

12        Do you see that?

13   A.  I do.

14   Q.  So Google, who had Chrome, was happy about the idea of a

15   choice screen, as well, right?

16        MR. SCHMIDTLEIN:  Objection.

17        THE WITNESS:  Well --

18        THE COURT:  Hang on.  There's an objection.  I have

19   to rule.

20        Can you rephrase the question?

21        MR. DINTZER:  Sure.

22   BY MR. DINTZER:

23   Q.  Google was excited about the idea of a choice screen in

24   Europe, as well?

25        THE COURT:  I'm not sure the question was rephrased,

 1    but --

 2              THE WITNESS:  I'm not sure I know --

 3              THE COURT:  -- why don't we try again.

 4              MR. DINTZER:  Okay.

 5    BY MR. DINTZER:

 6    Q.  Mr. Pichai wrote that he hoped to gain more users based on

 7    the choice screen -- or, he had his fingers crossed.  Do you

 8    see that?

 9    A.  It's kind of cryptic.  I assume that's what he's talking

10    about.  Doesn't explicitly say that, but you could assume that,

11    I would guess.

12    Q.  Google viewed the choice screen for a browser as a positive

13    thing; right?

14              MR. SCHMIDTLEIN:  Objection.

15    A.  Well, you got to be careful --

16              THE COURT:  Hang on.  I've just got to address the

17    objections.

18              THE WITNESS:  I'm sorry.

19              THE COURT:  I'll allow it.  It's fine.  Go ahead.  I

20    understand what the objection is, but go ahead.

21    A.  Okay.  So you're saying Google, who would be the

22    beneficiary of getting on this choice screen that would be

23    given to people who currently use Microsoft products, would be

24    happy about that?

25    BY MR. DINTZER:

```
 1    Q.  Yes, sir.

 2    A.  I would assume so.

 3    Q.  And, so --

 4              MR. DINTZER:  May I approach, Your Honor?

 5              This is UPX2087, and we'll offer this.  This is a

 6    board of directors fourth quarter 2010 CEO report.

 7              MR. SCHMIDTLEIN:  No objection.

 8              MR. DINTZER:  And we'll go to Bates number 697.

 9    BY MR. DINTZER:

10    Q.  Do you see that Highlights Fourth Quarter 2010 from Google?

11    A.  Yep.

12    Q.  And on the bullets on the left, the second-to-the-last

13    bullet says:  EU browser ballot.  Victory for users.

14    Opportunity for Chrome.

15         Do you see that?

16    A.  I do.

17    Q.  Google believed that a choice screen could benefit users,

18    right?

19    A.  Well, that's what they say here.  But, you know, that --

20    mostly, I think they're happy about themselves, but it's

21    usually good to say "benefit users," too.

22    Q.  So you think that the real beneficiary was Google itself?

23    A.  I think that's their primary interest in this, is that they

24    were benefitting from the choice screen.

25    Q.  Okay.
```

1           So let's go to UPXD267.

2               MR. DINTZER:  May I approach, Your Honor?

3    BY MR. DINTZER:

4    Q.  So, sir, did you read or did you see the opening statement

5    by the parties?

6    A.  I read them.  I didn't see them.  I was teaching, so I

7    didn't get here for that.

8    Q.  And in the opening statement, Google's counsel made the

9    statement:  If users want to change the default of the search

10   omni boxes, they can do that in a few easy clicks, as well.

11          Did you read that or do you remember that?

12   A.  I don't recall those specific words, but I recall that

13   general message.

14   Q.  Okay.  And then did you read Mark Israel's -- or,

15   Dr. Israel's testimony?

16   A.  Parts of it, not all of it.

17   Q.  He was asked the question:  So you're saying that the cost

18   of maneuvering between different search engines, whether it's

19   clicking or clicking and swiping, are minimal to get from one

20   search engine to another; is that right?

21          Answer:  I think that's right.  Not nonexistent, but in

22   the range of switching costs we see in cases, quite low.

23          Do you see that?

24   A.  I see it, yes.

25   Q.  Do you remember reading that?

```
1    A.  Not particularly.
2    Q.  Do you understand that he was talking about every time
3    somebody switched, the possibility of performing the movement
4    between different SVPs?  Do you recall if he was testifying
5    about that?
6    A.  I don't recall the -- I don't recall reading this, so I
7    don't recall the context.
8    Q.  Okay.  And my question here is this:  In comparing the
9    burden on the individual of changing the defaults, of piloting
10   between SVPs to find a place to search, and making a single,
11   one-time choice on a search engine, would you agree with me
12   that the -- I mean, on a choice screen, would you agree with me
13   that the choice screen is the easier of the three?
14   A.  I don't know.  That's outside my area of expertise.
15   Q.  Okay.  So you just don't know.  You can't compare those
16   three?
17   A.  Well, I haven't had experience with it, and I'm not a user
18   interface expert.  I'm an economist.  I'll try to stay in my
19   lane.
20   Q.  Okay.  Now, when you wrote your report, you concluded that
21   Apple had never wanted a choice screen for the default search
22   engine, right?
23   A.  That's correct.
24   Q.  Okay.  And you concluded in your report -- and I'm going to
25   read it to you.  I'm happy to show it to you, if you would
```

 1    like:  Browser defaults reflect product design decisions --
 2         Actually, we can put it up.  Let's put it up on the
 3    screen.
 4         So this is what you wrote.  This is from your report:
 5    Browser defaults reflect product designs decisions by Google's
 6    partners rather than a restriction on partner's ability to
 7    promote rivals.
 8         You wrote that in your report, right?
 9    A.  Yes.
10    Q.  Okay.  And then you wrote that:  There's no evidence that
11    suggests that Apple has or ever had any interest in
12    implementing a search box or choice screen on Safari.
13         Do you see that?
14    A.  That's correct.
15    Q.  Okay.  And you cite this as evidence that the ISA is not
16    exclusive.  Do you recall that?
17    A.  I think it's in the section discussing that, but it's --
18    it's -- I have a lot of other evidence I discuss there and a
19    lot of other discussion of the choice screen.
20    Q.  But you do understand now that Apple did, in fact, at one
21    point, ask for a choice screen from Google?
22    A.  Well, there was no evidence in the record at the time.  I
23    think we have some evidence there was a discussion of a choice
24    screen for a brief period of time in 2007 for Safari on
25    Windows.  That's what I recall.  The only time I remember a

1   choice screen in Safari on Windows was a very different

2   environment than Safari on Apple.

3   Q.  But you understood that Apple made the request to Google

4   for a choice screen, right?

5   A.  I think that was a suggestion that they made in the process

6   of negotiations.  It was not accepted, as I understand.

7   Q.  Okay.  And you understand that Apple was serious about

8   wanting the choice screen, right?

9   A.  I can't read that from the document.  I mean, you know,

10  they had discussion of choice screen in the context of

11  extending the agreement.

12          As far as what you literally read there, they talked

13  about a choice screen on Safari, as I recall, for Windows on

14  the same economic terms they currently had for default.  Now,

15  you know, I can't get in Google's head, I can't get in

16  Microsoft's head.

17          But I can tell you, as an economist, if somebody

18  said:  I'm paying this for a default and now you're going to

19  switch to a choice screen at the same rate, I can tell you, I

20  would expect the person to say, No.  You know, it's not the

21  same incremental volume for us.  We're not going to continue

22  the agreement at that rate.

23          MR. DINTZER:  So may I approach, Your Honor?

24  BY MR. DINTZER:

25  Q.  Sir, you've been handed UPX1033.  It's a 2007 email.  Is

```
 1    this what you've referring to when you talked about --
 2              MR. SCHMIDTLEIN:  Can we get a copy?
 3              MR. DINTZER:  Sorry.
 4    BY MR. DINTZER:
 5    Q.  Is this the document you were referring to, sir?
 6    A.  Yeah, this is -- I'm trying to look and see who this is
 7    from and to.
 8    Q.  Sure.
 9    A.  This is an internal Apple document, looks like; is that
10    right?
11    Q.  Yes.  Yes, it is.
12              Have you seen this document, sir?
13    A.  It looks similar to documents I've seen.  I can't tell you
14    it's the exact one, but this is -- it looks to be an internal
15    email within Apple that has these pages attached to it.
16    Q.  And what --
17              MR. DINTZER:  Oh, and we offer, Your Honor.
18              MR. SCHMIDTLEIN:  It is in evidence.
19              THE COURT:  If it's not in evidence, then we'll admit
20    it.  So 1033 -- UPX1033.
21    BY MR. DINTZER:
22    Q.  And Mr. Croll writes:  Here's a draft I put together with a
23    high-level overview of what a deal would look like.  I included
24    a section on Yahoo! distribution of Safari, even though Phil
25    may want to delete it.
```

 1              Do you see that?

 2    A.   Okay.  Who is this agreement with?

 3    Q.   This is a proposal -- if you're not familiar with the

 4    document, sir...

 5              THE COURT:  Why don't you direct him to where you

 6    want to direct him.  And this document sort of speaks for

 7    itself in terms of where it's from and the timing of it.

 8              MR. DINTZER:  Thank you, Your Honor.

 9    BY MR. DINTZER:

10    Q.   Let's go to the second page.  It says:  Apple Distribution

11    of Safari for Windows.

12              Do you see that?

13    A.   Yeah, but I'm trying to understand if -- you're saying this

14    is an agreement -- proposed agreement with somebody?

15    Q.   I'm not -- I'm not saying it's anything.

16              My question is:  Are you familiar with this?

17    A.   I've seen -- I think I've seen this exact document, but

18    there's a lot of different documents in this case.  Best of my

19    recollection, I have seen this document.

20    Q.   Okay.  And so under Apple Distribution of Safari For

21    Windows, the top says:  Boomer Agreement - Terms, and then it

22    has the date.

23              Do you see that copy of the document?

24    A.   Yeah, I do see that.

25    Q.   Okay.  So, Roman III says:  Apple Distribution of Safari

1    for Windows.

2         Do you see that?

3    A.  I do.

4    Q.  Second bullet says:  First time installation.  When an end

5    user installs Safari on a system for the first time, the end

6    user will be given the opportunity to select which default

7    provider they would prefer.

8         Do you see that?

9    A.  Right.  But the sentence above that, attached to the prior

10   part, seems to say this should only apply, I guess, to

11   downloads to non-Apple devices.  Is that what it says?

12   Q.  It does.  It says:  Apple distribution includes -- and it

13   says -- downloads from Apple web properties to Windows PC.

14        Do you see that?

15   A.  Yes.

16   Q.  And then let's go down to Roman V.

17   A.  But this -- the note, though, says this second --

18   first-time installation that you highlighted would only apply

19   to the downloads, right, not to the other ones, I think.

20   That's how I read it.

21   Q.  Okay.  That's fine.  I think the next Roman will explain

22   the rest of it.

23        Roman V says:  Yahoo! distribution of Safari For

24   Windows.

25        Do you see that?

1    A.  I do.

2    Q.  And it says:  Yahoo! distribution includes downloads from

3    Yahoo! web properties to a Windows PC.

4         Do you see that?

5    A.  I do.

6    Q.  And then is says:  First-time installation.  All copies of

7    Safari that Yahoo! distributes will be preset with the Yahoo!

8    defaults.

9         Do you see that?

10   A.  I do.

11   Q.  Okay.  So this would be yet another way of choosing the

12   default based on where the browser was downloaded from, right?

13   A.  Who is choosing?  Apple is doing distribution through

14   Yahoo!.  I presume Yahoo! wouldn't probably distribute it very

15   effectively, if it had some other default, right?  I would

16   expect it to have the Yahoo! default in that case.

17         So, you know, this is what really differentiates

18   Apple devices from Windows devices, right?  They're looking

19   here to should I distribute through Yahoo!, in which case I'm

20   going to have to make Yahoo! the default.  Otherwise, what's in

21   it for them?

22   Q.  So this would be yet another option where we had different

23   defaults based on, in this case, who was downloading -- or, who

24   is distributing the browser, right?

25   A.  That's what -- that's what they're talking about here on

```
 1    Safari for Windows at this one point in time.
 2    Q.  Okay.  Let's go to --
 3               MR. DINTZER:  May I approach, Your Honor?
 4               THE COURT:  Um-hum.
 5               MR. DINTZER:  Sir, you've been handed UPX1034.
 6               I believe this is in.
 7    BY MR. DINTZER:
 8    Q.  And you see a cover letter from Apple to Yahoo!
 9         Do you see that?
10    A.  I do.
11    Q.  Okay.  Are you familiar with this document?
12    A.  Probably.  I can't say I remember this document.
13    Q.  Okay.  This is a draft license agreement between Yahoo! and
14    Apple.  Do you see the -- go to the next page.
15    A.  Okay.
16    Q.  Do you see that?
17    A.  I do.
18    Q.  Okay.  So Apple was serious enough about the possibility of
19    distributing through Yahoo! and a choice screen that it
20    actually developed a licensing agreement with Yahoo! and sent
21    it over there.  Do you see that?
22    A.  You know, I don't remember if that was the history or
23    whether this started with Yahoo! and Apple did stuff.  I don't
24    remember the precise history.  But there was a back and forth
25    with Yahoo! about Safari for Windows, as I recall.  And this is
```

1    that same 2007 period.  Remember, Apple doesn't have much on

2    Windows, so they're going to work with other people for

3    distribution, I would assume.

4    Q.  In fact, this would have -- working with Yahoo! in this

5    manner would have been a way to help Apple get distribution of

6    its Safari for Windows, right?

7    A.  Could have been.  Might be other ways, too, but that could

8    be one way they were trying.  They certainly were talking about

9    getting distribution that way.

10   Q.  If you go to section 3.2 of this draft license agreement,

11   it indicates that -- that when Apples distributes the Yahoo!

12   search settings in Apple software.  Do you see that?

13   A.  No.  I'm not there yet.  Sorry.

14   Q.  No.  Please.

15   A.  Okay.

16   Q.  "The Apple software will provide a fair means" -- I'm

17   quoting -- "for the user to choose the default search service."

18        Do you see that?

19   A.  I do.

20   Q.  And that's a choice screen, right?

21   A.  I don't know.  It could be.  It doesn't say what it is.

22   But fair means -- exactly how that's implemented, I'm not sure,

23   but -- and I'm not sure who drafted this.  Is this from Yahoo!

24   or from Apple?

25   Q.  Well, if you go back to the first page, this is being

1    emailed to Yahoo! from Apple.  Do you see that?

2    A.  Yeah, but that doesn't mean that they started all this

3    process, right?  I mean, I've been involved in enough

4    negotiations that you send stuff back and forth, and you add to

5    what the other guy did.

6    Q.  Well, it says here, sir, it says:  Here is our proposal for

7    the Safari agreement.

8         Do you see that?

9    A.  Right.  But you don't know what they added, what was

10   already there.  You really don't, right?

11   Q.  You are aware -- I mean, I can show you the documents.

12        You are aware that Apple emailed Google and said:  We

13   would like a choice screen on Safari for Windows.

14        Are you aware of that?

15   A.  Well, I think there was some discussion, but it wasn't that

16   simple.  They wanted to continue to get the same revshare with

17   an alternative arrangement.  And, you know, not surprisingly,

18   as an economist, they would say, well, that doesn't work for

19   us.

20        You know, if you look at my report, one of the

21   reasons that the partner -- the search engine wouldn't pay the

22   the same is because they're not getting the same.  So I would

23   have expected Google to say no.  I would be surprised if they

24   hadn't.

25   Q.  Well, Google just didn't say, No, you can't get the same

1    amount of revshare; Google, in fact, said that if they didn't

2    get the default, they wouldn't give any revshare.  Are you

3    aware --

4    A.  At that point in time.  But they also said that we would

5    have to see if we were getting incremental sales before we

6    decide whether they would pay any revshare.  Which, in my mind,

7    is very consistent with what I would expect when people are

8    negotiating, that they would say, look, you know, I got to

9    figure out what I'm getting for it before I determine what I'm

10   willing to pay for it.

11   Q.  After being told "No default, no revshare" from Google,

12   Apple decided not to have a choice screen; is that correct?

13   A.  That's what you would infer from the record that we have.

14   I don't have any record of what led to that change.  That might

15   be a reasonable presumption based on what we know.  Although,

16   if it was something that they thought was commercially viable,

17   I'm not sure why they wouldn't have brought it up many more

18   times.

19          My understanding from watching Apple over time is

20   they're pretty persistent in looking out for their interest.  I

21   mean, not as bad as going to Bentonville and negotiating with

22   Walmart, but they're pretty tough.

23   Q.  So from that point on, Apple has not, to your knowledge,

24   ever sought a choice screen; is that right?

25   A.  You know, I don't know.  Might have been mentioned at some

1    points.  Who knows?  I mean, I've been involved in enough

2    negotiations in my life that you put a lot of stuff -- you ask

3    for things -- you start, you ask for things.  You ask for

4    things you expect to give up.  And if you don't do that, you're

5    being silly, because if you don't put things in you want --

6    willing to give up, you're going to be forced to give up

7    something you don't want to give up.

8    Q.  We've talked about choice screens and about the amount

9    being paid to the browser for having a choice screen.  You have

10   not quantified how much an OEM or carrier revenue would fall if

11   they adopted a choice screen, right?

12   A.  I don't.  We're starting to get some evidence in Europe as

13   the new agreements come in post choice screen.  As those -- as

14   those agreements get renegotiated, they do seem to be heading

15   down.  I don't think we have enough to do a real empirical

16   analysis of that yet, but we do seem to be seeing falling in

17   revshare in Europe post choice screen.

18   Q.  Okay.  You say you "seem to be seeing," and I just want to

19   make sure.

20          In your report, in your presentation, you haven't done

21   an econometric regression, any kind of analysis where you can

22   tie causality, a choice screen for a reduction in revshare; is

23   that right?

24   A.  No, we don't have -- nobody -- other than by judicial fiat,

25   nobody has asked for a choice screen -- nobody has implemented

1    a choice screen, so we don't have the empirical data to do

2    that.  We have Europe, where there was a choice screen put in

3    place, and we can get data on what happened since then.  But

4    that's the best I know of.  And it's not perfect because it's a

5    regulatory change, which obviously is not the equivalent to

6    what would happen if somebody did it in the marketplace.

7    Q.  But you also -- you haven't done that analysis for the

8    European revshare, have you?

9    A.  Yeah.  We didn't have the date, really, until post I wrote

10   my report.

11   Q.  Defaults are a method for search engine distribution,

12   right?

13   A.  I'm sorry.  What was that?

14   Q.  Defaults can be an efficient method for search engine

15   distribution, right?

16   A.  Yeah.  Remember, they're also part of the browser design,

17   as well, right?  They're both.

18   Q.  Right.  You're not offering an opinion as to when one

19   general search engine has the default, whether it becomes

20   inefficient or efficient?  You're not talking about a line from

21   that, are you?

22   A.  I have no idea what question you're asking.

23   Q.  Sure.  Is a general search engine being placed as the

24   default, is that always an efficient means of distribution?

25   A.  It's not really about being an efficient means of

9941

1    distribution.  It's really -- it's an efficient distribution

2    arrangement.  It's not about the technical costs of

3    distribution because that's not really what's there.  It's

4    about the value that that creates for the different

5    participants; the browser provider, the users, the search

6    engines.  And depending on who you put as the default, it could

7    create more or less value, which is why people choose the

8    default.  They don't just randomly pick one.

9    Q.  Having a default gives a search engine additional search

10   volume, right?

11   A.  The empirical evidence seems to say that's correct, yes.

12   Q.  And one of the benefits of having a search default is that

13   your rival doesn't get that default, right?  So the shares

14   don't go to your rival, as opposed to you.

15   A.  Depends on the alternative.  If you're competing for the

16   other guy with the default, then you're comparing a world where

17   you win versus he wins.  It's kind of like if we played a

18   head-to-head match up in baseball, right?  You can't both win

19   that night.  One of you can win and the other one will lose.

20   So that -- it's exactly like that.  We're competing for a

21   browser default.  Now, if it's more than two people, it's a

22   little more complicated.

23   Q.  Some people who use Google on Android do so because it's

24   the default, right?

25   A.  Well, if you use the choice screen evidence as kind of an

```
1    indication of how many people would not -- would switch away if
2    there wasn't a default, it's very small, very small.  Single
3    digit.  Low single digit.
4    Q.  All I'm saying, sir, is some people use Google on Android
5    because it's the default, right?
6    A.  Some people.
7    Q.  And some people who use a default search engine are not
8    aware of other options, right?
9    A.  Yeah, I think -- I think there's some people probably
10   aren't aware there are other options, yeah.
11   Q.  Some people who use Bing on Windows choose, make the
12   affirmative choice not to switch from Bing, right?  They're
13   happy with Bing, right?
14   A.  Yes.  So that one -- okay.  So some people decide, I want
15   to stay with Bing, yeah.
16   Q.  But some people of the people who use Bing on Windows are
17   not aware that they can change from Bing, right?
18   A.  There may be.  I mean, I haven't done a study of whether
19   those people exist, but I think it's a logical assumption that
20   some of those people exist.
21   Q.  And you mentioned a person that you work with, I think her
22   dad.  Was it Janin?
23   A.  Janin.
24   Q.  Janin.  And Janin's dad doesn't change a search engine,
25   right?
```

1    A.  Yeah, he's -- he figures the guy who gave him the search

2    engine knows more than he does, so I better not mess with it.

3    Q.  So some people are locked to their search engine.  They

4    just take it as it comes and whatever happens to be there,

5    that's what they're going to go with, right?

6    A.  There will be some people who follow advice.  Now, I

7    wouldn't consider them locked in any more than I am locked in

8    when I buy a car and I get the parts that come with it.

9    Q.  Well, they've made the decision that they're going to stick

10   with whatever the search engine is, right?

11   A.  It's a little funny because they're counting on the guy who

12   does -- the browser guy picking a decent one, right?  So to say

13   they would take whatever they put in there is kind of

14   mischaracterizing how they see the decision.  They don't see it

15   as, well, I get what I get.

16            No.  They're saying, I'm going with this browser, I'm

17   trusting him to put a decent search engine on there, right?

18   That's what they're doing.  They're not saying, Oh, I don't

19   care, whatever he does, it's okay.

20   Q.  And how do you spell Janin, just for the court reporter and

21   myself?

22   A.  J-A-N-I-N, Janin.

23   Q.  Okay.  Have you done any analysis to figure out what

24   percentage of people, say on Apple, are like Janin's dad and,

25   like, would just go with whoever the default is?  Have you

1    looked at that?

2    A.  No.  I'm just pointing out -- my whole point was there's a

3    tendency to think about people who just use the default as not

4    caring.  I think that's the wrong thing to think.  It's not

5    that they don't care.  In many cases, it's they feel like they

6    know enough to move away, or they think the other person knows

7    more than they do.

8    Q.  So, if -- I don't know what kind of phone Janin's dad has.

9    But if -- let's just say he has an Apple, and if Apple changed

10   the default, have you done an analysis on how many -- what

11   percent of Apple's users are like Janin's dad and would just go

12   with whoever the new default is?

13   A.  Sir, you're asking how many people are -- Janin's dad is a

14   unique guy, so I would assume nobody is exactly like that.

15   Q.  That's fair enough, sir.

16         But my question, and I think you get my question, is:

17   What percent of the users on Apple or Android are the people

18   who just go with the default?  Have you done that analysis?

19   A.  I think what we can say is we have empirical evidence on

20   cases where people have actually changed the default.  The ones

21   we know of, for example, would be the Firefox experiment.  We

22   also have evidence across some devices, like, you know, we can

23   compare Mac desktop with Windows.  But we don't really have

24   empirical data on actual changing of the default.  There's

25   various estimates that people come up with, but we don't have

9945

1    empirical evidence other than the cases where the default

2    actually changes.

3    Q.  And I'm asking you, in your report, do you give an actual

4    estimate of what percent of people on Apple would stick with

5    the default if it changed?

6    A.  I don't give a precise estimate, no.

7    Q.  And on Android, do you give a precise estimate of what

8    percent of people, like Janin's dad, would stick with the

9    default, if it changed?

10    A.  I don't.  I don't think I need to for purposes of my

11    analysis.

12            MR. DINTZER:  And with that, Your Honor, I'm at a

13    place -- I can start a new line, but if it would please the

14    Court, this is probably a good place.

15            THE COURT:  Okay.  We can stop for the day.

16            Okay.  Professor Murphy, we will continue tomorrow

17    morning at 9:30.  Look forward to seeing you then.  I would

18    just ask you not to discuss your testimony, please, with anyone

19    overnight.

20            Thank you, sir.

21            THE WITNESS:  Thank you, sir.

22            MR. DINTZER:  Apparently, UPX2087 we've moved, and

23    there's no objection.  We just want to confirm that it's been

24    entered into evidence.

25            THE COURT:  It has been.

 1                MR. DINTZER:  Okay.  Thank you, Your Honor.

 2                THE COURT:  Okay, everyone.  So, anything we need to

 3       discuss or anybody want to raise anything before we adjourn for

 4       the evening?

 5                MR. DINTZER:  Nothing from the DoJ plaintiffs, Your

 6       Honor.

 7                MR. CAVANAUGH:  Nothing from us, Your Honor.

 8                MR. SCHMIDTLEIN:  Nothing further.

 9                THE COURT:  Can I just ask:  With prior experts, have

10       there been requests for slide decks?

11                MR. DAHLQUIST:  Yes, Your Honor.

12                THE COURT:  Okay.  And have you all had --

13                MR. DAHLQUIST:  From the public and the press.

14                THE COURT:  I'm sorry?

15                MR. DAHLQUIST:  From the public and the press.

16                THE COURT:  And have you all had discussions about

17       those slide decks and where they are in terms of being

18       released?

19                MR. DAHLQUIST:  We've had discussions -- David

20       Dahlquist.

21                We've had discussions about past ones.  On this

22       current one, our teams have already sent an email to Google's

23       counsel asking to unredact a number of the slides that are

24       contained within Professor Murphy's deck that we believe should

25       not have been confidential.

1        THE COURT:  Okay.  All right.  Well, why don't I just

2    leave it there for now.  I mean, look, I didn't want to -- two

3    things.

4        One:  First of all, I appreciate all the hard work

5    that's going into this.  That's one.

6        Two:  I also didn't want to disrupt the flow of the

7    examination, but, you know, as I was listening and looking at

8    some of this, I did have some questions about why some of these

9    items were redacted.

10        In particular, there were slides concerning general

11    market shares and percentages and the like, and I understand

12    they may come from confidential sources, but I do wonder -- I

13    mean, let's put it this way:  If Google is asking me to rely on

14    some of this data to -- as a consideration of its defense, I

15    think it's the kind of thing that probably sort of tips the

16    scale, unless there's some real prejudice that would arise from

17    some of these numbers.

18        Now, I'm not saying that's true for all of it, but

19    certainly for some of these slides, I would put it in that

20    category.  Now, am I in a position to go back and identify them

21    one by one?  I can't do that right now, and maybe I should have

22    been taking notes.  But I just wanted to make that observation.

23    And if there's an issue that ultimately comes up, I wanted to

24    make that observation, and hopefully that will help things

25    along a little bit.

 1          MR. DAHLQUIST:  Your Honor, we'll do our best to

 2   coordinate with counsel tonight, and maybe bring to you in the

 3   morning any issues we may have.

 4          THE COURT:  Mr. Schmidtlein, I understand what you're

 5   about to tell me, but why don't you go ahead and put it on the

 6   record.

 7          MR. SCHMIDTLEIN:  For the record, we have -- I

 8   think -- I think my teams have largely tried to adhere to

 9   precedent in the case.

10          THE COURT:  Sure.

11          MR. SCHMIDTLEIN:  But if there are -- obviously,

12   we'll consider, you know, requests that are being made.  Part

13   of this is a timing issue, as well --

14          THE COURT:  Sure.

15          MR. SCHMIDTLEIN:  -- in terms of trying to get

16   witnesses on and off the stand, things like that.

17          THE COURT:  Understood.  Look, I guess -- let me say

18   the following, which is that:  It's been helpful as the trial

19   has gone along to see what the evidence is in its entirety.

20   And, so, my thinking at the start of the trial may be a little

21   bit different than what it is now, with the benefit of having a

22   greater record.

23          I guess what I would say is I have been, I think,

24   more protective and understanding of numbers, internal numbers,

25   financial numbers, than aggregate numbers that reflect

1      percentages.  Now, I'm not suggesting that it might not be a

2      world in which something that reflects percentages is not

3      potentially the kind of thing that might fall within, you know,

4      the rubric of something that might cause prejudice if it's

5      otherwise disclosed.

6              So, I just will leave you with that thought in terms

7      of your thinking about how to go about resolving these issues,

8      and then hopefully we'll get these out, if they're requested.

9              MR. SCHMIDTLEIN:  Thank you.

10             And, obviously, we -- oftentimes when we're talking

11     about market share percentages, those oftentimes implicate

12     third parties, and so that's also been part of the mix of --

13     and I think Your Honor has appropriately, in some instances,

14     done that balancing a little bit differently, vis-a-vis third

15     parties.  So, we hear where you're coming from and we'll do our

16     very best.

17             THE COURT:  Okay.  Great.

18             Thank you all very much.  We'll see you in the

19     morning.

20             Oh, hang on.

21             What?  Oh, yes.  Right.

22             MR. DINTZER:  I just wanted to remind the Court that

23     we had raised the possibility of going in closed session.  I

24     didn't want the Court to miss that one.  I apologize.

25             THE COURT:  No, no, no.  You're not apologizing.

1    You're raising something that I had forgotten.  Everybody can

2    have a seat.

3            MR. DINTZER:  Sorry.

4            THE COURT:  Can you tell me, for the record, what you

5    think is required -- why we need to go in closed session, in

6    light of the fact that the direct did not?

7            MR. DINTZER:  We do have documents with those

8    specific numbers that the Court has, in the past, said are

9    numbers that shouldn't be spoken aloud that -- I will see about

10   doing my best effort to not need it, but, obviously, with an

11   expert and sometimes a need to dig into numbers, I would at

12   least need to want the ability to do that, if necessary.

13           THE COURT:  What are the nature of the numbers?

14           MR. DINTZER:  Nature of the numbers are some of the

15   specific numbers in things, like estimates on clawbacks and the

16   things that have in the past, my understanding is, the Court

17   has said can remain confidential.

18           THE COURT:  Okay.  All right.  Well, why don't you

19   work on it overnight, see what you really need in terms of a

20   closed session.  I think we have successfully gone through some

21   of that in open session before, with the understanding that --

22   some of those numbers, because they reflect internal strategy,

23   ought not to be expressly referred to on the docket.

24           So, I think -- you know, Professor Murphy, I think,

25   has tried to adhere to that, and I think he will continue to do

1   that as long as we continue to remind him to do that.

2            MR. DINTZER:  Absolutely, Your Honor.  And if we can

3   avoid it, we will.

4            THE COURT:  Okay.  All right.

5            Thank you all.  We'll see you in the morning.

6            MR. DINTZER:  Thank you, Your Honor.

7                              *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, JANICE DICKMAN, do hereby certify that the above and

foregoing constitutes a true and accurate transcript of my

stenographic notes and is a full, true and complete transcript

of the proceedings to the best of my ability.

                    Dated this 14th day of November, 2023




                         _____

                         Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
                         Room 6523
                         333 Constitution Avenue, N.W.
                         Washington, D.C.  20001

```
 1                              INDEX

 2
      WITNESS:
 3
          Kevin Murphy
 4            Direct Examination (cont.) By Mr. Schmidtlein.....9832
              Cross-Examination By Mr. Dintzer..................9908
 5

 6
      EXHIBITS ADMITTED:
 7
          DXD37..............................................9908
 8        UPX1033............................................9931
          UPX2087............................................9926
 9        UPX2143............................................9922

10                              *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$200** [1] - 9851:11

## '

**'07** [2] - 9842:23, 9842:24
**'08** [2] - 9842:23, 9842:24
**'18** [1] - 9899:10
**'21** [1] - 9835:23
**'23** [1] - 9835:6

## 0

**0.6** [2] - 9876:3, 9876:5

## 1

**1** [26] - 9836:18, 9836:19, 9837:3, 9837:19, 9838:19, 9859:13, 9864:22, 9864:24, 9876:4, 9878:15, 9878:17, 9879:19, 9879:24, 9879:25, 9880:2, 9881:5, 9881:8, 9881:22, 9882:14, 9886:25, 9890:22, 9891:5, 9891:9
**1,000** [1] - 9887:12
**1.5** [1] - 9881:23
**1/2** [22] - 9836:18, 9836:19, 9837:3, 9837:19, 9838:19, 9876:4, 9878:15, 9878:17, 9879:19, 9879:24, 9879:25, 9880:2, 9881:5, 9881:8, 9881:22, 9884:7, 9884:13, 9886:25, 9890:22, 9891:5, 9891:9
**10** [1] - 9885:15
**100** [4] - 9858:7, 9887:9, 9887:11, 9887:12
**10019** [2] - 9831:10, 9831:13
**10036** [1] - 9831:3
**1033** [1] - 9931:20
**11-year** [1] - 9884:25
**1100** [1] - 9830:12
**1133** [1] - 9831:2
**12** [1] - 9858:10
**13** [1] - 9830:5

**1300** [1] - 9830:22
**1301** [2] - 9831:9, 9831:12
**139** [2] - 9899:2, 9899:3
**14** [1] - 9858:10
**140** [2] - 9858:7, 9858:8
**14th** [1] - 9952:7
**1:35** [1] - 9830:6
**1M** [1] - 9924:8
**1st** [1] - 9924:6

## 2

**2** [3] - 9839:24, 9885:12, 9885:15
**20-3010** [1] - 9830:4
**200** [1] - 9887:12
**20001** [2] - 9831:17, 9952:13
**2001** [1] - 9833:17
**20024** [1] - 9831:6
**2007** [4] - 9849:9, 9929:24, 9930:25, 9936:1
**2008** [2] - 9849:9, 9889:5
**2009** [2] - 9909:6, 9912:12
**2010** [11] - 9881:18, 9882:12, 9882:15, 9883:10, 9883:25, 9884:3, 9923:6, 9924:6, 9926:6, 9926:10
**2011** [6] - 9884:24, 9890:2, 9890:6, 9890:10, 9890:19, 9900:17
**2012** [3] - 9912:14, 9912:17, 9913:20
**202** [3] - 9830:13, 9830:17, 9831:7
**202-354-3267** [1] - 9831:18
**2021** [2] - 9834:7, 9834:19
**2022** [1] - 9884:24
**2023** [2] - 9830:5, 9952:7
**209** [1] - 9830:15
**212** [3] - 9831:3, 9831:10, 9831:14
**2143** [1] - 9922:18
**2200** [1] - 9831:2
**250** [1] - 9910:2

## 3

**3** [11] - 9838:20, 9838:21, 9838:23, 9839:4, 9876:4, 9878:16, 9882:10, 9882:11, 9882:13, 9885:18, 9924:9
**3.2** [1] - 9936:10
**30-something** [1] - 9836:4
**307-0340** [1] - 9830:13
**309** [1] - 9922:21
**333** [2] - 9831:17, 9952:12
**335-2793** [1] - 9831:3
**39** [1] - 9830:3
**3:04** [1] - 9885:22
**3:20** [1] - 9885:20
**3:21** [1] - 9885:22

## 4

**40** [1] - 9851:11
**400** [3] - 9887:18, 9887:19, 9905:7
**40th** [2] - 9831:9, 9831:13
**434-5000** [1] - 9831:7
**497-7728** [1] - 9831:10

## 5

**5** [1] - 9924:10
**508-6000** [1] - 9830:24

## 6

**6** [2] - 9859:14, 9881:21
**6-7ths** [1] - 9858:10
**600** [1] - 9830:16
**60604** [1] - 9830:16
**615** [1] - 9909:4
**6523** [2] - 9831:16, 9952:12
**680** [1] - 9831:6
**697** [1] - 9926:8

## 7

**720** [1] - 9830:24
**724** [1] - 9912:24
**79** [1] - 9833:10

## 8

**8** [1] - 9885:15
**80** [1] - 9894:15
**80203** [1] - 9830:23

**805-8563** [1] - 9830:17
**87** [1] - 9842:20

## 9

**9** [5] - 9838:24, 9881:24, 9884:8, 9885:11, 9891:4
**9.2** [1] - 9881:21
**999-5800** [1] - 9831:14
**9:30** [1] - 9945:17

## A

**ability** [14] - 9840:20, 9843:15, 9868:9, 9871:21, 9871:22, 9876:25, 9877:11, 9877:23, 9913:18, 9916:7, 9916:11, 9929:6, 9950:12, 9952:6
**able** [3] - 9861:10, 9871:19, 9872:12
**absent** [1] - 9907:9
**absolutely** [1] - 9951:2
**accelerated** [1] - 9883:1
**accelerating** [2] - 9882:18, 9885:5
**accepted** [1] - 9930:6
**access** [26] - 9832:17, 9832:19, 9832:23, 9837:7, 9845:3, 9849:5, 9857:3, 9865:12, 9867:6, 9881:3, 9886:14, 9886:15, 9888:8, 9889:11, 9889:13, 9889:16, 9889:19, 9890:8, 9890:15, 9890:23, 9891:1, 9894:6, 9894:11, 9905:15, 9905:19
**access-wise** [1] - 9891:1
**accordance** [1] - 9923:11
**according** [3] - 9886:7, 9903:19, 9906:4
**accounted** [2] - 9855:4, 9890:15
**accounts** [2] - 9859:19, 9865:24
**accurate** [1] - 9952:4
**acquisition** [1] - 9882:14
**active** [2] - 9863:3, 9863:7

9955

**activities** [1] - 9899:24
**activity** [1] - 9863:17
**actual** [3] - 9834:13, 9944:24, 9945:3
**add** [5] - 9860:21, 9875:1, 9876:16, 9879:11, 9937:4
**added** [5] - 9857:24, 9882:16, 9884:3, 9901:14, 9937:9
**adding** [1] - 9884:1
**addition** [3] - 9862:23, 9882:24, 9891:4
**additional** [5] - 9857:8, 9858:4, 9883:3, 9885:1, 9941:9
**address** [8] - 9844:22, 9866:22, 9877:15, 9878:5, 9879:10, 9879:11, 9886:5, 9925:16
**adhere** [2] - 9948:8, 9950:25
**adjourn** [1] - 9946:3
**admit** [2] - 9922:18, 9931:19
**admitted** [1] - 9908:8
**ADMITTED** [1] - 9953:6
**adopted** [2] - 9917:18, 9939:11
**ads** [2] - 9883:25, 9901:14
**advantage** [5] - 9845:6, 9854:15, 9881:2, 9881:11, 9891:5
**advantages** [1] - 9842:9
**adverse** [2] - 9877:16, 9877:20
**advice** [1] - 9943:6
**AFAs/ACCs** [1] - 9845:9
**affect** [13] - 9835:9, 9835:11, 9836:17, 9838:9, 9839:18, 9840:9, 9840:11, 9860:11, 9875:6, 9877:4, 9904:10, 9904:12, 9920:20
**affects** [1] - 9840:12
**afternoon** [1] - 9832:2
**afterwards** [1] - 9837:21
**aggregate** [1] - 9948:25
**aggressive** [1] - 9893:12
**ago** [1] - 9898:19

**agree** [8] - 9868:19, 9868:24, 9900:15, 9902:13, 9919:24, 9921:12, 9928:11, 9928:12
**agreed** [1] - 9912:1
**agreement** [35] - 9845:15, 9849:23, 9859:25, 9861:3, 9866:6, 9866:7, 9868:19, 9868:23, 9868:24, 9869:9, 9869:15, 9869:20, 9869:22, 9870:12, 9870:21, 9875:10, 9882:1, 9883:2, 9883:18, 9907:1, 9907:16, 9909:13, 9916:9, 9917:12, 9930:11, 9930:22, 9932:2, 9932:14, 9935:13, 9935:20, 9936:10, 9937:7
**Agreement** [1] - 9932:21
**agreements** [55] - 9838:6, 9838:23, 9839:25, 9840:3, 9840:5, 9840:6, 9840:9, 9840:18, 9840:19, 9840:22, 9841:24, 9842:16, 9843:16, 9844:22, 9846:3, 9846:6, 9846:14, 9854:22, 9858:22, 9858:25, 9859:18, 9859:25, 9868:1, 9877:11, 9877:17, 9877:18, 9877:19, 9877:23, 9878:1, 9878:8, 9878:11, 9879:9, 9879:23, 9879:24, 9885:25, 9886:3, 9886:14, 9887:3, 9888:5, 9892:17, 9892:20, 9898:18, 9904:21, 9907:6, 9907:7, 9907:10, 9907:14, 9907:24, 9908:1, 9914:19, 9914:20, 9939:13, 9939:14
**agrees** [1] - 9910:23
**ahead** [9] - 9835:15, 9900:12, 9910:11, 9910:12, 9917:22, 9918:1, 9925:19, 9925:20, 9948:5
**al** [1] - 9830:3

**algins** [1] - 9858:15
**allocating** [1] - 9921:7
**allow** [6] - 9870:6, 9920:18, 9920:23, 9920:24, 9920:25, 9925:19
**allowed** [3] - 9883:22, 9918:8, 9919:20
**allowing** [2] - 9846:20, 9869:16
**allows** [3] - 9852:5, 9853:6, 9853:20
**alls** [1] - 9918:10
**almost** [2] - 9885:17, 9921:19
**aloud** [1] - 9950:9
**Alphabet** [1] - 9901:4
**altered** [1] - 9870:19
**alternative** [10] - 9836:2, 9857:12, 9871:9, 9872:6, 9878:12, 9916:5, 9917:3, 9921:6, 9937:17, 9941:15
**alternatives** [3] - 9916:25, 9920:1, 9920:2
**ambiguous** [1] - 9888:15
**amendment** [1] - 9909:11
**America** [1] - 9830:2
**Americas** [3] - 9831:2, 9831:9, 9831:12
**AMIT** [1] - 9830:9
**amount** [17] - 9858:2, 9859:7, 9865:11, 9871:24, 9872:1, 9874:20, 9874:21, 9874:23, 9875:19, 9875:20, 9890:16, 9904:12, 9908:18, 9909:25, 9922:14, 9938:1, 9939:8
**analyses** [1] - 9838:16
**analysis** [14] - 9833:25, 9835:25, 9838:19, 9875:24, 9900:15, 9914:12, 9914:13, 9939:16, 9939:21, 9940:7, 9943:23, 9944:10, 9944:18, 9945:11
**analyze** [2] - 9858:24, 9871:5
**Android** [95] - 9836:7, 9839:5, 9839:7, 9839:10, 9839:25, 9840:3, 9840:18, 9840:22, 9841:1,

9841:4, 9841:24, 9842:6, 9842:16, 9842:21, 9843:19, 9844:10, 9844:11, 9844:12, 9844:13, 9844:20, 9844:22, 9844:23, 9844:24, 9845:1, 9845:2, 9845:4, 9845:8, 9845:20, 9845:23, 9846:1, 9846:7, 9846:11, 9846:13, 9846:19, 9846:25, 9847:1, 9847:3, 9847:6, 9848:7, 9848:8, 9848:13, 9848:16, 9848:19, 9849:8, 9849:11, 9849:14, 9850:6, 9850:21, 9850:22, 9851:2, 9851:8, 9851:10, 9851:20, 9853:3, 9853:15, 9853:19, 9855:14, 9856:11, 9856:12, 9856:14, 9858:21, 9858:25, 9859:7, 9859:11, 9859:14, 9859:17, 9859:18, 9860:13, 9865:12, 9870:2, 9871:6, 9873:1, 9873:11, 9873:13, 9875:24, 9876:5, 9876:24, 9877:1, 9877:19, 9899:2, 9899:7, 9899:10, 9899:11, 9901:15, 9907:7, 9917:24, 9920:8, 9920:14, 9941:23, 9942:4, 9944:17, 9945:7
**Android's** [1] - 9876:25
**Android-covered** [1] - 9876:5
**answer** [5] - 9896:24, 9897:25, 9916:1, 9918:13, 9927:21
**antitrust** [1] - 9838:7
**Antitrust** [1] - 9830:21
**anyway** [1] - 9878:14
**APIs** [1] - 9850:5
**apologize** [2] - 9873:23, 9949:24
**apologizing** [1] - 9949:25
**app** [21] - 9844:2, 9850:17, 9853:18, 9857:5, 9857:9,

9860:7, 9860:8,
9862:9, 9864:18,
9864:19, 9864:20,
9864:21, 9865:16,
9865:19, 9865:22,
9866:9, 9872:1,
9873:10, 9920:25
**appeal** [1] - 9904:3
**APPEARANCES**[1] -
9830:11
**Apple** [100] - 9839:6,
9839:10, 9839:16,
9839:17, 9839:19,
9842:1, 9844:17,
9844:18, 9847:6,
9851:3, 9851:5,
9851:7, 9851:9,
9853:16, 9853:17,
9853:21, 9853:22,
9856:6, 9856:7,
9859:4, 9859:9,
9859:18, 9876:3,
9876:25, 9877:1,
9891:16, 9891:18,
9891:22, 9891:25,
9909:4, 9909:11,
9910:6, 9910:16,
9910:23, 9910:25,
9911:7, 9911:12,
9911:19, 9912:1,
9912:11, 9913:10,
9913:15, 9913:18,
9913:20, 9914:1,
9914:11, 9915:22,
9916:6, 9916:11,
9916:19, 9917:7,
9917:11, 9917:13,
9918:14, 9918:19,
9918:22, 9919:2,
9919:6, 9919:17,
9920:8, 9920:14,
9920:20, 9928:21,
9929:11, 9929:20,
9930:2, 9930:3,
9930:7, 9931:9,
9931:15, 9932:10,
9932:20, 9932:25,
9933:11, 9933:12,
9933:13, 9934:13,
9934:18, 9935:8,
9935:14, 9935:18,
9935:23, 9936:1,
9936:5, 9936:12,
9936:16, 9936:24,
9937:1, 9937:12,
9938:12, 9938:19,
9938:23, 9943:24,
9944:9, 9944:17,
9945:4
**Apple's** [2] - 9913:7,
9944:11

**Apples** [1] - 9936:11
**apples** [4] - 9839:19,
9839:20, 9839:21
**application** [2] -
9863:14, 9865:17
**applications** [1] -
9844:4
**applied** [3] - 9859:8,
9859:9, 9876:4
**applies** [1] - 9839:4
**apply** [5] - 9838:21,
9859:10, 9911:15,
9933:10, 9933:18
**appreciate** [2] -
9883:12, 9947:4
**approach** [9] -
9908:23, 9912:18,
9915:10, 9918:2,
9922:3, 9926:4,
9927:2, 9930:23,
9935:3
**appropriately** [1] -
9949:13
**apps** [12] - 9845:24,
9848:14, 9848:15,
9850:10, 9853:8,
9860:15, 9860:18,
9860:23, 9860:24,
9861:4, 9920:16
**area** [3] - 9841:11,
9852:14, 9928:14
**areas** [2] - 9901:14,
9901:15
**argue** [1] - 9894:14
**argued** [1] - 9900:13
**argument** [1] -
9878:23
**arise** [1] - 9947:16
**arrangement** [2] -
9937:17, 9941:2
**arrangements** [1] -
9854:6
**articulated** [1] -
9891:15
**artificially** [1] - 9897:4
**aside** [2] - 9856:2,
9894:24
**aspects** [1] - 9870:18
**assess** [1] - 9904:19
**assessment** [1] -
9899:1
**assigned** [1] - 9872:2
**assume** [9] - 9857:19,
9874:8, 9878:14,
9923:22, 9925:9,
9925:10, 9926:2,
9936:3, 9944:14
**assumed** [1] - 9834:1
**assumption** [1] -
9942:19

**assures** [1] - 9858:12
**at-current-qualities**
[1] - 9886:23
**attached** [3] -
9909:20, 9931:15,
9933:9
**attachment** [2] -
9909:15, 9909:17
**attract** [9] - 9843:8,
9844:6, 9845:4,
9851:1, 9853:24,
9854:4, 9871:16,
9887:7, 9905:13
**attracting** [2] -
9843:21, 9895:18
**attractive** [1] -
9861:10
**attracts** [2] - 9853:23,
9853:24
**attributing** [1] -
9906:25
**automatically** [2] -
9868:15, 9868:22
**available** [6] -
9838:16, 9848:14,
9853:8, 9861:16,
9861:17, 9896:12
**Avenue** [6] - 9831:2,
9831:6, 9831:9,
9831:12, 9831:17,
9952:12
**average** [4] - 9833:18,
9901:21, 9901:23,
9902:5
**avoid** [1] - 9951:3
**aware** [14] - 9912:11,
9917:19, 9917:20,
9918:10, 9918:14,
9918:17, 9918:19,
9937:11, 9937:12,
9937:14, 9938:3,
9942:8, 9942:10,
9942:17
**axis** [1] - 9837:20

## B

**backup** [1] - 9882:4
**bad** [3] - 9856:14,
9921:22, 9938:21
**bag** [1] - 9903:5
**Baker** [1] - 9835:1
**balancing** [1] -
9949:14
**ball** [1] - 9909:16
**ballot** [1] - 9926:13
**bar** [6] - 9863:19,
9863:22, 9908:21,
9914:5, 9914:13,
9916:20

**bargain** [4] - 9858:13,
9858:18, 9869:4,
9871:1
**barter** [14] - 9849:19,
9849:23, 9850:1,
9851:16, 9851:21,
9851:25, 9852:7,
9857:3, 9866:3,
9866:6, 9868:12,
9868:13, 9868:21
**base** [4] - 9859:8,
9866:23, 9873:20,
9873:21
**baseball** [1] - 9941:18
**based** [11] - 9837:22,
9838:16, 9867:11,
9878:16, 9888:7,
9900:25, 9907:6,
9925:6, 9934:12,
9934:23, 9938:15
**basic** [4] - 9841:24,
9845:24, 9878:22,
9885:7
**basis** [1] - 9886:10
**Bates** [4] - 9910:1,
9910:2, 9912:24,
9926:8
**beat** [1] - 9871:19
**beats** [1] - 9875:3
**become** [1] - 9879:5
**becomes** [2] -
9853:19, 9940:19
**BEFORE** [1] - 9830:9
**beginning** [2] -
9882:10, 9910:23
**behavior** [3] - 9858:6,
9858:19, 9892:4
**Belknap** [1] - 9831:1
**below** [2] - 9851:11,
9862:4
**BENCH** [1] - 9830:9
**benchmark** [2] -
9832:21, 9833:3
**beneficiary** [2] -
9925:22, 9926:22
**benefit** [12] - 9840:22,
9844:20, 9849:4,
9858:4, 9858:12,
9858:18, 9869:4,
9871:1, 9872:23,
9926:17, 9926:21,
9948:21
**benefit-of-the-
bargain** [1] - 9871:1
**benefits** [16] - 9846:6,
9848:7, 9848:10,
9849:7, 9857:2,
9858:15, 9886:16,
9888:4, 9888:6,
9892:23, 9898:23,

9904:15, 9908:2, 9914:3, 9914:4, 9941:12

**benefitting** [1] - 9926:24

**Bentonville** [1] - 9938:21

**best** [10] - 9861:16, 9911:22, 9912:5, 9917:2, 9932:18, 9940:4, 9948:1, 9949:16, 9950:10, 9952:6

**better** [32] - 9841:13, 9846:8, 9846:9, 9847:1, 9847:2, 9847:14, 9847:23, 9851:20, 9854:15, 9855:11, 9878:3, 9879:10, 9880:12, 9880:13, 9882:8, 9888:25, 9889:1, 9891:1, 9891:16, 9892:25, 9893:10, 9893:14, 9897:22, 9897:23, 9898:21, 9898:22, 9905:3, 9905:5, 9905:6, 9905:9, 9943:2

**between** [17] - 9836:16, 9837:14, 9842:15, 9847:2, 9847:6, 9854:10, 9869:19, 9882:7, 9882:12, 9896:20, 9897:8, 9897:9, 9915:24, 9927:18, 9928:4, 9928:10, 9935:13

**beyond** [2] - 9834:9, 9867:12

**big** [31] - 9835:22, 9838:1, 9840:14, 9841:12, 9841:17, 9841:18, 9841:23, 9843:6, 9843:9, 9845:10, 9848:3, 9855:4, 9877:25, 9879:5, 9880:17, 9881:7, 9884:6, 9884:25, 9885:2, 9885:10, 9885:13, 9890:11, 9896:4, 9896:5, 9896:11, 9896:22, 9898:14, 9901:8, 9902:18, 9903:19, 9922:22

**bigger** [18] - 9836:6, 9837:15, 9837:16, 9843:3, 9851:20,

9880:8, 9880:24, 9884:7, 9884:8, 9884:13, 9884:17, 9887:1, 9896:1, 9896:2, 9896:25, 9907:2

**biggest** [2] - 9836:25, 9841:7

**Bing** [33] - 9862:11, 9862:13, 9862:23, 9864:14, 9864:18, 9864:22, 9865:1, 9865:3, 9865:4, 9881:18, 9882:8, 9882:11, 9883:23, 9884:19, 9887:14, 9887:18, 9889:5, 9889:11, 9889:13, 9890:1, 9890:13, 9900:17, 9900:18, 9900:20, 9905:21, 9906:14, 9942:11, 9942:12, 9942:13, 9942:15, 9942:16, 9942:17

**Bing's** [2] - 9882:2, 9882:7

**bit** [17] - 9836:22, 9839:7, 9841:15, 9843:4, 9849:17, 9868:4, 9873:24, 9878:22, 9879:1, 9879:2, 9882:13, 9896:3, 9898:19, 9924:10, 9947:25, 9948:21, 9949:14

**Blackberry** [1] - 9842:25

**bloat** [3] - 9860:14, 9860:17, 9860:18

**Blog** [1] - 9922:8

**blog** [1] - 9922:22

**blue** [6] - 9834:21, 9836:9, 9851:7, 9865:16, 9899:6, 9901:11

**bluish** [1] - 9854:25

**board** [5] - 9843:22, 9843:24, 9844:2, 9857:23, 9926:6

**books** [1] - 9843:20

**Boomer** [1] - 9932:21

**boost** [1] - 9881:19

**bottom** [8] - 9862:8, 9862:10, 9864:19, 9879:5, 9901:9, 9907:5, 9909:12, 9911:11

**bounty** [4] - 9867:16, 9867:18, 9867:19,

9867:21

**box** [11] - 9862:11, 9864:22, 9865:1, 9865:3, 9865:18, 9872:8, 9903:8, 9910:25, 9911:13, 9918:16, 9929:12

**boxes** [2] - 9862:23, 9927:10

**boy** [5] - 9886:24, 9888:14, 9888:18, 9890:20, 9914:21

**brain** [1] - 9873:24

**break** [1] - 9885:19

**brief** [1] - 9929:24

**briefly** [1] - 9840:6

**bring** [4] - 9887:9, 9905:16, 9905:18, 9948:2

**bringing** [2] - 9848:19, 9881:20

**broad** [1] - 9849:5

**broader** [2] - 9838:7, 9859:18

**Broadway** [1] - 9830:22

**broke** [2] - 9892:12, 9892:13

**brought** [1] - 9938:17

**browse** [2] - 9863:12, 9863:16

**browser** [47] - 9840:18, 9857:10, 9860:6, 9860:8, 9860:20, 9862:12, 9862:13, 9862:14, 9862:16, 9862:17, 9862:22, 9863:1, 9863:3, 9863:10, 9863:19, 9863:20, 9863:21, 9864:3, 9864:4, 9864:6, 9864:9, 9864:10, 9864:12, 9864:13, 9864:15, 9871:25, 9872:5, 9877:18, 9890:18, 9890:25, 9910:25, 9917:1, 9923:13, 9923:14, 9925:12, 9926:13, 9929:1, 9929:5, 9934:12, 9934:24, 9939:9, 9940:16, 9941:5, 9941:21, 9943:12, 9943:16

**Browser** [1] - 9922:9

**browsers** [15] - 9839:7, 9841:9, 9844:4, 9847:14, 9859:4, 9859:10,

9863:1, 9865:16, 9876:3, 9890:17, 9896:12, 9896:13, 9897:23, 9920:10, 9923:18

**browsing** [4] - 9917:15, 9917:19, 9918:20, 9918:23

**Bruce** [1] - 9830:19

**bucket** [1] - 9921:25

**build** [3] - 9842:2, 9842:3, 9846:8

**building** [3] - 9845:12, 9849:13, 9853:23

**bullet** [4] - 9892:16, 9906:16, 9926:13, 9933:4

**bullets** [1] - 9926:12

**bump** [2] - 9880:20

**bunch** [3] - 9836:22, 9874:9, 9900:1

**bundle** [6] - 9866:10, 9866:18, 9866:22, 9867:4, 9867:11, 9867:12

**bunny** [1] - 9903:9

**burden** [2] - 9921:14, 9928:9

**business** [12] - 9841:7, 9841:17, 9841:25, 9843:19, 9844:8, 9844:9, 9844:13, 9860:13, 9876:7, 9893:13, 9897:24, 9914:17

**but-for** [3] - 9878:21, 9886:24, 9890:21

**buy** [3] - 9847:19, 9875:5, 9943:8

**BY** [31] - 9832:6, 9838:3, 9839:23, 9849:16, 9853:1, 9858:20, 9861:22, 9865:7, 9868:7, 9871:3, 9873:18, 9875:22, 9883:16, 9885:23, 9898:16, 9908:17, 9908:24, 9912:20, 9915:15, 9918:4, 9922:20, 9924:22, 9925:5, 9925:25, 9926:9, 9927:3, 9930:24, 9931:4, 9931:21, 9932:9, 9935:7

## C

**calculation** [1] - 9861:9

**camera** [3] - 9898:8, 9898:9, 9898:10
**cameras** [1] - 9898:9
**cannot** [1] - 9870:19
**capable** [1] - 9916:8
**capture** [2] - 9872:9, 9883:7
**car** [2] - 9842:10, 9943:8
**care** [3] - 9887:7, 9943:19, 9944:5
**careful** [2] - 9865:14, 9925:15
**caring** [1] - 9944:4
**Carr** [1] - 9830:21
**carrier** [8] - 9846:8, 9854:24, 9856:12, 9871:9, 9871:17, 9874:8, 9874:24, 9939:10
**carriers** [12] - 9843:24, 9846:11, 9849:7, 9854:24, 9855:4, 9856:9, 9856:10, 9856:16, 9856:21, 9856:22, 9860:13
**case** [22] - 9840:5, 9840:8, 9845:10, 9850:4, 9854:12, 9854:15, 9856:22, 9860:23, 9864:14, 9871:7, 9878:1, 9887:2, 9888:3, 9889:9, 9889:18, 9897:7, 9906:18, 9932:18, 9934:16, 9934:19, 9934:23, 9948:9
**cases** [7] - 9854:13, 9904:5, 9911:25, 9927:22, 9944:5, 9944:20, 9945:1
**categories** [2] - 9900:4, 9900:5
**category** [1] - 9947:20
**causality** [1] - 9939:22
**caused** [1] - 9882:24
**causes** [1] - 9853:18
**caution** [2] - 9859:1, 9891:19
**CAVANAUGH** [1] - 9946:7
**Cavanaugh** [1] - 9831:1
**CCR** [1] - 9952:11
**Center** [1] - 9830:22
**CEO** [1] - 9926:6
**cereal** [2] - 9903:3, 9903:4
**certain** [2] - 9902:3,

9904:15
**certainly** [3] - 9872:25, 9936:8, 9947:19
**CERTIFICATE** [1] - 9952:1
**certify** [1] - 9952:3
**cetera** [2] - 9913:25
**chain** [1] - 9922:7
**challenge** [1] - 9868:14
**challenged** [15] - 9877:11, 9877:17, 9877:23, 9878:8, 9878:11, 9879:8, 9885:25, 9886:3, 9887:3, 9888:5, 9892:17, 9892:20, 9904:21, 9907:1
**challenges** [2] - 9842:21, 9844:22
**chance** [2] - 9915:6, 9923:24
**change** [20] - 9835:3, 9837:20, 9837:25, 9838:1, 9839:2, 9868:6, 9869:13, 9880:3, 9884:6, 9890:17, 9896:3, 9901:13, 9902:5, 9906:23, 9919:21, 9927:9, 9938:14, 9940:5, 9942:17, 9942:24
**changed** [4] - 9944:9, 9944:20, 9945:5, 9945:9
**changes** [3] - 9849:24, 9880:24, 9945:2
**changing** [3] - 9876:6, 9928:9, 9944:24
**charge** [1] - 9851:22
**charged** [1] - 9850:23
**chart** [5] - 9834:15, 9836:8, 9837:5, 9882:3, 9883:7
**cheap** [1] - 9851:15
**check** [2] - 9873:5, 9873:7
**Chicago** [1] - 9830:16
**choice** [115] - 9832:9, 9832:14, 9832:18, 9832:20, 9832:24, 9832:25, 9833:1, 9833:4, 9833:8, 9833:14, 9833:16, 9833:22, 9834:8, 9834:13, 9834:17, 9834:23, 9835:17, 9835:24, 9836:5, 9837:8, 9837:9,

9837:12, 9837:16, 9838:16, 9838:18, 9839:1, 9839:2, 9839:9, 9866:19, 9875:23, 9878:11, 9878:12, 9878:20, 9880:2, 9885:14, 9890:22, 9891:2, 9891:9, 9902:11, 9902:16, 9902:17, 9902:19, 9902:22, 9902:24, 9903:18, 9903:23, 9904:1, 9907:2, 9914:2, 9919:24, 9919:25, 9920:1, 9920:3, 9920:4, 9920:8, 9920:10, 9920:11, 9920:15, 9921:4, 9921:6, 9921:9, 9921:11, 9921:13, 9921:16, 9921:17, 9921:20, 9921:22, 9921:24, 9921:25, 9922:1, 9923:8, 9923:14, 9923:17, 9923:24, 9924:15, 9924:23, 9925:7, 9925:12, 9925:22, 9926:17, 9926:24, 9928:11, 9928:12, 9928:13, 9928:21, 9929:12, 9929:19, 9929:21, 9929:23, 9930:1, 9930:4, 9930:8, 9930:10, 9930:13, 9930:19, 9935:19, 9936:20, 9937:13, 9938:12, 9938:24, 9939:8, 9939:9, 9939:11, 9939:13, 9939:17, 9939:22, 9939:25, 9940:1, 9940:2, 9941:25, 9942:12
**Choice** [2] - 9922:9
**choices** [11] - 9833:13, 9834:1, 9834:2, 9834:3, 9834:10, 9834:19, 9834:22, 9834:24, 9835:4, 9920:20, 9923:4
**choose** [11] - 9833:23, 9893:11, 9913:19, 9915:24, 9919:25, 9920:18, 9921:18, 9921:23, 9936:17, 9941:7, 9942:11
**chooses** [1] - 9869:12

**choosing** [2] - 9934:11, 9934:13
**Chrome** [1] - 9850:17, 9856:2, 9857:5, 9857:8, 9862:5, 9866:9, 9867:14, 9872:4, 9901:15, 9924:14, 9926:14
**Chromium** [3] - 9896:11, 9896:12, 9900:8
**chunk** [2] - 9890:12, 9896:15
**circled** [1] - 9862:12
**cite** [1] - 9929:15
**claim** [5] - 9886:2, 9889:25, 9901:24, 9902:7, 9908:2
**claiming** [1] - 9880:9
**claims** [2] - 9902:12, 9906:18
**clarifying** [1] - 9883:6
**classic** [1] - 9880:15
**clawbacks** [1] - 9950:15
**clear** [6] - 9834:5, 9834:6, 9902:24, 9913:13, 9913:17, 9919:22
**clearly** [3] - 9848:1, 9888:8, 9906:14
**click** [3] - 9862:21, 9864:2, 9865:19
**clicking** [2] - 9927:19
**clicks** [1] - 9927:10
**close** [5] - 9837:17, 9837:18, 9861:18, 9882:13
**closed** [9] - 9842:1, 9842:8, 9842:9, 9846:21, 9854:10, 9854:13, 9949:23, 9950:5, 9950:20
**closely** [2] - 9837:24, 9842:3
**closer** [3] - 9836:7, 9836:10, 9885:11
**CMR** [1] - 9952:11
**CO** [1] - 9830:23
**code** [1] - 9845:3
**Colorado** [2] - 9830:19, 9830:22
**COLORADO** [1] - 9830:20
**colors** [1] - 9854:25
**COLUMBIA** [1] - 9830:1
**combine** [1] - 9843:15
**combined** [2] -

9877:2, 9883:25

**coming** [9] - 9855:22, 9864:9, 9893:22, 9899:17, 9910:6, 9911:6, 9923:13, 9949:15

**comment** [1] - 9918:24

**commercially** [1] - 9938:16

**Commission** [1] - 9923:7

**commitment** [1] - 9857:11

**common** [5] - 9848:14, 9849:6, 9863:11, 9863:12, 9863:17

**commonality** [1] - 9845:18

**companies** [1] - 9900:15

**company** [1] - 9919:3

**compare** [7] - 9835:14, 9835:16, 9851:3, 9896:17, 9901:20, 9928:15, 9944:23

**compared** [3] - 9834:13, 9900:14, 9901:3

**compares** [1] - 9901:4

**comparing** [3] - 9832:13, 9928:8, 9941:16

**comparison** [5] - 9859:12, 9894:6, 9900:24, 9902:1, 9902:9

**compatibility** [4] - 9843:9, 9843:16, 9845:11, 9846:20

**compelling** [1] - 9860:23

**compete** [25] - 9840:20, 9844:17, 9847:1, 9851:9, 9853:20, 9856:24, 9861:18, 9871:5, 9871:9, 9871:21, 9871:23, 9872:12, 9873:13, 9873:15, 9873:16, 9876:25, 9877:12, 9877:23, 9878:3, 9890:9, 9893:3, 9893:4, 9895:9, 9895:20, 9907:12

**competed** [1] - 9849:11

**competing** [25] - 9846:19, 9853:16, 9854:16, 9860:2, 9873:22, 9887:14, 9887:16, 9887:20, 9889:6, 9889:7, 9889:12, 9889:20, 9892:22, 9892:23, 9893:4, 9893:12, 9893:13, 9894:3, 9894:16, 9895:5, 9895:6, 9900:17, 9900:19, 9941:15, 9941:20

**competition** [58] - 9840:9, 9840:11, 9840:22, 9840:23, 9846:2, 9846:14, 9846:18, 9846:20, 9847:2, 9847:4, 9847:5, 9847:7, 9847:17, 9847:23, 9848:1, 9853:3, 9854:10, 9855:7, 9855:8, 9856:3, 9856:4, 9860:1, 9866:4, 9876:7, 9877:3, 9878:9, 9878:13, 9880:3, 9880:6, 9893:6, 9893:7, 9893:8, 9894:7, 9894:13, 9897:4, 9897:6, 9897:8, 9897:9, 9897:25, 9898:2, 9898:24, 9902:12, 9904:14, 9906:14, 9906:19, 9906:22, 9907:7, 9907:8, 9907:9, 9907:11, 9907:15, 9907:18, 9907:23, 9907:25

**competitiveness** [1] - 9884:21

**competitors** [1] - 9894:25

**complain** [1] - 9832:22

**complaint** [1] - 9866:5

**complementarity** [1] - 9846:3

**complementary** [1] - 9901:17

**complements** [5] - 9840:15, 9841:10, 9897:21, 9902:8

**complete** [1] - 9952:5

**complicated** [2] - 9941:22

**computer** [2] - 9898:6,

9900:15

**concept** [1] - 9910:21

**concerning** [1] - 9947:10

**concluded** [2] - 9928:20, 9928:24

**conclusion** [3] - 9840:17, 9885:7, 9907:5

**conclusions** [1] - 9938:17

**conditions** [1] - 9881:1

**conducive** [1] - 9881:1

**confidential** [3] - 9946:25, 9947:12, 9950:17

**configuration** [1] - 9869:13

**confirm** [1] - 9945:23

**confirming** [1] - 9922:13

**CONNOLLY** [1] - 9831:5

**conservative** [1] - 9838:20

**consider** [5] - 9840:22, 9866:3, 9892:5, 9943:7, 9948:12

**consideration** [1] - 9947:14

**consistency** [2] - 9853:15, 9853:18

**consistent** [1] - 9938:7

**constitutes** [1] - 9952:4

**Constitution** [2] - 9831:17, 9952:12

**Consumer** [1] - 9830:20

**cont** [1] - 9953:4

**Cont** [1] - 9832:5

**contained** [1] - 9946:24

**contest** [1] - 9875:6

**context** [3] - 9916:3, 9928:7, 9930:10

**continue** [7] - 9875:11, 9875:12, 9930:21, 9937:16, 9945:16, 9950:25, 9951:1

**continued** [3] - 9889:8, 9899:12, 9899:15

**continuing** [1] - 9882:17

**contract** [4] - 9842:16, 9869:3, 9869:25, 9871:1

**contracts** [3] - 9842:14, 9856:19, 9912:6

**contractual** [1] - 9854:6

**contrast** [1] - 9837:12

**control** [6] - 9842:2, 9842:10, 9853:25, 9854:7, 9892:14, 9902:8

**convergence** [1] - 9882:18

**Cook** [1] - 9891:17

**cool** [3] - 9863:25, 9870:17, 9899:22

**coordinate** [1] - 9948:2

**copies** [1] - 9934:6

**copy** [2] - 9931:2, 9932:23

**correct** [9] - 9836:12, 9858:17, 9861:25, 9896:10, 9909:14, 9928:23, 9929:14, 9938:12, 9941:11

**correcting** [1] - 9839:14

**correction** [2] - 9833:6, 9838:11

**cost** [6] - 9855:16, 9856:11, 9874:18, 9887:8, 9887:21, 9927:17

**costs** [12] - 9849:5, 9855:15, 9868:1, 9876:11, 9876:17, 9886:9, 9886:10, 9886:11, 9886:12, 9887:4, 9927:22, 9941:2

**counsel** [3] - 9927:8, 9946:23, 9948:2

**count** [2] - 9889:8, 9889:10

**counter** [1] - 9903:22

**counter-market** [1] - 9903:22

**counting** [1] - 9943:11

**country** [1] - 9833:18

**couple** [2] - 9843:2, 9890:4

**course** [3] - 9844:7, 9872:23, 9910:22

**court** [1] - 9943:20

**COURT** [75] - 9830:1, 9832:2, 9837:4, 9839:4, 9839:8,

9960

9839:11, 9839:13, 9839:22, 9848:21, 9848:25, 9852:19, 9852:25, 9858:14, 9860:11, 9862:24, 9863:2, 9863:7, 9863:18, 9863:23, 9864:7, 9864:17, 9867:14, 9867:17, 9867:19, 9870:4, 9870:15, 9870:18, 9870:24, 9872:15, 9872:19, 9874:2, 9874:5, 9874:7, 9875:7, 9875:9, 9883:6, 9883:12, 9885:20, 9894:23, 9895:10, 9896:8, 9908:8, 9908:13, 9912:19, 9915:11, 9918:3, 9922:10, 9922:17, 9924:18, 9924:25, 9925:3, 9925:16, 9925:19, 9931:19, 9932:5, 9935:4, 9945:15, 9945:25, 9946:2, 9946:9, 9946:12, 9946:14, 9946:16, 9947:1, 9948:4, 9948:10, 9948:14, 9948:17, 9949:17, 9949:25, 9950:4, 9950:13, 9950:18, 9951:4, 9952:1

**Court** [12] - 9831:15, 9831:16, 9832:11, 9849:19, 9873:19, 9892:3, 9945:14, 9949:22, 9949:24, 9950:8, 9950:16, 9952:11

**Courthouse** [1] - 9831:16

**cover** [3] - 9838:23, 9908:19, 9935:8

**coverage** [1] - 9859:17

**covered** [6] - 9838:22, 9838:24, 9859:5, 9875:9, 9876:5, 9900:9

**CRC** [1] - 9831:15

**create** [7] - 9844:11, 9860:14, 9860:17, 9907:8, 9907:13, 9941:7

**creates** [2] - 9846:2, 9941:4

**creating** [2] - 9860:19, 9897:4

**credit** [1] - 9856:22

**critique** [2] - 9878:19, 9886:23

**Croll** [1] - 9931:22

**cross** [1] - 9908:10

**CROSS** [1] - 9908:16

**Cross** [1] - 9953:4

**cross-examination** [1] - 9908:10

**CROSS-EXAMINATION** [1] - 9908:16

**Cross-Examination** [1] - 9953:4

**crossed** [2] - 9924:11, 9925:7

**CRR** [2] - 9831:15, 9952:11

**cryptic** [1] - 9925:9

**Cue** [1] - 9891:24

**current** [7] - 9878:21, 9884:16, 9886:23, 9905:14, 9906:25, 9916:9, 9946:22

**customers** [5] - 9868:16, 9886:15, 9896:22, 9905:19

**cut** [1] - 9858:8

**cutoff** [3] - 9902:2, 9902:3, 9902:4

**CV** [1] - 9830:4

**cycle** [1] - 9880:14

# D

**D.C** [4] - 9830:5, 9830:13, 9831:6, 9952:13

**dad** [7] - 9942:22, 9942:24, 9943:24, 9944:8, 9944:11, 9944:13, 9945:8

**Dahlquist** [2] - 9830:14, 9946:20

**DAHLQUIST** [5] - 9946:11, 9946:13, 9946:15, 9946:19, 9948:1

**dash** [1] - 9883:25

**data** [20] - 9834:19, 9838:16, 9848:12, 9861:16, 9880:19, 9881:20, 9882:3, 9882:4, 9882:14, 9882:15, 9882:24, 9884:18, 9900:25, 9905:2, 9905:11, 9940:1, 9940:3, 9944:24, 9947:14

**date** [2] - 9932:22, 9940:9

**dated** [1] - 9924:6

**Dated** [1] - 9952:7

**David** [2] - 9830:14, 9946:19

**David.dahlquist@usdoj.gov** [1] - 9830:17

**DAY** [1] - 9830:3

**days** [2] - 9847:13, 9849:9

**DC** [1] - 9831:17

**de** [1] - 9865:9

**deal** [16] - 9836:25, 9874:9, 9874:15, 9874:16, 9874:18, 9892:8, 9892:10, 9892:13, 9893:14, 9914:6, 9914:8, 9914:9, 9931:23

**dealt** [1] - 9900:8

**December** [6] - 9833:17, 9834:7, 9882:15, 9883:25, 9884:3, 9890:19

**decent** [2] - 9943:12, 9943:17

**decentralized** [1] - 9856:9

**decide** [3] - 9842:4, 9938:6, 9942:14

**decided** [2] - 9866:16, 9938:12

**decision** [3] - 9915:20, 9943:9, 9943:14

**decisionmaking** [1] - 9904:10

**decisions** [3] - 9904:20, 9929:1, 9929:5

**deck** [1] - 9946:24

**decks** [2] - 9946:10, 9946:17

**decrease** [3] - 9877:3, 9886:14, 9888:6

**decreased** [1] - 9886:3

**deep** [1] - 9915:6

**default** [106] - 9850:17, 9857:10, 9862:13, 9862:14, 9862:16, 9862:17, 9862:18, 9862:22, 9863:2, 9863:3, 9863:10, 9863:11, 9863:16, 9863:19, 9864:6, 9864:9, 9864:10, 9864:12, 9864:13, 9864:14, 9864:15, 9872:6, 9892:22, 9892:23, 9892:24, 9893:1, 9893:3, 9893:5,

9893:6, 9893:7, 9893:8, 9898:18, 9898:20, 9898:21, 9898:22, 9898:23, 9898:25, 9907:6, 9907:7, 9910:8, 9910:17, 9910:24, 9911:12, 9911:15, 9911:16, 9911:20, 9913:4, 9913:19, 9914:2, 9914:3, 9914:13, 9915:21, 9917:19, 9918:9, 9918:16, 9918:21, 9919:2, 9919:9, 9919:15, 9919:16, 9919:19, 9919:20, 9919:23, 9923:13, 9923:20, 9923:21, 9927:9, 9928:21, 9930:14, 9930:18, 9933:6, 9934:12, 9934:15, 9934:16, 9934:20, 9936:17, 9938:2, 9938:11, 9940:19, 9940:24, 9941:6, 9941:8, 9941:9, 9941:12, 9941:13, 9941:16, 9941:21, 9941:24, 9942:2, 9942:5, 9942:7, 9943:25, 9944:3, 9944:10, 9944:12, 9944:18, 9944:20, 9944:24, 9945:1, 9945:5, 9945:9

**Default** [1] - 9913:3

**defaults** [18] - 9832:13, 9862:15, 9865:3, 9889:14, 9890:24, 9892:21, 9893:5, 9912:2, 9913:24, 9913:25, 9919:13, 9928:9, 9929:1, 9929:5, 9934:8, 9934:23, 9940:11, 9940:14

**Defendant** [2] - 9830:7, 9831:5

**defense** [1] - 9947:14

**defined** [2] - 9913:16

**definitely** [1] - 9889:19

**definition** [1] - 9920:4

**degree** [1] - 9859:20

**delete** [2] - 9868:25, 9931:25

**demonstrative** [1] - 9908:5

**Denver** [1] - 9830:23

**deny** [1] - 9878:2

**DEPARTMENT** [2] - 9830:12, 9830:20
**Department** [1] - 9830:15
**depicted** [2] - 9833:11, 9861:23
**depicting** [1] - 9837:6
**depicts** [1] - 9842:20
**deploying** [1] - 9875:23
**deposit** [1] - 9875:4
**deprived** [1] - 9878:8
**depriving** [1] - 9877:24
**derive** [1] - 9886:8
**describe** [3] - 9833:11, 9854:19, 9877:13
**design** [4] - 9904:17, 9904:18, 9929:1, 9940:16
**designed** [1] - 9911:1
**designs** [1] - 9929:5
**desire** [1] - 9846:8
**desktop** [21] - 9841:15, 9841:20, 9862:6, 9872:3, 9879:22, 9883:8, 9883:9, 9883:10, 9883:11, 9883:15, 9890:24, 9894:6, 9894:7, 9894:9, 9894:10, 9894:12, 9894:16, 9905:15, 9905:18, 9906:15, 9944:23
**desktops** [3] - 9841:21, 9894:15, 9900:22
**determination** [1] - 9915:20
**determine** [2] - 9916:13, 9938:9
**developed** [2] - 9850:11, 9935:20
**developers** [5] - 9844:2, 9845:12, 9849:4, 9853:18, 9853:24
**development** [2] - 9849:4, 9849:5
**device** [23] - 9832:18, 9841:3, 9844:3, 9845:13, 9846:9, 9847:12, 9848:20, 9849:1, 9849:2, 9851:15, 9854:1, 9855:12, 9862:15, 9864:9, 9864:15, 9865:4, 9868:19,

9869:13, 9899:9, 9899:14, 9899:17, 9902:21
**devices** [63] - 9839:5, 9841:2, 9841:13, 9843:2, 9843:23, 9844:1, 9845:20, 9846:9, 9846:19, 9847:11, 9847:23, 9848:7, 9848:13, 9848:14, 9848:16, 9851:2, 9851:4, 9851:5, 9851:7, 9851:8, 9851:11, 9851:17, 9852:4, 9852:5, 9852:10, 9852:11, 9852:18, 9853:3, 9853:10, 9853:13, 9853:16, 9853:17, 9855:12, 9855:14, 9856:20, 9865:9, 9865:12, 9871:6, 9873:11, 9873:20, 9873:21, 9875:8, 9875:9, 9875:24, 9876:5, 9876:24, 9877:7, 9899:7, 9899:10, 9899:11, 9899:18, 9933:11, 9934:18, 9944:22
**DICKMAN** [1] - 9952:3
**Dickman** [2] - 9831:15, 9952:11
**dictionary** [2] - 9850:2, 9850:3
**difference** [2] - 9859:19, 9880:6
**different** [36] - 9833:2, 9836:1, 9841:15, 9846:18, 9846:25, 9849:10, 9854:5, 9860:8, 9865:12, 9867:13, 9886:6, 9886:25, 9890:17, 9896:18, 9899:24, 9903:10, 9904:7, 9911:5, 9912:2, 9912:3, 9915:23, 9915:24, 9919:21, 9921:17, 9921:18, 9921:19, 9927:18, 9928:4, 9930:1, 9932:18, 9934:22, 9941:4, 9948:21
**differentiates** [1] - 9934:17
**differently** [1] - 9949:14
**difficult** [1] - 9850:24

**dig** [1] - 9950:11
**digit** [2] - 9942:3
**dimension** [1] - 9895:24
**dimensions** [1] - 9904:6
**Dintzer** [1] - 9830:11
**DINTZER** [46] - 9908:11, 9908:15, 9908:17, 9908:23, 9908:24, 9912:18, 9912:20, 9915:10, 9915:12, 9915:15, 9918:2, 9918:4, 9922:3, 9922:19, 9922:20, 9924:21, 9924:22, 9925:4, 9925:5, 9925:25, 9926:4, 9926:8, 9926:9, 9927:2, 9927:3, 9930:23, 9930:24, 9931:3, 9931:4, 9931:17, 9931:21, 9932:8, 9932:9, 9935:3, 9935:5, 9935:7, 9945:12, 9945:22, 9946:1, 9946:5, 9949:22, 9950:3, 9950:7, 9950:14, 9951:2, 9951:6
**Dintzer..................
9908** [1] - 9953:4
**direct** [8] - 9833:3, 9844:19, 9893:6, 9908:1, 9908:6, 9932:5, 9932:6, 9950:6
**DIRECT** [1] - 9832:5
**Direct** [1] - 9953:4
**directional** [1] - 9835:19
**directly** [10] - 9836:1, 9851:9, 9854:7, 9855:21, 9856:8, 9878:5, 9879:9, 9883:21, 9886:21, 9917:20
**directors** [1] - 9926:6
**disclosed** [1] - 9949:5
**discuss** [3] - 9929:18, 9945:18, 9946:3
**discussed** [4] - 9843:20, 9845:9, 9855:9, 9916:4
**discussing** [2] - 9915:18, 9929:17
**discussion** [5] - 9877:20, 9929:19, 9929:23, 9930:10, 9937:15

**discussions** [3] - 9946:16, 9946:19, 9946:21
**disincentive** [1] - 9874:13
**disproportionally** [1] - 9879:23
**disrupt** [1] - 9947:6
**distribute** [5] - 9843:25, 9916:7, 9917:7, 9934:14, 9934:19
**distributes** [3] - 9917:1, 9934:7, 9936:11
**distributing** [2] - 9934:24, 9935:19
**distribution** [20] - 9838:6, 9846:10, 9889:25, 9894:9, 9894:10, 9901:25, 9931:24, 9933:12, 9933:23, 9934:2, 9934:13, 9936:3, 9936:5, 9936:9, 9940:11, 9940:15, 9940:24, 9941:1, 9941:3
**Distribution** [3] - 9932:10, 9932:20, 9932:25
**DISTRICT** [3] - 9830:1, 9830:1, 9830:10
**dive** [1] - 9915:7
**divert** [1] - 9915:19
**doc** [2] - 9857:9, 9862:9
**docket** [1] - 9950:23
**document** [17] - 9889:23, 9909:14, 9909:22, 9922:12, 9922:15, 9922:16, 9930:9, 9931:5, 9931:9, 9931:12, 9932:4, 9932:6, 9932:17, 9932:19, 9932:23, 9935:11, 9935:12
**documents** [8] - 9902:24, 9903:19, 9903:20, 9912:17, 9931:13, 9932:18, 9937:11, 9950:7
**DoJ** [2] - 9830:11, 9946:5
**dollar** [3] - 9852:7, 9873:8, 9905:16
**dollars** [7] - 9846:10, 9855:24, 9858:10, 9866:15, 9866:17,

9962

9867:22, 9887:10

**done** [20] - 9833:25, 9841:4, 9844:15, 9861:2, 9861:6, 9861:7, 9867:6, 9867:21, 9876:10, 9885:18, 9891:8, 9903:16, 9914:12, 9939:20, 9940:7, 9942:18, 9943:23, 9944:10, 9944:18, 9949:14

**dot** [6] - 9836:8, 9836:9, 9836:10, 9837:10, 9838:13, 9838:14

**double** [2] - 9873:8, 9873:17

**doubled** [5] - 9838:20, 9876:4, 9878:16, 9881:19, 9890:18

**doubling** [2] - 9891:3, 9902:4

**down** [23] - 9838:13, 9852:14, 9862:8, 9862:10, 9862:12, 9864:19, 9864:20, 9865:2, 9877:8, 9881:8, 9882:8, 9882:13, 9882:17, 9885:2, 9886:16, 9886:17, 9908:2, 9910:13, 9920:1, 9923:5, 9933:16, 9939:15

**downloaded** [2] - 9920:16, 9934:12

**downloading** [1] - 9934:23

**downloads** [4] - 9933:11, 9933:13, 9933:19, 9934:2

**Dr** [1] - 9927:15

**draft** [5] - 9909:11, 9909:13, 9931:22, 9935:13, 9936:10

**drafted** [1] - 9936:23

**dramatically** [1] - 9880:4

**draw** [2] - 9833:1, 9902:15

**drawing** [1] - 9848:2

**drawn** [2] - 9862:19, 9898:15

**draws** [1] - 9853:18

**drive** [3] - 9840:15, 9841:8, 9844:12

**driven** [4] - 9841:22, 9894:21, 9896:19, 9896:20

**drives** [1] - 9904:1

**driving** [6] - 9837:22, 9842:10, 9847:15, 9867:12, 9893:25, 9897:13

**drop** [1] - 9861:10

**dropped** [1] - 9849:11

**dropping** [1] - 9876:12

**DuckDuckGo** [5] - 9905:18, 9906:1, 9919:3, 9919:4, 9919:7

**due** [4] - 9847:25, 9880:20, 9881:25, 9921:10

**dumb** [1] - 9920:1

**Duo** [5] - 9861:2, 9862:1, 9871:11, 9871:12

**during** [2] - 9833:22, 9885:4

**duty** [2] - 9873:9, 9873:17

**DXD37** [1] - 9908:5

DXD37......................
..........................9908
[1] - 9953:7

## E

**E-MADA** [2] - 9867:7, 9876:10

**early** [6] - 9842:21, 9845:3, 9849:9, 9888:23, 9899:7, 9913:24

**easier** [4] - 9851:18, 9896:1, 9915:14, 9928:13

**easy** [3] - 9845:12, 9851:18, 9927:10

**econometric** [1] - 9939:21

**economic** [9] - 9854:8, 9854:9, 9855:6, 9857:18, 9886:20, 9888:12, 9906:21, 9914:12, 9930:14

**economically** [1] - 9868:10

**economics** [5] - 9843:20, 9879:11, 9886:19, 9888:7, 9896:21

**economist** [12] - 9858:5, 9904:23, 9904:24, 9906:8, 9906:9, 9906:11, 9914:16, 9914:18, 9928:18, 9930:17,

9937:18

**economy** [1] - 9880:14

**ecosystem** [2] - 9848:8, 9877:6

**Eddy** [1] - 9891:24

**Edge** [6] - 9862:8, 9862:10, 9862:12, 9862:13, 9864:14, 9896:14

**effect** [5] - 9847:6, 9879:20, 9880:8, 9891:6, 9907:21

**effectively** [4] - 9852:6, 9853:21, 9875:3, 9934:15

**effects** [9] - 9839:1, 9877:16, 9877:20, 9880:9, 9880:10, 9880:17, 9880:20, 9883:20

**efficiencies** [1] - 9857:18

**efficient** [6] - 9871:14, 9940:14, 9940:20, 9940:24, 9940:25, 9941:1

**effort** [2] - 9843:17, 9950:10

**efforts** [1] - 9893:24

**either** [7] - 9855:25, 9875:2, 9883:19, 9885:6, 9888:21, 9905:24

**electronic** [1] - 9898:3

**eliminate** [2] - 9893:6, 9901:22

**eliminating** [2] - 9876:17, 9876:18

**Email** [6] - 9830:14, 9830:17, 9830:24, 9831:7, 9831:11, 9831:14

**email** [11] - 9831:4, 9862:20, 9863:24, 9909:4, 9909:6, 9909:16, 9922:7, 9924:5, 9930:25, 9931:15, 9946:22

**emailed** [2] - 9937:1, 9937:12

**emails** [1] - 9924:5

**embedded** [1] - 9922:14

**emerge** [2] - 9917:5, 9921:11

**emerging** [2] - 9914:19, 9914:20

**emphasis** [1] - 9903:14

**empirical** [15] -

9861:15, 9880:18, 9885:8, 9886:18, 9886:20, 9888:21, 9906:24, 9907:19, 9907:22, 9939:15, 9940:1, 9941:11, 9944:19, 9944:24, 9945:1

**employees** [1] - 9909:8

**encourage** [4] - 9856:20, 9870:11, 9870:13, 9873:12

**encouraging** [3] - 9855:21, 9868:15, 9869:18

**end** [19] - 9833:17, 9833:24, 9845:25, 9846:1, 9851:9, 9852:5, 9852:10, 9852:18, 9853:7, 9853:9, 9853:11, 9853:12, 9882:12, 9902:22, 9902:23, 9914:10, 9933:4, 9933:5

**ends** [1] - 9914:9

**enforce** [2] - 9869:8, 9869:15

**enforcement** [3] - 9869:3, 9870:1, 9871:1

**enforcing** [2] - 9858:18, 9869:19

**engaged** [1] - 9914:16

**engine** [27] - 9872:6, 9890:18, 9893:11, 9894:24, 9894:25, 9915:21, 9915:24, 9918:9, 9918:15, 9919:2, 9919:9, 9927:20, 9928:11, 9928:22, 9937:21, 9940:11, 9940:14, 9940:19, 9940:23, 9941:9, 9942:7, 9942:24, 9943:2, 9943:3, 9943:10, 9943:17

**engines** [6] - 9847:14, 9879:16, 9895:6, 9915:25, 9927:18, 9941:6

**enhance** [4] - 9846:8, 9846:13, 9846:14, 9907:7

**enhanced** [1] - 9899:25

**enhances** [2] - 9855:20, 9916:13

**enormous** [1] -

9847:10
**ensuring** [1] - 9869:3
**entered** [1] - 9945:24
**entirety** [1] - 9948:19
**environment** [1] - 9930:2
**envision** [1] - 9917:4
**equal** [1] - 9894:9
**equalizing** [1] - 9832:19
**equally** [1] - 9887:15
**equation** [2] - 9842:13, 9875:18
**equivalent** [1] - 9940:5
**established** [1] - 9859:22
**estimate** [6] - 9836:19, 9837:2, 9878:16, 9945:4, 9945:6, 9945:7
**estimates** [2] - 9944:25, 9950:15
**et** [3] - 9830:3, 9913:25
**EU** [1] - 9926:13
**Europe** [34] - 9833:4, 9833:14, 9833:19, 9834:7, 9834:14, 9836:8, 9836:9, 9836:11, 9836:15, 9837:8, 9837:14, 9837:17, 9837:18, 9837:24, 9839:15, 9843:3, 9861:2, 9866:11, 9867:2, 9867:6, 9876:11, 9902:11, 9902:15, 9903:17, 9903:24, 9904:8, 9923:12, 9924:24, 9939:12, 9939:17, 9940:2
**European** [3] - 9832:25, 9923:7, 9940:8
**evaluate** [3] - 9868:8, 9904:19, 9906:17
**evaluated** [1] - 9891:18
**evening** [1] - 9946:4
**eventually** [3] - 9834:1, 9892:12, 9892:13
**evidence** [59] - 9839:10, 9861:6, 9861:14, 9861:15, 9861:20, 9867:12, 9877:10, 9878:7, 9879:13, 9880:5, 9880:19, 9881:10, 9881:11, 9881:13,

9881:25, 9882:24, 9884:10, 9884:12, 9884:14, 9885:6, 9885:8, 9886:18, 9886:22, 9886:23, 9887:1, 9888:22, 9889:24, 9891:11, 9892:3, 9899:19, 9902:11, 9904:19, 9906:7, 9906:12, 9906:25, 9907:3, 9907:20, 9907:22, 9908:4, 9909:7, 9919:18, 9922:6, 9929:10, 9929:15, 9929:18, 9929:22, 9929:23, 9931:18, 9931:19, 9939:12, 9941:11, 9941:25, 9944:19, 9944:22, 9945:1, 9945:24, 9948:19
**evolved** [1] - 9834:4
**exact** [3] - 9859:11, 9931:14, 9932:17
**exactly** [6] - 9853:22, 9876:2, 9910:10, 9936:22, 9941:20, 9944:14
**EXAMINATION** [2] - 9832:5, 9908:16
**examination** [3] - 9908:7, 9908:10, 9947:7
**Examination** [2] - 9953:4, 9953:4
**examine** [2] - 9834:13, 9883:2
**example** [10] - 9848:4, 9856:23, 9857:25, 9861:5, 9865:5, 9871:11, 9876:9, 9888:23, 9920:25, 9944:21
**exchange** [6] - 9850:3, 9850:14, 9857:4, 9857:20, 9866:14, 9868:20
**excited** [1] - 9924:23
**exclusive** [4] - 9865:9, 9907:12, 9914:5, 9929:16
**exclusivity** [5] - 9857:13, 9857:17, 9857:20, 9858:14, 9860:4
**execute** [1] - 9869:12
**eXHIBITS** [1] - 9953:6
**exist** [3] - 9914:25, 9942:19, 9942:20

**existence** [1] - 9921:13
**exiting** [1] - 9875:9
**expand** [6] - 9843:15, 9855:14, 9855:15, 9876:23, 9880:8, 9899:20
**expanded** [1] - 9841:5
**expect** [10] - 9835:4, 9835:10, 9855:6, 9904:9, 9916:24, 9924:9, 9930:20, 9934:16, 9938:7, 9939:4
**expected** [3] - 9838:9, 9838:18, 9937:23
**experience** [9] - 9835:24, 9836:7, 9836:24, 9853:15, 9853:16, 9856:14, 9861:13, 9899:25, 9928:17
**experiment** [2] - 9871:7, 9944:21
**expert** [5] - 9849:18, 9904:23, 9916:10, 9928:18, 9950:11
**expertise** [1] - 9928:14
**experts** [2] - 9833:25, 9946:9
**explain** [6] - 9832:10, 9842:20, 9849:19, 9858:24, 9915:17, 9933:21
**explicitly** [1] - 9925:10
**Explorer** [1] - 9890:15
**expressly** [1] - 9950:23
**extending** [1] - 9930:11
**extensive** [1] - 9899:15
**extent** [5] - 9859:20, 9901:18, 9906:5, 9910:2, 9922:14
**extra** [5] - 9856:21, 9856:22, 9857:21, 9860:19

# F

**face** [1] - 9894:13
**faced** [1] - 9844:23
**faces** [2] - 9894:7, 9906:14
**facilitate** [3] - 9845:17, 9845:20, 9868:9
**facilitated** [2] - 9868:11, 9868:13
**facilitates** [1] -

9852:10
**facilities** [1] - 9853:13
**fact** [12] - 9851:11, 9861:1, 9865:8, 9889:9, 9891:5, 9894:8, 9905:22, 9917:7, 9929:20, 9936:4, 9938:1, 9950:6
**facto** [1] - 9865:9
**facts** [1] - 9860:3
**failed** [1] - 9889:21
**fair** [9] - 9908:18, 9909:25, 9913:18, 9916:25, 9922:14, 9936:16, 9936:22, 9944:15
**fall** [5] - 9856:12, 9858:2, 9939:10, 9949:3
**fallen** [2] - 9845:22, 9849:13
**falling** [1] - 9939:16
**familiar** [4] - 9915:5, 9932:3, 9932:16, 9935:11
**far** [2] - 9889:13, 9930:12
**faster** [2] - 9893:25, 9899:8
**feature** [4] - 9850:22, 9852:15, 9852:19, 9873:2
**features** [1] - 9857:2
**February** [2] - 9884:24
**fee** [4] - 9850:13, 9850:14, 9866:14, 9868:20
**feed** [1] - 9847:23
**feedback** [8] - 9879:17, 9880:9, 9880:10, 9880:17, 9880:20, 9885:6, 9891:6
**feeds** [1] - 9852:17
**fees** [1] - 9850:24
**feet** [1] - 9895:17
**few** [3] - 9873:25, 9885:2, 9927:10
**fiat** [1] - 9939:24
**fifth** [2] - 9923:3, 9923:5
**figure** [2] - 9938:9, 9943:23
**figures** [1] - 9943:1
**final** [1] - 9834:18
**finally** [2] - 9840:17, 9844:5
**financial** [2] - 9914:12, 9948:25
**fine** [3] - 9918:13,

9964

9925:19, 9933:21
**fingers** [2] - 9924:10, 9925:7
**finish** [1] - 9885:18
**Firefox** [3] - 9885:1, 9892:7, 9944:21
**firm** [2] - 9842:16, 9887:24
**firms** [9] - 9842:15, 9887:24, 9901:5, 9901:10, 9901:20, 9901:22, 9901:23, 9901:25, 9902:9
**first** [23] - 9840:21, 9840:25, 9841:7, 9848:19, 9852:13, 9868:12, 9877:22, 9878:10, 9881:16, 9885:10, 9886:5, 9892:21, 9906:22, 9908:21, 9915:19, 9919:14, 9924:4, 9933:4, 9933:5, 9933:18, 9934:6, 9936:25, 9947:4
**first-time** [2] - 9933:18, 9934:6
**Fithian** [1] - 9909:12
**fits** [1] - 9870:25
**five** [3] - 9892:13, 9898:6, 9924:5
**five-year** [1] - 9892:13
**fix** [1] - 9904:9
**flat** [1] - 9899:10
**flattened** [1] - 9882:19
**flexibility** [1] - 9869:21
**Floor** [3] - 9830:23, 9831:9, 9831:13
**flow** [2] - 9866:17, 9947:6
**flowing** [2] - 9863:10, 9866:15
**flows** [1] - 9865:11
**focus** [10] - 9840:4, 9840:5, 9840:7, 9841:3, 9845:15, 9887:22, 9896:25, 9904:7, 9905:1, 9910:1
**focused** [4] - 9834:18, 9840:9, 9871:22, 9894:18
**folder** [11] - 9850:17, 9857:6, 9860:20, 9862:4, 9862:7, 9864:19, 9864:20, 9864:21, 9866:9, 9872:2
**folks** [1] - 9842:11
**follow** [3] - 9835:4, 9907:21, 9943:6

**follow-on** [1] - 9907:21
**following** [3] - 9837:4, 9837:24, 9948:18
**FOR** [1] - 9830:1
**force** [1] - 9848:10
**forced** [3] - 9866:7, 9866:11, 9939:6
**forcing** [1] - 9866:22
**Ford** [1] - 9847:19
**foreclose** [4] - 9840:19, 9858:22, 9860:1, 9870:3
**foreclosed** [1] - 9858:25
**forecloses** [1] - 9859:21
**foreclosure** [1] - 9859:24
**foregoing** [1] - 9952:4
**foremost** [1] - 9915:19
**forever** [1] - 9854:11
**forged** [1] - 9914:7
**forget** [1] - 9864:23
**forgotten** [1] - 9950:1
**form** [2] - 9848:24, 9850:16
**forth** [3] - 9846:22, 9935:24, 9937:4
**forward** [5] - 9844:18, 9844:20, 9892:16, 9893:25, 9945:17
**forwarded** [1] - 9909:16
**forwarding** [2] - 9909:11, 9909:13
**fosters** [1] - 9846:20
**four** [2] - 9843:21, 9877:15
**Fourth** [1] - 9926:10
**fourth** [2] - 9910:13, 9926:6
**fraction** [2] - 9890:10, 9890:14
**free** [7] - 9845:17, 9850:4, 9850:25, 9851:14, 9860:5, 9866:13, 9907:9
**front** [2] - 9903:9, 9915:16
**full** [5] - 9853:11, 9858:3, 9867:4, 9923:4, 9952:5
**fun** [1] - 9852:24
**function** [2] - 9918:20, 9918:23
**functionality** [2] - 9845:13, 9920:21
**fundamentally** [1] - 9905:1

**funny** [1] - 9943:11
**future** [1] - 9907:18

# G

**gain** [5] - 9832:8, 9884:12, 9885:5, 9924:9, 9925:6
**gained** [1] - 9900:20
**gains** [5] - 9881:25, 9883:3, 9883:18, 9885:9, 9886:16
**gap** [4] - 9882:7, 9882:9, 9882:10, 9882:13
**gees** [6] - 9859:16, 9874:13, 9874:24, 9875:15, 9880:16, 9924:1
**general** [10] - 9895:22, 9897:8, 9897:9, 9900:6, 9903:1, 9919:9, 9927:13, 9940:19, 9940:23, 9947:10
**generally** [6] - 9856:13, 9860:15, 9867:21, 9868:13, 9907:25, 9918:19
**generate** [2] - 9848:24, 9857:17
**generated** [3] - 9847:16, 9848:8, 9893:19
**generates** [1] - 9848:15
**generating** [1] - 9899:13
**generation** [1] - 9852:18
**Giannandrea's** [1] - 9915:8
**given** [11] - 9837:23, 9838:15, 9840:8, 9845:17, 9848:18, 9848:23, 9859:17, 9886:20, 9899:18, 9925:23, 9933:6
**GM** [1] - 9847:19
**GMS** [13] - 9850:5, 9851:21, 9852:2, 9852:6, 9853:10, 9857:4, 9866:15, 9866:16, 9866:20, 9866:25, 9867:7, 9867:23, 9868:20
**goal** [3] - 9844:6, 9844:8, 9904:2
**gomes** [1] - 9904:11
**Goodrich** [2] - 9831:8,

9831:12
**Google** [145] - 9830:6, 9831:5, 9841:6, 9844:10, 9848:3, 9848:4, 9850:4, 9850:13, 9850:16, 9851:22, 9852:3, 9853:22, 9855:1, 9856:2, 9856:9, 9856:15, 9856:24, 9857:2, 9857:7, 9858:1, 9860:18, 9860:20, 9860:23, 9861:4, 9861:19, 9862:3, 9862:4, 9865:8, 9866:8, 9866:9, 9866:14, 9866:16, 9867:8, 9868:3, 9869:4, 9871:6, 9871:15, 9871:16, 9871:18, 9871:19, 9872:21, 9872:23, 9873:3, 9873:20, 9874:9, 9874:11, 9874:13, 9874:15, 9874:16, 9874:17, 9874:21, 9875:12, 9875:14, 9875:16, 9875:17, 9875:18, 9875:25, 9876:7, 9876:20, 9876:22, 9879:15, 9882:9, 9882:18, 9885:3, 9887:14, 9887:19, 9888:23, 9889:4, 9889:7, 9889:10, 9889:12, 9889:21, 9891:7, 9892:20, 9892:22, 9893:17, 9893:18, 9893:20, 9894:7, 9894:11, 9894:23, 9896:11, 9896:13, 9897:13, 9897:17, 9897:18, 9898:17, 9899:21, 9900:13, 9900:20, 9901:4, 9901:17, 9901:20, 9901:21, 9901:23, 9902:10, 9902:12, 9903:11, 9903:24, 9905:21, 9905:24, 9906:13, 9909:4, 9909:8, 9910:6, 9911:9, 9911:12, 9911:20, 9912:1, 9912:7, 9913:3, 9913:4, 9913:19, 9913:23, 9914:1, 9914:2, 9914:5, 9914:8, 9914:15,

9965

9916:6, 9917:7,
9917:8, 9918:16,
9918:20, 9919:15,
9919:16, 9924:14,
9924:23, 9925:12,
9925:21, 9926:10,
9926:17, 9926:22,
9929:21, 9930:3,
9937:12, 9937:23,
9937:25, 9938:1,
9938:11, 9941:23,
9942:4, 9947:13
**Google's** [20] -
9848:18, 9856:8,
9872:7, 9873:19,
9875:2, 9882:2,
9882:7, 9882:11,
9892:18, 9894:17,
9894:20, 9899:19,
9902:7, 9904:10,
9904:19, 9913:8,
9927:8, 9929:5,
9930:15, 9946:22
**grandkids** [1] - 9898:9
**granted** [1] - 9893:7
**graph** [1] - 9866:2
**great** [7] - 9833:3,
9842:11, 9891:17,
9898:1, 9905:24,
9905:25, 9949:17
**greater** [4] - 9890:1,
9891:13, 9892:5,
9948:22
**green** [4] - 9836:8,
9838:14, 9854:25,
9865:16
**grew** [2] - 9877:6,
9895:14
**grocery** [1] - 9903:8
**ground** [1] - 9908:19
**groups** [2] - 9843:21,
9848:10
**grow** [16] - 9842:17,
9844:10, 9846:4,
9846:5, 9848:4,
9893:20, 9894:4,
9895:22, 9896:8,
9896:10, 9896:15,
9897:12, 9898:14,
9923:25
**growing** [16] -
9842:18, 9846:5,
9846:7, 9847:21,
9847:24, 9848:3,
9877:6, 9893:23,
9894:4, 9894:21,
9896:6, 9896:14,
9896:19, 9897:1,
9899:8, 9900:23
**grows** [1] - 9880:20

**growth** [18] - 9841:11,
9841:12, 9841:17,
9841:18, 9841:22,
9847:10, 9877:1,
9877:8, 9893:19,
9894:2, 9894:19,
9894:21, 9896:7,
9899:11, 9899:17,
9900:21
**guess** [8] - 9864:24,
9877:2, 9894:20,
9918:12, 9925:11,
9933:10, 9948:17,
9948:23
**guru** [1] - 9906:6
**guy** [10] - 9858:8,
9893:4, 9896:4,
9896:5, 9937:5,
9941:16, 9943:1,
9943:11, 9943:12,
9944:14
**guys** [6] - 9843:22,
9843:25, 9849:13,
9889:1, 9904:3,
9923:20

# H

**half** [7] - 9851:21,
9858:9, 9858:10,
9866:7, 9866:21,
9902:3, 9902:6
**hand** [9] - 9867:8,
9872:7, 9888:14,
9888:18, 9889:2,
9905:3, 9906:2,
9906:4, 9908:22
**handed** [5] - 9909:14,
9912:21, 9922:4,
9930:25, 9935:5
**hands** [2] - 9849:24,
9874:10
**hang** [3] - 9924:18,
9925:16, 9949:20
**happy** [6] - 9923:18,
9924:14, 9925:24,
9926:20, 9928:25,
9942:13
**hard** [8] - 9852:22,
9881:8, 9894:2,
9894:12, 9894:16,
9901:6, 9947:4
**harder** [4] - 9888:10,
9888:14, 9888:18,
9907:9
**hardware** [1] - 9842:2
**harm** [3] - 9876:7,
9876:12, 9921:13
**harmed** [1] - 9878:9
**head** [7] - 9889:8,

9889:10, 9919:11,
9930:15, 9930:16,
9941:18
  **head-to-head** [1] -
9941:18
  **headaches** [1] -
9868:5
  **heading** [2] - 9913:2,
9939:14
  **hear** [1] - 9949:15
  **heard** [10] - 9848:17,
9850:18, 9863:6,
9873:19, 9874:3,
9874:5, 9878:4,
9881:17, 9906:5,
9908:20
  **hearsay** [1] - 9922:15
  **heaven** [1] - 9847:21
  **heavily** [2] - 9841:13,
9889:4
  **help** [11] - 9833:3,
9841:8, 9853:15,
9866:24, 9873:13,
9873:15, 9873:16,
9879:2, 9879:11,
9936:5, 9947:24
  **helpful** [2] - 9913:25,
9948:18
  **helping** [2] - 9842:17,
9872:25
  **hereby** [1] - 9952:3
  **hiding** [1] - 9909:16
  **high** [10] - 9846:1,
9851:7, 9851:8,
9851:9, 9853:12,
9854:19, 9876:21,
9877:13, 9901:12,
9931:23
  **high-end** [2] - 9846:1,
9853:12
  **high-level** [2] -
9877:13, 9931:23
  **high-price** [1] - 9851:8
  **higher** [10] - 9855:18,
9856:20, 9887:21,
9901:23, 9901:24,
9904:5, 9904:6,
9924:10
  **higher-quality** [1] -
9856:20
  **highlight** [2] - 9848:7,
9910:12
  **highlighted** [2] -
9900:10, 9933:18
  **Highlights** [1] -
9926:10
  **hill** [4] - 9879:6,
9881:9, 9888:16,
9888:19
  **hinder** [1] - 9876:24

**history** [4] - 9833:15,
9841:16, 9935:22,
9935:24
  **hit** [1] - 9852:23
  **hold** [2] - 9888:2,
9902:7
  **home** [1] - 9850:17
  **Honor** [29] - 9885:16,
9900:10, 9908:4,
9908:11, 9908:15,
9908:23, 9909:7,
9912:18, 9915:10,
9918:2, 9922:3,
9922:6, 9922:8,
9922:19, 9926:4,
9927:2, 9930:23,
9931:17, 9932:8,
9935:3, 9945:12,
9946:1, 9946:6,
9946:7, 9946:11,
9948:1, 9949:13,
9951:2, 9951:6
  **HONORABLE** [1] -
9830:9
  **hope** [1] - 9907:17
  **hoped** [2] - 9892:12,
9925:6
  **hopefully** [2] -
9947:24, 9949:8
  **horizontal** [1] - 9837:7
  **horizontally** [1] -
9837:10
  **hotseat** [5] - 9857:9,
9860:9, 9862:9,
9872:4, 9872:5
  **hours** [2] - 9897:17,
9897:19
  **Huang** [1] - 9831:11
  **huge** [1] - 9905:16
  **hum** [3] - 9864:7,
9864:17, 9935:4
  **hurried** [1] - 9903:17
  **hypothetical** [3] -
9872:18, 9918:25,
9919:5
  **hypothetically** [1] -
9915:22

# I

**icon** [1] - 9865:18
**idea** [13] - 9832:14,
9843:13, 9869:14,
9874:1, 9884:15,
9888:8, 9900:2,
9905:24, 9905:25,
9921:22, 9924:14,
9924:23, 9940:22
**ideas** [1] - 9842:11
**identify** [2] - 9866:24,

9947:20
**Ill** [1] - 9932:25
**IL** [1] - 9830:16
**imagine** [1] - 9917:6
**impact** [15] - 9832:12,
9836:17, 9836:19,
9837:15, 9837:16,
9837:17, 9853:2,
9855:7, 9856:3,
9859:8, 9859:12,
9859:22, 9878:11,
9879:19, 9882:1
**impacted** [3] -
9884:20, 9892:20,
9904:20
**impacts** [1] - 9876:7
**impair** [4] - 9877:11,
9877:23, 9886:1,
9892:17
**impaired** [1] - 9858:25
**impede** [2] - 9840:20,
9879:9
**implementation** [1] -
9833:14
**implemented** [2] -
9936:22, 9939:25
**implementing** [3] -
9839:2, 9905:16,
9929:12
**implicate** [1] - 9949:11
**implicitly** [1] - 9853:10
**important** [13] -
9842:14, 9845:3,
9852:13, 9862:18,
9864:13, 9873:1,
9880:17, 9893:5,
9895:23, 9904:25,
9907:5, 9919:13,
9923:8
**importantly** [5] -
9869:10, 9873:6,
9876:14, 9879:12,
9906:24
**impose** [1] - 9921:14
**imposed** [1] - 9921:11
**improve** [3] - 9893:24,
9898:17, 9899:20
**improved** [1] -
9889:17
**improvement** [3] -
9884:10, 9885:9,
9886:12
**improvements** [1] -
9882:25
**improves** [1] -
9887:18
**improving** [1] -
9892:23
**IN** [1] - 9830:1
**incentive** [16] -

9841:6, 9846:4,
9855:13, 9856:10,
9856:16, 9858:8,
9876:23, 9876:24,
9877:11, 9888:9,
9890:7, 9892:18,
9893:14, 9895:1,
9895:4, 9895:8
**incentives** [10] -
9879:9, 9886:1,
9886:3, 9892:10,
9894:21, 9896:2,
9896:18, 9898:17,
9906:23, 9907:14
**incentivizes** [3] -
9846:10, 9873:9,
9873:10
**include** [4] - 9863:19,
9902:8
**included** [1] - 9931:23
**includes** [2] - 9933:12,
9934:2
**including** [6] -
9840:23, 9844:4,
9852:3, 9855:7,
9856:3, 9909:8
**inclusion** [1] - 9870:6
**incorrect** [1] - 9917:10
**increase** [11] -
9834:23, 9835:17,
9835:21, 9878:15,
9882:1, 9885:10,
9886:9, 9887:4,
9904:14, 9904:15,
9919:3
**increased** [3] -
9889:25, 9891:12,
9893:16
**increases** [3] -
9884:14, 9884:20,
9887:19
**increasing** [1] -
9887:14
**incremental** [15] -
9856:24, 9857:22,
9872:24, 9887:8,
9887:13, 9887:17,
9887:20, 9887:21,
9887:22, 9889:7,
9889:12, 9889:20,
9890:9, 9930:21,
9938:5
**indeed** [2] - 9869:11,
9892:8
**Indeed** [1] - 9841:5
**independent** [4] -
9839:6, 9859:4,
9859:10, 9876:3
**INDEX** [1] - 9953:1
**indicates** [2] - 9891:7,

9936:11
**Indicating** [1] -
9864:25
**indication** [2] -
9891:8, 9942:1
**indirect** [1] - 9844:19
**indirectly** [1] -
9855:22
**individual** [1] - 9928:9
**industry** [2] - 9880:16,
9896:17
**inefficient** [1] -
9940:20
**infer** [2] - 9899:14,
9938:13
**inference** [1] -
9917:10
**inflated** [1] - 9836:22
**inform** [1] - 9881:13
**information** [3] -
9891:23, 9892:15,
9921:21
**initial** [1] - 9879:19
**initiative** [1] - 9902:10
**innovations** [1] -
9900:2
**input** [1] - 9916:12
**install** [8] - 9857:11,
9860:5, 9868:19,
9868:25, 9869:12,
9871:19, 9902:20,
9904:3
**installation** [15] -
9850:16, 9857:13,
9857:17, 9860:4,
9860:12, 9871:6,
9873:22, 9876:18,
9888:24, 9889:3,
9890:14, 9905:20,
9933:4, 9933:18,
9934:6
**installed** [5] - 9860:25,
9869:1, 9873:20,
9873:21, 9890:13
**installed-base** [2] -
9873:20, 9873:21
**installs** [1] - 9933:5
**instances** [5] -
9834:17, 9862:19,
9880:22, 9884:19,
9949:13
**instead** [5] - 9861:11,
9866:13, 9897:15,
9897:16, 9901:13
**integrated** [1] - 9856:7
**integration** [1] -
9913:15
**intended** [1] - 9839:20
**intensive** [5] -
9848:18, 9849:1,

9849:2, 9899:16,
9899:18
**inter** [2] - 9846:14,
9847:3
**inter-platform** [2] -
9846:14, 9847:3
**intercept** [1] - 9915:18
**interest** [5] - 9858:15,
9889:3, 9926:23,
9929:11, 9938:20
**interested** [1] - 9906:3
**interesting** [2] -
9853:7, 9867:5
**interface** [2] -
9848:15, 9928:18
**internal** [4] - 9931:9,
9931:14, 9948:24,
9950:22
**Internet** [1] - 9890:15
**interpolate** [1] -
9837:14
**interpolated** [1] -
9836:15
**interpreting** [1] -
9912:5
**interrupt** [1] - 9870:4
**intra** [1] - 9846:14
**introduce** [1] -
9917:21
**invest** [23] - 9846:11,
9879:9, 9886:1,
9886:4, 9887:24,
9887:25, 9888:9,
9888:11, 9888:20,
9889:1, 9889:4,
9889:21, 9890:7,
9891:6, 9891:16,
9892:18, 9893:14,
9893:24, 9897:16,
9902:13, 9904:12,
9906:23
**invested** [3] - 9888:24,
9889:12, 9900:14
**investing** [4] -
9886:17, 9894:12,
9900:18
**investment** [21] -
9886:9, 9886:10,
9886:16, 9887:4,
9887:7, 9887:9,
9888:5, 9888:6,
9891:13, 9892:5,
9892:10, 9894:18,
9894:20, 9895:23,
9896:2, 9896:18,
9902:7, 9905:13,
9905:16, 9907:13
**investments** [4] -
9892:20, 9893:17,
9893:18, 9899:20

9967

**involved** [4] - 9842:11, 9844:11, 9937:3, 9939:1
**involves** [1] - 9905:2
**IOS** [1] - 9846:23
**iOS** [7] - 9846:25, 9847:2, 9847:3, 9849:8, 9849:11, 9849:14, 9856:15
**iPhone** [1] - 9917:22
**iPhones** [1] - 9911:1
**iPods** [1] - 9911:1
**ISA** [6] - 9916:5, 9917:9, 9918:14, 9918:17, 9919:1, 9929:15
**Israel's** [2] - 9927:14, 9927:15
**issue** [4] - 9866:22, 9878:5, 9947:23, 9948:13
**issues** [4] - 9843:6, 9948:3, 9949:7
**it'll** [1] - 9865:2
**item** [1] - 9850:3
**items** [2] - 9904:8, 9947:9
**itself** [4] - 9890:15, 9901:19, 9926:22, 9932:7

## J

**JANICE** [1] - 9952:3
**Janice** [2] - 9831:15, 9952:11
**Janin** [3] - 9942:22, 9943:20, 9943:22
**JANIN** [1] - 9943:22
**janin** [2] - 9942:23, 9942:24
**Janin's** [6] - 9942:24, 9943:24, 9944:8, 9944:11, 9944:13, 9945:8
**January** [1] - 9882:12
**Java** [1] - 9842:25
**John** [2] - 9831:5, 9915:8
**jon.sallet@coag.gov** [1] - 9830:24
**Jonathan** [1] - 9830:19
**Jr** [1] - 9831:1
**jschmidtlein@wc.com** [1] - 9831:7
**JUDGE** [1] - 9830:10
**judicial** [1] - 9939:24
**Judicial** [1] - 9830:22
**jump** [5] - 9835:22,

9878:6, 9884:25, 9885:2, 9885:15
**jungle** [2] - 9843:5, 9849:10
**JUSTICE** [1] - 9830:12
**Justice** [1] - 9830:15
**justified** [1] - 9868:10
**justify** [1] - 9872:25

## K

**keep** [3] - 9889:15, 9894:16, 9924:10
**keeping** [4] - 9836:11, 9838:25, 9869:14, 9869:19
**keeps** [1] - 9910:15
**Kenneth** [1] - 9830:11
**kenneth.dintzer2@usdoj.gov** [1] - 9830:14
**kept** [1] - 9832:15
**kevin** [1] - 9953:3
**KEVIN** [1] - 9832:4
**key** [4] - 9860:3, 9894:3, 9898:24, 9906:21
**keys** [1] - 9852:23
**kind** [56] - 9832:12, 9832:19, 9833:18, 9837:1, 9841:20, 9841:25, 9842:1, 9842:7, 9842:13, 9843:5, 9843:13, 9843:16, 9844:19, 9845:22, 9848:17, 9850:20, 9851:25, 9852:1, 9852:9, 9852:22, 9865:4, 9865:17, 9865:19, 9866:17, 9868:3, 9869:18, 9872:16, 9873:8, 9873:16, 9882:25, 9883:21, 9886:7, 9887:15, 9888:8, 9888:22, 9894:13, 9896:16, 9899:8, 9901:7, 9901:16, 9902:6, 9902:17, 9902:23, 9903:25, 9904:12, 9904:17, 9914:20, 9925:9, 9939:21, 9941:17, 9941:25, 9943:13, 9944:8, 9947:15, 9949:3
**kinds** [3] - 9898:23, 9899:24, 9914:18
**knowledge** [1] - 9938:23
**known** [1] - 9888:12

**knows** [4] - 9898:6, 9939:1, 9943:2, 9944:6

## L

**lack** [1] - 9886:20
**landmark** [1] - 9923:11
**lane** [1] - 9928:19
**language** [2] - 9912:16, 9913:6
**large** [8] - 9860:12, 9890:10, 9890:13, 9896:17, 9901:18, 9901:20, 9901:22, 9902:9
**largely** [4] - 9841:2, 9854:24, 9900:17, 9948:8
**larger** [1] - 9880:4
**LaSalle** [1] - 9830:15
**last** [4] - 9906:16, 9922:12, 9926:12
**late** [2] - 9922:12
**launched** [2] - 9868:15, 9889:5
**launcher** [15] - 9868:15, 9868:16, 9868:22, 9869:8, 9869:11, 9869:12, 9869:21, 9869:24, 9870:6, 9870:9, 9870:13, 9870:14, 9870:16, 9870:19, 9870:22
**launchers** [2] - 9869:10, 9869:23
**LAW** [1] - 9830:20
**law** [2] - 9896:21
**layers** [1] - 9844:25
**layman** [1] - 9844:25
**lead** [6] - 9876:11, 9876:25, 9881:6, 9902:12, 9907:3, 9907:18
**leading** [1] - 9892:5
**learned** [1] - 9906:7
**learning** [1] - 9880:15
**learning-by-doing** [1] - 9880:15
**least** [7] - 9834:1, 9849:5, 9850:24, 9872:24, 9877:2, 9882:23, 9950:12
**leave** [5] - 9875:15, 9875:16, 9894:23, 9947:2, 9949:6
**leaving** [2] - 9874:13, 9889:15
**led** [4] - 9882:1,

9884:10, 9884:14, 9938:14
**left** [7] - 9862:13, 9864:24, 9871:14, 9885:17, 9901:11, 9902:3, 9926:12
**legacy** [1] - 9875:8
**legal** [2] - 9916:10, 9923:21
**Leslie** [1] - 9909:12
**less** [25] - 9848:20, 9852:5, 9852:8, 9859:13, 9863:12, 9876:22, 9876:23, 9877:1, 9879:22, 9886:15, 9888:11, 9888:20, 9889:13, 9897:1, 9898:21, 9902:5, 9905:4, 9907:24, 9907:25, 9941:7
**letter** [3] - 9856:5, 9892:17, 9935:8
**level** [6] - 9854:19, 9877:13, 9902:3, 9902:4, 9902:5, 9931:23
**LG** [1] - 9846:19
**license** [12] - 9845:17, 9850:4, 9850:13, 9850:14, 9850:23, 9850:25, 9866:13, 9866:14, 9868:20, 9906:9, 9935:13, 9936:10
**licensing** [1] - 9935:20
**life** [2] - 9915:13, 9939:2
**light** [1] - 9950:6
**likely** [5] - 9876:19, 9892:24, 9893:11, 9898:22, 9919:3
**limit** [1] - 9860:15
**limitation** [2] - 9832:23, 9868:14
**limitations** [1] - 9922:17
**limited** [2] - 9832:17, 9897:10
**line** [10] - 9834:22, 9883:25, 9884:2, 9899:6, 9902:2, 9910:13, 9913:7, 9940:20, 9945:13
**lines** [6] - 9834:16, 9883:23, 9899:4, 9899:5, 9911:14, 9912:3
**Linux** [1] - 9842:25
**list** [3] - 9848:10,

9899:23, 9900:1
**listed** [1] - 9859:6
**listening** [1] - 9947:7
**literally** [1] - 9930:12
**litigation** [1] - 9866:11
**lives** [1] - 9923:4
**LLC** [1] - 9830:6
**LLP** [2] - 9831:1,
9831:5
**location** [2] - 9920:24,
9921:1
**locations** [2] -
9911:14, 9912:2
**locked** [3] - 9943:3,
9943:7
**logic** [3] - 9872:16,
9874:12, 9875:15
**logical** [1] - 9942:19
**look** [56] - 9832:12,
9832:24, 9834:3,
9834:4, 9834:8,
9834:9, 9834:11,
9835:2, 9836:14,
9840:3, 9842:23,
9859:24, 9861:16,
9861:17, 9863:25,
9865:11, 9865:13,
9865:15, 9868:18,
9880:18, 9880:22,
9880:25, 9881:11,
9881:16, 9882:22,
9883:17, 9884:19,
9885:3, 9885:7,
9886:18, 9886:19,
9887:8, 9888:4,
9888:25, 9890:7,
9891:14, 9897:18,
9898:5, 9899:4,
9899:23, 9905:11,
9906:12, 9906:20,
9909:17, 9914:17,
9914:18, 9914:21,
9931:6, 9931:23,
9937:20, 9938:8,
9945:17, 9947:2,
9948:17
**looked** [4] - 9840:19,
9892:19, 9893:15,
9944:1
**looking** [11] - 9833:15,
9834:6, 9837:23,
9883:20, 9884:11,
9884:23, 9897:19,
9901:1, 9934:18,
9938:20, 9947:7
**looks** [3] - 9931:9,
9931:13, 9931:14
**lose** [5] - 9874:12,
9875:16, 9893:1,
9906:9, 9941:19

**loses** [1] - 9874:16
**lost** [1] - 9900:20
**low** [14] - 9845:25,
9848:14, 9852:5,
9852:10, 9852:18,
9853:7, 9853:9,
9853:10, 9853:11,
9901:24, 9902:7,
9927:22, 9942:3
**low-end** [8] - 9845:25,
9852:5, 9852:10,
9852:18, 9853:7,
9853:9, 9853:11
**low-price** [1] -
9848:14
**lower** [5] - 9852:7,
9855:17, 9862:13,
9872:7, 9876:19
**lowering** [1] - 9855:15
**lowers** [1] - 9874:17
**lumping** [1] - 9877:19

## M

**Mac** [3] - 9842:7,
9854:12, 9944:23
**MADA** [51] - 9840:4,
9845:15, 9845:19,
9849:17, 9849:18,
9853:2, 9853:5,
9854:6, 9854:23,
9857:1, 9857:3,
9857:7, 9859:20,
9859:25, 9860:3,
9860:5, 9860:10,
9860:25, 9861:3,
9862:2, 9862:5,
9865:6, 9865:9,
9866:3, 9866:12,
9866:17, 9867:3,
9867:7, 9867:10,
9868:8, 9868:18,
9869:5, 9869:6,
9869:7, 9869:8,
9869:15, 9869:22,
9869:25, 9870:6,
9870:8, 9870:12,
9870:14, 9870:19,
9870:22, 9871:8,
9872:3, 9876:10
**magnitude** [1] -
9885:13
**Maine** [1] - 9831:6
**maintain** [1] - 9843:16
**major** [2] - 9878:19,
9895:7
**manage** [2] - 9842:3,
9843:14
**maneuvering** [1] -
9927:18

**manna** [1] - 9847:21
**manner** [2] - 9876:7,
9936:5
**March** [1] - 9924:6
**margin** [4] - 9858:4,
9895:9, 9899:16
**marginal** [1] - 9855:15
**Mark** [1] - 9927:14
**marked** [1] - 9922:4
**market** [32] - 9835:25,
9847:17, 9847:18,
9847:20, 9851:23,
9852:17, 9878:7,
9879:13, 9881:11,
9881:13, 9884:21,
9889:24, 9890:1,
9891:11, 9895:23,
9896:6, 9896:9,
9897:1, 9897:2,
9897:12, 9903:21,
9903:22, 9906:12,
9914:22, 9917:5,
9921:8, 9921:11,
9923:25, 9947:11,
9949:11
**marketing** [10] -
9902:18, 9902:19,
9902:22, 9902:23,
9903:1, 9903:2,
9903:12, 9903:13,
9904:9, 9904:15
**marketplace** [12] -
9832:15, 9844:23,
9851:3, 9851:9,
9879:14, 9898:14,
9899:13, 9907:8,
9907:25, 9914:19,
9914:20, 9940:6
**Marshall's** [1] -
9896:21
**marshall's** [1] -
9896:21
**match** [2] - 9850:2,
9941:18
**material** [1] - 9882:1
**math** [1] - 9861:12
**matter** [3] - 9838:13,
9845:13, 9860:17
**matters** [1] - 9898:2
**mature** [3] - 9841:16,
9841:20, 9847:18
**mean** [30] - 9846:8,
9847:8, 9848:21,
9849:19, 9852:20,
9855:9, 9863:8,
9882:19, 9882:22,
9884:5, 9895:3,
9895:11, 9895:12,
9895:18, 9897:3,
9911:22, 9912:14,

9920:22, 9921:16,
9924:1, 9928:12,
9930:9, 9937:2,
9937:3, 9937:11,
9938:21, 9939:1,
9942:18, 9947:2,
9947:13
**means** [13] - 9845:2,
9846:9, 9846:10,
9882:8, 9902:25,
9905:3, 9905:4,
9913:16, 9915:17,
9936:16, 9936:22,
9940:24, 9940:25
**measure** [4] - 9832:12,
9836:16, 9882:23,
9887:6
**measured** [4] -
9872:10, 9882:20,
9882:23, 9901:2
**measuring** [1] -
9887:5
**mechanisms** [1] -
9840:14
**meets** [1] - 9914:22
**MEHTA** [1] - 9830:9
**members** [1] - 9848:8
**mention** [1] - 9859:5
**mentioned** [4] -
9846:15, 9846:17,
9938:25, 9942:21
**mess** [1] - 9943:2
**message** [1] - 9927:13
**met** [2] - 9917:5,
9921:8
**method** [3] - 9921:7,
9940:11, 9940:14
**methodology** [3] -
9838:15, 9859:3,
9876:1
**Michael** [1] - 9831:8
**Microsoft** [27] -
9854:12, 9861:1,
9861:13, 9862:4,
9862:7, 9867:5,
9867:6, 9871:10,
9881:18, 9883:2,
9883:3, 9883:4,
9883:18, 9883:19,
9889:2, 9890:15,
9891:5, 9891:13,
9891:14, 9894:7,
9894:9, 9894:14,
9905:15, 9905:23,
9905:25, 9923:7,
9925:23
**Microsoft's** [4] -
9881:25, 9892:4,
9894:8, 9930:16
**middle** [1] - 9865:2

**might** [31] - 9833:7, 9835:3, 9836:21, 9837:22, 9841:21, 9848:16, 9848:17, 9858:5, 9858:11, 9859:16, 9879:21, 9880:16, 9888:14, 9888:16, 9888:18, 9895:25, 9903:2, 9904:1, 9904:6, 9908:23, 9917:25, 9921:1, 9921:20, 9921:22, 9936:7, 9938:14, 9938:25, 9949:1, 9949:3, 9949:4
**miles** [1] - 9905:7
**million** [2] - 9924:8, 9924:10
**mind** [11] - 9858:14, 9862:25, 9878:13, 9902:25, 9903:12, 9903:17, 9903:22, 9904:8, 9905:25, 9907:22, 9938:6
**minimal** [1] - 9927:19
**minus** [2] - 9864:22, 9864:24
**minute** [1] - 9861:19
**minutes** [1] - 9908:12
**mischaracterizing** [1] - 9943:14
**miss** [1] - 9949:24
**mix** [1] - 9949:12
**Mobile** [3] - 9842:25, 9843:1, 9850:23
**mobile** [34] - 9841:2, 9841:3, 9841:11, 9841:12, 9842:23, 9847:9, 9847:10, 9847:21, 9848:3, 9848:4, 9848:5, 9849:15, 9877:6, 9877:8, 9879:23, 9883:8, 9883:10, 9883:14, 9893:22, 9893:23, 9893:25, 9894:4, 9894:17, 9894:19, 9894:22, 9895:7, 9895:13, 9895:14, 9895:19, 9897:10, 9900:23
**mode** [2] - 9917:15, 9917:19
**model** [5] - 9842:1, 9843:19, 9844:13, 9876:7, 9897:24
**models** [1] - 9841:25
**modest** [3] - 9839:1, 9839:2, 9895:4
**modestly** [1] - 9907:2

**moment** [1] - 9861:1
**money** [9] - 9849:22, 9849:24, 9869:1, 9873:7, 9875:4, 9892:1, 9893:13, 9903:7, 9903:12
**monopolist** [2] - 9914:23, 9915:2
**monopoly** [1] - 9897:3
**months** [2] - 9834:20, 9923:14
**morning** [4] - 9945:17, 9948:3, 9949:19, 9951:5
**most** [11] - 9833:25, 9849:13, 9857:15, 9860:13, 9876:19, 9878:15, 9894:18, 9895:8, 9895:16, 9906:24, 9907:5
**mostly** [7] - 9849:12, 9851:7, 9855:1, 9855:4, 9894:10, 9899:25, 9926:20
**motivated** [1] - 9901:18
**motivation** [1] - 9848:19
**Motorola** [2] - 9845:21, 9845:22
**mouth** [1] - 9892:2
**move** [15] - 9838:13, 9838:14, 9844:18, 9845:22, 9845:25, 9846:21, 9846:24, 9892:16, 9902:2, 9902:3, 9902:4, 9903:7, 9907:1, 9908:4, 9944:6
**moved** [1] - 9945:22
**movement** [1] - 9928:3
**moves** [1] - 9902:5
**moving** [5] - 9844:20, 9845:20, 9846:1, 9853:13, 9873:25
**Mozilla** [3] - 9922:8, 9922:25, 9923:18
**MR** [80] - 9832:6, 9838:3, 9839:23, 9849:16, 9853:1, 9858:20, 9861:22, 9865:7, 9868:7, 9871:3, 9873:18, 9875:22, 9883:16, 9885:16, 9885:23, 9898:16, 9908:3, 9908:11, 9908:15, 9908:17, 9908:23, 9908:24, 9912:18,

9912:20, 9915:10, 9915:12, 9915:15, 9918:2, 9918:4, 9922:3, 9922:11, 9922:19, 9922:20, 9924:16, 9924:21, 9924:22, 9925:4, 9925:5, 9925:14, 9925:25, 9926:4, 9926:7, 9926:8, 9926:9, 9927:2, 9927:3, 9930:23, 9930:24, 9931:2, 9931:3, 9931:4, 9931:17, 9931:18, 9931:21, 9932:8, 9932:9, 9935:3, 9935:5, 9935:7, 9945:12, 9945:22, 9946:1, 9946:5, 9946:7, 9946:8, 9946:11, 9946:13, 9946:15, 9946:19, 9948:1, 9948:7, 9948:11, 9948:15, 9949:9, 9949:22, 9950:3, 9950:7, 9950:14, 9951:2, 9951:6
**msommer@wsgr. com** [1] - 9831:11
**multiple** [1] - 9852:23
**MURPHY** [1] - 9832:4
**Murphy** [14] - 9832:7, 9835:24, 9839:24, 9858:21, 9875:23, 9876:6, 9885:24, 9900:7, 9908:3, 9908:6, 9908:18, 9945:16, 9950:24, 9953:3
**Murphy's** [1] - 9946:24
**must** [1] - 9866:21

# N

**N.W** [1] - 9952:12
**natural** [1] - 9852:1
**nature** [4] - 9845:7, 9847:20, 9950:13, 9950:14
**nearly** [6] - 9835:3, 9865:25, 9872:11, 9885:13, 9889:4, 9891:6
**necessarily** [3] - 9897:5, 9905:5, 9914:21
**necessary** [1] - 9950:12

**need** [17] - 9833:5, 9836:12, 9843:8, 9889:14, 9896:8, 9896:10, 9897:21, 9897:22, 9897:23, 9945:10, 9946:2, 9950:5, 9950:10, 9950:11, 9950:12, 9950:19
**negotiated** [1] - 9914:10
**negotiating** [2] - 9938:8, 9938:21
**negotiations** [5] - 9913:21, 9913:22, 9930:6, 9937:4, 9939:2
**net** [2] - 9868:4, 9913:8
**neutral** [2] - 9832:16, 9887:15
**never** [3] - 9854:14, 9917:4, 9928:21
**New** [3] - 9831:3, 9831:10, 9831:13
**new** [9] - 9835:7, 9841:11, 9843:15, 9850:20, 9850:21, 9905:22, 9939:13, 9944:12, 9945:13
**next** [15] - 9832:7, 9834:12, 9842:20, 9843:18, 9848:9, 9856:15, 9858:21, 9861:23, 9882:3, 9900:7, 9911:6, 9913:7, 9913:14, 9933:21, 9935:14
**nice** [1] - 9842:9
**night** [2] - 9922:12, 9941:19
**nobody** [6] - 9867:2, 9876:15, 9939:24, 9939:25, 9944:14
**non** [2] - 9911:12, 9933:11
**non-Apple** [1] - 9933:11
**non-Google** [1] - 9911:12
**nonexistent** [1] - 9927:21
**note** [1] - 9933:17
**notes** [2] - 9947:22, 9952:5
**nothing** [4] - 9835:22, 9946:5, 9946:7, 9946:8
**notice** [1] - 9884:4
**November** [1] - 9952:7
**november** [1] - 9830:5
**number** [22] - 9835:18,

9835:20, 9836:18,
9836:21, 9837:1,
9837:18, 9838:8,
9838:19, 9838:21,
9842:24, 9859:5,
9877:25, 9890:10,
9899:18, 9901:8,
9901:9, 9906:12,
9910:1, 9910:2,
9912:24, 9926:8,
9946:23
   **number's** [1] -
9890:11
   **numbers** [16] - 9837:2,
9871:23, 9872:14,
9901:12, 9947:17,
9948:24, 9948:25,
9950:8, 9950:9,
9950:11, 9950:13,
9950:14, 9950:15,
9950:22
   **numerous** [1] -
9862:11
   **NW** [2] - 9830:12,
9831:17
   **NY** [3] - 9831:3,
9831:10, 9831:13

## O

   **object** [1] - 9922:13
   **objection** [6] -
9924:16, 9924:18,
9925:14, 9925:20,
9926:7, 9945:23
   **objections** [1] -
9925:17
   **obligated** [1] -
9913:19
   **obligation** [12] -
9910:7, 9910:17,
9911:8, 9911:20,
9911:25, 9912:12,
9913:3, 9913:11,
9914:1, 9914:14,
9914:24
   **observation** [2] -
9947:22, 9947:24
   **observed** [1] - 9847:5
   **obviously** [11] -
9836:5, 9847:9,
9849:5, 9849:7,
9850:9, 9878:23,
9908:18, 9940:5,
9948:11, 9949:10,
9950:10
   **occurred** [1] - 9893:17
   **OEM** [16] - 9850:9,
9850:11, 9853:25,
9866:15, 9866:16,

9869:12, 9869:15,
9869:17, 9869:20,
9870:7, 9870:8,
9870:12, 9871:8,
9871:9, 9871:17,
9939:10
   **OEM's** [2] - 9846:8,
9868:9
   **OEMs** [13] - 9843:22,
9845:4, 9849:6,
9853:24, 9854:22,
9855:1, 9855:2,
9856:21, 9856:22,
9860:13, 9873:13,
9876:22, 9902:20
   **OF** [5] - 9830:1,
9830:9, 9830:12,
9830:20, 9952:1
   **off-device** [1] - 9849:1
   **offer** [9] - 9874:21,
9874:22, 9874:24,
9874:25, 9875:2,
9875:19, 9922:8,
9926:5, 9931:17
   **offered** [1] - 9874:22
   **offering** [1] - 9940:18
   **Official** [2] - 9831:16,
9952:11
   **OFFICIAL** [1] - 9952:1
   **often** [2] - 9875:15,
9912:9
   **oftentimes** [2] -
9949:10, 9949:11
   **omni** [1] - 9927:10
   **on-device** [1] - 9849:2
   **once** [4] - 9898:24,
9901:22, 9902:8
   **one** [96] - 9834:17,
9834:18, 9840:14,
9840:17, 9841:4,
9841:7, 9843:6,
9843:9, 9844:10,
9845:15, 9846:21,
9848:11, 9849:7,
9849:20, 9850:2,
9850:3, 9851:6,
9851:14, 9851:21,
9852:8, 9854:13,
9855:17, 9855:25,
9856:6, 9856:16,
9857:2, 9859:13,
9861:4, 9862:20,
9863:3, 9865:10,
9865:21, 9865:22,
9866:5, 9866:19,
9866:21, 9867:8,
9867:24, 9868:3,
9868:13, 9873:23,
9873:24, 9876:12,
9877:22, 9877:25,

9879:7, 9881:16,
9882:21, 9885:11,
9886:8, 9890:10,
9891:14, 9892:24,
9893:9, 9896:2,
9896:18, 9896:19,
9896:25, 9900:16,
9901:6, 9901:13,
9902:18, 9903:11,
9906:2, 9909:24,
9911:7, 9913:2,
9914:24, 9916:25,
9917:1, 9917:3,
9917:4, 9921:8,
9927:19, 9928:11,
9929:20, 9931:14,
9935:1, 9936:8,
9937:20, 9940:18,
9941:8, 9941:12,
9941:19, 9942:14,
9943:12, 9946:22,
9947:4, 9947:5,
9947:21, 9949:24
   **one's** [1] - 9896:19
   **one-half** [1] - 9851:21
   **one-time** [1] - 9928:11
   **one-way** [1] - 9896:25
   **ones** [9] - 9843:9,
9849:10, 9860:18,
9899:15, 9901:10,
9921:10, 9933:19,
9944:20, 9946:21
   **online** [2] - 9895:14,
9895:15
   **open** [14] - 9842:6,
9842:8, 9842:10,
9844:24, 9845:1,
9845:2, 9845:6,
9850:6, 9854:11,
9854:12, 9864:2,
9865:22, 9921:2,
9950:21
   **opened** [1] - 9920:16
   **opening** [2] - 9927:4,
9927:8
   **operate** [1] - 9886:7
   **operating** [7] -
9844:25, 9845:23,
9850:21, 9850:22,
9852:6, 9853:8
   **Opinion** [1] - 9885:18
   **opinion** [9] - 9839:24,
9858:22, 9860:11,
9877:10, 9877:14,
9877:22, 9885:25,
9906:17, 9940:18
   **opinions** [3] -
9832:10, 9840:2,
9881:13
   **opportunistic** [2] -

9858:6, 9858:19
   **opportunities** [1] -
9860:9
   **opportunity** [8] -
9881:10, 9894:19,
9895:22, 9919:4,
9923:17, 9923:21,
9926:14, 9933:6
   **opposed** [3] - 9849:2,
9919:15, 9941:14
   **option** [13] - 9910:7,
9910:16, 9911:8,
9911:19, 9911:24,
9912:12, 9913:11,
9914:1, 9914:14,
9914:24, 9916:8,
9921:1, 9934:22
   **options** [4] - 9908:20,
9922:2, 9942:8,
9942:10
   **oranges** [2] - 9839:19,
9839:20
   **order** [2] - 9885:13,
9891:25
   **originally** [1] -
9867:21
   **OS** [4] - 9850:10,
9851:14, 9851:15,
9851:23
   **otherwise** [6] -
9874:19, 9875:21,
9893:2, 9894:1,
9934:20, 9949:5
   **ought** [2] - 9884:8,
9950:23
   **out-investing** [1] -
9900:18
   **outcomes** [1] -
9879:14
   **output** [3] - 9840:11,
9855:20, 9895:1
   **outside** [5] - 9895:5,
9895:10, 9895:21,
9898:3, 9928:14
   **overall** [3] - 9847:7,
9884:21, 9924:9
   **overnight** [2] -
9945:19, 9950:19
   **overpaying** [1] -
9872:22
   **overview** [2] -
9840:24, 9931:23
   **own** [4] - 9847:22,
9861:4, 9881:20,
9894:10

## P

   **p.m** [3] - 9830:6,
9885:22

9971

**package** [5] - 9852:3, 9852:7, 9853:11, 9861:10
**page** [12] - 9843:18, 9863:16, 9863:18, 9864:3, 9910:1, 9920:5, 9922:21, 9922:22, 9924:4, 9932:10, 9935:14, 9936:25
**pages** [1] - 9931:15
**paid** [6] - 9857:20, 9875:11, 9875:12, 9887:11, 9913:17, 9939:9
**PaLM** [1] - 9843:1
**pan** [1] - 9892:11
**paper** [1] - 9897:15
**paragraph** [5] - 9910:20, 9910:23, 9911:12, 9923:3, 9923:5
**part** [29] - 9836:23, 9841:8, 9841:12, 9841:16, 9841:18, 9842:15, 9842:19, 9845:1, 9845:10, 9845:11, 9846:3, 9848:1, 9848:3, 9868:12, 9893:5, 9893:9, 9896:22, 9896:23, 9898:12, 9906:10, 9913:21, 9917:9, 9919:14, 9920:11, 9933:10, 9940:16, 9948:12, 9949:12
**participants** [4] - 9843:8, 9843:21, 9854:4, 9941:5
**participate** [1] - 9914:24
**particular** [3] - 9840:11, 9851:3, 9947:10
**particularly** [8] - 9841:11, 9844:14, 9893:23, 9894:22, 9895:4, 9895:7, 9897:10, 9928:1
**parties** [4] - 9892:12, 9927:5, 9949:12, 9949:15
**partly** [1] - 9855:20
**partner** [2] - 9905:17, 9937:21
**partner's** [1] - 9929:6
**partners** [2] - 9846:11, 9929:6
**parts** [9] - 9832:15,

9843:12, 9873:25, 9876:12, 9891:19, 9904:18, 9915:9, 9927:16, 9943:8
**pass** [1] - 9855:16
**past** [4] - 9879:22, 9946:21, 9950:8, 9950:16
**Patterson** [1] - 9831:1
**Pause** [1] - 9908:14
**pay** [17] - 9851:15, 9858:8, 9867:22, 9867:23, 9871:17, 9871:18, 9874:15, 9874:16, 9874:17, 9876:20, 9898:21, 9917:11, 9917:13, 9924:2, 9937:21, 9938:6, 9938:10
**paying** [8] - 9853:10, 9857:22, 9857:23, 9857:24, 9872:8, 9873:3, 9873:21, 9930:18
**payment** [4] - 9855:10, 9855:21, 9867:14, 9873:4
**payments** [32] - 9846:7, 9855:7, 9856:21, 9858:3, 9873:2, 9873:8, 9873:12, 9873:14, 9873:16, 9873:19, 9874:1, 9874:2, 9874:3, 9874:4, 9874:10, 9874:11, 9874:12, 9874:16, 9874:17, 9874:19, 9874:20, 9874:22, 9874:23, 9874:25, 9875:7, 9875:13, 9875:14, 9875:16, 9875:17, 9875:19, 9875:20, 9876:17
**pays** [2] - 9873:8, 9917:7
**PC** [3] - 9923:12, 9933:13, 9934:3
**PCs** [1] - 9890:14
**pencil** [1] - 9897:15
**people** [79] - 9833:21, 9833:23, 9844:3, 9844:5, 9845:2, 9846:21, 9848:6, 9849:2, 9850:24, 9851:1, 9852:14, 9853:6, 9853:13, 9854:2, 9854:23, 9855:12, 9855:13, 9855:22, 9857:12,

9861:6, 9861:7, 9861:21, 9866:5, 9866:6, 9866:20, 9866:22, 9867:13, 9869:7, 9873:4, 9875:15, 9876:12, 9880:19, 9880:22, 9880:25, 9881:10, 9889:17, 9890:17, 9891:17, 9895:13, 9895:18, 9897:2, 9897:14, 9897:15, 9902:20, 9903:15, 9903:21, 9905:20, 9907:12, 9912:9, 9915:1, 9922:7, 9925:23, 9936:2, 9938:7, 9941:7, 9941:21, 9941:23, 9942:1, 9942:4, 9942:6, 9942:7, 9942:9, 9942:11, 9942:14, 9942:16, 9942:19, 9942:20, 9943:3, 9943:6, 9943:24, 9944:3, 9944:13, 9944:17, 9944:20, 9944:25, 9945:4, 9945:8
**people's** [1] - 9874:10
**per** [12] - 9847:12, 9855:25, 9862:19, 9886:9, 9886:12, 9887:8, 9887:21, 9899:9, 9899:14, 9899:17, 9904:14, 9924:8
**per-user** [1] - 9886:9
**percent** [28] - 9836:4, 9837:3, 9837:19, 9838:20, 9838:21, 9838:23, 9838:24, 9839:4, 9851:11, 9859:13, 9859:14, 9878:15, 9878:17, 9881:5, 9881:22, 9884:13, 9885:12, 9886:25, 9890:22, 9891:4, 9891:9, 9894:15, 9902:6, 9944:11, 9944:17, 9945:4, 9945:8
**percentage** [5] - 9835:20, 9836:20, 9865:14, 9881:21, 9943:24
**percentages** [4] - 9947:11, 9949:1, 9949:2, 9949:11
**perfect** [2] - 9870:1,

9940:4
**performing** [1] - 9928:3
**period** [17] - 9833:22, 9834:6, 9834:8, 9834:9, 9835:11, 9835:21, 9884:12, 9884:23, 9884:25, 9885:4, 9889:5, 9890:20, 9894:18, 9900:3, 9900:22, 9929:24, 9936:1
**persistent** [1] - 9938:20
**person** [3] - 9930:20, 9942:21, 9944:6
**perspective** [2] - 9855:6, 9904:24
**pertain** [1] - 9899:2
**pertains** [1] - 9892:6
**Phil** [1] - 9931:24
**phone** [20] - 9845:21, 9845:25, 9846:1, 9846:25, 9852:19, 9854:23, 9855:25, 9856:11, 9857:10, 9857:22, 9862:1, 9895:16, 9897:15, 9898:6, 9898:9, 9898:11, 9901:15, 9918:22, 9918:23, 9944:8
**phone's** [1] - 9920:21
**phones** [11] - 9835:7, 9852:15, 9852:22, 9853:7, 9853:9, 9855:25, 9856:8, 9874:9, 9920:8, 9920:14
**Pichai** [3] - 9922:7, 9924:5, 9925:6
**pick** [1] - 9941:8
**picking** [1] - 9943:12
**picture** [5] - 9848:1, 9854:21, 9900:6, 9901:10, 9918:5
**pie** [2] - 9894:22, 9896:19
**piece** [1] - 9859:11
**pieces** [3] - 9866:13, 9886:17, 9906:21
**piloting** [1] - 9928:9
**pitch** [1] - 9891:22
**Pixel** [1] - 9901:15
**place** [15] - 9834:17, 9836:5, 9841:7, 9842:14, 9848:19, 9880:11, 9882:6, 9907:16, 9917:2, 9918:18, 9928:10,

9940:3, 9945:13, 9945:14
**placed** [2] - 9865:9, 9940:23
**placement** [9] - 9850:18, 9853:2, 9857:5, 9866:14, 9867:8, 9867:24, 9868:23, 9870:18, 9873:4
**places** [1] - 9898:7
**plaintiff** [1] - 9833:25
**Plaintiff** [2] - 9830:19, 9831:1
**plaintiffs** [3] - 9832:22, 9868:14, 9946:5
**Plaintiffs** [2] - 9830:4, 9830:11
**plaintiffs'** [1] - 9906:18
**plan** [1] - 9885:20
**planning** [1] - 9922:15
**plastic** [1] - 9903:5
**platform** [62] - 9841:1, 9841:4, 9841:5, 9841:12, 9841:22, 9841:25, 9842:3, 9842:9, 9842:10, 9842:18, 9842:21, 9843:7, 9843:10, 9843:11, 9843:12, 9843:13, 9843:14, 9843:20, 9844:7, 9844:11, 9844:12, 9844:13, 9844:15, 9844:18, 9844:20, 9845:12, 9846:2, 9846:4, 9846:5, 9846:7, 9846:12, 9846:13, 9846:14, 9846:24, 9847:1, 9847:3, 9849:6, 9849:13, 9850:7, 9850:11, 9851:20, 9851:25, 9852:1, 9853:12, 9853:14, 9853:19, 9853:20, 9853:23, 9854:12, 9856:13, 9873:1, 9873:3, 9876:13, 9890:24, 9893:25, 9895:19, 9900:22
**platforms** [17] - 9840:14, 9840:15, 9841:10, 9841:14, 9841:18, 9841:19, 9841:22, 9842:24, 9843:6, 9843:7, 9849:15, 9850:25,

9854:11, 9855:23, 9877:8, 9897:22
**Play** [10] - 9850:5, 9852:3, 9866:6, 9866:15, 9866:16, 9866:20, 9866:25, 9867:7, 9867:23, 9868:20
**play** [3] - 9840:7, 9841:23, 9842:17
**played** [2] - 9892:10, 9941:17
**player** [1] - 9843:4
**pleased** [1] - 9923:6
**point** [24] - 9837:15, 9838:8, 9838:9, 9840:21, 9848:23, 9864:11, 9878:23, 9878:24, 9880:1, 9883:11, 9884:9, 9885:15, 9888:2, 9889:18, 9889:21, 9891:6, 9902:6, 9914:10, 9929:21, 9935:1, 9938:4, 9938:23, 9944:2
**pointed** [1] - 9902:10
**pointing** [1] - 9944:2
**points** [8] - 9836:20, 9851:7, 9854:19, 9865:12, 9877:13, 9881:21, 9882:11, 9939:1
**pose** [1] - 9906:18
**position** [2] - 9891:3, 9947:20
**positioned** [1] - 9905:14
**positions** [1] - 9893:10
**positive** [3] - 9850:23, 9868:4, 9925:12
**posits** [1] - 9886:6
**possibility** [3] - 9928:3, 9935:18, 9949:23
**post** [4] - 9922:22, 9939:13, 9939:17, 9940:9
**potential** [1] - 9896:7
**potentially** [1] - 9949:3
**pre** [16] - 9837:8, 9837:9, 9837:12, 9850:16, 9857:13, 9857:17, 9860:4, 9860:12, 9871:6, 9873:22, 9888:24, 9889:3, 9890:13, 9890:14, 9904:3,

9905:20
**pre-choice** [3] - 9837:8, 9837:9, 9837:12
**pre-install** [1] - 9904:3
**pre-installation** [11] - 9850:16, 9857:13, 9857:17, 9860:4, 9860:12, 9871:6, 9873:22, 9888:24, 9889:3, 9890:14, 9905:20
**pre-installed** [1] - 9890:13
**precedent** [1] - 9948:9
**precise** [3] - 9935:24, 9945:6, 9945:7
**precisely** [1] - 9866:1
**precision** [1] - 9882:9
**prefer** [1] - 9933:7
**preferred** [1] - 9891:3
**prejudice** [2] - 9947:16, 9949:4
**prepared** [2] - 9840:24, 9900:7
**present** [3] - 9840:2, 9916:5, 9921:6
**presentation** [3] - 9832:17, 9913:24, 9939:20
**preserve** [1] - 9907:13
**preserves** [1] - 9907:11
**preset** [7] - 9910:7, 9910:17, 9910:23, 9911:8, 9911:16, 9919:22, 9934:7
**press** [2] - 9946:13, 9946:15
**presumably** [1] - 9924:8
**presume** [1] - 9934:14
**presumption** [1] - 9938:15
**pretty** [8] - 9837:18, 9852:22, 9860:19, 9882:5, 9888:10, 9899:10, 9938:20, 9938:22
**prevent** [3] - 9860:2, 9869:11, 9873:21
**preventing** [2] - 9858:19, 9869:7
**prevents** [3] - 9858:5, 9870:8, 9870:10
**previous** [4] - 9834:23, 9848:9, 9850:22, 9852:22
**price** [8] - 9848:14, 9848:23, 9851:7,

9851:8, 9853:10, 9907:8, 9907:9, 9907:24
**priced** [1] - 9851:2
**prices** [2] - 9851:23, 9855:17
**primary** [4] - 9840:1, 9843:21, 9844:8, 9926:23
**principle** [3] - 9914:7, 9919:17, 9921:9
**privacy** [17] - 9904:20, 9904:22, 9904:23, 9904:25, 9905:1, 9905:4, 9905:5, 9905:6, 9905:8, 9905:9, 9905:12, 9905:16, 9905:18, 9905:22, 9906:4, 9906:13, 9917:15
**private** [8] - 9917:15, 9917:19, 9918:9, 9918:15, 9918:20, 9918:23, 9919:2, 9919:10
**problem** [2] - 9854:3, 9854:8
**proceedings** [1] - 9952:6
**process** [4] - 9915:6, 9920:11, 9930:5, 9937:3
**procompetitive** [2] - 9839:25, 9858:15
**produce** [1] - 9903:4
**produced** [1] - 9882:4
**producer** [1] - 9896:17
**product** [12] - 9875:5, 9889:17, 9902:18, 9903:10, 9904:17, 9904:18, 9905:20, 9911:1, 9911:14, 9912:3, 9929:1, 9929:5
**products** [1] - 9925:23
**profession** [2] - 9880:11, 9880:12
**Professor** [35] - 9832:7, 9833:5, 9834:25, 9835:1, 9835:13, 9835:24, 9836:11, 9839:24, 9858:21, 9866:3, 9870:2, 9875:23, 9875:24, 9876:6, 9877:15, 9878:19, 9881:1, 9882:3, 9885:24, 9886:2, 9889:24, 9890:3, 9890:6, 9900:7, 9900:13, 9900:25,

9973

9901:3, 9902:10, 9908:3, 9908:6, 9908:18, 9922:21, 9945:16, 9946:24, 9950:24

**program** [1] - 9904:11
**progress** [1] - 9882:19
**prominently** [1] - 9865:8
**promote** [4] - 9858:1, 9858:15, 9873:1, 9929:7
**promoting** [1] - 9846:11
**promotion** [15] - 9839:19, 9850:15, 9856:2, 9856:24, 9857:4, 9857:8, 9857:21, 9858:7, 9858:9, 9858:11, 9860:9, 9865:5, 9866:8, 9873:4
**promotional** [4] - 9846:6, 9858:2, 9866:21, 9866:23
**prompts** [1] - 9920:17
**properties** [2] - 9933:13, 9934:3
**proportionally** [1] - 9858:2
**proposal** [6] - 9909:21, 9910:6, 9912:8, 9912:9, 9932:3, 9937:6
**proposals** [2] - 9912:10, 9913:2
**proposed** [1] - 9932:14
**proposing** [3] - 9911:7, 9911:19, 9911:24
**Protection** [1] - 9830:20
**protective** [1] - 9948:24
**provide** [3] - 9846:6, 9913:14, 9936:16
**provided** [4] - 9858:4, 9881:18, 9910:25, 9916:13
**provider** [4] - 9844:16, 9871:9, 9933:7, 9941:5
**providers** [5] - 9868:9, 9894:4, 9895:21, 9896:20, 9897:11
**provides** [2] - 9844:14, 9911:12
**provision** [1] - 9857:20
**provisions** [5] -

9856:3, 9856:20, 9857:14, 9857:17, 9868:8

**public** [4] - 9891:23, 9892:15, 9946:13, 9946:15
**pun** [1] - 9839:19
**pure** [2] - 9839:17, 9849:23
**purpose** [2] - 9836:25, 9841:3
**purposes** [3] - 9838:11, 9838:20, 9945:10
**push** [3] - 9855:23, 9856:16, 9897:6
**pushing** [1] - 9855:22
**put** [52] - 9842:14, 9845:19, 9860:6, 9860:7, 9860:8, 9860:18, 9861:3, 9861:11, 9865:5, 9866:1, 9867:1, 9867:9, 9870:7, 9870:10, 9871:10, 9872:5, 9873:9, 9875:4, 9891:21, 9892:1, 9900:5, 9903:5, 9903:8, 9903:11, 9903:14, 9906:21, 9911:20, 9912:25, 9913:19, 9914:2, 9914:3, 9914:15, 9915:12, 9917:22, 9918:1, 9918:18, 9918:25, 9919:1, 9920:7, 9929:2, 9931:22, 9939:2, 9939:5, 9940:2, 9941:6, 9943:13, 9943:17, 9947:13, 9947:19, 9948:5
**puts** [1] - 9860:20
**putting** [2] - 9857:21, 9903:12

## Q

**qualities** [6] - 9878:21, 9878:24, 9878:25, 9884:16, 9886:23
**quality** [29] - 9847:12, 9855:18, 9856:20, 9876:21, 9882:2, 9882:7, 9882:8, 9882:20, 9882:21, 9882:22, 9883:7, 9883:20, 9887:14, 9887:15, 9887:18,

9892:23, 9893:13, 9893:24, 9894:9, 9898:17, 9899:20, 9899:25, 9904:5, 9904:6, 9905:10, 9906:25, 9907:11
**quantified** [1] - 9939:10
**quarter** [1] - 9926:6
**Quarter** [1] - 9926:10
**queries** [13] - 9838:25, 9839:2, 9874:7, 9875:25, 9899:6, 9899:7, 9899:8, 9899:9, 9899:12, 9899:14, 9916:6, 9917:1, 9917:8
**query** [3] - 9915:19, 9915:23, 9916:20
**questions** [3] - 9840:8, 9915:5, 9947:8
**quick** [2] - 9840:1, 9902:24
**quite** [8] - 9835:5, 9855:2, 9874:14, 9878:22, 9882:13, 9885:10, 9893:12, 9927:22
**quote** [2] - 9891:20, 9910:6
**quotes** [1] - 9891:24
**quoting** [2] - 9910:5, 9936:17

## R

**R&D** [4] - 9900:14, 9901:1, 9901:3, 9901:6
**rabbit** [1] - 9903:9
**races** [1] - 9879:3
**raise** [1] - 9946:3
**raised** [1] - 9949:23
**raises** [2] - 9876:11, 9877:16
**raising** [1] - 9950:1
**Ralph** [1] - 9830:21
**randomly** [1] - 9941:8
**range** [1] - 9927:22
**rate** [2] - 9930:19, 9930:22
**rather** [7] - 9861:4, 9882:17, 9882:25, 9883:20, 9891:4, 9893:13, 9929:6
**ratio** [2] - 9901:3, 9901:7
**ratios** [2] - 9901:2, 9901:8
**reach** [2] - 9838:17, 9888:11

**read** [15] - 9870:21, 9910:20, 9911:22, 9915:8, 9915:9, 9916:4, 9918:17, 9927:4, 9927:6, 9927:11, 9927:14, 9928:25, 9930:9, 9930:12, 9933:20
**reading** [3] - 9863:24, 9927:25, 9928:6
**ready** [3] - 9832:2, 9889:16, 9908:15
**real** [6] - 9876:14, 9881:8, 9885:9, 9926:22, 9939:15, 9947:16
**reality** [1] - 9860:13
**really** [61] - 9833:3, 9835:22, 9838:12, 9841:21, 9843:8, 9843:12, 9844:24, 9849:12, 9849:14, 9849:15, 9850:2, 9855:3, 9858:5, 9859:23, 9860:24, 9861:14, 9865:20, 9866:6, 9869:3, 9869:14, 9878:20, 9880:14, 9883:15, 9884:8, 9884:9, 9884:12, 9884:17, 9885:5, 9885:8, 9886:6, 9886:20, 9888:2, 9888:20, 9891:7, 9892:1, 9894:18, 9895:8, 9896:7, 9900:23, 9901:6, 9901:8, 9901:12, 9901:18, 9901:22, 9901:25, 9902:7, 9902:14, 9904:8, 9905:13, 9906:13, 9906:20, 9921:18, 9934:17, 9937:10, 9940:9, 9940:25, 9941:1, 9941:3, 9944:23, 9950:19
**reason** [5] - 9844:3, 9860:25, 9914:25, 9917:13
**reasonable** [1] - 9938:15
**reasons** [7] - 9841:7, 9841:8, 9844:10, 9855:9, 9879:20, 9898:19, 9937:21
**recent** [4] - 9856:19, 9891:11, 9899:17, 9918:8

**recently** [1] - 9917:18
**recess** [1] - 9885:22
**recognize** [1] - 9840:25
**recognizing** [1] - 9923:7
**recollection** [1] - 9932:19
**record** [9] - 9834:6, 9899:19, 9929:22, 9938:13, 9938:14, 9948:6, 9948:7, 9948:22, 9950:4
**recurring** [1] - 9878:24
**red** [5] - 9836:9, 9837:10, 9861:24, 9883:24, 9899:6
**redacted** [9] - 9833:12, 9834:15, 9836:18, 9851:6, 9891:19, 9901:1, 9909:25, 9913:8, 9947:9
**redaction** [1] - 9861:24
**redactions** [2] - 9854:18, 9859:2
**reduce** [5] - 9858:1, 9876:17, 9878:13, 9878:14, 9906:22
**reduced** [5] - 9866:4, 9874:25, 9875:19, 9895:1, 9907:23
**reduction** [1] - 9939:22
**refer** [1] - 9849:18
**referral** [1] - 9913:9
**referred** [3] - 9857:12, 9873:20, 9950:23
**referring** [2] - 9931:1, 9931:5
**reflect** [4] - 9929:1, 9929:5, 9948:25, 9950:22
**reflected** [2] - 9854:19, 9899:2
**reflecting** [1] - 9904:14
**reflects** [1] - 9949:2
**refundable** [1] - 9875:4
**refuses** [1] - 9914:23
**regard** [1] - 9854:2
**regarding** [2] - 9899:19, 9904:20
**regards** [1] - 9847:5
**regression** [1] - 9939:21
**regulatory** [1] - 9940:5
**related** [1] - 9901:14

**relating** [1] - 9868:8
**relative** [5] - 9834:21, 9834:22, 9878:11, 9882:2, 9882:8
**relatively** [2] - 9837:11, 9904:11
**released** [1] - 9946:18
**relevant** [3] - 9835:25, 9836:1, 9878:7
**relies** [1] - 9856:9
**rely** [1] - 9947:13
**remain** [1] - 9950:17
**remember** [21] - 9833:15, 9839:18, 9842:15, 9843:1, 9848:9, 9852:23, 9857:1, 9869:23, 9872:1, 9877:5, 9881:5, 9884:6, 9890:6, 9892:7, 9900:19, 9906:22, 9912:16, 9927:11, 9927:25, 9929:25, 9935:12, 9935:22, 9935:24, 9936:1, 9940:16
**remind** [2] - 9949:22, 9951:1
**render** [1] - 9865:9
**renegotiated** [1] - 9939:14
**rephrase** [1] - 9924:20
**rephrased** [1] - 9924:25
**replace** [1] - 9860:23
**replicate** [1] - 9866:18
**report** [10] - 9879:3, 9926:6, 9928:20, 9928:24, 9929:4, 9929:8, 9937:20, 9939:20, 9940:10, 9945:3
**REPORTER** [1] - 9952:1
**reporter** [1] - 9943:20
**Reporter** [3] - 9831:15, 9831:16, 9952:11
**reports** [2] - 9849:18, 9882:5
**represent** [1] - 9918:7
**represents** [1] - 9902:12
**request** [1] - 9930:3
**requested** [1] - 9949:8
**requests** [2] - 9946:10, 9948:12
**required** [3] - 9862:5, 9918:14, 9950:5
**requirement** [1] -

9858:12
**requirements** [4] - 9853:2, 9876:18, 9921:10
**requires** [1] - 9916:5
**requiring** [1] - 9856:17
**resolving** [1] - 9949:7
**respect** [3] - 9840:21, 9870:8, 9892:4
**response** [1] - 9886:2
**rest** [3] - 9848:2, 9881:9, 9933:22
**restaurant** [3] - 9903:3, 9903:6, 9905:7
**restrict** [2] - 9895:1, 9895:2
**restriction** [3] - 9869:10, 9869:23, 9929:6
**result** [4] - 9875:24, 9890:1, 9891:12, 9908:1
**resulted** [2] - 9883:3, 9883:18
**results** [3] - 9878:20, 9905:3, 9906:4
**resume** [1] - 9885:20
**retail** [2] - 9903:2, 9904:9
**return** [4] - 9849:22, 9849:25, 9851:24, 9881:7
**revenue** [12] - 9852:5, 9854:22, 9855:10, 9855:20, 9859:11, 9871:24, 9872:10, 9873:21, 9911:15, 9913:7, 9913:8, 9939:10
**Revenue** [1] - 9913:7
**review** [1] - 9881:13
**revshare** [16] - 9855:10, 9857:20, 9857:23, 9872:8, 9872:10, 9876:19, 9913:10, 9913:14, 9937:16, 9938:1, 9938:2, 9938:6, 9938:11, 9939:17, 9939:22, 9940:8
**revshares** [1] - 9872:7
**rid** [4] - 9832:22, 9907:14, 9907:23, 9908:1
**right-hand** [1] - 9872:7
**rights** [1] - 9916:11
**RIM** [1] - 9843:1
**rise** [1] - 9886:13
**rising** [1] - 9851:22

**rival** [15] - 9836:17, 9838:2, 9839:17, 9860:23, 9871:14, 9875:3, 9878:2, 9878:15, 9879:16, 9893:10, 9894:17, 9906:22, 9941:13, 9941:14
**rivals** [38] - 9832:8, 9832:23, 9833:6, 9834:24, 9836:3, 9836:13, 9837:8, 9837:9, 9837:10, 9837:12, 9838:12, 9839:2, 9839:14, 9839:16, 9840:20, 9858:23, 9858:25, 9859:21, 9859:22, 9860:2, 9860:22, 9860:24, 9870:3, 9871:5, 9873:21, 9875:25, 9877:21, 9878:8, 9878:18, 9878:22, 9879:16, 9880:2, 9881:15, 9886:8, 9890:7, 9907:18, 9929:7
**rivals'** [10] - 9839:18, 9877:23, 9879:9, 9886:1, 9886:3, 9886:9, 9886:14, 9887:4, 9888:6, 9906:25
**RMR** [1] - 9831:15
**road** [1] - 9908:2
**role** [4] - 9840:6, 9841:23, 9842:17, 9892:10
**roll** [2] - 9881:8, 9884:5
**rolling** [1] - 9879:4
**Rollout** [1] - 9922:9
**Roman** [4] - 9932:25, 9933:16, 9933:21, 9933:23
**Room** [2] - 9831:16, 9952:12
**Rosati** [2] - 9831:8, 9831:12
**roughly** [8] - 9834:20, 9835:4, 9835:18, 9836:4, 9866:18, 9881:21, 9883:14, 9894:8
**routinely** [1] - 9920:20
**royalty** [5] - 9845:17, 9850:4, 9850:20, 9851:14, 9866:13
**royalty-free** [4] - 9845:17, 9850:4,

9851:14, 9866:13
**RSA** [27] - 9840:4,
9846:3, 9855:6,
9856:3, 9856:18,
9857:7, 9857:15,
9857:17, 9859:25,
9861:10, 9867:10,
9871:10, 9871:18,
9871:19, 9872:22,
9873:2, 9873:5,
9873:8, 9873:12,
9873:14, 9873:22,
9874:10, 9874:11,
9874:12, 9876:17,
9876:18
**RSAs** [12] - 9846:8,
9854:17, 9854:21,
9854:24, 9854:25,
9855:3, 9856:25,
9870:2, 9871:4, 9871:6
**rubric** [1] - 9949:4
**rule** [1] - 9924:19
**run** [6] - 9843:12,
9868:22, 9869:21,
9870:13, 9870:16,
9873:2
**running** [2] - 9869:11,
9873:3
**runs** [1] - 9843:11
**Russia** [7] - 9833:2,
9836:23, 9837:12,
9837:14, 9837:16,
9838:1, 9838:7
**Russian** [6] - 9833:1,
9833:4, 9835:24,
9836:21, 9836:24,
9838:13

---

## S

**Safari** [22] - 9915:19,
9916:12, 9916:20,
9917:15, 9918:8,
9929:12, 9929:24,
9930:1, 9930:2,
9930:13, 9931:24,
9932:11, 9932:20,
9932:25, 9933:5,
9933:23, 9934:7,
9935:1, 9935:25,
9936:6, 9937:7,
9937:13
**sale** [1] - 9849:21
**sales** [10] - 9855:14,
9858:7, 9901:2,
9901:3, 9901:7,
9901:10, 9902:9,
9938:5
**Sallet** [1] - 9830:19
**Samsung** [7] -

9845:23, 9846:19,
9855:2, 9855:5,
9856:23, 9860:20
**saves** [1] - 9875:17
**saw** [4] - 9836:6,
9842:22, 9861:20,
9892:11
**scale** [32] - 9847:8,
9877:24, 9878:2,
9878:9, 9881:25,
9882:16, 9883:3,
9883:22, 9884:2,
9884:3, 9884:13,
9884:14, 9884:17,
9884:25, 9885:1,
9885:10, 9886:8,
9886:21, 9889:25,
9890:8, 9890:19,
9891:3, 9891:4,
9891:12, 9891:16,
9892:5, 9894:6,
9906:25, 9947:16
**scale-wise** [1] -
9891:3
**scales** [1] - 9899:3
**Schmidtlein** [4] -
9831:5, 9832:3,
9922:10, 9948:4
**SCHMIDTLEIN** [28] -
9832:6, 9838:3,
9839:23, 9849:16,
9853:1, 9858:20,
9861:22, 9865:7,
9868:7, 9871:3,
9873:18, 9875:22,
9883:16, 9885:16,
9885:23, 9898:16,
9908:3, 9922:11,
9924:16, 9925:14,
9926:7, 9931:2,
9931:18, 9946:8,
9948:7, 9948:11,
9948:15, 9949:9
**schmidtlein.....9832**
[1] - 9953:4
**score** [2] - 9882:9,
9883:8
**scores** [2] - 9882:21,
9903:15
**screen** [106] - 9832:9,
9832:14, 9832:18,
9832:20, 9832:24,
9832:25, 9833:2,
9833:5, 9833:8,
9833:14, 9833:16,
9833:22, 9834:14,
9834:17, 9835:24,
9836:5, 9837:8,
9837:9, 9837:12,
9837:16, 9838:16,

9838:18, 9839:1,
9839:3, 9839:9,
9850:17, 9864:22,
9864:23, 9864:25,
9865:2, 9870:6,
9875:23, 9878:12,
9878:13, 9878:20,
9880:3, 9885:14,
9890:22, 9891:2,
9891:10, 9902:11,
9902:16, 9902:17,
9902:19, 9902:22,
9903:18, 9903:23,
9904:1, 9907:2,
9909:3, 9910:2,
9910:15, 9912:25,
9915:13, 9919:25,
9920:2, 9920:4,
9920:15, 9921:6,
9921:10, 9921:13,
9921:20, 9921:22,
9921:25, 9922:1,
9923:14, 9923:17,
9923:24, 9924:15,
9924:23, 9925:7,
9925:12, 9925:22,
9926:17, 9926:24,
9928:12, 9928:13,
9928:21, 9929:3,
9929:12, 9929:19,
9929:21, 9929:24,
9930:1, 9930:4,
9930:8, 9930:10,
9930:13, 9930:19,
9935:19, 9936:20,
9937:13, 9938:12,
9938:24, 9939:9,
9939:11, 9939:13,
9939:17, 9939:22,
9939:25, 9940:1,
9940:2, 9941:25
**Screen** [1] - 9922:9
**screens** [13] -
9833:16, 9834:23,
9835:17, 9860:14,
9919:24, 9919:25,
9920:8, 9920:10,
9920:11, 9920:15,
9921:17, 9921:24,
9939:8
**scroll** [1] - 9864:23
**scrutiny** [1] - 9838:7
**se** [2] - 9862:19,
9904:14
**Search** [16] - 9850:16,
9856:2, 9857:5,
9862:3, 9865:8,
9866:8, 9866:9,
9895:4, 9896:14,
9896:15, 9901:4,

9901:17, 9901:18,
9913:3, 9913:4
**search** [205] - 9840:11,
9840:12, 9840:13,
9840:15, 9840:23,
9841:5, 9841:8,
9841:9, 9841:10,
9841:18, 9841:21,
9842:19, 9844:4,
9844:9, 9844:10,
9844:12, 9844:15,
9844:16, 9844:19,
9844:21, 9846:5,
9846:9, 9846:10,
9847:7, 9847:9,
9847:10, 9847:12,
9847:13, 9847:21,
9848:3, 9848:4,
9848:5, 9848:15,
9848:18, 9851:24,
9852:5, 9852:16,
9852:17, 9855:7,
9855:19, 9855:20,
9855:21, 9855:24,
9856:4, 9856:24,
9857:4, 9857:12,
9858:16, 9858:23,
9858:25, 9859:7,
9859:21, 9860:6,
9860:7, 9860:8,
9862:11, 9862:16,
9862:18, 9862:19,
9862:23, 9863:11,
9863:12, 9863:13,
9863:14, 9863:15,
9863:19, 9863:22,
9864:5, 9864:6,
9864:8, 9864:10,
9864:11, 9864:14,
9864:18, 9864:20,
9864:22, 9865:1,
9865:3, 9865:4,
9865:12, 9865:15,
9865:16, 9865:18,
9865:19, 9865:21,
9865:23, 9866:4,
9866:8, 9867:14,
9868:9, 9870:3,
9871:5, 9871:9,
9871:16, 9872:1,
9872:6, 9873:9,
9873:10, 9873:12,
9875:25, 9876:8,
9876:23, 9877:4,
9877:5, 9877:9,
9878:9, 9878:16,
9879:16, 9882:2,
9883:4, 9883:7,
9883:18, 9884:20,
9889:25, 9890:11,
9890:12, 9890:18,

9891:12, 9891:13,
9893:10, 9893:21,
9894:24, 9894:25,
9895:2, 9895:6,
9895:16, 9895:22,
9897:8, 9897:9,
9897:11, 9897:15,
9898:2, 9898:12,
9898:17, 9899:2,
9899:6, 9899:18,
9899:20, 9899:22,
9899:25, 9900:1,
9901:14, 9904:20,
9906:4, 9906:6,
9906:18, 9907:8,
9908:21, 9910:8,
9910:17, 9910:24,
9911:13, 9911:20,
9914:13, 9915:21,
9915:24, 9915:25,
9916:20, 9918:9,
9918:15, 9919:2,
9919:4, 9919:9,
9919:16, 9921:7,
9927:9, 9927:18,
9927:20, 9928:10,
9928:11, 9928:21,
9929:12, 9936:12,
9936:17, 9937:21,
9940:11, 9940:14,
9940:19, 9940:23,
9941:5, 9941:9,
9941:12, 9942:7,
9942:24, 9943:1,
9943:3, 9943:10,
9943:17

   **searches** [8] -
9855:12, 9855:13,
9855:25, 9871:25,
9874:5, 9893:16,
9899:17, 9916:7

   **searchs** [2] - 9848:24,
9855:11

   **searchy** [4] - 9848:17,
9848:20, 9848:21,
9849:3

   **seat** [1] - 9950:2

   **second** [9] - 9840:17,
9886:14, 9919:14,
9921:3, 9922:22,
9926:12, 9932:10,
9933:4, 9933:17

   **second-to-the-last** [1]
- 9926:12

   **section** [4] - 9885:17,
9929:17, 9931:24,
9936:10

   **Section** [1] - 9830:20

   **security** [1] - 9856:5

   **see** [145] - 9834:15,

9834:16, 9834:21,
9834:22, 9835:3,
9835:11, 9835:17,
9836:8, 9836:10,
9837:1, 9837:9,
9837:24, 9839:11,
9848:25, 9851:5,
9851:10, 9851:16,
9852:11, 9852:12,
9855:1, 9859:6,
9860:24, 9862:2,
9862:3, 9862:7,
9862:8, 9865:15,
9865:16, 9865:24,
9866:1, 9867:12,
9868:17, 9870:15,
9871:24, 9872:10,
9872:13, 9872:24,
9878:13, 9879:13,
9879:14, 9880:19,
9880:25, 9881:9,
9881:10, 9881:23,
9882:11, 9882:17,
9883:21, 9883:23,
9884:8, 9884:20,
9885:6, 9885:8,
9885:20, 9886:23,
9889:6, 9891:25,
9898:13, 9899:5,
9899:7, 9901:9,
9901:11, 9901:21,
9902:6, 9904:16,
9905:23, 9909:4,
9909:9, 9909:12,
9909:13, 9909:17,
9910:9, 9910:10,
9910:14, 9910:19,
9911:2, 9911:9,
9911:17, 9911:21,
9912:21, 9912:25,
9913:5, 9913:6,
9913:12, 9914:18,
9914:20, 9915:19,
9916:2, 9916:3,
9916:4, 9918:5,
9918:9, 9918:10,
9919:25, 9922:22,
9922:23, 9923:1,
9923:9, 9923:14,
9923:15, 9924:6,
9924:12, 9925:8,
9926:10, 9926:15,
9927:4, 9927:6,
9927:22, 9927:23,
9927:24, 9929:13,
9931:6, 9932:1,
9932:12, 9932:23,
9932:24, 9933:2,
9933:8, 9933:14,
9933:25, 9934:4,
9934:9, 9935:8,

9935:9, 9935:14,
9935:16, 9935:21,
9936:12, 9936:18,
9937:1, 9937:8,
9938:5, 9943:14,
9948:19, 9949:18,
9950:9, 9950:19,
9951:5

   **seeing** [4] - 9835:10,
9939:16, 9939:18,
9945:17

   **seeking** [1] - 9913:20

   **seem** [5] - 9882:23,
9907:20, 9939:14,
9939:16, 9939:18

   **sees** [1] - 9877:16

   **segment** [1] - 9901:21

   **select** [1] - 9933:6

   **selections** [9] -
9833:18, 9833:19,
9833:20, 9833:21,
9834:14, 9835:22,
9837:22, 9837:24

   **sell** [4] - 9842:4,
9849:21, 9873:10,
9876:24

   **selling** [1] - 9903:3

   **send** [6] - 9873:7,
9874:23, 9915:21,
9915:23, 9915:24,
9937:4

   **sense** [7] - 9853:9,
9864:16, 9870:1,
9870:12, 9889:16,
9894:15, 9902:18

   **sensitive** [1] - 9838:15

   **sent** [3] - 9916:6,
9935:20, 9946:22

   **sentence** [2] -
9913:15, 9933:9

   **separate** [9] - 9833:24,
9845:6, 9846:23,
9872:21, 9886:5,
9917:18, 9918:9,
9919:20, 9919:22

   **separated** [1] -
9866:12

   **September** [5] -
9833:17, 9834:7,
9834:19, 9835:6,
9835:22

   **serious** [2] - 9930:7,
9935:18

   **service** [5] - 9910:8,
9910:17, 9910:24,
9911:13, 9936:17

   **services** [5] - 9857:12,
9910:7, 9910:17,
9910:24, 9913:4

   **session** [4] - 9949:23,

9950:5, 9950:20,
9950:21

   **set** [7] - 9857:10,
9862:14, 9912:2,
9918:15, 9918:20,
9919:2, 9919:15

   **settings** [1] - 9936:12

   **settlement** [2] -
9923:12, 9923:22

   **setup** [2] - 9920:9,
9920:11

   **seven** [1] - 9900:5

   **Seventh** [1] - 9830:23

   **several** [3] - 9862:23,
9865:3, 9892:24

   **shape** [1] - 9842:17

   **shaping** [1] - 9842:18

   **Shardell** [1] - 9909:8

   **share** [34] - 9832:9,
9836:4, 9837:8,
9837:20, 9838:17,
9838:25, 9859:11,
9873:8, 9873:21,
9878:15, 9878:18,
9879:1, 9879:2,
9879:15, 9880:23,
9880:24, 9881:3,
9881:5, 9881:14,
9881:19, 9883:4,
9883:18, 9884:22,
9885:9, 9890:1,
9893:2, 9893:21,
9911:15, 9913:7,
9923:25, 9949:11

   **share-pays** [1] -
9873:8

   **shares** [5] - 9834:9,
9834:11, 9838:10,
9941:13, 9947:11

   **Shares** [1] - 9913:7

   **sharing** [2] - 9854:22,
9896:8

   **shift** [2] - 9838:24,
9875:25

   **shifts** [3] - 9838:17,
9879:15, 9881:14

   **ship** [1] - 9903:5

   **shock** [4] - 9881:21,
9885:10, 9885:11,
9885:14

   **short** [1] - 9885:17

   **shortly** [1] - 9885:21

   **show** [6] - 9848:12,
9854:18, 9899:4,
9928:25, 9937:11

   **showing** [2] - 9899:5,
9918:11

   **shows** [1] - 9888:22

   **shut** [2] - 9894:14,
9894:16

**sic** [1] - 9912:21
**side** [6] - 9851:23, 9852:8, 9854:9, 9859:14, 9888:4, 9905:2
**sides** [3] - 9842:13, 9875:18, 9906:2
**sign** [3] - 9854:23, 9854:24, 9868:24
**signed** [2] - 9861:3, 9869:15
**significant** [5] - 9843:6, 9865:25, 9875:25, 9880:5, 9896:15
**significantly** [3] - 9893:16, 9900:14, 9900:19
**signs** [1] - 9860:5
**silly** [2] - 9893:19, 9939:5
**silos** [1] - 9846:21
**similar** [2] - 9845:13, 9931:13
**simple** [2] - 9872:8, 9937:16
**simply** [1] - 9887:5
**single** [5] - 9894:24, 9921:25, 9928:10, 9942:2, 9942:3
**sir..** [1] - 9932:4
**situation** [1] - 9916:6
**six** [2] - 9834:19, 9900:4
**size** [4] - 9896:9, 9896:10, 9901:2, 9901:3
**skip** [1] - 9900:12
**skipped** [1] - 9890:4
**slap** [1] - 9903:9
**slide** [18] - 9833:10, 9833:11, 9834:12, 9840:24, 9842:20, 9848:9, 9854:18, 9854:20, 9861:23, 9889:22, 9890:5, 9899:2, 9900:7, 9909:12, 9946:10, 9946:17
**slides** [6] - 9832:8, 9890:4, 9908:5, 9946:23, 9947:10, 9947:19
**slightly** [1] - 9880:4
**slope** [2] - 9836:16, 9837:13
**slow** [2] - 9877:7, 9877:8
**small** [20] - 9835:20, 9835:21, 9855:2,

9879:15, 9881:14, 9887:24, 9896:3, 9896:5, 9896:18, 9896:23, 9901:9, 9901:10, 9901:23, 9901:25, 9904:11, 9942:2
**smaller** [5] - 9837:17, 9859:17, 9879:21, 9879:24, 9886:10
**smartphone** [2] - 9841:17, 9852:14
**smartphones** [2] - 9852:16, 9852:21
**snowball** [9] - 9879:4, 9879:5, 9880:7, 9881:23, 9883:21, 9884:5, 9891:6, 9907:3
**snowballing** [1] - 9881:2
**software** [15] - 9842:3, 9842:4, 9843:11, 9845:19, 9853:6, 9868:25, 9871:10, 9871:20, 9900:14, 9910:8, 9910:18, 9910:25, 9911:14, 9936:12, 9936:16
**solely** [1] - 9897:8
**solve** [1] - 9854:8
**someone** [2] - 9914:14, 9919:6
**sometimes** [5] - 9857:15, 9920:15, 9920:17, 9920:18, 9950:11
**somewhat** [3] - 9904:7, 9905:4, 9911:5
**somewhere** [1] - 9869:18
**Sommer** [1] - 9831:8
**Sonsini** [2] - 9831:8, 9831:12
**sorry** [19] - 9837:4, 9851:18, 9852:6, 9856:22, 9862:24, 9863:7, 9864:20, 9864:21, 9867:17, 9870:4, 9883:6, 9895:10, 9910:11, 9925:18, 9931:3, 9936:13, 9940:13, 9946:14, 9950:3
**sort** [20] - 9832:16, 9833:16, 9858:3, 9858:6, 9858:17, 9859:8, 9859:22, 9861:12, 9868:23, 9873:11, 9887:16, 9891:15, 9891:25,

9892:21, 9896:19, 9902:24, 9902:25, 9932:6, 9947:15
**sought** [1] - 9938:24
**source** [6] - 9844:24, 9845:1, 9845:2, 9845:6, 9850:6, 9915:23
**sources** [2] - 9895:15, 9947:12
**South** [1] - 9830:15
**space** [4] - 9861:17, 9897:12, 9908:21
**speaks** [1] - 9932:6
**specific** [3] - 9927:12, 9950:8, 9950:15
**speculative** [2] - 9907:17, 9908:2
**spell** [1] - 9943:20
**spend** [3] - 9848:13, 9853:5, 9903:7
**spending** [1] - 9887:11
**spillover** [1] - 9877:3
**split** [4] - 9845:5, 9857:15, 9867:2, 9918:18
**spoken** [1] - 9950:9
**sports** [1] - 9903:15
**spot** [1] - 9913:19
**Spotlight** [1] - 9915:20
**spurs** [1] - 9844:18
**stagnant** [1] - 9847:17
**stand** [1] - 9948:16
**start** [9] - 9832:18, 9835:10, 9859:4, 9878:23, 9878:25, 9908:19, 9939:3, 9945:13, 9948:20
**started** [3] - 9878:10, 9935:23, 9937:2
**starting** [1] - 9939:12
**starts** [1] - 9923:3
**State** [1] - 9830:19
**statement** [3] - 9927:4, 9927:8, 9927:9
**statements** [1] - 9917:10
**STATES** [2] - 9830:1, 9830:10
**States** [3] - 9830:2, 9831:1, 9831:16
**stay** [4] - 9875:14, 9889:17, 9928:18, 9942:15
**stayed** [1] - 9884:9
**steep** [1] - 9888:17
**stenographic** [1] - 9952:5
**steps** [1] - 9886:5

**stick** [3] - 9943:9, 9945:4, 9945:8
**still** [10] - 9837:11, 9843:4, 9858:9, 9860:19, 9869:20, 9911:15, 9913:10, 9919:12, 9919:14, 9923:13
**stop** [2] - 9874:10, 9945:15
**stopped** [2] - 9882:20, 9882:25
**Store** [1] - 9850:5
**store** [3] - 9897:17, 9897:18, 9903:8
**story** [9] - 9842:8, 9842:19, 9845:11, 9871:21, 9878:4, 9878:21, 9880:8, 9880:15, 9902:14
**straightforward** [1] - 9888:10
**strategy** [1] - 9950:22
**street** [1] - 9896:25
**Street** [2] - 9830:12, 9830:15
**strength** [6] - 9833:6, 9836:12, 9836:17, 9838:12, 9839:14, 9839:18
**strengthen** [2] - 9893:10, 9907:17
**strong** [2] - 9871:14, 9871:16
**stronger** [9] - 9838:1, 9860:24, 9861:6, 9861:20, 9871:15, 9878:22, 9879:16, 9881:15, 9894:8
**struck** [2] - 9914:6, 9914:7
**structure** [1] - 9842:6
**stuck** [1] - 9846:21
**studied** [1] - 9851:2
**study** [2] - 9840:12, 9942:18
**stuff** [15] - 9836:22, 9848:2, 9860:5, 9862:5, 9863:9, 9867:9, 9896:4, 9897:10, 9897:20, 9898:4, 9905:22, 9912:16, 9935:23, 9937:4, 9939:2
**styles** [1] - 9854:16
**sub** [3] - 9892:16, 9892:17, 9906:16
**sub-bullet** [2] - 9892:16, 9906:16
**sub-letter** [1] -

9892:17
**subject** [2] - 9922:8, 9922:17
**subpart** [1] - 9832:10
**subpoint** [2] - 9832:8, 9885:24
**subs** [1] - 9885:9
**subsequent** [5] - 9880:24, 9884:4, 9884:16, 9884:17, 9885:9
**substantial** [4] - 9834:23, 9835:11, 9881:18, 9890:16
**substantially** [8] - 9832:9, 9840:19, 9840:20, 9858:22, 9870:3, 9879:16, 9881:15, 9884:7
**succeed** [1] - 9850:25
**success** [2] - 9839:17, 9906:23
**successful** [13] - 9836:3, 9844:11, 9844:12, 9844:14, 9845:5, 9846:5, 9849:12, 9852:1, 9853:19, 9853:20, 9854:13, 9895:18, 9899:13
**successfully** [2] - 9849:12, 9950:20
**suffer** [1] - 9906:5
**suffering** [1] - 9906:1
**sufficiently** [1] - 9886:24
**Suggest** [1] - 9916:12
**suggesting** [2] - 9837:5, 9949:1
**suggestion** [1] - 9930:5
**suggests** [1] - 9929:11
**Suite** [2] - 9830:16, 9831:2
**suite** [1] - 9845:24
**summary** [1] - 9840:1
**support** [6] - 9877:14, 9886:20, 9886:21, 9889:24, 9907:20, 9923:6
**supported** [1] - 9884:17
**surprised** [2] - 9905:23, 9937:23
**surprising** [2] - 9848:18, 9904:7
**surprisingly** [2] - 9855:5, 9937:17
**SVPs** [2] - 9928:4,

9928:10
**SW** [1] - 9831:6
**swipe** [1] - 9865:2
**swiping** [1] - 9927:19
**switch** [8] - 9846:22, 9853:6, 9885:3, 9903:1, 9905:21, 9930:19, 9942:1, 9942:12
**switched** [5] - 9880:2, 9885:1, 9892:7, 9903:14, 9928:3
**switches** [1] - 9902:17
**switching** [5] - 9852:15, 9868:9, 9896:20, 9910:15, 9927:22
**Symbian** [3] - 9842:25, 9843:3, 9850:23
**syndication** [3] - 9881:17, 9885:13, 9890:19
**system** [10] - 9845:1, 9845:24, 9846:2, 9850:22, 9851:1, 9853:8, 9854:5, 9856:8, 9918:8, 9933:5
**systems** [1] - 9850:23

# T

**tablets** [2] - 9920:8, 9920:14
**tackling** [1] - 9854:3
**tail** [14] - 9874:1, 9874:3, 9874:4, 9874:5, 9874:7, 9874:15, 9874:17, 9874:20, 9874:22, 9874:23, 9874:25, 9875:13, 9875:19, 9875:20
**talks** [1] - 9896:21
**teaching** [1] - 9927:6
**teams** [2] - 9946:22, 9948:8
**teasers** [1] - 9873:24
**tech** [2] - 9854:9, 9854:10
**technical** [1] - 9941:2
**telephone** [1] - 9895:17
**tend** [3] - 9848:16, 9848:20, 9848:24
**tendency** [1] - 9944:3
**term** [3] - 9852:19, 9915:16, 9915:17
**Terms** [1] - 9932:21
**terms** [21] - 9832:17,

9852:2, 9853:23, 9855:2, 9862:17, 9866:2, 9870:21, 9870:23, 9871:24, 9872:17, 9877:20, 9890:23, 9899:3, 9902:9, 9903:14, 9930:14, 9932:7, 9946:17, 9948:15, 9949:6, 9950:19
**test** [3] - 9914:22, 9917:5, 9921:8
**testified** [1] - 9919:6
**testifying** [1] - 9928:4
**testimony** [7] - 9889:9, 9906:5, 9915:8, 9918:7, 9919:14, 9927:15, 9945:18
**text** [1] - 9859:6
**THE** [116] - 9830:1, 9830:1, 9830:9, 9832:2, 9837:4, 9837:7, 9839:4, 9839:6, 9839:8, 9839:9, 9839:11, 9839:12, 9839:13, 9839:14, 9839:22, 9848:21, 9848:23, 9848:25, 9849:1, 9852:19, 9852:21, 9852:25, 9858:14, 9858:17, 9860:11, 9860:16, 9862:24, 9863:1, 9863:2, 9863:3, 9863:7, 9863:9, 9863:18, 9863:21, 9863:23, 9863:24, 9864:7, 9864:8, 9864:17, 9864:18, 9867:14, 9867:16, 9867:17, 9867:18, 9867:19, 9867:20, 9870:4, 9870:10, 9870:15, 9870:16, 9870:18, 9870:20, 9870:24, 9870:25, 9872:15, 9872:16, 9872:19, 9872:20, 9874:2, 9874:3, 9874:5, 9874:6, 9874:7, 9874:8, 9875:7, 9875:8, 9875:9, 9875:11, 9883:6, 9883:9, 9883:12, 9883:13, 9885:20, 9894:23, 9895:3, 9895:10, 9895:12, 9896:8, 9896:10,

9908:8, 9908:13, 9912:19, 9915:11, 9918:3, 9922:10, 9922:17, 9924:17, 9924:18, 9924:25, 9925:2, 9925:3, 9925:16, 9925:18, 9925:19, 9931:19, 9932:5, 9935:4, 9945:15, 9945:21, 9945:25, 9946:2, 9946:9, 9946:12, 9946:14, 9946:16, 9947:1, 9948:4, 9948:10, 9948:14, 9948:17, 9949:17, 9949:25, 9950:4, 9950:13, 9950:18, 9951:4
**theirs** [1] - 9887:19
**themselves** [3] - 9903:12, 9903:17, 9926:20
**theories** [5] - 9878:1, 9879:10, 9879:12, 9879:13, 9886:6
**theory** [16] - 9879:7, 9879:8, 9879:17, 9879:18, 9886:7, 9886:21, 9886:22, 9888:2, 9888:15, 9890:4, 9890:6, 9891:15, 9894:11, 9907:19
**there're** [1] - 9856:19
**thereafter** [1] - 9834:20
**therefore** [4] - 9855:19, 9860:15, 9890:8
**they've** [5] - 9833:25, 9845:9, 9895:18, 9917:18, 9943:9
**thinking** [9] - 9855:3, 9860:1, 9885:14, 9897:8, 9903:19, 9903:21, 9904:25, 9948:20, 9949:7
**third** [6] - 9877:10, 9877:14, 9885:25, 9906:17, 9949:12, 9949:14
**threats** [1] - 9906:18
**three** [6] - 9889:8, 9889:10, 9892:14, 9912:12, 9928:13, 9928:16
**throw** [1] - 9921:24
**tie** [1] - 9939:22
**Tim** [1] - 9891:17

**timeline** [1] - 9899:21
**timely** [1] - 9856:17
**timing** [2] - 9932:7, 9948:13
**tiny** [1] - 9885:12
**tips** [1] - 9947:15
**today** [9] - 9849:15, 9850:8, 9880:5, 9881:22, 9887:12, 9895:16, 9907:15, 9917:11, 9917:14
**today's** [1] - 9849:14
**together** [12] - 9833:7, 9844:5, 9854:7, 9857:16, 9877:19, 9877:20, 9884:1, 9884:2, 9899:8, 9901:5, 9906:21, 9931:22
**tomorrow** [1] - 9945:16
**tonight** [1] - 9948:2
**took** [5] - 9867:7, 9867:8, 9867:10, 9881:2, 9881:11
**top** [19] - 9833:19, 9850:6, 9857:7, 9860:9, 9860:18, 9860:21, 9860:25, 9865:5, 9867:9, 9871:10, 9902:25, 9903:12, 9903:17, 9903:22, 9904:8, 9919:11, 9922:23, 9932:21
**top-of-mind** [3] - 9903:17, 9903:22, 9904:8
**total** [7] - 9838:25, 9848:5, 9859:7, 9878:15, 9893:15, 9896:23, 9904:12
**totally** [1] - 9856:10
**touch** [1] - 9865:1
**tough** [3] - 9882:22, 9888:13, 9938:22
**track** [1] - 9920:23
**trade** [1] - 9865:17
**tradeoff** [6] - 9905:2, 9905:8, 9905:9, 9906:2, 9906:9, 9906:10
**traffic** [15] - 9862:17, 9863:9, 9865:11, 9865:23, 9865:25, 9871:14, 9871:16, 9871:24, 9872:9, 9872:24, 9913:9, 9913:13, 9919:4, 9919:16

**transaction** [3] - 9849:20, 9849:21, 9868:1
**transcript** [2] - 9952:4, 9952:5
**TRANSCRIPT** [1] - 9830:9
**transfer** [1] - 9892:14
**translate** [2] - 9834:1, 9880:24
**tray** [2] - 9862:10, 9864:21
**trend** [2] - 9882:25, 9885:3
**trends** [1] - 9838:10
**TRIAL** [1] - 9830:9
**trial** [4] - 9906:5, 9906:7, 9948:18, 9948:20
**trick** [1] - 9875:17
**tried** [5] - 9842:7, 9861:9, 9906:20, 9948:8, 9950:25
**tries** [2] - 9853:22
**true** [5] - 9887:11, 9903:1, 9947:18, 9952:4, 9952:5
**trusting** [1] - 9943:17
**try** [7] - 9854:6, 9879:10, 9879:12, 9905:14, 9921:9, 9925:3, 9928:18
**trying** [10] - 9843:14, 9845:4, 9854:8, 9869:14, 9910:20, 9911:23, 9931:6, 9932:13, 9936:8, 9948:15
**turn** [9] - 9832:7, 9833:10, 9839:24, 9845:5, 9858:21, 9870:2, 9871:4, 9880:17, 9884:7
**turning** [1] - 9906:16
**turns** [1] - 9859:13
**two** [34] - 9833:7, 9835:5, 9835:8, 9836:16, 9837:14, 9840:3, 9840:7, 9841:24, 9842:13, 9844:24, 9854:16, 9857:14, 9859:25, 9862:15, 9862:24, 9866:13, 9868:1, 9875:18, 9877:2, 9884:11, 9884:12, 9886:5, 9886:6, 9886:17, 9893:11, 9900:4, 9900:5, 9906:2, 9906:12,

9908:11, 9941:21, 9947:2, 9947:6
**two-year** [1] - 9884:12
**Tyler** [1] - 9831:1
**type** [3] - 9849:20, 9865:21, 9865:22
**types** [1] - 9904:15
**typically** [6] - 9857:11, 9857:14, 9867:24, 9914:8, 9914:19, 9914:21

# U

**U.S** [25] - 9830:12, 9830:15, 9833:4, 9833:7, 9835:25, 9836:2, 9836:3, 9836:6, 9836:7, 9836:9, 9836:10, 9836:17, 9836:19, 9837:2, 9837:10, 9837:17, 9838:18, 9838:22, 9838:25, 9839:15, 9843:4, 9854:21, 9854:24, 9903:16
**ubiquitous** [1] - 9880:14
**ultimate** [1] - 9844:6
**ultimately** [1] - 9947:23
**um-hum** [3] - 9864:7, 9864:17, 9935:4
**unbundle** [1] - 9866:11
**unbundled** [1] - 9866:12
**unbundling** [2] - 9867:25, 9876:10
**under** [13] - 9833:7, 9871:18, 9875:10, 9875:24, 9894:11, 9898:20, 9913:2, 9913:7, 9916:9, 9917:12, 9918:14, 9932:20
**underlying** [1] - 9886:19
**understood** [2] - 9930:3, 9948:17
**undo** [2] - 9869:16
**undoes** [1] - 9868:22
**undoing** [1] - 9868:23
**uniformity** [1] - 9843:14
**unique** [1] - 9944:14
**Unit** [1] - 9830:21
**UNITED** [2] - 9830:1, 9830:10

**United** [1] - 9831:16
**united** [1] - 9830:2
**units** [2] - 9911:13, 9911:16
**universe** [3] - 9842:22, 9883:11, 9898:14
**unless** [1] - 9947:16
**unlimited** [1] - 9916:19
**unredact** [1] - 9946:23
**unwelcome** [1] - 9921:14
**unwinding** [1] - 9869:7
**up** [43] - 9833:24, 9838:13, 9845:5, 9847:12, 9850:2, 9851:24, 9851:25, 9857:15, 9863:21, 9875:20, 9884:4, 9884:25, 9885:18, 9888:13, 9888:17, 9888:18, 9890:10, 9892:12, 9892:14, 9899:8, 9899:9, 9899:12, 9900:5, 9902:7, 9907:15, 9908:22, 9909:13, 9914:9, 9917:22, 9918:1, 9920:7, 9924:5, 9929:2, 9938:17, 9939:4, 9939:6, 9939:7, 9941:18, 9944:25, 9947:23
**update** [1] - 9856:7
**updates** [3] - 9856:6, 9856:9, 9856:10
**upgrade** [1] - 9918:8
**upgrades** [2] - 9856:6, 9856:17
**upgrading** [1] - 9853:13
**upside** [1] - 9876:14
**UPX050** [1] - 9912:21
**UPX1033** [2] - 9930:25, 9931:20
**UPX1033...................**
**...........................9931**
[1] - 9953:8
**UPX1034** [1] - 9935:5
**UPX2087** [2] - 9926:5, 9945:22
**UPX2087...................**
**...........................9926**
[1] - 9953:8
**UPX2143** [1] - 9922:5
**UPX2143...................**
**...........................9922**
[1] - 9953:9

9980

**UPX615** [1] - 9908:25
**UPX675** [1] - 9909:20
**UPXD005** [1] - 9918:1
**UPXD009** [1] - 9920:7
**UPXD267** [1] - 9927:1
**urges** [1] - 9855:15
**URL** [1] - 9922:23
**usage** [23] - 9833:22,
9834:3, 9834:4,
9834:9, 9834:11,
9834:13, 9834:21,
9835:2, 9835:3,
9837:21, 9837:23,
9837:24, 9837:25,
9838:1, 9841:12,
9844:14, 9847:7,
9884:20, 9890:11,
9890:12, 9890:16,
9899:18
  **useful** [1] - 9913:25
**user** [20] - 9869:12,
9869:16, 9869:18,
9869:20, 9870:11,
9886:9, 9886:12,
9887:8, 9887:21,
9899:25, 9903:23,
9905:2, 9916:11,
9916:14, 9919:21,
9921:3, 9928:17,
9933:5, 9933:6,
9936:17
  **users** [53] - 9844:6,
9845:20, 9848:11,
9849:5, 9850:10,
9853:24, 9855:19,
9869:11, 9887:7,
9887:9, 9887:11,
9887:12, 9887:13,
9887:17, 9887:19,
9887:22, 9887:25,
9888:1, 9888:9,
9888:11, 9888:15,
9889:7, 9889:12,
9889:14, 9889:16,
9889:20, 9890:9,
9900:19, 9900:20,
9902:22, 9902:23,
9905:1, 9905:13,
9905:14, 9906:3,
9919:25, 9920:20,
9921:13, 9921:14,
9921:18, 9921:21,
9922:2, 9925:6,
9926:13, 9926:17,
9926:21, 9927:9,
9941:5, 9944:11,
9944:17
  **users'** [1] - 9832:23
**uses** [5] - 9834:1,
9848:15, 9865:17,

9882:3, 9895:19

## V

**valuable** [1] - 9852:2
**value** [13] - 9849:24,
9849:25, 9851:21,
9851:24, 9858:4,
9875:1, 9876:16,
9876:17, 9904:16,
9914:9, 9916:13,
9941:4, 9941:7
  **valued** [2] - 9875:20,
9914:13
  **values** [2] - 9850:9,
9921:17
  **varies** [1] - 9896:22
  **variety** [2] - 9848:13,
9851:10
  **various** [6] - 9833:16,
9834:16, 9882:5,
9891:24, 9920:17,
9944:25
  **versa** [2] - 9847:2,
9900:21
  **versions** [3] - 9909:23,
9911:15, 9912:3
  **versus** [8] - 9837:21,
9839:15, 9842:7,
9842:8, 9847:19,
9854:12, 9901:2,
9941:17
  **vertical** [3] - 9837:20,
9884:2, 9895:20
  **viable** [1] - 9938:16
  **vice** [2] - 9847:2,
9900:21
  **victory** [1] - 9926:13
  **view** [10] - 9864:11,
9869:25, 9871:1,
9871:2, 9876:6,
9879:15, 9887:3,
9888:5, 9904:14,
9915:2
  **viewed** [1] - 9925:12
  **vigorous** [1] - 9906:22
  **violate** [2] - 9869:22,
9870:22
  **violates** [1] - 9869:25,
9870:14
  **virtually** [2] - 9856:7,
9890:23
  **vis** [2] - 9949:14
  **vis-a-vis** [1] - 9949:14
  **vis-à-vis** [1] - 9833:4
  **visible** [2] - 9903:15,
9904:17
  **volume** [10] - 9838:22,
9838:23, 9838:24,
9859:5, 9861:17,

9879:22, 9888:25,
9890:22, 9930:21,
9941:10
  **vs** [1] - 9830:5

## W

**Walmart** [1] - 9938:22
**waning** [1] - 9885:5
**wants** [4] - 9850:12,
9916:19, 9917:8,
9921:20
  **washes** [1] - 9875:18
  **Washington** [5] -
9830:5, 9830:13,
9831:6, 9831:17,
9952:13
  **Waszmer** [1] - 9831:11
  **watching** [1] - 9938:19
  **ways** [8] - 9832:19,
9845:6, 9855:17,
9865:4, 9892:24,
9898:4, 9901:6, 9936:7
  **wayside** [2] - 9845:22,
9849:14
  **weaker** [1] - 9894:17
  **web** [7] - 9863:16,
9910:24, 9910:25,
9911:13, 9923:13,
9933:13, 9934:3
  **Webb** [1] - 9831:1
  **website** [8] - 9862:20,
9862:21, 9864:1,
9864:2, 9897:18,
9899:22, 9922:25
  **week** [1] - 9924:8
  **weeks** [1] - 9923:13
  **well-known** [1] -
9888:12
  **Wendy** [1] - 9831:11
  **Wfcavanaugh@pbwt**
**.com** [1] - 9831:4
  **whichever** [1] - 9917:2
  **Whinston** [10] -
9833:5, 9834:25,
9836:11, 9877:16,
9878:19, 9881:1,
9900:13, 9900:25,
9901:3, 9902:10
  **Whinston's** [6] -
9875:24, 9882:4,
9886:2, 9889:24,
9890:3, 9890:6
  **whoa** [1] - 9846:16
  **whole** [9] - 9833:20,
9843:13, 9857:23,
9874:1, 9897:24,
9899:23, 9900:1,
9910:20, 9944:2
  **wholesale** [1] - 9903:2

**wider** [1] - 9851:10
**widget** [14] - 9849:22,
9850:18, 9857:5,
9860:7, 9862:3,
9865:8, 9865:15,
9865:18, 9865:22,
9865:24, 9866:8,
9866:23, 9867:9
  **wife** [1] - 9863:25
  **William** [1] - 9831:1
  **WILLIAMS** [1] - 9831:5
  **willing** [5] - 9874:17,
9876:20, 9892:1,
9938:10, 9939:6
  **Wilson** [3] - 9831:8,
9831:12
  **win** [11] - 9871:22,
9874:18, 9875:6,
9892:24, 9893:1,
9894:13, 9896:4,
9898:23, 9941:17,
9941:18, 9941:19
  **Windows** [28] -
9842:7, 9843:1,
9850:23, 9890:10,
9890:11, 9890:14,
9894:10, 9900:18,
9923:12, 9929:25,
9930:1, 9930:13,
9932:11, 9932:21,
9933:1, 9933:13,
9933:24, 9934:3,
9934:18, 9935:1,
9935:25, 9936:2,
9936:6, 9937:13,
9942:11, 9942:16,
9944:23
  **winning** [2] - 9848:6,
9874:18
  **wins** [2] - 9874:15,
9941:17
  **wireless** [1] - 9843:24
  **wise** [2] - 9891:1,
9891:3
  **WITNESS** [41] -
9837:7, 9839:6,
9839:9, 9839:12,
9839:14, 9848:23,
9849:1, 9852:21,
9858:17, 9860:16,
9863:1, 9863:3,
9863:9, 9863:21,
9863:24, 9864:8,
9864:18, 9867:16,
9867:18, 9867:20,
9870:10, 9870:16,
9870:20, 9870:25,
9872:16, 9872:20,
9874:3, 9874:6,
9874:8, 9875:8,

9981

9875:11, 9883:9, 9883:13, 9895:3, 9895:12, 9896:10, 9924:17, 9925:2, 9925:18, 9945:21, 9953:2

**witnesses** [2] - 9908:5, 9948:16

**wonder** [1] - 9947:12

**words** [3] - 9870:18, 9916:4, 9927:12

**works** [3] - 9842:4, 9852:4, 9872:13

**world** [22] - 9832:9, 9842:24, 9848:3, 9849:14, 9849:21, 9859:15, 9878:22, 9883:9, 9886:7, 9886:24, 9890:21, 9891:2, 9894:25, 9895:5, 9895:11, 9905:12, 9905:14, 9915:3, 9916:25, 9917:4, 9941:16, 9949:2

**worry** [2] - 9896:5

**worse** [1] - 9889:10

**worth** [2] - 9887:10, 9914:14

**Wow** [1] - 9881:3

**write** [1] - 9845:12

**writes** [2] - 9924:8, 9931:22

**wrote** [7] - 9873:5, 9925:6, 9928:20, 9929:4, 9929:8, 9929:10, 9940:9

**wwaszmer@wsgr. com** [1] - 9831:14

## Y

**Yahoo** [35] - 9881:17, 9882:1, 9882:14, 9883:2, 9883:4, 9883:18, 9883:19, 9883:24, 9884:19, 9885:1, 9885:4, 9890:19, 9892:6, 9892:7, 9892:14, 9931:24, 9933:23, 9934:2, 9934:3, 9934:7, 9934:14, 9934:16, 9934:19, 9934:20, 9935:8, 9935:13, 9935:19, 9935:20, 9935:23, 9935:25, 9936:4, 9936:11, 9936:23, 9937:1

**Yahoo!** [1] - 9934:14

**Yahoo!'s** [2] - 9881:20, 9884:22

**Yandex** [6] - 9836:2, 9836:4, 9836:10, 9836:15, 9838:6, 9838:10

**year** [4] - 9883:13, 9883:14, 9884:12, 9892:13

**years** [11] - 9835:5, 9835:8, 9884:11, 9885:2, 9892:14, 9893:16, 9893:23, 9898:6, 9899:17, 9912:12

**yellow** [1] - 9883:24

**yield** [2] - 9879:16, 9881:14

**York** [3] - 9831:3, 9831:10, 9831:13

**yourself** [2] - 9842:2, 9842:4

## Z

**zero** [2] - 9850:20, 9868:20