```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA, et al., .
                                       .   Case Number 20-cv-3010
 4            Plaintiffs,              .
                                       .
 5        vs.                          .
                                       .   Washington, D.C.
 6   GOOGLE LLC,                       .   November 14, 2023
                                       .   1:37 p.m.
 7            Defendant.               .
     - - - - - - - - - - - - - - - - - .

 8

 9              TRANSCRIPT OF BENCH TRIAL, DAY 40
                       (AFTERNOON SESSION)
10            BEFORE THE HONORABLE AMIT P. MEHTA
                 UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For DOJ Plaintiffs:         KENNETH DINTZER, ESQ.
                                  United States Department of Justice
14                                1100 L Street Northwest
                                  Washington, D.C. 20005
15
                                  MEAGAN BELLSHAW, ESQ.
16                                CAMERON GOWER, ESQ.
                                  United States Department of Justice
17                                450 Fifth Street Northwest
                                  Washington, D.C. 20001
18
                                  VERONICA ONYEMA, ESQ.
19                                United States Department of Justice
                                  450 E Street Northwest
20                                Suite 8714
                                  Washington, D.C. 20530
21

22                           -- continued --

23

24

25
```

 1    APPEARANCES (CONTINUED):

 2    For Plaintiff State of
      Colorado:                     JONATHAN SALLET, ESQ.
 3                                  Colorado Department of Law
                                    Consumer Protection Section
 4                                  Antitrust Unit
                                    1300 Broadway
 5                                  Seventh Floor
                                    Denver, Colorado 80203
 6
      For Plaintiffs State of
 7    Colorado and State of
      Nebraska:                     WILLIAM F. CAVANAUGH, JR., ESQ.
 8                                  Patterson Belknap Webb & Tyler LLP
                                    1133 Avenue of the Americas
 9                                  Suite 2200
                                    New York, New York 10036
10
      For the Defendant:           JOHN SCHMIDTLEIN, ESQ.
11                                  BENJAMIN GREENBLUM, ESQ.
                                    Williams & Connolly LLP
12                                  680 Maine Avenue Southwest
                                    Washington, D.C. 20024
13

14

15    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
16                                  Room 4704-B
                                    Washington, D.C. 20001
17                                  202-354-3284

18
      Proceedings recorded by stenotype shorthand.
19    Transcript produced by computer-aided transcription.

20

21

22

23

24

25

# C O N T E N T S

### TESTIMONY

KEVIN MURPHY          Cross-Examination (Continued).... 10151
                      Redirect Examination............. 10190

```
 1                      P R O C E E D I N G S

 2          (Call to order of the court.)

 3              THE COURT:  All right, Mr. Dintzer.

 4              MR. DINTZER:  May I continue, Your Honor?

 5              THE COURT:  You may.

 6              MR. DINTZER:  Thank you, Your Honor.

 7                      CROSS-EXAMINATION (Continued)

 8              BY MR. DINTZER:

 9     Q.    So we were talking about the -- whether the distribution

10     contracts were intensely and the defaults were intensely

11     contested.

12          Do you recall that?

13     A.    I do.

14     Q.    Okay.  And on Apple, is it your position that the Apple

15     default on Safari was intensely competed?

16     A.    I think that's a fair general statement.

17     Q.    Okay.  Now, it's true that Bing made a proposal, is that

18     right, to Apple?

19     A.    Well, it depends on when you're looking at.  I mean, Bing

20     wasn't even around before 2009.

21     Q.    I'm talking about 2016.

22     A.    I had no way of knowing that from your question.

23     Q.    No, that's fair.  So let me rephrase.

24          Is it your position that in 2016, that the default -- that

25     the Safari default was intensely competed?
```

A.   I would think that's a fair characterization.

Q.   Okay.  And Bing tried to -- or made an offer to try to get the Safari default; right?

A.   That's my recollection, yes.

Q.   Bing tried offering everything it could and still couldn't match Google; is that right?

A.   Well, I don't know if that's everything it could under the plaintiffs' theory that they would gain immensely in terms of additional data and things.  You assume they would value that beyond just the current cash flows.

So if they believed that, I assume they would have been willing to bid more to get that highly valuable data; right?

MR. DINTZER:  May I approach, Your Honor?

BY MR. DINTZER:

Q.   Sir, we're passing this one out instead of putting it on the screen because there's a portion of it that is redacted, and we're not supposed to say it out loud.  Oh, we're going to have a redacted one up on the screen, but I want you to be able to see the whole thing.

THE COURT:  Hang on for a second.  It looks like only -- is the second iteration of that number --

THE WITNESS:  Whoops.

MR. DINTZER:  No, I think we're allowed to do -- we're not going to put it up.

THE COURT:  Okay.

```
 1              BY MR. DINTZER:
 2   Q.    So do you see the slide, sir?
 3   A.    I do.
 4   Q.    Okay.  And Mr. Cue is asked this question, and I'm going to
 5   leave out -- I see; I see.  I'm going to leave out both of the
 6   redactions.
 7        "Question:  And did Microsoft later increase its offer to
 8   X percent of revenue share?
 9        "Answer:  As they got more desperate, they increased their
10   offer to X percent.  They offered to have us invest in Bing, and
11   at one point, they offered to us to buy Bing and then ultimately
12   offered to basically give us Bing."
13        Do you see that?
14   A.    I do.
15   Q.    And Mr. Cue testified that there was no valid alternative
16   to Google; is that right?
17   A.    I don't remember those precise words.  I remember he said
18   that they viewed Google as the best choice.
19   Q.    Okay.  Let's put -- this one, we can put on the screen,
20   UPXD241.  And he was asked:
21        "Question:  And if you weren't able to reach a deal on the
22   economic terms, you were willing to walk away from the ISA;
23   right?
24        "Answer:  I've been fairly clear that I didn't think at the
25   time, nor today, that there's anybody out there who's anywhere
```

1  near as good as Google at searching.  And so certainly, there

2  wasn't a valid alternative that we could have gone to at that

3  time."

4       Do you see that?

5  A.   I do.

6  Q.   And even though Bing had tried to offer the X percent that

7  we had looked at in the previous slide.

8       Do you understand that?

9  A.   I do.

10 Q.   Okay.  Mr. Cue also testified that he had no choice in

11 which search engine to pick for the Safari default.

12      Do you recall that?

13 A.   I don't recall those words.  I know he talked about how

14 much he valued going with Google.

15 Q.   Okay.  Let's go to UPXD220.  He was asked this question:

16      "Question:  If you were unable to reach a deal with Google

17 in 2016, what would Apple have done?

18      "Answer:  Ultimately -- I don't know the answer, but I'm

19 going to speculate a little bit, and that is, it wasn't a choice

20 to pick any of the existing search engines."

21      Do you see that?

22      "We probably would have been left with no other choice than

23 to potentially building our own."

24      So as far as Apple was concerned, there was no other choice

25 of existing search engines?

```
1    A.   I think that mischaracterizes what he says when he's

2    talking about speculating.  So --

3             MR. DINTZER:  May I approach, Your Honor?

4             THE COURT:  Sure.

5             BY MR. DINTZER:

6    Q.   Sir, this one has a box on it, so I'm handing it up.  There

7    are parts of it that I can't read out loud.

8        And I'm going to draw your attention to -- you're welcome

9    to read the whole thing, of course -- to the answer as to what

10   Mr. Cue indicated was the place where they would deal with

11   Microsoft.

12       Do you see that?

13   A.   I do.

14   Q.   Okay.  And given that testimony, Apple did not view

15   Microsoft's -- Apple, not you, Apple did not view Microsoft's

16   competition with Google as intense?

17   A.   If you take that testimony at face value, I would say

18   that's what he believed, but for competition, it's more

19   important what Google believed.  Right?  Because -- I will tell

20   you why I know that.  I bet he didn't tell that to Google.

21   Q.   Android -- so moving from Apple to Android, Android OEMs

22   don't put their defaults out for bids when their contracts come

23   up.

24   A.   Well, I don't think they have a formal bid, but if somebody

25   approached them, I assume they would be interested.
```

Q.   Android OEMs that sell into the U.S. only negotiate their
search defaults with Google.

MR. SCHMIDTLEIN:  Objection.

THE WITNESS:  I --

THE COURT:  Hang on.  What's the basis for the
objection?

MR. SCHMIDTLEIN:  There's no foundation.  He's asking
him fact questions.  There's no foundation for it.

THE COURT:  Well, I assume he's referring to the
record or whatever he's reviewed or not reviewed.  And he can
either confirm that or not.

BY MR. DINTZER:

Q.   Android OEMs -- do you need me to repeat it?

A.   Yes, please.

Q.   Android OEMs that sell into the U.S. only negotiate their
search defaults with Google; is that right?

A.   I don't know the full extent of what they negotiate with.
So I would say -- that's all I can give you.  I haven't seen
evidence either way.

Q.   Okay.  So if you don't know how they negotiate, your
conclusion about them being -- there being intense competition
for the contracts, that's qualified by the fact that you don't
know how they negotiate.

A.   Well, I talk about the agreements.  I talked about the
browser agreements.  The statements, you're taking out of

1   context, because the statement I made about intense browser

2   agreement negotiations were with respect to Apple and the

3   independent browsers.  Remember, I dealt with those two pieces

4   separately in my report and in my testimony?  So if you look at

5   where in my testimony I talk about that intense competition,

6   that's for the independent browser agreements and Apple.

7       So I did not make that statement with regard to Android

8   OEMs.  So I wouldn't qualify the statement I made, because it

9   was already qualified to those.

10  Q.   Okay.  Changing default search to Bing wouldn't affect

11  market price for an Android phone, if you know?

12  A.   Well, it depends on how it affected revenues of the Android

13  OEMs, and given the Android -- there's competition within

14  Android and basically what we call in economics elastic supply,

15  I would assume that there's a change in their cost, in this case

16  a change in the revenues they receive.  It would translate into

17  changes in prices.

18  Q.   Have you done any analysis to determine how much less an

19  Android OEM could sell their phone for if it had Bing as the

20  default exclusively on the device?

21  A.   No, because I don't know how much the revenues would fall,

22  but if I knew how much the revenues would fall, my knowledge of

23  economics would say a significant part of that would be

24  reflected in the prices ultimately charged to consumers.

25  Q.   And in describing the competition for on Android, you

1    intentionally do not use the word "intensely competed"; right?

2    A.   I don't think I had evidence for that.  That's why I didn't

3    make a statement to the effect one way or the other whether it

4    was intensely competed or not.  I had evidence from the

5    marketplace that for independent browsers and Apple there was.

6    That's why I stated it there.

7    Q.   Could we go to slide 110 in your deck, and it's on the

8    screen.

9         I just want to make sure I get this right.  OEMs pay Google

10   for GMS; is that right?

11   A.   Where?

12   Q.   This is Europe.  I apologize.  In Europe.  I was

13   referencing your slide, 110.

14        You say, "European unbundling with separate pricing is the

15   appropriate counterfactual."

16        Do you see that?

17   A.   I think that's the -- yes, I think that's an appropriate

18   counterfactual for unbundling, not for everything but for

19   unbundling, yes.

20   Q.   So let's talk about that.  So Google receives a license fee

21   from the OEMs for GMS; right?

22   A.   Yes.

23   Q.   Okay.  And you have the arrow, the OEMs, and Google.  And

24   then Google pays a fee to the OEMs so that they will -- for the

25   placement of Google Search in Chrome; is that right?

A.    Yes.

Q.    Okay.  And these fees, roughly, not exactly, but roughly

net out; is that right?

A.    Yes.  I think the empirical fact for Europe is they roughly

net out.

Q.    Okay.  So combined, this is zero either way, zero cost for

either side, roughly?

A.    Yeah, it induces transaction costs and could create

problems if you can't set the prices right, because remember,

there's not just one price.  There are multiple prices going in

both directions.

Q.    And this is the EMADA; right?

A.    That is the EMADA.

Q.    And this exists in the EU even though there's a choice

screen that assigns the search default; right?

A.    Yes.

Q.    Okay.  So the existence of a choice screen assigning a

search default did not prevent the transfer in these two

directions on the EMADA; right?

A.    Well, it affected other parts of the deals.  This is a

regulated solution, though.  So you've got to be careful.  I'm

not sure this gives us a very good idea of what the competitive

dynamics of that would be.  Right?

      I mean, this was negotiated as part of a regulatory

solution.  So I'm not sure you can take the pricing change you

1    see here as indicative of that.

2    Q.   Okay.  So no further questions on that, sir.

3        Google doesn't track -- we're going to go to the subject of

4    pass-through.  You've talked about pass-through; right?

5        Google doesn't track pass-through for rev share; correct?

6    A.   Not that I know of.

7            THE COURT:  Sorry.  Can you just specify what you mean

8    by "pass-through"?

9            MR. DINTZER:  Sure.

10           BY MR. DINTZER:

11   Q.   Sir, the idea of pass-through is that when Google pays for

12   rev share for a default to a carrier or OEM, the question of

13   whether that passes through to the consumer.

14       Am I roughly getting that right, just to explain the

15   concept so we can move forward with that?

16   A.   Yeah.

17   Q.   Okay.  And so the question is, does money that goes from

18   Google to the carrier OEMs in some way pass through to the

19   benefit of the consumer?  Right?

20   A.   It's not a question of -- pass-through is the process by

21   which that happens.

22   Q.   Fair enough.  I just wanted to get a baseline for the

23   concept.  So then I will re-ask my question.  I think I got an

24   answer, but it's important.

25       So Google doesn't track pass-through for rev share; right?

A.    Well, you can't really track it at a given OEM.  Right?
Because that's not how pass-through works.

Q.    So you cited no Google docs or OEM docs showing that they
pass through money from the MADA to -- or the rev share paid on
the MADA to consumers; right?

A.    Well, you're misunderstanding how pass-through happens.
Pass-through doesn't just happen at a given OEM, because
pass-through happens in a marketplace.  So for example, if you
look at an individual firm and their costs go down, they may
pass through some -- they will pass through some, but it may be
only part.  But when you give it to all the firms, like all the
OEMs or all the carriers, then they're not just passing through
because their costs went down, but because the other people
lowered their prices, right, because they're competing against
one another.

        So the pass-through in an industry with multiple players is
not a single-player concept.  It happens at the market level.

Q.    My only question is, you haven't shown us any documents,
you haven't identified any documents, whether Google's or
carriers or OEMs, that show the amount of pass-through?

A.    Not the amount.  We have documents that talk about at the
OEM level, certainly the carrier level that talk about
pass-through and that they consider that as one of the things,
the costs that they have or the benefits they get from the RSA.

Q.    Okay.  And which documents are you referring to?

A.    We talk about it in the report.  There's discussions of
how, for example, the lower -- the lower costs they have or
their RSA payments help them compete.

Q.    Okay.  In the ordinary course, Google makes no effort to
track how its payments for search distribution are used by
Android partners; correct?

A.    No.  I wouldn't expect them to.  That's a hard thing to do.

Q.    And there's no testimony in the record of a direct
connection between rev share and phone prices; correct?

A.    On Android?

Q.    Well, we can start with Android.  On Android.

A.    We looked at things for Apple.  We didn't look at things
for Android.

Q.    So you didn't look at rev share for Android?

A.    But the economics is even clearer on Android where you have
a competitive market with elastic supply.

      I'm sure as Professor Whinston can tell you, there would be
high pass-through in a market like that.

Q.    Many factors affect the pass-through rate; is that right?

A.    Well, in a competitive market with elastic supply, you
would tend to expect very high pass-through rates as a matter of
underlying economics.

Q.    Let's go to slide 100 in your deck.

      Pass-through depends on variables that are difficult to
estimate.  Do you agree with that?

A.   Well, if you're trying to measure it as opposed to assess
whether it's going to happen, those are two very different
things.

Q.   So why don't we go to my question.  Pass-through depends on
variables that are very difficult to estimate; right?

A.   Not in the competitive market with elastic supply, no.

Q.   For example, supply and demand conditions in a market can
affect pass-through.

     I think you said that; right?

A.   Yeah, elastic supply together with industrywide cost
reductions is going to tend to have high pass-through.

Q.   Supply and demand in the cell phone market could affect OEM
pass-through rate; right?

A.   I mean, it could, but I'm telling you, if you have elastic
supply in a competitive marketplace, you can expect high
pass-through.

Q.   You have no econometric data that Google's payments to OEMs
and carriers affect the final price for Android phones; correct?

A.   I do not have the data with which to do that.

Q.   And you haven't sought to quantify pass-through; right?

A.   I'm basing it on economics.

Q.   And you don't have direct evidence on how moving to a
choice screen would affect the price of Android phones; right?

A.   Well, I think directionally, it's going to lead to lower
payments.  That's going to lead to higher prices for phones.

1    But I haven't quantified it.

2    Q.   You haven't done that.  And you don't have -- well, I think

3    we got that.

4         Let's go to UPXD254.

5              THE COURT:  Can I ask a question while we're on the

6    subject of choice screens and phone prices?

7         Has there been any analysis since the choice screen was

8    instituted in Europe and the impact on phone prices in Europe?

9    Not that necessarily you've done it, but are you aware of any

10   analysis?

11             THE WITNESS:  No, I mean -- the only thing we've

12   looked at some is on the RSA payments themselves, which would be

13   the driver of pass-through.  But given that you have to wait

14   until the contracts get renegotiated, it's taking some time for

15   that to happen.

16        So it does appear like there's been some reduction very

17   recently, but I don't know of a study that's linked that through

18   to phone prices.

19             THE COURT:  Thank you.

20             BY MR. DINTZER:

21   Q.   So now let's put up UPXD254.

22        This was Mr. Rosenberg's testimony.  Have you read

23   Mr. Rosenberg's testimony?

24   A.   Parts of it.

25   Q.   Okay.  And he was asked:

1       "Question:  And you don't have any understanding as to how

2    carriers or OEMs use the revenue share payments that Google pays

3    them?

4       "Answer:  I don't.

5       "Question:  There's no requirement that carriers or OEMs

6    use the revenue share payments they receive from Google to lower

7    the price of Android devices to consumers?

8       "Answer:  That's true."

9       And it goes on.

10      And one of the reasons that Google has established the

11   go-to market was to find a way to fund phones separate from the

12   RSA; right?

13   A.   You'd have to ask them, but if they view parts of that as a

14   replacement for parts of the RSA, I would say with that, that's

15   a --

16   Q.   Well, Google's go-to-market payments, you understand, were

17   aimed at phones above $400; right?

18   A.   Right.  So those would be pressing particular kind of

19   phones that satisfy particular characteristics.

20   Q.   And the go-to-market agreements did not require search

21   exclusivity or placement for Google Search; right?

22   A.   I don't know what all you're calling the go-to-market

23   agreements.  There's been a variety of different agreements.

24   The post -- the recent period's complicated, because the carrier

25   agreements are different on each of them.

1    Q.    Sir, are you familiar with the go-to-market agreements?

2    A.    You're talking about the whole replacement for the RSA or

3    just part?  I don't know by name.  I know kind of what's going

4    on with the replacement deals for the RSAs.

5    Q.    Okay.  And did you see the testimony or read the testimony

6    that Google is creating go-to-market agreements with their

7    partners to ensure investment in the Android system?

8    A.    I have looked at the deals themselves.  I did prior to the

9    testimony.  So I've looked at -- we've examined the deals

10   themselves.

11   Q.    And do you understand that those payments did not require

12   search exclusivity or placement for Google Search?

13         If you don't know, that's fine.

14   A.    I mean, you're -- when you say "those agreements," you mean

15   that part of the agreements that Google has with its various

16   OEMs?

17   Q.    Let's go to D287.

18         This is Ms. McAllister.  Did you read her testimony?

19   A.    I don't recall reading her testimony.

20   Q.    "Question:  Let me ask a better, more precise question.

21         The go-to-market agreements did not require carriers to

22   pre-install Google Search --

23         "Answer:  No, it did not.

24         "Question:  -- on devices?  It also didn't require Google

25   Search to be set as the default search engine on the Android

1    devices that qualified?

2        "Answer:  The go-to-market deal did not.  That was in the

3    RSA agreement.

4        "Question:  Got it.  And the go-to-market agreement did not

5    require that the devices that qualified had Google Search

6    exclusivity?

7        "Answer:  No."

8        So Google is setting up these go-to-market agreements to

9    encourage investment by the partners in the Android system;

10   right?

11   A.   What they did is that used to be -- there used to be kind

12   of one big thing called the RSA.  They split it into pieces.  So

13   they still have an RSA component, and they added -- they broke

14   it into a go-to-market component and the RSA component.  And the

15   RSA component is -- doesn't involve the search side.

16   Q.   Okay.  And so with these go-to-market payments, Google is

17   able to funnel money to their partners for investment in the

18   platform without seeking exclusivity; right?

19             MR. SCHMIDTLEIN:  Objection.

20             THE WITNESS:  Well --

21             THE COURT:  Hang on.  I think it's the wording of the

22   question you're objecting to?

23             MR. SCHMIDTLEIN:  He mischaracterized the agreements.

24             THE COURT:  The agreements will speak for themselves.

25   But he can answer the question if he knows the answer.

1          THE WITNESS:  I would have to go back and see all the

2     terms of the agreements.  But the search part is separated out

3     now.  That's the part I focused on.

4          BY MR. DINTZER:

5     Q.   Let's go to slide 17.

6          I can't show part of this.  So let me know when you have it

7     up on your screen, sir.

8     A.   I know the slide.  Go ahead.

9     Q.   Okay.  You testified about a possible link between Google's

10    ISA payments and Apple prices; is that right?

11    A.   I did.

12    Q.   Okay.  And so what we're seeing on this slide, without

13    talking about where the lines go, we're looking at Apple's gross

14    margin and services margin; is that right?

15    A.   Well, we have three lines.

16    Q.   And the device sales -- I was going to do them in parts,

17    but and device sales margin; is that right?

18    A.   That's correct.

19    Q.   And you say on the slide, "Higher service margins,

20    including the revenue share, are offset by lower device

21    margins"; right?

22    A.   That's correct.

23    Q.   And so what you're saying is that this may show

24    pass-through and that the ISA payments could be affecting the

25    price of the phones; right?

1    A.    That would be one interpretation of it, yes, simple

2    interpretation of what's going on.

3    Q.    Well, fair enough, because when you used this on direct,

4    you indicated that these movements could be a coincidence.

5    A.    They could be.

6    Q.    Okay.  And you can't causally -- separate from this, you

7    can't causally link the Google payments and Apple prices; right?

8    A.    I cannot eliminate the possibility that this is a

9    coincidence, but either you have them by coincidence or it's a

10    simple story that it happened the way with pass-through.

11    Q.    And you have no econometric analysis proving causality

12    between payments to Apple and iPhone prices going down?

13    A.    I don't think I could.  My testimony, I think, is clear as

14    to what I'm saying.

15    Q.    Okay.  And factors other than the pass-through of services

16    revenue could contribute to the decline in the device margins?

17    A.    It could.  I mean, I think I've been clear from the

18    beginning, yes.

19    Q.    Okay.

20            THE COURT:  Could I ask a question about this?  I

21    can't remember whether we've talked about the directionality of

22    the device sales margin.  But we've heard testimony that at some

23    point, I can't remember the exact year, Apple continued to sell

24    or kept selling older phones and did so at a lower price.

25    Whether that was to compete with lower-priced Android phones or

1    not, I'm not sure, but the bottom line is, they now offer

2    lower-priced older model phones.

3              THE WITNESS:  Yeah.

4              THE COURT:  Could that have some impact on this trend?

5              THE WITNESS:  I don't remember when that happened.  So

6    I don't think that would apply throughout the period.  Maybe

7    during some of the period.  So I would say maybe part of this

8    could be accounted for by that, but I don't think it would be

9    accounting for the whole time period.

10             THE COURT:  Okay.  Thank you.

11             BY MR. DINTZER:

12   Q.   Now, Google pays much more rev share to Apple than to

13   Android partners; is that right?

14   A.   Yes.  I mean, that's because on Apple there's no other

15   agreements that lead to placement.  Right?  We also have the

16   EMADA leading to placement on Android phones.  So you can sort

17   of think on Android, they're getting placement in two pieces,

18   some of it through the MADA and then some additional through the

19   RSA.

20        In Apple, all the -- the entire placement is all through

21   the ISA, whatever you want to call it.  It's all through that.

22        So the two are not really comparable, for reasons you see.

23   One is for part of it, and the other is for the whole.

24   Q.   So when Google is pricing the RSA, it's considering --

25             MR. SCHMIDTLEIN:  Your Honor, I don't know that this

```
 1    type of comparative discussion has been had in open court.

 2              THE COURT:  Let me just ask what the issue is.  What

 3    are we heading toward and --

 4              MR. DINTZER:  I'm just looking at the answer, because

 5    it wasn't quite -- he headed in a direction, and I need to see

 6    what he was saying.

 7         I'm not saying any numbers, so if that's their concern.

 8              MR. SCHMIDTLEIN:  He also heard this morning that we

 9    had you talking about comparators within different companies,

10    and he's now doing it across different companies.

11              MR. DINTZER:  I mean, my question was, Google pays

12    much --

13              MR. SCHMIDTLEIN:  Yes, that's your question.

14              MR. DINTZER:  I see.  I'm almost certain that that's

15    been said before in court.  But that's fine.  If we need to

16    close it --

17              THE COURT:  I don't recall exactly what we're talking

18    about, so you'll have to --

19              MR. DINTZER:  I can't --

20              THE COURT:  No, I understand.  Why don't you finish

21    up, and then we will -- we can come back to this and see what we

22    need -- if anything, we need to do about it.

23              MR. DINTZER:  Understood, Your Honor.

24         If I could converse with counsel, because he may be

25    thinking I'm asking something different than I am asking.
```

 1          THE COURT:  Why don't you take a couple minutes.

 2       (Counsel conferred.)

 3          MR. DINTZER:  I think we've gotten to the answer.  I'm

 4    going to go ahead and ask the question.  I'm just going to

 5    rephrase it to make sure that we're inside the line.

 6          THE COURT:  Okay.

 7          BY MR. DINTZER:

 8    Q.   Google pays much more total dollar rev share to Apple than

 9    it does total dollar rev share to its Android partners; is that

10    correct?

11    A.   You mean like the -- if you just said total dollars going

12    out the door, all --

13    Q.   In the two directions.

14    A.   I think that's already been in evidence in this case.  So

15    yeah, I could say that.

16    Q.   Okay.  And you talked about how for the RSA the thinking is

17    that part of the money is for -- that they can -- that the

18    percentage set by the RSA is set based on the consideration that

19    they've already provided a benefit in the MADA, so that can

20    affect whatever percentage rate Google is going to set for the

21    RSA.

22    A.   Well, it's not just they've already provided a benefit.

23    They've already received a benefit because of the placement they

24    got through the RSA.  Right?  It's both sides that have added to

25    the equation beforehand.

1    Q.   The existence of the MADA affects the RSA payment that

2    Google will make to its Android partners?

3    A.   I would think that's what economics would tell me, because

4    you're -- the value transferring between both sides is smaller

5    because you've already made part of the transaction already.

6    Q.   Okay.  When negotiating revenue share, Google does not

7    consider the effect in the smartphone market of these payments

8    to Apple; is that correct?

9    A.   I can't speak for Google.  I don't know what they consider

10   or not.

11   Q.   Let's go to UPX -- changing subjects, let's go to UPX1128.

12              THE COURT:  Can I go back for a moment?  Maybe I'm

13   just not following your point about the MADA/RSA pricing

14   interaction.

15        So if -- why wouldn't it be the case that the RSA payments

16   on the Android devices would be higher as a percentage because

17   Google is not receiving any kind of compensation for the MADA

18   placement?

19              THE WITNESS:  No, but the --

20              MR. SCHMIDTLEIN:  Your Honor, this is sort of a little

21   bit of the discussion.  I think Mr. Dintzer is talking about

22   total payments.

23              THE COURT:  Right.

24              MR. SCHMIDTLEIN:  In other words, which goes to the

25   volume of devices, not revenue share percentages between Apple

and Android.  And that's the issue that I wanted to make sure he
wasn't talking about in open court.

THE COURT:  I'm just asking him about the relative
percentage of the Android vertically.  I'm not talking about
anything across devices.

MR. SCHMIDTLEIN:  Understood.

THE WITNESS:  I can do it without money, because you
don't need the money side.

Think about when they get the agreement with Apple.  They
would be going from no pre-installation to default status on
Safari.  When you go on Android, going from nothing to where
they end up is -- is done in two steps.

You're paying for -- you buy part of it at the MADA stage.
Right?  So they're getting placement of the widget in Chrome and
GSA in a folder in the MADA.  So that payment is not going to
show up -- the payment for that value is not going to show up in
the RSA.

Whereas, when you look at Apple, you're looking at the
entire from nothing to full.  On Google, when you put on the
RSA, you're going from what you've already gotten in the MADA to
full.  So it's like you bought on the Android, you're buying it
in two pieces.  You're getting some pre-installation through the
MADA and the rest of it through the RSA.  On Apple, it's coming
in one fell swoop, and so there's only one payment that shows up
in that transaction.

1          THE COURT:  I think I follow you.

2          THE WITNESS:  So it's like, you don't even have to

3     think about the cash.  It's really like the real value flowing

4     in the other direction back to Google.  They're buying it in two

5     chunks.  I'll get some through the MADA, and then I will buy the

6     rest through the RSA.  And Apple, the payment's going to reflect

7     the whole ball of wax.

8          So when you're comparing across Google and Apple, you

9     wouldn't expect them to necessarily be the same, even if the

10    economics were the same, because you're only buying a part of it

11    through the RSA on Android.

12         THE COURT:  Okay.  Thank you.

13         BY MR. DINTZER:

14    Q.   When Google sets the RSA percentage for carriers, it is

15    taking into account the prior agreement and what they've already

16    got in the MADA; right?

17    A.   I would think so.  That's what -- as an economist -- I

18    can't speak for Google.  As an economist, that's what I would

19    expect them to do, yes.

20    Q.   Okay.  Let's go to UPX1128.  And that's not in your binder.

21    So I need to hand this one up.

22         MR. DINTZER:  May I approach, Your Honor?  This is an

23    updated version based on confidentiality negotiation.

24         BY MR. DINTZER:

25    Q.   And, sir, if you can see that this is a 2000 -- let's see.

```
 1    The date will be on the second e-mail.  The date is 2016; it's
 2    in October 2016.  It's a chain.
 3        Do you see that?
 4    A.    Okay.  I do see that.  I didn't see it on the first page.
 5    Yeah, I see it on the second page.
 6    Q.    Right.  And the top of it goes to a whole bunch of people
 7    at Google, including Ms. Porat, who is the CFO, and others that
 8    have appeared at trial.
 9        Do you see that?
10    A.    I do.
11    Q.    Okay.  And if you will see, it says "BC constituents."
12        Do you see that?  That's at the top of the e-mail.
13    A.    Yes.  This is about Amazon and something in India?
14    Q.    No.  The second line says, "We did not have time to review
15    the Amazon India."
16    A.    Oh, I'm sorry.
17    Q.    So the top line, it says "BC constituents."
18        Have you heard testimony or seen testimony about who the BC
19    constituents are?
20    A.    Not that I recall.
21    Q.    Oh, okay.  Let's go to -- it says, "Thank you for your time
22    today and for staying on beyond the allotted time to finish up
23    the OEM and carrier rev share proposal."
24        Do you see that?
25    A.    I do.
```

1    Q.   If you go to number 1, it says, "OEM and carrier rev

2    share," and then a link to materials.

3         Do you see that?

4    A.   I do.

5    Q.   Okay.  And the first blackened line says, "Reason for BC

6    review:  Maximum distribution commitment."  And we're not going

7    to say the stuff in the red boxes.

8         Okay?  Do you see that?

9    A.   I do.

10   Q.   And then the next one says, "Asks for BC."  So these were

11   the asks for the BC.  "Our offer strategic Android carrier and

12   OEM partners," and then there's a box, "revenue share for secure

13   distribution and placement for Search and Assistant."

14        Do you see that?

15   A.   I see that.

16   Q.   Okay.  So the BC is being asked for approval for revenue

17   share, and it explains why they're seeking revenue share.  It's

18   to secure distribution and placement for Search and Assistant.

19        Do you see that?

20   A.   I do.

21   Q.   Okay.  Farther down, under "rationale in support of deal,"

22   do you see that?  It says "Google receives search exclusivity on

23   in-scope devices with regional exclusions; expected to increase

24   mobile and tablet search revenue coverage," and then it has a

25   percentage increase.

```
 1          So they're asking to increase their rev share.  Do you see
 2     that?
 3     A.   That sentence isn't about increasing rev share.
 4     Q.   I'm sorry.  Increase of exclusivity.  Do you see that?
 5     A.   No.  It's -- the increase is in their coverage.
 6     Q.   Do you understand that the rationales that they list here,
 7     that there's no discussion of free rider problems, concerns
 8     about free riders?  Is that right?
 9     A.   I don't see anything here about that.  It doesn't mean
10     that's not one of the reasons they would get increases in
11     revenue.
12     Q.   Do you see any discussion here about price of phones and
13     the possibility that phones are going to rise -- that these rev
14     share payments would affect the price of phones?
15     A.   I don't in this e-mail, no.
16     Q.   Okay.  And then farther down, it says under the
17     heading "discussion" -- do you see that?
18     A.   I do.
19     Q.   And it says -- the third bullet says, "Goals are set to
20     additional restrictions on third-party Search and Assistant."
21     So these are the goals.  So "additional restrictions on
22     third-party Search and Assistant, ensure security updates, and
23     cover strategically important regions; TAC increase projected to
24     be," and I can read this, "$299 million over two years."
25          Do you see that?
```

1    A.    I do.

2    Q.    So those are the goals -- when Google is considering

3    increasing rev share payments for carriers and OEM partners,

4    those are the goals that the BC actually considers; correct?

5    A.    I mean, they're talking about coverage increase here.

6    Right?  They're not talking about changing the deal.  Right?

7    Q.    I will let the document speak for itself, sir, but there's

8    no discussion about some of the -- well, there's no discussion

9    about pass-through at all, is there?

10    A.    No.

11    Q.    Okay.  And then if we go to the next page, 098, two bullets

12    down, it says, "TAC payout to," and then there's a box which I

13    won't read, "due to historical precedents and a desire to anchor

14    new," box, "partnerships at lower rev share."

15        Do you see that?

16    A.    I do.

17    Q.    So one of the goals is to anchor, whoever is in that box,

18    partnerships at a lower rev share, not to increase the amount of

19    money to invest in Android but to pay them as little as

20    possible?

21    A.    Well, you're always considering both costs and benefits.

22    Right?  There's a cost to paying more, and there's a benefit to

23    paying more.

24    Q.    You haven't seen any rev share documents that consider the

25    value of expanding the overall search pie as part of the

1    calculation; right?

2    A.    Not as a part of the calculation, but we certainly have

3    seen discussions of trying to expand the Android platform.

4    Q.    Okay.  So let's go to UPX580.  This is in your binder.  Let

5    me know when you get there, sir.

6    A.    I'm there.

7    Q.    Okay.  And the subject here -- this is dated September 5th,

8    2017.  The subject is "BC deal review:  Agenda for Tuesday,

9    September 5th at 8:30."

10        Do you see that?

11   A.    I'm sorry.  Where are you looking?

12   Q.    Just the subject line at the top.  You can see it on the

13   screen, sir.

14   A.    Okay.  I see it now in the document.  Okay.

15   Q.    Okay.  And then at the very -- the greeting, it says, "Hi,

16   Ruth and Kristin.  The Android team is bringing the renewal of

17   the Samsung mobile search revenue share deal to BC tomorrow,

18   Wednesday," and there's a link.  "Please see below key terms and

19   finance perspective."

20        Do you see that?

21   A.    I do.

22   Q.    And if we go on this document towards the bottom third,

23   there's a line that says, "In exchange for revenue share,

24   Samsung has agreed to the following."

25        Do you see that?

1    A.    Yes.

2    Q.    And under "search," it says, "Google as default search

3    engine with exclusivity."

4          That's one of the things that Google is getting for its rev

5    share; right?

6    A.    Is this on Samsung direct-to-consumer devices, or does this

7    apply also to carrier devices?  I can't tell.

8    Q.    I'll let the document speak for itself, sir.  You're

9    welcome to look at what you like.

10         It says that what they're getting for the revenue share,

11   "Google as default search engine with exclusivity."

12         Do you see that?

13   A.    I agree, but I can't tell from that what it's covering.

14   Samsung has two types of devices:  Ones that they sell

15   themselves direct to consumer, and the other goes through the

16   carriers.  And the agreement's kind of -- what Samsung gets

17   varies on which one it is.

18   Q.    Okay.  Let's go to the next one.  It says, "Samsung browser

19   and keyboard cannot be enabled with Bixby."

20         You understand that that's Samsung's search assistant?

21   A.    Okay, I understand what Bixby is.

22   Q.    Okay.  Let's go to page 943.  There's a chart.

23   Under "search," it has the first box, which is "this deal."

24         Do you see that?

25   A.    Yes.

1    Q.   And it says, "Device exclusivity (home screen exclusivity

2    in EU, TR, KR); Russia subject to agreement with Yandex as

3    approved by FAS."

4        And then the next point is, "Default on all access points."

5        Do you see that?

6    A.   I do.

7    Q.   And then the second box, the one next to it, it

8    says "device exclusivity," and this is the new standard RSA for

9    OEMs.

10        Do you see that?

11    A.   I didn't see those words you just said.

12    Q.   Okay.  Then finally, let's go to two pages later, 945,

13    under "deal team stakeholders for Samsung," it says, "Hi, BC

14    constituents."

15        Do you see that?

16    A.   Where are you talking about?

17    Q.   It's showing on the screen.  It's on page Bates 945, about

18    a third of the way down.

19    A.   Okay.

20    Q.   And it says, "Samsung RSA," and then there's a link,

21    "reason for BC review, nonstandard RSA top partner."

22        Do you see that?

23    A.   I do.

24    Q.   And under "asks for BC," "requesting approval for mobile

25    search revenue share agreement with Samsung at," and there's a

1    box, "gross on current and new devices."

2         Do you see that?

3    A.   I do.

4    Q.   Under "rationale," it says, "Rationale in support of the

5    proposal:  Secures Google access on Samsung devices, including

6    Google as default search/exclusive search."

7         Do you see that?

8    A.   I do.

9    Q.   And then it notes something about Bixby.  It mentions

10   security upgrades and then something called daydream support.

11        Do you see that?

12   A.   I do.

13   Q.   There's nothing in here that says that -- well, nothing in here

14   here about pass-through; right?

15   A.   No.

16   Q.   Nothing in here about supporting low-priced phones

17   throughout the world or throughout the United States?

18   A.   No.

19   Q.   And there's nothing in here that says that Google believes

20   that if they don't enter into one of these exclusive agreements,

21   it won't matter because they'll keep all the customers anyways?

22   A.   I mean, first off, under -- the low-priced phones is due to

23   the MADA, and this is not a MADA agreement.  This is an RSA

24   agreement.  So I wouldn't expect to see anything about

25   low-priced phones here.

1        If you look at my testimony, the discussion of low-priced

2   phones was about the MADA, not about the RSAs.

3   Q.   Okay.  There's nothing in here that says that Google

4   believes that if they don't enter in one of these exclusive

5   agreements, it won't matter because they'll keep all the

6   customers anyways; right?

7   A.   I'm sorry.  What was that question?

8   Q.   There's nothing in here -- nobody suggests that if they

9   don't get the exclusive term, it won't matter because they'll

10  have the same number of customers anyways?  Nobody's suggesting

11  that; right?

12  A.   I didn't follow the many negatives in that statement.  So

13  I'm really -- I'm not trying to be funny.  There's too many

14  negatives for me.

15  Q.   Okay.

16        THE COURT:  Why don't we move to the next question.

17  The document says what it says.

18        MR. DINTZER:  Thank you, Your Honor.

19        BY MR. DINTZER:

20  Q.   No further questions on that document, sir.

21        Now, an OEM can't sign an RSA like the one we've just been

22  looking at, that discussion, unless they've already signed the

23  MADA; right?

24  A.   That's the way it works, yes.

25  Q.   And OEMs would consider the add-on benefits of signing the

1    RSAs when they consider the MADA?

2    A.    The net benefits, not the gross benefits.

3    Q.    Yes.  But --

4    A.    The value they get -- if you sign the RSA, you get the

5    option to sign the MADA.  And of course, it's got benefits, and

6    maybe you're giving something up because you could do something

7    else.  It would be the net value that they would consider when

8    signing the MADA.

9    Q.    But one of the things that -- and I'm just going to reframe

10   it with what you just said, but I think it captures it.

11        When you sign the MADA, one of the things you get is

12   optionality, the option of the RSA, and that optionality and the

13   benefits of it from the RSA has value?

14   A.    You should be clear, it's not just the optionality, which

15   would mean your value being able to go either way.  If there's a

16   net value to doing the RSA, even if you know that's coming, you

17   would consider that in the MADA.

18   Q.    You would consider that when deciding to sign the MADA?

19   A.    Yes.

20   Q.    And thinking about the advantages of the RSA -- well, I

21   think we've covered that.  So let's go to slide 95.

22        You discuss how the MADA was important for low-cost phones

23   in this one; right?

24   A.    Yes.

25   Q.    "The MADA barter has enabled many low-priced models."

1       All this slide is showing is the price of smartphones

2   shipped; right?  That's all you've got here; right?

3   A.   Yes.

4   Q.   Okay.  There's no causality that you're trying to show in

5   this slide about the MADA barter and prices being lower; right?

6   A.   This is evidence consistent with what you'd expect under

7   the MADA.  I don't think we can -- we don't have an experiment

8   where we have the MADA and not have the MADA and causal link

9   other than the only experiment we have is Apple versus Android,

10  and Android has facilitated the lower-priced devices.

11      Economics would say the MADA is a part of that, but I

12  can't -- I don't have the Android devices with or without the

13  MADA to make a comparison with.

14  Q.   Because all Android -- everybody who does Android signs the

15  MADA; right?

16  A.   Well, everybody -- well, no, there are other --

17  Q.   In the --

18  A.   There are other Android devices out there.  So don't -- be

19  clear about that.

20  Q.   Let me sharpen my question just so we don't waste time.

21      Everybody who sells an Android phone in the U.S. signs the

22  MADA.

23  A.   I don't know that's literally true, but -- because there

24  are -- there used to be like, for example, Fire Phones and stuff

25  like that.  But worldwide, more non-MADA Android is out there

worldwide than there would be in the U.S.  I can't say there are

none in the U.S.  I don't know that fact.

Q.   You haven't seen any documents that link the MADA bundle

with the sale of low-cost phones; right?

A.   I don't recall documents saying that.  I know, though,

Google viewed the MADA and the zero-priced license as an

important part of the design decision of Android, of the Android

model that they built.

Q.   You haven't quantified how many, if any, low-priced Android

devices would leave the U.S. market if the MADA bundle was

disallowed in the U.S.?

A.   I don't -- I don't know that, because we don't have

empirical data to do that.  As I've been saying throughout, my

approach is always to try to use market evidence to say what I

can say.

Q.   You haven't seen any data from Europe or Russia that showed

that low-end cell phone makers left the market after the MADA

bundle was disallowed?

A.   Well, I don't have evidence on that, no.  I haven't seen

the data.

Q.   Let's go to slide 109.

     And the slide says, "Browsers have long been a primary

access point."

     Do you see that?

A.   Yes.

Q.    Okay.  And the search widget is actually by itself

overtaking the browsers in your slide; right?

A.    That's correct.

Q.    Browser -- the search widget actually is a more important

access point if you measure it just by search volume than

browsers; right?

A.    Yeah, that assumes a degree of precision that may be beyond

here.  I would say they're very close.

Q.    The search widget is connected to the Google Search app.?

A.    What do you mean by "connected"?

Q.    Do you understand that the search widget actually operates

through the Google Search app.?

A.    Yeah.  I just didn't know what you meant by "connected."

Q.    That's fine.

A.    It's the same functionality, but it's Google Search no

matter if you do it in a browser or in a search app. or in the

widget.  You're getting the same search engine.

Q.    Do you have an understanding that if you took the Google

Search app. off your phone, if you could, that the search widget

wouldn't work?

A.    Well, you'd have to keep the code there.  You could get rid

of the app. as an access -- the app. as an access point.  But

they use the same -- my understanding -- I'm not a computer

scientist.  My understanding is it's the same underlying search

functionality, and you can either access through the search bar

1    or through an icon.

2         So I assume you could take the icon off for the search app.

3    and leave the guts to support the widget, but I'm not the

4    scientist here.  Somebody else can answer that.

5    Q.   Okay.  But you do understand they're connected?  That's

6    really the only point I wanted to make.

7    A.   I think they use the same underlying functionality is the

8    best way to think about it.

9              THE COURT:  Why don't we move on.  I think this is

10   fairly well-established.

11             MR. DINTZER:  That's fine.  No further questions on

12   that.

13             BY MR. DINTZER:

14   Q.   And the iPhones come with Safari browser pre-installed; is

15   that right?

16   A.   I think that is pretty well understood.

17   Q.   And Apple has said that they will not have third-party

18   apps. on their devices out of the box; is that right?

19   A.   That's my understanding of what they've said, and it's

20   pretty consistent with what they do.

21   Q.   And in determining how much revenue share to pay Apple for

22   Safari to default, Google considers that Apple does not allow

23   third-party apps. on the device; is that right?

24   A.   I can't say I know that for sure, but I would assume they

25   do.

1          Well, let me be careful.  It's not that they don't allow

2     third-party apps. on the device.  I think you misspoke.  They

3     don't pre-install third-party apps. on the device.

4          Your statement was incorrect as stated.  So I wanted to fix

5     it.

6     Q.  No, that's fair; that's fair.  And I think we -- just to

7     make sure it's clean --

8               THE COURT:  I think it's clear.  I think by week 10, I

9     understand this.

10              MR. DINTZER:  Thank you, Your Honor.  And I apologize.

11     If I may have a moment to confer with my colleagues.

12              THE COURT:  Sure.

13     (Counsel conferred.)

14              MR. DINTZER:  We have no further questions, Your

15     Honor.  We pass the witness.

16              THE COURT:  Terrific.  Thank you, Mr. Dintzer.

17     Mr. Cavanaugh or Mr. Sallet?  Do the States intend to

18     question?

19              MR. SALLET:  We had many questions.  Mr. Dintzer has

20     asked all of them.

21              THE COURT:  Terrific.  Now, that's efficient.

22     All right.  Mr. Schmidtlein, redirect.

23                         REDIRECT EXAMINATION

24              BY MR. SCHMIDTLEIN:

25     Q.  Professor Murphy -- could we get UPX1128 pulled back up.

1          Professor Murphy, this is a document that Mr. Dintzer
2     handed you.
3     A.   I've got a lot of paperwork.
4               THE COURT:  It's not in the binder.  It was a handout.
5               THE WITNESS:  Okay.
6               BY MR. SCHMIDTLEIN:
7     Q.   Now, this is a document the plaintiffs pushed into
8     evidence.  It is an e-mail amongst a lot of people at Google,
9     including Ms. Braddi, Ms. Kartasheva, Mr. Roszak, Mr. Rosenberg,
10    even Mr. Giannandrea, who have all testified as witnesses at
11    this trial but none of whom were asked about this document.
12              THE COURT:  Is there a question coming?
13              MR. SCHMIDTLEIN:  There's a question coming, Your
14    Honor.
15              BY MR. SCHMIDTLEIN:
16    Q.   Do you know whether, in fact, the subject matter of this
17    document pertains to devices sold in the United States or not?
18    A.    I don't.  I think I asked kind of about that, and I was
19    confused.  But I do not.
20    Q.   Do you know whether this document pertains to any Samsung
21    devices sold anywhere in the world?
22    A.    This document, I don't have any reason to believe it
23    involves -- Samsung, in fact, is excluded, it says right there.
24    Q.   Okay.  You can put that aside.
25         Now, Professor Murphy, you were shown some documents

yesterday, some very old documents yesterday about Apple and

choice screens from, I think, the 2007-ish time period.

Do you recall whether those documents related to the

situation of users downloading a Safari version for Windows?

A.    That's my understanding, yes.

Q.    And did you have a view as to whether a possible view of a

Safari version downloaded onto Windows was economically similar

to a Safari version that came preloaded on Apple devices?

A.    No.  As I think I stated in my testimony yesterday, I don't

think they would be similar.

Q.    And do you recall whether Mr. Cue testified about whether

Apple was interested in employing a choice screen for Safari

versions that came preloaded on Apple devices?

A.    I do.  I know he testified -- I remember his testimony

saying Apple was not interested in that.

Q.    Okay.  You also were asked some questions yesterday, I

think, about whether if Google and Apple had entered into some

sort of a different agreement, Apple would have been allowed to

send queries sort of on the same version of Safari to multiple

different search engines, in other words, send query 1 to Google

and send query 2 to Bing.

In your review of the evidence in this case, have you seen

any instance in which any browser provider, whether Apple or

anyone else in the history of browsers, has designed their

browser to split queries across multiple search engines?

1          MR. DINTZER:  Objection, Your Honor.  That kind of

2     crossed the line as far as leading.

3          The history of browsers --

4          THE COURT:  Will you just simplify the question,

5     Mr. Schmidtlein.  He can answer it.

6          BY MR. SCHMIDTLEIN:

7     Q.   Are you aware of any instance or precedent for a browser

8     splitting queries amongst multiple search engines?

9     A.   No, and I didn't need to be led here.  I believe that's

10    expressed in my report.  So I think it's something -- query

11    splitting is something Professor Whinston has talked about.  If

12    it wasn't in my report, it's certainly something I considered

13    after he said it, because I don't remember which of his reports

14    that came up.

15         But I have had the opinion -- I've examined the question

16    you have, is that a practice we see that's met the market test,

17    and the answer is no.

18    Q.   Are you aware of any evidence in this case of Apple asking

19    for a carve-out from Google to set another search provider as

20    the default for private browsing?

21    A.   I do not recall them saying they wanted to do that.  I

22    believe Mr. Cue actually addressed whether they would set

23    DuckDuckGo for that purpose.  And his testimony is there.  It's

24    no use me trying to recall exactly what it was, but it's in the

25    record.

Q.    Now, the Court asked you a question yesterday about

barriers to entry.

    Do you have a view as to whether the challenged agreements

increase barriers to entry?

A.    I don't believe they do.  That's not to say barriers --

it's not tough to enter the general -- it's a big investment.

There's a lot you have to do to get in general search.  A lot of

that is independent of agreements.  There's a lot involved in

that.

    As I said yesterday, you know, the agreements -- first off,

there's a lot of volume that's outside the default agreements.

Right?  Even if you take Professor Whinston's numbers, like

50 percent is outside these default agreements.  Right?  So

there's a lot there.

    But also, as I tried to emphasize yesterday, the ability to

actually contract for promotion, whether it's a default or

something smaller than a default, can actually be helpful for

people trying to enter, because I'm not good enough yet, but I

can kind of what I call buy my way in.  Right?  I can get you to

adopt me today knowing that I'm going to get the value of more

experience and more market exposure.

    So the ability to have those kind of payments that I talk

about as enhancing competition once people are in can actually

facilitate entry.  I think I talked about that yesterday.

    So I would view two things that are important.  One,

there's a lot of open volume that people could come in without
touching the agreements.  The other is, agreements of various
types can actually facilitate somebody coming in, because it
gives them the ability to kind of compete even though they might
not quite be all the way there in quality yet.

Q.   Now, yesterday, I know during the direct, you presented a
pie chart that examined the volume of search traffic that occurs
on iOS devices outside the Safari default.  I think you were
asked some questions about the nature of the Safari default and
whether that was sort of a de facto exclusive by my colleague,
Mr. Dintzer.

     Did you also perform a similar analysis with respect to how
much traffic comes off of or occurs on Mac computers outside of
the Safari default?

A.   I did, and the numbers are -- even more occurs outside the
Safari default on Mac computers than on iOS devices.  If you
remember the numbers from yesterday, it's sort of the other --
yeah, it's bigger on Mac devices, and not trivially -- and
non-trivially bigger.

Q.   Now, you were also asked some questions --

         THE COURT:  I'm sorry.  Can you just specify what the
other search entry points would be on Mac, having been a Mac
user?

         THE WITNESS:  Another browser.  It could be a
search -- a downloaded search app.  Because remember, the -- it

could be a downloaded search app., could be direct navigation to
one of the search sites.  It could be any of those kinds of
things.  Or a bookmark, it could be that, too.

       BY MR. SCHMIDTLEIN:

Q.  Now, you were also asked some questions about the
implementation of the European choice screen and the impact that
that had on Android and the support of Android partners in
Europe.

      Did the implementation of the European choice screen result
in zero RSA payments for the search widget and Chrome on Android
devices in Europe?

A.  I mean, under the MADA?  I'm a little confused.

Q.  No, under the -- as a result of the choice screen, were the
RSA payments for the widget and Chrome either reduced to zero or
substantially reduced?

A.  Well, we know that RSA rates have been going down as
contracts have been renegotiated.  I don't know the magnitude.

Q.  Okay.  Now, you were asked some questions earlier today
about why you had used a choice screen to assess and compare
competitive outcomes in the real world, even though you didn't
view a choice screen as a proper but-for world.

      Did Professor Whinston offer an opinion on a but-for world
as a part of his opinions in this case?

A.  He did not, and I stated that in my testimony.

Q.  Did you focus on a choice screen because that was the

1    parity world that Professor Whinston identified in his analysis?

2         THE COURT:  I would just ask you to rephrase the

3    question, Mr. Schmidtlein.

4         BY MR. SCHMIDTLEIN:

5    Q.   Where did you get the idea of using a choice screen in your

6    analyses?

7    A.   Well, I actually got it from two places.  One, I think it

8    is a simple way of thinking about the parity that Professor

9    Whinston talks about as a but-for world -- he doesn't call it

10   but-for world.  I don't want to put words in his mouth.  As a

11   useful analytical exercise or something, he called it.  Right?

12   I don't want to put words in his mouth.

13        But he talked about parity, and a choice screen would be an

14   example of that.

15        The other reason I really thought a choice screen was a

16   useful thing to consider to kind of get your bearings on things

17   was this case is fundamentally, at least on the browser side,

18   about access.  That is, do rivals have access to users and if

19   the contracts denied people access.

20        And I viewed the choice screen as answering that question

21   of moving from a world where the plaintiffs allege they've

22   been -- that certain sellers have been denied access to a world

23   where they clearly have access.  So it's to sort of get at that

24   access differential.  So I thought it provided a useful

25   benchmark.

1        The reason I don't think it's a but-for world is because I
2    don't think that's a competitive outcome that people would go
3    to.  Competition will lead to the kind of things I think about,
4    where people are actually monetizing their distribution
5    potential.
6        But given that this kind of goes all the way to direct
7    equal access, whatever you want to call it, I viewed it as a
8    useful benchmark for that reason.
9    Q.   You were asked some questions on cross-examination about
10   the right of first refusal in the Apple agreement pertaining to
11   Siri and Spotlight.
12       In your review of the record, did you see any evidence that
13   Apple had ever served an advertisement on Siri and Spotlight?
14   A.   My understanding, they have not, and I believe I state that
15   in my report.
16   Q.   And are you aware of Apple having a search ads business?
17   A.   Again, as I think I said in response to Mr. Dintzer, I
18   believe they do not.
19   Q.   If you can take a look at UPX6024, those are the
20   interrogatory -- or the Rule 30(b)(6) responses.
21   A.   Okay.  It's all the way at the back.
22   Q.   It's volume 2, and it's the very last tab.
23   A.   Okay.
24   Q.   You were asked some questions about Google's reliance on
25   certain analyses or claw-back analyses that included reference

1    to the Apple Maps situation.  And Mr. Dintzer excerpted portions

2    of these responses onto some slides, and I want to ask you about

3    some portions of the slide -- or portions of these responses

4    that Mr. Dintzer didn't include on his slides.

5         Now, if you will look at -- turn to page 15.  And there

6    were portions of this that I think were included on slides, but

7    if you will turn over to page 16 and the first paragraph there,

8    the very last sentence of the first paragraph reads, "Neither

9    the Mozilla experience nor the Apple Maps experience provided a

10   perfect comparator in assessing a claw-back rate on Safari."

11        Do you agree or disagree with that statement?

12   A.   I would agree with that statement.

13   Q.   If you will go down -- you were then asked some questions

14   about assessments that Google did using some of these same

15   comparators in assessing Android negotiations, Android

16   claw-backs.

17        So if you will go down to the bottom paragraph on page 16,

18   you were read or you were shown in slides excerpts from that

19   paragraph as well.  But again, Mr. Dintzer did not include on

20   the slide the following sentence:  "Again, these estimates did

21   not provide perfect comparators, and Google will never arrive at

22   a best estimate of the claw-back rate for these scenarios."

23        Do you agree or disagree with that statement?

24   A.   Again, I should have said this on the previous statement as

25   well, I don't agree with the first part, that -- or I agree with

the first part, that they don't provide perfect comparators.  I

can't contradict the second part, because I don't know that they

did arrive at a best estimate, but Google's better to testify

whether they did or not.

Do you understand what I'm trying to say?  The first part

is sort of a factual question.  I know they're not perfect or

even very good estimates.  The second part, to the best of my

knowledge, Google never arrived at a best estimate, but, you

know, that's for them to testify to, not me.

Q.    Finally, you were asked some questions about the following

paragraph on page 17.  Again, you were asked questions as to

whether Google had taken into account in its negotiations

specific offers made by rivals.

And again, I think Mr. Dintzer excerpted, I believe, the

first sentence from that paragraph, but he didn't excerpt other

portions, including, "As to actual offers, Google has not had

access to the particular revenue share terms offered by a

competitor during negotiation with the above partners."

Would you expect Google to have access to particular

competing offers that were being made by rivals?

A.    Given my experience, I would assume they typically would

not have that information.

Q.    Okay.  You were also asked some questions on

cross-examination about the benefits that Google got from

entering into RSA agreements with Android partners, and you

1    rattled off a list of a number of different benefits.

2         Do you recall whether or not a benefit that was available

3    under the RSAs was revenue share payment for placement of Chrome

4    in the hotseat?

5    A.   Yes, that's a part of the RSA, and that would be a part of

6    what generates presumably incremental volume.

7    Q.   And does having Chrome in the hotseat impact Android device

8    quality and competition with the iPhone, in your view?

9              MR. DINTZER:  Objection, Your Honor; leading.

10             THE COURT:  It's overruled.  You can answer that.

11             THE WITNESS:  It would depend on what the alternative

12   was, but given Chrome is the -- I think the evidence would say

13   it's the highest quality browser, it would improve the quality

14   in -- putting Chrome in the hotseat.

15             BY MR. SCHMIDTLEIN:

16   Q.   Would you expect putting Chrome in the hotseat would

17   increase overall search usage?

18   A.   Again, given that the market evidence would suggest that

19   it's the best browser on Android, I would assume it would

20   increase usage, yes.

21   Q.   Now, you were asked some questions about Apple and

22   questions around Apple's potential for entering the search

23   market.

24        Are you familiar with the term or the concept of "make or

25   buy"?

1    A.    Yes.  I talk about it frequently.

2    Q.    Okay.  And is the concept or the notion of make or buy a

3    very, very prevalent thing in the economy?

4            THE COURT:  Just rephrase the question.

5            BY MR. SCHMIDTLEIN:

6    Q.    Describe what make or buy is.

7    A.    Make or buy is when you have the option between doing

8    something for yourself or having somebody else do it for you.

9    Basic idea in economics is, it's going to come down to which you

10   think is -- gives you the best deal.

11           Effectively, the way -- the most common way I would teach

12   my students is if you can do it at lower costs than the guy who

13   is supplying you, you're probably going to want to do it for

14   yourself.  If your costs are higher than his, the best thing to

15   have happen is you negotiate him down to at or -- let's say I

16   can do it for a hundred and he can do it for 80.  Well, I'm not

17   going to pay more than a hundred, because I can do it myself for

18   a hundred.  He can do it for me for 80; I'm going to negotiate

19   something between 80 and a hundred.  He's happy because he'd get

20   the business and it's profitable, and I'm happy because I'd get

21   it for less than it would take me to do myself.

22           That's the basic lesson on make or buy.

23   Q.    If there is -- a large customer in the market also has the

24   potential to make or buy the input that it's looking to

25   purchase, would you expect that to generate more or less

1    competition in the sale of that input?

2    A.   Well, certainly, I would expect that person to be able to

3    get a better deal, and that could, depending on the market

4    structure, generate better deals for everybody else.  It would

5    just depend on how it works.

6              MR. SCHMIDTLEIN:  All right.  No further questions,

7    Your Honor.

8              THE COURT:  Okay.

9              MR. DINTZER:  I failed to move in a document, if I

10   may.

11             THE COURT:  Sure.  Well, why don't we excuse Professor

12   Murphy and wish him well.

13        Professor Murphy, thank you for all your work, and safe

14   travels home.

15             THE WITNESS:  Thank you so much.  I appreciate it.

16             MR. DINTZER:  Your Honor, UPX2086, I failed to move it

17   in.

18             THE COURT:  Why don't we do this.  We've got a few

19   things to talk about, and I want to give our court reporter a

20   break.  So if you would just take a look at that exhibit, and

21   you can let me know if there's an objection after the break.

22        We will come back at 3:15.  Thank you, everyone.

23        (Recess taken from 3:00 p.m. to 3:15 p.m.)

24        (Call to order of the court.)

25             THE COURT:  Mr. Schmidtlein?

1          MR. SCHMIDTLEIN:  Your Honor, before Google rests its

2     case, my colleague, Mr. Greenblum, has some housekeeping exhibit

3     matters --

4          THE COURT:  Okay.  Great.

5          MR. SCHMIDTLEIN:  -- that we would like to complete.

6     But with that, Google rests its case.

7          THE COURT:  Terrific.  Thank you, Mr. Schmidtlein.

8          MR. GREENBLUM:  Just briefly, Your Honor, three

9     things.  First, we have a set of exhibits that I understand,

10    after conferral with our colleagues, can be moved in either

11    without any objection or with the embedded hearsay objection.

12         I will hand copies of these up to J.C.  We always file

13    these as well, but just so we have that.

14         Second, there's one exhibit we were not able to reach

15    agreement with.  I can hand up copies.  This is DX384.  This is

16    a document produced by AT&T in the case, Your Honor.  It relates

17    to feedback that AT&T received and documented about the Backflip

18    phone.  The Court heard some testimony about that in the Ezell

19    deposition.

20         I think the plaintiffs -- I will let them speak for it.  I

21    think they have a hearsay objection.

22         We are offering this and we've told the plaintiffs and

23    compromised that we're offering it not for the truth of the

24    statements or as a statement of AT&T, but for the fact that

25    AT&T, in fact, monitored consumer feedback and for the effect on

1    the listener, in this case AT&T.  So it's for those two limited

2    purposes.

3        I've got one other thing, but let me let Mr. Gower address

4    that.

5        MR. GOWER:  Thank you.  Cameron Gower for the United

6    States.

7        Just taking a look, Your Honor, just to explain this

8    document for a moment, this appears to be a copy and paste of a

9    Facebook group into a Word document.  There's no author

10   identified.  There's no purpose identified within the document

11   for why it exists.  There's really no context at all.  This is

12   both first-level and second-level hearsay.

13       We have no 902.11 document for this, even though AT&T

14   produced 902.11s for other documents.  And Google seems to

15   recognize this, and that's why they're trying to limit the

16   purpose.  And they've offered it to show the effect on the

17   listener, but we don't have the listener here to testify about

18   why this document exists.  It doesn't really solve the lack of

19   context from this document, which is just a copy and paste of a

20   Facebook group.

21       MR. GREENBLUM:  Your Honor, the limited purpose is

22   that they were aware of this, that they tracked it, that they

23   maintained it.  I think limited context, if that were an

24   objection, we might have had several fewer exhibits admitted in

25   the case.

1    We're simply offering it for that limited purpose.

2        THE COURT:  Let me just ask, you know, from the face

3    of it, it doesn't appear to be a business record, and I know

4    you're not seeking to admit it for the truth.  So at least that

5    in and of itself is not an issue.

6        But its sort of provenance is a little unclear.  It's from

7    AT&T, but do you have any further information about custodian or

8    sort of where it came from?

9        MR. GREENBLUM:  I would have to check the metadata.

10   We can check that.  We don't have discovery information on that.

11   I would have to check the metadata.  It was certainly produced

12   by AT&T.  It's not disputed to be a document from their files.

13       THE COURT:  Right.  Let's at least -- if you could get

14   that information for me, that might help advance the ball in

15   terms of thinking about the document.  Otherwise, it just -- it

16   is -- I guess it is just a cut and paste from some Facebook

17   group that is making comments about the phone, for what that's

18   worth.

19       MR. GREENBLUM:  Sure.  No problem, Your Honor.  We'll

20   run that down.

21       THE COURT:  To be precise, for example, if it's in the

22   hands of a custodian that is responsible for the phone or in

23   marketing, that may benefit your argument in some way.

24       On the other hand, if it's from some custodian who has no

25   relationship to this at all, I think it's a little harder to

1    make the connection that it has any real probative value.

2              MR. GREENBLUM:  We will check that.

3              THE COURT:  Okay.

4              MR. GREENBLUM:  We have some deposition designations

5    and videos that we've been working with the plaintiffs on.  I've

6    got a pleading we will file.  They will be -- and a flash drive

7    for J.C.

8         The plaintiffs will be moving in some separately -- what

9    we've done is there's different buckets of them, and in each

10   case, we're moving up ours together with their counters and vice

11   versa.  So that's our bucket.

12        And that's it for me.

13             THE COURT:  Terrific.  Thank you.  So the record will

14   be left open for these few evidentiary issues, but with that,

15   then, Google has rested.  All right.  Terrific.

16        All right.  So where do we stand on Mr. Davies?

17             MS. BELLSHAW:  Thank you, Your Honor.  Megan Bellshaw

18   for the United States.

19        Based on Mr. Murphy's testimony, we have decided not to

20   call Mr. Davies as a part of our rebuttal case.

21             THE COURT:  Okay.  All right.  So I will deny the

22   motion as moot.

23             MS. BELLSHAW:  Thank you, Your Honor.

24             THE COURT:  Great.  Thank you.

25        All right.  So that, then, means in terms of scheduling,

tomorrow we have Professor Oard, if I'm pronouncing his last

name correctly?

         MS. BELLSHAW:  Yes, Your Honor.  Professor Oard will

be here tomorrow.

         THE COURT:  And that's the lone witness that's ready

to go tomorrow?

         MS. BELLSHAW:  Yes, Your Honor.  We expect Mr. Oard's

testimony not to last the entire day.

     And then Professor Whinston will come on Thursday.

         THE COURT:  And is the expectation still that he will

be about two and a half hours or so in terms of your direct?

         MS. BELLSHAW:  I think we expect the direct to be

shorter, closer to an hour and a half.  And it will be all open

session.

         THE COURT:  Terrific.  So it seems like we may be done

on Thursday.

     Mr. Cavanaugh, the States did formally rest?

         MR. CAVANAUGH:  We did.  We have a few more deposition

designations to hand up and, I think, a couple of additional

documents, but we're not -- we don't have a rebuttal witness,

Your Honor.

         THE COURT:  Okay.

         MS. BELLSHAW:  Your Honor, it's been pointed out to me

that I may have misunderstood your question about the length.

     We expect Professor Oard's testimony to be about an hour

and a half, but Professor Whinston we still expect to be about

two and a half hours.

I apologize if I misunderstood the question.

THE COURT:  All right.  Helpfully, that still puts us

on track to be done on Thursday.  Okay.  Terrific.

All right.  Just a few housekeeping matters from my end.

Let me just first -- what did I do with those notes?  Sorry,

everyone.  Just bear with me a moment.

There are a handful of outstanding matters that we have

been owing everybody rulings on.

With respect to first, the transcript redactions for

Ms. McAllister, as we did previously, we have done sort of a

line-by-line assessment of her closed session testimony.

I've applied the *Hubbard* factors to the requested

redactions.  And again, I appreciate everyone, including the

third parties, working on doing this and making as much of the

transcript available as they believe is proper.

All of that said, as I said, I have gone through, done

another *Hubbard* analysis -- or done the *Hubbard* analysis line by

line.  And we've not -- as we have in the past, we've accepted

some redactions; we have not accepted all of them.

In terms of what we have left unredacted, the following

sort of passages will remain unredacted:  Discussions about

various agreements that were designed to incentivize OEMs and

carriers to make security upgrades, there's been a lot of

discussion about that in open court, and I've not been told that
there's any real differentiation about that topic in a way that
would -- could cause any prejudice if that particular reference
is disclosed.  And it's a very high-level reference to it.  So
there's really nothing about it that seems to me to require
redaction.

Discussions of the RSAs and as they relate to search
exclusivity, even though some of that may not be a matter of
public record, the discussion was at a relatively high level,
one, and two, the extent that there is any differentiation among
those agreements, it's not apparent to me.

But also, more importantly, these are sort of the
agreements that are at the heart of the case, and this involved
the 2021 variation of those.  So I do think that those general
terms -- and they are very general -- did not warrant redaction.

There were proposed terms about configuration of
smartphones that seemingly were fairly common to all carriers
and OEMs that were discussed in closed testimony and did not
seem to involve any degree of differentiation, with one
exception.  So that has been unredacted.

There were discussions about wind-down periods in open
court, and there were requests about wind-down periods in the
closed session that were requested to be redacted, and I don't
think they justify redaction, particularly since it's been
discussed in open court.  And any party that doesn't have one

1    now knows about the possibility of getting one if -- since some

2    wind-down provisions have been used in other agreements.

3        We have continued to redact revenue share amounts.  There

4    is a bounty amount that is identified in the testimony for a

5    particular carrier that's structured uniquely to that carrier's

6    or OEM's contract.

7        And consistent with my prior rulings, I do think that the

8    weighing of the *Hubbard* factors warrants the nondisclosure of

9    those particular revenue shares and bounty numbers, as they

10   could give rise to competitive harm both to Google and to the

11   particular partner with whom the agreement has been struck,

12   since the disclosure of that information could create

13   competitive disadvantage in future negotiations.

14       And then finally, we've redacted a couple of terms of the

15   agreements that were requested that seemed to be specific and

16   unique, including those that touch on issues that are collateral

17   to the litigation that were, I think, requested at the very

18   first page -- or the very first redaction, I think, in

19   Ms. McAllister's requested redacted testimony.

20       All right?  We will get that out and available this

21   afternoon, or if not this afternoon, tomorrow when we have all

22   of that finalized.

23       Insofar as the request by Google to redact certain

24   testimony that was placed inadvertently of confidential

25   information on the public record, I've looked at the issue very

1    carefully.  I've read all of the cases that Google has

2    identified.

3        I just make the following observations:  It is not the case

4    that the Court is absolutely prohibited from sort of retroactive

5    sealing of information that ends up on a court record.

6    Certainly, there's no appellate court decision that says that

7    that's beyond the power of the district court to do that.  As a

8    general matter, courts that have done it, largely in the

9    district court, have done so when there have been extraordinary

10   circumstances, or at least that's the wording of one district

11   court in one of the cases that Google has cited.

12       What I tried to do is pay particular attention to any cases

13   that we could find that were in comparable circumstances.  We

14   just didn't find any, including those that were cited by Google.

15       In particular, the case out of the Delaware courts, *in re:*

16   *Trusts for Gore*, it was a case in which actually the Court did

17   sort of retroactively, if you will, order the nondisclosure of

18   certain information that had been inadvertently leaked in court.

19       However, the case is fairly distinguishable in that the

20   circumstances there involved an open session of court in which

21   every participant and every person who was actually present in

22   the courtroom was actually subject to the confidentiality order.

23   There were not members of the public present.  There were not

24   members of the media present.

25       And the other case that Google -- one of the other cases

that Google cited, that's out of the District of Arizona,

*TriQuint Semiconductor*, actually does a very nice job of

distinguishing the Delaware case, *In re: Gore*, and just notes

that in that case the Court declined to do what was requested in

terms of sealing.

And the Court wrote, and I think it's applicable

here, "Notably, however, in *Trusts for Gore*, the Court did not

just grant the moving party's request to redact the transcript

based on the inadvertency of the witness's statement alone.

Rather, the Court weighed the competing interests involved to

conclude that an inadvertent slip of the tongue should not undo

a party's efforts to maintain the confidentiality of nonpublic

information.  Thus, it was also relevant that the inadvertently

disclosed information had no material effect on the work of the

judicial system, was not important for the public's

understanding of the merits of the dispute, and because no

members of the public were present at the hearing, had not in

any meaningful sense entered the public sphere."

And I think those factors are different here than they were

in the Delaware decision.

So I will also just note one other case from the Second

Circuit.  It's actually an interesting case, *Gambala v. Deutsche

Bank,* 377 F.3d 133.  It involved a similar situation of a

district court sealing -- or actually refusing to seal certain

confidential settlement information.

1        And the circuit court actually held that it was actually an

2   abuse of discretion for the Court not to seal confidential

3   settlement information that was placed on the public record even

4   on the transcript, but the Court there actually distinguished or

5   said very clearly that that circumstance was different because

6   the way in which it ended up on the record was really at the

7   Court's insistence that the information be disclosed.  The

8   parties had a good faith understanding that the disclosure was

9   done in a confidential way.  And thirdly and most importantly,

10  that the casual questioning, as the Second Circuit described it,

11  was in the course of proceedings addressing the settlement, not

12  the adjudication of litigation.

13        And obviously, a trial is in a very different posture than

14  just a open court discussion of an otherwise confidential

15  settlement.

16        So as I said, we looked closely at the cases.  We've done

17  our own research, and I just did not find any authority in

18  comparable circumstances that would justify the sort of

19  retroactive sealing of information that was, even if

20  inadvertently, was put on the record during a witness's

21  testimony.

22        All right.  So that's that issue.

23        We then have the issue -- there was a motion concerning two

24  exhibits, JX24 and JX33.  I intended to rule yesterday, and I

25  neglected to do so.  Let me go ahead and do that now.

1        With respect to JX24, I am going to decline the request to

2    redact the portions that are in Sections 1.3 and 1.4.

3    Section 1.3 is simply the dates by which eligibility arises for

4    the selection of a different default engine, search engine in

5    two countries or three countries, and those dates are long past,

6    and I don't see the confidential nature of that giving rise to

7    any real prejudice by its disclosure.

8        In terms of the fourth paragraph, Section 1.4, I do think,

9    you know, the language already has been effectively solicited

10    from Ms. Braddi's testimony.  I do understand Google's position

11    that the fact that that was going to be elicited was not first

12    disclosed to Google.  But ultimately, in terms of the *Hubbard*

13    balancing, I don't think that is really a factor that plays into

14    the balancing.

15        And in terms of the prejudice, which is what I focused on

16    most in making these balancing assessments, the fact that the

17    sum and substance of the provision has already effectively been

18    put on the record I think really minimizes the prejudice.

19        Now, that, of course, is not applicable to the rev share

20    percentage or the -- essentially, the two conditions -- it's not

21    a rev share percentage, excuse me, the two conditions that would

22    trigger the provisions.

23        So those have already been agreed to, and nothing in my

24    ruling is meant to permit the disclosure of those two numbers.

25        With respect to Exhibit JX33, in Section 1A, the paragraph

1    that is subject to the permissible software default use that

2    begins with that sentence, that's already been read into the

3    record by counsel for Google.  So that may be unredacted and

4    disclosed.

5        The definition of search query, that, too, although has

6    not -- perhaps not word for word, the sum and substance of it

7    has been put into the record, and the fact of the actual words,

8    it doesn't seem to me, would prejudice either Google or Apple,

9    given the extent to which there's been a substantial discussion

10   in this case about search queries and what Apple may or may not

11   intercept and divert in terms of search traffic.

12       The provision that is on page 3 of the amendment that

13   begins with "subject to permissible software default use," that,

14   too, I think should be disclosed.  I do agree there was some

15   confusion about how this provision applies, particularly from

16   Mr. Pichai's testimony.

17       Apple's concern is that other search partners could

18   unfairly leverage the precise wording.  That seems to me

19   overstated, given that there's real no indication that Apple in

20   fact diverts search queries to any other search partners.  So

21   it's not clear to me why that would be a concern of Apple's in

22   terms of that disclosure.  And the general sense of that cause

23   has already been discussed quite a bit in open court.

24       In terms of the Section 2, that's titled "advertising and

25   monetization," I do think that too ought to be disclosed.  It's

already been discussed at a high level through Professor
Whinston's examination.

Apple fairly points out that this provision I did initially
have redacted from Mr. Cue's testimony.  But I've gone back and
actually reviewed Mr. Cue's testimony, and his testimony
actually undercuts Apple's position that somehow this would
prejudice them.  In fact, Mr. Cue said that it was included
because Google wanted it, and his words were "this was not
important to us," this particular provision.  And in fact, we
just talked about the provision today through Professor --
through Google's expert.  Although it wasn't word for word,
certainly, the essence of it was brought out.  So I think the
actual wording of it doesn't give rise to any real prejudice.

With respect to Section 4, I do think the requested
redactions in Section 4 titled "ad revenue share" are
appropriate, and that's just not limited to the revenue share
percentages.  The second full paragraph that begins
with "Google" reflects a provision that I think we've all been
operating under the understanding has not been made public in
any prior setting, including during this trial, and that there
have been efforts made to ensure the confidentiality of that
particular provision.

I do not think, notwithstanding the fact that it's been
introduced at trial, that the public interest in learning about
these specifics outweighs the potential prejudice to both Google

1    and Apple in having that particular provision disclosed.  The

2    fact of the revenue share, which this is related to, this

3    provision, I can say that at a very high level, is certainly

4    very well known to the public, and it does not -- it ultimately

5    is not a material -- well, I shouldn't be so firm.  Relative to

6    the overall issue of the payment of revenue share and what that

7    means, this particular provision doesn't have as great a

8    probative value in what will be my ultimate decisionmaking here.

9        So for all of those reasons, I do think that that provision

10   ought to be redacted in full.

11       And the same is true with the definitional provision that

12   appears in the fourth paragraph.  I do not understand that

13   particular definition to have been disclosed publicly, and

14   although the definition relates to concepts that we have

15   discussed here in open court, the specifics of that definition

16   which are particular to the relationship between the two

17   entities, I think, warrants nondisclosure, and not only because

18   of that but also, as I said about the last provision, the

19   general tenor of that provision has already been made in open

20   court, and so the public certainly is aware of what the

21   provision relates to.

22       There is not -- there may be some public interest in the

23   actual precise terms, but it seems to me the prejudice outweighs

24   that, and in particular, this does sort of refer to some very

25   specific elements of the term at issue that I do think warrant

1    confidential treatment.

2        Okay?  So that is the Court's ruling on those two exhibits.

3        All right.  So those are the open-ended issues that I had.

4    I guess the one last thing I would like to talk about while we

5    have a few minutes today, and I had planted a seed with the

6    parties some weeks ago in terms of thinking about proposed

7    findings of fact and conclusions of law.

8        Currently, the only thing we have in place is a 70-day due

9    date in terms of from the last day of trial.  And if the last

10   day of trial is Thursday, I think that puts us towards the end

11   of January, by my calculations.

12       MS. ONYEMA:  Thank you, Your Honor.  Veronica Onyema

13   for the United States.

14       DOJ plaintiffs have conferred with both the States and

15   Google regarding possible proposed scheduling.  And we wanted to

16   share our thoughts, and certainly, the States and Google will

17   chime in with theirs.

18       The CMO already contemplates the filing of post-trial

19   briefs, and we believe they're appropriate here.  Given the

20   length of trial, the complexity of the factual record, we would

21   propose that post-trial briefs be no longer than 80 pages and

22   that the States would have an opportunity to provide their own

23   separate filing as well of no more than 35 pages, while also

24   being able to join in DOJ plaintiffs' brief for overlapping

25   claims.

1            In terms of the proposed findings of facts and conclusions

2       of law, we would propose that those are two separate documents.

3            In terms of the proposed conclusions of law, we would

4       propose that they are --

5            THE COURT:  I'm sorry.  When you say post-trial

6       briefs, you're referring to -- you're contemplating a document

7       that is different than and in addition to the proposed findings

8       of fact and conclusions of law?

9            MS. ONYEMA:  Correct, Your Honor.

10           THE COURT:  And what would the post-trial briefs have

11      in them that would not be reflected in the proposed findings of

12      fact and conclusions of law?

13           MS. ONYEMA:  The brief would be a -- as often occurs

14      in post-trial briefs, it would be a narrative document that

15      would walk through the factual record and would demonstrate

16      hopefully, and you would agree with us the fact that we have

17      demonstrated a Section 2 violation, and we would like the

18      opportunity to be able to provide that in a narrative fashion.

19           THE COURT:  Okay.  I mean, it sounds to me more like

20      an executive summary.  In other words, I would assume that what

21      you're going to do is, in however many pages, the proposed

22      findings of fact and conclusions of law, you will cover the same

23      ground but in a much more detailed way.

24           MS. ONYEMA:  It will.  It will be much more detailed.

25      But again, the brief itself would walk through in a narrative

1    fashion.  We're happy to talk further in terms of our thoughts

2    on the length of these separate documents.

3             THE COURT:  Okay.  Maybe I'm not following what you

4    mean by "narrative fashion."  But okay.  All right.

5         We can talk about specifics in a moment, but you're

6    contemplating post-trial briefs and then findings of fact and

7    conclusions of law, and what are you currently contemplating the

8    length of those would be?

9             MS. ONYEMA:  Yes, Your Honor.

10        In terms of the proposed conclusions of law, we would

11   propose no more than 35 pages, and the State plaintiffs would

12   have the opportunity to join that submission, but they would be

13   able to also provide an additional submission of no more than 15

14   pages.

15        In terms of proposed conclusions of fact, we would propose

16   500 pages as a limit.  Just to provide some context as a

17   benchmark, at summary judgment, the DOJ plaintiffs and State

18   plaintiffs, our factual responses to Google's motion were over

19   350 pages, and that did not cover the issues that were not

20   brought in summary judgment, like market definition, monopoly

21   power, procompetitive justifications.

22        So we believe 500 pages, given the extensive factual

23   record, more than 10,000 pages, 50 witnesses, would be

24   appropriate and consistent with precedent as well, Your Honor.

25             THE COURT:  Okay.

 1          MS. ONYEMA:  We would also propose extending the

 2     deadline by two weeks, just given the holidays.  I know the CMO

 3     currently contemplates for ten weeks.  We would propose 12

 4     weeks.

 5          And we also do not believe that responsive briefing is

 6     necessary in this case.  The one exception is that the Court had

 7     indicated for outstanding evidentiary issues, there would be a

 8     filing -- either a separate filing or responsive proposed

 9     findings of fact.  So that would not be, obviously, captured

10     there.

11          But that would be our proposal overall.

12          THE COURT:  Okay.

13          MR. SALLET:  Your Honor, if I may just briefly, just

14     three things.

15          To the point Your Honor raised, we think the briefing would

16     be helpful because there would be a synthesis.  You've used the

17     term "executive summary."  I'm using "synthesis," because I

18     think what we would do is bring together the key facts with the

19     key conclusions of law in a way that we think would be helpful

20     to the Court, to the extent you choose to use it, in navigating

21     to sometimes granular filings that are findings of fact and

22     conclusions of law.  So we think it would be useful.

23          Secondly, there has been some back and forth with Google on

24     this.  So I'm going to go to one issue that Google has raised,

25     perhaps inadvertently, in terms of phrasing.

1    But the States' separate filings would not be confined just

2    to SA360, which is what Google has suggested.  We would address

3    the issues on which we have focused throughout the trial.  And I

4    think Your Honor knows that the way we've conducted ourselves

5    during the trial has indicated no desire to go through

6    repetitive, elongated repetition of issues that have been

7    otherwise discussed.  We would take the same approach with

8    post-trial filings.

9    We have, obviously, some issues that are distinct from DOJ,

10   including SA360, and a separate advertising market, as Your

11   Honor knows.  There are other factual allegations that appear in

12   our complaint that do not appear in DOJ's.  We would expect to

13   focus on those.

14   We would limit repetition to -- as much as possible, but we

15   believe it would be appropriate for us to have the discretion to

16   use those pages as we see fit.

17   And then I believe DOJ gave you page numbers for us under

18   the proposal that we and DOJ put forward but I think perhaps not

19   on findings of fact.  DOJ mentioned 500 pages for a unified

20   brief.

21   And Your Honor, this is the way the summary judgment pieces

22   were done, jointly with us and DOJ.  That's what we mean by

23   "unified."

24   We would ask for 100 pages for the separate State findings

25   of fact.

1          I think that's -- that those are our key points.

2          THE COURT:  Okay.  Mr. Schmidtlein?

3          MR. SCHMIDTLEIN:  Your Honor, we -- there's a couple

4     of areas where I think we agree.

5          The conclusions of law, 35 pages, we do think the DOJ and

6     the States should have a single kind of combined 35 pages on all

7     of the issues that are comparable.  And the only one, candidly,

8     I see that's really separate is SA360.  But I'm not going to

9     lose a whole lot of sleep if he wants to spend his 15 pages of

10    conclusions of law on other market definition.  I guess they can

11    do that.

12         We do not believe that a post-trial brief is necessary.  I

13    have absolutely no doubt that Your Honor and your staff are

14    going to look primarily and very thoroughly at the proposed

15    findings of fact and conclusions of law.  The brief is just more

16    make-work in my judgment at this point.

17         From our perspective, we think the page limitations should

18    be tighter on findings of fact.  We would propose 350 pages of

19    findings of fact on sort of the main, larger, overlapping

20    issues, 50 pages for the States' sort of specific issues.  We

21    agree with February 9th for the submission date.

22         But we also do believe very, very, very strongly that a

23    responsive -- responsive papers are in order here, and here's

24    why:  There is an extraordinary amount of either deposition

25    testimony, but more so documents that the plaintiffs have

insisted on pushing into evidence that no witness has said a word about. You've seen many examples of documents, I pointed one out somewhat amusingly with Professor Murphy, that they had lots of opportunities to ask witnesses about and they chose not to.

We anticipate that there's going to be not insignificant mischief that is going to take place on the findings of fact that they are going to push in. We believe that at summary judgment, we were able to effectively push back and persuade Your Honor that there were things that needed to be put in context.

So we would like the opportunity to respond. We would like 200 pages on the findings of fact and 35 pages on the States' findings of fact, and on conclusions of law, 25 pages and 10 pages. And we would propose that that filing be made on March the 22nd.

THE COURT: The 25 and 10 would be what?

MR. SCHMIDTLEIN: Would be on the conclusions of law.

THE COURT: And I take it you're contemplating that the plaintiffs would also have an opportunity to --

MR. SCHMIDTLEIN: Correct. Both sides could file responses to each other's initial filings, and we would propose those would come in on March the 22nd.

MS. ONYEMA: Your Honor, just a few responses.

One in terms of the post-trial brief, it's certainly not

1    make-work to DOJ plaintiffs.  This is an important case, and we

2    would like the opportunity to be able to highlight key facts and

3    testimony for the Court in a cohesive submission.

4        In terms of any potential mischief, Google has access to

5    the same record that we have.  The trial will be complete.  The

6    record is in.  And they'll have an opportunity at closing to

7    discuss any responses as well.

8        So again, we don't believe responsive briefing is

9    necessary.  If the Court is inclined to grant that, we would

10   have further thoughts on page limits, but we don't think it's

11   necessary, and we would like the opportunity to file a

12   post-trial brief.

13       MR. SALLET:  Just one point, Your Honor.

14       The Department of Justice and the Plaintiff States have

15   offered pages as a part of a proposal that includes the

16   post-trial briefing, the narrative, as it were.

17       If it's Your Honor's preference that we not have that, then

18   we would like a chance to look at the pages assigned to findings

19   of fact and conclusions of law, and if Your Honor would like

20   responses, to those as well.

21       And the very practical reason on part of that is, the

22   conclusions of law pages that we've cited -- in fact, we agreed

23   with Google for this purpose -- are not incredibly extensive.

24   If there is no memorandum of law or legal brief accompanying

25   them, one could imagine those particularly we might seek

1    additional pages.

2        But, Your Honor, I think we would be best off if we knew

3    Your Honor's preference as to having the separate narrative and

4    whether you would like to have responses.

5        THE COURT:  Okay.  Can I just ask, in terms of what

6    you all are contemplating, I mean, there are a couple of, in my

7    mind, and maybe there's more, but there are -- there's one big

8    legal issue.  There are a number of important legal issues, but

9    at least that was tied into the evidentiary motions that were

10   filed pretrial, and that's this issue of procompetitive effects

11   in other markets.

12       I am quite glad I did not endeavor to try and rule on that

13   pretrial, because it clearly is an important issue and a complex

14   one.  So that's one big issue, in my mind, that's going to

15   require more than just a basic, you know, discussion.

16       And then two, the second big issue that we've just sort of

17   reserved on is all of the hearsay that's been coming in and how

18   you all want me to consider it.  I mean, I suppose you all could

19   reach an agreement if you thought that was something that you

20   could come to agreement to in terms of how I should consider the

21   various types of hearsay that have come in.

22       So those are the two things that -- two important things

23   that have been top of mind for me.  There may be more.  And so

24   I'm curious how you are contemplating -- and I guess the third

25   thing is any -- we had left open the possibility of objections

1    in connection with proposed findings of fact and conclusions of

2    law, and that was meant to, you know, for efficiency purposes,

3    at least with respect to those exhibits that have been pushed

4    in.

5         Now, it may be the way you all have been operating is that

6    all of those have been resolved and that's not anything I need

7    to worry about.  But I guess that's sort of the third of the

8    issues and where those three would be placed in this proposed

9    post-trial briefings.

10             MR. SCHMIDTLEIN:  So the question of the competitive

11   effects and the various markets, I would anticipate that the

12   parties would address that in the conclusions of law and the

13   briefs that would get filed, you know, both initially, they

14   would both articulate their positions on law on that, because I

15   think it is a legal question.

16        Obviously, there's a factual component that goes --

17             THE COURT:  If I could just interrupt, I think -- let

18   me ask you this, because from my standpoint, at least as I

19   understand it, there is not a great deal of law on this issue.

20   Maybe I'm wrong about that, but that's my understanding.

21        And I want to make sure, given its importance and given how

22   much attention has been devoted to the evidence to that issue

23   and how important it is to Google's defense, to not give it

24   short shrift.  And so if it means carving that out and putting

25   it in something else, that's okay with me.  I mean, I don't want

1    that issue to suffer in terms of its amplification because

2    you're bumping up against page limits on all of the other legal

3    issues that you have to deal with.

4         MR. SCHMIDTLEIN:  Okay.  Let me kind of confer with my

5    team about that, but I anticipated that we would be able to

6    address that within that conclusions of law portion.

7         In terms of the hearsay, the embedded hearsay, are we going

8    to, you know, kind of continue -- have we reached a point of

9    mutual assured destruction on that?

10        THE COURT:  It seems like it.

11        MR. SCHMIDTLEIN:  That may well be sort of where we

12   are.  But that may well be an issue that we both would benefit

13   from seeing each other's initial proposed findings of fact.

14        And again, one of the reasons why I want the opportunity

15   for a response is so that we can -- if the parties need to

16   address those issues from an evidentiary admissibility

17   standpoint, the response would be the document to deal with

18   those issues and other issues that would come up.

19        But I suspect, Your Honor, we probably need to see each

20   other's filings before we -- I think either side is going to be

21   in a position where they will make a final decision on their

22   position.

23        THE COURT:  There's been, obviously, quite a bit of it

24   admitted in a sense.  On the other hand, it's not clear to me

25   how much of it is ultimately going to be relevant.  So that's

1    one.

2         And then two -- I'm trying to remember.  There have been a

3    handful of witnesses through whom hearsay has been admitted, and

4    maybe there was a standing objection, maybe there wasn't, but

5    certainly, most notably in my mind is the gentleman from Samsung

6    and his testimony that did involve those issues.

7              MR. SCHMIDTLEIN:  Right.  I think this is one that the

8    drafting process and as both sides think about the proposed

9    findings that they want to rely on and the bases for it, I think

10   that is going to crystallize people's thinking on that issue

11   much more clearly than our thinking is at week 10 of the trial

12   right now.

13             THE COURT:  Okay.

14             MR. SALLET:  Your Honor, could I just briefly

15   supplement, just for sake of completeness.

16             THE COURT:  Sure.

17             MR. SALLET:  In terms of the legal issues, Google's

18   pretrial brief did raise legal objections to the States-specific

19   allegations, most notably what it labels "a duty to deal" issue.

20   And we would, of course, expect to address that.

21        Secondly, in terms of evidentiary issues, just to remind

22   the Court, last week, Mr. Schmidtlein and I made an agreement.

23   There was a Baker slide, a slide from Professor Baker, and the

24   three -- Your Honor will remember the three Microsoft documents

25   that were subject to the motion in limine that you decided

1    pretrial to which Google later made an objection.

2         We agreed, to take them backwards, that we would use, the

3    States would use those Microsoft documents in our post-trial

4    filings.  Google would have the opportunity to object on an

5    evidentiary ground.  And Your Honor would then rule upon it.

6              THE COURT:  Right.

7              MR. SALLET:  We agreed on the same thing with the

8    single Baker slide.

9         So these aren't the biggest issues in the world, but

10   they're also a part of the post-trial process.

11             THE COURT:  All right.  Okay.  Anybody else wish to be

12   heard?

13             MS. ONYEMA:  Your Honor, if I may.  I neglected to

14   mention earlier when I noted our request for 500 pages for the

15   proposed findings of fact, I did note that in Microsoft, I

16   understand that the amended findings of fact, they were over 700

17   pages.  So we think given the complexity of the case, the

18   factual record, it is a request that -- is a page limit that we

19   will need.

20             THE COURT:  Okay.  I'm not making any pronouncements

21   just yet, but I will just say that it doesn't give me a heart

22   attack.  I was worried about a larger number that was a multiple

23   of 500.

24        In *Sysco*, I think it was 300, and that was --

25             MR. SCHMIDTLEIN:  Your Honor has heard a lot about

1    negotiating and how the negotiating dynamics work.

2         I will tell you that the initial proposal we got from them

3    was unlimited pages.  And so we will take credit for getting you

4    to 500.

5              THE COURT:  I do appreciate that.  I appreciate that

6    very much, because that would not have -- that would not have

7    worked.

8         All right.  Let me take all of this under consideration,

9    and then we can hammer this out tomorrow and Friday such that --

10   well, maybe not even Friday, tomorrow -- I mean Thursday, excuse

11   me, so that we all know what the schedule will be as we leave

12   court on Thursday.

13        Okay?

14             MR. DINTZER:  Your Honor, just -- as long as we're

15   sort of looking ahead, if the Court has any thoughts on closing

16   argument, just so that we can --

17             THE COURT:  You mean timing or structure or both?

18             MR. DINTZER:  Whatever the Court's pleasure, just if

19   there's -- and of course, if the Court hasn't thought about it,

20   but if the Court has, any guidance would be helpful for us.

21             THE COURT:  I think what I can tell you is this:  I've

22   certainly started thinking about it, and most importantly what

23   I've been thinking about is how to essentially clear my schedule

24   for the run-up.

25        In light of what you all have just proposed, let me go back

1    and think about it in terms of timing, one, and two, in terms of

2    structure.  Look, I would be surprised if we could get it all

3    done in a day.  I think it's probably a multi-day argument that

4    is structured similar to the way the summary judgment was

5    structured, but with a lot of the issues that we did not have to

6    deal with at summary judgment, most prominently market

7    definition and procompetitive effects.

8        So there's a lot to go over.  So I would be surprised if we

9    could do it in a meaningful way in two days -- excuse me, in a

10   day.  Hopefully, it can be done in two days, but we'll just have

11   to see.

12       But let me think about it and give it some more thought.

13   Obviously, I welcome everyone's thoughts and input as well.

14              MR. DINTZER:  We appreciate that, Your Honor.

15              THE COURT:  Thank you all very much.  We will see you

16   tomorrow.  Do not wait for me.

17       (Proceedings adjourned at 4:04 p.m.)

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8     /s/ Sara A. Wick                    November 14, 2023

9     SIGNATURE OF COURT REPORTER         DATE

## $

**$299** [1] - 10178:24
**$400** [1] - 10165:17

## /

**/s** [1] - 10234:8

## 0

**098** [1] - 10179:11

## 1

**1** [2] - 10177:1, 10192:20
**1.3** [2] - 10215:2, 10215:3
**1.4** [2] - 10215:2, 10215:8
**10** [4] - 10190:8, 10225:14, 10225:17, 10230:11
**10,000** [1] - 10221:23
**100** [2] - 10162:23, 10223:24
**10036** [1] - 10149:9
**10151** [1] - 10150:4
**10190** [1] - 10150:4
**109** [1] - 10187:21
**110** [2] - 10158:7, 10158:13
**1100** [1] - 10148:14
**1133** [1] - 10149:8
**12** [1] - 10222:3
**1300** [1] - 10149:4
**133** [1] - 10213:23
**14** [2] - 10148:6, 10234:8
**15** [3] - 10199:5, 10221:13, 10224:9
**16** [2] - 10199:7, 10199:17
**17** [2] - 10168:5, 10200:11
**1:37** [1] - 10148:6
**1A** [1] - 10215:25

## 2

**2** [4] - 10192:21, 10198:22, 10216:24, 10220:17
**20-cv-3010** [1] - 10148:3
**200** [1] - 10225:13
**2000** [1] - 10175:25
**20001** [2] - 10148:17, 10149:16

**20005** [1] - 10148:14
**20024** [1] - 10149:12
**2007-ish** [1] - 10192:2
**2009** [1] - 10151:20
**2016** [5] - 10151:21, 10151:24, 10154:17, 10176:1, 10176:2
**2017** [1] - 10180:8
**202-354-3284** [1] - 10149:17
**2021** [1] - 10210:14
**2023** [2] - 10148:6, 10234:8
**20530** [1] - 10148:20
**2200** [1] - 10149:9
**22nd** [2] - 10225:16, 10225:23
**25** [2] - 10225:14, 10225:17

## 3

**3** [1] - 10216:12
**30(b)(6** [1] - 10198:20
**300** [1] - 10231:24
**333** [1] - 10149:15
**35** [5] - 10219:23, 10221:11, 10224:5, 10224:6, 10225:13
**350** [2] - 10221:19, 10224:18
**377** [1] - 10213:23
**3:00** [1] - 10203:23
**3:15** [2] - 10203:22, 10203:23

## 4

**4** [2] - 10217:14, 10217:15
**40** [1] - 10148:9
**450** [2] - 10148:17, 10148:19
**4704-B** [1] - 10149:16
**4:04** [1] - 10233:17

## 5

**50** [3] - 10194:13, 10221:23, 10224:20
**500** [6] - 10221:16, 10221:22, 10223:19, 10231:14, 10231:23, 10232:4
**5th** [2] - 10180:7, 10180:9

## 6

**680** [1] - 10149:12

## 7

**70-day** [1] - 10219:8
**700** [1] - 10231:16

## 8

**80** [1] - 10202:16, 10202:18, 10202:19, 10219:21
**80203** [1] - 10149:5
**8714** [1] - 10148:20
**8:30** [1] - 10180:9

## 9

**902.11** [1] - 10205:13
**902.11s** [1] - 10205:14
**943** [1] - 10181:22
**945** [2] - 10182:12, 10182:17
**95** [1] - 10185:21
**9th** [1] - 10224:21

## A

**ability** [3] - 10194:15, 10194:22, 10195:4
**able** [12] - 10152:18, 10153:21, 10167:17, 10185:15, 10203:2, 10204:14, 10219:24, 10220:18, 10221:13, 10225:9, 10226:2, 10229:5
**above-entitled** [1] - 10234:5
**absolutely** [2] - 10212:4, 10224:13
**abuse** [1] - 10214:2
**accepted** [2] - 10209:20, 10209:21
**access** [17] - 10182:4, 10183:5, 10187:23, 10188:5, 10188:22, 10188:25, 10197:18, 10197:19, 10197:22, 10197:23, 10197:24, 10198:7, 10200:17, 10200:19, 10226:4
**accompanying** [1] - 10226:24
**account** [2] - 10175:15, 10200:12
**accounted** [1] - 10170:8
**accounting** [1] - 10170:9
**actual** [4] - 10200:16, 10216:7, 10217:13,

10218:23
**ad** [1] - 10217:15
**add** [1] - 10184:25
**add-on** [1] - 10184:25
**added** [2] - 10167:13, 10172:24
**addition** [1] - 10220:7
**additional** [7] - 10152:9, 10170:18, 10178:20, 10178:21, 10208:19, 10221:13, 10227:1
**address** [6] - 10205:3, 10223:2, 10228:12, 10229:6, 10229:16, 10230:20
**addressed** [1] - 10193:22
**addressing** [1] - 10214:11
**adjourned** [1] - 10233:17
**adjudication** [1] - 10214:12
**admissibility** [1] - 10229:16
**admit** [1] - 10206:4
**admitted** [3] - 10205:24, 10229:24, 10230:3
**adopt** [1] - 10194:20
**ads** [1] - 10198:16
**advance** [1] - 10206:14
**advantages** [1] - 10185:20
**advertisement** [1] - 10198:13
**advertising** [2] - 10216:24, 10223:10
**affect** [8] - 10157:10, 10162:19, 10163:8, 10163:12, 10163:18, 10163:23, 10172:20, 10178:14
**affected** [2] - 10157:12, 10159:20
**affecting** [1] - 10168:24
**affects** [1] - 10173:1
**afternoon** [2] - 10211:21
**AFTERNOON** [1] - 10148:9
**agenda** [1] - 10180:8
**ago** [1] - 10219:6
**agree** [11] - 10162:25, 10181:13, 10199:11, 10199:12, 10199:23, 10199:25, 10216:14,

10218:23
**10220:16, 10224:4, 10224:21
**agreed** [5] - 10180:24, 10215:23, 10226:22, 10231:2, 10231:7
**agreement** [16] - 10157:2, 10167:3, 10167:4, 10174:9, 10175:15, 10182:2, 10182:25, 10183:23, 10183:24, 10192:18, 10198:10, 10204:15, 10211:1, 10227:19, 10227:20, 10230:22
**agreement's** [1] - 10181:16
**agreements** [32] - 10156:24, 10156:25, 10157:6, 10165:20, 10165:23, 10165:25, 10166:1, 10166:6, 10166:14, 10166:15, 10166:21, 10167:8, 10167:23, 10167:24, 10168:2, 10170:15, 10183:20, 10184:5, 10194:3, 10194:8, 10194:10, 10194:11, 10194:13, 10195:2, 10200:25, 10209:24, 10210:11, 10210:13, 10211:2, 10211:15
**ahead** [4] - 10168:8, 10172:4, 10214:25, 10232:15
**aided** [1] - 10149:19
**aimed** [1] - 10165:17
**al** [1] - 10148:3
**allegations** [2] - 10223:11, 10230:19
**allege** [1] - 10197:21
**allotted** [1] - 10176:22
**allow** [2] - 10189:22, 10190:1
**allowed** [2] - 10152:23, 10192:18
**almost** [1] - 10171:14
**alone** [1] - 10213:9
**alternative** [3] - 10153:15, 10154:2, 10201:11
**Amazon** [2] - 10176:13, 10176:15
**amended** [1] - 10231:16
**amendment** [1] - 10216:12
**AMERICA** [1] - 10148:3
**Americas** [1] -

10149:8

**AMIT** [1] - 10148:10

**amount** [5] -
10161:20, 10161:21,
10179:18, 10211:4,
10224:24

**amounts** [1] - 10211:3

**amplification** [1] -
10229:1

**amusingly** [1] -
10225:3

**analyses** [3] -
10197:6, 10198:25

**analysis** [8] -
10157:18, 10164:7,
10164:10, 10169:11,
10195:12, 10197:1,
10209:19

**analytical** [1] -
10197:11

**anchor** [2] - 10179:13,
10179:17

**Android** [61] -
10155:21, 10156:1,
10156:13, 10156:15,
10157:7, 10157:11,
10157:12, 10157:13,
10157:14, 10157:19,
10157:25, 10162:6,
10162:10, 10162:11,
10162:13, 10162:14,
10162:15, 10163:18,
10163:23, 10165:7,
10166:7, 10166:25,
10167:9, 10169:25,
10170:13, 10170:16,
10170:17, 10172:9,
10173:2, 10173:16,
10174:1, 10174:4,
10174:11, 10174:21,
10175:11, 10177:11,
10179:19, 10180:3,
10180:16, 10186:9,
10186:10, 10186:12,
10186:14, 10186:18,
10186:21, 10186:25,
10187:7, 10187:9,
10196:7, 10196:10,
10199:15, 10200:25,
10201:7, 10201:19

**Answer** [8] - 10153:9,
10153:24, 10154:18,
10165:4, 10165:8,
10166:23, 10167:2,
10167:7

**answer** [11] -
10154:18, 10155:9,
10160:24, 10167:25,
10171:4, 10172:3,
10189:4, 10193:5,

10193:17, 10201:10

**answering** [1] -
10197:20

**anticipate** [2] -
10225:6, 10228:11

**anticipated** [1] -
10229:5

**Antitrust** [1] - 10149:4

**anyways** [3] -
10183:21, 10184:6,
10184:10

**apologize** [3] -
10158:12, 10190:10,
10209:3

**app** [9] - 10188:9,
10188:12, 10188:16,
10188:19, 10188:22,
10189:2, 10195:25,
10196:1

**apparent** [1] -
10210:11

**appear** [4] - 10164:16,
10206:3, 10223:11,
10223:12

**APPEARANCES** [2] -
10148:12, 10149:1

**appeared** [1] -
10176:8

**appellate** [1] -
10212:6

**Apple** [52] - 10151:14,
10151:18, 10154:17,
10154:24, 10155:14,
10155:15, 10155:21,
10157:2, 10157:6,
10158:5, 10162:12,
10168:10, 10169:7,
10169:12, 10169:23,
10170:12, 10170:14,
10170:20, 10172:8,
10173:8, 10173:25,
10174:9, 10174:18,
10174:23, 10175:6,
10175:8, 10186:9,
10189:17, 10189:21,
10189:22, 10192:1,
10192:8, 10192:12,
10192:13, 10192:15,
10192:17, 10192:18,
10192:23, 10193:18,
10198:10, 10198:13,
10198:16, 10199:1,
10199:9, 10201:21,
10216:8, 10216:10,
10216:19, 10217:3,
10218:1

**Apple's** [5] -
10168:13, 10201:22,
10216:17, 10216:21,
10217:6

**applicable** [2] -
10213:6, 10215:19

**applied** [1] - 10209:14

**applies** [1] - 10216:15

**apply** [2] - 10170:6,
10181:7

**appreciate** [5] -
10203:15, 10209:15,
10232:5, 10233:14

**approach** [5] -
10152:13, 10155:3,
10175:22, 10187:14,
10223:7

**approached** [1] -
10155:25

**appropriate** [6] -
10158:15, 10158:17,
10217:16, 10219:19,
10221:24, 10223:15

**approval** [2] -
10177:16, 10182:24

**approved** [1] -
10182:3

**apps** [4] - 10189:18,
10189:23, 10190:2,
10190:3

**areas** [1] - 10224:4

**argument** [3] -
10206:23, 10232:16,
10233:3

**arises** [1] - 10215:3

**Arizona** [1] - 10213:1

**arrive** [2] - 10199:21,
10200:3

**arrived** [1] - 10200:8

**arrow** [1] - 10158:23

**articulate** [1] -
10228:14

**aside** [1] - 10191:24

**assess** [2] - 10163:1,
10196:19

**assessing** [2] -
10199:10, 10199:15

**assessment** [1] -
10209:13

**assessments** [2] -
10199:14, 10215:16

**assigned** [1] -
10226:18

**assigning** [1] -
10159:17

**assigns** [1] - 10159:15

**Assistant** [2] -
10177:13, 10178:22

**assistant** [3] -
10177:18, 10178:20,
10181:20

**assume** [10] -
10152:9, 10152:11,
10155:25, 10156:9,

10157:15, 10189:2,
10189:24, 10200:21,
10201:19, 10220:20

**assumes** [1] - 10188:7

**assured** [1] - 10229:9

**AT&T** [8] - 10204:16,
10204:17, 10204:24,
10204:25, 10205:1,
10205:13, 10206:7,
10206:12

**attack** [1] - 10231:22

**attention** [3] -
10155:8, 10212:12,
10228:22

**author** [1] - 10205:9

**authority** [1] -
10214:17

**available** [3] -
10201:2, 10209:17,
10211:20

**Avenue** [3] - 10149:8,
10149:12, 10149:15

**aware** [6] - 10149:6,
10193:7, 10193:18,
10198:16, 10205:22,
10218:20

**B**

**Backflip** [1] -
10204:17

**backs** [1] - 10199:16

**backwards** [1] -
10231:2

**Baker** [3] - 10230:23,
10231:8

**balancing** [3] -
10215:13, 10215:14,
10215:16

**ball** [2] - 10175:7,
10206:14

**Bank** [1] - 10213:23

**bar** [1] - 10188:25

**barriers** [3] - 10194:2,
10194:4, 10194:5

**barter** [2] - 10185:25,
10186:5

**based** [4] - 10172:18,
10175:23, 10207:19,
10213:9

**baseline** [1] -
10160:22

**bases** [1] - 10230:9

**basic** [3] - 10202:9,
10202:22, 10227:15

**basing** [1] - 10163:21

**basis** [1] - 10156:5

**Bates** [1] - 10182:17

**BC** [13] - 10176:11,
10176:17, 10176:18,

10177:5, 10177:10,
10177:11, 10177:16,
10179:4, 10180:8,
10180:17, 10182:13,
10182:21, 10182:24

**bear** [1] - 10209:8

**bearings** [1] -
10197:16

**BEFORE** [1] -
10148:1, 10148:10

**beforehand** [1] -
10172:25

**beginning** [1] -
10169:18

**begins** [3] - 10216:2,
10216:13, 10217:17

**believes** [2] -
10183:19, 10184:4

**Belknap** [1] - 10149:8

**BELLSHAW** [7] -
10148:15, 10207:17,
10207:23, 10208:3,
10208:7, 10208:12,
10208:23

**Bellshaw** [1] -
10207:17

**below** [1] - 10180:18

**BENCH** [1] - 10148:9

**benchmark** [1] -
10197:25, 10198:8,
10221:17

**benefit** [8] - 10160:19,
10172:19, 10172:22,
10172:23, 10179:22,
10201:2, 10206:23,
10229:12

**benefits** [9] -
10161:24, 10179:21,
10184:25, 10185:2,
10185:5, 10185:13,
10200:24, 10201:1

**BENJAMIN** [1] -
10149:11

**best** [10] - 10153:18,
10189:8, 10199:22,
10200:3, 10200:7,
10200:8, 10201:19,
10202:10, 10202:14,
10227:2

**bet** [1] - 10155:20

**better** [4] - 10166:20,
10200:3, 10203:3,
10203:4

**between** [8] - 10162:9,
10168:9, 10169:12,
10173:4, 10173:25,
10202:7, 10202:19,
10218:16

**beyond** [4] -
10152:10, 10176:22,

10188:7, 10212:7
**bid** [2] - 10152:12, 10155:24
**bids** [1] - 10155:22
**big** [5] - 10167:12, 10194:6, 10227:7, 10227:14, 10227:16
**bigger** [2] - 10195:18, 10195:19
**biggest** [1] - 10231:9
**binder** [3] - 10175:20, 10180:4, 10191:4
**Bing** [11] - 10151:17, 10151:19, 10152:2, 10152:5, 10153:10, 10153:11, 10153:12, 10154:6, 10157:10, 10157:19, 10192:21
**bit** [4] - 10154:19, 10173:21, 10216:23, 10229:23
**Bixby** [3] - 10181:19, 10181:21, 10183:9
**blackened** [1] - 10177:5
**bookmark** [1] - 10196:3
**bottom** [3] - 10170:1, 10180:22, 10199:17
**bought** [1] - 10174:21
**bounty** [2] - 10211:4, 10211:9
**box** [9] - 10155:6, 10177:12, 10179:12, 10179:14, 10179:17, 10181:23, 10182:7, 10183:1, 10189:18
**boxes** [1] - 10177:7
**Braddi** [1] - 10191:9
**Braddi's** [1] - 10215:10
**break** [2] - 10203:20, 10203:21
**brief** [10] - 10219:24, 10220:13, 10220:25, 10223:20, 10224:12, 10224:15, 10225:25, 10226:12, 10226:24, 10230:18
**briefing** [4] - 10222:5, 10222:15, 10226:8, 10226:16
**briefings** [1] - 10228:9
**briefly** [3] - 10204:8, 10222:13, 10230:14
**briefs** [7] - 10219:19, 10219:21, 10220:6, 10220:10, 10220:14, 10221:6, 10228:13
**bring** [1] - 10222:18

bringing [1] - 10180:16
**Broadway** [1] - 10149:4
**broke** [1] - 10167:13
**brought** [2] - 10217:12, 10221:20
**browser** [14] - 10156:25, 10157:1, 10157:6, 10181:18, 10188:4, 10188:16, 10189:14, 10192:23, 10192:25, 10193:7, 10195:24, 10197:17, 10201:13, 10201:19
**Browsers** [1] - 10187:22
**browsers** [6] - 10157:3, 10158:5, 10188:2, 10188:6, 10192:24, 10193:3
**browsing** [1] - 10193:20
**bucket** [1] - 10207:11
**buckets** [1] - 10207:9
**building** [1] - 10154:23
**built** [1] - 10187:8
**bullet** [1] - 10178:19
**bullets** [1] - 10179:11
**bumping** [1] - 10229:2
**bunch** [1] - 10176:6
**bundle** [3] - 10187:3, 10187:10, 10187:18
**business** [3] - 10198:16, 10202:20, 10206:3
**but-for** [5] - 10196:21, 10196:22, 10197:9, 10197:10, 10198:1
**buy** [10] - 10153:11, 10174:13, 10175:5, 10194:19, 10201:25, 10202:2, 10202:6, 10202:7, 10202:22, 10202:24
**buying** [3] - 10174:21, 10175:4, 10175:10
**BY** [22] - 10151:8, 10152:14, 10153:1, 10155:5, 10156:12, 10160:10, 10164:20, 10168:4, 10170:11, 10172:7, 10175:13, 10175:24, 10184:19, 10189:13, 10190:24, 10191:6, 10191:15, 10193:6, 10196:4, 10197:4, 10201:15, 10202:5

**C**

**calculation** [2] - 10180:1, 10180:2
**calculations** [1] - 10219:11
**CAMERON** [1] - 10148:16
**Cameron** [1] - 10205:5
**candidly** [1] - 10224:7
**cannot** [2] - 10169:8, 10181:19
**captured** [1] - 10222:9
**captures** [1] - 10185:10
**careful** [2] - 10159:21, 10190:1
**carefully** [1] - 10212:1
**carrier** [9] - 10160:12, 10160:18, 10161:22, 10165:24, 10167:23, 10177:1, 10177:11, 10181:7, 10211:5
**carrier's** [1] - 10211:5
**carriers** [11] - 10161:12, 10161:20, 10163:18, 10165:2, 10165:5, 10166:21, 10175:14, 10179:3, 10181:16, 10209:25, 10210:17
**carve** [1] - 10193:19
**carve-out** [1] - 10193:19
**carving** [1] - 10228:24
**Case** [1] - 10148:3
**case** [28] - 10157:15, 10172:14, 10173:15, 10192:22, 10193:18, 10196:23, 10197:17, 10204:2, 10204:6, 10204:16, 10205:1, 10205:25, 10207:10, 10207:20, 10210:13, 10212:3, 10212:15, 10212:16, 10212:19, 10212:25, 10213:3, 10213:4, 10213:21, 10213:22, 10216:10, 10222:6, 10226:1, 10231:17
**cases** [5] - 10212:1, 10212:11, 10212:12, 10212:25, 10214:16
**cash** [2] - 10152:10, 10175:3
**casual** [1] - 10214:10
**causal** [1] - 10186:8
**causality** [2] - 10169:11, 10186:4

**causally** [2] - 10169:6, 10169:7
**CAVANAUGH** [2] - 10149:7, 10208:18
**Cavanaugh** [2] - 10190:17, 10208:17
**cell** [2] - 10163:12, 10187:17
**certain** [6] - 10171:14, 10197:22, 10198:25, 10211:23, 10212:18, 10213:24
**certainly** [14] - 10154:1, 10161:22, 10180:2, 10193:12, 10203:2, 10206:11, 10212:6, 10217:12, 10218:3, 10218:20, 10219:16, 10225:25, 10230:5, 10232:22
**CERTIFICATE** [1] - 10234:1
**certify** [1] - 10234:3
**CFO** [1] - 10176:7
**chain** [1] - 10176:2
**challenged** [1] - 10194:3
**chance** [1] - 10226:18
**change** [3] - 10157:15, 10157:16, 10159:25
**changes** [1] - 10157:17
**changing** [3] - 10157:10, 10173:11, 10179:6
**characteristics** [1] - 10165:19
**characterization** [1] - 10152:1
**charged** [1] - 10157:24
**chart** [2] - 10181:22, 10195:7
**check** [4] - 10206:9, 10206:10, 10206:11, 10207:2
**chime** [1] - 10219:17
**choice** [22] - 10153:18, 10154:10, 10154:19, 10154:22, 10154:24, 10159:14, 10159:17, 10163:23, 10164:6, 10164:7, 10192:2, 10192:12, 10196:6, 10196:9, 10196:13, 10196:19, 10196:21, 10196:25, 10197:5, 10197:13, 10197:15, 10197:20

**choose** [1] - 10222:20
**chose** [1] - 10225:4
**Chrome** [9] - 10158:25, 10174:14, 10196:10, 10196:14, 10201:3, 10201:7, 10201:12, 10201:14, 10201:16
**chunks** [1] - 10175:5
**Circuit** [2] - 10213:22, 10214:10
**circuit** [1] - 10214:1
**circumstance** [1] - 10214:5
**circumstances** [4] - 10212:10, 10212:13, 10212:20, 10214:18
**cited** [5] - 10161:3, 10212:11, 10212:14, 10213:1, 10226:22
**claims** [1] - 10219:25
**claw** [4] - 10198:25, 10199:10, 10199:16, 10199:22
**claw-back** [3] - 10198:25, 10199:10, 10199:22
**claw-backs** [1] - 10199:16
**clean** [1] - 10190:7
**clear** [9] - 10153:24, 10169:13, 10169:17, 10185:14, 10186:19, 10190:8, 10216:21, 10229:24, 10232:23
**clearer** [1] - 10162:15
**clearly** [4] - 10197:23, 10214:5, 10227:13, 10230:11
**close** [2] - 10171:16, 10188:8
**closed** [3] - 10209:13, 10210:18, 10210:23
**closely** [1] - 10214:16
**closer** [1] - 10208:13
**closing** [2] - 10226:6, 10232:15
**CMO** [2] - 10219:18, 10222:2
**code** [1] - 10188:21
**cohesive** [1] - 10226:3
**coincidence** [3] - 10169:4, 10169:9
**collateral** [1] - 10211:16
**colleague** [2] - 10195:10, 10204:2
**colleagues** [2] - 10190:11, 10204:10
**Colorado** [4] -

10149:2, 10149:3, 10149:5, 10149:7
**COLUMBIA** [1] - 10148:1
**combined** [2] - 10159:6, 10224:6
**coming** [6] - 10174:23, 10185:16, 10191:12, 10191:13, 10195:3, 10227:17
**comments** [1] - 10206:17
**commitment** [1] - 10177:6
**common** [2] - 10202:11, 10210:17
**companies** [2] - 10171:9, 10171:10
**comparable** [4] - 10170:22, 10212:13, 10214:18, 10224:7
**comparative** [1] - 10171:1
**comparator** [1] - 10199:10
**comparators** [4] - 10171:9, 10199:15, 10199:21, 10200:1
**compare** [1] - 10196:19
**comparing** [1] - 10175:8
**comparison** [1] - 10186:13
**compensation** [1] - 10173:17
**compete** [3] - 10162:3, 10169:25, 10195:4
**competed** [4] - 10151:15, 10151:25, 10158:1, 10158:4
**competing** [3] - 10161:14, 10200:20, 10213:10
**competition** [10] - 10155:16, 10155:18, 10156:21, 10157:5, 10157:13, 10157:25, 10194:23, 10198:3, 10201:8, 10203:1
**competitive** [10] - 10159:22, 10162:16, 10162:20, 10163:6, 10163:15, 10196:20, 10198:2, 10211:10, 10211:13, 10228:10
**competitor** [1] - 10200:18
**complaint** [1] -

10223:12
**complete** [2] - 10204:5, 10226:5
**completeness** [1] - 10230:15
**complex** [1] - 10227:13
**complexity** [2] - 10219:20, 10231:17
**complicated** [1] - 10165:24
**component** [5] - 10167:13, 10167:14, 10167:15, 10228:16
**compromised** [1] - 10204:23
**computer** [2] - 10149:19, 10188:23
**computer-aided** [1] - 10149:19
**computers** [2] - 10195:13, 10195:16
**concept** [5] - 10160:15, 10160:23, 10161:17, 10201:24, 10202:2
**concepts** [1] - 10218:14
**concern** [3] - 10171:7, 10216:17, 10216:21
**concerned** [1] - 10154:24
**concerning** [1] - 10214:23
**concerns** [1] - 10178:7
**conclude** [1] - 10213:11
**conclusion** [1] - 10156:21
**conclusions** [21] - 10219:7, 10220:1, 10220:3, 10220:8, 10220:12, 10220:22, 10221:7, 10221:10, 10221:15, 10222:19, 10222:22, 10224:5, 10224:10, 10224:15, 10225:14, 10225:18, 10226:19, 10226:22, 10228:1, 10228:12, 10229:6
**conditions** [3] - 10163:7, 10215:20, 10215:21
**conducted** [1] - 10223:4
**confer** [2] - 10190:11, 10229:4
**conferral** [1] -

10204:10
**conferred** [3] - 10172:2, 10190:13, 10219:14
**confidential** [7] - 10211:24, 10213:25, 10214:2, 10214:9, 10214:14, 10215:6, 10219:1
**confidentiality** [4] - 10175:23, 10212:22, 10213:12, 10217:21
**configuration** [1] - 10210:16
**confined** [1] - 10223:1
**confirm** [1] - 10156:11
**confused** [2] - 10191:19, 10196:12
**confusion** [1] - 10216:15
**connected** [4] - 10188:9, 10188:10, 10188:13, 10189:5
**connection** [3] - 10162:9, 10207:1, 10228:1
**Connolly** [1] - 10149:11
**consider** [12] - 10161:23, 10173:7, 10173:9, 10179:24, 10184:25, 10185:1, 10185:7, 10185:17, 10185:18, 10197:16, 10227:18, 10227:20
**consideration** [2] - 10172:18, 10232:8
**considered** [1] - 10193:12
**considering** [3] - 10170:24, 10179:2, 10179:21
**considers** [2] - 10179:4, 10189:22
**consistent** [4] - 10186:6, 10189:20, 10211:7, 10221:24
**constituents** [4] - 10176:11, 10176:17, 10176:19, 10182:14
**Constitution** [1] - 10149:15
**consumer** [5] - 10160:13, 10160:19, 10181:6, 10181:15, 10204:25
**Consumer** [1] - 10149:3
**consumers** [3] - 10157:24, 10161:5,

10165:7
**contemplates** [2] - 10219:18, 10222:3
**contemplating** [6] - 10220:6, 10221:6, 10221:7, 10225:19, 10227:6, 10227:24
**contested** [1] - 10151:11
**context** [6] - 10157:1, 10205:11, 10205:19, 10205:23, 10221:16, 10225:11
**continue** [2] - 10151:4, 10229:8
**continued** [3] - 10148:22, 10169:23, 10211:3
**Continued** [1] - 10151:7
**CONTINUED** [1] - 10149:1
**Continued)...** [1] - 10150:4
**contract** [2] - 10194:16, 10211:6
**contracts** [6] - 10151:10, 10155:22, 10156:22, 10164:14, 10196:17, 10197:19
**contradict** [1] - 10200:2
**contribute** [1] - 10169:16
**converse** [1] - 10171:24
**copies** [2] - 10204:12, 10204:15
**copy** [2] - 10205:8, 10205:19
**correct** [13] - 10160:5, 10162:6, 10162:9, 10163:18, 10168:18, 10168:22, 10172:10, 10173:8, 10179:4, 10188:3, 10220:9, 10225:21, 10234:4
**correctly** [1] - 10208:2
**cost** [6] - 10157:15, 10159:6, 10163:10, 10179:22, 10185:22, 10187:4
**costs** [8] - 10159:8, 10161:9, 10161:13, 10161:24, 10162:2, 10179:21, 10202:12, 10202:14
**counsel** [4] - 10171:24, 10172:2, 10190:13, 10216:3

**counterfactual** [2] - 10158:15, 10158:18
**counters** [1] - 10207:10
**countries** [2] - 10215:5
**couple** [5] - 10172:1, 10208:19, 10211:14, 10224:3, 10227:6
**course** [7] - 10155:9, 10162:4, 10185:5, 10214:11, 10215:19, 10230:20, 10232:19
**court** [23] - 10151:2, 10171:1, 10171:15, 10174:2, 10203:19, 10203:24, 10210:1, 10210:22, 10210:25, 10212:5, 10212:6, 10212:7, 10212:9, 10212:11, 10212:18, 10212:20, 10213:24, 10214:1, 10214:14, 10216:23, 10218:15, 10218:20, 10232:12
**COURT** [81] - 10148:1, 10151:3, 10151:5, 10152:20, 10152:25, 10155:4, 10156:5, 10156:9, 10160:7, 10164:5, 10164:19, 10167:21, 10167:24, 10169:20, 10170:4, 10170:10, 10171:2, 10171:17, 10171:20, 10172:1, 10172:6, 10173:12, 10173:23, 10174:3, 10175:1, 10175:12, 10184:16, 10189:9, 10190:8, 10190:12, 10190:16, 10190:21, 10191:4, 10191:12, 10193:4, 10195:21, 10197:2, 10201:10, 10202:4, 10203:8, 10203:11, 10203:18, 10203:25, 10204:4, 10204:7, 10206:2, 10206:13, 10206:21, 10207:3, 10207:13, 10207:21, 10207:24, 10208:5, 10208:10, 10208:15, 10208:22, 10209:4, 10220:5, 10220:10, 10220:19, 10221:3, 10221:25, 10222:12, 10224:2, 10225:17, 10225:19, 10227:5, 10228:17, 10229:10,

10229:23, 10230:13, 10230:16, 10231:6, 10231:11, 10231:20, 10232:5, 10232:17, 10232:21, 10233:15, 10234:1, 10234:9

**Court** [19] - 10149:15, 10194:1, 10204:18, 10212:4, 10212:16, 10213:4, 10213:6, 10213:7, 10213:10, 10214:2, 10214:4, 10222:6, 10222:20, 10226:3, 10226:9, 10230:22, 10232:15, 10232:19, 10232:20

**Court's** [3] - 10214:7, 10219:2, 10232:18

**courtroom** [1] - 10212:22

**courts** [2] - 10212:8, 10212:15

**cover** [3] - 10178:23, 10220:22, 10221:19

**coverage** [3] - 10177:24, 10178:5, 10179:5

**covered** [1] - 10185:21

**covering** [1] - 10181:13

**create** [2] - 10159:6, 10211:12

**creating** [1] - 10166:6

**credit** [1] - 10232:3

**Cross** [1] - 10150:4

**cross** [2] - 10198:9, 10200:24

**CROSS** [1] - 10151:7

**cross-examination** [2] - 10198:9, 10200:24

**Cross-Examination** [1] - 10150:4

**CROSS-EXAMINATION** [1] - 10151:7

**crossed** [1] - 10193:2

**CRR** [1] - 10149:15

**crystallize** [1] - 10230:10

**Cue** [7] - 10153:4, 10153:15, 10154:10, 10155:10, 10192:11, 10193:22, 10217:7

**Cue's** [2] - 10217:4, 10217:5

**curious** [1] - 10227:24

**current** [2] - 10152:10, 10183:1

**custodian** [3] -

10206:7, 10206:22, 10206:24

**customer** [1] - 10202:23

**customers** [3] - 10183:21, 10184:6, 10184:10

**cut** [1] - 10206:16

## D

**D.C** [6] - 10148:5, 10148:14, 10148:17, 10148:20, 10149:12, 10149:16

**D287** [1] - 10166:17

**data** [7] - 10152:9, 10152:12, 10163:17, 10163:19, 10187:13, 10187:16, 10187:20

**date** [4] - 10176:1, 10219:9, 10224:21

**DATE** [1] - 10234:9

**dated** [1] - 10180:7

**dates** [2] - 10215:3, 10215:5

**Davies** [1] - 10207:16, 10207:20

**DAY** [1] - 10148:9

**daydream** [1] - 10183:10

**days** [2] - 10233:9, 10233:10

**de** [1] - 10195:10

**deadline** [1] - 10222:2

**deal** [17] - 10153:21, 10154:16, 10155:10, 10167:2, 10177:21, 10179:6, 10180:8, 10180:17, 10181:23, 10182:13, 10202:10, 10203:3, 10228:19, 10229:3, 10229:17, 10230:19, 10233:6

**deals** [5] - 10159:20, 10166:4, 10166:8, 10166:9, 10203:4

**dealt** [1] - 10157:3

**decided** [2] - 10207:19, 10230:25

**deciding** [1] - 10185:18

**decision** [4] - 10187:7, 10212:6, 10213:20, 10229:21

**decisionmaking** [1] - 10218:8

**deck** [2] - 10158:7, 10162:23

**decline** [2] - 10169:16,

10215:1

**declined** [1] - 10213:4

**Default** [1] - 10182:4

**default** [28] - 10151:15, 10151:24, 10151:25, 10152:3, 10154:11, 10157:10, 10157:20, 10159:15, 10159:18, 10160:12, 10166:25, 10174:10, 10181:2, 10181:11, 10183:6, 10189:22, 10193:20, 10194:11, 10194:13, 10194:16, 10194:17, 10195:8, 10195:9, 10195:14, 10195:16, 10215:4, 10216:1, 10216:13

**defaults** [4] - 10151:10, 10155:22, 10156:2, 10156:16

**Defendant** [2] - 10148:7, 10149:10

**defense** [1] - 10228:23

**definition** [7] - 10216:5, 10218:13, 10218:14, 10218:15, 10221:20, 10224:10, 10233:7

**definitional** [1] - 10218:11

**degree** [2] - 10188:7, 10210:19

**Delaware** [3] - 10212:15, 10213:3, 10213:20

**demand** [2] - 10163:7, 10163:12

**demonstrate** [1] - 10220:15

**demonstrated** [1] - 10220:17

**denied** [2] - 10197:19, 10197:22

**Denver** [1] - 10149:4

**deny** [1] - 10207:21

**Department** [5] - 10148:13, 10148:16, 10148:19, 10149:3, 10226:14

**deposition** [4] - 10204:19, 10207:4, 10208:18, 10224:24

**describe** [1] - 10202:6

**described** [1] - 10214:10

**describing** [1] - 10157:25

**design** [1] - 10187:7

**designations** [2] -

10207:4, 10208:19

**designed** [2] - 10192:24, 10209:24

**desire** [2] - 10179:13, 10223:5

**desperate** [1] - 10153:9

**destruction** [1] - 10229:9

**detailed** [2] - 10220:23, 10220:24

**determine** [1] - 10157:18

**determining** [1] - 10189:21

**Deutsche** [1] - 10213:22

**Device** [1] - 10182:1

**device** [11] - 10157:20, 10168:16, 10168:17, 10168:20, 10169:16, 10169:22, 10182:8, 10189:23, 10190:2, 10190:3, 10201:7

**devices** [26] - 10165:7, 10166:24, 10167:1, 10167:5, 10173:16, 10173:25, 10174:5, 10177:23, 10181:6, 10181:7, 10181:14, 10183:1, 10183:5, 10186:10, 10186:12, 10186:18, 10187:10, 10189:18, 10191:17, 10191:21, 10192:8, 10192:13, 10195:8, 10195:16, 10195:18, 10196:11

**devoted** [1] - 10228:22

**different** [15] - 10163:2, 10165:23, 10165:25, 10171:9, 10171:10, 10171:25, 10192:18, 10192:20, 10201:1, 10207:9, 10213:19, 10214:5, 10214:13, 10214:5, 10220:7

**differential** [1] - 10197:24

**differentiation** [3] - 10210:2, 10210:10, 10210:19

**difficult** [2] - 10162:24, 10163:5

**Dintzer** [1] - 10151:3, 10173:21, 10190:16, 10190:19, 10191:1,

10195:11, 10198:17, 10199:1, 10199:4, 10199:19, 10200:14

**DINTZER** [39] - 10148:13, 10151:4, 10151:6, 10151:8, 10152:13, 10152:14, 10152:23, 10153:1, 10155:3, 10155:5, 10156:12, 10160:9, 10160:10, 10164:20, 10168:4, 10170:11, 10171:4, 10171:11, 10171:14, 10171:19, 10171:23, 10172:3, 10172:7, 10175:13, 10175:22, 10175:24, 10184:18, 10184:19, 10189:11, 10189:13, 10190:10, 10190:14, 10193:1, 10201:9, 10203:9, 10203:16, 10232:14, 10232:18, 10233:14

**direct** [10] - 10162:8, 10163:22, 10169:3, 10181:6, 10181:15, 10195:6, 10196:1, 10198:6, 10208:11, 10208:12

**direct-to-consumer** [1] - 10181:6

**direction** [2] - 10171:5, 10175:4

**directionality** [1] - 10169:21

**directionally** [1] - 10163:24

**directions** [3] - 10159:11, 10159:19, 10172:13

**disadvantage** [1] - 10211:13

**disagree** [2] - 10199:11, 10199:23

**disallowed** [2] - 10187:11, 10187:18

**disclosed** [9] - 10210:4, 10213:14, 10214:7, 10215:12, 10216:4, 10216:14, 10216:25, 10218:1, 10218:13

**disclosure** [5] - 10211:12, 10214:8, 10215:7, 10215:24, 10216:22

**discovery** [1] - 10206:10

**discretion** [2] -

10214:2, 10223:15
**discuss** [2] -
10185:22, 10226:7
**discussed** [6] -
10210:18, 10210:25,
10216:23, 10217:1,
10218:15, 10223:7
**discussion** [14] -
10171:1, 10173:21,
10178:7, 10178:12,
10178:17, 10179:8,
10184:1, 10184:22,
10210:1, 10210:9,
10214:14, 10216:9,
10227:15
**discussions** [5] -
10162:1, 10180:3,
10209:23, 10210:7,
10210:21
**dispute** [1] - 10213:16
**disputed** [1] -
10206:12
**distinct** [1] - 10223:9
**distinguishable** [1] -
10212:19
**distinguished** [1] -
10214:4
**distinguishing** [1] -
10213:3
**distribution** [6] -
10151:9, 10162:5,
10177:6, 10177:13,
10177:18, 10198:4
**DISTRICT** [3] -
10148:1, 10148:1,
10148:10
**district** [4] - 10212:7,
10212:9, 10212:10,
10213:24
**District** [1] - 10213:1
**divert** [1] - 10216:11
**diverts** [1] - 10216:20
**docs** [2] - 10161:3
**document** [25] -
10179:7, 10180:14,
10180:22, 10181:8,
10184:17, 10184:20,
10191:1, 10191:7,
10191:11, 10191:17,
10191:20, 10191:22,
10203:9, 10204:16,
10205:8, 10205:9,
10205:10, 10205:13,
10205:18, 10205:19,
10206:12, 10206:15,
10220:6, 10220:14,
10229:17
**documented** [1] -
10204:17
**documents** [18] -

10161:18, 10161:19,
10161:21, 10161:25,
10179:24, 10187:3,
10187:5, 10191:25,
10192:1, 10192:3,
10205:14, 10208:20,
10220:2, 10221:2,
10224:25, 10225:2,
10230:24, 10231:3
**DOJ** [11] - 10148:13,
10219:14, 10219:24,
10221:17, 10223:9,
10223:17, 10223:18,
10223:19, 10223:22,
10224:5, 10226:1
**DOJ's** [1] - 10223:12
**dollar** [2] - 10172:8,
10172:9
**dollars** [1] - 10172:11
**done** [18] - 10154:17,
10157:18, 10164:2,
10164:9, 10174:12,
10207:9, 10208:15,
10209:5, 10209:12,
10209:18, 10209:19,
10212:8, 10212:9,
10214:9, 10214:16,
10223:22, 10233:3,
10233:10
**door** [1] - 10172:12
**doubt** [1] - 10224:13
**down** [16] - 10161:9,
10161:13, 10169:12,
10177:21, 10178:16,
10179:12, 10182:18,
10196:16, 10199:13,
10199:17, 10202:9,
10202:15, 10206:20,
10210:21, 10210:22,
10211:2
**downloaded** [3] -
10192:7, 10195:25,
10196:1
**downloading** [1] -
10192:4
**drafting** [1] - 10230:8
**draw** [1] - 10155:8
**drive** [1] - 10207:6
**driver** [1] - 10164:13
**DuckDuckGo** [1] -
10193:23
**due** [3] - 10179:13,
10183:22, 10219:8
**during** [6] - 10170:7,
10195:6, 10200:18,
10214:20, 10217:20,
10223:5
**duty** [1] - 10230:19
**DX384** [1] - 10204:15
**dynamics** [2] -

10159:23, 10232:1

---

**E**

---

**e-mail** [4] - 10176:1,
10176:12, 10178:15,
10191:8
**econometric** [2] -
10163:17, 10169:11
**economic** [1] -
10153:22
**economically** [1] -
10192:7
**economics** [9] -
10157:14, 10157:23,
10162:15, 10162:22,
10163:21, 10173:3,
10175:10, 10186:11,
10202:9
**economist** [2] -
10175:17, 10175:18
**economy** [1] -
10202:3
**effect** [5] - 10158:3,
10173:7, 10204:25,
10205:16, 10213:14
**effectively** [4] -
10202:11, 10215:9,
10215:17, 10225:9
**effects** [3] - 10227:10,
10228:11, 10233:7
**efficiency** [1] -
10228:2
**efficient** [1] -
10190:21
**effort** [1] - 10162:4
**efforts** [2] - 10213:12,
10217:21
**either** [13] - 10156:11,
10156:19, 10159:6,
10159:7, 10169:9,
10185:15, 10188:25,
10196:14, 10204:10,
10216:8, 10222:8,
10224:24, 10229:20
**elastic** [6] - 10157:14,
10162:16, 10162:20,
10163:6, 10163:10,
10163:14
**elements** [1] -
10218:25
**elicited** [1] - 10215:11
**eligibility** [1] -
10215:3
**eliminate** [1] -
10169:8
**elongated** [1] -
10223:6
**EMADA** [4] -
10159:12, 10159:13,

10159:19, 10170:16
**embedded** [2] -
10204:11, 10229:7
**emphasize** [1] -
10194:15
**empirical** [2] -
10159:4, 10187:13
**employing** [1] -
10192:12
**enabled** [1] -
10181:19, 10185:25
**encourage** [1] -
10167:9
**end** [4] - 10174:12,
10187:17, 10209:6,
10219:10
**endeavor** [1] -
10227:12
**ended** [2] - 10214:6,
10219:3
**ends** [1] - 10212:5
**engine** [7] - 10154:11,
10166:25, 10181:3,
10181:11, 10188:17,
10215:4
**engines** [5] -
10154:20, 10154:25,
10192:20, 10192:25,
10193:8
**enhancing** [1] -
10194:23
**ensure** [3] - 10166:7,
10178:22, 10217:21
**enter** [4] - 10183:20,
10184:4, 10194:6,
10194:18
**entered** [2] -
10192:17, 10213:18
**entering** [2] -
10200:25, 10201:22
**entire** [3] - 10170:20,
10174:19, 10208:8
**entities** [1] - 10218:17
**entitled** [1] - 10234:5
**entry** [4] - 10194:2,
10194:4, 10194:24,
10195:22
**equal** [1] - 10198:7
**equation** [1] -
10172:25
**ESQ** [8] - 10148:13,
10148:15, 10148:16,
10148:18, 10149:2,
10149:7, 10149:10,
10149:11
**essence** [1] -
10217:12
**essentially** [2] -
10215:20, 10232:23
**established** [2] -

10165:10, 10189:10
**estimate** [5] -
10162:25, 10163:5,
10199:22, 10200:3,
10200:8
**estimates** [2] -
10199:20, 10200:7
**et** [1] - 10148:3
**EU** [2] - 10159:14,
10182:2
**Europe** [8] - 10158:12,
10159:4, 10164:8,
10187:16, 10196:8,
10196:11
**European** [3] -
10158:14, 10196:6,
10196:9
**evidence** [16] -
10156:19, 10158:2,
10158:4, 10163:22,
10172:14, 10186:6,
10187:14, 10187:19,
10191:8, 10192:22,
10193:18, 10198:12,
10201:12, 10201:18,
10225:1, 10228:22
**evidentiary** [6] -
10207:14, 10222:7,
10227:9, 10229:16,
10230:21, 10231:5
**exact** [1] - 10169:23
**exactly** [3] - 10159:2,
10171:17, 10193:24
**examination** [3] -
10198:9, 10200:24,
10217:2
**Examination** [1] -
10150:4
**EXAMINATION** [2] -
10151:7, 10190:23
**Examination............**
[1] - 10150:4
**examined** [3] -
10166:9, 10193:15,
10195:7
**example** [6] - 10161:8,
10162:2, 10163:7,
10186:24, 10197:14,
10206:21
**examples** [1] -
10225:2
**exception** [2] -
10210:20, 10222:6
**excerpt** [1] - 10200:15
**excerpted** [2] -
10199:1, 10200:14
**excerpts** [1] -
10199:18
**exchange** [1] -
10180:23

**excluded** [1] - 10191:23
**exclusions** [1] - 10177:23
**exclusive** [4] - 10183:20, 10184:4, 10184:9, 10195:10
**exclusively** [1] - 10157:20
**exclusivity** [12] - 10165:21, 10166:12, 10167:6, 10167:18, 10177:22, 10178:4, 10181:3, 10181:11, 10182:1, 10182:8, 10210:8
**excuse** [4] - 10203:11, 10215:21, 10232:10, 10233:9
**executive** [2] - 10220:20, 10222:17
**exercise** [1] - 10197:11
**Exhibit** [1] - 10215:25
**exhibit** [3] - 10203:20, 10204:2, 10204:14
**exhibits** [5] - 10204:9, 10205:24, 10214:24, 10219:2, 10228:3
**existence** [2] - 10159:17, 10173:1
**existing** [2] - 10154:20, 10154:25
**exists** [3] - 10159:14, 10205:11, 10205:18
**expand** [1] - 10180:3
**expanding** [1] - 10179:25
**expect** [17] - 10162:7, 10162:21, 10163:15, 10175:9, 10175:19, 10183:24, 10186:6, 10200:19, 10201:16, 10202:25, 10203:2, 10208:7, 10208:12, 10208:25, 10209:1, 10223:12, 10230:20
**expectation** [1] - 10208:10
**expected** [1] - 10177:23
**experience** [4] - 10194:21, 10199:9, 10200:21
**experiment** [2] - 10186:7, 10186:9
**expert** [1] - 10217:11
**explain** [2] - 10160:14, 10205:7
**explains** [1] -

10177:17
**exposure** [1] - 10194:21
**expressed** [1] - 10193:10
**extending** [1] - 10222:1
**extensive** [2] - 10221:22, 10226:23
**extent** [4] - 10156:17, 10210:10, 10216:9, 10222:20
**extraordinary** [1] - 10212:9, 10224:24
**Ezell** [1] - 10204:18

**F**

**F.3d** [1] - 10213:23
**face** [2] - 10155:17, 10206:2
**Facebook** [3] - 10205:9, 10205:20, 10206:16
**facilitate** [2] - 10194:24, 10195:3
**facilitated** [1] - 10186:10
**fact** [39] - 10156:8, 10156:22, 10159:4, 10187:2, 10191:16, 10191:23, 10204:24, 10204:25, 10215:11, 10215:16, 10216:7, 10216:20, 10217:7, 10217:9, 10217:23, 10218:2, 10219:7, 10220:8, 10220:12, 10220:16, 10220:22, 10221:6, 10221:15, 10222:9, 10222:21, 10223:19, 10223:25, 10224:15, 10224:18, 10224:19, 10225:7, 10225:13, 10225:14, 10226:19, 10226:22, 10228:1, 10229:13, 10231:15, 10231:16
**facto** [1] - 10195:10
**factor** [1] - 10215:13
**factors** [5] - 10162:19, 10169:15, 10209:14, 10211:8, 10213:19
**facts** [3] - 10220:1, 10222:18, 10226:2
**factual** [8] - 10200:6, 10219:20, 10220:15, 10221:18, 10221:22, 10223:11, 10228:16, 10231:18

**failed** [2] - 10203:9, 10203:16
**fair** [7] - 10151:16, 10151:23, 10152:1, 10160:22, 10169:3, 10190:6
**fairly** [5] - 10153:24, 10189:10, 10210:17, 10212:19, 10217:3
**faith** [1] - 10214:8
**fall** [2] - 10157:21, 10157:22
**familiar** [2] - 10166:1, 10201:24
**far** [2] - 10154:24, 10193:2
**FAS** [1] - 10182:3
**fashion** [3] - 10220:18, 10221:1, 10221:4
**February** [1] - 10224:21
**fee** [2] - 10158:20, 10158:24
**feedback** [2] - 10204:17, 10204:25
**fees** [1] - 10159:2
**fell** [1] - 10174:24
**few** [6] - 10203:18, 10207:14, 10208:18, 10209:6, 10219:5, 10225:24
**fewer** [1] - 10205:24
**Fifth** [1] - 10148:17
**file** [4] - 10204:12, 10207:6, 10225:21, 10226:11
**filed** [2] - 10227:10, 10228:13
**files** [1] - 10206:12
**filing** [5] - 10219:18, 10219:23, 10222:8, 10225:15
**filings** [6] - 10222:21, 10223:1, 10223:8, 10225:22, 10229:20, 10231:4
**final** [2] - 10163:18, 10229:21
**finalized** [1] - 10211:22
**finally** [3] - 10182:12, 10200:10, 10211:14
**finance** [1] - 10180:19
**findings** [22] - 10219:7, 10220:1, 10220:7, 10220:11, 10220:22, 10221:6, 10222:9, 10222:21, 10223:19, 10223:24,

10224:15, 10224:18, 10224:19, 10225:7, 10225:13, 10225:14, 10226:18, 10228:1, 10229:13, 10230:9, 10231:15, 10231:16
**fine** [4] - 10166:13, 10171:15, 10188:14, 10189:11
**finish** [2] - 10171:20, 10176:22
**Fire** [1] - 10186:24
**firm** [2] - 10161:9, 10218:5
**firms** [1] - 10161:11
**first** [19] - 10176:4, 10177:5, 10181:23, 10183:22, 10194:10, 10198:10, 10199:7, 10199:8, 10199:25, 10200:1, 10200:5, 10200:15, 10204:9, 10205:12, 10209:7, 10209:11, 10211:18, 10215:11
**first-level** [1] - 10205:12
**fit** [1] - 10223:16
**fix** [1] - 10190:4
**flash** [1] - 10207:6
**Floor** [1] - 10149:5
**flowing** [1] - 10175:3
**flows** [1] - 10152:10
**focus** [2] - 10196:25, 10223:13
**focused** [3] - 10168:3, 10215:15, 10223:3
**folder** [1] - 10174:15
**follow** [2] - 10175:1, 10184:12
**following** [7] - 10173:13, 10180:24, 10199:20, 10200:10, 10209:22, 10212:3, 10221:3
**FOR** [1] - 10148:1
**foregoing** [1] - 10234:3
**formal** [1] - 10155:24
**formally** [1] - 10208:17
**forth** [1] - 10222:23
**forward** [2] - 10160:15, 10223:18
**foundation** [2] - 10156:7, 10156:8
**fourth** [2] - 10215:8, 10218:12
**free** [2] - 10178:7, 10178:8

**frequently** [1] - 10202:1
**Friday** [2] - 10232:9, 10232:10
**full** [5] - 10156:17, 10174:19, 10174:21, 10217:17, 10218:10
**functionality** [3] - 10188:15, 10188:25, 10189:7
**fund** [1] - 10165:11
**fundamentally** [1] - 10197:17
**funnel** [1] - 10167:17
**funny** [1] - 10184:13
**future** [1] - 10211:13

**G**

**gain** [1] - 10152:8
**Gambala** [1] - 10213:22
**general** [8] - 10151:16, 10194:6, 10194:7, 10210:14, 10210:15, 10212:8, 10216:22, 10218:19
**generate** [2] - 10202:25, 10203:4
**generates** [1] - 10201:6
**gentleman** [1] - 10230:5
**Giannandrea** [1] - 10191:10
**given** [17] - 10155:14, 10157:13, 10161:1, 10161:7, 10164:13, 10198:6, 10200:21, 10201:12, 10201:18, 10216:9, 10216:19, 10219:19, 10221:22, 10222:2, 10228:21, 10231:17
**glad** [1] - 10227:12
**GMS** [2] - 10158:10, 10158:21
**go-to** [1] - 10165:11
**go-to-market** [11] - 10165:16, 10165:20, 10165:22, 10166:1, 10166:6, 10166:21, 10167:2, 10167:4, 10167:8, 10167:14, 10167:16
**goals** [5] - 10178:19, 10178:21, 10179:2, 10179:4, 10179:17
**Google** [103] - 10152:6, 10153:16,

10153:18, 10154:1,
10154:14, 10154:16,
10155:16, 10155:19,
10155:20, 10156:2,
10156:16, 10158:9,
10158:20, 10158:23,
10158:24, 10158:25,
10160:3, 10160:5,
10160:11, 10160:18,
10160:25, 10161:3,
10162:4, 10165:2,
10165:6, 10165:10,
10165:21, 10166:6,
10166:12, 10166:15,
10166:22, 10166:24,
10167:5, 10167:8,
10167:16, 10169:7,
10170:12, 10170:24,
10171:11, 10172:8,
10172:20, 10173:2,
10173:6, 10173:9,
10173:17, 10174:19,
10175:4, 10175:8,
10175:14, 10175:18,
10176:7, 10177:22,
10179:2, 10181:2,
10181:4, 10181:11,
10183:5, 10183:6,
10183:19, 10184:3,
10187:6, 10188:9,
10188:12, 10188:15,
10188:18, 10189:22,
10191:8, 10192:17,
10192:20, 10193:19,
10199:14, 10199:21,
10200:8, 10200:12,
10200:16, 10200:19,
10200:24, 10204:1,
10204:6, 10205:14,
10207:15, 10211:10,
10211:23, 10212:1,
10212:11, 10212:14,
10212:25, 10213:1,
10215:12, 10216:3,
10216:8, 10217:8,
10217:18, 10217:25,
10219:15, 10219:16,
10222:23, 10222:24,
10223:2, 10226:4,
10226:23, 10231:1,
10231:4
**GOOGLE** [1] -
10148:6
**Google's** [11] -
10161:19, 10163:17,
10165:16, 10168:9,
10198:24, 10200:3,
10215:10, 10217:11,
10221:18, 10228:23,
10230:17
**Gore** [3] - 10212:16,

10213:3, 10213:7
**Gower** [2] - 10205:3,
10205:5
**GOWER** [2] -
10148:16, 10205:5
**grant** [2] - 10213:8,
10226:9
**granular** [1] -
10222:21
**great** [4] - 10204:4,
10207:24, 10218:7,
10228:19
**Greenblum** [1] -
10204:2
**GREENBLUM** [7] -
10149:11, 10204:8,
10205:21, 10206:9,
10206:19, 10207:2,
10207:4
**greeting** [1] -
10180:15
**gross** [3] - 10168:13,
10183:1, 10185:2
**ground** [2] - 10220:23,
10231:5
**group** [3] - 10205:9,
10205:20, 10206:17
**GSA** [1] - 10174:15
**guess** [5] - 10206:16,
10219:4, 10224:10,
10227:24, 10228:7
**guidance** [1] -
10232:20
**guts** [1] - 10189:3
**guy** [1] - 10202:12

# H

**half** [4] - 10208:11,
10208:13, 10209:1,
10209:2
**hammer** [1] - 10232:9
**hand** [6] - 10175:21,
10204:12, 10204:15,
10206:24, 10208:19,
10229:24
**handed** [1] - 10191:2
**handful** [2] - 10209:9,
10230:3
**handing** [1] - 10155:6
**handout** [1] - 10191:4
**hands** [1] - 10206:22
**hang** [3] - 10152:20,
10156:5, 10167:21
**happy** [3] - 10202:19,
10202:20, 10221:1
**hard** [1] - 10162:7
**harder** [1] - 10206:25
**harm** [1] - 10211:10
**headed** [1] - 10171:5

**heading** [2] - 10171:3,
10178:17
**heard** [6] - 10169:22,
10171:8, 10176:18,
10204:18, 10231:12,
10231:25
**hearing** [1] - 10213:17
**hearsay** [8] -
10204:11, 10204:21,
10205:12, 10227:17,
10227:21, 10229:7,
10230:3
**heart** [2] - 10210:13,
10231:21
**held** [1] - 10214:1
**help** [2] - 10162:3,
10206:14
**helpful** [4] - 10194:17,
10222:16, 10222:19,
10232:20
**helpfully** [1] - 10209:4
**Hi** - 10180:15,
10182:13
**high** [8] - 10162:18,
10162:21, 10163:11,
10163:15, 10210:4,
10210:9, 10217:1,
10218:3
**high-level** [1] -
10210:4
**higher** [3] - 10163:25,
10173:16, 10202:14
**Higher** [1] - 10168:19
**highest** [1] - 10201:13
**highlight** [1] - 10226:2
**highly** [1] - 10152:12
**historical** [1] -
10179:13
**history** [2] - 10192:24,
10193:3
**holidays** [1] - 10222:2
**home** [2] - 10182:1,
10203:14
**Honor** [52] - 10151:4,
10151:6, 10152:13,
10155:3, 10170:25,
10171:23, 10173:20,
10175:22, 10184:18,
10190:10, 10190:15,
10191:14, 10193:1,
10201:9, 10203:7,
10203:16, 10204:1,
10204:8, 10204:16,
10205:7, 10205:21,
10206:19, 10207:17,
10207:23, 10208:3,
10208:7, 10208:21,
10208:23, 10219:12,
10220:9, 10221:9,
10221:24, 10222:13,

10222:15, 10223:4,
10223:11, 10223:21,
10224:3, 10224:13,
10225:10, 10225:24,
10226:13, 10226:19,
10227:2, 10229:19,
10230:14, 10230:24,
10231:5, 10231:13,
10231:25, 10232:14,
10233:14
**Honor's** [2] -
10226:17, 10227:3
**HONORABLE** [1] -
10148:10
**hopefully** [2] -
10220:16, 10233:10
**hotseat** [4] - 10201:4,
10201:7, 10201:14,
10201:16
**hour** [2] - 10208:13,
10208:25
**hours** [2] - 10208:11,
10209:2
**housekeeping** [2] -
10204:2, 10209:6
**Hubbard** [5] -
10209:14, 10209:19,
10211:8, 10215:12
**hundred** [4] -
10202:16, 10202:17,
10202:18, 10202:19

# I

**icon** [2] - 10189:1,
10189:2
**idea** [4] - 10159:22,
10160:11, 10197:5,
10202:9
**identified** [6] -
10161:19, 10197:1,
10205:10, 10211:4,
10212:2
**imagine** [1] -
10226:25
**immensely** [1] -
10152:8
**impact** [4] - 10164:8,
10170:4, 10196:6,
10201:7
**implementation** [2] -
10196:6, 10196:9
**importance** [1] -
10228:21
**important** [14] -
10155:19, 10160:24,
10178:23, 10185:22,
10187:7, 10188:4,
10194:25, 10213:15,
10217:9, 10226:1,

10227:8, 10227:13,
10227:22, 10228:23
**importantly** [1] -
10210:12, 10214:9,
10232:22
**improve** [1] -
10201:13
**in-scope** [1] -
10177:23
**inadvertency** [1] -
10213:9
**inadvertent** [1] -
10213:11
**inadvertently** [5] -
10211:22, 10212:18,
10213:13, 10214:20,
10222:25
**incentivize** [1] -
10209:24
**inclined** [1] - 10226:9
**include** [2] - 10199:4,
10199:19
**included** [3] -
10198:25, 10199:6,
10217:7
**includes** [1] -
10226:15
**including** [10] -
10168:20, 10176:7,
10183:5, 10191:9,
10200:16, 10209:15,
10211:16, 10212:14,
10217:20, 10223:10
**incorrect** [1] - 10190:4
**increase** [12] -
10153:7, 10177:23,
10177:25, 10178:1,
10178:4, 10178:5,
10178:23, 10179:5,
10179:18, 10194:4,
10201:17, 10201:20
**increased** [1] -
10153:9
**increases** [1] -
10178:10
**increasing** [2] -
10178:3, 10179:3
**incredibly** [1] -
10226:23
**incremental** [1] -
10201:6
**independent** [4] -
10157:3, 10157:6,
10158:5, 10194:8
**India** [2] - 10176:13,
10176:15
**indicated** [4] -
10155:10, 10169:4,
10222:7, 10223:5
**indication** [1] -

10216:19
**indicative** [1] -
  10160:1
**individual** [1] -
  10161:9
**induces** [1] - 10159:8
**industry** [1] -
  10161:16
**industrywide** [1] -
  10163:10
**information** [14] -
  10200:22, 10206:7,
  10206:10, 10206:14,
  10211:12, 10211:25,
  10212:5, 10212:18,
  10213:13, 10213:14,
  10213:25, 10214:3,
  10214:7, 10214:19
**initial** [3] - 10225:22,
  10229:13, 10232:2
**input** [3] - 10202:24,
  10203:1, 10233:13
**inside** [1] - 10172:5
**insignificant** [1] -
  10225:6
**insisted** [1] - 10225:1
**insistence** [1] -
  10214:7
**insofar** [1] - 10211:23
**install** [2] - 10166:22,
  10190:3
**installation** [2] -
  10174:10, 10174:22
**installed** [1] -
  10189:14
**instance** [2] -
  10192:23, 10193:7
**instead** [1] - 10152:15
**instituted** [1] -
  10164:8
**intend** [1] - 10190:17
**intended** [1] -
  10214:24
**intense** [4] -
  10155:16, 10156:21,
  10157:1, 10157:5
**intensely** [6] -
  10151:10, 10151:15,
  10151:25, 10158:1,
  10158:4
**intentionally** [1] -
  10158:1
**interaction** [1] -
  10173:14
**intercept** [1] -
  10216:11
**interest** [2] -
  10217:24, 10218:22
**interested** [3] -
  10155:25, 10192:12,

10192:15
**interesting** [1] -
  10213:22
**interests** [1] -
  10213:10
**interpretation** [2] -
  10169:1, 10169:2
**interrogatory** [1] -
  10198:20
**interrupt** [1] -
  10228:17
**introduced** [1] -
  10217:24
**invest** [2] - 10153:10,
  10179:19
**investment** [4] -
  10166:7, 10167:9,
  10167:17, 10194:6
**involve** [2] - 10167:15,
  10210:19, 10230:6
**involved** [5] - 10194:8,
  10210:13, 10212:20,
  10213:10, 10213:23
**involves** [1] -
  10191:23
**iOS** [2] - 10195:8,
  10195:16
**iPhone** [2] - 10169:12,
  10201:8
**iPhones** [1] -
  10189:14
**ISA** [4] - 10153:22,
  10168:10, 10168:24,
  10170:21
**issue** [20] - 10171:2,
  10174:1, 10206:5,
  10211:25, 10214:22,
  10214:23, 10218:6,
  10218:25, 10222:24,
  10227:8, 10227:10,
  10227:13, 10227:14,
  10227:16, 10228:19,
  10228:22, 10229:1,
  10229:12, 10230:10,
  10230:19
**issues** [22] -
  10207:14, 10211:16,
  10219:3, 10221:19,
  10222:7, 10223:3,
  10223:6, 10223:9,
  10224:7, 10224:20,
  10227:8, 10228:8,
  10229:3, 10229:16,
  10229:18, 10230:6,
  10230:17, 10230:21,
  10231:9, 10233:5
**iteration** [1] -
  10152:21
**itself** [5] - 10179:7,
  10181:8, 10188:1,

10206:5, 10220:25

---

## J

**J.C** [2] - 10204:12,
  10207:7
**January** [1] -
  10219:11
**job** [1] - 10213:2
**JOHN** [1] - 10149:10
**join** [2] - 10219:24,
  10221:12
**jointly** [1] - 10223:22
**JONATHAN** [1] -
  10149:2
**JR** [1] - 10149:7
**JUDGE** [1] - 10148:10
**judgment** [7] -
  10221:17, 10221:20,
  10223:21, 10224:16,
  10225:9, 10233:4,
  10233:6
**judicial** [1] - 10213:15
**Justice** [4] - 10148:13,
  10148:16, 10148:19,
  10226:14
**justifications** [1] -
  10221:21
**justify** [2] - 10210:24,
  10214:18
**JX24** [2] - 10214:24,
  10215:1
**JX33** [2] - 10214:24,
  10215:25

---

## K

**Kartasheva** [1] -
  10191:9
**keep** [3] - 10183:21,
  10184:5, 10188:21
**KENNETH** [1] -
  10148:13
**kept** [1] - 10169:24
**KEVIN** [1] - 10150:4
**key** [5] - 10180:18,
  10222:18, 10222:19,
  10224:1, 10226:2
**keyboard** [1] -
  10181:19
**kind** [16] - 10165:18,
  10166:3, 10167:11,
  10173:17, 10181:16,
  10191:18, 10193:1,
  10194:19, 10194:22,
  10195:4, 10197:16,
  10198:3, 10198:6,
  10224:6, 10229:4,
  10229:8
**kinds** [1] - 10196:2

**knowing** [2] -
  10151:22, 10194:20
**knowledge** [2] -
  10157:22, 10200:8
**known** [1] - 10218:4
**knows** [4] - 10167:25,
  10211:1, 10223:4,
  10223:11
**KR** [1] - 10182:2
**Kristin** [1] - 10180:16

---

## L

**labels** [1] - 10230:19
**lack** [1] - 10205:18
**language** [1] -
  10215:9
**large** [1] - 10202:23
**largely** [1] - 10212:8
**larger** [2] - 10224:19,
  10231:22
**last** [9] - 10198:22,
  10199:8, 10208:1,
  10208:8, 10218:18,
  10219:4, 10219:9,
  10230:22
**law** [23] - 10219:7,
  10220:2, 10220:3,
  10220:8, 10220:12,
  10220:22, 10221:7,
  10221:10, 10222:19,
  10222:22, 10224:5,
  10224:10, 10224:15,
  10225:14, 10225:18,
  10226:19, 10226:22,
  10226:24, 10228:2,
  10228:12, 10228:14,
  10228:19, 10229:6
**Law** [1] - 10149:3
**lead** [4] - 10163:24,
  10163:25, 10170:15,
  10198:3
**leading** [3] -
  10170:16, 10193:2,
  10201:9
**leaked** [1] - 10212:18
**learning** [1] -
  10217:24
**least** [7] - 10197:17,
  10206:4, 10206:13,
  10212:10, 10227:9,
  10228:3, 10228:18
**leave** [5] - 10153:5,
  10187:10, 10189:3,
  10232:11
**led** [1] - 10193:9
**left** [5] - 10154:22,
  10187:17, 10207:14,
  10209:22, 10227:25
**legal** [7] - 10226:24,

**knowing** continued ... 10227:8, 10228:15,
  10229:2, 10230:17,
  10230:18
**length** [4] - 10208:24,
  10219:20, 10221:2,
  10221:8
**less** [3] - 10157:18,
  10202:21, 10202:22
**lesson** [1] - 10202:22
**level** [9] - 10161:17,
  10161:22, 10205:12,
  10210:4, 10210:9,
  10217:1, 10218:3
**leverage** [1] -
  10216:18
**license** [2] - 10158:20,
  10187:6
**light** [1] - 10232:25
**limine** [1] - 10230:25
**limit** [4] - 10205:15,
  10221:16, 10223:14,
  10231:18
**limitations** [1] -
  10224:17
**limited** [5] - 10205:1,
  10205:21, 10205:23,
  10206:1, 10217:16
**limits** [2] - 10226:10,
  10229:2
**line** [12] - 10170:1,
  10172:5, 10176:14,
  10176:17, 10177:5,
  10180:12, 10180:23,
  10193:2, 10209:13,
  10209:19, 10209:20
**line-by-line** [1] -
  10209:13
**lines** [2] - 10168:13,
  10168:15
**link** [7] - 10168:9,
  10169:7, 10177:2,
  10180:18, 10182:20,
  10186:8, 10187:3
**linked** [1] - 10164:17
**list** [2] - 10178:6,
  10201:1
**listener** [3] - 10205:1,
  10205:17
**literally** [1] - 10186:23
**litigation** [2] -
  10211:17, 10214:12
**LLC** [1] - 10148:6
**LLP** [2] - 10149:8,
  10149:11
**lone** [1] - 10208:5
**look** [14] - 10157:4,
  10161:9, 10162:12,
  10162:14, 10174:18,
  10181:9, 10184:1,
  10198:19, 10199:5,

10203:20, 10205:7, 10224:14, 10226:18, 10233:2
**looked** [7] - 10154:7, 10162:12, 10164:12, 10166:8, 10166:9, 10211:25, 10214:16
**looking** [8] - 10151:19, 10168:13, 10171:4, 10174:18, 10180:11, 10184:22, 10202:24, 10232:15
**looks** [1] - 10152:20
**lose** [1] - 10224:9
**loud** [2] - 10152:17, 10155:7
**low** [9] - 10183:16, 10183:22, 10183:25, 10184:1, 10185:22, 10185:25, 10187:4, 10187:9, 10187:17
**low-cost** [2] - 10185:22, 10187:4
**low-end** [1] - 10187:17
**low-priced** [6] - 10183:16, 10183:22, 10183:25, 10184:1, 10185:25, 10187:9
**lower** [13] - 10162:2, 10163:24, 10165:6, 10168:20, 10169:24, 10169:25, 10170:2, 10179:14, 10179:18, 10186:5, 10186:10, 10202:12
**lower-priced** [3] - 10169:25, 10170:2, 10186:10
**lowered** [1] - 10161:14

## M

**Mac** [5] - 10195:13, 10195:16, 10195:18, 10195:22
**MADA** [38] - 10161:4, 10161:5, 10170:18, 10172:19, 10173:1, 10173:17, 10174:13, 10174:15, 10174:20, 10174:23, 10175:5, 10175:16, 10183:23, 10184:2, 10184:23, 10185:1, 10185:5, 10185:8, 10185:11, 10185:17, 10185:18, 10185:22, 10185:25, 10186:5, 10186:7,

10186:8, 10186:11, 10186:13, 10186:15, 10186:22, 10186:25, 10187:3, 10187:6, 10187:10, 10187:17, 10196:12
**MADA/RSA** [1] - 10173:13
**magnitude** [1] - 10196:17
**mail** [4] - 10176:1, 10176:12, 10178:15, 10191:8
**main** [1] - 10224:19
**Maine** [1] - 10149:12
**maintain** [1] - 10213:12
**maintained** [1] - 10205:23
**make-work** [2] - 10224:16, 10226:1
**makers** [1] - 10187:17
**Maps** [2] - 10199:1, 10199:9
**March** [2] - 10225:15, 10225:23
**margin** [4] - 10168:14, 10168:17, 10169:22
**margins** [3] - 10168:19, 10168:21, 10169:16
**market** [34] - 10157:11, 10161:17, 10162:16, 10162:18, 10162:20, 10163:6, 10163:7, 10163:12, 10165:11, 10165:16, 10165:20, 10165:22, 10166:1, 10166:6, 10166:21, 10167:2, 10167:4, 10167:8, 10167:14, 10167:16, 10173:7, 10187:10, 10187:14, 10187:17, 10193:16, 10194:21, 10201:18, 10201:23, 10202:23, 10203:3, 10221:20, 10223:10, 10224:10, 10233:6
**marketing** [1] - 10206:23
**marketplace** [3] - 10158:5, 10161:8, 10163:15
**markets** [2] - 10227:11, 10228:11
**match** [1] - 10152:6
**material** [2] - 10213:14, 10218:5
**materials** [1] -

10177:2
**matter** [9] - 10162:21, 10183:21, 10184:5, 10184:9, 10188:16, 10191:16, 10210:8, 10212:8, 10234:5
**matters** [3] - 10204:3, 10209:6, 10209:9
**maximum** [1] - 10177:6
**McAllister** [2] - 10166:18, 10209:12
**McAllister's** [1] - 10211:19
**MEAGAN** [1] - 10148:15
**mean** [25] - 10151:19, 10159:24, 10160:7, 10163:14, 10164:11, 10166:14, 10169:17, 10170:14, 10171:11, 10172:11, 10178:9, 10179:5, 10183:22, 10185:15, 10188:10, 10196:12, 10220:19, 10221:4, 10223:22, 10227:6, 10227:18, 10228:25, 10232:10, 10232:17
**meaningful** [2] - 10213:18, 10233:9
**means** [3] - 10207:25, 10218:7, 10228:24
**meant** [3] - 10188:13, 10215:24, 10228:2
**measure** [2] - 10163:1, 10188:5
**media** [1] - 10212:24
**Megan** [1] - 10207:17
**MEHTA** [1] - 10148:10
**members** [3] - 10212:23, 10212:24, 10213:17
**memorandum** [1] - 10226:24
**mention** [1] - 10231:14
**mentioned** [1] - 10223:19
**mentions** [1] - 10183:9
**merits** [1] - 10213:16
**met** [1] - 10193:16
**metadata** [2] - 10206:9, 10206:11
**Microsoft** [5] - 10153:7, 10155:11, 10230:24, 10231:3, 10231:15
**Microsoft's** [2] -

10155:15
**might** [4] - 10195:4, 10205:24, 10206:14, 10226:25
**million** [1] - 10178:24
**mind** [4] - 10227:7, 10227:14, 10227:23, 10230:5
**minimizes** [1] - 10215:18
**minutes** [2] - 10172:1, 10219:5
**mischaracterized** [1] - 10167:23
**mischaracterizes** [1] - 10155:1
**mischief** [2] - 10225:7, 10226:4
**misspoke** [1] - 10190:2
**misunderstanding** [1] - 10161:6
**misunderstood** [2] - 10208:24, 10209:3
**mobile** [3] - 10177:24, 10180:17, 10182:24
**model** [2] - 10170:2, 10187:8
**models** [1] - 10185:25
**moment** [5] - 10173:12, 10190:11, 10205:8, 10209:8, 10221:5
**monetization** [1] - 10216:25
**monetizing** [1] - 10198:4
**money** [7] - 10160:17, 10161:4, 10167:17, 10172:17, 10174:7, 10174:8, 10179:19
**monitored** [1] - 10204:25
**monopoly** [1] - 10221:20
**moot** [1] - 10207:22
**morning** [1] - 10171:8
**most** [7] - 10202:11, 10214:9, 10215:16, 10230:5, 10230:19, 10232:22, 10233:6
**motion** [4] - 10207:22, 10214:23, 10221:18, 10230:25
**motions** [1] - 10227:9
**mouth** [2] - 10197:10, 10197:12
**move** [5] - 10160:15, 10184:16, 10189:9, 10203:9, 10203:16

**moved** [1] - 10204:10
**movements** [1] - 10169:4
**moving** [6] - 10155:21, 10163:22, 10197:21, 10207:8, 10207:10, 10213:8
**Mozilla** [1] - 10199:9
**MR** [82] - 10151:4, 10151:6, 10151:8, 10152:13, 10152:14, 10152:23, 10153:1, 10155:3, 10155:5, 10156:3, 10156:7, 10156:12, 10160:9, 10160:10, 10164:20, 10167:19, 10167:23, 10168:4, 10170:11, 10170:25, 10171:4, 10171:8, 10171:11, 10171:13, 10171:14, 10171:19, 10171:23, 10172:3, 10172:7, 10173:20, 10173:24, 10174:6, 10175:13, 10175:22, 10175:24, 10184:18, 10184:19, 10189:11, 10189:13, 10190:10, 10190:14, 10190:19, 10190:24, 10191:6, 10191:13, 10191:15, 10193:1, 10193:6, 10196:4, 10197:4, 10201:9, 10201:15, 10202:5, 10203:6, 10203:9, 10203:16, 10204:1, 10204:5, 10204:8, 10205:5, 10205:21, 10206:9, 10206:19, 10207:2, 10207:4, 10208:18, 10222:13, 10224:3, 10225:18, 10225:21, 10226:13, 10228:10, 10229:4, 10229:11, 10230:7, 10230:14, 10230:17, 10231:7, 10231:25, 10232:14, 10232:18, 10233:14
**MS** [14] - 10207:17, 10207:23, 10208:3, 10208:7, 10208:12, 10208:23, 10219:12, 10220:9, 10220:13, 10220:24, 10221:9, 10222:1, 10225:24, 10231:13
**multi** [1] - 10233:3
**multi-day** [1] -

10233:3
**multiple** [6] -
10159:10, 10161:16,
10192:19, 10192:25,
10193:8, 10231:22
**Murphy** [6] -
10190:25, 10191:1,
10191:25, 10203:12,
10203:13, 10225:3
**MURPHY** [1] - 10150:4
**Murphy's** [1] -
10207:19
**mutual** [1] - 10229:9

## N

**name** [2] - 10166:3,
10208:2
**narrative** [6] -
10220:14, 10220:18,
10220:25, 10221:4,
10226:16, 10227:3
**nature** [2] - 10195:9,
10215:6
**navigating** [1] -
10222:20
**navigation** [1] -
10196:1
**near** [1] - 10154:1
**Nebraska** [1] -
10149:7
**necessarily** [2] -
10164:9, 10175:9
**necessary** [4] -
10222:6, 10224:12,
10226:9, 10226:11
**need** [12] - 10156:13,
10171:5, 10171:15,
10171:22, 10174:8,
10175:21, 10193:9,
10228:6, 10229:15,
10229:19, 10231:19
**needed** [1] - 10225:10
**negatives** [2] -
10184:12, 10184:14
**neglected** [2] -
10214:25, 10231:13
**negotiate** [7] -
10156:1, 10156:15,
10156:17, 10156:20,
10156:23, 10202:15,
10202:18
**negotiated** [1] -
10159:24
**negotiating** [3] -
10173:6, 10232:1
**negotiation** [2] -
10175:23, 10200:18
**negotiations** [4] -
10157:2, 10199:15,

10200:12, 10211:13
**net** [5] - 10159:3,
10159:5, 10185:2,
10185:7, 10185:16
**never** [2] - 10199:21,
10200:8
**New** [2] - 10149:9
**new** [3] - 10179:14,
10182:8, 10183:1
**next** [6] - 10177:10,
10179:11, 10181:18,
10182:4, 10182:7,
10184:16
**nice** [1] - 10213:2
**nobody** [1] - 10184:8
**nobody's** [1] -
10184:10
**non** [2] - 10186:25,
10195:19
**non-MADA** [1] -
10186:25
**non-trivially** [1] -
10195:19
**nondisclosure** [3] -
10211:8, 10212:17,
10218:17
**none** [2] - 10187:2,
10191:11
**nonpublic** [1] -
10213:12
**nonstandard** [1] -
10182:21
**Northwest** [4] -
10148:14, 10148:17,
10148:19, 10149:15
**notably** [2] - 10230:5,
10230:19
**Notably** [1] - 10213:7
**note** [2] - 10213:21,
10231:15
**noted** [1] - 10231:14
**notes** [3] - 10183:9,
10209:7, 10213:3
**nothing** [10] -
10174:11, 10174:19,
10183:13, 10183:16,
10183:19, 10184:3,
10184:8, 10210:5,
10215:23
**notion** [1] - 10202:2
**notwithstanding** [1] -
10217:23
**November** [2] -
10148:6, 10234:8
**number** [6] -
10152:21, 10177:1,
10184:10, 10201:1,
10227:8, 10231:22
**Number** [1] - 10148:3
**numbers** [7] -

10171:7, 10194:12,
10195:15, 10195:17,
10211:9, 10215:24,
10223:17

## O

**Oard** [2] - 10208:1,
10208:3
**Oard's** [2] - 10208:7,
10208:25
**object** [1] - 10231:4
**objecting** [1] -
10167:22
**objection** [12] -
10156:3, 10156:6,
10167:19, 10193:1,
10201:9, 10203:21,
10204:11, 10204:21,
10205:24, 10230:4,
10231:1
**objections** [2] -
10227:25, 10230:18
**observations** [1] -
10212:3
**obviously** [6] -
10214:13, 10222:9,
10223:9, 10228:16,
10229:23, 10233:13
**occurs** [4] - 10195:7,
10195:13, 10195:15,
10220:13
**October** [1] - 10176:2
**OEM** [12] - 10157:19,
10160:12, 10161:1,
10161:3, 10161:7,
10161:22, 10163:12,
10176:23, 10177:1,
10177:12, 10179:3,
10184:21
**OEM's** [1] - 10211:6
**OEMs** [21] - 10155:21,
10156:1, 10156:13,
10156:15, 10157:8,
10157:13, 10158:9,
10158:21, 10158:23,
10158:24, 10160:18,
10161:12, 10161:20,
10163:17, 10165:2,
10165:5, 10166:16,
10182:9, 10184:25,
10209:24, 10210:18
**OF** [5] - 10148:1,
10148:3, 10148:9,
10234:1, 10234:9
**offer** [7] - 10152:2,
10153:7, 10153:10,
10154:6, 10170:1,
10177:11, 10196:22
**offered** [6] - 10153:10,

10153:11, 10153:12,
10200:17, 10205:16,
10226:15
**offering** [4] - 10152:5,
10204:22, 10204:23,
10206:1
**offers** [3] - 10200:13,
10200:16, 10200:20
**Official** [1] - 10149:15
**OFFICIAL** [1] -
10234:1
**offset** [1] - 10168:20
**often** [1] - 10220:13
**old** [1] - 10192:1
**older** [2] - 10169:24,
10170:2
**once** [1] - 10194:23
**one** [57] - 10152:15,
10152:18, 10153:11,
10153:19, 10155:6,
10158:3, 10159:10,
10161:15, 10161:23,
10165:10, 10167:12,
10169:1, 10170:23,
10174:24, 10175:21,
10177:10, 10178:10,
10179:17, 10181:4,
10181:17, 10181:18,
10182:7, 10183:20,
10184:4, 10184:21,
10185:9, 10185:11,
10185:23, 10194:25,
10196:2, 10197:7,
10204:14, 10205:3,
10210:10, 10210:19,
10210:25, 10211:1,
10212:10, 10212:11,
10212:25, 10213:21,
10219:4, 10222:6,
10222:24, 10224:7,
10225:3, 10225:25,
10226:13, 10226:25,
10227:7, 10227:14,
10229:14, 10230:1,
10230:7, 10233:1
**ones** [1] - 10181:14
**ONYEMA** [9] -
10148:18, 10219:12,
10220:9, 10220:13,
10220:24, 10221:9,
10222:1, 10225:24,
10231:13
**Onyema** [1] -
10219:12
**open** [15] - 10171:1,
10174:2, 10195:1,
10207:14, 10208:13,
10210:1, 10210:21,
10210:25, 10212:20,
10214:14, 10216:23,

10218:15, 10218:19,
10219:3, 10227:25
**open-ended** [1] -
10219:3
**operates** [1] -
10188:11
**operating** [2] -
10217:19, 10228:5
**opinion** [2] -
10193:15, 10196:22
**opinions** [1] -
10196:23
**opportunities** [1] -
10225:4
**opportunity** [10] -
10219:22, 10220:18,
10221:12, 10225:12,
10225:20, 10226:2,
10226:6, 10226:11,
10229:14, 10231:4
**opposed** [1] - 10163:1
**option** [3] - 10185:5,
10185:12, 10202:7
**optionality** [3] -
10185:12, 10185:14
**order** [5] - 10151:2,
10203:24, 10212:17,
10212:22, 10224:23
**ordinary** [1] - 10162:4
**otherwise** [3] -
10206:15, 10214:14,
10223:7
**ought** [2] - 10216:25,
10218:10
**ourselves** [1] -
10223:4
**outcome** [1] - 10198:2
**outcomes** [1] -
10196:20
**outside** [5] -
10194:11, 10194:13,
10195:8, 10195:13,
10195:15
**outstanding** [2] -
10209:9, 10222:7
**outweighs** [2] -
10217:25, 10218:23
**overall** [4] - 10179:25,
10201:17, 10218:6,
10222:11
**overlapping** [2] -
10219:24, 10224:19
**overruled** [1] -
10201:10
**overstated** [1] -
10216:19
**overtaking** [1] -
10188:2
**owing** [1] - 10209:10
**own** [3] - 10154:23,

10214:17, 10219:22

# P

**p.m** [4] - 10148:6, 10203:23, 10233:17
**page** [16] - 10176:4, 10176:5, 10179:11, 10181:22, 10182:17, 10199:5, 10199:7, 10199:17, 10200:11, 10211:18, 10216:12, 10223:17, 10224:17, 10226:10, 10229:2, 10231:18
**pages** [29] - 10182:12, 10219:21, 10219:23, 10220:21, 10221:11, 10221:14, 10221:16, 10221:19, 10221:22, 10221:23, 10223:16, 10223:19, 10223:24, 10224:5, 10224:6, 10224:9, 10224:18, 10224:20, 10225:13, 10225:14, 10225:15, 10226:15, 10226:18, 10226:22, 10227:1, 10231:14, 10231:17, 10232:3
**paid** [1] - 10161:4
**papers** [1] - 10224:23
**paperwork** [1] - 10191:3
**paragraph** [10] - 10199:7, 10199:8, 10199:17, 10199:19, 10200:11, 10200:15, 10215:8, 10215:25, 10217:17, 10218:12
**parity** [3] - 10197:1, 10197:8, 10197:13
**part** [30] - 10157:23, 10159:24, 10161:11, 10166:3, 10166:15, 10168:2, 10168:3, 10168:6, 10170:7, 10170:23, 10172:17, 10173:5, 10174:13, 10175:10, 10179:25, 10180:2, 10186:11, 10187:7, 10196:23, 10199:25, 10200:1, 10200:2, 10200:5, 10200:7, 10201:5, 10207:20, 10226:15, 10226:21, 10231:10
**participant** [1] - 10212:21
**particular** [17] -

10165:18, 10165:19, 10200:17, 10200:19, 10210:3, 10211:5, 10211:9, 10211:11, 10212:12, 10212:15, 10217:9, 10217:22, 10218:1, 10218:7, 10218:13, 10218:16, 10218:24
**particularly** [3] - 10210:24, 10216:15, 10226:25
**parties** [5] - 10209:16, 10214:8, 10219:6, 10228:12, 10229:15
**partner** [2] - 10182:21, 10211:11
**partners** [14] - 10162:6, 10166:7, 10167:9, 10167:17, 10170:13, 10172:9, 10173:2, 10177:12, 10179:3, 10196:7, 10200:18, 10200:25, 10216:17, 10216:20
**partnerships** [2] - 10179:14, 10179:18
**parts** [6] - 10155:7, 10159:20, 10164:24, 10165:13, 10165:14, 10168:16
**party** [7] - 10178:20, 10178:22, 10189:17, 10189:23, 10190:2, 10190:3, 10210:25
**party's** [2] - 10213:8, 10213:12
**pass** [35] - 10160:4, 10160:5, 10160:8, 10160:11, 10160:18, 10160:20, 10160:25, 10161:2, 10161:4, 10161:6, 10161:7, 10161:8, 10161:10, 10161:16, 10161:20, 10161:23, 10162:18, 10162:19, 10162:21, 10162:24, 10163:4, 10163:8, 10163:11, 10163:13, 10163:16, 10163:20, 10164:13, 10168:24, 10169:10, 10169:15, 10179:9, 10183:14, 10190:15
**pass-through** [30] - 10160:4, 10160:5, 10160:8, 10160:11, 10160:20, 10160:25, 10161:2, 10161:6, 10161:7, 10161:8,

10161:16, 10161:20, 10161:23, 10162:18, 10162:19, 10162:21, 10162:24, 10163:4, 10163:8, 10163:11, 10163:13, 10163:16, 10163:20, 10164:13, 10168:24, 10169:10, 10169:15, 10179:9, 10183:14
**passages** [1] - 10209:23
**passes** [1] - 10160:13
**passing** [2] - 10152:15, 10161:12
**past** [2] - 10209:20, 10215:5
**paste** [3] - 10205:8, 10205:19, 10206:16
**Patterson** [1] - 10149:8
**pay** [5] - 10158:9, 10179:19, 10189:21, 10202:17, 10212:12
**paying** [3] - 10174:13, 10179:22, 10179:23
**payment** [6] - 10173:1, 10174:15, 10174:16, 10174:24, 10201:3, 10218:6
**payment's** [1] - 10175:6
**payments** [22] - 10162:3, 10162:5, 10163:17, 10163:25, 10164:12, 10165:2, 10165:6, 10165:16, 10166:11, 10167:16, 10168:10, 10168:24, 10169:7, 10169:12, 10173:7, 10173:15, 10173:22, 10178:14, 10179:3, 10194:22, 10196:10, 10196:14
**payout** [1] - 10179:12
**pays** [6] - 10158:24, 10160:11, 10165:2, 10170:12, 10171:11, 10172:8
**people** [9] - 10161:13, 10176:6, 10191:8, 10194:18, 10194:23, 10195:1, 10197:19, 10198:2, 10198:4
**people's** [1] - 10230:10
**percent** [4] - 10153:8, 10153:10, 10154:6, 10194:13
**percentage** [8] -

10161:16, 10161:20, 10161:23, 10162:18, 10162:19, 10162:21, 10162:24, 10163:4, 10163:8, 10163:11, 10163:13, 10163:20, 10164:13, 10168:24, 10169:10, 10169:15, 10179:9, 10183:14
**percentages** [2] - 10173:25, 10217:17
**perfect** [4] - 10199:10, 10199:21, 10200:1, 10200:6
**perform** [1] - 10195:12
**perhaps** [3] - 10216:6, 10222:25, 10223:18
**period** [4] - 10170:6, 10170:7, 10170:9, 10192:2
**period's** [1] - 10165:24
**periods** [2] - 10210:21, 10210:22
**permissible** [2] - 10216:1, 10216:13
**permit** [1] - 10215:24
**person** [2] - 10203:2, 10212:21
**perspective** [2] - 10180:19, 10224:17
**persuade** [1] - 10225:9
**pertaining** [1] - 10198:10
**pertains** [2] - 10191:17, 10191:20
**phone** [3] - 10157:11, 10157:19, 10162:9, 10163:12, 10164:6, 10164:8, 10164:18, 10186:21, 10187:17, 10188:19, 10204:18, 10206:17, 10206:22
**Phones** [1] - 10186:24
**phones** [20] - 10163:18, 10163:23, 10163:25, 10165:11, 10165:17, 10165:19, 10168:25, 10169:24, 10169:25, 10170:2, 10170:16, 10178:12, 10178:13, 10178:14, 10183:16, 10183:22, 10183:25, 10184:2, 10185:22, 10187:4
**phrasing** [1] - 10222:25
**Pichai's** [1] - 10216:16
**pick** [2] - 10154:11, 10154:20
**pie** [2] - 10179:25, 10195:7
**pieces** [5] - 10157:3, 10167:12, 10170:17,

10172:18, 10172:20, 10173:16, 10174:4, 10175:14, 10177:25, 10215:20, 10215:21
**percentages** [2] - 10173:25, 10217:17
**perfect** [4] - 10199:10, 10199:21, 10200:1, 10200:6
**perform** [1] - 10195:12
**perhaps** [3] - 10216:6, 10222:25, 10223:18
**period** [4] - 10170:6, 10170:7, 10170:9, 10192:2
**period's** [1] - 10165:24
**periods** [2] - 10210:21, 10210:22
**permissible** [2] - 10216:1, 10216:13
**permit** [1] - 10215:24
**person** [2] - 10203:2, 10212:21
**perspective** [2] - 10180:19, 10224:17
**persuade** [1] - 10225:9
**pertaining** [1] - 10198:10
**pertains** [2] - 10191:17, 10191:20
**phone** [3] - 10157:11, 10157:19, 10162:9, 10163:12, 10164:6, 10164:8, 10164:18, 10186:21, 10187:17, 10188:19, 10204:18, 10206:17, 10206:22
**Phones** [1] - 10186:24
**phones** [20] - 10163:18, 10163:23, 10163:25, 10165:11, 10165:17, 10165:19, 10168:25, 10169:24, 10169:25, 10170:2, 10170:16, 10178:12, 10178:13, 10178:14, 10183:16, 10183:22, 10183:25, 10184:2, 10185:22, 10187:4
**phrasing** [1] - 10222:25
**Pichai's** [1] - 10216:16
**pick** [2] - 10154:11, 10154:20
**pie** [2] - 10179:25, 10195:7
**pieces** [5] - 10157:3, 10167:12, 10170:17,

10174:22, 10223:21
**place** [3] - 10155:10, 10219:8, 10225:7
**placed** [3] - 10211:24, 10214:3, 10228:8
**placement** [13] - 10158:25, 10165:21, 10166:12, 10170:15, 10170:16, 10170:17, 10170:20, 10172:23, 10173:18, 10174:14, 10177:13, 10177:18, 10201:3
**places** [1] - 10197:7
**Plaintiff** [2] - 10149:2, 10226:14
**Plaintiffs** [3] - 10148:4, 10148:13, 10149:6
**plaintiffs** [13] - 10191:7, 10197:21, 10204:20, 10204:22, 10207:5, 10207:8, 10219:14, 10221:11, 10221:17, 10221:18, 10224:25, 10225:20, 10226:1
**plaintiffs'** [2] - 10152:8, 10219:24
**planted** [1] - 10219:5
**platform** [2] - 10167:18, 10180:3
**player** [1] - 10161:17
**players** [1] - 10161:16
**plays** [1] - 10215:13
**pleading** [1] - 10207:6
**pleasure** [1] - 10232:18
**point** [12] - 10153:11, 10169:23, 10173:13, 10182:4, 10187:23, 10188:5, 10188:22, 10189:6, 10222:15, 10224:16, 10226:13, 10229:8
**pointed** [1] - 10208:23, 10225:2
**points** [4] - 10182:4, 10195:22, 10217:3, 10224:1
**Porat** [1] - 10176:7
**portion** [2] - 10152:16, 10229:6
**portions** [6] - 10199:1, 10199:3, 10199:6, 10200:16, 10215:2
**position** [6] - 10151:14, 10151:24, 10215:10, 10217:6, 10229:21, 10229:22

**positions** [1] - 10228:14
**possibility** [4] - 10169:8, 10178:13, 10211:1, 10227:25
**possible** [5] - 10168:9, 10179:20, 10192:6, 10219:15, 10223:14
**post** [15] - 10165:24, 10219:18, 10219:21, 10220:5, 10220:10, 10220:14, 10221:6, 10223:8, 10224:12, 10225:25, 10226:12, 10226:16, 10228:9, 10231:3, 10231:10
**post-trial** [14] - 10219:18, 10219:21, 10220:5, 10220:10, 10220:14, 10221:6, 10223:8, 10224:12, 10225:25, 10226:12, 10226:16, 10228:9, 10231:3, 10231:10
**posture** [1] - 10214:13
**potential** [5] - 10198:5, 10201:22, 10202:24, 10217:25, 10226:4
**potentially** [1] - 10154:23
**power** [2] - 10212:7, 10221:21
**practical** [1] - 10226:21
**practice** [1] - 10193:16
**pre** [5] - 10166:22, 10174:10, 10174:22, 10189:14, 10190:3
**pre-install** [2] - 10166:22, 10190:3
**pre-installation** [2] - 10174:10, 10174:22
**pre-installed** [1] - 10189:14
**precedent** [2] - 10193:7, 10221:24
**precedents** [1] - 10179:13
**precise** [5] - 10153:17, 10166:20, 10206:21, 10216:18, 10218:23
**precision** [1] - 10188:7
**preference** [2] - 10226:17, 10227:3
**prejudice** [9] - 10210:3, 10215:7,

10215:15, 10215:18, 10216:8, 10217:7, 10217:13, 10217:25, 10218:23
**preloaded** [2] - 10192:8, 10192:13
**present** [4] - 10212:21, 10212:23, 10212:24, 10213:17
**presented** [1] - 10195:6
**pressing** [1] - 10165:18
**presumably** [1] - 10201:6
**pretrial** [4] - 10227:10, 10227:13, 10230:18, 10231:1
**pretty** [2] - 10189:16, 10189:20
**prevalent** [1] - 10202:3
**prevent** [1] - 10159:18
**previous** [2] - 10154:7, 10199:24
**previously** [1] - 10209:12
**price** [10] - 10157:11, 10159:10, 10163:18, 10163:23, 10165:7, 10168:25, 10169:24, 10178:12, 10178:14, 10186:1
**priced** [10] - 10169:25, 10170:2, 10183:16, 10183:22, 10183:25, 10184:1, 10185:25, 10186:10, 10187:6, 10187:9
**prices** [14] - 10157:17, 10157:24, 10159:9, 10159:10, 10161:14, 10162:9, 10163:25, 10164:6, 10164:8, 10164:18, 10168:10, 10169:7, 10169:12, 10186:5
**pricing** [4] - 10158:14, 10159:25, 10170:24, 10173:13
**primarily** [1] - 10224:14
**primary** [1] - 10187:22
**private** [1] - 10193:20
**probative** [2] - 10207:1, 10218:8
**problem** [1] - 10206:19
**problems** [2] - 10159:9, 10178:7

**proceedings** [2] - 10214:11, 10234:4
**Proceedings** [2] - 10149:18, 10233:17
**process** [3] - 10160:20, 10230:8, 10231:10
**procompetitive** [3] - 10221:21, 10227:10, 10233:7
**produced** [4] - 10149:19, 10204:16, 10205:14, 10206:11
**professor** [1] - 10208:3
**Professor** [19] - 10162:17, 10190:25, 10191:1, 10191:25, 10193:11, 10194:12, 10196:22, 10197:1, 10197:8, 10203:11, 10203:13, 10208:1, 10208:9, 10208:25, 10209:1, 10217:1, 10217:10, 10225:3, 10230:23
**profitable** [1] - 10202:20
**prohibited** [1] - 10212:4
**projected** [1] - 10178:23
**prominently** [1] - 10233:6
**promotion** [1] - 10194:16
**pronouncements** [1] - 10231:20
**pronouncing** [1] - 10208:1
**proper** [2] - 10196:21, 10209:17
**proposal** [7] - 10151:17, 10176:23, 10183:5, 10222:11, 10223:18, 10226:15, 10232:2
**propose** [10] - 10219:21, 10220:2, 10220:4, 10221:11, 10221:15, 10222:1, 10222:3, 10224:18, 10225:15, 10225:22
**proposed** [18] - 10210:16, 10219:6, 10219:15, 10220:1, 10220:3, 10220:7, 10220:11, 10220:21, 10221:10, 10221:15, 10222:8, 10224:14,

10228:1, 10228:8, 10229:13, 10230:8, 10231:15, 10232:25
**Protection** [1] - 10149:3
**provenance** [1] - 10206:6
**provide** [6] - 10199:21, 10200:1, 10219:22, 10220:18, 10221:13, 10221:16
**provided** [4] - 10172:19, 10172:22, 10197:24, 10199:9
**provider** [2] - 10192:23, 10193:19
**proving** [1] - 10169:11
**provision** [16] - 10215:17, 10216:12, 10216:15, 10217:3, 10217:9, 10217:10, 10217:18, 10217:22, 10218:1, 10218:3, 10218:7, 10218:9, 10218:11, 10218:18, 10218:19, 10218:21
**provisions** [2] - 10211:2, 10215:22
**public** [11] - 10210:9, 10211:25, 10212:23, 10213:17, 10213:18, 10214:3, 10217:19, 10217:24, 10218:4, 10218:20, 10218:22
**public's** [1] - 10213:15
**publicly** [1] - 10218:13
**pulled** [1] - 10190:25
**purchase** [1] - 10202:25
**purpose** [6] - 10193:23, 10205:10, 10205:16, 10205:21, 10206:1, 10226:23
**purposes** [2] - 10205:2, 10228:2
**push** [2] - 10225:8, 10225:9
**pushed** [2] - 10191:7, 10228:3
**pushing** [1] - 10225:1
**put** [14] - 10152:24, 10153:19, 10155:22, 10164:21, 10174:19, 10191:24, 10197:10, 10197:12, 10214:20, 10215:18, 10216:7, 10223:18, 10225:10
**puts** [2] - 10209:4, 10219:10
**putting** [4] - 10152:15,

10201:14, 10201:16, 10228:24

## Q

**qualified** [4] - 10156:22, 10157:9, 10167:1, 10167:5
**qualify** [1] - 10157:8
**quality** [4] - 10195:5, 10201:8, 10201:13
**quantified** [2] - 10164:1, 10187:9
**quantify** [1] - 10163:20
**queries** [5] - 10192:19, 10192:25, 10193:8, 10216:10, 10216:20
**query** [4] - 10192:20, 10192:21, 10193:10, 10216:5
**questioning** [1] - 10214:10
**questions** [20] - 10156:8, 10160:2, 10184:20, 10189:11, 10190:14, 10190:19, 10192:16, 10195:9, 10195:20, 10196:5, 10196:18, 10198:9, 10198:24, 10199:13, 10200:1, 10200:11, 10200:23, 10201:21, 10201:22, 10203:6
**quite** [5] - 10171:5, 10195:5, 10216:23, 10227:12, 10229:23

## R

**raise** [1] - 10230:18
**raised** [2] - 10222:15, 10222:24
**rate** [5] - 10162:19, 10163:13, 10172:20, 10199:10, 10199:22
**rates** [2] - 10162:21, 10196:16
**rather** [1] - 10213:10
**rationale** [2] - 10177:21, 10183:4
**Rationale** [1] - 10183:4
**rationales** [1] - 10178:6
**rattled** [1] - 10201:1
**re** [3] - 10160:23, 10212:15, 10213:3
**re-ask** [1] - 10160:23

**reach** [4] - 10153:21,
10154:16, 10204:14,
10227:19
**reached** [1] - 10229:8
**read** [10] - 10155:7,
10155:9, 10164:22,
10166:5, 10166:18,
10178:24, 10179:13,
10199:18, 10212:1,
10216:2
**reading** [1] - 10166:19
**reads** [1] - 10199:8
**ready** [1] - 10208:5
**real** [7] - 10175:3,
10196:20, 10207:1,
10210:2, 10215:7,
10216:19, 10217:13
**really** [13] - 10161:1,
10170:22, 10175:3,
10184:13, 10189:6,
10197:15, 10205:11,
10205:18, 10210:5,
10214:6, 10215:13,
10215:18, 10224:8
**Reason** [1] - 10177:5
**reason** [6] - 10182:21,
10191:22, 10197:15,
10198:1, 10198:8,
10226:21
**reasons** [5] -
10165:10, 10170:22,
10178:10, 10218:9,
10229:14
**rebuttal** [2] -
10207:20, 10208:20
**receive** [2] - 10157:16,
10165:6
**received** [2] -
10172:23, 10204:17
**receives** [2] -
10158:20, 10177:22
**receiving** [1] -
10173:17
**recent** [1] - 10165:24
**recently** [1] -
10164:17
**Recess** [1] - 10203:23
**recognize** [1] -
10205:15
**recollection** [1] -
10152:4
**record** [22] -
10156:10, 10162:8,
10193:25, 10198:12,
10206:3, 10207:13,
10210:9, 10211:25,
10212:5, 10214:3,
10214:6, 10214:20,
10215:18, 10216:3,
10216:7, 10219:20,

10220:15, 10221:23,
10226:5, 10226:6,
10231:18, 10234:4
**recorded** [1] -
10149:18
**red** [2] - 10177:7
**redact** [4] - 10211:3,
10211:23, 10213:8,
10215:2
**redacted** [7] -
10152:16, 10152:18,
10210:23, 10211:14,
10211:19, 10217:4,
10218:10
**redaction** [4] -
10210:6, 10210:15,
10210:24, 10211:18
**redactions** [5] -
10153:6, 10209:11,
10209:15, 10209:21,
10217:15
**redirect** [1] - 10190:22
**Redirect** [1] - 10150:4
**REDIRECT** [1] -
10190:23
**reduced** [2] -
10196:14, 10196:15
**reduction** [1] -
10164:16
**reductions** [1] -
10163:11
**refer** [1] - 10218:24
**reference** [3] -
10198:25, 10210:3,
10210:4
**referencing** [1] -
10158:13
**referring** [3] -
10156:9, 10161:25,
10220:6
**reflect** [1] - 10175:6
**reflected** [2] -
10157:24, 10220:11
**reflects** [1] - 10217:18
**reframe** [1] - 10185:9
**refusal** [1] - 10198:10
**refusing** [1] -
10213:24
**regard** [1] - 10157:7
**regarding** [1] -
10219:15
**regional** [1] -
10177:23
**regions** [1] - 10178:23
**regulated** [1] -
10159:21
**regulatory** [1] -
10159:24
**relate** [1] - 10210:7
**related** [2] - 10192:3,

10218:2
**relates** [3] - 10204:16,
10218:14, 10218:21
**relationship** [2] -
10206:25, 10218:16
**relative** [2] - 10174:3,
10218:5
**relatively** [1] - 10210:9
**relevant** [2] -
10213:13, 10229:25
**reliance** [1] - 10198:24
**rely** [1] - 10230:9
**remain** [1] - 10209:23
**remember** [13] -
10153:17, 10157:3,
10159:9, 10169:21,
10169:23, 10170:5,
10192:14, 10193:13,
10195:17, 10195:25,
10230:2, 10230:24
**remind** [1] - 10230:21
**renegotiated** [2] -
10164:14, 10196:17
**renewal** [1] - 10180:16
**repeat** [1] - 10156:13
**repetition** [2] -
10223:6, 10223:14
**repetitive** [1] -
10223:6
**rephrase** [4] -
10151:23, 10172:5,
10197:2, 10202:4
**replacement** [3] -
10165:14, 10166:2,
10166:4
**report** [5] - 10157:4,
10162:1, 10193:10,
10193:12, 10198:15
**Reporter** [1] -
10149:15
**reporter** [1] -
10203:19
**REPORTER** [2] -
10234:1, 10234:9
**reports** [1] - 10193:13
**request** [5] -
10211:23, 10213:8,
10215:1, 10231:14,
10231:18
**requested** [7] -
10209:14, 10210:23,
10211:15, 10211:17,
10211:19, 10213:4,
10217:14
**requesting** [1] -
10182:24
**requests** [1] -
10210:22
**require** [1] - 10165:20,
10166:11, 10166:21,

10166:24, 10167:5,
10210:5, 10227:15
**requirement** [1] -
10165:5
**research** [1] -
10214:17
**reserved** [1] -
10227:17
**resolved** [1] - 10228:6
**respect** [7] - 10157:2,
10195:12, 10209:11,
10215:1, 10215:25,
10217:14, 10228:3
**respond** [1] -
10225:12
**response** [3] -
10198:17, 10229:15,
10229:17
**responses** [9] -
10198:20, 10199:2,
10199:3, 10221:18,
10225:22, 10225:24,
10226:7, 10226:20,
10227:4
**responsible** [1] -
10206:22
**responsive** [5] -
10222:5, 10222:8,
10224:23, 10226:8
**rest** [3] - 10174:23,
10175:6, 10208:17
**rested** [1] - 10207:15
**restrictions** [2] -
10178:20, 10178:21
**rests** [2] - 10204:1,
10204:6
**result** [2] - 10196:9,
10196:13
**retroactive** [2] -
10212:4, 10214:19
**retroactively** [1] -
10212:17
**rev** [21] - 10160:5,
10160:12, 10160:25,
10161:4, 10162:9,
10162:14, 10170:12,
10172:8, 10172:9,
10176:23, 10177:1,
10178:1, 10178:3,
10178:13, 10179:3,
10179:14, 10179:18,
10179:24, 10181:4,
10215:19, 10215:21
**revenue** [25] -
10153:8, 10165:2,
10165:6, 10168:20,
10169:16, 10173:6,
10173:25, 10177:12,
10177:16, 10177:17,
10177:24, 10178:11,

10180:17, 10180:23,
10181:10, 10182:25,
10189:21, 10200:17,
10201:3, 10211:3,
10211:9, 10217:15,
10217:16, 10218:2,
10218:6
**revenues** [4] -
10157:12, 10157:16,
10157:21, 10157:22
**review** [6] - 10176:14,
10177:6, 10180:8,
10182:21, 10192:22,
10198:12
**reviewed** [3] -
10156:10, 10217:5
**rid** [1] - 10188:21
**rider** [1] - 10178:7
**riders** [1] - 10178:8
**rise** [4] - 10178:13,
10211:10, 10215:6,
10217:13
**rivals** [3] - 10197:18,
10200:13, 10200:20
**Room** [1] - 10149:16
**Rosenberg** [1] -
10191:9
**Rosenberg's** [2] -
10164:22, 10164:23
**Roszak** [1] - 10191:9
**roughly** [5] - 10159:2,
10159:4, 10159:7,
10160:14
**RPR** [1] - 10149:15
**RSA** [40] - 10161:24,
10162:3, 10164:12,
10165:12, 10165:14,
10166:2, 10167:3,
10167:12, 10167:13,
10167:14, 10167:15,
10170:19, 10170:24,
10172:16, 10172:18,
10172:21, 10172:24,
10173:1, 10173:15,
10174:17, 10174:20,
10174:23, 10175:6,
10175:11, 10175:14,
10182:8, 10182:20,
10182:21, 10183:23,
10184:21, 10185:4,
10185:12, 10185:13,
10185:16, 10185:20,
10196:10, 10196:14,
10196:16, 10200:25,
10201:5
**RSAs** [5] - 10166:4,
10184:2, 10185:1,
10201:3, 10210:7
**rule** [3] - 10214:24,
10227:12, 10231:5

**Rule** [1] - 10198:20
**ruling** [2] - 10215:24, 10219:2
**rulings** [2] - 10209:10, 10211:7
**run** [2] - 10206:20, 10232:24
**run-up** [1] - 10232:24
**Russia** [2] - 10182:2, 10187:16
**Ruth** [1] - 10180:16

## S

**SA360** [3] - 10223:2, 10223:10, 10224:8
**Safari** [17] - 10151:15, 10151:25, 10152:3, 10154:11, 10174:11, 10189:14, 10189:22, 10192:4, 10192:7, 10192:8, 10192:12, 10192:19, 10195:8, 10195:9, 10195:14, 10195:16, 10199:10
**safe** [1] - 10203:13
**sake** [1] - 10230:15
**sale** [2] - 10187:4, 10203:1
**sales** [3] - 10168:16, 10168:17, 10169:22
**SALLET** [7] - 10149:2, 10190:19, 10222:13, 10226:13, 10230:14, 10230:17, 10231:7
**Sallet** [1] - 10190:17
**Samsung** [13] - 10180:17, 10180:24, 10181:6, 10181:14, 10181:16, 10181:18, 10182:13, 10182:20, 10182:25, 10183:5, 10191:20, 10191:23, 10230:5
**Samsung's** [1] - 10181:20
**Sara** [2] - 10234:3, 10234:8
**SARA** [1] - 10149:15
**satisfy** [1] - 10165:19
**scenarios** [1] - 10199:22
**schedule** [2] - 10232:11, 10232:23
**scheduling** [2] - 10207:25, 10219:15
**Schmidtlein** [7] - 10190:22, 10193:5, 10197:3, 10203:25, 10204:7, 10224:2,

10230:22
**SCHMIDTLEIN** [31] - 10149:10, 10156:3, 10156:7, 10167:19, 10167:23, 10170:25, 10171:8, 10171:13, 10173:20, 10173:24, 10174:6, 10190:24, 10191:6, 10191:13, 10191:15, 10193:6, 10196:4, 10197:4, 10201:15, 10202:5, 10203:6, 10204:1, 10204:5, 10224:3, 10225:18, 10225:21, 10228:10, 10229:4, 10229:11, 10230:7, 10231:25
**scientist** [2] - 10188:24, 10189:4
**scope** [1] - 10177:23
**screen** [23] - 10152:16, 10152:18, 10153:19, 10158:8, 10159:15, 10159:17, 10163:23, 10164:7, 10168:7, 10180:13, 10182:1, 10182:17, 10192:12, 10196:6, 10196:9, 10196:13, 10196:19, 10196:21, 10196:25, 10197:5, 10197:13, 10197:15, 10197:20
**screens** [2] - 10164:6, 10192:2
**seal** [2] - 10213:24, 10214:2
**sealing** [4] - 10212:5, 10213:5, 10213:24, 10214:19
**section** [1] - 10215:3
**Sections** [1] - 10215:2
**secure** [2] - 10177:12, 10177:18
**secures** [1] - 10183:5
**security** [3] - 10178:22, 10183:10, 10209:25
**see** [65] - 10152:19, 10153:2, 10153:5, 10153:13, 10154:4, 10154:21, 10155:12, 10158:16, 10160:1, 10166:5, 10168:1, 10170:22, 10171:5, 10171:14, 10171:21, 10175:25, 10176:3, 10176:4, 10176:5, 10176:9, 10176:11, 10176:12, 10176:24, 10177:3, 10177:8,

10181:20, 10181:23, 10182:25, 10183:6, 10188:1, 10188:4, 10188:5, 10188:9, 10188:11, 10188:16, 10188:17, 10188:19, 10188:24, 10188:25, 10189:2, 10192:20, 10192:25, 10193:8, 10193:19, 10194:7, 10195:7, 10195:22, 10195:25, 10196:1, 10196:2, 10196:10, 10198:16, 10201:17, 10201:22, 10210:7, 10215:4, 10216:5, 10216:10, 10216:11, 10216:17, 10216:20
**search/exclusive** [1] - 10183:6
**searching** [1] - 10154:1
**Second** [2] - 10213:21, 10214:10
**second** [12] - 10152:20, 10152:21, 10176:1, 10176:5, 10176:14, 10182:7, 10200:2, 10200:7, 10204:14, 10205:12, 10217:17, 10227:16
**second-level** [1] - 10205:12
**secondly** [2] - 10222:23, 10230:21
**Section** [7] - 10149:3, 10215:8, 10215:25, 10216:24, 10217:14, 10217:15, 10220:17
**secure** [2] - 10177:12, 10177:18
**secures** [1] - 10183:5
**security** [3] - 10178:22, 10183:10, 10209:25
**see** [65] - 10152:19, 10153:2, 10153:5, 10153:13, 10154:4, 10154:21, 10155:12, 10158:16, 10160:1, 10166:5, 10168:1, 10170:22, 10171:5, 10171:14, 10171:21, 10175:25, 10176:3, 10176:4, 10176:5, 10176:9, 10176:11, 10176:12, 10176:24, 10177:3, 10177:8,

10177:14, 10177:15, 10177:19, 10177:22, 10178:1, 10178:4, 10178:9, 10178:12, 10178:17, 10178:25, 10179:15, 10180:10, 10180:12, 10180:14, 10180:18, 10180:20, 10180:25, 10181:12, 10181:24, 10182:5, 10182:10, 10182:11, 10182:15, 10182:22, 10183:2, 10183:7, 10183:11, 10183:24, 10187:24, 10193:16, 10198:12, 10215:6, 10223:16, 10224:8, 10229:19, 10233:11, 10233:15
**seed** [1] - 10219:5
**seeing** [2] - 10168:12, 10229:13
**seek** [1] - 10226:25
**seeking** [3] - 10167:18, 10177:17, 10206:4
**seem** [2] - 10210:19, 10216:8
**seemingly** [1] - 10210:17
**selection** [1] - 10215:4
**sell** [5] - 10156:1, 10156:15, 10157:19, 10169:23, 10181:14
**sellers** [1] - 10197:22
**selling** [1] - 10169:24
**sells** [1] - 10186:21
**Semiconductor** [1] - 10213:2
**send** [3] - 10192:19, 10192:20, 10192:21
**sense** [3] - 10213:18, 10216:22, 10229:24
**sentence** [5] - 10178:3, 10199:8, 10199:20, 10200:15, 10216:2
**separate** [12] - 10158:14, 10165:11, 10169:6, 10219:23, 10220:2, 10221:2, 10222:8, 10223:1, 10223:10, 10223:24, 10224:8, 10227:3
**separated** [1] - 10168:2
**separately** [2] - 10157:4, 10207:8
**September** [2] -

10180:7, 10180:9
**served** [1] - 10198:13
**service** [1] - 10168:19
**services** [2] - 10168:14, 10169:15
**SESSION** [1] - 10148:9
**session** [4] - 10208:14, 10209:13, 10210:23, 10212:20
**set** [9] - 10159:9, 10166:25, 10172:18, 10172:20, 10178:19, 10193:19, 10193:22, 10204:9
**sets** [1] - 10175:14
**setting** [2] - 10167:8, 10217:20
**settlement** [4] - 10213:25, 10214:3, 10214:11, 10214:15
**Seventh** [1] - 10149:5
**several** [2] - 10205:24
**share** [43] - 10153:8, 10160:5, 10160:12, 10160:25, 10161:4, 10162:9, 10162:14, 10165:2, 10165:6, 10168:20, 10170:12, 10172:8, 10172:9, 10173:6, 10173:25, 10176:23, 10177:2, 10177:12, 10177:17, 10178:1, 10178:3, 10178:14, 10179:3, 10179:14, 10179:18, 10179:24, 10180:17, 10180:23, 10181:5, 10181:10, 10182:25, 10189:21, 10200:17, 10201:3, 10211:3, 10215:19, 10215:21, 10217:15, 10217:16, 10218:2, 10218:6, 10219:16
**shares** [1] - 10211:9
**sharpen** [1] - 10186:20
**shipped** [1] - 10186:2
**short** [1] - 10228:24
**shorter** [1] - 10208:13
**shorthand** [1] - 10149:18
**show** [7] - 10161:20, 10168:6, 10168:23, 10174:16, 10186:4, 10205:16
**showed** [1] - 10187:16
**showing** [3] - 10161:3, 10182:17,

10186:1
**shown** [3] - 10161:18, 10191:25, 10199:18
**shows** [1] - 10174:24
**shrift** [1] - 10228:24
**side** [5] - 10159:7, 10167:15, 10174:8, 10197:17, 10229:20
**sides** [4] - 10172:24, 10173:4, 10225:21, 10230:8
**sign** [5] - 10184:21, 10185:4, 10185:5, 10185:11, 10185:18
**SIGNATURE** [1] - 10234:9
**signed** [1] - 10184:22
**significant** [1] - 10157:23
**signing** [2] - 10184:25, 10185:8
**signs** [2] - 10186:14, 10186:21
**similar** [5] - 10192:7, 10192:10, 10195:12, 10213:23, 10233:4
**simple** [3] - 10169:1, 10169:10, 10197:8
**simplify** [1] - 10193:4
**simply** [2] - 10206:1, 10215:3
**single** [3] - 10161:17, 10224:6, 10231:8
**single-player** [1] - 10161:17
**Siri** [2] - 10198:11, 10198:13
**sites** [1] - 10196:2
**situation** [3] - 10192:4, 10199:1, 10213:23
**sleep** [1] - 10224:9
**slide** [20] - 10153:2, 10154:7, 10158:7, 10158:13, 10162:23, 10168:5, 10168:8, 10168:12, 10168:19, 10185:21, 10186:1, 10186:5, 10187:21, 10187:22, 10188:2, 10199:3, 10199:20, 10230:23, 10231:8
**slides** [4] - 10199:2, 10199:4, 10199:6, 10199:18
**slip** [1] - 10213:11
**smaller** [2] - 10173:4, 10194:17
**smartphone** [1] - 10173:7

**smartphones** [2] - 10186:1, 10210:17
**software** [2] - 10216:1, 10216:13
**sold** [2] - 10191:17, 10191:21
**solicited** [1] - 10215:9
**solution** [2] - 10159:21, 10159:25
**solve** [1] - 10205:18
**sometimes** [1] - 10222:21
**somewhat** [1] - 10225:3
**sorry** [8] - 10160:7, 10176:16, 10178:4, 10180:11, 10184:7, 10195:21, 10209:7, 10220:5
**sort** [23] - 10170:16, 10173:20, 10192:18, 10192:19, 10195:10, 10195:17, 10197:23, 10200:6, 10206:6, 10206:8, 10209:12, 10209:23, 10210:12, 10212:4, 10212:17, 10214:18, 10218:24, 10224:19, 10224:20, 10227:16, 10228:7, 10229:11, 10232:15
**sought** [1] - 10163:20
**sounds** [1] - 10220:19
**Southwest** [1] - 10149:12
**specific** [5] - 10200:13, 10211:15, 10218:25, 10224:20, 10230:18
**specifics** [3] - 10217:25, 10218:15, 10221:5
**specify** [2] - 10160:7, 10195:21
**speculate** [1] - 10154:19
**speculating** [1] - 10155:2
**spend** [1] - 10224:9
**sphere** [1] - 10213:18
**split** [2] - 10167:12, 10192:25
**splitting** [2] - 10193:8, 10193:11
**Spotlight** [1] - 10198:11
**spotlight** [1] - 10198:13
**staff** [1] - 10224:13
**stage** [1] - 10174:13

**stakeholders** [1] - 10182:13
**stand** [1] - 10207:16
**standard** [1] - 10182:8
**standing** [1] - 10230:4
**standpoint** [2] - 10228:18, 10229:17
**start** [1] - 10162:11
**started** [1] - 10232:22
**State** [6] - 10149:2, 10149:6, 10149:7, 10221:11, 10221:17, 10223:24
**state** [1] - 10198:14
**statement** [13] - 10151:16, 10157:1, 10157:7, 10157:8, 10158:3, 10184:12, 10190:4, 10199:11, 10199:12, 10199:23, 10199:24, 10204:24, 10213:9
**statements** [2] - 10156:25, 10204:24
**STATES** [3] - 10148:1, 10148:3, 10148:10
**States** [17] - 10148:13, 10148:16, 10148:19, 10183:17, 10190:17, 10191:17, 10205:6, 10207:18, 10208:17, 10219:13, 10219:14, 10219:16, 10219:22, 10224:6, 10226:14, 10230:18, 10231:3
**States'** [3] - 10223:1, 10224:20, 10225:13
**States-specific** [1] - 10230:18
**status** [1] - 10174:10
**staying** [1] - 10176:22
**stenotype** [1] - 10149:18
**steps** [1] - 10174:12
**still** [5] - 10152:5, 10167:13, 10208:10, 10209:1, 10209:4
**story** [1] - 10169:10
**strategic** [1] - 10177:11
**strategically** [1] - 10178:23
**Street** [3] - 10148:14, 10148:17, 10148:19
**strongly** [1] - 10224:22
**struck** [1] - 10211:11
**structure** [3] - 10203:4, 10232:17, 10233:2

**structured** [3] - 10211:5, 10233:4, 10233:5
**students** [1] - 10202:12
**study** [1] - 10164:17
**stuff** [2] - 10177:7, 10186:24
**subject** [11] - 10160:3, 10164:6, 10180:7, 10180:8, 10180:12, 10182:2, 10191:16, 10212:22, 10216:1, 10216:13, 10230:25
**subjects** [1] - 10173:11
**submission** [4] - 10221:12, 10221:13, 10224:21, 10226:3
**substance** [2] - 10215:17, 10216:6
**substantial** [1] - 10216:9
**substantially** [1] - 10196:15
**suffer** [1] - 10229:1
**suggest** [1] - 10201:18
**suggested** [1] - 10223:2
**suggesting** [1] - 10184:10
**suggests** [1] - 10184:8
**Suite** [2] - 10148:20, 10149:9
**sum** [2] - 10215:17, 10216:6
**summary** [8] - 10220:20, 10221:17, 10221:20, 10222:17, 10223:21, 10225:8, 10233:4, 10233:6
**supplement** [1] - 10230:15
**supply** [8] - 10157:14, 10162:16, 10162:20, 10163:6, 10163:7, 10163:10, 10163:12, 10163:15
**supplying** [1] - 10202:13
**support** [5] - 10177:21, 10183:4, 10183:10, 10189:3, 10196:7
**supporting** [1] - 10183:16
**suppose** [1] - 10227:18

**supposed** [1] - 10152:17
**surprised** [2] - 10233:2, 10233:8
**suspect** [1] - 10229:19
**swoop** [1] - 10174:24
**synthesis** [2] - 10222:16, 10222:17
**Sysco** [1] - 10231:24
**system** [3] - 10166:7, 10167:9, 10213:15

## T

**tab** [1] - 10198:22
**tablet** [1] - 10177:24
**TAC** [2] - 10178:23, 10179:12
**talks** [1] - 10197:9
**teach** [1] - 10202:11
**team** [3] - 10180:16, 10182:13, 10229:5
**ten** [1] - 10222:3
**tend** [2] - 10162:21, 10163:11
**tenor** [1] - 10218:19
**term** [4] - 10184:9, 10201:24, 10218:25, 10222:17
**terms** [38] - 10152:8, 10153:22, 10168:2, 10180:18, 10200:17, 10206:15, 10207:25, 10208:11, 10209:22, 10210:15, 10210:16, 10211:14, 10213:5, 10215:8, 10215:12, 10215:15, 10216:11, 10216:22, 10216:24, 10218:23, 10219:6, 10219:9, 10220:1, 10220:3, 10221:1, 10221:10, 10221:15, 10222:25, 10225:25, 10226:4, 10227:5, 10227:20, 10229:1, 10229:7, 10230:17, 10230:21, 10233:1
**terrific** [7] - 10190:16, 10190:21, 10204:7, 10207:13, 10207:15, 10208:15, 10209:5
**test** [1] - 10193:16
**testified** [6] - 10153:15, 10154:10, 10168:9, 10191:10, 10192:11, 10192:14
**testify** [3] - 10200:3, 10200:9, 10205:17
**testimony** [39] -

10155:14, 10155:17,
10157:4, 10157:5,
10162:8, 10164:22,
10164:23, 10166:5,
10166:9, 10166:18,
10166:19, 10169:13,
10169:22, 10176:18,
10184:1, 10192:9,
10192:14, 10193:23,
10196:24, 10204:18,
10207:19, 10208:8,
10208:25, 10209:13,
10210:18, 10211:4,
10211:19, 10211:24,
10214:21, 10215:10,
10216:16, 10217:4,
10217:5, 10224:25,
10226:3, 10230:6

**TESTIMONY** [1] -
10150:3

**THE** [95] - 10148:1,
10148:1, 10148:10,
10151:3, 10151:5,
10152:20, 10152:22,
10152:25, 10155:4,
10156:4, 10156:5,
10156:9, 10160:7,
10164:5, 10164:11,
10164:19, 10167:20,
10167:21, 10167:24,
10168:1, 10169:20,
10170:3, 10170:4,
10170:5, 10170:10,
10171:2, 10171:17,
10171:20, 10172:1,
10172:6, 10173:12,
10173:19, 10173:23,
10174:3, 10174:7,
10175:1, 10175:2,
10175:12, 10184:16,
10189:9, 10190:8,
10190:12, 10190:16,
10190:21, 10191:4,
10191:5, 10191:12,
10193:4, 10195:21,
10195:24, 10197:2,
10201:10, 10201:11,
10202:4, 10203:8,
10203:11, 10203:15,
10203:18, 10203:25,
10204:4, 10204:7,
10206:2, 10206:13,
10206:21, 10207:3,
10207:13, 10207:21,
10207:24, 10208:5,
10208:10, 10208:15,
10208:22, 10209:4,
10220:5, 10220:10,
10220:19, 10221:3,
10221:25, 10222:12,
10224:2, 10225:17,

10225:19, 10227:5,
10228:17, 10229:10,
10229:23, 10230:13,
10230:16, 10231:6,
10231:11, 10231:20,
10232:5, 10232:17,
10232:21, 10233:15

**theirs** [1] - 10219:17

**themselves** [5] -
10164:12, 10166:8,
10166:10, 10167:24,
10181:15

**theory** [1] - 10152:8

**they've** [8] - 10172:19,
10172:22, 10172:23,
10175:15, 10184:22,
10189:19, 10197:21,
10205:16

**thinking** [10] -
10171:25, 10172:16,
10185:20, 10197:8,
10206:15, 10219:6,
10230:10, 10230:11,
10232:22, 10232:23

**third** [12] - 10178:19,
10178:20, 10178:22,
10180:22, 10182:18,
10189:17, 10189:23,
10190:2, 10190:3,
10209:16, 10227:24,
10228:7

**third-party** [6] -
10178:20, 10178:22,
10189:17, 10189:23,
10190:2, 10190:3

**thirdly** [1] - 10214:9

**thoroughly** [1] -
10224:14

**thoughts** [5] -
10219:16, 10221:1,
10226:10, 10232:15,
10233:13

**three** [7] - 10168:15,
10204:8, 10215:5,
10222:14, 10228:8,
10230:24

**throughout** [5] -
10170:6, 10183:17,
10187:13, 10223:3

**Thursday** [6] -
10208:9, 10208:16,
10209:5, 10219:10,
10232:10, 10233:2

**tied** [1] - 10227:9

**tighter** [1] - 10224:18

**timing** [2] - 10232:17,
10233:1

**titled** [2] - 10216:24,
10217:15

**today** [6] - 10153:25,

10176:22, 10194:20,
10196:18, 10217:10,
10219:5

**together** [3] -
10163:10, 10207:10,
10222:18

**tomorrow** [8] -
10180:17, 10208:1,
10208:4, 10208:6,
10211:21, 10232:9,
10232:10, 10233:16

**tongue** [1] - 10213:11

**took** [1] - 10188:18

**top** [6] - 10176:6,
10176:12, 10176:17,
10180:12, 10182:21,
10227:23

**topic** [1] - 10210:2

**total** [4] - 10172:8,
10172:9, 10172:11,
10173:22

**touch** [1] - 10211:16

**touching** [1] - 10195:2

**tough** [1] - 10194:6

**toward** [1] - 10171:3

**towards** [2] -
10180:22, 10219:10

**TR** [1] - 10182:2

**track** [6] - 10160:3,
10160:5, 10160:25,
10161:1, 10162:5,
10209:5

**tracked** [1] - 10205:22

**traffic** [3] - 10195:7,
10195:13, 10216:11

**transaction** [3] -
10159:8, 10173:5,
10174:25

**Transcript** [1] -
10149:19

**TRANSCRIPT** [1] -
10148:9

**transcript** [5] -
10209:11, 10209:17,
10213:8, 10214:4,
10234:4

**transcription** [1] -
10149:19

**transfer** [1] - 10159:18

**transferring** [1] -
10173:4

**translate** [1] -
10157:16

**travels** [1] - 10203:14

**treatment** [1] -
10219:1

**trend** [1] - 10170:4

**trial** [26] - 10176:8,
10191:11, 10214:13,
10217:20, 10217:24,

10219:7, 10219:10,
10219:18, 10219:20,
10219:21, 10220:5,
10220:10, 10220:14,
10221:6, 10223:3,
10223:5, 10223:8,
10224:12, 10225:25,
10226:5, 10226:12,
10226:16, 10228:9,
10230:11, 10231:3,
10231:10

**TRIAL** [1] - 10148:9

**tried** [5] - 10152:2,
10152:5, 10154:6,
10194:15, 10212:12

**trigger** [1] - 10215:22

**TriQuint** [1] - 10213:2

**trivially** [2] - 10195:18,
10195:19

**true** [4] - 10151:17,
10165:8, 10186:23,
10218:11

**trusts** [1] - 10212:16

**Trusts** [1] - 10213:7

**truth** [2] - 10204:23,
10206:4

**try** [3] - 10152:2,
10187:14, 10207:12

**trying** [9] - 10163:1,
10180:3, 10184:13,
10186:4, 10193:24,
10194:18, 10200:5,
10205:15, 10230:2

**Tuesday** [1] - 10180:8

**turn** [2] - 10199:5,
10199:7

**two** [35] - 10157:3,
10159:18, 10163:2,
10170:17, 10170:22,
10172:13, 10174:12,
10174:22, 10175:4,
10178:24, 10179:11,
10181:14, 10182:12,
10194:25, 10197:7,
10205:1, 10208:11,
10209:2, 10210:10,
10214:23, 10215:5,
10215:20, 10215:21,
10215:24, 10218:16,
10219:2, 10220:2,
10222:2, 10227:16,
10227:22, 10230:2,
10233:1, 10233:9,
10233:10

**Tyler** [1] - 10149:8

**type** [1] - 10171:1

**types** [3] - 10181:14,
10195:3, 10227:21

**typically** [1] -
10200:21

# U

**U.S** [7] - 10156:1,
10156:15, 10186:21,
10187:1, 10187:2,
10187:10, 10187:11

**ultimate** [1] - 10218:8

**ultimately** [6] -
10153:11, 10154:18,
10157:24, 10215:12,
10218:4, 10229:25

**unable** [1] - 10154:16

**unbundling** [3] -
10158:14, 10158:18,
10158:19

**unclear** [1] - 10206:6

**under** [16] - 10152:7,
10177:21, 10178:16,
10181:2, 10181:23,
10182:13, 10182:24,
10183:4, 10183:22,
10186:6, 10196:12,
10196:13, 10201:3,
10217:19, 10223:17,
10232:8

**undercuts** [1] -
10217:6

**underlying** [3] -
10162:22, 10188:24,
10189:7

**understood** [3] -
10171:23, 10174:6,
10189:16

**undo** [1] - 10213:11

**unfairly** [1] - 10216:18

**unified** [2] - 10223:19,
10223:23

**unique** [1] - 10211:16

**uniquely** [1] - 10211:5

**Unit** [1] - 10149:4

**UNITED** [3] - 10148:1,
10148:3, 10148:10

**United** [8] - 10148:13,
10148:16, 10148:19,
10183:17, 10191:17,
10205:5, 10207:18,
10219:13

**unless** [1] - 10184:22

**unlimited** [1] -
10232:3

**unredacted** [4] -
10209:22, 10209:23,
10210:20, 10216:3

**up** [26] - 10152:18,
10152:24, 10155:6,
10155:23, 10164:21,
10167:8, 10168:7,
10171:21, 10174:12,
10174:16, 10174:24,
10175:21, 10176:22,

10185:6, 10190:25, 10193:14, 10204:12, 10204:15, 10207:10, 10208:19, 10212:5, 10214:6, 10229:2, 10229:18, 10232:24
**updated** [1] - 10175:23
**updates** [1] - 10178:22
**upgrades** [2] - 10183:10, 10209:25
**UPX** [1] - 10173:11
**UPX1128** [3] - 10173:11, 10175:20, 10190:25
**UPX2086** [1] - 10203:16
**UPX580** [1] - 10180:4
**UPX6024** [1] - 10198:19
**UPXD220** [1] - 10154:15
**UPXD241** [1] - 10153:20
**UPXD254** [2] - 10164:4, 10164:21
**usage** [2] - 10201:17, 10201:20
**useful** [5] - 10197:11, 10197:16, 10197:24, 10198:8, 10222:22
**user** [1] - 10195:23
**users** [2] - 10192:4, 10197:18

**V**

**valid** [2] - 10153:15, 10154:2
**valuable** [1] - 10152:12
**value** [14] - 10152:9, 10155:17, 10173:4, 10174:16, 10175:3, 10179:25, 10185:4, 10185:7, 10185:13, 10185:15, 10185:16, 10194:20, 10207:1, 10218:8
**valued** [1] - 10154:14
**variables** [2] - 10162:24, 10163:5
**variation** [1] - 10210:14
**varies** [1] - 10181:17
**variety** [1] - 10165:23
**various** [5] - 10166:15, 10195:2, 10209:24, 10227:21,

10228:11
**VERONICA** [1] - 10148:18
**Veronica** [1] - 10219:12
**versa** [1] - 10207:11
**version** [5] - 10175:23, 10192:4, 10192:7, 10192:8, 10192:19
**versions** [1] - 10192:13
**versus** [1] - 10186:9
**vertically** [1] - 10174:4
**vice** [1] - 10207:10
**videos** [1] - 10207:5
**view** [9] - 10155:14, 10155:15, 10165:13, 10192:6, 10194:3, 10194:25, 10196:21, 10201:8
**viewed** [4] - 10153:18, 10187:6, 10197:20, 10198:7
**violation** [1] - 10220:17
**volume** [7] - 10173:25, 10188:5, 10194:11, 10195:1, 10195:7, 10198:22, 10201:6
**vs** [1] - 10148:5

**W**

**wait** [2] - 10164:13, 10233:16
**walk** [3] - 10153:22, 10220:15, 10220:25
**wants** [1] - 10224:9
**warrant** [2] - 10210:15, 10218:25
**warrants** [2] - 10211:8, 10218:17
**Washington** [6] - 10148:5, 10148:14, 10148:17, 10148:20, 10149:12, 10149:16
**waste** [1] - 10186:20
**wax** [1] - 10175:7
**Webb** [1] - 10149:8
**Wednesday** [1] - 10180:18
**week** [3] - 10190:8, 10230:11, 10230:22
**weeks** [4] - 10219:6, 10222:2, 10222:3, 10222:4
**weighed** [1] - 10213:10
**weighing** [1] -

10211:8
**welcome** [3] - 10155:8, 10181:9, 10233:13
**well-established** [1] - 10189:10
**whereas** [1] - 10174:18
**Whinston** [7] - 10162:17, 10193:11, 10196:22, 10197:1, 10197:9, 10208:9, 10209:1
**Whinston's** [2] - 10194:12, 10217:2
**whole** [8] - 10152:19, 10155:9, 10166:2, 10170:9, 10170:23, 10175:7, 10176:6, 10224:9
**Whoops** [1] - 10152:22
**Wick** [2] - 10234:3, 10234:8
**WICK** [1] - 10149:15
**widget** [10] - 10174:14, 10188:1, 10188:4, 10188:9, 10188:11, 10188:17, 10188:19, 10189:3, 10196:10, 10196:14
**WILLIAM** [1] - 10149:7
**Williams** [1] - 10149:11
**willing** [2] - 10152:12, 10153:22
**wind** [3] - 10210:21, 10210:22, 10211:2
**wind-down** [3] - 10210:21, 10210:22, 10211:2
**Windows** [2] - 10192:4, 10192:7
**wish** [2] - 10203:12, 10231:11
**witness** [4] - 10190:15, 10208:5, 10208:20, 10225:1
**WITNESS** [14] - 10152:22, 10156:4, 10164:11, 10167:20, 10168:1, 10170:3, 10170:5, 10173:19, 10174:7, 10175:2, 10191:5, 10195:24, 10201:11, 10203:15
**witness's** [2] - 10213:9, 10214:20
**witnesses** [4] - 10191:10, 10221:23,

10225:4, 10230:3
**word** [6] - 10158:1, 10216:6, 10217:11, 10225:2
**Word** [1] - 10205:9
**wording** [4] - 10167:21, 10212:10, 10216:18, 10217:13
**words** [10] - 10153:17, 10154:13, 10173:24, 10182:11, 10192:20, 10197:10, 10197:12, 10216:7, 10217:8, 10220:20
**works** [3] - 10161:2, 10184:24, 10203:5
**world** [12] - 10183:17, 10191:21, 10196:20, 10196:21, 10196:22, 10197:1, 10197:9, 10197:10, 10197:21, 10197:22, 10198:1, 10231:9
**worldwide** [1] - 10186:25, 10187:1
**worried** [1] - 10231:22
**worry** [1] - 10228:7
**worth** [1] - 10206:18
**wrote** [1] - 10213:6

**Y**

**Yandex** [1] - 10182:2
**year** [1] - 10169:23
**years** [2] - 10178:24
**yesterday** [11] - 10192:1, 10192:9, 10192:16, 10194:1, 10194:10, 10194:15, 10194:24, 10195:6, 10195:17, 10214:24
**York** [2] - 10149:9
**yourself** [2] - 10202:8, 10202:14

**Z**

**zero** [5] - 10159:6, 10187:6, 10196:10, 10196:14
**zero-priced** [1] - 10187:6