```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
        United States of America,     )
 3      et al.,                       )
                                      )  DAY 42
 4                     Plaintiffs,    )
                                      )  CV No. 20-3010
 5                          vs.  )  Washington, D.C.
                                      )  November 16, 2023
 6      Google LLC,                   )  1:15 p.m.
                                      )
 7                     Defendant.  )
        _____)
 8
                        TRANSCRIPT OF BENCH TRIAL
 9                 BEFORE THE HONORABLE AMIT P. MEHTA
                     UNITED STATES DISTRICT JUDGE
10
        APPEARANCES:
11      For DOJ Plaintiffs:      Kenneth M. Dintzer
                                 U.S. DEPARTMENT OF JUSTICE
12                               1100 L Street, NW
                                 Washington, D.C.
13                               (202) 307-0340
                                 Email:  Kenneth.dintzer2@usdoj.gov
14                               David E. Dahlquist
                                 U.S. DEPARTMENT OF JUSTICE
15                               209 South LaSalle Street, Suite 600
                                 Chicago, IL  60604
16                               (202) 805-8563
                                 Email:  David.dahlquist@usdoj.gov
17                               Elizabeth Jensen
                                 U.S. DEPARTMENT OF JUSTICE
18                               450 Golden Gate Avenue
                                 Suite 10-0101
19                               San Francisco, CA  94102
                                 (415) 583-9211
20                               Email:  Elizabeth.jensen@usdoj.gov
        For Plaintiff
21      State of Colorado:       Jonathan Bruce Sallet
                                 Conor May
22                               COLORADO DEPARTMENT OF LAW
                                 Consumer Protection Section
23                               Ralph L. Carr Colorado Judicial Center
                                 1300 Broadway, Seventh Floor
24                               Denver, CO 80203
                                 (720) 508-6000
25                               Email:  Jon.sallet@coag.gov
                                 Email:  Conor.may@coag.gov
```

```
 1    For Defendant Google:      John E. Schmidtlein
                                 WILLIAMS & CONNOLLY LLP
 2                               680 Maine Avenue SW
                                 Washington, D.C. 20024
 3                               (202) 434-5000
                                 Email: Jschmidtlein@wc.com
 4                               Michael Sommer
                                 Wilson Sonsini Goodrich & Rosati
 5                               1301 Avenue of the Americas
                                 40th Floor
 6                               New York, NY 10019
                                 (212) 497-7728
 7                               Email: Msommer@wsgr.com
                                 Wendy Huang Waszmer
 8                               Wilson Sonsini Goodrich & Rosati
                                 1301 Avenue of the Americas
 9                               40th Floor
                                 New York, NY 10019
10                               (212) 999-5800
                                 Email: Wwaszmer@wsgr.com
11
      Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
12                               Official Court Reporter
                                 United States Courthouse, Room 6523
13                               333 Constitution Avenue, NW
                                 Washington, DC 20001
14                               202-354-3267
                                      *   *   *
15

16

17

18

19

20

21

22

23

24

25
```

```
 1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

 2                THE COURT:  All right.  Mr. Schmidtlein, we're ready

 3      when you are.

 4                MR. SCHMIDTLEIN:  Thank you, Your Honor.

 5                        MICHAEL WHINSTON,

 6                        CROSS-EXAMINATION

 7      BY MR. SCHMIDTLEIN:

 8      Q.  Professor Whinston, do you agree that the smartphone market

 9      is a very competitive market in the United States?

10      A.  No.  No, I don't, not necessarily.

11      Q.  As part of your work in this case did you conduct any

12      analysis of competition in the U.S. smartphone market?

13      A.  No, I haven't studied it.

14      Q.  In your expert reports, you did not conduct any analysis of

15      whether competition among smartphones in the United States has

16      impacted search competition in the United States, correct?

17      A.  That's correct.

18      Q.  And in your expert reports you did not set forth any

19      analysis of whether competition among smartphones in the

20      United States has impacted search usage in the United States?

21      A.  I'm sorry, can you just repeat the question?

22      Q.  In your expert reports, you did not set forth any analysis

23      of whether competition among smartphones in the United States

24      has impacted search usage in the United States.

25      A.  That's correct.
```

1    Q.  Now, have you seen evidence in this case that buyers of

2    Android devices demand and expect those devices to come

3    preloaded with Google's applications, including Google Search?

4    A.  You know, I think they do expect it.  I mean, it is what

5    has happened.  So I'm not sure whether -- what to say beyond

6    that.

7    Q.  Android device buyers demand Google Search be preloaded on

8    Android smartphones.  You've seen evidence of that, correct?

9    A.  I have seen -- just trying to think of the specifics.  But

10   I think in general, yes, they -- you know, many.  I don't know

11   about all, but many.

12   Q.  The large majority of people, correct?

13   A.  I haven't seen a statistic on it, I guess, but I don't

14   disagree with you.

15   Q.  Android carriers who have in the past developed smartphones

16   with Bing or Yahoo! as the exclusive preloaded default search

17   engine have come under heavy criticism from consumers and

18   journalist who review smartphones in tech publications,

19   correct?

20   A.  Trying to -- I think, maybe example I'm thinking of -- I

21   may be getting the carrier wrong, but I think Verizon may have

22   had Bing at one point and was not well reviewed.  And so, like,

23   before 2010, I think.

24   Q.  And are you also familiar with evidence of when Yahoo!

25   preloaded -- or, when AT&T preloaded Yahoo! on an Android

1    device?

2    A.  I don't recall that evidence.

3              MR. SCHMIDTLEIN:  Your Honor, may I approach?

4              THE WITNESS:  Thanks.

5    BY MR. SCHMIDTLEIN:

6    Q.  Now, Professor Whinston, I've put before you two

7    demonstratives that we've marked, one is DXD41.002, the other

8    is DXD41.003.  And DXD41.002 is a -- are excerpts from press

9    coverage that is in DX737 and DX384 -- which I believe are both

10   admitted -- and testimony that was given by Mr. Nadella and

11   Mr. Ezell.  And then DXD41.003 are excerpts from DX737, which I

12   believe also is in evidence.  Looking at DX --

13   A.  I'm sorry what are the excerpts from?

14   Q.  A document that's been admitted into evidence, a Verizon

15   document that was admitted into evidence in this case.

16   A.  I see.

17   Q.  Now, sir, would you agree with me that these are the two

18   most prominent examples of Android devices that have come

19   preloaded with search engines other than Google, the Samsung

20   Fascinate and Motorola Backflip?

21   A.  The specifics aren't -- you know, I don't remember the

22   specifics of those two models to say that it's the most

23   prominent.  But, you know -- sorry.  It certainly seems that

24   they were loaded that way.

25   Q.  And did you review Mr. Nadella's testimony whereby he

1    acknowledged the reviews of Bing on the Verizon -- the Samsung

2    Fascinate phone Verizon offered?

3    A.  I did look at a good portion of his testimony.  I don't

4    remember this one question and answer, but I'm sure that it is

5    from his testimony.

6    Q.  And did you review Mr. Ezell's deposition testimony that

7    was played to the Court about the reviews he saw with respect

8    to the Motorola Backflip?

9    A.  I did not see his video deposition.

10   Q.  And would you agree that from an economic perspective, you

11   would expect that Android device manufacturers and Android

12   wireless carriers -- and let's flip over to -- let's flip over

13   to DXD41.002.  These are just some of the various reviews from

14   various publications on the Fascinate?

15   A.  Do you mean .003?

16   Q.  I'm sorry, .003.  You would agree, from an economic

17   perspective, it would be rational for an Android OEM or an

18   Android carrier to be very sensitive to and care about product

19   reviews like these when they go about making decisions about

20   how to configure their devices?

21   A.  Sure, I would.

22   Q.  And product reviews and experiences like this have impacted

23   Android device manufacturers and wireless carriers and how

24   they've thought about whether to preload Google versus other

25   rival search engines?

1    A.  I certainly think when they're confronted with the choice

2    of Google or a rival, that this would matter.

3    Q.  You understand that wireless carriers are competing against

4    one another for customers, right?

5    A.  Yes.

6    Q.  And you'd expect them, as part of that competition, to want

7    to choose the very, very best products and services for their

8    devices?

9    A.  Well, I think what they would want to do is choose, you

10   know, a setup that their customers or their perspective

11   customers would like, so that can -- isn't necessarily that

12   it's one -- you know, picking one search engine to be on the

13   device.  But I think they would -- I agree with you that they

14   want to do something desirable.

15   Q.  And if a wireless carrier or Android OEM wanted to preload

16   or believed that preloading a rival search engine other than

17   Google on the device was advantageous or would help to sell and

18   promote that device, you would expect them to do that?

19   A.  Well, it would depend what they were getting paid by

20   Google.  So they would be thinking about both money and the

21   factors that you were discussing.

22   Q.  You've not seen any evidence in this case that an Android

23   OEM or Android wireless carrier preferred, from a product

24   quality standpoint, Bing or Yahoo! or DuckDuckGo to be

25   preloaded on an Android device, but decided not to do that

1    because of the payments they got from Google?

2    A.  So, you know, Verizon wanted to -- and I guess in the end,

3    did end up negotiating to put its search engine, but restricted

4    version of Yahoo!, like Yahoo! home, I think it was called, on

5    its devices.  But that would be an example.  But not -- I mean,

6    Android devices have come, by and large, just with Google

7    preloaded.

8    Q.  And the Verizon example that you were talking about,

9    Verizon wasn't looking to put Yahoo! search, they wanted the

10   Yahoo! home application that came with all of the other Yahoo!

11   properties as parts of the application, correct?

12   A.  That's where it ended up.  I'm not sure that's where it

13   started, but that's where it ended up.

14   Q.  You're aware that during the time period, 2014 to 2021,

15   Verizon's RSA agreement with Google did not prohibit Verizon

16   from also preloading a rival search engine, in addition to

17   Google, on Verizon Android devices, correct?

18   A.  I am.  I mean, I think there were, nonetheless,

19   restrictions on how it can be preloaded and things.  But, I am

20   aware of that.

21   Q.  During that entire time period Verizon did not preload any

22   other rival search engine on Android devices, correct?

23   A.  Correct.

24   Q.  You've also seen evidence in this case that going back many

25   years AT&T has had what they call a device-by-device RSA

1    agreement with Google, correct?

2    A.  Yes.

3    Q.  And under that agreement AT&T could choose to preload a

4    rival search engine, in addition to Google, on the device but

5    chose -- but never decided to do that, correct?

6    A.  Well, again, it was paid more if it didn't.  So, you know,

7    it was paid enough that it -- they didn't do it.

8    Q.  Did you see any evidence in this case, sir, that during the

9    entire time period you looked at, AT&T wanted to put another

10   rival search engine on an AT&T Android device but didn't do so

11   because Google paid them to keep it off?

12   A.  I haven't seen such a document.

13   Q.  Now, in Europe -- you've talked a little bit about the

14   Europe situation and the EC remedies, right?

15   A.  I'm sorry, repeat the question.

16   Q.  You've talked about the situation in Europe and certain

17   remedies that the European Commission has imposed with respect

18   to Android, correct?

19   A.  Correct.

20   Q.  And in Europe Google has long had device-by-device revenue

21   share agreements with major mobile carriers, correct?

22   A.  I don't know exactly the details of their agreements with

23   mobile carriers in Europe, so I'm not sure what the history is

24   of that.

25   Q.  So you weren't aware that the device-by-device provisions

1    that Google has with mobile carriers in Europe led the European

2    Commission to find that those agreements did not have an

3    anticompetitive effect?

4    A.  I'm aware of the point about the European Commission and

5    device by device, I'm not sure -- or, sitting here, about

6    whether it was OEMs or carriers or exactly what -- my

7    impression has always been that the relation in the U.S., where

8    carriers are selling almost all the phones, is different than

9    Europe, but I don't know the exact details.

10   Q.  Do you know the detail that device-by-device RSAs were not

11   condemned in Europe?

12   A.  I know that.

13   Q.  And you've not cited in your expert reports in this case

14   any evidence that any Android OEM or Android carrier wanted to

15   have a choice screen put on their devices to choose the default

16   search engine?

17   A.  I haven't.  I mean, I think one of the things here that's

18   really important to distinguish, Your Honor, is that it's

19   again, this kind of point about the world as it is and has been

20   versus, you know -- so to the extent that, you know, one keeps

21   focusing on, like, this is what happened, well, this is what

22   happened with the weak rivals that exist.  So I think that's

23   always an important thing to keep in mind.

24        MR. SCHMIDTLEIN:  Your Honor, I'm handing out what

25   we're going to mark as DXD41.020.

1    BY MR. SCHMIDTLEIN:

2    Q.  Now, put this up.

3         Professor Whinston, I've handed you what we've marked as

4    DXD41.020.  Do you have that in front of you?

5    A.  I do.

6    Q.  And this is StatCounter general search engine shares and it

7    goes all the way back to 2009.  Do you see that?

8    A.  I do.

9    Q.  And in your prior testimony and then here again today and

10   just a moment ago you keep talking about how, well, you have to

11   go back in time; you have to go back in time and imagine and

12   look at how things might have been.  How far back in time did

13   you look at events in this case?

14   A.  I mean, I certainly have written about evidence that -- you

15   know, my assignment was to study from 2014 on.  I certainly

16   have talked about evidence that was prior to 2014, but I didn't

17   form opinions about prior to 2014.

18   Q.  Okay.  And you're aware that Google has had -- has been the

19   leading search engine in the United States for a time period

20   long preceding 2014, correct?

21   A.  Correct.

22   Q.  And you've never, ever in this case tried to go back and

23   distinguish between conduct that occurred in some earlier time

24   period, where Google supposedly didn't have substantial market

25   power, versus conduct when Google did acquire substantial

1    market power?

2    A.  I think the effects can be different.  The same conduct,

3    the effects can be different.  But I've -- you know, as I've

4    said several times, you know, my opinions are about 2014 and

5    beyond.

6    Q.  You've offered no opinion in this case that Google acquired

7    substantial market power through exclusionary conduct, correct?

8    A.  I have not.

9    Q.  And you've offered no opinion in this case as to when

10   Google first supposedly possessed substantial monopoly power,

11   correct?

12   A.  Correct.

13   Q.  And because of that, you've not been able to conduct any

14   before-and-after analysis to assess the competitive effects of

15   any conduct that you've considered in this case?

16   A.  Yeah, I think before and after is not a thing in looking at

17   Google.

18   Q.  Well, it's certainly not a thing you did for Google,

19   correct?

20   A.  And, therefore, it's also not a thing that I did.  Yes, I

21   agree.

22   Q.  You did not set forth in your expert reports in this case

23   any analysis of whether a smartphone preloaded with a search

24   engine other than Google would mark that smartphone more

25   competitive with Apple's iPhone?

```
1    A.  I'm sorry, could you just repeat the question?

2    Q.  Sure.  You did not set forth in your expert reports in this

3    case any analysis of whether an Android smartphone preloaded

4    with a search engine other than Google would make it more

5    competitive with Apple's iPhone?

6    A.  Sorry, you said other than Google, so --

7    Q.  Right?

8    A.  What we're comparing is pre-installation of a rival without

9    Google versus a phone with just Google --

10   Q.  Correct.

11   A.  -- that a comparison?

12   Q.  Correct.

13   A.  No, I haven't.  Although, I think, given the current

14   situation, you know, the Google phone would be more desirable.

15   Q.  You're saying a Google phone with a rival search --

16   A.  No, no.  I have certainly, many times, said I think right

17   now Google is a stronger search engine.  So it's -- what I'm

18   saying is consistent with that.

19   Q.  And that's been the case going back as far as you've looked

20   at the conduct in this case, to 2014, correct?

21   A.  Correct.

22   Q.  And you've not done any analysis of whether an Android

23   device with a choice screen on it would make that device more

24   or less competitive with an iPhone, correct?

25   A.  I certainly did not do any analysis of that in my reports
```

1    or anything else.  You know, I've --

2    Q.  Let me be clear.  For example, in Europe with a choice

3    screen -- where a choice screen has been implemented for

4    several years, various access points on Android devices, you're

5    certainly not offering an opinion in this case that those

6    devices with those choice screens have competed more

7    effectively with Apple's iPhone than before the choice screens

8    were implemented, correct?

9    A.  So, I have looked more recently at, like, using -- you know

10   just going on StatCounter and looking at what Android shares

11   are.  I know, Your Honor, you have asked several times about

12   things in Europe after the choice screen and the like.  So I

13   was kind of curious about this.  So, you know, it is -- when I

14   looked at that StatCounter -- and it's not a complete analysis,

15   but I can just say what the shares are because you asked me.

16   So, you know, in -- if you look over the five years, 2018 to

17   2023, in the U.S. Android fell -- I mean, I think you've heard

18   testimony that Android shares have been falling -- fell like

19   around 9 percent.  In Europe they only fell about 8 percent.

20          So, like, you know, if you're comparing Europe to the

21   U.S., Europe had the choice screen, it didn't fall as much.

22   But, you know, at some level I wouldn't expect to see a lot in

23   Europe because almost everyone is choosing Google still.  So

24   for the reasons we've talked about several times, the choice

25   screen, in the short run, hasn't had a big effect.

```
 1              If you look in Russia, actually Android market share
 2      has gone up 4 percent in that time.  So, you know, in Russia --
 3      and again, I don't want to make too big -- it's just literally
 4      saying what the share changes have been.  You know, the choice
 5      screen was very significant in Russia, it reversed Android --
 6      you know, the market shares on Android from Google being
 7      60 percent -- I hope -- maybe I shouldn't have said -- sorry.
 8      If I said something I shouldn't have said, I apologize.
 9              From Google having -- you know, basically reversed
10      market shares, as you saw when we talked about it, between
11      Google and Yandex.  So it was a very significant change in
12      Russia.  And actually Android phones have gained share in
13      Russia.  So is that causal?  You know, I don't want to make too
14      big a point, but since you raised it, you know, that's what
15      happened.
16              MR. SCHMIDTLEIN:  May I approach?
17      BY MR. SCHMIDTLEIN:
18      Q.  I've marked DXD41.008.  Are these some of the statistics
19      you were referencing about Android in Europe?
20      A.  I don't know because there's no data source listed here.
21      But it's the kind of -- I mean, I --
22      Q.  If you look right in the middle it says StatCounter.
23      A.  Oh, I'm sorry, it's in the -- whatever the digital water
24      mark is.  Apologies.
25      Q.  Yep.
```

1    A.  So, you know, I did go on and I looked at what the change

2    was -- I think you have roughly, not quite -- I did I think

3    from 2018 and, yeah, it's going down.  The U.S., where there

4    wasn't a choice screen, went down more.  And Russia, where

5    there was a significant choice screen, went up.  So that's

6    what -- you know, if you want to put this in perspective,

7    that's how I would do it.

8    Q.  Android's market share in Europe is higher, correct?

9    A.  Yeah.  So it's a very different situation in U.S. -- U.S.

10   compared to Russia and compared to the EU, Your Honor.  It's

11   almost a reverse.  So Android in both the EU -- you can see

12   here, in the EU has, you know, 60 percent, 64 percent,

13   70 percent share of operating -- of carrier -- sorry, of

14   smartphone phone -- phones.  That was bad English.  But, of

15   smartphones.  Similarly, in Russia, the same kind of thing.  In

16   the U.S. it's not exactly the reverse, but Apple has a bigger

17   share than Android in the U.S.

18             THE COURT:  This is Android versus iOS comparison?

19             MR. SCHMIDTLEIN:  Yes.  I know the ledger is small.

20   The top line is Android and bottom line is iOS.

21             THE COURT:  I figured.  I just saw the OEM carrier

22   names down here.  But, I got you.  Oh, I see, there's also a

23   very small -- lines that are not noticeable.  I thought that

24   was the X axis.

25   BY MR. SCHMIDTLEIN:

1    Q.  You're not offering an opinion that the Russian smartphone

2    market is comparable to the United States smartphone market,

3    are you?

4    A.  I haven't studied it and I haven't studied the European one

5    either in detail.  So all I'm doing -- you brought up this

6    question about what was happening with market shares and I was

7    just telling you what happened.

8    Q.  Do you agree that the browser market in the United States

9    is a very competitive market?

10   A.  Again, I haven't studied the browser market.  Obviously,

11   Chrome has an extreme -- a large share of it.  So, you know, I

12   mean, just like before when you asked me about the -- I think

13   you asked me about the smartphone market and I said I haven't

14   studied it.  But I wouldn't agree that it's incredibly

15   competitive, at least just looking at market structure.

16          Like, in the U.S. between Samsung and Motorola it's

17   like 80 percent of smartphone sales.  So, similarly, Chrome has

18   a large share in the U.S.  I haven't studied it.

19   Q.  You haven't studied market shares in the U.S. for browsers?

20   A.  I've looked at them, I'm aware of roughly what they look

21   like, but I haven't studied the browser market per se.

22   Q.  You have not offered an opinion in your expert reports that

23   the Apple Safari browser has monopoly power or substantial

24   market power in any market in the United States?

25   A.  No, I haven't.

1    Q.  And there are many browsers available for consumers to use

2    on iOS devices, correct?

3    A.  Yes.

4    Q.  And --

5    A.  Let me -- again, I haven't studied it, I'm just -- as a

6    layperson, really, saying, you know -- and, of course, having

7    worked on this case, I have some sense of this, that -- the

8    answer is yes.

9    Q.  You would agree that Apple has, for many years, designed

10   the Safari browser for Apple devices to have a single default

11   search engine?

12   A.  So, I guess, for many years it -- I'm not sure whether your

13   question is about whether it has a single default search engine

14   or a single default.  So, let me --

15   Q.  Let me ask it again.

16   A.  Okay.

17   Q.  Apple has, for many years, designed the Safari browser for

18   Apple devices to have a single default search engine?

19   A.  Google has been the default on Apple for quite a while.

20   Q.  And that is how Apple has designed its product, correct?

21   A.  That's what Apple has shipped.

22   Q.  In your expert reports you did not identify any instance

23   where any browser was designed to have multiple default search

24   engines for a user to choose from before they used the browser,

25   correct?

1    A.  Could you just repeat the question?  I'm sorry.

2    Q.  In your expert reports you did not identify any instance

3    where any browser was designed to have multiple default search

4    engines for a user to choose from before they used the browser?

5    A.  Just parsing the question.  Just give me a sec.

6            So, in my expert reports, no, because I was not aware

7    of the Apple desire to have a choice screen on Safari for

8    Windows, so --

9    Q.  You're not an expert in how best to design a browser to

10   meet user needs?

11   A.  Correct.

12   Q.  You've read the testimony in this case from the employees

13   of two browser developers, Apple and Mozilla, correct?

14   A.  Yes.

15   Q.  And the testimony from those executives was they've

16   selected Google to be the default due to Google's search

17   quality, correct?

18   A.  They certainly said things to that effect.

19   Q.  And you've not offered any expert opinion in your reports

20   in this case that Apple's Safari browser would be more

21   competitive against other browsers by using a search engine

22   other than Google as the Safari default, correct?

23   A.  So you're asking me the same kind of question you asked me

24   about Android, that if we use a rival instead of Google?

25   Q.  Yeah.  Would Safari be more competitive if it had chosen a

1    search engine other than Google?

2    A.  I haven't offered that opinion.  And like I said with

3    Android, you know, about your question for Android, I would

4    think not.

5    Q.  You've not offered any opinion in your expert reports that

6    Apple selecting Bing as the default for the Safari browser

7    would have increased total search usage on Safari, correct?

8    A.  Sorry.  Just repeat that question one more time.

9    Q.  You've not offered any opinion in your expert reports that

10   Apple selecting Bing as the default for the Safari browser

11   would have increased total search usage on Safari, correct?

12   A.  So, I think -- you know, there's a distinction here between

13   short run and long run, you know, and --

14   Q.  I'm asking you about the opinions you expressed in your

15   expert reports.

16   A.  Well, the opinion in my expert report wasn't exactly, like,

17   literally about that question, but it certainly was about what

18   effect scale would have on the quality of search engines and

19   the quality of Bing.  So that's why, you know, if Bing got more

20   traffic, its quality would improve.  I don't know exactly where

21   that would end up.  It also might invest more, having

22   distribution, like Mr. Nadella said.  So I'm not -- that's why

23   I'm, you know, not saying yes to that.

24   Q.  Well, you didn't do that -- you did not do any analysis of

25   that sort in your expert reports, correct?

1    A.  Not about that specific question, but I certainly did

2    analysis about the issues that are relevant to it.

3    Q.  Now, you've offered no opinion in your expert reports on

4    the economic cost of a browser having to build and administer a

5    choice screen for the selection of a default search engine?

6    A.  No.

7    Q.  And you've offered no opinion in your expert reports on how

8    a choice screen would impact the amount of revenue share

9    payments a browser would receive from search engines competing

10    for the default?

11    A.  Actually, just repeat that question, if you would.

12    Q.  You've offered no opinion in your expert reports on how a

13    choice screen would impact the amount of revenue share payments

14    a browser would receive from search engines competing for the

15    default?

16    A.  I think it would depend on exactly what the choice screen

17    was and how exactly what -- how competition for it was

18    happening.  But I don't -- I don't think I said anything about

19    that in my reports.

20    Q.  You're aware that Google has not paid Android partners

21    revenue share payments for choice screen selections in Europe

22    and Russia, correct?

23    A.  Sorry, say that question again.  I don't quite know what it

24    means.

25    Q.  You're aware, because you've looked at the choice screens

1    in Europe and in Russia, that Google has not paid either

2    browsers -- I should say, Android partners, when Google gets

3    selected on the choice screen?

4    A.  You mean the act of someone choosing them on the choice

5    screen?

6    Q.  Yes.  Correct.

7    A.  They are still paying revenue share payments.

8    Q.  For being chosen on the choice screen?

9    A.  I don't think right now anyone is paying when they're --

10    you know, a payment when they're chosen.

11    Q.  Correct.

12    A.  But that's different than paying revenue share payments,

13    so --

14    Q.  Google's revenue share payments in Europe have gone down as

15    a result of the implementation of the EC choice screen,

16    correct?

17    A.  No, I wouldn't say that.  I think even Professor Murphy

18    wouldn't say that.

19    Q.  Have you studied that question?

20    A.  No, I --

21    Q.  You haven't offered an opinion on that question?

22    A.  No, I have not.

23    Q.  You talked a little bit about the choice screen in Europe

24    before, and I believe you have testified previously that when

25    an auction was used as part of the EC choice screen, that

```
 1   produced a very negative result, didn't it?
 2   A.  So, I -- well --
 3           THE COURT:  I'm sorry, what do you mean by "negative
 4   result"?
 5   BY MR. SCHMIDTLEIN:
 6   Q.  The auction resulted in very, very poor search engines
 7   populating the choice screen?
 8   A.  Do you want to say what you mean by "poor"?
 9   Q.  Let me see if I can refresh your recollection.
10   A.  I think I probably know what you're talking about, but I
11   just want to make sure.
12   Q.  Let me show you what we've marked as DXD41.039.  This is
13   your testimony from October the 16th, Professor Whinston.  And
14   let me read it into the record.
15           "The result of that was lots of popular search engines
16   like Ecosia or DuckDuckGo that have lower monetization didn't
17   have, like -- it wasn't economic for them to bid and so they
18   didn't get on.  And in fact, there's one of the latest issues
19   of the American Economic Review has a paper talking about this
20   flaw in the choice screen.  So it became widely known that this
21   was a flawed choice screen.  And then starting in the third
22   quarter of 2021 they changed it so that popular -- sorry,
23   popular general search engines would all be on it."
24           Do you see that?
25   A.  I do.
```

1    Q.  The change in 2021 was no more auction, no more payment,

2    right?

3    A.  No more -- not no more revenue share; no more payments to

4    be in the choice screen.  So --

5    Q.  Sir, there were in revenue share payments made by anybody,

6    any of the rivals to Google when they were chosen in the choice

7    screen, correct?

8    A.  I'm not sure, so -- but let me address your question about

9    this -- about the flaw.  So I think, Your Honor, what this

10   was -- just to bring back your -- the discussion.  So, that

11   second choice screen, it was designed by Google, people --

12   people -- general search engines had to bid to get on, and I

13   think we talked about this a little earlier.  And one of the

14   problems was that low monetization search engines who were

15   popular couldn't manage to get on the choice screen.

16        I think, you know, I didn't go into this, but it's --

17   you know, in his testimony Professor Murphy was talking about

18   how good price competition is, that competition for defaults

19   and payments for defaults is a good things because it's price

20   competition.  This actually is showing you one, kind of,

21   downside of it.  That, you know, the popular -- you know, if a

22   distributor -- take the case where a distributor is deciding --

23   you know, an Ecosia that doesn't have much revenue isn't going

24   to actually win.

25        There were many things to possibly talk about with

1    the issues here, but -- and I didn't talk about that as

2    critique of Professor Murphy, but that also is kind of an

3    issue.

4    Q.  Professor, you've not modeled in your expert reports

5    what -- the payments that a general search engine would make to

6    be included on a choice screen implemented by a browser or any

7    Android device manufacturer, correct?

8    A.  I'm sorry, repeat the question.

9    Q.  Sure.  You have not modeled in your expert reports the

10   payments that a search engine would make to be included on a

11   choice screen implemented by a browser or any Android device

12   manufacturer, correct?

13   A.  In my reports I talk -- and like I did today -- I talk

14   about the, you know, what unconditional revenue share payment

15   competition would likely do to revenue share payments.  I did

16   not talk about what choice screen would do.  I have some views

17   on that, but I did not talk about it in my reports.

18   Q.  You've not provided any analysis in your expert reports

19   regarding what impact removing Google from being able to

20   compete through payments for default search would have on

21   browser innovation?

22   A.  I'm sorry, just -- I just want to make sure I get the

23   question correctly.  Can you just repeat it?

24   Q.  You have not provided any analysis in your expert reports

25   regarding what impact removing Google from being able to

10605

1    compete through payments for default search would have on

2    browser innovation?

3    A.  So, the hypothetical that you're asking me about is if

4    Google can't make any payments at all?

5    Q.  Google is not allowed to compete to be the default.

6    A.  Including on conditional revenue share payments or anything

7    else?

8    Q.  However you wanted to frame it.

9    A.  It would depend.

10    Q.  Did the United States tell you to assume a world in which

11    unconditional revenue share payments was allowed?

12    A.  No.  It was what I thought of as a less restrictive

13    alternative to think about for a but-for world.

14    Q.  You've offered no opinions in your expert reports about

15    what the impact would be if Google can't bid to be the

16    exclusive default?

17    A.  Right.  I'm asking you again, so now we're saying they

18    can't do anything?

19    Q.  Correct.

20    A.  No, I haven't.  I mean, I think -- yeah, no.

21    Q.  Have you seen evidence in this case as to whether browser

22    providers believe that preventing Google from competing for

23    browser defaults would have on browser competition?

24    A.  I'm sorry, I'm -- there's just a lot of questions.  Just

25    say it one more time.  And I'm not trying to be difficult.

1       It's been a long road to get to this point.

2       Q.  Have you seen evidence in this case as to whether browser

3       providers believe that preventing Google from competing for

4       browser defaults would have on competition?

5       A.  Again, you're asking me about preventing them entirely from

6       paying anything?

7       Q.  Yeah.

8       A.  I certainly -- I don't remember testimony about that.  I

9       certainly remember testimony about that -- you know, payments

10      from search engines is an important source of revenue for

11      browsers.

12              MR. SCHMIDTLEIN:  May I approach, Your Honor?

13              THE COURT:  Um-hum.

14              THE WITNESS:  Thanks.

15      BY MR. SCHMIDTLEIN:

16      Q.  So, Professor, I've put in front of you DX547.

17          This is in evidence, Your Honor.

18          Professor, have you seen this document before?

19      A.  I don't believe I have, no.

20      Q.  It wasn't on your materials considered?

21      A.  No.

22      Q.  Professor, this is a letter that was drafted less than a

23      month before this lawsuit was filed by counsel for Mozilla to

24      the United States Department of Justice.  Do you see that?

25      A.  I don't think it says anything about Mozilla.  But, I see

```
 1    Crowell and Morning, and I do see it's written --
 2    Q.  Do you see the very first sentence of the very first
 3    paragraph --
 4    A.  I don't know if that was shown before.
 5    Q.  -- "On behalf of Mozilla Foundation"?
 6    A.  I'm sorry I didn't mean to talk over you.
 7    Q.  Do you see the very first sentence?
 8    A.  Yes, now I do.
 9    Q.  And this letter was written after a meeting between counsel
10    for Mozilla and the United States Department of Justice.  Do
11    you understand that?
12    A.  Sorry, maybe I should read this, then.  First sentence,
13    yeah, "Meeting with us on Monday."  So, yes.
14    Q.  And the letter says, beginning in the second sentence, "We
15    appreciated having an opportunity to further explain why
16    consumers and competition in the browser market would be
17    significantly harmed if the U.S. Department of Justice
18    antitrust division brings an enforcement action that prohibits
19    small and independent browser companies, such as Mozilla
20    Corporation, from entering into default search agreements with
21    Google."
22         Do you see that?
23    A.  I do.
24    Q.  And if you go to the second paragraph -- and this has been
25    redacted, Your Honor, at the request of Mozilla's counsel.
```

```
 1            And if you read the first paragraph of that -- first
 2     sentence of that second paragraph, there's no discussion of
 3     allowing Mozilla to enter into unconditional revenue share
 4     payments with Google, correct?
 5     A.  I'm sorry.  Give me a moment to read it.
 6            (Pause.)
 7            I think -- can I -- I'm not sure what I can say in
 8     answering about what it says.
 9     Q.  Let me see if I can pose a question.
10     A.  Okay.
11     Q.  Would you agree that in this letter counsel for Mozilla is
12     expressing great concern about the viability of Mozilla if it
13     is not allowed to enter into a default search engine agreement
14     with Google?
15     A.  I do see that.  I don't see anything about the issue that
16     you were discussing with me, which is whether Google can make
17     payments.  But maybe it's further on, I don't know.  I haven't
18     read the whole thing yet.
19            THE COURT:  Mr. Schmidtlein, why don't we move on.  I
20     can read this just as well as he can.
21     BY MR. SCHMIDTLEIN:
22     Q.  Just so we're clear, Professor, the United States
23     Department of Justice did not give you that letter to consider
24     as part of your analysis in this case, is that right?
25     A.  I haven't seen this letter before.  So, you know, it's
```

1    always possible that it was sent to me or my team and I haven't

2    seen it, so I don't want to say that categorically.  But I

3    haven't seen it, that's all I can tell you.

4    Q.  Now, you've opined that the challenged agreements have

5    hindered rivals' incentives to invest to improve the quality of

6    their search engines, is that right?

7    A.  Yes.

8    Q.  The European choice screen that we've been talking about,

9    that was announced in 2019, is that right?

10   A.  It depends on what you mean by "that was announced."  You

11   know, there were several versions.  The first version wasn't

12   really a choice screen, it was, you know, something about the

13   ability to download an app on your phone.  So, I'm not sure

14   exactly how to answer you.

15   Q.  Well, you're aware there's been a choice screen implemented

16   in Europe since 2020, correct?

17   A.  In -- hopefully get the date right.  I think second

18   quarter -- I think since April 2020, was when that auction

19   version of the choice screen started.

20   Q.  And the revised choice screen with no auction, no payments

21   was in September 2021?

22   A.  Correct.

23   Q.  And have you identified in your expert reports any evidence

24   in the record in this case of Microsoft or Yahoo! or DuckDuckGo

25   increasing their investments to improve search quality in

```
 1    Europe as a result of the choice screen implementation?
 2    A.  No, the only evidence I've seen was about Google, the Go
 3    Big in Europe.
 4    Q.  Right.  Google went big in Europe but when the choice
 5    screen got implemented, Bing didn't go big in Europe, did they?
 6    A.  I can't say that.  All I'm saying is, you know, the one
 7    piece of evidence that I have is about Google.  I haven't seen
 8    evidence that others didn't do things.
 9    Q.  Google increased marketing in Europe, correct?
10    A.  They increased marketing.  They also increased content and
11    the things we talked about and the things I describe in my
12    reports.
13    Q.  Did you see evidence of Microsoft going big in Europe?
14    A.  I'm already saying to you, I haven't seen that Microsoft
15    did not do things.  But, I haven't -- you know, I certainly,
16    you know, relative -- well, let me just stop there.
17            You're handing me something, and then we can continue
18    the discussion.
19            MR. SCHMIDTLEIN:  May I approach, Your Honor?
20    BY MR. SCHMIDTLEIN:
21    Q.  Professor Whinston, did you review Mr. Parakhin's testimony
22    in this case?
23    A.  I have looked at Mr. Parakhin's testimony.
24    Q.  Let me just read into the record here an excerpt.
25            "In terms of Europe reference, that was exactly the time
```

1    and that was very widely discussed.  When Google introduced

2    voluntary and a choice screen in Europe, and there was a big

3    discussion in the team whether Bing should participate.  My

4    opinion, that we shouldn't.  It was not -- at least in my

5    opinion back then, it was that it was more of a marketing

6    ploy."

7          Do you see that?

8    A.  I do.  I guess I would have to go back to the testimony and

9    look at around it or something, if there's anything said about

10   also what choice screen he's referring to.

11   Q.  You haven't seen -- did you look for evidence in the record

12   as to whether Microsoft increased investments to improve

13   quality once a choice screen was implemented on Android in

14   Europe?

15   A.  I did not actively look for evidence about that.

16   Q.  Did you look for evidence for DuckDuckGo or Yahoo! on that

17   point?

18   A.  No, I did not.  I can say something about Russia -- you

19   know, I know something about Russia and what happened, but I

20   don't know what --

21   Q.  Well, Microsoft certainly didn't increase investments to

22   improve in Russia.

23   A.  No, but Yandex did.

24   Q.  You're not comparing Yandex to Bing, are you?

25   A.  No, I think Yandex is stronger.

1    Q.  Much stronger, correct?

2    A.  Yeah.

3    Q.  And in fact, as part of the settlement in Russia, the

4    Russian authorities ordered Google to reach a settlement to

5    negotiate directly with Yandex how to effectuate the remedy in

6    that case, isn't that right?

7    A.  I don't know the details of how Russia arranged what the

8    remedy would be.

9    Q.  In 2021, the Russian government implemented a law that

10   required people to carry Russian apps on devices.  Were you

11   aware of that?

12   A.  Yep.  Now, that's in 2021.  The --

13   Q.  Right.

14   A.  -- choice screen -- the remedy was well before that.

15   Q.  Right.  Do you think that the conditions in Russia, the

16   efforts to -- from a regulatory perspective -- interfere with

17   competition in Russia, were either greater or the same as other

18   jurisdictions?

19   A.  You know, I'm not a fan of Russia, you know, so -- but my

20   answer, sitting here, is I don't know.  I haven't studied that.

21   I haven't compared it to the EU.  But I'm not saying Russia is

22   a paradigm of democracy and openness.

23   Q.  DuckDuckGo didn't increase any of its investments in Europe

24   after the choice screen either, correct?

25   A.  I can't say that.  I don't know.

10613

1    Q.  DuckDuckGo -- all DuckDuckGo did in Europe was engage in

2    lobbying efforts complaining about the choice screen, correct?

3    A.  I can't -- I mean, you're making statements.  I don't

4    know -- so, I'm not sure.

5    Q.  Did you study in this case the data around how frequently

6    DuckDuckGo was selected on the choice screens in Europe?

7    A.  I mean, it was certainly part of looking at the choice

8    screen shares, but I don't remember what the -- you know, what

9    the numbers were.

10   Q.  In your report you compared market shares in Europe for

11   non-Google search engines with choice screen selections in

12   Europe, correct?

13   A.  What I -- I think what you're referring to is when I looked

14   at the relationship between prior strength, you know, captured

15   by market share, and what the choice screen selections were.

16   Q.  And you saw that there was a relatively small bump up in

17   choice screen selection percentages versus market shares,

18   correct?

19   A.  Are you -- so that's a different thing.  I think, you know,

20   that's different than the analysis that I was just describing

21   to you.

22           So, Your Honor, Professor Murphy showed a graph when

23   he testified, like to try to say that, oh, there was choice

24   screen selections.  But you don't see anything at all in

25   changes in usage shares.  It was a very -- excuse the

1    expression, it was a very misleading graph because the choice

2    screen was rolled out -- you know, basically happened right

3    away, but it would only start being used for new devices.  And

4    so, you know, five minutes after the choice screen starts,

5    you're not going to see any change in query shares because

6    almost no one has chosen -- has made choices, so -- and, you

7    know, he's showing some -- in that figure, you know, I'm

8    remembering it, but it was in his report as well and I

9    critiqued it then.

10            He shows the choice screen share jumping up with the

11   introduction of the third version of the choice screen and he

12   shows -- sorry, keep doing this -- a flat line of query shares.

13   But it's just uninformative because of what I just said.

14   Q.  You've not offered an opinion -- you haven't gone back and

15   actually looked at what usage -- how usage compares with choice

16   screen selections?

17   A.  Well, I did some work to critique Professor Murphy.  I

18   haven't done work -- anything since then.

19   Q.  You know that in fact the choice screen selections for

20   non-Google search engines does not perfectly correspond with

21   actual usage by those search engines?

22   A.  It certainly doesn't perfectly correspond.  You know, I

23   think one of the things, when I looked at this, I found was

24   there's also a relation in that with how strong the search

25   engines are.  So, actually, like Seznam in the Czech Republic

1    very much did.  But it's in my rebuttal report.  I think it's

2    rebuttal, not reply.

3                    MR. SCHMIDTLEIN:  May I approach, Your Honor?

4    BY MR. SCHMIDTLEIN:

5    Q.  Professor, I've handed you what's been marked as DXD41.021.

6    This pertains to the DuckDuckGo EU choice screen results and it

7    provides data on share of selections with choice screen -- and

8    this is after the new choice screen has been put in place --

9    versus Android usage of DuckDuckGo and then mobile usage

10   generally in StatCounter.  Do you see that?

11   A.  I do.

12   Q.  And those statistics are consistent with numbers you've

13   seen, correct?

14   A.  I haven't looked at -- I mean, studied -- I don't -- sorry,

15   I'm just trying to make sure I answer your question accurately.

16              I'm trying to remember what -- exactly how late the

17   data was that I was able to look at when I critiqued Professor

18   Murphy on this point.  So I don't remember about where it fell

19   relative to March 2022.  I certainly didn't have anything that

20   I did related to August of 2023.

21   Q.  You certainly don't have any bases to opine and you

22   certainly didn't opine in your expert report that the choice

23   screen has resulted in a material increase in usage of

24   DuckDuckGo in Europe?

25   A.  No.  I mean, I don't think I could have possibly really had

1    any evidence on that.  So, you know, the choice screen was

2    implemented and -- you know, that third choice screen was

3    implemented in 20 -- as you said, third quarter of 2021, and

4    it's only as new phones start getting bought that the phone --

5    you know, that choice screen is presented.  So, you know, that

6    is something that kind of rolls through the population

7    gradually.

8    Q.  Android has --

9              THE COURT:  Sorry.  Can you just -- I'm not following

10   what the second and third columns represent and whether they're

11   related to DuckDuckGo at all.

12             MR. SCHMIDTLEIN:  These are all DuckDuckGo numbers,

13   Your Honor.

14             THE COURT:  So in other words, this is the impact

15   on --

16             MR. SCHMIDTLEIN:  I'm sorry.  The second one is

17   DuckDuckGo market share, if you will, on Android devices.  And

18   the third is mobile usage more broadly.  In other words, a

19   StatCounter across all mobile devices.

20             THE COURT:  In terms of query share?

21             MR. SCHMIDTLEIN:  In Europe, that's correct.

22             THE COURT:  Okay.

23             THE WITNESS:  So, Your Honor, the point I was making,

24   which was about Professor Murphy's -- what Professor Murphy

25   said also applies here, that, you know, take Android usage in

```
 1    March 2022, that's six months after the third choice screen,

 2    you know, was implemented.  And, you know, in my -- when I

 3    critiqued Professor Murphy I had data on, like, what's the

 4    number of smart -- of Android phones that are new.  Android

 5    phones, you know, month by -- I think it was month by month,

 6    maybe it was quarter by quarter, going forward from that date.

 7    And, you know, it's a -- it's not that big a share.  It varies

 8    by country, but it's not that big of share of the existing

 9    stock of smartphones.  So it's only going to slowly, over time,

10    have an overall effect.

11    BY MR. SCHMIDTLEIN:

12    Q.  But the numbers here don't show any effect?

13    A.  Well, I don't know if they show any effect because you

14    have -- you know, I don't see a comparison to before.  Right?

15    You're showing me --

16    Q.  We've got on this -- we've got an uptick attributed to the

17    choice screen.

18    A.  Sorry.  The numbers on the right you're saying are gains in

19    usage or levels of usage?

20    Q.  Number on the left is share of selections.

21    A.  Um-hum.  What about the ones on the right?

22    Q.  That's actual usage.  The actual usage numbers are lower

23    than the choice screen selections.

24    A.  Oh, but that wasn't what you asked me.  You asked me if the

25    choice screen had an effect on usage.  To do that I would have
```

1    to compare it to prior usage.

2    Q.  And you haven't done that?

3    A.  No, because I haven't seen these numbers before.

4    Q.  Now, at the same time -- let me just back up.  As we've

5    looked at before, Android's market share in Europe is much

6    larger than in the U.S., right?

7    A.  Yes.

8    Q.  It's almost flipped in terms of Apple versus Android,

9    Europe versus the U.S., right?

10   A.  That's what I was saying earlier.

11   Q.  And so from an investment incentive standpoint, Android is

12   to Europe what Apple is to the U.S., right?

13   A.  I think you're going to break that question down, or tell

14   me what you mean.

15   Q.  In terms of queries, in terms of share of usage, Android is

16   a big potential place to pick up queries in Europe?

17   A.  If you're saying something about Android versus Apple?  If

18   you're saying -- I don't know whether the comparison in your

19   question --

20   Q.  Android --

21   A.  Let me just finish, if you would, just to clarify.

22           I'm not sure whether the comparison in your question

23   is Android versus Apple or is about Europe versus U.S.?  So I'm

24   just not sure how to answer you.

25   Q.  The point I'm making is Android is a very large platform in

```
 1    Europe, correct?
 2    A.  So, within Europe Android is a large platform.  It's larger
 3    than Apple.
 4    Q.  It's the leading platform in Europe, correct?
 5    A.  For mobile phones, yes.
 6    Q.  Okay.  And so from an incentive to invest perspective, it's
 7    the single largest platform to try to gain mobile queries,
 8    correct?
 9    A.  The single largest platform within what?
10    Q.  Europe.
11    A.  Oh, Europe, yes.
12    Q.  And notwithstanding that choice screens are being put on
13    Android devices in Europe, the number one platform for mobile
14    queries in Europe, you saw no evidence of increased investments
15    by Microsoft, DuckDuckGo, or Yahoo! for Europe, right?
16    A.  In terms of seeing, yes.
17    Q.  Now --
18    A.  Again, I just want to clarify, that's -- and again repeat,
19    that's -- I'm not saying I saw evidence that they didn't.  I
20    just didn't see evidence.
21    Q.  Now, at the same time that Microsoft was complaining about
22    the choice screen in Europe, you saw Mr. Parakhin's testimony
23    complaining about the choice screen and saying we shouldn't
24    participate in the choice screen?
25    A.  You're referring to the test --
```

```
1    Q.  Correct.

2    A.  Within Microsoft complaints --

3    Q.  Correct.

4    A.  -- that's what you mean?

5    Q.  Correct.  Microsoft was telling Apple:  You should make

6    Bing the default search engine for Safari.

7    A.  Okay.

8    Q.  And even though Bing search quality in Europe was very,

9    very poor, correct?

10   A.  I'm sorry, I don't understand what you're asking me.

11   Q.  Do you know what Bing search quality in Europe was in 2019?

12   A.  I think Bing's quality in Europe is substantially worse

13   than it is in the U.S.

14   Q.  Okay.  So at the same time that Mr. Parakhin was

15   uninterested in investing to improve Bing's search quality in

16   Europe to compete for this choice screen, he was telling Apple,

17   no, no, you should use Bing because we're good enough for

18   Europe.

19   A.  Oh, because we're -- I didn't -- it's this last thing that

20   you didn't say before, that, you know -- not that he was saying

21   it about the U.S. specific -- users in the U.S., that you

22   should use us in the world --

23   Q.  Use us all over.

24   A.  Okay.  My recollection -- just give my a moment, I'm just

25   trying to remember some things I've seen in the record.
```

1          So my recollection is that Microsoft tried to get a

2     U.S.-only deal.  But, I don't --

3     Q.  Based on what evidence, sir?

4     A.  I don't remember what I read.

5     Q.  Nothing you've read in the trial record in this case.

6     A.  Well, I'm not just referring to the trial record and

7     testimony.  So, I'm referring to things that I'd seen earlier.

8     But I don't know -- in terms of, like, your statement that in

9     2019 they were saying, you know, you should use us in Europe,

10    we're good enough in Europe, I'm not sure about that.  I don't

11    know.

12    Q.  Now, you've not cited any evidence in your expert reports

13    of any search provider ever agreeing to an unconditional

14    revenue share agreement, correct?

15    A.  To be -- sorry, any -- say that one more time.

16    Q.  You've not cited any evidence in your expert reports of any

17    search provider ever agreeing to an unconditional revenue share

18    agreement?

19    A.  In my expert reports?  No, I don't think I did.

20    Q.  You've not cited any evidence in your expert reports of any

21    search provider proposing to a browser developer or Android OEM

22    or a carrier entering into an unconditional revenue share

23    agreement, correct?

24    A.  Well, I think I was saying earlier that the default -- my

25    understanding has been the default change menus are paying

1    revenue shares.  So that's what I was saying earlier.

2    Q.  Those aren't unconditional revenue share payments?

3    A.  So say -- what are you saying?

4    Q.  The agreements, the secondary promotion agreements, is that

5    what you're referring to?

6    A.  Yeah, that is what I was referring to.

7    Q.  Those agreements all specifically provide for particular

8    promotion and particular placement, correct?

9    A.  So, what I said a moment ago, what -- my understanding and

10   the way I have thought about those agreements and what I said

11   earlier this morning, was in terms of those agreements paying

12   revenue share, you know, unconditionally for things that came

13   from the default, sitting here now, I'm trying to remember if

14   I've read those agreements, and I'm not sure I have, so --

15   Q.  You haven't even read the agreements, have you?

16   A.  The secondary ones, I'm not sure if -- I don't remember,

17   you know.

18   Q.  You didn't cite them in any of your expert reports as

19   examples of unconditional revenue share agreements, right?

20   A.  No, I did not.

21   Q.  You made that up today for the first time, right?

22            MR. SEVERT:  Objection.  Argumentative.

23            THE COURT:  Sustained.  Let's move forward.

24   A.  So, you know, I didn't make it up for the first time.  It's

25   been my understanding that that's how they were.  I didn't say

1    anything about it in the reports, I agree with that.  But I'm

2    also -- you know, if I'm -- I can't say that I specifically --

3    sitting here now, I can't say that I specifically remember,

4    like, looking at one of these agreements and seeing exactly how

5    it was structured.  And so I think that's a fair point.

6    BY MR. SCHMIDTLEIN:

7    Q.  So it's fair to say that not having read the agreements and

8    not having understood what the requirements of the agreements

9    are, you can't call them unconditional revenue share

10   agreements?

11   A.  I'm not saying that I haven't read them.  I'm saying I

12   don't remember whether I did -- I mean, I've been doing this

13   now for four years, so it's been a long time.  I've read a lot,

14   a lot of documents, a lot of contracts.  So I'm not -- I think

15   it's a fair point.  And I feel, like, relative to what I said

16   this morning, I think, you know, I can't confidently, without

17   going back and looking at these things, say whether it's fully

18   unconditional or not.

19            I can say that, you know, I think at some level, you

20   know, Google's the only firm of these general search engines

21   that just says no revshare unless I'm the exclusive default.

22   But that's a different issue.

23   Q.  Have you read Microsoft's jump start agreements?

24   A.  I've seen their agreements.

25   Q.  Jump start agreements are the Microsoft agreements with

1    Windows PC OEMs, correct?

2    A.  Yes.

3    Q.  Are those unconditional revenue share agreements?

4    A.  No.

5    Q.  Do you know whether Microsoft, in its negotiations of those

6    agreements, offered to do unconditional revenue share

7    agreements?

8    A.  I don't know.

9    Q.  You wouldn't expect them to, would you?

10   A.  I don't have an expectation, I'm just -- I'm telling you

11   whether I know it; I don't.

12   Q.  You don't know whether Windows PC OEMs asked for

13   unconditional revenue share agreements from Microsoft, do you?

14   A.  No.

15   Q.  And did you review Yahoo!'s agreement with Mozilla?

16   A.  I have seen it.

17   Q.  Was Yahoo!'s agreement with Mozilla an unconditional

18   revenue share agreement?

19   A.  No.

20   Q.  You've not offered any opinions in this case in your -- in

21   the expert reports that Google ever would have agreed to enter

22   into an unconditional revenue share agreement with any browser

23   developer or Android OEM or carrier?

24   A.  Sorry.  I think I missed some of your question because I

25   was sipping water.  I apologize.

1    Q.  You've not offered any opinions in your expert reports that

2    Google ever would have entered into an unconditional revenue

3    share agreement with any browser developer or Android OEM or

4    carrier, correct?

5    A.  By "ever would have," do you mean --

6    Q.  You've not offered any opinions in your reports that Google

7    ever would have agreed to enter into an unconditional revenue

8    share agreement with a browser developer or Android OEM or

9    carrier, correct?

10   A.  I mean, I certainly am thinking about that as a but-for

11   world that, you know, could have been what they did if they

12   couldn't be using exclusive contracts.  So in that sense, I

13   certainly was considering that.

14   Q.  You haven't modeled any but-for world in which an

15   unconditional revenue share agreement is the only thing

16   available to Google, correct?

17   A.  No, what I was referring to -- sorry, I shouldn't say -- I

18   think the record won't be clear on that.  So let me retract

19   that, start that answer.

20             When I described what the literature -- the models

21   that the literature has looked at of the effects of

22   unconditional pricing or, you know, I mean, this -- applied

23   here, unconditional revenue share payments versus competition

24   for exclusive, those are models in which the papers, the

25   authors are studying what the effect is of that competition.

1    Q.  The literature you're referring to is a single article,

2    correct?

3    A.  No.

4    Q.  The Zenger article?

5    A.  No, it's also a much older paper by Mathewson and Winter.

6    Q.  Is that cited in any of your expert reports?

7    A.  I believe it is, yes.

8    Q.  I'll have to get you to show that to me because I don't

9    believe it is, sir.

10            THE COURT:  Mr. Schmidtlein, let's move forward.  I

11   think we're descending into details here that are not doing

12   anybody very much good.

13   BY MR. SCHMIDTLEIN:

14   Q.  You reviewed the evidence of what Microsoft offered to

15   Apple in various negotiations over the years, correct?

16   A.  I did.

17   Q.  And did Microsoft ever offer to Apple an unconditional

18   revenue share payment?

19   A.  I mean, I saw information about what they were offering in

20   terms of the amount of the revenue share.  I don't remember

21   seeing, like, a draft contractor anything, so I can't really

22   say.

23   Q.  You're not aware of Microsoft ever saying that it would be

24   amenable to entering into an unconditional revenue share

25   agreement with Apple?

1    A.  No.  But on the other hand, you know, if Google is only

2    willing to offer, you know, an exclusive, it doesn't matter

3    whether Microsoft is doing it conditional or unconditional

4    because it's still all or nothing.

5    Q.  One of the prerequisites or one of the requirements for

6    your supposed model -- by the way, you haven't modeled what any

7    revenue share payments specifically would have been for any

8    contract under unconditional revenue share in any of your

9    reports, right?

10    A.  Do you mean modeled, like a quantitative model?  Is that

11    what you mean?

12    Q.  Correct.  You haven't gone back and looked at -- knowing

13    now what the terms of the actual deals were for all these

14    agreements that you had access to over all the years, you

15    didn't go back and you didn't say, okay, I'm going to take my

16    unconditional revenue share model and I'm going to apply it to

17    any individual deal and say this is what would have happened

18    under unconditional revenue share versus what happened in

19    exclusive, according to you?

20    A.  No, I haven't.  You know, the thing is, it also -- the

21    evidence was -- rather than me sitting here for a while

22    thinking about exactly, you know, the components of different

23    models, let me just say no.

24    Q.  One of the requirements for this model that you've cited to

25    is that the agreements are total exclusivity, right?  A

1    take-it-or-leave-it, total exclusivity agreement, right?

2    A.  You're referring to the Zenger article?

3    Q.  Yeah.

4    A.  Yes.

5    Q.  And default search agreements like the Apple agreement are

6    not take-it-or-leave-it, all-or-nothing exclusive deals,

7    correct?

8    A.  They are take-it-or-leave-it exclusive deals about the --

9    you know, the default.  But I agree that they are not -- you

10   know, you don't get zero in that --

11   Q.  Right.

12   A.  -- event.  So that is different, yes.

13   Q.  Right.  Right.  You talked about the potato chips, right,

14   this morning?

15   A.  I did.

16   Q.  And the hypothetical you talked about with the potato chips

17   was the dominant or the most popular potato chip manufacturer

18   saying I will only do a deal with me (sic) if you make me the

19   exclusive potato chip in the entire store, right?

20   A.  That is correct.

21   Q.  So if the person walks into that store, the only potato

22   chip they'll find or be able to buy is the dominant firm's

23   potato chip?

24   A.  In that example, yes.  I was trying to illustrate, kind of,

25   how these things are different.

1    Q.  Right.  And if I have an Apple iPhone, I can buy any -- I

2    can get any potato chip I want, right?

3    A.  Things are really going somewhere now.

4    Q.  Yeah, to use your analogy.

5            THE COURT:  I'm not sure it's in the right direction.

6    BY MR. SCHMIDTLEIN:

7    Q.  Professor, you understand that we showed you the chart last

8    time, the pie chart that showed -- and His Honor made reference

9    to it earlier today -- that showed the percentage of search

10   queries on an Apple device that went through the default that

11   you claim is part of your coverage, your Super Duck coverage

12   number, and then all that other part of the pie chart that

13   didn't come through that default, right?

14   A.  I mean, you're holding your fingers really close together,

15   but the reality is not really close together.  And foreclosure

16   is what it is.  I mean --

17   Q.  It's not a complete take it or nothing -- all or nothing

18   exclusive, right?

19   A.  I agree that there -- certainly that's the whole point of

20   the range of the foreclosure range, because --

21   Q.  But it --

22   A.  -- it's not.

23   Q.  I'm sorry, go ahead.

24   A.  That's all I'm saying.  Going back to the potato chips, I

25   agree that it isn't that this potato chip manufacturer -- you

1    know, the dominant firm, this other firm is completely out of

2    the store, there's no way for anyone to ever get it, no matter

3    what.  But it still would be the same basic points if people

4    could go to, you know, travel to other stores or if the

5    alternative was it was not an exclusive over the whole store,

6    but it was an exclusive over, you know, the end caps and all

7    the eye level things and, you know, this other manufacturer

8    would be in the back of the store, on the bottom shelf in the

9    corner.  So the same kind of points would apply.

10   Q.  But that's not what the article you cited to talks about.

11   It talks about an all-or-nothing offer from the dominant firm.

12   A.  I understand.  But, you know --

13   Q.  Google did not say --

14            MR. SEVERT:  Objection to the form of the question.

15            THE COURT:  Well, let's also move on.  The article is

16   not even in front of me.

17   BY MR. SCHMIDTLEIN:

18   Q.  You've not evaluated how Yahoo! tries to differentiate

19   itself from Google, have you?

20   A.  Yahoo! specifically?  In terms of, like, its, you know,

21   content that it offers and things like that?  I mean, I'm

22   vaguely aware of it but I haven't studied it in detail.

23   Q.  You've certainly not offered an opinion that Yahoo! has

24   distinguished itself from --

25   A.  Can I just pause for a second?  Because things are coming

1    up on my screen, including a picture video of me and things

2    like that.  I don't know whether you want that to or not.  Zoom

3    meeting ID, things like that.

4              THE COURT:  It's nothing to worry about.

5              THE WITNESS:  Okay.  All right.

6    BY MR. SCHMIDTLEIN:

7    Q.  You've certainly not offered an opinion that Yahoo! search

8    quality either on search results or search ads are superior to

9    Google's, right?

10   A.  Correct.

11   Q.  And you've not offered any expert opinion in this case that

12   Yahoo! or Bing has tried to differentiate itself from Google

13   based on privacy?

14   A.  I think in my initial report I had some discussion of Bing

15   thinking about privacy as possibly an angle it differentiate

16   itself.  I have to go back and double check, but I think I did

17   have something about that.  But that's different than saying

18   I've studied exactly what they've done.

19   Q.  You've certainly not offered any opinions in your expert

20   reports that Bing has tried to offer superior search privacy to

21   Google, correct?

22   A.  Well, that was the -- I think the idea, they thought that

23   might be a hook to attract users.  That was what I think I

24   wrote about, but --

25   Q.  You haven't offered an opinion as to whether they followed

1    through with any such initiative, correct?

2    A.  Correct.

3    Q.  You haven't offered an opinion -- you certainly haven't sat

4    down and tried to offer an opinion that Bing's privacy features

5    are superior to Google's privacy features for Search, correct?

6    A.  Correct.

7    Q.  Now, you've testified that if a rival developed a search

8    engine that was --

9    A.  I'm sorry, could you start over?  I missed the beginning of

10   your sentence.

11   Q.  You've testified that if a rival developed a search engine

12   that was superior to Google's, the rival would, nonetheless, be

13   foreclosed from 33 percent of the market due to Google's

14   default agreements, is that correct?

15   A.  So what I said is, you know, if you became -- I mean,

16   again, I'm sorry about the Super Duck term.  It's hard to get

17   it out of your head once it's there.  What I said is that if

18   the rival became as much better as Google now is to rivals,

19   that -- which I regard as kind of implausible.

20          So, like, the idea was I was trying to come up with a

21   lower bound, like, you know, foreclosures -- you know, the

22   amount tied up, the foreclosure level is at least this amount

23   because we're not going to, in any foreseeable reasonable

24   future, see someone that much stronger than Google.  And, so,

25   that's what I was saying was the 33 percent, you know, the

1   33 percent number, so --

2   Q.  Now, that hypothetical --

3   A.  I should say, if you were less strong than that, the

4   foreclosure would be greater.  So that's what I meant by saying

5   it's a lower bound.

6   Q.  That 33 percent figure in that hypothetical that you sort

7   of testified to about earlier today and in your earlier

8   testimony, that hypothetical was never disclosed in your expert

9   reports, correct?

10  A.  So, the -- you know, the specific description of that

11  wasn't, but the 33 percent foreclosure number, that was there

12  and the discussion -- there was a discussion of it there.

13  Q.  You never offered a hypothetical world in your expert

14  reports of a superior rival, a rival who was more superior to

15  Google as Google is superior to the rest of the firms in the

16  market today, being foreclosed to 33 percent of the market,

17  correct?

18  A.  What I used, what I did is I used the information of what

19  Google said its recovery would be.

20  Q.  Sir, I'm asking you a very specific question about what was

21  in your expert reports.

22  A.  I understand.

23  Q.  You never postulated or hypothesized a foreclosure rate for

24  a Super Duck or a super rival in your expert reports, correct?

25  A.  I never used Super Duck as a description, but I did say

1    that the foreclosure number, if you started to think about

2    using -- if you used the share shift numbers, that the

3    foreclosure number would be that 33 percent.

4    Q.  The 33 percent number you used in your expert reports was

5    premised on the notion that a firm won all the search default

6    agreements?

7    A.  Say that again.

8    Q.  The 33 percent number that you used in your report, that

9    you surfaced in your report, was based on an assumption that a

10   firm won all the default agreements?

11   A.  No, the share shift number was that.  That's not what

12   the -- I mean, the foreclosure number was the foreclosure

13   number.

14   Q.  We'll fight about it post trial, what you disclosed and

15   what you didn't disclose in your expert reports.

16        Now, the 33 percent figure you calculated using various

17   share numbers that you found, you picked out of Google

18   documents and out and of Microsoft documents, right?

19   A.  I'm sorry.  Repeat the question one more time.

20   Q.  The 33 percent figure you used was based on clawback rates

21   that you used from Google documents and Microsoft documents,

22   right?

23   A.  It was -- well, the 33 percent number was taking account of

24   all U.S. queries.  And I think I also -- you know, some of

25   those are on PCs.  I think I also discussed the Mozilla

1    evidence, which in some sense was duplicative of the Google

2    document because the Google document was citing the same

3    episode.  So -- but, certainly, the Google document that I

4    showed the Court and the Microsoft document that I showed the

5    Court were important.

6    Q.  And the Google percentage you picked were the highest bound

7    numbers you found in the Google documents, right?

8    A.  No.  I mean, I showed you the document that -- you know --

9    so in Android the number was -- there was a 60 to 70 percent --

10   Q.  I would ask you not to use the numbers.

11   A.  Oh, I'm sorry, I really apologize.  Okay.  Let me just

12   pause for a second so I formulate my answer in a way that

13   doesn't reveal anything.

14         So what did I use?  What were the inputs into those

15   share shift numbers?  One input, important input, was the

16   Google document that I showed the Court which talked about its

17   estimates of clawback or recovery rates, both for mobile and

18   desktop.  Those were numbers that I also put up today.  I also

19   used Google -- I also, when I talked about Android, there was

20   another document that -- there was very little about Android,

21   but there was one Android document that -- it was about Samsung

22   and the clawback rate, whether it would be for that.  And it

23   was a range which was -- can I -- it was the same number as the

24   mobile thing that it used for Apple.  Can I say, you know --

25   down to a small amount below that.  There's a little bit of a

1    range, but it was a very small range.  I also used Microsoft's

2    numbers that I showed today about both desktop -- it's

3    estimates of both desktop and mobile.

4         I -- was there anything else I used?  I cited the

5    Apple number, but I didn't use it directly because it was a

6    combined number, the number I showed you today, because I

7    was -- wanted to separately consider mobile and desktop

8    affects.  But I did cite it and point out that it was very

9    close to these estimates that the other firms were doing.

10        Hopefully I'm not forgetting anything else that I did

11    rely on.  But those were the things that I used in coming up

12    with the share shift estimates.

13   Q.  The Google documents you used, nobody who was involved in

14   the negotiations with Apple or with Android or with anybody

15   else said that they viewed those as sort of the gospel truth as

16   what in fact the clawback numbers would actually be, correct?

17   A.  I don't know what you're meaning of "gospel truth" is.  You

18   know, maybe -- I don't mean it's divine.  No one is saying it's

19   the absolute, we're totally sure, God-given number.  But they

20   certainly have testified that it was -- I think Mr. Roszak, for

21   example --

22   Q.  Mr. Roszak wasn't involved in the negotiations, was he?

23   A.  No, but it was in finance.  So, you know, it was definitely

24   the case that people have testified that those are the best

25   numbers that they have and they used them over and over again.

1    I have a list in my report of -- you know, from the many, many

2    times that they used the same estimates.

3    Q.  As the worse case scenarios, correct?

4    A.  No.  As of the scenarios that they were modeling the

5    profitability of the deals for.  I mean, today --

6    Q.  Let me --

7         THE COURT:  Hang on.  Go ahead.  Finish your answer.

8    A.  Today I showed again the Apple profitability number.

9    Right?  Those numbers were exactly coming from and using the

10   same estimates that I've used in the -- you know, the header,

11   Your Honor, that said, you know, recovery rate, consider the

12   different recovery rates.  Those are exactly what, you know,

13   was in that other document that I drew in.  So, they were using

14   this for, like, billions of dollars, you know, huge deals for

15   their company.

16        THE COURT:  Let's go ahead and take a break.  We'll

17   resume in about 15 minutes.

18        I'm going to ask you to just step outside, Professor

19   Whinston.

20        THE WITNESS:  Can I just grab the water?

21        THE COURT:  Yeah, sure.

22        (Whereupon the witness leaves the courtroom.)

23        THE COURT:  All right.  So we've talked a lot in this

24   trial about diminishing returns.  I think we're on the curve.

25   So how much more time do you think you have?

```
 1              MR. SCHMIDTLEIN:  No more than an hour.
 2              THE COURT:  Okay.  And there haven't been a lot of
 3    objections in terms of scope, so that's why I haven't said
 4    anything.  But what he hasn't done in the opinions he hasn't
 5    rendered, I know what his opinions are.  I know what they are
 6    now, so I don't know that we want to spend a lot more time on
 7    that.
 8              Two, let's try and avoid argumentation about the
 9    record.  Ultimately it will be my determination about what the
10    record is and you all will have arguments about those facts in
11    the end.  There's no -- it's not doing me any good to have you
12    wrestle over that.  So, to the extent that there's more left
13    about the things that he said today in his examination, if we
14    can get to that and finish up and then we can wrap this up this
15    afternoon.
16              MR. SCHMIDTLEIN:  Okay.
17              THE COURT:  Thank you, Mr. Schmidtlein.  Appreciate
18    it.
19              (Recess from 2:48 p.m. to 3:01 p.m.)
20              THE COURT:  Have a seat.
21              Mr. Schmidtlein, whenever you're ready.
22              MR. SCHMIDTLEIN:  Thank you, Your Honor.
23    BY MR. SCHMIDTLEIN:
24    Q.  Professor Whinston, going back to your 50 percent coverage,
25    33 percent -- or, 50 percent coverage/foreclosure and
```

1    33 percent foreclosure figures that we were talking about

2    before.  Am I correct that under your analysis, of that

3    50 percent, the rivals are able to compete for 17 percent of

4    total queries, but not the other 33 percent, is that right?

5    A.  I guess I wasn't putting it in terms of rivals competing

6    for, but what would a rival that was implausibly strong, as I

7    was describing, be able to get and what would be tied up?  And

8    that 33 percent of U.S. queries out of the 50 percent covered

9    would be tied up and unavailable even to that level of rival.

10   Q.  And that level of rival would have available to it the

11   other 50 percent of the market, correct?

12   A.  Not exactly because, you know, 20 percent is Chrome, where

13   it would face similar issues.  Not -- those issues are not part

14   of the government's case, but, nonetheless, it would.  And then

15   there's the 30 percent in -- if you remember it was red,

16   yellow, and green.  So I think it would be another 30 percent

17   that was in the green.

18   Q.  But Chrome comes with Google as the default, right?

19   A.  Correct.

20   Q.  And Chrome is getting whatever percentage Chrome is

21   getting.  It's not through exclusionary default agreements,

22   correct?

23   A.  Correct.

24   Q.  And, so, if a rival was superior to Google, the rival

25   should be able to overcome Chrome?

1            MR. SEVERT:  Objection.  Beyond the scope.

2            THE COURT:  That's overruled.  Go ahead.

3            THE WITNESS:  I'm sorry?

4            THE COURT:  You can answer the question.

5            THE WITNESS:  Oh, okay.

6     BY MR. SCHMIDTLEIN:

7     Q.  The rival will be able to overcome Chrome if it is a

8     superior search engine to Google?

9     A.  Not necessarily.  I mean, Chrome is a leading browser and,

10    you know, I think the evidence is -- I don't know how to

11    exactly split it up, but I think part of the attraction of

12    Chrome is Google's search for some people and part is Chrome,

13    and I don't -- it's both.

14    Q.  You're not -- you certainly haven't offered an opinion that

15    whatever percent of the Chrome business Google gets, that some

16    percent of that is foreclosed from rivals?

17    A.  I mean, I haven't talked about foreclosure measure about

18    Chrome.  You know, I talked about the covered queries.

19    Q.  And the rest of the uncovered queries come from Microsoft,

20    correct?

21    A.  Many of them.

22    Q.  Right.  And the superior rival can be expected to compete

23    effectively for all those queries, right?

24    A.  I mean, I guess -- at some point, I don't know when --

25    like, you know, it will start make -- you know, making sense if

1    we go down this road to start talking about what level of

2    superior rival, like how -- like you said, all the way to the

3    implausible Super Duck, or is it something comparable to Google

4    or a little better than Google, like Yandex.  I mean, so -- so

5    superior is -- there's a broad range of what superior could be

6    and how likely different superior things are to be relevant.

7    Q.  The rest of the market is contestable and available for a

8    superior rival to win, correct?

9    A.  I think the rest of the market is something that is

10   available, yeah.

11   Q.  And so we have 50 percent of the market --

12   A.  Let me just be clear -- let me leave it at that.  Yes.

13   Q.  We have 50 percent of the market that's available for them

14   to complete and they win 17 percent from the 50 percent that

15   are covered by the agreements, correct?

16   A.  Sorry.  Just repeat the numbers again.

17   Q.  Of the 50 percent that's covered, of all queries in the

18   market, 17 percent of total queries, or a third of the 50, the

19   superior rival would win under your model?

20   A.  Now I need to start --

21   Q.  Just answer my question, sir.

22   A.  Well, you need to say more, like superior rival, like as

23   strong as, you know -- I'm going to use the term Super Duck.

24   But as strong -- as much better than Google as Google is now to

25   rivals?  That strong superior or something less than that?  So

10642

1   that strong -- so, anyway, I just need you to clarify that.

2   Q.  You haven't offered any opinion about, sort of, some

3   sliding scale of foreclosure based on superiority, have you?

4   A.  I did testify, actually, about that.  I said that the 33

5   percent is a lower bound on what would be tied up, you know,

6   going all the way to this implausible level of quality.  But

7   that -- in fact, I even said it earlier today, that if a rival

8   was less good then that, more would be tied up by the

9   contracts.

10  Q.  You haven't -- you have not offered any opinion about what

11  the sliding scale looks like in terms of IS scores,

12  percentages; you've offered nothing like that?

13  A.  No, just qualitatively the direction, I mean, that it's a

14  lower bound on foreclosure.

15  Q.  And the next time that the contracts, the covered contracts

16  are up for renegotiation, the superior rival can be expected to

17  win those contracts?

18  A.  I need -- we need to -- if we want to start talking about

19  this, we really do need to start talking about how strong the

20  rival is.  So, Super Duck or something -- like, to take two

21  extremes, we could be the implausible Super Duck or a different

22  thing we could think about is a rival that's basically kind of

23  comparable to Google.  And I think in the case -- you know, so

24  that's kind of more what I think about, like, okay -- which I

25  still think is quite a leap, it would take quite a lot for

1    someone to become equal to Google.  I think you have often said

2    things that suggest that as well.

3         So lots -- and, so, you know, the way I think about

4    that is if somebody was equal to -- you know, managed over time

5    to somehow, you know, get equal to Google, invested enough to

6    do that, they would -- you know, I don't know exactly what the

7    scale is.  It wouldn't be that they got 17 percent of the

8    covered -- of U.S. queries that were covered, you know, out of

9    that 50 covered.

10        Let's pick a number.  Ten.  Just some intermediate

11   numbers.  Suppose they got ten.  And they got ten from Chrome,

12   you know, that same percent from Chrome and then they split the

13   green -- like, if you do calculations like that, you'd kind of,

14   you know, come to the conclusion that a rival that got to be

15   equal with Google, say, if the whole market was available as a

16   choice screen would get 50, if it was equal with Google.  If it

17   was a total level playing field they would get 50.

18        But on the other hand, with Google's contracts in

19   place, they'd get, at least when I was thinking about this,

20   something like 25.  So it would, like, cut in half what they

21   could get and substantially reduce the incentives for

22   investment.

23        And let me just say one more thing.  You asked me

24   about what happens when the contract next comes up for a rival

25   that is equal with Google when the contract next comes up.  In

1    that situation, where Google is protecting it's monopoly

2    profits, and it's likely to win.  So, you know, it's --

3    Q.  So basically we have to give the contract to the inferior

4    company?

5    A.  No, that's not what I'm saying.  All I'm saying is whether

6    you start thinking -- you know, whether you throw in

7    competition for the contract in the future -- I mean, these

8    contracts have, you know, durations, right?  And, so, there's

9    that -- the foreclosure number is talking about the contracts

10   taking them as given.  There's also this issue about

11   competition for the contract.  So, but when I think about this,

12   I think about it, you know, for a rival that was roughly

13   comparable the way I just said, that it would kind of cut in

14   half what I kind of think they would likely get.  And it would

15   take -- and not only that, it's not instantaneous.  It's quite

16   a road.  You're not going to be equaled on day one.

17   Q.  So, Professor, Microsoft has won a lot of default

18   agreements on Windows PCs, even though it is inferior to

19   Google, correct?

20   A.  Microsoft has agreements on Windows PCs.  It's obviously

21   also the operating system in Windows.  But the facts, just

22   stating a fact, Microsoft has agreements to be defaults on

23   Windows PCs, Google does not.

24   Q.  They have been able to win those contracts even though they

25   are not at par with Google on quality or consumer demand,

1    right?

2    A.  I think they are not on par with Google in search, as I've

3    said multiple, many, many times.  And I've also just said that

4    they've won those agreements.

5    Q.  When Yahoo! won the Mozilla agreement, default agreement,

6    Yahoo!'s search quality was not as good as Google's, correct?

7    A.  Yeah.  I mean, I think in that case yes.  And Yahoo! -- as

8    we talked about earlier today, Mozilla wanted -- was hoping

9    that they would generate competition in the market.  I think

10   that was sort of a slight -- for someone as small at Mozilla

11   acting on its own was somewhat wishful thinking.

12   Q.  The 50 percent -- or, let me back up.  The 33 percent

13   foreclosure number under your Super Duck example that we've

14   been talking about, if we focused only on what share of that is

15   Android, what would that number be?

16   A.  I'm sorry, just say it one more time.

17   Q.  Of the -- the 33 percent, under your sort of Super Duck

18   example, that's all the contracts, all the covered contracts,

19   right?

20   A.  Yes.

21   Q.  What -- would you translate that 33 percent into what piece

22   of it is Android agreements?

23   A.  I don't know, I haven't done that.  I wasn't asked to look

24   at the agreements separately.  I think I said in my previous

25   testimony I've thought -- you know, have looked at mobile

1    overall separately, that was, you know, device type, and that

2    would be much higher foreclosure, but I haven't -- but I have

3    not, just to be really clear, I have not separately done

4    foreclosure numbers by type -- by which agreement it is.

5    Q.  The Android percentage, if we just tried to isolate

6    Android, would be somewhere between 10 and 15 percent, correct?

7    A.  I haven't done the numbers.  I mean, I would have to sit

8    down and work through it.

9    Q.  Can we turn to slide 25?

10        I just want to see if I can understand a couple of these

11    bullet points here.

12        Okay.  The second bullet point, you say:  When bidding

13    for an exclusive contract, a dominant firm can use the monopoly

14    profits it -- use the monopoly profits it protects to make sure

15    it wins.  Okay?

16        You haven't offered an opinion in this case that Google

17    has used monopoly profits to win any particular contract, have

18    you?

19    A.  Yeah, so the form, I guess, that would take is seeing a

20    case where they overpaid.  You know, I think the one place

21    where I had sort of talked about that in my reports was the

22    Anna Kartasheva email and what her analysis would imply.  I

23    realize that, you know, in testimony she sort of walked away

24    from that.  So that's what you would see.  But that doesn't

25    mean that, you know, if you haven't seen it in the current

1    world, it doesn't mean that it's not relevant, right?

2    Q.  I appreciate that.  But, I understand the second bullet

3    point sort of hypotheses overpaying, paying too much, right?

4    A.  If necessary.

5    Q.  Okay.  The third bullet point says:  When there is a

6    dominant firm, competition for exclusives can make competition

7    less intense, right?

8    A.  Yes.

9    Q.  And that actually is prices are -- or, the payments are too

10   low, is that right?

11   A.  Yeah, but you're comparing two different things.

12   Q.  Have you -- and you've testified in this case that you

13   think, absent the alleged agreements, Google would have paid

14   more?

15   A.  What I said is that what the economic literature suggests

16   is that if there were unconditional -- if it was competition in

17   the form of unconditional revenue shares, that revenue shares

18   would be higher.

19   Q.  With --

20   A.  Likely.

21   Q.  With perfect take-it-or-leave-it payments?

22   A.  With -- so what the literature does is it models, using

23   game theoretic tools, firms that make revenue share offers

24   and -- or, you know, the translation of those models into the

25   present setting of revenue shares, they make unconditional

1    revenue share offers, you know, and looks at the game theoretic

2    equilibrium of that and compares it when you have unconditional

3    revenue shares being offered compared to when it's bidding for

4    an exclusive with revenue shares.  So that's what the models

5    do.  In that sense they are take-it-or-leave-it game

6    theoretically modeled.

7    Q.  Okay.

8    A.  Which, I should say, is like the standard, kind of, model

9    of competition that economists use.

10   Q.  Let me turn to slide 36.

11        Now, on this slide you are depicting Bing's quality

12   increasing after its syndication deal with Yahoo!, is that

13   right?

14   A.  I'm depicting its precision scores measured by Google from

15   February 2011 to October 2012, which was after the deal.

16   Q.  And when did the deal take place?

17   A.  So I think -- I mean, there was some debate about exactly

18   when Bing started to get Yahoo! data and serve Yahoo! queries.

19   You know, there was definitely a debate back and forth about

20   this in the reports.  But I think it's -- I think everybody

21   agrees that by December 2010 -- hopefully I'm getting this

22   right -- that that was -- that they were.

23   Q.  The debate was prompted by an opinion you'd offered that --

24   attributing supposed increases of Bing quality before the

25   Yahoo! data actually took effect, isn't that right?

1    A.  I think there was actually still some debate about the

2    extent to which they got data access to information in -- even

3    back in August.  So, I'm still not really resolved on exactly

4    what the story is, but there was this question about exactly

5    when it happened.

6    Q.  In light of that question, you certainly haven't offered

7    that opinion here today?

8    A.  No.

9           THE COURT:  Sorry, what opinion is he not offering

10   today?

11          MR. SCHMIDTLEIN:  An opinion -- he tried to offer an

12   opinion in his reports that Bing's quality shot up in the

13   months right after the deal, and Professor Murphy's testimony,

14   which you saw, debunked that.

15          THE WITNESS:  Sorry, if I can just --

16          THE COURT:  You'll have an opportunity on redirect,

17   if the question is asked.

18          THE WITNESS:  Fine.  No problem.

19   BY MR. SCHMIDTLEIN:

20   Q.  The Yahoo! deal occurred in 2009, right?

21   A.  Well, I just said -- I mean, when they wrote the deal or

22   when they started to actually --

23   Q.  They started getting data from the deal in 2009?

24   A.  Data from the deal?  I'm sorry, are you now saying that

25   they started to --

1    Q.  At the end of 2009 Microsoft started to get Yahoo! query

2    data?

3    A.  Sorry, I'm --

4    Q.  Do you remember what you offered, your --

5    A.  What I said a moment ago, I was trying to -- the debate was

6    about -- like this back and forth was about August versus

7    December and I'm just trying to --

8            THE COURT:  Hang on, hang on.

9    BY MR. SCHMIDTLEIN:

10   Q.  The spike you're talking about here is February '11 to

11   October 2012, right?

12   A.  Yes.

13   Q.  You're not offering the opinion that this increase is

14   attributable to the Yahoo! transaction, are you?

15   A.  What I'm saying is I'm -- like, I'm showing you that there

16   was an increase, because Professor Murphy suggested that there

17   weren't with this sort of misleading -- again, I'm sorry for

18   using the expression, but I did regard it as that -- slide that

19   looked at a gap and made a claim about Bing's quality not going

20   up, which was not accurate.  And, so, this is what happened

21   afterward.  So, that's -- that's why I showed this today.

22   Q.  Have you done an analysis to determine what exactly is the

23   cause of the improvement in the precision score that you set

24   forth in this figure 36?

25   A.  No.

```
 1              MR. SEVERT:  Objection.
 2              THE COURT:  That's overruled.
 3    BY MR. SCHMIDTLEIN:
 4    Q.  I'm sorry.  Did you answer?
 5    A.  I said -- well, why don't you -- with the back and forth --
 6              THE COURT:  I heard the answer.  The answer is he has
 7    not.
 8              MR. SCHMIDTLEIN:  Okay.
 9    BY MR. SCHMIDTLEIN:
10    Q.  Now, sir, you said that with an unconditional revenue share
11    rivals would be more likely to invest to improve their search
12    quality, is that correct?
13    A.  What I said is I thought that with an unconditional revenue
14    share there would be a more even playing field, more access to
15    traffic, and that even playing field and access to traffic
16    would have that affect.
17    Q.  And that only occurs if somebody decides to start splitting
18    queries in some fashion, is that right?
19    A.  I think your question makes it sound like they start
20    splitting queries and then the investment happens.  It's
21    actually sort of the reverse, that knowing that parties can
22    split queries creates incentives for investment.
23    Q.  And so it's your testimony that just the availability of
24    potentially being able to win some part of a deal would cause a
25    firm to invest?
```

1    A.  That is my view, yes.

2    Q.  Did you see the testimony in this case from Mr. Parakhin

3    about the position that Microsoft took with Apple about whether

4    it was prepared to invest to improve its search quality?

5    A.  So I did look at Mr. Parakhin's testimony.  I'm not sure

6    exactly what you're referring to.

7            THE COURT:  While you're looking, can I just ask a

8    question about this unconditional revenue share?

9            I understood Professor Murphy to say that

10   unconditional revenue share in these circumstances is not a

11   likely market outcome.  And the reason he said that is because

12   an unconditional revenue share is not tied to any promise,

13   guarantee that you're actually going to get the traffic through

14   ad revenue in order to warrant the revenue share.  In other

15   words, you pay it out but you don't know that you're going to

16   get the traffic back to justify the revenue share.  Do you

17   agree with that assessment?

18           THE WITNESS:  So, I think there are two pieces to

19   that, two things I would say about it, which, you know, one is,

20   you know, people all the time make incentive payments where

21   they're not 100 percent sure what they're going to get, but

22   they still are incentive payments.  So, a contingency fee, for

23   example.  I have a contract -- someone who has a law case has a

24   contract with their lawyer, which is a contingency.

25           THE COURT:  Okay.  But typically those arise in one

```
 1    of two circumstances; one in which there's been an assessment
 2    that the likelihood of the return is pretty high, or the volume
 3    of contingency cases is high enough that if you lose -- you're
 4    going to lose some percentage, but you're going to win on some
 5    others.  So at least there's some assessment of the
 6    contingency -- there's at least some assessment of the
 7    investment, getting a return on the investment.
 8              THE WITNESS:  Yeah.  So, I guess the first thing I
 9    would say is I realize now, you know, I'm on ground that you're
10    more comfortable than me.  But, you know, in the case of the
11    contingency fee, yes.  You know, obviously they're taking
12    account of the likelihood of success in setting the fee, and
13    that has something to do with it.
14              But it's also the case that the returns are uncertain
15    and, you know, you may win the case for reasons that have
16    nothing to do with your lawyer's effort.  Right?  And still the
17    payment is an incentive for the lawyer to do a good job.  In
18    fact you could, in that case, write some different thing that
19    specifically said what the lawyer was supposed to do, like you
20    have to work 9 to 5 on my job, on my law case, which is
21    contracting exactly on what you're, quote, getting.  But
22    actually it's not contracting on what you care about, and it's
23    probably an inefficient contract.
24              It's like leaving the lawyer to decide the best way
25    to -- you know, that fee in itself incentivizes the lawyer.
```

1    But there are many other cases -- like a sales agent.  You know

2    firms have sales agents.  Same thing.  They give them

3    commissions on the sales.  Now, many of those sales may come

4    regardless whether the agent has put in an effort or not.  But

5    it's still, you know, something you see as a way that

6    there's -- people are -- firms are incentivizing other parties.

7            CEOs get paid based on the stock performance or the

8    profitability of their firm.  They're not -- you know there are

9    many things that affect that, not just what the CEO is doing.

10   And again, you know, it turns out, you know, that's not

11   a bad -- that's a good way to potentially compensate them.  I'm

12   not saying it always is the best way, but --

13           THE COURT:  Why would it -- sorry, Mr. Schmidtlein.

14   Why would a distributor ever -- seems to me that that other

15   world in which there are unconditional revenue share payments

16   would be made possible only if the distributor was agreed to

17   some distribution of queries?  Right.

18           THE WITNESS:  Some distribution?

19           THE COURT:  Distributing of the queries to those

20   firms that have made the unconditional revenue share payments.

21           THE WITNESS:  Ask -- say it again.

22           THE COURT:  I'm sorry.  So in a world in which there

23   are multiple search engines paying unconditional revenue share

24   payments --

25           THE WITNESS:  Yes.

1              THE COURT:  -- presumably that would happen only if

2      the distributor made some promise they would spread out the

3      queries.

4              THE WITNESS:  Not necessarily.  So you can imagine

5      the firm's bidding, and they recognize that the higher their

6      revenue share is, the bigger -- the greater the likelihood

7      they'll be made the default, the greater the amount of queries

8      that's going to be shifted towards them.

9              So, you know, it's almost like -- think of a sales

10     agent that's representing two different manufacturers and

11     getting commissions from both.  They're not making a promise as

12     to how they're going to allocate things, but based on the

13     incentives that they are being faced with, they're allocating

14     their time, and that creates competition among the firms to

15     offer those payments.  So that's, I guess, part of -- you know,

16     a first answer.

17             The second thing I would just say is, you know --

18     maybe there are three things.  The second thing is just to

19     recognize that, you know, what Google cares about is revenue.

20     Not directly whether it's AT&T's exclusive, that's not what

21     generates profits for it.  It's revenue.  So it's not a crazy

22     idea that you would compensate based on the thing you care

23     about, okay, which is revenue, rather than this other thing

24     that's just an input to it.

25             And then the third thing is, you know, sort of a

1    different point, which is does it come up in -- as a -- you

2    know, saying that it doesn't satisfy the market, you know,

3    would come up in the market, like Google wouldn't do this

4    unless it had to.  Well, no.  Yeah, I realize that Google's

5    rational thing to do is doing what it's doing, you know, which

6    is try to maintain its monopoly.

7            So, like, saying that it would be irrational for

8    Google to do this other thing doesn't really answer the

9    question of, like, well, in this antitrust proceeding should it

10   be allowed to?  Those are the different things, I would say.

11   BY MR. SCHMIDTLEIN:

12   Q.  No other firm, monopolist or not, has ever done an

13   unconditional revenue share payment for browser distribution,

14   right?

15   A.  As I said earlier, like the comment I made about

16   unconditional revenue share, I would have to look at the

17   contracts.

18   Q.  Now, you've seen the testimony about what Microsoft

19   demanded of Apple before they would be prepared to make

20   investments to improve their search engine, right?

21   A.  When are you -- just tell me a little more context.

22   Q.  I'll show you a slide that was shown -- the plaintiffs

23   showed this the other day.  This was a question -- or, some

24   trial testimony from Mr. Parakhin:

25            "It is the case that Microsoft told Apple that it could

1    invest more in mobile search, but it would not do so unless

2    Apple gave it further distribution in mobile.

3         "It is uneconomical for Microsoft right now to invest

4    more in mobile because even any, like -- it's our belief that

5    no amount of investment without securing some way to do

6    distribution in mobile will result in any share gain.  And, so,

7    it is correct that unless Microsoft gets a more significant or

8    a more firmer guarantee of distribution, then it makes it

9    uneconomical for Microsoft to invest in mobile quality and in

10   mobile search mode."

11        Microsoft's position with Apple was, even though we are

12   inferior, even though our product is not as good as Google's,

13   even though in the short run it will harm the quality of the

14   Safari browser, we are not going to invest to improve our

15   product unless you give us the contract first.  Right?

16   A.  Well, I mean, the quote says what it says, but I'll tell

17   you what I see when I read this.

18   Q.  I'm not asking you to interpolate.  That was Microsoft's

19   position, correct?

20   A.  Well, I mean, I guess what I'm saying is you're

21   interpreting -- or interpolating, whichever verb you used --

22   and, like, I'm telling you the way I read this and interpret it

23   is different than what you're saying.  So it says what it says,

24   but, to me, it's actually exactly in line with the things I've

25   been saying.

1    Q.  You interpret this to mean that Microsoft would be prepared

2    to invest and improve its search engine with an unconditional

3    revenue share agreement, without any guarantee from Apple that

4    it would get any business at all?

5    A.  Do you want me to tell you how I interpret it?  I can.

6    It's up to you.

7    Q.  Sure.

8           THE COURT:  We're on the topic, so go ahead.

9           THE WITNESS:  Okay.  So, the way I interpret it is

10    Microsoft is facing these Google exclusives and what it's

11    saying is facing Google exclusives, it's not going to get any

12    distribution.  It's exactly the foreclosure point.  And so, you

13    know, it's -- that's how I interpret it.

14           MR. SCHMIDTLEIN:  No further questions, Your Honor.

15           THE COURT:  Thank you, Mr. Schmidtlein.

16           All right.  Any redirect.

17           MR. SEVERT:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19    BY MR. SEVERT:

20    Q.  Professor Whinston, you were asked about Apple's decision

21    to select Google as a default search engine near the beginning

22    of counsel's examination.  Do you recall that?

23    A.  Not the exact question.

24    Q.  Sure.  Well, let me just ask you this relating to that

25    testimony:  Are Apple's incentives perfectly aligned with those

1    of its customers?

2    A.  No.

3    Q.  Why not?

4    A.  Well, Apple cares about its customers, but it also cares

5    about money.  And, so, you know, those are two different

6    things, you know.  Attracting customers certainly affects

7    money, it affects profits, but so do payments from Google.

8    Q.  Okay.  And then, Professor, you were asked about the

9    desirability of phones with rivals preinstalled, instead of

10    Google.  So if Google offered unconditional revenue shares,

11    could Google's partners continue to set Google as the default,

12    if they wanted?

13    A.  Absolutely.  I mean, this was exactly kind of the start of

14    our discussion around defaults versus exclusive contracts for

15    defaults.

16    Q.  And would the same be true for most-favored supplier

17    agreements?

18    A.  Yes.

19    Q.  And, Professor, would it be a less restrictive alternative

20    if a revenue share provided for some promotional requirement,

21    but no default exclusivity?

22    A.  I'm sorry.  Can you just repeat the question?

23    Q.  Sure.  Would it be a less -- start over.

24         Would it be a less restrictive alternative if a revenue

25    share agreement provided for some promotional requirements, but

1    no default exclusivity?

2            MR. SCHMIDTLEIN:  Objection, Your Honor.  This was

3    nowhere in the expert reports and it wasn't even in his

4    directed.

5            MR. SEVERT:  It was in the scope of your exam.

6            THE COURT:  Hang on.  The response ought to be toward

7    me.  I think we should know that at this point.

8            If you want to ask him a hypothetical, go ahead.  But

9    rephrase your question.

10           MR. SEVERT:  Sure.  I'll move on.  One more topic.

11           Mr. Penado, if you could put up slide 25,

12   Mr. Whinston's presentation.

13   BY MR. SEVERT:

14   Q.  I want to focus on the second bullet on slide 25, Professor

15   Whinston, you were asked about by counsel.  In your second

16   bullet you write that Google can use monopoly profits to win.

17           Does that mean that Google's revenue shares payments

18   will actually be large?

19   A.  So -- wow.  That's a bad way to end testifying, blowing out

20   everyone's eardrums.

21           So, I think I'm trying to interpret your question a

22   little bit.  You know, I think the point, and this was coming

23   up earlier, is in the current situation, you know, Google as a

24   dominant firm doesn't have to go to the point of paying more

25   than -- more than the contract is worth to it.  I mean, maybe

1    it does.  You know, perhaps, depending on your view of the Anna

2    Kartasheva email, it sometimes does.

3            But that would -- you know, but if a rival got

4    stronger, it may need to do that in order to win.  And rivals

5    who are thinking about investing and they're looking ahead to

6    having to compete against Google for contracts take that into

7    account.  And so that, as a result, you know, even if you're

8    similar, you know, you get close to Google in quality or equal

9    to Google or a little bit better, you may still be losing

10   because of this point.

11   Q.  And if Google is not overpaying for search deals, does that

12   mean its ability to use monopoly profits to win does not impact

13   rivals' ability to compete?

14   A.  That's what I was just saying, that, like, a rival is going

15   to be looking ahead not only -- you know, when a rival is

16   thinking, Should I invest?  Your Honor, you know, I said how I

17   look at -- you know, I think about both on the one hand with

18   the contracts in place, what's the effect, and on the other

19   hand, then, taking that as given, thinking about competition

20   for the contract.

21           A rival who is thinking about investing is going to

22   consider both of those.  And, so, the foreclosure measure is

23   showing that the first of those things makes investment less

24   attractive, but it's also true that these points make -- also

25   make it less attractive because the rival is saying to himself,

10662

```
 1    well, okay, fine, I have to suffer for four years with Google
 2    having the defaults, but eventually -- oh, I may be able --
 3    I'll be able to compete when the contract finally comes up.
 4    But these points are saying, well, if it's competition for
 5    exclusives, it's -- I'm disadvantaged and I may still loose,
 6    good chance I will.  So that's kind of how I was thinking about
 7    it.
 8                MR. SEVERT:  One moment, Your Honor.
 9                (Pause.)
10                MR. SEVERT:  No further questions.
11                THE COURT:  Okay.  All right.  Professor Whinston.
12                THE WITNESS:  Thanks.  Three times the charm.
13                THE COURT:  Thank you very much for all of your work
14    and time here.  Safe travels.
15                THE WITNESS:  Thanks.  I appreciate the opportunity
16    to talk.
17                MR. SCHMIDTLEIN:  Your Honor, I had -- I would like
18    to move in the demonstratives that I used, which were
19    DXD41.002, .003, .008, .020, .021, .029, and .039.
20                MR. SEVERT:  No objection to the demonstratives.
21                THE COURT:  Okay.
22                MS. JENSEN:  Good afternoon, Your Honor.  Elizabeth
23    Jensen for the United States.  We have here just some
24    housekeeping, some demonstratives that were used with Professor
25    Murphy on cross.  We would like to move these in as
```

1    demonstratives.

2                THE COURT:  Okay.

3                MS. JENSEN:  May I approach, Your Honor?

4                THE COURT:  Sure.

5                MR. DINTZER:  With that, Your Honor, the Department

6    of Justice and the states that have joined us on our complaint

7    close our case.

8                THE COURT:  All right.  Thank you, Mr. Dintzer.

9                Mr. Sallet?

10                MR. SALLET:  Your Honor, if you might allow my

11    colleague from Colorado, Mr. May will move in some

12    designations.

13                But could I address one point you asked yesterday?

14    You asked yesterday whether we had any recommendations about

15    how you might spend your time watching videos in the coming

16    days.

17                THE COURT:  Right.

18                MR. SALLET:  If I could just say, our view is that

19    the best guide to what you might want to view will come in the

20    post trial filings, when you see specific segments of testimony

21    identified.  And we intend to do that, as I'm sure the other

22    parties do.

23                I did raise the case of two witnesses yesterday that

24    had different kinds of circumstances than the normal

25    designations.  I don't really want to go into detail.  One of

1     them was a particular situation.  But, in the document that

2     Mr. May is going to hand up about designations generally, we've

3     identified these two.  If Your Honor thinks they are worth

4     looking at now, of course we defer to your judgment on that.

5            THE COURT:  Okay.  Thank you.  I appreciate it.

6            Mr. May?

7            MR. MAY:  Conor May for the plaintiff states, the

8     state of Colorado.

9            We had previously handed up a flash drive containing

10    transcripts for the witnesses that we were handling on behalf

11    of the parties.  This is a replacement thumb drive that

12    contains those same transcripts, as well as video and the one

13    witness that we were still going back and forth on at the time.

14           THE COURT:  Okay.  Terrific.

15           MR. MAY:  And there's a letter in here that explains

16    the contents in more detail.

17           THE COURT:  Thank you.  Just while we're on the topic

18    of designations, do we have those designations committed to

19    writing in some way, so that they can be either posted on the

20    docket or just so that the record reflects a written record of

21    what in fact the designations are, as opposed to just having

22    the video?

23           MR. DINTZER:  On the thumb drive there is the written

24    designations as well.  So when we handed over the video, I

25    believe that there is a copy of the written ones, as well.

```
1              THE COURT:  Let me ask everyone to do the following:
2     Which is, if you would just please -- and maybe you've done
3     this already, just for some -- but if you would just docket all
4     of the deposition designations that you have made, just so
5     there's a clear record of what they are.  Is that something
6     everybody is in a position to do with some ease?
7              MR. DINTZER:  Subject to confidentiality concerns,
8     Your Honor.  You're saying -- just a --
9              MR. SCHMIDTLEIN:  Page and line.
10             THE COURT:  Just the page and line.  I'm not talking
11    about the actual testimony.  The testimony still would be
12    subject to any confidentiality concerns.  But, yes, of course.
13             MR. DINTZER:  Of course.
14             THE COURT:  Is that something you all have readily
15    available and can docket?
16             MR. MAY:  Yes.
17             MR. SALLET:  Yes, we can do that.
18             THE COURT:  Is that something Google has --
19             MR. SCHMIDTLEIN:  Yes, Your Honor.
20             THE COURT:  Just to make sure the record is clear.
21             Okay.  All right.  With that, I take it the states
22    have rested as well?
23             MR. SALLET:  We do, Your Honor.
24             THE COURT:  All right.  Okay.  So that brings us to
25    the end of the evidentiary portion of our case.  Just a few
```

1    loose ends, and not to the exclusion of anything you all may

2    have.  I forgot to mention yesterday that -- maybe it was the

3    day before -- in connection with the two exhibits that I've

4    ruled on that involved an Apple/Google agreement, I'd

5    referred -- I'd said that I'd gone back to Mr. Cue's testimony

6    to take a look at some of the things that he had said about one

7    of the provisions, and that was in part -- that was part of the

8    reason why I thought it justified disclosure.

9            I think it is a useful exercise for me to go back and

10    take a look at what we still have redacted in both Mr. Cue and

11    Mr. Giannandrea's testimony.  And so I do plan to do that in

12    the coming days, with an eye towards the whole trial and the

13    entirety of the trial and make determinations as to whether

14    more of that testimony can be released publicly.  So that's

15    one.

16            Two, Mr. Schmidtlein, we had left sort of open for

17    you to talk through yesterday, and maybe both sides have, the

18    issue -- the legal issue of procompetitive benefits in other

19    markets that I had flagged as a substantial issue that was

20    still left to resolve, and how you all want to do with that.

21    If it's something you think you can address in the context of

22    the pretrial briefs, great.  Although I will say, I'm not

23    contemplating responsive pretrial briefs.  So with that in

24    mind, I would like to have a sense of where that's going to

25    show up.

 1          And, I mean, there are a few of these things -- that

 2   one I still have not ruled yet on the motion in limine with

 3   respect to the -- or, the *Daubert* motion with respect to

 4   Professor Fox.  If there's further argument that each side

 5   wishes to make on that, that's still an open issue.  And then,

 6   of course, there's the hearsay issue.  So those are the three

 7   open, big legal issues or evidentiary matters that I have on my

 8   list.

 9          MR. SCHMIDTLEIN:  I think, as I mentioned the other

10   day, we were not in favor of post trial briefs.  If Your Honor

11   is -- I think we could address the issue you raised on

12   procompetitive justification in other markets in our

13   conclusions of law.  But if you are otherwise inclined to allow

14   more paper, we'll deal with it in the briefs.

15          THE COURT:  Okay.  Mr. Dintzer?

16          MR. DINTZER:  Your Honor, we agree that the

17   conclusions of law would be the best place to address it.  We

18   would ask the Court, given the greater girth of material, to

19   expand those from 35 pages that we discussed to 60 so we could

20   address all of them.

21          THE COURT:  Here's the thing, you don't both get a

22   post trial brief of the number of pages you've asked for and

23   more pages for the conclusions of law.  So which of the two do

24   you want?

25          MR. DINTZER:  I'm sorry, Your Honor, I misunderstood

```
 1     then.  So we'll do it in the post trial brief.
 2               THE COURT:  Okay.
 3               MR. DINTZER:  I misunderstood.
 4               THE COURT:  That's okay.  All right.
 5               MR. SCHMIDTLEIN:  Your Honor, there was a loose end
 6     the other day over an AT&T document and you had asked about who
 7     the custodian was.
 8               THE COURT:  Oh, right.
 9               MR. SCHMIDTLEIN:  This was the reviews, the Facebook,
10     you know, product reviews.  And we were -- I can hand up the
11     document with the custodian information.  The custodian that we
12     got it from was in fact Mr. Jeff Ezell, who was the witness who
13     you saw on the video.  So I'm happy to --
14               THE COURT:  Based on that representation, I'll then
15     admit the exhibit.  I don't know if we have the number.
16               MR. SCHMIDTLEIN:  It's exhibit -- it's DX384.
17               THE COURT:  Okay.  Is that the exhibit that -- is
18     that the number of what you're handing up to me, or the -- it
19     was -- it was what I had deferred on, correct?
20               MR. SCHMIDTLEIN:  Okay.  You've already got a copy of
21     DX384.  This just has the printout that I'll represent to you
22     comes from Mr. Ezell's files.
23               THE COURT:  All right.  Terrific.  So, just a couple
24     of other things, in terms of the record and the documents that
25     have been pushed into evidence both here in open court and
```

```
 1    otherwise.  We do have -- obviously, we've got physical
 2    possession of everything you've given us.  So we have it both
 3    electronically and in hard copy, or just hard copy at this
 4    point?
 5                THE LAW CLERK:  Hard.
 6                THE COURT:  At this point we have hard copies.  I do
 7    think we're going to need, for the record, all of the exhibits
 8    in an electronic format so that can be preserved in the event
 9    of an appeal.
10                MR. SALLET:  I'm going to try this on behalf of all
11    of the parties.  We had a conversation about this earlier in
12    the day.  We'll meet and we'll make a proposal as to how to
13    supply you with all the exhibits in electronic form.
14                THE COURT:  And Mr. Douyon, I think, has been keeping
15    a running exhibit list.  I don't know if that also includes the
16    exhibits that have been pushed in.
17                THE COURTROOM DEPUTY:  Yes.
18                THE COURT:  It does.  So everything that's been
19    pushed in as an exhibit -- I mean, presented as an exhibit is
20    on your exhibit list, is that right?
21                THE COURTROOM DEPUTY:  Yes.
22                THE COURT:  Including things that were just pushed in
23    but not introduced for a witness?
24                THE COURTROOM DEPUTY:  Yes.
25                THE COURT:  He's got the master.  I'm sure you are
```

1    all keeping track as well.  So that is something we will need,

2    just to complete the record.

3           All right.  Couple more things.  This will be a sign

4    of my age.  I'm going to ask you put together a face book of

5    the witnesses that testified when you submit your initial

6    proposed findings of fact, conclusions of law, so that I can

7    put a face to the names of the witnesses.  I notice many of

8    them have younger photos.  But that would be helpful, just to

9    jog my memory as needed.

10          The upcoming post trial briefings, just as with

11   summary judgment, I would like all of the exhibits to be

12   hyperlinked.  That will make our lives much easier, as well as

13   yours.  So, I do not need any case law to be hyperlinked, just

14   the record exhibits is all I would need hyperlinked.

15          Okay.  Finally --

16          MR. SCHMIDTLEIN:  I think just so we're clear, I

17   think when we did that before, I think there was a time lag

18   between when we filed the briefs and then we got you the

19   hyperlink version.  So if you can just remember that, or at

20   least accommodate that, because what I think we typically find

21   is getting the briefs locked down obviously is one Herculean

22   task, and then having a little bit of time to work with our

23   electronic --

24          THE COURT:  Well, it's a fair point because I did not

25   actually -- I did not think about that and I'm glad you raised

1    it.  So what is a reasonable time lag?  And the reason I ask is

2    because that will, in part, inform when to set oral argument

3    and closing.

4              MR. SCHMIDTLEIN:  I think we did two weeks last time.

5              MR. DINTZER:  Our support staff is asking for two

6    weeks, Your Honor.

7              THE COURT:  Is it the kind of thing we can do it on a

8    rolling basis such that -- are you asking for two weeks for all

9    of it, or can you -- I mean, you've got -- you will have some

10   amount of weeks between the initial filings and the subsequent

11   filings.  In other words, you could -- the initial post trial

12   briefs will be due February 9.  You've asked for responsive

13   filings, which I'm going to grant, on March 22nd.  So --

14             MR. DINTZER:  If we could have two weeks after each

15   filing for that filing.

16             THE COURT:  Okay.  Okay.  Mr. Schmidtlein, is that

17   what you're requesting, too?

18             MR. SCHMIDTLEIN:  (Nods head.)

19             THE COURT:  Okay.  All right.  So here will be the

20   post trial schedule.  I want to give everybody the full

21   opportunity to vet the facts on the issues to the extent that

22   you requested so the schedule will be as follows.  And we'll

23   get this all down in writing, it will be in an order.  So don't

24   feel like you need to write all this down.

25             So the opening post trial filings will be due

1    February 9th for the proposed findings of fact and -- for the

2    proposed findings of fact.  Page limits for the DoJ plaintiffs

3    will be 500, for the states will be 100, for Google it will be

4    600.  Conclusions of law will be 35, 15, and 50.  And the trial

5    briefs will be 70, 30, and 100; that's DoJ, states, and Google.

6            Responsive filings will be due March 22nd.  Responses

7    to the proposed findings of fact will be DoJ 120, states 30,

8    Google 150.  Responses to the conclusions of law will be DoJ

9    25, states 10, Google 35.

10            And I will ask all of you to please mark -- block off

11    on your calendars May 1, 2, and 3 for arguments on all of the

12    above.

13            Let me just confirm that that schedule does not

14    present a problem with anyone at this point based upon your

15    future plans, to the extent you've made any.

16            MR. SALLET:  We're looking forward to spending May

17    here.

18            THE COURT:  All right.  So that will be the final

19    schedule.  We'll put that into an order and take it from there.

20            Okay.  Is there anything else before we formally

21    adjourn?

22            MR. DINTZER:  Nothing from the DoJ plaintiffs, Your

23    Honor.

24            MR. SALLET:  Nothing for the state, Your Honor.

25            MR. SCHMIDTLEIN:  Nothing for Google, Your Honor.

```
 1              THE COURT:  Okay.  Let me just extend my gratitude to
 2      all of you.  It's been an extremely, long, arduous road, and
 3      that's not just this trial, but the duration of the case.  I
 4      can tell you, as I sit you here today, I have no idea what I'm
 5      going to do.  So at least to that extent all sides have been
 6      very effective.  But, the lawyering has been excellent.  I know
 7      there's a lot of folks in the background who have been
 8      supporting all of your efforts and so that work has certainly
 9      been outstanding as well.
10              So, I want to thank everybody.  These are big cases
11      and they require incredible amounts of professionalism and
12      that's been the case at every turn.  So I really am grateful
13      and you've made my job easier, at least until next spring.  So,
14      thank you.
15              I also want to extend my thanks to your families.
16      Please do that because I suspect they haven't seen very much of
17      you, certainly recently.  And, so, I'm sure they will be happy
18      to have you home.
19              All right.  Thank you, everyone.  Happy Thanksgiving.
20      Enjoy the holidays.  And we will see you next spring.  Please
21      don't wait for me.  And I'll ask everybody, just take these
22      final binders off of this carousel.  Thank you.
23              (Adjourned at 3:59 p.m.)
24                          *   *   *
25
```

10674

```
1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                        Dated this 17th day of November, 2023

8

9

10                       _____

11                       Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
12                       Room 6523
                         333 Constitution Avenue, N.W.
13                       Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2

    WITNESS:
3

        Michael Whinston
4            Cross-Examination By Mr. Schmidtlein............10582
             Redirect Examination By Mr. Severt..............10658
5

6

    EXHIBITS ADMITTED:
7

        DX384................................................10668
8       DXD41.002, 003, .008, .020, .021, .029, and .039......10662

9

10   Plaintiff Rests After Rebuttal............................10663

11                           *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**'**

**'11** [1] - 10650:10

**0**

**003** [4] - 10585:15, 10585:16, 10662:19, 10675:8
**008** [2] - 10662:19, 10675:8
**020** [2] - 10662:19, 10675:8
**021** [2] - 10662:19, 10675:8
**029** [2] - 10662:19, 10675:8
**039** [1] - 10662:19
**039......10662** [1] - 10675:8

**1**

**1** [1] - 10672:11
**10** [2] - 10646:6, 10672:9
**10-0101** [1] - 10580:18
**100** [3] - 10652:21, 10672:3, 10672:5
**1019** [2] - 10581:6, 10581:9
**1100** [1] - 10580:12
**120** [1] - 10672:7
**1300** [1] - 10580:23
**1301** [2] - 10581:5, 10581:8
**15** [3] - 10637:17, 10646:6, 10672:4
**150** [1] - 10672:8
**16** [1] - 10580:5
**16th** [1] - 10602:13
**17** [4] - 10639:3, 10641:14, 10641:18, 10643:7
**17th** [1] - 10674:7
**1:15** [1] - 10580:6

**2**

**2** [1] - 10672:11
**20** [2] - 10616:3, 10639:12
**20-3010** [1] - 10580:4
**20001** [2] - 10581:13, 10674:13
**20024** [1] - 10581:2
**2009** [4] - 10590:7, 10649:20, 10649:23, 10650:1
**2010** [2] - 10583:23,

10648:21
**2011** [1] - 10648:15
**2012** [2] - 10648:15, 10650:11
**2014** [7] - 10587:14, 10590:15, 10590:16, 10590:17, 10590:20, 10591:4, 10592:20
**2018** [2] - 10593:16, 10595:3
**2019** [3] - 10609:9, 10620:11, 10621:9
**202** [3] - 10580:13, 10580:16, 10581:3
**202-354-3267** [1] - 10581:14
**2020** [2] - 10609:16, 10609:18
**2021** [7] - 10587:14, 10602:22, 10603:1, 10609:21, 10612:10, 10612:12, 10616:3
**2022** [2] - 10615:19, 10617:1
**2023** [4] - 10580:5, 10593:17, 10615:20, 10674:7
**209** [1] - 10580:15
**212** [2] - 10581:6, 10581:10
**22nd** [2] - 10671:13, 10672:6
**25** [5] - 10643:20, 10646:9, 10660:11, 10660:14, 10672:9
**2:48** [1] - 10638:19

**3**

**3** [1] - 10672:11
**30** [4] - 10639:15, 10639:16, 10672:5, 10672:7
**307-0340** [1] - 10580:13
**33** [20] - 10632:13, 10632:25, 10633:1, 10633:6, 10633:11, 10633:16, 10634:3, 10634:4, 10634:8, 10634:16, 10634:20, 10634:23, 10638:25, 10639:1, 10639:4, 10639:8, 10642:4, 10645:12, 10645:17, 10645:21
**333** [2] - 10581:13, 10674:12
**35** [1] - 10667:19, 10672:4, 10672:9

**36** [2] - 10648:10, 10650:24
**3:01** [1] - 10638:19
**3:59** [1] - 10673:23

**4**

**4** [1] - 10594:2
**40th** [2] - 10581:5, 10581:9
**415** [1] - 10580:19
**42** [1] - 10580:3
**434-5000** [1] - 10581:3
**450** [1] - 10580:18
**497-7728** [1] - 10581:6

**5**

**5** [1] - 10653:20
**50** [15] - 10638:24, 10638:25, 10639:3, 10639:8, 10639:11, 10641:11, 10641:13, 10641:14, 10641:17, 10641:18, 10643:9, 10643:16, 10643:17, 10645:12, 10672:4
**500** [1] - 10672:3
**508-6000** [1] - 10580:24
**583-9211** [1] - 10580:19

**6**

**60** [4] - 10594:7, 10595:12, 10635:9, 10667:19
**600** [2] - 10580:15, 10672:4
**60604** [1] - 10580:15
**64** [1] - 10595:12
**6523** [2] - 10581:12, 10674:12
**680** [1] - 10581:2

**7**

**70** [3] - 10595:13, 10635:9, 10672:5
**720** [1] - 10580:24

**8**

**8** [1] - 10593:19
**80** [1] - 10596:17
**80203** [1] - 10580:24
**805-8563** [1] - 10580:16

**9**

**9** [3] - 10593:19, 10653:20, 10671:12
**94102** [1] - 10580:19
**999-5800** [1] - 10581:10
**9th** [1] - 10672:1

**A**

**ability** [4] - 10609:13, 10661:12, 10661:13, 10674:6
**able** [13] - 10591:13, 10604:19, 10604:25, 10615:17, 10628:22, 10639:3, 10639:7, 10639:25, 10640:7, 10644:24, 10651:24, 10662:2, 10662:3
**absent** [1] - 10647:13
**absolute** [1] - 10636:19
**absolutely** [1] - 10659:13
**access** [5] - 10593:4, 10627:14, 10649:2, 10651:14, 10651:15
**accommodate** [1] - 10670:20
**according** [1] - 10627:19
**account** [3] - 10634:23, 10653:12, 10661:7
**accurate** [2] - 10650:20, 10674:4
**accurately** [1] - 10615:15
**acknowledged** [1] - 10585:1
**acquire** [1] - 10590:25
**acquired** [1] - 10591:6
**act** [1] - 10601:4
**acting** [1] - 10645:11
**action** [1] - 10607:18
**actively** [1] - 10611:15
**actual** [5] - 10614:21, 10617:22, 10627:13, 10665:11
**ad** [1] - 10652:14
**addition** [2] - 10587:16, 10588:4
**address** [6] - 10603:8, 10663:13, 10666:21, 10667:11, 10667:17, 10667:20
**adjourn** [1] - 10672:21
**Adjourned** [1] -

10677

10673:23
**administer** [1] - 10600:4
**admit** [1] - 10668:15
**admitted** [3] - 10584:10, 10584:14, 10584:15
**ADMITTED** [1] - 10675:6
**ads** [1] - 10631:8
**advantageous** [1] - 10586:17
**affect** [2] - 10651:16, 10654:9
**affects** [3] - 10636:8, 10659:6, 10659:7
**afternoon** [2] - 10638:15, 10662:22
**age** [1] - 10670:4
**agent** [3] - 10654:1, 10654:4, 10655:10
**agents** [1] - 10654:2
**ago** [3] - 10590:10, 10622:9, 10650:5
**agree** [16] - 10582:8, 10584:17, 10585:10, 10585:16, 10586:13, 10591:21, 10596:8, 10596:14, 10597:9, 10608:11, 10623:1, 10628:9, 10629:19, 10629:25, 10652:17, 10667:16
**agreed** [3] - 10624:21, 10625:7, 10654:16
**agreeing** [2] - 10621:13, 10621:17
**agreement** [23] - 10587:15, 10588:1, 10588:3, 10608:13, 10621:14, 10621:18, 10621:23, 10624:15, 10624:17, 10624:18, 10624:22, 10625:3, 10625:8, 10625:15, 10626:25, 10628:1, 10628:5, 10645:5, 10646:4, 10658:3, 10659:25, 10666:4
**agreements** [41] - 10588:21, 10588:22, 10589:2, 10607:20, 10609:4, 10622:4, 10622:7, 10622:10, 10622:11, 10622:14, 10622:15, 10622:19, 10623:4, 10623:7, 10623:8, 10623:10, 10623:23, 10623:24, 10623:25, 10624:3,

10624:6, 10624:7, 10624:13, 10627:14, 10627:25, 10628:5, 10632:14, 10634:6, 10634:10, 10639:21, 10641:15, 10644:18, 10644:20, 10644:22, 10645:4, 10645:22, 10645:24, 10647:13, 10659:17
**agrees** [1] - 10648:21
**ahead** [8] - 10629:23, 10637:7, 10637:16, 10640:2, 10658:8, 10660:8, 10661:5, 10661:15
**al** [1] - 10580:3
**aligned** [1] - 10658:25
**all-or-nothing** [2] - 10628:6, 10630:11
**alleged** [1] - 10647:13
**allocate** [1] - 10655:12
**allocating** [1] - 10655:13
**allow** [2] - 10663:10, 10667:13
**allowed** [4] - 10605:5, 10605:11, 10608:13, 10656:10
**allowing** [1] - 10608:3
**almost** [6] - 10589:8, 10593:23, 10595:11, 10614:6, 10618:8, 10655:9
**alternative** [4] - 10605:13, 10630:5, 10659:19, 10659:24
**amenable** [1] - 10626:24
**America** [1] - 10580:2
**American** [1] - 10602:19
**Americas** [2] - 10581:5, 10581:8
**AMIT** [1] - 10580:9
**amount** [9] - 10600:8, 10600:13, 10626:20, 10632:22, 10635:25, 10655:7, 10657:5, 10671:10
**amounts** [1] - 10673:11
**analogy** [1] - 10629:4
**analysis** [19] - 10582:12, 10582:14, 10582:19, 10582:22, 10591:14, 10591:23, 10592:3, 10592:22, 10592:25, 10593:14, 10599:24, 10600:2,

10604:18, 10604:24, 10608:24, 10613:20, 10639:2, 10646:22, 10650:22
**Android** [73] - 10583:2, 10583:7, 10583:8, 10583:15, 10583:25, 10584:18, 10585:11, 10585:17, 10585:18, 10585:23, 10586:15, 10586:22, 10586:23, 10586:25, 10587:6, 10587:17, 10587:22, 10588:10, 10588:18, 10589:14, 10592:3, 10592:22, 10593:4, 10593:10, 10593:17, 10593:18, 10594:1, 10594:5, 10594:6, 10594:12, 10594:19, 10595:11, 10595:17, 10595:18, 10595:20, 10598:24, 10599:3, 10600:20, 10601:2, 10604:7, 10604:11, 10611:13, 10615:9, 10616:8, 10616:17, 10616:25, 10617:4, 10618:8, 10618:11, 10618:15, 10618:17, 10618:20, 10618:23, 10618:25, 10619:2, 10619:13, 10621:21, 10624:23, 10625:3, 10625:8, 10635:9, 10635:19, 10635:20, 10635:21, 10636:14, 10645:15, 10645:22, 10646:5, 10646:6
**Android's** [2] - 10595:8, 10618:5
**angle** [1] - 10631:15
**Anna** - 10646:22, 10661:1
**announced** [2] - 10609:9, 10609:10
**answer** [16] - 10585:4, 10597:8, 10609:14, 10612:20, 10615:15, 10618:24, 10625:19, 10635:12, 10637:7, 10640:4, 10641:21, 10651:4, 10651:6, 10655:16, 10656:8
**answering** [1] - 10608:8
**anticompetitive** [1] - 10589:3
**antitrust** [2] -

10607:18, 10656:9
**anyway** [1] - 10642:1
**apologies** [1] - 10594:24
**apologize** [3] - 10594:8, 10624:25, 10635:11
**app** [1] - 10609:13
**appeal** [1] - 10669:9
**APPEARANCES** [1] - 10580:10
**Apple** [37] - 10595:16, 10596:23, 10597:9, 10597:10, 10597:17, 10597:18, 10597:19, 10597:20, 10597:21, 10598:7, 10598:13, 10599:6, 10599:10, 10618:8, 10618:12, 10618:17, 10618:23, 10619:3, 10620:5, 10620:16, 10626:15, 10626:17, 10626:25, 10628:5, 10629:1, 10629:10, 10635:24, 10636:5, 10636:14, 10637:8, 10652:3, 10656:19, 10656:25, 10657:2, 10657:11, 10658:3, 10659:4
**Apple's** [6] - 10591:25, 10592:5, 10593:7, 10598:20, 10658:20, 10658:25
**Apple/Google** [1] - 10666:4
**application** [2] - 10587:10, 10587:11
**applications** [1] - 10583:3
**applied** [1] - 10625:22
**applies** [1] - 10616:25
**apply** [2] - 10627:16, 10630:9
**appreciate** [4] - 10638:17, 10647:2, 10662:15, 10664:5
**appreciated** [1] - 10607:15
**approach** [6] - 10584:3, 10594:16, 10606:12, 10610:19, 10615:3, 10663:3
**apps** [1] - 10612:10
**April** [1] - 10609:18
**arduous** [1] - 10673:2
**argument** [2] - 10667:4, 10671:2
**argumentation** [1] - 10638:8

**argumentative** [1] - 10622:22
**arguments** [2] - 10638:10, 10672:11
**arise** [1] - 10652:25
**arranged** [1] - 10612:7
**article** [5] - 10626:1, 10626:4, 10628:2, 10630:10, 10630:15
**assess** [1] - 10591:14
**assessment** [4] - 10652:17, 10653:1, 10653:5, 10653:6
**assignment** [1] - 10590:15
**assume** [1] - 10605:10
**assumption** [1] - 10634:9
**AT&T** [6] - 10583:25, 10587:25, 10588:3, 10588:9, 10588:10, 10668:6
**AT&T's** [1] - 10655:20
**attract** [1] - 10631:23
**attracting** [1] - 10659:6
**attraction** [1] - 10640:11
**attractive** [2] - 10661:24, 10661:25
**attributable** [1] - 10650:14
**attributed** [1] - 10617:16
**attributing** [1] - 10648:24
**auction** [5] - 10601:25, 10602:6, 10603:1, 10609:18, 10609:20
**August** [3] - 10615:20, 10649:3, 10650:6
**authorities** [1] - 10612:4
**authors** [1] - 10625:25
**availability** [1] - 10651:23
**available** [8] - 10597:1, 10625:16, 10639:10, 10641:7, 10641:10, 10641:13, 10643:15, 10665:15
**Avenue** [6] - 10580:18, 10581:2, 10581:5, 10581:8, 10581:13, 10674:12
**avoid** [1] - 10638:8
**aware** [13] - 10587:14, 10587:20, 10588:25, 10589:4, 10590:18,

10596:20, 10598:6, 10600:20, 10600:25, 10609:15, 10612:11, 10626:23, 10630:22
**axis** [1] - 10595:24

**B**

**Backflip** [2] - 10584:20, 10585:8
**background** [1] - 10673:7
**bad** [3] - 10595:14, 10654:11, 10660:19
**based** [10] - 10621:3, 10631:13, 10634:9, 10634:20, 10642:3, 10654:7, 10655:12, 10655:22, 10668:14, 10672:14
**bases** [1] - 10615:21
**basic** [1] - 10630:3
**basis** [1] - 10671:8
**became** [3] - 10602:20, 10632:15, 10632:18
**become** [1] - 10643:1
**BEFORE** [1] - 10580:9
**before-and-after** [1] - 10591:14
**beginning** [3] - 10607:14, 10632:9, 10658:21
**behalf** [3] - 10607:5, 10664:10, 10669:10
**belief** [1] - 10657:4
**below** [1] - 10635:25
**BENCH** [1] - 10580:8
**benefits** [1] - 10666:18
**best** [8] - 10586:7, 10598:9, 10636:24, 10653:24, 10654:12, 10663:19, 10667:17, 10674:6
**better** [4] - 10632:18, 10641:4, 10641:24, 10661:9
**between** [9] - 10590:23, 10594:10, 10596:16, 10599:12, 10607:9, 10613:14, 10646:6, 10670:18, 10671:10
**beyond** [3] - 10583:5, 10591:5, 10640:1
**bid** [3] - 10602:17, 10603:12, 10605:15
**bidding** [3] - 10646:12, 10648:3,

10655:5
**Big** [1] - 10610:3
**big** [12] - 10593:25, 10594:3, 10594:14, 10610:4, 10610:5, 10610:13, 10611:2, 10617:7, 10617:8, 10618:16, 10667:7, 10673:10
**bigger** [2] - 10595:16, 10655:6
**billions** [1] - 10637:14
**binders** [1] - 10673:22
**Bing** [20] - 10583:16, 10583:22, 10585:1, 10586:24, 10599:6, 10599:10, 10599:19, 10610:5, 10611:3, 10611:24, 10620:6, 10620:8, 10620:11, 10620:17, 10631:12, 10631:14, 10631:20, 10648:18, 10648:24
**Bing's** [6] - 10620:12, 10620:15, 10632:4, 10648:11, 10649:12, 10650:19
**bit** [6] - 10588:13, 10601:23, 10635:25, 10660:22, 10661:9, 10670:22
**block** [1] - 10672:10
**blowing** [1] - 10660:19
**book** [1] - 10670:4
**bottom** [2] - 10595:20, 10630:8
**bought** [1] - 10616:4
**bound** [5] - 10632:21, 10633:5, 10635:6, 10642:5, 10642:14
**break** [2] - 10618:13, 10637:16
**brief** [2] - 10667:22, 10668:1
**briefings** [1] - 10670:10
**briefs** [8] - 10666:22, 10666:23, 10667:10, 10667:14, 10670:18, 10670:21, 10671:12, 10672:5
**bring** [1] - 10603:10
**brings** [2] - 10607:18, 10665:24
**broad** [1] - 10641:5
**broadly** [1] - 10616:18
**Broadway** [1] - 10580:23
**brought** [1] - 10596:5
**browser** [36] -

10596:8, 10596:10, 10596:21, 10596:23, 10597:10, 10597:17, 10597:23, 10597:24, 10598:3, 10598:4, 10598:9, 10598:13, 10598:20, 10599:6, 10599:10, 10600:4, 10600:9, 10600:14, 10604:6, 10604:11, 10604:21, 10605:2, 10605:21, 10605:23, 10606:2, 10606:4, 10607:16, 10607:19, 10621:21, 10624:22, 10625:3, 10625:8, 10640:9, 10656:13, 10657:14
**browsers** [5] - 10596:19, 10597:1, 10598:21, 10601:2, 10606:11
**Bruce** [1] - 10580:21
**build** [1] - 10600:4
**bullet** [6] - 10646:11, 10646:12, 10647:2, 10647:5, 10660:14, 10660:16
**bump** [1] - 10613:16
**business** [2] - 10640:15, 10658:4
**but-for** [3] - 10605:13, 10625:10, 10625:14
**buy** [2] - 10628:22, 10629:1
**buyers** [2] - 10583:1, 10583:7
**BY** [25] - 10582:7, 10584:5, 10590:1, 10594:17, 10595:25, 10602:5, 10606:15, 10608:21, 10610:20, 10615:4, 10617:11, 10623:6, 10626:13, 10629:6, 10630:17, 10631:6, 10638:23, 10640:6, 10649:19, 10650:9, 10651:3, 10651:9, 10656:11, 10658:19, 10660:13

**C**

**CA** [1] - 10580:19
**calculated** [1] - 10634:16
**calculations** [1] - 10643:13
**calendars** [1] - 10672:11

caps [1] - 10630:6
captured [1] - 10613:14
care [3] - 10585:18, 10653:22, 10655:22
cares [1] - 10655:19, 10659:4
carousel [1] - 10673:22
Carr [1] - 10580:23
carrier [11] - 10583:21, 10585:18, 10586:15, 10586:23, 10589:14, 10595:13, 10595:21, 10621:22, 10624:23, 10625:4, 10625:9
carriers [9] - 10583:15, 10585:12, 10585:23, 10586:3, 10588:21, 10588:23, 10589:1, 10589:6, 10589:8
carry [1] - 10612:10
case [53] - 10582:11, 10583:1, 10584:15, 10586:22, 10587:24, 10588:8, 10589:13, 10590:13, 10590:22, 10591:6, 10591:9, 10591:15, 10591:22, 10592:3, 10592:19, 10592:20, 10593:5, 10597:7, 10598:12, 10598:20, 10603:22, 10605:21, 10606:2, 10608:24, 10609:24, 10610:22, 10612:6, 10613:5, 10621:5, 10624:20, 10631:11, 10636:24, 10637:3, 10639:14, 10642:23, 10645:7, 10646:16, 10646:20, 10647:12, 10652:2, 10652:23, 10653:10, 10653:14, 10653:15, 10653:18, 10653:20, 10656:25, 10663:7, 10663:23, 10665:25, 10670:13, 10673:3, 10673:12
cases [3] - 10653:3, 10654:1, 10673:10
categorically [1] - 10609:2
causal [1] - 10594:13
CCR [1] - 10674:11
Center [1] - 10580:23
CEO [1] - 10654:9
CEOs [1] - 10654:7
certain [1] - 10588:16

certainly [34] - 10584:23, 10586:1, 10590:14, 10590:15, 10591:18, 10592:16, 10592:25, 10593:5, 10598:18, 10599:17, 10600:1, 10606:8, 10606:9, 10610:15, 10611:21, 10613:7, 10614:22, 10615:19, 10615:21, 10615:22, 10625:10, 10625:13, 10629:19, 10630:23, 10631:7, 10631:19, 10632:3, 10635:3, 10636:20, 10640:14, 10649:6, 10659:6, 10673:8, 10673:17
CERTIFICATE [1] - 10674:1
certify [1] - 10674:3
challenged [1] - 10609:4
chance [1] - 10662:6
change [5] - 10594:11, 10595:1, 10603:1, 10614:5, 10621:25
changed [1] - 10602:22
changes [2] - 10594:4, 10613:25
charm [1] - 10662:12
chart [3] - 10629:7, 10629:8, 10629:12
check [1] - 10631:16
Chicago [1] - 10580:15
chip [6] - 10628:17, 10628:19, 10628:22, 10628:23, 10629:2, 10629:25
chips [3] - 10628:13, 10628:16, 10629:24
choice [78] - 10586:1, 10589:15, 10592:23, 10593:2, 10593:3, 10593:6, 10593:7, 10593:12, 10593:21, 10593:24, 10594:4, 10595:4, 10595:5, 10598:7, 10600:5, 10600:8, 10600:13, 10600:16, 10600:21, 10600:25, 10601:3, 10601:4, 10601:8, 10601:15, 10601:23, 10601:25, 10602:7, 10602:20, 10602:22, 10603:4, 10603:6, 10603:11, 10603:15,

10604:6, 10604:11, 10604:16, 10609:8, 10609:12, 10609:15, 10609:19, 10609:20, 10610:1, 10610:4, 10611:2, 10611:10, 10611:13, 10612:14, 10612:24, 10613:2, 10613:6, 10613:7, 10613:11, 10613:15, 10613:17, 10613:23, 10614:1, 10614:4, 10614:10, 10614:11, 10614:15, 10614:19, 10615:6, 10615:7, 10615:8, 10615:22, 10616:1, 10616:2, 10616:5, 10617:1, 10617:17, 10617:23, 10617:25, 10619:12, 10619:22, 10619:23, 10619:24, 10620:16, 10643:16
choices [1] - 10614:6
choose [6] - 10586:7, 10586:9, 10588:3, 10589:15, 10597:24, 10598:4
choosing [2] - 10593:23, 10601:4
chose [1] - 10588:5
chosen [5] - 10598:25, 10601:8, 10601:10, 10603:6, 10614:6
Chrome [15] - 10596:11, 10596:17, 10639:12, 10639:18, 10639:20, 10639:25, 10640:7, 10640:9, 10640:12, 10640:15, 10640:18, 10643:11, 10643:12
circumstances [3] - 10652:10, 10653:1, 10663:24
cite [2] - 10622:18, 10636:8
cited [8] - 10589:13, 10621:12, 10621:16, 10621:20, 10626:6, 10627:24, 10630:10, 10636:4
citing [1] - 10635:2
claim [2] - 10629:11, 10650:19
clarify [3] - 10618:21, 10619:18, 10642:1
clawback [4] - 10634:20, 10635:17, 10635:22, 10636:16

clear [8] - 10593:2, 10608:22, 10625:18, 10641:12, 10646:3, 10665:5, 10665:20, 10670:16
CLERK [1] - 10669:5
close [5] - 10629:14, 10629:15, 10636:9, 10661:8, 10663:7
closing [1] - 10671:3
CMR [1] - 10674:11
CO [1] - 10580:24
colleague [1] - 10663:11
Colorado [4] - 10580:21, 10580:23, 10663:11, 10664:8
COLORADO [1] - 10580:22
COLUMBIA [1] - 10580:1
columns [1] - 10616:10
combined [1] - 10636:6
comfortable [1] - 10653:10
coming [6] - 10630:25, 10636:11, 10637:9, 10660:22, 10663:15, 10666:12
comment [1] - 10656:15
Commission [3] - 10588:17, 10589:2, 10589:4
commissions [2] - 10654:3, 10655:11
committed [1] - 10664:18
companies [1] - 10607:19
company [2] - 10637:15, 10644:4
comparable [4] - 10596:2, 10641:3, 10642:23, 10644:13
compare [1] - 10618:1
compared [5] - 10595:10, 10612:21, 10613:10, 10648:3
compares [2] - 10614:15, 10648:2
comparing [4] - 10592:8, 10593:20, 10611:24, 10647:11
comparison [5] - 10592:11, 10595:18, 10617:14, 10618:18, 10618:22

10680

**compensate** [2] - 10654:11, 10655:22
**compete** [9] - 10604:20, 10605:1, 10605:5, 10620:16, 10639:3, 10640:22, 10661:6, 10661:13, 10662:3
**competed** [1] - 10593:6
**competing** [6] - 10586:3, 10600:9, 10600:14, 10605:22, 10606:3, 10639:5
**competition** [27] - 10582:12, 10582:15, 10582:16, 10582:19, 10582:23, 10586:6, 10600:17, 10603:18, 10603:20, 10604:15, 10605:23, 10606:4, 10607:16, 10612:17, 10625:23, 10625:25, 10644:7, 10644:11, 10645:9, 10647:6, 10647:16, 10648:9, 10655:14, 10661:19, 10662:4
**competitive** [9] - 10582:9, 10591:14, 10591:25, 10592:5, 10592:24, 10596:9, 10596:15, 10598:21, 10598:25
**complaining** [3] - 10613:2, 10619:21, 10619:23
**complaint** [1] - 10663:6
**complaints** [1] - 10620:2
**complete** [5] - 10593:14, 10629:17, 10641:14, 10670:2, 10674:5
**completely** [1] - 10630:1
**components** [1] - 10627:22
**concern** [1] - 10608:12
**concerns** [2] - 10665:7, 10665:12
**conclusion** [1] - 10643:14
**conclusions** [6] - 10667:13, 10667:17, 10667:23, 10670:6, 10672:4, 10672:8
**condemned** [1] -

10589:11
**conditional** [2] - 10605:6, 10627:3
**conditions** [1] - 10612:15
**conduct** [9] - 10582:11, 10582:14, 10590:23, 10590:25, 10591:2, 10591:7, 10591:13, 10591:15, 10592:20
**confidentiality** [2] - 10665:7, 10665:12
**confidently** [1] - 10623:16
**configure** [1] - 10585:20
**confirm** [1] - 10672:13
**confronted** [1] - 10586:1
**connection** [1] - 10666:3
**CONNOLLY** [1] - 10581:1
**Conor** [2] - 10580:21, 10664:7
**Conor.may@coag. gov** [1] - 10580:25
**consider** [4] - 10608:23, 10636:7, 10637:11, 10661:22
**considered** [2] - 10591:15, 10606:20
**considering** [1] - 10625:13
**consistent** [2] - 10592:18, 10615:12
**constitutes** [1] - 10674:4
**Constitution** [2] - 10581:13, 10674:12
**consumer** [1] - 10644:25
**Consumer** [1] - 10580:22
**consumers** [3] - 10583:17, 10597:1, 10607:16
**containing** [1] - 10664:9
**contains** [1] - 10664:12
**contemplating** [1] - 10666:23
**content** [2] - 10610:10, 10630:21
**contents** [1] - 10664:16
**contestable** [1] - 10641:7

**context** [2] - 10656:21, 10666:21
**contingency** [5] - 10652:22, 10652:24, 10653:3, 10653:6, 10653:11
**continue** [2] - 10610:17, 10659:11
**contract** [15] - 10627:8, 10643:24, 10643:25, 10644:3, 10644:7, 10644:11, 10646:13, 10646:17, 10652:23, 10652:24, 10653:23, 10657:15, 10660:25, 10661:20, 10662:3
**contracting** [2] - 10653:21, 10653:22
**contractor** [1] - 10626:21
**contracts** [16] - 10623:14, 10625:12, 10642:9, 10642:15, 10642:17, 10643:18, 10644:8, 10644:9, 10644:24, 10645:18, 10656:17, 10659:14, 10661:6, 10661:18
**conversation** [1] - 10669:11
**copies** [1] - 10669:6
**copy** [4] - 10664:25, 10668:20, 10669:3
**corner** [1] - 10630:9
**Corporation** [1] - 10607:20
**correct** [103] - 10582:16, 10582:17, 10582:25, 10583:8, 10583:12, 10583:19, 10587:11, 10587:17, 10587:22, 10587:23, 10588:1, 10588:5, 10588:18, 10588:19, 10588:21, 10590:20, 10590:21, 10591:7, 10591:11, 10591:12, 10591:19, 10592:10, 10592:12, 10592:20, 10592:21, 10592:24, 10593:8, 10595:8, 10597:2, 10597:20, 10597:25, 10598:11, 10598:13, 10598:17, 10598:22, 10599:7, 10599:11, 10599:25, 10600:22, 10601:6, 10601:11, 10601:16, 10603:7, 10604:7,

10604:12, 10605:19, 10608:4, 10609:16, 10609:22, 10610:9, 10612:1, 10612:24, 10613:2, 10613:12, 10613:18, 10615:13, 10616:21, 10619:1, 10619:4, 10619:8, 10620:1, 10620:3, 10620:5, 10620:9, 10621:14, 10621:23, 10622:8, 10624:1, 10625:4, 10625:9, 10625:16, 10626:2, 10626:15, 10627:12, 10628:7, 10628:20, 10631:10, 10631:21, 10632:1, 10632:2, 10632:5, 10632:6, 10632:14, 10633:9, 10633:17, 10633:24, 10636:16, 10637:3, 10639:2, 10639:11, 10639:19, 10639:22, 10639:23, 10640:20, 10641:8, 10641:15, 10644:19, 10645:6, 10646:6, 10651:12, 10657:7, 10657:19, 10668:19
**correctly** [1] - 10604:23
**correspond** [2] - 10614:20, 10614:22
**cost** [1] - 10600:4
**counsel** [5] - 10606:23, 10607:9, 10607:25, 10608:11, 10660:15
**counsel's** [1] - 10658:22
**country** [1] - 10617:8
**couple** [3] - 10646:10, 10668:23, 10670:3
**course** [5] - 10597:6, 10664:4, 10665:12, 10665:13, 10667:6
**COURT** [75] - 10580:1, 10582:2, 10595:18, 10595:21, 10602:3, 10606:13, 10608:19, 10616:9, 10616:14, 10616:20, 10616:22, 10622:23, 10626:10, 10629:5, 10630:15, 10631:4, 10637:7, 10637:16, 10637:21, 10637:23, 10638:2, 10638:17, 10638:20, 10640:2, 10640:4,

10649:9, 10649:16, 10650:8, 10651:2, 10651:6, 10652:7, 10652:25, 10654:13, 10654:19, 10654:22, 10655:1, 10658:8, 10658:15, 10660:6, 10662:11, 10662:13, 10662:21, 10663:2, 10663:4, 10663:8, 10663:17, 10664:5, 10664:14, 10664:17, 10665:1, 10665:10, 10665:14, 10665:18, 10665:20, 10665:24, 10667:15, 10667:21, 10668:2, 10668:4, 10668:8, 10668:14, 10668:17, 10668:23, 10669:6, 10669:14, 10669:18, 10669:22, 10669:25, 10670:24, 10671:7, 10671:16, 10671:19, 10672:18, 10673:1, 10674:1

**court** [1] - 10668:25
**Court** [8] - 10581:11, 10581:12, 10585:7, 10635:4, 10635:5, 10635:16, 10667:18, 10674:11
**Courthouse** [1] - 10581:12
**courtroom** [1] - 10637:22
**COURTROOM** [3] - 10669:17, 10669:21, 10669:24
**coverage** [4] - 10584:9, 10629:11, 10638:24
**coverage/ foreclosure** [1] - 10638:25
**covered** [9] - 10639:8, 10640:18, 10641:15, 10641:17, 10642:15, 10643:8, 10643:9, 10645:18
**crazy** [1] - 10655:21
**CRC** [1] - 10581:11
**creates** [2] - 10651:22, 10655:14
**criticism** [1] - 10583:17
**critique** [2] - 10604:2, 10614:17
**critiqued** [3] - 10614:9, 10615:17, 10617:3

**cross** [1] - 10662:25
**Cross** [1] - 10675:4
**CROSS** [1] - 10582:6
**Cross-Examination** [1] - 10675:4
**CROSS-EXAMINATION** [1] - 10582:6
**Crowell** [1] - 10607:1
**CRR** [2] - 10581:11, 10674:11
**Cue** [1] - 10666:10
**Cue's** [1] - 10666:5
**curious** [1] - 10593:13
**current** [3] - 10592:13, 10646:25, 10660:23
**curve** [1] - 10637:24
**custodian** [3] - 10668:7, 10668:11
**customers** [6] - 10586:4, 10586:10, 10586:11, 10659:1, 10659:4, 10659:6
**cut** [2] - 10643:20, 10644:13
**CV** [1] - 10580:4
**Czech** [1] - 10614:25

# D

**D.C** [4] - 10580:5, 10580:12, 10581:2, 10674:13
**Dahlquist** [1] - 10580:14
**data** [11] - 10594:20, 10613:5, 10615:7, 10615:17, 10617:3, 10648:18, 10648:25, 10649:2, 10649:23, 10649:24, 10650:2
**date** [2] - 10609:17, 10617:6
**Dated** [1] - 10674:7
**Daubert** [1] - 10667:3
**David** [1] - 10580:14
**David.dahlquist @ usdoj.gov** [1] - 10580:16
**DAY** [1] - 10580:3
**days** [2] - 10663:16, 10666:12
**DC** [1] - 10581:13
**deal** [13] - 10621:2, 10627:17, 10628:18, 10648:12, 10648:15, 10648:16, 10649:13, 10649:20, 10649:21, 10649:23, 10649:24, 10651:24, 10667:14

**deals** [6] - 10627:13, 10628:6, 10628:8, 10637:5, 10637:14, 10661:11
**debate** [5] - 10648:17, 10648:19, 10648:23, 10649:1, 10650:5
**debunked** [1] - 10649:14
**December** [2] - 10648:21, 10650:7
**decide** [1] - 10653:24
**decided** [2] - 10586:25, 10588:5
**decides** [1] - 10651:17
**deciding** [1] - 10603:22
**decision** [1] - 10658:20
**decisions** [1] - 10585:19
**default** [43] - 10583:16, 10589:15, 10597:10, 10597:13, 10597:14, 10597:18, 10597:19, 10597:23, 10598:3, 10598:16, 10598:22, 10599:6, 10599:10, 10600:5, 10600:10, 10600:15, 10604:20, 10605:1, 10605:5, 10605:16, 10607:20, 10608:13, 10620:6, 10621:24, 10621:25, 10622:13, 10623:21, 10628:5, 10628:9, 10629:10, 10629:13, 10632:14, 10634:5, 10634:10, 10639:18, 10639:21, 10644:17, 10645:5, 10655:7, 10658:21, 10659:11, 10659:21, 10660:1
**defaults** [8] - 10603:18, 10603:19, 10605:23, 10606:4, 10644:22, 10659:14, 10659:15, 10662:2
**Defendant** [2] - 10580:7, 10581:1
**defer** [1] - 10664:4
**deferred** [1] - 10668:19
**definitely** [2] - 10636:23, 10648:19
**demand** [3] - 10583:2, 10583:7, 10644:25
**demanded** [1] - 10656:19

**democracy** [1] - 10612:22
**demonstratives** [5] - 10584:7, 10662:18, 10662:20, 10662:24, 10663:1
**Denver** [1] - 10580:24
**Department** [5] - 10606:24, 10607:10, 10607:17, 10608:23, 10663:5
**DEPARTMENT** [4] - 10580:11, 10580:14, 10580:17, 10580:22
**depicting** [2] - 10648:11, 10648:14
**deposition** [3] - 10585:6, 10585:9, 10665:4
**DEPUTY** [3] - 10669:17, 10669:21, 10669:24
**descending** [1] - 10626:11
**describe** [1] - 10610:11
**described** [1] - 10625:20
**describing** [2] - 10613:20, 10639:7
**description** [2] - 10633:10, 10633:25
**design** [1] - 10598:9
**designations** [8] - 10663:12, 10663:25, 10664:2, 10664:18, 10664:21, 10664:24, 10665:4
**designed** [6] - 10597:9, 10597:17, 10597:20, 10597:23, 10598:3, 10603:11
**desirability** [1] - 10659:9
**desirable** [2] - 10586:14, 10592:14
**desire** [1] - 10598:7
**desktop** [4] - 10635:18, 10636:2, 10636:3, 10636:7
**detail** [5] - 10589:10, 10596:5, 10630:22, 10663:25, 10664:16
**details** [4] - 10588:22, 10589:9, 10612:7, 10626:11
**determination** [1] - 10638:9
**determinations** [1] - 10666:13

10682

**determine** [1] - 10650:22

**developed** [3] - 10583:15, 10632:7, 10632:11

**developer** [4] - 10621:21, 10624:23, 10625:3, 10625:8

**developers** [1] - 10598:13

**device** [26] - 10583:7, 10584:1, 10585:11, 10585:23, 10586:13, 10586:17, 10586:18, 10586:25, 10587:25, 10588:4, 10588:10, 10588:20, 10588:25, 10589:5, 10589:10, 10592:23, 10604:7, 10604:11, 10629:10, 10646:1

**device-by-device** [4] - 10587:25, 10588:20, 10588:25, 10589:10

**devices** [20] - 10583:2, 10584:18, 10585:20, 10586:8, 10587:5, 10587:6, 10587:17, 10587:22, 10589:15, 10593:4, 10593:6, 10597:2, 10597:10, 10597:18, 10612:10, 10614:3, 10616:17, 10616:19, 10619:13

**DICKMAN** [1] - 10674:3

**Dickman** [2] - 10581:11, 10674:11

**different** [23] - 10589:8, 10591:2, 10591:3, 10595:9, 10601:12, 10613:19, 10613:20, 10623:22, 10627:22, 10628:12, 10628:25, 10631:17, 10637:12, 10641:6, 10642:21, 10647:11, 10653:18, 10655:10, 10656:1, 10656:10, 10657:23, 10659:5, 10663:24

**differentiate** [3] - 10630:18, 10631:12, 10631:15

**difficult** [1] - 10605:25

**digital** [1] - 10594:23

**diminishing** [1] - 10637:24

**DINTZER** [10] - 10663:5, 10664:23,

10665:7, 10665:13, 10667:16, 10667:25, 10668:3, 10671:5, 10671:14, 10672:22

**Dintzer** [3] - 10580:11, 10663:8, 10667:15

**directed** [1] - 10660:4

**direction** [2] - 10629:5, 10642:13

**directly** [3] - 10612:5, 10636:5, 10655:20

**disadvantaged** [1] - 10662:5

**disagree** [1] - 10583:14

**disclose** [1] - 10634:15

**disclosed** [2] - 10633:8, 10634:14

**disclosure** [1] - 10666:8

**discussed** [3] - 10611:1, 10634:25, 10667:19

**discussing** [2] - 10586:21, 10608:16

**discussion** [8] - 10603:10, 10608:2, 10610:18, 10611:3, 10631:14, 10633:12, 10659:14

**distinction** [1] - 10599:12

**distinguish** [2] - 10589:18, 10590:23

**distinguished** [1] - 10630:24

**Distributing** [1] - 10654:19

**distribution** [8] - 10599:22, 10654:17, 10654:18, 10656:13, 10657:2, 10657:6, 10657:8, 10658:12

**distributor** [5] - 10603:22, 10654:14, 10654:16, 10655:2

**DISTRICT** [3] - 10580:1, 10580:1, 10580:9

**divine** [1] - 10636:18

**division** [1] - 10607:18

**docket** [3] - 10664:20, 10665:3, 10665:15

**document** [16] - 10584:14, 10584:15, 10588:12, 10606:18, 10635:2, 10635:3, 10635:4, 10635:8, 10635:16, 10635:20,

10635:21, 10637:13, 10664:1, 10668:6, 10668:11

**documents** [8] - 10623:14, 10634:18, 10634:21, 10635:7, 10636:13, 10668:24

**DoJ** [5] - 10672:2, 10672:5, 10672:7, 10672:8, 10672:22

**DOJ** [1] - 10580:11

**dollars** [1] - 10637:14

**dominant** [7] - 10628:17, 10628:22, 10630:1, 10630:11, 10646:13, 10647:6, 10660:24

**done** [11] - 10592:22, 10614:18, 10618:2, 10631:18, 10638:4, 10645:23, 10646:3, 10646:7, 10650:22, 10656:12, 10665:2

**double** [1] - 10631:16

**Douyon** [1] - 10669:14

**down** [12] - 10595:3, 10595:4, 10595:22, 10601:14, 10618:13, 10632:4, 10635:25, 10641:1, 10646:8, 10670:21, 10671:23, 10671:24

**download** [1] - 10609:13

**downside** [1] - 10603:21

**draft** [1] - 10626:21

**drafted** [1] - 10606:22

**drew** [1] - 10637:13

**drive** [3] - 10664:9, 10664:11, 10664:23

**Duck** [10] - 10629:11, 10632:16, 10633:24, 10633:25, 10641:3, 10641:23, 10642:20, 10642:21, 10645:13, 10645:17

**DuckDuckGo** [15] - 10586:24, 10602:16, 10609:24, 10611:16, 10612:23, 10613:1, 10613:6, 10615:6, 10615:9, 10615:24, 10616:11, 10616:12, 10616:17, 10619:15

**due** [5] - 10598:16, 10632:13, 10671:12, 10671:25, 10672:6

**duplicative** [1] - 10635:1

**duration** [1] - 10673:3

**durations** [1] - 10644:8

**during** [3] - 10587:14, 10587:21, 10588:8

**DX** [1] - 10584:12

**DX384** [3] - 10584:9, 10668:16, 10668:21

**DX384......................
.........................10668** [1] - 10675:7

**DX547** [1] - 10606:16

**DX737** [2] - 10584:9, 10584:11

**DXD41.002** [5] - 10584:7, 10584:8, 10585:13, 10662:19, 10675:8

**DXD41.003** [2] - 10584:8, 10584:11

**DXD41.008** [1] - 10594:18

**DXD41.020** [2] - 10589:25, 10590:4

**DXD41.021** [1] - 10615:5

**DXD41.039** [1] - 10602:12

### E

**eardrums** [1] - 10660:20

**ease** [1] - 10665:6

**easier** [2] - 10670:12, 10673:13

**EC** [3] - 10588:14, 10601:15, 10601:25

**economic** [5] - 10585:10, 10585:16, 10600:4, 10602:17, 10647:15

**Economic** [1] - 10602:19

**economists** [1] - 10648:9

**Ecosia** [2] - 10602:16, 10603:23

**effect** [11] - 10589:3, 10593:25, 10598:18, 10599:18, 10617:10, 10617:12, 10617:13, 10617:25, 10625:25, 10648:25, 10661:18

**effective** [1] - 10673:6

**effectively** [2] - 10593:7, 10640:23

**effects** [4] - 10591:2, 10591:3, 10591:14, 10625:21

**effectuate** [1] - 10612:5

**effort** [2] - 10653:16, 10654:4

**efforts** [3] - 10612:16, 10613:2, 10673:8

**either** [6] - 10596:5, 10601:1, 10612:17, 10612:24, 10631:8, 10664:19

**electronic** [3] - 10669:8, 10669:13, 10670:23

**electronically** [1] - 10669:3

**Elizabeth** [2] - 10580:17, 10662:22

**Elizabeth.jensen@ usdoj.gov** [1] - 10580:20

**Email** [8] - 10580:13, 10580:16, 10580:20, 10580:25, 10580:25, 10581:3, 10581:7, 10581:10

**email** [2] - 10646:22, 10661:2

**employees** [1] - 10598:12

**end** [9] - 10587:2, 10587:3, 10599:21, 10630:6, 10638:11, 10650:1, 10660:19, 10665:25, 10668:5

**ended** [2] - 10587:12, 10587:13

**ends** [1] - 10666:1

**enforcement** [1] - 10607:18

**engage** [1] - 10613:1

**engine** [30] - 10583:17, 10586:12, 10586:16, 10587:3, 10587:16, 10587:22, 10588:4, 10588:10, 10589:16, 10590:6, 10590:19, 10591:24, 10592:4, 10592:17, 10597:11, 10597:13, 10597:18, 10598:21, 10599:1, 10600:5, 10604:5, 10604:10, 10608:13, 10620:6, 10632:8, 10632:11, 10640:8, 10656:20, 10658:2, 10658:21

**engines** [20] - 10584:19, 10585:25, 10597:24, 10598:4, 10599:18, 10600:9,

10600:14, 10602:6, 10602:15, 10602:23, 10603:12, 10603:14, 10606:10, 10609:6, 10613:11, 10614:20, 10614:21, 10614:25, 10623:20, 10654:23

**English** [1] - 10595:14

**enjoy** [1] - 10673:20

**enter** [4] - 10608:3, 10608:13, 10624:21, 10625:7

**entered** [1] - 10625:2

**entering** [3] - 10607:20, 10621:22, 10626:24

**entire** [3] - 10587:21, 10588:9, 10628:19

**entirely** [1] - 10606:5

**entirety** [1] - 10666:13

**episode** [1] - 10635:3

**equal** [7] - 10643:1, 10643:4, 10643:13, 10643:15, 10643:16, 10643:25, 10661:8

**equaled** [1] - 10644:16

**equilibrium** [1] - 10648:2

**estimates** [6] - 10635:17, 10636:3, 10636:9, 10636:12, 10637:2, 10637:10

**et** [1] - 10580:3

**EU** [5] - 10595:10, 10595:11, 10595:12, 10612:21, 10615:6

**Europe** [58] - 10588:13, 10588:14, 10588:16, 10588:20, 10588:23, 10589:1, 10589:9, 10589:11, 10593:2, 10593:12, 10593:19, 10593:20, 10593:21, 10593:23, 10594:19, 10595:8, 10600:21, 10601:1, 10601:14, 10601:23, 10609:16, 10610:1, 10610:3, 10610:4, 10610:5, 10610:9, 10610:13, 10610:25, 10611:2, 10611:14, 10612:23, 10613:1, 10613:6, 10613:10, 10613:12, 10615:24, 10616:21, 10618:5, 10618:9, 10618:12, 10618:16, 10618:23, 10619:1, 10619:2, 10619:4, 10619:10,

10619:11, 10619:13, 10619:14, 10619:15, 10619:22, 10620:8, 10620:11, 10620:12, 10620:16, 10620:18, 10621:9, 10621:10

**European** [5] - 10588:17, 10589:1, 10589:4, 10596:4, 10609:8

**evaluated** [1] - 10630:18

**event** [2] - 10628:12, 10669:8

**events** [1] - 10590:13

**eventually** [1] - 10662:2

**evidence** [37] - 10583:1, 10583:8, 10583:24, 10584:2, 10584:12, 10584:14, 10584:15, 10586:22, 10587:24, 10588:8, 10589:14, 10590:14, 10590:16, 10605:21, 10606:2, 10606:17, 10609:23, 10610:2, 10610:7, 10610:8, 10610:13, 10611:11, 10611:15, 10611:16, 10616:1, 10619:14, 10619:19, 10619:20, 10621:3, 10621:12, 10621:16, 10621:20, 10626:14, 10627:21, 10635:1, 10640:10, 10668:25

**evidentiary** [2] - 10665:25, 10667:7

**exact** [2] - 10589:9, 10658:23

**exactly** [27] - 10588:22, 10589:6, 10595:16, 10599:16, 10599:20, 10600:16, 10600:17, 10609:14, 10610:25, 10615:16, 10623:4, 10627:22, 10631:18, 10637:9, 10637:12, 10639:12, 10640:11, 10643:6, 10648:17, 10649:3, 10649:4, 10650:22, 10652:6, 10653:21, 10657:24, 10658:12, 10659:13

**exam** [1] - 10660:5

**examination** [1] - 10638:13, 10658:22

**Examination** [2] -

10675:4, 10675:4

**EXAMINATION** [2] - 10582:6, 10658:18

**example** [9] - 10583:20, 10587:5, 10587:8, 10593:2, 10628:24, 10636:21, 10645:13, 10645:18, 10652:23

**examples** [2] - 10584:18, 10622:19

**excellent** [1] - 10673:6

**excerpt** [1] - 10610:24

**excerpts** [3] - 10584:8, 10584:11, 10584:13

**exclusion** [1] - 10666:1

**exclusionary** [2] - 10591:7, 10639:21

**exclusive** [17] - 10583:16, 10605:16, 10623:21, 10625:12, 10625:24, 10627:2, 10627:19, 10628:6, 10628:8, 10628:19, 10629:18, 10630:5, 10630:6, 10646:13, 10648:4, 10655:20, 10659:14

**exclusives** [4] - 10647:6, 10658:10, 10658:11, 10662:5

**exclusivity** [4] - 10627:25, 10628:1, 10659:21, 10660:1

**excuse** [1] - 10613:25

**executives** [1] - 10598:15

**exercise** [1] - 10666:9

**exhibit** [7] - 10668:15, 10668:16, 10668:17, 10669:15, 10669:19, 10669:20

**EXHIBITS** [1] - 10675:6

**exhibits** [6] - 10666:3, 10669:7, 10669:13, 10669:16, 10670:11, 10670:14

**exist** [1] - 10589:22

**existing** [1] - 10617:8

**expand** [1] - 10667:19

**expect** [7] - 10583:2, 10583:4, 10585:11, 10586:6, 10586:18, 10593:22, 10624:9

**expectation** [1] - 10624:10

**expected** [2] - 10640:22, 10642:16

**experiences** [1] - 10585:22
**expert** [44] - 10582:14, 10582:18, 10582:22, 10589:13, 10591:22, 10592:2, 10596:22, 10597:22, 10598:2, 10598:6, 10598:9, 10598:19, 10599:5, 10599:9, 10599:15, 10599:16, 10599:25, 10600:3, 10600:7, 10600:12, 10604:4, 10604:9, 10604:18, 10604:24, 10605:14, 10609:23, 10615:22, 10621:12, 10621:16, 10621:19, 10621:20, 10622:18, 10624:21, 10625:1, 10626:6, 10631:11, 10631:19, 10633:8, 10633:13, 10633:21, 10634:24, 10634:4, 10634:15, 10660:3
**explain** [1] - 10607:15
**explains** [1] - 10664:15
**expressed** [1] - 10599:14
**expressing** [1] - 10608:12
**expression** [2] - 10614:1, 10650:18
**extend** [2] - 10673:1, 10673:15
**extent** [6] - 10589:20, 10638:12, 10649:2, 10671:21, 10672:15, 10673:5
**extreme** [1] - 10596:11
**extremely** [1] - 10673:2
**extremes** [1] - 10642:21
**eye** [2] - 10630:7, 10666:12
**Ezell** [1] - 10584:11, 10668:12
**Ezell's** [2] - 10585:6, 10668:22

## F

**face** [3] - 10639:13, 10670:4, 10670:7
**Facebook** [1] - 10668:9
**faced** [1] - 10655:13
**facing** [1] - 10658:10, 10658:11
**fact** [13] - 10602:18, 10612:3, 10614:19, 10636:16, 10642:7, 10644:22, 10653:18, 10664:21, 10668:12, 10670:6, 10672:1, 10672:2, 10672:7
**factors** [1] - 10586:21
**facts** [3] - 10638:10, 10644:21, 10671:21
**fair** [4] - 10623:5, 10623:7, 10623:15, 10670:24
**fall** [1] - 10593:21
**falling** [1] - 10593:18
**familiar** [1] - 10583:24
**families** [1] - 10673:15
**fan** [1] - 10612:19
**far** [2] - 10590:12, 10592:19
**Fascinate** [3] - 10584:20, 10585:2, 10585:14
**fashion** [1] - 10651:18
**favor** [1] - 10667:10
**favored** [1] - 10659:16
**features** [2] - 10632:4, 10632:5
**February** [4] - 10648:15, 10650:10, 10671:12, 10672:1
**fee** [4] - 10652:22, 10653:11, 10653:12, 10653:25
**fell** [4] - 10593:17, 10593:18, 10593:19, 10615:18
**few** [2] - 10665:25, 10667:1
**field** [3] - 10643:17, 10651:14, 10651:15
**fight** [1] - 10634:14
**figure** [5] - 10614:7, 10633:6, 10634:16, 10634:20, 10650:24
**figured** [1] - 10595:21
**figures** [1] - 10639:1
**filed** [2] - 10606:23, 10670:18
**files** [1] - 10668:22
**filing** [2] - 10671:15
**filings** [6] - 10663:20, 10671:10, 10671:11, 10671:13, 10671:25, 10672:6
**final** [2] - 10672:18, 10673:22
**finally** [2] - 10662:3, 10670:15

**finance** [1] - 10636:23
**findings** [4] - 10670:6, 10672:1, 10672:2, 10672:7
**fine** [2] - 10649:18, 10662:1
**fingers** [1] - 10629:14
**finish** [3] - 10618:21, 10637:7, 10638:14
**firm** [12] - 10623:20, 10630:1, 10630:11, 10634:5, 10634:10, 10646:13, 10647:6, 10651:25, 10654:8, 10656:12, 10660:24
**firm's** [1] - 10628:22, 10655:5
**firmer** [1] - 10657:8
**firms** [7] - 10633:15, 10636:9, 10647:23, 10654:2, 10654:6, 10654:20, 10655:14
**first** [14] - 10591:10, 10607:2, 10607:7, 10607:12, 10608:1, 10609:11, 10622:21, 10622:24, 10653:8, 10655:16, 10657:15, 10661:23
**five** [2] - 10593:16, 10614:4
**flagged** [1] - 10666:19
**flash** [1] - 10666:13
**flat** [1] - 10614:12
**flaw** [2] - 10602:20, 10603:9
**flawed** [1] - 10602:21
**flip** [2] - 10585:12
**flipped** [1] - 10618:8
**Floor** [3] - 10580:23, 10581:5, 10581:9
**focus** [1] - 10660:14
**focused** [1] - 10645:14
**focusing** [1] - 10589:21
**folks** [1] - 10673:7
**followed** [1] - 10631:25
**following** [2] - 10616:9, 10665:1
**follows** [1] - 10671:22
**FOR** [1] - 10580:1
**foreclosed** [3] - 10632:13, 10633:16, 10640:16
**foreclosure** [20] - 10629:15, 10629:20, 10632:22, 10633:4, 10633:11, 10633:23,

10634:1, 10634:3, 10634:12, 10639:1, 10640:17, 10642:3, 10642:14, 10644:9, 10645:13, 10646:2, 10646:4, 10658:12, 10661:22
**foreclosures** [1] - 10632:21
**foregoing** [1] - 10674:4
**foreseeable** [1] - 10632:23
**forgetting** [1] - 10636:10
**forgot** [1] - 10666:2
**form** [5] - 10590:17, 10630:14, 10646:16, 10647:17, 10669:13
**formally** [1] - 10672:20
**format** [1] - 10669:8
**formulate** [1] - 10635:12
**forth** [9] - 10582:18, 10582:22, 10591:22, 10592:2, 10648:19, 10650:6, 10650:24, 10651:5, 10664:13
**forward** [4] - 10617:6, 10622:23, 10626:10, 10672:16
**Foundation** [1] - 10607:5
**four** [2] - 10623:13, 10662:1
**Fox** [1] - 10667:4
**frame** [1] - 10605:8
**Francisco** [1] - 10580:19
**frequently** [1] - 10613:5
**front** [3] - 10590:4, 10606:16, 10630:16
**full** [2] - 10671:20, 10674:5
**fully** [1] - 10623:17
**future** [3] - 10632:24, 10644:7, 10672:15

## G

**gain** [2] - 10619:7, 10657:6
**gained** [1] - 10594:12
**gains** [1] - 10617:18
**game** [3] - 10647:23, 10648:1, 10648:5
**gap** [1] - 10650:19
**Gate** [1] - 10580:18

10685

**general** [6] - 10583:10, 10590:6, 10602:23, 10603:12, 10604:5, 10623:20
**generally** [2] - 10615:10, 10664:2
**generate** [1] - 10645:9
**generates** [1] - 10655:21
**Giannandrea's** [1] - 10666:11
**girth** [1] - 10667:18
**given** [7] - 10584:10, 10592:13, 10636:19, 10644:10, 10661:19, 10667:18, 10669:2
**glad** [1] - 10670:25
**God** [1] - 10636:19
**God-given** [1] - 10636:19
**Golden** [1] - 10580:18
**Goodrich** [2] - 10581:4, 10581:8
**google** [1] - 10580:6
**Google** [134] - 10581:1, 10583:3, 10583:7, 10584:19, 10585:24, 10586:2, 10586:17, 10586:20, 10587:1, 10587:6, 10587:15, 10587:17, 10588:1, 10588:4, 10588:11, 10588:20, 10589:1, 10590:18, 10590:24, 10590:25, 10591:6, 10591:10, 10591:17, 10591:18, 10591:24, 10592:4, 10592:6, 10592:9, 10592:14, 10592:15, 10592:17, 10593:23, 10594:6, 10594:9, 10594:11, 10597:19, 10598:16, 10598:22, 10598:24, 10599:1, 10600:20, 10601:1, 10601:2, 10603:6, 10603:11, 10604:19, 10604:25, 10605:4, 10605:5, 10605:15, 10605:22, 10606:3, 10607:21, 10608:4, 10608:14, 10608:16, 10610:2, 10610:4, 10610:7, 10610:9, 10611:1, 10612:4, 10613:11, 10614:20, 10624:21, 10625:2, 10625:6, 10625:16, 10627:1, 10630:13,

10630:19, 10631:12, 10631:21, 10632:18, 10632:24, 10633:15, 10633:19, 10634:17, 10634:21, 10635:1, 10635:2, 10635:3, 10635:6, 10635:7, 10635:16, 10635:19, 10636:13, 10639:18, 10639:24, 10640:8, 10640:15, 10641:3, 10641:4, 10641:24, 10642:23, 10643:1, 10643:5, 10643:15, 10643:16, 10643:25, 10644:1, 10644:19, 10644:23, 10644:25, 10645:2, 10646:16, 10647:13, 10648:14, 10655:19, 10656:3, 10656:8, 10658:10, 10658:11, 10658:21, 10659:7, 10659:10, 10659:11, 10660:16, 10660:23, 10661:6, 10661:8, 10661:9, 10661:11, 10662:1, 10665:18, 10672:3, 10672:5, 10672:8, 10672:9, 10672:25
**Google's** [15] - 10583:3, 10598:16, 10601:14, 10623:20, 10631:9, 10632:5, 10632:12, 10632:13, 10640:12, 10643:18, 10645:6, 10656:4, 10657:12, 10659:11, 10660:17
**gospel** [2] - 10636:15, 10636:17
**government** [1] - 10612:9
**government's** [1] - 10639:14
**grab** [1] - 10637:20
**gradually** [1] - 10616:7
**grant** [1] - 10671:13
**graph** [2] - 10613:22, 10614:1
**grateful** [1] - 10673:12
**gratitude** [1] - 10673:1
**great** [2] - 10608:12, 10666:22
**greater** [5] - 10612:17, 10633:4, 10655:6, 10655:7, 10667:18
**green** [3] - 10639:16, 10639:17, 10643:13

**ground** [1] - 10653:9
**guarantee** [3] - 10652:13, 10657:8, 10658:3
**guess** [10] - 10583:13, 10587:2, 10597:12, 10611:8, 10639:5, 10640:24, 10646:19, 10653:8, 10655:15, 10657:20
**guide** [1] - 10663:19

## H

**half** [2] - 10643:20, 10644:14
**hand** [6] - 10627:1, 10643:18, 10661:17, 10661:19, 10664:2, 10668:10
**handed** [4] - 10590:3, 10615:5, 10664:9, 10664:24
**handing** [3] - 10589:24, 10610:17, 10668:18
**handling** [1] - 10664:10
**Hang** [1] - 10637:7
**hang** [3] - 10650:8, 10660:6
**happy** [3] - 10668:13, 10673:17, 10673:19
**hard** [5] - 10632:16, 10669:3, 10669:5, 10669:6
**harm** [1] - 10657:13
**harmed** [1] - 10607:17
**head** [2] - 10632:17, 10671:18
**header** [1] - 10637:10
**heard** [2] - 10593:17, 10651:6
**hearsay** [1] - 10667:6
**heavy** [1] - 10583:17
**help** [1] - 10586:17
**helpful** [1] - 10670:8
**Herculean** [1] - 10670:21
**hereby** [1] - 10674:3
**high** [2] - 10653:2, 10653:3
**higher** [4] - 10595:8, 10646:2, 10647:18, 10655:5
**highest** [1] - 10635:6
**himself** [1] - 10661:25
**hindered** [1] - 10609:5
**history** [1] - 10588:23
**holding** [1] - 10629:14

**holidays** [1] - 10673:20
**home** [3] - 10587:4, 10587:10, 10673:18
**Honor** [40] - 10582:4, 10584:3, 10589:18, 10589:24, 10593:11, 10595:10, 10603:9, 10606:12, 10606:17, 10607:25, 10610:19, 10613:22, 10615:3, 10616:13, 10616:23, 10629:8, 10637:11, 10638:22, 10658:14, 10658:17, 10660:2, 10661:16, 10662:8, 10662:17, 10662:22, 10663:3, 10663:5, 10663:10, 10664:3, 10665:8, 10665:19, 10665:23, 10667:10, 10667:16, 10667:25, 10668:5, 10671:6, 10672:23, 10672:24, 10672:25
**HONORABLE** [1] - 10580:9
**hook** [1] - 10631:23
**hope** [1] - 10594:7
**hopefully** [3] - 10609:17, 10636:10, 10648:21
**hoping** [1] - 10645:8
**hour** [1] - 10638:1
**housekeeping** [1] - 10662:24
**Huang** [1] - 10581:7
**huge** [1] - 10637:14
**hum** [2] - 10606:13, 10617:21
**hyperlink** [1] - 10670:19
**hyperlinked** [3] - 10670:12, 10670:13, 10670:14
**hypotheses** [1] - 10647:3
**hypothesized** [1] - 10633:23
**hypothetical** [7] - 10605:3, 10628:16, 10633:2, 10633:6, 10633:8, 10633:13, 10660:8

## I

**ID** [1] - 10631:3
**idea** [4] - 10631:22, 10632:20, 10655:22,

10686

10673:4
**identified** [3] -
10609:23, 10663:21,
10664:3
**identify** [2] - 10597:22,
10598:2
**IL** [1] - 10580:15
**illustrate** [1] -
10628:24
**imagine** [2] -
10590:11, 10655:4
**impact** [7] - 10600:8,
10600:13, 10604:19,
10604:25, 10605:15,
10616:14, 10661:12
**impacted** [4] -
10582:16, 10582:20,
10582:24, 10585:22
**implausible** [4] -
10632:19, 10641:3,
10642:6, 10642:21
**implausibly** [1] -
10639:6
**implementation** [2] -
10601:15, 10610:1
**implemented** [11] -
10593:3, 10593:8,
10604:6, 10604:11,
10609:15, 10610:5,
10611:13, 10612:9,
10616:2, 10616:3,
10617:2
**imply** [1] - 10646:22
**important** [5] -
10589:18, 10589:23,
10606:10, 10635:5,
10635:15
**imposed** [1] -
10588:17
**impression** [1] -
10589:7
**improve** [11] -
10599:20, 10609:5,
10609:25, 10611:12,
10611:22, 10620:15,
10651:11, 10652:4,
10656:20, 10657:14,
10658:2
**improvement** [1] -
10650:23
**IN** [1] - 10580:1
**incentive** [5] -
10618:11, 10619:6,
10652:20, 10652:22,
10653:17
**incentives** [5] -
10609:5, 10643:21,
10651:22, 10655:13,
10658:25
**incentivizes** [1] -

10653:25
**incentivizing** [1] -
10654:6
**inclined** [1] - 10667:13
**included** [2] -
10604:6, 10604:10
**includes** [1] -
10669:15
**including** [4] -
10583:3, 10605:6,
10631:1, 10669:22
**increase** [5] -
10611:21, 10612:23,
10615:23, 10650:13,
10650:16
**increased** [7] -
10599:7, 10599:11,
10610:9, 10610:10,
10611:12, 10619:14
**increases** [1] -
10648:24
**increasing** [2] -
10609:25, 10648:12
**incredible** [1] -
10673:11
**incredibly** [1] -
10596:14
**independent** [1] -
10607:19
**INDEX** [1] - 10675:1
**individual** [1] -
10627:17
**inefficient** [1] -
10653:23
**inferior** [3] - 10644:3,
10644:18, 10657:12
**inform** [1] - 10671:2
**information** [4] -
10626:19, 10633:18,
10649:2, 10668:11
**initial** [4] - 10631:14,
10670:5, 10671:10,
10671:11
**initiative** [1] - 10632:1
**innovation** [2] -
10604:21, 10605:2
**input** [3] - 10635:15,
10655:24
**inputs** [1] - 10635:14
**installation** [1] -
10592:8
**instance** [2] -
10597:22, 10598:2
**instantaneous** [1] -
10644:15
**instead** [2] - 10598:24,
10659:9
**intend** [1] - 10663:21
**intense** [1] - 10647:7
**interfere** [1] -

10612:16
**intermediate** [1] -
10643:10
**interpolate** [1] -
10657:18
**interpolating** [1] -
10657:21
**interpret** [6] -
10657:22, 10658:1,
10658:5, 10658:9,
10658:13, 10660:21
**interpreting** [1] -
10657:21
**introduced** [2] -
10611:1, 10669:23
**introduction** [1] -
10614:11
**invest** [12] - 10599:21,
10609:5, 10619:6,
10651:11, 10651:25,
10652:4, 10657:1,
10657:3, 10657:9,
10657:14, 10658:2,
10661:16
**invested** [1] - 10643:5
**investing** [3] -
10620:15, 10661:5,
10661:21
**investment** [8] -
10618:11, 10643:22,
10651:20, 10651:22,
10653:7, 10657:5,
10661:23
**investments** [6] -
10609:25, 10611:12,
10611:21, 10612:23,
10619:14, 10656:20
**involved** [3] -
10636:13, 10636:22,
10666:4
**iOS** [3] - 10595:18,
10595:20, 10597:2
**iPhone** [5] - 10591:25,
10592:5, 10592:24,
10593:7, 10629:1
**irrational** [1] - 10656:7
**IS** [1] - 10642:11
**isolate** [1] - 10646:5
**issue** [10] - 10604:3,
10608:15, 10623:22,
10644:10, 10666:18,
10666:19, 10667:5,
10667:6, 10667:11
**issues** [7] - 10600:2,
10602:18, 10604:1,
10639:13, 10667:7,
10671:21
**itself** [5] - 10630:19,
10630:24, 10631:12,
10631:16, 10653:25

**J**

**JANICE** [1] - 10674:3
**Janice** [2] - 10581:11,
10674:11
**Jeff** [1] - 10668:12
**Jensen** [2] - 10580:17,
10662:23
**JENSEN** [2] -
10662:22, 10663:3
**job** [3] - 10653:17,
10653:20, 10673:13
**jog** [1] - 10670:9
**John** [1] - 10581:1
**joined** [1] - 10663:6
**jon.sallet@coag.gov**
[1] - 10580:25
**Jonathan** [1] -
10580:21
**journalist** [1] -
10583:18
**jschmidtlein@wc.
com** [1] - 10581:3
**JUDGE** [1] - 10580:9
**judgment** [2] -
10664:4, 10670:11
**Judicial** [1] - 10580:23
**jump** [2] - 10623:23,
10623:25
**jumping** [1] -
10614:10
**jurisdictions** [1] -
10612:18
**JUSTICE** [3] -
10580:11, 10580:14,
10580:17
**Justice** [5] - 10606:24,
10607:10, 10607:17,
10608:23, 10663:6
**justification** [1] -
10667:12
**justified** [1] - 10666:8
**justify** [1] - 10652:16

**K**

**Kartasheva** [2] -
10646:22, 10661:2
**keep** [4] - 10588:11,
10589:23, 10590:10,
10614:12
**keeping** [2] -
10669:14, 10670:1
**keeps** [1] - 10589:20
**Kenneth** [1] -
10580:11
**kenneth.dintzer2@
usdoj.gov** [1] -
10580:13
**kind** [20] - 10589:19,

10687

10593:13, 10594:21,
10595:15, 10598:23,
10603:20, 10604:2,
10616:6, 10628:24,
10630:9, 10632:19,
10642:22, 10642:24,
10643:13, 10644:13,
10644:14, 10648:8,
10659:13, 10662:6,
10671:7
**kinds** [1] - 10663:24
**knowing** [2] -
10627:12, 10651:21
**known** [1] - 10602:20

## L

**lag** [2] - 10670:17,
10671:1
**large** [7] - 10583:12,
10587:6, 10596:11,
10596:18, 10618:25,
10619:2, 10660:18
**larger** [2] - 10618:6,
10619:2
**largest** [2] - 10619:7,
10619:9
**LaSalle** [1] - 10580:15
**last** [3] - 10620:19,
10629:7, 10671:4
**late** [1] - 10615:16
**latest** [1] - 10602:18
**law** [10] - 10612:9,
10652:23, 10653:20,
10667:13, 10667:17,
10667:23, 10670:6,
10670:13, 10672:4,
10672:8
**LAW** [2] - 10580:22,
10669:5
**lawsuit** [1] - 10606:23
**lawyer** [5] - 10652:24,
10653:17, 10653:19,
10653:24, 10653:25
**lawyer's** [1] -
10653:16
**lawyering** [1] -
10673:6
**layperson** [1] -
10597:6
**leading** [3] - 10590:19,
10619:4, 10640:9
**leap** [1] - 10642:25
**least** [9] - 10596:15,
10611:4, 10632:22,
10643:19, 10653:5,
10653:6, 10670:20,
10673:5, 10673:13
**leave** [6] - 10628:1,
10628:6, 10628:8,

10641:12, 10647:21,
10648:5
**leaves** [1] - 10637:22
**leaving** [1] - 10653:24
**led** [1] - 10589:1
**ledger** [1] - 10595:19
**left** [4] - 10617:20,
10638:12, 10666:16,
10666:20
**legal** [2] - 10666:18,
10667:7
**less** [12] - 10592:24,
10605:12, 10606:10,
10633:3, 10641:25,
10642:8, 10647:7,
10659:19, 10659:23,
10659:24, 10661:23,
10661:25
**letter** [7] - 10606:22,
10607:9, 10607:14,
10608:11, 10608:23,
10608:25, 10664:15
**level** [9] - 10593:22,
10623:19, 10630:7,
10632:22, 10639:9,
10639:10, 10641:1,
10642:6, 10643:17
**levels** [1] - 10617:19
**light** [1] - 10649:6
**likelihood** [3] -
10653:2, 10653:12,
10655:6
**likely** [7] - 10604:15,
10641:6, 10644:2,
10644:14, 10647:20,
10651:11, 10652:11
**limine** [1] - 10667:2
**limits** [1] - 10672:2
**line** [6] - 10595:20,
10614:12, 10657:24,
10665:9, 10665:10
**lines** [1] - 10595:23
**list** [4] - 10637:1,
10667:8, 10669:15,
10669:20
**listed** [1] - 10594:20
**literally** [2] - 10594:3,
10599:17
**literature** [5] -
10625:20, 10625:21,
10626:1, 10647:15,
10647:22
**lives** [1] - 10670:12
**LLC** [1] - 10580:6
**LLP** [1] - 10581:1
**loaded** [1] - 10584:24
**lobbying** [1] - 10613:2
**locked** [1] - 10671:8
**look** [18] - 10585:3,
10590:12, 10590:13,

10593:16, 10594:1,
10594:22, 10596:20,
10611:9, 10611:11,
10611:15, 10611:16,
10615:17, 10645:23,
10652:5, 10656:16,
10661:17, 10666:6,
10666:10
**looked** [17] - 10588:9,
10592:19, 10593:9,
10593:14, 10595:1,
10596:20, 10600:25,
10610:23, 10613:13,
10614:15, 10614:23,
10615:14, 10618:5,
10625:21, 10627:12,
10645:25, 10650:19
**looking** [13] -
10584:12, 10587:9,
10591:16, 10593:10,
10596:15, 10613:7,
10623:4, 10623:17,
10652:7, 10661:5,
10661:15, 10664:4,
10672:16
**looks** [2] - 10642:11,
10648:1
**loose** [3] - 10662:5,
10666:1, 10668:5
**lose** [2] - 10653:3,
10653:4
**losing** [1] - 10661:9
**low** [2] - 10603:14,
10647:10
**lower** [6] - 10602:16,
10617:22, 10632:21,
10633:5, 10642:5,
10642:14

## M

**Maine** [1] - 10581:2
**maintain** [1] - 10656:6
**major** [1] - 10588:21
**majority** [1] -
10583:12
**manage** [1] - 10603:15
**managed** [1] -
10643:4
**manufacturer** [5] -
10604:7, 10604:12,
10628:17, 10629:25,
10630:7
**manufacturers** [3] -
10585:11, 10585:23,
10655:10
**March** [4] - 10615:19,
10617:1, 10671:13,
10672:6
**mark** [4] - 10589:25,

10591:24, 10594:24,
10672:10
**marked** [5] - 10584:7,
10590:3, 10594:18,
10602:12, 10615:5
**market** [42] - 10582:8,
10582:9, 10582:12,
10590:24, 10591:1,
10591:7, 10594:1,
10594:6, 10594:10,
10595:8, 10596:2,
10596:6, 10596:8,
10596:9, 10596:10,
10596:13, 10596:15,
10596:19, 10596:21,
10596:24, 10607:16,
10613:10, 10613:15,
10613:17, 10616:17,
10618:5, 10632:13,
10633:16, 10639:11,
10641:7, 10641:9,
10641:11, 10641:13,
10641:18, 10643:15,
10645:9, 10652:11,
10656:2, 10656:3
**marketing** [3] -
10610:9, 10610:10,
10611:5
**markets** [2] -
10666:19, 10667:12
**master** [1] - 10669:25
**material** [2] -
10615:23, 10667:18
**materials** [1] -
10606:20
**Mathewson** [1] -
10626:5
**matter** [3] - 10586:2,
10627:2, 10630:2
**matters** [1] - 10667:7
**MAY** [3] - 10664:7,
10664:15, 10665:16
**mean** [58] - 10583:4,
10585:15, 10587:5,
10587:18, 10589:17,
10590:14, 10593:17,
10594:21, 10596:12,
10601:4, 10602:3,
10602:8, 10605:20,
10607:6, 10609:10,
10613:3, 10613:7,
10615:14, 10615:25,
10618:14, 10620:4,
10623:12, 10625:5,
10625:10, 10625:22,
10626:19, 10627:10,
10627:11, 10629:14,
10629:16, 10630:21,
10632:15, 10634:12,
10635:8, 10636:18,

10688

10637:5, 10640:9, 10640:17, 10640:24, 10641:4, 10642:13, 10644:7, 10645:7, 10646:7, 10646:25, 10647:1, 10648:17, 10649:21, 10657:16, 10657:20, 10658:1, 10659:13, 10660:17, 10660:25, 10661:12, 10667:1, 10669:19, 10671:9

**meaning** [1] - 10636:17

**means** [1] - 10600:24

**meant** [1] - 10633:4

**measure** [2] - 10640:17, 10661:22

**measured** [1] - 10648:14

**meet** [2] - 10598:10, 10669:12

**meeting** [2] - 10607:9, 10631:3

**Meeting** [1] - 10607:13

**MEHTA** [1] - 10580:9

**memory** [1] - 10670:9

**mention** [1] - 10666:2

**mentioned** [1] - 10667:9

**menus** [1] - 10621:25

**Michael** [2] - 10581:4, 10675:3

**MICHAEL** [1] - 10582:5

**Microsoft** [33] - 10609:24, 10610:13, 10610:14, 10611:12, 10611:21, 10619:15, 10619:21, 10620:2, 10620:5, 10621:1, 10623:25, 10624:5, 10624:13, 10626:14, 10626:17, 10626:23, 10627:3, 10634:18, 10634:21, 10635:4, 10640:19, 10644:17, 10644:20, 10644:22, 10650:1, 10652:3, 10656:18, 10656:25, 10657:3, 10657:7, 10657:9, 10658:1, 10658:10

**Microsoft's** [4] - 10623:23, 10636:1, 10657:11, 10657:18

**middle** [1] - 10594:22

**might** [6] - 10590:12, 10599:21, 10631:23, 10663:10, 10663:15,

10663:19

**mind** [2] - 10589:23, 10666:24

**minutes** [2] - 10614:4, 10637:17

**misleading** [2] - 10614:1, 10650:17

**missed** [2] - 10624:24, 10632:9

**misunderstood** [2] - 10667:25, 10668:3

**mobile** [20] - 10588:21, 10588:23, 10589:1, 10615:9, 10616:18, 10616:19, 10619:5, 10619:7, 10619:13, 10635:17, 10635:24, 10636:3, 10636:7, 10645:25, 10657:1, 10657:2, 10657:4, 10657:6, 10657:9, 10657:10

**mode** [1] - 10657:10

**model** [6] - 10627:6, 10627:10, 10627:16, 10627:24, 10641:19, 10648:8

**modeled** [6] - 10604:4, 10604:9, 10625:14, 10627:6, 10627:10, 10648:6

**modeling** [1] - 10637:4

**models** [7] - 10584:22, 10625:20, 10625:24, 10627:23, 10647:22, 10647:24, 10648:4

**moment** [6] - 10590:10, 10608:5, 10620:24, 10622:9, 10650:5, 10662:8

**Monday** [1] - 10607:13

**monetization** [2] - 10602:16, 10603:14

**money** [3] - 10586:20, 10659:5, 10659:7

**monopolist** [1] - 10656:12

**monopoly** [9] - 10591:10, 10596:23, 10644:1, 10646:13, 10646:14, 10646:17, 10656:6, 10660:16, 10661:12

**month** [4] - 10606:23, 10617:5

**months** [2] - 10617:1, 10649:13

**morning** [3] - 10622:11, 10623:16,

10628:14

**Morning** [1] - 10607:1

**most** [4] - 10584:18, 10584:22, 10628:17, 10659:16

**most-favored** [1] - 10659:16

**motion** [2] - 10667:2, 10667:3

**Motorola** [3] - 10584:20, 10585:8, 10596:16

**move** [8] - 10608:19, 10622:23, 10626:10, 10630:15, 10660:10, 10662:18, 10662:25, 10663:11

**Mozilla** [15] - 10598:13, 10606:23, 10606:25, 10607:5, 10607:10, 10607:19, 10608:3, 10608:11, 10608:12, 10624:15, 10624:17, 10634:25, 10645:5, 10645:8, 10645:10

**Mozilla's** [1] - 10607:25

**MR** [85] - 10582:4, 10582:7, 10584:3, 10584:5, 10589:24, 10590:1, 10594:16, 10594:17, 10595:19, 10595:25, 10602:5, 10606:12, 10606:15, 10608:21, 10610:19, 10610:20, 10615:3, 10615:4, 10616:12, 10616:16, 10616:21, 10617:11, 10622:22, 10623:6, 10626:13, 10629:6, 10630:14, 10630:17, 10631:6, 10638:1, 10638:16, 10638:22, 10638:23, 10640:1, 10640:6, 10649:11, 10649:19, 10650:9, 10651:1, 10651:3, 10651:8, 10651:9, 10656:11, 10658:14, 10658:17, 10658:19, 10660:2, 10660:5, 10660:10, 10660:13, 10662:8, 10662:10, 10662:17, 10662:20, 10663:5, 10663:10, 10663:18, 10664:7, 10664:15, 10664:23, 10665:7, 10665:9, 10665:13,

10665:16, 10665:17, 10665:19, 10665:23, 10667:9, 10667:16, 10667:25, 10668:3, 10668:5, 10668:9, 10668:16, 10668:20, 10669:10, 10670:16, 10671:4, 10671:5, 10671:14, 10671:18, 10672:16, 10672:22, 10672:24, 10672:25

**MS** [2] - 10662:22, 10663:3

**msommer@wsgr. com** [1] - 10581:7

**multiple** [1] - 10597:23, 10598:3, 10645:3, 10654:23

**Murphy** [11] - 10601:17, 10603:17, 10604:2, 10613:22, 10614:17, 10615:18, 10616:24, 10617:3, 10650:16, 10652:9, 10662:25

**Murphy's** [2] - 10616:24, 10649:13

---

## N

**N.W** [1] - 10674:12

**Nadella** [2] - 10584:10, 10599:22

**Nadella's** [1] - 10584:25

**names** [2] - 10595:22, 10670:7

**near** [1] - 10658:21

**necessarily** [4] - 10582:10, 10586:11, 10640:9, 10655:4

**necessary** [1] - 10647:4

**need** [12] - 10641:20, 10641:22, 10642:1, 10642:18, 10642:19, 10661:4, 10669:7, 10670:1, 10670:13, 10670:14, 10671:24

**needed** [1] - 10670:9

**needs** [1] - 10598:10

**negative** [2] - 10602:1, 10602:3

**negotiate** [1] - 10612:5

**negotiating** [1] - 10587:3

**negotiations** [4] - 10624:5, 10626:15, 10636:14, 10636:22

10689

**never** [6] - 10588:5, 10590:22, 10633:8, 10633:13, 10633:23, 10633:25

**new** [4] - 10614:3, 10615:8, 10616:4, 10617:4

**New** [2] - 10581:6, 10581:9

**next** [5] - 10642:15, 10643:24, 10643:25, 10673:13, 10673:20

**nobody** [1] - 10636:13

**non** [2] - 10613:11, 10614:20

**non-Google** [2] - 10613:11, 10614:20

**nonetheless** [3] - 10587:18, 10632:12, 10639:14

**normal** [1] - 10663:24

**notes** [1] - 10674:5

**nothing** [12] - 10621:5, 10627:4, 10628:6, 10629:17, 10630:11, 10631:4, 10642:12, 10653:16, 10672:22, 10672:24, 10672:25

**notice** [1] - 10670:7

**noticeable** [1] - 10595:23

**notion** [1] - 10634:5

**notwithstanding** [1] - 10619:12

**November** [2] - 10580:5, 10674:7

**nowhere** [1] - 10660:3

**number** [28] - 10617:4, 10617:20, 10619:13, 10629:12, 10633:1, 10633:11, 10634:1, 10634:3, 10634:4, 10634:8, 10634:11, 10634:12, 10634:13, 10634:23, 10635:9, 10635:23, 10636:5, 10636:6, 10636:19, 10637:8, 10643:10, 10644:9, 10645:13, 10645:15, 10667:22, 10668:15, 10668:18

**numbers** [21] - 10613:9, 10615:12, 10616:12, 10617:12, 10617:18, 10617:22, 10618:3, 10634:2, 10634:17, 10635:7, 10635:10, 10635:15, 10635:18, 10636:2,

10636:16, 10636:25, 10637:9, 10641:16, 10643:11, 10646:4, 10646:7

**NW** [2] - 10580:12, 10581:13

**NY** [2] - 10581:6, 10581:9

## O

**objection** [6] - 10622:22, 10630:14, 10640:1, 10651:1, 10660:2, 10662:20

**objections** [1] - 10638:3

**obviously** [5] - 10596:10, 10644:20, 10653:11, 10669:1, 10670:21

**occurred** [2] - 10590:23, 10649:20

**occurs** [1] - 10651:17

**October** [3] - 10602:13, 10648:15, 10650:11

**OEM** [9] - 10585:17, 10586:15, 10586:23, 10589:14, 10595:21, 10621:21, 10624:23, 10625:3, 10625:8

**OEMs** [3] - 10589:6, 10624:1, 10624:12

**OF** [7] - 10580:1, 10580:8, 10580:11, 10580:14, 10580:17, 10580:22, 10674:1

**offer** [7] - 10626:17, 10627:2, 10631:11, 10631:20, 10632:4, 10649:11, 10655:15

**offered** [36] - 10585:2, 10591:6, 10591:9, 10596:22, 10598:19, 10599:2, 10599:5, 10599:9, 10600:3, 10600:7, 10600:12, 10601:21, 10605:14, 10614:14, 10624:6, 10624:20, 10625:1, 10625:6, 10626:14, 10630:23, 10631:7, 10631:11, 10631:19, 10631:25, 10632:3, 10633:13, 10640:14, 10642:2, 10642:10, 10642:12, 10646:16, 10648:3, 10648:23, 10649:6, 10650:4,

10659:10

**offering** [5] - 10593:5, 10596:1, 10626:19, 10649:9, 10650:13

**offers** [3] - 10630:21, 10647:23, 10648:1

**Official** [2] - 10581:12, 10674:11

**OFFICIAL** [1] - 10674:1

**often** [1] - 10643:1

**older** [1] - 10626:5

**once** [2] - 10611:13, 10632:17

**one** [45] - 10583:22, 10584:7, 10585:4, 10586:4, 10586:12, 10589:17, 10589:20, 10596:4, 10599:8, 10602:18, 10603:13, 10603:20, 10605:25, 10610:6, 10614:6, 10614:23, 10616:16, 10619:13, 10621:15, 10623:4, 10627:5, 10627:24, 10634:19, 10635:15, 10635:21, 10636:18, 10643:23, 10644:16, 10645:16, 10646:20, 10652:19, 10652:25, 10653:1, 10660:10, 10661:17, 10662:8, 10663:13, 10663:25, 10664:12, 10666:6, 10666:15, 10667:2, 10670:21

**ones** [3] - 10617:21, 10622:16, 10664:25

**open** [4] - 10666:16, 10667:5, 10667:7, 10668:25

**opening** [1] - 10671:25

**openness** [1] - 10612:22

**operating** [2] - 10595:13, 10644:21

**opine** [2] - 10615:21, 10615:22

**opined** [1] - 10609:4

**opinion** [33] - 10591:6, 10591:9, 10593:5, 10596:1, 10596:22, 10598:19, 10599:2, 10599:5, 10599:16, 10600:3, 10600:7, 10600:12, 10601:21, 10611:4, 10611:5, 10614:14, 10630:23, 10631:7,

10631:11, 10631:25, 10632:3, 10632:4, 10640:14, 10642:2, 10642:10, 10646:16, 10648:23, 10649:7, 10649:9, 10649:11, 10649:12, 10650:13

**opinions** [10] - 10590:17, 10591:4, 10599:14, 10605:14, 10624:20, 10625:1, 10625:6, 10631:19, 10638:4, 10638:5

**opportunity** [4] - 10607:15, 10649:16, 10662:15, 10671:21

**opposed** [1] - 10664:21

**oral** [1] - 10671:2

**order** [4] - 10652:14, 10661:4, 10671:23, 10672:19

**ordered** [1] - 10612:4

**otherwise** [2] - 10667:13, 10669:1

**ought** [1] - 10660:6

**outcome** [1] - 10652:11

**outside** [1] - 10637:18

**outstanding** [1] - 10673:9

**overall** [2] - 10617:10, 10646:1

**overcome** [2] - 10639:25, 10640:7

**overpaid** [1] - 10646:20

**overpaying** [2] - 10647:3, 10661:11

**overruled** [2] - 10640:2, 10651:2

**own** [1] - 10645:11

## P

**p.m** [4] - 10580:6, 10638:19, 10673:23

**page** [3] - 10665:9, 10665:10, 10672:2

**pages** [3] - 10667:19, 10667:22, 10667:23

**paid** [8] - 10586:19, 10588:6, 10588:7, 10588:11, 10600:20, 10601:1, 10647:13, 10654:7

**paper** [3] - 10602:19, 10626:5, 10667:14

**papers** [1] - 10625:24

**par** [2] - 10644:25,

10690

10645:2
**paradigm** [1] - 10612:22
**paragraph** [4] - 10607:3, 10607:24, 10608:1, 10608:2
**Parakhin** [3] - 10620:14, 10652:2, 10656:24
**Parakhin's** [4] - 10610:21, 10610:23, 10619:22, 10652:5
**parsing** [1] - 10598:5
**part** [16] - 10582:11, 10586:6, 10601:25, 10608:24, 10612:3, 10613:7, 10629:11, 10629:12, 10639:13, 10640:11, 10640:12, 10651:24, 10655:15, 10666:7, 10671:2
**participate** [2] - 10611:3, 10619:24
**particular** [4] - 10622:7, 10622:8, 10646:17, 10664:1
**parties** [5] - 10651:21, 10654:6, 10663:22, 10664:11, 10669:11
**partners** [3] - 10600:20, 10601:2, 10659:11
**parts** [1] - 10587:11
**past** [1] - 10583:15
**Pause** [1] - 10662:9
**pause** [3] - 10608:6, 10630:25, 10635:12
**pay** [1] - 10652:15
**paying** [9] - 10601:7, 10601:9, 10601:12, 10606:6, 10621:25, 10622:11, 10647:3, 10654:23, 10660:24
**payment** [6] - 10601:10, 10603:1, 10604:14, 10626:18, 10653:17, 10656:13
**payments** [35] - 10587:1, 10600:9, 10600:13, 10600:21, 10601:7, 10601:12, 10601:14, 10603:3, 10603:5, 10603:19, 10604:5, 10604:10, 10604:15, 10604:20, 10605:1, 10605:4, 10605:6, 10605:11, 10606:9, 10608:4, 10608:17, 10609:20, 10622:2, 10625:23,

10627:7, 10647:9, 10647:21, 10652:20, 10652:22, 10654:15, 10654:20, 10654:24, 10655:15, 10659:7, 10660:17
**PC** [2] - 10624:1, 10624:12
**PCs** [4] - 10634:25, 10644:18, 10644:20, 10644:23
**Penado** [1] - 10660:11
**people** [9] - 10583:12, 10603:11, 10603:12, 10612:10, 10630:3, 10636:24, 10640:12, 10652:20, 10654:6
**per** [1] - 10596:21
**percent** [51] - 10593:19, 10594:2, 10594:7, 10595:12, 10595:13, 10596:17, 10632:13, 10632:25, 10633:1, 10633:6, 10633:11, 10633:16, 10634:3, 10634:4, 10634:8, 10634:16, 10634:20, 10634:23, 10635:9, 10638:24, 10638:25, 10639:1, 10639:3, 10639:4, 10639:8, 10639:11, 10639:12, 10639:15, 10639:16, 10640:15, 10640:16, 10641:14, 10641:13, 10641:14, 10641:17, 10641:18, 10642:5, 10643:7, 10643:12, 10645:12, 10645:17, 10646:5, 10646:6, 10652:21
**percentage** [5] - 10629:9, 10635:6, 10639:20, 10646:5, 10653:4
**percentages** [2] - 10613:17, 10642:12
**perfect** [1] - 10647:21
**perfectly** [3] - 10614:20, 10614:22, 10658:25
**performance** [1] - 10654:7
**perhaps** [1] - 10661:1
**period** [5] - 10587:14, 10587:21, 10588:9, 10590:19, 10590:24
**person** [1] - 10628:21
**perspective** [6] - 10585:10, 10585:17,

10586:10, 10595:6, 10612:16, 10619:6
**pertains** [1] - 10615:6
**phone** [7] - 10585:2, 10592:9, 10592:14, 10592:15, 10595:14, 10609:13, 10616:4
**phones** [8] - 10589:8, 10594:12, 10595:14, 10616:4, 10617:4, 10617:5, 10619:15, 10659:9
**photos** [1] - 10670:8
**physical** [1] - 10669:1
**pick** [2] - 10618:16, 10643:10
**picked** [2] - 10634:17, 10635:6
**picking** [1] - 10586:12
**picture** [1] - 10631:1
**pie** [2] - 10629:8, 10629:12
**piece** [2] - 10610:7, 10645:21
**pieces** [1] - 10652:18
**place** [7] - 10615:8, 10618:16, 10643:19, 10646:20, 10648:16, 10661:18, 10667:17
**placement** [1] - 10622:8
**plaintiff** [1] - 10664:7
**Plaintiff** [2] - 10580:20, 10675:10
**Plaintiffs** [2] - 10580:4, 10580:11
**plaintiffs** [3] - 10656:22, 10672:2, 10672:22
**plan** [1] - 10666:11
**plans** [1] - 10672:15
**platform** [6] - 10618:25, 10619:2, 10619:4, 10619:7, 10619:9, 10619:13
**played** [1] - 10585:7
**playing** [3] - 10643:17, 10651:14, 10651:15
**ploy** [1] - 10611:6
**point** [28] - 10583:22, 10589:4, 10589:19, 10594:14, 10606:1, 10611:17, 10615:18, 10616:23, 10618:25, 10623:5, 10623:15, 10629:19, 10636:8, 10640:24, 10646:12, 10647:3, 10647:5, 10656:1, 10658:12, 10660:7, 10660:22,

10660:24, 10661:10, 10663:13, 10669:4, 10669:6, 10670:24, 10672:14
**points** [6] - 10593:4, 10630:3, 10630:9, 10646:11, 10661:24, 10662:4
**poor** [3] - 10602:6, 10602:8, 10620:9
**popular** [6] - 10602:15, 10602:22, 10602:23, 10603:15, 10603:21, 10628:17
**populating** [1] - 10602:7
**population** [1] - 10616:6
**portion** [2] - 10585:3, 10665:25
**pose** [1] - 10608:9
**position** [4] - 10652:3, 10657:11, 10657:19, 10665:6
**possessed** [1] - 10591:10
**possession** [1] - 10669:2
**possible** [2] - 10609:1, 10654:16
**possibly** [3] - 10603:25, 10615:25, 10631:15
**post** [9] - 10634:14, 10663:20, 10667:10, 10667:22, 10668:1, 10670:10, 10671:11, 10671:20, 10671:25
**posted** [1] - 10664:19
**postulated** [1] - 10633:23
**potato** [9] - 10628:13, 10628:16, 10628:17, 10628:19, 10628:21, 10628:23, 10629:2, 10629:24, 10629:25
**potential** [1] - 10618:16
**potentially** [2] - 10651:24, 10654:11
**power** [6] - 10590:25, 10591:1, 10591:7, 10591:10, 10596:23, 10596:24
**pre** [1] - 10592:8
**pre-installation** [1] - 10592:8
**preceding** [1] - 10590:20
**precision** [2] -

10691

10648:14, 10650:23
**preferred** [1] - 10586:23
**preinstalled** [1] - 10659:9
**preload** [4] - 10585:24, 10586:15, 10587:21, 10588:3
**preloaded** [11] - 10583:3, 10583:7, 10583:16, 10583:25, 10584:19, 10586:25, 10587:7, 10587:19, 10591:23, 10592:3
**preloading** [2] - 10586:16, 10587:16
**premised** [1] - 10634:5
**prepared** [3] - 10652:4, 10656:19, 10658:1
**prerequisites** [1] - 10627:5
**present** [2] - 10647:25, 10672:14
**presentation** [1] - 10660:12
**presented** [2] - 10616:5, 10669:19
**preserved** [1] - 10669:8
**press** [1] - 10584:8
**presumably** [1] - 10655:1
**pretrial** [2] - 10666:22, 10666:23
**pretty** [1] - 10653:2
**preventing** [3] - 10605:22, 10606:3, 10606:5
**previous** [1] - 10645:24
**previously** [2] - 10601:24, 10664:9
**price** [2] - 10603:18, 10603:19
**prices** [1] - 10647:9
**pricing** [1] - 10625:22
**printout** [1] - 10668:21
**privacy** [5] - 10631:13, 10631:15, 10631:20, 10632:4, 10632:5
**problem** [2] - 10649:18, 10672:14
**problems** [1] - 10603:14
**proceeding** [1] - 10656:9
**proceedings** [1] - 10674:6

**procompetitive** [2] - 10666:18, 10667:12
**produced** [1] - 10602:1
**product** [7] - 10585:18, 10585:22, 10586:23, 10597:20, 10657:12, 10657:15, 10668:10
**products** [1] - 10586:7
**professionalism** [1] - 10673:11
**Professor** [34] - 10582:8, 10584:6, 10590:3, 10601:17, 10602:13, 10603:17, 10604:2, 10604:4, 10606:16, 10606:18, 10606:22, 10608:22, 10610:21, 10613:22, 10614:17, 10615:5, 10615:17, 10616:24, 10617:3, 10629:7, 10637:18, 10638:24, 10644:17, 10649:13, 10650:16, 10652:9, 10658:20, 10659:8, 10659:19, 10660:14, 10662:11, 10662:24, 10667:4
**profitability** [3] - 10637:5, 10637:8, 10654:8
**profits** [8] - 10644:2, 10646:14, 10646:17, 10655:21, 10659:7, 10660:16, 10661:12
**prohibit** [1] - 10587:15
**prohibits** [1] - 10607:18
**prominent** [2] - 10584:18, 10584:23
**promise** [3] - 10652:12, 10655:2, 10655:11
**promote** [1] - 10586:18
**promotion** [2] - 10622:4, 10622:8
**promotional** [2] - 10659:20, 10659:25
**prompted** [1] - 10648:23
**properties** [1] - 10587:11
**proposal** [1] - 10669:12
**proposed** [4] - 10670:6, 10672:1, 10672:2, 10672:7

**proposing** [1] - 10621:21
**protecting** [1] - 10644:1
**Protection** [1] - 10580:22
**protects** [1] - 10646:14
**provide** [1] - 10622:7
**provided** [4] - 10604:18, 10604:24, 10659:20, 10659:25
**provider** [3] - 10621:13, 10621:17, 10621:21
**providers** [2] - 10605:22, 10606:3
**provides** [1] - 10615:7
**provisions** [2] - 10588:25, 10666:7
**publications** [2] - 10583:18, 10585:14
**publicly** [1] - 10666:14
**pushed** [4] - 10668:25, 10669:16, 10669:19, 10669:22
**put** [16] - 10584:6, 10587:3, 10587:9, 10588:9, 10589:15, 10590:2, 10595:6, 10606:16, 10615:8, 10619:12, 10635:18, 10654:4, 10660:11, 10670:4, 10670:7, 10672:19
**putting** [1] - 10639:5

## Q

**qualitatively** [1] - 10642:13
**quality** [25] - 10586:24, 10598:17, 10599:18, 10599:19, 10599:20, 10609:5, 10609:25, 10611:13, 10620:8, 10620:11, 10620:12, 10620:15, 10631:8, 10642:6, 10644:25, 10645:6, 10648:11, 10648:24, 10649:12, 10650:19, 10651:12, 10652:4, 10657:9, 10657:13, 10661:8
**quantitative** [1] - 10627:10
**quarter** [5] - 10602:22, 10609:18, 10616:3, 10617:6

**queries** [22] - 10618:15, 10618:16, 10619:7, 10619:14, 10629:10, 10634:24, 10639:4, 10639:8, 10640:18, 10640:19, 10640:23, 10641:17, 10641:18, 10643:8, 10648:18, 10651:18, 10651:20, 10651:22, 10654:17, 10654:19, 10655:3, 10655:7
**query** [4] - 10614:5, 10614:12, 10616:20, 10650:1
**questions** [3] - 10605:24, 10658:14, 10662:10
**quite** [6] - 10595:2, 10597:19, 10600:23, 10642:25, 10644:15
**quote** [2] - 10653:21, 10657:16

## R

**raise** [1] - 10663:23
**raised** [3] - 10594:14, 10667:11, 10670:25
**Ralph** [1] - 10580:23
**range** [6] - 10629:20, 10635:23, 10636:1, 10641:5
**rate** [3] - 10633:23, 10635:22, 10637:11
**rates** [3] - 10634:20, 10635:17, 10637:12
**rather** [2] - 10627:21, 10655:23
**rational** [2] - 10585:17, 10656:5
**reach** [1] - 10612:4
**read** [18] - 10598:12, 10602:14, 10607:12, 10608:1, 10608:5, 10608:18, 10608:20, 10610:24, 10621:4, 10621:5, 10622:14, 10622:15, 10623:7, 10623:11, 10623:13, 10623:23, 10657:17, 10657:22
**readily** [1] - 10665:14
**ready** [2] - 10582:2, 10638:21
**reality** [1] - 10629:15
**realize** [3] - 10646:23, 10653:9, 10656:4
**really** [15] - 10589:18, 10597:6, 10609:12,

10692

10615:25, 10626:21, 10629:3, 10629:14, 10629:15, 10635:11, 10642:19, 10646:3, 10649:3, 10656:8, 10663:25, 10673:12
**reason** [3] - 10652:11, 10666:8, 10671:1
**reasonable** [2] - 10632:23, 10671:1
**reasons** [2] - 10593:24, 10653:15
**rebuttal** [2] - 10615:1, 10615:2
**Rebuttal...................
........10663** [1] - 10675:10
**receive** [2] - 10600:9, 10600:14
**recently** [2] - 10593:9, 10673:17
**recess** [1] - 10638:19
**recognize** [2] - 10655:5, 10655:19
**recollection** [3] - 10602:9, 10620:24, 10621:1
**recommendations** [1] - 10663:14
**record** [18] - 10602:14, 10609:24, 10610:24, 10611:14, 10620:25, 10621:5, 10621:6, 10625:18, 10638:9, 10638:10, 10664:20, 10665:5, 10665:20, 10668:24, 10669:7, 10670:2, 10670:14
**recovery** [4] - 10633:19, 10635:17, 10637:11, 10637:12
**red** [1] - 10639:15
**redacted** [2] - 10607:25, 10666:10
**Redirect** [1] - 10675:4
**REDIRECT** [1] - 10658:18
**redirect** [2] - 10649:16, 10658:16
**reduce** [1] - 10643:21
**reference** [2] - 10610:25, 10629:8
**referencing** [1] - 10594:19
**referred** [1] - 10666:5
**referring** [11] - 10611:10, 10613:13, 10619:25, 10620:6, 10621:7, 10622:5, 10622:6, 10625:17,

10626:1, 10628:2, 10652:6
**reflects** [1] - 10664:20
**refresh** [1] - 10602:9
**regard** [2] - 10632:19, 10650:18
**regarding** [2] - 10604:19, 10604:25
**regardless** [1] - 10654:4
**regulatory** [1] - 10612:16
**related** [2] - 10615:20, 10616:11
**relating** [1] - 10658:24
**relation** [1] - 10589:7, 10614:24
**relationship** [1] - 10613:14
**relative** [3] - 10610:16, 10615:19, 10623:15
**relatively** [1] - 10613:16
**released** [1] - 10666:14
**relevant** [3] - 10600:2, 10641:6, 10647:1
**rely** [1] - 10636:11
**remedies** [2] - 10588:14, 10588:17
**remedy** [3] - 10612:5, 10612:8, 10612:14
**remember** [17] - 10584:21, 10585:4, 10606:8, 10606:9, 10613:8, 10615:16, 10615:18, 10620:25, 10621:4, 10622:13, 10622:16, 10623:3, 10623:12, 10626:20, 10639:15, 10650:4, 10670:19
**remembering** [1] - 10614:8
**removing** [2] - 10604:19, 10604:25
**rendered** [1] - 10638:5
**renegotiation** [1] - 10642:16
**repeat** [12] - 10582:21, 10588:15, 10592:1, 10598:1, 10599:8, 10600:11, 10604:8, 10604:23, 10619:18, 10634:19, 10641:16, 10659:22
**rephrase** [1] - 10660:9
**replacement** [1] - 10664:11
**reply** [1] - 10615:2

**report** [9] - 10599:16, 10613:10, 10614:8, 10615:1, 10615:22, 10631:14, 10634:8, 10634:9, 10637:1
**REPORTER** [1] - 10674:1
**Reporter** [3] - 10581:11, 10581:12, 10674:11
**reports** [51] - 10582:14, 10582:18, 10582:22, 10589:13, 10591:22, 10592:2, 10592:25, 10596:22, 10597:22, 10598:2, 10598:6, 10598:19, 10599:5, 10599:9, 10599:15, 10599:25, 10600:3, 10600:7, 10600:12, 10600:19, 10604:4, 10604:9, 10604:13, 10604:17, 10604:18, 10604:24, 10605:14, 10609:23, 10610:12, 10621:12, 10621:16, 10621:19, 10621:20, 10622:18, 10623:1, 10624:21, 10625:1, 10625:6, 10626:6, 10627:9, 10631:20, 10633:9, 10633:14, 10633:21, 10633:24, 10634:4, 10634:15, 10646:21, 10648:20, 10649:12, 10660:3
**represent** [2] - 10616:10, 10668:21
**representation** [1] - 10668:14
**representing** [1] - 10655:10
**Republic** [1] - 10614:25
**request** [1] - 10607:25
**requested** [1] - 10671:22
**requesting** [1] - 10671:17
**require** [1] - 10673:11
**required** [1] - 10612:10
**requirement** [1] - 10659:20
**requirements** [4] - 10623:8, 10627:5, 10627:24, 10659:25
**resolve** [1] - 10666:20
**resolved** [1] - 10649:3

**respect** [4] - 10585:7, 10588:17, 10667:3
**response** [1] - 10660:6
**responses** [2] - 10672:6, 10672:8
**responsive** [3] - 10666:23, 10671:12, 10672:6
**rest** [4] - 10633:15, 10640:19, 10641:7, 10641:9
**rested** [1] - 10665:22
**restricted** [1] - 10587:3
**restrictions** [1] - 10587:19
**restrictive** [3] - 10605:12, 10659:19, 10659:24
**Rests** [1] - 10675:10
**result** [7] - 10601:15, 10602:1, 10602:4, 10602:15, 10610:1, 10657:6, 10661:7
**resulted** [2] - 10602:6, 10615:23
**results** [2] - 10615:6, 10631:8
**resume** [1] - 10637:17
**retract** [1] - 10625:18
**return** [2] - 10653:2, 10653:7
**returns** [2] - 10637:24, 10653:14
**reveal** [1] - 10635:13
**revenue** [69] - 10588:20, 10600:8, 10600:13, 10600:21, 10601:7, 10601:12, 10601:14, 10603:3, 10603:5, 10603:23, 10604:14, 10604:15, 10605:6, 10605:11, 10606:10, 10608:3, 10621:14, 10621:17, 10621:22, 10622:1, 10622:2, 10622:12, 10622:19, 10623:9, 10624:3, 10624:6, 10624:13, 10624:18, 10624:22, 10625:2, 10625:7, 10625:15, 10625:23, 10626:18, 10626:20, 10626:24, 10627:7, 10627:8, 10627:16, 10627:18, 10647:17, 10647:23, 10647:25, 10648:1, 10648:3, 10648:4,

10651:10, 10651:13,
10652:8, 10652:10,
10652:12, 10652:14,
10652:16, 10654:15,
10654:20, 10654:23,
10655:6, 10655:19,
10655:21, 10655:23,
10656:13, 10656:16,
10658:3, 10659:10,
10659:20, 10659:24,
10660:17
  **reverse** [3] - 10595:11,
10595:16, 10651:21
  **reversed** [2] -
10594:5, 10594:9
  **review** [5] - 10583:18,
10584:25, 10585:6,
10610:21, 10624:15
  **Review** [1] - 10602:19
  **reviewed** [2] -
10583:22, 10626:14
  **reviews** [7] - 10585:1,
10585:7, 10585:13,
10585:19, 10585:22,
10668:9, 10668:10
  **revised** [1] - 10609:20
  **revshare** [1] -
10623:21
  **rival** [40] - 10585:25,
10586:2, 10586:16,
10587:16, 10587:22,
10588:4, 10588:10,
10592:8, 10592:15,
10598:24, 10632:7,
10632:11, 10632:12,
10632:18, 10633:14,
10633:24, 10639:6,
10639:9, 10639:10,
10639:24, 10640:7,
10640:22, 10641:2,
10641:8, 10641:19,
10641:22, 10642:7,
10642:16, 10642:20,
10642:22, 10643:14,
10643:24, 10644:12,
10661:3, 10661:14,
10661:15, 10661:21,
10661:25
  **rivals** [10] - 10589:22,
10603:6, 10632:18,
10639:3, 10639:5,
10640:16, 10641:25,
10651:11, 10659:9,
10661:4
  **rivals'** [2] - 10609:5,
10661:13
  **RMR** [1] - 10581:11
  **road** [4] - 10606:1,
10641:1, 10644:16,
10673:2

  **rolled** [1] - 10614:2
  **rolling** [1] - 10671:8
  **rolls** [1] - 10616:6
  **Room** [2] - 10581:12,
10674:12
  **Rosati** [2] - 10581:4,
10581:8
  **Roszak** [2] - 10636:20,
10636:22
  **roughly** [3] - 10595:2,
10596:20, 10644:12
  **RSA** [2] - 10587:15,
10587:25
  **RSAs** [1] - 10589:17
  **ruled** [2] - 10666:4,
10667:2
  **run** [4] - 10593:25,
10599:13, 10657:13
  **running** [1] - 10669:15
  **Russia** [19] - 10594:1,
10594:2, 10594:5,
10594:12, 10594:13,
10595:4, 10595:10,
10595:15, 10600:22,
10601:1, 10611:18,
10611:19, 10611:22,
10612:3, 10612:7,
10612:15, 10612:17,
10612:19, 10612:21
  **Russian** [4] - 10596:1,
10612:4, 10612:9,
10612:10

# S

  **Safari** [13] - 10596:23,
10597:10, 10597:17,
10598:7, 10598:20,
10598:22, 10598:25,
10599:6, 10599:7,
10599:10, 10599:11,
10620:6, 10657:14
  **safe** [1] - 10662:14
  **sales** [6] - 10596:17,
10654:1, 10654:2,
10654:3, 10655:9
  **Sallet** [2] - 10580:21,
10663:9
  **SALLET** [7] -
10663:10, 10663:18,
10665:17, 10665:23,
10669:10, 10672:16,
10672:24
  **Samsung** [4] -
10584:19, 10585:1,
10596:16, 10635:21
  **San** [1] - 10580:19
  **sat** [1] - 10632:3
  **satisfy** [1] - 10656:2
  **saw** [10] - 10585:7,

10594:10, 10595:21,
10613:16, 10619:14,
10619:19, 10619:22,
10626:19, 10649:14,
10668:13
  **scale** [4] - 10599:18,
10642:3, 10642:11,
10643:7
  **scenarios** [2] -
10637:3, 10637:4
  **schedule** [4] -
10671:20, 10671:22,
10672:13, 10672:19
  **SCHMIDTLEIN** [53] -
10582:4, 10582:7,
10584:3, 10584:5,
10589:24, 10590:1,
10594:16, 10594:17,
10595:19, 10595:25,
10602:5, 10606:12,
10606:15, 10608:21,
10610:19, 10610:20,
10615:3, 10615:4,
10616:12, 10616:16,
10616:21, 10617:11,
10623:6, 10626:13,
10629:6, 10630:17,
10631:6, 10638:1,
10638:16, 10638:22,
10638:23, 10640:6,
10649:11, 10649:19,
10650:9, 10651:3,
10651:8, 10651:9,
10656:11, 10658:14,
10660:2, 10662:17,
10665:9, 10665:19,
10667:9, 10668:5,
10668:9, 10668:16,
10668:20, 10670:16,
10671:4, 10671:18,
10672:25
  **Schmidtlein** [10] -
10581:1, 10582:2,
10608:19, 10626:10,
10638:17, 10638:21,
10654:13, 10658:15,
10666:16, 10671:16
  **Schmidtlein............
10582** [1] - 10675:4
  **scope** [3] - 10638:3,
10640:1, 10660:5
  **score** [1] - 10650:23
  **scores** [2] - 10642:11,
10648:14
  **screen** [73] -
10589:15, 10592:23,
10593:3, 10593:12,
10593:21, 10593:25,
10594:5, 10595:4,
10595:5, 10598:7,

10600:5, 10600:8,
10600:13, 10600:16,
10600:21, 10601:3,
10601:5, 10601:8,
10601:15, 10601:23,
10601:25, 10602:7,
10602:20, 10602:21,
10603:4, 10603:7,
10603:11, 10603:15,
10604:6, 10604:11,
10604:16, 10609:8,
10609:12, 10609:15,
10609:19, 10609:20,
10610:1, 10610:5,
10611:2, 10611:10,
10611:13, 10612:14,
10612:24, 10613:2,
10613:8, 10613:11,
10613:15, 10613:17,
10613:24, 10614:2,
10614:4, 10614:10,
10614:11, 10614:16,
10614:19, 10615:6,
10615:7, 10615:8,
10615:23, 10616:1,
10616:2, 10616:5,
10617:1, 10617:17,
10617:23, 10617:25,
10619:22, 10619:23,
10619:24, 10620:16,
10631:1, 10643:16
  **screens** [5] - 10593:6,
10593:7, 10600:25,
10613:6, 10619:12
  **se** [1] - 10596:21
  **Search** [3] - 10583:3,
10583:7, 10632:5
  **search** [83] -
10582:16, 10582:20,
10582:24, 10583:16,
10584:19, 10585:25,
10586:12, 10586:16,
10587:3, 10587:9,
10587:16, 10587:22,
10588:4, 10588:10,
10589:16, 10590:6,
10590:19, 10591:23,
10592:4, 10592:15,
10592:17, 10597:11,
10597:13, 10597:18,
10597:23, 10598:3,
10598:16, 10598:21,
10599:1, 10599:7,
10599:11, 10599:18,
10600:5, 10600:9,
10600:14, 10602:6,
10602:15, 10602:23,
10603:12, 10603:14,
10604:5, 10604:10,
10604:20, 10605:1,
10606:10, 10607:20,

10694

10608:13, 10609:6,
10609:25, 10613:11,
10614:20, 10614:21,
10614:24, 10620:6,
10620:8, 10620:11,
10620:15, 10621:13,
10621:17, 10621:21,
10623:20, 10628:5,
10629:9, 10631:7,
10631:8, 10631:20,
10632:7, 10632:11,
10634:5, 10640:8,
10640:12, 10645:2,
10645:6, 10651:11,
10652:4, 10654:23,
10656:20, 10657:1,
10657:10, 10658:2,
10658:21, 10661:11
**seat** [1] - 10638:20
**sec** [1] - 10598:5
**second** [15] -
10603:11, 10607:14,
10607:24, 10608:2,
10609:17, 10616:10,
10616:16, 10630:25,
10635:12, 10646:12,
10647:2, 10655:17,
10655:18, 10660:14,
10660:15
**secondary** [2] -
10622:4, 10622:16
**Section** [1] - 10580:22
**securing** [1] - 10657:5
**see** [33] - 10584:16,
10585:9, 10588:8,
10590:7, 10593:22,
10595:11, 10595:22,
10602:9, 10602:24,
10606:24, 10606:25,
10607:1, 10607:2,
10607:7, 10607:22,
10608:9, 10608:15,
10610:13, 10611:7,
10613:24, 10614:5,
10615:10, 10617:14,
10619:20, 10632:24,
10646:10, 10646:24,
10652:2, 10654:5,
10657:17, 10663:20,
10673:20
**seeing** [4] - 10619:16,
10623:4, 10626:21,
10646:19
**segments** [1] -
10663:20
**select** [1] - 10658:21
**selected** [3] -
10598:16, 10601:3,
10613:6
**selecting** [2] -

10599:6, 10599:10
**selection** [2] -
10600:5, 10613:17
**selections** [9] -
10600:21, 10613:11,
10613:15, 10613:24,
10614:16, 10614:19,
10615:7, 10617:20,
10617:23
**sell** [1] - 10586:17
**selling** [1] - 10588:8
**sense** [6] - 10597:7,
10625:12, 10635:1,
10640:25, 10648:5,
10666:24
**sensitive** [1] -
10585:18
**sent** [1] - 10609:1
**sentence** [6] -
10607:2, 10607:7,
10607:12, 10607:14,
10608:2, 10632:10
**separately** [4] -
10636:7, 10645:24,
10646:1, 10646:3
**September** [1] -
10609:21
**serve** [1] - 10648:18
**services** [1] - 10586:7
**set** [7] - 10582:18,
10582:22, 10591:22,
10592:2, 10650:23,
10659:11, 10671:2
**setting** [2] - 10647:25,
10653:12
**settlement** [2] -
10612:3, 10612:4
**setup** [1] - 10586:10
**Seventh** [1] -
10580:23
**several** [5] - 10591:4,
10593:4, 10593:11,
10593:24, 10609:11
**SEVERT** [12] -
10622:22, 10630:14,
10640:1, 10651:1,
10658:17, 10658:19,
10660:5, 10660:10,
10660:13, 10662:8,
10662:10, 10662:20
**Severt...............**
**10658** [1] - 10675:4
**Seznam** [1] - 10614:25
**share** [80] - 10588:21,
10594:1, 10594:4,
10594:12, 10595:8,
10595:13, 10595:17,
10596:11, 10596:18,
10600:8, 10600:13,
10600:21, 10601:7,

10601:12, 10601:14,
10603:3, 10603:5,
10604:14, 10604:15,
10605:6, 10605:11,
10608:3, 10613:15,
10614:10, 10615:7,
10616:17, 10616:20,
10617:7, 10617:8,
10617:20, 10618:5,
10618:15, 10621:14,
10621:17, 10621:22,
10622:2, 10622:12,
10622:19, 10623:9,
10624:3, 10624:6,
10624:13, 10624:18,
10624:22, 10625:3,
10625:8, 10625:15,
10625:23, 10626:18,
10626:20, 10626:24,
10627:7, 10627:8,
10627:16, 10627:18,
10634:2, 10634:11,
10634:17, 10635:15,
10636:12, 10645:14,
10647:23, 10648:1,
10651:10, 10651:14,
10652:8, 10652:10,
10652:12, 10652:14,
10652:16, 10654:15,
10654:20, 10654:23,
10655:6, 10656:13,
10656:16, 10657:6,
10658:3, 10659:20,
10659:25
**shares** [22] - 10590:6,
10593:10, 10593:15,
10593:18, 10594:6,
10594:10, 10596:6,
10596:19, 10613:8,
10613:10, 10613:17,
10613:25, 10614:5,
10614:12, 10622:1,
10647:17, 10647:25,
10648:3, 10648:4,
10659:10, 10660:17
**shelf** [1] - 10630:8
**shift** [4] - 10634:2,
10634:11, 10635:15,
10636:12
**shifted** [1] - 10655:8
**shipped** [1] -
10597:21
**short** [3] - 10593:25,
10599:13, 10657:13
**shot** [1] - 10649:12
**show** [6] - 10602:12,
10617:12, 10617:13,
10626:8, 10656:22,
10666:25
**showed** [13] -

10613:22, 10629:7,
10629:8, 10629:9,
10635:4, 10635:8,
10635:16, 10636:2,
10636:6, 10637:8,
10650:21, 10656:23
**showing** [5] -
10603:20, 10614:7,
10617:15, 10650:15,
10661:23
**shown** [2] - 10607:4,
10656:22
**shows** [2] - 10614:10,
10614:12
**sic** [1] - 10628:18
**side** [1] - 10667:4
**sides** [2] - 10666:17,
10673:5
**sign** [1] - 10670:3
**significant** [4] -
10594:5, 10594:11,
10595:5, 10657:7
**significantly** [1] -
10607:17
**similar** [2] - 10639:13,
10661:8
**similarly** [2] -
10595:15, 10596:17
**single** [7] - 10597:10,
10597:13, 10597:14,
10597:18, 10619:7,
10619:9, 10626:1
**sipping** [1] - 10624:25
**sit** [2] - 10646:7,
10673:4
**sitting** [5] - 10589:5,
10612:20, 10622:13,
10623:3, 10627:21
**situation** [7] -
10588:14, 10588:16,
10592:14, 10595:9,
10644:1, 10660:23,
10664:1
**six** [1] - 10617:1
**slide** [7] - 10646:9,
10648:10, 10648:11,
10650:18, 10656:22,
10660:11, 10660:14
**sliding** [2] - 10642:3,
10642:11
**slight** [1] - 10645:10
**slowly** [1] - 10617:9
**small** [7] - 10595:19,
10595:23, 10607:19,
10613:16, 10635:25,
10636:1, 10645:10
**smart** [1] - 10617:4
**smartphone** [10] -
10582:8, 10582:12,
10591:23, 10591:24,

10695

10592:3, 10595:14, 10596:1, 10596:2, 10596:13, 10596:17
**smartphones** [8] - 10582:15, 10582:19, 10582:23, 10583:8, 10583:15, 10583:18, 10595:15, 10617:9
**someone** [5] - 10601:4, 10632:24, 10643:1, 10645:10, 10652:23
**sometimes** [1] - 10661:2
**somewhat** [1] - 10645:11
**somewhere** [2] - 10629:3, 10646:6
**Sommer** [1] - 10581:4
**Sonsini** [2] - 10581:4, 10581:8
**Sorry** [2] - 10617:18, 10624:24
**sorry** [46] - 10582:21, 10584:13, 10584:23, 10585:16, 10588:15, 10592:1, 10592:6, 10594:7, 10594:23, 10595:13, 10598:1, 10599:8, 10600:23, 10602:3, 10602:22, 10604:8, 10604:22, 10605:24, 10607:6, 10607:12, 10608:5, 10614:12, 10615:14, 10616:9, 10616:16, 10620:10, 10621:15, 10625:17, 10629:23, 10632:9, 10632:16, 10634:19, 10635:11, 10640:3, 10641:16, 10645:16, 10649:9, 10649:15, 10649:24, 10650:3, 10650:17, 10651:4, 10654:13, 10654:22, 10659:22, 10667:25
**sort** [13] - 10599:25, 10633:6, 10636:15, 10642:2, 10645:10, 10645:17, 10646:21, 10646:23, 10647:3, 10650:17, 10651:21, 10655:25, 10666:16
**sound** [1] - 10651:19
**source** [2] - 10594:20, 10606:10
**South** [1] - 10580:15
**specific** [5] - 10600:1, 10620:21, 10633:10,

10633:20, 10663:20
**specifically** [6] - 10622:7, 10623:2, 10623:3, 10627:7, 10630:20, 10653:19
**specifics** [3] - 10583:9, 10584:21, 10584:22
**spend** [2] - 10638:6, 10663:15
**spending** [1] - 10672:16
**spike** [1] - 10650:10
**split** [3] - 10640:11, 10643:12, 10651:22
**splitting** [2] - 10651:17, 10651:20
**spread** [1] - 10655:2
**spring** [2] - 10673:13, 10673:20
**staff** [1] - 10671:5
**standard** [1] - 10648:8
**standpoint** [2] - 10586:24, 10618:11
**start** [16] - 10614:3, 10616:4, 10623:23, 10623:25, 10625:19, 10632:9, 10640:25, 10641:1, 10641:20, 10644:6, 10651:17, 10651:19, 10659:13, 10659:23
**started** [8] - 10587:13, 10609:19, 10634:1, 10648:18, 10649:22, 10649:23, 10649:25, 10650:1
**starting** [1] - 10602:21
**starts** [1] - 10614:4
**StatCounter** [6] - 10590:6, 10593:10, 10593:14, 10594:22, 10615:10, 10616:19
**state** [2] - 10664:8, 10672:24
**State** [1] - 10580:21
**statement** [1] - 10621:8
**statements** [1] - 10613:3
**STATES** [2] - 10580:1, 10580:9
**states** [7] - 10663:6, 10664:7, 10665:21, 10672:3, 10672:5, 10672:7, 10672:9
**States** [18] - 10580:2, 10581:12, 10582:9, 10582:15, 10582:16,

10582:20, 10582:23, 10582:24, 10590:19, 10596:2, 10596:8, 10596:24, 10605:10, 10606:24, 10607:10, 10608:22, 10662:23
**stating** [1] - 10644:22
**statistic** [1] - 10583:13
**statistics** [2] - 10594:18, 10615:12
**stenographic** [1] - 10674:5
**step** [1] - 10637:18
**still** [18] - 10593:23, 10601:7, 10627:4, 10630:3, 10642:25, 10649:1, 10649:3, 10652:22, 10653:16, 10654:5, 10661:9, 10662:5, 10664:13, 10665:11, 10666:10, 10666:20, 10667:2, 10667:5
**stock** [2] - 10617:9, 10654:7
**stop** [1] - 10610:16
**store** [5] - 10628:19, 10628:21, 10630:2, 10630:5, 10630:8
**stores** [1] - 10630:4
**story** [1] - 10649:4
**Street** [2] - 10580:12, 10580:15
**strength** [1] - 10613:14
**strong** [8] - 10614:24, 10633:3, 10639:6, 10641:23, 10641:24, 10641:25, 10642:1, 10642:19
**stronger** [5] - 10592:17, 10611:25, 10612:1, 10632:24, 10661:4
**structure** [1] - 10596:15
**structured** [1] - 10623:5
**studied** [14] - 10582:13, 10596:4, 10596:10, 10596:14, 10596:18, 10596:19, 10596:21, 10597:5, 10601:19, 10612:20, 10615:14, 10630:22, 10631:18
**study** [2] - 10590:15, 10613:5
**studying** [1] - 10625:25

**subject** [2] - 10665:7, 10665:12
**submit** [1] - 10670:5
**subsequent** [1] - 10671:10
**substantial** [6] - 10590:24, 10590:25, 10591:7, 10591:10, 10596:23, 10666:19
**substantially** [2] - 10620:12, 10643:21
**success** [1] - 10653:12
**suffer** [1] - 10662:1
**suggest** [1] - 10643:2
**suggested** [1] - 10650:16
**suggests** [1] - 10647:15
**Suite** [2] - 10580:15, 10580:18
**summary** [1] - 10670:11
**Super** [10] - 10629:11, 10632:16, 10633:24, 10633:25, 10641:3, 10641:23, 10642:20, 10642:21, 10645:13, 10645:17
**super** [1] - 10633:24
**superior** [19] - 10631:8, 10631:20, 10632:5, 10632:12, 10633:14, 10633:15, 10639:24, 10640:8, 10640:22, 10641:2, 10641:5, 10641:6, 10641:8, 10641:19, 10641:22, 10641:25, 10642:16
**superiority** [1] - 10642:3
**supplier** [1] - 10659:16
**supply** [1] - 10669:13
**support** [1] - 10671:5
**supporting** [1] - 10673:8
**suppose** [1] - 10643:11
**supposed** [3] - 10627:6, 10648:24, 10653:19
**supposedly** [2] - 10590:24, 10591:10
**surfaced** [1] - 10634:9
**suspect** [1] - 10673:16
**sustained** [1] - 10622:23
**SW** [1] - 10581:2

10696

**syndication** [1] - 10648:12
**system** [1] - 10644:21

## T

**take-it-or-leave-it** [5] - 10628:1, 10628:6, 10628:8, 10647:21, 10648:5
**talks** [2] - 10630:10, 10630:11
**task** [1] - 10670:22
**team** [2] - 10609:1, 10611:3
**tech** [1] - 10583:18
**Ten** [1] - 10643:10
**ten** [2] - 10643:11
**term** [2] - 10632:16, 10641:23
**terms** [15] - 10610:25, 10616:20, 10618:8, 10618:15, 10619:16, 10621:8, 10622:11, 10626:20, 10627:13, 10630:20, 10638:3, 10639:5, 10642:11, 10668:24
**terrific** [1] - 10668:23
**Terrific** [1] - 10664:14
**test** [1] - 10619:25
**testified** [9] - 10601:24, 10613:23, 10632:7, 10632:11, 10633:7, 10636:20, 10636:24, 10647:12, 10670:5
**testify** [1] - 10642:4
**testifying** [1] - 10660:19
**testimony** [34] - 10584:10, 10584:25, 10585:3, 10585:5, 10585:6, 10590:9, 10593:18, 10598:12, 10598:15, 10602:13, 10603:17, 10606:8, 10606:9, 10610:21, 10610:23, 10611:8, 10619:22, 10621:7, 10633:8, 10645:25, 10646:23, 10649:13, 10651:23, 10652:2, 10652:5, 10656:18, 10656:24, 10658:25, 10663:20, 10665:11, 10666:5, 10666:11, 10666:14
**Thanksgiving** [1] - 10673:19

**THE** [98] - 10580:1, 10580:1, 10580:9, 10582:2, 10584:4, 10595:18, 10595:21, 10602:3, 10606:13, 10606:14, 10608:19, 10616:9, 10616:14, 10616:20, 10616:22, 10616:23, 10622:23, 10626:10, 10629:5, 10630:15, 10631:4, 10631:5, 10637:7, 10637:16, 10637:20, 10637:21, 10637:23, 10638:2, 10638:17, 10638:20, 10640:2, 10640:3, 10640:4, 10640:5, 10649:9, 10649:15, 10649:16, 10649:18, 10650:8, 10651:2, 10651:6, 10652:7, 10652:18, 10652:25, 10653:8, 10654:13, 10654:18, 10654:19, 10654:21, 10654:22, 10654:25, 10655:1, 10655:4, 10658:8, 10658:9, 10658:15, 10660:6, 10662:11, 10662:12, 10662:13, 10662:15, 10662:21, 10663:2, 10663:4, 10663:8, 10663:17, 10664:5, 10664:14, 10664:17, 10665:1, 10665:10, 10665:14, 10665:18, 10665:20, 10665:24, 10667:15, 10667:21, 10668:2, 10668:4, 10668:8, 10668:14, 10668:17, 10668:23, 10669:5, 10669:6, 10669:14, 10669:17, 10669:18, 10669:21, 10669:22, 10669:24, 10669:25, 10670:24, 10671:7, 10671:16, 10671:19, 10672:18, 10673:1
**theoretic** [2] - 10647:23, 10648:1
**theoretically** [1] - 10648:6
**therefore** [1] - 10591:20
**they've** [4] - 10585:24, 10598:15, 10631:18, 10645:4
**thinking** [13] -

10583:20, 10586:20, 10625:10, 10627:22, 10631:15, 10643:19, 10644:6, 10645:11, 10661:5, 10661:16, 10661:19, 10661:21, 10662:6
**thinks** [1] - 10664:3
**third** [10] - 10602:21, 10614:11, 10616:2, 10616:3, 10616:10, 10616:18, 10617:1, 10641:18, 10647:5, 10655:25
**three** [3] - 10655:18, 10662:12, 10667:6
**throw** [1] - 10644:6
**thumb** [2] - 10664:11, 10664:23
**tied** [6] - 10632:22, 10639:7, 10639:9, 10642:5, 10642:8, 10652:12
**today** [18] - 10590:9, 10604:13, 10622:21, 10629:9, 10633:7, 10633:16, 10635:18, 10636:2, 10636:6, 10637:5, 10637:8, 10638:13, 10642:7, 10645:8, 10649:7, 10649:10, 10650:21, 10673:4
**together** [3] - 10629:14, 10629:15, 10670:4
**took** [2] - 10648:25, 10652:3
**tools** [1] - 10647:23
**top** [1] - 10595:20
**topic** [3] - 10658:8, 10660:10, 10664:17
**total** [7] - 10599:7, 10599:11, 10627:25, 10628:1, 10639:4, 10641:18, 10643:17
**totally** [1] - 10636:19
**toward** [1] - 10660:6
**towards** [2] - 10655:8, 10666:12
**track** [1] - 10670:1
**traffic** [5] - 10599:20, 10651:15, 10652:13, 10652:16
**transaction** [1] - 10650:14
**TRANSCRIPT** [1] - 10580:8
**transcript** [2] - 10674:4, 10674:5

**transcripts** [2] - 10664:10, 10664:12
**translate** [1] - 10645:21
**translation** [1] - 10647:24
**travel** [1] - 10630:4
**travels** [1] - 10662:14
**TRIAL** [1] - 10580:8
**trial** [17] - 10621:5, 10621:6, 10634:14, 10637:24, 10656:24, 10663:20, 10666:12, 10666:13, 10667:10, 10667:22, 10668:1, 10670:10, 10671:11, 10671:20, 10671:25, 10672:4, 10673:3
**tried** [7] - 10590:22, 10621:1, 10631:12, 10631:20, 10632:4, 10646:5, 10649:11
**tries** [1] - 10630:18
**true** [4] - 10659:16, 10661:24, 10674:4, 10674:5
**truth** [2] - 10636:15, 10636:17
**try** [5] - 10613:23, 10619:7, 10638:8, 10656:6, 10669:10
**trying** [12] - 10583:9, 10583:20, 10605:25, 10615:15, 10615:16, 10620:25, 10622:13, 10628:24, 10632:20, 10650:5, 10650:7, 10660:21
**turn** [3] - 10646:9, 10648:10, 10673:12
**turns** [1] - 10654:10
**Two** [1] - 10638:8
**two** [20] - 10584:6, 10584:17, 10584:22, 10598:13, 10642:20, 10647:11, 10652:18, 10652:19, 10653:1, 10655:10, 10659:5, 10663:23, 10664:3, 10666:3, 10666:16, 10667:23, 10671:4, 10671:5, 10671:8, 10671:14
**type** [2] - 10646:1, 10646:4
**typically** [2] - 10652:25, 10670:20

## U

**U.S** [26] - 10580:11, 10580:14, 10580:17, 10582:12, 10589:7, 10593:17, 10593:21, 10595:3, 10595:9, 10595:16, 10595:17, 10596:16, 10596:18, 10596:19, 10607:17, 10618:6, 10618:9, 10618:12, 10618:23, 10620:13, 10620:21, 10634:24, 10639:8, 10643:8
**U.S.-only** [1] - 10621:2
**ultimately** [1] - 10638:9
**um-hum** [2] - 10606:13, 10617:21
**unavailable** [1] - 10639:9
**uncertain** [1] - 10653:14
**unconditional** [42] - 10604:14, 10605:11, 10608:3, 10621:13, 10621:17, 10621:22, 10622:2, 10622:19, 10623:9, 10623:18, 10624:3, 10624:6, 10624:13, 10624:17, 10624:22, 10625:2, 10625:7, 10625:15, 10625:22, 10625:23, 10626:17, 10626:24, 10627:3, 10627:8, 10627:16, 10627:18, 10647:16, 10647:17, 10647:25, 10648:2, 10651:10, 10651:13, 10652:8, 10652:10, 10652:12, 10654:15, 10654:20, 10654:23, 10656:13, 10656:16, 10658:2, 10659:10
**unconditionally** [1] - 10622:12
**uncovered** [1] - 10640:19
**under** [8] - 10583:17, 10588:3, 10627:8, 10627:18, 10639:2, 10641:19, 10645:13, 10645:17
**understood** [2] - 10623:8, 10652:9
**uneconomical** [2] - 10657:3, 10657:9
**uninformative** [1] -

10614:13
**uninterested** [1] - 10620:15
**United** [17] - 10581:12, 10582:9, 10582:15, 10582:16, 10582:20, 10582:23, 10582:24, 10590:19, 10596:2, 10596:8, 10596:24, 10605:10, 10606:24, 10607:10, 10608:22, 10662:23
**UNITED** [2] - 10580:1, 10580:9
**united** [1] - 10580:2
**unless** [5] - 10623:21, 10656:4, 10657:1, 10657:7, 10657:15
**up** [43] - 10587:3, 10587:12, 10587:13, 10590:2, 10594:2, 10595:5, 10596:5, 10599:21, 10613:16, 10614:10, 10618:4, 10618:16, 10622:21, 10622:24, 10631:1, 10632:20, 10632:22, 10635:18, 10636:11, 10638:14, 10639:7, 10639:9, 10640:11, 10642:5, 10642:8, 10642:16, 10643:24, 10643:25, 10645:12, 10649:12, 10650:20, 10656:1, 10656:3, 10658:6, 10660:11, 10660:23, 10662:3, 10664:2, 10666:4, 10666:25, 10668:10, 10668:18
**upcoming** [1] - 10670:10
**uptick** [1] - 10617:16
**usage** [20] - 10582:20, 10582:24, 10599:7, 10599:11, 10613:25, 10614:15, 10614:21, 10615:9, 10615:23, 10616:18, 10616:25, 10617:19, 10617:22, 10617:25, 10618:1, 10618:15
**useful** [1] - 10666:9
**user** [3] - 10597:24, 10598:4, 10598:10
**users** [2] - 10620:21, 10631:23

## V

**vaguely** [1] - 10630:22
**varies** [1] - 10617:7
**various** [5] - 10585:13, 10585:14, 10593:4, 10626:15, 10634:16
**verb** [1] - 10657:21
**Verizon** [10] - 10583:21, 10584:14, 10585:1, 10585:2, 10587:2, 10587:8, 10587:9, 10587:15, 10587:17, 10587:21
**Verizon's** [1] - 10587:15
**version** [5] - 10587:4, 10609:11, 10609:19, 10614:11, 10670:19
**versions** [1] - 10609:11
**versus** [16] - 10585:24, 10589:20, 10590:25, 10592:9, 10595:18, 10613:17, 10615:9, 10618:8, 10618:9, 10618:17, 10618:23, 10625:23, 10627:18, 10650:6, 10659:14
**vet** [1] - 10671:21
**viability** [1] - 10608:12
**video** [6] - 10585:9, 10631:1, 10664:12, 10664:22, 10664:24, 10668:13
**videos** [1] - 10663:15
**view** [4] - 10652:1, 10661:1, 10663:18, 10663:19
**viewed** [1] - 10636:15
**views** [1] - 10604:16
**volume** [1] - 10653:2
**voluntary** [1] - 10611:2
**vs** [1] - 10580:5

## W

**wait** [1] - 10673:21
**walked** [1] - 10646:23
**walks** [1] - 10628:21
**warrant** [1] - 10652:14
**Washington** [5] - 10580:5, 10580:12, 10581:2, 10581:13, 10674:13
**Waszmer** [1] - 10581:7
**watching** [1] - 10663:15

**water** [3] - 10594:23, 10624:25, 10637:20
**weak** [1] - 10589:22
**weeks** [5] - 10671:4, 10671:6, 10671:8, 10671:10, 10671:14
**Wendy** [1] - 10581:7
**whereby** [1] - 10584:25
**whichever** [1] - 10657:21
**WHINSTON** [1] - 10582:5
**Whinston** [11] - 10582:8, 10584:6, 10590:3, 10602:13, 10610:21, 10637:19, 10638:24, 10658:20, 10660:15, 10662:11, 10675:3
**Whinston's** [1] - 10660:12
**whole** [5] - 10608:18, 10629:19, 10630:5, 10643:15, 10666:12
**widely** [2] - 10602:20, 10611:1
**WILLIAMS** [1] - 10581:1
**willing** [1] - 10627:2
**Wilson** [2] - 10581:4, 10581:8
**win** [14] - 10603:24, 10641:8, 10641:14, 10641:19, 10642:17, 10644:2, 10644:24, 10646:17, 10651:24, 10653:4, 10653:15, 10660:16, 10661:4, 10661:12
**Windows** [7] - 10598:8, 10624:1, 10624:12, 10644:18, 10644:20, 10644:21, 10644:23
**wins** [1] - 10646:15
**Winter** [1] - 10626:5
**wireless** [5] - 10585:12, 10585:23, 10586:3, 10586:15, 10586:23
**wishes** [1] - 10667:5
**wishful** [1] - 10645:11
**WITNESS** [18] - 10584:4, 10606:14, 10616:23, 10631:5, 10637:20, 10640:3, 10640:5, 10649:15, 10649:18, 10652:18, 10653:8, 10654:18,

10654:21, 10654:25, 10655:4, 10658:9, 10662:12, 10662:15

**witness** [5] - 10637:22, 10664:13, 10668:12, 10669:23, 10675:2

**witnesses** [4] - 10663:23, 10664:10, 10670:5, 10670:7

**won** [5] - 10634:5, 10634:10, 10644:17, 10645:4, 10645:5

**words** [4] - 10616:14, 10616:18, 10652:15, 10671:11

**world** [10] - 10589:19, 10605:10, 10605:13, 10620:22, 10625:11, 10625:14, 10633:13, 10647:1, 10654:15, 10654:22

**worry** [1] - 10631:4

**worse** [2] - 10620:12, 10637:3

**worth** [2] - 10660:25, 10664:3

**wow** [1] - 10660:19

**wrap** [1] - 10638:14

**wrestle** [1] - 10638:12

**write** [3] - 10653:18, 10660:16, 10671:24

**writing** [2] - 10664:19, 10671:23

**written** [6] - 10590:14, 10607:1, 10607:9, 10664:20, 10664:23, 10664:25

**wrote** [2] - 10631:24, 10649:21

**wwaszmer@wsgr. com** [1] - 10581:10

## Y

**Yahoo** [26] - 10583:16, 10583:24, 10583:25, 10586:24, 10587:4, 10587:9, 10587:10, 10609:24, 10611:16, 10619:15, 10630:18, 10630:20, 10630:23, 10631:7, 10631:12, 10645:5, 10645:7, 10648:12, 10648:18, 10648:25, 10649:20, 10650:1, 10650:14

**Yahoo!'s** [3] - 10624:15, 10624:17, 10645:6

**Yandex** [6] - 10594:11, 10611:23, 10611:24, 10611:25, 10612:5, 10641:4

**years** [10] - 10587:25, 10593:4, 10593:16, 10597:9, 10597:12, 10597:17, 10623:13, 10626:15, 10627:14, 10662:1

**yellow** [1] - 10639:16

**yesterday** [5] - 10663:13, 10663:14, 10663:23, 10666:2, 10666:17

**York** [2] - 10581:6, 10581:9

**younger** [1] - 10670:8

## Z

**Zenger** [2] - 10626:4, 10628:2

**zero** [1] - 10628:10

**Zoom** [1] - 10631:2